IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DANA MARLENE BRADLEY, )<br>)<br>   Plaintiff, )<br>)<br>v. )<br>)<br>NEW ENGLAND COMPOUNDING )<br>PHARMACY, INC. D/B/A NEW ENGLAND )<br>COMPOUNDING CENTER )<br>Serve: Gregory Conigliaro, Its Registered Agent )<br>697 Waverly Street )<br>Framingham, MA 01701, )<br>)<br>)<br>MEDICAL SALES MANAGEMENT, INC. )<br>Serve: Secretary of the Commonwealth of )<br>Virginia, Janet Vestal Kelly )<br>Service of Process Department )<br>P.O. Box 2452 )<br>Richmond, VA 23218-2452 )<br>)<br>   and )<br>)<br>BARRY J. CADDEN, )<br>Serve at: 13 Manchester Drive )<br>Wrentham, MA 02093 )<br>)<br>   Defendants. ) | Civil Action No.:_____ |

### COMPLAINT

Dana Marlene Bradley (Mrs. "Bradley"), by counsel, states this Complaint against New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center ("NECC"), Medical Sales Management, Inc. ("MSM"), and Barry J. Cadden ("Cadden") (hereinafter collectively referred to as the "defendants"):

### Preliminary Statement

1. This lawsuit arises from the unnecessary fungal meningitis infection of Mrs. Bradley.

24439/1/6092115v1

**EXHIBIT A**

Mrs. Bradley received a medically prescribed epidural steroid injection on August 29, 2012. The purpose of the injection was to relieve lower back pain associated with scoliosis. Instead of bringing pain relief, the injection brought Mrs. Bradley a prolonged nightmare of extreme physical and mental suffering. The steroid shot, manufactured, advertised and distributed by the defendants, was adulterated and contaminated with fungus or mold bearing pathogens that were injected into her central nervous system along with the immune system suppressing steroid. As the fungus grew inside Mrs. Bradley's spinal fluid, she developed meningitis, severely inflaming the tissues lining her brain and spinal cord. Mrs. Bradley has had to undergo intensive treatment, often its own form of punishment. As a result of the defendants' actions, she spent over four (4) weeks in Roanoke Memorial Hospital, including eleven (11) days in the Intensive Care Unit (ICU), followed by many days in a nursing home. This lawsuit seeks compensation from the defendants for Mrs. Bradley's unnecessary illness and personal injury.

### Parties

2. Mrs. Bradley is a citizen of the Commonwealth of Virginia.

3. NECC is a Massachusetts corporation that maintains its principal place of operations at 697 Waverly Street, in Framingham, Massachusetts.

4. MSM is a Massachusetts corporation that maintains its principal place of operations at 701 Waverly Street, Framingham, Massachusetts.

5. Cadden, who was at all relevant times the responsible pharmacist for NECC, is a Massachusetts resident.

### Jurisdiction and Venue

6. This matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).

8.   A substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

9.   Venue is proper in this Court pursuant to at least 28 U.S.C. § 1391(b)(2).

## Factual Background

### The Defendants' Operations

10.   NECC is jointly owned by Cadden, his wife, Lisa Cadden and her brother, Gregory Conigliaro.

11.   The defendants operated a compounding pharmacy in Framingham, Massachusetts.

12.   Compounding pharmacies engage in mixing (or "compounding") drug products for specific patients, pursuant to a valid prescription.

13.   Because they typically compound drug products in forms that are not commercially available, compounding pharmacies are not regulated by the FDA.

14.   Rather, compounding pharmacies are generally regulated under state law applicable to pharmacies and pharmacists. Although it operates in Massachusetts, NECC must also comply with Virginia law in order to fill prescriptions in Virginia. It must be licensed and registered with the Virginia Board of Pharmacy.

15.   MSM is a separate corporate entity from NECC. Upon information and belief, at all relevant times, MSM served as the marketing arm for New England Compounding, providing marketing and advertising services, promoting the compounding business at medical trade shows nationwide, "cold-calling" potential customers, calling existing customers, and managing NECC's online operations.

16. Cadden is the pharmacist in charge of NECC's operations, and was listed as such in NECC's registration as a nonresident pharmacy in Virginia.

17. As pharmacist in charge, Cadden was at all relevant times personally responsible to ensure that NECC's operations complied with Virginia laws. Va. Code § 54.1-3434.1 (any non-resident pharmacy "*shall designate a pharmacist in charge who is licensed as a pharmacist in Virginia and is responsible for the pharmacy's compliance with this chapter* . . ." (emphasis added).

18. Furthermore, as pharmacist in charge of NECC, Cadden was at all times personally responsible to supervise NECC's operations at its facility in Framingham, Massachusetts. Va. Code § 54.1-3432 ("Every pharmacy shall be under the *personal supervision* of a pharmacist on the premises of the pharmacy.") (emphasis added).

19. The defendants are in the business of compounding and manufacturing medications and drugs, including methylprednisolone acetate. The brand name of this drug, Depo-Medrol, is produced by the FDA-regulated company, Pharmacia & Upjohn Company, a Division of Pfizer, Inc. Other FDA-regulated drug manufacturers produce generic versions of this drug.

20. Rather than producing small quantities of this knock-off Depo-Medrol, NECC produced vast batches of this drug, thousands at a time. It then acted as a wholesale distributor.

21. The defendants compounded and manufactured medications, including methylprednisolone acetate, that were contaminated with fungus, mold and other contaminants.

22. Under Virginia Code § 54.1-3435.01(A), non-resident pharmacies that engage in wholesale distribution of prescription drugs into the Commonwealth of Virginia must register with the Virginia Board of Pharmacy, in addition to registering as a non-resident pharmacy.

23. NECC is and was registered in the Commonwealth of Virginia as a non-resident pharmacy, but is not and was not registered as a wholesale distributor of prescription drugs as required by Virginia Code § 54.1-3435.01(A).

24. Under Virginia law, the compounding pharmacist must ensure compliance with USP-NF standards (United States Pharmacopeial National Formulary). Virginia Code § 54.1-3410.2(E).

25. Pharmacists and pharmacies may not engage in "the regular compounding or the compounding of inordinate amounts of any drug products that are essentially copies of commercially available drug products." Virginia Code § 54.1-3410.2(H)(2).

26. As well as other drugs, the defendants produced methylprednisolone acetate without preservative, which they then sold to clinics, hospitals and other healthcare providers in bulk, packaging the drug in single dosage vials.

27. Such large-scale production of a commercially available drug is illegal under Virginia Code § 54.1-3410.2(H)(2).

28. NECC is not accredited by the Pharmacy Compounding Accreditation Board ("PCAB") or any other similar organization, such as The Joint Commission, that offers independent assurance as to the quality and competence of compounding pharmacies that meet certain requirements.

29. The drug at issue was to be used in epidural steroid injections allowing direct contact with the central nervous system. It was produced from non-sterile ingredients which then had to be rendered sterile as a finished product, thus making the methylprednisolone acetate a high-risk compound. It was also produced without preservatives. Thus, although all drugs should be

produced in a highly sterile environment, these drugs in particular must be. Additionally, sterilization techniques and sterility testing are crucial to properly producing such drugs.

30. However, the defendants purposefully maintained the supposedly sterile NECC pharmacy in an aged building that is surrounded by a waste recycling center owned by one of the co-owners of NECC, Gregory Conigliaro. This facility, called Conigliaro Enterprises, receives many varieties of garbage and waste which are sorted, stored, and manipulated just outside the back door of the NECC facility. A photograph showing the rear wall and backyard of the "pharmacy" is attached as **Exhibit A**.

31. It is difficult to distinguish where NECC ends and the waste recycling center begins, if there is such a distinction in fact; but, the waste facility lists its address as 701 Waverly Street, Framingham, Massachusetts, and operates under the name "Conigliaro Industries." NECC lists its address as 697 Waverly Street. MSM lists its address as 701 Waverly Street, the same as Conigliaro Industries.

32. The conditions in which the defendants produced their products were unsanitary and unsterile. NECC failed to meet basic quality and sterility standards; and it failed to properly test the drugs at issue for sterility prior to releasing them. As a result, thousands of adulterated products manufactured by NECC were then released into the stream of commerce throughout the United States of America, including at least two clinics in the Commonwealth of Virginia.

33. The drug at issue in this case is a steroid which the defendants knew would be injected into patients so as to enter or potentially enter the central nervous system. The defendants also knew that such steroids act as immune-suppressing agents, thus weakening the patient's natural ability fight off pathogens that could possibly be included in the injection. The defendants also knew that the central nervous system is a relatively closed system, making treatment options more

6

difficult in the event of an adulterated invasion. Notwithstanding this knowledge, the defendants chose to operate NECC's facility in the same complex as the waste facility, chose to produce such drugs in bulk batches (making mistakes more likely), chose not to properly sterilize the drugs, and chose not to have the drugs sufficiently tested by an FDA-approved testing facility before release for sale.

Mrs. Bradley's Medical Timeline

34. By Summer of 2012, Mrs. Bradley had for some time been experiencing lower back and lower extremity pain, associated with scoliosis. She was referred by her physician, Dr. Trevar Chapmon, M.D., to Insight Imaging – Roanoke, where she was evaluated for nerve root compression and other issues.

35. After an examination conducted on August 2, 2012, Mrs. Bradley was scheduled for an epidural steroid injection with Insight Imaging.

36. The typical method for receiving such an injection requires radiological facilities that allow the proper placement of the shot in exactly the right place with the assistance of equipment such as a fluoroscope. An anesthesiologist or an interventional radiologist usually performs such a procedure.

37. Mrs. Bradley received the injection at the clinic on or about August 29, 2012.

38. Upon receiving the injection, Mrs. Bradley never experienced any real improvement in her symptoms. To the contrary, within days of the injection, Mrs. Bradley began suffering severe lower back and lower extremity pain.

39. Mrs. Bradley was eventually diagnosed with fungal meningitis, a life-threatening disease, and was admitted to Carilion Roanoke Memorial Hospital on October 7, 2012. She was transferred to the ICU on October 15, 2012 and remained there for 11 days. She was then moved to

the Progressive Unit until she was discharged from the hospital on November 4, 2012. At that point, she was admitted to Raleigh Court Health Care Center, where she remained for almost a month before being discharged to home.

40.   Mrs. Bradley has had to endure intensive and painful treatments, including 8 spinal taps, suffered a stroke and multiple blood clots, spent two weeks in the ICU and weeks in a nursing home, all due to the defendants' tainted drug being injected into her central nervous system.

41.   Mrs. Bradley's fungal meningitis was a direct and proximate result of having methylprednisolone acetate made by the defendants and contaminated with fungus, mold and other contaminants injected into her spinal cavity.

## COUNT I: NEGLIGENCE *PER SE*

42.   The plaintiff hereby incorporates each of the preceding paragraphs as if set forth fully herein.

43.   Virginia Code Section 8.01-221 establishes that a person who is harmed by violation of a statute may recover for such harm.

44.   Virginia law also establishes that:

> . . . the violation of a statute or municipal ordinance adopted for public safety constitutes negligence because the violation is the failure to abide by a particular standard of care prescribed by a legislative body. A party relying on negligence *per se* does not need to establish common law negligence provided the proponent of the doctrine produces evidence supporting a determination that the opposing party violated a statute enacted for public safety, that the proponent belongs to the class of persons for whose benefit the statute was enacted and the harm suffered was of the type against which the statute was designed to protect, and that the statutory violation was a proximate cause of the injury. Halterman v. Radisson Hotel Corp., 259 Va. 171, 176-77, 523 S.E. 2d 823, 825 (2000); Virginia Elec. & Power Co. v. Savoy Constr. Co., 224 Va. 36, 45, 294 S.E. 2d 811, 817 (1982)

Schlimmer v. Poverty Hunt Club, 268 Va. 74, 78-79, 597 S.E.2d 43, 46 (2004) (quotations omitted).

8

45. Virginia Code Sections 54.1-3400 et seq. (collectively known as "The Drug Control Act") are statutes enacted for public safety, in that they protect the public from the release of substandard and otherwise unreasonably dangerous pharmaceutical drugs and medications into the stream of Virginia commerce.

46. As a Virginia resident and consumer of a drug regulated by the Virginia Drug Control Act, Mrs. Bradley belongs to the class of persons for whose benefit those statutes were enacted.

47. A drug is deemed adulterated under Virginia law if it has been produced, prepared, packed, or held under insanitary conditions whereby it has been rendered injurious to health. Va. Code §54.1-3461(A)(2).

48. Additionally, a drug is considered adulterated if it purports to be a drug recognized in an official compendium, but fails to meet the quality or purity standards set forth in the compendium or the federal act. Va. Code §54.1-3461(B).

49. By manufacturing and selling an adulterated drug into the stream of Virginia commerce, the defendants violated Virginia Code §§ 54.1-3457(1), which is part of the Virginia Drug Control Act.

50. By negligently adulterating a drug, the defendants violated Virginia Code §§ 54.1-3457(2), which is part of the Virginia Drug Control Act.

51. By failing to adhere to proper quality control standards in producing the drug given to Mrs. Bradley, the defendants failed to comply with USP-NF standards in violation of Virginia Code § 54.1-3410.2(E).

52. By engaging in the wholesale distribution of prescription drugs in this Commonwealth without a valid unrevoked license to do so issued by the Virginia Board of

9

Pharmacy, the defendants violated Virginia Code § 54.1-3435, which is part of the Virginia Drug Control Act.

53. As pharmacist in charge, defendant Cadden was personally responsible for ensuring that NECC did not violate the provisions of the Virginia Drug Control Act. (Va. Code § 54.1-3432).

54. The defendants' actions violating Va. Code §§ 54.1-3457(1) and (2), 54.1-3410.2(E), and 54.1-3435 directly and proximately caused Mrs. Bradley's fungal meningitis.

55. Death or injury of a patient resulting from consumption of or contact with adulterated drugs belongs to the category of harms against which the Virginia Drug Control Act was designed to protect.

56. Death or injury of a patient resulting from consumption of or contact with adulterated drugs distributed wholesale by an entity engaging in the wholesale distribution of prescription drugs in this Commonwealth without registration belongs to the category of harms against which Virginia Drug Control Act was designed to protect

57. Therefore, because the defendants violated each of the above statutes, Virginia Code § 54.1-3457(1), Virginia Code § 54.1-3457(2) and Virginia Code § 54.1-3435), the defendants' actions and inactions constitute negligence *per se*, and the plaintiff is entitled to recovery of damages for the extreme physical and mental suffering she underwent as a result of that negligence.

## COUNT II: NEGLIGENT MANUFACTURE

58. Plaintiff hereby incorporates each of the preceding paragraphs as if set forth fully herein.

59. The defendants owed a duty to Mrs. Bradley, all other foreseeable users of their products, and the public in general to timely and properly:

    a. operate in a clean and sterile environment with properly functioning equipment;

    b. establish quality control measures;

    c. implement quality control measures;

    d. manufacture uncontaminated products;

    e. obtain representative sterility testing for their products for contamination prior to releasing the products into the stream of commerce; and

    f. refrain from releasing contaminated products into the stream of commerce;

    g. refrain from operating their facility in immediate proximity to a waste recycling center owned and operated by one of NECC's co-owners, and thus causing an inordinately high possibility that their drugs would become contaminated by contact with spores or other contaminants contained in the waste recycling center;

    h. refrain from producing such a high quantity of drugs that implementing proper quality control measures became difficult or impossible; and

    i. refrain from engaging in any other act or omission determined during the course of discovery.

60. The defendants breached the above duties and acted negligently, in at least the following ways, by failing to timely and properly:

    a. operate in a clean and sterile environment with properly functioning equipment;

    b. establish quality control measures;

    c. implement quality control measures;

    d. manufacture uncontaminated products;

    e. quality test their products for contamination prior to releasing the products into the stream of commerce;

    f. refrain from releasing contaminated products into the stream of commerce;

    g. refrain from operating their facility in immediate proximity to a waste recycling center owned and operated by one of NECC's co-owners, and thus causing an inordinately high possibility that their drugs would become contaminated by

24439/1/6092115v1

      contact with spores or other contaminants contained in the waste recycling center;

  h. refrain from producing such a high quantity of drugs that implementing proper quality control measures became difficult or impossible; and

  i. refrain from engaging in any other act or omission determined during the course of discovery.

61. The product methylprednisolone acetate administered to Mrs. Bradley was not reasonably safe at the time it left the defendants' control.

62. At the time the product left the control of the defendants, a feasible and reasonably implementable alternative production practice was available that would have prevented the harm caused to Mrs. Bradley without significantly impairing the usefulness or desirability of the product and without creating equal or greater risk of harm to others.

63. Mrs. Bradley's illness and related suffering occurred as a direct and proximate result of the defendants' breaches of their duties to Mrs. Bradley listed above.

### COUNT III: STRICT LIABILITY

64. The plaintiff hereby incorporates each of the preceding paragraphs as if set out fully herein.

65. The defendants manufactured and sold a product that was inherently dangerous for any human use, particularly those involving introduction of the tainted drug into the central nervous system.

66. The inherently dangerous nature of the product was present at the time the product left the defendants' control.

67. Mrs. Bradley's illness was directly and proximately caused by the introduction of the defendants' inherently dangerous product into her body.

### COUNT IV: NEGLIGENT FAILURE TO WARN

12

68.     The plaintiff hereby incorporates each of the preceding paragraphs as if set forth fully herein.

69.     The defendants were aware that NECC's production quantities exceeded amounts in which they could properly implement necessary quality controls.

70.     The defendants knew or had reason to know that the drug given to Mrs. Bradley was not produced under conditions that could reasonably ensure quality and sterility.

71.     On information and belief, the defendants chose not to obtain independent sterility test results from a representative sampling of the applicable batch of this drug from a third party sterility testing facility as other compounding pharmacies do before releasing such drugs. The size of the batches at issue made any such sampling (if done) representative of the thousands of dosages created.

72.     The defendants knew or had reason to know that compounding medications surrounded by the owner's garbage recycling center would result in increased chances of contaminating such drugs before and during the manufacturing process. These circumstances, while unreasonable and unbelievable under any scenario, further heightened the need to adhere to strict safety, quality, sterility and testing protocols. But, none of this was done. As a result, it was not a matter of "if" adulterated drugs would be produced and sold by NECC, but instead, a matter of when such would occur or when it would occur to such an extent that illness or death resulted. NECC was engaged in what amounted to "Russian-Roulette" with its practices.

73.     Because of their knowledge of those issues, as well as other things, the defendants knew or had reason to know that their product, the methylprednisolone acetate, was dangerous for its intended uses.

74. The defendants had no reason to believe that Mrs. Bradley would realize the dangerous condition of the methylprednisolone acetate.

75. Mrs. Bradley could not possibly have contemplated or anticipated the dangerousness of the defendants' product, as it was contained in a single, unremarkable dosage vial.

76. By engaging in the acts and omissions described above, and by failing to inform the buyers and foreseeable users of the contamination of the methylprednisolone acetate, the defendants failed to exercise reasonable care to inform users of the dangers associated with the product's use.

### COUNT V: GROSS NEGLIGENCE

77. The plaintiff hereby incorporates each of the preceding paragraphs as if set forth fully herein.

78. Each of the foregoing acts and omissions by the defendants went beyond mere thoughtlessness, inadvertence or error of judgment.

79. Such acts and omissions constituted such an utter disregard for the rights of others, and such an utter disregard for prudence, that they amount to complete neglect of the safety of others, including Mrs. Bradley. The defendants' acts and omissions were a heedless and palpable violation of their legal duties respecting the life and rights of Mrs. Bradley. Frazier v. City of Norfolk, 234 Va. 388, 393, 362 S.E.2d 688, 691 (1987).

80. Mrs. Bradley's illness occurred as a direct and proximate result of the defendants' grossly negligent acts and omissions.

### COUNT VI: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

81. The plaintiff hereby incorporates each of the preceding paragraphs as if set forth fully herein.

14

82. The defendants had a duty to buyers and foreseeable users such as Mrs. Bradley to provide a product that was not unreasonably dangerous for the use for which it was intended, and was not unreasonably dangerous for other foreseeable uses.

83. Despite that duty, the methylprednisolone acetate was unreasonably dangerous for the use for which it was intended—epidural injection into the bodies of patients, including Mrs. Bradley—as well as other reasonably foreseeable uses.

84. The methylprednisolone acetate was unreasonably dangerous for the above-stated uses at the time the product left the defendants' hands.

85. The unreasonably dangerous condition of the methylprednisolone acetate directly and proximately caused Mrs. Bradley's fungal meningitis.

### COUNT VII: BREACH OF IMPLIED WARRANTY OF USE FOR A PARTICULAR PURPOSE

86. The plaintiff hereby incorporates each of the preceding paragraphs as if set forth fully herein.

87. The defendants have heavily marketed both NECC itself and the product methylprednisolone acetate at medical trade shows and the like for use in the pain management setting, including but not limited to inclusion in epidural injections for back pain relief.

88. The defendants knew or had reason to know that the intermediate buyer, Insight Imaging, planned to use the methylprednisolone acetate in administering epidural injections to patients.

89. As such, the defendants knew or had reason to know the particular purpose for which the methylprednisolone acetate was purchased.

90. The defendants had reason to know that their skill or judgment was being relied upon to provide appropriate and reasonably safe goods.

24439/1/6092115v1

91. At the time of the sale, the methylprednisolone acetate failed to satisfy the purpose contemplated at the time of sale—to be injected into the central nervous systems of patients such as Mrs. Bradley without causing those patients to suffer unanticipated and unreasonably unsafe side-effects, e.g., fungal meningitis.

92. The failure of the product to satisfy the purpose contemplated at the time of sale proximately caused Mrs. Bradley's fungal meningitis.

<u>**COUNT VIII: MEDICAL NEGLIGENCE**</u>
(defendant Cadden)

93. Plaintiff repeats and re-alleges all allegations contained in the preceding paragraphs as if they were fully set forth herein.

94. As director of pharmacy and licensed pharmacist in charge of NECC's operations, Cadden was at all relevant times acting as NECC's agent and / or principal.

95. Cadden had a duty to Mrs. Bradley and other patients receiving these injections to utilize basic safety and cleanliness standards in the drug manufacturing processes.

96. Cadden had a duty to Mrs. Bradley and other patients receiving these injections to exercise reasonable care to ensure that the drugs NECC manufactured were sterile and were not adulterated.

97. Cadden breached his duties to Mrs. Bradley. He failed to utilize basic safety and cleanliness standards in the drug manufacturing processes, and he failed to exercise reasonable care to ensure that the drugs he and NECC manufactured were sterile and not adulterated.

98. Cadden's breaches of duty to Mrs. Bradley proximately caused Mrs. Bradley's illness.

16

WHEREFORE, Dana M. Bradley, by counsel, moves this Court for judgment against the defendants, jointly and severally, in the amount of $5,000,000 plus taxable costs with pre- and post-verdict interest on all of these amounts, as well as $350,000 in punitive damages.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES.**

DANA M. BRADLEY,

/s/ J. Scott Sexton
By Counsel

J. Scott Sexton, Esq. (VSB No. 29284)
Anthony M. Russell (VSB No. 44505)
Charles H. Smith, III (VSB No. 32891)
Benjamin D. Byrd (VSB No. 76560)
Daniel R. Sullivan, Esq. (VSB No. 81550)
GENTRY LOCKE RAKES & MOORE, LLP
10 Franklin Road, S.E., Suite 800
P. O. Box 40013
Roanoke, Virginia  24022-0013
(540) 983-9300
FAX (540) 983-9400
sexton@gentrylocke.com
russell@gentrylocke.com
smith@gentrylocke.com
byrd@gentrylocke.com
sullivan@gentrylocke.com

*Counsel for Dana M. Bradley*



EXHIBIT A

Copyright © 2012 Gentry Locke Rakes & Moore, LLP
All rights reserved

%JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Dana Marlene Bradley

**DEFENDANTS** New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, Medical Sales Management, Inc. and Barry J. Cadden

(b) County of Residence of First Listed Plaintiff **Roanoke City**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number) 540-983-9300
J. Scott Sexton, Esq. / Gentry Locke Rakes & Moore, LLP
10 Franklin Road SE, Suite 800, Roanoke, VA 24011

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☒ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
29 U.S.C. 1332(a) - Diversity
Brief description of cause:
Injuries caused by tainted steroid

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 5,000,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE 12-13-12
SIGNATURE OF ATTORNEY OF RECORD [signature]

**FOR OFFICE USE ONLY**
RECEIPT # 167648   AMOUNT 350.00   APPLYING IFP _____   JUDGE Wilson   MAG. JUDGE _____

7:12-cv-00606