1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    IN RE:  NEW ENGLAND              )  MDL NO. 13-02419-FDS
     COMPOUNDING                      )
5    PHARMACY CASES LITIGATION        )
                                      )
6                                     )
                                      )
7                                     )
                                      )
8

9

      BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11

                  STATUS CONFERENCE/MOTION HEARING
12

13

14

           John Joseph Moakley United States Courthouse
15                      Courtroom No. 2
                      One Courthouse Way
16                     Boston, MA 02210

17

                         May 14, 2013
18                        2:00 p.m.

19

20

21

22

23              Valerie A. O'Hara, FCRR, RPR
                   Official Court Reporter
24       John Joseph Moakley United States Courthouse
              One Courthouse Way, Room 3204
25                  Boston, MA 02210
                E-mail: vaohara@gmail.com

```
 1   APPEARANCES:

 2   For The Plaintiffs:

 3       Hagens, Berman, Sobol, Shapiro LLP, by THOMAS M.
     SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ATTORNEY,
 4   55 Cambridge Parkway, Suite 301, Cambridge,
     Massachusetts  02142;
 5
         Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ.,
 6   85 Merrimac Street, Suite 500, Boston,
     Massachusetts  02114;
 7
         Robinson & Cole, LLP, KIMBERLY A. DOUGHERTY,
 8   ATTORNEY, One Boston Place, Suite 2500, Boston,
     Massachusetts  02108;
 9
         Lieff, Cabraser, Heimann & Bernstein, LLP, by
10   MARK P. CHALOS, ATTORNEY, One Nashville Place,
     159 Fourth Avenue, North, Suite 1650, Nashville,
11   Tennessee  37219-2423;

12       Andrews Thornton, by ANNE ANDREWS, ATTORNEY, ESQ.,
     2 Corporate Park, Suite 110, Irvine, California 92606;
13
         Brown Rudnick, by DAVID J. MOLTON, ESQ., Seven Times
14   Square, New York, New York 10036;

15       Cohen, Placitella & Roth, P.C., by MICHAEL COREN,
     ESQ., Two Commerce Square, 2001 Market Street, Suite
16   2900, Philadelphia, Pennsylvania  19103;

17       Sugarman, Rogers, Barshak & Cohen, P.C., by ANTHONY
     V. AGUDELO, ESQ., 101 Merrimac Street, 9th Floor,
18   Boston, Massachusetts  02114;

19       Lipton Law, by MARC E. LIPTON, ESQ., 18930 West Ten
     Mile Road, Suite 3000, Southfield, Missouri  48075;
20
         Law Office of Hugo & Associates, MICHAEL R. HUGO,
21   ESQ., 1 Catherine Road, Framingham, Massachusetts
     01701;
22
         Gentry, Locke, Rakes & Moore, LLP, by J. SCOTT
23   SEXTON, ESQ., 10 Franklin Road, S.E., Suite 800
     P. O. Box 40013, Roanoke, Virginia 24022-001
24

25
```

```
1    APPEARANCES (CONTINUED):

2    For the Defendants:

3        Harris Beach PLLC, by FREDERICK H. FERN, ESQ. and,
     JESSICA EICHEL, ATTORNEY, 100 Wall Street, New York,
4    New York  10005;

5        Hinshaw & Culbertson LLP, by DANIEL E. TRANEN, ESQ.,
     28 State Street, 24th Floor, Boston, Massachusetts
6    02109;

7        Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ.,
     1150 Huntington Building, 925 Euclid Avenue, Cleveland,
8    Ohio  44115-1414;

9        Donoghue, Barrett & Singal, P.C., by MICHELLE R.
     PEIRCE, ATTORNEY, ESQ., One Beacon Street, Boston,
10   Massachusetts  02108-3106;

11       Michaels, Ward & Rabinovitz LLP, by DAN RABINOVITZ,
     ESQ., One Beacon Street, Boston, Massachusetts  02108;
12
         Todd & Weld LLP, by HEIDI A. NADEL, ESQ.,
13   28 State Street, 31st Floor, Boston, Massachusetts
     02109;
14
         Duane Morris LLP by MICHAEL R. GOTTFRIED,
15   ESQ., 100 High Street, Suite 2400, Boston, Massachusetts
     02110-1724;
16
         Lawson & Weitzen, LLP, by RYAN A. CIPORKIN, ESQ.,
17   88 Black Falcon Avenue, Boston, Massachusetts  02210;

18       Ulmer & Berne, by JOSEPH P. THOMAS, ESQ., 600 Vine
     Street, Suite 2800  Cincinnati, Ohio  45202;
19
         Curley & Curley P.C., ROBERT A. CURLEY, JR.,
20   ESQ., 27 School Street, Boston, Massachusetts  02108;

21   INTERESTED PARTY:

22       United States Attorney's Office, by ZACHARY A. CUNHA,
     ESQ., Suite 9200, 1 Courthouse Way, Boston,
23   Massachusetts  02210

24   VIA PHONE:

25       Frith & Ellerman Law Firm, P.C., by ROB DEAN, ESQ.,
     P.O. Box 8248, Roanoke, Virginia  24014;
```

```
 1      APPEARANCES (CONTINUED) VIA PHONE:

 2
            ELLIOT L. OLSEN, ESQ., 2950 Radisson Plaza Seven,
 3      45 South 7th Street, Minneapolis, Minnesota  55402-1650;

 4          THOMAS MARTIN, ESQ., 21st Floor, 1845 Walnut Street,
        Philadelphia, Pennsylvania  19103;
 5
            LichtensteinFeinwick, PLC, by JOHN LICHTENSTEIN, ESQ.
 6      and GREG LYONS, ESQ., 101 S. Jefferson Street,
        Suite 400, P.O. Box 601, Roanoke, Virginia 24004-0601;
 7
            Terry Dawes
 8          Patrick Fennell
            Paul Sand
 9          Randy Kinnard
            Wendy Fleishman
10          Melvin Wright
            Elisha Hawk
11          Steve Resnick
            Daniel Clayton
12          Sharon Houston
            Jonathan Nace
13          Brady Rife
            Sean Roth
14          Chris Cain
            Mark Dancer
15          Dan Myers
            Tim Housholder
16          Mary Gidaro
            Robert Sickels
17          Terry Cochran
            Rebecca Blair
18          Alyson Oliver
            Will Riley
19          Mark Zamora
            Regina Phandanouvong
20          John Alexander
            Patrick Montoya
21          Mitchell Toups
            Yvonne Flaherty
22          Jonathan Krohnfeldt
            David Rashid
23          Doug Jones
            Bryan Bleichner
24          Greg Lyons
            Kristi Osterday
25          Robert Dean, George Nolan, John Belcher
            and Nolan Nicely
```

<pre>
 1                        PROCEEDINGS
 2             THE CLERK:  All rise.  Thank you, all.
 3    Please be seated.  Court is now in session in the matter
 4    of in re:  New England Compounding Pharmacy,
 5    Incorporated Products Liability Litigation.  This is
 6    Case Number 13-MD-02419.  Counsel, please note your
 7    appearances for the record.
 8             MS. PARKER:  Good morning, your Honor,
 9    Kristen Johnson Parker for the plaintiffs' steering
10    committee.
11             THE COURT:  Good afternoon.
12             MR. SOBOL:  Good afternoon, your Honor,
13    Tom Sobol for the PSC.
14             MR. CHALOS:  Mark Chalos on behalf of the
15    PSC.
16             MR. LIPTON:  Marc Lipton on behalf of the
17    PSC.
18             MS. DOUGHERTY:  Good afternoon, your Honor,
19    Kim Dougherty on behalf of the PSC.
20             THE COURT:  Good afternoon.
21             MR. SEXTON:  Good afternoon, your Honor,
22    Scott Sexton on behalf of the Roanoke, Virginia
23    plaintiffs.
24             THE COURT:  Good afternoon.
25             MR. MOLTON:  Good afternoon, your Honor,
</pre>

02:01PM (line 10)
02:01PM (line 20)

```
 1    David Molton on behalf of the statutory creditors'
 2    committee.
 3                THE COURT:  Good afternoon.
 4                MS. ANDREWS:  Good afternoon, your Honor,
 5    Anne Andrews creditors' committee, also plaintiffs.
 6                THE COURT:  Good afternoon.
 7                MR. ELLIS:  Rick Ellis, various plaintiffs.
 8                MR. COREN:  Good afternoon, Mike Coren on
 9    behalf of the statutory creditors' committee, co-chair.
10                MR. GOTTFRIED:  Michael Gottfried for the
11    trustee.
12                MS. EICHEL:  Good afternoon, your Honor,
13    Jessica Eichel for the trustee.
14                MR. TUCKER:  Good afternoon, your Honor,
15    Scott Tucker for Ameridose.
16                MS. PEIRCE:  Michelle Peirce, Barry and
17    Lisa Cadden, your Honor.
18                MR. MORIARTY:  Matthew Moriarty for
19    Ameridose.  Good afternoon, your Honor.
20                MS. NADEL:  Good afternoon, your Honor,
21    Heidi Nadel for Doug and Carla Conigliaro.
22                MR. RABINOVITZ:  Dan Rabinovitz on behalf of
23    Medical Sales Management, Inc.  Good afternoon, your
24    Honor.
25                THE COURT:  Good afternoon.
```

1          MR. TRANEN:  Daniel Tranen for NECC.

2          MR. FERN:  Good afternoon, Judge,

3   Frederick Fern for NECC.

4          MR. CUNHA:  Good afternoon, your Honor,

5   Zachary Cunha for nonparty, United States of America.

6          MR. CIPORKIN:  Good afternoon, Ryan Ciporkin

7   for Alaunus Pharmaceuticals.

8          MR. THOMAS:  Joe Thomas, your Honor, on

9   behalf of GDC.

02:03PM  10          MR. CURLEY:  Good afternoon, your Honor,

11   Robert Curley for GDC.

12          THE COURT:  All right.  Good afternoon, and

13   good afternoon to everyone on the telephone.  We have,

14   as I see it, at least three things of some significance,

15   one of great significance that I want to talk about

16   today.  The principal issue is the trustees' motion to

17   transfer and the various related motions for abstention

18   to withdraw the reference to remand and so on.

19          The second issue is the trustees' motion

02:03PM  20   seeking limited relief from the protective order

21   essentially permitting it to cancel Lisa's and whatnot

22   with regard to equipment and property, and the third is

23   the plaintiffs' steering committee's motion to partially

24   lift the discovery protective order to proceed, and we

25   have, of course, other matters, odds and ends and

1    housekeeping matters to address as well.

2           What I propose to do is to try to have an

3    orderly discussion on what I'm going to call for the

4    sake of convenience the trustee's motion to transfer.  I

5    have, I think, read everything.  I have to say given how

6    complicated the docket is, I have something less than

7    100 percent confidence I've read everything, but I think

8    I've read everything, including Judge Wilson's opinion.

9           I was distracted last night by what turned

02:04PM  10   out to be a terrific hockey game.  Roanoke and such

11   parts, you're really missing out, I have to say, just a

12   great game, and I found it more interesting than the

13   bankruptcy code, but I do want to have an orderly

14   discussion of that, if I can.

15          To cut to the chase, I'm not prepared to

16   rule from the bench because I need to think about this

17   some more, although I think I do need to rule with some

18   alacrity.  There are, I think, four attorneys who want

19   to be heard by phone.  What I want to do is to have a

02:05PM  20   discussion first in open court and then permit a brief

21   opportunity for supplemental argument by phone, which,

22   again, I hope none of this is repetitive.

23          I'm not quite sure how to structure this,

24   but I think what I would propose is that we just jump

25   into this, and I should probably hear from counsel for

1   the trustee first, but let me first check with lead

2   counsel and see if there's something else that we ought

3   to do first.

4            Ms. Parker, Mr. Sobol.

5            MS. PARKER:  That's fine with us, your

6   Honor, thank you.

7            MS. EICHEL:  May I argue the motion?

8            THE COURT:  Yes.  Please argue somewhere

9   where there's a microphone so everyone can hear you.

02:06PM 10            MR. FERN:  Judge, if I may, I'd like to

11   introduce Jessica Eichel.  She's an associate in my

12   office.  She'll be arguing the motion on behalf of the

13   trustee.

14            THE COURT:  Are you now representing the

15   trustee?  It's not clear to me, Mr. Fern.

16            MR. FERN:  Judge, there's a motion pending

17   before Judge Boroff for a special appointment.  That has

18   not yet been adjudicated, so I'm working under full

19   authority of the trustee though.

02:06PM 20            THE COURT:  All right, go ahead.

21            MS. EICHEL:  Good afternoon, your Honor, my

22   name is Jessica Eichel.  I'm an attorney at Harris,

23   Beach, proposed counsel for the trustee.

24            The trustee moved to transfer to this

25   district all actions relating to injuries arising from

1    the alleged contamination of the injectable steroid.

2    This is directly on point with this Court's mandate to

3    coordinate the entirety of this litigation and ensure

4    compensation for all plaintiffs in an equitable manner,

5    and in order to do so, we need all cases before this

6    Court.

7              The bulk of the motion is unopposed.  No one

8    disputes that this Court has jurisdiction over cases

9    naming the debtor and all affiliated entities and

02:07PM    10    individuals.

11              Where the dispute lies, in what is called by

12    the plaintiffs' steering committee a narrow subset of

13    cases, those that do not name the debtor or its

14    affiliates, but we would submit, your Honor, that this

15    purportedly narrow subset of cases has the potential to

16    unravel much of what the Court and all of the parties

17    hope to accomplish and what the bankruptcy code was

18    designed for, the efficient and equitable administration

19    of the estate.

02:08PM    20              At the forefront of the argument against

21    transfer are the Roanoke, Virginia plaintiffs

22    represented by the Gentry, Locke firm.  As you mentioned

23    earlier, this past Friday, a Judge in the Western

24    District of Virginia remanded several of these cases to

25    state court.  The trustee stands firm that these and all

1    cases should be transferred because they are related to

2    the bankruptcy case.

3           Notably, Judge Wilson did not come to a

4    decision on "related to" jurisdiction.  He assumed that

5    it existed for the sake of his analysis.  Frankly, the

6    policy considerations that are before this Court are

7    well beyond the jurisdictional considerations that were

8    before Judge Wilson when he issued his decision, whose

9    primary rationale for remand was that the removals were

02:09PM  10   untimely.

11          Indeed, your Honor has a mandate and

12   authority that far exceeds any other court to coordinate

13   all litigation related to the outbreak as the JPML

14   intended with the arsenal of tools provided by

15   bankruptcy code.

16          If I may, I'd like to talk about "related

17   to" jurisdiction.

18          THE COURT:  All right.  Let me, at the risk

19   of stating the obvious, I can't do something just

02:09PM  20   because it's practical or efficient or it makes sense, I

21   have to have jurisdiction, I have to follow these

22   statutes which fit together somewhat less than

23   perfectly, and there are other considerations as well,

24   including economy and respect for state court systems

25   and other considerations, which may be trumped at the

1    end of the day, but I certainly am not free to act with

2    sweeping dictatorial powers, I need to follow the law

3    such as I can figure it out, but go ahead.

4                 MS. EICHEL:  I would agree, and it's our

5    position that under 1334(b), this Court does have

6    "related to" jurisdiction over all cases that are

7    related to the bankruptcy.

8                 THE COURT:  Let me interject the following,

9    and I'm sure I'm getting ahead of your argument, but for

02:10PM  10   the sake of simplicity, let me think of this in terms of

11   a state court action against parties not related to

12   NECC, let's call it a pain clinic, a physician, and the

13   principal concern, as I understand it, not the only

14   concern, but the principal concern are contribution or

15   indemnity claims against NECC, right?

16                MS. EICHEL:  Right.

17                THE COURT:  And the problem, or one of the

18   many problems, is the contribution and indemnity claims

19   come in different flavors, contractual, statutory,

02:11PM  20   common law and may be asserted at different times.  You

21   can assert them as soon as you're sued, or you can wait

22   until there's a judgment against you and assert it.

23                But what is the "parade of horribles"?

24   Suppose I did let things go forward in Roanoke City

25   Court, let's say that there was a large judgment in the

1    future against pain clinic or physician or both and that

2    they then sought indemnity or contribution from NECC,

3    what is the horrible consequence that follows from that?

4    Suppose that is replicated, you know, in other courts,

5    other state courts around the country?

6              In other words, presumably as long as it's

7    still in bankruptcy, those are claims that have to be

8    made in the bankruptcy court, right, there's an

9    automatic stay, you can't just file a third-party

02:11PM  10    complaint I assume at this point against NECC.

11              MS. EICHEL:  Right.

12              THE COURT:  Wouldn't the bankruptcy court

13    have jurisdiction over those contribution or indemnity

14    claims?

15              MS. EICHEL:  Well, one moment.

16              THE COURT:  Or to put it in another way, and

17    bluntly -- I'm sure I'm going to say things that reveal

18    my ignorance -- but let's say you had a $50 million

19    judgment against a pain clinic in Roanoke and they make

02:12PM  20    a claim for indemnity, and the bankruptcy court says

21    that's very interesting, you know, we're paying out

22    $1500 on each indemnity claim, that's all we have, or

23    you get zero because you're too late, you filed past our

24    deadline.

25              MS. EICHEL:  Right.

1          THE COURT:  I just want to make sure I

2   understand what the consequences are if I don't do what

3   you're asking me to do.

4          MS. EICHEL:  Well, of course, the primary

5   concern here are remuneration for the plaintiffs, but

6   what's going to happen is that by its very nature

7   personal injury claims are -- you can't predict the

8   outcome of what's going to happen, and it's very likely

9   that these plaintiffs will get large verdicts against

02:13PM 10   their healthcare providers and other nondebtors in their

11   state court cases.

12          THE COURT:  All right.

13          MS. EICHEL:  While that's going on, while

14   that litigation is going on, these defendants are going

15   to be litigating the same issues in many forums all over

16   the country.

17          THE COURT:  There's a discovery issue which

18   I want to get to, in other words --

19          MS. EICHEL:  Sure.

02:13PM 20          THE COURT:  -- having multiple competing

21   demands for discovery, which is important, but I want to

22   focus now on contribution and indemnity.  In other

23   words, wouldn't the pain clinic have a strong incentive

24   to try to bring a third-party claim of some sort in the

25   bankruptcy court or wherever you bring it now, in other

1    words, not to wait, whatever hope they have of

2    contribution indemnity, they need to assert that claim

3    now?

4              MS. EICHEL:  We expect that they will, for

5    example, InSight Health Corp. has already asserted in

6    many different avenues that it intends to bring a claim

7    against the estate, but where a plaintiff -- what we

8    have to be concerned with, your Honor, is that these

9    defendants are going to get out in front of the

02:14PM    10    plaintiffs.

11              We have a limited estate, as we know.

12    There's limited resources, and there are multiple

13    parties already asserting claims or that intend to

14    assert claims.  We know of 180 approximately plaintiffs

15    that already have filed claims in the MDL, cases in the

16    MDL, and there are several other claims that we're aware

17    of to date, but then you have these claims for

18    contribution indemnification that are potentially in the

19    millions of dollars, and so what's going to happen is

02:14PM    20    that these defendants are going to come into the estate

21    and make claims against it and try to get around the

22    plaintiffs and interfere with the process, which is to

23    keep these cases coordinated, to keep them together and

24    to fairly and equitably treat all creditors of NECC.

25              THE COURT:  All right.  But at the end of

1  the day, doesn't the bankruptcy court manage that

2  process?  In other words, wouldn't the bankruptcy court,

3  or for this court, depending on how it plays out --

4          MS. EICHEL:  Right.

5          THE COURT:  -- be in charge of that process

6  at the end of the day?  In other words, you could come

7  in with your $50 million judgment, but you're just

8  another unsecured creditor, aren't you?

9          Couldn't the bankruptcy court say that's

02:15PM  10  very interesting, you know, get in line behind everybody

11  else, and, by the way, the injured plaintiffs come

12  first?  I'm having trouble sorting this out in my mind

13  exactly how this would work.

14          MS. EICHEL:  I think it's difficult trying

15  to predict what is going to happen.  Right now we're

16  still working, and the trustee is still working on

17  creating a plan that's fair to all claimants, and so

18  it's difficult to predict exactly how it's going to

19  work.

02:16PM  20          What we're most concerned with is that right

21  now we have 20 or so actions in Virginia that involve

22  these nondebtor entities.  If they have a path, the

23  plaintiffs have a path to bring state court actions

24  against those entities, we're going to have cases all

25  over the country involving those nondebtor healthcare

1    providers.

2                THE COURT:  But, again, doesn't it intersect

3    in two ways with this case?  Discovery, in other words,

4    we don't want the same people deposed 30 times.  If

5    nothing else, to manage the resources of the estate, so

6    there's a discovery issue there, and there's this

7    contribution and indemnity issue.

8                Is there another issue?  I think your

9    pleadings referred to the idea that NECC might itself

02:17PM  10   have indemnity claims anyway against some other

11   entities.  It's not clear to me whether they would have

12   any against any of these pain clinics or physicians, but

13   is that the whole universe of how it would intersect

14   with this proceeding?

15               In other words, suppose I had a way to

16   manage discovery so we didn't have multiple depositions.

17               MS. EICHEL:  Right.

18               THE COURT:  Maybe I don't.  I don't know,

19   I'm just thinking out loud, and we have the contribution

02:17PM  20   indemnity issue.  Is there something else I would need

21   to be concerned about?  I mean, at the end of the day,

22   these pain clinics may not have any source for

23   contribution indemnity.  They may be out of luck, and it

24   may be unfair to them, but is that my concern?

25               MS. EICHEL:  I think every potential

 1   creditor is a concern of this Court.  While the

 2   plaintiffs that we know of are at the foremost concern

 3   of the MDL, the bankruptcy estate is going to be created

 4   to treat all creditors fairly and equitably, and so

 5   we're asking for more by allowing these cases to proceed

 6   separately, we're going to have more claims for

 7   contribution and indemnification and more entities that

 8   are able to assert claims against the estate, which

 9   would necessarily deplete it.

02:18PM   10          THE COURT:  I guess that's what I'm

11   struggling with.  Why would it necessarily deplete it?

12   Do all these claims have to be made pro rata in the

13   bankruptcy court?  Does the law require that?  In other

14   words, if you have a $50 million judgment and you're

15   seeking indemnity or contribution, does that mean you

16   have 50 times the rights of a $1 million creditor?  Is

17   that automatic?

18          Could the bankruptcy court say, for example,

19   you know, we have this limited fund, here's what we're

02:19PM   20   going to do, every death case gets this much, this kind

21   of illness gets this much, and whatever is left over,

22   you know, it's going to get split among, you know,

23   whatever creditors remain.  I thought they had sweeping

24   powers to manage the estate.

25          MS. EICHEL:  Right.

1          THE COURT:  And I'm sure I can be wrong on

2     that, I probably am wrong, but it's just not clear to me

3     why this mega judgment against a pain clinic in Virginia

4     necessarily fouls up the bankruptcy plan as opposed to

5     just being a piece of paper that's like any other piece

6     of paper where --

7          MS. EICHEL:  Right.

8          THE COURT:  -- you know, the bankruptcy

9     court takes it into consideration and in effect says get

10    in line with everyone else.

11         MS. EICHEL:  Sure.  Well, you know, at this

12    point, the trustee has not yet formulated a plan, and

13    that's obviously the goal, so I think it's really

14    difficult to predict how exactly this is going to work,

15    but if your Honor had control over all of these cases,

16    then the overriding goals of the bankruptcy and

17    maintaining the estate, the resources of the estate so

18    that ultimately there's as much money as possible for

19    the claimants is the best way to avoid letting this

20    really run amuck because we're going to have all of

21    these state court actions and all of these potential

22    claims that are going to be filed against NECC.

23         THE COURT:  I want you to get back on track

24    with your argument, but let me ask another question.  Is

25    there any way that I could control discovery if I do

02:19PM (line 10)

02:20PM (line 20)

1    what the plaintiffs' steering committee suggests, which

2    is to deny these without prejudice and let it play out?

3    In other words, you know, someone in a case in Roanoke

4    wants to take the deposition of somebody at NECC or, you

5    know, demand documents or whatever, do I have the power

6    in any way to control that?

7            MS. EICHEL:  I think that suggestion is

8    really concerning because if you don't take jurisdiction

9    over these cases, even if temporarily, we see how it all

02:21PM  10    plays out, it's creating a road map for all these other

11    cases to go forward, and the overriding goal is to

12    centralize.  That's what the JPML wanted this Court to

13    do by creating the MDL to only go through these

14    discovery issues one time in one court through one

15    overseer of the entirety of the action.

16            THE COURT:  Suppose I took, I swept in

17    everything, as the trustee suggests, could I sever or

18    spin things out?  In other words, could I issue some

19    orders to manage the process, for example, let's say I

02:22PM  20    now have jurisdiction over every case everywhere in the

21    country and I set some process for filing contribution

22    indemnity claims, set some procedures for discovery and

23    then spin it back, sever it and spin it back out, would

24    that be a sensible solution?  I'm thinking out loud.  I

25    have no idea.

1          MS. EICHEL:  No, I understand.  I think that

2     there's potential for that.  It's not something that's

3     been briefed, and I think it's something that we'd have

4     to look into, what the most practical way of doing this

5     is as long as the overriding goal continues to be that

6     the litigation is coordinated and that we're not

7     needlessly conducting discovery in many different fora

8     over and over again, so, you know, I can't really speak

9     to what the potential opportunities are for you.

02:23PM  10          I think that you have to exercise

11     jurisdiction over these cases so it's firmly within your

12     hands how these cases go forward and so that we can work

13     with the trustee and all the creditors to effectuate an

14     equitable plan.

15          THE COURT:  All right.  I think I

16     interrupted you about 15 minutes ago.  I'm going to let

17     you get back on track.

18          MS. EICHEL:  It's not a problem.  I did want

19     to get into a "related to" jurisdiction analysis, and it

02:23PM  20     hits on some of what we've discussed.  1334(b), as I

21     mentioned, gives this Court jurisdiction over all cases

22     that are related to the bankruptcy, and the trustee

23     argues that this Court should not stop a transfer of

24     cases against the debtor, it should extend its

25     jurisdiction to all cases that impact the estate because

1       of the overriding policy to formulate and conform a

2       Chapter 11 plan that treats all claimants equitably.

3               We look at it that the number of

4       contribution claims that will inevitably be filed

5       certainly if the Gentry, Locke plaintiffs are allowed to

6       proceed, it's going to lead to a multitude of other

7       cases filed in state courts against the nondebtor

8       entities.  That would render the whole plan futile.

9               We know that the healthcare providers and

02:24PM   10    the other nondebtor entities are planning to file claims

11      for indemnification and contribution.  Even if we just

12      look at the InSight Health Corp. defendant, they've

13      taken multiple measures to try to assert those claims

14      against the estate.

15              THE COURT:  Am I right that those claims

16      have to be asserted at this point in the bankruptcy

17      court, in other words, because they couldn't file a

18      third-party complaint because of the automatic stay?

19              MS. EICHEL:  At this time, what they did was

02:25PM   20    they -- first they demurred.  In Virginia, that's a

21      motion to dismiss.  They also removed the cases

22      obviously, as you know, under 1452, and then they also

23      attempted to implead the debtor as a necessary and

24      indispensable party.

25              In Virginia, those claims are considered

1   ripe, so they could potentially assert a claim in the

2   bankruptcy, but, again, that's somewhat premature

3   because the claims process and the deadlines haven't yet

4   been set, and those details haven't been worked out.

5          What's important when you're thinking about

6   "related to" jurisdiction is what the Sixth Circuit did

7   in Dow Corning.  There they found that the Court had

8   "related to" jurisdiction over the unasserted claims for

9   contribution indemnification because of its impact on

02:26PM  10   the estate.  There, the defendants had used the same

11   product that were originating with the debtor, and the

12   Court held that there was a unity of the defendants

13   there that we would argue exists here.

14          The defense of any claims by these

15   nondebtors will have to involve NECC.  It all leads back

16   to what NECC did or did not do.  They're going to derive

17   from the same facts.  In order to prosecute and defend

18   those cases, they'll need discovery from the estate, and

19   what we fear will happen is we're going to have

02:27PM  20   to -- NECC and the estate is not going to be in your

21   control, it's going to be in the control of state court

22   judges around the country.

23          We already know of this coming up in

24   Virginia, but we're aware of other jurisdictions,

25   Tennessee, Alabama, Minnesota, Michigan where this same

1    thing is going to happen, and what's happening now is

2    that the Roanoke plaintiffs are creating somewhat of a

3    road map for these other plaintiffs to follow.

4           And it really will cause the -- what's

5    happening in this courtroom to implode because your

6    control and what the JPML mandate was, which to

7    coordinate these actions, it's going to be impossible to

8    do so.  It's unimaginable how that would work.

9           I also, your Honor, want to point out that

02:28PM   10    several of those Roanoke plaintiffs are actually before

11    this Court because they filed actions in the MDL.  They

12    filed the actions against NECC, and those cases were

13    transferred to the MDL, and then when NECC filed for

14    bankruptcy, they brought these actions in state court

15    against the nondebtor entities, the healthcare providers

16    and so on.

17           It doesn't seem possible how they can argue

18    how those two actions which derive from the same

19    injuries are not related to one another.  They are state

02:29PM   20    court actions that necessarily are going to run into the

21    issues that we're dealing with here.

22           THE COURT:  Let me interject again.  How

23    would this play out?  Let's suppose that we had a plan

24    from the bankruptcy court, it's approved, the matter is

25    closed.  Other litigation against other -- would other

1    litigation, again, like the pain clinic, would that be

2    spun out?  In other words, let's say three years from

3    now everything is in place but all these actions still

4    exist.  Under the MDL, whatever, I'm supposed to spin

5    those cases back to their home jurisdictions if there's

6    anything left to be litigated.

7            If there's a claim against a pain clinic,

8    wouldn't that go back to Roanoke to be tried against the

9    pain clinic?  If the pain clinic then had a claim for

02:30PM  10   contribution indemnity, what would happen?  Wouldn't it

11   just be out of luck, again, getting back to my

12   hypothetical $50 million verdict?  Wouldn't it just be

13   stuck at that point?

14           MS. EICHEL:  First of all, we're not really

15   just dealing with an MDL in the traditional sense,

16   there's also a bankruptcy.

17           THE COURT:  Right.

18           MS. EICHEL:  And for as long as those other

19   actions are going on and being litigated, the bankruptcy

02:30PM  20   plan can't be finalized and closed.

21           THE COURT:  I guess I'm saying those actions

22   are going to exist regardless.  I mean, a plaintiff in

23   Roanoke could make the rational decision that I'm more

24   likely to get more money from the pain clinic and its

25   insurers than I'm going to get from this quagmire, and I

1    can't take that claim away from them entirely unless the

2    pain clinic is somehow in bankruptcy in my court, right?

3                MS. EICHEL:  Right.

4                THE COURT:  I mean, they've got a Seventh

5    Amendment jury trial right and they have the right to

6    pursue that claim, so if they don't give up, they may

7    pursue it eventually.  What happens if I take that case,

8    again, we resolve everything at the bankruptcy as to

9    NECC and its affiliates, we now have these claims

02:31PM  10   remaining against pain clinics and physicians and

11    whatnot, I spin those all back out, they go to judgment,

12    what happens to their contribution indemnity claims,

13    they're just out of luck at that point, right, they got

14    what they got out of the bankruptcy estate if there's a

15    fund, and that's it, right?

16                MS. EICHEL:  I think that that is a possible

17    scenario, that they would be left without any available

18    remedies, but I think it's important when we do this

19    analysis to think about the broader issues at stake

02:31PM  20   here, which are that these aren't a few health care

21    providers that are going to have these claims or a few

22    plaintiffs that are raising these issues, this is really

23    every single plaintiff in this action, so the bankruptcy

24    plan really can't be formulated without all of those

25    actions being brought here and centralized.

1           I would just say that the claims process,

2    that the claims process basically will crumble because

3    we'll be waiting to see what's happening with these

4    claims for contribution and indemnification, and we

5    won't be able to pay out until we know what is -- who is

6    try to recover from the estate.  We won't have all of

7    the claimants before us while these other actions are

8    being litigated.

9           THE COURT:  Well, that's, again, what I'm

02:33PM   10   struggling with.  In other words, suppose instead this

11   court, the bankruptcy court, said, you know, here we set

12   a deadline, maybe the deadline is in 2015, but there's a

13   deadline.  If you have a claim, you have to file it.  If

14   it's a claim for contribution indemnity, file it.  If

15   you're a pain clinic in Tennessee, you have a pretty

16   strong incentive, I think, to get that claim on file,

17   and like any other bankruptcy estate, you know, we have

18   a deadline, you file your claim, and either you file it

19   or you don't, and if you don't, then the obligation is

02:33PM   20   discharged, right?

21           MS. EICHEL:  You know, the outcome of what

22   happens I think is less important than what's happening

23   while this is all going on because while we can talk

24   about the claims against the healthcare providers and

25   the distributors in a vacuum and what those actions will

1    look like, they can't be litigated without considering

2    NECC, which will lead to discovery.

3              THE COURT:  Let's talk about that.  And I

4    may want post-argument briefing on this.  Do I have any

5    way at all to manage that discovery process without

6    taking jurisdiction over those cases?  Do I have any

7    authority at all to limit and regulate and ride herd

8    over discovery requests as to NECC and its affiliates

9    and related individuals unless I have jurisdiction over

02:34PM  10   those cases?  I don't know the answer to that.

11             MS. EICHEL:  I don't think that you do.  I

12   don't see how you can control what's happening in a

13   state court action in Virginia or elsewhere.  Those

14   judges are going to control those cases, and they're not

15   concerned with the broader mandate that we have here,

16   which is to:  1, litigate all claims that arise from

17   injuries related to the injectable steroid; and, 2, to

18   fairly and equitably to allow these claimants to

19   recover, to create a plan that's fair and equitable that

02:35PM  20   counts for everybody.

21             So, you know, I think that might warrant

22   further briefing, if that's what you ultimately decide,

23   but I would say that at this point it's better for you

24   to take jurisdiction and figure out how we can

25   potentially, if necessary, spin some of these issues off

1   than for you to relinquish jurisdiction, and then it's a

2   free-for-all.

3            THE COURT:  Well, I guess that's exactly the

4   issue I'm trying to figure out, and I have some natural

5   caution here to reach out and grab everything.  I mean,

6   at the end of the day, I may do that.  It may be the

7   best of a lot of bad alternatives, but, again, there are

8   countervailing considerations.  I do want to be

9   respectful to state court processes and not to violate

02:36PM  10   any of the relevant statutes.

11            If I took control of the state court cases

12   and issued orders in them and then spun them back out,

13   it's not clear that those orders would continue to be

14   valid or that they couldn't be modified by a state

15   judge, on the other hand, I assume someone from Virginia

16   can't just take a deposition in a Virginia state action

17   in Massachusetts, you need to get process, right, you'd

18   have to go into state court or something.  That may be a

19   hook there.  Maybe we could work something out that way

02:37PM  20   that all state discovery be coordinated through -- I'm

21   not sure how it would work.  I certainly share the

22   concern about multiple discovery requests.  I think that

23   is a genuine issue that needs to be addressed somehow.

24            MS. EICHEL:  If I may, your Honor.

25            THE COURT:  Yes.

1          MS. EICHEL:  I think it's also important to

2    think about why these actions were filed in state court,

3    and it seems clear to me that they were trying to fort

4    this Court's jurisdiction, to stay out of the

5    bankruptcy, but the bankruptcy is there to protect all

6    creditors of the estate, and it's really just an end run

7    around this Court's jurisdiction and getting out in

8    front of all these other plaintiffs.

9          If you're going to question whether you have

02:38PM  10   jurisdiction or whether state court cases, state courts

11   can deal with these issues independently, I would say

12   that the only way you can effectively manage it is to

13   retain jurisdiction over all of these actions, which is

14   consistent with what the JPML gave you the mandate to

15   do, and it's consistent with the arsenal of tools that

16   the bankruptcy code provides.

17          THE COURT:  So getting back to you say I

18   have an obligation or the bankruptcy court has the

19   obligation to protect the creditors.  In this case, you

02:38PM  20   would include the pain clinics or the physicians as

21   creditors in that analysis, is that the idea?  In other

22   words, if they are contribution and indemnity creditors,

23   they're creditors, nonetheless?  Does it make a

24   difference whether they are potential claimants as

25   opposed to actual claimants?  Does that make any

1    difference in this context?

2            MS. EICHEL:  They're potential, but we know

3    that they exist and that they're going to be asserted,

4    so there's really no difference between those.

5            Do we -- I think you're asking if we really

6    are concerned with whether at the end of the day those

7    pain clinics pay out to these plaintiffs and are not

8    able to recover?  You know what, and it's a good

9    question, I just -- I don't think that we can really

02:39PM  10   begin to figure it out because it's -- there's just too

11   much at stake.  There's too many cases, too many

12   plaintiffs that are going to bring these claims.

13   There's too many other parties that are going to be

14   subject to other court's jurisdiction, and they're going

15   to be out of pocket potentially rightfully, potentially

16   they do have or should have an opportunity to recover as

17   well.

18           I think in answer to your question, the

19   foremost concern of I would think everybody here are the

02:40PM  20   injured parties.

21           THE COURT:  I agree with that.  All right.

22   Go on.  At the end of the day, you may be right.  I may

23   agree with you.  I'm struggling with that, obviously.

24   Maybe this means I don't have the right Federal Judge

25   attitude, that I'm pausing before taking over every

1    single problem, state and federal, in the United States.

2    Maybe the full weight of the robe hasn't fallen on my

3    shoulders yet, but I do think I need to pause and think

4    this through.

5              There are lots of countervailing

6    considerations, and I want to make sure I'm not doing

7    more harm than good if I go down this path, that this is

8    sensible, and I'm being fair to everyone.  Obviously

9    injured parties are an important part of it, but they're

02:41PM  10    not the only part of it.

11              MS. EICHEL:  Well, you know, I'll leave you

12    then with a thought about centralization.

13    Centralization of this litigation is critical for the

14    efficient and expeditious resolution of this case, and

15    the trustee's making every effort to efficiently and

16    fairly compensate the creditors, and from that

17    perspective, the only chance at any kind of global

18    resolution is to use the powers afforded to you by

19    Congress, by the JPML and to transfer all these cases to

02:42PM  20    this court.

21              THE COURT:  All right.  Thank you.  I think

22    what I'd like to do next is hear from the steering

23    committee and then maybe from -- Mr. Sexton, are you

24    going to take the lead on the Roanoke piece of this?  Is

25    that the plan?

1          MR. SEXTON:  Yes, your Honor.

2          MR. MOLTON:  Your Honor, David Molton for

3     the creditors' committee.

4          THE COURT:  Yes.

5          MR. MOLTON:  I was just thinking because we

6     joined in the motion that we'd maybe go next, and maybe

7     I could answer some of your questions.

8          THE COURT:  Ms. Parker, do you have a

9     problem with that?

02:42PM   10          MS. PARKER:  No, your Honor.

11          THE COURT:  Go ahead.

12          MR. MOLTON:  Judge, David Molton for the

13     statutory creditors' committee, and I'm glad I brought

14     my bankruptcy code with me.  In any event --

15          THE COURT:  Are you going to read from it?

16          MR. MOLTON:  No, Judge.

17          THE COURT:  I have a tape of the hockey

18     game.

19          MR. MOLTON:  I was glad I had it because a

02:43PM   20     number of your questions caused me to open the book.  I

21     think I can, first of all, answer a few of your

22     questions by reference to the bankruptcy and the

23     bankruptcy code.  First of all, the creditors'

24     committee, as you know, is a statutory committee

25     invested with power to represent all the creditors, and

1    that includes at this point not only the plaintiffs in

2    this MDL but also all the infected folks, 700 plus,

3    possibly the 13,000 who received the tainted MPA

4    steroid, and one of the things we don't want to do, and

5    the trustee joins me on this, is create new creditors

6    for us to represent, which would be indemnity and

7    contribution creditors, so we're supporting the

8    trustee's motion, and that motion has to be read in

9    context, your Honor, with the trustee's stated goal,

02:44PM  10    which he's told you a number of times, which is what he

11    wants to do is bring everybody here together in front of

12    your Honor and devise a plan using the bankruptcy tools

13    to get all parties, all potentially liable parties,

14    whether it be through a mediation process, through

15    discussions, whatever, to contribute to a pot in the

16    bankruptcy, for which those people, including the pain

17    clinics in the states, would release their indemnity

18    claims and contribution claims against the estate in

19    return for plan releases.

02:44PM  20            That's why they are incented to come here

21    and deal with the trustee in accordance with his global

22    plan, and he believes and we believe that getting

23    everybody here is a significant step in that direction.

24            I know your Honor read all the papers.  I

25    know the trustee cited many times the Twin Labs case and

1    the Metabolife case.  That's what happened there.

2            THE COURT:  We do have cases pointing in the

3    other direction, the Third Circuit.

4            MR. MOLTON:  And I'm going to get to that,

5    I'm just going to add some things.  But the "parade of

6    horribles," your Honor, that you asked about is simply

7    this:  Is there plaintiffs in jurisdictions or with

8    defendants, all of who have claims against the debtor,

9    they have asserted or may have potential claims against

02:45PM  10  various non-debtors, some of them may have a lot of

11   money, some of them may not have a lot of money.  Some

12   of them may have big policies, others of them may have

13   no policies.

14           In any event, what I think my friend from

15   Harris, Beach was trying to say is that if there is a

16   major judgment against one of these state third parties,

17   that party then has a liquidated claim for indemnity and

18   contribution, forget about whether they'll be an

19   objection, whether it should be allowed or not, that's

02:46PM  20  separate litigation, but that claim is filed in the

21   bankruptcy, and they rank *pari passu* with the victims.

22   They're all unsecured creditors, there's no priority,

23   and I think that answers one of your questions, your

24   Honor.

25           THE COURT:  And it has to be that way?

1          MR. MOLTON:  It has to be that way pursuant

2     to the code, and I'd refer you to 502 of the code,

3     Section 502 of the code.

4          Now, the bottom line is that any time from

5     here, there's 362, Section 362 of the bankruptcy stay,

6     so none of these third parties can crossclaim for

7     indemnification unless they get a vacator of that stay

8     by the bankruptcy judge, or they can't file an

9     independent suit, but what they can do, even now, and

02:46PM  10     they will do the bar date, and there's going to be a bar

11     date at some period of time in the bankruptcy, they will

12     have to file at that point a contingent indemnification

13     and contribution claim in the bankruptcy.  That is a

14     valid claim.

15          Section 101 of the bankruptcy code defines

16     claim to include "all contingent claims."  That claim

17     then ranks on the same level with the contingent claims

18     of the victims, and that's what the trustee is trying to

19     avoid, and you're right, your Honor, at the end of the

02:47PM  20     day, if there's a plan confirmed and those claims are

21     still contingent, they're disallowed, right, so that was

22     one of your questions, what happens at the end of the

23     day when if these claims aren't -- and remind me about

24     attorneys' fees because that's a different issue --

25          THE COURT:  I'm sure none of us care about

1    attorneys' fees.

2             MR. MOLTON:   -- and then liability.  I'm

3    talking about defense costs, but the code provides for

4    that, and, you know what, these third parties who have

5    contingent indemnification or contribution claims in the

6    bankruptcy aided by capable bankruptcy counsel aren't

7    going to sit and wait until a plan is confirmed.

8             First of all, they're going to be part of

9    that plan process, they're going to scream and yell and

02:48PM   10  fight to assert themselves, and there's a provision in

11   the code called 502(c), yes, 502(c) of the bankruptcy

12   code.

13            What that code does is says they can make a

14   motion, the trustee can make a motion, the creditors'

15   committee can make a motion to estimate those claims for

16   the purpose of the plan, and what that will do, they'll

17   be a lot of litigation over that, they'll be a mini

18   trial, mini trial, maybe a maxi trial over that, all of

19   which is going to deplete the estate.

02:48PM   20           But the bottom line is these people aren't

21   helpless, these people who hold these claims aren't

22   helpless to wait till the end of the day, and if they

23   haven't liquidated their claim, they're out, no, they

24   get a right to try and have those claims estimated in

25   the bankruptcy, and that's going to be more costs, so

1    what we're trying to do, the committee with the trustee

2    and the PSC, looking at a vision, and there may be

3    differences of approach at times, but what we'd like to

4    do is eliminate as much as possible giving me more

5    people to represent.

6            Okay.  So the way to do that, and the way

7    it's been done all across the nation, as your Honor has

8    read in the cases, is by having a consolidated

9    proceeding supervised in coordination with the

02:49PM  10    bankruptcy court, and we believe that the "parade of

11    horribles" is that that poor plaintiff in Michigan, in

12    Virginia, even Virginia, my friend, Mr. Sexton, is going

13    to disagree with me, who doesn't have a big pocket is

14    going to have to then compete with the big pockets that

15    other more fortunate victims were able to collect

16    against, and that pot in the bankruptcy, if this is let

17    to go unbridled is just going to be -- it's going to be

18    a finite pot.

19            Hopefully we're going to enlarge it for the

02:50PM  20    benefit of everybody, but you're going to have that poor

21    plaintiff who doesn't have the wealthy, big pocket

22    defendants is going to have his or her victims' claim

23    diminish *pari passu* by these big judgments or these

24    estimated claims, and in that way, if I can add to my

25    friend from Harris, Beach, that's the inequity that the

1    trustee is trying to prevent, that's the inequity is

2    that we're trying to treat all these plaintiffs alike

3    and get them paid out *pari passu* for the benefit of --

4    you know, to pay them, compensate for their injuries and

5    keep out competing claims by people who we don't need

6    competing against them.

7              Your consolidating these claims, your Honor,

8    and taking jurisdiction over them -- and I'm going to

9    get to that in a minute -- would significantly

02:50PM  10   facilitate that process.

11             Your Honor also asked about discovery.

12   Assuming I want to retain jurisdiction, and, you know, I

13   want to supervise discovery, well, I think the trustee

14   in last night's papers gave you one way of doing that,

15   the All Writs Act, and I know that that was raised last

16   night.

17             Also, your Honor, in bankruptcy courts all

18   over the country, to the extent it becomes an issue,

19   there may also be other remedies to deal with that

02:51PM  20   through the injunction of Section 105 of the bankruptcy

21   code, but that's not here and now.

22             THE COURT:  I hope you appreciate my

23   hesitation in either, you know, acting under the All

24   Writs Act or enjoining a state court proceeding.  I

25   mean, we're at the outer limits of judicial authority

under any circumstances.

MR. MOLTON:  Judge, I agree with you, and, you know what, I don't think you need to do that.  I think 157(b)(5) gives you the authority to bring these cases here.  That brings me -- and I'm going to finish up because I know there's a lot of other people here, and I hope I touched -- was able to answer, to help my friends, to add to my friend's answers to your Honor with some more specific references to how things work in the bankruptcy.

Judge, one of the things that I intended to get up here today, not talking about the bankruptcy code itself, but I intended just to talk about "related to" jurisdiction, and I know it's been briefed, and I'm not going to go over those.

I think the trustee did a magnificent job of describing the state of the law of it, but what I did over the last day or so is I had the occasion, there were three District of Massachusetts cases, one bankruptcy appellate panel, two magistrate judge opinions that were adopted by the District Court, and when you read them closely, I mean really drill down on them, they actually support the Sixth Circuit.

They don't contradict, and they don't reject the Sixth Circuit approach, and this goes to what you

1    mentioned earlier to me about the Pacor case in the

2    Third Circuit against now Corning, and I know the Second

3    Circuit, from where I come from, is pretty well in line

4    with Dow Corning.

5            But I just want to quickly go through these

6    these cases, then I'm going to get off this rostrum,

7    your Honor.  The Cambridge Place Investment Management

8    case dealt with an indemnity agreement.  It was adopted

9    by Judge Gordon, 813 F. Supp. 2d 242.

02:53PM    10            What I would do is, you know, there's a lot

11    of discussion at the beginning about the various

12    positions of the parties and the various states of law.

13    I know my friends from the PSC cited some of that in

14    their papers, but I'd refer you to the Westlaw pages 20

15    to 21 where the Court goes through First Circuit law and

16    says the First Circuit has recognized that "related to"

17    jurisdiction is to be construed fairly broadly and

18    encompasses proceedings which potentially -- and that's

19    the significant difference from Pacor, I think -- have

02:53PM    20    the effect on the bankruptcy case such as altering

21    debtor's rights, liabilities, options and freedom of

22    action, or otherwise having the impact upon the handling

23    and administration of the estate, citing Middlesex Power

24    Equipment, 292 F.3d. 61, First Circuit, 2002.

25            The Court then went on to say that clearly a

1   finding of liability pursuant to that potential

2   agreement would effect the estate.  Accordingly, it had

3   "related to" jurisdiction.  It remanded the case on

4   abstention grounds, and I'm not going to deal with

5   whether that was right or wrong.  I'm not even going to

6   deal with that.  Those were raised in the papers, and

7   I'm going to leave my friend, Sexton, Mr. Sexton, to

8   argue for that and leave the trustee to his papers on

9   that.

02:54PM   10          Then it went on in the next paragraph to

11  say, even if the Pacor rule was adopted, we'd have it

12  here, anyways.  So just from that case, that

13  First Circuit District Court case, I think from a close

14  reading supports the broader view.

15          I'd also refer your case to the

16  Haber v. Massey case.  I think that this is actually

17  more on point.  It was adopted by Judge Ponsor, 2012,

18  Westlaw, 5398567, and, again, I think it's the same page

19  numbers, Westlaw at page 20 to 21, and this case, your

02:55PM   20  Honor, concerned an auto accident, I believe, but it's a

21  tort case where the driver of a truck was in Chapter 7

22  bankruptcy, an individual liquidation, and the case

23  against him was stayed pursuant to 362 of the code, and

24  the plaintiff went after the truck owner who had

25  vicarious liability, right, you know, alleged vicarious

1    liability, which isn't an automatic indemnification, so

2    to say, I mean, pursuant to Pacor, other things had to

3    be proved in order to prove that case.

4         The Court basically adopted from my reading,

5    and other people may beg to differ, but I think it's

6    pretty clear, the Sixth Circuit rule, and the Court said

7    on pages Westlaw star 20 to 21, "The Court concludes

8    that "related to" jurisdiction over a plaintiff's state

9    law claims is present here."

02:56PM   10         First, courts have explicitly found that

11   tort actions are related to a debtor's bankruptcy

12   proceeding because any disposition of issues in a tort

13   case will be related to the determination of a debtor's

14   liability and would also bear upon any resultant

15   contribution owed, and there it was saying two things

16   because in that case, the liability was linked, the same

17   core facts as we have here.  Everything, as the

18   trustee's motion says, goes back, goes back to NECP, and

19   those facts that come from there.

02:56PM   20         Then it talked about resulting contribution

21   owed, not automatic indemnity, and it cited to

22   NUTRIQUEST, which is a District of New Jersey case that

23   was part of the Ephedra bankruptcies, of which Twin and

24   Metabolife were part of.

25         The Court then there, I believe, also on

1    abstention grounds sent it back, but those cases that

2    dealt with abstention, I'm just going to deal with it

3    for one second, Judge, didn't deal with a mass tort, and

4    it's arguably whether this is comparable to mass tort

5    with thousands of cases, but we've got hundreds of cases

6    and potentially a thousand plus cases, and so the issues

7    there are different in terms of abstention from the

8    issues here, and they've been briefed at length.

9           But I would refer your Honor to that case,

02:57PM   10    which is on page -- I'm trying to find it -- 28 where

11    the Court says, "As one Court has observed, the question

12    of abstention boils down to whether in the balance

13    justice is better served by the bankruptcy court or

14    another court deciding the matter.  At the heart of the

15    matter is what is in the best interests of the estate."

16           And it's my submission to your Honor today

17    that the trustee has made a compelling case that the

18    best interests of the estate here is served by your

19    taking jurisdiction of these cases for the reasons set

02:58PM   20    forth in the trustee's motions.

21           Lastly, then I'm going to sit down, the

22    Santa Clara case, that's an older BAP case, bankruptcy

23    appellate panel from the First Circuit.  It dealt with a

24    guarantee, and that case is a little more opaque, and I

25    had to read it about three times before I decided what

1    it meant, and folks may differ, but it dealt with a

2    declaratory judgment, and also what it dealt with, your

3    Honor, is whether that declaratory judgment invested one

4    party nondebtor with a right to recover from another

5    party nondebtor, who had the principal liability from

6    the debtor, and what I read the Court as saying, first,

7    it's a declaratory judgment.

8            Second, all that happened here was the

9    shifting of liability, meaning it didn't create a new

02:59PM   10    claim, it just shifted the liability from one creditor

11    to another.

12            I think that's not the case here for the

13    reasons stated in the trustees' motion.  Indeed, getting

14    back to the thing I put on the side, Judge, defense

15    costs.  Any progress of the state court actions is going

16    to create defense costs on the part of the defendants

17    that arguably, potentially, conceivably, to use the

18    Pacor general principle standard, not getting into the

19    third-party part of Pacor would have an effect on the

02:59PM   20    estate.

21            So it's our contention, your Honor, that,

22    you know, there's not just liability shifting here,

23    there's more than that.  Any progression of state court

24    litigation, again, increases my constituency, and our

25    goal from the get-go is to make sure that that doesn't

1 increase and that the funds that are available and may

2 be aggregated through the trustees, the PSCs and the

3 committee's good efforts are utilized to pay victims,

4 and that's my presentation.  I hope that was helpful,

5 Judge.

6 THE COURT:  All right.  Thank you.  All

7 right.  Mr. Sexton, why don't I hear from you next.  You

8 can identify yourself for the record.

9 MR. SEXTON:  Thank you, your Honor.

03:00PM 10 Scott Sexton from Roanoke, Virginia.  Where I come from,

11 *pari passu,* I think, is an Italian dessert we get at the

12 Olive Garden.

13 MR. SOBOL:  Come on, your Honor, that was a

14 good one.

15 THE COURT:  I hope you brought your winter

16 coat.  It was in the 30's last night.

17 MR. SEXTON:  I don't have my bankruptcy code

18 either, so Mr. Molton has me up one on that.

19 I would like to address a couple of your

03:01PM 20 questions, if I could.  That seems like a good way to

21 start.  One of your most practical questions, at least

22 it seemed to me, was the issue of how do you control

23 discovery, and, particularly, I guess, the only

24 discovery we're worried about here at all would be

25 discovery of New England Compounding Pharmacy.

1         That's got to be the only discovery that

2    would be at the attention of this Court, and I would

3    have to say, it is at the absolute bottom of my

4    attention list because we just don't see much there

5    worthy of discovery or needing discovery.

6         THE COURT:  But surely the defendant in your

7    case, or the defendants, I mean, I don't know much about

8    the case, obviously, but I can certainly guess that

9    they're going to say we bought this product, we had no

03:01PM  10    idea it was contaminated, we administered it, it's their

11    fault, not ours, and maybe under Virginia law, they're

12    on the hook, but they're going to say, well, this isn't

13    fair, we need the claim against them, and at a minimum,

14    we need discovery from them.

15         MR. SEXTON:  Right.  I'm sure there is some

16    discovery that we'll be asked for in that case.  First

17    off, it's very important to understand Virginia does not

18    have comparative fault, so in this case I don't know

19    what Massachusetts has, but let's say New England

03:02PM  20    Compounding was 90 percent at fault and say InSight

21    Imaging was only 10 percent at fault, it's a joint and

22    several verdict, and there is no apportionment for

23    purposes of contribution.

24         It's pro rata, not proportionate, so you do

25    not even have a claim as one joint feasor for

1    contribution until after you have paid more than your

2    fair share, which if there are two defendants means more

3    than half.

4             So, yes, Harris, Beach made an issue of the

5    fact that you can assert a cause of action for

6    contribution only by third-party claim, only with the

7    permission of the Court at this time, the automatic time

8    period having expired, and so there is no right claim

9    for contribution in Virginia, it's all at the discretion

03:03PM  10   of the Court, and it is, as you pointed out, impossible

11   because New England Compounding Pharmacy is in

12   bankruptcy, which makes them not subject to service of

13   process, which makes them absolutely impossible to be a

14   necessary party in Virginia.

15            I will correct counsel as well.  There has

16   not been a motion to implead them as a third party.

17   There has been a motion to dismiss, as she noted, a

18   demur in Virginia alleging that the plaintiff had failed

19   to state a cause of action against InSight for failing

03:03PM  20   to add New England as a party, so that there has not yet

21   been a motion.

22            There was a motion for leave for additional

23   time to file a third-party complaint, which was not

24   granted so that was -- that's as close as they have come

25   to moving to implead.

1           Now, so there's discovery.  I mean, in

2     reality, the discovery of whom, the New England

3     executives, the New England people who are on the hook.

4     As we pointed out in our filings, those will be the

5     shortest depositions.  They should last about as long as

6     the congressional hearings did, which is long enough for

7     the plaintiff to say are you really going to plead the

8     Fifth to every substantive question, and so I won't be

9     coming up here to take depositions of the New England

03:04PM   10   executives, but certainly somebody might, and I'm sure

11    they'll tell us what they say when they do that, and if

12    the defendant in our cases wants to take their

13    deposition, they will have to go through you.

14          You raised a practical question.  I think

15    there was some reference to the fact that just the gates

16    would open and people would be barreling up here to get

17    New England's documents.  I'm a little confused by that

18    myself because I saw on the TV that the Federal

19    Government was taking out all those documents at some

03:05PM   20   point, but I assume New England still has some documents

21    that may be relevant and some other evidence that may be

22    relevant.

23          THE COURT:  Well, you know, I haven't yet

24    been called upon to address the issue of how, you know,

25    criminal investigations is going to interact with civil

1    discovery, but at some point civil litigants are going

2    to get access to these documents if they want them.  The

3    government isn't going to keep them hidden from view

4    forever, at a minimum.

5              MR. SEXTON:  Here's a practical, if the

6    "parade of horribles" was that there would be just

7    hordes of plaintiffs' lawyers wanting to take

8    depositions and look at the same document, you have

9    authority over the bankruptcy court that is

03:05PM  10    administering the estate of New England Compounding.

11              It seems to me as simple as you withdrawing

12    the reference as to issues relating to discovery of

13    New England Compounding lifting the stay as to issues

14    related to their insiders, their close associates, and

15    then you would be in direct charge of that, and I assure

16    you, no state court in Virginia is going to tell a

17    District Court sitting in bankruptcy when and how that

18    court's debtor is going to be deposed or is going to

19    produce documents.

03:06PM  20              I don't see any other way than to go through

21    you, and, honestly, I've never assumed there would be a

22    way to go other than through this Court.  I think

23    there's also this point that the MDL has a state court

24    liaison.

25              I mean, what's the point of having a court

 1   state liaison if you don't have any state court actions?

 2   I had assumed that that person was somebody who would

 3   actually help us coordinate with the plaintiffs'

 4   steering committee, we submit to them, these are

 5   documents that we'd like to have, can you help us get

 6   them.  I can tell you the plaintiffs' steering committee

 7   has asked me what types of documents to ask for with

 8   regard to certain issues.

 9            So, I, again, do not see that as a big

03:07PM  10   problem at all, and I see it something well within your

11   power to control should you choose to do so, and I

12   believe you should choose to do so.

13            So that was the one main reason was that

14   there would be problems with discovery, and I believe

15   that's what the trustee's counsel cited as the big

16   concern for this free-for-all.

17            We just simply don't see the reality of

18   that, and I think Mr. Molton made a much, much, much

19   more cogent argument that I actually understood for the

03:07PM  20   very first time because I think it's actually been said

21   for the very first time, which he said the whole goal is

22   to prevent there from being any other contribution

23   claims, and the only way you do that is by preventing

24   the plaintiffs from actually succeeding in any of their

25   cases, and so he has a worthy goal.  His goal is not to

1    have any more clientele, which means there are no more

2    creditors.

3              That's a worthy goal, and it's an

4    understandable goal, and I get it that if you thwart the

5    Virginia cases, then that does have that effect.  It

6    does sort of conflict, however, with our American system

7    of justice in that's the problem because it is a totally

8    logical argument to say if you stop these plaintiffs

9    from getting the judgments they're entitled to against

03:08PM  10    nondebtor defendants, then you will in fact stop

11    contribution claims, and I think for the poor plaintiff

12    who does not have the big defendant who will then have

13    his claim decreased by a large contribution claim also

14    made against the estate.

15              The only problem is that this Court does not

16    have the authority to prevent claimants who have

17    interacted, contracted with third-party defendants from

18    pursuing their goals of achieving justice in those cases

19    and against those defendants, and if that in fact gives

03:09PM  20    rise to a contribution claim, then that is something

21    that just comes naturally from that process, but it's

22    simply not part of our system to prevent those parties

23    from pursuing their rights so as to prevent the

24    aftermath of that pursuit.

25              I can tell you in Virginia, a contribution

1    claim, like I said, at most would be half of the

2    judgment, and I believe it would just simply be asserted

3    as a contingency just like our client's claims will be

4    asserted as contingency claims.

5            THE COURT:  But if Mr. Molton is right, I

6    mean, let's say that some plaintiff gets a big hit, gets

7    a billion dollar judgment or something, I don't know,

8    even a contribution claim for half that, when it gets

9    presented as a liquidated claim in the bankruptcy court,

03:10PM  10    they take all the food at the Olive Garden, right, I

11    mean, they get everything.

12            MR. SEXTON:  In Virginia, I can only speak

13    as to Virginia law, in Virginia that plaintiff who you

14    just described would have to first pay $500 million plus

15    one dollars before they would have a claim against

16    New England Compounding.  The likelihood of that is slim

17    to none, and I think slim just left town, but you just

18    don't have the claim until you pay more than half of the

19    judgment.

03:10PM  20            So it is possible, but, there again, a

21    worthy goal, Judge, but it has never been the policy of

22    American justice to prevent plaintiffs from pursuing

23    their rights of a jury trial just to avoid the

24    consequence of a contribution claim.

25            THE COURT:  What about indemnification?

1   Again, obviously, I don't know anything about Virginia

2   law, but isn't there a common law right of

3   indemnification if you're found liable based on someone

4   else's fault, you know, like the liability, the claim

5   that a principal would have against an agent who caused

6   the principal to file?

7             MR. SEXTON:  There is a common law indemnity

8   associated with products liability in Virginia.  There

9   is no statutory indemnity, and it depends upon the clean

03:11PM   10   hands of the parties seeking the indemnity, and in this

11   case, based upon the facts and allegations we've

12   discovered, there are no clean hands to be found, and so

13   we do not believe there will be an indemnity claim.

14             I think we probably said that in our brief,

15   but you have to have clean hands, you have to have --

16   don't have independent fault, and your liability has to

17   be derivative of the primary defendants such that you

18   can imagine a retailer, like Wal-Mart, selling a lawn

19   mower.  All Wal-Mart does is put it on the shelf.

03:11PM   20             THE COURT:  Or pharmaceutical, as happens

21   all the time.

22             MR. SEXTON:  In pharmaceuticals, they put it

23   on the shelf.  In this case, it's different.  There's a

24   primary service that intervenes, you have

25   representations made by that primary service provider,

1   you have medicals negligence, Consumer Protection Act in

2   Virginia, Virginia fraud, and so there are any number of

3   cases, I mean, factors in this case which make it almost

4   inconceivable that New England would have an indemnity

5   claim brought after it successfully by the debtor here,

6   the nondebtor party.

7            So I think that is not to be -- that really

8   shouldn't drive it, and it seems to me this idea that

9   you -- the trustee's counsel also said that you could

03:12PM   10   never do a plan until you had some type of knowledge of

11   all these contribution claims, but it seems to me that

12   there's one thing that we know for sure.  New England

13   Compounding did not sell these products directly to any

14   consumer.

15           There is no patient out there who injected

16   themselves with this product, and so if you simply

17   assume that every claim that's made against a debtor,

18   there is somebody who has a contribution claim

19   associated with that claim.

03:13PM   20           That to me defines the universe of the

21   contribution claims, and if I were representing any

22   healthcare provider who handled any of these things,

23   regardless of whether I had been sued or not, I would

24   definitely file a notice of claim for contribution,

25   unliquidated, because I know I have that exposure.

1            So I think those are not -- those are not

2    issues that really are going to change based upon

3    whether we're going forward in Virginia or not.

4            I do believe that the trustee has expressed

5    in some respects the kind of -- I think contribution is

6    a rationale here.  I think the real reason is expressed

7    roughly on the second page of the brief that was filed

8    on May 2d where the trustee goes into the fact what they

9    are really looking for is contributions from these

03:14PM   10    third-party defendants.

11            It's not the contribution claim from these

12    third-party defendants, it's the amount of money that

13    these third-party defendants can contribute to the

14    trustee's plan that is what's really at issue, and so

15    they've laid it out fairly bluntly.

16            I think the point is to get the third-party

17    defendants before your Court, attempt to engage in a

18    mediation, hold a carrot out for the defendants that

19    they will stay discovery so long as they participate and

03:14PM   20    participate meaningfully and then offer that nondebtor

21    defendant a nondebtor discharge somehow, which I think

22    is dubious in its own right.

23            So that's the reason these debtors are

24    wanted here is not because of the contribution claims

25    they're going to assert but the funds they potentially

1    bring to a pool that would then be part of the trustee's

2    plan.

3                By the way, that doesn't take away or

4    detract anything from the trustee, it doesn't take away

5    or detract anything from the debtor because they are all

6    third-party funds coming into that pool that would be

7    part of the pool, so that, I believe, is fairly squarely

8    addressed in the trustee's filings and certainly in the

9    some of the comments that have been made to you today.

03:15PM  10                Your Honor, I have a practical question that

11    has never been raised, and I'm not posing it to the

12    Court but just posing it for the Court.  A practical

13    question that has not yet been addressed in any of these

14    filings, when the trustee filed his original transfer

15    motion, it had a draft order attached to it that

16    appeared like it would just go out to all state courts

17    saying transfer your case up to Boston District Court,

18    and I have looked, with no success, in trying to find

19    any kind of procedural justification for that, and so it

03:16PM  20    is very unclear to us folks in Virginia as to how that

21    leap would be made from a state court to this court

22    unless you --

23                THE COURT:  I'm assuming I have to issue an

24    injunction which triggers issues under the

25    Anti-Injunction Act and a host of other type issues, but

1    I don't think I just send something in the mail to the
2    Davidson County, Tennessee court, and, by the way,
3    transfer your case to me.  I don't think it quite works
4    that way.
5             MR. SEXTON:  It is a matter that we have
6    rather scratched our heads about as to how that would
7    happen, and I would assume it would mean that the cases
8    would have to go through the Federal Court in Roanoke,
9    which, of course, they just attempted that.
10            THE COURT:  That's a good point.  I can't
11   say that I've thought that through completely myself.
12            MR. SEXTON:  Speaking of the Federal Court
13   in Roanoke, your Honor, after the trustee filed his
14   transfer motion in this action, a number of weeks
15   passed, then the defendant, InSight, in that case, in
16   those cases removed them to Federal Court.
17            As you know, Judge Wilson just issued an
18   opinion on that last Friday.  Those were 17 cases which
19   I think is more than a handful, and 14 were remanded on
20   three alternate grounds, one of them including
21   untimeliness, and three were remanded on two alternate
22   grounds, not including untimeliness, and, of course, the
23   Court addressed abstention and permissive and/or
24   equitable abstention in all of those cases, and I just
25   wanted to address the statistics as to how many of those

1    there were.

2              THE COURT:  All right.  Just because we have

3    a lot of ground here, why don't you wrap up, Mr. Sexton.

4              MR. SEXTON:  Your Honor, I would be happy to

5    address any questions that you have.  I know you've said

6    you read our pleadings.  I think I've addressed the

7    questions you asked of the trustee's counsel, so I think

8    we've addressed the "parade of horribles."  I don't

9    think there will be a "parade of horribles."

03:18PM  10          We think everything could be orderly

11   handled.  We think the "parade of horribles" would be to

12   prevent these parties from having their day in court

13   against these other defendants and that you could

14   control any discovery such that it would be that would

15   occur, and really I'd be happy to answer any questions,

16   but that's...

17             THE COURT:  I think, again, to jump to my

18   conclusion, I am going to take these issues under

19   advisement, and I'm going to permit parties to file a

03:19PM  20   very short post-argument supplemental memoranda in a

21   relatively brief window of time.  Ms. Parker.

22             MS. PARKER:  Could the PSC be heard briefly,

23   your Honor?

24             THE COURT:  Yes.

25             MS. PARKER:  So the plaintiffs' steering

1    committee largely supports the trustees' motion, but we

2    have advocated that the District Court carve out, that

3    is, not decide whether to exercise "related to"

4    jurisdiction over narrow sets of cases, specifically

5    state court cases against only defendants who are

6    unaffiliated with NECP where the only claim of "related

7    to" jurisdiction is based on a potential, but

8    unasserted, claim of contribution or indemnity.

9            I wanted to address for the Court briefly

03:19PM   10    why the plaintiffs' steering committee cares about this

11    motion.  It might be understandable for one to think,

12    well, you're the lawyers running the show in Federal

13    Court up there in Boston, you would want all of these

14    cases to come there, and, admittedly, it would

15    undoubtedly be more efficient if all of these cases, at

16    all touching on anything related to NECP, came to

17    Boston, but federal courts are courts of limited

18    jurisdiction.

19            With that in mind, we have three reasons

03:20PM   20    that we're concerned here:  First, we've read the case

21    law.  Our reading of the case law, and, admittedly, I

22    think reasonable minds disagree on this -- they

23    certainly have today -- this Court does not have

24    "related to" jurisdiction over cases against nondebtor

25    defendants in state courts where the only issue, where

```
 1    the only allegation of "related to" jurisdiction or

 2    potential indemnity and contribution claims.

 3              I won't rehash the case law here, we've set

 4    it out in our brief, but I will say from the PSC's

 5    perspective, if one is being academically honest about

 6    the state of affairs, it is at a minimum an open

 7    question and one that need not be decided today.

 8              The second concerned and ties in with the

 9    first.  The PSC has every interest in protecting the

10    finality of the settlement or plan here, and along those

11    lines, we're interested in avoiding appeals and

12    potential appeals.

13              We would not want a situation where an

14    appellate court reviews the decision from this Court and

15    reverses because it determines that this Court

16    overreached slightly in asserting "related to"

17    jurisdiction and have a situation where that would

18    effect what is otherwise a final plan or settlement.

19              Thirdly, as I think the dialogue today has

20    fleshed out, there are other tools available here to

21    coordinate and address both indemnity and contribution

22    claims and to control discovery.

23              So I'll focus on discovery first since your

24    Honor seemed to be interested in that in particular.

25    I'll observe that federal and state court judges
```

03:20PM (line 10)

03:21PM (line 20)

1    regularly coordinate discovery in mass tort proceedings.

2    It is not uncommon that they do so.

3              THE COURT:  Well, I'm certainly familiar

4    with one federal judge coordinating with one state court

5    judge in the same jurisdiction.  It's not so clear to me

6    that I can coordinate with 38 state judges in 38

7    different, I mean, I'm pulling that number out of the

8    air, it could be 178 different judges, or whether I can

9    even keep track of it.

03:22PM  10              One of my fears is that I'll find, you know,

11    that the case in Minneapolis that I've deferred a

12    decision on is in its second week of trial and that

13    events have far exceeded my ability to coordinate

14    things.

15              MS. PARKER:  Yes, your Honor, so in which

16    case, the next point may give you some more solace,

17    which is that the All Writs Act and the Anti-Injunction

18    Act, which is 11 U.S.C., Section 105(a), work together

19    to permit a Federal Court to enjoin state court

03:22PM  20    proceedings.

21              So, if it really came down to a concern,

22    those are options.  Your Honor referred to post-argument

23    briefing.  We'd be happy to brief that further, but that

24    is an option for the Court.

25              Finally, in terms of discovery against.

1    New England Compounding, in order to enforce a subpoena

2    against NECC, someone would need to file a lawsuit to do

3    that, and that lawsuit would wind up within this Court's

4    jurisdiction.

5              THE COURT:  But, of course, it isn't just

6    NECC.  I don't know the facts well enough, but

7    presumably there were employees, contractors,

8    subcontractors, cleaning people, inspectors, all kinds

9    of people must have been in and out of there, and I

03:23PM    10    would assume discovery is not limited to the five or six

11    executives and shareholders and the company itself, and

12    I'm less sanguine about my ability to control all of

13    that.  What my power is over either the person seeking

14    the discovery or the witness is not clear to me.

15              What about this issue -- and your brief was

16    very tempting to me.  It appealed, among other things,

17    to my desire to defer every difficult decision I can

18    defer --

19              MS. PARKER:  Thank you.

03:24PM    20              THE COURT:  -- but I wish it were that easy.

21    You know, basically you say I should deny it without

22    prejudice, don't address issues of potential

23    contribution and indemnity.  Well, what about the actual

24    issues of contribution and indemnity?  In other words, a

25    non-NECC party that has already either asserted or

1    attempted to assert a contribution or indemnity claim.

2    Is that the break point?  Once they've done that, do I

3    now assert jurisdiction over that?

4              MS. PARKER:  Yes, your Honor.

5              THE COURT:  How do I draw a distinction?

6              MS. PARKER:  We would suggest it is a bright

7    line, that once indemnity or contribution claims are

8    asserted, then that triggers the Court's "related to"

9    jurisdiction.

03:24PM   10              THE COURT:  All right.  Again, presumably

11   every defendant would have the incentive to do that, I

12   would think, yes?  I mean, I can't imagine what the

13   disincentive would be.

14              MS. PARKER:  I agree with that statement,

15   your Honor, though I can never read the minds of defense

16   counsel.

17              I'll also observe that in terms of tools

18   that are available, New England Compounding -- many of

19   the plaintiffs in the civil actions that we identified

03:25PM   20   as a part of our carve-out have also filed separate

21   cases against New England Compounding that are part of

22   the MDL, so given that New England Compounding can

23   assert, as I think your Honor suggested, indemnity

24   claims in either the MDL action or a separate action,

25   and that would bring those cases within this Court's

1    jurisdiction as well.

2              So in order to resolve this motion, your

3    Honor, you need to consider jurisdiction, mandatory

4    abstention and discretionary abstention.  I will address

5    each of those but only very briefly.

6              In terms of jurisdiction, 28 U.S.C. 1334(b)

7    gives original but not exclusive jurisdiction over civil

8    proceedings related to, and we have discussed that I

9    think ad nauseam today, but I will say that the

03:26PM  10   plaintiffs' steering committee's case research suggests

11   that courts almost uniformly hold that a state court

12   proceeding against a nondebtor unaffiliated with the

13   debtor -- I'm sorry, courts almost uniformly hold that a

14   state court proceeding against an entity unaffiliated

15   with the debtor with only hypothetical contribution and

16   indemnity claims are outside of the scope of "related

17   to" jurisdiction.

18             The First Circuit Bankruptcy Appellate Panel

19   that we cited in our brief considered a similar issue.

03:26PM  20   Admittedly, as Mr. Molton pointed out, it is not

21   factually identical, but the First Circuit Bankruptcy

22   Appellate Panel found an insufficient nexus to confer

23   "related to" jurisdiction over state court actions

24   involving nondebtor parties and possible contribution

25   claims.

1          The Third Circuit in the Pacor test is

2     important, I think, and bankruptcy attorneys may point

3     fingers at me, but Pacor is less important for setting a

4     test here but rather because of what it resulted, what

5     it concluded, which is that Pacor did not exercise

6     jurisdiction over potential indemnity claims there.

7     That Pacor result and the text were both cited favorably

8     by the Supreme Court in Celotex, and additional cases

9     since then have cited to that to reach similar

03:27PM  10    conclusion in the Third Circuit and elsewhere.

11          Twin Labs and Dow Corning appear to us to be

12    outliers.  Twin Labs is a short order with a single

13    paragraph addressing "related to" jurisdiction that

14    reaches a conclusion and cites Dow Corning but does not

15    do any further analysis.  Dow Corning applied the Pacor

16    test and reached a different conclusion than the Pacor

17    Court did.

18          It's interesting to note there that the

19    nondebtor entities that were the subject of that order

03:28PM  20    were other Dow companies in a situation where the debtor

21    was Dow and those other Dow companies were shareholders

22    of the Dow debtor, very different factual scenario as

23    between the relationship of a Virginia pain clinic, for

24    example, and New England Compounding.

25          On abstention, under 1334(c)(2), which

1    addresses mandatory abstention, the bankruptcy code

2    provides that the Court must abstain.  In certain

3    circumstances, that evaluation turns on whether claims

4    left where they are will be timely adjudicated.

5              We would suggest that no one here today has

6    argued that there will not be timely adjudication if

7    these cases are left in the state courts.  In

8    particular, we have seen action both by the Federal

9    Court on remands recently but also in the Tennessee

03:29PM   10    state court cases that these cases are moving forward.

11              We would suggest that that's another factor

12    that may counsel in favor of waiting to decide this

13    issue to determine whether or not there is any reason to

14    be concerned about the timely adjudication.

15              As to discretionary abstention, there are

16    over a dozen factors that are considered by courts.  We

17    have gone through, set out some of those in our brief.

18    I won't go through them all.  Some point towards

19    abstaining, we think, some point against.

03:29PM   20              We would suggest that on the whole, they

21    suggest that this Court should abstain, but, again, we

22    urge the Court to refrain from deciding that issue

23    unless it becomes necessary.

24              Under 1334(b), 46, it says, "An exception to

25    the mandatory abstention provision that exception

1    applies only to non-core proceedings.  The only

2    exception, the only example of a non-core proceeding

3    that's given in the bankruptcy code is liquidation or

4    estimation of contingent or unliquidated personal injury

5    tort or wrongful death claims against the estate for

6    purposes of distribution."

7            Now, there's two ways to read that phrase,

8    and there's been much case law and much academic

9    discussion about it, but, in any event, the state court

03:30PM  10   cases are not claims against the estate, nor are they

11   being made for purposes of distribution of any sort of

12   plan.

13           Finally, 28 U.S.C., 157(b)(5) says, "The

14   District Court shall try personal injury and wrongful

15   death claims."  There's no dispute about what that

16   requires, but that provision cannot create jurisdiction

17   where jurisdiction has not otherwise been granted by

18   Congress.  Courts have held that that provision

19   requiring the District Court try personal injury cases

03:30PM  20   applies only to tort claims that are against the debtor.

21           And a few points in response to the

22   creditors' committee and the trustee's argument today,

23   there is no liquidated claim just because there's a $50

24   million verdict against a pain clinic in Virginia.  They

25   would have to file a separate action in order to have

1    that become liquidated, which would bring things under

2    this Court's jurisdiction.

3             While it is noble of Mr. Molton to want to

4    minimize claims against the estate, I think we all share

5    that goal in some sense, at least, but I do note that

6    the right to contribution and indemnification against

7    NECC exists even if those cases come here.

8             Now, there may be means here where we're

9    better able and more efficiently able to address those

10   rights, but they are not erased.

11            THE COURT:  Let me ask you, Ms. Parker,

12   assuming that I get over the abstention hurdle, and

13   let's just focus on the "related to" jurisdiction point,

14   is it the committee's view that I do not have "related

15   to" jurisdiction over potential contribution indemnity

16   claims, but if, again, assuming the abstention issue is

17   solved, I could set up a regime where as soon as any

18   party claimed contribution or indemnity, then

19   jurisdiction would attach, and I could bring that case

20   into the court, is that the idea here?  I'm struggling

21   to understand how this would work as a practical matter.

22            MS. PARKER:  The short answer, your Honor,

23   is, yes, that once a claim is asserted against New

24   England Compounding Company, that those matters would

25   come before your Honor.

1          THE COURT:  All right.  Here's what I want

2     to do.  I want to give the stenographer's fingers a

3     break.  I'd like to take a 10-minute break.  The people

4     on the phone should probably stay on the phone.  When we

5     come back, I want to see if Ameridose and GDC want to

6     weigh in.  I think I have a question for either the

7     trustee or Mr. Molton, and I want to see if the four

8     people who want to be heard on the phone want to weigh

9     in briefly as well, and then we need to turn to the

03:33PM  10   other remaining issues before we run out of time.  Let's

11    take a break of about 10 minutes.

12          THE CLERK:  All rise.

13          (A recess was taken.)

14          THE CLERK:  All rise.  Thank you.  Please be

15    seated.

16          THE COURT:  All right.  Quickly now, does

17    Ameridose wish to be heard?  Mr. Moriarty.

18          MR. MORIARTY:  Your Honor, I don't need to

19    be heard on the trustees' motion in general.

03:44PM  20         THE COURT:  I'm thinking of your related

21    motions.

22          MR. MORIARTY:  The Section 157 motions, I'm

23    not even sure that Mr. Ellis still sees the issues the

24    same way today that he did when he filed his briefs in

25    opposition to that transfer, but let me just say this,

1    that the cases with Ameridose, such as the four

2    Massachusetts cases and the fifteen New Jersey cases,

3    whatever that number is, are very different because in

4    that situation Ameridose is a related entity.

5              The complaints allege that either Ameridose

6    made the product, or, and/or that they are an alter ego

7    of NECC, so that's clearly related to, and I don't think

8    there is a party that has filed a brief that has

9    contested that issue.

03:45PM   10              I mean, the four Massachusetts cases that

11   are in the bankruptcy court, even when Mr. Ellis filed

12   his brief in opposition, he did not contest federal

13   jurisdiction.  That's more of an issue of which Federal

14   Court in the State of Massachusetts the case belongs,

15   and we think it's an easy case, as do many others, that

16   it belongs here.  There's no reason to have those four

17   cases in the bankruptcy court.

18              The New Jersey cases, you know, clearly

19   that's "related to" jurisdiction, and I can argue the

03:46PM   20   motion for remand separately if you want, or I can stand

21   here and talk about it, but we have other grounds

22   besides Section 157 for those removals and the

23   opposition to remand in the first place.

24              THE COURT:  Okay.  All right.  Counsel for

25   GDC.  Mr., is it, Thomas?

1          MR. THOMAS:  Yes, your Honor.  Your Honor, I

2    actually filed a memorandum in support of the Ameridose

3    motion.  I don't have anything in particular to add to

4    that.  We're basically in the same position, we're a

5    related entity, and we simply are supporting the

6    transfer and withdraw the reference.  We rely on our

7    papers.

8          THE COURT:  Okay.  Thank you.  On the

9    telephone, is Attorney Greg Lyons from Roanoke with us?

10         MR. LYONS:  Yes, Judge, I am here.

11         THE COURT:  I'll let you say your peace

12   quickly.

13         MR. LYONS:  And I am here, Judge, with my

14   partner John Lichtenstein, who is on the pleadings in

15   the case as well.  I don't know that we would add very

16   much more, Judge.  The one thing that has been kind of

17   talked around but maybe not particularly addressed, I

18   mean, "related to" has certainly been discussed, but how

19   you decide what is "related to," the Third Circuit, we

20   think, has articulated a workable basis for that, and we

21   set that out in our filing, Judge, and we think that

22   provides a good way for the Court to approach this in

23   terms of deciding whether "related to" jurisdiction

24   exists over these matters.

25               The particular matters for which we

1    represent the interveners from the Roanoke area, they

2    were similarly situated to Mr. Sexton's clients.  We

3    would adopt and agree with Mr. Sexton's arguments, but,

4    you know, as things stand, Judge, the articulation of

5    the test by the Third Circuit is one that would, when

6    applied here, we think, give the Court every reason to

7    find that there is not "related to" jurisdiction, and we

8    would urge the Court to do that.

9            THE COURT:  All right.  Mr. Dean also from

03:48PM  10    Roanoke, Rob Dean.

11            MR. DEAN:  Yes, Judge, Rob Dean with Frith &

12    Ellerman Law Firm in Roanoke, and I am appearing also on

13    behalf of the Roanoke plaintiffs who have only filed

14    cases against the InSight defendants here in Roanoke.

15            I should state that our three cases were

16    designated on the exhibits to the trustees' motion,

17    having also included a close affiliate of NECC,

18    Alaunus Pharmaceuticals.

19            We have since voluntarily dismissed Alaunus

03:48PM  20    in Federal Court here in Roanoke, and orders have been

21    granted, and our case is consolidated before

22    Judge Wilson, and the cases going forward are only

23    against the InSight defendants.

24            We, again, would join in Mr. Sexton's motion

25    and the reasons for granting abstention in this case.

1    We would also oppose the trustees' motion.

2              Judge, the only thing we wish to add to your

3    decision, and we will follow up if given an opportunity

4    in supplemental briefing before your Honor renders a

5    decision, is that the balance of equity in this case in

6    terms of where the proper forum is for discovery, it is

7    our position that whatever discovery either the InSight

8    defendants or the plaintiffs seek from NECC or its

9    employees in Massachusetts will really be attenuated at

03:49PM    10    best.

11              As Mr. Sexton stated to the Court, those

12    depositions will likely result in the assertions of

13    Fifth Amendment privilege.  The documents can already be

14    facilitated through the PSC, and because of that, we ask

15    that you accept their position as well.

16              Finally, Judge, our cases that have happened

17    here in Roanoke are really different than how the

18    creditors' committee is represented to the Court or the

19    trustee is represented to the Court because unlike what

03:50PM    20    the creditors' committee counsel have said, that the

21    goal is to treat all plaintiffs alike and that the

22    InSight cases shouldn't be the more fortunate victim, if

23    there is such a thing, the fact is what happened here in

24    Roanoke is really factually distinct than what happened

25    around the country.

1         Because unlike the Twin Labs case, which

2    really involved a chain of distribution, a wholesaler

3    and a retailer, a debtor and a nondebtor defendant, what

4    we have against InSight is independently tortious

5    conduct, where it wasn't so much that the InSight

6    defendants here in Roanoke were simply selling a Ford

7    Pinto, and our clients were hurt, what they were doing

8    is saying they were selling a Mercedes, and as a

9    consequence of that, really our cases are going to

03:50PM  10    require extensive discovery involving local employees

11    and local witnesses and documents that are located in

12    Roanoke as well.

13         So by consolidating discovery of the other

14    NECC cases in Massachusetts would make sense, we would

15    argue that our cases should be allowed to proceed for

16    pretrial discovery here in Roanoke because this is where

17    the substance of our claims are located and for the same

18    reasons that we urge the Court not to find "related to"

19    jurisdiction, we also urge the Court to abstain from

03:51PM  20    exercising such jurisdiction over our claims as well,

21    and we join in the Gentry, Locke motion.

22              THE COURT:  Thank you.

23              MR. DEAN:  Thank you, Judge.

24              THE COURT:  Elliot Olsen from Minneapolis.

25              MR. OLSEN:  Thank you, your Honor.  I

1    represent Tracy Maccoux.  She is one of the personal

2    injury claimants, and we have commenced a lawsuit

3    against Medical Advanced Pain Specialists, a pain clinic

4    here in Minneapolis, and we would oppose the motion, and

5    we would ask you to abstain from asserting jurisdiction

6    over this claim.

7              One thing that no one has said yet is in my

8    case, at least, I think it's speculative to assume that

9    MAPS is going to pursue contribution from NECC.  MAPS

03:52PM    10   may decide, well, we want to get involved in that

11   quagmire, that bankruptcy quagmire.  We're going to have

12   to expend a lot of attorney fees, and we may not get

13   much back in the way of contribution, so, you know, MAPS

14   may choose to use its resources elsewhere.

15             It may choose to use its resources in simply

16   defending against this case or trying to settle my case

17   rather than chasing money that just is very speculative,

18   especially for those entities that are simply seeking

19   contribution and don't actually have personal injuries.

03:52PM    20             So I think it's up to MAPS, and I think, at

21   least at this point, the best solution, at least with

22   respect to my case, would be for you to deny the motion

23   without prejudice, as I think you said you were inclined

24   to do, so that's all I have to add, your Honor, thank

25   you.

```
 1                THE COURT:  Thomas Martin from Philadelphia.
 2                MR. MARTIN:  Thank you, your Honor.  Here
 3      only recently brought to the table, and I think that our
 4      case has a little bit of a different procedural posture
 5      than anything that's been discussed heretofore.
 6                THE COURT:  Are you with us?  I think we
 7      lost him.  We'll have to -- all right.  Peter, why don't
 8      you see if you can reach him.  In the meantime, I had a
 9      question for the trustee or for Mr. Molton.  I'm not
10      sure who's the right person to address it.
11                If I did wind up agreeing with you,
12      procedurally, how do I transfer the state cases here?
13      Do I enjoin state courts around the country?  Is that my
14      only vehicle?  Mr. Molton.
15                MR. MOLTON:  Your Honor, my recollection
16      from some of the cases I dealt on, if there's a transfer
17      order, just a simple transfer order that goes to --
18                THE COURT:  What authority do I have to
19      order a Judge in Grand Travers County, Michigan to send
20      his case to me or her case to me?
21                MR. MOLTON:  I think pursuant to 157(b)(5),
22      according to the courts that have found that to be the
23      vehicle for such transfer.  I don't recall.  I mean,
24      your Honor, I can go back and take a look and see what
25      Judge Raycroft did and some of the other Judges did in
```

03:54PM (line 10)

03:54PM (line 20)

1    connection with this and get those form of orders to

2    you, but that's my recollection as I stand here today.

3    I may be wrong.

4         MS. ANDREWS:  Your Honor, excuse me, this is

5    Anne Andrews.  I'm co-chair of the creditors' committee.

6    I wanted to weigh in on behalf of some victims, but

7    Mr. Thomas, who actually I argued these motions against

8    him in another court, knows the exact vehicle where he

9    brought my cases to that court, so he wanted to address

03:55PM  10    you.

11         THE COURT:  All right.

12         MR. THOMAS: It probably worked only because

13    it was acceptable to Judge Raycroft that we do it by

14    this means, but what we did is we filed a motion where

15    we identified the cases that we believed should be

16    removed to this Court.  He executed the order basically

17    ordering us to remove those cases that we then filed

18    notices of removal of the cases in the state courts and

19    removed them directly to the Federal Court where the

03:55PM  20    bankruptcy was pending.

21         THE COURT:  All right.  I'm sorry,

22    Ms. Andrews, is there something else you wanted to say?

23         MS. ANDREWS:  Just two brief comments, your

24    Honor.  Our committee put in papers, and I'm not

25    addressing you in an official capacity on behalf of the

1    creditors' committee, but as my law firm, Andrews &

2    Thornton, representing a number of victims, well over

3    70.  I think the count is up to 80 today.

4            The committee, and, in fact, many victims,

5    victims of our law firm represents central or support

6    centralization of these cases for a number of reasons.

7    I won't go over the law, the cases, but I just want to

8    bring attention to the Court that you've heard from six

9    different firms now, at least three different states,

03:56PM    10    and the concern that my clients have and that I have

11    talked with them, as I know many attorneys have around

12    the country, that without centralization, I ask your

13    Honor who, among God's victims of this tragedy, will you

14    pick to go forward to take from the estate in a way that

15    will reduce from all of the children of the victims of

16    this case?

17            And so we're chasing -- centralization stops

18    that bloodletting of the scarcity, and when we talk

19    about the Twin Labs, the Ephedrine cases and the

03:57PM    20    Metabolife cases, where we had Fortune 500 companies, we

21    had large successful companies that attorneys in this

22    courtroom now represented there, we do not have that

23    kind of assets in this case, so for every discovery

24    order, for every case and for every state, my friend,

25    Mr. Sexton, who I respect and respect the citizens of

1    the great state of Virginia, I don't see them as more --

2            THE COURT:  The Commonwealth.

3            MS. ANDREWS:  The Commonwealth, thank you

4    for reminding me, since I'm from a western state, but

5    those victims do not deserve more justice than the

6    victims from all 24 or other states at a time greater or

7    less than others, and through the vehicle, we support

8    the trustees' motion, my clients have the same right

9    from all 12 states we represent them from, to share in

03:57PM  10    this estate that will waste quickly if this litigation

11    is not centralized and if all these people are allowed

12    to go forward for every discovery motion, for every

13    request in a state court, for every order, there will be

14    five or six reactive orders, growing and growing the

15    estate's costs and ultimately ending up in the same

16    place where the victims will recover in the bankruptcy

17    court, so we're asking for centralization, we're asking

18    for and support the trustees' motion and hope that this

19    case will be centralized quickly.

03:58PM  20            THE COURT:  Thank you.  Mr. Martin, are you

21    back on the phone?

22            MR. MARTIN:  I am, your Honor.  Am I being

23    heard?

24            THE COURT:  Yes.

25            MR. MARTIN:  Very quickly, your Honor, we

 1    represent Dale Devilli.  We filed an action in

 2    New Jersey State Court naming various healthcare

 3    providers as well as Ameridose and other NECC-related

 4    entities.  We filed after the bankruptcy, so we did not

 5    name NECC as a defendant.

 6          In the notice of removal that Ameridose

 7    filed in New Jersey District Court, they suggested that

 8    the negligence claims against the New Jersey healthcare

 9    providers should be severed, and we frankly think that's

10    a pretty good idea.

11          The concerns that a number of counsel have

12    raised about the ability to proceed in these tort

13    actions we share, and I think that the ability of the

14    Court to sever the state law actions and remand them

15    while keeping the NECC-related cases gives the Court the

16    opportunity to, along with that order, direct that any

17    discovery directed at NECC-related parties or activities

18    be subject to the ongoing supervision of that Court.

19          THE COURT:  All right.  Thank you.  Here's

20    what I'm going to do.  I'm going to ask that any party

21    that wishes to follow up with a post-argument

22    memorandum, supplemental memorandum may do so.  I think

23    because I can't let this sit very long, I think I'd like

24    that to be filed why don't we say by Monday of next

25    week, which is, what, the 20th?

1          THE CLERK:  Yes.

2          THE COURT:  I'm not going to put a page

3     limit on it except, again, I'm more likely to read it

4     carefully the more succinct it is.  Don't assume based

5     on my ignorant questions or anything else I've said that

6     I'm leaning in any particular direction.  There are

7     strong countervailing issues going both ways here, and

8     I'm going to make the best decision I can under the

9     circumstances, but I'll give the parties an opportunity

04:01PM   10     to file one more round of briefing.

11          Please, while on the subject, and as a

12     housekeeping matter, we have lots of filings that have

13     both the MDL number and the Erkan number, which I think

14     is a mistake at this point.  I don't know if I need to

15     issue an order to clean that up, but things really ought

16     to be filed in the MDL number that apply to everything.

17          I keep having to go back and forth between

18     the MDL and the Erkan docket, and Erkan was the first

19     case, and I issued some orders in that, and, again, if

04:01PM   20     there's something I need to clean up, I'm prepared to do

21     that.  I want things applying to all cases or of general

22     significance to be on the MDL docket.

23          MR. MOLTON:  Judge, can I add one thing --

24          THE COURT:  Yes.

25          MR. MOLTON:  -- because I came here to speak

1   about the "related to," and your Honor posed a number of

2   bankruptcy questions.  On the issue of whether the

3   bankruptcy court does have the authority to subordinate

4   contribution and indemnity claims --

5          THE COURT:  Yes.

6          MR. MOLTON:  -- your Honor may want to look

7   at 510 of the bankruptcy code, which does allow

8   equitable subordination based on case specific and fact

9   specific circumstances, and 509(c) that deals with

10  contribution and indemnification claims.

11         I'm talking about how and when they get

12  subordinated.  I'm sorry I didn't raise that to your

13  Honor, but I was trying to do my best under

14  circumstances where, you know, your Honor asked some

15  questions.

16         THE COURT:  Well, that's one of the reasons

17  I want to allow supplemental briefing, but so the

18  concept there is it's not necessarily true that every

19  unsecured creditor has to be treated *pari passu*.  There

20  might be equitable considerations where that is trumped.

21         MR. MOLTON:  That's true.  That's 510 and

22  509 deals specifically, your Honor, with indemnification

23  and indemnity claims under various situations.  I know

24  various circuits deal with that provision differently.

25  I haven't looked at it recently in the context of the

1   First Circuit, but maybe we'll write about that to your

2   Honor during that time.

3           THE COURT:  All right.  Let's take up the

4   trustee has moved for limited relief from the Court's

5   order as to the preservation of potential evidence.  The

6   government has filed a response that provides for some

7   perhaps more elaborate than necessary notice provisions.

8           What I was going to propose is that because

9   all of this has happened somewhat quickly, I think

04:03PM  10  within the last day or two, that perhaps the government

11  and the trustee, see if they can agree on an order.  I'm

12  not sure anyone opposes this.  The time hasn't run yet.

13  Is there anyone who wants to be heard in opposition to

14  it?

15          At least the general concept is, you know,

16  to the extent that there is a real estate lease,

17  equipment lease or whatever, it's theoretically

18  evidence, on the other hand, it costs money.  Is there a

19  good reason not to or to require the estate to continue

04:04PM  20  payments on this, or can we let it go?

21          Is there any further evidentiary value to be

22  had from it?  I'm assuming, of course, that anything

23  that contains information or data like a computer system

24  has been otherwise preserved.  I hope we're talking

25  about other kinds of equipment.

```
 1              Does anybody want to be heard on that?  What
 2    about my idea for the trustee and the government to see
 3    if you can agree?  The government's proposed, among
 4    other things, newspaper publication, even though I guess
 5    I'm still a lawyer, does anyone actually read newspaper
 6    publications?
 7              MR. SOBOL:  Some people read the bankruptcy
 8    code, your Honor.
 9              THE COURT:  Well, you have to do that.  I
10    suppose some people have to read the newspaper
11    publications as well, but I certainly don't have a
12    problem with a notice procedure that's at least, if it
13    moves expeditiously, to make sure that if there's some,
14    you know, criminal target or subject, or for that
15    matter, for anyone else to at least weigh in.
16              Yes, Mr. Cunha.
17              MR. CUNHA:  Yes, your Honor, and from the
18    government's perspective, we're more than happy to work
19    with the trustee, and our intent in proposing the notice
20    regime is not to be excessive or unduly burdensome, but
21    in a belt and suspenders sense to the extent that
22    there's anyone out there, since the government no longer
23    has a need to retain these items that might have an
24    interest or claim, we want to make sure that they have
25    that opportunity to be heard.  There probably is a way
```

1    short of newspaper publication to do that.  We're happy

2    to work with the trustee.

3              THE COURT:  And, again, to the extent -- I

4    mean, I'm speaking from an old-fashioned perspective,

5    that computers are separate from other items, and, of

6    course, almost every item we have nowadays has a

7    computer chip in it.  I don't know what data can be

8    downloaded from what, but my assumption is that to the

9    extent that there is data or information that can be

04:06PM   10   preserved, it will be preserved independent of whatever

11   these things are.

12             I mean, for all I know, it's the lawn mower.

13   I don't know necessarily what this equipment is.  There

14   was a schedule filed, but I didn't look at it very

15   carefully.

16             MR. CUNHA:  I'll let the trustee speak more

17   specifically, but I believe that much of the property,

18   things like water coolers and postage meters, are

19   probably wholly irrelevant, and to the extent that there

04:06PM   20   is some computerized component to something else, my

21   understanding is that it has been preserved, and our

22   understanding is that it would be preserved.

23             THE COURT:  And I don't know whether people

24   want an opportunity to photograph things, I don't know

25   the answer to any of that, but I would expect to grant

1       that motion, and if someone does have an opposition or

2       wants me to do something different, they should respond

3       quickly.

4                    MR. GOTTFRIED:  Your Honor,

5       Michael Gottfried for the trustee.  Two points.

6       Certainly we're willing to work with the U.S. Attorney's

7       Office.  We certainly conferred with them on several

8       occasions prior to actually filing our papers and indeed

9       made several revisions to what we proposed based on

10      their good input.

11                   Second, this is a two-step process, so one

12      step is to reject the leases; the second step is to get

13      relief preservation order.  Really this motion in front

14      of you, your Honor, is directed to the second piece,

15      relief from the preservation order, and I did want to

16      make the Court aware that some of the lessors have

17      assented to rejection of the leases, and those motions,

18      some of them are actually pending in front of

19      Judge Boroff, and several will be heard tomorrow.

20                   All of those motions are subject to the

21      preservation order, so whatever this Court ultimately

22      decides with respect to notice and process will not be

23      affected by whatever Judge Boroff does tomorrow, but I

24      did want to make you aware of that, your Honor.

25                   THE COURT:  Thank you.  I didn't know the

1   timing of it, but I assumed as much.  Again, from my

2   perspective, if there is an issue, it's preservation.

3   In other words, you might want to photograph something,

4   you might want to inspect it, you might want to download

5   data, but a postage meter, I'm having trouble seeing why

6   that lease can't be rejected.

7          MR. GOTTFRIED:  The trustee agrees with you,

8   your Honor.

9          THE COURT:  All right.  The steering

04:08PM  10   committee's motion to partially lift discovery.  I don't

11   know if it's ripe in the sense that the time for

12   opposition has run.  My instinct certainly is to grant

13   it, but I obviously want to give parties an opportunity

14   to address this issue.

15          I know we're still just getting organized,

16   but I am anxious that every day or week or month that

17   goes by, discovery is becoming staler, and I would like

18   the parties who are actually going to litigate the

19   claims a reasonable opportunity to do so.  Mr. Sobol.

04:09PM  20          MR. SOBOL:  Yes, your Honor.  So, first,

21   it's my understanding, I'm pretty sure that the time for

22   filing an opposition expired yesterday.

23          THE COURT:  Expired yesterday.

24          MR. SOBOL:  Correct.

25          THE COURT:  That's right.  You said you

1       filed it in time to get the opposition.

2               MR. SOBOL:  So it would be dealt with here

3       today.  So the motion is ripe for you to rule on it.

4       There has been no opposition that has been filed.  In

5       order, and although that's the case, I want to take a

6       couple of steps back to sort of frame what it is that

7       the PSC will actually be doing so you can also have a

8       little bit better understanding of at least a portion of

9       the case management issues that are attendant to this.

04:09PM   10             First, you'll recall, your Honor, that you

11      appointed the PSC back in the second week or so of

12      April.  Shortly after that I sat down with the trustee,

13      Paul Moore.  Over the past four weeks or so, we've

14      established obviously a good working relationship, as

15      well as some substantive understandings about various

16      things that are going on that are sort of -- that he's

17      dealing with and that the PSC will be dealing with, and

18      that helps understand why it is we've asked for what

19      we've asked for in the motion and what it is we haven't

04:10PM   20      asked for, which I wanted to address briefly to you.

21              Again, I'm doing this not because of the

22      motion itself, but, frankly, there are some important

23      issues about case management that are going on that I

24      think it's helpful to air before you.

25              So there are, at least in my understanding,

1    other than NECC or NECP itself, there are three other

2    levels of actual or potential defendants or

3    nondefendants, depending upon whether the liability

4    exists there or not.

5             The other three levels are, first, the NECC

6    insiders, the Caddens, the Conigliaros, the individuals

7    who actually own the companies, along with all the

8    myriad companies that are affiliated with NECC, so that

9    includes Ameridose and Medical Systems or Sales

04:11PM  10  Management, Alaunus, GDC, and I think our count total is

11   about there are actually 19 entities that are in our

12   view affiliated with NECC which we've shared with

13   Mr. Moore and Mr. Gottfried to be able to help define

14   what we understand is that group of actual or potential

15   defendants.

16            There's then, second, what I call the

17   national defendants, meaning those companies who were

18   involved with respect to the allegedly defective

19   products at a national level, and, therefore, may or may

04:11PM  20  not be exposed nationally to persons all throughout

21   wherever the product was distributed.

22            Those might be companies that were involved

23   in, for instance, the testing, or the creation of the

24   clean room or who was supposed to be cleaning the clean

25   room, or what have you, those are people who would

1    theoretically be exposed nationwide, and then finally,

2    of course, there are the state and localized entities,

3    which you spent most of your time this afternoon

4    addressing, essentially clinics, although I recall in

5    some situations physicians who actually dispensed, and

6    it would only be liable to a certain group of people who

7    had actually in some way come in contact with the

8    product or the product as adulterated or allegedly

9    adulterated by the clinic.

04:12PM    10             Now, I set that out because--

11             THE COURT:  Isn't there a fourth category of

12   people who were on the ground in Massachusetts, for

13   example, former employees of the company or people who

14   were subcontractors, contractors, in other words, people

15   who might not be in the zone of management necessarily

16   but, nonetheless, might be percipient witnesses?

17             MR. SOBOL:  The answer to that is yes.  I

18   think they come in two varieties.  One is I would call

19   them actually national defendants, although they're from

04:12PM    20   Massachusetts, if they were involved in the creation of

21   the product, they could distribute nationwide, then

22   they're potentially liable nationwide, so I put them in

23   that bucket.

24             There's an issue which I'm not addressing

25   today which is what about other former or current

1    employees but not principals at NECC?  Where are they

2    going to go?  Do they have contribution indemnification

3    claims?  Don't they have to be released as a part of a

4    global settlement?  I'm not really addressing that here

5    today, but you're right to identify that that's out

6    there.

7              Now, with respect to the NECC and the

8    NECC-affiliated entities and persons, there has become

9    an understanding, which is that the trustee is in the

04:13PM  10    process of trying to undertake what would be a

11    resolution with all of those persons and entities to

12    create a pot, which pot eventually would become subject

13    to a bankruptcy plan and an allocation and a release.

14             Because I've come to an understanding with

15    Mr. Moore that your negotiation right now is your

16    negotiation, and when as, and, if appropriate, other

17    people be brought in, including myself, to make sure

18    that the settlement is satisfactory or not, that's fine.

19             Obviously in the context of a plan as well,

04:14PM  20    the creditors' committee would want to know what the

21    proposed resolution is, the amounts, the basis for it

22    and sign off on it as well.

23             For the time being, we are hands off.  There

24    are some issues though that are back and forth on that.

25    So, we've said, we, the PSC has said then we won't take

1   any discovery, we won't racket up any bills with respect

2   to those entities, we're not interested in doing it, you

3   stay away from us, you don't take discovery with respect

4   to us because you don't need any discovery from us,

5   you're in the middle of a settlement right now, let's

6   just leave that be as it is, and I'll see how things go.

7            So with respect to taking discovery of those

8   entities and persons, they're not a subject of the

9   motion, okay.  There may be an issue which I've only

04:14PM  10   recently brought to their attention, and we're going to

11   try and work out, which is whether those entities and

12   individuals we should negotiate a tolling agreement

13   because there are people who have unfiled cases that are

14   out there who may feel that they have some reason to

15   file but who there are lots of reasons why they

16   shouldn't be forced to file right now for the time

17   being, and, therefore, from my point of view, at least

18   as a matter of principle, and I'm just beginning this

19   negotiation, to find out whether or not a *quid pro quo*

04:15PM  20   for this hands-off attitude is also that you agree to

21   some kind of reasonable tolling agreement which we can

22   work out.  That's a part of it.

23            Now, also in the context of so we're not

24   seeking discovery from those entities, we're going to be

25   seeking information from everybody else, so from the

1   clinics and from the national defendants, whether they

2   are defendants here or whether they are nonparties that

3   have information that relate to this issue because a

4   part of what the PSC plans to do is to find out the

5   truth about what it is that happened here, find out what

6   products were distributed from NECC, when, to whom, what

7   they did with them and who they distributed them to,

8   some basic facts about what's out there.

9          During that process, if any of those

04:16PM   10   national or state-based defendants want to join a

11   discussion that's happening with the trustee or the PSC

12   or the creditors' committee with the PSC, then that's

13   what they'll do, and we'll stand down, but we're going

14   to go forward with discovery with respect to that.

15          Now, the intention of the PSC is to

16   undertake this discovery in a judicious manner, meaning

17   we are not trying to just undertake discovery for

18   discovery sake.  One thing we're trying to be mindful,

19   for instance, is whether or not any of these defendants

04:16PM   20   or potential defendants have wasting policies, that we

21   don't end up wasting the policy or that you know about

22   it, just like you would in any other tort case, you'd

23   sort of have to balance what information you have versus

24   the defense costs that you've racked up, so that will be

25   a part of what it is that we address as well.

1          I should also be mindful, by the way, that

2     in the context of the tolling agreement, one other thing

3     that has begun is a discussion regarding presenting to

4     this Court an order that to the extent the Federal Court

5     or this Court has the jurisdiction and the authority to

6     toll or stay the operation of prefiling or post-filing

7     deadlines that are imposed by state law of some sort,

8     that that might exist, but, obviously, plaintiffs to the

9     extent they want individual relief and believe that the

04:17PM  10   Court's in a position to grant it would have to come

11    forward individually and seek more specific or other

12    relief, and, similarly, a defendant can come forward

13    with respect to that.

14         Now, the creditors' committee reviewed the

15    motion to lift the stay for discovery, raised some of

16    the issues that I've identified that the PSC has been

17    addressing.  We've come to an understanding that there's

18    going to be a further dialogue.  I've indicated to them

19    that I'll have a teleconference or a meeting where we

04:18PM  20   sit down and any further concerns about discovery with

21    respect to wasting policies, or, you know, making sure

22    that we get a tolling agreement in place or in the

23    process of doing that, you know, get the other order in

24    place I mentioned, that we get those things in place,

25    and I think there were -- well, we're going to do that.

1          I made a commitment to them I'm going to do

2    that, that's what we're going to do.  We'll have that

3    meeting, we'll have that dialogue, just to make sure we

4    get this thing off the ground and running the right way.

5          That's sort of an overview, if you will, of

6    why it is we're asking for what we want and why we're

7    not asking for anything further.  On this piece of

8    things, there's some other case management issues I

9    wanted to address whenever we get to that.

04:18PM  10          On this piece of things, I would just

11    finally want to add that there was a misstep maybe or a

12    misunderstanding, which I think is in the process of

13    being taken care of, but my understanding is about the

14    scope of who has been in the discussions with Mr. Moore

15    is based on my discussions with Mr. Moore.

16          I think that he has a pretty firm

17    understanding about how global his negotiations have

18    been.  I'm not sure whether or not everybody on the

19    defendant's side, who is within that group, has the same

04:19PM  20    understandings or not, but that's just a function of

21    communication, which they'll have, right, and it's

22    completely understandable in a situation like this.

23          We've got a core group of people who are

24    trying to have a discussion and working with principals,

25    but then you have other people that are out there

```
 1    representing entities, and they might have been retained
 2    by insurance companies somewhere, so that's all neither
 3    here nor there.  What I'm basically saying is my
 4    statements about my understanding about what's been
 5    going on are from Mr. Moore.
 6              There might be some other impressions, but,
 7    frankly, I'm very comfortable that that's going to be
 8    worked out.  Now, again, there's other case management
 9    issues at some point, but that sort of deals with
10    lifting the discovery piece of things for the time
11    being.
12              THE COURT:  All right.  Let me pause there.
13    Does anyone else want to be heard on that topic?  Okay.
14    Hearing nothing, do you want to take up your other case
15    management issues?
16              MR. SOBOL:  Yes, your Honor.  Well, the next
17    case management issue I'd like to address and actually
18    have Ms. Dougherty address the website, then I would
19    address a couple other things.
20              THE COURT:  All right.
21              MS. DOUGHERTY:  Good afternoon, your Honor.
22    Things are ever changing, noting with the website, we
23    just got a further e-mail, but we are working on some
24    way of moving forward in a cost efficient manner in
25    order to get a website set up for the MDL web page, and
```

```
 1   the idea was to have that linked with the creditors'
 2   committee website, and so we have had some back and
 3   forth with respect to the content that would be on that
 4   web page and how that would be uploaded and the costs
 5   related to that.
 6              There is some concern that the MDL web page
 7   is going to be subject to the control and approval of
 8   the creditors' committee.  We've raised that concern.
 9              We, as of this morning, were hopeful that
10   that issue was resolved.  We were told it was resolved,
11   but since we've been sitting here in this courtroom,
12   I've now seen an additional e-mail stating that that is
13   not resolved, so we're going to continue to work hard to
14   get this resolved because we think it's very important
15   for the victims here to have access not only to the
16   information related to the bankruptcy but also to the
17   information related to the MDL procedure, the orders
18   that you have put in place, eventually access to a
19   master complaint, to a short form complaint, to a
20   profile form or fact sheet.
21              All of that information is equally
22   important, and we want to be able to share that
23   information.  We are asked by the trustee to work with
24   the creditors' committee to use one website, and we've
25   been attempting to do so.
```

1          Hopefully we can move forward in that this

2   is just a bump in the road, and we'll be able to get

3   that issue resolved so that the MDL page will have the

4   content that is needed without the supervision and

5   control and approval of the creditors' committee, and

6   if, in fact, we have to get a separate website, you

7   know, that will be unfortunate, but we'll do what we

8   have to do to make sure that the victims that need

9   information related to the MDL proceeding are able to

04:22PM   10   get that.

11          THE COURT:  Okay.  Mr. Sobol.

12          MR. SOBOL:  I think that the ultimate choice

13   that the PSC will have, your Honor, is whether or not we

14   bring a matter to your attention that lawyers should be

15   embarrassed about.

16          THE COURT:  If that were the standard, my

17   workload would be cut dramatically.  I'll leave it to

18   your collective good judgment.

19          I've said in the past, there's no reflection

04:23PM   20   on anymore in this room, I've said that the best

21   training for being a Judge is being a parent of teenage

22   children because it's often very much an identical

23   dynamic, but, you know, in all seriousness, I understand

24   you're not going to be able to work everything out.

25   Some of that I'm going to work out myself, some of it

1    I'm going to kick to the Magistrate Judge.  It depends.

2    I haven't heard anyone say yet that there's a problem,

3    at least as to the last couple of issues that require my

4    immediate attention.  I have lots on my plate.  If I

5    have to resolve it, I will, and if I think it's

6    appropriate for the magistrate, I will send it to her.

7              MR. SOBOL:  Fair enough.  As a practical

8    matter, you know, it would be a shame if people couldn't

9    figure out a way to have one website for the victims in

04:24PM  10   the case.

11             THE COURT:  I don't know what the issues

12   are.  I make no comment.

13             MR. SOBOL:  Right.  There are other two case

14   management issues I wanted to address with you, your

15   Honor.  As you can see, the bankruptcy court has under

16   way some case management on its own, which it's been in

17   the process of doing.

18             Before this Court, we have the PSC has

19   circulated a draft, which is very much a DRAFT, I'll put

04:24PM  20   all caps, bold, italics, underlined, any other font we

21   can put on it, to whoever is in the MDL who wants to

22   give comments to it, suggestions, all the rest of that

23   so that we can get in place something to that effect.

24             THE COURT:  I'm sorry, draft case management

25   order?

1           MR. SOBOL:  Yes, case management order, yes.

2    That essentially is intended, your Honor, to address

3    some of the items that I've mentioned to you today, you

4    know, a tolling agreement, the order regarding pre- and

5    post-filing requirements, some idea about how long this

6    discovery process is going to be undertaken before we

7    make a decision whether we're going to fish or cut bait

8    with those people who want to put money into a pot and

9    peel off the NECC bankruptcy and whoever wants to

04:25PM  10   participate in that and find out who wants to be left,

11   trying to put some timing on those features of things.

12           In broad brush, I don't want to get into

13   most of the details, but that's essentially what it is

14   that we're trying to address there.

15           THE COURT:  Does it also take up the issue

16   of master complaints and master answers?

17           MR. SOBOL:  It does, it does, so the notion

18   is the timing of when the master complaint would be

19   filed, how people would participate into that master

04:25PM  20   complaint, when answers would be filed.  That's all a

21   part of it.

22           I had been a little bit too hopeful to

23   actually being able to circulate a draft so that even

24   the Court might see something right now, but, frankly,

25   we haven't been able to get our act together enough to

1    be able to do that.  We'll do that soon and commit

2    hopefully to have either an agreed upon case management

3    order or proposed versions of case management orders

4    from various constituencies by the next status

5    conference so that you can have that, your Honor, at

6    that time.

7                Related to this is that we're going to have

8    to start a dialogue, and I'm starting a dialogue with

9    the trustee, and I will with others this week, but in

10   this situation where we have the bankruptcy court doing

11   its case management and the District Court doing its

12   case management, there also needs to be some case

13   management between this district court and the

14   bankruptcy court.

15               That's very classic in these kinds of

16   situations, and sometimes that can remain very informal,

17   but sometimes aspects of it should be formalized,

18   sometimes courts do that *sui sponte*, sometimes the

19   parties come to an understanding, make a proposal,

20   sometimes they have very different proposals, okay, but

21   certainly the PSC knows that that's something that needs

22   to be done.

23               We have our opinions about it.  We're going

24   to try to get and be educated by everybody else, also,

25   so that in a timely fashion before we have the next

1   status conference, it's ripe for decision or argument,

2   just like the case management order, that issue in terms

3   of whether, and, if so, how to address case management

4   between the bankruptcy court.

5        THE COURT:  I think that issue will probably

6   be relatively easy to resolve one way or the other.  I

7   think Judge Boroff and I, at least in the past, have

8   seen eye-to-eye, and I think we have a good

9   relationship, and that's a phone call that's easy to

04:27PM   10   make, if it comes to that, but I will call him and just

11   touch the base, which I haven't done in a little while,

12   and see whether there's anything we need to be paying

13   attention to from our end.

14        MR. SOBOL:  There's also one last issue,

15   which I'm going to flag to you, but I'm flagging it to

16   you because if you get an emergency motion tomorrow or

17   Thursday or Friday, I don't want to have not flagged it

18   to you today.

19        There is a major concern, your Honor, that I

04:28PM   20   have, as lead counsel for the plaintiffs' steering

21   committee, that other people are sending letters to

22   clinics and other people trying to have a dialogue, a

23   settlement dialogue, outside of the PSC process, and I'm

24   trying to find out who got those letters, when they got

25   the letters, to make sure that actual or potential

1    defendants know your order, which is obviously an effort

2    to put some kind of cohesiveness on discussions that are

3    happening by way of settlements.

4              I'm going to continue to try to do that over

5    the next two days to avoid your intervention, but there

6    may end up being a situation where I have to file an

7    emergency motion before you because there are people out

8    there being confused about who and when and how they

9    should speak to people about settling or not settling

04:28PM   10   this case.

11             THE COURT:  All right.  Does anyone want to

12   respond to any of that?

13             MR. FERN:  Judge, not a way of response but

14   some additional information the Court might be

15   interested in.  I have seen the draft PMO that the PSC

16   has drafted.  My comments via red line went back to the

17   PSC yesterday afternoon about 24 hours after I received

18   them.

19             What has not been spoken about, Judge, in

04:29PM   20   way of the discovery to be taken of Level II and

21   Level III defendants, what Mr. Sobol calls the national

22   defendants or the state specific defendants.  What that

23   bespeaks is some discovery from NECC, documents which

24   are necessary to identify many of those defendants and

25   what role they had in way of what they received from

1    NECC or what goods and services NECC received from them.

2          There was an informal discovery that came to

3    our attention in conjunction with the trustee.  We have

4    negotiated that informal discovery, and my office is

5    currently in the midst of gathering the documents that

6    we have agreed to.  It will be some time, but we will

7    produce them on a rolling production as they become

8    available.

9          Documents that were originally paper

10   documents and were scanned will be much easier, and they

11   will be produced first.  ESI discovery will come, is

12   also being processed, and that will come later in the

13   rolling production.

14         What is necessary that also has not been

15   spoken of is a protective order.  My office drafted a

16   protective order.  It was sent out to the PSC 10 days

17   ago.  Some of that red lines came back to us also in

18   conjunction with the trustee.  The second draft of the

19   protective order has been circulated among all the other

20   defendants.  I am waiting for their comments back, and

21   then the next draft will go back to the PSC.

22         It is our intention, Judge, that after that

23   protective order stipulation is fully negotiated and

24   completed, we will submit it to the Court to be so

25   ordered.

```
 1              So, there are a lot of different maneuvers

 2     and things taking place simultaneously with both the

 3     PSC, with the trustee, with my office and others, so we

 4     are making progress, we are moving forward to get this

 5     case off of first base and moving to a point where we

 6     can get that compensation pool available to the

 7     claimants.  Mr. Sobol.

 8              MR. SOBOL:  Mr. Fern is absolutely right.  I

 9     forgot to mention that there is some informal
```

04:31PM
```
10     discussions that are going on, and he's been very

11     responsive, as has the trustee, in terms of that

12     informal discovery, and, yes, one of the other things

13     with the case management order was also the protective

14     order issues as well.

15              THE COURT:  Ms. Andrews.

16              MS. ANDREWS:  Yes, your Honor, Anne Andrews

17     on behalf of the creditors' committee.  We are delighted

18     to hear about the discovery plan and the judicious

19     words, the word "judicious" used by the steering
```

04:32PM
```
20     committee, and I think I've already said on behalf of my

21     clients but can say whole-heartedly on behalf of the

22     creditors' committee how much economy this case requires

23     and how willing we are to meet and to hone discovery

24     across the country with the challenge of 79 pain

25     clinics, and now we're up to 24 states or so.
```

1             What I want to tell the Court is that the

2    committee in its work, which we don't often report to

3    you on this kind of level, but I think it's important

4    that we do to you today, the committee and its

5    co-chairs, Mr. Coren, who's in the courtroom today, and

6    myself and our committee, sent out a letter to each and

7    every pain clinic as the official creditor group telling

8    them about the bankruptcy and asking them to contact the

9    creditors' committee just to dialogue with them about

04:33PM   10   bankruptcy proceedings.

11            The copy of that letter was attached and has

12   been circulated.  I'll be happy to give a copy of it to

13   Mr. Sobol if he doesn't have it.  He is a member of our

14   committee.  It might have escaped his attention, but we

15   have an open request for them to contact us as the

16   creditors' group, something that routinely happens in

17   every bankruptcy case, and is in no way intended to, as

18   we get acquainted and work together and will work

19   together, trip over each other's responsibilities, and

04:33PM   20   they are responding.

21            There will be at some point a discussion

22   where all are brought into the room to move this

23   forward, but, quite frankly, many of them are anxious to

24   hear from somebody who wanted to tell them about a

25   bankruptcy so far away that has perhaps so much impact

1    on their clinics and their patients and their presence

2    in this case without being present, if you will, so with

3    that I just wanted to let the Court know.

4                THE COURT:  All right.

5                MR. MOLTON:  Your Honor, just a few things

6    to end up.

7                THE COURT:  Yes.

8                MR. MOLTON:  Basically I'm hop-skipping

9    because part of this deals with status update of the

04:34PM  10   bankruptcy proceedings.  With regard to the website, I

11   think the parties are working in good faith to get this

12   done.  We're letting the invited, and at Mr. Moore's

13   request, and basically at our agreement, to let the PSC

14   basically get on our back with respect to the website.

15               We're working out those protocols.  I think

16   the motion is on tomorrow, and Ms. Dougherty and one of

17   my partners, Rebecca Fordham, are going to make that

18   happen, so one way or another, although there are issues

19   with it, we're seeking to get it done, and I think

04:34PM  20   everybody is working in good faith, and I wanted to make

21   that clear.

22               Mr. Sobol referred to Mr. Moore, the

23   trustee's negotiations with what we call first here

24   insider defendants.  There was a protocol entered

25   between the committee and the trustee with the

1    committee's consent in the bankruptcy court that

2    established that protocol, and Mr. Moore has, you know,

3    as Mr. Sobol aptly and ably described, Mr. Moore is

4    running that and realizing that creditor and plaintiff

5    consent is crucial to any agreement going forward at the

6    appropriate time.  He's going to bring us into that

7    under his discretion and at that time.

8              Mr. Sobol accurately set forth our agreement

9    regarding the discovery order, and I appreciate that.

04:35PM  10    We've been -- we're taking a look at the CMO, and we're

11    going to be circulating red line to Mr. Sobol as well on

12    that and hopefully having discussions among the trustee

13    ourselves and Mr. Sobol so we can get that all on the

14    same page.

15              I think Mr. Sobol was correct in noting the

16    committee's had some concerns about some issues, and we

17    will be discussing that with him on a going forward

18    basis and his folks in good faith.

19              Lastly, Ms. Andrews just remarked about the

04:36PM  20    committee's efforts, and I do want to note, your Honor,

21    and we understand Mr. Sobol's role in this case,

22    acknowledge it, and are working with him on it, but one

23    of the points that we do want to make is, and I'm citing

24    Collier on this, your Honor, "A committee's role in the

25    plan process is probably the most important role in any

1    case."  It's Collier, 1103.05.

2              Norton, another bankruptcy treaty, 98.34,

3    the legislative history to Code Section 11028 states

4    that, "The creditor and equity securities holders

5    committees -- " there's no equity and securities holders

6    here -- "will be the primary negotiating body for the

7    formulization of the plan of reorganization."

8              We're cognizant of your Honor's MDL order,

9    which basically gave lead counsel various rights and

04:37PM   10    privileges vis-a-vis settlement.  We don't think we're

11   talking settlement in violation of that order, and what

12   we are doing, your Honor, is fulfilling our statutory

13   mandate in terms of talking with various interested

14   parties since we've been doing since day one of this

15   case, since January 18th, when we were formed about plan

16   process, plan protocol and moving this case to a

17   successful conclusion.  Thank you.

18              THE COURT:  All right.  Without commenting

19   on the last point, I hope that the parties can work

04:37PM   20    together, and I hope that turf battles can be kept to a

21   minimum.  Let's leave it at that.

22              Anything else I need to take up?  We have, I

23   think, complaints that haven't been answered yet.  I

24   would propose again to roll that over for the time

25   being, and I think there may be -- are there motions to

1    dismiss that are in the same category; is that right?

2    Ms. Parker.

3              MS. PARKER:  Yes, your Honor.

4              THE COURT:  Rolling over things from one

5    conference to the other to try to minimize work until we

6    have a master complaint and so forth in place.

7              MS. PARKER:  Yes, your Honor.  On Alaunus'

8    motion to dismiss, I have spoken with Mr. Ciporkin, who

9    can jump in, of course.  As I understand it, they have

04:38PM  10  agreed to, I think his word was "forbear" the deadlines

11   on those indefinitely.

12             THE COURT:  All right.  Again, I do want to

13   take them, particularly the motion to dismiss, I don't

14   want to keep saying this, and I keep rolling it over,

15   but I don't want it to sit indefinitely, I do want to

16   bring that to a head, so I will do that.

17             Is there anything else other than setting

18   dates for the next conferences, is there anything else

19   that anybody wants to bring to my attention?

04:39PM  20  MR. MORIARTY:  Yes, your Honor, I have two

21   things.  I'm sorry to go back -- this is Matt Moriarty

22   for Ameridose -- I'm sorry to circle back to the

23   removal, New Jersey motions or the remand motions, but

24   one of the New Jersey lawyers on the phone mentioned

25   that severance is an option, so I want to address where

1    that really stands in the pecking order.

2             Under 1334 and Section 157, we are confident

3    that the array of defendants in the New Jersey cases

4    give you "related to" jurisdiction.

5             NECC is in a number of those cases, if not

6    all of them.  Ameridose is in all of them.  Alaunus is

7    in all or most of them, clearly "related to"

8    jurisdiction, and under the New Jersey Product Liability

9    Act, those state court defendants are clearly by

04:39PM  10    definition not manufacturers or sellers.  That's why we

11    argued fraudulent joinder pretty vigorously at every

12    level.

13             And, quite frankly, our argument on 157 in

14    the New Jersey cases is very consistent with the

15    trustees' motion and even the view taken by the PSC on

16    these matters because the carve-out that they're urging

17    only pertain to cases like the Virginia cases, the

18    Tennessee cases where there are no Tier I, if you will,

19    defendants, so when we put in there that severance was

04:40PM  20    an option, it was clearly argued last and meant to be an

21    option of last resort.

22             Now, that segues into my second point.  We

23    believe pretty strongly in the Section 157 argument for

24    many reasons and in many levels in what you've heard

25    today.  There is certainly the possibility that you will

1   not agree with the trustee and the creditors' committee

2   and that those Virginia cases will stay in Roanoke for

3   ever more.

4            The only thing that I ask is that in many

5   MDLs where there is state litigation going on with

6   federal litigation where there may be any overlap

7   whatsoever in discovery is that you give us some lead

8   time to quickly put together a coordination order for

9   submission to you that talks about how potentially we

04:41PM  10   can reach out to state plaintiffs, state defendants,

11   possibly ways for you to reach out to state court judges

12   so that we can promote coordination to the greatest

13   degree and alleviate some of the concerns that have been

14   expressed here today.

15            THE COURT:  Okay.  If we get to that point,

16   I will certainly take that very seriously.

17            MR. MORIARTY:  That's all, thank you.

18            THE COURT:  Unless there's anything further,

19   I think what I'd like to do is to set a -- we might as

04:42PM  20   well set the next three or so.  Peter, is it June 11th?

21            THE CLERK:  June 11th at two.

22            THE COURT:  June 11th at two.  My schedule

23   is quite constricted going forward, and if some of you

24   can't make some of these dates with family vacation

25   plans and so forth, that's going to be hard for me to

1  move them.  I certainly don't require the senior most

2  person to be here at all times, but I propose the next

3  status for June 11th at two.  How about one in mid-July?

4          THE CLERK:  July 18th at two.

5          THE COURT:  July 18th at two, then

6  August before I disappear.

7          THE CLERK:  August 20th at two.

8          THE COURT:  August 9th at two, and to

9  recap --

04:43PM  10          MR. MORIARTY:  I'm sorry, your Honor, to

11  interrupt, but on July 18th, it's the 10th anniversary

12  of our firm.  There will probably not be any lawyers

13  available to come.  We can send somebody or we can

14  appear by phone or we can try for the 17th, but --

15          THE COURT:  I permit appearances by phone.

16  I can do July 19th at two, I can do July 17th at three.

17          MR. MORIARTY:  If it has to be between the

18  18th and 19th, let's leave it at the 18th, and we'll do

19  the best we can.

04:44PM  20          THE COURT:  All right.  See if one junior

21  person can remain attentive and stay away from the punch

22  and the champagne and sit in on the meeting.

23          All right.  With regard to the trustee's

24  motion to transfer and the related motions, motions for

25  mandatory abstention to withdraw the reference, to

1    remand and so on, those motions are all taken under

2    advisement.  Parties wishing to file may do so by next

3    Monday, the 20th.

4            The trustee's motion seeking limited relief

5    as to the preservation order I will grant subject to

6    further discussion with the government.  Hopefully

7    they'll be an agreed upon proposal.  The plaintiffs'

8    steering committee's motion to partially lift discovery

9    will be granted, and we will again roll over until the

04:45PM    10    next status answers to complaints and responses to or

11    oppositions to Alaunus' motion to dismiss.  Next

12    conference to be June 11th at 2:00.

13            All right.  Is there anything else?

14            MR. FERN:  Your Honor, just a point of

15    clarification.

16            THE COURT:  Yes.

17            MR. FERN:  I heard August 9th and I heard

18    August 20th.

19            THE COURT:  I'm sorry, August 9th.

04:45PM    20            MR. SOBOL:  I'm taking the alternate issue

21    seriously, your Honor, if there's something that myself

22    or Ms. Parker can't be here, we're just going to --

23            THE COURT:  Yes.  There is no way between my

24    schedule and all of your schedules that we can have

25    perfection where everyone is going to be available all

1    the time.  I recognize you all have busy schedules, as I

2    do, and I'm sure we'll find a way to get through, and

3    that goes for any of you.

4            You know, I will accept the appearance of a

5    relatively junior person.  I expect that person to be

6    reasonably well prepared, but I don't need to see the

7    senior most person with rare exceptions at any of these

8    conferences.  All right.  Thank you, all.  Thank you for

9    your appearances and I will see you in about a month.

04:46PM   10        MS. PARKER:  Thank you, your Honor.

11            (Whereupon, the hearing was adjourned at

12    4:46 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                     C E R T I F I C A T E

2

3     UNITED STATES DISTRICT COURT )

4     DISTRICT OF MASSACHUSETTS ) ss.

5     CITY OF BOSTON )

6

7          I do hereby certify that the foregoing

8     transcript, Pages 1 through 117 inclusive, was recorded

9     by me stenographically at the time and place aforesaid

10    in MDL NO. 13-02419-FDS, IN RE:   NEW ENGLAND COMPOUNDING

11    PHARMACY CASES LITIGATION and thereafter by me reduced

12    to typewriting and is a true and accurate record of the

13    proceedings.

14          Dated this May 17, 2013.

15                    s/s Valerie A. O'Hara

16                    _____

17                    VALERIE A. O'HARA

18                    OFFICIAL COURT REPORTER

19

20

21

22

23

24

25
```