IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETS

| | |
|---|---|
| IN RE : NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | Master Docket No. 1 :13-md-2419-FDS |
| CONSTANCE GAY RHODES<br><br>   Plaintiff,<br><br>vs.<br><br>NEW ENGLAND COMPOUNDING PHARMACY, INC., D/B/A/ NEW ENGLAND COMPOUNDING CENTER,<br><br>and<br><br>CARILION SURGERY CENTER NEW RIVER VALLEY LLC, D/B/A NEW RIVER VALLEY SURGERY CENTER, LLC,<br><br>   Defendants. | This Document Relates to<br>Civil Action No: 1:13-CV-10504-FDS |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT CARILION SURGERY CENTER NEW RIVER VALLEY, LLC'S, D/B/A NEW RIVER VALLEY SERGERY CENTER, LLC ("NEW RIVER"), MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

**I. BACKGROUND**

Plaintiff, by her attorneys, THE MILLER FIRM, LLC, files this Brief In Opposition To Defendant Carilion Surgery Center New River Valley LLC's, D/B/A New River Valley Surgery Center, LLC, Motion To Dismiss For Failure To State A Claim Upon Which Relief May Be Granted.

1

Plaintiff filed a complaint in the Roanoke City Circuit Court in the Commonwealth of Virginia on November 12, 2012, against Defendants for injuries and damages suffered after Plaintiff was injected with methylprednisolone acetate, a steroid pain reliever manufactured, distributed and sold by the Defendants.  Specifically, the Plaintiff alleged that the defective methylprednisolone acetate was contaminated with a fungus, causing Plaintiff to suffer from fungal meningitis.  (Compl. ¶ 24).  Defendant Carilion Surgery Center New River Valley LLC's, D/B/A New River Valley Surgery Center, LLC ("New River") knew or should have known that defendant New England Compounding Center ("NECC") had been cited repeatedly for failing to use proper sterilization practices.  (Compl. ¶ 39).  Furthermore, New River knew or should have known that NECC distributed products without a proper prescription in violation of state regulations.  (Compl. ¶ 39).  Despite these known or knowable facts about NECC, New River negligently purchase compounded medicines from NECC.  (Compl. ¶ 41).  New River was in the business of distributing pain management products and devices to its clients. (Compl. ¶ 6).  During the course of New River's business of selling products, it sold the defective methylprednisolone acetate to Plaintiff, thereby causing her injury.  (Compl. ¶¶ 42-44).

Plaintiff has alleged viable causes of actions under Virginia law for negligence, breach of implied warranty and breach of express warranty.    Defendants were served with the complaint on March 18, 2013, but have yet to file an answer to the complaint.  Defendants' first responsive document was its Motion to Dismiss filed on June 11, 2013, well outside the 21-day time limit for filing a responsive pleading.  The Court should deny this belatedly filed Motion to Dismiss.

## II.  ARGUMENT

 "In deciding a motion to dismiss, a court does not rule on the evidentiary sufficiency of a complaint, only on whether its factual and legal assertions allege 'a plausible entitlement to relief.'"

*Balerna v. Gilberti*, 2010 U.S. Dist. LEXIS 124639 (D. Mass. Nov. 24, 2010); (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007)). "In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." On a motion to dismiss the Court must "treat as true all well-pleaded facts, viewing those facts in the light most favorable to the plaintiff, and drawing all reasonable inferences therefrom for him." *Knowlton v. Shaw*, 704 F.3d 1 (1st Cir. 2013).

### a. Plaintiff has Alleged Viable Claims for Breach of Warranty Against Defendant New River Under Virginia Law.

New River misleadingly argues that Plaintiff's reliance on breach of warranty claims to establish liability has been rejected by Virginia courts. This is simply untrue. No Virginia Appellate or Supreme Court decision has ever considered this issue and, therefore, there is no binding Virginia authority over how this matter should be decided.

To support its argument that "Virginia courts" have rejected such a claim, New River cites to two unreported Virginia circuit court opinions: *Gressman v. Peoples Serv. Drug Stores*, Inc., No. LL-692-4, 1998 WL 619115; and *Coffman v. Arthrex*, Inc., 69 Va. Cir. 17 (August. Co. Cir. Ct. 2005); It also cites to a Virginia tax case, *Commonwealth Dep't of Taxation v. Bluefield Sanitarium, Inc*., 222 S.E.2d 526 (1976). These precise arguments were analyzed at length by the U.S. District Court for the Eastern District of Virginia in *Sanders v. Medtronic, Inc.*, 2006 U.S. Dist. LEXIS 45516 (E.D. Va. 2006). After reviewing the foregoing authority for purposes of determining Medtronic's fraudulent joinder argument, the Court in *Sanders* concluded they do not foreclose claims for breach of warranty under the Virginia U.C.C.

In *Sanders,* the Court decided that it is possible for a defendant health care provider to be liable as a seller of a defective product in Virginia. *Id.* at *30. The Court considered, and rejected, the same authority that New River now relies upon to support its arguments in favor of

dismissal. For example, the Court in *Sanders* extensively considered *Gressman v. Peoples Service Drug Stores, Inc.,* 10 Vir. Cir. 397 (Va. Cir. Ct. 1988). In *Gressman*, the circuit court held that a pharmacist could not be held liable for breach of warranty for dispensing the wrong drug to the plaintiff because as a "health care provider", the pharmacist was engaged primarily in the business of providing a service, rather than the sale of goods. *Id*. at 409.

The Court in *Sanders* concluded that *Gressman* provided an insufficient legal basis to conclude that Sanders' claim for breach of warranty was foreclosed in Virginia:

> As to *Gressman*, the court recognizes that the circuit court found that a pharmacist, as a health care provider, is primarily a provider of services, rather than a seller of goods. However, the court does not feel that a circuit court case from 1988 involving the liability of a pharmacist for breach of warranty is compelling enough for this court to say with certainty that a Virginia court could not reasonably find that Sentara, a hospital, is a "seller" of goods in the instant case. … *Gressman* does not convince this court that a hospital cannot be a "seller" under Virginia law. Accordingly, with respect to Medtronic's argument that Sentara is not a "seller", the court finds that the Virginia case law set forth by Medtronic is insufficient to convince this court there is not a reasonable possibility that a Virginia court could find that Sentara is a "seller" of Medtronic IPG devices in this case."

*Id*. at *20-21.

Defendant also cites *Commonwealth Dep't of Taxation v. Bluefield Sanitarium, Inc*., 222 S.E.2d 526 (1976). *Blue Field Sanitarium* was a tax case, in which the issue before the court was whether the sales tax exemption for purchase of medical supplies applied to private hospitals. *Id*. at 687. The Court held that the provision of the tax code on which the hospital was attempting to avoid paying sales tax was intended to benefit patients, not hospitals engaging in the provision of health care services. *Id*. at 690.

The court in *Sanders* carefully analyzed *Bluefield Sanitarium* and concluded it does not answer the relevant question of whether a health care provider is a seller of goods under the U.C.C.:

> As to Bluefield Sanitarium, this court,…. is concerned by the fact that Bluefield Sanitarium is a tax case which was decided under completely different policy considerations and had nothing to do with a hospital's potential liability for breach of warranty or an individual's right to recover for her injuries.  Although the Supreme Court of Virginia might be compelled to consider its analysis in Bluefield Sanitarium in deciding the instant case, *Bluefield Sanitarium* is significantly distinguishable from the instant case for this court to conclude that there is no reasonable possibility that the Supreme Court of Virginia would find that Sentara is not a seller under the U.C.C.

*Sanders*, at *20.

Finally, in analyzing the circuit court's opinion in *Coffman v. Arthrex*, *Inc.,* the Court in *Sanders* found it of little precedential value given the *Coffman* court's acknowledgement that there are no Virginia appellate or supreme court decisions discussing the issue of whether a health care provider may be held liable under a theory of strict product liability:

> The Circuit Court of Augusta County sustained the demurrer, explaining that a hospital is a health care provider, and a "health care provider is not a 'seller' and is not subject to liability on a products liability theory." …. However, in rendering this decision, the circuit court acknowledged that "[t]here apparently is no Virginia case directly on point." [citation omitted]. Furthermore, the circuit court explains that the only case that could possibly "shed some light upon how the Virginia Supreme Court w[ould] rule upon this issue is the case of Commonwealth Department of Taxation v. Bluefield Sanitarium, Inc., 216 Va. 686, 222 S.E.2d 526 (1976)."

*Sanders*, at ** 12-14 (E.D. Va. 2006) (citing *Coffman*, 2005 Va. Cir. 143, at *4).

*Sanders* is directly on point to the present case.  No pertinent changes to Virginia law have been made since *Sanders* was decided.  Moreover, subsequent analogous Federal Court decisions in other districts have since supported the reasoning in *Sanders*. *See, e.g*., *Phillips v. Medtronic, Inc.*, 2010 U.S. Dist. LEXIS 127961 *12 (D. Mass. Dec. 1, 2010) (remanding case because there was no definitive state case law as to whether a hospital can be liable on breach of warranty claim); *Snyder v. Davol, Inc.,* 2008 U.S. Dist. LEXIS 1675 (D. Or. Jan. 7, 2008)

5

(remanding case because there was no definitive state case law as to whether a healthcare provider can be liable on a products liability claim).

Moreover, other jurisdictions have held that the sale of medical products to patients by health care providers can constitute a sale of goods for purposes of imposing strict liability. For example, in *Cunningham v. MacNeal Memorial Hosp., 47 Ill. 2d 443, 446-453 (Ill. 1970)* (superseded by statute), the court held that a tainted blood transfusion that was given to a patient constituted a sale of goods, subjecting the hospital to strict product liability:

> To assert that the transfusion of whole blood by a hospital into a patient, for which a charge is made, does not give rise to implied warranties because no "sale" is involved is in our judgment simply unrealistic. As noted by the appellate court in this case… "'It seems to us a distortion to take what is, at least arguably, a sale, twist it into the shape of a service, and then employ this transformed material in erecting the framework of a major policy decision.'" (113 Ill. App. 2d 74, 84-85).
>
> * * *
>
> Further, that providing blood for patients is not a hospital's principal function clearly cannot determine, as maintained by defendant, whether it is engaged in the business of selling a product (i.e., blood) for purposes of the imposition of strict liability. Thus, as set forth in the Restatement: "f. Business of Selling. The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products.

*Cunningham,* 47 Ill. 2d at 450-451 (Ill. 1970)

Although *Cunningham* was superseded by statute as it applies to blood transfusions, the Illinois Supreme Court has employed its reasoning to the sale of other medical products by health care providers. *See, e.g.*, *Dubin v. Michael Reese Hospital & Medical Center*, 74 Ill. App. 3d 932, 945 (Ill. App. Ct. 1st Dist. 1979)("we hold that the supply of X-radiation for absorption

into a patient for treatment purposes by a hospital, for which a charge is made, places such hospital in the business of introducing such X-radiation in the stream of commerce").

Plaintiff acknowledges this matter is unsettled under Virginia law. However, this is all the more reason to allow the claim to move forward into discovery so Plaintiff can have opportunity to fully develop the factual record in relation to New River's status as a seller of prednisolone acetate.

### b. The Virginia Medical Malpractice Act is not Applicable to Plaintiff's Allegations of Negligence against New River.

New River argues that Plaintiff's claim falls within the Virginia Medical Malpractice Act and, as such, Plaintiff was required to certify that an expert has reviewed her claim and provide a written opinion that New River deviated from the medical standard of care.  However, Plaintiff's allegations of negligence against New River do not arise out of any "health care" it provided to her as that term is defined under Va. Code Ann. § 8.01-581.1, which provides as follows:

> "Health care" means any act, professional services in nursing homes, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical diagnosis, care, treatment or confinement.

New River's negligent conduct  in this case was independent of any health care provided to Plaintiff "during the patient's medial diagnosis, care, treatment or confinement." Rather New River's negligence arises out of its failure to use reasonable care in selecting NECC as its supplier of compounded medicines given NECC's well-known history of using improper practices and previous violations of industry standards.  Compl. at ¶¶39-41.  Carelessly procuring mediation from a disreputable supplier is a business and/or administrative practice, not "health care" as that term is defined above.  Moreover, the allegations of the Complaint state that

7

NECC was selling large batches methylprednisolone acetate without individual prescriptions, in violation of Virginia and federal law and industry standards. Compl. at ¶ 38. Therefore, when New River negligently purchased the contaminated methylprednisolone acetate from NECC, it did so independent of any individual prescription for Plaintiff, or any consideration for Plaintiff's individual medical needs.

The Virginia Supreme Court has recognized that not all tort or contract claims by patients against their health providers fall within the Medical Malpractice Act. In *Alcoy v. Valley Nursing Homes, Inc.*, 272 Va. 37, 630 S.E. 2d 301 (2006), the Court held that the Medical Malpractice Act only applied to tort or contract claims arising out of "health care or professional services rendered" under the Act and, therefore, did not apply to other tort claims such as an alleged assault by a member of the nursing home's staff:

> By their terms, the definitions of "malpractice" and "health care" apply to patients on an individual basis, rather than to the staffing and security of any medical facility in which the patients are located. As defined in Code § 8.01-581.1, "health care" relates to acts or omissions "on behalf of a patient." Likewise, under the same definitional statute, "malpractice" involves health care or professional services that are rendered or should have been rendered "to a patient." The factual allegations of the administrator's pleadings address conduct unrelated to any health care or professional service that Valley should have rendered to Alcoy individually. Instead, as stated above, the administrator's allegations involve failures relating to proper staffing and security measures for the facility.

*Alcoy*, 272 Va. at 43.

The Court in *Alcoy* further explained that the statutory requirement that a medical expert who testifies as to the standard of care must have an active clinical practice shows that the Act does not apply to negligence claims arising out of administrative decisions by the health care providers:

> The specific statutory requirement that an expert have had an active clinical practice plainly indicates a legislative intent that expert testimony in cases

> subject to the Act address medical standards of care, rather than standards concerning building security or employment protocols. Therefore, we conclude that the circuit court erred in holding that the administrator's claims were subject to the provisions of the Act.

*Alcoy*, 272 Va. at 43-44.

Other jurisdictions have also declined to apply medical malpractice statutes to claims arising out of the corporate or administrative negligence of health care providers. *See, e.g.*, *Miles Laboratories v. Doe*, 315 Md. 704, , 556, 556 A.2d 1107, A.2d 1107, 1125 (1989) (holding claims against a blood bank "are not for medical malpractice of its employees, but for the organization's failure to adopt proper testing and screening procedures"); *Bleiler v. Bodnar*, 65 N.Y.2d 65, 72, 479 N.E.2d 230, 235, 489 N.Y.S.2d 885, 890 (1985) (a hospital's failure to adopt and prescribe proper procedures and regulations differs from medical malpractice); *Sweeney v. Presbyterian/Columbia Presbyterian Medical Center*, 763 F. Supp. 50, 51-53 (S.D.N.Y. 1991) (claim that a hospital failed to employ procedures which would have adequately insured that blood it obtained for transfusions was not toxic is not of a nature that calls into question the medical decisions made regarding plaintiff's treatment and therefore is not medical malpractice). *Kaiser v. Memorial Blood Center, Inc.*, 486 N.W.2d 762, 767-768 (Minn. 1992) (holding that provision of tainted blood due to failure to properly screen donors was not a claim for medical malpractice but for common law negligence).

Additionally, even if Plaintiff's claims could be considered under the Medical Malpractice Act, a certification from an expert witness would be unnecessary. Pursuant to Va. Code Ann. § 8.01-20.1 a "certification is not necessary if the plaintiff, in good faith, alleges a medical malpractice action that asserts a theory of liability where expert testimony is unnecessary because the alleged act of negligence clearly lies within the range of the jury's common knowledge and experience." Here, the Plaintiff's theories of liability do not require

9

expert testimony. It is clearly within the range of the jury's common knowledge and experience to under it would be negligent to purchase drugs from a company that has been cited numerous times for safety violations and that is selling the drugs in violation of state and federal law. *Sweeney* is instructive on this point, holding:

> the claim that a hospital failed to employ procedures which would adequately insure that the blood it obtained for transfusions was not toxic is most closely analogous to a claim of failure to hire competent employees or failure to provide functioning wheelchairs to patients. See e.g., DeLeon v. Hosp. of the Albert Einstein College of Medicine (1st Dept. 1991) 164 A.D.2d 743, 566 N.Y.S.2d 213; McCormack v. Mount Sinai Hosp. (2nd Dept. 1981) 85 A.D.2d 596, 444 N.Y.S.2d 702. The nature of this claim is not such that it calls into question the competency of the medical decisions made regarding Sweeney's treatment; the complaint does not allege that the decision to give Sweeney a transfusion was wrongful, nor does it -- as was the case in Khan -- charge that the hospital was negligent in the manner in which it administered the transfusion. n2 Rather, the instant claim challenges the competency of the hospital as a supplier of a particular product, namely blood. As such, the requisite elements of this claim are that the hospital failed to exercise reasonable care in selecting and furnishing blood -- as judged by comparison to the blood-screening procedures then available or employed by other hospitals in the relevant community -- and that such failure was a proximate cause of Sweeney's injury and death; elements which are markedly different from medical malpractice**, and which do not necessitate expert medical knowledge**. See DiMarco v. Hudson Valley Blood Services (Brx. Sup. Ct. 1988) 141 Misc. 2d 59, 532 N.Y.S.2d 488, rev'd on other grounds, 147 A.D.2d 156, 542 N.Y.S.2d 521 (action against blood center for HIV contaminated blood lies in negligence); John Doe v. New York Hospital (N.Y. Sup. Ct. 1990) 148 Misc. 2d 756, 561 N.Y.S.2d 326 (action against hospital for failure to adequately screen blood for HIV virus sounds in negligence).

763 F. Supp. at 52.

Based on the foregoing authority and the allegations of the Complaint, New River's negligent selection of NECC as a source for compounded medicines is clearly an administrative and/or corporate function that does not constitute "health care" provided to the Plaintiff. Its decision to select NECC as its source for compounded drugs was unrelated to any treatment it provided specifically to Plaintiff. Therefore, the allegations of negligence and breach of

warranty against New River set forth in the Complaint to do not fall under the Medical Malpractice Act.

At the very least, any decision regarding this issue is premature given the infancy of this case. Discovery has yet to commence and at this time it is unknown whether the individual at IPGM who was charged with ordering and purchasing the methylprednisolone acetate from NECC was even a medical professional at all. The person ordering such medications may very well have been an office administrator without any medical credentials whatsoever. This is certainly likely given that NECC did not require valid prescriptions before selling compounded medications to their customers in violation of federal and state regulations. Compl. at ¶ 38. Accordingly, New River's motion to dismiss the negligence and warranty claims against it on the grounds that Plaintiff failed to comply with the Medical Malpractice Act should be denied.

Should the Court grant New River's motion to dismiss on the basis of lack of an expert certification, then Plaintiff requests that the motion to dismiss be without prejudice to allow Plaintiff to obtain an expert certification. As argued above, the Plaintiffs have a good faith basis for asserting that no expert certification is needed and such as severe sanction as dismissal would be inequitable. Importantly the Medical Malpractice Act, explicitly provides the trial court with discretion as to whether to dismiss the case on the basis of a lack of expert certification, and further provides discretion as to whether dismissal would be with or without prejudice. Va. Code Ann. § 8.01-20.1 ("…**may** dismiss the case with prejudice.")

    **c.**    **Virginia Code § 54.1-3410 does not Absolve New River of its Negligence.**

New River makes the remarkable argument that because NECC was responsible for compounding the methylprednisolone acetate under Va. Code. § 54.1-3410(2)(D), "there are no

11

set of facts set forth in the Complaint which could implicate liability on behalf of any health care provider, including New River." This argument is fatally flawed for several reasons.

Although Va. Code §§ 54.1 3410.2(D) and (E) state that the compounding pharmacy has the obligation to ensure compliance for sterile compounding and the accuracy of formulas, this language in no way provides blanket immunity to New River from liability in this case. New River knew, or should have known with the exercise of reasonable care, that NECC had a history failing to live up to these standards. NECC has a long history of citations for violating laws like Va. Code § 54.1-3410. Compl. at ¶¶ 40, 41. To suggest that New River should be immune from liability for purchasing compounded drugs from a disreputable pharmacy such as NECC simply has no precedent under Virginia law. Such a result would represent an extraordinary abrogation of New River's legal duty to use reasonable care in the selection of its medication suppliers. This is likely why New River cites no Virginia case law in support of its argument.

New River further complains that holding it liable for its negligent conduct in this regard "would result in an unduly burdensome set of requirements whereby New River and other health care providers would have to independently test all drugs they administer." This argument is wholly without merit. The only burden that Plaintiff seeks to impose on New River is its common-law duty to use reasonable care in the purchase of its medications. Undoubtedly, there are many reputable suppliers of prednisolone acetate, including Pfizer, which manufactures it under the brand name Depo-Medrol. New River's decision to purchase medication from NECC was a negligent one based on NECC's poor track record of safety violations, and Va. Code § 54.1-3410 contains no provisions shielding New River from such liability.

> **d.  The Complaint Alleges Sufficient Facts to State a Claim for Breach of Express Warranty and for Breach of Implied Warranty Of Merchantability.**

Plaintiff has alleged that New River breached an express warranty under Virginia Coed § 8.2-313: "Defendants expressly warranted that the methylprednisolone acetate was safe and effective." Compl. at ¶ 48. This allegation, which must be taken as true for purposes of the present motion, satisfies the express warranty provisions of Va. Code § 8.2-313, which provides in relevant part as follows:

> § 8.2-313. Express warranties by affirmation, promise, description, sample
>
> (1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
>
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Defendants' warranty that the methylprednisolone acetate was "safe and effective" satisfies subsection (a) as an "affirmation or promise made by the seller to the buyer which relates to the goods". It further satisfies subsection (b) as "any description of the goods which is made part of the basis of the bargain".

Defendant's reliance on *Sanders v. Medtronic* in this regard is misplaced. The Court in *Sanders* held that the hospital defendant, Sentara, could not be liable for breach of express warranty because it simply made no representations or warranties of any kind to the plaintiff:

13

> In this case, the plaintiff alleges in her Motion for Judgment that the defendants provided documentation to the plaintiff that stated the following: "The battery life of the pulse generator depends on the number of hours you use it each day and how strong the stimulation must be to control your pain. Your doctor can give you an estimate once your pulse generator settings have been determined." (Mot. for J. at 12)(emphasis in original). The plaintiff claims that the surgeon responsible for implanting the device gave her a battery life estimate of four to five years.
>
> The problem with the plaintiff's breach of express warranty claim as against Sentara is that the plaintiff has not alleged any facts that suggest that Sentara made any express warranties to the plaintiff regarding the Medtronic IPG devices. Even if Sentara gave the defendant the documentation to which the plaintiff refers, which is not clear from the Motion for Judgment, such documentation does not contain an express warranty. It simply states that her doctor can give her an estimate for the battery life. Furthermore, the plaintiff's surgeon, who is not a party to this case and not an employee of Sentara, gave her the estimation of four to five years.

*Sanders v. Medtronic, Inc*., 2006 U.S. Dist. LEXIS 45516, 27-28 (E.D. Va. 2006)

Thus, in *Sanders* the doctor who made representations regarding the battery life of the plaintiff's pacemaker was not even a party to the lawsuit. In the present case, New River is clearly a defendant in this lawsuit, and expressly warranted to Plaintiff that "the methylprednisolone acetate as safe and effective." Compl. at ¶ 47. Defendant's characterization and application of *Sanders* is this regard is simply inaccurate, and fails to support the dismissal of Plaintiff's express warranty claim.

Under Count IV of the Complaint, Plaintiff further alleges a claim for breach of implied warranty of merchantability under Va. Code § 8.2-314. New River's motion to dismiss does not directly address the sufficiency of this warranty claim. Compl. at ¶ 53. New River seeks to dismiss a claim for breach of implied warranty for a particular purpose under Va. Code § 8.2-315. However, Plaintiff is not alleging a breach of implied warranty for a particular purpose.

## IV.  CONCLUSION

For the aforementioned reasons, the Defendant's Motion to Dismiss should be denied in its entirety. Should the Court grant the motion to dismiss, the Plaintiff requests that the dismissal be without prejudice and/or with leave to file an amended complaint.

Respectfully Submitted by:

/s/ Jeffrey Travers
THE MILLER FIRM, LLC
Jeffrey Travers, Esq.VSB #77409
108 Railroad Ave.
Orange, VA 22960
Phone: (540) 672-4224
Fax: (540) 672-3055
jtravers@millerfirmllc.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system and that electronic notice and service will be completed through the ECF system to all counsel of record.

/s/  Jeffrey Travers, Esq.

Jeffrey Travers, Esq. VSB # 77409