UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | MDL No. 2419<br>Dkt. No. 1:13-md-2419 (FDS) |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | |

## PLAINTIFFS' RESPONSE TO LIBERTY INDUSTRIES, INC. MOTION TO QUASH AND/OR TO MODIFY

NOW COMES Plaintiffs, by the Plaintiffs' Steering Committee ("PSC"), and respectfully moves this Court to deny Liberty Industries, Inc.'s ("Liberty") Motion to Quash and/or to Modify.

Pursuant to Rule 45 of the Federal Rules of Civil Procedure and this Court's June 21 Order on Central Enforcement of Subpoenas (Dkt. No. 193), this Court has the authority to enforce the subpoena issued by the PSC upon Liberty on June 21, 2013 and to deny Liberty's motion to quash and/or modify. The Court should deny this motion for the following reasons:

1.  In direct violation of Rule 26(c)(1) of the Federal Rules of Civil Procedure and this Court's Local Rule 7.1 (a)(2), Liberty failed to meet and confer prior to seeking court action, and completely ignored the PSC's good faith attempts to resolve and/or narrow the issues.

2.  Liberty has failed to establish that compliance with the Subpoena would cause an undue burden. To the contrary, Liberty has already collected the relevant information without issue, yet continues to refuse or ignore all proposals made by the PSC to have the documents produced.

3. The PSC is not required to bear any of the costs associated with Liberty's compliance with the Subpoena, and Liberty has not provided a compelling or legally supported argument as to why Plaintiffs should be required to bear Liberty's costs.

Further, as a result of Liberty's refusal to meet and confer, the PSC will incur significant costs associated with responding to this motion - costs that should be borne by Liberty.

WHEREFORE, the PSC respectfully moves this Court to deny Liberty's Motion to Quash and/or Modify and order Liberty to compensate the PSC for the reasonable costs associated with responding to this motion.


Dated:  July 15, 2013                                     Respectfully submitted,

*/s/ Marc E. Lipton*
Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI 48075
Phone: (248) 557-1688
Fax: (248) 557-6344
marc@liptonlawcenter.com

*Plaintiffs' Steering Committee*

Thomas M. Sobol
Kristen Johnson Parker
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Phone: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
kristenjp@hbsslaw.com

*Plaintiffs' Lead Counsel*

Elizabeth J. Cabraser
Mark P. Chalos
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Phone: (415) 956-1000
Fax: (415) 956-1008
ecabraser@lchb.com
mchalos@lchb.com

*Federal/State Liaison*

Kim Dougherty
JANET, JENNER & SUGGS, LLC
75 Arlington St.
Suite 500
Boston, MA 02116
Phone: (617) 933-1265
kdougherty@myadvocates.com

Patrick T. Fennell
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, Virginia 24016
Phone: (540) 342-2000
pfennell@crandalllaw.com

J. Gerard Stranch, IV
Benjamin A. Gastel
BRANSETTER, STRANCH & JENNINGS
PLLC
227 Second Avenue North
Nashville, TN 37201
Phone: (615) 254-8801
Fax: (615) 255-5419
gerards@branstetterlaw.com

Mark Zamora
ZAMORA FIRM
6 Concourse Parkway, 22nd Floor
Atlanta, GA 30328
Phone: (404) 451-7781
Fax: (404) 506-9223
mark@markzamora.com

*Plaintiffs' Steering Committee*

## CERTIFICATE OF SERVICE

I, Marc E. Lipton, hereby certify that I caused a copy of the above Plaintiff's Response to Liberty Industries, Inc.'s Motion to Quash and/or Modify to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated: July 15, 2013

*/s/ Marc E. Lipton*

Marc E. Lipton

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | MDL No. 2419<br>Dkt. No. 1:13-md-2419 (FDS) |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | |

**MEMORANDUM IN SUPPORT OF RESPONSE TO LIBERTY INDUSTRIES, INC. MOTION TO QUASH AND/OR TO MODIFY**

**STATEMENT OF FACTS**

As the Court is well aware, this case involves the distribution of contaminated pharmaceuticals from the New England Compounding Pharmacy ("NECP") to various clinics throughout the country and the subsequent illness and death to patients as a result of exposure to the tainted medication. As of July 1, 2013, 749 patients have confirmed illnesses related to their exposure to the tainted pharmaceuticals, over 240 have confirmed cases of meningitis, and 61 people have died.[1] The various medications manufactured by NECP were compounded in "cleanrooms" that were designed and installed by Liberty Industries, Inc. ("Liberty"). (Liberty Mot. To Quash at 1).

As a professional courtesy, on June 20, 2013, the Plaintiffs' Steering Committee ("PSC") contacted Liberty to advise that the PSC would be serving a subpoena upon it. During this June 20 call the parties discussed the subpoena, and Liberty gave the impression that production of documents could be made before the noticed deposition date and that Liberty had an understanding that the PSC had an interest in obtaining documents related to Liberty's involvement with the cleanrooms built for NECP. (Exhibit 1 at 3-4). On June 21, pursuant to

---

[1] The Centers for Disease Control and Prevention will be updating the case counts on August 5, 2013. More information can be found at www.cdc.gov/hai/outbreaks/meningitis.

Rule 45 of the Federal Rules of Civil Procedure, the PSC served a subpoena to testify at a deposition in a civil action upon Liberty, which included a demand to produce documents responsive to the requests made in Exhibit B to the subpoena. (Liberty Mot. To Quash at Doc. No. 232-2 and 232-4).

After service of the subpoena, Liberty's participation in the meet and confer process to facilitate a smooth transition of information germane to this case became wanting. This frivolous motion is a direct result of Liberty's refusal to meet and confer on issues that could well have been resolved without burdening the Court. Liberty fails to offer any compelling support for its arguments and its motion should, therefore, be denied.

## ARGUMENT

### I. Liberty Has Failed To Meet And Confer In Good Faith

In accordance with Rule 26 of the Federal Rules of Civil Procedure, the moving party must show that it has "in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without seeking court action." Fed. R. Civ. P. 26(c)(1). Liberty's refusal to meet and confer in good faith is the sole reason why this motion is in front of the Court. The issues complained of by Liberty could easily have been resolved, and the PSC attempted to resolve them, prior to the filing of this motion.

Nearly two weeks passed between Liberty's notice of the subpoena and the filling of this motion. In that time, Liberty was able to identify and collect most, if not all, of the materials responsive to the PSC requests. However, as the PSC attempted on numerous occasions to compromise with Liberty and work with it to alleviate any semblance of a burden with regard to

2

the production of its records, Liberty essentially closed its doors after initial contact and provided only vague correspondence and refusals to cooperate from that point on.[2]

In its first substantive email to the PSC on June 25, following service of the subpoena, Liberty sets out that it "will look to the PSC to cover the cost of complying," that certain documents were identified that would be produced "in the event that [the PSC] wish[es] to narrow the scope of the documents to be produced, and that an appearance *will* be entered "for the purpose of moving that certain production requests be either quashed or modified." (Exhibit 1 at 2-3). Nowhere in the correspondence does Liberty offer to confer or even *ask* if the PSC would be willing to aid in the cost of compliance or narrow the scope of its requests. And though Liberty offers to "make all these materials available for inspection at Liberty with copying of whatever materials the PSC identifies," all subsequent correspondence from Liberty fails to address when and how such inspection or copying will take place, focusing on its imagined need to prematurely file a motion to quash. *Id*.

The next day, June 26, the PSC stated that it was "more than willing to work cooperatively with Liberty to expedite production of the records Liberty intends to produce, and to meet and confer regarding any areas of concern Liberty may have, as to avoid unnecessarily burdening the court." (Exhibit 1 at 1). The PSC went on to address its concerns regarding expenses, to remind Liberty that the PSC had no obligation to finance a nonparty's compliance with a subpoena, though it would consider reimbursing Liberty for a portion of its cost in the event that a detailed estimate was provided. *Id*. To the surprise of the PSC, Liberty simply

---

[2] It should be noted that there were discussions with Liberty prior to the issuance of this subpoena. The plaintiff in the matter of *George Cary, individually and as the personal representative of the Estate of Lilian Cary v. NECP*, also attempted to seek information from Liberty. In an email from February 12, 2013, Liberty falsely tried to lead the plaintiff to believe that "Liberty had no involvement in the design, construction or installation of [Clean Rooms 1 and 2]," (Exhibit 2). As is the case here, Liberty refused to cooperate or confer in good faith, even when it was faced with proof that plaintiff knew of Liberty's involvement with the construction of the cleanrooms. (Exhibit 3 at 3-6).

3

replied with a one-line email stating that it would be forced to file a motion to quash – again without any request to have a conversation or explain how the PSC's position was unfavorable or problematic for Liberty. *Id*.

In a series of emails on June 27, the PSC continued to attempt to seek clarification regarding Liberty's position and to schedule a meet and confer. (Exhibit 4 at 1-2) The only response received was that Liberty was in the process of collecting documents and was preparing a cost estimate to submit to the Court. *Id*. Again, though Liberty states that responsive documents were ready to be turned over (which is untrue, as the documents had yet to be reviewed, scanned, copied, or otherwise processed), it makes no effort to discuss execution of the task or the potential issues that Liberty may be facing. Liberty's focus remained solely on an amount of costs still unknown to the PSC at the time, and the filing of its premature motion.

On July 2, the PSC sent a detailed email, spelling out what it thought were Liberty's areas of concern, and again reiterating the PSC's willingness to discuss and resolve any issues. (Exhibit 5 at 3). In response, Liberty stated, "[o]ur motion to quash or for court orders will be filed tomorrow." *Id*. Even after this discordant response, the PSC again offered to meet and confer before the filing of the motion and attempted to call counsel for Liberty. *Id.* at 2. It was not until 5:16 p.m. on July 2, 2013 that Liberty notified the PSC that there was a potential burden associated with compliance with the subpoena. *Id*. Continuing that evening and into the following day (July 3), the PSC maintained a nearly one-sided email exchange with Liberty's non-responsive counsel in an attempt to come to some semblance of an agreement. (Exhibit 5 at 1; Exhibit 6). However, every proposal was either ignored or rejected by Liberty. Liberty filed this motion on July 3, 2013 at 2:16 p.m.

4

In its motion, for the first time, the PSC finally learned of Liberty's potential issues with identifying and coding confidential documents and the extent of costs involved, which it refused to meet and confer about in the nearly two weeks prior to the filing of this motion. (Liberty Mot. To Quash at 2-3). The PSC has continued attempting to reach an agreement with Liberty, even though the issues complained of do not rise to the level of an undue burden or excessive costs.

## II. Liberty Has Failed To Establish That Compliance With The Subpoena Would Cause An Undue Burden

In order to succeed on a motion to quash, the party moving for relief carries the burden of proving that a subpoena *duces tecum* is unduly burdensome. *See Flatow v. Islamic Republic of Iran*, 201 F.R.D. 5, 8 (D.D.C. 2001); *In re Smirman*, 267 F.R.D. 221, 223 (E.D. Mich. 2010).[3] The burden to support a motion to quash as opposed to more limited protection is particularly heavy. *Heat & Control, Inc. v. Hester Ind.*, 785 F.2d 1017, 1025 (Fed. Cir. 1986). A subpoena will not be quashed simply because the documents sought are voluminous and cumbersome and the production of them proves difficult and expensive. *See Alexander's Dep't Stores, Inc. v. E. J. Korvette, Inc.*, 198 F. Supp. 28, 29 (D.C.N.Y. 1961). And even if the party seeking relief can meet the substantial burden of showing the subpoena is unduly burdensome, the court has many alternatives to quashing a subpoena. Such alternatives include modifying the scope of the subpoena or cost-sharing *if* the moving party can show that the costs to comply with the subpoena are excessive. *Dravo Corp. v. Liberty Mut. Ins. Co.*, 160 F.R.D. 123 (D. Neb. 1995).

In its motion, Liberty first states that it has identified the following documents as responsive to the subpoena: binders and cardboard boxes consisting of approximately 5,000 pages of documents; 250 over-sized engineering drawings, 250 photos, and over 1,300 emails.

---

[3] *See also Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004); 9A Wright, Miller & Cooper, *Federal Practice & Procedure* § 2459, at 53-55 (2d ed. 1994).

5

Liberty next argues that it would take 3 individuals 100 hours to review and designate documents as confidential. Since learning of this issue (*after* this motion was filed), the PSC has offered to allow Liberty to designate all of its documents confidential so that its employees would not be burdened. (Exhibit 7 at 2). Incongruously, Liberty responded, stating "[t]he auto marking of all documents as Confidential, as you suggested, has increased the cost of copying." (Exhibit 8).

Liberty next asserts that an administrative assistant "will have to devote approximately 40-50 hours to stamping every single document as confidential and produced pursuant to a protective order." In an effort to help reduce Liberty's costs, the PSC suggested that Liberty purchase a bate-stamping software program that can automatically stamp PDF files, eliminating the need for an administrative assistant to hand-stamp hard documents.[4] (Exhibit 7 at 1).

At every turn, the PSC has "taken reasonable steps to avoid imposing an undue burden or expense" on Liberty, as is required under Rule 45. Fed. R. Civ. P. 45(c)(1). The PSC has suggested numerous options to alleviate the time and cost required of Liberty to comply with the subpoena and has continually offered to discuss the scope of the document requests. Further, the PSC has offered to cover the unique costs associated with Liberty's over-sized engineering documents (Exhibit 8); to pick up the documents for scanning (Exhibit 7 at 1); and to narrow the scope of certain requests (*Id.* at 2). In return, Liberty has been uncooperative, vague, evasive, and nonresponsive. It must also be noted that at no point did the PSC "decline[] the opportunity to inspect to identify [sic] relevant documents," as Liberty purports in its motion.[5] (Liberty Mot. To Quash at 3).

Had Liberty met in good faith to discuss these issues prior to filing, then simple remedies could have been settled upon to alleviate the need for court action. As it stands, Liberty cannot

---

[4] The cost of such a program can cost as little as $29.99. *See* www.batesblaster.com.
[5] The Subpoena is noticed for August 5, 2013, and a deposition date has not yet been determined.

support a contention that it is unduly burdened by compliance with the subpoena. Further, Liberty has done nothing to mitigate its own costs. Instead of scanning the documents in-house, Liberty has chosen to pay, or rather asks that the PSC pay, an outside vendor. In addition, Liberty retained outside counsel to answer the subpoena – apparently spending more on counsel than even its outlandish claims of the cost of compliance with the subpoena.

### III. The PSC Is Not Required To Bear The Cost Of Liberty's Production

It has long been recognized in federal courts that nonparties, like Liberty, are required to absorb the costs of complying with a subpoena *duces tecum* unless they can demonstrate that this would require the expenditure of an excessive amount of time or money beyond what they should expect to bear as a cost of doing business. *See U.S. v. Friedman*, 532 F.2d 928, 937-38 (3rd Cir. 1976) (finding that bank must bear costs of responding to a subpoena *duces tecum* as part of the normal cost of doing bank business). To determine who should bear the costs, federal courts consider three broad factors: "whether the nonparty actually has an interest in the outcome of the case, whether the nonparty can more readily bear the costs than the requesting party, and whether the litigation is of public importance." *Linder v. Calero-Portocarrero*, 180 F.R.D. 168, 177 (D.D.C. 1998).

Liberty cites to *Behrend v. Comcast Corp.* for the standard used to determine an undue burden, and properly cites that "[u]sually, absent an order compelling document production, a non-party bears the cost of production." *Behrend v. Comcast Corp.*, 248 F.R.D. 85, 86. However, Liberty does not use *Behrend*, or any other case law for that matter, to support its contention that its compliance with the subpoena creates an undue burden or that its cost should be reallocated to the PSC. This is not surprising, given that the facts in *Behrend* are extremely

7

similar to those here, and the court in *Behrand* granted the subpoenaing party's motion to compel production. *Id.* at 87.

The nonparty in *Behrend* argued, as Liberty does here, that it had no interest in the outcome of the litigation because its affiliation with the Defendant ended many years prior. *Id.* However, even though the court recognized that there was no longer a direct affiliation, the nonparty still had an interest in the outcome of the litigation, stating the nonparty "was involved in a transaction with [Defendant] and could have anticipated such a transaction could potentially spawn litigation or discovery." *Id. See In re First AM. Corp.*, 184 F.R.D. 234, 242 (S.D.N.Y. 1998) (noting that nonparty "was substantially involved in the underlying transaction"). Liberty is the designer and installer of the cleanrooms from which contaminated pharmaceuticals were dispersed throughout the country, leading to serious injuries to the public. To rely on Liberty's self-serving affidavit and the many claims made regarding the scope of its involvement and/or obligations regarding the installation and maintenance of the cleanrooms it installed would be careless and irresponsible. The PSC has an obligation to the affected class to identify all parties responsible for the contamination, and Liberty clearly could have anticipated that the installation of a cleanroom could spawn litigation.

Next, Liberty improperly suggests that because the PSC is comprised of multiple law firms that this somehow creates a larger pot from which Liberty purports to draw. However, the subpoenaing party in this matter is a class containing individuals who have suffered great illness at the hands of Defendant and potential other parties. The class members are not the ones who should bear the cost of an interested nonparty's compliance with a subpoena. Further, as previously stated, the PSC has provided numerous suggestions to mitigate Liberty's costs.[6]

---

[6] *Behrend* suggests that mitigation of costs is a factor that can be used to determine cost allocation. *Id.*

8

In the absence of any effort to mitigate costs, Liberty claims that it will need to spend approximately $8,400 with attorney fees and approximately $3,400 without. (Liberty Mot. to Quash at Doc. No. 232-1). These values are *de minimis* in and of themselves, especially in light of amounts that federal courts consider "excessive" in cases of great public importance, such as this case against NECP, as this matter already impacts individuals in at least 20 states and touches on the very welfare of the public and impacts the entire healthcare industry.[7] Liberty argues that the PSC should bear the costs of Liberty's entire production, but cites no case law to support such a claim. As suggested above, $8,400 comes nowhere near the threshold of "excessive" and is a comparatively meager amount, especially to the parties interested in the outcome of this case.

It is also alarming that Liberty believes it is reasonable to demand the PSC pay its attorney fees, a cost *greater* than its cost to fully comply with the subpoena. Liberty unilaterally chose to retain a law firm to assist it with responding to the subpoena. The PSC should not be forced to subsidize this arrangement. Indeed, courts that have addressed this issue have held third parties are not entitled to recover attorney fees. *See Phillips Petroleum Co. v. Pickens, et al.*, 105 F.R.D. 545, 551 (N.D. Tex. 1985) ("There is no authority in the federal rules for reimbursing a third party witness for his attorneys' fees."); *United States v. CBS, Inc.,* 103 F.R.D. 365, 374 (C.D. Cal. 1984) ("The Nonparty Witnesses will not be allowed to recover the costs incurred in retaining outside counsel."); *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 290 (S.D.N.Y.

---

[7] *Cf. Dow Chem. Co. v. Reinhard*, 2008 WL 1968302 at *2 (S.D.N.Y. Apr. 29, 2008) (apportioning part of $360,000 third party discovery costs to requesting party); *Crandall v. City & County of Denver*, 2007 WL 162743 at *1 (D. Colo. Jan. 1, 2007) (requiring demanding party to pay $29,078.40 of $164,905.70 in expenses sought by third party); *U.S. v. Columbia Broad. Sys., Inc.*, 666 F.2d 364 (9th Cir. 1982) ($2.3 million excessive in a case of great public importance); *SEC v. Arthur Young & Co.*, 584 F.2d 1018 (D.C. Cir. 1978) ($100,000 excessive in a case of great public importance).

2003) (refusing to allocate the costs of reviewing documents to the requesting party where the "producing party has the ability to control the cost").

Further, cost is clearly not a significant factor for Liberty, considering that the PSC had already offered to consider covering a portion of Liberty's costs after review of a cost estimate and was still attempting to meet and confer when Liberty decided to file this motion. Instead, Liberty decided to bear the costs of litigating this matter in an out-of-state district court, while refusing to accept Plaintiffs' reasonable offer to pay over half of Liberty's production costs, despite the clear rule that these costs are Liberty's responsibility.[8]

For the forgoing reasons, the Motion to Quash and/or Modify should be denied.

## RESPONSE TO OBJECTIONS

On July 10, Liberty stated that it was "willing to provide all its files on [sic] NECC. Costs to be carried by the PSC." (Exhibit 8). It is apparent the Liberty is waiving its objections to the specific requests, and focusing solely on its misbegotten claim for reimbursement of costs. However, since Liberty included some specific objections in its motion, and likewise refused to meet and confer prior to the filing of this motion, the PSC will respond to each objection as follows:

11. Written standards, instructions, and specifications related to the processes, methods, policies, and/or protocols used by Liberty to design, construct, install, maintain, and/or repair any NECP cleanroom.

OBJECTION: This request is overly broad and unduly burdensome. Inasmuch as the clean rooms were designed by professional engineers utilizing years of education, professional training and experience, this request implicates a wide range of not readily identifiable materials.

---

[8] As previous mentioned, the PSC had offered to cover the cost to copy the over-sized engineering documents that are quoted at being $1,897.50 of the $3,389.91 total cost for production, or 56 percent. Due to the cost incurred associated with responding to this Motion, this offer is no longer available.

10

Additionally, Liberty's methodology, practices and policies have been developed and accumulated over the course of all its years of operation. For all of these reasons, this request is incapable of meaningful response.

RESPONSE:  This request is for *written standards, instructions, and specifications* that Liberty uses, maintains, and refers to in its ordinary course of business.  This is not a request for the internal knowledge of its engineers.  Therefore, to the extent that Liberty documents responsive to this request, it should be obligated to produce them.

13. All documents related to inspections, citations, violations, and/or notices of lack of compliance from Federal, State and/or Local agencies related to any cleanroom designed, constructed, installed, maintained, and/or repaired by Liberty.

OBJECTION:  This request is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Liberty installs clean rooms in a host of different settings, including semiconductor manufacturing, aerospace electronics, laser and optic industries, microelectronic facilities, paint rooms, pharmaceuticals industries, research facilities. The specifications for a clean room vary based upon the work to be performed in the room. Notwithstanding this objection, Liberty has identified certifications related to NECP/Ameridose.

RESPONSE:   The PSC will agree to limit this request to any cleanroom industry designed, constructed, installed, maintained, and/or repaired by Liberty for the pharmaceutical industry.

15. All documents related to complaints from Liberty's customers regarding any cleanroom it designed, constructed, installed, maintained, and/or repaired.

OBJECTION:  See objection to production request 13. Notwithstanding this objection, after certification of the rooms, Liberty received no complaints from NECP or Ameridose aside from normal punch list items.

RESPONSE:  The PSC will agree to limit this request to complaints regarding any cleanroom for the pharmaceutical industry, and assume that the "normal punch list items" are included in the documents set to produce.

22. All documents, including correspondence, related to the products and equipment considered for the design, construction, installation, maintenance and/or repair of any NECP cleanroom, including documents related to the basis for using each product or piece of equipment.

OBJECTION:  This request is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. In addition, to the extent that it seeks documents related to products and equipment "considered", it is vague.

RESPONSE:  Knowing how and why certain decisions were made regarding materials to use and/or reject during the construction of the cleanrooms is tantamount to understanding where potential deficiencies occurred. To the extent that documents and/or correspondence in this regard exist, they are responsive and should be produced.

25. All documents related to the instruments, monitors, machines, and other devices related to maintaining the sterility of any NECP cleanroom including warranties, instructions, service requirements, and maintenance information.

OBJECTION: Since Liberty provided none of the above-mentioned equipment, this request is vague. Further, it is incapable of meaningful response as "sterility" is assessed on a continuum.

Different levels of sterility apply to different operations. More importantly, Liberty addresses particulates in the environment in a clean room, not sterility.

RESPONSE:  To the extent that Liberty provided none of the above-mentioned equipment, no response is necessary, other than written confirmation in response to the Subpoena. To the extent that discussion is necessary to properly define the word "sterility," and/or whether Liberty possesses documents related to instruments, monitors, machines, and other devices related to maintaining the particle levels in the environment in a cleanroom, the PSC is willing to meet and confer on this topic.

Dated:  July 15, 2013                           Respectfully submitted,

/s/ *Marc E. Lipton*
Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI 48075
Phone: (248) 557-1688
Fax: (248) 557-6344
marc@liptonlawcenter.com

*Plaintiffs' Steering Committee*

Thomas M. Sobol
Kristen Johnson Parker
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Phone: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
kristenjp@hbsslaw.com

*Plaintiffs' Lead Counsel*

Elizabeth J. Cabraser
Mark P. Chalos
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Phone: (415) 956-1000
Fax: (415) 956-1008
ecabraser@lchb.com
mchalos@lchb.com

*Federal/State Liaison*

Kim Dougherty
JANET, JENNER & SUGGS, LLC
75 Arlington St.
Suite 500
Boston, MA 02116
Phone: (617) 933-1265
kdougherty@myadvocates.com

Patrick T. Fennell
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, Virginia 24016
Phone:  (540) 342-2000
pfennell@crandalllaw.com

J. Gerard Stranch, IV
Benjamin A. Gastel
BRANSETTER, STRANCH & JENNINGS
PLLC
227 Second Avenue North
Nashville, TN  37201
Phone: (615) 254-8801
Fax: (615) 255-5419
gerards@branstetterlaw.com

Mark Zamora
ZAMORA FIRM
6 Concourse Parkway, 22nd Floor
Atlanta, GA 30328
Phone: (404) 451-7781
Fax: (404) 506-9223
mark@markzamora.com

*Plaintiffs' Steering Committee*