UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  NEW ENGLAND            )  MDL NO. 13-02419-FDS
COMPOUNDING                    )
PHARMACY CASES LITIGATION      )
                               )
                               )
                               )
                               )
                               )


BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV


STATUS CONFERENCE




John Joseph Moakley United States Courthouse
Courtroom No. 2
One Courthouse Way
Boston, MA 02210


July 18, 2013
2:00 p.m.






Valerie A. O'Hara, FCRR, RPR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

```
1    APPEARANCES:

2    For The Plaintiffs:

3        Hagens, Berman, Sobol, Shapiro LLP, by THOMAS M.
     SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ATTORNEY,
4    55 Cambridge Parkway, Suite 301, Cambridge,
     Massachusetts
5    02142;

6        Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ.,
     85 Merrimac Street, Suite 500, Boston, Massachusetts
7    02114;

8        Robinson & Cole, LLP, KIMBERLY A. DOUGHERTY,
     ATTORNEY, One Boston Place, Suite 2500, Boston,
9    Massachusetts  02108;

10       Branstetter, Stranch & Jennings, PLLC, by J. GERARD
     STRANCH, IV, ESQ., 227 Second Avenue North, Nashville,
11   Tennessee 37201-1631;

12       Lieff, Cabraser, Heimann & Bernstein, LLP, by MARK P.
     CHALOS, ESQ., One Nashville Place, 150 Fourth Avenue,
13   North, Suite 1650, Nashville, Tennessee 37219-2423;

14       Law Office of Hugo & Associates, MICHAEL R. HUGO,
     ESQ., 1 Catherine Road, Framingham, Massachusetts
15   01701;

16       Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ.,
     366 Elm Avenue, SW, Roanoke, VA 24016;
17
         Law Offices of Mark Zamora and Associates, by
18   MARK ZAMORA, ESQ., 5 Concourse Parkway, Suite 2350,
     Atlanta, Georgia  30328;
19

20   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

21       Brown Rudnick, by DAVID J. MOLTON, ESQ.,
     Seven Times Square, New York, New York 10036;
22
         Brown Rudnick, by JESSICA L. CONTE, ATTORNEY,
23   One Financial Center, Boston, Massachusetts 02111;

24       Cohen, Placitella & Roth, P.C., by MICHAEL COREN,
     ESQ., 2 Commerce Square, 2001 Market Street, Suite 2900,
25   Philadelphia, Pennsylvania  19103;
```

```
1    For the Defendants:

2
        Harris Beach PLLC, by FREDERICK H. FERN, ESQ.,
3    100 Wall Street, New York, New York  10005;

4        Hinshaw & Culbertson LLP, by DANIEL E. TRANEN, ESQ.,
     28 State Street, 24th Floor, Boston, Massachusetts
5    02109;

6        Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ.,
     1150 Huntington Building, 925 Euclid Avenue, Cleveland,
7    Ohio  44115-1414;

8        Donoghue, Barrett & Singal, P.C., by MICHELLE R.
     PEIRCE, ATTORNEY, ESQ., One Beacon Street, Boston,
9    Massachusetts  02108-3106;

10       Michaels, Ward & Rabinovitz LLP, by DAN RABINOVITZ,
     ESQ., One Beacon Street, Boston, Massachusetts  02108;
11
         Todd & Weld LLP, by HEIDI A. NADEL, ESQ.,
12   28 State Street, 31st Floor, Boston, Massachusetts
     02109;
13
         Lawson & Weitzen, LLP, by RYAN A. CIPORKIN, ESQ.,
14   88 Black Falcon Avenue, Boston, Massachusetts  02210;

15       Nelson, Mullins, Riley & Scarborough, LLP, by
     DAVID E. FIALKOW, ESQ., One Post Office Square, Boston,
16   Massachusetts  02109;

17       Debevoise & Plimpton, LLP, by CARI A. WINT, ATTORNEY,
     919 Third Ave, New York, NY 10022;
18
         Donovan & Hatem, LLP, by KRISTEN R. RAGOSTA, ESQ.,
19   Two Seaport Lane, Boston, Massachusetts  02210;

20
     FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE
21   OF NECP, INC.:

22       Duane Morris LLP by MICHAEL R. GOTTFRIED,
     ESQ. and JEFFREY D. STERNKLAR, ESQ., 100 High Street,
23   Suite 2400, Boston, Massachusetts 02110-1724;

24

25
```

```
 1    INTERESTED PARTY:

 2        United States Attorney's Office, by ZACHARY A. CUNHA,
      ESQ., Suite 9200, 1 Courthouse Way, Boston,
 3    Massachusetts  02210

 4        Gideon, Cooper & Essary, PLC, by CHRIS J. TARDIO,
      ESQ., 315 Deaderick St, Suite 1100, Nashville, TN 37238
 5
      VIA PHONE FOR THE PLAINTIFFS:
 6
      Marc Lipton
 7    Anne Andrews
      Ben Gastel
 8    Bill Leader
      Bryan L. Bleichner
 9    Chris Cain
      Daniel L. Clayton
10    Daniel O. Myers
      David J. Rashid
11    David W. Lawrence
      Douglas A. Mulvaney
12    Douglas D. Small
      Douglas E. Jones
13    Ed Jazlowiecki
      Elliot L. Olsen
14    Erin Amos
      Forest Home
15    Frank J. Federico
      George Nolan
16    Greg Lyons
      H. David Gibson
17    H. Keith Moore
      Harry M. Roth
18    James Girards
      James Stephen King
19    Jennifer Crawford
      John Lichtenstein
20    John T. Alexander
      John Thornton
21    Johnathan Nace
      Johnathan R. Krohnfeldt
22    Karen Schaeffer
      Kristine A. Osterday
23    Linda Aldon
      Mark R. Dancer
24    Mary T. Gidaro
      Meaghan Skillman
25    Melvin B. Wright
      Michael Pattanite
```

```
 1   VIA PHONE FOR THE PLAINTIFFS (CONTINUED):

 2   Mitchell A. Toups
     Nolan Nicely
 3   Patrick Montoya
     Randy Kinnard
 4   Rebecca Blair
     Rob Briley
 5   Robert Randall
     Rob Sickels
 6   Ryan Quinn
     Scott Sexton
 7   Sean Roth
     Shannon Carey
 8   Sharon Houston
     Stephanie Arndt
 9   Steven D. Resnick
     Terry Dawes
10   Timothy A. Housholder

11   VIA PHONE FOR THE NON-PARTY OBJECTORS:

12   Chris Wolk (NJ)
     Stephen Grossman (NJ)
13   Kathryn J. Humphrey (MI)
     Halley Stephens (FL)
14   Alan Bozer (NY)

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
  1                        PROCEEDINGS
  2            THE CLERK:  All rise.  Thank you.  Please be
  3   seated.  Court is now in session in the matter of in re:
  4   New England Compounding Pharmacy, Incorporated products
  5   liability litigation.  This is Case Number 13-MD-02419.
  6   Counsel for plaintiffs' steering committee, please
  7   identify yourselves for the record.
  8            MR. SOBOL:  Good afternoon, your Honor,
  9   Tom Sobol for the plaintiffs' steering committee.
 10            MS. PARKER:  Good afternoon, your Honor,
 11   Kristen Johnson Parker for the plaintiffs' steering
 12   committee.
 13            MR. FENNELL:  Good afternoon,
 14   Patrick Fennell for the plaintiffs' steering committee.
 15            MR. STRANCH:  Good afternoon, Gerard Stranch
 16   for plaintiffs' steering committee.
 17            MR. CHALOS:  Mark Chalos, plaintiffs'
 18   steering committee.
 19            MS. DOUGHERTY:  Good afternoon, your Honor,
 20   Kim Dougherty for the plaintiffs' steering committee.
 21            MR. ZAMORA:  Judge, Mark Zamora for the PSC.
 22            THE CLERK:  Attorney Lipton, are you on the
 23   phone?
 24            MR. LIPTON:  I am, Marc Lipton on behalf of
 25   the steering committee.
</pre>

```
 1                    THE CLERK:  Why don't we start in the middle
 2       there.
 3                    MR. ELLIS:  Rick Ellis for the plaintiffs.
 4                    MR. COREN:  Michael Coren, co-chair,
 5       official creditors' committee.
 6                    MR. MOLTON:  Good afternoon, your Honor,
 7       David Molton for the statutory official creditors'
 8       committee.
 9                    THE CLERK:  Mr. Gottfried.
10                    MR. GOTTFRIED:  Mike Gottfried for the
11       Chapter 11 trustee.
12                    MR. STERNKLAR:  Good afternoon, your Honor,
13       Jeffrey Sternklar, Duane Morris, also here for the
14       Chapter 11 trustee.
15                    THE CLERK:  For the defendants?
16                    MR. FERN:  Your Honor, Frederick Fern from
17       Harris Beach on behalf of liaison counsel for NECC and
18       some of the individuals.
19                    MR. TRANEN:  Daniel Tranen for NECC.
20                    MR. RABINOVITZ:  Dan Rabinovitz for Medical
21       Sales Management, Inc.  Good afternoon, your Honor.
22                    MS. NADEL:  Good afternoon, your Honor,
23       Heidi Nadel for Doug and Carla Conigliaro.
24                    MR. MORIARTY:  Good afternoon, your Honor,
25       Matt Moriarty for Ameridose.
```

02:01PM (line 10)
02:01PM (line 20)

1          MR. THOMAS:  Your Honor, Joe Thomas for GDC.

2          MS. KUNDERT:  Lisabeth Ryan Kundert for GDC.

3          THE COURT:  All right.  As usual, we have a

4  number of people on the telephone who I will not ask to

5  identify themselves.  All right.  This is a status

6  conference in this case.  I have the agenda proposed I

7  think yesterday, which I will follow.  I think we're

8  going to start with a report on PSC discovery efforts.

9  Mr. Sobol.

02:02PM  10          MR. SOBOL:  Good afternoon, your Honor.

11  I'll be tag-teaming with Ms. Johnson on this today.  So

12  I'm going to retitle this the discovery efforts and the

13  nondiscovery efforts so the Court understands what's

14  going on and what is not going on.

15          First, in terms of discovery, as you'll see,

16  that there were about 82 subpoenas served on clinics

17  across the country in the past month or so.  There are

18  objections that will be heard later that's not at this

19  point in the agenda.  That is by and large a summary

02:03PM  20  about what's going on in terms of formal discovery.

21          In terms of informal discovery, now that

22  the -- yes, there were also subpoenas served on several

23  of the national defendants as well that's been brought

24  to my attention.

25          With respect to informal efforts, now that

1    there's a protective order in place, Mr. Fern and NECC

2    have started producing some informal discovery to the

3    plaintiff's steering committee that's also being shared

4    with the creditors' committee, and so that's going ahead

5    well at this point.

6         There is, however, also some nondiscovery

7    efforts that I want to bring to your attention because I

8    think that we'll have to revisit that at the August 9th

9    status conference that's coming up in several weeks.

02:04PM  10         As you recall, your Honor, a fundamental

11    premise of the case management in this group of

12    affiliated actions is that there would be essentially a

13    standing down from discovery with respect to formal

14    discovery against NECC and formal discovery regarding

15    affiliated defendants.

16         From the PSC's point of view, that means the

17    individuals who owned and controlled NECC as well as the

18    19 affiliated corporate defendants and that the premise

19    behind standing down with respect to that formal

02:04PM  20    discovery is that there is an ongoing effort to mediate

21    a resolution with those entities and persons through the

22    auspicious of the trustee of NECC.

23         Those negotiations have been ongoing, and it

24    is our understanding that they continue to be ongoing.

25    We have no reason to think that they aren't, however,

1    it's increasingly coming to my attention that there may

2    be some, one or more of the 19 entities, or their

3    insurers, who are not in a position at this time to be

4    moving forward with a resolution, and if we're not in a

5    mediation or settlement mode with them, then obviously

6    we have to revisit standing down with respect to a

7    discovery stay with respect to them.

8              So what I would expect essentially to be the

9    case on August 9th when we're giving a status to you is

02:05PM  10    we should be giving a status as to whether there is a

11    proposed resolution with the insiders or not because at

12    that point it will be August of 2013, where are we with

13    that, where are we going with that, and also it's

14    incumbent upon me and the PSC to find out whether or not

15    there are some, one or more entities, or insurers of

16    those entities, who are not interested at this time in

17    terms of doing mediation, in which case we'll have to

18    revisit that aspect of case management, so that would be

19    my report with respect to these issues.

02:06PM  20              THE COURT:  All right.  Does anyone want to

21    respond to that?  Anyone from the defense group or

22    trustee?

23              MR. GOTTFRIED:  No, I can address that issue

24    I think when we get to the bankruptcy section, your

25    Honor.

```
 1                    THE COURT:  All right.  Anything further on
 2     item 1?
 3                    MR. SOBOL:  No, your Honor.
 4                    THE COURT:  Let's go to 2, conduct of
 5     discovery order.
 6                    MS. PARKER:  Your Honor, the plaintiffs'
 7     steering committee and defendants are in the process of
 8     exchanging drafts of an order that would govern basic
 9     discovery aspects, including things that may seem to be
10     straightforward, but may, nonetheless, warrant reducing
11     to words on a page, including things like service of
12     subpoenas.
13                    We had spoken about service of the subpoenas
14     as well as access to documents produced pursuant to the
15     subpoenas with Mr. Moriarty on this issue this morning.
16     I believe we are working forward and moving ahead on
17     that, but we do expect to present to the Court hopefully
18     before the next status conference a kind of discovery
19     order.
20                    THE COURT:  All right.  Anything else on
21     that topic?  Any response?
22                    (No response)
23                    THE COURT:  All right.  Item 3, status of
24     bankruptcy proceedings.
25                    MR. SOBOL:  Why don't I go first, your
```

1    Honor, and then I'm sure that counsel for NECC and the

2    bankruptcy will also want to add their comments as well.

3    Essentially the matter that is front and center in the

4    bankruptcy is the motion for the entry of a bar date

5    that was filed by the trustee on Friday afternoon,

6    June 28th, a day after the New England Journal of

7    Medicine issued its article about how the diseases in

8    these situations are often concealed for many months and

9    remain a concern about new onsets.

02:08PM   10        This has been the focus of quite a bit

11   attention by the creditors' committee, the trustee and

12   the plaintiffs' steering committee over the past couple

13   of weeks.  The matter is scheduled to be heard at this

14   time before Judge Boroff next Wednesday, I think it is

15   on the 24th.

16        The date for filing objections with respect

17   to that bar date is Monday, the 22d.  There have been

18   less than a dozen issues that have been trying to be

19   resolved between various people, particularly the PSC

02:08PM   20   and the trustee.  We've been meeting recently also to

21   see if we can whittle that down.  I'm not sure whether

22   or not we'll ultimately reach a resolution in terms of

23   an agreement about how to proceed, but that's where we

24   are with respect to all of that right now.

25        THE COURT:  All right.  Mr. Gottfried.

1          MR. GOTTFRIED:  Yes, your Honor, thank you.

2    I'll start I guess with the bar date where Mr. Sobol

3    left off.  There was a hearing scheduled for originally

4    yesterday, but in order to give the parties an

5    opportunity to continue to try to narrow the issues, the

6    hearing was continued to next Wednesday, the 24th.

7          The parties actually met this morning for

8    two hours at my office to try to make progress, and we

9    believe progress was made.  I think at the end of the

02:09PM   10   day, the issues will be narrowed.  There may very well

11   be some issues that Judge Boroff will need to take up

12   that are not agreed to by the parties.  Obviously the

13   Judge needs to evaluate on his own on the 24th, but we

14   would think that as of that date, the issue will be

15   joined before Judge Boroff, and he'll enter a decision.

16         In terms of the status of the negotiations

17   with the so-called affiliate defendants, today the

18   trustee consented to the filing of a motion to extend

19   the deadlines to August 15th.  That is consonant with

02:10PM   20   his view that he --

21         MR. SOBOL:  You met October 15th.

22         MR. GOTTFRIED:  October 15th, sorry.  That

23   is consonant with his view that he is continuing to make

24   progress in those discussions.  The trustee also

25   continues to administer the estate I would say in the

1    ordinary course.  He's involved in preparing of tax

2    returns, continuing to be involved in product returns as

3    well as collections of accounts receivable.

4            THE COURT:  Anyone else want to be heard on

5    the status of the bankruptcy proceedings?

6            MR. MOLTON:  Your Honor, David Molton for

7    the committee.

8            THE COURT:  Yes.

9            MR. MOLTON:  We've heard about the

02:10PM   10    affiliated defendants and the bar date.  The committee

11    is working with the PSC and the trustee to alleviate

12    those disputes between them, and hopefully we'll have a

13    resolution by Tuesday.  I'm going to be discussing and

14    just bringing the Court up to speed regarding the

15    unaffiliated defendant's proposed mediation program that

16    was part of your Honor's CMO that was entered I believe

17    on June 28th.

18            In accordance, the committee with and in

19    cooperation, in conjunction with the PSC, held a meeting

02:11PM   20    in New York on June 28th with many, many unaffiliated

21    defendants participating either by phone or otherwise by

22    which both committees made a presentation as to what

23    they foresee to be a likely or a contemplated bankruptcy

24    plan by which the nonaffiliated defendants would

25    participate to that plan for the benefit of all the

1  injured parties, and the committee, two committees have

2  been working diligently in accordance with your Honor's

3  CMO on getting a mediation order to your Honor by I

4  think it's July 29th is the deadline, and hopefully that

5  will be teed up in front of your Honor at the

6  August status conference, we can have an entered order

7  and go forward with that.

8              THE COURT:  What was the last bit again?

9              MR. MOLTON:  Your Honor, pursuant to the CMO

02:12PM  10  that your Honor signed --

11              THE COURT:  Right.

12              MR. MOLTON:  -- we have until July 29th to

13  offer up --

14              THE COURT:  Right.

15              MR. MOLTON:  -- the committee, the two

16  committees and the trustee a proposed mediation order

17  for the unaffiliated defendants, and we intend to have

18  that to your Honor by that date and hopefully have that

19  teed up, your Honor, for the next status conference in

02:12PM  20  August so that we can then proceed on that important

21  aspect of this case thereafter.

22              THE COURT:  Okay.  Thank you.

23              MR. SOBOL:  If I may, your Honor.

24              THE COURT:  Yes.

25              MR. SOBOL:  I should probably map out sort

1    of the two tracks then of what's going on just so you

2    have the clear impression about what unfolds in July,

3    August, September, October.

4            As Mr. Molton just indicated, there is a

5    track of mediation.  That track involves both the

6    potential 80-odd clinics that have received subpoenas as

7    well as the national defendants to -- and essentially

8    what we would expect to happen there, as Mr. Molton

9    indicates, we present a mediation order to you in July,

02:13PM   10    a mediation order gets entered in early August.

11            That mediation order may likely have a

12    deadline by which potentially responsible parties, if

13    you will -- if I can borrow that phrase from another

14    area of the law -- decide to opt in or not into the

15    mediation program.  There's a deadline for that.  We

16    will have a mediator that will be also a part of this

17    package and a mediation time period.  I don't know if we

18    really spelled that out, but some time period, call it

19    for the sake of something right now, September,

02:13PM   20    October or whatever, to see if there can be a resolution

21    with those entities.

22            To the extent that an entity, clinic,

23    national defendant has not opted into the mediation

24    program, well then the PSC is going to take up looking

25    at the master complaint and starting a litigation track

1   with respect to those entities, and we currently have a

2   schedule with respect to that which may need some

3   modifications given understandable things that happened

4   over the past couple of months.

5         While that is going on, at the same time

6   there is the trustee's motion for a bar date, which

7   assuming, if it is allowed, then contemplates the

8   publication of notice, the issuance of letters, which

9   will obviously be a big part of the subject you'll deal

02:14PM  10   with in terms of the subpoenas later on in this

11   proceeding, and after that notice period, the date by

12   which the claimants, you know, right now I think it is,

13   as Mr. Gottfried says, you know, October 15th, the date

14   by which people either have signed, filed a claim or

15   not, and then at that point, of course, there would be

16   planned discussions, and hopefully also at that time to

17   have a sense from mediation as to the extent to which

18   there may be nondebtors participating in that plan.

19         That's sort of an overview about how this is

02:15PM  20   all ultimately shaking out right now.  You can see that

21   there are many balls that are in the air, and, frankly,

22   every time we sort of look at it, to me, from my

23   perspective we look at it, it's almost like looking at a

24   tangled ball of string.  You've got to sort of stare at

25   it awhile to understand how it fits together, and then

```
 1   if you walk away from it, you've got to look back at it
 2   again, so, anyway, that's where we are on that.  I agree
 3   with everything Mr. Molton said about how we're moving
 4   forward with that mediation effort.
 5             THE COURT:  All right.  Anything else on
 6   that topic?  Mr. Gottfried or Mr. Molton, do you want to
 7   respond to that last comment?
 8             MR. GOTTFRIED:  No, your Honor.
 9             THE COURT:  All right.  Item Number 4,
10   liaison counsel for unaffiliated defendants, who's going
11   to take that up?
12             MS. PARKER:  So, I concede your Honor, that
13   I was not the person adding that to the agenda, but we
14   do think in particular it would be very helpful to the
15   plaintiffs' steering committee if a liaison were
16   appointed to interact with all of the clinics, doctors
17   and/or healthcare providers that have received subpoenas
18   and some of whom are defendants in this MDL.
19             THE COURT:  I can certainly sympathize and
20   understand why you want to deal with one person rather
21   than 89 or 82 or whatever the number is clinics.  How do
22   you propose that I go about selecting a person to fill
23   that role?  How does anyone propose that I go about
24   doing that?
25             MR. COREN:  Your Honor, if I may, I was the
```

           1    person who put that on the agenda, Michael Coren,

           2    official creditors' committee.

           3              THE COURT:  Yes.

           4              MR. COREN:  And several exercises of having

           5    to deal with the defendants begot this, the most recent

           6    being the subpoena and the motions.  It just seems to be

           7    from experience in other MDLs, pharmaceutical cases

           8    where you have multiple defendants, it was not uncommon,

           9    first of all, that there be a defendant's liaison

02:17PM   10    structure.

          11              Obviously everybody would like defendants to

          12    organize themselves, so I guess the easy way for the

          13    Court to approach that is to order them to do it, okay,

          14    come up with their own structure, and if that structure

          15    satisfies the concerns and needs of this Court, great,

          16    then if not, to reckon back to one of your earlier

          17    conferences, This ain't a democracy.

          18              There will be times that you'll listen to

          19    the parties, and you'll make the decision as your

02:18PM   20    prerogative.  What I suggest is that your Honor take and

          21    order that, say defendants, the NECC defendants are

          22    organized, they're easy to deal with with their liaison.

          23    There may be need one or maybe two or three, depending

          24    upon if I was to look at it, but in the first instance,

          25    I would suggest you let the defendants take a stab at

1    it, just like the plaintiffs were given the opportunity

2    to do it.  You had two different groups, two different

3    theories, you may find that they come forward with a

4    very acceptable proposal.

5              THE COURT:  All right.  Anybody else want to

6    be heard on this?  Let me toss out an idea then that I

7    set a deadline for submission of proposals for a liaison

8    counsel for unaffiliated defendants, and once that is

9    ripe, I either follow one or more of the proposals, come

02:19PM  10   up with my own proposal or reject them all and leave

11   things as they are.

12             My sense is that things are -- I wouldn't

13   say they're moving quickly, but there are a lot of

14   things happening at once, and it would be better not to

15   delay this unduly.  August 8th provides three weeks in

16   which this could be accomplished.  Does that strike

17   anyone as being an unfairly short or unduly long period

18   of time in which to submit proposals?  Mr. Sobol.

19             MR. SOBOL:  This may be a situation, your

02:19PM  20   Honor, where no one actually steps forward, you have a

21   lot of people who step backwards, and so that date

22   sounds fine, but you just must be prepared yourself with

23   the status conference the next day that we might need to

24   go to a plan B.

25             THE COURT:  If the conference is the next

1    day, I'm going to make it August 7th so I have time,

2    which leads to the next question, Mr. Coren, I'm going

3    to look to you since it's your idea.  Exactly how do I

4    go about doing this fairly and appropriately if nobody

5    volunteers for the task?  How do I decide who is the

6    right counsel, and presumably that counsel's clients are

7    going to have higher costs and so forth, how am I going

8    to pick such a person if no one steps forward?

9             MR. COREN:  One, the person -- first of all,

02:20PM  10   one, you've -- I guess they have the common benefit fund

11   on the other side where somebody is going to have an

12   order entered that they keep their hours and get it

13   defrayed, so you might find someone volunteering, but in

14   terms of the beauty contest of it, your Honor will look

15   at what are the categories of defendants you have, you

16   have hospitals, you have pain clinics, you have doctors,

17   and you need a liaison from any one of those particular

18   levels, just, however, when you look at who the parties

19   have entered in here, and we can provide you, for

02:21PM  20   example, from the plaintiffs' point of view how we see

21   the categories are.  That could help, and then just, you

22   know, whoever I guess you perceive has the biggest stake

23   in there.

24             THE COURT:  I don't even know how I would

25   figure that out, you know, how do I compare a pain

1   clinic in Virginia to a pain clinic in Tennessee to a

2   doctor in Michigan, I don't know who has the biggest

3   stake.  I don't know how to figure that out.

4           MR. COREN:  Well, I'm sure that if my

5   Brother in Tennessee were here, they would say that

6   there's a hospital called St. Thomas.  That might be of

7   interest to them, or Virginia might be looking at there,

8   but if there is a grouping of the states where we know

9   that the interest is there, and perhaps one of those

02:21PM 10   institutions, so you take a look at that from that

11   level.  I wish I could give you better guidance, but it

12   would be nice if the defendants were to organize

13   themselves to aid the Court in this.

14           THE COURT:  Here's what I'll do as an

15   initial step, and I guess I'll make this up as I go

16   along.  August 7th will be a deadline for any group or

17   subgroup of the unaffiliated defendants to propose a

18   liaison counsel structure and anyone else wishing to

19   weigh in by way of a memorandum to the Court which could

02:22PM 20   include any other party or liaison counsel can file a

21   submission, if they choose, but I'll want that by

22   August 7th, and we'll take it up at the August 9th

23   status conference.

24           Anything else on that topic?

25           (No response)

1         THE COURT:  All right.  Number 5, mechanism

2    for collection and sharing of plaintiffs' medical

3    information, including product I.D.

4         MR. FERN:  Judge, this was a topic that I

5    requested to be put on the agenda.  We're still not

6    there yet.  I spoke with the PSC earlier this morning.

7    They have previously designated two companies which they

8    filed before the Court, a Rust Omni and --

9         MS. PARKER:  U.S. Legal.

02:23PM  10         MR. FERN:  -- U.S. Legal.  My understanding

11   is that U.S. Legal is going to be the repository for

12   non-HIPPA protected information and that Rust Omni may

13   be a likely candidate for the HIPAA-protected

14   information.  I don't think the PSC has made a

15   definitive decision as to which way they are going to go

16   there.

17         As I reported to the Court at the last

18   conference, I had also submitted three proposals from

19   three national vendors who basically specialize in the

02:24PM  20   collection and then making those records available via

21   online.  I think the PSC, from what I'm told, is still

22   considering those vendors.

23         I just put this on the agenda.  The last

24   time, the Judge, the Court said you do not want to

25   micromanage this situation.  I appreciate that.  Perhaps

1    if we could put this off until the August agenda, we

2    will have a finer resolution, and we'll have a mechanism

3    in place where this process can move forward, and we can

4    start to collect the medical records of these

5    individuals for everybody's availability.

6                    THE COURT:  All right.  Does anyone want to

7    respond?  Ms. Parker.  Mr. Sobol.

8                    MR. SOBOL:  Well, that's all perfectly fine,

9    what Mr. Fern says.  Two things:  Just to make clear

02:24PM    10    that it's Rust Omni, which is the location where

11    information responsive to the subpoena is going because

12    there are some people on the phone, too.  We want to

13    just make sure that's clear, Number 1.

14                    Number 2, it also should be indicated that

15    many of the plaintiff lawyers are, of course, have or

16    are in the process of acquiring medical information.

17    There are some obviously situations where we might want

18    to hire a common vendor to do that as well, so it's not

19    like the process is stalled, it's just a matter of also

02:25PM    20    having a common vendor, and that is in the process of

21    being taken care of by the committee.

22                    THE COURT:  Okay.  Anything else on that

23    topic?  Item 6, pending motions beginning with motions

24    to dismiss Alaunis Pharmaceutical.  These motions have

25    been pending for some time, and Carilion, if I'm

1    pronouncing that right, Surgery Center, New River

2    Valley.

3         Who wants to be heard on that?  Ms. Parker.

4         MS. PARKER:  Thank you.  As to the Alaunus

5    motions, your Honor, Alaunus has agreed that we should

6    continue rolling those over from status conference to

7    status conference.  There's actually language in the

8    case management order that addresses that more

9    specifically.

02:26PM   10        As to Carilion, I understand that counsel

11   for Carilion may be on the phone.  There was discussion

12   about having oral argument scheduled for today on those

13   motions, however, from the PSC's perspective, that

14   particular motion, those specific to a single entity

15   does raise issues that the PSC expect will have impact

16   on many of the other liability claims and will be

17   relevant to both other entities, and plaintiffs in that

18   state as well as may tee up some issues that apply to

19   cases nationwide.

02:26PM   20        So the PSC would request that I guess I'll

21   make this informally because I have not spoken with

22   counsel for Carilion, but, at minimum, that that be

23   marked up for next time so the PSC can respond in the

24   interim, but better, your Honor, would be if motions to

25   dismiss, which you have extended the deadlines for

1    responding to complaints, so we haven't seen many of

2    them, but we would suggest that even those that are

3    filed are dealt with after the plaintiffs file a master

4    complaint in a consolidated and comprehensive fashion.

5              THE COURT:  What is the timetable for doing

6    that?

7              MS. PARKER:  The master complaint is

8    currently scheduled to be filed on September 15th, I

9    believe.  I apologize, September 5th, and Mr. Fennell

02:27PM  10   has informed me that counsel for Carilion has agreed

11   that the motion to dismiss be heard later following the

12   amended complaint.

13             THE COURT:  After September 5th?

14             MS. PARKER:  Correct.

15             THE COURT:  All right.  I don't have a

16   problem with that, but let me just offer some thoughts.

17   The first is a motion to dismiss by definition is an

18   indication that the defendant thinks that they shouldn't

19   be a part of these proceedings, which, of course, costs

02:28PM  20   money and time and attention, and I ought to try to

21   resolve those early on, particularly, I mean, by

22   definition, they should involve issues of law, not

23   issues of fact, and it's not clear to me that we need to

24   take up everyone's time if we get to this point with

25   individual motions to dismiss, with individual

1    defendants.

2              You know, it may affect one case out of

3    many, and it could be that we set aside a day other than

4    the big status conference to argue some of these issues,

5    but I guess for the time being, I will roll those over

6    at least until the next status conference, and we'll

7    continue to discuss what the plan is for doing that.

8              I also don't like having unresolved motions

9    pending for long periods of time either, which is

02:29PM   10    perhaps silly on my part, but I feel like at some point

11    I ought to address them and one way or the other move

12    on, but at least for now, we'll roll over those motions

13    until the next status and presumably till after

14    September 5th.

15             All right.  Motions opposing the case

16    management order, which is 6b.  My understanding of this

17    is several, and I think the unaffiliated defendants all

18    were unhappy with the case management order in several

19    respects, either because the discovery deadlines were

02:29PM   20    seen as too aggressive or unfair or that mediation

21    proposals or the process of modifying the CMO in some

22    way treated them unfairly.

23             It's not clear to me which of these issues

24    remain live or not.  It's certainly not my intention to

25    treat any party unfairly.  A deadline is the easiest

1    thing to deal with.  If a deadline doesn't work, you can

2    always extend it, but I'm not quite sure what to do with

3    this.  My instinct is to deny the pending motions

4    without prejudice since the CMO has issued, and the

5    landscape has changed somewhat without prejudice to

6    their renewal after perhaps an opportunity to consult

7    with the PSC and with the affiliated defendants and see

8    if it can't be worked out, but I don't know if that

9    makes sense or not.

02:30PM  10           Who wants to take the lead?  And is there

11    someone on the telephone?  I think we have -- I will try

12    to reconstruct.  I know there's some lawyers from

13    Tennessee who wanted to take this issue up who had not

14    filed a motion to intervene.  Well, let me first hear

15    from the PSC.  What's your reaction?  Let's start there.

16           MS. PARKER:  We think that's a very workable

17    situation.  Your Honor, we remain more than willing to

18    discuss any lingering objections or concerns about the

19    CMO with any of those parties that have filed these

02:31PM  20    motions.

21           THE COURT:  Again, you don't have to resolve

22    them, but some of this I think are issues that either

23    didn't occur to me or in the process of revising the CMO

24    fell by the wayside perhaps accidentally, and I

25    certainly don't want to treat anyone unfairly.  Let me

1    recognize, are Attorneys Tardio or Cline from Tennessee

2    on the phone?  Okay, in person, yes.

3              MR. TARDIO:  Chris Tardio from the national

4    bar.

5              THE COURT:  Yes.  Welcome to the cool north,

6    Mr. Tardio.

7              [Laughter]

8              MR. TARDIO:  Well, I think it's hotter here

9    than it was when I left.

02:32PM  10              As your Honor recognized, we didn't actually

11    file an opposition.  Since I represent five Tennessee

12    defendants or Tennessee parties, we're nonparties, so we

13    were unable to file an opposition to the case management

14    order formally.

15              THE COURT:  Can you speak into a mic. so

16    that people on the phone can hear you.  Yes, go to the

17    podium.  Thank you.

18              MR. TARDIO:  We, at this point, as I stand

19    in front of the Court now, all five of my clients,

02:32PM  20    Surgery Center of Crossville, Chatanooga Neurosurgery &

21    Spine, Dr. Don Jones, St. Thomas Outpatient Neurosurgery

22    Center and Specialty Surgery Center of Crossville, if I

23    didn't mention them, are all nonparties so we were not

24    able to file a formal objection, but our objection, had

25    we had been able to file it, was primarily with the

aggressiveness of the discovery deadlines, and we
adopted opposition that had been filed previously by
actual parties in the MDL who may or may not be on the
phone.

THE COURT:  All right.  Stephen Grossman
from New Jersey, are you on the phone?

MR. GROSSMAN:  Good afternoon, your Honor, I
am on the phone.  I appreciate the opportunity to be
heard.  Our concerns more so beyond the scope of the
deadlines had to due with the fact that the CMO may have
ordered certain procedures or certain elements within
the CMO with respect to the mediation requirements and
the native file requirements of the electronic discovery
order.

Although the PSC is seeking to submit those
orders, the preview that they placed into the CMO, we
were concerned that that was actually being ordered by
the Court, so to the extent that those provisions,
particularly the native file requirement for production
of any documents going forward, isn't part of the order
or has not been ordered by the Court and will be dealt
with the ESI protocol that we have yet to see, then that
objection can be worked out.

THE COURT:  All right.  And Attorney, is it,
Wolk?  I'm sorry.

1              MR. GROSSMAN:  We do agree with the

2    gentleman who just spoke with respect to some of the

3    clinics in Tennessee.  We, as well, believe that the

4    deadlines set forth in the case management order are

5    incredibly aggressive, and we do not believe that the

6    case warrants that type of fast case management in this

7    case, particularly with the number of parties and

8    defendants.

9              We also feel that being stuck with those

02:35PM   10    particular deadlines would also prejudice us in terms of

11    the discovery that we would seek not only as to the

12    plaintiffs but also to co-defendants as well as

13    third-party defendants we have yet to bring in.

14              THE COURT:  All right.  Attorney Wolk, I

15    think it is from New Jersey, do you wish to be heard?

16              MR. WOLK:  Yes, your Honor, thank you.  This

17    is Christopher Wolk from the office of Jay Blumberg.  We

18    represent Premier Orthopaedics and Dr. Smith-Martin here

19    in Vineland, New Jersey.  I really have very little to

02:35PM   20    add to what Mr. Grossman has already said to your Honor.

21              I agree that the deadlines are very

22    aggressive in this instance, however, given what has

23    already been discussed here today, particularly

24    regarding a liaison to the unaffiliated defendants, this

25    may be something that we could work out with the PSC

1    moving forward to extend some of those deadlines as we

2    discuss it a little bit further.

3         My main objection, your Honor, to the case

4    management order are the deadlines are very aggressive,

5    and I don't see how realistically we could conduct the

6    deadlines within the deadlines.

7         THE COURT:  All right.  Did I miss anyone on

8    the telephone who wanted to be heard not on the

9    subpoenas but on opposition to the case management

02:36PM   10   order?

11         (No response)

12         THE COURT:  All right.  Here's what I'm

13   going to do.  The current pending motions, which

14   according to the agenda, and I think that's correct,

15   docket numbers 188, 189, 201, 210, 223 and 226 are

16   denied without prejudice to their renewal.

17         I'm going to direct the objecting parties to

18   meet and confer with the PSC and any other relevant

19   party to attempt to negotiate a satisfactory solution,

02:36PM   20   and you can either file a new motion or we can take it

21   up on the agenda for the August 9th conference, and

22   we'll handle it that way, and if someone needs emergency

23   relief from a deadline, I'll certainly consider

24   providing it.  I want to be mildly aggressive but not

25   extremely aggressive on deadlines, how about that?

1          All right.  The next item on the agenda is

2     requests for preservation of evidence, which I think

3     various -- there were four more or less identical ones

4     where the response was from the government and from the

5     trustee.  Does anyone want to be heard on those?  Is

6     anyone here present?  I think it's for the individual

7     defendants.  Yes, I'm sorry, Ms. Peirce.

8          MS. PEIRCE:  I had a limited appearance in

9     this case early on, which is why I'm sitting.

02:37PM  10          THE COURT:  Speak at the podium and identify

11     yourself for the record.  Thank you.

12          MS. PEIRCE:  Michelle Peirce on behalf of

13     Barry and Lisa Cadden individually.  As I said, I have

14     had a limited -- and Bruce Singal and I both represent

15     Lisa and Barry Cadden.  We filed limited appearances in

16     this proceeding because our clients are represented

17     currently by Mr. Fern, so I'm just identifying myself in

18     response to your question that we did file one of the

19     statements in response to the preservation order, and

02:38PM  20     I'm present if you need to hear from me, but I don't

21     need to be heard beyond what we filed.

22          THE COURT:  All right.  It's not clear to me

23     whether any action is required on my part.  The last

24     time I think this topic came up, as I understood it, the

25     trustee was seeking to dispose of pieces of equipment

1    and other property as to which there were leases that we

2    wished to avoid, and I was assured, as I recall, that

3    there were no kind of information present, data or

4    things of that nature that was in any danger of being

5    destroyed.

6              It's quite an abstract question to me

7    whether someone, either to defend themselves in one of

8    these proceedings or in a criminal proceeding, which I

9    probably don't have jurisdiction over, needs to preserve

02:39PM  10    a particular item of equipment.

11              Someone, the trustee, I think said either if

12    you want to keep a particular piece of property, you

13    need to take custody of it and pay to store it or

14    whatever it is, that this can't go on forever, but I

15    think there's at this point nothing for me to do.

16              Mr. Gottfried, do you want to respond?

17              MR. GOTTFRIED:  Yes, your Honor, I think the

18    order worked as you set it up.  Unless you modify it in

19    response to the objections, then it will be effective,

02:39PM  20    and what will happen is if a lessor wants to pick up a

21    piece of equipment, for example, the water cooler, the

22    postage meter, the Xerox machine or some other piece of

23    equipment that has been scheduled on the list, they'll

24    be able to do that absent you changing that status quo.

25              So if you do nothing to modify the order in

 1    response to the preservation request, I believe the

 2    lessors, who have been specifically identified, will be

 3    free to pick up their equipment.  To the extent there is

 4    something that has not been scheduled, there is a

 5    procedure for providing notice to certain parties which

 6    would then be followed if there's an additional item

 7    that the trustee needs to dispose of, but I think if you

 8    do nothing, the order goes forward as it was

 9    contemplated, your Honor.

02:40PM 10           THE COURT:  All right.  To use the example

11    of a Xerox machine, I have no idea how a modern

12    photocopier works, but if there's some chip in there

13    that stores and records data what's being photocopied

14    and one of the individual defendants think that that's

15    important to preserve, by all means, let's take steps to

16    preserve it, otherwise I don't see why these machines

17    need to be kept or stored, or at least if someone wants

18    to do it, they'll have to make arrangements and pay for

19    it, so at present I'm going to leave matters as they

02:41PM 20    stand.

21           Is Mr. Cunha present?  Does the government

22    want to -- yes.

23           MR. CUNHA:  Yes, your Honor, unless the

24    Court has any specific questions for the government, I

25    think we've laid out our position.  Again, we were in

1    the anomalous position of being a nonparty here, and

2    this was really an abundance of caution measure to make

3    sure that anyone who was not a party to the

4    multi-district litigation who might conceivably have an

5    interest could bring that interest forward and raise it

6    with the Court.

7         Since no one has stood up for any of the

8    individuals who has filed an objection, it's not my

9    place to advocate for them.  I would note that there is

02:41PM    10    some generalized language in the filings that they made

11    requesting the preservation of property, but I think

12    that without more, it's very hard to understand exactly

13    what that might mean or how that might go forward, and I

14    certainly think that the trustee has raised very valid

15    points about the expense of maintaining property that is

16    not subject to the preservation order any further.

17         THE COURT:  All right.  Just to be clear, if

18    I haven't said this in the past, when I'm permitting

19    someone like Ms. Peirce or Mr. Cunha to speak, I may not

02:42PM    20    be saying it every time, but I'm permitting them to

21    speak to educate the Court.  I don't deem them to have

22    either entered an appearance or consented to

23    jurisdiction or anything of the sort, and for that

24    matter, private parties can intervene for a limited

25    purpose of asserting a particular interest and a

1    particular issue.

2            All right.  Unless there's anything else on

3    that, 6D, the Virginia plaintiffs' motion seeking

4    interlocutory appeal or to alter judgment.  This is the

5    motions in the memoranda are 195, 196 and 211, 212.

6            The trustee and the unsecured creditors, I'm

7    sorry, the creditors' committee have opposed those

8    motions.  I can deal with this very quickly, I think.  A

9    motion for reconsideration to the extent that it is a

02:43PM  10  motion for reconsideration normally requires a decision

11   that's clearly erroneous, and that would work a manifest

12   injustice.

13           Just to review what I did, as to state court

14   cases involving state court claims against state court

15   defendants with no claim against NECC or related party,

16   I assumed, without deciding the existence of subject

17   matter jurisdiction, and abstained as a matter of

18   discretion.

19           Ordinarily, of course, the Court has to

02:44PM  20  decide subject matter jurisdiction in the first

21   instance, and I saw no reason here to decide that when I

22   would abstain, in any event, as a practical difference,

23   I don't see any practical difference between the two.

24           I left open the possibility that there would

25   be -- could be a different ruling under different

circumstances.  Certainly if a defendant in one of those cases files a claim for contribution or indemnity against NECC, it certainly raises the possibility that "related to" jurisdiction may attach, but by definition, these are cases in which there is no claim against NECC or related entity.

The Virginia plaintiffs indicated, among other things, that a defendant under Virginia law has no right of indemnity if they were actively negligent.  I don't think I need to decide any of these issues at this point.

The real point from my perspective is that these Virginia plaintiffs have achieved what they wanted.  It may not be as permanent as they want, but I did not transfer any state court cases involving only state court claims and state court defendants if there was no claim against NECC or related entity, and so they have in effect won.

They've asked me to certify this for an interlocutory appeal under Section 1292(b).  To the extent I abstained 28 U.S.C., Section 1344(d) I think bars an appeal from an abstention decision in a bankruptcy case, but, again, in any event, these plaintiffs were successful.

The facts may change in the future, but at

1    this point I see no reason either to alter my order or

2    to certify an interlocutory appeal, and if a bar date

3    gets set and some of these defendants elect to file a

4    contribution or an indemnity claim, we may well revisit

5    some of these cases, but, for the present, I see no

6    reason to do so or to otherwise address or revise what I

7    did or to permit an interlocutory appeal, assuming I

8    have the discretion to do so, and so those motions will

9    be denied.

02:46PM   10          Is there anything further on those issues?

11    Are Virginia counsel on the phone?  Do you wish to take

12    anything else up?

13          (No response)

14          THE COURT:  I don't hear anything.

15          MR. SEXTON:  No, your Honor, this is

16    Scott Sexton in Roanke, Virginia.  We had anticipated

17    and I think agreed with counsel for the trustee that

18    that would be argued at the next status conference.  I

19    think you've addressed it.

02:47PM   20          THE COURT:  All right.

21          MR. SEXTON:  Perhaps that's not necessary.

22          THE COURT:  All right.  This may not be the

23    last of these issues, but that's where we are today,

24    July 18th.

25          All right.  Next up, 6E is ARL's motion for

1    a protective order.  Mr. Ellis.

2              MR. ELLIS:  Yes, I have been negotiating on

3    behalf of plaintiffs' group, ARL.  We're going to push

4    this motion over.

5              THE COURT:  Can you speak into the mic. so

6    everyone can hear you, sir.

7              MR. ELLIS:  We've been meeting and

8    conferring with ARL, and we're going to hold this over

9    to the August 9th hearing, and hopefully we won't have

02:47PM  10   to deal with it.

11             THE COURT:  Anyone else want to be heard on

12   that?

13             (No response)

14             THE COURT:  That will be held over to the

15   next status for August 9th.

16             All right.  Item 7 are responses to the

17   PSC's subpoenas.  7A is mechanism for access

18   information.  I'm not sure I know what that means.

19             MS. PARKER:  I think it's misplaced, your

02:48PM  20   Honor, but, as I understand it, the defendants wanted to

21   make sure that we had addressed adequately how they will

22   be accessing information that is produced pursuant to

23   the subpoenas.  Let me stop for a minute and make a

24   distinction.  I think Mr. Sobol helped to clarify this

25   earlier, but so everyone on the phone understands and

1    the Court understands, documents that are produced

2    pursuant to subpoenas issued, in particular, to clinics,

3    doctors or healthcare providers, falls into two camps.

4    Some of what has been sought pursuant to those subpoenas

5    is protected health information.  Anything that falls

6    into that bucket is going to be sent to Rust Omni, who

7    is the vendor identified by the plaintiffs' steering

8    committee, who is a HIPAA-qualified and compliant

9    vendor, who will hold onto, do nothing with yet, but

10   hold onto and receive that information.

11            Separate from the HIPAA or

12   healthcare-protected information, you have ordinary old

13   discovery, so all discovery other than HIPAA goes to

14   U.S. Legal, who we also have identified to the Court and

15   to the defendants to receive that information.

16            U.S. Legal is setting up a single repository

17   that will be available and accessible to both plaintiffs

18   and defendants.  We're working through the process with

19   U.S. Legal of making sure that we have appropriately

20   cordoned off particular materials, there's no work

21   product concerns and that everyone has access.  That

22   process we hope to have up and running very soon.

23            And I will make, if I may, your Honor,

24   unless defense counsel have any comment to that, I would

25   make one, two corrections or addendums to the list of

1   objections that's included in the subpoena.

2        As I understand it, Number 8 and9, Erlanger

3   Health Systems and HCA Health Services, those objections

4   are in the process of being resolved.  The plaintiffs

5   and the recipients are conferring on those, and I

6   understand there's no need for the Court to address

7   those particular objections today.  The same goes for

8   Liberty Industries, I understand that that need not be

9   taken up today either.

02:50PM   10        THE COURT:  All right.

11        MS. PARKER:  With that, I will turn -- well,

12   back to the Court, of course.

13        THE COURT:  Let me dispose of an issue that

14   cuts across all the subpoenas, which I think is the

15   easiest issue of all, and that is jurisdiction or

16   authority.  I concluded that I had the authority both to

17   have the subpoenas issue out of this Court and to have

18   centralized enforcement.

19        28 U.S.C., Section 1407(b) provides that I

02:50PM   20   can exercise the powers of a district judge in any

21   district.  The statute literally says for the purpose of

22   conducting pretrial depositions, and there is authority

23   to the effect that that includes document subpoenas as

24   well, there being little practical difference between a

25   document subpoena and a keeper of the records deposition

1  with a subpoena duces tecum.

2          I issued an order providing for that

3  centralized enforcement.  I think that decision is

4  correct as well as practical.  I think I have the

5  authority under the statute to do it, and to that

6  extent, on any of these motions, objections to the

7  jurisdiction or authority of the Court is going to be

8  denied.

9          I have one set of broad -- let me, I'm

02:51PM  10  getting ahead of myself here.  What I expect to do on

11  these is to talk about one overarching issue that I

12  think cuts across most or all of these subpoenas, and

13  then to the extent that there are other issues

14  concerning relevant scope, breadth, defects in service,

15  time for responses, so forth, that haven't been

16  resolved, I'm going to refer them to the magistrate

17  judge, but I want to take up first this broader issue,

18  and that is the question of subpoenas seeking

19  information from pain centers or clinics or physicians

02:52PM  20  who are not parties, who don't have patients who are

21  parties where there is no claim presently pending by a

22  patient of the clinic or pain center or physician.

23          In other words, some of the providers have

24  said, look, you're seeking information protected by the

25  physician or patient privilege as well as HIPAA

1    information.  It's privileged, it's confidential, it's

2    not relevant.  What you're looking to do is to create a

3    list of names so that you can provide notice in the

4    bankruptcy action.  That's not an appropriate use of a

5    subpoena in a case of this nature.  That's sort of the

6    basic issue I would like to discuss, and I think I

7    understand the recipient's point of view.  I'd like to

8    hear from whoever wants to take it up for the

9    plaintiffs' committee to address that issue.

02:53PM  10              MR. FENNELL:  Your Honor, I'm

11    Patrick Fennell, and I'm from Crandall & Katt, Roanoke,

12    Virginia.  I'm on the plaintiffs' steering committee.

13    I'll address those concerns, and I'd like to begin by

14    discussing some of the accommodations that the

15    plaintiffs' steering committee has decided to make after

16    we got -- after we received a lot of these objections

17    and motions to quash, the plaintiffs' steering committee

18    took those very seriously and met and discussed them,

19    and we have decided to make three very significant

02:54PM  20    accommodations in terms of narrowing the scope of the

21    discovery that is being sought in these subpoenas.

22              The first significant step is that we're

23    reducing the scope of the documents that we're actually

24    seeking to discover by basically defining the documents

25    by those patients who were identified by the clinics as

having received an injection or some kind of application
of a medication that was identified by the CDC as having
being contaminated.

So, if it's an injection or the MPA, if the
clinics will identify those patients of theirs who
received an injection of MPA that was identified as
contaminated, like from a contaminated lot, we're
seeking that information, the identity of those
patients.

02:55PM
If it was eye drops, for example, one of the
other three drugs that the CDC identified as
contaminated, we're looking for the names of the
patients who received contaminated eye drops.  So by
limiting the scope of the request for information about
patients to just those who actually received the
contaminated medications, we're very narrowly tailoring
the request to meet the needs of probably notice
requirements for the bar date and so forth, and we
understand that that may include some clinics who don't

02:55PM
know of any plaintiffs that are patients of theirs.

They may feel like they don't have any
-- they haven't been named in any lawsuits yet and that
sort of thing, but in order to we think satisfy the due
process requirements of a notice and a bar date-type
situation, we have to undertake reasonable steps to

 1    identify all of those patients who are either known or

 2    reasonably renewable, so that's why we're asking for

 3    those.  That's the first accommodation that the PSC is

 4    offering to the recipients of the subpoenas.

 5              The second one is that we have agreed to

 6    change the date by which the recipients have to respond

 7    to the subpoenas provided they are agreeing to produce

 8    documents on a rolling basis.  We've changed the date

 9    for responding to the subpoenas and producing the

02:56PM 10    documents to August 15th to give them more time to go

 11    through their records and produce the information we're

 12    requesting.  And a third significant accommodation, it

 13    has to do with the depositions, the subpoena, the

 14    standard subpoena that was sent out included a notice of

 15    deposition for a records custodian-type of deposition,

 16    and the plaintiffs' steering committee has determined

 17    that we will by and large adjourn those depositions, and

 18    we won't even conduct them unless it really becomes

 19    necessary because the clinic is not providing the

02:57PM 20    documents we need and that sort of thing.

 21              THE COURT:  All right.  Let me go back to I

 22    guess the purpose of collecting this information, and I

 23    don't -- I understand the practical reasons for doing it

 24    this way, but I have to start with the legal reasons,

 25    whether it's permissible or not.

1          We have this bankruptcy proceeding, which is

2     proceeding in parallel to this.  The expectation is that

3     a bar date will be set, that it will be on some

4     reasonably close horizon and that notice will have to be

5     sent.

6          I had understood that the notice required in

7     a bankruptcy proceeding is to known creditors and

8     otherwise publication notices permissible, but, in any

9     event, the PSC wants to go farther and to try to send

02:58PM    10     what I understand is individualized notice to people who

11     may be effected.

12          Even assuming that that's a good idea and a

13     fair idea, isn't it appropriate use of the subpoena

14     power in this litigation, I'm struggling to come up with

15     an analogy here where this sort of thing has happened

16     before and has been permitted is relevant from a

17     nonparty.

18          Those of you on the phone, we're getting

19     feedback.  My words are coming back to me.  Thank you.

02:59PM    20     Don't put me on speaker.  Thank you.

21          All right.  This is not a class action,

22     right, so we have a specific universe of patients who

23     are plaintiffs in this case, these cases, they have

24     filed a lawsuit, and in the ordinary course, they're

25     entitled under Rule 26 to information that's relevant to

1    their claims or reasonably calculated to lead to the

2    discovery of admissible evidence, and the defendants are

3    entitled, of course, to likewise obtain that kind of

4    information, including information from third parties.

5            But here what we're doing is using the

6    subpoena power to compile a list really, I mean, you're

7    looking for other information, but I'm focused at this

8    point on the list, and I'm troubled as to whether

9    that -- in any event, I'm troubled by whether or not

03:00PM  10   that's appropriate or permissible, then we have some

11   other layers to the problem.

12           The subpoenas do seek health information,

13   which is normally protected by physician-patient

14   privilege.  The plaintiffs who have sued, of course,

15   have implicitly waived that privilege as to their

16   claims, but the people who are not parties or are not

17   plaintiffs have not.

18           HIPAA is, of course, a layer, and particular

19   states may have their own additional requirements for

03:01PM  20   how privileged material is handled.  I confess, I don't

21   know how that works, but some of the papers have alluded

22   to additional requirements, balancing tests and so forth

23   to overcome the privilege.

24           Let me start with the basic question.  Is

25   this an appropriate use of the Rule 26 and subpoena

1    power?  Can we do this?  Is this legal?

2         MR. FENNELL:  Your Honor, I think the answer

3    is yes because what the PSC is trying to do is tailor

4    the document requests, the information requests as

5    narrowly as possible to satisfy the need for

6    information.

7         At this point, as I indicated, the PSC is

8    trying to identify who present claimants might be but

9    also who -- what other claimants might be out there, in

03:02PM    10    other words, the known claimants now and the reasonably

11    knowable claimants, that the problem with the clinics

12    and other parties relying on this idea, that all of the

13    claimants have been identified because of this reporting

14    set up by the Centers For Disease Control doesn't

15    account for a lot of potential injured parties out

16    there, and the reason I say that is for a couple of

17    reasons:

18         Number 1, the instances of injuries that are

19    being reported by the Centers For Disease Control

03:02PM    20    include people who have received a diagnosis of

21    meningitis.  There are all kinds of different ways of

22    getting a diagnosis of meningitis, and there are

23    different standards out there, which is largely due to

24    the fact that the state of medicine in terms of

25    diagnosing a fungal infection is fairly new.

1            It's in its infancy compared to what we know

2    about bacterial infections, so the finish line or the

3    goal line for identifying a fungal infection has moved

4    just since this case began.

5            The other instance is that there are lots of

6    people out there, I know myself, I know lots of other

7    lawyers who represent people who never got a diagnosis

8    of fungal meningitis in a formal sense but they suffered

9    a lot of symptoms which are very consistent with a

03:03PM  10    fungal meningitis diagnosis, but they never got reported

11    to the CDC because they never officially got that

12    diagnosis, so there are potentially lots of people who

13    are out there, probably hundreds, at least, who are not

14    on the chart or not on the grid as far as the CDC is

15    concerned for various reasons but we feel will be

16    entitled to some kind of notice if there's a bar date

17    imposed and that sort of thing.

18            THE COURT:  Again, let's go to the practical

19    issues as to why you want to do it, and, of course, no

03:04PM  20    matter what the system is, there's always going to be

21    people who don't become aware of that they may have a

22    claim and lots of people who are aware they have a claim

23    but choose not to exercise it.

24            Am I not being asked to permit this in order

25    to support the notice function of the bankruptcy court

1    once a bar date is set?  Can't this matter be handled by

2    the bankruptcy court?  What powers does the Court have

3    to effectuate the best possible notice under the

4    circumstances or the fairest possible notice?

5              MR. SOBOL:  If I may, your Honor.

6              THE COURT:  I'm sorry.

7              MR. SOBOL:  In addition to what Mr. Fennell

8    has indicated?

9              THE COURT:  Yes.

03:05PM  10          MR. SOBOL:  I think that this goes -- the

11   answer to the legal question and the practical question

12   is that this goes to the heartland of the purposes and

13   the obligations of the plaintiffs' steering committee,

14   the creditors' committee and this Court to protect the

15   interests of people whose rights are going to be

16   affected by this proceeding and the bankruptcy

17   proceeding.

18             I'm going to take a step back and explain

19   how this kind of thing has happened previously and then

03:05PM  20   draw the analogy between those prior proceedings and

21   this one.  The first time that this kind of a project

22   was engaged in that I'm aware was in front of

23   Judge Young in the Relafen case where he was not

24   satisfied -- it was a class action case, I recognize,

25   all these cases I'm about to describe are class actions,

1    I'll draw the analogy to you in a moment -- where the

2    usual publication notice goes out, and you get 4,000

3    claims of consumers nationwide, and that's not adequate,

4    and instead, he said, that this Court has the power and

5    the obligation to ensure the interests of the members of

6    the class, it has a fiduciary duty to make sure that

7    people really know about what's going on and really have

8    a genuine opportunity to file a claim.

9              So he ordered the plaintiffs' lawyers, of

03:06PM  10    which I was one, to go out and subpoena pharmacies and

11    PBMs, get healthcare information that is privileged and

12    highly sensitive, but do it under the same kind of terms

13    we've done it, get it to Rust, the same company that

14    we've done here, so that they could deduce names and we

15    could write checks to those people with an indication

16    that you're entitled to this money, and instead of it

17    going to 4,000 people, the checks went out to over a

18    quarter of a million or 350,000 people or something on

19    that order.

03:06PM  20              That process that I've just described was

21    then adopted by Judge Saris where we sent out notices to

22    over a million Medicare patients, written notices to

23    make sure that they got -- because Judge Saris thought

24    it was her obligation as well as the plaintiffs'

25    obligation, not only power but obligation to make sure

1    the people have actual notice of their rights.

2              THE COURT:  Is that a class action?

3              MR. SOBOL:  These are all class action cases

4    I'm giving you.

5              THE COURT:  But, of course, a class action,

6    there's a specific provision in the rules for members to

7    the class, and that strikes me that's a horse of a

8    different color, that's what I'm struggling with.

9              MR. SOBOL:  Let me draw the analogy then

03:07PM  10   here, although there are other examples, I think I don't

11   want to beat that dead horse for a moment, and I'll see

12   if I can also show you how they are the same colors of a

13   horse.

14              So here in this situation, the reason you

15   have the hooks, if you will, are twofold:  First, you do

16   have class actions before you, not just my office but

17   other offices have filed class actions, and you have the

18   power under those class actions to issue orders and

19   effectuate subpoenas to the members of those class.

03:08PM  20              You recall in the very beginnings I have

21   filed and other people have filed class actions saying

22   we have a limited fund here, we have these people in the

23   United States, they need and they're entitled to

24   genuine, honest notice, that if you don't file a claim,

25   your rights are going to be wiped out and that they

1    should have an equitable process of distribution, so

2    you, yourself, regardless of any bankruptcy, have a hook

3    to do that in this MDL.

4              But, second, what's going to happen in the

5    bankruptcy, what's happening with the bar date notice

6    right now is for all practical purposes and legal

7    purposes is exactly a class action.  It's treating all

8    of the victims in the country as if they have a right to

9    file a claim, and if you file a claim, you're in, and if

03:08PM  10   you don't file a claim, you're out.  There is no

11   difference.

12             It's de facto a class action right now, and,

13   in fact, that's what's often argued in bankruptcy court

14   is that you no longer need a class action because we're

15   treating everybody like they're in a class.

16             Now, if there's a distinction because I

17   think that only carries that second explanation only

18   takes us nine-tenths of the way because then you'd be

19   saying, well, why don't you bring this issue to

03:09PM  20   Judge Boroff rather than to me, and that's a question

21   that we also looked into as well.

22             There what we tried to say is, well, where

23   is this going to most efficiently be done?  The nearest

24   we could tell in a bankruptcy court did not have the

25   power to issue subpoenas nationwide and insist upon

1    central enforcement.

2              Now, that may or may not be a correct legal

3    conclusion, but it was explored jointly among people,

4    not just the PSC but others, and we came to the

5    conclusion that the more efficient way to approach this

6    would be to have the MDL Court do it because we could

7    have central enforcement.

8              Now, finally, I'll so just we can get beyond

9    what I would consider to be the final small technical

03:10PM  10   gap that has to be closed, which is sure, okay, it's

11   more practical here, Mr. Sobol, but I'm still not the

12   bankruptcy court, I'd say, well, you can issue an order

13   that for this tiny, small purpose, the reference is

14   withdrawn, and you're sitting not only as a Federal

15   District Court Judge but also as the Bankruptcy Court

16   Judge and everything is taken care of.

17             Now, that's only the answer to the legal

18   question, but I'll also say the fairness question in

19   this situation, this is not a common situation where

03:10PM  20   you've got a bankruptcy that's dealing really with a

21   mass tort and where it is fundamental to the purposes of

22   not just the PSC and the creditors' committee but to you

23   and to Judge Boroff to make sure that everybody gets as

24   clear an opportunity to file a claim before their rights

25   get wiped out, particularly where we've got 60 or so

1      dead Americans and 700 and whatever, you know, illnesses

2      as well as other potential claims that are out there,

3      this can't be dealt with by -- well, that's why we're

4      doing this.

5                So I think you've got the hooks for those

6      reasons and why it is it's practical to do it and why

7      it's, frankly, I don't think it's a matter simply that

8      you have the power, I think you have the obligation,

9      frankly.

03:11PM   10                THE COURT:  What about the issues of

11      physician-patient privilege, which are matters

12      presumably of individual state law?  Why does -- how is

13      that privilege overcome that a plaintiff, a resident of

14      New Hampshire, let's say, who went to a pain clinic, put

15      HIPAA aside, but its covers more or less the same

16      ground, how does that privilege get waived or overcome?

17                In other words, you're asking me to ask a

18      New Hampshire pain clinic or Virginia pain clinic to go

19      through its record and say patient X received treatment

03:12PM   20      Y on such-and-such a date, and, therefore, patient X,

21      you know, we're going to give you that information,

22      including that patient's contact information, so that

23      you can contact that patient.  What about -- why is that

24      not privileged and how do we overcome the privilege?

25                MR. FENNELL:  Your Honor, this is

1    Patrick Fennell, and if it pleases the Court, I'll

2    address that concern.

3              Earlier in this case, the Court entered the

4    qualified protective order which set out the procedures

5    by which the protected health information would be

6    received by the plaintiffs' steering committee pursuant

7    to the discovery efforts that it undertook, and in your

8    Honor's order, you required that the protected health

9    information be kept in the strictest confidence and

03:13PM   10   would not be released to any other person or entity

11   until further order of the Court.

12              Pursuant to that order --

13              THE COURT:  I was focusing on HIPAA frankly

14   at the time, not privilege, and my understanding is that

15   because HIPAA has a Court Order out to it that that

16   procedure did not violate HIPAA, but that was all I was

17   focused on, I wasn't focused on the privilege.

18              MR. FENNELL:  That procedure, it will

19   address any concerns that the Court has about the HIPAA

03:13PM   20   concerns, but I think it also will address any concerns

21   the Court would have about the patient-physician

22   privilege.  The information that is being requested is

23   necessary for the plaintiffs' steering committee to

24   obtain so that we can help identify all of the

25   claimants, the potential claimants that are out there

1    before they lose their rights pursuant to some bar date

2    that might be imposed, so those concerns about the

3    patient privilege, the patient physician privilege will

4    be protected in the same manner that the HIPAA concerns

5    will be protected.

6              If your Honor would like, the plaintiffs'

7    steering committee would be happy to submit a

8    supplemental brief on that issue by this coming Tuesday.

9              THE COURT:  Mr. Gottfried, does the trustee

03:14PM  10   have a position on this?

11             MR. GOTTFRIED:  We don't have a position

12   with respect to the subpoenas and the specific questions

13   that the Court has raised with respect to that issue.

14   We do think that the issue of notice under the bar date

15   is something that would be taken up by Judge Boroff next

16   week, and we think that's the appropriate place for that

17   to occur.

18             THE COURT:  What powers does he have as a

19   bankruptcy court, putting aside the centralized

03:15PM  20   enforcement issue?  In other words, does he have the

21   power as a bankruptcy judge to undertake discovery, I

22   guess, to provide appropriate notice to affected

23   parties?

24             MR. GOTTFRIED:  Well, I brought my

25   bankruptcy partner wingman here with me, and I'll let

1    him answer that question, Attorney Sternklar.

2           THE COURT:  All right.

3           MR. STERNKLAR:  Thank you, your Honor,

4    Attorney Jeffrey Sternklar.

5           THE COURT:  Why don't you remain seated and

6    speak into the mic.

7           MR. STERNKLAR:  Thank you, your Honor.  The

8    answer to your question is yes, Judge Boroff clearly has

9    the power under a variety of rules and provisions of the

03:15PM  10    bankrupt code to obtain whatever information he wants.

11    We should note, your Honor, on the bar date motion that

12    is on for hearing before Judge Boroff next week, we have

13    specifically and directly addressed the issue of how we

14    give notice both to known and unknown creditors, and

15    your observation we believe is correct.

16           The law in bankruptcy is that the Courts

17    make a distinction between known and unknown creditors.

18    The leading case in the First Circuit on that point is

19    the *Arch Wireless* case, and what the Court says is a

03:16PM  20    known creditor is a creditor that is either known or

21    reasonably ascertainable, and it goes on to explain that

22    a reasonably ascertainable creditor is one who appears

23    from review of the books and records of the debtor,

24    which in this case is New England Compounding.

25           There are a number of cases, not so much in

1    the First Circuit but in the Third Circuit, the *Chemtron*

2    case, and in the Fifth Circuit, that make clear that the

3    test is whether the identity is ascertainable from the

4    books and records, not that it's discoverable or not

5    that the claim itself is foreseeable but whether the

6    actual identity by looking at the books and records is

7    ascertainable.  In those circumstances, you have to give

8    some other notice, constructive notice by publication or

9    otherwise.

03:17PM  10          Now, Judge Boroff, we have proposed in our

11   bar date motion a method of giving publication notice.

12   Judge Boroff in prior hearings has sort of forecast that

13   there are some specific changes he wants made to that

14   that we are prepared to make.  He apparently believes

15   people do read local and state papers and wants us to

16   provide publication notice more broadly than we

17   proposed, and we're prepared to do that.

18          With respect to your question about the

19   power, your Honor, the Court has the power with respect

03:18PM  20   to notice under Bankruptcy Rule 2002(a)(7).  That rule

21   specifically provides that, and I'll read it in

22   pertinent part.  There's a lot of stuff that's not

23   pertinent here.

24          It says, "The clerk," meaning the bankruptcy

25   clerk, "or some other person, as the Court may direct,

1    give a number of parties, including all creditors, at

2    least 21 days' notice by mail of," and Subsection 7 then

3    says, "The time fixed for filing proofs of claim

4    pursuant to another rule."

5              The Court clearly has the power to require

6    that notice to be given.  If those names are not

7    ascertainable, there is another rule in the bankruptcy,

8    Rule 2004, that permits a party to take discovery, if

9    you will, even though there's no lawsuit pending.

03:19PM  10             The courts have literally said that with

11   respect to issues relating to debtor and its financial

12   affairs, that that is, and this is a quote, "a fishing

13   expedition."  It's a very, very, broad power to conduct

14   discovery far beyond the Rule 26 limits that apply in

15   civil discovery under the Federal Rules of Civil

16   Procedure.

17             So one way we propose to deal with that,

18   we've got a proposal in our motion whereby we're going

19   to request of some of these clinics.  Actually we're

03:19PM  20   going to ask Judge Boroff to order that these clinics

21   make an election.  They either give the notice

22   themselves to those people we don't know that they gave,

23   administered some of the product from at least the three

24   contaminated lots that the CDC has identified caused

25   harm, or if they don't want to give the notice, simply

1    turn over the names and contact information to us and to

2    our noticing agent, Donnell, McConnell & Company (ph),

3    who in a HIPAA-compliant way will provide notice to

4    those parties in lieu of having the clinics provide

5    them.

6              And we've briefed, at least in a summary

7    form, our motion to law in which we believe Judge Boroff

8    is empowered to enter such an order.  So that's the

9    minimum, and Judge Boroff certainly has the power to do

03:20PM  10    that.

11             Now, we have made clear that we share at

12   least the goal of getting as broad a notice as possible,

13   of actual notice as possible out to as many people as we

14   can, and we have been in discussions with at least as

15   many people as we can who we can identify have been

16   administered the tainted product that has caused harm.

17             We've consulted both with the creditors'

18   committee, Mr. Molton and his group, with Mr. Sobol and

19   his group where they want more, and we're not resisting

03:21PM  20   everything they want.  We're trying to work out some of

21   the details.

22             We obviously only have limited funds to use

23   to provide notice.  We can spend a lot of money getting

24   the last two or three percent of people notice who may

25   not otherwise get notice, and we want to be careful that

1    we not spend inordinate amounts of money trying to do

2    that, and I think that the prospects are good that for

3    the most part, we will reach accommodation with the

4    different committees.  To the extent there are issues

5    about the bar date in bankruptcy, a creature of the

6    bankruptcy rules, Rule 3003(c) is what requires the

7    Court to set a bar date for claims in the Chapter 11

8    case and issues about notice of that bar date, then in

9    response to your question, there are numerous provisions

03:22PM  10   of the bankruptcy rules and the bankruptcy code that

11   authorize and empower Judge Boroff to enter the

12   appropriate orders to give notice that complies with due

13   process, and as noted, will endeavor to the extent

14   there's more than the minimum required to do within

15   reason, we hope to do it.

16          I think we've made a lot of progress on

17   that.  I think, as Mr. Sobol indicated, there's still

18   some issues outstanding, and if we can't resolve them

19   all, then Judge Boroff will be prepared to decide them

03:23PM  20   next week.  Thank you, your Honor.

21          THE COURT:  What about the suggestion that I

22   would have the power to withdraw the reference to the

23   bankruptcy court for the limited purpose of dealing with

24   these notice issues?  Does that work?

25          MR. STERNKLAR:  No, your Honor.  Well, I

```
 1   don't think --

 2              THE COURT:  Does it work legally?

 3              MR. STERNKLAR:  Legally?

 4              THE COURT:  Yes.

 5              MR. STERNKLAR:  You can withdraw the

 6   reference, if you wish, your Honor, that's up to you, if

 7   the conditions for withdrawal of the reference exist,

 8   then there's various standards if a motion is made to

 9   withdraw the reference that have to be met.

10              I would submit it would be extremely

11   disruptive to our ability to administer this bankruptcy

12   estate if we start doing this piecemeal and you start

13   taking pieces here, pieces there.

14              As your Honor may recall from the 28 U.S.C.,

15   157 that governs, part of what governs what the

16   bankruptcy court has the power to hear and determine,

17   there are core proceedings and non-core proceedings.

18   Core proceedings, the courts have substantially greater

19   powers to enter final orders and judgments than they do

20   as to non-core proceedings, the bankruptcy courts, at

21   least, and this is about as core of a proceeding as one

22   can get, setting a bar date under a bankruptcy rule for

23   the submission of claims that will be subject to

24   allowance or disallowance under the bankruptcy code,

25   have consequences potentially for voting under a plan of
```

1   reorganization, and I can't think of something that

2   would be more disruptive at this point if your Honor

3   were to withdraw the reference for one piece of this

4   than the other.

5           There's no suggestion, nor is there any real

6   good faith argument that Judge Boroff can't or won't

7   handle this appropriately, as he's done regularly in

8   these cases, and as we expect he'll do on Wednesday.

9           THE COURT:  I think I heard you say that

03:25PM  10   Judge Boroff would have the power to, for example,

11   direct let's say a pain clinic in Virginia to either

12   provide the notice or provide the names so that the

13   Court can provide notice.  Is that correct?

14           I mean, in other words, could he issue an

15   enforceable order, let's say a pain clinic in Roanoke,

16   Virginia, I want you to give notice to the patients,

17   according to your records, who received any of these

18   medications and report back to me that you've done that,

19   otherwise I want the names.  Does he have the power to

03:25PM  20   do that?

21           MR. STERNKLAR:  Your Honor, I believe he

22   does.  The plain language of Rule 2002(a) is that the

23   clerk "or some other person as the Court may direct" has

24   to give the notice.  "Person" is a defined term under

25   the bankruptcy code that would include the pain clinics

1    and the other what we call notice intermediaries in our

2    motion.  I don't know of any basis on which one could

3    read that out of the rule and say that he doesn't have

4    the power to direct other persons.

5              THE COURT:  That's nationwide power as well,

6    right?

7              MR. STERNKLAR:  Yes, your Honor, under the

8    bankruptcy code, I believe the Supreme Court, certainly

9    the First Court has held that for purposes of personal

10   jurisdiction, minimum contacts do not have to do with

11   the forum state but rather with the United States, so

12   it's nationwide personal jurisdiction.

13             THE COURT:  All right.  Mr. Fennell,

14   Mr. Sobol, do you want to respond to that?

15             MR. SOBOL:  I do, your Honor.  First taking

16   that last issue and then working backwards.  Speaking

17   candidly, the discussion that led to us approaching the

18   clinics in the way that we have through the subpoena

19   power of this Court was the determination from

20   Paul Moore, the trustee's counsel, that the more

21   efficient and better way to do this was not through the

22   fishing expedition powers of the bankruptcy court but

23   instead through this Court's subpoena power and its

24   ability to have central enforcement.

25             THE COURT:  Why is one a fishing expedition

1    and not the other?  It wouldn't essentially be the same

2    thing.

3              MR. SOBOL:  Well, I used that expression

4    simply because in that context, in the bankruptcy rules,

5    they sort of call it and use that expression, but it's

6    really not important for these purposes.

7              THE COURT:  But it seems to me that

8    argument, for better, for worse applies equally to what

9    I would do.  I mean, you know, if that's a fishing

03:27PM  10    expedition, this is, too.

11              MR. SOBOL:  Fair.  Then the other thing

12    about whether or not the bankruptcy court has the power

13    to insist that a clinic then issue, you know, that the

14    clinic provide notice is problematic for a variety of

15    reasons.  First, I think there is a genuine question

16    about whether or not clinics, they haven't even filed

17    the claim in the bankruptcy court, think that they could

18    be ordered as to what it is they can do by the

19    Bankruptcy Court Judge, Number 1.

03:28PM  20              My understanding is that as a result of the

21    filing of the bar date motion, some clinics have already

22    said you don't have the power to require us to do that.

23    It's also problematic for two other really --

24              THE COURT:  You understand, I don't have the

25    power, I mean --

1          MR. SOBOL:  It doesn't mean that you don't

2     have the power through the issuance of a subpoena, which

3     is what we've done, and its court process, which is why

4     we've gone through this, to make clear that there is the

5     power of the Court and there's court process.

6          THE COURT:  But my power is limited by

7     Rule 26.

8          MR. SOBOL:  Well, and Rule 45.

9          THE COURT:  And Rule 45.

03:28PM   10          MR. SOBOL:  I'll turn to in a little bit the

11     withdrawal of the reference issue.  It's also

12     impractical though because there's no ability to monitor

13     compliance with whether or not the clinic has really

14     done it or not.

15          For example, it's the case often that when

16     you send out a mailing, you get a lot of letters back,

17     we don't know where the person went, that kind of thing.

18     There's been some experience here even that when the CDC

19     letters went out and clinics were supposed to send out

03:29PM   20     letters, that they got returned mail of a large quantity

21     or returned things, and then so are you going to do what

22     you need to do to make sure you get real notice to

23     people but then also you don't have a track record of

24     knowing who it is you're trying to contact.

25          One thing the PSC would likely do if we had

1    the names and are making sure that people are contacted

2    is if somebody hasn't filed a claim that there could be

3    a way to do a follow-up telephone bank or a follow-up

4    mailing to make sure that the people do have.  So

5    there's some practical considerations as well.

6              There's also a really fundamental practical

7    issue, which is this:  It's a little bit nuance, but I

8    have to describe it.  What we contemplate in this case,

9    your Honor, is that eventually the clinics will

03:30PM  10  participate in the eventual plan of reorganization and

11   that the clinics, therefore, will have channeling

12   injunctions and will be, for all practical purposes,

13   released.

14             Now, if a person now gets a notice and does

15   not file a claim here, it may be that their rights

16   against the clinic, too, eventually will be functionally

17   released through channeling injunctions and the rest.

18   So the position of the PSC has been that you have to at

19   this time or later make sure that people know that their

03:30PM  20  rights against the clinics are going to be wiped out.

21             Now, are we going to be have the clinics

22   under some emorpheus obligation sending notices that

23   can't be monitored and can't be followed up, and those

24   notices make clear to people you might have a right to

25   sue your clinic?  I mean, it ends up being a situation

1    where it's not a practical way to go about doing things.

2           Now, I will say there is, because of this

3    situation where you have precisely the conundrum in

4    front of you, which is should this Court Judge be

5    dealing with this, or should Judge Boroff be dealing

6    with this?  If you struggle with that power issue at

7    all, this is not a new issue in a mass tort bankruptcy

8    context.

9           There are other situations in mass tort

03:31PM  10   bankruptcies where right out of the gate, the

11   Article III Judge withdraws the reference for purposes

12   of the bar date, hearing the notice procedures, content

13   of notice and even planned confirmation, you know,

14   whether it's in the Babcock bankruptcy case or the Dow

15   Corning bankruptcy case, and I think that if you go into

16   there's an article about how it is that -- sorry.

17          Yes, the *H.A. Robbins* case, there are many

18   examples where the reference is withdrawn in a mass tort

19   because the Article III Judge is better equipped and is

03:32PM  20   more efficient because you deal with it once and once

21   only.

22          THE COURT:  I cannot imagine that I'm better

23   equipped than Judge Boroff to do things like confirm

24   a --

25          MR. SOBOL:  Well, it's one --

```
 1                    THE COURT:  There's no possibility that
 2      that's true.
 3                    MR. SOBOL:  -- stop shopping.  Right now you
 4      have 82 issued subpoenas.  Judge Boroff doesn't have
 5      any.
 6                    THE COURT:  All right.  Is there anyone
 7      present for a third-party subpoena recipient who wants
 8      to be heard?  I know there are people on the phone.
 9      Anyone physically present in the courtroom?  Yes, sir,
10      please come up to the podium.
11                    MR. TARDIO:  For the record, again,
12      Chris Tardio here on behalf of five Tennessee non-party
13      recipients of subpoenas, and these legal issues have
14      been covered in the discussion that the Court has
15      leveled over the last few minutes, but one thing that I
16      don't know if the Court wants to address it now or later
17      when we talk more specifically about the breadth of the
18      subpoenas.
19                    As I understand the bar date motion, and as
20      I understand the subpoenas that have been issued, the
21      breadth expands the universe of patients expected to be
22      noticed or listed by these clinics beyond those patients
23      who received just the MPA, and as we know the CDC --
24                    THE COURT:  Let me cut to the chase on this.
25      I intend to resolve this broad issue of can we do this
```

1  at all?  I'm going to give the details to the magistrate

2  judge, the breadth of a particular subpoena as applied,

3  and I should note that the subpoenas, as I understand

4  it, seek information beyond individual patient names,

5  what I'll call business-type records, insurance

6  policies, sales of NEC products and so forth.  I'm going

7  to give all of that to the magistrate judge.

8         I don't want to struggle through all 33

9  objections and 82 subpoenas.  I'm going to let her

03:34PM  10  wrestle with that, but I want to decide this broader

11  issue up front, and one way or another, she'll get what

12  remains.  That's my intention of how to proceed here.

13         MR. TARDIO:  Fair enough, your Honor.  I

14  think from my perspective, the legal issues have been

15  discussed sufficiently.

16         THE COURT:  All right.  I'm going to go down

17  the list of people who have indicated on the phone that

18  they may want to be heard.  Again, if you have something

19  to add that is not duplicative, I'll give you that

03:34PM  20  opportunity.  What I'm going to do rather than resolve

21  it now is I'm going to take up the plaintiffs on their

22  suggestion to have supplemental memoranda filed by next

23  Tuesday, and I'll give any party or third-party an

24  opportunity to do that, to supplement the briefs in

25  light of the discussion today, but let me go down the

1   list.

2           Mr. Wolk from New Jersey, do you want to be

3   heard on this?

4           (No response)

5           THE COURT:  I don't hear a response.

6   Mr. Brock or Mr. Bennett from Tennessee, do you want to

7   be heard?

8           (No response)

9           THE COURT:  I don't hear a response.

03:35PM 10  Mr. Myers from South Carolina, do you wish to be heard?

11          (No response)

12          THE COURT:  We're not mooted, are we?

13  Mr. Grossman from New Jersey?

14          (No response)

15          THE COURT:  No response.  Ms. Humphrey from

16  Michigan?

17          (No response)

18          THE COURT:  Mr. Shaw from D.C.?

19          (No response)

03:35PM 20  THE COURT:  Ms. Stevens from Florida?

21          (No response)

22          THE COURT:  Mr. Bozer from New York?

23          (No response)

24          THE COURT:  I think that's it.  Anyone else

25  on the telephone who wishes to be heard on this issue?

```
 1              (No response)
 2              THE COURT:  All right.  Let me --
 3              MR. MOLTON:  Your Honor --
 4              THE COURT:  Yes.
 5              MR. MOLTON:  -- just with respect to I
 6    didn't have an opportunity to weigh in.
 7              THE COURT:  I'm sorry, go ahead.
 8              MR. MOLTON:  David Molton for the committee.
 9    We didn't take any position, vis-à-vis the subpoenas.  I
10    just want to set the committee's position with respect
11    to three points.  Number 1, without reiterating what
12    trustee's counsel said, we fully agree that the
13    bankruptcy court has the power to do what Mr. Sternklar
14    said, has full authority and power under the bankruptcy
15    code and has full nationwide jurisdiction.  This is
16    things that bankruptcy courts do all the time.
17              We think that the two courts have been
18    operating quite efficiently dealing with their
19    respective duties, and we agree that with piecemeal
20    withdrawal of the reference, especially in connection
21    with something that is core as core can be as bar date
22    would not benefit the efficient administration of the
23    bankruptcy estate.
24              And Number 3, a lot of the argument that you
25    heard today, your Honor, will be undertaken and is being
```

1   briefed and will be dealt with by Judge Boroff next

2   Wednesday with full opportunity for all counsel to be

3   heard, you know, and for him to make a decision based on

4   applicable law, and hopefully the various parties will

5   come to agreement to provide not just minimal

6   constitutionally sufficient notice, but as Mr. Sternklar

7   said, the trustee has announced his intent to go beyond

8   that and to work with the two committees to provide

9   notice that goes beyond what's just constitutionally

03:38PM   10   necessary to make it adequate for the circumstances of

11   this case, so I just wanted the committee's position to

12   be known.

13               THE COURT:  All right.  Just to clarify, the

14   briefing, supplemental briefing by next Tuesday, I would

15   like counsel to address the question of

16   physician-patient privilege and how that may be affected

17   here.  It's not clear to me how that issue is resolved,

18   and I understand why this is desirable, why it's

19   practical, why it works better than any other solution.

03:38PM   20               That's not my immediate concern, my

21   immediate concern is whether it is legally permissible

22   for me to do this when the recipients of the subpoena

23   object.  At the risk of sounding old-fashioned, I'm

24   going to do what the law permits me to do and limit

25   myself to that, and if as a result the notice is

1   imperfect, then the notice is imperfect if the law

2   doesn't permit me to go farther, but I need to be

3   persuaded that I have this power or that it makes sense

4   for me to exercise this power rather than having the

5   bankruptcy court exercise it.

6            In the meantime, all of the various

7   objections and motions to quash to the extent they

8   haven't been resolved voluntarily will remain pending.

9   There were 33 at last count.  I don't know how many

03:39PM  10  there are at present -- apparently Attorney Bozer, can

11   you hear me?

12            MR. BOZER:  Yes, your Honor.

13            THE COURT:  You wanted to speak, and

14   apparently you had trouble being heard?

15            MR. BOZER:  Your Honor, I had Peter's e-mail

16   on my desktop.  There are a number of people on the

17   system I heard trying to respond to your Honor, and I

18   wanted to alert Peter of that fact.

19            THE COURT:  Okay.

03:40PM  20            MR. BOZER:  I myself am satisfied that the

21   arguments have been presented.

22            THE COURT:  At the risk of opening this up,

23   if anyone wants to be heard, identify yourself and

24   speak.  Anybody from New Jersey?

25            MR. GROSSMAN:  Thank you, your Honor.  This

1    is Steve Grossman.  Hopefully you can hear us at this

2    point.

3              THE COURT:  Yes, yes.

4              MR. GROSSMAN:  The one issue I wanted to

5    raise with respect to of notice is that the very issue

6    of the scope and the notice that's being discussed today

7    is obviously pending before the bankruptcy court as part

8    of that bar date motion.  We were hoping to have

9    guidance on that yesterday, as many pointed out, but, of

03:40PM   10   course, that's been adjourned.

11              Our concern, and although I think you've

12   just ruled that these will be held in abeyance, one of

13   the things we did want to say is that the decision made

14   today obviously could have a broad impact on the notice

15   requirements that will be imposed on the debtor and the

16   bankruptcy and which would affect to the extent that

17   scope goes beyond the particular three lots at issue

18   would impact a number of patients and certainly various

19   medical centers, and as such we were going to suggest to

03:41PM   20   the Court that your Honor consider deferring that

21   decision on the scope of discovery until the bankruptcy

22   judge determines the scope of who needs to receive

23   actual notice in the context of the bar date motion.

24              THE COURT:  All right.  Anyone else from

25   New Jersey?  Anyone from Tennessee?  Like the Miss

1    America contest here.

2              [Laughter]

3              THE COURT:  North Carolina?

4              COUNSEL FROM NORTH CAROLINA:  Your Honor,

5    we're fine.

6              THE COURT:  Michigan?

7              MS. HUMPHREY:  Yes, your Honor, this is

8    Kathryn Humphrey.  Can you hear me, sir?

9              THE COURT:  Yes.

03:41PM   10              MS. HUMPHREY:  I simply wanted to point out

11    two things in response to the three points that the

12    plaintiffs' steering committee lawyer made in support of

13    this Court permitting him to issue subpoenas and gain

14    this kind of patient information through that route.

15    The first is that he said it ought to be done not by the

16    clinics and the hospitals because there will be

17    follow-up that's necessary, letters get returned as

18    undelivered, et cetera.

19              Assuming that someone is going to need to do

03:42PM   20    that follow-up, it can be done by whomever the Court

21    requires it to be done by, and as the Court probably

22    knows, there has already been a notice procedure because

23    of the recall, and in the instance of my client, they

24    were in contact with each of their patients, and they

25    knew who they were and how to contact them, and I think

1          that is much more the rule than the exception.

2                    The second point I want to make is to his

3          point about are we going to have the clinics notifying

4          their own patients that they may want, they may wish not

5          to waive rights against the clinic, and the point I want

6          to say here is simply that the text of the notice that

7          can be provided by the clinics themselves in order to

8          protect the patient privilege, the patient physician

9          privilege, the text of that notice I fully expect would

03:43PM  10          be dictated by the bankruptcy court or you under

11          different circumstances and that whatever text is,

12          whatever is required to be told to the patients, a Court

13          is going to tell us what that text is, and that need not

14          be -- that is not an objection that carries any weight

15          weighing in favor of the plaintiffs' steering committee

16          as opposed to the clinics.  Thank you, sir.

17                    THE COURT:  District of Columbia?

18                    (No response)

19                    THE COURT:  Florida?

03:44PM  20                    COUNSEL FROM FLORIDA:  No, your Honor, thank

21          you.

22                    THE COURT:  Thank you.  Anything else on

23          that issue that I've failed to take up?  Again, there

24          are other issues that may need to be resolved, as I

25          indicated, what I'll call the business information-type

1    issues I'm clearly going to refer to the magistrate

2    judge, but for the time being, I'm going to wait for the

3    further briefing and make a decision on this larger

4    issue.

5              MR. STERNKLAR:  Your Honor --

6              THE COURT:  Yes.

7              MR. STERNKLAR:  -- Jeffrey Sternklar again,

8    a couple points.  One, as related to by counsel from I

9    believe Michigan just spoke, among the things we're

03:45PM  10   asking Judge Boroff to approve is the form of the

11   notice.

12              Second, I would echo the suggestion and make

13   it even broader of I forget the gentleman who made it on

14   the phone, his name, but that it might be very helpful

15   when we're briefing these issues to know what

16   Judge Boroff has decided, so might I suggest that rather

17   than having the brief due Tuesday, you set the deadline

18   for the briefing for a date after Wednesday, a couple

19   days at least after Wednesday, so we have the benefit of

03:45PM  20   Judge Boroff's ruling in hand when we're submitting

21   things to you that might be impacted by that?

22              Certainly one of the other reasons that

23   comes to mind is because, you know, we put this hearing

24   off before Judge Boroff for one week.  I understand it

25   was done so in part based on the agreement of --

1          [Audio feedback]

2          THE COURT:  There's one small step for a

3    man, that sounds like.

4          MR. STERNKLAR:  It's a giant leap, your

5    Honor, but I understand it was in part based on the

6    agreement more of the trustee and Mr. Sobol that they

7    expand the week trying to work this out, but then

8    ultimately Judge Boroff, they agreed, is the proper

9    party to decide this, so it's somewhat anomalus when we

03:46PM  10   hear now that there's some discussion of maybe

11   withdrawing the reference to take that motion on for

12   Wednesday and bring it to this Court.

13          Finally, your Honor, just a question of

14   clarity.  I want to understand precisely what it is you

15   want briefed.  We understand the issue of the privilege.

16   When you get into the question of whether you have the

17   power to issue these subpoenas, are you asking for

18   briefing whether you have the power under Rule 26, or

19   are you going father and asking us to brief whether you

03:47PM  20   can or should withdraw the reference?

21          If it's the latter, I might suggest, your

22   Honor, we await a formal motion to withdraw the

23   reference so we know we have a clear target to shoot at

24   rather than talk in some abstract fashion.

25          THE COURT:  Why don't we put the issue of

1    withdrawing the reference on hold for the time being.  I

2    think that's kind of a radical proposal, so to speak,

3    and I'm not prepared to do it without further briefing

4    and consideration.  It's an opportunity for supplemental

5    briefing.  I think I've hopefully expressed my concerns

6    here.  I'll let people react as they wish.  You can file

7    nothing, you can file what you think is appropriate.

8            I do tend to be influenced by things like

9    cases and statutes, and, you know, I made clear I'm

03:48PM  10  concerned about my legal authority to do this,

11   particularly in the context of privileged information.

12   It may be that there's some shining authority out there

13   that clears it all up for me.

14           I do think it makes sense to wait till after

15   Wednesday for the hearing before Judge Boroff which will

16   also give everyone else a little more time to reflect on

17   this.  Why don't I make it Friday, the 26th, for

18   supplemental briefing unless someone thinks this is more

19   urgent than that, and we'll handle it that way.

03:48PM  20          And, again, I don't think we need to take up

21   the issue of this partial withdrawal completely,

22   complete withdrawal of the reference at this stage.  It

23   will take a lot of work to convince me that I would do a

24   better job at that than Judge Boroff.  That's a hill

25   that's too steep to climb I think probably, but, in any

1    event, let's see how that goes.

2                    MR. SOBOL:  If I may, your Honor?

3                    THE COURT:  Yes.

4                    MR. SOBOL:  Just to respond to

5    Mr. Gottfried's comments regarding withdrawal of the

6    reference, I have a very explicit agreement with

7    Mr. Moore that I was not going to move to withdraw the

8    reference, and I haven't.

9                    What I was responding to, however, was

03:49PM  10   Mr. Gottfried's argument that when expounding on what he

11   perceives to be the powers of the bankruptcy court that

12   implicitly does not, and I don't think that's the law,

13   nor do I think that the plan all along had been

14   explicitly with the trustee, that the PSC would spend

15   hundreds of hours issuing subpoenas to 80 clinics to be

16   able to make sure that we get affected notice to these

17   injured people and then for the trustee's position

18   implicitly before this Court to be that it's all been a

19   waste of time, and I've been disappointed by that,

03:50PM  20   frankly.

21                   THE COURT:  Well, I don't know that that

22   requires a response from me.  I, the Judge, am concerned

23   about my legal authority.  At least some of the

24   recipients of the subpoenas have briefed this quite

25   capably and raised concerns that had not occurred to me,

1    and I want to make sure I understand those issues before

2    fully we go further, and --

3                MR. SOBOL:  And that will be briefed by the

4    26th?

5                THE COURT:  That will be any supplemental

6    briefing will be done by the 26th, and we'll see where

7    we are at that point.  All right.  Does that exhaust the

8    agenda?  Is there anything else anyone wants to take up?

9    I want to set a date for I guess into October, November,

03:51PM   10    whatever, to keep setting dates in the future for the

11    status.

12                The suggestion has been passed onto by me

13    Mr. Cicolini that some people would prefer that these

14    start a little earlier in order to accommodate people's

15    flight schedules if you're coming here for the day.

16                Does anyone have a view on that?  I do

17    function better when I've had a sandwich.  I don't want

18    to skip lunch altogether.  We can do it at 1:30 or 1:00.

19    I'm not sure I care as long as -- if I have a trial that

03:51PM   20    morning, I'm going to go to 1:00, and I'm going to need

21    a window of time, but they don't have to be at 2:00.

22    Does anyone have a view?  Yes?  No?

23                MR. MORIARTY:  Your Honor, I'm the one who

24    raised the point just because these agendas get longer

25    and more meaty, they do take some time, and, you know,

1    it's one thing if you come in the night before and are

2    prepared to start at nine or ten in the morning and then

3    have a leisurely way to get out as opposed to if you

4    have to leave the courthouse at five and rush to the

5    airport and miss a plane.  Even 30 minutes sometimes

6    helps.

7            THE COURT:  Why don't we do this.  Let's

8    schedule them for 1:30.  Peter, can I do that on

9    August 9th?

03:52PM    10            THE CLERK:  Sure.

11            THE COURT:  Unless that fouls anyone up, why

12    don't we make it 1:30 on August 9th.  What was our

13    September?

14            THE CLERK:  September 12th.

15            THE COURT:  September 12th?

16            THE CLERK:  Yes.

17            THE COURT:  Do you want to make that 1:30 as

18    well.  We can look at this and even make it earlier.

19    That part of being a lawyer I remember, trying to get

03:53PM    20    out of town onto an airplane, sitting on the tarmac at

21    Laguardia waiting for the shuttle to take off, I

22    understand that part of the practice.  Let's get a date

23    in October.

24            THE CLERK:  October 8th, we can do 1:30, we

25    can do the morning.

```
 1                 THE COURT:  Tuesday, October 8th, we could
 2   make that why don't we call it 1:30.  Again, I
 3   understand that not everyone's going to be able to make
 4   every date.  I don't have any problem at all with
 5   hearing from your law partners or associates, as the
 6   case may be.  I understand that you can't all
 7   necessarily attend every hearing.
 8                 All right.  Anything else we need to take
 9   up?  Anything from the PSC?  Mr. Sobol?  Ms. Parker?
10                 MR. SOBOL:  No, your Honor.
11                 THE COURT:  The trustee?
12                 MR. GOTTFRIED:  No, your Honor.
13                 Creditors' committee?
14                 MR. MOLTON:  No, your Honor.
15                 THE COURT:  Defendants?
16                 MR. FERN:  No issue, Judge.
17                 THE COURT:  Anybody else?  Okay.  Thank you,
18   all have a good trip back, and we'll see you in about a
19   month.
20                 (Whereupon, the hearing was adjourned at
21   3:54 p.m.)
22
23
24
25
```

1          C E R T I F I C A T E

2

3

4  UNITED STATES DISTRICT COURT )

5  DISTRICT OF MASSACHUSETTS ) ss.

6  CITY OF BOSTON )

7

8          I do hereby certify that the foregoing

9  transcript, Pages 1 through 35 inclusive, was recorded

10  by me stenographically at the time and place aforesaid

11  in MDL NO. 13-02419-FDS, IN RE:  NEW ENGLAND COMPOUNDING

12  PHARMACY CASES LITIGATION and thereafter by me reduced

13  to typewriting and is a true and accurate record of the

14  proceedings.

15          Dated this July 22, 2013.

16                    s/s Valerie A. O'Hara

17              _____

18              VALERIE A. O'HARA

19              OFFICIAL COURT REPORTER

20

21

22

23

24

25