**PRINDLE, AMARO, GOETZ,**
**HILLYARD, BARNES & REINHOLTZ LLP**
Jack R. Reinholtz, Esq. (Bar No. 149884)
Cynthia A. Palin, Esq. (Bar No. 143486)
310 Golden Shore, Fourth Floor
Long Beach, California 90802
Telephone:  (562) 436-3946
Facsimile:  (562) 495-0564
jreinholtz@prindlelaw.com
cpalin@prindlelaw.com
ADMR 0136

Attorneys for Encino Outpatient Surgery Center

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **IN RE:  NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION**<br><br>**THIS DOCUMENTS RELATES TO:**<br><br>**All Cases** | **MDL No. 2419**<br>**Dkt. No. 1:13-md-02419**<br><br>**Hon. F. Dennis Saylor, IV** |

**ENCINO OUTPATIENT SURGERY CENTER, LLC'S CALIFORNIA AUTHORITY IN SUPPORT OF ITS MOTION TO QUASH PLAINTIFFS' SUBPOENA AND ITS PATIENTS' RIGHT TO PRIVACY**

I.      **STATUTORY**

1.      California Constitution, Article I, Section I

2.      California Code of Civil Procedure section 2017.010

3.      California Evidence Code section 994

4.      California Health & Safety Code section 1280.15(a)

///

///

///

1

## II.   CASE LAW

1.   *Life Technologies Corp. v. Superior Court* (2011) 197 Cal.App.[4th] 640

2.   *Slagle v. Superior Court* (1989) 211 Cal.App.3d 1309

3.   *John B. v. Superior Court* (2006) 38 Cal.4[th] 117

4.   *Board of Medical Quality Assurance v. Gherardini* (1979) 93 Cal.App.3d 669


DATED: July 22 2013                    PRINDLE, AMARO, GOETZ,
                                       HILLYARD, BARNES & REINHOLTZ LLP


                                       By: _____
                                           JACK R. REINHOLTZ
                                           CYNTHIA A. PALIN
                                           Attorneys for Encino Outpatient
                                           Surgery Center

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been filed with the Clerk of the Court on July ___, 2013 using the CM/EFC system which sent notifications of this filing to all ECF registered counsel of record via e-mail generated by the Court's ECF system.

DATED:  July 23 2013          PRINDLE, AMARO, GOETZ,
                              HILLYARD, BARNES & REINHOLTZ LLP


                              By: _____
                                 JACK R. REINHOLTZ
                                 CYNTHIA A. PALIN
                                 Attorneys for

# STATUTES

1

CALIFORNIA CONSTITUTION

ARTICLE 1.  DECLARATION OF RIGHTS


SECTION 1.  All people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

2

Rutter, Cal. Practice Guide: Civ. Pro. Before Trial Ch. 8G-5, Responses to Bias.

Rutter, Cal. Practice Guide: Civ. Pro. Before Trial Ch. 8H-6, Responding to Demand.

Rutter, Cal. Practice Guide: Civ. Pro. Before Trial Ch. 8I-2, Physical Examination by Demand in Personal Injury Cases.

Rutter, Cal. Practice Guide: Civil Trials & Evidence Ch. 8J-3, Deadline for Demand.

Rutter, Cal. Practice Guide: Civil Trials & Evidence Ch. 11-A, A. Direct Examination of Expert Witnesses.

Rutter, Cal. Practice Guide: Personal Injury Ch. 6-B, B. Overview of Selected Discovery Procedures.

Rutter, Cal. Practice Guide: Personal Injury Ch. 6-C, C. Physical and Mental Examinations (CCP § 2032.020 et seq.).

Rutter, Cal. Practice Guide: Personal Injury Ch. 6-D, D. Expert Witness Information Exchanges (CCP § 2034.210 et seq.).

Rutter, Cal. Practice Guide: Personal Injury Ch. 8-B, B. After Trial Date Set (Three to Four Months Before Trial).

Witkin Cal. Proc. 5th Trial § 74, Completion of Discovery.

### § 2016.070. Application to enforcement of money judgments

This title applies to discovery in aid of enforcement of a money judgment only to the extent provided in Article 1 (commencing with Section 708.010) of Chapter 6 of Title 9 of Part 2. *(Added by Stats.2004, c. 182 (A.B.3081), § 23, operative July 1, 2005.)*

#### Law Revision Commission Comments

Section 2016.070 continues former Section 2016(c) without change, except to replace article with title. [33 Cal.L.Rev.Comm. Reports 811 (2004)].

#### Research References

Rutter, Cal. Practice Guide: Enforcing Judgments/Debts Ch. 6G-2, Written Interrogatories to Judgment Debtor.

Rutter, Cal. Practice Guide: Enforcing Judgments/Debts Ch. 6G-3, Inspection Demand to Judgment Debtor.

Witkin Cal. Proc. 5th Enforcement of Judgment § 381, (S 381) Proceedings and Determination.

## CHAPTER 2. SCOPE OF DISCOVERY

| Article | Section |
|---|---|
| 1. General Provisions | 2017 |
| 2. Scope of Discovery in Specific Contexts | 2017.210 |
| 3. Violation of the Elder Abuse and Dependent Adult Civil Protection Act | 2017.310 |

### ARTICLE 1. GENERAL PROVISIONS

Section
2017.010. Persons entitled to discovery; matters discoverable.
2017.020. Judicial limits upon discovery; order; sanctions; exceptions.

### § 2017.010. Persons entitled to discovery; matters discoverable

Unless otherwise limited by order of the court in accordance with this title, any party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action or to the determination of any motion made in that action, if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence. Discovery may relate to the claim or defense of the party seeking discovery or of any other party to the action. Discovery may be obtained of the identity and location of persons having knowledge of any discoverable matter, as well as of the existence, description, nature, custody, condition, and location of any document, electronically stored information, tangible thing, or land or other property. *(Added by Stats.2004, c. 182 (A.B.3081), § 23, operative July 1, 2005. Amended by Stats.2012, c. 72 (S.B.1574), § 8.)*

#### Law Revision Commission Comments

Section 2017.010 continues former Section 2017(a) without change, except to replace article with title. [33 Cal.L.Rev.Comm. Reports 811 (2004)].

#### Research References

Rutter, Cal. Practice Guide: Civ. Pro. Before Trial Ch. 8A-3, Civil Discovery Act.

Rutter, Cal. Practice Guide: Civ. Pro. Before Trial Ch. 8B-3, Limitations on Right to Discovery.

Rutter, Cal. Practice Guide: Civ. Pro. Before Trial Ch. 8C-1, "Relevant to Subject Matter".

Rutter, Cal. Practice Guide: Civ. Pro. Before Trial Ch. 8C-2, "Reasonably Calculated to Lead to Discovery of Admissible Evidence".

Rutter, Cal. Practice Guide: Civ. Pro. Before Trial Ch. 8C-3, "Not Privileged".

Rutter, Cal. Practice Guide: Civ. Pro. Before Trial Ch. 8F-3, Propounding Interrogatories.

Rutter, Cal. Practice Guide: Civ. Pro. Before Trial Ch. 8E-12, Conduct of Deposition.

Rutter, Cal. Practice Guide: Civil Trials & Evidence Ch. 8E-D, D. Other Public Policy Exclusions.

Rutter, Cal. Practice Guide: Enforcing Judgments/Debts Ch. 4-A, A. Attachment.

Rutter, Cal. Practice Guide: Family Law Ch. 11-C, C. Optional "Formal" Discovery Procedures.

Rutter, Cal. Practice Guide: Fed.Civ.Pro. Before Trial Ch. 11(III)-B, B. Scope of Discovery.

Rutter, Cal. Practice Guide: Insurance Litigation Ch. 15-G, G. Discovery.

Rutter, Cal. Practice Guide: Landlord-Tenant Ch. 8-F, F. Pretrial Discovery.

Rutter, Cal. Practice Guide: Personal Injury Ch. 4-C, C. Effective Settlement Negotiations.

Rutter, Cal. Practice Guide: Personal Injury Ch. 6-A, A. Scope of Discovery and Limitations.

Rutter, Cal. Practice Guide: Personal Injury Ch. 6-B, B. Overview of Selected Discovery Procedures.

7 Witkin, California Summary 10th Constitutional Law § 581, (S 581) Discovery of Medical Patient's Records.

### § 2017.020. Judicial limits upon discovery; order; sanctions; exceptions

(a) The court shall limit the scope of discovery if it determines that the burden, expense, or intrusiveness of that discovery clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence. The court may make this determination pursuant to a motion for protective order by a party or other affected person. This motion shall be accompanied by a meet and confer declaration under Section 2016.040.

(b) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion for a protective order, unless it finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

(c)(1) Notwithstanding subdivision (b), or any other section of this title, absent exceptional circumstances, the court shall not impose sanctions on a party or any attorney of a party for failure to provide electronically stored information that has been lost, damaged, altered, or overwritten as the result of the routine, good faith operation of an electronic information system.

(2) This subdivision shall not be construed to alter any obligation to preserve discoverable information. *(Added by Stats.2004, c. 182 (A.B.3081), § 23, operative July 1, 2005. Amended by Stats.2012, c. 72 (S.B.1574), § 9.)*

3

cians, defeated the privilege, since the privilege extends to all confidential communications. Further, even though the decedent's medical condition was an issue in the case, the decedent had not waived the privilege as to other aspects of her medical history unrelated to the collision. The privilege continued after the decedent's death, and, as the holder of the privilege, the estate was free to communicate with the physicians. Hale v Superior Court (1994, 4th Dist) 28 Cal App 4th 1421, 34 Cal Rptr 2d 279.

## § 994. Physician-patient privilege

Subject to Section 912 and except as otherwise provided in this article, the patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and physician if the privilege is claimed by:

(a) The holder of the privilege;

(b) A person who is authorized to claim the privilege by the holder of the privilege; or

(c) The person who was the physician at the time of the confidential communication, but such person may not claim the privilege if there is no holder of the privilege in existence or if he or she is otherwise instructed by a person authorized to permit disclosure.

The relationship of a physician and patient shall exist between a medical or podiatry corporation as defined in the Medical Practice Act and the patient to whom it renders professional services, as well as between such patients and licensed physicians and surgeons employed by such corporation to render services to such patients. The word ''persons'' as used in this subdivision includes partnerships, corporations, limited liability companies, associations, and other groups and entities.

Enacted Stats 1965 ch 299 § 2, operative January 1, 1967. Amended Stats 1968 ch 1375 § 3; Stats 1980 ch 1313 § 12; Stats 1994 ch 1010 § 105 (SB 2053).

**Amendments:**

   **1968 Amendment:** Added the last paragraph.

   **1980 Amendment:** Substituted ''or podiatry corporation as defined in the Medical Practice Act'' for ''corporation as defined in Article 17 (commencing with Section 2500) of Chapter 5 of Division 2 of the Business and Professions Code'' in the last paragraph.

   **1994 Amendment:** Added (**1**) ''or she'' after ''existence or if he'' in subd (c); and (**2**) ''limited liability companies,'' in the second sentence of the second paragraph.

**Historical Derivation:**

   (a) Former CCP § 1881, was enacted 1872, amended Stats 1893 p 301, Stats 1907 p 87, Stats 1911 p 113, Stats 1917 p 954, Stats 1927 p 1154, Stats 1933 p 1424, Stats 1935 p 1609, Stats 1939 p 1426, Stats 1957 ch 1961 § 1, Stats 1961 ch 629 § 1, ch 923 § 1, Stats 1965 ch 922 § 1, ch 923 § 1.

   (b) Practice Act 395 (Stats 1851 ch 5 § 395, as amended Stats 1863 ch 528 § 1).

   (c) Practice Act §§ 396, 397 (Stats 1851 ch 5 §§ 396, 397).

   (d) Practice Act § 398 (Stats 1851 ch 5 § 398, as amended Stats 1861 ch 313 § 1).

   (e) Practice Act § 399 (Stats 1851 ch 5 § 399).

**Law Revision Commission Comments:**

   **1965**—This section, like Section 954 (lawyer-client privilege), is based on the premise that the privilege must be claimed by a person who is authorized to claim the privilege. If there is no claim of privilege by a person with authority to make the claim, the evidence is admissible. See the Comments to EVIDENCE CODE §§ 993 and 954.

   For the reasons indicated in the Comment to Section 954, an eavesdropper or other interceptor of a communication privileged under this section is not permitted to testify to the communication.

**Cross References:**

General provisions relating to privileges: Ev C §§ 911 et seq.
Waiver of privilege generally: Ev C § 912.
"Physician": Ev C § 990.
"Patient": Ev C § 991.
"Confidential communication between patient and physician": Ev C § 992.
"Holder of the privilege": Ev C § 993.
Requirement that physician claim privilege authorized under subd (c) of this section: Ev C § 995.

**Collateral References:**

Cal Forms Pl & Practice (Matthew Bender) ch 190 "Depositions and Discovery" C2.
Witkin Evidence (3d) §§ 1074, 1188, 1190.
Jefferson's California Evidence Benchbook, 3rd Edition (CEB, 2003) § 37.2.

*Law Review Articles:*

Breach of the Physician/Patient Privilege. 17 Cal Trial Law J 93.
Waiver of privileged communications to physician. 6 CLR 300.
Physician and patient privilege. 25 CLR 108.
Discovering Donors: Legal Rights to Access Information about Anonymous Sperm Donors Given to Children of Artificial Insemination in Johnson V. Superior Court of Los Angeles County. 31 Golden Gate LR 193.
The physician-patient privilege. 1983 Med Tr T Q 61.
Confidential communications between patient and physician in judicial and administrative proceedings. 1983 Med Tr T Q 331.
The physician-patient privilege—An impediment to public health. 16 Pacific LJ 787.
Scope and purpose of physician and patient privilege. 5 SCLR 446.
Medical practice computer profile (proof of doctor's actions in series of similar cases); restrictions on discovery. 7 UCD LR 529.

*Annotations:*

Right of physician, notwithstanding physician-patient privilege, to give expert testimony based on hypothetical question. 64 ALR2d 1056.
Who may waive privilege of confidential communication to physician by persons since deceased. 97 ALR2d 393.
Testimony as to communications or observations as to mental condition of patient treated for other condition. 100 ALR2d 648.
Commencing action involving physical condition of plaintiff or decedent as waiving physician-patient privilege as to discovery proceedings. 21 ALR3d 912.
Physician-patient privilege as applied to physician's testimony concerning wonnd required to be reported to public authority. 85 ALR3d 1196.
Physician-patient privilege as extending to patient's medical or hospital records. 10 ALR4th 552.

## NOTES OF DECISIONS

1. Application
2. Construction
3. Waiver

### 1. Application

The doctor-patient privilege (former CCP § 1881(4), superseded by Ev C §§ 990–1007) does not usually apply to examinations for commitment for narcotics addiction, and did not apply where the primary purpose of defendant's admission to the county jail infirmary was to determine whether he was addicted to narcotics, and prior to his admission he had been so advised pursuant to statute and formally presented with a copy of the application, and where the record contained no evidence of trickery or misrepresentation which might have led defendant to believe he was entering for medical treatment, although once he had been admitted for examination, the examining physician administered to his ailments. People v Lipscomb (1968, 2nd Dist) 263 Cal App 2d 59, 69 Cal Rptr 127.

In a malpractice action against a doctor and a hospital, the trial court improperly ordered defendants to produce the names and addresses of certain patients who had received the same tests as plaintiff, including the names of two patients who developed complications therefrom; while the disclosure of a patient's name does not necessarily violate the physician-patient privilege, the names coupled with the fact that such persons had received the tests in question would result in revealing facts communicated to the physician indicating the need for such testing, and the vice of the inquiry was aggravated with respect to the two patients who developed complications from the test-

§ 994, n 1                                   PRIVILEGES

ing. Marcus v Superior Court (1971, 2nd Dist) 18 Cal App 3d 22, 95 Cal Rptr 545.

In petitioner's action against the manufacturer of a certain drug for damages for injuries allegedly caused by her use of the drug, the manufacturer, on petitioner's application for discovery of records pertaining to any reports in its possession of adverse effects of the drug on other users, could claim the physician-patient privilege on behalf of the patient if the submission of such report to the manufacturer by the physician was in confidence and was reasonably necessary in order to accomplish the purpose for which the physician was consulted. If, however, the report was not made in confidence or was not reasonably necessary to accomplish such purpose, the manufacturer could not claim the privilege on the patient's behalf. In its discretion, and on its own or the manufacturer's motion, the trial court may protect the privilege of an absent patient who has not waived it. Rudnick v Superior Court of Kern County (1974) 11 Cal 3d 924, 114 Cal Rptr 603, 523 P2d 643.

The physician-patient privilege provided for in Ev C § 994, applies in custody disputes between parents. Thus, in proceedings on a motion by a divorced father to modify a child custody decree, in which the father asserted the mother had been hospitalized for treatment for an overdose of narcotics, and that her hospital records were vital to determine whether or not she was fit to have custody of the children, the father's assertion of the importance of the medical records to his motion for modification was irrelevant. Moreover, Ev C § 996, providing an exception when an issue concerning the condition of the patient has been tendered by the patient was not applicable, where the mother did not tender her medical condition as an issue. Accordingly, the mother's medical records were privileged. Koshman v Superior Court (1980, 3rd Dist) 111 Cal App 3d 294, 168 Cal Rptr 558.

A parent who was awarded physical custody of minor children in a marital dissolution proceeding could not compel disclosure of records otherwise protected by the psychotherapist-patient privilege (Ev C § 1014), and by the physician-patient privilege (Ev C § 994), in order to demonstrate that her former spouse suffered from emotional instability of such a nature that he should not be allowed visitation rights, where the father had not voluntarily disclosed and tendered some specific emotional or mental condition, so as to render applicable the patient-litigant exceptions to both privileges (Ev C §§ 996, 1016), simply by asserting his presumptive right of visitation, in which the psychotherapist-patient privilege, which the communications at issued primarily involved, had been accorded special protection by the Legislature and by the courts. Such privileges are applicable, even assuming records of confidential communications are relevant to a disputed issue, unless waived or subject to a statutory exception. Simek v Superior Court (1981, 1st Dist) 117 Cal App 3d 169, 172 Cal Rptr 564.

In an action by a woman allegedly injured as a result of her mother's ingesting a certain drug while she was pregnant with plaintiff, against drug companies who manufactured and distributed the drug, in which defendants sought information from the mother concerning her medical history both before and after plaintiff's birth, the mother's patient-physician privilege (Ev C § 994) was not automatically eliminated or substantially diminished by the action of her daughter in bringing the lawsuit. Because plaintiff was not suing "on account of the conduct of" her mother, the exception to the privilege in Ev C § 999, was not applicable. Neither was plaintiff "claiming through or under the patient" within the meaning of the exception in Ev C § 996(b). Nor could plaintiff reasonably be said to "claiming as a beneficiary of the patient through a contract to which the patient is or was a party" within the meaning of the exception in Ev C § 996(c). Though plaintiff's complaint invoked express and implied warranties, an action based on such theories may be maintained by an injured party against the manufacturer of biologics despite the absence of privity; also, such "warranty" without privity is not a contractual warranty, but a species of strict tort liability. Jones v Superior Court of Alameda County (1981, 1st Dist) 119 Cal App 3d 534, 174 Cal Rptr 148.

Ev C § 994, prohibits the discovery of confidential communications to which the patient-physician privilege applies, even where the information is relevant. Slagle v Superior Court (1989, 1st Dist) 211 Cal App 3d 1309, 260 Cal Rptr 122.

In an action against a sperm bank for selling sperm which allegedly transmitted a kidney disease to a child conceived by the sperm of an anonymous sperm donor, the parents and their child could compel donor's deposition and the production of relevant documents based on the broad scope of discovery (CCP § 2017) and the absence of privilege or other right. The physician-patient privilege (Ev C § 994) was inapplicable, since the "patient" is the holder of the privilege and since the donor, who visited defendant for the sole purpose of selling his sperm, was not a patient. In addition, defendant's agreement with the parents precluding disclosure of the donor's identity and other information pertaining to the donor under all circumstances was contrary to public policy (Fam C § 7613) and unenforceable. As to the constitutional right to privacy (Cal Const art I § 1), there were compelling state interests and, in the context of the facts presented, the state's interests, as well as those of plaintiffs, outweighed the donor's limited privacy interest. However, his identity should remain undisclosed to the fullest extent possible. Johnson v Superior Court (2000, 2nd Dist) 80 Cal App 4th 1050, 95 Cal Rptr 2d 864.

## 2. Construction

The physician-patient privilege (Ev C § 994) protects only against disclosure of "confidential communications" between patient and physician, and while that term is broadly defined to include any diagnosis made and advice given by the physician in the course

of the physician-patient relationship, it does not include information which does not intrude on that relationship. Jones v Superior Court of Alameda County (1981, 1st Dist) 119 Cal App 3d 534, 174 Cal Rptr 148.

**3. Waiver**

In an action by homeowners and residents against a public agency operating an airport for damages for diminution in the value of property, personal injuries, and emotional disturbance allegedly caused by the operation of the airport, the trial court erred in making a discovery order that required plaintiffs to make unlimited disclosure of their lifetime medical histories without regard to whether such medical conditions had any bearing on the present litigation. The automatic waiver of the physician-patient and psychotherapist-patient privileges (Ev C §§ 990 et seq., and 1010 et seq.) contemplated by the patient-litigant exception (Ev C §§ 996 and 1016) must be construed not as a complete waiver of the privilege, but only as a limited waiver concomitant with the purposes of the exception. Thus, while plaintiffs could not withhold information which related to any physical or mental condition which they put in issue by bringing the lawsuit, they were entitled to retain the confidentiality of all unrelated medical or psychotherapeutic treatment they may have undergone in the past. Britt v Superior Court of San Diego County (1978) 20 Cal 3d 844, 143 Cal Rptr 695, 574 P2d 766.

The scope of the waiver of the physician-patient privilege (Ev C § 994) is not limited to what the patient intends. There is always the objective consideration that when conduct touches a certain point of disclosure fairness requires the privilege shall cease whether the patient intended that result or not. However, Ev C § 912, prescribes waiver with respect to "a communication" when there has been a disclosure of a "significant part of the communication." The term "communication" deserves a liberal construction. The scope of the waiver should be determined primarily by reference to the purpose of the privilege, which is to preclude the humiliation of the patient that might follow disclosure of his ailments. When the disclosure sought is so related to the disclosure already made that the patient could not reasonably retain a privacy interest in preventing it, then the purpose of the privilege no longer exists, and it may be said the privilege has been waived. Jones v Superior Court of Alameda County (1981, 1st Dist) 119 Cal App 3d 534, 174 Cal Rptr 148.

In an action by a woman allegedly injured as a result of her mother's ingesting a certain drug while she was pregnant with plaintiff, against drug companies who manufactured and distributed the drug, the mother's physician-patient privilege (Ev C § 994) was subject to Ev C § 912, which provides that the right of a person to claim the privilege "is waived with respect to a communication protected by such privilege if any holder of the privilege, without coercion has disclosed a significant part of the communication." By testifying freely that she ingested the drug, and as to certain of the circumstances in which she did so, the mother disclosed a "significant part" of her communications with physicians on that subject, and on the inextricably related subject of her pregnancy with plaintiff, and therefore waived her statutory privilege as to those matters. However, it did not follow that the mother waived her privilege as to all otherwise protected communications during her lifetime. Even the waiver which follows on tender of a medical issue by a party depends on the nature of the injuries which the patient-litigant has brought before the court, and a waiver through disclosure by a nonparty witness, proceeding from different policy premises and based on different statutory language, is presumably intended to be more limited in scope. Jones v Superior Court of Alameda County (1981, 1st Dist) 119 Cal App 3d 534, 174 Cal Rptr 148.

In proceedings to probate a holographic instrument, the trial court erred in denying the petition by decedent's special administrator to quash a subpoena for decedent's medical records sought by a university opposing probate of the instrument. Under Ev C §§ 912 and 994, the special administrator, as decedent's personal representative, was the statutorily designated holder of the privilege and could claim or waive it. Ev C § 993(c), making the personal representative of the patient the holder of the privilege if the patient is dead, does not require the personal representative to make an affirmative showing as a prerequisite to claiming the privilege that the benefit to the estate in maintaining confidentiality outweighs the interest in disclosure. It grants the personal representative the same right to claim or waive the privilege as any other holder, and until the personal representative by "word or deed" waives the privilege, it remains inviolate. Rittenhouse v Superior Court (1991, 3rd Dist) 235 Cal App 3d 1584, 1 Cal Rptr 2d 595.

# § 995. When physician required to claim privilege

The physician who received or made a communication subject to the privilege under this article shall claim the privilege whenever he is present when the communication is sought to be disclosed and is authorized to claim the privilege under subdivision (c) of Section 994.

Enacted Stats 1965 ch 299 § 2, operative January 1, 1967.

tendered the issue of his seizure/tic disorder because he did not seek custody of the parties' child on the ground that he had a tic/seizure disorder within the meaning of Ev C § 996, the trial court abused its discretion by quashing a subpoena to a doctor who had examined the father regarding his neurological condition where the father waived the physician-patient privilege with respect to certain records of the doctor because the mother, whose presence was not necessary, was present during the exam, and where the marital-communications privilege could not be invoked because the proceed-

ing was one brought by one spouse against the other spouse. However, the trial court did not abuse its discretion with respect to quashing a subpoena to a doctor who had treated the father for seizures when he was a child where the documents mother sought from that doctor were privileged because when the father spoke to that doctor, he reasonably believed he could fully and freely discuss his medical condition. Manela v. Superior Court (2009, 2d Dist) 177 Cal App 4th 1139, 99 Cal Rptr 3d 736, 2009 Cal App LEXIS 1561.

## § 993. "Holder of the privilege"

**Collateral References:**

Cal. Points & Authorities (Matthew Bender®) ch 81 "Discovery: Privileges And Other Discovery Limitations," § 81.120.

Cal. Points & Authorities (Matthew Bender®) ch 81 "Discovery: Privileges And Other Discovery Limitations," § 81.122.

Matthew Bender ® Practice Guide: Cal. Trial and Post Trial Civil Procedure §§ 11.80, 11.85[2].

Cal. Fam. Law Practice & Procedure 2d (Matthew Bender®), ch 110, Trial Preparation and Discovery § 110.12.

Cotchett, California Courtroom Evidence, § 18.48 (Matthew Bender).

2 Witkin Cal. Evidence (4th ed) Witnesses §§ 65, 199.

### NOTES OF DECISIONS

1. Construction

**1. Construction**

In a class action suit brought by patients who alleged that they had received the wrong medication for a sexually transmitted disease, an administrator was needed to control notice to protect the physician-patient privilege under Ev C § 994. Because passive consent to mem-

bership in an opt-out class action would not expressly place at issue the medical condition of an unnamed class member, no waiver of the physician-patient privilege under Ev C §§ 912(a), 996, resulted; and by its terms, Ev C § 993, does not apply to class action representation. Los Angeles Gay & Lesbian Center v. Superior Court (2011, 2d Dist) 194 Cal App 4th 288, 2011 Cal App LEXIS 433.

## § 994. Physician–patient privilege

**Collateral References:**

Cal. Forms Pleading & Practice (Matthew Bender®) ch 190 "Depositions and Discovery" C2.

Cal. Points & Authorities (Matthew Bender®) ch 81 "Discovery: Privileges And Other Discovery Limitations," § 81.110.

Cal. Points & Authorities (Matthew Bender®) ch 81 "Discovery: Privileges And Other Discovery Limitations," § 81.120.

Matthew Bender ® Practice Guide: Cal. Trial and Post Trial Civil Procedure §§ 11.80, 11.85[2].

Matthew Bender® Practice Guide: Federal Pretrial Civil Procedure in California, 24.41, 24.43.

Cal. Fam. Law Practice & Procedure 2d (Matthew Bender®), ch 110, Trial Preparation and Discovery § 110.12.

Cotchett, California Courtroom Evidence, § 18.49 (Matthew Bender).

2 Witkin Cal. Evidence (4th ed) Witnesses §§ 66, 67, 81, 83, 196, 198, 200.

### NOTES OF DECISIONS

1. Application
2. Construction
3. Waiver

**1. Application**

Substantial evidence supported a trial court's conclusion that the physician-patient privilege set forth in Ev C § 994 did not apply to defendant's statements to a nurse where defendant did not make a threshold showing that the physician-patient privilege extended to nurses.

In the trial court, defendant did not argue—or demonstrate—that the nurse with whom she consulted was licensed to practice medicine or that she reasonably believed the nurse was authorized to practice medicine. Duronslet v. Kamps (2012, 1st Dist) 2012 Cal App LEXIS 137.

**2. Construction**

In an action arising from criticism of a study into recovered memory of childhood abuse, the subject of the study established a prima facie

case for intrusion by presenting evidence that a critic intentionally misrepresented the critic's relationship with the author of the study, a psychiatrist, and thus obtained personal information about the subject from the subject's former foster mother. The court noted that under Ev. C § 994, 1014, special legal protection is provided to information communicated in the course of a physician-patient or psychotherapist-patient relationship; even if the subject's relationship with the investigator did not implicate the evidentiary privilege, the relationship bore a close similarity to such a relationship. Taus v. Loftus (2007) 40 Cal 4th 683, 54 Cal Rptr 3d 775, 151 P3d 1185, 2007 Cal LEXIS 1896.

Ev C § 990 does not define "physician" to include nurse or any other medical staff. The word "nurse" is not mentioned in any of the statutes pertaining to the physician-patient privilege. Duronslet v. Kamps (2012, 1st Dist) 2012 Cal App LEXIS 137.

### 3. Waiver

In a case in which a nonprofit organization challenged the Department of Managed Health Care's implementation of provisions of the Knox-Keene Health Care Services Plan Act of 1975 relating to disclosure of medical reports, a deceased health care plan enrollee's daughter, who was not the conservator of the enrollee's estate, was not entitled to receive information or copies of documents concerning the enrollee's care. Since the daughter was not the holder of the physician-patient privilege, the daughter could not waive the privilege and the Department was within its discretion to decline to release the enrollee's records. California Consumer Health Care Council, Inc. v. California Dept. of Managed Health Care (2008, 3d Dist) 161 Cal App 4th 684, 74 Cal Rptr 3d 215, 2008 Cal App LEXIS 478, review denied California Consumer Health Care Council, Inc. v. California Department of Managed Health Care (2008, Cal.) 2008 Cal. LEXIS 5577.

Although a father in a marital dissolution action that involved a custody dispute had not tendered the issue of his seizure/tic disorder because he did not seek custody of the parties' child on the ground that he had a tic/seizure disorder within the meaning of Ev C § 996, the trial court abused its discretion by quashing a subpoena to a doctor who had examined the father regarding his neurological condition where the father waived the physician-patient privilege with respect to certain records of the doctor because the mother, whose presence was not necessary, was present during the exam, and where the marital-communications privi-

lege could not be invoked because the proceeding was one brought by one spouse against the other spouse. However, the trial court did not abuse its discretion with respect to quashing a subpoena to a doctor who had treated the father for seizures when he was a child where the documents mother sought from that doctor were privileged because when the father spoke to that doctor, he reasonably believed he could fully and freely discuss his medical condition. Manela v. Superior Court (2009, 2d Dist) 177 Cal App 4th 1139, 99 Cal Rptr 3d 736, 2009 Cal App LEXIS 1561.

In a class action suit brought by patients who alleged that they had received the wrong medication for a sexually transmitted disease, an administrator was needed to control notice to protect the physician-patient privilege under Ev C § 994. Because passive consent to membership in an opt-out class action would not expressly place at issue the medical condition of an unnamed class member, no waiver of the physician-patient privilege under Ev C §§ 912(a), 996, resulted; and by its terms, Ev C § 993, does not apply to class action representation. Los Angeles Gay & Lesbian Center v. Superior Court (2011, 2d Dist) 194 Cal App 4th 288, 2011 Cal App LEXIS 433.

Trial court erred in a dependency proceeding in denying a child's motion to quash her father's subpoena of the child's sexual history medical records for its in camera review because Ev C § 996(a)'s patient-litigant exception was not triggered by either the child's disclosure of sexual abuse to authorities or her submission to a forensic medical examination. All of those events predated the dependency litigation; and the child did not file the dependency petition and did not tender any issue regarding her medical condition in the superior court litigation. Karen P. v. Superior Court (2011, 2d Dist) 200 Cal App 4th 908, 2011 Cal App LEXIS 1404.

Trial court erred in a dependency proceeding in denying a child's motion to quash her father's subpoena of the child's sexual history medical records for its in camera review where the filing of the dependency petition did not extinguish the child's physician-patient privilege vis-à-vis § 996(b), because when the department of children and family services (DCFS) filed the dependency petition, it did so on behalf of the county, not in a representative capacity of the child. The DCFS was not acting akin to a guardian seeking to set aside a deed by a patient or to cancel a contract for want of capacity of the patient to execute the instrument. Karen P. v. Superior Court (2011, 2d Dist) 200 Cal App 4th 908, 2011 Cal App LEXIS 1404.

## § 995. When physician required to claim privilege

**Collateral References:**

Cal. Points & Authorities (Matthew Bender®) ch 81 "Discovery: Privileges And Other Discovery Limitations," § 81.120.

Cal. Points & Authorities (Matthew

Bender®) ch 81 "Discovery: Privileges And Other Discovery Limitations," § 81.156.

Matthew Bender® Practice Guide: Federal Pretrial Civil Procedure in California, 24.41, 24.43.

4

paid when appeals pursuant to those provisions have been exhausted.

"(b) This section shall not apply to a deficiency for which a facility was cited prior to January 1, 1994."

**2007 Amendment:** (1) Added "Prior to the effective date of regulations adopted to implement

Section 1280.3," at the beginning of subd (a); and (2) added subd (f).

**2008 Amendment:** (1) Added "Subject to subdivision (d)," in subd (a); (2) substituted "Section 131071" for "Section 100171" in the first sentence of subd (b); (3) added the last four sentences of subd (d); and (4) added subd (g).

### § 1280.15. Unlawful or unauthorized access and use or disclosure of patients' medical information; Investigation; Report

(a) A clinic, health facility, home health agency, or hospice licensed pursuant to Section 1204, 1250, 1725, or 1745 shall prevent unlawful or unauthorized access to, and use or disclosure of, patients' medical information, as defined in subdivision (g) of Section 56.05 of the Civil Code and consistent with Section 130203. The department, after investigation, may assess an administrative penalty for a violation of this section of up to twenty-five thousand dollars ($25,000) per patient whose medical information was unlawfully or without authorization accessed, used, or disclosed, and up to seventeen thousand five hundred dollars ($17,500) per subsequent occurrence of unlawful or unauthorized access, use, or disclosure of that patients' medical information. For purposes of the investigation, the department shall consider the clinic's, health facility's, agency's, or hospice's history of compliance with this section and other related state and federal statutes and regulations, the extent to which the facility detected violations and took preventative action to immediately correct and prevent past violations from recurring, and factors outside its control that restricted the facility's ability to comply with this section. The department shall have full discretion to consider all factors when determining the amount of an administrative penalty pursuant to this section.

(b)(1) A clinic, health facility, home health agency, or hospice to which subdivision (a) applies shall report any unlawful or unauthorized access to, or use or disclosure of, a patient's medical information to the department no later than five business days after the unlawful or unauthorized access, use, or disclosure has been detected by the clinic, health facility, home health agency, or hospice.

(2) Subject to subdivision (c), a clinic, health facility, home health agency, or hospice shall also report any unlawful or unauthorized access to, or use or disclosure of, a patient's medical information to the affected patient or the patient's representative at the last known address, no later than five business days after the unlawful or unauthorized access, use, or disclosure has been detected by the clinic, health facility, home health agency, or hospice.

(c)(1) A clinic, health facility, home health agency, or hospice shall delay the reporting, as required pursuant to paragraph (2) of subdivision (b), of any unlawful or unauthorized access to, or use or disclosure of, a patient's medical information beyond five business days if a law enforcement agency or official provides the clinic, health facility, home health agency, or hospice with a written or oral statement that compliance with the reporting requirements of paragraph (2) of subdivision (b) would be likely to impede the law enforcement agency's activities that relate to the unlawful or unauthorized access to, and use or disclosure of, a patient's medical information and specifies a date upon which the delay shall end, not to exceed 60 days after a written request is made, or 30 days after an oral request is made. A law enforcement agency or official may request an extension of a delay based upon a written declaration that there exists a bona fide, ongoing, significant criminal investigation of serious wrongdoing relating to the unlawful or unauthorized access to, and use or disclosure of, a patient's medical information, that notification of patients will undermine the law enforcement agency's activities, and that specifies a date upon which the delay shall end, not to exceed 60 days after the end of the original delay period.

(2) If the statement of the law enforcement agency or official is made orally, then the clinic, health facility, home health agency, or hospice shall do the following:

(A) Document the oral statement, including, but not limited to, the identity of the law enforcement agency or official making the oral statement and the date upon which the oral statement was made.

(B) Limit the delay in reporting the unlawful or unauthorized access to, or use or disclosure of, the patient's medical information to the date specified in the oral statement, not to exceed 30 calendar days from the date that the oral statement is made, unless a written statement that complies with the requirements of this subdivision is received during that time.

(3) A clinic, health facility, home health agency, or hospice shall submit a report that is delayed pursuant to this subdivision not later than five business days after the date designated as the end of the delay.

(d) If a clinic, health facility, home health agency, or hospice to which subdivision (a) applies violates subdivision (b), the department may assess the licensee a penalty in the amount of one hundred dollars ($100) for each day that the unlawful or unauthorized access, use, or disclosure is not reported, following the initial five-day period specified in subdivision (b). However, the total combined penalty assessed by the department under subdivision (a) and this subdivision shall not exceed two hundred fifty thousand dollars ($250,000) per reported event.

(e) In enforcing subdivisions (a) and (d), the department shall take into consideration the special circumstances of small and rural hospitals, as defined in Section 124840, and primary care clinics, as defined in subdivision (a) of Section 1204, in order to protect access to quality care in those hospitals and clinics. When assessing a penalty on a skilled nursing facility or other facility subject to Section 1423, 1424, 1424.1, or 1424.5, the department shall issue only the higher of either a penalty for the violation of this section or a penalty for violation of Section 1423, 1424, 1424.1, or 1424.5, not both.

(f) All penalties collected by the department pursuant to this section, Sections 1280.1, 1280.3, and 1280.4, shall be deposited into the Internal Departmental Quality Improvement Account, which is hereby created within the Special Deposit Fund under Section 16370 of the Government Code. Upon appropriation by the Legislature, moneys in the account shall be expended for internal quality improvement activities in the Licensing and Certification Program.

(g) If the licensee disputes a determination by the department regarding a failure to prevent or failure to timely report unlawful or unauthorized access to, or use or disclosure of, patients' medical information, or the imposition of a penalty under this section, the licensee may, within 10 days of receipt of the penalty assessment, request a hearing pursuant to Section 131071. Penalties shall be paid when appeals have been exhausted and the penalty has been upheld.

(h) In lieu of disputing the determination of the department regarding a failure to prevent or failure to timely report unlawful or unauthorized access to, or use or disclosure of, patients' medical information, transmit to the department 75 percent of the total amount of the administrative penalty, for each violation, within 30 business days of receipt of the administrative penalty.

(i) Notwithstanding any other law, the department may refer violations of this section to the Office of Health Information Integrity for enforcement pursuant to Section 130303.

(j) For purposes of this section, the following definitions shall apply:

(1) "Reported event" means all breaches included in any single report that is made pursuant to subdivision (b), regardless of the number of breach events contained in the report.

(2) "Unauthorized" means the inappropriate access, review, or viewing of patient medical information without a direct need for medical diagnosis, treatment, or other lawful use as permitted by the Confidentiality of Medical Information Act (Part 2.6 (commencing with Section 56) of Division 1 of the Civil Code) or any other statute or regulation governing the lawful access, use, or disclosure of medical information.

Added Stats 2008 ch 605 § 2 (SB 541), effective January 1, 2009. Amended Stats 2009 ch 180 § 1 (SB 337), effective January 1, 2010.

**Amendments:**

**2009 Amendment:** (1) Added "home health" each time it appears in subd (b) and in the first sentence of subd (d); (2) substituted "five business days" for "five days" in subds (b)(1) and (b)(2); (3) added "Subject to subdivision (c)," in subd (b)(2); (4) added subd (c); (5) redesignated former subds (c)–(i) to be subds (d)–(j); (6) substituted "subdivisions (a) and (d)" for "subdivisions (a) and (c)" in the first sentence of subd (e); and (7) amended subd

(i) by (a) substituting "other law" for "other provision of law"; (b) substituting "Office of Health Information Integrity" for "office of Health Information Integrity"; and (c) deleting ", except that if

Assembly Bill 211 of the 2007-08 Regular Session is not enacted, the department may refer violations to the Office of HIPAA Implementation" at the end.

## § 1280.2. Failure to meet Building Standards Code as not constituting citable failure

(a) No deficiency cited pursuant to paragraph (2) of subdivision (b) of Section 1280 or Section 1280.1 shall be for the failure of a facility to meet the requirements of the California Building Standards Code if, as of January 1, 1994, the hospital building was approved under Chapter 12.5 (commencing with Section 15000) of Division 12.5, or if the hospital building was exempt from that approval under any other provision of law in effect on that date.

(b) It is the intent of the Legislature that neither the amendments made to Section 1280 by the act that added this section, nor Section 1280.1 shall be construed to require the retrofitting of hospital buildings built prior to January 1, 1994, to meet seismic standards in effect on that date.

Added Stats 1993 ch 1152 § 3 (AB 1621).

**Editor's Notes**—Chapter 1 of Division 12.5, referred to in this section, was repealed by Stats   1995 ch 415 § 129. See now H & S C § 129675 et seq.

## § 1280.3. Administrative penalties

(a) Commencing on the effective date of the regulations adopted pursuant to this section, the director may assess an administrative penalty against a licensee of a health facility licensed under subdivision (a), (b), or (f) of Section 1250 for a deficiency constituting an immediate jeopardy violation as determined by the department up to a maximum of seventy-five thousand dollars ($75,000) for the first administrative penalty, up to one hundred thousand dollars ($100,000) for the second subsequent administrative penalty, and up to one hundred twenty-five thousand dollars ($125,000) for the third and every subsequent violation. An administrative penalty issued after three years from the date of the last issued immediate jeopardy violation shall be considered a first administrative penalty so long as the facility has not received additional immediate jeopardy violations and is found by the department to be in substantial compliance with all state and federal licensing laws and regulations. The department shall have full discretion to consider all factors when determining the amount of an administrative penalty pursuant to this section.

(b) Except as provided in subdivision (c), for a violation of this chapter or the rules and regulations promulgated thereunder that does not constitute a violation of subdivision (a), the department may assess an administrative penalty in an amount of up to twenty-five thousand dollars ($25,000) per violation. This subdivision shall also apply to violation of regulations set forth in Article 3 (commencing with Section 127400) of Chapter 2 of Part 2 of Division 107 or the rules and regulations promulgated thereunder.

The department shall promulgate regulations establishing the criteria to assess an administrative penalty against a health facility licensed pursuant to subdivisions (a), (b), or (f) of Section 1250. The criteria shall include, but need not be limited to, the following:

(1) The patient's physical and mental condition.

(2) The probability and severity of the risk that the violation presents to the patient.

(3) The actual financial harm to patients, if any.

(4) The nature, scope, and severity of the violation.

(5) The facility's history of compliance with related state and federal statutes and regulations.

(6) Factors beyond the facility's control that restrict the facility's ability to comply with this chapter or the rules and regulations promulgated thereunder.

(7) The demonstrated willfulness of the violation.

county. Brown v.
2, 2d Dist) 2012 Cal

v. Northern Inyo
t. (2012, 4th Dist)

es
iat a whistleblower
:1 & S C § 1278.5
inistrative action
ings under B & P C
on to a civil action
: doctor's failure to
iot render improb-
1278.5 claim or a
P C § 803.1; the
:rategic Lawsuit
motion was prop-
:r Central Valley
3 Cal App 4th 557,

**connections**

· (f) of Section

as defined in
rom using an
ither than the
.on exists and

as defined in
·om using an
>r that would
·or, unless an
d impair the

January 1 of
ature with a
ardization in
ivenous, epi-

safety plan
measures to
ious, enteral
·erative as to
(b) and as to
e of subdivi-

**Amendments:**

**2012 Amendment:** (1) Amended subd (b) by substituting (a) "January 1, 2016" for "36 months after the publication of a new design standard for connections for epidural applications by the International Organization for Standardization, or January 1, 2014, whichever occurs first"; and (b) "connector" for "connection" after "an epidural"; (2) substituted "connector" for "connection port" after "fit into a" in subds (b) and (c); (3) amended subd (c) by substituting (a) "January 1, 2016" for "24 months after the publication of a new design standard for connections for intravenous or enteral applications by the International Organization for Standardization, or January 1, 2013, whichever occurs first"; and (b) "connector" for "connection" after "an intravenous" and after "enteral feeding"; and (4) substituted "connectors" for "connections" wherever it appears in subd (d) and in the second sentence of subd (e).

## § 1280.15. Unlawful or unauthorized access and use or disclosure of patients' medical information; Investigation; Report

(a) A clinic, health facility, home health agency, or hospice licensed pursuant to Section 1204, 1250, 1725, or 1745 shall prevent unlawful or unauthorized access to, and use or disclosure of, patients' medical information, as defined in subdivision (g) of Section 56.05 of the Civil Code and consistent with Section 130203. For purposes of this section, internal paper records, electronic mail, or facsimile transmissions inadvertently misdirected within the same facility or health care system within the course of coordinating care or delivering services shall not constitute unauthorized access to, or use or disclosure of, a patient's medical information. The department, after investigation, may assess an administrative penalty for a violation of this section of up to twenty-five thousand dollars ($25,000) per patient whose medical information was unlawfully or without authorization accessed, used, or disclosed, and up to seventeen thousand five hundred dollars ($17,500) per subsequent occurrence of unlawful or unauthorized access, use, or disclosure of that patients' medical information. For purposes of the investigation, the department shall consider the clinic's, health facility's, agency's, or hospice's history of compliance with this section and other related state and federal statutes and regulations, the extent to which the facility detected violations and took preventative action to immediately correct and prevent past violations from recurring, and factors outside its control that restricted the facility's ability to comply with this section. The department shall have full discretion to consider all factors when determining the amount of an administrative penalty pursuant to this section.

(b)(1) A clinic, health facility, home health agency, or hospice to which subdivision (a) applies shall report any unlawful or unauthorized access to, or use or disclosure of, a patient's medical information to the department no later than five business days after the unlawful or unauthorized access, use, or disclosure has been detected by the clinic, health facility, home health agency, or hospice.

(2) Subject to subdivision (c), a clinic, health facility, home health agency, or hospice shall also report any unlawful or unauthorized access to, or use or disclosure of, a patient's medical information to the affected patient or the patient's representative at the last known address, no later than five business days after the unlawful or unauthorized access, use, or disclosure has been detected by the clinic, health facility, home health agency, or hospice.

(c)(1) A clinic, health facility, home health agency, or hospice shall delay the reporting, as required pursuant to paragraph (2) of subdivision (b), of any unlawful or unauthorized access to, or use or disclosure of, a patient's medical information beyond five business days if a law enforcement agency or official provides the clinic, health facility, home health agency, or hospice with a

written or oral statement that compliance with the reporting requirements of paragraph (2) of subdivision (b) would likely impede the law enforcement agency's investigation that relates to the unlawful or unauthorized access to, and use or disclosure of, a patient's medical information and specifies a date upon which the delay shall end, not to exceed 60 days after a written request is made, or 30 days after an oral request is made. A law enforcement agency or official may request an extension of a delay based upon a written declaration that there exists a bona fide, ongoing, significant criminal investigation of serious wrongdoing relating to the unlawful or unauthorized access to, and use or disclosure of, a patient's medical information, that notification of patients will undermine the law enforcement agency's investigation, and that specifies a date upon which the delay shall end, not to exceed 60 days after the end of the original delay period.

(2) If the statement of the law enforcement agency or official is made orally, then the clinic, health facility, home health agency, or hospice shall do the following:

(A) Document the oral statement, including, but not limited to, the identity of the law enforcement agency or official making the oral statement and the date upon which the oral statement was made.

(B) Limit the delay in reporting the unlawful or unauthorized access to, or use or disclosure of, the patient's medical information to the date specified in the oral statement, not to exceed 30 calendar days from the date that the oral statement is made, unless a written statement that complies with the requirements of this subdivision is received during that time.

(3) A clinic, health facility, home health agency, or hospice shall submit a report that is delayed pursuant to this subdivision not later than five business days after the date designated as the end of the delay.

(d) If a clinic, health facility, home health agency, or hospice to which subdivision (a) applies violates subdivision (b), the department may assess the licensee a penalty in the amount of one hundred dollars ($100) for each day that the unlawful or unauthorized access, use, or disclosure is not reported to the department or the affected patient, following the initial five-day period specified in subdivision (b). However, the total combined penalty assessed by the department under subdivision (a) and this subdivision shall not exceed two hundred fifty thousand dollars ($250,000) per reported event. For enforcement purposes, it shall be presumed that the facility did not notify the affected patient if the notification was not documented. This presumption may be rebutted by a licensee only if the licensee demonstrates, by a preponderance of the evidence, that the notification was made.

(e) In enforcing subdivisions (a) and (d), the department shall take into consideration the special circumstances of small and rural hospitals, as defined in Section 124840, and primary care clinics, as defined in subdivision (a) of Section 1204, in order to protect access to quality care in those hospitals and clinics. When assessing a penalty on a skilled nursing facility or other facility subject to Section 1423, 1424, 1424.1, or 1424.5, the department shall issue only the higher of either a penalty for the violation of this section or a penalty for violation of Section 1423, 1424, 1424.1, or 1424.5, not both.

(f) All penalties collected by the department pursuant to this section, Sections 1280.1, 1280.3, and 1280.4, shall be deposited into the Internal Departmental Quality Improvement Account, which is hereby created within

the Special Deposit Fund under Section 16370 of the Government Code. Upon appropriation by the Legislature, moneys in the account shall be expended for internal quality improvement activities in the Licensing and Certification Program.

(g) If the licensee disputes a determination by the department regarding a failure to prevent or failure to timely report unlawful or unauthorized access to, or use or disclosure of, patients' medical information, or the imposition of a penalty under this section, the licensee may, within 10 days of receipt of the penalty assessment, request a hearing pursuant to Section 131071. Penalties shall be paid when appeals have been exhausted and the penalty has been upheld.

(h) In lieu of disputing the determination of the department regarding a failure to prevent or failure to timely report unlawful or unauthorized access to, or use or disclosure of, patients' medical information, transmit to the department 75 percent of the total amount of the administrative penalty, for each violation, within 30 business days of receipt of the administrative penalty.

(i) Notwithstanding any other law, the department may refer violations of this section to the Office of Health Information Integrity for enforcement pursuant to Section 130303.

(j) For purposes of this section, the following definitions shall apply:

(1) "Reported event" means all breaches included in any single report that is made pursuant to subdivision (b), regardless of the number of breach events contained in the report.

(2) "Unauthorized" means the inappropriate access, review, or viewing of patient medical information without a direct need for medical diagnosis, treatment, or other lawful use as permitted by the Confidentiality of Medical Information Act (Part 2.6 (commencing with Section 56) of Division 1 of the Civil Code) or any other statute or regulation governing the lawful access, use, or disclosure of medical information.

Amended Stats 2010 ch 501 § 1 (SB 270), effective September 29, 2010.

**Amendments:**
**2010 Amendment:** (1) Added the second sentence in subd (a); (2) amended subd (c)(1) by substituting (a) "likely impede the law enforcement agency's investigation that relates" for "be likely to impede the law enforcement agency's activities that relate" in the first sentence; and (b) "investigation" for "activities" after "enforcement agency's" in the last sentence; and (3) amended subd (d) by adding (a) "to the department or the affected patient" in the first sentence; and (b) the last sentence.

## § 1283. Surrender of custody of minor under age 16.

**Collateral References:**
Cal. Fam. Law Practice & Procedure 2d (Mat-thew Bender®), ch 172, Adoption of Unmarried Minors § 172.43.

## § 1289.4. Long-term health care facilities

A theft and loss program shall be implemented by the long-term health care facilities within 90 days after January 1, 1988. The program shall include all of the following:

(a) Establishment and posting of the facility's policy regarding theft and investigative procedures.

(b) Orientation to the policies and procedures for all employees within 90 days of employment.

(c) Documentation of lost and stolen patient property with a value of twenty-five dollars ($25) or more and, upon request, the documented theft and

# CASES

1

# Life Technologies Corp. v. Superior Court (Joyce) (2011)197 Cal.App.4th 640 , -- Cal.Rptr.3d --

[No. A131120. First Dist., Div. One. July 14, 2011.]

LIFE TECHNOLOGIES CORPORATION, Petitioner, v. THE SUPERIOR COURT OF SAN MATEO COUNTY, Respondent; TIMOTHY H. JOYCE, Real Party in Interest.

(Superior Court of San Mateo County, No. 494692, Joseph C. Scott, Judge.)

(Opinion by Banke, J., with Marchiano, P. J., and Margulies, J., concurring.)

**COUNSEL**

Payne & Fears, Rodney B. Sorensen, and Daniel F. Lula, for Petitioner.

Ungerman Law Offices, Elisa W. Ungerman and Kurt N. Strauss, for Real Party in Interest. **[197 Cal.App.4th 643]**

**OPINION**

**BANKE, J.-**

## I. INTRODUCTION

Real party in interest Timothy Joyce has sued petitioner Life Technologies Corporation (LTC) for wrongful termination, claiming, among other things, that he was discriminated against on the basis of his age and retaliated against because he complained about such discrimination. Joyce successfully moved to compel further answers to special interrogatories seeking detailed information about other employees/former employees. LTC seeks writ relief, contending the information ordered disclosed is irrelevant, unlikely to lead to admissible evidence and implicates significant privacy rights of the third party employees/former employees. It also contends the trial court failed to provide adequate procedural protections to the third parties before their private information is disclosed and failed to provide adequate protections for any such information once it is disclosed.

We conclude the trial court did not adequately consider, or provide procedural protections for, the substantial privacy interests of the third party employees/former employees. Accordingly, we will issue a peremptory writ directing the court to vacate its order compelling further answers to the challenged interrogatories and reconsider Joyce's motion in light of our opinion.

## II. BACKGROUND

Given the procedural posture of the case, our background recitation is largely derived from the allegations of Joyce's operative (first amended) complaint. We recognize LTC disputes all of Joyce's allegations of discrimination and retaliation.

Joyce is a patent attorney. In May 2007, he was hired by Applied Biosystems, Inc., then a wholly owned subsidiary of Applera Corporation, to manage the Chemistry Patent Group within the Intellectual Property Legal Department. He drafted and filed patent applications and also managed the Group. In February 2008, he was promoted to Director of the Molecular Biology & Chemistry Group, and received an increase in compensation.

In May 2008, a planned merger between Applera and Invitrogen Corporation was announced. After the merger there would be an " 'excess capacity' of employees." Therefore, a "certain amount of employees" of Applied Biosystems would be let go over a two-year period. **[197 Cal.App.4th 645]**

In June 2008, Applera and Invitrogen entered into a "Merger Agreement," part of which included a "Special Severance Plan," which would apply to employees laid off because of and within two years of the merger. Employees who voluntarily resigned, died or became disabled, or terminated for cause or as a result of a sale or transfer of a business group, would be ineligible for a severance package.

Around this time, Joyce consulted recruiters about future job opportunities. He was told Invitrogen had a pattern of acquiring companies, and then ridding itself of older employees and replacing them with younger new hires. Thereafter (Joyce does not allege when), he was told by his supervisor, Jeff Frazier, to "manage out" two over-40 female employees by "documenting them," i.e., by composing negative performance reviews. Joyce refused to do so, "preferring instead to manage in a positive fashion."

In September and October 2008, the Special Severance Plan was formally announced and publicized. Employees "were promised that if they stayed focused and working in their jobs and did not look for another job, take another job, or take the time to job hunt in lieu of performing their job duties, the company would provide the benefits of the 'Special Severance Plan' . . . in order to ease the 'financial impact on those who would be involuntarily terminated following the [merger/integration]' while '[helping] to alleviate both the negative effects [of the merger] on productivity due to the uncertainty during this 2 year transition period and the potential for economic hardship of affected employees.' " Joyce "accepted this offer and did not seek out new employment at this time, instead staying focused on his job as requested."

During this period of time, Joyce "noticed that he was being excluded from various opportunities that could have an impact on his selection for a position with the new company while younger employees were allowed these opportunities." He was also told by another employee that Frazier told her to warn Joyce "he should 'get ready to be documented.' " This same employee later told him she heard he was on a " 'hit list' for termination where performance issues would be fabricated and his work life made generally miserable in the hopes [he] would either voluntarily quit or 'documented cause' would be established for his termination, thereby justifying the denial of a severance package." He also heard the same thing from other directors and staff, and that the same strategy would be taken with two other over-40 employees, including one of the two women Frazier had asked him to "manage out." Joyce then went online to the U.S. Patent and Trademark Office Web site and observed almost all of the lawyers in the Invitrogen legal department had high registration numbers, "indicating that most were newly-minted attorneys, much younger than [he]." **[197 Cal.App.4th 646]**

At the end of September, Joyce met with Frazier and stated concern about his potential termination "due to his age and being cheated out of his severance." Frazier "never denied what was occurring," and indicated he did not agree with decisions being made by Invitrogen's general counsel, but "there was nothing he could do."

In early October 2008, Joyce saw a copy of the new company's "IP legal department organization chart," and also saw his name on the layoff list on the chart. The list "appeared to confirm that many of those being laid off were over 40." Joyce spoke with Frazier about the chart and the "three people being 'managed out,' all of whom were over 40." Frazier did not deny there was such a document and told Joyce his concerns about age discrimination and being let go "were not going to help [him]." In late October, Joyce met with Frazier and the HR Senior Manager, Wendy Van Bronkhorst, and expressed his concern about being let go. Frazier and Van Bronkhorst "fraudulently" told him there would be a position for him with the new company.

As the preparation for the merger continued, Joyce was "systematically stripped of duties and assigned menial tasks." He became the object of ridicule, and was eventually "demoted to a non-management position, in contrast to similarly situated younger employees." He also was subject to a litany of

unreasonable demands by Frazier and, in turn, increasing "documentation," again in contrast to "other similarly situated younger employees." In addition, he was "forced" to dig up information about another of the over-40 employees on the layoff list to support a termination for cause "to avoid paying her a severance package."

The merger of Invitrogen and Applera took place on November 21, 2008, resulting in the creation of LTC.

On November 26, 2008, Joyce complained in writing to Van Bronkhorst that he was being subjected to age discrimination and also retaliation for his earlier informal complaints. Two days later, Joyce met with Van Bronkhorst, who denied any discrimination and said no investigation would be done. She also said there would be several rounds of layoffs, and "confirmed her understanding of Invitrogen's tendency to hire younger workers." The first round of layoffs occurred on or about December 10, 2008. Two of the three employees laid off were over the age of 40. fn. 1 **[197 Cal.App.4th 647]**

In January 2009, the new organizational chart was made public, and Joyce did not have a position on it. His prior duties were reassigned to younger employees, and he was "effectively . . . demoted."

The following month, Joyce was put on a "performance improvement plan," the "last step in the plan to 'manage [him] out' " and "ostensibly provide grounds" to terminate him for cause and deny him a severance package. The asserted shortcomings in his performance were "petty, false and pretextual." Joyce wrote to the Director of Employee Relations, Rosine Lawson, and asked for a full-fledged investigation into his age discrimination complaint.

On February 12, 2009, Joyce filed a complaint of age discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC). On February 13, he met with Lawson about his internal complaint, and then began gathering information for her.

On March 9, 2009, Joyce was "let go" for "poor performance." He did not receive a severance package. Eleven of the 14 former employees of Applied Biosystems "laid off" as a result of the merger were over the age of 40. fn. 2

On March 16, he filed an additional complaint with the EEOC. His administrative complaints were consolidated, and the Department of Fair Employment and Housing (DFEH) issued a right to sue letter on April 2, 2009. The EEOC issued a right to sue letter on April 15, 2010.

Joyce filed the underlying action on May 3, 2010, and a first amended complaint on June 18, asserting causes of action for age discrimination (Gov. Code, § 12940, subd. (a) [disparate treatment]), a pattern and practice of age discrimination that included him (Gov. Code, § 12940, subd. (b) [disparate impact]), retaliation for his complaints of FEHA (California Fair Employment and Housing Act--Govt. Code, § 12900 et seq.) violations, as well as for breach of contract. He sues only on own his own behalf.

The instant petition for writ of mandate arises from a discovery dispute, culminating in an order compelling answers to special interrogatories asking that LTC provide the following information:

(a) The names of all employees terminated during a two-year period, November 1, 2008 to June 28, 2010. **[197 Cal.App.4th 648]**

(b) The department each worked for when terminated.

(c) The date of termination.

(d) The age of each at termination.

(e) The reason for termination.

(f) Whether severance benefits were offered.

(g) Whether offered severance benefits were accepted.

(h) A description of any offered severance benefits.

(i) A detailed explanation of reasons for any failure to offer severance benefits.

(j) The identity (including name, address and telephone number) of all former Applied Biosystems employees still employed by LTC after the RIF.

(k) Whether the terminated employees were former employees of Appelera or Applied Biosystems.

LTC objected to the interrogatories on the grounds the information sought was irrelevant, not likely to lead to admissible evidence (Code Civ. Proc., § 2017.010; Evid. Code, § 210), and implicated the privacy rights of third parties. fn. 3 (Cal. Const., art. I, § 1.)

The order compelling answers requires counsel for Joyce and LTC to "meet and confer, and to draft a notice letter to relevant California-based current employees/former employees to briefly inform them of the general nature of this lawsuit. The employees/former employees should be informed of the nature of the information that will be disclosed to the Plaintiff unless they file a motion for a protective order." The order places no restraint on the time and manner by which current and former employees may be contacted, nor does it contain safeguards maintaining the confidentiality of any information ultimately disclosed. fn. 4 **[197 Cal.App.4th 649]**

## III. DISCUSSION

*Standard of Review*

We review the trial court's discovery order under the abuse of discretion standard. (*Pioneer Electronics (USA), Inc. v. Superior Court* (2007) 40 Cal.4th 360, 371-372 [53 Cal.Rptr.3d 513, 150 P.3d 198] (*Pioneer Electronics*); *Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733 [101 Cal.Rptr.3d 758, 219 P.3d 736].) Accordingly, we may not substitute our view for that of the trial court unless there is no legal justification for the court's order (*Alch v. Superior Court* (2008) 165 Cal.App.4th 1412, 1421 [82 Cal.Rptr.3d 470] (*Alch*).)

*Relevance*

*Nature of Claims*

LTC contends none of the information sought by the special interrogatories is relevant to Joyce's discrimination and retaliation claims, nor likely to lead to admissible evidence. (Code Civ. Proc., § 2017.010; Evid. Code, § 210.) LTC points out Joyce's suit is not a class action. It also points out the record does not indicate the third party employees/former employees about whom information is sought are percipient witnesses to the discrimination and retaliation Joyce claims to have experienced.

Joyce counters the information is necessary for him to develop a statistical analysis in support of his disparate treatment and disparate impact claims, emphasizing the latter claim. In addition, he "expects" the information may lead to evidence to prove his retaliation claim, as well as his claim for punitive damages.

[1] Although LTC acknowledges Joyce has pled both disparate treatment and disparate impact claims, it contends Joyce has not demonstrated, and cannot demonstrate, the elements of a disparate impact claim. " 'Disparate treatment' is *intentional* discrimination against one or more persons on prohibited grounds. [Citations.] [2] Prohibited discrimination may also be found on a theory of 'disparate impact,' i.e., that regardless of motive, a *facially neutral* employer practice or policy, bearing no manifest relationship to job requirements, *in fact* had a disproportionate adverse effect on members of the protected class." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354, fn. 20 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) LTC asserts Joyce has not identified "a specific, facially neutral employment practice or policy."

[3] The record shows otherwise. Joyce is clearly challenging a RIF he claims was discriminatorily applied. This suffices as the predicate for a **[197 Cal.App.4th 650]** disparate impact claim. (See *Pottenger v. Potlatch Corp.* (9th Cir. 2003) 329 F.3d 740, 749 [RIF "would constitute" a specific, outwardly neutral business practice]; *Schechner v. KPIX-TV* (N.D.Cal. 2011, No. C08-05049 MHP) 2011 WL 109144, *1 [disparate impact case based on RIF].) Furthermore, as we next discuss and contrary to LTC's apparent assumption, statistical evidence may be introduced in a disparate treatment, as well as a disparate impact, case.

*Statistical Evidence*

[4] "Statistical proof is indispensable in a disparate impact case: ' "The plaintiff must begin by identifying the specific employment practice that is challenged." ' ' "Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." ' " (*Alch, supra,* 165 Cal.App.4th at p. 1428, quoting *Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1323-1324 [19 Cal.Rptr.3d 519], quoting *Watson v. Fort Worth Bank & Trust* (1988) 487 U.S. 977, 994 [101 L.Ed.2d 827, 108 S.Ct. 2777]; see also *Paige v. California* (9th Cir. 2002) 291 F.3d 1141, 1145 (*Paige*) [statistical analysis "must show a disparity that is 'sufficiently substantial' as to 'raise such an inference of causation' "]; *Schechner v. KPIX-TV, supra,* 2011 WL 109144, at p.*2; *Stagi v. AMTRAK* (3d Cir. 2010) 391 Fed.Appx. 133, 137-140 ["a plaintiff will typically have to demonstrate that the disparity in impact is sufficiently large that it is highly unlikely to have occurred at random, and to do so by using one of several tests of statistical significance"].)

Thus, the critical comparison in a disparate impact case is "the group that 'enters' the [employment] process with the group that emerges from it." (*Paige v. California, supra,* 291 F.3d at p. 1145.) " 'The best evidence of discriminatory impact is proof that an employment practice selects members of a protected class . . . in a proportion smaller than in the actual pool of eligible employees.' " (*Ibid.,* quoting *Moore v. Hughes Helicopters, Inc.* (9th Cir. 1983) 708 F.2d 475, 482.)

[5] Statistical evidence may also be utilized in a disparate treatment case. However, because discriminatory intent must be shown in such a case, statistical evidence must meet a more exacting standard. "[T]o create an inference of intentional discrimination, statistics must demonstrate a significant disparity and must eliminate nondiscriminatory reasons for the apparent disparity. *Aragon* [*v. Republic Silver State Disposal Inc.* (9th Cir. 2002) 292 F.3d 654, 663 (*Aragon*) (finding that statistics unsupported by other probative **[197 Cal.App.4th 651]** evidence of discrimination was insufficient to show pretext and to demonstrate discrimination); see also *Coleman v. Quaker Oats Co.* (9th Cir. 2000) 232 F.3d 1271, 1283 (holding that to raise a triable issue of fact regarding pretext based solely on statistical evidence, the statistics 'must show a stark pattern of discrimination unexplainable on grounds other than age'); *United States v. Ironworkers Local 86* (9th Cir. 1971) 443 F.2d 544, 551, fn. omitted] . . . (holding that use of statistical evidence 'is conditioned by the existence of proper supportive facts and the absence of variables which would undermine the reasonableness of the inference of discrimination which is drawn.')." (*Gratch v. Nicholson* (N.D.Ca. 2005, No. C04-03028 JSW) 2005 WL 2290315, *4.)

Thus, "[a]lthough use of statistics is permissible [in a disparate treatment case], statistical evidence 'rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an

individual employee.' *Aragon*[, *supra*, at p. 663, fn. 6.] . . . [T]his is so because 'in disparate treatment cases, the central focus is less on whether a pattern of discrimination existed [at the company] and more how a particular individual was treated and why. As such, statistical evidence of a company's general hiring patterns, although relevant, carries less probative weight than it does in a disparate impact case.' [*Ibid.*, citing *LeBlanc v. Great Amer. Ins. Co.* (1st Cir. 1993) 6 F.3d 836, 848-49.]" (*Gratch v. Nicholson, supra*, at p. *4, fn. 4.)

To some extent, then, the special interrogatories seek information arguably likely to lead to admissible evidence, although some of the information sought (e.g., descriptions of severance benefits) does not appear to be pertinent to any relevant statistical analysis. In any case, our inquiry does not end here because the information sought by the interrogatories implicates significant privacy rights of the third party employees/former employees.

*Privacy Rights*

*Pioneer Electronics* sets forth the legal principles governing our review of the privacy concerns implicated by the special interrogatories. "[T]he right of privacy protects the individual's *reasonable* expectation of privacy against a *serious* invasion. [Citation.] . . . [W]hether a legally recognized privacy interest exists is a question of law, and whether the circumstances give rise to a reasonable expectation of privacy and a serious invasion thereof are mixed questions of law and fact." (*Pioneer Electronics, supra*, 40 Cal.4th at pp. 370-371.)

[6] The "analytical framework" for assessing privacy claims should proceed as follows: "First, the claimant must possess a 'legally protected **[197 Cal.App.4th 652]** privacy interest.' [Citation.] An apt example from *Hill* [v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633] (*Hill*)] is an interest 'in precluding the dissemination or misuse of sensitive and confidential information ("informational privacy") . . . .' [Citation.] Under *Hill*, this class of information is deemed private 'when well-established social norms recognize the need to maximize individual control over its dissemination and use to prevent unjustified embarrassment or indignity.' [Citation.] . . . [¶] Second, *Hill* teaches that the privacy claimant must possess a reasonable expectation of privacy under the particular circumstances, including 'customs, practices, and physical settings surrounding particular activities . . . .' [Citation.] As *Hill* explains, 'A "reasonable" expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms.' [Citation.] '[O]pportunities to consent voluntarily to activities impacting privacy interests obviously affect[] the expectations of the participant.' [Citation.] [¶] Third, *Hill* explains that the invasion of privacy complained of must be 'serious' in nature, scope, and actual or potential impact to constitute an 'egregious' breach of social norms . . . . [¶] Assuming that a claimant has met the foregoing *Hill* criteria for invasion of a privacy interest, that interest must be measured against other competing or countervailing interests in a ' "balancing test." ' [Citations.] [7] 'Conduct alleged to be an invasion of privacy is to be evaluated based on the extent to which it furthers legitimate and important competing interests.' [Citation.] Protective measures, safeguards and other alternatives may minimize the privacy intrusion. 'For example, if intrusion is limited and confidential information is carefully shielded from disclosure except to those who have a legitimate need to know, privacy concerns are assuaged.' " (*Pioneer Electronics, supra*, 40 Cal.4th at pp. 370-371.)

[8] Joyce asserts no serious invasion of privacy interests is implicated by his interrogatories. We disagree. The interrogatories effectively seek the disclosure of confidential personnel records of non-witness third parties. The public interest in preserving confidential, personnel information generally outweighs a private litigant's interest in obtaining that information. (*Board of Trustees v. Superior Court* (1981) 119 Cal.App.3d 516, 530 [174 Cal.Rptr. 160].) "A showing of relevancy may be enough to cause the court to balance the compelling public need for discovery against the fundamental right of privacy. (*Mendez v. Superior Court* (1988) 206 Cal.App.3d 557, 567 [253 Cal.Rptr. 731].) However, the balance will favor privacy for confidential information in third party personnel files unless the litigant can show a compelling need for the particular documents *and that the information cannot reasonably be obtained through depositions or from nonconfidential sources.* (See *El Dorado Savings & Loan Assn. v. Superior Court* (1987) 190 Cal.App.3d 342, 346 [235 Cal.Rptr. 303].) Even when the balance does weigh in favor of

disclosure, *the scope of disclosure must be narrowly* **[197 Cal.App.4th 653]** *circumscribed.*" (*Harding Lawson Associates v. Superior Court* (1992) 10 Cal.App.4th 7, 10 [12 Cal.Rptr.2d 538], italics added; see also *Alch, supra*, 165 Cal.App.4th at p. 1433 [plaintiffs abandoned their request for "sensitive information ordinarily found in personnel files, such as evaluation of the person's work . . . , income information, employment contracts and the like"]; cf. *Britt v. Superior Court* (1978) 20 Cal.3d 844, 855-864 [143 Cal.Rptr. 695, 574 P.2d 766] (*Britt*) [even party plaintiffs could not be compelled to provide information about all their political activities or their entire medical histories; party seeking discovery must show both compelling need for the information and that discovery request is narrowly and specifically drawn to minimize intrusion into private matters].)

[9] As Joyce points out, the importance of "eradicating discrimination and retaliation in the workplace and providing a remedy to employees when such occurs" is a compelling public policy, codified in the FEHA statutes. But, as noted, that public policy must be weighed against the privacy interests involved. Here, the trial court failed to separately analyze the several categories of information sought by the interrogatories, and "to consider whether a more nuanced approach to the different categories of data would satisfy the balance that must be taken between privacy interests and a litigant's need for discovery." (*Alch, supra*, 165 Cal.App.4th at p. 1422.) This, alone, is reason to issue a writ and return the matter to the trial court.

We further observe that, while Joyce points out he must make a statistical showing in connection with his disparate impact claim, there is no apparent reason on this record why he cannot obtain the necessary raw data from LTC in a form that would not disclose individual-specific confidential information. Although Joyce will be required to demonstrate the reliability of any statistical evidence he presents (*Ortega v. Safeway Stores, Inc.* (10th Cir. 1991) 943 F.2d 1230, 1243), nothing in the record at this stage of the case supports his speculation LTC will not supply accurate data. There also is nothing in the record that explains why Joyce needs data of the breadth he seeks, particularly given the focus of a statistical analysis for disparate impact purposes.

[10] The interrogatories also seek employee/former employee residential addresses and telephone numbers. "Courts have frequently recognized that individuals have a substantial interest in the privacy of their home." (*Planned Parenthood Golden Gate v. Superior Court* (2000) 83 Cal.App.4th 347, 359 [99 Cal.Rptr.2d 627] (*Planned Parenthood*).) Joyce asserts "there is no other way to obtain percipient witnesses contact information." But, again, nothing in the record suggests all of the employees/former employees as to whom contact information is sought were witnesses to the discriminatory and retaliatory acts he allegedly suffered. (Compare *Puerto v. Superior Court* (2008) **[197 Cal.App.4th 654]** 158 Cal.App.4th 1242 [70 Cal.Rptr.3d 701] [names and contact information authorized for individuals identified by defendant as percipient witnesses].) fn. 5

Nor are these employees/former employees potential class members who previously self-identified. (Compare *Pioneer Electronics, supra*, 40 Cal.4th 360.) Indeed, the Supreme Court framed the issue in *Pioneer Electronics* as: "Does a complaining purchaser possess a right to privacy protecting him or her from unsolicited contact by a class action plaintiff seeking relief from the vendor to whom the purchaser's complaint was sent?" (*Pioneer Electronics, supra*, 40 Cal.4th at pp. 365-366.) The third party employees/former employees whose personnel information is sought by Joyce have not placed themselves in a comparable situation. Other recent class action cases are also on a distinctly different footing and do not support the sweeping disclosure of individual -specific confidential information sought here. (E.g., *Crab Addison, Inc. v. Superior Court* (2008) 169 Cal.App.4th 958, 965-975 [87 Cal.Rptr.3d 400]; *Lee v. Dynamex, Inc.* (2008) 166 Cal.App.4th 1325, 1336-1338 [83 Cal.Rptr.3d 241] [observing contact information regarding the identity of "potential class members" is "generally discoverable"; putative class members are also, by definition, witnesses to the allegedly wrongful conduct].)

As for the interrogatories seeking severance package information, the features of the Special Severance Plan were publicized throughout the company, including the criteria by which an employee would or would not receive a severance package. Accordingly, the record indicates Joyce does not need private

information from individual personnel files to support his claim that he was denied such benefits in retaliation for his complaints of age discrimination.

In sum, the interrogatories are in some respects overbroad and in other respects seek private and personal information without a sufficient showing of compelling need for it.

In addition, the trial court failed to provide sufficient procedural safeguards in connection with the ordered disclosure. In *Pioneer Electronics*, for example, the company, not the plaintiffs' attorney, was the party directed to give notice to putative class members (a status not shared by the third party employees/former employees here) of "important limitations, requiring written notice of the proposed disclosure to all complaining Pioneer customers, giving them the opportunity to object to the release of their own personal identifying information." (*Pioneer Electronics*, *supra*, 40 Cal.4th at p. 373.) In *Alch*, *supra*, notice to putative class members included a simple objection form **[197 Cal.App.4th 655]** "on which recipients could object to the disclosure of all or specific categories of information, and a list of frequently asked questions and corresponding answers. The notice advised recipients that a motion could be filed to overrule any objection. It also advised that a court order would restrict use of and access to the requested records, which would be made available only in connection with the litigation." (*Alch*, *supra*, 165 Cal.App.4th at p. 1418.) Thereafter, objectors were sent a second notice notifying them that the party requesting the information "intended to move to overrule their objections, and advising them of their rights to respond to the . . . motion in writing and at a hearing." (*Ibid.*)

Had Joyce sought the information at issue here by way of a deposition subpoena, instead of through interrogatories, he would have been required to cause a copy of the subpoena duces tecum to be served on the employees/former employees, as well as the declaration in support of the subpoena, along with a detailed privacy notice. (Code Civ. Proc., § 1985.6, subds. (b)-(e).) A nonparty employee/former employee could thereafter "serve on the subpoenaing party, the deposition officer, and the witness a written objection that cites the specific grounds on which production of the employment records should be prohibited." (Code Civ. Proc., § 1985.6, subd. (f)(2).) "No witness or deposition officer shall be required to produce employment records . . . after receipt of a written objection from a nonparty employee, except upon order of the court in which the action is pending . . . ." (Code Civ. Proc., § 1985.6, subd. (f)(3).) We do not believe a nonparty employee/former employee should be deprived of such protections simply because the discovery vehicle used is a set of special interrogatories, rather than a subpoena duces tecum.

The trial court also failed to make any provision for maintaining the confidentiality of any disclosed information, by sealing it and/or limiting its use and dissemination. (See *Pioneer Electronics*, *supra*, 40 Cal.4th at p. 371 ["[p]rotective measures, safeguards and other alternatives may minimize the privacy intrusion"]; *Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652 [125 Cal.Rptr. 553, 542 P.2d 977] [appropriate confidentiality and sealing orders].)

[11] We therefore conclude the trial court abused its discretion in ordering further answers to the challenged special interrogatories. The court failed to evaluate, with regard to each category of information requested by Joyce, whether a compelling need for the information outweighs the third parties' privacy interests, taking into consideration whether less intrusive means exist for Joyce to obtain the information he seeks. (See *Britt*, *supra*, 20 Cal.3d at pp. 855-864; *Harding Lawson Associates v. Superior Court*, *supra*, 10 Cal.App.4th at p. 10; *El Dorado Savings & Loan Assn. v. Superior Court*, *supra*, **[197 Cal.App.4th 656]** 190 Cal.App.3d at p. 346.) The court also failed to provide sufficient notice to the third party employees/former employees affording them a simple, reasonable means of objecting to the disclosure of their personal information, and failed to provide for the protection of any such information ultimately ordered disclosed. (See *Alch*, *supra*, 165 Cal.App.4th at p. 1218; cf. Code Civ. Proc., § 1985.6, subds. (b)-(f).)

## IV. DISPOSITION

Let a peremptory writ of mandate issue commanding respondent Superior Court of San Mateo County to set aside that portion of its order filed February 2, 2011, in *Joyce v. Life Technologies Corporation, et al.*

(Super. Ct. San Mateo County, No. Civ. 494692) granting Joyce's motion to compel responses to special interrogatory numbers 2-10, 59 and 62 and to, instead, reconsider the motion in light of our opinion.

The stay previously imposed shall remain in effect until the remittitur issues.

Petitioner, LTC, shall recover its costs.

Marchiano, P. J., and Margulies, J., concurred.

FN 1. The record is not clear, but suggests these individuals were former employees of the Applied Biosystems' legal department and, specifically, the Molecular Biology & Chemistry Group. The record is also unclear or wholly silent in a number of other respects, including as to the total number of employees subject to the two-year reduction in force (RIF) company-wide, in California only, in the company's (or prior companies' legal departments), and in groups within the legal department(s).

FN 2. As noted, the record is unclear as to whether these 14 individuals were employed in Applied Biosystems' legal department, or a group within the legal department, or throughout the company.

FN 3. LTC also asserted the interrogatories potentially impacted hundreds of employees/former employees. Joyce then stated he would be satisfied with information for "California" employees/former employees, and the order compelling further answers was narrowed accordingly. The record is silent as to how many individuals are or were employed in-state.

FN 4. Although Joyce makes reference to protective order provisions, none are part of the record.

FN 5. Even as witnesses, they would be entitled to privacy protections. (*Pioneer Electronics, supra,* 40 Cal.4th at p. 373; *Planned Parenthood, supra,* 83 Cal.App.4th 347.)

2

# Slagle v. Superior Court (Maryon) (1989)
# 211 Cal. App. 3d 1309 [260 Cal. Rptr. 122]

[No. A044846. Court of Appeals of California, First Appellate District, Division Four. June 29, 1989.]

BILL SLAGLE, Petitioner, v. THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent; ARTHUR C. MARYON, JR., et al., Real Parties in Interest

(Opinion by Channell, J., with Anderson, P. J., concurring. Separate dissenting opinion by Poche, J.)

COUNSEL

Robert W. Lazzarini and Lazzarini & Frazier for Petitioner.

No appearance for Respondent.

Rita Rowland and McCray, Rowland & Donovan for Real Parties in Interest.

OPINION

CHANNELL, J.

Petitioner Bill Slagle seeks a writ to require respondent court to grant his motion to quash a subpoena for medical records which petitioner claims are privileged. We conclude that the records are discoverable under section 999 of the Evidence Code. fn. 1

The lawsuit arises out of an automobile accident on April 7, 1987. On April 4, 1988, petitioner filed an action for personal injuries against real parties in interest herein on the theory that real party Margaret Maryon negligently backed her car out of an angle parking space and hit petitioner's car. Real parties filed an answer alleging contributory negligence on the part of petitioner and a cross-complaint against petitioner for equitable contribution and indemnity.

During the course of discovery, real parties served a subpoena duces tecum on John Muir Hospital and Roger Greenwald, M.D. seeking petitioner's medical records. Petitioner moved to quash the subpoenas contending that he was never treated at John Muir Hospital or by Dr. Greenwald for any injuries related to the accident and thus the patient-litigant **[211 Cal. App. 3d 1312]** exception to the physician-patient privilege

did not apply. In opposition, real parties contended that the motion to quash was untimely under section 1985.3 subdivision (e)(2) of the Code of Civil Procedure and that the records are relevant to the damages petitioner suffered in the accident and to the issue of liability. In regard to the latter point, real parties provided handwritten notes of real party Arthur C. Maryon, Jr., while at the hospital on the day of the accident. One of these notes stated that Mr. Maryon overheard petitioner tell the doctor that he was blind in both eyes six months prior to the accident.

Respondent court denied the motion and required the production of the records. We review this decision on a petition for extraordinary writ because petitioner claims a privilege and because the issue raised is one of first impression. (Sav-On Drugs, Inc. v. Superior Court (1975) 15 Cal. 3d 1, 5 [123 Cal.Rptr. 283, 538 P.2d 739]; Oceanside Union School Dist. v. Superior Court (1962) 58 Cal. 2d 180, 180-186 [23 Cal.Rptr. 375, 373 P.2d 439].)

[1] We turn first to real parties' contention that the motion to quash was untimely. Section 1985.3 of the Code of Civil Procedure sets forth the procedure for serving a subpoena for personal records of what the section refers to as a "consumer." Subdivision (e) requires that a copy of the subpoena must be served on the consumer with a notice which informs the consumer of three things: (1) that a subpoena for his records has been sought; (2) that if he objects to the witness furnishing the records he "must file papers with the court prior to the date specified for production on the subpoena"; and (3) that if the party seeking the records will not agree to cancel or limit the subpoena, the consumer should consult an attorney. Subdivision (g) provides that the consumer "may, prior to the date for production, bring a motion ... to quash or modify the subpoena ...." The witness, having been informed of the motion, is then not required to produce personal records until the matter is resolved.

Nothing in the procedure set forth above suggests that a court lacks jurisdiction to consider a motion to quash if it is brought after the date set forth in the subpoena for production. The time limits mentioned in the procedure for bringing the motion are obviously designed to guide those involved as to when the witness with the records may safely honor or not honor the subpoena when the consumer objects. Real parties contend that the court did not abuse its discretion in denying the motion to quash since the motion was not brought prior to the date for production set forth in the subpoena. This is a frivolous argument since there was no exercise of **[211 Cal. App. 3d 1313]**

discretion on this ground. The court simply ignored the argument and went to the merits of the motion to quash to which we now turn our attention.

[2] Section 994 provides, subject to statutory exceptions, that a "patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and physician ...." To the extent that the privilege applies, it operates as a bar to discovery of even relevant information. (Code Civ. Proc., § 2017, subd. (a).) [3] "[T]here can be no discovery of matter which is privileged." (Rudnick v. Superior Court (1974) 11 Cal. 3d 924, 929 [114 Cal.Rptr. 603, 523 P.2d 643].)

[4] An exception to the physician-patient privilege which was asserted by real parties below is that afforded by section 996. Under that exception, "[t]here is no privilege ... as to a communication relevant to an issue concerning the condition of the patient if such issue has been tendered by ... [t]he patient." A patient tenders the issue of his physical health if he files an action for personal injuries but only as to information which relates to the claimed injuries. (Britt v. Superior Court (1978) 20 Cal. 3d 844, 862-864 [143 Cal.Rptr. 695, 574 P.2d 766].) Petitioner made clear on his motion to quash that he was not seeking to recover for any injury to his eyes. The patient-litigant exception, therefore, does not apply nor do real parties any longer pursue this argument.

[5a] Real parties rely solely on the exception to the physician-patient privilege contained in section 999. That section reads as follows: "There is no privilege under this article as to a communication relevant to an issue concerning the condition of the patient in a proceeding to recover damages on account of the conduct of the patient if good cause for disclosure of the communication is shown." (Italics added.)

We are concerned here with whether this section applies if the patient whose records are sought is the plaintiff. At first glance, an action for personal injuries could be construed as a proceeding to recover damages solely "on account of the conduct of" the defendant. (See Jones v. Superior Court (1981) 119 Cal. App. 3d 534, 544 [174 Cal.Rptr. 148].) However, if a defendant who has been sued for personal injuries files an answer alleging comparative negligence as an affirmative defense or files a cross-complaint against the plaintiff for his or her own injuries, we think it unclear whether or not the proceeding is one "to recover damages on account of the conduct of the patient." (§ 999.) **[211 Cal. App. 3d 1314]**

The application of section 999 here is sufficiently in doubt to permit the use of extrinsic aids to ascertain the legislative intent behind the statute. (County of San Diego v. Superior Court (1986) 176 Cal. App. 3d 1009, 1021 [222 Cal.Rptr. 484].) These include the history of the legislation and the comments of the law revision commission which studied the problem addressed by the legislation. [6] "Explanatory comments by a law revision commission are persuasive evidence of the intent of the Legislature in subsequently enacting its recommendations into law. [Citation.]" (Brian W. v. Superior Court (1978) 20 Cal. 3d 618, 623 [143 Cal.Rptr. 717, 574 P.2d 788].)

[5b] Section 999 originally created an exception to the physician-patient privilege for a civil action to recover damages based on "conduct of the patient which constitutes a crime." In 1974, the California Law Revision Commission recommended the elimination of the "criminal conduct" exception and the substitution of a "good cause" exception. (12 Cal. Law Revision Com. Rep. (1974) pp. 602-608.) The specific recommendation was for the following language: "There is no privilege under this article as to a communication relevant to an issue concerning the condition of a patient who is a party to the proceeding where good cause for the disclosure of the communication is shown to the presiding officer." (Id., at p. 607.) If this had been the language actually enacted, there would be no question but that the medical records of a plaintiff would be discoverable. However, instead of applying the exception to a "party," the statute applies it to a "patient in a proceeding to recover damages on account of the conduct of the patient." The Law Revision Commission comments to the statute suggest that this change was a broadening, not a narrowing, of the exception. "Section 999 permits disclosure not only in a case where the patient is a party to the action but also in a case where a party's liability is based on the conduct of the patient." (Deering's Ann. Evid. Code (1986 ed.) § 999, p. 177; 29B West's Ann. Evid. Code (1989 pocket supp.) p. 80.)

[7] "Statutes relating to discovery procedures should be liberally construed in favor of disclosure. [Citations.]" (Harabedian v. Superior Court (1961) 195 Cal. App. 2d 26, 31 [15 Cal.Rptr. 420, 89 A.L.R.2d 994].) [5c] Adhering to this doctrine of liberal construction and in view of the legislative history of section 999, we interpret the section to include within its scope medical records of a plaintiff where the plaintiff's conduct is shown to be relevant to the issue of proximate causation if "good cause for disclosure" is shown.

Petitioner raises the specter of unlimited discovery of a plaintiff's medical records in order to ferret out a possible defense to an action for damages. **[211 Cal. App. 3d 1315]** We emphasize, however, that real parties here, through the unprivileged information that petitioner was blind six months before the accident, showed good cause to believe that the history of treatment to petitioner's eyes was relevant to the cause of the accident. If petitioner fears that the medical records ordered produced will reveal information not relevant to the condition of his eyesight at the time of the accident, he may request an in camera inspection of the records to segregate the irrelevant information.

The alternative writ is discharged and the petition is denied.

Anderson, P. J., concurred.

POCH, J.

I respectfully dissent.

Evidence Code section 999 fn. 1 creates an exception to the physician-patient privilege for "a communication relevant to an issue concerning the condition of the patient in a proceeding to recover damages on account of the conduct of the patient ...." (Italics added.) The proceeding here is not to recover damages on account of the conduct of the patient. Defendant neither alleges he suffered damages nor seeks to recover damages on account of plaintiff's conduct. The clear and unambiguous language of section 999 therefore does not fit this situation.

Nor does the legislative history lend itself to the construction adopted by the majority opinion. It does just the opposite. In 1974 the California Law Revision Commission recommended amending section 999 to produce the very result suggested by the majority. (See 12 Cal. Law Revision Com. Rep. (1974) pp. 602-608.) The Legislature, however, rejected that recommendation.

The comment of the Law Revision Commission to the enacted statute is even less supportive of the majority's construction of section 999. The gist of the comment, as well as its emphasized wording, reveals the obvious and single goal of the Legislature was to cover a derivative action based upon the doctrine of respondeat superior. As the commission commented: "Section 999 permits disclosure not only in a case where the patient is a party to the action but also in a case where a party's liability is based on the conduct of the patient. An example of the latter situation is a personal injury action brought against an employer based on the negligent conduct of his employee who was

killed in the accident." (Italics added; see Cal. Law Revision **[211 Cal. App. 3d 1316]** Com. com., Deering's Ann. Evid. Code (1986 ed.) § 999, p. 177; 29B West's Ann. Evid. Code (1989 pocket supp.) p. 80.) The party to which this comment refers must be the defendant, since it is the defendant, not the plaintiff, who is potentially liable.

In sum, neither the actual wording of section 999, nor the legislative history provides a pad sufficient to support the majority's leap frogging to permit discovery of plaintiff's medical records. I would therefore issue a peremptory writ directing respondent superior court to grant the motion to quash the subpoena directed at plaintiff's medical records.

FN 1. All statutory references are to the Evidence Code unless otherwise indicated.

FN 1. All further statutory references are to the Evidence Code.

3

# Board of Medical Quality Assurance v. Gherardini (1979) 93 Cal. App. 3d 669 [156 Cal.Rptr. 55]

[Civ. No. 16600. Fourth Dist., Div. One. May 16, 1979.]

DIVISION OF MEDICAL QUALITY, BOARD OF MEDICAL QUALITY ASSURANCE, Plaintiff and Respondent, v. MEL GHERARDINI et al., Defendants and Appellants.

(Opinion by Staniforth, Acting P.J., with Weiner, J., and Ehrenfreund, J., concurring.)

COUNSEL

Alexander R. Tobin and John T. Borje for Defendants and Appellants.

Evelle J. Younger, George Deukmejian, Attorneys General, and David Chandler, Deputy Attorney General, for Plaintiff and Respondent. **[93 Cal. App. 3d 673]**

OPINION

STANIFORTH, Acting P. J.

Mount Helix General Hospital and Mel Gherardini, custodian of records, appeal an order granting a petition of the Division of Medical Quality of the Board of Medical Quality Assurance (Medical Board), fn. 1 commanding appellants to testify and produce hospital records and documents pertaining to five named patients. fn. 2

Facts

The Medical Board would examine the complete medical-hospital records of five named patients of a San Diego doctor -- a licensee of the Medical Board. The investigator's declaration in support of the subpoena duces tecum alleges: "I am conducting an investigation involving an allegation of gross negligence and/or incompetence in the treatment of patients" by the named doctor and continues: "The medical records ... may offer evidence to substantiate the ... allegations. ..." The declarations allege neither patient consent nor complaint. There is no specification of any charge by a fellow physician or member of the public. No facts support the conclusionary statements. The records sought are hospital records kept by Mount Helix General Hospital (Mt. Helix). Upon Mt. Helix's refusal to surrender the records, the Medical Board sought and obtained, after hearing, the challenged superior court order. **[93 Cal. App. 3d 674]**

Contentions

Mt. Helix's refusal to surrender the records is based upon (1) the failure of the subpoena to allege facts amounting to reasonable and probable cause; (2) the patient-physician privilege (Evid. Code, §§ 990-1007); and (3) the patient's right of privacy found in the Bill of Rights of the United States Constitution and article I, section 1, of the California Constitution.

The Medical Board contends (a) "reasonable cause" need not be shown before compliance with the subpoena is required, (b) the patient-physician privilege does not apply in an investigation by the Medical Board, and (c) there is no constitutional objection to such a system.

The Medical Board concedes the patient-physician privilege, but contends Evidence Code section 1007 makes it inapplicable here; that section provides: "There is no privilege under this article in a proceeding brought by a public entity to determine whether a right, authority, license, or privilege (including the right or privilege to be employed by the public entity or to hold public office) should be revoked, suspended, terminated, limited or conditioned." The Medical Board contends this statutory exception "squarely" applies and authorizes the subpoena here. The Medical Board reasons as follows: Evidence Code section 901 defines a "proceeding" as "any action, hearing, investigation, inquest, or inquiry (whether conducted by a court, administrative agency, hearing officer, arbitrator, legislative body, or any other person authorized by law) in which, pursuant to law, testimony can be compelled to be given"; an investigation under Government Code section 11180 is a proceeding within the meaning of Evidence Code section 901, since testimony can be compelled pursuant to Government Code section 11181, subdivision (e); and concludes the doctor-patient privilege does not apply in an investigative proceeding conducted under Government Code section 11180 when the purpose of the investigation is to determine if a right, authority, license, or privilege should be revoked, suspended, terminated, limited, or conditioned. (59 Ops.Cal.Atty.Gen. 186, 194-195 (1976).)

The Medical Board further asserts that in order to compel testimony and production of documents pursuant to an administrative investigative subpoena, all that need be shown is that an investigation is under way. Brovelli v. Superior Court, 56 Cal. 2d 524, 529 [15 Cal.Rptr. 630, 364 P.2d 462] cited in support of this proposition, declares: "There is no **[93 Cal. App. 3d 675]** constitutional objection to a system under which the heads of departments of government may compel the production of evidence for

purposes of investigation, without instituting formal proceedings against the one from whom the evidence is sought or filing any charges against him. As has been said by the United States Supreme Court, the power to make administrative inquiry is not derived from a judicial function but is more analogous to the power of a grand jury, which does not depend on a case or controversy in order to get evidence but can investigate 'merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.' [Citation.] Of course, department heads cannot compel the production of evidence in disregard of the privilege against self-incrimination or the constitutional provisions prohibiting unreasonable searches and seizures. ... Insofar as the prohibition against unreasonable searches and seizures can be said to apply at all it requires only that the inquiry be one which the agency demanding production is authorized to make, that the demand be not too indefinite, and that the information sought be reasonably relevant. [Citations.]" (Italics added.) (See also Shively v. Stewart, 65 Cal. 2d 475, 479 [55 Cal.Rptr. 217, 421 P.2d 65, 28 A.L.R.3d 108] People v. West Coast Shows, Inc., 10 Cal. App. 3d 462, 470 [89 Cal.Rptr. 290] Fielder v. Berkeley Properties Co., 23 Cal. App. 3d 30, 40 [99 Cal.Rptr. 791].)

Discussion

The right of the Medical Board to investigate, to reasonably regulate the licensee-doctor is not in dispute, but here the rights of the patient are under scrutiny. Therefore, we confront a threshold question of the right of Mt. Helix to assert the statutory privilege or constitutional rights to privacy on behalf of the patient who, insofar as the record reflects, has not been notified of the Medical Board's desire to look at the data or consented to such an examination by the investigators. [1] Mt. Helix, a third party recipient of privileged matter, has standing to claim the privilege on behalf of the absent nonconsenting patient (Rudnick v. Superior Court, 11 Cal. 3d 924, 933, fn. 12 [114 Cal.Rptr. 603, 523 P.2d 643]) fn. 3 and under the "vicarious exclusionary rule" to object to the admission of evidence obtained in violation of another's constitutional rights (Kaplan v. Superior Court, 6 Cal. 3d 150, 155-157 [98 Cal.Rptr. 649, 491 P.2d 1]). **[93 Cal. App. 3d 676]**

Since the Brovelli decision, the United States Supreme Court in Katz v. United States, 389 U.S. 347, 350-352 [19 L.Ed.2d 576, 581-583, 88 S.Ct. 507] added a new dimension to search and seizure law. The individual is protected under the Fourth Amendment to the federal Constitution from governmental intrusion where (1) he has exhibited a reasonable expectation of privacy, and (2) that expectation had been

violated by an unreasonable government intrusion. The Katz concepts parallel similar reasoning with roots in the California Constitution (art. I, §  13) prohibiting unreasonable searches and seizures. While the Katz rule grows from a criminal setting, these parallel constitutional provisions protect the individual in as yet unmeasured, unexplored noncriminal fact settings where the individual has a reasonable expectation of privacy from state intrusion. (See Burrows v. Superior Court, 13 Cal. 3d 238 [118 Cal.Rptr. 166, 529 P.2d 590] White v. Davis, 13 Cal. 3d 757, 774 [120 Cal.Rptr. 94, 533 P.2d 222] People v. Krivda, 5 Cal. 3d 357, 364-365 [96 Cal.Rptr. 62, 486 P.2d 1262] People v. Doyle, 77 Cal. App. 3d 126, 128 [141 Cal.Rptr. 639].)

The Brovelli decision also was written before Griswold v. Connecticut, 381 U.S. 479, 484 [14 L.Ed.2d 510, 514-515, 85 S.Ct. 1678] where the United States Supreme Court declared: "[Specific] guarantees in the Bill of Rights have penumbras formed by emanations from those guarantees that help give them life and substance. [Citation.] Various guarantees create zones of privacy."

The breadth of the concept of privacy enunciated by Griswold v. Connecticut has been upheld in a multitude of fact contexts (White v. Davis, 13 Cal. 3d 757, 774, fn. 10 [120 Cal.Rptr. 94, 533 P.2d 222]) but as yet remain a concept of as yet "undetermined parameters" albeit in process of almost daily growth. (See Tavernetti v. Superior Court, 22 Cal. 3d 187, 194-195 [148 Cal.Rptr. 883, 583 P.2d 737] Burrows v. Superior Court, 13 Cal. 3d 238, 247, 248 [118 Cal.Rptr. 166, 529 P.2d 590].)

Further, the Brovelli rule must be examined in light of article I, section 1, of the California Constitution wherein the people of this state mandate express constitutional protection to the individual's right of privacy. Article I, section 1 (as reworded by constitutional amendment in Nov. 1974) now reads: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." **[93 Cal. App. 3d 677]**

[2] This constitutional amendment reflects "the public policy favoring the protection of privacy rights" and "[this] forceful expression of the constitutional stature of privacy rights reflects a concern previously evinced by the Legislature in enacting the invasion of privacy provisions of the Penal Code. The Legislature expressly declared its intent 'to protect the right of privacy of the people of this state.' (Pen. Code, §  630.)" (Tavernetti v. Superior Court, supra, 22 Cal. 3d 187, 194.)

This constitutional amendment did more than declare an already existing right. "The elevation of the right to be free from invasions of privacy to constitutional stature was apparently intended to be an expansion of the privacy right. The election brochure argument states: 'The right to privacy is much more than "unnecessary wordage." It is fundamental to any free society. Privacy is not now guaranteed by our State Constitution. This simple amendment will extend various court decisions on privacy to insure protection of our basic rights.' (Cal.Ballot Pamp. (1972) p. 28.) (Italics added.)" (Porten v. University of San Francisco, 64 Cal. App. 3d 825, 829 [134 Cal.Rptr. 839] fn. omitted.) The Supreme Court, in White v. Davis, supra, 13 Cal. 3d 757, articulated four purposes of the 1972 amendment in light of the statement contained in the election brochure (drafted by the proponents) stating: "First, the statement identifies the principal 'mischiefs' at which the amendment is directed: (1) 'government snooping' and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records." The Supreme Court then observed: "[T]he statement makes clear that the amendment does not purport to prohibit all incursion into individual privacy but rather that any such intervention must be justified by a compelling interest. ... the statement indicates that the amendment is intended to be self-executing, i.e., that the constitutional provision, in itself, 'creates a legal and enforceable right of privacy for every Californian.'" (Id, at p. 775.) And in People v. Privitera, 23 Cal. 3d 697, 709 [153 Cal.Rptr. 431, 591 P.2d 919] the Supreme Court discerned: "'[The] moving force behind the new constitutional provision was a more focussed privacy concern, relating to the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society. The new provision's primary purpose is to afford individuals some **[93 Cal. App. 3d 678]** measure of protection against this most modern threat to personal privacy.'" (Italics added.)

In short the amendment was a voter response to a public awareness and concern that "''proliferation of government snooping and data collecting is threatening to destroy our traditional freedoms. Government agencies seem to be competing to compile the most extensive sets of dossiers of American citizens. Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American.'''" (People v. Privitera, supra at p. 709.)

The data here sought to be obtained would allow the administrative agency to create literally "a cradle-to-grave profile on every [Californian]" without his knowledge, without his consent. Furthermore, fundamental to the privacy of medical information "is the ability to control [its] circulation!!!!" While the statute requires the governmental agency recipient to keep the matters disclosed confidential, a discerned objective of the constitutional amendment is to keep these areas of privacy specifically away from the eyes and ears of governmental agents -- to forestall "governmental snooping."

To determine whether the amendment created a right of privacy intended to protect the medical records here in dispute, we must examine into the nature of the information sought. A person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature than many areas already judicially recognized and protected. (See Burrows v. Superior Court supra, 13 Cal. 3d 238; Valley Bank of Nevada v. Superior Court, 15 Cal. 3d 652 [125 Cal.Rptr. 553, 542 P.2d 977] White v. Davis, supra, 13 Cal. 3d 757; Carlson v. Superior Court, 58 Cal. App. 3d 13 [129 Cal.Rptr. 650] Porten v. University of San Francisco, supra, 64 Cal. App. 3d 825; Rudnick v. Superior Court, 11 Cal. 3d 924, 932-933 [114 Cal.Rptr. 603, 523 P.2d 643] Britt v. Superior Court, 20 Cal. 3d 844 [143 Cal.Rptr. 695, 574 P.2d 766] Tavernetti v. Superior Court, supra, 22 Cal. 3d 187; In re Lifschutz, 2 Cal. 3d 415, 431-433 [85 Cal.Rptr. 829, 467 P.2d 577, 44 A.L.R.3d 1] Camara v. Municipal Court, 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727, 1734] City of Carmel-by-the-Sea v. Young, 2 Cal. 3d 259 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313] Stanley v. Georgia, 394 U.S. 557, 564 [22 L.Ed.2d 542, 549, 89 S.Ct. 1243].)

[3] The patient-physician privilege (Evid. Code, §§ 990-1007) creates a zone of privacy whose purposes are (1) "to preclude humiliation of the patient that might follow disclosure of his ailments" City & County of **[93 Cal. App. 3d 679]** S.F. v. Superior Court, 37 Cal. 2d 227, 232 [231 P.2d 26, 25 A.L.R.3d 1418] Marcus v. Superior Court, 18 Cal. App. 3d 22, 24 [95 Cal.Rptr. 545, 74 A.L.R.3d 1051]) and (2) to encourage the patient's full disclosure to the physician of all information necessary for effective diagnosis and treatment of the patient (In re Flint, 100 Cal. 391, 396-397 [34 P. 863] Green v. Superior Court, 220 Cal. App. 2d 121, 125 [33 Cal.Rptr. 604]).

The patient should be able to rest assured with the knowledge that "the law recognizes the communication as confidential and guards against the possibility of his feelings being shocked or his reputation tarnished by their subsequent disclosure." (In re Flint, supra, at p. 397.) The matters disclosed to the physician arise in most sensitive areas

often difficult to reveal even to the doctor. Their unauthorized disclosure can provoke more than just simple humiliation in a fragile personality. The reasonable expectation that such personal matters will remain with the physician are no less in a patient-physician relationship than between the patient and psychotherapist. [4] The individual's right to privacy encompasses not only the state of his mind, but also his viscera, detailed complaints of physical ills, and their emotional overtones. The state of a person's gastro-intestinal tract is as much entitled to privacy from unauthorized public or bureaucratic snooping as is that person's bank account, the contents of his library or his membership in the NAACP. We conclude the specie of privacy here sought to be invaded falls squarely within the protected ambit, the expressed objectives of article I, section 1. [5] While the amendment does not prohibit all incursions into individual privacy, "any such intervention must be justified by a compelling interest" (White v. Davis, supra, 13 Cal. 3d 757, 775) and any statute authorizing invasion of such area of privacy must be subject to strict scrutiny.

Conclusion

[6] We start with these premises: an individual's right to privacy is not an absolute right; it may be outweighed by supervening public concerns; the State of California has a most legitimate interest in the quality of health and medical care received by its citizens; and an individual's medical records may be relevant and material in the furtherance of this legitimate state purpose; therefore, under some circumstances disclosure may permissably be compelled.

But a governmental administrative agency is not in a special or privileged category, exempt from the right of privacy requirements which **[93 Cal. App. 3d 680]** must be met and honored generally by law enforcement officials. To so hold is to ignore the federal and state constitutional commands as well as the numerous and persuasive judicial decisions in analogous areas. Moreover, such a premise focuses our attention only on the unquestioned right of the Medical Board to investigate the doctor; it ignores the patient's constitutional and statutory rights to be left alone.

[7] The constitutional provisions here reviewed do not prohibit all incursions into the individual zone of privacy but rather require that any such intervention be justified by a compelling state interest. The resolution of these insistent issues involves a balancing of the respective interests and if state scrutiny is to be allowed, it must be by the least intrusive manner.

[8] Such "purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (Shelton v. Tucker, 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247].)

While it may be reasonably argued that prior to the 1974 amendment to article I, section 1, an administrative body was not required to make a showing of reasonable cause "before an investigatory subpoena issued," federal constitutional growth as well as the California constitutional amendment limited, circumscribed any such broad authority.

The argument that a privileged area -- an area of reasonably expected privacy -- can be subjected to government scrutiny just because the government wants assurance the law is not violated or a doctor is not negligent in treatment of his patient must give way before the articulated purposes of article I, section 1. Although the amendment is new and its scope as yet neither carefully defined nor analyzed by the courts, "we may safely assume that the right of privacy extends to one's confidential financial affairs as well as to the details of one's personal life." (Valley Bank of Nevada v. Superior Court, supra, 15 Cal. 3d 652, 656; italics added.)

To require the Medical Board, before invading the patient's medical records, to show (1) waiver or (2) "good cause" would be merely to require the administrative agency to conform to the standards to which law enforcement officials, respondents in administrative investigations, and civil litigants are held. (Shively v. Stewart, supra, 65 Cal. 2d 475, 482; Britt v. Superior Court, supra, 20 Cal. 3d 844, 855, 856.) **[93 Cal. App. 3d 681]**

Within the Brovelli opinion itself we find seeds of a similar due process requirement. In fact the Brovelli court foreshadowed the evolving constitutional standards reviewed here in declaring: "Of course department heads cannot compel the protection of evidence in disregard of the privilege against self-incrimination or the constitutional provisions prohibiting unreasonable searches and seizures." (Brovelli v. Superior Court, 56 Cal. 2d 524, 529 [15 Cal.Rptr. 630, 364 P.2d 462].) Brovelli further compared the administrative inquiry to the grand jury function which does not depend upon case or controversy in order to get evidence but can investigate "'merely on suspicion that the law is being broken or even just because it wants assurances it is not.'" (Ibid.) We do not question the right of a grand jury to so investigate within its lawful sphere, yet it cannot invade the individual's zone of financial privacy except on a showing of due diligence in an attempt at service upon the individual (Gov. Code, §§ 7476, subd.

(a)(1)); and upon a "written showing" of the equivalent of probable or good cause made to the superior court judge (Gov. Code, § 7476, subd. (b)(1)).

The "good cause," or "probable cause" concept involves no entombed legal formalisms. Rather "it calls for a factual exposition of a reasonable ground for the sought order." (Waters v. Superior Court, 58 Cal. 2d 885, 893 [27 Cal.Rptr. 153, 377 P.2d 265].) "Good cause" which must be shown "should be such that will satisfy an impartial tribunal that the request may be granted without abuse of the inherent right of an adversary." (Greyhound Corp. v. Superior Court, 56 Cal. 2d 355, 388 [15 Cal.Rptr. 90, 364 P.2d 266].)To this principle we add: without abuse of a third party's constitutionally protected right of privacy.

The declaration here sets forth no facts, no showing of relevance or materiality of the medical records of these five specified patients to the general charge of gross negligence and/or incompetence of the licensee-doctor. The state agency cannot, merely by making reference to a broad investigation enabling statute, avoid due process restraints. Beyond the showing of relevance, materiality to the investigation, it is encumbent on the Medical Board to show that the patient's constitutional rights are not infringed. If disclosure is to be compelled after the requisite balancing of the juxtaposed rights, and the finding of a compelling state interest, then it should be accomplished only by an order drawn with narrow specificity.

By interposition of such minimal due process requirements the mandate of Katz v. United States, supra, 389 U.S. 347; Griswold v. **[93 Cal. App. 3d 682]** Connecticut, supra, 381 U.S. 479, and article I, section 1, of the California Constitution will be fulfilled and Evidence Code section 1007 held constitutional. Only by such procedure may the requisite balancing of the private and the state interest be effected.

Order is reversed and remanded for proceedings not inconsistent with the views here expressed.

Weiner, J., and Ehrenfreund, J., concurred.

FN 1. The Board of Medical Quality Assurance is a state agency within the Department of Consumer Affairs, State of California (Bus. & Prof. Code, § 2100). It is composed of three divisions: the Division of Medical Quality, the Division of Licensing, and the Division of Allied Health Professions (Bus. & Prof. Code, § 2100.5). The Division of Medical Quality is responsible for "(a) reviewing the quality of medical practice carried out by physician and surgeon certificate holders under the jurisdiction of the board; (b)

the administration and hearing of disciplinary actions; (c) carrying out disciplinary action appropriate to findings made by a medical quality review committee, a hearing officer, or the division." (Bus. & Prof. Code, § 2100.6.)

FN 2. The statutes governing investigational subpoenas are set forth in Government Code sections 11180 to 11191. Section 11180 provides: "The head of each department may make investigations and prosecute actions concerning: (a) All matters relating to the business activities and subjects under the jurisdiction of the department. (b) Violations of any law or rule or order of the department. (c) Such other matters as may be provided by law." And Government Code section 11181 provides in part: "In connection with these investigations and actions he may: (a) Inspect books and records. ... (e) Issue subpoenas for the attendance of witnesses and the production of papers, books, accounts, documents and testimony in any inquiry, investigation, hearing or proceeding pertinent or material thereto. ..." Government Code section 11183 makes confidential all information acquired by a state officer pursuant to such subpoena.

FN 3. (See note, Protecting the Privacy of the Absent Patient: Rudnick v. Superior Court (1975) 27 Hastings L.J. 99-104; see also Cooper, The Physician's Dilemma: Protection of the Patient's Right to Privacy (1978) 22 St. Louis U. L.J. 397.)

4

# John B. v. Superior Court (Bridget B.) (2006)38 Cal.4th 1177 , 45 Cal.Rptr.3d 316; 137 P.3d 153

[No. S128248. July 3, 2006.]

JOHN B., v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; BRIDGET B., Real Party in Interest.

(Superior Court of Los Angeles County, No. BC271134, Lawrence W. Crispo, Judge.)

(The Court of Appeal, Second Dist., Div. Eight, No. B169563, 121 Cal.App.4th 1000.)

(Opinion by Baxter, J., with George, C.J., Chin, J., and Corrigan, J., concurring. Concurring and dissenting opinion by Kennard, J. (see p. 1203). Dissenting opinion by Werdegar, J. (see p. 1210). Dissenting opinion by Moreno, J. (see p. 1212).)

## COUNSEL

Garrard & Davis, Donald A. Garrard; and Eric S. Multhaup for Petitioner.

No appearance for Respondent.

Garassini & Wrinkle, Maryann P. Gallagher and Roland Wrinkle for Real Party in Interest. **[38 Cal.4th 1181]**

## OPINION

**BAXTER, J.-**

This is a sad case. Bridget B., the plaintiff in the underlying action and real party in interest herein, is infected with the human immunodeficiency virus (HIV), the probable causative agent of acquired immune deficiency syndrome (AIDS). So is her husband, petitioner herein and defendant in the underlying action, John B.

Bridget alleges that John became infected with HIV first, as a result of engaging in unprotected sex with multiple men before and during their marriage, and that he then knowingly or negligently transmitted the virus to her. John, who now has full-blown AIDS, alleges in his answer that Bridget infected *him* and offers as proof a negative HIV test conducted in connection with his application for life insurance on August 17, 2000, six weeks before Bridget discovered she was infected with HIV.

This factual scenario raises a number of interesting questions: What duty does an HIV-positive individual have to avoid transmitting the virus? What level of awareness should be required before a court imposes a duty of care on an HIV-positive individual to avoid transmission of the virus? What responsibility does the victim have to protect himself or herself against possible infection with the virus? And who infected whom with HIV here? However, this case comes to us at an early stage, before any discovery has been conducted. The issue here is simply the extent to which Bridget may inquire into John's medical records and sexual conduct in order to confirm or refute her allegations that John knowingly or negligently infected her with HIV.

The proposed discovery treads on important statutory and constitutional privacy rights. To decide what discovery should be permitted, we must **[38 Cal.4th 1182]** balance Bridget's right to discover relevant

evidence against John's right to privacy. After balancing these interests, the superior court overruled John's objections and authorized broad discovery into John's medical records as well as his sexual history over the past 10 years. The Court of Appeal granted John's petition for writ of mandate to the extent the discovery sought the identities of John's previous sexual partners and admissions concerning his "lifestyle," but otherwise denied relief.

[1] We conclude that discovery should be further limited in light of John's negative HIV test on August 17, 2000, which restricts the window period of possible infection to the six months preceding the negative test. However, Bridget, on remand, may overcome this temporal limitation on discovery by offering some basis to question the accuracy or reliability of John's negative HIV test. We therefore affirm in part and reverse in part the judgment of the Court of Appeal and remand the matter for further proceedings.

# I. THE PLEADINGS

Bridget's complaint for damages alleges the following:

Plaintiff Bridget B. and defendant John B. met in September 1998 and began dating shortly thereafter. The couple became engaged in late 1999 and were married in July 2000. During this period, John represented to Bridget that he was healthy, disease-free, and monogamous. Indeed, it was John who insisted that the couple stop using condoms during intercourse. Based on John's representations, Bridget complied with his demand to engage in unprotected sex. In September 2000, however, Bridget began to suffer from exhaustion and high fevers.

On October 1, 2000, Bridget learned that she had tested positive for HIV. She was advised to undergo a second test and to have her husband tested as well. The second test confirmed that Bridget was HIV positive. John, too, was determined to be HIV positive. John's doctor told Bridget that she had "brought the HIV into the marriage." The doctor prescribed medications for John that made his viral load virtually undetectable. Bridget, on the other hand, was not offered treatment; she was informed that she had "had the illness for a long time." Bridget became depressed that she had infected her husband with this deadly disease.

In September 2001, John began telling others that Bridget had infected him with HIV. The next month, after defendant refused to continue his treatment, he became much sicker and developed sores on his face and scalp. Although he was diagnosed with AIDS, he refused all treatments and medications except those that treated the visible signs of the disease. **[38 Cal.4th 1183]**

In November 2001, Bridget began to doubt that she had been the cause of defendant's infection. John responded by asking whether she was "accusing" him of bringing HIV into their lives and advised "it would not be healthy for their marriage to blame him." The following month, however, John admitted to Bridget that he had had sexual relations with men before their marriage. The complaint further alleges that John also engaged in sexual relations with men during their marriage and used the Internet to solicit these relationships.

The first cause of action (intentional infliction of emotional distress) alleges in material part that John knew he was HIV positive before he married Bridget and before he engaged in unprotected sexual relations with her, that he infected her with HIV knowingly and intentionally, and that he then falsely accused her of infecting him. It further alleges that Bridget was unaware that John had been unfaithful prior to and during their marriage, which put her at great risk for HIV, AIDS, syphilis, and other sexually transmitted diseases, and that she would not have engaged in unprotected sexual relations with him had she known of his infidelity.

The second cause of action (negligent infliction of emotional distress) alleges that John knew or had a reasonable belief that he had HIV, that he nonetheless engaged in unprotected sex with Bridget, and that his negligence caused her to become infected with HIV.

The third cause of action (fraud) alleges that John falsely represented that he did not have any communicable diseases, including HIV, AIDS, or syphilis; that Bridget engaged in unprotected sexual relations with John in reliance on those representations; and that John thereby infected her with HIV.

The fourth cause of action (negligence) incorporates the foregoing allegations and alleges that John owed Bridget a duty of care to disclose the fact that he was HIV positive, that he breached this duty, and that he thereby infected her with HIV.

John's answer denied every allegation in the complaint and alleged instead that "[i]f either party transmitted the HIV virus to the other, it was Plaintiff who transmitted the virus to the Defendant." The answer also asserted Bridget's comparative fault as a defense in that she had "intimate sexual relations with Defendant without using condoms or any other form of protection against the HIV virus or other sexually transmitted diseases." In a declaration attached to his motion for summary judgment, John stated that he had been tested for HIV in connection with a life insurance application on August 17, 2000, and was found to be negative. John further alleged that he did not discover he was HIV positive until October 13, 2000. **[38 Cal.4th 1184]**

## II. DISCOVERY PROCEEDINGS

As relevant here, Bridget's pretrial discovery included the service of special interrogatories and requests for admission concerning John's sexual history and his awareness of his HIV infection. Bridget also subpoenaed John's medical and employment records. John objected to each and every special interrogatory and request for admission and also filed motions to quash the subpoenas duces tecum. After plaintiff filed motions to compel responses to the interrogatories and requests for admission, the parties stipulated to the appointment of a discovery referee to hear the pending discovery motions and to make nonbinding recommendations. The referee recommended that John's objections be overruled and his motions to quash be denied. The superior court adopted the referee's recommendations.

John filed the instant petition for writ of mandate. The Court of Appeal issued an order to show cause and granted the petition as to four interrogatories and two requests for admission, but otherwise denied relief in a published opinion. Because the issue before us concerns the permissible scope of discovery propounded by Bridget, we describe with particularity the discovery requests in controversy and John's objections to them below.

A. *The Special Interrogatories*

Bridget served special interrogatories that required John to state (1) the name, address, and telephone number of every man with whom he has had sexual relations in the last 10 years; (2) the date of his first sexual encounter with a man; (3) the date of his last sexual encounter with a man; (4) the name, address, and telephone number of every man with whom he has had unprotected sex in the last 10 years; (5) the date on which he first became aware he was HIV positive; (6) the date on which he first became aware he had AIDS; (7) the date on which he first told Bridget that he had engaged in unprotected sex with men; (8) the name, address, and telephone number of every HIV-positive man with whom he has had unprotected sex; (9) the name, address, and telephone number of every man who has AIDS and with whom he has had unprotected sex; (10) the number of sexual encounters with men he has had in the five years prior to his relationship with Bridget; (11) the date of his last sexual encounter with a man prior to the date of his engagement to Bridget; (12) the date of every sexual encounter he had with a man between his engagement to Bridget and the wedding; and (13) the number of sexual encounters he has had with men since he first met Bridget.

John objected to each of these interrogatories as burdensome, oppressive, overly broad, and harassing, and claimed that they were an invasion of his right to privacy under the state and federal Constitutions. He also objected to **[38 Cal.4th 1185]** selected interrogatories as violative of the physician-patient privilege (Evid. Code, § 990 et seq.) and Health and Safety Code section 120975. In his responses, John disclosed only that he first discovered he had tested positive for HIV on October 13, 2000.

The Court of Appeal granted John's petition for writ of mandate as to interrogatories Nos. 1, 4, 8, and 9, which sought the identities of his previous sexual partners, and denied relief as to the rest. Bridget had asserted a need to discover the identities of these sexual partners on the ground that John might have told these persons he had HIV but, as the Court of Appeal observed, she offered "nothing to support the suggestion that John may have disclosed his condition at an undisclosed time to an undisclosed person."

## B. *The Requests for Admission*

Bridget requested John to admit that (1) he had had unprotected sexual relationships with multiple men in the 10 years prior to meeting Bridget; (2) he never told Bridget before they were married that he had had any sexual relationships with men; (3) he had AIDS prior to the time he first had unprotected sex with Bridget; (4) he knew he had AIDS prior to the time he first had unprotected sex with Bridget; (5) he transmitted AIDS to Bridget; (6) he transmitted HIV to Bridget; (7) he never told Bridget, prior to the time he had unprotected sex with her, that he had had unprotected sexual encounters with men; (8) he knew that his lifestyle prior to the time that he met Bridget put him at risk of acquiring HIV; (9) he never told Bridget, prior to having unprotected sex with her, about his lifestyle of having unprotected sex with men; (10) he continued to have unprotected sexual relationships with men after he was married; (11) prior to his marriage, he hid his sexual relations with men from Bridget; (12) he knew he had a history of having unprotected sexual relations with men that put him at risk of acquiring HIV at the time he accused Bridget of infecting him with HIV; (13) he has AIDS; (14) he knew he had AIDS before he married Bridget; and (15) he hid his sexual relations with men from Bridget before the wedding.

John objected to each of these requests as burdensome, oppressive, overly broad, and harassing, and claimed that they were an invasion of his right to privacy under the state and federal Constitutions. He also objected to selected requests as violative of Health and Safety Code section 120975.

The Court of Appeal granted John's petition for writ of mandate as to requests Nos. 8 and 9, which referred to his "lifestyle," but denied relief as to the rest. The Court of Appeal determined that the word "lifestyle" was vague and ambiguous and, to the extent it suggested a sexual orientation, impermissibly intruded into John's zone of sexual privacy. **[38 Cal.4th 1186]**

## C. *The Subpoenas of Medical and Employment Records and the Results of HIV Tests*

Bridget subpoenaed John's medical records, seeking the results of any HIV and AIDS tests, medical records concerning HIV and AIDS and treatment for those conditions, medical records concerning any and all sexually transmitted diseases since 1980, and medical records concerning any "treatment" he had received since 1980. Bridget also subpoenaed John's employment records from Universal Studios, including records "regarding his medical leave and the reasons therefor" and "any disability he was suffering from."

John filed a motion to quash the subpoenas on the grounds that the subpoenas were not supported by affidavits or declarations as required by Code of Civil Procedure section 1985, subdivision (b) or by good cause; that the records were privileged from discovery under the right to privacy in the state and federal Constitutions; that the records were additionally privileged from discovery under Health and Safety Code section 120975 and Evidence Code sections 994 and 1014; and that the subpoenas constituted harassment.

The referee recommended the motions to quash be denied but limited the discoverable medical records relating to treatment since 1980 to "those regarding treatment received 'for AIDS or HIV infection.' " The superior court adopted the referee's recommendation, and the Court of Appeal denied relief as to this part of the order.

# III. DISCUSSION

[2] John asserts a number of reasons for limiting discovery of his sexual history and HIV status, including his constitutional right to privacy, but we first determine whether the requested discovery comports with statutory requirements. (See *Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 711; *Vinson v. Superior Court* (1987) 43 Cal.3d 833, 838.) " 'Under the discovery statutes, information is discoverable if it is unprivileged and is either relevant to the subject matter of the action or reasonably calculated to reveal admissible evidence.' " (*Schnabel, supra,* 5 Cal.4th at p. 711.) "Discovery may relate to the claim or defense of the party seeking discovery or of any other party to the action." (Code Civ. Proc., § 2017.010.) "In reviewing an order of a superior court granting discovery, we recognize at the threshold that 'the discovery statutes vest a wide discretion in the trial court in granting or denying discovery' and 'such exercise [of discretion] may only be disturbed when it can be said that there has been an abuse of discretion.' " (*Pacific Tel. & Tel. Co. v. Superior Court* (1970) 2 Cal.3d 161, 171.) **[38 Cal.4th 1187]**

The subject matter of this action concerns Bridget's allegation that John infected her with HIV. The gist of the four causes of action--intentional infliction of emotional distress, negligent infliction of emotional distress, fraud, and negligence--is that John represented to Bridget that he was monogamous and had no sexually transmitted diseases; that John made these representations to convince Bridget to engage in unprotected sex with him; that, contrary to these representations, John had not been monogamous and had knowledge, actual or constructive, that he was HIV positive; that John nonetheless had unprotected sex with Bridget without telling her that he was HIV positive; and that Bridget was unaware that John was HIV positive and had not been monogamous. In his defense, John denies infecting Bridget and asserts that if either party infected the other, Bridget infected *him.*

In light of these allegations, the special interrogatories and requests for admission at issue are within the statutory limits of discoverability. Bridget seeks to discover whether John has AIDS (request for admission No. 13); whether he infected her with HIV and AIDS (request for admission Nos. 5, 6); when John first became aware that he was HIV positive (special interrogatory No. 5); and when he first discovered that he had developed AIDS (special interrogatory No. 6; request for admission Nos. 3, 4, 14). For her claims concerning infliction of emotional distress, Bridget asked John to admit that he knew his sexual behavior had put him at risk of contracting HIV at the time he accused her of infecting him. (Request for admission No. 12.) To help establish that she had been justifiably ignorant of John's HIV status, Bridget propounded discovery designed to show that John did not tell her he had previously engaged in unprotected sex with men. (Special interrogatory No. 7; request for admission Nos. 2, 7, 11, 15.) Finally, Bridget sought to establish that John had infected her (and not the other way around) by asking John to admit that he had engaged in unprotected sex with men prior to meeting her and during their courtship, engagement, and marriage and by inquiring into the dates and numbers of these encounters. (Special interrogatory Nos. 2, 3, 10-13; request for admission Nos. 1, 10.)

Having determined that the discovery requests meet the statutory standard of discoverability, we proceed to consider John's specific objections.

*A. Whether Discovery Must Be Limited Because the Torts in the Complaint Require Proof That the Infected Individual Had Actual Knowledge of the Infection*

John does not deny he would be liable if he had actual knowledge he was infected with HIV and failed to disclose that fact to Bridget. However, he vigorously denies that he can be held liable if the evidence shows only that **[38 Cal.4th 1188]** he had *constructive* knowledge he was infected with HIV. He concludes, therefore, that discovery should be limited to those requests aimed at uncovering whether he had actual knowledge that he was infected with HIV. According to John, such knowledge can be established only by a positive HIV test from an accredited laboratory or a medical diagnosis of HIV or AIDS.

[3] John's proposed limitation on discovery calls into question the scope of the torts alleged in the complaint, principally the fourth cause of action for negligent transmission of HIV. This court has not yet had occasion to consider the tort of negligent transmission of a sexually transmitted disease, but the tort is far from novel. Our sister jurisdictions have long imposed liability on individuals who have harmed others by transmitting communicable diseases. (See, e.g., *Berner v. Caldwell* (Ala. 1989) 543 So.2d 686,

688 ["For over a century, liability has been imposed on individuals who have transmitted communicable diseases that have harmed others"]; *Crowell v. Crowell* (N.C. 1920) 105 S.E. 206, 208 ["it is a well-settled proposition of law that a person is liable if he negligently exposes another to a contagious or infectious disease"]; see generally 39 Am.Jur.2d (1999) Health, § 99, p. 549 ["The general principle is established that a person who negligently exposes another to an infectious or contagious disease, which such other thereby contracts, is liable in damages"].) In particular, courts throughout the United States have recognized a cause of action for the negligent transmission of sexually transmitted diseases. (E.g., *McPherson v. McPherson* (Me. 1998) 712 A.2d 1043, 1045 [citing cases]; *Hamblen v. Davidson* (Tenn.Ct.App. 2000) 50 S.W.3d 433, 438 ["all the jurisdictions which have considered the issue"]; *Doe v. Johnson* (W.D.Mich. 1993) 817 F.Supp. 1382, 1389 [citing cases].) California appellate courts are in accord. (*Doe v. Roe* (1990) 218 Cal.App.3d 1538, 1543 & fn. 3; *Kathleen K. v. Robert B.* (1984) 150 Cal.App.3d 992, 996-997.) We agree with these courts that "[t]o be *stricken with disease* through another's negligence is in legal contemplation as it often is in the seriousness of consequences, no different from *being struck with an automobile* through another's negligence." (*Billo v. Allegheny Steel Co.* (Pa. 1937) 195 A. 110, 114.)

[4] To prevail in an action for negligence, the plaintiff must demonstrate that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach proximately caused the plaintiff's injuries. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1145.)

[5] The existence of a legal duty is a question of law for the court. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 237.) **[38 Cal.4th 1189]** "As this court has explained, 'duty' is not an immutable fact of nature ' "but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' [Citations.] In California, the general rule is that all persons have a duty ' "to use ordinary care to prevent others being injured as the result of their conduct. . ." ' (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561] (citations omitted); Civ. Code, § 1714)." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572-573, fn. 6.) Foreseeability of harm is a " 'crucial factor' " in determining the existence and scope of that duty. (*Delgado, supra*, 36 Cal.4th at p. 237.)

John concedes that a person who actually knows he or she is infected with a sexually transmitted disease based on a test from an accredited laboratory or a medical diagnosis has a duty to use ordinary care to see that the disease is not transmitted to others. The foreseeability of harm in such a circumstance is manifest. John also concedes the viability of the tort of negligent transmission of HIV. In his view, though, a duty under this tort exists only when the actor has actual knowledge of being HIV positive; constructive knowledge of the infection is insufficient.

Tellingly, neither John nor our dissenting colleagues have identified a single jurisdiction that has limited liability for negligent transmission of HIV or other sexually transmitted diseases only to those who have actual knowledge they are infected. Our sister states instead impose liability when the actor has knowledge, actual *or* constructive, of a sexually transmitted disease. (*Berner v. Caldwell, supra*, 543 So.2d at pp. 689-690 & fn. 4 [applying this standard to the transmission of herpes and noting that the same duty could be imposed for other sexually transmitted diseases, including AIDS]; *Meany v. Meany* (La. 1994) 639 So.2d 229, 236; *McPherson v. McPherson, supra*, 712 A.2d at p. 1046; *Deuschle v. Jobe* (Mo.Ct.App. 2000) 30 S.W.3d 215, 219; *M.M.D. v. B.L.G.* (Minn.Ct.App. 1991) 467 N.W.2d 645, 647 [liability for negligent transmission of herpes exists where boyfriend had history of genital sores but had not been diagnosed with herpes]; *Mussivand v. David* (Ohio 1989) 544 N.E.2d 265, 270 ["We find the reasoning of these other jurisdictions persuasive"]; *Plaza v. Estate of Wisser* (App.Div. 1995) 626 N.Y.S.2d 446, 451-452 [allegations of decedent's actual and constructive knowledge he was infected with HIV was sufficient to withstand motion to dismiss claims of fraud and negligence]; *Hamblen v. Davidson, supra*, 50 S.W.3d at p. 439 [noting that "the majority of states who have addressed the issue" extend liability to those with actual or constructive knowledge of a sexually transmitted disease]; *Doe v. Johnson, supra*, 817 F.Supp. at p. 1391 [liability for negligent transmission of HIV includes those who "knew s/he was suffering symptoms associated with the HIV virus . . . or . . . knew of a prior sex partner who was diagnosed as having the HIV virus"]; accord, 65 C.J.S. (2000) Negligence, § 171, p. 503.) **[38 Cal.4th 1190]**

[6] Extending liability to those who have constructive knowledge of the disease, as these jurisdictions have done, comports with general principles of negligence. Indeed, the "very concept of negligence presupposes that the actor either does foresee an unreasonable risk of injury, or could have foreseen it if he conducted himself as a reasonably prudent person." (3 Harper et al., The Law of Torts (2d ed. 1986) § 16.5, p. 397; accord, Prosser & Keeton on Torts (5th ed. 1984) § 32, pp. 182-185; Rest.2d Torts, §§ 289, 290; Nolte, *The Spoliation Tort: An Approach to Underlying Principles* (1994) 26 St. Mary's L.J. 351, 380 ["negligence law regularly utilizes the concept of constructive knowledge as the requisite notice"].) Because " '[a]ll persons are required to use ordinary care to prevent others being injured as a result of their conduct' " (*Rowland v. Christian, supra,* "69 Cal.2d at p. 112), this court has repeatedly recognized a cause of action for negligence not only against those who have actual knowledge of unreasonable danger, but also against those who have constructive knowledge of it. (See, e.g., *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1210; *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253, 260, fn. 1; *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 823; *Garcia v. Superior Court* (1990) 50 Cal.3d 728, 735; *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 407.) Neither John nor our dissenting colleagues have pointed to any indication that the Legislature intended a lesser duty to apply to HIV.

Moreover, limiting tort defendants to those who have actual knowledge they are infected with HIV would have perverse effects on the spread of the virus. If only those who have been tested are subject to suit, there may be "an incentive for some persons to avoid diagnosis and treatment in order to avoid knowledge of their own infection." (Gostin & Hodge, *Piercing the Veil of Secrecy in HIV/AIDS and Other Sexually Transmitted Diseases: Theories of Privacy and Disclosure in Partner Notification* (1998) Duke J. Gender L. & Poly. 9, 40.) Extending liability to those with constructive knowledge of the disease, on the other hand, "will provide at least a small incentive to others to use proper diagnostic techniques and to alter behavior and procedures so as to limit the likelihood of HIV transmission." (Hermann, *Torts: Private Lawsuits about AIDS* in AIDS and the Law: A Guide for the Public (Dalton & Yale AIDS Law Project edits., 1987) p. 172 (Hermann).) Justice Moreno offers no support for his view that tort liability would have no effect on human behavior in this context.

It must be noted, though, that "constructive knowledge," which means knowledge "that one using reasonable care or diligence should have, and therefore is attributed by law to a given person" (Black's Law Dict. (7th ed. 1999) p. 876), encompasses a variety of mental states, ranging from one who **[38 Cal.4th 1191]** is deliberately indifferent in the face of an unjustifiably high risk of harm (see *Farmer v. Brennan* (1994) 511 U.S. 825, 836-840) to one who merely should know of a dangerous condition (see *Ortega v. Kmart Corp., supra,* 26 Cal.4th at pp. 1208-1209). At this early stage, when no facts have yet been developed, the issue is not which of these mental states is required for the tort of negligent transmission of HIV, but what is permissible discovery for a party seeking to prove such a tort. In determining whether the requested discovery satisfies statutory requirements, therefore, we should recognize a duty no broader than is necessary to resolve the current discovery dispute.

[7] In this case, we conclude that the tort of negligent transmission of HIV does not depend solely on actual knowledge of HIV infection and would extend at least to those situations where the actor, under the totality of the circumstances, has *reason to know* of the infection. Under the reason-to-know standard, "the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists." (Rest.2d Torts, § 12, subd. (1).) In other words, "the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist." (*Id.,* § 12, com. a., p. 20.) fn. 1

[8] Imposing liability for the transmission of HIV where the actor knows or has reason to know he or she is HIV positive is consistent with the general principle of California law that " '[a]ll persons are required to use ordinary care to prevent others being injured as the result of their conduct.' " (*Rowland v. Christian, supra,* "69 Cal.2d at p. 112.) "Although it is true that some exceptions have been made to the general principle that a person is liable for injuries caused by his failure to exercise reasonable care in the circumstances, it is clear that in the absence of a statutory provision declaring an exception to the

fundamental principle enunciated by section 1714 of the Civil Code, no such exception should be made unless clearly supported by public policy." (*Ibid.*; see also *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1077 (*Randi W.*).) **[38 Cal.4th 1192]** "Before judicially establishing an exception based on public policy, [we] consider a variety of factors; 'the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477.)

[9] An analysis of these factors does not justify a departure from the general rule in this instance. The factor that " 'plays a very significant role in this calculus' " (*Randi W., supra*, 14 Cal.4th at p. 1077) is the foreseeability of the particular harm, which (like the reason-to-know standard) is assessed by an objective test. (See *id.* at pp. 1077-1078.) When the actor has reason to know of the HIV infection--i.e., when there is sufficient information to cause a reasonably intelligent actor to infer he or she is infected with the virus or that infection is so highly probable that his or her conduct would be predicated on that assumption-- the potential for harm through sexual transmission of the virus is reasonably foreseeable. As to causation, Bridget has plausibly alleged that John infected her during unprotected sex. (See *id.* at p. 1078.) Whether John's conduct is morally blameworthy will depend on the evidence uncovered during discovery, but it is certainly arguable that failing to exercise due care to prevent the transmission of a gravely serious disease of which the actor knows or has reason to know falls in that category. (*Ibid.*)

Moreover, society has an overriding policy of preventing the spread of sexually transmitted diseases (see Health & Saf. Code, § 120290), especially HIV (see, e.g., Health & Saf. Code, § 120291), which would be enhanced by imposing a duty of care on those who have reason to know they are infected with HIV. The burden of a duty of care on defendants who know or have reason to know of their HIV infection is minimal, and the consequences for the community would be salutary. (Cf. Health & Saf. Code, § 121015, subd. (a) [permitting physicians and surgeons to disclose to "a person reasonably believed to be the spouse, or to a person reasonably believed to be a sexual partner or a person with whom the patient has shared the use of hypodermic needles, . . . that the patient has tested positive on a test to detect HIV infection, except that no physician and surgeon shall disclose any identifying information about the individual believed to be infected"].) Indeed, limiting liability only to those who have actual knowledge they are infected would discourage those who fear they may be infected from getting tested, which would be contrary to the public policy of encouraging testing for and preventing the spread of HIV and thwart the effectiveness of new treatments that depend on early diagnosis of the virus. **[38 Cal.4th 1193]**

In sum, none of the factors above justifies a departure from the general negligence rule imposing a duty on those who have actual or constructive knowledge of a dangerous condition. At the same time, we are mindful that our precedents direct us to consider whether a duty of care exists " 'on a case-by-case basis.' " (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472.) Accordingly, our conclusion that a claim of negligent transmission of HIV lies against those who know or at least have reason to know of the disease must be understood in the context of the allegations in this case, which involves a couple who were engaged and subsequently married; a defendant who falsely represented himself as monogamous and disease-free and insisted the couple stop using condoms; and a plaintiff who agreed to stop using condoms in reliance on those false representations. We need not consider the existence or scope of a duty for persons whose relationship does not extend beyond the sexual encounter itself, whose relationship does not contemplate sexual exclusivity, who have not represented themselves as disease-free, or who have not insisted on having sex without condoms.

The discovery Bridget has requested comports with the reason-to-know standard. Evidence that John engaged in unprotected sex outside the relationship during the relevant period and hid these encounters from Bridget, even if insufficient to *establish* the requisite knowledge for a negligence claim, might reasonably lead to the discovery of evidence as to John's awareness of the HIV status of those partners-- without even disclosing their identities, contrary to Justice Werdegar's assumption--and thus may be relevant to whether John knew or had reason to know he was infected with HIV. (*Doe v. Johnson, supra,*

817 F.Supp. 1395-1396.) Similarly, evidence that John had symptoms consistent with HIV infection may be insufficiently distinctive to indicate HIV infection by itself but may be relevant to whether John knew or had reason to know he was infected when considered in combination with his alleged history of engaging in unprotected sex outside the relationship.

John fails to consider whether the requested information, even if insufficient to establish the requisite knowledge by itself, may be relevant to the existence of such knowledge or reasonably calculated to lead to evidence on that point. He (like our dissenting colleagues) argues instead that the framework for other sexually transmitted diseases ought not be applied to HIV, but does not offer persuasive bases for distinguishing HIV from the other diseases. After careful analysis of John's argument, we cannot agree that persons who have reason to know they are infected with HIV, a gravely serious disease with no known cure, should be subject to a lesser duty of care than persons who have reason to know they are infected with other sexually transmitted diseases. **[38 Cal.4th 1194]**

John contends that because carriers of HIV may be asymptomatic, possible symptoms of HIV (other than those distinctively and idiosyncratically associated with the virus, such as Kaposi's sarcoma), are irrelevant. But merely because "[m]any people who are infected with HIV do not have any symptoms at all for many years" fn. 2 does not mean that plaintiffs are barred from discovering whether a particular defendant *did* have unique or diffuse symptoms and whether those symptoms, singly or in combination with other factors, gave the defendant reason to know he or she was infected with HIV. Many sexually transmitted diseases--such as chlamydia, fn. 3 gonorrhea, fn. 4 syphilis, fn. 5 herpes, fn. 6 and human papillomavirus (HPV) fn. 7 --likewise commonly present asymptomatically at the initial stages or have nonspecific symptoms that can be confused with other, more common diseases. Yet, we have been pointed to no decision that has invoked the possible difficulties of establishing the requisite knowledge of these diseases in *some* instances as a justification for categorically foreclosing recovery in *all* cases. To the contrary, courts here and elsewhere have regularly found negligence when the evidence *does* show the defendant knew or had reason to know of infection with these sexually **[38 Cal.4th 1195]** transmitted diseases. John fails to explain why Bridget should be precluded from discovering whether he harbored such knowledge in this case. fn. 8

[10] John also complains that the risk of transmission of HIV in any individual act of intercourse is so low as to make it unreasonable to impose a duty of care on someone who is not actually aware he or she is infected. We disagree. A low risk of transmission is insufficient to relieve the infected individual of a duty where the harm itself is great and the duty of care to prevent that harm is not onerous. (See *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57; Prosser & Keeton on Torts, *supra*, § 31, p. 171 ["as the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution"].) The AIDS epidemic was and continues to be one of the most dangerous of the modern era, killing over half a million Americans as of the end of 2003. Despite the introduction of antiretroviral therapy, AIDS remains the fifth leading cause of death among those ages 25 to 44. Sadly, HIV mortality declines have slowed while, at the same time, AIDS diagnoses have risen. (The Henry J. Kaiser Family Foundation, HIV/AIDS Policy Fact Sheet: The HIV/AIDS Epidemic in the United States (Sept. 2005) p. 1 at < [as of July 3, 2006].) The medical advances in combating HIV do not relieve infected individuals of their duty to avoid transmitting what remains a very serious disease, nor should the efficacy of those advances necessarily determine what discovery is permissible.

The dissenting opinions' effort to narrow the duty of care for persons infected with HIV is similarly unconvincing. Justice Moreno contends that the general analytic framework of negligence cannot apply here because HIV infection, unlike other sexually transmitted diseases, is "life-threatening." **[38 Cal.4th 1196]** (Dis. opn. of Moreno, J., *post*, at p. 1215.) The premise of his argument suffers from a factual flaw; other sexually transmitted diseases, such as syphilis and HPV, are also life-threatening. Moreover, the gravity of the harm from HIV infection is a justification for imposing a *greater* duty of care on those who are infected (see Prosser & Keeton on Torts, *supra*, § 31, p. 171; Rest.2d Torts, § 293, com. c, p. 59)--not, as Justice Moreno would have it, a basis for insulating those infected from responsibility for their conduct in transmitting the virus to others. Justice Moreno is also mistaken in assuming that HIV is "unique" (dis. opn. of Moreno, J., *post*, at p. 1215) in the opprobrium with which those infected are viewed. (See Note, *Liability in Tort for the Sexual Transmission of Disease: Genital Herpes and the Law* (1984) 70 Cornell

L.Rev. 101, 107-108 ["The social stigma associated with genital herpes prompted one popular news magazine to label the disease the 'new scarlet letter' "].) In any event, Justice Werdegar and Justice Moreno fail at bottom to explain why the distinctions between HIV and other sexually transmitted diseases are so fundamental as to warrant wholesale rejection of ordinary tort principles in this case (cf. Hermann, *supra*, at p. 158 [in analyzing liability for sexual transmission of HIV, "there is clear precedent in the analogous area of transmission of genital herpes"]) or to identify any court that has summarily absolved infected individuals of any responsibility for negligently infecting an intimate partner with HIV.

Justice Moreno's contention that the Legislature, by criminalizing the intentional and knowing transmission of HIV, has evinced an intent to limit tort liability only to those individuals who have actual knowledge they are infected misapprehends the respective roles of criminal and tort law. That the Legislature "has not adopted a constructive knowledge standard in statutes criminalizing the transmission of AIDS" hardly "reflects a legislative judgment that a constructive knowledge standard is not appropriate for purposes of imposing [tort] liability for the transmission of HIV." (Dis. opn. of Moreno, J., *post*, at p. 1222.) After all, the Legislature typically intends a lowered standard be required for a civil suit to recover damages than for a prosecution imposing criminal penalties, especially where those penalties are substantial. For example, Health & Safety Code section 120291, which criminalizes the intentional and knowing transmission of HIV through unprotected sexual activity, is punishable by up to eight years in prison—but "conduct that is more, not less, culpable is required for imposition of criminal penalties." (*People v. Simon* (1995) 9 Cal.4th 493, 517.) "In the criminal context, 'ordinary negligence sufficient for recovery in a civil action will not suffice.' " (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 573.) Thus, the fact the Legislature did not attach *criminal* penalties to those persons who have reason to know they carry HIV and nonetheless take no steps to avoid infecting others in no way suggests that the Legislature intended to depart **[38 Cal.4th 1197]** from Civil Code section 1714 or from ordinary negligence principles in a *civil* action for negligent transmission of HIV. fn. 9

The dissenting opinions' suggestion that the duty of individuals infected with HIV not to infect others-- and not merely the permissibility of discovery aimed at uncovering their HIV status--has somehow been limited by the enactment of statutes protecting the confidentiality of HIV test results proves far too much, inasmuch as the cause of action under the actual-knowledge standard poses the same threat to the confidentiality of a defendant's HIV test results as does a cause of action under the reason-to-know standard. Indeed, Justice Moreno acknowledges that even an actual-knowledge standard would permit discovery "directed at whether and when defendant had actual knowledge he was HIV positive." (Dis. opu. of Moreno, J., *post*, at p. 1212.) The logical consequence of the dissenting opinions' reading of the statutory scheme, therefore, would be to eliminate entirely the possibility of tort liability for the knowing *or* negligent transmission of HIV, even when the discovery the plaintiff eventually seeks does not tread on statutory confidentiality. Had the Legislature intended to abrogate ordinary tort principles to such an extent, one would expect it to have expressed its intent more clearly. fn. 10

In any event, it is not necessary to consider here whether a conflict exists between Bridget's entitlement to discover relevant evidence and Health and **[38 Cal.4th 1198]** Safety Code section 120975, which protects the identity of a person taking an HIV test. As the Court of Appeal found, John waived (or is estopped from invoking) this statutory protection by claiming in his answer that Bridget infected him with HIV and by relying on a negative HIV test in support of his motion for summary judgment. (See Taub, *Doctors, AIDS, and Confidentiality in the 1990's* (1994) 27 J. Marshall L.Rev. 331, 335 ["courts have held that patients waived their confidentiality rights with respect to their HIV status by placing their medical condition at issue in litigation"].) Nor need we consider the extent of permissible discovery about the HIV status of third parties, since (as the dissenting opinions concede) the discovery we have authorized does not include identifying information about John's sexual partners. In response to the dissenting opinions' concerns about future discovery in this and other cases, we reiterate that we do not (and properly cannot) opine as to the propriety of discovery requests that are not before us.

Finally, Justice Moreno's fear of a spate of shakedown lawsuits designed to force lucrative settlements or to embarrass a former sexual partner is ill-founded and overblown. Such a risk applies equally to tort actions under an actual knowledge standard. Indeed, the risk inheres in a tort for the transmission of *any* venereal disease. The fact that no jurisdiction has yet been deluged with such suits persuasively rebuts

this concern. Moreover, the use of protective orders, sealing orders, and the identification of parties by their initials as well as the constitutional and statutory limits on discovery will ensure that the burden ou the litigants and third parties will be minimized to the extent possible and should assuage the fear that litigation will be used as a bludgeon or will become a media circus.

In sum, we are not persuaded that California should be the first jurisdiction in the country to limit liability for the negligent transmission of HIV only to those who have actual knowledge they are HIV positive.

B. *Whether Discovery Must Be Limited Because of John's Right to Privacy Under the State Constitution*

[11] Article I, section 1 of the California Constitution recognizes a number of inalienable rights, including the right to privacy. As we have previously observed, the right of privacy extends to sexual relations (*Vinson v. Superior Court, supra,* 43 Cal.3d at p. 841) and medical records (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 41). Accordingly, a litigant may invoke the constitutional right to privacy as justification for refusing to answer questions that unreasonably intrude on that right. (*Britt v. Superior Court* (1978) 20 Cal.3d 844, 855 [associational privacy]; *Fults v. Superior Court* (1979) 88 Cal.App.3d 899, 903 [sexual privacy].) **[38 Cal.4th 1199]**

[12] The right to privacy, however, is not absolute. In appropriate circumstances, this right must be balanced against other important interests. (*Hill v. National Collegiate Athletic Assn., supra,* 7 Cal.4th at p. 37.) "On occasion [a party's] privacy interests may have to give way to [the] opponent's right to a fair trial. Thus courts must balance the right of civil litigants to discover relevant facts against the privacy interests of persons subject to discovery." (*Vinson v. Superior Court, supra,* 43 Cal.3d at p. 842.)

Here, defendant has invoked his constitutional right to privacy as justification for refusing to answer questions concerning his HIV status or his sexual history. Bridget, in turn, has identified not only "the historically important state interest of facilitating the ascertainment of truth in connection with legal proceedings" (*In re Lifschutz* (1970) 2 Cal.3d 415, 432), but also the state's compelling interest in preventing the spread of AIDS, a communicable and dangerous disease. Penal Code section 12022.85, which provides for a three-year enhancement if the perpetrator of specified felonies knows he or she is HIV positive, and Health and Safety Code section 120291, which makes it a felony to intentionally infect another with HIV, are strong statements by the Legislature that the spread of HIV is a serious public health threat and that its control is of paramount importance. (See generally *Cruzan v. Director, Missouri Dept. of Health* (1990) 497 U.S. 261, 282 [recognizing the state's "unqualified interest in the preservation of human life"].)

In balancing these competing concerns, we note at the outset that this is not a case in which a plaintiff seeks discovery to obtain information from a defendant whose HIV status is unknown. Both parties have admitted they are HIV positive, informally and in court filings. John thus has a diminished privacy interest in his HIV status. (Cf. *In re Marriage of Bonneau* (Ill.App.Ct. 1998) 691 N.E.2d 123, 134 [declining to permit discovery of medical records where neither party's HIV status was alleged].) Moreover, not only does the complaint allege sufficient facts to permit the inference that John infected Bridget with HIV, but John has alleged that Bridget infected *him.* By thus putting his own medical condition at issue, John has "substantially lowered" his expectation of privacy even further. (*Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 43.) After balancing the competing interests in this case, we are persuaded that Bridget is entitled to discovery concerning John's sexual history and HIV status.

[13] We emphasize, though, that Bridget is not entitled to discovery without limit. As the Court of Appeal pointed out, even where the plaintiff can establish a compelling state interest in discovery, " ' " '[p]recision of [compelled disclosure]' " ' is required so that the right of privacy is not **[38 Cal.4th 1200]** ' " 'curtailed except to the extent necessitated by the legitimate governmental objective.' " ' " Thus, where a plaintiff seeks discovery from a defendant concerning sexual matters protected by the constitutional right of privacy, the "intrusion upon sexual privacy may only be done on the basis of ' "practical necessity" ' (*Fults v. Superior Court, supra,* at pp. 904-905), and 'the compelled disclosure [must] be narrowly drawn to

assure maximum protection of the constitutional interests at stake.' (*Britt v. Superior Court, supra,* [20 Cal.3d] at p. 859.)" (*Boler v. Superior Court* (1987) 201 Cal.App.3d 467, 473-474.)

It is therefore essential to measure the closeness of the fit between the requested discovery and the allegations of the complaint. The theory of Bridget's complaint is that John became infected with HIV prior to or during their relationship by engaging in unprotected sex with other men, that he knew or had reason to know he was infected before he engaged in unprotected sex with her, that he did not share his knowledge with Bridget or otherwise take steps to prevent transmission of the virus, and that he infected her with HIV during unprotected sex. To prove these allegations, it is necessary for Bridget to inquire into John's medical records and his sexual activity, as the superior court and the Court of Appeal found.

Not all of the discovery authorized by the superior court and the Court of Appeal satisfies this heightened standard, however. To the extent that special interrogatory Nos. 3 and 13 and request for admission No. 10 seek information concerning John's sexual conduct *after* the couple stopped having sex--which, according to the complaint, was sometime during the honeymoon in July 2000--they are overbroad. John's sexual conduct after the cessation of marital sexual relations could not have resulted in the transmission of HIV to Bridget through sexual relations as alleged in the complaint, nor would it shed light on whether John knew or had reason to know that he was HIV positive at the time he and Bridget engaged in unprotected sex. Bridget thus has failed to identify the practical necessity for discovery of John's sexual conduct subsequent to their honeymoon.

The Court of Appeal also erred in upholding discovery into John's sexual behavior dating back years before he even met Bridget. Under the record as it currently stands, Bridget has failed to identify the practical necessity for discovery of John's sexual conduct any earlier than the six months that preceded his negative HIV test.

John's declaration in support of his motion for summary judgment states that he was tested for HIV in connection with a life insurance application on August 17, 2000, and includes a copy of the lab report. The results were negative. Based on information from the Centers for Disease Control that the **[38 Cal.4th 1201]** window period between exposure to HIV and the production of sufficient antibodies to detect the presence of the virus in the blood can last up to six months, fn. 11 John reasons that he "was necessarily HIV negative six months prior to August 17, i.e., mid-February 2000, and at every prior time in his life." He therefore contends that any discovery related to his sexual history must be limited to the six-month window period. Bridget responds that John's negative HIV test in August 2000 is "a mere allegation which defendant has advanced as a part of his 'she-infected-me' defense and which plaintiff intends to prove to be patently *false.* Obviously, discovery cannot serve to debunk a lie if discovery is thwarted by having to assume the truth of the lie."

The defect in Bridget's response is that John's negative HIV test is not a mere allegation. John has supported his allegation with an applicant profile from Intellisys reflecting the results of his HIV test. If the test is accurate, and if the latency period for development of HIV antibodies is no longer than six months, John could not have been infected any earlier than February 2000. Under those circumstances, as Bridget's counsel conceded at oral argument, John's sexual behavior during that earlier period would not be relevant to the issue of when he became infected. In other words, Bridget has not demonstrated, under the heightened standard applicable to constitutional rights of privacy, a practical necessity for discovery of John's sexual conduct before he could have been infected with HIV.

On the other hand, as Bridget's counsel explained at oral argument, it is possible that Bridget could offer evidence to cast doubt on the results of the August 2000 HIV test, such as by challenging the accuracy or reliability of an insurance application test or by offering expert testimony that the test was inconsistent with John's development of full-blown AIDS the following year. If Bridget were to offer some basis to question the August 2000 test, or to adduce evidence that the time period from exposure to the virus to the development of antibodies in the blood can be longer than six months, then she may be entitled to discovery covering a broader time period. That option remains open to Bridget on remand. Because Bridget has not yet done so, however, we must balance John's constitutional right to privacy against

Bridget's need for discovery based on the record as it currently stands. We must therefore limit her discovery requests concerning John's sexual behavior to the period between February 17, 2000, the earliest date at which John could have been infected, through July 2000, when the couple last had sexual relations. **[38 Cal.4th 1202]**

Finally, we emphasize that we have not been asked and therefore express no views as to what measures the trial court should employ to maintain the confidentiality of the materials produced in discovery. The propriety of in camera review, orders to seal documents, protective orders, and other measures is an issue that remains for the trial court on remand. (See *Schnabel v. Superior Court*, *supra*, 5 Cal.4th at p. 714.)

*C. Whether Discovery Must Be Limited Because of the Physician-Patient Privilege*

John also asserts that the medical information sought by the subpoenas is protected by the physician-patient privilege but concedes, as he must, that "[t]here is no privilege under this article as to a communication relevant to an issue concerning the condition of the patient in a proceeding to recover damages on account of the conduct of the patient if good cause for disclosure of the communication is shown." (Evid. Code, § 999.) John contends that discovery must nonetheless be denied because a good cause showing should require at a minimum "an expert declaration regarding the [plaintiff's] infection status; the probable exposure period; and a description of the plaintiff's sexual history that establishes the defendant as a probable transmitter."

John cites no authority for his contention that a plaintiff must essentially eliminate other possible agents of infection before discovery may proceed. (Cf. *M.M.D. v. B.L.G.*, *supra*, 467 N.W.2d at pp. 647-648 [evidence was sufficient to support liability despite inability of medical expert to determine whether plaintiff's herpes outbreak was due to a recent infection or a dormant virus].) The statutory standard is good cause, and Bridget has amply established good cause for disclosure of John's medical records concerning HIV and AIDS: she has recently been diagnosed as HIV positive; John, too, has been diagnosed as HIV positive, but his viral infection has already progressed to full-blown AIDS; during the two years preceding Bridget's diagnosis, she was dating John, engaged to him, and married to him; and the couple engaged in unprotected sex during that period. Bridget thus has offered far more than "conjecture" or a "speculative presumption" to justify the requested discovery. (*Mendez v. Superior Court* (1988) 206 Cal.App.3d 557, 570-571.) Moreover, John has not offered any evidence to suggest that an expert could pinpoint the time period for Bridget's exposure to the virus. We therefore find that the superior court did not abuse its discretion in overruling John's objection under the physician-patient privilege. fn. 12 **[38 Cal.4th 1203]**

# DISPOSITION

The judgment of the Court of Appeal is reversed insofar as it affirmed the order compelling responses to plaintiff's special interrogatories and requests for admission to the extent they seek information about John's sexual history outside the time period between February 17, 2000, and the end of July 2000, and the matter is remanded for further proceedings consistent with the views herein.

George, C.J., Chin, J., and Corrigan, J., concurred.

**KENNARD, J., Concurring and Dissenting:**

This case involves a discovery dispute that arose in the early stages of a lawsuit that a wife, Bridget, brought against her husband, John. In her complaint, Bridget alleged, among other things, that John negligently infected her with human immunodeficiency virus (HIV) when they had unprotected sexual relations. To obtain the evidence necessary to prove her allegation, Bridget sought to discover various facts about John's sexual contacts with others, both before and during the marriage. John resisted the discovery, arguing that the information Bridget sought was irrelevant and that the proposed discovery violated his right of privacy under the California Constitution.

The majority concludes that the tort of negligent transmission of HIV will lie when "the actor knows or has reason to know he or she is HIV positive." (Maj. opn., *ante*, at p. 1191.) In their dissenting opinions Justices Werdegar and Moreno would limit liability to those who engage in sexual relations with actual knowledge of their HIV infection. (Dis. opn. of Werdegar, J., *post*, at p. 1210; dis. opn. of Moreno, J., *post*, at p. 1212.) Unlike the majority and the dissenters, I see no need to decide the level of knowledge necessary to trigger the tort duty.

I would simply apply normal discovery principles, under which Bridget is entitled to discover any unprivileged information that might reasonably assist her in evaluating her case, preparing it for trial, or facilitating a settlement. Applying that standard, the Court of Appeal properly permitted Bridget to discover information about John's sexual contacts (although not the identities of John's sexual partners) both before and during their marriage. Allowing this discovery does not violate John's constitutional privacy right, not only because he and Bridget are married, but also because John has put his own sexual conduct at issue by alleging that it was Bridget who infected him with HIV. Because Bridget would be entitled to discover this information under either the majority's "reason to know" standard of liability or Justice Moreno's "actual knowledge" standard, I take no position here on which of these two knowledge standards is appropriate for the tort of negligent **[38 Cal.4th 1204]** transmission of HIV. Under either standard the scope of discovery is the same, because evidence that John should have known that he was HIV positive is not only relevant to questions of negligence but also is circumstantial evidence that John actually knew he was HIV positive. Finally, I question the soundness of the majority's newly fashioned rule that all discovery implicating the constitutional right of sexual privacy must be supported by a showing of "practical necessity" for the information sought.

Insofar as the majority decision affirms the judgment of the Court of Appeal, I concur. I dissent, however, from the majority's imposition of temporal limits on the discovery of certain information that Bridget has sought.

## I.

Bridget and John began dating in 1998. John represented himself as a healthy, heterosexual man with old-fashioned values, and the couple became engaged on New Year's Eve 1999. In May 2000, the couple began living together until Bridget could find separate housing. That month or the next, Bridget received a telephone call, purportedly from the office of John's physician, saying that John had tested negative for HIV.

When the couple first became intimate they used condoms, but eventually John persuaded Bridget to switch to birth control pills. They were married in late July 2000, and ceased having sexual relations after their honeymoon. An HIV test of John done in connection with a life insurance application on August 17, 2000, was negative.

In September 2000, Bridget consulted John's physician about her exhaustion and high fevers. Testing revealed that she was HIV positive. When John also tested positive for HIV, the physician informed Bridget that she had brought "HIV into the marriage." John repeated that allegation a year later, shortly before he was diagnosed with acquired immune deficiency syndrome (AIDS). In November 2001, Bridget was told that the likelihood she had infected John was .03%. The next month, John for the first time revealed to Bridget that before their marriage he had had sexual relations with men; Bridget later learned that John continued to do so after their marriage.

In April 2002, Bridget sued John. Her complaint alleged facts she contends support causes of action for negligent as well as intentional infliction of emotional distress in that John knew or "had a reasonable belief" he had HIV before they engaged in unprotected sex, but nevertheless he insisted that she had infected him. She also alleged that John fraudulently misrepresented **[38 Cal.4th 1205]** himself as being free of communicable sexual diseases and that she engaged in unprotected sexual relations with him in reliance on that misrepresentation. Finally, she alleged that John's knowledge of his ongoing sexual

conduct with male partners gave him a duty to warn her that unprotected sexual relations between them could expose her to sexually transmitted diseases.

Two months later, John answered the complaint; after generally denying its allegations, he specifically asserted that "[i]f either party transmitted the HIV virus to the other," it was Bridget who had infected him. He alleged as an affirmative defense that Bridget had assumed the risk of infection by engaging in unprotected sex with him before their marriage. Finally, he alleged that any claim against him for personal injury resulting from HIV infection was barred by the one-year statute of limitation. (Code Civ. Proc., former § 340, subd. (3) ["for injury . . . by the wrongful act or neglect of another . . . ."], amended by Stats. 1905, ch. 258, § 2, p. 232.)

At his deposition in January 2003, John refused to answer 124 questions about his sexual history and practices, maintaining that the information sought invaded his right to privacy under the California Constitution. In John's briefing to the trial court, he argued that disclosing his sexual history was not "directly relevant to the issue of his knowledge" of his HIV status, asserting that only his knowledge of his health status at the time he had unprotected sex with Bridget was directly relevant. John renewed his privacy objections when Bridget later propounded certain interrogatories and requests for admissions pertaining to his sexual history. The parties' discovery dispute was heard by a referee, who rejected John's claims that his constitutional right of privacy barred Bridget from discovering certain information about his sexual conduct, his sexual history, and his medical records relating to sexually transmitted diseases. The referee's report was confirmed by the trial judge, who ordered the requested discovery. John sought a writ of mandate in the Court of Appeal, arguing that the discovery ordered would infringe his statutory and constitutional rights to privacy.

The Court of Appeal struck all of the special interrogatories that sought the names, addresses, and telephone numbers of men with whom John had had sexual relations. Because Bridget did not seek review in this court of that part of the Court of Appeal's decision, the propriety of that stricken discovery is not before us. The discovery at issue here includes only those special interrogatories, requests for admission, and medical record subpoenas ordered by the trial court, but not those that pertain to identifying John's sexual partners and were stricken by the Court of Appeal. (Maj. opn., *ante*, at pp. 1184-1186.) **[38 Cal.4th 1206]**

## II.

To determine the propriety of the discovery Bridget has sought, this court need not resolve whether, as the majority concludes, Bridget can recover in tort if John has reason to know that he was HIV positive, or only if he actually knew he was HIV positive when they had unprotected sexual relations. " 'Under the discovery statutes, information is discoverable if it is unprivileged and is either relevant to the subject matter of the action or reasonably calculated to reveal admissible evidence.' " (*Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 711; see Code Civ. Proc., § 2017.010.) " '[I]n accordance with the liberal policies underlying the discovery procedures, doubts as to relevance should generally be resolved in favor of permitting discovery [citation].' " (*Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652, 656.) Evidence is relevant for discovery purposes "if it might reasonably assist a party in evaluating its case, preparing for trial, or facilitating a settlement." (*Glenfed Development Corp. v. Superior Court* (1997) 53 Cal.App.4th 1113, 1117.) Evidence that is relevant for purposes of discovery need not be admissible; it will be relevant, and hence discoverable, if it might reasonably lead to other, admissible evidence. (*TBG Ins. Services Corp. v. Superior Court* (2002) 96 Cal.App.4th 443, 449.) Courts "shall limit the scope of discovery" when they determine that "the burden, expense, or intrusiveness of that discovery clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence," and they "may make this determination pursuant to a motion for protective order by a party or other affected person." (Code Civ. Proc., § 2017.020, subd. (a).)

To determine what discovery is relevant, courts look to the allegations of the complaint. Here, Bridget alleged causes of action for intentional as well as negligent infliction of emotional distress on the basis that John *knew* he was HIV positive before he engaged in unprotected sex with her. As to the cause of

action for negligent infliction of emotional distress, Bridget further alleged John either "knew or had a reasonable belief that he had HIV." Those factual allegations as to John's degree of knowledge were incorporated by reference into Bridget's causes of action for fraudulent misrepresentation and for negligent failure to disclose his HIV status. For each of the causes of action Bridget seeks to allege, evidence tending to prove John's actual knowledge of his HIV-positive status is relevant. The definition of the elements of the tort of negligent transmission does not affect the scope of discovery, because any evidence tending to show that John *should have known* that he was HIV positive is also circumstantial evidence that he *actually knew* he was HIV positive. Because resolution of the discovery issue in this case does not turn on the elements of the tort of negligent transmission of HIV, a subject debated at length by both the majority and the dissent, I **[38 Cal.4th 1207]** would not reach the question of whether the tort requires actual knowledge or reason to know that one is HIV positive.

Under the ordinary test of relevance applicable to discovery, the majority improperly limits discovery in two ways. First, it bars discovery of John's sexual relations for the period more than six months before he tested HIV negative on August 17, 2000. (Maj. opn., *ante*, at pp. 1200-1202.) Even assuming that Bridget will be unable to attack the relevance of that timeframe or the accuracy of the August 2000 test, John's conduct during that earlier period might still reveal whether he regularly or habitually acted negligently with respect to the risks of contracting or transmitting HIV. Second, the majority bars Bridget from discovering information pertaining to John's sexual conduct after he and Bridget stopped having sexual relations. (Maj. opn., *ante*, at p. 1201.) But John's conduct during that period--in particular, whether he revealed his HIV-positive status to any sexual partners--could be highly relevant to Bridget's claim that John intentionally concealed his disease from her.

The right of privacy accorded by our state Constitution protects John's interest in making intimate personal decisions in the conduct of his sexual life, an interest we have described as autonomy privacy. (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35-36; see, e.g., *Vinson v. Superior Court* (1987) 43 Cal.3d 833, 841 (*Vinson*).) The right of privacy in sexual conduct is held by the married and the unmarried alike. (*Vinson*, at p. 841.)

Here, the majority's limitations on discovery are not necessary to protect John's right to sexual privacy under article I, section 1, of the California Constitution. When a party asserts an invasion of a constitutionally protected privacy interest, courts apply a balancing test. (*Hill v. National Collegiate Athletic Assn., supra*, 7 Cal.4th at p. 37.) Because "[t]he diverse and somewhat amorphous character of the privacy right necessarily requires that privacy interests be specifically identified and carefully compared with competing or countervailing privacy and nonprivacy interests" (*ibid.*), the inquiry is made on a case-by-case basis (see *Vinson, supra*, 43 Cal.3d at pp. 841-842 [using a case-specific analysis]).

Here John, as husband, is in the anomalous position of arguing that his personal right to sexual privacy protects him from providing otherwise relevant discovery to his wife, Bridget. By alleging that John infected her with HIV, Bridget may be deemed to have implicitly waived her constitutional privacy right against discovery that is "directly relevant" and "essential to a fair resolution" of that claim. (*Vinson, supra*, 43 Cal.3d at p. 842 [discussing *Britt v. Superior Court* (1978) 20 Cal.3d 844, 859].) **[38 Cal.4th 1208]** John has made a similar claim in his answer to the complaint, asserting that Bridget infected him with HIV. In this factual context, I conclude that, as between themselves, John and Bridget, who at all relevant times were either planning to be married or were married, both have a vastly diminished constitutional right of personal privacy with regard to disclosure to one another of their sexual conduct with others.

The majority limits Bridget's discovery requests, asserting that privacy protections for sexual behavior require her to establish the "practical necessity" for the information she seeks to discover from John. (Maj. opn., *ante*, at p. 1200.) Almost 40 years ago, this court applied a practical necessity standard in a decision precluding a county government from conditioning public employment or other benefits on a loyalty oath that imposed substantial burdens on the First Amendment rights of speech and association granted by our federal Constitution. (*Vogel v. County of Los Angeles* (1967) 68 Cal.2d 18, 21; see also *Bagley v. Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 505 [practical necessity showing

must be made by employer seeking to limit political activity by public employee].) *Vogel* described the government's "heavy burden of demonstrating the practical necessity for the limitation" that a loyalty oath imposed on the rights of the affected citizens. (*Vogel*, at p. 21.) Thereafter two Court of Appeal decisions-- *Fults v. Superior Court* (1979) 88 Cal.App.3d 899 (*Fults*) and *Boler v. Superior Court* (1987) 201 Cal.App.3d 467 (*Boler*)--applied the practical necessity test to civil discovery that allegedly intruded on sexual privacy.

*Fults* was a paternity action brought by the County of Sonoma, which sought to recoup from the child's father public assistance provided for the child's support. (*Fults, supra,* 88 Cal.App.3d at p. 901 & fn. 1.) When the defendant father sought to discover the names and addresses of all men with whom the mother had ever had sexual intercourse, the mother refused to provide that information except as temporally relevant to the date of the child's conception. (*Id.* at pp. 902, 904.) After citing the practical necessity phraseology this court used in *Vogel,* the Court of Appeal in *Fults* rejected a discovery order spanning a two-year period centered on the likely date of conception. (*Id.* at p. 905.) It concluded that the defendant had made no showing that the discovery sought was "likely to turn up material information," and therefore its utility did not outweigh the mother's right to sexual privacy. (*Ibid.*)

The second Court of Appeal decision, *Boler,* involved discovery sought in a workplace sexual harassment suit. (*Boler, supra,* 201 Cal.App.3d at p. 469.) The plaintiff employee sought to discover the identities of all women that her employer had both "worked with and slept with." (*Id.* at p. 474.) Because the **[38 Cal.4th 1209]** relevant information (complaints by coworkers who found the employer's attentions unwelcome) could be obtained by less intrusive means, the Court of Appeal concluded that the discovery sought was not justified by practical necessity, noting that the broad discovery impermissibly invaded the privacy rights of women whose sexual relationships with the employer were consensual. (*Id.* at pp. 473-474.)

Some three months before the Court of Appeal decided *Boler, supra,* 201 Cal.App.3d 467, this court in *Vinson, supra,* 43 Cal.3d 833, which involved a claim of sexual harassment, addressed discovery that implicated the constitutional right of sexual privacy. Notably absent from our analysis in *Vinson* is any mention of the practical necessity test. Instead, this court concluded that the plaintiff had waived her right to sexual privacy as to discovery that was "directly relevant" to her claim and "essential to its fair resolution." (*Id.* at p. 842.) Referring to plaintiff's unwaived sexual privacy rights, the opinion emphasized that courts "must balance the right of civil litigants to discover relevant facts against the privacy interests of persons subject to discovery." (*Id.* at p. 842.) And this court pointed out that the sexual privacy rights of plaintiffs who bring civil actions for sexual harassment, sexual assault, or sexual battery are protected by a statutory requirement that discovery of their sexual history may be had only on a showing of good cause. (Code Civ. Proc., § 2017.220; *Vinson,* at pp. 843-844 [discussing predecessors to section 2017.220].) In light of this court's decision in *Vinson,* I question the majority's assertion here that intrusions on the constitutional right of sexual privacy may only be contenanced on a showing of practical necessity. (Maj. opn., *ante,* at p. 1200.)

Such a showing is unnecessary here. Both Bridget and John have already put their own sexual conduct at issue, and they have implicitly waived some of their rights to sexual privacy. (*Vinson, supra,* 43 Cal.3d at p. 842.) And their remaining sexual privacy rights are "not necessarily absolute." (*Ibid.*) Because each alleges that the other, rather than some third party, is the source of the infection, both must accept inquiry into their sexual conduct with partners other than their spouse as a possible source of the infection. Accordingly, unlike the majority (maj. opn., *ante,* at p. 1200) and Justice Werdegar (dis. opn. of Werdegar, J., *post,* at p. 1211), I would not require Bridget to show a practical necessity for discovery of John's sexual conduct after July 2000, when the couple ceased to have sexual relations with one another. Even under a practical necessity test, the information Bridget seeks to discover from John is of a type that she has no ready means of obtaining, except from John. (See, e.g., *Boler, supra,* 201 Cal.App.3d at p. 474 [plaintiff had alternative means of obtaining discovery].)

Notwithstanding the diminished right to privacy of John and Bridget as between one another, they each retain some sexual privacy interests. I would **[38 Cal.4th 1210]** leave the protection of those privacy

interests to the discretion of the trial court, which remains free to fashion protective orders or to adopt other measures tailored to the specific information and documents before it. Moreover, I stress that my conclusion that John and Bridget have a diminished privacy interest *as to one another* in the context of this litigation does not affect the privacy interests of other persons. Bridget's discovery of the identities of John's previous sexual partners was precluded by the Court of Appeal and is not an issue before us.

## III.

For the reasons given above, I would affirm the judgment of the Court of Appeal.

**WERDEGAR, J., Dissenting:**

I respectfully dissent. Notwithstanding my sympathy with the law's preference for prudence in sexual matters, as in general (Civ. Code, § 1714), I am unwilling in the context of this atypical case to join the majority in creating the prospect that an individual may be drawn into intrusive litigation, whether as a party, witness, or respondent to discovery requests, whenever a former partner, or that partner's subsequent partner, contracts a sexually transmitted disease.

I do not question that one who negligently transmits HIV to another may be held liable in tort. On this point, I agree with all of my colleagues. I part company with the majority, however, in its creating the prospect of tort liability for future defendants who are alleged not actually to have known, but merely to have possessed "constructive knowledge," they were infected. The majority's vague and inconclusive treatment of the concept of constructive knowledge in my view demonstrates that its enterprise in this respect is not only premature--given this is a case in which actual knowledge is alleged (see maj. opn., *ante*, at p. 1183)--but also insufficiently grounded in California law and ill considered as a matter of public policy.

As Justice Moreno's dissenting opinion ably demonstrates, a Californian's medical privacy is protected by a complex of statutes, case law, and ethical principles. Our Legislature has given particular and heightened protection to the confidentiality of an individual's HIV status. (See dis. opn. of Moreno, J., *post*, at pp. 1216-1219.) In this case, however, most of these protections are not in issue because the parties already have disclosed that they are HIV positive and each is suing the other for transmitting the virus. Moreover, as the majority emphasizes, the alleged relationship between the parties was not limited to sexual encounters but, rather, was a marriage of spouses who contemplated sexual exclusivity. (Maj. opn., *ante*, at pp. 1183, 1187, 1193.) **[38 Cal.4th 1211]** John B. allegedly not only knew he was HIV positive (*id.* at p. 4), but represented himself as disease free and repeatedly insisted that the parties forgo the use of condoms (*id.* at pp. 9, 18). Bridget allegedly would not have engaged in unprotected sex had she known John had been sexually active with other people prior to and during their marriage. (*Id.* at p. 4.) I agree with the majority that in these circumstances and on such egregious facts Bridget potentially may state a cause of action against John for negligently transmitting HIV to her. Upon demonstrating "practical necessity," moreover, she may obtain narrowly drawn discovery circumscribed by appropriate confidentiality measures. (See *id.* at pp. 28-31.)

I disagree, however, that Bridget may prevail on any such cause of action merely by showing that John had constructive knowledge he was HIV positive. fn. 1 As Justice Moreno correctly observes, no California statute or judicial decision establishes that mere constructive knowledge may support liability for negligent HIV transmission. (See dis. opn. of Moreno, J., *post*, at p. 1214.) Moreover, as counsel pointed out at oral argument, the record contains neither factual findings nor briefing upon the complex issues of AIDS policy this case implicates. Perhaps partly for this reason, the majority does not persuasively address these issues; I share in particular Justice Moreno's concern that the majority fails adequately to consider the Legislature's response to them. As he points out, the majority, for example, does not attempt to reconcile the discovery its opinion authorizes with Health and Safety Code section 120975, except to state John himself has waived that statute's protection by placing his HIV status in issue. (See dis. opn. of Moreno, J., *post*, at p. 1218, citing maj. opn., *ante*, at p. 1198.) fn. 2

I disagree, moreover, with the majority's assertion that allowing Bridget to discover John's sexual history during the six-month period preceding his negative HIV test may yield evidence relevant to show John knew or "had **[38 Cal.4th 1212]** reason to know" he was infected. (See maj. opn., *ante*, at p. 1193.) As Bridget's counsel acknowledged in oral argument, discovery that John had unprotected sex with other people during that time would reveal nothing pertinent; only if Bridget could discover the names and HIV status of John's former sexual partners--information protected by statute--would she learn anything arguably relevant to her causes of action, even assuming application of a "reason to know" standard. Accordingly, I agree with Justice Moreno that Bridget is entitled only to discovery directed at whether and when John had actual knowledge he was HIV positive and not to discovery of John's sexual history.

The majority as well as Justice Moreno in dissent cite numerous policy considerations they believe support their different conclusions. This divergence of views--all conjecture as far as this court knows--illustrates that complex public health, privacy, and other policy issues are involved in determining the scope of a tort for negligent transmission of HIV or AIDS. Given the complexity of such issues, this court is ill equipped and ill advised to venture into an area the Legislature already has extensively addressed.

**MORENO, J., Dissenting:**

In this case of first impression, the majority holds that a wife who sues her husband claiming that he negligently infected her with the human immunodeficiency virus (HIV) is not limited to a theory that he did so knowing he was HIV positive but that liability also extends "to those situations where the actor, under the totality of circumstances, has *reason to know* of the infection." (Maj. opn., *ante*, at p. 1191.) According to the majority, reason to know exists "when there is sufficient information to cause a reasonably intelligent actor to infer he or she is infected with the virus or that infection is so highly probable that his or her conduct would be predicated on that assumption." (*Id.*, at p. 1192.) Based on these conclusions, the majority authorizes broad discovery into defendant's sexual history.

I dissent. While I agree that a defendant who *knows* that he or she is infected with HIV and conceals that fact from a partner with whom the defendant has unprotected sex may be held liable for negligently transmitting the virus, I do not agree, for the reasons set forth below, that such liability may be predicated on a later finding by a trier of fact that the defendant *had reason to know* that he or she was infected with HIV. In this case, therefore, I would hold that plaintiff is entitled to discovery directed at whether and when defendant had actual knowledge he was HIV positive, but not to discovery of defendant's sexual history.

Whether particular information is discoverable necessarily depends on whether there is a cause of action as to which that discovery is either relevant **[38 Cal.4th 1213]** or " 'reasonably calculated to reveal admissible evidence.' " (*Schabel v. Superior Court* (1993) 5 Cal.4th 704, 711.) The majority acknowledges that "[t]his court has not yet had occasion to consider the tort of negligent transmission of a sexually transmitted disease" but concludes "the tort is far from novel," citing two California Court of Appeal decisions and a number of decisions from our sister jurisdictions. (Maj. opn., *ante*, at p. 1188.) The majority thus implies that the creation of a cause of action for negligent transmission of HIV based on a constructive knowledge standard is simply a logical extension of existing precedent. Not so.

Neither of the Court of Appeal decisions cited by the majority supports its expansion of the law. In *Kathleen K. v. Robert B.* (1984) 150 Cal.App.3d 992, the plaintiff alleged she had contracted genital herpes from the defendant. Judgment was rendered in the defendant's favor. On review, the Court of Appeal noted that the plaintiff's negligence claim included a constructive knowledge allegation that, because the appeal was from a judgment on the pleadings, the court "accepted as true." (*Id.* at p. 944.) The court rejected claims by the defendant that the plaintiff's complaint was barred by either the right of privacy or the Anti-Heart Balm statute (Civ. Code § 43.5, subd. (c)), and reversed the judgment. (*Kathleen K., supra,* 150 Cal.App.3d at pp. 996-998.) Because the court had no occasion to decide whether negligent transmission of a sexually transmitted disease must be based on an actual knowledge standard only or if it can also be based on constructive knowledge, *Kathleen K.* is not authority for the proposition that a

constructive knowledge standard will suffice. (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335,343 ["A decision, of course, does not stand for a proposition not considered by the court"].)

*Doe v. Roe* (1990) 218 Cal.App.3d 1538, lends even less support for the majority's conclusion because in that case, which also involved transmission of herpes, it was undisputed that the defendant had actual knowledge he was infected was herpes, and had had several prior outbreaks, but "believed that he could not transmit it to [the plaintiff] as long as he was symptom free." (*Id.* at p. 1541.) In affirming judgment for the plaintiff, the court emphasized that the "defendant admittedly had *actual knowledge* that herpes was sexually transmissible . . . . Having discovered that he had a venereal disease, defendant did nothing." (*Id.* at p. 1546.)

In the absence of support in California law for its conclusion that a constructive knowledge standard will support the negligent transmission of HIV, the majority relies on a spate of decisions from other jurisdictions. (*Meany v. Meany* (La. 1994) 639 So.2d 229 [herpes]; *Berner v. Caldwell* (Ala. 1989) 543 So.2d 686 [same]; *Hamblem v. Davidson* (Tenn.Ct.App. 2000) **[38 Cal.4th 1214]** 50 S.W.3d 433 [same]; *Deuschle v. Jobe* (Mo.Ct.App. 2000) 30 S.W.2d 215 [same]; *M.M.D. v. B.L.G* (Minn.Ct.App. 1991) 467 N.W.2d 645 [same]; *McPherson v. McPherson* (Mass. 1998) 712 A.2d 1043 [human papilloma virus (HPV)]; *Mussivand v. David* (Ohio 1989) 544 N.E.2d 265 [transmission of unspecified sexual disease].) While these decisions do recognize a claim for negligent transmission of a sexually transmitted disease based on actual or constructive knowledge, only one of them, *Doe v. Johnson* (W.D.Mich. 1993) 817 F.Supp. 1382), involves the transmission of HIV; the others, as noted above, involve herpes, HPV, or an unspecified disease. fn. 1

As I shall explain, the distinction between HIV and other sexually transmitted diseases is crucial when discussing the wisdom of creating a cause of action for negligent transmission based on constructive knowledge. Contrary to the majority's analysis, creation of such a tort for HIV is not a simple extension of existing California law, nor has any other state created such a cause of action. fn. 2 It must be clearly understood, therefore, that in creating this cause of action the majority ventures into largely uncharted waters.

This expansion of the law cannot be justified by the majority's application of the *Rowland* factors (*Rowland v. Christian* (1969) 69 Cal.2d 108) because its analysis proceeds from an a priori assumption that constructive knowledge *is* a viable theory upon which to base a claim for negligent transmission of HIV. Rather, in deciding whether to create this cause of action, the analysis must begin with the relevant policy considerations. (*Borer v. American Airlines, Inc.* (1977) 19 Cal.3d 441, 446-447 [" 'In delineating the extent of a tortfeasor's responsibility for damages under the general rule of tort liability (Civ. Code, § 1714), the courts must locate the line between liability and nonliability at some point, a decision which is essentially political' "]; **[38 Cal.4th 1215]** *Dillon v. Legg* (1968) 68 Cal.2d 728, 734 [" 'duty is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection' "].)

Accordingly, the question before this court is whether creation of a cause of action for negligent transmission of HIV -- and not some other sexually transmitted disease -- based on a constructive knowledge standard will serve the relevant policy considerations associated with the fight against the AIDS epidemic. I believe the answer is no.

To begin with, the majority fails even to recognize the relevant policy considerations associated with the AIDS epidemic because the majority assumes that AIDS is the same as other sexually transmitted diseases and the same analytic framework can be applied to the negligent transmission of HIV as is applied to other sexually transmitted diseases (See maj. opn., *ante*, at p. 1193.) This is inaccurate. Unlike other sexually transmitted diseases HIV infection has been, and continues to be, life-threatening "killing over half a million Americans as of the end of 2003." (Maj. opn., *ante*, at p. 1195.) There are also significant medical differences between these other sexually transmitted diseases and HIV infection. HIV infection can remain latent for years before the appearance of any kind of symptom, unlike other sexually transmitted diseases and, unlike symptoms associated with other sexually transmitted diseases, the

symptoms of AIDS-related disease, because they are generally nonspecific to AIDS, may not necessarily alert a person to the fact that he or she is HIV positive. (U.S. Dept. of Health & Human Services, Centers for Disease Control and Prevention (CDC), HIV/AIDS Prevention in the United States FAQ: How Can I Tell if I'm Infected with HIV?, at < [as of July 3, 2006] ["The only way to know if you are infected is to be tested for HIV infection. You cannot rely on symptoms to know whether or not you are infected. Many people who are infected with HIV do not have any symptoms at all for many years . . . . The symptoms of AIDS are similar to the symptoms of many other illnesses."].) Finally, AIDS is unique in the opprobrium with which those infected with HIV are viewed in part because one of the populations most at risk has been traditionally stigmatized on the basis of sexual orientation. (*Urbaniak v. Newton* (1991) 226 Cal.App.3d 1128, 1140 [HIV-positive status "is ordinarily associated either with sexual preference or intravenous drug uses. It ought not to be, but quite commonly is, viewed with mistrust or opprobrium"]; *Herbert v. Regents of University of California* (1994) 26 Cal.App.4th 782, 788 [" 'Public speculation about the potential for transmission of [the AIDS] virus, the degree of morbidity, and other factors, has led to expression of public fears or anxieties approaching, in some circumstances, panic or hysteria' "]; see CDC, HIV/AIDS Prevention in the United States, Basic **[38 Cal.4th 1216]** Prevention, Fact Sheet, A Glance at the HIV/AIDS Epidemic at < (as of July 3, 2006) ["In 2004, the largest estimated proportion of HIV/AIDS diagnoses were for men who have sex with men (MSM), followed by adults and adolescents infected through heterosexual contact."].)

The convergence of these three factors: the potential deadliness of HIV infection, the possibility that a person may be unknowingly infected with HIV for years and the opprobrium to which those who are infected have been subjected, distinguishes HIV/AIDS from all other sexually transmitted diseases. Thus the battle to contain the transmission of HIV raises complex questions of public and public health policy not present with respect to other sexually transmitted diseases. Some of these questions are: What is the best way to promote testing for HIV given that testing is the only way to definitively determine HIV status? How can transmission of the virus be contained in light of the long period of latency and the absence of specific recognizable symptoms? How should prevention measures be balanced against the right of privacy in sexual matters? How can a policy promoting testing and preventing transmission be crafted so as to prevent discrimination against those infected with HIV and stigmatization of populations vuluerable to infection?

These are the questions this court should be consider before rushing into the complex terrain that constitutes AIDS policy. The majority have failed to adequately and persuasively address these difficult issues. Equally glaring is the majority's failure to adequately consider the Legislature's response to these questions because, for the last two decades, the Legislature has been the body responsible for setting AIDS policy in California through its enactment of a comprehensive system of AIDS-related statutes. (See Cal. Dept. of Health Services, Off. of AIDS, A Brief Guide to Cal.'s HIV/AIDS Laws, 2004 (Feb. 2005).) fn. 3 **[38 Cal.4th 1217]**

The Legislature's response to those policy questions I posed earlier has been to enact laws that encourage voluntary testing and voluntary disclosure of HIV status, promote initiatives to educate sexually active Californians about how to protect themselves against HIV infection, and guard against any tendency to conflate transmission of the virus with sexual orientation. Crucial to these policy goals is the requirement that HIV testing and test results be absolutely confidential. The guarantee of confidentiality is so important to the Legislature's efforts that unauthorized disclosure of another person's HIV test results may be punishable by fines and even imprisonment. (Health & Saf. Code, § 120980.) fn. 4

The Legislature's concern for confidentiality specifically extends to prohibiting unauthorized disclosure of an individual's HIV test results in civil discovery proceedings. Health and Safety Code section 120975 provides that to "protect the privacy of individuals who are the subject of blood testing for antibodies to human immunodeficiency virus . . . : [¶] . . . no person shall be compelled in any state, county, city or other local *civil*, criminal, administrative, legislative, or other proceedings to identify or provide identifying characteristics that would identify any individual who is the subject" of an HIV test. (Health & Saf. Code, § 120975; italics added.)

*Irwin Memorial Blood Centers v. Superior Court* (1991) 229 Cal.App.3d 151, examined this prohibition in the context of civil discovery and concluded that the prohibition is absolute. In *Irwin*, the plaintiffs brought an action against a blood bank alleging that they had acquired AIDS from infected blood. They sought to take the depositions of blood donors implicated as potential sources of their infection. Applying the predecessor statute to Health and Safety Code section 120975, the Court of Appeal quashed an order granting the request even though the depositions were to be taken "behind a screen." (*Irwin*, at p. 157.) "[T]he production of the donor for deposition is in itself an identification within the meaning of the **[38 Cal.4th 1218]** statute. . . . Until the time that the donor appears for deposition, the donor is a number unconnected to a person. Once the person is required to step forth, the connection between the number and the person is made. The donor has been identified. The *extent* to which that identification is made known to third parties will depend upon the care taken at the deposition but the identification in a civil proceeding has been made. This the statute prohibits." (*Ibid.*)

The majority does not attempt to reconcile the discovery that they authorize with Health and Safety Code section 120975 except to assert that defendant has waived his protection by placing his HIV status at issue. (Maj. opn., *ante*, at p. 1198.) Even if this is true of defendant's own HIV status, it is not true of the identity or HIV status of any third party with whom he may have had a sexual relationship. While the discovery authorized by the majority regarding defendant's sexual history does not include identifying information for his prior sexual partners or their HIV status, but only the dates and number of his sexual encounters with other men, nothing in the majority opinion prevents plaintiff from renewing her request for such identifying information. To the contrary, the majority opinion *encourages* her to seek this information because it deems the discovery of defendant's sexual history relevant to whether defendant had reason to know he was infected with HIV. Moreover, at argument, plaintiff's counsel *acknowledged* that he would learn nothing useful if all that is disclosed to plaintiff is the limited information of the dates and number of defendant's past sexual encounters with other men. Now that plaintiff has the benefit of the majority opinion, she will inevitably renew her request for the identity of defendant's sexual partners to ascertain their HIV status and the particulars of their encounters with defendant. fn. 5

Thus, by creating this new tort, the majority puts this court into the position of encouraging plaintiff to seek disclosure that is not only statutorily prohibited (Health & Saf. Code, § 120975; *Irwin Memorial Blood Centers v. Superior Court, supra,* 229 Cal.App.3d at p. 157), and subject to civil and **[38 Cal.4th 1219]** criminal penalties (Health & Saf. Code, § 120980) but quite likely unconstitutional as well. (*Vinson v. Superior Court* (1987) 43 Cal.3d 833, 841 ["California's privacy protection . . . embraces sexual relations"].) Moreover, once people realize that their HIV status may be exposed during the course of discovery in cases like this, the incentive for voluntary testing provided by the Legislature's extensive guarantees of confidentiality will be eroded.

The majority seeks to justify imposition of a constructive knowledge standard by asserting that "limiting tort defendants to those who have actual knowledge they are infected with HIV would have perverse effects on the spread of the virus" because it would provide an incentive for some individuals to avoid diagnosis and treatment in order to avoid knowing they are infected. (Maj. opn., *ante*, at p. 1190.) I find it difficult to believe that avoidance of theoretical future civil liability would play any part in the decision of most people whether or not to get tested to determine if they are infected with a potentially life-threatening virus. I would also point out that this is the first case to reach our appellate courts in which a defendant is alleged to have negligently transmitted HIV. I submit, therefore, that the negligent transmission of HIV by irresponsible individuals is not such a widespread phenomenon that it requires us to create a new tort based on a knowledge standard the scientific viability of which has not been demonstrated and which raises serious issues about statutorily protected confidentiality guarantees and the state constitutional guarantee of privacy. Finally, to the extent that future civil liability is a concern, the majority opinion may have its own "perverse effects on the spread of the virus" by deterring voluntary disclosure of HIV infection to avoid such liability. If a person learns through testing that he or she is HIV positive, he or she would have no incentive to disclose the results of his or her status to his or her former sexual partners so that they might be tested, because under the majority's holding, to do so would invite them to sue him or her on the theory that he or she should have known he or she was infected even before he or she obtained the test results.

The majority finds "remarkable" what the majority characterizes as "our dissenting colleagues' proposed rule that even when substantial evidence indicates an HIV-positive individual has reason to know of his or her infection, that individual owes *no duty of care* as a matter of law to any sexual partner, and that such a duty could arise *only* when the individual acquires actual knowledge of the infection -- although neither [dissent] ever defines how actual knowledge may be established . . . ." (Maj. opn., *ante*, at p. 1197, fn. 9.) The majority then, after repeatedly stating that it need not decide what facts would satisfy its reason to know standard, posits an hypothetical example that apparently would fulfill that standard, to wit, "an **[38 Cal.4th 1220]** intravenous drug user who knowingly shares needles daily with a circle of HIV-positive individuals and has 'symptoms associated with HIV.' " (*Ibid.*)

My conclusion that constructive knowledge should not be the standard for negligent transmission of HIV is guided by my assessment of the policy issues raised by the AIDS epidemic and the legislative response to those issues. It is the majority's disregard for these policy considerations and the Legislature's policy judgments in its rush to create this new tort, and not my analysis, that is "remarkable." In my view, the majority's ill-considered decision "intrudes into the Legislature's domain and indulges its own notions about what constitutes good public policy." (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1209 (dis. opn. of Baxter, J.).) As for how actual knowledge may be established, as I have noted, according to the CDC, at this point in time, the only way an individual can definitively know whether he or she is infected is through testing. Whether there are or may be other diagnostic tools by which to determine a person's HIV status is not before us, in part because the majority's decision, unlike the Legislature's policy judgments, is not based on any of the underlying science that bears upon HIV infection or transmission.

As to the majority's hypothetical example -- which indulges the rhetorical trick of setting forth an extreme scenario to justify a dubious conclusion -- I would observe, first, that the example is incomplete because the majority neither explains how the hypothetical drug user would know that his fellow users are HIV positive nor describes his symptoms and their specific association with HIV as opposed to other illness. Moreover, after 25 years of widely available public information regarding the risk factors for HIV and the manner in which HIV is transmitted, one would think the potential sexual partner of an intravenous drug user bearing needle marks and showing signs of any kind of illness would, if not run for the nearest exit, insist on precautions against possible transmission of HIV.

Second, the majority's hypothetical example conflates reason to know that one is at higher risk of infection with reason to know that one is HIV positive. The drug user in the majority's hypothetical would certainly have reason to know he was at higher risk of infection but not necessarily that he was infected with HIV. As I understand the majority, a person who is in possession of knowledge that he or she is at higher risk of HIV infection would not be liable for the negligent transmission of HIV based on a theory he or she had reason to know he or she was HIV positive. If this is not the case, then the majority should be clear about what type of liability it is creating with this new tort. **[38 Cal.4th 1221]**

The majority's rejection of an actual knowledge standard as a predicate for imposing liability for transmitting HIV also flies in the face of the Legislature's adoption of an actual knowledge standard in statutes that penalize the transmission of the virus. Health and Safety Code section 120291 makes it a felony, punishable by up to eight years in state prison, for a person to "expose[] another to . . . [HIV] by engaging in unprotected sexual activity when the infected person *knows* at the time of the unprotected sex that he or she is infected with HIV, has not disclosed his or her HIV-positive status, and acts with the specific intent to infect another person with HIV." (Health & Saf. Code, § 120291, subd. (a), italics added.) fn. 6 Health and Safety Code section 1621.5 also makes it a felony, punishable by up to six years in prison, "for any person to donate blood, body organs or other tissue, semen . . . , or breast milk . . . who *knows* that he or she has acquired immune deficiency syndrome, as diagnosed by a physician and surgeon, or who *knows* that he or she has tested reactive to HIV." (Health & Saf. Code, § 1621.5, subd. (a), italics added.) Finally, Penal Code section 12022.85 imposes a three-year sentence enhancement on any person who commits a specified sexual offense "with *knowledge* that he or she has acquired immune deficiency syndrome (AIDS) or with *knowledge* that he or she carries antibodies of the human immunodeficiency virus at the time of the commission of those offenses." (Pen. Code, § 12022.85, subd. (a), italics added.)

The Legislature's use of an actual knowledge standard in statutes that criminalize the transmission of HIV is significant and instructive. The Legislature has not hesitated to impose criminal penalties based upon constructive as well as actual knowledge when it has deemed constructive knowledge sufficient to warrant liability. (See e.g., Pen. Code, § 245, subd. (c) [assault with a deadly weapon or instrument, other than a firearm, upon a victim whom the perpetrator "knows or reasonably should know . . . is a peace officer or firefighter engaged in the performance of his or her duties"]; id., subd. (d) [same, for assault with a firearm]; id., § 12022.9 [imposing a five-year enhancement for an injury inflicted during the commission of a felony upon a victim whom the perpetrator "knows or reasonably should know . . is pregnant"].) Yet, despite the Legislature's greater expertise dealing with the AIDS epidemic, it has not adopted a constructive knowledge standard in statutes criminalizing the transmission of AIDS. Rather, the Legislature has recognized, through its educational and public information initiatives, that the responsibility for preventing the spread of HIV must rest **[38 Cal.4th 1222]** primarily with sexually active individuals precisely because the virus may be unknowingly and unwittingly transmitted. Therefore, I conclude that the Legislature's use of an actual knowledge requirement in these penal statutes reflects a legislative judgment that a constructive knowledge standard is not appropriate for purposes of imposing civil liability for the transmission of HIV.

The majority asserts that the Legislature's use of an actual knowledge standard in these criminal statutes "in no way suggests that the Legislature intended to depart from Civil Code section 1714 or from ordinary negligence principles in a *civil* action for negligent transmission of HIV." (Maj. opn., *ante*, at p. 1196-1197, fn. omitted.) This assertion is consistent with the majority's decision to ignore the unique nature of the AIDS epidemic and minimize the implications of legislative policy judgments with respect to the epidemic as reflected in the large body of AIDS law. The Legislature, much more than this court, has a long history of responding to the epidemic and doing so with an expertise this court cannot command in service of the goal of reducing HIV infection. Plainly, if the Legislature believed that a constructive knowledge standard was workable and would help achieve that goal it would not have hesitated to include that standard in the HIV penal statutes, just as it has adopted a constructive knowledge standard in other penal statutes where it deemed the use of such a standard necessary to protect the public safety. Thus, the Legislature's decision *not* to use a constructive knowledge standard, but to premise criminal liability for the transmission of HIV on actual knowledge only, cannot be dismissed as irrelevant to the discussion of civil liability which, in effect, is what the majority has done.

Finally, I am concerned that the creation of this new tort is also inconsistent with the Legislature's policy of guarding against the conflation of transmission of HIV with sexual orientation in a way that stigmatizes one of the populations most vulnerable to infection. This legislative solicitude is demonstrated, for example, in Health and Safety Code section 120292, which governs disclosure of HIV records in criminal investigation. In that statute, the Legislature has specifically provided that a court order for such records "shall not be based upon the sexual orientation of the defendant." (*Id.*, § 120292, subd. (a)(1).) In this same vein, the Legislature has mandated that AIDS education in public schools include "[d]iscussion about societal views on HIV/AIDS, including stereotypes and myths regarding persons with HIV/AIDS. This instruction shall emphasize compassion for persons living with HIV/AIDS." (Ed. Code, § 51934, subd. (b)(7).) Thus, in adopting AIDS policy, the Legislature has been sensitive to the need to separate the public health issues raised the AIDS epidemic from the prejudice AIDS has generated toward some of its victims. The majority does not similarly consider whether and what impacts its creation of this new tort might have on the populations most vulnerable to infection. **[38 Cal.4th 1223]**

For these reasons, I dissent from the majority's creation of a cause of action for negligent transmission of HIV based on a constructive knowledge standard. I would find that civil liability for transmission of the virus must be predicated upon actual knowledge of infection. This result would be consistent with the Legislature's painstaking formulation of a comprehensive policy to combat the AIDS epidemic.

By contrast, the majority's result is inconsistent with legislative policy. The majority allows a person who tests HIV positive to bring an action against all former sexual partners and attempt to ascertain not only whether they had actual knowledge they were HIV positive when they engaged in sexual relations but also whether they had any "reason to know" they were HIV positive. fn. 7 This cause of action potentially licenses invasions into the sexual privacy of all sexually active Californians and may even invite abuse of

the judicial process. One can easily foresee a spate of "shakedown" or vengeance lawsuits brought by plaintiffs whose motivation is not so much to discover how they contracted HIV as to force lucrative settlements or embarrass a former sexual partner by exposing that person's sexual history in the guise of obtaining relevant discovery. Even without this potential for abuse, the threat to the confidentiality of HIV test results and to sexual privacy, the apparent absence of any scientific grounding for a constructive knowledge standard, and the potential for stigmatization of individuals based on their sexual orientation are powerful arguments against this novel theory of liability for the negligent transmission of HIV. I understand that the majority is guided by the commendable goal of preventing transmission of HIV and AIDS, but creating this new tort is not the way to go about it. Instead, with this decision the majority has opened a Pandora's box. For these reasons, I respectfully but emphatically dissent.

FN 1. We note that the Proposed Final Draft of section 18, subdivision (a) of the Restatement Third of Torts, Liability for Physical Harm, imposes a duty to warn or to adopt further precautions if "the defendant knows or has reason to know" of the risk and "that those encountering the risk will be unaware of it." Included in the examples of the "range of defendant conduct that can give rise" to this duty is "the defendant who is about to come into intimate contact with the plaintiff . . . for failing to warn the plaintiff that the defendant suffers from a communicable disease." (Rest.3d Torts; Liability for Physical Harm (Proposed Final Draft No. 1, Apr. 1, 2005) § 18, com. a, p. 247.)

FN 2. United States Department of Health and Human Services, Centers for Disease Control and Prevention (CDC), HIV/AIDS Prevention in the United States FAQ: How can I Tell if I'm Infected with HIV?, at < (as of July 3, 2006).

FN 3. "Chlamydia is known as a 'silent' disease because about three quarters of infected women and about half of infected men have no symptoms." (CDC, Sexually Transmitted Diseases, Chlamydia-CDC Fact Sheet, at < [as of July 3, 2006].)

FN 4. "Although many men with gonorrhea may have no symptoms at all, some men have some signs or symptoms that appear two to five days after infection; symptoms can take as long as 30 days to appear. . . . [¶] In women, the symptoms of gonorrhea are often mild, but most women who are infected have no symptoms. Even when a woman has symptoms, they can be so non-specific as to be mistaken for a bladder or vaginal infection." (CDC, Sexually Transmitted Diseases, Gonorrhea-CDC Fact Sheet, at < [as of July 3, 2006].)

FN 5. "Many people infected with syphilis do not have any symptoms for years." "It has often been called 'the great imitator' because so many of the signs and symptoms are indistinguishable from those of other diseases." (CDC, Sexually Transmitted Diseases, Syphilis-CDC Fact Sheet, at < (as of July 3, 2006].)

FN 6. "Most people infected with HSV-2 [herpes simplex virus type 2] are not aware of their infection. . . . [T]hey may have very mild signs that they do not even notice or that they mistake for insect bites or another skin condition." (CDC, Sexually Transmitted Diseases, Genital Herpes-CDC Fact Sheet, at < [as of July 3, 2006].)

FN 7. "Most HPV infections have no signs or symptoms; therefore, most infected persons are unaware they are infected, yet they can transmit the virus to a sex partner." (CDC, Sexually Transmitted Diseases, Genital Herpes-CDC Fact Sheet, at < [as of July 3, 2006].)

FN 8. At oral argument, John abandoned our dissenting colleagues' contention that actual knowledge is an essential predicate to liability. He claimed instead that actual knowledge of HIV infection, as verified by a medical diagnosis or test, *or* constructive knowledge based on a very limited category of symptoms of HIV (namely, Kaposi's sarcoma) or a medical opinion was required before an individual could be liable for negligent transmission of HIV. He also urged the court to "lock in the duty" he described so as to avoid having to consider "constantly evolving medical and epidemiological information" concerning the disease.

Once again, John has failed to cite any legal authority for the limited duty he proposes. Nonetheless, his concession demonstrates the appropriateness of imposing liability on those who, under the totality of the circumstances, have reason to know they are infected. As stated earlier, it is premature to decide here which physical symptoms, considered in isolation or in combination with conduct reasonably likely to have resulted in the transmission of the virus, would support a finding of liability for negligent transmission of HIV. The question of duty depends on the facts of a particular case, including available medical and epidemiological information. This opinion does not purport to offer a primer on proving the tort of negligent transmission of HIV, but inquires only whether the discovery Bridget has requested is relevant to the tort or is reasonably calculated to lead to the discovery of admissible evidence. We therefore decline John's invitation to "lock in the duty" he has described.

FN 9. In particular, we find remarkable our dissenting colleagues' proposed rule that even when substantial evidence indicates an HIV-positive individual has reason to know of his or her infection, this individual owes *no* duty of care as a matter of law to any sexual partner, and that such a duty could arise *only* when the individual acquires actual knowledge of the infection-although neither Justice Werdegar nor Justice Moreno ever defines how actual knowledge may be established, other than to reject the definition Justice Kennard proposes. Thus, under their proposed rule, an intravenous drug user who knowingly shares needles daily with a circle of HIV-positive individuals and has symptoms "associated with HIV" (dis. opn. of Moreno, J., *post*, at p. 1214, fn. 1) owes *no* duty of care as a matter of law when he or she insists on engaging in unprotected sex with or donates blood to uninfected individuals. Or, to put it another way, a defendant spouse who was in a relationship that "contemplated sexual exclusivity," who "represented himself as disease free and repeatedly insisted that the parties forgo the use of condoms," and who had reason to know he was infected with HIV has no duty even to warn the other spouse. (Dis. opn. of Werdegar, J., *post*, at p. 1211.) None of the statutes cited by our colleagues even arguably suggests the Legislature intended these results.

FN 10. The dissenting opinions rely also on a false dichotomy between tort recovery for those individuals who have been negligently infected with HIV and legislative efforts to build awareness of HIV through education and voluntary testing. Education and tort liability can-and invariably *do*-work hand in hand in preventing harmful behavior. (*Developments in the Law: Sexual Orientation and the Law* (1989) 102 Harv. L.Rev. 1508, 1530, fn. 77 ["Education and tort suits against persons transmitting AIDS through sexual conduct are other viable alternatives for deterring AIDS transmission"].) We likewise disagree with Justice Moreno that the best way to protect "the populations most vulnerable to infection" with HIV is to reduce the incentive of all infected persons to guard against transmission of the virus. (Dis. opn. of Moreno, J., *post*, at p. 1222.)

FN 11. CDC, HIV/AIDS Prevention in the United States, FAQ: Symptoms; Testing; Treatment: How long after a possible exposure should I wait to get tested for HIV?, at < (as of July 3, 2006).

FN 12. We note also that John has already propounded discovery concerning Bridget's sexual history designed to uncover other possible agents of her infection. Those requests are not before us, and we express no views as to their propriety.

FN 1. For clarity, I emphasize that, contrary to the majority's assertion, I have not proposed any categorical rule that a defendant spouse who behaves as defendant here is alleged to have behaved and who has "reason to know" he is infected with HIV "has no duty even to warn the other spouse." (Maj. opn., *ante*, at p. 1197, fn. 9, citing this dissent.) Rather, I agree such a person *may* have a duty to warn a spouse if, in fact, he knows he is infected. But I remain unwilling on the present record, which does not permit full consideration of the public policy ramifications, to impose new warning duties on persons who do *not* know they are infected.

FN 2. Health and Safety Code section 120975 provides in its entirety: "To protect the privacy of individuals who are the snbject of blood testing for antibodies to human immunodeficiency virus (HIV), the following shall apply: [¶] Except as provided in Section 1603.1 [disclosure to blood banks by health officials], 1603.3 [notification of blood donors], or 121022 [assuring access to anonymous testing while

directing health care providers to report HIV cases consistently with federal funding requirements], no person shall be compelled in any state, county, city, or other local civil, criminal, administrative, legislative, or other proceedings to identify or provide identifying characteristics that would identify any individual who is the subject of a blood test to detect antibodies to HIV."

FN 1. In *Doe v. Johnson*, plaintiff Jane Doe alleged that defendant Earvin "Magic" Johnson wrongfully transmitted HIV to her through consensual sexual conduct. Included in her action were allegations that Johnson knew or should have known he was infected with HIV. The district court found that constructive knowledge could be based on the presence of symptoms associated with HIV or actual knowledge that a prior partner was HIV positive. (*Doe v. Johnson, supra,* 817 F.Supp. at p. 1392.) Although I do not agree with *Doe* that a constructive knowledge standard is appropriate in a claim involving the negligent transmission of HIV, *Doe* at least applies a more rigorous standard of what constitutes constructive knowledge than the majority.

FN 2. In *Plaza v. Estate of Wisser* (App. Div. 1995) 626 N.Y.S.2d 446, the appellate court, without substantive analysis, held that allegations in a complaint that the defendant knew or had reason to know he was infected with HIV prior to his having been diagnosed as HIV positive, including an allegation that he was aware a prior sexual partner was HIV positive, were sufficient to withstand a motion to dismiss fraud and negligence claims. (*Id.* at pp. 450-451.) These allegations were made in a procedural context that required the reviewing court to accept them as true. (*Id.* at p. 452.)

FN 3. The majority insists that HIV is no different from other sexually transmitted diseases like syphilis and HPV because they "are also life-threatening," and a social stigma may also attach to them. (Maj. opn., *ante,* at p. 1196.) The majority asserts that "the dissent fails at bottom to explain why the distinctions between HIV and other sexually transmitted diseases warrant wholesale rejection of ordinary tort principles in this case." (Maj. opn., *ante,* at p. 1196.) My point, of course, is not that tort principles are inapplicable to transmission of HIV but that the applicability of such principles *must* be examined in light of the special policy issues raised by HIV and the Legislature's response to those issues to ensure that the courts and the Legislature are on the same page with respect to combating this still potentially lethal disease. Since the majority denies that HIV is any different than other sexually transmitted diseases, it fails to undertake this examination. The majority's comparison of HIV to other sexually transmitted diseases is also specious. While other sexually transmitted diseases may have serious consequences, if untreated, and some degree of social stigma may attach to them, there is simply no comparison between those diseases and HIV in terms of the life-threatening potential of HIV and the stigma that attaches to it because of its association with drug use and homosexuality. (See, e.g., Fullbright, *Disease Denial Devastating For African Americans,* S.F. Chronicle (June 5, 2005), pp. 1, 8 ["The decades-long lag in identifying AIDS as a black health issue results from both the disease's initial identification as a white epidemic and its association with homosexuality, which carries a heavy stigma in the black community"].) The singularity of HIV is also evident in the Legislature's response to the AIDS epidemic in comparison to its treatment of other sexually transmitted diseases. For example, while the Legislature created a Office of AIDS within the California Department of Health (Health & Saf. Code, § 100117) it has not created a comparable office for any of the sexually transmitted diseases mentioned by the majority nor has it enacted anything like the large body of AIDS-specific statutes with regard to these other sexually transmitted diseases. Given all this, it is simply not plausible to assert that AIDS is no different from other sexually transmitted diseases.

FN 4. The recent enactment of legislation that requires California to use a name-based system for reporting cases of HIV/AIDS to public health agencies in order to protect federal funding does not impact statutes that bar the unauthorized disclosure of an individual's HIV status. (Keller, *Schwarzenegger Signs Bill to Track HIV Cases by Name,* L.A. Times (Apr. 18, 2006) p. B3.)

FN 5. The majority's response that it need not consider the propriety of discovery requests not before it is part and parcel of its failure to examine the ramifications of its decision on legislatively enacted HIV policy, specifically, in this case, the effect of its newly minted tort on the proscription against the discovery of HIV test results in Health and Safety Code section 120975. This failure is particularly conspicuous in

this case where, in argument, plaintiff's counsel essentially informed this court that he will be seeking identifying information about defendant's sexual partners. The majority also asserts that my interpretation of the HIV confidentiality statutes would "eliminate entirely the possibility of tort liability for the knowing *or* negligent transmission of HIV." (Maj. opn., *ante*, at p. 1197.) Certainly, one reading of these statutes may be that they would bar a claim for transmission of HIV insofar as that claim required a defendant to disclose his or her HIV status or the status of his or her sexual partners. This is precisely the kind of question with which the majority might have been expected to grapple before rushing to create a novel cause of action for transmission of HIV based on a constructive knowledge standard.

FN 6. Yet even a defendant accused of this offense does not lose all of his or her privacy rights with respect to information about his or her HIV status. Health and Safety Code section 120292 permits disclosure of such information only with a court order and only after the court has "weigh[ed] the public interest and the need for disclosure against any potential harm to the defendant including, but not limited to, damage to the physician-patient relationship and to treatment services." (Health & Saf. Code, § 120292, subd. (a)(2).)

FN 7. The majority's suggestion that its holding applies only to "a couple who were engaged and subsequently married" (maj. opn., *ante*, at p. 1193) is no real limitation given that the duty analysis that precedes this statement makes no distinction between married couples and everyone else.