UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: NEW ENGLAND COMPOUNDING PHARMACY, INC, PRODUCTS LIABILITY LITIGATION | |
| | MDL No. 2419 |
| | Master Dkt: 1:13-md-02419-FDS |
| THIS DOCUMENT RELATES TO: | |
| All Actions | |

**NEUROMUSCULAR AND REHABILITATION ASSOCIATES OF NORTHERN MICHIGAN ("NRANM") SUPPLEMENTAL BRIEF IN SUPPORT OF OBJECTIONS TO THE PLAINTIFFFS' STEERING COMMITTEE'S SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

NOW COMES Neuromuscular and Rehabilitation Associates of Northern Michigan ("NRANM") by and through its attorneys, Hackney, Grover, Hoover and Bean, PLC, and pursuant to this Honorable Court's July 18, 2013 request for Supplemental Briefs on the issue of this Court's authority to enforce subpoenas that seek information that violates Michigan's statutory physician –patient privilege submits the following Supplemental Brief:

I.   **INTRODUCTION**

NRANM is a Michigan company that operates a rehabilitation clinic in Michigan. NRANM is **not** a party to this multi-district litigation ("MDL"), but is presently a Defendant in one state court action relating to the administration of methylprednisolone acetate ("MPA") purchased from the New England Compounding Pharmacy (hereinafter referred to as "NECC"). Importantly, upon information and belief the alleged NECC contaminated MPA

HG
HB

was only allegedly administered by NRANM between August 13, 2012 and September 26, 2012.

On June 26, 2013, the plaintiff's steering committee ("PSC") for the above captioned matter served a subpoena on NRANM demanding production of 21 separate categories of documents/information. (A copy of the subpoena and the exhibit to the subpoena is attached as Exhibit 1.[1]) The subpoena seeks production of information, which, if produced under the current circumstances, would violate Michigan's statutory physician-patient privilege. (Mich. Comp. Laws 600.2157) Because the Michigan physician-patient privilege must be used to analyze this objection to the subpoena when there is no federal common law and Congress has not codified such a privilege and when, under application of Michigan's physician-patient privilege, production of the sought protected health information would be prohibited, this Honorable Court, respectfully, does not have the authority to enforce the PSC's subpoena relative to the production of protected health information sought from nonparty NRANM.

## II.   LAW AND ARGUMENT

### A.   Relevant Standards Of Review

FRCP 45(c)(3) permits this Court to quash or modify a subpoena that requires the disclosure of privileged matter. Similarly, FRCP 26(b)(1) limits the scope of discovery to non-privileged matters that are relevant to a party's claim or defense. This Court is required to quash a subpoena if it seeks to compel the disclosure of privileged matters for which no exception or waiver applies. FRCP 45 (c)(3)(A)(iii). The instant subpoena requests matters

---

[1] Although the PSC has indicated it will "accommodate" NRANM's objection by narrowing the scope of the information sought in the subpoena, NRANM has not been served with any such modified subpoena and the subpoena still seeks information, the production of which violates the statutory Michigan physician-patient privilege.

2

that are subject to the Michigan physician-patient privilege (Mich. Comp. Laws 600.2157) and therefore must be quashed.

A subpoena for documents issued to a nonparty to an action (such as NRANM), must issue from the court for the district where the production will be made. FRCP 45(a)(2)(C). Under such circumstances, any disputes concerning the subpoena must be resolved by the court that issued the subpoena. FRCP 45(c)(2)(B). Accordingly, in multi-district litigation, it has been held that the MDL Judge, for purposes of enforcing a subpoena for documents, acts as a judge in the discovery district. *U.S. ex rel. Pogue v Diabetes Treatment Centers of America, Inc.*, 444 F3d 462, 468-469 (6th Cir. 2006). As stated in *Pogue* at 468-469:

> A judge presiding over an MDL case therefore can compel production by an extra-district nonparty; enforce, modify, or quash a subpoena directed to an extra-district nonparty; and hold an extra-district nonparty deponent in contempt, notwithstanding the nonparty's physical situs in a foreign district where discovery is being conducted.

Thus, an MDL judge has the authority to enforce a subpoena in the discovery district and is acting as a judge in *that* district when doing so.

In this case, the subpoena at issue served on NRANM was issued in Michigan and required disclosure of information in Southfield, Michigan. (Exhibit 1)Therefore, this Court is sitting as a Judge in the United States District Court for the Eastern District of Michigan in deciding whether to enforce or quash a subpoena that seeks disclosure of information contrary to MCL 600.2157 from a nonparty.

Notably, in matters of deciding whether a state privilege applies, this Court is required to apply the law of the forum state in which this Court sits; in this case, Michigan. FRE 501; *Palmer v Fisher*, 228 F.2d 603, 608-609 (7th Cir. 1955); *In re Westinghouse Electrical Corp. Uranium Contracts Litigation*, 76 F.R.D. 47, 53 (W.D. Pa. 1977); *In re Baycol Products*

HG
HB

3

*Litigation*, 219 F.R.D 468, 469 (D.Minn. 2003); *In re Zimmer Nexgen Knee Implant Productions Liability Litigation*, 890 F. Supp. 2d 896, 901-903 (N.D. Ill. 2012).

FRE 501 reads:

The common law-as interpreted by United States courts in the light of reason and experience-governs a claim of privilege unless any of the following provides otherwise:
- the United States Constitution;
- a federal statute; or
- rules prescribed by the Supreme Court.

*But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.* (Emphasis supplied.)

The physician-patient privilege does not exist under federal common law and Congress has not codified such a privilege. *Griffin v Sanders*, 2012 WL 5817928 (E.D. Mich) citing *G.M.C. v Dir. Of the Nat'l Inst. For Occupational Safety & Health*, 636 F.2d 163, 165 (6th Cir. 1980)(citing *Whalen v Roe*, 429 U.S. 589, 602 n. 28; 97 S.Ct. 869; 51 L.Ed.2d 64 (1977).

Because the instant matter is a civil case to which no federal common law or federal statute applies, the law governing the physician-patient privilege in the state of Michigan applies.

### B. The Information At Issue Sought In the PSC Subpoena Is Privileged Under Michigan Law.

The physician-patient privilege is statutorily created in Michigan and is found at MCL 600.2157. Michigan law prohibits a physician from disclosing any information regarding his or her patients obtained during the course of rendering treatment. MCL 600.2157 provides:

*Except as otherwise provided by law, a person duly authorized to practice medicine or surgery shall not disclose any information that the person has acquired in attending a patient in a professional character, if the information was necessary to enable the person to prescribe for the patient as a physician, or to do any act for the patient as a surgeon. If the patient brings an action against any defendant to recover for any personal injuries, or for any malpractice, and the patient produces a physician as a*

HG
HB

4

witness in the patient's own behalf who has treated the patient for the injury or for any disease or condition for which the malpractice is alleged, the patient shall be considered to have waived the privilege provided in this section as to another physician who has treated the patient for the injuries, disease, or condition. If the patient has died, the heirs at law of the patient, whether proponents or contestants of the patient's will, shall be considered to be personal representatives of the deceased patient for the purpose of waiving the privilege under this section in a contest upon the question of admitting the patient's will to probate. If a patient has died, the beneficiary of a life insurance policy insuring the life of the patient, or the patient's heirs at law, may waive the privilege under this section for the purpose of providing the necessary documentation to a life insurer in examining a claim for benefits. (Emphasis supplied.)

Michigan courts have been very clear that the statutory physician-patient privilege is an absolute bar that protects the medical information of nonparty patients. See, e.g., *Baker v Oakwood Hosp. Corp.*, 608 NW2d 823 (Mich. Ct. App. 2000); and citing, *Schechet v Kesten*, 126 NW2d 718 (Mich. 1964); *Dorris v Detroit Osteopathic Hosp.*, 594 N.W.2d 455 (Mich. 1999); *Popp v Crittenton Hosp.*, 449 N.W.2d 678 (Mich. Ct. App. 1989); *Dierickx v Cottage Hosp. Corp.*, 393 N.W.2d 564 (1986). In applying this privilege, the names, addresses, telephone numbers and medical information relative to nonparty patients all fall within the scope of the privilege. *Steiner v Bonanni*, 807 N.W.2d 902, 274-275 (Mich. Ct. App. 2011)

The subpoena served on NRANM by the PSC seeks medical information about patients of NRANM, the disclosure of which would offend the physician-patient privilege under MCL 600.2157. For example, The PSC subpoena seeks, *inter alia*, "Any and all documents…related to, the identification of each and every patient that was administered an NECP product during the two-year period immediately preceding October 6, 2012, including patient name, address, date of birth, identification of product administered and date product was administered." (Exhibit 1 at ¶ 6) The subpoena also seeks: "Any and all documents…containing communications made or issued by the Healthcare Provider, its employees and/or agents, in response to any recall notice regarding NECP products."

HG
HB

5

(Exhibit 1 at ¶ 15) The disclosure of the information in ¶¶ 6 and 15 is a violation of MCL 600.2157.

Presently, none of the patients who would be affected by disclosure of the requested information are parties to this matter. Additionally, the PSC has not provided NRANM with a valid release[2], signed by each patient, to indicate a willingness to waive his or her physician-patient privilege. Accordingly, applying Michigan law to this issue should result in quashing the subpoena requests that seek individual patient's health information that is privileged under MCL 600.2157.

### C. HIPPA Does Not Preempt Michigan's Physician-Patient Privilege.

In *Northwest Memorial Hospital v Ashcroft*, 362 F.3d 923, 925 (7th Cir. 2004), the Seventh Circuit expressly held that HIPAA is a procedural statute and *not* "an Act of Congress that creates a privilege." In *Knoynenbelt v Flagstar Bank*, 617 N.W.2d 706, 709-710 (Mich. Ct. App. 2000) the Michigan Court of Appeals, citing *Fidelity Fed. Savings & Loan Ass'n v de la Cuesta*, 102 S.Ct. 3014 (1982), wrote:

> Under the Supremacy Clause of the United States Constitution, US Const, Art VI, Cl 2, federal law preempts state law were Congress so intends... However, there is a strong presumption against preemption of state law and preemption will be found only where it is the clear and unequivocal intent of Congress... Congressional intent to preempt state law may be express or implied... If express, the intent of Congress to preempt state law must be clearly stated in the statute's language or impliedly contained in the statutes structure and purpose.

It is clear that Congress did not intend to preempt state law on the issue of physician-patient privilege when it enacted HIPAA. Specifically, the HIPAA preemption statement, as set forth in 45 C.F.R. § 160.203(b) provides:

---

[2] Presently, there is one lawsuit in Grand Traverse Circuit Court in which a patient of NRANM is suing NRANM, but NECP is not a party (yet). In that case, by initiating a lawsuit against NRANM, the patient has waived the physician-patient privilege. (See MCL 600.2912(f)).

> A standard, requirement, or implementation specification adopted under this subchapter that is contrary to a provision of state law preempts the provision of state law. This general rule applies, except if one or more of the following conditions is met:
>
> \*\*\*
>
> (b) The provision of state law relates to the privacy of individually identifiable health information and is more stringent than a standard, requirement, or implementation specification adopted under subpart E of part 164 of this subchapter.

Thus, HIPAA specifically articulates no intention to preempt state law that is more stringent. While HIPAA allows for disclosure of patient information after notice is given to the patient, Michigan law requires patient consent before disclosure of patient information. The Michigan Court of Appeals made the following observation in *Meier v Awaad*, 832 N.W.2d 251 (Mich. Ct. App. 2013):

> By its language, HIPAA asserts supremacy in this area, but allows for the application of state law regarding physician-patient privilege if the state law is more protective of patients' privacy rights. In the context of litigation that, as here, involves nonparty patients' privacy, HIPAA requires only notice to the patient to effectuate disclosure whereas *Michigan law grants the added protection of requiring patient consent before disclosure of patient information. Because Michigan law is more protective of patients' privacy interest in the context of this litigation, Michigan law applies to plaintiff's attempted discovery of defendant's patient information.*

*Meier, id,* at 258 quoting *Steiner v Bonanni*, 807 N.W.2d 902, 904 (Mich. Ct. App. 2011)) (Emphasis supplied.)

Although a Qualified Protective Order relative to the disclosure of patient information has been entered by this court, HIPAA does not excuse the PSC's attempt to effectuate a violation of Michigan's physician patient privilege and NRANM respectfully asks this Court not to endorse such a violation.

### III. CONCLUSION

Respectfully, this Honorable Court does not have the authority to enforce the PSC's subpoena relative to the production of protected health information sought from nonparty NRANM because the Michigan physician-patient privilege must be used to analyze this

7

objection to the subpoena when there is no federal common law and Congress has not codified such a privilege and when under application of Michigan's physician-patient privilege, production of the sought protected health information would be prohibited.

WHEREFORE, based on the foregoing Supplemental Brief, NRANM respectfully requests that the subpoena served upon it by the PSC be quashed with respect to production of patient information.

Respectfully submitted,

**_Hackney Grover Hoover & Bean, PLC_**
Attorneys for NRANM

/s/ Timothy J. Dardas
By:_____
Brett J. Bean (P31152)
Timothy J. Dardas (P62094)
Business Address
1715 Abbey Road, Suite A
East Lansing, Michigan 48823
Telephone: (517) 333-0306

Dated: July 26, 2013

### CERTIFICATE OF SERVICE

This will certify that a true and accurate copy of the foregoing was served on all parties hereto by virtue of the Court's electronic filing system this 26th day of July, 2013.

/s/ Marcia A. Fogarty
_____
Marcia A. Fogarty

HG
HB

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Massachusetts

| In re New England Compunding Pharmacy, Inc. | ) | |
|---|---|---|
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   MDL 1:13-md-02419 |
| | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Neuromuscular and Rehabilitation Associates of Northern Michigan, c/o Registered Agent, James Mackenzie MD, 3988 West Royal Drive, Traverse City, Michigan 49684

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:
    See Exhibit A

| Place: Marc E. Lipton, Lipton Law, 18930 West Ten Mile Road, Suite 3000, Southfield, Michigan 48075 | Date and Time: 07/15/2013 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

    The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: ___06/21/2013___

    *CLERK OF COURT*
                                                    OR
    _____                       /s/ Marc E. Lipton_____
    *Signature of Clerk or Deputy Clerk*                *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____
Plaintiffs' Steering Committee_____ , who issues or requests this subpoena, are:
Marc E. Lipton, Lipton Law, 18930 West Ten Mile Road, Suite 3000, Southfield, Michigan 48075, marc@liptonlaw.com

Exhibit 1

# Exhibit A to Subpoena

1. Any and all documents and/or electronically stored information ("ESI") reflecting, and/or related in any way whatsoever to, the procurement of methylprednisolone acetate ("MPA") and any other injectable steroid preparations from New England Compounding Pharmacy, Inc. ("NECP") during the two-year period immediately preceding October 6, 2012, including without limitation of the foregoing, information reflecting dates of shipment and/or receipt, quantities of shipment, lot numbers and other identifying labels, sizes of containers of steroid preparation, the cost you paid for the steroid preparation, applicable warranties, shelf life, expiration dates, requirements and instructions for shipment and/or storage, and the specific identity of the preparation being purchased. Also including account information, prescriptions submitted to NECP, prescription order forms, NECP charges for MPA (before and after any discounts applied).

2. Any and all documents and/or ESI reflecting, and/or related in any way whatsoever to, the procurement of MPA, or its generic or name-brand equivalent, from any producer, compounding facility or manufacturer other than NECP, since October 6, 2007, including without limitation of the foregoing, information reflecting dates of shipment and/or receipt, quantities of shipment, lot numbers and other identifying labels, sizes of containers of the product, the cost you paid for the product, applicable warranties, shelf life, expiration dates, requirements and instructions for shipment and/or storage, and the specific identity of the preparation being purchased.

3. Any and all documents and/or ESI reflecting, and/or related in any way whatsoever to, the procurement of cardioplegic solution from NECP during the two-year period immediately preceding October 6, 2012, including without limitation of the foregoing, information reflecting dates of shipment and/or receipt, quantities of shipment, lot numbers and other identifying labels, sizes of containers of cardioplegic solution, the cost you paid for the cardioplegic solution, applicable warranties, shelf life, expiration dates, and requirements and instructions for shipment and/or storage. Also including prescriptions submitted to NECP, prescription order forms, NECP charges for cardioplegic solution (before and after any discounts applied).

4. Any and all documents and/or ESI reflecting, and/or related in any way whatsoever to, the procurement of ophthalmic solution from NECP during the two-year period immediately preceding October 6, 2012, including without limitation of the foregoing, information reflecting dates of shipment and/or receipt, quantities of shipment, lot numbers and other identifying labels, sizes of containers of ophthalmic solution, the cost you paid for the ophthalmic solution, applicable warranties, shelf life, expiration dates, and requirements and instructions for shipment and/or storage. Also including prescriptions submitted to NECP, prescription order forms, NECP charges for opthalmic solution (before and after any discounts applied).

5. Any and all documents and/or ESI reflecting, and/or related in any way whatsoever to, the procurement of preservative-free saline solution from NECP during the two-year period immediately preceding October 6, 2012, including without limitation of the

foregoing, information reflecting dates of shipment and/or receipt, quantities of shipment, lot numbers and other identifying labels, sizes of containers of saline solution, the cost you paid for the saline solution, applicable warranties, shelf life, expiration dates, and requirement and instructions for shipment and/or storage. Also including prescriptions submitted to NECP, prescription order forms, NECP charges for preservative-free saline solution (before and after any discounts applied).

6. Any and all documents and/or ESI reflecting, and/or related to, the identification of each and every patient that was administered an NECP product during the two-year period immediately preceding October 6, 2012, including patient name, address, date of birth, identification of product administered, and date product was administered.

7. Any and all documents and/or ESI reflecting or containing communications (written or otherwise) between Neuromuscular and Rehabilitation Associates of Northern Michigan ("Healthcare Provider"), its employees, principals, partners, and/or agents, and NECP, its employees and/or agents, during the two-year period immediately preceding October 6, 2012, including, but not limited to, any complaints or adverse event reports made to NECP by the Healthcare Provider.

8. Any and all documents and/or ESI reflecting or containing information obtained by the Healthcare Provider, its employees and/or agents, regarding NECP, including without limitation of the foregoing, NECP's qualifications, certifications or accreditations, or lack thereof, regulatory compliance, lack of regulatory compliance, operations, enforcement actions, suitability for conducting its business, legal actions and/or warnings, brochures, policies and procedures, ordering and delivery information company overviews, standard operating procedures, executive summaries, attachments A, B or others (relating to HIPAA, NECP policies and procedures, or other information).

9. Any and all documents and/or ESI reflecting or containing information obtained by, or communications received by, the Healthcare Provider, its employees and/or agents, concerning the fitness of any products purchased or obtained from NECP for their intended use, during the two-year period immediately preceding October 6, 2012, including but not limited to any environmental testing results, microbiology reports or certificates of analysis.

10. Any and all documents and/or ESI reflecting or containing information obtained by, or sent to, the Healthcare Provider, its employees and/agents, from the Centers for Disease Control and Prevention, the Federal Food and Drug Administration, and/or any other Federal, state or local regulatory agency, concerning the fitness of any products manufactured, compounded or produced by NECP for their intended purpose.

11. Any and all documents and/or ESI reflecting or containing communications between the Healthcare Provider and any federal or state agency (including, but not limited to state licensing authorities, the Food and Drug Administration, and the Centers for Disease Control and Prevention) in connection with the procurement of products from any compounding pharmacy.

12. Any and all documents and/or ESI reflecting or containing marketing information from NECP, NECP's agents, or any sales company or person marketing, selling, or attempting to sell products on behalf of NECP.

13. Any and all documents and/or ESI reflecting or containing agreements, contracts and/or warranties between the Healthcare Provider and NECP, NECP's agents, or any sales company or person marketing, selling, or attempting to sell products on behalf of NECP.

14. Any and all documents and/or ESI reflecting or containing recall notices received by the Healthcare Provider pertaining to products produced by NECP, including without limitation of the foregoing, the date, time and manner of receipt of the recall notices, the specific person or persons within the Healthcare Provider who received the notice, and the substance of the notice.

15. Any and all documents and/or ESI reflecting or containing communications made or issued by the Healthcare Provider, its employees and/or agents, in response to any recall notice regarding NECP products, including without limitation of the foregoing, the date, time and manner of transmission of the communication, the person(s) to which the communication was directed, and the person at the Healthcare Provider who made or delivered the communication.

16. Any and all documents regarding any investigation or inquiry the Healthcare Provider performed related to attempts by NECP to comply with United States Pharmacopeia – National Formulary, Chapter 797 (USP – NF General Chapter 797, entitled "Pharmaceutical Compounding – Sterile Preparations").

17. Any and all policies of insurance, including without limitation of the foregoing, professional liability, malpractice, products liability, general liability, and comprehensive or umbrella policies, issued to the Healthcare Provider and/or its principal officers and directors and/or any physician working for or on behalf of the Healthcare Provider, for the policy periods including calendar years 2011, 2012 and 2013.

18. Articles of Incorporation and/or By-Laws applicable to the Healthcare Provider for calendar years 2011, 2012 and 2013.

19. Any and all documents and/or ESI reflecting or containing the names, addresses and positions (President, Vice-President, Director, etc.) within the Healthcare Provider of all officers and directors of the Healthcare Provider during the calendar years 2011, 2012 and 2013.

20. Any and all documents showing the entities or individuals with an ownership interest in the Healthcare Provider.

21. Any and all organizational charts maintained by the Healthcare Provider and/or any documents listing directors, officers, employees, and/or agents of the Healthcare Provider showing the names and positions of said directors, officers, employees, and/or agents and their relationship or rank within the Healthcare Provider.