# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | : | MDL No. 2419 |
| | : | Docket No. 1:13-md-2419 (FDS) |
| NEW ENGLAND COMPOUNDING | : | |
| PHARMACY, INC. PRODUCTS | : | |
| LIABILITY LITIGATION | : | Judge F. Dennis Saylor, IV |
| | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

## NON-PARTY SAHARA OUTPATIENT SURGERY CENTER'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SUBPOENA TO TESTIFY AND PRODUCE DOCUMENTS

Pursuant to Rules 26, 30, 34, and 45 of the Federal Rules of Civil Procedure, Non-Party Sahara Outpatient Surgery Center, Ltd. ("Sahara"), by its attorneys, Debevoise & Plimpton LLP, hereby responds and objects to Plaintiffs' Steering Committee's ("PSC" or "Plaintiffs") Subpoena To Testify at A Deposition in a Civil Action, dated July 12, 2013 (the "Subpoena").

### Introductory Statement

Sahara is not a party to the MDL. Sahara did not administer any medications from the tainted NECC lots. It has not been named as a party in a single suit in the MDL and, as far as Sahara is aware, not a single Sahara patient is a party in the MDL. In fact, as far as Sahara is aware, not a single Sahara patient has filed suit in any forum in

connection with the NECC fungal meningitis outbreak.  Last week, the Bankruptcy Court overseeing the NECC Chapter 11 proceedings, determined that facilities like Sahara that did not administer any of the tainted NECC medications do not need to provide patient information or any other information to the Trustee in connection with the Bankruptcy proceeding.  Transcript of Jul. 24, 2013 Bankruptcy Hearing, Case No. #12-19882-hjb, at 38:4-10.

The Subpoena is overly broad and unduly burdensome and seeks documents and testimony that are not at all relevant to the recalls of NECC tainted medications nor calculated to lead to the discovery of admissible evidence.  Compliance with these requests would impose unwarranted burdens – in the form of expense, effort and time – on Sahara to locate and review documents that are irrelevant and immaterial to the facts at issue in the Multi-District Litigation ("MDL").

At the MDL status conference of July 18, 2013 (July 18 Status Conference), Plaintiffs announced that they were narrowing the scope of their subpoenas to documents concerning patients to whom tainted NECC medications were administered and adjourning indefinitely their requests compelling non-party depositions.  Sahara did not administer a single dose of tainted NECC medication.  Taking Plaintiffs at their word, Sahara thus has no relevant documents responsive to Plaintiffs' requests.

Nevertheless, the Subpoena seeks to compel Sahara to provide at least one corporate representative to testify under oath regarding 10 broad subjects and to produce 21 categories of documents.[1]  Specifically, the Subpoena calls for testimony and documents concerning:

- Sahara's creation, storage and organization of electronic and hard copy patient records and other documents;

- Sahara's procurement of methylprednisolone acetate, cardioplegia, or any ophthalmic solutions from New England Compounding Pharmacy for a two year period;

- Sahara's procurement of methylprednisolone acetate from any producer, compounding facility, or manufacturer other than New England Compounding Pharmacy for a five year period;

- Sahara's practices and procedures regarding its selection of NECC and other compounding pharmacies;

- Sahara's use of NECC products or other compounded medications;

- Sahara's communications with NECC;

- Sahara's communications with federal and state regulators and law enforcement agencies;

- Sahara's insurance policies for the hospital and its officers and directors;

- Sahara's corporate structure and ownership.

---

[1]   In papers submitted to the Court on July 26 (Plaintiffs' Supplemental Brief"), Plaintiffs also stated that they no longer sought to enforce requests for patient identification.  Nothing in these responses and objections should be construed as an agreement to produce anything beyond or outside the narrowed scope Plaintiffs announced at the July 18 Status Conference and/or in Plaintiffs' Supplemental Brief nor as an agreement to produce a corporate representative to testify under oath.

With very few exceptions, the Subpoena's requests are not remotely relevant to the claims at issue in the MDL nor are they calculated to lead to the discovery of admissible evidence in the MDL.  Instead, the Subpoena appears to be an improper fishing expedition to identify additional potential claims and clients for Plaintiffs' counsel.  Plaintiffs should not be permitted to use the power of this Court to impose these burdensome and impermissible requests on Sahara, which is a non-party to this action, and based on the Bankruptcy Court's determination, does not even have patients who are potential victims who might have claims against NECC.

Sahara respectfully requests that the Court limit discovery to information concerning patients to whom NECC tainted medications were administered and find that, by informing Plaintiffs that it did not administer such medications, Sahara has met its obligations under the Subpoena.

## **Background**

On July 15, 2013, the Plaintiffs Steering Committee served Sahara with a subpoena, issued from the United States District Court for the District of Massachusetts and signed by Patrick Fennell.  The Response Date for the Subpoena was August 2, 2013.  The Subpoena called for a company representative to testify on August 9, 2013.

At the MDL status conference of July 18, 2013 ("July 18 Status Conference"), this court heard objections from other non-party clinics to which Plaintiffs had earlier served subpoenas similar to the Subpoena.  At the July 18 Status Conference, Plaintiffs announced that they were narrowing the scope of the non-party subpoenas to documents relating to patients "who were identified by the clinics as having received an injection or

some kind of application of medication that was identified by the CDC as having being (sic) contaminated." July 18 Status Conference Tr. 44: 25-45:3. Plaintiffs also announced that they were adjourning indefinitely the depositions of non-party company representatives. This Court stayed the objections pending before it at the July 18 Status Conference while it considered the threshold question of whether it had the authority to compel the production of privileged and other information for the purposes of patient notification.

On July 24, 2013 the Bankruptcy Court in the NECC Bankruptcy ruled on the Trustee's proposed mechanism for determining and notifying potential victims of the NECC outbreak of the impending bankruptcy bar date. The Court determined that "the victims" are "those people who received products that the CDC said were contaminated. Not everybody that any NECC ever dealt with, and not people who, under any stretch of the imagination might have had some contact with NECC." Transcript of Jul. 24, 2013 Bankruptcy Hearing, Case No. #12-19882-hjb, at 38:4-10. The Bankruptcy Court therefore ruled from the bench that only "those entities who administered contaminated [NECC] product" should have to provide the Trustee with the names of those patients to whom the contaminated product was administered (the "Bankruptcy Bench Order"). Id. at 38:20-22. As a result of the Bankruptcy Bench Order, Plaintiffs "agree[d] to suspend any enforcement efforts for the portions of the subpoenas seeking the patient information that the bankruptcy court ordered disclosed under applicable law . . ." Plaintiffs further stated that any "dispute before the Court as to those portions of the PSC's subpoenas requesting patient information appears to be moot at this time." Plaintiffs Steering

Committee's Supplemental Submission Regarding Privilege Objections to Subpoenas, Dkt. No. 352, Jul. 26, 2013, at 2-3.

## Objections to the Requests for the Production of Documents[2]

Sahara objects to certain portions of Exhibit B to the Subpoena compelling the production of certain documents and materials.

1.     Sahara understands that Plaintiffs no longer seek documents or information concerning the identification of Sahara patients who received NECC medications, other than those from the tainted lots. Accordingly, Sahara will not produce information in response to those requests. To the extent Plaintiffs seek information concerning patient identification outside the scope of the information required under the Bankruptcy Bench Order, Sahara objects on the grounds that such information is neither relevant to the issues raised in this action nor reasonably calculated to lead to the discovery of evidence admissible in this action. The Bankruptcy Court properly determined that patients who did not receive tainted NECC medications were not personal injury "victims" entitled to notice of the upcoming Bar Date. In light of the Bankruptcy Court's findings about the scope of required notice, there is no reasonable basis on which to impose upon Sahara the burden of providing information about

---

[2] Nothing in Sahara's responses and objections herein shall be construed as a waiver of Sahara's rights to (i) object on the grounds of competency, relevance, materiality, hearsay or any other proper grounds to the use of any information provided in these responses for any purpose, in whole or in part, in any subsequent stage or proceeding in this or any other action; (ii) object on any and all grounds, at any time, during any discovery procedure relating to the subject matter of these documents; or (iii) assert the attorney-client privilege, the work product doctrine, doctor-patient privilege, or any other privilege or right.

patients who received non-tainted NECC medications.  Sahara further objects to those requests to the extent that they call for information protected from disclosure by the patient physician privilege, under the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. 1320d et seq. (HIPAA) and regulations promulgated thereunder, or under the Health Information Technology for Economic and Clinical Health (HITECH) Act, 42 U.S.C. 1176a et seq. and regulations promulgated thereunder.

      2.     Sahara objects to the portions of the Subpoena that seek the discovery of non-patient identifying information or documents that are beyond the reduced scope of the requests that Plaintiffs' announced at the July 18 Status Conference.  Specifically, Sahara objects to any portions of the Subpoena that call for documents beyond those concerning patients "who were identified by the clinics as having received an injection or some kind of application of medication that was identified by the CDC as having being (sic) contaminated."  July 18 Status Conference Transcript 44:25-45:3.  Sahara did not administer a single dose of medication from the NECC lots that the CDC identified as tainted and thus does not have any documents or materials responsive to Plaintiffs' narrowed request.  Sahara notified PSC Counsel Patrick Fennell on July 25, 2013 that Sahara received methylprednisolone from one of the tainted NECC lots.  However, Sahara never administered any of the tainted methylprednisolone and instead returned all of the medication it received from the NECC tainted lots to the FDA.  Sahara respectfully

requests that the Court determine that, with this disclosure, Sahara has fully met its reasonable obligations under the Subpoena.[3]

3.      Sahara objects to portions of the Subpoena that seek the discovery of documents that are neither relevant to the issues raised in this action nor are reasonably calculated to lead to the discovery of evidence admissible in this action.  As noted above, Sahara did not administer a single dose of medication from any of the NECC tainted lots. Plaintiffs have failed to identify a single Sahara patient who has filed a claim or joined the MDL.  As far as Sahara is aware, none of its patients have contracted fungal meningitis or suffered from other injuries in connection with the tainted NECC medications.  Consequently, none of the documents that the Plaintiffs seek are relevant to the claims of any parties in the MDL and Plaintiffs' broad requests are not reasonably calculated to lead to the discovery of such evidence.  Moreover, several of Plaintiffs' requests seek documents that do not involve NECC or the fungal meningitis outbreak at all.  For example, Plaintiffs seek "[a]ny and all organizational charts" and "any documents listing directors, officers, employees, and/or agents of the Healthcare Provider showing the names and positions of said directors, officers, employees, and/or agents and their relationship or rank within the Healthcare Provider."  They likewise seek Sahara's

_____

[3] Sahara includes additional grounds upon which it objects to the Subpoena because the Subpoena contains requests that are outside the scope of the patient information requests and the reduced scope that Plaintiffs announced at the July 18 Status Conference. Nothing in these subsequent responses and objections should be construed as an agreement to produce information in response to the patient identification requests nor to produce anything beyond or outside the reduced scope of Plaintiffs' requests announced at the July 18 Status Conference.

articles of incorporation and by-laws for the years 2011, 2012, and 2013.  Subpoena Ex. B Request Nos. 18 & 21.  Sahara's organizational structure, leadership structure, and governance documents are not relevant to any of the claims at issue in the MDL. Requests such as these thus do not comply with FRCP 26(b)(1).  Accordingly, Sahara requests that this Court modify the Subpoena so as to limit Plaintiffs' requests to documents relating to Sahara patients who received medications from the NECC tainted lots.

       4.     Sahara objects to the Subpoena to the extent it purports to impose burdens other than or beyond those imposed by the Federal Rules of Civil Procedure ("FRCP"), the Local Civil Rules of the United States District Court of Massachusetts ("Local Rules"), or any current or future orders of this Court.  As noted above, none of Sahara's patients are parties to any of the litigations that comprise the MDL and none have filed suit against Sahara in any forum in relation to NECC medications.  Therefore, Sahara does not have any documents relevant to resolving any of the claims at issue in the MDL. Rather than tailor their requests to avoid placing an undue burden on Sahara, Plaintiffs demand broad categories of documents that would be burdensome and expensive for Sahara to locate and produce.  For example, the Subpoena calls for documents and information about Sahara's relationships with other pharmacies and drug manufacturers spanning a five-year period.  Those vendors are not parties to the MDL actions nor have they been linked to the fungal meningitis outbreak in any way.  Accordingly, these requests and others like them are overly broad and unduly burdensome and do not comport with FRCP 45(c)(1).  Sahara requests that the Court modify the Subpoena to

limit Plaintiffs' requests to documents and information that are relevant to the claims at issue in the MDL, namely documents and information relating to medications administered to patients from the tainted NECC lots.  In addition, Sahara requests that the Court order Plaintiffs to reimburse Sahara under FRCP 45(c)(1) for costs and fees it incurs in connection with all proceedings related to the Subpoena.

5.     Sahara objects to the Subpoena as overbroad under FRCP 45(c)(1) to the extent no time limitation is included in the requests or to the extent that the time limitations included are unreasonable.  Sahara requests that the Court modify the Subpoena to limit Plaintiffs' requests to documents and information created between January 1, 2012 and November 30, 2012.

6.     Sahara objects to the Subpoena to the extent it calls for disclosure of information or documents protected by the attorney-client privilege, work product doctrine, doctor-patient privilege, or any other applicable privileges ("privileged documents") on the ground that such discovery is impermissible under Rule 26(b) of the FRCP.  Sahara requests that the Court modify the Subpoena so as to limit Plaintiffs' requests to non-privileged documents.  In addition, Sahara requests the right to demand the return of any documents that inadvertently may be produced during discovery if it determines, in its sole discretion, that such documents may contain privileged information.

7.     Sahara objects to the Subpoena to the extent it calls for production of documents outside of Sahara's possession, custody, control, in Plaintiffs' possession, custody or control, readily available to Plaintiffs, or attainable by Plaintiffs from public

sources, including but not limited to the Food & Drug Administration, Centers for Disease Control, or other federal, state or local government agencies. For example, the Subpoena seeks documents pertaining to NECC sales materials and sales agents. Plaintiffs can and should obtain any information concerning NECC's sales force or NECC's marketing materials from NECC, which is the central party to this litigation. Such requests are overly broad, unduly burdensome, and in excess of FRCP 45. Sahara requests that the Court modify the Subpoena so as to limit Plaintiffs' requests to documents solely within Sahara's exclusive custody and control.

8.      Sahara objects to the Subpoena to the extent it calls for disclosure of confidential protected health information protected under HIPAA or HITECH which are not covered by the Bankruptcy Bench Order. The Bankruptcy Bench Order covers only protected health information for patients who received tainted NECC medications. Yet, several of the Subpoena's requests would require Sahara to produce information and documents relating to patients who received medications from the non-tainted NECC lots or did not receive NECC medications at all. If Sahara produced such information, it would be outside the protection of the Bankruptcy Bench Order and would violate its patients' Privacy Rights under HIPAA and HITECH. Sahara requests that the Court modify the Subpoena to require Sahara only to produce information protected Bankruptcy Court Bench Order, specifically to provide the names and other information for patients who Sahara can confirm received tainted NECC medications.

9.      Sahara objects to the Subpoena to the extent it calls for the disclosure of confidential or proprietary business information. For example, the Subpoena calls for

documents relating to Sahara's compliance policies and procedures and vendor selection processes. See, e.g., Subpoena Ex. B Request Nos. 8, 16. These requests would call for Sahara to produce non-public information relating to its internal business practices. Given that Sahara is not a party to the MDL and many of the documents Plaintiffs seek are wholly irrelevant, Sahara should not be forced to disclose this sensitive business information. Sahara requests that the Court modify the Subpoena so as to limit Plaintiffs' requests to non-confidential documents. To the extent that Plaintiffs seek information to authenticate documents to use as exhibits during trial, Sahara will provide Plaintiffs with a business records affidavit to aid Plaintiffs in so doing.

10.     Sahara objects to the Subpoena to the extent it calls for the production of documents prior to August 15, 2013. At the July 18 Status Conference, Plaintiffs stated that they have "changed the date for responding to the subpoenas and producing the documents to August 15th . . . " July 18 Status Conference Tr. 46:8-10. The Response Date on the Subpoena is August 2, 2013. Sahara respectfully requests that the Court sets the Response Date by which Sahara must produce responsive documents, to the extent any exist, to be the later of August 15th  or 30 days from the date on which the Court rules on these Objections.

## Objections to the Request for Deposition Testimony

Plaintiffs stated at the July 18 Status Conference that they have indefinitely adjourned their request for deposition testimony by corporate representatives from Sahara on certain designated subjects. To the extent that the deposition requests have not been

adjourned, Sahara incorporates its above objections into its objections concerning the request for deposition testimony and further objects as follows:

11.     Sahara objects to the Subpoena to the extent it calls for testimony relating to the existence, storage, retrieval, location, and authenticity of irrelevant documents that Plaintiffs' seek in violation with FRCP 26(b)(1) or documents outside the scope of the Court's orders and Plaintiffs' narrowed requests.  Where the Court modifies or limits Plaintiffs' requests for documents, Sahara requests that it also modify and limit Plaintiffs' corresponding requests for testimony related to those documents.

12.     Sahara objects to the Subpoena because Plaintiffs failed to provide Sahara with the $40.00 witness fee for attendance at a deposition required upon service of the Subpoena under FRCP 45(b)(1).

For all of the above reasons, non-party Sahara Outpatient Surgery Center respectfully requests that the Court modify the Subpoena in accordance with the above stated objections.

/s/ Maura K. Monaghan

Mark P. Goodman, NY 2207884
Maura K. Monaghan, NY 3042751
Cari A. Wint, NY 4684833
mpgoodman@debevoise.com
mkmonagh@debevoise.com
cawint@debevoise.com

*Of counsel*:

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY  10022
Tel.:  (212) 909–6000
Fax:  (212) 909–6836

*Attorneys for Non-party Sahara Outpatient Surgery Center, Ltd.*

CERTIFICATE OF SERVICE


      I, Cari A. Wint, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 29, 2013.



      /s/ Cari A. Wint_____
      Cari A. Wint

# EXHIBIT A

Daniel L. Crandall*
Peter A. Katt
Danny D. Ashwell, Jr.
Patrick T. Fennell**
D. Adam McKelvey
William C. Pattisall***
John F. Pyle
David J. Crandall

* also admitted in Washington, DC
** also admitted in West Virginia
***also admitted in North Carolina



# Crandall & Katt

Attorneys & Counselors at Law
366 Elm Avenue, S.W., Roanoke, Virginia 24016
July 12, 2013

Telephone:
540-342-2000
Facsimile:
540-345-3527
Email:
info@crandalllaw.com

**Certified Mail: 7012 1010 0002 6657 6255**

**Sahara Outpatient Surgery Center, Ltd.**
**d/b/a Sahara Surgery Center**
**Attn: Registered Agent for The Corporation**
**Trust Company of Nevada**
**311 S. Division Street**
**Carson City, NV 89703**

Re:    New England Compounding Center Litigation, MDL No. 2419

To Whom It May Concern,

As you are aware, last year New England Compounding Pharmacy, Inc. d/b/a the New England Compounding Center ("NECC") distributed tainted medication to various clinics throughout the country and specifically in Nevada. Hundreds, if not thousands, of patients have been injured as a result of exposure to tainted NECC products. The most recent Center for Disease Control reports confirm that over 700 patients have confirmed illnesses related to their exposure to tainted NECC pharmaceuticals and over 240 people have confirmed cases of meningitis. Fifty-eight people have died.

According to the CDC, Sahara Outpatient Surgery Center, LTD., d/b/a Sahara Surgery Center purchased and received preservative free methylprednisolone actetate from at least one of the three contaminated lots distributed by NECC.

The Judicial Panel on Multidistrict Litigation created a multi-district litigation forum in the United States District Court for the District of Massachusetts to address federal lawsuits alleging harm related to products manufactured by NECC (No. 1:13-md-2419-FDS). The Honorable Judge Saylor appointed seven firms to the Plaintiffs' Steering Committee (PSC) and appointed Thomas M. Sobol of Hagens Berman Sobol Shapiro LLP as Lead Counsel.

Lead Counsel and the PSC are charged with:

1.     Initiating, coordinating, and conducting all pretrial discovery on behalf of plaintiffs in all actions subject to this order;

2.     Developing and proposing to the Court schedules for the commencement, execution, and completion of all discovery on behalf of all plaintiffs;

3.     Issuing in the name of all plaintiffs the necessary discovery requests, motions, and subpoenas concerning any witnesses and documents needed to prepare for the trial of this litigation (similar requests, motions, and subpoenas may be caused to be issued by the PSC upon written request by an individual attorney in order to assist him or her in the preparation of the pretrial stages of his or her client's particular claims); and

4.     Conducting all discovery, by members or their designees approved by Lead Counsel, in a coordinated and consolidated manner on behalf and for the benefit of all plaintiffs.

NECC has filed for reorganization under Chapter 11 of the Bankruptcy Code. Lead Counsel and the PSC are coordinating their efforts with the Official Creditor's Committee and its counsel, and will share with the Creditor's Committee all appropriate information that you produce in response to the subpoena. The PSC and Lead Counsel are committed to working hand-in-hand with the Official Creditors' Committee. Lead Counsel and the Creditors' Committee will be involved in any settlement discussions.

Lead Counsel and the PSC have designated me, Patrick T. Fennell of Crandall & Katt, to handle the day-to-day litigation of claims against Sahara Outpatient Surgery Center, LTD. d/b/a Sahara Surgery Center.

I have enclosed a subpoena requesting information about your purchase, storage, and use of NECC products.

The subpoena requests some information that is protected under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and other privacy laws. Judge Saylor has entered an order in the MDL governing the production of this protected health information. (Dkt. No. 192) We have identified a HIPAA-compliant vendor to receive (only) protected health information that is responsive to this subpoena. (Dkt No. 237)

Judge Saylor has entered an order confirming that he will centrally enforce all subpoenas and instructing subpoena recipients to file any objections or motions to quash directly into the MDL. (Dkt. No. 193) Judge Saylor will hear any objections to subpoenas at the July 18, 2013 MDL status conference. (Dkt. No. 193).

Thank you.  Please contact me at (540) 342-2000 with any questions.

Very truly yours,

**CRANDALL & KATT**
**Attorneys and Counselors at Law**

**Patrick T. Fennell, Esq.**

PTF/cmh
Enclosures

010337-13  616206 V1

AO 88A  (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Massachusetts

| | |
|---|---|
| In re: New England Compounding Pharmacy, Inc. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   MDL 1:13-md-02419 |
| | ) |
| | ) (If the action is pending in another district, state where: |
| *Defendant* | ) ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:   Sahara Outpatient Surgery Center, LTD. d/b/a Sahara Surgery Center; C/O: The Corporation Trust Company of Nevada, Registered Agent, 311 S. Division Street, Carson City, NV 89703

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Exhibit A

| Place: Sahara Outpatient Surgery Center, LTD d/b/a Sahara Surgery Center, 2401 Paseo Del Prado, Las Vegas, NV 89102 | Date and Time: <br> 08/02/2013 9:00 am |
|---|---|

The deposition will be recorded by this method:   Stenographically and/or Videographically

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

See Exhibit B

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:   07/12/2013

| *CLERK OF COURT* | OR | |
|---|---|---|
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____

Plaintiffs' Steering Committee , who issues or requests this subpoena, are:
Patrick T. Fennell, Crandall & Katt, 366 Elm Avenue, SW, Roanoke, Virginia 24016

AO 88A  (Rev.  06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  MDL 1:13-md-02419

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*   Sahara Outpatient Surgery Center d/b/a Sahara Surgery Ctr

was received by me on *(date)*   07/12/2013   .

☑ I served the subpoena by delivering a copy to the named individual as follows: Certified Mail to

The Corporation Trust Company of Nevada, Registered Agent, 311 S. Division Street, Carson City, NV 89703

_____   on *(date)*   07/12/2013   ; or

☐ I returned the subpoena unexecuted because: _____

_____   .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____   .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:   07/12/2013   _____

*Server's signature*

Patrick T. Fennell, Esq.
_____
*Printed name and title*

The Law Office of Crandall & Katt
366 Elm Avenue, SW
Roanoke, Virginia 24016
_____

*Server's address*

Additional information regarding attempted service, etc:

AO 88A  (Rev.  06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE: NEW ENGLAND                    )
COMPOUNDING PHARMACY, INC.            )        MDL No. 1:13-md-02419
PRODUCTS LIABILITY LITIGATION )
                                      )        Hon. F. Dennis Saylor, IV
This Document Relates To: All Cases   )
                                      )
_____     )

## NOTICE OF TAKING VIDEOTAPED ORAL DEPOSITION OF DESIGNATED REPRESENTATIVE(S) OF NON PARTY SAHARA OUTPATIENT SURGERY CENTER, LTD. d/b/a SAHARA SURGERY CENTER

Please take notice that on August 9, 2013 beginning at 9:00 a.m. at the offices of Sahara Outpatient Surgery Center, LTD. d/b/a Sahara Surgery Center, 2401 Paseo Del Prado, Las Vegas, NV 89102 the deposition of a designated corporate representative will be taken upon oral examination by one or more attorneys of the Plaintiffs' Steering Committee in the pending MDL, pursuant to Rule 30 of the Federal Rules of Civil Procedure for the purpose of discovery or for use as evidence in this action, and before an officer authorized by law to administer oaths.

PLEASE TAKE FURTHER NOTICE that pursuant to Rules 30 and 34 of the Federal Rules of Civil Procedure, the non-party deponent(s) shall produce at the deposition the documents identified in Exhibit B.

**Duty to designate.** By designating a representative, the organization indicates its representative has the authority to speak on its behalf about the matters listed in this deposition notice – not only to facts, but also to subject beliefs and opinions.[1]

_____

**Duty to substitute**.  If it becomes clear that the chosen representative is unable to respond to questions on the matters for which he or she has been designated, the organization must immediately provide a substitute knowledgeable witness.   This is required even if the initial designation was made in good faith.[2]

**Duty to prepare**. The testimony elicited in the deposition represents the organization's knowledge, not the individual deponent's knowledge. The organization must conduct a thorough investigation in response to the deposition notice and must prepare any witness to testify to all matters "known or reasonably available to the organization."   Therefore, if the organization's designee is not knowledgeable about the matters specified in the deposition notice, it must nonetheless prepare such designee to give knowledgeable, binding answers.[3]

"Reasonably available" information includes all documents that the organization has the authority, legal right, or practical ability to obtain.   An inadequately prepared designated witness will amount to an impermissible refusal to answer and a sanctionable failure to appear.[4]

---

[1] *Lapenna v. Upjohn Co.,* 110 F.R.D. 15, 20 (E.D. Pa. 1986); *See also Alexander v. Fed. Bureau of Investigation,* 186 F.R.D. 148, 151-52 (D.D.C. 1999); *Mitsui & Co. v. Puerto Rico Water Res. Autho.,* 93 F.R.D. 62, 66-67 (D.P.R. 1981).

[2] *See Marker v. Union Fidelity Life,* 125 F.R.D. 121, 126 (M.D.N.C. 1989).

[3] *United States v. Taylor,* 166 F.R.D. 356, 361 (M.D.N.C. 1996) .

[4] *Prokosch v. Catalina Lighting, Inc.,* 193 F.R.D. 633, 637 (D. Minn. 2000) (citing *Lumber v. PPG Industries, Inc.,* 168 F.R.D. 641, 643 n. 1 (D. Minn. 1966); *See Black Horse Lane Assoc., L.P. v. Down Chem. Corp.,* 228 F. 3d 275, 303-04 (3d Cir. 2000); *Resolution Trust Corp. v. S. Union Co.,* 985 F. 2d 196, 197 (5th Cir. 1993); *Taylor,* 166 F.R.D. at 363; *Marker v. Union Fidelity Life Ins. Co.,* 125 F.R.D. 121, 126 (M.D.N.C. 1989).

**Scope of inquiry**   The description contained  in the deposition notice simply identifies the minimum to which a witness must be prepared to testify.  If an examining party asks questions outside the scope of the matters described in the notice, the general deposition rules govern.

## DESIGNATION OF TESTIMONY AND PRODUCTION OF DOCUMENTS

The designated matters upon which examination is requested are as follows:

1.  To provide testimony regarding those individuals involved in the production of documents.

2.  To provide testimony regarding the efforts made and the time expended in the production of documents.

3.  To provide testimony regarding the methods of search and methods of production of documents produced.

4.  To provide testimony regarding the authenticity of documents.

5.  To provide testimony regarding the methods of storage, entry and use of computer data and the method by which it has been produced.

6.  To provide testimony regarding the location and methods of storage of corporate documents.

7.  To provide testimony regarding the existence of documents.

8.  To provide testimony regarding the electronic creation, duplication and/or storage of the documents.

9.  To provide testimony regarding any and all document retention/destruction policies that would relate to any of the documents.

10. To provide testimony regarding the searchability of databases for the extraction of information.

RESPECTFULLY SUBMITTED

Patrick T. Fennell (VSB 40393)
Crandall & Katt
366 Elm Avenue, S.W.
Roanoke, Virginia 24016
Telephone:  540/342-2000
Facsimile:  540/400-0616
pfennell@crandalllaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 12th day of July 2013, a true and Complete copy of the foregoing was delivered to the following via electronic mail:

SEE ATTACHED SERVICE LIST.

Patrick T. Fennell (VSB 40393)
Crandall & Katt
366 Elm Avenue, S.W.
Roanoke, Virginia 24016
Telephone:  540/342-2000
Facsimile:  540/400-0616
pfennell@crandalllaw.com

All Defense Counsel of record in MDL 2419

| Attorney | Email |
|---|---|
| Alan Winchester | awinchester@harrisbeach.com |
| Dan Rabinovitz | dmr@michaelsward.com |
| Daniel Tranen | dtranen@hinshawlaw.com |
| Frederick Fern | hbnecc@harrisbeach.com |
| Geoffrey Coan | gcoan@hinshawlaw.com |
| Heidi Nadel | hnadel@toddweld.com |
| Jessica Saunders Eichel | jeichel@harrisbeach.com |
| Judi Abbott Curry | Jcurry@HarrisBeach.com |
| Matthew Moriarty | matthew.moriarty@tuckerellis.com |
| Richard Dean | richard.dean@tuckerellis.com |
| Thomas Coffey | thomas.coffey@tuckerellis.com |
| Matthew Mantalos | mantalos@tsd-lawfirm.com |
| Paul Saltzman | saltzman@tsd-lawfirm.com |
| Scott Kremer | kremer@tsd-lawfirm.com |
| Scott Tucker | tucker@tsd-lawfirm.com |
| Joshua Klarfeld | jklarfeld@ulmer.com |
| Robert Curley | rac@curleylaw.com |
| Kenneth Walton | kwalton@donovanhatem.com |
| Kristen Ragosta | kragosta@donovanhatem.com |
| Melinda Thompson | mthompson@toddweld.com |
| Stephen Grossman | sgrossman@mmwr.com |
| John Lovely | jlovely@cashmanlovely.com |
| Joseph Lang | jlang@lenoxlaw.com |
| Michael Gardner | michael.gardner@leclairryan.com |
| Joseph Thomas | jthomas@ulmer.com |
| Nicki Samson | ns@michaelsward.com |
| Ryan Ciporkin | rciporkin@lawson-weitzen.com |
| Dan Rabinovitz | dmr@michaelsward.com |
| Nicki Samson | ns@michaelsward.com |
| Brady Hermann | bjh@michaelsward.com |
| Chris Hassell | Chassell@bonnerkiernan.com |
| Matthew Moriarty | Matthew.moriarty@tuckerellis.com |

# EXHIBIT B

# Exhibit B to Subpoena

1.      Any and all documents and/or electronically stored information ("ESI") reflecting, and/or related in any way whatsoever to, the procurement of methylprednisolone acetate ("MPA") and any other injectable steroid preparations from New England Compounding Pharmacy, Inc. ("NECP") during the two-year period immediately preceding October 6, 2012, including without limitation of the foregoing, information reflecting dates of shipment and/or receipt, quantities of shipment, lot numbers and other identifying labels, sizes of containers of steroid preparation, the cost you paid for the steroid preparation, applicable warranties, shelf life, expiration dates, requirements and instructions for shipment and/or storage, and the specific identity of the preparation being purchased. Also including account information, prescriptions submitted to NECP, prescription order forms, NECP charges for MPA (before and after any discounts applied).

2.      Any and all documents and/or ESI reflecting, and/or related in any way whatsoever to, the procurement of MPA, or its generic or name-brand equivalent, from any producer, compounding facility or manufacturer other than NECP, since October 6, 2007, including without limitation of the foregoing, information reflecting dates of shipment and/or receipt, quantities of shipment, lot numbers and other identifying labels, sizes of containers of the product, the cost you paid for the product, applicable warranties, shelf life, expiration dates, requirements and instructions for shipment and/or storage, and the specific identity of the preparation being purchased.

3.      Any and all documents and/or ESI reflecting, and/or related in any way whatsoever to, the procurement of cardioplegic solution from NECP during the two-year period immediately preceding October 6, 2012, including without limitation of the foregoing, information reflecting dates of shipment and/or receipt, quantities of shipment, lot numbers and other identifying labels, sizes of containers of cardioplegic solution, the cost you paid for the cardioplegic solution, applicable warranties, shelf life, expiration dates, and requirements and instructions for shipment and/or storage.  Also including prescriptions submitted to NECP, prescription order forms, NECP charges for cardioplegic solution (before and after any discounts applied).

4.      Any and all documents and/or ESI reflecting, and/or related in any way whatsoever to, the procurement of ophthalmic solution from NECP during the two-year period immediately preceding October 6, 2012, including without limitation of the foregoing, information reflecting dates of shipment and/or receipt, quantities of shipment, lot numbers and other identifying labels, sizes of containers of ophthalmic solution, the cost you paid for the ophthalmic solution, applicable warranties, shelf life, expiration dates, and requirements and instructions for shipment and/or storage.  Also including prescriptions submitted to NECP, prescription order forms, NECP charges for opthalmic solution (before and after any discounts applied).

5.      Any and all documents and/or ESI reflecting, and/or related in any way whatsoever to, the procurement of preservative-free saline solution from NECP during the two-year period immediately preceding October 6, 2012, including without limitation of the

foregoing, information reflecting dates of shipment and/or receipt, quantities of shipment, lot numbers and other identifying labels, sizes of containers of saline solution, the cost you paid for the saline solution, applicable warranties, shelf life, expiration dates, and requirement and instructions for shipment and/or storage.   Also including prescriptions submitted to NECP, prescription order forms, NECP charges for preservative-free saline solution (before and after any discounts applied).

6.      Any and all documents and/or ESI reflecting, and/or related to, the identification of each and every patient that was administered an NECP product during the two-year period immediately preceding October 6, 2012, including patient name, address, date of birth, identification of product administered, and date product was administered.

7.      Any and all documents and/or ESI reflecting or containing communications (written or otherwise) between Sahara Outpatient Surgery Center, LTD d/b/a Sahara Surgery Center ("Healthcare Provider"), its employees, principals, partners, and/or agents, and NECP, its employees and/or agents, during the two-year period immediately preceding October 6, 2012, including, but not limited to, any complaints or adverse event reports made to NECP by the Healthcare Provider.

8.      Any and all documents and/or ESI reflecting or containing information obtained by the Healthcare Provider, its employees and/or agents, regarding NECP, including without limitation of the foregoing, NECP's qualifications, certifications or accreditations, or lack thereof, regulatory compliance, lack of regulatory compliance, operations, enforcement actions, suitability for conducting its business, legal actions and/or warnings, brochures, policies and procedures, ordering and delivery information company overviews, standard operating procedures, executive summaries, attachments A, B or others (relating to HIPAA, NECP policies and procedures, or other information).

9.      Any and all documents and/or ESI reflecting or containing information obtained by, or communications received by, the Healthcare Provider, its employees and/or agents, concerning the fitness of any products purchased or obtained from NECP for their intended use, during the two-year period immediately preceding October 6, 2012, including but not limited to any environmental testing results, microbiology reports or certificates of analysis.

10.      Any and all documents and/or ESI reflecting or containing information obtained by, or sent to, the Healthcare Provider, its employees and/agents, from the Centers for Disease Control and Prevention, the Federal Food and Drug Administration, and/or any other Federal, state or local regulatory agency, concerning the fitness of any products manufactured, compounded or produced by NECP for their intended purpose.

11.      Any and all documents and/or ESI reflecting or containing communications between the Healthcare Provider and any federal or state agency (including, but not limited to state licensing authorities, the Food and Drug Administration, and the Centers for Disease Control and Prevention) in connection with the procurement of products from any compounding pharmacy.

12.     Any and all documents and/or ESI reflecting or containing marketing information from NECP, NECP's agents, or any sales company or person marketing, selling, or attempting to sell products on behalf of NECP.

13.     Any and all documents and/or ESI reflecting or containing agreements, contracts and/or warranties between the Healthcare Provider and NECP, NECP's agents, or any sales company or person marketing, selling, or attempting to sell products on behalf of NECP.

14.     Any and all documents and/or ESI reflecting or containing recall notices received by the Healthcare Provider pertaining to products produced by NECP, including without limitation of the foregoing, the date, time and manner of receipt of the recall notices, the specific person or persons within the Healthcare Provider who received the notice, and the substance of the notice.

15.     Any and all documents and/or ESI reflecting or containing communications made or issued by the Healthcare Provider, its employees and/or agents, in response to any recall notice regarding NECP products, including without limitation of the foregoing, the date, time and manner of transmission of the communication, the person(s) to which the communication was directed, and the person at the Healthcare Provider who made or delivered the communication.

16.     Any and all documents regarding any investigation or inquiry the Healthcare Provider performed related to attempts by NECP to comply with United States Pharmacopeia – National Formulary, Chapter 797 (USP – NF General Chapter 797, entitled "Pharmaceutical Compounding – Sterile Preparations").

17.     Any and all policies of insurance, including without limitation of the foregoing, professional liability, malpractice, products liability, general liability, and comprehensive or umbrella policies, issued to the Healthcare Provider and/or its principal officers and directors and/or any physician working for or on behalf of the Healthcare Provider, for the policy periods including calendar years 2011, 2012 and 2013.

18.     Articles of Incorporation and/or By-Laws applicable to the Healthcare Provider for calendar years 2011, 2012 and 2013.

19.     Any and all documents and/or ESI reflecting or containing the names, addresses and positions (President, Vice-President, Director, etc.) within the Healthcare Provider of all officers and directors of the Healthcare Provider during the calendar years 2011, 2012 and 2013.

20.     Any and all documents showing the entities or individuals with an ownership interest in the Healthcare Provider.

21.     Any and all organizational charts maintained by the Healthcare Provider and/or any documents listing directors, officers, employees, and/or agents of the Healthcare Provider showing the names and positions of said directors, officers, employees, and/or agents and their relationship or rank within the Healthcare Provider.

CERTIFIED MAIL™

7012 1010 0002 6657 6255



UNITED STATES POSTAL SERVICE

U.S. POSTAGE
PAID
ROANOKE, VA
24022
JUL 12, '13
AMOUNT
$7.17
1000    89703    00057013-07

THE LAW OFFICES OF



# Crandall & Katt

Attorneys & Counselors at Law

366 Elm Avenue, S.W., Roanoke, Virginia 24016

Sahara Outpatient Surgery Center, Ltd.
d/b/a Sahara Surgery Center
Attn: Registered Agent for The Corporation
Trust Company of Nevada
311 S. Division Street
Carson City, NV 89703