# EXHIBIT 3

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS - WESTERN DIVISION**

```
==============================
IN THE MATTER OF:             . Case #12-19882-hjb
                              .
NEW ENGLAND COMPOUNDING       .
    PHARMACY, INC.,           . Springfield, Massachusetts
                              . July 24, 2013
                Debtor.       . 1:04 p.m.
==============================
```

**TRANSCRIPT OF HEARING ON:**
**(#166) AMENDED APPLICATION OF CHAPTER 11**
**TRUSTEE TO EMPLOY AND RETAIN HARRIS BEACH PLLC AS SPECIAL**
**COUNSEL;**
**(#167) MOTION OF CHAPTER 11 TRUSTEE FOR AN ORDER AUTHORIZING**
**HIM TO BE REPRESENTED BY SPECIAL LOCAL COUNSEL IN THE ORDINARY**
**COURSE OF BUSINESS;**
**(#263) MOTION OF CHAPTER 11 TRUSTEE FOR AN ORDER**
**(I) ESTABLISHING BAR DATES FOR FILING PROOFS OF CLAIM;**
**(II) APPROVING CERTAIN ADDITIONAL DOCUMENTATION REQUIREMENTS**
**AND PROCEDURES FOR PERSONAL INJURY TORT AND WRONGFUL-DEATH**
**CLAIMS; (III) APPROVING THE FORM AND MANNER OF NOTICE; AND FOR**
**ADDITIONAL RELATED RELIEF;**
**(#326) MOTION OF BERTRAM WALKER BRYANT, JR. AND THE CREDITORS'**
**COMMITTEE FOR A DECLARATION OF DEBTOR INSOLVENCY**


**BEFORE THE HONORABLE HENRY J. BOROFF**

APPEARANCES:

For the Chapter 11          JEFFREY D. STERNKLAR, ESQ.
Trustee, Paul D. Moore:     DUANE MORRIS, LLP
                            100 High Street
                            24th Floor
                            Boston, MA 02110


For the United States       PAULA R.C. BACHTELL, ESQ.
Trustee:                    OFFICE OF THE U.S. TRUSTEE
                            5 Post Office Square
                            Suite 1000
                            Boston, MA 02109


For the                     WILLIAM R. BALDIGA, ESQ.
Official Committee of       BROWN RUDNICK LLP
Unsecured Creditors:        One Financial Center
                            Boston, MA 02111

```
APPEARANCES (cont'd.):
For Barry and          HAROLD B. MURPHY, ESQ.
Lisa Cadden:           MURPHY & KING
                       One Beacon Street
                       21st Floor
                       Boston, MA 02108


For Bertram Walker     MICHAEL D. GALLIGAN, ESQ.
Bryant, Jr.:           LAW OFFICES OF GALLIGAN & NEWMAN
                       309 West Main Street
                       McMinnville, TN 37110


For Individual         WILLIAM J. DAILEY, JUNIOR, ESQ.
Defendants in          SLOANE AND WALSH, LLP
the MDL Action:        Three Center Plaza
                       Boston, MA 02108


For the Plaintiffs'    THOMAS M. SOBOL, ESQ.
Steering Committee:    HAGENS BERMAN SOBOL SHAPIRO LLP
                       55 Cambridge Parkway
                       Suite 301
                       Cambridge, MA 02142


For Insight Health     RONALD E. MEISLER, ESQ.
Corp.:                  (TELEPHONICALLY)
                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM
                        LLP & AFFILIATES
                       155 N. Wacker Drive
                       Chicago, IL 60606


For the Steering       MARC E. LIPTON, ESQ. (TELEPHONICALLY)
Committee:             LIPTON LAW
                       18930 W. 10 Mile Road
                       Southfield, MI 48075


For Inspira Health     STEPHEN A. GROSSMAN, ESQ.
Network, Inc. and       (TELEPHONICALLY)
Inspira Medical        MONTGOMERY McCRACKEN WALKER & RHOADS
Centers, Inc.:          LLP
                       457 Haddonfield Road
                       Suite 600
                       Cherry Hill, NJ 08002


                       JOSEPH O'NEIL, JR., ESQ.
                        (TELEPHONICALLY)
                       MONTGOMERY McCRACKEN WALKER & RHOADS
                        LLP
                       123 South Broad Street
                       Philadelphia, PA 19109
```

APPEARANCES (cont'd.):

For PMIC:                    RICHARD E. MIKELS, ESQ.
                              (TELEPHONICALLY)
                             MINTZ LEVIN COHN FERRIS GLOVSKY AND
                              POPEO PC
                             One Financial Center
                             Boston, MA 02111


For Chattanooga              CHRIS J. TARDIO, ESQ.
Neurosurgical Group:          (TELEPHONICALLY)
                             GIDEON, COOPER & ESSARY, PLC
                             315 Deaderick Street
                             Suite 1100
                             Nashville, TN 37238


For Dr. O'Connell's          WILLIAM E. CHRISTIE, ESQ.
Pain Care Center:             (TELEPHONICALLY)
                             SHAHEEN & GORDON, P.A.
                             107 Storrs Street
                             Concord, NH 03302


For Erlanger Health          CARA E. WEINER, ESQ. (TELEPHONICALLY)
System, Inc.:                SPEARS, MOORE, REBMAN & WILLIAMS,
                              P.C.
                             801 Broad Street
                             Sixth Floor
                             Chattanooga, TN 37401



     Electronic Sound Recording Operator:  Laura L. Chambers



       Proceedings Recorded by Electronic Sound Recording
     Transcript Produced by Certified Transcription Service
                      ESCRIBERS, LLC
     700 West 192nd Street Suite 607, New York, NY 10040
            1-973-406 2250; operations@escribers.net

I N D E X

| RULING: | PAGE | LINE |
|---|---|---|
| Motion of Bertram Walker Bryant, Jr., and the creditors' committee for a declaration of debtor insolvency, granted. | 23 | 17 |
| Motion of Chapter 11 trustee for an order authorizing him to be represented by special local counsel in the ordinary course of business, granted. | 26 | 20 |
| Application of Chapter 11 trustee to employ and retain Harris Beach PLLC as special counsel, approved. | 39 | 18 |
| Harris Beach is to file quarterly disclosures of time in the case, but disclosure is to be sent only to the United States Trustee, the Chapter 11 trustee, counsel to the Chapter 11 trustee, counsel to the unsecured creditors' committee, and counsel to the plaintiffs' steering committee, absent further court order. | 39 | 19 |
| The Court will not rule on the reasonableness of the Harris Beach fees, absent a request for that ruling from either the insurer or from Harris Beach. | 39 | 25 |
| Notice should be sent to those people who received products that the CDC said were contaminated. | 106 | 16 |
| Notice intermediaries should be the entities who administered the contaminated product. | 107 | 7 |
| The notice should not identify any particular third party targets. | 108 | 3 |
| Noticing agent must be appointed through the bankruptcy court. | 109 | 7 |
| Notice intermediaries who administered contaminated lots identified by the CDC are to supply the names, addresses, last four digits of the Social Security number, what was administered and when, to the Chapter 11 Trustee on or before August 16. | 111 | 3 |
| Notice to be published ten days after the bar date order, and then twenty days before the expiration of the order, in newspapers that were listed in the trustee's amended supplemental bar-date motion. | 111 | 12 |
| By August 22, counsel for Chapter 11 Trustee, PSC and the creditors' committee are to create a joint list of who should receive notice. | 112 | 3 |

| RULING (cont'd.): | PAGE | LINE |
|---|---|---|
| By end of week, Chapter 11 Trustee to submit proposed revised notice requesting that intermediaries turn over lists to the Chapter 11 Trustee and counsel for the PSC, in confidence by August 16. | 112 | 12 |
| Modifications to the notice will be discussed on August 22 at 10 a.m. | 112 | 16 |
| Revised form of notice due by August 16. | 116 | 12 |
| Order as to docket #263 is an interim order. | 119 | 11 |

1    (At 1:04 p.m.)

2              THE CLERK:  All rise.

3              THE COURT:  Good afternoon.  Please be seated.

4    Sorry for the technical delays.

5              THE CLERK:  Case number 12-19882, New England

6    Compounding Pharmacy, Inc.; a hearing on the amended

7    application of the Chapter 11 trustee to employ and retain

8    Harris Beach PLLC, as special counsel; a hearing on the motion

9    of the Chapter 11 trustee for an order authorizing him to be

10   represented by special local counsel in the ordinary course of

11   business; a hearing on the motion of the Chapter 11 trustee

12   for an order establishing bar dates for filing proofs of

13   claim, approving certain additional documentation requirements

14   and procedures for personal-injury tort and wrongful-death

15   claims, and approving the form and manner of notice, and for

16   additional relief; as well as a motion of Bertram Walker

17   Bryan, Jr. and the creditors' committee, for a declaration of

18   debtor insolvency.

19              Beginning with Ms. Bachtell on my right, could I ask

20   counsel present in the courtroom in Springfield, please

21   identify themselves as well as who they represent.

22              MS. BACHTELL:  Good afternoon, Your Honor.  Paula

23   Bachtell for the U.S. Trustee.

24              MR. STERNKLAR:  Good afternoon.  Jeffrey Sternklar

25   from Duane Morris, representing Paul Moore, the Chapter 11

1    trustee.

2              MR. BALDIGA:  Good afternoon, Your Honor.  William

3    Baldiga, Brown Rudnick, for the official committee of

4    unsecured creditors.

5              MR. GALLIGAN:  Good afternoon, Your Honor.  Mike

6    Galligan from Tennessee, representing Walter Bryant, Jr., as

7    well as a number of other creditors.

8              THE COURT:  Okay.

9              MR. STERNKLAR:  Thank you, Your Honor.  Your Honor,

10   first, I want to thank you for your accommodations to us over

11   the past few weeks, with scheduling.  We've had to move these

12   hearings around and we're not unmindful of the burden that

13   imposes on the Court, and we thank you for your patience with

14   that.

15             Second, there are essentially three matters on for

16   hearing today:  There's the trustee's motion to establish a

17   bar date; there are two professional-retention motions that

18   are somewhat related; and there is a motion by the creditors'

19   committee and Mr. Galligan's client, for a declaration of

20   insolvency.  Notwithstanding the flurry of papers and the

21   widespread participation, I believe we've made significant

22   process in resolving many of the issues that will arise with

23   respect to all three motions.  Unfortunately, I can't tell you

24   we've resolved all issues.  It will be my hope that I can

25   outline what the remaining issues are, and they can be

1   disposed of in some orderly fashion.

2         With Your Honor's indulgence, I believe Mr. Galligan

3   has a plane he needs to catch, so, with your indulgence, we

4   would take the insolvency motion first.

5         THE COURT:  Sure.

6         MR. BALDIGA:  Thank you, Your Honor.

7         THE COURT:  For the benefit of those on the

8   telephone, I'm afraid we'll have to keep reintroducing who we

9   are as speaker.

10        MR. BALDIGA:  Absolutely, Your Honor.  And this is

11  William Baldiga, Brown Rudnick, counsel for the official

12  committee of unsecured creditors.

13        And, Your Honor, we're here on the motion, as

14  announced, with respect to the finding that this debtor is

15  insolvent; hearkens back to, for some of us, pre-Code days,

16  perhaps when those things were -- the last time any of us had

17  seen those.  And perhaps the Tennessee statute also goes back

18  to the days before the Code, in the 1970s, because it seems to

19  be a legacy type of thing that I've never seen before and I'm

20  sure for the Court is somewhat novel as well.

21        Mr. Galligan and I, Your Honor, think that the

22  better way to present this to the Court is first for me to

23  introduce you to Mr. Galligan, who does represent Mr. Bryant,

24  and he could explain a little bit about the background of the

25  Tennessee statute.  We have resolved the trustee's objection,

1    but I would like to speak to the other remaining objections,

2    and hopefully this will be something that the Court can

3    understand where we come from.  Thank you.

4              THE COURT:  Thank you.

5              MR. BALDIGA:  And, Your Honor, I'm not even sure

6    whether we have filed a motion for the pro hac admission of

7    Mr. Galligan.

8              MR. GALLIGAN:  I sent it to --

9              MR. BALDIGA:  Then I think we have.  I'm sorry.

10             THE COURT:  All right.  Okay.

11             MR. BALDIGA:  If not, we will check the docket and

12   certainly do that this week.

13             THE COURT:  Let's move on.

14             MR. BALDIGA:  Thank you.

15             MR. GALLIGAN:  Good afternoon, Your Honor.  As I

16   said earlier --

17             THE COURT:  Again --

18             MR. GALLIGAN:  -- I'm Mike Galligan --

19             THE COURT:  I'm sorry.  Yes.  Go ahead.

20             MR. GALLIGAN:  -- from Tennessee.  I represent

21   Walker Bryant, Jr., who's the husband of Margaret Bryant, who

22   died on September the 18th, 2012; she died as the result of a

23   shot of MPA that was manufactured by NECC.  Additionally, I'm

24   a member of the OCC; would like to say that I've been a -- and

25   assure the Court that I've been a strong supporter of the

1    bankruptcy resolution of this matter, since the inception.  We

2    filed our first lawsuit against NECC only.  We now are looking

3    to file against other affiliates, other pain -- the pain

4    clinic, et cetera.  I have other clients, but this is the one

5    I'm here on today.

6           I'm asking for a declaration of insolvency; that's

7    because of a Tennessee statute that I will go into in just a

8    few moments.  I don't think it's contested that NECC's

9    insolvent.  None of the pleadings that have responded to our

10   motion have mentioned it at all.  I think it is -- I had an

11   old judge tell me one time -- and I'm not suggesting you're an

12   old judge by any means -- I had --

13          THE COURT:  I was married --

14          MR. GALLIGAN:  -- but when I was a young lawyer,

15   that nothing is obvious in the law.  But there's not much more

16   obvious than we're asking the Court to make a declaration of

17   something that is pretty obvious to everybody:  that NECC is

18   insolvent.  There've been over -- last time I checked, over

19   741 injuries, 61 deaths, of which my client's wife was one of

20   them.  The -- so I don't think that's contested.

21          So we're just asking the Court to do really what's

22   obvious.  Now, why are we asking that?  29-28-106 -- and let

23   me go over it, if I could, that statute, with you -- in

24   Tennessee it says, and this is on the cause of action of

25   strict liability that we would like to bring against the St.

1    Thomas Neurological Outpatient clinic, and we have -- I don't

2    know that the Court wants to hear all the grounds about it or

3    that this is the place and time, but this statute says, "No

4    product-liability action, as defined in 29-280-102", which is

5    the statute defining products-liability actions, "shall be

6    commenced or maintained against any seller other than the

7    manufacturer unless" -- the first three are totally irrelevant

8    to our issues today; 4 and 5 may be discussed.  5 is the one

9    that we're here about; it says, "unless [the] manufacturer has

10   been judicially declared insolvent".  So it isn't just a case,

11   according to the statute here, that they are insolvent, but

12   must be judicially declared insolvent.  We came to this Court

13   on this issue because this Court is certainly more, and is

14   eminently, involved in this.  And NECC, to bring it in any

15   other court, would have to be made a party, we believe, and

16   there's a stay concerning that.

17          So this is, it seems to me, the most efficient court

18   for everyone, all of the plaintiffs, in Tennessee.  And all

19   the plaintiffs' lawyers -- just about all have contacted me

20   about it -- are interested in this.  And this would stave off

21   multiple filings, lots of expense, just for this Court to

22   declare what is most obvious, really.

23          Now, I have read, and I'm sure the Court has read,

24   some of the briefs that came in against it, and some will

25   mention other things, such as, could we not do it under number

1     4 above, on that, without the necessity of this.  But one

2     thing Plaintiffs' lawyers, as this Court I'm sure is aware,

3     want to do is avoid issues that can later lead to reversal,

4     later lead to problems down the road.  This is simple, it's

5     nice, and it does it, but however, under number 4, the

6     manufacturer, distributor of the product or part in question

7     is not subject to service of process in this state.  If it

8     ended there, we would be fine, because NECC's not subject to

9     process -- service of process in Tennessee.  But it says "and"

10    the long-arm statutes of Tennessee do not serve as the basis

11    for obtaining service of process.

12            Now, there have been a couple cases cited that

13    state, well, maybe they could, but that's under another

14    statute, and that was an older statute, 29-28-106(b), in which

15    it said -- instead of "and", it was "or".  So those cases are

16    totally inapplicable to the argument today.

17            So, without delaying the issue, we want to get

18    around the substantive pre-filing requirement; and to do that,

19    it would help us, and I think it would save a lot of expense,

20    if we could have an order declaring NECC insolvent as of the

21    day of their filing and subsequently.  Thank you, Your Honor.

22            THE COURT:  Thank you.

23            Mr. Baldiga?

24            MR. BALDIGA:  Thank you, Your Honor.  William

25    Baldiga again, for the committee.

1    The committee takes seriously its obligations here,

2    Your Honor, to represent the creditor body generally.  We do

3    not represent any particular victim, even victims who happen

4    to be members of our committee.  We do not represent any of

5    the clinics in their own capacity, even if they have an

6    indemnity claim.  But we are here, and we joined this motion,

7    for important reasons that are benefits to the estate, and

8    that's the stress I want to make.

9    In Tennessee alone, Your Honor, there have been 153

10   reported meningitis cases and at least 15 deaths.  Tennessee

11   is a particular area that has been devastated by the tainted

12   MPA.  And as Mr. Galligan said, at the present time, only a

13   small fraction of those suits have been filed, but we do have

14   a one-year statute of limitations that arises as early as

15   September; so we are nearly weeks away from that statute of

16   limitations.

17   If this motion were allowed, this does not create

18   any liability; it's solely to minimize the expense and to

19   increase the efficiency as to the assertion -- ability to

20   assert liability, subject to whatever defenses may lie.  So,

21   allowance of this motion does not create liability in the

22   least and is not a determination by this Court or a view by

23   the committee or by the trustee or anyone else that liability

24   should apply or that the statute has validity on its merits,

25   these claims come under the statute, or anything else in that

1   regard.

2           If the motion is denied, these plaintiffs, as well

3   as whatever injuries may lie in Tennessee, will each be faced

4   with a quandary of complying with the statute of limitations.

5   I can understand why they may want to at least assert the

6   statutory liability.  Whether or not down the road there's

7   ever a trial on any of those cases or a motion to dismiss,

8   that day will perhaps come.  But each of them will them need

9   to seek relief somewhere in state court, other federal courts,

10  this court, maybe a hodgepodge of courts, as to that

11  declaration.  That almost certainly implicates this estate in

12  each of those.  There could be inconsistent rulings; there

13  could be ancillary relief that is joined.  And it would seem

14  to be a mess, and mess equals expense, and it's expense to

15  this estate in two respects:  one, it requires the trustee and

16  the committee to understand what's going on in what may be a

17  couple of hundred or more requests; second, the request is

18  likely to be made in the context of litigation against

19  parties, such as clinics, that have indemnity claims against

20  this estate, for evaluating and responding to those requests.

21  And there would be a multiplicity by 100 or 200 factor as to

22  the expense that we've already incurred here.  And there's no

23  benefit to this estate to having that tremendous expense, even

24  if a lot of them consist of motions for relief to this Court.

25          We have also, Your Honor, worked with the trustee

1    carefully.  The trustee did file an objection, and one or the

2    other objections was focused on an important purpose of

3    whatever relief here should be to maximize the incentive on

4    the many Tennessee personal-injury and victim death cases, to

5    be centralized in the MDL.

6          As Your Honor knows, it is the stated goal of the

7    trustee and of the committee, from the outset of this case, to

8    centralize as many cases in the MDL as possible.  And this

9    motion, with a revision especially to the order, after much

10   discussion with the trustee, will do that.  And, Your Honor,

11   I'd like to hand up -- and I have copies for others, I think,

12   as many as others want to see that.  But I certainly will read

13   it clearly over the phone for everyone, because I think at

14   least one of the objecting parties is present by telephone.

15   May I approach, Your Honor?

16          THE COURT:  Yes, please.

17          MR. BALDIGA:  I refer to decretal paragraph 4.

18   There are two changes, Your Honor; one change, which is not

19   delineated in pencil here, is to eliminate what was romanette

20   iii, and that's eliminated altogether.  Romanette iii

21   provided -- well, let me just start at the -- romanette i --

22   this is the application of this -- is that this order would

23   apply to actions that have been filed or will be filed

24   directly in the MDL proceeding.  There is a question that has

25   been raised by some parties as to whether there is related-to

 1    jurisdiction as to cases that do not name NECC or an affiliate

 2    of NECC; so ii are -- is that this would apply to cases that

 3    have been or will be removed or transferred to the MDL

 4    proceeding.  And my penciled-in comment -- so -- and I'll read

 5    it, then, in full, by agreement with the trustee, so that ii

 6    is complete -- romanette ii would be, "subject to removal or

 7    transfer to the MDL proceeding, that have been or will be

 8    removed or transferred to the MDL proceeding".

 9            And then romanette iii is eliminated altogether.

10    Romanette iii previously referred to actions filed in some

11    other court, for which there was a consent to remove or

12    transfer.  Frankly, Mr. Galligan's client would have very much

13    preferred that but, in the spirit of compromise and, again,

14    working hand in hand with the trustee to maximize the

15    incentive for all to have these claims administered in the MDL

16    proceeding, we've agreed on this language.

17            THE COURT:  After the clause "subject to removal or

18    transfer to the MDL proceeding", instead of the comma,

19    wouldn't it be clearer if it said "and"?

20            MR. BALDIGA:  I'm happy to do that.

21            THE COURT:  Okay.

22            MR. STERNKLAR:  That's fine, Your Honor.

23            THE COURT:  All right.

24            MR. BALDIGA:  And let me ask -- I have three or four

25    other copies.

1          Are there others in the courtroom that want a copy

2   of this?

3          Doesn't seem to be the most popular matter in the

4   court today.

5          Your Honor, I would then turn -- because one of

6   those directly relates this language to the two objections

7   that have been filed, and I believe that at least one of the

8   objectors is -- and perhaps both -- on the telephone; I

9   believe that neither is in the court.  St. Thomas Outpatient

10  Center, docket number 373, filed an objection with two

11  grounds:  one is that the motion is moot because these product

12  liability claims will at some point fail on the merits, and so

13  I think it's a futility type of objection.  I stress, and I

14  stress again, this is not a position by the trustee, by the

15  committee or anyone else, including by Mr. Galligan's client,

16  for this Court to make any finding whatsoever.  There's been

17  no effort as to the merits of this; it is solely a procedural

18  pre-filing requirement to facilitate and minimize the cost to

19  the estate, of claims being asserted.

20         And I -- so I want to clarify on the record; I

21  thought the motion was clear in that regard but, certainly,

22  St. Thomas and every other party here deserves to have it be

23  without doubt whatsoever that there's nothing here that were

24  to pre-judge the merits of anything.

25         Second, a -- second objection by St. Thomas is that

1    the committee here has a duty to Tennessee healthcare

2    providers, on account of implicitly that they have the same

3    type of indemnity contribution claims that I mentioned

4    earlier.  These -- and you'll hear later in the bar-date

5    motion, these indemnity claims, or potential indemnity claims,

6    that are now being incurred, are a primary driver of

7    everything that the trustee and the committee talk about.  And

8    while we respect very much that St. Thomas and others have

9    these indemnity claims, and we're trying to minimize those, we

10   do not owe a fiduciary or other duty to any creditor.  We owe

11   a fiduciary duty to the creditor body consisting of all

12   general unsecured claims more generally.  And while we may

13   side on this or other issues in a way that favor or disfavor

14   certain groups of creditors, we do so only because we believe

15   that it's best for the creditor body generally.

16          So we do owe a duty to St. Thomas and to

17   Mr. Galligan's client and to every other general unsecured

18   claim but not one that precludes us from taking positions on

19   this or any other motion in the case, if we think it benefits

20   creditors generally.  And we are, after a great deal of

21   discussions -- this -- the filing of this motion followed

22   eight weeks of discussion with the trustee.  So we take that

23   duty seriously.

24          The second objection, Your Honor, is the Inspira

25   Health Network, docket 391, and two objections are noted:  the

1   same duty of loyalty that I mentioned -- I obviously won't

2   repeat that again -- and secondly, at paragraph 11, asks that

3   the relief entered by this Court is -- would be limited to

4   cases filed in or going to the MDL.  And it so happens that

5   the resolution of the trustee's objection does exactly that.

6   So we've satisfied the second objection, I believe.

7   Obviously, Inspira can speak for itself but, as to that

8   objection, I think we are -- we've done exactly what they

9   asked.

10          So, Your Honor, it's an odd motion, one that I would

11   not have anticipated, even in a case that has quite a few

12   twists and turns already, but one that, again, the benefit to

13   the estate is very real.  And, happy to answer any questions

14   the Court may have, but believe it's something that is very

15   important to get done, and get done today, so that the 160,

16   170-odd claimants who we've been telling 'Hold off.  Don't

17   incur expense.  Don't make the estate incur expense' can get

18   done what they need to do without putting the estate through

19   that ringer.

20          THE COURT:  Thank you.

21          MR. BALDIGA:  Thank you, Your Honor.

22          THE COURT:  Is counsel for St. Thomas on the phone?

23          MR. TARIO:  Yes, sir.  This is Chris Tario from

24   Nashville.

25          THE COURT:  All right, sir, do you want to speak to

1    your objection, if you still have one?

2              MR. TARIO:  Yes, sir, and I appreciate the Court's

3    indulgence, especially by phone.  First and foremost, I think

4    that I do take exception, respectfully, to the representation

5    by Mr. Galligan that the objection did not object to the

6    notion that NECC is insolvent.  On page 1 of our response,

7    footnote 2, we do object to the finding that NECC is

8    insolvent.  And frankly, based on what is in front of the

9    Court, respectfully, I don't believe that there's sufficient

10   proof that, at this point at least, based on the record that

11   the Court's deciding upon, NECC is insolvent under the test

12   set out in the motions.

13             So, first and foremost, I guess I take exception

14   with Mr. Galligan's first comment that he started off with.

15   The remainder of our objections to the substance of the motion

16   were characterized accurately by counsel who spoke before me.

17   The relief that the creditors' committee seeks is -- they're

18   seeking a remedy -- a nonmeaningful remedy and that if the

19   Court were to grant this motion and these cases were filed

20   under this theory of liability, it's not going to -- it's not

21   tenable as a matter of law in Tennessee to maintain products

22   liability actions against healthcare providers.

23             So it is a utility argument, and I would

24   respectfully submit that granting the motion allowing suits to

25   be filed under this theory, and then having to rule on motions

1    to dismiss, adds expense to the case when in the first place

2    the claim is not tenable as a matter of law.  So that is the

3    first grounds for our objection.

4           Related, we -- as we put in our papers, the

5    exclusive remedy under the -- under Tennessee law, for any

6    claim against a healthcare provider, related to the provision

7    of health care, is pursuant to the Health Care Liability Act.

8    So even if the Court grants this motion, Tennessee claimants

9    cannot -- contrary to I think what was suggested in the

10   motion, cannot walk out tomorrow and file products liability

11   claims; pre-suit notice still has to be served on healthcare

12   defendants, under our Title 29, Chapter 26.  So that in -- if

13   the motive or the grounds for the motion is that the claims

14   will be filed immediately and need to be filed immediately,

15   they can't; the plaintiffs still have to comply with the

16   pre-suit notice period requirements.

17          And lastly, Your Honor, the creditors' committee --

18   and I understand the position taken by the creditors'

19   committee as articulated a moment ago but, even if you

20   characterize the duty of the creditors' committee to all

21   creditors generally to exercise that duty to the body

22   generally, I believe, respectfully, the case law requires that

23   the committee not favor certain classes of creditors over

24   other classes of creditors.  We are -- us in Tennessee and

25   other clinics and hospitals are creditors.  We not only have

```
 1    an indemnity claim against NECC; we also have breach-of-

 2    warranty claims against NECC for providing us these unfit

 3    products.  So we do have claims against NECC, we do fit within

 4    the class of creditors, and we are owed a duty as part of the

 5    body.  So we would respectfully submit that that is grounds

 6    for denial of the motion that the creditors' committee, in

 7    bringing the motion as a joining movant, is breaching that

 8    duty.

 9            So we would respectfully submit, for all those

10    reasons and the reasons we set out in our response, that the

11    motion be denied.

12            THE COURT:  Thank you.

13            And Inspira, does it have counsel on the phone?

14            MR. O'NEIL:  Good afternoon, Your Honor.  Joseph

15    O'Neil for Inspira.

16            Your Honor, with respect to the changes to the

17    proposed order, that was our main concern, that the claims

18    here would be limited to the MDL proceeding.  We discussed

19    this yesterday with the trustee and we appreciate his efforts

20    in coordinating with the committee counsel in order to revise

21    the order to reflect that.  Given those changes, I believe

22    that we are okay with respect to the order, and we would agree

23    that, as long as it's limited to the MDL, we're okay with it

24    going forward.

25            THE COURT:  Does anyone else on the telephone wish
```

1    to be heard with respect to this motion?

2              All right, hearing nothing, the Chapter 11 trustee?

3              MR. STERNKLAR:  Your Honor, just briefly.  The

4    change in the order resolves our objection; it squarely places

5    the risk on the plaintiffs that they will be unable to get the

6    case transferred or removed or asserted in the MDL; that's a

7    risk they should bear, not the trustee.  It's important to the

8    trustee's overall goals here that case -- as many cases as

9    possible get consolidated into the MDL.  So we read the order

10   now as providing that only those cases heard and determined in

11   the MDL, or at least transferred to the MDL, will have the

12   benefit of this finding.  And with that, we no longer object.

13             THE COURT:  Okay.  Does the United States Trustee

14   have a view?

15             MS. BACHTELL:  U.S. Trustee has no opposition, Your

16   Honor.

17             THE COURT:  I'll enter the order.  I think it makes

18   sense from the perspective of judicial economy, for the

19   reasons mentioned by counsel for the creditors' committee, and

20   it also promotes economy for the affected creditors.  I see no

21   prejudice for the estate.  The insolvency of this debtor is

22   apparent; it has been so from the outset.  And in fact, at the

23   very first hearing in this case, counsel for the debtor

24   reported that, in his view, in the debtor's view, the

25   insurance proceeds would be very much insufficient to meet the

1    debtor's claims.

2         With respect to the issue raised by St. Thomas

3    Outpatient Neurological Center and others who joined in that

4    motion, with respect to whether or not these claims, if I

5    granted the motion, would then be ripe for filing in their

6    home court, claims in the bankruptcy case may be contingent,

7    they may be unliquidiated, but they are still claims.  And it

8    is irrelevant that there may in fact be additional hoops which

9    those creditors would have to overcome in order to file civil

10   actions.  All that is important is that they are, or may be,

11   owed monies under the definition of claims in the Bankruptcy

12   Code.

13        And then finally, with respect to the concern raised

14   about the duty of the creditors' committee, I have to agree

15   with the committee that its fiduciary duty is only to general

16   unsecured creditors as a body, not to any particular unsecured

17   creditor or even any class of unsecured creditors.  Now,

18   indeed, on occasion, creditors' committees are granted the

19   authority to seek preference recoveries against individual

20   creditors who are members of their constituency, and that is

21   not viewed as a conflict, because, in the end, the

22   responsibility of the committee is to seek the highest

23   possible dividend for general unsecured creditors as a whole.

24        Accordingly, I will enter this order.  Is it your

25   intention that I sign it with the language marked up, or would

1   you prefer to send something in?

2           MR. BALDIGA:  Unless the Court has some preference;

3   otherwise, we're fine with this as marked.

4           THE COURT:  Okay.  Hold on just a moment.

5           All right, one down.

6           MR. GALLIGAN:  Your Honor, may I --

7           MR. BALDIGA:  Your Honor, may Mr. Galligan have

8   leave to go to the airport?

9           MR. GALLIGAN:  I have --

10          THE COURT:  Well, I will miss you, Mr. Galligan, but

11  if you have to go --

12          MR. GALLIGAN:  Thank you, Your Honor.

13          THE COURT:  -- go on.

14          MR. GALLIGAN:  I got to go down South where it's

15  been cooler than it has been --

16          THE COURT:  Yeah.  Safe travel, sir.

17          MR. STERNKLAR:  Thank you, Your Honor.  With Your

18  Honor's indulgence, I would propose we take up the bar-date

19  motion next.

20          THE COURT:  Okay.  You think that's easier than the

21  employment motions?

22          MR. STERNKLAR:  I don't know that's easier or not,

23  but it certainly --

24          THE COURT:  Let's do the employment motions.

25          MR. STERNKLAR:  Do the employment motion first?

1            THE COURT:  Yes, yes.

2            MR. STERNKLAR:  Okay.  Your Honor, there are two

3   employment motions on for hearing:  There is the motion -- the

4   trustee's motion to retain Harris Beach as special counsel,

5   pursuant to 327(e), and the related motion to retain local

6   counsel as ordinary-course professionals.  The easier one

7   perhaps is the local counsel; they aren't doing much right

8   now; the cases are stayed as against the estate.  But under

9   local law, we need local counsel in those jurisdictions.  And

10  these are people identified by Mr. Fern at Harris Beach as

11  being particularly capable in this area.  We would ask Your

12  Honor to allow that motion, as there's no objection to it

13  pending.  I don't know that there's anything remarkable or

14  unusual in there, or certainly wasn't intended to be if there

15  was.

16            THE COURT:  Is there anyone who wishes to be heard

17  with respect to that motion?

18      (No response)

19            THE COURT:  All right, hearing nothing -- do you

20  have an order for me to sign, or do you want me to simply

21  endorse it as granted?

22            MR. STERNKLAR:  Thank you, Your Honor.

23            THE COURT:  Which?  Want me to endorse it as --

24            MR. STERNKLAR:  Endorse it as granted --

25            THE COURT:  Okay.

1            MR. STERNKLAR:  -- is fine.  Thank you, Your Honor.

2            THE COURT:  Thank you.

3            MR. STERNKLAR:  Next is the motion of trustee to

4    retain Harris Beach.  Harris Beach is a firm that was

5    identified and retained by the debtor's insurer, Pharmacist

6    Mutual Insurance Company to provide insurance defense coverage

7    pre-petition to the insurers under the policy who were the

8    debtor and certain individuals who are collectively referred

9    to as insiders in our motion.

10           When this case was first filed, it became apparent

11   or when the trustee was first appointed, it became apparent to

12   the trustee that Mr. Fern possesses a unique combination of

13   both expertise and credibility.  He's a registered pharmacist,

14   he has handled numerous complex mass tort cases on the defense

15   side.  He also is credible.  He has the respect of, I think,

16   not just the trustee, but of the plaintiffs' attorneys as well

17   and he is for all the reasons we've articulated in the various

18   papers we've filed, we believe, uniquely qualified to

19   represent the trustee and be the point person.

20           Now, we heard Your Honor loud and clear multiple

21   times before.  We think we heard them; it is important to the

22   trustee that he be able to retain Mr. Fern.  So we propose

23   changes to his retention.  Originally we had proposed that the

24   trustee would be jointly represented by Harris beach with the

25   insiders.  That's no longer proposed.  Now what's proposed is

1    that Harris Beach will solely represent the trustee; solely

2    with respect to the insurance defense matters, as outlined in

3    the application.  His sole duty of loyalty will be to the

4    trustee.  The insiders, as we call them, have retained

5    separate counsel.

6           As Mr. Fern made clear in his declaration, all of

7    the information he has about the underlying merits of this

8    case are, in his view, not confidential.  He obtained them

9    from his own investigation review of the documents.  We need

10   just to clarify that, of course, it's not in the estate's

11   interest that anyone be able to claim he's violating or

12   breaching any privileges that may inure to the benefit of the

13   insiders.  That would open up a lot of things we don't want to

14   open up.

15          But there's no information that he has that he can't

16   share because he's obtained all the relevant information from

17   his own investigation.  So it's not as if there's anything

18   about the merits of these defenses that he can't use, he can't

19   share, he can't do with whatever he wants, notwithstanding his

20   prior representation of these individuals.  Well, of course,

21   he won't disclose things, the contents of his communications

22   with the insiders because those are privileged.  The

23   information that is the subject of those communications is

24   information he has acquired from other sources and he can

25   share with the trustee.

1          So we've been mindful of the concerns expressed with

2   respect to other professionals that there be no dual

3   loyalties.  We've been mindful of the concerns expressed that

4   there be no restrictions on the trustee's ability to share

5   information -- for professionals' ability to share information

6   with the trustee with respect to the matters on which they're

7   employed.  We've tried and we believe we've successfully

8   resolved those problems with this proposed change to the

9   employment arrangement.  And we've provided a supplemental

10  declaration for Mr. Fern.  I think we'll add another

11  supplemental declaration to clarify the point of the privilege

12  because we didn't say that affirmatively in our declaration,

13  but we would ask Your Honor to approve his retention on those

14  revised terms.

15          I believe the last point is, Your Honor, if Your

16  Honor wants him to file fee applications, he's perfectly

17  prepared to do that, notwithstanding that he's being paid

18  solely by the insurer and it's not what is colloquially

19  referred to as a wasting policy.  So payments for defense

20  costs don't affect the limits -- the obligation or the amounts

21  available for indemnity under the policy.  But he's perfectly

22  prepared to do that if Your Honor wants.

23          THE COURT:  To what extent may Harris Beach's

24  loyalties be distracted by the fact that he's being paid by

25  the insurer?

1    MR. STERNKLAR:  I don't think at all.  This is not

2    uncommon.  If anything, he's an insurance defense counsel,

3    he's not getting involved in insurance coverage issues.  He's

4    staying completely out of that.  PMIC has retained Mr. Mikels

5    and Mintz Levin to deal with coverage issues.  Indeed, this is

6    even more beneficial than the usual circumstance where defense

7    counsel is paid by an insurer because in many of those cases,

8    the policy wastes.  In this case, it does not.

9    THE COURT:  Okay.  Thank you.

10    MR. STERNKLAR:  Thank you, Your Honor.

11    THE COURT:  Does --

12    MR. STERNKLAR:  May I have one moment, Your Honor?

13    THE COURT:  Yes.

14    (Pause)

15    MR. STERNKLAR:  Your Honor, perhaps in an

16    overabundance of caution, the counsel for the insiders has

17    requested an opportunity to review the supplemental

18    declaration I mentioned that Mr. Fern will file with respect

19    to privilege to be sure it says what I've said it will say.

20    We -- I don't have a problem; I fully anticipate it will say

21    what I said it would say.

22    THE COURT:  Well, I'll handle that at the end.

23    MR. STERNKLAR:  Okay, thank you, Your Honor.

24    THE COURT:  Thank you.  Does anyone else wish to be

25    heard with respect to this motion?

1          Mr. Baldiga?

2          MR. BALDIGA:  Thank you, Your Honor; William Baldiga

3     for the Official Committee again.

4          Your Honor, we've talked through this extensively

5     with the trustee.  We think the accommodation that he has made

6     in deference to the Court's comments and informal objections

7     by various parties, the U.S. Trustee and others, does address

8     those concerns in a very responsible way.  Mr. Fern adds

9     considerable value here, and we think that it helps to drive

10    the case forward for this to be allowed.  So we support this

11    fully.

12          THE COURT:  United States Trustee?

13          MS. BACHTELL:  Thank you, Your Honor.  Paula

14    Bachtell for the U.S. Trustee.

15          Your Honor, initially, the U.S. Trustee was

16    concerned about the retention.  The UST's office has worked

17    closely with the Chapter 11 trustee and there is an amended

18    pleading before the Court.  And now that the representation is

19    limited and a fee app will be filed that will allow all of us

20    to review it and to object with respect to any issues of

21    unreasonableness, it's a close call, Your Honor.  The UST is

22    relying on the business judgment of the Chapter 11 trustee.

23    We feel he's in the best position to make the decision, and in

24    light of that, the UST has not filed an objection to this

25    retention application as amended.  Thank you.

1              THE COURT:  Thank you.

2              Sir?  If you'd identify yourself for the record and

3      for those on the phone?

4              MR. DAILEY:  Yes, thank you, Your Honor.  My name is

5      William Dailey, Bill Dailey.  I'm a lawyer in Boston with

6      Sloan and Walsh.  We expect to be filing an appearance on

7      behalf of the individual defendants in the MDL action.

8              I would make the observation that we inure to

9      Pharmacist Mutual.  We have had no relationship with them in

10     the past.  We've had very good conversations with them as we

11     get ready to come in.  But I think that Mr. Fern brings a

12     unique perspective here.  He is someone that they are very

13     comfortable with.

14             THE COURT:  You're speaking for or against the

15     motion?

16             MR. DAILEY:  I'm speaking for.

17             They are very comfortable with -- and I think that

18     is important as I try to develop some background information.

19     I asked about resolution and whether or not there was any

20     discussion about resolution.  I was told that I should go very

21     slowly in that regard and that I should -- was not going to be

22     provided with a lot of information.  But nevertheless, I think

23     Mr. Fern brings with him the ability to speak with Pharmacist

24     Mutual which is a relatively small mutual company, but a good

25     one, a solid one, in Iowa.  And they will listen to him on

1    that subject.  Hopefully, in time, my credibility will be

2    developed with them, but I don't have it right now, and I

3    think that he can help us along as we approach that very, very

4    important question, and hopefully can assist greatly.

5           Secondly, as we try to get ramped up and represent

6    the individual defendants, Mr. Fern has an awful lot of

7    information that you get when you come into a case early.

8    It's hard to come in eight or ten months after the matter

9    has -- after the incident has occurred.  I would urge that the

10   Court consider keeping Mr. Fern in place representing NECC.

11          And thanks for the opportunity to speak.

12          THE COURT:  Thank you.

13          Does anyone on the telephone wish to be heard on

14   this motion?

15          MR. MIKELS:  Yes, Your Honor; Richard Mikels for

16   Pharmacist Mutual.

17          THE COURT:  Go ahead.

18          MR. MIKELS:  First of all, if it becomes an issue

19   that we're paying defense counsel, whether it's Mr. Fern or

20   anybody else, then I will -- I haven't discussed this with my

21   client but I think we can probably offer to be relieved of

22   that obligation if it makes plaintiff more comfortable.

23          THE COURT:  Thank you --

24          MR. MIKELS:  However, assuming --

25          THE COURT:  -- thank you for your input.  Is there

1   something else?

2           MR. MIKELS:  Yes, Your Honor.

3           We do support Mr. Fern and on the issue of the fee

4   applications and whether they should be required, I don't

5   think that is an issue in terms of whether he should be

6   employed or not.  But to the extent it becomes an issue, we'd

7   like to be heard on it.

8           THE COURT:  Well --

9           MR. MIKELS:  So I just want to preserve my rights on

10  that.

11          THE COURT:  Mr. Sternklar, you phrased this somewhat

12  in the alternative, and I don't recall whether the amended

13  application takes a position.  Does it take a position?

14          MR. STERNKLAR:  The supplemental declaration says

15  he's prepared to file fee apps if Your Honor orders it.

16          THE COURT:  Okay.

17          MR. STERNKLAR:  It's a really -- the problem is,

18  Your Honor, if Your Honor's view is that it's not required,

19  then we'd be imposing a substantial burden on Your Honor

20  simply to agree to it.  We're prepared to agree to it, but we

21  don't want to be presumptuous and say well, we'll do it, and

22  now you're got to deal with this problem.

23          It's -- so it's up to you.  We'll do it either way.

24          THE COURT:  All right.  So, what is the United

25  States Trustee's position on that?  What is the benefit to the

1     estate of reviewing fee applications between the insurer and

2     its counsel?

3               MS. BACHTELL:  Paula Bachtell for the U.S. Trustee.

4               Your Honor, the UST would like the opportunity to

5     review the time entries that would be provided by the

6     applicant.  I understand that the source of funds for payment

7     is someone other than the estate, but reasonable fees are part

8     of the expectation in the Bankruptcy Court.  It's something

9     that we're prepared to do; we're willing to do it.  I can't

10    speak for others' interest in participating in that exercise,

11    but we would like to.

12              And my understanding of the situation in speaking to

13    my colleagues and Mr. Sternklar prior to the hearing was that

14    the parties were prepared to engage in that activity.  So it

15    was with that information that I explained to the Court that

16    the UST has no objection to the retention, and was relying on

17    the business judgment of the Chapter 11 trustee in moving

18    forward with the amended application.  And so I would ask that

19    the Court allow a provision that requires the filing of fee

20    applications and the UST is ready, willing, and able to review

21    the fee apps when filed.

22              Thank you.

23              THE COURT:  Thank you.

24              I see this in two -- I see two different goals to be

25    served by these fee applications, one of which seems to me we

1   can do without, and the other one seems to be more important.

2   The one that seems to me that we could do without is a

3   determination of the reasonableness of the fee.  That is

4   between Harris Beach and the insurer, and to the extent that

5   the insurer creates difficulties for Harris Beach, that Harris

6   Beach thinks are inappropriate, then I suppose Harris Beach

7   can always come to this Court and ask that its payments be

8   made from the estate, reserving to the estate the right to

9   seek reimbursement from the insurer.

10           So whether or not the fees are reasonable or not,

11   seems to me in the first instance to be a matter between

12   Harris Beach and the insurer.  And it makes sense that both

13   keep careful records with respect to their own position.

14           The other goal of the fee application, one that

15   usually it's not focused on, is as a record of what Harris

16   Beach is doing.  And to the extent that Harris Beach is

17   working for the estate, then it seems to me that a careful

18   disclosure of what Harris Beach is accomplishing is a

19   worthwhile endeavor, particularly when there's a question of

20   it being paid by somebody else.

21           And so my inclination is to require Harris Beach to

22   make disclosure of its time as would any professional

23   rendering services to the estate, but not asking for a ruling

24   on its fees unless it chooses to have the Court review the

25   relationship between Harris Beach and the insurer.

1           How does that sit with you, Mr. Mikels?

2           MR. MIKELS:  Your Honor, I'm concerned -- well, a

3    few concerns.  The first is that there's always a balance in

4    terms of the risks of disclosure of fees because they give

5    away issues of strategy.  And this happens all the time in

6    bankruptcy cases --

7           THE COURT:  But you don't have to disclose the fees.

8    You just have to disclose the --

9           MR. MIKELS:  No, I was talking about what he's

10   working on --

11          THE COURT:  I know.  But he doesn't work for you.

12   He works for the --

13          MR. MIKELS:  No, no, I understand --

14          THE COURT:  He works for the Chapter 11 trustee.

15          MR. MIKELS:  But we have a common interest in the

16   defense of these actions because the claims against the estate

17   that in the first instance, they'll be claims that we may have

18   to indemnify the estate on, subject to whatever rights we have

19   on coverage issues.  So we have a commonality of interests in

20   terms of how these claims that are being defended are

21   resolved.  And we are required, at least so long as we have

22   the obligation to cover the defense costs -- which of course

23   we're doing -- and so therefore we have a common interest with

24   the estate in not disclosing and Mr. Fern not disclosing his

25   strategy and so forth.

1       Now, as I said, this is always an issue in

2   bankruptcy cases because I've made a career, as have many

3   other people before you, and as you did before you were a

4   judge, of making those kinds of disclosures.  And we got sort

5   of used to them.  But the reason that we did is because it was

6   a balance.  On one hand, we had the risk of giving too much

7   information to the adversary, and on the other hand, we had

8   the overriding concern and the very important concern of

9   making sure that bankruptcy estates weren't overpaying fees,

10  and that made it worth, on balance, requiring the detailed

11  disclosure.

12       In this case, that balance doesn't exist as long as

13  we're paying the defense costs.  And therefore I would say

14  that the risk of giving information to adversaries would be

15  prevailing because there's no countervailing balance, because

16  we're not protecting the bankruptcy estate against fees.  And

17  in Your Honor's case, In re Plant about ten years ago, it's a

18  Chapter 13, but you made it clear that what was overriding

19  about fee applications and in that case, you, I believe, made

20  a secured creditors counsel file fee applications because they

21  were looking for reimbursement from the estate.  And you were

22  quite clear that if you're looking for reimbursement from an

23  estate, there is an overriding concern that the fees be

24  reasonable and the fee application should be filed.

25       That doesn't exist here; it's the mirror image of

 1    that case.  Until and unless he's ever looking for

 2    reimbursement for his fees from the estate, then that priority

 3    concern doesn't exist and the issue of disclosure of strategy

 4    and so forth, to me, becomes paramount because he's got a

 5    whole bunch of adversaries in litigation, all of whom will be

 6    reading the fee applications if, in fact, it's required.

 7            So we would prefer that, since we have a commonality

 8    of interest with the estate in the defense, we would prefer

 9    that as long as we're paying the defense costs, that this kind

10    of disclosure not be made to the adversaries because there's

11    no advantage to doing it --

12            THE COURT:  Who do you see as the adversaries?

13            MR. MIKELS:  The people he's defending against:  the

14    claimants.

15            THE COURT:  Okay.  I understand.

16            Anyone else?

17            All right.  Mr. Sternklar, would you send me an

18    order which approves the Harris Beach employment, that

19    requires Harris Beach to file quarterly disclosures of time in

20    the case, in the type of detail that we expect in 2016-1 of

21    the Local Rules, but that the disclosure is to be sent only to

22    the United States Trustee, the Chapter 11 trustee, counsel to

23    the Chapter 11 trustee, counsel to the unsecured creditors'

24    committee, and counsel to the plaintiffs' steering committee,

25    absent further court order; and also that the Court will not

1   rule on the reasonableness of the Harris Beach fees, absent a

2   request for that ruling from either the insurer or from Harris

3   Beach?  Okay?

4           MR. STERNKLAR:  Thank you, Your Honor.

5           MR. MURPHY:  Your Honor?

6           THE COURT:  Mr. Murphy?

7           MR. MURPHY:  Yes.  Your Honor, Harry Murphy for

8   Barry and Lisa Cadden.  Your Honor, with respect to the

9   supplemental affidavit that Mr. Sternklar referenced --

10          THE COURT:  Oh, yes, I'm sorry.

11          MR. MURPHY:  -- you were going to get to that before

12  you make a --

13          THE COURT:  Right.

14          MR. MURPHY:  -- ruling.

15          THE COURT:  Thank you.  I assume that Mr. Sternklar

16  can get that to you in the next couple of days.  If it says

17  something that you think is disturbing, then please file a

18  motion for reconsideration, within the fourteen-day

19  reconsideration period.  All right?

20          So the default will be, if you do nothing, then

21  you're satisfied; if there's something about it you don't

22  like, then you'll file such a motion and that'll be set for

23  hearing.

24          MR. MURPHY:  Your Honor, can you direct

25  Mr. Sternklar when he'll serve that supplemental affidavit,

1   so --

2            THE COURT:  Oh, he'll get that to you by Friday.

3            MR. MURPHY:  By Friday next week?

4            THE COURT:  By Friday this week or next week?

5            MR. MURPHY:  This --

6            MR. STERNKLAR:  If I can have a moment, Your Honor?

7            MR. MURPHY:  Monday fine with us, Your Honor.

8            THE COURT:  Monday's good.  Okay?

9            MR. STERNKLAR:  Thank you, Your Honor.

10           THE COURT:  You needn't put that in the order; just

11   send me the amended -- the revised order with the supplement;

12   get that to Mr. Murphy and his colleagues representing the

13   individual defendants; and if they're unhappy, I'm sure

14   they'll tell me.  All right?

15           MR. STERNKLAR:  Thank you, Your Honor.

16           MR. MURPHY:  Thank you, Your Honor.

17           THE COURT:  Thank you.

18           MR. STERNKLAR:  Two down.  Your Honor, now, if we

19   could turn our attention to the bar-date motion.  This is a

20   motion that in most cases is ministerial.  Nothing seems to be

21   ministerial in this case.  The trustee requests the

22   establishment of a bar date, for all the usual reasons:  He

23   needs a bar date so that he knows what the claims are; he

24   needs a bar date so that he can prepare and file a disclosure

25   statement, making adequate disclosure about what the claims

1    may be; he needs to know the claims so he can file a plan,

2    which will be the vehicle through which he hopes those

3    personal-injury claimants will actually get paid.

4            So, overlaid on that was the memorandum opinion by

5    Judge Saylor on the transfer of motions -- excuse me --

6    transfer of civil actions, where he made it clear that the

7    establishment of an early bar date might go a long way towards

8    resolving the remaining issue that he left open in the case,

9    which is whether and to what extent he should transfer cases

10   in state courts where neither NECC nor any of its affiliates

11   were named as parties, and that if those defendants, by the

12   bar date, filed a claim for indemnification, contribution --

13   or any other claim, I suppose -- he left open the possibility

14   he would transfer those matters to the MDL.  As we've made

15   clear in numerous filings, consolidation of these actions in

16   the MDL is a core component of the trustee's strategy to reach

17   a global settlement with all parties as soon as possible so we

18   can get money to these people as soon as possible, at the

19   lowest cost.

20           Your Honor, originally we filed the bar-date motion

21   asking for a bar date, on September 20.  We provided that we

22   would give actual notice of the bar date to known and

23   reasonably ascertainable creditors.  We provided that we would

24   publish notice in USA Today, the national edition.  We also

25   had a procedure in place to protect the confidentiality of

1    information, on those claims, about claimants' personal health

2    matters.  We also had -- and that, we believe, was sufficient

3    to meet all our statutory obligations as well as our

4    due-process obligations to these people, to provide both

5    actual notice to known creditors and constructive notice to

6    unknown creditors.

7              Going further, we had a procedure in the motion,

8    where we asked Your Honor to enter an order directing the

9    parties we call the notice intermediaries -- these are the

10   clinics, the healthcare providers, who administered the NECC

11   products to their customers and patients; we don't know who

12   those people are, but we do want them to have notice of the

13   bar date.  And we arranged a procedure that we requested Your

14   Honor approved whereby we would ask Your Honor to require that

15   the notice intermediaries make an election:  They can either

16   send notice to everyone who received an NECC product within

17   the two years prior to the filing, or they could turn over to

18   us on a confidential basis the names and contact information

19   of these people so that we could send those people notice as

20   well.

21             Since we filed those pleadings, and in light of the

22   numerous objections that have been filed, and in light of

23   observations made at other hearings in this case, we filed in

24   our response to the objections our proposed fix to the

25   problems that seem to have arisen.  That proposed fix extended

1    the bar date to October 8 -- October 15 from September 20th;

2    it provided for publication not just in USA Today but in

3    various local publications in the localities where these pain

4    clinics and healthcare providers are located and where these

5    products were administered.  We also, with respect to the

6    notice intermediaries, agreed that, and we proposed that,

7    instead of being required to send notice to or give us the

8    names of all patients who received any NECC product in the two

9    years to the filing, that it be limited to those people

10   reasonably expected to have suffered an injury, and those are

11   the people identified as having received product in three lots

12   identified by the Centers for Disease Control as having caused

13   harm.

14          Certainly others who received other products are

15   free to file a claim but, in terms of the obligation of the

16   notice intermediaries, they either provide notice themselves

17   or turn over the names.  We've limited it to those people.

18   Not only did that limitation, in our view, limit this process

19   for the notice intermediaries and the burden on the notice

20   intermediaries solely to those most likely to have suffered

21   harm, but it also corresponded with the identities of the

22   recipients of the recall notices that many, if not all, of

23   these notice intermediaries previously were required to

24   provide to these people by the federal government.

25          So this list should be readily ascertainable,

1    readily available.  There shouldn't be much burden.

2            We also changed the form of the notice, to make it

3    more consumer-friendly.  We also limited who the information

4    will be shared with.  There's a concern, which I believe

5    you'll hear from some of the people on the telephone about

6    that this -- the identities of the potential creditors not be

7    made available to some -- not be made available generally, be

8    limited only to those who have a need for that information to

9    provide notice to -- of the bar date, and to administer these

10   cases.  Obviously, all of these provisions would be subject to

11   alteration upon motion to Your Honor and the entry of an

12   additional order upon whatever grounds Your Honor decides to

13   change the order, if such grounds exist.

14           We think that these changes have resolved most, but

15   not all, of the objections by the notice intermediaries.  And

16   there are three classes of objections here:  There are the

17   notice-intermediary objections, which, in terms of number, are

18   clearly the largest number of objections; there are issues the

19   U.S. Trustee has raised, although they have not filed a formal

20   objection; and last, there's the objection filed by the PSC,

21   which is truly a horse of a different color and has its own

22   unique issues, which I'll get to in a moment.

23           The remaining objections, Your Honor -- remaining

24   issues, I think, in the notice-party objections, that are not

25   resolved by the accommodations we're proposing to make, are, I

1    believe, the following:  One, the notice intermediaries object

2    to being forced to give notice without being reimbursed for

3    their costs to do so.  The trustee's view is that he's not

4    requiring them to give that notice; it's an accommodation

5    anticipating that many of them are going to feel uncomfortable

6    having a third party give notice to their patients.  They want

7    to control that process; then they will have to bear the cost.

8    If for any reason, including cost, they prefer not to give the

9    notice, then they can simply give the information to the

10   trustee.

11          You'll see from the objections, they're all over the

12   map.  Some of the notice parties object, on the grounds of

13   patient privacy and HIPAA, that they can't give us that

14   information and, therefore, they exclusively want to give the

15   notice themselves.  Others complain they shouldn't have to

16   give the notice, that they want to give us the information.

17   We simply will give them an election.

18          The HIPAA objection, Your Honor, we believe, is

19   misplaced, for the reasons we said in our response.  HIPAA

20   clearly contemplates that disclosure can be made pursuant to a

21   court order.  There are different kinds of court orders.  Most

22   of the objections focus on what's called a qualified

23   protective order, which is, under the statute -- under --

24   excuse me -- Federal Regulations, a specific protective order

25   issued in litigation, in response to a subpoena.  And then

1     there's a separate provision that says any order; you can --

2     if a court orders it, you can disclose it.  We think the

3     bar-date order is such an order.  We think that, so long as

4     the confidentiality restrictions we have in place are deemed

5     sufficient, and we believe they are, the order provides all

6     the authority that -- under HIPAA, that these notice

7     intermediaries need to turn over this information.

8          If the notice intermediaries choose to give notice

9     themselves, they will have to certify to the trustee that

10    they've done so, but they will not have to disclose the names

11    of the people to whom they sent the notice.

12         So with respect to the objection of cost, we think

13    they have an election, and we think the trustee shouldn't be

14    put in the position of having to monitor at that level the

15    costs incurred and then reimburse people if they decline to

16    turn the names over and instead prefer to send the notice

17    themselves.

18         Second objection is largely by a contingent of

19    notice intermediaries based in Maryland, that the bar date is

20    too soon, that it should at least extend out till the

21    expiration of all statutes of limitation under nonbankruptcy

22    law, for the assertion of claims.  And for obvious reasons,

23    Your Honor, we can't keep this case open, nor should we be

24    required to keep this case open, for years and delay payment

25    to creditors concomitantly for an extended period of time to

1    address that issue.  This is -- I'm unaware of any bankruptcy

2    case that has ever kept a statute of limitations open till the

3    expiration of the last possible statute of limitations.

4         The third issue that's been raised is that, well,

5    why should the notice intermediaries give us the names; we can

6    go to various state or federal governmental agencies and get

7    the names.  Well, the short answer is these people have it.

8    These are the same names to the people -- the people that gave

9    the notice -- the recall notices to.  This should not be

10   burdensome.  This should not be difficult.  The burden on the

11   trustee of having to go through a state-by-state or federal

12   process to try to get access to this information is

13   potentially, at least, too severe to justify imposing that

14   obligation on the trustee.

15        Finally, the -- I believe, the last remaining

16   objection is to the absence of an affirmative exculpation in

17   the order, for those who comply with the order.  And I think

18   it's self-evident:  If you comply with the order, you're not

19   going to have liability.  So I don't know that we need

20   anything further on that point, other than perhaps a sentence

21   stating the obvious:  If you comply with the order, you won't

22   have liability.  We've only asked people to make commercially

23   reasonable efforts.  Again, we're talking about mailing a

24   short notice to people whose names and addresses should be

25   readily available to them.  But again, if they don't want to

1   do that, the order certainly authorizes them, under HIPAA and

2   otherwise, to make that information available to the trustee.

3           Even if the order were characterized as an order

4   that requires the notice intermediaries to give notice -- I

5   don't believe it is; nevertheless, I believe that would be

6   appropriate.  Rule 2002(a)(7), on its face, authorizes the

7   Court to direct who will give notice; it says the clerk, or

8   some other party as the Court may direct, shall give notice.

9   So 2002(a)(7) is a specific subsection that deals with notice

10  of the bar date.  Rule, I believe, 9007 gives the Court

11  general authority to regulate the form and manner of notice.

12          So I don't think there is a serious argument that

13  Your Honor lacks the authority to require it, if one

14  characterizes that order as requiring it, which, again, the

15  trustee believes it does not; it simply provides for an

16  election.

17          The UST had three issues, Your Honor, they've raised

18  with me informally; the first is -- and in no particular

19  order, the first is that we put in the bar-date notice,

20  consistently with Local Rule 3002-1, that 503(b)(9) claim --

21  502(b)(9) claims, for administrative claims for goods and

22  services -- goods rendered -- provided to the debtor within

23  the twenty days prior to bankruptcy -- that date was set by

24  Local Rule as sixty days after the first date set for the

25  creditors' meeting, unless the Court orders otherwise.  The

1    U.S. Trustee wants the Court to order otherwise and provide

2    the general bar date for those claims.

3           I'm aware of Your Honor's unpublished opinion in JJ

4    Donovan where I believe you interpreted that Rule and the

5    interplay of that Rule on 9006(b)(6) as providing that the

6    Court doesn't have the power to do that but does have the

7    power to allow for untimely-filed claims of that nature, upon

8    a showing of excusable neglect.  Again, the trustee's

9    preference is just simply to leave the Local Rule as it is,

10   because that's out there.  But at the end of the day, it's

11   more important we get final resolution of the issue, than

12   anything else.

13          THE COURT:  I thought I heard you say this now two

14   ways.  What is the trustee's preference:  that I extend it, or

15   that I not extend it?

16          MR. STERNKLAR:  I think the trustee's preference is

17   you not extend it.

18          THE COURT:  Okay.

19          MR. STERNKLAR:  But I don't know that's -- how

20   seriously -- strongly felt -- I mean, I guess --

21          THE COURT:  Okay.

22          MR. STERNKLAR:  -- it's easier that way.  The Rule

23   is what it is, and people know what it is and -- or if they

24   don't, they should.  We're not creating ambiguity or conflict,

25   but the U.S. Trustee has asked for that, and I did say I'd

1   raise it with Your Honor.

2        The second issue the UST has raised is it wants some

3   changes to -- which I believe are unobjectionable and modest,

4   to the bar-date notice, to make clear that untimely-filed

5   claims may nevertheless still be allowed under certain

6   circumstances.  And Ms. Bachtell's proposed some language and

7   I'm confident we can work that out, and that will be

8   unobjectionable.

9        The third issue is probably the most difficult;

10  concerns the U.S. Trustee's concern that we are proposing that

11  the proofs of claim and the addenda remain confidential.  The

12  U.S. Trustee recognizes that the agenda should remain

13  confidential, but it's concerned, in its view, this is a -- in

14  his view, this is a public process and that the actual proofs

15  of claim should be made available.

16       We've explained that our concerns with that issue

17  are that people shouldn't put medical information on the face

18  of the claims, but they might.  And we're expecting tens of

19  thousands of claims.  It is not a simple exercise to review

20  them for redaction.  And there's also a concern that the

21  identities of these claimants not be widely distributed.

22       So what we are prepared to do, and I believe the

23  U.S. Trustee is agreeable to this, is ask our notice agent to

24  prepare a spreadsheet or list that simply has initials or some

25  moniker that says this is a claim, this is the amount, this is

1   the nature of the claim -- it's a tort claim or some other

2   claim -- and this is the priority -- general unsecured or

3   something else -- and that that list be made available to the

4   public.

5        The trustee's concern was that that list contained

6   enough information so someone can identify claims they might

7   need more information on; and I think identifying them as tort

8   claims or some other claim provides that, in this case,

9   information.  And we'd be prepared to amend the order to

10  provide for that.

11       Finally, we get, Your Honor, to the PSC objection,

12  which is truly wide-ranging.  At its core, regardless of what

13  was intended, what that objection would result in is the

14  wholesale supplanting of the trustee by the PSC.  Despite what

15  the PSC argues, this is not a class action; this is not -- if

16  it were, we wouldn't need Rule 7023 to deal with class

17  certifications in adversary proceedings.  These are -- this is

18  a process governed by very specific statutes and rules and

19  case law that, while it certainly has some superficial

20  similarities to a class action, is not the same thing as a

21  class action.  And they don't always serve the same purposes.

22       So the PSC's approach that this is just another big

23  class action and should do what we do on all the other big

24  class actions is:  (a) wrong; (b) reveals a fundamental

25  misunderstanding of how this process works and what its role

1    is in this process, compared to the role of the trustee; and

2    three, would result in the PSC getting to make decisions and

3    having discretion that, I submit, the Code and the law imposes

4    on the trustee to make.

5         PSC wants two bar dates, not one:  It wants a bar

6    date for personal-injury claimants and a bar date for someone

7    else.  They don't say when the bar date should be for the

8    personal-injury claimants, but the implication is it should be

9    way, way out in the future.  They want -- and that seems to be

10   a concern for unknown and future claims.

11        This is an issue that the Code addresses.  As Your

12   Honor noted earlier, the definition of claims is broad.  We

13   understand, as part of a plan, we're going to have to address

14   in some fashion how we propose to treat claims for which

15   symptoms may not have arisen yet, if any, or in other ways

16   that haven't manifested themselves.  But that's not a bar-date

17   issue; that's a plan issue.

18        We're going to have to set a bar date at some point,

19   no matter what.  We believe the notice regime we get will

20   identify those claims.  But it proves too much to say, 'People

21   who don't know they have a claim need to get notice of a bar

22   date for a claim they don't know they have, even if they get

23   the notice.'  They don't know it, they don't know it.

24        So to extend out the bar date some indefinite long

25   period of time to see how many more claims get manifested,

1    whether they get manifested, truly injures those seriously

2    injured who have suffered claims, who'll have to wait to get

3    their money for these somewhat speculative contingent

4    potential claims to emerge in the future.  That's not to say

5    they're not creditors.  That's not to say we don't have to

6    deal with it.  But it's not a bar-date issue.  We have to set

7    a bar date.

8            Moreover, this bar date is almost a year after NECC

9    terminated its operations.  Everybody -- as one of the

10   objecting parties, the Dr. O'Connell Pain clinic objection at

11   docket number 356 avers everybody who got product from the

12   three lots knows it, and everyone -- it's inconceivable that

13   there's anybody out there, given the wide publicity --

14   nationally, regionally, in the health industry -- this debtor

15   has received, that there is a larger substantial -- perhaps

16   any creditors who received any product, who either won't get

17   actual notice of this or won't be covered by the publication

18   notice.  It's hard to imagine there's anyone who doesn't know

19   that they haven't been affected but, for that reason, Your

20   Honor, we can't have an extended open-ended bar date; that's

21   an argument for no bar date at all.

22           The PSC doesn't like the trustee's notice agent,

23   Donlin Recano; it wants to hire its own notice agent.  Now,

24   originally it said it wanted to hire its own notice agent to

25   handle different issues in the MDL, notably, gathering medical

1   records and things that are peculiar to the MDL.  Now they

2   want a wholesale change; they want us to get rid of Donlin.

3   They cast aspersions on Donlin Recano's credibility because

4   the debtor originally selected Donlin Recano.

5          Your Honor, we have no particular loyalty or -- to

6   anyone.  Donlin Recano's a nationally recognized, known

7   noticing agent.  The delay in this process and the -- and

8   potentially the money, to simply switch forces now is -- in

9   the trustee's judgment, makes that an unwise thing to do.  And

10  the PSC's arguments to the contrary -- well, I understand the

11  PSC has a different view, but it's not the trustee.

12         The PSC complains that the notice does not

13  specifically describe the potential effects in a plan of

14  third-party releases.  As we said, it is our expectation at

15  some point we will have a global settlement, a component of

16  which will be third-party releases that will inure to the

17  benefit of those who make a substantial monetary contribution

18  to the pot.

19         Your Honor, we don't have that plan, and this is not

20  a disclosure statement.  And in light of, indeed, opinions

21  such as Your Honor's opinion in Clamp-All, I'm not sure how

22  much we can or even should say about third-party releases in a

23  bar-date notice.  That's the kind of thing that, in order to

24  be explained fully and thoroughly, needs to be included in a

25  court-approved disclosure statement, and we're not at that

1    point yet.

2           So the fact that the notice -- the notice does say

3    that creditors should be aware that if they don't file a claim

4    they will not have claims against NECC, but whether they file

5    a claim or not, it's possible the plan may prevent them from

6    going after other third parties.  I think that's as far as

7    we're allowed to go, frankly, absent plan and a disclosure

8    statement in describing what the consequences may be, because

9    anything more we say starts opening up a door to a much larger

10   disclosure, and we start resembling what would be in a

11   disclosure statement, and I submit that's inappropriate for a

12   bar-date notice.

13          The PSC complains that our direct notice is

14   inadequate.  They don't want to limit the obligations of the

15   notice intermediaries to -- or the trustee to send direct

16   notice only to those who received contaminated products from

17   the three lots.  They say we should defer to the PSC who, in

18   the MDL, sent out some eighty-odd subpoenas where they want to

19   gather the names of a broader -- much broader group of people

20   from the notice intermediaries of former NECC customers.  We

21   should wait until that process plays out.  We should then give

22   direct notice to every one of those people.

23          The short answer is we think that is unduly lengthy,

24   open-ended, costly, and we believe that our approach is

25   superior and is more likely to get resolution of this case and

1    the names of these affected people who have the real claims

2    quicker with less acrimony, with less fighting, with less

3    litigation.  But again, it's the trustee's role to make that

4    decision, not the PSC's role to make that decision.

5          Its related complaint that our process interferes

6    with the MDL discovery gets it backwards.  We're indifferent

7    to that discovery.  They can do what they want in the MDL, but

8    that's got nothing to do with what we do here in terms of

9    identifying claimants for notice.  And indeed, Judge Saylor

10   has requested additional briefing on whether he even has the

11   power under the Federal Rules of Civil Procedure that limit

12   discovery to information recently calculated to lead to

13   discovery of admissible evidence in the litigation, to use

14   that process to get names and contact information to be used

15   in the bankruptcy process to give notice.  I'm not sure he has

16   that power.  But that he even asked the question shows why

17   it's the trustee's duty, indeed, and power and obligation to

18   move forward in this court without being limited by what the

19   PSC is doing in the MDL.

20         Your Honor, so I believe what we've done is

21   constitutional.  I believe it provides due process.  I think

22   we've done more.  The trustee nevertheless is prepared to do

23   even more, if there's something that makes sense to do.  The

24   PSC has supplied the affidavit of Kinsella (ph.), someone who

25   proposes to be an expert on noticing matters.  And Kinsella

1    proposes a different noticing process.  And what's interesting

2    to note is Kinsella also explains that its background is in

3    various cases.

4         Well, if you look at the list of bankruptcy cases

5    that it's involved in, those are megacases.  Those cases have

6    a lot more cash available to -- and have a much broader

7    constituency range of potential creditors than NECC has.  If

8    we had an unlimited pot and we had unlimited time, maybe we'd

9    do something different, but we don't, nor do we know what this

10   would cost, whether it would cost more or less than the small

11   amount of money we even have on hand to do what Kinsella

12   wants.

13        We don't think that what -- you know, what Kinsella

14   proposes is not inherently good or bad, but under these

15   circumstances, it's the trustee's judgment that it is

16   inappropriate, that we don't have the money or the time to

17   engage in the kind of class action based solicitation of

18   claims that the PSC proposes will occur under the Kinsella

19   proposal.

20        Finally, Your Honor, the PSC, perhaps in an

21   overexuberant advocacy, alleges that by setting a bar date

22   we're seeking to bar claims.  We're not seeking to bar any

23   claims; we're seeking just simply to do what Rule 3003(c)(3)

24   says we're supposed to do which ask the court to set a

25   deadline for claims.  It's the trustee's view that it needs

1    that deadline.

2         The PSC complains we haven't disclosed to them the

3    status of the trustee's negotiations with the insiders over a

4    settlement and the time frame in which we think that's going

5    to be completed.  We have certain confidentially obligations,

6    but those negotiations are moving forward.  They're moving

7    forward aggressively.  The trustee is trying to bring them to

8    closure as soon as possible.  That we haven't disclosed the

9    particulars of that to the PSC reveals more about what the PSC

10   perceives its role to be compared to what the code says the

11   trustee's role is.  They've gotten all the information on that

12   they're entitled to, and that we haven't said more isn't the

13   reason not to set a bar date.

14        So, Your Honor, I suppose I'm prepared to answer any

15   questions you may have, and after you hear from these people,

16   perhaps I can have a very brief opportunity to give a final

17   summation, if that becomes necessary.  But we need a bar date.

18   We think the bar-date procedures we've proposed are both

19   constitutional and reasonable.  We believe that we've resolved

20   the bulk of the objections by the notice intermediaries.  We

21   believe the PSC's objection is not well taken and should be

22   denied.  And we would ask Your Honor to allow the motion.

23   Thank you.

24        THE COURT:  All right.  We'll take a fifteen-minute

25   recess to give Ms. Chambers there a break.  All right.

1    (Off the record at 2:39 p.m.)

2    (On the record at 3:03 p.m.)

3            THE CLERK:  All rise.  Please be seated.  The court

4    is now in session.

5            THE COURT:  All right, so I have the Chapter 11

6    trustee's position with respect to the motion for the bar

7    date.  Does the creditors' committee wish to be heard?

8            MR. BALDIGA:  Thank you, Your Honor.  Mr. Sobol

9    himself has a real time constraint and asked whether --

10           THE COURT:  Wow.

11           MR. BALDIGA:  -- he could --

12           THE COURT:  Okay.

13           MR. BALDIGA:  -- possibly go next, if the Court

14   would permit?

15           THE COURT:  Absolutely.

16           Mr. Sobol, go ahead.

17           MR. SOBOL:  Thank you very much, Your Honor.

18           THE COURT:  I thought you were on the phone, or

19   going to be on the phone.

20           MR. SOBOL:  That must have been --

21           THE COURT:  No?

22           MR. SOBOL:  -- a miscommunication --

23           THE COURT:  Okay.

24           MR. SOBOL:  -- in my office, for which I'll take the

25   responsibility.  And it won't happen again.  I apologize for

1   that hassle, really.

2           So, cutting through the histrionics, I want to go to

3   three very substantive issues; the first is the issue of

4   notice to the injured victims, okay?  I think that there's a

5   shared desire to get as much notice out as we possibly can to

6   the victims.  The PSC thinks the following is a very

7   straightforward necessary proposition in this case:  that

8   those people who received contaminated products from NECC

9   receive direct written notice by a professional notice

10  administrator and claims expert; we think that's a very

11  straightforward thing.  And our position in the papers, and

12  I'll get into it --

13          THE COURT:  Before --

14          MR. SOBOL:  Yes.

15          THE COURT:  Before I -- let me just interrupt you

16  for a moment.  Because this Court is going to rule on -- and

17  pre-approve what the notice says, why can't any notice

18  provider send out these notices?

19          MR. SOBOL:  Any notice provider can.  That's --

20          THE COURT:  Okay.

21          MR. SOBOL:  -- not our issue.

22          THE COURT:  Oh, I thought you were --

23          MR. SOBOL:  Yeah.

24          THE COURT:  -- saying that it needs to be a notice

25  provider who is familiar with these kinds of issues.

1          MR. SOBOL:  Oh, no, no, no.  I guess the distinction

2     I'm drawing is whether it's Donlin or Kinsella or some company

3     like that --

4          THE COURT:  Right.

5          MR. SOBOL:  -- versus clinics doing it.

6          THE COURT:  I see.

7          MR. SOBOL:  So that's one of our issues.  So just

8     let me drive right into that right now.

9          So we think that it should not be sent out by the

10    clinics; it just should be sent out by a professional, whether

11    Donlin or Kinsella, whoever, because you can track who it is

12    that they're getting it.  If you get a return letter, you

13    could have somebody do something to be able to figure out

14    where they live; we're going to get this back out to them.

15    You have a record as to who it is you're sending out

16    information to, so that if you don't get a claim and there's

17    an application by the PSC or the creditors' committee that

18    there be supplemental notice to those people, you know who

19    they are.  Right?  It's all a very, very routine kind of

20    thing.  And there are reasons, as we've explained in our

21    submissions, why it is that the clinics would be less prone

22    and in a conflict position to do that, particularly if the

23    notice is making clear to those people that they might have a

24    claim against the clinic.  So rather than having the clinic

25    send it out, our position is very, very straightforwardly that

1   it should be by a claims expert.

2          And so whether or not the names are coming from an

3   order that you enter or an order that Judge Saylor enters, and

4   I'll deal with that just briefly in a few moments, is really

5   not material to our ultimate real core desire, which is, these

6   people need to get notice, that you have approved, from a

7   professional claims expert, so that we can track

8   professionally who's getting the notice, whether they need

9   supplements, whether we can find them, are we going to

10   actually create -- one of the things the PSC might do, on our

11   nickel, is a phone bank so that we can follow up if people

12   haven't filed a claim or, if their claim information is

13   insufficient, to tell people that.  Right?  It's all very

14   simple.  That's the core part of our -- and we remain at a

15   difference of opinion with the trustee as to how to do that.

16   That's one substantive position.

17          A footnote to that, just to clarify something that

18   may not be clear in either the presentation of the lawyers or

19   in the materials so far, before I get to my second point, this

20   footnote is that, just so you can understand, months ago, the

21   PSC, through me, sat down with the trustee's office and we

22   looked at this issue of notice and how we're going to do this.

23   And frankly, I thought that what we had made arrangements for

24   was that the PSC would take on the job, because we're going to

25   be conducting discovery anyway, of the clinics, to also be

1   seeking the names, for multiple purposes; right?  Remember

2   that one of the issues in this case is that NECC and the

3   clinics should have had these people's names to begin with,

4   not names like Mickey Mouse or Donald Duck or whoever it is

5   they were writing who are falsified names or backdating names

6   or not having sufficient names.  They should have been keeping

7   these names all along; it's one of the things the PSC wants to

8   find out about:  who actually has the list around.  But we sat

9   down, me and the trustee sat down, and decided that that would

10  be an effective way -- the most effective way, through Rule 45

11  and through Judge Saylor, for that process to do that, because

12  it would be central enforcement and it would be one

13  consolidated pursuit.

14          Now, I was surprised to find out, when the bar-date

15  motion was filed, that the trustee wants to do his own thing

16  too; right?  At some level I don't care about it, so long as

17  the victims don't pay for it; right?  But it does, frankly,

18  seem that there's a little bit of now -- there's one effort by

19  the trustee to get names, and there was an effort by us, in

20  the Rule 45 context, in front of Judge Saylor, to get the

21  names, and it seems to me that that's frankly a little silly

22  and should be worked out.

23          But I'm going to move on to the second issue anyway,

24  okay?  The second issue is, what is it that the notice should

25  say about this notion that there may be what are functionally

1    nondebtor releases; they're really channeling injunctions but

2    which effectively cut off the rights of these victims -- not

3    against NECC but the debtor, because that's going to happen no

4    matter what -- but against, like, if they're real life, like

5    the clinic, with their doctor, with a testing company, with a

6    company that's supposed to make the clean room or the company

7    that was supposed to be cleaning the clean room, right?, all

8    these other people.  What is it that's planned now, if

9    anything?

10           Now, on the one hand, we're agnostic to what the

11   decision is, but I think it's important to make an observation

12   about what the decision is.  If today the bar-date notice is

13   not intended to provide constitutional do-not notice to these

14   people, in a real way this is a real problem.  This is, in a

15   real way, if you don't file a claim in this bankruptcy now,

16   your rights against your clinic may be out; we don't know,

17   because there isn't a deal to get together, but it may be out

18   the door, or against your position, or against the test

19   company's blah, blah, blah, blah, blah.  Right?

20           If it's intended to do that, then it needs to say,

21   like, right out of the gate, in very clear language, and we

22   don't think that it does.  We were provided something that we

23   think does it in somewhat the best way you sort of can do it

24   now, and the reason I say it that way is because there are no

25   deals yet, so you don't even know defendants you're talking

1   about, whose claims might be waived right now, functionally.

2   But we've done the best we can, in our proposed notice.

3          Now, on the other hand, I've heard this said by the

4   trustee and I can completely understand it, and I've heard it

5   today too:  'No, no, no, no, we're not trying to deal with a

6   plan today.  We're only dealing with the bar date.  And if we

7   have a plan -- and we plan on having a plan that has nondebtor

8   releases, channeling injunctions against as many people as we

9   possibly can, including the insiders, and we're going to do

10  that later on; and at that point we're going to need full

11  disclosure in the context of a plan.'  Well, then my question

12  is, well, okay, but then you're going to have to send notice

13  to everybody, right?, not just those people who filed a claim,

14  because now you're barring those people's -- everybody's

15  rights against these new nondebtors that weren't disclosed

16  previously.

17          So we're not just talking about the population of

18  claimants in a vote on a confirmation plan; you're going to

19  need to send out notice to everybody before you have a

20  channeling injunction that says, 'Too bad, your rights against

21  your clinic are now gone,' which, okay, again, from our point

22  of view, sort of agnostic.  If -- in fact, we encourage having

23  a nondebtor release program here; we think it will maximize

24  the value to the estate, to be sure, and we're doing all sorts

25  of things to do that.  But if we're going to do that later on,

1    and if we're going to have all that disclosure later on and

2    we're going to have lots of expense later on, then it really

3    does ask the question:  Why don't we wait to do that notice

4    for NECC's bar date for the victims, then, too, rather than

5    having to do another round of notice in a situation where

6    we're trying to conserve valuable resources?

7            Now, if I understand the logic, then, it's, well,

8    wait a second, we've got to be doing something now.  And I

9    understand that.  Our position on the PSC's position is you

10   should enter a bar date for nonvictim claims and that our

11   position is that with respect to this -- again, this is the

12   way this logic goes -- if we're going to be doing a big notice

13   program later on with a nondebtor release program, and then

14   the question is why not wait, and you can do your bar date now

15   for nonvictims.  And then it raises the question, well, do we

16   need any information today or in October about the victim

17   claims, in order to do these negotiations or do something

18   else?  And near as we can tell, frankly, the answer's no.

19           In other words, it's not critical path to getting

20   this case done, from our point of view, from what we can see,

21   to have a bar date now for victims if we're going to go

22   through that notice program again later anyway.  It's not

23   critical path, because we need to put together the deals,

24   because we're going to have to put together a plan, I mean,

25   because we're going to have to go through a notice process

1   anyway, and none of that requires knowing anything about the

2   victims now.

3          Now, why do we keep on saying that?  Well, because

4   NECC is insolvent; because there are 700 and more illnesses

5   that have been documented, and 61 deaths and exposures that

6   are out there; and the value of the insurance, by any

7   participant that we've spoken to so far, recognizes

8   accumulatively it's not going to come close to compensating

9   everybody.

10         So at one level, it's immaterial whether or not one

11  person's claim is big or another person's claim is small, or

12  whether you have forty-five of the sixty-one deaths in the

13  case right now, or only twenty-five of the sixty-one deaths,

14  because you're going to do a notice program later on when

15  you're confirming the plan, to bring those people in, if

16  that's what you're planning on doing later on.

17         So just again, to make the second point clear, we

18  are not philosophically, in terms of this issue of nondebtor

19  releases, against the notion of doing a notice now that

20  adequately protects people's rights, although I'm not sure we

21  can really get enough done there on it, simply because what

22  you do -- again, what we're doing is so oblique, frankly; your

23  rights may be lost against anybody under any circumstances

24  involving anything, right?, that we end up going down that

25  way.  So be it, and hopefully that'll be enough.  But on the

1    other hand, if, as the trustee expects, we're going to have to

2    do full-blown notice later on, we don't see a purpose, in

3    terms of critical path, for having to do a bar-date notice now

4    for victims.

5              The third point I wanted to address, and this is

6    frankly one of the smaller ones but it seems to have raised

7    the ire of the trustee a little bit, is that anticipating

8    these issues about the importance of notice and the

9    acquisition of names and how we're going to deal with all of

10   this stuff, both the plaintiffs' steering committee and the

11   creditors' committee began a process sometime -- I think it

12   was in mid-May or something like that -- to do a competitive

13   bidding process to find out who was going to be the best and

14   the cheapest at a variety of things, which includes being the

15   black box -- the lockbox, if you will -- that gets these

16   names, de-duplicates the names, sends out the notice, sends

17   out following notices to track people down, deals with census

18   information later on, houses medical information for purposes

19   of allocation, et cetera, et cetera, et cetera.  And we

20   invited the Donlin firm to participate; the Donlin firm

21   refused to participate.  The creditors' committee and the PSC

22   made a joint recommendation to the trustee to use Kinsella,

23   whose bid was markedly less than the professional services

24   being -- of Donlin.  And for reasons that, frankly --

25   actually, for reasons that escape me because the reason I've

1    only been given is timing, the trustee chose to reject that.

2           Now, the timing issue I don't think is -- should --

3    is or should be a problem because, again, the notice hasn't

4    been approved yet, let alone sent out, let alone names coming

5    back and back-identifying.  It is the case that the subpoenas

6    that we've issued to eighty-two recipients, seventy-some-odd

7    of which are the clinics, does indicate to people that they

8    are to return information to the Kinsella firm.

9           The final thing I should indicate is that there is

10   some question as to not the intent but the follow-through by

11   the clinics when responding to the CDC's request to give a

12   notice of the -- what's been called here as the recall notice.

13   It's not clear the extent to which the clinics were successful

14   in an effort of sending recall notices to everybody.  There's

15   no declaration before you right now, either by the trustee or

16   by me, in terms of the adequacy or inadequacy of that process.

17          I will represent to you, however, within my

18   discussions with various people, and this is at best hearsay

19   from other lawyers telling me what it is that they were told

20   by other people in various states, is that it's mixed results

21   and in some places that the return of the letters was almost a

22   third, as the address -- unknown or something to that effect;

23   that in some other places, it wasn't letters that went out to

24   people; there were phone calls that were made to people, and

25   in some places the population of to whom it is that was to be

1    contacted has been reported back to me in varying ways; in

2    some places it's anybody who got a contaminated product

3    between March and October of 2012, and in other situations

4    it's anybody who the clinic has reason to think was injured by

5    the MPA.  It's because of issues like that that we thought it

6    important to have a court order under which each clinic has

7    been served formal court process to which to respond and to be

8    obligated in terms of providing information.

9            The final thing I just want to throw out is that

10   it's been observed that there is obviously an overlap in terms

11   of the tort issues that Judge Saylor has been dealing with and

12   the bankruptcy issues that you've been dealing with.  And one

13   of the things that's clear overlap is this bar-date issue, as

14   it certainly affects the material rights of tort claimants

15   under bankruptcy laws.  And at least I'll say that I have

16   suggested, whether this is crazy or not, but at some

17   proceeding when we're dealing with these issues, that the

18   courts -- plural -- might consider holding a joint session

19   where we're dealing with these issues, because it might be --

20   frankly, it might be more fun -- I can put it that way -- but

21   maybe also more efficient, because of the need to toggle back

22   and forth.

23           If Your Honor -- I have never done this in my thirty

24   years of practicing law, but I have kept some people waiting

25   for me for a couple of hours.  If the Court has any questions

1    for me, I'm happy to answer them; otherwise --

2              THE COURT:  No, I don't.

3              MR. SOBOL:  Okay.

4              THE COURT:  I don't.  Thank you.

5              MR. SOBOL:  Thank you very much, Your Honor.

6              THE COURT:  Thank you.

7              Is there someone else on the phone, who's going to

8    be representing the PSC committee?

9              MR. SOBOL:  There was a Mr. Lipton, I think, or

10   Mr. Sobor (ph.).

11             MR. LIPTON:  Yes, Your Honor, this is Marc Lipton;

12   I'm on the phone still.

13             THE COURT:  Okay, good.  All right.

14             Safe travel, sir.

15             All right, does anyone else -- I'm sorry,

16   Mr. Baldiga, you wanted to be heard.

17             This is Mr. Baldiga on behalf of the official

18   creditors' committee of the bankruptcy case.

19             MR. BALDIGA:  Thank you, Your Honor.  For the

20   record, William Baldiga, Brown Rudnick, for the creditors'

21   committee.

22             Your Honor, we support this motion.  And like

23   everything else we do, the context is important.  We are seven

24   months into this case, as quickly as that has gone by in some

25   respects.  And it's an important case in the sense that you

1    heard from Mr. Galligan earlier:  There's real suffering here.

2    And this is not a class action where I might get a fifty-

3    dollar check next year or the year after, for participation in

4    whatever happened.  But the recompense here is critical to the

5    ongoing care of some very, very sick people.  And we're also

6    dealing -- so time is critical.  And in some ways I'm

7    embarrassed that we're seven months into the case, just asking

8    for a bar date.

9            This process -- and we're here today after what has

10   been a full two-, almost three-, month process of discussions,

11   almost daily, among the trustee, the PSC and the committee.

12   It's fair to say that the committee wanted in March to file

13   the motion that you have before you; we held off because the

14   trustee, to his credit, asked that the committee expend every

15   conceivable effort in bringing the PSC on board, and the

16   trustee joined us in trying to do that, and we spent ten weeks

17   trying to do that; we were successful in certain respects.  A

18   lot of what you've read is the product of a lot of very good

19   cooperation, but we were unable to get that on board.

20           We did reach an agreement on June 6 with the PSC

21   that they would fully support a motion brought before this

22   Court for a bar date of around October 15, and that would

23   apply to all claims.  That's an agreement that we did reach in

24   writing.  And it gives us pause that something different than

25   that is suggested.

1        We -- there is very good reason for a bar date here,

2   and two primary ones.  First, it drives the settlement

3   process.  We at Brown Rudnick have been here before, as

4   perhaps other parties; certainly Harris Beach, who you heard

5   from previously, in other cases, including the ephedra cases.

6   It is really very difficult to expect potential defendants,

7   potentially culpable parties, and especially the insurers, to

8   cut significant checks without knowing the universe of claims

9   in front of them, as the Bankruptcy Code requires or the Rules

10  require, under oath, certified, with some real level of

11  detail.  We all know, from 60 Minutes and news reports and

12  everything, what happened here, reports of deaths and so

13  forth.  But people don't write big checks unless they have the

14  details in front of them; that's only responsible.  Everyone

15  who writes checks reports to someone else who would expect

16  that.

17        Second, and this is critical, and in the context of

18  the -- what you heard Mr. Sobol say, we are here in the

19  context of a dual proceeding, the MDL.  And it's impossible to

20  fully appreciate the importance of the bar date now and the

21  immediacy of it, without appreciating what has happened in the

22  MDL.

23        The -- there was a motion by the trustee, in May, to

24  centralize all pending actions relating to NECC, including

25  those that did not name NECC specifically, for strategic

1    reasons perhaps, in the MDL, for efficiency and, incredibly

2    important, to avoid the multiplicity of indemnification claims

3    arising in cases such as the ephedra cases; those are the

4    claims that could really break the back of any case.  And

5    every time there's an expenditure by one of the clinics and so

6    forth, there's a potential indemnity claim; those are

7    contractual here.  There're some common-law indemnities but,

8    for the most part, as you heard from the trustee very early in

9    the case, most or all of these clinics and hospitals, and so

10   forth, have contractual indemnities from NECC as part of their

11   normal purchase of product.

12           The PSC has issued eighty-two subpoenas to clinics

13   about a month ago.  There have been more than thirty, perhaps

14   forty, objections in the MDL.  Every piece of paper has a

15   cost.  The cost of that process is considerable; we hope not

16   overwhelming.  We believe that, as of this date, there has

17   been nothing yet produced by way of the names and addresses

18   that Mr. Sobol referenced.  We would like that not to be the

19   case, we would like that to have all come in easy with no

20   objection, but nothing is easy.

21           In the ideal world, we would have those lists and

22   this would be that easy, but there are legitimate objections,

23   including by many people on the phone, and those have to be

24   played out.  You heard Mr. Sternklar say earlier Judge Saylor,

25   even after receipt of those and a full hearing, has asked for

 1   supplemental briefing; there's further hearings.  We're not

 2   going to get what we need there.  Hopefully we'll get some of

 3   the eighty-two.  But waiting till the last person complies

 4   with something that is subject to that much legal give-and-

 5   take is a very, very long process.

 6          Judge Saylor expressed concern as to the

 7   centralization with respect to certain claims, those that

 8   didn't name NECC in his ruling, in his written decision -- and

 9   the Court may have seen it; I hope you have; if not, we can

10   certainly put it on the docket on this proceeding.

11          THE COURT:  I've read it.

12          MR. BALDIGA:  -- is that concerned with comity and

13   other important considerations that did not transfer into the

14   MDL cases that did not name NECC or one of its affiliates, and

15   understanding explicitly that that could allow -- he wouldn't

16   be able to stay those and so there could be -- it could drive

17   indemnity costs significantly.  And Judge Saylor suggested to

18   the trustee, and the trustee heard him loud and clear and

19   announced to the committee and to the PSC, coming out of that

20   hearing -- or after reading that decision, 'We need a bar date

21   and we can't wait any longer for you, OCC, to try to get the

22   PSC fully on board.'  And the reason is, because with a bar

23   date, if one of these clinics or others with indemnification

24   rights file a proof of claim, it's no longer a theoretical

25   claim but something that could justify Judge Saylor exercising

1    his jurisdiction.

2          So a bar date will drive the settlement process that

3    we're all here -- we don't need to be in Chapter 11 if we're

4    not going to have the settlement process; Chapter 7 would

5    suffice.  And the bar date is a necessary tool to the success

6    of this case where time is important.  Secondly, it will

7    reduce claims substantially, and that's critical.  This is a

8    very limited-universe case.

9          The PSC has argued a few things -- I think Mr. Sobol

10   narrowed them significantly in his comments, which is

11   appreciated -- and has argued last week -- came close to

12   arguing again today, but clearly in last week's transcript

13   said that 'We are here with a de facto class action.'  And

14   Judge Saylor corrected them and said, 'No, that is a horse of

15   a different color.  This is not a class action.'  And the

16   argument persisted that there was a case that Mr. Sobol's firm

17   was involved in, the Relafen case -- I don't -- I'm

18   phonetically taking it from the transcript -- in which there

19   were 4,000 timely claims filed; there was then -- authorized

20   some further outreach.  An additional 350,000, or so, claims

21   came in deserving payment, and that's when Judge Saylor said,

22   'Well, this is a much different case.'

23          Mr. Sobol's first point was -- and this is really

24   the primary driver; he said, 'I think we can all agree that we

25   should do as much notice as possible.'  We don't think that's

1    what the standard is.  This case -- as much notice as possible

2    would cost more cash than this estate has.  We don't have the

3    funds.  We don't have Merck on the other side here.  We can't

4    afford to do as much notice as possible.  It's a balancing

5    act.  I think the trustee has done a great job balancing

6    competing demands between economy of the estate and that type

7    of theoretical class-action type of ideal where funds are

8    unlimited.

9         And Mr. Sobol's specific point is, 'We suggest that

10   everyone who got a contaminated product should get a direct

11   mail notice.'  That's the specific.  Well, what does that

12   mean, getting down to brass tacks?  First, none of us really

13   know how many contaminated products there were.  We believe,

14   and the CDC has said, there were three contaminated vials of

15   MPA; maybe 14,000 people got that -- got a shot from one of

16   those.  And so we're looking at, we think, a universe from

17   people who may have taken an injection from a contaminated

18   vial, up to 14,000 or so; could be much less than that, but

19   that's the -- would seem to be.  But that's one drug.

20        If you look at Exhibit 5 to the PSC's objection

21   here, they're pretty explicit about what they just asked the

22   Court to do, because we talked about 14,000 people getting

23   direct mail notice, but they want direct mail notice to all

24   people who may have gotten a contaminated drug.  At Exhibit 5,

25   the PSC is pretty explicit; there were 1,900 different types

1    of drugs that may or may not have been contaminated, at 457

2    facilities, in virtually every state in the country.  If there

3    were 14,000 who got MPA, how many people got the other 1,900

4    drugs?  Are we talking about a million notices?  Three million

5    pieces of mail?

6           It's -- it would be nice to be able to be in the

7    abstract where there is a large party at the other end who

8    could permit us to give every conceivable notice, but we

9    can't, so we do have to deal in the practical realities.  The

10   trustee has been -- "patient" is a good word -- to take our

11   comments, take the PSC's comments, in more hours of meetings

12   and calls and drafts.  What you have before you is probably

13   the twenty-fifth, or so, draft of a bar-date notice; it's not

14   been for lack of trying to come to a consensus.

15          I do want to comment on the DRC part of this.  Well,

16   Mr. Sobol is correct; we did join with the PSC in a

17   competitive process to see whether DRC or someone else would

18   reduce their cost, and it does seem like we can get there.

19   And -- but we would do it at the official committee with the

20   trustee and not over the back of the trustee.

21          There's time to do that.  All this Court would be

22   asked to do today is approve DRC as the mail drop for these

23   notices.  There is plenty of time ahead of us, in a couple

24   months, three months ahead, to change horses in that regard.

25   There's a lot of work to do with these claims; a lot of it

1    will be done by the trustee; a lot of it will be done by the

2    committee, in terms of analyzing them, trying to figure out

3    settlement.  The plan has been already in the works, but

4    there'll be plan balloting and so forth.  Maybe that won't be

5    DRC that does that work, and -- but we know how to bring a

6    motion to the Court on due notice and do that, and we'll give

7    DRC a further opportunity to be competitive in that regard.

8    But this bar-date notice does lock in DRC.

9          I do want to mention -- so we're fully supportive of

10   what the trustee has done here; it may not be perfect; it does

11   use the estate wisely.  We -- it encourages the filing of a

12   claim by those who have claims.  It does not do what the

13   further Kinsella drafted notice would do, which is actually

14   encourage the filing of a claim by someone who has non-

15   personal-injury claims but who may have suffered distress.  We

16   think, while there are some class actions where that is

17   appropriate, it invites what the PSC may term millions of,

18   literally, claims by people who may or may not have been

19   exposed to a drug, possibly, and may have had legitimate fear

20   that it just doesn't know whether it ever got an injection or

21   was exposed to something that may or may not have been

22   contaminated or caused any harm whatsoever.  But we don't

23   think it's our job, at the estate level, to encourage everyone

24   who has any conception in that regard, to file a claim and see

25   what happens; that would make this case come to a crawl, and

1   those people who have had such tremendous suffering will be

2   waiting years for any type of recompense.

3          There is one point that Mr. Sternklar and I were

4   talking just a moment ago that we may have to come back to the

5   Court on, which is the amended order suggested by the trustee

6   with respect to -- on his supplemental response, or whatever

7   it is, provides, at the request of some of the people on the

8   phone, some of the clinics, that the members of the creditors'

9   committee, acting in their fiduciary capacity, do not get to

10  see the information that comes in on the bar date; that's a

11  legitimate concern today.  Part of the dynamic here is that

12  there is a real concern, and you see it in Judge Saylor's

13  transcript, of client-trolling and, for these addresses to be

14  made public, give rise to a real concern that there are

15  lawyers out there who may want to take a huge mailing list and

16  do the type of solicitation which none of us would be proud

17  of.

18          And so we have committed to the trustee that,

19  because there are lawyers who represent clients on our

20  committee of course, just like on the PSC, that we would have

21  it be at attorneys' eyes -- that is, Brown Rudnick eyes --

22  only, until the bar date comes and goes, but that once the

23  information comes in, it's critical that the members of the

24  creditors' committee, who are very experienced lawyers in the

25  ephedra cases and in other cases like this, get to see the

1   substantive information, as will then all the people on the

2   defendants' side and so forth, if that's what we need to do to

3   make a settlement.

4            So we -- that one part of the order we do take issue

5   with; it's a very minor part in the universe of things here.

6   And hopefully with the clarification that the members won't

7   see that information till the bar date has come and gone,

8   assuming we're dealing with October 15th -- that's a

9   reasonable period -- we are not going to do client-trolling on

10  our committee.  And that concern is completely alleviated once

11  the bar date has come and gone.  Thank you.

12            THE COURT:  Thank you.

13            MR. BALDIGA:  Any questions for the committee, Your

14  Honor?

15            THE COURT:  No.

16            MR. BALDIGA:  Thank you.

17            THE COURT:  United States Trustee?

18            MS. BACHTELL:  Thank you, Your Honor.  Paula

19  Bachtell for the U.S. Trustee.  Good afternoon.

20            Your Honor, the U.S. Trustee understands and

21  appreciates the Chapter 11 trustee's efforts to obtain a firm

22  bar date to give clarity and to provide proper notice, but we

23  have requested amendments to the proposed order that was

24  submitted to the Court under document number 372; I'd like to

25  address them in reverse order as presented by Attorney

1    Sternklar.  First, Your Honor, with respect to paragraph 6,

2    the UST has requested a more narrowly tailored relief with

3    respect to information that is treated as confidential in

4    order to address the rebuttable presumption that the public

5    has a right to access to proofs of claims filed by creditors

6    concerning their own claims; these are documents filed with

7    the Court and, therefore, they are judicial records.

8           Your Honor, it's extraordinary to the U.S. Trustee

9    for anyone to request that the face of the proof of claim not

10   be made part of the public record.  I will say to you that we

11   are in agreement that with respect to the addendum which is

12   separately referenced in paragraph 6 and which I understand

13   will include the very personal information about the

14   claimants' medical situation, the UST does understand that

15   that information, the addendum alone, is properly kept

16   confidential.

17          But with respect to the face of the proof of claim,

18   we have requested that that POC itself be made available to

19   the public.  The reason for that, Your Honor, is it's our view

20   that it allows for an opportunity for a party-in-interest to

21   request further information from the Court, for cause; it'll

22   assist in the objection to claim process and voting

23   calculations; but most importantly, Your Honor, it'll provide

24   the public with a more complete understanding of the judicial

25   system and a better perception of its fairness.

1          We did also discuss the issue of a list.  Your

2     Honor, our first request would be that the POCs themselves be

3     made part of the public records, which is consistent with any

4     other case that we've ever been involved with, but that if the

5     Court is inclined to consider the substitute option of a list,

6     I would submit that the UST will actively negotiate and

7     participate in what information would be provided on the list.

8     And it would be our request that essentially the same

9     information that you would see on a proof of claim itself be

10    made part of the public record in that alternative manner.

11    But I just would like to make clear to Your Honor that our

12    first request is that the face of the POC be made public,

13    consistent with other bankruptcy cases.  Your Honor, that's

14    paragraph 6.

15          The next issue:  related paragraph 20, which just

16    dealt with the barring of claims; and the specific language in

17    that particular area raised a concern about late-filed claims.

18    And so the UST has suggested language for the trustee to

19    consider that would insert the word "a timely claim" in

20    paragraph 20 and also make reference to the debtor and its

21    estate being forever discharged if the claim is not paid in

22    Chapter 11, so that untimely proofs of claim, in the event

23    that there are funds available after the payment of timely

24    filed proofs of claim, would be available to those claimants.

25          And then last but not least, Your Honor, the UST did

1    raise a concern regarding paragraph 11(f) and the "provided,

2    however" language. I understand from Attorney Sternklar that

3    he was taking that language from -- and the particular date

4    reference therein is tied to the language in our Local Rule

5    3002.1, which begins with, "Unless otherwise ordered by the

6    court". I will say, Your Honor, that the UST has requested

7    that there be a general bar date for all creditors. In our

8    view, it was either important not to add superfluous

9    information into the context of a notice for bar date, or it

10    was just more fair and easy to have a general bar date for all

11    creditors, which is what we're accustomed to seeing.

12        If the Court is predisposed to not diverging from

13    the Local Rule, which Attorney Sternklar did share with me

14    that you had made that ruling in an unpublished decision -- I

15    was unaware of it -- I have to defer to the Court on your

16    feelings on that matter. But the request --

17        THE COURT: I --

18        MS. BACHTELL: -- has been made.

19        THE COURT: I certainly understand all the arguments

20    that have been made about --

21        MS. BACHTELL: Um-hum.

22        THE COURT: -- about victims not being able to

23    identify the full extent of their injuries, and so forth. But

24    those who would take advantage of 502(b)(9), they're the --

25        MS. BACHTELL: 50 --

```
 1              THE COURT:  -- trade.

 2              MS. BACHTELL:  503(b)(9)?

 3              THE COURT:  503(b)(9).

 4              MS. BACHTELL:  Yeah.  Yeah.

 5              THE COURT:  I'm sorry.  They're just --

 6              MS. BACHTELL:  No problem.

 7              THE COURT:  They're the trade.

 8              MS. BACHTELL:  Um-hum.

 9              THE COURT:  Why should they get any better treatment

10    than any other trade creditor in any other case?

11              MS. BACHTELL:  I understand that that's your

12    concern --

13              THE COURT:  Okay.

14              MS. BACHTELL:  -- Your Honor.  And if that's your

15    ruling, it's acceptable to the UST.

16              THE COURT:  Okay.

17              MS. BACHTELL:  Thank you.

18              THE COURT:  Thank you.

19              Does anyone on the telephone wish to be heard?

20              MR. GROSSMAN:  Yes, Your Honor.  This is Steve

21    Grossman, who represents Inspira Health Care (sic) and Inspira

22    Medical Centers.

23              THE COURT:  Yes, sir.

24              MR. GROSSMAN:  I want to thank you, first of all,

25    for allowing the courtesy of us being able to appear by phone
```

1    today.  I also want to extend thanks to the trustee for

2    reaching out to Inspira and, I believe, some other healthcare

3    providers, with respect to the objections that were filed, and

4    for listening and trying to resolve those objections; and we

5    feel we've done a very good job at that.

6            What I'd like to address, and I feel a need to

7    address, are many of the issues that have been raised by the

8    PSC and some of the confusion that that may be -- that may

9    have created as to what is the universe of potential claims.

10   What the PSC has not been clear about and what forms, I think,

11   the basis of their objection, is who are the victims and the

12   potential claimants.  The PSC believes alone and, I believe,

13   since the trustee has agreed to what has been presented in the

14   amended motion, or that is their motion, and the creditors'

15   committee supports that motion, it's the PSC alone that

16   believes that notice, actual notice, should go to any patient

17   who got any NECC product, and that's not correct.

18           As the trustee established, the potential claims

19   against the estate relate to three specific lot numbers of

20   NECC MPA that were administered after May 21st, 2012 and only

21   three other NECC products, with nine specific lot numbers,

22   produced after June 6, 2012.  That's the universe of potential

23   claims; nothing more.  There's no evidence that any other lot

24   number, any other product, has been contaminated or that any

25   other patient may be at risk according to the CDC.  No

1    healthcare provider should be required to provide the names of

2    patients who were not exposed to those three lot numbers or

3    those nine specific lot numbers of the other products.

4         The PSC is attempting in this court, as they've

5    tried to do so, so far, and failed to do so in the MDL, to

6    create claims where none exist, by obfuscating the medical

7    literature to suggest that there is an unknown latency period

8    for those who receive contaminated NECC products.  What the

9    PSC has failed to inform the Court about is that all of the

10   studies on which they rely and cite in their opposition

11   evaluated patients exposed to only the three specific lots of

12   MPA administered after May 21st, 2012; no other products, no

13   other lots.  As such, these studies have nothing to do with

14   any other NECC product as the PSC suggests, or in any way

15   provides the basis for them to be able to believe that notice

16   should go beyond that or that there would be potential claims

17   beyond those particular products.

18        Inspira's a hospital that's been treating patients

19   tied to the outbreak relating to these three specific lots of

20   MPA, and continues to do so today.  Inspira's on the

21   frontlines of treatment of these patients that have been

22   affected by what NECC has done.  But the patients being

23   treated and those who the CDC assessed were at risk, which

24   includes those who may be at harm in the future, relate only

25   to those three specific lot numbers of MPA administered after

1    May 21st, and no more.

2              As we said in our brief, but I think it's important

3    to reiterate today, if the CDC or any federal, state or

4    health -- or local health authority had evidence or believed

5    in any way that the contamination or the outbreak or potential

6    patient risk was linked to any other product or lot number

7    other than the three lot numbers of MPA and those nine

8    specific lot numbers of the three other products, they would

9    have required Inspira and every other clinic to notify each

10   patient to ensure that those patients were evaluated and for

11   the CDC to assess the risk.  That did not and has not

12   happened.

13             And to respond to the PSC's comment today in court

14   that they have no idea of the success of notice, the CDC Web

15   site suggests -- or it's on the CDC Web site, to my knowledge,

16   that ninety-nine percent of those patients were contacted.  To

17   provide actual notice to any patient who ever received any lot

18   of MPA or any other product in the last two to five years, or

19   to anyone who did not get an injection from one of the three

20   specific lot numbers of MPA, would be reckless and harmful to

21   those patients.

22             If there is a concern about patients as the PSC

23   suggests, it wouldn't be advocating to cause them harm by

24   notifying them, implicitly telling them that they are at risk

25   for meningitis or related infections, serious issues, when

1    there's no evidence -- and indeed the PSC has provided no

2    evidence to this Court or to Judge Saylor in the MDL court --

3    that these patients are at risk and, therefore, potential

4    claimants.  We agree with the trustee that actual notice, if

5    any, should be limited to those patients who may be at risk

6    and who may file a claim if they are provided notice, which

7    are those patients that were administered one of the three

8    specific lots of MPA after May 21st, 2012.

9           We'd also like to address some of the comments the

10   PSC made about requiring more information about third parties

11   who might be responsible, or at least should be in the notice

12   for third parties who could be -- where plaintiffs could be

13   potentially barred, or claimants potentially barred, against

14   third parties other than the debtor.  The notice provisions

15   the PSC requests aren't designed to do anything other than, we

16   believe, to help the PSC, in the plaintiffs bar (ph.), obtain

17   new clients.  The waiver (ph.) consumer-friendly or pointing

18   to language that suggests that there's claims against the

19   hospitals, clinics or doctors, including mislabeling or

20   malpractice claims, is beyond any provision we're aware of

21   that's required for the notice.

22          Interestingly, and despite what the PSC represented

23   today in court, there's no other category of entities

24   specifically named, other than healthcare providers.  There's

25   no mention of testing facilities, cleaning companies, sales

1    companies, or any affiliated defendants such as the owners and

2    principals of NECC, that are named in the new notice that the

3    PSC drafted.  Such language, we believe, is unnecessary to

4    advise patients of their potential claims against the debtor.

5              Our recommendation, which we believe is agreed upon

6    by the trustee based on what has been submitted to the Court,

7    and apparently the CC -- or the creditors' committee also

8    supports given their representation today in court, is to

9    simply identify any other potential parties as simply any

10   other party, which Inspira did as an accommodation to the

11   trustee in lieu of fighting to have the entire reference

12   removed entirely.

13             Since the inception of the MDL and the creation of

14   the creditors' committee, the PSC has pushed very hard to move

15   this case at lightning speed against the healthcare providers,

16   and advocated an early bar date in order to have leverage

17   against healthcare providers, to come to the settlement in

18   exchange for some type of release or channeling injunction.

19   Yet today the PSC says it's not critical to go forth in that

20   fashion.  I think they take that different position today for

21   the bar date, for personal-injury claimants, or at least

22   trying to separate out the personal-injury claimants that they

23   not be set -- or the bar date not be set as to them or be

24   deferred, because they don't want Your Honor's ruling to

25   impact their attempt to obtain a treasure trove of patient

1   information in the MDL, through the use of eighty or more

2   subpoenas to healthcare providers, for information on patients

3   that have no connection to, and never received any injection

4   of, one of the three specific lot numbers.

5          If Your Honor limits that scope here to those

6   affected lots, the PSC won't be able to continue their fishing

7   expedition in the MDL or even here.  There has been enough

8   harm and the potential for harm to the patients who actually

9   received one of the three specific lots of MPA after May 21st,

10  2012; we believe there's no need to create more based on

11  speculation and the desires of the plaintiffs' steering

12  committee.

13         Finally, we object to the creditors' committee

14  request in their objection that notice intermediaries, like

15  Inspira, include a cover letter with the notice that they may

16  be ordered to provide.  Not only should there be no cover

17  letter included; it should clearly not include one with the

18  wording "the creditors' committee suggests", which is, "This

19  office, clinic or facility -- select one -- has been directed

20  to send you the enclosed bankruptcy notice, based upon our

21  records showing you were administered or prescribed a product

22  made by New England Compounding Center.  This notice explains

23  who you can contact for more information or to answer your

24  questions about the notice," end quote.

25         First, there's no reason for any cover letter, as

1    the notice documents are sufficient.  The patients who

2    received or may have received an injection of one of the three

3    specific lots of MPA were already contacted by Inspira and

4    other health -- and the other healthcare providers who are on

5    this phone likely, as required by the CDC and other federal,

6    state and local health authorities.  Some were contacted on a

7    weekly basis, and those who were asymptomatic were contacted

8    on a monthly basis through March 2013.  This pattern and

9    required contact with patients is unique to this case.

10   Getting the notice, proof of claim and the addendum as

11   drafted, without more, as a result of NECC's bankruptcy, is

12   not going to come as a surprise or be the first time that

13   these patients are reminded that they may be at risk because

14   of their exposure to NEC's (sic) MPA.

15          As such, there should be no cover letter required,

16   whether sent by a claims administrator or Inspira or other

17   healthcare providers.  If the Court does require that the

18   cover letter be included, it should be amended to be -- to

19   more accurately reflect the patient receiving it.  Right now

20   it is not limited to the three specific lots of MPA at issue.

21   And the cover should not create a concern that other MPA or

22   other NECC products could have harmed them, when there's no

23   evidence as I described earlier.

24          Also, there's no reason to identify Inspira or any

25   other healthcare provider in a cover letter, as it provides no

1    benefit to the patient or the recipient, and will invite calls

2    or other inquiries to Inspira, which is, I don't believe the

3    purpose.  As such, we request that no cover letter be required

4    at all, or revised to accurately reflect the patients who are

5    being sent a notice, and not include any reference or

6    identifying information concerning Inspira.

7            I think the last point the PSC made for a joint

8    session is really not necessary.  The scope of the claims and

9    the potential claims are pretty clear.

10           For these reasons and for those set forth in our

11   brief, as well as for the reasons the trustee has expressed,

12   we respectfully request that the bankruptcy court issue the

13   bar-date order contained in the trustee's revised notice, with

14   the exception of the language including the identification of

15   mislabeling or malpractice claims, as well as the naming of

16   healthcare providers as an entity the patients may have a

17   potential claim against.  We also request that there be no

18   cover letter requirement with the notice.  Thank you, Your

19   Honor.

20           THE COURT:  Thank you very much.

21           MS. BACHTELL:  Your Honor, Paula Bachtell for the

22   U.S. Trustee.

23           THE COURT:  Yeah.

24           MS. BACHTELL:  May I make one final point?

25           THE COURT:  Yes.

1          MS. BACHTELL:  Thank you, Your Honor.  I just wanted

2     to raise one other issue and it relates to Code Section 107

3     and the public-access-to-papers provision.  Your Honor, this

4     is an instance -- I'm referring to the matter of the

5     protection of the information placed on the face of the proofs

6     of claim.  Your Honor, I just want to submit to the Court that

7     there's a general rule with respect to public records being

8     open to examination under Section 107, and thus far there

9     really hasn't been any discussion or offer of proof that would

10    put the Court in a position to protect a person with respect

11    to scandalous or defamatory matter contained in a paper filed

12    in a case under this title.  But I just wanted to raise that

13    as well, as another reason that the information contained on

14    the face of the POC should remain in a public realm.  Thank

15    you.

16          THE COURT:  Thank you.

17          Anyone else on the phone?

18          MR. MEISLER:  Yes, Your Honor.  This is Ron Meisler

19    of Skadden Arps.  Your Honor, I represent Insight Health

20    Corporation; we're one of the parties that filed an objection.

21          Your Honor, as a threshold matter, we believe that

22    what the debtor is requesting of notice intermediaries, and

23    that is, directing them to send notice or otherwise imposing

24    upon them to do something, that's a mandatory injunction.

25    And, Your Honor, I think it's been well established in case

1    law, and it's statutory, that for a debtor to seek a mandatory

2    injunction or equitable relief, Rule 7001 applies, which makes

3    this motion procedurally defective.  And, Your Honor, even if

4    they filed an adversary, there's no cognizable right to impose

5    this kind of relief on a third party that has no property to

6    the estate and that is otherwise not currently involved in the

7    bankruptcy.

8              Your Honor --

9              THE COURT:  You want me to write a decision that

10   says that your client won't cooperate for technical reasons,

11   won't send information to its patients who may have been

12   harmed?  Is that what you're looking for?

13             MR. GROSSMAN:  Your Honor, I don't think that the

14   debtor can ask from us, the third-party healthcare provider --

15   I don't think they can ask for us to do anything at this

16   point.

17             THE COURT:  It's a lawyerly response, not a business

18   one.  Go ahead.

19             MR. GROSSMAN:  Your Honor, look, we're bound by

20   HIPAA and we've got certain requirements.

21             THE COURT:  HIPAA doesn't apply.  Go ahead.

22             MR. GROSSMAN:  Your Honor, what the debtor -- Your

23   Honor, actually, I'm going to need clarification on the

24   application to HIPAA, because if what they're looking for are

25   patient contact information --

1              THE COURT:  Keep on -- keep --

2              MR. GROSSMAN:  -- we're --

3              THE COURT:  Keep on going, counsel.

4              MR. GROSSMAN:  Thank you.  Your Honor, the trustee

5    likes to argue that 2002 is what applies and gives this Court

6    the authority to direct us to provide notice.  Your Honor,

7    that's not what 2002 is meant for.  2002 is meant so that in

8    the larger cases where the Clerk of the Court can't handle the

9    claims and noticing, that this Court and courts around --

10   bankruptcy courts around the country can direct a claims and

11   noticing agent to assist, or otherwise puts that burden on the

12   debtor in Chapter 11.  It's not an obligation that should be

13   imposed upon third parties.

14             Your Honor, it's also important to note that the

15   debtor doesn't need third parties like us to go through our

16   own books and records and to provide notice.  The law is

17   clear.  The Fifth Circuit's opined on this.  The Third

18   Circuit's opined on this.  The courts in this district have

19   opined on this.  The notice requirement is for the debtor to

20   search his own records.  But to ask us to search our records

21   and to be in essence their agent, simply goes -- it goes too

22   far.  The debtor has publication notice; we think that's

23   appropriate for those parties that the debtor doesn't have

24   contact information in its own books and records.

25             Your Honor, put simply, we share the same skepticism

1     that Judge Saylor does.  We do think that they've got a

2     procedural issue.  We think also that they've got a

3     jurisdictional issue.  In fact, if they were asking for this

4     information pursuant to the subpoena, they would have to do it

5     through the court in which -- the court that has jurisdiction

6     over us and the other notice intermediaries; they couldn't do

7     it straight out of the district court in Massachusetts.

8           Your Honor, they also try to compare us to banks and

9     brokers in the solicitation context.  I think it's important

10    to note that that's not comparable.  The banks and brokers are

11    already obligated to provide notices to their customers who

12    hold debt or equity with the banks and brokers.  So we don't

13    think that that analogy applies.

14          Your Honor, for those reasons, we believe that this

15    motion, with respect to its request on notice intermediaries,

16    is improper and should be rejected.

17          Your Honor, to the extent that you see our objection

18    on this ground differently, we have three remaining issues

19    with respect to the request.  Two of our -- we have five

20    issues to begin with; two have been resolved.  By the way, the

21    trustee has changed its procedures.  The two have to do with

22    the scope; we said the scope was too broad.  Now that the

23    trustee is limited to three specific lots, we're okay with

24    that.  With respect to the form of notice and requiring

25    clarification, again, the trustee did clarify that.  And the

1   three remaining issues are:  reimbursement of expenses; a

2   clear and specific statement that there's no liability on

3   account of providing notice; and three, to the extent, again,

4   that you disagree with our perspective that we cannot be

5   directed, we would also request that there be a duty that a

6   notice intermediary simply provide commercially reasonable

7   efforts to identify the contact information of its patients.

8            Your Honor, just to touch on reimbursement of

9   expenses, we think it's inappropriate that the debtor shifts

10  the burden and the cost related to notice, onto the notice

11  intermediaries.  Donlin Recano -- it's a noticing agent, and

12  they can't take advantage of what we perceive as HIPAA issues,

13  to shift that cost and burden onto us and parties that are

14  similarly situated.

15           Your Honor, I think the other two points are clearly

16  stated in our objection, and with that, Your Honor, you've

17  heard our perspective.

18           THE COURT:  Thank you.

19           Anyone else on the phone?

20           All right, hearing --

21           MS. WEINER:  Your Honor --

22           MR. LIPTON:  Your Honor --

23           MS. WEINER:  -- this --

24           MR. LIPTON:  Your Honor, this is Mark Lipton for the

25  PSC, and I'm not sure if you want to hear again -- I just

1    have, like --

2           THE COURT:  Well, before I hear from you, sir, I

3    thought I heard somebody else speak up.

4           MS. WEINER:  Yes, Your Honor.  This is Cara Weiner.

5    I represent nonparty Erlanger.  I respect the Court's time

6    and, if you don't mind, I just have a couple of minutes, at

7    most, of objections --

8           THE COURT:  Go ahead.

9           MS. WEINER:  -- that I wanted to raise and point --

10   first, Your Honor, I do appreciate that the trustee reached

11   out to us.  We are in full agreement with the objections that

12   he filed, docket number 372; they address our major concerns.

13   Our position is a little bit different than some of the other

14   healthcare providers, in that my client, nonparty Erlanger,

15   did not receive any of the tainted medication; specifically,

16   they did not receive the MPA nor any of the other drugs that

17   may be considered tainted.  At this point the only evidence of

18   harm is from the three MPA lots, and my client didn't receive

19   any of those lots.

20          Therefore, requiring my client to notify anybody is

21   certainly outside the scope of what we think this bankruptcy

22   is about.  And moreover, our client is unable to identify

23   patients that specifically received other lots -- other drugs

24   from NECC.  That is, as you'll see in our objection, our

25   client did receive other medications from NECC and other

 1    providers.  We cannot differentiate necessarily what vendors

 2    we used to give certain adult patient medications.

 3            Therefore, requiring us to give a list of patients

 4    who may have received NECC products but may have received

 5    products from a different vendor would be a violation of HIPAA

 6    and would be outside the scope of what this bankruptcy is

 7    about.

 8            If you have any questions for us, Your Honor, I'm

 9    happy to answer them.  But in the interest of this Court's

10    time, I'll stop talking.

11            THE COURT:  Thank you.

12            Anyone else other than Mr. Lipton?

13            Okay, Mr. Lipton, go ahead.

14            MR. LIPTON:  Well, I want to thank you again, like

15    everyone else, Your Honor, for allowing me to do this from my

16    office rather than traveling to Boston.  I think that it's

17    paramount for all the lawyers here that we're trying to

18    preserve the assets of the estate.

19            THE COURT:  Well, if you had gone to Boston, it

20    would have been the wrong place anyway.

21            MR. LIPTON:  That's true.  That's true as well, Your

22    Honor.  So, saved double time.

23            So let me -- I'm going to be brief.  I'm going to

24    try very hard not to reiterate or repeat anything.

25            The PSC's position is -- supported our papers as it

1   relates to a bar date, and at least specifically as it relates

2   to the victims.  I do think that the Court has the authority

3   to differentiate between the victims of the NECC debacle and

4   the businesses, with regards to setting the bar date.  And I

5   just want to point out that from the very beginning of this

6   bankruptcy, it was represented by NECC, with the original

7   trustee that they chose and then the trustee now, that this

8   entire process is being designed to move for the benefit of

9   the patients who have been victimized.  And I don't want to

10  lose sight of that, and that's why I think that, unlike even

11  in normal bankruptcy, it's important to bend over backwards to

12  make sure that the right people get notice of -- before we

13  start looking to bar claims.

14          I heard Mr. Baldiga talk a lot about that we need to

15  maybe -- to cut down -- create a bar date so that we can close

16  a number of claimants and move this thing forward.  But at the

17  end of the day, it's really about cutting out potential

18  injured people, and that is really who this -- the reason why

19  we're in this bankruptcy court, at this point anyhow.

20          The rest of those comments I'll leave to the brief.

21          I want to just touch on a couple points that I did

22  not hear notice -- or raised, I mean.  And the issue of the

23  notice to third-party -- or notice intermediaries, and I think

24  the gentleman from Skadden Arps mentioned it, but I also heard

25  it before, the complaint that the trustee or the debtor should

1    be responsible for notifying the patients.  Your Honor, I need

2    to make sure that you're aware that many of these clinics,

3    certainly not all but many of them -- and I happen to be from

4    Michigan, so I can speak specifically about the documents that

5    I've seen from the Brighton clinic, which is one of the two

6    clinics in Michigan from whom at this point the majority of

7    the patients are coming from.  And in fact, Michigan has more

8    injured people, according to the CDC, than any state.  At

9    least one of those clinics, when it was submitting its forms

10   to NECC for medications, was not providing any patient names.

11   Now, that was a violation by the debtor, and it was a

12   violation of applicable law by the clinic, but it means that

13   the debtor does not have in their possession the names of a

14   majority of the Michigan victims, and the Michigan victims

15   that represent the majority of the known identifiable --

16   identifiably sick people from the lot -- from the MPA lot.

17          So there's a good reason to -- at least as it

18   relates to the clinics that violated the law by not providing

19   the names of their patients to NECC, to require them to -- if

20   you were to impose a bar date at some point, whether it's now

21   or later, on the patients, to require them to in fact either

22   give those names to the trustee or notify them themselves.

23          And the second point I want to just make mention of,

24   and we haven't really discussed it all either, has to do with

25   the addendum.  So I do understand someone argued and made it

1    clear that the addendum -- I think this was the U.S.

2    Trustee -- made it clear that the addendum itself would not be

3    a public record.  But I want to point out that under all of

4    the proffered rationales that I've heard and that were written

5    about, none of them, at least now, require -- or should

6    require a patient, or an attorney on behalf of the patient, to

7    complete those lengthy addendums, because the information in

8    there, by all the medical literature -- it's clear that no one

9    knows today what these patients' condition is going to be even

10   in the next two or three months.

11          I could speak as an attorney representing a number

12   of clients who have thought that they were out of the woods,

13   who then subsequently had relapses and have ended up back in

14   the hospital and had surgery, when they thought that they had

15   been treated already and had already made it through and put

16   this behind them.  So in -- the literature's already replete

17   with information that the physicians don't know what the

18   long-term effects are.  If you require a patient, as part of a

19   proof of claim in the next thirty, sixty or ninety days, to

20   prepare and respond to this addendum, and then at the minimum

21   ninety (sic) to six months after that, before a plan is in a

22   position to be distributed, they're going to have to

23   prepare -- complete those forms again, which, again, in the

24   interest of reducing cost both to the victims and to the

25   estate and also to the attorneys around the country who are

1    representing these people, it doesn't make sense to

2    essentially have a snapshot today that is going to -- that is

3    going to be required to be redone again.

4         So I would urge that the -- any order that you

5    issue, if you decide to do a bar date as one bar date now or

6    if you decide to split them up, you do not require the

7    completion of an addendum until such time as there's actually

8    money to distribute, which is going to be sometime after the

9    bar date anyhow.

10        And I think the rest of the stuff has been covered

11   in the briefs and by counsel, so I'm going to pause at that

12   point.  And I want to thank you again for your time.

13        THE COURT:  Okay.  Well done.  All right.  Let me

14   start out by providing my perspective as to the delineation of

15   the job that I have and the job that I think the district

16   court has taken on.  And I preface that by reminding those of

17   you that are familiar with the Bankruptcy Code and Title 28 of

18   the United States Code that any time that the district court

19   chooses to do so, it may withdraw the reference from this

20   court and deal with the whole ball of wax.  Until and unless

21   it does that, then the following delineation is, I think, what

22   I'm doing and what I think the district court is doing, and

23   the delineation is created not as a result of anyone's choice,

24   as much as it is statutory and constitutional requirements.

25        The bankruptcy court's job here is to marshal the

1   assets of the estate, to approve a mechanism for distribution

2   of the proceeds of those assets to allowed claims, and to

3   liquidate claims that are neither personal injury nor wrongful

4   death claims.  Those are the primary functions of this court.

5   The primary function of the district court, so long as it

6   chooses to do so, as I indicated, is to liquidate the personal

7   injury and the wrongful death claims.  Frankly, I think I've

8   got the better of the deal.

9           The parties differ on whether there needs to be an

10  early bar date for the victims.  I agree that there should be,

11  not so much an early but an earlier, relatively speaking, bar

12  date.  The goal is to get everybody around the table, and I

13  don't think that that can be appropriately done unless the

14  victims are required to file claims.

15          Now, which victims should that be -- or I should say

16  what persons should that be?  And those should be those people

17  who received products that the CDC said were contaminated.

18  Not everybody that any NECC ever dealt with, and not people

19  who, under any stretch of the imagination might have had some

20  contact with NECC.  The CDC has identified the contaminated

21  lots.  Those are the people who need the actual notice.

22  Again, those claims are not going to tell us very much.

23  They're not going to give us very much information about the

24  ultimate liquidation value of those claims.  And if the

25  district court wants to fashion some sort of a secondary

1    notice or to appoint some mediation intermediary in order to

2    resolve these claims, I wouldn't be surprised.  But this

3    court's job is to get everybody around the table that should

4    be around the table.

5            Now, the parties differ as to what the notice

6    intermediaries should -- who they should be.  Well, they

7    should be those entities who administered the contaminated

8    product.  Again, not everybody who administered any NECC

9    product over a stated period of time.  They ought to be

10   required to produce, for the Chapter 11 Trustee -- as well as

11   the PSC, but I leave what should be produced for the PSC to

12   District Judge Saylor.  But they ought to produce a list of

13   the names, the addresses, the last four digits of Social

14   Security numbers, so that they can be separately identified

15   for those with similar names, and what was administered to,

16   when, and by whom.  I really can't see anything else of value

17   that would be put to good use.

18           The Chapter 11 Trustee ought to be sending the

19   notices to all of those people, and that list, by each of the

20   notice intermediaries, ought to be supplied in short order.

21   The request for reimbursement for identifying the names of

22   patients, who probably have already been identified to the

23   CDC, has a level of arrogance that I won't even begin to

24   address.

25           The PITWD -- and I think that the creditors'

1    committee called it something else, but the supplement, again,

2    ought to be extremely limited because of its limited value.

3    The notice should not identify any particular third-party

4    targets.  It's enough, it seems to me, if it says to the

5    claimant that your failure to file a claim in the NECC case

6    may affect your rights against parties other than NECC.  That

7    ought to be enough to give them a clue as to who those parties

8    might be.  And I think being more specific and identifying

9    classes of likely third-party targets paints a target on those

10   entities that is inappropriate.

11          HIPAA is not a problem.  HIPAA contains the

12   exception for information requested supplied by court order.

13   In the order that I'm going to ask the Chapter 11 Trustee to

14   prepare, we'll say that in the Court's view, HIPAA is

15   satisfied by the terms of the order.

16          As for these different noticing agents, I think that

17   the PSC, understandably, views this proceeding much

18   differently than does this court.  This is a case here about

19   all of the creditors.  The victims of these adulterated

20   products are clearly the vast majority, and undoubtedly, the

21   most sympathetic.  But to have a separate noticing agent for

22   the PSC, whose job it also is to collect claims and deal with

23   plan votes, if that time ever comes, with respect to -- it

24   simply creates confusion if we're going to have secondary

25   notices, one for nonvictims and one for victims.

1    Accordingly, this court is happy to consider any

2    change that the Chapter 11 Trustee and the creditors'

3    committee in the bankruptcy case, with the advice of the PSC,

4    recommends to change noticing agents, in the event that one of

5    them is less expensive than the other.  And the parties know

6    how to file a motion seeking to substitute one notice agent

7    for another.  But that noticing agent must come from the

8    bankruptcy court, which is responsible for a larger class of

9    creditors than simply the victims of these adulterated lots.

10    I've already indicated my unwillingness to disrupt

11    the 503(b)(9) deadline that is addressed in the Local Rules.

12    Just going down my list of the different issues that

13    were raised, a number of the objections addressed the problem

14    of statutes of limitations that might extend for periods well

15    after the bar date.  Well, frankly, that's what bankruptcy is

16    all about.  We don't wait for the statute of limitations,

17    because that delays recovery for creditors.  Creditors who

18    have claims must state those claims.  It's okay that they're

19    unliquidated.  It's okay that they're contingent.  But they

20    must identify the claims in order to participate with other

21    creditors.  Claims filed can always be amended, so long as

22    they're not substantively different.  So a creditor who has

23    incurred loss as a result of one of these adulterated lots,

24    and whose illness progressed thereafter, is always free to

25    file an amended claim.  And even untimely claims may be

1    allowed under the Pioneer -- the Supreme Court's Pioneer case,

2    in Chapter 11 cases, so long as the failure to file the claim

3    was by virtue of excusable neglect and the estate has not been

4    unduly prejudiced.

5         And so I have no problem with telling these

6    creditors that in fact if they fail to file a claim they may

7    be barred from doing so thereafter.  But rather than using the

8    words "shall be forever barred", I'd either prefer "may be

9    barred", or if "shall be barred" is the choice of the Chapter

10   11 Trustee, that it be appropriately footnoted with an

11   indication that it may be subject to amendment, and there may

12   even be an opportunity for later filed claims.  See the

13   Pioneer case.

14        Hold on just a moment.  Let me just make sure.  Oh,

15   one last thing that I think Mr. Lipton suggested, or perhaps

16   it was Mr. Sobol, that this court may want to have a joint

17   session with the district court.  I'm not calling for that.

18   If the district court finds it of value then I can make my way

19   to Boston well enough.  But so long as the district court is

20   satisfied that I'm doing the job the way it would prefer, then

21   I'm happy to do that from a distance.  I'm happy to do a joint

22   session, if that's what the district court wants, and I'm even

23   happy to -- not happy, but I'm either content to send the file

24   to the district court, if the district court chooses to

25   withdraw the reference.  At the moment, I don't see any

1    indication that the district court wishes to do that.

2         So now, in terms of timing.  I'm going to ask the

3    Chapter 11 Trustee to send me a proposed order, ordering the

4    notice intermediaries who administered these adulterated lots

5    identified by the CDC, to supply the names, addresses, last

6    four digits of the Social Security number, what was

7    administered and when, to the trustee on or before August 16.

8    I then would ask the Chapter 11 Trustee and his counsel and

9    counsel for the plaintiff steering committee to sit down and

10   see if they can create a joint list of who it is that ought to

11   get this actual notice.

12        Then I want the notice to be published ten days

13   after the bar-date order, and then twenty days before the

14   expiration of the order, in each of the newspapers which were

15   listed in the trustee's amended supplemental bar-date motion.

16   It currently reads that the trustee has the option to do that;

17   I would prefer that the trustee be directed to do it.

18        And I assume that that list is a list of newspapers

19   of general distribution in those places where the drug was

20   administered.  If somebody thinks that there ought to be

21   another newspaper, then I'm happy to hear about that, and I

22   would be happy to hear about it on August 22 at 10 a.m. in

23   Springfield.  Parties who wish to appear by phone, as they

24   have today, are welcome to do so again.

25        On August 22, I'm hoping that what I will hear

1    counsel for the PSC and counsel for the Chapter 11 Trustee and

2    counsel for the creditors' committee.  What I will hear from

3    them is that they have a list, with which they feel some

4    degree of confidence is a list of all those who received the

5    drugs from the allegedly adulterated lots.  The notice

6    intermediaries ought to use their best efforts to produce

7    those names, for no other reason than that, of all the things

8    that I may eventually release them from, I will never agree to

9    release them from their original responsibility to have

10   provided these names to the Chapter 11 Trustee.  So they ought

11   to do a good job, for their own sake.

12            So I'm hoping that I will receive the order from the

13   Chapter 11 Trustee by week's end.  And again, that's the order

14   to the notice intermediaries to turn over those lists to the

15   Chapter 11 Trustee and counsel for the PSC, in confidence, on

16   or before August 16, and we'll address, again, on August 22 at

17   10 a.m. what modifications need to be made to the notice

18   that's going to go out to these people and also to the

19   nonvictims.  I hope that you'll have for me a proposed revised

20   notice consistent with what I've talked about in the last

21   twenty minutes or so.

22            Thank you very much.

23            MS. BACHTELL:  Excuse me, Your Honor?

24            THE COURT:  Yes?

25            MS. BACHTELL:  Will the Court order that the

1    proposed order include a reference to the face of the proofs

2    of claim being -- remaining part of the public record?

3              THE COURT:  Well, we can --

4              MS. BACHTELL:  My apologies --

5              THE COURT:  -- we can --

6              MS. BACHTELL:  -- Your Honor.

7              THE COURT:  -- we can talk about that, but I have to

8    tell you -- we can talk about that on the 22nd.  But --

9              MS. BACHTELL:  Okay.

10             THE COURT:  -- I have to tell you -- because we're

11   not sending out yet the bar-date order; we're just -- on

12   the --

13             MS. BACHTELL:  I understand.

14             THE COURT:  -- 22nd, we're talking about what that

15   order's going to say.  But I apologize that I didn't reach

16   that question.

17             But I truly understand the role that the United

18   States Trustee plays, but I can't help to think of on how many

19   occasions attorneys, members of the bar, have sent me motions

20   to impound, and messed it up so that before I could even reach

21   it, the information was in the public record.  In one

22   instance, the attorney put the problem information in the

23   motion to impound, and we had to grab it quickly.  These

24   mistakes get made with some regularity, and I'm very concerned

25   about not -- complicating these people's lives by exposing

1    them in this way.

2              And I apologize; I meant to mention one other thing,

3    and that is that when we talk about whoever it is that's going

4    to be the claims agent, that public disclosure of who these

5    people are, for my purposes in the bankruptcy court, ought to

6    be by assigning them code numbers.  And those code numbers, as

7    Ms. Bachtell suggested, might be the substitute that the

8    United States Trustee could eventually become comfortable

9    with.  I did something very similar to this in the Berkshire

10   Hospital case, and you may want to talk to counsel for the

11   debtor, Ropes & Gray, about what I did there.

12             I'm sorry, Mr. Baldiga?

13             MR. BALDIGA:  Just one quick question, Your Honor.

14   In your directions, you mentioned the OCC once and left the

15   OCC out once, in terms of who is supposed to report on August

16   22nd as to whether we really have this.  I just want to have

17   clarified, given that you're going to be requiring these

18   parties to make this list available to the trustee, to the

19   PSC, and I believe you said to the OCC but I just didn't

20   want --

21             THE COURT:  Yes.

22             MR. BALDIGA:  -- to leave that -- okay, thank you.

23             THE COURT:  Yes.

24             MR. BALDIGA:  That's all.

25             THE COURT:  Also to counsel for the --

```
 1              MR. BALDIGA:  Counsel --

 2              THE COURT:  -- for the creditors' committee, subject

 3     to the confidentiality requirements that we've -- that have

 4     been contained in other orders, I think.

 5              MR. BALDIGA:  Absolutely.

 6              THE COURT:  Yeah, okay.

 7              MR. BALDIGA:  Thank you.

 8              MR. STERNKLAR:  Just want to be clear, Your Honor;

 9     the order -- Jeffrey Sternklar for the trustee.  The order

10     you're looking for by week's end, you want, is limited only to

11     what it directs the notice intermediaries --

12              THE COURT:  Right.

13              MR. STERNKLAR:  -- to do?

14              THE COURT:  Well, it will save a lot more time if

15     you get a copy of the transcript of the last twenty or thirty

16     minutes.

17              MR. STERNKLAR:  I will.

18              THE COURT:  Okay?

19              MR. STERNKLAR:  But --

20              THE COURT:  Okay.

21              MR. STERNKLAR:  But -- so we're not actually setting

22     a bar date now?

23              THE COURT:  We're not setting a bar date.  My

24     guess -- just a guess -- is that where we're going to go is,

25     if we have the list at the end of August, that that list goes
```

1    out sometime in September and that we give parties sixty days.

2    At the moment that -- I find that attractive, but I certainly

3    could be talked out about --

4              MR. STERNKLAR:  And I'm sorry, Your Honor --

5              THE COURT:  Yeah.  Yeah.

6              MR. STERNKLAR:  -- just a couple questions.  You

7    indicated that you wanted a form -- a revised form of notice

8    that conforms to what you've talked about.

9              THE COURT:  I would appreciate a draft of that, yes.

10              MR. STERNKLAR:  When did you want that?  You want

11    that today?

12              THE COURT:  No.  I want that by August 16th as

13    well --

14              MR. STERNKLAR:  By August 16.  I think we --

15              THE COURT:  -- so that parties have an opportunity

16    to look at it and --

17              MR. STERNKLAR:  Okay.

18              THE COURT:  -- and --

19              MR. STERNKLAR:  Okay.

20              THE COURT:  -- respond to it.

21              MR. STERNKLAR:  Finally, Your Honor, you mentioned

22    that there's -- you mentioned that the notice should contain

23    some language to the effect that if creditors file a claim or

24    not, they may be affecting their rights against third parties.

25              THE COURT:  If they fail to file a claim.

```
 1              MR. STERNKLAR:  Well, I suppose our contemplation

 2    would be that the third-party releases would, if they're

 3    approved --

 4              THE COURT:  Right, but there are no third-party

 5    releases.

 6              MR. STERNKLAR:  Right, if the --

 7              THE COURT:  Third-party releases are unborn.

 8              MR. STERNKLAR:  I beg your pardon?

 9              THE COURT:  Third-party releases are unborn.

10              MR. STERNKLAR:  Un?

11              THE COURT:  They're not here yet.

12              MR. STERNKLAR:  Yeah, oh, right.  But at -- there is

13    at least the open prospect it would be binding on those even

14    if they do file claims or whether they don't.  In other words,

15    the only thing that the claim does is affects their rights

16    against NECC.  Whether they file a claim or not may have no

17    bearing on whether they're bound by third-party releases

18    against third parties.

19              THE COURT:  That's why the word "may" is there.

20              MR. STERNKLAR:  I'm sorry --

21              THE COURT:  That -- I'm sorry.  That's why the word

22    "may" is there.

23              MR. STERNKLAR:  Okay.  Okay.

24              THE COURT:  We just want to warn them --

25              MR. STERNKLAR:  Okay.
```

1        THE COURT:  -- as I think you tried to do, except

2   that you raised the hackles of some of the notice

3   intermediaries.  We just want to warn them that sitting and

4   doing nothing may not only affect their ability to get a

5   distribution from NECC but may affect their ability ultimately

6   to get recoveries from other parties.

7        MR. STERNKLAR:  I suppose whether they do nothing or

8   not may affect their rights against third parties at all; it

9   only affects their rights against NECC.  That's what I'm

10  struggling with.

11       THE COURT:  Well, ultimately it may impact if there

12  are third-party releases, but I don't know where the case is

13  going.

14       MR. STERNKLAR:  I don't either; that's why I was

15  thinking perhaps the notice simply needs to say, 'If you file

16  a' -- 'don't file a claim, you may not have rights against

17  NECC.  You should consider' -- 'When you're considering

18  whether to file a claim, you should be mindful of the fact

19  that, regardless whether you file a claim, a plan may one day

20  cut off your rights against third parties.'

21       THE COURT:  Only a lawyer would understand that

22  sentence --

23       MR. STERNKLAR:  Well, I'm not drafting --

24       THE COURT:  -- and barely.  And I struggled.

25       MR. STERNKLAR:  And I probably misspoke.  But,

1    okay --

2            THE COURT:  If --

3            MR. STERNKLAR:  -- thank you, Your Honor.

4            THE COURT:  If you want to fashion something a

5    little bit different --

6            MR. STERNKLAR:  That's fine.

7            THE COURT:  -- it's an opportunity to do that for

8    August 22nd.

9            MR. STERNKLAR:  Okay.  So this is an interim order,

10   then, only for the --

11           THE COURT:  It's an interim order.  We're going to

12   get the names and the addresses of these people.

13           MR. STERNKLAR:  Got it.

14           THE COURT:  And that's all we're going to do, except

15   we're going to try to get a little closer to an agreement

16   between all the parties that are managing these two

17   proceedings, by August 22, and then see where we have

18   differences.

19           MR. STERNKLAR:  Thank you, Your Honor.

20           THE COURT:  All right?  Thank you.

21           IN UNISON:  Thank you, Your Honor.

22           MR. CHRISTIE:  Your Honor, is there an issue we can

23   address telephonically?

24           THE COURT:  I'm sorry, counsel.  You mean on August

25   22nd?

1          MR. CHRISTIE:  No, just an issue that you did not, I

2     don't believe, cover in your rationale.

3          THE COURT:  All right --

4          MR. CHRISTIE:  This is William Christie.

5          THE COURT:  -- you want to tell me quickly what that

6     is?

7          MR. CHRISTIE:  Yes.  William Christie; I represent

8     Pain Care.  An issue that we raised and other clinics raised,

9     while I understand your ruling on HIPAA that a court order

10    would cover HIPAA, but we also raised in our pleadings that we

11    are concerned that HIPAA's a 4 (ph.) and, above that, is

12    doctor-patient privilege issues in providing names of patients

13    to third parties, including the trustee.  It was an issue that

14    the district court was very concerned about last week in

15    enforcing the subpoenas.  And just our concerns moving

16    forward, unless I misunderstood, I don't believe your verbal

17    order addressed that.

18         THE COURT:  I'm comfortable that my order satisfies

19    those concerns, for these very limited purposes.  And I'd ask

20    the Chapter 11 trustee to put language in the order to that

21    effect.

22         MR. STERNKLAR:  Thank you, Your Honor.

23         THE COURT:  Okay.  Thank you.

24    (End of requested audio at 4:42 p.m.)

25              * * * * * * * * *

1

2                         C E R T I F I C A T I O N

3

4            I, Clara Rubin, the court approved transcriber, do

5    hereby certify the foregoing is a true and correct transcript

6    from the official electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9

10                                        July 29, 2013

11    _____      _____

12                                         DATE

13

14

15

16

17

18

19

20

21

22

23

24

25

[

[the] (1)
11:9

A

a' (1)
118:16
ability (5)
13:19;29:4,5;32:23;
118:4,5
able (10)
27:22;28:11;35:20;
62:13;76:16;79:6;
85:22;86:25;88:15;
92:6
above (2)
12:1;120:11
absence (1)
48:16
absent (3)
39:25;40:1;56:7
Absolutely (3)
8:10;60:15;115:5
abstract (1)
79:7
acceptable (1)
86:15
access (2)
48:12;83:5
accommodation (3)
31:5;46:4;91:10
accommodations (2)
7:10;45:25
accomplishing (1)
36:18
according (3)
11:11;87:25;103:8
Accordingly (2)
24:24;109:1
account (2)
18:2;99:3
accumulatively (1)
68:8
accurately (3)
20:16;93:19;94:4
accustomed (1)
85:11
acquired (1)
28:24
acquisition (1)
69:9
acrimony (1)
57:2
Act (2)
21:7;78:5
acting (1)
81:9
action (9)
10:24;11:4;32:7;
52:15,20,21,23;58:17;

73:2
action' (2)
77:13,15
actions (11)
11:5;15:23;16:10;
20:22;24:10;37:16;
42:6,15;52:24;74:24;
80:16
actively (1)
84:6
activity (1)
35:14
actual (9)
42:22;43:5;51:14;
54:17;87:16;89:17;
90:4;106:21;111:11
actually (9)
42:3;63:10;64:8;
69:25;80:13;92:8;
96:23;105:7;115:21
add (2)
29:10;85:8
addenda (1)
51:11
addendum (8)
83:11,15;93:10;
103:25;104:1,2,20;
105:7
addendums (1)
104:7
additional (6)
6:13,16;24:8;45:12;
57:10;77:20
Additionally (1)
9:23
address (14)
31:7;48:1;53:13;
69:5;70:22;82:25;83:4;
87:6,7;90:9;100:12;
107:24;112:16;119:23
addressed (3)
109:11,13;120:17
addresses (7)
48:24;53:11;75:17;
81:13;107:13;111:5;
119:12
adds (2)
21:1;31:8
adequacy (1)
70:16
adequate (1)
41:25
adequately (1)
68:20
administer (1)
45:9
administered (14)
16:15;43:10;44:5;
87:20;88:12,25;90:7;
92:21;107:7,8,15;
111:4,7,20
administrative (1)
49:21

administrator (2)
61:10;93:16
admissible (1)
57:13
admission (1)
9:6
adult (1)
101:2
adulterated (5)
108:19;109:9,23;
111:4;112:5
advantage (3)
39:11;85:24;99:12
adversaries (4)
38:14;39:5,10,12
adversary (3)
38:7;52:17;96:4
advice (1)
109:3
advise (1)
91:4
advocacy (1)
58:21
advocated (1)
91:16
advocating (1)
89:23
affect (5)
29:20;108:6;118:4,5,
8
affected (5)
23:20;54:19;57:1;
88:22;92:6
affecting (1)
116:24
affects (3)
71:14;117:15;118:9
affidavit (3)
40:9;25;57:24
affiliate (1)
16:1
affiliated (1)
91:1
affiliates (3)
10:3;42:10;76:14
affirmative (1)
48:16
affirmatively (1)
29:12
afford (1)
78:4
afraid (1)
8:8
afternoon (8)
6:3,22,24;7:2,5;9:15;
22:14;82:19
Again (34)
9:17;12:25;16:13;
17:14;19:2,12;31:3;
48:23,25;49:14;50:8;
57:3;60:25;66:21;
67:11,22;68:17,22;
70:3;77:12;98:25;99:3,

25;101:14;104:23,23;
105:3,12;106:22;
107:8;108:1;111:24;
112:13,16
against (45)
10:2,3,25;11:6,24;
14:18,19;20:22;21:6;
22:1,2,3;24:19;26:8;
32:14;37:16;38:16;
39:13;56:4;62:24;65:3,
4,16,18,18;66:8,15,20;
68:19,23;87:19;90:13,
18;91:4,15,17;94:17;
108:6;116:24;117:16,
18;118:8,9,16,20
agencies (1)
48:6
agenda (1)
51:12
agent (12)
51:23;54:22,23,24;
55:7;97:11,21;99:11;
108:21;109:6,7;114:4
agents (2)
108:16;109:4
aggressively (1)
59:7
agnostic (2)
65:10;66:22
ago (5)
21:19;38:17;63:20;
75:13;81:4
agree (8)
22:22;24:14;34:20,
20;77:24;90:4;106:10;
112:8
agreeable (1)
51:23
agreed (4)
16:16;44:6;87:13;
91:5
agreement (6)
16:5;73:20,23;83:11;
100:11;119:15
ahead (9)
9:19;33:17;60:16;
79:23,24;96:18,21;
100:8;101:13
airport (1)
25:8
allegedly (1)
112:5
alleges (1)
58:21
alleviated (1)
82:10
allocation (1)
69:19
allow (6)
26:12;31:19;35:19;
50:7;59:22;76:15
allowance (1)
13:21

allowed (6)
13:17;31:10;51:5;
56:7;106:2;110:1
allowing (3)
20:24;86:25;101:15
allows (1)
83:20
almost (5)
14:11;54:8;70:21;
73:10,11
alone (6)
13:9;70:4,4;83:15;
87:12,15
along (2)
33:3;64:7
alteration (1)
45:11
alternative (2)
34:12;84:10
although (2)
45:19;68:20
altogether (2)
15:20;16:9
always (6)
36:7;37:3;38:1;
52:21;109:21,24
ambiguity (1)
50:24
amend (1)
52:9
amended (12)
6:6;31:17,25;34:12;
35:18;41:11;81:5;
87:14;93:18;109:21,
25;111:15
amendment (1)
110:11
amendments (1)
82:23
among (1)
73:11
amount (2)
51:25;58:11
amounts (1)
29:20
analogy (1)
98:13
analyzing (1)
80:2
ancillary (1)
14:13
announced (2)
8:14;76:19
answer's (1)
67:18
anticipate (1)
30:20
anticipated (1)
19:11
anticipating (2)
46:5;69:7
apologies (1)
113:4

**apologize (3)**
60:25;113:15;114:2
**app (1)**
31:19
**apparent (3)**
23:22;27:10,11
**apparently (1)**
91:7
**appear (2)**
86:25;111:23
**appearance (1)**
32:6
**applicable (1)**
103:12
**applicant (1)**
35:6
**application (10)**
6:7;15:22;28:3;
31:25;34:13;35:18;
36:14;38:24;62:17;
96:24
**applications (8)**
29:16;34:4;35:1,20,
25;38:19,20;39:6
**applies (3)**
96:2;97:5;98:13
**apply (5)**
13:24;15:23;16:2;
73:23;96:21
**appoint (1)**
107:1
**appointed (1)**
27:11
**appreciate (5)**
20:2;22:19;74:20;
100:10;116:9
**appreciated (1)**
77:11
**appreciates (1)**
82:21
**appreciating (1)**
74:21
**approach (4)**
15:15;33:3;52:22;
56:24
**appropriate (3)**
49:6;80:17;97:23
**appropriately (2)**
106:13;110:10
**approve (3)**
29:13;79:22;106:1
**approved (4)**
43:14;63:6;70:4;
117:3
**approves (1)**
39:18
**approving (2)**
6:13,15
**apps (2)**
34:15;35:21
**area (3)**
13:11;26:11;84:17
**argue (1)**

**97:5
argued (3)**
77:9,11;103:25
**argues (1)**
52:15
**arguing (1)**
77:12
**argument (6)**
12:16;20:23;49:12;
54:21;77:16
**arguments (3)**
55:10;85:19
**arise (1)**
7:22
**arisen (2)**
43:25;53:15
**arises (1)**
13:14
**arising (1)**
75:3
**around (10)**
7:12;12:18;64:8;
73:22;97:9,10;104:25;
106:12;107:3,4
**Arps (2)**
95:19;102:24
**arranged (1)**
43:13
**arrangement (1)**
29:9
**arrangements (1)**
63:23
**arrogance (1)**
107:23
**articulated (2)**
21:19;27:17
**ascertainable (2)**
42:23;44:25
**aspersions (1)**
55:3
**assert (1)**
13:20;14:5
**asserted (2)**
17:19;23:6
**assertion (2)**
13:19;47:22
**assess (1)**
89:11
**assessed (1)**
88:23
**assets (3)**
101:18;106:1,2
**assigning (1)**
114:6
**assist (3)**
33:4;83:22;97:11
**assume (2)**
40:15;111:18
**assuming (2)**
33:24;82:8
**assure (1)**
9:25
**asymptomatic (1)**

**93:7
attempt (1)**
91:25
**attempting (1)**
88:4
**attention (1)**
41:19
**Attorney (6)**
82:25;85:2,13;104:6,
11;113:22
**attorneys (3)**
27:16;104:25;113:19
**attorneys' (1)**
81:21
**attractive (1)**
116:2
**audio (1)**
120:24
**August (12)**
111:7,22,25;112:16,
16;114:15;115:25;
116:12,14;119:8,17,24
**authorities (1)**
93:6
**authority (7)**
24:19;47:6;49:11,13;
89:4;97:6;102:2
**authorized (1)**
77:19
**authorizes (2)**
49:1,6
**authorizing (1)**
6:9
**available (13)**
29:21;45:1,7,7;
48:25;49:2;51:15;52:3;
58:6;83:18;84:23,24;
114:18
**avers (1)**
54:11
**avoid (2)**
12:3;75:2
**aware (5)**
12:2;50:3;56:3;
90:20;103:2
**away (2)**
13:15;37:5
**awful (1)**
33:6

**B**

**Bachtell (31)**
6:19,22,23;23:15;
31:13,14;35:3,3;82:18,
19;85:18,21,25;86:2,4,
6,8,11,14,17;94:21,21,
24;95:1;112:23,25;
113:4,6,9,13;114:7
**Bachtell's (1)**
51:6
**back (10)**
8:15,17;62:14;70:5;

**71:1,21;75:4;79:20;
81:4;104:13
backdating (1)**
64:5
**background (3)**
8:24;32:18;58:2
**back-identifying (1)**
70:5
**backwards (2)**
57:6;102:11
**bad (2)**
58:14;66:20
**balance (1)**
37:3;38:6,10,12,15
**balancing (2)**
78:4,5
**BALDIGA (39)**
7:2,3;8:6,10,11;9:5,
9,11,14;12:23,24,25;
15:17;16:20,24;19:21;
25:2,7;31:1,2,2;60:8,
11,13;72:16,17,19,20;
76:12;82:13,16;
102:14;114:12,13,22,
24;115:1,5,7
**ball (1)**
105:20
**balloting (1)**
80:4
**bank (1)**
63:11
**bankruptcy (34)**
10:1;24:6,11;35:8;
37:6;38:2,9,16;48:1;
49:23;57:15;58:4;
65:15;71:12,15;72:18;
74:9;84:13;92:20;
93:11;94:12;96:7;
97:10;100:21;101:6;
102:6,11,19;105:17,25;
109:3,8,15;114:5
**banks (3)**
98:8,10,12
**bar (71)**
6:12;7:17;41:22,23,
24;42:7,12,21,22;
43:13;44:1;45:9;47:19;
49:10;50:2;53:5,5,6,7,
18,21,24;54:7,8,20,21;
58:21,22,22;59:13,17;
60:6;66:6;67:4,10,14,
21;73:8,22;74:1,20;
76:20,22;77:2,5;81:10,
22;82:7,11,22;85:7,9,
10;90:16;91:16,21,23;
102:1,4,13,15;103:20;
105:5,5,9;106:10,11;
109:15;113:19;115:22,
23
**bar-date (22)**
18:4;25:18;41:19;
42:20;47:3;49:19;51:4;
53:16;54:6;55:23;

**56:12;59:18;64:14;
65:12;69:3;71:13;
79:13;80:8;94:13;
111:13,15;113:11
barely (1)**
118:24
**barred (6)**
90:13,13;110:7,8,9,9
**barring (1)**
66:14;84:16
**Barry (1)**
40:8
**based (7)**
20:8;10;47:19;58:17;
91:6;92:10,20
**basis (6)**
12:10;43:18;87:11;
88:15;93:7,8
**Beach (22)**
6:8;26:4,10;27:4,4,
24;28:1;36:4,5,6,6,12,
16,16,18,21,25;39:18,
19;40:1,3;74:4
**Beach's (1)**
29:3
**bear (2)**
23:7;46:7
**bearing (1)**
117:17
**became (2)**
27:10,11
**become (1)**
114:8
**becomes (4)**
33:18;34:6;39:4;
59:17
**beg (1)**
117:8
**began (1)**
69:11
**begin (3)**
64:3;98:20;107:23
**Beginning (2)**
6:19;102:5
**begins (1)**
85:5
**behalf (3)**
32:7;72:17;104:6
**behind (1)**
104:16
**believes (3)**
49:15;87:12,16
**bend (1)**
102:11
**beneficial (1)**
30:6
**benefit (9)**
8:7;14:23;19:12;
23:12;28:12;34:2;
55:17;94:1;102:8
**benefits (2)**
13:7;18:19
**Berkshire (1)**

114:9
**Bertram (1)**
6:16
**best (7)**
18:15;31:23;65:23;
66:2;69:13;70:18;
112:6
**better (4)**
8:22;83:25;86:9;
106:8
**beyond (3)**
88:16,17;90:20
**bid (1)**
69:23
**bidding (1)**
69:13
**big (5)**
52:22,23;67:12;
68:11;74:13
**Bill (1)**
32:5
**binding (1)**
117:13
**bit (5)**
8:24;64:18;69:7;
100:13;119:5
**black (1)**
69:15
**blah (5)**
65:19,19,19,19,19
**board (2)**
73:15,19
**board' (1)**
76:22
**body (6)**
13:2;18:11,15;21:21;
22:5;24:16
**books (2)**
97:16,24
**Boston (4)**
32:5;101:16,19;
110:19
**both (7)**
17:8;27:13;36:12;
43:4;59:18;69:10;
104:24
**bound (2)**
96:19;117:17
**box (1)**
69:15
**brass (1)**
78:12
**breaching (2)**
22:7;28:12
**breach-of- (1)**
22:1
**break (2)**
59:25;75:4
**brief (5)**
59:16;89:2;94:11;
101:23;102:20
**briefing (1)**
57:10;76:1

**briefly (2)**
23:3;63:4
**briefs (2)**
11:24;105:11
**Brighton (1)**
103:5
**bring (5)**
10:25;11:14;59:7;
68:15;80:5
**bringing (2)**
22:7;73:15
**brings (2)**
32:11,23
**broad (2)**
53:12;98:22
**broader (3)**
56:19,19;58:6
**brokers (3)**
98:9,10,12
**brought (1)**
73:21
**Brown (5)**
7:3;8:11;72:20;74:3;
81:21
**Bryan (1)**
6:17
**Bryant (4)**
7:6;8:23;9:21,21
**bulk (1)**
59:20
**bunch (1)**
39:5
**burden (8)**
7:12;34:19;44:19;
45:1;48:10;97:11;
99:10,13
**burdensome (1)**
48:10
**business (4)**
6:11;31:22;35:17;
96:17
**businesses (1)**
102:4

**C**

**Cadden (1)**
40:8
**calculated (1)**
57:12
**calculations (1)**
83:23
**call (3)**
28:4;31:21;43:9
**called (3)**
46:22;70:12;108:1
**calling (1)**
110:17
**calls (3)**
70:24;79:12;94:1
**came (4)**
11:12,24;77:11,21
**can (65)**

7:24,25;9:2;12:3;
14:5;19:7,17;28:24;
33:3,4,21;36:1,7;40:16,
24;41:6,24;42:1,18;
43:15;46:9,20;47:1,2;
48:5;51:7;52:6;55:22;
57:7;59:16;61:5,19;
62:11;63:7,9,11,20;
65:23;66:2,4,9;67:14,
18,20;68:21;71:20;
76:9;77:24;79:18;
92:23;96:14,15;97:10;
102:15;103:4;106:13;
107:14;109:21;110:18;
111:10;113:3,5,7,8;
119:22
**capable (1)**
26:11
**capacity (2)**
13:5;81:9
**Cara (1)**
100:4
**care (6)**
21:7,7;64:16;73:5;
86:21;120:8
**career (1)**
38:2
**careful (2)**
36:13,17
**carefully (1)**
15:1
**Case (61)**
6:5;11:10;15:7;
18:19;19:11;21:1,22;
23:6,8,23;24:6;27:10;
28:8;30:8;31:10;33:7;
38:12,17,19;39:1,20;
41:21;42:8;43:23;
47:23,24;48:2;52:8,19;
56:25;61:7;64:2;67:20;
68:13;70:5;72:18,24,
25;73:7;75:4,9,19;
77:6,8,16,17;78:1;
80:25;84:4;86:10;
91:15;93:9;95:12,25;
108:5,18;109:3;110:1,
13;114:10;118:12
**case' (1)**
77:22
**cases (33)**
12:12,15;13:10;14:7;
15:4,8;16:1,2;19:4;
20:19;23:8,10;26:8;
27:14;30:7;36:38:2;
41:20;42:9;45:10;58:3,
4,5;74:5,5;75:3,3;
76:14;81:25;84:13;
97:8;110:2
**cash (2)**
58:6;78:2
**cast (1)**
55:3
**catch (1)**

8:3
**category (1)**
90:23
**cause (3)**
10:24;83:21;89:23
**caused (2)**
44:12;80:22
**caution (1)**
30:16
**CC (1)**
91:7
**CDC (13)**
78:14;87:25;88:23;
89:3,11,14,15;93:5;
103:8;106:17,20;
123:2;111:5
**CDC's (1)**
70:11
**census (1)**
69:17
**Center (3)**
17:10;24:3;92:22
**Centers (2)**
44:12;86:22
**central (1)**
64:12
**centralization (1)**
76:7
**centralize (2)**
15:8;74:24
**centralized (1)**
15:5
**certain (10)**
6:13;18:14;21:23;
27:8;51:5;59:5;73:17;
76:7;96:20;101:2
**certainly (17)**
9:12;11:13;14:11;
15:12;17:21;25:23;
26:14;44:14;49:1;
52:19;71:14;74:4;
76:10;85:19;100:21;
103:3;116:2
**certifications (1)**
52:17
**certified (1)**
74:10
**certify (1)**
47:9
**cetera (4)**
10:4;69:19,19,19
**Chambers (1)**
59:25
**change (8)**
15:18;23:4;29:8;
45:13;55:2;79:24;
109:2,4
**changed (2)**
45:2;98:21
**changes (6)**
15:18;22:16,21;
27:23;45:14;51:3
**channeling (4)**

65:1;66:8,20;91:18
**Chapter (32)**
6:7,9,11,25;21:12;
23:2;31:17,22;35:17;
37:14;38:18;39:22,23;
60:5;77:3,4;82:21;
84:22;97:12;107:10,
18;108:13;109:2;
110:2,9;111:3,8;112:1,
10,13,15;120:20
**characterize (1)**
21:20
**characterized (2)**
20:16;49:3
**characterizes (1)**
49:14
**cheapest (1)**
69:14
**check (2)**
9:11;73:3
**checked (1)**
10:18
**checks (3)**
74:8,13,15
**choice (2)**
105:23;110:9
**choose (1)**
47:8
**chooses (4)**
36:24;105:19;106:6;
110:24
**chose (2)**
70:1;102:7
**Chris (1)**
19:23
**CHRISTIE (6)**
119:22;120:1,4,4,7,7
**Circuit's (2)**
97:17,18
**circumstance (1)**
30:6
**circumstances (3)**
51:6;58:15;68:23
**cite (1)**
88:10
**cited (1)**
12:12
**civil (3)**
24:9;42:6;57:11
**claim (61)**
6:13;13:6;18:18;
21:2,6;22:1;28:11;
42:12,13;44:15;49:20;
51:11,15,25;52:1,1,2,8;
53:21,22;56:3,5;62:16,
24;63:12,12;65:15;
66:13;68:11,11;75:6;
76:24,25;80:12,14,24;
83:9,17,22;84:9,19,21,
22,24;90:6;93:10;
94:17;95:6;104:19;
108:5;109:25;110:2,6;
113:2;116:23,25;

117:15,16;118:16,18,
19
**claimant (1)**
108:5
**claimants (17)**
19:16;21:8;39:14;
42:3;51:21;53:6,8;
57:9;66:18;71:14;
84:24;87:12;90:4,13;
91:21,22;102:16
**claimants' (2)**
43:1;83:14
**claims (105)**
6:15;13:25;14:19;
16:15;17:12,19;18:3,5,
5,9,12;21:11,13;22:2,3,
17;24:1,4,6,7,11;37:16,
17,20;41:23,25;42:1;
43:1;47:22;49:21,21;
50:2;7;51:5,18,19;52:6,
8;53:10,12,14,20,25;
54:2,4;56:4;57:1;
58:18,22,23,25;61:10;
63:1,7;66:1;67:10,17;
73:23;74:8;75:2,4;
76:7;77:7,19,20;79:25;
80:12,15,18;83:5,6;
84:16,17;87:9,18,23;
88:6,16;90:18,20;91:4;
93:16;94:8,9,15;97:9,
10;102:13;106:2,3,4,7,
14,22,24;107:2;
108:22;109:18,18,20,
21,25;110:12;114:4;
117:14
**Clamp-All (1)**
55:21
**clarification (3)**
82:6;96:23;98:25
**clarified (1)**
114:17
**clarify (5)**
17:20;28:10;29:11;
63:17;98:25
**clarity (1)**
82:22
**class (14)**
22:4;24:17;52:15,16,
20,21,23,24;58:17;
73:2;77:13,15;80:16;
109:8
**class-action (1)**
78:7
**classes (4)**
21:23,24;45:16;
108:9
**clause (1)**
16:17
**clean (2)**
65:6,7
**cleaning (2)**
65:7;90:25
**clear (24)**

17:21;27:20;28:6;
38:18,22;42:6,15;51:4;
62:23;63:18;65:21;
68:17;70:13;71:13;
76:18;84:11;87:10;
94:9;97:17;99:2;104:1,
2,8;115:8
**clearer (1)**
16:19
**clearly (7)**
15:13;45:18;46:20;
77:12;92:17;99:15;
108:20
**CLERK (5)**
6:2,5;49:7;60:3;97:8
**client (11)**
7:19;16:12;17:15;
18:17;33:21;96:10;
100:14,18,20,22,25
**clients (4)**
10:4;81:19;90:17;
104:12
**client's (1)**
10:19
**client-trolling (2)**
81:13;82:9
**clinic (14)**
10:4;11:1;54:10;
62:24,24;65:5,16;
66:21;71:4,6;89:9;
92:19;103:5,12
**clinics (24)**
13:5;14:19;21:25;
43:10;44:4;62:5,10,21;
63:25;64:3;70:7,11,13;
75:5,9,12;76:23;81:8;
90:19;103:2,6,9,18;
120:8
**close (4)**
31:21;68:8;77:11;
102:15
**closely (1)**
31:17
**closer (1)**
119:15
**closure (1)**
59:8
**clue (1)**
108:7
**Code (11)**
8:18;24:12;53:3,11;
59:10;74:9;95:2;
105:17,18;114:6,6
**cognizable (1)**
96:4
**colleagues (2)**
35:13;41:12
**collect (1)**
108:22
**collectively (1)**
27:8
**colloquially (1)**
29:18

color (2)
45:21;77:15
**combination (1)**
27:12
**comfortable (5)**
32:13,17;33:22;
114:8;120:18
**coming (4)**
63:2;70:4;76:19;
103:7
**comity (1)**
76:12
**comma (1)**
16:18
**commenced (1)**
11:6
**comment (4)**
16:4;20:14;79:15;
89:13
**comments (6)**
31:6;77:10;79:11,11;
90:9;102:20
**commercially (2)**
48:22;99:6
**committed (1)**
81:18
**committee (57)**
6:17;7:3,19;8:12;
12:25;13:1,4,23;14:16;
15:7;17:15;18:1,7;
20:17;21:17,19,20,23;
22:6,20;23:19;24:14,
15,22;31:3;39:24,24;
60:7;62:17;69:10,11,
21;72:8,18,21;73:11,
12,14;76:19;79:19;
80:2;81:9,20,24;82:10,
13;87:15;91:7,14;
92:12,13,18;108:1;
109:3;111:9;112:2;
115:2
**committees (1)**
24:18
**common (2)**
37:15,23
**commonality (2)**
37:19;39:7
**common-law (1)**
75:7
**communications (2)**
28:21,23
**companies (2)**
90:25;91:1
**Company (6)**
27:6;32:24;62:2;
65:5,6,6
**company's (1)**
65:19
**comparable (1)**
98:10
**compare (1)**
98:8
**compared (2)**

53:1;59:10
**compensating (1)**
68:8
**competing (1)**
78:6
**competitive (3)**
69:12;79:17;80:7
**complain (1)**
46:15
**complains (3)**
55:12;56:13;59:2
**complaint (2)**
57:5;102:25
**complete (4)**
16:6;83:24;104:7,23
**completed (1)**
59:5
**completely (3)**
30:4;66:4;82:10
**completion (1)**
105:7
**complex (1)**
27:14
**complicating (1)**
113:25
**complies (1)**
76:3
**comply (4)**
21:15;48:17,18,21
**complying (1)**
14:4
**component (2)**
42:16;55:15
**Compounding (2)**
6:6;92:22
**compromise (1)**
16:13
**conceivable (2)**
73:15;79:8
**conception (1)**
80:24
**concern (21)**
22:17;24:13;38:8,8,
23;39:3;45:4;51:10,20;
52:5;53:10;76:6;81:11,
12,14;82:10;84:17;
85:1;86:12;89:22;
93:21
**concerned (7)**
31:16;37:2;51:13;
76:12;113:24;120:11,
14
**concerning (3)**
11:16;83:6;94:6
**concerns (9)**
29:1,3;31:8;37:3;
51:10,16;100:12;
120:15,19
**concomitantly (1)**
47:25
**condition (1)**
104:9
**conducting (1)**

63:25
**confidence (2)**
112:4,15
**confident (1)**
51:7
**confidential (6)**
28:8;43:18;51:11,13;
83:3,16
**confidentiality (3)**
42:25;47:4;115:3
**confidentially (1)**
59:5
**confirmation (1)**
66:18
**confirming (1)**
68:15
**conflict (3)**
24:21;50:24;62:22
**conforms (1)**
116:8
**confusion (2)**
87:8;108:24
**connection (1)**
92:3
**consensus (1)**
79:14
**consent (1)**
16:11
**consequences (1)**
56:8
**conserve (1)**
67:6
**consider (5)**
33:10;71:18;84:5,19;
109:1
**consider' (1)**
118:17
**considerable (2)**
31:9;75:15
**considerations (1)**
76:13
**considered (1)**
100:17
**considering (1)**
118:17
**consist (1)**
14:24
**consistent (3)**
84:3,13;112:20
**consistently (1)**
49:20
**consisting (1)**
18:11
**consolidated (2)**
23:9;64:13
**consolidation (1)**
42:15
**constituency (2)**
24:20;58:7
**constitutional (4)**
57:21;59:19;65:13;
105:24
**constraint (1)**

60:9
**constructive (1)**
43:5
**consumer-friendly (2)**
45:3;90:17
**contact (8)**
43:18;57:14;92:23;
93:9;96:25;97:24;99:7;
106:20
**contacted (6)**
11:19;71:1;89:16;
93:3,6,7
**contain (1)**
116:22
**contained (5)**
52:5;94:13;95:11,13;
115:4
**contains (1)**
108:11
**contaminated (15)**
56:16;61:8;71:2;
78:10,13,14,17,24;
79:1;80:22;87:24;88:8;
106:17,20;107:7
**contamination (1)**
89:5
**contemplates (1)**
46:20
**contemplation (1)**
117:1
**content (1)**
110:23
**contents (1)**
28:21
**contested (2)**
10:8,20
**context (8)**
14:18;64:20;66:11;
72:23;74:17,19;85:9;
98:9
**contingent (4)**
24:6;47:18;54:3;
109:19
**continue (1)**
92:6
**continues (1)**
88:20
**contractual (2)**
75:7,10
**contrary (2)**
21:9;55:10
**contribution (3)**
18:3;42:12;55:17
**Control (2)**
44:12;46:7
**conversations (1)**
32:10
**cooler (1)**
25:15
**cooperate (1)**
96:10
**cooperation (1)**
73:19

**coordinating (1)**
22:20
**copies (2)**
15:11;16:25
**copy (2)**
17:1;115:15
**core (4)**
42:16;52:12;63:5,14
**Corporation (1)**
95:20
**corrected (1)**
77:14
**corresponded (1)**
44:21
**cost (14)**
17:18;42:19;46:7,8;
47:12;58:10,10;75:15,
15;78:2;79:18;99:10,
13;104:24
**costly (1)**
56:24
**costs (7)**
29:20;37:22;38:13;
39:9;46:3;47:15;76:17
**counsel (36)**
6:8,10,20;8:11;
19:22;20:16;22:13,20;
23:19,23;26:4,6,7,9;
28:5;30:2,7,16;33:19;
35:2;38:20;39:22,23,
24;97:3;105:11;111:8,
9;112:1,1,2,15;114:10,
25;115:1;119:24
**countervailing (1)**
38:15
**country (3)**
79:2;97:10;104:25
**couple (8)**
12:12;14:17;40:16;
71:25;79:23;100:6;
102:21;116:6
**course (5)**
6:10;28:10,20;37:22;
81:20
**COURT (276)**
6:3;7:8,13;8:5,7,20,
22;9:2,4,10,13,17,19,
25;10:13,16,21;11:2,
12,13,15,17,21,23;
12:2,22;13:22;14:9,10,
24;15:16;16:11,17,21,
23;17:4,9,16;19:3,14,
20,22,25;20:9,19;21:8;
22:12,25;23:13,17;
24:6;25:2,4,10,13,16,
20,24;26:1,16,19,23,
25;27:2;29:23;30:9,11,
13,22,24;31:12,18;
32:1,14;33:10,12,17,
23,25;34:8,11,16,24;
35:8,15,19,23;36:7,24;
37:7,11,14;39:12,15,
25,25;40:6,10,13,15;

41:2,4,8,10,17;46:21,
21;47:2;49:7,8,10,25;
50:1,6,13,18,21;57:18;
58:24;59:24;60:3,5,10,
12,13,15,18,21,23;
61:13,15,16,20,22,24;
62:4,6;71:6,7,25;72:2,
4,6,13;73:22;76:9,11;
78:22;79:21;80:6;81:5;
82:12,15,17,24;83:7,
21;84:5;85:6,12,15,17,
19,22;86:1,3,5,7,9,13,
16,18,23;88:4,9;89:13;
90:2,2,23;91:6,8;
93:17;94:12,20,23,25;
95:6,10,16;96:9,17,21;
97:1,3,5,8,9;98:5,5,7;
99:18;100:2,8;101:11,
19;102:2,19;105:13,16,
18,20,22;106:4,5,25;
108:12,18;109:1,8;
110:16,17,18,19,22,24,
24;111:1;112:24,25;
113:3,5,7,10,14;114:5,
21,23,25;115:2,6,12,
14,18,20,23;116:5,9,
12,15,18,20,25;117:4,
7,9,11,19,21,24;118:1,
11,21,24;119:2,4,7,11,
14,20,24;120:3,5,9,14,
18,23
**court-approved (1)**
55:25
**courtesy (1)**
86:25
**courtroom (2)**
6:20;17:1
**courts (7)**
14:9,10;42:10;71:18;
97:9,10,18
**Court's (9)**
20:2,11;31:6;100:5;
101:9;105:25;107:3;
108:14;110:1
**cover (12)**
37:22;92:15,16,25;
93:15,18,21,25;94:3,
18;120:2,10
**coverage (4)**
27:6;30:3,5;37:19
**covered (2)**
54:17;105:10
**crawl (1)**
80:25
**crazy (1)**
71:16
**create (8)**
13:17,21;63:10;88:6;
92:10;93:21;102:15;
111:10
**created (2)**
87:9;105:23
**creates (2)**

36:5;108:24
**creating (1)**
50:24
**creation (1)**
91:13
**credibility (3)**
27:13;33:1;55:3
**credible (1)**
27:15
**credit (1)**
73:14
**creditor (7)**
13:2;18:10,11,15;
24:17;86:10;109:22
**creditors (36)**
7:4,7;8:12;18:14,20;
21:21,23,24,25;22:4;
23:20;24:9,16,17,20,
23;38:20;42:23;43:5,6;
45:6;47:25;54:5,16;
56:3;58:7;83:5;85:7,
11;108:19;109:9,17,17,
21;110:6;116:23
**creditors' (29)**
6:17;7:18;20:17;
21:17,18,20;22:6;
23:19;24:14,18;39:23;
49:25;60:7;62:17;
69:11,21;72:18,20;
81:8;24;87:14;91:7,14;
92:13,18;107:25;
109:2;112:2;115:2
**critical (9)**
67:19,23;69:3;73:4,
6;74:17;77:7;81:23;
91:19
**culpable (1)**
74:7
**currently (2)**
96:6;111:16
**customers (3)**
43:11;56:20;98:11
**cut (4)**
65:2;74:8;102:15;
118:20
**cutting (2)**
61:2;102:17

---

**D**

**DAILEY (4)**
32:4,5,5,16
**daily (1)**
73:11
**date (68)**
7:17;41:22;23,24;
42:7,12,21,22;43:13;
44:1;45:9;47:19;49:10,
23,24;50:2;53:6,6,7,18,
22,24;54:7,8,20,21;
58:21;59:13,17;60:7;
66:6;67:4,10,14,21;
73:8,22;74:1,20;75:16;

76:20,23;77:2,5;81:10,
22;82:7,11,22;85:3,7,9,
10;91:16,21,23;102:1,
4,15;103:20;105:5,5,9;
106:10,12;109:15;
115:22,23
**dates (2)**
6:12;53:5
**day (5)**
12:21;14:8;50:10;
102:17;118:19
**days (9)**
8:15,18;40:16;49:23,
24;104:19;111:12,13;
116:1
**de (1)**
77:13
**deadline (3)**
58:25;59:1;109:11
**deal (13)**
18:20;30:5;34:22;
52:16;54:6;63:4;65:17;
66:5;69:9;79:9;105:20;
106:8;108:22
**dealing (7)**
66:6;71:11,12,17,19;
73:6;82:8
**deals (4)**
49:9;65:25;67:23;
69:17
**dealt (2)**
84:16;106:18
**death (3)**
15:4;106:4,7
**deaths (6)**
10:19;13:10;68:5,12,
13;74:12
**debacle (1)**
102:3
**debt (1)**
98:12
**debtor (26)**
6:18;8:14;23:21,23;
27:8;49:22;54:14;55:4;
65:3;84:20;90:14;91:4;
95:22;96:1,14,22;
97:12,15,19,22,23;
99:9;102:25;103:11,
13;114:11
**debtor's (3)**
23:24;24:1;27:5
**decide (2)**
105:5,6
**decided (1)**
64:9
**decides (1)**
45:12
**deciding (1)**
20:11
**decision (9)**
31:23;57:4,4;65:11,
12;76:8,20;85:14;96:9
**decisions (1)**

NEW ENGLAND COMPOUNDING PHARMACY, INC.
Case #12-19882-hjb

July 24, 2013

53:2
**declaration (12)**
 6:17;7:19;10:6,16;
 14:11;28:6;29:10,11,
 12;30:18;34:14;70:15
**declare (1)**
 11:22
**declared (2)**
 11:10,12
**declaring (1)**
 12:20
**decline (1)**
 47:15
**decretal (1)**
 15:17
**de-duplicates (1)**
 69:16
**deemed (1)**
 47:4
**defamatory (1)**
 95:11
**default (1)**
 40:20
**defective (1)**
 96:3
**defendants (8)**
 21:12;32:7;33:6;
 41:13;42:11;65:25;
 74:6;91:1
**defendants' (1)**
 82:2
**defended (1)**
 37:20
**defending (1)**
 39:13
**defense (12)**
 27:6,14;28:2;29:19;
 30:2,6;33:19;37:16,22;
 38:13;39:8,9
**defenses (2)**
 13:20;28:18
**defer (2)**
 56:17;85:15
**deference (1)**
 31:6
**deferred (1)**
 91:24
**defined (1)**
 11:4
**defining (1)**
 11:5
**definition (2)**
 24:11;53:12
**degree (1)**
 112:4
**delay (2)**
 47:24;55:7
**delaying (1)**
 12:17
**delays (2)**
 6:4;109:17
**delineated (1)**
 15:19

**delineation (3)**
 105:14,21,23
**demands (1)**
 78:6
**denial (1)**
 22:6
**denied (3)**
 14:2;22:11;59:22
**describe (1)**
 55:13
**described (1)**
 93:23
**describing (1)**
 56:8
**deserves (1)**
 17:22
**deserving (1)**
 77:21
**designed (2)**
 90:15;102:8
**desire (2)**
 61:5;63:5
**desires (1)**
 92:11
**Despite (2)**
 52:14;90:22
**detail (2)**
 39:20;74:11
**detailed (1)**
 38:10
**details (2)**
 74:14
**determination (2)**
 13:22;36:3
**determined (1)**
 23:10
**devastated (1)**
 13:11
**develop (1)**
 32:18
**developed (1)**
 33:2
**died (2)**
 9:22,22
**differ (2)**
 106:9;107:5
**difference (1)**
 63:15
**differences (1)**
 119:18
**different (18)**
 35:24;45:21;46:21;
 54:25;55:11;58:1,9;
 73:24;77:15,22;78:25;
 91:20;100:13;101:5;
 108:16;109:12,22;
 119:5
**differentiate (2)**
 101:1;102:3
**differently (2)**
 98:18;108:18
**difficult (3)**
 48:10;51:9;74:6

**difficulties (1)**
 36:5
**digits (2)**
 107:13;111:6
**direct (12)**
 40:24;49:7,8;56:13,
 15,22;61:9;78:10,23,
 23;97:6,10
**directed (3)**
 92:19;99:5;111:17
**directing (2)**
 43:8;95:23
**directions (1)**
 114:14
**directly (2)**
 15:24;17:6
**directs (1)**
 115:11
**disagree (1)**
 99:4
**discharged (1)**
 84:21
**disclose (5)**
 28:21;37:7,8;47:2,10
**disclosed (3)**
 59:2,8;66:15
**disclosing (2)**
 37:24,24
**disclosure (18)**
 36:18,22;37:4;38:11;
 39:3,10,21;41:24,25;
 46:20;55:20,25;56:7,
 10,11;66:11;67:1;
 114:4
**disclosures (2)**
 38:4;39:19
**discovery (5)**
 57:6,7,12,13;63:25
**discretion (1)**
 53:3
**discuss (1)**
 84:1
**discussed (4)**
 11:8;22:18;33:20;
 103:24
**discussion (4)**
 15:10;18:22;32:20;
 95:9
**discussions (3)**
 18:21;70:18;73:10
**Disease (1)**
 44:12
**disfavor (1)**
 18:13
**dismiss (2)**
 14:7;21:1
**disposed (1)**
 8:1
**disrupt (1)**
 109:10
**distance (1)**
 110:21
**distinction (1)**

 62:1
**distracted (1)**
 29:24
**distress (1)**
 80:15
**distribute (1)**
 105:8
**distributed (2)**
 51:21;104:22
**distribution (3)**
 106:1;111:19;118:5
**distributor (1)**
 12:6
**district (16)**
 97:18;98:7;105:15,
 18,22;106:5,25;
 107:12;110:17,18,19,
 22,24,24;111:1;120:14
**disturbing (1)**
 40:17
**diverging (1)**
 85:12
**dividend (1)**
 24:23
**docket (6)**
 9:11;17:10;18:25;
 54:11;76:10;100:12
**doctor (1)**
 65:5
**doctor-patient (1)**
 120:12
**doctors (1)**
 90:19
**document (1)**
 82:24
**documentation (1)**
 6:13
**documented (1)**
 68:5
**documents (4)**
 28:9;83:6;93:1;
 103:4
**dollar (1)**
 73:3
**Donald (1)**
 64:4
**done (19)**
 19:8,15,15,18;47:10;
 57:20,22;66:2;67:20;
 68:21;71:23;78:5;80:1,
 1,10;87:5;88:22;
 105:13;106:13
**Donlin (11)**
 54:23;55:2,3,4,6;
 62:2,11;69:20,20,24;
 99:11
**do-not (1)**
 65:13
**Donovan (1)**
 50:4
**door (2)**
 56:9;65:18
**double (1)**

 101:22
**doubt (1)**
 17:23
**down (14)**
 12:4;14:6;25:5,14;
 41:18;63:21;64:9,9;
 68:24;69:17;78:12;
 102:15;109:12;111:9
**Dr (1)**
 54:10
**draft (2)**
 79:13;116:9
**drafted (3)**
 80:13;91:3;93:11
**drafting (1)**
 118:23
**drafts (1)**
 79:12
**drawing (1)**
 62:2
**DRC (6)**
 79:15,17,22;80:5,7,8
**drive (4)**
 31:9;62:8;76:16;
 77:2
**driver (2)**
 18:6;77:24
**drives (1)**
 74:2
**drop (1)**
 79:22
**drug (4)**
 78:19,24;80:19;
 111:19
**drugs (5)**
 79:1,4;100:16,23;
 112:5
**dual (2)**
 29:2;74:19
**Duane (1)**
 6:25
**Duck (1)**
 64:4
**due (2)**
 57:21;80:6
**due-process (1)**
 43:4
**duty (15)**
 18:1,10,11,16,23;
 19:1;21:20,21;22:4,8;
 24:14,15;28:3;57:17;
 99:5
**dynamic (1)**
 81:11

## E

**earlier (7)**
 9:16;18:4;53:12;
 73:1;75:24;93:23;
 106:11
**early (7)**
 13:14;33:7;42:7;

Case 1:13-md-02419-RWZ   Document 380-3   Filed 08/08/13   Page 129 of 144
NEW ENGLAND COMPOUNDING PHARMACY, INC.
Case #12-19882-hjb

July 24, 2013

75:8;91:16;106:10,11
**easier (4)**
    25:20,22;26:6;50:22
**easy (4)**
    75:19,20,22;85:10
**economy (3)**
    23:18,20;78:6
**edition (1)**
    42:24
**effect (3)**
    70:22;116:23;120:21
**effective (2)**
    64:10,10
**effectively (1)**
    65:2
**effects (2)**
    55:13;104:18
**efficiency (2)**
    13:19;75:1
**efficient (2)**
    11:17;71:21
**effort (5)**
    17:17;64:18,19;
    70:14;73:15
**efforts (5)**
    22:19;48:23;82:21;
    99:7;112:6
**eight (2)**
    18:22;33:8
**eighty (1)**
    92:1
**eighty-odd (1)**
    56:18
**eighty-two (3)**
    70:6;75:12;76:3
**either (13)**
    34:23;40:2;43:15;
    44:16;54:16;63:18;
    70:15;85:8;103:21,24;
    110:8,23;118:14
**election (4)**
    43:15;46:17;47:13;
    49:16
**eliminate (1)**
    15:19
**eliminated (2)**
    15:20;16:9
**else (25)**
    13:23,25;17:15;
    22:25;30:24;33:20;
    34:1;36:20;39:16;
    50:12;52:3;53:7;67:18;
    72:7,15,23;74:15;
    79:17;95:17;99:19;
    100:3;101:12,15;
    107:16;108:1
**embarrassed (1)**
    73:7
**emerge (1)**
    54:4
**eminently (1)**
    11:14
**employ (1)**

6:7
**employed (2)**
    29:7;34:6
**employment (6)**
    25:21,24,25;26:3;
    29:9;39:18
**enclosed (1)**
    92:20
**encourage (3)**
    66:22;80:14,23
**encourages (1)**
    80:11
**end (11)**
    24:21;30:22;50:10;
    68:24;79:7;92:24;
    102:17;112:13;115:10,
    25;120:24
**endeavor (1)**
    36:19
**ended (2)**
    12:8;104:13
**endorse (3)**
    26:21,23,24
**enforcement (1)**
    64:12
**enforcing (1)**
    120:15
**engage (2)**
    35:14;58:17
**England (2)**
    6:5;92:22
**enough (7)**
    52:6;68:21,25;92:7;
    108:4,7;110:19
**ensure (1)**
    89:10
**enter (5)**
    23:17;24:24;43:8;
    63:3;67:10
**entered (1)**
    19:3
**enters (1)**
    63:3
**entire (2)**
    91:11;102:8
**entirely (1)**
    91:12
**entities (3)**
    90:23;107:7;108:10
**entitled (1)**
    59:12
**entity (1)**
    94:16
**entries (1)**
    35:5
**entry (1)**
    45:11
**ephedra (3)**
    74:5;75:3;81:25
**equals (1)**
    14:14
**equitable (1)**
    96:2

**equity (1)**
    98:12
**Erlanger (2)**
    100:5,14
**escape (1)**
    69:25
**especially (3)**
    15:9;20:3;74:7
**essence (1)**
    97:21
**essentially (3)**
    7:15;84:8;105:2
**establish (1)**
    7:16
**established (2)**
    87:18;95:25
**establishing (1)**
    6:12
**establishment (2)**
    41:22;42:7
**estate (37)**
    13:7;14:11,15,20,23;
    17:19;19:13,17,18;
    23:21;26:8;35:1,7;
    36:8,8,17,23;37:16,18,
    24;38:16,21,23;39:2,8;
    66:24;78:2,6;80:11,23;
    84:21;87:19;96:6;
    101:18;104:25;106:1;
    110:3
**estates (1)**
    38:9
**estate's (1)**
    28:10
**et (4)**
    10:4;69:19,19,19
**evaluated (2)**
    88:11;89:10
**evaluating (1)**
    14:20
**even (28)**
    9:5;13:3,5;14:23;
    19:11;21:8,19;24:17;
    30:6;49:3;53:22;55:22;
    57:10,16,23;58:11;
    65:25;75:25;92:7;96:3;
    102:10;104:9;107:23;
    109:25;110:12,22;
    113:20;117:13
**event (2)**
    84:22;109:4
**eventually (2)**
    112:8;114:8
**everybody (5)**
    10:17;54:9,11;66:13,
    19;68:9;70:14;106:12,
    18;107:3,8
**everybody's (1)**
    66:14
**everyone (8)**
    11:18;15:13;43:16;
    54:12;74:14;78:10;
    80:23;101:15

**evidence (7)**
    57:13;87:23;89:4;
    90:1,2;93:23;100:17
**exactly (2)**
    19:5,8
**examination (1)**
    95:8
**except (2)**
    118:1;119:14
**exception (4)**
    20:4,13;94:14;
    108:12
**exchange (1)**
    91:18
**exclusive (1)**
    21:5
**exclusively (1)**
    46:14
**exculpation (1)**
    48:16
**excusable (1)**
    50:8;110:3
**excuse (3)**
    42:5;46:24;112:23
**exercise (3)**
    21:21;35:10;51:19
**exercising (1)**
    76:25
**Exhibit (2)**
    78:20,24
**exist (5)**
    38:12,25;39:3;45:13;
    88:6
**expect (4)**
    32:6;39:20;74:6,15
**expectation (2)**
    35:8;55:14
**expected (1)**
    44:10
**expecting (1)**
    51:18
**expects (1)**
    69:1
**expedition (1)**
    92:7
**expend (1)**
    73:14
**expenditure (1)**
    75:5
**expense (10)**
    11:21;12:19;13:18;
    14:14,14,22,23;19:17;
    21:1;67:2
**expense' (1)**
    19:17
**expenses (2)**
    99:1,9
**expensive (1)**
    109:5
**experienced (1)**
    81:24
**expert (4)**
    57:25;61:10;63:1,7

**expertise (1)**
    27:13
**expiration (3)**
    47:21;48:3;111:14
**explain (1)**
    8:24
**explained (4)**
    35:15;51:16;55:24;
    62:20
**explains (2)**
    58:2;92:22
**explicit (1)**
    78:21,25
**explicitly (1)**
    76:15
**exposed (4)**
    80:19,21;88:2,11
**exposing (1)**
    113:25
**exposure (1)**
    93:14
**exposures (1)**
    68:5
**expressed (4)**
    29:1,3;76:6;94:11
**extend (3)**
    47:20;50:14,15,17;
    53:24;87:1;109:14
**extended (3)**
    43:25;47:25;54:20
**extensively (1)**
    31:4
**extent (9)**
    29:23;34:6;36:4,16;
    42:9;70:13;85:23;
    98:17;99:3
**extraordinary (1)**
    83:8
**extremely (1)**
    108:2
**eyes (2)**
    81:21,21

**F**

**face (8)**
    49:6;51:17;83:9,17;
    84:12;95:5,14;113:1
**faced (1)**
    14:3
**facilitate (1)**
    17:18
**facilities (2)**
    79:2;90:25
**facility (1)**
    92:19
**fact (11)**
    23:22;24:8;29:24;
    39:6;56:2;66:22;98:3;
    103:7,21;110:6;118:18
**facto (1)**
    77:13
**factor (1)**

NEW ENGLAND COMPOUNDING PHARMACY, INC.
Case #12-19882-hjb

July 24, 2013

14:21

**fail (3)**
17:12;110:6;116:25

**failed (2)**
88:5,9

**failure (2)**
108:5;110:2

**fair (2)**
73:12;85:10

**fairness (1)**
83:25

**falsified (1)**
64:5

**familiar (2)**
61:25;105:17

**far (6)**
56:6;63:19;68:7;
88:5;95:8;97:22

**fashion (5)**
8:1;53:14;91:20;
106:25;119:4

**favor (2)**
18:13;21:23

**fear (1)**
80:19

**federal (8)**
14:9;44:24;46:24;
48:6,11;57:11;89:3;
93:5

**fee (14)**
29:16;31:19;34:3,15;
35:1,19,21,25;36:3,14;
38:19,20,24;39:6

**feel (5)**
31:23;46:5;87:5,6;
112:3

**feelings (1)**
85:16

**fees (10)**
35:7;36:10,24;37:4,
7;38:9,16,23;39:2;40:1

**felt (1)**
50:20

**Fern (14)**
26:10;27:12,22;28:6;
29:10;30:18;31:8;
32:11,23;33:6,10,19;
34:3;37:24

**few (6)**
7:11;10:8;19:11;
37:3;63:4;77:9

**fiduciary (4)**
18:10,11;24:15;81:9

**fifteen-minute (1)**
59:24

**Fifth (1)**
97:17

**fifty- (1)**
73:2

**fighting (2)**
57:2;91:11

**figure (2)**
62:13;80:2

**file (36)**
10:3;15:1;21:10;
24:9;29:16;30:18;
34:15;38:20;39:19;
40:17,22;41:24;42:1;
44:15;56:3,4;65:15;
73:12;76:24;80:24;
90:6;106:14;108:5;
109:6,25;110:2,6,23;
116:23,25;117:14,16;
118:15,16,18,19

**filed (40)**
9:6;10:2;13:13;
15:23,23;16:10;17:7,
10;19:4;20:19,25;
21:14,14;27:10,18;
31:19,24;35:21;38:24;
42:12,20;43:21,22,23;
45:19,20;63:12;64:15;
66:13;77:19;83:5,6;
84:24;87:3;95:11,20;
96:4;100:12;109:21;
110:12

**filing (10)**
6:12;12:21;18:21;
24:5;32:6;35:19;43:17;
44:9;80:11,14

**filings (2)**
11:21;42:15

**final (5)**
50:11;59:16;70:9;
71:9;94:24

**finally (6)**
24:13;48:15;52:11;
58:20;92:13;116:21

**find (5)**
63:9;64:8,14;69:13;
116:2

**finding (4)**
8:14;17:16;20:7;
23:12

**finds (1)**
110:18

**fine (6)**
12:8;16:22;25:3;
27:1;41:7;119:6

**firm (6)**
27:4;69:20,20;70:8;
77:16;82:21

**first (32)**
7:10;8:4,22;10:2;
11:7;20:3,13,14;21:1,
3;23:23;25:25;27:10,
11;33:18;36:11;37:3,
17;49:18,19,24;61:3;
74:2;77:23;78:12;83:1;
84:2,12;86:24;92:25;
93:12;100:10

**fishing (1)**
92:6

**fit (1)**
22:3

**five (2)**

**fix (2)**
43:24,25

**flurry (1)**
7:20

**focus (1)**
46:22

**focused (2)**
15:2;36:15

**follow (1)**
63:11

**followed (1)**
18:21

**following (4)**
46:1;61:6;69:17;
105:21

**follow-through (1)**
70:10

**footnote (3)**
20:7;63:17,20

**footnoted (1)**
110:10

**forced (1)**
46:2

**forces (1)**
55:8

**foremost (2)**
20:3,13

**forever (2)**
84:21;110:8

**form (6)**
6:15;45:2;49:11;
98:24;116:7,7

**formal (2)**
45:19;71:7

**former (1)**
56:20

**forms (3)**
87:10;103:9;104:23

**forth (11)**
37:25;39:4;71:22;
74:13;75:6,10;80:4;
82:2;85:23;91:19;
94:10

**forty (1)**
75:14

**forty-five (1)**
68:12

**forward (8)**
22:24;31:10;35:18;
57:18;59:6,7;102:16;
120:16

**four (3)**
16:24;107:13;111:6

**fourteen-day (1)**
40:18

**fraction (1)**
13:13

**frame (1)**
59:4

**Frankly (13)**
16:12;20:8;56:7;
63:23;64:17,21;67:18;

**fix**
89:18;98:19

**fix (2)**
68:22;69:6,24;71:20;
106:7;109:15

**free (2)**
44:15;109:24

**Friday (3)**
41:2,3,4

**front (4)**
20:8;64:20;74:9,14

**frontlines (1)**
88:21

**full (6)**
16:5;66:10;73:10;
75:25;85:23;100:11

**full-blown (1)**
69:2

**fully (7)**
30:20;31:11;55:24;
73:21;74:20;76:22;
80:9

**fun (1)**
71:20

**function (1)**
106:5

**functionally (2)**
64:25;66:1

**functions (1)**
106:4

**fundamental (1)**
52:24

**funds (4)**
35:6;78:3,7;84:23

**further (8)**
39:25;43:7;48:20;
76:1;77:20;80:7,13;
83:21

**futility (1)**
17:13

**future (4)**
53:9,10;54:4;88:24

**G**

**GALLIGAN (21)**
7:5,6;8:2,21,23;9:7,
8,15,18,18,20;10:14;
13:12;20:5;25:6,7,9,10,
12,14;73:1

**Galligan's (5)**
7:19;16:12;17:15;
18:17;20:14

**gate (1)**
65:21

**gather (1)**
56:19

**gathering (1)**
54:25

**gave (1)**
48:8

**general (11)**
18:12,17;24:15,23;
49:11;50:2;52:2;85:7,
10;95:7;111:19

**generally (7)**

**gentleman (1)**
102:24

**gets (2)**
57:6;69:15

**give-and- (1)**
76:4

**Given (5)**
22:21;54:13;70:1;
91:8;114:17

**gives (3)**
49:10;73:24;97:5

**giving (2)**
38:6,14

**global (2)**
42:17;55:15

**goal (3)**
15:6;36:14;106:12

**goals (2)**
23:8;35:24

**goes (6)**
8:17;67:12;81:22;
97:21,21;115:25

**gone' (1)**
66:21

**Good (20)**
6:3,22,24;7:2,5,9:15;
22:14;32:10,24;41:8;
58:14;72:13;73:18;
74:1;79:10;82:19;87:5;
103:17;107:17;112:11

**goods (2)**
49:21,22

**governed (1)**
52:18

**government (1)**
44:24

**governmental (1)**
48:6

**grab (1)**
113:23

**grant (1)**
20:19

**granted (4)**
24:5,18;26:21,24

**granting (1)**
20:24

**grants (1)**
21:8

**Gray (1)**
114:11

**great (2)**
18:20;78:5

**greatly (1)**
33:4

**GROSSMAN (8)**
86:20,21,24;96:13,
19,22;97:2,4

**ground (1)**
98:18

**grounds (8)**
11:2;17:11;21:3,13;

**fifth**
13:2;18:12,15,20;
21:21,22;45:7

22:5;45:12,13;46:12
**group (1)**
  56:19
**groups (1)**
  18:14
**guess (5)**
  20:13;50:20;62:1;
  115:24,24

**H**

**hac (1)**
  9:6
**hackles (1)**
  118:2
**hand (9)**
  15:11;16:14,14;38:6,
  7;58:11;65:10;66:3;
  69:1
**handle (3)**
  30:22;54:25;97:8
**handled (1)**
  27:14
**happen (4)**
  13:3;60:25;65:3;
  103:3
**happened (4)**
  73:4;74:12,21;89:12
**happens (3)**
  19:4;37:5;80:25
**happy (11)**
  16:20;19:13;72:1;
  101:9;109:1;110:21,
  21,23,23;111:21,22
**hard (4)**
  33:8;54:18;91:14;
  101:24
**harm (8)**
  44:13,21;80:22;
  88:24;89:23;92:8,8;
  100:18
**harmed (2)**
  93:22;96:12
**harmful (1)**
  89:20
**Harris (23)**
  6:8;26:4,10;27:4,4,
  24;28:1;29:23;36:4,5,
  5,6,12,15,16,18,21,25;
  39:18,19;40:1,2;74:4
**Harry (1)**
  40:7
**hassle (1)**
  61:1
**Health (11)**
  18:25;21:7,7;43:1;
  54:14;86:21;89:4,4;
  93:4,6;95:19
**healthcare (18)**
  18:1;20:22;21:6,11;
  43:10;44:4;87:2;88:1;
  90:24;91:15,17;92:2;
  93:4,17,25;94:16;

96:14;100:14
**hear (11)**
  11:2;18:4;45:5;
  59:15;99:25;100:2;
  102:22;111:21,22,25;
  112:2
**heard (25)**
  23:1,10;26:16;27:20,
  21;30:25;33:13;34:7;
  50:13;60:7;66:3,4;
  72:16;73:1;74:4,18;
  75:8,24;76:18;86:19;
  99:17;100:3;102:14,
  24;104:4
**hearing (13)**
  6:6,8,11;7:16;23:2,
  23;26:3,19;35:13;
  40:23;75:25;76:20;
  99:20
**hearings (3)**
  7:12;43:23;76:1
**hearkens (1)**
  8:15
**hearsay (1)**
  70:18
**held (1)**
  73:13
**help (4)**
  12:19;33:3;90:16;
  113:18
**helps (1)**
  31:9
**highest (1)**
  24:22
**himself (1)**
  60:9
**HIPAA (15)**
  46:13,18,19;47:6;
  49:1;96:20,21,24;
  99:12;101:5;108:11,
  11,14;120:9,10
**HIPAA's (1)**
  120:11
**hire (2)**
  54:23,24
**histrionics (1)**
  61:2
**hodgepodge (1)**
  14:10
**Hold (4)**
  19:16;25:4;98:12;
  110:14
**holding (1)**
  71:18
**home (1)**
  24:6
**Honor (159)**
  6:22;7:2,5,9,9;8:6,
  10,13,21;9:5,15;12:21,
  24;13:2,9;14:25;15:6,
  10,15,18;16:22;17:5;
  18:24;19:10,21;21:17;
  22:14,16;23:3,16;25:6,

7,12,17;26:2,12,22;
  27:1,20;29:13,15,16,
  22;30:10,12,15,23;
  31:2,4,13,15,21;32:4;
  33:15;34:2,15,18,19;
  35:4;37:2;40:4,5,7,8,
  24;41:6,7,9,15,16,18;
  42:20;43:8,14,14;
  45:11,12,23;46:18;
  47:23;49:13,17;51:1;
  52:11;53:12;54:20;
  55:5,19;57:20;58:20;
  59:14,22;60:8,17;
  71:23;72:5,11,19,22;
  82:14,18,20;83:1,8,19,
  23;84:2,11,13,25;85:6;
  86:14,20;92:5;94:19,
  21;95:1,3,6,18,19,21,
  25;96:3,8,13,19,22,23;
  97:4,6,14,25;98:8,14,
  17;99:8,15,16,21,22,
  24;100:4,10;101:8,15,
  22;103:1;112:23;
  113:6;114:13;115:8;
  116:4,21;119:3,19,21,
  22;120:22
**Honor's (7)**
  8:2;25:18;34:18;
  38:17;50:3;55:21;
  91:24
**hoops (1)**
  24:8
**hope (4)**
  7:24;75:15;76:9;
  112:19
**hopefully (6)**
  9:2;33:1,4;68:25;
  76:2;82:6
**hopes (1)**
  42:2
**hoping (2)**
  111:25;112:12
**horse (2)**
  45:21;77:14
**horses (1)**
  79:24
**hospital (3)**
  88:18;104:14;114:10
**hospitals (3)**
  21:25;75:9;90:19
**hours (2)**
  71:25;79:11
**houses (1)**
  69:18
**huge (1)**
  81:15
**hundred (1)**
  14:17
**husband (1)**
  9:21

**I**

**idea (1)**
  89:14
**ideal (2)**
  75:21;78:7
**identifiable (1)**
  103:15
**identifiably (1)**
  103:16
**identification (1)**
  94:14
**identified (8)**
  26:10;27:5;44:11,12;
  106:20;107:14,22;
  111:5
**identify (11)**
  6:21;32:2;52:6;
  53:20;85:23;91:9;
  93:24;99:7;100:22;
  108:3;109:20
**identifying (5)**
  52:7;57:9;94:6;
  107:21;108:8
**identities (3)**
  44:21;45:6;51:21
**ii (3)**
  16:2,5,6
**iii (4)**
  15:20,20;16:9,10
**illness (1)**
  109:24
**illnesses (1)**
  68:4
**image (1)**
  38:25
**imagination (1)**
  106:19
**imagine (1)**
  54:18
**immaterial (1)**
  68:10
**immediacy (1)**
  74:21
**immediately (2)**
  21:14,14
**impact (2)**
  91:25;118:11
**implicates (1)**
  14:11
**implication (1)**
  53:8
**implicitly (2)**
  18:2;89:24
**importance (2)**
  69:8;74:20
**important (23)**
  13:7;15:2;19:15;
  23:7;24:10;27:21;
  32:18;33:4;36:1;38:8;
  50:11;65:11;71:6;
  72:23,25;75:2;76:13;
  77:6;85:8;89:2;97:14;
  98:9;102:11
**importantly (1)**

83:23
**impose (2)**
  96:4;103:20
**imposed (1)**
  97:13
**imposes (2)**
  7:13;53:3
**imposing (1)**
  34:19;48:13;95:23
**impossible (1)**
  74:19
**impound (2)**
  113:20,23
**improper (1)**
  98:16
**inadequacy (1)**
  70:16
**inadequate (1)**
  56:14
**inapplicable (1)**
  12:16
**inappropriate (5)**
  36:6;56:11;58:16;
  99:9;108:10
**Inc (1)**
  6:6
**incentive (2)**
  15:3;16:15
**inception (2)**
  10:1;91:13
**incident (1)**
  33:9
**inclination (1)**
  36:21
**inclined (1)**
  84:5
**include (5)**
  83:13;92:15,17;94:5;
  113:1
**included (3)**
  55:24;92:17;93:18
**includes (2)**
  69:14;88:24
**including (9)**
  17:15;46:8;66:9;
  74:5,24;75:23;90:19;
  94:14;120:13
**inconceivable (1)**
  54:12
**inconsistent (1)**
  14:12
**increase (1)**
  13:19
**incredibly (1)**
  75:1
**incur (2)**
  19:17,17
**incurred (4)**
  14:22;18:6;47:15;
  109:23
**indeed (6)**
  24:18;30:5;55:20;
  57:9,17;90:1

Case 1:13-md-02419-RWZ   Document 380-3   Filed 08/08/13   Page 132 of 144
NEW ENGLAND COMPOUNDING PHARMACY, INC.
Case #12-19882-hjb

July 24, 2013

**indefinite (1)**
53:24
**indemnification (3)**
42:12;75:2;76:23
**indemnify (1)**
37:18
**indemnities (2)**
75:7,10
**indemnity (10)**
13:6;14:19;18:3,5,5,
9;22:1;29:21;75:6;
76:17
**indicate (2)**
70:7,9
**indicated (3)**
106:6;109:10;116:7
**indication (2)**
110:11;111:1
**indifferent (1)**
57:6
**individual (4)**
24:19;32:7;33:6;
41:13
**individuals (2)**
27:8;28:20
**indulgence (4)**
8:2,3;20:3;25:18
**industry (1)**
54:14
**infections (1)**
89:25
**inform (1)**
88:9
**informal (1)**
31:6
**informally (1)**
49:18
**information (66)**
28:7,15,16,23,24;
29:5,5;32:18,22;33:7;
35:15;38:7,14;43:1,18;
45:3,8;46:9,14,16;
47:7;48:12;49:2;51:17;
52:6,7,9;57:12,14;
59:11;62:16;63:12;
67:16;69:18,18;70:8;
71:8;81:10,23;82:1,7;
83:3,13,15,21;84:7,9;
85:9;90:10;92:1,2,23;
94:6;95:5,13;96:11,25;
97:24;98:4;99:7;104:7,
17;106:23;108:12;
113:21,22
**inherently (1)**
58:14
**initially (1)**
31:15
**initials (1)**
51:24
**injection (5)**
78:17;80:20;89:19;
92:3;93:2
**injunction (4)**

**66:20;91:18;95:24;**
96:2
**injunctions (2)**
65:1;66:8
**injured (5)**
54:2;61:4;71:4;
102:18;103:8
**injures (1)**
54:1
**injuries (3)**
10:19;14:3;85:23
**injury (3)**
44:10;106:3,7
**input (1)**
33:25
**inquiries (1)**
94:2
**insert (1)**
84:19
**insiders (8)**
27:9,25;28:4,13,22;
30:16;59:3;66:9
**Insight (1)**
95:19
**insolvency (5)**
6:18;7:20;8:4;10:6;
23:21
**insolvent (11)**
8:15;10:9,18;11:10,
11,12;12:20;20:6,8,11;
68:4
**Inspira (15)**
18:24;19:7;22:13,15;
86:21,21;87:2;89:9;
91:10;92:15;93:3,16,
24;94:2,6
**Inspira's (2)**
88:18,20
**instance (4)**
36:11;37:17;95:4;
113:22
**instead (4)**
12:15;16:18;44:7;
47:16
**insufficient (2)**
23:25;63:13
**insurance (7)**
23:25;27:6,6;28:2;
30:2,3;68:6
**insurer (11)**
27:5;29:18,25;30:7;
35:1;36:4,5,9,12,25;
40:2
**insurers (2)**
27:7;74:7
**intended (4)**
26:14;52:13;65:13,
20
**intent (1)**
70:10
**intention (1)**
24:25
**interest (7)**

**28:11;35:10;37:15,**
23;39:8;101:9;104:24
**interested (1)**
11:20
**interesting (1)**
58:1
**Interestingly (1)**
90:22
**interests (1)**
37:19
**interferes (1)**
57:5
**interim (2)**
119:9,11
**intermediaries (30)**
43:9,15;44:6,16,19,
20,23;45:15;46:1;47:7,
8,19;48:5;49:4;56:15,
20;59:20;92:14;95:22;
98:6,15;99:11;102:23;
107:6,20;111:4;112:6,
14;115:11;118:3
**intermediary (2)**
99:6;107:1
**interplay (1)**
50:5
**interpreted (1)**
50:4
**interrupt (1)**
61:15
**into (9)**
10:7;23:9;33:7;
61:12;62:8;72:24;73:7;
76:13;85:9
**introduce (1)**
8:23
**inure (3)**
28:12;32:8;55:16
**investigation (2)**
28:9,17
**invite (1)**
94:1
**invited (1)**
69:20
**invites (1)**
80:17
**involved (6)**
11:14;30:3;58:5;
77:17;84:4;96:6
**involving (1)**
68:24
**Iowa (1)**
32:25
**ire (1)**
69:7
**irrelevant (2)**
11:7;24:8
**issue (42)**
11:13;12:17;24:2;
33:18;34:3,5,6;38:1;
39:3;42:8;48:1,4;
50:11;51:2,9,16;53:11,
17,17;54:6;61:3,21;

**63:22;64:23,24;68:18;**
70:2;71:13;82:4;84:1,
15;93:20;94:12;95:2;
98:2,3;102:22;105:5;
119:22;120:1,8,13
**issued (3)**
46:25;70:6;75:12
**issues (34)**
7:22,24,25;11:8;
12:3;18:13;30:3,5;
31:20;37:5,19;45:18,
22,24;49:17;54:25;
61:3,25;62:7;64:2;
69:8;71:5,11,12,17,19;
87:7;89:25;98:18,20;
99:1,12;109:12;120:12

**J**

**Jeffrey (2)**
6:24;115:9
**JJ (1)**
50:3
**job (11)**
63:24;78:5;80:23;
87:5;105:15,15,25;
107:3;108:22;110:20;
112:11
**join (1)**
79:16
**joined (4)**
13:6;14:13;24:3;
73:16
**joining (1)**
22:7
**joint (6)**
69:22;71:18;94:7;
110:16,21;111:10
**jointly (1)**
27:24
**Joseph (1)**
22:14
**Jr (3)**
6:17;7:6;9:21
**judge (19)**
10:11,12;38:4;42:5;
57:9;63:3;64:11,20;
71:11;75:24;76:6,17,
25;77:14,21;81:12;
90:2;98:1;107:12
**judgment (4)**
31:22;35:17;55:9;
58:15
**judicial (3)**
23:18;83:7,24
**judicially (2)**
11:10,12
**June (2)**
73:20;87:22
**jurisdiction (3)**
16:1;77:1;98:5
**jurisdictional (1)**
98:3

**jurisdictions (1)**
26:9
**justify (2)**
48:13;76:25

**K**

**keep (8)**
8:8;36:13;47:23,24;
68:3;97:1,1,3
**keeping (2)**
33:10;64:6
**kept (3)**
48:2;71:24;83:15
**kind (5)**
39:9;55:23;58:17;
62:19;96:5
**kinds (3)**
38:4;46:21;61:25
**Kinsella (11)**
57:24,25;58:2,11,13,
18;62:2,11;69:22;70:8;
80:13
**knowing (2)**
68:1;74:8
**knowledge (1)**
89:15
**known (4)**
42:22;43:5;55:6;
103:15
**knows (4)**
15:6;41:23;54:12;
104:9

**L**

**lack (1)**
79:14
**lacks (1)**
49:13
**language (15)**
16:16;17:6;24:25;
51:6;65:21;84:16,18;
85:2,3,4;90:18;91:3;
94:14;116:23;120:20
**large (1)**
79:7
**largely (1)**
47:18
**larger (4)**
54:15;56:9;97:8;
109:8
**largest (1)**
45:18
**last (18)**
8:16;10:18;29:15;
45:20;48:3,15;76:3;
77:11,12;84:25;89:18;
94:7;107:13;110:15;
111:5;112:20;115:15;
120:14
**lastly (1)**
21:17

**NEW ENGLAND COMPOUNDING PHARMACY, INC.**
Case #12-19882-hjb

July 24, 2013

**late-filed (1)**
84:17

**latency (1)**
88:7

**later (15)**
12:3,4;18:4;66:10,
25;67:1,2,13,22;68:14,
16;69:2,18;103:21;
110:12

**law (14)**
10:15;20:21;21:2,5,
22;26:9;47:22;52:19;
53:3;71:24;96:1;97:16;
103:12,18

**laws (1)**
71:15

**lawsuit (1)**
10:2

**lawyer (3)**
10:14;32:5;118:21

**lawyerly (1)**
96:17

**lawyers (8)**
11:19;12:2;63:18;
70:19;81:15,19,24;
101:17

**lead (3)**
12:3,4;57:12

**least (19)**
13:10,22;14:5;15:14;
17:7;20:10;23:11;
37:21;47:20;48:13;
71:15;84:25;90:11;
91:21;102:1;103:9,17;
104:5;117:13

**leave (5)**
25:8;50:9;102:20;
107:11;114:22

**left (3)**
42:8,13;114:14

**legacy (1)**
8:19

**legal (1)**
76:4

**legitimate (3)**
75:22;80:19;81:11

**lengthy (2)**
56:23;104:7

**less (8)**
57:2,2,2;58:10;
62:21;69:23;78:18;
109:5

**letter (9)**
62:12;92:15,17,25;
93:15,18,25;94:3,18

**letters (2)**
70:21,23

**level (6)**
47:14;64:16;68:10;
74:10;80:23;107:23

**leverage (1)**
91:16

**Levin (1)**

30:5

**liability (14)**
10:25;13:18,20,21,
23;14:6;17:12;20:20,
22;21:7,10;48:19,22;
99:2

**lie (2)**
13:20;14:3

**lieu (1)**
91:11

**life (1)**
65:4

**light (4)**
31:24;43:21,22;
55:20

**lightning (1)**
91:15

**likely (5)**
14:18;44:20;56:25;
93:5;108:9

**likes (1)**
97:5

**limit (3)**
44:18;56:14;57:11

**limitation (2)**
44:18;47:21

**limitations (7)**
13:14,16;14:4;48:2,
3;109:14,16

**limited (16)**
19:3;22:18,23;31:19;
44:9,17;45:3,8;57:18;
90:5;93:20;98:23;
108:2,2;115:10;120:19

**limited-universe (1)**
77:8

**limits (2)**
29:20;92:5

**linked (1)**
89:6

**Lipton (11)**
72:9,11,11;99:22,24,
24;101:12,13,14,21;
110:15

**liquidate (2)**
106:3,6

**liquidation (1)**
106:24

**Lisa (1)**
40:8

**list (22)**
44:25;51:24;52:3,5;
58:4;64:8;81:15;84:1,
5,7;101:3;107:12,19;
109:12;111:10,18,18;
112:3,4;114:18;
115:25,25

**listed (1)**
111:15

**listen (1)**
32:25

**listening (1)**
87:4

lists (2)
75:21;112:14

**literally (1)**
80:18

**literature (2)**
88:7;104:8

**literature's (1)**
104:16

**litigation (5)**
14:18;39:5;46:25;
57:3,13

**little (7)**
8:24;64:18,21;69:7;
100:13;119:5,15

**live (1)**
62:14

**lives (1)**
113:25

**local (15)**
6:10;26:5,7,9,9;
39:21;44:3;49:20,24;
50:9;85:4,13;89:4;
93:6;109:11

**localities (1)**
44:3

**located (1)**
44:4

**lock (1)**
80:8

**lockbox (1)**
69:15

**logic (2)**
67:7,12

**long (13)**
22:23;37:21;38:12;
39:9;42:7;47:3;53:24;
64:16;76:5;106:5;
109:21;110:2,19

**long-arm (1)**
12:10

**longer (4)**
23:12;27:25;76:21,
24

**long-term (1)**
104:18

**look (4)**
58:4;78:20;96:19;
116:16

**looked (1)**
63:22

**looking (9)**
10:2;38:21,22;39:1;
78:16;96:12,24;
102:13;115:10

**lose (1)**
102:10

**loss (1)**
109:23

**lost (1)**
68:23

**lot (27)**
12:19;14:24;28:13;
32:22;33:6;58:6;73:18,

18;79:25,25;80:1;
87:19,21,23;88:2,3,25;
89:6,7,8,17,20;92:4;
102:14;103:16,16;
115:14

**lots (22)**
11:21;44:11;54:12;
56:17;67:2;88:11,13,
19;90:8;92:6,9;93:3,
20;98:23;100:18,19,
23;106:21;109:9,23;
111:4;112:5

**loud (2)**
27:20;76:18

**lowest (1)**
42:19

**loyalties (2)**
29:3,24

**loyalty (3)**
19:1;28:3;55:5

## M

**mail (5)**
78:11,23,23;79:5,22

**mailing (2)**
48:23;81:15

**main (1)**
22:17

**maintain (1)**
20:21

**maintained (1)**
11:6

**major (1)**
100:12

**majority (4)**
103:6,14,15;108:20

**makes (2)**
23:17;33:22;36:12;
55:9;57:23;96:2

**making (4)**
38:4;9;41:25;62:23

**malpractice (2)**
90:20;94:15

**managing (1)**
119:16

**mandatory (2)**
95:24;96:1

**manifested (1)**
53:16,25;54:1

**manner (3)**
6:15;49:11;84:10

**manufactured (1)**
9:23

**manufacturer (3)**
11:7,9;12:6

**many (18)**
7:22;15:4,8,12;23:8;
30:7;38:2;44:22;46:5;
53:25;66:8;75:23;
78:13;79:3;87:7;103:2,
3;113:18

**map (1)**

46:12

**Marc (1)**
72:11

**March (3)**
71:3;73:12;93:8

**Margaret (1)**
9:21

**Mark (1)**
99:24

**marked (2)**
24:25;25:3

**markedly (1)**
69:23

**married (1)**
10:13

**marshal (1)**
105:25

**Maryland (1)**
47:19

**mass (1)**
27:14

**Massachusetts (1)**
98:7

**material (2)**
63:5;71:14

**materials (1)**
63:19

**matter (12)**
10:1;17:3;20:21;
21:2;23:8;36:11;53:19;
65:4;85:16;95:4,11,21

**matters (6)**
7:15;28:2;29:6;
42:14;43:2;57:25

**maximize (3)**
15:3;16:14;66:23

**may (86)**
11:8;13:20;14:3,5,
16;15:15;18:12;19:14;
24:6,7,8,10;25:6,7;
28:12;29:23;30:12;
37:17;42:1;49:8;51:5;
53:15;56:5,8;59:15;
63:18;64:25;65:16,17;
68:23;74:23;76:9;
78:17,24;79:1,1;80:10,
15,17,18,18,19,21,21;
81:4,15;87:8,8,20,25;
88:12,24;89:1;90:5,6,
8;92:9,15;93:2,13;
94:16,24;96:11;
100:17;101:4,4;
105:19;108:6;109:25;
110:6,8,11,11,16;
112:8;114:10;116:24;
117:16,19,22;118:4,5,
8,11,16,19

**maybe (7)**
12:13;14:10;58:8;
71:21;78:15;80:4;
102:15

**MDL (34)**
15:5,8,24;16:3,7,8,

15,18;19:4;22:18,23;
23:6,9,11,11;32:7;
42:14,16;54:25;55:1;
56:18;57:6,7,19;74:19,
22;75:1,14;76:14;88:5;
90:2;91:13;92:1,7
**mean (5)**
50:20;67:24;78:12;
102:22;119:24
**means (2)**
10:12;103:12
**meant (3)**
97:7,7;114:2
**mechanism (1)**
106:1
**mediation (1)**
107:1
**medical (7)**
51:17;54:25;69:18;
83:14;86:22;88:6;
104:8
**medication (1)**
100:15
**medications (3)**
100:25;101:2;103:10
**meet (2)**
23:25;43:3
**meeting (1)**
49:25
**meetings (1)**
79:11
**megacases (1)**
58:5
**Meisler (2)**
95:18,18
**member (1)**
9:24
**members (6)**
13:4;24:20;81:8,23;
82:6;113:19
**memorandum (1)**
42:4
**meningitis (2)**
13:10;89:25
**mention (5)**
11:25;80:9;90:25;
103:23;114:2
**mentioned (9)**
10:10;18:3;19:1;
23:19;30:18;102:24;
114:14;116:21,22
**Merck (1)**
78:3
**merits (6)**
13:24;17:12,17,24;
28:7,18
**mess (2)**
14:14,14
**messed (1)**
113:20
**Michigan (5)**
103:4,6,7,14,14
**Mickey (1)**

64:4
**mid-May (1)**
69:12
**might (15)**
42:7;51:18;52:6;
62:23;63:10;66:1;
71:18,19,20;73:2;
90:11;106:19;108:8;
109:14;114:7
**Mike (2)**
7:5;9:18
**Mikels (13)**
30:4;33:15,15,18,24;
34:2,9;37:1,2,9,13,15;
39:13
**million (2)**
79:4,4
**millions (1)**
80:17
**mind (1)**
100:6
**mindful (3)**
29:1,3;118:18
**minimize (1)**
13:18;17:18;18:9
**minimum (1)**
104:20
**ministerial (2)**
41:20,21
**minor (1)**
82:5
**Mintz (1)**
30:5
**Minutes (4)**
74:11;100:6;112:21;
115:16
**mirror (1)**
38:25
**miscommunication (1)**
60:22
**mislabeling (2)**
90:19;94:15
**misplaced (1)**
46:19
**miss (1)**
25:10
**misspoke (1)**
118:25
**mistakes (1)**
113:24
**misunderstanding (1)**
52:25
**misunderstood (1)**
120:16
**mixed (1)**
70:20
**modest (1)**
51:3
**modifications (1)**
112:17
**moment (10)**
21:19;25:4;30:12;
41:6;45:22;61:16;81:4;

110:14,25;116:2
**moments (2)**
10:8;63:4
**Monday (1)**
41:7
**Monday's (1)**
41:8
**monetary (1)**
55:17
**money (6)**
42:18;54:3;55:8;
58:11,16;105:8
**monies (1)**
24:11
**moniker (1)**
51:25
**monitor (1)**
47:14
**month (2)**
73:10;75:13
**monthly (1)**
93:8
**months (8)**
33:8;63:20;72:24;
73:7;79:24,24;104:10,
21
**Moore (1)**
6:25
**moot (1)**
17:11
**more (39)**
10:15;11:13;14:17;
18:12;30:6;33:22;36:1;
45:3;50:11;52:7;53:25;
56:9,25;57:22,23;58:6,
10;59:9,12;68:4;71:20,
21;75:13;78:2;79:11;
83:2,24;85:10;87:23;
89:1;90:10;92:1,10,23;
93:11,19;103:7;108:8;
115:14
**Moreover (2)**
54:8;100:22
**Morris (1)**
6:25
**most (14)**
11:17,22;17:3;41:20;
44:20;45:14;46:21;
51:9;64:10;75:8,9;
83:23;100:7;108:21
**motion (68)**
6:8,11,16;7:16,18;
8:4,13;9:6;10:10;13:6,
17,21;14:2,7;15:9;
17:11,21;18:5,19,21;
19:10;20:15,19,24;
21:8,10,13;22:6,7,11;
23:1;24:4,5;25:19,25;
26:3,4,5,12,17;27:3,9;
30:25;32:15;33:14;
40:18,22;41:19,20;
42:20;43:7;45:11;
59:22;60:6;64:15;

72:22;73:13,21;74:23;
80:6;87:14,14,15;96:3;
98:15;109:6;111:15;
113:23
**motions (10)**
7:17,23;14:24;20:12,
25;25:21,24;26:3;42:5;
113:19
**motive (1)**
21:13
**Mouse (1)**
64:4
**movant (1)**
22:7
**move (7)**
7:11;9:13;57:18;
64:23;91:14;102:8,16
**moving (4)**
35:17;59:6,6;120:15
**MPA (21)**
9:23;13:12;71:5;
78:15;79:3;87:20;
88:12,20,25;89:7,18,
20;90:8;92:9;93:3,14,
20,21;100:16,18;
103:16
**much (29)**
10:15;15:9;16:12;
18:8;23:25;26:7;38:6;
45:1;53:20;55:22;56:9,
19;58:6;60:17;61:5;
72:5;76:4;77:22,25;
78:1,4,18;94:20;
105:24;106:11,22,23;
108:17;112:22
**multiple (3)**
11:21;27:20;64:1
**multiplicity (2)**
14:21;75:2
**MURPHY (12)**
40:5,6,7,7,11,14,24;
41:3,5,7,12,16
**must (5)**
11:12;60:20;109:7,
18,20
**Mutual (5)**
27:6;32:9,24,24;
33:16

**N**

**name (5)**
16:1;32:4;74:25;
76:8,14
**named (3)**
42:11;90:24;91:2
**names (40)**
43:18;44:8,17;47:10,
16;48:5,7,8,24;56:19;
57:1,14;63:2;64:1,3,4,
5,5,6,7,19,21;69:9,16,
16;70:4;75:17;88:1;
103:10,13,19,22;

107:13,15,21;111:5;
112:7,10;119:12;
120:12
**naming (1)**
94:15
**narrowed (1)**
77:10
**narrowly (1)**
83:2
**Nashville (1)**
19:24
**national (1)**
42:24
**nationally (2)**
54:14;55:6
**nature (2)**
50:7;52:1
**near (1)**
67:18
**nearly (1)**
13:15
**NECC (55)**
9:23;10:2,17;11:14;
12:20;16:1,2;20:6,7,
11;22:1,2,3;33:10;
42:10;43:10,16;44:8;
54:8;56:4,20;58:7;
61:8;64:2;65:3;68:4;
74:24,25;75:10;76:8,
14;87:17,20,21;88:8,
14,22;91:2;93:22;
100:24,25;101:4;
102:3,6;103:10,19;
106:18,20;107:8;
108:5,6;117:16;118:5,
9,17
**NECC's (4)**
10:8;12:8;67:4;
93:11
**necessarily (1)**
101:1
**necessary (4)**
59:17;61:7;77:5;
94:8
**necessity (1)**
12:1
**NEC's (1)**
93:14
**need (31)**
14:8;19:18;21:14;
26:9;28:9;45:8;47:7;
48:19;52:7,16;53:21;
59:17;63:6,8;66:10,19;
67:16,23;71:21;76:2,
20;77:3;82:2;87:6;
92:10;96:23;97:15;
102:14;103:1;106:21;
112:17
**needn't (1)**
41:10
**needs (10)**
8:3;41:23,24;42:1;
55:24;58:25;61:24;

65:20;106:9;118:15
**neglect (2)**
50:8;110:3
**negotiate (1)**
84:6
**negotiations (3)**
59:3,6;67:17
**neither (3)**
17:9;42:10;106:3
**Network (1)**
18:25
**Neurological (2)**
11:1;24:3
**nevertheless (4)**
32:22;49:5;51:5;
57:22
**New (5)**
6:5;66:15;90:17;
91:2;92:22
**news (1)**
74:11
**newspaper (1)**
111:21
**newspapers (2)**
111:14,18
**next (10)**
25:19;27:3;40:16;
41:3,4;60:13;73:3;
84:15;104:10,19
**nice (2)**
12:5;79:6
**nickel (1)**
63:11
**nine (3)**
87:21;88:3;89:7
**ninety (2)**
104:19,21
**ninety-nine (1)**
89:16
**non- (1)**
80:14
**nonbankruptcy (1)**
47:21
**nondebtor (5)**
65:1;66:7,23;67:13;
68:18
**nondebtors (1)**
66:15
**None (6)**
10:9;68:1;78:12;
81:16;88:6;104:5
**nonmeaningful (1)**
20:18
**nonparty (2)**
100:5,14
**nonvictim (1)**
67:10
**nonvictims (3)**
67:15;108:25;112:19
**nor (5)**
42:10;47:23;58:9;
100:16;106:3
**normal (2)**

75:11;102:11
**notably (1)**
54:25
**note (3)**
58:2;97:14;98:10
**noted (2)**
18:25;53:12
**notice (169)**
6:15;21:11,16;42:22,
24;43:5,5,9,12,15,16,
19;44:6,7,16,16,19,19,
23;45:2,9,15;46:1,2,4,
6,9,12,15,16;47:6,8,8,
11,16,19;48:5,9,24;
49:4,4,7,8,9,11,19;
51:4,23;53:19,21;
54:17,18,22,23,24;
55:12,23;56:2,2,12,13,
15,16,20,22;57:9,15;
59:20;61:4,5,9,9,17,17,
19,24;62:18,23;63:6,8,
22;64:24;65:12,13;
66:2,12,19;67:3,5,12,
22,25;68:14,19;69:2,3,
8,16;70:3,12,12;77:25;
78:1,4,23,23;79:8,13;
80:6,8,13;82:22;85:9;
87:16,16;88:15;89:14,
17;90:4,6,11,14,21;
91:2;92:14,15,20,22,
24;93:1,10;94:5,13,18;
95:22,23;97:6,16,19,
22;98:6,15,24;99:3,6,
10,10;102:12,22,23,23;
106:21;107:1,5,20;
108:3;109:6;111:4,11,
12;112:5,14,17,20;
115:11;116:7,22;
118:2,15
**notice' (2)**
53:23;78:11
**notice-intermediary (1)**
45:17
**notice-party (1)**
45:24
**notices (10)**
44:22;48:9;61:18;
69:17;70:14;79:4,23;
98:11;107:19;108:25
**noticing (10)**
55:7;57:25;58:1;
97:9,11;99:11;108:16,
21;109:4,7
**notify (3)**
89:9;100:20;103:22
**notifying (2)**
89:24;103:1
**notion (3)**
20:6;64:25;68:19
**Notwithstanding (3)**
7:20;28:19;29:17
**novel (1)**
8:20

**number (16)**
6:5;7:7;11:25;12:5;
17:10;45:17,18;54:11;
82:24;87:24;89:6;
100:12;102:16;104:11;
109:13;111:6
**numbers (12)**
87:19,21;88:2,3,25;
89:7,8,20;92:4;107:14;
114:6,6
**numerous (3)**
27:14;42:15;43:22

## O

**oath (1)**
74:10
**obfuscating (1)**
88:6
**object (7)**
20:5,7,23:12;31:20;
46:1,12;92:13
**objecting (2)**
15:14;54:10
**objection (35)**
8:25;15:1;17:10,13,
25;18:24;19:5,6,8;
20:1,5;21:3;23:4;
26:12;31:24;35:16;
45:20,20;46:18;47:12,
18;48:16;52:11,13;
54:10;59:21;75:20;
78:20;83:22;87:11;
92:14;95:20;98:17;
99:16;100:24
**objections (24)**
9:1;15:2;17:6;18:25;
20:15;31:6;43:22,24;
45:15,16,17,18,23,24;
46:11,22;59:20;75:14,
22;87:3,4;100:7,11;
109:13
**objectors (1)**
17:8
**obligated (2)**
71:8;98:11
**obligation (7)**
29:20;33:22;37:22;
44:15;48:14;57:17;
97:12
**obligations (5)**
13:1;43:3,4;56:14;
59:5
**oblique (1)**
68:22
**observation (2)**
32:8;65:11
**observations (1)**
43:23
**observed (1)**
71:10
**obtain (3)**
82:21;90:16;91:25

**obtained (2)**
28:8,16
**obtaining (1)**
12:11
**obvious (7)**
10:15,16,17,22;
11:22;47:22;48:21
**obviously (4)**
19:1,7;45:10;71:10
**OCC (5)**
9:24;76:21;114:14,
15,19
**occasion (1)**
24:18
**occasions (1)**
113:19
**occur (1)**
58:18
**occurred (1)**
33:9
**O'Connell (1)**
54:10
**October (6)**
44:1,1;67:16;71:3;
73:22;82:8
**odd (1)**
19:10
**off (7)**
11:20;19:16;20:14;
60:1;65:2;73:13;
118:20
**offer (2)**
33:21;95:9
**office (5)**
31:16;60:24;63:21;
92:19;101:16
**official (5)**
7:3;8:11;31:3;72:17;
79:19
**old (2)**
10:11,12
**older (1)**
12:14
**once (4)**
81:22;82:10;114:14,
15
**one (75)**
10:4,11,19;11:8;
12:1;14:15;15:1,14,18;
17:5,7,11;18:18;19:10,
12;20:1;25:5;26:6;
30:12;32:25,25;35:25;
36:1,2,14;38:6;46:1;
49:13;53:5;54:9;56:22;
62:7;63:10,16;64:2,7,
12,18;65:10;68:10,10;
69:6;71:12;75:5;76:14,
23;78:15,19;81:3;82:4;
89:19;90:7;92:4,9,17,
19;93:2;94:24;95:2,20;
96:18;103:5,9;104:8;
105:5;108:25,25;
109:4,6,23;110:15;

113:21;114:2,13;
118:19
**O'NEIL (2)**
22:14,15
**ones (2)**
69:6;74:2
**one-year (1)**
13:14
**ongoing (1)**
73:5
**only (27)**
10:2;13:12;18:14;
21:25;23:10;24:15;
39:21;44:18;45:8;
48:22;56:16;66:6;
68:13;70:1;74:14;
81:22;87:20;88:11,24;
92:16;100:17;115:10;
117:15;118:4,9,21;
119:10
**onto (2)**
99:10,13
**open (9)**
28:13,14;42:8,13;
47:23,24;48:2;95:8;
117:13
**open-ended (2)**
54:20;56:24
**opening (1)**
56:9
**operations (1)**
54:9
**opined (3)**
97:17,18,19
**opinion (4)**
42:4;50:3;55:21;
63:15
**opinions (1)**
55:20
**opportunity (9)**
30:17;33:11;35:4;
59:16;80:7;83:20;
110:12;116:15;119:7
**opposition (2)**
23:15;88:10
**option (2)**
84:5;111:16
**order (75)**
6:9,12;12:20;15:9,
22;22:17,20,21,22;
23:4,9,17,24:9,24;
26:20;39:18,25;41:10,
11;43:8;45:12,13;
46:21,23,24;47:1,3,3,5;
48:17,17,18,21;49:1,3,
3,14,19;50:1;52:9;
55:23;63:3,3;67:17;
71:6;81:5;82:4,23,25;
83:4;91:16;94:13;
105:4;107:1,20;
108:12,13,15;109:20;
111:3,13,14;112:12,13,
25;113:1,11;115:9,9;

119:9,11;120:9,17,18,
20
**ordered (2)**
85:5;92:16
**ordering (1)**
111:3
**orderly (1)**
8:1
**orders (5)**
34:15;46:21;47:2;
49:25;115:4
**order's (1)**
113:15
**ordinary (1)**
6:10
**ordinary-course (1)**
26:6
**original (2)**
102:6;112:9
**Originally (4)**
27:23;42:20;54:24;
55:4
**others (9)**
15:11,12;17:1;18:8;
24:3;31:7;44:14;46:15;
76:23
**others' (1)**
35:10
**otherwise (9)**
25:3;49:2,25;50:1;
72:1;85:5;95:23;96:6;
97:11
**ought (11)**
107:9,12,18,20;
108:2,7;111:10,20;
112:6,10;114:5
**out (52)**
20:12;21:10;22:10;
30:4;47:20;50:10;51:7;
53:9,24;54:13;56:18,
21;61:5,18;62:9,10,13,
14,15,25;64:8,14,22;
65:16,17,21;66:19;
68:6;69:13,16,17;70:4,
23;71:9;75:24;76:19;
80:2;81:15;87:2;91:22;
98:7;100:11;102:5,17;
104:3,12;105:14;
112:18;113:11;114:15;
116:1,3
**outbreak (2)**
88:19;89:5
**outline (1)**
7:25
**outlined (1)**
28:2
**Outpatient (3)**
11:1;17:9;24:3
**outreach (1)**
77:20
**outset (2)**
15:7;23:22
**outside (2)**

100:21;101:6
**over (17)**
7:10;10:18,18,23;
15:13;21:23;43:17;
44:17;46:11;47:7,16;
59:3;79:20;98:6;
102:11;107:9;112:14
**overabundance (1)**
30:16
**overall (1)**
23:8
**overcome (1)**
24:9
**overexuberant (1)**
58:21
**overlaid (1)**
42:4
**overlap (2)**
71:10,13
**overpaying (1)**
38:9
**overriding (3)**
38:8,18,23
**overwhelming (1)**
75:16
**owe (3)**
18:10,10,16
**owed (2)**
22:4;24:11
**own (13)**
13:5;28:9,17;36:13;
45:21;54:23,24;64:15;
83:6;97:16,20,24;
112:11
**owners (1)**
91:1

## P

**page (1)**
20:6
**paid (6)**
29:17,24;30:7;36:20;
42:3;84:21
**pain (5)**
10:3,3;44:3;54:10;
120:8
**paints (1)**
108:9
**paper (2)**
75:14;95:11
**papers (5)**
7:20;21:4;27:18;
61:11;101:25
**paragraph (8)**
15:17;19:2;83:1,12;
84:14,15,20;85:1
**paramount (2)**
39:4;101:17
**pardon (1)**
117:8
**part (16)**
12:6;22:4;35:7;

53:13;63:14;75:8,10;
79:15;81:11;82:4,5;
83:10;84:3,10;104:18;
113:2
**participant (1)**
68:7
**participate (4)**
69:20,21;84:7;
109:20
**participating (1)**
35:10
**participation (2)**
7:21;73:3
**particular (9)**
13:3,11;24:16;49:18;
55:5;84:17;85:3;88:17;
108:3
**particularly (3)**
26:11;36:19;62:22
**particulars (1)**
59:9
**parties (37)**
14:19;15:14,25;31:7;
35:14;42:11,17;43:9;
46:12;54:10;56:6;74:4,
7;90:10,12,14;91:9;
95:20;97:13,15,23;
99:13;106:9;107:5;
108:6,7;109:5;111:23;
114:18;116:1,15,24;
117:18;118:6,8;
119:16;120:13
**parties' (1)**
118:20
**party (7)**
11:15;17:22;46:6;
49:8;79:7;91:10;96:5
**party-in-interest (1)**
83:20
**past (2)**
7:11;32:10
**path (3)**
67:19,23;69:3
**patience (1)**
7:13
**patient (16)**
46:13;79:10;87:16,
25;89:6,10,17;91:25;
93:19;94:1;96:25;
101:2;103:10;104:6,6,
18
**patients (34)**
43:11;44:8;46:6;
88:2,11,18,21,22;
89:10,16,21,22;90:3,5,
7;91:4;92:2,8;93:1,9,
13;94:4,16;96:11;99:7;
100:23;101:3;102:9;
103:1,7,19,21;107:22;
120:12
**patients' (1)**
104:9
**pattern (1)**

93:8
**Paul (1)**
6:25
**Paula (5)**
6:22;31:13;35:3;
82:18;94:21
**Pause (3)**
30:14;73:24;105:11
**pay (1)**
64:17
**paying (3)**
33:19;38:13;39:9
**payment (4)**
35:6;47:24;77:21;
84:23
**payments (2)**
29:19;36:7
**peculiar (1)**
55:1
**pencil (1)**
15:19
**penciled-in (1)**
16:4
**pending (2)**
26:13;74:24
**people (69)**
26:10;38:3;39:13;
42:18;43:4,12,19,19;
44:9,11,17,24;45:5;
47:11,15;48:7,8,8,22,
24;50:23;51:17;53:20;
56:19,22;57:1;59:15;
61:8;62:18,23;63:6,11,
13;65:8,14;66:8,13;
68:15;69:17;70:7,18,
20,24,24;71:24;73:5;
74:13;75:23;78:15,17,
22,24;79:3;80:18;81:1,
7;82:1;102:12,18;
103:8,16;105:1;
106:16,18,21;107:19;
112:18;114:5;119:12
**people's (4)**
64:3;66:14;68:20;
113:25
**perceive (1)**
99:12
**perceives (1)**
59:10
**percent (1)**
89:16
**perception (1)**
83:25
**perfect (1)**
80:10
**perfectly (2)**
29:16,21
**perhaps (15)**
8:16,17;14:8;17:8;
26:7;30:15;48:20;
54:15;58:20;59:16;
74:4;75:1,13;110:15;
118:15

**period (7)**
21:16;40:19;47:25;
53:25;82:9;88:7;107:9
**periods (1)**
109:14
**permit (2)**
60:14;79:8
**persisted (1)**
77:16
**person (3)**
27:19;76:3;95:10
**personal (4)**
43:1;83:13;106:3,6
**personal-injury (8)**
6:14;15:4;42:3;53:6,
8;80:15;91:21,22
**persons (1)**
106:16
**person's (2)**
68:11,11
**perspective (5)**
23:18;32:12;99:4,17;
105:14
**ph (5)**
57:24;72:10;90:16,
17;120:11
**Pharmacist (5)**
27:5,13;32:9,23;
33:16
**Pharmacy (1)**
6:6
**philosophically (1)**
68:18
**phone (18)**
15:13;19:22;20:3;
22:13;23:3;60:18,19;
63:11;70:24;72:7,12;
75:23;81:8;86:25;93:5;
95:17;99:19;111:23
**phonetically (1)**
77:18
**phrased (1)**
34:11
**physicians (1)**
104:17
**piece (1)**
75:14
**pieces (1)**
79:5
**Pioneer (3)**
110:1,1,13
**PITWD (1)**
107:25
**place (6)**
11:3;21:1;33:10;
42:25;47:4;101:20
**placed (1)**
95:5
**places (6)**
23:4;70:21,23,25;
71:2;111:19
**plaintiff (2)**
33:22;111:9

NEW ENGLAND COMPOUNDING PHARMACY, INC.
Case #12-19882-hjb

July 24, 2013

**plaintiffs (6)**
11:18;14:2;21:15;
23:5;90:12,16
**plaintiffs' (6)**
11:19;12:2;27:16;
39:24;69:10;92:11
**plan (19)**
42:1;53:13,17;55:13,
19;56:5,7;66:6,7,7,7,
18;67:24;68:15;80:3,4;
104:21;108:23;118:19
**plan' (1)**
66:11
**plane (1)**
8:3
**planned (1)**
65:8
**planning (1)**
68:16
**Plant (1)**
38:17
**played (1)**
75:24
**plays (2)**
56:21;113:18
**pleading (1)**
31:18
**pleadings (3)**
10:9;43:21;120:10
**Please (5)**
6:3,20;15:16;40:17;
60:3
**plenty (1)**
79:23
**PLLC (1)**
6:8
**plural (1)**
71:18
**pm (4)**
6:1;60:1,2;120:24
**PMIC (1)**
30:4
**POC (3)**
83:18;84:12;95:14
**POCs (1)**
84:2
**point (30)**
17:12;20:10;27:19;
29:11,15;48:20;53:18;
55:15;56:1;63:19;
66:10,21;67:20;68:17;
69:5;77:23;78:9;81:3;
94:7,24;96:16;100:9,
17;102:5,19;103:6,20,
23;104:3;105:12
**pointing (1)**
90:17
**points (2)**
99:15;102:21
**policy (4)**
27:7;29:19,21;30:8
**popular (1)**
17:3

**population (2)**
66:17;70:25
**position (22)**
17:14;21:18;31:23;
34:13,13,25;36:13;
47:14;60:6;61:11;
62:22,25;63:16;65:18;
67:9,9,11;91:20;95:10;
100:13;101:25;104:22
**positions (1)**
18:18
**possesses (1)**
27:12
**possession (1)**
103:13
**possibility (1)**
42:13
**possible (5)**
15:8;23:9;24:23;
42:17,18;48:3;56:5;
59:8;78:1,4
**possible' (1)**
77:25
**possibly (4)**
60:13;61:5;66:9;
80:19
**pot (2)**
55:18;58:8
**potential (20)**
18:5;45:6;54:4;
55:13;58:7;74:6;75:6;
87:9,12,18,22;88:16;
89:5;90:3;91:4,9;92:8;
94:9,17;102:17
**potentially (5)**
48:13;55:8;74:7;
90:13,13
**power (5)**
50:6,7;57:11,16,17
**practical (1)**
79:9
**practicing (1)**
71:24
**pre-approve (1)**
61:17
**precludes (1)**
18:18
**pre-Code (1)**
8:15
**predisposed (1)**
85:12
**preface (1)**
105:16
**prefer (8)**
25:1;39:7,8;46:8;
47:16;110:8,20;111:17
**preference (5)**
24:19;25:2;50:9,14,
16
**preferred (1)**
16:13
**pre-filing (2)**
12:18;17:18

**pre-judge (1)**
17:24
**prejudice (1)**
23:21
**prejudiced (1)**
110:4
**prepare (5)**
41:24;51:24;104:20,
23;108:14
**prepared (10)**
29:17,22;34:15,20;
35:9,14;51:22;52:9;
57:22;59:14
**pre-petition (1)**
27:7
**prescribed (1)**
92:21
**present (4)**
6:20;8:22;13:12;
15:14
**presentation (1)**
63:18
**presented (2)**
82:25;87:13
**preserve (2)**
34:9;101:18
**pre-suit (2)**
21:11,16
**presumption (1)**
83:4
**presumptuous (1)**
34:21
**pretty (4)**
10:17;78:21,25;94:9
**prevailing (1)**
38:15
**prevent (1)**
56:5
**previously (4)**
16:10;44:23;66:16;
74:5
**primary (5)**
18:6;74:2;77:24;
106:4,5
**principals (1)**
91:2
**prior (4)**
28:20;35:13;43:17;
49:23
**priority (2)**
39:2;52:2
**privacy (1)**
46:13
**privilege (3)**
29:11;30:19;120:12
**privileged (1)**
28:22
**privileges (1)**
28:12
**pro (1)**
9:6
**probably (5)**
33:21;51:9;79:12;

107:22;118:25
**problem (10)**
30:20;34:17,22;
65:14;70:3;86:6;
108:11;109:13;110:5;
113:22
**problems (3)**
12:4;29:8;43:25
**procedural (2)**
17:17;98:2
**procedurally (1)**
96:3
**procedure (4)**
42:25;43:7,13;57:11
**procedures (3)**
6:14;59:18;98:21
**proceeding (11)**
15:24;16:4,7,8,16,
18;22:18;71:17;74:19;
76:10;108:17
**proceedings (2)**
52:17;119:17
**proceeds (2)**
23:25;106:2
**process (35)**
7:22;12:7,9,9,11;
44:18;46:7;48:12;
51:14;52:18,25;53:1;
55:7;56:21;57:5,14,15,
21;58:1;64:11;67:25;
69:11,13;70:16;71:7;
73:9,10;74:3;75:15;
76:5;77:2,4;79:17;
83:22;102:8
**produce (3)**
107:10,12;112:6
**produced (3)**
75:17;87:22;107:11
**product (19)**
12:6;17:11;43:16;
44:8,11;54:11,16;71:2;
73:18;75:11;78:10;
87:17,24;88:14;89:6,
18;92:21;107:8,9
**product-liability (1)**
11:4
**products (20)**
20:21;21:10;22:3;
43:11;44:5,14;56:16;
61:8;78:13;87:21;88:3,
8,12,17;89:8;93:22;
101:4,5;106:17;108:20
**products-liability (1)**
11:5
**professional (5)**
36:22;61:9;62:10;
63:7;69:23
**professionally (1)**
63:8
**professional-retention (1)**
7:17
**professionals (2)**
26:6;29:2

**professionals' (1)**
29:5
**proffered (1)**
104:4
**program (5)**
66:23;67:13,13,22;
68:14
**progressed (1)**
109:24
**promotes (1)**
23:20
**prone (1)**
62:21
**proof (8)**
20:10;76:24;83:9,17;
84:9;93:10;95:9;
104:19
**proofs (8)**
6:12;51:11,14;83:5;
84:22,24;95:5;113:1
**proper (1)**
82:22
**properly (1)**
83:15
**property (1)**
96:5
**proposal (1)**
58:19
**propose (3)**
25:18;27:22;53:14
**proposed (15)**
22:17;27:23,25,25;
29:8;43:24,25;44:6;
51:6;59:18;66:2;82:23;
111:3;112:19;113:1
**proposes (2)**
57:25;58:1,14,18
**proposing (2)**
45:25;51:10
**proposition (1)**
61:7
**prospect (1)**
117:13
**protect (2)**
42:25;95:10
**protecting (1)**
38:16
**protection (1)**
95:5
**protective (2)**
46:23,24
**protects (1)**
68:20
**proud (1)**
81:16
**proves (1)**
53:20
**provide (17)**
27:6;43:4;44:16,24;
45:9;50:1;52:10;65:13;
82:22;83:23;88:1;
89:17;92:16;97:6,16;
98:11;99:6

NEW ENGLAND COMPOUNDING PHARMACY, INC.
Case #12-19882-hjb
July 24, 2013

**provided (14)**
15:21;29:9;32:22;
35:5;42:21,23;44:2;
49:22;65:22;84:7;85:1;
90:1;6;112:10
**provider (7)**
21:6;61:18,19,25;
88:1;93:25;96:14
**providers (14)**
18:2;20:22;43:10;
44:4;87:3;90:24;91:15,
17;92:2;93:4,17;94:16;
100:14;101:1
**provides (5)**
47:5;49:15;52:8;
57:21;81:7;88:15;
93:25
**providing (9)**
22:2;23:10;50:5;
71:8;99:3;103:10,18;
105:14;120:12
**provision (5)**
21:6;35:19;47:1;
90:20;95:3
**provisions (2)**
45:10;90:14
**PSC (64)**
45:20;52:11,14,15;
53:2,5;54:22;55:11,12;
56:13,17;57:19,24;
58:18,20;59:2,9,9;
61:6;62:17;63:10,21,
24;64:7;69:21;72:8;
73:11,15,20;75:12;
76:19,22;77:9;78:25;
79:16;80:17;81:20;
87:8,10,12,15;88:4,9,
14;89:22;90:1,10,15,
16,22;91:3,14,19;92:6;
94:7;99:25;107:11,11;
108:17,22;109:3;
112:1,15;114:19
**PSC's (9)**
52:22;55:10;57:4;
59:21;67:9;78:20;
79:11;89:13;101:25
**public (16)**
51:14;52:4;81:14;
83:4,10,19,24;84:3,10,
12;95:7,14;104:3;
113:2,21;114:4
**public-access-to-papers (1)**
95:3
**publication (3)**
44:2;54:17;97:22
**publications (1)**
44:3
**publicity (1)**
54:13
**publish (1)**
42:24
**published (1)**
111:12

**purchase (1)**
75:11
**purpose (3)**
15:2;69:2;94:3
**purposes (5)**
52:21;64:1;69:18;
114:5;120:19
**pursuant (1)**
21:7;26:5;46:20;
98:4
**pursuit (1)**
64:13
**pushed (1)**
91:14
**put (15)**
21:4;41:10;47:14;
49:19;51:17;67:23,24;
71:20;76:10;95:10;
97:25;104:15;107:17;
113:22;120:20
**puts (1)**
97:11
**putting (1)**
19:18

**Q**

**qualified (2)**
27:18;46:22
**quandary (1)**
14:4
**quarterly (1)**
39:19
**quick (1)**
114:13
**quicker (1)**
57:2
**quickly (3)**
72:24;113:23;120:5
**quite (2)**
19:11;38:22
**quote (1)**
92:24

**R**

**raise (5)**
51:1;85:1;95:2,12;
100:9
**raised (6)**
15:25;24:2,13;45:19;
48:4;49:17;51:2;69:6;
84:17;87:7;102:22;
109:13;118:2;120:8,8,
10
**raises (1)**
67:15
**ramped (1)**
33:5
**range (1)**
58:7
**rather (4)**
62:24;67:4;101:16;

110:7
**rationale (1)**
120:2
**rationales (1)**
104:4
**re (1)**
38:17
**reach (5)**
42:16;73:20,23;
113:15,20
**reached (1)**
100:10
**reaching (1)**
87:2
**read (7)**
11:23,23;15:12;16:4;
23:9;73:18;76:11
**readily (3)**
44:25;45:1;48:25
**reading (2)**
39:6;76:20
**reads (1)**
111:16
**ready (2)**
32:11;35:20
**real (12)**
19:13;57:1;60:9;
63:5;65:4,14,14,15;
73:1;74:10;81:12,14
**realities (1)**
79:9
**really (19)**
10:21;11:22;34:17;
61:1;63:4;65:1;67:2;
68:21;74:6;75:4;77:23;
78:12;94:8;95:9;
102:17,18;103:24;
107:16;114:16
**realm (1)**
95:14
**reason (16)**
38:5;46:8;54:19;
59:13;65:24;69:25;
71:4;74:1;76:22;83:19;
92:25;93:24;95:13;
102:18;103:17;112:7
**reasonable (7)**
35:7;36:10;38:24;
48:23;59:19;82:9;99:6
**reasonableness (1)**
36:3;40:1
**reasonably (2)**
42:23;44:10
**reasons (16)**
13:7;22:10,10;23:19;
27:17;41:22;46:19;
47:22;62:20;69:24,25;
75:1;94:10,11;96:10;
98:14
**rebuttable (1)**
83:4
**recall (5)**
34:12;44:22;48:9;

70:12,14
**Recano (3)**
54:23;55:4;99:11
**Recano's (2)**
55:3,6
**receipt (1)**
75:25
**receive (7)**
61:9;88:8;100:15,16,
18,25;112:12
**received (18)**
43:16;44:8,11,14;
54:15,16;56:16;61:8;
89:17;92:3,9;93:2,2;
100:23;101:4,4;
106:17;112:4
**receiving (1)**
93:19
**recently (1)**
57:12
**recess (1)**
59:25
**recipient (1)**
94:1
**recipients (2)**
44:22;70:6
**reckless (1)**
89:20
**recognized (1)**
55:6
**recognizes (2)**
51:12;68:7
**recommendation (2)**
69:22;91:5
**recommends (1)**
109:4
**recompense (2)**
73:4;81:2
**reconsideration (2)**
40:18,19
**record (13)**
17:20;20:10;32:2;
36:15;60:1,2;62:15;
72:20;83:10;84:10;
104:3;113:2,21
**records (10)**
36:13;55:1;83:7;
84:3;92:21;95:7;97:16,
20,20,24
**recoveries (2)**
24:19;118:6
**recovery (1)**
109:17
**redaction (1)**
51:20
**redone (1)**
105:3
**reduce (2)**
77:7;79:18
**reducing (1)**
104:24
**refer (1)**
15:17

**reference (7)**
84:20;85:4;91:11;
94:5;105:19;110:25;
113:1
**referenced (3)**
40:9;75:18;83:12
**referred (3)**
16:10;27:8;29:19
**referring (1)**
95:4
**reflect (3)**
22:21;93:19;94:4
**refused (1)**
69:21
**regard (6)**
14:1;17:21;32:21;
79:24;80:7,24
**regarding (1)**
85:1
**regardless (2)**
52:12;118:19
**regards (1)**
102:4
**regime (1)**
53:19
**regionally (1)**
54:14
**registered (1)**
27:13
**regularity (1)**
113:24
**regulate (1)**
49:11
**Regulations (1)**
46:24
**reimburse (1)**
47:15
**reimbursed (1)**
46:2
**reimbursement (7)**
36:9;38:21,22;39:2;
99:1,8;107:21
**reintroducing (1)**
8:8
**reiterate (2)**
89:3;101:24
**reject (1)**
70:1
**rejected (1)**
98:16
**Relafen (1)**
77:17
**relapses (1)**
104:13
**relate (2)**
87:19;88:24
**related (8)**
7:18;21:4,6;26:5;
57:5;84:15;89:25;
99:10
**related-to (1)**
15:25
**relates (5)**

**NEW ENGLAND COMPOUNDING PHARMACY, INC.**
Case #12-19882-hjb

July 24, 2013

17:6;95:2;102:1,1;
103:18
**relating (2)**
74:24;88:19
**relationship (2)**
32:9;36:25
**relatively (2)**
32:24;106:11
**release (5)**
66:23;67:13;91:18;
112:8,9
**releases (12)**
55:14,16,22;65:1;
66:8;68:19;117:2,5,7,9,
17;118:12
**relevant (1)**
28:16
**relief (10)**
6:16;14:9,13,24;
15:3;19:3;20:17;83:2;
96:2,5
**relieved (1)**
33:21
**rely (1)**
88:10
**relying (2)**
31:22;35:16
**remain (4)**
51:11,12;63:14;
95:14
**remainder (1)**
20:15
**remaining (9)**
7:25;9:1;42:8;45:23,
23;48:15;98:18;99:1;
113:2
**remarkable (1)**
26:13
**remedy (3)**
20:18,18;21:5
**Remember (1)**
64:1
**reminded (1)**
93:13
**reminding (1)**
105:16
**removal (2)**
16:6,17
**remove (1)**
16:11
**removed (4)**
16:3,8;23:6;91:12
**rendered (1)**
49:22
**rendering (1)**
36:23
**repeat (2)**
19:2;101:24
**replete (1)**
104:16
**report (1)**
114:15
**reported (3)**

13:10;23:24;71:1
**reports (3)**
74:11,12,15
**represent (15)**
6:21;8:23;9:20;13:2,
3,4;27:19;28:1;33:5;
70:17;81:19;95:19;
100:5;103:15;120:7
**representation (4)**
20:4;28:20;31:18;
91:8
**represented (4)**
6:10;27:24;90:22;
102:6
**representing (7)**
6:25;7:6;33:10;
41:12;72:8;104:11;
105:1
**represents (1)**
86:21
**request (18)**
14:17;40:2;70:11;
81:7;83:9,21;84:2,8,
12;85:16;92:14;94:3,
12,17;98:15,19;99:5;
107:21
**requested (9)**
30:17;43:13;57:10;
82:23;83:2,18;85:6;
108:12;120:24
**requesting (1)**
95:22
**requests (4)**
14:17,20;41:21;
90:15
**require (11)**
36:21;43:14;49:13;
74:10;93:17;103:19,
21;104:5,6,18;105:6
**required (17)**
34:4,18;37:21;39:6;
44:7,23;47:24;88:1;
89:9;90:21;93:5,9,15;
94:3;105:3;106:14;
107:10
**requirement (4)**
12:18;17:18;94:18;
97:19
**requirements (5)**
6:13;21:16;96:20;
105:24;115:3
**requires (7)**
14:15;21:22;35:19;
39:19;49:4;68:1;74:9
**requiring (8)**
38:10;46:4;49:14;
90:10;98:24;100:20;
101:3;114:17
**resembling (1)**
56:10
**reserving (1)**
36:8
**resolution (6)**

10:1;19:5;32:19,20;
50:11;56:25
**resolve (2)**
87:4;107:2
**resolved (8)**
7:24;8:25;29:8;
37:21;45:14,25;59:19;
98:20
**resolves (1)**
23:4
**resolving (2)**
7:22;42:8
**resources (1)**
67:6
**respect (37)**
7:23;8:14;18:8;
22:16,22;23:1;24:2,4,
13;26:17;27:15;28:2;
29:2,6;30:18,25;31:20;
36:13;40:8;44:5;47:12;
60:6;67:11;76:7;81:6;
83:1,3,11,17;87:3;95:7,
10;98:15,19,24;100:5;
108:23
**respectfully (7)**
20:4,9,24;21:22;
22:5,9;94:12
**respects (3)**
14:15;72:25;73:17
**respond (4)**
71:7;89:13;104:20;
116:20
**responded (1)**
10:9
**responding (2)**
14:20;70:11
**response (8)**
20:6;22:10;26:18;
43:24;46:19,25;81:6;
96:17
**responsibility (3)**
24:22;60:25;112:9
**responsible (5)**
31:8;74:14;90:11;
103:1;109:8
**rest (2)**
102:20;105:10
**restrictions (2)**
29:4;47:4
**result (6)**
9:22;52:13;53:2;
93:11;105:23;109:23
**results (1)**
70:20
**retain (5)**
6:7;26:4,5;27:4,22
**retained (3)**
27:5;28:4;30:4
**retention (5)**
27:23;29:13;31:16,
25;35:16
**return (3)**
62:12;70:8,21

**reveals (2)**
52:24;59:9
**reversal (1)**
12:3
**reverse (1)**
82:25
**review (7)**
28:9;30:17;31:20;
35:5,20;36:24;51:19
**reviewing (1)**
35:1
**revise (1)**
22:20
**revised (6)**
29:14;41:11;94:4,13;
112:19;116:7
**revision (1)**
15:9
**Richard (1)**
33:15
**rid (1)**
55:2
**right (48)**
6:19;9:10;16:23;
19:25;23:2;25:5;26:7,
19;33:2;34:24;36:8;
39:17;40:13,19;41:14;
59:24,25;60:5;62:4,8,8,
19;63:13;64:1,16,17;
65:7,19,21;66:1,13;
68:13,24;70:15;72:13,
15;83:5;93:19;96:4;
99:20;102:12;105:13;
115:12;117:4,6,12;
119:20;120:3
**rights (17)**
34:9;37:18;65:2,16;
66:15,20;68:20,23;
71:14;76:24;108:6;
116:24;117:15;118:8,
9,16,20
**ringer (1)**
19:19
**ripe (1)**
24:5
**rise (3)**
6:2;60:3;81:14
**risk (12)**
23:5,7;38:6,14;
87:25;88:23;89:6,11,
24;90:3,5;93:13
**risks (1)**
37:4
**road (2)**
12:4;14:6
**role (7)**
52:25;53:1;57:3,4;
59:10,11;113:17
**romanette (6)**
15:19,20,21;16:6,9,
10
**Ron (1)**
95:18

**room (2)**
65:6,7
**Ropes (1)**
114:11
**round (1)**
67:5
**routine (1)**
62:19
**Rudnick (5)**
7:3;8:11;72:20;74:3;
81:21
**rule (19)**
20:25;40:1;49:6,10,
20,24;50:4,5,9,22;
52:16;58:23;61:16;
64:10,20;85:4,13;95:7;
96:2
**Rules (5)**
39:21;52:18;57:11;
74:9;109:11
**ruling (7)**
36:23;40:2,14;76:8;
85:14;86:15;91:24;
120:9
**rulings (1)**
14:12

## S

**Safe (2)**
25:16;72:14
**sake (1)**
112:11
**sales (1)**
90:25
**same (7)**
18:2;19:1;48:8;
52:20,21;84:8;97:25
**sat (3)**
63:21;64:8,9
**satisfied (4)**
19:6;40:21;108:15;
110:20
**satisfies (1)**
120:18
**save (2)**
12:19;115:14
**saved (1)**
101:22
**saying (2)**
61:24;68:3
**Saylor (15)**
42:5;57:9;63:3;
64:11,20;71:11;75:24;
76:6,17,25;77:14,21;
90:2;98:1;107:12
**Saylor's (1)**
81:12
**scandalous (1)**
95:11
**scheduling (1)**
7:11
**scope (6)**

92:5;94:8;98:22,22;
100:21;101:6
**search (2)**
97:20,20
**seated (2)**
6:3;60:3
**Second (15)**
7:15;14:17;17:25,25;
18:24;19:6;47:18;51:2;
63:19;64:23,24;67:8;
68:17;74:17;103:23
**secondary (2)**
106:25;108:24
**secondly (3)**
19:2;33:5;77:6
**Section (2)**
95:2,8
**secured (1)**
38:20
**Security (2)**
107:14;111:6
**seeing (1)**
85:11
**seek (5)**
14:9;24:19,22;36:9;
96:1
**seeking (6)**
20:18;58:22,22,23;
64:1;109:6
**seeks (1)**
20:17
**seem (6)**
14:13;17:3;43:25;
64:18;78:19;79:18
**seems (12)**
8:18;11:17;35:25;
36:1,2,11,17;41:20;
53:9;64:21;69:6;108:4
**select (1)**
92:19
**selected (1)**
55:4
**self-evident (1)**
48:18
**seller (1)**
11:6
**send (17)**
25:1;39:17;41:11;
43:16,19;44:7;47:16;
56:15;61:18;62:25;
66:12,19;92:20;95:23;
96:11;110:23;111:3
**sending (4)**
62:15;70:14;107:18;
113:11
**sends (2)**
69:16,16
**sense (5)**
23:18;36:12;57:23;
72:25;105:1
**sent (10)**
9:8;39:21;47:11;
56:18;62:9,10;70:4;

93:16;94:5;113:19
**sentence (2)**
48:20;118:22
**separate (4)**
28:5;47:1;91:22;
108:21
**separately (2)**
83:12;107:14
**September (5)**
9:22;13:15;42:21;
44:1;116:1
**serious (2)**
49:12;89:25
**seriously (4)**
13:1;18:23;50:20;
54:1
**serve (3)**
12:10;40:25;52:21
**served (3)**
21:11;35:25;71:7
**service (3)**
12:7,9,11
**services (3)**
36:23;49:22;69:23
**session (5)**
60:4;71:18;94:8;
110:17,22
**set (12)**
20:12;22:10;40:22;
49:23,24;53:18;54:6;
58:24;59:13;91:23,23;
94:10
**setting (4)**
58:21;102:4;115:21,
23
**settlement (9)**
42:17;55:15;59:4;
74:2;77:2,4;80:3;82:3;
91:17
**seven (2)**
72:23;73:7
**seventy-some-odd (1)**
70:6
**severe (1)**
48:13
**shall (4)**
11:5;49:8;110:8,9
**share (7)**
28:16,19,25;29:4,5;
85:13;97:25
**shared (2)**
45:4;61:5
**shift (1)**
99:13
**shifts (1)**
99:9
**short (4)**
48:7,24;56:23;
107:20
**shot (2)**
9:23;78:15
**showing (2)**
50:8;92:21

**shows (1)**
57:16
**sic (3)**
86:21;93:14;104:21
**sick (2)**
73:5;103:16
**side (4)**
18:13;27:15;78:3;
82:2
**sight (1)**
102:10
**sign (2)**
24:25;26:20
**significant (2)**
7:21;74:8
**significantly (2)**
76:17;77:10
**silly (1)**
64:21
**similar (2)**
107:15;114:9
**similarities (1)**
52:20
**similarly (1)**
99:14
**simple (3)**
12:4;51:19;63:14
**simply (18)**
26:20;34:20;46:9,17;
49:15;50:9;51:24;55:8;
58:23;68:21;91:9,9;
97:21,25;99:6;108:24;
109:9;118:15
**sit (2)**
37:1;111:9
**site (2)**
89:15,15
**sitting (1)**
118:3
**situated (1)**
99:14
**situation (3)**
35:12;67:5;83:14
**situations (1)**
71:3
**six (1)**
104:21
**sixty (3)**
49:24;104:19;116:1
**sixty-one (2)**
68:12,13
**Skadden (2)**
95:19;102:24
**skepticism (1)**
97:25
**Sloan (1)**
32:6
**slowly (1)**
32:21
**small (4)**
13:13;32:24;58:10;
68:11
**smaller (1)**

69:6
**snapshot (1)**
105:2
**Sobol (21)**
60:8;16,17,20,22,24;
61:14,19,21,23;62:1,5,
7;72:3,5,9;74:18;
75:18;77:9;79:16;
110:16
**Sobol's (3)**
77:16,23;78:9
**Sobor (1)**
72:10
**Social (2)**
107:13;111:6
**sole (1)**
28:3
**solely (6)**
13:18;17:17;28:1,1;
29:18;44:20
**solicitation (3)**
58:17;81:16;98:9
**solid (1)**
32:25
**somebody (4)**
36:20;62:13;100:3;
111:20
**someone (10)**
32:12;35:7;52:6;
53:6;57:24;72:7;74:15;
79:17;80:14;103:25
**sometime (3)**
69:11;105:8;116:1
**somewhat (5)**
7:18;8:20;34:11;
54:3;65:23
**somewhere (1)**
14:9
**soon (4)**
42:17,18;47:20;59:8
**Sorry (11)**
6:4;9:9,19;40:10;
72:15;86:5;114:12;
116:4;117:20,21;
119:24
**sort (4)**
38:4;65:23;66:22;
106:25
**sorts (1)**
66:24
**source (1)**
35:6
**sources (1)**
28:24
**South (1)**
25:14
**speak (9)**
9:1;19:7,25;32:23;
33:11;35:10;100:3;
103:4;104:11
**speaker (1)**
8:9
**speaking (4)**

32:14,16;35:12;
106:11
**special (3)**
6:8,10;26:4
**specific (22)**
46:24;49:9;52:18;
78:9,11;84:16;87:19,
21;88:3,11,19,25;89:8,
20;90:8;92:4,9;93:3,
20;98:23;99:2;108:8
**specifically (7)**
55:13;74:25;90:24;
100:15,23;102:1;103:4
**speculation (1)**
92:11
**speculative (1)**
54:3
**speed (1)**
91:15
**spent (1)**
73:16
**spirit (1)**
16:13
**split (1)**
105:6
**spoke (1)**
20:16
**spoken (1)**
68:7
**spreadsheet (1)**
51:24
**Springfield (2)**
6:20;111:23
**squarely (1)**
23:4
**St (8)**
10:25;17:9,22,25;
18:8,16;19:22;24:2
**standard (1)**
78:1
**start (4)**
15:21;56:10;102:13;
105:14
**started (1)**
20:14
**starts (1)**
56:9
**state (10)**
12:7,13;14:9;42:10;
48:6;79:2;89:3;93:6;
103:8;109:18
**state-by-state (1)**
48:11
**stated (3)**
15:6;99:16;107:9
**statement (5)**
41:25;55:20,25;56:8,
11;99:2
**States (5)**
23:13;31:12;34:25;
39:22;70:20;82:17;
105:18;113:18;114:8
**stating (1)**

48:21

**status (1)**
59:3

**statute (18)**
8:17,25;10:7,23;
11:3,5,11;12:14,14;
13:14,15,24,25;14:4;
46:23;48:2,3;109:16

**statutes (4)**
12:10;47:21;52:18;
109:14

**statutory (4)**
14:6;43:3;96:1;
105:24

**stave (1)**
11:20

**stay (2)**
11:16;76:16

**stayed (1)**
26:8

**staying (1)**
30:4

**steering (4)**
39:24;69:10;92:11;
111:9

**STERNKLAR (70)**
6:24,24;7:9;16:22;
23:3;25:17,22,25;26:2,
22,24;27:1,3;30:1,10,
12,15,23;34:11,14,17;
35:13;39:17;40:4,9,15,
25;41:6,9,15,18;50:16,
19,22;75:24;81:3;83:1;
85:2,13;115:8,9,13,17,
19,21;116:4,6,10,14,
17,19,21;117:1,6,8,10,
12,20,23,25;118:7,14,
23,25;119:3,6,9,13,19;
120:22

**Steve (1)**
86:20

**still (6)**
20:1;21:11,15;24:7;
51:5;72:12

**stop (1)**
101:10

**straight (1)**
98:7

**straightforward (2)**
61:7,11

**straightforwardly (1)**
62:25

**strategic (1)**
74:25

**strategy (4)**
37:5,25;39:3;42:16

**stress (3)**
13:8;17:13,14

**stretch (1)**
106:19

**strict (1)**
10:25

**strong (1)**

9:25

**strongly (1)**
50:20

**struggled (1)**
118:24

**struggling (1)**
118:10

**studies (2)**
88:10,13

**stuff (2)**
69:10;105:10

**subject (12)**
12:7,8;13:20;16:6,
17;28:23;33:1;37:18;
45:10;76:4;110:11;
115:2

**submissions (1)**
62:21

**submit (7)**
20:24;22:5,9;53:3;
56:11;84:6;95:6

**submitted (1)**
82:24;91:6

**submitting (1)**
103:9

**subpoena (2)**
46:25;98:4

**subpoenas (5)**
56:18;70:5;75:12;
92:2;120:15

**subsection (1)**
49:9

**subsequently (2)**
12:21;104:13

**substance (1)**
20:15

**substantial (3)**
34:19;54:15;55:17

**substantially (1)**
77:7

**substantive (4)**
12:18;61:3;63:16;
82:1

**substantively (1)**
109:22

**substitute (3)**
84:5;109:6;114:7

**success (2)**
77:5;89:14

**successful (2)**
70:13;73:17

**successfully (1)**
29:7

**suffered (4)**
44:10,20;54:2;80:15

**suffering (2)**
73:1;81:1

**suffice (1)**
77:5

**sufficient (5)**
20:9;43:2;47:5;64:6;
93:1

**suggest (2)**

78:9;88:7

**suggested (8)**
21:9;71:16;73:25;
76:17;81:5;84:18;
110:15;114:7

**suggesting (1)**
10:11

**suggests (5)**
88:14;89:15,23;
90:18;92:18

**suits (2)**
13:13;20:24

**summation (1)**
59:17

**superficial (1)**
52:19

**superfluous (1)**
85:8

**superior (1)**
56:25

**supplanting (1)**
52:14

**supplement (2)**
41:11;108:1

**supplemental (10)**
29:9,11;30:17;34:14;
40:9,25;62:18;76:1;
81:6;111:15

**supplements (1)**
63:9

**supplied (3)**
57:24;107:20;108:12

**supply (1)**
111:5

**support (4)**
31:10;34:3;72:22;
73:21

**supported (1)**
101:25

**supporter (1)**
9:25

**supportive (1)**
80:9

**supports (2)**
87:15;91:8

**suppose (5)**
36:6;42:13;59:14;
117:1;118:7

**supposed (4)**
58:24;65:6,7;114:15

**Supreme (1)**
110:1

**Sure (16)**
8:5,20;9:5;11:23;
12:2;30:19;38:9;41:13;
55:21;57:15;66:24;
68:20;99:25;102:12;
103:2;110:14

**surgery (1)**
104:14

**surprise (1)**
93:12

**surprised (2)**

78:9;88:7

64:14;107:2

**switch (1)**
55:8

**sympathetic (1)**
108:21

**symptoms (1)**
53:15

**system (1)**
83:25

**T**

**table (3)**
106:12;107:3,4

**tacks (1)**
78:12

**tailored (1)**
83:2

**tainted (3)**
13:11;100:15,17

**talk (3)**
18:7;102:14;113:7,8;
114:3,10

**talked (5)**
31:4;78:22;112:20;
116:3,8

**talking (8)**
37:9;48:23;65:25;
66:17;79:4;81:4;
101:10;113:14

**target (1)**
108:9

**targets (2)**
108:4,9

**TARIO (3)**
19:23,23;20:2

**technical (2)**
6:4;96:10

**telephone (7)**
8:8;15:14;17:8;
22:25;33:13;45:5;
86:19

**telephonically (1)**
119:23

**telling (4)**
19:16;70:19;89:24;
110:5

**ten (4)**
33:8;38:17;73:16;
111:12

**tenable (2)**
20:21;21:2

**Tennessee (18)**
7:6;8:17,25;9:20;
10:7,24;11:18;12:9,10;
13:9,10;14:3;15:4;
18:1;20:21;21:5,8,24

**tens (1)**
51:18

**term (1)**
80:17

**terminated (1)**
54:9

**terms (16)**
29:14;34:5;37:4,20;
44:15;45:17;57:8;
68:18;69:3;70:16;71:8,
10;80:2;108:15;111:2;
114:15

**test (2)**
20:11;65:18

**testing (2)**
65:5;90:25

**thanks (2)**
33:11;87:1

**that'll (2)**
40:22;68:25

**theoretical (2)**
76:24;78:7

**theory (2)**
20:20,25

**thereafter (2)**
109:24;110:7

**therefore (7)**
37:23;38:13;46:14;
83:7;90:3;100:20;
101:3

**therein (1)**
85:4

**there'll (1)**
80:4

**There're (1)**
75:7

**There've (1)**
10:18

**thinking (1)**
118:15

**third (18)**
46:6;48:4;51:9;56:6;
69:5;70:22;90:10,12,
14;96:5;97:13,15,17;
116:24;117:18;118:8,
20;120:13

**third-party (13)**
55:14,16,22;96:14;
102:23;108:3,9;117:2,
4,7,9,17;118:12

**thirty (4)**
71:23;75:13;104:19;
115:15

**Thomas (8)**
11:1;17:9,22,25;
18:8,16;19:22;24:2

**thoroughly (1)**
55:24

**thought (9)**
17:21;50:13;60:18;
61:22;63:23;71:5;
100:3;104:12,14

**thousands (1)**
51:19

**three (34)**
7:15,23;11:7;16:24;
44:11;45:16;49:17;
53:2;54:12;56:17;61:3;
78:14;79:4,24;87:19,

21;88:2,11,19,25;89:7,
8,19;90:7;92:4,9;93:2,
20;98:18,23;99:1,3;
100:18;104:10
**three- (1)**
73:10
**threshold (1)**
95:21
**throw (1)**
71:9
**thus (1)**
95:8
**tied (2)**
85:4;88:19
**till (4)**
47:20;48:2;76:3;
82:7
**timely (3)**
77:19;84:19,23
**times (1)**
27:21
**timing (3)**
70:1,2;111:2
**Title (3)**
21:12;95:12;105:17
**today (28)**
7:16;10:5;11:8;
12:16;17:4;19:15;
42:24;44:2;65:12;66:5,
6;67:16;73:9;77:12;
79:22;81:11;87:1;
88:20;89:3,13;90:23;
91:8,19,20;104:9;
105:2;111:24;116:11
**together (3)**
65:17;67:23,24
**toggle (1)**
71:21
**told (2)**
32:20;70:19
**tomorrow (1)**
21:10
**tool (1)**
77:5
**tort (6)**
6:14;27:14;52:1,7;
71:11,14
**totally (2)**
11:7;12:16
**touch (2)**
99:8;102:21
**towards (1)**
42:7
**track (3)**
62:11;63:7;69:17
**trade (3)**
86:1,7,10
**transcript (4)**
77:12,18;81:13;
115:15
**transfer (8)**
16:7,12,18;42:5,6,9,
14;76:13

**transferred (4)**
16:3,8;23:6,11
**travel (2)**
25:16;72:14
**traveling (1)**
101:16
**treasure (1)**
91:25
**treat (1)**
53:14
**treated (3)**
83:3;88:23;104:15
**treating (1)**
88:18
**treatment (2)**
86:9;88:21
**tremendous (2)**
14:23;81:1
**trial (1)**
14:7
**tried (3)**
29:7;88:5;118:1
**trove (1)**
91:25
**true (2)**
101:21,21
**truly (4)**
45:21;52:12;54:1;
113:17
**trustee (133)**
6:7,9,11,23;7:1;
13:23;14:15,25;15:1,7,
10;16:5,14;17:14;18:7,
22;22:19;23:2,7,13,15;
27:3,11,12,16,19,22,
24;28:1,4,25;29:6;
31:5,7,12,14,15,17,22;
35:3,17;37:14;39:22,
22,23;41:21;45:19;
46:10;47:9,13;48:11,
14;49:2,15;50:1,25;
51:12,23;52:14;53:1,4;
55:11;56:15;57:22;
59:7;63:15;64:9,15,19;
66:4;69:1,7,22;70:1,
15;73:11,14,16;74:23;
75:8;76:18,18;78:5;
79:10,20,20;80:1,10;
81:5,18;82:17,19,20;
83:8;84:18;87:1,13,18;
90:4;91:6,11;94:11,22;
97:4;98:21,23,25;
100:10;102:7,7,25;
103:22;104:2;107:10,
18;108:13;109:2;
110:10;111:3,7,8,16,
17;112:1,10,13,15;
113:18;114:8,18;
115:9;120:13,20
**trustee's (27)**
7:16;8:25;19:5;23:8;
26:4;29:4;34:25;42:16;
46:3;50:8,14,16;51:10;

52:5;54:22;55:9;57:3,
17;58:15,25;59:3,11;
60:6;63:21;82:21;
94:13;111:15
**try (7)**
32:18;33:5;48:12;
76:21;98:8;101:24;
119:15
**trying (11)**
18:9;59:7;66:5;67:6;
73:16,17;79:14;80:2;
87:4;91:22;101:17
**turn (7)**
17:5;41:19;43:17;
44:17;47:7,16;112:14
**turns (1)**
19:12
**twenty (4)**
49:23;111:13;
112:21;115:15
**twenty-fifth (1)**
79:13
**twenty-five (1)**
68:13
**twists (1)**
19:12
**two (23)**
7:17;14:15;15:18;
17:6,10;18:25;26:2;
35:24,24;41:18;43:17;
44:8;50:13;53:5;74:2;
89:18;98:19,20,21;
99:15;103:5;104:10;
119:16
**two- (1)**
73:10
**type (9)**
8:19;17:13;18:3;
39:20;78:6,7;81:2,16;
91:18
**types (1)**
78:25

## U

**ultimate (2)**
63:5;106:24
**ultimately (2)**
118:5,11
**Um-hum (2)**
85:21;86:8
**Un (1)**
117:10
**unable (3)**
23:5;73:19;100:22
**unaware (2)**
48:1;85:15
**unborn (2)**
117:7,9
**uncomfortable (1)**
46:5
**uncommon (1)**
30:2

**under (33)**
11:25;12:5,13;13:25;
20:11,20,25;21:5,5,12;
24:11;26:8;27:7;29:21;
46:23,23;47:6,21;49:1;
51:5;57:11;58:14,18;
68:23;71:6,15;74:10;
82:24;95:8,12;104:3;
106:19;110:1
**underlying (1)**
28:7
**understandably (1)**
108:17
**understands (1)**
82:20
**undoubtedly (1)**
108:20
**unduly (2)**
56:23;110:4
**unfit (1)**
22:2
**Unfortunately (1)**
7:23
**unhappy (1)**
41:13
**unique (4)**
27:12;32:12;45:22;
93:9
**uniquely (1)**
27:18
**UNISON (1)**
119:21
**United (8)**
23:13;31:12;34:24;
39:22;82:17;105:18;
113:17;114:8
**universe (5)**
74:8;78:16;82:5;
87:9,22
**unknown (4)**
43:6;53:10;70:22;
88:7
**unless (11)**
11:7,9;25:2;36:24;
39:1;49:25;74:13;85:5;
105:20;106:13;120:16
**unlike (1)**
102:10
**unlimited (3)**
58:8,8;78:8
**unliquidated (1)**
109:19
**unliquidated (1)**
24:7
**unmindful (1)**
7:12
**unnecessary (1)**
91:3
**unobjectionable (2)**
51:3,8
**unpublished (2)**
50:3;85:14
**unreasonableness (1)**

31:21
**unsecured (10)**
7:4;8:12;18:12,17;
24:16,16,17,23;39:23;
52:2
**untimely (2)**
84:22;109:25
**untimely-filed (2)**
50:7;51:4
**unusual (1)**
26:14
**unwillingness (1)**
109:10
**unwise (1)**
55:9
**up (15)**
15:11;24:25;25:18;
28:13,14;33:5;34:23;
56:9;63:11;68:24;
78:18;100:3;104:13;
105:6;113:20
**upon (8)**
20:11;45:11,12;50:7;
91:5;92:20;95:24;
97:13
**urge (2)**
33:9;105:4
**USA (2)**
42:24;44:2
**use (7)**
28:18;57:13;69:22;
80:11;92:1;107:17;
112:6
**used (3)**
38:5;57:14;101:2
**using (1)**
110:7
**UST (14)**
31:21,24;35:4,16,20;
49:17;51:2;83:2,14;
84:6,18,25;85:6;86:15
**UST's (1)**
31:16
**usual (2)**
30:6;41:22
**usually (1)**
36:15
**utility (1)**
20:23

## V

**validity (1)**
13:24
**valuable (1)**
67:6
**value (7)**
31:9;66:24;68:6;
106:24;107:16;108:2;
110:18
**variety (1)**
69:14
**various (7)**

27:17;31:7;44:3;
48:6;58:3;70:18,20
**varying (1)**
71:1
**vast (1)**
108:20
**vehicle (1)**
42:2
**vendor (1)**
101:5
**vendors (1)**
101:1
**verbal (1)**
120:16
**versus (1)**
62:5
**vial (1)**
78:18
**vials (1)**
78:14
**victim (3)**
13:3;15:4;67:16
**victimized (1)**
102:9
**victims (22)**
13:3;61:4,6;64:17;
65:2;67:4,21;68:2;
69:4;85:22;87:11;
102:2,3;103:14,14;
104:24;106:10,14,15;
108:19,25;109:9
**view (17)**
13:22;23:14,24,24;
28:8;34:18;44:18;46:3;
51:13,14;55:11;58:25;
66:22;67:20;83:19;
85:8;108:14
**viewed (1)**
24:21
**views (1)**
108:17
**violated (1)**
103:18
**violating (1)**
28:11
**violation (3)**
101:5;103:11,12
**virtually (1)**
79:2
**virtue (1)**
110:3
**vote (1)**
66:18
**votes (1)**
108:23
**voting (1)**
83:22

**W**

**wait (7)**
54:2;56:21;67:3,8,
14;76:21;109:16

**waiting (3)**
71:24;76:3;81:2
**waived (1)**
66:1
**waiver (1)**
90:17
**walk (1)**
21:10
**Walker (2)**
6:16;9:21
**Walsh (1)**
32:6
**Walter (1)**
7:6
**wants (14)**
11:2;28:19;29:16,22;
50:1;51:2;53:5,5;
54:23;58:12;64:7,15;
106:25;110:22
**warn (2)**
117:24;118:3
**warranty (1)**
22:2
**wastes (1)**
30:8
**wasting (1)**
29:19
**wax (1)**
105:20
**way (24)**
8:22;18:13;31:8;
34:23;42:7;50:22;53:9,
9;64:10,10;65:14,15,
23,24;67:12;68:25;
71:20;75:17;88:14;
89:5;98:20;110:18,20;
114:1
**ways (4)**
50:14;53:15;71:1;
73:6
**Web (2)**
89:14,15
**week (6)**
9:12;41:3,4,4;77:11;
120:14
**weekly (1)**
93:7
**weeks (4)**
7:11;13:15;18:22;
73:16
**week's (1)**
77:12;112:13;115:10
**WEINER (5)**
99:21,23;100:4,4,9
**welcome (1)**
111:24
**weren't (2)**
38:9;66:15
**what's (6)**
10:21;14:16;27:25;
46:22;58:1;70:12
**whatsoever (3)**
17:16,23;80:22

**whereby (1)**
43:14
**whole (3)**
24:23;39:5;105:20
**wholesale (2)**
52:14;55:2
**who'll (1)**
54:2
**who's (3)**
9:21;63:8;72:7
**whose (3)**
48:24;66:1;69:23;
108:22;109:24
**wide (1)**
54:13
**widely (1)**
51:21
**wide-ranging (1)**
52:12
**widespread (1)**
7:21
**wife (1)**
10:19
**William (8)**
7:2;8:11;12:24;31:2;
32:5;72:20;120:4,7
**willing (2)**
35:9,20
**wisely (1)**
80:11
**wish (6)**
22:25;30:24;33:13;
60:7;86:19;111:23
**wishes (2)**
26:16;111:1
**withdraw (2)**
105:19;110:25
**within (5)**
22:3;40:18;43:16;
49:22;70:17
**without (11)**
12:1,17;17:23;19:18;
36:1,2;46:2;57:18;
74:8,21;93:11
**woods (1)**
104:12
**word (4)**
79:10;84:19;117:19,
21
**wording (1)**
92:18
**words (3)**
67:19;110:8;117:14
**work (4)**
37:11;51:7;79:25;
80:5
**worked (3)**
14:25;31:16;64:22
**working (3)**
16:14;36:17;37:10
**works (4)**
37:12,14;52:25;80:3
**world (1)**

75:21
**worth (1)**
38:10
**worthwhile (1)**
36:19
**Wow (1)**
60:10
**write (2)**
74:13;96:9
**writes (1)**
74:15
**writing (2)**
64:5;73:24
**written (4)**
61:9;76:8;104:4
**wrong (2)**
52:24;101:20
**wrongful (2)**
106:3,7
**wrongful-death (1)**
6:14

**Y**

**year (3)**
54:8;73:3,3
**years (7)**
38:17;43:17;44:9;
47:24;71:24;81:2;
89:18
**yesterday (1)**
22:19
**young (1)**
10:14

**1**

**1 (1)**
20:6
**1,900 (2)**
78:25;79:3
**1:04 (1)**
6:1
**10 (2)**
111:22;112:17
**100 (1)**
14:21
**107 (2)**
95:2,8
**11 (30)**
6:7,9,11,25;19:2;
23:2;31:17,22;35:17;
37:14;39:22,23;60:5;
77:3;82:21;84:22;
97:12;107:10,18;
108:13;109:2;110:2,
10;111:3,8;112:1,10,
13,15;120:20
**11f (1)**
85:1
**12-19882 (1)**
6:5
**13 (1)**

38:18
**14,000 (4)**
78:15,18,22;79:3
**15 (3)**
13:10;44:1;73:22
**153 (1)**
13:9
**15th (1)**
82:8
**16 (3)**
111:7;112:16;116:14
**160 (1)**
19:15
**16th (1)**
116:12
**170-odd (1)**
19:16
**18th (1)**
9:22
**1970s (1)**
8:18

**2**

**2 (1)**
20:7
**2:39 (1)**
60:1
**20 (3)**
42:21;84:15,20
**200 (1)**
14:21
**2002 (3)**
97:5,7,7
**2002a7 (2)**
49:6,9
**2012 (7)**
9:22;71:3;87:20,22;
88:12;90:8;92:10
**2013 (1)**
93:8
**2016-1 (1)**
39:20
**20th (1)**
44:1
**21st (5)**
87:20;88:12;89:1;
90:8;92:9
**22 (4)**
111:22,25;112:16;
119:17
**22nd (5)**
113:8,14;114:16;
119:8,25
**26 (1)**
21:12
**28 (1)**
105:17
**29 (1)**
21:12
**29-280-102 (1)**
11:4
**29-28-106 (1)**

**NEW ENGLAND COMPOUNDING PHARMACY, INC.**
**Case #12-19882-hjb**

July 24, 2013

10:22
**29-28-106b (1)**
12:14

### 3

**3:03 (1)**
60:2
**3002.1 (1)**
85:5
**3002-1 (1)**
49:20
**3003c3 (1)**
58:23
**327e (1)**
26:5
**350,000 (1)**
77:20
**356 (1)**
54:11
**372 (2)**
82:24;100:12
**373 (1)**
17:10
**391 (1)**
18:25

### 4

**4 (5)**
11:8;12:1,5;15:17;
120:11
**4,000 (1)**
77:19
**4:42 (1)**
120:24
**45 (2)**
64:10,20
**457 (1)**
79:1

### 5

**5 (4)**
11:8,8;78:20,24
**50 (1)**
85:25
**502b9 (2)**
49:21;85:24
**503b9 (4)**
49:20;86:2,3;109:11

### 6

**6 (5)**
73:20;83:1,12;84:14;
87:22
**60 (1)**
74:11
**61 (2)**
10:19;68:5

### 7

**7 (1)**
77:4
**700 (1)**
68:4
**7001 (1)**
96:2
**7023 (1)**
52:16
**741 (1)**
10:19

### 8

**8 (1)**
44:1

### 9

**9006b6 (1)**
50:5
**9007 (1)**
49:10