<pre>
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3

 4   IN RE:  NEW ENGLAND          )  MDL NO. 13-02419-FDS
     COMPOUNDING                  )
 5   PHARMACY CASES LITIGATION    )
                                  )
 6                                )
                                  )
 7                                )
                                  )
 8
                     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV.
 9

10

11
                            STATUS CONFERENCE
12

13

14

15        John Joseph Moakley United States Courthouse
                        Courtroom No. 2
16                     One Courthouse Way
                       Boston, MA 02210
17

18                      October 8, 2013
                          1:30 p.m.
19

20

21
                  Valerie A. O'Hara, FCRR, RPR
22                   Official Court Reporter
          John Joseph Moakley United States Courthouse
23               One Courthouse Way, Room 3204
                       Boston, MA 02210
24               E-mail: vaohara@gmail.com

25
</pre>

```
 1    APPEARANCES:

 2    For The Plaintiffs:

 3        Hagens, Berman, Sobol, Shapiro LLP,
      by THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER,
 4    ATTORNEY, 55 Cambridge Parkway, Suite 301, Cambridge,
      Massachusetts 02142;
 5
          Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ.,
 6    85 Merrimac Street, Suite 500, Boston, Massachusetts
      02114;
 7
          Janet, Jenner & Suggs, LLC, KIMBERLY A. DOUGHERTY,
 8    ATTORNEY, 75 Arlington Street, Suite 500, Boston,
      Massachusetts  02116;
 9
          Lieff, Cabraser, Heimann & Bernstein, LLP, by MARK P.
10    CHALOS, ESQ., One Nashville Place, 150 Fourth Avenue,
      North, Suite 1650, Nashville, Tennessee 37219-2423;
11
          Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ.,
12    366 Elm Avenue, SW, Roanoke, VA 24016;

13        Lipton Law, by MARC E. LIPTON, ESQ., 18930 West Ten
      Mile Road, Suite 3000, Southfield, Missouri 48075;
14
          Branstetter, Stranch & Jennings, PLLC, by BEN GASTEL,
15    ESQ., ESQ., 227 Second Avenue North, Nashville,
      Tennessee 37201-1631;
16
          Law Office of Hugo & Associates, MICHAEL R. HUGO,
17    ESQ., 1 Catherine Road, Framingham, Massachusetts
      01701;
18
      FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
19
          Brown Rudnick, by DAVID J. MOLTON, ESQ.,
20    Seven Times Square, New York, New York 10036;

21        Brown Rudnick, by KIERSTEN A. TAYLOR, ATTORNEY,
      One Financial Center, Boston, Massachusetts  02111;
22
          Cohen, Placitella & Roth, P.C., by MICHAEL COREN,
23    ESQ., 2 Commerce Square, 2001 Market Street, Suite 2900,
      Philadelphia, Pennsylvania  19103;
24

25
```

<u>For the Defendants</u>:

1

2      Harris Beach PLLC, by FREDERICK H. FERN, ESQ.,
100 Wall Street, New York, New York  10005;

3
   Hinshaw & Culbertson LLP, by DANIEL E. TRANEN, ESQ.,
4   28 State Street, 24th Floor, Boston, Massachusetts
02109;

5
   Tucker & Ellis LLP, by RICHARD A. DEAN, ESQ.,
6   1150 Huntington Building, 925 Euclid Avenue, Cleveland,
Ohio 44115-1414;

7
   Michaels, Ward & Rabinovitz LLP, by NIKKI SAMSON, One
8   Beacon Street, Boston, Massachusetts 02108;

9      Todd & Weld LLP, by CORRINA L. HALE, ESQ.,
28 State Street, 31st Floor, Boston, Massachusetts
10  02109;

11     Curley & Curley, P.C., by ROBERT A. CURLEY, JR.,
ESQ., 27 School Street, Boston, Massachusetts 02108;

12
   Lawson & Weitzen, LLP, by RYAN A. CIPORKIN, ESQ.,
13  88 Black Falcon Avenue, Boston, Massachusetts  02210;

14     Ulmer & Berne LLP, by JOSEPH P. THOMAS, ESQ.,
600 Vine Street, Suite 2800, Cincinnati, OH 45202;

15
   Marks, O'Neill, O'Brien, Doherty & Kelly, P.C., by
16  MICHAEL T. HAMILTON, ESQ., 600 Baltimore Avenue, Suite
305, Towson, Maryland 21204;

17
   Donovan & Hatem, LLP, by KENNETH B. WALTON, ESQ.,
18  Two Seaport Lane, Boston, Massachusetts  02210;

19     Sloane & Walsh, LLP, by WILLIAM J. DAILEY, JR., ESQ.,
Three Center Plaza, Boston, Massachusetts  02108;

20
   Nutter, McClennen & Fish LLP, by SARAH P. KELLY,
21  ATTORNEY, World Trade Center West, 155 Seaport
Boulevard, Boston, Massachusetts  02210-2604;

22
   Fulbright & Jaworski, LLP, by MARCY HOGAN GREER,
23  ATTORNEY, and YVONNE K. PUIG, ATTORNEY, 98 San Jacinto
Blvd, Suite 1100, Austin, Texas 78701;

24

25

1    FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE
     OF NECP, INC.:

2

         Duane Morris LLP by MICHAEL R. GOTTFRIED,
3    ESQ., 100 High Street, Suite 2400, Boston, Massachusetts
     02110-1724;

4

     VIA PHONE FOR THE PLAINTIFFS:
5

     Benjamin Perry
6    Danielle R. Anderson
     Heather Seifert
7    Jaime Kendall
     Saamia Dasti
8    Susan Groeden
     Susan Taylor
9    William N. Riley
     Yvonne M. Flaherty
10   Amanda Rhodes
     Anne Andrews
11   Bill Leader
     Brady J. Rife
12   Bryan L. Bleichner
     Daniel L. Clayton
13   Daniel O. Myers
     David Gibson
14   David J. Rashid
     Deborah Gresco-Blackburn
15   Clint Daniel
     Douglas A. Mulvaney
16   Douglas D. Small
     Erin Amos
17   Evan Baker
     Forest Home
18   Frank Federico
     George Nolan
19   Harry M. Roth
     J. Stephen King
20   Jason Denton
     Jeff J. Keiser
21   John Sly
     John T. Alexander
22   Jonathan Nace
     Jonathan R. Krohnfeldt
23   Karen Schaeffer
     Mark R. Dancer
24   Mark Zamora
     Mary T. Gidaro
25   Melvin Wright
     Michael Coren

1  <u>VIA PHONE FOR THE PLAINTIFFS (CONTINUED)</u>:

2  Michael J. Fay
   Mitchell A. Toups
3  Nolan Nicely
   Patrick S. Montoya
4  Randy Kinnard
   Rebecca Blair
5  Rob Briley
   Robert B. Sickels
6  Robert Randall
   Scott Kaminski
7  Scott Sexton
   Sean R. Roth
8  Shannon C. Carey
   Sharon Houston
9  Steven D. Resnick
   Terry A. Dawes
10 Tom Murphy
   Timothy Housholder
11 Stephanie Arndt
   Alyson Oliver1Lauren Ellermann
12 Robert Dean
   Dan Frith
13 Marc Lipton
   Chris Cain
14 Greg Lyons
   Nolan Nicely
15 Elliot Olsen
   Greg Kirby
16 Frank Prokos

17 <u>VIA PHONE FOR THE DEFENDANTS</u>:

18 John-Mark Zini
   Matthew H. Cline
19 Robert H. Gaynor

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2        THE CLERK:  All rise.  Thank you.  Please be

3  seated.  Court is now in session in the matter of in re:

4  New England Compounding Pharmacy, Incorporated Products

5  Liability litigation.  This is Case Number 13-md-02419.

6  Counsel for plaintiffs' steering committee, please

7  identify yourself for the record.

8        MS. PARKER:  Good afternoon, your Honor,

9  Kristen Johnson Parker with Hagens, Berman, Sobol,

01:32PM  10  Shapiro for the plaintiffs' steering committee.

11        MR. SOBOL:  Good afternoon, your Honor,

12  Mr. Sobol with Ms. Parker.

13        MS. DOUGHERTY:  Good afternoon, your Honor,

14  Kim Dougherty from Janet, Jenner & Suggs on behalf of

15  the plaintiffs' steering committee.

16        MR. GASTEL:  Good afternoon, Ben Gastel from

17  Branstetter, Stranch & Jennings on behalf of the

18  plaintiffs' steering committee.

19        MR. ELLIS:  Rick Ellis for various

01:33PM  20  plaintiffs.

21        MR. FENNELL:  Patrick Fennell for the

22  plaintiffs' steering committee.

23        MR. GOTTFRIED:  Michael Gottfried for the

24  trustee, Paul Moore.

25        MR. MOLTON:  Good afternoon, your Honor,

1    David Molton of Brown Rudnick with Kiersten Taylor for

2    the official committee of unsecured creditors.

3                    THE CLERK:  Mr. Fern.

4                    MR. FERN:  Good afternoon, Judge,

5    Frederick Fern on behalf of the retained counsel on

6    behalf of the trustee.

7                    MR. GAYNOR:  Good afternoon, your Honor,

8    Robert Gaynor, Sloane and Walsh on behalf of the

9    individual defendants.

01:33PM  10                    MS. SAMSON:  Good afternoon, your Honor,

11   Nicki Samson, Michaels, Ward & Rabinovitz for Medical

12   Sales Management.

13                    MR. DEAN:  Richard Dean from Tucker, Ellis

14   for Ameridose.

15                    THE COURT:  All right.  Anyone else?

16                    MR. THOMAS:  Joe Thomas on behalf of GDC.

17                    MS. SCHAEFFER:  Karen Schaffer on behalf of

18   multiple plaintiffs.

19                    MS. KELLY:  Good afternoon, your Honor,

01:34PM  20   Sarah Kelly from Nutter, McClennen & Fish for St. Thomas

21   Hospital, St. Thomas Network and St. Thomas Health.

22   With me is Marcy Greer and Yvonne Puig.

23                    THE COURT:  All right.  Good afternoon,

24   everyone.  This is our monthly status conference.  I

25   have the joint proposed agenda, which I will propose to

1   follow.  The first item is update on subpoenas and

2   objections.  Who's going to take the lead?  Mr. Fennell.

3            MR. FENNELL:  Good afternoon, your Honor,

4   this is Patrick Fennell for the plaintiffs' steering

5   committee.  We had a hearing with Judge Boal about two

6   weeks ago in which she ordered the production of a

7   joint -- a chart showing all the various clinics vs.

8   their objections, and this was based on a spreadsheet

9   that the plaintiffs' steering committee had developed

01:35PM   10   early on, and she wanted it submitted as a joint

11   endeavor between the plaintiffs' steering committee and

12   all of the clinics.

13            We have since had a conference call with all

14   of the counsel representing many of the clinics in order

15   to iron out as many of our differences on the chart as

16   we can.  The chart is scheduled to be filed no later

17   than October 16th, and I think objections to the chart

18   as filed are due on October 23d, and then we will have a

19   substantive hearing with arguments in November on the

01:35PM   20   morning of the same day as this Court's next status

21   conference, which I believe is November 7th, and in the

22   process of our conference call, we have ironed out some

23   of the differences, and I think we've also gotten some

24   of the clinics to go ahead and produce documents in the

25   process of all this, so we are making progress and

 1   moving forward.

 2           THE COURT:  All right.  Does anyone else

 3   want to be heard on that topic?  All right.  That's item

 4   Number 1.  Item Number 2, status of mediation efforts.

 5           MR. MOLTON:  Your Honor, David Molton for

 6   the official committee of unsecured creditors, and I'm

 7   here to give your Honor a status report but also to ask

 8   for certain extensions of time of deadlines in the

 9   mediation order supported by a motion of the committee,

10   the plaintiffs' steering committee and the trustee for

11   the purpose of bringing into the tent as many people as

12   possible.

13           And let me give your Honor an update, which

14   I think provides facts that supports our joint motion,

15   and we've had a number of people, your Honor, as your

16   Honor knows, from the docket opt into the mediation, but

17   there is presently large groups of defendants that for

18   various reasons did not opt in by the September 23d date

19   but are presently actively engaged in discussions with

20   one or more of the movants, the plaintiffs' steering

21   committee, the security of unsecured creditors and the

22   trustee in terms of joining into the mediation.

23           My understanding as well as my actual

24   knowledge is that these groups encompass, do encompass

25   and may include in the mediation dozens of clinics, and

1   those discussions are ongoing, and, accordingly, we

2   thought it appropriate to have a short stop of the

3   deadlines in order to allow those groups to continue

4   discussions with the interested parties, have input into

5   such items as the selection of mediators, and give

6   people time in order to what we believe to come

7   participate, come under the tent of this important

8   aspect of this case.

9           For those reasons, your Honor, we believe

01:38PM  10   that the opt-in, which was scheduled for the 23d, should

11   remain open for 21 days, and we'd ask your Honor to

12   extend it for a 21-day period until October 28th to

13   allow these discussions to proceed and hopefully bring

14   in more people under the tent.

15           We don't believe that there's any prejudice,

16   your Honor, for this request.  As my friend,

17   Mr. Gottfried, will point out during his part of today's

18   status report, the bar date has been set by Judge Boroff

19   for January 15th, and, accordingly, until that date, we

01:38PM  20   really won't know the universe of claimants, so the

21   extension of the deadline for a 21-day period will not

22   have a material effect in progressing or impairing the

23   progress of this case, and, second of all, we think it's

24   beneficial to do our best to get as many people under

25   the mediation tent as possible.

1          Also, your Honor, I want to advise you that

2    we've asked for an extension of the dates as well

3    because we've not yet been able with the folks who have

4    opted in to arrive at a consensual mediator pick to

5    offer to your Honor, and instead of belaboring your

6    Honor with various proposals by the parties, we thought

7    it appropriate to give a little more effort in terms of

8    seeking to try and find common ground on the choice of

9    mediator.

01:39PM   10          I do know that the parties are actively

11    engaged in interviewing proposed mediators who have been

12    offered by certain parties.  That even happened as late

13    as yesterday.  The extension will allow also parties

14    that may want to become involved in the mediation the

15    important opportunity to be involved in the mediator

16    selection process as well, and, accordingly, we think

17    it's important for movement in this case for those dates

18    to be extended.

19          Accordingly, in connection with the joint

01:40PM   20    motion we filed today, your Honor, we think it's very

21    helpful and will add value to the mediation effort to

22    extend the opt-in date to October 28th, to extend till

23    October 28th, which is a 21-day period, the date for the

24    submission of a consensual selected mediator, to extend

25    until November 4th, which is 21 days after the date for

1    this deadline, a submission date for mediators for your

2    Honor's consideration if consent is not obtained, and

3    also we thought appropriate to put off till after that

4    period of time the proposal for a fee structure, which

5    was front-ended originally in the mediation order till I

6    think earlier in the deadline process so that, again, we

7    can have all parties that want to become involved and

8    then do become involved, possibly with the help of a

9    mediator, come and bring your Honor a

01:41PM 10   consensually-agreed upon fee proposal for how the

11   mediator will be paid and the mediation will be paid,

12   and then to extend -- and we're asking that that date be

13   November 11th, your Honor, and then November 11th also,

14   your Honor, for the date when the parties would offer a

15   mediation procedures protocol or order to your Honor.

16          So I do know that the trustee and the PSC

17   support this, and we would ask your Honor respectfully

18   to grant those extensions as part of your Honor's case

19   management functions.

01:41PM 20          THE COURT:  All right.  Does anyone else

21   want to be heard on this?

22          MS. DOUGHERTY:  Kim Dougherty, your Honor,

23   on behalf of the plaintiffs' steering committee.  We

24   just want to alert the Court that we have been making

25   progress with respect to potential mediators.  We have

1    been interviewing mediators that were proposed by ARL

2    and Victory, two of what we're calling the national

3    defendants.

4            We have had a phone call yesterday with the

5    potential mediator that both of those parties had

6    proffered up.  The challenge that we are foreseeing and

7    that has been coming up is contemplation of one vs. more

8    than one mediator because various entities have the

9    mediators in their region that they are more comfortable

01:42PM 10    with, so we're working towards trying to come to an

11    agreement to one mediator but also understanding that,

12    for example, the clinics that are in this mediation

13    program out of Florida are offering up other names, so

14    the process is a little bit longer because we are

15    conducting interviews of the folks that have been

16    proposed because we want to give the defendants an

17    opportunity to have a say in the matter, but that is one

18    of the challenges that we're trying to work through,

19    whether or not we're going to be able to move forward

01:43PM 20    with one or whether or not we're going to need more than

21    one.

22            We were asked by the trustee and the

23    official creditors' committee to agree to a three-week

24    extension, and we did so because we are hopeful that the

25    negotiations that are ongoing right now with some of the

1    clinics, with the trustee, and, in fact, some of the

2    plaintiffs' steering committee members -- one is going

3    on today with the Michigan clinics -- will be fruitful

4    and bring in more participants to the mediation program.

5            THE COURT:  All right.  I'm not sure I have

6    a view about one mediator vs. multiple mediators.  That

7    probably means I should just hold my tongue and not say

8    anything at all -- but I can see advantages both ways --

9    and see how this plays out.

01:44PM   10            I certainly would like this process to get

11    going if it's going to work, but I also don't see that I

12    have a problem with this relatively brief extension, and

13    I think ARL has filed a related motion for extension of

14    time within which to file a proof of claim.  I don't see

15    any problem granting that either.

16            Does anybody else want to be heard on the

17    topic generally, either on the two motions pending or

18    mediation generally?

19            (No response)

01:44PM   20            THE COURT:  All right.  Rather than wait the

21    additional time, I think I'm going to grant the joint

22    motion, which I think is docket Number 502, extending

23    the deadline to October 28th with certain additional

24    extensions as set forth in paragraph 8 that take us out

25    to November 11th and also grant the motion of ARL Bio

1    Pharma for extension of time within which to file proof

2    of claim, docket Number 465.

3              November 11th Mr. Cicolini points out is

4    Veteran's Day.  Why don't we make those November 12th.

5    That will be the proposal for the fee sharing structure

6    and the deadline for meeting and conferring.  Some of

7    those deadlines assume we're going to have a functioning

8    Federal Government still next month.  I'm going to

9    proceed on that assumption as well.

01:45PM  10              All right.  Unless there's anything else on

11   mediation, Number 3, collection of medical records.

12              MS. PARKER:  Your Honor, the parties have

13   agreed to take that item off of the agenda.

14              THE COURT:  All right.  Number 4 is pending

15   motions.  We have St. Thomas' motion for

16   reconsideration, which I have read, and several parties

17   have joined in it, and plaintiffs' steering committee

18   has filed a response as well.  Who wants to be heard for

19   St. Thomas?  I'm sorry, you're Ms. --

01:46PM  20              MS. GREER:  Marcy Greer, your Honor.

21              THE COURT:  Greer, all right.

22              MS. GREER:  And I thank you for the

23   privilege of appearing before the Court to be heard on

24   this motion.  As the Court is aware, our clients have

25   not been in the MDL until very, very recently.  The

1   circumstances of this are very unusual because typically

2   in the MDL, the cases are filed, and then the MDL

3   proceeding happens, and then everybody is moved over.

4   That hasn't been the case with us.

5           In the last few weeks, over 100 cases have

6   been filed against our clients and others, mostly in the

7   Middle District of Tennessee, a few in this Court, and

8   they are in the process of being served, being

9   transferred to this Court, et cetera.

01:47PM 10           In fact, we were not even in the MDL until

11   the afternoon of September 9th, which is an important

12   date because that's when some of the meet and confers

13   that are discussed in the response were talked about.

14           THE COURT:  Let me -- not to interrupt, I

15   apologize.  I guess I'm not particularly interested in

16   hearing -- I know both sides are unhappy with one

17   another about how we got from there to here, I guess,

18   whether there was an appropriate meet and confer,

19   whether certain representations were made or not made.

01:47PM 20   I'm less interested in that and more interested in how

21   can I make sure this is fair to everyone on a going

22   forward basis as well as manageable and efficient at the

23   same time?

24           MS. GREER:  I appreciate that.  I just

25   wanted to give the Court some background when we

1    appeared and why.  Where we are now is that we have 100

2    lawsuits that are going to be in the process of having

3    to be answered or motions to dismiss filed, and they're

4    all pretty much the same in terms of the allegations,

5    but there are different plaintiffs' lawyers involved and

6    different iterations of the above.

7            The complaints are typically 50 pages long,

8    multiple hundreds of paragraphs, multiple counts,

9    multiple parties, and as the Court's order stands, we

01:48PM 10   will start having to answer I think 8 to 12 of them

11   tomorrow, filing our responsive pleadings.

12           We asked that the Court first and foremost

13   defer that deadline.  Our first proposal would be to use

14   the master complaint process that has been established

15   under CMO-7, those dates have been set, and use that

16   process because it's designed to work the way it's

17   supposed to work, which is the plaintiffs put together

18   what their key allegations are in one document, we

19   respond to one document with a master answer, master

01:49PM 20   motion to dismiss and then deal with it at that point.

21           And so we ask the Court to consider doing

22   that, or at the minimum, giving us additional time, 60

23   days, at least, to get all these lawsuits answered.  I'm

24   worried about the CM/ECF system being inundated with

25   these long pleadings.

                    THE COURT:  Well, as I'm sure you know,

that's certainly the way I expect it to operate for

claims arising in 44 different states, and I was

persuaded, I guess, is the right word that for six

states, including Tennessee, that because of some

special circumstance, a one-year statute of limitations

or equivalent, something that required certain things to

occur within one year, that that would be unfairly

prejudicial unless we did things more formally.  We now

01:49PM are, I guess, past the one-year anniversary of this

problem coming to light.

                    It certainly is not my intention to require

anyone to do unnecessary work, which is why, among other

things, I said you don't have to file a memorandum in

support of a motion to dismiss.  In other words, the

idea here is just do the minimum that needs to be done

in order to make sure certain things happen by the

relevant time frame, then we can sort it out later.

                    I'd be amenable to any proposal that would

01:50PM permit something short of that.  I think one of

plaintiffs' concerns is identifying third-party

defendants, as I understand it.  In other words, either

cross-claims or third-party claims that clients such as

yours might make, defendants such as yours might make,

you know, within this time frame so that the statute of

1    limitations doesn't expire, but my intention is to be,

2    again, fair, trying to balance out all these different

3    considerations without requiring some poor paralegal or

4    associate to grind their way through hundreds of

5    documents that no one is ever going to read, and I'll

6    listen to any proposal that satisfies the interests of

7    both sides, and the default is always going to be the

8    Rules of Civil Procedure if I can't figure out anything

9    better to do.

01:51PM  10          MR. GASTEL:  Your Honor, Ben Gastel on

11   behalf of the plaintiffs' steering committee, if I may

12   just put forward just a couple of issues here.  I can't

13   say I've reviewed all complaints that have been filed by

14   the Tennessee plaintiffs, but I'm very familiar with the

15   complaint, and although it's not a true master

16   complaint, there are significant overlap between the

17   allegations of all those complaints, and so it's not

18   that they're having to answer different --

19          THE COURT:  I'm not shocked to hear that

01:52PM  20   either.  I'm familiar with word processors.

21          MR. GASTEL:  So I think that should belie

22   some concern with regard to the associates having to

23   devote an inordinate amount of time to answering

24   complaints, but also going to the idea that we sought

25   answers to these complaints so that we could have

1    identities of comparative fault parties.

2           We have offered to sort of -- we have asked

3    the St. Thomas entities, along with their affiliated

4    clinic, STOPNC, to go ahead and identify the people that

5    they think might be at comparative fault, and they have

6    simply not taken us up on that offer with regard to each

7    of the complaints, and that's why we have sort of

8    aggressively pushed the filing of answers, and with

9    regard to I know I've been on several phone calls with

01:53PM   10    the affiliated STOPNC Clinic.

11           We are certainly work to work with them.  I

12    believe the vast majority of Tennessee plaintiffs have

13    granted them a 45-day extension on filing answers.

14    We're happy to work with the St. Thomas entities to

15    accommodate a reasonable request on extension, but we

16    think that the Court's strategy that is planned out has

17    been carefully balanced, and we'd request that the Court

18    sort of maintain that balance that it has previously

19    decided.

01:53PM   20           THE COURT:  I'm flattered that you call it

21    both the strategy and a careful one.  Ms. Greer, I'll

22    let you respond.

23           MS. GREER:  Your Honor, just to be clear, my

24    clients do not operate hospitals where MPA was

25    administered that was sold by NECC.  They're in it on

1   vicarious liability theories only, so we would be filing

2   motions to dismiss, and, yes, they would probably look a

3   lot alike, but there are differences, you've got to get

4   the complaint paragraphs right.  It takes time.

5          I don't know what information they're going

6   to get because the motion to dismiss typically doesn't

7   reveal third parties, and we're still getting our arms

8   around the dispute and everything else at this point,

9   and they're asking us to commit to something that no

01:54PM  10  other parties in this lawsuit are being asked to commit

11  to, and if the issue is coming up with one master

12  pleading, I think we can work out something like that.

13         If we have one master pleading to respond

14  to, we've already answered four lawsuits in Tennessee,

15  state court that were filed there and then dismissed and

16  then nothing, and then all of a sudden this onslaught.

17  There were notices of intent and things like that going

18  on, but, again, we're vicarious liability defendants

19  only, and so until the lawsuits were filed and things

01:54PM  20  started getting in the MDL, we've been in kind of

21  no-mans land.

22         THE COURT:  Do you expect to file motions to

23  dismiss in every case because in that case you don't

24  have to do the paragraph by paragraph answer thing,

25  right?  In other words, I'm not requiring you to file a

1    memorandum of law, so wouldn't it be just a matter of

2    identifying the grounds on which you say the complaint

3    fails to state a claim?

4                 MS. GREER:  It would, your Honor, but if you

5    look at the situation with Tennessee, he's been

6    intervening in all of these cases.  I mean, every day

7    we're all getting hundreds of e-mails, notifications

8    that they filed, yet another motion to intervene,

9    another brief in support and all of the things --

01:55PM  10                 THE COURT:  Is it the State of Tennessee?

11                 MS. GREER:  The State of Tennessee, and so

12   I'm thinking that there's a better way to streamline

13   this process.  You know, we're willing to do a master

14   answer, if need be, on a reasonable basis, if there is a

15   pleading that we can respond to, but the point is this

16   is not the streamlined process that I think makes any

17   sense, and it won't give them any more information.

18                 MR. GASTEL:  I think we're happy to confer

19   with them about a master complaint process sort of.

01:55PM  20                 THE COURT:  Master of Tennessee complaint?

21                 MR. GASTEL:  Yes, but, I mean, we sort of

22   wish that this would have been brought to our attention

23   60 days ago as opposed to today.  This is the first time

24   that I'm hearing that they're sort of willing to --

25                 THE COURT:  I don't have a time machine, so

1    let's talk about what we can do going forward.  Does it

2    make sense for you to try to meet and confer and see if

3    you can't work out some streamline way of dealing with

4    this?

5              MR. GASTEL:  We are happy to do that with

6    the St. Thomas entities.

7              MS. GREER:  Yes, your Honor.

8              THE COURT:  Which would require, I mean, if

9    you have things due tomorrow, you'd have to at least

01:56PM   10    assent to some brief extension of time in order to make

11    that work, that is, the plaintiffs would have to.  Would

12    that be a problem, Mr. Gastel, do you expect?

13              MR. GASTEL:  No.  Like I said, we've been

14    granting STOPNC that 40-day extension for the vast

15    majority of the complaints or the answers that they need

16    to file.

17              THE COURT:  All right.  I feel I'm at a

18    disadvantage here, not knowing, of course, anything

19    about Tennessee product liability law, but I think what

01:56PM   20    makes sense to me is to direct you to try to meet and

21    confer.  If you come up with any reasonable proposal,

22    I'm likely to approve it; if you can't agree, you want

23    to offer competing visions of how my order should be

24    modified to take care of these interests, I'd be willing

25    to consider that.

```
 1                In the meantime, I guess the order will stay
 2   in place until somebody convinces me that it doesn't
 3   make sense anymore, and I certainly don't think that
 4   there's any point in flooding the system with answers,
 5   which is maybe the least meaningful document filed in
 6   any court in the United States nowadays, right, whoever
 7   looks at answers unless they contain an affirmative
 8   defense, but still this process has to be orderly, and
 9   it has to protect the rights of both the defendants and
10   the plaintiffs, so let's do this.
11                Why don't you meet and confer, and if you're
12   unable to agree on a joint proposal, let's say in two
13   weeks, by October 22d, you can submit competing motions
14   or not, I mean, also plaintiff may prefer the status
15   quo, and we'll take it from there.  Will that work,
16   Ms. Greer?
17                MS. GREER:  Yes, your Honor, that will work.
18                THE COURT:  Mr. Gastel?
19                MR. GASTEL:  That's fine, your Honor.
20                THE COURT:  Are there other plaintiffs'
21   counsel that need to be involved in this?  In other
22   words, do you speak for all Tennessee plaintiffs,
23   Mr. Gastel?
24                MR. GASTEL:  Yes, we also serve as the
25   Tennessee state chair.
```

```
 1                THE COURT:  Remind me, is someone from
 2   Tennessee on the PSC, right?
 3                MR. GASTEL:  It's George Stranch.  He's in
 4   my office, your Honor.
 5                THE COURT:  All right.  He's a IV, right?
 6   We have a bond.
 7                MR. GASTEL:  That's correct, and very much
 8   to his chagrin, there's not a V.
 9                THE COURT:  There's none in my family
10   either.  All right.
11                MS. GREER:  Your Honor, that wasn't the only
12   problem we had.
13                THE COURT:  Yes, go ahead.
14                MS. GREER:  I also wanted to address the
15   bellwether provision of the order because that is also
16   very problematic in terms of it's picking a date before
17   a process has even been arrived upon, and we gave the
18   Court a flavor of at least Judge Fallon's views, you
19   know, based from the bench, of the types of
20   considerations that go into that process.
21                It's usually very complicated because, of
22   course, the goal is to get a representative sampling to
23   try cases so that there is confidence in the result so
24   that the Court can have information about how these
25   cases could be tried, and the parties can have
```

01:58PM (line 10)
01:59PM (line 20)

1    information about what the settlement values might be.

2         Without that, as the *In Re:  Yasmin* Court

3    said, it's a waste of everybody's time, and that's what

4    we're trying to avoid, and I think that setting a date

5    for six bellwether cases in January is very premature at

6    this point.

7         I'm not even sure that these cases are

8    appropriate for bellwether trials because once NECC, if

9    they are discharged from bankruptcy and the affiliated

02:00PM  10   defendants are able to settle, you've got a series of

11   clinics all over the country with very, very different

12   issues, and those cases may not really result in

13   appropriate bellwether trials, so that's the threshold

14   question to be asked, and then if it were appropriate,

15   what does it look like because the pick 3 per side model

16   was an early on, but that doesn't work in the real world

17   anymore.

18        I think that the courts have shown through

19   experience that you really need to have a process to

02:00PM  20   select representative cases so that we can gain

21   information.  We don't have medical records.  I mean,

22   there's been a discussion about some medical records.

23   Yes, medical records are being obtained as to parties

24   that are defendants in Tennessee right now.  There is a

25   limited HIPAA waiver that has been provided, but that's

1    it.  That's just going to have your treatment records

2    and your records as to when the MPA was administered.

3    That's not going to have the history, the

4    co-morbidities, the confounding factors, the types of

5    things that go into a decision whether this is a

6    representative plaintiff from which we can draw

7    information.

8            We also mentioned the Lexicon issue, which

9    is a big one.  It's been a deal killer in many MDLs,

02:01PM   10    including the *Denture Adhesive* litigation before

11    Judge Altonaga.  They never got to bellwether trials

12    because there weren't Lexicon waivers.  You know,

13    Lexicon, of course, being the case that the

14    Supreme Court said an MDL court does not have the

15    authority to try a case without it being properly venued

16    there in the first place or the parties consent.

17            And *Denture Adhesive*, some of the parties

18    would not give a consent, and, so, therefore, there were

19    only a very few cases that were actually filed in the

02:01PM   20    Southern District of Florida, and so they never got

21    there, and that's not unusual.  It's an issue that

22    Judge Fallon raised in his law review article, which I

23    think is insightful.

24            THE COURT:  Basically I agree with what

25    you're saying, okay, to cut to the core.  I don't know

 1    what this case is going to look like.  I don't know,

 2    plaintiffs proposed, I think, an even more aggressive

 3    schedule.  I went as far as the bellwether designation,

 4    which I think may work if it's what I'll call an NECP

 5    case, okay.  If it's not an NECP case, that date can't

 6    remotely work, and there are in my mind at least three

 7    major groups of defendants:  There's NECP/affiliates,

 8    there are what I'll call service supplier companies, and

 9    then there's these individual pain clinics, physicians

02:02PM  10    and so forth.

11          It's by no means clear to me certainly

12    without consent that I can preside over a Tennessee case

13    against a Tennessee pain clinic.  It's not clear to me

14    that I can resolve motions to dismiss or motions for

15    summary judgment.  I want to talk about that, how that

16    process is going to play out.  Maybe I do, maybe I

17    don't, but I think we're very far from making those

18    kinds of decisions.

19          On the other hand, because this case is

02:03PM  20    unusual for a variety of reasons, including having the

21    core defendant, NECP being a small company in bankruptcy

22    with limited assets and a finite amount of insurance,

23    things may resolve more quickly than they might in a

24    different situation.

25          It's not even clear to me NECP is fighting

1    on what I'll call the core liability issue, was the

2    product tainted, and did it cause injury.

3              I don't know the answers to any of those

4    questions, but I'm not going to do anything unless I

5    think everyone's had a reasonable opportunity to be

6    heard, unless I think the process is fair, unless

7    everyone's had the discovery that they need.  Having

8    said that, I want to pull people's feet to the fire, we

9    have a finite amount of resources here, and I want to

02:04PM   10    try to get this case resolved in some reasonable time

11    frame.  I don't want to be doing this ten years from

12    now.  So, I hear what you're saying, like I say, I agree

13    with the sentiments, at least the challenges involved,

14    and I'm going to take it a step at a time.  Okay.

15              MS. GREER:  Well, your Honor, right now the

16    CMO order does have the date in there.

17              THE COURT:  I know it has the date in there,

18    and we're going to meet once a month, and I wouldn't go

19    to Las Vegas and wager your life's savings on that date

02:04PM   20    being final.  On the other hand, this case may look very

21    different in January than it looks right now, I don't

22    know, so let's put that on hold, and --

23              MR. SOBOL:  If I may, your Honor --

24              THE COURT:  Yes.

25              MR. SOBOL:  -- just indicate that we could

1    take it up at the next status conference.  In the

2    meantime, obviously, the PSC is going to be plunging in

3    with discovery.  If they want any information from us,

4    they can be asking us for the information, and we'll

5    revisit it in a month from now.

6              THE COURT:  Discovery is not stayed as to

7    either the plaintiffs or unaffiliated defendants --

8              MR. SOBOL:  Right.

9              THE COURT:  -- at this stage?

02:05PM  10              MR. SOBOL:  So it's just ready to go, so

11    let's start litigating the case, and then if we have

12    some issues, we'll bring them next month.

13              THE COURT:  I'm confessing my ignorance

14    here.  There's some recent Supreme Court case directly

15    on point, and I just don't know it.  My authority to

16    make rulings, for example, on Tennessee law is a

17    Tennessee law constitutional.  It's not clear to me that

18    the MDL covers that, that it's appropriate for me.  It

19    may be, it may make sense.  It may be that the parties

02:05PM  20    consent because there's no other realistic way of

21    dealing with it, but I would like early on, I think, to

22    address those types of issues.

23              Am I really supposed to decide those, what

24    may be very significant issues of Tennessee or Florida

25    or Michigan law, you know, I am not an expert, it's fair

1    to say, in the law of any those of jurisdictions, and

2    the bounds of my authority are not clear to me.

3           On the other hand, it's also not clear to me

4    how else we would work this out.  If there's some, you

5    know, defendant in Florida or Michigan or Tennessee who

6    says I shouldn't be in this case, you should decide a

7    12(b)(6) motion in my favor, it seems fair to resolve

8    that up front rather than waiting until the MDL is

9    spinning cases back out to the different jurisdictions,

02:06PM  10   so I just raise that as a potential issue.

11           THE COURT:  All right.  Anything else,

12   Ms. Greer?

13           MS. GREER:  I can just check.  I think that

14   covers everything.

15           THE COURT:  All right.  I'm going to leave

16   the motion for reconsideration pending.  We'll see how

17   this meet and confer process goes.  It may be superseded

18   by a supplemental motion, we'll see how that works out.

19   In the meantime, again, I'm attempting to balance things

02:07PM  20   that are going to be difficult to balance, of moving

21   this case along expeditiously in light of the finite

22   resources and the unusual posture of the case with

23   making sure everyone has a fair opportunity to litigate

24   their issues, and that includes unaffiliated defendants,

25   of whom there are dozens, if not hundreds.

1          MS. GREER:  Well, your Honor, that's another

2    point that we would make in our motion that I would like

3    to reiterate here.  A lot of people that are going to be

4    affected by this order aren't even in the room yet,

5    haven't been served, et cetera.

6          I think that one of the reasons we're here

7    is because of the one-year statute and the need to bring

8    this formally here, but there are a lot of people who

9    presumably are waiting to see what happens.

02:08PM 10          THE COURT:  But, of course, I can't wait

11   until we have every defendant in every case.  Some

12   states has some six-year statute of limitations.  I'm

13   going to have to do this the best I can.  As I've

14   indicated in previous meetings, I do want to set up some

15   process or procedure under which I can resolve 12(b)(6)

16   motions, motion for summary judgment early on.

17          For parties who think that they are not

18   properly in the case, I express no opinion one way or

19   the other, but it seems to me in a normal litigation I

02:08PM 20   would be resolving those issues early on, and I should

21   be trying to do that here.

22          MS. GREER:  We appreciate that, your Honor.

23          THE COURT:  All right.  Anything further on

24   that, Mr. Gastel?

25          MR. GASTEL:  At this time, no.

             1              THE COURT:  All right.

             2              MS. PARKER:  If I may, your Honor.

             3              THE COURT:  Yes.

             4              MS. PARKER:  One other scheduling matter

             5    since we're discussing the CMO, the master complaint is

             6    currently due on November 5th.

             7              THE COURT:  Yes.

             8              MS. PARKER:  The hearing on subpoena

             9    objections is scheduled for November 7th, which we

02:09PM     10    believe means that many of the objections on the

            11    outstanding subpoenas will not be resolved until some

            12    time after that, so the PSC has not, and I'm not today

            13    asking the Court for relief on that particular issue,

            14    but I do expect that we may present some type of motion

            15    to address that to the Court before the next status

            16    conference.

            17              THE COURT:  And explain to me how.

            18              MS. PARKER:  One option, your Honor, might

            19    be to extend the deadline for the master complaint for a

02:09PM     20    short period of time in order to allow production of

            21    documents in response to the subpoenas so that the PSC

            22    may incorporate those into the master complaint.

            23    Another option would be to file the master complaint on

            24    November 5th but to permit some type of amendment to

            25    incorporate any additional information that we received

1    in response to those subpoenas.

2              THE COURT:  Explain to me how.  Are there

3    going to be multiple master complaints?  In other words,

4    they'll be a Tennessee complaint, a Florida complaint, a

5    Michigan complaint.  How is this expected to work?

6    Mr. Sobol.

7              MR. SOBOL:  In my experience in handling

8    these multi-facetted things, it's a matter of really the

9    power of the word processor.  You know, really at some

02:10PM  10   point the complaint ends up being so large, do we end up

11   having to break it up?  That's just really the reality

12   of it.  So, you know, we had the same problems in a

13   matter in front of Judge Saris in AWP and the like, if

14   the complaint ends up looking just too cumbersome

15   because it has too many defendants and too many specific

16   facts, we'd probably wind up having to break it up, but

17   we're not looking forward to that, we're not trying to

18   do that.

19              One of the other things that the PSC is in a

02:10PM  20   position of having to do right now, too, is that with so

21   few clinics right now opting into the mediation but with

22   that remaining a moving target, if you will, for another

23   21 days or whatever, you know, whatever the Court has

24   just ordered, we will not know until three weeks or more

25   from now which of the clinics remain out there that we

1    have to be suing to begin with.

2            That's been one of the issues that we have

3    even with the current date, if you can follow what I'm

4    saying.  It's been a little bit of a juggling act

5    because all the parties in very much good faith have

6    been trying to balance the needs of trying to have

7    consensual resolutions and not run up the meter, but by

8    the same token, get going with litigation, so the short

9    answer to your question is that right now, as the case

02:11PM   10   schedule stands, come the end of the third week or

11   thereabouts of October, we'll know what clinics are or

12   are not in the mediation so that we'll know what

13   potential targets there are to sue, and then the PSC --

14   of course, we're working on this now anyway -- will have

15   to craft the master complaint without any of the

16   discovery that we've sought because that's been

17   understandably postponed, then we can do the best we can

18   under those circumstances by November 5th, knowing that

19   we want to move forward with things, or, alternatively,

02:12PM   20   we can postpone things again.

21            Neither of those results, frankly, are

22   ideal, that's why I think that what Ms. Parker has

23   suggested is that we're still sort of mulling it through

24   ourselves, and she's flagging this issue for you, and

25   we're going to try to come to an understanding as to

1    what we're going to do, and I've probably described a

2    little bit too much of how the sausage is made.  I'm

3    sure, I hope you're going to love the sausage.

4              THE COURT:  All right.  My prejudice, if

5    that's the right word, is going to be to hold to the

6    November 5th date and to have amendments as appropriate.

7    We're never going to achieve perfection, complete

8    knowledge or at least not for some considerable amount

9    of time, and we need a process in place.  I feel like

02:13PM  10   having a master complaint is long overdue.

11              This situation that we have with Tennessee

12   and the other states is, you know, we're going to be

13   repeating this soon enough with other jurisdictions.  I

14   feel like we need to get this on file, but let's see

15   where we are.  You can work on it and come up with a

16   proposal if you think that doesn't work.

17              All right.  4b, motion to dismiss Alaunus.

18   These are the motions that have been out there forever,

19   right?  Does anyone have a better idea than simply

02:14PM  20   rolling those over yet again?  Yes, sir.

21              MR. CIPORKIN:  Your Honor, I'm working for

22   Alaunus Pharmaceutical.  I do not have a better idea.

23   Your last order that was entered simply stated that the

24   deadlines to respond would be stayed until further order

25   of the Court.

1          THE COURT:  Right.

2          MR. CIPORKIN:  And as long as the deadline

3     for discovery remains stayed as to the affiliated

4     defendants, then we're content to keep your order in

5     place for now.

6          THE COURT:  All right.  Just to state the

7     obvious, I mean, those are stayed, we have the

8     bankruptcy proceeding, we have mediation, we have what I

9     assume are various negotiations.  I'm not staying any of

02:14PM  10    this for its own sake, and I would -- again, I'm anxious

11    to move forward on some of these issues if they can't be

12    resolved, you know, either voluntarily or somehow

13    through the processes of the bankruptcy court.

14          I'm content to leave it in place for now,

15    but I'm not doing this as a favor to anyone.  In other

16    words, I'm trying to permit this process to work itself

17    out.  While on the subject, where are we on obtaining

18    discovery from the affiliated defendants?

19          MR. SOBOL:  If I may, your Honor?

02:15PM  20         THE COURT:  Yes, Mr. Sobol.

21          MR. SOBOL:  Thank you.  So, answering that

22    question requires also giving the Court a little bit of

23    information as to where we are regarding potential

24    resolution with those defendants.  So there has been

25    some -- I'll say this first, aspirationally, some of us

1    had the notion that it would be a terrific result to be

2    able to announce some form of a proposed resolution by

3    October 3rd, which had been the one-year anniversary of

4    the closing of NECC.

5              We didn't make that, however, I think that

6    all the parties are acting in some good faith, and there

7    has been some very substantial progress from my

8    perspective personally since Labor Day.

9              Now, what do I mean when I say that?  Apart

02:16PM   10    from getting into the details, which, of course, I'm not

11    going to get into, so there are insurers that are

12    involved for NECC and a couple of the -- three of the

13    related companies.  There are excess insurers.  There

14    are the companies themselves, not just the primary ones

15    that would come, you know, to the tip of your tongue

16    immediately but some of the other entities behind it,

17    and, of course, NECC and Ameridose and MSM itself, too.

18              So with all of that said, there has been

19    very significant progress, and as you've seen, we've

02:17PM   20    been delaying doing anything formal by way of discovery

21    in the meantime.  A sort of implicit condition of those

22    negotiations has been for everybody to stand down in

23    terms of doing formal discovery, so we've done that

24    today.

25              Now, over the next short period of time,

1    probably now in the next status conference, the parties

2    are going to continue to negotiate.  At some point,

3    they'll be some proposals, hopefully.  At some point,

4    one or more of the parties have to say, you know what,

5    we've done enough, now we've got to start walking and

6    chewing gum at the same time, meaning we've got to

7    continue our settlement discussions but also go forward

8    with litigation if we haven't been able to reach a

9    resolution.

02:17PM   10          Now, the other thing that I'll point out

11    before I finally give you what I think is the conclusion

12    of this is that regardless of the results of a

13    negotiation between the PSC, the creditors' committee

14    and the trustee on the one hand and all of the

15    affiliated entities and the individuals on the other

16    hand, even if there were a complete proposal that

17    suggested a resolution that created funds for victims

18    that would be available upon confirmation of a plan,

19    there would still be two other issues.

02:18PM   20          First, there would be a lot of time between

21    then and the confirmation of the plan, and the second

22    issue would be that there are other defendants that are

23    out there, the clinics, that want some information and

24    are entitled to discovery from NECC, perhaps Ameridose,

25    MSM and the like.  What does one do in that situation?

1            So, regardless of where these negotiations

2   conclude, we're going to have to do the discovery

3   anyway, and that's a discussion that has begun with the

4   trustee and with some of the representatives of NECC and

5   Ameridose, which is, you know, we're going to have to

6   create a document depository that's available to

7   everybody.

8            There may need to be some depositions of

9   some people, they'll have to be made available to

02:19PM  10  everybody, so where are we?  I will say honestly that

11  while we have sort of previously indicated that there

12  were discussions, there were robusts and that kind of

13  thing that you expect out of like a diplomacy-type

14  meeting, I can say now more concretely that there's been

15  some progress, and really by the time of the next status

16  conference, we're going to need to grapple with the

17  reality that there's going to have to be formal

18  discovery with respect to these entities because we will

19  be going forward with discovery regarding some of the

02:19PM  20  clinics, and they're going to be entitled to it

21  regardless.

22            And the one final thing I should put on this

23  because I think it's a showing of the good faith by NECC

24  and Mr. Fern and Mr. Moore, apart from formal discovery,

25  there has been informal discovery, and the PSC has from

1    time to time asked information from Mr. Fern and NECC,

2    and they've been providing document information, so

3    there has been that exchange to enable some of the

4    discussions and other things to occur.  So it's not as

5    if there hasn't been any kind of information being

6    provided by NECC, that's not the case at all.  That's

7    what I would tell you where we're at on that topic.

8              THE COURT:  All right.  Anybody want to

9    respond to that?

02:20PM   10              MR. FERN:  Judge, if I can just follow up on

11    what Mr. Sobol just commented on.

12              THE COURT:  Can you speak into the mic.

13              MR. FERN:  In addition, as the Court well

14    knows, the trustee entered into an agreement with the

15    PSC to do informal discovery to allow them to have some

16    insight into the documents.

17              More so, those document requests have now

18    turned to documents within NECC's possession vs. some of

19    what the Court called before the national vendors who

02:20PM   20    had access to the NECC facilities in the way of cleaning

21    them, maintaining them, building them and the like.

22              Also, as part of the informal discovery,

23    there have been e-mails from individual affiliated

24    defendants as well as affiliated entities such as MSM

25    have been produced.  This process is ongoing, as

1   Mr. Sobol just commented on.

2           Recently we were asked for additional

3   documents, such as the standard operating procedure

4   manual, which was turned over quickly and in

5   completeness.  There were some other requests within the

6   last week by members of the PSC, which my team is

7   currently working on.  I hope to have those produced

8   soon.

9           Just as I gave the Court a report last time,

02:21PM  10   we have now made nine informal productions via a file

11   transfer process directly to the PSC.  There have been

12   over 27,000 pages of documents.  In addition to that, to

13   the Rust Omni depository, which is taking the HIPAA

14   protected information, there were about 9700 pages of

15   documents which have been produced to them.

16           We've continued to do that, as Mr. Sobol

17   says, not that I'm inviting further requests, but as a

18   comment, as the trustee feels they're appropriate, we

19   will continue to cooperate and make those informal

02:22PM  20   productions.

21           THE COURT:  All right.  I guess I'll leave

22   it at this.  I do, as Mr. Sobol says, this is going to

23   happen almost certainly anyway, that is, the discovery

24   production, having a central repository.  There's

25   unaffiliated defendants who are going to want to have

1    access to it and so on, and I know you have other things

2    going on, but I do want to keep up the progress on this

3    front as well.

4           All right.  Number 5 is identification of

5    Tennessee motions for summary judgment filed,

6    pretransfer to MDL.  Who wants to take up that?

7           MR. GASTEL:  Ben Gastel, again, your Honor,

8    if I may.  We have identified in the agenda that was

9    filed yesterday, there's really only one substantive

02:23PM   10   motion before the Court right now that we identified

11   there in the agenda.

12          The other issue is there's a motion for

13   summary judgment that was filed in the O'Brien case, but

14   that was filed in state court, and that case was moved

15   to the Middle District of Tennessee, and it's been

16   tagged for transfer, but it is not here yet, and those

17   are the two motions that we have identified based on the

18   Court's directive the last time we were here.

19          THE COURT:  All right.  And is there a

02:23PM   20   proposal for what I do with that, stay responses?

21          MR. GASTEL:  Yes, we filed yesterday, your

22   Honor, a notice pursuant to your instruction from the

23   last time about how to go ahead and handle these types

24   of issues.  I don't know if your Honor has had a chance

25   to review that notice, but it essentially proposed three

1    categories of motions.

2              The first category is Rule 12 motions where

3    a party seeks complete dismissal.  We think that those

4    motions should be gone ahead and briefed pursuant to the

5    Court's local rule standard briefing schedule.

6              For dispositive motions filed under Rule 12

7    that seek dismissal of only claims but not of a party,

8    we propose that the briefing on those be stayed pending

9    further the order of the Court, and the last is for

02:24PM  10   dispositive motions filed under Rule 56, of which these

11   two motions are, we propose that those motions be

12   dismissed without prejudice so that the PSC may proceed

13   with discovery related to those Rule 56 dispositive

14   motions.

15             MR. CLINE:  Your Honor, this is Matt Cline.

16             THE COURT:  I'm sorry, who do you represent?

17             MR. CLINE:  This is Matt Cline.  We

18   represent St. Thomas Outpatient Neurosurgical Center.

19   We're the movants on these two motions for summary

02:25PM  20   judgment.  We just received this notice filed by the PSC

21   with this proposal, and we would just ask the Court to

22   wait to rule until we've had a time to look at it and

23   quickly brief it.

24             THE COURT:  All right.  Why don't I do this.

25   Why don't I, pending further order, why don't I hold in

1    abeyance any requirement to respond to either of these

2    two motions, that is, in the Carman and O'Brien cases.

3    I'll give St. Thomas a chance to respond to this

4    proposal.

5              This, again, touches on the broader issue,

6    what framework do I set up for resolving Rule 12

7    motions, and I think it is a sensible distinction, the

8    ones that get rid of parties altogether as opposed to

9    ones that get rid of particular claims, which are

02:26PM  10   perhaps of less immediacy, and Rule 56 motions, but I'm

11   not prepared to make any decisions yet.  I'll allow a

12   response to this proposal, and we'll see where we go

13   from there.

14             While I'm at it, this reminds me, the State

15   of Tennessee has sought leave to intervene.  Is there

16   any reason I should not allow that?

17             MR. GASTEL:  I guess I'll take that one as

18   well.  Yes, the plaintiff's position is that there's

19   really no basis to prevent the State of Tennessee from

02:26PM  20   intervening.  We would like to reach out to the attorney

21   general to maybe enter into some sort of joint

22   stipulation so that they don't end up filing, you know,

23   hundreds of these motions to intervene in every single

24   case because principally every single Tennessee

25   complaint is going to contain those allegations

1    challenging the constitutionality of certain tort reform

2    law in Tennessee, and that's what's prompting the

3    attorney general to intervene, and we think that that

4    might, you know, ensure that there's a clean docket as

5    opposed to a docket entry every single time that one of

6    these cases gets transferred in.

7              THE COURT:  All right.  In the meantime, I'm

8    going to grant the motion, which is it was filed at the

9    main MDL docket, Docket Number 435.  I will grant that,

02:27PM  10    and it is my intention unless there's some particular

11    circumstance mandating a different result that I would

12    grant any similar motion permitting the State of

13    Tennessee to intervene for the purpose of defending the

14    constitutionality of any challenged Tennessee statute.

15              All right.  Item 6 is status of bankruptcy

16    proceedings.  Who wants to take that up?  Mr. Gottfried.

17              MR. GOTTFRIED:  Thank you, your Honor.

18    Well, I think you've already heard from Sobol that the

19    trustee is continuing to make progress in negotiations

02:28PM  20    with the affiliated defendants and has been

21    collaborating and working with both the creditors'

22    committee and the PSC in connection therewith.  I think

23    you also heard from my Brother, Mr. Molton, that the

24    bankruptcy court established a bar date of January 15th.

25    We are expecting to send out the notices on the 16th of

1     this month with respect to that.

2              Other than that, the trustee is continuing

3     to deal with recalled products, continuing to marshal

4     assets, including looking for the possibility of selling

5     some equipment that is not covered by the preservation

6     order to recoup some monies for the estate, and

7     continuing to generally administer the estate.

8              THE COURT:  All right.  Anything else on

9     status of bankruptcy?

02:29PM  10          (No response)

11             THE COURT:  All right.  Status of appeals.

12    Who wants to take that up?  Mr. Gottfried again.

13             MR. GOTTFRIED:  As you know, the appeal from

14    the bankruptcy court to your Honor has been dismissed.

15    What remains is the appeal to the First Circuit of the

16    transfer order.  At this point, a briefing schedule has

17    not yet been established, and I believe that will be the

18    next step.

19             THE COURT:  All right.  And so it's not on

02:29PM  20    any expedited schedule, at least at this stage?

21             MR. GOTTFRIED:  Not at this stage.

22             THE COURT:  All right.  Is there anything

23    else anyone wants to take up?  Anything from the

24    plaintiffs' side of the house?

25             MR. SOBOL:  No, your Honor.

1          THE COURT:  Creditors' committee?

2          MR. MOLTON:  No, your Honor, thank you.

3          THE COURT:  Bankruptcy trustee?

4          MR. GOTTFRIED:  We're all set, thank you.

5          THE COURT:  Any defendants?  Mr. Fern.

6          MR. FERN:  Judge, just to make the Court

7    aware, there are almost two dozen cases that are

8    duplicate cases filed in the MDL.  Most of them were

9    filed early on in November and December of 2012 naming

02:30PM  10   only NECC before the petition of bankruptcy was filed on

11   December 21.

12          With the Tennessee statute of limitations,

13   new cases with the same plaintiffs were filed within the

14   last couple of weeks now, not including NECC, but having

15   many of the affiliated defendants as well as the local

16   healthcare providers.

17          I am working with those individual counsel

18   in Tennessee seeking a resolution that does not hurt

19   anyone but allows them to voluntarily dismiss the first

02:31PM  20   case, file a proof of claim in the bankruptcy court so

21   they're protected against the bankruptcy estate, and

22   then continue with the second filed case in the MDL

23   court.  Hopefully by when we return next month, I'll

24   have all those resolved, so you may see duplicate names

25   on your list.

```
 1                    THE COURT:  All right.  Thank you.  Does
 2    anyone on the telephone wish to be heard on any issue?
 3                    MR. CLINE:  This is Matt Cline again.  We
 4    filed a joinder in the motion to reconsider filed by the
 5    St. Thomas entities.  I was just asking for some
 6    clarification that the instruction of the PSC to meet
 7    and confer would also apply to all Tennessee defendants
 8    as well as the --
 9                    THE COURT:  Yes, certainly all moving
10    Tennessee defendants.
11                    MR. CLINE:  Okay.
12                    THE COURT:  That is, anyone who joined in
13    the motion.
14                    MR. CLINE:  Okay.  Thank you.
15                    THE COURT:  All right.  Let's set one more
16    date.
17                    THE CLERK:  January 10th.  The next status
18    is November 7th, then there's December 13th.
19    January 10th at 1:30.
20                    THE COURT:  January 10th at 1:30.  Does that
21    work?  So the next one will be November 7th and
22    December 13th and January 10th at 1:30.
23                    MS. PARKER:  Your Honor.
24                    THE COURT:  Yes.
25                    MS. PARKER:  Counsel in the plaintiffs'
```

1    steering committee have some trials scheduled for the

2    months of February and March.  We were wondering if it

3    would be possible to set dates for those status

4    conferences, understanding they may need to be adjusted

5    but so that we had some benchmarks.

6              THE COURT:  All right.

7              THE CLERK:  February 13th at 1:30.

8              THE COURT:  February 13th at 1:30.

9              THE CLERK:  March 13th at 2:00.  We have a

02:33PM  10    jury trial in the morning.

11              THE COURT:  We can make it 1:30.  I may be

12    eating a sandwich on the bench, but I'll make it 1:30,

13    get people out of here who need to fly back on the east

14    coast.  I'm sorry, what was the date again?

15              THE CLERK:  March 13th.

16              THE COURT:  March 13th at 1:30.

17              MS. PARKER:  Thank you, your Honor.

18              MR. SOBOL:  With the House willing?

19              THE COURT:  I'm sorry.

02:34PM  20              MR. SOBOL:  With the House willing?

21              THE COURT:  Okay.  Anything else?  Thank

22    you, all.

23              MS. PARKER:  Thank you, your Honor.

24              (Whereupon, the hearing was adjourned at

25    2:34 p.m.)

```
                   C E R T I F I C A T E
```

UNITED STATES DISTRICT COURT )

DISTRICT OF MASSACHUSETTS ) ss.

CITY OF BOSTON )


        I do hereby certify that the foregoing

transcript, Pages 1 through 51 inclusive, was recorded

by me stenographically at the time and place aforesaid

in MDL NO. 13-02419-FDS, IN RE:   NEW ENGLAND COMPOUNDING

PHARMACY CASES LITIGATION and thereafter by me reduced

to typewriting and is a true and accurate record of the

proceedings.

        Dated this October 17, 2013.

                        s/s Valerie A. O'Hara

                        _____

                        VALERIE A. O'HARA

                        OFFICIAL COURT REPORTER