```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2

 3

 4   IN RE:  NEW ENGLAND          )  MDL NO. 13-02419-FDS
     COMPOUNDING                  )
 5   PHARMACY CASES LITIGATION    )
                                  )
 6                                )
                                  )
 7                                )
                                  )
 8

 9

10         BEFORE:  MAGISTRATE JUDGE JENNIFER C. BOAL

11

12                     MOTION HEARING

13

14

15     John Joseph Moakley United States Courthouse
                   Courtroom No. 17
16                 One Courthouse Way
                   Boston, MA 02210
17

18                  November 7, 2013
                     11:30 a.m.
19

20

21

22          Valerie A. O'Hara, FCRR, RPR
               Official Court Reporter
23     John Joseph Moakley United States Courthouse
24        One Courthouse Way, Room 3204
                   Boston, MA 02210
25          E-mail: vaohara@gmail.com
```

 1   APPEARANCES:

 2   For The Plaintiffs;

 3       Hagens, Berman, Sobol, Shapiro LLP,
     by KRISTEN JOHNSON PARKER, ATTORNEY, 55 Cambridge
 4   Parkway, Suite 301, Cambridge, Massachusetts 02142;

 5       Janet, Jenner & Suggs, LLC, KIMBERLY A. DOUGHERTY,
     ATTORNEY, 75 Arlington Street, Suite 500, Boston,
 6   Massachusetts  02116;

 7       Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ.,
     366 Elm Avenue, SW, Roanoke, VA 24016;
 8
         Branstetter, Stranch & Jennings, PLLC, by BEN GASTEL,
 9   ESQ., ESQ., 227 Second Avenue North, Nashville,
     Tennessee 37201-1631;
10
     FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
11
         Brown Rudnick, by KIERSTEN A. TAYLOR, ATTORNEY,
12   One Financial Center, Boston, Massachusetts  02111;

13       Cohen, Placitella & Roth, P.C., by MICHAEL COREN,
     ESQ., 2 Commerce Square, 2001 Market Street, Suite 2900,
14   Philadelphia, Pennsylvania  19103;

15   For the Defendants:

16       Harris Beach PLLC, by FREDERICK H. FERN, ESQ.,
     100 Wall Street, New York, New York  10005;
17
         Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ.,
18   1150 Huntington Building, 925 Euclid Avenue, Cleveland,
     Ohio 44115-1414;
19
         Batten, Lee, by ADAM MOYERS, ESQ., 4141 Parklake
20   Avenue, Suite 350, Raleigh, North Carolina  27612;

21       Dykema Gossett PLLC, by KATHRYN J. HUMPHREY,
     ATTORNEY, 400 Renaissance Center, Detroit, Michigan
22   48243;

23

24

25   For the Defendants (Continued):

1    Debevoise & Plimpton LLP, by CARI ALMO WINT, ATTORNEY,  919 Third Avenue, New York, New York 10022;

2

3    Shaheen & Gordon, P.A., by WILLIAM E. CHRISTIE, ESQ. and BENJAMIN T. SIRACUSA HILLMAN, ESQ., 107 Storrs Street, P.O. Box 2703, Concord, New Hampshire

4    03302-2703;

5    Nelson Mullins, by DAVID E. FIALKOW, ESQ., One Post Office Square, Boston, Massachusetts 02109;

6

7    Marks, O'Neill, O'Brien, Doherty & Kelly, P.C., MICHELLE J. MARZULLO, ATTORNEY, 600 Baltimore Avenue, Suite 305, Towson, Maryland  21204;

8

9    Pessin, Katz Law, P.A., by GREGORY K. KIRBY, ESQ., 901 Dulaney Valley Road, Suite 400, Towson, Maryland 21204;

10

11    Eccleston and Wolf, P.C., by THOMAS J. ALTHAUSER, ESQ., 7240 Parkway Drive, 4th Floor, Hanover, Maryland  21076-1378;

12

13    Gideon, Cooper & Essary, PLC, by CHRIS J. TARDIO, ESQ., 315 Deaderick Street, Suite 1100, Nashville, Tennessee 37238;

14

15    Fuller, Mitchell, Hood & Stephens, LLC, by HALLEY M. STEPHENS, ATTORNEY, 2565 Barrington Circle, Tallahassee, Florida  32308;

16

17    Morrison, Mahoney, & Miller, LLP, by ANTHONY E. ABELN, ESQ., 250 Summer Street, Boston, MA 02210-1181;

18    Law Offices of Jay J. Blumberg, ESQ., by CHRISTOPHER M. WOLK, ESQ., 158 Delaware Street, P.O. Box 68,

19    Woodbury, New Jersey  08096;

20    <u>VIA PHONE FOR THE OBJECTORS</u>:

21    Saamia Dasti, Attorney and John Sly, Esq.
    Sandra Lake, Attorney

22    Matthew C. Daly, Esq.
    Jason D. Lewis, Esq.

23    Jay J. Blumberg, Esq.
    Paul M. Corson, Esq.

24    Justin Saar, Esq.
    Joanna J. Chen, Attorney

25

```
 1              PROCEEDINGS
 2         THE CLERK:  All rise.  Today is
 3   November 7th, 2013.  We're on the record in the matter
 4   of New England Compounding Pharmacy Products Liability
 5   Litigation.  Can I have counsel for the plaintiffs'
 6   steering committee please identify yourself and then all
 7   parties who are present in the courtroom, please
 8   identify yourselves and the parties you represent.
 9         MR. FENNELL:  Good afternoon, your Honor,
10   Patrick Fennell from Roanke, Virginia for the
11   plaintiffs' steering committee.
12         MS. PARKER:  Good morning, your Honor,
13   Kristen Johnson Parker of Hagens, Berman, Sobol, Shapiro
14   for the plaintiffs' steering committee.
15         MR. GASTEL:  Good morning, your Honor,
16   Ben Gastel from Nashville, Tennessee on behalf of the
17   plaintiffs' steering committee.
18         MS. DOUGHERTY:  Good morning, your Honor,
19   Kim Dougherty on behalf of the plaintiffs' steering
20   committee.
21         MR. TARDIO:  Chris Tardio, your Honor, from
22   Nashville, Tennessee on behalf of five separate
23   Tennessee defendants and deponents.
24         MS. HUMPHREY:  Your Honor, I'm
25   Kathryn Humphrey from Michigan.  I'm here today on
```

10:34AM (line 10)
10:35AM (line 20)

1   behalf of Southeast Michigan Surgical Hospital.

2           MR. FIALKOW:  Good morning, your Honor, I'm

3   David Fialkow.  I'm here on behalf of the South Bend

4   Clinic.

5           MR. ALTHAUSER:  Good morning, your Honor,

6   Tom Althauser.  I'm from Maryland on behalf of Harford

7   County Ambulatory Surgery Center.

8           MS. MARZULLO:  Good morning, your Honor,

9   Michelle Marzullo on behalf of Baltimore Pain Management

10 10:35AM  Center.

11          MR. CHRISTIE:  Good morning.  My name is

12   William Christie from Concord, New Hampshire.  We

13   represent Dr. O'Connell's Pain Care Centers.

14          MR. HILLMAN:  Good morning.  I'm

15   Benjamin Siracusa Hillman, also from Concord,

16   New Hampshire and also representing Dr. O'Connell's Pain

17   Care Centers.

18          MS. WINT:  Good morning, your Honor,

19   Cari Wint from Debevoise & Plimpton.  We represent

20 10:36AM  Sahara Surgery Center, Surgical Park Center and the

21   Centennial Medical Center.

22          MR. MOYERS:  Good morning, Adam Moyers.

23          UNIDENTIFIED SPEAKER ON THE PHONE: I think

24   there may be a problem with the phone connection.

25          THE COURT:  For the people on the phone,

1    we've been able to solve, and I thank everyone for their

2    patience here, the great table caper I guess I would

3    call it, when I understand the parties showed up in the

4    courtroom this morning, there were tables missing and

5    apparently microphones as well, so at least for purposes

6    of the introductions, I'm sorry for the people on the

7    phone, but we really don't have enough microphones for

8    all the introducers.

9          I am going to ask when we get to the oral

10   argument, people are welcome to stay seated.  I find

11   that makes for a better presentation into the microphone

12   to stay seated, and if you're not able to get to a

13   microphone at the table to go to the podium, so my

14   apologies for those on the phone with respect to the

15   introductions, but hopefully that will be the only part

16   that you will miss.

17         MR. MOYERS:  Adam Moyers from Batten, Lee,

18   Raleigh, North Carolina for Surgery Center of Wilson,

19   North Carolina.

20         MS. TAYLOR:  Good morning, your Honor,

21   Kiersten Taylor from Brown, Rudnick on behalf of the

22   official committee of unsecured creditors.

23         MR. COREN:  Good morning, your Honor,

24   Michael Coren, Cohen, Placitella & Roth from

25   Philadelphia, and I'm here on behalf of the official

1   creditors' committee.  I'm one of the co-chairs.

2           THE COURT:  All right.  And anyone in the

3   back of the room?

4           MS. STEPHENS:  Your Honor, my name is

5   Halley Stephens.  I'm from Tallahassee, Florida.  I

6   represent Pain Consultants of West Florida.

7           MR. KIRBY:  Good morning, your Honor,

8   Gregory Kirby from Baltimore, Maryland, and I represent

9   three, The Pain Medicine Specialists, Box Hill Surgery

10  Center and Surgery Center of Bel Air.

11          MR. ABELN:  Your Honor, Anthony Abeln from

12  down the street on behalf of Pain Associates of

13  Charleston, LLC.

14          THE COURT:  All right.  I think that covers

15  everyone in the room who wishes to make appearance.  I

16  know that Mr. York already has noted the appearances of

17  those on the phone, so I will not go over that at this

18  time.

19          Since there's so many of you and there's so

20  many filings, what I thought I would do is ask pointed

21  questions initially about the various filings, and

22  obviously at the end, if I've missed anything and anyone

23  wants to add anything, they will be welcome to do so.

24          So let me start with the plaintiffs'

25  steering committee, and the first focus for me, what I'm

1    trying to determine is what is -- there's still a lot

2    left, but I want to be sure I understand what is left.

3    There seem to be, I have three different charts, one

4    from categorizing the different objections and the

5    parties, the nonparties that are objecting, and those

6    are from August 6th, October 16th and November 5th.

7            When I compare the November 5th chart to

8    earlier versions, there are a number of respondents that

9    are no longer listed.  Can I assume that either for the

10:39AM   10   entities that are no longer listed that those objections

11   or motions have been resolved or that they are

12   participating in the mediation program?

13           MR. FENNELL:  Your Honor, Patrick Fennell

14   for the plaintiffs' steering committee.  That is

15   correct.  We did remove four healthcare providers from

16   the previous chart and filed the new chart on the 5th.

17   We removed High Point Surgery Center, Premier

18   Orthopaedic and Sports Medicine, Inspira Health Network

19   and Insight Health Corp. because we have resolved the

10:40AM   20   remaining issues with respect to the PSC's subpoena, so

21   those were removed.

22           One other note is we added South Bend Clinic

23   from Indiana onto the chart.  They had originally

24   indicated their intention to participate in mediation

25   but then opted out of mediation, so we added them back

1   into the chart.

2            THE COURT:  All right.  So that was

3   certainly one of my questions about South Bend Clinic.

4   So with respect to the four that you identified, would

5   it be fair for me to deny the objections or motions to

6   quash without prejudice?

7            MR. FENNELL:  I think what we have done is I

8   would consider the objections and motions to quash

9   withdrawn, and when we get the production from these

10  clinics, there may be additional issues, but for now all

11  of the motions and objections are withdrawn.

12           THE COURT:  All right.  With respect to

13  Liberty Industries, there was filing docket Number 321

14  that suggested that the parties had resolved their

15  issues.  Is that correct?

16           MR. FENNELL:  Liberty Industries is not

17  really one of the healthcare providers that we're here

18  to discuss today.  Liberty Industries is one of the

19  national, what we call a national defendant, and

20  truthfully, your Honor, I'm not exactly sure what

21  Liberty's status is right now because I've been focused

22  on the healthcare providers' end of this and not the

23  national defendants.

24           MS. PARKER:  I can share with the Court that

25  the subpoena that was issued to Liberty was

1  substantially different in scope and materials requested

2  than the subpoenas that this Court is currently

3  addressing.

4          THE COURT:  All right.  So it sounds like

5  that entity should not be included in any order that

6  we're discussing or potential order today?

7          MR. FENNELL:  That's correct.

8          THE COURT:  All right.  So are there also

9  entities that are no longer listed in the chart,

10  Erlanger Health System, Carilion Surgery Center, HCA

11  Health Services of Tennessee, Howell Allen Clinic,

12  St. Thomas Outpatient and Doylestown Hospital.

13          MR. FENNELL:  Your Honor, I have the chart

14  that was filed two days ago in front of me.  I want to

15  make sure that I understand exactly what your Honor is

16  indicating.  St. Thomas Outpatient Neurosurgical Center

17  is on that chart.

18          THE COURT:  Yes, I see that now.  Perhaps it

19  got moved on and off.  So it is in for our purposes?

20          MR. FENNELL:  Yes.

21          THE COURT:  All right.

22          MR. FENNELL:  I understand there was a

23  second St. Thomas entity.  That is not on the chart, so

24  that was maybe the one your Honor is referring to.

25  Doylestown Hospital has been removed also from the chart

as -- and their objections are withdrawn also and motion

to quash.

THE COURT:  The other entities?

MR. GASTEL:  With respect to the Erlanger

and HCA, those subpoenas have been withdrawn, your

Honor.

THE COURT:  All right.  I think that just

leaves Carilion?

MR. FENNELL:  Carilion, we have resolved the

10:43AM  issues with Carilion, and their objections and motions

are withdrawn as well.

THE COURT:  The last sort of cleanup

question, my understanding from docket Number 537 is

Premier Orthopaedic withdrew their objections; is that

correct?

MR. FENNELL:  That is correct.  We --

THE COURT:  I'm sorry, you're welcome to

finish, and then we'll go to the gentlemen in the back.

MR. WOLK:  I'm sorry, your Honor, yes,

10:44AM  Christopher Wolk from the law office of Jay Blumberg on

behalf of Premier Orthopaedics.  We did write the Court

indicating that we withdrew our objections, however,

we'd like the record to reflect that we reserve the

right to bring those objections in the future should

there be additional subpoenas or requests for production

1   of documents.  As to this particular revised subpoena,

2   however, we've come to an agreement with the PSC, and we

3   will start to produce our documents.

4                   THE COURT:  All right.  Thank you.  All

5   right.  So I'm going to move onto the relevancy

6   objections, and my first question is relevancy as to

7   clinics that have no plaintiff patients, so I had

8   understood that Judge Saylor had already quashed the

9   subpoenas with respect to information pertaining to

10  nonplaintiff patients, but if I'm reading the subpoenas

11  correctly, they still seem to seek information from

12  those clinics where there are no plaintiffs or patients.

13  Is that correct?

14                  MR. FENNELL:  That's correct, your Honor.

15  Judge Saylor's order quashed the subpoenas insofar as

16  they were requesting protected health information for

17  individual people who were not parties in litigation.

18  The PSC is still seeking information from clinics or

19  healthcare providers which do not have patients involved

20  in litigation or which at least so far don't even have

21  identified injured people, and if I may, your Honor,

22  there's a lot of reasons why the information from these

23  healthcare providers would still be relevant in this

24  case.

25                  This is -- I wanted to suggest to the Court

1    that there are really two important factors to consider

2    when discussing the relevance issue.  One is that this

3    is not a national health catastrophe involving just one

4    actor, just New England Compounding Pharmacy.

5              There are many other actors involved in

6    this, and without the other actors, in fact, New England

7    Compounding Pharmacy would never have injured anybody,

8    and it never would have killed anybody, so there are

9    other actors involved here.  The question is is that the

10:46AM  10   clinics, the recipients of the subpoenas played a role

11   in allowing the catastrophe to happen.  Whether their

12   actions were negligent or not, they did participate in a

13   drama that unfolded that led to injured people and

14   deaths.

15             THE COURT:  So give me some specifics.

16   That's hard for me.  The relevancy argument is hard to

17   follow based on what you just said, right, I understand

18   why NECC is a defendant, but saying that there are many

19   other actors without actually linking them to the

10:47AM  20   defendants currently in the case, I'm not seeing the

21   relevance.

22             MR. FENNELL:  Yes, your Honor.  In order for

23   the plaintiffs' steering committee or anybody, for that

24   matter, to build a case against New England Compounding

25   Pharmacy, against the insiders and against the

1    affiliates, the plaintiffs' steering committee needs to

2    develop the case, needs to develop a set of facts in

3    terms of proximate cause of the injuries, the negligence

4    that took place at New England Compounding Pharmacy and

5    connect that with injuries and death, so the plaintiffs'

6    steering committee needs to know things like standard

7    operating procedures.  We need to know from the clinic

8    side of things --

9            THE COURT:  Just so I'm clear about that,

10:48AM   10   you want to learn about standard operating procedures

11   from nondefendants so then you will argue that New

12   England Compounding did not or defendant providers did

13   not follow other standard operating procedures employed

14   by similar entities?

15           MR. FENNELL:  We want to know -- if there

16   were standard operating procedures, we want to know what

17   they were.  We also need to know in terms of how New

18   England Compounding conducted its business in terms of

19   marketing, we want to know how the various healthcare

10:48AM   20   providers received the drugs, we want to know how the

21   various healthcare providers prepared the drugs for

22   administration to the various patients.  We want to know

23   how they procured the drugs, how they stored them, how

24   the whole administration took place from the procurement

25   of the drug to the point of administration, and the

1    reason this is important information to get from

2    nonparties is because it identifies several things.

3           It identifies a course of conduct on the

4    part of New England Compounding Pharmacy.  It identifies

5    potentially, at least, certain things like notice, what

6    did New England Compounding Pharmacy know that these

7    various healthcare providers were doing.

8           It establishes potentially a standard of

9    care that would be applicable to the clinics that are

10:49AM  10   parties to the case in terms of whether or not due

11   diligence, for example, was required, how many of these

12   clinics went back and inspected    New England

13   Compounding Pharmacy's premises just to see what type of

14   operation they were running, how many of these

15   pharmacies were required under state law.

16           THE COURT:  But why is the inspection by a

17   nondefendant of NECC relevant to the parties in the

18   case?

19           MR. FENNELL:  Because it can't, it has the

10:50AM  20   potential, at least, for establishing a standard of

21   care, for one thing.  This is the relationship between

22   these healthcare providers, and a compounding pharmacy

23   is not something that has been litigated a lot in the

24   past, this is kind of a unique set of circumstances, and

25   from my own personal experience, I can tell the Court

that we're speaking with pharmacists and doctors and

asking them what is the standard of care for a

physician, for example, who wants to purchase drugs from

a compounding pharmacy in these circumstances, and they

say, well, we don't know because, Number 1, they're

spread out all over the country, and this is not

something that's ever been litigated before, so this is

something that in order to build a liability case

against New England Compounding Pharmacy and the

insiders and the affiliates and the other clinics and

healthcare providers that are in litigation, we have to

have a better understanding of how the process should

have worked and also an understanding, a complete

understanding of how the process did work.

            MS. PARKER:  Your Honor, I'll add that not

all plaintiffs or all victims have filed complaints yet,

and there are a variety of reasons for that.  One is

that the statute of limitations in many states has not

run or is not close to running, so there's an

understandable reason why some attorneys may have

elected not to file former claims.

            Another reason is that we have this proof of

claim deadline in the bankruptcy that's in January.

Plaintiffs' attorneys are aware of that.  Another is

that the MDL process had contemplated that the

1    plaintiffs' steering committee would file a master

2    complaint, which we did yesterday, and that the

3    allegations in that master complaint would be available

4    for plaintiffs to adopt and to incorporate in their own

5    complaints, so having spoken with many plaintiffs'

6    attorneys, we were aware that many of them were waiting

7    for the master complaint to be filed to see what

8    allegations the PSC might propose that then could be

9    adopted by individual plaintiffs.

10:52AM    10    The short form complaints, as currently

11    scheduled, are due to be filed in late November.  We do

12    think we'll have a much clearer picture then in terms

13    of -- certainly a clearer picture in terms of which

14    subpoenaed defendants, which subpoenaed healthcare

15    providers are actually going to be named as defendants

16    in this MDL.

17    So that's sort of the reality of where we

18    are today.  It's worth noting, I think, that every

19    clinic that has been subpoenaed, including those in

10:53AM    20    front of you, which you're addressing objections,

21    purchased or received contaminated MPA manufactured by

22    New England Compounding Company, at least according to

23    the CDC's list they did.

24    So to prove our case, plaintiffs's cases

25    against NECC --

1          THE COURT:  Can I just add with one

2     exception, and you can tell me why this is an exception,

3     I believe that the Neurosurgical Group of Chattanooga

4     claims that it is not on the I don't know if it's the

5     CDC or the FDA list of NECC customers?

6          MR. GASTEL:  I'll take that question, your

7     Honor.  We are in receipt of documents where a clinic in

8     Chattanooga was informing patients that -- the clinic is

9     named Chattanooga Neurosurgery and Spine, and the

10:53AM   10     Secretary of State's website reveals that that is an

11     assumed name of the Neurosurgical Group of Chattanooga.

12     They were sending letters to patients informing them

13     that they were exposed to an NECC product.  That clinic

14     is not on -- neither of those clinics, your Honor, are

15     on the CDC list or the FDA list, which begs the question

16     of where did they get their NECC product if they were

17     sending these letters, and that's why the subpoena was

18     sent to that one entity.

19          THE COURT:  All right.  Just because this is

10:54AM   20     a very discrete issue, does someone who represents one

21     of those clinics want to speak to that?

22          MR. TARDIO:  Ma'am, Chris Tardio on behalf

23     of Chattanooga Neurosurgery and Spine.  Chattanooga

24     Neurosurgery and Spine is a physicians group that

25     injects at another site.  The physician group did not

1    purchase NECC product.  They're in the same position,

2    frankly, your Honor, as Howell Allen, another group that

3    I represent, and Dr. Jones, an individual physician I

4    represent, they did not purchase this product.

5            They were associated with entities that

6    purchased the product, however, these three recipients

7    of the subpoenas did not purchase the product in the

8    order that allowed these subpoenas to be issued, limited

9    it to purchasers of the product, and they similarly are

10:55AM  10    not, so on the discrete issue that your Honor asked

11    about, the Chattanooga Group of Physicians did not

12    purchase.

13            THE COURT:  All right.  Be rest assured, I'm

14    going to let everyone speak to everything, but in order

15    to keep us moving along, and I know you have something

16    else at 1:30, and so do I, and hopefully we're not going

17    to take that long.  Yes.

18            MS. PARKER:  Let me be very direct and to

19    the point then in answering your Honor's question as to

10:55AM  20    why the PSC is entitled to information from some of

21    these entities who have not yet been named as

22    defendants.  In order for us to prove our case against

23    New England Compounding Company and it's affiliated,

24    what we call the affiliated defendants, which includes

25    Ameridose, Medical Sales Management, Barry Cadden,

1    Lisa Conigliaro Cadden, Doug Conigliaro,

2    Carla Conigliaro and Gregory Conigliaro, we need to know

3    who these clinics spoke with when procuring MPA.  Did

4    they speak with, for example, employees of Medical Sales

5    Management or Ameridose, did they speak with employees

6    of New England Compounding Company, what role, if any,

7    did Medical Sales Management play in marketing these

8    products to clinics, were the clinics told by NECC,

9    Ameridose, MSM or any of the individuals that it was

10:56AM  10   okay for the clinics to submit false patient names, were

11   representations made to these clinics about how products

12   should be stored, what procedures needed to be followed

13   in order to ensure or at least enhance the sterility of

14   these products, did NECC make representations to these

15   clinics, NECC or any of the affiliated entities, make

16   representations to these clinics about the quality of

17   their products, about whether NECC was complying with

18   certain USP or other industry guidelines, what did NECC

19   represent about pricing, was NECC or any of the

10:57AM  20   affiliated entities selling their products as an equally

21   high quality but lower priced product?

22           I won't say to this Court that it would be

23   impossible for us to prove the case against NECC or the

24   affiliated defendants without that information, but it

25   is certainly information that is relevant to the

1    plaintiffs' claims in this case.

2                THE COURT:  So which are the clinics or

3    healthcare providers that at this time, and if it's

4    easier for you to submit a list afterwards, that's fine,

5    who are not -- who do not have any patients that are

6    either plaintiffs or, as you said, there's some

7    nonplaintiff victims at this point, which clinics are

8    those?

9                MS. PARKER:  So as I'm sure your Honor can

10:58AM   10   understand, that list is in flux.

11               THE COURT:  I understand.  So it would only

12   be what you know at this time?

13               MS. PARKER:  That's right.  So as of now, I

14   don't have the current list in front of me.  There was a

15   conditional transfer order that came through just a few

16   days ago that brought additional plaintiffs here.  There

17   also are many instances where plaintiffs' counsel have

18   sent letters of representation or otherwise informed

19   clinics about potential claims of a slightly different

10:58AM   20   bucket, I understand.

21               We would be happy to provide the Court

22   though with a list of those clinics that are currently

23   named understanding that when the short form complaints

24   then come in in November, that list probably changes

25   dramatically.

1                    THE COURT:  So that would be helpful, if you

2       could provide that.  How long do you need to do that?

3                    MS. PARKER:  Early next week.

4                    THE COURT:  That would be fine.  A week from

5       today?

6                    MS. PARKER:  Yes, thank you.

7                    THE COURT:  And I'm going to circle back on

8       the relevancy, I just want to ask the plaintiffs'

9       steering committee all my relevancy questions.  The next

10:59AM   10       question is why do you need the insurance policies of

11       nonparties?

12                    MR. FENNELL:  Your Honor, the plaintiffs'

13       steering committee concedes, I think, that insurance

14       policies in most cases are not discoverable, liability

15       policies are not discoverable unless somebody is a party

16       to a case.

17                    The unusual circumstances of this case, we

18       think, call for at least a minimal disclosure of

19       insurance policies for one very good reason, and that is

11:00AM   20       that this is a case where there are many, many injured

21       people and many people who have died.  There are very

22       limited assets to resolve these claims, and it would

23       just be in everybody's best interest, we think,

24       to -- for the plaintiffs' steering committee to at least

25       find out what policies are out there in terms of whether

1   those policies are wasting policies or not so that we

2   know if we're engaging in discovery battles over

3   subpoenas with various clinics whether or not we're

4   using up assets for that purpose, so that's at least a

5   limited reason for the plaintiffs' steering committee to

6   know at this point what the nature of these policies

7   are.

8           THE COURT:  All right.  What about the

9   articles of incorporation for nonparties?

11:00AM   10           MR. FENNELL:  The articles of incorporation

11   were requested, your Honor, because I believe we know of

12   some instances in which some clinics or healthcare

13   providers purchased drugs from New England Compounding

14   Pharmacy and then turned around and redistributed those

15   drugs to some related entities, some corporations that

16   it was affiliated with who may not have been direct

17   purchasers from New England Compounding but ultimately

18   ended up obtaining drugs that were manufactured by New

19   England Compounding, so what we're trying do is get some

11:01AM   20   idea of what the corporate structures are to find out if

21   there are any related entities, parent corporations or

22   otherwise that may have been involved.

23           THE COURT:  All right.  Then it's sort of a

24   relevancy question, but this is for the Pain Medicine

25   Specialist attorney, is that someone over here?  I

1    believe you had made an argument that what you should be

2    limited to in turning over was based on the bankruptcy

3    bench order with respect to patients and plaintiffs, and

4    I wasn't quite following that because it seemed to me

5    that was for a very different purpose, and,

6    unfortunately, I think you're going to have to go over

7    to the other side of the courtroom to the microphone.

8                    MR. KIRBY:  Your Honor, Greg Kirby.

9                    THE COURT:  Thank you.

11:02AM   10                    MR. KIRBY:  I think when I made that

11    argument, it was a while back, and it was before we had

12    entered into a stipulation agreement with the trustee

13    with regards to what information was going to get turned

14    over, so I don't think that really applies.

15                    THE COURT:  That's still alive?

16                    MR. KIRBY:  So I apologize.

17                    THE COURT:  Thank you.  That's helpful.  So

18    do any of the respondents or parties want to speak to

19    the relevancy issues that I have covered?

11:02AM   20                    MS. HUMPHREY:  I will, your Honor.

21                    THE COURT:  That would be great.  Perhaps

22    the court reporter doesn't need it, but it would be

23    helpful to me if you could identify yourself again and

24    who you're representing.

25                    MS. HUMPHREY:  Absolutely.  May I sit?

1          THE COURT:  Yes, absolutely.

2          MS. HUMPHREY:  I am Kathryn Humphrey, and I

3    have one respondent, one deponent, Southeast Michigan

4    Surgical Hospital.  It is in that category that you put

5    your finger on, your Honor.  We have no patients who are

6    plaintiffs, we have no patients for whom we have

7    received letters of representation from counsel, we have

8    no patients for whom we have received claims, and, most

9    tellingly, we have been told by the Department of Mental

11:03AM   10   Health and the CDC that we have no patients who are

11   being tracked by them as a part of the fungal meningitis

12   outbreak.

13          Now, that's not particularly surprising.  My

14   client bought one small lot of I believe it was 25 vials

15   and didn't even use them all.  They were not all

16   administered.  Most of them were returned, so we're

17   talking about a small number of people, and yet we

18   received a subpoena for all of the things that your

19   Honor sees before you.

11:04AM   20          The answer that you received as to why there

21   is relevance to these sought-after documents is

22   something I would like to speak to quickly.  The litany

23   of things that Mr. Fennell gave you -- and maybe

24   Ms. Parker, too -- as to what kinds of things they need

25   to know in order to make their claim, included, it was

1    Ms. Parker, included a host of questions that started

2    with were there representations made as to how to store,

3    what the quality was, whether NECC was complying with

4    the USP requirements, whether this was equally high

5    quality but at a lower price, et cetera.

6              In order for them to prove a case of

7    liability against a defendant, they must show that

8    representations were causally linked to the injury that

9    was caused to a plaintiff, and, therefore, some

11:05AM  10   representation made by NECC to my client can have no

11   logical or legal connection to reliance by and injury to

12   a patient of a different clinic, a different hospital,

13   perhaps in a different part of the country.

14             Nothing that NECC said, whether it was

15   truthful or deceitful, can have any effect on the claims

16   that a plaintiff is making against other defendants, and

17   there are no plaintiffs who are making claims against

18   Southeast Michigan Surgical Hospital, so that is the

19   break in the link, you called it a link, and you were

11:06AM  20   absolutely right, and there is a break here, and that is

21   the problem broadly stated in the relevancy argument.

22             THE COURT:  All right.  Anyone else want to

23   speak to the relevancy argument?  Yes.

24             MS. WINT:  Good morning, your Honor,

25   Cari Wint from Debevoise & Plimpton on behalf of

1   Surgical Park and Sahara Surgery Center.  Surgery Park

2   and Sahara are actually both in the same position as

3   Southeastern Michigan Surgical Hospital, and we agree

4   completely with what Ms. Humphrey just said, so I will

5   leave that there.

6           I'd like to speak just briefly to point out

7   with regard to Sahara Surgery Center that in addition, I

8   think Sahara is in a unique position because it received

9   only five vials of MPA from one of the tainted lots from

11:07AM  10   NECC.  It never opened any of those vials.  Those vials

11   actually stayed on the loading dock.  They were received

12   I think on a Friday afternoon, and we received the

13   recall notice I believe Monday morning, so those vials

14   were actually shipped back unopened, and that is noted

15   on the CDC list, so in terms of relevance, we think

16   that's a very important point.

17           THE COURT:  Thank you.  Yes.

18           MR. CHRISTIE:  William Christie for

19   Dr. O'Connell's Pain Care Centers.  Just very briefly,

11:07AM  20   we agree with Ms. Humphrey's statements, but just so the

21   record is clear, I think there's just a slightly

22   different position for our clinic than many of the

23   nonparties here in that we are a clinic who has no

24   plaintiffs against us, a clinic that did receive product

25   from NECC but a clinic with no plaintiffs against us

1   over a year after these events have unfolded, but the

2   same arguments apply to our clinics as would apply to

3   the more limited scope that Ms. Humphrey spoke about.

4           THE COURT:  Thank you.  Anyone else?  Yes,

5   the gentleman, and then I'll take the lady in the back.

6           MR. FIALKOW:  David Fialkow on behalf of

7   South Bend Clinic echoing the point that there are no

8   plaintiffs asserting claims against the South Bend

9   Clinic, and I don't know if this is the appropriate time

11:08AM  10   to address it, address the relevance issue, but it

11   relates to the request that goes to finding out

12   information about purchases from other clinics, not

13   NECC, and so the relevance there is even further

14   removed.

15           This is request or docket Number 2 in the

16   subpoena received, and there's kind of other issues,

17   too, so I'll maybe just speak to the relevance portion

18   of it now, but we're talking about orders by a

19   nondefendant, a nonparty regarding patients that aren't

11:09AM  20   parties from an entity that isn't a party to the case,

21   so the relevance is even further attenuated in that

22   circumstance.

23           THE COURT:  All right.  Thank you.

24           MS. MARZULLO:  Thank you, your Honor,

25   Michelle Marzullo on behalf of Baltimore Pain Management

1  Center, if I could just address the insurance issue

2  briefly.  The PSC in what they have presented to you

3  today, and, indeed, what they wrote in response to my

4  center's objections, it appears that they are using the

5  insurance information to determine whether or not to

6  file suit against certain individual clinics.  That

7  is -- that's a prejudicial use of the insurance

8  policies, the insurance policies which are nonrelevant

9  to any of the current parties.

11:10AM  10         At least in my case, I have a nonparty

11  objector.  There are no known plaintiffs who are clients

12  of my center, so the insurance policies that my center

13  might have or might not have, it should not be used to

14  determine whether or not the PSC or any of the

15  plaintiffs' counsel would choose to file suit, or, well,

16  would choose to file suit against my client.

17         The same goes for the corporate information

18  that they're requesting, and in my reading of the

19  revised subpoena request, it's not just articles of

11:10AM  20  incorporation, but it's also the bylaws that are

21  requested.  Again, that information, well, first off,

22  the articles of incorporation, at least in Maryland, are

23  available online, so they can get that themselves.  The

24  bylaws, not some much.

25         Again, what is that information going to

1    tell them that is going to determine whether or not they

2    are going to sue my client?  To me, that's a prejudicial

3    use of the discovery process.  They have also with

4    regard to relevancy, they're asking for information as

5    to nonparty vendors that the nonparty clinics would use

6    that as a substitute or instead of turning to the NECC.

7              Again, where is the relevance of that

8    information?  The way I kind of think of it, your Honor,

9    is if I go out today and have lunch down the street here

11:11AM  10  and I get food poisoning and I decide to sue the

11    restaurant, for what reason would I go to the restaurant

12    down the street from my office in Towson, Maryland and

13    ask them for their insurance policies?  It makes no

14    sense.  Why would I ask the restaurant in Towson where

15    they buy their meat and their bread and their

16    vegetables?  It makes no sense for a lawsuit against a

17    Boston restaurant, and so I see that as akin to the

18    conversation that we're having today with regard to

19    these clinics.

11:12AM  20             This Baltimore Pain Management Center in

21    Baltimore, Maryland doesn't have any patients who are

22    currently plaintiffs in this case, so at this point,

23    requests for the insurance documents, our corporate

24    documents, vendor information, it's all irrelevant to

25    the parties in the case that Judge Saylor's order

1    referred to, it just doesn't connect.  Thank you.

2              THE COURT:  Thank you.  Anyone else on

3    relevancy?

4              MS. DOUGHERTY:  If I may on behalf of the

5    plaintffs' steering committee?

6              THE COURT:  Yes.

7              MS. DOUGHERTY:  Kim Dougherty.  I just

8    wanted to, first of all, just respond very briefly to

9    say that to assume that plaintiffs are making a decision

11:13AM  10   whether or not to sue clinics based upon their insurance

11   policies is simply outrageous and offensive.  We are

12   pursuing claims on behalf of people that have been

13   injured.

14             We do not look at insurance policies to make

15   that decision.  We represent people because they've been

16   wronged here.  Whether there's five dollars in insurance

17   or $20 million in insurance, we are representing our

18   clients to the best of our ability.

19             Moving on from that, your Honor, one thing

11:13AM  20   that I think we need the Court to be aware of is that

21   notices of claims have gone out.  Whether they're

22   plaintiffs or not at this point in time, there are folks

23   who just spoke to you telling you that plaintiffs --

24   there are no plaintiffs.  They have received letters of

25   representation from this very table, from people sitting

1    right at this table, and so what I would like and what

2    the plaintiffs' steering committee would like is for you

3    also not to order just a list of plaintiffs that are out

4    there, but to order all of the defendants who are

5    subject to these subpoenas to produce a list of patients

6    who have been identified, whether through a letter of

7    representation or notice that has been provided by any

8    lawyer that there's a claim out there, because I can

9    tell you I represent over 100 people, and I have maybe

11:14AM   10    five percent of my clients on file at this point in

11    time, and I think that a lot of other people are

12    similarly situated.

13          Now I can tell you who I've sent letters of

14    representation to, and we can, as the plaintiffs'

15    steering committee, tell you who us seven folks have

16    sent letters of representation to, but there are

17    hundreds of plaintiffs' lawyers out there, and we are

18    not able to capture the identity of every patient and

19    every person who has sent a notice to these facilities,

11:14AM   20    so we ask that you also place the burden on the

21    defendants to identify, self-identify when they have

22    received a letter of representation or a notice of any

23    kind by the same deadline that we have of the 14th.

24          THE COURT:  All right.  Moving onto the

25    witness fee issue, as I understand, that has largely

1    been resolved.  I understand that the PSC, the witness

2    fee is associated with the deposition testimony, and

3    that the PSC is no longer seeking depositions except

4    with respect to entities in Tennessee.  Is that correct?

5            MR. FENNELL:  That is correct, your Honor,

6    and it is the PSC's intention to pay the fee once a

7    deposition has been scheduled.

8            THE COURT:  Am I correct also, and perhaps

9    someone from Tennessee can address this, I don't believe

11:15AM  10  that any of the Tennessee entities objected on the basis

11   of the witness fee issue?

12           MR. GASTEL:  I believe that they did

13   initially, your Honor, and then we subsequently tendered

14   new subpoenas that were accompanied with the fee, and I

15   think that objection is functionally withdrawn or

16   mooted.

17           THE COURT:  All right.

18           MR. TARDIO:   That's correct, your Honor.

19           THE COURT:  Thank you.  With respect to the

11:16AM  20  scope of the time period for the subpoena, the requested

21   information, I had understood that the PSC reduced the

22   time frame for responsive documents from October 6th,

23   2010 to October 6th, 2012, and I was just wondering how

24   that comports with Judge Saylor's order authorizing

25   discovery from January, 2011 to November, 2012?

1        MR. FENNELL:  Your Honor, if I'm not

2   mistaken, the order from Judge Saylor to which you're

3   referring is document 192?

4        THE COURT:  Yes.

5        MR. FENNELL:  I believe that that time frame

6   that Judge Saylor was addressing in that order

7   specifically applied to protected health information --

8        THE COURT:  All right.

9        MR. FENNELL:  -- which is an issue that's

11:17AM   10   sort of been mooted at this point because of the rulings

11   subsequent from Judge Saylor and the bankruptcy court

12   action on that point.

13        THE COURT:  Thank you.  That's helpful.

14   Moving onto confidentiality, and specifically those who

15   raised attorney-client privilege objections, so I don't

16   know who wants to speak to this from the respondents.

17   Why is the -- and also business information, why isn't

18   the protective order that Judge Saylor entered not

19   sufficient to protect any confidential or business

11:17AM   20   information?

21        (No response)

22        THE COURT:  All right.  I'll move on.

23        Also, anyone who raised an attorney-client

24   privilege or work product objection, I was wondering how

25   they wanted me to evaluate that given that I have no

 1    privilege log?

 2                (No response)

 3                THE COURT:  All right.  Moving on, I'm going

 4    to move to the HIPAA and physician-patient privilege,

 5    and some people after or entities after the issuance of

 6    the qualified protective order I understand are still

 7    maintaining that that order is not sufficient to comply

 8    with the HIPAA regulations, so if someone is maintaining

 9    that objection, I'd be interested to hear from them why

11:18AM  10    the qualified protective order doesn't satisfy HIPAA.  I

11    understand we have a separate physician-patient

12    privilege argument as well.

13                (No response)

14                THE COURT:  All right.  Moving on to the

15    physician-patient privilege, why isn't that waived with

16    respect to any plaintiff?  And to the extent that it's

17    not waived, if I were to order the plaintiffs to sign a

18    waiver, why isn't that sufficient?

19                (No response)

11:19AM  20                THE COURT: I think some parties or

21    respondents had objected based on the time to comply

22    with the subpoena, and my understanding, and perhaps, as

23    you pointed out before this isn't relevant, but

24    Judge Saylor's order as captioned in Docket 192 allowed

25    for 30 days to comply.  Was there a reason why someone,

         1    if I was to order them to respond to a subpoena, why 30

         2    days wouldn't be sufficient?  Mr. Christie.

         3              MR. CHRISTIE:  I would give the Court -- and

         4    it would depend obviously on what the Court's order

         5    would be, but I could tell from our clinics with the

         6    extent of the information that is requested in the

         7    various locations, we have two locations and the various

         8    disparate places where the extent of this information is

         9    requested, with the healthcare practice, it's trying to

11:20AM 10    provide services that 30 days would not be sufficient to

        11    comply.  Something more like I think 60 days would be

        12    more appropriate.

        13              THE COURT:  All right.  Thank you.

        14              MR. FENNELL:  Your Honor, can I make a

        15    suggestion?

        16              THE COURT:  Yes.

        17              MR. FENNELL:  The subpoenas have been

        18    outstanding since June, and most of the -- I mean, we're

        19    approaching, I guess, maybe four months now or even

11:20AM 20    longer, and on top of that, the plaintiffs' steering

        21    committee has a deadline approaching of December 2d, I

        22    believe, by which we have to file a complaint against

        23    New England Compounding, and we would ask the Court if

        24    the Court is going to enter an order requiring

        25    production pursuant to the subpoenas, as we hope, that

1    the Court put a fairly short time fuse on it given that

2    four months have passed and this upcoming deadline.

3           Now, having said that, we would ask for

4    something like 14 days, but if clinics really have a

5    logistical problem with that, then we would encourage

6    them to contact us, and we can discuss it with them, and

7    we'll be flexible in that regard, but keeping an eye on

8    our deadline coming up for filing the complaint.

9           MS. PARKER:  I believe Mr. Fennell misspoke.

11:21AM  10   The deadline for filing the master complaint as to the

11    affiliated defendants is currently set for

12    December 20th.

13           THE COURT:  Thank you.  If I read the chart

14    correctly, it lists objections that have not been filed

15    with the Court.  Is that correct?

16           MR. FENNELL:  Yes, that's correct.  A few of

17    the objections were actually sent directly to the

18    plaintiffs' steering committee.

19           THE COURT:  So you've included them for sake

11:21AM  20   of completeness.  Obviously I can't rule on them if

21    they're not performing.

22           MR. FENNELL:  Yes, ma'am.

23           THE COURT:  Thank you.  Now, with respect to

24    burden, I think I've gone through most of the papers,

25    but I may have missed something.  I don't believe any

1   clinic provided examples for burden, sort of estimates

2   of time or expense, or did I miss something?  On the

3   burden issue as well, I think a number of respondents

4   said that the PSC should get discovery from NECC.

5   Obviously being in bankruptcy raises certain

6   difficulties with respect to discovery, but my

7   understanding is that there's some discovery allowed

8   from NECC, and, therefore, I was wondering what the

9   status of that was?

11:22AM   10            MR. FENNELL:  There is, your Honor, an

11   informal arrangement between counsel for the debtor and

12   the plaintiffs' steering committee to obtain a very

13   limited amount of discovery from New England Compounding

14   Center.  That comes with a couple of conditions.

15   Number 1, it is basically subject to the judgment of

16   counsel for New England Compounding whether they want to

17   disclose certain things or not.  They have worked with

18   us for months now, and they have disclosed some

19   documents, but it is ultimately subject to their

11:23AM   20   determination as to whether and how much they want to

21   respond to our requests because it is informal, and the

22   second thing is that the plaintiffs' steering committee

23   feels very strongly that the information we're getting

24   is very limited, and it is also struck subject to

25   certain confidential or protective probations that were

1       part of our agreement for the informal discovery, so

2       we're limited in what we can do with it and who we can

3       share it with at this point.

4                   MS. PARKER:  I will add also, your Honor,

5       that as part of the raid on NECC by other government

6       entities, we understand that some materials that had

7       previously been in New England Compounding's possession

8       may no longer be in New England Compounding's

9       possession, and I don't intend to take a position one

11:24AM  10      way or the other as to whether that's true, but it

11      certainly is a concern that I think everyone is

12      sensitive to here.

13                  THE COURT:  All right.  Moving onto I guess

14      it's a jurisdictional question as to whether or not the

15      District of Massachusetts can enforce subpoenas.  Having

16      read the cases, and perhaps you all can tell me,

17      otherwise I did not read any cases that were decided in

18      the context of an MDL.

19                  MR. FENNELL:  Your Honor, I guess initially

11:24AM  20      I'd like to point out, I think Judge Saylor already

21      issued an order on enforcement of the subpoenas.  I

22      believe his ruling was that he is permitted to enforce

23      them, and that is in document Number 377.

24                  MS. PARKER:  Sorry, Judge Saylor ordered

25      from the bench during a status conference that all

1   objections concerning jurisdiction or centralized

2   authority of this Court to issue or enforce subpoenas

3   would be denied, and that's noted in docket Number 340,

4   which is the electronic's clerk notes from the July 18,

5   2013 status conference.

6              THE COURT:  Thank you.  I should have picked

7   that up.  I appreciate that.  All right.  So those are

8   my questions.  I'm going to start with any -- did you

9   have something to add on that issue?

11:25AM  10              MR. FENNELL:  No, your Honor.  Actually I

11   would like to have an opportunity to respond briefly on

12   some of the relevance.

13              THE COURT:  What I would like to do is open

14   it up to any of the respondents to talk about any issue

15   that I haven't addressed or that we have addressed that

16   they would like to add anything to, and then I'll come

17   back to you for the last word on everything.

18              All right.  So, yes.

19              MS. MARZULLO:  This is Michelle Marzullo

11:26AM  20   with Baltimore Pain Management Center.  One of the

21   questions that you asked and then moved forward on, why

22   was the protective order not sufficient to protect

23   against the production of corporate documents I believe

24   is what you asked.

25              It's my understanding that the order, with

1    the protective order, if we're both referring to the

2    same document, which is document 192 is what I'm

3    referring to.  It's called order granting plaintiffs'

4    leave to serve subpoenas and qualified protective order

5    regarding protection of health information.

6           The way that I read that order was that the

7    qualified protective order was only regarding the health

8    information and did not cover corporate documents or the

9    relevancy thereof, and so, again, I go back to the

11:27AM   10    question of whether or not the corporate documents are

11    relevant.

12           THE COURT:  I believe there was also an

13    amended stipulated protective order of confidentiality

14    at Docket Number 397.  So I think -- in terms of the

15    business and proprietary information, I was wondering

16    why that wouldn't be protected by Docket Number 397.

17    You're correct that there's also 192, but you're right,

18    I took that as being particular to the health

19    information.

11:27AM   20           MS. MARZULLO:  Thank you, your Honor.  397

21    I'm not prepared to discuss.  Thank you.

22           THE COURT:  Do any other respondents want to

23    speak about issues in general?  Yes, I'll take you.

24    Just for purposes of the record, let me clarify that

25    when I asked questions before, I moved on because there

1    was no one that indicated that they wanted to respond to

2    it.  Yes.

3              MR. ALTHAUSER:  Your Honor, Tom Althauser.

4    I just want to make sure that at this point you wanted

5    to open it up for anything else that was on the chart?

6              THE COURT:  Yes.

7              MR. ALTHAUSER:  Thank you.  My client,

8    Hartford County Ambulatory Surgery Center is actually in

9    a unique position with regard to these objections.  My

11:28AM  10   client, I should say, is the only one that is in

11   Categories VI TU at page 20 of the chart, and I'll be

12   very brief with this.

13             What happened is that my client is served

14   with a subpoena.  I had many things that gave me pause

15   over this subpoena.  I sought to comply with the local

16   rule of this Court, which I knew there had to be one

17   since every other Court has it, and I tracked it down.

18             I was unable to confer with counsel.  I then

19   was forced to file an objection.  To this very day,

11:29AM  20   there has been nothing filed in court, in this court

21   responding to my objections.  There was no mention of my

22   client specifically, there was nothing ever filed, there

23   was no mention of my client whatsoever with his

24   objections, and they're consolidated, and the subpoena

25   should be quashed in its entirety as to my client for

1    that reason.

2            The corporate documents is a perfect

3    example.  I may have been able to reach some sort of

4    agreement with counsel prior to filing the motion with

5    regard to scope of corporate documents, and I could

6    continue on and on and on with the list, but as to my

7    client, it should be quashed in its entirety for that

8    reason.

9            THE COURT:  Are you saying that you have

11:29AM  10    distinctive arguments from the other respondents that

11    have not been addressed in general?

12            MR. ALTHAUSER:  No, your Honor, the

13    insurance -- I have waited on the insurance, it was a

14    distinctive argument that I made, but, in addition, in

15    my mind it should be quashed in its entirety as to my

16    client for the failure to be able to comply with the

17    local rule.

18            THE COURT:  Thank you.  Anyone else?

19            MS. DOUGHERTY:  Your Honor, if I may briefly

11:30AM  20    respond.  This is Kim Dougherty from Janet, Jenner &

21    Suggs.  My office has reached out to counsel for Harford

22    who just spoke.  We e-mailed, we called, so we did make

23    efforts to work out any objections that he had to the

24    subpoenas, client had to the subpoenas.  We made the

25    efforts to do so.  We were unable to actually reach him

1    or get a response, and it was our understanding that the

2    omnibus response that was filed by the plaintiffs'

3    steering committee was going to apply to all of the

4    objections that have been made by all of the clinics

5    rather than doing individual responses to everyone.

6              THE COURT:  Briefly.

7              MR. ALTHAUSER:  Yes, your Honor, I will be

8    brief because that's not accurate.  I, as is clear in my

9    motion that I filed, sent an e-mail, I made a phone

11:31AM  10    call, I sent a letter.  None of them were responded to,

11    at which point I had no choice whatsoever but to have to

12    file a motion to quash the subpoena in its entirety, so

13    the comments that anything that I was contacted

14    afterwards is totally irrelevant to that point.

15              THE COURT:  All right.  Thank you.  Any

16    other respondents?  Yes, I'm sorry, I did say you could

17    go next.

18              MR. TARDIO:  Thank you, your Honor.

19    Chris Tardio on behalf of five Tennessee parties and

11:31AM  20    nonparties.  I just want to make three very direct and

21    concise points that I don't believe have been addressed

22    or made yet.  First, specific to Tennessee, as I

23    understand it from the statements of plaintiffs'

24    counsel, one of the intentions of the subpoenas to

25    nonparties is to "establish the standard of care for

1    parties in the litigation."

2              Tennessee has specific case law,

3    *Lewis v. Brooks* is the name of the case, I don't have

4    the cite from memory, but persons not involved in the

5    care at issue cannot be compelled to give expert

6    testimony.  That's what the case says, and that's the

7    law in Tennessee, and as I understand from the

8    statements of counsel, that's the intention to use

9    nonparty subpoenas to establish the standard of care.

11:32AM  10          Tennessee also has ample case law that says

11   other people's personal practice does not set the

12   standard of care, the standard of care is set by expert

13   testimony, so, respectfully, on the relevance argument,

14   specific to Tennessee, that's an improper use of a

15   nonparty subpoena.

16             Secondly, as it pertains to Chattanooga

17   Neurosurgical Group, Howell Allen and Dr. Jones, three

18   of my clients, the original enforcement order was

19   limited to purchasers of product.  Those three entities

11:33AM  20   did not purchase product, and we filed affidavits to

21   that effect, and I believe, respectfully, the subpoenas

22   to those entities that did not purchase product are, 1,

23   improper; and, 2, outside the scope of the order that

24   originally allowed the PSC to issue subpoenas.

25             Thirdly, specific to two of my other

1    clients, three, I'm sorry, Howell Allen, St. Thomas

2    Outpatient and Specialty Surgery Center, all three of

3    those entities are now parties to the MDL.  They weren't

4    when the subpoenas were originally issued, but they are

5    now party defendants to cases in the MDL, and we've

6    cited in papers that at least as I read the District

7    Court opinions coming from the District of

8    Massachusetts, a Rule 45 subpoena is not the way you

9    discover information from a party, and for that reason,

11:34AM 10   respectfully, your Honor, I request that the subpoenas

11   to those three now parties be quashed and discovery of

12   those parties proceed under Rule 34, which is the way

13   that as I read the District Court rule orders it has

14   been done.

15            THE COURT:  My understanding is that you've

16   already received as now parties Rule 34 requests; is

17   that correct?

18            MR. TARDIO:   Yes, we have received --

19            THE COURT:  And are they identical or

11:34AM 20   they're different to the Rule 45 requests?

21            MR. TARDIO:  They're different.  I'm mean,

22   they cover a lot of the same issues, and I'm sure some

23   of the documents will fall under both, but they are not

24   identical.

25            THE COURT:  Any other respondents, yes?

MR. FIALKOW:  Thank you.  Again, David Fialkow on behalf of the South Bend Clinic. Judge, we had narrowed our issues and ordered that in filing 451.  There were two left.  One was the insurance piece.  You've heard enough about that, we don't need to speak to that, but the other point was one I started to talk about earlier with regard to request Number 2. That's a request where in the initial subpoena, it sought any and all documents regarding the procurement of MPA or a generic or name brand equivalents from anyone other than NECC.

I want to leave apart the relevance point I made earlier on.  You're talking about getting information from a nonparty, from what they bought from a nonparty regarding a nonparty patient regarding a noncontaminated drug and move on.

So what happened after our objection was, we said -- we had a number of objections, but they came back, and they limited the time scope of the period that they were looking for, but they also said we're going to clarify this and add three drugs.

Well, they weren't clarifying anything, they were adding three different drugs that they wanted to get, so what we wanted was the Court to say that the original subpoena, what they asked for is what they're

1    entitled to get, but beyond that, again, those points

2    wouldn't be relevant, but the fact that they're also

3    asking for equivalence of drugs, that's where the burden

4    would come in, and that's where a 30-day compliance

5    would come in.

6            To determine the equivalent of the three

7    drugs, cardioplegia, betamethasone, and triamcinolone --

8    I can't pronounce the word, but to have to go through,

9    look through lists of drugs, then make a determination

10   as to whether or not it's equivalent, and then go ahead

11   and produce it would be extremely burdensome, especially

12   considering the fact that it's coming from, it's

13   purchased from an entity that isn't even a party to the

14   case regarding a patient who isn't a patient in the case

15   and involves a drug that wasn't even contaminated.

16   Those are our points.

17           THE COURT:  Thank you.  Anyone else?  Yes.

18           MR. KIRBY:  Your Honor, Greg Kirby again,

19   this time on behalf of SurgCenter of Bel Air.  I just

20   wanted it to be noted for the record, I recently began

21   representing SurgCenter of Bel Air.  Once that happened,

22   I filed a motion of limited appearance just for the

23   point of objecting to the subpoena, filed the motion to

24   quash, and Judge Saylor's law clerk was helpful in that.

25           I'm not admitted here in the District of

1    Massachusetts, nor do I have an efiling log-in.  I've

2    had some issues getting that.  The point is I'm not on

3    the objection chart.  SurgCenter of Bel Air is not

4    listed on the objection chart.  It's a little hard to

5    follow.  I've got several different copies, and I'm not

6    sure which one is the current one, but, in any event, I

7    just wanted to make sure that I'm covered by filing the

8    motion to quash.  I'm in the same position, I'm a

9    nonparty subpoena recipient similar to Ms. Humphrey.

11:37AM   10         None of the patients are parties, no one is

11   injured, very limited scope, so I would just ask that

12   you consider the motion I filed even though I'm not on

13   the objection chart.

14         THE COURT:  All right.  Thank you.  Anyone

15   else?  Yes.

16         MR. HILLMAN:  Your Honor, Ben Siracusa

17   Hillman for Dr. O'Connell's Pain Care Centers.  Just

18   briefly to touch on a couple of issues that came up and

19   then a procedural issue.  One, with regard to

11:38AM   20   attorney-client privilege our view is that at the time

21   of production, if it is ordered, a privilege log would

22   be, you know, created if in fact any responsive

23   documents to whatever the ultimate --

24         THE COURT:  The hard thing for me now is I

25   don't even think I have categories, I think people just

1    raised the objection.  There's no examples.  Given

2    obviously the specific documents, you may not be able to

3    identify until you actually go through each document for

4    the production, but if I remember correctly, it was sort

5    of I don't know want to say generic.  I think there was

6    more than that, there was probably case law, but I don't

7    think there was a lot else in those objections.

8              MR. HILLMAN:  Yes, I understand.  I think

9    from our perspective, a specific ruling on

11:38AM  10   attorney-client privilege would not necessarily make

11   sense at this point, but that there may ultimately be --

12             THE COURT:  You're preserving it?

13             MR. HILLMAN:  Yes, we'd like to preserve

14   that, thank you.  The second issue, there was some

15   question about burden and no clinic raising burden.  I

16   mean, we've -- for our clinic in particular, and I

17   imagine for others as well, for us it would be

18   redactions of documents that are stored electronically

19   and in paper to remove patient identifying information

11:39AM  20   or other protected health information.

21             That itself is a vastly time-consuming

22   process.  Obviously errors in that process subject us to

23   legal exposure and complaints from our patients if we're

24   releasing patient identifying information, and that has

25   been one of our primary concerns throughout this whole

1    process that patients who are, you know, nonparties, not

2    plaintiffs, were not injured, you know, having their

3    patient information turned over and exposed.

4         Finally, just on the procedural matter, you

5    had asked the PSC to file a, you know, a document with

6    the Xs that we're all familiar with.  We had e-mailed

7    the plaintiffs' steering committee with our list of the

8    relevant Xs.  Three of those on our list were not

9    included, so we had filed a pleading document, 532,

10   indicating, you know, what additional Xs should be

11   marked, and in the latest chart, those are still not

12   marked, so we just wanted to call your attention to

13   that, and also, similarly, the plaintiffs' steering

14   committee filed a pleading, Document 544 where they

15   noted with regard to us, and perhaps other clinics as

16   well, that certain objections were not made in our

17   initial filings, and, therefore, were untimely and

18   should not be considered.

19        We would submit that of the five that they

20   identify with the exception of the attorney-client

21   privilege issue, which we did not specifically raise,

22   the other four, all of them were raised in our pleading,

23   Document 311 at pages 712 and 13 essentially, and so we

24   just, you know, would like to make that record.  Thank

25   you.

                    THE COURT:  All right.  Other respondents?

Yes.

                    MR. MOYERS:  Your Honor, Adam Moyers for

Surgical Center of Wilson, North Carolina.  I just

wanted to touch very briefly on the burden issue.  You

mentioned that no one gave specifics, but the issue with

burden is the weighing of the relevance of the material

requested vs. the burden, particularly on nonparties

like my client who has no patients who are parties, no

11:41AM  patients who are plaintiffs, no patients who have sent

any letter of representation to us in any way.

                    The courts throughout the country, both

here, down in the Fourth Circuit, where I'm from, even

as far out as California have recognized that with

nonparties, that burden carries a specific weight, more

so than with a party, and now that we've heard what the

relevance is according to the plaintiffs' steering

committee that there may be other patients out there

that they are attempting to establish some kind of

11:42AM  nebulous standard of care, I would highlight to the

Court that for a small rural clinic like Surgery Center

of Wilson and some of the other clinics here, that

burden of responding relative to their size far, far

outweighs the very tenuous relevance theory that we've

heard here today, and I would just ask the Court to just

1    deeply consider the burden on those small clinics.

2            THE COURT:  Thank you.  Next.

3            MS. HUMPHREY:  Your Honor, Kathryn Humphrey,

4    I'd like to add one thing to something that Mr. Fialkow

5    said when he was talking about Category Number 2 in the

6    revised subpoena and the request for equivalents to MPA,

7    and I thought it might be useful to the Court to know

8    that there are, for example, at least five equivalents

9    to generic MPA, so that addition by them of the

11:43AM  10   equivalent nexus increases the burden on all of our

11   hospitals and clinics in the Court orders' production

12   greatly to look for and then to provide, and I gave you

13   the example of how little of the NECC product my

14   hospital bought.  A hospital that bought very little

15   from NECC may have bought a great deal of some other

16   type of drug.  The relevance is nil, and the burden is

17   great.

18           THE COURT:  Thank you.  Any other

19   respondents?  All right.  The PSC, actually, if you

11:43AM  20   could also address the issue that's been raised about

21   the equivalents relevancy.

22           MR. FENNELL:  Yes, your Honor.  I'd like to

23   begin, if it pleases the Court, with just some general

24   comments about relevance and just first say that getting

25   back to the argument that was first presented by myself

1    and Ms. Parker.  We're trying to prove a case against

2    New England Compounding Center, against its affiliates

3    and against its insiders.

4              Without a complete picture of what was done

5    in terms of marketing through all of the clinics that

6    purchased this drug, without a big picture in terms of

7    what the administrative aspects were in terms of

8    communications between New England Compounding Pharmacy

9    and these healthcare providers who were purchasing the

11:44AM  10    drug, whether the healthcare providers were negligent or

11    not negligent or liable in some other way or not,

12    whether they had -- whether they have sick patients or

13    not, this is the kind of picture that the plaintiffs'

14    steering committee and other plaintiffs are going to

15    need to establish this liability case.

16              We don't -- the master complaint has just

17    been filed.  We can anticipate that there are going to

18    be all kinds of defenses coming out of the woodwork from

19    New England Compounding and from the affiliates and the

11:45AM  20    national defendants and everybody, and without this big

21    picture, we're not going to be able to respond to those

22    defenses as completely as we should be allowed to.

23              Just to be specific, there are detailed

24    requirements in many states about whether or

25    not -- about how to procure drugs from a compounding

1    pharmacy.  Some states require that it be done pursuant

2    to a specific, individual prescription for each patient,

3    and so whether or not New England Compounding Pharmacy,

4    you know, was complying with that requirement across the

5    board with all of these healthcare providers is

6    something that the plaintiffs' steering committee simply

7    needs to know to prosecute its cases.

8         Compliance in general with state and federal

9    regulations is something that the plaintiffs' steering

10   committee is going to have to know.  Likewise, in terms

11   of recalls, what did these clinics -- if clinics who

12   aren't on the radar because they have no plaintiffs and

13   no injured patients, if they had specific knowledge

14   about a drug that they had a problem with or found out

15   about and sent notifications back to New England

16   Compounding Pharmacy about it, that's clearly relevant

17   to this case.

18        So there's a lot of information that these

19   clinics can provide the plaintiffs' steering committee

20   and should provide the plaintiffs' steering committee

21   that will be highly relevant to our case against NECC

22   and its affiliates.

23        One of the attorneys raised the restaurant

24   analogy about somebody who got food poisoning in a

25   restaurant in Boston, and I would submit to the Court if

1   that one restaurant purchased from the same food

2   distributor as a dozen other restaurants in Boston, and

3   there was an outbreak that resulted in 70 deaths and 800

4   injuries, the documentation of the purchase and

5   acquisition of food from that one food distribution

6   company to 12 other restaurants who don't have any

7   injuries, I would submit to the Court would be highly

8   relevant to a case like that.

9           With respect to request Number 2, which is

11:47AM   10   the inquiry into the equivalents to MPA, the reason that

11   that was put in on a subpoena specifically was there's

12   been information out there that New England Compounding

13   Pharmacy was able to sort of take advantage of a market

14   that was identified for preservative-free

15   methylprednisolone acetate, that it was a drug that they

16   couldn't find anywhere else, the healthcare providers

17   couldn't find anywhere else, so they went to New England

18   Compounding Pharmacy.

19           The lack of equivalents or presence of

11:48AM   20   equivalents could be relevant to this case for reasons

21   having to do with procurement, for reasons having to do

22   with pricing, having to do with availability of the MPA,

23   the preservative-free form.

24           In addition to that, as far as I can tell,

25   none of the clinics or healthcare providers responding

```
 1    to the subpoenas specifically made the objection that

 2    the equivalents requirement in the subpoena was

 3    burdensome.  Plenty of them made objections because of

 4    burdensome, but I'm not sure, I would submit to the

 5    Court that some of them probably mentioned this in their

 6    discussion, but they didn't raise a specific objection

 7    just to the equivalents thing.

 8              Responding to Mr. Althauser's comments about

 9    I believe he said that he was unable to confer.  I,

10    myself, have responded to dozens of phone calls from

11    many healthcare providers about the subpoenas.  In

12    addition to my efforts, there have been a number of

13    attorneys not on the plaintiffs' steering committee but

14    helping the plaintiffs' steering committee out very

15    diligently, and to my knowledge I just can't imagine

16    somebody receiving a call from a clinic who wants to

17    discuss, meet and confer about the subpoena and not

18    getting a call back or being unable to confer, it just

19    doesn't sound plausible to me.

20              With respect to Mr. Tardio's comment about

21    the standard of care under Tennessee law, my

22    understanding of that law is that it applies only to

23    medical malpractice, and I'm not sure exactly what the

24    the scope of that law is, but there are many reasons why

25    the plaintiffs' steering committee in this case will
```

11:49AM (line 10)

11:49AM (line 20)

1    have to establish a standard of care in many different

2    contexts other than strictly medical malpractice.

3              Finally, I just wanted to add some comments

4    about burden.  Obviously the Court has to weigh the need

5    for the information that the plaintiffs' steering

6    committee has requested against the burden on the

7    claimants.  I would suggest to the Court that as far as

8    I can tell, there's so many, it's hard for me to

9    remember everything, but I don't remember any healthcare

11:50AM  10  provider coming back to us and specifically identifying

11    a burden that was inherent in the production of these

12    documents other than to say it is a big burden.

13              For example, the argument was made today

14    that redaction of documents could be a big burden.  We

15    have no idea what the volume of documents we're talking

16    about are or specifically what that burden is.  We don't

17    know whether we're talking about 10,000 pages of

18    documents or a million pages of documents, so those

19    objections haven't been made sufficiently for the PSC to

11:51AM  20  be able to respond in a meaningful way to a specific

21    objection, and I think given the late hour, it's time

22    for the clinics and the healthcare providers to just

23    start producing the documents.

24              The plaintiffs' steering committee has bent

25    over backwards over the last several months to, A,

1    reduce the scope of the original subpoena in the form of

2    several what we called accommodations to limit the scope

3    of the production required, to eliminate the deposition

4    thing and to address many clinics' concerns about not

5    having enough time to respond.

6              We have been on the phone with lots of

7    healthcare providers and worked out our differences, and

8    we've been willing to do that for a long time, but we've

9    been going at this for four months now.

11:52AM  10              What it really comes down to burdenwise is

11    that 800, probably more, people have been seriously

12    injured as a result of this case.  Close 70 people have

13    died as a result.  Ultimately the burden is spread out

14    amongst 75 to 80 clinics to help the plaintiffs'

15    steering committee develop the picture that we need to

16    prosecute this case against New England Compounding

17    Pharmacy and the affiliates, and we submit to the Court

18    that under the circumstances of that, of this case, that

19    burden is very reasonable, and I think that's all I have

11:53AM  20    to say unless Ms. Parker has anything to add.

21              MS. PARKER:  Just quickly, your Honor, as we

22    all know, the Federal Rules permit plaintiffs to take

23    discovery of third parties and nonparties for purposes

24    of collecting evidence relevant to proving their case

25    against another.

1          Mr. Fennell and I have given you both today

2     in our argument and in our briefing our best effort to

3     explain to this Court and these clinics why this

4     information is relevant to proving plaintiffs' cases.

5     We've also taken precautions to put in place protective

6     orders to ensure that both patient information and

7     confidential business information is treated

8     accordingly.

9          These clinics by and large admit that

11:54AM 10     they've purchased, received and injected their own

11     patients with contaminated products manufactured by

12     New England Compounding Company.  They're now apparently

13     unwilling to help the plaintiffs' steering committee

14     prosecute its case against NECC.

15          Clinics have made burden arguments and we

16     leave it to you, to this Court, to evaluate whether the

17     showing they have provided on those allegations of

18     burden is sufficient, but we note the clinics should not

19     be able to avoid producing discovery that is relevant to

11:54AM 20     proving the cases against New England Compounding

21     Company and the affiliated defendants simply because

22     they have not been sued yet.  Thank you.

23          THE COURT:  Thank you.  That was all very

24     helpful.  I don't know if I'll see you again, but thank

25     you very much.

1          THE CLERK:  All rise.  Court is in recess.

2              (Whereupon, the hearing was adjourned at

3     11:54 a.m.)

4

5                  C E R T I F I C A T E

6

7     UNITED STATES DISTRICT COURT )

8     DISTRICT OF MASSACHUSETTS ) ss.

9     CITY OF BOSTON )

10

11         I do hereby certify that the foregoing

12    transcript, Pages 1 through 61 inclusive, was recorded

13    by me stenographically at the time and place aforesaid

14    in MDL NO. 13-02419-FDS, IN RE:  NEW ENGLAND COMPOUNDING

15    PHARMACY CASES LITIGATION and thereafter by me reduced

16    to typewriting and is a true and accurate record of the

17    proceedings.

18         Dated this November 14, 2013.

19                   s/s Valerie A. O'Hara

20              _____

21              VALERIE A. O'HARA

22              OFFICIAL COURT REPORTER

23

24

25