**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC.  PRODUCTS LIABILITY LITIGATION | MDL No. 2419<br><br>Dkt. No. 1:13-md-2419 (FDS) |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | |

**PLAINTIFFS' STEERING COMMITTEE'S CONSOLIDATED RESPONSE TO THE TENNESSEE DEFENDANTS' MOTIONS ADDRESSING DISCOVERY, BELLWETHER PROTOCOL, AND PROTECTIVE ORDERS**

## I.     INTRODUCTION

The Tennessee Defendants' proposal is an invitation to disaster.  The PSC in good faith could not accept it.  The Court should not either.

To begin, the Plaintiffs' Steering Committee ("the PSC") proposes that each plaintiff complete a straight forward Plaintiff Profile Form (the same as the form required with the proof of claim in the bankruptcy) along with a medical records release for purposes of selecting bellwether plaintiffs;  thereafter, additional discovery of bellwether plaintiffs will occur after they are selected, including completion of a Plaintiff fact sheet, additional written discovery, and potentially plaintiff-specific depositions.

The Tennessee Defendants (as defined below) functionally propose that full written discovery over *all* plaintiffs in the MDL occur *before* bellwether selection.  This will have disastrous consequences and sacrifice the very efficiencies at the heart of MDL mass tort litigation.  There is simply no practical way to complete full written discovery of every plaintiff in the MDL *and* select bellwether plaintiffs in the near future.  The Court would be mired in discovery disputes over the completeness of individual plaintiff discovery, including conceivably

hundreds of motions to compel.  And since these individual discovery motions would be driven based on the individual requirements of each case, there would be little ability of the Court to resolve these motions on a global basis.

In short, the difference between the PSC and the Tennessee Defendants with regard to bellwether selection is this: the Tennessee Defendants want full discovery in hundreds of cases before a case is selected as a bellwether, the PSC, on the other hand, believes that full discovery should occur for approximately six cases and that the bankruptcy addendum and HIPAA release should provide ample information to the parties to select bellwether cases.

Next, the Tennessee Defendants propose unilateral changes to the Court's Protective Order.  They do so, in part, on the basis that they had no input on the issuance of the Protective Order.  That may be true; the Protective Order was first negotiated and entered before many defendants were in the MDL.  But the existing Protective Order is more than sufficient.  The Tennessee Defendants propose material changes principally to the manner in which deposition transcripts are redacted, the paralegals and staff who can access confidential information, and also seek a unique addition based on Tennessee state law.  As explained in greater detail below, each of these changes are unnecessary and/or legally unwarranted.  Moreover, accepting the Tennessee Defendants' premise would invite every Unaffiliated Defendant to make changes to standing orders entered once they entered this MDL, once again raising the prospect of the Court having to do this 70+ times each time a new Unaffiliated Defendant is named in the MDL.  This also is an administrative burden that is not warranted, especially in light of the unnecessary changes proposed by Tennessee Defendants.

The Tennessee Defendants also propose that this Court design individual, defendants' specific, Rule 26(f) discovery plans to govern discovery for each defendant.   Practically

speaking, this could easily be well over 70 discovery plans.  Indeed, the Tennessee Defendants, despite having largely overlapping interests, could not even among themselves agree on a discovery protocol order and as a result the Court is already faced with two competing discovery plans offered by substantially the same parties.[1]  The Court can expect similar results when other Unaffiliated Defendants join, namely that each Unaffiliated Defendant will request a full Rule 26(f) discovery plan to govern their own unique circumstances.  This obviously sacrifices the very efficiencies the MDL is designed to achieve with little or no benefit gained by the imposition of such a useless administrative burden.  Rather, the benefit of this request mainly appears to be that the Tennessee Defendants can delay providing responses to discovery that this Court has repeatedly stated should proceed "forthwith."  In short, the Tennessee Defendants have failed to demonstrate the need for individually tailored Rule 26(f) discovery plans, and the Court should not open this MDL to the slippery slope that each Unaffiliated Defendant is entitled to such a plan.

The PSC proposes a reasonable approach to managing this MDL, as explained in greater detail in its filing of November 25, 2013,[2]  that creates fewer administrative burdens and allows this case to prudently proceed to efficiently litigating the merits of Plaintiffs' claims.

The PSC is always disappointed when forced to put divergent proposals before the Court, but after extensive meet and confers, the PSC believed there was no other option.

## II.    PROCEDURAL HISTORY

On November 25, 2013, Saint Thomas West Hospital, f/k/a Saint Thomas Network, and Saint Thomas Health (collectively the "Saint Thomas Entities") and Saint Thomas Outpatient Neurosurgical Center, Howell Allen Clinic, Dr. John Culclasure, and Debra Schamberg

---

[1] *See e.g.*, Dkt. No. 597-2 and 592-2.
[2] Dkt. No. 591.

(collectively "STOPNC") and together with the Saint Thomas Entities, ("Saint Thomas") along with Specialty Surgery Center and Dr. Lister (collectively "SSC"), and together with Saint Thomas the ("Tennessee Defendants") filed and/or joined in the filing of:

1)      Response to Court's Directive in Further Support of Motion to Reconsider MDL Order No. 7;[3]

2)      Motion for Entry of a Second Amended Protective Order;[4] and

3)      Motion to Stay Objections and Responses To Discovery Pending Submission of a Discovery Plan and Amended Protective Order.[5]

MDL Order #7 sets out the current case management schedule for this MDL.  The Amended Stipulated Protective Order of Confidentiality (Dkt. No. 397) applies to all confidential documents produced during discovery in this MDL.

Previously, on September 26, 2013, Saint Thomas Entities and Saint Thomas filed or joined in the filing of a Motion for Reconsideration (Dkt. No. 457) seeking unidentified modifications to the existing case management schedule.

On October 7, 2013, the Plaintiffs Steering Committee ("PSC") filed a response to the Saint Thomas' Motion (Dkt. No. 478).  The Court heard argument on the Saint Thomas Motion at its regularly scheduled October 8, 2013 status conference and ordered the parties to meet and confer on the Saint Thomas Motion (Dkt. No. 519).  Thereafter, the PSC and the Tennessee Defendants conducted an extensive meet and confer.  Despite the parties holding at least six meet and confer telephonic discussions, exchanging numerous emails, and trading drafts of four different case management orders, they were unable to agree on many substantive issues.  At the November status conference, the Court ordered the PSC and the Tennessee Defendants to provide proposals by November 25, 2013 (See Dkt. No. 567).

[3] Dkt. No. 592.
[4] Dkt. No. 594.
[5] Dkt. No. 595.

On November 25, 2013 – after at least six additional meet and confer conversations and exchanging competing draft proposals – the PSC offered a proposal for resolving the Saint Thomas Motion.[6]  St. Thomas filed (1) a Response to Court's Directive in Further Support of Motion to Reconsider MDL Order No. 7;[7] (2) Motion for Entry of a Second Amended Protective Order;[8] and (3) Motion to Stay Objections and Responses to Discovery Pending Submission of a Discovery Plan and Amended Protective Order.[9] The PSC now files this consolidated response to the Tennessee Defendants' Motion.

### III.    AREAS OF DISAGREEMENT

Regrettably – despite dozens of hours meeting and conferring – the competing proposals submitted by the PSC and the Tennessee Defendants differ significantly.  The PSC therefore endeavors to present a side-by-side description of the parties' areas of agreement and disagreement, for the Court's convenience.[10]

| Initial Plaintiff Profile Forms |
|---|
| The parties agree that Plaintiffs should have to complete forms that provide information that can be used to select Bellwether Plaintiffs. |

| PSC's Position: | Tennessee Defendants' Position: |
|---|---|
| All plaintiffs will provide a Patient Profile Form (which the PSC proposes to use the PITWD Addendum that all plaintiffs will file with their proof of claim in the bankruptcy).  Thereafter, for those cases selected for | All plaintiffs must complete an 18-page detailed Plaintiff Fact Sheet that includes 21 requests for production (Dkt. No. 593-4).  This information is necessary to choose bellwether pools and additional discovery of |

---

[6] Dkt. No. 591.
[7] Dkt. No. 592.
[8] Dkt. No. 594.
[9] Dkt. No. 595.
[10] The PSC endeavors to fairly and neutrally represent the Tennessee Defendants' positions based on their pleadings and their representations during countless meet and confers, but recognize that the Tennessee Defendants and their pleadings of course speak for themselves.

| bellwether, plaintiffs will complete and serve full Plaintiff Fact Sheets and additional plaintiff-specific discovery can be conducted. | bellwether plaintiffs, once selected, will also occur later. |
|---|---|

| **Additional Information for Selecting Bellwether Plaintiffs** | |
|---|---|
| The parties agree that some additional information is needed to select Bellwether plaintiffs. | |
| **PSC's Position:** | **Tennessee Defendants' Position:** |
| All plaintiffs will provide a HIPAA-compliant medical release along with the Plaintiff Profile Form.<br><br>Plaintiffs should not have to produce HIV/AIDS records. Plaintiffs should only have to produce mental health records (per a defendants' request) in cases where mental health has been affirmatively put at issue by the plaintiff. The additional releases are unnecessary.<br><br>For those cases selected for bellwether pools, plaintiffs will complete and serve full Plaintiff Fact Sheets and additional discovery can be conducted. | All plaintiffs must respond to 21 requests for production in addition to completing the 18-page Plaintiff Fact Sheet (Dkt. No. 593-4).<br><br>All plaintiffs must sign the following releases with a ten year limitation on the records released:<br>- HIV/AIDS records<br>- Workers compensation records<br>- Education records<br>- Tax records<br>- Employment records<br>- Mental health records<br>- Insurance records<br>- Social Security records |

| **Master Complaint** | |
|---|---|
| The parties agree that the St. Thomas Entities who were not named in the Master Complaint should be able to tee up global issues of Tennessee law in an efficient manner. | |
| **PSC's Position:** | **Tennessee Defendants' Position:** |
| The PSC cannot be compelled to name St. Thomas Entities as defendants in the Master Complaint.<br><br>The PSC has no objection to the St. Thomas Entities filing a global motion to dismiss or | The PSC should amend the Master Complaint to name the St. Thomas Entities as defendants (Dkt. No. 592)<br><br>Or, the St. Thomas Entities will begin filing motions for summary judgment raising this |

6

| global motions for summary judgment that raise global issues of Tennessee law (with a negotiated briefing schedule). | issue in individual cases (*see, e.g.*, Dkt. No. 606). |
|---|---|

| **Bellwether Protocol** | |
|---|---|
| The parties agree that St. Thomas should have input into the protocol for selecting bellwether plaintiffs | |
| **PSC's Position:**<br><br>There should be a single bellwether protocol that applies to all cases.  All defendants should have input into the development of a bellwether protocol. | **Tennessee Defendants' Position:**<br><br>There should be a unique bellwether protocol that applies only to those cases against St. Thomas Entities (and, possibly, a unique bellwether protocol for each defendant named in the MDL) (Dkt. Nos. 592 and 597). |

| **Protective Order** | |
|---|---|
| The parties agree that a protective order is necessary to govern confidential information. | |
| **PSC's Position:**<br><br>The existing Amended Stipulated Protective Order of Confidentiality (Dkt. No. 397) sufficiently protects confidential information. The Tennessee Defendants have not identified specific reasons that the existing Protective Order is inadequate. | **Tennessee Defendants' Position:**<br><br>The existing Protective Order is inadequate, and a different protective order, one drafted solely by the Tennessee Defendants, should be entered (Dkt. No. 594). |

| **Discovery Related To Tennessee Defendants** | |
|---|---|
| The parties agree that Plaintiffs are entitled to discovery. | |
| **PSC's Position:**<br><br>The Court ordered discovery against parties and non-parties to commence "forthwith." Pursuant to that instruction, the PSC served master written discovery on the Tennessee Defendants in October and the Tennessee | **Tennessee Defendants' Position:**<br><br>St. Thomas should not have to respond to any written discovery until a written Rule 26(f) plan specific to each defendant has been filed with the Court (Dkt. No.595). |

| Defendants should provide written responses thereto and commence rolling production of documents as they are located. | |

## IV.     ARGUMENT

### A.  The Tennessee Defendants' Case Management Proposals are Inefficient or Unworkable.

#### 1.   The Tennessee Entities' Proposed Plaintiff Fact Sheet Threatens To Consume This MDL With Discovery Disputes.

The central disagreement between the PSC and the Tennessee Defendants involves the Plaintiff Fact Sheet ("PFS"), specifically, the form of the PFS, who must complete the PFS, and when.  The PSC proposes that all plaintiffs provide a Plaintiff Profile Form (which the PSC proposes to be the Bankruptcy Personal Injury Addendum along with a HIPAA-compliant medical release) and give defendants the opportunity to review these forms and the medical records compiled prior to making bellwether selections.  In the meantime all stakeholders can be working on developing a uniform and acceptable plaintiff fact sheet, bellwether protocols, and discovery protocols.  Thereafter, the parties can identify those cases set for initial bellwether selection, and then provide more detailed plaintiff fact sheets for the selected bellwether cases so that trial pools can then be determined based on this information.  In contrast, the proposed Tennessee Defendants' PFS seeks information irrelevant to the issues before the court, is unreasonably invasive, involves full written discovery over every plaintiff, and threatens to consume this MDL with discovery disputes.

The purpose of the Plaintiff Profile Form is to provide enough basic information for plaintiffs and defendants to select potential bellwether cases for the first round of trials.  It is not intended (or at least the PSC did not intend) for the Plaintiff Profile Form to be the full extent of

discovery produced by plaintiffs.  It appears that St. Thomas agrees, as their proposal also contemplates additional discovery from bellwether plaintiffs down the road.[11]

The Tennessee Defendants' proposed PFS is an 18-page invasive questionnaire appended with 21 document requests that the Tennessee Defendants propose be completed by every single plaintiff in the MDL prior to any bellwether selection.[12]  Much of the information sought has no relevancy to *any* claims raised in this litigation, let alone all claims.  Here is a sampling of the information requested by the Tennessee Defendants:

- **Request 22** requests a plaintiff provide detailed information on any absence from work lasting longer than 30 days at any time in the past 10 years.  By way of example, if a plaintiff went on a 30 day vacation to Europe in 2004, the plaintiff would have to disclose this.

- **Request 27** would require a plaintiff to disclose if any child, parent, sibling, or grandparent has been diagnosed with HIV/Aids or other diseases.  It goes without saying that whether a plaintiff's sister has HIV/AIDS cannot possibly have any bearing on any claim made in this litigation by any plaintiff.  To require ALL plaintiffs disclose this highly personal, family information is simply egregious.

- **Request 28** similarly requires plaintiffs to disclose virtually the full medical status of every child, parent, sibling, or grandparent as it specifically requests information related to "arthritis/joint pain, chronic pain, diabetes, heart attack, cardiac disease, high cholesterol, high blood pressure, blood clots, coronary artery disease, congestive heart failure, deep vein thrombosis, vascular disease, transient ischemic attack, or stroke."  Imagine a plaintiff with living parents and a set of elderly grandparents, a response to this request could consume multiple pages and take hours to complete, all for information that cannot be conceivably related to any claim in this litigation.

- **Request 48** requires a plaintiff to describe his alcohol use over the course of the past 10 years if the plaintiff has consumed a single alcoholic beverage during that time period.  Obviously whether a plaintiff consumes one glass of wine each year at Christmas could not conceivably be related to any claim in this litigation.

[11] Dkt. No. 593-22 at page 4.
[12] Dkt. No. 592-4.

- **Requests 51 and 52** require a plaintiff to provide essentially a full medical history for all illnesses and identify a host of medications that the patient may or may not have taken in the past ten years. The PSC cannot conceivably see how a patient receiving a steroid injection, for example, to combat a bee sting in 2004 has any relevancy whatsoever to any claim made in this litigation.

The above list is illustrative only. Numerous other requests in Tennessee Defendants' proposed PFS are equally broad and/or not reasonably tailored to lead to the discovery of admissible evidence. The 21 additional requests for production are similarly unbounded:

- **Request 6** requires a plaintiff to provide all documents related to any disability or worker's compensation claim filed by the plaintiff without restriction on time or scope. A plaintiff that filed a worker's compensation claim in 1981 related to a foot injury sustained in a job he retired from 10 years ago would have to produce these documents despite them being unrelated to any possible claim in this litigation.

- **Request 19** requires a plaintiff to produce all documents related to any benefit a plaintiff has received in the past from any illness or injury from any source unrestricted by time and scope. This requires plaintiffs to produce medical insurance benefit from every trip to the doctors office for every cold the plaintiff has suffered in their entire life.

- **Request 21** requires a plaintiff to produce every document the plaintiff, or plaintiff's attorney has obtained from any defendant in this lawsuit. Taken on its face this would require the reproduction of likely hundreds of thousands of pages of documents, documents that should already be in the possession of all defendants, by every plaintiff in this litigation. This is patently unworkable and obviously unnecessary.

The Tennessee Defendants' proposed PFS is unnecessarily long, seeks irrelevant information, and is simply too burdensome for every plaintiff in this MDL to complete. And at a very minimum, the Court should be reluctant to impose upon this MDL the unilaterally proposed PFS offered by one single party that has not been vetted or agreed to by any other party in this MDL.

The PSC's proposal is far more fair and far less fraught with peril.[13]  This streamlined process is far less administratively taxing while providing defendants an opportunity to obtain the information they truly need to make informed bellwether pool selections – all while saving the court the burden of being mired in discovery disputes for the foreseeable future.  It also does not require each and every plaintiff lawyer to bill his or her client for the considerable amount of time spent completing and checking an 18-page form with the client.  This has the practical effect of keeping more of any eventual recovery in victims' pockets (not lawyers' coffers).  Why create more work and more billing opportunities for lawyers on both sides of the aisle, when the simple and straightforward Plaintiffs' Profile Form and medical records release will provide enough information to make bellwether decisions?

### 2.  The Tennessee Defendants Proposal To File A New Master Complaint Is Without Merit.

The Tennessee Defendants next take issue with the Master Complaint filed by the PSC on November 5, 2013.[14]  Specifically the Saint Thomas Entities propose the PSC file a master complaint alleging specific allegations against them.  This request invites disaster and runs counter to the very purpose of a Master Complaint.  As noted at the prior hearing, the Master Complaint is simply meant to be an administrative tool to place in one document all of the claims at issue in this litigation.  The Saint Thomas Entities' proposal, if deemed persuasive, may require the PSC amend the Master Complaint each time an Unaffiliated Defendant not named in the Master Complaint is added.

The Defendants' argument serves to defeat the very purpose of a Master Complaint, and, accordingly, the PSC structured the Master Complaint and the Short Form Complaint to accommodate this unique problem without the need for constantly amending the Master

---

[13] *See* Dkt. No. 591.
[14] Dkt. No. 545.

Complaint.  This is a far more reasonable and administratively convenient manner to handle this than the Tennessee Defendants' proposal.

The Tennessee Defendants' claims that failure to address the Saint Thomas Entities in the Master Complaint means that it cannot file a master motion to dismiss.  This is not true.  The Saint Thomas Entities or, for that matter any Unaffiliated Defendant not named in the Master Complaint, can be permitted to file a motion to dismiss against the allegations in the short form complaint and can easily designate the short forms for which the motion could apply.[15]  This simple administrative issue is far easier than amending the Master Complaint a dozen times to permit Unaffiliated Defendants to file motions to dismiss.

Finally, the Saint Thomas Entities claim that it should be permitted to file a motion to dismiss because only claims of vicarious liability exist against it is not accurate.  As can be seen from the attached declaration, Plaintiffs' claims against these entities clearly involve broader allegations than strict vicarious liability claims.[16]

### 3.  The Tennessee Defendants Bellwether Proposal Is Inefficient.

Tennessee Defendants propose its own unique bellwether protocol to apply only to those cases against it.  This obviously invites each Unaffiliated Defendant to do the same, in other words it invites the development of potentially over 70 bellwether protocols.  This obviously defeats the very purpose of the bellwether selection process and the PSC could not in good conscious accept this proposal.  Instead, the PSC proposes a single bellwether protocol at this initial stage for all parties to work together to develop a uniform bellwether protocol.  This would obviate the need to develop unique bellwether protocols for every Unaffiliated Defendant

---

[15] The PSC extended this offer to counsel for the Saint Thomas Entities, but they remained steadfast in their position that they should be named in the Master Complaint. *See* Declaration of Benjamin A. Gastel, attached hereto as Exhibit A, ¶ 8.
[16] *Id.* at ¶¶ 2-6 (describing in detail the relationship between the Saint Thomas Entities and STOPNC and summarizing the claims brought against the Saint Thomas Entities in this litigation).

and allows all stakeholders to have a say in the development of this very important process.  The PSC submits this is a far more fair and economical approach than the one proposed by the Tennessee Defendants.

This is not an idle concern, as Specialty Surgery Center, who is represented by the very same counsel representing some of the Saint Thomas Defendants, has already filed a motion seeking its own bellwether protocol.[17]  The Court cannot reasonably desire the development of separate bellwether protocols for every Unaffiliated Defendant.

The PSC proposal, on the other hand, gives all stakeholders an opportunity to participate in the development of a universal bellwether process, and the PSC has even reached out to Unaffiliated Defendants not currently named, to ensure the fullest level of participation on the key development of case management issues.[18]  This will ensure that a bellwether protocol can be developed once, not potentially seventy times.  The superiority of this alternative is obvious, especially in light of the fact that the Court is already entertaining the need to develop more than one bellwether protocol.

Moreover, the PSC proposal is more consistent with the prevailing trends in multidistrict litigation bellwether protocols.  As one commentator, summarizing the prevailing trends and citing to the very same Judge Fallon law review article repeatedly cited by the Tennessee Defendants, states:

> Judge Fallon of the United States District for the Eastern District of Louisiana has suggested a three step process for selecting and implementing a case management plan that includes bellwether trials based on his experience with the Vioxx multidistrict litigation.  First, the parties and court must categorize the cases comprising the multidistrict litigation *based on objective, easily identifiable, and substantively significant variables*.  This serves the dual purposes of focusing the litigation on the most important

---

[17] Dkt. No. 597-3.
[18] Gastel Decl., ¶ 6.

> issues and provides a framework for ensuring that the cases ultimately selected as bellwethers are representative of the entire universe of cases.  Second, a discovery pool should be created of cases representative of the major variables chosen to catalogue the litigation.  In those cases forming the pool, the parties would be permitted to conduct case-specific discovery as they would in any typical trial.  Third, the individual bellwether trials must be chosen.[19]

The PSC proposal obviously follows this prevailing trend, while the Tennessee Defendants' jettison the first phase and immediately proceed to the second phase, with, as explained above, likely disastrous consequences.

Cognizant of the need to move bellwether selection process forward, the PSC will convene a meet and confer on bellwether protocol with all defendants immediately following the December 13 status conference.

**B.  The Tennessee Defendants' Proposed Changes to the Protective Order are Unnecessary**

The Tennessee Defendants filed a proposed new protective order[20] and a related brief in support[21] seeking certain changes to the Court's Amended Stipulated Protective Order of Confidentiality (the "Protective Order").[22]

The Tennessee Defendants first propose a change removing the obligation to designate portions of deposition transcripts as confidential.  The Tennessee Defendants propose instead that this be done on an item by item basis and on an as needed basis.  This is an unfair burden.  For instance, if a party wanted to file a portion of a deposition transcript in support of a motion, it would first have to reach out to all defense counsel and confirm the pages counsel intends to

---

[19] H. Thomas Wells Jr., *Recent Issues Arising in Multidistrict Litigation Bellwether Trials*, ABA Section of Litigation Join Committees CLE Seminar, January 19-21, 2012, at p.4-5  (internal citations omitted and emphasis added) (citing Eldon E. Fallon, *et al.*, *The Problem of Multidistrict Litigation: Bellwether Trials in Multidistrict Litigation*, 82 Tu. L. Rev. 2323 (June 2008)).
[20] Dkt. No. 594.
[21] Dkt. No. 596 at p. 8-11.
[22] Dkt. No. 397.

file are not meant to be covered by the protective order.  This is a tremendous hassle and would delay filing numerous motions.  It is far easier for those individuals with confidentiality interests in depositions to, after the deposition is taken, to designate those portions of deposition transcripts as confidential, *which is the exact same process the Court uses as it relates to hearing transcripts*.  The Tennessee Defendants offer no explanation for this proposed change, other than the process as outlined in the current Protective Order may be burdensome to the Tennessee Defendants.  This does not justify pushing even more work onto other parties in this litigation.

The Tennessee Defendants' next proposed change limiting the paralegals and staff who can access confidential information to only those who are specifically assigned to work on this litigation is unnecessary.  The Protective Order already extends to paralegals and clerical staff employed by counsel and the Tennessee Defendants' proposed change is unnecessarily limiting. For example, under the Tennessee Defendants' proposal, a paralegal working in counsel's office, but not directly working on this matter, who accidently read a designated confidential document in this litigation while searching for documents in an unrelated litigation would be in violation of the Protective Order.  This is simply unfair and ignores the realities of modern law practice.

The Tennessee Defendants' proposed change to Section 7(J) should be rejected.  The current Protective Order already places a "good faith" limit on disclosure of confidential material to witnesses, which should be sufficient to assuage the Tennessee Defendants' concerns about widely distributing confidential material to witnesses who do not necessarily need access to it. Moreover, witnesses will be required to abide by the confidentiality order when in receipt of such material providing further protections, which should further assuage any such concern.  The Tennessee Defendants alternatively propose a far stricter process that limits access, without court or party approval, to confidential materials to witnesses who were original custodians of the

document.  This will invite unnecessary briefing and endless meet and confers as to whether a witness should or should not be given access to a confidential document and would force the party seeking to use the document to reveal deposition strategy and deposition themes to the opposing party.  The PSC believes that the current Protective Order is sufficient to assure that witnesses do not abuse and violate the confidential interests of parties in this litigation without the need to spend endless amounts of time determining whether a witness can or cannot review a document.  No more complexity is needed.

The Tennessee Defendants' final proposed change (*i.e.*, seeking automatic rights to have ex parte communications with plaintiffs' treating physicians pursuant to T.C.A. § 29-26-121(f)) is simply contrary to Tennessee law.  Not surprisingly, the Tennessee Defendants never cite the *actual language* of the statute in support of this provision, presumably because they have not demonstrated, and could not demonstrate on a global basis, the applicability of this statute to every case involving a Tennessee Plaintiff.   In relevant part, T.C.A. § 29-26-121(f) states (emphasis added):

> **(f) (1)** Upon the filing of any "healthcare liability action," as defined in § 29-26-101, the named defendant or defendants *may petition* the court for a qualified protective order allowing the defendant or defendants and their attorneys the right to obtain protected health information during interviews, outside the presence of claimant or claimant's counsel, with the relevant patient's treating "healthcare providers," as defined by § 29-26-101. *Such petition shall be granted under the following conditions*:
>
> **(A)** The petition must identify the treating healthcare provider or providers for whom the defendant or defendants seek a qualified protective order to conduct an interview;
>
> **(B)** The claimant may file an objection seeking to limit or prohibit the defendant or defendants or the defendant's or defendants' counsel from conducting the interviews, which may be granted only upon good cause shown that a treating healthcare

16

provider does not possess relevant information as defined by the Tennessee Rules of Civil Procedure; and

**(C)** **(i)** The qualified protective order shall expressly limit the dissemination of any protected health information to the litigation pending before the court and require the defendant or defendants who conducted the interview to return to the healthcare provider or destroy any protected health information obtained in the course of any such interview, including all copies, at the end of the litigation;

**(ii)** The qualified protective order shall expressly provide that participation in any such interview by a treating healthcare provider is voluntary.

**(2)** Any disclosure of protected health information by a healthcare provider in response to a court order under this section shall be deemed a permissible disclosure under *Tennessee law, any Tennessee statute or rule of common law notwithstanding*.

**(3)** Nothing in this part shall be construed as restricting in any way the right of a defendant or defendant's counsel from conducting interviews outside the presence of claimant or claimant's counsel with the defendant's own present or former employees, partners, or owners concerning a healthcare liability action.

Obviously to trigger the rights to conduct these ex parte communications, the Tennessee Defendants have to go through a rather elaborate procedure with the Court, and must specifically identify the treating physicians to which they want to speak,[23] and must give the plaintiff an opportunity to object to the communication, and if an objection is lodged,[24] then the Tennessee Defendants would have to demonstrate that the information they seek to obtain is relevant.[25]   The Court then may issue a tailored qualified protective order with certain restrictions on the use of the information gleaned.[26]

---

[23] T.C.A. § 29-26-121(f)(1)(A)
[24] T.C.A. § 29-26-121(f)(1)(B)
[25] *Id.*
[26] *See* T.C.A. § 29-26-121(f)(1)(C) and (D)

17

The Tennessee Defendants have done none of that here and try to pass off as a routine part of litigation a very technical part of Tennessee's medical malpractice law that greatly impacts the privacy rights of all plaintiffs in this litigation.   The Tennessee Defendants' attempts to obtain this right in a global protective order is obviously not supported by the plain language of the statute.[27]

Moreover, the PSC maintains that this is a procedural rule governing discovery that cannot apply in federal court cases.   Although the PSC does not believe that this is the appropriate time to brief at length this issue, case law shows that when a state medical malpractice law addresses issues related to discovery, such laws are not generally applicable in federal courts.[28]   T.C.A. § 29-26-121(f) clearly dictates how a court is to conduct discovery and cites to the Tennessee Rules of Civil Procedure.[29]   Accordingly, the PSC maintains that the Tennessee State Legislature cannot impose restrictions on a federal court's power to conduct discovery in accordance with the Federal Rules of Civil Procedure, and therefore, T.C.A. § 29-26-121(f) does not apply in federal court.[30]

To the extent the Court entertains the Tennessee Defendants' proposed change over the PSC's objection, the PSC asks the Court to first give the parties a full opportunity to brief T.C.A. § 29-26-121(f)'s applicability in federal court proceedings.   Nevertheless at a very minimum, the Tennessee Defendants should be required to demonstrate the application of

---

[27] *Id.*

[28] *See e.g.*, *Willever v. United States*, 775 F. Supp. 2d 771, 781 (D. Mary. 2011)(refusing to apply state medical malpractice law's rules related to discovery because they had no application in federal court); *see also Lewis v. Womack Army Med. Ctr.*, 886 F. Supp. 2d 1304 (N.D. Fla. 2012) (same and collecting cases holding similar).

[29] *See e.g.*, T.C.A. § 29-26-121(f)(1)(B) ("The claimant may file an objection seeking to limit or prohibit the defendant or defendants or the defendant's or defendants' counsel from conducting the interviews, *which may be granted only upon good cause shown* that a treating healthcare provider does not possess relevant information as defined by the *Tennessee Rules of Civil Procedure.*")

[30] *See Willever*, 775 F.Supp. 2d at 781-82; *Womack Army Med*, 886 F. Supp.3d at 1308 (collecting cases).

T.C.A. § 29-26-121(f) in individual cases and this should not be resolved on a global basis in a protective order of this nature.

Accordingly, in light of all of the above, the PSC maintains that the current Protective Order is adequate and the Tennessee Defendants' proposed changes are legally unwarranted and unnecessary.

### C.  The Tennessee Defendants' Motion to Stay Discovery Is Meritless

The Tennessee Defendants' move for a stay of discovery pending individual Rule 26 discovery plans for each Unaffiliated Defendant.  Individual, defendant-specific discovery plans present the same problems as individual, defendant-specific bellwether selection processes (described above).  They would be both inefficient and unnecessary.

The Tennessee Defendants do take the curious position that the discovery served by the PSC is premature, on the basis that "Rule 26(d) prevents a party from 'seeking discovery from any source before the parties have conferred as required by Rule 26(f)," but in the *very next sentence* acknowledges that this restriction does not apply when "discovery is authorized by…court order."[31]  Obviously the Tennessee Defendants are aware that the Court, on September 18, weeks before the PSC served master discovery on the Tennessee Defendants, ordered that discovery over parties and non-parties commence "forthwith."[32]  The PSC believes the Court's instruction was clear that discovery was to proceed immediately, but the Tennessee Defendants appear to believe the Court did not mean what it said.

This position is even more curious given the Tennessee Defendants' inability to identify any prejudice it has suffered by being served master written discovery in the absence of such Rule 26(f) discovery plan.  Indeed, they cite to no efficiency or advantage of having a plan, only

---

[31] Dkt. No. 596 at 5.
[32] Dkt. No. 438, CMO 7, at 3.

that they want it.  The reality is the Tennessee Defendants have not faced duplicative discovery efforts or otherwise been prejudiced in the least by having written discovery served in the absence of a Rule 26(f) discovery plan, and indeed the PSC is at a loss to contemplate exactly what prejudice could be experienced.  After all, the Federal Rules of Civil Procedure provide safeguards and protections to litigants in discovery.

In short, it seems this proposal is just offered for delay and runs the added risk of creating an administrative nightmare for the Court once each Unaffiliated Defendant begins petitioning for individual Rule 26(f) discovery plans before proceeding with responses to master written discovery.

Accordingly, the Tennessee Defendants' Motion to Stay Discovery should be denied, and the Tennessee Defendants should be ordered to respond to the master written discovery propounded by the PSC immediately.  After all, they have been in possession of these requests for two months.[33]

## V.    CONCLUSION

In light of the foregoing, the PSC respectfully requests that the Court deny in entirety Docket Numbers 594, 595, and 597, deny the Tennessee Defendants' requests in Docket Number 592, and enter the proposed case management order proposed by the PSC on November 25, 2013.

---

[33] Dkt. Nos. 593-1 through 593-17.

Date:  December 10, 2013          Respectfully submitted:

**/s/ J. Gerard Stranch, IV**
J. Gerard Stranch, IV
Benjamin A. Gastel
BRANSTETTER, STRANCH &
JENNINGS, PLLC
227 Second Avenue North
Nashville, TN 37201
Telephone:  615/254-8801
Facsimile:  615/255-5419
gerards@branstetterlaw.com

*Plaintiffs' Steering Committee and Tennessee State Chair*

Thomas M. Sobol
Kristen Johnson Parker
HAGENS BERMAN SOBOL SHAPIRO, LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone:  617/482-3700
Facsimile:  617/482-3003
tom@hbsslaw.com
kristenjp@hbsslaw.com

*Plaintiffs' Lead Counsel*

Elizabeth J. Cabraser
Mark P. Chalos
LIEFF CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone:  415/956-1000
Facsimile:  415/956-1008
ecabraser@lchb.com
mchalos@lchb.com

*Federal/State Liaison*

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI 48075
Telephone:  248/557-1688
Facsimile:  248/557-6344
marc@liptonlaw.com

Kimberly A. Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue, Suite 365
Boston, MA 02116
Telephone:  617/933-1265
kdougherty@myadvocates.com

Mark Zamora
ZAMORA FIRM
6 Concourse Parkway, 22nd Floor
Atlanta, GA 30328
Telephone:  404/451-7781
Facsimile:  404/506-9223
mark@markzamora.com

Patrick T. Fennell
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, VA 24016
Telephone:  540/342-2000
Facsimile:  540/400-0616
pfennell@crandalllaw.com

*Plaintiffs' Steering Committee*

<u>CERTIFICATE OF SERVICE</u>

I, J. Gerard Stranch, IV, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system.  Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Date:   December 10, 2013

/s/J. Gerard Stranch, IV
J. Gerard Stranch, IV