# EXHIBIT 2



# Janet, Jenner & Suggs, LLC
## ATTORNEYS AT LAW

Howard A. Janet, P.C.* | Kenneth M. Suggs• | Robert K. Jenner, P.C.*±
Dov Apfel*± | Stephen C. Offutt*±≈ | Giles H. Manley, M.D., J.D.* | Gerald D. Jowers, Jr.• | Brian D. Ketterer∆

Sharon R. Guzejko* | Kimberly A. Dougherty◊ | Francis M. Hinson, IV• | Hal J. Kleinman∆‡ | Tara J. Posner*±† | Elisha N. Hawk*±≈
Justin A. Browne* | Joyce E. Jones* | Jessica H. Meeder*± | Leah K. Barron* | Lindsey M. Craig* | Jason B. Penn*±
Seth L. Cardeli §≠ | Samuel M. Collings*± | William F. Burnham*

OF COUNSEL
John C. Hensley, Jr.º | Steven J. German§≠± | Joel M. Rubenstein§≠ | Thomas G. Wilson■†♦

BAR MEMBERSHIPS
*Maryland | •South Carolina | ◊Massachusetts | ±District of Columbia | ≈Minnesota | ∆Pennsylvania
‡Illinois | †Florida | ºNorth Carolina | §New York | ≠New Jersey | ■West Virginia | ♦California

December 17, 2013

*Certified Mail No. 70110470000257800262*
**Return Receipt Requested**

Mr. Ronald D. Croatti, President
UniFirst Corporation
68 Jonspin Road
Wilmington, MA 01887

Re:   <u>Patel v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>

<u>Carter v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>

<u>Edwards v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>

<u>Musselwhite v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>

<u>Filipowicz v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>

<u>Whitehead v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>

<u>Cohen v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>

Janet, Jenner & Suggs, LLC
─ ATTORNEYS AT LAW ─

December 17, 2013
Page 2

> <u>Rousselle v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>
>
> <u>Kennedy v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>
>
> <u>Smith v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>
>
> <u>B. Cooper v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>
>
> <u>P. Cooper v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>
>
> <u>Montee v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>
>
> <u>Brady v. New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, et al.</u>

Dear Mr. Croatti:

      I represent the plaintiffs Pinal Patel, Individually, and as Personal Representative of the Estate of Gokulbhai M. Patel, Wilma S. Carter, Susan Edwards, Leslie Musselwhite, Theresa Filipowicz, Jesse Whitehead, Gerald Cohen, Lynn Rousselle, Michael Kennedy, Warren Smith, Brandy Cooper, Pamela Cooper, Donna Montee and Joseph Brady in the above-referenced matters. Plaintiffs and/or Decedents named received injections of contaminated methylprednisolone acetate that was compounded by New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center ("NECC") at its facilities at 697 Waverly Street in Framingham, Massachusetts. As a direct result of being injected with the contaminated steroids, the plaintiffs and/or decedents were hospitalized, subjected to painful lumbar punctures and other evaluative procedures and have endured many symptoms, including death. UniFirst Corporation, through its operating segment or division known as UniClean Cleanroom Services ("UniFirst"), was responsible for cleaning and sanitizing NECC's facilities, but UniFirst failed, *inter alia*, to properly perform those duties and failed to use reasonable care to prevent and eliminate contamination within NECC's facilities. This letter constitutes a demand upon UniFirst pursuant to Massachusetts General Laws, Chapter 93A, § 9 ("Chapter 93A"). Please immediately provide a copy of this letter to UniFirst's insurance carrier.

**Janet, Jenner & Suggs, LLC**
──────── ATTORNEYS AT LAW ────────

December 17, 2013
Page 3

**Relevant Facts**

On May 24, 2012 and September 13, 2012 Mrs. Carter was injected with methylprednisolone acetate by Kenneth R. Lister, M.D. at Specialty Surgery Center, located in Crossville, Tennessee. The methylprednisolone acetate that was injected into Mrs. Carter's spine was compounded and distributed by NECC.

On August 27, 2012 and September 10, 2012, Mr. Gokulbhai M. Patel was injected with methylprednisolone acetate by Vaughan A. Allen, M.D. at Howell Allen Clinic, located in Nashville, Tennessee and St. Thomas Outpatient Neurological Center located in Nashville, Tennessee. The methylprednisolone acetate that was injected into Mr. Patel's spine was compounded and distributed by NECC.

On July 17, 2012 Ms. Edwards was injected with methylprednisolone acetate by David M. Schultz, M.D. at MAPS – Edina Medical Pain Clinics, located in Minneapolis, Minnesota and Michigan Pain Specialists in Maple Grove, Minnesota. The methylprednisolone acetate that was injected into Ms. Edward's spine was compounded and distributed by NECC.

On June 28, 2012, August 9, 2012 and September 7, 2012 Mr. Musselwhite was injected with methylprednisolone acetate by Randolph Y. Chang, M.D. at APAC Centers for Pain Management, located in Chicago, Illinois. The methylprednisolone acetate that was injected into Mr. Musselwhite's cervical spine was compounded and distributed by NECC.

On July 20, 2012, August 10, 2012 and August 31, 2012, Ms. Filipowicz was injected with methylprednisolone acetate by Ritu T. Bhambhani, M.D. at Box Hill Surgery Center located in Abingdon, MD. The methylprednisolone acetate that was injected into Ms. Filipowicz's spine was compounded and distributed by NECC.

On August 16, 2012 Mr. Whitehead was injected with methylprednisolone acetate by Lisa E. Grant, M.D. at Ortho Maryland located in Baltimore, MD. The methylprednisolone acetate that was injected into Mr. Whitehead's spine was compounded and distributed by NECC.

On August 2, 2012 and September 6, 2012, Mr. Cohen was injected with methylprednisolone acetate by Lisa E. Grant, M.D. at Ortho Maryland located in Baltimore, MD. The methylprednisolone acetate that was injected into Mr. Cohen's spine was compounded and distributed by NECC.

On August 3, 2012 Ms. Rousselle was injected with methylprednisolone acetate by Russ Plewinski at Dr. O'Connell's PainCare Centers located in Somersworth, NH. The methylprednisolone acetate that was injected into Ms. Rousselle's spine was compounded and distributed by NECC.

On July 2, 2012, August 6, 2012 and August 27, 2012, Mr. Kennedy was injected with methylprednisolone acetate by Randolph Y. Chang, M.D. at APAC Centers for Pain

management, located in Westchester, Illinois. The methylprednisolone acetate that was injected into Mr. Kennedy's cervical spine was compounded and distributed by NECC.

On August 13, 2012 and September 10, 2012, Mr. Smith was injected with methylprednisolone acetate by Louis Bojrab, M.D. at Michigan Pain Specialists located in Brighton, Michigan. The methylprednisolone acetate that was injected into Mr. Smith's spine was compounded and distributed by NECC.

On May 30, 2012 and June 18, 2012, Mrs. Brandy Cooper was injected with methylprednisolone acetate by Adil Katabay, M.D. at BKC Pain Specialists located in Marion, Ohio. The methylprednisolone acetate that was injected into Mrs. Cooper's spine was compounded and distributed by NECC.

On September 24, 2012 and October 1, 2012, Mrs. Pamela Cooper was injected with methylprednisolone acetate by Adil Katabay, M.D. at BKC Pain Specialists located in Marion, Ohio. The methylprednisolone acetate that was injected into Mrs. Cooper's cervical spine was compounded and distributed by NECC.

On September 4, September 18, and October 2, 2012, Ms. Montee was injected with methylprednisolone acetate by Nikesh Batra, M.D. at BKC Pain Specialists located in Marion, Ohio. The methylprednisolone acetate that was injected into Ms. Montee's spine was compounded and distributed by NECC.

On August 29, 2012 Mr. Brady was injected with methylprednisolone acetate by G. Sudarshan, M.D. at Cincinnati Pain Management located in Cincinnati, Ohio. The methylprednisolone acetate that was injected into Mr. Brady's spine was compounded and distributed by NECC.

Methylprednisolone acetate is a steroid that is administered via epidural injection to patients suffering from back, neck and/or knee pain. Until October 2012, NECC compounded methylprednisolone acetate at its facility in Framingham, Massachusetts, and NECC compounded, marketed, sold and distributed tens of thousands of vials of methylprednisolone acetate to healthcare providers across the country.

Between January 2012 and August 2012, NECC's environmental monitoring program for its compounding facility yielded numerous microbiological isolates (bacteria and mold) within the cleanroom used for the production of methylprednisolone acetate. NECC and UniFirst knew or should have known of these findings. NECC and UniFirst failed to investigate those isolates and made no effort to identify those isolates, and NECC and UniFirst failed to take any corrective actions with regards to the isolates which were found. Despite these findings, NECC continued to compound, market, sell and distribute methylprednisolone acetate.

On September 21, 2012, the Centers for Disease Control and Prevention (the "CDC") was notified by the Tennessee Department of Health of a patient with the onset of meningitis following an epidural steroid injection. It was later determined that the patient had fungal meningitis.

December 17, 2013
Page 5

On its website, the CDC explains that "fungal meningitis occurs when the protective membranes covering the brain and spinal cord are infected with a fungus[,]" and that "fungal meningitis is rare and usually the result of spread of a fungus through blood to the spinal cord." According to the CDC, symptoms for meningitis include the following: new or worsening headache; fever; sensitivity to light; stiff neck; new weakness or numbness in any part of the body; slurred speech; and increased pain, redness or swelling at the injection site. Death may result from meningitis. The symptoms of fungal meningitis, according to the CDC, "are similar to symptoms of other forms of meningitis; however, they often appear more gradually and can be very mild at first. In addition to typical meningitis symptoms, like headache, fever, nausea, and stiffness of the neck, people with fungal meningitis may also experience confusion, dizziness, and discomfort from bright lights. Patients might just have one or two of these symptoms."

In late September 2012, NECC recalled the following lots of methylprednisolone acetate (PF) 80mg/ml that it had compounded and sold: Methylprednisolone Acetate (PF) 80 mg/ml Injection, Lot #05212012@68, BUD 11/17/2012; Methylprednisolone Acetate (PF) 80 mg/ml Injection, Lot #06292012@26, BUD 12/26/2012; and Methylprednisolone Acetate (PF) 80 mg/ml Injection, Lot #08102012@51, BUD 2/6/2013. NECC identified PCA Pain Care Center, located in Oak Ridge, Tennessee, Specialty Surgery Center, located in Crossville, Tennessee, St. Thomas Outpatient Neurosurgical, located in Nashville, Tennessee, MAPS – Edina Medical Pain Clinic located in Edina, Minnesota, Minnesota Surgery Center located in Maple Grove, Minnesota and APAC Centers for Pain Management located in Chicago, Illinois and Westchester, Illinois, Box Hill Surgery Center located in Abingdon, Maryland, Greenspring Surgery Center located in Baltimore, Maryland, Dr. O'Connell's Pain Care Centers located in Somersworth, New Hampshire, BKC Pain Specialists located in Marion, Ohio and Cincinnati Pain Management located in Cincinnati, Ohio as healthcare facilities that received vials of methylprednisolone acetate that were part of the September 2012 recall.

On October 6, 2012, NECC announced that it was recalling "all products currently in circulation that were compounded at and distributed from its facility in Framingham, Massachusetts." In NECC's October 6, 2012, press release, NECC advised that it was "notifying its customers of this recall by fax[,]" and that "[c]linics, hospitals and healthcare providers that have product which is being recalled should stop using the product immediately, retain and secure the product, and follow instructions contained in the fax notice."

Soon after the receiving the injection, Mr. Brady experienced constant stabbing and throbbing headaches, photophobia and a stiff neck. He was admitted to St. Elizabeth Healthcare on October 29, 2012 where he underwent painful lumbar punctures to evaluate meningitis. He was started on anti-fungal medication and began to develop night sweats and chills. Plaintiff understands that he will require additional medical care, including follow-up spinal taps and MRIs.

Soon after the receiving the injections, Mrs. Carter began to experience headaches, neck stiffness and weakness. She went to Cumberland Medical Center on October 5, 2012

where she underwent a painful lumbar puncture to evaluate meningitis. On October 11, 2012, she was admitted to Cumberland Medical Center where she was treated with anti-fungal medication. She began to experience worsening headaches, fevers, neck stiffness, weakness and visual hallucinations. Mrs. Carter was admitted to Cookeville Regional Hospital on October 30, 2012 after developing an epidural abscess secondary to receiving a tainted steroid injection that was required to be removed by surgery. Plaintiff understands that she will require additional medical care, including follow-up spinal taps and MRIs.

Soon after the receiving the injection, Mr. Patel experienced chills, fevers, dizziness and weakness. He was admitted to Heritage Medical Center and transferred to St. Thomas Hospital on October 17, 2012 where he underwent a painful lumbar puncture to evaluate meningitis. He was started on anti-fungal medication. After a long battle with fungal meningitis, he ultimately died.

Soon after the receiving the injection, Ms. Edwards experienced neck stiffness, headaches, photophobia, fever, chills and back pain that radiated with pain and numbness into both legs. On October 5, 2012, she underwent a painful lumbar puncture to evaluate meningitis at Fairview University Medical Center – Mesabi in Hibbing, Minnesota. She was started on anti-fungal medication after her lumbar puncture results were reviewed. Plaintiff understands that she will require additional medical care, including follow-up spinal taps and MRIs.

Soon after the receiving the injections, Ms. Filipowicz began to experience headaches. On October 5, 2012, she underwent a painful lumbar puncture to evaluate meningitis at Franklin Square Hospital located in Baltimore, MD. On October 25, 2012, she was admitted to MedStar Harbor Hospital located in Baltimore, MD. She developed an epidural abscess that required surgical removal. Plaintiff understands that she will require additional medical care, including follow-up spinal taps and MRIs.

On October 7, 2012, Mr. Whitehead was admitted to St. Agnes Hospital located in Baltimore, MD and underwent painful lumbar punctures to evaluate meningitis. He was started on anti-fungal medication after his lumbar puncture results were reviewed. Plaintiff understands that he will require additional medical care, including follow-up spinal taps and MRIs.

Soon after receiving the injections, Mr. Cohen experienced headaches, nausea, vomiting, difficulty concentrating, weakness, neck stiffness and suffered a stroke. On October 8, 2012, Mr. Cohen was admitted to Sinai Hospital located in Baltimore, MD and underwent a painful lumbar puncture to evaluate meningitis. Plaintiff understands that he will require additional medical care, including follow-up spinal taps and MRIs.

Soon after the receiving the injection, Ms. Rousselle experienced constant headaches, fatigue, neck stiffness, dizziness, nausea, vomiting, photophobia and vision changes. On October 22, 2012, she underwent a painful lumbar puncture to evaluate meningitis. In October 2012, she was diagnosed with fungal meningitis and began treatment. Plaintiff

**Janet, Jenner & Suggs, LLC**
———— ATTORNEYS AT LAW ————

December 17, 2013
Page 7

understands that she will require additional medical care, including follow-up spinal taps and MRIs.

Soon after the receiving the injections, Mr. Kennedy experienced neck pain, headaches, blurred vision, joint pain, dizziness, hot/cold sweats, nausea and extreme joint pain. On October 13, 2012, he underwent a painful lumbar puncture to evaluate meningitis at Advocate Good Samaritan Hospital. Mr. Kennedy was diagnosed with fungal meningitis and began treatment. Plaintiff understands that he will require additional medical care, including follow-up spinal taps and MRIs.

Soon after the receiving the injections, Mr. Smith experienced worsening headaches, vomiting, photophobia and extreme pain. On October 19, 2012, he was admitted to St. Joseph Mercy Hospital in Ann Arbor, Michigan where he underwent a painful lumbar puncture to evaluate meningitis. Mr. Smith was diagnosed with fungal meningitis and began treatment. Mr. Smith was admitted to St. Joseph Mercy Hospital on November 7, 2012 and was not discharged until January 4, 2013. He developed an abscess that was removed on November 8, 2012 during his hospital admission. He now suffers from arachnoiditis. Plaintiff understands that he will require additional medical care, including follow-up spinal taps and MRIs.

Soon after the receiving the injections, Mrs. Brandy Cooper experienced worsening headaches, nausea and stiff neck. On October 18, 2012, she underwent a painful lumbar puncture to evaluate meningitis at Marion Area Health Center located in Marion, Ohio. Plaintiff understands that she will require additional medical care, including follow-up spinal taps and MRIs.

Soon after the receiving the injections, Mrs. Pamela Cooper experienced worsening headache, neck stiffness and fevers. On November 8, 2012, she underwent a painful lumbar puncture to evaluate meningitis at Grady Memorial Hospital located in Delaware, Ohio. Plaintiff understands that she will require additional medical care, including follow-up spinal taps and MRIs.

Soon after the receiving the injections, Ms. Montee experienced worsening headache, weakness, neck stiffness, photophobia and blurred vision. On October 15, 2012, she was admitted to Marion General Hospital where she underwent a painful lumbar puncture to evaluate meningitis. After her lumbar puncture was reviewed, Ms. Montee was started on anti-fungal medication. Plaintiff understands that she will require additional medical care, including follow-up spinal taps and MRIs.

Soon after the receiving the injections, Mr. Musselwhite experienced fevers, headaches, photophobia, and confusion. He was admitted to Methodist Medical Center on October 7, 2012 where he underwent multiple painful lumbar punctures to evaluate meningitis. In November 2012, he was diagnosed with fungal meningitis and began treatment. Mr. Musselwhite has most recently had to have his gallbladder removed due to the prolonged anti-fungal treatment he needed to endure. Plaintiff understands that he will require additional medical care, including follow-up spinal taps and MRIs.

December 17, 2013
Page 8

### Liability

UniFirst holds itself out as a service provider delivering value-added services and products to, among other industries, the medical device, pharmaceutical, and other industries that utilize cleanroom controlled environments. UniFirst represents that it offers comprehensive cleanroom cleaning and maintenance programs to help ensure that facilities are operating within specified classification goals. UniFirst touts its expertise to companies like NECC.

UniFirst knows that particulates in cleanrooms are deposited onto surfaces such as floors, walls, work surfaces and machinery, and that these particulates may cause increases in manufacturing and product compounding reject rates. UniFirst, its agents, employees, representatives, and UniClean workers have, for many years, actual knowledge that visible and non-visible particulate loads can also lead to product contamination safety concerns for end users. In its marketing materials UniFirst acknowledges that to reduce these risks, it is imperative that an effective cleanroom cleaning program be implemented and maintained. UniFirst claims to follow stringent cleaning procedures and claims to employ highly-trained technicians as key components in eliminating such contamination threats.

At all times mentioned herein and material hereto, UniFirst held itself and its agents, servants, workers, representatives, personnel, and employees out to be skillful and qualified to deliver quality services and products and through the highest standards. Indeed, UniFirst represents that it is an ISO 9001: 2008 registered company offering services that include sterile and non-sterile garment services, and contamination control including cleanroom cleaning, fogging and environmental monitoring, among other services.

UniFirst recognizes the dangers associated with contaminated cleanrooms. In the company's own marketing materials, it acknowledges that "80% of the dirt and grime that enters your building is tracked in on the shoes of employees and visitors." UniFirst knows that any contract for services or products entered into with any company such as NECC has a direct benefit for customers, who are the intended beneficiaries of such contracts. For example, UniFirst has stated on its website and in marketing materials that over 70% of customers say that a poorly maintained facility "is enough reason not to patronize a business again," and that by hiring UniFirst, a company's "business image will remain spotless, and your customers and employees will know you care."

UniFirst markets its products and services aggressively, and represents that, among other things, "[t]o help with your infection control efforts, UniFirst delivers fresh mops and wipers and picks up your soiled ones on a regular schedule. We maintain inventory, perform hygienic laundering, and replace any worn out items."

**Janet, Jenner & Suggs, LLC**
——— ATTORNEYS AT LAW ———

December 17, 2013
Page 9

   UniFirst entered into a Contamination Control Service Agreement ("CCSA") with NECC on October 7, 2008, and renewed it thereafter, such that a contract existed in calendar years 2011 and 2012. According to the terms of the CCSA and later iterations, UniFirst agreed to furnish services with supporting materials necessary for the performance of its duties, which expressly included cleaning each cleanroom at NECC's facilities. UniFirst's duties were outlined in a Service Schedule attached and incorporated into the CCSA first signed and thereafter in force and effect. UniFirst's duties included cleaning and sanitizing each anteroom and cleanroom. The areas to be cleaned and sanitized by UniFirst employees included, but were not limited to, the floors, ceilings, and hoods of each room. UniFirst agreed to a triple decontamination process for each room, using products provided by UniFirst. UniFirst further agreed that, among other things, it would specifically provide its staff with cleanroom training and training regarding NECC's Standard Operating Procedures.

   UniFirst performed services and sold products to NECC each month, from calendar year 2010 through September 2012, and UniFirst invoiced NECC for services rendered. During the stated time frame, UniFirst failed to meets its own written standards in performing its contractual duties, allowing the contamination of the cleanrooms UniFirst was entrusted to clean in the following ways: (i) UniFirst employees, contractors and/or representatives, including those within the UniClean division, entered the NECC facilities (including the anterooms) in street clothes, without donning sterile or contaminant-free protection, such as shoe covers, hair caps, coveralls, and gloves that were readily available at the NECC facilities; (ii) UniFirst employees, contractors and/or representatives brought into the NECC anterooms and cleanrooms cleaning equipment, including mops, mop heads, sponges and buckets that had been moved through exterior environments, even though such equipment had not been sanitized by or cleaned appropriately, allowing contamination to occur throughout various parts of NECC's facilities; and (iii) UniFirst employees, contractors and/or representatives failed to clean or wipe shoes, boots and other footwear on floor mats used in the room entry process, thereby allowing contaminants into and throughout the NECC facility.

   UniFirst had actual knowledge of the dangers of bacteria, mold and other microorganisms. UniFirst knew or should have known that such contaminants - if not eliminated - would expose patients and end use consumers such as Wilma Carter, Gokulbhai Patel, Susan Edwards, Leslie Musselwhite, Theresa Filipowicz, Jesse Whitehead, Lynn Rousselle, Michael Kennedy, Gerald Cohen, Warren Smith, Brandy Cooper, Pamela Cooper, Donna Montee and Joseph Brady to contamination of products produced by NECC in its cleanrooms. Indeed, UniFirst had actual knowledge of the very mold that was ultimately found in the NECC facility. In a "white paper" found on the www.unifirst.com website, UniFirst identifies aspergillus niger as a "mold" that grows when garments are contaminated. In the white paper, UniFirst acknowledges that this mold represents one of the most common types of microorganism contaminants found in facilities like the NECC location.

December 17, 2013
Page 10

      Over a significant period of time, UniFirst willfully and knowingly failed to abide by regulations, laws and guidelines, including its own policies and procedures and those of NECC, set forth to protect consumer safety in the cleaning and ongoing maintenance of NECC's facilities, including the cleanrooms. Consequently, UniFirst allowed dangerous contaminants into, and failed to eliminate these dangerous contaminants from, NECC's facilities. For instance, between January 2012 and August 2012, NECC's environmental monitoring program for its compounding facility yielded numerous microbiological isolates (bacteria and mold) within the cleanroom used for the production of methylprednisolone acetate. Moreover, aspergillus niger was found or brought into NECC's facilities. UniFirst, its agents, and employees knew or should have known of the dangers of allowing contaminants into NECC's facilities, including its anterooms and cleanrooms.

      Unless UniFirst offers a reasonable settlement amount to resolve this matter, Wilma Carter, Gokulbhai Patel, Susan Edwards, Leslie Musselwhite, Theresa Filipowicz, Jesse Whitehead, Lynn Rousselle, Michael Kennedy, Warren Smith, Brandy Cooper, Pamela Cooper, Donna Montee, Gerald Cohen and Joseph Brady intend to amend their complaint to add claims against UniFirst pursuant to Chapter 93A based on the facts as summarized above.

**Damages**

> A plaintiff who has suffered physical injury through the fault of a
> defendant is entitled to recover for pain and suffering; for
> reasonable expenses incurred by him for medical care and nursing
> in the treatment and cure of his injury; for diminution in his
> earning power; and for such pain and suffering and such expenses
> and diminution of earning capacity as are shown to be reasonably
> probable to continue in the future. The measure of damages is fair
> compensation for the injury sustained.

*Rodgers v. Boynton*, 315 Mass. 279, 280 (1943). *Accord Donovan v. Philip Morris USA, Inc.*, 455 Mass. 215, 221 (2009).

      With respect to Chapter 93A claims, the following relief is provided:

> recovery shall be in the amount of actual damages . . . or up to
> three but not less than two times such amount if the court finds that
> the use or employment of the act or practice was a willful or
> knowing violation of said section two or that the refusal to grant
> relief upon demand was made in bad faith with knowledge or
> reason to know that the act or practice complained of violated said
> section two.

**Janet, Jenner & Suggs, LLC**
ATTORNEYS AT LAW

December 17, 2013
Page 11

Mass. G. L. c. 93A, § 9(3). Additionally, a prevailing plaintiff is also entitled to reasonable attorneys' fees and costs pursuant to Mass. G. L. c. 93A, § 9(4).

As a consequence of undergoing the ordeal of being injected with the contaminated drug, Wilma Carter, Gokulbhai Patel, Susan Edwards, Leslie Musselwhite, Theresa Filipowicz, Jesse Whitehead, Lynn Rousselle, Michael Kennedy, Warren Smith, Brandy Cooper, Pamela Cooper, Donna Montee, Gerald Cohen and Joseph Brady have suffered the injuries and/or death detailed above. They have not only incurred several thousand dollars in medical expenses, but, given the fungal contamination and the toxins that can be produced by these fungi, they will need long-term monitoring and/or treatment for allergies, cancer and strokes that are the foreseeable consequence of their exposure, that have even led to death in the case of Mr. Gokulbhai Patel.

Aside from these expenses, Wilma Carter, Pinal Patel and the beneficiaries of the Estate of Mr. Gokulbhai Patel, Susan Edwards, Leslie Musselwhite, Theresa Filipowicz, Jesse Whitehead, Lynn Rousselle, Michael Kennedy, Warren Smith, Brandy Cooper, Pamela Cooper, Donna Montee, Gerald Cohen and Joseph Brady obviously experienced and are still experiencing a great deal of pain and anxiety. It is simply impossible to overstate the severity of their ordeals.

Please be advised that if UniFirst or its insurer(s) fail to respond with a good faith offer of settlement within thirty (30) days of receipt of this letter, the Court may find additional violations of Chapter 93A and award reasonable attorneys' fees and multiple damages of up to three times the actual damages found at trial. *See* Mass. G. L. c. 93A, § 9(3).

## Conclusion

Pursuant to Massachusetts General Law, Chapter 93A, § 9, demand is made to UniFirst to make a reasonable offer of settlement within thirty (30) days of the date of this letter.

Sincerely,

Kimberly Dougherty

KAD/ofc

cc: Myra Staggs, Esq. (via electronic mail)
    David, Randolph, Smith & Associates (via electronic mail)
    Rischmiller & Knippel, LLP (via electronic mail)
    Levin & Perconti (via electronic mail)

**Janet, Jenner & Suggs, LLC**
ATTORNEYS AT LAW

December 17, 2013
Page 12

  Berger, Cox & Nienaber (via electronic mail)
  Doyle Raizner, LLP (via electronic mail)
  Saiontz & Kirk, P.A. (via electronic mail)
  Leslie Gladstone, Esq. (via electronic mail)
  Boynton, Waldron, Doleac, Woodman & Scott, P.A. (via electronic mail)
  Bill North, Esq. (via electronic mail)