1            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2

3

4    IN RE:  NEW ENGLAND           )  MDL NO. 13-02419-FDS
     COMPOUNDING                   )
5    PHARMACY CASES LITIGATION     )
                                   )
6                                  )
                                   )
7                                  )
                                   )
8

              BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
9

10

11

                    STATUS CONFERENCE
12

13

14

15    John Joseph Moakley United States Courthouse
                   Courtroom No. 2
16                 One Courthouse Way
                   Boston, MA 02210
17

18                 December 13, 2013
                    11:04 a.m.
19

20

21

22

23          Valerie A. O'Hara, FCRR, RPR
               Official Court Reporter
24    John Joseph Moakley United States Courthouse
            One Courthouse Way, Room 3204
25               Boston, MA 02210
            E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The Plaintiffs:

3       Hagens, Berman, Sobol, Shapiro, LLP,
     by KRISTEN JOHNSON PARKER, ATTORNEY, 55 Cambridge
4    Parkway, Suite 301, Cambridge, Massachusetts 02142;

5       Ellis & Rapacki LLP, by FREDERIC L. ELLIS, ESQ.,
     85 Merrimac Street, Suite 500, Boston, Massachusetts
6    02114;

7       Janet, Jenner & Suggs, LLC, KIMBERLY A. DOUGHERTY,
     ATTORNEY, 75 Arlington Street, Suite 500, Boston,
8    Massachusetts  02116;

9       Lieff, Cabraser, Heimann & Bernstein, LLP, by MARK P.
     CHALOS, ESQ., One Nashville Place, 150 Fourth Avenue,
10   North, Suite 1650, Nashville, Tennessee 37219-2423;

11      Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ.,
     366 Elm Avenue, SW, Roanoke, VA 24016;
12
        Leader, Bulso & Nolan, PLC, by WILLIAM D. LEADER,
13   JR., ESQ., 414 Union Street, Suite 1740, Nashville,
     Tennessee 37219-1734;
14
        Branstetter, Stranch & Jennings, PLLC, by J. GERARD
15   STRANCH, IV, ESQ., ESQ., 227 Second Avenue North,
     Nashville, Tennessee 37201-1631;
16

17   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

18      Brown Rudnick, by KIERSTEN A. TAYLOR, ATTORNEY,
     One Financial Center, Boston, Massachusetts  02111;
19
        Cohen, Placitella & Roth, P.C., by MICHAEL COREN,
20   ESQ., 2 Commerce Square, 2001 Market Street, Suite 2900,
     Philadelphia, Pennsylvania  19103;
21
        Harris Beach PLLC, by FREDERICK H. FERN, ESQ.,
22   100 Wall Street, New York, New York  10005;

23      Hinshaw & Culbertson LLP, by DANIEL E. TRANEN, ESQ.,
     28 State Street, 24th Floor, Boston, Massachusetts
24   02109;

25

```
1    For the Defendants (Continued):

2        Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ.,
     1150 Huntington Building, 925 Euclid Avenue, Cleveland,
3    Ohio 44115-1414;

4        Michaels, Ward & Rabinovitz LLP, by DAN RABINOVITZ,
     ESQ., One Beacon Street, Boston, Massachusetts 02108;
5
         Todd & Weld LLP, by CORRINA L. HALE, ESQ. and
6    CHRISTOPHER WELD, JR., ESQ., 28 State Street,
     31st Floor, Boston, Massachusetts 02109;
7
         Lawson & Weitzen, LLP, by FRANKLIN H. LEVY, ESQ.,
8    88 Black Falcon Avenue, Boston, Massachusetts  02210;

9        Ulmer & Berne LLP, by JOSHUA A. KLARFELD, ESQ.,
     1660 West 2nd Street, Suite 1100, Cleveland, OH
10   44113-1448;

11       Donovan & Hatem, LLP, by KRISTEN R. RAGOSTA, ESQ.,
     Two Seaport Lane, Boston, Massachusetts  02210;
12
         Nutter, McClennen & Fish LLP, by SARAH P. KELLY,
13   ATTORNEY, World Trade Center West, 155 Seaport
     Boulevard, Boston, Massachusetts  02210-2604;
14
         Fulbright & Jaworski, LLP, by MARCY H. GREER,
15   ATTORNEY, 98 San Jacinto Blvd, Suite 1100, Austin, Texas
     78701;
16
         Debevoise & Plimpton LLP, by CARI ALMO WINT,
17   ATTORNEY,  919 Third Avenue, New York, New York 10022;

18       Law Offices of Jay J. Blumberg, ESQ., by JAY J.
     BLUMBERG, ESQ., 158 Delaware Street, P.O. Box 68,
19   Woodbury, New Jersey  08096;

20       Curley & Curley, P.C., by LISABETH RYAN KUNDERT,
     ATTORNEY, 27 School Street, Boston, Massachusetts
21   02108;

22       Morrison, Mahoney, & Miller, LLP, by ANTHONY E.
     ABELN, ESQ., 250 Summer Street, Boston, MA 02210-1181;
23
         Sloane and Walsh, ROBERT A. GAYNOR, ESQ.,
24   Three Center Plaza, Boston, Massachusetts
     02108;
25
```

```
1    For the Defendants (Continued):

2        Tucker, Saltzman & Dyer, LLP, by SCOTT J. TUCKER,
     ESQ., 100 Franklin Street, Suite 801,
3    Boston, MA 02110;

4
     FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE
5    OF NECP, INC.:

6        Duane Morris LLP by MICHAEL R. GOTTFRIED,
     ESQ., 100 High Street, Suite 2400, Boston, Massachusetts
7    02110-1724;

8
     VIA PHONE FOR THE PLAINTIFFS:
9
     George Nolan
10   Bill Leader
     Jason Eyberg
11   Frank Federico
     Ben Gastel
12   Benjamin Perry
     Susan Bourque
13   Laura Pittner
     James P. Smith, Jr.
14   Scott Kaminski
     Laurie Fitzgerald
15   Rob Briley
     John E. Lyons, Jr.
16   Nolan Nicely
     Kristine A. Osterday
17   Sharon L. Houston
     Ted Corvey
18   David Rashid
     Daniel L. Clayton
19   Jeff J. Keiser
     Deb Gresco-Blackburn
20   Mark Dancer
     Mel Wright
21   Michael G. Derrick
     Jonathan B. Nace
22   Forest Horne
     Nicole Kreklau
23   Terry Cochran
     Evan D. Baker
24   Amanda Williams
     Mitchell A. Toups
25   Harry Roth
     Mike Corren
```

```
 1   VIA PHONE FOR THE PLAINTIFFS (CONTINUED):

 2   George Nolan
     Lauren Ellerman
 3   Rob Randall
     Kristine A. Osterday
 4   Tom Martin
     Christopher T. Cain
 5   Ann Mandt
     Steven D. Resnick
 6   Mary T. Gidaro
     Alyson Oliver
 7   Timothy A. Housholder
     Will Riley
 8   Rebecca Blair
     Terry  Cochran
 9   Bryan L. Bleichner
     J. Stephen King
10   Michael J. Fay
     Elliot Olsen
11   John Thornton
     Anne Andrews
12   Anthony V. Agudelo

13

     VIA PHONE FOR THE DEFENDANTS:
14
     Stephen A. Grossman
15   Nichole Dorman
     Jason D Lewis
16   Joseph R. Lang
     Chris J. Tardio
17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

1

2         THE CLERK:  All rise.  Thank you.  Please be

3  seated.  Court is now in session in the matter of In re:

4  New England Pharmacy Company, Incorporated Products

5  Liability Litigation.  This is Case Number 13-MD-02419.

6         Counsel, please note your appearances for

7  the record.  We'll start with the PSC.

8         MS. PARKER:  Good morning, your Honor,

9  Kristen Johnson Parker with Hagens, Berman, Sobol,

11:04AM  10  Shapiro for the plaintiffs' steering committee.

11         THE COURT:  Good morning.

12         MR. STRANCH:  Good morning, your Honor,

13  Gerard Stranch, Branstetter, Stranch & Jennings for the

14  plaintiffs' steering committee.

15         MS. DOUGHERTY:  Good morning, your Honor,

16  Kim Dougherty with Janet, Jenner & Suggs for the

17  plaintiffs' steering committee.

18         MR. CHALOS:  Your Honor, Mark Chalos for the

19  plaintiffs' steering committee.

11:05AM  20         MR. ELLIS:  Rick Ellis for various

21  plaintiffs.

22         MR. FENNELL:  Good morning, your Honor,

23  Patrick Fennell from Roanoke, Virginia for the

24  plaintiffs' steering committee.

25         THE COURT:  Good morning, all.

```
 1                    MR. LEADER:  Bill Leader, National Tennessee
 2     for individual plaintiffs.
 3                    MS. TAYLOR:  Kiersten Taylor from Brown,
 4     Rudnick.
 5                    THE COURT:  Did someone put me on speaker?
 6     Thank you.  Mr. Gottfried.
 7                    MR. GOTTFRIED:  Michael Gottfried from Duane
 8     Morris for the trustee, Paul Moore.
 9                    MR. KLARFELD:  Joshua Klarfeld, Ulmer, Berne
10     for GDC.
11                    THE CLERK:  Mr. Fern.
12                    MR. FERN:  Good morning, Judge,
13     Frederick Fern, especially-appointed counsel on behalf
14     of the trustee.
15                    MR. RABINOVITZ:  Dan Rabinovitz on behalf of
16     MSM.  Thank you.
17                    MR. GAYNOR:  Robert Gaynor, Sloane and
18     Walsh, on behalf of the affiliates, the individuals.
19                    MR. MORIARTY:  Good morning,
20     Matthew Moriarty for Ameridose.
21                    MR. TUCKER:  Scott Tucker for Ameridose.
22                    MR. TRANEN:  Daniel Tranen for the trustee.
23                    THE CLERK:  That's it.
24                    THE COURT:  Good morning, all.  We have
25     several dozen people on the telephone, as usual.  I've
```

11:05AM (line 10)

11:06AM (line 20)

1    received the jointly-proposed agenda.  We have a number

2    of things to talk about today, but in keeping with past

3    practice, I think it makes sense to follow the agenda,

4    so let's start with update on subpoenas and objections.

5    Ms. Parker.

6              MS. PARKER:  Mr. Fennell will speak to that,

7    your Honor.

8              THE COURT:  All right.  Mr. Fennell.

9              MR. FENNELL:  Good morning, your Honor,

11:07AM  10   Patrick Fennell, again, from Roanoke, Virginia for the

11   plaintiffs' steering committee.  As your Honor I'm sure

12   knows, the plaintiffs' steering committee served about

13   88 healthcare providers with subpoenas back in June of

14   2013.

15             Objections and motions to quash were

16   referred to the magistrate judge for resolution.  On

17   November 13, the magistrate judge issued her ruling on

18   the objections and motions to quash.  She did narrow the

19   scope of the subpoenas in some ways, and she held that

11:07AM  20   all clinics had to provide documents reflecting

21   communications with NECC about warnings and recalls.

22             She also ruled that any clinic that is a

23   party in the MDL or has a patient who has filed suit is

24   in the MDL or has given notice of a claim must comply

25   with the full subpoena as it was amended by the

 1  magistrate judge, and that was to be done within 30 days

 2  of the date of her order.  The 30-day deadline is

 3  actually today.  As of the close of business yesterday,

 4  approximately 17 clinics had responded by filing

 5  something in the document repository.

 6          Some clinics have already announced the

 7  position that the plaintiffs' steering committee feels

 8  is contrary to Judge Boal's ruling, and we anticipate

 9  that the plaintiffs' steering committee will be

11:08AM  10  addressing those issues in the coming days, perhaps with

11  some motions to compel, but we'll be evaluating that in

12  the next few days.  That's where we stand on the

13  subpoenas.

14          THE COURT:  All right.  Anyone else want to

15  be heard on the topic of the subpoenas?

16          (No response)

17          THE COURT:  All right.  Item 2 is status of

18  mediation efforts.

19          MS. PARKER:  Yes, your Honor, a short report

11:08AM  20  on that one.  The entities who have opted into mediation

21  are moving forward with that.  The mediation I think to

22  date has been subject to several orders of this Court,

23  including on fee sharing.  That went in I believe since

24  the last status conference.  Mediation is moving

25  forward, and we have nothing but positive things to

1    report.

2              I will note that Liberty, Liberty Industries

3    Limited, I'm equivocating slightly on the formal name of

4    the entity, forgive me.

5              THE COURT:  This is the manufacturer of the

6    clean room?

7              MS. PARKER:  That's correct, your Honor.

8    Liberty has opted into the mediation program.  They have

9    filed a notice on the docket informing people of that.

11:09AM  10  They have done that since the plaintiffs' steering

11   committee filed its master complaint and its short form

12   complaint.

13             The plaintiffs' steering committee took the

14   position with entities who've opted into mediation that

15   we would not encourage plaintiffs to name them in

16   complaints at this point in time.  We recognize that if

17   they fall out of mediation, that may need to be

18   addressed on the back end.

19             The plaintiffs' steering committee has,

11:10AM  20  therefore, filed a corrected short form complaint that

21   omits counts against Liberty but retains the remainder

22   of the counts that were filed in the original short form

23   complaint.

24             Plaintiffs' steering committee has also done

25   a significant amount of outreach to plaintiffs' lawyers

1    individually to inform them that Liberty has opted into

2    mediation and to suggest that they not be named in the

3    short form complaints.

4              THE COURT:  Who, which entities are in the

5    mediation program at this point?

6              MS. PARKER:  Liberty, Victory, ARL, and I

7    believe three clinics, four clinics, Orlando Pain

8    Management, West Orange, which is another Florida

9    clinic, I believe the South Bend Clinic was in mediation

11:11AM   10    but has now opted out of mediation and then one other

11    pain clinic.

12              THE COURT:  All right.  Anything further on

13    the mediation piece?

14              (No response)

15              THE COURT:  All right.  Let's turn to the

16    master complaint and responsive pleadings.

17              MS. PARKER:  As I mentioned, your Honor, the

18    short form complaints against unaffiliated defendants

19    are due to be filed on December 20th, and I want to

11:11AM   20    clarify for the benefit of those attorneys on the phone

21    that that deadline applies to plaintiffs with cases on

22    file in the MDL already, whether filed here directly or

23    transferred here, as well as plaintiffs who wish to be

24    considered for potential bellwether pools, that deadline

25    applies.

1

2          THE COURT:  I'm sorry, back up.  One thing

3  that I'm not entirely clear on at this stage is -- well,

4  I guess I want to walk through this one step at a time.

5  We have any number of complaints filed in different

6  courts around the country.  Some of those plaintiffs,

7  obviously, are going to adopt the short form complaint.

8  I have indicated they do not need to file a motion under

9  Rule 15 to do so.

11:12AM   10          What universe of those complaints, of those

11  cases are going to be incorporated in the short form

12  complaint?  Are there any plaintiffs who are not going

13  to incorporate the short form complaint, and, if so,

14  what do we do with that?

15          MS. PARKER:  I don't know that I can speak

16  to that conclusively, your Honor.  I can tell you that

17  in speaking with plaintiffs' attorneys about the short

18  form complaint and just to update them on the MDL status

19  generally, my impression is that the vast majority, if

11:13AM   20  not all them, intend to file short form complaints.

21          Now, each short form complaint may wind up

22  being slightly different.  For example, there's an

23  option to add additional counts or to retain previous

24  counts that were identified in the original complaint,

25  but my sense of things is that if not all plaintiffs'

1  counsel, the vast majority of plaintiffs' counsel intend

2  to adopt the short form complaint.

3          THE COURT:  Is it your sense that any

4  plaintiff who does not adopt a short form complaint

5  essentially goes to the back of the line, for example,

6  for purposes of bellwether trials and so forth?

7          MS. PARKER:  I think that would be our

8  position, your Honor, though certainly if there were

9  plaintiffs' counsel who felt that their case should be

11:13AM  10  considered for bellwether but for some reason had not

11  filed a short form complaint, the PSC would be willing

12  to speak with that attorney, of course, but the

13  structure imagined was that we would be working from

14  short form complaints when it came time to select

15  bellwether pools.

16          THE COURT:  One of the reasons I adopted

17  this process and did not make it mandatory on the

18  thinking that plaintiffs are masters of their complaint,

19  and I can't really force someone, I don't think, to

11:14AM  20  adopt a particular complaint, but I hadn't thought

21  through the consequences of what happens if you don't.

22          Obviously I don't want to make any

23  additional work for anyone, including myself, but this

24  proceeding is at a stage where certain things have to

25  happen, including teeing up motions to dismiss and so

1   forth, and to the extent we are not using this master

2   complaint, short form complaint form, it does get

3   awfully complicated, and there are certain cases in

4   which there are pending motions to dismiss or even

5   motions for summary judgment.

6          I guess let me ask about that.  What happens

7   to the pending motions to dismiss or motions for summary

8   judgment, are they rendered moot with the adoption of a

9   short form complaint in your view?

11:15AM  10          MS. PARKER:  Our proposal would be that they

11   would be rendered moot by the filing of a short form

12   complaint but without prejudice to raising those

13   arguments again, your Honor, once the short form

14   complaints have been filed.  If I may for just a moment?

15          THE COURT:  Yes.

16          MS. PARKER:  As your Honor, I think,

17   referred to, the idea of the short form complaints was

18   to provide some uniformity to counts so that we could

19   group plaintiffs and evaluate them for bellwether

11:15AM  20   purposes.

21          THE COURT:  One of the purposes.

22          MS. PARKER:  One of the purposes, yes, thank

23   you, your Honor.  The idea behind the bellwether

24   selection, of course, is that you can identify

25   representative claims that are representative of a

1   number of plaintiffs on file that can then be tried

2   efficiently.  That may have import then on how remaining

3   plaintiffs' claims are dealt with, so our suggestion

4   would be that any existing motions to dismiss or motion

5   for summary judgments would in fact be mooted by the

6   filing of a short form complaint, but, as I say, those

7   issues could certainly be raised later.

8              THE COURT:  Again, this is intertwined,

9   obviously, with the issues raised by St. Thomas.  I

11:16AM  10   mean, to put it simplistically, this case is, to my

11   mind, unusual and complicated in kind of an odd way.  We

12   don't have a central defendant, so to speak, at least

13   for practical purposes.

14              I mean, I guess in a normal product

15   liability case, you have either a central defendant or a

16   central product or both, and there are issues, you know,

17   did it cause the injury, was the company negligent, is

18   there individual causation and so on?

19              We kind of have a donut here, we have a hole

11:17AM  20   in the middle of the case in that we have this small

21   company that in effect no longer exists.  Obviously,

22   there's a bankruptcy proceeding.  I am not privy to

23   what's going on, but I have to say I would not be

24   surprised if, for example, whatever insurers there are

25   have tendered the limits of the policy, but that raises

1    the question what is a bellwether case?  Where is this

2    case going?  What are these things going to look like?

3    We have affiliated parties.  We have perhaps Liberty,

4    perhaps UniFirst, these individual pain clinics.

5              I'm having trouble, and maybe nobody knows

6    the answer to this at this stage, I'm having trouble

7    even conceptualizing what the central issues are going

8    to be at the end of the day and whether those are issues

9    that are going to rise under Tennessee law, Virginia

11:17AM  10  Law, Michigan law, whatever, but before we get to those

11   issues, I do need to, as in any case, resolve motions to

12   dismiss, get discovery underway to the extent

13   appropriate and so on.

14             I think the time has come to get organized

15   along those lines beginning with the resolution of

16   motions to dismiss, creating a framework for that so

17   they can be decided and we can move on.

18             What I hope to accomplish in some reasonably

19   short term is exactly that, to know what the universe of

11:18AM  20  short complaints are and to permit defendants who so

21   intend to have their 12(b)(6) motions or other

22   preliminary motions resolved, either they win or they

23   lose, and we go on from there.

24             MS. PARKER:  If I may, your Honor?

25             THE COURT:  Yes.

             1          MS. PARKER:  There has been a bifurcation of

             2   sorts in this case certainly.  The plaintiffs' steering

             3   committee has filed a master complaint that named

             4   certain unaffiliated defendants, and there are deadlines

             5   associated with that master complaint against the

             6   unaffiliated defendants, including the December 20th

             7   deadline to file short form complaints against the

             8   unaffiliated defendants, and also a January deadline for

             9   motions to dismiss the master complaint by the

11:19AM     10   unaffiliated defendants.

            11          THE COURT:  To dismiss the master complaint,

            12   but that doesn't quite answer it because the way it's

            13   framed, for example, the pain clinics, as I understand

            14   the structure of the master complaint, are identified

            15   but not necessarily defendants?

            16          I guess I can't quite figure out where the

            17   individual pain clinics fit in that scheme of things.  I

            18   mean, there's a listing of clinical defendants, there's

            19   a listing of different claims that are made against them

11:20AM     20   generically, but I don't think you could move to dismiss

            21   the master complaint without a short form complaint as

            22   well, right?

            23          MS. PARKER:  I think that's right, your

            24   Honor, at least insofar as the pain clinics are

            25   concerned, so we have spoken with the pain clinics about

1    how we deal with that issue.  The plaintiffs' steering

2    committee has no objection to providing some manner for

3    clinics to tee up in a global fashion motion to dismiss

4    issues that would affect all short form complaint

5    clinics.  We've been having that discussion with them

6    about what makes sense, what deadlines make sense, how

7    we would go about doing that.

8            Clinics, also, of course, will have an

9    opportunity to move to dismiss individual short form

10   complaints.  The plaintiffs' steering committee would,

11   of course, prefer that this be addressed globally to the

12   extent that there are issues that are cross-cutting as

13   opposed to issues that are attended to a particular

14   plaintiff.

15           THE COURT:  Well, obviously speaking for

16   myself, I would like to resolve issues globally as well,

17   but sometimes it's not as neat as that.  All right.

18   Remind me, the master answer/response is due when?

19           MS. PARKER:  I believe it's January 9th,

20   your Honor, but, unfortunately, I don't have my schedule

21   in front of me.  If any other counsel would like to

22   correct me on that, please do.

23           THE COURT:  I have it in my notes here,

24   January 8th, I think.

25           MS. PARKER:  Thank you.

1                THE COURT:  No, I'm sorry, I'm looking at

2      the wrong calendar, January 10th.  I think I ruled at

3      the last status conference that those were due

4      January 10th.

5                MS. DOUGHERTY:  Your Honor, if I may?

6                THE COURT:  Yes.

7                MS. DOUGHERTY:  We're struggling as much as

8      you are with the conundrums that you've raised today,

9      and we're all trying to sort out efficient answers to

11:22AM  10      the process.

11                Generically in the plaintiffs' steering

12      committee's experience, the generic issues are teed up

13      in motions to dismiss, and those are heard in sort of

14      the first phase, but where there are case-specific

15      issues with respect to motion to dismiss, such as a

16      statute of limitation problem, those are uniformly dealt

17      with after the case is selected for bellwether, and

18      that's usually the way that we see things work.

19                Generic issues are dealt with up front, for

11:22AM  20      example, if the clinic thinks that they just essentially

21      aren't liable to any plaintiff in that we cannot proceed

22      on our claim of conspiracy, for example, they would tee

23      that up because that would apply to all of the

24      plaintiffs, however, if there are case-specific issues

25      with respect to a particular plaintiff, those are always

1  usually stayed until the time when that case is selected

2  for bellwether, and so that's sort of in our own mind

3  what we had envisioned the process would be, and perhaps

4  that helps your Honor as well, if that makes sense to

5  you.

6           THE COURT:  Well, I was certainly thinking

7  along those lines, although, again, I guess two

8  observations:  Number 1, when you begin to look at

9  actual cases, the division between global and individual

11:23AM  10  cases sometimes is more blurred than we would like it to

11  be.

12           The second point is that deciding legal

13  issues in the abstract is sometimes dangerous without a

14  factual context, but I can state with considerable

15  confidence that I know next to nothing about Tennessee

16  or Virginia law, but if a pain clinic in Tennessee or

17  Virginia is sued on seven counts, and they say at a

18  minimum five of them ought to be dismissed, they have

19  the right to do that and have me decide that, and maybe

11:24AM  20  I agree, maybe I don't, but that issue needs to be

21  resolved, and as with any defendant, they have a right

22  to say that the complaint fails to state a claim upon

23  which relief can be granted, and they ought to be let

24  out.

25           I have no idea whether or not any defendant

1   can be so let out.  At this point, I simply want to

2   create a framework for making that happen without indue

3   delay.

4             MS. GREER:  Your Honor --

5             THE COURT:  Yes.

6             MS. GREER:  -- Marcy Greer for the St.

7   Thomas entities.

8             THE COURT:  Yes.  Can I get you to come up

9   to the podium and speak into the mic. so everyone can

11:24AM  10   hear you?

11             MS. GREER:  Of course, your Honor.  I didn't

12   know if you were ready to hear from me or not.

13             THE COURT:  Maybe not every issue you

14   raised, but on this one, go ahead, yes.

15             MS. GREER:  Of course.  I think we're all

16   dealing with the same conceptual basis, which is that a

17   defense or a claim or something that applies against all

18   the plaintiffs in a certain category should be addressed

19   upfront.

11:25AM  20             The proposal that we have is that those

21   would not be addressed as to any of our defendants until

22   after bellwethers are chosen, or at least the initial

23   pool is chosen, and that's where we have a problem

24   because if you look at the 100 complaints, and I

25   wouldn't ask the Court to have to do this, the 100 plus,

1    against the Tennessee defendants, all of them state

2    vicarious liability counts against our clients in the

3    form of alter ego or parent agency, things like that.

4    They're all the same.

5              Those are generic against our clients, and

6    they should be resolved at the beginning.  That's kind

7    of, as the Court has indicated, why you do a master

8    complaint process at all, but the proposal has been

9    we're going to do short form complaints that include

11:26AM  10   you, and I'll bet you 100 plus of those short form

11   complaints will all contain the same allegations, but

12   there's no process for us to move against them.

13             Now, they've said, well, we'll entertain

14   contain a global motion after the bellwether pool is

15   picked, we will entertain a global motion as to one of

16   those and will consider whether to apply it to other

17   cases.  That's what we're trying to avoid.

18             I don't want to speak for our co-defendants.

19   I know STOPNC, Howell Allen, et cetera, who are all in

11:26AM  20   these same cases with us have filed motions directed to

21   certain counts, but they are also all the same under

22   Tennessee law, and there are issues that can be decided

23   as a matter of law once and for all, which is the

24   purpose of doing this in an MDL as opposed to

25   seriatim.

1          THE COURT:  Right.  Unless somebody

2    convinces me otherwise, I want to do this in sort of a

3    linear way.  I want to do Rule 12(b)(6) motions.  If

4    some of them should be postponed because they are so

5    idiosyncratic that there is no value to deciding them

6    now, fine, we can put those on hold, but something that

7    cuts across 100 cases or 50 cases or 25 cases, it seems

8    to me ought to be resolved now.

9          It's a 12(b)(6) standard.  It may be that I

11:27AM  10    say, you know, I can't resolve this now or it states a

11    claim, and we'll take it up again on summary judgment,

12    but I want to do -- conceptually we'll do motions to

13    dismiss, we'll do discovery, we'll do summary judgment,

14    we'll have a trial.

15          There are lots of wrinkles along the way

16    because it's an MDL, but that's the basic framework I

17    want to follow here.  Obviously we're going to focus at

18    some point on a handful of cases because we can't

19    prepare a thousand cases for trial.  I'm certainly going

11:27AM  20    to adopt the bellwether process, but I think we're a

21    ways away from that at this point.

22          Let me ask, Ms. Greer, this question.  You

23    have master answers or responses due on January the

24    10th.  Should I simply set a deadline for the filing of

25    motions to dismiss?

1          MS. GREER:  Actually, your Honor, we do not.

2     Right now there is not a live master pleading against

3     us.  We are specifically not mentioned in the master

4     complaint, and in the short forms, they are supposed to

5     fill in the blanks and then I assume add in all the

6     vicarious liability and agency allegations and counts,

7     and then we have to respond to 100 plus of those and

8     deny them, and we're kind of back at the same point

9     where we started when we had the first hearing in

11:28AM  10     October.

11          THE COURT:  Not necessarily.  The master

12     complaint is long, okay.  I can't say that I'm

13     intimately familiar with it.  You're certainly mentioned

14     by name.

15          MS. GREER:  We are not named, your Honor, in

16     the master complaint.

17          THE COURT:  Well, there's certainly

18     something called St. Thomas that's in the master

19     complaint.

11:29AM  20          MS. GREER:  It's our co-defendant, and

21     that's St. Thomas Outpatient Neurosurgical Center.

22          THE COURT:  All right.  Regardless, as of a

23     week from today, let's say you get 100 short form

24     complaints, and maybe some of them are actually long,

25     even though they're called short form.  How do you

1   propose that I handle your responses to those 100 short

2   form complaints, which presumably name your client,

3   otherwise you don't care, right, it's only if you're

4   named?

5            MS. GREER:  Correct.

6            THE COURT:  How do you think I ought to

7   proceed?

8            MS. GREER:  My suggestion would be if they

9   file a single short form complaint that has counts in it

11:29AM  10   and says this is our form, which is not what's on file

11   now, but if they did and said people can elect into

12   these counts so that we would have something to operate

13   against globally, we would file a master short form

14   answer or a master answer, however you want to do it.

15            We proposed a Tennessee-only complaint.

16   They've done 100 plus of them, and they're all very

17   similar, so I don't think it would be that hard to get

18   to something, but what we're asking for is a single

19   document that has the allegations in it that deal with

11:30AM  20   vicarious liability and agency issues so that we can

21   respond to that with a motion to dismiss, and if the

22   Court wants to answer that, we can answer that, too, and

23   then do short form answers in all of the cases where

24   it's been filed, where it's been adopted, and the short

25   form answer would simply say we adopt, you know,

1   everything in the short form answer except this.

2              THE COURT:  So you're saying there should be

3   in effect a middle stage between the master and the

4   short form complaint so that you have --

5              MS. GREER:  If that's the way they want to

6   do it.  Our proposals were actually either do a

7   Tennessee-only master complaint, which we were perfectly

8   fine with, or put counts in the master, as it is, amend

9   it to include counts that plaintiffs can opt in or out

11:30AM  10   of.

11             They didn't want to do either of those, and

12   they said, well, we'll bring you in in the short form

13   answers, which puts us back in a situation of having to

14   answer all those short form complaints, excuse me.

15             THE COURT:  Well, is there any way to handle

16   this?  I mean, let's say you get 100 short form

17   complaints, if your 100 complaints are all the same, I'm

18   guessing your 100 short form complaints are going to be

19   pretty identical as well.

11:31AM  20             Is there some vehicle, some way -- I'm

21   sorry, I'm stumbling over my own words here.  I am

22   reluctant to set up a new form of master and short form

23   complaint because it's going to take certainly months to

24   do that.  I don't want to do that.  I don't want to

25   spend the time.

1           I'd rather try to figure out a way in which

2    expeditiously and with unnecessary waste of resources a

3    Tennessee or Virginia or Michigan defendant can answer

4    100 complaints, 50 complaints and tee up the issues for

5    resolution by a 12(b)(6) motion.  There must be some way

6    to do this.

7           MS. GREER:  Well, I have another idea.  This

8    is kind of on the fly.

9           THE COURT:  Lay it on me.

11:32AM  10           MS. GREER:  It is this:  Have them amend the

11   master short form complaint, have the master short form

12   complaint contain the vicarious liability allegations

13   and counts in it, and then when they do the short form,

14   when each individual short form complaint is filed, they

15   will say we opt in to everything that's in the master,

16   everything that's in the short form in paragraphs, you

17   know, 5, 6, 7, 8, and we want punitive damages, and we

18   don't want to seek lost wages.  That's how they tailor

19   it, then we will respond to those in a true short form

11:32AM  20   answer which says we opt into everything we said in our

21   master short form answer.

22           I mean, semantics put aside, this would work

23   without having to disturb what's already in place, and

24   it would address the issues here.  It kind of gets to

25   the Tennessee only, but they could build in:  Here are

1    the Tennessee counts, here are the Virginia counts, here

2    are Florida, whatever is necessary in that document.

3           Now, we'd have to probably move those

4    deadlines a little bit to make it all happen, but then

5    that way we would be filing in individual cases the

6    truly individual documents which are, if plaintiff

7    Jane Doe says, you know, I want to opt in to these

8    counts of these pleadings, this is the relief I want,

9    oh, and I want to add one more thing that's particular

11:33AM   10   to me, she does that, then we come back and say, you

11   know, we've already filed everything, we adopt that in

12   full, and, by the way, there's an issue with notice

13   that's particular to her that doesn't go to all --

14           THE COURT:  Let's say I do that.  Let's say

15   I direct plaintiffs to file --

16           MS. DOUGHERTY:  Your Honor, I believe the

17   Tennessee plaintiffs have a response and a possible

18   solution as well.

19           THE COURT:  All right.

11:33AM   20   MR. STRANCH:  Your Honor, what we've

21   proposed and the way we think this should work from an

22   efficiency point of view, we're not saying that they

23   can't file global motions to dismiss.  We've actually

24   set out a specific time to do it.  What we've said is

25   after we go through the selection of those cases that

1    are going to go into a discovery pool, and that's going

2    to be --

3                 THE COURT:  We're not going to wait for a

4    selection of cases, I want this done upfront.

5                 MR. STRANCH:  Okay.  Well, your Honor, I

6    mean, we're talking --

7                 THE COURT:  12(b)(6), again, we're going to

8    basically follow the Rules of Civil Procedure.  Right

9    upfront, if you're a defendant, you have a right to file

11:34AM  10   a motion that says this does not state a claim upon

11   relief can be granted.  I may deny them all, I don't

12   know what I'm going to do, but you have that right, and

13   I'm going to give them right.

14                MR. STRANCH:  Your Honor, the short form

15   Tennessee complaints are going to be filed next week,

16   and it's my understanding that every lawyer is going to

17   be filing those short form complaints, and it's my

18   understanding also that those short form complaints are

19   going to be very uniform as it relates to allegations

11:34AM  20   against the big St. Thomas entities, and what we've

21   proposed, and we can move the timing around, is that

22   they file any global motions that they belief they have

23   against that, and we can designate one case.

24                We propose that it be those that go into the

25   discovery pool, but we can designate a case earlier and

1   say file your motion against this case, and we'll agree

2   that every case that raises those issues, which I

3   suspect will be all Tennessee cases, will then be

4   affected by it, and so if the motion is granted, we

5   propose that we would then agree that all those cases

6   that are affected by it, that they would be dismissed in

7   those, and there would be no need to file additional

8   global motions in those cases.

9           THE COURT:  What I'm struggling with is

11:35AM  10   why -- and I guess this question is directed to you,

11   Ms. Greer, why can't you file a document that says

12   motion to dismiss all claims of X, Y and Z as to the

13   following 100, you know, short form complaints?  Let's

14   say you say that there should be no vicarious liability

15   under Tennessee law.

16           MS. GREER:  We can do that, but that wasn't

17   the proposal.  The proposal was we'll think about

18   whether it applies in these other cases.  I mean, what

19   we want is one -- I mean, it's going to be a lot of

11:36AM  20   extra work because we're going to have to go through all

21   100 and make sure because they're filed by different

22   lawyers, sometimes they state things just a little bit

23   differently or they have one paragraph off.

24           I mean, it's easier if we could have a

25   specimen to operate against, if they could designate

1   that, that would help tremendously so that we could say,

2   you know, as they say in paragraph X, otherwise I think

3   it will be a nightmare for the Court to follow what

4   we're saying and where it comes from, but if they would

5   designate a specimen short form and say that it's

6   binding as to all, then -- and we can have it upfront

7   before we go down the road of discovery and bellwethers,

8   we can work with that.

9           THE COURT:  Isn't the problem -- let's say I

11:36AM  10   direct that there be a short form Tennessee complaint

11   and short form Virginia complaint, short form Michigan,

12   short form Florida and so forth, while those have to be

13   developed, right, people have to meet, talk about it,

14   develop it, then they have to meet with their clients, I

15   don't know whoever it is has to decide, yes, we're going

16   to join this, no, we're not going to, and isn't all of

17   that going to take some period of time, which ordinarily

18   would be fine, but if the point of this exercise is

19   efficiency and saving resources and trying to cut to the

11:37AM  20   quick, have we really gained anything as opposed to, I

21   guess, and I'm thinking out loud here --

22           MS. GREER:  No, I hear your Honor, and this

23   is what we tried to avoid back in October, instead,

24   they've gone off in this direction, so it's not that we

25   didn't try to stop this from happening, we tried to set

1    out an orderly process.  We raised this immediately,

2    but -- and I understand, we are where we are, and I

3    don't want to make work for anyone either, but I do want

4    to get us in a situation where we can file a global

5    motion to dismiss the purely vicarious liability claims

6    against our client and have that heard because if we're

7    right, and we believe we are, there's a very strong

8    standard in Tennessee, then we shouldn't be here, and we

9    shouldn't be doing bellwether, we shouldn't be doing

11:37AM   10    discovery.  We have answered discovery.

11            We're not saying that we're not going to go

12    along with it as long as we're in the case, but by the

13    same token, we think that should be heard early.

14            THE COURT:  But, again, suppose you file a

15    document that says motion to dismiss, we dismiss all

16    claims of vicarious liability in the following listed

17    100 short form complaints, however framed or phrased,

18    then you file a memorandum in support that talks about

19    the issue under Tennessee law, they oppose it.

11:38AM   20            I say, you know, yes or no, and either you

21    win or you don't, but it applies to those 100 cases, and

22    let's say you win, you are now presumably out of those

23    100 cases.  Yes, there may be some nuance.  There may be

24    some quibbling about whether it applies to this case,

25    never mind the clinic that's in Crossville or wherever

1   the other, you know, Tennessee plaintiffs are located.

2   We can cross that bridge when we come to it.

3          This doesn't seem to me to be an

4   insurmountable hurdle, and my strong suspicion is that

5   everyone is going to be cutting and pasting from the

6   same word processing documents either way, and so we're

7   probably to get to the same process regardless of what

8   path we take.

9          You know, from my standpoint, you know, I'll

11:39AM  10   probably have a Virginia motion to dismiss and a

11   Michigan motion to dismiss and so forth, and they're

12   going to raise multiple issues of state law as to which

13   I am going to be starting from square 1, but so be it.

14          My -- I just want a rational vehicle for

15   getting to that point.

16          MS. GREER:  I agree, and I think that could

17   work, your Honor, we just needed your blessing and

18   shared understanding of how that process would work.

19          THE COURT:  I guess part of this is, and

11:39AM  20   this applies to both sides, I do want everyone to be

21   careful, but I also understand that there may be a

22   glitch here and there where someone has missed some

23   nuance in some case, and we can maybe fix some problems

24   after the fact if in fact, you know, the attorney

25   representing one plaintiff from the Crossville clinic

1   was raising a somewhat different claim and it got lost

2   in the shuffle, we can dust that off and revisit it in

3   the future.

4           MS. GREER:  Kind of like a cooperation

5   clause in a contract?

6           THE COURT:  Yes, I guess.  Does anyone else

7   want to be heard on this topic?  Again, this is one of

8   the problems of not having a normal lead defendant, so

9   to speak, or at least -- well, it's not a normal case,

11:40AM   10   as you all know.

11           Is there someone, for example, representing

12   Virginia or Michigan or Florida defendants or from

13   another jurisdiction who wants to be heard on this

14   topic?

15           (No response)

16           THE COURT:  All right.  I hear nothing but

17   silence.  Here's going to be my working assumption then.

18   When the master responses are due, which is on

19   January 10th, that's the deadline for responding to the

11:40AM   20   master complaint.

21           Well, let me take it a step at a time.

22   Should that also be the deadline for filing motions to

23   dismiss or other answers or responses to short form

24   complaints that were filed by December 20th?

25           MS. PARKER:  From the plaintiffs' steering

1    committee suggestion, that makes sense so long as we're

2    talking about global motions to dismiss that would be

3    raising these cross-cutting issues that we talked about.

4              THE COURT:  Yes.

5              MS. GREER:  Your Honor, we can file our

6    master motion to dismiss at that point, and I'll let the

7    STOPNC defendants speak for themselves, but that

8    shouldn't be a problem, then do we have to also answer

9    all those because under normal 12(b)(6) procedure, that

11:41AM   10   suspends your answer, but we're kind of in a different

11   world here.  If we need to do short form answers --

12             THE COURT:  My assumption is if you file a

13   motion to dismiss, you don't have to answer.

14             MS. GREER:  Okay.

15             MR. STRANCH:  Your Honor, we have one issue

16   with that that's going on here.  Tennessee, as you know,

17   has a one-year statute of limitations.

18             THE COURT:  Yes, that's another wrinkle in

19   all of this.  Yes.

11:42AM   20            MR. STRANCH:  We have been told by some of

21   the defendants in Tennessee that they believe that some

22   of our plaintiffs have service problems and notice

23   problems with their complaints.  Because we're not

24   getting answers early on, they may run out of time to

25   fix those errors if there truly is a service error or

1    truly is a notice error.

2           What we've proposed in our process to follow

3    to have streamlined this is that the defendants provide

4    us a list of those cases where they believe there is a

5    service or a notice problem under our state statutes so

6    that people can look at it and decide if they want to

7    fight that out or if they want to just go correct it

8    while they still have time to correct it.

9           THE COURT:  Why wouldn't that be included in

11:42AM  10   the January 10th response?  I mean, normally a motion to

11   dismiss for insufficient service of process or failure

12   to serve is made in a Rule 12 motion, it's like a motion

13   to dismiss.

14          MS. PARKER:  We would be fine with that,

15   your Honor, except it's case-specific, so it's not a

16   large problem with service, it's case-specific, and so

17   we propose that they provide us just the list and what

18   they think is wrong by letter so that people can look at

19   it and decide do they want to try to fix it, do they

11:43AM  20   think they did it right, and then they have an

21   opportunity to do that.

22          If there's a service of process issue and

23   someone did serve the wrong person by accident and the

24   Court finds that, the Court under our current scheduling

25   is not going to get to that until it's too late to

```
 1    correct it.  Normally that would be taken up at the
 2    beginning of a case when there's still an opportunity to
 3    correct it.
 4              THE COURT:  Right.  Ms. Greer.
 5              MS. GREER:  I'm not sure -- I think that
 6    they're passed limitations because that ran in October,
 7    but, you know, we can certainly entertain that.
 8              THE COURT:  My understanding is that all of
 9    these medical events, let's put it that way, basically
10    happened September, October, that time frame a year ago,
11    so that year has passed.  That doesn't necessarily mean
12    that every one-year limitations period has run.
13              MS. GREER:  Well, the CDC recall was in
14    early October though, and by then everybody was on
15    notice.
16              THE COURT:  That may be the answer, but I
17    can't say for certain as to whether or not anyone who
18    hasn't filed yet is precluded.  There may be other
19    wrinkles, as you know, in any limitations-type defense,
20    but it does seem to me to at least try to tee this issue
21    up as well even though it's not global and
22    individualized so that if there is a service of process,
23    either failure to serve or inefficiency of service of
24    the type of motion that would be normally made in a
25    Rule 12 context to have that fleshed out relatively soon
```

11:43AM

11:44AM

1    as well.  I don't see any reason not to do that given

2    the circumstances.

3              MS. GREER:  Sure.  I think we can come up

4    with something to handle that.

5              MR. STRANCH:  Your Honor.

6              THE COURT:  Yes.

7              MR. STRANCH:  We'd also like to make sure

8    that includes the pre-suit notice under our medical

9    malpractice statutes because there is a time frame in

11:44AM  10    which people can correct those if there's a problem.

11              THE COURT:  In other words, a failure to

12    make that pre-suit notice?

13              MR. STRANCH:  Or if they made it, and

14    there's going to be an argument about you didn't use

15    their full middle name, you used an initial, and we

16    require strict compliance.  If they intend to raise

17    that, let's go ahead and correct those while there's

18    still time do those, and so we'd like them just to give

19    us a list of cases where they believe they have that

11:45AM  20    problem and what it is so that we can weigh out whether

21    this is something we want to just take head on or

22    whether it's something that we want to correct.

23              THE COURT:  Your vision is that I issue some

24    sort of order requiring all defendants to indicate in

25    any pending case whether there is either a service of

1  process issue or failure to give notice under state law?

2          MR. STRANCH:  That's correct.

3          THE COURT:  Issued by a particular date and

4  identifying the name of the case and the --

5          MR. STRANCH:  What the perceived defect is.

6          THE COURT:  What the perceived issue is.

7  Ms. Greer.

8          MS. GREER:  I can't speak for all the

9  defendants obviously, but I believe we can work

10 something out.

11         THE COURT:  Is January 10th a fair time

12 frame for that?

13         MR. STRANCH:  We would actually ask that it

14 be earlier, your Honor.  It's my understanding from

15 talking to the lawyers, some of the defense lawyers,

16 that they already have those lists, they just have so

17 far refused to share them with us.

18         MS. GREER:  Your Honor, that's not the case.

19 I mean, we don't have a list, we just have a notice here

20 and there.  We're going to have to go through every

21 single one and determine whether both the notice and the

22 service were adequate, and so we would ask that at least

23 January 10th.

24         THE COURT:  Does anyone else want to be

25 heard on this topic, that is, the service of process

11:45AM (line 10)

11:46AM (line 20)

1    issue?

2              (No response)

3              THE COURT:  All right.  Here's what I'm

4    going to do.  I will separately issue an order, and I

5    want to think through how it's phrased, that will

6    require any defendants seeking to make -- to raise a

7    defense concerning service of process or failure to give

8    notice, and it seems to me that has to apply to a subset

9    or to cases that have been filed by I guess

11:47AM  10    December 20th, right, otherwise it doesn't make any

11    sense.

12              MR. CHALOS:  Your Honor, would it be helpful

13    to submit some proposed language on that?

14              THE COURT:  I certainly won't throw it in

15    the trash.  How quickly could you do that?

16              MR. STRANCH:  We'd be happy to do that, your

17    Honor.

18              THE COURT:  I would like to move quickly on

19    this.

11:47AM  20              MR. STRANCH:  We'll get it to you by Monday,

21    your Honor.

22              THE COURT:  Ms. Greer, do you want to submit

23    something by Monday?

24              MS. GREER:  Sure, I'd be happy to take a

25    look at their language and see if we can work with that.

1            THE COURT:  All right.  As far as the

2    deadline, I think it won't be any later than

3    January 10th.  Whether it's going to be earlier or not,

4    I'll have to see.  That will be separate from this issue

5    of what I'll call the global issues.  I want to

6    again --

7            MS. GREER:  Your Honor, could I make one

8    last point?

9            THE COURT:  Yes.

11:48AM  10          MS. GREER:  It's already December 13th, and

11   a lot of people are gone for the holidays.  Some of this

12   information we may need because service went through the

13   hospital, so we'll do our best, but we really ask that

14   it not before January 10th to make sure we've got all

15   the full information.

16          THE COURT:  That's my concern is it's

17   complicated under any circumstances, and we do have the

18   holidays, and --

19          MS. GREER:  We have a lot of people who have

11:48AM  20   use it or lose it vacation policy, and it wouldn't be

21   fair to force them to...

22          MR. STRANCH:  Your Honor, we're happy to

23   consider a later date if we can get an agreement from

24   the Tennessee counsel that will toll it as of today or

25   some period very shortly in the near future because

1   we're under real time constraints ourselves, and we

2   don't want someone to find out they've got a problem

3   that could have been fixed if they just found about it

4   five days earlier.

5        THE COURT:  Why don't you talk to one

6   another and see if you can agree on language or narrow

7   the field of conflict.  I don't conceptually have a

8   problem with that.  I can make it February 10th and

9   everyone agrees that the time period is tolled for 30

11:49AM  10   days or whatever the relevant time period is.  I don't

11   have a problem with that.

12        Then in terms of what is due on

13   January 10th, I guess my concept here is that any

14   Rule 12 motion that applies to, what should I say, more

15   than one case, more than five cases, should I put a

16   number on it?

17        MR. STRANCH:  We would suggest that that be

18   global as to those defendants' claims.

19        THE COURT:  Well, if 99 out of 100

11:50AM  20   plaintiffs are raising the same claim, I want to deal

21   with that up front.  The idea is to not get tangled in

22   idiosyncratic ideas or claims.

23        MR. STRANCH:  How about a substantial number

24   of the cases against the defendant?

25        THE COURT:  Substantial number, does that

1     sound right to you, Ms. Greer?

2                  MS. GREER:  That sounds right.

3                  THE COURT:  I'm making you the de facto lead

4     because I don't have anyone else to talk to.

5                  MS. GREER:  That works for us, your Honor.

6     To be clear, we would simply identify the cases that it

7     would operate against as an attachment to the motion to

8     dismiss.

9                  THE COURT:  My concept is you would move to

11:50AM  10    dismiss and say it applies to this type of claim, a

11    vicarious claim, for example, in the following cases.

12                  MS. GREER:  That won't count against page

13    limits?

14                  THE COURT:  That's the least of my worries

15    right now.  That would be in the motion and then a

16    memorandum in support would address the issue once.

17                  MR. STRANCH:  We're willing to agree on page

18    extensions, your Honor.

19                  THE COURT:  So far there have been lots of

11:51AM  20    pleadings, but none of them have been, you know, of the

21    150-page variety other than the master complaint.

22    Again, we have to turn square corners on some of this.

23    I need to know exactly what you are asking me to do in

24    what cases, and so when I issue an order, it applies to

25    particular claims, particular cases and so on.

```
 1              I mean, you're free to dismiss all the
 2   claims in every case.  If you think the law supports it,
 3   I'm not going to stop you, but you have to identify them
 4   and work these through one-by-one.  I will issue a
 5   separate order on that as well that clarifies what is to
 6   be filed by January 10th, but the thrust of it will be
 7   global motions to dismiss by any defendant.
 8              Now, just to alarm myself, this applies, of
 9   course, to cases in which short form complaints have
10   been filed by December 20th.  Liberty, I guess, has
11   opted into the mediation program.  I don't know what the
12   status of UniFirst is.  Again, we may be adding
13   defendants here that have not yet been served or entered
14   an appearance, and I guess we'll take that in due course
15   as the issues arise.
16              MS. PARKER:  Yes, your Honor, I would
17   suggest that counsel for the plaintiffs' steering
18   committee will discuss with counsel for UniFirst whether
19   UniFirst will be in a position to file any other similar
20   global motions to dismiss by that January deadline.  We
21   do recognize though, that would be a voluntarily move on
22   UniFirst counsel's part, and I don't mean to suggest
23   they've agreed with it, but we can certainly propose it
24   to them.
25              THE COURT:  We have issues with, I mean,
```

11:52AM (line 10)

11:53AM (line 20)

1   this medication may fail, we may have lots of different

2   iterations of this.  Right now those defendants who want

3   to file in effect global motions to dismiss, who want to

4   do so, I'll give them that opportunity, and for want of

5   a better idea, I'm going to do it with this framework.

6           I guess I'm getting a little off the agenda

7   here, but let me -- well, anything else on the master

8   complaint, short form complaints, motions to dismiss?

9           MS. PARKER:  Unfortunately, yes, your Honor.

11:54AM  10  The plaintiffs' steering committee, the affiliated

11  defendants and the trustee all heard this Court very

12  clearly when you said at the last status conference that

13  you want to know whether we are litigating against the

14  affiliated defendants by the January status conference.

15          With that in mind, the parties have

16  continued to negotiate.  The parties have though,

17  mindful of that January deadline, agreed to certain

18  additional extensions of time, specifically, the

19  plaintiffs' steering committee has agreed not to press

11:54AM  20  its motion for discovery against the affiliated

21  defendants.

22          THE COURT:  This is the one that has been

23  pending for some time?

24          MS. PARKER:  The one that has been pending

25  for some time.  We have agreed that the affiliated

1  defendants may have until January 8th, which is two days

2  before the January status conference, to oppose or

3  otherwise respond to the plaintiffs' motion to take

4  discovery, and the affiliated defendants have likewise

5  agreed to extend the tolling period through the

6  January status conference.

7          We recognize that the master complaint

8  against the affiliated defendants is currently scheduled

9  to be filed on December 20th.  Given these additional

11:55AM  10  extensions and that we've agreed until January 8th to

11  let the affiliated defendants respond, the parties have

12  discussed and feel that it would be appropriate for the

13  master complaints against the affiliated defendants to

14  also be filed on January 8th.

15          That would get it on file before the

16  January 10th status conference, and it would have a

17  filing at a point in time where we would have a much

18  better sense of whether or not there will be a

19  resolution with the affiliated defendants, so while the

11:56AM  20  plaintiffs' steering committee has no interest in

21  protracting this, we do also want to give fair due to

22  the prospect of resolving this by the January 10th

23  status conference.

24          If we did agree to extend that deadline,

25  your Honor, the plaintiffs' steering committee would not

1   come back and ask for an additional deadline.  That

2   would be the deadline, and the complaint would be filed

3   on that date.

4          THE COURT:  All right.  I'm sorry, can you

5   identify yourself.

6          MR. BLUMBERG:  Jay Blumberg from the Premier

7   defendants in New Jersey.  My understanding is that the

8   last time that the Court put the deadline at

9   December 20th for the affiliated defendants is because

11:56AM   10   the unaffiliated defendants also have claims, and we

11   need to know whether we have to third-party these people

12   in or their cross-claims, which is why the December 20th

13   date was set and then the January 10th date was set for

14   our responses.

15          So if that is going to take place, the

16   unaffiliated defendants are going to need additional

17   time with regard to pressing their claims because the

18   PSC may not have a claim against or may settle their

19   claims with the affiliated defendants, but the

11:57AM   20   unaffiliated defendants still have claims against them.

21          THE COURT:  I guess let me ask Ms. Parker,

22   this has kind of proceeded in an odd way that maybe I

23   didn't intend at the beginning of the process with the

24   affiliated defendants carved off from everyone else and

25   has lead to anomalies such as the one or potential

1    anomalies such as the one identified.

2          If this is a question of just getting the

3    document on file, why should that wait until

4    January 8th?  In other words, other than the amount of

5    work necessary to get it done, if there is additional

6    work, what harm is there filing it on December 20th?

7          MS. PARKER:  Let me recognize that the

8    representative for the trustee may also wish to address

9    that issue.  I don't know, but he certainly may.  To be

11:58AM  10   very frank about it, your Honor, I'm not sure what

11   effect filing that master complaint will have on the

12   settlement discussions.

13         I could see it having a positive effect, I

14   could see it having no effect, it could have a negative

15   effect, I suppose.  Our thought was --

16         THE COURT:  I would guess that you're going

17   to accuse the affiliated defendants of --

18         MS. PARKER:  Some malfeasance.

19         THE COURT:  -- some malfeasance?

11:58AM  20   MS. PARKER:  Yes, we certainly will, your

21   Honor.  There are some insurance coverage concerns, I

22   believe, that could theoretically be raised by the

23   master complaint against the affiliated defendants that

24   would have some bearing conceivably on the settlement

25   discussions, and I'll leave it to the trustee's

1        representative to address that further, if he wishes.

2                   MR. GOTTFRIED:  So, your Honor, this may be,

3        with your permission, a good time to just sort of give

4        you, A, some sense of where things stand --

5                   THE COURT:  I would be delighted with that

6        since I don't have a sense where things stand.

7                   MR. GOTTFRIED:  -- and tell you, first of

8        all, the trustee supports the PSC's request to extend

9        the date to January 8th, and, indeed, would be

11:59AM  10       supportive of a later date.  I would inform the Court

11       that we've reached agreement with NECC's primary and

12       excess insurers subject to final documentation, which

13       will be facilitated by the finalization of settlements

14       with the individual defendants.

15                  We've reached agreement with one of the

16       insurers for another affiliated defendant, and we are

17       close with yet another affiliated defendant insurers.

18       The process with respect to negotiating those individual

19       settlements is continuing.  The creditors' committee is

12:00PM  20       engaged in that process.  A full meeting of the

21       creditors' committee, which includes Attorney Sobol and

22       Lipton, who are also on the PSC, is scheduled for next

23       week to discuss the various issues regarding the insider

24       settlement.

25                  The trustee is available to participate, as

1    requested, in that meeting, and we believe that we're

2    making progress, and we believe the PSC's request to

3    defer would help facilitate the progress I think the

4    trustee is making.

5              THE COURT:  All right.  What I'm going to do

6    then is I'm going to accept the proposal, that is, the

7    master complaint against the affiliated defendants shall

8    be filed by January the 8th.  The deadline for opposing

9    the PSC's motion for discovery from way back when is

12:01PM  10   extended to January 8th.  I'm sorry, I don't have the

11   docket number at my fingerprints.  Actually, I may.

12             MS. PARKER:  Your Honor, I believe you

13   already entered a stipulation that included that date

14   extension.

15             THE COURT:  I did.  All right.  Does that

16   include the tolling as well?

17             MS. PARKER:  Yes, it did, your Honor.

18             THE COURT:  What was the -- I'm sorry, this

19   is the motion to partially lift the discovery stay was

12:01PM  20   Docket Number 534, and I did extend it to January 8th.

21   That's been extended, the tolling agreement, and then do

22   I need to enter a new order extending the deadline for

23   the master complaint against affiliated defendants to

24   January 8th?

25             MS. PARKER:  Yes, your Honor, that would

 1    need an order.

 2            THE COURT:  All right.  We'll let the chips

 3    fall where they may and take it from there.  Yes, sir.

 4            MR. BLUMBERG:  I guess the question then

 5    becomes, Judge, will that affect the time period in

 6    which the unaffiliated defendants have to respond?

 7            THE COURT:  In other words, you're concerned

 8    about having two days in which to --

 9            MR. BLUMBERG:  Yes.

12:02PM  10            THE COURT:  -- potentially... why don't we

11    do this.  I'm going to leave things where they are for

12    now, and I will entertain, if necessary, an emergency

13    motion to provide relief if it becomes necessary.

14            MR. BLUMBERG:  Very well.

15            THE COURT:  All right.  Anything else on the

16    motions to dismiss master complaints, short form

17    complaints?

18            MS. PARKER:  Mercifully, no.

19            THE COURT:  All right.

12:02PM  20            MR. LEWIS:  Judge --

21            THE COURT:  I'm sorry, who is this?

22            MR. LEWIS:  This is Jason Lewis of Mason,

23    Georgia, and I represent Forsyth Street Ambulatory

24    Surgery Center, and I know that we had said that we

25    wouldn't have any questions here, but there was some

1    conversation earlier that I would just be remiss if I

2    didn't ask this question.

3           It seems that there was some language

4    potentially expecting a response of defendants -- well,

5    I shouldn't even call them defendants but clinics that

6    are identified in the master complaint but who have not

7    been served and have not received a lawsuit against them

8    at any point.  That was expected by January 10th?

9           THE COURT:  Well, if you haven't been

12:03PM  10   served, you don't need to respond.  My intention here is

11   that any complaint that is served by December 20th will

12   be responded to by January 10th.  That is, you've served

13   the complaint, you've adopted the short form complaint,

14   your response is due January 10th.  If you haven't been

15   served yet, you don't have an obligation to respond.

16           MR. LEWIS:  Absolutely.  I just wanted to

17   confirm that was right.  Thank you, Judge.

18           THE COURT:  Now, if there's a dispute about

19   that, as we've discussed, I'm going to separately issue

12:04PM  20   this order that if there's some question about service

21   of process, I'm going to in some form or another make

22   defendants provide a list, if you think there's an issue

23   in that regard, and we'll try to sort it out then.  I

24   don't know what else to do.  I can't make you respond to

25   a complaint that you haven't been served with.

1          MR. LEWIS:  Absolutely, thank you.

2          MR. STRANCH:  Your Honor, we have one other

3    docket-keeping issue on the master complaints and short

4    form complaints.

5          THE COURT:  Yes, sir.

6          MR. STRANCH:  This is really for the relief

7    of the clerk's office and the lawyers.  Under Tennessee

8    law, there's a requirement that you attach to your

9    complaint certain documents to meet our prefiling

12:05PM  10    requirements.  All the Tennessee cases that we're aware

11    of have already been filed and did attach those to the

12    original complaints, so we either filed a proposed order

13    with the Court last night or it will be filed here

14    shortly that allows the Tennessee plaintiffs to adopt

15    that by reference so that we're not required to attach a

16    thick set of additional documents to every short form

17    complaint when they're already in the record, and we

18    wanted to bring that to the Court's attention and see if

19    that was acceptable.

12:05PM  20          THE COURT:  It certainly sounds sensible,

21    but I don't have the power to modify Tennessee law.

22    Ms. Greer, do you have a view?

23          MS. GREER:  Well, again, I can only speak

24    for my client, but I think we could work something out

25    on that.  We did get the proposal but hadn't had a

1   chance to respond, and we felt like there was a lot to

2   be worked out before that point.

3            THE COURT:  Here's what I'm going to do.  If

4   Tennessee law requires that these documents be included,

5   they need to be included in some form or another.  If

6   there is an existing complaint that is going to be

7   superseded by the adoption of the short form complaint,

8   and those documents are on file and otherwise in

9   accordance with Tennessee law, and this applies to the

12:06PM   10   law of any state, not just Tennessee, if that's what the

11   law requires, I will permit plaintiffs to adopt those

12   items by reference, and if it appears in the future that

13   you can't do that under Tennessee law, if the law

14   permits, I'll give an opportunity to cure.  Will that

15   work?

16            MR. STRANCH:  Yes.  Thank you, your Honor.

17            MR. LANG:  Your Honor, can I ask a

18   clarifying question?

19            THE COURT:  Yes, sir, I'm sorry, who is

12:06PM   20   this?

21            MR. LANG:  My name is Joseph Lang.  I'm an

22   Attorney in New Jersey.

23            THE COURT:  Yes.

24            MR. LANG:  I represent two physicians that

25   have been named in these complaints, and I have filed

motions for dismissal at this point.  They're not global

issues, they are issues that pertain specifically to

physicians in New Jersey wherein an affidavit of merit

is required to be served at some point in time after an

answer is filed.

Will that motion be heard along with the

other general motions, or am I going to have to wait on

the hearing of my motions?

THE COURT:  And so is the issue that you

represent two physicians and this issue applies only to

those two physicians?

MR. LANG:  Correct.

MR. FENNELL:  Your Honor --

THE COURT:  Yes.

MR. FENNELL:  -- Patrick Fennell for the

plaintiffs' steering committee.  I think I can speak on

behalf of the plaintiffs' lawyer in those cases.  They

have filed short form complaints in those cases which do

not include those doctors or the individual doctor as a

defendant in the short form complaint, and their

position on this is that renders the motion to dismiss,

at least to those defendant doctors, moot.

THE COURT:  Did you hear that Mr. Lang?

MR. LANG:  I did.  I don't necessarily agree

with that, but I did hear that.

1          THE COURT:  Let me leave it this way for

2     now.  I don't think it's fair for the physicians to be

3     in the case if either, A, plaintiffs don't intend for

4     them to be in the case; or, B, they ought to be

5     dismissed as a matter of law, and I will give an

6     opportunity for the defendant, if required, to make such

7     a motion early on, even if it only applies to two

8     physicians, but I'm going to put that issue on hold for

9     the time being.  We'll see what is filed by

12:08PM  10     December 20th, and you can look at it and formulate your

11     position, and we'll take it from there.

12          MR. LANG:  Okay.  Thank you.  Excellent.

13     Thank you, your Honor.

14          THE COURT:  Just because I have to do

15     something, I'm going to deem any case in which a motion

16     to dismiss or motion for summary judgment was filed and

17     then a short form complaint has subsequently been

18     adopted, I'm going to deem those to be denied without

19     prejudice to their renewal.  I don't know any other way

12:09PM  20     to handle that to clean that up.  Okay.

21          At some point we'll have to go through the

22     docket and pick those out one-by-one.  It's without

23     prejudice.  It's simply an administrative tool in order

24     to try to simply file this.  I recognize, like with

25     Mr. Lang's clients, there may be cases that are not

```
 1    "global" because they involve one clinic, one physician
 2    or even one plaintiff, and I'll try to deal with them as
 3    fairly and expeditiously as possible.
 4              MR. LANG:  Great.  That's all I can ask for,
 5    your Honor.
 6              THE COURT:  Expeditious in this context may
 7    have a different meaning than it does in another
 8    context, but I'll do the best I can.
 9              [Laughter]
10              THE COURT:  All right.  Let me, I guess,
11    talk about discovery which intersects with this question
12    of the bellwether cases and the issues raised by the
13    St. Thomas defendants.
14              My somewhat simplistic, perhaps, view of
15    this is that the parties ought to be permitted to engage
16    in discovery with one another, putting aside whatever
17    discovery needs to be stayed, if there's a motion to
18    dismiss pending or so on, but, speaking generically, the
19    process should not be one-sided.
20              Even the affiliated companies, or for that
21    matter, at some point the bankrupt entity itself are
22    going to have to produce discovery somehow in some form,
23    and I don't see any reason why that process cannot at
24    least get underway in some rational form.
25              Let me start with discovery from the
```

12:09PM (line 10)  12:10PM (line 20)

1    plaintiffs.  There is, I understand it, a dispute, at

2    least a dispute between the St. Thomas defendants and

3    plaintiffs as to what information ought to be provided

4    and at what stage.

5            I do not see that all discovery ought to be

6    stayed as to, that is, discovery from the plaintiffs,

7    pending selection of bellwether cases.  That doesn't

8    make any sense to me at all.  Obviously, you cannot

9    select bellwether cases without understanding what your

12:11PM  10   options are, and that includes the defendant being able

11   to discover from the plaintiffs various pieces of

12   information.

13           I think a plaintiff fact sheet of some kind

14   is desirable or standardized interrogatories or

15   something in which the requests, more or less, looks the

16   same, and I don't see why we can't have standard forms

17   of authorizations for medical records or employment

18   records, if that's relevant in protective orders.

19           It's not clear to me how we get from there

12:12PM  20   to here exactly.  As I understood the dispute, it's

21   plaintiffs want to provide less information, and

22   defendants want to obtain more, and I guess my starting

23   point is I think fact sheets are desirable.

24           I think the fact sheet ought to have a

25   reasonable amount of detail.  The negotiation of those

```
 1    exact questions might have to be resolved by either me

 2    or a magistrate judge, but some reasonably detailed fact

 3    sheet with relevant information should be produced, and

 4    I don't see why authorizations cannot be executed for

 5    things such as medical records or product I.D. records.

 6              I think plaintiffs' depositions ought to be

 7    probably put on hold for the time being while we sort

 8    out these other issues, but, again, I don't think the

 9    discovery process should be one-sided.

10              I'm simply stating a starting point, not

11    necessarily an ending point, and I'm sure I'm saying

12    things simplistically, but I would like to have some

13    reasonably standardized process that gives defendants

14    sufficiently substantial information that they can

15    evaluate cases, among other things, for bellwether

16    purposes and that plaintiffs not control which cases

17    discovery occurs in.

18              Ms. Parker or someone from the PSC, let me

19    hear your position on this issue.  Mr. Stranch.

20              MR. STRANCH:  Yes, your Honor,

21    Gerard Stranch for the PSC.  We have proposed that there

22    will be a plaintiff profile form sheet and a medical

23    records release that we provided to the defendant early

24    on for all of the cases that are pending as of

25    December 20th, and what we've proposed that plaintiff
```

12:13PM (line 10)

12:14PM (line 20)

1  form sheet be is the PITWD, the personal injury and

2  wrongful death addendum from the bankruptcy court

3  filing, and this is the information that the bankruptcy

4  judge found was necessary to determine how much her

5  claim is worth when the bankruptcy court will be sending

6  money out to people, so this -- or allowing claims or

7  disallowing claims, and so with the form, that would

8  give the defendants basic biographical information on

9  the plaintiffs.

12:15PM  10          It would also give the defendants

11  information about what their underlying medical

12  condition was, who treated them, what product they

13  received, what their claimed injury is as a result of

14  that, whether they had lost wages, whether they were on

15  disability at the time that this occurred or whether

16  they were employed.  It provides substantial basic

17  information about the plaintiff.

18          The medical records release that we have

19  provided, that we've suggested be used as part of that

12:15PM  20  also would allow the defendant to then go get all the

21  medical records from this period of time relating to

22  this, and so they'll be able to know, you know, exactly

23  what were they treated from, how much were those bills

24  that are related to that, and so it provides enough

25  information, we believe it's a substantial amount of

1    information, and we can hand up this form to you if

2    you'd like to see the form that we've proposed.

3              THE COURT:  Sure.

4              MS. PARKER:  I'll note that it has some

5    handwriting, scribblings.

6              MR. STRANCH:  We believe that two of those

7    provide more than enough information for defendants or

8    clinic defendants to look at those various ones and pick

9    which cases they believe should go into a full discovery

12:16PM    10    mode, which would have the more end up uniform plaintiff

11    fact sheet, it would have depositions and other things

12    at that time.

13              With that document you're looking at now,

14    your Honor, they would receive a medical records release

15    as well signed by the plaintiff.

16              THE COURT:  What about employment records?

17              MR. STRANCH:  Well, we think it's only

18    relevant if someone makes a lost wage claim, and on that

19    form, it says are you making a claim for lost wages,

12:16PM    20    and, if so, how much, and so the defendants are able to

21    see what the lost wage claim is, and then when the case

22    is selected to go into a discovery pool, then there

23    would be an employment record release for those that are

24    claiming it, there would be greater authorizations on a

25    case-by-case basis, you know, for example, someone

1    shouldn't sign a disability release for disability

2    records if they're not on disability, and so what we've

3    said in all those authorizations is we're not

4    categorically saying no, all we're saying is when it

5    goes into the discovery pool, we'd look at each case and

6    decide which ones of the negotiated releases makes sense

7    for this plaintiff, and the example I will give you is

8    if one of my plaintiffs, for example, is a retiree and

9    hasn't worked in ten years, there's not going to be

12:17PM   10    employment information that's going to be relevant to

11    that claim, there's not going to be disability

12    information that's relevant to that complaint, and so we

13    think -- or education that's relevant to that claim.

14          You know, education records wouldn't be

15    relevant to that claim, you know, and so we believe that

16    that should be dealt with on a case-by-case basis once

17    the plaintiff is in a full discovery pool, and we are

18    happy to negotiate the terms of those authorizations so

19    that there is kind of a standard form, but whether it's

12:18PM   20    used on each plaintiff, we think should be dealt with on

21    an individualized basis instead of a requirement that

22    everybody has to sign every one.

23          THE COURT:  Ms. Greer, do you want to

24    respond to this?  Again, I'm turning to you by default,

25    but you did raise some of these issues in your

1   pleadings.

2           MS. GREER:  Yes, your Honor, I'm happy to

3   address it.  The problem with the form that was

4   developed by the bankruptcy court for evaluating claims

5   is it doesn't give the kind of information that's

6   necessary to make bellwether decisions, and I want the

7   Court to be very clear that when they talk about this

8   discovery pool, they're talking about six cases out of

9   100, and I believe that applies only to the Tennessee

12:18PM  10  plaintiffs from Nashville, but that's the universe that

11  we're talking about.  We would only get real discovery,

12  if you will, on those plaintiffs.

13          Now I've selected for the Court the

14  plaintiffs' fact sheets that have been approved, and

15  these are public record documents, in five or six

16  different type MDLs.  Here's ours, which you have, and

17  if you want another copy, I'm happy to hand that up.

18          THE COURT:  Could you hand it up, please.  I

19  have it here somewhere.

12:19PM  20          MS. GREER:  Your Honor, if I could

21  substitute a clean copy of the addendum that they're

22  using.  I notice that there's handwriting on the back of

23  that document that you have.  This is a clean copy of

24  the same document.

25          I have four extra copies of everything for

1   the various parties in the room.  That's the same one I

2   handed up, but ours has a lot of notes on the front and

3   the back, so if we could substitute.  These, your Honor,

4   are the two proposals that are before the Court right

5   now.

6            Now, ours is very similar to the Vioxx order

7   your Honor, if I may approach?

8            THE COURT:  Yes.

9            MS. GREER:  This is the fact sheet from the

12:20PM  10   Vioxx case.  This is the one that Judge Fallon discusses

11   in his article that we've represented, both sides have

12   relied on to the Court, if you want a copy.  We'll

13   distribute out copies to everyone later unless they want

14   them right now.  I don't want to hold up the Court's

15   time.

16            All of these orders that I'm going to be

17   handing you, this is from the Alabama GE CAT scan

18   litigation where people were claimed to have been

19   over-radiated.  This was what I used, frankly, as a

12:20PM  20   basis for coming up with the proposed fact sheet that we

21   supplied.

22            All of these, by the way, your Honor, have

23   releases attached to them.  Some of them have more than

24   we've asked for, including one that I'm kind of kicking

25   myself on asking for psychoanalysis reports, so, I mean,

 1   these have been approved by courts, agreed to by

 2   parties, but these have been operative documents.

 3   They're all publicly available.  I can provide the

 4   website.

 5           This one is from the Denture Adhesives that

 6   I'm going to be handing up.  I'll just bring them all up

 7   at one time if that's okay with you.

 8           MR. STRANCH:  Your Honor, I'd like to

 9   correct one thing that's been said that we insisted that

12:21PM  10   there only be six plaintiffs that have full discovery.

11   That's not actually true.

12           THE COURT:  Let me let Ms. Greer finish.

13           MS. GREER:  This last one is the Paxil

14   litigation.  These are all MDL state-coordinated

15   proceedings.  All of these fact sheets ask for a lot of

16   the same information we're asking for.  We asked for

17   comments to our fact sheet.  We said if you think we're

18   asking for too many authorizations, too many questions,

19   and let me just back up and talk about what a fact sheet

12:21PM  20   is.

21           A fact sheet takes the place of

22   interrogatories, and at some point once we settle on a

23   form, we're going to need the Court to do an order that

24   says this is what you're going to use.  This takes the

25   place of interrogatories and requests for productions,

1    and the reason that people have been using these forms,

2    that Judges have approved them is because they're easier

3    for plaintiffs to fill out.  They look a lot like what

4    you fill out at the doctor's office.

5                THE COURT:  You don't need to convince me

6    that some form of this is necessary.

7                MS. GREER:  Okay.

8                THE COURT:  If there's anything more useless

9    than interrogatories, I don't know what it is.

12:22PM  10                MS. GREER:  Then let's talk about what the

11    plaintiffs' proposal is.

12                THE COURT:  Requests for admissions are more

13    useless than interrogatories.

14                MS. GREER:  I couldn't agree with you more.

15    I just served our responses.  Their fact sheet does not

16    have any historical information in it, including prior

17    treaters.  That's really, really critical in the

18    bellwether process.  Every order you read, every article

19    on bellwether, this is what Judge Fallon has referred to

12:22PM  20    as the important basic information.

21                The reason I gave you his fact sheet and his

22    authorizations that were used in Vioxx because that's

23    what he considered important basic information.  That is

24    a given before you move to the bellwether selection

25    process.  It's not just limited to medical records.

1          By the way, they've had an issue medical

2    records only going back three years.  The standard is

3    ten.  That's what we've asked for.  The standard in

4    every malpractice case, whether it's individual

5    plaintiffs, whether it's multiple, I mean, however it's

6    done, all of the authorizations, I've gone back, have

7    been 10 years, and that's what's in all of these orders

8    that we've given you.  They also want to X out certain

9    things like HIV and psychoanalysis records, and, you

12:23PM  10    know, we can make accommodations for that.

11          In terms of HIV, we really can't.  That's an

12    autoimmune that bears directly on multiple issues in the

13    case, everything from causation to, you know, life

14    expectancy, et cetera.  These kinds of things play in,

15    and to have a true picture of these plaintiffs so that

16    we know that we are dealing with a truly representative

17    case and not what all the Federal Judges who were just

18    summarized in the ACI conference, they spoke on this

19    very issue of bellwethers, and they said their

12:24PM  20    frustration was that all the parties are trying to get

21    outliers tried as bellwether cases.

22          An outlier, you want to find somebody who

23    doesn't have "sexy facts," and that's the case you want

24    to be represented, but we won't know that until we have

25    this information, and I want to be clear.  The

1    plaintiffs have this information.  What they're trying

2    to prevent is us from having it, and there's another

3    piece of this that I don't think is fully before the

4    Court, and that is this issue of getting the medical

5    records at all because the plaintiffs' proposal is that

6    all the medical records would go to a registry, even

7    after the authorizations are signed, and they would have

8    first access to them and decide what would be produced

9    to us and what would not be.  That's not the way it's

10   done.  That's not the way it's not done.

11          Now, there have been various protocols that

12   have been developed, and, I apologize, I can't remember

13   which MDL, but it's one of the five that I've just given

14   you where they took an approach and said if the

15   physician or the treater is identified on your fact

16   sheet, we'll give a blank authorization, then you can go

17   serve them.

18          If you want to go get records from anybody

19   who's not on the fact sheet, you have to have an

20   objection, meet and confer process, then the Court will

21   eventually decide if it can't be resolved.  That is how

22   it's usually done, and that's the way it should be done

23   here.

24          Also, if there's specific records that they

25   think shouldn't be in the mix, then we can deal with

1    that when the records are requested.  There is a process

2    for that, but to put them in a registry where they get

3    to decide what we get and what we don't is getting back

4    to the one-sided process that I think the Court's trying

5    to avoid.

6              MS. PARKER:  If I could respond to that?

7              THE COURT:  Yes, Ms. Parker.

8              MS. PARKER:  Thank you, your Honor.  The

9    tragedy of this situation is that we are dealing with a

12:25PM  10    defendant who is in bankruptcy and a definitively

11    limited fund context.  Efficiency here is of the

12    paramount importance.

13              The plaintiffs' steering committee struggles

14    with this, your Honor, on a daily basis trying to figure

15    out how we best represent the interests of plaintiffs

16    and provide information that defendants may be entitled

17    to at some point while keeping in mind efforts to keep

18    costs down.

19              In this situation, we have proposed using

12:26PM  20    the same form that plaintiffs already have to fill out

21    in the bankruptcy as a starting point, and only as a

22    starting point, but as a starting point that will allow

23    plaintiffs and defendants to sit down together and to

24    group cases into bellwether groupings that then will be

25    subject to additional discovery, and one the reasons

1   we have done that, your Honor, is not just your ordinary

2   concern for efficiency sake but because it costs time

3   and money for plaintiffs and their lawyers to sit down

4   and to go through these forms and to fill out these

5   questions, so to the extent that we can avoid billing on

6   both sides, both by plaintiffs' lawyers and by defense

7   lawyers, that eat away theoretically at assets of the

8   estate or at the plaintiffs' recovery, we have

9   endeavored to do that.

12:27PM   10        The plaintiffs' steering committee could

11   give you just as many examples, your Honor, of five-page

12   plaintiff profile forms, but I think it suffices to say

13   that none of the forms that Ms. Greer has handed up to

14   you apply in the context where you had a different in

15   bankrupt and a limited fund.

16        Vioxx was not a case where they were worried

17   about there being enough money to go around.  We also

18   could give you examples of instances where medical

19   records go back five years, not ten years.  We've also

12:27PM   20   got three years and two years, so I think it's a little

21   bit of an overstatement to say that ten years is the

22   default.

23        On the medical records piece, I believe what

24   Ms. Greer is referring to is the plaintiffs' steering

25   committee has been upfront since the beginning of this

1    litigation that we intended to set up and have set up a

2    repository where plaintiffs' lawyers who have already

3    paid and incurred the costs for collecting medical

4    records could be able to upload those records to a

5    repository that could be accessed by the defendants if

6    they chose to use those records rather than go out and

7    incur additional costs of collecting records on their

8    own.

9         We never intended to suggest that the

10   defendants could not in fact go out and re-collect the

11   same set of medical records on their own.  It was an

12   effort to share costs and to share information in this

13   very particular bankruptcy context.

14        Finally, on the HIV point, plaintiffs'

15   steering committee has asked since the first time the

16   HIV issue was raised for any sort of scientific

17   explanation for why HIV would matter here.

18        If there were a declaration from an expert,

19   for example, saying that someone with HIV was five times

20   more likely to contract fungal meningitis from a

21   contaminated dose of MPA, maybe the plaintiffs' steering

22   committee would reconsider our position, but until

23   someone explains to us why HIV records may be relevant

24   here from a scientific basis rather than speculation or

25   simply saying it's autoimmune, we're not comfortable

1    making that accommodation.

2         Also, if someone did have HIV, we would

3    suggest that that case would not be representative and

4    would not be a good bellwether selection.

5         MS. GREER:  Which is why we need to know,

6    your Honor.  It's why we need to know.  I mean, it's

7    really important that we have access to the same

8    information that they do.

9         Now, the way the repository has been

12:29PM  10   presented to us is very different from what you just

11   heard.  The way the repository was presented to us is

12   that it will be a channelling mechanism for all records

13   that we would seek.

14        We have access to the records of these

15   people being treated and these people being administered

16   the steroids.  Those releases have already been

17   provided.  What we need are records going back in time

18   so that we can truly figure out the health histories,

19   the co-morbidities, the kinds of confounding factors

12:30PM  20   that are going to be necessary to understand.

21        What they are suggesting to you as an

22   overall procedure is unprecedented, and they haven't

23   been able to show you anything to support it.

24        Now, they've mentioned the transvaginal

25   pelvic mesh litigation, which is in Western District of

Virginia right now.  There are four major defendants
that are into bellwether phases, and we have both relied
upon those.  They entered into a very different strategy
for the specific context of the case, but even there,
your Honor, if I may approach again, the profile sheet
that was used was much more detailed and had health
histories in it and physicians going back in time for
treating for other conditions, and, really critically,
they had full access to all records on all plaintiffs.

12:30PM

        That was a very different proposal from what
you're hearing today.  The records are that important.
Now, the reason that they agreed to this abbreviated
profile form in the mesh litigation, from what I
understand, is that they had so many cases.

        At that point I think they had 8,000, very
different from our situation.  Right now, as a practical
matter, what you're dealing with are a little more than
100 cases because we're the only ones here talking
because we're the only ones affected by these orders,

12:31PM

and we represent about 100 cases, so that's the universe
at this time, not 8,000, and so to streamline the
process, they agreed to do this.

        Another very, very significant difference
was that the "discovery pool" or the "bellwether pool"
that you were choosing from where they had full access

1    to everything, including depositions, the treaters, the

2    individuals, everybody involved, that was more like 20

3    or 30 per stage, and they're approaching six, so it's a

4    one-sided fight here.  We're not going to be able to

5    have representative information that we can really

6    understand these claims, and that's the whole game.

7              THE COURT:  All right.  Let me cut this

8    short.  I'm not going to decide this on the fly as I sit

9    here.  There are lots of different parts of this and

10   lots of questions not only are you entitled to the

11   information at all but at what stage and so on.

12             What I'm going to do is think about this.

13   I'm going to set up a process for developing a uniform

14   fact sheet.  It might be a one-stage process, it might

15   be two-stage, I don't know.

16             I'm very likely, although I haven't told her

17   yet, that I'm going to involve the magistrate judge in

18   this because I don't think this is something that is

19   going to lend itself to lawyer-to-lawyer negotiation,

20   there being so many parts.  I think it's going to have

21   to be guided or structured somehow.

22             I want to think through that process, but

23   for better or worse, I want to resolve it one way or the

24   other.  I suspect that the bankruptcy form is on the

25   light side, but I'll see.  I want to think about it, and

1   we may not need every piece of information at this

2   stage, but what I need to do, again, is put a process in

3   place for getting this resolved so we can get going on

4   it, and that's where I'm going to leave it now.

5            I am convinced that the fact sheet is the

6   way to go, that it should supersede, at least at this

7   stage, pending further order any interrogatories,

8   document production or requests for admissions and

9   served by any defendants and any plaintiffs.  I don't

12:33PM   10   see the point.  Plaintiffs' depositions are going to be

11   put on hold for the time being.

12            Let's leave it that way for now, and I will

13   issue an order, and we'll take it from there, and I

14   strongly suspect that the poor magistrate judge is going

15   to be in the middle of this fight.

16            MS. DOUGHERTY:  Your Honor, since the

17   plaintiffs' steering committee's filing on this matter,

18   we've made additional compromises related to the

19   negotiations that we were having, and those were not

12:34PM   20   represented here in court today.  The compromises were

21   sent by a letter this morning, so, granted, Ms. Greer

22   has not probably had the opportunity to take a look at

23   that.

24            Would it be useful if we filed just a short

25   supplemental briefing that sets forth the additional

```
 1    compromises that we've made?
 2             THE COURT:  That's fine.
 3             MS. GREER:  Would we have an opportunity to
 4    respond, your Honor?
 5             THE COURT:  Yes.
 6             MS. DOUGHERTY:  Thank you.
 7             THE COURT:  I mean, I think as a practical
 8    matter, not much real headway is going to be made until
 9    after the first of the year, given everything else we
10    have to do, but I would like to tee this up for
11    resolution relatively promptly.  Thank you, Ms. Greer.
12             Anything else on discovery from plaintiffs?
13             (No response)
14             THE COURT:  Okay.  In terms of discovery
15    from defendants, what do we have to talk about there?
16    Who wants to take the lead?
17             MR. STRANCH:  Your Honor, this is
18    Gerard Stranch on behalf of the plaintiffs' steering
19    committee.
20             THE COURT:  Yes.
21             MR. STRANCH:  Cognizant of the Court's
22    request over the summer and then the Court's orders in
23    September telling us to start discovery and get this
24    case moving, we served master discovery on multiple
25    defendants, particularly in Tennessee, and where that
```

12:34PM (line 10)

12:35PM (line 20)

1    stands right now is the magistrate judge has ordered

2    that the subpoenas be responded to as of today.

3         Our discovery responses were due, the

4    magistrate judge's order said you don't have to

5    duplicate, so if you're ordered to give something in the

6    subpoena, you don't have to regive it in your regular

7    discovery if you're in.

8         Well, where we are now, we've yet to receive

9    a single page of documents in this case.  We've yet to

12:36PM 10  receive -- we did receive some limited interrogatory

11   responses from one of the Tennessee defendants or a

12   group of the Tennessee defendants yesterday, but there's

13   motions to stay down, and the reasons for the motion to

14   stay is there's this desire by the defendants to create

15   discovery protocol orders, ESI.  They've requested that

16   we do Rule 26(f) conferences for every single defendant

17   to set up how that discovery is going to go.

18        Our position has been we're happy to talk

19   about a discovery protocol that would, you know, place

12:36PM 20  limitations on depositions and how depositions go

21   forward and where they go forward, ESI protocols.  In

22   light of that, we've provided an ESI protocol to the

23   defendants, we've provided a deposition protocol to the

24   defendants, but our position all along has been

25   consistent with what the Court said, discovery is open,

1    go do discovery.

2            We've even suggested to the defendants

3    because some of the Tennessee defense were sued in state

4    court earlier and produced some documents in state court

5    and did some limited discovery, that the first tranche

6    of discovery here could be just reproducing that in the

7    Federal Court so that we would have it given to us in

8    our case.

9            So far that's not occurred, your Honor, so

12:37PM  10   we're at the position where we need some help from the

11   Court to get discovery moving so that we can be prepared

12   to move these cases through to trial as quickly as

13   possible.

14           THE COURT:  Well, let me -- Ms. Greer was

15   about to stand up.  I want to hear from her, but there

16   are -- I'm not sure that we can truly avoid 26(f)

17   conferences, at least, I mean, we have defendants who

18   are individual physicians, and we have defendants who

19   are multi-national corporations, and there are a lot of

12:37PM  20   different types of defendants here, and they may be in

21   very different positions, and it has to be sensible and

22   tailored as makes sense under the circumstances.

23           Ms. Greer.

24           MS. GREER:  I'm happy to address it whenever

25   you're ready.

```
 1              THE COURT:  Why don't you do so now.
 2              MS. GREER:  Well, first, you know, we
 3     received master discovery, and we responded to master
 4     discovery.  We've told the plaintiffs' steering
 5     committee that we will produce the documents from,
 6     Tennessee but we do have a dispute over the protective
 7     order, which we can take up when you're ready for that.
 8              We were not involved in that decision, and
 9     we feel that there are changes that need to be made, and
10     once the Court rules on that request, we will produce
11     the paper copies.
12              The electronic discovery was a completely
13     different matter because, you know, certainly we have
14     been collecting it, we have been going forward, we
15     haven't been dragging our feet, but going through the
16     production process, as the Court probably has heard
17     rumors about, is an extremely expensive and
18     time-consuming proposition, and we don't want to start
19     that process until we have a shared understanding of
20     what it is that we're going to be doing.
21              ESI protocols have become very common in
22     complex litigation of all kinds.  It's not unusual to
23     negotiate one.  They sent us one November 22d right
24     before the Thanksgiving holiday, and then I was out of
25     town on a planned vacation, and so we have comments that
```

1   we're going to be sending back, but until those issues

2   are addressed or resolved, or we may have to take it to

3   either your Honor or Judge Boal and have a resolution

4   there, but it doesn't make sense to put defendants

5   through the expense, and, by the way, this is another

6   one-sided deal because they're not going to have the

7   volumes of electronic discovery that we have to deal

8   with.

9           THE COURT:  Virtually every product

12:39PM  10   liability case is lopsided, and that's just kind of the

11   way it is.

12           MS. GREER:  It is, but that's why it's so

13   important that we get this protocol in place.

14           THE COURT:  It makes no sense at all to just

15   go half-cocked into electronic discovery.  It has to be

16   thoughtful and negotiated because otherwise it's going

17   to be a nightmare.  It's a nightmare even when it's

18   that.

19           MS. GREER:  Right.

12:40PM  20           THE COURT:  But it needs to be developed in

21   some sensible way, search terms and, you know, all the

22   rest of it.

23           MS. GREER:  Well, and what they said is they

24   expected a rolling production of electronic discovery to

25   start immediately, and we're not in a position to do

1    that until we have, Number 1, the protective order issue

2    resolved; and, Number 2, some sort of understanding of

3    how this is going to work because the last thing we want

4    to be doing is trying to do fix it on the back end.

5              I just recently went through that in another

6    case, and we did not enter into an ESI protocol, much to

7    everyone's chagrin, and it turned out the other side had

8    not done what they were supposed to do, and we had to do

9    post-discovery cutoffs, discovery to the tune of 40,000

12:40PM   10   documents that should have been produced, so that's what

11   I'd like to avoid here so that we do it once and we do

12   it right.  That was not our issue, it was the other

13   side's, but that is certainly possible when people take

14   different views and the operative terms and the rules of

15   engagement aren't set out in advance.

16             We are not asking for a separate Rule 26

17   order or report to be entered in every single case for

18   every single defendant.  I think there are ways that we

19   can come together.  Their position has been, well, we

12:41PM   20   don't have to do it because the Judge has already

21   ordered discovery.  Again, we're being discovered

22   against but we are not getting access to any of their

23   discovery.  It's very one-sided.

24             We feel that there ought to be some rules of

25   engagement regarding just the discovery process and how

1   it's going to occur.  We are working on a deposition

2   protocol.  They sent us that the day before

3   Thanksgiving.  We've got comments that will be going

4   back.  We're working on, you know, different pieces of

5   it, but there ought to be kind of an overall plan.  I've

6   seen it done in all these different MDLs, and I think it

7   helps kind of have a shared understanding.

8                   MR. STRANCH:  Your Honor, if I may, in CMO-6

9   this Court ordered the defendants to produce any

12:41PM  10  discovery produced in state court to lead plaintiffs, to

11  the plaintiffs' steering committee, to the lead counsel.

12  The production was to be in native format unless we

13  otherwise agreed between the parties.  That's not

14  happened yet.

15                  That is many months old.  You know, I hear

16  the discussion about meeting ESI in deposition

17  protocols.  We have proposed those.  Those have been

18  proposed since November 22nd, and we've not gotten back

19  one comment yet.

12:42PM  20                  In fact, we were told there would be none

21  and they'd be filing a motion to stay if we didn't agree

22  to certain changes that they wanted in a protective

23  order that would waive substantive rights that our

24  clients have to have their doctors not speak with

25  defense counsel without someone being present there or

1   prior knowledge of it.

2           You know, your Honor, we're trying to move

3   this.  We want it to be orderly, but we keep putting it

4   off, and there's nothing happening, so we need it to

5   move.  If the Court wants to put a deadline to get that

6   ESI protocol and that ESI deposition protocol completed,

7   we are very happy to have that done.

8           We have said on the electronic discovery

9   they don't need to do it until we get this worked out,

12:43PM  10   but we've got to get comments back so we can get it

11   worked out.

12           MS. GREER:  We agree, your Honor, but to be

13   fair, we have been negotiating for many, many weeks.  We

14   got out a bunch of protocols, and the Court's got it

15   detailed in my declaration ad nauseam all the different

16   things that we've sent over and shared with them.  The

17   first written document we got from them was

18   November 22d, so we're just now responding to this.

19           THE COURT:  This is another issue I'm not

12:43PM  20   going to resolve as I sit here.  This has to be worked

21   out one way or another in terms of the modification of

22   the protective order.  You filed a motion, right,

23   St. Thomas did?

24           MS. GREER:  We did, your Honor.

25           THE COURT:  And I think what I am highly

1   likely to do here is to issue an order that sets some

2   deadlines, refers it to the magistrate judge or both,

3   but, again, the time to sort these issues out is now.

4           There may not be perfect congruence in terms

5   of discovery against defendants proceeding in perfect

6   synchronization with discovery against plaintiffs, just

7   given the way this has played out, and that's just the

8   way it is, and in all likelihood, obviously, the

9   defendants are going to have a lot more work to do than

12:44PM  10   plaintiffs in terms of producing documents, and that's,

11   again, kind of the way it is, but these are solvable

12   issues.  It's just a matter of working through them,

13   setting deadlines, making decisions and so forth, and I

14   think in all likelihood poor Magistrate Judge Boal has

15   to get involved.

16           MS. GREER:  Are you going to tell her before

17   or after the holidays?

18           THE COURT:  I may not just return her phone

19   calls, I may issue an order and avoid her.  For the

12:44PM  20   record, that was a joke.

21           [Laughter]

22           MR. STRANCH:  The magistrate judge certainly

23   hopes so.

24           THE COURT:  These are solvable problems.

25   Again, it's just a matter of working at it and

1   negotiating that which can be negotiated, resolving the

2   disputes that remain, and what I want to do is get it on

3   track and get it going, and, again, as a practical

4   matter, that will likely not occur until after the first

5   of the year, but I want to get started on it.

6          Anything else on discovery from defendants?

7   Again, I'm using Ms. Greer as the de facto

8   representative of I guess unaffiliated defendants here,

9   for want of a different representative.  Does anyone

12:45PM   10   else want to be heard on this topic?

11          MR. TARDIO:  Your Honor, this is

12   Chris Tardio in Nashville.  I represent St. Thomas

13   Outpatient Neurosurgical Clinic and other Tennessee

14   defendants, which, as your Honor knows, is a separate

15   defendant with a similar name to Ms. Greer's client.

16          I want to make sure that I understand our

17   obligations under the Court's direction a moment ago.

18   There is outstanding discovery to us.  As your Honor

19   knows, from the papers we filed, our position has been

12:46PM   20   that some plan needs to be put in place before we are

21   required to respond to that written discovery.

22          My understanding the Court's direction to us

23   that in essence we don't need to respond to the written

24   discovery that's out there until a plan is put in place

25   or until Magistrate Judge Boal rules on a plan, enters a

1       plan or enters some deadlines?

2                   THE COURT:  Well, I'm not sure I can answer

3       that question in the abstract.  My intent is that I

4       don't want anyone to be put to unnecessary work or to go

5       off half-cocked until some of these issues are resolved

6       since I don't know precisely what discovery requests

7       have been made, what the status of it is.  I'm not sure

8       I can grant a blanket immunity here, but my general

9       sense and intention is that there are some issues that

12:47PM  10       it appears to me likely that need to be worked out with

11       at least some defendants, perhaps your client being one

12       of them.

13                   I think you joined in what Ms. Greer is

14       going to do, but those issues are going to have to be

15       resolved in a thoughtful manner, and I'm not sure at

16       this point I see the point of either plaintiffs filing a

17       motion to compel or you filing a motion for protective

18       order while we sort these out, but I'm not going to make

19       a blanket ruling either since I just don't know what the

12:47PM  20       individual requests are, what we're talking about.

21                   MR. STRANCH:  Your Honor, if I could make a

22       suggestion on how to do this that I think will set in

23       course the process that you've alluded to.  Magistrate

24       Judge Boal has already ordered that subpoenas be

25       responded to, and she's limited what those are.  We

1    think that those should go ahead and go forward and the

2    defendants who receive those should go ahead and produce

3    responses to those pursuant to her previous order.

4         We think that pursuant to Court CMO-6

5    anything you've turned over in state court litigation,

6    you need to turn over to the lead counsel for the PSC so

7    they have those same documents in discovery, should go

8    ahead and go forward now, and then we believe there

9    should be answers and objections to the written

12:48PM  10   discovery that we've put out so far so that we can begin

11   the process of meeting and conferring and working

12   through that because I suspect there's going to be

13   meeting and conferring over time periods, over, you

14   know, whether you get certain documents, and so we

15   should start that process now instead of kicking that

16   process on into January or February.

17        Now, for the ESI protocols, the deposition

18   protocols, those you're going to understand the Court's

19   going to give to the magistrate judge to deal with, and

12:48PM  20   we can put off the electronic document searches until

21   that is entered with the magistrate, but in terms of the

22   getting to the meat of what discovery people are going

23   to be able to agree, what's relevant, what's not

24   relevant, what's burdensome, what's not burdensome, we

25   should start that meeting and conferring process now,

1    your Honor, and for the other two categories of

2    documents, those have already been vetted and should go

3    ahead and be turned over post-haste.

4              THE COURT:  Mr. Fennell, did you want to say

5    something?

6              MR. FENNELL:  I was just going to, I guess,

7    second that a little bit.  Judge Boal's order was

8    effective -- I mean, the 30-day deadline is today for

9    her order, and as far as I know, nobody's appealed it.

12:49PM  10   People have announced, certain healthcare providers have

11   announced their position or their interpretation of her

12   order as applies to each of them, and we're going to

13   deal with that, but I would hope that today would be the

14   deadline for all of the clinics to respond to it, and I

15   would hope that the Court today wouldn't affect --

16   anything this Court does today in terms of rulings

17   wouldn't affect that deadline.

18             THE COURT:  Well, this may be a

19   Nashville-only dispute, I don't know.  Ms. Greer.

12:50PM  20             MS. GREER:  Judge, I have a quick

21   clarification.  On the CMO-6 issue which was entered

22   before we were in the case, we will produce those

23   documents once the Court resolves the protective order

24   issues.  Those are not tied to ESI protocol or

25   depositions, but we can't produce them until we have

1    that resolution.

2              MR. STRANCH:  Your Honor, there's a

3    protective order in place that provides coverage.

4              THE COURT:  Well, they're asking me to

5    modify it, and I at least have to consider that.

6              All right.  I'm going to take all of that

7    under advisement, and I am anxious to get things going

8    and will do my best to kickstart that.

9              Let me ask before my stenographer's fingers

12:50PM  10    fall off here, how much longer do you think we have to

11    go?  Should we take a break?

12              MR. STRANCH:  Does your Honor intend to take

13    up the protective order arguments today, or are you

14    going take that under submission?

15              THE COURT:  I'm going to take that under

16    submission.

17              MR. GASTEL:  Your Honor --

18              THE COURT:  Yes.

19              MR. GASTEL:  -- this is Ben Gastel in

12:51PM  20    Nashville with Branstetter, Stranch & Jennings.

21    Ms. Greer can correct me if I'm wrong on this, but I

22    believe that the documents that they produced in state

23    court litigation they produced in the absence of a

24    protective order, so I'm not entirely sure why they are

25    now taking the position that they need a protective

1   order before they produce those in Federal Court.

2          THE COURT:  All right.  Again, I'm going to

3   take all that under advisement, and we'll take it as it

4   comes.  Let's do this.  Why don't we take a break of 5,

5   1, 2, 3, 4, 5 minutes, I will leave the phone lines

6   open, and that will give everyone a chance to use the

7   facilities, and we'll be back in five minutes.

8          (A recess was taken.)

9          THE COURT:  I see empty chairs.  Are we

12:57PM  10  ready to go?

11          MS. PARKER:  Yes, your Honor.

12          THE COURT:  Let me take up one more thing as

13  long as I'm off the agenda and onto my own agenda, and

14  that is the question of selection of bellwether cases.

15          Following plaintiffs' lead, I had some set

16  deadlines in MDL Number 7.  I think they clearly need to

17  be vacated.  I'm not prepared to set new deadlines at

18  this point.  I'm not sure quite what a bellwether case

19  is going to look like.  I want that framework to be in

12:58PM  20  place relatively quickly, but I think at this point,

21  that process needs to be put on hold pending some of

22  these other developments, and we can continue to talk

23  about it, but just so that it's clear, those MDL

24  deadlines, that is, in MDL Number 7 for completion of

25  plaintiff profiles and selection of bellwether cases,

1    are vacated and we will take it up at a later time.

2           What else do we have to talk about?  By the

3    way, on these St. Thomas, the various motions that are

4    pending, I'm going to try to sort through and figure out

5    what I'm granting, what I'm denying and what I'm doing

6    with it.  I know some of you were trying to get out

7    because it's Friday afternoon.  I have a major and

8    lengthy hearing at 2:30, and I'd like to gobble down a

9    sandwich before that, if I can, but so I will sort that

12:59PM  10  out by electronic order after the hearing.

11          MS. PARKER:  I believe there are two points,

12   your Honor.  I think they're both quick ones.  The first

13   would be ARL's motion for extension of time to file a

14   proof of claim.

15          THE COURT:  Yes.

16          MS. PARKER:  The second would be access to

17   informal discovery produced by NECC.  I think we can

18   dispense with each of those quickly.

19          THE COURT:  Okay.

12:59PM  20         MS. PARKER:  I'll note there's a typo on the

21   agenda, it refers to ARL BioPharma's motion for

22   extension as assented to.

23          THE COURT:  It is not.

24          MS. PARKER:  It is not assented to, and that

25   is the wrong docket number.  The docket number that it

```
 1    should have referred to is 570, and I'll let the trustee

 2    address that.

 3              THE COURT:  All right.  Mr. Gottfried.

 4              MR. GOTTFRIED:  Thank you, your Honor.

 5    First, before we get into I guess the merits of it, if

 6    in fact what ARL is seeking is an extension of time to

 7    file on or before January 15th.  Given the pace of the

 8    mediation with ARL, the trustee would have no objection

 9    to that provided that they affirm to the Court that they

10    will file the proof of claim on or about January 15th

11    and not seek any further extensions.  So if that's

12    acceptable, then I think the motion would be resolved.

13              As we indicated in our papers, we believe

14    it's extremely important that the proof of claim be

15    filed, which would absolutely confirm under your

16    transfer order the subject matter jurisdiction of the

17    Court with respect to ARL and these matters.

18              We also believe that it's critical that we

19    have the proof of claim, believe it can be filed,

20    believe it can be estimated, certainly can be amended

21    after the fact and is done all the time, so and with the

22    extension that we're prepared to agree to, they would

23    have plenty of time to prepare that, but, most

24    importantly, I would say that as this motion itself

25    indicates, it's only seeking extension until
```

01:00PM (line 10)

01:01PM (line 20)

1    January 15th, and our concern is that the real agenda is

2    not more time, which we've repeatedly given multiple

3    times, as a courtesy, but rather not to file at all

4    until they see whether they reach a settlement, and

5    that's something that the trustee strongly objects to

6    for many reasons.

7           Just to highlight one or two, to be brief,

8    there are many benefits participating in the mediation

9    process, including Number 1, the opportunity to resolve

01:02PM  10  these cases expeditiously and inexpensively.  If we

11   proceed with the schedule we talked about with the

12   mediator, they would be getting meaningful, informal

13   discovery, they're getting the time and attention of

14   multiple decision-makers from the PSC, the trustee, the

15   creditors' committee, and this is the protocol that was

16   agreed to.

17          They are important reasons, and particularly

18   with respect to jurisdiction why it's important, and if

19   they want the benefits of this process, we believe they

01:02PM  20  should be more than willing to file a proof of claim, as

21   they themselves concede they would need to do if a

22   settlement is reached and they wanted to take advantage

23   of what we hope will be a successful bankruptcy plan.

24          THE COURT:  Who wants to -- yes.

25          MS. RAGOSTA:  Thank you, your Honor.

1    Kristen Ragosta, R-a-g-o-s-t-a.  Your Honor, it is true

2    at this time we are seeking to extend the time to file a

3    proof of claim until January 15th.  Ultimately, though,

4    we are considering what your order actually meant, and

5    if ARL decided that it didn't have a claim that it

6    intends to assert at all or if it has only a meaningless

7    or unallowable claim, that's still a prerequisite to

8    mediation.

9             THE COURT:  I guess I don't know the answer

01:03PM   10   to that.  I hadn't thought about that.

11            MS. RAGOSTA:  And, your Honor, ARL feels

12   very strongly about this because their position -- there

13   are several issues I want to discuss with you, but first

14   and foremost, they believe if they're compelled to file

15   a proof of claim in the bankruptcy court, then that will

16   impede on their constitutional right to a jury trial and

17   to have an ARL III Judge decide some of the issues in

18   this case.

19            ARL understands that it needs --

01:03PM   20            THE COURT:  I'm not sure I understand why.

21   Normally jury issues, the reference is withdrawn, and we

22   resolve them like any other case.

23            MS. RAGOSTA:  Your Honor, the case law that

24   we are reading states that if you file a proof of claim,

25   that you've waived your right to a jury trial, so even

1   though if you had a right to a jury trial, you would be

2   able to have that heard by an ARL III Judge.

3            We believe that once you waive that right,

4   then you lose it, especially once we file a proof of

5   claim, we believe that the trustee can then assert a

6   counterclaim, and a counterclaim filed by the trustee

7   would then be potentially considered a court proceeding,

8   and once it's a court proceeding, we believe then we

9   have trouble having that case removed or having the

01:04PM  10   trial removed if we have trial rights at all.

11            THE COURT:  Well, I'm no bankruptcy maven,

12   but I don't think that's the way it works.  Anyhow, I'm

13   not going to make that decision now.  Go ahead.

14            MS. RAGOSTA:  Thank you, your Honor.  ARL

15   understands that it needs to consent to the jurisdiction

16   of the bankruptcy court in order to enjoy the benefits

17   of the mediation.  ARL does not need to file an

18   additional proof of claim to do that, ARL can merely

19   consent to the bankruptcy court jurisdiction upon a

01:05PM  20   successful mediation without then waiving what it

21   believes are its important constitutional rights, and,

22   moreover, ARL believes it's already deemed to have filed

23   a proof of claim because it's listed on the schedule

24   that NECC filed listing the claimants.

25            It already has an uncontested, unliquidated,

1    undisputed claim on the record, and so it's already in

2    the bankruptcy court for the purposes of participating

3    in the plan and having jurisdiction.

4             We believe that that's reflected in

5    Judge Boroff's order on the bar date, which states that

6    if someone's already listed on those schedules, they

7    don't have to file a proof of claim, and so there's an

8    inconsistency with the order in this Court that says

9    there has to be a proof of claim filed where

01:05PM  10   Judge Boroff's order suggests that it does not.

11            Your Honor, ARL is also uncomfortable filing

12   a proof of claim under oath when they believe it

13   potentially could be meaningless and it's not allowable

14   in the bankruptcy court.  They believe both of these

15   things because it would be a contingent claim.  The

16   claim is meaningless because it's contingent on claims

17   that are asserted by the plaintiffs which haven't been

18   finalized yet.

19            They won't be tabulated and provided to ARL

01:06PM  20   for at least 30 days after the bar date, potentially

21   longer, and, your Honor, the point of a proof of claim

22   is so that the claimant can obtain money from the

23   estate.

24            In this case, there is no reasonable

25   expectation that ARL will ever obtain any money from the

1   estate, and they believe potentially if they filed a

2   claim, it won't be allowable because it will never

3   become allowable until they pay money, it will always be

4   for contribution or contingent.

5        It's particularly at the time that the Court

6   or the trustee decides whether to allow it or not, and

7   so their difficulty is trying to file a claim under oath

8   that they know won't be allowable, and they believe that

9   pursuant to Chapter 11, Section 502(e)(1)(b).

01:07PM  10        I know that the trustee has cited in his

11   brief *Hemingway v. Transport* against that proposition,

12   and I don't think that that case applies here.  In that

13   case, the claim was called contingent, but I believe the

14   Court determined that it may have been improperly called

15   contingent in that he remanded it back to determine

16   whether it was actually an administrative expense or if

17   it was an actual contingent claim in a joint and several

18   liability case, and they determined that if it was a

19   situation where there was joint and several tort

01:07PM  20   liability, that claim would be still unallowable if it

21   was contingent, so I think that that case doesn't apply

22   here.

23        So, your Honor, because the claim may be

24   baseless, unallowable, and we're already potentially

25   part of the plan, and we can consent to the plan at any

1    time, the only impact that ARL sees it will have is it

2    will potentially waive jury trial rights, allow the

3    estate to file cross-claims against ARL giving them an

4    unfair advantage, and I do have the case law that

5    they're citing to and the statutes, which I can either

6    read to you now or send to you in a supplemental brief.

7           The creditors have relied on

8    *Stern v. Marshall* during our discussions, and I would

9    suggest that that case doesn't apply either.  In that

10   case, the claim asserted against the estate was for

11   defamation.

12          The estate countered with a claim for

13   intentional interference with a gift, and the Court

14   found that those two claims weren't sufficiently related

15   to call the counterclaim of Court proceeding so that

16   they determined that they weren't going to here the

17   counterclaim under the bankruptcy court jurisdiction,

18   but in this case, I suggest that the Court could come to

19   a different conclusion because it basically would be the

20   same operative facts that the Court was trying to

21   decide, and the only question would be is ARL liable or

22   NECC, and it wouldn't be different dates and different

23   issues, it would all be the same core issue, and that's

24   their concern.

25          Your Honor, just to hit some of the points

in the trustee's brief, ARL has objected to this

provision from the outset.  We were working with the

PSC, and they did grant extensions.  We continue to work

it out, but we have never agreed to this provision.

We understand that there's a benefit to

being in the mediation process.  That's a benefit that

both parties are receiving.  ARL is a small company with

a small insurance policy that's eroding, and the more

money that we save is the more money that we have for

mediation for the plaintiffs and the parties in this

case.  I think the mediation generally is beneficial to

both sides, and it's not just one-sided on our part.

The trustee is also saying we need to file a

proof of claim to ensure that we're going to participate

in the mediation, and I'd suggest we've already filed a

certification to this Court that we're going to

participate.

You ordered us to participate in good faith.

We've produced tens of thousands of documents already,

so the discovery stay is questionably helpful.  They're

already asking us to produce thousands of more

documents.  We haven't received any documents in return.

The trustee hasn't even agreed whether or not he will

participate in the mediation in person, so I think we've

shown that we are going to participate in good faith,

1    and if anyone's questioning who's going to participate

2    in good faith, it would be a question of the trustee.

3             So, your Honor, for all those reasons, we'd

4    just ask at first that you extend our time to file the

5    proof of claim until the bar date but that you not make

6    this proof of claim issue a contingency for mediation

7    and allow ARL to decide on its own whether it wants to

8    consider this the case law and make its own

9    determination.

01:10PM  10             THE COURT:  All right.  Mr. Gottfried.

11             MR. GOTTFRIED:  I think our response is

12   simple and straightforward.  The mediation order was

13   clear.  If you want to participate in the mediation

14   process that the Court outlined and approved within 10

15   days of the filing that you're going to participate,

16   this was a requirement.  I've explained the reasons for

17   that.

18             If they don't want to participate, it's a

19   voluntary process, that's fine.  We prefer they do.  We

01:11PM  20   prefer they filed a proof of claim.  We don't view it as

21   a significant burden at all.  We don't agree with their

22   analysis as to what would happen to them and befall them

23   if in fact the proof of claim was filed.

24             THE COURT:  What's your view of the jury

25   trial issue?

1                MR. GOTTFRIED:  I think the Court has

2       already withdrawn the reference on two cases that were

3       filed in the bankruptcy court to this court, and they're

4       here already, ARL, and I think on the personal injury

5       claims, that's what would happen.

6                So I'm not sure I candidly understand their

7       argument or why they think *Stern v. Marshall* doesn't

8       apply, but that's -- if they want to participate in this

9       Court-sanctioned process and get the benefit.  I mean,

01:11PM  10     we don't have a single document from them.  The trustees

11      have no documents from them.  We've received no

12      discovery.

13               In the mediation call that we had with the

14      mediator, we certainly indicated that we would be happy

15      to have the PSC make the voluminous, informal discovery

16      that we have been producing all along available to ARL

17      as part of this process.

18               They've asked for information regarding

19      proof of claims.  Under Judge Boroff's order, the only

01:12PM  20     way they can get that is if they are "a participating

21      party in a Court-sanctioned mediation," and then they

22      have to move for leave to get the claim forms.

23               So all this assumes that the bankruptcy

24      court's jurisdiction is confirmed under the transfer

25      order by filing a proof of claim and so we think it's an

1    important jurisdictional step that makes the mediation

2    meaningful.

3           MR. ELLIS:  Your Honor, the PSC agrees with

4    the trustee, and, frankly, I've been dealing with this

5    issue for three months, and I still don't understand

6    what ARL's concern is, but if it comes down to it, you

7    know, we think they can withdraw from the mediation if

8    they don't want to file a proof of claim, but it has to

9    be their decision, but we think it should be a

01:13PM   10   requirement.

11          THE COURT:  Ms. Ragosta, any response?

12          MS. RAGOSTA:  Your Honor, I think the only

13   result, and that would be a tragedy, because our firm

14   would make a lot of money doing discovery for the next

15   three years, and the money would just start depleting

16   and not go -- and I don't think the mediation should be

17   predicated on this issue that's contested, and it's

18   unnecessary.

19          THE COURT:  Mr. Gottfried, what would happen

01:13PM   20   if I simply granted the extension?  If nothing else, I'm

21   kicking the can down the road.  Does that make sense?

22   In other words, has the deadline passed?

23          MR. GOTTFRIED:  I think technically the

24   deadline has passed from your last extension.

25          THE COURT:  Was it December -- well,

1    whatever.

2            MR. GOTTFRIED:  I think technically it's

3    passed.  Obviously, as I said, we've be happy to extend

4    to January.  I think the issue in terms of kicking the

5    can down the road is we are not inclined to continue to

6    work with the mediator if we don't have a

7    Court-sanctioned mediation process, so from our

8    perspective, our position is if you put everything on

9    hold until they either file or don't file, I guess

01:14PM   10   that's our view.

11            Again, I mean, I'm not trying to cast any

12   aspersions on anyone.  I mean, from the trustee's

13   perspective, we were told, well, we were not quite sure

14   how to do this, we'll give you more time, we'll give you

15   more time.

16            Even this motion, in my view, is

17   disingenuous because it says we want an extension till

18   the 15th when the real answer is they don't want an

19   extension to the 15th, they want an option to see how

01:14PM   20   the mediation goes, and I think from our perspective,

21   they should be forced, if they want it, get the benefits

22   of the mediation process to fish or cut bait on that

23   point.

24            If this is such a significant issue that

25   they would rather not mediate under the Court-ordered

1    process, then fine, let's slow it down.  If it isn't,

2    then let's go forward.  We've certainly had I think

3    almost a two-hour call that I participated in with the

4    mediator to try to get this mediation going promptly,

5    and I think certainly we'd love to participate in it,

6    but we think this is an important jurisdictional piece,

7    and, you know, we stand on our opposition.

8              THE COURT:  All right.  What I'm going to do

9    is this.  I'm going to grant it in part, I'm going to

01:15PM  10    grant the extension to December 23d, which is 10 days

11    and let the chips fall where they may.

12              MR. GOTTFRIED:  Thank you, your Honor.

13              MS. RAGOSTA:  Thank you, your Honor.

14              THE COURT:  That's I think Number 570,

15    granted in part and denied in part.

16              Ms. Parker.

17              MS. PARKER:  I think that brings us to

18    NECC's informal discovery.  I'll suggest if it's all

19    right with Mr. Fern that we forego the usual report of

01:15PM  20    what has been done in the last month.  There has been

21    discovery produced.

22              THE COURT:  All right.

23              MS. PARKER:  As the Court knows, NECC has

24    informally produced some discovery to the plaintiffs'

25    steering committee.  The agreement between the

1    plaintiffs' steering committee and NECC precludes the

2    PSC from sharing that informally-produced discovery.  I

3    want to bring one thing to the Court's attention on

4    that.  The PSC has received a subpoena from InSight, I'm

5    sorry, it's not InSight Health.

6              MR. FENNELL:  InSight Health Corp.

7              MS. PARKER:  Thank you, InSight Health

8    Corp., which is a Virginia pain clinic trying to gain

9    access to the materials in the PSC's possession that

01:16PM  10  have been informally produced by NECC.  The plaintiffs'

11   steering committee has responded informally but in

12   writing to InSight to let them know our position on that

13   matter.

14             We are considering our options on how to

15   respond.  We raise it with the Court because it is

16   conceivable that we may wind up asking the Court for

17   assistance in resolving that matter.

18             THE COURT:  All right.  Again, just, again,

19   to state what may be obvious, at some point this

01:17PM  20  discovery needs to be made available.  The only question

21   is doing this in a way that's reasonably controlled,

22   organized, fair to everyone and keeps costs down

23   and -- well, I would like to get to that point.

24             At some point, everyone is going to have to

25   be able to see these records, let's put it that way.

1          MS. PARKER:  I'm sorry, I'm being reminded,

2    your Honor, that I sent a letter to all of the

3    unaffiliated defendants in this case identifying this

4    issue and suggesting that we meet and confer about how

5    best to resolve the issue.  The PSC has no interest in

6    indefinitely keeping this information, but we are very

7    cognizant of the terms of our sharing agreement with

8    Mr. Gottfried and Mr. Moore.

9          THE COURT:  All right.  Let's leave that for

01:17PM    10    the time being where it is.  Why don't we take two

11    minutes, status of bankruptcy proceedings, anything I

12    ought to know?

13          MR. GOTTFRIED:  I think I gave you earlier

14    in the hearing what I think is the most important

15    developments, your Honor.

16          THE COURT:  All right.  Status of appeal

17    appeals?

18          MS. PARKER:  The only recent activity is

19    that the creditors' committee moved to intervene in the

01:18PM    20    appeal, and that motion to intervene was granted.

21          THE COURT:  All right.  Anything else that

22    needs to be taken up now other than I'm going to have to

23    move the date of the February status conference because

24    of a change in my schedule, but otherwise is there

25    anything else anyone wants to take up?  Ms. Greer.

1          MS. GREER:  Your Honor, I have one very

2     small technical issue that I think will be easy,

3     hopefully will be easy.  On CMO-Number 7, the Court had

4     an answer deadline for all of the 100 plus lawsuits that

5     were filed individually, and we got an extension while

6     we were kind of working through this process to answer

7     those.

8          I'm assuming that the Court would take that

9     deadline off the table as well because we're coming up

01:19PM  10     with the short form process, et cetera, and the only

11     people that this would affect would be people that

12     didn't file a short form to supersede their individual

13     complaint.

14          THE COURT:  Is there any reason not to

15     extend it to January 15th so that we have everything on

16     file at the same time?

17          MS. GREER:  That works for me.

18          THE COURT:  Why don't we do that.  Again,

19     that would be for the answer or responsive pleading

01:19PM  20     deadline for any case filed on or before December 20th

21     in which plaintiffs have not adopted the short form

22     complaint.

23          MS. GREER:  Your Honor, I would just ask

24     that if for some reason there were 30 people who did not

25     opt in, if we could come back to the Court and ask for

1   more time on that because, obviously, responding to a

2   55-page, you know, multi-various complaint takes time.

3           THE COURT:  All right.  Let's cross that

4   bridge when and if we come to it.

5           MS. GREER:  Thank you.

6           THE COURT:  Peter, what is the timetable?

7           THE CLERK:  The next status is January 10th

8   at 1:30, then the February one is scheduled for

9   February 13th.

01:20PM   10           THE COURT:  It is now February 13th.  When

11   would we move it to?

12           THE CLERK:  The Friday before is

13   February 7th.

14           THE COURT:  All right.  It looks like we can

15   do February 6th or 7th, Thursday or Friday.  I may have

16   a deliberating jury at that point, but 1:30 in the

17   afternoon?

18           MR. ELLIS:  Which date, Judge?

19           THE COURT:  Either February 6th or 7th.

01:20PM   20           MS. PARKER:  I believe the 6th would be more

21   convenient.  The plaintiffs' Bar meeting begins

22   February 7th, so the PSC may --

23           THE COURT:  February 6th at 1:30.  That's

24   rescheduling the February status conference which had

25   been I think the following week.  All right.  We might

1    as well set one for May.

2            THE CLERK:  May 15th at 1:30.

3            THE COURT:  May 15th at 1:30.  All right,

4    thank you all for your patience.  I have a number of

5    things under advisement.  I'm going to try to work

6    through these as best I can and issue some further

7    orders.  Thank you, all, and Merry Christmas to those of

8    who you celebrate, save travels to everyone, and I will

9    see you after the first of the year.

10            (Whereupon, the hearing was adjourned at

11    1:21 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3    UNITED STATES DISTRICT COURT )

 4    DISTRICT OF MASSACHUSETTS ) ss.

 5    CITY OF BOSTON )

 6

 7         I do hereby certify that the foregoing

 8    transcript, Pages 1 through 110 inclusive, was recorded

 9    by me stenographically at the time and place aforesaid

10    in MDL NO. 13-02419-FDS, IN RE:  NEW ENGLAND COMPOUNDING

11    PHARMACY CASES LITIGATION and thereafter by me reduced

12    to typewriting and is a true and accurate record of the

13    proceedings.

14         Dated this December 30, 2013.

15                        s/s Valerie A. O'Hara

16                        _____

17                        VALERIE A. O'HARA

18                        OFFICIAL COURT REPORTER

19

20

21

22

23

24

25
```