# Exhibit G



82 TLNLR 2323                                                                                                                   Page 1
82 Tul. L. Rev. 2323

C

Tulane Law Review
June, 2008

Proceedings of the Tulane Law Review Symposium

The Problem of Multidistrict Litigation

**\*2323** BELLWETHER TRIALS IN MULTIDISTRICT LITIGATION

Eldon E. Fallon [FNa1]

Jeremy T. Grabill [FNd1]

Robert Pitard Wynne [FNaa1]

Copyright (c) 2008 Tulane Law Review Association; Eldon E. Fallon; Jeremy T. Grabill; Robert Pitard Wynne

This Article first provides an overview of the multidistrict litigation process and the history of bellwether trials within it. The Article then recounts in detail specific uses and multiple techniques for implementing bellwether trials under the modern informational approach. After weighing the benefits and drawbacks of using bellwether trials, the Article concludes that procedures that involve considerable attention to the selection of bellwether cases, especially those that include significant attorney participation, are best suited to assist the parties in accurately valuating the thousands of other cases for which trial is often not practical or authorized in the transferee district. The Article sounds a hopeful note for judges and practitioners in multidistrict litigation today by highlighting and deconstructing one of the most innovative and useful techniques for the resolution of complex cases.

| I. Introduction | 2324 |
|---|---|
| II. Overview of the Multidistrict Litigation Process | 2326 |
| III. The Rise of Bellwether Trials | 2330 |

82 TLNLR 2323
82 Tul. L. Rev. 2323

|  |  |
|---|---|
| A. Early Experimentation: The Binding Approach | 2331 |
| B. The Modern Informational Approach | 2332 |
| 1. In re Propulsid Products Liability Litigation (MDL 1355) | 2332 |
| 2. In re Vioxx Products Liability Litigation (MDL 1657) | 2334 |
| C. Benefits of the Modern Approach | 2337 |
| 1. Trial Packages | 2338 |
| 2. Enhancing Global Settlements | 2340 |
| IV. The Selection Process | 2342 |
| A. Cataloguing the Entire Universe of Cases | 2344 |
| B. Creating a Pool of Potential Bellwether Cases | 2346 |
| 1. Determining the Size of the Pool | 2346 |

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2. Filling the Pool                                               2348

a. Random Selection                                              2348

b. Selection by the Transferee Court                            2348

c. Selection by the Attorneys                                   2349

3. Limitations on Cases To Be Considered                        2351

a. Trial-Ready Cases                                            2351

b. Cases Amenable to Trial                                      2352

c. Waiver Considerations                                        2357

C. Case-Specific Discovery                                      2360

D. Selecting Individual Cases from the Pool for Trial           2360

1. Random Selection                                             2361

2. Selection by the Transferee Court                            2363

82 TLNLR 2323
82 Tul. L. Rev. 2323



3. Selection by the Attorneys 2363

4. Strikes or Vetoes 2365

V. Conclusion 2365

**\*2324** The term bellwether is derived from the ancient practice of belling a wether (a male sheep) selected to lead his flock. The ultimate success of the wether selected to wear the bell was determined by whether the flock had confidence that the wether would not lead them astray, and so it is in the mass tort context. [FN1]

I. Introduction

In an age of increasing skepticism regarding the use of class actions in our legal regime, the modern multidistrict litigation (MDL) process embodied in 28 U.S.C. § 1407 is emerging as the primary vehicle for the resolution of complex civil cases. [FN2] The MDL process has traditionally been limited to establishing a centralized forum where related cases are consolidated so that coordinated pretrial discovery can proceed in an efficient and effective manner. [FN3] In theory, this centralized forum, or "transferee court," as it is known, is a sort of way-station at which the preliminary aspects of the litigation can be **\*2325** more or less completed before individual cases are sent to their final destinations in courts across the country for ultimate resolution. In practice, however, the centralized forum can do more than function as a discovery crucible. Indeed, by establishing a mechanism for conducting "bellwether" or "representative" trials, the transferee court can enhance and accelerate both the MDL process itself and the global resolutions that often emerge from that process.

This Article begins with a brief overview of the traditional MDL process. It then traces the rise and development of bellwether trials, from early attempts to bind related claimants to the results of such trials, to the modern informational, or nonbinding, approach. A typical bellwether case often begins as no more than an individual lawsuit that proceeds through pretrial discovery and on to trial in the usual binary fashion: one plaintiff versus one defendant. Such a case may take on "bellwether" qualities, however, when it is selected for trial because it involves facts, claims, or defenses that are similar to the facts, claims, and defenses presented in a wider group of related cases. The primary argument presented here in support of the informational approach is that the results of bellwether trials need not be binding upon consolidated parties with related claims or defenses in order to be beneficial to the MDL process. Instead, by injecting juries and fact-finding into multidistrict litigation, bellwether trials assist in the maturation of disputes by providing an opportunity for coordinating counsel to organize the products of pretrial common discovery, evaluate the strengths and weaknesses of their arguments and evidence, and understand the risks and costs associated with the litigation. At a minimum, the bellwether process should lead to the creation of "trial packages" that can be utilized by local counsel upon the dissolution of MDLs, a valuable by-product in its own right that supplies at least a partial justification for the traditional delay associated with MDL practice. But perhaps more importantly, the knowledge and experience gained during the bellwether process can precipitate global settlement negotiations and ensure that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

such negotiations do not occur in a vacuum, but rather in light of real-world evaluations of the litigation by multiple juries.

The Article moves on to discuss the primary practical consideration for courts and counsel in employing bellwether trials, namely the method of selecting bellwether cases from a wider group of related lawsuits.  Although there is no one trial selection paradigm, the process generally should proceed in three steps.  First, the transferee court should catalogue the entire universe of cases that comprise the **\*2326** MDL and attempt to divide the cases into several discrete categories based on prominent variables. Second, the transferee court should create a pool of representative cases, which includes cases from each category, and then place these cases on a fast-track for case-specific discovery. Third, the transferee court must devise the appropriate methodology for selecting a predetermined number of individual cases from the pool for trial. Throughout the entire process, the transferee court can greatly benefit from the assistance of the attorneys involved in the litigation. Indeed, the bellwether process works best when counsel are engaged and devoted to the endeavor from the start.

## II. Overview of the Multidistrict Litigation Process

Congress amended the Judicial Code in 1968 "[t]o provide for the temporary transfer to a single district for coordinated or consolidated pretrial proceedings of civil actions pending in different districts which involve one or more common questions of fact." [FN4] In its current form, the MDL statute provides:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings.  Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.  Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated: Provided, however, [t]hat the panel may separate any claim, cross-claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded. [FN5]

Thus, the consolidation of related cases pending in federal courts across the country is achieved by the Judicial Panel on Multidistrict Litigation, known informally as the "MDL Panel." [FN6]

**\*2327** The MDL Panel "consist[s] of seven [sitting federal] circuit and district judges designated from time to time by the Chief Justice of the United States, no two of whom shall be from the same circuit." [FN7] According to the MDL Panel itself, "[t]he job of the Panel is to (1) determine whether civil actions pending in different federal districts involve one or more common questions of fact such that the actions should be transferred to one federal district for coordinated or consolidated pretrial proceedings; and (2) select the judge or judges and court assigned to conduct such proceedings." [FN8] The MDL Panel may carry out these functions either "upon its own initiative" or in response to a "motion filed with the panel by a party in any action in which transfer . . . may be appropriate." [FN9]

When the MDL Panel finds that centralization of related actions is appropriate, an MDL is formally created by the issuance of a "transfer order." [FN10] The Panel's transfer order will assign a title and number to the MDL and will identify the related actions currently pending in districts outside the selected transferee forum that are being **\*2328** transferred pursuant to 28 U.S.C. § 1407. These cases, together with any related actions originally filed in the transferee forum, will constitute the MDL. As the MDL Panel subsequently learns of additional related cases, it will issue "conditional transfer orders" identifying

82 TLNLR 2323
82 Tul. L. Rev. 2323

tag-along actions that are to join the MDL. [FN11] A conditional transfer order does not become final, however, until it is filed by the MDL Panel in the transferee court and such filing is delayed fifteen days to allow any objections to the transfer of tag-along actions to be made. [FN12] Thus, transferor courts retain jurisdiction over cases subject to conditional transfer orders until such orders are filed in the transferee court. From time to time, the MDL Panel will vacate a conditional transfer order before it becomes final, typically based either on a well-founded objection to transfer or in light of the dismissal or remand of an action by the transferor court.

The MDL Panel transfers cases to the transferee court for "coordinated or consolidated pretrial proceedings." [FN13] And as the MDL Panel has explained, the word "pretrial, as an adjective, means before trial," thus "all judicial proceedings before trial are pretrial proceedings." [FN14] Indeed, the transferee court's authority has been described as "broad," and it necessarily encompasses issuing pretrial orders, resolving pretrial motions (including discovery motions, motions to amend, motions to dismiss, motions for summary judgment, and motions for class certification), and attempting to facilitate settlement. [FN15] In reality, there is only one true limit on a transferee court's authority over cases transferred to it by the MDL Panel, namely that a transferee court cannot "unilaterally transfer[] cases to [itself] for trial." [FN16] The United States Supreme Court defined this limitation in Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, noting that the MDL statute "not only authorizes the Panel to transfer for coordinated or consolidated pretrial proceedings, but obligates the Panel to remand any pending case to its originating court *2329 when, at the latest, those pretrial proceedings have run their course." [FN17] Thus, Lexecon held that the language of § 1407 precludes a transferee court from utilizing 28 U.S.C. § 1404(a) to make "self-assignments" and thereby retain transferred cases beyond pretrial proceedings. [FN18] Accordingly, at the conclusion of pretrial proceedings, cases that have not been terminated in the transferee court as a result of summary judgment, judgment of dismissal, or judgment upon stipulation must be remanded by the MDL Panel to the transferor courts for trial. [FN19] However, in practice, "[f]ew cases are remanded for trial; most multidistrict litigation is settled in the transferee court." [FN20] But this process can take time.

*2330 Indeed, the strongest criticism of the traditional MDL process is that the centralized forum can resemble a "black hole," into which cases are transferred never to be heard from again. [FN21] The fact that MDL practice is relatively slow is to be expected, however, when one court is burdened with thousands of claims that would otherwise be spread throughout courts across the country. Despite criticisms of inefficiency, judicial economy is undoubtedly well-served by MDL consolidation when scores of similar cases are pending in the courts. The relevant comparison is not between a massive MDL and an "average case," but rather between a massive MDL and the alternative of thousands of similar cases clogging the courts with duplicative discovery and the potential for unnecessary conflict. Nevertheless, the excessive delay and "marginalization of juror fact finding" (i.e., dearth of jury trials) sometimes associated with traditional MDL practice are developments that cannot be defended. [FN22] The use of bellwether trials can temper both of these negative tendencies.

### III. The Rise of Bellwether Trials

While "consolidation improves the efficiency of the pre-trial process, courts still face the daunting possibility of adjudicating numerous similar claims." [FN23] Indeed, just like consolidation under Rule 42 of the Federal Rules of Civil Procedure, consolidation of individual cases in a transferee court by the MDL Panel pursuant to § 1407 "does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." [FN24] It is in this setting that the use of bellwether, or representative, trials has developed and in which the practice can flourish.

*2331 A. Early Experimentation: The Binding Approach

Initially, courts attempted to use the results of bellwether trials to bind related claimants formally. [FN25] The early use of bellwether trials in this binding fashion was essentially an alternative to the adjudication of a class action. That is, notwithstanding the absence of class certification, it was nevertheless thought that the trial of representative claims could somehow have a binding effect on the consolidated cases of related claimants. [FN26] Appellate courts have been skeptical of this practice, and for good reason. [FN27]

**\*2332** B. The Modern Informational Approach

Two recent pharmaceutical MDLs that were centralized in the United States District Court for the Eastern District of Louisiana utilized bellwether jury trials for informational purposes: In re Propulsid Products Liability Litigation (MDL 1355) and In re Vioxx Products Liability Litigation (MDL 1657). [FN28] The ultimate purpose of holding bellwether trials in those settings was not to resolve the thousands of related cases pending in either MDL in one "representative" proceeding, but instead to provide meaningful information and experience to everyone involved in the litigations. [FN29] Because the remainder of this Article draws examples from both MDLs, a brief factual summary of the Propulsid and Vioxx MDLs and the bellwether trials that were conducted is appropriate.

1. In re Propulsid Products Liability Litigation (MDL 1355)

The federal Propulsid MDL was created by the MDL Panel on August 7, 2000. [FN30] Propulsid is the trade name for a family of prescription drugs that contain the active pharmaceutical ingredient cisapride. [FN31] Propulsid was manufactured by Janssen Pharmaceutica, Inc., which is a wholly owned subsidiary of Johnson & Johnson, and approved by the United States Food and Drug Administration (FDA) in 1993 for the treatment of nocturnal heartburn symptoms caused by gastroesophageal reflux disease. [FN32] Propulsid is a prokinetic agent that was designed to work by increasing the rate at which the esophagus, stomach, and intestines move food during digestion. [FN33] The plaintiffs in the Propulsid MDL asserted state law products liability claims, primarily alleging that Propulsid was defectively designed and that the **\*2333** defendants failed to warn that dangerous heartbeat irregularities could develop when the drug was consumed by some individuals in certain circumstances. [FN34]

The transferee court conducted one bellwether trial in the Propulsid MDL before a jury in New Orleans.  The bellwether trial, Diez v. Johnson & Johnson, involved the surviving spouse and children of a male plaintiff who suffered a fatal cardiac arrhythmia, allegedly as a result of his use of Propulsid. [FN35] The case was governed by Louisiana law and resulted in a verdict for the defendants.

In addition to the Diez case, the transferee court had intended to hold two additional bellwether trials in the Propulsid MDL.  The second bellwether case, Reed v. Johnson & Johnson, involved a female plaintiff who allegedly suffered damage to her intestinal track as a result of using Propulsid. [FN36] But prior to trial, the transferee court granted summary judgment in favor of the defendants under Louisiana law, finding that the plaintiff could not state a claim because her alleged gastric problems predated her use of Propulsid. [FN37] The third bellwether case, Brock v. Johnson & Johnson, involved a female plaintiff who alleged that her use of Propulsid caused her to have a sustained prolonged QT interval, placing her at risk for sudden death. [FN38] Prior to trial, however, the transferee court excluded the causation opinions proffered by two of the plaintiff's expert physicians and granted summary judgment in favor of the defendants under Louisiana law. [FN39]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

A settlement of all Propulsid-related federal lawsuits was announced on February 4, 2004. [FN40] Pursuant to the terms of the settlement, the defendants agreed to pay eligible claimants at least $69.5 million, but no more than $90 million, with individual awards being determined by a medical review panel comprised of individuals **2334** jointly selected by counsel. [FN41] A second settlement of all state lawsuits, and federal suits filed after the deadline for enrollment in the first settlement program, was announced on December 15, 2005. [FN42] Pursuant to the terms of the second settlement, the defendants agreed to pay eligible claimants at least $14.5 million, but no more than $15 million, with individual awards again being determined by a medical review panel. [FN43] Finally, on August 30, 2007, a supplemental agreement was announced, which provided that certain claimants originally determined to be ineligible under either of the previous settlement programs would be entitled to a re-review of their claims. [FN44]

2. In re Vioxx Products Liability Litigation (MDL 1657)

The federal Vioxx MDL was created by the MDL Panel on February 16, 2005. [FN45] Vioxx is a prescription drug that belongs to a general class of pain relievers known as nonsteroidal anti-inflammatory drugs (NSAIDs). [FN46] Vioxx was manufactured by Merck & Company, Inc. and approved by the FDA in 1999 for the treatment of pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. [FN47] Vioxx was designed to work by selectively inhibiting one form of the cyclooxygenase enzyme, namely COX-2, and to thereby provide pain relief with a reduced risk of gastrointestinal perforations, ulcers, and bleeds traditionally associated with NSAID use. [FN48] The plaintiffs in the Vioxx MDL assert state law products liability claims primarily **2335** alleging that Merck failed to warn of an increased risk of heart attacks and strokes associated with the use of Vioxx. [FN49] The bulk of these claims are individual personal injury claims; however, the Vioxx MDL also includes claims for medical monitoring and third-party payor claims seeking reimbursement of amounts spent on the drug. [FN50]

The transferee court conducted six bellwether trials in the Vioxx MDL, only one of which resulted in a verdict for the plaintiffs. [FN51] The first federal trial was held before a jury in Houston, Texas, while the transferee court was temporarily displaced during Hurricane Katrina. [FN52] The remaining federal trials were held before juries in New Orleans, Louisiana. [FN53] During this time, approximately thirteen additional cases were tried before juries in state courts in New Jersey, California, Texas, Alabama, Illinois, and Florida. [FN54]

The first federal bellwether trial, Plunkett v. Merck, involved the surviving spouse of a male plaintiff who suffered a fatal heart attack in 2001 at the age of fifty-three, allegedly as a result of his use of Vioxx for several weeks. [FN55] The case was governed by Florida law and resulted in a hung jury. [FN56] The case was subsequently retried as the second bellwether trial and resulted in a verdict for the defendant. [FN57] Because of a misrepresentation by one of the defendant's expert witnesses during the retrial, the court vacated this verdict and reopened the case. [FN58]

**2336** The third bellwether trial, Barnett v. Merck, involved a male plaintiff who suffered a heart attack in 2002 at the age of fifty-eight, allegedly as a result of his use of Vioxx for several years. [FN59] The case was governed by South Carolina law and resulted in a $51 million verdict for the plaintiff, which consisted of $50 million in compensatory damages and $1 million in punitive damages. [FN60] The court initially ordered a new trial on the issue of damages, [FN61] but upon further consideration remitted the jury's award to $1.6 million. [FN62] After the plaintiff accepted the remitted award, the defendant appealed to the United States Court of Appeals for the Fifth Circuit, but the parties have since settled the case and the appeal has been

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

dismissed. [FN63]

The fourth bellwether trial, Smith v. Merck, involved a male plaintiff who suffered a heart attack in 2003 at the age of fifty-two, allegedly as a result of his use of Vioxx for approximately four months. [FN64] The case was governed by Kentucky law and resulted in a verdict for the defendant. [FN65] The fifth bellwether trial, Mason v. Merck, involved a male plaintiff who suffered a heart attack in 2003 at the age of fifty-nine, allegedly as a result of his use of Vioxx for approximately ten months. [FN66] The case was governed by Utah law and resulted in a verdict for the defendant. [FN67] The sixth bellwether trial, Dedrick v. Merck, involved a male plaintiff who suffered a heart attack in 2003 at the age of fifty-four, allegedly as a result of his use of Vioxx for approximately six months. [FN68] The case was governed by Tennessee law and resulted in a verdict for the defendant. [FN69]

After these six bellwether trials in the MDL, as well as several trials in the state courts, the parties, with the encouragement of the various courts, began serious settlement discussions. Those discussions ultimately proved successful and a partial settlement of all *2337 Vioxx-related personal injury lawsuits pending in both federal and state courts was announced on November 9, 2007. [FN70] Pursuant to the terms of the settlement, which was contingent upon a certain percentage of current claimants agreeing to participate, Merck agreed to pay $4.85 billion to eligible claimants, with individual settlement awards varying based on an objective analysis of individual circumstances by a claims administrator. [FN71]

C. Benefits of the Modern Approach

In the MDL setting, bellwether trials can be effectively employed for nonbinding informational purposes and for testing various theories and defenses in a trial setting. Although the results of such "nonbinding" bellwether trials are obviously binding upon the parties to the specific cases that are tried, the results need not be binding on consolidated claimants in order to be beneficial to the MDL process. The Fifth Circuit has recognized the potential value of employing bellwether trials in this manner:

The notion that the trial of some members of a large group of claimants may provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one that has achieved general acceptance by both bench and bar . . . . The reasons for acceptance by bench and bar are apparent. If a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the cases as reflected by the jury verdicts. [FN72]

Another significant benefit of bellwether trials is that they provide a vehicle for putting litigation theories into practice. As most experienced litigators know, trials rarely proceed exactly as planned. *2338 In addition to the unexpected logistical problems that may arise, one can never be sure how certain arguments and evidence will "play" before a trier of fact. In multidistrict litigation, these uncertainties are often exacerbated by variations that exist among the circumstances of consolidated claimants and by the sheer volume of relevant material produced during discovery.

Bellwether trials thus assist in the maturation of any given dispute by providing an opportunity for coordinating counsel to organize the products of pretrial common discovery, evaluate the strengths and weaknesses of their arguments and evidence, and understand the risks and costs associated with the litigation. [FN73] Indeed, the utilization of bellwether jury trials can enhance and accelerate the MDL process in two key respects. First, bellwether trials allow coordinating counsel to hone their presentation for subsequent trials and can lead to the development of "trial packages" for use by local counsel upon the dis-

solution of MDLs. Second, and perhaps more importantly, bellwether trials can precipitate and inform settlement negotiations by indicating future trends, that is, by providing guidance on how similar claims may fare before subsequent juries.

  1. Trial Packages

  The bellwether process can benefit all consolidated litigants in an MDL by providing the impetus for coordinating attorneys to assemble "trial packages." [FN74] As noted above, bellwether trials force litigants to **2339** organize and streamline the massive wealth of material that is often produced during pretrial discovery in multidistrict litigation. Trial packages are a valuable by-product of this forced organization, and can be distributed to litigants and local counsel when an MDL is dissolved and individual cases are remanded to transferor courts for trial.

  Trial packages come in different shapes and sizes, but typically will include various databases of material such as the relevant docu-ments acquired in discovery, other valuable background information, expert reports, deposition and trial testi-mony (both transcripts and video, if available), biographies of potential witnesses, transferee court rulings and transcripts, and the coordinating attorneys' work product and strategies with respect to all of this material. Ideally, these materials will be well-organized, indexed, and electronically searchable.

  To the extent that trial lawyers can be analogized to actors in a play, it is helpful to think of coordinating counsel as playwrights in this aspect of the bellwether process. A bellwether trial forces these playwrights to draft their manuscripts in a relatively short period of time--that is, to develop fully the presentation of their clients' cases within the MDL. Multiple bellwether trials allow counsel to hone their presentations, making minor adjustments based on previous performances and the realities of litigation--not unlike the practice of Shakespeare himself. [FN75] The trial package is the final product of this **2340** interactive creative process, and its dissemination to local counsel upon the dissolution of an MDL is akin to "taking the show on the road."

  Ultimately, the availability of a trial package ensures that the knowledge acquired by coordinating counsel is not lost if a global resolution cannot be achieved in the transferee court. Trial packages also ensure that the products of pretrial common discovery do not overwhelm local counsel in the event that cases are remanded for trial. In this way, the bellwether process guarantees that, at a minimum, the transferee court is effective at its intended goal of streamlining pretrial discovery and pre-paring cases for trial in their local districts. Indeed, the creation of a complete trial package is tangible evidence that the transferee court's statutory role in overseeing pretrial discovery is nearing an end and that the dissolution of the MDL is a real possibility. By ushering in these realities, the bellwether process can also precipitate global settlement negotiations.

  2. Enhancing Global Settlements

  "As in traditional tort litigation, the endgame for a mass tort dispute is not trial but settlement . . . . [and] the most ambitious settlements seek to make and enforce a grand, all-encompassing peace in the subject area of the litigation as a whole." [FN76] By virtue of the temporary national jurisdiction conferred upon it by the MDL Panel, the transferee court is uniquely situated to preside over global settlement negotiations. Indeed, the centralized forum created by the MDL Panel truly provides a "once-in-a-lifetime" opportunity for the resolution of mass disputes by bringing similarly situated litigants from around the country, and their lawyers, before one judge in one place at one time. [FN77] Transferee courts can contribute to the fulfillment **2341** of this important role through the initiation and management of the bellwether trial process.

In his recent treatment of mass tort settlements, Professor Richard Nagareda succinctly describes the way in which a typical mass dispute evolves: "[M]ass tort litigation frequently proceeds from an immature stage to a mature stage and, thereafter, to what one might call a peacemaking stage, where efforts focus on the crafting of a comprehensive settlement." [FN78] When the MDL Panel first centralizes related cases in a transferee court, chances are that the litigation is still in its "immature" stage, exhibiting the following characteristics:

> The immature stage marks the period for exploration of the legal and factual questions surrounding the merits of the litigation. The ultimate success of the litigation remains fraught with uncertainty . . . . Some individual lawsuits typically will proceed through full-scale trials to test the quality of proof gathered on the plaintiffs' side and to gauge the reactions of jurors to the allegations presented. Defendants, in particular, will be on the lookout for arguments with the potential to knock out the entire subject area of litigation--a lack of general causation as a factual matter or the absence of some other necessary element as a matter of law. [FN79]

Over time, as the litigation matures, both litigants and counsel begin to shift their focus to the potential for global resolution. [FN80] By bringing **2342** fact-finding to the forefront of multidistrict litigation, bellwether trials can make a significant contribution to the maturation of disputes and, thus, can naturally precipitate settlement discussions. [FN81]

In addition to this valuable contribution, bellwether trials also allow MDL litigants and their lawyers to gain an understanding of the litigation that is exponentially more grounded in reality than that which has traditionally persisted in the absence of jury trials. [FN82] To grasp fully how bellwether trials can enhance the ultimate resolution of a given dispute, one must understand the structure of modern mass tort settlements: "[I]n the period since the [Supreme] Court's decisions [in Amchem Products, Inc. v. Windsor [FN83] and Ortiz v. Fibreboard Corp. [FN84]], a rough consensus has emerged about the desirability of moving toward some manner of grid-based solution once mass tort litigation has matured." [FN85] These "grid-based solutions" are so-called because they "use grids to match medical conditions with compensation payouts in a systematic manner." [FN86] By allowing juries an initial opportunity to carry out such matching on an ad hoc, case-by-case basis, bellwether trials essentially supply counsel with "raw" data around which a more fair and equitable grid-based compensation system can ultimately be constructed.

### IV. The Selection Process

After the threshold determination to utilize bellwether trials, the transferee court and coordinating counsel should focus on the **2343** mechanics of the trial-selection process. If bellwether trials are to serve their twin goals as informative indicators of future trends and catalysts for an ultimate resolution, the transferee court and the attorneys must carefully construct the trial-selection process. Ideally, the trial-selection process should accurately reflect the individual categories of cases that comprise the MDL in toto, illustrate the likelihood of success and measure of damages within each respective category, and illuminate the forensic and practical challenges of presenting certain types of cases to a jury. Any trial-selection process that strays from this path will likely resolve only a few independent cases and have a limited global impact.

At the very outset, it must be noted that the sheer number and type of feasible trial-selection processes are limited only by the ingenuity of each transferee court and the coordinating attorneys. This Part will discuss possible alternatives and offer recommendations to consider in drawing up a trial-selection blueprint, taking into account the experiences learned through the Propulsid and Vioxx MDLs and the paths taken in other MDLs. Notwithstanding the views espoused here, it is important to

note that no one process is a paragon for all MDLs. Instead, each transferee court that chooses to conduct its own bellwether trials must consider all the unique factual and legal aspects specific to its litigation and then fashion an appropriate, custom-made trial-selection formula.

There are three separate but equally important sequential steps that will streamline any trial-selection process and allow that process to achieve its full potential, regardless of the type of MDL. The first step requires the transferee court and the attorneys to catalogue the entire universe of cases that comprise the MDL and then to divide the cases into several distinct, easily ascertainable categories of cases. The second step necessitates that the transferee court and the attorneys select a manageable pool of cases, which reflects the various categories and contains cases that are both amenable to trial in the MDL and close to being trial-ready. Once the pool has been constructed, all the cases comprising the pool should be set on a fast track for case-specific discovery. Third, near the conclusion of the case-specific discovery, the transferee court and the attorneys should select a predetermined number of individual cases within the sample and set these cases for trial. Each of these steps will be discussed in turn.

**\*2344** A. Cataloguing the Entire Universe of Cases

Before the transferee court and the attorneys can determine which cases to set for trial, they should first ascertain the makeup of the MDL. The rationale behind cataloguing and dividing the entire universe of cases within the MDL is simple. A bellwether trial is most effective when it can accurately inform future trends and effectuate an ultimate culmination to the litigation; therefore, it is imperative to know what types of cases comprise the MDL. Otherwise, the transferee court and the attorneys risk trying an anomalous case, thereby wasting substantial amounts of both time and money. Thus, to ensure that the cases ultimately tried are emblematic of all the cases comprising the MDL, the transferee court and the attorneys must determine the composition of the MDL prior to engaging in any further trial-selection steps.

To discharge this task effectively, the transferee court and the attorneys should each conduct a census of the entire litigation and identify all the major variables. [FN87] This initial step in the bellwether process will require that the attorneys have some knowledge about the individual cases in the MDL. In the Vioxx MDL, this was achieved with limited case-specific discovery through the exchange of plaintiff and defendant profile forms. [FN88] Of course, each MDL is unique, and it would be nonsensical to suggest that the major variables in a products liability MDL would be the same as those in an antitrust, common disaster, or securities MDL. [FN89] Likewise, it would be equally unrealistic to suggest that even two MDLs within the same subject matter would share the same major variables. As it would be ill-conceived simply to cut and paste the major variables of one MDL to another, regardless of how similar the two MDLs may be, each transferee court and coordinating counsel must perform this task anew.

In any given MDL, there will be innumerable variables differentiating each case from the others. Rather than attempt to **\*2345** delineate every identifiable variable, the transferee court and the attorneys should focus on those variables that can be easily identified, are substantively important, and provide clear lines of demarcation--i.e., the major variables. By identifying the major variables, the transferee court and the attorneys can create sensible and easily ascertainable groupings by which to categorize the entire MDL, providing manageability and order to what may otherwise appear to be a massive, chaotic conglomeration of loosely analogous cases. To put it summarily, these groupings will act as guideposts, focusing the attorneys on the most predominant and important issues in the litigation.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

After the transferee court and the attorneys have each separately evaluated the composition of the MDL and considered all the major variables, the transferee court should hold a status conference at which time it and the attorneys should discuss all of the relevant variables in an attempt to reach a consensus on which variables are the most predominant and important. By the conclusion of this status conference, the court should determine how the MDL will be divided and, more importantly, the attorneys should know why the groupings have been chosen.

By way of illustration, the major variables ultimately decided upon in the Vioxx MDL were (1) type of injury (heart attack, stroke, or other), (2) period of ingestion (short-term versus long-term), (3) age group (older or younger than sixty-five), (4) prior health history (previous cardiovascular injuries or not), and (5) date of injury (before or after a certain label change). [FN90] Each of these variables could be easily identified, appeared to be substantively important, and provided a clear line of demarcation. In addition, these variables allowed the court to separate the entire litigation into meaningful divisions and focused the attorneys on the most predominant and important issues, ensuring that the cases ultimately tried were representative of the entire census.

At first glance, it may appear to be counterintuitive to focus only on a small group of variables, even if they are the most predominant **2346** and important. If the rationale behind bellwether trials is for the attorneys to ascertain the range of value or forensic challenges of each case, then it would be ideal to understand the importance of all the variables. Indeed, only after accounting for every variable in an individual case can an attorney fully appreciate that case. Although that thought process is true in some respects, it must be tempered by the realities of modern mass tort litigation. Time simply will not allow a transferee court, tasked with its MDL pretrial duties as well as the duties attendant to its regular docket, to try enough cases so that the attorneys can fully appreciate how every factual nuance of a case will unfold at trial. If a transferee court intends to try only a small representative sampling of bellwether trials, as the Vioxx and Propulsid transferee courts did, it must limit the attorneys' focus to approximately four to five variables. [FN91] If a transferee court places more variables in play, it risks the chance that some of the variables at issue will not be accounted for during the bellwether trials and that the most predominant and important issues may be lost among the mass amalgamation of variables.

B. Creating a Pool of Potential Bellwether Cases

After determining the composition of the MDL and creating groupings by which to divide the MDL, the transferee court and coordinating counsel should begin the process of creating a pool of cases that accurately represents the different divisions within the MDL from which the bellwether cases will be selected. This step requires the transferee court and the attorneys to (1) determine the size of the pool, (2) determine who will select the cases to fill the pool and how they will do so, and (3) fill the pool with cases that are both amenable to trial within the MDL and close to being trial-ready.

1. Determining the Size of the Pool

The first phase in creating a proper pool of potential bellwether cases is determining the size of the ultimate pool to be formed. In calculating the size of the pool, the transferee court and the attorneys **2347** must ensure that the pool is large enough to account for all of the major variables previously identified, but small enough to be manageable and time-efficient.

If the pool is too large, then an inordinate amount of time will be spent analyzing which cases should fill the pool, conducting case-specific discovery once the pool is filled, and selecting the actual cases to be tried once case-specific discovery has

been completed. Not only will this result in an inefficient use of time, it may turn the trial-selection process into an unwieldy mess ripe with countless conflicts, rather than a finely tuned process.

If the pool is too small, then there is a risk that too few of the major variables will be properly represented. In addition, a small pool may inadvertently commingle aspects of the second step (selecting cases to fill the trial-selection pool) and third step (selecting cases from the trial-selection pool to be tried), by essentially forcing the attorneys to select which cases will be tried before completion of case-specific discovery. This is so because the smaller the pool of cases, the less choice the transferee court can afford to pick cases from the pool. For instance, if the transferee court intends to try five cases and the pool itself is only five to ten cases, then the ability to pick, veto, or strike cases within the pool is greatly diminished, and the second step essentially eliminated. This is problematic because, as can often happen, a case that appears to be favorable or representative early in the litigation process (when the pool is initially filled) may be eventually determined to be unrepresentative or grossly unfavorable once case-specific discovery is complete. Therefore, a small pool may force the attorneys to try unrepresentative or disparately unfavorable cases.

Unfortunately, there is no precise numerical size that will guarantee a manageable trial-selection pool while simultaneously accounting for the major variables. Thus, to determine the satisfactory number, each transferee court must consider several factors, such as the number of cases it intends to try, the number of major variables at issue, and how it intends to conduct the actual selection of cases for trial from the pool. Although it may be imprudent to recommend a set size for the pool, the Propulsid and Vioxx experiences reflect that a pool consisting of twenty cases should be satisfactory for situations in which the transferee court intends to hold approximately six trials, with four to five major variable groupings, while giving each side of attorneys a few vetoes or strikes during the final trial-selection phase. Nevertheless, common sense dictates that the greater the number of **2348** trials to be held, the greater the number of variables at issue, and the greater the discretion afforded in selecting which cases will be tried, the larger the pool should be.

2. Filling the Pool

After determining the size of the pool from which cases will be selected for bellwether trials, it becomes necessary to determine who will fill the pool and how they will do so. There are essentially three ways to fill the pool: random selection, selection by the transferee court, and selection by the attorneys.

a. Random Selection

Under the random-selection option, the trial-selection pool is filled with a prearranged number of cases selected randomly from the total universe of cases in the MDL or from various logical subsets of that group. [FN92] This method is easy to perform, but it can be problematic. If cases are selected at random, there is no guarantee that the cases selected to fill the trial-selection pool will adequately represent the major variables. Because the primary goal in filling the trial-selection pool is to narrow the field of potential bellwether cases to those that are representative, a selection method that may potentially frustrate this purpose by permitting unrepresentative cases to serve as bellwether trials should be rejected.

b. Selection by the Transferee Court

Alternatively, the transferee court can select which cases will fill the pool. Being an unbiased neutral, the transferee court's

selections are likely to be more focused on cases that are truly representative of the litigation and not on cases that present the best opportunity for success at trial. [FN93]

 **\*2349** Although the existence of a neutral arbiter is undoubtedly a great benefit, it is highly unlikely that the transferee court can properly conduct this task on its own. Given their inherent costs, bellwether trials will generally only be utilized in large-scale MDLs. Such MDLs typically consist of thousands of individual cases. Some cases will be filed directly in the transferee court. Some will be filed in, or removed to, other federal district courts and then transferred to the transferee court by the MDL Panel. Still others may be pending in state court awaiting trial. The transferee court simply does not have the resources available, or the familiarity with each individual case, to conduct this task adequately. [FN94] Therefore, this option should also be avoided.

c. Selection by the Attorneys

The last available option is to allow coordinating counsel to fill the trial-selection pool with cases. The attorneys are in the best position to know, or ascertain, the true census of the litigation. In addition, they have the most staff resources available. Although there may be some incentive for the attorneys to focus more on selecting cases that will be successful at trial than those that are truly representative, the attorneys, with the transferee court's encourage-ment, must be mindful that unrepresentative cases, even if they are successful at trial, will do little to resolve the entire litigation and will have little predictive value. Additionally, the transferee court can take steps to curb this behavior by giving the attorneys veto or strike power during the subsequent trial-selection step. Accordingly, of the three possible alternatives, allowing the attorneys to fill the trial-selection pool will likely be the best, if not the only feasible, option.

Assuming the transferee court opts to allow the attorneys to fill the pool, there are three separate ways in which the court can allow the attorneys to accomplish their task: (1) allowing one side to pick all of the cases, (2) dividing the selections evenly between the two sides, or (3) requiring the attorneys to agree on all the cases jointly. These three alternatives will be discussed in turn.

First, the transferee court can give one side (plaintiffs or defendant(s)) the right to pick all of the cases that will fill the pool. Thus, if the transferee court determines that there should be fifteen **\*2350** cases in the trial-selection pool, it would authorize the coordinating attorneys from one side to select all fifteen cases. The rationale behind this option is that, if the side that picks loses all or a majority of the bellwether trials, then there would likely be little or no merit to that side's position and the litigation could likely be resolved quickly and easily. The primary downside to this option is that, in permitting only one side to fill the entire trial-selection pool, the transferee court opens the door for the inequitable stacking of overtly unfavorable and possibly unrepresentative cases, as well as creating an atmosphere of antagonism.

Second, the transferee court can divide the selections evenly between the two sides. [FN95] For example, if the transferee court determines that there should be twenty cases in the pool, then each side would be allowed to select ten. The obvious rationale behind this option is equity and fairness between the sides. The primary problem with this option, however, is that it does not eliminate or minimize the chance that the attorneys will select favorable, rather than representa-tive, cases.

Third, the transferee court can require that the sides jointly agree on all of the cases selected to fill the trial-selection pool. [FN96] The reasoning being that, if the sides can agree on the cases, the cases will likely be representative and fair to both sides.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN97] Of the three options, the last one is the best, but it is also the most difficult to effectuate. With so much at stake, it may be difficult for the attorneys to agree on which cases should fill the trial-selection pool. The transferee court can serve as a catalyst to assure fairness and remind the attorneys that the bellwether trial concept is designed specifically to help them predict how the litigation may unfold and ultimately resolve the litigation. Indeed, for the transferee court, it may often be less challenging and less time-consuming to perform only its MDL discovery duties, leaving the trial duties to the transferor courts on *2351 remand. This, however, will make global resolution of the litigation next to impossible. Moreover, by being stubborn in their advocacy, as opposed to participating in meaningful, good-faith negotiations, the attorneys will lose an opportunity to resolve their clients' cases effectively and efficiently.

Thus, in having the attorneys fill the trial-selection pool, the transferee court should first have the sides attempt to utilize the third option. Only once it appears that the sides are unable to agree jointly on which cases should fill the pool, despite judicial encouragement, should the transferee court opt to implement one of the other two methods.

3. Limitations on Cases To Be Considered

After determining how to fill the trial-selection pool, the transferee court should focus on several additional issues concerning which cases should be considered for the pool. Indeed, not every case in an MDL should be considered for trial, nor will every case be susceptible to trial within the MDL. There are two specific limitations on which cases should and can be considered as potential bellwether cases. The first limitation is purely discretionary and cautions that only cases that are close to being trial-ready be considered as candidates to fill the pool. The second limitation is imposed by current law and requires that cases be amenable to trial before the transferee court.

a. Trial-Ready Cases

The discretionary limitation that bellwether trial candidates be trial-ready should be imposed as a means to streamline the trial-selection process. Once the trial-selection pool is filled, the attorneys must begin case-specific discovery in those cases. This process should not be any different than the discovery phase of any non-MDL case. Like the normal case, the discovery process can go smoothly and quickly or can be long and complicated. An important factor in how the discovery process proceeds is the shape the case is in when it is filed and when discovery begins. Bellwether trial-candidate cases are no different from the typical non-MDL case--the less information that is known when a case is selected to fill the pool, the longer the discovery process will be. Therefore, to ensure that the case-specific discovery process progresses in an expeditious manner, it is vital that *2352 only cases that are close to being trial-ready be considered to fill the trial-selection pool.

Of course, few, if any, cases will be trial-ready in the sense that all witnesses are lined up and all expert reports and testimony are prepared such that the case can proceed to trial in a matter of weeks. Instead, in this context, trial-ready means that the attorneys have adequate proof of the important, basic information. [FN98] For example, in the Propulsid and Vioxx MDLs, this meant that the attorneys had access to the plaintiffs' medical files and sufficient evidence tending to prove who had prescribed the drug, that the litigants had taken the drug, and what damages were allegedly suffered. [FN99] The importance of being trial-ready in this sense, other than the accelerated manner in which the case can be prepared, is that it prevents the unfortunate situation where a case is proposed and accepted to fill the pool, but the attorneys later discover that the existence of one of these preliminary matters is uncertain or even challenged.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

b. Cases Amenable to Trial

Just as some cases may not be able to be adequately discovered prior to the selection of bellwether trials, some cases may not be amenable to trial by the transferee court.  To understand which cases are amenable to trial and why, it is necessary to discuss how cases find their way into an MDL.

In the MDL context, there have been two traditional sources from which cases originate: (1) those cases filed in, or re-moved to, federal district courts across the country and transferred to the transferee court by the MDL Panel and (2) those cases for which venue is proper in the transferee court's judicial district and are therefore filed directly into **2353** the MDL. [FN100] The distinctions between these two separate categories of cases, as well as a third recently conceived hybrid category, are vitally important to the determination of which cases are amenable for trial by the transferee court.

Absent extraordinary circumstances, the vast majority of cases within an MDL will come from the first category. [FN101] For instance, at just over the two-year mark into the Vioxx MDL, approximately 6000 cases had been transferred into the Eastern District of Louisiana by the MDL Panel, whereas only roughly 350 cases had been filed directly into the Eastern District of Louisiana by Louisiana citizens--a significant difference. [FN102]

Another key distinction between the two categories is the applicable substantive law.  With respect to cases founded upon diversity jurisdiction and transferred by the MDL Panel, the transferee court is bound to apply the law of the transferor forum, that is, the law of the state in which the action was originally filed, including the transferor forum's choice-of-law rules. [FN103] In cases filed directly in the transferee court's district, the transferee court must apply the law of the state in which it sits. [FN104] Thus, for instance, if a case had been originally filed in the United States District Court for the Southern District of New York and then transferred by the MDL Panel to the Vioxx MDL in the Eastern District of Louisiana, the transferee court would apply New York's choice-of-law rules and perhaps New York substantive law; but for a similar case filed directly into the Vioxx MDL in the Eastern District of Louisiana, the court would apply Louisiana's choice-of-law rules and perhaps Louisiana substantive law.

At initial glance, it may appear that these two distinctions, especially the numerical disparity, have little bearing on the trial-selection process.  For one, why would it matter if the mathematical ratio between the sources of cases is dramatically skewed?  As long as the transferee court can try representative cases, regardless of their origin, it would seem that the purposes behind bellwether trials are achievable.  Likewise, federal courts routinely handle cases that involve interstate and international parties that require the application of substantive laws of jurisdictions other than the forum state.  Why **2354** then would a microcosmic case that is essentially the functional equivalent of a typical binary trial present any abnormal difficulties?

Notwithstanding such logical observations, the interfusion of these two distinctions wreaks havoc on a transferee court's trial powers when considered in light of the Supreme Court's Lexecon decision. [FN105] As mentioned above, pursuant to Lexecon, a transferee court cannot try cases transferred to it by the MDL Panel, unless the litigants consent to trial before the transferee court. [FN106] The import of this holding can be quite debilitating to the effectiveness of bellwether trials. If litigants in cases transferred by the MDL Panel do not consent to trial, the universe of cases amenable to trial in an MDL is extremely limited in both number and applicable law. For example, had none of the non-Louisiana litigants consented to trial in the Vioxx MDL, the total universe of triable cases would have been approxi-mately 350 and all would have been tried under Louisiana law, which does not allow recovery of punitive damages. In litigation like the Vioxx MDL (which involved different types of

injuries to different types of people in different jurisdictions, each of whom had a different prescribing physician who conducted his or her own independent review of the drug's warning label and the relevant literature over the course of several years during which the label changed multiple times), as well as most modern MDLs which share a host of variables, a total universe of 350 cases, or a like number, all tried under a single state's substantive law would render the bellwether trials of limited value. Under such circumstances, the complete universe of triable cases, without any tactical assistance or creative approaches, will regularly be too limited to justify the time and expense common to the bellwether process. [FN107]

 *2355 In recent years, thanks to scientific and technical advances, many aspects of our society have grown at increased rates and have inevitably become more complex. With these advances have come the increased development and production of products, as well as an increased ability to market and sell products nationally and internationally. Perhaps as an inevitable consequence of the mass-production and mass-marketing of an increased number of products, broad-based complex litigation has also increased at a high rate. In turn, with the recent statutory and judicial discouragement of class actions, [FN108] the federal court system has found itself turning to the MDL's broad remedial powers more frequently than ever before. [FN109] Attendant to this growth and despite the best efforts of all involved, inevitable delays associated with the transfer of cases from transferor courts to the transferee court have occurred. With greater sources of litigation subject to MDL consideration and larger numbers of individual cases subject to MDL transfer, it has become increasingly more time-consuming and expensive for an individual case to find its way into a transferee court.

In response to these realities, a third source from which cases in an MDL may originate has developed. Under this third category, the transferee court permits plaintiffs who do not reside in the judicial district encompassing the transferee court to file cases directly into the MDL. [FN110] This procedure obviates the expense and delay inherent with plaintiffs having to file their cases in local federal courts around the country after the creation of an MDL and then waiting for the MDL Panel to transfer the "tag-along" cases to the transferee court. [FN111] In *2356 addition, it eliminates the judicial inefficiency that results from two separate clerk's offices having to docket and maintain the same case and three separate courts (the transferor court, the MDL Panel, and the transferee court) having to preside over the same matter. [FN112] In its Pretrial Order No. 11, the Vioxx transferee court recognized the beneficial aspects of this form of direct filing and thus permitted the use of the direct filing mechanism. [FN113] At just past the two-year anniversary of the Vioxx MDL, approximately 2000 cases had been filed directly into the Vioxx MDL by non-Louisiana citizens. [FN114]

Besides its efficiency aspects, direct filing can also play an important role in the trial-selection process. A case filed directly into the MDL, whether by a citizen of the state in which the MDL sits or by a citizen of another jurisdiction, vests the transferee court with complete authority over every aspect of that case. This is because the transferee court is no longer cognizable as the transferee court under 28 U.S.C. § 1407, but is technically the forum court. [FN115] Therefore, by *2357 filing cases directly into the MDL, plaintiffs, in effect, waive their Lexecon objections, thereby subjecting their cases to trial within the MDL. [FN116]

c. Waiver Considerations

Of the three potential sources of cases, each of which is capable of producing hundreds of bellwether candidates, only cases deriving from one source--those filed directly into the MDL by residents of the state in which the transferee court sits--are amenable to trial without the consent of the parties. From a realistic standpoint, this typically will not suffice to warrant the cost and effort necessary to conduct fruitful bellwether trials. Thus, as a predicate for meaningful bellwether trials, the parties must

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

be willing to waive their objections as to cases from the remaining two sources.  Encouragement by the transferee court can be helpful in securing waivers. [FN117]

 **\*2358** As illustrated above, the type of waiver required, and which parties must effectuate it for each case, depends on the origin of the case. For cases transferred to the transferee court by the MDL Panel pursuant to § 1407, the parties must each waive their Lexecon objections before that case can be set for trial. To effectuate Lexecon waivers, the parties should each consider the merits of all cases individually and, under circumstances with which each feels comfortable, waive their Lexecon objections on a case-by-case basis.

For cases filed directly into the MDL by nonresident plaintiffs, the defendant, and only the defendant, must waive its sustainable venue and venue-related objections. [FN118] To do so, the defendant can effectuate one of two venue waivers: (1) a full waiver or (2) a pretrial waiver. Under the full-waiver approach, the defendant waives all of its available venue objections as to all cases (those already within the MDL and those that will later become part of the MDL) through a stipulated pretrial order. Once such a stipulated pretrial order is entered, the transferee court is free to set any of these cases for trial. Under the pretrial-waiver approach, a defendant waives its available venue objections through a stipulated pretrial order, just as it would under a full-waiver approach, but expressly limits this waiver to pretrial proceedings only. That way, the defendant allows cases to become part of the MDL through an overarching waiver, but preserves its right to object to venue if the transferee court ever schedules these cases for trial. If the defendant later decides to waive its venue objections fully and permit a case to proceed to trial, the defendant can then execute a full waiver for that case alone. As part of Pretrial Order No. 11 in the Vioxx MDL, Merck effectuated a pretrial waiver, waiving any and all venue objections as to pretrial proceedings only. [FN119] Then, for the five bellwether cases that proceeded to trial in the Vioxx MDL, Merck subsequently waived its venue objections fully.

Much can be made of when and whether counsel and their respective clients should consent to trial within the transferee court.  For instance, it is plausible to suggest that consent should only be given for each side's strongest cases.  The thought being that, if the **\*2359** bellwether trials will set the tone for global resolution, or be considered as a proximate indicator for future non-MDL trials, then it would be foolish to offer weaker cases voluntarily and risk negatively affecting the outcome for the remaining cases.  Likewise, on a micro level, counsel and client in an individual, weaker case certainly would not want to serve as a sacrificial lamb for the benefit of the remaining consolidated parties.

Notwithstanding a litigator's natural instincts to put forward only his or her best cases and reserve weaker ones, it must be remembered that bellwether trials are not meant to be stand-alone victories or defeats.  Instead, their true purpose is to serve as an archetype for how the litigation will proceed.  If one side, therefore, can cast aside with conviction its defeats as being atypical, the bellwether trials will have failed in their ultimate purpose.  Thus, although a favorable verdict is always of the utmost importance, counsel's initial concerns should not be whether an individual victory is probable, but whether resolution of a specific case will aid in resolution of the entire litigation.  Similarly, the parties must temper their personal aversion to the risk of an adverse jury verdict with the realization that (1) for a plaintiff, a favorable verdict at trial may result in a greater recovery than would be received through settlement; and (2) for a defendant, favorable verdicts at trial may result in a more favorable settlement in the remaining cases.

From a practical standpoint, the attorneys and litigants must provide their consent to trial prior to nominating a case to fill a spot in the trial-selection pool.  If consent is not obtained at this stage, a situation can develop where the attorneys or the litigants can back out of their commitment to try a given case. [FN120] To determine whether to **\*2360** afford consent, counsel

should begin examining all cases within the MDL as soon as possible to determine whether they would be good candidates for a bellwether trial and should continue to investigate tag-along cases as they are added to the MDL on a rolling basis. This inquiry should principally be the duty of the coordinating counsel which, unlike individual local counsel, have a broad perspective of the entire litigation and the means and authority to conduct this task most properly. In discharging their duties, coordinating counsel should examine cases not only to ascertain whether they are representative of the entire litigation, but also to discover whether the consent of the individual litigant and the litigant's local counsel to try the case can be obtained. [FN121] Importantly, coordinating counsel should focus on identifying the best cases (i.e., the most representative) to propose as bellwether trials, rather than culling out the weakest ones. At this stage, counsel should be focused on deciding which cases should be proposed as bellwether candidates, not on striking any cases from further consideration.

## C. Case-Specific Discovery

Once the trial-selection pool has been assembled, each of the cases within the pool must undergo case-specific discovery. This discovery process will typically be no different from that which occurs in an ordinary case, and thus requires no additional explanation here.

## D. Selecting Individual Cases from the Pool for Trial

Near the conclusion of case-specific discovery in the cases comprising the trial-selection pool, the transferee court and coordinating counsel can begin the final step of selecting the actual *2361 cases to serve as bellwether trials. In anticipation of the exercise of trial-selection picks, the transferee court, with the input of the attorneys, should have set forth the method by which the final selections will be made. As can be imagined, there are multiple methods, or any combination of methods, that can be used, such as (1) random selection, (2) selection by the transferee court, and (3) selection by the attorneys. Indeed, the alternative methods at this stage of the bellwether process in large part mirror the approaches that can be used earlier in the process to fill the trial selection pool. [FN122] In addition to these various selection methods, the transferee court can permit the attorneys to exercise a predetermined number of strikes or vetoes to eliminate cases in the pool from consideration prior to the actual selection. Again, the appropriate method is case-specific and may be different for each MDL.

### 1. Random Selection

The first trial-selection method is random selection. [FN123] Here, the bellwether trials are picked at random from the previously established trial-selection pool, whether picked out of a hat [FN124] or pursuant to a more sophisticated method. [FN125] Random selection appears to be a fair and sensible method of picking bellwether cases given that it is based purely on chance and neither side is given a tactical advantage over the other. [FN126] In addition, random selection is an efficient means of selecting cases because it does not require much time or any analysis by the transferee court or the attorneys. But despite its favorable appearance, random selection presents two problems that may weigh against its implementation.

*2362 First, if the selection is purely random, a distinct possibility exists that one or more of the major variables identified during the first phase of the trial-selection process will not be represented during the bellwether trials. For instance, if a trial-selection pool of fifteen cases has been created and there are five cases each representing short-term, mid-term, and long-term ingestion of a pharmaceutical product, there exists the possibility that one of the three categories will not be represented if the transferee court conducts five bellwether trials. The failure to represent a major variable at trial would be a major

setback in the trial-selection process, compromising the value of the entire process. Of course, to combat this possibility, the transferee court could further segregate the trial-selection pool before selecting cases for trial. That is, the transferee court could divide the entire trial-selection pool into smaller pools representing the separate categories within each major variable and require that at least one case from each of the smaller subpools be selected randomly for trial.

The second, and chief, complaint against using random selection is that it detaches the attorneys from the process. Victories and defeats at trial are not the only information sought to be gained from bellwether trials. The attorneys should be interested in how best to present their cases at trial and in developing a familiarity with the strategic decisions that must be made prior to setting foot in the courtroom. By allowing the attorneys to have some hand in selecting which cases they will eventually have to try, the attorneys are provided an opportunity to make trial-selection choices that further their own agendas. For instance, different trial attorneys have different styles of preparing for and presenting a case at trial. If the coordinating attorneys are afforded an opportunity to pick which cases are eventually tried, they can control who gets to conduct the bellwether trials and learn first-hand how each style of preparation and presentation unfolds in front of an actual jury. [FN127] By imposing random selection, the transferee court precludes the coordinating attorneys from meeting these goals, which may inhibit the potential of a mass resolution of the litigation. [FN128]

**2363* 2. Selection by the Transferee Court

The next method of trial-selection is selection by the transferee court. Pursuant to this method, the attorneys prepare individual reports (either jointly or separately) for each case within the trial-selection pool, outlining (1) the facts of each case (those agreed-on and those in contention), (2) the major legal issues in each case, and (3) their positions on why each case should or should not be selected as a bellwether case by the transferee court. This method is advantageous because it permits the transferee court to ensure that each of the predetermined major variables is represented at trial and that the cases ultimately selected are fair to both sides.

The major problem with this method, like that of random selection, is that it minimizes attorney participation. Unlike random selection, the attorneys are permitted to argue for and against the selection of specific cases, addressing their own internal reasons for wanting to try a particular case. Permitting the attorneys to present their personal goals, however, will not ensure that the attorneys are allowed to effectuate them. Moreover, the attorneys may not want to share their internal motives with the transferee court or opposing counsel. This process will also be considerably more time-consuming for both the transferee court and the attorneys, requiring the attorneys to prepare reports for each case and the transferee court to analyze the merits of each case.

3. Selection by the Attorneys

The final trial-selection method is selection by the coordinating attorneys. This method may be employed in different ways by either allowing one side to select all of the bellwether cases or by allowing each side to make alternating selections. [FN129]

Under the first variety of this selection method, one side of coordinating attorneys selects all of the bellwether cases from the pool. The reasoning behind this approach is that if one side is allowed the opportunity to pick all of the bellwether cases and that side ultimately loses all or most of the trials, then it can reasonably be surmised that that side's theories are essentially

without merit.  This method was **2364** utilized in the Propulsid MDL. [FN130] The advantages of this approach are that it is efficient, necessitating engagement by only one side in the trial-selection step (although both sides of coordinating attorneys should have been continuously analyzing the strengths and weaknesses of the cases from the outset anyway), and at least furnishes one side of coordinating attorneys the ability to participate. The disadvantage is that it gives the selecting side of coordinating attorneys a potentially unfair advantage. In addition, with the power to control which cases are set for trial, the selecting side of attorneys may disregard their responsibility to select cases that represent the major variables and instead choose cases that increase their ability to prevail at trial.

Under the second variety of this method, both sides of coordinating attorneys make selections by exercising alternating picks.  For example, one side of coordinating attorneys would select the first case from the pool to be tried as a bellwether trial and then the other side of coordinating attorneys would select the second case.  The process would continue in this alternating fashion until the full allotment of cases is reached.  This approach is likely fairer than allowing one side to select all of the cases and it also ensures that both sides are involved in the process.  Of course, this approach may be slightly less efficient than the previous alternatives because both sides of attorneys are involved.  Moreover, although allowing the attorneys to select the bellwether cases will not absolutely guarantee that all of the major variables are represented, it must be remembered that the designation of major variables is a tool used to help focus the attorneys on the important aspects of the litigation.  If both sides of coordinating attorneys, after the close of case-specific discovery, knowingly and intentionally choose to disregard the ostensible aid of the major variables in selecting bellwether cases, then such is their prerogative.  Given that this approach institutes fairness and attorney participation, while maintaining efficiency and placing the burden of ensuring representative cases on those with the most at stake in the trial-selection process, this methodology is probably the most useful approach.  Indeed, this method was utilized in the Vioxx MDL.  There, the transferee court permitted each side of coordinating attorneys to select five cases. [FN131] From the collective group of ten cases, each side of coordinating attorneys was permitted to veto two cases from the other **2365** side's list of five cases. [FN132] The remaining six cases were then set for trial on a rotating basis, starting with the plaintiffs' selection. [FN133]

4. Strikes or Vetoes

Regardless of which method is ultimately employed, a transferee court should consider allowing each side of coordinating attorneys to veto or strike from consideration a predetermined number of cases in the trial-selection pool. [FN134] No matter how diligently the attorneys or the transferee court fill the trial-selection pool, the possibility will always remain that, after the close of case-specific discovery, an unrepresentative case or a grossly unfavorable case will wind up in the trial-selection pool. By permitting the attorneys to strike or veto cases, the transferee court can minimize the chance that one of these outliers is selected as a bellwether trial, without having to disturb the preordained method of trial selection. In this way, if the abnormal case rears its head, the attorneys are equipped to deal with it on their own, without seeking court intervention.

V. Conclusion

Although the MDL process has traditionally been limited to establishing a centralized forum for coordinated pretrial discovery, transferee courts can play an important role in effectively and efficiently resolving multidistrict litigation by employing some version of the nonbinding bellwether process described in this Article. Once this process is completed and several cases are selected and given trial dates, transferee courts and counsel are free to prepare for the bellwether trials as they would any other case. Indeed, in the Vioxx and Propulsid MDLs, the transferee court essentially utilized its normal trial

schedule, addressing various motions in limine and objections to both exhibits and deposition testimony in advance of each trial.  Potential jurors filled out questionnaires prior to the first day of trial, and voir dire was often then able to be completed in several hours on day one.  Most of the trials lasted between two to three weeks in accordance with time limits imposed by the court.

As discussed above, the injection of juries and fact-finding into multidistrict litigation through the use of bellwether trials can greatly **2366** assist in the maturation of disputes. At a minimum, the bellwether process provides counsel an opportunity to develop their cases and gain practical litigation experience. This can lead to the development of trial packages by coordinating counsel which can be used by local counsel in the event that a global resolution cannot be reached. But the objective results obtained through bellwether trials often do precipitate settlement negotiations and also ensure that all of the parties to such negotiations are grounded by the real-world evaluations of the litigation by multiple juries. Indeed, these experiences, coupled with the alternative of dispersed litigation in courts across the country, supply a strong impetus for global resolution.

Despite the overwhelming benefits of nonbinding informational bellwether trials, there are some potential disadvantages associated with the practice.  First, bellwether trials are often exponentially more expensive for the litigants and attorneys than a normal trial.  This is to be expected to a degree, as coordinating counsel often pull out all the stops for bellwether trials given the raised stakes. For example, in the Vioxx MDL, both sides employed teams of lawyers and utilized jury selection con- sultants, shadow juries, and mock juries.  Live trial testimony was streamed from the courtroom into separate "war rooms" in the courthouse and to remote locations around the country so that attorneys could follow along and, in some instances, draft various motions in real time. All of these bells and whistles add up; indeed, holding multiple trials on this stage can quickly swell the cost of multidistrict litigation. Second, tactical opportunities can arise for trial counsel to become familiar with the rulings, expectations, customs, and practices of one transferee judge. Astute trial lawyers will learn the tendencies or prefer- ences of any judge with repeated exposure, and given the realities of representation, such opportunities may be subject to exploitation. Finally, because bellwether trials are typically held in the transferee court's judicial district, the informational output is generally limited to the views of one local jury pool. And in a country as diverse as ours, local communities are bound to exhibit divergent tendencies and beliefs. Of course, to the extent that this reality raises concerns, the transferee judge can travel to different districts to hold bellwether trials before different jury pools. [FN135] But even recognizing **2367** these disadvantages, the use of bellwether trials proves on balance an effective tool in resolving complex multidistrict litigation.


© 2008 Eldon E. Fallon, Jeremy T. Grabill and Robert Pitard Wynne.

[FNa1]. Judge, United States District Court for the Eastern District of Louisiana. B.A. 1960, Tulane University; J.D. 1962, Tulane University School of Law; LL.M. 1963, Yale Law School.


[FNd1]. Associate, Weil, Gotshal & Manges LLP. Law Clerk to the Honorable Eldon E. Fallon, United States District Court for the Eastern District of Louisiana, 2006-2008. B.A. 2003, Cornell University; J.D. 2006, Tulane University School of Law.


[FNaa1]. Associate, Dewey & LeBoeuf LLP. Law Clerk to the Honorable Jacques L. Wiener, Jr., United States Court of Ap- peals for the Fifth Circuit, 2006-2007. Law Clerk to the Honorable Eldon E. Fallon, United States District Court for the Eastern District of Louisiana, 2005-2006. B.A. 2002, Louisiana State University; J.D. 2005, Loyola University College of Law.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 TLNLR 2323                                                                                                    Page 24
82 Tul. L. Rev. 2323

[FN1]. In re Chevron U.S.A., Inc., 109 F.3d 1016, 1019 (5th Cir. 1997).

[FN2]. See, e.g., In re Zyprexa Prods. Liab. Litig., 238 F.R.D. 539, 542 (E.D.N.Y. 2006) ("As use of the class action device to aggregate claims has become more difficult, MDL consolidation has increased in importance as a means of achieving final, global resolution of mass national disputes."); see also In re Fosamax Prods. Liab. Litig., 248 F.R.D. 389, 396 & nn.7-8 (S.D.N.Y. 2008) (collecting recent authorities rejecting the use of class actions in the mass tort context).

[FN3]. See 28 U.S.C. §1407 (2000).

[FN4]. Pub. L. No. 90-296, 82 Stat. 109, 109 (1968) (codified as amended at 28 U.S.C. §1407 (2000)).

[FN5]. 28 U.S.C. §1407(a).

[FN6]. See Manual for Complex Litigation (Fourth) §20.13 (2004); see also Delaventura v. Columbia Acorn Trust, 417 F. Supp. 2d 147, 148 (D. Mass. 2006) ("Since all 94 district courts follow identical rules concerning discovery and trial prepara-tion, one excellent innovation in civil practice is the idea that a single judge might manage a number of 'related' cases, getting them all ready for trial in a uniform manner and returning the 'trial-ready' cases from whence they came (i.e., to the district courts with proper jurisdiction and venue) for trials before local juries."). Increasingly, the states are adopting similar legisla-tion, which allows for intra-state consolidation of related cases pending in the courts of any given state. See, e.g., Mark Herrmann et al., Statewide Coordinated Proceedings: State Court Analogues to the Federal MDL Process (2d ed. 2004) (de-scribing the consolidation procedures of each state); Jeremy T. Grabill, Comment, Multistate Class Actions Properly Frustrated by Choice-of-Law Complexities: The Role of Parallel Litigation in the Courts, 80 Tul. L. Rev. 299, 321-23 (2005) (discussing the frameworks utilized by several states). The emerging multidistrict litigation model will often benefit, therefore, from co-ordination between the federal MDL and multiple state consolidations involving similar claims. See generally Francis E. McGovern, Toward a Cooperative Strategy for Federal and State Judges in Mass Tort Litigation, 148 U. Pa. L. Rev. 1867, 1867-96 (2000) (suggesting complimentary roles for state and federal courts in the national mass tort context); William W. Schwarzer et al., Judicial Federalism in Action: Coordination of Litigation in State and Federal Courts, 78 Va. L. Rev. 1689, 1691 (1992) (arguing that "informal coordination can advance judicial economy, efficiency, and fairness").

[FN7]. 28 U.S.C. §1407(d).

[FN8]. U.S. Judicial Panel on Multidistrict Litig., An Introduction to the Judicial Panel on Multidistrict Litigation (2006), available at http:// www.jpml.uscourts.gov/General_Info/Overview/PanelBrochure-04-08.pdf.

[FN9]. 28 U.S.C. §1407(c). Pursuant to its statutory authority under §1407(f), the Panel has promulgated rules for the conduct of its business. See Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425 (2001) [hereinafter J.P.M.L. R.P.]. Current amendments to the these rules are posted on the Panel's Web site. See Rules & Procedures, http://www.jpml.uscourts.gov/General_Info/general_info.html (last visited June 13, 2008). For further information concerning the functioning of the Panel, see generally David F. Herr, Multidistrict Litigation Manual (2006); Gregory Hansel, Extreme Litigation: An Interview with Judge Wm. Terrell Hodges, Chairman of the Judicial Panel on Multidistrict Litigation, 19 Me. B.J. 16 (2004); Earle F. Kyle, IV, The Mechanics of Motion Practice Before the Judicial Panel on Multidistrict Litigation, 175 F.R.D. 589 (1998); Note, The Judicial Panel and the Conduct of Multidistrict Litigation, 87 Harv. L. Rev. 1001 (1974); and

Peter Geier, MDL Panel: 'Traffic Cop' Seeing Its Power Grow, Nat'l L.J., Mar. 26, 2007, at 1.

[FN10]. See 28 U.S.C. §1407(c).

[FN11]. J.P.M.L. R.P. 7.4, 199 F.R.D. at 435-36.

[FN12]. Id.

[FN13]. 28 U.S.C. §1407(a).

[FN14]. In re Plumbing Fixture Cases, 298 F. Supp. 484, 494 (J.P.M.L. 1968).

[FN15]. See generally In re Patenaude, 210 F.3d 135, 142-46 (3d Cir. 2000) (discussing the transferee court's authority and the views expressed in the legislative history regarding that authority); Stanley A. Weigel, The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts, 78 F.R.D. 575, 578-83 (1978) (discussing the authority of transferee courts).

[FN16]. Benjamin W. Larson, Comment, Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach: Respecting the Plaintiff's Choice of Forum, 74 Notre Dame L. Rev. 1337, 1337 (1999).

[FN17]. 523 U.S. 26, 34 (1998) (emphasis added). It should be noted, however, that the transferee court does have the authority to "enter pretrial orders that will govern the conduct of the trial." In re Factor VIII or IX Concentrate Blood Prods. Litig., 169 F.R.D. 632, 636 (N.D. Ill. 1996). Although transferor courts may depart from a transferee court's pretrial orders after cases have been remanded, "it is obvious that the objectives of §1407 can best be achieved when a departure from the transferee judge's pretrial orders is the exception rather than the rule, and it is this court's impression that such departures are in fact exceptional." Id. at 637.

[FN18]. Lexecon, 523 U.S. at 40-41. Section 1404 is the change-of-venue statute and allows a district court to "transfer any civil action to any other district or division where it might have been brought" if such a transfer will be "[f]or the convenience of parties and witnesses" or if it is "in the interest of justice." 28 U.S.C. §1404(a). There have been numerous unsuccessful attempts in Congress to overturn the holding of Lexecon. See, e.g., Multidistrict Litigation Restoration Act of 2005, S. 3734, 109th Cong. §3 (as introduced in the Senate on July 26, 2006); Multidistrict Litigation Restoration Act of 2005, H.R. 1038, 109th Cong. §2 (as passed by the House on April 19, 2005); Multidistrict Litigation Restoration Act of 2004, H.R. 1768, 108th Cong. §2 (as passed by the House on March 24, 2004); Multidistrict, Multiparty, Multiforum Trial Jurisdiction Act of 2001, H.R. 860, 107th Cong. §2 (as passed by the House on March 14, 2001); Multidistrict Litigation Act of 2000, H.R. 5562, 106th Cong. §2 (as passed by the House on December 15, 2000); Multidistrict Jurisdiction Act of 1999, S. 1748, 106th Cong. §2 (as introduced in the Senate on October 19, 1999); Multidistrict, Multiparty, Multiforum Trial Jurisdiction Act of 1999, H.R. 2112, 106th Cong. §2 (as passed by the House on September 13, 1999); Multidistrict Trial Jurisdiction Act of 1999, H.R. 1852, 106th Cong. §2 (as introduced in the House on May 18, 1999).

[FN19]. See J.P.M.L. R.P. 7.5, 199 F.R.D. 425, 436-38 (2001). The MDL Panel may remand actions upon the motion of a party,

the suggestion of the transferee court, or its own initiative. However, "[t]he Panel is reluctant to order remand absent a suggestion of remand from the transferee district court." Id.

[FN20]. Delaventura v. Columbia Acorn Trust, 417 F. Supp. 2d 147, 151 (D. Mass. 2006). The MDL Panel maintains detailed statistical summaries of its activities. See U.S. Judicial Panel on Multidistrict Litig., Statistical Analysis of Multidistrict Litigation (2007), available at http:// www.jpml.uscourts.gov/General_Info/Statistics/Statistical_Analysis_2007.pdf. According to the most recent numbers, which are current through September 30, 2007, there have been 265,269 actions subjected to MDL proceedings since the MDL Panel's inception in 1968. Id. This consists of 202,601 actions transferred by the MDL Panel and 62,668 actions filed directly in the transferee courts. Id. Of this total, 176,424 actions were terminated in the transferee courts, 393 actions were reassigned to transferor judges within the transferee courts, and 76,842 actions remain pending in the transferee courts. Id. Thus, only 11,610 cases have been remanded by the MDL Panel since 1968. Id.

[FN21]. See, e.g., Delaventura, 417 F. Supp. 2d at 147-57 (collecting criticisms and noting that "as compared to the processing time of an average case, MDL practice is slow, very slow"); In re "East of the Rockies" Concrete Pipe Antitrust Cases, 302 F. Supp. 244, 254 (J.P.M.L. 1969) (Weigel, J., concurring) ("There are a number of inherent inconveniences in transfers for coordinated or consolidated pretrial. Some plaintiffs are temporarily deprived of their choices of forum and some defendants may be forced to litigate in districts where they could not have been sued. Considerable time and trouble are involved in the sheer mechanics of transferring and remanding.").

[FN22]. Delaventura, 417 F. Supp. 2d at 153.

[FN23]. R. Joseph Barton, Note, Utilizing Statistics and Bellwether Trials in Mass Torts: What Do the Constitution and Federal Rules of Civil Procedure Permit?, 8 Wm. & Mary Bill Rts. J. 199, 210 (1999).

[FN24]. Johnson v. Manhattan Ry. Co., 289 U.S. 479, 496-97 (1933) (discussing consoli-dation under 28 U.S.C. §734, a precursor to Rule 42).

[FN25]. See, e.g., Cimino v. Raymark Indus., Inc., 151 F.3d 297, 318 (5th Cir. 1998).

[FN26]. See id.

[FN27]. The United States Court of Appeals for the Fifth Circuit has been particularly critical of using bellwether trials to bind related claimants. See, e.g., id. ("While the [In re Chevron U.S.A., Inc., 109 F.3d 1016, 1019 (5th Cir. 1997)] majority opinion ... contains language generally looking with favor on the [binding] use of bellwether verdicts when shown to be statistically representative, this language is plainly dicta, certainly insofar as it might suggest that representative bellwether verdicts could properly be used to determine individual causation and damages for other plaintiffs."). In his recent book, Professor Richard Nagareda discusses in significant detail Cimino and the trial plan that Judge Parker sought to implement in this asbestos litigation. See Richard A. Nagareda, Mass Torts in a World of Settlement 67-70 (2007). For an in-depth discussion of the In re Chevron case to which Cimino cites, see generally Richard O. Faulk, Robert E. Meadows & Kevin L. Colbert, Building a Better Mousetrap? A New Approach to Trying Mass Tort Cases, 29 Tex. Tech L. Rev. 779, 779-810 (1998).

Other circuits have also recognized that the results of bellwether trials are not properly binding on related claimants unless those claimants expressly agree to be bound by the bellwether proceedings.  See In re Hanford Nuclear Reservation Litig., 497

F.3d 1005, 1025 (9th Cir. 2007) ("We recognize that the results of the Hanford bellwether trial are not binding on the remaining plaintiffs."); Dodge v. Cotter Corp., 203 F.3d 1190, 1199 (10th Cir. 2000) ("[T]here is no indication in the record before us that the parties understood the first trial would decide specific issues to bind subsequent trials."); In re TMI Litig., 193 F.3d 613, 725 (3d Cir. 1999) ("[A]bsent a positive manifestation of agreement by Non-Trial Plaintiffs, we cannot conclude that their Seventh Amendment right is not compromised by extending a summary judgment against the Trial Plaintiffs to the non-participating, non-trial plaintiff."); see also Manual for Complex Litigation (Fourth), supra note 6, §20.132 ("[T]he transferee court could conduct a bellwether trial of a centralized action or actions originally filed in the transferee district, the results of which (1)may, upon the consent of parties to constituent actions not filed in the transferee district, be binding on those parties and actions, or (2)may otherwise promote settlement in the remaining actions." (footnote omitted)). For an example of a situation where consolidated parties agreed to be bound by at least some of the results of a bellwether trial, see Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 358-60 (2d Cir. 2003).

In a recent article, Professor Alexandra Lahav attempts to utilize the theory of deliberative democracy to defend the use of binding bellwether trials.  See Alexandra D. Lahav, Bellwether Trials, 76 Geo. Wash. L. Rev. 576, 577 (2008). Although we believe bellwether trials to be more appropriately employed for nonbinding informational purposes, the bulk of Professor Lahav's policy arguments would appear to be no less forceful when marshaled in support of nonbinding bellwether trials.

[FN28]. In re Vioxx Prods. Liab. Litig., 360 F. Supp. 2d 1352 (J.P.M.L. 2005); In re Propulsid Prods. Liab. Litig., MDL No. 1355, 2000 WL 35621417 (J.P.M.L. Aug. 7, 2000).

[FN29]. See, e.g., Edward F. Sherman, Segmenting Aggregate Litigation: Initiatives and Impediments for Reshaping the Trial Process, 25 Rev. Litig. 691, 697 (2006) ("[E]ven without preclusive effect, [bellwether trials] offer an accurate picture of how different juries would view different cases across the spectrum of weak and strong cases that are aggregated.").

[FN30]. Propulsid, 2000 WL 35621417, at *1-2. For a more detailed factual background of the Propulsid MDL, see In re Propulsid Prods. Liab. Litig., 208 F.R.D. 133, 144-47 (E.D. La. 2002) (denying the plaintiffs' motion for certification of a nationwide personal injury class action). The transferee court has also catalogued various orders, transcripts, and other materials on a Web site dedicated to the Propulsid MDL. See MDL-1355 Propulsid Product Liability Litigation, http://propulsid.laed.uscourts.gov (last visited June 13, 2008).

[FN31]. Propulsid, 208 F.R.D. at 135.

[FN32]. Id.

[FN33]. Id. at 137.

[FN34]. Id. at 135.

[FN35]. Diez v. Janssen Pharmaceutica, Inc., No. 00-2577 (E.D. La. filed Aug. 30, 2000).

[FN36]. Zeno v. Johnson & Johnson Co., No. 00-282 (E.D. La. filed Jan. 28, 2000) (regarding Samantha Reed).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN37]. See In re Propulsid Prods. Liab. Litig., MDL No. 1355, 2003 WL 367739, at *1 (E.D. La. Feb. 18, 2003).

[FN38]. Black v. Johnson & Johnson Co., No. 00-2497 (E.D. La. filed Aug. 22, 2000) (regarding Ernestine J. Brock).

[FN39]. See In re Propulsid Prods. Liab. Litig., 261 F. Supp. 2d 603, 604-05 (E.D. La. 2003).

[FN40]. See In re Propulsid Prods. Liab. Litig., MDL No. 1355, 2004 WL 305816, at *1-3 (E.D. La. Feb. 5, 2004) (consent order expressing transferee court's agreement to exercise various powers under the settlement program).

[FN41]. See MDL-1355 Propulsid Product Liability Litigation, supra note 30 (providing a settlement update on February 4, 2004).

[FN42]. Press Release, Janssen, L.P., The Plaintiffs Steering Committee and the State Liaison Committee of the Propulsid Multi-District Litigation Announce Agreement To Resolve Remaining Federal and State Court Cases (Dec. 15, 2005), available at http://propulsid.laed.uscourts.gov/settlement.htm.

[FN43]. Id.

[FN44]. MDL-1355 Propulsid Product Liability Litigation, supra note 30 (providing a settlement agreement on August 30, 2007).

[FN45]. In re Vioxx Prods. Liab. Litig., 360 F. Supp. 2d 1352, 1354-55 (J.P.M.L. 2005). For a more detailed factual background of the Vioxx MDL, see In re Vioxx Prods. Liab. Litig., 501 F. Supp. 2d 776, 778-79 (E.D. La. 2007) (denying Merck's motion for summary judgment on federal preemption grounds); and In re Vioxx Prods. Liab. Litig., 239 F.R.D. 450, 452-54 (E.D. La. 2006) (denying the plaintiffs' motion for certification of a nationwide personal injury class action). The transferee court has also catalogued various orders, transcripts, and other materials on a Web site dedicated to the Vioxx MDL. See MDL-1657 Vioxx Products Liability Litigation, http:// vioxx.laed.uscourts.gov (last visited June 13, 2008).

[FN46]. Vioxx, 501 F. Supp. 2d at 778.

[FN47]. Id. at 778-79.

[FN48]. Id. at 778.

[FN49]. Id. at 779.

[FN50]. Vioxx, 239 F.R.D. at 453.

[FN51]. See id. at 452 n.4. As discussed below, the first bellwether trial resulted in a mistrial and was subsequently retried. Thus, although the transferee court held six bellwether trials, it did so in only five individual cases.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN52]. Id.

[FN53]. See id.

[FN54]. See, e.g., Heather Won Tesoriero, Sarah Rubenstein & Jamie Heller, Merck's Tactics Largely Vindicated as It Reaches Big Vioxx Settlement, Wall St. J., Nov. 10, 2007, at A1. Under current law and practice, any given mass tort will often manifest itself in both the federal and state courts. Parallel bellwether trials in the state courts serve essentially the same beneficial purposes as do bellwether trials in the federal MDL, and can also provide a wider geographic sampling of jury verdicts.

[FN55]. Plunkett v. Merck & Co., No. 05-4046 (E.D. La. filed Aug. 23, 2005). Prior to the first bellwether trial, the transferee court issued an omnibus order addressing various Daubert challenges to proffered expert witnesses. See In re Vioxx Prods. Liab. Litig., 401 F. Supp. 2d 565, 599-600 (E.D. La. 2005).

[FN56]. See, e.g., Alex Berenson, A Mistrial is Declared in 3rd Suit Over Vioxx, N.Y. Times, Dec. 13, 2005, at C1.

[FN57]. See, e.g., Heather Won Tesoriero, Merck Wins Vioxx Decision in Vital Second Court Victory, Wall St. J., Feb. 18, 2006, at A7.

[FN58]. See In re Vioxx Prods. Liab. Litig., 489 F. Supp. 2d 587, 591-95 (E.D. La. 2007).

[FN59]. See Barnett v. Merck & Co., No. 06-485 (E.D. La. filed Jan. 31, 2006).

[FN60]. See, e.g., Alex Berenson, Merck Suffers a Pair of Setbacks over Vioxx, N.Y. Times, Aug. 18, 2006, at C1.

[FN61]. In re Vioxx Prods. Liab. Litig., 448 F. Supp. 2d 737, 738 (E.D. La. 2006).

[FN62]. See In re Vioxx Prods. Liab. Litig., 523 F. Supp. 2d 471, 472 (E.D. La. 2007).

[FN63]. See Barnett v. Merck & Co., No. 07-30897 (5th Cir. Apr. 18, 2008) (entry of dismissal).

[FN64]. Smith v. Merck & Co., No. 05-4379 (E.D. La. filed Sept. 29, 2005).

[FN65]. See, e.g., Heather Won Tesoriero, Merck is Victorious in New Orleans Vioxx Trial, Wall St. J., Sept. 27, 2006, at A13.

[FN66]. Mason v. Merck & Co., No. 06-0810 (E.D. La. filed Feb. 16, 2006).

[FN67]. See, e.g., Janet McConnaughey, Jury Clears Merck in 11th Vioxx Trial, Wash. Post, Nov. 16, 2006, at D3.

[FN68]. Dedrick v. Merck & Co., No. 05-2524 (E.D. La. filed June 21, 2005).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN69]. See, e.g., Heather Won Tesoriero, Merck Prevails in 12th Trial Since Vioxx Was Pulled, Wall St. J., Dec. 14, 2006, at B10.

[FN70]. See, e.g., Tesoriero, Rubenstein & Heller, supra note 54.

[FN71]. See id.

[FN72]. In re Chevron U.S.A., Inc., 109 F.3d 1016, 1019 (5th Cir. 1997); see also In re Hanford Nuclear Reservation Litig., 497 F.3d 1005, 1014 (9th Cir. 2007) ("After almost two decades of litigation, ... the parties in 2005 agreed to a bellwether trial. The trial was designed to produce a verdict that would highlight the strengths and weaknesses of the parties' respective cases and thus focused on six plaintiffs ... who were representative of the larger group. The purpose of the trial was to promote settlement and bring long-overdue resolution to this litigation."); In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., MDL No. 1358, 2007 WL 1791258, at *2-3 (S.D.N.Y. June 15, 2007) ("A bellwether trial also allows a court and jury to give the major arguments of both parties due consideration without facing the daunting prospect of resolving every issue in every action .... And every experienced litigator understands that there are often a handful of crucial issues on which the litigation primarily turns. A bellwether trial allows each party to present its best arguments on these issues for resolution by a trier of fact. Moreover, resolution of these issues often facilitates settlement of the remaining claims.").

[FN73]. The bellwether trial process is often only one phase in the effective management of multidistrict litigation. For an excellent discussion of techniques that may be employed in prior phases with respect to expert discovery and scientific evidence, see generally Barbara J. Rothstein, Francis E. McGovern & Sarah Jael Dion, A Model Mass Tort: The PPA Experience, 54 Drake L. Rev. 621, 621-38 (2006). Indeed, almost every judicial action taken by an MDL transferee court could be described as having "bellwether" qualities:

> Due process requires that persons not parties to a particular litigation be afforded their own day in court unless the circumstances warrant a conclusion that they were in privity with the litigants against whom a ruling was made. Presenting similar claims or defenses, or raising the same legal issues as someone else, has never sufficed for such privity. Recognition of the due process rights of litigants need not cripple the courts in multidistrict litigation, however. Once a section 1407 or other participating judge has ruled on a matter, it will not take her long to dispose of subsequent motions based on the same legal arguments. New parties will figure out quickly which efforts to litigate issues already decided by the judge at the urging of others will be futile.

Joan Steinman, Law of the Case: A Judicial Puzzle in Consolidated and Transferred Cases and in Multidistrict Litigation, 135 U. Pa. L. Rev. 595, 669 (1987) (footnote omitted).

[FN74]. In most MDLs, the transferee court will appoint two lawyers as "lead" or "liaison" counsel, one for plaintiffs and one for defendants. These lawyers essentially serve as the communication conduit between the transferee court and the thousands of lawyers that can often be involved in any given MDL. Lead or liaison counsel are usually "[c]harged with essentially administrative matters," but may also be expected to formulate and present "positions on substantive and procedural issues." Manual for Complex Litigation (Fourth), supra note 6, §10.221. In addition, the transferee court may also appoint various committees of lawyers for each side, often referred to as "steering committees." For example, in the Vioxx and Propulsid MDLs, the transferee court appointed a Plaintiffs' Steering Committee and Defendants' Steering Committee. See, e.g., In re Vioxx Prods. Liab. Litig., MDL No. 1657, 2005 WL 850962, at *1-2 (E.D. La. Apr. 8, 2005) (pretrial order no. 7) (delineating the duties and

responsibilities of the Defendants' Steering Committee); In re Vioxx Prods. Liab. Litig., MDL No. 1657, 2005 WL 850963, at *1-6 (E.D. La. Apr. 8, 2005) (pretrial order no. 6) (delineating the duties and responsibilities of the Plaintiffs' Steering Committee); In re Propulsid Prods. Liab. Litig., MDL No. 1355 (E.D. La. Oct. 2, 2000) (pretrial order no. 2 at 5-10) (delineating the duties and responsibilities of the Plaintiffs' Steering Committee and designating lead counsel for the defendant), available at http://propulsid.laed.uscourts.gov/Orders/order2.pdf. Throughout this Article, we refer to all lawyers appointed by the transferee court as "coordinating counsel."

[FN75]. See, e.g., Gerald Eades Bentley, The Profession of Dramatist in Shakespeare's Time, 1590-1642, at 260-63 (1971). Indeed, the practical realities of modern mass tort litigation, revealed through the bellwether process, are not so different from those faced by the dramatist:

In the world of the theatre, ... the impact of the author's creation is in good part determined by the playwright's cooperation with his colleagues in presentation. The tailoring of the literary product to the qualities of the actors, the design of the theatre, and the current conventions of production is of vital importance in achieving the effects which the author planned.

Id. at 8.

[FN76]. Nagareda, supra note 27, at ix.

[FN77]. To be precise, we mean once in any given mass tort's lifetime. Indeed, when the structure provided by the transferee court breaks down upon the dissolution of an MDL, that is, when cases are remanded to the districts from which they originated, it becomes exceedingly difficult to organize and achieve a global settlement of related claims. The institutional value of the transferee forum in this respect is beyond dispute. See, e.g., id. at 260 ("As a practical matter, consolidated pretrial proceedings at the behest of the MDL Panel already form a setting ripe for plaintiffs' lawyers and defendants to begin discussions about a comprehensive peace.").

[FN78]. Id. at 12; see Francis E. McGovern, Resolving Mature Mass Tort Litigation, 69 B.U. L. Rev. 659, 688-94 (1989) (recognizing that mass disputes can mature and ultimately be resolved through a hybrid process of consolidation, resolution of common issues, and acquisition of knowledge regarding the valuation of individual claims); see also Francis E. McGovern, An Analysis of Mass Torts for Judges, 73 Tex. L. Rev. 1821, 1841-45 (1995) (expanding on this view and focusing on styles of judicial management).

[FN79]. Nagareda, supra note 27, at 14-15.

[FN80]. See id. at 54-57 ("When mass tort litigation reaches the mature stage, the game changes from the resolution of cases to the crafting of a comprehensive peace .... The basic thrust of the shift is from litigation of individual claims in the tort system to creation of private administrative systems for the compensation of claimants in the future."). Professor Nagareda goes on to describe the motivations underlying this inevitable shift:

Savvy lawyers on opposing sides have not hit upon the ideal of comprehensive peace by happenstance; rather, observed behavior reveals an underlying truth. The prospect of mass liability extending over years or decades--especially, liability of such a scope as to threaten the viability of the defendant as a business firm--generates huge uncertainty. For plaintiffs, the main uncertainty concerns the availability of resources to compensate persons who happen to develop disease later rather than sooner. For defendants, uncertain and potentially firm-threatening liability can cripple their ability to draw upon the capital markets to support their continued business operations.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Id. at x.

[FN81]. See, e.g., Peter H. Schuck, Mass Torts: An Institutional Evolutionist Perspective, 80 Cornell L. Rev. 941, 959 (1995) ("Individual cases proceeding through trial, verdict, and appeal in a variety of jurisdictions gradually reveal the behavior of juries and judges, clarify the applicable rules of law, and render the expected value of individual claims more predictable.").

[FN82]. See, e.g., Delaventura v. Columbia Acorn Trust, 417 F. Supp. 2d 147, 155 (D. Mass. 2006) (extolling the "inevitable uncertainties of the direct democracy of the American jury"). Judge Young may be correct that "the 'settlement culture' for which the federal courts are so frequently criticized is nowhere more prevalent than in MDL practice," and that when "[f]act finding is relegated to a subsidiary role[,] ... bargaining focuses instead on ability to pay [and] the economic consequences of the litigation." Id. at 150, 155 (footnotes omitted). The use of bellwether trials obviously recognizes the important institutional role of the jury system, but it can also broaden the focus of settlement negotiations in multidistrict litigation beyond these traditional considerations.

[FN83]. 521 U.S. 591 (1997).

[FN84]. 527 U.S. 815 (1999).

[FN85]. Nagareda, supra note 27, at 97. For an informative overview of the various structural components of modern mass tort settlement programs, see generally Francis E. McGovern, The What and Why of Claims Resolution Facilities, 57 Stan. L. Rev. 1361, 1362-75 (2005).

[FN86]. Nagareda, supra note 27, at 223.

[FN87]. See, e.g., In re Medtronic, Inc. Implantable Defibrillator Prod. Liab. Litig., MDL No. 05-1726, 2007 WL 846642, at *3-4 (D. Minn. Mar. 6, 2007). In an unpublished amended order, the Medtronic transferee court set forth six categories of cases based on the parties' recommendations. See In re Medtronic, Inc. Implantable Defibrillator Prod. Liab. Litig., MDL No. 05-1726 (D. Minn. Apr. 12, 2007) (amended order on bellwether actions).

[FN88]. See In re Vioxx Prods. Liab. Litig., 501 F. Supp. 2d 789, 790-91 (E.D. La. 2007).

[FN89]. The MDL Panel divides MDLs into ten separate subject-matter categories: (1)air disaster, (2)antitrust, (3)contract, (4)common disaster, (5)employment practices, (6)intellectual property, (7)miscellaneous, (8)products liability, (9)sales practices, and (10)securities. See U.S. Judicial Panel on Multidistrict Litig. Docket Information, http://www.jpml.uscourts.gov/Docket_Info/docket_info.html (last visited June 13, 2008).

[FN90]. Regarding the type of injury, although the plaintiffs alleged injuries in the Vioxx MDL other than heart attack or stroke, these two injuries so predominated that such cases promised to be the most informative. Similarly, the cases in the Propulsid MDL were divided into categories based on the type of injury alleged. See In re Propulsid Prods. Liab. Litig., MDL No. 1355, 2003 WL 22023398, at *1 (E.D. La. Mar. 11, 2003) ("The Court further noted that it wished to proceed to trial on three types of cases involving Propulsid: wrongful death cases, personal injury cases, and the sustained prolonged QT cases

seeking medical monitoring.").

[FN91]. Of course, a transferee court may take a more ambitious approach and set a greater number of cases for bellwether trials. In such instances, a transferee court may find it prudent to place more variables in play, allowing for a greater number of divisions and groupings. A transferee court that takes this approach, however, must remain cognizant of the ultimate purpose of bellwether trials and be vigilant of the law of diminishing returns, understanding that at some point the costs inherent to trying additional bellwether trials will outweigh the benefits.

[FN92]. The transferee court in the Bextra & Celebrex MDL employed a hybrid method, allowing the attorneys to agree on a certain group of cases as pool-candidates and then permitting a subset of pool-candidates to be randomly selected to fill the pool. See In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., MDL No. 1699 (N.D. Cal. Nov. 17, 2006) (pretrial order no. 18 at 2-4) (describing the initial selection of plaintiffs for discovery and trial pool), available at http:// ecf.cand.uscourts.gov/cand/bextra/content/files/pretrial_order_18.pdf.

[FN93]. See, e.g., In re Welding Fume Prods. Liab. Litig., MDL No. 1535, 2006 WL 2505891, at *2 (N.D. Ohio Aug. 28, 2006) (selecting fifteen cases for case-specific discovery); see also In re Baycol Prods. Liab. Litig., MDL No. 1431 (D. Minn. July 18, 2003) (pretrial order no. 89 at 2) (providing that the court will determine eligible cases to be tried if the parties are unable to agree), available at http://www.mnd.uscourts.gov/Mdl-Baycol/pretrial_ minutes/baycol89.ord.pdf.

[FN94]. Even if the attorneys prepare briefs outlining the potential cases, similar to a final pretrial order, it is still doubtful that the transferee court's selections will be as knowledgeable as the attorneys' picks.

[FN95]. See, e.g., In re Guidant Defibrillators Prods. Liab. Litig., MDL No. 05-1708, 2006 WL 905344, at *3 (D. Minn. Mar. 23, 2006) (pretrial order no. 8) (expressing the court's preference for party input in selecting representative trials); In re Guidant Defibrillators Prods. Liab. Litig., MDL No. 05-1708 (pretrial order no. 9 at 2) (allowing each party to select twenty potential bellwether cases), available at http:// www.mnd.uscourts.gov/Mdl-Guidant/Pretrial_Minutes/05md1708pto9050306.pdf.

[FN96]. E.g., In re Baycol Prods. Liab. Litig. (pretrial order no. 89 at 2).

[FN97]. In addition, a transferee court can implement a mix of these processes. See, e.g., In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig. (pretrial order no. 18 at 2) (allowing the plaintiffs and defendants to each select ten cases out of a pool of forty-five cases, and then selecting the remaining twenty-five cases randomly from a list agreed on by both sides).

[FN98]. See id. at 4 (limiting selections to those plaintiffs who had filled out the Plaintiff Fact Sheets and provided the authorizations and responsive documents pursuant to pretrial order no. 6).

[FN99]. The parties will usually be required to provide all of this information early on in the litigation pursuant to a global pretrial discovery order. See, e.g., In re Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. June 29, 2006) (pretrial order no. 18C) (governing the provision of Plaintiff Profile Forms, Merck Profile Forms, and medical authorizations); In re Propulsid Prods. Liab. Litig., MDL No. 1355 (E.D. La. Jan. 31, 2001) (pretrial order no. 9) (governing the provision of Plaintiff Profile Forms and medical authorizations). Notwithstanding such a requirement, the parties may occasionally fail to provide this

82 TLNLR 2323                                                                                    Page 34
82 Tul. L. Rev. 2323

information. Cases in which this basic level of disclosure is not complete should not be considered for bellwether trials, and may even be subject to dismissal if the parties fail to comply after additional prompting. See In re Phenylpropanolamine (PPA) Prods. Liab. Litig., 460 F.3d 1217, 1232-34 (9th Cir. 2006); Acuna v. Brown & Root Inc., 200 F.3d 335, 340-41 (5th Cir. 2000).

[FN100]. See In re Vioxx Prods. Liab. Litig., 478 F. Supp. 2d 897, 903 (E.D. La. 2007).

[FN101]. See id.

[FN102]. See id.

[FN103]. See Ferens v. John Deere Co., 494 U.S. 516, 523-25 (1990).

[FN104]. See Vioxx, 478 F. Supp. 2d at 903.

[FN105]. See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998); supra notes 17-18 and accompanying text.

[FN106]. Lexecon, 523 U.S. at 40. A party's consent may be express or implied through conduct. See In re Carbon Dioxide Indus. Antitrust Litig., 229 F.3d 1321, 1325-27 (11th Cir. 2000); Armstrong v. La Salle Bank, N.A., No. 01 C 2963, 2007 WL 704531, at *2-6 (N.D. Ill. Mar. 2, 2007); Solis v. Lincoln Elec. Co., No. 1:04-CV-17363, 2006 WL 266530, at *4-5 (N.D. Ohio Feb. 1, 2006).

[FN107]. Just because a case is currently pending in state court does not mean that it should not be considered for trial within the MDL or that a transferee court will not be able to obtain jurisdiction over it. The first case tried in the Vioxx MDL--the Plunkett case--had been pending in Florida state court for several years when the Vioxx transferee court and the attorneys agreed to set it as the first bellwether trial. See supra notes 45-58 and accompanying text. To effectuate this decision, the attorneys agreed that (1)the plaintiff would seek a voluntary dismissal without prejudice from the Florida state court (obviously informing the Florida state court of the purported bellwether plan and seeking the state court's permission), (2)the plaintiff would then file the case directly into the Vioxx MDL, and (3)the defendant would waive its venue and statute of limitations objections. Id. All three of these steps went smoothly and the Plunkett case was enveloped by the MDL, proceeding to trial approximately three months after the parties agreed to set it as the first bellwether trial.

Likewise, in other MDLs, the fact that a case is not presently within the transferee court's jurisdiction, or even within the federal court system, does not preclude its amenability to trial in the MDL. Creative thinking and attorney cooperation can provide the transferee court and the attorneys with the ability to try representative cases that would otherwise be untriable. Indeed, this sort of flexibility suggests that perhaps the primary perceived benefit of legislatively overruling Lexecon, namely authorizing transferee courts to try cases transferred by the MDL Panel, may be outweighed by the unintended consequence of a diminished threat of remand.

[FN108]. See Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.); Castano v. Am. Tobacco Co., 84 F.3d 734, 746-51 (5th Cir. 1996); In re Rhone-Poulenc Rorer Inc., 51 F.3d 1293, 1299-1304 (7th Cir. 1995).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN109]. See discussion supra notes 2 and 20.

[FN110]. See In re Vioxx Prods. Liab. Litig., 478 F. Supp. 2d 897, 903-04 (E.D. La. 2007).

[FN111]. See id. at 904.

[FN112]. Direct filing also avoids any unfortunate situations that may arise when a transferor court acts on a motion after being divested of its jurisdiction by a transfer order from the MDL Panel becoming final. When the MDL Panel orders a case transferred from a transferor court to a transferee court, the transferor court is deprived of jurisdiction until such time, if at all, the case is returned to it. See, e.g., Astarte Shipping Co. v. Allied Steel & Export Serv., 767 F.2d 86, 87 (5th Cir. 1985); In re Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig., 664 F.2d 114, 118 (6th Cir. 1981); In re Prudential Ins. Co. of Am. Sales Practices Litig., 177 F.R.D. 216, 229-30 (D.N.J. 1997); In re Plumbing Fixture Cases, 298 F. Supp. 484, 495-96 (J.P.M.L. 1968). Thus, any orders issued by the transferor court after the final transfer are null and without effect, Plumbing Fixture, 298 F. Supp. at 496, and the transferee court is empowered to modify or rescind those orders. Astarte, 767 F.2d at 87; Upjohn, 664 F.2d at 118. In the Vioxx MDL, the transferee court vacated two remand orders from two different transferor courts, because those transferor courts ordered remand after the MDL Panel's transfer order became final. In re Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Sept. 5, 2007) (order relating to Coker v. Merck & Co., No. 07-3998); In re Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Mar. 13, 2006) (order relating to Hendershot v. Merck & Co., No. 05-6134). This is "unfortunate" because the transferee court, itself a district court, is essentially forced to abrogate another district court's order.

[FN113]. See Vioxx, 478 F. Supp. 2d at 904.

[FN114]. See id.

[FN115]. But see In re Vioxx Prods. Liab. Litig., 522 F. Supp. 2d 799, 812-13 (E.D. La. 2007) (noting the "fictional" quality of the transferee court's status as the forum state in cases filed directly into an MDL by nonforum citizens). Indeed, the practice of allowing cases to be filed directly into an MDL can create difficult choice-of-law issues for the transferee court, including whether the transferee forum's choice-of-law principles must be applied in such cases. See In re Express Scripts, Inc., PBM Litig., MDL No. 1672, 2007 WL 4333380, at *1-2 (E.D. Mo. Dec. 7, 2007) (applying the choice-of-law rules of the transferee forum); In re Bausch & Lomb Inc. Contacts Lens Solution Prods. Liab. Litig., MDL No. 1785, 2007 WL 3046682, at *2-3 (D.S.C. Oct. 11, 2007) (avoiding this choice-of-law issue by finding that no conflict existed among the potentially applicable state laws); Vioxx, 478 F. Supp. 2d at 903-05 & n.2 (discussing the implications of direct filing, but ultimately applying the choice-of-law rules of the transferee forum). Ultimately, if a transferee court is going to employ direct filing in any given MDL, it should encourage the parties to think about the choice-of-law issues that may arise as a result and, ideally, the transferee court should include a choice-of-law provision in the pretrial order authorizing direct filing.

[FN116]. Conceivably, there are two ways in which nonresident plaintiffs can preserve their Lexecon objections while still taking advantage of the speed and cost benefits of direct filing. First, as part of a pretrial order allowing for direct filing, the transferee court, at the behest of the parties, could stipulate that direct filing into the MDL does not serve as a waiver of Lexecon objections. The transferee court, however, may be unwilling to do this because such an order places self-imposed conditions on the transferee court's jurisdiction. Second, an individual plaintiff could potentially preserve his Lexecon objection by making a

82 TLNLR 2323
82 Tul. L. Rev. 2323

notation of such in his complaint. While this alternative appears attractive, it may not be effective. Although there is no case law on the subject, it is doubtful that a litigant can unilaterally place conditions on a court order. Without an order allowing direct filing by a nonresident plaintiff, such plaintiffs have no right to file directly into the MDL. This right is the sole product of the transferee court's order, although it is conceivable that a plaintiff could file an action directly into the MDL, despite improper venue, and just hope that its filing is not challenged on venue grounds. Thus, if the transferee court does not acknowledge a plaintiff's right to preserve his Lexecon objection or affirmatively permit such preservation, a plaintiff may not have that right at all. On a related point, at least one court has held that a Lexecon waiver has no effect on the applicable choice-of-law principles. See In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig., 489 F. Supp. 2d 932, 934-35 (D. Minn. 2007) (applying the choice-of-law rules of the transferor forum in a case transferred by the MDL Panel and selected as the first bellwether trial).

[FN117]. There are two methods of encouragement: the carrot and the stick. The carrot method involves the transferee court explaining the benefits of the bellwether trial process and how those benefits cannot be fully achieved unless the parties are willing to consent to the most representative cases serving as bellwether trials. The stick method involves the transferee court, faced with obstinate attorneys refusing to provide consent, unilaterally setting cases filed directly into the MDL by citizens of the forum state for trial. Preparation of these "stick" cases for trial will likely be just as rigorous and expensive as preparation of a "carrot" case, but will be devoid of the institutional benefits and freedom of choice that are available when the attorneys are permitted to select their own bellwether trials. Thus, a transferee court, by signaling its willingness to use its "stick," can persuade the attorneys to choose the "carrot."

[FN118]. This is true unless a plaintiff reserves the right to object to venue if his case is set for trial or stipulates that direct filing is only for expediency and discovery purposes, and not for trial.

[FN119]. In re Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. May 18, 2005) (pretrial order no. 11 at 1-2), available at http:// vioxx.laed.uscourts.gov/Orders/Orders.htm (follow "Pretrial Order No. 11" hyperlink).

[FN120]. An unfortunate incident developed in the Vioxx MDL that illustrates the importance of obtaining consent to trial within an MDL at the beginning of the trial-selection process. For various reasons, the Vioxx transferee court accorded the attorneys a vast amount of leeway in selecting cases for bellwether trials, prior to implementing a formal and rigid trial-selection process. See In re Vioxx Prods. Liab. Litig., MDL No. 1657, 2005 WL 3665985, at *1 (E.D. La. Dec. 16, 2005) (discussing the relatively informal process initially adopted). After the selection of the first case, the parties began negotiating which case would be picked as the second bellwether trial. At the conclusion of this drawn-out process, which was riddled with many letters to the court and status conferences, the parties agreed to set a second case for trial. As part of the agreement, lead counsel in the second case, who was also a member of the Plaintiffs' Steering Committee, stipulated that he and his client would only consent to trial if the case were tried in the state where the case had been originally filed. To move the trial-selection process along and to honor the agreement of the attorneys, the Vioxx transferee court proceeded to contact the proper officials and obtain the requisite permission to travel to the transferor forum and conduct the second trial. Before the trial was set to begin, however, plaintiff's counsel unexpectedly withdrew the case from consideration, reporting that his client refused to consent to trial. Although the attorneys had represented that all of the necessary consents had been obtained, the attorneys apparently never received the client's consent formally and, in light of Lexecon, the Vioxx transferee court was precluded from either forcing the selected case to trial or dismissing it for failure to prosecute. As a result, another case had to be selected.

[FN121]. It should not be difficult to determine whether the individual litigants or local counsel object to trial in the MDL. For

a defendant, the Defendants' Steering Committee, which is generally handpicked by the defendant, usually consists of the defendants' personal attorneys, so it should be easy for them to answer such questions. For plaintiffs, the Plaintiffs' Steering Committee will most likely be comprised of attorneys who represent a large number of plaintiffs and are highly knowledgeable of the subject matter. Given their number of cases, their knowledge, and their status, these attorneys will often be willing, if not excited, to offer one or more of their cases as bellwether candidates. For example, in the Vioxx MDL, four of the five bellwether cases were filed and tried by members of the Plaintiffs' Steering Committee. Even though one case was filed and tried by a nonmember, it was nevertheless overseen by a member of the Plaintiffs' Steering Committee.

[FN122]. See supra Part IV.B.2.

[FN123]. See, e.g., In re Norplant Contraceptive Prods. Liab. Litig., MDL No. 1038, 1996 WL 571536, at *1 (E.D. Tex. Aug. 13, 1996).

[FN124]. See In re Prempro Prods. Liab. Litig., MDL No. 1507 (E.D. Ark. June 20, 2005) (order regarding bellwether trial selection); In re Prempro Prods. Liab. Litig., MDL No. 1507 (E.D. Ark. July 14, 2005) (letter order). Information about these two orders can be found on a Web site dedicated to this multidistrict litigation. See Prempro Product Liability, http://www.are.uscourts.gov/mdl/index.cfm (last visited June 13, 2008).

[FN125]. In the Bextra & Celebrex MDL, the transferee court had attorneys use a third-party randomizer computer program as a random selection method. See In re Bextra & Celebrex Mktg. Sales Practice & Prod. Liab. Litig., MDL No. 1699 (N.D. Cal. Nov. 17, 2006) (pretrial order no. 18) (describing the initial selection of plaintiffs for discovery and trial pool), available at http://ecf.cand.uscourts.gov/cand/bextra/content/files/pretrial_order_18.pdf.

[FN126]. See Manual for Complex Litigation (Fourth), supra note 6, §22.315.

[FN127]. See supra Part III.C.

[FN128]. Moreover, although random selection may be a theoretically attractive method for selecting bellwether trials, and, indeed, although some courts and commentators have suggested that it may even be of constitutional significance when the results of bellwether trials are used to bind related claimants, random selection is of considerably less importance when bellwether trials are employed in practice for nonbinding informational purposes.

[FN129]. Of course, it would likely be best if the coordinating attorneys could mutually agree on which cases to set for bellwether trials. This option, however desirable, may not be realistically achievable because the stakes may be too great and the perceived values of the cases too divergent for the attorneys to reach an amicable agreement. In the Vioxx litigation, only one case--the first one--was selected by agreement. See discussion supra note 107.

[FN130]. See In re Propulsid Prods. Liab. Litig., MDL No. 1355, 2003 WL 22023398, at *1 (E.D. La. Mar. 11, 2003).

[FN131]. See In re Vioxx Prods. Liab. Litig., 501 F. Supp. 2d 789, 791 (E.D. La. 2007).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 Tul. L. Rev. 2323

[FN132]. See id.

[FN133]. See id.

[FN134]. The number of vetoes or strikes should be proportionate to the number of cases in the trial-selection pool.

[FN135]. As mentioned above, the transferee court in the Vioxx MDL did just this by holding the first bellwether trial in Houston, Texas, albeit fortuitously as a result of evacuating New Orleans for Hurricane Katrina. In addition, the Vioxx trans-feree court arranged to travel to another district for a subsequent bellwether trial, but ultimately these plans were not carried out. See discussion supra note 120.

82 Tul. L. Rev. 2323

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.