# EXHIBIT 3

# Statewide Coordinated Proceedings:
## State Court Analogues to the Federal MDL Process

Second Edition

By Mark Herrmann, Geoffrey J. Ritts, and Katherine Larson

THOMSON
★ ™
WEST

"The Panel has neither the power nor the inclination to make any determinations regarding the actual conduct of the coordinated or consolidated pretrial proceedings."[46]

A basic question is what proceedings are classified as "pretrial," and thus within the scope of the MDL judge's power. It is accepted that the MDL judge has the ability to rule on the kinds of motions listed in the previous paragraph, and to issue orders that determine the course of proceedings for discovery and for dispositive motions, for example. At some point, however, the MDL court's rulings might have such an effect on the trial proceedings that a question might arise as to whether the rulings are truly "pretrial" ones.[47] This situation could arise, for example, if a transferee court took it upon itself to decide a raft of *in limine* motions immediately before the remand of a case to its home court. Case law suggests that any proceedings that occur before the seating of a jury, or before the start of a bench trial, are literally "pre-trial" and therefore fair game for the transferee judge.[48] An order, for example, precluding the presentation of evidence at trial because of discovery abuse does affect the course of the trial, but the power to enter an order of that kind also is essential for the MDL judge to be able to effectively govern the discovery process:

> The pretrial and the trial are not ... two unrelated phases of the case. Rather, they are part of a continuum that results in resolution of the case, and the relationship between them is intimate. "Pretrial" proceedings are conducted to prepare for trial. A judge who has no power to impose limits as to what will happen at trial is obviously a judge who has little ability to manage pretrial proceedings in a meaningful way, since there would be no assurance that the judge's efforts are directed toward what is likely to happen at trial.[49]

Similarly, it makes sense for the MDL judge, who normally will acquire familiarity with the technical issues raised in a litigation, to decide *Daubert* motions, rather than a transferor judge who will know little or nothing about a case when it returns to him or her for trial.

Because the transferee judge has control over all aspects of discovery, the potential for duplicative discovery can be eliminated in an MDL. One of the main potential benefits of coordinated MDL proceedings is centralizing all discovery in federal cases before a single judge. Using the discovery-control methods outlined in the *Manual for Complex Litigation (Third)*, the transferee court will be able to make the results of discovery available to all of the parties in all of the related actions, as well as to parties in later-filed "tag-along" actions.[50] Standard procedures include establishing centralized document depositories so that documents will need to be produced only once, using master sets of written discovery so that interrogatories will need to be answered only once, and making depositions useable in all of the related cases, so that a defendant's officers, directors and employees will need to

---

[46] Weigel, *supra*, at 579.

[47] See *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, Master File No. IP 00-9373-C-B/S, MDL No. 1373 (S.D. Ind. Aug. 5, 2002) (staying motion by defendant to apply presumption under Florida law that evidence that plaintiffs failed to preserve would have been favorable to defendant; "Firestone's motion presents evidentiary and jury instructions issues more properly addressed by the transferor court at or before trial.").

[48] See *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 169 F.R.D. 632, 636 (N.D. Ill. 1996) (holding that MDL judge did not exceed his powers by entering an order limiting the number of expert witnesses that a party could call at trial).

[49] *Id.*

[50] See *Manual for Complex Litigation (Third)* § 21.4 (1995); Weigel, *supra*, at 579.

Copyright © 2004 West, a Thomson business.

be deposed only once for all the federal cases.[51] As a matter of course, the transferee court will appoint a plaintiffs' coordinating committee of counsel and charge that committee with the task of coordinating discovery from the plaintiffs' side, to ensure no duplication.[52]

One of the authors of this book has observed, however, that the cost savings (at least to a defendant) from coordinated discovery "may be more imagined than real."[53] While coordination avoids duplicative discovery, it allows for much deeper inquiry into a wider range of issues than would occur in separate, autonomous cases.

> [T]he time and money that plaintiffs' counsel are not investing in repetitive depositions of corporate officers and directors will likely be channeled into new areas of discovery. In a single case, involving a single plaintiff, counsel may decide not to spend the time and money deposing every supplier of every component used in the product, or every distributor ever responsible for sales. Once thousands of cases are in a single forum, however, plaintiffs may well decide to undertake that tangential discovery. Similarly, the depth of plaintiffs' inquiry into critical issues may increase significantly when many cases are aggregated in a single forum. Plaintiffs' counsel collectively are, after all, better financed than counsel acting individually. With more lawyers to share the work, more work can be undertaken.[54]

Another factor impelling more thorough discovery in an MDL is the fact that plaintiffs' counsel's claims for fees if the cases are settled will be based in large part on the number of hours they spend on the case. "Counsel who perceive mass torts as likely candidates for settlement will view time spent helping with discovery as a no-lose investment. Defense counsel should therefore anticipate that, once an MDL proceeding is created, duplicative discovery will be eliminated, but additional discovery will fill the void."[55]

As in any other case, counsel should attempt to negotiate a discovery plan to govern the MDL proceeding. Issues typically addressed in the discovery plan include: whether and how discovery should be phased or sequenced to focus on common or controlling issues; the extent to which plaintiffs and defendants will be required to coordinate their discovery (*i.e.*, whether plaintiffs will be required to serve joint discovery on liability issues, and the extent to which counsel for individual plaintiffs will be allowed to serve case-specific discovery requests); limits on the number of written discovery requests; establishing document depositories and computerizing discovery materials; establishing cut-off dates for various stages of discovery proceedings;

---

[51] See *Manual for Complex Litigation (Third)* § 21.4 (1995); Herr, *supra*, at 202-07 (discussing discovery procedures in multidistrict litigation).

[52] See *Manual for Complex Litigation (Third)* § 20.22 (1995) (discussing potential roles of lead/liaison counsel and committees of counsel in complex litigation). Procedures for appointing lead and liaison counsel are typically addressed in an initial case management order, along with such other topics as administrative matters (including creating an MDL Master File and establishing document service requirements); briefing schedules for early resolution of jurisdictional issues that apply to large numbers of parties; appointment of magistrate judges or special masters to supervise discovery proceedings; and schedules for future case management conferences. See John L. Strauch & Robert C. Weber, "Multidistrict Litigation," *Business and Commercial Litigation in Federal Courts* 663-64 (Robert L. Haig ed.) (1998).

[53] See Herrmann, "To MDL Or Not To MDL," *supra*, at 45.

[54] *Id.*

[55] *Id.*

Copyright © 2004 West, a Thomson business.

procedures for depositions (*i.e.*, who can attend, order of questioning, time limits, etc.); and timetables for expert discovery.[56]

### 5. Settlement

Most cases transferred into MDL proceedings are ultimately resolved by settlement during the MDL proceedings. Frequently, the MDL judge will actively promote settlement. If most of the cases facing a defendant are in federal court and have been swept up in the MDL proceeding, and the plaintiffs' coordinating committee has a measure of control over all of the plaintiffs' counsel, then a coordinated proceeding may significantly enhance the opportunities for settlement. "All of the parties are already in one room; the question simply becomes one of price."[57] On the other hand, if most pending cases are in state courts and are not removable to federal court, then an MDL proceeding may be less helpful in achieving a broad settlement.[58]

The extent to which the MDL court will get involved in trying to bring about a settlement depends upon the style and preferences of the particular judge. Many of the judges who serve as transferee judges are repeat players in the mass-litigation field, and some practicing attorneys have suggested that some of these judges "view their role as 'getting the parties to a claims process'—a settlement—as quickly as possible."[59] Creative settlement attempts by MDL judges in asbestos cases have resulted in some of the leading cases in recent years on the limits of large-scale settlements.[60] If a judge wishes, he or she can use the MDL process to induce settlement: "By delaying rulings on critical motions or requiring that the coordinated deposition schedule resemble the Bataan Death March, judges can increase the parties' desire to put an end to their differences."[61]

In the mass tort context, there are three main alternatives for resolving large numbers of cases: an inventory settlement, some form of class action settlement, or bankruptcy proceedings. In an inventory settlement, a defendant resolves one plaintiffs' counsel's (or a group of counsel's) entire inventory of cases. This can be accomplished with or without an MDL proceeding. Class action settlements, at least on a nationwide basis, have had their availability limited by *Amchem*.[62] Traditional opt-out class action settlements may do more harm than good to a defendant in mass tort context, anyway: plaintiffs with strong cases are likely to opt out, while those with weak

---

[56] *See* Strauch & Weber, *supra*, at 665-66. For an example of an initial case management order in an MDL proceeding, see section D of this chapter.

[57] *See* Herrmann, "To MDL Or Not To MDL," *supra*, at 47.

[58] *Id.*

[59] *Id.* at 45.

[60] *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997); *In re Asbestos Litig. (Ahearn)*, 134 F. 3d 668 (5th Cir. 1998), rev'd sub nom. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). *See also* Peter Schuck, *Agent Orange On Trial* 178-79 (1986) (describing aggressive efforts by Judge Jack Weinstein to cause settlement of Agent Orange cases).

[61] *See* Herrmann, "To MDL Or Not To MDL," *supra*, at 47. According to the Second Circuit, MDL proceedings engender "great pressure to settle. Indeed, a settlement in a case such as [this]. . .seems almost as inevitable as the sunrise." *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 166 (2d Cir. 1987).

[62] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). *See generally* Herbert J. Newberg & Alba Conte, *Newberg On Class Actions*, ch. 11 (3d ed. 1992 & Supp. 2002), for a comprehensive discussion of the current state of the law on class action settlements, which is beyond the scope of this book.

Copyright © 2004 West, a Thomson business.

cases will accept the settlement.[63] Non-opt-out class action settlements are available in a much more limited category of cases where a strong argument can be made that there is only a "limited fund" against which recovery can be had. One such settlement took place in the context of an MDL in recent years,[64] although the Supreme Court in *Ortiz* limited the situations in which limited fund settlements will be permitted.[65]

The *Manual for Complex Litigation (Third)* discusses a variety of steps trial judges can take to foster settlement, and MDL judges can be expected to turn to these mechanisms with regularity.[66] MDL judges not only have available to them such traditional settlement-promoting options as mediation and settlement conferences, but an MDL proceeding is often an especially appropriate context for the use of "bellwether trials," in which a small number of representative cases are actually tried, with the results of those trials serving as the basis for a settlement of a larger number of cases.[67]

Because most MDL cases are resolved through settlement, and because MDL judges are frequently focused on achieving settlement as a measure of their "success" in managing the litigation, whether one wants the opportunity for a global settlement is a critical factor in deciding whether to seek or to oppose an MDL proceeding.[68] At the start of the MDL proceeding, each party should consider what information is needed to determine the settlement value of the litigation, and each party should consider how the MDL process should be structured to enhance the likelihood of favorable resolution on settlement. This can be accomplished, for instance, by ordering discovery in a way to delay or avoid the disclosure of information that will harm the settlement value of the case, or by seeking to have critical motions scheduled in a fashion that maximizes a party's settlement leverage.[69]

### 6. Remand for Trial

If any cases remain after pretrial proceedings conclude, the transferee judge may petition the Panel to remand the cases for trial in the courts from which they were transferred.[70] The transferee court itself does not have the power to remand cases to the transferor court; it can only make a suggestion to the Panel. The Panel can remand cases on its own initiative or on the motion of a party, although its rules state that "[t]he Panel is reluctant to order remand absent a suggestion of remand from the transferee district court."[71] Cases can be remanded before the conclusion of all pretrial proceedings; this might occur where discovery has been finished as to all common

---

[63] See Herrmann, "To MDL Or Not To MDL," *supra*, at 47.

[64] See *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 176 F.R.D. 158 (E.D. Pa. 1997) (approving "limited fund" class action settlement). See also Elizabeth J. Cabraser, "Class Action Update 2001: Mass Tort Trends, Choice of Law, Rule 23(f) Appeals, and Proposed Amendments to Rule 23," ALI-ABA Course of Study, Feb. 7-9, 2002 (available on Westlaw, SG046 ALI-ABA 1063).

[65] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

[66] See *Manual for Complex Litigation (Third)*, ch. 23.

[67] See Nangle, "From the Horse's Mouth," *supra*, at 345 (suggesting that transferee courts try bellwether cases in actions originally filed in the transferee district, to promote settlement and as a means to avoid remanding large numbers of cases to transferor courts for trial).

[68] See Strauch & Weber, *supra*, at 684.

[69] For a more detailed discussion of settlement strategy in MDL proceedings, see *id*. at 684-86.

[70] Rule 7.6, R.P.J.P.M.L.

[71] Rule 7.6(c), (d), R.P.J.P.M.L.

Copyright © 2004 West, a Thomson business.