**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | MDL No. 2419<br>Master Dkt. 1:13-md-02419-FDS |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**STEERING COMMITTEE'S MOTION FOR ENTRY OF**
**BELLWETHER TRIAL AND PRE-TRIAL SCHEDULING ORDER**

Pursuant to Federal Rules of Civil Procedure 16(b) and 26(f), and Local Rule 16.1, the

Plaintiffs Steering Committee ("PSC") has moved the Court for entry of the proposed MDL

Order Regarding Initial Bellwether Trial Settings and Pretrial Deadlines for Saint Thomas-

Related Defendants.[1]  The proposed order ("The Plan") includes deadlines for pretrial discovery

and motion practice, as well as outlines a process for selection of bellwether cases into a pool of

potential trial candidate cases. The Plan culminates in trial of two bellwether cases in May and

June of 2015.[2]

I.       **GUIDING PRINCIPLES OF THE PROPOSED ORDER**

The Plan is premised on the following principles:

- Rule 1 of the Federal Rules of Civil Procedure directs that the Federal Rules be

---

[1] For purposes of the proposed Order, the "St. Thomas-Related Defendants" include:  Saint Thomas Outpatient Neurosurgical Center, LLC, Howell Allen Clinic A Professional Corporation, John Culclasure, M.D., Debra Schamberg, R.N., Saint Thomas West Hospital Formerly Known As St. Thomas Hospital, Saint Thomas Network, Saint Thomas Health, Ascension Health Alliance, and Ascension Health.

[2] The PSC has also been conferring with Unifirst, which is a named defendant in many or all of the cases in which the St. Thomas defendants are named.  The PSC anticipates establishing a pretrial schedule with Unifirst that will largely track the proposed schedule relating to the St.Thomas-Related Defendants and with the ultimate goal of having all other remaining parties in the St. Thomas cases participate in the bellwether selection process and trial at the same time.

employed to secure the just, speedy, and inexpensive determination of the actions centralized in this proceeding.

- Given the number of fatal, severe, and life-changing injuries at issue in this MDL, and given that some defendants have limited assets and insurance coverage with which to pay for the harm they allegedly caused, the parties must conduct this litigation with particular efficiency and economy.

- The Court and the PSC have expressed an intention that case not in a mediation program – either the program established by this Court or through other private mediation – should be moved through discovery and readied for trial as soon as practicable.

In view of these guiding principles, the proposed Plan seeks to balance the rights and concerns of the impacted parties.  The Plan also seeks to maximize the efficiencies available in MDLs to develop information the parties need in order to assess the potential avenues for resolving the cases – whether through motions, trials, or settlement.

## II.    KEY FEATURES OF THE PROPOSED PLAN[3]

The Plan sets forth in detail the sequence and deadlines for conducting the litigation involving the St. Thomas-Related Defendants.  The table below summarizes the deadlines set forth in the Plan.

---

[3] Plaintiffs provided the proposed Order to St. Thomas-Related Defendants and other defendants on January 24, 2014 and attempted to confer with defendants by telephone on January 29, 2014.  Defendants have not yet provided substantive comments on the PSC's proposal.

| Case Selection Process and Initial Discovery | |
|---|---|
| **EVENT** | **DATE** |
| Defendants to serve initial 26(a) disclosures regarding Common Issues. | 30 days from entry of this Order. |
| Saint Thomas-Related Defendants to provide substantive responses to the Master Discovery served on October 4, 2013. | 30 days from entry of this Order. |
| Plaintiffs naming one or more St. Thomas-Related Defendants to serve completed Plaintiff Profile Forms ("PPF") and medical authorizations. | 60 days from approval of PPF form by the Court. |
| Defendants to notify Plaintiffs of any claimed material deficiencies in the PPFs. | 15 days from receipt of the completed PPF. |
| Plaintiffs to cure any claimed material defect of the PPFs. | 30 days from notification by Defendants of claimed deficiencies. |
| Plaintiffs and Defendants to each select four cases as candidates for initial trials ("Initial Trial Pool Cases"). | 120 days from approval of the form of PPF by the Court. |
| All Case-Specific fact discovery for Initial Trial Pool cases completed. | October 15, 2014. |

| Common Issues Discovery and Common Dispositive Motions | |
|---|---|
| **EVENT** | **DATE** |
| All Common Issue fact discovery for Initial Trial Pool cases completed. | October 15, 2014. |
| Plaintiffs to disclose experts to testify on Common Issues related to Initial Trial Pool Cases. | November 15, 2014. |
| Defendants to disclose experts who will testify on Common Issues related to Initial Trial Pool Cases. | December 15, 2015. |
| Plaintiffs to disclose rebuttal experts who will testify on Common Issues related to Initial Trial Pool Cases. | January 9, 2015. |
| All Common Issue Expert discovery for Initial Trial Pool cases completed. | February 20, 2015. |
| Parties to file submissions as to the order in which the Initial Trial Pool Cases should be tried and/or remanded. | October 22, 2014. |
| **Initial Trial Selections** | |
| **EVENT** | **DATE** |
| Court to designate the first two cases to be tried and/or remanded. | November 5, 2014. |
| Parties to file briefs regarding venue and Lexecon issues. | 10 days from Court's order designating first two cases for trial. |

| First Two Trial Case Picks | |
| --- | --- |
| **EVENT** | **DATE** |
| Plaintiffs to disclose Case-Specific Experts for first two cases for trial. | December 5, 2014. |
| Defendants to disclose Case-Specific Experts for the first two cases for trial. | January 7, 2015. |
| Plaintiffs to disclose rebuttal experts as to Case-Specific issues for the first two cases for trial. | January 28, 2015. |
| All Case-Specific fact and expert discovery as to first two cases for trial completed. | March 10, 2015. |
| Motions in limine, motions to exclude or limit experts, and any dispositive motions, in the First Two Trial Case Picks. | March 24, 2015. |
| Response to motions. | April 21, 2015. |
| Reply to responses. | April 30, 2015. |
| Trial in first case. | May 2015. |
| Trial in second case. | June 2015. |

It is useful to highlight several key features of the plan.  First, the Plan reiterates that discovery by and against parties in cases involving the St. Thomas-Related Defendants is open. Proposed Order, attached to Motion as Exhibit 1, at ¶I.A.  The Plan distinguishes between common and case-specific discovery[4] and sequences discovery to maximize efficiency.[5] Common fact discovery of Defendants would be conducted through  Defendants providing a global set of mandatory initial disclosures regarding common issues,  Proposed Order at ¶I.B., as well as traditional discovery methods, including the Master Discovery requests previously propounded on the St. Thomas-Related Defendants and additional discovery requests and depositions.  *Id.* at ¶I.E.   The parties would also engage in bi-lateral common expert discovery, including providing Rule 26 disclosures and reports, and conducting depositions of experts on common issues.  *Id.* at ¶II.

For all cases against St. Thomas-Related Defendants, Plaintiffs will complete Court-approved Plaintiff Profile Forms ("PPFs") and execute Court-approved authorizations that permit Defendants to obtain specified documents from third parties, such as relevant medical records. *Id.* at ¶I.C.  The plan includes a process for addressing any alleged deficiencies in the completed PPF forms.  *Id.* at ¶I.D.   The PPFs and documents will provide both parties with information to assist the parties in gathering basic information about the individual cases that will enable the parties to select cases for inclusion in the Initial Trial Pool.  The parties will each select four cases to be included in the Initial Trial Pool, resulting in a total of eight Initial Trial Pool cases.

---

[4] The proposed Order provides:
    A "Common Issue" for purposes of this Order means an issue that potentially impacts all or a substantial number of cases against a particular defendant.  Examples of a Common Issue would be the scope and amount of defendants' insurance coverage available to satisfy claims made and or a parent company's liability for a subsidiary company's conduct.  A "Case-Specific Issue" is an issue that impacts a single case or a small number of cases.  An example of a Case-Specific Issue would be the amount of physical harm an individual patient suffered as a result of defendants' wrongdoing or statements made by Defendants to a particular plaintiff.
[5] Manual for Complex Litigation, Fourth ("MCL 4th"), §11.422.

*Id.* at ¶I.F.  Out of that pool, the Court would eventually select the first two bellwether trial cases.

After the eight Initial Trial Pool Cases are selected, the parties would conduct case-specific discovery in those cases only, which would include depositions of parties regarding case-specific issues, and depositions of other treating health care-providers.  *Id.* at ¶I.H.  After case-specific discovery is completed, the parties will propose to the Court the sequence in which the Initial Trial Pool cases should be tried, along with an explanation supporting their proposed trial sequence.  *Id.* at ¶III.A.  The Court would then determine the final sequence in which the cases will be tried.  *Id.* at ¶III.B.

In the first two trial cases only, the parties would conduct case-specific expert discovery, including providing Rule 26 disclosures and reports, as well as depositions on case-specific issues.  *Id.* at ¶IV.  The plan also sets forth deadlines for motions *in limine*, motions to limit expert testimony, and case-specific dispositive motions.  *Id.* at ¶IV.E.  These requirements, as set forth in the Plan, are also represented in the chart below:

|  | PPFs and document authorizations | Common Discovery from Defendants | Case-Specific Fact Discovery | Case-Specific Expert Discovery | Case-Specific Dispositive Motions, Motions in Limine, and Daubert Motions |
|---|---|---|---|---|---|
| All St.Thomas cases | X | X |  |  |  |
| Initial Trial Pool | X | X | X |  |  |
| 1st 2 Trial Cases | X | X | X | X | X |

The two initial trial cases would be tried in the MDL Court in May and June 2015, or remanded to another appropriate venue for trial.  *Id.* at ¶V.A.  Additional bellwether cases would

be set for trial by future case management orders.

## III.   **BELLWETHER TRIALS**

An important feature of the PSC's Plan is selecting and trying bellwether cases.  A "bellwether" case "is selected for trial because it involves facts, claims, or defenses that are similar to the acts, claims, or defenses presented in a wider group of related cases . . . . [B]ellwether trials assist in the maturation of disputes by providing an opportunity for coordinating counsel to organize the products of pretrial common discovery, evaluate the strengths and weaknesses of their arguments and evidence, and understand the risks and costs associated with the litigation."[6]  Bellwether Trials serve the guiding principles of promoting efficient resolution, while conserving scarce resources.  Bellwether trials have been used frequently, with significant success, in many MDLs and can be used efficiently and effectively here.

### A.   **Bellwether Trials Further The Goal Of Securing Just, Speedy, And Inexpensive Determination Of The Actions Centralized In This Proceeding**

#### 1.   **Bellwether Trials Help Move Cases Towards Resolution**

Rule 1 of the Federal Rules of Civil Procedure directs that the rules be employed to secure the just, speedy, and inexpensive determination of the actions centralized in this proceeding.  In the MDL context, this is a statutory command as well as a Rule-based goal.  The MDL statute specifically directs that achieving such efficiencies is a prerequisite to the creation of an MDL.[7]  The Judicial Panel on Multidistrict Litigation centralized these cases because they featured important common questions of fact, and would benefit from coordinated, judicially

---

[6] Eldon E. Fallon, et al, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2325 (June, 2008) (hereafter, "Fallon") (attached to Motion as Ex.2).

[7] *See* 28 U.S.C. § 1407 (prior to centralizations, the Panel must determine that centralization will "promote the just and efficient conduct of such actions.").

controlled discovery.[8]

Trials of these cases may be conducted here as well as elsewhere. Bellwether trials should be carefully selected to inform the parties about the range of issues in these related cases. In the context of modern MDL practice the transferee court "can do more than function as a discovery crucible."[9]   Instead, "by establishing a mechanism for conducting "bellwether" or "representative" trials, the transferee court can enhance and accelerate both the MDL process itself and the global resolutions that often emerge from that process."[10]

As one commentator noted, "MDL judges not only have available to them such traditional settlement–promoting options as mediation and settlement conferences, but an MDL proceeding is often an especially appropriate context for the use of "bellwether trials," in which a small number of representative cases are actually tried with the results of those trials serving as a basis for a settlement of a larger number of cases."[11]

Bellwether trials provide two primary benefits to the parties.  First, bellwether trials provide important information that will enable parties to better evaluate cases for resolution. Second, bellwether trials provide an impetus and mechanism for the parties to distill and to refine massive amounts of information into workable "trial packages" for subsequent trials inside and outside the MDL.[12]

### a.   Bellwether Trials Inform the Settlement Process

Centralized proceedings, in certain circumstances, "may significantly enhance the

---

[8] ECF No. 2 ("All actions share factual questions arising from the alleged contamination of the injectable steroid methyl-prednisolone acetate at the New England Compounding Pharmacy in Framingham, Massachusetts, which allegedly resulted in a multistate outbreak of hundreds of cases of fungal meningitis and other infections.")

[9] Fallon at 2325.

[10] *Id.*

[11] Mark Herrmann, et al, *Statewide Coordinated Proceedings:  State Court Analogs to the Federal MDL Process*, 12 (2d ed. 2004) (hereinafter "Herrmann"), *citing* John F. Nangle, *From the Horse's Mouth:  The Workings of the Judicial Panel on Multidistrict Litigation*, 66 Def. Couns. J. 341, 345 (1999) (excerpt attached to Motion as Ex.3).

[12] *See* Fallon at 2366.

opportunities for settlement."[13]    MDLs provide a "unique opportunity for the negotiation of a global settlement."[14]  Judge Fallon observed that "the centralized forum created by the MDL Panel trial provides a "once-in-a-lifetime" opportunity for the resolution of mass disputes by bringing similarly situated litigants from around the country, and their lawyers, before one judge in one place at one time." [15]  "All of the parties are already in one room; the question simply becomes one of price."[16]

Bellwether trials can further contribute to the important role transferee courts serve in the resolution process.[17]   Observing that the notion that representative trials may enhance prospects for global settlement has achieved general acceptance by both bench and bar.  The Fifth Circuit stated, "[i]f a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the cases as reflected by the jury verdicts."[18]  In other words, bellwether trials help ensure that settlement negotiations do not occur in a vacuum, but rather occur with an "understanding of the litigation that is exponentially more grounded in reality than that which has traditionally persisted in the absence of jury trials."[19]   Bellwether trials can supply the "raw data around which a more fair and equitable settlement compensation system can ultimately be constructed."[20]

### b.    Bellwether Trials Foster the Creation of a Trial Package

Bellwether trials also afford litigants impetus and opportunity to organize and to

---

[13] Herrmann at 11.

[14] MCL 4th, § 20.132.

[15] Fallon at 2340.

[16] Herrmann at 11.

[17] Fallon at 2340-2341.

[18] *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997).

[19] Fallon at 2342.

[20] *Id.*

streamline the massive amounts of information developed during pre-trial discovery.[21]   This

information can be distilled into a "trial package," including various databases of materials

developed during discovery, expert reports, deposition and trial testimony, biographies and

reports on potential witnesses, transferee court rulings and transcripts, and the MDL coordinating

attorneys' work product and strategies with respect to all this material.[22]  In addition to providing

the means through which to develop much of these materials, bellwether trials also provide

opportunities to refine the trial package in view of the experiences gained.  Creation and

refinement of a trial package "ensures that the knowledge acquired by coordinating counsel is

not lost if a global resolution cannot be achieved in the transferee court."[23]

    Bellwether trials, and the resulting trial packages, will also help the parties clarify the

issues for trial and enable the parties to present subsequent trials, in the transferee court or

elsewhere, in a more concise and streamlined manner, thereby reducing the time and expense

associated with subsequent trials.  Finally, "creation of a complete trial package is tangible

evidence that the transferee court's statutory role in overseeing pretrial discovery is nearing an

end and that the dissolution of the MDL is a real possibility," which can further "precipitate

global settlement negotiations."[24]

### 2.    Bellwether Trials In MDLs Have Been Used Successfully To Promote Resolution of Cases By Settlement And Adjudication

    The use of bellwether trials in two recent MDLs involving personal injury and wrongful

death claims is instructive.  First, the *Propulsid* MDL, which was centralized in the Eastern

District Louisiana, involved personal injury and wrongful death claims related to a group of

---

[21] *Id.* at 2338-2339.
[22] *Id.* at 2339.
[23] *Id.*
[24] *Id.* at 2340.

pharmaceuticals prescribed to treat heartburn.[25]  In that MDL, the Court used a bellwether trial

process.[26]  The Court intended to try three bellwether cases.  The first trial resulted in a verdict

for the defendants.[27]  The second bellwether case was disposed of pre-trial by summary

judgment on the ground that the onset of plaintiffs' injuries predated her exposure to the drug at

issue.[28]  The third bellwether case was disposed of by summary judgment after the transferee

court excluded the causation opinions proffered by two of the plaintiff's expert physicians.[29]

On February 2, 2004, the parties announced a settlement of all *Propulsid*-related federal lawsuits.

The settlement process ultimately included several phases, including establishing jointly selected

medical review panels to review claims and to determine compensation for claimants.[30]

     The bellwether trial process was also used successfully in the federal *Vioxx* MDL, which

was also centralized in the Eastern District of Louisiana.[31]  The *Vioxx* MDL included personal

injury and wrongful death claims related to the ingestion of a prescription pain reliever, as well

as economic loss claims brought as individual cases and class actions by health plans,

government entities, and other "third party payors".  The transferee court addressed the personal

injury/death claims first, and conducted six bellwether trials, only one of which resulted in a

verdict favorable to the plaintiff.[32]  The first bellwether trial resulted in a hung jury and was

retried as the second bellwether trial, which resulted in a defense verdict.[33]  After the six

bellwether trials, as well as several state court trials which also served as bellwethers (notably in

---

[25] *In re Propulsid Prods. Liab. Litig.*, MDL No. 1355, 200 WL 35621417 (J.P.M.L. Aug 7, 2000).

[26] Fallon at 2332-2333; *see also* Ex. 4, Minute Entry, *In re Propulsid Prods. Liab. Litig.*, MDL No. 1355 (Aug. 9, 2002 E.D. La.); Ex. 5, Order, *In re Propulsid Prods. Liab. Litig.*, MDL No. 1355 (Aug. 20, 2002 E.D. La.).

[27] Fallon at 2333.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *In re Vioxx Prods. Liab. Litig.*, 360 F.Supp. 2d 1352 (J.P.M.L. 2005); *see also* Ex. 6, Pretrial Order No. 38, *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657 (April 14, 2009 E.D. La.).

[32] Fallon at 2335.

[33] *Id.*

the many cases coordinated before New Jersey state mass tort Judge Carol Higbee), the parties announced a comprehensive settlement process that included federal and state cases.  The settlement was contingent on the participation of a certain percentage of claimants and provided that defendants would pay up to $4.85 billion to eligible claimants.[34]   Other MDL courts have employed the bellwether trial process to organize, prioritize, and frame discovery, and such templates have facilitated comprehensive settlements in these litigations.

     **B.**     **Implementation Of A Bellwether Trial Process Can Be Accomplished In An Efficient, Fair, And Cost-Effective Manner**

Once the determination has been made that bellwether trials will provide significant benefit to the parties and will promote the fair and just resolution of matters centralized in this MDL, the parties and the Court must craft procedures that maximize the effectiveness and efficiencies associated with a bellwether trial process.  Plaintiffs propose that the Court adopt the sequence employed and recommended by other MDL courts: (1) gather data about the individual cases through PPFs and document discovery, which will enable the parties to identify key variables in the gathered data; (2) establish a process for populating a pool of cases from which trial cases will be selected; (3) sequence and schedule discovery in a way that allows the parties and the Court efficiently to marshal resources to best achieve a meaningful resolution process; and (4) select the bellwether trial cases.[35]

     **1.**     **Gathering Data on Relevant Cases**

To be effective, a bellwether trial selection process must be informed by an understanding of the basic facts of the relevant cases within the MDL and the important variables associated with the universe of included cases.[36]   Otherwise, the parties risk trying an anomalous

---

[34] *Id.* at 2336-2337.

[35] *Id.* at 2344-2347.

[36] *See* Fallon at 2344.

case that, although it would yield some valuable information, would not necessarily yield to the type and magnitude of information most globally useful to the parties.  "Rather than attempt to delineate every identifiable variable, the transferee court and the attorneys should focus on the variables that can be easily identified, are substantively important, and provide clear lines of demarcation – i.e. the major variables."[37]  By identifying major variables – that is, the key defining elements of defined sub-groups of cases – the Court and the parties can "create sensible and easily ascertainable groupings by which to categorize the entire MDL, providing manageability and order to what may otherwise appear to be a massive, chaotic conglomeration of loosely analogous cases."[38]   Although there might be many variables at issue in the entire group of cases, the parties should limit the focus to a few of the "most predominant and important issues in the litigation."[39]  In these cases, where the range of differences among the cases is narrow, the operative variables would likely include exposure to NECC-manufactured methylprednisolone acetate and diagnosis of resulting infection.  The PPFs and related document authorizations will provide more than adequate information to parties.

### 2.        Populating The Trial Pool

To use effectively a bellwether trial process, the bellwether cases must be selected from an adequately-sized pool of potential trial cases.[40]  A pool that is too large will inevitably lead to inefficiencies; and a pool that is too small poses the danger that the bellwether cases are not adequately representative.[41]  This raises two questions.  First, how many cases should be included in the trial pool?  Second, how should cases be selected into the trial pool?

---

[37] *Id.* at 2344-2345.
[38] *Id.* at 2345.
[39] *Id.* at 2345-2346.
[40] *Id*. at 2347-2348.
[41] *Id.*

### a.   Size of the Trial Pool

Determining the desired size of the trial pool will depend on a number of factors, including the number of bellwether trials the Court intends to conduct, the number of major variables at issue, and the process it intends to use for the final selection of actual trial cases.[42] Judge Fallon observed that a pool of twenty cases would be sufficient where: the court intended to try six bellwether cases, the parties focused on four or five major variables, and each side of attorneys was given a few strikes or vetoes during the final trial-selection phase.

In the third party payor bellwether phase, as reflected in *Vioxx* Pretrial Order No. 38, Judge Fallon specified a "select, discover, and strike," process to create a bellwether trial pool from the approximately 50 third party payor cases in the MDL"[43].   Judge Fallon ordered each side: 1) to select ten cases for initial discovery exchange; then, based on that information, 2) to select five of the ten cases as lead trial cases for intensive discovery.[44]  Ninety days after selection of the lead trial cases, each side was permitted to strike two of the five cases identified by the opposing side.  The court then determined which, and in what order, the remaining six cases would be tried.[45]  In this litigation, given the more narrow range of cases and the exigencies of the potentially limited funds available to compensate for suffered harm, the parties would suggest a smaller number of cases of cases (eight) be selected for inclusion in the trial pool via the streamlined process outlined in the proposed plan.

### b.   Selection Of Cases For Inclusion In The Initial Trial Pool

Selecting cases for the trial pool can be accomplished by a variety of methods, including random selection, selection by the Court, and selection by the attorneys.  Random selection is not

---

[42] *Id.*

[43] *See* Ex. 6, Pretrial Order No. 38, *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657 (April 14, 2009 E.D. La.).

[44] *Id.*

[45] *Id.*

preferable because there is a significant likelihood that a randomly selected pool would include a number of unrepresentative cases, which would frustrate the bellwether trial process.[46] Selection by the Court has the advantage of having a truly neutral party select cases, but given the number of relevant cases and the imposition on the resources of the Court that such a process would require, Court selection of the initial trial pool cases seems not to be the preferable method here.[47] Selection of trial pool cases by attorneys would likely be the most appropriate method for populating the Initial Trial Pool in this MDL. While there are a variety of permutations on how attorneys can populate the trial pool, Plaintiffs propose that each side selects four cases for inclusion in the initial trial pool, with the intention of creating a pool of representative cases that are viable candidates for selection as among the first two trial cases.

### 3. Trial Venue

To the extent that there is a question of whether this Court is the proper venue for a sufficient number of cases from which to draw a representative trial pool,[48] that issue can be addressed several ways. The parties can and should consider waiving any "*Lexecon*" objections to having this Court conduct a trial of their claims. The Plan provides a deadline by which the parties must make this election. Proposed Order at ¶III.C. Other available methods for addressing the *Lexecon* issue include post-remand transfer by the transferor court back to this Court pursuant to 28 U.S.C. § 1404, or this Court's inter- or intra-circuit appointment to preside over the trial of a case.[49] This Court may arrange to preside over a trial in any of the transferor districts, or obtain the agreement of other judges to try bellwether cases. In short, parties committed to establishing a meaningful bellwether trial process can do so notwithstanding the

---

[46] Fallon at 2348.

[47] *See Id.* at 2348-2349.

[48] *See In re Lexecon v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

[49] 28 U.S.C. § 292 and 28 U.S.C. § 294. *See* MCL, 4th, § 20.132.

hurdles potentially presented by *Lexecon*.

### 4.     Discovery Sequencing

The proposed discovery schedule provides for fact discovery on common issues from defendants and third parties, and through PPFs and document productions related to Plaintiffs. Every procedure has a price tag, and the expert discovery price tag is especially high.  If the case-specific expert work is not confined to only trial cases, assuming case-specific expert discovery costs each side "only" $30,000 to complete  (an unrealistically conservative estimate) each side would spend $3 million in developing case-specific experts in the approximately 100 cases filed against the St. Thomas Related Defendants alone.  It is likely that most of cases outside of the trial pool would not be tried for several years, at the earliest. There is a significant risk that the expert discovery will be stale by trial and one or both parties might seek to re-take the expert discovery, which would be wasteful.  If there is ultimately a global resolution process, there is also a significant likelihood that the expert discovery might never need to be taken in all of those cases.

One significant benefit to the parties of using a bellwether trial process is that they can realize efficiencies by focusing discovery on only those cases that are included in the trial pool.[50] Case-specific expert discovery should proceed only in the cases designated as the first two trial cases, and in subsequent trial cases in accordance with a schedule to be set by future case management orders.  For the non-trial pool cases, the parties can continue conducting discovery by agreement or in exceptional circumstances, with leave of court.  In any event, because experts are not testifying based on memory, but rather based on scientific analysis and documents, postponing expert discovery presents no real danger of memories fading or potential testimony being lost.

---

[50] *See* Fallon at 2360.

     5.    **Trial Selection Process**

As with selecting cases for inclusion in the trial pool, selecting cases for trial can be accomplished through a variety of methods, including random selection, selection by the Court, or selection by the attorneys.  While no process is perfect, Plaintiffs propose that the Court consider the parties' proposed sequence of conducting trials, along with the reasons supporting those proposals.  Ultimately, the Court would determine the trial sequence, including the first two trial cases, from among the Initial Trial Pool cases.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs ask that the Court enter the proposed MDL Order Regarding Initial Bellwether Trial Settings and Pretrial Deadlines for Saint Thomas-Related Defendants.


Dated:  January 31, 2014             Respectfully submitted,

                                **/s/ Thomas M. Sobol**
                                Thomas M. Sobol
                                Kristen Johnson Parker
                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                55 Cambridge Parkway, Suite 301
                                Cambridge, MA  02142
                                Telephone:  (617) 482-3700
                                Facsimile:  (617) 482-3003
                                tom@hbsslaw.com
                                kristenjp@hbsslaw.com

                                *Plaintiffs' Lead Counsel*

Elizabeth J. Cabraser
Mark P. Chalos
Annika K. Martin
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219-2417
Telephone:  615.313.9000
Facsimile:  615.313.9965
ecabraser@lchb.com
mchalos@lchb.com
akmartin@lchb.com

*Federal/State Liaison*

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI  48075
Telephone:  (248) 557-1688
Facsimile:  (248) 557-6344
marc@liptonlawcentercom

Kim Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue, Suite 365
Boston, MA  02116
Telephone:  (617) 933-1265
kdougherty@myadvocates.com

Patrick T. Fennell
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, VA  24016
Telephone:  (540) 342-2000
pfennel@crandalllaw.com

Mark Zamora
ZAMORA FIRM
6 Concourse Way, 22nd Floor
Atlanta, GA  30328
Telephone:  (404) 451-7781
Facsimile:  (404) 506-9223
marc@markzamora.com

J. Gerard Stranch, IV
Benjamin A. Gastel
BRANSETTER, STRANCH & JENNINGS
PLLC
227 Second Avenue North
Nashville, TN  37201
Telephone:  (615) 254-8801
Facsimile:  (615) 255-5419
gerards@branstetterlaw.com
beng@branstetterlaw.com

*Plaintiffs' Steering Committee*

<u>**CERTIFICATE OF SERVICE**</u>

I, Thomas M. Sobol, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated: January 31, 2014

<u>**/s/ Thomas M. Sobol**</u>
Thomas M. Sobol, BBO # 471770