# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC.  PRODUCTS LIABILITY LITIGATION | MDL No. 2419<br><br>Dkt. No. 1:13-md-2419 (FDS) |
| THIS DOCUMENT RELATES TO:<br>All Actions | |

**PLAINTIFFS' STEERING COMMITTEE'S REPLY IN**
**SUPPORT OF MOTION FOR ENTRY OF COMMON BENEFIT ORDER**

## I.        INTRODUCTION

The Plaintiffs' Steering Committee ("PSC") respectfully files this reply to address three issues raised by the responses to the PSC's Motion for Entry of Common Benefit Order.[1]  First, the PSC's motion merely asks this Court to segregate, as an initial hold back, a percentage of any funds payable to tort claimants who have filed claims in the MDL or are otherwise beneficiaries of the common benefit work done in this litigation.  The held back funds would be placed in escrow, and would only be distributed by express order of this Court after all interested parties have an opportunity to be heard on (and, potentially, object to) distribution at some future time. The Motion does not address who is entitled to these funds, under what criteria, or how the funds will ultimately be distributed.  The PSC is committed to a fair and inclusive process if and when it comes time for the Court to distribute any common benefit funds.  But any request to address the issue of entitlement to these funds now is premature and unnecessary.

Second, as to the manner in which the segregation of these funds is accomplished, the PSC does not take a position, but does point out the possible alternatives for the Court's

---

[1] Limited Objections filed by the Chapter 11 Trustee of the New England Compounding Pharmacy, Inc. ("Trustee Br.") (Dkt. No. 834), Limited Objections filed by the Official Committee of Unsecured Creditors ("OCC Br.") (Dkt. No. 833), Response Filed by Certain Members of the Official Committee of Unsecured Creditors ("Members' Br.") (Dkt. No. 830), Opposition Filed by Plaintiffs Dale and Allison Devilli (Dkt. No. 836), and Response of Interested Plaintiffs' Counsel (Dkt. No. 839).

consideration.  The PSC does not seek to "seize or otherwise interfere with property of the NECC estate without the required leave of the bankruptcy court" *see, e.g.,* OCC Br. at p. 2, ¶ 2; rather, the PSC merely seeks to segregate these funds in the most efficient manner.

Third, the OCC's request – echoed by some members of the OCC – that the Court declare that members of the OCC are entitled to payment of common benefit fees in the MDL for work done in their role as members of the OCC is antithetical to both the law and the policy of the United States Trustee.  The express provisions of the bankruptcy code prohibit OCC members from obtaining payment of fees by their individual attorneys.  The United States Trustee informed each applicant to the OCC of this fact before appointing them to the creditor's committee.

The PSC does not object to members of the OCC applying for reimbursement for their efforts in the MDL litigation that adhere to this Court's established procedures for reporting common benefit work.  But the OCC members' request that they be exempt from the requirements of MDL Order No. 3 regarding eligibility for common benefit work should be denied.  This Court established procedures, set forth in MDL Order No. 3, intended to ensure that this litigation is conducted efficiently, with the goal of maximizing funds available to NECC's victims.  To achieve this end, common benefit work must be performed in an orderly and coordinated fashion –without needless duplication of effort.  The procedures adopted by the Court apply, of course, not only to OCC members but to all lawyers, including PSC members and designees.  They ensure efficiency and maximize victim recovery and should be strictly enforced, not abandoned.

## II.      FACTUAL BACKGROUND

On February 12, 2013, the Judicial Panel on Multidistrict Litigation issued its Transfer Order centralizing all actions pending in federal court related to injuries arising from the alleged contamination of drugs compounded at New England Compounding Pharmacy in this Court for coordinated or consolidated pre-trial proceedings.

In its April 9, 2013, MDL Order No. 2 (Dkt. No. 82), this Court appointed Plaintiffs' Lead Counsel and a Plaintiffs' Steering Committee.  These counsel have spearheaded the MDL litigation for the common benefit of all Plaintiffs.  Given the potentially limited-fund nature of this case, and the desire to maximize the amount of recovery for victims, the PSC made it its mission to limit fees and expenses and run a streamlined litigation.[2]

In its April 11, 2013, MDL Order No. 3 (Dkt. No. 85), this Court authorized Lead Counsel to establish a bank account for the collection and deposit of assessments into a Common Benefit Fund.  MDL Order No. 3 also set out the standards and procedures to apply to all activities and expenses incurred by counsel that relate to matters common to all claimants and requires that all claims for time and expenses for common benefit work must be authorized by Lead Counsel.  It also requires that any counsel who intends to seek fees from a common benefit fund submit their time and expenses to Lead Counsel on a monthly basis.   These procedures apply to all plaintiffs' counsel, including PSC members and the PSC's designees.

In the ten months since entry of MDL Order No. 3, Lead Counsel, members of the PSC, and others have engaged in intensive and sustained activity, including extensive fact investigation, informing and coordinating activities among claimants nationwide, engaging in motion practice, establishing a Court-sanctioned mediation program, drafting and filing a Master Complaint and Short Form Complaints, and conducting formal discovery against over 70 clinics and other national defendants.

On January 17, 2014, Lead Counsel and the PSC filed its motion seeking establishment of an assessment procedure by which a percentage assessment would be held back from every recovery in MDL No. 2419 and, by agreement, those parties not in the MDL who choose to participate.[3]  Various parties made limited objections or otherwise responded.[4]

---

[2] *See* Feb. 27, 2013, Letter to Court re Proposed Plaintiffs' Structure [ECF No. 20]; Mar. 19, 2013, Proposal for PSC Slate [ECF No. 64].

[3] Motion for Entry of Case Management Order Establishing Assessment Procedures to Fund Common Benefit Account (the "Motion") (Dkt. No.790).

[4] *See* n.1, *supra*.

### III.    ARGUMENT

**A.    The Court need not decide, now, what common benefit work is compensable.**

It is premature for the Court to consider whether any attorney's efforts are compensable at this juncture.  The question of who, if anyone, is entitled to recover common benefit time and expense reimbursement is not before the Court.  All interested parties will have an opportunity to be heard on those subjects at the appropriate time.  The PSC's proposal is simply to establish a percentage amount to be held back from payment of claims, or any settlement, to form a fund from which the Court may order, at the appropriate time, that funds be allocated as compensation for common benefit efforts.  There is no motion pending at this time that would direct any funds be paid as compensation or reimbursement to anyone.  Nor is such an order necessary.

**B.    Application of the holdback to funds of the bankruptcy estate.**

Responses to the Motion question the correct procedural mechanism to accomplish the sequestration of common benefit funds, and whether it is appropriate to levy a common benefit assessment on funds paid pursuant to a Chapter 11 bankruptcy plan.  The expressed concern is that imposition of a holdback on funds in the bankruptcy estate might assess monies other than those to be paid to tort plaintiffs.[5]

The PSC sees three possible procedural mechanisms through which the Court might accomplish the sequestration of common benefit funds.  First, the Court could require that a percentage of the funds to be paid into the bankruptcy estate pursuant to any settlement with NECC Affiliated Defendants (or others) be set aside in a common benefit fund.  Second, the Court could require the claims of attorneys in the MDL who are or may become entitled to payment of fees from a common benefit fund be recognized as a valid claim in the bankruptcy

---

[5] The PSC does not seek to levy an assessment on payments from the bankruptcy estate to non-tort creditors – a position communicated to the Trustee as well as counsel for the OCC prior to their filing of oppositions to the Motion.  By e-mail exchange dated January 27, 2014 Lead Counsel explained to counsel for the OCC that any hold-back was intended to apply only to tort-creditors of the bankruptcy estate.  This same position was communicated to the Trustee in an e-mail exchange with Lead Counsel on January 28, 2014.

proceedings itself and paid in due course into a common benefit account.[6]  The final possibility is that if there is a tort trust created as part of an approved bankruptcy plan, the Court require that a percentage of those funds be set aside and paid into a common benefit account for later distribution.

The PSC's proposed common benefit order simply seeks to ensure that a small percentage of the funds is segregated for a later payment of common benefit attorney's fees and costs by this Court.  The first option would appear to be most efficient in accomplishing this goal as there has been no settlement agreement yet signed with NECC affiliated entities or individuals, no bankruptcy plan presented for confirmation and no bankruptcy plan yet confirmed.  However, the PSC takes no position with respect to which of these mechanisms is ultimately most appropriate and leaves that to the discretion of the Court.

### C.   Members of the OCC are not entitled to reimbursement of attorney's fees for counsel retained to represent them individually.

Members of the OCC are not entitled to reimbursement of attorney's fees for the separate attorneys they hired to represent their individual interests in the bankruptcy proceedings.

The Bankruptcy Code allows the OCC to employ professionals, such as attorneys, to perform work on behalf of the committee as a whole.[7]  The Code further provides that the OCC may recover from the bankruptcy estate reimbursement of reasonable attorney's fees for such counsel employed by the committee as a whole.[8]  Here, the OCC has retained Brown Rudnick as counsel for the committee as a whole, and thus the OCC may recover reimbursement for attorney's fees charged by Brown Rudnick from the estate, provided they are found "reasonable."

---

[6] In an abundance of caution, on January 14, 2014 Lead Counsel filed a Proof of Claim with the claims administrator appointed in the NECC bankruptcy proceedings on behalf of "all counsel who are or may become entitled to payment of common benefit fees by order of Judge Saylor in MDL No. 2419."  A copy of that Proof of Claim is attached hereto as Exhibit A.

[7] 11 U.S.C. § 1103(a).

[8] 11 U.S.C. § 503(b)(4).

The Bankruptcy Code does not provide for recovery by individual members of the OCC for fees generated by their own separate counsel.  The Code specifically excludes individual committee members from the list of those who may receive reimbursement for attorney's fees under § 503(b)(4).  That exclusion was intended by Congress.[9]  This is because there is typically no need for individual members of a committee to have separate counsel in addition to the counsel employed by the committee as a whole.  Such a situation creates a risk of duplicative legal work and conflicts of interest.[10]

The fact that the attorney fees of individual attorneys acting in their role as counsel for members of the OCC are non-reimbursable was clearly communicated to potential members of the OCC by the Office of the United States Trustee.  In the very correspondence soliciting parties interested in serving on the OCC, the United States Trustee indicated that while actual expenses of individual committee members may be reimbursed, this "does not include[e] the professional fees of its individual counsel which is specifically prohibited under the Bankruptcy Code."[11]

---

[9] *See, e.g., In re FirstPlus Fin., Inc*., 254 B.R. 888, 894 (Bankr. N.D. Tex. 2000) (finding legislative history showed Congress did not intend to allow every member of the committee to be reimbursed for his or her individually hired attorney as an administrative expense from the estate).

[10] *See*, *e.g., In re FirstPlus*, 254 B.R. at 894 (holding § 503(b)(3)(F) did not include reimbursement of fees of counsel for each individual member of the committee in addition to those of the committee's counsel where creditor's attorney, in essence, served as a substitute for the committee member, because legal services often duplicated the efforts of the committee's attorneys, the situation was ripe for a conflict of interest between the creditor's attorney and the committee's counsel, and the fees were not necessary or justified because the services were only of value to the creditor and were of no value to the estate and the other creditors); *In re Worldwide Direct, Inc.*, 259 B.R. 56 (Bankr. D. Del. 2001) (a committee member was denied compensation for the cost of its separate counsel after the court found such expense was not necessary for the committee member to perform the member's duties); *In re S & T Indus., Inc*. 63 BR 656 (Bankr. W.D. Ky) (holding creditor was not entitled under § 503(b)(3)(D) to legal fees and related expenses it incurred during service on unsecured creditors' committee where creditor failed to obtain prior court approval for employment of their attorney).

[11] *See* January 3, 2013 Letter from Office of the United States Trustee soliciting interest for serving on OCC, attached hereto as Exhibit B, p. 2.

**D.      The rules governing common benefit work should apply to all lawyers seeking compensation.**

While counsel for OCC members cannot recover for work done in their role as counsel for members of the OCC, they could recover for work done for the common benefit in the MDL that is done pursuant to MDL Order #3.

MDL Order No. 3, entered after the Court considered briefing and heard argument, sets out a mechanism for the efficient conduct of this case.  It is consistent with Fed. R. Civ. P. 1's mandate that the Rules be administered to secure "the just, speedy, and inexpensive determination of every action and proceeding."  With regard to common benefit time and expenses, order states:

1.  These standards and procedures are intended to apply to all activities performed and expenses incurred by counsel that relate to matters common to all claimants in this litigation.  *Any* claimants' counsel who seeks reimbursement or compensation for common-benefit time and expenses (including any state-court counsel) shall comply with these guidelines and any submission by such counsel shall be in accordance with this order.

2.  *All claims for time and expenses submitted must be incurred only for work authorized in advance by the Lead Counsel.*  Prior to the appointment of Lead Counsel, such work may only be authorized by Lead Counsel or the Court.

3.  Counsel who intend to seek reimbursement shall submit time and expense reports to Lead Counsel monthly.  These reports shall include both time and expenses and should summarize, with back-up detail, the submissions of all firms.[12]

The PSC's proposed Order Establishing Assessment Procedures to Fund Common Benefit Account incorporates this fundamental principle:

This Order is entered pursuant to this Court's April 9, 2013 Order Appointing Lead Counsel, Federal-State Liaison Counsel, and Plaintiffs' Steering Committee (MDL Order No. 2, Dkt. No. 82) and

---

[12] MDL Order No. 3, dated April 11, 2013, at sec. 2.A.1-3. (Dkt. No. 85) (emphasis added).

> April 11, 2013 Order Concerning Sharing and Funding of Plaintiffs'
> Pretrial Expenses and Costs (MDL Order No. 3, Dkt. No. 85) to
> establish a reasonable prospective contingent assessment of eight
> percent (8%) upon recoveries on Plaintiffs' claims in or related to this
> litigation, and to provide a procedure for the fair and equitable sharing
> among Plaintiffs of the cost of services performed and expenses
> incurred by Lead Counsel and the Plaintiffs' Steering Committee
> (collectively, "PSC") and other attorneys designated by that Order
> acting for the MDL administration and common benefit of all
> plaintiffs in this complex litigation ("Designated Counsel").[13]

Consistent with the PSC's proposed order, Lead Counsel and the PSC do not object to any lawyer, including members of the OCC, seeking reimbursement for work performed that is in conformity with MDL Order No. 3 and which inures to the common benefit of all claimants (as opposed to work performed in furtherance of the interests of the OCC itself).  The terms of MDL Order No. 3 apply to all plaintiffs' lawyers, including PSC members and their designees.  But, for an attorney to have an expectation of compensation, that common benefit work must be coordinated and approved by Lead Counsel.

The June 6, 2013 letter agreement the OCC and some members of the OCC cite in their papers in no way suggests an agreement that lawyers may be compensated for common benefit work outside of the Court's established rules.  In recognition that there are talented and dedicated attorneys on the OCC, Lead Counsel entered into the June 6, 2013 letter agreement with the understanding that some members of the OCC may be called on to do work in the MDL that is non-duplicative and that inures to the common benefit of all claimants.  The letter, and attached draft proposed case management order, are consistent with MDL Order No. 3 which was entered almost two months before the letter agreement.  The proposed CMO attached to the letter states:

> Common Fund participants *may* include members of the Plaintiffs'
> Steering Committee and any lawyer performing services for the
> benefit of multiple tort victims on reasonable terms, including work
> connected to resolution pursuant to a chapter 11 plan in the Chapter 11
> Case, whose common benefit work is made available to the Plaintiffs'
> Steering Committee and the Official Committee.  Common Fund

---

[13] Proposed Common Benefit Order (emphasis added).

participants *may* include member representatives serving on the
Official Committee, to the extent the services they perform are for the
common benefit of multiple tort victims.[14]

Nowhere in the June 6, 2013 letter or the proposed CMO attached to that letter is there an agreement that members of the OCC could operate independently of the PSC – with the attendant risk of duplication of efforts and cumulative work – and expect compensation for that work.  The letter agreement was never intended to create an expectation of reimbursement among OCC members for common benefit work not coordinated or approved by Lead Counsel – either beforehand or *nunc pro tunc* – in a manner that would circumvent orders of this Court meant to avoid duplication of effort and preserve limited funds for NECC's victims.

### E.   The proposed holdback amount of 8% is appropriate.

Certain responses suggest that an 8% holdback is not consistent with the amount held back in other MDLs or is not justified here.  While the PSC acknowledges that 8% is at the higher side of assessment amounts, the hold back is justified here for several reasons.  First, the amount is within the range of assessments in other large MDLs.[15]

Second, the amount sought is merely a hold back – that is, the PSC is not suggesting that the final amount of common benefit time and expense reimbursements will consume the full amount of the hold back.  Any funds above the amount ultimately approved by the Court for common benefit time and expense reimbursements will be refunded to claimants.  This was precisely the circumstance in *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, where 3% of the initial 9% holdback was returned to claimants once it was

---

[14] *See* Limited Objection of the OCC at Ex. A (Dkt. No. 833-1) (emphasis added).

[15] *See, e.g., In re Fosamax Prods. Liab. Litig.*, MDL 1789, No. 1:06-md-1789 (S.D.N.Y. Apr. 28, 2011) (approving 9% assessment) (Order attached as Exhibit C; *In re Genetically Modified Rice Litig.*, No. 4:06 MD 1811, 2010 U.S. Dist. LEXIS 19168 (E.D. Mo.) (approving 11% assessment); *In re Diet Drugs*, 582 F.3d at 554 (initially 9% held back, later lowered to 6%); *Turner v. Murphy Oil USA, Inc.*, 422 F. Supp. 2d 676 (E.D. La. 2006) (approving 12% assessment); *In re MGM Grand Hotel Fire Litig.* (MDL No. 453), 660 F. Supp. 522 (D. Nev. 1987) (approving 7% assessment); *see also* William B. Rubenstein, "*On What a 'Common Benefit Fee' Is, Is Not, and Should Be,*" 3 Class Action Attorney Fee Digest 87, 92-93 (March 2009) (hereinafter "Rubenstein") (attached hereto as Exhibit D).

determined that the funds held back were more than adequate to compensate common benefit counsel. 582 F.3d 524, 534 n.17 (3d Cir. Pa. 2009).

Third, the number of claimants in this MDL, while significant, is lower than in many MDLs.  For example, in the *Diet Drugs* MDL, over 105,000 plaintiffs filed lawsuits, and over 35,000 plaintiffs' cases were transferred to the MDL; similarly the *Vioxx* and *Zyprexa* MDLs both consolidated tens of thousands of cases filed in state and federal court.[16]  Given that almost all defendants except for the entities and individuals related to NECC, have opted, so far, not to participate in the Court-established mediation program, the amount of common benefit work and expenses may be considerable.  Where the number of claimants is in the hundreds, rather than in the tens of thousands, a larger amount is required to be held back initially to ensure there will be sufficient funds to compensate lawyers expending time and advancing expenses for the common benefit of litigants– albeit, at a greatly reduced rate.

This is, again, a motion for holdback only.  The amount, if any, actually allocated to counsel for common benefit work requires much thought (and briefing) and is a decision for another day.

### IV.    CONCLUSION

For the foregoing reasons, the PSC requests that the Court grant the PSC's Motion for Entry of Case Management Order Establishing Assessment Procedures to Fund Common Benefit Account and the Proposed Revised Order filed herewith.


Dated:  February 6, 2014             Respectfully submitted,


                                     By:  /s/ *Thomas M. Sobol*
                                          Thomas M. Sobol

                                     Thomas M. Sobol
                                     Kristen Johnson Parker
                                     HAGENS BERMAN SOBOL SHAPIRO LLP

---

[16] *See* Rubenstein.

55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Telephone:  (617) 482-3700
Facsimile:  (617) 482-3003
tom@hbsslaw.com
kristenjp@hbsslaw.com

*Plaintiffs' Lead Counsel*

Elizabeth J. Cabraser
Mark P. Chalos
Annika K. Martin
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219
Telephone:  (615) 313-9000
Facsimile:  (615) 313-9965
ecabraser@lchb.com
mchalos@lchb.com
akmartin@lchb.com

*Federal/State Liaison*

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI  48075
Telephone:  (248) 557-1688
Facsimile:  (248) 557-6344
marc@liptonlawcentercom

Kim Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue
Suite 365
Boston, MA  02116
Telephone:  (617) 933-1265
kdougherty@myadvocates.com

Patrick T. Fennell
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, VA  24016
Telephone:  (540) 342-2000
pfennel@crandalllaw.com

Mark Zamora
ZAMORA FIRM
6 Concourse Way, 22nd Floor
Atlanta, GA  30328
Telephone:  (404) 451-7781
Facsimile:  (404) 506-9223
marc@markzamora.com

J. Gerard Stranch, IV
Benjamin A. Gastel
BRANSETTER, STRANCH & JENNINGS PLLC
227 Second Avenue North
Nashville, TN  37201
Telephone:  (615) 254-8801
Facsimile:  (615) 255-5419
gerards@branstetterlaw.com

*Plaintiffs' Steering Committee*

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas Sobol, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on February 6, 2014.

Dated: February 6, 2014                    */s/ Thomas M. Sobol*
                                                        Thomas M. Sobol

# EXHIBIT A

B 10 (Official Form 10) (12/12)

| UNITED STATES BANKRUPTCY COURT  DISTRICT OF MASSACHUSETTS | PROOF OF CLAIM |
|---|---|

| Name of Debtor: <br><br>**NEW ENGLAND COMPOUNDING PHARMACY, INC., d/b/a NEW ENGLAND COMPOUNDING CENTER** <br><br>**TAX ID. NO. 04-3407495** | Case Number: <br><br>**12-19882-HJB** |
|---|---|

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Thomas M. Sobol, lead counsel, on behalf of all legal counsel who are or may become entitled to payment of fees in MDL No. 2419

Name and address where notices should be sent:

  Thomas M. Sobol, Esq., Lead Counsel, MDL No. 2419
  Hagens Berman Sobol Shapiro LLP
  55 Cambridge Parkway, Suite 301, Cambridge, MA 02142

Telephone number: 617-482-3700 email: Tom@hbsslaw.com

Name and address where payment should be sent (if different from above):

Telephone number:        email:

**COURT USE ONLY**

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number:
  *(If known)*

Filed on:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**   $ in excess of $75,000.00

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** See MDL Order No. 3 (attached) contemplating a contingent assessment for
*(See instruction #2)* common benefit work upon recovery of claims stemming from injuries due to injection of contaminated NECC products.

**3. Last four digits of any number by which creditor identifies debtor:** _____

| 3a. Debtor may have scheduled account as: <br> N/A <br> *(See instruction #3a)* | 3b. Uniform Claim Identifier (optional): <br> N/A <br> *(See instruction #3b)* |
|---|---|

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate ☐ Motor Vehicle ☐ Other
**Describe:**

**Value of Property:** $ _____

**Annual Interest Rate** _____% ☐ Fixed or ☐ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:

$ _____

**Basis for perfection:** _____

**Amount of Secured Claim:** $ _____

**Amount Unsecured:** $ _____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(____).

**Amount entitled to priority:**

$ _____

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

RECEIVED
2014 JAN 15 PM 2:18
US BANKRUPTCY COURT/DA

B 10 (Official Form 10) (12/12)                                                                                                    2

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:  N/A

---

**8. Signature:** (See instruction #8)

Check the appropriate box.

[✓] I am the creditor.   [✓] I am the creditor's authorized agent.   [ ] I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)   [ ] I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim and in the attached "PITWD Addendum" (if required and submitted) is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:   Thomas M. Sobol, Lead Counsel, MDL No. 2419
Title:   Claimant*
Company:   Hagens Berman Sobol Shapiro LLP
Address and telephone number (if different from notice address above):
[add address here and phone number, NOT email]

_____          (Signature)                          Janmy 14, 2014
_____                                                      (Date)

Telephone number:                        email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

**INSTRUCTIONS FOR PROOF OF CLAIM FORM**

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*
*Items to be completed in Proof of Claim form*

*IF YOU ARE ASSERTING A CLAIM FOR PERSONAL INJURY, PLEASE COMPLETE, SIGN AND RETURN THE ENCLOSED CONFIDENTIAL PERSONAL INJURY OR WRONGFUL DEATH CLAIM INFORMATION FORM (THE "PITWD ADDENDUM"). DO NOT INCLUDE ANY MEDICAL INFORMATION IN YOUR ANSWERS TO THE QUESTIONS ON THIS FORM. INSTEAD INCLUDE PRIVATE MEDICAL INFORMATION ONLY IN YOUR ANSWERS TO THE QUESTIONS IN THE PITWD ADDENDUM*

---

    *See MDL Order No. 3, contemplating a contingent assessment for common benefit work upon recovery of claims stemming from injuries due to injection of contaminated NECC products.  A copy of MDL Order No. 3 is attached hereto. The claim is on behalf of all counsel who are or may become entitled to payment of common benefit fees by order of Judge Saylor in MDL No. 2419, Master Docket No.12-md-2419-FDS.

B 10 (Official Form 10) (12/12)                                                                                                          3

| | |
|---|---|
| **Court, Name of Debtor, and Case Number:**<br>Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.<br><br>**Creditor's Name and Address:**<br>Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).<br><br>**1. Amount of Claim as of Date Case Filed:**<br>State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.<br><br>**2. Basis for Claim:**<br>State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.<br><br>**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**<br>State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.<br><br>**3a. Debtor May Have Scheduled Account As:**<br>Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.<br><br>**3b. Uniform Claim Identifier:**<br>If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.<br><br>**4. Secured Claim:**<br>Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of | lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.<br><br>**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**<br>If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.<br><br>**6. Credits:**<br>An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>**7. Documents:**<br>Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.<br><br>**8. Date and Signature:**<br>The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.<br><br>***SUBMIT CLAIM TO DONLIN, RECANO & CO. IN ACCORDANCE WITH ENCLOSED INSTRUCTIONS*** |

_____**DEFINITIONS**_____                                                    _____**INFORMATION**_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing.

**Secured Claim Under 11 U.S.C. § 506 (a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507 (a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the claims agent's website (www.donlinrecano.com/necp) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claim. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE:  NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | MDL No. 1:13-md-2419-FDS |
| This Document Relates To: | |
| All Actions | |

## MDL Order No. 3
April 11, 2013

### ORDER CONCERNING SHARING AND FUNDING OF PLAINTIFFS' PRETRIAL EXPENSES AND COSTS

This order is intended to create a structure for plaintiffs' counsel to share and fund discovery and pretrial expenses and costs in connection with this litigation.

1.   **Common Benefit Fees, Costs, and Assessments.**

The Plaintiffs' Steering Committee ("PSC") created by MDL No. 2 shall be responsible, in the first instance, for funding common discovery and pretrial costs as may be necessary and appropriate.  To do so, the PSC may request contributions from other firms or individual plaintiffs' counsel.  As soon as practicable, based upon the PSC's evaluation of the particular circumstances of this litigation, the PSC shall submit a proposal for any reasonable prospective contingent assessment upon recoveries on the claims comprising this litigation.  Such proposal will be subject to court approval (after notice and opportunity to be heard from all stakeholders) and will be implemented under the equitable principles of the common-benefit doctrine, commensurate with the benefits of economy, efficiency, and value actually conferred upon the

3.      Counsel who intends to seek reimbursement shall submit time and expense reports to Lead Counsel monthly.  These reports should include both time and expenses and should summarize, with back-up detail, the submissions of all firms.

4.      Lead Counsel is authorized to establish on behalf of the PSC one or more bank accounts for the collection and deposit of assessments and for the payment of Shared Costs as defined herein, as well as any other such functions as may be necessary and appropriate.  Any bank statements concerning such accounts shall be periodically provided to, and reviewed by, the PSC.

5.      Submission of a claim for reimbursement shall constitute a representation by the named counsel that the time and expenses are accurately reported.

**B.      Time Reporting**

1.      Only time spent on matters common to all claimants in this litigation will be considered in determining fees.  No time spent on developing or processing any case for an individual claimant should be submitted, unless the case is specifically determined by the PSC or the Court to be a "common-benefit case" (for example, a "test case" or "bellwether" case), as set forth below.

2.      All time should be recorded on a daily basis.  The failure to maintain such records, as well as insufficient description of the activity, may result in a loss of fees.

C.     **Expense Reporting**

1.     All costs will be deemed as either "Shared Costs" or "Held Costs."

    a.     Shared Costs are costs that will be paid out of a separate PSC

        account to be established and administered by Lead Counsel, to be

        funded by all members of the PSC and others as determined by the

        PSC (and agreed by such other counsel).

    b.     Held Costs are those that will be carried by each attorney

        representing a client in this litigation, and reimbursed as and when

        determined by the PSC.

D.     **Shared Costs**

1.     Shared Costs are costs incurred for the common benefit of the MDL

    plaintiffs as a whole.  No individual client-related costs shall be

    considered as Shared Costs, unless the case is determined by the PSC or

    the Court to be a "common-benefit case."  All costs of a substantial nature

    that meet these requirements and fall under the following categories shall

    be considered Shared Costs and qualify to be submitted and paid directly

    from the Shared Costs account.  All Shared Costs must be approved by

    Lead Counsel prior to being incurred and prior to payment.

2.     Lead Counsel shall prepare and be responsible for distributing to the

    appropriate plaintiffs' counsel and the PSC reimbursement procedures and

    any associated forms.  Request for payments should include sufficient

    information to allow Lead Counsel to account properly for costs and to

provide adequate detail to the Court.  All requests shall be subject to review and approval by Lead Counsel.

**E.    Held Costs**

1.    Held Costs are costs incurred for the global benefit of the MDL plaintiffs. Held Costs are those that do not qualify as Shared Costs, but are incurred for the benefit of all plaintiffs in general.  No specific client-related costs can be considered as Held Costs, unless the case is determined by the PSC or the Court to be a "common-benefit case."  Time spent on such a case shall be reported in a separate expense submission.  All costs of a substantial nature that meet these requirements and fall under the following categories shall be considered Held Costs and qualify to be submitted for consideration by the PSC and the Court for future reimbursement.

a.    faxes;

b.    postage, shipping, courier, and certified mail;

c.    printing and photocopying (in-house);

d.    computerized research - Lexis/Westlaw;

e.    telephone - long distance (actual charges only); and

f.    travel, pursuant to travel limitations set forth below, including travel for attorney to attend depositions, court or legislative matters:

(1)    airfare

5

(2)     reasonable ground transportation

(3)     hotel

(4)     reasonable meals and entertainment

(5)     reasonable other (parking)

(6)     car rental, cabs, etc.

(7)     secretarial and clerical overtime

2.      The PSC shall propose expense limitations and guidelines for use by all

plaintiffs' counsel.  Lead Counsel may establish forms and procedures to

implement and carry out the time and expense submissions required by the

Court and necessary to compile and maintain the records.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: April 11, 2013

# EXHIBIT B



**U.S. Department of Justice**

Office for United States Trustees
*Districts of Maine, Massachusetts,
New Hampshire and Rhode Island*

*John P. McCormack Post Office and Courthouse
5 Post Office Square, Suite 1000
Boston, MA 02109-3934
Phone: 617-788-0400
Fax: 617-565-6368*

January 3, 2013

RE:   **SOLICITATION OF INTEREST FOR SERVING ON AN UNSECURED
CREDITORS' COMMITTEE AND/OR TORT CLAIMANTS' COMMITTEE**

**New England Compounding Pharmacy, Inc., Chapter 11 Case No. 12-19882-HJB
United States Bankruptcy Court for the District of Massachusetts**

Dear Creditor or Claimant:

The above named debtor filed for reorganization under chapter 11 of the Bankruptcy
Code and has identified you as one of their largest creditors or as a potential claim holder (or
representative of same). The Bankruptcy Code requires the United States Trustee to appoint a
committee of unsecured creditors to participate in the case and to represent the interests of all
unsecured creditors, if there is sufficient interest, or such other committees as appropriate.

If you are willing to serve on a committee, please complete the enclosed questionnaire
and return it to the Office of the United States Trustee at your earliest convenience but no later
than **JANUARY 16, 2013**. Return of the questionnaire, however, does not guarantee
appointment to a committee – only that you will be considered by the United States Trustee for
appointment to a committee, if the United States Trustee decides to appoint one.

Please take this opportunity to consider serving on a committee. The members of a
committee act on behalf of all similarly situated creditors or claimants. Under the Bankruptcy
Code, committees have the right to demand that the debtor consult with the committee prior to
making major decisions or changes, to request the appointment of a trustee or examiner, to
participate in the formation of a plan of reorganization, and in some cases, to propose its own
plan of reorganization. If appropriate, committees may request that the Bankruptcy Court
convert a chapter 11 case to one under chapter 7, at which time the debtor's operations would
cease and its assets would be liquidated.

We will have a meeting for purposes of forming a committee(s) on **FRIDAY,
JANUARY 18, 2013 AT 10:00 A.M.** at the **Office of the United States Trustee, John W.
McCormack Post Office and Courthouse, 5 Post Office Square, Suite 1000, Boston, MA.** If,
however, a sufficient number of creditors do not elect to serve on the committee, a committee
may not be formed, and these rights may go unexercised.

Official committees are authorized by the Bankruptcy Code, subject to court approval, to
select and employ an attorney and other necessary professionals. Fees of professionals

January 3, 2013
Page 2

employed by committees may be paid from available assets, if any, of the bankruptcy estate after court approval. Further, actual expenses of committee members (not including the professional fees of its individual counsel which is specifically prohibited under the Bankruptcy Code) may be reimbursed from available estate assets.

Thank you for your assistance, and we hope that you will choose to participate.

Sincerely,

WILLIAM K. HARRINGTON
United States Trustee, Region 1

By:     */s/ Jennifer L Hertz*
Trial Attorney
Jennifer.L.Hertz@USDOJ.gov

Attachments
(questionnaire and information sheet)

### Official Committee of Unsecured Creditors' Committee
### Information Sheet

**Purpose of Unsecured Creditors' Committees.**  To increase participation in the chapter 11 proceeding, section 1102 of the Bankruptcy Code requires that the United States Trustee appoint a committee of unsecured creditors (the "Committee") as soon as practicable after the order for relief has been entered.  The Committee ordinarily consists of the persons, willing to serve, who hold the seven largest unsecured claims of the kinds represented on such committee. The debtor has filed a list indicating that your claim may be among the largest unsecured claims against the debtor, and for that reason, you may be eligible to serve on the Committee. Generally, there must be at least three unsecured creditors willing to serve in order to form a Committee.

**Powers and Duties of Unsecured Creditors' Committees.**   Members of the Committee are fiduciaries who represent all unsecured creditors as a group without regard to the types of claims which individual unsecured creditors hold against the debtor.  Section 1103 of the Bankruptcy Code provides that the Committee may consult with the debtor, investigate the debtor and its business operations and participate in the formulation of a plan of reorganization. The Committee may also perform such other services as are in the interests of the unsecured creditors whom it represents.

**Employment of Professionals.**   Section 1103 of the Bankruptcy Code provides that the Committee may, subject to the bankruptcy court's approval, employ one or more attorneys, accountants or other professionals to represent or perform services for the Committee.  The decision to employ particular professionals should occur at a scheduled meeting of the Committee where a majority of the Committee is present.  All professionals retained by the Committee may be compensated from assets of the debtor's estate pursuant to section 330 of the Bankruptcy Code.  Applications for the payment of professional fees may be monitored by the Office of the United States Trustee and are subject to the Court's approval.  However, the Committee should carefully review all applications and not rely on the Court or the United States Trustee to discover and object to excessive professional fees or costs.

**Other Matters**. The Committee should elect a chairperson and may adopt bylaws.  As a party in interest, the Committee may be heard on any issue in the bankruptcy proceeding. Federal Bankruptcy Rule 2002(i) requires that the Committee (or its authorized agent) receive all notices concerning motions and hearings in the bankruptcy proceeding.

**Creditors wishing to serve on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the debtor while they are committee members absent an order of the Court.  By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition.  The United States Trustee reserves the right to take appropriate action, including removing a creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or otherwise.  You are hereby notified that the United States Trustee may share this information with the Securities and Exchange Commission if deemed appropriate.**

Should you have any additional questions concerning the Committee or your membership on the Committee, please contact **Attorney Jennifer L. Hertz** at the **Office of the United States Trustee, John W. McCormack Post Office and Courthouse, 5 Post Office Square, Suite 1000, Boston, MA 02109-3934, (617) 788-0412 or Jennifer.L.Hertz@usdoj.gov.**

**OFFICE OF THE UNITED STATES TRUSTEE**
**John W.  McCormack Post Office and Courthouse**
**5 Post Office Square, Suite 1000**
**Boston, MA 02109-3934**
**Tel. No. (617) 788-0400**
**Fax No. (617) 565-6368**

**QUESTIONNAIRE FOR OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND/OR TORT CLAIMANTS COMMITTEE**

CASE NAME          **NEW ENGLAND COMPOUNDING PHARMACY, INC.**

CASE NUMBER          **12-19882-HJB (Bankr. D. Mass.)**

**Please Type or Print Clearly.**

I am willing to serve on a Committee of Unsecured Creditors or Tort Claimants Committee. Yes (  ) No (  )

A.      Unsecured Creditor's or Claimant's Name and Contact Information:

Name: _____     Phone: _____
Address: _____     Fax: _____
         _____     E-mail: _____

B.      Counsel (If Any) for Creditor or Claimant and Contact Information:

Name: _____     Phone: _____
Address: _____     Fax: _____
         _____     E-mail: _____

C.      If you have been contacted by any professional person (attorney, accountant or financial advisors) regarding the formation of a committee, please provide that individual's name and/or contact information:

         _____
         _____
         _____

D.      Amount of Unsecured Claim (U.S. $) _____

E.      Describe the nature of your claim(s), i.e., whether arising from goods or services provided; loans made; litigation; etc., including whether any portion is secured.  If secured, please provide nature of collateral securing the claim.  If your claim arises in tort, please also state the nature of your damages, the severity of your damages, and the geographic location where your claim arose.  If any portion of the claim(s) arise from litigation, please state the nature of the claim, the case number and jurisdiction (if applicable) and the status.

         _____
         _____
         _____

F.      Amount of Unsecured Claim entitled to 11 U.S.C. §503(b) treatment as an administrative expense:

         _____

G.  Would your schedule permit you to actively participate on the committee by attending weekly meetings (either by telephone or in person)?   Yes ( )   No ( )

Representations:

1.  Are you or the company you represent in any way: "affiliated" with the debtor within the meaning of Section 101(2) of the Bankruptcy Code, a shareholder of, or related to the debtor? Yes ( ) No ( ) If a shareholder, state the number of shares: _____

2.  Do you, or the company you represent, engage in a business which directly or indirectly competes with any of the businesses of the debtor? Yes ( ) No ( )

3.  Have you ever been or are you an officer, director, agent, representative or employee of the debtor? Yes ( ) No ( ) Does your claim arise from this relationship? Yes ( ) No ( )

4.  Please set forth the appropriate date(s) you acquired the claim, the amount paid and the face amount of the claim: _____
    _____

5.  Have you or your attorney entered into a settlement agreement with the debtor, its representatives or agents regarding resolution of your claim? Yes ( ) No ( )

6.  Do you have a claim against any entity affiliated with the debtor? Yes ( ) No ( )
    State the name of the entity and the nature and amount of the claims: _____
    _____

7.  Do you or any affiliated entities have any other claims against and/or debt or equity securities of the debtor? Yes ( ) No ( )

8.  Do you or any affiliated entities have any financial arrangement that may affect the value of your claim(s) against or interest(s) in the debtor (personal guarantees, credit insurance, etc.)? Yes ( ) No ( )

9.  If you have given a proxy to a third party either to represent you at the creditors' committee formation meeting, or in connection with your claim, please attach a copy of the written proxy. If a professional person has arranged for someone to hold a proxy on your behalf, please identify that individual: _____

**You may attach a written statement to explain or supplement any responses.**

**Creditors wishing to serve on an official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the debtor while they are committee members absent an order of the court on application of the creditor.**

I hereby certify that, to the best of my knowledge and belief, the answers to this Questionnaire are true and correct. By executing this Questionnaire, I agree to the restrictions and conditions set forth in the preceding paragraph and the attached Information Sheet.

**Date:** _____          _____
                                       **Signature**

                                       _____
                                       **Print Name**

                                       _____
                                       **Title**

*Note: This is not a proof of claim form.  Proof of claim forms are filed with the Clerk of the Bankruptcy Court, not with the United States Trustee.*

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4-28-11
```

-------------------------------------------------------------x
IN RE: FOSAMAX PRODUCTS LIABILITY  :
LITIGATION                          :        MDL NO. 1789
                                    :        1:06-md-1789 (JFK)
-------------------------------------------------------------x
This Document Relates to:           :
ALL ACTIONS                         :
-------------------------------------------------------------x

**CASE MANAGEMENT ORDER NO. 17 (amended)**
**(ESTABLISHING PLAINTIFFS' COMMON BENEFIT FUND)**

This order is entered to provide for the fair and equitable sharing among plaintiffs of the

cost of litigation services performed and expenses incurred by attorneys acting for MDL 1789

administration and common benefit of all plaintiffs in this complex litigation. The order is

presented by the Plaintiffs Steering Committee without opposition from Defendant.

Accordingly, the Court **ORDERS** as follows:

1.      **The Plaintiffs Steering Committee Has Created Work Product for the Common**
        **Benefit of All Federal Litigants.**

        On September 25, 2006, this Court entered Case Management Order 2 and through that

CMO appointed the MDL No. 1789 Plaintiffs Executive Committee and Plaintiffs Steering

Committee ("PSC"). The Court charged the PSC with the following obligations:

        (1)     Initiate, coordinate, and conduct all common benefit pretrial discovery on behalf

                of all plaintiffs in all actions which are consolidated with the instant MDL.

        (2)     Develop and propose to the Court schedules for the commencement, executions,

                and completion of all discovery on behalf of all plaintiffs.

        (3)     Cause to be issued in the name of all plaintiffs the necessary discovery requests,

-1-

motions, and subpoenas pertaining to any witnesses and documents needed to properly prepare for the pretrial of relevant issues found in the pleadings of this litigation.

(4)     Conduct all discovery in a coordinated and consolidated manner on behalf of and for the benefit of all MDL plaintiffs.

(5)     Examine witnesses and introduce evidence at hearings on behalf of plaintiffs.

(6)     Act as spokesperson for all plaintiffs at pretrial proceedings and in response to any inquiries by the Court.

(7)     Submit and argue any motions to the Court, and file any briefs in opposition to motions, on behalf of all plaintiffs, which involve matters within the sphere of the responsibilities of the Plaintiffs' Steering Committee.

(8)     Explore, develop, and pursue all settlement options pertaining to the common benefit of all plaintiffs.

(9)     Maintain adequate files of all pretrial matters, including establishing and maintaining a document depository, and having those documents available, under reasonable terms and conditions, for examination by all MDL Plaintiffs or their attorneys.

(10)    Perform any task necessary and proper for the Plaintiffs' Steering Committee to accomplish its responsibilities as defined by the Court's orders, including organizing sub-committees comprised of plaintiffs' attorneys both on the PSC and not on the PSC and assigning them tasks consistent with the duties of the Plaintiffs' Steering Committee.

(11)     Perform such other functions as may be expressly authorized or directed by

further orders of this Court.

This Court is satisfied that the PSC has faithfully executed the duties with which it was

charged and that it is appropriate to order the establishment of a common benefit fund in order to

remunerate the PSC for the expenses incurred and efforts conducted on behalf of all Fosamax

plaintiffs in this MDL.

**2.     Plaintiffs' Litigation Expense Fund to be Established**

a.     Plaintiffs' Lead Counsel and Defendants' Lead Counsel are directed to establish

an interest-bearing account to receive and disburse funds as provided in this order.

Plaintiffs' Lead Counsel has nominated (without opposition from Merck)

Hancock Bank as the escrow agent for purposes of this Order. This Court,

accordingly, appoints Hancock Bank as the escrow agent for purposes of this

Order. These funds will be held by the escrow agent as funds subject to the

direction of the Court. The escrow agent fees negotiated by Plaintiffs' Lead

Counsel are payable out of the escrow account funds or, in the event the escrowed

funds are insufficient to cover the escrow agent fees, by the PSC: Merck will bear

no liability or obligation for any escrow agent fees or expenses related in any way

to the Plaintiffs' Litigation Expense Fund.

b.     No party or attorney has any individual right to any of these funds except to the

extent of amounts directed to be disbursed to such person by order of the Court.

These funds will not constitute the separate property of any party or attorney or be

subject to garnishment or attachment for the debts of any party or attorney except

-3-

when and as directed to be disbursed as provided by court order to a specific person.

**3.** **Assessment**

a. All plaintiffs and their attorneys who, either agree or have agreed - for a monetary consideration - to settle, compromise, dismiss, or reduce the amount of a claim, or, with or without trial, recover a judgment for monetary damages or other monetary relief, including such compensatory and punitive damages, with respect to a FOSAMAX claim are subject to an assessment of the "gross monetary recovery," as provided herein.

b. Defendants are directed to withhold this assessment from amounts paid to plaintiffs and their counsel, and to pay the assessment directly into the fund as a credit against the settlement or judgment. If for any reason the assessment is not or has not been so withheld, the plaintiff and his counsel are jointly responsible for paying the assessment into the fund promptly.

c. No orders of dismissal of any plaintiff's claim, subject to this order, shall be filed unless accompanied by a certificate of plaintiff's and defendant's counsel that the assessment has been withheld and deposited into the fund. Lead Counsel for the PSC and Defendant shall meet and confer on the appropriate form of such a certificate and submit the agreed-upon form to the Court for ratification.

d. The Plaintiffs' Steering Committee shall provide Defense Counsel, plaintiff's counsel, the escrow agent, and the Court (or its designee) with a list of cases and/or counsel who have entered into written agreements with the Plaintiff's Steering

-4-

Committee. In the event there is a dispute as to whether a case should be on the list, the Plaintiff's Steering Committee shall resolve the matter with the particular plaintiff's counsel either informally or upon written motion. In the absence of a written agreement, Defendant shall consider the case as subject to the mandatory assessment set forth in ¶ 3(f)(3), *infra*.

e.     The "gross monetary recovery" is any and all sums paid by Defendant to settle the plaintiffs' respective claims and, in the event of any structured settlement, include the present value of any fixed and certain payments to be made in the future.

f.     This obligation attaches in the following instances:

(1)     <u>Assessment Option #1</u>. For all cases whose counsel who have already agreed or who have agreed within 90 days of this Order to cooperate with the MDL PSC by signing an appropriate agreement, the assessment in such cases shall be six percent (6%) of the "gross monetary recovery" (3% fees/3% costs). The assessment shall apply to all of those cases of such Counsel with FOSAMAX cases now pending or later filed in, transferred to, or removed to this Court as well as unfiled and/or tolled cases and treated as part of the coordinated MDL 1789 proceeding known as *In re: Fosamax Products Liability Litigation* including cases later remanded to a state court or any cases on tolling agreements, filed in any state court, or clients whose cases are as yet unfiled. Three percent (3%) of the "gross monetary recovery" shall be deemed fees to be subtracted from the attorney's fee portion of the individual fee contract, and three percent (3%) of the "gross monetary

-5-

recovery" shall be deemed costs to be subtracted from the client portion of individual fee contracts. Regardless of whether any such agreement has been executed, by operation of this Order this option is deemed accepted by all members of the PSC (and their respective firms and consortiums), and MDL common benefit committee members (and their respective firms and consortiums).

(2)      <u>Assessment Option #2</u>. Following the 90 day period to permit counsel to consider the Assessment Option #1, Counsel can sign an appropriate agreement to an assessment on all FOSAMAX cases now pending, or later filed in, transferred to, or removed to this Court and treated as part of the coordinated proceeding known as *In re: Fosamax Products Liability Litigation* including cases later remanded to a state court or any cases on tolling agreements, or cases which are as yet unfiled. The assessment in such cases shall be eight percent (8%) of the "gross monetary recovery" (5% fees/3% costs). Five percent (5%) of the "gross monetary recovery" shall be deemed fees to be subtracted from the attorney's fee portion of the individual fee contract, and three percent (3%) of the "gross monetary recovery" shall be deemed costs to be subtracted from the client portion of individual fee contracts.

(3)      <u>Mandatory Assessment (Option #3)</u>. The following mandatory assessment shall apply to all MDL plaintiffs' counsel who do not sign either an Assessment Option #1 agreement or Assessment Option #2 agreement.

Because the extensive litigation efforts of the PSC by necessity inure to the benefit of all Federal litigants, in the absence of a signed Assessment Option agreement, the Court mandates that the following assessment provision shall apply to all Federal Fosamax cases. Additionally, any plaintiff's counsel with cases not in the MDL who utilizes any aspect of the MDL common benefit work product, or who participates in a PSC-coordinated resolution, and who has not signed an Assessment Option agreement, shall be subject to the following assessment provision. The assessment in such cases shall be nine percent (9%) of the "gross monetary recovery" (6% fees/3% costs). Six percent (6%) of the "gross monetary recovery" shall be deemed fees to be subtracted from the attorney's fee portion of the individual fee contract, and three percent (3%) of the "gross monetary recovery" shall be deemed costs to be subtracted from the client portion of individual fee contracts.

g.    For any settlement of any matter alleging ONJ or any jaw related injury in any jurisdiction in the United States, counsel for Merck shall contact the PSC Lead Counsel and identify all plaintiff's counsel involved in the settlement and the jurisdiction in which the case was pending. The PSC shall promptly respond in writing, preferably within 10 days as to whether and at what rate the PSC believes the settlement is to be assessed. If the PSC states that it believes the settlement is subject to an assessment under the terms of this CMO No. 17, Merck shall deposit a portion of the gross monetary recovery under this settlement into the escrow account at the percentage rate identified by the PSC. If any individual plaintiff counsel or firm with

-7-

whom Merck may elect to settle any particular case or cases alleging ONJ or any jaw related injury in any jurisdiction in the United States objects, absent court order providing to the contrary Merck will withhold funds citing its obligations under this Order and deposit them into the escrow account, which shall act to terminate Merck's obligations with respect to the particular case or cases. Any other obligation to enforce the terms of this Order or pursue disputes over withheld funds placed into escrow shall be the PSC's and the PSC's alone.

h.  For those counsel desiring to execute any Assessment Option agreement, the PSC has designated Anthony Irpino, Esq., as the contact person:

> Irpino Law Firm
> One Canal Place
> 365 Canal Street, 22nd Floor
> New Orleans, LA 70130
> (504) 525-1500
> irpinoanthony@hotmail.com

## 4. **Disbursements**

a.  Upon order of the Court, payments may be made from the fund to attorneys who provide services or incur expenses for the joint and common benefit of plaintiffs in addition to their own client or clients. Attorneys eligible are limited to Plaintiffs' Lead Counsel, Plaintiffs' Liaison Counsel, members of the Plaintiffs' Steering Committee and other attorneys called upon by them to assist in performing their responsibilities. All time and expenses are subject to proper and timely submission (each month) of contemporaneous records certified to have been received by Plaintiffs' Administrative Committee in accord with this Court's prior orders.

b.  Payments will be allowed only to entities for special services performed, and to reimburse for special expenses incurred, for the joint and common benefit of all plaintiffs.

c.  Payment may, for example, be made for services and expenses related to the obtaining, reviewing, indexing, and payment for hard copies of computerized images of documents for the defendants; to conducting "national" or "state" depositions; and to activities connected with the coordination of federal and state litigation. The fund will not, however, be used to pay for services and expenses primarily related to a particular case, such as the deposition of a treating physician, even if such activity results in some incidental and consequential benefit to other plaintiffs.

d.  Payments will not exceed the fair market value for the services performed or the reasonable amount of the expenses incurred, and, depending upon the amount of the fund, may be limited to a part of the value of such services and expenses. Noting this, it is the express intention for the aforementioned assessments to properly and fully compensate Plaintiffs' Lead Counsel, Plaintiffs' Liaison Counsel, members of the Plaintiffs' Steering Committee and other attorneys called upon by them to assist in performing their responsibilities for the common benefit work which they perform in connection with this matter.

e.  No amounts will be disbursed without review and approval by the Court or such other mechanism as the Court may order. Defense Counsel shall provide at least quarterly notice to the Court or its designee the names and docket numbers of the cases for which it has made an assessment. Details of any individual settlement

-9-

agreement, individual settlement amount and individual amounts deposited into escrow shall be confidential and shall not be disclosed to the Plaintiff's Steering Committee, the Court, or the Court's designee.  Further, unless and until there are at least twenty settlements and assessment deposits made into the escrow account being set up pursuant to this Order, the total amounts contained in the escrow account shall remain confidential.  However, once there are at least twenty settlements and assessment deposits made into the escrow account, monthly statements from the escrow agent shall be provided to Plaintiff's Lead Counsel, Defendants' Lead Counsel, the Court and/or the Court's designee showing only the aggregate total of all deposits, disbursements, interest earned, financial institution charges, if any, and current balance.

f.     If the fund exceeds the amount needed to make payments as provided in this order, the Court may order a refund to those who have contributed to the fund.  Any such refund will be made in proportion to the amount of the contributions.

## 5.    Distribution of this CMO.

The Court directs the PSC to post this CMO to its website, www.fosamaxmdl.com, as well as the appropriate Assessment Option agreements referenced in this Order. The Court further understands that Merck, upon a plaintiff filing a new Fosamax case in the MDL, automatically circulates to the plaintiff's counsel documentation concerning the plaintiff's CMO 8 profile form obligations.

The Court directs Merck to include this CMO in the package circulated to plaintiff's counsel

-10-

upon the filing of a new Fosamax MDL case.

**IT IS SO ORDERED.**

Dated: New York, New York

April _28_, 2011.

JOHN F. KEENAN
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

# EXHIBIT D

# The Expert's Corner

## ON WHAT A "COMMON BENEFIT FEE" IS, IS NOT, AND SHOULD BE

### William B. Rubenstein*

This month's column is a war story. I am currently an expert witness in a mass tort proceeding in Rhode Island. The case involves the Kugel Mesh Hernia Patch, a medical device used following abdominal surgeries to aid recovery and prevent hernias. In late 2005 and early 2006, the Food and Drug Administration and the product's manufacturer, Davol, Inc. (a subsidiary of C.R. Bard, Inc.), initiated two separate recalls following complications arising out of use of the patch. Lawsuits followed.

About 100,000 patches have been implanted in the U.S. There are currently about 1,000 individual lawsuits that were filed in (or removed to) federal courts throughout the country that the Judicial Panel on Multidistrict Litigation (JPML) has sent to Judge Mary Lisi in the U.S. District Court for the District of Rhode Island for coordinated pre-trial proceedings. *See In re Kugel Mesh Hernia Patch Products Liability Litigation*, 493 F. Supp. 2d 1371 (J.P.M.L. 2007). Another 1,000 or so individual cases are pending in Rhode Island state court, where they also have been sent to one judge – Superior Court Associate Justice Alice Gibney – for coordinated pre-trial proceedings. Both courts have appointed plaintiffs' steering committees (PSC), with significant overlap in their membership, and with Motley Rice attorney Donald Migliori serving as liaison counsel in both the federal and state proceedings.

The PSC in the state proceeding has asked the judge to approve an assessment on settling attorneys of a 12% "common benefit fee" (8% for attorneys fees and 4% for costs). I have been retained by an attorney representing many individual plaintiffs who believes that this common benefit fee is too high. My research confirms my client's intuition – I have found 21 reported cases involving common benefit fees and the 12% sought here is far outside the norm. A chart of the 21 cases, and a graph showing the distribution of common benefit fees, are set out in the graph on the next page.

While mine is but one war story, I write about the common benefit fee subject this month because the issue is a hot recurring topic – if you have any doubt, review the firestorm that erupted over the common benefit fee assessment in the Guidant (defibrillator) MDL[1] – and it is an issue about which there is significant confusion.

Four points are worth emphasizing here. First, what is a "common benefit fee"? Second, what is the normal common benefit fee level? Third, is there anything about the Kugel Mesh litigation that would support an inordinately high common benefit fee? And finally, what is likely to happen in this and other similar cases?

### What Is A Common Benefit Fee?

The one thing a common benefit fee is not is a class action fee award. The easiest way to see the distinction is to start with the basic small-claims class action. In such a case, there would be no individual litigation because no claim has enough value to support the costs of pursuing it. A fee is provided to class counsel because she aggregates the class's claims into one case, making them economically viable, and returns a common fund to the class; she is permitted to take a fee from the fund to reward her for her efforts on behalf of the class. It is that common *fund* fee that makes litigation possible

*William B. Rubenstein, a law professor at Harvard Law School, specializes in class action law; he has litigated, and regularly writes about, consults, and serves as an expert witness in class action cases, particularly on fee-related issues. Professor Rubenstein's work can be found at www.billrubenstein.com. The opinions expressed in this article are solely those of the author.

---

1     *See In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig*, 2008 WL 682174 (D. Minn. Mar. 7, 2008).

(continued on page 88)

COPYRIGHT © 2009 OCTAGON PUBLISHING, INC. REPRODUCTION STRICTLY PROHIBITED.

(continued from **Expert's Corner**, page 88)



in the small-claims situation. (Sometimes, when the outcome of class action litigation is not a fund of money but some form of other relief for the class, the court will reward counsel for having secured a "common benefit" for the class rather than a "common fund." Do not confuse that nomenclature in class action cases with "common benefit fees" in mass tort matters.)

Many mass tort cases do not fit the small-claims class action mold, although they might end up with class settlements. They do not fit this mold because they typically involve individual claims that are large enough to be brought individually. For that reason, many mass torts are composed of a set of individual claimants, each with their own attorney, and each with a contingent fee agreement with that attorney – typically providing 33%

of the recovery to the attorney for pursuing the case. Often in mass tort litigation, particular attorneys will have large inventories of individual claimants, but they will, nonetheless, typically have individual retainer agreements with each plaintiff in their inventory. These local attorneys with individual clients are often referred to as "individually-retained plaintiffs' attorneys" or IRPAs.[2]

When mass tort cases are consolidated for pre-trial proceedings, a lot of the work up of the case is done by a few attorneys, typically those on the PSC, and then shared among all of the consolidated claimants. These

---

2       The term was coined by Judith Resnik and her colleagues in the San Juan, Puerto Rico Dupont Plaza hotel fire litigation in the 1990s. *See* Judith Resnik, Dennis E. Curtis, and Deborah R. Hensler, *Individuals Within The Aggregate: Relationships, Representation, and Fees*, 71 N.Y.U. L. Rev. 296 (1996).

(continued on page 89)

(continued from Expert's Corner, page 88)

PSC attorneys often have large inventories of cases and could survive simply on the 33% return they will get from those cases. However, it is arguably unfair to them and to their clients to have PSC attorneys do work for the common benefit of all claimants, but have the costs of that work covered solely by the fees paid by their individual clients.

The "common benefit fee" addresses this problem. It taxes each individual attorney in the consolidated proceeding – or even outside of it – who benefits from the work done by the common benefit attorneys. Essentially, the common benefit fee says to the IRPA: "Look, you would normally get 33% for doing the whole case, but because the common benefit attorneys did some portion of the case for you, you have to pony up some percentage of your 33% to acknowledge that." If the common benefit fee did not work this way, clients could theoretically be charged twice, 33% by their local counsel and another fee by the PSC, potentially leading to an unethically-high contingent fee.

Courts often set the fee early in the litigation, ordering the defendant to "hold back" that amount from any settlement it reaches throughout the case. A fund is thereby generated, and at the conclusion of the case, those attorneys who did common benefit work can petition the judge for disbursement of some or all of the fund. (Often, PSC members will seek disbursements provisionally throughout the case.) Any funds not disbursed are the property of the local attorneys who had been taxed and should revert to them at the conclusion of the case, though it's rare that there's money left over.[3]

The common benefit fee is therefore a way of spreading the fees for a case between IRPAs doing individual client work locally and PSCs doing common benefit work at the national or aggregate level. It is essentially an intra-attorney fee allocation mechanism.

It differs in this regard from a class action attorney fee. The class action attorney fee is the fee that class action attorneys are entitled to at the conclusion of the case for the work they did on behalf of the class; generally, that fee is not shared with any local attorneys because there are none. The class action attorneys get all the fee because they did all the work. The two appear superficially similar in that they both look, in considering the proper level of such an award, to the work done on behalf of a group of aggregated plaintiffs. The difference, however, is that the class action fee is generally a judicially-set fee in a case with scant client interest while the common benefit fee is generally a judicially-set portion of fees in a case with real clients who have already negotiated a different fee arrangement with their own local lawyers. As a judicially imposed *portion* of a larger privately-negotiated contingent fee, the common benefit fee is logically, therefore, generally a lower fee than the class action fee award.

It is fair to ask why the common benefit fee need be lower than the class action fee. To understand the logic, it's helpful again to contrast the small-claims class action with the mass tort case. In a small-claims class action settlement of $100 million, class counsel might walk away with $25 million, if they have a lodestar and multiplier that justifies it, in return for having done 100% of the legal work in the case. In a mass tort case, there might similarly be a $100 million aggregate settlement, with many claimants coming forward to take from the fund. The common benefit attorneys who helped manufacture that fund might also even have a lodestar that could, with some multiplier, justify a similar $25 million award.

But here's the hitch – in the mass tort case there are also local counsel who have contingent fee contracts with the claimants, and, more importantly, who contributed important attorney work to producing the settlement as well. The common benefit lawyers simply do not do 100% of the legal work in the case. It's not

---

3      One interesting issue is whether the common benefit attorneys can negotiate a common benefit fee as part of the settlement with the defendants, particularly as the defendants have no real interest in that issue. Full treatment of that question is beyond the scope of this article.

(continued on page 90)

Copyright © 2009 Octagon Publishing, Inc. Reproduction strictly prohibited.

(continued from **EXPERT'S CORNER**, page 89)

just that claimants have local counsel in common benefit cases and not in class action cases, it's that the local counsel in common benefit cases perform important functions. These functions include publicizing the problems at issue through advertising, advising clients of their legal rights, performing intake evaluations and screening cases, working up all of the individual aspects of the cases,[4] reviewing common benefit documents, negotiating settlements, advising clients on settlement rights, finalizing settlements, etc. It is precisely because of the many individual issues in these cases that classes are rarely certified (except perhaps for settlement purposes); yet, sadly the lawyers who do much of the individual work are outside the purview of the MDL court and can be easily short-changed by the judge there.

## What Are Typical Common Benefit Fees?

The chart below (on page 92) and preceding graph (on page 88) reflect my research on the typical level of common benefit fees – of the 21 reported cases my research assistant found, almost all have common benefit fee assessments around 4-6%. There's one case at 18% and one at 12%. Remarkably, when the common benefit lawyers in my Rhode Island case were pressed to justify their fee, they filed a brief in which they emphasized but one case – the 18% case! They also relied on a study of *class action attorneys' fees* that suggested mass tort class action fees averaged around 16%. But they failed to advise the judge that class action fees are not the same thing as common benefit fees and hence that the study upon which they relied is inapposite.

Many observers to this intra-lawyer dispute might well throw up their hands and ask, "Who cares?" But we should care. The problem of setting a common benefit fee too high is that it unfairly taxes the local lawyer and makes the litigation infeasible for him to

pursue. Consider that a local lawyer making 33% is likely paying a referral fee (perhaps a third of a third), meaning his take starts at 22%. If he has to hire local counsel in another state where the MDL is proceeding, he will have to share some of this fee with that lawyer – say he pays local counsel 5%, he is now down to a 17% fee. If the common benefit fee is 12%, the IRPA has little return and nowhere near enough to fund the amount of individual work he is doing in the case.

The consequences are clear: when common benefit fees are high, local lawyers will simply abandon that mass tort and look for other ones. If the IRPA's cases are a portfolio of investments, why invest in a case returning 5% for a lot of work when you could get 33% or 22% for the same amount of work in a different field? This loss is especially problematic to the extent that local lawyers help publicize harms and inform clients of their rights. In the hernia cases, for example, doctors have implanted patches in 100,000 individuals, but only 2,000 have filed cases. It's possible that there is only a 2% defect rate and 100% of the people with defective patches have lawyers and have filed cases. But if there's a 10% defect rate, that means there are another 8,000 harmed individuals out there in need of lawyers – but less likely to find them if a high common benefit fee deters local lawyers from seeking them out.

## Are There Special Circumstances?

The common benefit attorneys in the Rhode Island matter argued that there are so few claimants in the case, as compared to many mass tort cases, that a larger than normal common benefit fee is needed. Apparently, the argument is that the cost of the common benefit work is constant across cases and when spread among fewer claimants, it therefore must cost them each more. First, it is not at all clear that the amount of common benefit work is constant across all cases; indeed, a lot of common benefit work in federal MDL proceedings often involves administering the tens of thousands of claims pending

---

4       For instance, in the Kugel Mesh Hernia Patch cases, each claimant will have had an individual surgery with an individual local surgeon, under individual circumstances, etc.

(continued on page 91)

COPYRIGHT © 2009 OCTAGON PUBLISHING, INC. REPRODUCTION STRICTLY PROHIBITED.

(continued from EXPERT'S CORNER, page 90)

around the country; if there are only a 1,000 claimants, this administrative task decreases. Second, it is not at all clear that the cases using 4% and 6% common benefit fees in my chart all involved larger groups of claimants than the group at issue in the Rhode Island case; the chart includes notations from the MDLs at issue identifying the approximate number of cases – and many of these cases with low common benefit fees consist of relatively small numbers of claimants. Third, and most centrally, it is a bit of a misunderstanding of the common benefit fee to imagine that "the fewer the claimants, the higher the charge." Generally speaking, there are some claimants in a mass tort case like this whose individual case *alone* would return damages significant enough to fund a lot of common benefit work – that is precisely why many claimants have individual lawyers. Those lawyers have made a calculation that they can *litigate* the case and make money. What the common benefit fee really does is less fund the litigation than share the funding costs equitably across the claimants taking advantage of it.

## A Few Closing Notes: High and Low

*Process*. Common benefit fee assessment hearings are rarely conducted properly. The local attorneys who are the losers in the fee assessments often are not given advanced warning of the assessment hearing nor an opportunity to be heard there. In the Rhode Island case, the PSC lawyers simply presented an "assented" to order to the state judge and asked her to sign it. To her credit, she asked whether there were objectors and has hesitated to sign it to date. My testimony in the case urged her not only to hear out the local objectors, but also to coordinate a common benefit fee with the federal judge in the MDL proceeding down the street, as the *Manual for Complex Litigation* recommends. *See* FEDERAL JUDICIAL CENTER, MANUAL FOR COMPLEX LITIGATION (FOURTH) § 20.312 at 233 (2004). Moreover, judges are often told that the PSC members have "agreed" to the fee level, which sounds significant since

they themselves have large inventories and are therefore essentially taxing themselves. Of course, this is a fudge – since they are going to *get* the common benefit fee, they are only truly taxing the non-PSC attorneys; their own taxes will indeed go into the fund, but will then go right out of the fund and back into their pockets. To be sure, some PSC members may pay a 6% tax and, depending on their common benefit work, only get a 4% fee – but that still means that they have effectively lost only 2% of their fee, not the 6% the local lawyer has lost.

*Substance*. At the end of the day, the key question is "What is the right level of the common benefit fee"? I emphasize the 4-6% figures solely because they are most commonly used. That alone doesn't mean that they are on target. It could be that common benefit lawyers are being underpaid or overpaid. Two law professors – Charles Silver at Texas and Geoff Miller at NYU – have recently posted a draft paper with an interesting suggestion: let the market set the rate for common benefit work.[5] How? Make the PSC (or in particular, the lawyers with the largest inventory) *hire outside lawyers* to do the common benefit work. Since the PSC members will be paying for these lawyers out of their own recoveries, they have a vested interest in hiring the best lawyers they can find at the lowest prices. The suggestion mimics the PSLRA's creation of a controlling client in the securities field, accomplished by authorizing the largest shareholder to become the lead plaintiff and hence select, monitor, and negotiate a fee with lead counsel. Here, the largest inventory firm is conceptualized as "the largest shareholder" in MDL litigation, which, with 33% arrangements and hundreds of clients, it may well be. But the genius of the solution is that it forecloses the PSC itself from collecting the common benefit fee; while their incentive (maximize their own recovery) stays constant, they can no longer

---

5      Charles Silver & Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multidistrict Litigations: Problems and a Proposal*, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1352646.

(continued on page 92)

COPYRIGHT © 2009 OCTAGON PUBLISHING, INC. REPRODUCTION STRICTLY PROHIBITED.

(continued from Expert's Corner, page 91)

do that by setting a high common benefit fee that they will add to their 33% recoveries, but rather only by negotiating a low common benefit fee that they will be forced to pay out to others. The proposal also removes the judge from the middle of the arrangement. While I marvel at the ingenuity of the suggestion, it is somewhat unclear how it would actually operate in practice, namely who PSCs will hire and what sorts of deals will be made from case to case among PSC attorneys and those being hired to do the common benefit work, etc. The nuances are beyond the scope of this column, but the proposal is creative and important enough that readers should be aware of it.

* * *

As an independent expert in the Rhode Island case, I have no vested interest in its outcome. But it will, nonetheless, be interesting to see what happens there – and in the development of common benefit fees more generally. Stay tuned.

## Assessment Fees In Multidistrict Litigation

| Case Name | Citation | Withheld for Fees (%) | Withheld for Costs (%) | Total Withheld (%) | Approximate Number of Claims/Actions at Time of Withholding | Notes |
|---|---|---|---|---|---|---|
| In re Orthopedic Bone Screw Prods. Liab. Litig. | 1996 WL 900349 (E.D. Pa. June 17, 1996) (PTO 402) | 12 | 5 | 17 | > 1,839 actions (as of Feb. 20, 1997) | |
| PROPOSED ASSESSMENT | PC-2008-9999 | 8 | 4 | 12 | | |
| Turner v. Murphy Oil USA, Inc. | 422 F. Supp. 2d 676 (E.D. La. 2006) (PTO 8) | 10 | 2 | 12 | Several thousand claims in 27 consolidated class actions (as of Mar. 27, 2006) | Court ordered set-aside from settlements made according to defendant's voluntary settlement program; PSC originally requested 15% in fees, 7% in costs. |
| In re Protegen Sling and Vesica System Prods. Liab. Litig. | 2002 WL 31834446 (D. Md. Apr. 12, 2002) | | | 9 [federal] 6 [state] | 22 individual civil actions (as of Apr. 5, 2001) > 500 cases (as of Sept. 17, 2004) | |
| In re Air Crash Disaster at Florida Everglades | 549 F. 2d 1006 (5th Cir. 1977) | | | 8 | > 150 claims | Lead counsel had requested 10% set-aside. |
| Smiley v. Sincoff | 958 F.2d 498 (2d Cir. 1992) | | | 8 | < 300 individual actions | |

(continued on page 93)

Copyright © 2009 Octagon Publishing, Inc. Reproduction strictly prohibited.

(continued from EXPERT'S CORNER, page 92)

## ASSESSMENT FEES IN MULTIDISTRICT LITIGATION (CONTINUED)

| Case Name | Citation | Withheld for Fees (%) | Withheld for Costs (%) | Total Withheld (%) | Approximate Number of Claims/Actions at Time of Withholding | Notes |
|---|---|---|---|---|---|---|
| In re MGM Grand Hotel Fire Litig. | 660 F. Supp. 522 (D. Nev. 1987) | 5 | 1.5 | 6.5 | 1,357 releases pursuant to global settlement agreement (as of Jul. 12, 1983) | Court later raised fee withholding to 7% (for total withholding of 8.5%) because of PLC's extraordinary work, which had "never been equaled in any other mass disaster litigation." |
| In re Diet Drugs Prods. Liab. Litig. | 553 F. Supp. 2d 442 (E.D. Pa. 2008) (PTOs 467 & 2622) | | | 6 [federal] 4 [state] | > 105,000 total plaintiffs filing lawsuits; > 35,000 plaintiffs transferred to MDL and >130 class actions (as of Apr. 8, 2008) | Court reduced initial withholdings of 9 and 6 percent by one third to comport with typical withholdings in MDLs. |
| In re Propulsid Prods. Liab. Litig. | MDL 1355 (E.D. La. Dec. 26, 2001) (PTO 16) | | | 6 [federal] 4 [state] | Several thousand individual cases, and 28 class actions from 30 states (as of March 11, 2003) | |
| In re Rezulin Prods. Liab. Litig. | 2002 WL 441342 (S.D.N.Y. Mar. 20, 2002) (PTO 67) | | | 6 [federal] 4 [state] | "Hundreds" of actions in MDL (as of Sept. 12, 2002) | |
| In re St. Jude Med. Inc., Silzone Heart Valves Prods. Liab. Litig. | 2002 WL 1774232 (D. Minn. Aug. 1, 2002) (PTO 18) | | | 6 | Two proposed classes included 10,535 and 1,000 individuals, respectively (as of Mar. 27, 2003) | |
| In re Baycol Prods. Liab. Litig. | MDL 1431 (PTO 25; June 5. 2002) | 4 | 2 | 6 | 1,253 actions before MDL (as of Oct. 22, 2002) | |
| In re Aredia & Zometa Prods. Liab. Litig. | MDL 1760 (Docket Entry 593; Aug. 30, 2007); (Docket Entry 815; Nov. 29, 2007) | | | 6 | JPML initially consolidated 60 actions in transfer order; approximately 350 cases before MDL (as of Oct. 23, 2007) | Magistrate judge later revoked the PTO establishing the common benefit fund, stating that he would consider a revised order "when notified there is an actual need." |
| In re Bausch & Lomb Contact Lens Solution Prods. Liab. Litig. | MDL 1785 (PTO 15; May 21, 2008) | 4 | 2 | 6 4 | > 400 related actions brought (as of Mar. 4, 2009) | Order established 6% assessment for personal injury claims and 4% assessment for economic loss claims. |

(continued on page 94)

(continued from EXPERT'S CORNER, page 93)

## ASSESSMENT FEES IN MULTIDISTRICT LITIGATION (CONTINUED)

| Case Name | Citation | Withheld for Fees (%) | Withheld for Costs (%) | Total Withheld (%) | Approximate Number of Claims/Actions at Time of Withholding | Notes |
|---|---|---|---|---|---|---|
| In re Phenylpropanolamine (PPA) Prods. Liab. Litig. | MDL 1407 (Amended CMO 8; Jul. 9, 2002) | | | 4 [federal] 3 [state] | Almost 900 actions transferred (as of Feb. 7, 2003) | |
| In re Silicone Gel Breast Implants Prods. Liab. Litig. | MDL 926 (PTO 13; Jul. 23, 1993); (PTO 13A; Dec. 28, 1999) | | | 4 | > 1,778 actions (as of June 3, 1993) | Court originally set withholding at 5% for early signers and 6% for late signers; court subsequently reduced to 4% and rebated one third of prior 6% assessment. |
| In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig. | 2008 WL 682174 (D. Minn. Mar. 7, 2008) (PTO 6; Feb. 15, 2006) | 2 | 2 | 4 | Approximately 9 months after court set initial CBF, > 400 cases had been consolidated (as of Nov. 3, 2006) | Court increased withholding if attorneys did not agree to sign within 90 days; court later awarded 14.4% of settlement as part of negotiated settlement, pursuant to Master Settlement Agreement. |
| In re Bextra & Celebrex Mktg. Sales Practices. & Prods. Liab. Litig. | MDL 1699 (PTO 8; Feb. 28, 2006) | 2 | 2 | 4 | JPML initially consolidated 31 actions and more than 100 potential tag-along actions in transfer order; to date, > 1,800 cases pending in MDL | Court adopted 8% assessment for late signers. |
| In re Clearsky Shipping Corp. | 2003 WL 1563820 (E.D. La. Feb. 26, 2003) (Docket Entry 1592) | | | 4 | > 1,500 personal injury and property damage claims filed | Counsel originally proposed 10% withholding. |
| In re Vioxx Prods. Liab. Litig. | MDL 1657 (E.D. La. Aug. 4, 2005) (PTO 19) | 2 | 1 | 3 | Thousands of lawsuits in both state and federal court | Court increased withholding to 4-8% for attorneys signing the agreement late; as part of Master Settlement Agreement, PSC is requesting 8% of settlement fund as common benefit award. |
| In re Zyprexa Prods. Liab. Litig. | MDL 1596 (orders dated Aug. 25, 2006 & Aug. 17, 2007) | | | 1 3 | Approximately 30,000 cases filed in state and federal court (as of June 11, 2007) | Court imposed 1% set aside of gross settlement as assessment for first PSC, and 3% set aside for work of second PSC. |
| In re Worldcom, Inc. Secs. Litig. | 2004 WL 2549682 (S.D.N.Y Nov. 10, 2004) | | | 1 | Almost 40 individual actions pending at time set common benefit fee | Court ordered creation of common benefit fund for Liaison Counsel for individual plaintiffs. |

COPYRIGHT © 2009 OCTAGON PUBLISHING, INC. REPRODUCTION STRICTLY PROHIBITED.