# EXHIBIT D

## The Expert's Corner

### On What A "Common Benefit Fee" Is, Is Not, and Should Be

William B. Rubenstein*

This month's column is a war story. I am currently an expert witness in a mass tort proceeding in Rhode Island. The case involves the Kugel Mesh Hernia Patch, a medical device used following abdominal surgeries to aid recovery and prevent hernias. In late 2005 and early 2006, the Food and Drug Administration and the product's manufacturer, Davol, Inc. (a subsidiary of C.R. Bard, Inc.), initiated two separate recalls following complications arising out of use of the patch. Lawsuits followed.

About 100,000 patches have been implanted in the U.S. There are currently about 1,000 individual lawsuits that were filed in (or removed to) federal courts throughout the country that the Judicial Panel on Multidistrict Litigation (JPML) has sent to Judge Mary Lisi in the U.S. District Court for the District of Rhode Island for coordinated pre-trial proceedings. *See In re Kugel Mesh Hernia Patch Products Liability Litigation*, 493 F. Supp. 2d 1371 (J.P.M.L. 2007). Another 1,000 or so individual cases are pending in Rhode Island state court, where they also have been sent to one judge – Superior Court Associate Justice Alice Gibney – for coordinated pre-trial proceedings. Both courts have appointed plaintiffs' steering committees (PSC), with significant overlap in their membership, and with Motley Rice attorney Donald Migliori serving as liaison counsel in both the federal and state proceedings.

The PSC in the state proceeding has asked the judge to approve an assessment on settling attorneys of a 12% "common benefit fee" (8% for attorneys fees and 4% for costs). I have been retained by an attorney representing many individual plaintiffs who believes that this common benefit fee is too high. My research confirms my client's intuition – I have found 21 reported cases involving common benefit fees and the 12% sought here is far outside the norm. A chart of the 21 cases, and a graph showing the distribution of common benefit fees, are set out in the graph on the next page.

While mine is but one war story, I write about the common benefit fee subject this month because the issue is a hot recurring topic – if you have any doubt, review the firestorm that erupted over the common benefit fee assessment in the Guidant (defibrillator) MDL[1] – and it is an issue about which there is significant confusion.

Four points are worth emphasizing here. First, what is a "common benefit fee"? Second, what is the normal common benefit fee level? Third, is there anything about the Kugel Mesh litigation that would support an inordinately high common benefit fee? And finally, what is likely to happen in this and other similar cases?

### What Is A Common Benefit Fee?

The one thing a common benefit fee is not is a class action fee award. The easiest way to see the distinction is to start with the basic small-claims class action. In such a case, there would be no individual litigation because no claim has enough value to support the costs of pursuing it. A fee is provided to class counsel because she aggregates the class's claims into one case, making them economically viable, and returns a common fund to the class; she is permitted to take a fee from the fund to reward her for her efforts on behalf of the class. It is that common *fund* fee that makes litigation possible

---

*William B. Rubenstein, a law professor at Harvard Law School, specializes in class action law; he has litigated, and regularly writes about, consults, and serves as an expert witness in class action cases, particularly on fee-related issues. Professor Rubenstein's work can be found at www.billrubenstein.com. The opinions expressed in this article are solely those of the author.

1       *See In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig*, 2008 WL 682174 (D. Minn. Mar. 7, 2008).

(continued on page 88)

Copyright © 2009 Octagon Publishing, Inc. Reproduction strictly prohibited.

(continued from Expert's Corner, page 88)



in the small-claims situation. (Sometimes, when the outcome of class action litigation is not a fund of money but some form of other relief for the class, the court will reward counsel for having secured a "common benefit" for the class rather than a "common fund." Do not confuse that nomenclature in class action cases with "common benefit fees" in mass tort matters.)

Many mass tort cases do not fit the small-claims class action mold, although they might end up with class settlements. They do not fit this mold because they typically involve individual claims that are large enough to be brought individually. For that reason, many mass torts are composed of a set of individual claimants, each with their own attorney, and each with a contingent fee agreement with that attorney – typically providing 33% of the recovery to the attorney for pursuing the case. Often in mass tort litigation, particular attorneys will have large inventories of individual claimants, but they will, nonetheless, typically have individual retainer agreements with each plaintiff in their inventory. These local attorneys with individual clients are often referred to as "individually-retained plaintiffs' attorneys" or IRPAs.[2]

When mass tort cases are consolidated for pre-trial proceedings, a lot of the work up of the case is done by a few attorneys, typically those on the PSC, and then shared among all of the consolidated claimants. These

---

2   The term was coined by Judith Resnik and her colleagues in the San Juan, Puerto Rico Dupont Plaza hotel fire litigation in the 1990s. *See* Judith Resnik, Dennis E. Curtis, and Deborah R. Hensler, *Individuals Within The Aggregate: Relationships, Representation, and Fees*, 71 N.Y.U. L. Rev. 296 (1996).

(continued on page 89)

Copyright © 2009 Octagon Publishing, Inc.  Reproduction strictly prohibited.

(continued from **EXPERT'S CORNER**, page 88)

PSC attorneys often have large inventories of cases and could survive simply on the 33% return they will get from those cases. However, it is arguably unfair to them and to their clients to have PSC attorneys do work for the common benefit of all claimants, but have the costs of that work covered solely by the fees paid by their individual clients.

The "common benefit fee" addresses this problem. It taxes each individual attorney in the consolidated proceeding – or even outside of it – who benefits from the work done by the common benefit attorneys. Essentially, the common benefit fee says to the IRPA: "Look, you would normally get 33% for doing the whole case, but because the common benefit attorneys did some portion of the case for you, you have to pony up some percentage of your 33% to acknowledge that." If the common benefit fee did not work this way, clients could theoretically be charged twice, 33% by their local counsel and another fee by the PSC, potentially leading to an unethically-high contingent fee.

Courts often set the fee early in the litigation, ordering the defendant to "hold back" that amount from any settlement it reaches throughout the case. A fund is thereby generated, and at the conclusion of the case, those attorneys who did common benefit work can petition the judge for disbursement of some or all of the fund. (Often, PSC members will seek disbursements provisionally throughout the case.) Any funds not disbursed are the property of the local attorneys who had been taxed and should revert to them at the conclusion of the case, though it's rare that there's money left over.[3]

The common benefit fee is therefore a way of spreading the fees for a case between IRPAs doing individual client work locally and PSCs doing common benefit work at the national or aggregate level. It is essentially an intra-attorney fee allocation mechanism.

It differs in this regard from a class action attorney fee. The class action attorney fee is the fee that class action attorneys are entitled to at the conclusion of the case for the work they did on behalf of the class; generally, that fee is not shared with any local attorneys because there are none. The class action attorneys get all the fee because they did all the work. The two appear superficially similar in that they both look, in considering the proper level of such an award, to the work done on behalf of a group of aggregated plaintiffs. The difference, however, is that the class action fee is generally a judicially-set fee in a case with scant client interest while the common benefit fee is generally a judicially-set portion of fees in a case with real clients who have already negotiated a different fee arrangement with their own local lawyers. As a judicially imposed *portion* of a larger privately-negotiated contingent fee, the common benefit fee is logically, therefore, generally a lower fee than the class action fee award.

It is fair to ask why the common benefit fee need be lower than the class action fee. To understand the logic, it's helpful again to contrast the small-claims class action with the mass tort case. In a small-claims class action settlement of $100 million, class counsel might walk away with $25 million, if they have a lodestar and multiplier that justifies it, in return for having done 100% of the legal work in the case. In a mass tort case, there might similarly be a $100 million aggregate settlement, with many claimants coming forward to take from the fund. The common benefit attorneys who helped manufacture that fund might also even have a lodestar that could, with some multiplier, justify a similar $25 million award.

But here's the hitch – in the mass tort case there are also local counsel who have contingent fee contracts with the claimants, and, more importantly, who contributed important attorney work to producing the settlement as well. The common benefit lawyers simply do not do 100% of the legal work in the case. It's not

---

[3] One interesting issue is whether the common benefit attorneys can negotiate a common benefit fee as part of the settlement with the defendants, particularly as the defendants have no real interest in that issue. Full treatment of that question is beyond the scope of this article.

(continued on page 90)

COPYRIGHT © 2009 OCTAGON PUBLISHING, INC. REPRODUCTION STRICTLY PROHIBITED.

(continued from **Expert's Corner**, page 89)

just that claimants have local counsel in common benefit cases and not in class action cases, it's that the local counsel in common benefit cases perform important functions. These functions include publicizing the problems at issue through advertising, advising clients of their legal rights, performing intake evaluations and screening cases, working up all of the individual aspects of the cases,[4] reviewing common benefit documents, negotiating settlements, advising clients on settlement rights, finalizing settlements, etc. It is precisely because of the many individual issues in these cases that classes are rarely certified (except perhaps for settlement purposes); yet, sadly the lawyers who do much of the individual work are outside the purview of the MDL court and can be easily short-changed by the judge there.

### What Are Typical Common Benefit Fees?

The chart below (on page 92) and preceding graph (on page 88) reflect my research on the typical level of common benefit fees – of the 21 reported cases my research assistant found, almost all have common benefit fee assessments around 4-6%. There's one case at 18% and one at 12%. Remarkably, when the common benefit lawyers in my Rhode Island case were pressed to justify their fee, they filed a brief in which they emphasized but one case – the 18% case! They also relied on a study of *class action attorneys' fees* that suggested mass tort class action fees averaged around 16%. But they failed to advise the judge that class action fees are not the same thing as common benefit fees and hence that the study upon which they relied is inapposite.

Many observers to this intra-lawyer dispute might well throw up their hands and ask, "Who cares?" But we should care. The problem of setting a common benefit fee too high is that it unfairly taxes the local lawyer and makes the litigation infeasible for him to pursue. Consider that a local lawyer making 33% is likely paying a referral fee (perhaps a third of a third), meaning his take starts at 22%. If he has to hire local counsel in another state where the MDL is proceeding, he will have to share some of this fee with that lawyer – say he pays local counsel 5%, he is now down to a 17% fee. If the common benefit fee is 12%, the IRPA has little return and nowhere near enough to fund the amount of individual work he is doing in the case.

The consequences are clear: when common benefit fees are high, local lawyers will simply abandon that mass tort and look for other ones. If the IRPA's cases are a portfolio of investments, why invest in a case returning 5% for a lot of work when you could get 33% or 22% for the same amount of work in a different field? This loss is especially problematic to the extent that local lawyers help publicize harms and inform clients of their rights. In the hernia cases, for example, doctors have implanted patches in 100,000 individuals, but only 2,000 have filed cases. It's possible that there is only a 2% defect rate and 100% of the people with defective patches have lawyers and have filed cases. But if there's a 10% defect rate, that means there are another 8,000 harmed individuals out there in need of lawyers – but less likely to find them if a high common benefit fee deters local lawyers from seeking them out.

### Are There Special Circumstances?

The common benefit attorneys in the Rhode Island matter argued that there are so few claimants in the case, as compared to many mass tort cases, that a larger than normal common benefit fee is needed. Apparently, the argument is that the cost of the common benefit work is constant across cases and when spread among fewer claimants, it therefore must cost them each more. First, it is not at all clear that the amount of common benefit work is constant across all cases; indeed, a lot of common benefit work in federal MDL proceedings often involves administering the tens of thousands of claims pending

---

4   For instance, in the Kugel Mesh Hernia Patch cases, each claimant will have had an individual surgery with an individual local surgeon, under individual circumstances, etc.

(continued on page 91)

Copyright © 2009 Octagon Publishing, Inc. Reproduction strictly prohibited.

(continued from **Expert's Corner**, page 90)

around the country; if there are only a 1,000 claimants, this administrative task decreases. Second, it is not at all clear that the cases using 4% and 6% common benefit fees in my chart all involved larger groups of claimants than the group at issue in the Rhode Island case; the chart includes notations from the MDLs at issue identifying the approximate number of cases – and many of these cases with low common benefit fees consist of relatively small numbers of claimants. Third, and most centrally, it is a bit of a misunderstanding of the common benefit fee to imagine that "the fewer the claimants, the higher the charge." Generally speaking, there are some claimants in a mass tort case like this whose individual case *alone* would return damages significant enough to fund a lot of common benefit work – that is precisely why many claimants have individual lawyers. Those lawyers have made a calculation that they can *litigate* the case and make money. What the common benefit fee really does is less fund the litigation than share the funding costs equitably across the claimants taking advantage of it.

## A Few Closing Notes: High and Low

*Process*. Common benefit fee assessment hearings are rarely conducted properly. The local attorneys who are the losers in the fee assessments often are not given advanced warning of the assessment hearing nor an opportunity to be heard there. In the Rhode Island case, the PSC lawyers simply presented an "assented" to order to the state judge and asked her to sign it. To her credit, she asked whether there were objectors and has hesitated to sign it to date. My testimony in the case urged her not only to hear out the local objectors, but also to coordinate a common benefit fee with the federal judge in the MDL proceeding down the street, as the *Manual for Complex Litigation* recommends. *See* Federal Judicial Center, Manual For Complex Litigation (Fourth) § 20.312 at 233 (2004). Moreover, judges are often told that the PSC members have "agreed" to the fee level, which sounds significant since they themselves have large inventories and are therefore essentially taxing themselves. Of course, this is a fudge – since they are going to *get* the common benefit fee, they are only truly taxing the non-PSC attorneys; their own taxes will indeed go into the fund, but will then go right out of the fund and back into their pockets. To be sure, some PSC members may pay a 6% tax and, depending on their common benefit work, only get a 4% fee – but that still means that they have effectively lost only 2% of their fee, not the 6% the local lawyer has lost.

*Substance*. At the end of the day, the key question is "What is the right level of the common benefit fee"? I emphasize the 4-6% figures solely because they are most commonly used. That alone doesn't mean that they are on target. It could be that common benefit lawyers are being underpaid or overpaid. Two law professors – Charles Silver at Texas and Geoff Miller at NYU – have recently posted a draft paper with an interesting suggestion: let the market set the rate for common benefit work.[5] How? Make the PSC (or in particular, the lawyers with the largest inventory) *hire outside lawyers* to do the common benefit work. Since the PSC members will be paying for these lawyers out of their own recoveries, they have a vested interest in hiring the best lawyers they can find at the lowest prices. The suggestion mimics the PSLRA's creation of a controlling client in the securities field, accomplished by authorizing the largest shareholder to become the lead plaintiff and hence select, monitor, and negotiate a fee with lead counsel. Here, the largest inventory firm is conceptualized as "the largest shareholder" in MDL litigation, which, with 33% arrangements and hundreds of clients, it may well be. But the genius of the solution is that it forecloses the PSC itself from collecting the common benefit fee; while their incentive (maximize their own recovery) stays constant, they can no longer

---

5   Charles Silver & Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multidistrict Litigations: Problems and a Proposal*, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1352646.

(continued on page 92)

Copyright © 2009 Octagon Publishing, Inc. Reproduction strictly prohibited.

(continued from EXPERT'S CORNER, page 91)

do that by setting a high common benefit fee that they will add to their 33% recoveries, but rather only by negotiating a low common benefit fee that they will be forced to pay out to others. The proposal also removes the judge from the middle of the arrangement. While I marvel at the ingenuity of the suggestion, it is somewhat unclear how it would actually operate in practice, namely who PSCs will hire and what sorts of deals will be made from case to case among PSC attorneys and those being hired to do the common benefit work, etc. The nuances are beyond the scope of this column, but the proposal is creative and important enough that readers should be aware of it.

* * *

As an independent expert in the Rhode Island case, I have no vested interest in its outcome. But it will, nonetheless, be interesting to see what happens there – and in the development of common benefit fees more generally. Stay tuned.

## ASSESSMENT FEES IN MULTIDISTRICT LITIGATION

| Case Name | Citation | Withheld for Fees (%) | Withheld for Costs (%) | Total Withheld (%) | Approximate Number of Claims/Actions at Time of Withholding | Notes |
|---|---|---|---|---|---|---|
| In re Orthopedic Bone Screw Prods. Liab. Litig. | 1996 WL 900349 (E.D. Pa. June 17, 1996) (PTO 402) | 12 | 5 | 17 | > 1,839 actions (as of Feb. 20, 1997) | |
| PROPOSED ASSESSMENT | PC-2008-9999 | 8 | 4 | 12 | | |
| Turner v. Murphy Oil USA, Inc. | 422 F. Supp. 2d 676 (E.D. La. 2006) (PTO 8) | 10 | 2 | 12 | Several thousand claims in 27 consolidated class actions (as of Mar. 27, 2006) | Court ordered set-aside from settlements made according to defendant's voluntary settlement program; PSC originally requested 15% in fees, 7% in costs. |
| In re Protegen Sling and Vesica System Prods. Liab. Litig. | 2002 WL 31834446 (D. Md. Apr. 12, 2002) | | | 9 [federal] 6 [state] | 22 individual civil actions (as of Apr. 5, 2001) > 500 cases (as of Sept. 17, 2004) | |
| In re Air Crash Disaster at Florida Everglades | 549 F. 2d 1006 (5th Cir. 1977) | | | 8 | > 150 claims | Lead counsel had requested 10% set-aside. |
| Smiley v. Sincoff | 958 F.2d 498 (2d Cir. 1992) | | | 8 | < 300 individual actions | |

(continued on page 93)

COPYRIGHT © 2009 OCTAGON PUBLISHING, INC. REPRODUCTION STRICTLY PROHIBITED.

(continued from Expert's Corner, page 92)

## Assessment Fees In Multidistrict Litigation (continued)

| Case Name | Citation | Withheld for Fees (%) | Withheld for Costs (%) | Total Withheld (%) | Approximate Number of Claims/Actions at Time of Withholding | Notes |
|---|---|---|---|---|---|---|
| In re MGM Grand Hotel Fire Litig. | 660 F. Supp. 522 (D. Nev. 1987) | 5 | 1.5 | 6.5 | 1,357 releases pursuant to global settlement agreement (as of Jul. 12, 1983) | Court later raised fee withholding to 7% (for total withholding of 8.5%) because of PLC's extraordinary work, which had "never been equaled in any other mass disaster litigation." |
| In re Diet Drugs Prods. Liab. Litig. | 553 F. Supp. 2d 442 (E.D. Pa. 2008) (PTOs 467 & 2622) | | | 6 [federal] 4 [state] | > 105,000 total plaintiffs filing lawsuits; > 35,000 plaintiffs transferred to MDL and >130 class actions (as of Apr. 8, 2008) | Court reduced initial withholdings of 9 and 6 percent by one third to comport with typical withholdings in MDLs. |
| In re Propulsid Prods. Liab. Litig. | MDL 1355 (E.D. La. Dec. 26, 2001) (PTO 16) | | | 6 [federal] 4 [state] | Several thousand individual cases, and 28 class actions from 30 states (as of March 11, 2003) | |
| In re Rezulin Prods. Liab. Litig. | 2002 WL 441342 (S.D.N.Y. Mar. 20, 2002) (PTO 67) | | | 6 [federal] 4 [state] | "Hundreds" of actions in MDL (as of Sept. 12, 2002) | |
| In re St. Jude Med. Inc., Silzone Heart Valves Prods. Liab. Litig. | 2002 WL 1774232 (D. Minn. Aug. 1, 2002) (PTO 18) | | | 6 | Two proposed classes included 10,535 and 1,000 individuals, respectively (as of Mar. 27, 2003) | |
| In re Baycol Prods. Liab. Litig. | MDL 1431 (PTO 25; June 5. 2002) | 4 | 2 | 6 | 1,253 actions before MDL (as of Oct. 22, 2002) | |
| In re Aredia & Zometa Prods. Liab. Litig. | MDL 1760 (Docket Entry 593; Aug. 30, 2007); (Docket Entry 815; Nov. 29, 2007) | | | 6 | JPML initially consolidated 60 actions in transfer order; approximately 350 cases before MDL (as of Oct. 23, 2007) | Magistrate judge later revoked the PTO establishing the common benefit fund, stating that he would consider a revised order "when notified there is an actual need." |
| In re Bausch & Lomb Contact Lens Solution Prods. Liab. Litig. | MDL 1785 (PTO 15; May 21, 2008) | 4 | 2 | 6 4 | > 400 related actions brought (as of Mar. 4, 2009) | Order established 6% assessment for personal injury claims and 4% assessment for economic loss claims. |

(continued on page 94)

Copyright © 2009 Octagon Publishing, Inc. Reproduction strictly prohibited.

(continued from EXPERT'S CORNER, page 93)

## ASSESSMENT FEES IN MULTIDISTRICT LITIGATION (CONTINUED)

| Case Name | Citation | Withheld for Fees (%) | Withheld for Costs (%) | Total Withheld (%) | Approximate Number of Claims/Actions at Time of Withholding | Notes |
|---|---|---|---|---|---|---|
| In re Phenylpropanolamine (PPA) Prods. Liab. Litig. | MDL 1407 (Amended CMO 8; Jul. 9, 2002) | | | 4 [federal] 3 [state] | Almost 900 actions transferred (as of Feb. 7, 2003) | |
| In re Silicone Gel Breast Implants Prods. Liab. Litig. | MDL 926 (PTO 13; Jul. 23, 1993); (PTO 13A; Dec. 28, 1999) | | | 4 | > 1,778 actions (as of June 3, 1993) | Court originally set withholding at 5% for early signers and 6% for late signers; court subsequently reduced to 4% and rebated one third of prior 6% assessment. |
| In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig. | 2008 WL 682174 (D. Minn. Mar. 7, 2008) (PTO 6; Feb. 15, 2006) | 2 | 2 | 4 | Approximately 9 months after court set initial CBF, > 400 cases had been consolidated (as of Nov. 3, 2006) | Court increased withholding if attorneys did not agree to sign within 90 days; court later awarded 14.4% of settlement as part of negotiated settlement, pursuant to Master Settlement Agreement. |
| In re Bextra & Celebrex Mktg. Sales Practices. & Prods. Liab. Litig. | MDL 1699 (PTO 8; Feb. 28, 2006) | 2 | 2 | 4 | JPML initially consolidated 31 actions and more than 100 potential tag-along actions in transfer order; to date, > 1,800 cases pending in MDL | Court adopted 8% assessment for late signers. |
| In re Clearsky Shipping Corp. | 2003 WL 1563820 (E.D. La. Feb. 26, 2003) (Docket Entry 1592) | | | 4 | > 1,500 personal injury and property damage claims filed | Counsel originally proposed 10% withholding. |
| In re Vioxx Prods. Liab. Litig. | MDL 1657 (E.D. La. Aug. 4, 2005) (PTO 19) | 2 | 1 | 3 | Thousands of lawsuits in both state and federal court | Court increased withholding to 4-8% for attorneys signing the agreement late; as part of Master Settlement Agreement, PSC is requesting 8% of settlement fund as common benefit award. |
| In re Zyprexa Prods. Liab. Litig. | MDL 1596 (orders dated Aug. 25, 2006 & Aug. 17, 2007) | | | 1 3 | Approximately 30,000 cases filed in state and federal court (as of June 11, 2007) | Court imposed 1% set aside of gross settlement as assessment for first PSC, and 3% set aside for work of second PSC. |
| In re Worldcom, Inc. Secs. Litig. | 2004 WL 2549682 (S.D.N.Y Nov. 10, 2004) | | | 1 | Almost 40 individual actions pending at time set common benefit fee | Court ordered creation of common benefit fund for Liaison Counsel for individual plaintiffs. |

COPYRIGHT © 2009 OCTAGON PUBLISHING, INC. REPRODUCTION STRICTLY PROHIBITED.