UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE NEW ENGLAND COMPOUNDING )
PHARMACY, INC. PRODUCTS LIABILITY )
LITIGATION )
_____ )   MDL No. 2419
                                     )   Dkt. No 1:13-md-2419 (FDS)
THIS DOCUMENT RELATES TO:            )
                                     )
    The cases listed in Exhibit A to the    )
    Saint Thomas Entities' Global Motion    )
    to Dismiss                              )
_____ )

**SAINT THOMAS ENTITIES' MEMORANDUM IN SUPPORT OF GLOBAL MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Saint Thomas West Hospital, formerly known as St. Thomas Hospital ("Saint Thomas Hospital"), Saint Thomas Network, and Saint Thomas Health (collectively referred to as the "Saint Thomas Entities") file this Motion to Dismiss the Complaints of various MDL Plaintiffs whose cases are listed in Exhibit A[1] to the Saint Thomas Entities' Global Motion to Dismiss ("Tennessee Plaintiffs"), and in support, show the Court as follows:

**STATEMENT OF AFFECTED PLEADINGS**

As the Court is aware, the Plaintiffs' Steering Committee ("PSC") filed a *Master Complaint [and] Demand for Jury Trial* ("Master Complaint"), in MDL No. 2419, Master Docket No. 1:13-md-2419-FDS (Docket #545) on November 5, 2013. This Master Complaint focuses on the claims against the "Unaffiliated Defendants" and "does not include allegations against the New England Compounding Center ("NECC"), Ameridose LLC, Alanus Pharmaceuticals, Inc., GDG Holdings, Barry Cadden, Lisa Conigliaro Cadden, Doug Conigliaro,

---

[1] For convenience, a courtesy copy of this list is also attached to this memorandum as Exhibit A.

53271536.2

1

Carla Conigliaro, or Glenn Chinn" because those "Affiliated Defendants" are subject to a court-ordered stay. *See, e.g.,* Master Complaint ¶ 8. The Master Complaint does not name any of the Saint Thomas Entities, nor does it make specific allegations or purport to assert claims against these defendants.

Instead, the PSC indicated at the December 13, 2013, Status Conference that they would be filing "Short-Form" Complaints in accordance with the Court's MDL Order No. 7 in which they would assert such claims. The Short-Form Complaints would have the effect of superseding the original 55-page complaints filed in the individual cases. The PSC represented that the "short form complaints are going to be very uniform as it relates to allegations against the big S[aint] Thomas Entities, and what we've proposed . . . is that they file any global motions that they believe they have against that, and we can designate one case." *See* Transcript of Dec. 13, 2013, Status Conference at 29 (Exhibit B attached).

Almost all of the Tennessee Plaintiffs filed their Short-Form Complaints on or around December 20, 2013[2]—although they are far from uniform. Several of these "short-form" pleadings incorporate by reference their original individual complaints, thus complicating the process for filing a global motion to dismiss and obviating the efficiencies of the short-form process in terms of the allegations against the Saint Thomas Entities. In essence, however, all of the claims against the Saint Thomas Entities are vicarious liability claims based on alter ego, agency, and conspiracy theories that are lacking under Tennessee law, and so the Saint Thomas Entities file this Global Motion to Dismiss the claims against them. To facilitate the Court's

---

[2] It appears that the only Tennessee Plaintiffs who did not file a Short-Form Complaint are the Temple Plaintiffs who filed *Temple v. Ameridose, et al.*, No. 1:13-cv-12696-FDS. But the allegations in the *Amended Complaint* in that case are essentially the same as the exemplar pleadings and so are covered by this motion to dismiss and subject to dismissal for the same reasons set forth above.

53271536.2

analysis, the Saint Thomas Entities designate the following Short-Form Complaints as exemplars of the pleadings from Tennessee Plaintiffs who are represented by the same counsel for purposes of discussing the putative claims against them:

- *Martha Schultz, et al. v. Unifirst Corp., et al.*, No. 1:13-cv-12311-FDS, filed by Hagens Berman Sobol Shapiro LLP ("Schultz Compl.")

- *Adam C. Ziegler, et al. v. Unifirst Corp., et al.*, No. 1:13-cv-12588-FDS, filed by Lieff Cabraser Heimman & Bernstein, LLP ("Ziegler Compl.")

- *Robert Barnard, et al. v. Unifirst Corp., et al.*, No. 1:13-cv-10460-FDS, filed by Branstetter, Stranch & Jennings PLLC ("Barnard Compl.")

- *Janet M. Russell, et al. v. Unifirst Corp. et al.*, No. 1:13-cv-12794-FDS, filed by Kinnard, Clayton & Beveridge ("Russell Compl.")

- *Joshua Kirkwood, et al. v. Ameridose LLC*, *et al.*, No. 1:13-cv-12431-FDS, filed by Leader, Bulso & Nolan, PLC ("Kirkwood Compl.")

- *Bertrum Walker Bryant, Jr. et al. v. Unifirst Corp., et al.*, No. 1:13-cv-01011-FDS, filed by Galligan & Newman ("Bryant Compl.")

Collectively, these Short Form Complaints—and, to the extent they are incorporated by reference, the original, individual complaints—are representative of all of the complaints (both short-forms and originally) filed by the Tennessee Plaintiffs against the Saint Thomas Entities ("Complaints").  As demonstrated below, the sum total of the allegations are insufficient to state colorable causes of action against the Saint Thomas Entities as a matter of Tennessee law.  As a result, the Saint Thomas Entities should be dismissed entirely from this MDL.

## INTRODUCTION

The Tennessee Plaintiffs assert myriad causes of action against a number of defendants based on personal injuries claimed by individual Tennessee Plaintiffs from the injection of an allegedly contaminated steroid they received from Defendant Saint Thomas Outpatient Neurosurgical Center, LLC ("STOPNC").  Although the form of the allegations varies from

individual to individual, it is evident from the pleadings themselves that the Saint Thomas Entities did not procure or inject any patients with the steroid. Plaintiffs' assertion of liability against these defendants is purely vicarious—based on their relationship with STOPNC. Saint Thomas Hospital and Saint Thomas Health have no ownership interest in STOPNC. Nor did any of the Saint Thomas Entities employ any of the STOPNC Defendants accused of wrongdoing, and so the claims against these entities should be dismissed on that basis. Moreover, the claims against the Saint Thomas Entities should also be dismissed, as the Tennessee Plaintiffs have not alleged a sufficient factual basis for imposing vicarious liability against any of the Saint Thomas Entities. In stark contrast to the detailed "alter ego" allegations against the NECC-related Defendants in their Complaints against the "Affiliated Defendants,"[3] Plaintiffs only assert in very conclusory terms that "Saint Thomas"—which they define to include Saint Thomas Health and Saint Thomas Network (and at times Saint Thomas Hospital)—is a partial owner of, shares a name with, was in close geographic proximity to, and "handles contracting and finances" for, STOPNC. The conclusion by some of the Tennessee Plaintiffs that the Saint Thomas Entities are "liable under the doctrine of *respondeat superior*" is neither "entitled to the assumption of truth," nor is it plausibly supported by the Tennessee Plaintiffs' factual allegations.[4] These allegations are even more inadequate to satisfy Tennessee's rigorous standards for piercing the corporate veil.

---

[3] *E.g.*, Kirkwood Compl. ¶ 15 (incorporating by reference *Plaintiffs' Original Complaint* filed in 1:13-cv-12431-FDS (Docket #1) at ¶¶ 62-77, 104-08). The allegations in the Kirkwood Original Complaint regarding NECC and the Affiliate Defendants are typical of the original complaints filed by the Tennessee Plaintiffs in the individual cases. As noted above, the Master Complaint does not include the more detailed allegations against NECC and its affiliates because they are subject to the stay. *See* Master Complaint at ¶ 8.

[4] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

Nor do the Tennessee Plaintiffs state viable claims under Tennessee law for liability against the Saint Thomas Entities based on any agency theory. The individual defendants are alleged to be employees of STOPNC,[5] and the Tennessee Plaintiffs cannot allege facts to support a finding that any of the Saint Thomas Entities held them out as their employees or agents. As a result, all claims against the Saint Thomas Entities should be dismissed for failure to state a claim against these entities.

Even if there were a basis for imputing liability to the Saint Thomas Entities, the vicarious claims against these defendants for civil conspiracy, strict products liability, and general negligence fail as a matter of law because the Tennessee Plaintiffs have failed to state a legally viable claim against STOPNC, which is a necessary predicate for any form of vicarious liability against the Saint Thomas Entities. Many of the Tennessee Plaintiffs assert civil conspiracy, strict liability, and regular negligence claims against STOPNC under Tennessee law, but it is clear from the four corners of their pleadings that all claims against STOPNC stem from its administration of epidural injections to the STOPNC patients. This is unquestionably health care—not the sale of products—and so the claims all fall under the Tennessee Health Care Liability Act, TENN. CODE ANN. § 26-26-101, *et seq.* ("Health Care Liability Act"). The Tennessee Plaintiffs' sole claim against STOPNC falls under the Health Care Liability Act, which requires them to prove the applicable standard of care and a departure from it. Independently and in addition, Tennessee does not recognize a claim against a professional services provider, like STOPNC, for items consumed in connection with the rendition of professional services. Because their Complaint fails to state a claim against STOPNC for these

---

[5] Master Complaint ¶¶ 346-48.

53271536.2

theories of liability, there is no basis for imputing any such liability to the Saint Thomas Entities. Under either analysis, the claims against the Saint Thomas Entities should be dismissed.

## BACKGROUND

The Tennessee Plaintiffs' claims are among many in this MDL arising out injections of steroids compounded by NECC that are claimed to have caused an outbreak of fungal meningitis in the patients who received them. The Tennessee Plaintiffs include patients, who received epidural injections of methylprednisolone acetate ("MPA") at Defendant STOPNC and were later diagnosed with fungal meningitis, and their family members. The MDL Plaintiffs claim that NECC compounded the MPA in unsanitary conditions, leading to contamination with microbial contaminants. *E.g.*, Master Complaint at ¶¶ 1-3.

Relevant to this motion, the Tennessee Plaintiffs allege only vicarious liability against the Saint Thomas Entities. In varying forms and degrees, they assert that STOPNC is the "alter ego" or "actual, ostensible, and apparent agent" of Saint Thomas Hospital because (i) they share a "common name;" (ii) STOPNC is located in the Saint Thomas Medical Plaza on the hospital campus; and (iii) STOPNC "instructed many patients to report to the St. Thomas Hospital emergency room for evaluation and treatment." *See, e.g.*, Ziegler Compl. ¶ 15 (incorporating by reference their original complaint); Barnard Compl. ¶ 15 (incorporating by reference their original complaint), ¶¶ 20, 25, 30; Russell Compl. ¶ 15 (incorporating by reference their original complaint); Kirkwood Compl. ¶ 15 (incorporating by reference their original complaint); Bryant Compl. ¶ 5.[6]

---

[6] The Schulz Complaint does not state any specific allegations against the Saint Thomas Entities that would support a vicarious liability claim. It merely defines "Clinic Related Defendants" to include these defendants, Schultz Compl. ¶ 7, and then, through that definition, adopts claims from the Master Complaint that relate to the purchase and administration of MPA, which, as noted previously, none of the Saint Thomas Entities played any role in obtaining or injecting.

53271536.2

The Tennessee Plaintiffs assert that Saint Thomas Health is an "owner and/or member" of STOPNC, which is a limited liability company and that "Saint Thomas"—which, as noted, they often define to include both Saint Thomas Network and Saint Thomas Health—"acted in concert" with Defendant Howell Allen Clinic "to operate jointly" STOPNC." Barnard Compl. ¶ 27; Bryant Compl. ¶ 5. The Tennessee Plaintiffs make similarly vague allegations about "Saint Thomas" being vicariously liable for STOPNC based on the shared name; proximity; the fact that Saint Thomas Network partially owns and purportedly operates STOPNC; STOPNC's referral of suspected meningitis patients to Saint Thomas Hospital for evaluation and treatment; and the allegation that "Saint Thomas" handles STOPNC's contracting and finances. *E.g.*, Barnard Compl. at ¶¶ 23(ii); 27(vii); Bryant Compl. ¶ 5.[7]

Based on these general allegations, the Tennessee Plaintiffs allege a variety of claims, including civil conspiracy, strict products liability, and general negligence, against STOPNC and the Saint Thomas Entities.

## ARGUMENT AND AUTHORITIES

**I.   Tennessee Law Governs the Substantive Claims**

Courts in this Circuit follow the rule that, where a suit is transferred and coordinated under 28 U.S.C. § 1407 for purposes of an MDL, the court is to apply the choice of law rules of

---

[7] The Barnard Complaint has an additional allegation that the "Tennessee Defendants"—which term is defined to include the Saint Thomas Entities, STOPNC, John Culclasure, M.D., Debra Schamberg, R.N., and Howell Allen Clinic, a Professional Corporation, Barnard Compl. ¶¶ 7, 19—"stood in a special relationship with Plaintiff" and owed him a "duty to protect [him] from foreseeable harm caused by NECC's intentional conduct . . . ." *Id.* ¶ 19(iv). The duty is not defined further, but appears to relate to patients. None of the Tennessee Plaintiffs is claiming that they were administered MPA from the Saint Thomas Entities, and so these claims could only relate to the defendant health care providers who did. Thus, to the extent such an unspecified duty exists and there could be a viable claim, it would not give rise to liability against the Saint Thomas Entities. Nor is the unspecified duty a sufficient basis for any claims against STOPNC that could be vicariously applied to the Saint Thomas Entities.

53271536.2

the transferor court with respect to substantive law. *See In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4, 17 (1st Cir. 2012) (citations omitted); *In re New Eng. Mut. Life Ins. Co. Sales Practices Litig. I*, 236 F. Supp. 2d 69, 74 (D. Mass. 2002) (transferee court must apply choice of law rule of transferor court, regardless of whether case is transferred under § 1404(a) or § 1407, the venue transfer statute.), *aff'd*, 346 F.3d 218 (1st Cir. 2003). All of the material facts underlying the Tennessee Plaintiffs transpired in Tennessee—the injections at STOPNC, diagnoses, and treatment. Most of the Tennessee Plaintiffs reside in Tennessee (or neighboring states like Kentucky). The local defendants are Tennessee residents. Finally, the claims against the Saint Thomas Entities are made under Tennessee statutory provisions and common law, and so Tennessee law governs the application of substantive law to the claims against the Saint Thomas Entities.

## II. Plaintiffs' Conclusory Allegations Fall Far Short of the Requirements for Pleading Alter Ego

Procedural rulings, by contrast, are governed by federal law, in particular, the law of this Circuit. *In re New Eng. Mut. Life Ins. Co. Sales Practices Litig. II*, 324 F. Supp. 2d 288, 297 (D. Mass. 2004) ("In the ordinary course, questions of federal law in MDL-transferred cases are governed by the law of the transferee circuit." (citing *Montana v. Abbott Labs.*, 266 F. Supp. 2d 250, 259-60 (D. Mass. 2003))).

In prior status conferences, the Court has asked whether it has the power to grant dispositive relief in the context of the MDL. Although that was once a controversial question, the matter has been effectively settled in favor of such authority. The meaning of Section 1407's use of the words "pretrial proceedings" has been interpreted liberally to give the transferee district court control over any and all proceedings prior to trial, including authority to rule on dispositive motions. *See In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, 245

53271536.2

8

F.R.D. 55, 57 (D. Mass. 2007); *see also In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 58, 64-65 (D.D.C. 2003) ("In a multidistrict litigation action, the transferee judge has the same jurisdiction and power over pretrial proceedings that the transferor judge would have in the absence of the transfer." (quoted with approval by *In re Neurontin Litig.*, 245 F.R.D. at 57)); *In re 'Agent Orange' Prod. Liability Litig.*, 597 F. Supp. 740, 751-52 (E.D.N.Y. 1984) ("Once a case has been transferred by the Panel on Multidistrict Litigation, the transferee court assumes complete jurisdiction for pretrial purposes. It has the authority to settle all pretrial motions, including dispositive motions such as those for summary judgment or approval of a settlement." (quoted with approval by *In re Neurontin Litig.*, 245 F.R.D. at 58)). Thus, so long as the dispositive motion meets the governing procedural standards—as is the case here and will be demonstrated below—the Court has the authority to grant it, even to the extent of dismissing the Saint Thomas Entities from all pending cases in the MDL.

      A.      **The *Respondeat Superior* and Agency Conclusions as to the Saint Thomas Entities Are Devoid of Factual Allegations**

Although legal conclusions can provide the framework of a complaint, they must be "supported by factual allegations." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009); *see id.* at 1951 ("The court need not accept as true pleadings that are no more than legal conclusions or the 'formulaic recitation of the elements' of a cause of action."). A party's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In *Twombly*, the Supreme Court repeatedly emphasized the problems of invasive and costly discovery as grounds for requiring more specific pleadings in the context of complex cases, such as antitrust: "'[A] district court must retain the power to insist upon some specificity

in pleading before allowing a potentially massive factual controversy to proceed.'" *Id.* at 558 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983)); *Rando v. CVS Pharmacy, Inc.*, No. 13–11130–FDS, 2013 WL 6489947, at *2 (D. Mass. Dec. 9, 2013). They cannot rely on discovery to fill in this gap: "[A] plaintiff cannot 'unlock the doors of discovery . . . armed with nothing more than conclusions' in the hopes of meeting his or her pleading requirements under Rule 8." *Oinonen v. TRX, Inc.*, No. 3:09-CV-1450-M, 2010 U.S. Dist. LEXIS 9530, at *16 (N.D. Tex. Feb. 2, 2010). Rather, dismissal is appropriate if a plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008). As explained below, Plaintiffs' claims against the Saint Thomas Entities fail to pass muster under the Federal Rules of Civil Procedure.

### B. Tennessee Has a High Standard for Piercing the Corporate Veil

Tennessee law is deferential to corporations, including limited liability corporations,[8] and does not lightly disregard the corporate form. Generally, Tennessee "courts will disregard the corporation as a separate entity upon a showing that the corporation is a sham or dummy or such action is necessary to accomplish justice." *Edmunds v. Delta Partners, L.L.C.*, 403 S.W.2d 812, 828 (Tenn. Ct. App. 2012) (perm app. denied May 9, 2013). More specifically, "[w]hen piercing the corporate veil, a court may disregard the corporate entity in order to impose liability against a related entity, such as a parent corporation or a controlling shareholder, where the two entities are in fact identical or indistinguishable and where necessary to accomplish justice." *Id.*, at 29.

---

[8] Limited liability companies are treated the same as corporations for purposes of piercing the corporate veil. *See Edmunds v. Delta Partners, L.L.C.*, 403 S.W.2d 812, 828 (Tenn. Ct. App. 2012) (perm app. denied May 9, 2013).

53271536.2

The seminal decision is *Continental Bankers Life Ins. Co. of the South v. Bank of Alamo*, 578 S.W.2d 625, 631-32 (Tenn. 1979), setting forth three required elements for alter ego liability: (i) complete domination by the parent of the subsidiary/affiliate; (ii) use of that control to commit a fraud or wrong; and (iii) proximate cause of the injury or unjust loss to the plaintiff. Some courts have gone so far as to state that "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Se. Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 674 (6th Cir. 2006).

In addition, Tennessee courts also consider a number of common, non-exclusive factors in determining whether to disregard the corporate veil:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arm's length relationships among related entities.

*Huntsville Golf Dev., Inc. v. Brindley Const. Co.*, No. 1:08-00006, 2011 U.S. Dist. LEXIS 86445 at *48-50 (M.D. Tenn. Aug. 4, 2011) (citing *FDIC v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984)). Where the subsidiary is "liable for a debt but is without funds due to some misconduct on the part of the [parent entities]," courts are more apt to find the equitable mix tips in favor of disregarding the corporate form. *Pamperin, v. Streamline Mfg.*, 276 S.W.3d 428, 437, 439 (Tenn. Ct. App. 2008).

For example, in *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 399-400 (Tenn. 2002), the court held that the complaint did not state a claim for vicarious liability because it did "not allege facts showing that [the owner/investor] directed, commanded, or

53271536.2

11

knowingly authorized the Richardson Firm to engage in its allegedly tortious conduct—an essential element for vicarious liability in this context—. . . the plaintiff ha[d] not stated a claim against [the owner/investor] upon which she may be granted relief." Not surprisingly, federal courts applying Tennessee law have dismissed alter ego claims for failing to sufficiently allege that the corporate form was used to sanction a "fraud or similar injustice." *See Prime Hospitality Corp.*, 462 F.3d at 674, 676 (citing *Cont'l Bankers Life Ins. Co.*, 578 S.W.2d at 632 (the control of the parent corporation over the subsidiary "must have been used to commit a fraud or wrong[.]"); *Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985) (quoting the *Continental Bankers* test); *Tenn. Racquetball Investors, Ltd. v. Bell*, 709 S.W.2d 617, 622 (Tenn. Ct. App. 1986) (citing *Continental Bankers* and noting that under an alter ego theory of liability, "mere dominance, standing alone, does not render [a corporate director] liable for the corporate debts;" rather, "[u]se of control to commit fraud or wrong" is also required to fix liability).

In *Prime Hospitality*, the Sixth Circuit held that even though the plaintiff "stated sufficient facts that, if true, establish the dominion/control component of a claim to pierce the corporate veil," 462 F.3d at 677, the plaintiff did "not plead with specificity that, in making the decision to walk away from the Lease without renegotiating it, Prime and the corporate officers misused the limited liability supplied to Prime by May-Ridge's and Ridgewood's corporate forms to sanction a fraud, injustice, or equivalent misfeasance." *Id*. at 679; *see id.* at 676 ("Under the law of [Tennessee], Southeast must sufficiently allege that May-Ridge's corporate form was used to sanction a 'fraud or similar injustice' in order to survive Prime's 12(b)(6) motion to dismiss."); *see also Newsboys, Inc. v. Warner Music Inc.*, No. 3:12–0678, 2013 WL 1718048, at *2 (M.D. Tenn. Apr. 19, 2013) (granting New Jersey entity's motion to dismiss claims involving FED. R.

CIV. P. 9(b) because "Plaintiffs fail to allege any facts suggestive of WMI as the 'alter ego' of WBR or factual allegations suggestive of 'fraud or similar injustice' to warrant piercing WMI's corporate veil"); *Flake v. Schrader-Bridgeport Int'l, Inc.*, No. 3:07–0925, 2010 WL 1027128 (M.D. Tenn. Mar. 18, 2010) (dismissing claim for lack of personal jurisdiction, in part, because plaintiff's alter ego theory failed to meet the pleading standards discussed in *Prime Hospitality*); *Gonzalez v. HCA, Inc.*, No. 3:10–00577, 2011 WL 3793651, at *11 (M.D. Tenn. Aug. 25, 2011) (same). These holdings are a natural extension of *Twombly* and *Iqbal* to the high threshold required to pierce the veil of a Tennessee corporation.

In their Complaints, the Tennessee Plaintiffs rely largely on conclusions for their alter ego claims; their only factual allegations, even if proven, would not suffice under Tennessee law to pierce the corporate veil. When their pleadings are stripped of legal conclusions, the Tennessee Plaintiffs are left with allegations about the common name, proximity of facilities, and partial ownership. Notably, unlike the very specific allegations about other Defendants controlling NECC and playing integral roles in the key decisions about which they complain, they do not tie the Saint Thomas Entities into the conduct of STOPNC at issue in anything more than speculation and conclusory rhetoric. Mere ownership—and here, not even a majority stake—is not enough to pierce the corporate veil. Nor is the common name and proximity of facilities.[9] The real indicia of alter ego—like commingling of property, undercapitalization, and diversion of assets—are lacking both in fact and in the Tennessee Complaints. The Court only need look to the alter ego allegations about the NECC Defendants to see that Plaintiffs are capable of providing such factual allegations, *see supra* note 3, yet they were not able to come

---

[9] In fact, the Tennessee Plaintiffs' lumping together of distinct entities into a single alter ego theory underscores that they do not have specific facts as would be necessary to make such a claim.

53271536.2

close to that level of detail with the Saint Thomas Entities. Like *Givens*, Plaintiffs have "not allege[d] facts showing that [the Saint Thomas Entities] directed, commanded, or knowingly authorized [STOPNC] to engage in its allegedly tortious conduct." 75 S.W.3d 383, 399-400.

### C. The Agency Claims Likewise Are Fatally Defective

Although, as a general matter, it is difficult to successfully move to dismiss a plaintiff's agency claim under Tennessee law, *see Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 432 (Tenn. 2008), the "agency" claims here also fail on the face of the Complaints. Specifically, the Tennessee Plaintiffs have attempted to frame their claims as similar to cases where certain physicians, such as ER doctors and anesthesiologists, were found to be agents or apparent agents of a hospital. *See id.; Simmons v. Tuomey Reg'l Med. Ctr.,* 533 S.E.2d 312, 322 (S.C. 2000); *Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142 (Ind. 1999). But those cases involved hospital medical services that were offered ***at the hospital***. *Simmons,* 341 S.C at 52 ("Although the present cases involve emergency room physicians, our decision is not necessarily limited to such physicians. It is limited, however, to those situations in which a patient seeks services at the hospital as an institution, and is treated by a physician who reasonably appears to be a hospital employee."); *Sword*, 714 N.E.2d at 151 ("Courts considering this factor often ask whether the hospital 'held itself out' to the public as a provider of hospital care, for example, by mounting extensive advertising campaigns."); *Boren*, 251 S.W.3d at 434 ("Comparable tests have been adopted in several other jurisdictions, specifically with respect to the rendering of emergency services or anesthesia services." (citation omitted)); *id*. at 436 ("An increasing number of jurisdictions have held that in situations where a hospital offers a service, such as the care of an anesthesiologist, and the patient has no part in choosing the individual who will perform the service, a court may infer that the patient reasonably relied on the health care provider's apparent authority to act for the hospital." (citation omitted)).

53271536.2

14

Here, however, there is no alleged basis—nor could there be—for the conclusory assertion that Saint Thomas Hospital or the other Saint Thomas Entities offered or held themselves out as offering outpatient neurosurgical treatment. *Cf. Boren*, 251 S.W.3d at 437 ("River Park offers emergency services to the public. . . . River Park held itself out as providing emergency care to the public."). The relevant services were neither offered nor provided at Saint Thomas Hospital. *Cf. id.* at 435 ("[T]he emergency room operated in conjunction with the rest of the hospital; the hospital required all of the physicians with staff privileges to work in the emergency room on a rotating basis, treating members of the public who came to the hospital for emergency medical care; and all emergency treatment took place on the hospital's premises and utilized the hospital's supporting personnel and equipment. [And] [t]he patient does not know or select the physician but relies upon the hospital for providing the physician." (citation and quotation marks omitted)). Under similar circumstances, a Tennessee court granted summary judgment to a defendant on a plaintiff's apparent agency claim. *See Hartford Fire Ins. Co. v. CMC Const. Co.*, No. 3:06–CV–11, 2010 WL 3338581, at *8-10 (E.D. Tenn. Aug. 24, 2010) ("Ms. Asher's claim fails because she does not identify how the alleged principal—Hartford—granted authority to Mr. Crowe. In other words, Ms. Asher has failed to explain how Hartford 'clothed the agent [Mr. Crowe] with the appearance of authority[.]" (quoting *Boren*, 251 S.W.3d at 433)).

The vague allegations as to the Saint Thomas Entities' employees are not enough to fill the gap. The Tennessee Plaintiffs do not allege that Defendant John Culclasure, M.D. ("Culclasure") or Debra Schamberg, R.N. ("Schamberg") were employees of any of the Saint Thomas Entities. To the contrary, they assert that Dr. John Culclasure was, at all relevant times, "an employee of the Howell Allen Clinic and the Medical Director of" STOPNC and that Ms.

Schamberg was "an employee of Howell Allen Clinic and the Facilities Director of" STOPNC. *E.g.*, Kirkwood Original Complaint (incorporated in full by reference in the Kirkwood Compl. at ¶ 15) at ¶ 24-25; *see also id.* at ¶ 127 ("During all relevant times, Dr. Culclasure and Ms. Schamberg co-managed [STOPNC's] day to day operations."); *see also* Master Complaint ¶¶ 346-48. And they do not identify any other STOPNC actors who could be employees or agents of the Saint Thomas Entities. Here again, the Tennessee Plaintiffs have failed to provide factual support for such a claim to raise it to plausibility. The agency claims should be dismissed.

### III. The Tennessee Plaintiffs Have Not Stated Colorable Claims Against STOPNC From Which to Impute Liability to the Saint Thomas Entities

Separate from the vicarious liability theories, the Tennessee Plaintiffs have failed to state claims for civil conspiracy, products liability, or general negligence against STOPNC, and so for this independent reason, the Court should dismiss these putative causes of action against the Saint Thomas Entities. In particular, Plaintiffs' claims against STOPNC are governed exclusively by the Health Care Liability Act, TENN. CODE ANN. § 29-26-101, *et seq.* Under that statute, a "'[h]ealth care liability action' means any civil action . . . alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, ***regardless of the theory of liability on which the action is based***." TENN. CODE ANN. § 29-26-101(a)(1) (emphasis added); *see also id.* § 29-26-101(c). There is little question that the claims against STOPNC all stem from the factual assertions that the STOPNC patients were injured during treatment at STOPNC.

Because the claims are governed by the Tennessee Health Care Liability Act, the Tennessee Plaintiffs have the burden of proving "[t]he recognized standard of acceptable professional practice in the profession and the specialty thereof" and that STOPNC "acted with

less than or failed to act with ordinary and reasonable care in accordance with such standard . . . ." *Id.* § 29-26-115(a). The Health Care Liability Act affords no basis for holding health care providers strictly liable for professional services, even if products are involved in the diagnosis or treatment. Instead, Plaintiffs must plead and ultimately prove the relevant standard of care and a deviation from it, which they have not done and cannot do with respect to their civil conspiracy, products liability, and general negligence claims.

Moreover, the Tennessee courts have held that providers of professional services are not "sellers" of the products used and consumed in the course of providing that service. *See Parker v. Warren*, 503 S.W.2d 938 (Tenn. Ct. App. 1973) (carpenters not liable as sellers of defective lumber); *Delta Ref'g Co. v. Procon, Inc.*, 552 S.W.2d 387 (Tenn. Ct. App. 1976) (general contractor who installed pump not strictly liable as seller where pump was manufactured by third party). Because the STOPNC Defendants provided professional services—and the only "product" involved was used and consumed in connection with those services—their claims are not actionable under the Products Liability Act, but instead must be brought under the Health Care Liability Act. Plaintiffs cannot state a claim for strict liability against STOPNC on this independent basis and so cannot hold the Saint Thomas Entities vicariously liable on this cause of action. This claim should be dismissed on this independent ground.

**IV. The Saint Thomas Entities Cannot Be Vicariously Liable for any Claims Against Dr. Culclasure**

Further, to the extent any of the Tennessee Plaintiffs' claims constitute a healthcare liability action against Dr. Culclasure, the Saint Thomas Entities cannot be vicariously liable for those claims due to Tennessee's prohibition on the corporate practice of medicine. *See* TENN. CODE ANN. § 68–11–205; *Med. Educ. Assistance Corp. v. State ex rel. East Tenn. State Univ. Quillen College of Med.*, 19 S.W.3d 803, 813 (Tenn. Ct. App. 1999) ("The corporate practice of

medicine is enjoined in Tennessee by T.C.A § 68–11–205."). Dr. Culclasure was not employed by any of the Saint Thomas Entities, and all of the Saint Thomas Entities were "legally precluded from controlling the means and methods by which physicians render medical care and treatment to . . . patients." *See Thomas ex rel. Thomas v. Oldfield*, No. M2007-01693-COA-R3-CV, 2008 WL 2278512, at *3 (Tenn. Ct. App. June 2, 2008) (citations omitted). Because the corporate practice of medicine doctrine prohibits the Saint Thomas Entities from directing health care decisions by Dr. Culclasure, the Saint Thomas Entities cannot be vicariously liable for his professional decisions. Thus, any healthcare liability claims against Dr. Culclasure cannot form the predicate for imposing vicarious liability against the Saint Thomas Entities.

## CONCLUSION AND PRAYER

For these reasons, Saint Thomas West Hospital, formerly known as St. Thomas Hospital, Saint Thomas Network, and Saint Thomas Health respectfully request that the Court: (i) grant their Global Motion to Dismiss in its entirety and dismiss all putative claims against the Saint Thomas Entities by the Tennessee Plaintiffs; (ii) alternatively, and solely in the event it does not dismiss all claims against the Saint Thomas Entities, dismiss the claims against Saint Thomas Hospital and Saint Thomas Health, neither of whom has any ownership interest in STOPNC; and (iii) grant such other and further relief to which the Saint Thomas Entities are entitled.

        SAINT THOMAS WEST HOSPITAL,
FORMERLY KNOWN AS ST. THOMAS
HOSPITAL, SAINT THOMAS NETWORK,
AND SAINT THOMAS HEALTH

By its attorneys,
*/s/ Sarah P. Kelly*
Sarah P. Kelly (BBO #664267)
skelly@nutter.com
NUTTER McCLENNEN & FISH LLP
Seaport West
155 Seaport Boulevard
Boston, Massachusetts  02210
(617) 439-2000

Dated:  February 7, 2014

53271536.2

OF COUNSEL:

Yvonne K. Puig*
Texas State Bar No. 16385400
Eric J. Hoffman*
Texas State Bar No. 24074427

FULBRIGHT & JAWORSKI L.L.P.
98 San Jacinto Blvd. Suite 1100
Austin, Texas 78701
(512) 536-2450
(512) 536-4598 (FAX)

*Appearing *Pro Hac Vice*

## CERTIFICATE OF SERVICE

This certifies that a true and accurate copy of the foregoing was served on all parties of record by virtue of the Court's electronic filing system this 7th day of February, 2014.

                                                */s/ Sarah P. Kelly*
                                                SARAH P. KELLY

2364502.1

53271536.2