UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) | MDL No. 2419 Dkt. No 1:13-md-2419 (RWZ) |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| All Actions | ) ) | |

**SAINT THOMAS ENTITIES' OPPOSITION TO PLAINTIFF STEERING
COMMITTEE'S MOTION FOR ENTRY OF
BELLWETHER TRIAL AND PRE-TRIAL SCHEDULING ORDER**

Saint Thomas West Hospital, formerly known as St. Thomas Hospital, Saint Thomas
Network, and Saint Thomas Health (collectively referred to as the "Saint Thomas Entities") file
this Opposition to the *Plaintiffs' Steering Committee's Motion for Entry of Bellwether Trial and
Pre-Trial Scheduling Order* (Docket ##837 & 838) ("Motion"), and in support show as follows:

**INTRODUCTION**

This is Round II of the PSC's rush to set bellwether trials.  Several months ago, at a time
when all proceedings against NECC and its affiliated parties ("Affiliated Defendants") were
stayed and most of the "Unaffiliated Defendants"[1] had yet to be brought into the MDL, the PSC
unilaterally requested the Court to enter MDL Order No. 7,[2] which set a timetable, but no
procedure, for the initial bellwether, or "test" trials.

---

[1] The "Unaffiliated Defendants" are a nebulous group of hospitals, clinics, and other healthcare
providers, many of whom have not yet appeared in the MDL, although a few have made limited
appearances for the purpose of objecting to third-party subpoenas, and the Court has made
provision for these limited appearances.

[2] *See* MDL Order No. 7 (Docket #438) ("MDL Order No. 7").

After the Saint Thomas Entities were brought into the MDL, they immediately sought reconsideration of the Order, demonstrating, among other things, that it was premature and could not produce reliable or meaningful results under the unnecessarily accelerated circumstances.[3] After briefing and argument, Judge Saylor vacated that portion of MDL Order No. 7, finding that, "[f]or good cause shown, the deadlines in that order as to the selection of bellwether cases are hereby vacated."[4]   He also informed the parties that he would "set a timetable for identification of potential bellwether cases, further discovery in those cases, and selection of actual cases for trial at a future date."[5]

At the January 10, 2014, status conference in this matter, Judge Saylor directed the parties to meet and confer about a "discovery plan."[6]  The Court indicated that the discovery plan should include an overview of the discovery elements in the case, such as sequencing written discovery and depositions, and an "order that directs and sets deadlines and so on . . . ."[7]

Immediately after the January 10, 2014, status conference, the parties met, and the PSC offered to draft the discovery plan.  In subsequent conversations, both verbal and via email, the PSC provided drafts of other documents, including the ESI and deposition protocols, but indicated that they were continuing to work on a "discovery plan."   The PSC has never circulated such a document; instead, it shifted course and presented a bellwether schedule proposal as a substitute.  On January 24, 2014, shortly before the filing deadline in accordance with Judge Boal's Scheduling Order on related discovery matters, the PSC circulated a number

---

[3] *Saint Thomas Entities' Motion to Reconsider the Court's Entry of MDL Order No. 7* (Docket #457) ("Motion to Reconsider").

[4] *Order on Timetable for Determining "Bellwether" Cases*, dtd. Dec. 23, 2013 (Docket #721).

[5] *Id.*

[6] *See* Excerpts from transcript from Jan. 10, 2014, hearing ("Tr.") at 39-41, 47-50 (Exhibit A).

[7] *See id.* 48-50.

of documents, including a bellwether trial and pretrial proposal and "propose[d] that any competing proposals be filed no later than January 31, 2014."[8]  The Saint Thomas Entities responded that that they did not understand the Court's directive to include bellwether proposals and asked when the discovery plan that had been repeatedly promised would be available.[9]  The PSC's response was that, "[w]ith respect to a "discovery plan," the PSC believes that all the elements required to be addressed under Fed. R. Civ. P. 26(f) and Local Rule 16.1 are addressed in substance in the various filings, both proposed and previously filed . . . .," and that a discovery plan was merely "a potential pro forma issue," inviting the defendants to come up with a counter-proposal "asap."[10]

The parties conferred, and the Saint Thomas Entities and other defendants agreed to send suggestions in writing.  Four days later, on January 31, 2014, the PSC filed a *Memorandum in Support of Plaintiffs' Steering Committee's Motion and Memo in Support of Motion for Entry of Bellwether Trial and Pre-Trial Scheduling Order* (Docket ##837 & 838) ("PSC's Second Bellwether Proposal").

The PSC's Second Bellwether Proposal is premature, as there are also a number of contingencies and exigent circumstances that need to be resolved before the Court and the parties are positioned to entertain a productive bellwether discussion.  NECC and its affiliates are under bankruptcy-related stays while they attempt to resolve their liability to the MDL Plaintiffs as part of a master settlement that was publicly announced weeks ago, but has yet to be consummated, and at this time, the terms are largely secret.  Other defendants are participating in a court-

---

[8] Declaration of Yvonne K. Puig of Jan. 31, 2014 ("Puig Decl.") (Exhibit B) at ¶ 2 & Exhibit B-1. The Puig Decl. was originally docketed as #840-2.

[9] *See id.* at Exhibit B-2.

[10] *See id.*

ordered mediation program—with an attendant stay of discovery—that has been ongoing for months with no apparent resolution in sight.  The Saint Thomas Entities believe that there are a number of plaintiffs living in states with two-year statutes of limitation who will file claims before October 2014.[11]  As a result, the landscape of this MDL is likely to change dramatically in the next few months, and the outcome of these events will have significant impacts on the development of MDL proceedings.  Any bellwether consideration should be deferred pending resolution of these events.

To the extent the Court would consider the PSC's Second Bellwether Proposal at this time, the proposal is unworkable for a number of reasons.  To begin with, it does not include a discovery plan.[12]  Instead, it effectively precludes the defendants from equal access to information, yet forces them to choose bellwether trials under a timeline that that is heavily skewed in the PSC's favor.  The PSC presumably believes these overly ambitious deadlines for designating bellwether plaintiffs are realistic because it has full access to all the records necessary to make these decisions—not only of the Plaintiffs it represents, but also those currently residing in the NECC repository.  Thus far, the Unaffiliated Defendants have been denied access to these critical documents.   Although the PSC claims that this expedited treatment is necessary to bring justice to these Plaintiffs, the parties are best served—and justice more promptly obtained—if the Court establishes a process for streamlined, bilateral, and coordinated discovery, allowing ***all*** parties to be adequately informed in making the important bellwether decisions.

---

[11] The MDL Plaintiffs treated in Tennessee filed their claims in September and October of last year, in light of Tennessee's one-year statute of limitations for such claims.

[12] The Saint Thomas Entities and other parties have submitted proposed discovery plans that are along the lines of Judge Saylor's directive.  *See, e.g.*, Docket #840-3.

The Second Bellwether Proposal exacerbates the lack of access to information by restricting the defendants even more in their ability to obtain the necessary information and documents through a truncated discovery process that does not afford the Saint Thomas Entities sufficient time to obtain the records of these 100+ patients, much less to process and analyze them in order to make meaningful bellwether decisions.

While the PSC touts its Second Bellwether Proposal as "balanc[ing] the rights and concerns of the impacted parties" and "maximiz[ing] the efficiencies available in MDLs to develop information the parties need in order to assess the potential avenues for resolving the cases . . .,"[13] its proposal does no such thing.   There is simply no "balance" that takes into account the rights and concerns of the Saint Thomas Entities and other defendants who would be seriously and adversely "impacted" by the PSC's plan.   The Saint Thomas Entities have proposed an alternative plan that would put discovery back on track and allow for a streamlined and orderly process for case development that is fair to all parties.   They respectfully request the Court to consider this alternative as the appropriate framework for going forward with further case development.

## ARGUMENT AND AUTHORITIES

### I.      The Bellwether Deadlines Are Premature

The PSC is aggressively pushing this MDL to bellwether trials on an unrealistic schedule. Its consistent goal is to get dates in place so that it can pressure the Unaffiliated Defendants into discovery procedures and processes designed solely to comply with those deadlines.   The PSC has the process exactly backwards.   Before a bellwether order can be crafted, the Court and the parties need to be positioned to determine whether bellwethers are appropriate and if so, how

---

[13] Second Bellwether Proposal (Docket #838) at 2.

bellwether selections can be realistically made.  In addition to needing discovery, including the critical medical records of the MDL Plaintiffs, there are a number of significant contingencies that need to be resolved in order to move forward with selecting bellwethers.

> ### A.       The Bellwether Process Must Be Carefully Designed

Judge Eldon Fallon, who presided over the Vioxx and Propulsid MDLs, has advocated for the process of selecting a few representative "bellwether"[14] cases for initial trials as an effective means for resolving MDLs, but has noted that the process must be done with care. Eldon E. Fallon, Jeremy T. Grabill & Robert Pitard Wynne, *The Problem of Multidistrict Litigation: Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2323-25 (June 2008).  In appropriate circumstances, bellwether trials can be used to glean important information about the claims of the litigation as a whole.  *See* Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.315 at 360 ("[T]o produce reliable information about other mass tort cases, the specific plaintiffs and their claims should be representative of the range of cases.").  As the Fifth Circuit has aptly summarized:

> A bellwether trial designed to achieve its value ascertainment function for settlement purposes or to answer troubling causation or liability issues common to the universe of claimants has as a core element representativeness -- that is, the sample must be a randomly selected one of sufficient size so as to achieve statistical significance to the desired level of confidence in the result obtained. Such samples are selected by the application of the science of inferential statistics. The essence of the science of inferential statistics is that one may confidently draw inferences about the whole from a representative sample of the whole.

*In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019-20 (5th Cir. 1997).

---

[14] The term bellwether "is derived from the ancient practice of belling a wether (a male sheep) selected to lead his flock. The ultimate success of the wether selected to wear the bell was determined by whether the flock had confidence that the wether would not lead them astray, and so it is in the mass tort context."  *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997).

Although the PSC extols the virtues of bellwethers generally, it fails to explain how its proposal is designed to ferret out the truly representative cases, which must be the goal if the process is to achieve any success:  "[i]t is critical to a successful bellwether plan that an honest representative sampling of cases be achieved."  *In re Yasmin and Yaz (Drospirenone) Mktg., Sales Practices and Prods. Liab. Litig.*, No. 3:09-md-0210  0-DRH-PMF, 2010 WL 4024778, at *1 (S.D. Ill. Oct. 13, 2013); *see also* Manual for Complex Litigation (Fourth) § 22.315 at 360 ("[T]est cases should produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis, and what range of values the cases may have if resolution is attempted on a group basis.  The more representative the test cases, the more reliable the information about similar cases will be.").  As Judge Fallon indicated, "[i]f bellwether trials are to serve their twin goals as informative indicators of future trends and catalysts for an ultimate resolution, the transferee court and the attorneys must carefully construct the trial-selection process. . . .  Any trial-selection process that strays from this path will likely resolve only a few independent cases and have a limited global impact."  Fallon, *Bellwether Trials*, 82 Tul. L. Rev. at 2343; *see also In re Yasmin*, Mktg., 2010 WL 4024778, at *2 ("Little credibility will be attached to this process, and it will be a waste of everyone's time and resources.").

Based on his extensive experience in the Vioxx and Propulsid MDLs, Judge Fallon has set out important principles for selecting bellwether trials.  He suggests that although there is no "one-size-fits-all" procedure, there are certain sequential steps that should be followed in crafting the protocols and processes.  First, the MDL court must be in a position to catalogue the "Entire Universe of Cases," meaning that it "conduct[s] a census of the entire litigation and identif[ies]

all the major variables." Fallon, *Bellwether Trials*, 82 TUL. L. REV. at 2344.  The next step is for the court and the attorneys for both sides to "creat[e] a pool of cases that accurately represents the different divisions within the MDL from which the bellwether cases will be selected." *Id.* at 2346.  Important to this step is deciding the size of the pool—"[i]f the pool is too small, then there is a risk that too few of the major variables will be properly represented." *Id.* at 2347.  To fill the pool, there are different methods—random selection, selection by the MDL court, and selection by the attorneys. *Id.* at 2348-49.  And there are many variables within each strategy for filling the pool, all of which need to geared to finding a truly representative, and therefore, credible sampling. *Id.* at 2348-60.  After the trial-selection pool has been determined, the parties conduct case-specific discovery. *Id.* at 2360.  Then the third step is to select individual cases from the pool, which also can be done in a variety of ways depending on the facts and circumstances. *Id.* at 2360-65.

Although the Saint Thomas Entities agree that bellwether trials can be very useful in an appropriate case, that determination should not be assumed here, as the PSC has done.  This MDL is very atypical in a number of respects that bear on whether bellwether trials will produce meaningful results.  The combination of the NECC bankruptcy and MDL proceedings makes this case quite unusual.  The global settlement-in-principle with the primary MDL defendants (NECC and its affiliates), if consummated, will necessarily impact how the claims against the remaining defendants will be tried.  Assuming the manufacturer is removed from the MDL through release and/or discharge, the remaining defendants break down into a few "national defendants" (such as Unifirst, ARL, and Liberty) and a large number of local health care/pain clinics that are subject to very divergent regulatory and legal regimes.  Under the circumstances, it is by no means clear

that any individual case in this MDL will truly be representative of any other.  Indeed, as the Court has previously noted:

> My assumption from day one has been that when cases are ready for trial, they get spun out to the individual home districts where they first arose.  Again, this seems to me putting aside the so-called national defendants that if what the case is is against a pain clinic and a doctor, that probably those cases ought to be spun out for trial to where they originated.
>
> I have not done any sophisticated thinking on that topic, and it obviously depends on what the cases look like and so on, but that's going to affect what cases are selected as bellwethers.  All this by way of saying, this is not a typical case where, you know, you have pharmaceutical product X, and the question is did it cause injury Y, and was appropriate testing done and so forth.
>
> I think that's not going to be the central issue in these cases, so it's not clear to me what this is going to look like, where these cases are going to be tried, and what the stage in the process we need to begin talking about that, but certainly it was too soon to be thinking about it a month ago, at least when we were issuing orders, and it's one more thing. I think we ought to formulate a step at a time.  It depends very much what these cases look like, who the defendants are and what happens from there.

*See* Excerpts from transcript from Jan. 10, 2014, hearing ("Tr.") at 46 (Exhibit C).

Even assuming that test trials would be proper and useful here, it is premature to set deadlines when the litigation landscape is rapidly evolving.  Neither the Court nor the parties are in a position to "conduct a census of the entire litigation and identify all the major variables."  *Id.* at 2344.  New cases are in the process of being filed in or transferred to this Court.  Further, with applicable two-year statutes of limitations running later this year in several of the jurisdictions involved in the MDL, the Saint Thomas Entities expect that more lawsuits against other parties in other states will be coming.  Without any understanding of what the universe of potential bellwether plaintiffs will be, it is premature to set deadlines for making binding choices.  There should also be some resolution to the claims against the primary defendants, NECC and its affiliates, before further case development occurs.   Whether these defendants will be in any cases tried and if not, what impact their settlement will have on individual claims will

undoubtedly be a major litigation variable.   The court-ordered mediation program should likewise be concluded so that the Court will be able to define the full universe of parties before taking further steps to identify candidates for test trials.

Further, much more work is needed to identify the critical "litigation variables."   The PSC suggests that the only relevant "litigation variables" are "exposure to NECC-manufactured methylprednisolone acetate and diagnosis of resulting infection."   Motion at 14.   But those factors are (or should be) common—not variable—factors for all Plaintiffs; presumably none of the Plaintiffs would have filed a lawsuit without those minimum allegations.   In *Vioxx* for example, the "major variables ultimately decided on . . . were (1) the type of injury (heart attack, stroke, or other), (2) period of ingestion (short-term versus long-term), (3) age group (older or younger than sixty-five), (4) prior health history (previous cardiovascular injuries or not), and (5) date of injury (before or after a certain label change)."   Fallon, *Bellwether Trials*, 82 TUL. L. REV. at 2345.   Although, in this case, discovery will likely be necessary to reveal the full panoply of variables, factors relating to acuity and co-morbid conditions will be significant litigation variables, as there are many individuals who were exposed to the contaminated NECC products who did not develop disease.

## II.   Discovery Must Come First

The bellwether discussion should also be deferred until the discovery process has been more thoroughly defined.   *See, e.g.*, *In re: Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. 1:00-1898, MDL 1358(SAS), M21-88, 2007 WL 1791258, at *3 (S.D.N.Y. June 15, 2007) (approving plan developed after investigation and discovery revealed particular variables in litigation census).   Here, the PSC wants the process completed in a matter of a few months, at a time when a large number of cases have yet to be filed or transferred to this MDL, and without

affording sufficient time for the Defendants to obtain Plaintiffs' medical and other records and information that is critical to the process.  As Judge Fallon explains it:

> The discretionary limitation that bellwether trial candidates be trial-ready should be imposed as a means to streamline the trial-selection process. . . .  [*I]n this context, trial-ready means that the attorneys have adequate proof of the important, basic information, [which includes] access to the plaintiffs' medical files* . . .  The importance of being trial-ready in this sense, other than the accelerated manner in which the case can be prepared, is that it prevents the unfortunate situation where a case is proposed and accepted to fill the pool, but the attorneys later discover that the existence of one of these preliminary matters is uncertain or even challenged.
>
> *The parties will usually be required to provide all of this information early on in the litigation pursuant to a global pretrial discovery order.  See, e.g., In re Vioxx Prods. Liab. Litig.*, MDL No. 1657 (E.D. La. June 29, 2006) (pretrial order no. 18C) (governing the provision of Plaintiff Profile Forms, Merck Profile Forms, and medical authorizations); *In re Propulsid Prods. Liab. Litig.*, MDL No. 1355 (E.D. La. Jan. 31, 2001) (pretrial order no. 9) (governing the provision of Plaintiff Profile Forms and medical authorizations). Notwithstanding such a requirement, the parties may occasionally fail to provide this information*. Cases in which this basic level of disclosure is not complete should not be considered for bellwether trials*, and may even be subject to dismissal if the parties fail to comply after additional prompting. *See In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1232-34 (9th Cir. 2006); *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 340-41 (5th Cir. 2000).

*Id*. at 2352 & n.99 (emphasis added).  After lengthy negotiations, briefing, and a hearing on February 6, 2014, Judge Boal has recently prescribed the form for the Plaintiffs' Fact Sheet and authorizations for releases of records to be executed by the Plaintiffs.  *See Order on Plaintiffs' Profile Forms and Authorizations for Release of Plaintiffs' Records* ("Fact Sheet Order") (Feb. 14, 2014) (Docket #923).  These items of discovery from the Plaintiffs are part of the "basic, important information" that Judge Fallon has identified as necessary to the bellwether process, and considering the number of plaintiffs, it will be months before the Fact Sheets and authorizations are completed and produced, and even longer still for the records to be gathered, analyzed, and synthesized.  That process is likely to reveal important litigation variables that should be considered in defining the bellwether process.  The fact that discovery is in its infancy

11

is yet another reason to continue to defer the bellwether selection process, as Judge Saylor has done.

III.     **The Discovery and Other Requirements of the PSC Proposal Need Balance**

      A.     **The Discovery Deadlines Are Unworkable**

The Second Bellwether Proposal does contain a few discovery deadlines relative to the bellwether selection, but they are unrealistic and one-sided.  For example, the PSC proposes that Plaintiffs and Defendants select four cases as candidates for the Initial Trial Pool within 120 days of the approval of the Fact Sheet by this Court—which just occurred on February 14, 2014.  The PSC at the same time proposes that Plaintiffs be allowed 60 days to complete and execute the Fact Sheets and authorizations—and a 45 day window to identify and cure any material defects. What the PSC is essentially recommending is that Defendants will receive executed Fact Sheets and authorizations by April 15 (or if defects need to be cured, May 30) and have less than two months to obtain, review, analyze, and synthesize all of the information and records for more than 100 Plaintiffs to be in a position to pick the first bellwether cases—all by June 14. Considering that it typically takes 60 to 90 days to obtain medical records ***after*** a valid authorization is presented to the provider, and the Fact Sheets and authorizations will not be available to the Defendants under the PSC's proposal for at least another 45 days, this deadline is impossible.

The PSC also attempts to require Defendants to notify the PSC of any claimed deficiencies in the Fact Sheets within 15 days of receipt.  Considering the number of Fact Sheets that are likely to come in at one time, this time limit is unreasonable.

The PSC sets a date for initial disclosures by Defendants, but none for Plaintiffs.  The Fact Sheets do not cover the matters addressed by Federal Rule of Civil Procedure 26(a)(1), and Plaintiffs should not be effectively excused from complying with these important disclosure

requirements.    Additionally,  the  PSC  demands  that  the  Saint  Thomas  Entities  provide

"substantive responses" to certain master discovery served on these entities in October 2013.

But the Saint Thomas Entities have objected and responded to the "Master Discovery" served on

them in October 2013, and the PSC has not identified any responses that are incomplete.   The

PSC cannot attempt to require the Saint Thomas Entities to provide additional "substantive

responses" within "30 days from entry of this Order" without going through the proper procedure

to identify and challenge the responses previously provided.

The "Common Discovery Deadlines" are also too ambitious considering all that must be

accomplished during this phase.   The PSC already has access to all of the documents both from

its own clients and in the document repositories and so has a significant advantage in terms of

the timing of this discovery.   And at this point it is unclear precisely when these Defendants will

have access to the same materials.   Once they do, they will need time to review the 40,000

documents—and  any  others  discovered  from  other  parties  in  this  case—to  factor  into  the

common discovery phase of this litigation.   For analogous reasons, the time frames for expert

discovery are unrealistic—especially when considering that, to the Saint Thomas Entities'

knowledge, not a single expert has been designated in this litigation.

### B.      If Considered at all, the PSC's Bellwether Procedure Needs Revision

There  are  other  major  flaws  in  the  PSC's  Second  Bellwether  Proposal,  including  the

arbitrarily small pool of potential candidates in the "Initial Trial Pool Cases"—only *eight* from

the  hundreds  of  MDL  Plaintiffs  selected  by  each  side—which  will  guarantee  a  most

*un*representative sample for selection of the bellwether trials.   This is far too small a bellwether

pool to provide representative cases for test trials.   *See* Fallon*, Bellwether Trials*, 82 TUL. L. REV.

at  2346-47  (pool  must  be  large  enough  to  account  for  the  major  litigation  variables).

Considering that the litigation variables have yet to be identified, it is premature to estimate a number for the pool.

Also concerning is the fact that while the PSC promotes Judge Fallon's bellwether orders in *Vioxx* and *Propulsid*, it then suggests an entirely different process that will not achieve similar results.  Under the PSC's proposal, the eight cases will be chosen by the litigants for full discovery and then the Court will choose the first two of those eight for initial trials, but all eight will be the effective bellwether pool.  Judge Fallon did not provide the two sides with the unfettered right to choose.  As the PSC notes, he permitted each side to have strikes so that the outliers could be eliminated.  But under the PSC's proposal, there is no vetting process to eliminate outlier cases.

The PSC also proposes that the *Lexecon*[15] and venue issues be deferred until after the Initial Trial Selections are made.  But unless all of the parties in an individual case agree to a *Lexecon* waiver, the case cannot be tried in Boston.  In other words, the Court may have to transfer a large percentage of these cases back to their transferor courts for trial (or travel around the country trying the cases in their native venues).  It makes no sense to defer this decision until after the bellwethers are actually chosen, as it is important to the bellwether process to know where and by whom the test cases will be tried.  In *In re Yasmin*, the court found "such a waiver to be critical to the success of th[e bellwether] endeavor." 2010 WL 4024778, at *1.

Finally, there is no contingency plan if a case is dismissed or settled on the eve of trial. There should be a procedure or protocol for substituting a new bellwether case—for example, if

---

[15] In *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34 (1998), the Supreme Court held that the MDL transfer statute, 28 U.S.C. § 1407, does not permit the transferee court to try cases that were not originated under its jurisdiction absent agreement by the parties.

the Plaintiff is permitted to unilaterally dismiss the case after full case development, Defendants should be able to choose its replacement.

These objections should by no means be viewed as an exhaustive list of problems with the PSC's Second Bellwether Proposal.  Instead, they should illustrate the reasons why the Court should proceed with caution in considering the PSC's precipitous proposal.

## CONCLUSION AND PRAYER

For these reasons, Saint Thomas West Hospital, formerly known as St. Thomas Hospital, Saint Thomas Network, and Saint Thomas Health respectfully request that the Court: (i) deny the PSC's Motion; (ii) defer further consideration of bellwether selection; (iii) order the parties to meet and confer regarding a proposed discovery plan—with direction from the Court as to the elements of that plan, and return to the Court with a joint proposal, if possible, or alternatives; and (iii) grant such other and further relief to which the Saint Thomas Entities are entitled.

Respectfully submitted,

SAINT THOMAS WEST HOSPITAL,
FORMERLY KNOWN AS ST. THOMAS
HOSPITAL, SAINT THOMAS NETWORK,
AND SAINT THOMAS HEALTH

By its attorneys,
*/s/ Sarah P. Kelly*
Sarah P. Kelly (BBO #664267)
skelly@nutter.com
NUTTER McCLENNEN & FISH LLP
Seaport West
155 Seaport Boulevard
Boston, Massachusetts  02210
(617) 439-2000

Dated:  March 3, 2014

OF COUNSEL:

Yvonne K. Puig*
Texas State Bar No. 16385400
Eric J. Hoffman*
Texas State Bar No. 24074427
FULBRIGHT & JAWORSKI L.L.P.
98 San Jacinto Blvd. Suite 1100
Austin, Texas 78701
(512) 536-2450
(512) 536-4598 (FAX)

Marcy Hogan Greer*
Texas Bar No. 08417650
ALEXANDER DUBOSE JEFFERSON
& TOWNSEND L.L.P.
515 Congress Ave., Suite 2350
Austin, Texas  78701
(512) 482-9300
(512) 482-9303 (FAX)

*Appearing *Pro Hac Vice*

<u>**CERTIFICATE OF SERVICE**</u>

        This certifies that a true and accurate copy of the foregoing was served on all parties of record by virtue of the Court's electronic filing system this 3rd day of March, 2014.


                                                    */s/ Sarah P. Kelly*_____
                                                    SARAH P. KELLY


2386241.1

16