**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ) | |
| ) | |
| IN RE: NEW ENGLAND COMPOUNDING ) | MDL No. 2419 |
| PHARMACY, INC. PRODUCTS LIABILITY ) | |
| LITIGATION ) | Master Dkt. No. 1:13-md-2419- RWZ |
| ) | |
| ) | |
| ) | |
| ) | |
| This Document Relates To: ) | |
| All Cases ) | |
| ) | |
| ) | |
| ) | |

## DEFENDANT UNIFIRST CORPORATION'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' STEERING COMMITTEE'S MOTION FOR ENTRY OF BELLWETHER TRIAL AND PRE-TRIAL SCHEDULING ORDER

Until December 2013, UniFirst had not been named a defendant in any of the more than 300 cases currently pending in this MDL; UniFirst only recently appeared in this case and today makes its first substantive submission. The reason for UniFirst's delayed entry into this case is clear: UniFirst has no liability here and was only named a defendant because the culprit in these actions, New England Compounding Pharmacy, Inc. ("NECC"), filed for bankruptcy. As will be explained in UniFirst's motion to dismiss—due to be filed on April 1, 2014—UniFirst's sole connection to this case is that, once a month for approximately 1.5 hours on a Thursday morning, in return for $865, two UniFirst employees came to NECC and performed certain limited cleaning services in NECC's cleanrooms. UniFirst had no idea what NECC did with its cleanrooms during the remaining 700-plus hours per month. But what is clear is that it was NECC's responsibility to keep its cleanrooms clean at all times. And, of course, it was NECC's responsibility—and only NECC's responsibility—to make sure that its products remained free of

1

ACTIVE/71603350.13

contaminants.  Because UniFirst had no duty to ensure the sterility of either NECC's cleanrooms or its products, and because the allegations in the Master Complaint confirm that UniFirst did not proximately cause the plaintiffs' alleged injuries, UniFirst expects to be dismissed from this case on the pleadings.

UniFirst's recent addition to this litigation is not the only reason why this proceeding remains in its infancy.  Indeed, plaintiffs have not yet named or served several other entities that the plaintiffs' steering committee ("PSC") has identified as potential defendants in all or virtually all of the pending cases.  Additionally, this proceeding remains stayed against each and every defendant that has any affiliation whatsoever with NECC.  Yet, despite the incomplete roster, the PSC has filed a motion seeking to litigate this action on an unnecessarily accelerated schedule, the sequencing of which defies common sense.  The PSC asks this Court to enter an order that would require the parties immediately to begin the process of selecting a pool of "bellwether" cases for trial, and to complete all fact discovery on those cases (and all fact discovery on "global" issues) by October 15, 2014.  *See* Motion for Entry of Bellwether Trial and Pre-Trial Scheduling Order, Ex 1, at 3 (Dkt. # 837) ("Bellwether and Scheduling Motion").  The PSC's proposal is premature and entirely inconsistent with Judge Saylor's previous rulings in this case, which made clear that the Court would proceed in "a linear way"—first determining the universe of litigating parties and resolving the Rule 12(b)(6) motions, *and only then* turning attention to the discovery schedule and bellwether process.  Status Conference Tr. at 23:1-21 (Dec. 13, 2013); *see also id.* at 16:18-23 ("What I hope to accomplish [is first] to know what the universe of short complaints are and to permit defendants who so intend to have their 12(b)(6) motions or other preliminary motions resolved, either they win or they lose, and we go on from there.").

Even were it not premature, the PSC's proposed schedule is simply unworkable.  It

ACTIVE/71603350.13

allows for barely eight months from today for the parties and the Court to: (1) address the plethora of dispositive motions that are pending or will be filed; (2) submit and review the "plaintiff profile forms" that must be completed by each and every one of the approximately 400 plaintiffs in this proceeding who claim they were injected with products manufactured by NECC;[1] (3) obtain and review medical records for each of the plaintiffs; (4) decide upon cases to be included in the bellwether pool; and (5) pursue document and deposition discovery for those cases (and for all "global" issues). Thereafter, the PSC's proposed schedule would allow barely five months to complete all expert discovery relating both to global issues and to the bellwether cases *and* to file summary judgment motions, *Daubert* motions, and motions *in limine*. The Court would then have less than one month to rule on these motions and take the first two bellwether cases to trial. The PSC's proposed schedule would be challenging in an "ordinary" litigation involving one plaintiff; it is entirely unworkable in a litigation involving more than 500 plaintiffs, more than 55 defendants and the laws of at least 17 different states.

With respect to the PSC's bellwether proposal, UniFirst agrees in principle that this Court ultimately should adopt a bellwether protocol and conduct bellwether trials against any defendants that remain in this action after dispositive motions have been resolved. As explained by a leading authority on MDL proceedings and bellwether trials, Judge Eldon Fallon, the bellwether trial is an important tool that facilitates the efficient resolution of complex, multi-party civil disputes by advancing to trial a handful of representative actions so that the parties can gauge the value of the cases and more readily reach a global settlement. Eldon E. Fallon, et al, *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2325 (June, 2008)

---

[1]     Approximately 400 of the over 500 plaintiffs in the MDL allege that they were injected with products manufactured by NECC. The remaining plaintiffs have brought derivative claims, such as loss of consortium.

ACTIVE/71603350.13

(hereinafter, "Fallon")).[2]  But, although the PSC pays lip service to Judge Fallon's guidance on

the bellwether process,[3] it proceeds to ignore this guidance by suggesting that a *subset* of the

parties in only one judicial district (Tennessee) litigate a bellwether process that will affect *all*

defendants (including those not yet named) and hundreds of plaintiffs from at least 17 other

states.  The PSC's proposal all but guarantees that the Court and the parties will have to litigate

the bellwether process a second time and third time as additional defendants are added to the

litigation.  As Judge Saylor recently explained, "even conceptualizing what the central issues are

going to be" in an eventual bellwether case is impossible to do at this time, given the potential

settlement with the Affiliated Defendants and the uncertainty surrounding which of the National

Defendants ultimately will be named in the case.  Status Conference Tr. at 23:15:19-16:13 (Dec.

13, 2013).  Accordingly, this litigation remains "a ways away" from the appropriate stage at

which to consider and adopt a bellwether protocol.  Id. at 23:19-21.

Further, the PSC's proposed bellwether protocol fails to promote the central objectives of

the bellwether process—to ensure efficiency and the selection of representative cases.[4]  By

suggesting that the parties each select only four cases out of more than 300, and by insisting that

these eight cases necessarily must be the first to be tried, the PSC's approach ensures that neither

of these objectives could possibly be attained.  Accordingly, when the time comes to set a

protocol for the bellwether selection process, the Court should instead impose a protocol like that

described by UniFirst below, which parallels the bellwether protocols used in other large-scale

---

[2]     Judge Fallon is a district court judge for the Eastern District of Louisiana.  He wrote *Bellwether Trials in Multidistrict Litigation* with two of his former law clerks after presiding over two complex and high profile MDLs:  *In re Propulsid Prods. Liab. Litig.*, 00-md-01355-EEF-KWR (E.D. La.), and *In re Vioxx Prods. Liab. Litig.*, 05-md-01657-EEF-DEK (E.D. La.).  This article is regularly cited as a leading authority on the bellwether process in multidistrict litigation.

[3]     *See, e.g.*, Mem. in Supp. of PSC's Bellwether and Scheduling Motion, at 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 (Jan. 31, 2014) (Dkt. # 838).

[4]     Fallon, at 2324-25,  2337, 2349.

ACTIVE/71603350.13

MDL proceedings, provides for a larger pool from which to choose cases for trial, and allows for additional judicial input and oversight to ensure that the cases to be tried are sufficiently representative of the total universe of pending actions.

For each of these reasons, the PSC's Bellwether and Scheduling Motion should be denied.

## I.   THE COURT SHOULD NOT CONSIDER OR ADOPT THE DISCOVERY SCHEDULE PROPOSED BY THE PSC.

The PSC's request that the Court immediately set a detailed and inflexible schedule for every stage of these proceedings—from Rule 26 disclosures through trial—is both premature and misguided.  The purpose of an MDL proceeding is to promote the efficient and economical resolution of large groups of related cases.[5]  Here, it would be neither efficient nor economical to proceed with this litigation in the manner proposed by the PSC.

### A.   It Is Premature To Impose A Comprehensive Discovery Schedule.

At least two prospective defendants that are unaffiliated with NECC—ARL BioPharma, Inc., ("ARL") and Liberty Industries, Inc. ("Liberty")[6]—have been mediating with the PSC and, thus, have not yet been named in or served with short form complaints.[7]  Like UniFirst, ARL and

---

[5]   *See* Fallon, at 2326-30  ("[T]ransfers [to the MDL] shall be made by the judicial panel on multidistrict litigation . . . upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." (quoting 28 U.S.C. § 1407(a))).

[6]   ARL is alleged to have been responsible for testing the pharmaceuticals for contamination  before they left NECC's facility.  *See, e.g.*, Angst Complaint, 13- cv-10565-RWZ, at ¶¶ 54-68 (Dkt. # 1).  Liberty is alleged to have designed and installed NECC's cleanrooms.  Master Complaint, 13-md-2419-RWZ, at  ¶¶ 20, 125-135 (Dkt. # 545).

[7]   Judge Saylor's order establishing the mediation program exempts participants from various discovery obligations in the MDL.  Order on Mediation Program, at 9 (Aug. 15, 2013) (Dkt. # 394) ("Any person, organization, or entity executing a participation notice and agreement shall not be subject to discovery in the MDL except as provided in this Order, or as otherwise directed by the Court.  All discovery in the MDL is stayed as to such enrolled participants until further order of this Court"); *see also* MDL Order No. 6, at 10 (June 28, 2013) (Dkt. # 209) ("The proposed mediation order shall provide that any unaffiliated defendant or non-party who elects to participate in mediation shall . . . be exempt from discovery except as required to facilitate participation in mediation.").  As a result, litigation against the parties that agreed to mediate is effectively stayed pending resolution of the mediation program, and plaintiffs have not been

5

Liberty are "national" defendants (collectively with UniFirst, the "National Defendants"), meaning that every single plaintiff in the MDL potentially may bring a claim against them. Despite months of mediation, there is no indication that the parties are close to an agreement. Thus, if (or when) mediation fails, the majority, if not all, of the MDL plaintiffs will file short form complaints naming these additional National Defendants.

Additionally, all litigation against NECC, and against each and every individual or entity affiliated with NECC, is currently stayed. Although NECC is in bankruptcy and, therefore, may never be an active defendant in this matter, the individuals and entities affiliated with NECC (the "Affiliated Defendants") also have been named as defendants in virtually every one of the hundreds of cases in this proceeding.[8] At the moment, NECC and the Affiliated Defendants are attempting to reach a global settlement in the bankruptcy proceeding that would result in the release of all of the MDL plaintiffs' claims against them. There have been reports that the parties are close to a settlement, but so far they have been unable to reduce any agreement to writing, and it is far from clear that they (and their insurers) ultimately will be able to agree upon the necessary terms.[9] If the settlement is not consummated, then the PSC can and will seek to lift

---

required to file short form complaints or otherwise advance the litigation with respect to such parties. Indeed, although Liberty was named in the PSC's Master Complaint against all defendants unaffiliated with NECC, once Liberty agreed to mediate, the PSC recognized that plaintiffs need not file short form complaints or otherwise proceed with litigation against it until the mediation process ran its course. Status Conference Tr. 10:13-18 (Dec. 13, 2013) ("The plaintiffs' steering committee took the position with entities who've opted into mediation that we would not encourage plaintiffs to name them in complaints at this point in time. We recognize that if they fall out of mediation, that may need to be addressed on the back end.").

[8]   MDL Order No. 7 defines the "Affiliated Defendants" to include Barry Cadden; Lisa Cadden; Doug Conigliaro; Carla Conigliaro; Gregory Conigliaro; Glenn Chin; Alaunus Pharmaceutical, LLC; Ameridose, LLC; GDC Properties Management, Inc.; Medical Sales Management; and Medical Sales Management SW. Court Order, Dkt. # 438 (Sept. 18, 2013).

[9]   Status Conference Tr. at 16:9-25 (Feb. 6, 2014) ("THE COURT: Status of proposed settlement. Who's going to take the lead? Mr. Sobol. MR. SOBOL: Good afternoon, your Honor. Slowly, 'glacially' used to be a word that would be apt, but I think the glacials are moving faster than the  settlement of this case. THE COURT: I think the glacials are moving backwards actually. MR. SOBOL: Oh, that's right, backwards. It depends where you're standing actually. I hope that we're able to make more progress next month.").

ACTIVE/71603350.13

the stay and continue to pursue claims against the Affiliated Defendants in this MDL
proceeding.[10]

It makes no sense to proceed into discovery—especially on the timeline suggested by the
PSC—without the involvement of these numerous additional parties that are likely to be
defendants in many or all of the pending cases.  For one thing, every step taken by the parties,
and every decision reached by this Court, will have to be revisited once any additional defendant
joins the proceedings.  It goes without saying that the Affiliated Defendants, ARL and Liberty
will have a right to be heard with regard to the bellwether protocol, what documents are relevant
and should be collected and produced by the other parties, and the like.  And, it also goes without
saying that it would be *neither* efficient nor economical for the Court and the parties to resolve
these issues now, only to have to revisit them anew each time another defendant is brought into
the litigation.

Proceeding with discovery now also would be unfair to UniFirst and the other defendants
who are already parties to this proceeding:

> **First**, UniFirst fully expects that its motion to dismiss will be granted, and we understand
> from many of the other defendants that their dispositive motions also have a significant
> likelihood of success.  (This, of course, is unsurprising, given that NECC is indisputably
> the principal wrongdoer, and that many of the other defendants, including UniFirst, were
> only brought into this litigation as a result of NECC's bankruptcy.)  The Court should not
> force these defendants—against whom the PSC cannot even state a claim—to engage in
> discovery before resolving their dispositive motions.

> **Second**, given the pace of the PSC's proposed schedule, it is entirely possible that the
> defendants could have no choice but to proceed with depositions, only to have their
> witnesses forced to come back for a second deposition once the additional defendants are

---

[10]  The PSC already has filed a motion to lift the stay of proceedings so that it can commence seeking
discovery from the Affiliated Defendants.  PSC's Mot. to Partially Lift Discovery Stay, 13-md-02419-
RWZ (Oct. 28, 2013) (Dkt. # 534).  But, in a status conference in January, Judge Saylor declined to rule on
the motion in order to allow the parties to focus on settlement discussions; Judge Saylor recognized,
however,  that "[w]e're going to have to [lift the stay] eventually . . . unless every single defendant settles,
and it's been a while, and we ought to get going on it."  Status Conference Tr. at 31:10-20 (Jan. 10, 2014);
*see also id.* at 36:22-33:16.

ACTIVE/71603350.13

added to the mix.

**Third**, not only the PSC, but also the defendants (or at least those defendants who remain in this case following resolution of the motions to dismiss), will be interested in pursuing discovery from the Affiliated Defendants, ARL, Liberty and any other parties that the PSC is considering bringing into this litigation.  Such discovery would be essential for the remaining defendants to assess their respective responsibility (if any).  But, under the PSC's proposed schedule, the defendants' opportunity to take party discovery may well be over by the time these additional entities are added to the case—and the existing defendants may be forced to go through the deposition process without the benefit of first having obtained documents from these yet-to-be-added parties.

**Forth and finally**, it would be unfair to proceed with discovery now, as the PSC suggests, because, as things stand, the PSC is in possession of more than 40,000 pages of NECC documents that are subject to a confidentiality agreement.  The PSC has not, and will not, share these documents with defendants.[11]  Unless and until the Court lifts the stay against NECC—at least for the purposes of pursuing discovery—defendants have no way to secure these central documents in this case.[12]  Given this information disparity, it would be unjust for the Court to impose a discovery schedule that could require defendants to proceed with depositions before they have had an equal opportunity to secure and review critical NECC documents.

Notably, before his recusal, Judge Saylor repeatedly indicated that he was aware of precisely the concerns that UniFirst raises here, and, as a result, he repeatedly declined to impose a discovery schedule on the parties.  For example, Judge Saylor limited his initial scheduling order to only certain preliminary deadlines concerning the pleadings, and he expressly provided that, because his order pertaining to mediation "exempt[ed] participating defendants from various discovery obligations, . . . [i]n order to ensure that the litigation process is fair[,] should attempts at mediation prove unsuccessful, the Court may find it appropriate to modify the deadlines in this order, grant additional stays, or take such other action as justice may require." MDL Order No. 7, at 2-3 (Sept. 18, 2013) (Dkt. # 438).  More recently, during a December 13,

---

[11]     *See* Status Conference Tr. at 8:21-9:5 (July 18, 2013); Status Conference Tr. at 36:1-13 (Jan. 10, 2014).

[12]     Although the PSC has filed a motion to lift the discovery stay as to the Affiliated Defendants, that motion does not apply to NECC.  *See* PSC's Mot. to Partially Lift Discovery Stay, 13-md-02419-RWZ (Oct. 28, 2013) (Dkt. # 534); *see also* Status Conference Tr. at 29:10-14 (counsel for the PSC explaining that the motion to lift the discovery stay "did not include NECC because I was personally under a misimpression that I thought that I needed to go to the bankruptcy court to have the bankruptcy court automatic stay lifted for these purposes.").

8

2013 status conference, Judge Saylor made clear that he wanted this proceeding to progress in "a linear way," that, *as an initial matter*, determined the universe of litigating parties and resolved the Rule 12(b)(6) motions *before turning to the discovery process*.  Status Conference Tr. at 15:19-16:23, 23:1-21 (Dec. 13, 2013) ("[C]onceptually we'll do motions to dismiss, we'll do discovery, we'll do summary judgment, we'll have a trial.  There are lots of wrinkles along the way because it's an MDL, but that's the basic framework I want to follow here.").  As the Court explained:  "What I hope to accomplish in some reasonably short term is exactly that, to know what the universe of short complaints are and to permit defendants who so intend to have their 12(b)(6) motions or other preliminary motions resolved, *either they win or they lose, and we go on from there*."  *Id.* at 16:18-23 (emphasis added).  The Court specifically stated that it did not "want anyone to be put to unnecessary work or to go off half-cocked until some of these issues are resolved . . . ."  *Id.* at 86:3-5.  Because there are currently at least eight dispositive motions pending and at least one more scheduled to be filed, and because it is likely that the plaintiffs will be filing additional short form complaints to add in claims against more National Defendants, including Liberty, ARL and potentially others, the Court should continue to refrain from imposing a discovery schedule until the universe of litigating parties has been resolved.

**B.        The PSC's Proposed Discovery Schedule Is Unworkable And Unrealistic.**

When the time does come to set a discovery schedule, this Court should not look to the schedule proposed by the PSC as a model:  The deadlines suggested by the PSC would be unrealistic in an ordinary civil case—and are entirely fantastical in an MDL proceeding that requires the Court and parties to coordinate discovery in hundreds of cases involving thousands of claims subject to the laws of at least 17 different jurisdictions.[13]  To be clear, the PSC's

---

[13]        "The fact that MDL practice is relatively slow is to be expected . . . when one court is burdened with thousands of claims that would otherwise be spread throughout courts across the country."  Fallon, at 2330.

ACTIVE/71603350.13

proposal is not simply accelerated—it sequences the necessary steps to this litigation in a way that makes it impossible to carry out these MDL proceedings in a manner that is either efficient or economical.  Under the PSC's proposal, between now and October 15th *of this year*, the parties would have to (1) complete "common-issue"—or "global"—fact discovery for all 300-plus cases; (2) prepare, submit and review the plaintiff profile forms (or "PPFs") for each and every one of the more than 400 plaintiffs who claim they were injected with products manufactured by NECC;[14] (3) complete medical records release forms and secure relevant medical records for plaintiffs; (4) review the PPFs and medical records for each plaintiff; and, based on that information, select cases for the bellwether pool.  Then, if *any* additional defendants are added to the litigation, the parties would have to do this all over again.  Thereafter, the PSC's proposed schedule would allow for less than seven months for the parties to complete all expert discovery relating to both global issues and issues specific to the bellwether cases (with no opportunity to file case-specific motions to dismiss); for the parties to file, and the court to rule on, all summary judgment motions, *Daubert* motions and motions *in limine*; and for the first two bellwether cases to be tried.  Because the PSC's proposed schedule is entirely unrealistic and would result in unnecessary duplication and delay, this Court should disregard it.

II.    **THE COURT SHOULD NOT CONSIDER OR ADOPT THE BELLWETHER PROTOCOL PROPOSED BY THE PSC.**

    A.    **It Is Premature To Consider The Bellwether Selection Protocol.**

For the very same reasons that it is premature to impose a discovery schedule, it also is premature for the Court to set a protocol for selection of bellwether cases.  At this point, it is

---

[14]    The PSC's proposal only requires that plaintiffs that have brought claims against the Saint-Thomas Entities complete and submit PPFs and medical record authorizations.  Mem. in Supp. of PSC's Bellwether and Scheduling Motion, at 3, 6 (Dkt. # 838).  But, for the reasons explained below, *see infra* note 25, this court should require all plaintiffs injected with NECC products to complete the PPFs at this time, irrespective of their jurisdiction.

ACTIVE/71603350.13

unclear who the litigating defendants will be.  Some of the currently-litigating defendants likely will be dismissed, and some of the yet-to-be named defendants (and, potentially, the Affiliated Defendants) may well be added into the mix.  It is possible that, given particular issues relevant to the law of a particular state, an entire state's worth of defendants could be dismissed.  Indeed, although the PSC would have the Court select a bellwether pool and bellwether cases exclusively from among the cases that arose in Tennessee,[15] each of the "Tennessee Defendants" has filed a motion to dismiss which, if granted, would completely moot the PSC's proposal.[16]  And because each of the parties that ultimately may be joined in this case has a right to have input, it is simply too early for the Court to make a decision about the bellwether selection process.

In light of these very concerns, on December 23, 2013—just over two months ago—Judge Saylor vacated his original scheduling order in this case, to the extent it set deadlines concerning the selection of bellwether cases (Dkt. # 721).  The Court was responding to a motion in which several defendants argued that the deadlines imposed were premature and that "many more parties should be heard" before the Court entertained issues relating to the bellwether process.  *See* Saint Thomas Entities' Motion To Reconsider MDL Order No. 7 (Sept. 26, 2013) at 9-13 (Dkt. # 457).  In a one page order, the Court vacated the portions of the scheduling order pertaining to selection of bellwether cases and stated that it would "set a timetable for identification of potential bellwether cases, further discovery in those cases, and selection of actual cases for trial at a future date."  *See* Order On Timetable For Determining "Bellwether"

---

[15]     *See* Mem. in Supp. of PSC's Bellwether and Scheduling Motion, at 3, 6 (Dkt. # 838).

[16]     *See, e.g.*, The Tennessee Defendants' Motion to Dismiss the Plaintiffs' Complaints for Failure to Comply with Tenn. Code. Ann. § 29-26-121, (Jan. 10, 2014) (Dkt. # 770); The Tennessee Defendants' Motion to Dismiss Global Claims, (Jan. 10, 2014) (Dkt. # 771); Motion to Dismiss for Failure to Comply with Tennessee Health Care Liability Act, (Jan. 10, 2014) (Dkt. # 779); Saint Thomas Entities' Global Motion To Dismiss Under Federal Rule Of Civil Procedure 12(b)(6), (Feb. 7, 2014) (Dkt. # 893); Ascension Parties' Global Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6), (Feb. 7, 2014) (Dkt. # 895).

ACTIVE/71603350.13

Cases  (Dec. 23, 2013) (Dkt. # 721).  In a status conference held shortly before this order was entered, the Court specifically noted the difficulties of "even conceptualizing what the central issues are going to be" in an eventual bellwether case in light of the ongoing bankruptcy proceeding, the potential settlement with the Affiliated Defendants and the uncertainty surrounding which of the National Defendants ultimately would be named in the case.  Status Conference Tr. at 23:15:19-16:13 (Dec. 13, 2013).  The Court made clear that, in light of these uncertainties, the litigation was "a ways away from [imposition of a bellwether process] at this point."  *Id*. at 23:19-21.  Similarly, during the January 10, 2014 status conference, the Court recognized that, because the appropriate bellwether selection process will "depend[] very much what these cases look like, who the defendants are and what happens from there," it was premature to discuss the bellwether protocol at that time.  Status Conference Tr. at 45:19-46:25 (Jan. 10, 2014).

The relevant facts have not changed in any way since January 10, 2014.  The Affiliated Defendants and the PSC are continuing to discuss the possibility of settlement, but that settlement is far from certain, *and the other National Defendants still have not been named in, or served with, short form complaints*.  Accordingly, any discussion of a bellwether selection protocol is still just as premature as it was when the Court vacated its earlier scheduling order.

### B.    The PSC's Proposed Bellwether Protocol Is Not Properly Calibrated To Ensure Representative Bellwether Cases.

Even if it were appropriate to set a Bellwether protocol at this time (and it is not), the proposal submitted by the PSC is unworkable and should be rejected.

As explained by a leading authority in MDL proceedings and bellwether trials, Judge

ACTIVE/71603350.13

Eldon Fallon—in a law review article cited, but largely disregarded, by the PSC[17]—the
bellwether trial is an important tool that has been developed to facilitate the efficient resolution
of complex, multi-party civil disputes.[18]  Because the trial of properly-selected bellwether cases
can provide useful "information on the value of the [entire population of] cases as reflected by
the jury verdicts,"[19]  trying a number of "'bellwether' or 'representative' trials . . . can enhance
and accelerate both the MDL process itself and the global resolutions that often emerge from that
process."[20]  If the bellwether selection process is flawed,  however, it "will do little to resolve the
entire litigation," as verdicts in unrepresentative cases "have little predictive value," and
therefore do not facilitate a broader resolution of the proceedings.[21]

> As explained by Judge Fallon:
>
> There are three separate but equally important sequential steps that will streamline
> any trial-selection process and allow that process to achieve its full potential,
> regardless of the type of MDL.  The first step requires the transferee court and the
> attorneys to catalogue the entire universe of cases that comprise the MDL and
> then to divide the cases into several distinct, easily ascertainable categories of
> cases.  The second step necessitates that the transferee court and the attorneys
> select a manageable pool of cases, which reflects the various categories and
> contains cases that are both amenable to trial in the MDL and close to being trial-
> ready.  Once the pool has been constructed, all the cases comprising the pool
> should be set on a fast track for case-specific discovery. Third, near the
> conclusion of the case-specific discovery, the transferee court and the attorneys
> should select a predetermined number of individual cases within the sample and
> set these cases for trial.[22]

---

[17]    *See, e.g.*, Mem. in Supp. of PSC's Bellwether and Scheduling Motion, at 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 (Jan. 31, 2014) (Dkt. # 838) (citing Fallon)).

[18]    *See* Fallon, at 2330, 2337-42.

[19]    Fallon, at 2337 (quoting *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997)).

[20]    Fallon, at 2325.

[21]    Fallon, at 2349; *see also id.* at 2343 ("Ideally, the trial-selection process should accurately reflect the individual categories of cases that comprise the MDL *in toto*, illustrate the likelihood of success and measure of damages within each respective category, and illuminate the forensic and practical challenges of presenting certain types of cases to a jury.  Any trial-selection process that strays from this path will likely resolve only a few independent cases and have a limited global impact.").

[22]    *See* Fallon, at 2343.

ACTIVE/71603350.13

The PSC's proposal either ignores or subverts each step of this process.  First, the PSC completely eliminates the very first step—in which the Court and the parties catalogue the universe of cases and divide them in to ascertainable categories.  The PSC suggests that this step is unnecessary because the Plaintiff Profile Forms and medical records "will provide more than adequate information to the parties" to select bellwether cases.[23]  But this misses the point.  "The rationale behind cataloguing and dividing the entire universe of cases within the MDL" is not to provide the parties with information, but to allow the parties and the Court to *use* the information that has been gathered through the PPFs to ascertain the makeup of the MDL and "identify all the major variables" that will be in play in the cases.[24]  And, of course, until all relevant parties have been brought into the litigation, it is impossible to determine what those "major variables" will be.

The PSC's proposal also butchers the second step of the bellwether selection process— namely, the selection of a pool of cases that "reflects the various categories and contains cases that are both amenable to trial in the MDL and close to being trial-ready."  Suffice it to say, because the PSC has not proposed to catalogue the cases, its proposed selection process provides for no mechanism to ensure that the cases selected for further discovery include an appropriate mix of each of the relevant categories.  For example, although fewer than 10% of the cases involve fatalities, because the PSC's proposal would authorize the PSC to select any four cases for inclusion in the discovery pool, the PSC could choose to select only fatality cases to add to the pool.  Conversely, defendants would be free to select cases that involve only emotional distress and no physical injury.  Although the vast majority of the cases concern injuries that lie

---

[23]      Mem. in Supp. of PSC's Bellwether and Scheduling Motion, at 14 (Jan. 31, 2014) (Dkt. # 838).

[24]      Fallon, at 2344.

ACTIVE/71603350.13

somewhere between these two extremes, the pool from which the Court could select bellwether cases for trial would contain no cases lying in this middle ground.  As a result, the cases ultimately selected for trial would not serve as adequate representatives and would lack any and all predictive value.

The PSC also has corrupted the bellwether process by suggesting that litigation should or will proceed only in the Tennessee cases.  Mem. in Supp. of PSC's Bellwether and Scheduling Motion, at 3, 6 (Jan. 31, 2014) (Dkt. # 838).  UniFirst—and the other National Defendants likely to be added to the litigation—will be required to defend themselves in cases originating in at least 17 different jurisdictions, and governed by the laws of at least 17 different states.  The PSC's proposal to limit the bellwether pool to only Tennessee cases subverts the essence of an MDL by excluding from the litigation any and all of the hundreds of actions from jurisdictions other than Tennessee.[25]

Finally, by insisting that the eight cases selected for discovery also will be the first eight cases tried, the PSC improperly "commingle[s] aspects of the second step (selecting cases to fill the trial-selection pool) and third step (selecting cases from the trial-selection pool to be tried), by essentially forcing the attorneys to select which cases will be tried before completion of case-

---

[25]     Because the bellwether selection process must involve cases from all jurisdictions, it is critical that all of the plaintiffs—and not just the Tennessee plaintiffs—fill out and submit Plaintiff Profile Forms and medical records releases.  Thus, to the extent that the PSC and other relevant parties may have assumed that only the Tennessee plaintiffs need fill out these forms in the near term, that assumption is in error.  As counsel for the Saint Thomas Defendants explained during the February status conference, the PPFs and collection of records serve "twin purposes":  they provide a "wholistic health history" of the plaintiffs so the parties can "evaluate [them] for Bellwether," and they also serve "to make[s] sure that the [relevant medical] records are preserved."  Status Conference Tr. 44:5-45:6 (Feb. 6, 2014); *see also* Fallon, at 2343 ("If bellwether trials are to serve their twin goals as informative indicators of future trends and catalysts for an ultimate resolution, the transferee court and the attorneys must carefully construct the trial-selection process.").  Because many of the non-bellwether cases will not proceed to discovery or trial for years (if at all), it is imperative that the court and the parties take steps now to preserve all relevant medical records for the plaintiffs in these cases.

ACTIVE/71603350.13

specific discovery."[26] After discovery, it is likely that at least some of the eight cases in the PSC's proposed discovery pool will turn out not to be representative. Under the PSC's proposal, there would be no opportunity to cast those cases aside in favor or more representative actions. In other words, the PSC's protocol would "force the attorneys to try unrepresentative or disparately unfavorable cases"[27]—even though judgments and verdicts in those cases would have no predictive value and, thus, would not serve to advance any possibility of a global resolution.

The PSC's proposed protocol also suffers from two other critical defects. First, the pool of cases that the PSC proposes to send to fact-specific discovery is far too small. Under the PSC's proposal, only eight of the 300-plus cases pending in this MDL would undergo case-specific fact discovery and become eligible for bellwether trial. A pool of eight (out of 300 or more) is not large enough to ensure a representative sample.[28] Second, by excluding the Court entirely from the bellwether selection process (other than allowing the Court to choose the order in which the eight bellwether cases will be tried), the PSC's proposal eliminates the only neutral mediator from the selection process. Of course, counsel should be integrally involved in the selection of bellwether cases, but it is just as important that the Court play a meaningful role to ensure that the cases to be discovered—and, ultimately, the cases to be tried—are truly representative. By excluding the Court from this process, the PSC's proposal leaves the door open for the parties to game the system and, thus, to undermine the usefulness of the bellwether

---

[26] Fallon, at 2347.

[27] Fallon, at 2347 ("[I]f the transferee court intends to try five cases and the pool itself is only five to ten cases, then the ability to pick, veto, or strike cases within the pool is greatly diminished, and the second step essentially eliminated. This is problematic because, as can often happen, a case that appears to be favorable or representative early in the litigation process (when the pool is initially filled) may be eventually determined to be unrepresentative or grossly unfavorable once case-specific discovery is complete.")

[28] *See* Fallon, at 2347 ("If the pool is too small, then there is a risk that too few of the major variables will be properly represented.")

process.[29]

### C.      UniFirst's Proposed Bellwether Protocol

Although UniFirst believes that it is premature for the Court to select a bellwether

protocol (at least until all parties are joined and can be heard), UniFirst nonetheless presents the

Court with an alternative to the PSC's proposal, so that the Court can get a better sense of how

this process might meaningfully be used to select truly representative bellwether cases for trial.

*First*, once all Plaintiffs have filled out their Plaintiff Profile Forms and medical records

releases—and defendants have had a meaningful opportunity to review the PPFs and to secure

and review the relevant medical records—the parties (with guidance from the Court or Judge

Boal), can determine the categories of cases that must be adequately represented in the

bellwether pool.  Such categories may include, but are not limited to, the nature of the alleged

injury; the age group, prior health history and location of the plaintiff; the medical facility where

the plaintiff was treated; the batch number of the contaminated drug administered to the plaintiff;

and the jurisdiction whose law will govern the case.[30]  The parties can meet and confer to try to

come to agreement on the major variables and, if no such agreement is reached, can seek

guidance from the Court.[31]

*Second*, once the relevant categories have been determined, the Court can determine the

number of cases to proceed into discovery.  The Court will need to ensure that "the pool is large

enough to account for all of the major variables previously identified, but small enough to be

---

[29]     *See* Fallon, at 2349 (discussing how even if the Court opts to have the attorneys select the trial-selection
pool "the attorneys, with the transferee court's encouragement, must be mindful that unrepresentative
cases, even if they are successful at trial, will do little to resolve the entire litigation and will have little
predictive value.  Additionally, the transferee court can take steps to curb this behavior by giving the
attorneys veto or strike power during the subsequent trial-selection step.")

[30]     Fallon, at 2344-45.

[31]     Fallon, at 2345.

ACTIVE/71603350.13

manageable and time-efficient."[32]  Defendants anticipate that, given the number of cases and the

expected variables in play, it may make sense to proceed to case-specific discovery on

approximately 20 cases.[33]  The Court could involve the parties in the process of selecting the

discovery pool by, for example, allowing each side to propose 20 cases.  To ensure that the cases

that proceed to discovery are representative rather than outliers, the Court could then review the

Plaintiff Profile Forms and the parties' submissions to select 20 cases (from the 40 proposed)

that the Court believes would adequately represent the various categories and variables present in

the total population.[34]  This method would allow the Court to play an active role in mediating the

process without overtaxing judicial resources.

*Finally*, after case-specific discovery of those 20 cases is complete, the Court could

select a subset of representative cases from the bellwether pool to be set for trial.  In Judge

Fallon's experience, "a discovery pool consisting of twenty cases should be satisfactory for

situations in which the transferee court intends to hold approximately six trials, with four to five

major variable groupings, while giving each side of attorneys a few vetoes or strikes during the

final trial-selection phase."[35]  In other words, this process would allow for the parties to try

approximately six cases that adequately reflect and represent the most critical variables among

the total pool of cases in the MDL.  It is this sort of methodical, even-handed, and thoughtful

process that could ensure that the bellwether trials promote the very purpose of an MDL:

efficiency and economy, with the hope and potential to reach a global resolution of all cases.

---

[32]   Fallon, at 2347.

[33]   *See* Fallon, at 2347.

[34]   Although there are three principal ways to fill the trial pool—(1) random selection; (2) selection by the Court; and (3) selection by the parties—the particular method for selecting the bellwether pool should be based on what is most reasonable given the specific facts and circumstances of a given case.  Fallon, at 2348.  Indeed, the "number and type of feasible trial-selection processes are limited only by the ingenuity of each transferee court and the coordinating attorneys."  Fallon, at 2343.

[35]   *See* Fallon, at 2347.

ACTIVE/71603350.13

## <u>CONCLUSION</u>

The PSC's Bellwether and Scheduling Motion should be denied.  It would be inefficient, unfair, and likely to cause duplication of work for the Court to set a case schedule and a bellwether selection protocol at this time, when (1) several of the anticipated National Defendants have not yet been named or served in this action, (2) certain of the Affiliated Defendants may fail to settle and could join the litigation, (3) litigation against the Affiliated Defendants remains stayed, and (4) only the PSC has access to NECC documents.  Once these issues have been addressed, all the parties can efficiently and fairly move forward with litigation. But, until then, the PSC's Motion remains premature.

Respectfully submitted,

DEFENDANT UNIFIRST CORPORATION

By its attorneys,


<u>/s/ James C. Rehnquist</u>

James C. Rehnquist (BBO #552602)
Roberto M. Braceras (BBO # 566816)
Abigail K. Hemani (BBO # 650721)
Damian W. Wilmot (BBO # 648693)
Josh L. Launer (BBO # 673661)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, Massachusetts 02109-2881
Telephone: 617.570.1000
Facsimile: 617.523.1231
jrehnquist@goodwinprocter.com
rbraceras@goodwinprocter.com
ahemani@goodwinprocter.com
dwilmot@goodwinprocter.com
jlauner@goodwinprocter.com


Dated:  March 3, 2014

ACTIVE/71603350.13

## <u>CERTIFICATE OF SERVICE</u>

     I, James C. Rehnquist, hereby certify that a copy of this document, filed through the CM/ECF system will be accessible to those attorneys who are registered with the Court's electronic filing system and Notice of Electronic filing (NEF) will be sent to these parties by operation of the CM/ECF system on March 3, 2014.

                             */s/ James C. Rehnquist*

ACTIVE/71603350.13