# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC.  PRODUCTS LIABILITY LITIGATION | MDL No. 2419 <br> Dkt. No. 1:13-md-2419 (RWZ) |
| THIS DOCUMENT RELATES TO: <br><br> All Actions | |

## PLAINTIFFS' STEERING COMMITTEE'S STATUS REPORT

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  FACTUAL BACKGROUND ON THE OUTBREAK..................................................3

    A.   Compounding Pharmacies ........................................................................3

    B.   Meningitis .................................................................................................3

    C.   The Creation of NECC...............................................................................4

    D.   The Outbreak and its Aftermath ...............................................................6

    E.   The Investigation Grew to Cover other NECC-Related Entities and
        Drugs........................................................................................................9

    F.   Criminal and Congressional Investigations ...........................................10

    G.   CDC Case Counts ...................................................................................10

III. PLAINTIFFS' LEADERSHIP.................................................................................11

IV.  THE DEFENDANTS...............................................................................................12

    A.   Affiliated Defendants:  NECC, the Individual Insiders, and Related
        Entities.....................................................................................................12

    B.   National Defendants: UniFirst, Liberty, ARL, and Victory ...................13

    C.   Clinic Related Defendants:  Clinics, Hospitals, Doctors, and Others....15

V.   INSPECTION AND PRE-MDL LITIGATION .........................................................16

    A.   Judge Saylor Consolidated All Cases Filed in the District of
        Massachusetts .........................................................................................16

    B.   The Court Entered an Injunction and Attachment against NECC
        for the Benefit of Victims .......................................................................16

    C.   The Court Ordered an Inspection of NECC's Premises .........................16

    D.   NECC Filed for Bankruptcy ...................................................................17

VI.  PROCEEDINGS IN THE MDL ..............................................................................17

    A.   Major Substantive Orders Entered by the Court....................................17

B.      Master Complaint Against the Unaffiliated Defendants.......................................20

C.      Current MDL Case Count and Census.................................................................21

D.      Status of Discovery .............................................................................................23

E.      Mediation Efforts to Date ....................................................................................26

F.      Pending Motions ..................................................................................................27

VII.    INSURER DECLARATORY JUDGMENT ACTIONS.............................................31

VIII.   NECC BANKRUPTCY PROCEEDINGS ..................................................................32

A.      Appointment of Chapter 11 Trustee and Official Committee of
        Unsecured Creditors.............................................................................................32

B.      "Non-Debtor Releases"........................................................................................32

C.      Bar Date for Victim's Claims ..............................................................................33

D.      Census of Proof of Claims Filed in the Bankruptcy Proceedings.........................35

IX.     PROPOSED SETTLEMENT WITH NECC INSIDERS ..................................................36

# I.    INTRODUCTION

The Plaintiffs' Steering Committee ("PSC") submits this status report in advance of the March 13, 2014 status conference – the first status conference since this MDL has been assigned to the Honorable Rya W. Zobel – to provide a brief history of the MDL and bankruptcy proceedings to date, describe where things stand on both the litigation and settlement tracks, and identify some matters that we expect the Court will need to take up in the near future.  We have tried to present this information neutrally, without advocacy, in an effort to aid the Court in sifting through the voluminous docket.

This multidistrict litigation arose as a result of a widespread outbreak of fungal meningitis and other infections that have affected at least 751 individuals in 23 states; at least 64 people have died.[1]



---

[1] http://www.cdc.gov/hai/outbreaks/meningitis-map-large.html(updated October 23, 2013).

The United States Food and Drug Administration ("FDA") and the Centers for Disease Control and Prevention ("CDC") have confirmed the presence of fungus in unopened vials of methylprednisolone acetate ("MPA"), a steroid often injected into patients by medical providers to treat chronic back pain. The FDA and CDC have also identified bacteria and/or fungus present in NECC-supplied preservative-free injectable betamethasone (also used to treat back pain), preservative-free triamcinolone (another injectable steroid), and cardioplegia solution (used during heart surgery).[2]

The contaminated products that caused these injuries were made by New England Pharmacy, Inc., d/b/a New England Compounding Center ("NECC"). No one seriously disputes that the conditions under which these products were compounded and distributed by NECC contributed to this outbreak. But the story does not end with NECC. Multiple actors contributed to the chain of events that lead to these 64 deaths and countless injuries. For example, given the obvious, visible deficiencies in NECC's sterility practices, coupled with its history of contamination problems and heavily discounted pricing, any reasonable due diligence by a provider purchasing supposedly sterile products from NECC for administration to patients would have revealed that NECC's products endangered patient safety. Also, for example, as described in more detail below and in the many complaints filed by Tennessee patients, the Tennessee defendants are alleged to have participated in NECC's scheme to evade patient safety rules and evade detection of their violations by the state regulators.

Should the Court have any questions, we will answer them at the March 13, 2014 status conference or, at the Court's request, in another written submission.

---

[2] http://www.cdc.gov/medicationsafety/recalls/necc/.

## II.      FACTUAL BACKGROUND ON THE OUTBREAK[3]

**A.     Compounding Pharmacies**

According to the FDA, traditional pharmacy compounding is the combining, mixing, or altering of ingredients by a pharmacist in response to a physician's prescription to create a medication tailored to the specialized needs of an individual patient.  Compounding is traditionally used to prepare medications that are not available routinely, such as a drug for a patient who is allergic to an ingredient in a mass-produced product.

When this catastrophe occurred, in Massachusetts and many other states, compounding pharmacies were required to obtain a prescription from an individual patient in order to prepare and sell a medication.[4]  The serious risks of pharmacy compounding were the subject of considerable public discussion in the pharmacy community and the medical community well before the subject meningitis outbreak.[5]

**B.     Meningitis**

Meningitis is an infection of the membranes covering the brain and spinal cord (meninges).  Primary symptoms include: fever, chills, altered mental status, nausea, vomiting, sensitivity to

---

[3] The facts presented in this section are drawn from the Master Complaint (ECF No. 545) and other complaints naming the affiliated defendants (*e.g.*, *Cole v. Erkan*, 12-cv-12066, ECF No. 5).

[4] *See* 105 CMR 721.000.

[5] For example, on November 5, 2010, the American Society of Anesthesiologists, the American Society of Health-System Pharmacists published a report regarding drug shortages. That report included an article written by the ASHP stating as follows:

> Compounding pharmacies have also pursued the production of drugs that are in short supply. Caution is warranted because preparations from these pharmacies may not meet applicable state or federal standards (e.g., United States Pharmacopeia chapter 797 or FDA labeling requirements). The sources of raw materials used by compounding pharmacies have been questioned, and apparent lapses in quality control have resulted in serious patient injury, including death.
> . . .
> Compounding pharmacies may also present patient risks; several deaths have been associated with improperly sterilized compounded products.

*See also* FDA Consumer Health Information report *The Special Risks of Pharmacy Compounding*, available at www.fda.gov/consumer/updates/compounding053107.html.

light, severe headache, and neck stiffness.  Complications and risks from meningitis include:
brain damage, buildup of fluid between the skull and brain, hearing loss, hydrocephalus,
seizures, stroke and death.  Meningitis is typically diagnosed by lumbar puncture (spinal tap or
"LP") to collect cerebrospinal fluid which is then tested.

Meningitis can be caused by several factors including bacteria, viruses, and fungus.  Fungal
meningitis is rare, difficult to diagnose, and difficult to treat.  The typical incubation period for
contracting fungal meningitis from a tainted steroid is one to four weeks after injection, though it
can be far longer.  Treatment of fungal meningitis typically requires long courses of high dose
antifungal medications, which itself can present challenges to the patient's health.  Treatment is
not always effective and its length can vary depending on the state of the patient's immune
system and type of fungus.

The contaminated injections also caused dangerous and, in some cases, life-threatening,
fungal infections in locations in the body other than in the meninges. The CDC reported
hundreds of cases of fungal infections in the paraspinal area (tissue near the spinal column, but
not in the meninges) and in other joints, such as the sacroiliac joint (between the sacrum and the
pelvis).

## C.     The Creation of NECC

Gregory Conigliaro and Barry Cadden co-founded NECC in 1998.  Gregory Conigliaro's
sister, Lisa Conigliaro Cadden, and her husband, Barry Cadden (the "Caddens") were both
licensed pharmacists.  NECC opened in the same Waverly Street building that housed the
Conigliaro family recycling plant and real estate business.

Greg Conigliaro's brother, Dr. Douglas Conigliaro, was an anesthesiologist with a pain
management practice in Florida.  Douglas Conigliaro's wife, Carla Conigliaro, initially owned
sixty-five percent of NECC.  Carla Conigliaro (a nurse) was originally listed as the company's

president.  Cadden held positions as the President, Chief Pharmacist, and Director of NECC. Gregory Conigliaro provided advice to NECC and Lisa Conigliaro Cadden was a board member and worked as a pharmacist at NECC.

The Conigliaros and Caddens opened another company in the same Framingham building, called Medical Sales Management Inc. ("MSM").   MSM, led by Douglas Conigliaro, provided advertising and marketing services for NECC.  As the sales arm for NECC and its sister company Ameridose, MSM promoted the compounding business at trade shows across the country, and its sales force aggressively worked the phones, reaching out to new and established customers.

In 2006, the Conigliaros and Caddens launched Ameridose, LLC ("Ameridose"), originally located in the same Framingham building.  Ameridose sold prefilled syringes and broke down large vats of liquid medications into smaller intravenous bags for individual treatments.  Unlike NECC, Ameridose has a manufacturing license from the FDA, allowing it to ship medications in bulk without obtaining individual prescriptions.

In 2009, the Conigliaros and Caddens founded Alaunus Pharmaceutical LLC ("Alaunus"). Alaunus identifies, develops, and markets generic pharmaceutical products to physicians and pharmacies throughout the United States.  It has several Abbreviated New Drug Applications on file with the FDA although no products have been approved.  Alaunus is located in the same office park as NECC and the recycling facility.

These were not the only Conigliaro family businesses.  In 1990, Gregory Conigliaro opened Conigliaro Industries, Inc. to recycle plastic, metal, glass, and paper products in an industrial building in Framingham, Massachusetts.  In April 2003, Conigliaro Industries opened the first U.S. commercial plant to shred and recycle mattresses.  The business operates out of an

88,000 square foot facility located at 701 Waverly Street, in a large Framingham complex owned by Gregory Conigliaro's real estate companies, GDC Holdings Inc. and/or GDC Properties Management LLC ("GDC") – the same complex that housed NECC and Ameridose.

**D.      The Outbreak and its Aftermath**

On September 24, 2012 the Tennessee Department of Health ("TDH") notified the Massachusetts Department of Public Health ("MDPH") about a cluster of fungal meningitis cases with symptoms that began between July 30 and September 18, 2012.  These patients all received injections of preservative free MPA compounded at NECC.

**1.      FDA and MDPH Began Investigating NECC.**

The MDPH, Massachusetts Board of Registration in Pharmacy, and Bureau of Infectious Diseases convened a multi-agency meeting with the TDH, the CDC, the FDA, and NECC.  At the demand of MDPH staff, Barry Cadden and Gregory Conigliaro provided documentation of facilities that received medications from three lots of MPA suspected as linked to the fungal infections.  According to those lists, the suspected lots contained 17,676 doses and were distributed to more than 14,000 patients in 23 states.

On October 1, 2012 MDPH and FDA began a joint investigation of NECC.  Investigators were shown examples of MPA products that were labeled as patient-specific.  But NECC did not have individual prescriptions.  Instead, it had lists of patients generated by clinical facilities and provided to NECC to obtain the product.

**2.      NECC Surrendered its Pharmacy License and Recalled All of its Products.**

In early October 2012 NECC surrendered its pharmacy license.  MDPH and FDA investigators noted visible contaminants in sealed recalled vials of MPA and issued a nationwide alert to providers and facilities across the country, informing them about the particulate matter. NECC ceased all production and in conjunction with the federal and state investigations, recalled

all products currently in circulation that were compounded at and distributed from its facility in Framingham "due to the potential risk of contamination."

### 3.      FDA and Massachusetts Board of Pharmacy's Findings

The MDPH and FDA identified "serious deficiencies and significant violations of pharmacy law and regulations that clearly placed the public's health and safety at risk."  The FDA reported that it had detected fungal contamination by microscopic examination of particulate matter taken from a sealed vial of MPA collected from NECC.  The FDA also noted that "foreign material" had also been observed in other vials collected by the FDA.

### 4.      MDPH's Preliminary Findings

On October 23, 2012, the MDPH released its preliminary investigation findings.  Among the report's findings:

- NECC did not follow industry standards for product sterilization.
- In violation of its state pharmacy license NECC distributed large batches of compound products directly to facilities for general use rather than requiring a prescription for an individual patient.
- NECC did not conduct patient-specific medication history or drug utilization reviews, as required by regulations.
- The clean rooms used to compound drugs were not appropriately sealed, allowing contaminants to infiltrate the room, and exposing drugs to contamination.
- Powder hoods within the sterile compounding area were not thoroughly cleaned pursuant to industry standards or NECC's operating procedures.
- "Tacky mats" used to trap dirt, dust, and other potential contaminants from shoes prior to clean room entry were visibly soiled with debris.
- A leaky boiler next to the clean room, including a pool of standing water, created an environment susceptible to contaminant growth.

5.      **FDA's Initial Findings and Form 483 Report**

On October 26, 2012, the FDA released a copy of the FDA form 483 issued to NECC.  The FDA issues a 483 at the end of an inspection when the investigators believe that they observed conditions or practices that indicate violations of the Food, Drug, and Cosmetic Act or attendant regulations.

The FDA observed and has since confirmed the presence of contaminated products and listed a number of observations regarding conditions in the clean rooms at NECC's Framingham facility, including:

- 83 of 321 vials of MPA from a lot shipped between August 17, 2012 and September 25, 2012 contained a greenish black foreign matter.  Seventeen vials from the same bin contained white filamentous material.

- Sterility analysis of a sample confirmed the presence of "viable microbial growth" in all of the 50 vials tested.

- On at least 26 occasions in 2012, NECC's internal environmental monitoring program recorded bacteria and mold in the clean rooms used to produce "sterile" drug products.

- Samples taken from inside the hoods used for compounding showed at least eight instances of bacterial and/or mold contamination.

- The plastic and mattress recycling facility next door produced dust and other airborne contaminants.  NECC's HVAC units on the roof were about 100 feet from the recycling facility.  Inside NECC, the FDA observed that dark particulate and white, filamentous substances covered the louvers of an HVAC return located behind the autoclave in the clean room.

- The air-conditioning in the clean rooms was turned off overnight.  This is not typical for a clean room, as temperatures must be kept constant to minimize microbial growth.

E.      **The Investigation Grew to Cover other NECC-Related Entities and Drugs**

      **1.      MDPH Shut Down Ameridose and Suspended Insiders' Pharmacy Licenses**

On October 8, 2012, at the insistence of MDPH and FDA, Barry Cadden, Glenn Chin, and Lisa Cadden, pharmacists at NECC, agreed to stop practicing until the investigation was complete.  On October 10, 2012 MDPH asked Ameridose and Alaunus Pharmaceuticals to cease all operations, including dispensing, manufacturing, or distributing any products.  MDPH demanded that Barry Cadden immediately resign as manager, director and from any other management position at NECC and Ameridose.

      **2.      FDA Confirmed Other NECC Products were Contaminated**

On October 15, 2012 the FDA issued an advisory that a patient may have acquired fungal meningitis from a different steroid injection, triamcinolone acetonide.  In addition, the FDA reported a transplant patient with aspergillus funigatus infection who received NECC cardioplegic solution during surgery.  MDPH asked Massachusetts providers to contact any patients who received any injectable product, including opthalmic drugs or cardioplegia solutions prepared by NECC after May 21, 2012.

      **3.      FDA and MDPH investigated Ameridose and Alaunus Pharmaceuticals**

On October 19, 2012 investigators at MDPH and FDA scrutinized the business practices of Alaunus for inappropriate distribution of NECC or Ameridose products.  On October 31, 2012 Ameridose announced a recall of all of its products.

On November 1, 2012 the FDA and CDC found bacterial contamination in two other drugs made by NECC, preservative-free betamethasone (a steroid used to alleviate back pain) and cardioplegia solution (used during heart surgery).  These finding "reinforce the FDA's concern about the lack of sterility in products produced at NECC's compounding facility."

### 4.   FDA Confirmed Ameridose's Products were Contaminated

On November 9, 2012, the FDA released a report describing the results of its inspection of the Ameridose facilities in Westborough, MA.  This report, like those concerning NECC's practices found significant lapses in sterility testing procedures, failure to act in the face of tests showing potential contamination of drug products, and physical conditions conducive to contamination.

### F.   Criminal and Congressional Investigations

The Department of Justice and the Commonwealth of Massachusetts have announced that they are pursuing criminal investigations of NECC's practices.  Other states' Attorneys General are also pursuing criminal investigations.

The U.S. House of Representatives Energy and Commerce Committee also investigated the outbreak.  On October 11, 2012, the Committee wrote to Barry Cadden individually to request that NECC preserve all relevant documents and communications and that NECC make arrangements with Committee staff to testify before the Committee.  On November 14, 2012, the Committee held a hearing, titled "The Fungal Meningitis Outbreak: Could It Have Been Prevented?"  Barry Cadden appeared, but repeatedly asserted his Fifth Amendment right against self-incrimination and did not answer any of the Committee's substantive questions.

### G.   CDC Case Counts

As of November 3, 2013, the CDC reported 751 cases of fungal meningitis, stroke due to presumed fungal meningitis, or other central nervous system-related infection meeting the CDC outbreak case definition, in addition to paraspinal/spinal joint infections and peripheral joint infections (e.g., knee, hip, shoulder, and elbow).  The CDC reports cases in Florida, Georgia, Idaho, Illinois, Indiana, Maryland, Michigan, Minnesota, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, and

Virginia.  Of these 751 reported cases of fungal meningitis, at least 64 people have died (in nine different states).  The CDC estimates that at least 14,000 patients were administered injections from just the three recalled lots of MPA.

### III.    PLAINTIFFS' LEADERSHIP

After the MDL was created,[6]  Judge Saylor sought input from plaintiffs' counsel on the creation of a structure for leadership of plaintiffs in the MDL.[7]   The Court received submissions from various plaintiffs' attorneys, and groups of attorneys, seeking a leadership position.  On April 9, 2013 the Court appointed Thomas Sobol of Hagens Berman Sobol Shapiro LLP as Lead Counsel.  The Court also appointed a seven person PSC and a Federal-State Liaison.[8]

Among other responsibilities, the Court appointed Lead Counsel to chair the PSC, present the position of plaintiffs in all pretrial proceedings, delegate tasks to other plaintiffs' counsel to "ensure that pretrial preparation for the plaintiffs is conducted effectively, efficiently, and economically,"[9] and to "coordinate and lead discussions with the Court, plaintiffs' counsel and other stakeholders (for example, the Chapter 11 Trustee and its counsel, the Creditors' Committee and its counsel, other defense counsel, and non-parties) to ensure that . . .unnecessary expenditures of time and funds are avoided, and any negotiations are reasonably efficient and

---

[6] While the motion for multidistrict consolidation was pending, Judge Saylor appointed Kristen Johnson Parker of Hagens Berman Sobol Shapiro LLP in Boston as interim liaison counsel for plaintiffs.  Dkt. No. 108.

[7] Dkt. No. 194.

[8] The members of the PSC include (i) Thomas M. Sobol of Hagens Berman Sobol Shapiro, LLP, (ii) Mark Chalos of Lieff Cabraser Heimann & Bernstein, LLP, (iii) Kim Dougherty of Janet Jenner & Suggs, LLC, (iv) Marc Lipton from Lipton Law, (v) Patrick Fennell of Crandall & Katt,(vi) J. Gerard Stranch, IV of Branstetter, Stranch & Jennings PLLC, and (vi) Mark Zamora of the Zamora Firm.

[9] Dkt. No. 82 at 3.

productive."[10]  Pursuant' to the Court's order, Lead Counsel is to be involved in any settlement discussions "whether taking place in the MDL or the bankruptcy."[11]

The PSC responsibilities include the following: to "initiate, coordinate, and conduct all pretrial discovery on behalf of plaintiffs in all actions," to coordinate plaintiffs' positions in hearings and in briefs in all pretrial proceedings, to coordinate the presentation of any common issues in any "bellwether" and/or "test case trials," and to "negotiate and propose settlement of cases on behalf of plaintiffs or plaintiffs groups, including . . . pursuing all settlement options concerning any claim or portion thereof of any case filed in this litigation."[12]

The PSC work falls into two categories:  a settlement track and a litigation track.  The PSC has aggressively pursued settlement with the Affiliated Defendants and others who have opted into mediation and have actively gathered evidence to establish the liability of each such settlement participant.  To date, the PSC's litigation efforts have focused on the so-called unaffiliated defendants, particularly St Thomas Hospital defendants from Tennessee, New Jersey, and the national defendant UniFirst.  The PSC has proposed a trial against the St. Thomas defendants in the spring of 2015 (discussed further below).

## IV.     THE DEFENDANTS

### A.     Affiliated Defendants:  NECC, the Individual Insiders, and Related Entities

As described above, Barry Cadden, his wife Lisa Cadden, Greg Conigliaro, his brother Douglas Conigliaro, and Doug's wife Carla Conigliaro (referred to herein collectively as the "Insiders") founded and ran NECC and the various NECC related entities, including Ameridose, MSM, MSM-SW, GDC and Alaunus (the "Affiliated Entities").

---

[10] *Id* at 4.

[11] *Id.*.

[12] *Id.* at 7.

**B.      National Defendants: UniFirst, Liberty, ARL, and Victory**

     **1.      UniFirst Corporation**

Defendant UniFirst Corporation ("UniFirst.") holds itself out as providing services to the pharmaceutical industry and other industries that utilize cleanroom-controlled environments. UniFirst offers comprehensive cleanroom cleaning and maintenance programs to help ensure that facilities are operating within specified classification goals.

UniFirst entered into a Contamination Control Service Agreement ("CCSA") with NECC on October 7, 2008, and renewed it thereafter, such that a contract existed in calendar years 2011 and 2012.  The Master Complaint alleges that, according to the terms of the CCSA and later iterations, UniFirst was responsible for cleaning each cleanroom at the NECC facilities. UniFirst's duties included cleaning and sanitizing each anteroom and cleanroom – including floors, ceilings, and ventilation hoods.  UniFirst agreed to a triple decontamination process for each room, using products provided by UniFirst.

The Master Complaint alleges that UniFirst employees entered the NECC facilities in street clothes, without donning sterile or contaminant-free protection such as shoe covers, hair caps, coveralls, and gloves.  It alleges that UniFirst used mops, mop heads, sponges and buckets that had been moved through exterior environments, even though such equipment had not been sanitized or cleaned appropriately and that UniFirst employees failed to clean or wipe shoes, boots and other footwear on floor mats used in the room entry process, thereby allowing contaminants into and throughout the NECC facility.  It is alleged that as a result of these failures and omissions, UniFirst negligently allowed contaminants into every cleanroom where recalled products were made.  UniFirst has elected not to participate in mediation.

### 2. Liberty Industries Inc.

Liberty Industries Inc. ("Liberty") designs, manufactures, and installs cleanrooms and contamination control supplies in the United States and worldwide.  The Master Complaint alleges that between 2005 and 2008, Liberty designed, manufactured, and/or installed three cleanrooms for NECC and/or Ameridose at the Framingham facility.  The Master Complaint alleges that subsequent cleanroom additions, rework or repair (warranty or otherwise), and/or system upgrades, were performed by Liberty within each of these cleanrooms after they were initially certified for use.  It is alleged that the clean rooms contained defects that made them unsuitable for their intended use, and that Liberty breached its duty to plaintiffs to manufacture, construct, install, and/or design the cleanrooms so as to prevent the contamination of pharmaceuticals compounded within them.

In November 2013, shortly after the PSC's Master Complaint was filed naming Liberty as a defendant, Liberty elected to participate in this Court's mediation program. The PSC encouraged individual plaintiffs to not name Liberty as a defendant in their short form complaints (which were filed in December 20013) while it is participating in mediation.

### 3. ARL Bio Pharma Inc.

ARL Bio Pharma Inc., d/b/a Analytical Research Laboratories ("ARL"), was NECC's outside laboratory testing company, which performed sterility and endotoxin testing on the lots of contaminated drugs produced by NECC over the spring and summer of 2012.  ARL provided microbiology reports to NECC which declared that ARL had conducted its sterility and endotoxin testing pursuant to the standards set for in the United States Pharmacopoeia ("USP") and that the contaminated drugs had passed these tests.  Numerous plaintiffs named ARL as a defendant in individual lawsuits alleging that ARL was negligent for not following the procedures set forth in the USP.  In September, 2013, ARL entered into this Court's mediation

program and therefore, they were not named in the Master Complaint filed by the PSC.

Mediation sessions are currently scheduled with ARL for April 1 and 2, 2014.

### 4. Victory Heating and Air Conditioning Co., Inc.

Victory Heating and Air Conditioning Co., Inc. ("Victory") installed, maintained and

serviced the HVAC system utilized in the cleanrooms, and elsewhere throughout the NECC

facility. Victory provided maintenance and servicing to the HVAC system at NECC for years

prior to and continuing through and after the outbreak. Plaintiffs intended to set forth allegations

regarding Victory's negligent servicing and maintenance of the NECC facility in the Master

Complaint, however, Victory opted to enter into this Court's mediation program in the fall of

2013, prior to being named in lawsuits by hundreds of plaintiffs. The parties have exchanged

documents and plaintiffs will provide a memorandum setting forth their theories of liability

against Victory on March 24, 2014.  The parties hope to participate in a meaningful mediation

within the next few months.

### C. Clinic Related Defendants:  Clinics, Hospitals, Doctors, and Others

The Master Complaint lists each of the clinics or hospitals in 23 states identified by the

CDC as receiving recalled lots of MPA from NECC as reflected in the chart attached as Exhibit

A (the "Clinic Related Defendants").[13]  Upon information and belief, the Clinic Related

Defendants injected or administered the NECC Contaminated Drugs to Plaintiffs.  These

defendants are potentially liable under at least two theories:  negligence/medical negligence; and

products liability.

A census of the number of short form complaints naming each Clinic Related Defendant

is provided below.

---

[13] This chart omits clinics that have opted to mediate their claims pursuant to the Court's Mediation Order.

## V.    INSPECTION AND PRE-MDL LITIGATION

In the wake of the meningitis outbreak and subsequent government investigations, lawsuits alleging death or injury caused by contaminated MPA and other NECC drugs have been filed around the country.  In October 2012, at a time when 24 federal lawsuits claiming injury or death resulting from contaminated NECC products were pending, a motion to consolidate these litigations into a single judicial district was filed with the Judicial Panel on Multidistrict Litigation.

### A.    Judge Saylor Consolidated All Cases Filed in the District of Massachusetts

While the MDL petition was pending, this Court issued an order consolidating the thirteen federal actions that were then pending in the District of Massachusetts.[14]  Judge Saylor appointed Kristen Johnson Parker of Hagens Berman Sobol Shapiro LLP in Boston as interim liaison counsel for plaintiffs.[15]

### B.    The Court Entered an Injunction and Attachment against NECC for the Benefit of Victims

While the motion for multidistrict consolidation was pending, this Court issued a preliminary order enjoining NECC from issuing any dividends or making any payments outside of the ordinary course of business and issued a writ of attachment as to the physical property of NECC.[16]

### C.    The Court Ordered an Inspection of NECC's Premises

Plaintiffs in the MDL also sought early discovery in the form of an inspection of the NECC compounding facility in order to collect and preserve evidence concerning conditions at NECC. Judge Saylor referred the request for inspection to Magistrate Judge Boal.  After extensive

---

[14] Dkt. No. 57.

[15] Dkt. No. 108.

[16] Dkt. No. 38.

briefing in December 2012, including multiple hearings, Judge Boal ordered a four-day

inspection of the NECC facility by plaintiffs and their consultants.[17]

Plaintiffs' consultants conducted an inspection of the interior and exterior of NECC's

facility from December 18 through December 21, 2012.  Plaintiffs provided Defendants and the

government with detailed daily protocol schedules the night before each day of inspection.  The

sampling by Plaintiffs' consultants found dozens of bacteria and fungus inside the NECC

facility, including in the cleanrooms and HVAC system.

**D.     NECC Filed for Bankruptcy**

On December 21, 2012, the day the inspection concluded, NECC filed a voluntary

petition for relief under Chapter 11 of the Bankruptcy Code.  The NECC bankruptcy proceedings

are pending in front of the Honorable Henry J. Boroff.

## VI.     PROCEEDINGS IN THE MDL

On February 12, 2013, the JPML issued an order under 28 U.S.C. § 1407 transferring

federal court proceedings involving NECC to this Court for coordinated pretrial proceedings.

The JPML transferred a discrete list of cases, all of which named NECC as a defendant.

**A.     Major Substantive Orders Entered by the Court**

**1.     MDL Order 6, Establishing Case Management Procedures**

On June 28, 2013, the Court set case management procedures in jointly proposed MDL

Order No. 6.[18]  The PSC, Trustee, and Defendants negotiated a proposed case management order

with an eye towards maximizing efficiency and minimizing costs associated with traditional

---

[17] Dkt. No. 126.

[18] Dkt. No. 209.  While the PSC, Trustee, and the Affiliated Defendants submitted competing proposed case management orders with slight modifications of some language, the vast majority of the provisions were mutually agreed upon by all parties.

MDL activities in order to enhance the recovery that may one day be available to victims.  While the schedule set in that order has been superseded, the substantive provisions remain in effect.

MDL Order No. 6 established the following procedures:

- The creation of a joint document repository accessible by all parties in the MDL and state court litigants;

- Permitted attorneys to listen in to status conference by telephone (and permitted telephonic appearances with prior court permission);

- Waived service provisions for many of the Affiliated Defendants;

- Waived some pre-suit notice requirements for the Affiliated Defendants; and

- Permitted direct filing of claims into the MDL.

### 2.   Court Order Creating a Formal Mediation Program

In August 2013 the PSC, the Trustee and the Creditors' Committee submitted competing proposals to establish procedures governing any effort to mediate the claims of non-NECC affiliated defendants, including clinics and medical providers.

On August 15, 2013, the Court entered an order creating a formal mediation process for the MDL and the associated Chapter 11 bankruptcy proceeding.[19]  The order provided that this Court would oversee any disputes that might arise during the mediation process.

### 3.   Order on the Chapter 11 Trustee's Original Motion to Transfer Cases

On March 10, 2013, the Trustee filed a Motion to Transfer Personal Injury Tort and Wrongful Death Cases to this Court pursuant to 28 U.S.C. §§ 1334 and 157(b)(5) ("Original Transfer Motion").[20]  The Trustee sought the transfer of all personal injury and wrongful death cases then pending in both state and federal courts which involved claims arising from the use of contaminated products compounded by NECC and other affiliated entities.  The Trustee asked

---

[19] Dkt. No. 394.

[20] Dkt. No. 37.

the Court to exercise "related to" jurisdiction over cases pending in state courts in which neither NECC nor any affiliated entities were named parties.[21]   As a practical matter, at the time of the Original Transfer Motion, this group of cases consisted solely of cases filed in state court in Roanoke, Virginia (the "Roanoke, Virginia cases").  The plaintiffs in the Roanoke, Virginia cases objected to the Original Transfer Motion on several grounds.[22]

In its response to the Original Transfer Motion the PSC largely supported the Trustee's position, recommending transfer of most cases.  The PSC took limited exception to the proposed transfer of state cases in which neither NECC nor any affiliated entities were named parties where the sole articulated basis for "related to" jurisdiction is a potential – but as yet unasserted -- indemnification or contribution claim against [NECC] . . . ."[23]  The PSC cited limits on "related to" jurisdiction, and questions as to whether the Court had jurisdiction over such cases or, assuming it did, whether it should exercise such jurisdiction.[24]

Ultimately this Court adopted the course recommended by the PSC, ordering transfer of all cases except those in state court that named neither NECC nor any Affiliated Defendants. The Court assumed the existence of subject-matter jurisdiction over such cases, but abstained from exercising jurisdiction, indicating that it would take up the issue again at some future date if the circumstances changed.[25]

The Court also indicated that

---

[21] The Trustee identified four categories of cases that he wished to transfer: (1) cases pending in other federal courts that had not yet been transferred to this court; (2) cases pending in state courts in which removal was in process; (3) cases pending in state courts that named NECC or affiliated entities as defendants; and (4) cases pending in state courts that did not name NECC or affiliated entities as defendants.

[22] See Opposition filed by Roanoke Gentry Locke Plaintiffs, Dkt. No. 109; Opposition filed by Chance Baker, et al., Dkt. No. 115; Supporting Memorandum filed by Roanoke Gentry Locke Plaintiffs, Dkt. No. 126; and Opposition filed by Roanoke Lichtenstein Fishwick Plaintiffs, Dkt. No. 129.

[23] MDL Doc. No. 125, p. 2.

[24] Id., p. 9, 13.

[25] MDL Doc. No. 224, p. 18.

> if the Bankruptcy Court were to set a relatively early bar date for
> the filing of claims against the estate, it would appear that any
> defendant in a state-court action would be effectively forced to
> decide whether it wanted to file a claim for contribution or
> indemnity against the estate.  Such a claim, in turn, would probably
> permit the exercise of federal jurisdiction over the underlying
> matter.[26]

The Trustee has since filed a renewed motion for transfer, asking this Court to transfer cases that it declined to transfer pursuant to the Original Transfer Motion.  This renewed motion for transfer is discussed below.

## B.    Master Complaint Against the Unaffiliated Defendants

As part of MDL Order No. 6, the Court required the PSC to file a Master Complaint and a form of short form complaint.  The Master Complaint was meant as an administrative tool, allowing the allegations and claims against all Defendants to be stated in one document. Plaintiffs who already had cases on file or who wished to file in the MDL could then file a short form complaint to assert facts and claims set out in the master complaint, streamlining the process of filing claims in the MDL.

By the time the deadline for filing a Master Complaint was imminent, negotiations on a proposed settlement that would include NECC and all Affiliated Defendants were well underway (see below).  The PSC and the Trustee jointly sought leave to postpone any filing of a Master Complaint and form of short form complaint against Affiliated Defendants so close to a potential settlement.[27]  That motion was granted.

---

[26] Id., at 19.

[27] Dkt. No. 540.

The PSC filed a Master Complaint and form of short form complaint against certain non-NECC related entities on November 5, 2012.[28]  Short-form complaints for cases then currently pending in the MDL were filed in December 2013.  The deadline for filing a master complaint and short form complaint as against NECC-affiliated entities has been rescheduled and is currently due March 31, 2014.[29]

The Master Complaint filed in November 2012 asserts claims against Liberty, Unifirst, and seventy-four health clinics in the 23 states identified by the CDC as having obtained tainted lots of NECC's MPA.  The Master Complaint does not assert, but expressly reserves the right to do so at a later time if necessary, claims again any entities that have agreed to participate in either this Court's mediation program or some form of private mediation (addressed below).

## C.    Current MDL Case Count and Census

As of January 14, 2013, there were 330 unique cases pending in this MDL representing claims by approximately 400 individual plaintiffs.[30]  Of these 330 unique cases, 253 had short form complaints on file as of December 20, 2013.  All short form complaints name Unifirst as a party defendant and 11 short form complaints name Liberty as a defendant.  One hundred forty nine short form complaints name clinic related defendants.[31]  The below chart summarizes the number of short form complaints pending against the clinics performing injections.[32]

---

[28] Master Complaint, Dkt. No. 545, Form of Short Form Complaint, Dkt. No. 546.  First Amendment to the Master Complaint, Dkt. No. 832.

[29] Dkt. No. 881(5).

[30] The discrepancy between unique cases and number of plaintiffs is due to the fact that some cases name multiple plaintiffs.  *See Adair v. Ameridose*, 1:13-cv-11609-FDS (34 plaintiffs); *Ferguson v. Ameridose*, 1:13-cv-12571-FDS (3 plaintiffs); *Besaw v. Ameridose*, 1:13-cv-12604 (16 plaintiffs); *Barger v. Ameridose*, 1:13-cv-12619 (13 plaintiffs).

[31] Clinic related defendants are doctors or healthcare professionals who administered the NECC drug and the healthcare facilities where the NECC drug was administered.  *See* Corrected Short Form Complaint. Dkt. No. 590.

[32] For convenience, the chart does not break out every employee or physician named in the short form complaints, but rather summarizes the number of short form complaints pending against clinics or hospitals that administered

| Clinic Name | State | Short Form Complaints Naming Clinic |
|---|---|---|
| Saint Thomas Outpatient Neurosurgical Center, LLC[33] | TN | 87 |
| Specialty Surgery Center, PLLC | TN | 23 |
| Premier Orthopedic Surg. Associates LLC | NJ | 10[34] |
| South Jersey Healthcare | NJ | 9[35] |
| BKC Pain Specialists, LLC | OH | 3 |
| Minnesota Surgery Center (MAPS) | MN | 3 |
| APAC Centers For Pain Management | IL | 2 |
| Michigan Pain Specialist | MI | 2 |
| Neuromuscular & Rehabilitation | MI | 2 |
| Ocean State Pain Management | RI | 2 |
| Ambulatory Care Center, LLC | IN | 1 |
| DBMJ Rehabilitation Services, PLLC | MI | 1 |
| Dr. O'Connell's Pain Care Center | NH | 1 |
| Genesys Hospital | MI | 1 |
| High Point Regional Health | NC | 1 |
| Marion Pain Management Center, Inc. | FL | 1 |
| PCA Pain Care Specialists | TN | 1 |

NECC products.  Many short form complaints also name individual physicians or other employees, and affiliated corporate entities.

[33] Affiliated entities and individuals named in suits naming Saint Thomas Outpatient Neurosurgical Center, LLC ("STOPNC") are: Howell Allen Clinic, John Culclasure, M.D., Debra Schamberg, R.N., Saint Thomas West Hospital f/k/a Saint Thomas Hospital, Saint Thomas Network, Saint Thomas Health, Ascension Health Alliance, and Ascension Health.   Not all 87 short form complaints naming STOPNC name all of these parties, but all complaints naming STOPNC also name a collection of these affiliated parties.

[34] These 10 SFCs represent all short form complaints that name one or more of the following entities and individuals: Premier Orthopedic and Sports Medicine Associates of Southern New Jersey, LLC d/b/a Premier Orthopedic Associates, Premier Orthopedic Associates Surgical Center, LLC, and/ or Kimberly Yvette Smith, M.D.

[35] These 8 SFCs represent all short form complaints that name one or more of the following entities and individuals: South Jersey Healthcare, South Jersey Hospital, Kimberly Yvette Smith, M.D., and/or Nitesh Bhagat. One case naming these entities also names Premier Orthopedic Associates and this case has been counted in both columns.

**D.      Status of Discovery**

In its April 2013 order establishing the PSC, this Court assigned responsibility to initiate, coordinate and conduct all pretrial discovery on behalf of plaintiffs in all actions subject to this order."[36]  On June 28, 2013 the Court entered MDL Order No. 6, reiterating that "formal discovery of unaffiliated defendants and non-parties shall be conducted by the [PSC] . . . ."[37]

**1.      The PSC subpoenaed 70+ healthcare providers and national defendants.**

In the Spring of 2013, the PSC informed the Court that it wanted to subpoena dozens of healthcare providers who had obtained contaminated products from NECC.  The PSC then presented a series of motions intended to accomplish this as efficiently as possible.  The PSC asked the Court to decide, in advance, that it would centrally enforce subpoenas issued out of the MDL (so that any objections would be addressed by this Court in light of its knowledge of the NECC litigation, and the PSC  would not have to litigate objections in other districts scattered across the country).  The PSC also asked the Court to enter a protective order to permit subpoena recipients to disclose HIPAA protected information without violating state or federal laws.  (The PSC also informed the Court that it had retained a HIPAA compliant vendor to receive any protected information.).

On June 21, 2013, the Court entered its Order Granting Plaintiffs Leave to Serve Subpoenas and Qualified Protective Order Regarding Protection of Health Information ("Qualified Protective Order") ,[38] and its Order on Central Enforcement of Subpoenas ("Order on

---

[36] Dkt. No. 82 at 5-6.

[37] *Id.*

[38] Dkt. No. 192.

Central Enforcement"),[39] authorizing the PSC to serve subpoenas on clinics identified by the CDC as having received medication from any of three recalled lots of MPA from NECC.

The subpoenas contained both a Notice of Deposition (to the take the deposition of a designated records custodian) and a demand for production of certain documents identified in the subpoena.  Approximately 75 healthcare providers were served with the subpoenas.  Many of the healthcare providers filed objections and motions to quash, in response to which the subpoena was modified by agreement of the PSC to reduce its scope through certain "accommodations."[40] Additionally, certain segments of the subpoena were quashed by order of this Court dated August 1, 2013.[41]  Subsequently the PSC issued a Notice of Revised Subpoena Exhibit.[42]  The subpoena was further limited in scope by this Court in its November 13, 2013 Discovery Order ("Discovery Order").[43]  (The resulting subpoena is hereinafter referred to as the "PSC Subpoena").

To date, approximately 60 healthcare providers have provided documents in accordance with the PSC Subpoena and the Court's Discovery Order, contributing a total of approximately 3000 documents.  These documents are currently being held in two on-line data storage facilities – one for documents containing HIPAA-protected personal health information, and one for documents that do not contain personal information.

In the Discovery Order, the Court expressly contemplated the difference between healthcare providers "who have received notices of claims or letters of representation from any potential plaintiff," and those who received no such notice or letters, when ordering production

---

[39] Dkt. No. 193.

[40] Dkt. No. 325, pp. 4-7.

[41] Dkt. No. 370.

[42] Dkt. No. 464.

[43] Dkt. No. 572.

by healthcare providers.[44]  The PSC has now identified numerous healthcare providers that were served with the PSC Subpoena, received notices of claims,  and have not yet produced documents in compliance with the Discovery Order.[45]

On January 17, 2014 the PSC filed its Motion to Compel Production, For a Finding of Civil Contempt and for an Award of Sanctions and supporting memorandum against healthcare provider, Baltimore Pain Management Center.[46]  That motion has been referred to Magistrate Judge Boal.[47]  The PSC anticipates the filing of additional motions to compel production from other healthcare providers in order to enforce the Discovery Order.

The PSC also issued a subpoena to Liberty's insurer (Traveler's) which was referred to Judge Boal.  Judge Boal held oral argument on a motion to compel production of documents in response to that subpoena.  The Court's order required Travelers to make a production of "any policies issued to Liberty between 2005 and 2011 and all documents concerning the reasons for the cancellation of the 2010-2011 policy."[48]

### 2.    Discovery Against NECC, the Insiders and NECC Affiliates.

In MDL Order No. 6, the Court imposed a stay of discovery against NECC and the affiliated defendants and insiders.[49]

On October 28, 2013 – more than one year after the fungal meningitis outbreak began – the PSC filed its Motion to Partially Lift Discovery Stay to permit plaintiffs to take discovery of

---

[44] Dkt. No. 572, p. 19.

[45] For example, several healthcare providers in Maryland have taken the position that, although they have received notices of claims and/or letters of representation, as those terms are used in the Court's Discovery Order, such notices and letters do not comply with the unique requirements of Maryland's statute governing healthcare malpractice claims and therefore do not trigger production requirements under the Discovery Order.

[46] Dkt. Nos. 786, 787.

[47] Dkt. No. 879.

[48] Dkt. No. 890.

[49] Dkt. No. 879 at 13.

Affiliated Defendants.[50]  The PSC, on behalf of hundreds of plaintiffs around the country who have cases pending against the affiliated and insiders, must develop the facts and legal claims against these parties; as explained in the PSC's motion, some discovery from the Affiliated Defendants is necessary to litigate against other defendants (and for those other defendants to defend themselves).  This motion has been fully briefed by the interested parties and is ripe for argument and decision by the Court.[51]

In addition, the PSC has pursued lifting the stay of discovery against NECC through direct discussions with the Trustee.  There is a need for direct discovery against NECC to support the development of litigation taking place in  state courts and in the MDL proceedings against non-debtor defendants.

Although the PSC has previously announced in Court its desire to lift the stay of discovery against NECC, no motion has yet been filed.  The Trustee has informally produced to the PSC some documents obtained from NECC.  The PSC continues to discuss a full production of documents in NECC's possession with the Trustee.  Several defendants have complained, in filings, in written correspondence, and verbally, that they have not been permitted access to NECC's documents or to any discovery of the Affiliated Defendants.  The PSC has repeatedly suggested that they should join the PSC's efforts to move the Court to lift the discovery stays. To date, no Defendant has taken any such action.

**E.    Mediation Efforts to Date**

On October 28, 2013 the PSC, the Trustee and the Creditors' Committee recommended that the Court appoint Prof. Eric Green of Resolutions, LLC as the mediator in this case and the

---

[50] Dkt. No. 534.

[51] *See* Chapter 11 Trustee's Response, Dkt. No. 758; Affiliated Defendants' Opposition, Dkt. No. 757; and Official Committee of Unsecured Creditor's Response, Dkt. No. 762.

Court approved that appointment.[52]  Four unaffiliated defendants have opted into the Court supervised mediation program:  Liberty, Victory, ARL, and one other entity.[53]  New Jersey healthcare provider Insight is participating in a private mediation.  These mediations are ongoing, with some mediation sessions scheduled for April 2014.

## F.    Pending Motions

The Jointly Proposed Agenda for the March 13, 2014 Status Conference identifies each and every motion currently pending in the MDL.  The PSC identifies some of the more substantive motions below.

### 1.    The Trustee's Renewed Motion to Transfer

On December 20, 2013, Insight Health Corp., a defendant healthcare provider in the Roanoke, Virginia cases, filed a Proof of Claim stating as the basis for its claim against NECC, in part, the potential liability it may incur in the Roanoke, Virginia cases.[54]

On December 27, 2013, the Trustee filed his Renewed and Supplemental Motion to Transfer Additional Personal Injury Tort and Wrongful Death Cases to this Court Pursuant to 28 U.S.C. §§ 157(b)(5) and 1334 ("Renewed Transfer Motion").[55]  Once again the plaintiffs in the Roanoke, Virginia cases have objected to the motion on various grounds.[56]  Based on the

---

[52] Dkt, Nos. 536, 549.

[53] The Court entered a seal order pertaining to participation in mediation on August 15, 2013.  Dkt. No. 394.  Two healthcare providers/clinics had initially opted in to mediation but have since dropped out.

[54] *See* Insight Health Corp.'s Proof of Claim, attached to the *Memorandum of Law in Support of Chapter 11 Trustee's Renewed and Supplemental Motion to Transfer Additional Personal Injury Tort and Wrongful Death Cases to this Court Pursuant to 28 U.S.C. §§ 1334 and 157(b)(5)*, MDL Doc. No. 733.

[55] Dkt. Nos. 732 and 733.

[56] *See* Opposition filed by Sandra F. Artis, et al., MDL Doc. No. 764; Opposition filed by Chance Baker, et al., Dkt. No. 766; Opposition filed by Roanoke Area Lichtenstein Fishwick Intervenors, Dkt. No. 792; and Roanoke Gentry Locke Reply to Trustee and Official Committee of Unsecured Creditors Omnibus Reply, Dkt. No. 844.

changed circumstances reflected in the Insight Health Corp. Proof of Claim, the PSC recommends granting the Renewed Transfer Motion.[57]

There is precedent to support this Court's exercise of "related to" jurisdiction over the Roanoke, Virginia cases based on the Insight Health Corp. Proof of Claim.  The potential size of the claim could quickly overwhelm the very limited assets of the NECC Bankruptcy Estate, to the grave detriment of other personal injury tort and wrongful death victims.[58]  Nor are there grounds for the Court to abstain from exercising such jurisdiction.[59]  Accordingly the PSC recommends granting the Trustee's Renewed Transfer Motion.

### 2.        PSC's Motion to Establish a Common Benefit Holdback

On January 17, 2014 the PSC filed a Motion for Entry of Case Management Order Establishing Assessment Procedures to Fund Common Benefit Account. (the "Common Benefit Motion").[60]  The Common Benefit Motion seeks an order establishing procedures for funding a common benefit account with a percentage assessment to be held back from every recovery by Plaintiffs in this MDL and participating parties in non-MDL cases.  The PSC has not requested that the Court determine who, if anyone, is entitled to receive funds from any common benefit account, in what amounts or under what criteria.  Those issues are for another day.

The PSC crafted its common benefit proposal with the understanding that where, as here, some Defendants have limited assets, the total recovery, despite the best efforts of all involved, must be predicted to be modest.  As the PSC has stated to the Court, they recognize that the

---

[57] In its response to the Renewed Transfer Motion, the PSC carved out an exception for one case, which it felt should not be transferred.  That case, *Wingate v. Insight Health Corp., Inc.*, a Virginia state court case has since been settled. The settlement's approval by the Court will render moot its status vis-à-vis the transfer issue.

[58] MDL Doc. No. 799, p. 8.  The PSC also strongly supports equitable subordination of the Insight Health Corp. Proof of Claim for the same reason.

[59] *Id.* at 9 -14.

[60] Dkt. No. 791.

unique circumstances of this MDL warrant a lean, economical approach to common benefit work and expenditures, and should result in relatively modest compensation for common benefit counsel in order to preserve as much of the recovery for victims.[61]

The Trustee and the Creditors' Committee have filed limited objections to the Common Benefit Motion, raising an objection as to the mechanism proposed for effectuating the holdback of funds that flow through the bankruptcy estate. Neither oppose the imposition of a percentage holdback to fund a common benefit account.[62] Individual members of the Creditors' Committee who represent plaintiffs have also filed objections to the Common Benefit Motion.[63] They have asked the Court for an order establishing that they are eligible for payment from any such fund.[64] The Common Benefit Motion is fully briefed and is ripe for oral argument and/or decision.

### 3. PSC's Proposal for Establishing Tennessee Bellwether Trials (AKA "Trial Plan")

An important feature of the PSC's plan is selecting and trying bellwether cases. A "bellwether" case, according to Judge Eldon Fallon who handled the Vioxx MDL, "is selected for trial because it involves facts, claims, or defenses that are similar to the acts, claims, or defenses presented in a wider group of related cases . . ."[65] Bellwether Trials serve the guiding principles of promoting efficient resolution, while conserving scarce resources. This mechanism has been used frequently, with significant success, in many MDLs.

---

[61] *See* Feb. 27, 2013 Letter to Court re Proposed Plaintiffs' Structure. Dkt. No. 20.

[62] Dkt. Nos. 833, 834.

[63] Dkt. Nos. 830, 915.

[64] Dkt. No. 830.

[65] Eldon E. Fallon, et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2325 (June, 2008).

On January 31, 2014, the PSC submitted a proposed bellwether trial and pre-trial schedule order to guide this MDL to its first bellwether trials.[66]  The PSC proposes that the first bellwether trials be conducted for plaintiffs that received treatment at St. Thomas Clinic, a clinic located in Nashville, Tennessee.  St. Thomas was one of the largest recipients of lots of MPA from NECC confirmed to be tainted and the clinic with the most cases currently pending against it in the MDL.[67]  The PSC's plan calls for a completion of common fact discovery by mid-October 2014 and common expert discovery by February 20, 2015.  The PSC proposes that the Court will designate the bellwether cases to be tried by early November 2014, and case-specific discovery over these selected cases will be completed by March 10, 2015 and the first bellwether trial conducted by May 2015.

To guide the Court's selection of bellwether cases the PSC proposes that all St. Thomas Clinic-related plaintiffs provide the Court a completed Plaintiff Profile Form ("PPF")[68] within 60 days of the Court entering the proposed schedule.  The PPF will assist all parties in gathering basic information about individual cases and enable them to select cases for inclusion in an initial trial pool.  The PSC proposes that each party select four cases (or approximately 4% of the cases currently pending against St. Thomas Clinic) to be included in the initial trial pool.  Out of that pool the Court will select two for trial.

---

[66] Dkt. Nos. 837, 838.

[67] The overwhelming majority of cases brought against St. Thomas Clinic also name other St. Thomas related entities (including Howell Allen Clinic, St. Thomas Network, St. Thomas Health, and/or Ascension Health Network) and St. Thomas related individuals (Dr. John Culclasure, the medical director of St. Thomas Clinic and Debra Schamberg,R.N., the Facilities Director of St. Thomas Clinic).  Trials against St. Thomas Clinic will presumably include some, although not necessarily all, of these related entities and individuals.

[68] On February 14, 2014, Judge Boal entered an Order approving the form of PPF. Dkt. No. 923.

## VII.   INSURER DECLARATORY JUDGMENT ACTIONS.

On May 31, 2013, Landmark American Insurance Company ("Landmark"), the insurer for ARL, a national defendant thatwas NECC's outside testing company, filed a petition in the district court of Oklahoma County seeking a declaratory judgment concerning the scope of its insurance policy.[69]   Landmark seeks a declaration that (i) "the claims asserted in the underlying lawsuits, and all other claims asserted against ARL for injuries, arise out of a series of related, allegedly negligent acts, errors, or omissions and are therefore treated as a single claim," and (ii) "because [the claims] are treated as a single claim, $3,000,000 per claim limit, and not the $6,000,000 aggregate limit, applies to satisfy all claims or suits asserted against ARL arising from the underlying event[.]"   On January 23, 2014, the Oklahoma court granted the PSC's unopposed motion to intervene in the declaratory judgment action, and the PSC filed Intervenor's Answer and Affirmative Defenses to Petition for Declaratory Judgment.   Landmark is currently participating in this Court's mediation program with ARL and will attend the mediation sessions currently scheduled for April 1 & 2, 2014.

On October 16, 2013, Certain Underwriters at Lloyd's, London ("Lloyd's) filed a Complaint for Declaratory Relief in this Court[70] seeking a declaration that there is no insurance coverage for plaintiffs' claims under the Lloyd's insurance policy issued to Ameridose LLC, one of NECC's affiliated companies. The case is pending before Judge Saylor and the PSC will be filing a motion to intervene in that action shortly.

---

[69] *See Landmark Am. Ins. Co. v. ARL Bio Pharma, Inc. d/b/a Analytical Research Laboratories,* C.A. No. 13-3193 (Oklahoma County Dist. Ct.).

[70] *Certain Underwriters at Lloyd's, London v. Ameridose, LLC, Barry J. Cadden, Lisa Conigliaro Cadden, Glen A. Chin*, Carla A. Conigliaro, Douglas A. Conigliaro, and Gregory A. Conigliaro, C.A. No. 1:13-cv-12609-FDS.

On November 22, 2013, another of Ameridose's insurers, Ironshore Specialty Insurance Company ("Ironshore"), also filed a declaratory judgment action in this Court.[71]  This action also seeks a declaration that another insurance policy issued to Ameridose provides no coverage for the plaintiffs' claims.  The case is pending before Judge Saylor and the PSC will also be filing a motion to intervene in that action shortly.

## VIII.   NECC BANKRUPTCY PROCEEDINGS

**A.    Appointment of Chapter 11 Trustee and Official Committee of Unsecured Creditors**

On December 21, 2012, NECC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The NECC bankruptcy proceedings are pending Chapter 11 the Honorable Henry J. Boroff.  In January 2013 the bankruptcy court appointed an Official Committee of Unsecured Creditors ("Creditors' Committee").[72]  In addition the bankruptcy court appointed Paul D. Moore as the Chapter 11 Trustee for the bankruptcy estate of NECC (the "Trustee").

**B.    "Non-Debtor Releases"**

NECC is only debtor involved in this Chapter 11 bankruptcy.  Usually, a Chapter 11 bankruptcy resolves only the rights and obligations of the debtor.  But this case presents unique circumstances; there has been an effort to see if a "non-debtor release" approach may be possible, in which non-debtors contribute funds to the estate and received the benefit of a bankruptcy release through an injunction.

---

[71] *Ironshore Specialty Insurance Company v. Ameridose et al.*, C.A. No. 1:13-cv-13000.

[72] Members of the Creditors' Committee include: Robert Cole (represented by Thomas M. Sobol and Kristen Johnson Parker of Hagens Berman Sobol Shapiro LLP); Brenda Bansale (represented by Marc Lipton of Lipton Law); Victor Davis (represented by Terry Dawes of Fieger Law); Kathleen Distler (represented by Melvin Wright); Katrina Eldreth (represented by Anne Andrews of Andrews & Thornton); Meghan A. Handy (represented by Harry Roth of Cohen Placitella & Roth); Danny Swartzell (represented by Greg Skikos and Adriana Suarez Diamond of Skikos Crawford Skikos); Bertram Walker Bryant, Jr. (represented by Michael Galligan); and Nstar Electric Company (represented by Honor Heath).

The First Circuit recognizes that de facto "non-debtor releases" may be appropriate in extraordinary circumstances:

> In extraordinary circumstances, it has been held that a bankruptcy court can grant permanent injunctive relief essential to enable the formulation and confirmation of a reorganization plan if, for example, nondebtors who would otherwise contribute to funding the plan will not settle their mutual claims absent "protection" from potential post-confirmation lawsuits arising from their prepetition relationship with the chapter 11 debtor. These courts have taken into consideration whether (1) the creditors have overwhelmingly approved the plan, with the injunction; (2) the plan contemplates full payment of all creditor claims; and (3) the injunction would affect a relatively small class of claimants.[73]

The current settlement proposal contemplates such "non-debtor releases." It is hoped that such a settlement will come to fruition, one that satisfies the requirements that there are exceptional circumstances, that a plan of reorganization be prepared, that the plan contemplate full payment of creditors' claims, that there be a vote to approve the plan, and that the plan be approved by the bankruptcy court. It is believed that this case presents similar circumstances to those where courts have approved "non-debtor releases" in other bankruptcies.[74]

## C.   Bar Date for Victim's Claims

### 1.   The Trustee Moved the Bankruptcy Court to Set a Bar Date of September 20, 2013 for All Claimants

On June 28, 2013, the Trustee moved the bankruptcy court to set a bar date.[75]  The Trustee asked the bankruptcy court to set a deadline for all claimants – including tort claimants – to submit proofs of claim by September 20, 2013.  The Trustee also asked the bankruptcy court

---

[73] *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 979 (1st Cir. 1995).

[74] Examples include in the Twinlab bankruptcy, the Ephedra bankruptcy, the Muscletech bankruptcy, and the Metabolife bankruptcy.  *See* Joint Status Report of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors, ECF No. 701-1 (March 5, 2014) at p.3, n.4 (citing cases).

[75] 12-br-19882 (ECF No. 263).

to require tort victims to also complete a seven-and-a-half page Personal Injury and Tort Wrongful Death Addendum, and attach medical records substantiating their claims.

The Trustee proposed that the Court approve retention of a claim agent hired by the insiders, that notice be accomplished by publishing a notice twice in USA Today, and by mailing a copy of the bar date order along with proof of claim form and the Addendum to individuals identified by clinics who purchased lots of MPA that the CDC determined were contaminated.

### 2.    The PSC Filed a Limited Opposition on Behalf of Tort Victims

On July 22, 2013, the PSC opposed the Trustee's motion insofar as it sought to set an early bar date for tort victims.[76]  The PSC believed that the early bar date would violate the rights of tort victims, unnecessarily waste scarce estate assets, and conflict with a longer term important strategy to maximize estate assets by encouraging non-debtor contributions into the estate for the benefit of victims.  The PSC's limited opposition raised the following concerns:

On August 16, 2013, the Trustee filed a revised bar date notice and proposed order reflecting some of the changes requested by the PSC.[77]

### 3.    The Bankruptcy Court Set a Bar Date of January 15, 2014

On July 29, 2013, the bankruptcy court entered an interim bar date order requiring customers of NECC who received lots of contaminated MPA (as identified by the CDC) to provide a list of all persons to whom they administered contaminated MPA to the Trustee, the Creditors' Committee, and Lead Counsel.[78]

---

[76] 12-br-19882 (ECF No. 365).  The U.S. Trustee also filed a limited objection to the Trustee's bar date motion, arguing that all proofs of claim should be publicly accessible.  12-br-19882 (ECF No. 497).  A number of clinics or other healthcare professional also objected; we do not catalogue all of those objections here.

[77] 12-br-19882 (ECF No. 496).

[78] 12-br-19882 (ECF No. 412).

On September 27, 2013, the bankruptcy court entered an order (i) establishing a bar date of January 15, 2014 at 4:00 pm Eastern for all claimants, (ii) approving additional requirements and procedures for personal injury tort and wrongful death claims, and (iii) approving the form and manner of notice.[79]  The order required the Trustee to publish notice of the bar date in 62 different local papers (most from areas with the largest outbreaks).  It included a shorter, four-and-a-half page, PITWD Addendum than originally proposed and did not require victims to provide medical records.

**D.     Census of Proof of Claims Filed in the Bankruptcy Proceedings.**

Over 3600 individuals or entities have filed proofs of claim against NECC.  The vast majority of these (more than 3,300), were accompanied by an addendum asserting a personal injury or wrongful death claim against the NECC bankruptcy estate stemming from exposure to an NECC contaminated product.

While Lead Counsel for plaintiffs has requested and has received an inventory of the proofs of claim and accompanying personal injury addendum, by operation of the confidentiality order governing that information imposed by the Bankruptcy Court, Lead Counsel is prevented from sharing that information, even on an aggregate, non-individual specific level, with members of the PSC or any other plaintiffs counsel for any purpose.  Relief will be needed to enable the PSC members' ability to make adequate assessments, for instance, in their negotiations and mediation efforts with various clinics.  As a result, the PSC may file for relief from the confidentiality order to allow Lead Counsel to share information contained on the proof of claim addendums, on a non-individual aggregate level only, with members of the PSC.

---

[79] 12-br-19882 (ECF No. 582).

## IX.    PROPOSED SETTLEMENT WITH NECC INSIDERS

Shortly before Christmas, the Trustee, Creditors' Committee, and the PSC announced a proposed settlement in principle with NECC and NECC's insurers.[80]  One press release stated that the settling entities had agreed "to contribute an amount estimated to exceed $100 million to a compensation fund to be distributed to NECC creditors, including victims who received injections of tainted steroids traced to NECC."[81]  As of this filing no settlement agreement has been signed; the PSC is optimistic that an agreement will be executed in a matter of days.


Dated:  March 12, 2014                              Respectfully submitted,

                                                    **/s/ Thomas M. Sobol**
                                                    Thomas M. Sobol
                                                    Kristen Johnson Parker
                                                    HAGENS BERMAN SOBOL SHAPIRO LLP
                                                    55 Cambridge Parkway, Suite 301
                                                    Cambridge, MA  02142
                                                    Telephone:  (617) 482-3700
                                                    Facsimile:  (617) 482-3003
                                                    tom@hbsslaw.com
                                                    kristenjp@hbsslaw.com

                                                    *Plaintiffs' Lead Counsel*

---

[80] *See* http://www.prnewswire.com/news-releases/preliminary-settlement-agreements-establish-100m-fund-for-victims-of-tainted-steroids-traced-to-necc-237071451.html.

[81] *Id.*

Elizabeth J. Cabraser
Mark P. Chalos
Annika K. Martin
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219-2417
Telephone:  615.313.9000
Facsimile:  615.313.9965
ecabraser@lchb.com
mchalos@lchb.com
akmartin@lchb.com

*Federal/State Liaison*

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI  48075
Telephone:  (248) 557-1688
Facsimile:  (248) 557-6344
marc@liptonlawcentercom

Kim Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue, Suite 365
Boston, MA  02116
Telephone:  (617) 933-1265
kdougherty@myadvocates.com

Patrick T. Fennell
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, VA  24016
Telephone:  (540) 342-2000
pfennel@crandalllaw.com

Mark Zamora
ZAMORA FIRM
6 Concourse Way, 22nd Floor
Atlanta, GA  30328
Telephone:  (404) 451-7781
Facsimile:  (404) 506-9223
marc@markzamora.com

J. Gerard Stranch, IV
Benjamin A. Gastel
BRANSETTER, STRANCH & JENNINGS
PLLC
227 Second Avenue North
Nashville, TN  37201
Telephone:  (615) 254-8801
Facsimile:  (615) 255-5419
gerards@branstetterlaw.com
beng@branstetterlaw.com

*Plaintiffs' Steering Committee*

## CERTIFICATE OF SERVICE

I, Thomas M. Sobol, hereby certify that I caused a copy of the foregoing to be filed

electronically via the Court's electronic filing system. Those attorneys who are registered with

the Court's electronic filing system may access these filings through the Court's system, and

notice of these filings will be sent to these parties by operation of the Court's electronic filing

system.

Dated: March 12, 2014

**/s/ Thomas M. Sobol**
Thomas M. Sobol, BBO # 471770

Exhibit A
The State Defendants

| Facility Name | City | State |
|---|---|---|
| CYPRESS SURGERY CENTER<br>Principal place of business located at:<br>842 S Akers Road<br>Visalia, CA 93277 | VISALIA | CA |
| ENCINO OUTPATIENT SURGICENTER<br>Principal place of business located at:<br>16311 Ventura Boulevard #580<br>Encino, CA 91436 | ENCINO | CA |
| UKIAH VALLEY MEDICAL CENTER*<br>Principal place of business located at:<br>275 Hospital Drive<br>Ukiah, CA 95482 | UKIAH | CA |
| UNIVERSAL PAIN MANAGEMENT<br>Principal place of business located at:<br>819 Auto Center Drive<br>Palmdale, CA 93551 | PALMDALE | CA |
| INTERVENTIONAL SPINE AND SPORTS MED<br>1625 Straits Turnpike, Ste. 205<br>Middlebury, CT 06762 | MIDDLEBURY | CT |
| FLORIDA PAIN CLINIC<br>Principal place of business located at:<br>2300 S. Pine Ave, Suite B<br>Ocala, FL 34471 | OCALA | FL |
| INTERVENTIONAL REHABILITATION CENTER<br>Principal place of business located at:<br>1549 Airport Blvd., Ste. 420<br>Pensacola, FL 32504 | PENSACOLA | FL |
| MARION PAIN MANAGEMENT CENTER<br>Principal place of business located at:<br>1737 A SE 28th Loop<br>Ocala, FL 34471-1079 | OCALA | FL |
| NORTH COUNTY SURGICENTER<br>Principal place of business located at:<br>4000 Burns Road<br>Palm Beach Gardens, FL 33410 | PALM BEACH GARDENS | FL |
| PAIN CONSULTANTS OF WEST FLORIDA<br>Principal place of business located at:<br>4624 N. Davis Highway | PENSACOLA | FL |

| | | |
|---|---|---|
| Pensacola, FL 32503 | | |
| SURGERY CENTER OF OCALA<br>Principal place of business located at:<br>3241 SW 34th Street<br>Ocala, FL 34474<br>Registered Agent Address:<br>CT Corporation System<br>1200 South Pine Island Road<br>Plantation, FL 33324 | OCALA | FL |
| SURGICAL PARK CENTER<br>Principal place of business located at:<br>9100 87th Avenue<br>Miami, FL 33176<br>Registered Agent Address:<br>CT Corporation System<br>1200 South Pine Island Road<br>Plantation, FL 33324 | MIAMI | FL |
| FORSYTH STREET AMBULATORY SURGURY CENTER<br>Principal place of business located at:<br>1610 Forsyth Street<br>Macon, GA 31201 | MACON | GA |
| PAIN SPECIALISTS OF IDAHO<br>Principal place of business located at:<br>2375 East Sunnyside Road, Ste. J<br>Idaho Falls, ID 83404<br>Registered Agent Address:<br>3400 Merlin Drive<br>Idaho Falls, ID 83404 | IDAHO FALLS | ID |
| WALTER KNOX MEMORIAL HOSPITAL<br>Principal place of business located at:<br>1202 E. Locust Street<br>Emmett, ID 83617 | EMMETT | ID |
| APAC CENTERS FOR PAIN MANAGEMENT<br>Principal place of business located at:<br>2450 Wolf Road, Suite D<br>Westchester, IL 60154<br>Entity Address:<br>425 Joliet Street, Ste. 400<br>Dyer, IN 46311 | WESTCHESTER | IL |
| APAC CENTERS FOR PAIN MANAGEMENT<br>Principal place of business located at:<br>2860 N Broadway Street<br>Chicago, IL 60657 | CHICAGO | IL |

| | | |
|---|---|---|
| Entity Address:<br>425 Joliet Street, Ste. 400<br>Dyer, IN 46311 | | |
| THOREK MEMORIAL HOSPITAL<br>Principal place of business located at:<br>850 W Irving Park Road, Ste. 306<br>Chicago, IL 60613 | CHICAGO | IL |
| AMBULATORY CARE CENTER LLC<br>Principal place of business located at:<br>1125 Professional Boulevard<br>Evansville, IN 47714 | EVANSVILLE | IN |
| FORT WAYNE PHYSICAL MEDICINE<br>Principal place of business located at:<br>5750 Coventry Lane, Ste. 101<br>Fort Wayne, IN 46804<br>Registered Agent Address:<br>1400 One Summit Square<br>Fort Wayne, IN 46802 | FORT WAYNE | IN |
| OSMC OUTPATIENT SURGERY CENTER<br>Principal place of business located at:<br>2310 California Road<br>Elkhart, IN 46514 | ELKHART | IN |
| UNION HOSPITAL<br>Principal place of business located at:<br>1606 N. 7th Street<br>Terre Haute, IN 47804 | TERRE HAUTE | IN |
| WELLSPRING<br>Principal place of business located at:<br>2400 North Park, Ste. 20<br>Columbus, IN 47203 | COLUMBUS | IN |
| BALTIMORE PAIN MANAGEMENT<br>Principal place of business:<br>3215 Bancroft Road<br>Baltimore, MD 21215<br>Registered Agent Address:<br>Jeffrey Kagan<br>106 Old Court Road, Ste. 104<br>Baltimore, MD 21208 | BALTIMORE | MD |
| BERLIN INTERVENTIONAL PAIN MANAGEMENT<br>Principal place of business located at:<br>10308 Old Ocean City Boulevard<br>Berlin, MD 21811 | BERLIN | MD |
| BOX HILL SURGERY CENTER | ABINGDON | MD |

3

| | | |
|---|---|---|
| Principal place of business located at:<br>100 Walter Ward Boulevard<br>Abingdon, MD 21009<br>Registered Agent Address:<br>L. Stephen Hess, Esq.<br>2100 East Pratt Street, 26th Floor<br>Baltimore, MD 21202 | | |
| GREENSPRING SURGERY CENTER<br>Principal place of business located at:<br>6080 Falls Road, Ste. 203<br>Baltimore, MD 21209 | BALTIMORE | MD |
| HARFORD COUNTY ASC, LLC<br>Principal place of business located at:<br>1952 A. Pulaski Highway<br>Edgewood, MD 21040 | EDGEWOOD | MD |
| PAIN MEDICINE SPECIALISTS<br>Principal place of business located at:<br>8322 Bellona Avenue, Ste. 330<br>Towson, MD 21204 | TOWSON | MD |
| SURGCENTER OF BEL AIR<br>Principal place of business located at:<br>209 Thomas Street<br>Baltimore, MD 21014<br>Registered Agent Address:<br>421 S Union Avenue<br>Havre De Grace, MD 21078 | BEL AIR | MD |
| MICHIGAN NEUROSURGICAL INSTITUTE<br>Principal place of business located at:<br>4620 Genesys Pkwy<br>Grand Blanc Township, MI 48439 | GRAND BLANC | MI |
| MICHIGAN PAIN SPECIALISTS<br>Principal place of business located at:<br>2305 Genoa Business Park Drive, Ste. 210<br>Brighton, MI 48114<br>Registered Office Address:<br>135 S Prospect Street<br>Ypsilanti, MI 48198 | BRIGHTON | MI |
| NEUROMUSCULAR & REHABILITATION<br>Principal place of business located at:<br>3988 W Royal Drive<br>Traverse City, MI 49684 | TRAVERSE CITY | MI |
| SOUTHEAST MICHIGAN SURGICAL HOSPITAL<br>Principal place of business located at:<br>21230 Dequindre Road | WARREN | MI |

4

| | | |
|---|---|---|
| Warren, Michigan 48091<br>Registered Agent Address:<br>601 Abbot Road<br>East Lansing, Michigan 48823 | | |
| MAPS-EDINA MEDICAL PAIN CLINIC<br>Principal place of business located at:<br>7400 France Avenue South, Ste. 102<br>Edina, MN 55435 | MINNEAPOLIS | MN |
| MAPS-MEDICAL ADVANCED PAIN<br>Principal place of business located at:<br>480 Osborne Rd., Ste. 260<br>Fridley, MN 55432 | FRIDLEY | MN |
| MEDICAL ADVANCED PAIN SPECIALISTS<br>Principal place of business located at:<br>2104 Northdale Blvd. NW, Ste. 220<br>Coon Rapids, MN 55433 | SHAKOPEE | MN |
| MEDICAL ADVANCED PAIN SPECIALISTS<br>Principal place of business located at:<br>2104 Northdale Blvd. NW, Ste. 220<br>Coon Rapids, MN 55433 | MAPLE GROVE | MN |
| MINNESOTA SURGERY CENTER<br>Principal place of business located at:<br>2104 Northdale Blvd. NW, Ste. 220<br>Coon Rapids, MN 55433 | EDINA | MN |
| MINNESOTA SURGERY CENTER-<br>Principal place of business located at:<br>2104 Northdale Blvd. NW, Ste. 220<br>Coon Rapids, MN 55433 | MAPLE GROVE | MN |
| HIGH POINT SURGERY<br>Principal place of business located at:<br>600 North Lindsay Street<br>High Point, NC 27262 | HIGH POINT | NC |
| NORTH CAROLINA ORTHOPAEDIC CLINIC<br>Principal place of business located at:<br>3609 Southwest Durham Drive<br>Durham, NC 27707 | DURHAM | NC |
| SURGERY CENTER OF WILSON<br>Principal place of business located at:<br>1709 Medical Park Drive<br>Wilson, NC 27893<br>Registered Agent Address:<br>CT Corporation System, 150 Fayetteville St.<br> Box 1011 | WILSON | NC |

| | | |
|---|---|---|
| Raleigh, NC 27601 | | |
| DR. O'CONNELL'S PAIN CARE CENTER<br>Principal place of business located at:<br>255 RT. 108<br> Somersworth, NH 03878<br>Registered Agent Address:<br>Michael J O'Connell, M.D.<br>255 State Route 108 S1<br>Somersworth, NH 03878 | MERRIMACK | NH |
| DR. O'CONNELL'S PAIN CARE CENTERS, INC<br>Principal place of business located at:<br>255 RT. 108<br>Somersworth, NH 03878 | SOMERSWORTH | NH |
| CENTRAL JERSEY ORTHOPEDICS<br>SPECIALISTS PC<br>Principal place of business located at:<br>1907 Park Ave., Ste. 102<br>South Plainfield, NJ 07080 | SOUTH PLAINFIELD | NJ |
| EDISON SURGICAL CENTER<br>Principal place of business located at:<br>10 Parsonage Rd.<br>Edison, NJ 08837 | EDISON | NJ |
| IF PAIN ASSOCIATES / ISAIAH FLORENCE<br>Principal place of business located at:<br>222 Cedar Lane, Ste. 210<br>Teaneck, NJ 07666 | TEANECK | NJ |
| PREMIER ORTHOPEDICS SURG. ASSOC., LLC<br>Principal place of business located at:<br>352 S. Deslea Drive<br>Vineland, NJ 08360 | VINELAND | NJ |
| COMPREHENSIVE PAIN MANAGEMENT<br>Principal place of business located at:<br>270 S. Sparta Ave.<br>Sparta, NJ 07871 | SPARTA | NJ |
| SOUTH JERSEY HEALTH CARE<br>Principal place of business located at:<br>501 West Front Street<br>Elmer, NJ 08318 | ELMER | NJ |
| SOUTH JERSEY HEALTHCARE<br>Principal place of business located at:<br>1505 West Sherman Ave.<br>Vineland, NJ 08360 | VINELAND | NJ |
| SAHARA SURGERY CENTER | LAS VEGAS | NV |

| | | |
|---|---|---|
| Principal place of business located at:<br>2401 Paseo Del Prado<br>Las Vegas, NV 89102 | | |
| BUTANI, SUNIL H., PHYSICIAN PC<br>Principal place of business located at:<br>184 Old Country Rd.<br>Mineola, NY 11501 | MINEOLA | NY |
| OBOSA MEDICAL SERVICES<br>Principal place of business located at:<br>11 Golden Rd.<br>Montebello, NY 10901 | MOUNT VERNON | NY |
| ROCHESTER BRAIN AND SPINE<br>Principal place of business located at:<br>Seth M. Zeidman, M.D.<br>400 Red Creek Dr., Ste. 120<br>Rochester, NY 14623 | ROCHESTER | NY |
| BKC PAIN SPECIALISTS, LLC<br>Principal place of business located at:<br>1065 Delaware Ave., Ste. A<br>Marion, OH 43302<br>Registered Agent Address:<br>Mark A. Peterson<br>2 Miranova Place, Ste. 330<br>Columbus, OH 43215 | MARION | OH |
| CINCINNATI PAIN MANAGEMENT<br>Principal place of business located at:<br>8261 Cornell Rd., Ste. 630<br>Cincinnati, OH 45249 | CINCINNATI | OH |
| MARION PAIN CLINIC<br>Principal place of business located at:<br>1199 Delaware Ave.<br>Marion, OH 43302 | MARION | OH |
| ORTHO-SPINE REHABILITATION CENTER, INC.<br>Principal place of business located at:<br>7211 Sawmill Road, Ste. 101<br>Dublin, OH 43016<br>Registered Agent Address:<br>David L. Humphrey<br>7658 Slate Ridge Blvd.<br>Reynoldsburg, OH 43068 | DUBLIN | OH |
| ALLEGHENY PAIN MANAGEMENT<br>Principal place of business located at:<br>1402 9th Ave.<br>Altoona, PA 16602 | ALTOONA | PA |

| | | |
|---|---|---|
| SOUTH HILLS PAIN & REHAB ASSOCIATES<br>Principal place of business located at:<br>575 Coal Valley Rd.<br>Jefferson Hills, PA 15025 | JEFFERSON HILLS | PA |
| NEW ENGLAND ANESTHESIOLOGY (NEA)<br>Principal place of business located at:<br>22 Pasco Circle<br>Warwick, RI 02886<br>Registered Agent Address:<br>Stephen D. Zubiago, Esq.<br>Nixon Peabody LLP<br>One Citizens Plaza, Ste. 500<br>Providence, RI 02903 | WARWICK | RI |
| OCEAN STATE PAIN MANAGEMENT<br>Principal place of business located at:<br>219 Cass Ave., Ste. A<br>Woonsocket, RI 02895<br>Registered Agent Address:<br>Abdul R. Barakat<br>6 Blackstone Valley Place, Unit 201<br>Lincoln, RI 02865 | WOONSOCKET | RI |
| OCEAN STATE PAIN MANAGEMENT<br>Principal place of business located at:<br>219 Cass Ave., Ste. A<br>Woonsocket, RI 02895<br>Registered Agent Address:<br>Abdul R. Barakat<br>6 Blackstone Valley Place, Unit 201<br>Lincoln, RI 02865 | EAST GREENWICH | RI |
| INTERVENE MD<br>Principal place of business located at:<br>1341 Old Georgetown Rd.<br>Mt. Pleasant, SC 29464 | MOUNT PLEASANT | SC |
| PCA PAIN CARE CENTER<br>Total Healthcare Consultants, PLLC d/b/a Pain Care of Oak Ridge, now known as Comprehensive Pain Specialists, principal office and registered agent: Joy Day, 200 New York Ave #320, Oak Ridge, TN 37830<br>3024 Business Park Circle, Goodlettsville, TN 37072 | OAK RIDGE | TN |
| SPECIALTY SURGERY CENTER<br>Principal place of business located at:<br>116 Brown Ave.<br>Crossville, TN 38555<br>Registered Agent Address: | CROSSVILLE | TN |

| | | |
|---|---|---|
| Donathan M. Ivey<br>116 Brown Ave.<br>Crossville, TN 38555 | | |
| ST. THOMAS OUTPATIENT NEUROSURGICAL<br>Principal place of business located at:<br>4230 Harding Pike, Floor 9<br>Nashville, TN 37205-2013<br>Registered Agent located at:<br>2011 Murphy Ave., Ste. 301<br>Nashville, TN 37203 | NASHVILLE | TN |
| DALLAS BACK PAIN MANAGEMENT<br>Principal place of business located at:<br>7515 Greenville Avenue, Ste. 505<br>Dallas, TX 75231 | DALLAS | TX |
| HARRIS METHODIST SOUTHLAKE CENTER<br>Principal place of business located at:<br>1545 E. Southlake Blvd.<br>Southlake, TX 76092 | SOUTHLAKE | TX |
| INSIGHT IMAGING-ROANOKE<br>Principal place of business located at:<br>2923 Franklin Rd. SW<br>Roanoke, VA 24014<br>Registered Agent Address:<br>National Registered Agents, Inc.<br>4701 Cox Road, Ste. 285<br>Glen Allen, VA 23060 | ROANOKE | VA |
| NEW RIVER VALLEY SURGERY CENTER<br>Principal place of business located at:<br>2901 Lamb Circle<br>Christiansburg, VA 24073<br>Registered Agent Address:<br>Tedd Puckett<br>2901 Lamb Circle<br>Christiansburg, VA 24073 | CHRISTIANSBURG | VA |
| PARS INTERVENTIONAL PAIN<br>Principal place of business located at:<br>1212 Garfield Ave.<br>Parkersburg, WV 26101 | PARKERSBURG | WV |