UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
PHARMACY CASES LITIGATION          )
                                   )
                                   )
                                   )
                                   )
                                   )
                                   )


BEFORE:  THE HONORABLE RYA W. ZOBEL



**STATUS CONFERENCE AND**
**MOTION HEARING**



John Joseph Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, MA 02210


March 13, 2014
1:30 p.m.


Catherine A. Handel, RPR-CM, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 5205
Boston, MA 02210
E-mail: hhcatherine2@yahoo.com

1    APPEARANCES:

2     For The Plaintiffs:

3        Hagens, Berman, Sobol, Shapiro LLP, by THOMAS M. SOBOL,
     ESQ., and KRISTEN JOHNSON PARKER, ESQ., 55 Cambridge Parkway,
4     Suite 301, Cambridge, MA 02142;

5        Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
     ESQ., One Nashville Place, 150 Fourth Avenue, North, Suite 1650,
6     Nashville, TN 37219-2423;

7        Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K.
     MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, NY
8     10013-1413;

9        Lipton Law, by MARC E. LIPTON, ESQ., 18930 West Ten Mile
     Road, Southfield, MI 48075;
10

11        Janet, Jenner & Suggs, LLC, KIMBERLY A. DOUGHERTY, ESQ., 75
     Arlington Street, Suite 500, Boston, MA 02116;

12        Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ., 366 Elm
     Avenue, SW, Roanoke, VA 24016;
13

14        Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,
     IV, ESQ., and BEN GASTEL, ESQ., ESQ., 227 Second Avenue North,
     Nashville, TN 37201-1631;
15

16        Cohen, Placitella & Roth, P.C., by MICHAEL COREN, ESQ.,
     2 Commerce Square, 2001 Market Street, Suite 2900, Philadelphia,
     PA 19103;
17

18        Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
     Street, Suite 500, Boston, MA 02114;

19        Gentry Locke Rakes & Moore, by J. SCOTT SEXTON, ESQ.,
     10 Franklin Road, S.E., P.O. Box 40013, Roanoke, VA 24022-0013;
20


21
      FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
22
         Brown Rudnick, by DAVID J. MOLTON, ESQ., Seven Times Square,
23     New York, NY 10036;

24        Brown Rudnick, by KIERSTEN A. TAYLOR, ESQ., One Financial
     Center, Boston, MA  02111;
25
      (Appearances continued on the next page.)

1    <u>FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS</u>: (Continued.)

2    Andrews & Thornton, by ANNE ANDREWS, ESQ., 2 Corporate Park,
     Suite 110, Irvine, CA 92606;

3

4    <u>For the Defendants</u>:

5        Harris Beach PLLC, by FREDERICK H. FERN, ESQ., 100 Wall
     Street, New York, NY 10005;

6

7        Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ.,
     1150 Huntington Building, 925 Euclid Avenue, Cleveland, OH
     44115-1414;

8

9        Todd & Weld LLP, by CORRINA L. HALE, ESQ., and CHRISTOPHER
     WELD, JR., ESQ., 28 State Street, 31st Floor, Boston, MA 02109;

10       Ulmer & Berne LLP, by JOSHUA A. KLARFELD, ESQ., 1660 West
     2nd Street, Suite 1100, Cleveland, OH 44113-1448;

11

12       Lawson & Weitzen, by FRANKLIN H. LEVY, ESQ., 88 Black
     Falcon Avenue, Suite 345, Boston, MA 02210;

13       Hinshaw & Culbertson LLP, by DANIEL E. TRANEN, ESQ., and
     JOHN CULBERTSON, ESQ., 28 State Street, 24th Floor, Boston, MA

14   02109;

15       Hermes, Netburn, O'Connor & Spearing, P.C., by PETER G.
     HERMES, ESQ., and SCOTT S. SPEARING, ESQ., 265 Franklin Street,

16   7th Floor, Boston, MA 02110-3113;

17       Nutter, McClennen & Fish LLP, by SARAH P. KELLY, ESQ.,
     World Trade Center West, 155 Seaport Boulevard, Boston, MA

18   02210-2604;

19       Fulbright & Jaworski, LLP, by MARCY H. GREER, ESQ., and
     YVONNE K. PUIG, ESQ., 98 San Jacinto Blvd, Suite 1100, Austin, TX

20   78701;

21       Michaels, Ward & Rabinovitz LLP, by DANIEL M. RABINOVITZ,
     ESQ., One Beacon Street, Second Floor, Boston, MA 02108;

22       Blumberg & Wolk LLC, by JAY J. BLUMBERG, ESQ., 158 Delaware
     Street,Woodbury, NJ 08096;

23

24

25   (Appearances continued on the next page.)

1     For the Defendants: (Continued.)

2

3         Skadden, Arps, Slate, Meagher & Flom, LLP, by ALBERT L.
      HOGAN, III, ESQ., 155 North Wacker Drive, Chicago, IL 60606-1720;

4         Goodwin Procter LLP, by JAMES REHNQUIST, ESQ., ROBERTO M.
      BRACERAS, ESQ., and JOSH LAUNER, ESQ., Exchange Place, 53 State
5     Street, Boston, MA 02109;

6         Gideon, Cooper & Essary, PLLC, by ALAN S. BEAN, ESQ., and
      CHRIS J. TARDIO, ESQ., 315 Deaderick Street, Suite 1100,
7     Nashville, TN 37238;

8

9     FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
      NECP, INC.:
10
          Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
11    Street, Suite 2400, Boston, MA 02110-1724;

12

13    APPEARING TELEPHONICALLY:

14    For the Plaintiffs:

15        Firth & Ellerman Law Firm, P.C., by LAUREN ELLERMAN, ESQ.,
      P.O. Box 8248, Roanoke, VA 24014;
16
          Lichtenstein Fishwick PLC, by JOHN E. LICHTENSTEIN, ESQ.,
17    P.O. Box 601, Roanoke, VA 24004-0601.

18    Nolan R. Nicely
      Sandra Lake
19    Daniel Frith
      Greg Lyons
20    Harry Roth
      Deborah Gresco-Blackburn
21    Jim Girards
      Mary Gidaro
22    Rebecca Blair
      Nicole Kreklau
23    William N. Riley
      Jaime Kendal
24    Karren Schaeffer

25    (Appearances continued on the next page.)

```
 1    APPEARING TELEPHONICALLY: (Continued)

 2    For the Plaintiffs:

 3    George Nolan
      Daniel Myers
 4    Mark Dancer
      Kristine Osterday
 5    Bill Leader
      Alyson Oliver
 6    Matthew Barsenas
      Steven Resnick
 7    Sean Roth
      Jason Denton
 8    Sharon Houston
      Kyle Roby
 9    Bob Young
      Ned Muligan
10    Evan Smith
      Peter McGrath
11    Jonthan Nace
      Jonathan R. Krohnfeldt
12
      For the Defendants:
13
      Brooke Hastings
14    Halley Stephens
      Tony Agudelo
15    Chris Cain
      Tim Housholder
16    James Stephen King
      David Gibson
17    Laura Pittner
      Forest Horne
18    Rick Morgan
      Ed Jazlowiecki
19    Michelle Forni
      John Griffith
20    Jefferey Travers
      Robert Randall
21    Stephen Mullins
      Bryan Bleichner
22    Michael G. Derrick
      Elliot L. Olsen
23    Leslie Muse
      Daniel Clayton
24    Jeff Keiser
      Perry Poole
25    Sara Moen
      Frank Federico
```

```
1                    P R O C E E D I N G S

2        (The following proceedings were held in open court before

3   the Honorable Rya W. Zobel, United States District Court Judge,

4   United States District Court, District of Massachusetts, at the

5   John J. Moakley United States Courthouse, One Courthouse Way,

6   Boston, Massachusetts, on March 13, 2014.)

7            THE COURT:  Good afternoon.  Please be seated.

8   Please be seated.

9            (Discussion off the record at the bench.)

10           COURTROOM DEPUTY CLERK URSO:  This is In Re:  New

11  England Compounding case.  It's MD-13-2419.

12           THE COURT:  Good afternoon.

13           MR. SOBOL:  Good afternoon, your Honor.

14           There is a joint proposed agenda, your Honor --

15    (Interruption by automated telephone conference announcement.)

16           THE COURT:  Anybody who is late joining the

17  conference is now out of order.  So, please don't tell us any

18  more, Robot.

19           COURTROOM DEPUTY CLERK URSO:  I just turned it down.

20           MR. SOBOL:  Judge, we're starting things off on a

21  good foot, your Honor.  It's 1:30 in the afternoon.

22           There's a proposed agenda.  I don't know if you have

23  a copy.

24           THE COURT:  I have it.  I have a proposed agenda.  I

25  have the Plaintiffs' Steering Committee status report, the
```

1    Bankruptcy Committee's status report, and a couple of other

2    papers that were filed earlier in a different context.

3              MR. SOBOL:  Very good, your Honor.

4              So, the question, then, is what organizing -- what do

5    you want to get accomplished today?  So, we should probably

6    set that up, because I know that you have other matters that

7    are on this afternoon.  So, I would suggest, but it's

8    obviously up to the Court, that we forego introductions of the

9    parties.  You've got lots of lawyers here.  They represent

10   lots of people.  Perhaps they could tell you --

11             THE COURT:  There are a couple of lawyers whose names

12   I would like to know the identity.

13             I know you.  I know -- Ms. Parker, is it?

14             MS. PARKER:  Yes, your Honor.

15             THE COURT:  And Mr. Gerstein is not here.

16             MR. SOBOL:  No.  That's a different case, your Honor.

17   He's not on this one, unfortunately, but Mr. Stranch is here.

18             THE COURT:  I know at least two others.

19             Mr. Sobol was before me at least twice this week,

20   right?

21             MR. SOBOL:  Yes, your Honor.

22             THE COURT:  So, Mr. Stranch?

23             MR. STRANCH:  Good afternoon, your Honor.

24             THE COURT:  Let me just make a note.

25             (Pause.)

```
1              THE COURT:  Mr. Stranch, are you not among the
2    consolidated plaintiffs?  Oh, here you are.  Mr. Stranch, Ms.
3    Parker, Mr. Sobol.
4              And who else is at counsel table for the plaintiffs?
5              MR. CHALOS:  Mark Chalos, your Honor, C-h-a-l-o-s.
6              THE COURT:  I have it.
7              And now for the NECC defendants.  Is anybody here for
8    them?  No.
9              MR. FERN:  Yes, your Honor.  Frederick Fern from
10   Harris Beach, especially retained counsel for the trustee for
11   the Chapter 11 NECC defendant.  Also --
12             THE COURT:  I'm sorry.  Mr. Dean?
13             MR. FERN:  Fern, F-e-r-n, Frederick Fern.
14             THE COURT:  I got it.
15             MR. FERN:  Thank you.
16             MR. GOTTFRIED:  Your Honor, Michael Gottfried for the
17   bankruptcy trustee Paul Moore from Duane Morris.
18             THE COURT:  I'm not there yet.  You're at the end of
19   my list.
20             MR. GOTTFRIED:  Okay.  Thank you, your Honor.
21             THE COURT:  I didn't do that.
22             Now, anybody else for the NECC defendants, including
23   all of their subsidiaries and --
24             MR. TRANEN:  Your Honor, Daniel Tranen and --
25             THE COURT:  I'm sorry?
```

1          MR. TRANEN:  Daniel Tranen and John Culbertson.

2          THE COURT:  Okay.  Anybody else?

3          MR. RABINOVITZ:  Dan Rabinovitz on behalf of Medical

4  Sales Management, Inc., your Honor.

5          THE COURT:  Okay.  Anybody else?

6          MR. KLARFELD:  Good afternoon, your Honor.  Joshua

7  Klarfeld on behalf of GDC Properties.

8          THE COURT:  I don't know.  I can't find you, but I'll

9  take your word for it.

10          MR. MORIARTY:  Good afternoon, your Honor.  My name

11  is Matthew Moriarty.  I represent Ameridose.

12          THE COURT:  This may be a silly exercise.  I found

13  you.  Who else?

14          (No response.)

15          THE COURT:  Okay.  Now, who is here for Unifirst?  Is

16  that the name?

17          MR. REHNQUIST:  Jim Rehnquist, your Honor, and

18  Roberto Braceras, your Honor.

19          THE COURT:  Mr. Rehnquist.  And I'm sorry?

20    (Interruption by automated telephone conference announcement.)

21          (Discussion off the record at the bench.)

22          COURTROOM DEPUTY CLERK URSO:  Judge, I just typed and

23  I said you don't need to listen to who is calling in.

24          THE COURT:  Now, is there anybody else whose identity

25  I should know?  Liberty, is Liberty represented?

```
1              MR. HERMES:  Good afternoon, your Honor.  Peter

2     Hermes representing Liberty Industries.  With me is Scott

3     Spearing, your Honor, S-p-e-a-r-i-n-g.

4              MR. SPEARING:  Good afternoon, your Honor.

5              THE COURT:  Okay.  Anybody else that I need to know

6     who will be actually anticipating?

7              MS. ANDREWS:  Yes, your Honor.  Anne Andrews.  I'm

8     the co-chair of the Official Creditor's Committee.

9              THE COURT:  Oh, yes.

10             MS. ANDREWS:  I'm here with my co-chair, one of them,

11    Mr. Michael Coren.

12             MR. COREN:  Good afternoon, your Honor.

13             THE COURT:  Hold it one second.

14             (Pause.)

15             THE COURT:  I have all of these little stickies, but

16    I'm not familiar, not yet, with who is who.

17             Okay.  Ms. Anderson.  And who is with you?

18             MR. COREN:  Michael Coren, your Honor, C-o-r-e-n.

19             MS. ANDREWS:  And, your Honor, may I introduce --

20             THE COURT:  I don't have you as a member of the

21    committee.

22             MR. COREN:  I'm co-chair, your Honor.

23             THE COURT:  Mr.?

24             MR. COREN:  Coren, C-o-r-e-n.

25             MR. MOLTON:  Your Honor --
```

```
1              MS. ANDREWS:  Pardon me, your Honor.  I wanted to
2     introduce you to our committee counsel.  The official
3     committee has counsel for the committee, Mr. Molton.
4              MR. MOLTON:  David Molton, your Honor, of Brown
5     Rudnick for the Official Committee of Unsecured Creditors.
6              THE COURT:  Got you.
7              MR. MOLTON:  Thank you.
8              THE COURT:  Now we come to you.
9              MR. GOTTFRIED:  I'm glad to be here, your Honor.
10    Michael Gottfried for the trustee, Paul Moore.
11             THE COURT:  This is very interestingly arranged
12    because it's got interested parties, of which you are one.
13             MR. GOTTFRIED:  That certainly would be accurate.
14             THE COURT:  You're at the very end.  Mr. Gottfried,
15    right?
16             MR. GOTTFRIED:  Yes.
17             THE COURT:  Anybody else for the trustee?
18             MR. GOTTFRIED:  I'm by myself.
19             THE COURT:  So, that's it, right?  Okay.  Thank you
20    all very much.
21             I'm sorry that you now have to put up with another
22    Judge after having had such a good relationship with Judge
23    Saylor, but I'll do my best to keep up with him.
24             Mr. Sobol, Ms. Parker, who will address your jointly
25    proposed agenda with the report regarding the status of
```

```
 1   various issues?
 2           As you tell me about that, understand that I have
 3   read all of it.  That is, all of the stuff you gave me, and
 4   that the trustee gave me -- or the committee, rather.
 5           MR. SOBOL:  Excellent.
 6           MR. LICHTENSTEIN:  Has the Court requested who wishes
 7   to participate?  I couldn't tell what you were saying.
 8           THE COURT:  Who is speaking?
 9           COURT REPORTER:  I cannot hear him.
10           THE COURT:  We cannot hear you.  Speak up, please.
11   Are you there?
12           MR. LICHTENSTEIN:  Now I can hear.  Those of us on
13   the phone can barely hear you.
14           THE COURT:  Crank up the volume on your phone.
15           MR. SOBOL:  Ask them to mute them.
16           THE COURT:  Now, did you wish to speak?  Other than
17   to tell me that you can't hear me?
18           MR. LICHTENSTEIN:  Your Honor, this is John
19   Lichtenstein and we did -- I don't think the Court could hear
20   us before.  We have requested the opportunity to participate.
21   We are down the course agenda a ways in Section 5.  So, we're
22   very appreciative of the opportunity to participate.
23           THE COURT:  Section 5 of the agenda?
24           MR. LICHTENSTEIN:  Yes, ma'am.
25           THE COURT:  Which has to do with the trustee's motion
```

1     to transfer?

2              MR. LICHTENSTEIN:  That is correct, your Honor.

3              THE COURT:  Okay.  Well, Mr. Sobol is about to

4     address all of the sections to the extent that they deem it

5     necessary.  I told him I have read all of the agenda.  I have

6     read the report of the committee as well as the report of the

7     Bankruptcy Committee.

8              So, when Mr. Sobol finishes, I will ask you if you

9     have to say anything, and I would much appreciate it if you

10    would do it in as brief a time as possible.

11             MR. LICHTENSTEIN:  Absolutely, your Honor.

12             And, your Honor, we -- there are other counsel as

13    well, as the Court knows, with respect to these matters and we

14    would actually follow them, I believe, and that is Mr. Sexton,

15    who I understand is with the Court today.

16             MR. SEXTON:  That's me, your Honor.

17             MR. LICHTENSTEIN:  But we will be brief.

18             MR. SOBOL:  When we get there, we'll --

19             THE COURT:  I don't wish to have anybody talking

20    twice about the same thing, please.

21             So, Mr. Sobol, you may begin.

22             MR. SOBOL:  Thank you, your Honor.

23             So, the overview that I would like to present to you,

24    since you have read everything, is I think that it probably

25    makes most sense, since this is your first time really hearing

1    the matter, for me to give you just an overview about what

2    pieces are at play, what in a broad context is really sort of

3    going on in this MDL and what you should, therefore, be

4    sensitive to.

5         THE COURT:  Would it be helpful if I were to explain

6    to you what I understand the situation to be?

7         MR. SOBOL:  Yes.

8         THE COURT:  And then you can fill it in and tell me

9    what I have wrong.

10         MR. SOBOL:  That will be most efficient.  Go ahead,

11    your Honor.

12         THE COURT:  Okay.  As I understand it, there is,

13    first of all, the bankruptcy piece, and the committee

14    appointed by the trustee or the bankruptcy judge or both, and

15    they and the -- well, the bankruptcy judge and the bankruptcy

16    trustee have apparently managed to collect a relatively large

17    amount of money from the NECC, whatever they are, defendants

18    from the bankrupt as well as the affiliated people who are the

19    Conigliaros, and others like that, as well as their insurers,

20    and that there is in progress now an attempt to settle all of

21    these claims, with the notion that there would be set up some

22    kind of a fund eventually, that a common fund -- that they

23    would go -- that's not called a common fund.  It has another

24    name.

25         MR. SOBOL:  Yes.

```
1              THE COURT:  For distribution in some way, with hold-
2       backs, distribution to the people who were harmed.
3              And there are some issues remaining as between the
4       bankruptcy court and this Court as to what cases should come
5       here, which may be ripe and may not.  I'm not sure about that.
6              So, that I understand to be one piece that appears to
7       be well under control, except for the fact as to how much
8       formality there exists with respect to certain parties in this
9       Court that are now in bankruptcy court.
10             That, I understand, to be one piece; is that correct?
11             MR. SOBOL:  Generally, that's right.  If you're done,
12      I'll sort of fill it in or was there more you wanted to add,
13      your Honor?
14             THE COURT:  Go ahead.
15             COURTROOM DEPUTY CLERK URSO:  Can you speak into
16      there?
17             THE COURT:  Now, in fact, let me try to finish,
18      because then I get a picture of the whole and you can
19      certainly elaborate on anything.
20             The second piece, as I understand it, is the piece
21      that caused Judge Saylor to have to leave.  The introduction
22      as defendants in this case of the Cleanroom Group.  Liberty,
23      which as I understand it, manufactured or produced or
24      installed these Cleanrooms and you need -- what is it?
25             MR. BRACERAS:  Unifirst.
```

```
 1              THE COURT:  I'm sorry?

 2              MR. BRACERAS:  Unifirst.

 3              THE COURT:  Unifirst, which was in charge of cleaning

 4    them.

 5       (Interruption by automated telephone conference announcement.)

 6              THE COURT:  There has to be a way to stop that.

 7              So, as I understand it, one of these two new

 8    defendants is in the process of some settlement negotiations

 9    and Unifirst is not, correct?

10              MR. BRACERAS:  Correct.

11              THE COURT:  At least not yet.

12              MR. BRACERAS:  Correct.

13              THE COURT:  That, as I understand, is the story with

14    respect to those defendants at this point.

15              And then there is a large group of what I have been

16    calling "state defendants," the people -- the injectors, and

17    their companies.

18              What I'm not altogether clear about is -- I gather

19    that those who are here are those who either filed initially

20    in the federal court in their states or who filed in state

21    court and were removed to the federal court, but we do not

22    have any plaintiffs or defendants from those cases that may

23    still be in state court; is that right?

24              MR. SOBOL:  Generally.  I'm going to let you finish

25    and then sort of fill it in around the edges, yes.
```

1          THE COURT:  Okay.  So, that's what I understand to be

2    the picture of the litigation in terms of the participants.

3          MR. SOBOL:  Okay.  So, let me fill in some other

4    things.

5          THE COURT:  I wish you would.

6          MR. SOBOL:  Obviously, you've done your homework.

7          THE COURT:  That's what I wanted you to say.

8          MR. SOBOL:  Very good.

9          So, there are -- as you've identified, there are

10   essentially three groups of different kinds of defendants.

11   There's what we have been calling here -- to give you some of

12   our vernacular, there are the -- there's NECC, which is the

13   only debtor in the bankruptcy, technically.  There are then

14   the affiliated companies and the individuals who owned and/or

15   ran NECC.  So, those --

16         THE COURT:  Excuse me one minute.

17         There are some seats over here.

18         MR. SOBOL:  There are the affiliated defendants, the

19   companies that are associated with NECC and the individuals

20   who owned and ran NECC who are -- we call "the insiders."

21   That's the second group.  NECC and then the affiliated.

22         The third group are what we've been calling "national

23   defendants."  You picked up on that.  That's Unifirst or ARL

24   or Liberty, companies that were generally involved with NECC

25   who might be an actual or potential defendant from anybody all

1  over the country because of their central arguable

2  involvement.

3         And then the fourth group are "the injectors," the

4  clinics, scattered across many states in the country.  We have

5  those --

6         THE COURT:  I'm sorry.  Who is the third group?  You

7  called it the "state defendants"?

8         MR. SOBOL:  The third group are the national

9  defendants.

10         THE COURT:  National defendants.

11         MR. SOBOL:  And then the fourth group are the --

12         THE COURT:  Who are the national defendants?

13         MR. SOBOL:  Unifirst that did like cleaning.  ARL,

14  that was --

15         THE COURT:  That was my second group.

16         MR. SOBOL:  Yes, exactly.

17         THE COURT:  Because you divided the NECC defendants.

18         MR. SOBOL:  Right, just because, technically, you've

19  got NECC only as the debtor, which in some respects sometimes

20  is relevant.

21         THE COURT:  Okay.

22         MR. SOBOL:  So, there are those four groups of

23  defendants.

24         Now, as an overall mission, as an aspiration that is

25  shared by many people in this courtroom, there's a desire --

1    to the extent there's any defendant from any category that

2    wants to participate in a settlement through a bankruptcy

3    envelope, if you will, that would lead to a plan that would

4    create a tort trust, right.  So, the notion is any

5    participants might be able to go into that process, okay?

6              So, where are we to date with respect to that?

7              Well, NECC, the affiliated defendants and the

8    individuals -- we have a proposal that is not yet signed, but,

9    hopefully, will be signed imminently to have money put in, not

10   only by NECC, but by the affiliated defendants and individuals

11   into a pot in a bankruptcy context.

12             Once that money is put in there, there might be other

13   contributions.  Perhaps, a clinic settles.  Perhaps we can get

14   Unifirst to settle and discuss and they can put some money

15   into that pot.  The notion is then a plan gets formed.  There

16   has to be voting on the plan, objections, all the rest of that.

17             The ultimate output of that would be a tort trust

18   where there would be a matrix and an allocation to

19   individuals, that kind of thing.  That's an overall aspiration

20   shared by many to have both the MDL driving litigation, to

21   have settlements and money that goes into the bankruptcy as an

22   overall effort.

23             Now, therefore, it's important for you to understand

24   where we are with each of those buckets so that you can have

25   some context about what's going on with the motions that

```
1   people want to try to argue today or at least in some way
2   address.
3           I've indicated where we are with NECC today.
4           You will also understand where we are with the
5   affiliated defendants and the individuals.  A proposal,
6   hopefully, will be signed.  Hopefully, there will be some
7   things that will then go through a process.
8           There are then -- there are some mediations that are
9   going on for some national defendants.  I'm not going to get
10  into the details of them right because we don't have an awful
11  lot of time.  You will learn that some mediations are going on
12  for some national defendants.
13          Some other national defendants, as you indicated,
14  like Unifirst, are defendants that we have to proceed forward
15  with the usual litigation.
16          On the clinic side, although there are scores of
17  clinics across the United States, injectors, that are arguable
18  potential defendants, some clinics are the target of many more
19  lawsuits than others, obviously.  Some of those clinics have
20  agreed to participate also in mediation, and we have discovery
21  stays that would relate to them, and then there are a small
22  handful of larger clinics who are larger in the sense that
23  their targets are more, which we're going forward with the
24  litigation.
25          So, as an example, one of them is the St. Thomas
```

1    entities which we're moving forward with litigation, which

2    there are some things on before you today.

3          Now, the only other things that I would give sort of

4    an overview so you can understand it is that to date, the way

5    that Judge Saylor and Judge Boroff dealt with bankruptcy

6    issues is that there have been no formal motions, I don't

7    think, maybe a detail here or there, but, by in large, there

8    hasn't been any sort of formal order put in place that says,

9    here's what Judge Saylor is going to do and here's what Judge

10   Boroff is doing to do.  There's nothing formal like that.

11   They have informally talked with one another, but as a

12   practical matter, if something has to go forward in the

13   bankruptcy court, they have gone forward with Judge Boroff,

14   and some things that are classically MDL-ish, if it will, it

15   went forward with Judge Saylor, and the parties have let Judge

16   Saylor and Judge Boroff informally communicate with the -- at

17   least, that's what we've been informed.  Obviously, we haven't

18   participated in those communications -- to the extent they

19   thought was necessary there.

20         I think that's the main overview, if you will.  I'm

21   not trying to get into anything more specific, but I think

22   that's generally what's going on.

23         I guess I need to add just one piece.  Although there

24   are about 80 clinics, for instance, that the Plaintiffs'

25   Steering Committee served subpoenas on for certain kinds of

1    information, we won't see as the mission of this MDL to

2    litigate cases against every single one of those 80 clinics,

3    because there's going to be some kind of triage that would

4    have to occur, and there's going to have to be some kind of

5    understanding that there are some clinics that aren't being

6    sued by many people at all, but then there'll be other clinics

7    where we see, you know, outside -- like St. Thomas and some

8    others, that are larger, that have more victims, that we will

9    see it as our job to, you know, make sure those are buttoned

10   down with respect to them.

11            THE COURT:  But those -- do you anticipate that they

12   would be litigated here?

13            MR. SOBOL:  No, not all of them.  Some of them may.

14   Like St. Thomas may right now be litigated here, all right,

15   because their cases --

16            THE COURT:  Under the umbrella of the MDL?

17            MR. SOBOL:  Yes, that's right.  That's right.

18            And there are probably, you know, a small handful of

19   other clinics that, in our view, would fall into that bucket.

20            We've also -- by the way, there's been very -- I

21   won't even call it discussions -- remarks between the

22   participants and Judge Saylor about, you know, if one actually

23   got to a trial, well, where would that be conducted and who

24   would be doing the trial.  Sort of questions posed.  No

25   answers to those.  No papers filed.  Questions posed.

1          Certainly, I'm sure that you would look forward to

2     going to Roanoke, Virginia, for instance, and trying some

3     cases there for Mr. Sexton, or others, but that's an issue

4     down the road.  So --

5          UNIDENTIFIED SPEAKER:  Would everyone on the line

6     please put their phones on mute.

7          MR. SOBOL:  So, the bottom line ends up being that

8     although there are lots of people and there are lots of moving

9     pieces, I think that what you'll see is that, at least from my

10    point of view, this MDL is becoming somewhat more -- you can

11    see a very faint light at the end of the tunnel.

12         Why?  Because there will be an agreement in

13    principle.  There is an agreement in principle.  There will be

14    a final agreement that's going to be proposed in the

15    bankruptcy for the main defendant, NECC, and their related

16    entities and individuals.  And then there is going to be many

17    mediations that are ongoing for most of the national

18    defendants right now and not many of the national defendants

19    are litigating right now.  So, that's sort of a -- you can see

20    the light at the end of the tunnel there.

21         And then on this huge number of clinics, there's

22    going to have to be some kind of manageability kind of

23    identification of which clinics are really to be serious about

24    and which are really not the role of the MDL.  That's sort of

25    an overview.

1         With that, then, what I would suggest, your Honor,

2    because I've sort of given you an update on these things, is

3    that we could, therefore, skip A(1), 2, 3, 4, 5 and 6.  These

4    are matters that -- you know, there's a trial plan issue for

5    St. Thomas.  There's some motions to dismiss on.  There are

6    some issues that need to be argued, perhaps, later on, but I

7    think we can go through those items.  We might be able to jump

8    to Item No. 7 at the top of Page 2.

9         I was just handed a note, your Honor.  One other part

10   of the overview I guess I should give you is that in terms of

11   the -- to the extent we're going forward with litigation, for

12   instance, against St. Thomas or a national defendant, there

13   has been filed master complaint and there are short forms

14   people have signed on to.  There'll be a process there to

15   identify --

16        THE COURT:  What is the short -- what is the purpose

17   of the short form complaint?  Is it --

18        MR. SOBOL:  For somebody to -- if they want to have

19   their case considered for Bellwether treatment as a test case,

20   they sign on to the master complaint by adding their client's

21   name and providing some other case-specific information

22   without them having to file a whole big fancy complaint.

23   That's the purpose of it.

24        THE COURT:  But this is for individual plaintiffs?

25        MR. SOBOL:  Correct.  Correct.

```
1              So, unless there's a party that would object, I'd
2     suggest that we can move to A(7), which is at the top of Page
3     2, and I don't know if we could -- and I don't know if Mr.
4     Gottfried wants to add something else in terms of the status
5     of the bankruptcy proceeding.
6              THE COURT:  He does.
7              MR. GOTTFRIED:  Thank you, your Honor.
8              Just to brief --
9              THE COURT:  Why don't you do it sitting down, Mr.
10    Gottfried, and then you can speak into the microphone more
11    easily, and all of these people who come and go can hear you.
12             MR. GOTTFRIED:  Sure.  Okay.
13             THE COURT:  Provided they're still there.
14             MR. GOTTFRIED:  Okay.  So, here's a brief status
15    report on the bankruptcy.
16             The trustee, Paul Moore's, primary focus has been to
17    negotiate settlements with the insiders, the affiliates and
18    their insurance companies and, as Mr. Sobol has reported, we
19    are making excellent progress.  We're very close to having, we
20    think, signed agreements.
21             I can report to you that the final settlement
22    agreements for the two NECC insurers are out for signature.
23    The insiders' insurers, that agreement is final as well,
24    subject to buttoning up the last issue, really, with the
25    insiders.
```

1          So, the primary mission of the trustee during this

2    first sort of year to get these settlements done is really on

3    the verge of being signed.

4          The next step would be to file in the bankruptcy

5    court for approval of those settlements.  It's our thinking

6    that from the day we file those motions, it will probably take

7    30 days for Judge Boroff to hear those.

8          Part and parcel of what's been happening with that is

9    the trustee filed a motion seeking a bar date be put in place

10   by Judge Boroff.  Judge Boroff entered extensive orders on how

11   we would gather names on people we would give notice to, where

12   we would publish.  More than -- or approximately 20,000

13   notices were sent out, your Honor.  They were published from

14   publishing in 62 newspapers.  As a result some 3,600 proof of

15   claims have been received by the bar date by the trustee.

16         There was an oversight by the company that was doing

17   the noticing and three clinics' patients were not notified in

18   that original notice, and the motion was filed before Judge

19   Boroff and he has established a supplemental bar date for

20   those group -- those group of patients, which is on May 5th,

21   and I'm pleased to report a number of those folks had notice,

22   anyway, and many of them have already filed proof of claims,

23   but there certainly is a group that we're glad to have given

24   those supplemental notices to.

25         The trustee has also spent a good deal of time

dealing with recalls and collecting receivables on behalf of
the estate and he has collected $800,000 in receivables on
behalf of the estate through those efforts.

So, what I would say is I think the bankruptcy is
proceeding well.  I certainly agree with what Mr. Sobol said,
that the end game here is to create a bankruptcy plan which
will result in a trust and, you know, we think that there's a
great deal of benefit to defendants to participating in that
process and ultimately, you know, getting protection against
other claims by joining in the settlement.

THE COURT:  Thank you.

The agenda includes some additional information about
-- well, the insurance declaratory judgment action, as I
understand.  And there were some appeals, I gather?

MR. GOTTFRIED:  I can talk about the appeals, your
Honor, if you would like.

You know that the renewed -- the trustee's renewed
motion to transfer is before you.  The appeal relates to Judge
Saylor's original order.  You know, in that order he found the
Court had related-to jurisdiction.  He rejected the argument
that he had to mandatorily abstain to transfer and he
concluded that he was going to exercise his discretion to
abstain from a small category of cases which were state cases
where there was no affiliated defendant.

He indicated that if and when indemnification claims

1      were actually filed, that he would, perhaps, reconsider that

2      and view it as a dynamic exercise, whereby he would look at

3      new facts and circumstances as they came down the pipe.

4              Even though the so-called Roanoke defendants actually

5      prevailed under Judge Saylor's order, they weren't

6      transferred.  They filed an appeal with the First Circuit

7      because they believed he was wrong, certainly not by

8      abstaining, but by not mandatorily abstaining.

9              So, recently the First Circuit established a new date

10     for their brief, which I have in my notes as April 21st, 2014,

11     is when the first --

12             THE COURT:  Still this year.

13             MR. GOTTFRIED:  Still this year.  So, that's when

14     their brief is due and that's what that relates to.

15             THE COURT:  Okay.  Now, Mr. Sobol, what next?

16             MR. SOBOL:  Well, I think it's sufficient to say Mr.

17     Ellis is going to address the declaratory judgment action.

18             There are two excess insurers for Ameridose.  Each of

19     them have filed declaratory judgment actions.  They are

20     pending before Judge Saylor still.  The PSC, through Mr.

21     Ellis' efforts, is moving to -- and others, is moving to

22     intervene, and that's what you need to understand now.

23             THE COURT:  Well, there's nothing for us to do with

24     respect to that?

25             MR. SOBOL:  There's nothing to do with that.

1          I'd also suggest on these other items -- I would like

2    to have Ms. Parker just give you a very brief update regarding

3    the status of the mediation efforts, too.

4          MS. ANDREWS:  And No. 8, Mr. Sobol?

5          MR. SOBOL:  Yes, we'll get to that, too.

6          MS. ANDREWS:  Well get to that?

7          MR. SOBOL:  Yes.

8          UNIDENTIFIED SPEAKER:  Would you please put your

9    phone on mute.

10         MS. PARKER:  Good afternoon, your Honor.

11         THE COURT:  Good afternoon.

12         MS. PARKER:  The Court entered -- well, Judge Saylor

13   entered a mediation order that established a formal court-

14   supervised mediation program.  It was done in conjunction with

15   both the bankruptcy proceeding and the MDL proceedings.

16         There are currently as of today three of the national

17   defendants who are participating in that mediation process.

18   Those are ARL, Victory and Liberty.  There are two clinics,

19   both of whom happen to be from Florida, participating in that

20   process, and then outside of that process there is one clinic,

21   Inspira from New Jersey, that is participating in a private

22   mediation process.  There's also one entity participating in

23   the formal court mediation process that I'm not at liberty to

24   disclose publicly who is participating, but there is an order

25   under seal that identifies that entity to the Court, and we're

1    happy to provide additional information if the Court would

2    request.

3              None of those mediations have to date resulted in

4    full resolution or payments of any money and satisfaction of

5    claims.  There are, however, mediation dates set with the

6    Court-appointed mediator, which is Resolution LLC.  I believe

7    Ms. Carmin Reiss is actually in the gallery today from

8    Resolutions LLC.

9              And there are dates set for various mediations in the

10   month of April.  So, we hope to know within the next 60 to 90

11   days whether those mediations will be successful or not.

12   Thank you.

13             THE COURT:  Thank you.

14             MR. SOBOL:  Can we jump back to No. 8, your Honor?

15   Because I believe that Ms. Andrews and Mr. Coren might want to

16   address something that --

17             THE COURT:  Okay.

18             MS. ANDREWS:  Thank you, your Honor.  I'm going to

19   jump to this mic.  Excuse me.

20             So, your Honor, a piece of this litigation that is

21   very interesting to all in the room is that you not only have

22   the PSC led by Mr. Sobol, a very fine committee, you also have

23   a committee of nine creditors that were appointed by the

24   United States Trustee's Office, and I see Mr. Fitzgerald here

25   today.

1       And their duties -- this committee's duties are very

2  different.  Before you, you have some 400 filed cases

3  transferred to you or directly filed here before you as

4  plaintiffs.

5       Our role as a creditor's committee is to represent

6  each and every victim and each and every creditor of this

7  company.  There are some 3500 claims filed in the -- by virtue

8  of the order.  So, this committee represents all of their

9  interests.  Its job is to manage those interests, to work

10 together with the trustee in providing and building this fund,

11 to provide essential mediation tools.

12      Because the remedy for this case, and the way I think

13 we all are working, is to drive it through the confirmation of

14 a plan of Chapter 11, because there is a remedy there for all

15 these victims, and the timeline in this case is so essential,

16 that Judge Saylor was really aggressive with and we hope your

17 Honor can appreciate, is to get these funds into the hands of

18 the victims and creditors in this case.  So, that's the role

19 of our duly -- a constitutional body appointed by the

20 government and that's the challenge that we face each week in

21 trying to move this case as quickly and as economically as

22 possible toward that.

23      And I'll be happy to answer any questions.  And Mr.

24 Coren may have a few comments he would like to make.

25      THE COURT:  Anything else, Mr. Coren?

1          MR. COREN:  No, your Honor.  I think Ms. Andrews

2     outlined the statutory committee's, you know, role.  There

3     are, obviously, going to be overlaps between what we do and

4     the PSC does.

5          We in that regard entered an operating agreement of

6     June 6th that hopes to -- to reduce the friction that exists

7     when you have a bicameral set of committees that have to share

8     responsibilities.

9          I think we, for the most part, have done an admirable

10    job.  I applaud PSC.  I think we pat ourselves on the back for

11    how we've worked together not to have the clashes, but there

12    is an overlap.  We recognize that overlap and we hope you

13    understand that.

14          THE COURT:  Thank you.

15          Mr. Sobol, what's next?

16          MR. SOBOL:  I think we're ready for B(1), your Honor.

17          THE COURT:  Let me ask you.  There is a pile of

18    motions here.  I had not anticipated that we would have any

19    sort of extensive argument on motions.  Which one of them

20    actually requires hearing?

21          MR. SOBOL:  So, I think that the one that requires

22    hearing, that you should hear, your Honor, is the motion to --

23    the renewed motion to transfer, because there's also counsel

24    from out of state who have been here once before and we

25    couldn't go forward with Judge Saylor.  Mr. Sexton is back

```
 1    here again.  So, I would suggest if that you're going to hear

 2    any argument, that it be on No. 5 on Page 3.

 3            THE COURT:  Is that the issue that is in the Court of

 4    Appeals?

 5            MR. SOBOL:  I don't think -- it's a related issue,

 6    but this is a renewed motion on the basis of some different

 7    facts and, therefore, it requires a different, new treatment.

 8    So, you won't be able to -- you won't be able to escape the

 9    ruling given the appeal.

10            THE COURT:  Whatever was done before is not relevant

11    to this motion?

12            MR. SOBOL:  It may be relevant, but it's not

13    dispositive and, therefore, this motion needs to be treated

14    because there are different facts with respect to this motion

15    now that require the Court's attention.

16            THE COURT:  Okay.

17            MR. SOBOL:  So, as to --

18            THE COURT:  Is there any reason why I can't deal with

19    the others on the papers?

20            MR. SOBOL:  No, there's not from my point of view.

21            I want to make clear one thing.  In terms of the

22    motion that's at B(1), the PSC's motion to partially lift the

23    stay, the PSC is content to put that over to the next status

24    conference so you don't have to rule on that one.

25            There will be likely if we settle this case, settle
```

1    the -- sign the papers that we talked about earlier, that

2    motion will be redrafted to address the different

3    circumstances, and you'll be asked to pass on that, but we'll

4    be essentially asking you to stay matters that relate to

5    dispositive motions against the insiders and making sure that

6    there aren't more motions to attach their assets because

7    they've done a deal.  So, we're going to ask you stay -- to

8    modify that request, but there will be a request that some

9    discovery go forward because there are other defendants we

10   also need information about.  But the long and the short of it

11   is, number one, we're content to put that over.

12            THE COURT:  How about your motion to shorten time,

13   does that go to Judge Boal?

14            MR. STRANCH:  Your Honor --

15            MR. SOBOL:  Do we intend to put that over?  Can we do

16   that on the papers or no?

17            MR. STRANCH:  I think there's actually been an

18   agreement.  There was a response filed by --

19            THE COURT:  So, it's done, correct?

20            MR. STRANCH:  -- the clinics.

21            They said we're not entitled to it, but they're going

22   to give us what we want.  So, we're happy with their --

23            THE COURT:  So, done.

24            MR. STRANCH:  Thank you, your Honor.

25            MR. SOBOL:  On No. 3 --

```
1              THE COURT:  The motion for entry of CMO establishing
2      assessment procedures.  That I think Judge Saylor also had
3      wrestled with at one point, sort of.
4              MR. SOBOL:  Yes.  And with respect to that, the PSC
5      would be content to have you rule on the papers.
6              THE COURT:  Is that one that requires a decision
7      forthwith?
8              MR. SOBOL:  No.  So, if you wanted to bump that off
9      also until the next time we're all here, that's probably
10     satisfactory.
11             MR. GOTTFRIED:  Your Honor, just on that one, if I
12     may.  I think you should bump that off until the next one.
13     The PSC actually filed something last night at 5 o'clock,
14     which -- at least we would like to address in oral argument.
15     So, if we don't have time for that today, I would do it later.
16     I don't think it's --
17             THE COURT:  So, there's no hurry on it.
18             MR. GOTTFRIED:  I don't think --
19             MR. MOLTON:  This is David Molton for the creditor's
20     committee.
21             I'm going to join in Mr. Gottfried's request.  The
22     committee and the trustee filed joint pleadings on that, your
23     Honor, and, again, in light of the late filing last night --
24             THE COURT:  I've already done it.
25             MR. MOLTON:  Okay.  Thank you.
```

```
 1              THE COURT:  Ms. Anderson, I've already done it.
 2              MS. ANDREWS:  I'm sorry, your Honor?
 3              MR. SOBOL:  Pushed it off.
 4              THE COURT:  We're passing it.
 5              MS. ANDREWS:  Thank you, your Honor.
 6              The only question I had was whether or not you wished
 7    to hear oral argument on it.  There are a number of joinders
 8    to -- that they had various positions on that motion.  If you
 9    were going to hear it on the papers, that was simply my
10    question.
11              THE COURT:  Speaking of papers, the filings are
12    extensive.  They're very long.  And I think we have a rule
13    about 20 pages.  And it doesn't do for you to say that with
14    the assent of all the parties, we're going to file 70.  I want
15    to assent.  So, please don't just assent to yourselves and
16    amongst yourselves, but ask me whether I'm prepared to read 70
17    pages.  If you don't, I will simply ask you to kindly tell me
18    which 20 pages you want me to read.
19              MR. SOBOL:  That's the second time this week you gave
20    me that lecture, your Honor.
21              THE COURT:  Well?
22              (Laughter.)
23              THE COURT:  In any event, Ms. Andrews, we have agreed
24    that that one we will let sit until the next time.
25              MS. ANDREWS:  Thank you, your Honor.
```

```
 1            My only question was whether or not you wished to

 2    hear oral argument on it or if you intended to rule on the

 3    papers.

 4            THE COURT:  I have not decided, but I will let you

 5    know in due course.

 6            MS. ANDREWS:  Thank you, your Honor.

 7            THE COURT:  Then there's the motion for the

 8    Bellwether trial and pretrial scheduling orders.  Is that the

 9    short form or is that -- are you interested in that?

10            MR. BRACERAS:  Yes, your Honor.  I think Mr. Gross

11    set up this microphone for the defendants.  Is that working,

12    Lisa?

13            COURTROOM DEPUTY CLERK URSO:  Yes.

14            MR. SOBOL:  No objection, your Honor.

15            MR. BRACERAS:  I wasn't seeking his objection or his

16    approval.

17            So, your Honor --

18            THE COURT:  No.  He's not objecting to your butting in.

19            MR. BRACERAS:  We're about as new to this case as --

20            THE COURT:  I think you're as new as I am.  No,

21    you're older than I am.  In the case.

22            MR. BRACERAS:  Barely.  Barely.

23            (Laughter.)

24            THE COURT:  Be sure that you speak into it so that

25    the telephone people can hear you.
```

1          MR. BRACERAS:  Yes.  Roberto Braceras from Goodwin

2     Procter and Mr. Rehnquist.

3          So, unfortunately, I think Mr. Rehnquist and I helped

4     bring this entire mess to your Honor.  We apologize for that.

5          THE COURT:  Get on your knees.

6          (Laughter.)

7          MR. BRACERAS:  I was expecting that.

8          So, this has actually been helpful to us because

9     we're sort of learning on the fly with the Court since this is

10    our first hearing.

11         THE COURT:  I'm happy to share these synopses with

12    you.

13         MR. BRACERAS:  They're very useful.  They're very

14    useful, but we are afraid they don't tell the entire picture,

15    and especially on this motion for entry of the Bellwether

16    trial.  That is something that we think should be set for the

17    next hearing and that we will want to be heard on that.

18         We do think that, and especially this agenda, really

19    gets into the weeds of a lot of the specifics, but as we're

20    just getting into the case, we really think we always have to

21    step back and see the entire organization.

22         I know Judge Saylor, for instance, did not intend

23    these mediations to go into perpetuity.  It's also very

24    possible for the other parties to participate in the

25    litigation even if they're going to continue in mediation or

1    other settlement negotiations.  I think Mr. Sobol even noted,

2    who knows maybe, Unifirst --

3              THE COURT:  What do you want me to do?

4              MR. BRACERAS:  I think that at some point all the

5    parties -- we have to know who all the parties are and before

6    we dive into some of the motions, for instance, to discuss

7    pretrial scheduling, you know, orders, we need to know who are

8    the parties going to be.  And so, I think this is something we

9    can argue -- well, but a lot of other national defendants

10   aren't here.  So, they haven't settled.  So, I think that this

11   is something that we would like to be heard on and we can do

12   that --

13             THE COURT:  This motion, which is No. 4 on Mr.

14   Sobol's list?

15             MR. BRACERAS:  Yes.

16             THE COURT:  That's what you want to be heard on?

17             MR. BRACERAS:  Exactly.

18             THE COURT:  Okay.

19             MR. SOBOL:  Turning, then, to No. 5, your Honor.

20   That is the motion that I think --

21             THE COURT:  That's the one you want to argue?

22             MR. SOBOL:  I think -- in fairness to everybody, I

23   think that's the motion you want to hear, and other people

24   have more than an interest in the PSC.  I just want to say

25   this at the outset so you can understand procedurally what is

1    in front of you before the parties start arguing.

2           At the outset of this MDL, there were many cases in

3    the state courts and here in the federal court and also some

4    have been filed in other federal courts that were being

5    transferred pursuant to the MDL.

6           The original motion to transfer that was filed by the

7    trustee sought to move not only all cases that were in federal

8    courts here, but also all cases that were in state courts

9    here, too.

10          Functionally, what Judge Saylor ruled was that all

11   cases in the United States are to be sent here with one carve-

12   out exception.  If there were cases that have been filed in

13   state court where NECC, the affiliated defendants, and the

14   individuals were not parties -- so you only have non-

15   affiliated -- you know, no NECC, no insiders, parties to the

16   case, no affiliated defendant parties to the case, and that

17   the defendant clinic, if you will, then, had not filed a proof

18   of claim for contribution or indemnification in the bankruptcy

19   process itself.  That was the carve-out.

20          THE COURT:  The indemnification claims are also

21   subject to the bar date?

22          MR. SOBOL:  Yes, they are.  And they're also subject

23   to the bar date that came and went in January for the vast

24   majority of the claims.  That was the carve-out.

25          And I think -- I'll be corrected, but I think that

1    carve-out de facto left were a group of cases that were

2    pending in Virginia, by in large, which is why you see most of

3    the opposition now to the renewed motion coming from the

4    Roanoke plaintiffs.  Okay?

5            THE COURT:  Okay.  So, that one when you finish with

6    the rest of it is what I need to hear today, correct?

7            MR. SOBOL:  Yes, your Honor.

8            THE COURT:  With respect to briefing in progress,

9    that really -- that is simply informational, right?

10           MS. PARKER:  Yes.

11           MR. SOBOL:  Yes, your Honor.

12           THE COURT:  And that is the referred to Judge Boal,

13   similarly.

14           I have, by the way, talked with her and invited her

15   to participate in these proceedings to the point of being on

16   the bench with me, but she is today in Washington and couldn't

17   be here.

18           So, does that mean -- does anybody else wish to be

19   heard on these issues that Mr. Sobol and Mr. Braceras have

20   been talking about, as well as the bankruptcy contingent

21   before we go to the hearing on the motion to transfer?

22           MR. SOBOL:  If I may, your Honor.  There are -- I'm

23   sorry.  There are, I think, two other housekeeping matters

24   that people have handed me notes about.

25           There is a deadline -- the PSC had a deadline to file

```
1    an amended complaint against the affiliated defendants and the
2    insiders.
3              THE COURT:  How much time do you need to do it?
4              MR. SOBOL:  Another month, because if we have the
5    case settled --
6              THE COURT:  No objection, right?  So, that's allowed.
7    What's next?
8              MR. CHALOS:  Your Honor, may I be heard briefly on
9    these other issues?
10             THE COURT:  You mean on the one that I just ruled on?
11             MR. CHALOS:  Different issue.
12             The St. Thomas defendants have filed a set of motions
13   to dismiss.  They've each filed two different motions to
14   dismiss.  One set of those motions is mostly focused on case-
15   specific issues, and we have an agreement.  The deadline for
16   the plaintiffs to respond to those motions is currently March
17   28th.  We have an agreement and it was, I believe, Judge
18   Saylor's contemplation that the case-specific motions wouldn't
19   be heard at this point.  It would only be global motions heard
20   at this point.  So, the Court wouldn't have to get into the
21   factual details of 100 and --
22             THE COURT:  So, the general motion that still has the
23   March 28th deadline?
24             MR. CHALOS:  They all currently have the March 28th
25   deadline, but we have --
```

```
1              THE COURT:  Yes, but you don't want to extend that or

2   you do?

3              MR. CHALOS:  We do not.  We don't want to extend the

4   global motion deadline or the --

5              THE COURT:  So, the global motions, you respond by

6   the 28th.

7              MR. CHALOS:  Right.

8              THE COURT:  And the other one sits there.

9              MR. CHALOS:  The other one, we ultimately will ask

10  the Court to extend that indefinitely, at least for the time

11  being.  But, in the meantime, we have an agreement to extend

12  that deadline by about two weeks to April the 14th.

13             In the interim, we're going to work to figure out if

14  we can agree which issues are truly case specific and which

15  issues are global, and we will brief the global issues, to the

16  extent there are any in those motions, by the 14th of April,

17  if not sooner.  And we will also present to the Court a

18  proposal for putting off the deadline to respond to truly

19  case-specific issues indefinitely.  And the motions I'm

20  talking about are Motions 770 and 779.

21             So, what we're asking your Honor to do is, in the

22  interim, to extent the deadline to respond to Motions 770 and

23  779 to April the 14th, and then we'll come back to your Honor

24  at some point before then and say we want to extend that

25  deadline indefinitely for the following issues and we're going
```

```
 1   to respond on these other issues.
 2           THE COURT:  I don't see those motions in my list.
 3   Where are they on Mr. Sobol's list?
 4           MS. PARKER:  On Page 4, your Honor, No. 3(A) -- I
 5   apologize, your Honor.  3(C).
 6           THE COURT:  I see.  Under (C).  770 was under (C).
 7   And what was the other one?
 8           MR. CHALOS:  779.
 9           THE COURT:  I saw that up above.
10           Okay.  So, in any event, 770 and 779 have -- the time
11   for responding is now April 14th.
12           MR. CHALOS:  Yes, ma'am.
13           THE COURT:  And the other one, is it -- yes.  779 is
14   part three of the (C).
15           MR. CHALOS:  The motion --
16           THE COURT:  Which is the one that is ripe?
17           MR. CHALOS:  771 and 893, both of those are going --
18   the deadline is going to remain March the 28th.
19           THE COURT:  Okay.  771 is C(2).  And 899, did you
20   say?
21           MR. CHALOS:  893.
22           THE COURT:  893.
23           MR. CHALOS:  We'll file a proposed order, your Honor,
24   if that would be helpful.
25           THE COURT:  Okay.  That's good.  Thank you.
```

1          MR. CHALOS:  Okay.  Thank you, your Honor.

2          THE COURT:  Now, who wants to be heard on the motion

3    that you all agree I should hear?  Namely, the No. 722.  Mr.

4    Gottfried, you want to be heard?

5          MR. GOTTFRIED:  Yes.  Should I sit for this again?

6          THE COURT:  Well, I think it's probably better if you

7    sit down.

8          Let me just suggest that we hear the persons who are

9    far away first and then you can incorporate anything you want

10   to say with respect to that.  I would ask nobody to go for

11   more than three minutes because I can see there are a number

12   of you.

13         MR. MOLTON:  Your Honor, David Molton for the

14   committee.  Mr. Gottfried and myself have broken off the

15   movants' argument into two portions, meaning jurisdiction and

16   the abstention issue.  Mr. Gottfried will be handling the

17   jurisdiction issue.  I'll be handling the abstention issue.

18         THE COURT:  Okay.  Who of those people who are

19   participating by telephone want to be heard on this motion?

20         MS. ELLERMAN:  Lauren Ellerman in Roanoke, Virginia,

21   your Honor.

22         MR. LICHTENSTEIN:  And John Lichtenstein, Roanoke,

23   Virginia as well, your Honor.

24         THE COURT:  Are you both on the same side of this

25   issue?

1              MS. ELLERMAN:  Same side of the issue yes, your

2    Honor, but represent very different plaintiffs.

3              THE COURT:  I'm sorry.  It was Ms. Ellerman.  And who

4    is the second one?

5              MR. LICHTENSTEIN:  The other is John Lichtenstein.

6              THE COURT:  Okay, got it.

7              MR. LICHTENSTEIN:  And, your Honor, I would suggest,

8    at least with respect to these issues -- I believe Mr. Sexton

9    is there in the courtroom --

10             THE COURT:  He's already stood up.  So --

11             MR. LICHTENSTEIN:  -- follow his argument.

12             THE COURT:  So, Mr. Sexton.

13             MR. LICHTENSTEIN:  And we'll be brief.

14             THE COURT:  And somebody else in the back.

15             MR. HOGAN:  Good afternoon.  Al Hogan from Skadden,

16   Arps.

17             THE COURT:  Whom do you represent?

18             MR. HOGAN:  Insight Health Corporation, the clinic.

19   We filed a joinder to the trustee's motion.

20             THE COURT:  You need to speak up because neither the

21   reporter nor I can hear you.  Just shout.

22             MR. HOGAN:  I represent Insight Health Corporation.

23   We filed a joinder to the trustee's motion.  I would like to

24   be heard after the trustee presents the motion.  I would like

25   an opportunity to address the Court.

```
1              THE COURT:  Okay.  Ms. Ellerman and Mr. Lichtenstein,
2    why don't you start, but, please, do not collectively take
3    more than four minutes because there are many people speaking
4    and I have some other cases waiting.
5              MS. ELLERMAN:  Thank you, Judge.  This is Lauren
6    Ellerman.
7              I have the privilege of representing three plaintiffs
8    who have filed state court claims that have been ongoing for
9    almost 13, 14 months here in Roanoke City.  I represent Chance
10   Baker, Ferman Wertz and Patrick Johnson.
11             Your Honor, we filed a response to the trustee's
12   motion to transfer, appealing to the Court on not only the
13   related two jurisdiction issue asking the Court to abstain
14   from exercising such jurisdiction, but, most importantly, your
15   Honor, pointing out to some of the judicial equity issues that
16   justice really does require for our three plaintiffs and
17   clients the ability to remain here locally and to continue to
18   prosecute their claims.
19             Reason number one, your Honor, is that dealing with
20   discovery disputes in Boston is, quite frankly, economically
21   prohibitive for these three individuals.
22             In addition, your Honor, one of our state court
23   claims -- actually, all three of our state court claims have
24   trial dates in the next year in Roanoke City.
25             Now, just this week there was an attempt by an
```

1    affiliated defendant to remand one of our cases to federal

2    court in the Baker matter, but, your Honor, as a third party

3    defendant, they do not have the right to remand to federal

4    court and we are quite confident that the Western District of

5    Virginia will, in fact, take that case back to state court,

6    and we hope that we will be keeping our August trial date.

7           Your Honor, we did not name NECC.  We did not name

8    any of the affiliated defendants.  We have not prosecuted

9    claims against them.  Our cases are against the local

10   physician practice and the local clinic here in Roanoke,

11   Virginia, and we believe, your Honor, because we are in no way

12   affecting the NECC debtor's claim or the estate, that we

13   should have the right under the -- that justice requires that

14   we have the ability to continue here.

15          And, your Honor, very briefly -- and I know my

16   colleagues from Roanoke, Mr. Lichtenstein and Mr. Sexton, will

17   be more detailed.

18          But, your Honor, when we are dealing with cases that

19   are substantially litigated already, discovery is almost

20   complete in one, thoroughly on its way the other two, where we

21   have trial cases in state court -- trial dates, we are very

22   aware that we've been pushing these cases.  We ask that you

23   choose not to exercise jurisdiction and, essentially, allow

24   the plaintiffs that have worked so hard to push these matters

25   to seek justice quickly not to be hampered by the trustee's

1    motion to bring us up to Boston.

2              Thank you, your Honor, for your time.  And I know

3    that my two colleagues here in Roanoke have additional

4    comments.

5              THE COURT:  Mr. Lichtenstein.

6              MR. LICHTENSTEIN:  Thank you, your Honor.

7              And I would let the Court know as well that we also

8    have cases pending and we have them pending with regard to

9    Insight and the local clinic, and I would advise the Court as

10   well that the local clinic defendant also opposes this motion

11   to transfer.

12             THE COURT:  Is that your client?  Do you represent

13   the local clinic?

14             MR. LICHTENSTEIN:  No.  We represent the -- we

15   represent -- collectively we filed on behalf of 46 plaintiffs.

16             THE COURT:  Okay.

17             MR. LICHTENSTEIN:  We represent 33, and we include in

18   this argument that Brown & Jennings, intervene lawyers, now

19   have pending cases as we have pending cases with respect to

20   these arguments.

21             So, we're on behalf of 46 injured plaintiffs who

22   oppose the trustee's motion to transfer.

23             THE COURT:  Okay.

24             MR. LICHTENSTEIN:  We have not filed these actions

25   against NECC.  We have not filed against affiliated

1    defendants.  We have filed against Insight Health Corporation,

2    the owner of the clinic, and the local Image Guided Pain

3    Management aspect, who also, like us, opposes the transfer.

4    One of the two defendants in the case opposes the transfer,

5    and we have two points that we have briefed to your Honor, and

6    we also greatly appreciate the opportunity to be quickly

7    heard.

8             With regard to related-to jurisdiction, we had

9    previously set forth and now have pending cases in the City of

10   Roanoke Circuit Court based on battery and based on fraud, and

11   under Virginia law, there is no way of contribution.  There is

12   an express prohibition of contribution for those causes of

13   action.

14            And so, we've taken the position early now on pending

15   cases argued to your Honor, that the mere filing of a proof of

16   claim by Insight Health Corporation is hollow and cannot

17   confer jurisdiction where there is, indeed, no right to

18   contribution.

19            I know that Mr. Sexton will further argue the other

20   matters with regard to abstention, which we have joined, but

21   we, similarly, make the arguments to your Honor where we have

22   46 persons, we do not -- we have not joined these other

23   defendants in these actions, NECC or affiliated.

24            So, we have to -- your Honor, the end result of that,

25   we submit to the Court, is that because there is absolutely by

law no right of contribution in Virginia, there is no related-to jurisdiction with respect to Insight Health Corp.  It is already the case that the second defendant, Image Guided Pain Management, has asked to stay in Virginia, has asked to stay in the City of Roanoke Circuit Court and has filed that motion to the Court and it's before your Honor today.

So, we have asked the Court to find that there is no related-to jurisdiction with respect to these cases.  We join the abstention arguments that Mr. Sexton will argue.

And, your Honor, with respect to pending cases in the City of Roanoke, without joining NECC or affiliated defendants, we respectfully ask the Court to allow us to stay in the City of Roanoke for these cases.

Thank you, your Honor.

THE COURT:  Thank you.  Mr. Sexton.

MR. SEXTON:  Yes, your Honor.  Thank you.  It's great to be before you, your Honor.

This transfer motion presents some issues.  It's very hard to summarize in just a few minutes, but, fortunately, I think the briefing --

THE COURT:  Consider it a challenge.

MR. SEXTON:  The briefing -- I do it consider it a challenge.

The briefing that you have before you is really -- it puts a good -- it definitely sheds a lot of light on the

1    issues.

2          You have started this a year ago with the trustee's

3    motion to transfer these cases.  I agree mostly with what Mr.

4    Sobol said about what Judge Saylor did.

5          I do not believe he carved out in exactly the same

6    manner.  I think he decided to permissively abstain because he

7    said he thought even the existence of jurisdiction was so

8    dubious and he thought that, perhaps, if a proof of claim was

9    filed, that would change things.  He did not telegraph exactly

10   how he would rule.  He just left it open that he would allow

11   that open.

12         However, one of the most significant things that he

13   said in his opinion was that if -- any defendant who did not

14   file a claim would be barred from pursuing contribution and

15   indemnity.  And he wrote:  "And the state court case could

16   proceed to judgment without interference from the federal

17   court."  That's paragraph -- that's Page 19 of his opinion.

18         Now, what my colleague, Mr. Lichtenstein, has pointed

19   out to you is very significant and it is an issue that I would

20   like to bring to your attention because no one has briefed it.

21         There are four defendants in each of the Roanoke

22   cases.  All of my colleagues are, essentially, the filing the

23   same case, and one defendant is Insight Health Corp., who you

24   will hear from.  One defendant is a practice group called

25   Image Guided Pain Management.  Another defendant is a doctor,

1    Dr. Madda (phonetic) and another is a Dr. O'Brien.  So, there

2    are four defendants.

3         Three of those defendants read what Judge Saylor

4    wrote in his opinion last year and said they wanted to stay as

5    far away from the Boston MDL and Boston bankruptcy as they

6    could get.  So, consequently, they did not file a proof of

7    claim.

8         Now, this places -- apart from all of the challenging

9    legal issues before you, this places a very practical issue.

10   You have one defendant who has for some type of strategic

11   reason decided it's better to be here, and then you have three

12   defendants who have chosen the opposite path, with a

13   representation from this Court through a prior opinion, that I

14   know you didn't write, which said if they choose that path,

15   they would remain unmolested by the federal court system.

16        So, that is something that I do not believe has been

17   briefed and it's one thing I wanted to make sure that I

18   brought to your attention.

19        To go back to the basic --

20        THE COURT:  Are you saying that the motion of the

21   bankruptcy -- the trustee's motion to transfer cases includes

22   cases in which there was no proof of claim filed and which

23   were not cases removed to federal court and here by virtue of

24   that?

25        MR. SEXTON:  Right.  They have not removed to federal

1    court.  Now --

2          THE COURT:  Why would the bankruptcy court -- or the

3    trustee of bankruptcy seek to transfer a case that is not

4    before the trustee?

5          MR. SEXTON:  Well, your Honor, we've been perplexed

6    by that, too, and we feel --

7          THE COURT:  But how do you know that these other

8    cases are included in the bankruptcy court's motion?

9          MR. SEXTON:  I know that because they fought me at

10   every step of the way in trying to protect these cases and I

11   know what these cases are.

12         THE COURT:  Okay.

13         MR. SEXTON:  And in these instances, we have filed

14   state court cases only.  We have state court defendants.  We

15   have state court causes of action.  They could not have been

16   brought in federal court.

17         Now, the trustee --

18         THE COURT:  They could on the basis of diversity,

19   couldn't they?

20         MR. SEXTON:  There is no diversity, because we have

21   state court defendants.

22         THE COURT:  Because you didn't sue NECC or any of

23   them?

24         MR. SEXTON:  Right, we did not sue NECC or any

25   affiliated defendant of NECC.

1          THE COURT:  So, your motion really is directed not at

2     the trustee's motion, in general, but simply with respect to

3     your clients as being special and different from everybody

4     else?

5          MR. SEXTON:  Absolutely.

6          THE COURT:  Got it.

7          MR. SEXTON:  Our clients are state court cases.

8          THE COURT:  Okay.

9          MR. SEXTON:  And we believe, as a practical matter,

10    that the trustee has stretched the outer bounds of related-to

11    jurisdiction.  If you go back to *Pay Corp* and then you just

12    compare what it says about contribution and indemnity -- and

13    I'm not going to go through that litany, but they tend more to

14    *Dow*, the *Dow* argument of the Sixth Circuit.  And so, that is a

15    substantial issue, because in *Pay Corp* the court said, you

16    know, a potential contribution or indemnity claim is simply

17    not enough to refer -- confer related-to jurisdiction.

18         THE COURT:  Are they prepared to waive any claims of

19    that sort?

20         MR. SEXTON:  They have waived the claims.

21         THE COURT:  By not filing within the bar date?

22         MR. SEXTON:  Yes.  Three of the defendants --

23         THE COURT:  And they understand that they're out of

24    any claim of -- or indemnity or contribution?

25         MR. SEXTON:  Right, which is illusory, anyway.  Every

1    single defendant is --

2         THE COURT:  Whether it's illusory or not, they agreed

3    that they cannot under any circumstances get indemnity or

4    contribution?

5         MR. SEXTON:  They certainly do, and they have even

6    joined in filing -- if you look at Mr. Sobol's agenda, Item

7    5(J) is the opposition filed by Image Guided Pain Management.

8    Their counsel has entered a special appearance in this case

9    just to note their opposition to being uprooted and

10   transferred to Boston.  So, the --

11        THE COURT:  Well, that is different from waiving

12   rights and claims.

13        MR. SEXTON:  Well, I believe the notice and the bar

14   date -- the bar date order makes it very clear that you waive

15   your claims if you don't file by the bar date.  So --

16        THE COURT:  Okay.

17        MR. SEXTON:  -- this raises a second issue.

18        Even if you get past the related-to jurisdiction,

19   then you have to get past mandatory abstention.  If you have a

20   state court case that's been filed that's proceeding that

21   could not have been brought in federal court in the first

22   place, then the Court must abstain.

23        THE COURT:  Okay.

24        MR. SEXTON:  And so, that is where we disputed what

25   happened with Judge Saylor's first opinion and that is what is

1    on appeal.  Judge Saylor's first opinion was in direct

2    conflict with the Western District of Virginia.

3         THE COURT:  Would it not be prudent of me to hold off

4    on deciding that particular piece of it until the Court of

5    Appeals tells me what's right?

6         MR. SEXTON:  Well, that would put me in a bit of a

7    problem, because we've told the Court of Appeals that they

8    should hold off until they hear from you, because if you grant

9    -- if grant our motion to --

10         (Laughter.)

11         MR. SOBOL:  He thought it was Judge Saylor, not Judge

12    Zobel.

13         MR. SEXTON:  If you grant our motion to abstain, the

14    appeal is moot.  And so, we've been in constant contact with

15    the Clerk and, as Mr. Gottfried said, the --

16         THE COURT:  You should have consulted me first.

17         MR. SEXTON:  Pardon me?

18         THE COURT:  You should have consulted me first before

19    you tell the Court of Appeals something like that.

20         MR. SEXTON:  Well, they very much value your opinion.

21    They want to know what you have to say.

22         (Laughter.)

23         THE COURT:  I'll I remind them of that the next time

24    they reverse me.

25         (Laughter.)

1          MR. SEXTON:  Well, I think they're bound to reverse

2    Judge Saylor, but I certainly hope they won't reverse your

3    opinion on that.

4          The gist of it, your Honor, I really would hope you

5    would rule on it and grant the motion.  We've renewed our

6    motion for mandatory abstention.

7          THE COURT:  I understand your argument.

8          MR. SEXTON:  Okay.  Then do you understand their

9    argument as to why mandatory abstention doesn't apply?

10   Because they take --

11         THE COURT:  I understand that that's the position

12   that various participants are taking.

13         MR. SEXTON:  Okay.  The --

14         THE COURT:  Can we finish this?

15         MR. SEXTON:  I'm landing the plane, your Honor.

16         The last thing I would like to point out to you is

17   something you seemed interested in and something that I have

18   tried to draw to the attention of anyone has been sitting in

19   your spot in this proceeding.

20         This is not a transfer motion under an MDL.  This is

21   a transfer motion under bankruptcy law, claiming that our

22   claims that we've asserted against state court defendants are

23   the equivalent of claims against the debtor and, therefore,

24   must be heard in federal court, either in the district where

25   they arose, which is Roanoke, or this district.  That's

1    157(b)(5) transfer, venue provision.

2            THE COURT:  If I were to say that I will not allow

3    the motion to transfer if your clients file absolute and total

4    waivers of any claim against the bankrupt estate or any

5    defendant in these proceedings, would they do it?

6            MR. SEXTON:  Are you talking about would the

7    plaintiffs waive their claims?

8            THE COURT:  No.  The plaintiffs are suing your

9    clients, aren't they?

10           MR. SEXTON:  No.  I'm a plaintiff.

11           THE COURT:  You're a plaintiff, too.

12           MR. SEXTON:  Oh, I have failed miserably.

13           THE COURT:  Then you're talking about -- but then the

14   plaintiffs will need to file these waivers, too.  Whoever

15   doesn't want to get transferred needs to tell me that they're

16   not part of the case, not part of the bankruptcy case, have no

17   claims against anybody in the bankruptcy court.

18           MR. SEXTON:  Well, we don't believe that that is the

19   procedure that's required in order to grant a motion to

20   abstain.

21           THE COURT:  Well, it may not be the procedure

22   required, but it may be the procedure required here.

23           MR. SEXTON:  Okay.  Well, then maybe --

24           THE COURT:  I'm simply putting out there, you know,

25   you may let me know.  You make a point of the fact that your

1    clients are not claiming in the bankruptcy court and,

2    therefore, their cases should not be transferred here as

3    related to the bankruptcy court.  So, make it very clear that

4    they are not claiming.

5           MR. SEXTON:  Well, your Honor, it seems to me, to be

6    honest, like just another hurdle.  And the last time we were

7    here, it was, well, maybe if they don't file a proof of claim.

8    And so, now that benchmark has come and gone and it's, well,

9    in addition, now maybe they'll sign a waiver.

10          THE COURT:  It sounds to me as though you're not

11   waiving.  You're keeping open the doors.

12          MR. SEXTON:  We were never requested to waive until

13   just now.  The defendants -- if you read Judge Saylor's

14   opinion, it said any defendant -- if you go back to the

15   trustee's motion, he seeks to join claims against defendants

16   -- and these were his direct words -- "who may have

17   indemnification claims against NECC."

18          So, his motion only covered people who may have

19   claims.

20          Three of those four people have now said, We have no

21   claims, and they did it by the way this Court told them to do

22   it, by not filing a proof of claim.

23          And so, if the Court would like them to do something

24   else, I will point that out to those defendants.  I have one

25   defendant in the room who I'm sure is not going to do that and

1    that's Insight Health Corp., which presents another conundrum.

2         But the point of 157 is this.  I do believe that it

3    is not like an MDL transfer for purposes of pretrial

4    proceeding.  We view that as exactly what it says, a transfer

5    for purposes of trial.

6         And so, we think it would be artificial for the Court

7    to say, Yes, I'm going to use 157(b)(5) to transfer it up to

8    my court for purposes of trial and then later on attempt to

9    use some other procedure to transfer it back to some other

10   venue.

11        That is particularly troublesome in this case because

12   the federal court in Roanoke, Virginia has already had a

13   chance to have all of my cases -- and that's 18 remaining.

14   One now is fully resolved.  18 remaining cases have already

15   been before that judge and he has said that he does not want

16   them and that he had to mandatorily abstain.  So, we are --

17             THE COURT:  Thank you very much.

18             MR. SEXTON:  Thank you, Judge Zobel.

19             THE COURT:  Mr. Hogan.

20             MR. HOGAN:  Good afternoon.

21             THE COURT:  You got three minutes, too.

22             MR. HOGAN:  I'll try to go quickly, Judge.  I think

23   we need to try and clear up some chafe here.

24             The first thing that you need to understand, each one

25   of the plaintiffs in the Virginia actions that Mr. Sexton was

1    talking to you about and all the folks on the phone were

2    talking to you about, have filed proofs of claim in the

3    bankruptcy.  Fact number one.

4              THE COURT:  Including Mr. Sexton's client?

5              MR. HOGAN:  Absolutely, Judge.

6              Second fact, Judge:  The three other defendants that

7    didn't file proofs of claim, I don't care about them.  Insight

8    Health Corporation is a defendant in each and every one of

9    those actions.  We filed a proof of claim in the bankruptcy.

10   Our proof of claim is going to have a substantial effect on

11   this bankruptcy to the extent that we're held liable anywhere

12   in the world for the harm caused by NECC providing our pain

13   clinics with tainted steroids and then injecting them into our

14   patients.

15             The claims that they seek against us in Virginia,

16   they're asking for more than $100 million in total.  That's

17   our proof of claim.  We're not waiving it.  We intend to

18   pursue our claims for contribution and indemnity and

19   negligence and fraud against NECC --

20             THE COURT:  Are you objecting to the transfer?

21             MR. HOGAN:  I support the transfer, Judge, because --

22   I support the transfer because Insight Health Corporation

23   believes that in the interest of justice and judicial economy,

24   the consolidated proceeding is the best way to deal with the

25   circumstance, and we intend to pursue our claim in the

1    bankruptcy court and that's why we support the trustee's

2    motion to transfer.

3              THE COURT:  Thank you.

4              MR. HOGAN:  That's all I have to say, Judge.

5              THE COURT:  Mr. Gottfried, did Mr. Sexton's clients

6    file proof of claim?

7              MR. GOTTFRIED:  Yes.  So, what I was going to say to

8    the Court, as briefly as I can, before I turn it over to Mr.

9    Molton, is that I think the starting point for you in looking

10   at this motion is Judge Saylor's very well-reasoned,

11   thoughtful opinion, and just to point out to the Court that

12   our renewed motion pivots on Judge Saylor's opinion and is

13   based on what now are true changed circumstances that didn't

14   exist when Judge Saylor first looked at this and which he

15   expressly understood would change, in all likelihood, once the

16   bar date was set and come and went.

17             And what those two circumstances are, what my brother

18   just said, which is that the plaintiffs who are saying they

19   want to be in Virginia, also filed proof of claims in this

20   bankruptcy because they think they also want to participate in

21   the settlements that we've been reporting to you today.  So, I

22   think that supports related-to jurisdiction under 1334(b).

23             The second changed circumstance is something, again,

24   that Judge Saylor expressly countenanced in his opinion, which

25   is that when the bar date was set, folks like Insight who you

1     just heard from would have to choose.  Are they going to file

2     a proof of claim for indemnity or contribution or not?

3              In this case, Insight said, yes, they did.  And

4     that's precisely the change in circumstance that we say Judge

5     Saylor contemplated, and that's the reason why we filed our

6     renewed motion.

7              The only other thing I want to say, because I'm in

8     agreement with my brother, Mr. Sexton, the papers are quite

9     good and I think Judge Saylor's opinion is excellent, is that

10    the cases -- just to avoid any lack of clarity for the Court,

11    the cases that we're talking about at the time we filed our

12    renewed motion are in Exhibit 1 to our motion, which are one

13    through -- I think it's 22 in our chart.  And Insight, the

14    clinic that, in fact, filed the proof of claim is a defendant

15    in all of those cases.

16             And I'll turn it over to Mr. Molton.

17             THE COURT:  Okay.

18             MR. MOLTON:  Your Honor, I'm going to be as quick as

19    Mr. Gottfried, which I hope will make your Honor happy.

20             I'm going to address a few things my friend Mr.

21    Sexton --

22             THE COURT:  How about Mr. Hogan?  He was the fastest

23    of all.

24             MR. MOLTON:  Well, I'm going to refer to him --

25             THE COURT:  Now we have a race.

1        MR. MOLTON:  The mandatory abstention issue raised by

2   my friend Mr. Sexton has already been decided by Judge -- by

3   Judge Saylor's prior decision and, basically, what he said,

4   *Correcting Cases* at 496 DR 272, is that in the context of a

5   157(b)(5) transfer and 1334 of Title 28, that mandatory

6   abstention is not applicable here.

7        Now, I just want to say a few things about the

8   appeal, because I know there was a status report given, but

9   one of the things that the First Circuit asked us to brief is

10  whether they have appellate jurisdiction over this, and this

11  is why we joined in asking your Honor to decide this case now

12  and not to wait.  It's a non-final order that was appealed.

13  There was no 1292(b) certification requested of Judge Saylor,

14  and the circuit in granting the committee's motion for

15  intervention gave the parties a list of questions that they

16  wanted answered in connection with final order issues and

17  jurisdictional issues.  So, it may be that that appeal will be

18  dismissed on jurisdictional grounds.

19        Number two, your Honor, I think Mr. Sexton is right,

20  completely right, that this is a bankruptcy transfer.  This is

21  a bankruptcy transfer pursuant to a specific section that

22  Congress legislated, that all the courts that have considered

23  this have said, Well, it's a different sort of abstention

24  review that's required, and that goes right to what Congress

25  said and what it means.

1          157(b)(5), it says the District Court shall order the

2     transfer.  The courts have dealt with this, have said that's

3     the default.  It's not a typical abstention review and that

4     the default -- and the rule is transfer.  The exception is

5     abstention.  And the grounds for abstention have to be really

6     compelling.

7          And I refer your Honor to Judge Rakoff's case, the

8     *Twin Labs* case in the federal litigation and the *Pan Am* case

9     that we cited from the Second Circuit in our brief.

10          And I want to take you, your Honor, to one thing that

11     hasn't been talked about, but I think should be brought up to

12     the Judge, because we've heard a lot about equity from the

13     plaintiffs on the phone and from Mr. Sexton and about, you

14     know, that they're in Virginia and they want to pursue these

15     cases.

16          Judge Saylor, at Page 263 of 496, bankruptcy

17     reported, basically said why does Congress want

18     centralization?  And why did Congress want centralization of

19     cases?  Not just the plaintiff cases, but the indemnification

20     cases.

21          He said pursuant to the bankruptcy court, such

22     indemnification claims -- and I'm paraphrasing a little --

23     would normally have to be considered on an equal footing with

24     the claims of injured plaintiffs against the estate, as claims

25     of unsecured creditors, because all unsecured creditors are

1   normally paid *pari passu*, that is proportionally without

2   preference, based on the amounts of their claims.

3          And then I'm going to underscore, "Even one large

4   contribution or indemnity claim against the estate could

5   greatly diminish or virtually eliminate the amount available

6   to be paid to the remaining claimants."

7          Now, your Honor, I was looking through my email this

8   morning and I saw -- when this transfer motion was first made,

9   there were 22 Virginia cases to be transferred.  Now there's

10  only 21, because Mr. Sexton's case, a case that was scheduled

11  for trial in April, settled.  And today it was announced all

12  over the Internet that that settlement amount was $4.5

13  million.

14         Now, what that means in terms of the bankruptcy and

15  in terms of all the other plaintiffs --

16         THE COURT:  4.5 indemnification?

17         MR. MOLTON:  That's it, Judge.

18         And where does that money come from?  It comes from

19  the pockets of other plaintiffs.  And not only that, but to

20  the extent that insurance money has been used to pay that $4.5

21  million, that's lesser insurance that's available for the good

22  of the whole.

23         So, when we talk about equity and when we talk about

24  justice in the context of bankruptcy, let's go back to what

25  Congress realized and mandated and wrote.  Let's bring

1    everybody together where your Honor can case manage these

2    cases in an effective way to prevent people getting a one up

3    on other injured victims who have suffered horribly as a

4    result of this outbreak, and creating claims in the bankruptcy

5    that now Mr. Gottfried and the committee will have to litigate

6    against these indemnifications, further using up resources of

7    the estate, all to the detriment of everybody else's client in

8    this room and on the phone.  Thank you.

9            THE COURT:  Thank you, very much.

10           MR. SOBOL:  If I may, your Honor.  I just want to

11   make sure that we don't throw the baby out with the bath water

12   on the plaintiffs' side.

13           The plaintiffs' -- PSC's point of view, although

14   there's a verdict that's out there, it doesn't mean anything

15   about the validity of Insight's contribution and

16   indemnification claim.  We would still fight that in the

17   bankruptcy case.  We still think it's worth zero, not worth

18   $4.5 million.

19           THE COURT:  But there's always a risk.

20           MR. SOBOL:  Well, there's a risk, to be sure, but the

21   only risk that's out there is whether or not it's a valid

22   indemnification and contribution claim, not the fact that

23   there's been a settlement for that amount.  We don't want to

24   lose sight of that issue.

25           THE COURT:  Are there any other issues that we need

1      to discuss, not the transfer?

2            MR. MOLTON:  One point, Judge.  Can I just follow up?

3      I forgot to say one thing.

4            Judge Saylor, way back when he considered the first

5      transfer motion, had real questions about how indemnification

6      and contribution cases worked in a bankruptcy and whether --

7      I'm not going to give a bankruptcy lecture right now.  I know

8      your Honor would cut me at the legs off for doing that, but

9      I'm going to refer you, your Honor --

10           THE COURT:  Maybe at the legs.

11           (Laughter.)

12           MR. MOLTON:  -- to a pleading that the committee

13     filed in conjunction with the trustee that really gave a real

14     synopsis of this.

15           This was a May 20th, 2013 post-hearing memorandum of

16     official committee in support of the trustee's motion.  And

17     it's on the docket.  It's a docket entry and it goes through--

18       (Interruption by automated telephone conference announcement.)

19           MR. MOLTON:  It goes through the issues and it

20     addresses some of the issues raised by Mr. Sobol, but outlines

21     the significant risks.

22           THE COURT:  Thank you.

23           Are there any other matters that we need to deal with

24     besides this motion to transfer?

25           MR. SOBOL:  Yes.  I don't know whether you want to do

1    this now, your Honor, but there probably should be a schedule.

2    There should be other dates for status conferences.

3              THE COURT:  Yes.

4              MR. SOBOL:  We're also --

5              THE COURT:  I have the schedule that Judge Saylor has

6    set up.  I, frankly, am not enamored with a 1:30 meeting.  So,

7    I propose that we change the status conference that he

8    scheduled on April 11th to April 10th, at 2:00.

9              Lisa, I know there is something else, but I think we

10   can manage that.

11             COURTROOM DEPUTY CLERK URSO:  We have two.

12             THE COURT:  Just move it.

13             So, April 10th, at 2:00, is the next meeting of this

14   group.  Okay?

15             MR. SOBOL:  Thank you, your Honor.  We'll work on the

16   technology so that --

17             THE COURT:  I'm sorry?

18             MR. SOBOL:  We'll work on the telephone things.

19             THE COURT:  Yes.  Well, I think it may be that we

20   have to do something to keep them from talking to us.

21             COURTROOM DEPUTY CLERK URSO:  We do.

22             THE COURT:  So, we'll do that next time.

23             COURTROOM DEPUTY CLERK URSO:  IT just typed and told

24   me what I have to do before the next hearing.

25             THE COURT:  Okay.  So, before the next hearing, we'll

1    do what we have to do to quiet the people out there.  It's not

2    them as much as the operator.

3           Thank you.  We're in recess on this case.

4           And I do wish to thank you for your very good

5    briefings and I hope that this will be as seamless a

6    transition as we can make it.

7      (Attorneys collectively say, "Thank you, your Honor.")

8           (Adjourned, 2:59 p.m.)

9

10

11

12

13                C E R T I F I C A T E

14           I, Catherine A. Handel, Official Court Reporter of

15    the United States District Court, do hereby certify that the

16    foregoing transcript, from Page 1 to Page 71, constitutes to the

17    best of my skill and ability a true and accurate transcription

18    of my stenotype notes taken in the matter of Civil Action No.

19    MDL-13-2419-RWZ, In Re:  New England Compounding Pharmacy Cases

20    Litigtion.

21

22

23    March 17, 2014          /s/Catherine A. Handel
      Date                    Catherine A. Handel, RPR-CM, CRR
24

25