# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION** | ) <br> ) <br> ) |
| ——————————————————— | ) <br> **MDL No. 2419** |
| **THIS DOCUMENT RELATES TO:** | ) <br> **Dkt. No. 1:13-md-2419 (RWZ)** <br> ) |
| **Suits Identified in the Exhibit to the Tennessee Defendants' Contemporaneously-Filed Motion to Dismiss** | ) <br> **(Leave to File Requested 3/20/14, Dkt. 1029)** <br> ) <br> ) <br> ) |
| ——————————————————— | ) |

## RESPONSE IN OPPOSITION TO THE TENNESSEE DEFENDANTS'
## MOTION TO DISMISS GLOBAL CLAIMS

## **TABLE OF CONTENTS**

I.     FACTS SUPPORTING PLAINTIFFS' CLAIMS ........................................................1

II.    SUMMARY OF THE ARGUMENT.................................................................10

III.   ARGUMENT .................................................................................16

     A.    Applicable Legal Standard.....................................................16

     B.    Tennessee Law Requires Those Who Chose to Sell NECC's Products to Stand Behind Those Products ................................................17

     C.    Tennessee Clinics Sold NECC's Products and Charged Plaintiffs Separately For Those Products ................................................18

     D.    The Tennessee Healthcare Liability Act and the Tennessee Products Liability Act Each Support Plaintiffs' Product Liability Claims...........20

           1.    The Tennessee Healthcare Liability Act, Tenn. Code Ann. § 29-26-101, by its plain terms, does not bar product liability actions against healthcare providers .........................20

           2.    Unique Provisions Contained in the Tennessee Products Liability Act Reveal that Healthcare Providers Can be Product Sellers.....................................................22

     E.    The Tennessee Opinions Cited by Defendants Do Not Support Their Position .................................................................25

     F.    The Tennessee Healthcare Liability Act Does Affect Plaintiffs' Claims for Joint and Several Liability.............................................26

     G.    The Tennessee Healthcare Liability Act Does Not Affect Plaintiffs' Conspiracy Claims .......................................................30

     H.    Plaintiffs State A Claim for Civil Conspiracy .......................................31

     I.    Plaintiffs' Civil Conspiracy Claims Are Not Barred by the Statute of Limitations ............................................................34

     J.    Plaintiffs State A Claim for Agency .......................................38

IV.   CONCLUSION...............................................................40

## **TABLE OF AUTHORITIES**

### Cases

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ...................................................................15

*Baldwin v. Pirelli Armstrong Tire Corp.*, 927 F.Supp. 1046 (M.D. Tenn. 1996) ........................29

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ...................................................15

*Blakeney v. Kassel*, 1991 WL 87978 (Tenn. Ct. App. 1991)..............................................32, 33, 34

*Bradshaw v. Daniel*, 854 S.W.2d 865, 872 (Tenn.1993)..................................................24, 27

*Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (2001) ...........................................28, 29

*Budget Rent-A-Car of Knoxville, Inc. v. Car Services, Inc.*, 225 Tenn. 342,
  469 S.W.2d 360 (1971).................................................................................33, 34

*Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1055 (9th Cir. 2011) ...................................15

*Carver v. Citizen Utilities Co.*, 954 S.W.2d 34, 35 (Tenn. 1997)...........................................22

*Composite Co., Inc. v. Am. Int'l Grp., Inc.*, No. 13-10491-FDS,
  2013 WL 5236534, at *10 (D. Mass. Sept. 16, 2013) (Saylor, D.J.)........................................15

*Cunningham v. Williamson County Hosp. Dist.*, 2013 WL 1912611 at *2
  (Tenn. May 9, 2013) .....................................................................................19

*Delta Refining Co. v. Procon, Inc.*, 552 S.W.2d 387 (Tenn. Ct. App. 1976) .........................23, 24

*Estate of French v. Stratford House*, 333 S.W.3d 546, 554 (Tenn. 2011)...................................20

*Gallant v. City of Fitchburg*, 739 F. Supp. 2d 39, 44-45 (D. Mass. 2010) (Saylor, D.J.) .............15

*Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) ...............................................15

*Givens v. Mullikin*, 75 S.W.3d 383, 398-99 (Tenn. 2002).........................................................35, 36

*Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957)....................33, 34

*Hester v. United Healthcare Insurance Co.*, Case No. 1:08-cv-105,
  2009 U.S. Dist. LEXIS 3378 (E.D. Tenn. Jan. 16, 2009).................................................35, 36

*Hill v. A.O. Smith Corp.*, 801 F.2d 217 (6th Cir. 1986)..........................................................32, 33, 34

*Limbaugh v. Coffee Medical Center*, 59 S.W.3d 73, 84 (Tenn. 2001) .......................22, 24, 26, 27

*McCroskey v. Bryant Air Conditioning Co.*, 524 S.W.2d 487 (Tenn.1975)......................32, 33, 34

*McHendry v. Anderson*, 344 S.W.2d 769 (Tenn. Ct. App. 1960)...............................................29

*Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 692 (Tenn. 2011) .....................................16, 17

*Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 17 (1st Cir. 2011) ........................................18

*Owens v. Truckstops of America*, 915 S.W.2d 420, 432 (Tenn. 1996).........................................16

*Parker v. Warren*, 503 S.W.2d 938 (Tenn. Ct. App. 1973)...................................................23, 24

*Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir.2007) ...............1, 15, 18, 29, 31

*Seals v. Sears, Roebuck and Co., Inc.*, 688 F. Supp. 1252, 1256
  (E. D. Tenn. 1988) .......................................................................................16, 25, 27

*Swafford v. Memphis Individual Practice Ass'n,* No. 02A01-96120CV099311,
  1998 WL 281935 (Tenn. Ct. App. 1998)..............................................................29, 33

*Teeters v. Currey*, 518 S.W.2d 512, 515 (Tenn.1974).......................................31, 32, 33, 34

*Turner v. Jordan*, 957 S.W.2d 815, 819 (1997).........................................................24, 25, 27, 28

*Union Leasing, Inc. v. Advantage, Inc.*, Case No. 3-12-0666, 2012 U.S. Dist. LEXIS 154056 (M.D. Tenn. Oct. 26, 2012) .......................................................35, 36

*White v. Revco Discount Drug Ctrs., Inc.*, 33 S.W.3d 713, 723 (Tenn. 2001) ......................35, 36

*Wilson v. Thompson Constr. Co.*, 86 S.W.3d 536, 541 (Tenn. Ct. App. 2001) ............................35

## Statutes

Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Public Law 104-191 ......................................................................................8, 30

Tennessee Healthcare Liability Act, Tenn. Code Ann. § 29-26-101, *et seq.* .........................18

Tennessee Products Liability Act, Tenn. Code Ann. § 29-28-101, *et seq.* ............................15

Tenn. Code Ann. § 29-26-101, *et seq.* .................................................10, 12, 18, 19, 20, 27, 28

Tenn. Code Ann. § 29-26-115 .........................................................................................28

Tenn. Code Ann. § 29-26-121 .........................................................................................28

Tenn. Code Ann. § 29-28-101, *et seq.* ........................................................................10, 15

Tenn. Code Ann. § 29-28-102 ....................................................................................17, 21

Tenn. Code Ann. § 29-28-103 ...............................................................................11, 20, 21

Tenn. Code Ann. § 29-28-105 .........................................................................................17

Tenn. Code Ann. § 29-28-106 ....................................................................................10, 16

## Regulations

105 CMR § 700.002(F) .......................................................................................................6, 29

45 C.F.R. § 164.502 ...........................................................................................................8, 30

Code of Federal Regulations Title 45, Subtitle A, Subchapter C, including 45 C.F.R. § 164.502 .......................................................................................8, 30

Mass. Gen. Law c. 94C, § 17(c) ........................................................................................6, 29

## Rules

Fed. R. Civ. P. 8(a)(2) ...........................................................................................................15

## Other

Tennessee Pattern Jury Instruction – Civil 8.80 Civil Conspiracy ...............................................28

Plaintiffs' Steering Committee respectfully submits this response opposing the Tennessee Defendants' Motion to Dismiss Global Claims (Doc Nos. 771 & 772).[1]

## I.      FACTS SUPPORTING PLAINTIFFS' CLAIMS

The following facts, alleged in Plaintiffs' pleadings, are presumed true for purposes of the present motion to dismiss.[2]

This litigation arises from a widespread outbreak of fungal meningitis affecting victims in at least 20 states.  To date, more than 750 people have been diagnosed with fungal meningitis, fungal infections and/or abscesses.  More than 64 people have died nationwide.[3]  The outbreak impacted Tennessee with particular severity.  The outbreak sickened 153 Tennesseans, causing 16 Tennesseans to die.[4]

The fungal infections were caused by a contaminated prescription medication known as methylprednisolone acetate ("MPA").[5]  Pain clinics and hospitals purchased the contaminated MPA from a compounding pharmacy known as New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center ("NECC") located in Framingham, Massachusetts.[6]

### A.      Compounding Pharmacies Are Generally Not Regulated by the FDA.

According to the FDA, traditional compounding is the extemporaneous combining, mixing, or altering of ingredients by a pharmacist in response to a physician's prescription.[7] Compounded drugs are mixed in response to a physician's prescription in order to create a medication tailored to the specialized needs of an individual patient.[8]  Traditional compounding is used typically to prepare medications that are not available commercially, such as a drug for a

---

[1] For purposes of this Response, the term "Tennessee Defendants" shall refer to those defendants who filed the relevant Motion to Dismiss (Dkt. Nos. 771 and 772) and include the following defendants: Saint Thomas Outpatient Neurosurgical Center, LLC ("Saint Thomas Clinic"), Howell Allen Clinic, a Professional Corporation, and part owner of Saint Thomas Clinic ("Howell Allen"), John W. Culclasure, M.D., the Medical Director of Saint Thomas Clinic ("Dr. Culclasure"), Debra V. Schamberg, R.N., the Facilities Director of Saint Thomas Clinic ("Ms. Schamberg"), Specialty Surgery Center, Crossville, PLLC, another clinic in Tennessee and unrelated to Saint Thomas Clinic ("SSC"), Kenneth R. Lister, M.D., the Medical Director of SSC ("Dr. Lister"), and Kenneth Lister, M.D., P.C., the incorporated entity for Lister's practice ("Dr. Lister's Practice").
[2] *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir.2007).
[3] Master Complaint (Dkt. No. 545 hereinafter "Master Compl."), ¶1.
[4] *U. S. Centers for Disease Control and Prevention*, http://www.cdc.gov/hai/outbreaks/meningitis-map-large.html.
[5] *Id.* ¶¶61-64.
[6] Master Compl., ¶6.
[7] *Id.*, ¶43.
[8] *Id.*

patient who is allergic to an ingredient in a mass-produced product, or diluted dosages for children.[9]

Because the law requires that compounding pharmacies compound specific medications in response to individual prescriptions, compounding pharmacies should not produce medications in bulk for mass distribution.[10]   Accordingly, the FDA does not regulate compounding pharmacies to the same degree as pharmaceutical companies.[11]   The FDA generally leaves regulation of compounding pharmacies to state pharmacy boards.

**B.    Risks of Pharmacy Compounding Known Before Meningitis Outbreak.**

The serious risks of pharmacy compounding were the subject of considerable public discussion in the pharmacy community and the medical community <u>before</u> the subject meningitis outbreak.[12]   For example, in 2002 (ten years before the meningitis outbreak), the CDC published a report regarding at least two cases of fungal meningitis arising from contaminated medication used in epidural injections. That report concluded:   "purchasers of pharmaceuticals should determine if supplies are provided from a compounding pharmacy that . . . follows appropriate measures to ensure that injectable products are free of contamination."[13]

On March 24, 2005 (seven years before the outbreak), *USA Today* published a front page article with the following headline:   "**Safety concerns grow over pharmacy-mixed drugs."** That article discussed growing concern over the fact that drugs produced in bulk by compounding pharmacies are not FDA approved and are not subject to the same oversight as drugs produced by pharmaceutical companies.[14]

In 2006 (six years before the outbreak), the FDA conducted a survey of compounded drug products. They collected 36 samples from compounding pharmacies across the United States during unannounced visits. Twelve of the 36 samples (33%) failed analytical testing. The

---

[9] *Id.*
[10] *Id.*, ¶¶43 and 165.
[11] *Id.*, ¶50.
[12] *Id.*, ¶48.
[13] *Id.*, ¶49.
[14] *Id.*, ¶50.

FDA survey concluded "***poor quality compounded drugs are a serious public health concern, as improperly compounded products have been linked to grave adverse events, including deaths.***"[15]

In May 2007 (five years before the outbreak), the FDA published an article titled: "*The Special Risks of Pharmacy Compounding*." That article highlighted numerous adverse events involving compounded products.  It also warned of the emergence of large scale compounding operations that were clearly operating outside the bounds of traditional compounding practice.[16]

In 2010 (two years before the outbreak), the FDA posted an educational video on YouTube regarding concerns over the quality of compounded drugs.[17]

On November 5, 2010 (about two years before the outbreak), the American Society of Anesthesiologists, the American Society of Health-System Pharmacists ("ASHP") and other medical societies published a joint report regarding drug shortages. That report included an article written by the ASHP stating as follows:

> Compounding pharmacies have also pursued the production of drugs that are in short supply. Caution is warranted because preparations from these pharmacies may not meet applicable state or federal standards (e.g., United States Pharmacopeia chapter 797 or FDA labeling requirements). The sources of raw materials used by compounding pharmacies have been questioned, and apparent lapses in quality control have resulted in serious patient injury, including death.
>
> . . .
>
> Compounding pharmacies may also present patient risks; several deaths have been associated with improperly sterilized compounded products.[18]

In May 2012 (a few months before the outbreak), the CDC published a report regarding fungal infections arising from medications obtained from a compounding pharmacy. That report advised that "contamination of compounded sterile preparations has caused outbreaks. Since

---

[15] *Id.*, ¶51.
[16] *Id.*, ¶52.
[17] *Id.*, ¶53.
[18] *Id.*, ¶54.

1990, FDA has learned of approximately 200 adverse events associated with 71 compounded products."[19]

### C.     Pharmacist Society Recommends Safe Purchasing Practices.

In 2010 (two years before the outbreak), the American Society of Health System Pharmacists published the "ASHP Guidelines on Outsourcing Sterile Compounding Services." They also developed a "Contractor Assessment Tool" for healthcare organizations to use in conjunction with their guidelines. That document was developed for health systems to use when deciding whether to purchase compounded medications.[20]

The ASHP guidelines state that healthcare providers should perform certain due diligence before purchasing drugs from compounders. For example, health systems should: (1) have an employee or agent visit the compounding pharmacy; (2) determine whether the compounding pharmacy has had product liability lawsuits filed against it; (3) determine whether the compounding pharmacy has ever recalled any of its compounded preparations; (4) review regulatory surveys conducted of the compounding pharmacy's site, including copies of significant regulatory actions; and (5) determine whether the compounding pharmacy maintains adequate liability insurance.[21]

Plaintiffs allege that the Tennessee Defendants failed to investigate NECC adequately, if at all, before buying injectable medicines from that compounding pharmacy.[22] If the Tennessee Defendants had investigated NECC before buying medications from it, they would have discovered that NECC had a terrible regulatory history and that NECC operated its purportedly sterile compounding pharmacy on a site shared with a garbage compacting operation. Rather than purchasing purportedly sterile injectable steroids from an under regulated, out-of-state

---

[19] *Id.*, ¶55.
[20] *Reed v. Ameridose, LLC, et al.*; United States District Court, District of Massachusetts, 1:13-cv-12565, (MDL No. 1:13-md-2419), Complaint (Dkt. No. 1 hereinafter "Reed Complaint")(Dkt. No. 1), ¶119.
[21] *Id.*, ¶120.
[22] Master Compl. ¶234.

compounding pharmacy, the Tennessee Defendants should have purchased medications from an FDA approved drug manufacturer such as Pfizer.[23]

**D.    NECC Had a Well-Known History of Regulatory Non-Compliance.**

Before the meningitis outbreak, NECC had a well-known history of adverse events relating to its operation as a compounding pharmacy. NECC was the subject of multiple complaints to and investigations by the FDA and the Massachusetts Board of Registration in Pharmacy ("MBP").  Those complaints and investigations often focused on unsterile conditions at NECC's facilities.  For example, the FDA issued a Warning Letter to NECC in 2006. The FDA letter details numerous problems at NECC including the sale of compounded drugs without patient-specific prescriptions. In addition, the FDA's Warning Letter stated that NECC was compounding copies of commercially available drugs, selling misbranded compounded drugs, and experiencing problems with storage and sterility. That warning letter was available to the Tennessee Defendants on the FDA's website long before the meningitis outbreak.[24]

**E.    For Reasons of Price, Saint Thomas Clinic Becomes NECC's Largest Customer.**

Defendant Dr. Culclasure is the medical director of Saint Thomas Clinic in Nashville, Tennessee.  Ms. Schamberg is the clinic's Facilities Director.  Dr. Culclasure and Ms. Schamberg made the decision for the Saint Thomas Clinic to purchase MPA from NECC.[25]

Plaintiffs allege that Saint Thomas Clinic's only motivation in purchasing steroids in bulk from NECC, as opposed to an FDA approved drug manufacture, was price.[26]  Saint Thomas Clinic, Dr. Culclasure and Ms. Schamberg knew or should have known of the dangers of using compounded drugs generally and specifically products compounded by NECC.  Nevertheless, they decided to purchase injectable steroids from NECC without undertaking appropriate due

---

[23] *Id.*, ¶203.
[24] Reed Complaint ¶79.
[25] *Id.*, ¶252.
[26] *Id.*, ¶131.

- 5 -

diligence. They did nothing to ascertain the safety and quality of NECC's products. Instead, they decided to purchase the cheapest steroid available.[27]

In late 2010, Saint Thomas Clinic began purchasing MPA from a supplier known as Clint Pharmaceuticals. The MPA that Saint Thomas Clinic bought from Clint Pharmaceuticals did <u>not</u> come from a compounding pharmacy. It came from an FDA approved drug manufacturer.[28]

Unfortunately, in June of 2011, Saint Thomas Clinic chose to stop buying FDA approved steroids through Clint Pharmaceuticals. At that time, Saint Thomas Clinic started buying compounded MPA from NECC. Saint Thomas Clinic made that change exclusively for reasons of price and in order to enhance clinic profits.[29]

Through limited discovery conducted in Tennessee state court litigation, Plaintiffs obtained copies of emails exchanged between Ms. Schamberg at Saint Thomas Clinic and an NECC sales representative. Those emails prove, conclusively, that Saint Thomas Clinic switched from purchasing FDA approved steroids to purchasing compounded steroids from NECC in order to save $2.45 per vial.[30]

According to invoices produced by Saint Thomas Clinic in Tennessee state court, the clinic purchased two-thousand, five hundred (2,500) vials of MPA from NECC during a period of three months.[31] That extraordinary volume made Saint Thomas Clinic NECC's largest customer by volume for the purchase of MPA during the critical three month period when NECC distributed tainted pharmaceuticals throughout the country.[32]

---

[27] Id., ¶¶130 – 132.
[28] Id., ¶¶143 – 145.
[29] Id., ¶¶147 – 153.
[30] Saint Thomas Clinic purchased MPA from Clint Pharmaceuticals at the price of $6.49 per 80mg vial. In May 2011, an NECC sales representative emailed Saint Thomas Clinic's facility director, Ms. Schamberg, asking what price NECC would need to offer for MPA in order to gain Saint Thomas Clinic's business. Ms. Schamberg replied that if NECC could get the price under $6.50 per vial, she would be willing to "talk" to NECC.
   On June 9, 2011, Clint Pharmaceuticals increased the price for MPA from $6.49 to $8.95 per vial, an increase of $2.46 per vial. Saint Thomas Clinic was not willing to pay $8.95 per vial of MPA from Clint Pharmaceuticals if it could be procured more cheaply from NECC. Therefore, Ms. Schamberg emailed an NECC sales representative indicating that, if NECC would guarantee a price for MPA of $6.50 per 80mg vial, Saint Thomas Clinic would be willing to do business with NECC. After NECC indicated its willingness to sell MPA for $6.50 per 1mL 80mg vial, Ms. Schamberg obtained approval from Dr. Culclasure to begin ordering from NECC.
[31] Reed Complaint, Exhibit O.
[32] See FDA List of NECC Customers By Product Information, available at:
http://www.fda.gov/downloads/Drugs/DrugSafety/FungalMeningitis/UCM326145.xls.

**F.**     **The Tennessee Defendants Knew That Purchasing MPA From NECC Required An Individual, Patient-Specific Prescription.**

The Tennessee clinics knew that NECC is a compounding pharmacy.  The FDA defines pharmacy compounding as follows:

> FDA regards traditional pharmacy compounding as the extemporaneous combining, mixing or altering of ingredients by a pharmacist in response to a physician's prescription to create a medication tailored to the specialized medical needs of an individual patient.

*2006 Limited FDA Survey of Compounded Drug Products (emphasis added).*[33]

MPA is a prescription drug defined by 105 CMR § 700.002(F) as a Schedule VI controlled substance.[34]  Pursuant to Mass. Gen. Law c. 94C, § 17(c), MPA, as a controlled substance, cannot be dispensed without a prescription.  In pertinent part, that statute states:

> (c)  A controlled substance included in Schedule III, IV, V or VI shall not be dispensed without a written or oral prescription of a practitioner.

Mass. Gen. Law c. 94C, § 17(c).  That law is enforced by the Massachusetts Board of Pharmacy and other government agencies.

The external packaging for MPA sold by NECC indicates that MPA is a prescription drug.  Therefore, it is beyond dispute that the Tennessee Defendants knew that purchasing MPA required a prescription.[35]

**G.**     **The Tennessee Defendants Conspired with NECC to Violate the Individual Prescription Rule.**

Plaintiffs allege that the Saint Thomas Clinic, Dr. Culclasure and Ms. Schamberg acted in concert with NECC to accomplish the common and unlawful purpose of violating the Massachusetts law which prohibits the distribution of MPA, a Schedule VI controlled substance, without patient specific prescriptions.  Those Defendants accomplished that unlawful purpose via the unlawful means of using bogus patient lists to accompany orders of MPA.[36]

---

[33] First Amendment to Master Complaint (Dkt. No. 832), ¶371.
[34] *Id.*, ¶372.
[35] *Id.*, ¶375.
[36] *Id.*, ¶¶376 – 377.

Saint Thomas Clinic ordered MPA compounded by NECC in bulk and thereafter submitted false and inaccurate lists of patient names, regardless of whether the listed patients actually received the drug. Sometimes those lists included fictitious names."[37]

Saint Thomas Clinic was specifically aware of NECC's intent to use bogus patient lists supplied by the clinic in order to subvert Massachusetts Board of Pharmacy requirements. For example, in early to mid-2012, an NECC representative informed Ms. Schamberg, Facilities Director of the Saint Thomas Clinic, that NECC needed to receive lists of patients with each order for MPA. The NECC representative explained that NECC needed those lists in order to comply with Massachusetts Board of Pharmacy requirements.[38] Ms. Schamberg then told the NECC representative that she could not predict which patients would receive MPA and therefore could not provide lists that would actually correspond with patients who receive MPA. In response, the NECC representative indicated that any list of patient names would suffice.[39]

In response to NECC's request for assistance in papering over Massachusetts Board of Pharmacy requirements, Saint Thomas Clinic sent NECC lists of patients' names and addresses even though the listed patients did not necessarily receive MPA. Some of those lists contained fictitious names, including Mickey Mouse.[40]

Saint Thomas Clinic's conduct in forwarding lists of patient names and addresses to NECC, even though those names did not correspond with patients who received MPA, was unlawful. It violated Title II of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Public Law 104-191, as amended, and the regulations related thereto codified in the Code of Federal Regulations Title 45, Subtitle A, Subchapter C, including 45 C.F.R. § 164.502.[41] In other words, Saint Thomas Clinic decided to purchase MPA from the cheapest source possible even though the supplier's methods were illegal.[42]

---

[37] *Id.*, ¶377.
[38] *Id.*,¶379.
[39] *Id.*
[40] *Id.*,¶380.
[41] Saint Thomas Clinic violated HIPPA by sending NECC names of patients who did not receive epidural steroid injections.
[42] *Id.*

If the Tennessee Defendants[43] and NECC had abided by the law requiring individual prescriptions, then NECC could not and would not have produced and sold MPA in bulk to Tennessee clinics.[44]   Mass producing MPA and selling it across the country in bulk, while abiding by the individual prescription rule, is not logistically possible.  If NECC had followed the legally required practice of compounding medicines intended for specific patients in response to prescriptions written by licensed healthcare providers, then NECC could not and would not have produced and sold MPA at prices frequently cheaper than those charged for FDA approved steroids such as Depo-Medrol® made by Pfizer.[45]

Plaintiffs allege that the Tennessee Defendants and others conspired with NECC, in violation of the individual prescription rule, because the Tennessee Defendants desired to buy MPA from the cheapest and easiest source, thereby enhancing clinic profits.   Rather than participating in the subterfuge of papering over the individual prescription rule, the Tennessee Defendants should have declined to conspire with NECC.[46]

The Tennessee Defendants could have and should have purchased MPA from a reputable, FDA approved drug manufacturer such as Pfizer.  Purchasing from Pfizer was safer, although slightly more expensive.  If the Tennessee Defendants had chosen to purchase Depo-Medrol®, the safer name brand version of MPA manufactured by Pfizer, then the fungal meningitis outbreak in Tennessee would have been avoided.[47]

**H.    Saint Thomas Clinic Bills Separately For Steroid Injections.**

When Saint Thomas Clinic administers epidural steroids to patients, it bills for those steroid injections separately from the services of the physicians who inject the medicine.  In other words, each time that Saint Thomas Clinic administers an epidural steroid injection to a patient, it sends a separate invoice for that product to the patient's private or public health

---

[43] Because litigation against St. Thomas Clinic in state court proceeded to limited discovery, the Master Complaint and the First Amendment to the Master Complaint contains specific allegations against St. Thomas Clinic, but based on other evidence uncovered in this litigation, the Master Complaint also contains allegations that other clinics, like SSC, similarly conspired to violate Massachusetts Pharmacy Board regulations.  *See* Master Compl. ¶¶337-351. Obviously for purposes of this motion those allegations must be accepted as true and apply with equal force to SSC as Saint Thomas Clinic.
[44] First Amend. Master Compl., ¶386.
[45] *Id*., ¶381.
[46] *Id*., ¶386.
[47] *Id.*

insurer, such as Medicare or Blue Cross Blue Shield of Tennessee.  Separate and apart from that invoice, Howell Allen Clinic (the neurosurgery group that owns ½ of Saint Thomas Clinic) also sends an individual invoice to the patient's private or public insurer for the services of the physician who administered the injection.

For example, in the case of a patient named Diana Reed, Saint Thomas Clinic charged Mrs. Reed's health insurer, United Healthcare, $1,034 for each epidural steroid injection that she received.[48]  Simultaneously with those charges, Howell Allen Clinic (½ owner of Saint Thomas Clinic) charged United Healthcare $642 for Dr. Culclasure's services each time that he administered an epidural steroid injection to Mrs. Reed.[49]  Simply stated, Saint Thomas Clinic charged United Healthcare for the product (an epidural steroid injection), and Howell Allen Clinic (part owner of Saint Thomas Clinic) charged United Healthcare for the service (a doctor injecting the product into the patient's spinal column).

## II.    SUMMARY OF THE ARGUMENT

On November 15, 2013, the PSC filed a Master Complaint[50] against Clinic-Related Defendants, like the Tennessee Defendants, and certain National Defendants.[51]  The Master Complaint, and its amendment, contains various counts against the Tennessee Defendants including:  Negligence and Gross Negligence (Count III), Failure to Warn (Count VIII), Tennessee Products Liability Claims (Count IX), Agency (Count X) and Civil Conspiracy (Counts XI & XI-A).  The Tennessee Defendants' Motion to Dismiss (Doc. No. 771) seeks to dismiss each of those counts.

---

[48] Reed Complaint, ¶233 and Exhibit R.
[49] *Id*. at ¶234 and Exhibit S.
[50] As part of MDL Order No. 6, the Court required the PSC to file a Master Complaint and a form of short form complaint. The Master Complaint was meant as an administrative tool, allowing the allegations and claims against all Defendants to be stated in one document. Plaintiffs who already had cases on file or who wished to file in the MDL could then file a short form complaint to assert facts and claims set out in the master complaint, streamlining the process of filing claims in the MDL.  Because of Tennessee's one year statute of limitations, the overwhelming majority of cases against the Tennessee Defendants were on file by the time the PSC filed the Master Complaint, yet on or around December 20 2012, all but one case pending against the Tennessee Defendants filed a short-form complaint.  In addition to allegations in the Short Form Complaint, because of the unique requirements of Tennessee law, many Plaintiffs also opted to adopt claims in the originally filed short form complaint, which includes, part from claims asserted in the Short Form Complaint, claims alleging Duty to Prevent Foreseeable Harm and specific claims related to the substandard care provided by the Tennessee Defendants.  *See e.g.* Reed Compl. at ¶¶187-195, 245-273.
[51] Dkt. No. 545, the terms "Clinic-Related Defendants" and "National Defendants" are more fully defined in the Master Complaint.

## A.    Tennessee Law Specifically Requires Healthcare Providers to Stand Behind Products Which They Sell.

Defendants' motion to dismiss lacks merit because all businesses that sell products in Tennessee, including healthcare providers, are required to stand behind those products. Plaintiffs assert product liability claims pursuant to the Tennessee Products Liability Act of 1978, Tenn. Code Ann. § 29-28-101 *et seq.* That statute authorizes claims for strict tort liability against sellers of defective or unreasonably dangerous products if and when a product manufacturer is judicially declared insolvent.[52]

By authorizing strict product liability claims against product sellers if and when product manufacturers are insolvent, the Tennessee legislature enacted important public policy. The risk that a product maker will become defunct rightfully falls upon sellers who choose to do business with product manufactures who later prove financially unsound. That risk does not fall upon innocent tort victims.

Plaintiffs' product liability claims are supported by the plain language of both the Tennessee Healthcare Liability Act, Tenn. Code Ann. § 29-26-101 *et seq.,* and the Tennessee Products Liability Act, Tenn. Code Ann. § 29-28-101 *et seq.* By its terms, the Tennessee Healthcare Liability Act applies <u>only</u> to claims based upon negligently rendered healthcare *services.*[53] The Act does not encompass, or even mention, claims based upon defective or dangerous *products.*[54] The express language of the Tennessee Healthcare Liability Act covers a broad range of healthcare *services*, but the statute says absolutely nothing about harm caused by *goods or products.*[55] In fact, those words never appear in the entire act.

In contrast to the Healthcare Liability Act, the plain language of the Tennessee Products Liability Act indicates that healthcare providers are required to stand behind products that they choose to sell to the same extent required of any other Tennessee

---

[52] Tenn. Code Ann. § 29-28-106(5).
[53] Tenn. Code Ann. § 29-26-101(a)(1).
[54] *Id.*
[55] *Id.*

- 11 -

business.   The Tennessee Products Liability Act contains a unique statutory provision clearly indicating the legislature's intent that healthcare providers can be product sellers.

The Tennessee Products Liability Act contains an express statutory carve-out indicating that there is <u>one circumstance, and only one circumstance</u>, in which healthcare providers are not considered product sellers:   when they sell silicone breast implants.[56]   In all other instances, healthcare providers are required to stand behind products made by defunct manufacturers to the same extent as any other seller.[57]

Tennessee's unique statutory carve-out is not present in the product liability statutes of any other state.   None of the out-of-state jurisdictions relied upon by the Tennessee Defendants have product liability laws containing a similar provision.   Therefore, the Tennessee Defendants should not be permitted to rely upon inapplicable and inapposite out-of-state authority while ignoring express provisions contained in the Tennessee Products Liability Act.

When Tennessee Defendants sold and administered contaminated MPA to patients, they frequently charged their patients separately for that product.   In many instances, Tennessee clinics sent invoices charging for the steroid injections separate and apart from invoices charging for the services of physicians who administered those steroids to patients.   In other words, Tennessee clinics frequently charged separately for the product (a steroid injection) and separately for the service (a physician administering the injection to the patient).

The Tennessee clinics cannot have it both ways.   They cannot tell third-party payers, like Medicare and private health insurance companies, that the product (an injectable steroid) is separate and apart from the service (administration by a physician) for billing purposes while simultaneously telling this Honorable Court that the same steroid is part and parcel of a singular service.

---

[56] Tenn. Code Ann. § 29-28-103(c).
[57] *See* Tenn. Code Ann. §§ 29-28-103(c) & -106(5).

Plaintiffs did not undergo epidural steroid injections in order to acquire the service of acupuncture.  They desired to receive a specific product, a steroid that would relieve their back pain.  MPA was the only active ingredient contained in the shots administered to Tennessee patients.  Tennessee clinics frequently charged for that product separately from the service, and they are considered product sellers under clear Tennessee law.

### B.  The Tennessee Defendants Are Jointly And Severally Liable For Injuries Sustained By Plaintiffs.

The Tennessee Healthcare Liability Act does not require the dismissal of Plaintiffs' claims for joint and several liability.  Under Tennessee law, healthcare providers, because of their special relationships with patients, have an affirmative duty to protect patients from foreseeable harm caused by certain third-parties.  Under Tennessee's common law of comparative fault, healthcare providers cannot reduce their liability by relying upon the same foreseeable harm from which they have an affirmative duty to protect patients. Therefore, because the Tennessee Defendants had an affirmative duty to protect patients from NECC's contaminated products, they are jointly and severally liable for the foreseeable harm which they had a duty to prevent.

The Tennessee Healthcare Liability Act, if and when it applies, merely imposes certain procedure requirements and expert proof requirements upon certain healthcare liability claims.[58]  The statute does not discuss, affect or even mention the doctrine of joint and several liability.  Tennessee's common law of comparative fault and its common law of joint and several liability apply to all tort claims (including healthcare liability claims), and nothing in the Healthcare Liability Act says otherwise.

### C.  The Master Complaint States A Claim For Civil Conspiracy.

Plaintiffs' pleadings contain extraordinarily detailed factual allegations establishing that the Tennessee clinics engaged in an unlawful conspiracy.  The Tennessee Defendants

---

[58] Tenn. Code Ann. § 29-26-101 *et seq.*

used bogus patient lists, in an unlawful manner, in order to assist NECC in violating Massachusetts law requiring individual patient specific prescriptions.   The Tennessee Defendants knew that MPA is a prescription medication.   In spite of that knowledge, they agreed to provide patient lists, containing fictitious names such as "Mickey Mouse," to NECC along with purchase orders requesting large quantities of MPA.   The Tennessee Defendants engaged in that illegal practice, at NECC's request, in order to purchase MPA from the cheapest source available.   That concerted, illegal conduct allowed NECC to compound and distribute MPA in bulk without patient specific prescriptions.   Therefore, the Tennessee Defendants are liable for the acts and omissions of their co-conspirator, NECC.

Plaintiffs specifically allege that the above described illegal conspiracy caused the fungal meningitis outbreak, and their detailed factual allegations describe the specific manner in which the conspiracy caused the outbreak.   By helping NECC acquire false and misleading documents intended to appease government regulators, the Tennessee clinics enabled NECC to mass produce injectable steroids under illegal circumstances.   Plaintiffs' detailed factual allegations, all of which must be taken as true, are more than enough to state a claim for civil conspiracy.

### D. Plaintiffs' Claims For Civil Conspiracy Are Not Barred By The Statute of Limitations.

The Tennessee Defendants' erroneous assertion that Plaintiffs' conspiracy claims are barred by Tennessee's one year statute of limitations is without merit.   The overwhelming majority of Tennessee Plaintiffs filed suit less than one year after they contracted fungal meningitis and less than one year after any information about NECC and/or the fungal meningitis outbreak became public.   The Tennessee Plaintiffs filed suit within approximately five months of their first discovery of information indicating the presence of a civil conspiracy.   Therefore, Plaintiffs' civil conspiracy claims were timely filed.

Tennessee follows the "date of discovery rule" when applying statutes of limitations in tort cases.  Under that rule, a statute of limitation does not begin to run until an injury occurs and the claim is discovered.  The Tennessee Court of Appeals and the Sixth Circuit have applied the "date of discovery rule" in civil conspiracy cases.  Those courts have held that the statute of limitations does not begin to run until the date when both an injury occurs and the plaintiff discovers, or reasonably should discover, the existence of the conspiracy.  Accordingly, Plaintiffs' civil conspiracy claims were timely filed.

### E.   <u>Practical Import of This Court's Ruling.</u>

Clear Tennessee law and important public policy require the Tennessee Defendants to stand behind the defective product that they sold and administered to innocent patients.  Plaintiffs' product liability claims, as well as their civil conspiracy and joint/several liability claims, require the Tennessee Defendants to be responsible for all harm caused by that product.  The Tennessee Defendants selected NECC as their supplier of choice for steroids which they then sold and injected into patients' spinal columns for profit.  The patients played absolutely no role in that selection.  They relied exclusively upon the Tennessee clinics to make a safe choice.

The Tennessee Defendants now request dismissal of all claims under which they can be held responsible for all harm caused by the contaminated steroids (i.e. strict product liability, civil conspiracy, and joint/several liability claims).  If those claims are dismissed, the Tennessee Defendants will then attempt to attribute fault to everyone but themselves, including NECC, the NECC insiders, the National Defendants, the FDA, the Massachusetts Board of Pharmacy, the Tennessee Department of Health, and others.  Such a circumstance would cause this litigation to become mired for years in expensive and time consuming discovery that will not serve the interests of justice.

Conversely, if this Court permits the Tennessee Plaintiffs' product liability claims (and similar claims) to proceed, then this litigation will result in swifter and more efficient

administration of justice.  Once the Tennessee Defendants are required to stand behind the subject product, the parties will quickly move past the finger pointing common in many comparative fault cases.  The parties will be able to quantify and calculate liability and damages with added certainty and predictability.  Such an approach would shorten the duration of this litigation significantly, and it would compensate innocent victims fully in accordance with the law and public policy of Tennessee.

### III.   ARGUMENT

#### A.   Applicable Legal Standard.

A claim for relief must be supported by "a short and plain statement showing that the pleader is entitled to relief."[59]  When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom."[60]

To survive a motion to dismiss, the plaintiff must state a claim that is plausible on its face.[61]  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true."[62]

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[63]  Dismissal is appropriate only if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief."[64]

When considering a motion to dismiss, the issue is not whether the plaintiff will ultimately prevail but whether she is entitled to offer evidence to support the claims asserted.[65]

---

[59] Fed. R. Civ. P. 8(a)(2).
[60] *Ruiz*, 496 F.3d at 5 (citing Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999)).
[61] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).
[62] *Id.* at 555 (citations omitted).
[63] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556).
[64] *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir.2008) (quotations and original alterations omitted); *Composite Co., Inc. v. Am. Int'l Grp., Inc.*, No. 13-10491-FDS, 2013 WL 5236534, at *10 (D. Mass. Sept. 16, 2013) (Saylor, D.J.); and *Gallant v. City of Fitchburg*, 739 F. Supp. 2d 39, 44-45 (D. Mass. 2010) (Saylor, D.J.)
[65] *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).

That is, the pleading must raise a reasonable expectation that discovery will reveal evidence of the misconduct alleged.[66]

### B.    Tennessee Law Requires Those Who Chose to Sell NECC's Products to Stand Behind Those Products.

Plaintiffs assert strict product liability claims against the Tennessee clinics.  Plaintiffs base those claims upon provisions of the Tennessee Products Liability Act of 1978, Tenn. Code Ann. § 29-28-101 *et seq.*  That Act expressly authorizes claims for strict tort liability against sellers of defective or unreasonably dangerous products in certain circumstances, including when a product manufacturer is judicially declared insolvent.[67]  The primary purpose of the seller liability statute "is to insure that where the manufacturer is insolvent, an injured party may look to a solvent seller for his losses."[68]

Under Tennessee law, a product seller "may be liable in strict liability for physical harm caused to a consumer by a defective product."[69]  "[A] product liability action may be brought against a manufacturer or seller on strict liability grounds, with no proof of negligence, if the product causing injury to person or property 'is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.'"[70]

By authorizing strict product liability claims against sellers, the Tennessee legislature enacted important public policy.  Companies that sell products to consumers are required to stand behind those products if and when the product maker is insolvent.[71]  In other words, the risk that a product maker will become defunct rightfully falls upon a seller who chooses to do business with a product maker that later proves financially unsound.  That risk does not fall upon injured consumers.[72]

---

[66] *Cafasso v. Gen. Dynamics C4 Sys.,* 637 F.3d 1047, 1055 (9th Cir. 2011)(quoting *Twombly,* 550 U.S. at 556).
[67] Tenn. Code Ann. § 29-28-106(5).
[68] *Seals v. Sears, Roebuck and Co., Inc.,* 688 F. Supp. 1252, 1256 (E. D. Tenn. 1988).
[69] *Nye v. Bayer Cropscience, Inc.,* 347 S.W.3d 686, 692 (Tenn. 2011)(citing RESTATEMENT (SECOND) OF TORTS § 402A (1965)).
[70] *Id.* at 692-93 (quoting Tenn. Code Ann. § 29-28-105(a)).
[71] *See Owens v. Truckstops of America,* 915 S.W.2d 420, 432 (Tenn. 1996).
[72] *Id.*

In *Owens*, the Tennessee Supreme Court described the public policy associated with

holding product sellers strictly liable for harm caused by defective products:

> A primary purpose of this section is "to ensure that an injured consumer may maintain a strict liability action against whomever is most likely to compensate him for his injuries." When the manufacturer is not amenable to service of process or is insolvent, an injured consumer can assert liability against the "faultless" seller. If, under these circumstances, the seller were not held to be jointly liable for the plaintiff's damages, then, contrary to the products liability statute, the injured consumer would be left with no remedy.[73]

On July 24, 2013, the Honorable Henry J. Boroff, Judge of the United States Bankruptcy

Court for this district, declared that the product manufacturer, NECC, is insolvent. Accordingly,

injured Tennessee tort victims are entitled to assert strict product liability claims against those

who sold defective NECC products in Tennessee. In order to succeed in prosecuting such

claims, Plaintiffs need only establish: (1) that a Tennessee clinic was a "seller" of the subject

product; (2) that the product was "in a defective condition or unreasonably dangerous at the time

it left the control of the manufacturer or seller"; and (3) that the product caused harm to

Plaintiffs.[74]

## C. Tennessee Clinics Sold NECC's Products and Charged Plaintiffs Separately For Those Products.

The Tennessee clinics are not charitable organizations. They are for-profit entities. They

do not dispense MPA to their patients for free. They charge handsomely and in many instances,

if not all instances, separately for the products that they sell to their patients.

In many instances, Tennessee clinics charge for and sell steroid injections to patients

separate and apart from moneys charged for the services of physicians who administer the

injections. For example, when Saint Thomas Clinic administers epidural steroids to patients, it

bills for those steroid injections separately from the services of the physician who injects the

medicine. In other words, when Saint Thomas Clinic administers an epidural steroid injection to

a patient, it sends a separate bill for that product to the patient's private or public health insurer,

such as Medicare or Blue Cross Blue Shield of Tennessee. Separate and apart from that invoice,

---

[73] *Id*. at 432 (citations omitted).
[74] *Nye*, 347 S.W.3d at 692-93; and Tenn. Code Ann. §§ 29-28-105(a) & -102.

the Defendant Howell Allen Clinic (the neurosurgery group that owns ½ of Saint Thomas Clinic) also sends an individual invoice to the patient's private or public insurer for the services of the physician who administered the injection.

As previously noted, Saint Thomas Clinic charged United Healthcare, health insurer of a patient named Diana Reed, $1,034 for each epidural steroid injection that Mrs. Reed received. Simultaneously with those charges, the Defendant Howell Allen Clinic charged United Healthcare $642 for Dr. Culclasure's services each time that he administered an epidural steroid injection to Mrs. Reed.  In other words, Saint Thomas Clinic charged United Healthcare for the product (a steroid injection), and Howell Allen Clinic charged United Healthcare for the service (Dr. Culclasure administering the injection into the patient's spinal column).

In their brief, the Tennessee Defendants attempt to cast steroid injections as "services" rather than "products."  That characterization is both misleading and completely inconsistent with the money trail.

Tennessee Plaintiffs did not visit the Tennessee clinics for purposes of undergoing acupuncture.  They were there to receive a product, a steroid (MPA), intended to relieve their back pain.  The Tennessee clinics charged for that product separate and apart from additional charges imposed for the services of physicians who injected the medicine into patients' spines. Therefore, the Tennessee clinics should not be heard to suggest that the steroid known as MPA was merely an incidental part of the service of giving injections.  To the contrary, MPA was the only active ingredient contained in the epidural steroid injections administered to patients. Succinctly stated, the steroid is the thing and the thing is the steroid.  There was no other purpose for the transaction.

Patients specifically allege that the Tennessee clinics sold MPA and that the clinics charged for those steroids separate and apart from the physicians' services in administering that medicine.  Those allegations must be taken as true for purposes of the present motion.[75]

---

[75] *Ruiz*, 496 F.3d at 5.

Therefore, this Court should not dismiss Plaintiffs' claims summarily without affording Plaintiffs the opportunity to conduct meaningful discovery.[76]

      **D.**    **The Tennessee Healthcare Liability Act and the Tennessee Products Liability Act Each Support Plaintiffs' Product Liability Claims.**

Defendants contend, erroneously, that Plaintiffs' product liability claims are precluded by the Tennessee Healthcare Liability Act. That contention is without merit because the plain terms of both the Tennessee Healthcare Liability Act and the Tennessee Products Liability Act demonstrate otherwise.

      1.    <u>The Tennessee Healthcare Liability Act, Tenn. Code Ann. § 29-26-101, by its plain terms, does not bar product liability actions against healthcare providers</u>.

The Tennessee Healthcare Liability Act, Tenn. Code Ann. § 29-26-101 *et seq.*, does not bar product liability claims against healthcare providers. The Healthcare Liability Act, by its express terms, applies only to healthcare *services*, not *products* sold by healthcare providers.

The Healthcare Liability Act was amended in 2011 to bring within its scope claims arising from all manner of healthcare *services*. To that end, the Tennessee General Assembly enacted Section 101 of the Healthcare Liability Act ("HLA"), which specifically defines "health care liability action" and states that all such actions are subject to the statute.[77] Importantly, Section 101 of the HLA defines a "health care liability action" in terms of claims arising from the provision of "health care *services*," not the sale or distribution of goods or products.[78] The Healthcare Liability Act states:

> "Health care liability action" means any civil action, including claims against the state or a political subdivision thereof, alleging that a health care provider or providers have caused an injury <u>related to the provision of, or failure to provide, health care *services* to a person</u>, regardless of the theory of liability on which the action is based;[79]

The statute specifically defines "health care services" as follows:

---

[76] *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 17 (1st Cir. 2011) (holding that a claim should survive a Rule 12(b)(6) motion if it alleges "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of the illegal conduct.") (internal citations and quotations omitted).
[77] Tenn. Code Ann. § 29-26-101.
[78] Tenn. Code Ann. §§ 29-26-101(a)(1) & (b) (emphasis added).
[79] Tenn. Code Ann. § 29-26-101(a)(1) (emphasis added).

> Health care services to persons includes care by health care providers, which includes care by physicians, nurses, licensed practical nurses, pharmacists, pharmacy interns or pharmacy technicians under the supervision of a pharmacist, orderlies, certified nursing assistants, advance practice nurses, physician assistants, nursing technicians and other agents, employees and representatives of the provider, and also includes staffing, custodial or basic care, positioning, hydration and similar patient **services**.[80]

Nowhere does the statute say that "health care *services*" include *products* sold or distributed by healthcare providers.  Although the statute expressly states that it applies to a broad variety of healthcare decisions such as "staffing, custodial or basic care, positioning, hydration and similar patient *services*," the statute contains zero language suggesting that "healthcare *services*" actually means defective *products*.[81]  In fact, the words "goods," "product," and/or "products" never appear anywhere in the entire Healthcare Liability Act.[82]

This Court should not warp the plain language of the Healthcare Liability Act by extending it to claims for harm caused by defective or unreasonably dangerous products.  As the Tennessee Supreme Court recently reiterated, courts "must determine the legislature's intent and purpose by reading the words of the statutes using their *plain and ordinary meaning* in the context in which the words appear."[83]  Courts are not permitted to add words to unambiguous statutes in order to expand their scope:  "When the language of a statute is clear and unambiguous, courts will not look beyond the plain language of the statute to determine its meaning."[84]  In other words, "[w]hen a statute is clear, [courts] apply the plain meaning without complicating the task," and "[a court's] obligation is simply to enforce the written language."[85]  Although the Tennessee Legislature expanded the scope of the Healthcare Liability Act to encompass claims based on various specified *services*, including "positioning, hydration and similar patient services"[86], it plainly stopped short of including claims arising from the sale or distribution of defective *products* such as contaminated medicine.

---

[80] Tenn. Code Ann. § 29-26-101(b) (emphasis added).
[81] *Id.*
[82] Tenn. Code Ann § 29-26-101 *et seq.*
[83] *Cunningham v. Williamson County Hosp. Dist.*, 2013 WL 1912611 at *2 (Tenn. May 9, 2013) (emphasis added).
[84] *Id.*
[85] *Estate of French v. Stratford House*, 333 S.W.3d 546, 554 (Tenn. 2011) (citations omitted).
[86] Tenn. Code Ann. § 29-26-101(b).

Plaintiffs' product liability claims arise from the defective and unreasonably dangerous condition of the contaminated steroid *product*, not the *services performed while administering the product to the patients.* In other words, Plaintiffs do not complain about the manner in which physicians at the Tennessee clinics used needles to administer the product. Plaintiffs' product liability claims are limited to harm caused by the product itself. As discussed below, the unique provisions of the Tennessee Products Liability Act indicate that healthcare providers, just like any other product seller, are required to stand behind the products that they sell.

      2.    <u>Unique Provisions Contained in the Tennessee Products Liability Act Reveal that Healthcare Providers Can be Product Sellers</u>.

The Tennessee Products Liability Act contains a provision that is unique to Tennessee. That unique statutory provision reveals that healthcare providers can be considered sellers of harmful or defective products.

The Tennessee Products Liability Act contains a statutory carve-out indicating that there is <u>one circumstance and only one circumstance</u> in which healthcare providers are not considered sellers of dangerous or defective products: when the product is a silicone breast implant.[87] In all other circumstances, Tennessee healthcare providers are subject to the same degree of seller liability as all other Tennessee businesses who sell harmful products.

Tennessee's unique statutory provision is <u>not</u> found in the product liability laws of any of the 23 out-of-state jurisdictions relied upon by the Tennessee Defendants. Therefore, opinions from those other jurisdictions, which are based upon product liability statutes fundamentally different from Tennessee's statute, are inapposite and inapplicable.

The Tennessee Products Liability Act broadly defines "product" as "any tangible object or goods produced."[88] The Act broadly defines "product liability action" as "all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning,

---

[87] Tenn. Code Ann. § 29-28-103(c).
[88] Tenn. Code Ann. § 29-28-102(5).

instruction, marketing, packaging or labeling of any product,"[89] and it broadly defines "seller" to include "a retailer, wholesaler, *or distributor*" and "any individual or entity engaged in the business of selling a product, whether such sale is for resale, or *for use or consumption*."[90] Those broad definitions necessarily include, and make no effort to exclude, healthcare providers who sell defective products such as contaminated medicine.

The Tennessee Products Liability Act expressly excludes healthcare providers from the definition of "seller" in one and only one specific circumstance, if the product is a silicone breast implant.[91] That limited carve-out clearly reveals the Tennessee Legislature's intent that healthcare providers are generally subject to the same degree of seller liability as any other business that distributes products to Tennessee consumers.

Section 103(c) of the Tennessee Products Liability Act sets forth an extended statute of repose for actions against manufacturers or sellers of silicone breast implants.[92] The statute then carves-out healthcare providers from the definition of the term "seller" for purposes of breast implant litigation *only*. Specifically, Section 103(c) provides:

> (c)(1) Any action against a manufacturer or seller for injury to a person caused by a silicone gel breast implant must be brought within a period not to exceed twenty-five (25) years from the date such product was implanted; provided, that such action must be brought within four (4) years from the date the plaintiff knew or should have known of the injury.
>
> (2) ***For purposes of this subsection (c) only***, "seller" does not include a hospital or other medical facility where the procedure took place, nor does "seller" include the physician or other medical personnel involved in the procedure.
>
> (3) This subsection (c) only applies to causes of action not pending or decided on or before May 26, 1993. For the purposes of this subsection (c), a "pending case" is defined as a case actually filed by a silicone gel-filled breast implant recipient.[93]

That specific and limited exclusion plainly and irrefutably demonstrates that the Tennessee legislature knew and intended that healthcare providers (e.g., medical facilities and medical personnel) may be held liable as "sellers" in cases involving products *other than* silicone breast implants. Otherwise, the statutory carve-out would be completely superfluous and of no effect.

---

[89] Tenn. Code Ann. § 29-28-102(6).
[90] Tenn. Code Ann. § 29-28-102(7) (emphasis added).
[91] Tenn. Code Ann. § 29-28-103(c)(2).
[92] Tenn. Code Ann. § 29-28-103(c)(1).
[93] Tenn. Code Ann. § 29-28-103(c)(emphasis added).

If the Legislature intended to immunize healthcare providers against product liability claims based on the sale of contaminated steroid injections, it would have singled out such claims for special treatment along with silicone breast implant cases.  It did not do so.[94]

A well-established rule of statutory construction is "the maxim '*expressio unius est exclusio alterius,*' which states the principle that the expression of one thing implies the exclusion of all things not expressly mentioned."[95]  According to the Tennessee Supreme Court, "the mention of one subject in a statute means the exclusion of other subjects that are not mentioned.  Omissions are significant when statutes are express in certain categories but not others."[96]  The Product Liability Act expressly excludes healthcare providers from seller liability in cases involving only one specific type of product (silicone breast implants), and no others.  Under the rules of statutory construction, therefore, that one *specific* exclusion means that seller liability for healthcare providers is *not* excluded in cases involving any products *other than* silicone breast implants.

The Tennessee Defendants cite no statute from any portion of the Tennessee Code stating that healthcare providers are not sellers of products.  The Tennessee Defendants, in their briefs, never even mention the unique language contained in the Tennessee Products Liability Act.  Instead, the Tennessee Defendants rely upon opinions from other jurisdictions, none of which have product liability statutes like that of Tennessee.

None of the 23 states mentioned in the Tennessee Defendants' brief have a product liability statute containing an illuminating statutory carve-out indicating that healthcare providers are not sellers in one, and only one, limited circumstance: when the product is a silicone gel breast implant.  Therefore, Defendants' out-of-state authority is both non-controlling and inapposite.

---

[94] The Tennessee Defendants also request dismissal of Plaintiffs' claims for general negligence and failure to warn.  Those claims are also viable products liability theories under Tennessee law, and Defendants' motion as to those theories should likewise be denied.  However, Plaintiffs' claims for strict product liability are Plaintiffs' primary product claims.
[95] *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 84 (Tenn. 2001).
[96] *Carver v. Citizen Utilities Co.*, 954 S.W.2d 34, 35 (Tenn. 1997) (citations omitted).

E.     **The Tennessee Opinions Cited by Defendants Do Not Support Their Position.**

The Tennessee Defendants cite two Tennessee opinions, *Parker* and *Delta Refining*, in support of their incorrect assertion that "Tennessee Courts have *specifically* concluded that providers of professional services are not sellers."[97]  That assertion is false.  Neither of those opinions state that "providers of professional services" cannot be considered sellers if and when such providers actually select and sell products.  Instead, the Tennessee Court of Appeals, based on the particular facts presented in each of those two cases, held that certain defendants were not "sellers" because, unlike in the present case, they neither selected nor sold the subject products.

In *Parker*, the plaintiff was injured while attending a wrestling match when the bleachers upon which she was sitting broke.[98]  The plaintiff sued the owner of the premises and the promoter of the wrestling match.[99]  The owner and the promoter, by way of a third party complaint, sued the supplier of the lumber used to construct the bleachers as well as the carpenters who built the bleachers.[100]  That third party complaint alleged that the lumber supplier and the carpenter were liable for the broken bleachers under theories of negligence, breach of express and implied warranties, and strict liability.[101]

In *Parker*, the owner of the premises hired and paid the carpenters, by the hour, to build bleachers from lumber supplied by someone else.[102]  The carpenters did not select the lumber or charge for the lumber.[103]  The court in *Parker* held that the defendant carpenters were not "sellers" for purposes of strict liability because "they were not engaged in the business of [s]elling" the lumber.[104]  That ruling makes perfect sense given that the carpenters did not charge their customer for the lumber.

The facts in *Parker* are not similar or even analogous to the case at hand.  In the present case, the Tennessee clinics selected MPA manufactured by NECC as their injectable steroid of

---

[97] Defs. Mem. Supp. Mot. Dismiss, p. 32 (emphasis added); *Parker v. Warren*, 503 S.W.2d 938 (Tenn. Ct. App. 1973); *Delta Refining Co. v. Procon, Inc.*, 552 S.W.2d 387 (Tenn. Ct. App. 1976).
[98] *Parker*, 503 S.W.2d at 941.
[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] *Id.* at 945.

choice.  Moreover, the Tennessee clinics charged their customers for that steroid separate and apart from the physicians' services in administering them.  Unlike the present case, the *Parker* carpenters did not select the subject lumber nor did they charge their customer for it.  Therefore, the *Parker* decision is not instructive in the least.

In *Delta Refining*, a pump exploded at an oil refinery owned by the plaintiff.[105]  The plaintiff alleged that the pump exploded because certain bolts used in the pump were manufactured to an incorrect hardness rating.[106]  Plaintiff sued the manufacturer of the pump as well as the general contractor who installed the pump.[107]  Just as in *Parker*, the actual supplier of the defective product in *Delta Refining*, the manufacturer, was a named defendant.[108]  In addition, the pump was manufactured "according to specifications furnished by Plaintiff."[109]  The court in *Delta Refining* found that the general contractor who installed the pump could not be held liable under a theory of strict liability.[110]

In both *Parker* and *Delta Refining*, the specifications for the allegedly defective products were dictated by entities <u>other than</u> the defendants deemed not to be "sellers."[111]  The general contractor in *Delta Refining* "merely contracted with Delta to purchase and install a pump which [the manufacturer] would build according to specifications *furnished by Plaintiff*."[112]  In the present case, in contrast, the Tennessee Defendants hand-picked NECC to supply the subject steroid.  The injured Plaintiffs played zero role in that decision.  Therefore, *Parker* and *Delta Refining* are neither factually nor legally analogous to the present case.

### F.   The Tennessee Healthcare Liability Act Does Affect Plaintiffs' Claims for Joint and Several Liability.

Tennessee law provides that healthcare providers maintain a "special relationship" with their patients.[113]  Because of that special relationship, healthcare providers owe an affirmative

---

[105] *Delta Refining*, 552 S.W.2d at 388.
[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.* at 389.
[110] *Id.*
[111] *Parker*, 503 S.W.2d at 941; *Delta Refining*, 552 S.W.2d at 388.
[112] *Delta Refining*, 552 S.W.2d at 389 (emphasis added).
[113] *Bradshaw v. Daniel*, 854 S.W.2d 865, 872 (Tenn.1993).

duty to take whatever steps are reasonably necessary and available to protect their patients from foreseeable harm caused by a third-party's conduct.[114]  When a healthcare provider breaches its affirmative duty to protect its patient from foreseeable harm caused by a third-party's conduct, the healthcare provider is jointly and severally liable for that foreseeable harm.[115]

In *Turner v. Jordan*,[116] a hospital nurse sued a psychiatrist for medical malpractice.  The nurse alleged that the psychiatrist breached his duty of reasonable care by failing to medicate or restrain a psychiatric in-patient with a known history of violent behavior.[117]  The psychiatrist knew that the patient was extremely violent because the patient had previously attacked the psychiatrist with a table leg torn from a table.[118]  In spite of that knowledge, the psychiatrist did not take appropriate measures to medicate or restrain the violent patient.[119]  Instead, the psychiatrist ordered the nursing staff to encourage the patient to check out of the mental health facility "against medical advice."[120]  After the psychiatrist made that order, the violent patient severely beat a hospital nurse, causing permanent brain injuries.[121]  The injured nurse, through her husband, then sued the psychiatrist for medical malpractice.[122]

On appeal, the Tennessee Supreme Court held that the psychiatrist had an affirmative duty to prevent his patient from causing foreseeable harm to the nurse.[123]  The Court also held that the psychiatrist could not reduce his liability by asking the jury to allocate fault to the violent patient under Tennessee's common law doctrine of comparative fault.[124]  In other words, the psychiatrist was responsible for all foreseeable harm that he had a duty to prevent, and he was therefore jointly and severally liable for all injuries caused by the violent attack.[125]  As the court

---

[114] *Turner v. Jordan*, 957 S.W.2d 815, 819 (1997); and *Limbaugh v. Coffee Medical Center*, 59 S.W.3d 73, 79 (2001).
[115] *Id.*
[116] *Turner v. Jordan*, 957 S.W.2d 815, 819 (1997).
[117] *Id.* at 816-817.
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] *Id.* at 815.
[123] *Id.* at 819.
[124] *Id.* at 820.
[125] *Id.*

stated, the psychiatrist "should not be permitted to reduce his liability by relying on the occurrence of the foreseeable risk of harm he had a duty to prevent."[126]

In *Limbaugh v. Coffee Medical Center*,[127] the Tennessee Supreme Court recognized that, when a "special relationship exists between the defendant and 'a person who is foreseeably at risk from . . . danger,'" the defendant is under an affirmative duty to take reasonable measures to protect that person.[128]   In *Limbaugh*, the defendant was a nursing home that allegedly hired a nursing assistant with known violent propensities.[129]   The nursing assistant then assaulted a nursing home resident.[130]   The injured resident sued the nursing home, and the nursing home asserted that the nursing assistant was comparatively at fault.[131]   In other words, the nursing home asserted that its liability should be reduced by fault attributed to the assailant.[132]

Finding that the doctrine of joint and several liability applied to the nursing home because of its duty to protect its resident, the Tennessee Supreme Court emphasized that a "special relationship" existed between the nursing home and its resident.[133]   That relationship is akin to the special relationship existing between physicians and patients, and it gives rise to an affirmative duty to protect the patient from harm by a third-party.[134]   Specifically, the Court stated:

> Although the parties have not raised the issue of whether a nursing home is under an affirmative duty to act to prevent [its residents] from sustaining harm, we have held that where a special relationship exists between the defendant and "a person who is foreseeably at risk from ... danger," the defendant is under an affirmative duty to take "whatever steps are reasonably necessary and available to protect an intended or potential victim." **An example of this special relationship, and one most analogous to the relationship at issue in this case, is the physician/patient relationship born out of the physician's assumption of responsibility for the care and safety of another**.[135]

---

[126] *Id.*
[127] *Limbaugh v. Coffee Medical Center*, 59 S.W.3d 73, 79 (2001).
[128] *Id.*
[129] *Id.* at 76.
[130] *Id.*
[131] *Id.* at 86-87.
[132] *Id.*
[133] *Id.* at 79.
[134] *Id.*
[135] *Id.* (citations omitted, emphasis added).

The Court found that the defendant was not permitted to reduce its fault by relying upon the foreseeable harm that it had a duty to prevent.[136]  The Court stated:

> we expressed our concern that allowing comparison would reduce the negligent person's incentive to comply with the applicable duty of care and thus prevent further wrongdoing. Finally, we recognized that when a defendant breaches a duty to prevent the foreseeable risk of harm by a nonparty intentional actor, that negligent co-tortfeasor cannot reduce his or her liability by relying on the foreseeable risk of harm that he or she had a duty to prevent.[137]

Therefore, the Tennessee Supreme Court found that the defendant was jointly and severally liable for all harm suffered by the person whom the defendant had a duty to protect.[138]

In the present case, the Tennessee Defendants maintained a special relationship with each patient who received an epidural steroid injection.[139]  By virtue of that special relationship, the Tennessee Defendants had an affirmative duty to protect their patients.[140]  The Tennessee Defendants breached that affirmative duty by selecting NECC as the source of preservative free steroids injected into patients' spines.  The Tennessee Defendants selected NECC as its medication supplier because it was the cheapest source of MPA available.  In making that decision, motivated exclusively by price, the Tennessee Defendants ignored NECC's deplorable site conditions and terrible regulatory history.

The injured Plaintiffs played no role in selecting NECC as the supplier of the injectable steroids that sickened or killed many patients.  They relied exclusively upon the Tennessee clinics to make that choice.  Basic precepts of justice, and well established principles of Tennessee tort law, each require that the Tennessee Defendants be held jointly and severally liable for all harm caused by their decision to select NECC as their supplier of injectable steroids.  Under the legal reasoning articulated in *Turner v. Jordan* and *Limbaugh*, the Tennessee Defendants cannot reduce their liability by relying upon the foreseeable harm from which they had an affirmative duty to protect their patients.

---

[136] *Id.*
[137] *Id.* at 86-87(citations omitted).
[138] *Id.*
[139] *See Bradshaw*, 854 S.W.2d at 872 (recognizing the special relationship between physician and patient).
[140] *See Limbaugh*, 59 S.W.3d at 79.

The Tennessee Healthcare Liability Act does not discuss, affect or even mention the doctrine of joint and several liability.[141]   Nothing in the Tennessee Healthcare Liability Act suggests that basic principles of Tennessee tort law do not apply to healthcare liability cases. The statute merely adds certain expert proof requirements and pre-suit filing requirements.[142]   It does not supplant or replace the common law of comparative fault or the common law of joint and several liability.

The Tennessee Defendants cite no statutory provision and no judicial opinion indicating that healthcare providers cannot be held jointly and severally liable for harm foreseeably caused by their conduct.   Healthcare providers can be held jointly and severally liable, under certain limited circumstances, just like any other Tennessee tortfeasor.[143]   Therefore, this Court should deny the Tennessee Defendants' unsupported request for dismissal of Plaintiffs' claims based upon Defendants' duty to prevent foreseeable harm by NECC.

G.      **The Tennessee Healthcare Liability Act Does Not Affect Plaintiffs' Conspiracy Claims.**

The Tennessee Healthcare Liability Act imposes certain procedural and expert proof requirements on certain claims arising from the improper provision of healthcare services.[144]   It does <u>not</u> purport to be an exclusive remedy statute.   In fact, the statute expressly indicates that various theories of liability can be asserted against healthcare defendants.   The Healthcare Liability Act states:

> "Health care liability action" means any civil action, including claims against the state or a political subdivision thereof, alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, **regardless of the theory of liability on which the action is based**;[145]

Therefore, by its plain terms, that statute recognizes that various theories of recovery can be asserted against healthcare defendants, including claims not covered by the Healthcare Liability

---

[141] *See* Tenn. Code. Ann. § 29-26-101 *et seq.*
[142] *Id.*
[143] *See Turner v. Jordan*, 957 S.W.2d at 819.
[144] Tenn. Code Ann. § 29-26-115.
[145] Tenn. Code Ann. § 29-26-101(a)(1) (emphasis added).

Act.[146]  Nothing in the statute purports to immunize healthcare defendants from being held liable if they choose to participate in a conspiracy to violate important safety laws.

### H.   Plaintiffs State A Claim for Civil Conspiracy.

Under Tennessee law, a civil conspiracy is defined as a common design, between two or more defendants, to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, each with knowledge of the other's intent.[147]  The agreement or common design need not be formal, the understanding among the defendants may be tacit, and it is not essential that each conspirator have knowledge of the details of the conspiracy.[148]  As stated by the Tennessee Supreme Court in *Brown*:

> This tort is defined as a "combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means."   Each conspirator must have the intent to accomplish this common purpose, and each must know of the other's intent.
>
> The agreement "need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy."
>
> Finally, "it is [a] basic principle that each conspirator is responsible for everything done by his confederate which the execution of the common design makes probable as a consequence"; in other words, each conspirator is liable for the damage caused by the other.[149]

Defendants erroneously assert that "a common purpose to intentionally defraud" is an essential element of a civil conspiracy claim.[150]  That unsupported assertion is contrary to clear Tennessee law.   Civil conspiracy in Tennessee does not require a fraudulent action by a defendant.   It only requires an unlawful purpose or a lawful purpose accomplished by unlawful means.[151]  Civil conspiracy claims based upon unlawful conduct other than fraud are frequently litigated in Tennessee.[152]

---

[146] *See* Tenn. Code Ann. § 29-26-121(e) ("In the event that a complaint is filed in good faith reliance on the extension of the statute of limitations or repose granted by this section ***and it is later determined that the claim is not a health care liability claim***, the extension of the statute of limitations and repose granted by this section is still available to the plaintiff.")

[147] See Tennessee Pattern Jury Instruction – Civil 8.80 Civil Conspiracy.

[148] *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (2001).

[149] *Id.* (citations omitted).

[150] *Defs. Mem. Supp. Mot. Dismiss* at 60 (emphasis added).

[151] *See Brown*, 42 S.W.3d at 67.

[152] *See McHendry v. Anderson*, 344 S.W.2d 769 (Tenn. Ct. App. 1960) (conspiracy to violate Unemployment Compensation Law, etc.); *Baldwin v. Pirelli Armstrong Tire Corp.*, 927 F.Supp. 1046 (M.D. Tenn. 1996) (conspiracy to violate Tennessee law based on wrongful termination); *Swafford v. Memphis Individual Practice Ass'n*, No. 02AN01-96120CV099311, 1998 WL 281935 (Tenn. Ct. App. 1998) (conspiracy to libel).

Plaintiffs' pleadings allege ample facts sufficient to state a plausible claim for civil conspiracy.  On January 31, 2014, Plaintiffs amended their pleadings to add an additional Civil Conspiracy Count.[153]  That pleading contains the following factual allegations, all of which must be taken as true for purposes of this motion:[154]

- The Tennessee Defendants knew that NECC is a compounding pharmacy.  The FDA defines pharmacy compounding as follows:

  FDA regards traditional pharmacy compounding as the extemporaneous combining, mixing or altering of ingredients by a pharmacist in response to a physician's prescription to create a medication tailored to the specialized medical needs of an individual patient.

  *2006 Limited FDA Survey of Compounded Drug Products (emphasis added).*[155]

- MPA is a prescription drug defined by 105 CMR § 700.002(F) as a Schedule VI controlled substance.  Pursuant to Mass. Gen. Law c. 94C, § 17(c), MPA, as a controlled substance, cannot be dispensed without a prescription.[156]

- The Tennessee Defendants knew that MPA is a prescription drug.[157]

- Saint Thomas Clinic, Dr. Culclasure and Ms. Schamberg acted in concert with NECC to accomplish the common and unlawful purpose of violating the Massachusetts law which prohibits the distribution of MPA, a Schedule VI controlled substance, without patient specific prescriptions.  Those Defendants accomplished that unlawful purpose via the unlawful means of using bogus patient lists to accompany orders of MPA.[158]

- NECC's standard order form for MPA and other drugs requested patient specific information.  Instead of filling out those standard forms properly, Saint Thomas Clinic ordered NECC pharmaceuticals in bulk and thereafter submitted bogus lists of patient names, regardless of whether the listed patients actually received the drug.  Sometimes those lists included fictitious names such as "Mickey Mouse."[159]

- Saint Thomas Clinic was aware of NECC's intent to use bogus patient lists in order to subvert Massachusetts Board of Pharmacy requirements.  For example, in early to mid-2012, an NECC representative informed Ms. Schamberg, Facilities Director of the Saint Thomas Clinic, that NECC needed to receive lists of patients with each order for MPA.  The NECC representative explained that NECC needed those lists in order to comply with Massachusetts Board of Pharmacy requirements.  Ms. Schamberg then told the NECC representative that she could not predict which patients would receive MPA and therefore could not provide

---

[153] (Doc. 832).
[154] *Ruiz*, 496 F.3d at 5.
[155] First Amendment to Master Complaint (Document No. 832) , ¶371; Case No. MDL No. 1:13-md-2419-FDS.
[156] *Id.*, ¶372.
[157] *Id.*, ¶374.
[158] *Id.*, ¶¶376-377.
[159] *Id.*,¶378.

lists that would actually correspond with patients who receive MPA. In response, the NECC representative indicated that any list of patient names would suffice.[160]

- In response to NECC's request for assistance in papering over Massachusetts Board of Pharmacy requirements, Saint Thomas Clinic sent NECC lists of patients' names and addresses even though the listed patients did not necessarily receive MPA. Some of those lists contained fictitious names, including Mickey Mouse.[161]

- Saint Thomas Clinic's conduct in forwarding lists of patient names and addresses to NECC, even though those names did not correspond with patients who received MPA, violated Title II of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Public Law 104-191, as amended, and the regulations related thereto codified in the Code of Federal Regulations Title 45, Subtitle A, Subchapter C, including 45 C.F.R. § 164.502. That conduct was unlawful.[162]

- Saint Thomas Clinic decided to purchase MPA from the cheapest source possible regardless of whether the supplier's methods were illegal.[163]

- The subject conspiracy caused Plaintiffs' injuries. If the Tennessee Defendants and NECC had abided by the law requiring individual prescriptions, then NECC could not and would not have produced and sold MPA in bulk to Tennessee clinics.[164]

- Mass producing MPA and selling it across the country in bulk, while abiding by the individual prescription rule, is not logistically possible. If NECC had followed the legally required practice of compounding medicines intended for specific patients in response to prescriptions written by licensed healthcare providers, then NECC could not and would not have produced and sold MPA at prices cheaper than those charged for FDA approved steroids such as Depo-Medrol®.[165]

- The Tennessee Defendants conspired with NECC, in violation of the individual prescription rule, because the Tennessee Defendants desired to buy MPA from the cheapest and easiest source, thereby enhancing clinic profits.[166]

- Rather than participating in the subterfuge of papering over the individual prescription rule, the Tennessee Defendants should have declined to conspire with NECC.[167]

- The Tennessee Defendants could have purchased MPA from a reputable FDA approved drug manufacturer such as Pfizer. Purchasing from Pfizer was safer, although slightly more expensive. If the Tennessee Defendants had chosen to

---

[160] *Id.*, ¶379.
[161] *Id.*, ¶380.
[162] *Id.*, ¶381.
[163] *Id.*
[164] *Id.*, ¶386.
[165] *Id.*
[166] *Id.*, ¶386.
[167] *Id.*

purchase Depo-Medrol®, the safer name brand version of MPA manufactured by Pfizer, the fungal meningitis outbreak in Tennessee would have been avoided.[168]

The above described factual allegations more than articulate a plausible claim for civil conspiracy. Those detailed allegations describe the Defendants' concerted and illegal conduct, and they explain specifically the manner in which the Defendants' illegal conduct caused Plaintiffs' injuries.[169] Because this Court is required to take all of those factual allegations as true, while giving Plaintiffs the benefit of all reasonable inferences,[170] Defendants' motion to dismiss Plaintiffs' conspiracy claims should be denied.

## I.   Plaintiffs' Civil Conspiracy Claims Are Not Barred by the Statute of Limitations.

Plaintiffs' civil conspiracy claims are not barred by any statute of limitations because Plaintiffs filed their claims less than one year after their injuries occurred and less than one year after any plaintiff discovered the subject conspiracy. Under Tennessee's "date of discovery rule," a cause of action for any tort, including conspiracy, does not accrue until an injury occurs or is discovered.[171] In other words, a cause of action does not accrue until the plaintiff is actually injured and has a reasonable means of discovering that her cause of action exists.[172] Virtually all Tennessee Plaintiffs filed their claims within less than one year of suffering any injury. Virtually all Tennessee Plaintiffs filed their claims less than one year after any information about NECC and/or the fungal meningitis outbreak became public. All Tennessee Plaintiffs filed their claims within approximately five months of any plaintiff discovering that the Tennessee Defendants conspired with NECC to violate the individual prescription rule. Therefore, Defendants' statute of limitations defense is meritless.

The Tennessee Supreme Court first announced the "date of discovery rule" in *Teeters*, a medical malpractice case.[173] The rule provides that a statute of limitations does not begin to run

---

[168] *Id.*

[169] As explained above, the allegations in the First Amendment to the Master Complaint contain additional allegations specific to the actions of Saint Thomas Clinic and its related defendants. Additionally, the Master Complaint contains specific allegations that other clinics, like SSC, similarly conspired with NECC to violate Massachusetts Pharmacy Board regulations. Master Compl. ¶¶ 338-351. Those allegations must be accepted as true and are sufficient at this stage to state a claim for civil conspiracy against SSC and its related defendants. *Ruiz*, 496 F.3d at 5.

[170] *Ruiz*, 496 F.3d at 5.

[171] *Teeters v. Currey*, 518 S.W.2d 512, 515 (Tenn.1974).

[172] *Id.*

[173] *Teeters*, 518 S.W.2d at 515.

until an injury is discovered, or in the exercise of reasonable care and diligence, the injury should have been discovered.[174]  The rule responds to the unfairness of requiring that a plaintiff sue to vindicate a non-existent wrong, at a time when injury is unknown and unknowable.[175]  Since its announcement in *Teeters*, the "date of discovery rule" has been applied to various tort actions including product liability and civil conspiracy cases.[176]

The Tennessee Supreme Court in *McCroskey* addressed the question of when a cause of action for product liability accrues for purposes of triggering the statute of limitations.[177]  The *McCroskey* court held that causes of action accrue in tort cases "when the injury occurs or is discovered."[178]  The court reasoned that "[t]he public policy of our state is opposed to [requiring] that suit be filed when circumstances totally beyond the control of the injured make it impossible for him to bring suit."[179]  The Court stated:

> It is only just for us to decree that in **any tort action** the cause of action accrues when, and only when, the force wrongfully put in motion, produces injury.  We cannot embrace or continue any rule of law which charges a litigant with sleeping upon any right which he does not have.[180]

In other words, litigants are not required to prosecute claims before they are injured.

Contrary to the Tennessee Supreme Court's clear and controlling authority in *McCroskey*, the Defendants rely on an unpublished Tennessee Court of Appeals' opinion for the erroneous proposition that Tennessee's one year statute of limitations bars Plaintiffs' civil conspiracy claims.[181]  The Tennessee Defendants' reliance upon *Swafford* is misplaced.  The unreported *Swafford* opinion does not discuss the applicability of Tennessee's "date of discovery" rule in civil conspiracy cases.  In fact, the *Swafford* opinion does not even mention the Tennessee Supreme Court's controlling opinions in *Teeters* and *McCroskey*.  Therefore, *Swafford* is of no

---

[174] *Id.*
[175] *Id.*
[176] *McCroskey v. Bryant Air Conditioning Co.*, 524 S.W.2d 487 (Tenn.1975); *Hill v. A.O. Smith Corp.*, 801 F.2d 217 (6th Cir. 1986); and *Blakeney v. Kassel*, 1991 WL 87978 (Tenn. Ct. App. 1991).
[177] *McCroskey,* 524 S.W.2d at 489.
[178] *McCroskey*, 524 S.W.2d at 490 (quoting *Teeters v. Currey*, 518 S.W.2d 512, 515 (Tenn. 1974)).
[179] *Id.*
[180] *Id.* at 489 (emphasis added).
[181] *See Swafford v. Memphis Individual Practice Ass'n*, No. 02A01-96120CV099311, 1998 WL 281935 (Tenn. Ct. App. 1998).

precedential value regarding the applicability of Tennessee's "date of discovery rule" in civil conspiracy cases.

In *Hill v. A.O. Smith Corp.*,[182] the Sixth Circuit, interpreting Tennessee law, followed *McCroskey* and held that the "date of discovery rule" applies to civil conspiracy cases. The plaintiffs in *Hill* brought a conspiracy action against defendants, and the defendants moved to dismiss on statute of limitations grounds.  The defendants asserted that the "last overt act" in furtherance of the conspiracy was the date when the statute of limitations began to run.[183]  The Sixth Circuit, citing *McCroskey*, recognized that it would be unjust to permit the statute of limitations applicable to a conspiracy claim to begin running before the plaintiff is injured or discovers the nature of the conspiracy.[184]  The court stated, "[i]f the date of the last overt act were used to determine when the cause of action accrued in this case, it would be contrary to the clear judicial policy recognized by this court when construing *McCroskey*."[185]  Additionally, the court noted: "Tennessee does not favor doctrines that activate statutes of limitations before the plaintiff had knowledge of the injury."[186]

In *Blakeney v. Kassel*,[187] the Tennessee Court of Appeals applied the "date of discovery rule" in a civil conspiracy case and held that the statute of limitations does <u>not</u> begin to run until the plaintiff's injury occurs or is discovered.[188]  The court stated:

> Defendant asserts that the statute of limitations begins to run at the time of the last overt act in furtherance of the primary purpose of the conspiracy. . . . Defendant cites *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). Similarly, our Supreme Court held in 1971 in *Budget Rent-A-Car of Knoxville, Inc. v. Car Services, Inc.*, 225 Tenn. 342, 469 S.W.2d 360 (1971), that a conspiracy is a tort and that cause of action begins to run from the time of the last overt act.  However, in 1975, our Supreme Court departed from that rationale in *McCroskey v. Bryant Air Conditioning Co.*, 524 S.W.2d 487 (Tenn.1975), and held that a "cause of action accrues and the statute

---

[182] *Hill v. A.O. Smith Corp.*, 801 F.2d 217 (6th Cir. 1986).
[183] *Hill*, 801 F.2d at 224.
[184] *Id.* at 224–25.
[185] *Id.* at 225.
[186] *Id.* at 224–25.
[187] *Blakeney v. Kassel*, 1991 WL 87978 (Tenn. Ct. App. 1991).
[188] *Blakeney*, 1991 WL 87978 at *3-4.

of limitations commences to run when the injury occurs or is discovered."  524 S.W.2d at 491.  *McCroskey* also held that "all cases contra are overruled." *Id.* at 491.[189]

The court further stated: "It is axiomatic that no judicial remedy was available to this plaintiff until he discovered, or reasonably should have discovered, (1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) the identity of the defendant who breached the duty."[190]

  Defendants' motion asks this Court to reach an absurd result.  It asks this Court to rule that the statute of limitations began running against each individual meningitis victim before the first victim contracted fungal meningitis and before any information about NECC or the meningitis outbreak became public.  Information about the meningitis outbreak first became public on October 1, 2012.[191]  Approximately, seven months later, on April 30, 3013, Saint Thomas Clinic first revealed, through discovery in a state court proceeding, information establishing that it conspired with NECC, by using bogus patient lists, in order to circumvent Massachusetts law requiring individual prescriptions.[192]  The overwhelming majority of Tennessee Plaintiffs filed suit before September 30, 2013, less than one year after any information about NECC and/or the fungal meningitis outbreak became public.  Most Tennessee meningitis victims filed suit less than one year after they first began suffering symptoms of meningitis.  All of the Tennessee Plaintiffs filed suit approximately five months after any information about the subject conspiracy was first discovered.  Therefore, under the clear precedent of *Teeters, McCroskey, Hill* and *Blakeney*, Plaintiffs' claims were timely filed.  The Defendants' motion should be denied.[193]

---

[189] *Blakeney*, 1991 WL 87978 at *3.

[190] *Id.* (quoting *Foster v. Harris*, 633 S.W.2d 304 (Tenn. 1982)).

[191] *Press Release*, Tennessee Department of Health, October 1, 2012, http://news.tn.gov/node/9662.

[192] Saint Thomas Clinic's response to Interrogatory No. 2 in *Reed v. Saint Thomas Outpatient Neurosurgical Center*, LLC et al; Davidson County Circuit Court No. 13C417.

[193] In their motion to dismiss, the Tennessee Clinic Defendants claim that claims against SSC and its related defendants accrued no later than September 26, 2012.  Dkt. No. 772 at 56.  However, for similar reasons as articulated above, the clear precedent of *Teeters, McCroskey, Hill* and *Blakeney* applies with equal force to claims brought against SSC and as a result, there is no basis to find that conspiracy claims asserted by Plaintiffs are barred by the statute of limitations.

### J.        Plaintiffs State A Claim for Agency.

The Tennessee Defendants erroneously assert that Plaintiffs' claims that NECC acted as the agent of the Tennessee Defendants must be dismissed.[194]   In support of that position, the Tennessee Defendants maintain that seven specific factors "determine whether an agency relationship exists."[195]   That assertion is incorrect.   Tennessee agency law is not limited to a seven factor test.  The seven factor test relied upon by the Defendants deals with only one subset of a particular form of agency (i.e. whether a party is an employer or independent contractor).  It is not used by Tennessee Courts in order to determine whether a party is acting as the agent of another party in all instances.[196]

The Tennessee Supreme Court describes the concept of agency under Tennessee law as follows:

> In its broadest sense, the concept of agency includes every relation in which one person acts for or represents another. An agency relationship does not require an explicit agreement, contract, or understanding between the parties and when the facts establish the existence of an agency relationship, it will be found to exist whether the parties intended to create one or not. Whether an agency exists is a question of fact under the circumstances of the particular case; and whether an agency has been created is to be determined by the relation of the parties as they in fact exist under their agreement or acts.[197]

In other words, Tennessee law on agency is not simply limited to the employee/independent contractor analysis as the Tennessee Defendants would have this Court believe.  The question of agency is *fact* determinative and "includes every relation in which one person acts or represents another."[198]

Tennessee law does <u>not</u> require a plaintiff to plead with particularity the factual basis for an agency claim.  The Supreme Court has overturned the grant of a motion to dismiss when a

---

[194] Memo. at 62.
[195] *Id.*
[196] *See Wilson v. Thompson Constr. Co.*, 86 S.W.3d 536, 541 (Tenn. Ct. App. 2001) (holding that the seven factor test relied upon by the Tennessee Defendant is used to determine "whether the relationship…is that of employer-employee or general contractor-independent contractor").
[197] *White v. Revco Discount Drug Ctrs., Inc.*, 33 S.W.3d 713, 723 (Tenn. 2001) (internal quotations and citations omitted).
[198] *Id.*

complaint contains only superficial allegations that an agency relationship exists and federal district courts have denied motions to dismiss based on similar allegations.[199]

In the present case, Plaintiffs' pleadings contain allegations more than sufficient to state an agency claim. The Master Complaint contains detailed factual allegations related to the use of compounding pharmacies to procure drugs for the Tennessee Defendants to administer to their clients and how the Tennessee Defendants controlled the procurement of drugs from NECC.[200]

Even though allegations of specific facts are not required, the Master Complaint contains additional allegations that: 1) the Tennessee Defendants contracted with NECC to procure compounded drugs to administer to their patients, 2) a consensual fiduciary relationship arose when the Tennessee Defendants contracted with NECC to procure compounded drugs from NECC; 3) NECC agreed to act as the agent of the Tennessee Defendants when compounding and delivering compounded drugs to the Tennessee Defendants to be sold and administered to the Tennessee Defendant's patients; 4) the Tennessee Defendants controlled the procurement of the drugs from NECC; and 5) NECC acted within the scope of its agency when it negligently and grossly negligently compounded drugs on behalf of the Tennessee Defendants.[201]

The Master Complaint's robust allegations clearly contain facts (which must be taken as true) sufficient to give the Tennessee Defendants "fair notice of what the claim is and the grounds upon which it rests." [202] Those allegations demonstrate that the relationships between NECC and the Tennessee Defendants "include [a] relation in which [NECC] acted for or

---

[199] *Givens v. Mullikin*, 75 S.W.3d 383, 398-99 (Tenn. 2002) (overturning grant of motion to dismiss based on two paragraphs in complaint that alleged agency relationship between insurer and law firm because "a complaint need not contain in minute detail the facts that give rise to the claim so long as the complaint does contain allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial."); *see also Union Leasing, Inc. v. Advantage, Inc.*, Case No. 3-12-0666, 2012 U.S. Dist. LEXIS 154056 (M.D. Tenn. Oct. 26, 2012) (denying motion to dismiss where claim merely alleged that party was the agent of a third party and that the party's conduct giving rise to liability was "within the scope of the agency"); *Hester v. United Healthcare Insurance Co.*, Case No. 1:08-cv-105, 2009 U.S. Dist. LEXIS 3378 (E.D. Tenn. Jan. 16, 2009) (denying motion to dismiss where complaint contained an allegation that defendant's "personnel" committed negligence because at the motion to dismiss phase "plaintiff is not required to plead specific facts, he must only give the defendant fair notice of what the claim is and the grounds upon which it rests.") (internal citations and quotations omitted).
[200] Master Compl. ¶¶6, 48-53, 80-81, 157-158, 162-67, 170-82, 330-36.
[201] *Id.* at 331-335.
[202] *Hester*, 2009 U.S. Dist. LEXIS 3378 ("[P]laintiff is not required to plead specific facts, he must only given the defendant fair notice of what the claim is and the grounds upon which it rests.") (internal citations and quotations omitted); *White*, 33 S.W.3d at 723; *see also Givens*, 75 S.W.3d 383 at 398-99 ("[A] complaint need not contain in minute detail the facts that give rise to the claim so long as the complaint does contain allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial."); *Union Leasing*, 2012 U.S. Dist. LEXIS 154056 (denying motion to dismiss where claim merely alleged that party was the agent of a third party and that the party's conduct giving rise to liability was "within the scope of the agency").

represents [the Tennessee Defendants]."[203]   In short, Plaintiffs' pleadings adequately allege an agency relationship.

## IV.      CONCLUSION

Through their motion, the Tennessee Defendants ask this Court to dismiss each and every claim that would require the Tennessee Defendants to stand behind the defective products that they selected and sold for profit.  The Tennessee Defendants request dismissal of those claims even though they acquired contaminated steroids from NECC in bulk illegally and then injected those lethal steroids into the spines of patients.  Dismissal of Plaintiffs' strict product liability claims and other similar claims would cause this litigation to become mired for years in fault shifting and finger pointing common in comparative fault cases.  Such a result would violate Tennessee law and squander judicial resources.   Allowing Plaintiffs' strict product liability claims to proceed, on the other hand, would permit the parties to move past such blame shifting. Such an approach would provide just and expedient compensation to innocent Tennessee victims by requiring the Tennessee Defendants to compensate victims for all harm caused by the compounded medications which the Tennessee Defendants selected and sold.  Such an approach would result in justice that is swift, equitable, and consistent with the law and public policy of Tennessee.  For the reasons stated above, the Tennessee Defendants' Motion to Dismiss Global Claims (Dkt. No. 771 and 772) should be denied.[204]

Respectfully submitted,

Dated:  March 28, 2014

/s/ **George Nolan**

George Nolan (B.P.R. No. 14974)
LEADER, BULSO &  NOLAN, PLC
414 Union Street, Suite 1740
Nashville, Tennessee  37219
(615) 780-4111
gnolan@leaderbulso.com

*As designated counsel on behalf of the*
*Plaintiffs' Steering Committee*

---

[203] *Id.*

[204] In their "Request for Relief," the Tennessee Defendants also seek dismissal of claims based on failure to comply with certain provisions of the Tennessee Health Care Liability Act (Memo. at P. 73, ¶ 2).  The basis of that request is the subject of another Motion to Dismiss filed by the Tennessee Defendants (Dkt. No. 770).  The PSC, and if necessary individual plaintiff's counsel, will address the merits of that position in more detail in response to that motion (Dkt. No. 770), the response of which is currently due on April 14, 2014.

Thomas M. Sobol
Kristen Johnson Parker
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Telephone:  (617) 482-3700
Facsimile:  (617) 482-3003
tom@hbsslaw.com
kristenjp@hbsslaw.com

*Plaintiffs' Lead* Counsel

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI  48075
Telephone:  (248) 557-1688
Facsimile:  (248) 557-6344
marc@liptonlawcenter.com

Patrick T. Fennell
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, VA  24016
Telephone:  (540) 342-2000
pfennel@crandalllaw.com

J. Gerard Stranch, IV
Benjamin A. Gastel
BRANSTETTER, STRANCH & JENNINGS PLLC
227 Second Avenue North, 4th Floor
Nashville, TN  37201
Telephone:  (615) 254-8801
Facsimile:  (615) 255-5419
gerards@branstetterlaw.com

*Plaintiffs' Steering* Committee

Elizabeth J. Cabraser
Mark P. Chalos
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
ecabraser@lchb.com
mchalos@lchb.com

Federal*/State Liaison*

Kim Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Ave., Suite 365
Boston, MA  02116
Telephone:  (617) 933-1265
kdougherty@myadvocates.com

Mark Zamora
ZAMORA FIRM
6 Concourse Way, 22nd Floor
Atlanta, GA  30328
Telephone:  (404) 451-7781
Facsimile:  (404) 506-9223
marc@markzamora.com

## CERTIFICATE OF SERVICE

I, George Nolan, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system.  Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

/s/ **George Nolan**
George Nolan