UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
PHARMACY CASES LITIGATION          )
                                   )
                                   )
                                   )
                                   )
                                   )
                                   )



BEFORE:  THE HONORABLE RYA W. ZOBEL




**STATUS CONFERENCE**




John Joseph Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, MA 02210


April 10, 2014
2:00 p.m.


Catherine A. Handel, RPR-CM, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 5205
Boston, MA 02210
E-mail: hhcatherine2@yahoo.com

1    APPEARANCES:

2     For The Plaintiffs:

3         Hagens, Berman, Sobol, Shapiro LLP, by THOMAS M. SOBOL,
     ESQ., and KRISTEN JOHNSON PARKER, ESQ., 55 Cambridge Parkway,
4     Suite 301, Cambridge, MA 02142;

5
          Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
6     ESQ., One Nashville Place, 150 Fourth Avenue, North, Suite 1650,
     Nashville, TN 37219-2423;

7

8         Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ., 366 Elm
     Avenue, SW, Roanoke, VA 24016;

9

10        Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,
     IV, ESQ., 227 Second Avenue North, Nashville, TN 37201-1631;

11

12
          Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
13    Street, Suite 500, Boston, MA 02114;

14

15
      FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

16

17        Cohen, Placitella & Roth, P.C., by MICHAEL COREN, ESQ.,
     2 Commerce Square, 2001 Market Street, Suite 2900, Philadelphia,
18    PA 19103;

19
          Brown Rudnick, by DAVID J. MOLTON, ESQ., Seven Times Square,
20    New York, NY 10036;

21
          Brown Rudnick, by KIERSTEN A. TAYLOR, ESQ., One Financial
22    Center, Boston, MA  02111;

23

24     (Appearances continued on next page.)

25

1    For the Defendants:

2

3        Harris Beach PLLC, by FREDERICK H. FERN, ESQ., 100 Wall
     Street, New York, NY 10005;

4

5        Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ.,
     1150 Huntington Building, 925 Euclid Avenue, Cleveland, OH
     44115-1414;

6

7        Todd & Weld LLP, by CORRINA L. HALE, ESQ., and CHRISTOPHER
     R. O'HARA, ESQ., One Federal Street, Boston, MA 02110;

8

9        Ulmer & Berne LLP, by JOSHUA A. KLARFELD, ESQ., 1660 West
     2nd Street, Suite 1100, Cleveland, OH 44113-1448;

10

11       Hinshaw & Culbertson LLP, by DANIEL E. TRANEN, ESQ., 28
     State Street, 24th Floor, Boston, MA 02109;

12

13       Hermes, Netburn, O'Connor & Spearing, P.C., by PETER G.
     HERMES, ESQ., 265 Franklin Street, 7th Floor, Boston, MA
14   02110-3113;

15

16       Nutter, McClennen & Fish LLP, by STEPHEN J. BRAKE, ESQ.,
     World Trade Center West, 155 Seaport Boulevard, Boston, MA
17   02210-2604;

18       Fulbright & Jaworski, LLP, by MARCY H. GREER, ESQ., and
     ADAM T. SCHRAMEK, ESQ., 98 San Jacinto Boulevard, Suite 1100,
19   Austin, TX 78701;

20

21       Michaels, Ward & Rabinovitz LLP, by DANIEL M. RABINOVITZ,
     ESQ., One Beacon Street, Second Floor, Boston, MA 02108;

22

23       Donoghue, Barrett & Singal, PC, by BRUCE A. SINGAL, ESQ.,
     One Beacon Street, Suite 1320, Boston, MA 02108-3113;

24

25    (Appearances continued on the next page.)

1   For the Defendants: (Continued.)

2

3       Sloane & Walsh LLP, by ROBERT H. GAYNOR, ESQ., Three Center
Plaza, Boston, MA 02108;

4

5       Goodwin Procter LLP, by ROBERTO M. BRACERAS, ESQ., and JOSH
LAUNER, ESQ., Exchange Place, 53 State Street, Boston, MA 02109;

6

7       Gideon, Cooper & Essary, PLLC, by CHRIS J. TARDIO, ESQ.,
315 Deaderick Street, Suite 1100, Nashville, TN 37238;

8

9       Smith Duggan Buell & Rufo LLP, by BARBARA HAYES BUELL, ESQ.,
55 Old Bedford Road, Lincoln, MA 01773-1125;

10

11

    FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
12  NECP, INC.:

13

        Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
14  Street, Suite 2400, Boston, MA 02110-1724;

15

    APPEARING TELEPHONICALLY:
16
    Anthony Agudelo
17  John T. Alexander
    Erin Amos
18  Anne Andrews
    Stephanie Arndt
19  Evan Baker
    Jennifer Bean
20  Rebecca Blair
    Bryan Bleichner
21  S. James Boumil
    Athena Brick
22  Robert Briley
    Brent Brown
23  Chris Cain
    Daniel Clayton
24  Mark Dancer
    Mike Derrick
25
    (Appearances continued on the next page.)

1    APPEARING TELEPHONICALLY: (Cont'd)

2    Kimberly Dougherty
     Lauren Ellerman
3    Frank Federico
     Dan Frith
4    David Gibson
     Mary T. Gidaro
5    Jim Girards
     Deborah Gresco-Blackburn
6    John Griffith
     Robert Hall
7    Brook Hastings
     Sharon Houston
8    Michael Hugo
     Doug Jones
9    Jeff Keiser
     Jaime Kendall
10   James Kennamer
     James Stephen King
11   Nicole Kreklau
     Jonathan R. Krohnfeldt
12   Bill Leader
     Greg Lyons
13   Thomas Martin
     Greg Mintzer
14   Leslie Muse
     Daniel Myers
15   Jonathan Nace
     Nolan Nicely
16   George Nolan
     Alyson Oliver
17   Kristi Osterday
     Laura Pittner
18   Robert Randall
     Steven Resnick
19   Chadwick Rickman
     William N. Riley
20   J. Kyle Roby
     Harry Roth
21   Sean Roth
     Karen Schaeffer
22   Scott Sexton
     Stephanie Slabon
23   Douglas Small
     Bridge Stratton
24   Mitchell Toups
     Amanda Williams
25   Melvin Wright
     Robert A. Young

```
 1                      P R O C E E D I N G S

 2         (The following proceedings were held in open court before

 3    the Honorable Rya W. Zobel, United States District Court Judge,

 4    United States District Court, District of Massachusetts, at the

 5    John J. Moakley United States Courthouse, One Courthouse Way,

 6    Boston, Massachusetts, on April 10, 2014.)

 7              THE COURT:  Good afternoon.  Please be seated.

 8              COURTROOM DEPUTY CLERK URSO:  This is 13-MDL-2419, In

 9    Re:  New England Compounding Cases.

10              THE COURT:  Good afternoon those on the telephone

11    with whom I may not have spoken before.

12              This is the docket sheet (indicating).

13              MR. SOBOL:  That's not the file.  That's the docket.

14              THE COURT:  Simply identify those of you who are

15    actively involved in these matters.  The first inch-and-a-half

16    is just the list of the cases.  There has to be a simpler way

17    to do this.  I charge you with trying to figure out what it

18    might be.

19              Plaintiffs, I think we start with Mr. Sobol, right?

20              MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol

21    for the lead counsel.

22              THE COURT:  For some reason you don't appear until

23    Page 10 or thereabouts.

24              MR. SOBOL:  As you know, your Honor, I'm usually

25    trying to hide.
```

```
1                 THE COURT:  I can understand that.

2                 MR. SOBOL:  While I'm standing, your Honor, you're

3       looking for that, do you have the proposed agenda?

4                 THE COURT:  I have it.  Thank you very much.

5                 Okay.  Mr. Sobol.  Ms. Parker.

6                 MS. PARKER:  Yes, your Honor.

7                 THE COURT:  And Mr. Stranch.

8                 MR. STRANCH:  That's correct, your Honor.

9                 THE COURT:  Who else is at counsel table?

10                MR. CHALOS:  Mark Chalos, your Honor, for the PSC.

11                MR. FENNELL:  Patrick Fennell, your Honor, also for

12      the PSC.

13                THE COURT:  Now, that's it.

14                For defendants.  Mr. Fern.

15                MR. FERN:  Good afternoon, Judge.

16                THE COURT:  Mr. Tranen.

17                MR. TRANEN:  Yes, your Honor.

18                THE COURT:  Okay, got you.  Mr. Moriarty?

19                MR. MORIARTY:  Good afternoon, your Honor.

20                THE COURT:  This is much easier.  I need to know who

21      is next to Mr. Tranen.

22                MR. GAYNOR:  Robert Gaynor on behalf of the

23      individuals, your Honor.

24                THE COURT:  You know what I would ask?  If counsel

25      could, please, before the next meeting let me have a list of
```

```
1    those who are actually going to participate in these
2    proceedings and then I won't have to wander through this
3    entire docket sheet, which has mostly people who never say a
4    peep.
5              MR. SOBOL:  We'll file that as an attachment to the
6    agenda.
7              THE COURT:  That would be very helpful.  Thank you
8    very much.
9              I think I'll just give up and you identify yourselves
10   if you need to speak.  So, let us turn to the agenda, which is
11   really much more important.
12             Mr. Sobol, I guess you're going to give the report to
13   the Court.
14             MR. SOBOL:  As well as two other folks, at least,
15   your Honor, but let me start by saying this:
16             The first matter, of course, on the proposed agenda
17   is the status of the proposed settlement in principle with the
18   insiders, and just a few -- a couple of sentences about that
19   first just to make it clear.
20             The proposed settlement is with the Cadden and
21   Conigliaro families and various entities that they own and
22   control that are affiliated with them.  The notion --
23             THE COURT:  And their insureds?
24             MR. SOBOL:  Excuse me?
25             THE COURT:  And their insureds?
```

```
 1              MR. SOBOL:  That's correct.  As well as the two other

 2   insurers.  There are some insurers with whom there is not a

 3   solution yet, but there are two insurers with whom there is a

 4   proposed settlement.

 5              There has been a lot of progress, a lot of lawyering

 6   over the past four years, and my understanding is that the

 7   settlement should be signed in a matter of days or shortly,

 8   but that is certainly the way I express it because I'm trying

 9   to push people in a matter of days, but I think we can report

10   shortly.

11              Also, to remind the Court what that means and what it

12   does not mean.  What it means is that there will be an

13   agreement now signed to go forward with a funding program as a

14   part of a bankruptcy plan that would occur basically over the

15   months of 2014, and that's, essentially, I think the best

16   report with respect to that at this time.

17              I will say, however, that there's -- the reverse side

18   of that, that album, if you will, is a description of what's

19   therefore left, which Ms. Johnson Parker will handle at a

20   later point in the proceeding, but I think I'll just stick

21   with the proposed settlement at this point and yield to my

22   brother.

23              MR. GOTTFRIED:  Good afternoon, your Honor.  Michael

24   Gottfried for the trustee.

25              I think I would add just a little bit to Mr. Sobol's
```

1    report.  The settlement with NECC's insurers --

2              COURTROOM DEPUTY CLERK URSO:  Is that on?  That's not

3    on.  There's a button in the back that you can press to make

4    it green.

5              MR. GOTTFRIED:  My apologies, your Honor.

6              THE COURT:  Start again.

7              MR. GOTTFRIED:  So, Michael Gottfried for the --

8              THE COURT:  The people on the phone couldn't hear you

9    without the microphone.

10              MR. GOTTFRIED:  Certainly.  Michael Gottfried for the

11    trustee.

12              Just add a couple of points to Mr. Sobol's report.

13    The settlement with the two NECC insurers is due to be signed

14    tomorrow by the insiders and the insurers.  I think there are

15    still one to two issues with the insiders that people are

16    working very hard at resolving and we are hopeful that that

17    will be resolved shortly.

18              Once those agreements are signed -- and we expect

19    that they all will be resolved -- they'll be filing a motion

20    with the bankruptcy court for approval of those settlements.

21    It will be our anticipation that probably about 30 days or so

22    after those are filed, to hold a hearing and at that point the

23    settlements, hopefully, will be approved by the bankruptcy

24    court.

25              THE COURT:  Does the settlement -- or do the

1    settlements allocate funds as between the unsecured creditors

2    and other creditors and the plaintiffs in this case?

3            MR. GOTTFRIED:  I will let Mr. Molton handle that.

4            MR. MOLTON:  Your Honor, David Molton for the

5    creditors' committee from Brown Rudnick.

6            These settlements merely are the funding mechanisms

7    by which the moneys are going to go into the estate.  There

8    will then be -- and we anticipate -- all the bankruptcy

9    parties anticipate as the spring comes around and turns into

10   early summer, that there will be planned discussions, planned

11   negotiations and planned drafting that will allocate those

12   moneys into various pots:  A tort trust, a non-tort general

13   creditors' trust, or maybe that will be left with the

14   post-confirmation debtor for the purpose of distribution to

15   general unsecured tort claimants, but that's a subject that is

16   all on our minds, but that isn't the part of the job.  The

17   settlements just get the money over to the bankruptcy estate

18   where the parties will be engaged in discussions to create a

19   plan that fairly and equitably allocates that money in

20   accordance with the bankruptcy code.

21           THE COURT:  There are several motions pending now

22   that appear, at least on the part of some of the parties, to

23   hinge on the settlement, and I wonder whether they will be

24   ripe when this is signed or will those be -- from the point of

25   view of those who object to the motions going forward, would

```
1    they hinge on -- hold it just a second, Mr. Sobol.

2            MR. SOBOL:  I'm sorry.

3            THE COURT:  Would the resolution of those motions,

4    like discovery, would that be something that should be decided

5    independent of the settlement after the signing of the funding

6    or is that -- should there still be some deference paid to the

7    bankruptcy court with respect to those kinds of issues?

8            MR. GOTTFRIED:  Well, the trustee's position, as

9    indicated in its recent filing, is that it thinks that -- he

10   thinks that the stay should remain in place at least until

11   such time as the settlements are approved by the bankruptcy

12   court.  At that point he thinks there should be a discussion

13   as to what should happen next and, at a minimum, before

14   discovery just gets initiated, there should be meet-and-

15   confers, a landscape that he believes will be changed at that

16   point, and there should be a -- if it's decided that discovery

17   does need to go forward at that point, that it could be done

18   through the meet-and-confer process in an orderly, targeted

19   fashion.

20           The worst thing here would be to have the estate

21   burdened by getting 50 requests from 50 different parties as

22   opposed to some, you know, coordinated process.

23           So, our view is certainly at this point, those

24   motions would be best taken up after the settlements are

25   approved and then we could talk about the process that I just
```

1    suggested to the Court.

2         THE COURT:  I wasn't really thinking of hearing

3    argument at the moment, but if you want to make a comment,

4    that's fine.

5         MR. SOBOL:  We'll address it later on, then, and I'll

6    save my powder for then.

7         THE COURT:  Okay.  But you're still -- no.  Ms.

8    Parker now, right?  Yes?

9         MS. PARKER:  Yes, your Honor, if you're ready to move

10   on to mediation efforts.

11        THE COURT:  Okay.

12        MS. PARKER:  So, as the Court is aware, we have

13   various parties that are participating in both a court-

14   sanctioned mediation process as well as a separate private

15   mediation arrangement.  On the first matter, I'll turn to Rick

16   Ellis to discuss the status of the ARL mediation.

17        MR. ELLIS:  Yes, your Honor.  Rick Ellis for the

18   plaintiffs.

19        We had a two-day mediation session last week and I'm

20   pleased to report we have reached a settlement in principle

21   with ARL, which is the outside testing laboratory, and we're

22   in the process of drafting settlement papers as we speak.

23        THE COURT:  This is the Cleanroom defendants?

24        MR. ELLIS:  This is the outside testing company.

25   They tested the final products -- or the products that were

1    shipped out.

2              THE COURT:  Okay.

3              MS. PARKER:  As to the other parties in mediation,

4    your Honor, Liberty, who is the entity that built and

5    installed the Cleanroom.

6              THE COURT:  That's the one I was thinking.

7              MS. PARKER:  That mediation has, unfortunately,

8    reached a standstill, due to a lack of production of documents

9    from NECC disclosing Liberty's involvement in the Cleanroom on

10   an ongoing basis since the time of installation.  We now have

11   had some additional documents produced by NECC.  Those

12   documents have either been produced to Liberty or are in the

13   process of being produced to Liberty now and we're optimistic

14   that will get that mediation moving forward again.

15             As to Inspira, who is a New Jersey pain clinic, that

16   entity is participating in a private mediation.  The

17   plaintiffs have made a demand of Inspira and the mediation is

18   hopefully being scheduled for the first week in June.

19             As to Victory, who is another one of the national

20   defendants --

21             THE COURT:  Let me go back for a moment to Liberty.

22             Is there a court that is in any way supervising or

23   encouraging the production of documents or is it done entirely

24   between the parties?

25             MS. PARKER:  It has been done so far, your Honor,

1   through an informal process wherein NECC was sharing documents

2   with the Plaintiffs' Steering Committee subject to some

3   provisions.  It has also been done with the assistance of the

4   mediator there, which is Ms. Carmin Reiss, and the trustee and

5   the various parties in mediation have worked together to

6   attempt to resolve that issue.  To date we have not had to ask

7   this Court to intercede, but it would be this Court that has

8   the power and ability to do so, if necessary.

9           THE COURT:  Despite the stay?

10          MS. PARKER:  That's correct, your Honor.  This Court,

11  pursuant to the mediation order, has the ability to intercede

12  and to make decisions to move the mediation along.

13          THE COURT:  Mr. Gottfried, do you agree?

14          MR. GOTTFRIED:  I think you do have that power.  I

15  also would simply say that I think we have now produced

16  everything they're looking for.  So, I don't think there's any

17  reason to intercede.

18          MR. HERMES:  Your Honor, my name is Peter Hermes.  I

19  represent Liberty Industries.

20          There were arrangements finalized this morning for

21  production of some 44,000 pages of documents which have not

22  been produced.  The mediation with Liberty will not go forward

23  until such time as we have the opportunity to review and

24  analyze those documents and determine whether they establish

25  liability or even potential liability on the part of my

1    client.  This has been done in cooperation with the

2    Plaintiffs' Steering Committee.

3         There was a motion which was before the Court which

4    has been withdrawn which would purportedly change the

5    mediation order.  The parties have come to an accommodation on

6    that.  The trustee cooperated with the Plaintiffs' Steering

7    Committee and me in order to bring that about.

8         THE COURT:  Is there anything for me to do at the

9    moment?

10        MR. HERMES:  There is one motion on the list today to

11   extend the time for my client to answer.  There is a hole in

12   the various orders that says the affiliated defendants do not

13   have to answer for some period of time.  However, the non-

14   affiliated defendants -- we have filed a motion to which no

15   objection has been filed.  It's Item C at the bottom of Page

16   3, the top of Page 4.  That motion would continue the time for

17   either side -- or continue the time for my client to answer

18   until either July 31st of this year or after either side opted

19   out of the mediation.

20        THE COURT:  Well, I made a note to that motion which

21   says, "Why not allow it?"

22        MR. HERMES:  I would like the Court to allow it, if

23   your Honor pleases.

24        THE COURT:  Any objection?

25        MS. PARKER:  We have consented to that motion, your

1   Honor.

2           THE COURT:  It is allowed.

3           MR. HERMES:  Thank you, your Honor.

4           THE COURT:  How about the other two motions for

5   extension of time, which have nothing to do with Liberty,

6   Cincinnati Pain and a briefing schedule?

7           MS. PARKER:  The PSC has assented and agreed to both

8   of those.  So, we have no objection.

9           THE COURT:  So they are allowed as well.

10          MS. PARKER:  Thank you, your Honor.

11          THE COURT:  Okay.  Carry on.

12          MS. PARKER:  So, as to Victory, who is another

13  mediating defendant, Victory is one of the national

14  defendants.  They are an HVAC servicing company.  Victory has

15  requested some input from experts.  We have retained an expert

16  and are in the process of providing that information to

17  Victory.  I think everything is moving along in that

18  mediation.

19          As to two Florida pain clinics who have nominally

20  opted into mediation, we have not had much success in actually

21  communicating with them and moving that ball forward.  So, the

22  PSC has made it a priority within the next week to identify

23  whether we actually believe those mediations will be

24  successful or whether or not we need to revisit the

25  arrangements with those clinics.

1          And, finally, that brings us to one other entity who

2     is mediating pursuant to a confidential order, and I will say

3     simply that that mediation is also moving along.

4          As a practical matter, given the timing of the

5     settlement and what we anticipate the timing of a bankruptcy

6     plan and then approval, hopefully, of that plan, mediations

7     will need to be wrapped up by the month of June in order for

8     those mediating defendants to be able to participate in the

9     bankruptcy plan and get the non-debtor releases that they are

10    ostensibly seeking.  So, June really now becomes the target

11    date for deciding whether or not these mediations are

12    functional or whether we need to resume litigating against

13    those participating defendants.

14          THE COURT:  Thank you very much.

15          MS. PARKER:  I think that brings us, your Honor, if I

16    may -- the Court might wonder where we're left after we deal

17    with the settlements and assuming that the mediating

18    defendants all, in fact, mediate to a successful conclusion.

19    So, if I may.  The PSC would wind up in a position where we

20    would be litigating against the following:

21          UniFirst, who would be the single national defendant

22    remaining in the litigation --

23          THE COURT:  Which is the Cleanroom -- the other

24    Cleanroom defendant?

25          MS. PARKER:  Which is the company who was hired to

 1   clean the Cleanroom, yes, your Honor.

 2            MR. ELLIS:  Well --

 3            MS. PARKER:  As well as other things --

 4            MR. BRACERAS:  It was just 90 minutes once a month,

 5   your Honor, just to put it in perspective.

 6            MS. PARKER:  The "cleaners," we'll call them.

 7            We're also then litigating against some Tennessee

 8   defendants and I would lump those into two categories.  You

 9   have the St. Thomas entities and the St. --

10            THE COURT:  They just want out.

11            MS. PARKER:  Excuse me?

12            THE COURT:  They just want out.

13            MS. PARKER:  Well, first they want out, yes, that's

14   true.  They filed several motions to ask the Court to do that.

15            So, you have the St. Thomas entities who are St.

16   Thomas Health, St. Thomas Network, two Ascension entities, as

17   well as St. Thomas Hospital, and then you have another group

18   of Tennessee defendants that we refer to as "the Tennessee

19   clinic defendants," which includes St. Thomas Clinic or Stop

20   and See, Dr. Culclasure, Ms. Schamberg, the Howell Allen

21   Clinic, Specialty Surgery Center in Crossville, and Dr. Lister.

22            We then have one New Jersey clinic against whom a

23   number of cases have been filed.  That clinic is Premier.

24   You'll recall that in the mediation, the other New Jersey

25   clinic that seems to have had a number of cases filed against

1   it, Inspira, is in the process of mediating its claim, which

2   leaves the PSC in a position of litigating against Premier.

3        And then we have only a handful of clinics with four

4   or fewer cases against them and rather than identify all those

5   clinics, I'll just give you the states to give you a sense of

6   what's remaining:

7        So, clinics in Ohio, Minnesota, New Hampshire,

8   California, Rhode Island and Illinois each have four or fewer

9   cases against them.  I'll say that most of those are single-

10  clinic cases where one patient has named a clinic as a

11  defendant.

12       THE COURT:  What's happening with them?  They're just

13  sitting there?

14       MS. PARKER:  At the moment, they are just sitting

15  there, your Honor.  A couple of those clinics have filed

16  motions to dismiss, some of which will be the subject of the

17  extensions that you have just granted now, the assented-to

18  extensions and briefing schedule on those.  Some of them are

19  just sitting there.  Some of those clinics have not moved to

20  dismiss those cases.  So, those cases remain before the Court.

21       So, that's where we would be in a situation where the

22  settlement goes forward and all of the ongoing mediations are

23  successful.  The universe that we're looking at would be

24  active litigation against the Tennessee defendants, the New

25  Jersey defendants, and then a handful of other pain clinics,

1    as well as UniFirst as the remaining national defendant.

2    Thank you.

3            MR. COREN:  Your Honor, Michael Coren, co-chair,

4    creditors' committee in the bankruptcy.

5            I just want to add one, that there is more to come,

6    other states.  For example, Maryland will shortly be in suit.

7    That I can tell you because I'm preparing some of the papers

8    for those to go into suit on behalf of my individual

9    plaintiffs that my firm represents, and there are others.

10           There will be some additional -- some of the states

11   will see more cases filed because we are now approaching the

12   end of the second year in the two-year states.  There will be

13   more cases coming from other states, like the Carolinas, to

14   give you an example, where there are the three-year statutes

15   of limitations, including Florida.  So, I guess we're in the

16   eye of the storm at the moment.

17           There were 3,000 -- to give you some sense of some

18   numbers, there were 14,000 vials administered.  Some people

19   got two shots, three shots.  So, it's not 14,000 people, but

20   to give you maybe a better number, 3,000 individuals filed

21   claims for either wrongful death or tort injury in the

22   bankruptcy.

23           THE COURT:  Thanks for that good news.

24           (Laughter.)

25           MR. COREN:  And we're trying -- one of the things

1    that I -- if I may just underscore.

2           There is a window of opportunity here for these

3    clinics to try to resolve their liability, but there's a

4    finite time now because we are advancing the plan of -- you

5    know, the Chapter 11 plan, which is a principal function of my

6    committee, and after this June date that Ms. Parker refers to,

7    the ship is going to sail.  So, now is the time if there is an

8    interest in trying to resolve your liability on a global basis

9    as opposed to somewhat of Armageddon now.

10          To the extent that you may need to be asked to allow

11   them into the mediation order No. 394, we're willing to assent

12   to those motions.  I'm sure the PSC is willing to assent to

13   those motions.  So, I make a plea for them -- to consider them.

14          THE COURT:  Okay.  That takes care of Item 2 of

15   Part A.  The insurance declaratory actions, Ms. Parker.

16          MS. PARKER:  Yes.  Thank you, your Honor.

17          A number of insurance companies who face potential

18   exposure as a result of insuring defendants that have been

19   named in these lawsuits have filed declaratory judgment

20   actions.  Two of those involve defendant Ameridose and are

21   pending in front of Judge Saylor in this district.  Both of

22   those actions have been scheduled for a status conference on

23   Monday, April 14th, and I will mention to the Court that the

24   Plaintiffs' Steering Committee has moved to intervene to

25   assert the plaintiff victims' rights in those actions, and

1   we'll be addressing those motions hopefully with Judge Saylor

2   on Monday.

3           As to the ARL declaratory judgment action, my

4   understanding with the counsel who are dealing with a

5   tentative settlement with ARL are determining how best to

6   resolve and tie up that action, but we believe that that will

7   be resolved by the next status conference, hopefully, which

8   brings us to the most-recently filed action, which is an

9   insurance declaratory judgment action filed by Star Insurance

10  Company against Michigan Pain.

11          THE COURT:  That's a new one?

12          MS. PARKER:  Yes.

13          THE COURT:  New on the list?

14          MS. PARKER:  Yes, your Honor, that's very new.  In

15  fact, I understand it's been filed but not has even been

16  served yet.  That is an action against Michigan Pain

17  Specialists, which is the largest clinic in Michigan and we

18  believe has the largest number of victims in the State of

19  Michigan, but not --

20          THE COURT:  Well, who are not yet parties -- they're

21  not plaintiffs in this case?

22          MS. PARKER:  That is largely correct, your Honor.

23          THE COURT:  The clients of the pain specialist

24  company are not yet in this case?

25          MS. PARKER:  I believe there are, in fact, maybe two

1    or three cases on file in this MDL involving Michigan

2    plaintiffs, but it is not the universe and they are not named

3    in many short-form complaints, for example, the way the

4    Tennessee or New Jersey defendants were, that's correct.

5             THE COURT:  Now, status of discovery, Mr. Sobol.

6             I assume that the motion to partially lift discovery

7    should await at least for the next step of the settlement,

8    which it seems to hinge on.

9             MR. SOBOL:  So, the position of the PSC, my position,

10   your Honor, is no, it shouldn't wait any longer.

11            THE COURT:  But everybody else thinks otherwise.

12            MR. SOBOL:  Yes, that's right.  So, I'm going to be

13   swimming uphill here, but would you give me a two-minute shot

14   at it?  Thank you.

15            THE COURT:  Is this a motion that I should now

16   decide?

17            MR. SOBOL:  Yes.  Well, let me be serious and explain

18   why it is that I think this is actually important to protect

19   the interest of the victims.

20            First, let me make it clear, if the settlement goes

21   through and if Judge Boroff approves the settlement, the

22   settlement explicitly says that discovery goes forward.  It

23   doesn't say --

24            THE COURT:  Why not wait a month or two?  I mean, if

25   it's going to be signed tomorrow and there's an approval

1    hearing within two months.

2           MR. SOBOL:  Because we're trying to get discovery

3    going so that we can push pain clinics to be able to settle

4    things before June or July of this year so that we can put the

5    money into a pot.  Now, let me be very concrete with it with

6    respect to that.

7           One of the positions St. Thomas entities have been

8    taking is, Let's not do anything in the case -- as far as I

9    understand it, Let's not do anything in the case yet because

10   we can't get any discovery from NECC.

11          Until this morning we were having a problem with

12   Liberty because Liberty was saying, We're not going to go

13   forward with our mediation unless we have some documents,

14   right.  There are other entities that are out there that we

15   would like to be able to say, If you need some information,

16   here's the information you're going to be able to need.  Let's

17   go to mediation posthaste and move forward with it.

18          This is also something that has to happen, anyway.

19   I've made that position clear to Judge Saylor previously.  He

20   understood it.  He shot me down, sure, but at the time what we

21   thought was -- what the purpose of waiting was to wait until

22   the settlement is signed, and people thought at that point,

23   Well, it was only four weeks, Mr. Sobol.  Don't worry, it's

24   only four weeks.  This is four months ago.

25          And now it's four months later and now the trustee's

1   position is, Let's not wait until it signed.  Let's wait until

2   it's approved by Judge Boroff and then we'll see and then

3   we'll start having our meet-and-confers.

4           So, the bottom line -- if I may, the bottom line will

5   be if the stay stays in place, that we have now put a finite

6   limit to the people who are going to be coming into this pot,

7   because we won't be able to work out any more resolutions by

8   the summer of this year, and that's the practical reality of

9   keeping the stay in place, the stay that everybody knows has

10  to be lifted at some point, anyway.  That's --

11          THE COURT:  I feel duly threatened.

12          MR. SOBOL:  Excuse me?

13          THE COURT:  I feel duly threatened.

14          MR. SOBOL:  Thank you very much.  Then I've

15  accomplished my point.

16          THE COURT:  Let me ask to the extent -- Mr.

17  Gottfried, to the extent that the trustee or whoever on behalf

18  of the bankruptcy court and the bankrupt, is making available

19  documents for the -- I think it's the Liberty, the Liberty

20  mediation, is there any reason why those same documents should

21  not be made available to the plaintiff, to the rest of the --

22  you know, to the plaintiffs' group?

23          MR. SOBOL:  It's not us -- if I may, it's not us that

24  don't have those documents.

25          THE COURT:  Well, the Tennessee people.

```
1              MR. SOBOL:  But it's not the same documents that

2     they're after.  They're after different documents.  Sorry.

3              THE COURT:  They're after different documents?

4              MR. SOBOL:  Yes.  As an example --

5              THE COURT:  So, getting those will help with nothing?

6              MR. SOBOL:  Right.  As an example, UniFirst's

7     position, with all due respect to my brother counsel for

8     UniFirst, their position is not only do we need discovery, but

9     we have to wait for Armageddon before we can start going over

10    this case.

11             THE COURT:  Well, I can understand that.  They're

12    relatively new defendants.

13             MR. SOBOL:  Fair enough.

14             MR. GOTTFRIED:  Your Honor, if I may.

15             Just so it's clear, the trustee has produced to the

16    Plaintiffs' Steering Committee, I think it's 43,000 or 44,000

17    pages --

18             THE COURT:  Out of how many?

19             MR. GOTTFRIED:  -- of documents.

20             Well, these are the relevant -- we went through the

21    meet-and-confer process.  These are relevant documents, I

22    would say, after a lengthy meet-and-confer process.

23             Those documents have been made available to a variety

24    of different parties participating in the mediation and the

25    thought was that it would be a carrot to have people
```

1    participate in mediation and discovery would be stayed and

2    that if they were participating, they would get documents.

3        Having said that, given where we are today, which is

4    we have certainly a number of parties who are participating in

5    mediation and we have a number of parties who are not, the

6    trustee would be prepared to permit the PSC to make the

7    documents that the trustee has already produced to the PSC

8    available to parties who sign on to the protective order in

9    this case.

10       So, the only condition that the trustee would have to

11   have Mr. Sobol make those documents available to the parties

12   is that they sign the protective order in the case.

13       The biggest concern that the trustee has had, in

14   addition to encouraging people to participate in mediation, is

15   to not be burdened by these discovery requests, but if the PSC

16   is willing to pick up the requirement of making these

17   documents available, as long as people sign the protective

18   order, if that helps facilitate others to join mediation, we

19   would be great with that.  If that is sort of a half a loaf,

20   they have 44,000 relevant pages to chew on while we are -- our

21   biggest thing is we want to be focused on getting the

22   settlement done.  It is difficult.  It is complex.  There are

23   multiple parties.  The idea that we should be distracted on

24   general answering interrogatories and document requests just

25   doesn't seem like the appropriate focus.

1          So, our suggestion is that we stay until the

2    settlement is approved, hopefully.  At that point we take up

3    the issue of broad discovery, but in the interim right now,

4    the documents that we've produced, some 44,000 pages, be made

5    available through the PSC, so the trustee's limited resources

6    are not wasted, to parties who sign on to the protective

7    order, which we think that is a critical condition.

8          THE COURT:  Any reason why that wouldn't help?

9          MR. SOBOL:  Well, since the documents that we

10   understand the St. Thomas wants aren't the documents we

11   already have, it's not a solution.

12         THE COURT:  But it may be some help to them.

13         MR. SOBOL:  Well, it may be.  I'm not saying it's not

14   a genuine effort.  Of course, it's a genuine effort by them,

15   but the problem -- it doesn't answer the problem.

16         And I'll also say this, your Honor, because I think

17   it's important to understand.  Mr. Fern and his office are the

18   people who produced the documents.  He's done a very good job.

19   Mr. Fern is not involved in the settlement discussions and Mr.

20   Fern's bills aren't paid for by the trustee.  They're paid

21   for, if I understand it, by the insurer.

22         So that there's no burden to the trustee or to Mr. --

23   or to Duane Morris from having to produce these documents.

24   The burden -- and he's been very good at it.  He can be

25   burdened by it.  Mr. Fern's office can produce the documents,

1    because, you're right, it's not what we got.  It's what we

2    haven't gotten that remains to be the problem.

3           By saying that, I do not mean to be whiny.  I do

4    understand that is a fair gesture by Mr. Moore, you know, by

5    Duane Morris to produce documents or to have us be allowed to

6    produce what we've got, but that doesn't solve the problem we

7    have.  And everybody recognizes that this is a process that's

8    going to have to go forward, no matter what, anyway.  That's

9    the best I can tell you.

10          THE COURT:  Mr. Fern, is there any reason why that

11   process can't go now?  Now, I understand there is a view that

12   it shouldn't go on while the settlement -- until the

13   settlement is, more or less, completed, but if, in fact, your

14   role is separate and apart from the settlement, why could not

15   the discovery process go on now?  You know, that may be a

16   totally stupid question and you're entitled to say so.

17          MR. FERN:  Judge, as specially-retained counsel for

18   the trustee, I think that directive directly stills the

19   trustee.  His concept was giving up documents was an incentive

20   to get defendants to the mediation table and, therefore, they

21   would not be burdened by discovery between the PSC and those

22   defendants.

23          That has worked.  As Ms. Parker just told you, many

24   national defendants and a number of state defendants,

25   injectors, as you called them last time, have come to the

```
1    table and a number have already reached agreement.

2            There are -- I'm not prepared, Judge, but there are

3    terabytes of documents that were collected in this case on the

4    first couple of weeks after this tragedy first occurred.  We

5    are not prepared to do any wholesale dumping of these

6    documents.

7            At some point, as Judge Saylor said, and as even St.

8    Thomas entities told Magistrate Boal early this morning, there

9    has to be some type of meet-and-confer process, whether under

10   Rule 26(f), because the St. Thomas entities want some

11   documents.  The Tennessee clinics want different documents.

12   UniFirst wants different documents.  That, indeed, Judge,

13   would be a burden to answer the document demands coming from

14   multiple parties all seeking different documents.

15           THE COURT:  So, how do you propose one should go

16   ahead with this process, since everybody seems to agree that

17   that kind of a process is necessary?

18           MR. FERN:  Well, it may be necessary, Judge, but it

19   would be imprudent to do it until the bankruptcy Judge Boroff

20   signs off on the 9109 motion for approval of the settlement

21   agreement, which is very close to being effectuated.

22           THE COURT:  All right.  Well, continue to give -- did

23   you want to say something?

24           MR. MORIARTY:  I have a few things to say, your

25   Honor.
```

```
1              THE COURT:  You go right ahead.

2              MR. MORIARTY:  Matt Moriarty for Ameridose.

3              THE COURT:  I'm sorry.  You are?

4              MR. MORIARTY:  Matt Moriarty for Ameridose.

5              The byplay that you've had with Mr. Fern, Mr. Sobol

6    and Mr. Gottfried is all about NECC documents.  There's a

7    completely separate issue because the PSC and now two

8    Tennessee defendants are trying to get the stay lifted as to

9    affiliated defendants who are not NECC, okay?

10             THE COURT:  Who are they?

11             MR. MORIARTY:  My client Ameridose, GDC, which is a

12   real estate company, some of the individuals.

13             THE COURT:  But they are involved in the settlement.

14             MR. MORIARTY:  They are involved in the settlement,

15   but no one has ever asked for Ameridose or other affiliated

16   defendants to produce documents to facilitate mediation or

17   settlement.  There's never been any even informal discovery.

18             So, let me comment on this, because there are several

19   motions before you about this, and I first only want to talk

20   about procedure.  This motion --

21             THE COURT:  I think that's the only thing I want to

22   talk about.

23             MR. MORIARTY:  Okay.  This motion to lift the stay as

24   to the affiliated defendants is not ripe for oral argument.

25   It's not ripe for decision.
```

```
 1              THE COURT:  Well, then you're in agreement that we
 2      only talk about the procedure.
 3              MR. MORIARTY:  Yes, because -- their motion was filed
 4      in October.  Our brief in opposition was filed in January.
 5      Within the last two weeks two different Tennessee clinic
 6      defendants, out of rule and without leave of this Court, filed
 7      briefs, supporting the PSC.  This is a vital issue.
 8              We actually followed the Federal Rules of Civil
 9      Procedure and moved this Court for leave to respond to those
10      briefs.  So, it's not ripe today.  We still need our chance,
11      as do GDC, and the other affiliated defendants, like MSL.
12              There is no reason why this has to be decided
13      immediately for the reasons that Mr. Gottfried talked about.
14              THE COURT:  Okay.
15              MR. MORIARTY:  This is really important and it's a
16      vital issue.
17              And Mr. Sobol -- I'm not one to use a lot of Latin,
18      but I love the phrase *ipse dixit*, because Mr. Sobol stands up
19      and the Tennessee defendants will stand up and say, Well, this
20      is inevitable that this is going to happen, and they'll say
21      everybody knows that this discovery is going to happen.
22              Well, as to the affiliated defendants who did not
23      compound this product, didn't distribute this product, didn't
24      warehouse this product, and didn't necessarily have contracts
25      with UniFirst or Tennessee clinic defendants or anybody else,
```

```
1    we do not believe that their statement that this discovery is
2    inevitable and is going to happen at some point is true.
3              THE COURT:  Thank you.
4              Now, I think we are finished with -- oh, more?
5              MR. KLARFELD:  Your Honor, Joshua Klarfeld on
6    behalf --
7              THE COURT:  I think you can pull that thing toward you.
8              MR. KLARFELD:  I'm short.  Joshua Klarfeld on behalf
9    of --
10             THE COURT:  It's long.
11             (Laughter.)
12             MR. KLARFELD:  We find ourselves in the same position
13   as Mr. Moriarty's client and I would really just echo --
14             THE COURT:  Who is your client?
15             MR. KLARFELD:  GDC.  And I would echo everything that
16   he has said to the Court, particularly about timing.  We don't
17   believe that this motion is ripe because of the recent
18   developments and to the extent the Court is inclined to
19   consider it at this time, we would still note that the --
20   getting the settlement done is of primary importance and
21   anything that would detract from that would really be
22   detrimental.  That's all I have to add.
23             THE COURT:  Thank you.  Mr. Gottfried.
24             MR. GOTTFRIED:  Just to respond briefly.
25             The idea that Mr. Fern would be doing this in a
```

```
1    vacuum is simply incorrect.  Mr. Moore and our office would be
2    very heavily involved in responding to discovery and dealing
3    with it.  You know, PMIC is not necessarily -- as NECC's
4    insurers, is not responsible necessarily for responding to
5    discovery directed from other parties.
6            So, this should be put off until the settlement is
7    finalized and approved.  At that time a discussion should
8    occur.  I think the trustee's suggestion that the documents
9    that the PSC has had and produced over 43,000, 44,000 pages
10   could be made available to parties now provided they sign the
11   protective order, is a reasonable compromise to let people go
12   forward, and we hope that the Court will adopt.
13           THE COURT:  Let me ask you, Mr. Gottlieb, to let me
14   know, and I assume also the principals in the case, when the
15   settlement is signed and what the projection is as to when the
16   settlement will come before the bankruptcy judge for approval.
17           MR. GOTTFRIED:  Of course.  How would you like us to
18   do that?
19           THE COURT:  I assume that will -- I gather you think
20   it will be signed next week.  So, at that point you may be
21   able to also have some idea of when the hearing will be.
22           MR. SOBOL:  File a notice, your Honor.
23           MR. MOLTON:  Your Honor, what we'll do -- David
24   Molton for the committee.
25           What we'll do is we'll file a notice of -- a notice
```

1    in the MDL, a notice of filing of the 9019 motions that are

2    concurrently filed in the bankruptcy.  That way not only will

3    those folks in the NECC and bankruptcy get notice of the 9019,

4    but the folks in the MDL as well your Honor will also see the

5    fact that the 9019 motion was filed in bankruptcy court.

6         And, also, Judge, you have our papers joining the

7    trustee's position on this.  So, I'm not going to belabor the

8    record, but the committee itself supports the trustee's

9    position vis-a-vis this particular --

10        THE COURT:  I have seen your papers.  And I think I

11   will do nothing on these two motions.  That is, PSC's motion

12   to partially lift discovery and Tennessee clinic's motion to

13   reconsider, that's it on those two issues, until I hear the

14   next -- what the next step is.

15        MR. SOBOL:  You should know, your Honor, that in

16   connection with the settlement, in addition to a motion that

17   will be filed with the bankruptcy court for a form of

18   preliminary approval, there'll also be a motion presented to

19   you that will establish a different form of a stay as to the

20   affiliated entities and the individuals.  So that you'll also

21   get a motion, too, for your own consideration.

22        THE COURT:  I look forward to it.

23        All right.  That now takes us through Paragraph 4(a),

24   (b).  And to the extent the trustee's response is (c), that as

25   well.

1          MS. PARKER:  I think that brings us to No. 5, status

2     of litigation.

3          THE COURT:  Status of litigation.

4          MS. PARKER:  So, we've talked already, your Honor,

5     about what litigation in this MDL will look like after the

6     settlements and assuming these mediations are successful.

7          I will let Mr. Chalos speak about the Plaintiffs'

8     Steering Committee's submission that identified a plan in

9     order to get through some discovery milestones and some

10    Bellwether process to get to a Tennessee trial, and I'll let

11    him address that.

12         I will mention that what is contemplated on a broader

13    scale is a completion of the ongoing motion to dismiss

14    briefing, which is in various stages as to the various pain

15    clinic defendants.

16         THE COURT:  These are the Tennessee -- the two

17    Tennessee parties?

18         MS. PARKER:  That's correct, your Honor.

19         THE COURT:  And a couple of others.

20         MS. PARKER:  That's correct, your Honor.

21         THE COURT:  Primarily the two Tennessee.

22         MS. PARKER:  Primarily, I would say, the two

23    Tennessee entities and then also the Premier New Jersey

24    defendants.  Those defendants have the two biggest motions to

25    dismiss briefing proceedings so far, although as I mentioned

1    earlier, there was a few clinics with a handful of cases that

2    have also filed motions to dismiss.

3         Oh, and you know what?  I'm remiss to not mention

4    UniFirst has also filed a motion to dismiss and we're in the

5    process of negotiating briefing schedule on that.  If we

6    haven't already submitted it, we will do so quickly and have

7    that in front of the Court.

8         THE COURT:  Okay.

9         MS. PARKER:  Thank you.

10        MR. CHALOS:  Your Honor, Mark Chalos for the

11   plaintiffs.

12        We're prepared to argue the motion for entry of

13   Bellwether trial and pretrial scheduling order.  I think that

14   UniFirst at the last hearing expressed a desire to be heard on

15   that motion.

16        THE COURT:  That's really Item 4 on the --

17        MR. CHALOS:  It's Item 4, right, under Section B.

18   So, we're prepared to argue that.  We're also prepared to

19   submit it on the papers, whatever your Honor prefers.

20        THE COURT:  How does any Bellwether trial fit in with

21   the pending motions to dismiss?  I mean, you include the -- I

22   gather, all of the conceivable Tenet parties in this.

23        MR. CHALOS:  Right.  Well, the motion --

24        THE COURT:  Don't we need to deal with the motions to

25   dismiss first?

1          MR. CHALOS:  I don't think so, your Honor.  Before

2    you enter the schedule, I don't think so.  The schedule

3    accounts for a process to hear motions to dismiss.

4          Now, the St. Thomas entities have, I think, a

5    slightly different issue than UniFirst, although I'll leave

6    them to talk about that, but the St. Thomas entities have

7    filed a total of, I think, five motions to dismiss.  Two of

8    the motions are confined to global issues.  That is, it's

9    confined to -- or they are confined to issues that relate to

10   all or most of the Tennessee cases, and then they filed some

11   case-specific motions to dismiss, which we've agreed -- St.

12   Thomas defendants and us, in accordance with Judge Saylor's

13   instructions, we've agreed that the case-specific motions

14   would be put off and your Honor wouldn't have to decide the

15   case-specific issues until and unless those cases are included

16   in a Bellwether discovery pool.

17         THE COURT:  The case-specific issues are the statutes

18   of limitations?

19         MR. CHALOS:  Statutes of limitations, although I

20   don't think there are -- right, that would be an example of

21   one.  Any issue that involves or requires the Court to dig

22   into the particulars of any given case, what happened on June

23   15th, and did they go to the right place, or did they say the

24   right things or write the right things.

25         But the order -- the pretrial scheduling order in the

1    Bellwether trial plan that we've submitted accounts for a

2    staged motion to dismiss process, like the one we've entered

3    into now.  So, there's no reason to put off the Bellwether

4    trial schedule for the purpose of hearing motions to dismiss.

5    They can be done in tandem.

6              MR. BRACERAS:  And, your Honor, if I could address

7    that.

8              THE COURT:  Hold it one second.

9              There is -- somehow there came to me a St. Thomas

10   entities global motion to dismiss that was filed in one of the

11   individual cases, not in the MDL.  Can I just ignore that?  I

12   think it's identical to the --

13             MR. CHALOS:  Sure, ignore it.

14             MR. STRANCH:  We're fine with that, your Honor.

15             THE COURT:  Throw it away, right?

16             MR. CHALOS:  Yes.

17             (Laughter.)

18             MR. CHALOS:  They're here.  Maybe they can address it.

19             MS. GREER:  Marcy Greer.  I represent the St. Thomas

20   entities.

21             We filed that motion in the Temple case because it

22   was the only case in which a long-form original complaint had

23   been filed and no short-form was filed.  So, it wasn't covered

24   by some of the Court's prior orders.  So, we had to file a

25   motion in that case.  The issues --

```
 1              THE COURT:  But that case is now part of the MDL,

 2    isn't it?

 3              MS. GREER:  It is, your Honor, but the orders and the

 4    agreements of the parties addressed cases where short-form

 5    complaints were filed and there was going to be a master

 6    complaint and then short-form complaints.  The Temple

 7    plaintiffs did not file a short-form complaint.  So, to

 8    protect the record, we had to file a motion to dismiss in that

 9    case.  It is identical to the others and we've listed Temple

10    to be addressed locally because the same ruling should apply

11    to all of the plaintiffs.

12              Our issue is vicarious liability.  We did not have a

13    hospital room or a clinic that administered --

14              THE COURT:  But if I decide the issue of vicarious

15    liability, presumably under the law of Tennessee, then it

16    would cover the other case as well, would it not?

17              MS. GREER:  Absolutely, it would, your Honor.

18              THE COURT:  So, I can't ignore it.

19              MS. GREER:  Well --

20              THE COURT:  I decide it in one case, but not in both.

21              MS. GREER:  Right.  But when the Court issues a

22    global ruling, it will apply to the Temple case as well.

23              THE COURT:  All right.

24              MR. BRACERAS:  Your Honor, I just wanted to say on

25    behalf of UniFirst, we agree with the Court's instinct on
```

1   this, that it's just too early and premature to argue this

2   motion, which -- the Bellwether motion, essentially, is making

3   a plan for --

4          THE COURT:  I'm not sure I said that.

5          MR. BRACERAS:  Well, I want you to say it.

6          The idea of the Bellwether motion and the discovery

7   plan is to make a plan to select representative cases to be

8   tried, whatever, a year, two years from now.

9          Now, we've just heard --

10         THE COURT:  In 2015, as I recall.

11         MR. BRACERAS:  Well, if you think that we're going to

12  have a trial in this case in 2015, a year from now --

13         THE COURT:  I don't understand why not.  I mean,

14  there are several defendants, but they all raise substantially

15  the same issue.  It's not clear to me why one even needs to

16  wait until 2015.  It's a negligence case.

17         MR. BRACERAS:  Well, certainly, UniFirst raises a

18  much different position than the clinic defendants.

19         THE COURT:  I confess, I haven't studied these

20  papers.  So, I may be speaking totally out of turn, but --

21         MR. BRACERAS:  So, the idea -- and plaintiffs would

22  agree with this -- is that when you have hundreds of

23  plaintiffs here, is that ultimately you select certain

24  representative cases to try, and at this stage, where we've

25  heard represented to us that we're going to have an Armageddon

1    of new cases coming, where we are still debating over

2    discovery from NECC, which is perhaps going to -- that

3    discovery will get to us in another month or two, where we

4    still have certain national defendants in mediation, these are

5    all parties that when they're joined to the litigation will

6    want to have a say in how we select Bellwether cases,

7    representative cases to go forward.  So --

8         THE COURT:  Why isn't that possible, to have a

9    schedule for Bellwether trials without identifying the

10   particular parties to be involved in that trial until sometime

11   later?

12        MR. BRACERAS:  Well, if you are -- let's take a

13   defendant that's going to be added in Michigan, and you're not

14   even in this courtroom because you're not a party, you're not

15   a litigant, and you're added to this case in June or whenever

16   the Armageddon is.  Presumably, they would want to have a

17   right to say how their own case is going to get litigated.

18   And this is an MDL for, we've heard, 3,000 potential claimants

19   in 17 different jurisdictions.

20        The way it's currently cast and what the Bellwether

21   motion -- plaintiffs' current Bellwether motion anticipates is

22   to have cases -- Bellwether trials of just Tennessee

23   plaintiffs in just Tennessee.  Now, how is that representative

24   of the other 16 jurisdictions, where there are hundreds of

25   other plaintiffs, have different law?

1          And as Judge Fallon has written in, you know, really,

2     one of the leading pieces on MDLs, is that the most --

3          THE COURT:  Who is Judge Fallon?

4          MR. BRACERAS:  Judge Fallon?  He's a graduate of Yale

5     Law School and is now in the District of Louisiana, and he

6     presided over a couple of MDLs, and both the plaintiffs and

7     defense cite to Judge Fallon in their papers on this, because

8     he really is a leading authority on MDLs and Bellwether

9     procedure.

10          THE COURT:  I'm sure I've met him at one of these

11     multi-district affairs.

12          MR. BRACERAS:  Yes.  And he speaks a lot on the MDLs.

13          And what Judge Fallon has said -- and we've cited

14     this -- that the first step -- the very first step that a

15     transferee court must take is to identify and catalog, and I'm

16     quoting, "the entire universe of cases that comprise the MDL."

17          And what we suggest is that we take that first step,

18     and it might be a month away, it might be whenever we have a

19     resolution of the mediations.

20          And I must point out that we can have a deadline to

21     the mediation without precluding the possibility of settlement

22     down the road.

23          And Mr. Sobol makes a good point about the

24     bankruptcy, participating in a bankruptcy, separate issue, but

25     just because we're asking that other defendants and that other

```
 1    parties and other jurisdictions be involved in this process to

 2    make it more representative and more efficient doesn't mean

 3    that we're asking to delay this for a year.

 4              The parties that have currently been mediating have

 5    been mediating for months, and there can be a deadline to the

 6    mediation.  Those parties could be, you know, ordered to be

 7    joined to this litigation, and then we could have a more

 8    coordinated approach to how we address this issue.

 9              THE COURT:  How long are we going to wait, until the

10    two-year or three-year statutes of limitations run out?

11              MS. PARKER:  Actually, six years, your Honor, is the

12    longest.

13              MR. BRACERAS:  Well, your Honor, I wonder.  That's

14    the most challenging issue, and we've been trying to think

15    about whether the defendants, you know, try to, you know, add

16    those parties by way of contribution claims to the extent that

17    in certain jurisdictions, the national defendants have been

18    sued where clinics may not have been sued.  So, it --

19              THE COURT:  You're turning this into an asbestos

20    case.

21              MR. BRACERAS:  The plaintiffs have already turned it

22    into asbestos case.

23              So, your Honor, there's a number of issues.  We can

24    then get down to the details of the Bellwether motion about,

25    you know, the time, about how you select the cases, how to
```

1    make the most representative, you know, whether you select 16

2    cases for case-specific discovery or 20 cases, and we can get

3    into those.

4          Maybe we want to refer that to Judge Boal for the

5    details of that or we can argue that, but I think the broader

6    issue is do we decide the motions to dismiss.  This is what I

7    suggest, is that UniFirst has a motion to dismiss.  We don't

8    think we should be in this case, but --

9          THE COURT:  Why not?

10         MR. BRACERAS:  Because we're just not liable.

11   There's no way the plaintiffs can carry a burden against -- a

12   case against us.  And I don't know, your Honor -- you haven't

13   read the papers, but if you like just some background on

14   what --

15         THE COURT:  No, not at the moment.  I haven't even

16   seen that motion, frankly.

17         MR. BRACERAS:  It's not fully briefed.  It's not

18   fully briefed.

19         THE COURT:  Well, then I think we should until it is

20   fully briefed before we talk about the details of it.

21   Clearly, there will have to be hearing on it.

22         MR. BRACERAS:  Yes, clearly, but the parties --

23         THE COURT:  The issue of the Bellwether -- I mean, I

24   would like some assistance from counsel as to whether one

25   could not go forward with some plan for Bellwether trials

1    without at the moment identifying -- I don't want to do it

2    right know, but without identifying which cases are going to

3    be the Bellwether cases.  I mean, they're very similar cases.

4    You get a Tennessee bunch and you get a New Jersey bunch and

5    there are not likely to be huge numbers of differences between

6    the plaintiffs and one defendant.

7         MR. BRACERAS:  Well, what I would suggest is we could

8    proceed with document discovery to the extent that that is

9    unlikely to be --

10        THE COURT:  I think the plaintiffs -- excuse me.  The

11   plaintiffs have to come up with some kind of a plan that

12   includes sort of specifics as to how to do what when, and it

13   is not clear to me why we cannot proceed along those lines

14   without now identifying who the plaintiffs are whose trial --

15   whose cases will go forward in a Bellwether trial, which

16   appears to create some sense of unease among the parties.

17   There has to be a bunch of general discovery that would apply

18   in all cases that go forward.

19        MR. BRACERAS:  Your Honor, I think that's correct

20   with regard to the document discovery, but there's -- and so,

21   that's certainly a place that you wouldn't run the risk of

22   duplications, for instance, as opposed to deposition

23   discovery, where you could imagine the same person being

24   deposed numerous times as other parties are added to the

25   litigation.

1          So, I think that the Court is correct that you could

2     go forward with document discovery, but what we request is

3     that we proceed with the motions to dismiss.  We see where the

4     parties are with respect to the mediation and whether the

5     Court sets a deadline for the mediating parties to make clear

6     who all the litigating parties are so that all the litigating

7     parties can reach some resolution of these issues.

8          In the meantime, while we do the motion --

9          THE COURT:  I think you should give up representing

10    your clients and be my assistant.

11         MR. BRACERAS:  You want me to sit here?

12         THE COURT:  Thank you.

13         MR. CHALOS:  Your Honor, I just have a few brief

14    points to make.

15         The proposal that -- the structure that we've

16    proposed, the plaintiffs, does nothing more than set forth

17    some achievable goals, a trial in May of 2015, with a second

18    trial a month or so after that, and set forth a framework that

19    makes clear how the cases will proceed in an orderly way.  It

20    doesn't presuppose anything substantive.

21         THE COURT:  Okay.  I will look at it and I will look

22    at the objection.

23         Incidentally, there are a couple of other motions

24    that should be allowed.  There is No. 1008, PSC's motion to

25    leave to file a sur-reply to 790, I think.  And there is a PSC

```
1    motion for leave to file reply in the Bellwether motion, which
2    is No. 987.  I think that the Tennessee clinic defendants'
3    motion for reconsideration on access to NECC documents is
4    denied, without prejudice to reconsideration at sometime in
5    the future, if that's appropriate.  And, otherwise, I have to
6    look at the Bellwether.  I have not studied the documents and
7    the several motions to dismiss that I think are ripe,
8    particularly the Tennessee ones and the New Jersey ones, I
9    think you said was also ripe.
10             MR. GOTTFRIED:  Your Honor having allowed 1008 for
11   the PSC to file a sur-sur-reply, the trustee at 1030 had filed
12   a motion for leave to file a reply to that.
13             THE COURT:  Yes, but let me add one thing.  I would
14   like the sur-replies to be no longer than five pages.
15             MR. GOTTFRIED:  I think ours might be only five or
16   six pages, actually.
17             MR. COREN:  Your Honor --
18             THE COURT:  All the briefs are too long in this case.
19             MR. COREN:  Your Honor, Mike Coren.  I'm going to
20   wear my New Jersey lawyer hat for one second.
21             The Premier motion that -- there is going to be a
22   motion filed shortly, for leave to file a sur-reply of four
23   pages.
24             THE COURT:  It will be allowed subject to the five-
25   page limit.
```

```
1              MR. COREN:  Thank you, your Honor.

2              THE COURT:  Ms. Urso has made a note of that.

3              MS. GREER:  The St. Thomas motions to dismiss are not

4      fully briefed yet.  We have a reply brief deadline of May 7

5      and then they will be ripe.

6              THE COURT:  Your reply brief will also be no more

7      than five pages.  So, you can certainly meet that deadline,

8      right?

9              MS. GREER:  It's a lot harder to write a short brief

10     than a long one.  Thank you, your Honor.

11             THE COURT:  All right.  I think we are down to Item

12     C, are we not?

13             MR. STRANCH:  Your Honor, we have one additional

14     issue that we reached.  You heard that there was some

15     discussion about global versus individual motions to dismiss,

16     and we've been trying to work on notice issues, which is a

17     Tennessee statute that requires you provide notice prior to

18     instituting a suit.

19             The Tennessee defendants have filed all those

20     motions.  We've almost reached an agreement on which portions

21     of those are truly global in nature and will be briefed and

22     which ones are truly individual in nature and will come up

23     once they enter the Bellwether discovery pool.

24             Right now our responses to those motions to dismiss

25     are due all on the 14th.  We've agreed with both Tennessee
```

1   defendants to bump those responses to the 28th of April.

2        THE COURT:  Done.

3        MR. STRANCH:  Great.  Thank you.

4        MR. SOBOL:  The other thing, your Honor, before you

5   move on to C, briefing in progress.  At the last status

6   conference --

7        THE COURT:  I'm not having much progress today.

8        MR. SOBOL:  We're making progress.  I think I'm 0 for

9   whatever today.

10       B(3), your Honor, the parties had agreed to submit

11  that at the last status conference on the papers.  I think

12  that we're --

13       THE COURT:  Well, I have a question.  Is it ripe?

14       MR. SOBOL:  Oh, yes.

15       THE COURT:  Okay.

16       MR. SOBOL:  And I think that -- now that we've had a

17  sur-sur-sur-sur-reply --

18       THE COURT:  That's the assessment --

19       MR. SOBOL:  Yes.

20       THE COURT:  -- the assessment motion?

21       Does that need a hearing?

22       MR. SOBOL:  It's the -- yeah.  It's the assessment

23  motion B(3), your Honor.

24       THE COURT:  I mean, do I have to have an oral

25  argument on that motion?

1          MR. SOBOL:  I believe that the parties agreed that we

2     could submit it on the papers and you could read the papers,

3     unless you want argument.

4          THE COURT:  No.  No.  We'll decide it without

5     argument.

6          MR. GOTTFRIED:  So, since you are deciding that

7     without argument, you allowed our motion to file our reply.

8     It's only five and a half pages.

9          THE COURT:  Yes, that was one of them.

10          MR. GOTTFRIED:  Okay.

11          MR. MOLTON:  Judge, that was Document 1030 and that's

12     a joint motion.

13          THE COURT:  Well, there's also 1008 and there is

14     1030, both allowed, five pages.

15          MR. GOTTFRIED:  Five and a half.  It's attached to

16     our motion.

17          MR. MOLTON:  It's already filed.

18          THE COURT:  Okay.  Then four we have finished for

19     today.

20          MR. SOBOL:  Yes.

21          THE COURT:  And five I think I have also finished,

22     subject only to reconsideration or to review without prejudice

23     if things change in the future.

24          That takes us to briefing in progress, the master

25     complaint against affiliated defendants and responsive

1    pleadings.  Anything to report on that?

2            MS. PARKER:  Yes, your Honor.  At the previous status

3    conference, in light of the settlements we had discussed, that

4    it is hoped that the PSC will not need to file a master

5    complaint against the affiliated defendants.

6            The way that we handled it last month was your Honor

7    agreed to extend the deadline for the PSC to file that master

8    complaint by another 30 days, which has a current deadline of

9    April 30th.

10           While we hope certainly that the settlement will be

11   done by then, we would ask out of an abundance of caution that

12   the Court give us another month on that deadline.  So, it

13   would expire the end of May.

14           THE COURT:  Fine.

15           MS. PARKER:  Thank you.

16           THE COURT:  Then the motions for extension of time we

17   have dealt with earlier and they were all allowed.

18           That takes us to three, Ameridose motion to destroy

19   recalled products, which has not yet been filed.  So, I'm not

20   sure why we need to talk about it.

21           MR. MORIARTY:  It will be filed with a few days, your

22   Honor.

23           THE COURT:  Good.  So we'll talk about it next month.

24           MR. MORIARTY:  Sure.

25           Your Honor, one housekeeping matter.  I'm sorry to do

```
1    this, but can we go back just to B(1)?

2            THE COURT:  I want to go forward.

3            MR. MORIARTY:  We go forward so fast, sometimes I get

4    left behind.

5            The only reason I mention B(1) --

6            THE COURT:  I'm sorry.  What are we going back to?

7            MR. MORIARTY:  B(1).  It's the fully-briefed motion

8    to -- supplemental motion to transfer cases.

9            THE COURT:  I thought I heard argument on that the

10   last time and it is subject -- it is on my desk to be decided.

11           MR. MORIARTY:  Okay.

12           THE COURT:  In fact, we had a lot of arguments about

13   that last time.

14           So, we go back again to dispositive motions.

15   Tennessee clinic still has a response coming on something,

16   right?

17           MR. STRANCH:  Your Honor, on that summary judgment

18   brief, pending before you, but not listed here, is a motion

19   for leave to file a reply to the 56(d) designation that the

20   PSC did in that one.  The St. Thomas clinic Stop and See has

21   opposed that.  And so, that's for your consideration and I

22   believe if that's granted, it's fully briefed and we're --

23           THE COURT:  You want to file a reply?

24           MR. STRANCH:  We're already filed it with the Court.

25   We filed a motion to leave and attached it to --
```

```
1                THE COURT:  Well, that is allowed, over objection.

2                MR. STRANCH:  Thank you.

3                THE COURT:  But is it --

4                MR. STRANCH:  I think that makes it -- it's over five

5     pages, I believe, your Honor.  I'm not positive how many.

6                THE COURT:  It's not six or seven.  It's probably 22.

7                MR. STRANCH:  It's not 22.  I think it's more like

8     about nine and --

9                THE COURT:  Well, I'll read the first five pages.

10               MR. SOBOL:  Just read the first five pages.

11               THE COURT:  Or any five you want me to.

12               (Laughter.)

13               MR. STRANCH:  To be fair, your Honor, it takes a page

14    and a half just to list all their names, the defendants.

15               THE COURT:  So, that motion is now ripe.  And do I

16    need to hear argument on that?

17               MR. STRANCH:  We think it can go on the papers.  If

18    the Court believes oral argument would be helpful, we would be

19    happy to argue the matter before the Court.

20               THE COURT:  You are?

21               MR. TARDIO:  Chris Tardio on behalf of the Tennessee

22    clinic defendants.

23               I'm fine with that motion being decided on the

24    papers, the 56 motion that we filed on -- it deals with our

25    certificate of good faith requirements.
```

```
 1              THE COURT:  Okay.  So, I can decide that on the
 2     papers.
 3              MR. STRANCH:  Yes.  To be clear, what we did, your
 4     Honor, it's a motion for summary judgment and we filed a Rule
 5     56(d) designation saying we need discovery before we can
 6     respond to it, and we ask that if the Court did deny the
 7     56(d), that we be given an opportunity to fully brief the
 8     legal issue -- legal issues that they raise.  We think it
 9     needs more factual discovery first, but we're happy with it
10     going on the papers, your Honor, or oral argument if you
11     believe it will be helpful for you.
12              THE COURT:  I'm sorry.  If I deny the 56(d) motion
13     that you have filed, then what do you want me to do?
14              MR. STRANCH:  Just give us an opportunity to respond
15     to the arguments that they made.
16              THE COURT:  Okay.
17              MR. STRANCH:  Because instead of going through a full
18     legal response to the arguments, we said we need this
19     discovery before we can do that.  It's also what Judge Saylor
20     ordered.  We lay it out pursuant to Rule 56(d).
21              THE COURT:  And you don't object to that?
22              MR. TARDIO:  To them having discovery as to --
23              THE COURT:  No.  If the 56(d) motion is denied,
24     giving them time to respond to the merits.
25              MR. TARDIO:  I think they've already responded to the
```

1    merits, but I understand that and I will not object to another

2    responsive briefing filed.

3            THE COURT:  You do object?

4            MR. TARDIO:  No, I will not.  Will not.

5            THE COURT:  Okay.

6            MR. STRANCH:  Thank you.

7            THE COURT:  Ms. Parker.

8            MS. PARKER:  I believe that brings us to the Premier

9    motion to dismiss, your Honor.

10           THE COURT:  Correct.

11           MS. PARKER:  There is a sur-reply that the PSC

12   intends to seek leave to file.  We have advised counsel for

13   Premier.  In fact, counsel for Premier has advised us they

14   don't object to us filing the motion for leave to file --

15           THE COURT:  So that will be allowed, again subject to

16   the five pages.

17           MS. PARKER:  Thank you.

18           I will also mention that I understand -- we discussed

19   briefly with counsel for Premier whether to ask the Court to

20   set this for argument the next status conference.  We don't

21   know the date of the next status conference yet, which is

22   something Mr. Fennell will yell at me if I don't bring it up

23   with your Honor.  But, also, we're not sure whether or not

24   we'll be in a position to have that argued, but if the Court

25   would like argument on that motion, we're happy to provide

1    that and work out a schedule with the defendant.

2              THE COURT:  So, I should not deal with this until

3    after the next meeting?

4              MS. PARKER:  Correct.  Correct, your Honor.  Thank you.

5              THE COURT:  Okay.  Cincinnati Pain Management

6    Consultant's Motion.  Also next time?

7              MS. PARKER:  Yes, your Honor.  I believe that was

8    subject to one of the scheduling extensions that you have just

9    previously allowed.  So, I think that takes us over to next

10   time.

11             THE COURT:  And Tennessee clinic defendants' motion

12   to dismiss.

13             MR. STRANCH:  Your Honor, that's the one that I

14   mentioned earlier where we agreed to continue to meet and

15   confer and try to work out the individual versus global issues

16   by the -- you've already agreed to allow us to file that reply

17   on the 28th of April.

18             THE COURT:  Will it be ripe at that point or should

19   we talk about it after --

20             MR. STRANCH:  It will be after the next status

21   conference, because when we file our response, then I think

22   they've got a short reply, that we've agreed in the briefing

23   schedule --

24             THE COURT:  You'll get a status report on this motion

25   next time?

```
1              MR. STRANCH:  That's correct, your Honor.

2              THE COURT:  And the global claims, similarly?

3              MR. STRANCH:  That's the same thing.  They're all

4    tied together, your Honor.

5              THE COURT:  And Ascension Health?

6              MR. STRANCH:  All together, your Honor.

7              THE COURT:  They're all together?

8              MR. STRANCH:  Yes.

9              THE COURT:  BKC?

10             MS. PARKER:  BKC also is the subject of an

11   assented-to motion that your Honor has just allowed.  I,

12   unfortunately, don't know the date of the last briefing.

13   Pursuant to that schedule, off the top my head, I'm not sure

14   whether it will be done before the next status conference or

15   not.

16             THE COURT:  And UniFirst is not yet ripe?

17             MR. BRACERAS:  We filed the motion, but it's not yet

18   ripe.

19             THE COURT:  So, we'll talk about all of these next

20   time.

21             Now, the matters referred to Judge Boal she's

22   addressing, correct?

23             MS. PARKER:  Yes, your Honor.  We had a hearing this

24   morning before Judge Boal.  She is currently considering three

25   matters:
```

1            The first is a motion for entry of deposition

2     protocol, which was argued this morning.  Second is a motion

3     for entry of ESI protocol, which is unopposed.  And third was

4     a motion to compel production by a non-party subpoena

5     recipient, Baltimore Pain Management, and we advised Judge

6     Boal -- and by way of being helpful to the Court, I'll point

7     this out as well, that depending on what Judge Boal does with

8     the current motion to compel, the PSC anticipates additional

9     motions to compel coming down the line, but we're waiting to

10    see how Judge Boal deals with the issue that is currently

11    before her before filing additional motions.

12            THE COURT:  Incidentally, I had invited Judge Boal to

13    come to these meetings if she wanted to, but she has been

14    unable to for the last two.  So, she may or may not show up

15    the next time.

16            MR. SOBOL:  Not after this one.

17            THE COURT:  I think it's you guys who are the

18    problem, not Judge Boal.

19            (Laughter.)

20            MS. PARKER:  Decidedly correct, your Honor.

21            THE COURT:  Now, when should we have the next

22    meeting?  May when?

23            MS. PARKER:  We would suggest roughly 30 days from

24    today.  We would also ask the Court, if possible, given the

25    number of lawyers that travel in from out of town, if perhaps

```
 1    we could schedule the May, June and even July status

 2    conferences now so that we have some ability to plan around

 3    those.

 4              THE COURT:  Okay.  Is the time 2 o'clock appropriate

 5    for all counsel?  So, we would be talking about sometime

 6    around May 14?

 7              COURTROOM DEPUTY CLERK URSO:  Yes.

 8              THE COURT:  Is there any day of the week that's

 9    better?

10              MR. SOBOL:  Just not --

11              MR. MORIARTY:  Your Honor, just with that week, there

12    is a national meeting that at least three of the lawyers that

13    I know at this table attend every year and it's that week.

14    It's the 14th, 15th and 16th.  If we could avoid those.

15              THE COURT:  There will be that less lawyers here.

16              MR. MORIARTY:  Yes, that's true.

17              MS. PARKER:  Aren't those lawyers going to be out of

18    the case by then?

19              MR. MORIARTY:  That would be nice.  If I could be

20    sure of that, I wouldn't be standing here.

21              The 13th would be fine.

22              THE COURT:  Sure.  We don't have a problem, do we,

23    Lisa?

24              COURTROOM DEPUTY CLERK URSO:  No.

25              THE COURT:  2 o'clock, on May 13th?
```

```
 1              COURTROOM DEPUTY CLERK URSO:  Yes.

 2              THE COURT:  And then in June?

 3              COURTROOM DEPUTY CLERK URSO:  One sec.

 4              (Pause.)

 5              COURTROOM DEPUTY CLERK URSO:  We could do --

 6              THE COURT:  10, 11, 12?

 7              COURTROOM DEPUTY CLERK URSO:  What abut the 18th, at

 8    2:00, if we could do that?

 9              MR. FERN:  Perfect.

10              COURTROOM DEPUTY CLERK URSO:  So, June 18th, at 2:00.

11              THE COURT:  And July.

12              COURTROOM DEPUTY CLERK URSO:  What about July 17th,

13    at 2:00?

14              THE COURT:  All Thursdays, right?

15              COURTROOM DEPUTY CLERK URSO:  That's a Thursday --

16    no.  The 18th -- June 18th is a Wednesday, Judge.

17              THE COURT:  I think we should make it the same day of

18    the week.  Is June 19th okay?  So, we always have the same day.

19              MR. SOBOL:  Sure.

20              THE COURT:  What do we have on the 19th?

21              COURTROOM DEPUTY CLERK URSO:  We have a sentencing at

22    2:00.

23              THE COURT:  I'm sorry?

24              COURTROOM DEPUTY CLERK URSO:  We have a sentencing at

25    2:00.
```

```
 1              THE COURT:  So, we'll do it after.  We'll push it to
 2    3:00.
 3              COURTROOM DEPUTY CLERK URSO:  The sentencing?
 4              THE COURT:  Yes.  And for July, it was --
 5              MR. FERN:  For clarification, you want Thursday, July
 6    19th, at 2:00 p.m.?
 7              MR. BRACERAS:  June 19th.
 8              THE COURT:  June 19th, so that we always do it on a
 9    Thursday.  I'm a creature of habit and if I know it's a
10    Thursday, then I know what to do.
11              COURTROOM DEPUTY CLERK URSO:  July 17th, at 2:00.
12              THE COURT:  Maybe in August we'll take a break.
13    Maybe not.
14              MR. SOBOL:  So, just following your habit, your
15    Honor, then May 13th the first of those dates, you scheduled a
16    Tuesday, not a Thursday.
17              THE COURT:  Well, that's terrible.  So, we go to the
18    14th.
19              COURTROOM DEPUTY CLERK URSO:  So, 15th --
20              THE COURT:  May 14th.
21              COURTROOM DEPUTY CLERK URSO:  Well, the gentleman
22    can't do it on the 14th.
23              THE COURT:  Oh, that's the bad -- yes.  We all agree
24    to have an out-of-order one in order to accommodate the people
25    who are going to some kind of a meeting always, every year.
```

```
 1              MR. FERN:  We appreciate the accommodation, Judge.
 2    I'm one of those.  Thank you.
 3              MR. SOBOL:  We should discuss their rates that day,
 4    your Honor.
 5              THE COURT:  Is there anything else that somebody else
 6    wishes desperately to talk about, including those on the
 7    telephone whom I can't see?
 8              (No response.)
 9              THE COURT:  Well, I think this has been a successful
10    meeting, therefore.  I thank you all very much.
11              Did you want to say anything else?
12              MR. BRACERAS:  No.  Thank you, your Honor.
13              MR. STRANCH:  Thank you, your Honor.
14              (Adjourned, 3:20 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

1                     C E R T I F I C A T E

2              I, Catherine A. Handel, Official Court Reporter of

3      the United States District Court, do hereby certify that the

4      foregoing transcript, from Page 1 to Page 64, constitutes to the

5      best of my skill and ability a true and accurate transcription

6      of my stenotype notes taken in the matter of Civil Action No.

7      MDL-13-2419-RWZ, In Re:  New England Compounding Pharmacy Cases

8      Litigtion.

9

10

11      April 14, 2014              /s/Catherine A. Handel
        Date                       Catherine A. Handel, RPR-CM, CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25