# EXHIBIT B

*Chapter 11 Trustee's Motion to Approve Compromise of Controversies and Settlements With Pharmacists Mutual Insurance Company and Maxum Indemnity Company*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEW ENGLAND COMPOUNDING PHARMACY, INC., | ) | Case No. 12-19882-HJB |
| | ) | |
| Debtor. | ) | |
| | ) | |

## CHAPTER 11 TRUSTEE'S MOTION TO APPROVE COMPROMISE OF CONTROVERSIES AND SETTLEMENTS WITH PHARMACISTS MUTUAL INSURANCE COMPANY AND MAXUM INDEMNITY COMPANY

### I.    INTRODUCTION AND SUMMARY OF RELIEF REQUESTED

Paul D. Moore, the duly appointed chapter 11 Trustee ("Trustee") of New England Compounding Pharmacy, Inc. (the "Debtor" or "NECC"), hereby moves this Court (this "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A, approving a Plan Support and Settlement Agreement ("Agreement") with NECC's primary and excess liability insurance carriers, Pharmacists Mutual Insurance Company ("PMIC") and Maxum Indemnity Company ("Maxum") (PMIC and Maxum are collectively referred to as the "Insurers"), on account of certain insurance policies.[1]  As more particularly described below, such policies were issued to NECC, Barry J. Cadden, Lisa M. Conigliaro Cadden, Glenn Chin, C. Leary, G. Svirskiy, J. Keough and K. Chin as named insureds ("Individual Insureds"), and one or more of them also may provide coverage of defense costs in favor of Greg Conigliaro and Carla Conigliaro.  In support of this Motion, the Trustee respectfully states as follows:

---

[1]    An executed copy of the Agreement is attached as Exhibit B.  Capitalized terms used but not defined herein have the meaning ascribed to them in the Agreement.

DM3\2838061.6

1.      If approved and consummated, the Agreement provides that the Insurers will pay to the Trustee, within one month following entry of an order approving this Motion, the aggregate amount of $25.2 million, which amounts will be used by the Trustee to pay administrative expenses, as well as to provide partial funding for the Trustee's contemplated Chapter 11 plan (the "Plan"). Further, PMIC will continue, until the effective date of the Plan, to fund costs of defense for the NECC and other insureds under certain policies.

2.      The Trustee submits that the proposed settlement is fair and equitable and decidedly in the best interests of NECC, its creditors and its estate. The Insurers have advised the Trustee that they believe they have substantial coverage defenses that absolve them of any liability under the applicable policies. While the Trustee disagrees with the Insurers, the Agreement, if approved, will provide the estate, among other things, with substantial sums, without the need for costly, complex and protracted litigation regarding the Insurers' alleged coverage defenses. The Agreement also will "prime the pump" and provide a significant component of the initial funding towards the Plan that the Trustee hopes will furnish a mechanism to provide meaningful compensation to personal injury claimants with allowed claims who have suffered grievous injuries and illnesses alleged to have resulted from the administration of contaminated medications compounded by NECC. Moreover, the Agreement provides the framework for the terms of the Plan, which the Trustee hopes to propose and confirm well before the end of 2014, that will maximize the recovery of all creditors on account of their allowed claims.

## II.   JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C §§ 1408 and 1409. This is a core proceeding

DM3\2838061.6

pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are Bankruptcy Code sections 105 and 363 and Federal Rule of Bankruptcy Procedure 9019.

### III.   STATEMENT OF RELEVANT BACKGROUND FACTS

#### A.   *This Case and the Trustee's Appointment*

4.   On December 21, 2012 (the "Petition Date"), NECC filed a voluntary petition for relief pursuant to chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

5.   On January 24, 2013, this Court entered an order [Docket No. 92] authorizing the appointment of a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.

6.   On January 25, 2013 (the "Appointment Date"), the United States Trustee (the "UST") filed an Application for and Certificate of Appointment of Chapter 11 Trustee [Docket No. 98] (the "UST Application") requesting the appointment of the Chapter 11 Trustee. The UST Application was granted by order of this Court [Docket No. 99] entered the same day. Thereafter, on February 1, 2013, the Chapter 11 Trustee filed his Verified Statement Pursuant to Rule 2007.1 of Paul D. Moore in Support of Application for and Certificate of Chapter 11 Trustee [Docket No. 111] (the "Statement").

#### B.   *The Settling Parties*

7.   The parties to the Agreement are as follows:

a.   The Trustee

b.   Barry Cadden: As of the Petition Date, Barry Cadden owned a 17.5% interest in NECC, and is a director and President of NECC. Prior to October 2012, he served as Head Pharmacist and Director of Pharmacy at NECC.

c.   Lisa Conigliaro Cadden (together with Barry Cadden, the "Caddens"): Lisa Conigliaro Cadden is the spouse of Barry Cadden. As of the Petition Date, Mrs. Cadden owned a 17.5% interest in NECC, and served as a director of NECC.

d.   Carla Conigliaro: As of the Petition Date, Carla Conigliaro owned a 55.0% interest in NECC, and served as a director of NECC.

3

e.  <u>Douglas Conigliaro</u>: (together with Carla Conigliaro, the "<u>Conigliaros</u>"):  Douglas Conigliaro is the spouse of Carla Conigliaro.[2]

f.  <u>Gregory Conigliaro</u>:  Gregory Conigliaro is the brother of Lisa Conigliaro Cadden.  As of the Petition Date, Gregory Conigliaro owned a 10% interest in NECC, and was a director and Treasurer, Secretary, and Vice President of NECC.  Prior to October 2012, he provided financial advice and operational support for NECC.

g.  <u>Glenn Chin</u>:  Glenn Chin is a pharmacist and former employee of NECC.

h.  <u>Kathy Chin</u>:  Kathy Chin is a pharmacist and former employee of NECC (together with Glenn Chin, the "Chins").

i.  <u>PMIC</u>:  As explained below, PMIC was the Debtor's primary and first level excess general liability insurance carrier and also, as explained below, issued professional liability policies to the Caddens, the Chins, C. Leary, G. Svirskiy and J. Keough.

j.  <u>Maxum</u>:  As explained below, Maxum was NECC's second level excess liability insurance carrier.

## C.    *The Debtor's Prepetition Operations*

8.    Prior to the Petition Date, NECC operated as a compounding pharmacy. Beginning in September 2012, reports began to surface of several patients who contracted fungal meningitis (the "<u>Outbreak</u>") after receiving injections of preservative-free methylprednisolone acetate ("<u>MPA</u>") prepared by NECC.  An investigation was initiated by the Massachusetts Department of Public Health ("<u>MDPH</u>") and, two days later, on September 26, 2012, NECC issued a voluntary recall of three suspect lots, containing 17,646 doses of MPA that NECC had distributed to over 14,000 patients.  The Centers for Disease Control and Prevention ("<u>CDC</u>") reported that, as of October 23, 2013, 64 people had died and 751 individuals had fallen ill.[3]

---

[2]    Collectively, as of and at all relevant times prior to the Petition Date, the Caddens and the Conigliaros were the sole shareholders of NECC and the sole members of NECC's board of directors.

[3]    Reported at http://www.cdc.gov/HAI/outbreaks/meningitis-map-large.html#casecount_table.  The CDC has not updated the case counts since October 23, 2013 and indicates that further updates to the case counts are not anticipated.

9.     Upon information and belief, on October 1, 2012, the MDPH issued a formal quarantine notice pursuant to M.G.L. ch. 94C, §§ 13 & 189A, and M.G.L. ch. 112, §§ 30 & 42A, requiring NECC to preserve all products used to prepare the MPA, including products returned from pharmacies.

10.    Upon information and belief, in response to October 2, 2012 findings from the United States Food and Drug Administration ("FDA") and the MDPH, the Massachusetts Board of Registration in Pharmacy (the "Board") voted to request a voluntary surrender of NECC's pharmacy license.  NECC surrendered its Massachusetts license, effective at noon on October 3, 2012, and further instituted a voluntary recall of all of its intrathecal medications, which are designed for injection near the spinal cord or brain.

11.    The FDA and the CDC recommended that all health care providers cease using, and remove from inventory, any NECC products.  At the behest of the MDPH, NECC issued an immediate recall of all of its products, and Barry Cadden and Glenn Chin surrendered their pharmacist licenses pending the outcome of the investigation.  There are ongoing proceedings to revoke or otherwise take action against the licenses of Mr. Cadden, Mr. Chin and Ms. Conigliaro Cadden.

12.    The Outbreak has resulted in potentially tens of thousands of claims from personal injury claimants against NECC and others.

13.    Shortly prior to the Petition Date, NECC suspended the operation of its business. NECC also surrendered its Massachusetts pharmacy license and laid off most of its employees. Mr. and Mrs. Cadden agreed at that time to a voluntary license surrender.  There are ongoing proceedings at the Board to revoke or otherwise take action against the licenses of Mr. Cadden,

DM3\2838061.6

Mr. Chin and Ms. Conigliaro Cadden.   The MDPH also has temporarily barred former pharmacists for NECC from practicing pharmacology.

14.     NECC initiated this case in response to the volume and wide geographic distribution of cases it confronted.  As of March 5, 2014, 322 separate lawsuits have been joined in the multi-district litigation pending in the United States District Court for the District of Massachusetts, and are pending before Judge Zobel ("MDL Action")[4].  As of February 26, 2014, over 3,600 individuals had filed proofs of claim against NECC asserting claims for injury or wrongful death from injections of MPA (generally, collectively with the pending lawsuits, the "Civil Actions").

### D.     The Adversary Proceeding

15.     On January 24, 2014, one day before the Appointment Date, the Official Committee of Unsecured Creditors ("Committee") commenced in this Court Adversary Proceeding No. 13-01040 (the "Adversary Proceeding"), on behalf of NECC's bankruptcy estate, against the Caddens, the Conigliaros, and NECC's affiliated companies Ameridose, GDC and MSM.  In the Complaint, the Committee sought to avoid, as preferential and constructively fraudulent transfers, certain payments to or for the benefit of the defendant insiders (the "Defendants").  The Committee also sought to disallow claims that the Defendants might assert against NECC and to recover damages attributable to alleged breaches of fiduciary duties of loyalty and care that the Caddens and Conigliaros owed to NECC in their capacity as directors of NECC.

16.     On January 24, 2013, the Committee filed in the Adversary Proceeding its Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief (the

---

[4]     Case No. 1:13-md-02419-FDS, *In re New England Compounding Pharmacy, Inc. Products Liability Litigation.*

"TRO/PI Motion"), Emergency Motion for Attachment on Trustee Process (the "Trustee Process Motion"), Emergency Motion for Reach and Apply Injunction (the "Reach and Apply Motion"), and Emergency Motion for Approval of Real Estate Attachment (the "Real Estate Attachment Motion").

17.     On January 28, 2013, after a January 25, 2013, hearing, this Court issued the following orders with respect to the Committee's motions:

>     a.     an order partially granting the TRO/PI Motion, and temporarily restraining and enjoining the Shareholder Defendants (as defined in the Adversary Proceeding complaint) from transferring, encumbering, assigning, pledging, mortgaging, or spending any asset other than as necessary for ordinary living or legal-representation expenses, except by leave of the Bankruptcy Court (the "TRO Order");

>     b.     an order granting the Trustee Process Motion and approving the attachment of up to $21,110,344.30 on each of six bank accounts held for the benefit of the Shareholder Defendants (the "Trustee Process Order");

>     c.     an order granting the Reach and Apply Motion, and restraining and enjoining the Affiliate Defendants (as defined in the Adversary Proceeding complaint) from paying, transferring, distributing, disbursing, or in any way alienating any amounts due or to become due to the Shareholder Defendants (the "Reach and Apply Order"); and

>     d.     an order granting the Real Estate Attachment Motion and approving the attachment of up to $21,110,344.30 on each piece of real property standing in the name of the Shareholder Defendants in the Commonwealth of Massachusetts (the "Real Estate Attachment Order" and, together with the TRO Order, the Trustee Process Order and the Reach and Apply Order, the "Security Orders").

18.     On February 12, 2013, this Court entered a stipulated order, assented to by the Trustee, the Committee and the Defendants (the "February 2013 Stipulation"), whereby the TRO Order matured into a preliminary injunction and the Trustee was substituted for the Committee as the plaintiff in the Adversary Proceeding.

### E.     Claims and Proceedings Against Insiders by Third Parties

19.     Although not asserted by the Committee in the Adversary Proceeding, numerous creditors allege that the Insiders are liable to them for various acts and omissions that resulted in

DM3\2838061.6

the alleged contamination of NECC's products that allegedly caused grievous personal injury and death. The theories of liability are varied; at bottom, the Defendants are alleged to have caused the Outbreak or to have been complicit with those who caused the Outbreak in ways that render them civilly liable for the Outbreak. To the extent that the Debtor's insiders ("Insiders"), including the Defendants, caused, are responsible for, or are complicit with those who caused or are responsible for, the Outbreak, the Trustee has claims against the Defendants, as well as for damage caused to NECC, including those on account of death or personal injury claims against NECC and its estate, as a result of the Outbreak.

20.     Upon information and belief, in addition to the potential and actual civil actions naming some or all of the Insiders as defendants, there are ongoing criminal investigations in which some or all of the Insiders may be targets. Moreover, upon information and belief, multiple state regulatory agencies are seeking to compel some of the Insiders to surrender, permanently, their pharmacists' licenses.

### F.     *The Relevant NECC Insurance Policies*

#### 1.     PMIC Primary and Umbrella/Excess Policies Issued to NECC

21.     PMIC issued two insurance policies, each covering two calendar year policy periods, to NECC that are relevant to this Motion. The Trustee contends that PMIC is liable under these policies in the minimum amount of $30 million. PMIC contends that the policies do not provide coverage for the claims but that, were coverage to exist, liability does not exceed $6 million (exclusive of defense costs).

22.     As a primary policy, PMIC issued a Special Businessowner's Policy BOP 0068490 08 (the "Primary Policy"). The Primary Policy obligates PMIC to provide for the defense of claims covered by the Primary Policy. The Primary Policy is not a "wasting" policy, in that defense costs do not reduce the limits of liability for indemnification of NECC.

8

23.    PMIC contends that the Primary Policy limits its liability at $1 million for each "Occurrence" in each "policy year" (i.e., each calendar year) and, regardless of the number of "Occurrences," at $5 million in the aggregate for each calendar year.  PMIC contends that its limit of liability for "Occurrences" of "PCWH claims" (described below) in a policy year is limited to $2 million in the aggregate, and that its limit of liability for "Occurrences" of claims that are not PCWH claims in a policy year is limited to $3 million in the aggregate.  In the event the claims were covered and also constituted multiple "Occurrences", which PMIC disputes, the claims arising from the Outbreak are subject to either the PCWH Aggregate Limit of $2 million, or the $3 million General Aggregate Limit, but not both.

24.    PMIC also issued to NECC a Commercial Umbrella/Excess Coverage Policy Number UCL 0068490 8, effective January 1, 2012 to January 1, 2013 (the "PMIC Umbrella/Excess Policy").  According to the "Declarations" page, the PMIC Umbrella/Excess Policy provides limits of $5 million for each occurrence, subject to a $5 million general aggregate limit, and a $5 million aggregate limit for PWCH claims.

25.    The Primary Policy contains various terms, conditions and exclusions that PMIC contends preclude coverage under the policy, including, without limitation, with respect to claims arising from products manufactured, rather than compounded, by NECC, and for claims arising from fungal contamination.  Alternatively, if these terms, conditions and/or exclusions do not apply, then PMIC contends that the claims arising from the Outbreak constitute a single "Occurrence" under the Primary Policy occurring in a single policy year, since, PMIC contends, all such claims stem from the alleged failure by NECC to follow applicable regulations and maintain a sterile environment.  Accordingly, PMIC contends that the claims are, at most, subject to a limit of $1,000,000 under the Primary Policy, which PMIC interprets as the maximum

9

coverage available for a single "Occurrence." PMIC contends that at most, upon exhaustion of the $1,000,000 limit of liability under the Primary Policy, the PMIC Umbrella/Excess Policy would provide up to an additional $5,000,000 of coverage. Thus, PMIC contends that it has no liability whatsoever under either the Primary Policy or the PMIC Umbrella/Excess Policy, but, alternatively, that its liability under these policies is at most $6 million.

26.    The Primary Policy also provides coverage to NECC in the amount of $1 million per "Occurrence" and $2 million in the aggregate with respect to claims covered by the "Products/Completed Work Hazard" ("PCWH") under the Primary Policy. The PCWH covers claims arising for "products hazard" and "completed work hazard" as those terms are defined in the Primary Policy. .

27.    The Trustee disagrees with PMIC's analysis and interpretation of PMIC's liability under its policies. The Trustee believes that the exclusions PMIC relies upon are inapplicable, and apply narrowly to certain claims other than those arising from the Outbreak. The Trustee believes, at a minimum, that each of the three batches of MPA that the CDC has identified with respect to the Outbreak represent three separate "Occurrences" within the meaning of the Policies. Moreover, as this Court is aware, claimants have asserted that they have suffered personal injuries from NECC products other than MPA, and any such claims would not be combined into a single "Occurrence" with claims arising from allegedly contaminated MPA. Moreover, even assuming *arguendo* that PMIC's narrow interpretation of "Occurrence" is accurate, the Trustee contends that claimants have alleged a host of distinct other actions, conduct and omissions over the course of years by NECC that give rise to multiple "Occurrences" under multiple policy years.

DM3\2838061.6

28. Thus, the Trustee contends, with multiple Occurrences at issue, the Trustee is entitled to coverage of $1 million per "Occurrence" under the Primary Policy for each policy year, subject to the aggregate liability cap for non-PCWH claims of $3 million. The Trustee believes many of the claims may be PCWH claims. Thus, the Trustee contends that the Primary Policy provides additional coverage of up to $2 million for PCWH claims. The Trustee believes that the total available under the Primary Policy for PCWH claims and non-PCWH claims, therefore, is at least $5 million for each policy year.

29. With respect to the PMIC Umbrella/Excess Policy, the Trustee disagrees with PMIC's assertion that coverage is limited to $5 million in the aggregate for each policy year. The Trustee contends that the PMIC Umbrella/Excess Policy provides $5 million of excess coverage for non-PCWH claims, as well as an additional $5 million for PCWH claims, for total coverage of at least $10 million for each policy year. Adding this additional $10 million in excess coverage to the minimum $5 million coverage under the Primary Policy, the Trustee contends that PMIC's liability is at least $15 million under both the Primary Policy and the PMIC Umbrella/Excess Policy for each policy year. The Trustee contends that claims have arisen that are covered under at least two policy years (2011 and 2012), and, thus, that PMIC's exposure is at least $30 million for those years.

30. In summary, PMIC contends that it has no exposure, but alternatively that its exposure is at most $6 million under both policy periods. The Trustee contends that PMIC may be liable for at least $15 million for each policy year, and that there are claims arising in at least two policy years, resulting in a possible exposure for PMIC of at least $30 million.

## 2. Maxum Excess Policy Issued to NECC

31. Maxum issued excess liability policy number EXC 6013127-01 to NECC for the period of June 25, 2010 to January 1, 2012, and an identical excess liability policy number EXC

11

6013127-02 to NECC for the period of January 1, 2012 to January 1, 2013 (the "Maxum Policy"). The Maxum Policy is excess over both the PMIC Primary Policy and the PMIC Umbrella/Excess Policy for both policy years. Maxum contends, and the Trustee disputes, that it has no duty to defend claims under the Maxum Policy, although Maxum has the option to do so if it so chooses. The "Declarations" page of the Maxum Policy provides a limit of liability (after exhaustion of both PMIC policies) of $5 million for each "Occurrence", subject to a $5 million general aggregate limit.".

32.   Maxum contends, like PMIC, that various exclusions absolve it entirely from any liability. Specifically, Maxum contends that NECC and the Individual Insureds' liability for the Outbreak and the Civil Actions does not constitute an occurrence under the policies or is excluded by various policy exclusions, including, without limitation, for claims arising from products manufactured, rather than compounded, by NECC, for claims arising from fungal contamination and for harm that was expected, directed or intended by the insureds or a result of the insureds' intentional acts. Alternatively, if these exclusions do not apply Maxum contends that the claims constitute a single occurrence or are subject to the $5 million general aggregate limit of liability.

33.   The Trustee disagrees with Maxum's analysis. First, as noted above, the Trustee believes the exclusions will not preclude the Insurers' liability under the policies. Second, as noted above with respect to the PMIC policies, the Trustee contends that the claims allege facts and circumstances that constitute multiple "Occurrences" under the Maxum Policy occurring in multiple calendar years.

### 3.   The Individual Policies

34.   PMIC issued separate policies providing coverage for Glenn Chin (Policy No. PHL 0072483 08), Kathy Chin (Policy No. PHL 0096806), Barry Cadden (Policy No. PHL

12

0072481 08), Lisa Cadden (Policy No. PHL 0072480 08), C. Leary (Policy No. PHL 0122124),

G. Svirskiy (Policy No. PHL 0096033), and J. Keough (Policy No. PHL 0105223) as named

insureds (the "Individual Policies"). Pursuant to the Individual Policies, PMIC provided

coverage, under each, of up to $1 million per occurrence subject to a $3 million aggregate in

excess of the PMIC Primary and Umbrella/Excess Policies and the Maxum Policy. NECC is not

an insured under the Individual Policies. As with the PMIC Primary Policy issued to NECC, the

defense costs provided by the Individual Policies are in addition to, and do not reduce, the limits

of liability for indemnification of the individuals. However, the Individual Policies do not pay

for defense costs until all underlying limits are exhausted. There is a duty to defend if there is no

coverage in the underlying policies or if the underlying Insurers (PMIC and Maxum) "refuse or

neglect" to act on the insured's behalf. Unlike the NECC policies, the Individual Policies do not

include a fungal exclusion.

35.     The coverage disputes regarding the Individual Policies overlap with, but are not

entirely identical to, the coverage disputes regarding the NECC policies. Nevertheless, at bottom

PMIC contends that it has no obligations under the Individual Policies. Although the Individual

Policies do not name NECC as an insured, nevertheless, the Trustee believes (i) there is likely to

be substantial coverage available under the Individual Policies, and (ii) the NECC estate should

benefit from this coverage, if nothing else than through the Trustee's claims against the

individual named insureds for the harm to NECC's business arising from the Outbreak by reason

of the acts or omissions of the beneficiaries of the Individual Policies, which NECC purchased

and paid all premiums for.

## PROPOSED COMPROMISES

36.     As is apparent from the foregoing description of the Policies, the coverage issues

are complex. Moreover, the range of potential outcomes is extreme. If the positions of PMIC

DM3\2838061.6

and Maxum are correct, then they have no liability under the Policies, or alternatively, liability not greater than $11 million (exclusive of defense costs and liability under the Individual Policies). As a result of the complexity and wide range of potential outcomes, the Trustee, in consultation with the Official Committee of Unsecured Creditors ("Committee") and the Plaintiffs Steering Committee established in the MDL Action ("PSC"), has entered into the Agreement to resolve issues arising under the Policies issued by the Insurers to NECC. A copy of the Agreement is attached as Exhibit B. The essential terms of the Agreement, which is subject to entry of an order approving this Motion, are summarized as follows:[5]

    a.    PMIC shall pay to the Trustee the sum of $15 million ("PMIC Settlement Payment") on or before the first business day following thirty (30) days after the Bankruptcy Court's approval of the Agreement, which payment shall be held in a separate, interest-bearing account until the Plan Effective Date, and on such date, the PMIC Settlement Payment shall be deemed irrevocably and indefeasibly paid to the Trustee for distribution to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 case;

    b.    Subject to full payment by PMIC of the PMIC Settlement Payment, on the Plan Effective Date, the limits of liability under all PMIC policies (including the Individual Policies) for policy years 2011 and 2012 shall be deemed exhausted and paid in full;

    c.    PMIC shall continue to provide a defense to all claims for all those who are insureds under the PMIC policies or otherwise entitled to be provided coverage for defense costs under the PMIC policies;

    d.    Maxum shall pay to the Trustee the sum of $10.2 million ("Maxum Settlement Payment") on or before the first business day following thirty (30) days after the Bankruptcy Court's approval of the Agreement, which payment shall be held in a separate, interest-bearing account until the Plan Effective Date, and on such date, the Maxum Settlement Payment shall be deemed irrevocably and indefeasibly paid to the

---

[5]    The description of the proposed settlement and the Agreement in this Motion is only a summary. The Agreement controls in all instances to the extent the summary is incomplete or inaccurate or conflicts with the Agreement. Parties in interest should review the Agreement in its entirety as to all of its terms and conditions.

Trustee for distribution to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 case;

e. Other than with respect to PMIC's obligation to provide continuing defense coverage as described above its obligations on account of policies issued by PMIC to Ameridose, NECC's affiliate, and its obligations under the Agreement, the insureds (including NECC) shall release PMIC and Maxum on the Plan Effective Date, and PMIC and Maxum shall receive the protection of a permanent channeling injunction from all claims as set forth in the Agreement and as will be provided for in the Plan;

f. PMIC and Maxum preserve and assign to the Trustee, for the benefit of the estate, all claims for contribution, indemnification, subrogation and similar matters, and waive and shall not assert against the estate, any claims not otherwise assigned to the Trustee pursuant to the Agreement; and

g. The Settling Parties agree to support and not oppose or object to the Plan. *See* Agreement § 4.

## ARGUMENTS AND AUTHORITIES

### A. Standard for Determining Motion

37. Pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure, this Court has authority to approve a settlement or compromise. *See* Fed. R. Bankr. P. 9019(a). The decision to approve a settlement or compromise lies within the discretion of the bankruptcy court, and is warranted when the settlement is found to be reasonable and fair in light of the particular circumstances of the case. *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968). In evaluating whether a settlement is fair and reasonable, a bankruptcy court need not be convinced the settlement is the best possible compromise or that the estate has maximized its recovery. Rather, a settlement or compromise should be approved as fair and reasonable as long as it does not "fall below the lowest point in the range of reasonableness." *In re Healthco Int'l, Inc.*, 136 F.3d 45, 51 (1st Cir. 1998) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d. Cir. 1983).

38. When evaluating a proposed compromise, a bankruptcy court must assess and balance the value of the claim that is being compromised against the value to the estate by virtue

DM3\2838061.6

of the compromise proposed.[6] Bankruptcy courts consider the following factors in determining whether the proposed settlement is in the best interest of the debtor's estate: (1) the probability of success in the litigation being compromised; (2) the difficulties to be encountered in the matter of collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay in pursuing the litigation; and (4) the paramount interests of the creditors, and a proper deference to their views. *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, supra; Jeffrey v. Desmond,* 70 F.3d 183, 185 (1st Cir. 1995); see also *In re Martin,* 91 F.3d 289 (3d Cir. 1996).

### B. The Proposed Compromise is Fair and Reasonable and Should be Approved

39. The Trustee submits that the proposed compromise in the Agreement is fair and reasonable and should be approved. The Agreement is the product of extended and intensive good faith, arm's-length negotiations, resolves complex and difficult insurance coverage disputes and provides substantial cash to this estate and its creditors. In considering the specific *TMT* and *Jeffrey v. Desmond* factors, the Trustee submits that the third and fourth factors particularly weigh strongly in support of the proposed settlement.[7] The complexity of the litigation involved

---

[6] Although not directly on point, this Court's observations in a different case regarding the test for confirmation of a Chapter 11 plan where a Chapter 11 debtor seeks to provide releases are instructive. This Court observed that "there are only two questions: and the first one is, is there some consideration for the release; and then the second one is, does the release benefit the estate?" *In re Northern Berkshire Healthcare, et. al., Case No. 11-31114-HJB, Transcript of April 2, 2012 Hearing [Notice of Filing of Transcript at Docket No. 653] at 37 (lines 9 – 13).* The Trustee submits that the releases the Trustee contemplates providing to PMIC and Maxum pursuant to the Agreement easily satisfy this standard.

[7] The first factor (likelihood of success on the merits) and second factor (difficulties of collection) are not as significant here. With respect to the first factor, the Trustee believes his position is strong, but presumably the Insurers similarly are confident in the strength of their case. Litigation is inherently risky, regardless of the subjective views of the parties of the merits of their respective positions. With regard to the second factor, the Trustee does not anticipate any difficulty in collection should his position on the coverage issues prevail.

16

and the expense, inconvenience and delay in pursuing the litigation virtually mandates approval of the proposed compromise. At bottom, the coverage dispute is a contract dispute. Under Massachusetts law, "insurance contracts must be interpreted to reflect the intention of the parties as manifested by the policy language." *Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am.*, 338 F.3d 42, 47 (1st Cir. 2003)(citations omitted). The interpretation of an insurance policy begins "with the actual language of the policies," and a court is to consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *GRE Ins. Group v. Metropolitan Boston Hous. Ptnership.*, 61 F.3d 79, 81 (1st Cir. 1995), *citing Trustees of Tufts Univ. v. Comm. Union Ins. Co.*, 415 Mass. 844, 849, 616 N.E.2d 576, 583 (1990).

40. "Contract interpretation presents, in the first instance, a question of law, and is therefore the court's responsibility. If, however, a contract is thought ambiguous, the court may receive extrinsic evidence, even parol evidence, to determine whether uncertainty exists." *In re Access Cardiosystems, Inc.*, 361 B.R. 626, 641 (Bankr. D. Mass. 2007) *quoting, Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989)(citations omitted). Thus, if this Court determines that the policies are unambiguous, then, without a trial, the parties would have to brief and this Court would have to examine multiple provisions of the various Policies to discern the parties' intentions. Critical terms, including "Occurrence," "Loss," and "Aggregate Limits" would be the subject to painstaking analysis and argument. If this Court determines that the policies are ambiguous, then a trial may be required. The Trustee may have to rely in part upon the testimony of NECC's former principals, who the Trustee expects may refuse to testify and assert their rights under the Fifth Amendment of the United States Constitution. At a minimum, the Trustee anticipates that the credibility of NECC's former principals will be challenged aggressively by the Insurers, leaving the Trustee is the position of having to vouch for the

17

credibility and integrity of certain of NECC's former insiders. Moreover, many if not all of the coverage issues are heavily fact-intensive and will turn on facts that may not be determined until the outcome of the underlying litigation, regardless of which party prevails in the coverage action. This significant delay in recovery even in the best of circumstances weighs heavily in favor of approval of the proposed settlement. Regardless of whether this Court determines that a trial is required, the Trustee anticipates that costly, expensive and time-consuming discovery will be required. In light of the magnitude of the sums involved, and the wide range of potential outcomes, the Trustee anticipates any decision by this Court on the coverage issues will be the subject of multiple appeals.

41.    In short, the expense, time and complexity of litigation of the coverage issues is substantial and, indeed, dispositive when compared to the benefits of the contemplated settlement. Without incurring substantial litigation cost and risk, and without the passage of many years required to bring coverage litigation to a conclusion, the estate will recover $25.2 million of cash forthwith under the Agreement. Many of the NECC insiders allege that claims only arose in the calendar year of 2012, and if true, then this settlement represents a complete victory by the Trustee on his claims. Moreover, the Trustee is involved in significant settlement negotiations with other parties, and believes this will be the first, not the last, eight figure settlement he will be able to achieve. The settlement with the Insurers primes the pump for further settlements and sets a very high bar as a precedent for settlements with other potentially liable parties.

42.    The fourth factor, the paramount interests of the creditors and a proper deference to their views, further compels the conclusion that the proposed settlement is fair and reasonable and should be approved. The Trustee is mindful both that the creditors' interests are

18

"paramount" and, perhaps more importantly, as yet not vindicated. Personal injury claimants who have suffered grievous harm cannot wait, and should not be compelled to wait, for lawyers to fight endlessly over the meanings of arcane and technical language in complex commercial insurance policies. The proposed settlement provides the estate with the functional equivalent of a complete victory for NECC regarding coverage disputes for policy year 2012, and the prompt recovery of substantial funds available for distribution to NECC creditors as soon as a plan can be confirmed. The Trustee does not believe that the "paramount" interests of creditors are served if he is compelled to forego this settlement and instead pursue litigation that is likely to remain unresolved for the indefinite future and carries the inherent risks of any litigation of this nature.

C. **The Plan Support Provisions of the Agreement are Fair and Reasonable, and Should be Approved**

43. As noted above, the Agreement (in Section 4) contains extensive provisions that require PMIC and Maxum (and the Individual Insureds) to support the Trustee's contemplated plan under certain terms and conditions. These "plan support provisions" are a significant component of the settlement and a material term in the Agreement, and should be approved.

44. The case law on the propriety of plan support agreements is evolving. Recently, the court in *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013) denied a request by certain creditors to designate the votes of other creditors to a "Restructuring Support Agreement" and not count those votes pursuant to 11 U.S.C. §§ 1125(g) and 1126(e). In denying the motion, the court relied upon *In re Century Glove*, 860 F.2d 94 (3rd Cir. 1988). In *Century Glove*, which the *Indianapolis Downs* court characterized as the "seminal case [in the Third Circuit] construing solicitation and the designation of votes," the court affirmed the denial of a motion to designate votes of a creditor who had circulated an alternative plan to the creditors committee seeking to garner that body's support. The Third Circuit ruled that "solicitation must

19

be read narrowly" and that a broad reading "can seriously inhibit free creditor negotiations." *Id.*
at 101.

45.     Although this Court has questioned the Third Circuit's reasoning in *Century Glove*, this Court's precedent is entirely consistent with *Indianapolis Downs* and its holding that creditors signing a plan support agreement have not violated the Bankruptcy Code. In *In re Clamp-All Corp.*, 233 B.R. 198 (Bankr. D. Mass. 1999), a creditor filed an objection to a disclosure statement, attaching as an exhibit a full copy of a disclosure statement and alternative, competing reorganization plan. This Court held that such conduct violated sections 1121(b) and 1125(b) of the Bankruptcy Code as well as Federal Rule of Bankruptcy Procedure 3017(a). Nevertheless, this Court emphasized that "open negotiation by creditors is imperative." *Id.* at 206. This Court characterized the "difficult task" as "distinguishing between permissible negotiations and prohibited solicitations. . . ." *Id.* To pass muster as permissible negotiations, such "negotiations must be conducted in a manner consistent with the policy goals intended by Congress to be effectuated through sections 1121(b) and 1125(b) of the Bankruptcy Code." *Id.*

46.     This Court's principal disagreement with *Century Glove* concerned the impairment of a chapter 11 debtor's exclusive right to solicit acceptances and rejections of a plan under 11 U.S.C. § 1121(d) arising from the disclosure by dissenting creditors of a potential, alternative plan. Exclusivity concerns do not exist here, as NECC's exclusive rights to solicit acceptances and rejections of a plan were terminated, pursuant to 11 U.S.C. § 1121(c)(1), on the Appointment Date. Here the parties entered into the plan support agreement to build support for, and not rejection of, the Trustee's contemplated plan of reorganization. Indeed, section 4 (a) of the Agreement contemplates that solicitation of the Insiders' votes will occur separately, in accordance with 11 U.S.C. §§ 1125 and 1126, and expressly conditions the Insiders'

20

commitments to vote to accept the plan on the subsequent, proper solicitation of the Insiders'

votes pursuant to those sections of the Bankruptcy Code.  The potential impairment of NECC's

terminated exclusivity rights under 11 U.S.C. § 1121, so critical to this Court's *Clamp-All*

opinion, simply is not at issue or relevant here.

      47.      The remaining concern raised by *Clamp-All* is whether the negotiations and the

plan support provisions of the Agreement "are consistent with the policy goals intended by

Congress to be effectuated through section[ ] . . . 1125(b) of the Bankruptcy Code." *Id.* at 206.

Section 1125(b) requires a written disclosure statement, approved by the bankruptcy court as

containing adequate information, be transmitted to creditors, together with a plan or a summary

of the plan, prior to any post-petition solicitation of votes for or against the plan. *Id.* at 208.  This

Court noted that the requirement of advance court approval "was thought to discourage the

undesirable practice . . . of soliciting acceptance or rejection at a time when creditors and

stockholders were too ill-informed to act capably in their own interests." *Clamp-All Corp.*, 233

B.R. at 206 (citations and internal quotations omitted).

      48.      Unlike with respect to the section 1121 issues, *Indianapolis Downs* not only is

consistent with *Clamp-All* with respect to the section 1125 issues, but, indeed, cites to *Clamp-All*

in finding that "the interests that § 1125 and the disclosure requirements are intended to protect

are not at material risk [from the plan support agreement] in this case." *In re Indianapolis

Downs, LLC*, 486 B.R. at 295-96.  Here, as in *Indianapolis Downs*, the Insurers "are all

sophisticated. . . players and have been represented by able and experienced professionals

throughout these proceedings." *Id.* at 296. "[T]he entities whose votes are targeted [here, the

Insurers and Individual Insureds] cannot seriously be characterized as too ill-informed to act

capably in their own interests." *Id.* (*quoting In re Heritage Organization, LLC*, 376 B.R. 783, 794 (Bankr. N.D. Tex. 2007)).

49.     In sum, this Court acknowledged that "the *Century Glove* court's concern that a broad reading of § 1125(b) could limit creditor communications and negotiations." *Clamp-All*, 233 B.R. at 209. Such an anomalous result, which *Indianapolis Downs* avoided partly in reliance upon *Clamp-All*, would occur here if this Court does not approve the plan support provisions of the Agreement. The negotiations and the Agreement are all "consistent with the policy goals intended by Congress to be effectuated through . . . the Bankruptcy Code." *Clamp-All*, 233 B.R. at 209. There is no plan competing with or proposed as an alternative to the Trustee's contemplated plan that the Insurers were solicited to accept. NECC's exclusivity period has terminated, and the Agreement contemplates, and is conditioned upon, subsequent, proper solicitation of all votes, including those of the Insurers, under Bankruptcy Code Sections 1125 and 1126. The plan support provisions operate to ensure the Insurers and Individual Insureds do not seek to interfere with confirmation of the Trustee's contemplated plan or take any other action that may result in the escrowed settlement funds being returned to them rather than used to fund payments to holders of allowed claims under a plan. The plan support provisions operate to foster, rather than disrupt, the formulation and confirmation of the Trustee's plan to maximize the recovery of creditors consensually, without a battle between competing plans. Accordingly, the Trustee submits that this Court can and should approve the Agreement in its entirety, including the plan support provisions in section 4 thereof.

### D.     **The Committee and the PSC Support This Motion**

50.     Finally, as set forth in the Addendum to the Agreement, the Committee and PSC support this Motion and this Court's approval of the Agreement in all respects and assent to the requested relief. Thus, the Trustee's "proper deference" to the views of the creditors further

DM3\2838061.6

supports the determination that the contemplated settlement is fair and reasonable and that this

Motion should be allowed. *See Jeffery v. Desmond, supra.*

51. **WHEREFORE,** the Trustee respectfully requests that this Court approve this

Motion and the Agreement by entering an order substantially in the form attached hereto as

Exhibit A, and grant the Trustee such other and further relief as this Court deems just and proper.

Dated:   May 6, 2014             Respectfully submitted,
          Boston, Massachusetts

**DUANE MORRIS LLP**

By: /s/ Jeffrey D. Sternklar
Jeffrey D. Sternklar (BBO #549561)
100 High Street, Suite 2400
Boston, MA 02110-1724
Phone: (857) 488-4200
Fax: (857) 488-4201
Email: jdsternklar@duanemorris.com

DM3\2838061.6

# EXHIBIT A

## *PROPOSED ORDER*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEW ENGLAND COMPOUNDING | ) | |
| PHARMACY, INC., | ) | |
| | ) | Case No. 12-19882 (HJB) |
| Debtor. | ) | |
| | ) | |

**ORDER PURSUANT TO FED. R. BANKR. P. 9019 APPROVING THE
SETTLEMENT AGREEMENT AND MUTUAL RELEASE BETWEEN THE
CHAPTER 11 TRUSTEE, PHARMACISTS MUTUAL INSURANCE COMPANY,
MAXUM INDEMNITY COMPANY AND INDIVIDUAL INSUREDS**

This Court has considered the Chapter 11 Trustee's Motion to Approve Compromise of

Controversies and Settlements with Pharmacists Mutual Insurance Company and Maxum

Indemnity Company (the "9019 Motion"), by which the Chapter 11 Trustee of New England

Compounding Pharmacy, Inc. (the "Debtor" or "NECC") is seeking approval, pursuant to Rule

9019 of the Federal Rules of Bankruptcy Procedure,[1] of a Plan Support and Settlement

Agreement (the "Agreement") with NECC's primary and excess liability insurance carriers,

Pharmacists Mutual Insurance Company ("PMIC") and Maxum Indemnity Company ("Maxum")

(PMIC and Maxum are collectively referred to as the "Settling Insurers"), on account of certain

insurance policies issued to NECC, Barry J. Cadden, Lisa M. Conigliaro Cadden, Glenn Chin, C.

Leary, G. Svirskiy, J. Keough and K. Chin as named insureds; and this Court having determined

that the relief requested in the 9019 Motion is fair and equitable and in the best interests of

NECC, its creditors and its estate; and it appearing that notice of the 9019 Motion was good and

sufficient under the particular circumstances and that no further or other notice need be given;

---

[1] An executed copy of the Agreement is attached as Exhibit B to the 9019 Motion. Capitalized terms used but not defined herein have the meaning ascribed to them in the Agreement.

and upon the record herein; and after due deliberation thereon; and good cause appearing

therefor,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. The 9019 Motion is granted;

2. The Agreement is approved in all respects;

3. On or before the first Business Day following thirty (30) days after the entry of this Order, and provided that this Order is not then stayed, the Settling Insurers shall make the Settlement Payments, which Settlement Payments shall be held in a segregated, interest-bearing account separate and apart from any other assets of the Debtor's estate, until the Plan Effective Date, at which point the Settlement Payments shall be utilized to fund administrative expenses of the NECC estate and the trust to be established for the benefit of creditors in accordance with the terms of the Agreement and such Plan;

4. The Plan and the Confirmation Order shall contain, among other things, all of the provisions as required under the Agreement, including, without limitation, the following:

(i) The Policies are, and shall be, deemed exhausted and all of PMIC's and Maxum's obligations under those Policies are, and are deemed to be, extinguished;

(ii) All claims, as described in the Agreement, by and against the Settling Insurers, the Trustee, NECC and the Individual Insureds shall be deemed released as set forth in the Agreement;

(iii) All persons as described in the Agreement shall be enjoined from asserting claims against the persons identified in the Agreement, including without limitation, the Trustee, NECC, the Individual Insureds and the Settling Insurers.

5. The Parties are authorized to execute and to deliver any and all instruments, documents and papers, and to take any and all actions which they deem reasonably necessary or appropriate to consummate and implement the Agreement and to perform any and all obligations contemplated therein;

DM3\2851696.2

6.     This Court shall retain exclusive jurisdiction with respect to the implementation of the Agreement and this Order; and

Dated: _____, 2014

                                        _____

Honorable Henry J. Boroff
United States Bankruptcy Judge

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 29 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 1 of 35

# EXHIBIT B

*PLAN SUPPORT AND SETTLEMENT AGREEMENT*

Case 1:13-md-02419-RWZ Document 1106-2 Filed 05/06/14 Page 30 of 63

Case 12-19882 Doc 713-2 Filed 05/06/14 Entered 05/06/14 14:25:15 Desc Exhibit
B (Plan Support and Settlement Agreement) Page 2 of 35

## PLAN SUPPORT AND SETTLEMENT AGREEMENT

This Plan Support and Settlement Agreement (together with all exhibits and schedules attached hereto, the "Agreement") is made and entered into as of May 2, 2014, by and among: (a) Paul D. Moore, in his capacity as chapter 11 trustee and not individually (together with any successors thereto, including any Estate Representative, as hereinafter defined, the "Trustee") for the estate of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center (the "Debtor" or "NECC") appointed in the chapter 11 case of NECC (the "Chapter 11 Case"), Case No. 12-19882, pending in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"); (b) Pharmacists Mutual Insurance Company ("PMIC"); (c) Maxum Indemnity Company ("Maxum" and, together with PMIC, the "Settling Insurers"); and (d) Barry J. Cadden, Lisa M. Conigliaro Cadden, Gregory Conigliaro, Carla Conigliaro, Glenn Chin, Christopher Leary, Jill Keough, Gene Svirskiy and Kathy Chin (collectively, the "Individual Insureds").

Each of the Trustee, the Settling Insurers and the Individual Insureds are defined as a "Party" and collectively as the "Parties."

Capitalized terms not defined in this introduction or in the recitals to this Agreement shall have the meanings assigned to them in Section 1 of this Agreement.

## RECITALS

WHEREAS, PMIC issued a Special Businessowners Policy to NECC, as named insured, under policy number BOP 0068490 07, and a Commercial Umbrella/Excess Liability Policy to NECC as named insured under policy number UCL 0068490 07, both with a policy period of January 1, 2011 to January 1, 2012 (the "2011 PMIC Policies") and a Special Businessowners Policy to NECC as named insured under policy number BOP 0068490 08, and a Commercial Umbrella/Excess Liability Policy to NECC as named insured under policy number UCL 0068490 08, both with a policy period of January 1, 2012 to January 1, 2013 (the "2012 PMIC Policies");

WHEREAS, PMIC issued Individual Pharmacist Professional Liability Policies to Barry J. Cadden (Policy No. PHL 0072481), Lisa M. Conigliaro Cadden (Policy No. PHL 0072480), Glenn Chin (Policy No. PHL 0072483), C. Leary (Policy No. PHL 0122124), G. Svirskiy (Policy No. PHL 0096033), J. Keough (Policy No. PHL 0105223), and K. Chin (Policy No. PHL 0096806) as named insureds, providing, in pertinent part, professional liability coverage (the "Individual Policies") (collectively with the 2011 PMIC Policies and the 2012 PMIC Policies, the "PMIC Policies");

WHEREAS, Maxum issued two Commercial Excess Liability Policies to NECC, as named insured, under policy number EXC 6013127-01 for the period of June 25, 2010 to January 1, 2012 (the "2011 Maxum Policy") and policy number EXC 6013127-02 for the period of January 1, 2012 to January 1, 2013 (the "2012 Maxum Policy") (collectively the "Maxum Policies" and, together with the PMIC Policies, the "Policies"). The Maxum Policies are excess over the 2011 PMIC Policies and the 2012 PMIC Policies;

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 31 of 63
Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 3 of 35

WHEREAS, on December 21, 2012 (the "Petition Date"), the Debtor filed a voluntary petition in the United States Bankruptcy Court for the District of Massachusetts Eastern Division (the "Bankruptcy Court") for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case");

WHEREAS, prior to the Petition Date, NECC allegedly compounded injectable methylpredinisolone acetate ("MPA") and other drugs (collectively, the "Drugs") and distributed the Drugs nationwide;

WHEREAS, in September 2012, it was discovered that the Drugs were allegedly contaminated and hundreds of patients who were injected with the Drugs allegedly developed injuries or died, such injuries or deaths allegedly giving rise to claims and causes of action against, *inter alia*, NECC and the Individual Insureds (such claims and causes of action, collectively, the "Drug Claims");

WHEREAS, lawsuits were filed against, among others, NECC and the Individual Insureds in various state and federal courts by certain of said patients alleging, *inter alia*, the negligent design, manufacture, marketing and sale of the Drugs;

WHEREAS, on January 18, 2013, the Office of the United States Trustee (the "UST") appointed an official committee of unsecured creditors in the Chapter 11 Case (the "Committee");

WHEREAS, the UST appointed Paul D. Moore to serve as chapter 11 trustee for the Debtor's estate, and, on January 25, 2013, the Bankruptcy Court approved such appointment;

WHEREAS, on February 12, 2013, the Judicial Panel on Multidistrict Litigation entered an order transferring certain actions against, among others, NECC and/or the Individual Insureds to the United States District Court for the District of Massachusetts (the "MDL Court") for consolidated pretrial proceedings, which actions are pending under the caption *In re New England Compounding Pharmacy Cases Litigation*, MDL No. 2419, Case No. 13-cv-02419 (D. Mass.) (the "MDL Proceeding");

WHEREAS, on April 9, 2013, the MDL Court entered an order establishing a seven-attorney Plaintiffs' Steering Committee (the "PSC") to organize, simplify, and streamline the handling of the MDL Proceeding on behalf of all plaintiffs to actions therein;

WHEREAS on May 31, 2013, the MDL Court entered an order transferring to the MDL Court three categories of cases based on bodily injuries resulting from the administration of tainted MPA: (1) all cases pending in other federal courts that had not yet been transferred to the MDL Court; (2) all cases pending in state courts where removal was in process; and (3) all cases pending in state courts that named NECC or its affiliated entities and individuals, including the Individual Insureds, as defendants;

WHEREAS, by Case Management Order dated June 28, 2013, the MDL Court temporarily stayed all discovery (the "MDL Stay") with respect to the cases transferred to the MDL Court;

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 32 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 4 of 35

WHEREAS, *inter alia*, the Trustee asserts, and the Settling Insurers dispute, the existence of coverage under the Policies for NECC and the Individual Insureds for the Drug Claims, including, but not limited to, the existence of any duty to defend NECC and the Individual Insureds, as well as the scope and amount of available coverage, should coverage be determined to exist (the "Dispute"); and

WHEREAS, the Parties wish to settle their differences and resolve (a) the Dispute and (b) any and all claims, causes of action, demands, disputes, obligations and other matters (i) between them, and (ii) concerning or relating to NECC and its products, including, but not limited to, the Drug Claims.

NOW, THEREFORE, based on these premises, and in consideration of the mutual promises contained herein and other good and valuable consideration, the adequacy and sufficiency of which the Parties hereby acknowledge, the Parties agree as follows:

**Section 1.**    **Definitions.**

"Alternative Plan" has the meaning set forth in Section 4.

"Ameridose" means Ameridose, LLC.

"Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court.

"Business Day" means any day that is not a Saturday, a Sunday or a federal holiday in the United States of America.

"Claim" means "claim" as defined in section 101(5) of the Bankruptcy Code.

"Confirmation Order" has the meaning set forth in Section 11.

"Disclosure Statement" has the meaning set forth in Section 11.

"Disclosure Statement Order" has the meaning set forth in Section 11.

"Estate Representative" means the Trustee and any successor in interest to the Trustee or person designated under the Plan to administer and liquidate the assets of the Debtor's estate and make distributions to creditors thereof, including any trustee for any trust established under the Plan to make such distributions.

"Execution Date" means the date on which this Agreement has been signed by all Parties.

"Incidents" means the various injuries or damages allegedly suffered by the Tort Plaintiffs which they contend are related to the compounding, preparation, marketing or distribution of any NECC product, including, but not limited to, contaminated MPA as alleged in the Tort Cases.

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 33 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 5 of 35

"Individual Plan Funding Agreement" means that certain Plan Support and Funding Agreement dated as of May 2, 2014, by and among the Trustee and Barry J. Cadden, Lisa M. Conigliaro Cadden, Gregory Conigliaro, Carla Conigliaro.

"Insurance Termination Provision" has the meaning set forth in Section 5.

"Maxum Settlement Payment" has the meaning set forth in Section 2.

"Outside Date" has the meaning set forth in Section 12.1.

"Plan" has the meaning set forth in Section 11.

"Plan Effective Date" means the later of (i) the first Business Day following (a) fourteen (14) days after the Bankruptcy Court's entry of the Confirmation Order, provided that the Confirmation Order is not subject to a stay by any court of competent jurisdiction as of such date, or (b) only if the Bankruptcy Court determines that it lacks jurisdiction or authority to enter final judgment confirming all or any portion of the Plan, then thirty (30) days after the United States District Court's entry of the Confirmation Order, provided that the Confirmation Order is not subject to a stay by any court of competent jurisdiction as of such date, and (ii) the first Business Day on which all other conditions to the effective date of the Plan have been satisfied or waived.

"Plan Injunctions" has the meaning set forth in Section 5.

"Plan Releases" has the meaning set forth in Section 5.

"PMIC Settlement Payment" has the meaning set forth in Section 2.

"Released Tort Matters" means  (a) the Incidents; (b) all claims, causes of action, and demands asserted, or which could have been alleged, in the Tort Cases; and (c) all claims, causes of action, and demands relating to the design, compounding, marketing, sale, distribution, fabrication, advertising, supply, production, formulation, use, labeling, or ingestion of any product produced, compounded, marketed, sold and/or distributed by the Debtor, including, but not limited to, MPA, notwithstanding the identity of the retailer, wholesaler, administrator or other seller of such product, including, but not limited to, MPA.

"Rule 9019 Motion" means the motion to be filed jointly by the Trustee seeking the Bankruptcy Court's entry of the Rule 9019 Order.

"Rule 9019 Order" means an order of the Bankruptcy Court or other court of competent jurisdiction, with such modifications as may be acceptable to the Parties, approving, pursuant to Rule 9019 of the Bankruptcy Rules, this Agreement and the compromises and settlements memorialized in this Agreement.

"Settlement Payments" has the meaning set forth in Section 2.

"Supplemental Documents" has the meaning set forth in Section 11.

"Tort Cases" means any and all cases, Claims, and causes of action currently pending or which may be brought in any forum against NECC, any or all of the Individual Insureds, or any and all of the Settling Insurers, that involve, arise from, or relate to NECC or the Drug Claims, including, but not limited to, those pending in the MDL Proceeding..

"Tort Plaintiffs" means the plaintiffs in the Tort Cases.

**Section 2.**     Settlement Payments.  On or before the first Business Day following thirty (30) days after the Bankruptcy Court's entry of the Rule 9019 Order, and provided that the Rule 9019 Order is not stayed by an order of any court of competent jurisdiction as of such date, (a) PMIC shall make a cash payment, in immediately available funds, to the Trustee in the amount of fifteen million dollars ($15,000,000) (the "PMIC Settlement Payment") and (b) Maxum shall make a cash payment, in immediately available funds, to the Trustee in the amount of ten million two hundred thousand dollars ($10,200,000) (the "Maxum Settlement Payment" and, together with the PMIC Settlement Payment, the "Settlement Payments").  The Trustee shall hold the Settlement Payments in a segregated, interest-bearing account separate and apart from any other assets of the Debtor's estate.  On the Plan Effective Date, the Settlement Payments, together with all accrued interest thereon, shall be, and shall be deemed, irrevocably and indefeasibly paid to the Trustee for payment of the costs and expenses of administration of the Chapter 11 Case and distribution to creditors under the Plan (including, but not limited to, pursuant to any plan trust established thereunder to make distributions to creditors or classes thereof), and neither PMIC nor Maxum shall have any further right, claim or interest in or to the Settlement Payments. Notwithstanding the foregoing, if this Agreement is terminated pursuant to Section 12 hereof or the Rule 9019 Order is reversed or vacated by any court of competent jurisdiction, in each case, prior to the Plan Effective Date, the Trustee shall return the Settlement Payments together with all accrued interest thereon to the Settling Insurers; provided, however, that (a) if the reason for such termination is the breach of this Agreement by PMIC and PMIC's failure to cure such breach within ten (10) Business Days after the Trustee has delivered written notice of such breach to PMIC, then in such case the Trustee shall (i) retain the PMIC Settlement Payment, together with all accrued interest thereon; (ii) within twenty (20) Business Days of the date of termination, seek a judicial determination of PMIC's alleged breach and the resulting damages from the Bankruptcy Court or, if the Bankruptcy Court determines that it lacks or declines to exercise jurisdiction over the matter, another court of competent jurisdiction; (iii) apply the PMIC Settlement Payment (and accrued interest thereon) as a credit against any damages arising from such breach awarded to the Trustee by the applicable court (it being agreed and understood that the Trustee is not precluded from seeking damages for any such breach in excess of the PMIC Settlement Payment); and (iv) if any balance of the PMIC Settlement Payment (and accrued interest thereon) remains after application of the credit described in clause (iii), the Trustee shall return such balance to PMIC within five (5) Business Days; and (b) if the reason for such termination is the breach of this Agreement by Maxum and Maxum's failure to cure such breach within ten (10) Business Days after the Trustee has delivered written notice of such breach to Maxum, then in such case the Trustee shall (i) retain the Maxum Settlement Payment, together with all accrued interest thereon; (ii) within twenty (20) Business Days of the date of termination, seek a judicial determination of Maxum's alleged breach and the resulting damages from the Bankruptcy Court or, if the Bankruptcy Court determines that it lacks or declines to exercise jurisdiction over the matter, another court of competent jurisdiction; (iii) apply the Maxum Settlement Payment (and accrued interest thereon) as a credit against any damages

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 35 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 7 of 35

arising from such breach awarded to the Trustee by the applicable court (it being agreed and understood that the Trustee is not precluded from seeking damages for any such breach in excess of the Maxum Settlement Payment); and (iv) if any balance of the Maxum Settlement Payment (and accrued interest thereon) remains after application of the credit described in clause (iii), the Trustee shall return such balance to Maxum within five (5) Business Days. The Parties intend and agree that the Settlement Payments shall constitute a material part of a fund to be ultimately distributed to bodily injury claimants against and other creditors of the Debtor under the Plan and, accordingly, shall be protected from collateral attack and reach by the Debtor's creditors or any other persons or entities whatsoever; and that such funds shall be therefore held in a legal manner that protects such funds from the reach of others to the full extent permitted by law. The Parties further intend and agree that each Settlement Payment shall constitute, and shall be treated, at all times, as a deposit of the type described in Bankruptcy Rule 3020(a).

**Section 3.**     Solicitation and Prosecution of the Plan.  As long as this Agreement has not been terminated, the Trustee agrees to:

(a)     no later than thirty (30) days after the Execution Date, file the Rule 9019 Motion with the Bankruptcy Court and use commercially reasonable efforts to obtain approval of this Agreement and entry of the Rule 9019 Order;

(b)     file the Plan (which shall include the Insurance Termination Provision, Plan Releases and Plan Injunctions), the Disclosure Statement, and a motion seeking entry of the Disclosure Statement Order with the Bankruptcy Court, and use commercially reasonable efforts to obtain (i) approval of the Disclosure Statement and entry of the Disclosure Statement Order by the Bankruptcy Court, and (ii) confirmation and consummation of the Plan;

(c)     use commercially reasonable efforts to consummate the Plan;

(d)     during the period from the entry of the Rule 9019 Order and the Plan Effective Date, all Parties shall take reasonable steps to ensure the MDL Stay remains in effect; and

(e)     in the event the MDL Stay is modified for any and all claims transferred to the MDL Court, at the request and sole expense of PMIC (including the expense of the Trustee's attorneys' fees and expenses), the Trustee shall commence an adversary proceeding in a manner that is procedurally acceptable to PMIC against all parties prosecuting such claims to seek the entry of a preliminary injunction that is consistent with the injunction provisions set forth in Section 5 below, unless the Trustee reasonably determines that doing so would be inconsistent with the exercise of his fiduciary duties under applicable law.

**Section 4.**     Support of Plan.  Subject to the terms and conditions of this Agreement, each Settling Insurer (severally and not jointly) agrees to:

(a)     so long as its vote has been properly solicited pursuant to sections 1125 and 1126 of the Bankruptcy Code, timely vote any and all Claims that it is entitled to vote, now or hereafter beneficially owned by such Settling Insurer (subject to Section 6

Case 1:13-md-02419-RWZ Document 1106-2 Filed 05/06/14 Page 36 of 63

Case 12-19882 Doc 713-2 Filed 05/06/14 Entered 05/06/14 14:25:15 Desc Exhibit
B (Plan Support and Settlement Agreement) Page 8 of 35

hereof), to accept the Plan in accordance with the applicable procedures set forth in the solicitation materials accompanying the Plan, and timely return a duly executed ballot in connection therewith;

(b) not withdraw or revoke its tender, consent or vote with respect to the Plan and any Supplemental Documents, except as otherwise expressly permitted pursuant to this Agreement; and

(c) not

(i) oppose or object to the Plan, the Disclosure Statement, or other Supplemental Documents, or the solicitation or consummation of the Plan and the transactions contemplated by the Supplemental Documents, whether directly or indirectly;

(ii) join in or support any objection to the Plan, Disclosure Statement, or other Supplemental Documents, or to the solicitation of the Plan;

(iii) initiate any legal proceedings that are inconsistent with or that would delay, prevent, frustrate or impede the approval, confirmation or consummation of the Plan, the Disclosure Statement, or other Supplemental Documents, or otherwise commence any proceedings to oppose the Plan, the Disclosure Statement, or any of the other Supplemental Documents, or take any other action that is barred by or likely to frustrate this Agreement;

(iv) vote for, consent to, support or participate in the formulation of any other restructuring or settlement of Claims, any other transaction involving any plan of reorganization (with the exception of the Plan) or liquidation under applicable bankruptcy or insolvency laws, whether domestic or foreign, in respect of the Debtor or its affiliates, except as otherwise expressly contemplated pursuant to this Agreement;

(v) directly or indirectly seek, solicit, or enter into any agreements relating to, any restructuring, plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, transaction, sale, disposition or restructuring of the Debtor or its affiliates (or substantially all of their assets or stock) other than the Plan or as otherwise set forth in this Agreement (any such plan or other action as described in clauses (iv) and (v) immediately above, an "Alternative Plan"); or

(vi) enter into any letter of intent, memorandum of understanding or agreement in principle relating to any Alternative Plan.

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 37 of 63
Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 9 of 35

**Section 5.**     Required Plan Provisions.  The Trustee shall confer with the Settling Insurers in preparing the Plan, and shall provide the Settling Insurers an opportunity to provide comments to the Plan and all Plan-related documents, including the Confirmation Order.  The Plan and the Confirmation Order shall comply with Section 11 herein and (i) provide that on the Plan Effective Date, the Policies are, and shall be deemed to be, exhausted, and all of PMIC's and Maxum's obligations under those Policies are, and are deemed to be, extinguished (the "Insurance Termination Provision"), (ii) be in all respects in compliance with the Individual Plan Funding Agreement and (iii) provide releases (the "Plan Releases") and injunctions (the "Plan Injunctions") that are materially consistent with the foregoing:

(a)     *Releases by Settling Insurers.*  On the Plan Effective Date, each of the Settling Insurers shall unconditionally release, and shall be deemed to forever unconditionally release, each of the Debtor, the Debtor's estate, the Trustee, the Committee, the Committee members, the Individual Insureds, the Tort Plaintiffs, and the foregoing persons' and entities' respective attorneys and advisors from any and all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action whatsoever, including without limitation any and all Drug Claims and any direct or indirect claims that are in any way related to the Drug Claims (other than the right to enforce the obligations under this Agreement, the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether known or unknown, whether foreseen or unforeseen, whether contingent or actual, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, whether statutory or common law, whether asserted or unasserted, and whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act, omission, defect, incident, transaction, event or circumstance from the beginning of the world to the Plan Effective Date, in any way relating to or in connection with (i) the Debtor, the Drugs, or any and all products of and/or distributed by the Debtor, or (ii) the Debtor's estate, the Chapter 11 Case, the Plan, the Disclosure Statement, this Agreement, the Policies, and/or the Released Tort Matters.

(b)     *Releases by the Trustee, the Debtor, and Glenn Chin.*  On the Plan Effective Date, the Trustee, the Debtor and its estate, and Glenn Chin shall unconditionally release, and shall be deemed to forever unconditionally release, each of the Settling Insurers, their officers, directors, employees, attorneys, successors, general partners, limited partners, insurers, reinsurers, assigns and independent contractor Stefany Roberts, and the foregoing entities' respective attorneys and advisors from any and all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action whatsoever, including without limitation any and all Drug Claims and any direct or indirect claims for indemnity, contribution, reimbursement, subrogation or similar claim that are in any way related to the Drug Claims (other than the right to enforce the obligations under this Agreement, the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether known or unknown,

-8-

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 38 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 10 of 35

whether foreseen or unforeseen, whether contingent or actual, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, whether statutory or common law, whether asserted or unasserted, and whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act, omission, defect, incident, transaction, event or circumstance from the beginning of the world to the Plan Effective Date, in any way relating to or in connection with (i) the Debtor, the Drugs, or any and all products of and/or distributed by the Debtor, or (ii) the Debtor's estate, the Chapter 11 Case, the Plan, the Disclosure Statement, this Agreement, the Policies, and/or the Released Tort Matters.

(c)   *Releases by the Trustee, the Debtor, and the Individual Insureds.*  On the Plan Effective Date and so long as the Plan is in compliance with the Individual Plan Funding Agreement, the Trustee, the Debtor and its estate, and the Individual Insureds shall unconditionally release, and shall be deemed to forever unconditionally release, each of the Settling Insurers, their officers, directors, employees, attorneys, successors, general partners, limited partners, insurers, reinsurers, assigns and independent contractor Stefany Roberts, and the foregoing entities' respective attorneys and advisors from any and all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action whatsoever, including without limitation any and all Drug Claims and any direct or indirect claims for indemnity, contribution, reimbursement, subrogation or similar claim that are in any way related to the Drug Claims (other than the right to enforce the obligations under this Agreement, the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether known or unknown, whether foreseen or unforeseen, whether contingent or actual, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, whether statutory or common law, whether asserted or unasserted, and whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act, omission, defect, incident, transaction, event or circumstance from the beginning of the world to the Plan Effective Date, in any way relating to or in connection with (i) the Debtor, the Drugs, or any and all products of and/or distributed by the Debtor, or (ii) the Debtor's estate, the Chapter 11 Case, the Plan, the Disclosure Statement, this Agreement, the Policies, and/or the Released Tort Matters. Notwithstanding the foregoing, nothing herein shall be deemed to be a release by the Individual Insureds as insureds under the PMIC Policies from PMIC's obligations to pay defense costs incurred by the Individual Insureds relating to the Tort Matters in accordance with the terms of the PMIC Policies through the Plan Effective Date relating to the Tort Cases, as is set forth in Section 10(c) below.

(d)   *Injunction in Favor of NECC, Individual Insureds and Settling Insurers.*  Except as to the rights and claims created or expressly preserved by the Plan, this

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 39 of 63
Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 11 of 35

Agreement, and the Confirmation Order, upon the Plan Effective Date, NECC, the Individual Insureds and the Settling Insurers, their officers, directors, employees, attorneys, successors, general partners, limited partners, insurers, reinsurers, assigns and independent contractor Stefany Roberts, and the foregoing entities' respective attorneys and advisors shall have and be entitled to an injunction forever barring and enjoining all persons and/or entities from asserting against NECC, any Individual Insured or any Settling Insurer any past, present, and future rights, interests, obligations, claims, causes of action, damages (including punitive damages), demands (including demands for contribution, indemnity, or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees, and other professional fees) and costs of any kind or any type whatsoever, including without limitation any and all Drug Claims and any direct or indirect claims for indemnity, contribution, reimbursement, subrogation or similar claim that are in any way related to the Drug Claims (other than the right to enforce the obligations under this Agreement, the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether known or unknown, whether foreseen or unforeseen, whether contingent or actual, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, whether statutory or common law, whether asserted or unasserted, and whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, transaction, event or circumstance from the beginning of the world to the Plan Effective Date, in any way relating to or in connection with (i) the Debtor, the Drugs, or any and all products of and/or distributed by the Debtor, or (ii) the Debtor's estate, the Chapter 11 Case, the Plan, the Disclosure Statement, this Agreement, the Policies, and/or the Released Tort Matters.

Notwithstanding anything to the contrary in the foregoing, the Plan Releases and the Plan Injunctions shall not include the release of, or an injunction against, any Claims, causes of action or rights of recovery of any person or entity, including, without limitation, the Trustee, the Debtor or its estate or any and all holders of Drug Claims or any Claims that are in any way related to the Drug Claims that are held directly or indirectly, against Ameridose or any insurer of Ameridose (including, without limitation, PMIC, but only to the extent of its coverage of Ameridose), unless such party enters into a separate agreement with the Trustee providing for the inclusion of such party in the Plan Releases and Plan Injunctions.

**Section 6.**     Waiver and Release of Claims and Subrogation Rights; Assignment of Related Rights.  Upon the Plan Effective Date, and so long as this Agreement has not terminated or been terminated, each Settling Insurer hereby (a) waives, relinquishes and releases (i) any and all Claims, of any kind or character it holds against the Debtor or its estate, and (ii) any and all rights to distributions or recoveries, of any kind or character, on account of such Claims including, without limitation, pursuant to a chapter 11 plan for the Debtor (including, without limitation, the Plan), and (b) unconditionally assigns and transfers to the Trustee any and all Claims that it holds against any person or entity, including, without limitation, any affiliate of the Debtor or any Individual Insured, in any way relating to or in connection with the Debtor or any

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 40 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 12 of 35

and all products of and/or distributed by the Debtor, provided however, this Section 6 shall not apply to any Claims that are not released or enjoined against any person, including without limitation, Ameridose, as set forth in Section 5 above.

**Section 7.**   Representations and Warranties of the Settling Insurers. To induce the Trustee and the Individual Insureds to enter into and perform their obligations under this Agreement, each Settling Insurer, severally but not jointly, represents, warrants and acknowledges as follows:

(a)   *Authority.* The Settling Insurer has all necessary authority to enter into this Agreement.

(b)   *Validity.* This Agreement has been duly executed and delivered by the Settling Insurer and constitutes the legal, valid and binding agreement of the Settling Insurer, enforceable against the Settling Insurer in accordance with its terms.

(c)   *No Conflicts.* The execution, delivery and performance by such Settling Insurer (when such performance is due) of this Agreement does not violate any provision of law, rule or regulation applicable to him or her.

(d)   *No Limitation or Impairment of Scope of Release.* The Settling Insurer has not assigned, pledged, sold, encumbered, transferred or conveyed any right, title, interest or lien in any claim it releases or purports to release herein to a third party, or otherwise limited or impaired the full and final scope of such release.

**Section 8.**   Representations and Warranties of the Trustee. To induce the Settling Insurers to enter into and perform their obligations under this Agreement, the Trustee represents, warrants and acknowledges as follows:

(a)   *Validity.* Subject to any Bankruptcy Court approval that may be required, this Agreement has been duly executed and delivered by the Trustee and constitutes the legal, valid and binding agreement of the Trustee, enforceable against the Trustee in accordance with its terms;

(b)   *No Conflicts.* The execution, delivery and performance by the Trustee (when such performance is due) of this Agreement does not (A) subject to the actions, consents and filings referred to in clause (c) below, violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its or their certificates of incorporation or bylaws or other organization documents, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it is a party.

(c)   *Authorization of Governmental Authorities.* No action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority or regulatory body other than the Bankruptcy Court, is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance of this Agreement by the Trustee.

Case 1:13-md-02419-RWZ Document 1106-2 Filed 05/06/14 Page 41 of 63

Case 12-19882 Doc 713-2 Filed 05/06/14 Entered 05/06/14 14:25:15 Desc Exhibit
B (Plan Support and Settlement Agreement) Page 13 of 35

(d) *No Limitation or Impairment of Scope of Release.* The Trustee has not assigned, pledged, sold, encumbered, transferred or conveyed any right, title, interest or lien in any claim he releases or purports to release herein, including the Policies, to a third party, or otherwise limited or impaired the full and final scope of such release.

**Section 9.   Representations and Warranties of the Individual Insureds.**

(a) *Authority.* The Individual Insureds have all necessary authority to enter into this Agreement.

(b) *Validity.* This Agreement has been duly executed and delivered by the Individual Insureds and constitutes the legal, valid and binding agreement of the Individual Insureds, enforceable against the Individual Insureds in accordance with its terms.

(c) *No Conflicts.* The execution, delivery and performance by such Individual Insureds (when such performance is due) of this Agreement does not violate any provision of law, rule or regulation applicable to him or her.

(d) *No Limitation or Impairment of Scope of Release.* The Individual Insureds have not assigned, pledged, sold, encumbered, transferred or conveyed any right, title, interest or lien in any claim it releases or purports to release herein, including the Policies, to a third party, or otherwise limited or impaired the full and final scope of such release.

**Section 10.   Further Assurances and Obligations.**

(a) After the Plan Effective Date, the Settling Insurers, at no cost to them, and not inconsistent with their obligations to the Individual Defendants with respect to confidentiality and privilege, shall provide other assistance consistent with this Agreement to the Trustee, any other Estate Representative, the Committee and the PSC as reasonably requested to assist their efforts to augment the Debtor's estate and to resolve Claims. Without limitation of the foregoing, from and after the Execution Date, the Settling Insurers shall not take any steps to interfere with the Trustee and the Committee in connection with (x) the prosecution of the Chapter 11 Case, (y) the mediation, discovery, and/or prosecution of civil matters in the MDL Proceeding, and (z) consummating and effectuating settlements with other insurers of the Debtor and its affiliates, in each case, as reasonably requested by the Trustee.

(b) The Settling Insurers shall provide notice to the Trustee or any successor Estate Representative of (i) any action by a third party seeking to attach any or all of the Settlement Payments, any Settling Insurer's interest therein, or any Party's interest in the Policies, or (ii) any order of attachment granted in favor of a third party in respect of any or all of the Settlement Payments, any Settling Insurer's interest therein, or any Party's interest in the Policies, in the case of (i) and (ii), within five (5) Business Days of any Party receiving notice of such action or order. The Settling Insurers agree to reasonably cooperate with the Trustee and

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 42 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 14 of 35

take such reasonable actions as the Trustee may direct, in each case at the Trustee's sole expense, in connection with such actions or orders. No Party shall interfere with or oppose the Trustee's efforts to intervene or seek relief in such actions.

(c)     Notwithstanding anything or provision in this Agreement to the contrary, until the Plan Effective Date, PMIC will pay the reasonable and necessary attorneys' fees and other defense costs for NECC and the Individual Insureds to defend against the Released Tort Matters pursuant to and in accordance with the terms and conditions of the Policies and applicable law and, until the Plan Effective Date or termination of this agreement pursuant to Section 12 of this Agreement, shall not seek to terminate any defense obligations under the Policies through a declaratory judgment action or otherwise.

(d)     The Trustee and the Settling Insurers shall each use commercially reasonable efforts to permit (including in connection with relief sought by such party in the MDL Proceeding and the Chapter 11 Case) the Settling Insurers to have the benefit of the stays of litigation and discovery now applicable to them in connection with the Released Tort Matters pending the Plan Effective Date (with corresponding and continuing relief to be provided thereafter by the Plan itself).

**Section 11.**     Supplemental Documents.  The Trustee shall prepare, in consultation with the Committee, the form of the following documents (the "Supplemental Documents"): (a) a chapter 11 plan for the Debtor to be jointly proposed by the Trustee and the Committee (the "Plan") that (i) is in form and substance consistent in all material respects with this Agreement and the Individual Plan Funding Agreement and (ii) includes the Insurance Termination Provision, the Plan Releases and Plan Injunctions, and any appendices, amendments, modifications, supplements, exhibits and schedules relating thereto; (b) a disclosure statement for the Plan (the "Disclosure Statement"); (c) the proposed order approving the Disclosure Statement and solicitation procedures for the Plan (the "Disclosure Statement Order"); (d) the proposed order of the Bankruptcy Court confirming the Plan (the "Confirmation Order"); and (e) the proposed Rule 9019 Order, each of which shall be in form and substance consistent with this Agreement in all material respects, and, in the case of the material terms and conditions of the Rule 9019 Order and the provisions of the Plan and the Confirmation Order implementing this Agreement or otherwise concerning the rights of the Settling Insurers, shall otherwise be in form and substance reasonably acceptable to the Settling Insurers.

**Section 12.     Termination.**

     **Section 12.1.     Automatic Termination.**  The obligations of the Parties under this Agreement shall automatically terminate upon the occurrence of any of the following (except if such occurrence was caused by the action or inaction of one or more of the Settling Insurers or any of the Individual Insureds): (a) the Bankruptcy Court denies confirmation of the Plan and such denial cannot be cured by amending the Plan in a manner that is either (i) not materially inconsistent with this Agreement or (ii) otherwise agreed to by each of the Parties; (b) the Plan is withdrawn; (c) the Plan Effective Date fails to occur on or before one (1) year after the date the Rule 9019 Order is entered in the Bankruptcy Court (the "Outside

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 43 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 15 of 35

Date"); (d) the Court denies the Rule 9019 Motion and does not enter the Rule 9019 Order; (e) an order is entered by a court of competent jurisdiction modifying or altering the terms of this Agreement or any Party's rights and remedies hereunder, in each case, in any material respect, without the consent of the affected Party or Parties (such consent not to be unreasonably withheld); (f) an order is entered dismissing or converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Case. The Outside Date may be further extended in a signed writing by counsel for each of the Parties.

**Section 12.2.   Termination by Trustee.**   The Trustee may terminate this Agreement, at his sole discretion and election, if any of the Settling Insurers has breached any of its obligations, representations, warranties, or covenants set forth in Sections 2, 4, 6, 7, 10 and 13 of this Agreement in any material respect and such breach has not been cured within ten (10) Business Days after the Trustee has delivered written notice of such breach to the applicable Settling Insurer.

**Section 12.3.   Termination by Settling Insurers.**   The Settling Insurers may terminate this Agreement as to all Parties if the Trustee has breached any of his obligations, representations, warranties, or covenants set forth in Sections 3, 5, 8, 10, 11 and 13 of this Agreement in any material respect, and such breach has not been cured within ten (10) Business Days after the Settling Insurers have delivered written notice of such breach to the Trustee.

**Section 12.4.   Effect of Termination.**   In the event this Agreement is terminated as provided above, (i) the Parties shall be restored to the same position which they were in immediately prior to the execution of this Agreement, without waiver of any rights, claims or defenses and (ii) the Policies shall remain effective in all respects in accordance with their terms, and the Parties shall retain, and do not waive, any and all rights, claims and defenses thereunder; provided, however, that in no event shall any such termination relieve a Party hereto from liability or his, her or its obligations under this Agreement for the breach or non-performance of his, her or its obligations hereunder prior to the date of such termination.

**Section 13.   Miscellaneous Provisions.**

**Section 13.1.   Effectiveness.**   Upon the Bankruptcy Court's entry of the Rule 9019 Order, this Agreement shall become effective and binding on the Parties in accordance with its terms.

**Section 13.2.   Committee and PSC Rights.**   The Parties agree (a) that they shall not amend this Agreement in any material respect prior to consulting in good faith with the Committee and the PSC, and (b) to provide the counsel to the Committee and the PSC with copies of (i) a fully executed copy of this Agreement and all exhibits, schedules and attachments thereto, (ii) all documents delivered by the Parties to the Trustee in connection with this Agreement, and (iii) all notices, demands or other communications delivered pursuant to this Agreement. The Trustee shall not terminate this Agreement or withdraw the Plan prior to consulting in good faith with the Committee. For the avoidance of doubt, nothing in this Agreement shall impair, waive or otherwise affect the Committee's rights to apply to the Bankruptcy Court for standing or authority to commence or prosecute claims or

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 44 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 16 of 35

causes of action on behalf of the Debtor or its estate nor the Trustee's right to oppose any such application by the Committee.

     **Section 13.3.**  **No Waiver of Privileges.**  Nothing herein shall constitute a waiver of any privilege or immunity of any Party under federal, state or other applicable law.

     **Section 13.4.**  **Enforcement of Agreement.**  The Parties hereby acknowledge that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by any Party and that such breach shall cause the non-breaching Parties irreparable harm. Accordingly, the Parties agree that in the event of any breach or threatened breach of this Agreement by any of the Parties, the Parties, in addition to any other remedies at law or in equity that they may have, shall be entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance.

     **Section 13.5.**  **Costs.**  Except as otherwise provided herein, each Party shall pay its own fees and costs, including any transfer taxes, in connection with the performance of its obligations under this Agreement and any proceedings to enforce or interpret the terms and conditions of this Agreement.

     **Section 13.6.**  **Statutes of Limitations.**  The Parties agree and consent that all statutes of limitations as to any and all claims and causes of action either (i) among the Parties, or (ii) pertaining to any of the Parties concerning or related to NECC and/or its products, shall be tolled from and after October 1, 2013, until January 31, 2015.

     **Section 13.7.**  **Governing Law; Jurisdiction.**

(a)    *Governing Law.*  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

(b)    *Jurisdiction.*  By his, her or its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for himself, herself or itself that any legal action, suit or proceeding against it with respect to any matter brought by any Party against and other Party to enforce or interpret this Agreement in the Bankruptcy Court. By execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits himself, herself or itself to the exclusive jurisdiction of the Bankruptcy Court with respect to any such action, suit or proceeding, and only with respect to such action, and waives any objection it may have to venue or the convenience of the forum. In the event the Bankruptcy Court does not have or refuses to exercise jurisdiction with respect to this Agreement and any disputes arising therefrom, any legal action, suit, or proceeding against the Parties (or any of them) with respect to any matter under or arising out of or in connection with this Agreement, or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the

Case 1:13-md-02419-RWZ Document 1106-2 Filed 05/06/14 Page 45 of 63

Case 12-19882 Doc 713-2 Filed 05/06/14 Entered 05/06/14 14:25:15 Desc Exhibit
B (Plan Support and Settlement Agreement) Page 17 of 35

U.S. District Court for the District of Massachusetts or, solely if jurisdiction is lacking in the District Court, in the Superior Court of the State of Massachusetts, and by execution and delivery of this Agreement, each Party irrevocably accepts and submits himself, herself or itself to the exclusive jurisdiction of the Bankruptcy Court and those courts. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION, SUIT OR PROCEEDING REFERRED TO ABOVE.

**Section 13.8. No Admission.** This Agreement is part of a settlement among the Parties. Nothing herein shall be deemed to be an admission of any kind, including, but not limited to, an admission or concession of coverage, responsibility, liability, or non-liability or wrongdoing by any Party to this Agreement. To the extent provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

**Section 13.9. No Precedent.** The Parties stipulate that they have entered this Agreement only for their own business reasons based on the unique circumstances presented by the Drug Claims, and that the Agreement creates no binding legal or factual precedent for themselves or others in any future case. The Agreement does not constitute an admission of coverage or noncoverage, and is not based upon language in the Policies.

**Section 13.10. Knowledge.** The Parties expressly warrant and represent that they have had the benefit of the professional advice of attorneys of their own choosing, that they are fully satisfied with that advice, and that they have not relied on any statement or representation of other Parties to this Agreement regarding the specific matters in dispute. The Parties also represent and acknowledge that, in executing this Agreement, they do not rely and have not relied upon any representation or statement made by any Party or any of their agents, representatives, or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as specifically stated in this Agreement.

**Section 13.11. Notices.** All notices, demands, or other communications to be provided pursuant to this Agreement shall be in writing and sent by registered or certified mail, return receipt requested or by an overnight delivery service, and by e-mail, if possible, to the Party receiving such communication at the addresses set forth below, or such other address as either Party may designate in writing from time to time:

If to the Trustee:

Paul D. Moore, Esq.
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA 02110
Tel: (857) 488-4200
Fax:
Email: pdmoore@duanemorris.com

-16-

Case 1:13-md-02419-RWZ Document 1106-2 Filed 05/06/14 Page 46 of 63

Case 12-19882 Doc 713-2 Filed 05/06/14 Entered 05/06/14 14:25:15 Desc Exhibit
B (Plan Support and Settlement Agreement) Page 18 of 35

<u>With Copy To</u>:

Michael R. Gottfried
Duane Morris LLP
100 High Street Suite 2400
Boston, MA 02110
Tel: (857) 488-4200
Fax:
Email: mrgottfried@duanemorris.com

<u>If to PMIC</u>:

Victor Garman
Pharmacists Mutual Companies
808 HWY 18 W
PO Box 370
Algona, IA 50511
Tel: (800) 247-5930
Fax: (515) 295-4321
E-mail: vic.garman@phmic.com

<u>With Copy To</u>:

Richard Mikels, Esq.
Nancy D. Adams, Esq.
MINTZ, LEVIN, COHN, FERRIS,
    GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
Tel: (617) 542-6000
Fax: (617) 542-2241
E-mail: rmikels@mintz.com
        nadams@mintz.com

<u>If to Maxum</u>:

Richard V. Sforzo , CPCU, AIC
Maxum Specialty Insurance Group
3655 North Point Parkway, Suite 500
Alpharetta, Georgia 30005
Tel: (678) 597-4500
Fax: (678) 587-4501
Email: rsforzo@mxmsig.com

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 47 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 19 of 35

With Copy To:

Joseph A. Ziemianski
Cozen O'Connor
1221 McKinney Street, Suite 2900
Houston, Texas 77010
Tel: (832) 214-3904
Fax: (713) 512-5303
Email: JZiemianski@cozen.com

If to Barry and/or Lisa M. Conigliaro Cadden:

Barry J. Cadden
13 Manchester Drive
Wrentham, MA 02093

With Copy To:

Charles R. Bennett, Jr.
Murphy & King, PC
One Beacon Street
Boston, MA 02108
Tel: (617) 423-0400
Fax: (617) 556-8985
Email: crb@murphyking.com

If to Carla Conigliaro:

Carla Conigliaro
15 Hale Drive
Dedham, MA 02026

With Copy To:

John J. Monaghan, Esq.
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
Tel:    (617) 523-2700
Fax:    (617) 523-6850
Email: john.monaghan@hklaw.com

Case 1:13-md-02419-RWZ  Document 1106-2  Filed 05/06/14  Page 48 of 63

Case 12-19882    Doc 713-2    Filed 05/06/14    Entered 05/06/14 14:25:15    Desc Exhibit
B (Plan Support and Settlement Agreement)    Page 20 of 35

If to Gregory Conigliaro:

Gregory Conigliaro
50-52 Sears Road
Southborough, MA 01772-1102

With Copy To:

Christopher J. Panos, Esq.
Partridge Snow & Hahn LLP
30 Federal Street
Boston, MA 02110
Tel:    617-292-7900
Fax:    617-292-7910
Email: cpanos@PSH.com

If to Glenn Chin:

Glenn A. Chin
173 Mechanic Street
Canton, MA 02021

With Copy To:

Paul W. Shaw, Esq.
K&L Gates
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Phone: (617) 261-3111
Fax:    (617) 261-3175
Email: paul.shaw@klgates.com

If to Kathy Chin:

Kathy Chin
173 Mechanic Street
Canton, MA 02021

With Copy To:

Paul W. Shaw, Esq.
K&L Gates
State Street Financial Center
One Lincoln Street
Boston, MA 02111

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 49 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 21 of 35

Phone: (617) 261-3111
Fax:      (617) 261-3175
Email: paul.shaw@klgates.com

If to Christopher Leary:

Christopher Leary
63 Camelot Drive
Shrewsbury, MA 01545

If to Jill Keough:

Jill Keough
43 Alan Road
Marlborough, MA 01752

If to Gene Svirskiy:

Gene Svirskiy
123 Spyglass Hill Drive
Ashland MA 01721

**Section 13.12. Additional Parties.**  With the consent of all Parties, other persons or entities who have asserted or may assert claims for insurance coverage under or against any of the Policies may be added as a Party to this Agreement.

**Section 13.13. Cooperation.**      PMIC and the Trustee each agree to take such steps and to execute and deliver any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability.   In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any person or entity not a Party to this Agreement to invalidate, interpret, or prevent the validation, enforcement, or carrying out of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate in opposing such action or proceeding.

**Section 13.14. Successors.**  This Agreement shall be binding upon and inure to the benefit of the Parties and each of their respective successors, heirs and assigns.

**Section 13.15. Complete Agreement, Amendments.**   This Agreement and the Individual Plan Support Agreement contains the entire agreement among the Parties with respect to the matters and transactions contemplated hereby, and shall supersede all negotiations, presentations, warranties, commitments, offers, contracts and writings prior to the date hereof relating to the subject matters hereof.  This Agreement shall be interpreted as if drafted jointly by all Parties.   This Agreement may be amended, modified, waived, discharged or terminated only by a writing signed by the Party to be charged with such amendment, modification, waiver, discharge or termination.

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 50 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 22 of 35

Section 13.16. **Descriptive Headings.**   The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

Section 13.17. **Counterparts.**   This Agreement may be executed by one or more of the Parties on any number of separate counterparts and delivered by facsimile or email, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

Section 13.18. **Executed Under Seal.** This Agreement is intended to be and shall have the effect of a document executed under seal in accordance with the laws of the Commonwealth of Massachusetts.

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 51 of 63
Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 23 of 35

*Signature Page to Agreement*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed under seal as of the date first written above.

Paul D. Moore, in his capacity as Chapter 11
Trustee of New England Compounding Pharmacy,
Inc., d/b/a New England Compounding Center and
not individually

Pharmacists Mutual Insurance Company

By: _____
Its:    Chief Operating Officer

Maxum Indemnity Company

By: _____
Its:    Vice President, Liability Claims Manager


_____
Barry Cadden


_____
Lisa Conigliaro Cadden


_____
Carla Conigliaro


_____
Gregory Conigliaro

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 52 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 24 of 35

*Signature Page to Agreement*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed under seal as of the date first written above.

_____
Paul D. Moore, in his capacity as Chapter 11 Trustee of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center and not individually

Pharmacists Mutual Insurance Company

By: _____
Its:    Chief Operating Officer

Maxum Indemnity Company

By: _____
Its:    Vice President, Liability Claims Manager

_____
Barry Cadden

_____
Lisa Conigliaro Cadden

_____
Carla Conigliaro

_____
Gregory Conigliaro

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 53 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 25 of 35

*Signature Page to Agreement*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed under seal as of the date first written above.

_____

Paul D. Moore, in his capacity as Chapter 11 Trustee of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center and not individually


Pharmacists Mutual Insurance Company


By: _____
Its:    Chief Operating Officer

Maxum Indemnity Company


By: _____
Its:    Vice President, Liability Claims Manager


_____
Barry Cadden


_____
Lisa Conigliaro Cadden


_____
Carla Conigliaro


_____
Gregory Conigliaro

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 54 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 26 of 35

*Signature Page to Agreement*

     IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed under seal as of the date first written above.

_____

Paul D. Moore, in his capacity as Chapter 11 Trustee of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center and not individually

Pharmacists Mutual Insurance Company

By: _____
Its:    Chief Operating Officer

Maxum Indemnity Company

By: _____
Its:    Vice President, Liability Claims Manager

_____
Barry Cadden

_____
Lisa Conigliaro Cadden

_____
Carla Conigliaro

_____
Gregory Conigliaro

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 55 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 27 of 35

*Signature Page to Agreement*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed under seal as of the date first written above.

_____
Paul D. Moore, in his capacity as Chapter 11
Trustee of New England Compounding Pharmacy,
Inc., d/b/a New England Compounding Center and
not individually

Pharmacists Mutual Insurance Company

By:  _____
Its:  Chief Operating Officer

Maxum Indemnity Company

By:  _____
Its:  Vice President, Liability Claims Manager

_____
Barry Cadden

_____
Lisa Conigliaro Cadden

_____
Carla Conigliaro

_____
Gregory Conigliaro

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 56 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 28 of 35

*Signature Page to Agreement*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed under seal as of the date first written above.

_____

Paul D. Moore, in his capacity as Chapter 11
Trustee of New England Compounding Pharmacy,
Inc., d/b/a New England Compounding Center and
not individually

Pharmacists Mutual Insurance Company

By: _____
Its:   Chief Operating Officer

Maxum Indemnity Company

By: _____
Its:   Vice President, Liability Claims Manager

_____

Barry Cadden

_____

Lisa Conigliaro Cadden

_____

Carla Conigliaro

_____

Gregory Conigliaro

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 57 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 29 of 35

*Signature Page to Agreement*

     IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed under seal as of the date first written above.

Paul D. Moore, in his capacity as Chapter 11 Trustee of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center and not individually

Pharmacists Mutual Insurance Company

By: _____

Its:    Chief Operating Officer

Maxum Indemnity Company

By: _____

Its:    Vice President, Liability Claims Manager

_____

Barry Cadden

_____

Lisa Conigliaro Cadden

_____

Carla Conigliaro

_____

Gregory Conigliaro

Case 1:13-md-02419-RWZ Document 1106-2 Filed 05/06/14 Page 58 of 63

Case 12-19882 Doc 713-2 Filed 05/06/14 Entered 05/06/14 14:25:15 Desc Exhibit
B (Plan Support and Settlement Agreement) Page 30 of 35

_____

Glenn Chin

_____

Kathy Chin

_____

Jill Keough

_____

Christopher Leary

_____

Gene Svirskiy

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 59 of 63
Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 31 of 35

_____

Glenn Chin


_____

Kathy Chin


_____

Jill Keough


_____

Christopher Leary


_____

Gene Svirskiy

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 60 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 32 of 35

---

Glenn Chin

---

Kathy Chin

---

Jill Keough

04-16-14

---

Christopher Leary

---

Gene Svirskiy

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 61 of 63

Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 33 of 35

_____

Glenn Chin


_____

Kathy Chin


_____

Jill Keough


_____

Christopher Leary


_____

Gene Svirskiy

Case 1:13-md-02419-RWZ   Document 1106-2   Filed 05/06/14   Page 62 of 63
Case 12-19882   Doc 713-2   Filed 05/06/14   Entered 05/06/14 14:25:15   Desc Exhibit
B (Plan Support and Settlement Agreement)   Page 34 of 35

## ADDENDUM TO PLAN SUPPORT AND SETTLEMENT AGREEMENT

This Addendum (the "Addendum") to the *Plan Support and Settlement Agreement* dated as of May 2, 2014 (the "Agreement") is made as of May 2, 2014 by:

(i)  the Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 case of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center, Case No. 12-19882, pending in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"); and

(ii)  the Plaintiffs' Steering Committee (the "PSC") appointed in the multi-district litigation captioned *In re New England Compounding Pharmacy Cases Litigation*, MDL No. 2419, Case No. 13-cv-02419 (D. Mass.).

Capitalized terms not defined herein shall have the meanings assigned to them in Section 1 of the Agreement.

1.  Each of the Committee and the PSC acknowledges that it has had a sufficient opportunity to discuss and review the Agreement with its counsel, has in fact done so, and fully understands the terms, conditions, and agreements set forth therein.

2.  Each of the Committee and the PSC is in favor of the Agreement and the compromise and settlement embodied therein.

3.  Each of the Committee and the PSC supports the Bankruptcy Court's approval of the Agreement in all respects.

4.  Nothing in this Addendum is intended to or does modify the Agreement in any respect.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

-1-

Case 1:13-md-02419-RWZ  Document 1106-2  Filed 05/06/14  Page 63 of 63
Case 12-19882  Doc 713-2  Filed 05/06/14  Entered 05/06/14 14:25:15  Desc Exhibit
B (Plan Support and Settlement Agreement)  Page 35 of 35

*Signature Page to Addendum to Plan Support and Settlement Agreement*

BROWN RUDNICK LLP

By: _____
William R. Baldiga, Esq. (BBO #542125)
Kiersten A. Taylor, Esq. (BBO #681906)
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
wbaldiga@brownrudnick.com
ktaylor@brownrudnick.com

and

David J. Molton, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com

*Counsel to the Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc.*

HAGENS BERMAN SOBOL SHAPIRO LLP

By: _____
Thomas M. Sobol, Esq.
Kristen Johnson Parker, Esq.
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700
tom@hbsslaw.com
kristenjp@hbsslaw.com

*Plaintiffs' Lead Counsel, for the PSC*

28588597v.1

-2-