# EXHIBIT C

*Chapter 11 Trustee's Motion to Approve Compromise of Controversies and Insurance Settlement and Release Agreement With GDC Properties Management, LLC, Its Insurer and Certain of its Insiders.*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| NEW ENGLAND COMPOUNDING | ) | |
| PHARMACY, INC., | ) | Case No. 12-19882 (HJB) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## CHAPTER 11 TRUSTEE'S MOTION TO APPROVE COMPROMISE OF CONTROVERSIES AND INSURANCE SETTLEMENT AND RELEASE AGREEMENT WITH GDC PROPERTIES MANAGEMENT, LLC, ITS INSURER AND CERTAIN OF ITS INSIDERS

Paul D. Moore, the duly appointed chapter 11 Trustee ("Trustee") of New England Compounding Pharmacy, Inc. (the "Debtor" or "NECC"), hereby moves this Court (this "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A, approving an Insurance Settlement and Release Agreement ("Agreement") with GDC Properties Management, LLC, ("GDC"), its insurer Preferred Mutual Insurance Company ("Preferred Mutual") and certain insiders of GDC, including Gregory Conigliaro and Douglas Conigliaro, in their respective capacities as the principal managers, members, or employees of GDC, who are or may be insured parties under certain insurance policies issued by Preferred Mutual ("Individual GDC Insureds").[1]  In support of this Motion, the Trustee respectfully states as follows:

---

[1]     An executed copy of the Agreement is attached as Exhibit B.  Capitalized terms used but not defined herein have the meaning ascribed to them in the Agreement.

DM3\2838051.6

## PRELIMINARY STATEMENT

1.      GDC is NECC's landlord at NECC's former principal place of business in Framingham, Massachusetts ("Facility"). The proposed settlement is a complete settlement of all claims between and among the Parties. If approved and consummated, and subject to the terms and conditions of the Agreement, the contemplated settlement will result in a waiver and release of all claims among the Parties and the payment by Preferred Mutual to the Trustee, for the benefit of NECC's estate, of $3,750,000.

2.      The Trustee submits that the proposed settlement is fair and equitable and decidedly in the best interests of NECC, its creditors and its estate. The settlement resolves claims (i) by the Trustee against GDC and the Individual GDC Insureds relating to the conditions at the Facility and operations by affiliates of GDC at the Facility that may have contributed to the alleged contamination of products compounded by NECC, (ii) claims by GDC and the Individual GDC Insureds against NECC, including claims related to the conditions at the Facility and NECC's and the estate's lease, use, and occupancy of the facility, and (iii) coverage disputes between and among Preferred Mutual, GDC and the Individual GDC Insureds regarding the existence and scope of Preferred Mutual's obligations if any, under two insurance policies issued to GDC ("Policies"). The settlements embodied in the Agreement are a significant step towards funding of a chapter 11 plan that the Trustee hopes will provide a mechanism to provide meaningful compensation to personal injury claimants with allowed claims who allegedly have suffered death, grievous injuries and illnesses from the administration of allegedly contaminated medications compounded by NECC. Together with the other settlements the Trustee proposes in the accompanying motions, these settlements will result in the aggregate recovery by the estate of approximately $100 million and serve as a centerpiece of a chapter 11 plan that the Trustee

2

hopes to propose and confirm well before the end of 2014 that will maximize the recovery of all creditors on account of their allowed claims.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are Bankruptcy Code Sections 105 and 363 and Federal Rule of Bankruptcy Procedure 9019.

## BACKGROUND

4.      On December 21, 2012 (the "Petition Date"), NECC filed a voluntary petition for relief pursuant to chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

5.      On January 24, 2013, this Court entered an order [Docket No. 92] authorizing the appointment of a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.

6.      On January 25, 2013 (the "Appointment Date"),  the United States Trustee (the "UST") filed an Application for and Certificate of Appointment of Chapter 11 Trustee [Docket No. 98] (the "UST Application") requesting the appointment of the Chapter 11 Trustee.  The UST Application was granted by order of this Court [Docket No. 99] entered the same day. Thereafter, on February 1, 2013, the Chapter 11 Trustee filed his Verified Statement Pursuant to Rule 2007.1 of Paul D. Moore in Support of Application for and Certificate of Chapter 11 Trustee [Docket No. 111] (the "Statement").

A.      **The Parties to the Agreement**

7.      The parties to the Agreement are as follows:

a.      The Trustee

b.      GDC:  GDC is the owner of the Facility, a portion of which was leased by NECC and used in its compounding and other business activities.  Upon information and

3

belief, Douglas Conigliaro and Gregory Conigliaro, insiders of NECC, are the principal members and managers of GDC and, at all relevant times, were the persons in control of GDC. Upon information and belief, "GDC" is an acronym for "Gregory D. Conigliaro."

c. <u>Individual GDC Insureds</u>: Any of GDC's directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, who are or may be an "insured" under the Policies, including, but not limited to, Gregory Conigliaro and Douglas Conigliaro, each acting in their respective capacity as such.

d. <u>Preferred Mutual</u>: Issuer of the Policies.

## B. The Debtor's Prepetition Operations

8. Prior to the Petition Date, NECC operated as a compounding pharmacy. At all relevant times, NECC leased its sole operating business premises in Framingham, Massachusetts ("<u>Premises</u>") from GDC, pursuant to one or more written leases between GDC and NECC ("<u>Lease</u>").

9. Beginning in September 2012, reports began to surface of several patients who contracted fungal meningitis (the "<u>Outbreak</u>") after receiving injections of preservative-free methylprednisolone acetate ("<u>MPA</u>") compounded by NECC. An investigation was initiated by the Massachusetts Department of Public Health ("<u>MDPH</u>") and, two days later, on September 26, 2012, NECC issued a voluntary recall of three suspect lots, containing 17,646 doses of MPA that NECC had distributed to over 14,000 patients. The Centers for Disease Control and

Prevention ("CDC") reported that, as of October 23, 2013, 64 people had died and 751 individuals had fallen ill.[2]

10.   Upon information and belief, on October 1, 2012, the MDPH issued a formal quarantine notice pursuant to M.G.L. ch. 94C, §§ 13 & 189A, and M.G.L. ch. 112, §§ 30 & 42A, requiring NECC to preserve all products used to compound MPA, including products returned from pharmacies.

11.   Upon information and belief, in response to October 2, 2012 findings from the United States Food and Drug Administration ("FDA") and the MDPH, the Massachusetts Board of Registration in Pharmacy (the "Board") voted to request a voluntary surrender of NECC's pharmacy license.  NECC surrendered its Massachusetts license, effective at noon on October 3, 2012, and further instituted a voluntary recall of all of its intrathecal medications, which are designed for injection near the spinal cord or brain.

12.   The FDA and the CDC recommended that all health care providers cease use of, and remove from inventory, any products from NECC.  At the behest of the MDPH, NECC issued an immediate recall of all of its products, and Barry Cadden and Glenn Chin surrendered their pharmacist licenses pending the outcome of the investigation.  There are ongoing proceedings to revoke or otherwise take action against the licenses of Mr. Cadden, Mr. Chin and Ms. Conigliaro Cadden.

13.   The Outbreak has resulted in potentially tens of thousands of claims from personal injury claimants against NECC and others.

---

[2]   Reported at http://www.cdc.gov/HAI/outbreaks/meningitis-map-large.html#casecount_table.  The CDC previously updated the count of cases of reported illnesses and deaths on the Monday of each week, but it is not clear to the Trustee whether the CDC is continuing to update the count in light of then well-publicized existing federal government budgetary issues.

5

14.     Shortly prior to the Petition Date, NECC suspended the operation of its business. NECC also surrendered its Massachusetts pharmacy license and laid off most of its employees. Mr. and Mrs. Cadden agreed at that time to a voluntary license surrender.   There are ongoing proceedings at the Board to revoke or otherwise take action against the licenses of Mr. Cadden, Mr. Chin and Ms. Conigliaro Cadden.   The MDPH also has temporarily barred former pharmacists for NECC from practicing pharmacology.

15.     NECC initiated this case in response to the volume and wide geographic distribution of cases it confronted.  As of March 5, 2014, 322 separate lawsuits have been joined in the multi-district litigation pending in the United States District Court for the District of Massachusetts, and are pending before Judge Zobel ("MDL Action")[3].   In addition, as of the January 15, 2014 bar date for filing of claims in this case, some 3,300 claims asserting injury from injections of MPA were submitted to the Trustee's claims and noticing agent, Donlin, Recano & Co. (generally, collectively with the pending lawsuits, the "Civil Actions").

**C.     Claims and Proceedings Against GDC and the Individual GDC Insureds**

16.     Upon information and belief, numerous creditors allege that GDC is liable to them for various acts and omissions that resulted in the alleged contamination of NECC's products and, in turn, caused grievous personal injury and death.  The theories of liability are varied, but at bottom GDC is alleged (i) to have assumed the obligation to ensure that NECC operated its business in accordance with applicable rules and regulations (which NECC allegedly did not do); (ii) to have maintained a high degree of control over the premises leased by NECC; and (iii) generally to have been complicit with those who caused the Outbreak in ways that result in civil liability for the Outbreak.  *See, e.g.,* ¶¶ 130 *et. seq.* of the Amended Complaint filed in

---

[3]     Case No. 1:13-md-02419-FDS, *In re New England Compounding Pharmacy, Inc. Products Liability Litigation.*

6

*O'Brien v. St. Thomas Outpatient Neurosurgical Center, LLC, et. al,* Case No. 13C3323, in the Circuit Court for Davidson County, Tennessee. GDC also is alleged to have failed to properly maintain and repair the Facility, as a result of which the alleged contamination occurred. GDC has denied liability for all such claims. If true, these allegations may support claims by the Trustee against GDC and the Individual GDC Insureds on *alter ego* and breach of fiduciary duty theories, *see generally, Morley v. Ontos, Inc. (In re Ontos, Inc.),* 478 F.3d 427, 432 (1st Cir. 2007), as well as for contribution or indemnity for all or substantially all of the related claims against NECC's estate. On the other hand, GDC (or Preferred Mutual as GDC's subrogee) may have claims against NECC and its estate for contractual indemnity under the Lease agreement, and for equitable indemnity.

17. Upon information and belief, there are various potential and actual civil actions naming the Individual GDC Insureds as defendants, including, without limitation, as officers, directors, managers and members of GDC (as applicable).

### D. The GDC Insurance Policies

18. Upon information and belief, Preferred Mutual issued to GDC two (2) Commercial Lines Insurance Policies (No. CP 0160530884) for the policy periods of September 27, 2011 to September 27, 2012 and September 27, 2012 to September 27, 2013 ("Policies"). Among other things, the Policies provide commercial general liability ("CGL") insurance, which covers, in part,"those sums the insured becomes obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" CG 00 01 12 07 at 1 of 17.

19. The Policies also provide $5000 in medical payments to any one person for bodily injury "caused by an accident on premises [GDC] own[s] or rent[s]" or "because of [its] operations," subject to certain exceptions not relevant here. This amount is subject to the Policies' $2 million "General Aggregate Limit" as well as to the $1 million "Each Occurrence"

7

Limit, such that the $1 million Each Occurrence Limit is the most Preferred Mutual will pay "for the sum of" damages under the CGL and Medical Expense coverage "because of all 'bodily injury' . . . arising out of any one "occurrence." P. 11 of 17, Para. III.5. The Policies define "Occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." CG 00 01 12 07 at p. 15 of 17.

### E.   The Insurance Coverage Disputes

20.        Preferred Mutual, GDC and the Individual GDC Insureds disagree on whether and to what extent the Policies have any applicability to the claims asserted against GDC and the Individual GDC Insureds. Preferred Mutual agreed to defend the claims asserted against GDC and the Individual GDC Insureds, subject to a non-waiver agreement, pursuant to which Preferred Mutual, GDC and the Individual GDC Insureds mutually reserved all of their rights and defenses regarding coverage for these claims under the Policies. Although unclear, it appears Preferred Mutual may allege that the claims asserted against GDC and the Individual GDC Insureds are not covered by the Policies. At bottom, Preferred Mutual may argue that the Policies only cover GDC as the named insured. The Policies also cover as "insureds" the Individual GDC Insureds, but only with respect to the conduct of [GDC's] business," and its managers, "but only with respect to their duties as [GDC's] managers." CG 00 01 12 07 at p. 9 of 17. Preferred Mutual may contend that none of the claims resulting from NECC's operations are claims against GDC "with respect to the conduct of [GDC's] business" or against the Individual GDC Insureds "with respect to their duties as [GDC's] managers." Accordingly, Preferred Mutual may argue the claims are not covered by the Policies. Second, Preferred Mutual may contend that the Policies contain various exclusions, including, without limitation, (i) for injury "expected or intended from the standpoint of the insured" ("Expected or Intended Injury Exclusion"), (ii) for "[b]odily injury or property damage which would not have occurred, in

8

whole or in part, but for the actual, alleged or threatened . . . exposure to, existence of, or presence of, and 'fungi' or bacterial on or within a building structure, including its contents" ("Fungi or Bacteria Exclusion"), and (iii) for "[b]odily injury or property damage arising out of the actual or alleged transmission of a communicable disease" ("Communicable Disease Exclusion"). Preferred Mutual may contend that these exclusions eliminate its liability under the Policies. Alternatively, if these exclusions do not apply, then Preferred Mutual may contend that the claims arising from the Outbreak constitute only a single "Occurrence" under the Primary Policy occurring in a single policy year. Accordingly, Preferred Mutual may well contend that the claims are at most subject to a limit of $1,000,000 under the Primary Policy, as the maximum coverage available for a single "Occurrence." Thus, Preferred Mutual may contend that it has no liability whatsoever under either the Policies, but, in any event, that its liability for claims arising from the Outbreak is no greater than $1 million.

21.    GDC and the Individual GDC Insureds (collectively, the "GDC Parties"), would disagree with any such contentions by Preferred Mutual. The allegations against the GDC Parties broadly assert that the GDC Parties exercised extensive control of NECC and assumed obligations as landlord to insure that NECC operated in accordance with all applicable rules and regulations. Allegedly, however, NECC failed to operate properly, leading to the alleged contamination of MPA. Thus, it is argued, the claims squarely fall within the definition of claims covered by the CGL coverage. Moreover, it is unclear that the claims arose or are asserted in only a single policy year. Thus, coverage may not be limited by the General Aggregate Limit and Each Occurrence Limit in a single policy year. Instead, the limits effectively may be doubled, since claims may arise in two policy years.

9

22.    Second, the GDC Parties and the Trustee contend that the exclusions are inapplicable.  GDC and NECC have contended that the harm allegedly caused by the contaminated MPA was not expected, and thus not within the Expected or Intended Injury Exclusion.  The Fungi or Bacteria Exclusion arguably applies to claims from mold in walls due to defective construction, not product liability claims of GDC's tenant.  Moreover, the Communicable Disease Exclusion is geared to diseases with which GDC's employees may be infected and GDC's treatment, testing, management and reporting of that disease.  Moreover, the contaminants in the MPA are not, in themselves, "communicable diseases."  Fungal meningitis is not contagious, which means it is not transmitted from person to person.

F.    **Settlement Negotiations with the GDC Parties and Preferred Mutual**

23.    Many of the lawsuits naming GDC and the Individual GDC Insureds as defendants have been joined in the MDL Proceeding and are stayed in accordance with Judge Saylor's orders temporarily staying litigation against NECC insiders and affiliates to allow the Trustee to attempt to negotiate a settlement of all claims against them.  Some of those lawsuits, however, are pending in various state courts, and have not yet been joined in the MDL Proceeding or stayed in the MDL Proceeding.

24.    Since the Appointment Date, the Trustee has viewed settlement negotiations with the Insiders (such as the Individual GDC Insureds) and affiliated entities controlled by some of the Insiders (such as GDC) as among his highest priorities.  Those negotiations, spanning many months, have focused on a variety of factors.  For example, the Trustee had to overcome the Insiders' concerns about the consequences to them in ongoing criminal investigations that might result from negotiations and a settlement.  The Insiders were reluctant to engage in discussions regarding their individual culpability or liability due to concerns about how such discussions might be used against them in the criminal investigations and the numerous pending civil

10

actions. Accordingly, the Trustee's inquiries, and the Insiders' responses, essentially assumed, for purposes of settlement, that the Insiders were culpable, and focused instead upon the financial wherewithal of the Insiders to fund a settlement and their desire to do so to address the needs of those who have been injured. With the assistance of his financial advisor, and in consultation with the Committee and the Plaintiffs' Steering Committee established in the MDL Action ("PSC"), the Trustee devoted substantial time and effort to his investigation of the financial condition of the Insiders. As part of that investigation, the Insiders provided the Trustee confidential information regarding their financial condition. The Trustee's negotiations relating to Preferred Mutual more narrowly focused on the claims asserted against the GDC Parties and the terms of the Policies.

### PROPOSED COMPROMISE

25.     As is apparent from the foregoing, the interrelated disputes between and among the parties, including the coverage issues with Preferred Mutual, are complex. The Trustee, in consultation with the Committee and the PSC, has entered into the Agreement to resolve the claims and potential claims between and among the GDC Parties and NECC's bankruptcy estate.[4] The essential terms of the Agreement, which is subject to entry of an order approving this Motion, are summarized as follows:[5]

---

[4]     The Trustee also has entered into agreements, subject to completion of definitive documentation and approval of this Court, with the Insiders ("Insider Settlement") and NECC's primary and excess insurers ("Insurer Settlement"). The Trustee will be filing separate motions seeking approval of these settlements.

[5]     The description in this Motion of the proposed settlement and the Agreement with GDC, the Individual GDC Insureds and Preferred Mutual (the "GDC Settlement") is only a summary. The Agreement controls in all instances to the extent the summary is incomplete, inaccurate or conflicts with the Agreement. Parties in interest should review the Agreement in its entirety as to all of its terms and conditions.

- **Settlement Payment**:  No later than the first business day following fourteen (14) days after the Bankruptcy Court's entry of an order approving the settlement, Preferred Mutual shall pay the sum of $3,750,000 ("Plan Deposit") to an escrow account established by the Trustee.  The Plan Deposit will be released to the Trustee from the escrow account on the Plan Effective Date.  The Plan Deposit is intended to constitute a material part of a fund to be ultimately distributed to personal injury claimants and other creditors of NECC under the Trustee's contemplated chapter 11 plan ("Plan").[6]

- **Plan Releases/Injunctions:**  The Plan shall provide for mutual releases of all "Settled Claims" (substantially general releases), on the "Plan Effective Date," and an injunction permanently barring and enjoining any person or entity from pursuing such claims.

- **Plan Support**:  Pursuant and subject to section III.e. of the Agreement (the "Plan Support Provisions"), the GDC Parties and Preferred Mutual agree to support and not oppose or object to the Plan.

- **Waiver and Assignment of Claims:**  Upon the "Plan Effective Date" each Settling Party shall waive, relinquish and release any and all claims against the Debtor or its estate.  In addition, they shall be deemed to have unconditionally assigned to the Trustee any and all claims they may have between them and against any persons not a party to the Agreement, including any claims for indemnification, contribution or subrogation, that are based upon or arise out of the Settled Claims.

## ARGUMENTS AND AUTHORITIES

A.    **Standard for Determining Motion**

26.    Pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure, this Court has authority to approve a settlement or compromise.  *See* Fed. R. Bankr. P. 9019(a).  The decision to approve a settlement or compromise lies within the discretion of the bankruptcy court, and is warranted when the settlement is found to be reasonable and fair in light of the particular circumstances of the case.  *See Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968).  In evaluating whether a settlement is fair and reasonable, a bankruptcy court need not be convinced the settlement is the best possible compromise or that the estate has maximized its recovery.  Rather a settlement or

---

[6]    The Trustee would recover from the assets of the Individual GDC Insureds through the separate Insider Settlement.  This GDC Settlement contemplates a cash payment only from Preferred Mutual.

12

compromise should be approved as fair and reasonable as long as it does not "fall below the lowest point in the range of reasonableness." *In re Healthco Int'l, Inc.*, 136 F.3d 45, 51 (1st Cir. 1998) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d. Cir. 1983)). The Trustee is better situated than is any individual creditor to determine whether a settlement is in the best interests of the estate, and his informed judgment, after reasonable investigation, to settle and avoid the inherent risks, delays and expense of prolonged litigation is entitled to "wide latitude" from an inquiring court. *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 212 F.3d 632, 635 (1st Cir. 2000) (citing *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l., Inc.)*, 136 F.3d 45, 50 – 52 (1st Cir. 1998); *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1145 (1st Cir. 1992)).

27. When evaluating a proposed compromise, a bankruptcy court must assess and balance the value of the claim that is being compromised against the value to the estate by virtue of the compromise proposed.[7] Bankruptcy courts consider the following factors in determining whether the proposed settlement is in the best interest of the debtor's estate: (1) the probability of success in the litigation being compromised; (2) the difficulties to be encountered in the matter of collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay in pursuing the litigation; and (4) the paramount interests of the creditors, and a proper deference to their views. *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc.*

---

[7]     Although not directly on point, this Court's observations in a different case regarding the test for confirmation of a chapter 11 plan where a chapter 11 debtor seeks to provide releases are instructive. This Court observed that "there are only two questions: and the first one is, is there some consideration for the release; and then the second one is, does the release benefit the estate?" *In re Northern Berkshire Healthcare, et. al.*, Case No. 11-31114-HJB, Transcript of April 2, 2012 Hearing [Notice of Filing of Transcript at Docket No. 653] at 37::9-13). The Trustee submits that the releases the Trustee contemplates providing pursuant to the Agreement satisfy this standard.

*v. Anderson, supra; Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995); *see also In re Martin*, 91 F.3d 289 (3d Cir. 1996).

**B.    The Proposed Compromise is Fair and Reasonable and Should be Approved**

28.    The Trustee submits that the proposed compromise in the Agreement is fair and reasonable and should be approved.  The Agreement is the product of extended and intensive good faith, arm's-length negotiations that resolve complex and difficult disputes and provides substantial cash to this estate for the benefit of its creditors.  In considering the specific *TMT* and *Jeffrey v. Desmond* factors, and the circumstances of this case, the Trustee submits that all four factors – the "paramount" interests of creditors – weighs particularly strongly in support of the proposed settlement.

29.    The first factor (likelihood of success) and third factor (complexity, expense and delay of litigation) are related, and must be measured both with regard to the Trustee's claims against the GDC Parties and with regard to the coverage dispute with Preferred Mutual. The difficulty and complexity of the litigation involved and the expense, inconvenience and delay in pursuing the litigation at both levels virtually mandates approval of the proposed compromise.  As against the GDC Parties, while the Trustee is confident in his litigation position, nevertheless, litigation is inherently risky.  The claims that the Trustee has against the GDC Parties are difficult and expensive claims to pursue.  The underlying facts that must be proved would be based in part upon testimony of some of the Insiders, which may be unavailable to the Trustee if the Insiders assert their rights to withhold testimony under the Fifth Amendment of the United States Constitution.  Even if the Insiders waive their Fifth Amendment rights and testify, the Trustee would be in the position of relying upon the credibility of the testimony of the Insiders.  Moreover, the GDC Parties likely will assert numerous defenses, such as *in pari delicto*, unclean

14

hands and contractual defenses based upon specific provisions of the Lease that limit or exculpate GDC entirely from liability.

30.     Similar issues exist with respect to the coverage disputes with Preferred Mutual. At bottom, the coverage dispute is a contract dispute.   Under Massachusetts law, "insurance contracts must be interpreted to reflect the intention of the parties as manifested by the policy language." *Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am.*, 338 F.3d 42, 47 (1st Cir. 2003)(citations omitted).   The interpretation of an insurance policy begins "with the actual language of the policies," and a court is to consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered."   *GRE Ins. Group v. Metropolitan Boston Hous. Ptnership.*, 61 F.3d 79, 81 (1st Cir. 1995), *citing Trustees of Tufts Univ. v. Comm. Union Ins. Co.*, 415 Mass. 844, 849, 616 N.E.2d 576, 583 (1990).

31.     "Contract interpretation presents, in the first instance, a question of law, and is therefore the court's responsibility.  If, however, a contract is thought ambiguous, the court may receive extrinsic evidence, even parol evidence, to determine whether uncertainty exists." *In re Access Cardiosystems, Inc.*, 361 B.R. 626, 641 (Bankr. D. Mass. 2007) *quoting, Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989) (citations omitted).  Thus, if this Court determines that the Policies are unambiguous, then, without a trial, the parties would have to brief and this Court would have to examine multiple provisions of the various Policies to discern the parties' intentions.  Critical terms, including "Occurrence" and "Aggregate Limits" would be the subject to painstaking analysis and argument.  If this Court determines that the Policies are ambiguous, then a trial may be required.  The Trustee may have to rely in part upon the testimony of NECC's former principals for these coverage disputes as well.  Many of the coverage issues are heavily fact-intensive and will turn on facts that may not be determined until

15

the outcome of the underlying litigation, including any appeals, regardless of which party prevails in the coverage action.   This significant delay in recovery, even in the best of circumstances, weighs heavily in favor of approval of the proposed settlement.   Regardless of whether this Court determines that a trial is required, the Trustee anticipates that costly, expensive and time-consuming discovery will be required.

32.     With regard to the second factor (difficulty of collection), the Trustee is mindful that the proposed settlement contemplates Preferred Mutual will pay the Trustee money for the benefit of NECC's estate.  Collection against Preferred Mutual is subject to the outcome of the claims asserted against GDC, and then to the outcome of the coverage dispute with Preferred Mutual.  Collection against GDC likely is unavailing, other than to the extent of any equity GDC may have in the Premises as of the date when the litigation is concluded.  Collection against the Individual GDC Insureds is subject to the Insider Settlement.

33.     Perhaps the most compelling factor supporting approval of the GDC Settlement is the fourth factor – the best interests of the creditors.   The Trustee is mindful both that the creditors' interests are "paramount" and, as yet, not vindicated.   Personal injury claimants who have suffered grievous harm and have incurred and continue to incur substantial medical expenses cannot wait, and should not be compelled to wait, for lawyers and the parties to conclude what inevitably would be difficult, costly and lengthy litigation against the GDC Parties and Preferred Mutual if the contemplated settlement is not approved.     In contrast, without litigation and further delay, claimants will obtain the benefit of payment from Preferred Mutual of an amount which represents virtually all of the available coverage under the Policies, without the risk, expense, and delay of protracted litigation and related appeals.

16

34.     Additionally, together with the Insider Settlement and the Insurer Settlements, the GDC Settlement furthers significantly the progress of NECC's bankruptcy case and provides a structure, and support, for a contemplated chapter 11 plan. The Agreement includes plan support provisions, whereby the GDC Parties and Preferred Mutual agree to support a plan that (i) incorporates the Agreement, and (ii) provides them with protections against the Settled Claims and an injunction permanently barring and enjoining any person or entity from pursuing such claims. As the Trustee has made clear previously, a plan that leverages settlements with parties potentially responsible for the Outbreak, including the GDC Parties, in return for substantial payments that would fund a pot for distributions to holders of allowed claims, is precisely the type of plan the Trustee envisions as the vehicle to maximize payments to personal injury claimants allegedly harmed by the Outbreak. Upon information and belief, the Committee and the PSC support the Court's approval of the Agreement "in all respects." By definition, this includes the Plan Support Provisions. The support by the Committee and the PSC for the approval of the Agreement and contemplated plan structure evidences that creditors will overwhelmingly vote to accept the Plan. Indeed, none of the hypothetical alternatives to the contemplated Plan will produce more for creditors than will the Plan.

35.     Under these circumstances, the Trustee does not believe that the "paramount" interests of creditors are served if the Trustee is compelled to forego this settlement, risk loss or diminution of assets the estate might look to recover in any litigation, risk insurance coverage assertions that, if successful, would deprive the estate of substantial amounts from Preferred Mutual that represent virtually all of the available coverage, and instead pursue complex and difficult litigation that is likely to remain unresolved for the indefinite future. Likewise, it decidedly is not in the interests of creditors, particularly those who allegedly suffered personal

17

injury as a result of the Outbreak and reportedly are struggling financially as a result of substantial, ongoing medical expenses and reduced or lost employment, to forego the benefits of the settlement in favor of protracted litigation for the indefinite future.

36. Finally, as noted above, upon information and belief, the Committee and the PSC support this Motion and assent to the requested relief. Thus, the Trustee's "proper deference" to the views of the creditors further supports the determination that the contemplated settlement is fair and reasonable and that this Motion should be allowed.

## C. The Plan Support Provisions of the Agreement Fostered the Settlement Negotiations, are Fair and Reasonable, and Should be Approved

37. As noted above, the Plan Support Provisions require the GDC Parties and Preferred Mutual to support the Plan under certain terms and conditions. These Plan Support Provisions" are a significant component of the settlement and a material term in the Agreement, and should be approved.

38. The case law on the propriety of plan support agreements is evolving. Most recently, the Court in *In re Indianapolis Downs, LLC,* 486 B.R. 286 (Bankr. D. Del. 2013) denied a request by certain creditors to designate the votes of other creditors to a "Restructuring Support Agreement" and not count those votes pursuant to 11 U.S.C. §§ 1125(g) and 1126(e). In denying the motion, the court relied upon *In re Century Glove,* 860 F.2d 94 (3rd Cir. 1988). In *Century Glove,* which the *Indianapolis Downs* court characterized as the "seminal case [in the Third Circuit] construing solicitation and the designation of votes," the court affirmed the denial of a motion to designate votes of a creditor who had circulated an alternative plan to the creditors committee seeking to garner that body's support. The Third Circuit ruled that "solicitation must be read narrowly" and that a broad reading "can seriously inhibit free creditor negotiations." *Id.* at 101.

18

39. Although this Court has questioned the Third Circuit's reasoning in *Century Glove*, this Court's precedent is entirely consistent with *Indianapolis Downs* and its holding that creditors signing a plan support agreement have not violated the bankruptcy code. In *In re Clamp-All Corp.*, 233 B.R. 198 (Bankr. D. Mass. 1999), a creditor filed an objection to a disclosure statement, attaching as an exhibit a full copy of a disclosure statement and alternative, competing reorganization plan. This Court held that such conduct violated Sections 1121(b) and 1125(b) of the Bankruptcy Code as well as Federal Rule of Bankruptcy Procedure 3017(a). Nevertheless, this Court emphasized that "open negotiation by creditors is imperative." *Id.* at 206. The Court characterized the "difficult task" as "distinguishing between permissible negotiations and prohibited solicitations. . . ." *Id.* To pass muster as permissible negotiations, such "negotiations must be conducted in a manner consistent with the policy goals intended by Congress to be effectuated through sections 1121(b) and 1125(b) of the Bankruptcy Code." *Id.*

40. This Court's principal disagreement with *Century Glove* concerned the impairment of a chapter 11 debtor's exclusive right to solicit acceptances and rejections of a plan under 11 U.S.C. § 1121(d) arising from the disclosure by dissenting creditors of a potential, alternative plan.[8] Exclusivity concerns do not exist here, as NECC's exclusive rights to solicit acceptances and rejections of a plan were terminated, pursuant to 11 U.S.C. § 1121(c)(1), on the

---

[8] This Court wrote:

> This Court believes that the *Century Glove* analysis fails to sufficiently recognize Congress' intention to allow the debtor a reasonable time to obtain confirmation of a plan without the threat of a competing plan. Therefore, whether a creditor's action during the exclusivity period violates § 1121(b) must be evaluated not only in terms of its effect on the ability of a debtor to delay reorganization, but also in terms of its interference with the debtor's efforts to propose and confirm a plan of reorganization.

*Clamp-All*, 233 B.R. at 207-08 (citation omitted).

19

Appointment Date.  Here the parties entered into the Agreement to build support for, and not

rejection of, the Trustee's contemplated plan of reorganization.  Indeed, section 4(a) of the

Agreement contemplates that solicitation of the Insiders' votes will occur separately, in

accordance with 11 U.S.C. §§ 1125 and 1126, and expressly conditions the Insiders'

commitments to vote to accept the plan on the subsequent, proper solicitation of the Insiders'

votes pursuant to those sections of the Bankruptcy Code.  The potential impairment of NECC's

terminated exclusivity rights under 11 U.S.C. § 1121, so critical to this Court's *Clamp-All*

opinion, simply is not at issue or relevant here.

41.      The remaining concern raised by *Clamp-All* is whether the negotiations and the

plan support provisions of the Agreement "are consistent with the policy goals intended by

Congress to be effectuated through section[ ] . . . 1125(b) of the Bankruptcy Code."  *Id.* at 206.

Section 1125(b) requires a written disclosure statement, approved by the bankruptcy court as

containing adequate information, be transmitted to creditors, together with a plan or a summary

of the plan, prior to any post-petition solicitation of votes for or against the plan.  *Id.* at 208.  This

Court noted that the requirement of advance court approval "was thought to discourage the

undesirable practice . . . of soliciting acceptance or rejection at a time when creditors and

stockholders were too ill-informed to act capably in their own interests."  *Clamp-All Corp.*, 233

B.R. at 206 (citations and internal quotations omitted).

42.      Unlike with respect to the Section 1121 issues, *Indianapolis Downs* not only is

consistent with *Clamp-All* with respect to the Section 1125 issues, but indeed, cites to *Clamp-All*

in finding that "the interests that § 1125 and the disclosure requirements are intended to protect

are not at material risk [from the plan support agreement] in this case."  *In re Indianapolis

Downs, LLC,* 486 B.R. at 295-96.  As in *Indianapolis Downs,* here the Insiders "are all

sophisticated. . . players and have been represented by able and experienced professionals throughout these proceedings." *Id.* at 296. "[T]he entities whose votes are targeted [here, the GDC Parties and Preferred Mutual] cannot seriously be characterized as too ill-informed to act capably in their own interests." *Id.* (quoting *In re Heritage Organization, LLC*, 376 B.R. 783, 794 (Bankr. N.D. Tex. 2007)).

43.    In sum, this Court acknowledged "the *Century Glove* court's concern that a broad reading of § 1125(b) could limit creditor communications and negotiations." *Clamp-All*, 233 B.R. at 209. Such an anomalous result, which *Indianapolis Downs* avoided partly in reliance upon *Clamp-All*, would occur here if this Court does not approve the plan support provisions of the Agreement. The negotiations and the Agreement are all "consistent with the policy goals intended by Congress to be effectuated through . . . the Bankruptcy Code." *Clamp-All*, 233 B.R. at 209. There is no plan competing with or proposed as an alternative to the Trustee's contemplated plan that the Insiders were solicited to accept. NECC's exclusivity period has terminated, and the Agreement contemplates, and is conditioned upon, subsequent, proper solicitation of all votes, including those of the Insiders, under Bankruptcy Code Sections 1125 and 1126. The Plan Support Provisions operate to ensure Preferred Mutual does not seek to interfere with confirmation of the Trustee's contemplated plan or take any other action that may result in the escrowed settlement funds being returned to it rather than used to fund payments to holders of allowed claims under the Plan. The Plan Support Provisions operate to foster, rather than disrupt, the formulation and confirmation of the Trustee's Plan to maximize the recovery of creditors consensually, without a battle between competing plans. Accordingly, the Trustee submits that the Court can and should approve the Agreement in its entirety, including the Plan Support Provisions in section 4 thereof.

21

**WHEREFORE**, the Trustee respectfully requests that this Court approve this Motion

and the Agreement by entering an order substantially in the form attached hereto as Exhibit A,

and grant the Trustee such other and further relief as this Court deems just and proper.

Dated:    May 6, 2014                        Respectfully submitted,
          Boston, Massachusetts

                                             **DUANE MORRIS LLP**

                                             By: /s/ *Jeffrey D. Sternklar*
                                             Jeffrey D. Sternklar  (BBO #549561)
                                             100 High Street, Suite 2400
                                             Boston, MA 02110-1724
                                             Phone: (857) 488-4200
                                             Fax: (857) 488-4201
                                             Email: jdsternklar@duanemorris.com

DM3\2838051.6

# EXHIBIT A

## *PROPOSED ORDER*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |
|---|---|
| In re: ) | Chapter 11 |
| NEW ENGLAND COMPOUNDING ) PHARMACY, INC., ) | Case No. 12-19882 (HJB) |
| Debtor. ) | |

ORDER GRANTING CHAPTER 11 TRUSTEE'S MOTION TO APPROVE
COMPROMISE OF CONTROVERSIES AND INSURANCE
SETTLEMENT AND RELEASE AGREEMENT WITH PREFERRED
MUTUAL INSURANCE COMPANY, GDC PROPERTIES
MANAGEMENT, LLC, AND CERTAIN OF ITS INSIDERS

THIS matter having come before this Court upon the Motion (the "Motion") (ECF Docket No. ___) of Paul D. Moore, as Chapter 11 Trustee (the "Trustee") of debtor New England Compounding Pharmacy, Inc. ("Debtor") to approve a compromise of controversies as embodied in that certain GDC Insurance Settlement and Release Agreement (the "Agreement") annexed to the Motion as Exhibit B, by, between and among the Trustee, Preferred Mutual Insurance Company ("Preferred Mutual"), GDC Properties Management, LLC ("GDC") and certain insiders of GDC, including Gregory Conigliaro and Douglas Conigliaro (the "Individual GDC Insureds"), all as more fully defined and set forth in the Agreement;[1] and this Court having conducted a hearing (the "Hearing") on the Motion and any objections or responses filed in response thereto; and after due deliberation, this Court having concluded at the Hearing that

---

[1] All capitalized terms used herein shall have the meaning ascribed to such terms in the Agreement.

DM3\2850944.3

good and sufficient cause exists to grant the relief requested by the Motion; now, therefore, this Court hereby finds and concludes as follows:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]

Jurisdiction, Final Order and Statutory Predicates

A.      This Court has jurisdiction over the Motion to approve the Agreement between the Trustee, Preferred Mutual, GDC and the Individual GDC Insureds, and the relief requested therein, including responses and objections thereto, if any, pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      This Order constitutes a final and immediately appealable order within the meaning of 28 U.S.C. § 158(a).

C.      The predicate for the relief sought in the Motion is Federal Rule of Bankruptcy Procedure 9019(a).

Notice of the Motion

D.      The Trustee has provided due and adequate notice of the Motion, the Hearing, the Agreement, and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein, to all creditors and parties in interest pursuant to Bankruptcy Rule 2002(a)(3) and in accordance with this Court's Order dated _____, 2014, Granting the Trustee's Motion Designating Manner of Service of 9019 Motions and Approving Form and

---

[2]  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rule of Bankruptcy Procedure, as made applicable to this proceeding pursuant to Rule 9014 of the Federal Rule of Bankruptcy Procedure.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2

Manner of Service of Notice of Hearings on 9019 Motions (ECF Docket No. ___). Such notice was good and sufficient under the particular circumstances, and no further notice is necessary.

  Sound Business Judgment and Reasonableness

  E.  The relief requested in the Motion is fair, reasonable and in the best interests of the Debtor's estate and its creditors. The Trustee has demonstrated good, sufficient and sound business purposes and justifications for the relief requested in the Motion and the approval of the transactions contemplated thereby. The settlement and compromise with Preferred Mutual and the other Settling Parties embodied in the Agreement is consistent with the reasonable range of litigation outcomes if the Trustee were to litigate the matters resolved pursuant to this Order. Settling on the terms set forth in the Agreement permits the Trustee to save the expense and avoid the burden, delay, and risk of further negotiations or litigation with Preferred Mutual and the other Settling Parties concerning the estate's entitlement to the proceeds of the Policies, which provides the estate with substantial financial and other benefits to pay claims and administer the estate. The Agreement was negotiated in good faith and the consideration and payments to be made thereunder are found to be made for reasonably equivalent value and for fair consideration by and among the Trustee, Preferred Mutual and the other Settling Parties.

  F.  The Trustee has demonstrated that the probability of success for the estate in litigation over the matters resolved by the Agreement is uncertain; that the litigation of the matters resolved by the Agreement would be complex and costly to the estate; that the entry into the Agreement is consistent with the reasonable range of potential litigation outcomes; and that entry into the Agreement is in the best interests of the estate and its creditors.

3

**For all of the foregoing reasons and after due deliberation, IT IS HEREBY**

**ORDERED, ADJUDGED, AND DECREED THAT:**

The Motion is GRANTED and APPROVED in all respects.

1.      The failure to specifically include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreement be authorized and approved in its entirety.

2.      The Trustee, on behalf of the Debtor's estate and its respective predecessors, creditors and beneficiaries, is authorized and directed to enter into the Agreement and undertake all acts as the Trustee deems necessary or appropriate to consummate the transactions contemplated by the Agreement in accordance with its terms, and to execute and deliver all documents as he may deem to be required or appropriate to effectuate the transactions contemplated by the Agreement, subject only to the conditions specified in the Agreement.

3.      For the reasons set forth herein and on the record at the Hearing, all objections to the Motion and the relief requested therein and/or granted in this Order that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are overruled on the merits.

4.      Pursuant to Bankruptcy Rule 9019(a), the settlement and mutual release of claims as set forth in the Agreement are hereby approved as of the Plan Effective Date (as set forth in the Agreement).  This Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing and shall not be stayed under Bankruptcy Rule 6004(h) (to the extent applicable).

4

DM3\2850944.3

5.      Upon the occurrence of the Plan Effective Date (as set forth in the Agreement), Preferred Mutual shall have no further obligations under the Policies to any Insureds or any other Persons for or with respect to the Settled Claims, whether for defense, indemnity, bad faith, improper or unfair claims handling, or otherwise, all as more fully set forth in the Agreement.

6.      This Court shall retain jurisdiction to interpret and enforce the provisions of this Order and the Agreement in all respects, and to adjudicate, if necessary, all disputes arising under or relating to or affecting any of the transactions contemplated under the Agreement. The foregoing shall not constitute a general consent, waiver, estoppel, or agreement by Preferred Mutual to otherwise submit itself to the jurisdiction of the Bankruptcy Court for any dispute relating to the Policies set forth in the Agreement or for any other matter.

IT IS SO ORDERED.


Dated: _____, 2014


                                    _____
                                    Honorable Henry J. Boroff
                                    United States Bankruptcy Judge

DM3\2850944.3

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 1 of 21

# EXHIBIT B

*GDC INSURANCE SETTLEMENT*
*AND RELEASE AGREEMENT*

## GDC INSURANCE SETTLEMENT
## AND RELEASE AGREEMENT

This GDC Insurance Settlement and Release Agreement (the "Agreement") is made and entered by, between and among the NECC Trustee (as defined below), GDC (as defined below), the Individual GDC Insureds (as defined below) and Preferred Mutual (as defined below).

### RECITALS

WHEREAS, NECC, GDC and the Individual GDC Insureds have been named as defendants in numerous Claims (as defined below) seeking damages for alleged fungal meningitis contamination allegedly traced to certain lots of injectable methylpredinisolone acetate and other products compounded at and dispensed by NECC from the Facility (as more fully defined herein, the "NECC Claims");

WHEREAS, in or about December 10, 2012, GDC sought coverage for the NECC Claims from Preferred Mutual under certain policies of commercial general liability insurance (as more fully defined herein, the "Policies");

WHEREAS, in response to the these tenders, Preferred Mutual agreed to defend the NECC Claims asserted against GDC and the Individual GDC Insureds, subject to a Non-Waiver Agreement (as defined below), pursuant to which Preferred Mutual, GDC and the Individual GDC Insureds mutually reserved all of their rights and defenses regarding coverage for the NECC Claims under the Policies;

WHEREAS, Preferred Mutual, GDC and the Individual GDC Insureds dispute whether and to what extent the Policies have any applicability to the NECC Claims;

WHEREAS, the NECC Trustee, GDC, the Individual GDC Insureds and Preferred Mutual may have Claims against each other or others for the NECC Claims based upon subrogation or contractual or equitable indemnification or contribution;

WHEREAS, Preferred Mutual, GDC and the Individual GDC Insureds have engaged in good faith settlement discussions amongst themselves and with the NECC Trustee in an effort to fully and finally compromise and resolve Preferred Mutual's coverage obligations, if any, for the NECC Claims under the Policies or otherwise;

WHEREAS, even though Preferred Mutual, GDC and the Individual GDC Insureds dispute any liability in connection with the NECC Claims, Preferred Mutual, GDC, the Individual GDC Insureds and the NECC Trustee believe that if their disputes and other remaining issues are not resolved now, future proceedings would be protracted and expensive, involve complex issues of liability and/or damages, and involve substantial uncertainties and risks inherent in litigation;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the adequacy and sufficiency of which is hereby acknowledged by the Parties, and intending to be legally bound hereby, subject to approval by the Bankruptcy Court, the Parties agree as follows:

Case 1:13-md-02419-RWZ   Document 1106-3   Filed 05/06/14   Page 32 of 50

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 3 of 21

I.     **Definitions.**  The following definitions shall apply to the capitalized terms used in this Agreement:

a.   **"Agreement"** shall have the meaning set forth above in the preamble.

b.   **"Bankruptcy Case"** means the Chapter 11 case filed by NECC in the Bankruptcy Court captioned as *In Re: New England Compounding Pharmacy, Inc.,* Case No. 12-19882 (HJB).

c.   **"Bankruptcy Code"** means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.,* as it may be amended.

d.   **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Massachusetts, Eastern Division.

e.   **"Bankruptcy Rules"** means collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court.

f.   **"Claim"** means any  past, present or future claim, demand, action, cause of action, suit or liability of any kind or nature whatsoever (including claims for equitable or contractual indemnification or contribution), whether at law or in equity, pursuant to a statute, rule or regulation, known or unknown, asserted or unasserted, anticipated or unanticipated, accrued or unaccrued, fixed or contingent, which has been asserted, or that may in the future be asserted, by or on behalf of any Person, whether seeking damages (including compensatory, punitive or exemplary damages) or equitable, mandatory, injunctive or any other type of relief, including cross-claims, counter-claims, third-party claims, suits, lawsuits, administrative proceedings, notices of liability or potential liability (including Potentially Responsible Party or "PRP" notices), arbitrations, actions, rights, requests, demands for payment, causes of action, orders, or judgments, including without limitation, any "claim" as that term is defined in the Bankruptcy Code, 11 U. S. C. § 101(5).

g.   **"Claimants"** mean any Person asserting an NECC Claim against NECC, Preferred Mutual, GDC and/or the Individual GDC Insureds.

h.   **"Confirmation Order"** means the order confirming the Plan which includes the Plan Release and the Plan Injunction, without any material changes or modifications, and is in all respects in compliance with the Individual Plan Support Agreement with respect to the rights of the parties thereunder.

i.   **"Creditors' Committee"** means the official committee of unsecured creditors appointed in the Bankruptcy Case and any of its retained legal counsel or other professionals.

j.   **"Direct Action Claim"** means any Claim asserted or that could be asserted by any Person against Preferred Mutual that arises from (i) the activities of GDC and/or the Individual GDC Insureds that give rise to the Settled Claims under the Policies, or (ii) GDC's and the Individual GDC Insured's alleged interests in or rights to coverage under the Policies, whether arising by contract, in tort or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action against an insurer.

Case 1:13-md-02419-RWZ   Document 1106-3   Filed 05/06/14   Page 33 of 50

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 4 of 21

k.  **"Escrow"** means the escrow account to be established by the NECC Trustee at an FDIC insured bank listed on the United States Trustee's List of Authorized Depositories for Bankruptcy Cases filed in Region One, dated July 26, 2013, to hold the Settlement Amount pending the satisfaction of all conditions to the effectiveness of this Agreement set forth in Section VII hereof, or the Termination Date of this Agreement, whichever comes first.

l.  **"Execution Date"** means the first date upon which all of the following have occurred:  (1) Preferred Mutual, the NECC Trustee, GDC and the Individual GDC Insureds have executed this Agreement; and (2) a complete copy of the Agreement has been circulated to all Parties.

m.  **"Extra Contractual Claim"** means any Claim asserted or that could be asserted by any Person against Preferred Mutual with respect to any Policies seeking any type of relief, including compensatory, exemplary or punitive damages on account of alleged bad faith; failure to act in good faith; violation of any duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation or code; or any other similar type of alleged misconduct or any other act or omission of Preferred Mutual of any type for which the Person seeks relief other than coverage or benefits directly provided under the Policies.

n.  **"Facility"** shall mean the real property and buildings located at 697 Waverly Street, Framingham, Massachusetts, owned and controlled by GDC, where NECC conducted its business operations.

o.  **"GDC"** means GDC Properties Management, LLC, and any of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting in their respective capacity as such.

p.  **"Individual GDC Insureds"** means any of GDC's directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, who are or may be an "insured" under the Policies, including, but not limited to, Gregory Conigliaro and Douglas Conigliaro, each acting in their respective capacity as such.

q.  **"Insurance Coverage Claim"** means any Claim for insurance coverage under the Policies, whether direct, indirect or derivative, for defense, indemnity, contribution or otherwise.

r.  **"Individual Plan Support Agreement"** means that certain Plan Support and Funding Agreement dated as of May 2, 2014, by and among the Trustee and Barry J. Cadden, Lisa M. Conigliaro Cadden, Gregory Conigliaro, and Carla Conigliaro.  For the avoidance of doubt, Preferred Mutual is not a party to the Individual Plan Support Agreement.

s.  **"MDL Court"** means the United States District Court for the District of Massachusetts (at Boston) presiding over the matter entitled *In Re: New England Compounding Pharmacy, Inc. Product Liability Litigation*, MDL Docket No. 2419, Master File No. 1: 13-MD-2419.

t.  **"NECC"** or **"Debtor"** means debtor New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, and any of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting in their respective capacity as such.

Case 1:13-md-02419-RWZ Document 1106-3 Filed 05/06/14 Page 34 of 50

Case 12-19882 Doc 714-2 Filed 05/06/14 Entered 05/06/14 14:29:33 Desc Exhibit
B (GDC Insurance Settlement and Release Agreement) Page 5 of 21

u. **"NECC Claims"** means any and all Claims asserted or that could be asserted by any Person against NECC or GDC for personal injury, tort, wrongful death, medical monitoring, or any other economic or noneconomic injury or damage, based upon, arising out of or in any way related to the business operations of NECC or GDC, whether conducted at the Facility or otherwise, including, but not limited to, the actual or alleged compounding, production, sale or distribution of injectable methylpredinisolone acetate or any other drugs or products.

v. **"NECC Trustee"** or **"Trustee"** means Paul D. Moore solely in his capacity as the Chapter 11 Trustee for debtor New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center and not individually, and any retained attorneys or other professionals acting on his behalf.

w. **"Non-Waiver Agreement"** means that certain Amended Non-Waiver Agreement dated as of January 7, 2013, by and among Preferred Mutual and GDC concerning certain NECC Claims submitted for coverage by GDC under the Policies.

x. **"Parties"** means collectively, the NECC Trustee, Preferred Mutual, GDC and the Individual GDC Insureds.

y. **"Person"** means an individual, a corporation, a partnership, an association, a limited liability company, a proprietorship, a joint venture, a trust, an estate, trustee, executor, administrator, legal representative, or any other entity or organization.

z. **"PI Trust"** means a trust created by the Plan which will be funded by, *inter alia*, the Settlement Amount from Preferred Mutual and which establishes procedures for the resolution and payment of all NECC Claims.

aa. **"Plaintiffs' Steering Committee"** means the attorneys identified in MDL Order No. 2: Order Appointing Lead Counsel, Federal-State Liaison Counsel and Plaintiffs' Steering Committee.

bb. **"Plan"** means the Chapter 11 plan of reorganization or liquidation for NECC prepared, filed, noticed and solicited by the Trustee, at his own cost and expense, which is consistent with, incorporates and effectuates the terms and provisions of this Agreement without any material changes or modifications with respect to the rights of the Parties hereto, and which includes and incorporates the PI Trust, the Plan Release and the Plan Injunction and shall be in all respects in compliance with the Individual Plan Support Agreement with respect to the rights of the parties thereunder.

cc. **"Plan Effective Date"** means the later of (i) the first business day following (a) fourteen (14) days after the Bankruptcy Court's entry of the Confirmation Order, provided that the Confirmation Order is not subject to a stay by any court of competent jurisdiction as of such date, or (b) only if the Bankruptcy Court determines that it lacks jurisdiction or authority to enter final judgment confirming all or any portion of the Plan, then thirty (30) days after the United States District Court 's entry of the Confirmation Order, provided that the Confirmation Order is not subject to a stay by any court of competent jurisdiction as of such date, and (ii) the first business day on which all other conditions to the effective date of the

Plan as set forth therein, and to the effective date of this Agreement as set forth in Section VII hereof, have been satisfied or waived.

dd. **"Plan Injunction"** means the permanent injunction forever barring and enjoining all Persons from commencing, continuing or prosecuting any Settled Claims against GDC, the Individual GDC Insureds and/or Preferred Mutual, as incorporated in the Plan and Confirmation Order.

ee. **"Plan Release"** means a release to be included in the Plan and Confirmation Order pursuant to which the Settled Claims are deemed to have been waived and/or released by any and all Claimants.

ff. **"Policies"** means the two (2) Commercial Lines Insurance Policies issued by Preferred Mutual to GDC for the policy periods of 09/27/2011 to 09/27/2012 (No. CPP 0150530884) and 09/27/2012 to 09/27/2013 (No. CPP 0160530884), and any other known or unknown insurance policies issued by Preferred Mutual to GDC prior to the Execution Date.

gg. **"Preferred Mutual"** means Preferred Mutual Insurance Company and any of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting in their respective capacity as such.

hh. **"Settlement Amount"** means the sum of $3,750,000.00 (USD), together with any income or interest earned thereon from the date such amount is paid by Preferred Mutual to the Escrow pursuant to Section II hereof.

ii. **"Settlement Approval Motion"** means the motion seeking the approval of this Agreement by the Bankruptcy Court in its entirety without any material changes or modifications, to be prepared, filed and noticed by the NECC Trustee, at his own cost and expense.

jj. **"Settlement Approval Order"** means the order entered by the Bankruptcy Court granting the Settlement Approval Motion in its entirety, without any material changes or modifications.

kk. **"Settlement Effective Date"** means the first business day following fourteen (14) days after the Bankruptcy Court's entry of the Settlement Approval Order, provided that the Settlement Approval Order is not subject to a stay by any court of competent jurisdiction as of such date.

ll. **"Settled Claims"** means any and all Claims asserted or that could be asserted by or on behalf of any Person in any capacity whatsoever against GDC, the Individual GDC Insureds, Preferred Mutual, the NECC Trustee, the Debtor and/or its estate, based upon, arising out of or in any way relating to (i) NECC or the business operations of NECC, including, but not limited to, the actual or alleged compounding, production, sale or distribution of injectable methylpredinisolone acetate or any other drugs or products, (ii) the NECC Claims, (iii) GDC or the business operations of GDC, including, but not limited to, the actual or alleged lease, maintenance or operation of the Facility by GDC to or for the benefit of NECC, and/or (iv) the Policies, including, but not limited to, Insurance Coverage Claims, Direct Action Claims and/or Extra-Contractual Claims.

mm.   **"Termination Date"** shall have the meaning set forth in Section VII hereof.

Case 1:13-md-02419-RWZ   Document 1106-3   Filed 05/06/14   Page 36 of 50

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 7 of 21

II.          **Payment of Settlement Amount**

On the Settlement Effective Date, Preferred Mutual shall promptly pay the Settlement Amount in immediately available funds to the Escrow established by the NECC Trustee in accordance with the wire transfer instructions to be supplied by the NECC Trustee to Preferred Mutual.  On the Plan Effective Date, the Settlement Amount shall be, and shall be deemed, irrevocably and indefeasibly transferred from the Escrow to the Trustee for payment of the costs and expenses of administration of the Bankruptcy Case and distribution to creditors under the Plan (including, but not limited to, pursuant to the PI Trust), and Preferred Mutual shall have no further right, claim or interest in or to the Settlement Amount.  Notwithstanding the foregoing, if the Termination Date (defined below) occurs prior to the Plan Effective Date, the Settlement Amount shall be transferred from the Escrow to Preferred Mutual on the Termination Date.  The Parties intend and agree that the Settlement Amount shall constitute a material part of a fund to be ultimately distributed to personal injury Claimants against and other creditors of the Debtor under the Plan and, accordingly, shall be protected from collateral attack and reach by the Debtor's creditors or any other Persons whatsoever; and that such funds shall be therefore held in a legal manner that protects such funds from the reach of others to the full extent permitted by law.  The Parties further intend and agree that the Settlement Amount shall constitute, and shall be treated, at all times, as a deposit of the type described in Bankruptcy Rule 3020(a).

III.     **Bankruptcy Related Obligations**

a.   As soon as reasonably practicable after the Execution Date, the Trustee shall file and notice the Settlement Approval Motion seeking the entry of the Settlement Approval Order.

b.   As soon as reasonably practicable after the entry of the Settlement Approval Order, the Trustee shall prepare, file and solicit (following approval of a disclosure statement) approval and confirmation of the Plan and the entry of the Confirmation Order. The Confirmation Order shall include the terms and provisions of the Plan Release and the Plan Injunction, without any material changes or modifications and shall be in all respects in compliance with the Individual Plan Support Agreement with respect to the rights of the parties thereunder.

c.   The Trustee shall use his good faith commercially reasonable efforts to obtain support for this Agreement, the Settlement Approval Motion, the Plan and the Confirmation Order by and from the Creditors Committee and the Plaintiffs' Steering Committee. In the event the Trustee is unable after commercially reasonably good faith diligent efforts to obtain such support from the Creditors Committee and/or the Plaintiffs' Steering Committee, the Trustee shall nevertheless go forward with seeking approval of this Agreement and confirmation of the Plan, notwithstanding any lack of support thereof or objection thereto from the Creditors Committee and/or the Plaintiffs' Steering Committee.

d. The Settlement Approval Motion, the Settlement Approval Order, the Plan, the Confirmation Order and any other related documents, pleadings, notices or orders (including any disclosure statement), insofar as they effectuate or relate to the rights, benefits and obligations provided for by this Agreement, shall each be in a form that is reasonably satisfactory to Preferred Mutual, and shall each be provided to Preferred Mutual, GDC and the Individual GDC Insureds in draft for review and comment a reasonable time prior to their filing with the Bankruptcy Court or the MDL Court or otherwise being publicly disclosed.

e. Preferred Mutual hereby agrees with respect to any Plan (as defined herein), provided that the Trustee is not in breach of this Agreement, to:

   i. so long as its vote has been properly solicited pursuant to sections 1125 and 1126 of the Bankruptcy Code, timely vote any and all Claims (to the extent filed) that it is entitled to vote, now or hereafter beneficially owned by such Party (subject to Section IV hereof), to accept the Plan in accordance with the applicable procedures set forth in the solicitation materials accompanying the Plan, and timely return a duly executed ballot in connection therewith;

   ii. not withdraw or revoke its tender, consent or vote with respect to the Plan, except as otherwise expressly permitted pursuant to this Agreement; and

   iii. not:

   1. oppose or object to the Plan or the solicitation or consummation of the Plan and the transactions contemplated by the Plan, whether directly or indirectly;

   2. join in or support any objection to the Plan or to the solicitation of the Plan;

   3. initiate any legal proceedings that are inconsistent with or that would delay, prevent, frustrate or impede the approval, confirmation or consummation of the Plan, or otherwise commence any proceedings to oppose the Plan, or take any other action that is barred by or likely to frustrate this Agreement;

   4. vote for, consent to, support or participate in the formulation of any other restructuring or settlement of Claims, any other transaction involving any plan of reorganization or liquidation (with the exception of the Plan) under applicable bankruptcy or insolvency laws, whether domestic or foreign, in respect of the Debtor or its affiliates, except as otherwise expressly contemplated pursuant to this Agreement;

   5. directly or indirectly seek, solicit, or enter into any agreements relating to, any restructuring, plan of reorganization, proposal or

offer of dissolution, winding up, liquidation, reorganization, merger, transaction, sale, disposition or restructuring of the Debtor or its affiliates (or substantially all of their assets or stock) other than the Plan or as otherwise set forth in this Agreement (any such plan or other action as described in clauses (4) and (5) immediately above, an "Alternative Plan"); or

    6.  enter into any letter of intent, memorandum of understanding or agreement in principle relating to any Alternative Plan.

f.  The Trustee, GDC, Preferred Mutual and the Individual GDC Insureds shall each use good faith commercially reasonable efforts to permit (including in connection with relief sought by any such Party in proceedings in the MDL Court and the Bankruptcy Case) GDC, Preferred Mutual and the Individual GDC Insureds to continue to have the benefit of the stays of litigation and discovery now applicable to them in connection with the Settled Claims pending the Plan Effective Date (with corresponding, continuing and permanent relief to be provided thereafter by the Plan itself).

g.  Provided that this Agreement has not terminated in accordance with its terms, and provided that no Party is in breach of this Agreement, until the Plan Effective Date, Preferred Mutual will pay the reasonable and necessary defense costs for GDC and, if applicable the Individual GDC Insureds, pursuant to and in accordance with the terms, conditions, limits and exclusions of the Policies, the Non-Waiver Agreement and applicable law in connection with any NECC Claims asserted against GDC and the Individual GDC Insureds (in their capacity as such) in the MDL Court or otherwise.

## IV.  Waiver and Release of Bankruptcy Claims

Upon the Plan Effective Date, and so long as this Agreement has not terminated, each of GDC and Preferred Mutual hereby (a) waives, relinquishes and releases (i) any and all Claims (to the extent filed), of any kind or character he, she or it holds against the Debtor or its estate (including, without limitation, any Claims on account of NECC's or the NECC estate's use and occupancy of GDC's premises or for any amounts otherwise payable for any reason in connection with the foregoing), and (ii) any and all rights to distributions or recoveries, of any kind or character, on account of such Claims including, without limitation, pursuant to the Plan.

## V.  Releases

a.  Subject only to the conditions set forth in Section VII hereof, and without any further action by the Parties, GDC, the Individual GDC Insureds and the NECC Trustee each hereby fully, finally and completely, remises, releases, acquits and forever discharges Preferred Mutual of and from the Settled Claims.

b.  Subject only to the conditions set forth in Section VII hereof, and without any further action by the Parties, the NECC Trustee hereby fully, finally and

Case 1:13-md-02419-RWZ   Document 1106-3   Filed 05/06/14   Page 39 of 50

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 10 of 21

completely, remises, releases, acquits and forever discharges GDC and the
Individual GDC Insureds of and from the Settled Claims.

c.   Subject only to the conditions set forth in Section VII hereof, and without any
further action by the Parties, Preferred Mutual hereby fully, finally and
completely, remises, releases, acquits and forever discharges GDC, the Individual
GDC Insureds, the NECC Trustee, the Debtor and its estate of and from the
Settled Claims.

d.   Upon the satisfaction of the conditions set forth in Section VII hereof, Preferred
Mutual, GDC and the Individual GDC Insureds shall be deemed to have
unconditionally assigned to the NECC Trustee any and all Claims that they may
have between them and against any Persons not a Party to this Agreement
(including any claims for indemnification, contribution or subrogation) that are
based upon or arise out of the Settled Claims.

e.   Nothing in this Section V or any other provision of this Agreement is intended to,
nor shall it be construed to, have any effect on, or constitute a release, waiver,
assignment or discharge of, Preferred Mutual's rights or Claims for reinsurance in
connection with the Policies and/or the Settled Claims, all of which are expressly
reserved by Preferred Mutual.

f.   Nothing in this Section V or any other provision of this Agreement is intended to,
nor shall it be construed to, have any effect on, or constitute a release, waiver or
discharge of, the Parties' respective rights, obligations, remedies or Claims
created under this Agreement.

## VI.   Representations and Warranties of the Parties

Each of the Parties separately represents and warrants to each of the other Parties as
follows:

a.   It has the requisite power and authority to enter into this Agreement and to
perform the obligations contemplated by this Agreement, subject only to the entry
of the Settlement Approval Order;

b.   The execution and delivery of this Agreement, and the performance of the
obligations contemplated by this Agreement, have been approved by duly
authorized representatives of the Party, and by all other necessary actions of the
Party;

c.   It has expressly authorized its undersigned representative to execute this
Agreement on the Party's behalf as its duly authorized agent;

d.   The making and performance of this Agreement will not violate any provision of
the Party's respective articles of incorporation, membership agreement, charter or
bylaws, where applicable;

Case 1:13-md-02419-RWZ  Document 1106-3  Filed 05/06/14  Page 40 of 50

Case 12-19882  Doc 714-2  Filed 05/06/14  Entered 05/06/14 14:29:33  Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)  Page 11 of 21

e.  It has read the entire Agreement and knows the contents hereof; it understands that the terms hereof are contractual and not merely recitals; it has signed this Agreement of its own free act and will; and in making this Agreement, it has obtained the advice of its own legal counsel;

f.  It has not previously assigned or transferred, or purported to assign or transfer to any other Person, any right or Claim that is the subject matter of this Agreement;

g.  This Agreement has been negotiated, executed and delivered in good faith, with the assistance of its own legal counsel, pursuant to good faith arm's length negotiations, and for good and valuable consideration; and

h.  GDC and Preferred Mutual have conducted diligent good faith searches for any insurance policies that may have been issued by Preferred Mutual that provide insurance coverage and/or other benefits to GDC or the Individual GDC Insureds for the Settled Claims, and that they are unaware of any such insurance policies other than the Policies specifically identified herein.  The search conducted by GDC consisted of a review of relevant files and documents for copies of insurance policies and a review of available insurance schedules.  The search conducted by Preferred Mutual consisted of searches of internal corporate databases in which extant historical policy information is maintained. GDC, the Individual GDC Insureds and Preferred Mutual each agree that the searches described in the prior sentences constitute "diligent, good faith searches."

**VII.  Conditions to Effectiveness of this Agreement.**

Upon the Settlement Effective Date, this Agreement shall be binding upon the Parties in accordance with its terms; provided, however, that the effectiveness and finality of the provisions of this Agreement concerning the payment and release of the Settlement Amount from Escrow to the NECC Trustee (Section II) and the Releases (Section V) are expressly conditioned upon and subject to the following:

a.  The occurrence of the Settlement Effective Date;

b.  The payment of the Settlement Amount to the Escrow by Preferred Mutual; and

c.  The occurrence of the Plan Effective Date.

For the avoidance of doubt, and without diminishing any other condition to the effectiveness of this Agreement or the Plan, it is expressly understood and agreed by the Parties that the Plan Release and the Plan Injunction and the entry of the Confirmation Order that is in compliance with this Agreement are material, non-waivable conditions to the effectiveness of this Agreement, and that they will also be made material, non-waivable conditions to the effectiveness of the Plan.

In the event that: (a) the Plan Effective Date does not occur within one (1) year from the entry of the Settlement Approval Order; (b) the Bankruptcy Court denies confirmation of the Plan and such denial cannot be cured by amending the Plan in a manner that is either

Case 1:13-md-02419-RWZ   Document 1106-3   Filed 05/06/14   Page 41 of 50

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 12 of 21

(i) not materially inconsistent with this Agreement and the Individual Plan Support Agreement with respect to the rights of the parties thereunder or (ii) otherwise agreed to by each of the Parties; (c) the Plan is withdrawn; or (d) the Court denies the Settlement Approval Motion and does not enter the Settlement Approval Order; then this Agreement shall immediately terminate and be of no further force or effect (the date of such termination, the "Termination Date"), and the NECC Trustee shall immediately return the Settlement Amount to Preferred Mutual together with any interest accrued thereon without the need for any further order by the Bankruptcy Court, the MDL Court or any other court. Upon the Termination Date, the Parties shall be restored to the same position they were in immediately prior to the Execution Date without waiver of any rights, claims, defenses or remedies that the Parties may have against each other.

The Parties may agree and consent in a writing signed by the Parties to extend the Termination Date for a reasonable period of time in the sole discretion of the Parties.

## VIII.   Other Provisions.

a.   **Informed Consent and Knowledge**. The Parties expressly warrant and represent that they have had the benefit of the professional advice of attorneys of their own choosing, that they are fully satisfied with that advice, and that they have not relied on any statement or representation of other Parties to this Agreement regarding the specific matters in dispute. The Parties also represent and acknowledge that, in executing this Settlement Agreement, they do not rely and have not relied upon any representation or statement made by any other Party or any of their agents, representatives, or attorneys, with regard to the subject matter, basis or effect of this Settlement Agreement or otherwise, other than as specifically stated in this Agreement.

b.   **No Precedent**. The Parties stipulate that they have entered into this Agreement only for their own business reasons based on the unique circumstances presented by the Settled Claims, and that this Agreement creates no binding legal or factual precedent for themselves or others in any future case. This Agreement does not constitute an admission of coverage or noncoverage, and is not based upon language in the Policies.

c.   **Confidentiality**. The Parties agree, subject to any disclosure obligations imposed by law, to hold this Agreement confidential and not to disclose the terms of this Agreement to any Person, other than the Creditors' Committee and the Plaintiffs' Steering Committee, until the Trustee files the Settlement Approval Motion; provided, however, that after the Execution Date and prior to the filing of the Settlement Approval Motion, the Parties may inform the Bankruptcy Court and/or the MDL Court that they have entered into this Agreement.

d.   **Cooperation**. Each Party agrees to take such steps and to execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Person not a Party hereto to invalidate, interpret or prevent the validation, enforcement or carrying out of all or any of

Case 1:13-md-02419-RWZ   Document 1106-3   Filed 05/06/14   Page 42 of 50

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 13 of 21

the provisions of this Agreement, the Parties mutually agree, represent, warrant and covenant to cooperate in opposing such action or proceeding.

e. **Entire Agreement.** This Agreement (and, in the case of certain Individual GDC Insureds and the Trustee, the Individual Plan Support Agreement) set forth the entire agreement between the Parties and fully supersedes any and all prior agreements and understandings, written or oral, between and among the Parties pertaining to the subject matter hereof. Except as explicitly set forth in this Agreement, there are no representations, warranties, promises or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Agreement or alter or supplement its terms. Any statements, promises or inducements, whether made by any Party or the agent of any Party, that are not contained in this Agreement shall not be valid or binding. This Agreement shall have perpetual existence, except as otherwise provided herein. In the event of a conflict between this Agreement and the Individual Plan Support Agreement, the Individual Plan Support Agreement shall control but only with respect to the rights or obligations of any Party to this Agreement who is also a party to the Individual Plan Support Agreement.

f. **Amendment/Modification.** No amendment or modification of this Agreement shall be binding or enforceable unless in writing and signed by each of the Parties and, if required, approved by the Bankruptcy Court.

g. **Construction.** This Agreement is the jointly-drafted product of good faith arm's length negotiations between the Parties with the benefit of advice from their own respective legal counsel and each of them has had sufficient opportunities to propose and negotiate changes to this Agreement prior to its execution. As such, no Party will claim that any ambiguity in this Agreement shall be construed against any other Party by reason of their identity as a drafter or insurer. The following rules of construction shall also apply to this Agreement:

   1. The Recitals and Definitions to this Agreement are a material part of this Agreement having the same force and effect as a mutual representation, warranty and covenant of the Parties;

   2. Unless the context of this Agreement otherwise requires, (a) words of any gender include each other gender, and the word "it" may refer to a Person as the context requires; (b) words used in the singular or plural also include the plural or singular number, respectively; (c) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (d) the words "include,' "includes" or "including" shall be deemed to be followed by the words "without limitation;" (e) the word "or" shall be disjunctive but not exclusive; (f) the words "any" or "all" shall mean "any and all";

   3. References to policies, agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto; and

Case 1:13-md-02419-RWZ   Document 1106-3   Filed 05/06/14   Page 43 of 50

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 14 of 21

4.  References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating or amending or replacing the statute or regulation.

h.  **Applicable Law.** This Agreement shall be interpreted and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the conflict of laws of the Commonwealth of Massachusetts, except to the extent that any particular provision hereof may be governed by the Bankruptcy Code and Rules. Each of the Parties hereby irrevocably consents to the exclusive jurisdiction of the Bankruptcy Court solely with respect to any action to enforce the terms and provisions of this Agreement, and expressly waives any right to commence any such action in any other forum (unless the Bankruptcy Court does not have or refuses to exercise such jurisdiction). In any dispute arising from this Agreement, the Parties hereby waive any right to a jury trial. This Agreement is intended to be and shall have the effect of a document executed under seal in accordance with the laws of the Commonwealth of Massachusetts.

i.  **No Admissions/Not Evidentiary.** This Agreement is not and shall not be construed as an admission or concession of coverage, responsibility, liability, non-liability or wrongdoing by any Party to this Agreement. No part of this Agreement may be used in any action or proceeding as evidence of the rights, duties or obligations of Preferred Mutual under the Policies or otherwise.

j.  **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto, and their respective successors, permissible assigns, agents, employees and legal representatives, including, without limitation, NECC and its bankruptcy estate, any trust or trustee, responsible Person, estate administrator, representative or similar Person appointed for NECC in connection with the Bankruptcy Case, the Plan or any subsequent Chapter 7 case. Except as expressly provided in this Agreement, neither this Agreement nor any of the rights and obligations set forth herein shall be assigned by any Party without the prior written consent of the other Parties, which consent shall not be unreasonably withheld.

k.  **No Rights of Third Parties.** All Persons expressly included within the definitions of "GDC," "Individual GDC Insureds," "Preferred Mutual" and "NECC Trustee," are intended beneficiaries of this Agreement. The Parties agree that, except as set forth in the prior sentence or otherwise expressly set forth in this Agreement, there are no intended third party beneficiaries to this Agreement.

l.  **Enforcement of Agreement.** The Parties hereby acknowledge that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by any Party and that such breach shall cause the non-breaching Parties irreparable harm. Accordingly, the Parties agree that in the event of any breach or threatened breach of this Agreement by any of the Parties, the Parties, in addition to any other remedies at law or in equity that they may have, shall be entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance.

Case 1:13-md-02419-RWZ   Document 1106-3   Filed 05/06/14   Page 44 of 50

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 15 of 21

m. **Captions and Headings**. Captions and headings to paragraphs or sections in this Agreement are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof.

n. **Notice.** Unless another Person is designated in writing for receipt of notices hereunder, notices to the respective Parties shall be sent to the following Persons to the extent so designated below. All notices shall be sent via email <u>and</u> by either (i) overnight courier or (ii) fax (to the extent such information is set forth below), and shall be deemed effective upon receipt.

<u>As to the NECC Trustee:</u>
Paul D. Moore
Duane Morris LLP
100 High Street Ste 2400
Boston, MA 02110
Tel: 857-488-4200
Fax: 857-401-3057
Email: pdmoore@duanemorris.com

<u>With Copy To:</u>
Michael R. Gottfried
Duane Morris LLP
100 High Street Ste 2400
Boston, MA 02110
Tel: 857-488-4200
Fax: 857-401-3057
Email: mrgottfried@duanemorris.com

<u>As To Preferred Mutual:</u>
Preferred Mutual Insurance Company
One Preferred Way
New Berlin, NY 13411
Attention: James B. Dolan, Jr.
Tel: 1-601-847-1756
Fax: 1-607-847-2756
Email: james.dolan@preferredmutual.com

<u>With Copy To:</u>
Carl Pernicone
Mark G. Ledwin
Wilson Elser Moskowitz Edelman & Dicker LLP
150 E. 42nd Street
New York, NY 10017
Tel: 212-490-3000
Fax: 212-490-3038
Email: carl.pernicone@wilsonelser.com

Case 1:13-md-02419-RWZ   Document 1106-3   Filed 05/06/14   Page 45 of 50

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 16 of 21

mark.ledwin@wilsonelser.com

As to GDC:
GDC Properties Management, LLC
697 Waverly Street
Framingham, MA  01702
Attention:  Gregory Conigliaro
Tel: 508-872-9668
Fax:
Email:

With Copy To:
Andrew C. Gately
316 Franklin Street
Newton, MA  02458
Tel: 617-969-8555
Fax:
Email: agately@gately-law.com

As to the Individual GDC Insureds:
Gregory Conigliaro
50-52 Sears Road
Southborough, MA 01772-1102
Tel:
Fax:
Email:

Case 1:13-md-02419-RWZ   Document 1106-3   Filed 05/06/14   Page 46 of 50

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 17 of 21

<u>With Copy To</u>:
Christopher J. Panos, Esq.
Partridge Snow & Hahn LLP
30 Federal Street
Boston, MA 02110
Tel:    617-292-7900
Fax:    617-292-7910
Email: cpanos@PSH.com

Douglas Conigliaro
15 Hale Drive
Dedham, MA 02026-5504
Tel:
Fax:
Email:

<u>With Copy To</u>:
John J. Monaghan, Esq.
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
Tel:    (617) 523-2700
Fax:    (617) 523-6850
Email: john.monaghan@hklaw.com

n.  **Execution and Delivery.**  This Agreement may be executed in one or more counterparts, all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by email and facsimile, which shall be deemed the same as originals.

**[Signature Page Follows]**

Case 1:13-md-02419-RWZ   Document 1106-3   Filed 05/06/14   Page 47 of 50

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 18 of 21

IN WITNESS WHEREOF, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

**New England Compounding Pharmacy, Inc.**
**d/b/a New England Compounding Center**

By:  Paul D. Moore, as Chapter 11 Trustee
Date:  April 30, 2014


**Preferred Mutual Insurance Company**


By:  James B. Dolan, Jr., General Claims Counsel
Date:  April _____, 2014


**GDC Properties Management, LLC**


By:  Gregory Conigliaro, Managing Member
Dated:  April _____, 2014


**Individual GDC Insureds:**


Gregory Conigliaro
Dated:  April _____, 2014


Douglas Conigliaro
Dated:  April _____, 2014

Case 1:13-md-02419-RWZ   Document 1106-3   Filed 05/06/14   Page 48 of 50

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 19 of 21

IN WITNESS WHEREOF, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

New England Compounding Pharmacy, Inc.
d/b/a New England Compounding Center

_____
By:  Paul D. Moore, as Chapter 11 Trustee
Date:  April ____, 2014

Preferred Mutual Insurance Company

_____
By:  James B. Dolan, Jr., General Claims Counsel
Date:  April 50, 2014

GDC Properties Management, LLC

_____
By:  Gregory Conigliaro, Managing Member
Dated:  April ____, 2014

Individual GDC Insureds:

_____
Gregory Conigliaro
Dated:  April ____, 2014

_____
Douglas Conigliaro
Dated:  April ____, 2014

Case 1:13-md-02419-RWZ   Document 1106-3   Filed 05/06/14   Page 49 of 50

Case 12-19882   Doc 714-2   Filed 05/06/14   Entered 05/06/14 14:29:33   Desc Exhibit
B (GDC Insurance Settlement and Release Agreement)   Page 20 of 21

IN WITNESS WHEREOF, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

New England Compounding Pharmacy, Inc.
d/b/a New England Compounding Center

_____
By:  Paul D. Moore, as Chapter 11 Trustee
Date:  April _____, 2014

Preferred Mutual Insurance Company

_____
By:  James B. Dolan, Jr., General Claims Counsel
Date:  April _____, 2014

GDC Properties Management, LLC

_____
By:  Gregory Conigliaro, Managing Member
Dated:  April _18_, 2014

Individual GDC Insureds:

_____
Gregory Conigliaro
Dated:  April _18_, 2014

_____
Douglas Conigliaro
Dated:  April _____, 2014

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

**New England Compounding Pharmacy, Inc.
d/b/a New England Compounding Center**

_____
By:  Paul D. Moore, as Chapter 11 Trustee
Date:  April _____, 2014

**Preferred Mutual Insurance Company**

_____
By:  James B. Dolan, Jr., General Claims Counsel
Date:  April _____, 2014

**GDC Properties Management, LLC**

_____
By:  Gregory Conigliaro, Managing Member
Dated:  April _____, 2014

**Individual GDC Insureds:**

_____
Gregory Conigliaro
Dated:  April _____, 2014

_____
Douglas Conigliaro
Dated:  April 2_, 2014