```
 1                    UNITED STATES DISTRICT COURT
 2                    DISTRICT OF MASSACHUSETTS
 3

 4
    IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
 5  PHARMACY CASES LITIGATION          )
                                       )
 6                                     )
                                       )
 7                                     )
                                       )
 8                                     )
 9

10
              BEFORE:  THE HONORABLE RYA W. ZOBEL
11                              AND
                     THE HONORABLE JENNIFER C. BOAL
12

13

14
                      STATUS CONFERENCE
15

16

17         John Joseph Moakley United States Courthouse
                       Courtroom No. 12
18                     One Courthouse Way
                       Boston, MA 02210
19

20                       May 13, 2014
                          2:00 p.m.
21

22
                Catherine A. Handel, RPR-CM, CRR
23                   Official Court Reporter
            John Joseph Moakley United States Courthouse
24             One Courthouse Way, Room 5205
                      Boston, MA 02210
25             E-mail: hhcatherine2@yahoo.com
```

1    APPEARANCES:

2     For The Plaintiffs:

3        Hagens, Berman, Sobol, Shapiro LLP, by THOMAS M. SOBOL,
     ESQ., and KRISTEN JOHNSON, ESQ., 55 Cambridge Parkway, Suite
4    301, Cambridge, MA 02142;

5        Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
     ESQ., One Nashville Place, 150 Fourth Avenue North, Suite 1650,
6    Nashville, TN 37219-2423;

7        Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K.
     MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, NY
8    10013-1413;

9        Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ., 366 Elm
     Avenue, SW, Roanoke, VA 24016;
10

11        Branstetter, Stranch & Jennings, PLLC, by BEN GASTEL, ESQ.,
     ESQ., 227 Second Avenue North, 4th Floor, Nashville, TN
     37201-1631;
12

13        Cohen, Placitella & Roth, P.C., by MICHAEL COREN, ESQ.,
     2 Commerce Square, 2001 Market Street, Suite 2900, Philadelphia,
     PA 19103;
14

15        Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
     Street, Suite 500, Boston, MA 02114;

16

17
      FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
18

19        Brown Rudnick, by DAVID J. MOLTON, ESQ., Seven Times Square,
     New York, NY 10036;

20        Brown Rudnick, by KIERSTEN A. TAYLOR, ESQ., One Financial
     Center, Boston, MA 02111;
21

22
      For the Defendants:
23

24        Harris Beach PLLC, by FREDERICK H. FERN, ESQ., 100 Wall
     Street, 23rd Floor, New York, NY 10005;

25

      (Appearances continued on the next page.)

1    For the Defendants: (Cont'd)

2        Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ.,
     950 Main Avenue, Cleveland, OH 44113-7213;

3

4        Todd & Weld LLP, by CORRINA L. HALE, ESQ., and CHRISTOPHER
     WELD, ESQ., 28 State Street, 31st Floor, Boston, MA 02109;

5

6        Sloane & Walsh LLP, by ROBERT H. GAYNOR, ESQ., Three Center
     Plaza, Boston, MA 02108;

7

8        Fulbright & Jaworski, LLP, by MARCY H. GREER, ESQ., 98 San
     Jacinto Blvd, Suite 1100, Austin, TX 78701;

9

10       Michaels, Ward & Rabinovitz LLP, by DANIEL M. RABINOVITZ,
     ESQ., One Beacon Street, Second Floor, Boston, MA 02108;

11

12       Blumberg & Wolk LLC, by CHRISTOPHER M. WOLK, ESQ., 158
     Delaware Street, P.O. Box 68, Woodbury, NJ 08096;

13

14       Goodwin Procter LLP, by JAMES REHNQUIST, ESQ., and ROBERTO
     M. BRACERAS, ESQ., Exchange Place, 53 State Street, Boston, MA

15   02109;

16       Gideon, Cooper & Essary, PLLC, by CHRIS J. TARDIO, ESQ.,
     315 Deaderick Street, Suite 1100, Nashville, TN 37238;

17

18       Morrison Mahoney LLP, by ANTHONY E. ABELN, ESQ., 250 Summer
     Street, Boston, MA 02210;

19

20       Smith Duggan Buell & Rufo LLP, by BARBARA HAYES BUELL,
     ESQ., Lincoln North, 55 Old Bedford Road, Lincoln, MA 01773;

21

22    FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
      NECP, INC.:

23

         Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
24   Street, Suite 2400, Boston, MA 02110-1724;

25

```
1                    P R O C E E D I N G S

2        (The following proceedings were held in open court before

3   the Honorable Rya W. Zobel, United States District Court Judge,

4   United States District Court, District of Massachusetts, at the

5   John J. Moakley United States Courthouse, One Courthouse Way,

6   Boston, Massachusetts, on May 13, 2014.)

7             THE COURT:  Good afternoon.  Please be seated.

8             COURTROOM DEPUTY CLERK URSO:  Can I just remind

9   counsel that they have to talk into the microphone for all to

10  hear.  And I'm going to call right now.

11            (Pause.)

12            THE COURT:  Can we proceed, Lisa?

13            COURTROOM DEPUTY CLERK URSO:  Yes, Judge.

14            THE COURT:  First, I invited Magistrate Judge Boal to

15  sit with us on the theory that what we do here will inform

16  what she does and the interchange amongst all of us would be

17  helpful to the case.

18            So, I know we have Mr. Sobol, Ms. Parker.  I've

19  forgotten your name, sorry.

20            MR. GASTEL:  Hi, Judge.  Ben Gastel from Branstetter,

21  Stranch & Jennings.

22            THE COURT:  And --

23            MR. CHALOS:  Mark Chalos, your Honor.

24            THE COURT:  And Mr. Rehnquist.

25            MR. REHNQUIST:  Good afternoon.
```

```
1              THE COURT:  I know it.  I know it.

2              MR. BRACERAS:  Braceras, your Honor.

3              THE COURT:  Braceras.  That's what happens when you

4    get old.  You're not participating?

5              MR. FENNELL:  No, your Honor, we're not participating.

6              THE COURT:  And then we have for the defense.

7              MR. FERN:  Good afternoon, your Honor.  Frederick

8    Fern.

9              THE COURT:  Mr.?

10             MR. FERN:  Fern, F-e-r-n.

11             MR. GAYNOR:  Good afternoon, your Honor.  Robert

12   Gaynor for the individual defendants.

13             MR. RABINOVITZ:  Daniel Rabinovitz on behalf of

14   Medical Sales Management, Inc.

15             THE COURT:  I'm sorry?  It got lost in your beard.

16             (Laughter.)

17             MR. RABINOVITZ:  Dan Rabinovitz on behalf of Medical

18   Sales Management, Inc.  Good afternoon, your Honor.

19             MR. SOBOL:  You just made the top ten, your Honor.

20             MR. MORIARTY:  Good afternoon, your Honor.  Matt

21   Moriarty for Ameridose.

22             THE COURT:  And we have for the trustee?

23             MR. GOTTFRIED:  Michael Gottfried, your Honor.

24             MR. MOLTON:  Your Honor, David Molton, Brown Rudnick,

25   for the Chapter 11 creditor's committee.
```

```
 1            MR. ELLIS:  Your Honor, Fredric Ellis for the
 2   plaintiffs.
 3            MR. COREN:  Good afternoon, your Honor.  Michael
 4   Coren, co-chair Official Creditor's Committee.
 5            MS. TAYLOR:  Good afternoon, your Honor.  Kiersten
 6   Taylor, from Brown Rudnick, also the creditor's committee.
 7            THE COURT:  That's about it, right?  Anybody else who
 8   speaks will identify himself or herself when he or she does.
 9            As usual, you've done a fantastically good job with
10   your agenda and I much appreciate that.
11            So, Mr. Sobol, do you wish to go first?
12            MR. SOBOL:  If I may, your Honor.
13            THE COURT:  If you want to sit down to make it easier
14   to speak into the microphone, that's fine.  Whatever you
15   prefer.
16            MR. SOBOL:  I feel a little uncomfortable sitting
17   down in front of you, but I'll try to --
18            THE COURT:  Well, you can always hold it up in your
19   hand, if you want.
20            MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol,
21   lead counsel on the Plaintiffs' Steering Committee.
22            It only took us four months, but the lawyers figured
23   out a way to get the proposed settlement with the insiders and
24   the affiliated defendants memorialized in a settlement
25   agreement and everybody has signed it.  The settlement
```

1   agreement is between the principals of NECC, the NECC trustee,

2   certain unaffiliated defendants, and the creditor's committee

3   and the PSC have also joined in.  Excuse me.

4            (Discussion off the record.)

5            MR. SOBOL:  Yes, there's two also insurers of NECC as

6   well as PMIC and Maxim.

7            The process going forward will be that there'll be

8   notice that will go out to the creditors.  There's a motion

9   that's going to be scheduled later in the month to have that

10  put forward, and then a hearing date will be scheduled for a

11  -- functionally, a preliminary approval by the bankruptcy

12  court of the settlement.

13           The settlement also contemplates an order that would

14  be presented to you as well that will govern some matters here

15  in the MDL.  Most notably, a stay of certain kinds of

16  activities with respect to the insiders and affiliated

17  defendants, meaning dispositive motions and provisional

18  relief, but --

19           THE COURT:  When is that scheduled, more or less?

20           MR. SOBOL:  I'll defer to Mr. Gottfried and Mr.

21  Molton on that, but I think that's in a motion that's

22  presented to you after there's a preliminary approval by the

23  bankruptcy court.

24           THE COURT:  We're talking end of summer or

25  earlier?

1          MR. SOBOL:  Oh, no.  We're talking -- people are

2     aspiring to something that would be in June or early July, I

3     think.

4          It's important to note that there will be some

5     discovery contemplated against those individuals and entities

6     because there are other defendants, obviously, remaining in

7     the case and they have information that's relevant to them.

8     That is where we are at with respect to that.

9          I'll also candidly admit that because the process

10     took longer than everybody expected, although everybody was

11     working very hard to get things done, that really is true.  I

12     think you know me.  I can be a little bit -- try to be a

13     little bit funny at times.  Although it did take four months,

14     people really did work very hard during those four months to

15     get it done.

16          I need personally to visit with the trustee:  What we

17     are contemplating in terms of a schedule going forward, when

18     are we really planning to have a plan put together, when do we

19     have a vote on the plan, when are we going to get a confirmed

20     plan.  Most importantly, when are we going to start

21     distributing money to the victims.  That needs to be revisited

22     because we're four months later than the original announcement

23     of the settlement.  And I would yield to Mr. Gottfried and Mr.

24     Molton to fill in the other aspects of this.

25          THE COURT:  Mr. Gottfried.

1          MR. GOTTFRIED:  Your Honor, to answer to your

2   question first, I think it pivots off the next -- the trustee

3   filed his motion for approval of the settlement in front of

4   Judge Baroff.  There are actually three motions with respect

5   to three distinct settlements.

6          Judge Baroff had scheduled a hearing on the form and

7   manner of notice as to when he's going to hear that motion

8   from May 30th, and that will be in Boston on May 30th.  By

9   rule, he has to give at least 25 days' notice.  Generally

10  we've seen 30 days' notice.  So, we're expecting the actual

11  hearing will be scheduled by Judge Baroff, obviously, with

12  respect to his calendar, probably either the very end of June,

13  which would be about 30 days later, or the very beginning of

14  July.

15         Once that hearing is held, Judge Baroff will act on

16  the motion as he deems just, and then under the support

17  agreement and the settlement agreement, as Mr. Sobol

18  referenced, there are certain actions with respect to what

19  would happen vis-à-vis the affiliated defendants, the

20  individual defendants, vis-à-vis discovery, dispositive

21  motions, preliminary relief, while the bankruptcy plan is

22  being formulated, filed and ultimately approved.  The

23  agreement calls for that to take place -- a motion to be filed

24  ten business days after Judge Baroff were to approve the

25  settlement agreement.  So --

```
1            THE COURT:  So, we're in the middle of July.

2            MR. GOTTFRIED:  It could be the middle of July,

3    depending on how quickly he acts.  That ten-day window pivots

4    off his decision, is the actual answer.

5            MR. MOLTON:  Your Honor, to get to another

6    question -- David Molton of the creditors committee -- raised

7    and referred to by Mr. Sobol.  With respect to the plan and

8    the disclosure statement, it's the contemplation and the hope

9    of the trustee to have that rolled out sometime in August.  So

10   that it can be in front of Judge Baroff for confirmation

11   before the calendar year-end, in which case, if that happens,

12   there may be an ability to have distributions in 2015.  So,

13   that is the goal of the committee and the trustee and how

14   we're looking forward to it, and in connection with that --

15           THE COURT:  Excuse me.  When you say "2015," you mean

16   January, February of 2015, not December?

17           MR. MOLTON:  We're hoping earlier rather than later,

18   your Honor, but all we can do right now is contemplate,

19   because, as your Honor has already seen from your experience

20   in this case, there's a lot of moving pieces.

21           And one of the things that not only will be insider

22   settlements and the insurance settlements be part of that

23   plan, but to the extent that any of the depending mediations

24   that are under your Honor's supervision result in a settlement

25   also over the next coming months, those settlements also will
```

```
1    be included in the plan and be part of the confirmation order
2    that we're going to be asking Judge Baroff to grant at the end
3    of this year.
4             THE COURT:  You mean all sums that are collected from
5    the defendants by either settlement or judgment, or whatever,
6    end up in the bankruptcy pot?
7             MR. MOLTON:  Your Honor, yes.  The goal is that all
8    -- I'm going to refer, all sums that result from the
9    mediations -- the consensual mediations with pain clinics, the
10   medical care providers, as well as what we call the national
11   defendants, by which those defendants will want the non-debtor
12   releases that may become available by way of a confirmed plan,
13   those will be part of the plan and will be put into the
14   plaintiff pot, what we call the victim pot.
15            THE COURT:  But, presumably, any claims against that
16   pot will be limited to the victims so-called in this case or
17   not -- at least not including the ordinary creditors of NECC
18   or is everybody --
19            MR. MOLTON:  Judge, everybody.
20            And one of the things I think I mentioned when we
21   first introduced ourselves when you came on this case, the
22   universe of what I would call general unsecured creditors is
23   limited in this case.  We don't have significant bank
24   creditors.  We don't have any, I believe, secured creditors.
25   We have -- you know, I don't want to -- I don't want to
```

1    guesstimate the amount of general unsecured creditor claims,

2    but my understanding is that when NECC went into bankruptcy,

3    they scheduled about $800,000 as the amount and it may be

4    more, but to the extent it's more, I don't think it's going to

5    be a significant amount that's going to interfere with

6    ensuring that a large portion, if not the predominant portion,

7    of the moneys accumulated into the estate for the purpose of

8    distribution ultimately go to victims.

9          THE COURT:  Are there any provisions now with respect

10   to, I assume, mostly subsequent claims for indemnity and

11   contribution?

12         MR. MOLTON:  In terms -- yes.  Your Honor, to the

13   extent that entities have made indemnification claims and

14   contribution claims against the estate, they are being dealt

15   with, and if your Honor -- part of -- I'll use for an example,

16   the insider settlement because it's public now.  How those are

17   being dealt with there is to the extent that the defendant

18   participants want the benefit of a bankruptcy type of release

19   as a result of a plan, they are releasing those claims, those

20   indemnification and contribution claims against the estate.

21         So, it's our contemplation that all defendant

22   participants will be negotiating to be able to benefit from

23   non-debtor releases and a plan.  Part of that is they'll have

24   to be releasing whatever indemnification or contribution

25   claims they have against the estate.

```
 1              MR. SOBOL:  If I may, your Honor.
 2              THE COURT:  Go ahead.
 3              MR. SOBOL:  With respect to that one issue -- now I'm
 4    going to take it a step back -- my understanding is that when
 5    the bar date notice went out for any creditors of NECC, that
 6    parties having contribution or indemnification claims were
 7    also required to file a claim.  And so, the available
 8    potential parties that might have contribution or
 9    indemnification claims are parties that already have,
10    obviously, a claim in the bankruptcy now because that bar date
11    expired in the middle of January or thereabouts.
12              That position, of course, from the victims' point of
13    view, is that, as a practical matter, we think that all claims
14    for contribution or indemnification should be subordinated to
15    the claims of the victims.  That's an issue that will need to
16    be worked out in the context of the plan.
17              A couple of other things that I think it's important,
18    since you're showing some interest this because it's now
19    becoming relevant, to keep our mind on top of in terms of the
20    crucial issues.  Another crucial issue will be, obviously, as
21    you've indicated, the plan will to have address in some way
22    the ordinary creditors, which in this case are, as a practical
23    matter, relatively de minimis, and then there'll be, call it
24    what you will, but a tort trust, and the question -- you know,
25    a pot, if you will, the tort trust created for the victims.
```

```
1    There are a couple of issues with respect to that.  First --
2            THE COURT:  Excuse me.  Will that be done under the
3    auspices of the bankruptcy court or this Court?
4            MR. SOBOL:  You pegged it.  This Court.  We think
5    that -- Judge Baroff has already indicated in open court
6    previously issues in terms of how to determine who should get
7    what and the relationship to what should be under the auspices
8    of this Court.
9            THE COURT:  Is there an agreement on that?
10           MR. SOBOL:  I don't -- I thought there used to be,
11   but I got a feeling that this is one of the issues that's
12   brewing in terms of the parallel activities in the bankruptcy
13   court and this Court, but I flagged that as an issue which you
14   need to be mindful of.
15           I'll also say that in connection with that, your
16   Honor --
17           THE COURT:  Judge Baroff and I need to get together.
18           MR. SOBOL:  Exactly.
19           Judge Saylor, essentially, has been doing two today
20   because there were informal discussions between he and Judge
21   Baroff and they apparently were working issues out and today
22   we have acquiesced to that occurring.  That's one issue.
23           Another issue which I think that I end up stepping
24   into in my professional career is the issue of attorney's fees
25   and expenses.  Now, here we have a situation where we have a
```

1    limited fund.  There have been a lot of professionals doing a

2    lot of work, but, unfortunately, this starts out with being a

3    mass tort that involves a bankrupt defendant that has

4    extremely complicated issues, multi-parties.  It's really

5    taken quite an awful lot of effort and all the rest of that,

6    and a lot of expenses, but very little money.

7          And so, there are many professionals around that will

8    need to be paid in the bankruptcy context and expenses to be

9    paid.  There are also plaintiffs' counsel that have their

10   contingency fee contracts with their clients and will be

11   expected to be paid on that.

12         And so, you can imagine fairly quickly, you know,

13   something reminiscent of The Old Man and The Sea and wondering

14   how much money is going to be left over for the victims.

15   That's all I'll say.

16         It's a challenge -- that's a challenge that will be

17   before Judge Baroff.  It's a challenge that I hope will be

18   also in front of you in terms of the way that the tort trust

19   gets administered, but that is another major issue that is out

20   there and would require coordination between this Court and

21   the bankruptcy court, sacrifices by lawyers, sacrifices by

22   other professionals, and some pretty touch decision making.

23         THE COURT:  Thank you.  Who is next?  Ms. Johnson?

24   Ms. Johnson, right, not --

25         MS. JOHNSON:  Yes, it is Ms. Johnson now.  Thank you,

1    your Honor.

2             Turning to the status of the mediation efforts.

3    There are six entities who are currently mediating.  Liberty --

4             THE COURT:  I only have five on the list.

5             MS. JOHNSON:  Yes, your Honor.  There is one

6    mediating pursuant to a sealed order that I'm not at liberty

7    to disclose in open court, but I believe your Honor does have

8    that information and if your Honor would like an update on

9    that, we can certainly -- I'm happy to provide that to you.

10            In terms of the Liberty, the company who built and

11   installed the clean rooms, that mediation has been moving

12   forward.  Plaintiffs have sent their mediation brief to

13   Liberty --

14            THE COURT:  So, last month's pause has been overcome?

15            MS. JOHNSON:  Yes, your Honor, it has been overcome

16   with the assistance of the trustee who has produced some

17   additional documents, also some materials have been produced

18   by some of the affiliated defendants that helped us to answer

19   some questions to get that moving forward.  So, we are quite

20   appreciative of that.  We do think -- we're optimistic that

21   that will resolve itself favorably.

22            In terms of Victory, Victory is the HVAC servicing

23   company.  That also is moving forward well.  We're pleased

24   with the status.

25            Inspira is a New Jersey clinic who is not mediating

pursuant to this Court's formal order, but as part of a

private mediation.  The goal of that mediation, though, is to

establish a sum of money that will be paid into the tort trust

that Mr. Sobol referred to earlier.  So, it is in that sense

money that is expected to be paid into and administered out of

the bankruptcy.  There is mediation expected in either late

June or early July.

There are then two Florida clinics.  The Ocala clinic

and the Orlando clinic.  We have been working with those

clinics and a mediator.  We think that there will be a

mediation in the near -- mediation dates scheduled in the very

near future on those.

And as to ARL, I'd ask Mr. Ellis to give the update

on that mediation.

MR. ELLIS:  Yes, your Honor.

Last month I told you we had reached a settlement in

principle.  We have exchanged drafts with ARL.  They were the

outside testing laboratory for NECC, and we hope to have a

final settlement agreement, hopefully, very soon so that we

can include it as part of the notice that's going to go out on

the other settlements.

THE COURT:  If you want to include it in the

settlement notice of the --

MR. ELLIS:  Exactly, at the end of the month.  So, if

we can get it done.  So, we are pushing them to try to get it

1    done within the next week, hopefully.

2            THE COURT:  How about your client, Mr. Braceras?

3            MR. BRACERAS:  We're just in litigation, your Honor.

4            THE COURT:  Why weren't you talking settlement?

5            (Interruption by automated telephone message.)

6            COURT REPORTER:  I'm sorry, I can't hear you while

7    the phone is talking.

8            THE COURT:  Is there anything that I can do to assist

9    in moving this case faster to resolution than it appears to be?

10            MR. BRACERAS:  I think, your Honor, we've been

11   cooperating and speaking with Mr. Sobol.  So, I think that

12   we're on the right track.

13            THE COURT:  I'm not suggesting you're not

14   cooperating.  I'm just trying to get resolution.

15            (Interruption by automated telephone message.)

16            THE COURT:  Just let it go, Lisa.  We'll talk around

17   it.

18            MR. BRACERAS:  Your Honor, we'd never say never to,

19   you know, possible resolution.

20            THE COURT:  Well, Mr. Sobol and Mr. Braceras and Mr.

21   Rehnquist, if you think of a way in which I can be helpful,

22   you let me know that.

23            MR. BRACERAS:  We will, your Honor.  Thank you.

24            THE COURT:  Thank you.

25            MR. COREN:  Your Honor?

```
1              THE COURT:  Yes.

2              MR. COREN:  Just apropos of the schedule -- Mike

3     Coren from the OCC creditors committee.

4              And your Honor has picked up on something, and that

5     is there is a window of opportunity here to participate and

6     use the bankruptcy and non-debtor releases both on the

7     national level and the clinic, but there's a finite time

8     because we have, as you see, to do the plan and submit it.

9     So, that deadline is going to be approaching quickly in this

10    summertime.  So, now is the time or else that window of

11    opportunity will close and then it will be much more difficult

12    to resolve.  So, whatever --

13             THE COURT:  You mean the underlying dispute is

14    difficult to resolve or the distribution of any proceeds

15    difficult to resolve or both?

16             MR. COREN:  Well, both because to the extent they

17    become aggregate settlements, the opportunity, the vehicle is

18    gone.  So, it's an interesting situation where now is the time

19    to sit down and figure out what your liability is, such as the

20    cleaning service people, for example, and the other clinics

21    who have not wanted to come forward yet and try to resolve.

22             Both the PSC on the OCC are available.  We're

23    amenable.  We have the people who can handle the mediations.

24    It's just that, you know, it takes two to mediate.  So,

25    whatever we can do.
```

```
1                THE COURT:  I hear you.

2                MR. COREN:  But how do we get those people to hear us?

3                THE COURT:  Did you want to talk?

4                MR. FENNELL:  (Shakes head.)

5                MR. BRACERAS:  Your Honor, we also have a motion to

6       dismiss which could resolve the case even more quickly.

7                MR. SOBOL:  Good luck with that.

8                MR. BRACERAS:  We understand.  We understand the

9       issues that are outstanding.  We think that we have very

10      strong defenses, both by way of motion to dismiss and

11      otherwise, but we understand the message we're getting from

12      the Court and we'll thoroughly...

13               THE COURT:  All right.  Now the status of the

14      declaratory actions.

15               MS. JOHNSON:  Thank you, your Honor.

16               There are two declaratory judgment actions that are

17      currently pending before Judge Saylor that involve Ameridose'

18      insurance coverage.  There are -- the Plaintiffs' Steering

19      Committee has filed motions to intervene in both of those

20      actions to assert the rights of victims.  Replies have

21      recently been filed in support of the plaintiffs' motion.

22      There is also a motion to stay that has been filed in at least

23      one, if not both, of those actions asking that those actions

24      be put on hold while some additional work is done in the MDL.

25      The Plaintiffs' Steering Committee will be responding to that
```

1    motion to stay on Monday, and there's also a hearing -- I

2    think, actually, it's styled as a status conference before

3    Judge Saylor on Monday.

4              As to the ARL Bio Pharma insurance declaratory

5    judgment action, that will be resolved as part of the ARL

6    settlement.  So, you may not see that on here next month.

7              And, finally, as to the Michigan Pain Specialists'

8    declaratory judgment action.  The complaint in that case has

9    recently been served.  I understand that there's been an

10   extension of time to respond to that, and the PSC is

11   contemplating whether to move to intervene in that action as

12   well.

13             THE COURT:  Any reason why you wouldn't?

14             MS. JOHNSON:  I can't think of one right now, your

15   Honor.

16             THE COURT:  Okay.  Now, the status of discovery.

17             MS. JOHNSON:  First, I would like to bring to the

18   Court's attention -- I'm sure the Court remembers at the last

19   status conference Mr. Gottfried represented that the Chapter

20   11 trustee had agreed to share some of the informally-produced

21   documents from New England Compounding Company with parties to

22   the MDL, provided that those parties sign a protective order,

23   and the PSC has also imposed on those parties a fee for

24   accessing the repository in which those documents are stored.

25             The PSC has received, I believe, three requests so

1    far from defendants to access those documents.  I don't think

2    the details of those have been ironed out quiet yet, but it

3    should be the case that in the next two to three days those

4    defendants have access to the entire repository, which

5    includes documents formally produced in discovery here as well

6    as that universe of documents that Mr. Gottfried identified,

7    those informally-produced NECC documents.

8            THE COURT:  Anybody else?  Any comments on that?

9    Anybody wishes more or less?

10           (No response.)

11           THE COURT:  Tennessee discovery issues.

12           MS. JOHNSON:  I'll ask Mr. Gastel to address those.

13           MR. GASTEL:  Real quickly -- sorry, it got turned off.

14           Real quickly, by way of background, in September of

15   last year, Judge Saylor issued MDL Order No. 7, which stated,

16   in relevant part, that discovery over unaffiliated defendants,

17   which the Tennessee defendants are, should be begin forthwith.

18   Thereafter the PSC served discovery in October, written

19   discovery on the overwhelming majority of the Tennessee-

20   related defendants.  We got to varying degrees some responsive

21   answers to that written discovery in December.  We have been

22   meeting and conferring on that discovery throughout the last

23   couple of months --

24           THE COURT:  Excuse me.

25           The Tennessee defendants are the Tennessee clinic

 1    defendants?  Do they include the St. Thomas group?

 2            MR. GASTEL:  Yes.  To be clear, discovery was served

 3    on the Tennessee clinic defendants and the St. Thomas

 4    entities.  Discovery was not served on --

 5            THE COURT:  Is that the totality of the Tennessee

 6    defendants?

 7            MR. GASTEL:  There's also the Ascension parties and

 8    no discovery has been served on the Ascension parties.

 9            THE COURT:  Okay.

10            MR. GASTEL:  Through that meet-and-confer process,

11    both counsel for the Tennessee clinic defendants and counsel

12    for the St. Thomas entities have taken the position that

13    discovery is not open as a result of the Court not entering a

14    discovery plan.  We believe that the time is now ready to get

15    discovery rolling pursuant to that order.

16            THE COURT:  This is No. 11 of the next part of the

17    agenda on the under part (b)?

18            MR. GASTEL:  It is somewhat related to that issue,

19    yes.  The --

20            THE COURT:  Well, also 16.

21            MR. SOBOL:  Yes.

22            MR. GASTEL:  That is correct, your Honor.  You have a

23    very firm grasp of the agenda and the relevant motions to

24    which this all relates.

25            So, I'll get to my point, which is that we anticipate

1    needing to file probably before the next status conference a

2    motion to compel those responses to discovery that was served

3    back in October specifically addressing the issue of whether

4    or not discovery is or is not open.  The PSC's position is

5    that Judge Saylor's MDL Order No. 7 was clear that the

6    discovery is open and we should continue with written

7    discovery.

8            THE COURT:  Let me ask you, to the extent that the

9    question of the Tennessee discovery issues is related to No.

10   11 and maybe No. 16, would it be useful to refer this matter

11   to Magistrate Judge Boal?  There are a bunch of issues, as I

12   understand it, surrounding discovery issues.  I gather there's

13   some fundamental differences between the plaintiffs and

14   defendants as to the order in which things should be done.

15           MR. GASTEL:  I think that's a fair assessment of the

16   status of things and we would -- I believe we would agree a

17   referral to Judge Boal would be appropriate for this matter.

18           THE COURT:  Are there any defense counsel here that

19   wish to respond?  Yes.

20           MR. TARDIO:  Good afternoon, your Honor.  Chris

21   Tardio for the Tennessee clinic defendants.

22           I think your Honor has appropriately captured that

23   there is a fundamental dispute as to the order that some

24   things are going to go.  Our position has always been that

25   we're willing to engage in written discovery to some extent,

1    but we would like some parameters in place.  So, we would very

2    much appreciate a referral to Judge Boal.

3             THE COURT:  Okay.  Done.

4             MS. JOHNSON:  Your Honor, if I may, two quick

5    comments on that.

6             No objection, certainly, to referring those matters

7    to Judge Boal, but I will preview two things for you:

8             The first is that there is some argument that No. 11,

9    which has been fully briefed and argued in front of Judge

10   Saylor, has been functionally denied by an order that Judge

11   Saylor entered.  It was an electronic order, No. 731.  I don't

12   want to argue that with you now.  I understand Tennessee

13   counsel may take a different view of things, but just to

14   identify that issue in advance.

15            The other thing I would point out, your Honor, is

16   that No. 16, there is a good deal of No. 16 that deals with

17   discovery issues.  There are, however, some other pretrial

18   matters that are included in that order, and I mention that

19   only in case your Honor may prefer to keep those other

20   pretrial matters for herself while asking Judge Boal to deal

21   with the discovery matters.

22            THE COURT:  That's reasonable.  Thank you.

23            MS. GREER:  Your Honor, if I may address that.  Marcy

24   Greer for the St. Thomas entities.

25            As Ms. Johnson indicated, there is disagreement over

```
 1    whether Judge Saylor ruled on the discovery plan.  He actually
 2    asked the parties to meet and confer and that never happened
 3    and the response to that request for discovery plan was their
 4    motion for a Bellwether plan, was their response to Judge
 5    Saylor's order to have us meet and confer on the discovery plan.
 6          So, the parties have been trying to navigate all
 7    these different interrelated issues.  And so, we do see them
 8    as being very much integrated and would benefit from,
 9    hopefully, having it all decided by one judge.
10          THE COURT:  Well, to the extent that there is
11    disagreement as to what Judge Saylor's order might mean, I'll
12    look at that.  I'll decide it, but probably with the help of
13    Magistrate Judge Boal.  In any event, it seems to me
14    appropriate to send the discovery piece of it to her.
15          Mr. Braceras.
16          MR. BRACERAS:  I think we're basically all in
17    agreement.  I think it's complicated to divide up 16, the
18    motion for Bellwether, between what's discovery, what's
19    pretrial.  All discovery is pretrial and --
20          THE COURT:  Right.
21          MR. BRACERAS:  So, I would suggest referring it to
22    Judge Boal and the two of you working on it together rather
23    than trying to slice and dice it now.
24          THE COURT:  Okay.  Thank you all very much.
25          That brings us to scheduling argument on fully-
```

1    briefed motions to dismiss.  I believe there are a couple of

2    those and we'll come to those.

3            MS. JOHNSON:  There are, your Honor.  I actually have

4    a list for you.  We thought that may be helpful to the Court.

5            I appreciate that you were quite complimentary of our

6    agenda, but it's not actually as clear as I would like it to

7    be yet.

8            THE COURT:  Well, I have -- 14(c) is a motion -- a

9    revised motion to dismiss briefing schedule, which includes a

10   hearing, I assume, and I have to set a hearing in 14(d).  Is

11   that correct or incorrect?

12           MS. JOHNSON:  I believe that both of those motions to

13   dismiss, both the BKC motion, which is (c), and APAC motion,

14   which is (d), would ultimately require hearings.  We actually

15   -- if I could step back for a moment, your Honor.

16           THE COURT:  Okay.

17           MS. JOHNSON:  The Plaintiffs' Steering Committee has

18   spoken with counsel for the defendants for those motions that

19   are fully briefed or will be fully briefed before the next

20   status conference.

21           The PSC's suggestion -- and I'll provide you a list

22   of those motions, your Honor.  The PSC's suggestion is that

23   the Court set time for oral arguments on those motions that

24   will be fully briefed before the next status conference.  We

25   had thought it may make sense to do that either a day or two

1    on either side of the next status conference so as to perhaps

2    not try and compact everything on some of these complex

3    matters into one afternoon.  We thought we might save you a

4    headache by doing that.  We, of course, prefer the Court's

5    discretion on that.  There are motions that are already for

6    oral argument to be scheduled, though, your Honor.  I can

7    identify those for you.

8            THE COURT:  Are they listed in some different way on

9    the briefing in progress or are they outside of that list?

10           MS. JOHNSON:  They are listed in some way in the

11   briefing in progress.  So, let me see if I can cut through

12   this and, hopefully, bring a little clarity to it.

13           The Plaintiffs' Steering Committee's 56(d)

14   response --

15           THE COURT:  I'm sorry, which number?

16           MS. JOHNSON:  21(a), Sub i.  21(a) is the Tennessee

17   clinics defendants' motion for summary judgment.  In response

18   to that motion for summary judgment, the PSC filed what used

19   to be called a 56(d) motion, is now called 56(d) response, I

20   understand.  The 56(d) issue is ripe for -- it's fully briefed

21   and it's ripe for argument, your Honor.  The summary judgment

22   motion to which a response is not --

23           THE COURT:  I mean, they either get some additional

24   discovery or they don't, right?

25           MS. JOHNSON:  That's correct, your Honor.  And if

```
1   your Honor would prefer to decide that on the papers, the

2   plaintiffs would not have an objection to that.

3           THE COURT:  Who is here -- is there anybody here for

4   the Tennessee clinic defendants?  Yes.  I'm sorry.

5           MR. TARDIO:  Yes, your Honor.  Chris Tardio.

6           I think we -- we're fine with deciding on the briefs.

7   I think that's something we addressed at the last status

8   conference.

9           THE COURT:  Okay.  So, the 56(d) motion, decide on

10  the papers quickly, right?

11          MS. JOHNSON:  Yes, your Honor.  Thank you.

12          The next motion that will be fully briefed and ready

13  for argument as of June 9th, which is before the next

14  status --

15          THE COURT:  I'm sorry.  Go back for a moment to the

16  -- so, I need to decide that motion in order to decide when

17  the rest of the motion is to be heard?

18          MS. JOHNSON:  That's correct, your Honor.

19          THE COURT:  Okay.

20          MS. JOHNSON:  The next motion will be the Tennessee

21  clinic defendants' motion to dismiss for failure to comply

22  with the Tennessee Healthcare Liability statute.  That's ECF

23  No. --

24          THE COURT:  70 -- no.  19, right?

25          MS. JOHNSON:  No, your Honor.  It's 21(d).
```

1          THE COURT:  Oh, 21(d).

2          MS. JOHNSON:  The motion itself is ECF No. 770,

3    related to --

4          THE COURT:  Is it correct that the motion to dismiss

5    is based entirely on the Tennessee healthcare statute that

6    requires some kind of certificate when you file?  And the

7    others are the ordinary common law tort claims?

8          MR. GASTEL:  To be clear --

9          THE COURT:  That is, the motion for summary judgment.

10         MR. GASTEL:  21(d), the motion to dismiss relates to

11   getting pre-suit notice under Tennessee Code Annotated 29-26-

12   121.

13         THE COURT:  That's a certificate?

14         MR. GASTEL:  The certificate is actually contained in

15   Tennessee Code Annotated 29-26-122 and is the subject of

16   21(a), the motion for summary judgment.

17         THE COURT:  And is there any reason why they

18   shouldn't be heard together?

19         MR. GASTEL:  I'm sorry.  One point of clarification,

20   your Honor.

21         The issue of pre-suit notice under Section 121 is

22   raised by the Tennessee clinic defendants' motion to dismiss.

23   The issue of pre-suit notification is raised by the St. Thomas

24   entities and Ascension party's motion to dismiss, which are

25   both listed in 21(d).

1          THE COURT:  Well, what's No. 19, then?  Oh, no.

2   That's a motion to amend.

3          MS. JOHNSON:  Yes, your Honor.  No. 19 was an

4   assented-to motion.  The Plaintiffs' Steering Committee agreed

5   to that motion.

6          THE COURT:  So, that is allowed by agreement, right?

7          MR. GASTEL:  That's correct, your Honor.

8          MS. JOHNSON:  So, there's a second motion --

9          THE COURT:  Didn't the St. Thomas defendants also

10  have --

11         MS. JOHNSON:  If I may, your Honor.

12         THE COURT:  St. Thomas also had motions to dismiss

13  based on the statute?

14         MS. JOHNSON:  Yes, your Honor, that's correct.  So,

15  there are two separate motions to dismiss based on an

16  interpretation of the Tennessee Healthcare Liability Act.  The

17  first -- they're both listed under 21(d).  The first is filed

18  by the Tennessee clinic defendants, which would be ECF 770.

19  The second was filed by both the St. Thomas entities and

20  Ascension, and that's ECF No. 779.

21         In addition to the motions to dismiss relating to the

22  Healthcare Liability Act, the Tennessee defendants have also

23  filed and we have now fully-briefed motions to dismiss that

24  address global claims.  That would be No. 21(e).  There are

25  three separate motions to dismiss on global claims under

```
 1    21(e), one filed by the Tennessee clinic defendants which is

 2    ECF No. 771, one filed by the St. Thomas entities which is ECF

 3    No. 893, one filed by the Ascension parties which is ECF No.

 4    895.

 5              So, that's the universe of fully-briefed Tennessee-

 6    related dispositive motions that we think are --

 7              THE COURT:  The statute.

 8              MS. JOHNSON:  The first of those address the statute

 9    specifically, your Honor.

10              THE COURT:  And the second ones do not?

11              MS. JOHNSON:  The second ones are not just about

12    statute issues, that's correct.

13              THE COURT:  Is there any reason why all of these

14    shouldn't be heard at the same time?

15              MS. JOHNSON:  Our suggestion would be, in fact, that

16    they are all heard at the same time.

17              We would add to that, there is also a fully-briefed

18    motion to dismiss that relates to the New Jersey pain clinic

19    who is litigating, which is Premier.  That is -- I'm sorry,

20    bear me.

21              (Pause.)

22              MR. ELLIS:  No. 13.

23              MS. JOHNSON:  No. 13.

24              The plaintiffs' suggestion is that all of those seven

25    motions that we have just identified, the six Tennessee
```

1    motions and the New Jersey motion to dismiss, should be

2    scheduled for oral argument perhaps on the same day near the

3    time of the next status conference.

4              THE COURT:  So, 13(b), (c) -- pretty much all of 21

5    once we decide the 56(d) motion, right?

6              MS. JOHNSON:  The only piece of 21 I think, your

7    Honor, that will not be fully ready by the next status

8    conference would be 21(a), because the Plaintiffs' Steering

9    Committee has requested that if you deny the 56(d), that we be

10   provided an opportunity to respond on the merits of the

11   summary judgment motion, 21(a).

12             THE COURT:  And the summary judgment is a statutory

13   claim or a common law claim?

14             MR. GASTEL:  Once again, the 21 --

15             THE COURT:  I'm sorry.  It gets too confusing.

16             MR. GASTEL:  Fair enough.

17             21(a) is a motion to -- for summary judgment under

18   the Healthcare Liability Act and, more specifically, failure

19   to -- or alleged failure to provide pre-suit -- or, I'm sorry,

20   certification.

21             THE COURT:  So that is the same issue that, in fact,

22   is ready with respect to other defendants under the motion to

23   dismiss?

24             MR. GASTEL:  They're very similar, your Honor.

25             MS. JOHNSON:  If the Court would prefer to address

```
 1    all of those Tennessee-related issues together, the
 2    Plaintiffs' Steering Committee would have no objection to
 3    that.  We would remind the Court that it really is a decision
 4    on the 56(d) issue that is preventing that motion -- that
 5    Tennessee summary judgment motion from being fully briefed.
 6              THE COURT:  Right.  Now, if the 56(d) motion were to
 7    be allowed, would the cases be ready for argument next month?
 8              MR. GASTEL:  I guess I'm a little confused.  If the
 9    56(d) is granted, then I assume that we would get discovery
10    and that the motion would be denied, presumably, without
11    prejudice.
12              THE COURT:  Which motion?
13              MS. JOHNSON:  The motion for summary judgment, your
14    Honor.
15              MR. SOBOL:  21(a) ii.
16              MS. JOHNSON:  21(a) is the motion for summary
17    judgment.  If the 56(d) motion, which is 21(a) ii --
18              THE COURT:  Well, why wouldn't the 56(d) motion
19    simply postpone hearing on the 56(a) motion?
20              MR. GASTEL:  Yes.
21              MS. JOHNSON:  That is precisely correct, your Honor.
22    That's absolutely --
23              THE COURT:  But then it wouldn't be included in the
24    other motions that are ready for hearing by next month?
25              MS. JOHNSON:  That's correct.
```

1          THE COURT:  If the motion is denied, then it would be

2     ready because there's nothing else to do.

3          MR. CHALOS:  Your Honor, if I may.  Mark Chalos on

4     behalf of the plaintiffs.

5          The summary judgment motion raises statutory issues.

6     It also raises some other issues that we think require

7     discovery for us to fully respond to.

8          If your Honor were to hear the motions to dismiss, to

9     the extent there's overlap with the issues raised in the

10    summary judgment motion, you could decide those issues, and

11    there are some legal issues in there as well, and that would,

12    I think in part, help the parties work through the summary

13    judgment issues and may result --

14         THE COURT:  On the other issues?

15         MR. CHALOS:  I'm sorry?

16         THE COURT:  Summary judgment on the remaining issues

17    contained in the summary judgment motion?

18         MR. CHALOS:  Right.  In other words, I don't think

19    your Honor has to hear the summary judgment motion at the same

20    time that your Honor hears the motions to dismiss in order to

21    resolve all of those issues.  We can --

22         THE COURT:  But the motion to dismiss issues,

23    statutory and otherwise, would -- any decision on them would

24    cover also the Tennessee clinic summary judgment motion to the

25    extent it raises those issues.

```
 1            MR. CHALOS:  Right, some portion of it.  There are

 2   also other issues in the summary judgment motion that I don't

 3   think will be addressed and I think discovery will help the

 4   parties, particularly the plaintiffs, to better respond on

 5   some of those other issues in the summary judgment motion.

 6            So, I think one possible course could be for your

 7   Honor to hear the motions to dismiss on the issues that the

 8   parties have fully briefed or will fully brief by the next

 9   status conference, and if your Honor were to grant on the

10   56(d) on summary judgment, we can take the need for discovery

11   and whatever issues remain in connection with the summary

12   judgment motion, your Honor could take those up at a later day.

13            THE COURT:  So, the next conference, I think, is

14   scheduled July -- no.  June 19th.

15            MS. JOHNSON:  Yes, your Honor.

16            THE COURT:  Do you want to have a hearing at that time?

17            MS. JOHNSON:  We would suggest perhaps a day on

18   either side.

19            THE COURT:  Lisa, what can we do on either the 18th

20   or 20th?

21            (Discussion off the record at the bench.)

22            THE COURT:  How about June 18th in the morning?

23            MS. JOHNSON:  That works for the Plaintiffs' Steering

24   Committee, your Honor.

25            THE COURT:  Does it work for all of -- those of you
```

```
1    who need to be arguing?

2              MR. TARDIO:  Yes, ma'am.

3              MS. GREER:  Yes, your Honor.

4              THE COURT:  How about 9:30 on June 18th?

5              MR. WOLK:  Christopher Wolk for the Premier

6    defendants in New Jersey.

7              Would that also include the New Jersey motion to

8    dismiss as well?

9              THE COURT:  You tell me.

10             MS. JOHNSON:  The Plaintiffs' Steering Committee

11   would suggest we should create some --

12             THE COURT:  You're included, too.

13             MR. WOLK:  Very good.

14             MR. ABELN:  Anthony Abeln on behalf of BKC

15   defendants.

16             I think also a completed brief that can be argued --

17             COURT REPORTER:  I'm sorry, I can't hear you.

18             THE COURT:  I can't either.

19             MR. ABELN:  I'm sorry, your Honor.  Anthony Abeln on

20   behalf of BKC clinic.

21             That also is a motion to dismiss that's completed

22   briefing.

23             MS. JOHNSON:  21(g), your Honor.

24             MR. ABELN:  21(g), correct.

25             It may be worthwhile to schedule it as well.  That
```

1    specifically deals with all the issues of Ohio law.

2            THE COURT:  There's no reason not to include them, is

3    there?

4            MS. JOHNSON:  They should be included as well, your

5    Honor.  My oversight.

6            MR. ABELN:  Thank you, your Honor.

7            THE COURT:  So, what we have now is (c), (d), (e),

8    (f), (g).  And what else?  There is also UniFirst's motion to

9    dismiss.  That's you, isn't it, Mr. Braceras?

10           MS. JOHNSON:  That will not be completely briefed.

11           MR. BRACERAS:  That's not fully briefed, your Honor.

12           THE COURT:  (i), Does the proper affidavit of merit

13   refer to the same healthcare statute?

14           MS. JOHNSON:  I'm not sure, your Honor.  What I would

15   suggest, if it may be helpful, the PSC would be glad to file

16   what we believe are all of the fully-briefed motions that

17   could be heard for argument on that day, including identifying

18   all of the ones that we've just discussed, but I can also get

19   you a much clearer answer on (i) and (j), and whether they

20   will be done by then I'm not certain.

21           THE COURT:  Okay.  Because Ms. Urso will need to send

22   out notices and she will need to know not only which motions,

23   but to whom to send the notices.

24           MS. JOHNSON:  Yes, your Honor, and we will, of

25   course, confer with defense counsel on that list as well.

```
 1              THE COURT:  Okay.  Let us try to agree that PSC and
 2    the principal defendants, that is the proponents of the
 3    motion, take no more than half an hour to argue and PSC no
 4    more than half an hour, with some minor leeway to respond,
 5    okay?
 6              MR. SOBOL:  Does that make up for the page limits?
 7              THE COURT:  I'm sorry?
 8              MR. SOBOL:  Does that make up for the page limits?
 9              THE COURT:  Maybe.
10              MR. CHALOS:  Your Honor, before we leave the
11    Tennessee motions, there is another --
12              THE COURT:  You need to talk into the microphone
13    because the people on the telephone can't hear you.
14              COURTROOM DEPUTY CLERK URSO:  They're not there.
15              MR. CHALOS:  I'm not sure there's anybody there.
16              THE COURT:  Don't bother with them.  You can bother
17    with me.
18              MR. CHALOS:  Your Honor, before we leave the
19    Tennessee motions -- this is Mark Chalos on behalf of the
20    plaintiffs.  There is a motion, Docket No. 1100, one one zero
21    zero.  It's an assented-to motion.  It does two things.  It
22    sets forth some deadlines for briefing that have now passed
23    and the parties have complied with it, but it also sets forth
24    the three agreed-upon areas where the parties --
25              MS. JOHNSON:  That would be 21(e) ii, your Honor.
```

```
1            MR. CHALOS:  It's on Page 5 of the agenda.  It sets
2   forth three areas where the parties agree that those issues
3   were sufficiently global for purposes of briefing and the
4   parties agreed to brief those and present those to the Court
5   now, while reserving for later decision in case-specific
6   issues, such as so-and-so delivered to the door when they were
7   supposed to deliver --
8            THE COURT:  If there's no objection to doing it, I
9   don't object.
10           MR. CHALOS:  Okay.  So, the order has been presented
11  to the Court as an assented-to order.  So, we would ask that
12  your Honor enter that order, then, to make sure the record is
13  clear on that and all parties understand where we are.
14           THE COURT:  I think there was somewhere in here an
15  order that I -- oh, yes, there was an order under 14(b) for
16  revised motion schedule, and I have signed that order today.
17           MR. CHALOS:  Right.  And that, I think, relates to a
18  different set of motions.
19           THE COURT:  It does.  I didn't understand your -- but
20  if there is an order and Ms. Johnson agrees, then it's fine
21  with me.
22           MS. JOHNSON:  There is one other matter, your Honor.
23           We've deviated a little from the agenda, but No. 9 on
24  Page 2, there is an attorney who is seeking to withdraw as
25  counsel for plaintiff.
```

1          THE COURT:  Yes.  I wish your views on that.

2          MS. JOHNSON:  I have to confess, your Honor, I'm not

3     in a position to offer you a view on that motion.

4          THE COURT:  Excuse me.  Is it your motion?

5          MS. BUELL:  No, your Honor.  I'm opposing it.

6          MS. JOHNSON:  There was a request by plaintiff's

7     counsel that they be permitted to argue that by phone.  I

8     understand we're not connected on the telephone.

9          THE COURT:  I'm not sure why we need to have

10    argument.  As I understand it, counsel want out because he has

11    a conflict, and I guess the -- you are who?  And you represent

12    whom?

13         MS. BUELL:  I'm Barbara Buell and I represent the

14    Hahnemann defendants.  Hahnemann Hospital and --

15         THE COURT:  Right.  Right.

16         MS. BUELL:  And the --

17         THE COURT:  How can I keep counsel in who has an

18    admitted conflict?

19         MS. BUELL:  Because, your Honor, I think that if you

20    keep counsel in, it will serve to have counsel resolve the

21    conflict with his client.  This client did not get this drug,

22    the drug that is the subject of the MDL, at all.

23         THE COURT:  But that's the conflict, isn't it?

24         MS. BUELL:  That is the conflict, your Honor, but if

25    counsel is permitted to withdraw, having brought the case, he

```
 1    will leave a -- effectively, a pro se plaintiff in an MDL case
 2    in which there's no factual underpinning for that plaintiff
 3    being in the case, and it will simply leave to the Court -- to
 4    the court system and potentially to defense counsel the
 5    problems of dealing with this plaintiff, a lay person.  I
 6    think it's a situation that the Court -- the Court would be
 7    left to mop up a problem, unfortunately, created by plaintiff
 8    counsel.
 9            THE COURT:  Why do you say that?  As I understand the
10    papers and the case so far, counsel proceeded on the
11    assumption that the client was telling him the truth and then
12    found out that he or she wasn't.  Isn't that what the papers
13    say?
14            MS. BUELL:  Well, I don't know that the --
15            THE COURT:  I don't know whether that's correct or
16    not.
17            MS. BUELL:  I don't know that there was any lack of
18    truthfulness, but that either --
19            THE COURT:  Or a misunderstanding.
20            MS. BUELL:  A misunderstanding or perhaps a hope on
21    the part of plaintiff's counsel, but it turns out that the --
22    that particular plaintiff did not receive this drug and,
23    therefore, this hospital and physician and others should not
24    be in this case and to keep them --
25            THE COURT:  Is that the only plaintiff that brought
```

1    your client into the picture?

2            MS. BUELL:  Yes.

3            THE COURT:  Well, let me think about it.

4            MS. BUELL:  Thank you, your Honor.

5            THE COURT:  Mr. Sobol.

6            MR. SOBOL:  Just one thing from the point of view

7    from the Plaintiffs' Steering Committee, your Honor.  If the

8    Court allows the motion, which, of course, is well within its

9    discretion, particularly given the papers that have been filed

10   by counsel, we simply want to make sure that the withdrawing

11   counsel provides a good address by which the Plaintiffs'

12   Steering Committee can provide notice of the proceedings to

13   the pro se plaintiff so we make sure that we're protecting

14   that party's rights.

15           THE COURT:  Okay.  Now, we have -- No. 10 is in my

16   court and I'm working on it.  No. 11, I think, is the one that

17   we have sent to Judge Boal.

18           MS. JOHNSON:  Yes, your Honor.

19           THE COURT:  No. 12, I don't really know what the

20   status of that is, nor what, if anything, I should do about

21   it.  There is a motion to extend the time to respond and maybe

22   that makes it unripe and that motion is allowed.

23           MR. MORIARTY:  We have no objection to the motion to

24   respond because we're in the process of negotiating.  We have

25   a potential -- or a proposed resolution of a large chunk of

1   this motion, that the PSC and the Tennessee defendants and the

2   UniFirst defendant now have in their hands a proposed order

3   for you to sign that resolves one -- or a big chunk of this

4   debate.  So, we will work out the terms of the order, submit

5   it to you, hopefully this week, and then I will continue to

6   negotiate with UniFirst and the Tennessee defendants on the

7   recalled products that are not subject to the order we'll give

8   you.

9             THE COURT:  Thank you.  But, in the meantime, you

10  don't have to worry about the 9th.  You got until the 23rd.

11            MR. MORIARTY:  Thank you.

12            MS. JOHNSON:  Your Honor, if I could preview --

13            THE COURT:  This is Docket No. 1099.

14            Sorry.  Go ahead.

15            MS. JOHNSON:  The Plaintiffs' Steering Committee

16  filed a response in which we took no position based on our

17  understanding of what that motion has requested.  There is a

18  question, though, we think, in terms of whether that motion

19  would apply to products -- any products that were created,

20  manufactured or compounded in the Framingham facility where

21  the NECC products were contaminated, and we'll work with Mr.

22  Moriarty to try to get resolution on the Plaintiffs' Steering

23  Committee's question on that.

24            THE COURT:  Good.

25            Now comes the Premier Orthopedic No. 13, which is

1   based on New Jersey law, as I understand it.  And my question

2   was whether we need to hear argument on that.

3           MS. JOHNSON:  The Plaintiffs' Steering Committee

4   suggests that it might be helpful for the Court to hear

5   argument.  So, we would ask for that.

6           THE COURT:  This is separate from the Tennessee

7   issues, right?

8           MS. JOHNSON:  It is separate from the Tennessee

9   issues, yes.  I believe we've already set that for argument on

10  the 18th.

11          THE COURT:  So, that's part of that?

12          MS. JOHNSON:  Yes, your Honor.

13          No. 14 is just a series of proposed briefing

14  schedules that we're seeking Court approval.  I believe all

15  are assented to.

16          THE COURT:  Okay.  So, now (a) is allowed -- well,

17  it's okay.  We'll have a -- we'll get an order.  Do you want

18  me to make that up or are you going to make it up?

19          MS. JOHNSON:  We'll submit that to the Court, your

20  Honor.

21          THE COURT:  Okay.  (b) is an order that I've signed.

22  I can't remember where it is now.

23          And (c), I think that is part of June 18th, is it

24  not?

25          MS. JOHNSON:  Yes, your Honor, it is.

1          THE COURT:  And (d), you will give me a hearing --

2     you will give me a proposed order for that one, too?

3          MS. JOHNSON:  Yes, your Honor, we will.

4          THE COURT:  Then we come to 15, which has part (a).

5     That is allowed.  That is the motion to join.  Unless there's

6     an objection.

7          MS. JOHNSON:  I'm sorry, your Honor.  15(a)?

8          THE COURT:  15(b) -- there are two (a)'s.

9          MS. JOHNSON:  Oh, goodness.

10         THE COURT:  And then there was a motion to join.  The

11    motion to join is allowed.  And I need to decide 15.

12         MS. JOHNSON:  Yes.  Thank you.

13         MR. GOTTFRIED:  Yes, your Honor.

14         15, as you may recall, we did argue that to you at

15    the last status conference.

16         THE COURT:  Right.

17         MR. GOTTFRIED:  And at least the trustee's position

18    was that the stay should be kept in place, at least until

19    Judge Baroff has a chance to decide whether he's going to

20    approve the settlements and, as we discussed earlier today, we

21    would anticipate that there would be a motion from the trustee

22    which the PSC and the OCC would join in which we would file

23    within ten business days of the approval of that, which would

24    address this issue, and I think the stay should continue

25    through your decision on that motion.

1          THE COURT:  Okay.  Then there is the entry of

2    Bellwether and pretrial schedule order, which we agreed Judge

3    Boal would include in her activities.

4          And then No. 17 is the trustee's supplemental motion

5    to transfer.  I will allow that as of today.  You will have an

6    opinion by the end of the week.

7          MR. GOTTFRIED:  Thank you, your Honor.

8          THE COURT:  Then we come to briefing in progress.

9    Ms. Johnson.

10         MS. JOHNSON:  There are a few things here I think we

11   can clean up, your Honor.  The first, No. 18, given the

12   settlement, while the settlement has not been approved, it

13   does appear that it will not be necessary for the PSC to file

14   a master complaint against the affiliated defendants.

15         As a procedural matter only, the current deadline for

16   that is April 30th, 2014.  We suggest -- while we think that's

17   moot, perhaps in the interim until the settlement is approved,

18   the Court agrees to an additional extension of time.  So, we

19   hope that never comes to pass, to be clear.

20         THE COURT:  So, the time to file master complaint is

21   extended to when?

22         MS. JOHNSON:  Perhaps September 1st, to be absolutely

23   safe.  September 2nd, which may be a business day.  I'll keep

24   going, September 3rd.

25         THE COURT:  September 2nd.

1           MS. JOHNSON:  There we go.  Thank you, your Honor.

2           And No. 20, the St. Thomas entities' motion to modify

3   case management order No. 6, we think that has been

4   functionally mooted by the trustee's willingness to provide

5   the informally-produced NECC materials.

6           THE COURT:  Is that agreed by everybody who is

7   affected?

8           MS. GREER:  Your Honor, if we could keep it pending.

9   Marcy Greer for the St. Thomas entities.  Keep it pending

10  while we work through the details, because the access was only

11  one piece of that motion.

12          THE COURT:  Okay.

13          MS. JOHNSON:  No. 21, your Honor, I think we've

14  addressed fully.  And that brings us to the end.

15          THE COURT:  Right.  Is there anything else that

16  anybody has to bring to the Court?

17          (No response.)

18          THE COURT:  Well, as usual, you've done a fantastic

19  job.  I thank you all.  And we will see each other on June

20  18th and then again on June 19th.

21          MS. JOHNSON:  I'm sorry, your Honor.  One small

22  thing.  We do not have a date for an August status conference.

23  I think the Court --

24          THE COURT:  Yes.  In August, I'm proposing August 14.

25          (Discussion off the record at the bench.)

```
1              THE COURT:  I'm sorry, I need to change the July
2      date.  I have a problem with July because I have a meeting
3      July 8th, 9th, and 10th, and then I'm on vacation the
4      following week through the 23rd.  If you want, the only time
5      we could do it, very early in July, which doesn't make a whole
6      lot of sense, or the 28th or 29th or we could skip July.
7              COURTROOM DEPUTY CLERK URSO:  Can we skip July and go
8      to the August 14th date?
9              MR. SOBOL:  Why don't we do that and if we need
10     something in particular --
11             THE COURT:  You'll call.
12             MR. SOBOL:  Yes.
13             THE COURT:  Let Ms. Urso know and you'll work it out.
14             I thank you all for my vacation.  I hope you will
15     have one, too.
16             MR. FERN:  2:00 p.m., on the 14th?
17             COURTROOM DEPUTY CLERK URSO:  No.  So, July 17th is
18     gone.  So, the August 14th date is going to be at 2:30, okay?
19             MR. MORIARTY:  Your Honor, I hate to go back to one
20     matter, but on that order, the proposed order that we are
21     going to submit, I forgot that the DEA is waiting for word
22     from my client on when we're going to destroy the scheduled
23     drugs.  What do you --
24             THE COURT:  Give me the order and I'll sign it.
25             MR. MORIARTY:  Okay.  I'm just wondering, do you want
```

1    us to put it through ECF or send it to you separately by a

2    letter?

3            THE COURT:  You can do it through ECF.

4            MR. MORIARTY:  Okay.  Thank you.

5            THE COURT:  Anything else?

6            (No response.)

7            THE COURT:  Thank you all again.

8            MR. BRACERAS:  Thank you, your Honor.

9            MS. JOHNSON:  Thank you, your Honor.

10           (Adjourned, 3:11 p.m.)

11

12                   C E R T I F I C A T E

13            I, Catherine A. Handel, Official Court Reporter of the

14   United States District Court, do hereby certify that the

15   foregoing transcript, from Page 1 to Page 50, constitutes to the

16   best of my skill and ability a true and accurate transcription of

17   my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

18   Re:  New England Compounding Pharmacy, Inc., Products Liability

19   Litigation.

20

21    May 14, 2014            /s/Catherine A. Handel
      Date                    Catherine A. Handel RPR-CM, CRR
22

23

24

25