UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
PHARMACY CASES LITIGATION          )
                                   )
                                   )
                                   )
                                   )
                                   )
                                   )


BEFORE:  THE HONORABLE RYA W. ZOBEL



**HEARING ON MOTION TO DISMISS**



John Joseph Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, MA 02210


June 18, 2014
3:00 p.m.


Catherine A. Handel, RPR-CM, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 5205
Boston, MA 02210
E-mail: hhcatherine2@yahoo.com

1     APPEARANCES:

2      For The Plaintiffs:

3         Hagens, Berman, Sobol, Shapiro LLP, by JESSICA ROSE
MacAULEY, ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, MA
4     02142;

5         Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
ESQ., One Nashville Place, 150 Fourth Avenue, North, Suite 1650,
6     Nashville, TN 37219-2423;

7         Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,
IV, ESQ., and BEN GASTEL, ESQ., ESQ., 227 Second Avenue North,
8     Nashville, TN 37201-1631;

9         Cohen, Placitella & Roth, P.C., by MICHAEL COREN, ESQ.,
2 Commerce Square, 2001 Market Street, Suite 2900, Philadelphia,
10    PA 19103;

11        Feldman Wholgelernter Tanner Dodig & Weinstock LLP, by
THOMAS B. MARTIN, ESQ., 21st Floor, 1845 Walnut Street,
12    Philadelphia, PA 19103;

13        Leader, Bulso & Nolan, P.C., by GEORGE NOLAN, ESQ., 414
Union Street, Nashville, TN 37219;
14
          Kinnard Clayton & Beveridge, by DANIEL L. CLAYTON, ESQ.,
15    The Woodlawn, 127 Woodmont Bloulevard, Nashville, TN 37205;

16
       For the Defendants:
17
          Alexander Dubose Jefferson & Townsend LLP, by MARCY HOGAN
18    GREER, ESQ., 515 Congress Avenue, Suite 2350, Austin, TX
78701-3562;
19
          Nutter, McClennen & Fish LLP, by SARAH P. KELLY, ESQ.,
20    World Trade Center West, 155 Seaport Boulevard, Boston, MA
02210-2604;
21
          Fulbright & Jaworski, LLP, by YVONNE K. PUIG, ESQ., 98 San
22    Jacinto Blvd, Suite 1100, Austin, TX 78701;

23        Blumberg & Wolk LLC, by JAY J. BLUMBERG, ESQ., 158 Delaware
Street, Woodbury, NJ 08096;
24
          Gideon, Cooper & Essary, PLLC, by C.J. GIDEON, JR., ESQ.,
25    and CHRIS J. TARDIO, ESQ., 315 Deaderick Street, Suite 1100,
Nashville, TN 37238.

```
1                    P R O C E E D I N G S

2        (The following proceedings were held in open court before

3   the Honorable Rya W. Zobel, United States District Court Judge,

4   United States District Court, District of Massachusetts, at the

5   John J. Moakley United States Courthouse, One Courthouse Way,

6   Boston, Massachusetts, on June 18, 2014.)

7             THE COURT:  Good afternoon.  Please be seated.

8             COURTROOM DEPUTY CLERK URSO:  This is In re: New

9   England Compounding, MD-13-2419.

10             THE COURT:  For the plaintiffs, who is here?

11             MS. MacAULEY:  Jessica MacAuley.

12             THE COURT:  Ms. MacAuley?

13             MS. MacAULEY:  Yes.  Hagens, Berman, Sobol, Shapiro,

14   lead counsel.

15             MR. CHALOS:  Good morning, your Honor -- good

16   afternoon, your Honor.  Mark Chalos for the plaintiffs'

17   steering committee.

18             MR. STRANCH:  Good afternoon, your Honor.  Gerard

19   Stranch on behalf of the plaintiffs' steering committee.

20             MR. CLAYTON:  Good afternoon.  Daniel Clayton with

21   the plaintiffs' steering committee.

22             THE COURT:  Okay.

23             MR. NOLAN:  Your Honor, I'm George Nolan from

24   Nashville also here for the PSC.

25             THE COURT:  I'm sorry.  You're for whom?
```

```
1              MR. NOLAN:  With the plaintiffs' steering committee.

2              THE COURT:  Oh, plaintiffs.

3              MR. GASTEL:  Good afternoon, Judge.  Ben Gastel, also

4     here for plaintiffs' steering committee.

5              MR. COREN:  Good afternoon, your Honor.  Michael

6     Coren, co-chair of official creditor's committee, but today

7     I'll be here wearing my plaintiffs' hat on the Premier motions

8     in front of you.

9              THE COURT:  Premier is the New Jersey?

10             MR. COREN:  Yes, your Honor.

11             MR. MARTIN:  Your Honor, Thomas Martin, also here for

12    the plaintiffs' motion, on the Premier motion.

13             THE COURT:  Now we go over to this side.

14             MS. GREER:  Your Honor, Marcy Greer for the Saint

15    Thomas entities and the Ascension parties.

16             THE COURT:  Greer for Saint Thomas?

17             MS. GREER:  Yes, your Honor, and the Ascension

18    parties.

19             MS. PUIG:  Same, your Honor.  Yvonne Puig, lead

20    counsel for the Saint Thomas entities and the Ascension

21    entities.

22             THE COURT:  I'm sorry.  Your last name is?

23             MS. PUIG:  Yvonne Puig, P-u-i-g, your Honor.

24             THE COURT:  Thank you.

25             MS. PUIG:  Thank you.
```

1          MS. KELLY:  Your Honor, Sarah Kelly for the Saint

2    Thomas entities and the Ascension parties.

3          MR. GIDEON:  Your Honor, C.J. Gideon on behalf of

4    Saint Thomas Outpatient Neurosurgical Center, Howell Allen

5    Clinic, John Culclasure, Debra Schamberg, Specialty Surgery

6    Center, Ken Lister, M.D., and Kenneth Lister, M.D., PC, along

7    with Chris Tardio from my office.

8          MR. TARDIO:  Good afternoon, your Honor.

9          THE COURT:  Your last name?

10          MR. TARDIO:  Tardio, T-a-r-d-i-o.

11          MR. BLUMBERG:  And I'm Jay Blumberg from the firm of

12    Blumberg & Wolk on behalf of the Premier defendants in New

13    Jersey.

14          THE COURT:  That's it?

15          Now, is everybody who announced his or her name going

16    to argue?

17          MR. STRANCH:  I don't believe so, your Honor.  I

18    think you just got to meet everybody today.

19          THE COURT:  I'm happy to meet everybody.

20          Could I have a show of hands as to who is going to

21    argue?  You're kidding?

22          MR. STRANCH:  It's only half of us.

23          THE COURT:  Well, let me first apologize for this

24    constantly-changing time.  What happened was that a defendant

25    decided not to plead and go to trial instead.  So, we finished

1    the criminal trial this morning and the jury is out, which may

2    be yet another interruption since they should have had a

3    verdict long ago, and we also have a couple of other criminal

4    cases that are waiting in the wings.

5          So, I do not think that I could even give 15 minutes

6    to each of you and I hope that you will make some arrangements

7    so that we can finish within an hour or so all of your

8    arguments.  If you need to talk to each other, do that and

9    tell me how long each of you is going to be or we'll simply

10   start.  To the extent -- yes.

11         MR. STRANCH:  From the PSC's perspective, we've

12   already divided that up, your Honor, and that's fine with us.

13         THE COURT:  So, how much are all of you going to take

14   together?

15         MR. STRANCH:  I think we can do it in half an hour or

16   less, all of us.

17         THE COURT:  I mean, I assume that the plaintiffs'

18   arguments are substantially identical, no matter who the

19   defendant is.  That is, there are no more separate plaintiffs

20   who have different arguments from --

21         MR. STRANCH:  That's correct, your Honor.

22         THE COURT:  Okay.  Now, with respect to the

23   defendants, I think that the major ones are Saint Thomas and

24   Ascension.  Premier is sort of a little less, I think.

25         MR. BLUMBERG:  I don't know what you mean by "a

1    little less," but there are different issues.

2              THE COURT:  There are different issues.

3              (Discussion off the record.)

4              THE COURT:  So, I think we'll start with the Saint

5    Thomas defendants.  So, how much time will you take

6    collectively?

7              MS. GREER:  The Saint Thomas entities and the

8    Ascension parties will take -- together with the Tennessee

9    clinic defendants will take -- 25 minutes?

10             MR. GIDEON:  Yes.

11             MS. GREER:  25 minutes, and Premier will take five.

12             THE COURT:  Okay.  So, who will start?

13             MS. GREER:  Your Honor, I'll be prepared to start for

14   the Saint Thomas entities and the Ascension parties.

15             THE COURT:  Right.  I think it is appropriate for

16   counsel who argue to do so seated because the microphone

17   doesn't reach high enough and the people who are on the phone

18   elsewhere can't hear you unless you speak directly into the

19   microphone.  Okay?

20             MS. GREER:  That's fine.

21             THE COURT:  So, at least you can be comfortable.

22             MS. GREER:  Thank you, your Honor.

23             THE COURT:  All right.  Ms. Greer, you may begin.

24             MS. GREER:  Your Honor, if I may, I'd like to start

25   with the Saint Thomas entities' motion.  The Ascension

1    parties' motion keys off of that and provides additional

2    grounds for the motion to dismiss.

3         I have handed up to the Court a schematic drawing of

4    an organizational chart that I think will be helpful to

5    guide -- yes, your Honor -- to guide our discussion.  I've

6    provided it to the other parties as well.  It just simply

7    reflects the corporate structure that is in play here.

8         We have some additional arguments as to why Tennessee

9    law would not impose liability upon the Tennessee clinic

10   defendants, which is the basis for our vicarious liability.

11        THE COURT:  This is the healthcare law?

12        MS. GREER:  The healthcare law and the -- exactly.

13   And our co-defendants are going to address that.  So, rather

14   than duplicate that presentation, I'm going to focus just on

15   the allegations that defeat vicarious liability.

16        So, looking at this chart, just to understand

17   schematically, because it helps me visually, what the

18   plaintiffs are trying to accomplish and must accomplish here

19   in order to have a claim for vicarious liability against any

20   of the parties that I represent.  They have to break through

21   this dotted red line (indicating), which is based solely on a

22   50 percent ownership of the STOPNC clinic by Saint Thomas

23   Network.

24        THE COURT:  Is that because the two entities on the

25   right side of the paper are the only operating ones, if you

1    will?  That is the ones who had something to do with the

2    injections.

3          MS. GREER:  That's correct, your Honor.  STOPNC was

4    the entity that administered the injections.  None of my

5    clients injected MPA.  None of them ordered it or bought it

6    from NECC.  Howell Allen is the other 50 percent owner of

7    STOPNC and that's why they have a 50 percent dotted line as

8    well.

9          THE COURT:  So, they also had nothing to do with

10   injecting anybody?

11         MS. GREER:  I'll let them address that.  They are

12   involved with the clinic on more of a day-to-day basis.

13         Their employees, Dr. Culclasure and Nurse Schamberg,

14   were also directors, medical and health directors of the

15   clinic.  So -- but none of our employees cross over to this

16   entity right here (indicating).

17         And I think there are a couple of things that are

18   really important to understand from the outset, and I'm sure

19   the Court read our papers and understands our position, but

20   one is that Saint Thomas Network is not a 100 percent owner.

21   It is a 50 percent owner, which means, by definition, it does

22   not have legal control over this entity.  Very different from

23   a lot of the alter ego cases that I'm sure the Court has seen

24   where you've got a principal that either owns or completely

25   dominates the other entities such that piercing the corporate

1   veil would be appropriate.

2           Another feature of this particular scenario --

3           THE COURT:  Excuse me.

4           Are these companies on the left operating companies

5   of one kind or another or are they simply -- is it simply a

6   holding company?

7           MS. GREER:  Well, at the top of the chain is a

8   holding company in it, but then there are operating companies

9   as well.  So -- but they are all nonprofit entities and that's

10  another unusual feature of this.

11          Usually when you're piercing the corporate veil, it's

12  for-profit entities or individuals who are taking money out of

13  the company where the veil is sought to be pierced, and here

14  we've got a Tennessee for-profit LLC, STOPNC, and they're

15  trying to pierce the veil up to each one of these entities on

16  this side of the equation, and to go through each chain they

17  have to produce evidence and to start they have to have

18  specific allegations, allegations that would suffice under

19  Tennessee law, and Tennessee law is very strong on alter ego.

20  It respects corporate separateness.  When companies are

21  separately incorporated and separately run, you have to show

22  quite a bit to get past their separate corporate veils.

23          And we've cited to the Court the law.  It's not

24  different from a lot of states, but it is very strong and

25  there is a presumption against it, and to start again, they

```
1    have to allege certain things.

2              THE COURT:  What does the not-for-profit part add to

3    this?

4              MS. GREER:  Well, I can't state a principle of law

5    that supports not for finding alter ego against a nonprofit.

6    Certainly it can be done, but I will submit to you that just

7    on the number of cases I've read throughout the country, it's

8    very rare because the objectives are different.  We've got

9    companies that are non-profits based in faith-based

10   ministries.  That is what they do.  They are not trying to

11   make a profit or pull money out of STOPNC or anything else.

12   It's an investment that they have had and based on that, the

13   plaintiffs are trying to push all of the liability up to these

14   five entities (indicating).

15             And our -- the reason we're here today is to test the

16   viability of those allegations, because there are cases, like

17   the Edmonds case that we cited, that say the kinds of

18   allegations that they're making are not enough to support a

19   verdict under Tennessee law.

20             So, to take that a step back to where we are at the

21   pleading stage, if those allegations if proved would not

22   support a verdict against my clients, then they should be

23   dismissed at this stage because this is a very, very expensive

24   proposition for our clients to be in an MDL and to have

25   discovery.  It's a very complicated and drawn-out process and
```

1    our position is we shouldn't be here.  We didn't have anything

2    to do with these injections.  We didn't have anything to do

3    with procuring the MPA from NECC, and we're only in it on

4    these vicarious liability claims and agencies.  So, we want to

5    really have the Court take a deep look at this because the

6    kinds of things that they're alleging -- again, I'm going to

7    focus on the Saint Thomas entities first -- are things like a

8    common name.

9         Well, Saint Thomas is a pretty famous name.  I

10   thought at one point about looking up how many entities in the

11   United States are called Saint Thomas that are based in

12   healthcare and I stopped because it was going to take too much

13   time, but it is a very common name.

14        The fact that there is some common ownership is not

15   enough.  That has never been sufficient to pierce the veil.

16   It is an extraordinary remedy, to be used sparingly when the

17   corporate form has been misused, and that's what I will submit

18   to you, your Honor, is conspicuously absent from these

19   pleadings, is allegations that would support that we misused

20   the corporate form, that we did not respect STOPNC's

21   separateness.

22        The things that they said in that regard are things

23   like, Well, you provided some financial services and

24   management services.  That's not enough to pierce the veil.

25   If that's not done on an arm's-length basis, which it was

1    here, that's not enough.  We didn't share employees.  They

2    said, Well, you have the right to appoint two directors to the

3    board of directors.  As we cited the Supreme Court of the

4    United States, that's not enough to shift liability.  They

5    mention that --

6            THE COURT:  Well, I don't look at these things

7    individually, do I?  As I understand it, the plaintiffs are

8    supposing a collection of facts.

9            MS. GREER:  Absolutely, that's correct.

10           THE COURT:  Name, plus other things.

11           MS. GREER:  The totality of the circumstances.

12           THE COURT:  Right.

13           MS. GREER:  Exactly, but what I'm suggesting to you

14   -- and I'm looking at each one and then I want to explain to

15   you that collectively, for example, in the *Edmonds* case, they

16   found that the principal was so completely dominating the

17   subsidiary, had complete control and dominion or domination --

18   they use different words -- that it would otherwise support

19   piercing the veil, and the court said, no, we're not going to

20   pierce the veil because there's been no misuse of the

21   corporate form here, and that's what's lacking here.

22           I mean, the Court, no doubt, has seen alter ego

23   allegations over the years, and the three features that are

24   kind of -- what I call the real indicia that kind of cross all

25   lines are things like commingling of property and assets

```
 1    and/or capitalization and diversion of corporate assets, and
 2    none of that is present in this case.  All they've got is a 50
 3    percent ownership, which, again, is not control.  The fact
 4    that they provided a board room for STOPNC to have its board
 5    meetings -- you know, my church provides a place for our
 6    neighborhood association to have meetings as an accommodation
 7    because they're in the same community.  That's not the kind of
 8    thing that warrants piercing the veil.  What warrants piercing
 9    the veil is when you're really misusing the separate forms and
10    those allegations are lacking here.
11            As to the Ascension parties, it's even more remote.
12    They say absolutely nothing about Ascension.  The only
13    specific thing that they have said about either Ascension
14    parties that would warrant piercing the veil even between
15    these entities (indicating), not even getting all the way to
16    STOPNC, is that we listed in our Form 990, which is a form we
17    file with the IRS, that some of these entities were direct-
18    controlled entities.
19            Well, there's a definition for that under the tax
20    code, and that means if you own 50 percent or more, and
21    because these are wholly-owned subsidiaries, of course, we had
22    to list them.  So, the allegations based on that have never
23    been used.  I've never found a case that a Form 990
24    representation was used to pierce the veil.  So, at a minimum,
25    those entities should be dismissed.
```

1          And then another issue that we raise as a matter of

2     law is the prohibition against the practice -- corporate

3     practice of medicine in Tennessee.  Tennessee, like many

4     states, has a law that says we do not want corporations

5     directing and controlling the professional judgment of

6     physicians.

7          Here, most of the allegations, agency and otherwise,

8     are based on the actions of John Culclasure, who is a

9     physician, who, again, was an employee of Howell Allen, a

10    medical director of the clinic STOPNC, and to the extent that

11    the veil could be pierced or even agency allegations could be

12    made based on his actions, that is barred as a matter of law

13    under Tennessee law.  We made that argument in our motion.  It

14    was not responded to.

15         And I know I'm running low on time, so let me make a

16    brief statement on the agency issues because those are

17    different.

18         As to the agencies, again, the focus is on the

19    actions of two individuals who there's been no showing that

20    they had actual authority of any kind to act on behalf of my

21    clients.  They did not have apparent authority.  There's not

22    been an allegation that someone was dealing with Nurse

23    Schamberg and thought they were dealing with any of my

24    clients, and there's been no ostensible agency.

25         The only cases that they've cited have been cases

1    that involved emergency-room practitioners and that is a very

2    different model.  If you walk into an emergency room, most

3    people who are not familiar with healthcare will assume that

4    the people that work there are employees of the hospital.  So,

5    that's why Tennessee and other states have laws that require

6    you to have some sort of disclaimer if you don't want to incur

7    the liability.

8            This is very different.  The STOPNC clinic is a

9    different building.  It has a different entrance, different

10   signage.  It's completely separate from our facility, the

11   Saint Thomas facilities.  And so, to suggest that we would

12   have to disclaim another building and say that's not ours

13   makes no sense, and they don't cite any law for that

14   proposition.  So, we would ask that the Court dismiss the

15   Ascension parties and the Saint Thomas entities on the

16   pleadings.

17           THE COURT:  The Saint Thomas entities are on the left

18   side of your paper?

19           MS. GREER:  Yes, your Honor.

20           THE COURT:  You don't speak for the STOPNC?

21           MS. GREER:  No, your Honor.

22           THE COURT:  Okay.  Thank you.

23           Who else wants to speak for Tennessee?

24           MR. GIDEON:  C.J. Gideon and Chris Tardio wish to

25   divide the remaining time.

1          MR. TARDIO:  Good afternoon, your Honor.  Chris

2     Tardio.

3          As your Honor picked up on, we represent the entities

4     on the right-hand side of this chart, and I want to take a few

5     minutes to talk about the Healthcare Liability Act, which your

6     Honor mentioned a moment ago at the beginning of Ms. Greer's

7     presentation, and then I'll turn the presentation over to Mr.

8     Gideon to deal with the bulk of the global issues.

9          We have two motions pending, one deals with pre-suit

10    notice and certificate requirements, another deals with the

11    global motions -- or the global issues of law.  I'll address

12    briefly the Healthcare Liability Act and then the statutory

13    requirements.

14          In Tennessee in 2008, the legislature passed the

15    first round of tort reform and the first round of pre-suit

16    requirements in at that time medical malpractice actions.

17    That's what they were called.  And the statute was amended

18    over the years and what we have now is two separate statutes,

19    121, which requires pre-suit notice of a healthcare liability

20    action at least 60 days before suit is filed.

21          THE COURT:  How does the statute define a healthcare

22    liability action?

23          MR. TARDIO:  That's the heart of the issue here.  A

24    healthcare liability action in Tennessee is defined as any

25    claim for injury -- any claim against a healthcare provider

1    for injury related to the provision of healthcare services.

2            If you look at the legislative history behind that

3    statute -- that's 29-26-101, the definition.  If you look at

4    the legislative history -- I mean, obviously, it's very, very

5    broad to some --

6            THE COURT:  I assume it does not apply to

7    pharmacists.

8            MR. TARDIO:  It does apply to pharmacists.

9            THE COURT:  Pharmacists who sell a drug are deemed to

10   be providing healthcare services?

11           MR. TARDIO:  If the claim is for injury related to

12   the provision of healthcare services, then, yes, the claim

13   falls under the Healthcare Liability Act and the -- another

14   important part of the act is that the language says

15   "regardless of any other claims or theories in the complaint."

16           So, if there is a claim in that complaint for

17   injury -- claim against healthcare provider for injury related

18   to the provision of healthcare services, the requirements of

19   the act apply, 121 the pre-suit notice requirements and 122

20   the certificate requirements.

21           And the -- if you look at the legislative history

22   behind the act -- and we've cited some of it in the

23   briefing -- the intent was to avoid exactly what happened

24   here, plaintiffs attempting to plead around the requirements

25   of the act.  The sponsoring legislator said in some of the

1    legislative history that we have cited, "It is advantageous in

2    the minds of some plaintiffs to keep their lawsuit out from

3    under the healthcare provider statutes, make a cause of action

4    look like something it isn't at its core."

5            So, you spend most of your time at the outset trying

6    to define what the cause of action is.  We're hopeful that

7    this statute will obviate some of that and reduce some of the

8    time spent.  These claims are for injury related to the

9    provision of healthcare services.

10           THE COURT:  So, if somebody sells prosthetic devices,

11   for example, that would also be a healthcare-related injury?

12           MR. TARDIO:  If it's against the healthcare -- if the

13   claim is against the healthcare provider and the injury --

14           THE COURT:  But that begs the question, you know,

15   whether somebody who sells a product is a healthcare provider.

16   That's a distinction that the plaintiffs certainly make.

17           MR. TARDIO:  I don't know that the plaintiffs make

18   any argument that we're not healthcare providers.

19           THE COURT:  Well, they make the argument that the

20   statute applies to those who provide the service, not to those

21   who sell a product, as I understand it.

22           MR. TARDIO:  Well, they've chosen -- what the

23   plaintiffs have done is said, We're not suing you.  We're

24   bringing a product liability claim.  We're not suing you as

25   healthcare providers, but the statute -- that's not the way

1    the statute is written.

2         The statute is written broadly, such that if the

3    injury claimed is related to -- not arising from, related to

4    healthcare services, it falls within the act, regardless of

5    any other claim in the complaint, and that's -- no matter how

6    you twist --

7         THE COURT:  Healthcare services?  Related to

8    healthcare services?

9         MR. TARDIO:  Yes, ma'am, and that's defined --

10   healthcare provider and healthcare services are both defined

11   within the act, and if you look at allegations in these

12   complaints, that's what the claims are for.  They're for --

13   regardless of any other claims in the complaint, 121 and 122

14   must be followed.

15        Let me just very briefly touch on the 122, which is

16   the certificate requirement deficiency.

17        If the Healthcare Liability Act applies, and it does

18   under the broad definition, at least that's our position, you

19   have to file a certificate of good faith or certificate of

20   merit with the complaint.

21        43 cases didn't have one filed with it.  About a

22   dozen are easy.  They specifically alleged negligence against

23   healthcare provider and injury related to the provision of

24   healthcare services.  There's no excuse for not filing one in

25   those cases.  Those cases should be dismissed with prejudice

1    under the plain language of the statute.

2         THE COURT:  Is it clear that the statute does not

3    permit an amendment of the complaint?

4         MR. TARDIO:  The *Vaughn* case, which we've cited, and

5    our Supreme Court denied cert and it said that an amendment is

6    not sufficient under the act to cure deficiencies.  You can't

7    amend later.  And if you think about the policy reasons behind

8    it, the intent of the certificate requirement is that when you

9    filed the complaint, you've had somebody -- an expert look at

10   the case and certified its merits.  If you filed that three or

11   four months later, it defeats the intent behind the act.

12        THE COURT:  Excuse me one moment.

13        (Discussion off the record at the bench.)

14        THE COURT:  Excuse me one moment.

15        Are counsel in the criminal case here?

16        COURTROOM DEPUTY CLERK URSO:  John is here.  Mr.

17   Butters is -- he's up in the library.

18        (Discussion off the record at the bench.)

19        THE COURT:  I'm sorry.  Go on.

20        MR. GIDEON:  Your Honor, I'm going to finalize our

21   presentation on behalf of the Tennessee clinic defendants.

22        You need to add on the right side of the page some

23   additional names.  We also represent John Culclasure, who is

24   an M.D., anesthesiologist who administered a number of

25   injections.  Debra Schamberg, who is a Registered Nurse who

1    was the practice operator for STOPNC, Registered Nurse.  She

2    is named as an individual defendant.

3         THE COURT:  As to them, you're invoking the statute

4    that says they have to certify ahead of time?

5         MR. GIDEON:  Yes, ma'am.

6         As well as Howell Allen, which is a professional

7    corporation made up of a group of neurosurgeons.

8         To track what Mr. Tardio said just a moment ago,

9    there's some additional reasons why the Products Liability Act

10   of Tennessee does not apply by definition.  First, what was

11   delivered here, even as it is described in the master

12   complaint, is services.  These patients predominantly had

13   lower back pain, serious lower back pain.  They were referred

14   to STOPNC for the epidural steroid injections, and a physician

15   administered the injection in the epidural space.  Granted,

16   the physician used methylprednisolone acetate secured from

17   NECC, but there wasn't a sale of MPA to any of the patients.

18        THE COURT:  How did the physicians treat this service

19   and -- with an injection on their bills?

20        MR. GIDEON:  The Howell Allen Clinic billed for the

21   physician fee by Dr. John Culclasure, and if the Court will

22   look at Exhibit 8 to the Reed complaint, there is also a

23   charge for a facility fee that is approximately $1,042.  There

24   is no bill for MPA.  There is no bill of sale for MPA.  There

25   is no discrete individual charge for the steroid.  So, we

1  respectfully submit to the Court there was no sale.

2          And one of the reasons why the Tennessee Products

3  Liability Act does not apply, your Honor, is because (A) there

4  was no sale, but for the act to apply, there has to be a sale

5  by a seller who is engaged in the sale of those products.  So,

6  it eliminates this by definition.

7          Secondly, there is no tangible product or good here.

8  There is a service, the delivery of a healthcare service,

9  which I know this Court is familiar with.  The vast majority

10  of the jurisdictions that have looked at this issue, even when

11  there is a defective product involved like the defective

12  devices in the mouth and the back that we cited in our case

13  submissions, always treated predominantly as a service and

14  that has been the rule in Tennessee as well.

15          Tennessee is one of those states that does not

16  distinguish between a sale versus a service in the same

17  transaction.  The Court looks to see what is the predominant

18  aspect of the relationship, which in this case is a service,

19  and if it is, the products act does not apply.

20          Finally, Mr. Tardio didn't touch on this fact, but

21  there is a definition of healthcare providers that fall within

22  the act.  It extends to hospitals, ambulatory service centers,

23  physicians, even certified nursing assistants in nursing

24  homes, to give you some idea of the intended breadth of the act.

25          So, one of the principal points for the Court to

1    address is, the plaintiffs wish to impose liability without

2    fault on these healthcare providers.  The Healthcare Liability

3    Act of Tennessee says there cannot be liability without fault.

4    If we are responsible, we are responsible only if they prove

5    there was a departure from accepted standards of professional

6    practice that caused an injury which would not have otherwise

7    occurred.

8          THE COURT:  But we can't deal with that at the moment

9    because we do not have evidence yet and there's been no

10    discovery on this issue at this point, right?

11          MR. GIDEON:  I'm not asking for summary judgment on

12    the merits.

13          THE COURT:  I understand.

14          MR. GIDEON:  I'm saying that the substantive law that

15    should apply is the Healthcare Liability Act, not the Products

16    Liability Act.

17          Two additional points that I think the Court should

18    focus on.  We filed our motion to dismiss on January 10th,

19    2014.  We raised nine grounds, eight of them are due to be

20    granted and should be allowed based on the plaintiffs' March

21    28th, 2014 response.

22          The product liability claims against Drs. Culclasure,

23    Lister, and Schamberg should be granted.  They aren't sellers

24    under any scenario, any argument at all.  The product

25    liability claim against Howell Allen should be granted.  They

1    didn't sell anything and they admit that in their response.

2    The claims of ordinary negligence should be dismissed.  The

3    Tennessee Consumer Protection Act claim should be dismissed.

4    It's clear that that does not apply here.  The medical battery

5    claims were not contested, and the failure to warn or lack of

6    informed consent claims should be dismissed as well.

7            The only thing that should remain as to our

8    healthcare provider clients is a claim under the Healthcare

9    Liability Act, nothing more.

10           We also respectfully submit that civil conspiracy and

11   agency should be dismissed.  Why should the civil conspiracy

12   claim be dismissed?  When your Honor looks at the materials,

13   you will see, taken in the light most favorable to the PSC --

14   they say that Debbie Schamberg was told by a representative of

15   NECC that she had to provide a patient list to get a further

16   supply of MPA.  She said I can't predict who will be here next

17   week.  And they said any list will be fine.  So, she gave them

18   the list, and even their allegations establish she was doing

19   so with the intent to comply with what she was told was

20   Massachusetts law.

21           That's not a civil conspiracy.  There is no intent to

22   violate the law by Debbie Schamberg and, in addition, in

23   Tennessee a compounder can provide product in anticipation of

24   a prescription.  An individual prescription is not required as

25   a matter of law.

1        Vicarious liability and agency.  There is absolutely

2   nothing in these papers that would establish that my clients

3   should be held responsible for NECC.  There's not even a

4   showing that we controlled their methods, means or manner,

5   which in Tennessee is required in order to establish agency.

6        And, last, as to this claim of special relationship,

7   the *Limbough* case and *Turner vs. Jordon* case, in both of those

8   cases the plaintiff was able to show that the defendant had

9   actual knowledge, actual knowledge of the threat of harm

10  created by a third party.  In this case there is no such proof

11  at all.

12        Any additional questions, your Honor?

13        THE COURT:  Thank you very much.

14        MR. GIDEON:  Thank you.

15        THE COURT:  Let me interrupt again for a moment.

16        May I see Mr. Wortmann and Mr. Butters, please?

17        (Discussion off the record at the bench.)

18        THE COURT:  I'm sorry.  This jury is giving me

19  trouble.  We'll have to interrupt once more in order to deal

20  with the jury, but, in the meantime, we will continue with

21  this case.

22        MR. STRANCH:  Your Honor, we have a notebook that we

23  put together as part of the plaintiffs' responses.  It has

24  some documents, statutory sections and other things that we're

25  going to be referring to.  We've provided copies for the

1    defendants, and we'll hand this up to you if that's okay.

2              THE COURT:  Do you have two copies, by any chance?

3              MR. NOLAN:  Yes, we do.

4              THE COURT:  So, maybe we can give one to the law

5    clerks, if you would, please.

6              MR. STRANCH:  Sure.

7       (Attorney Stranch hands binders to the Court and law clerks.)

8              MR. NOLAN:  Your Honor, does the Court wish to

9    address the argument regarding STOPNC and their application to

10   the Products Liability Act first or the --

11             THE COURT:  Whatever you wish to do.

12             MR. NOLAN:  Sure.

13             THE COURT:  But within the time limits, please.  So,

14   how long are you going to be?

15             MR. NOLAN:  Your Honor, I will be no more than 30

16   minutes.

17             I'm George Nolan from Nashville and I will be

18   discussing the application of the Tennessee Products Liability

19   Act to these sellers, and I think it's important for the Court

20   to understand how the Tennessee Products Liability Act of 1978

21   works.

22             That statute provides, your Honor, that all

23   businesses that sell or distribute products in Tennessee are

24   required to stand behind those products and cover any harm

25   caused by those products under certain limited circumstances.

```
 1              THE COURT:  This is not limited to medical products?

 2              MR. NOLAN:  No.  The act, your Honor, defines the

 3    term "seller" very broadly.  It makes no effort to exclude

 4    healthcare providers from the definition and, in fact, if you

 5    turn in your notebook, your Honor, to the first tab, you will

 6    see how the statute defines the term "seller" and it's very

 7    broad and it includes some words that the defendants don't

 8    focus on in their arguments.  It, "includes a retailer,

 9    wholesaler or distributor, and means any individual or entity

10    engaged in the business of selling a product, whether such

11    sale is for resale, or for use or consumption."

12              It's a very broad definition, no effort to exclude

13    healthcare providers.  Your Honor, we know from the

14    defendants' deeds and words that they fit that definition.  If

15    you turn in your booklet to Tab No. 20. --

16              THE COURT:  Well, booklet this is not.  It's a major

17    book.

18              MR. NOLAN:  The exhibit notebook might be a more apt

19    way of putting it.

20              Tab No. 20, your Honor, is a letter sent by the

21    defendants Saint Thomas Outpatient Neurosurgical Center less

22    than two weeks after this outbreak became public knowledge

23    and, as you can see here, the clinic writes to NECC and, first

24    of all, accuses that company of breaching the warranty of

25    merchantability, and then says:  "Specifically, the below
```

1    listed goods have been recalled and/or no longer fit for

2    use/sale due to contamination or suspected contamination."

3           So, less than two weeks after this happened, this

4    clinic is writing to NECC and threatening to sue NECC because

5    the products are not good for use or resale.

6           So, clearly, your Honor, they fit within the broad

7    definition of "seller" that we find under the products

8    liability statute.  And in Tennessee, your Honor, anyone who

9    is a seller is required to stand behind that product under

10   certain limited circumstances, and the circumstance implicated

11   in this case is when the manufacturer is determined to be

12   insolvent.  That's the baseline rule.

13          That is the public policy decision that our

14   legislature made, and it's a very important public policy

15   because our legislature decided that when something like this

16   happens and these terrible losses occur, the loss doesn't rest

17   within the innocent victims.  It rests with the businesses who

18   make the business decision to import products into Tennessee

19   made by a manufacturer that doesn't have the wherewithal to

20   stand behind those products, and they're asking this Court to

21   make a huge and very detrimental change to Tennessee products

22   liability law that's been the law of Tennessee for the last 36

23   years, your Honor.

24          And I think it's important for the Court to also

25   focus on the definition of the term "seller" in the Healthcare

1    Liability Act, and if you look at Tab 3 of our notebook, your

2    Honor, you find how that particular term is defined in the

3    healthcare liability statute and, as you can see, your Honor,

4    the scope of that statute is key to healthcare services.  It

5    doesn't say anything about products.  "Healthcare services" is

6    a defined term, and our legislature wrote a very thorough

7    definition that includes any manner of services, but it never

8    anywhere says that services means products.  In fact, the

9    words good, goods, service -- product or products, never

10   appear anywhere in the statute.

11        So, the defendants are asking this Court to

12   judicially insert words into the Healthcare Liability Act

13   which are not present in that statute.

14        It would have been so easy for the legislature to say

15   healthcare services includes all care, products, goods and

16   services provided to the patient, but that's not what our

17   legislature did, your Honor.

18        So, the defendants are asking this Court really to go

19   out on a limb.  They're asking this Court to reverse 36 years

20   of products liability law and they're asking this Court to

21   rule that our legislature decided to completely change

22   Tennessee's scheme for allocating loss caused by harmful

23   products without ever expressly saying so.

24        And, your Honor, a ruling like that, not only would

25   it be unjust, your Honor, it would be -- it can cause this

1    litigation to boggle on for years, and here's why:

2         If the Court finds that the plaintiffs are allowed to

3    prosecute product liabilities claims against these defendants

4    as sellers, then these defendants are required to stand behind

5    the product and they are jointly or severally liable for the

6    harm caused by the product.  Suddenly the case becomes simple

7    and it will move to resolution under very just circumstances

8    and in accordance with public policy adopted by the Tennessee

9    legislature, but if the Court adopts the defendants' position,

10   then we'll be here a decade from now arguing over the

11   defendants' compared default defenses, and the fact that they

12   want to try these cases to the jury verdict form that has a

13   long list of parties, including the FDA and the CDC and the

14   Massachusetts Board of Pharmacy and the Tennessee Board of

15   Pharmacy, and they want to attribute fault to all of those

16   particular players and that, your Honor, that would be

17   completely contrary to how our products liability system is

18   set up.

19        Your Honor, in our statute we have a provision that's

20   not present in any other state and that's a provision that

21   says that there is one circumstance and only one circumstance

22   in which healthcare providers are not considered sellers and

23   that's when the product is a silicone gel breast implant and

24   that statute was passed in '93, your Honor, at the request of

25   a very highly-regarded woman senator in Tennessee who was a

1   breast cancer survivor and it was in the midst of the Dow

2   Corning litigation in which -- at a time when thousands and

3   thousands of cases across the country were pending against Dow

4   Corning and this particular senator thought that it was unfair

5   that some of the women in Tennessee were having their claims

6   time barred by Tennessee's ten-year statute of repose in

7   products cases.  So, she proposed a bill to extend the statute

8   of repose from ten years to 25 years for that particular

9   product, and when she proposed that bill, the medical

10  community pushed back and they lobbied into the bill, your

11  Honor, a statutory carve-out indicating that for purposes of

12  that product only, that product only, that healthcare

13  providers are not considered sellers and that carve-out, your

14  Honor, is found in your booklet under Tab 2A.

15         So, the statute is very clear.  There's only one

16  circumstance in which healthcare providers are not considered

17  sellers and that's when we're discussing a silicone gel breast

18  implant, and in all other circumstances, in all other

19  circumstances, your Honor, the healthcare providers have the

20  same obligations as any other business that sells a product.

21         And, your Honor, as the Court observed, we do

22  specifically allege in our complaint that these clinics sold

23  this stuff.  They broke out the charges separately.  They

24  charged separately for the doctor's service and they sent a

25  bill to Medicare and the other insurers for the injection

```
1    itself and the injection is the steroid.  That's the only

2    reason for that transaction.

3              That concludes my portion of the --

4              THE COURT:  Thank you.

5              MR. NOLAN:  Unless the Court has a question.

6              THE COURT:  No, I do not.

7              MR. NOLAN:  Thank you.

8              THE COURT:  I'm not exactly sure how to do this.  Who

9    is arguing next?

10             MR. CHALOS:  I am, your Honor.

11             THE COURT:  How long will you be?

12             MR. CHALOS:  About ten minutes probably.

13             THE COURT:  I think Ms. Urso has gone to get the

14   jury.  If you could just --

15             COURTROOM DEPUTY CLERK URSO:  I'm sorry.

16             THE COURT:  Don't all leave.  If I could have one

17   chair in each of the front tables, that's all I need, just one

18   chair.  Oh, yeah, we need two.

19             COURTROOM DEPUTY CLERK URSO:  You can leave your

20   stuff.  This will not take very long.

21             THE COURT:  Okay.  Bring the jury down.

22             (Pause.)

23             THE COURT:  Sorry about this.  And we will continue

24   with New England Compounding.  I thank you for your

25   indulgence, but I've managed to take care of two cases in the
```

1     interim.  Mr. Stranch, you were next.

2              MR. STRANCH:  Mr. Chalos will be next.

3              THE COURT:  Okay.  Mr. Chalos.

4              MR. CHALOS:  Yes, your Honor.  Mark Chalos on behalf

5     of the plaintiffs' steering committee.

6              I'm going to address the Saint Thomas entities'

7     arguments that they should be dismissed at the threshold based

8     on the allegations in our complaint.  I'm going to leave aside

9     for now the Ascension entities.  Those are the ultimate

10    corporate parent companies.

11             THE COURT:  So, you're addressing the vicarious

12    liability products?

13             MR. CHALOS:  Your Honor, yes, as well as some direct

14    liability that brings me to my first point.

15             Counsel for the Saint Thomas entities represent to

16    the Court that all of the allegations against her clients are

17    vicarious, and that's not entirely the case.

18             If your Honor -- again, in the notebook that Mr.

19    Nolan handed up to you, Tab 36 is Wayne Reed on behalf of his

20    deceased wife, Diana Reed, their lawsuit against these

21    entities, and this is a complaint that I'm going to refer to

22    from time to time during my argument as setting forth the

23    allegations that are operative for purposes of our discussion

24    today, and if your Honor will turn to Page 51 in Tab 36 of our

25    notebook.

```
 1                THE COURT:  Okay.
 2                MR. CHALOS:  Count XII claims against Saint Thomas,
 3    and Saint Thomas is defined for purposes of this complaint and
 4    this section to include Saint Thomas Network and Saint Thomas
 5    Health.  I want to pause here for one second.
 6                Saint Thomas Network is a company that essentially is
 7    a holding company.  It has no employees and we don't know its
 8    asset situation, but it's our understanding it has no assets.
 9    Your Honor correctly identified these companies as not
10    essentially operating companies.  These are shells and there
11    are various movements around.  At one point the corporate
12    owner of Saint Thomas Outpatient Clinic was a company called
13    Saint Thomas Health Services.
14                THE COURT:  Saint Thomas?
15                MR. CHALOS:  Health Services.
16                Apparently, Saint Thomas Network was at one time
17    known as Saint Thomas Health Services, that now refer to Saint
18    Thomas Health -- I'm sorry.  The entity they now refer to as
19    Saint Thomas Health at one time was Saint Thomas Health
20    Services as well.  At some point somehow ownership
21    transferred.  It's unclear to us at this point.  We have not
22    yet gotten any discovery that's meaningful from these
23    entities.  They've produced I think some total of 51 pages of
24    documents, two documents totaling 51 pages.  So, to some
25    extent we're limited in the information we have.  Appears to
```

1    be some shells moving around and some flimflam going on at a

2    billion-dollar hospital, but we don't yet have the information

3    to really nail it down.

4         But that said, we're at the pleading stage and our

5    obligation at the pleading stage is to plead enough facts to

6    state a claim for relief that's plausible on its face.

7    "Plausible" means it will raise a reasonable expectation that

8    this discovery will reveal evidence of the necessary elements.

9    That comes from the *Twombly* case.

10        So, looking at Count X, these are direct negligent

11   claims, direct --

12             THE COURT:  X or XII?

13             MR. CHALOS:  I'm sorry.  XII, you're right, your

14   Honor.

15        The allegations here are that Saint Thomas, which,

16   again, includes Saint Thomas Network and Saint Thomas Health

17   and Howell Allen Clinic, were negligent in the manner in which

18   they operated Saint Thomas Neurosurgical, the clinic.

19             THE COURT:  But if, as you say, they were shell

20   corporations, what obligation would they have had over the way

21   the surgical clinic operated?

22             MR. CHALOS:  Well, they have an operating agreement

23   that is also in this notebook at Tab 39, which outlined, among

24   other things, the powers of the various entities and the flow

25   of the money and, as your Honor will see, it's a fairly dense

1    document.  The money moved around, and what our allegations

2    are -- when I say "moved around," moved from the clinic up

3    through the Saint Thomas chain.  They may call themselves

4    nonprofit entities, but there's a lot of money, hundreds of

5    millions of dollars moving around over there.

6           Ascension is a $15-billion-a-year company.  So,

7    whether they call it profits, meaning they pay federal income

8    tax on it, or they call it something else is immaterial for

9    purposes of our discussion.  But, in any event, these are

10   allegations that they directly committed their own negligence.

11   At least those entities did.

12          We also have claims that the Saint Thomas entities --

13   that the clinic operated as an agent of those entities, both

14   an actual agent and an apparent agent.  Those do not require,

15   nor does the direct negligence claim require any piercing of

16   any veil.  Those are independent claims for the bad conduct of

17   these entities.  And, again, we're at the pleading stage at

18   this point.  We still need to prove our case.  We need to

19   properly surmount a summary judgment motion at some point and

20   we'll need to prove it to the jury at trial, but for now we're

21   focused solely on the obligations of the complaint.

22          The allegations of apparent agency and actual agency--

23          THE COURT:  Excuse me.

24          You make allegations about their obligation to --

25   with respect to the supplies from NECC.

1          MR. CHALOS:  Yes.

2          THE COURT:  Is that something that they would have

3     been obligated to do under this operating agreement?

4          MR. CHALOS:  Well, your Honor, again, at this point

5     we have no real discovery from these entities.  We have made

6     allegations based on the information available to us and it's

7     our understanding based on the information that we have at

8     this point that they had a role in that.

9          The apparent agency claim arises from a number of

10    facts.  Correctly identified, it's a constellation of facts

11    and they are set forth in the complaint as well.  And, again,

12    using the Reed complaint as an exemplar, starting on Page 50,

13    Count XI, that sets forth the apparent agency and actual

14    agency claims against Saint Thomas Hospital, and on Page 53

15    there are a number of allegations that set forth the claims of

16    apparent agency against Saint Thomas Health and Saint Thomas

17    Network.  And, again, we're focused on the complaint, but I'd

18    like to point your Honor to a few things.

19         These are facts that I think put context around the

20    allegations and I think they also directly refute some of the

21    points that counsel for Saint Thomas made.  If your Honor will

22    turn to Page 20 -- Tab 22 of the binder.

23         THE COURT:  Tab 22?

24         MR. CHALOS:  Tab 22.  This is a photograph of how

25    Saint Thomas represents itself in the national community.

1     This is a photograph taken on a main street downtown Nashville

2     and it represents itself as, "One name, one healing community,

3     Saint Thomas."

4           If your Honor would turn to Tab 23 of the notebook,

5     it's another photograph.  This is taken at the national

6     airport.  Again, Saint Thomas representing themselves to the

7     national community and to the world, "One name, one healing

8     community."

9           If your Honor would turn to Tab 24, this is the sign

10    that patients see as they approach from a main street the

11    Saint Thomas Hospital campus, and it says right on top, "Saint

12    Thomas," and then on the bottom of the sign, "Outpatient

13    services."  It directs you to the main building.

14          If your Honor would turn to Tab 25, you'll see a map.

15    This is the Saint Thomas facility.  The clinic was located on

16    the ninth floor right where it says, "Medical Plaza East."

17          If your Honor would turn to Tab 26, this is what the

18    patients saw when they walked in the ninth floor of Saint

19    Thomas Hospital.  They saw a sign that says, "Saint Thomas

20    Outpatient Neurosurgical Center."

21          Counsel for Saint Thomas entities suggested they had

22    no obligation to clear up any notion that people going to

23    Saint Thomas Hospital, when they walk into Saint Thomas

24    Hospital and go to the ninth floor of Saint Thomas Hospital

25    and go to the clinic called Saint Thomas, that they have no

1    obligation somehow to clear up the notion that this is somehow

2    not affiliated with Saint Thomas in any way.

3            I want to point out a couple of other -- if your

4    Honor would turn to Tab 28.  This is Dr. Culclasure's hospital

5    I.D.  This is the I.D. that he would have on the outside of

6    his clothes when he saw patients and injected them, and if you

7    look on the back of it, it says, "This card is official

8    property of Saint Thomas Health Services and must be

9    surrendered when requested by hospital authorities," further

10   supporting the notion that this clinic is in the hospital if

11   they're controlling access to the facility.

12           I want to point out just a couple of other points of

13   what Saint Thomas said to the community.  Tab 29 is the letter

14   that the clinic, Saint Thomas Clinic, sent to patients to

15   inform them that they may be in grave danger because of a

16   product that was injected into them at the Saint Thomas

17   Clinic.  What it highlights, it says either call us or visit

18   the Saint Thomas Hospital emergency room.  Why they would be

19   directing the patients to a stranger entity is puzzling.  It's

20   them.

21           Tab 30 is a medical record from Diane Reed, deceased,

22   patient at Saint Thomas.  This is the record from when she was

23   admitted into the Saint Thomas Hospital.  If you look at the

24   top, it says, "Saint Thomas Hospital" next to "Saint Thomas

25   Health Services."  This is the physician on duty, Dr. Motyka,

1    and Dr. Motyka writes, "The patient recently underwent a

2    steroid epidural injection here five days ago."  "Here,"

3    meaning the clinic in their building.

4         So, your Honor, I point those out.  Those are

5    documents that we've been able to pull together over the last

6    period of time, some well after the complaints were filed.

7    These complaints were filed some time ago.  These put a

8    context around the notion that these are -- it is, "one name,

9    one healing community."  It's a group of entities that are

10   interrelated.  They're interconnected.  They call themselves

11   here...

12        And I want to point out just one more, Tab 38 of the

13   binder.  This is Scott Butler, who was the CFO of the clinic,

14   and he said -- this is a quote in the newspaper.  He said,

15   "This is a bad event for us, and obviously it puts a scar on

16   our doctors, our patients and our hospital."  This is the CFO

17   of Saint Thomas Clinic.  "Our hospital."

18        So, your Honor, at this point what we've alleged is

19   more than sufficient to withstand a 12(b)(6) challenge.

20        THE COURT:  If you are -- I mean, assume that these

21   allegations -- I mean, these allegations are here.  How far up

22   the chain would they go for liability purposes?  I mean, would

23   you be able to catch, based on these allegations, Ascension

24   Health Reliance?

25        MR. CHALOS:  Well, Mr. Stranch will address that

1   issue.  The answer is yes.

2          I want to point out one more thing to your Honor and

3   then I'll stop and Mr. Stranch can take over on the Ascension

4   question.

5          Tab 33 of the book, this is a chart that we created

6   and it is a representation of the interrelationships among the

7   Saint Thomas entities, Health, the hospital, Saint Thomas

8   Network and Saint Thomas Clinic.  It's sort of a counterweight

9   to the chart that they presented.  They presented it in a way,

10  obviously, they think supports their case, and we presented it

11  in a way we believe supports our case and also more represents

12  reality, and that's Tab 33.

13         So, we think at the very least our allegations as

14  pleaded currently are sufficient for 12(b)(6) purposes to at

15  least allege a cause of action against all of the Saint Thomas

16  entities.  Mr. Stranch will address the Ascension entities.

17         THE COURT:  Thank you.

18         MR. STRANCH:  Thank you, your Honor.

19         On the Ascension entities, basically, if you take a

20  look at our briefs, we think we've covered it well within the

21  brief, but what you see is that these are entities, starting

22  first with Saint Thomas, that are operating as if they're one

23  community, one set of hospitals, one corporation, and it

24  appears that the corporate leanings are being used either for

25  tax purposes or, you know, as a shell game maybe, you know,

1    but Ascension, when you go look at their tax forms -- and

2    we've had no discovery from Ascension.  They say they're a

3    direct controlling -- they directly control the Saint Thomas

4    entities.  They're under their direct control.  That's what

5    they say.

6           They say also that Saint Thomas Outpatient

7    Neurosurgical Center is a related organization that is taxable

8    as a partnership.  In other words, Ascension derives revenue

9    from Saint Thomas Outpatient Neurosurgical because it is a

10   related entity that is taxable as a partnership because it's

11   an LLC that's chosen to be treated as a partnership as opposed

12   to an S Corp or C Corp.

13          And, frankly, your Honor, these sorts of allegations

14   of agency, of corporate veil piercing, of vicarious liability,

15   these are generally dealt with after full discovery has been

16   done.  And so -- you know, because they're highly factual

17   intensive.  These are not the sorts of allegations where, you

18   know, you don't have to delve into, as you put it earlier, all

19   of the facts as they come together, but here you do.

20          And so, we think that the 12(b)(6), at least as it

21   relates to all of the agency, vicarious liability and other

22   claims, should be denied.  We should be allowed to do the

23   discovery that we've already -- some we've already found,

24   flush those things out.

25          THE COURT:  You speak on behalf of the two Ascension

1    defendants?

2            MR. STRANCH:  Yes.

3            THE COURT:  Not the Saint Thomas Health and Saint

4    Thomas Network?

5            MR. STRANCH:  Well, I think that motion should be

6    denied as well, your Honor, but I'm speaking --

7            THE COURT:  You're now not addressing the

8    relationship they have may.

9            MR. STRANCH:  I'm not.  I'm just discussing

10   Ascension.

11           Ascension says we directly control the Saint Thomas

12   entities.  You know, we think that is by itself enough to let

13   us get some discovery.  When you add in, you know, the issues

14   as it relates to STOPNC also being listed as something that's

15   a related organization for them, we think we should be

16   entitled to do that discovery and, frankly, even if it's

17   dismissed from the case, we're still going to get the

18   discovery and then maybe we'll just be amending to add it back

19   in later.  So, we think it's better to move forward and

20   consider it on a summary judgment record, you know, at an

21   appropriate time.  That's Ascension.

22           The other issue that I'm talking about -- and I'm

23   trying to go quickly, your Honor, to be cognizant of the time

24   and I do think this has been briefed well.  So, I'm trying not

25   to cover what's already been briefed for the Court.

1          THE COURT:  Yes, I appreciate all your briefs.

2          MR. STRANCH:  Thank you.  And I hope you've got a

3     couple of good law clerks to help you carry it.

4          THE COURT:  I mean the briefs of all the people, not

5     just all of yours.  All the people who are here.

6          MR. STRANCH:  Well, your Honor, I'm also going to

7     talk about the product liability actions because there was a

8     group of approximately 40 cases that were filed initially only

9     as product liability actions and were not originally a product

10    liability action and a healthcare liability action, and that

11    arises because of the way that Tennessee law works.

12         We're a one-year statute state.  And so, some of

13    these cases came in the door to the lawyers where they didn't

14    have 60 days to serve a notice beforehand, and it's not -- and

15    get the extra tolling of the statute that the extension of the

16    statute of limitations that you get under 121 for serving an

17    appropriate notice.  And so, those lawyers are faced with the

18    decision, Do I file my products case and know I've preserved

19    that statute when I don't think it has anything to do with the

20    healthcare liability action.  Go ahead and serve my notice,

21    but, alternatively, I am going to plead a Healthcare Liability

22    Act claim on down the road and let that 60 days run and then

23    amend to add those claims in.

24         You know, I can tell you, your Honor, as a

25    plaintiff's lawyer, one thing you don't do is let a statute

1    expire without a case being on file.  And so, those lawyers in

2    that situation, and we should include some of my cases, they

3    file the complaint as products.  We filed ours.  We made it

4    clear, this is not Healthcare Liability Act.  This is only for

5    the sale of the MPA, and I can tell you the insurance records

6    for some of my clients, the MPA is a specific line item that

7    they're charged for.  They get one insurance record that goes

8    to the Howell Allen Clinic that's for the services provided.

9    They get a separate one that's for the facilities.  It's for

10   the substance, the product itself and other materials that are

11   used during the procedure, you know.  So, they get two

12   separate insurance bills.

13          And so, we break all that down and we filed that case

14   first, you know.  We said in there specifically we are going

15   to assert a Healthcare Liability Act claim on down the road.

16   This is not it.  We served our notices, and once the 60 days

17   runs, we're going to amend to add those claims back in.

18          And, your Honor, the purpose behind the statute, the

19   Healthcare Liability Act, is to give the 60-day almost a

20   cooling off period in which the defendants can look at what

21   they're being accused of and can decide whether they want to

22   settle the case or not, and it gives the parties an

23   opportunity to work through it.

24          Well, not a single case has been settled in this

25   litigation with any of the Tennessee entities.

1          THE COURT:  *Wingate* was not Tennessee?

2          MR. STRANCH:  That's not part of the Tennessee

3   entities.  That's Virginia.

4          THE COURT:  Oh, yes.

5          MR. STRANCH:  And the defendants can't in good

6   conscience claim to the Court that they didn't know they were

7   going to have claims against them because they were calling

8   the plaintiffs, many of them, and letting them know that you

9   may have gotten this and you may be sick.  They were actively

10  involved in an investigation with the Tennessee Department of

11  Health where they were looking at people who had meningitis.

12  So, any claim that they didn't know that someone was sick just

13  should fall on deaf ears, your Honor.

14          Now, if you take a look at the *Stevens* case, which is

15  from the Tennessee Supreme Court, the defendants have argued

16  that it requires strict compliance with 121 and 122 for a

17  claim to survive.

18          The *Stevens* case is different.  It's from the

19  Tennessee Supreme Court.  It's a very recent case and it says,

20  no, that's not correct.  Substantial compliance is what is

21  required and that will meet the statute, and you have to also

22  show that there was a lack of substantial compliance and

23  prejudice to the defendants in order for a case to be

24  dismissed as a result of failing to meet the 121 and 122 pre-

25  filing requirements.

1      And I would submit to the Court, even though the

2 products liability actions are not included in there, for

3 anyone that had a Healthcare Liability Act claim, the

4 defendants can't show that there wasn't substantial compliance

5 because they all got notices.  They also can't show prejudice

6 under any set of factors, your Honor.

7      In fact, if we need to brief that in individual --

8 that needs to be looked at individual cases, because we've got

9 some cases where the medical records requests were sent and

10 they never even ordered them to look at them.  They made no

11 effort to determine.  So, there can be no showing of

12 prejudice.

13      So, where we stand, we have the stand-alone product

14 liability actions, as we've said to the Court.  Then there's

15 the healthcare liability actions that were added later.  And

16 the defendants are suggesting that because of that statute of

17 limitations conundrum, all those cases, those 40-odd cases,

18 should be dismissed, with no right to recovery for the

19 plaintiffs, and we believe that is inconsistent with the

20 products liability statute, as you heard Mr. Nolan explain how

21 that statute works.  We believe it's inconsistent with the

22 legislative purposes that the legislature has put forward for

23 the products liability action, and we also believe that that

24 would be inconsistent with the *Stevens* case that says to get a

25 case dismissed for problems with 121 and 122, you have to show

1     two things, actual prejudice and there was a failure of

2     substantial compliance, and those things cannot be met by the

3     defendants and, in fact, your Honor, there's no affidavit, no

4     declaration, no allegation by the defendants that they've been

5     prejudiced by this at all.  And so, those -- that must be

6     denied.

7            The last aspect I want to talk about quickly again is

8     the 122 claim.  That is the certificate of good faith that you

9     heard about earlier that says when you have an -- when you

10    file one of these cases, you have to certify that they've

11    conferred in good faith with an expert.

12           One of the things you need to know about that, your

13    Honor, is -- actually delve down into the statute, the

14    certificate of good faith only arises in cases in which part

15    of your proof is that there is a violation of the standard of

16    care.  Products liability actions do not have a standard of

17    care.  It's a strict liability standard.  I don't have to put

18    someone on in a products liability case to say what the

19    standard of medical care was in a community.  That's not part

20    of it.  It's not something that's considered because you're

21    talking about the product, was it defective.  And so, if you

22    look at it -- that's Section 29-26-115, it goes through and

23    defines exactly what you have to do.

24           So, that evidence that you would have to have to do

25    that would be the recognized standard of acceptable

1    professional practice in the profession and the specialty

2    thereof, if any, and that the defendant practices in the

3    community in which the defendant practices or in a similar

4    community at the time the alleged injury or wrongful action

5    occurred.

6         The next portion of that is that the defendant acted

7    with less than or failed to act with ordinary and reasonable

8    care in accordance with that standard in the community.

9         None of this applies to a products liability action,

10   your Honor.  So, even if the Court were to say I think you may

11   need to comply with Section 121 and give pre-suit notice for a

12   products liability action --

13        THE COURT:  Are you addressing those cases that you

14   say you brought explicitly as product liability cases or all

15   cases?  Because there are some that are not just that, right?

16        MR. STRANCH:  That's right.  Well, your Honor, there

17   are --

18        THE COURT:  Are you talking about only the cases that

19   were brought explicitly as product liability cases?

20        MR. STRANCH:  These are the cases -- these are the

21   40-odd cases that were originally filed as only products

22   liability actions and then after the notice period ran were

23   amended to add in Healthcare Liability Act claims.  They're

24   pleadings in the alternative, is what they are.

25        THE COURT:  But the argument that you're making now

1   doesn't apply to any other cases that were not brought in one

2   way or another as product liability, right?

3          MR. STRANCH:  Yes.  So, any complaint that doesn't

4   have a product liability action, this doesn't apply to.

5          THE COURT:  Okay.

6          MR. STRANCH:  But I believe all the complaints do

7   have a product liability action.  The question is whether they

8   were filed after the notice ran or not, and we don't think

9   that the 122 certificate of good faith applies to a product

10  liability action because there's no requirement of showing

11  what the standard of care is within a community as required

12  under 115.

13         So, we think that the 122 should be denied out of

14  hand, request on that, and as we've already explained, the

15  defendants can't meet the requirements of 121 because they

16  can't show any prejudice whatsoever, nor can they show that we

17  didn't substantially comply, because every one of those cases

18  now has notice that's been served.  The notice has been filed

19  with the complaint.  The medical records releases were given

20  to the defendants.  They have everything now.

21         Their real argument is you filed a products liability

22  case and then 60 or 90 days later, you amended to add it and,

23  you know, you can't do that.  It's a strict compliance

24  argument, which the Tennessee Supreme Court explicitly

25  rejected in the *Stevens* case.  And so, we think that should be

```
 1    denied and those cases should be allowed to go forward to
 2    discovery, your Honor.
 3            Do you have any additional questions for me that I
 4    can address?
 5            THE COURT:  No.
 6            MR. STRANCH:  On those issues?
 7            THE COURT:  I do not.
 8            MR. STRANCH:  Okay.  Thank you.
 9            THE COURT:  Is there anybody else on the plaintiffs'
10    behalf?
11            MR. CLAYTON:  Yes, your Honor.  Daniel Clayton.  I
12    should be five minutes, and it's on the issue -- and this is
13    an important issue because the Saint Thomas Clinic defendants
14    represented by Mr. Gideon and Mr. Tardio have moved to dismiss
15    virtually every case, Tennessee case, for an alleged failure
16    to comply with 121.
17            And if you would, please, turn to Tab 34.  And I'm
18    going to quickly address how they are glossing over this
19    statute in much the same way that they are misinterpreting the
20    product liability statute, okay?
21            When a notice letter is sent out, we have to include
22    certain things in that notice letter.  The things that are
23    included in the notice letter are found under Section 2 of Tab
24    34 where it says, "The notice shall include."
25            To put this in context, the Tennessee Saint Thomas
```

1    Clinic defendants have said you did not include in this notice

2    letter NECC, Ameridose, Barry Cadden, et cetera, those NECC

3    related defendants.  So, therefore, since you sued them, your

4    case should be dismissed, period.  That's what they are

5    alleging.

6          If you look at the statute, Judge, the statute says

7    exactly what the notice shall include, and under Section D it

8    says, "A list of the name and addresses of all providers being

9    sent a notice."  All providers, healthcare providers, being

10   sent a notice.  Okay.

11         So, in this situation, if you have multiple

12   healthcare providers and you've given notice to one healthcare

13   provider, you have to let all the ones that you gave notice

14   to -- you have to include them on a list in here.

15         The problem with their argument is, number one, NECC,

16   Ameridose, Barry Cadden, they weren't healthcare providers.

17   They were manufacturers.  Even in their brief they refer to

18   them as manufacturers, not healthcare providers.

19         Number two, NECC, Ameridose and those NECC-related

20   defendants were never sent notice because we didn't have an

21   obligation or a duty to send them notice.  MDL Order No. 6

22   specifically addresses this, because under MDL Order No. 6,

23   which is found on Tab 40, it says -- on the second page of

24   that exhibit, it says there's a waiver.  If there happens to

25   be any kind of pre-suit notice anywhere, any state in the

1    country as to these NECC-related defendants, it's waived.  You

2    don't have to send them notice.  It's waived.

3         And on top of that, underneath Paragraph E it says,

4    "Any pleading or motion asserting the applicability of any

5    state lawsuit requirements described herein, whether

6    considered procedural or jurisdictional, is deemed struck as

7    to these parties."  All right.

8         So, the Tennessee Saint Thomas Clinic defendants are

9    trying to rewrite -- if you go back to Tab 34 -- the

10   healthcare liability action, because when the notice letter is

11   sent out, we only have to include the names and addresses of

12   all providers deemed sent a notice.

13        In terms of NECC, Ameridose, Barry Cadden were never

14   sent notice so, therefore, they do not have to be on this

15   list.  There's no statutory requirement they be on the list,

16   period.

17        Then the Saint Thomas defendants are saying you need

18   to dismiss these cases because they didn't give us a HIPAA

19   authorization allowing them to get the records from NECC,

20   Barry Cadden and that crew, but if you look at Subsection E,

21   under what the notice shall include, that's on Tab 34, it says

22   the exact same thing here, a HIPAA-compliant medical

23   authorization permitting the provider receiving the notice to

24   obtain complete medical records from each other provider being

25   sent a notice.

1              NECC, Ameridose and those NECC defendants were never

2    sent a notice.  We had no obligation to include them on some

3    list.  We had no obligation to include them and no statutory

4    requirement to give them a medical authorization form to get

5    records that NECC wouldn't even have because it's -- the

6    Tennessee clinic defendants sent them a list of names and they

7    weren't patient-specific restrictions.  They just sent them a

8    list of names, including Mickey Mouse.  So, maybe if I

9    represent Mickey Mouse, maybe NECC would have records on that,

10   but I doubt it, but it shows the absurdity of their position,

11   Judge, and it's a good ending point because it covers so much

12   of what's going on before us today.  Thank you, Judge.

13              THE COURT:  Thank you.

14              Any other plaintiffs wish to be heard?

15              MR. STRANCH:  Your Honor, unless you have specific

16   questions for the plaintiffs, we'll rest on our papers.

17              THE COURT:  Thank you.

18              Any defendants who wish to have brief reply or --

19              MS. GREER:  Yes, your Honor.

20              THE COURT:  Wait a minute.

21              You have not spoken yet and -- I'm sorry.  Your name.

22              MR. BLUMBERG:  My name is Jay Blumberg, but I'm with

23   the Premier defendants.

24              THE COURT:  Right.  You have not had a chance to talk?

25              MR. BLUMBERG:  Correct.  Would you like the replies

1    first?  How do you --

2              THE COURT:  No.  You go ahead.

3              MR. BLUMBERG:  Okay.  Your Honor, our motions to

4    dismiss are obviously fully set out in our papers, but I want

5    to just touch on a few of them.

6              The first and I think the one that may be the easiest

7    to decide by the Court is whether my defendants are subject to

8    the Product Liability Act, and I think caselaw and the

9    statute, more specifically the statute in New Jersey, is clear

10   that professionals who are engaged in the practice of medicine

11   are not subject -- are not sellers under the Product Liability

12   Act if, in fact, that product is being utilized as part of the

13   medical care that's being rendered.

14             I don't think there's any question in this case --

15   and if you look at the plaintiffs' reply brief, they basically

16   almost acknowledge that, in fact, these entities are not

17   subject to the Product Liability Act, and I would submit to

18   the Court that based upon that, all claims with respect to

19   product liability should be dismissed against all of the

20   Premier defendants.

21             In addition to the fact that they are not subject to

22   the Product Liability Act, I would also submit, your Honor,

23   that they're also not subject under the statute to the

24   Consumer Fraud Act, because the Consumer Fraud Act is also

25   very specific that when there are learned professionals

1    involved in the rendering of medical care, that, in fact, they

2    are not subject to the Consumer Fraud Act and, in fact, there

3    is at least one case, *Macedo vs. Dello Russo*, which indicates

4    that -- it continues to identify that learned professionals

5    are beyond the reach of the Consumer Fraud Act and even look

6    to the legislature to change that if the legislature wanted to

7    do so.  That was back in 2004, I believe, and, in fact, no

8    action has been taken by the legislature.

9            So, it's clear that the learned professionals, which

10   would be my clients in this case, the Premier defendants, are

11   beyond the reach of the Consumer Fraud Act.

12           The third thing that I would like the Court to take

13   knowledge of is -- and I will say that some of my arguments

14   are the same as Mr. Gideon's with respect to civil conspiracy

15   and with respect to the agency claims as well, that there is

16   no -- in terms of even the pleadings, there is no allegation

17   -- or there is no credible allegation in this case that, in

18   fact, there was a civil conspiracy.  There was no allegation

19   of an agreement.

20           And, in fact, in our case, as -- I don't think

21   anybody can point to a situation in the New Jersey case where

22   an individual who was identified on those order forms did not

23   get the medication, and I would submit to the Court that those

24   individuals did get that medication.  So, I would submit that

25   the civil conspiracy claim should be dismissed as well.

1          And then, finally, your Honor, I will -- the agency

2     claim as it relates to the fact that my client should somehow

3     be responsible for the conduct of NECC, it's just not borne

4     out by any facts that have ever been pled.  We purchased a

5     product from NECC, and there is no credible evidence --

6     there's no credible pleading that, in fact, shows that we are

7     somehow now responsible for the product that we purchased from

8     NECC.

9          And, again, I know I said "finally," but the last

10    thing is battery.  The plaintiffs allege -- seriously allege

11    that we committed battery because we didn't tell patients that

12    we were going to inject a contaminated steroid into their

13    back, and there was never anything that could ever be shown --

14    and I don't even think it's pled -- that we had any knowledge

15    whatsoever that that was the case.

16          So, I would submit to the Court for those reasons, I

17    would ask the Court to dismiss those cases -- or those claims

18    at this juncture and it's appropriate to do it at this

19    juncture because of the fact that -- the way the pleadings are

20    structured.

21          THE COURT:  Thank you.

22          (Discussion off the record.)

23          THE COURT:  All right.  Now, you want to talk to

24    Premier?

25          MR. COREN:  Yes, your Honor.  Michael Coren.  Once

1    again, co-chair of the creditor's committee, and also I'm a

2    plaintiffs' counsel with matters that are pending -- one

3    matter that is pending against Premier and several others to

4    come.

5            I'm going to divide our argument.  I just want to

6    handle factual issues, factual issues and some legal issues my

7    colleague, Mr. Thomas Martin, is going to address with you,

8    your Honor.

9            THE COURT:  How much time do you --

10           MR. COREN:  Me, I'm only going to need about five

11   minutes, maybe six minutes, okay, because I've got -- I just

12   have --

13           THE COURT:  I have one case after I finish with you.

14           MR. COREN:  I understand, your Honor.  Okay.

15           Your Honor, they say that there is no conspiracy, no

16   agreement going on here, and it's mind boggling that across

17   the country, clinic after clinic is submitting bogus

18   prescription order forms in the same way as Tennessee did.

19   It's the same way that --

20           THE COURT:  What do you mean?

21           MR. COREN:  What I mean by that, your Honor, is

22   they're taking all old fictitious names or they're taking

23   former patients and they're putting those former patients down

24   on the prescription order form and the order form is attached

25   to my -- my declaration.

```
 1              THE COURT:  What does it have to do with this case?

 2              MR. COREN:  It has to do with the fact that they say

 3     there's no agreement, no conspiracy going on, and the point of

 4     fact of the matter is, clinic after clinic is submitting bogus

 5     lists to NECC and it has to be coming from both NECC and the

 6     clinic has to agree to do that.  It is simply wrong to take an

 7     old name, put it on a prescription and send it in to get

 8     medication that's a controlled substance under Massachusetts

 9     law.

10              And, your Honor, Massachusetts law, when it comes to

11     prescriptions from a compounding pharmacy, is controlling.

12     Why is that?  Chapter 94 of the statutes of Massachusetts says

13     so.  At Section 19 they say that -- excuse me -- 17 they say

14     out-of-state doctors' prescriptions will be honored, but they

15     have to comply with Massachusetts law.  Massachusetts law at

16     19 says no office supplies.  You have to write a prescription

17     for a respective plaintiff, a respective plaintiff fills it.

18     Then at 22, it says you have to have the doctor's name, the

19     patient's name, which, by the way, it's also the law of New

20     Jersey by regulation.  A prescription has a patient name.

21              What were they doing?  Patients would come in.  They

22     would administer steroid shots either in the back or in the

23     hip or in the shoulder and then a couple of days later to

24     renew their office supply, they put the order form and, once

25     again, it's in our declaration -- my declaration that we
```

1    submitted to you in response.

2            And on Page 3 of my declaration, there's a chart,

3    your Honor, and if you take a look at that chart, you're going

4    to see that for patient -- because we filed under seal, I'm

5    going to refer to patient one or two.  Patient one, date of

6    injection, 6/27/12.  Date of purported prescription, the same

7    day, 6/27/12.  The purchase order date, that date.  When does

8    the drug actually get shipped?  Two days later.  Now, how do

9    you go back in time in this particular matter?  You can't.

10   Other prescriptions are filled several days or several weeks

11   later.

12           So, what was going on here is, once again, to get

13   office supplies, in violation of Massachusetts law, which is

14   by statute governing, they were falsifying or sending in bogus

15   prescriptions.  That violates Chapter 93A because they decided

16   to come here to Massachusetts.  So, Massachusetts Consumer

17   Protection Law for that violation is going to be applicable.

18           Two, it actually also violates -- because now they're

19   giving somebody else's prescription to my client, his client

20   and other New Jersey clients -- patients, that violates the

21   law.  And the next thing is that they're charging them for

22   Depo-Medrol, not a knock-off compound that they bought

23   cheaper, but a prescription medicine.  So, what it is in New

24   Jersey -- and I know I'm going to segue for a moment into the

25   law.  I apologize, Bob.

1          But in New Jersey, where you're dealing with the

2     economics, the business, the front end of -- the business end

3     of the medical practice, that's covered under the New Jersey

4     Consumer Fraud Law as well.

5          And I would propose to you, your Honor, that both

6     statutes, both apply because they're not mutually exclusive.

7     Both states have an interest in protecting it.  Both can apply

8     and it's an issue of dual sovereignty, not choice of law, as

9     to that.

10          So, your Honor, I ask that you seriously do take a

11     look at my affidavit.  I think you'll be able to follow it.

12     Once again, we summarized it into a chart for your

13     convenience, but I think it all bears out, you know, with the

14     documents that we've submitted.  So, yes, there was an

15     agreement.  Yes, the CFA can apply.

16          As to the other legal issues, I would like to yield

17     to my colleague.

18          THE COURT:  Thank you.  Mr. Martin.

19          MR. MARTIN:  Yes, your Honor.  I will be brief and

20     try not to repeat the things covered in the briefs here, but I

21     first want to clarify a point which may be a little ambiguous,

22     and that is with respect to the application of the New Jersey

23     Product Liability Act to this motion.

24          The master complaint that was filed here does not

25     have any claim under the New Jersey Product Liability Act.

1    The New Jersey committee made a conscious decision not to make

2    a claim under that act because of the specific provision that

3    it has which is different than, as I understand, the Tennessee

4    law, that delivering a product in the course of medical

5    treatment is not selling the product for the purposes of

6    product liability law.  So, that act really doesn't have any

7    application to this motion.

8           What the defendants did is they made a claim that

9    negligence actions are barred because there is a product

10   involved and that's how they brought in the Product Liability

11   Act.  That claim is not borne out by any of the decisions in

12   New Jersey that have looked into that issue.

13          Specifically, there's a couple of cases that we've

14   cited in the brief that involved blood supplies that were

15   tainted with HIV, and the court specifically held that for

16   policy reasons, they were not going to apply strict product

17   liability law, but that if there is a fault proved against the

18   medical provider in connection with the providing contaminated

19   blood products, that negligence claim can proceed, and that's

20   exactly what we have here.

21          There's also a decision that we cited, the *Estate of*

22   *Halbert Finich* (phonetic), which was not addressed by the

23   defendants in their reply memorandum that involved tainted

24   blood with hepatitis and, again, the court said the same

25   thing, that we're not going to apply the Product Liability Law

1    here, but we will allow for a claim of ordinary negligence,

2    and that's what we have here.

3          So, I didn't hear Mr. Blumberg even address the issue

4    of whether the negligence claims should proceed here.  I think

5    it's clear that the negligence claims presented in the master

6    complaint do survive and should proceed.

7          With respect to the battery issue, again, I'll try to

8    be very brief.  The defendants' motion stated that under New

9    Jersey law, there is no claim for battery in connection with

10   failure to provide sufficient information in obtaining consent

11   to a medical procedure, and that's not exactly true, because

12   what New Jersey law does provide is that a claim of informed

13   consent -- lack of informed consent does not lead to a

14   battery.  However, if you obtain consent for one type of

15   procedure and perform another one, that is a battery.

16   Specifically, that the caselaw in New Jersey addressed the

17   issue of a patient who said they objected to the use of a

18   cadaver bone in a bone-grafting procedure --

19         THE COURT:  How does that apply in this case?  I

20   mean, are you suggesting that they only gave consent to

21   good --

22         MR. MARTIN:  No, your Honor, that's not it.  It's not

23   only they gave consent to non-contaminated products.  They

24   gave consent to the Depo-Medrol product, which is an FDA-

25   approved product manufactured under FDA guidelines.  They did

1    not give consent to the compounding situation which we have

2    here and which as a result of the compounding errors, led to

3    the harm.

4           So, it's similar to the case that we cited and it's

5    also cited by the New Jersey Supreme Court, *Ashcroft*, where

6    there was a transfusion and the patient said that, My family

7    members gave blood and I was -- gave consent to be transfused

8    with their blood and, yet, what the hospital did was give them

9    a transfusion from general supplies of blood, and the

10   California court found that that stated a cause of action for

11   battery and, similarly, the Arizona court that we cite found

12   that if you give consent for one type of anesthetic, that does

13   not give the physician the right to administer a different

14   type of anesthetic.

15          That's almost exactly on point with what we have

16   here.  Giving consent to one type of injection does not shield

17   the medical professional from a claim of battery for

18   administering a different product entirely.

19          Just very briefly with respect to the agency claims

20   here, the master complaint alleged that the NECC entities were

21   acting on behalf of the New Jersey medical providers when they

22   compounded the materials and delivered to New Jersey.  As

23   they're an agent in doing that, the Premier defendants are

24   responsible.

25          In response, the defendants in their motion state

1    that under New Jersey law, an agent, if it's an independent

2    contractor, does not provide liability to the principal, but

3    what we pointed out is that if the principal hires an

4    incompetent agent, then that agent's actions do give liability

5    to the principal.

6         The defendants don't contest that in their reply

7    memorandum.  What they said is that the master complaint does

8    not allege sufficiently that the NECC entities were

9    incompetent.

10        I think, frankly, your Honor, that's just silly.

11   There's hundreds of paragraphs of allegations detailing the

12   incompetence of the NECC defendants.  So, I think that, again,

13   the agency principle should apply.

14        I think Mr. Coren adequately explained the factual

15   nature behind our conspiracy claim and I won't prolong that.

16        With respect to the Consumer Fraud Act, New Jersey

17   decisions are quite consistent and proudly assert that the New

18   Jersey Consumer Fraud Act is perhaps the broadest and most

19   consumer friendly Consumer Fraud Act in the country.  The

20   claim that a medical professional cannot be sued under

21   Consumer Fraud Act because they are learned professionals is

22   just wrong.  You can't sue them under the fraud act for

23   actions taken as part of their profession.

24        However, here what we've alleged is that these

25   medical professionals acted as merchants and with a common

1   plan, which the NECC defendants figured out a way to get a

2   product outside of the FDA scope of scrutiny and have it

3   cheaper and increase everybody's profits.  They were acting as

4   a merchant when they did it, and we should be allowed to

5   pursue the discovery on that claim as well, your Honor.

6           THE COURT:  Thank you.  If I absolutely must hear any

7   replies, you got three minutes total.

8           MS. GREER:  Your Honor, I'll make it very brief, but

9   I do think it's a little unfair that we were given five pages

10  to do a reply and had to get everything in and now they come

11  forward with a book of evidence that they haven't cited in

12  pleadings and we haven't had a chance to respond to.  If the

13  Court would prefer to do supplemental brief, we could come

14  back and explain these things.

15          The evidence does not add up any more than the bus

16  allegation.  We explained in our reply that the bus and the

17  "one healing community, the one name," doesn't even include

18  STOPNC.  So, how that could be evidence of alter ego is beyond

19  me.  It's clear from the Website that that's not even part of

20  it.

21          I'll leave it to you as to how you would like me to

22  go through each of these pieces, but they do not support the

23  allegations that they are making now and they don't overcome

24  the strong presumption.

25          THE COURT:  Mr. Gideon.

1           MR. GIDEON:  Yes, your Honor.

2           I'm not going to characterize the arguments you heard

3     as absurd, but I do want to respond to a little bit of the

4     hyperbole.

5           Mr. Nolan told you that if you decided in our favor,

6     you would be changing law of Tennessee, and that's absolutely

7     inaccurate.  Our position is supported by the published case

8     of *Burris vs. Hospital Corporation of America*, decided in

9     1999, that dealt with a case much like this where there was

10    care provided and allegedly a defective product, and the

11    holding was the Malpractice Claims Act provided the sole

12    substantive basis for evaluating the defendant's liability.

13          The carve-out that they referred to, 29-28-103.  The

14    one point we agree on is Senator Thelma Harper sponsored the

15    25-year statute of repose, but we cited the legislative

16    history in which she was asked, What's this deal with?  And

17    she said, This does not deal with malpractice.  This deals

18    only with a product.

19          Article II, Section 17 of the Tennessee Constitution,

20    if it applied in Washington, we wouldn't have the problems we

21    have with legislation because it says any bill can only

22    address one subject and that subject has to be in the caption.

23    And you know what the caption of that act was that Mr. Nolan

24    relied on to completely changed the law?  The caption was, "An

25    act relative to statute of limitations."  It clearly was not

1    intended to carry out the result he intends to get you to accept.

2           The Healthcare Liability Act clearly applies.

3    Paragraph 17 of the master complaint makes it clear they're

4    suing us for providing services.

5           Two additional points.  The binder that Ms. Greer

6    referred to a moment ago, don't you think if there was a

7    single document that supported the argument that there was a

8    sale of MPA, it would be somewhere in that binder that was

9    just given to us right before the argument?  And it's not

10   there, not at all.

11          Finally, Tennessee law does not have any transaction

12   -- doesn't treat any transaction as one where it's part

13   product, part service.  You look at the predominant feature

14   and if the predominant feature is service, the Healthcare

15   Liability Act applies.  Thank you.

16          THE COURT:  Thank you very much.  I will take the

17   papers of all of you.  I thank you for the good briefs.  I

18   thank you for your indulgence in this rather both truncated

19   and confused hearing.  I apologize for that.

20          MR. GIDEON:  Thank you.

21          MR. STRANCH:  Thank you, your Honor.

22          (Adjourned, 4:42 p.m.)

23

24

25

```
 1                 C E R T I F I C A T E

 2         I, Catherine A. Handel, Official Court Reporter of the

 3  United States District Court, do hereby certify that the

 4  foregoing transcript, from Page 1 to Page 69, constitutes to the

 5  best of my skill and ability a true and accurate transcription of

 6  my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

 7  Re: New England Compounding Pharmacy, Inc., Products Liability

 8  Litigation.

 9

10    June 29, 2014          /s/Catherine A. Handel
      Date                   Catherine A. Handel RPR-CM, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```