UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  NEW ENGLAND COMPOUNDING   )  MDL NO. 13-02419-RWZ
PHARMACY CASES LITIGATION         )
                                  )
                                  )
                                  )
                                  )
                                  )
                                  )


BEFORE:  THE HONORABLE RYA W. ZOBEL



**STATUS CONFERENCE**



John Joseph Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, MA 02210


June 19, 2014
2:40 p.m.


Catherine A. Handel, RPR-CM, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 5205
Boston, MA 02210
E-mail: hhcatherine2@yahoo.com

```
 1     APPEARANCES:

 2     For The Plaintiffs:

 3         Hagens, Berman, Sobol, Shapiro LLP, by THOMAS M. SOBOL,
       ESQ., and KIRSTEN JOHNSON, ESQ., 55 Cambridge Parkway, Suite 301,
 4     Cambridge, MA 02142;

 5         Branstetter, Stranch & Jennings, PLLC, by BEN GASTEL, ESQ.,
       ESQ., 227 Second Avenue North, Nashville, TN 37201-1631;

 6
           Janet Jenner & Suggs, LLC, by KIMBERLY A. DOUGHERTY, ESQ.,
 7     75 Arlington Street, Suite 500, Boston, MA 02116;

 8         Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
       Street, Suite 500, Boston, MA 02114;

 9
           Tucker Law Group LLC, by BERNARD SMALLEY, ESQ., One Penn
10     Center at Suburban Station, 1617 John F. Kennedy Boulevard,
       Suite 1700, Philadelphia, PA 19103 (appearing telephonically);

11
           Smith Duggan Buell & Rufo LLP, by MATTHEW J. WALKO, ESQ.,
12     Three Center Plaza, Suite 800, Boston, MA 02108-2011;

13
           For the Official Committee of Unsecured Creditors:

14

15         Brown Rudnick, by KIERSTEN A. TAYLOR, ESQ., One Financial
       Center, Boston, MA 02111;

16
           Cohen, Placitella & Roth, P.C., by MICHAEL COREN, ESQ.,
17     2 Commerce Square, 2001 Market Street, Suite 2900, Philadelphia,
       PA 19103;

18

19         For the Defendants:

20         Alexander Dubose Jefferson & Townsend LLP, by MARCY HOGAN
       GREER, ESQ., 515 Congress Avenue, Suite 2350, Austin, TX
21     78701-3562;

22         Nutter, McClennen & Fish LLP, by SARAH P. KELLY, ESQ.,
       World Trade Center West, 155 Seaport Boulevard, Boston, MA
23     02210-2604;

24
           (Appearances continue on the next page.)
25
```

<u>For the Defendants</u> (Cont'd):

Fulbright & Jaworski LLP, by YVONNE K. PUIG, ESQ., 98 San Jacinto Boulevard, Suite 1100, Austin, TX 78701-4255;

Blumberg & Wolk LLC, by JAY J. BLUMBERG, ESQ., 158 Delaware Street,Woodbury, NJ 08096;

Gideon, Cooper & Essary, PLLC, by C.J. GIDEON, JR., ESQ., and CHRIS J. TARDIO, ESQ., 315 Deaderick Street, Suite 1100, Nashville, TN 37238;

Tucker Ellis, LLP, by MATTHEW P. MORIARTY, ESQ., 925 Euclid Avenue, Suite 1150, Cleveland, OH 44115-1414;

McGuire Woods LLP, by STEPHEN D. BUSCH, ESQ., One James Center, 901 East Cary Street, Richmond, VA 23219-4030;

Michaels & Ward, LLP, by DANIEL M. RABINOVITZ, ESQ., One Beacon Street, 2nd Floor, Boston, MA 02108;

Ulmer & Berne LLP, by JOSHUA A. KLARFELD, ESQ., 1600 W. 2nd Street, Suite 1100, Cleveland, OH 44113;

Goodwin Procter LLP, by ROBERTO M. BRACERAS, ESQ., and JAMES REHNQUIST, ESQ., Exchange Place, 53 State Street, Boston, MA 02109;

Hermes, Netburn, O'Connor & Spearing, P.C., by PETER G. HERMES, ESQ., 265 Franklin Street, 7th Floor, Boston, MA 02110-3113;

Sloane & Walsh, LLP, by WILLIAM J. DAILEY, ESQ., Three Center Plaza, Boston, MA 02108;

Morrison Mahoney LLP, by ANTHONY E. ABELN, ESQ., 250 Summer Street, Boston, MA 02210;


<u>For Paul D. Moore, In His Capacity as Chapter 11</u>
<u>Trustee of NECP, Inc.:</u>

Duane Morris LLP, by MICHAEL R. GOTTFRIED, ESQ., 100 Hig Street, Suite 2400, Boston, MA 02110-1724.

Harris Beach PLLC, by FREDERICK H. FERN, ESQ., 100 Wall Street, 23rd Floor, New York, NY 10005.

```
1                       P R O C E E D I N G S
2         (The following proceedings were held in open court before
3    the Honorable Rya W. Zobel, United States District Court Judge,
4    United States District Court, District of Massachusetts, at the
5    John J. Moakley United States Courthouse, One Courthouse Way,
6    Boston, Massachusetts, on June 19, 2014.)
7              COURTROOM DEPUTY CLERK URSO:  This is the In Re:  New
8    England Compounding case.  It's MD-13-2419.  I ask counsel
9    that are on the telephone to please moot their phones, please,
10   and I ask counsel here to please talk into the mic so all can
11   hear you, 66 participants on the phone.
12             THE COURT:  Which means that you can remain seated
13   because otherwise you speak above the microphone.
14             Who will start, Ms. Johnson or Mr. Sobol?
15             I guess we should start by taking roll.  Mr. Sobol
16   and Ms. Johnson for the plaintiffs.  Are you speaking?
17             MR. GASTEL:  Yes.  Mr. Gastel from Tennessee.
18             THE COURT:  I'm sorry?
19             MR. GASTEL:  Benjamin Gastel from Nashville,
20   Tennessee on behalf of the plaintiffs' steering committee.
21             THE COURT:  I still didn't get who you represent.
22             MR. GASTEL:  The plaintiffs' steering committee, your
23   Honor.
24             THE COURT:  Steering committee?
25             MR. GASTEL:  Yes.
```

```
 1            THE COURT:  But you will also speak?

 2            MR. GASTEL:  I will be speaking a little bit today,

 3     your Honor.

 4            THE COURT:  Okay.  And you?

 5            MS. DOUGHERTY:  Good afternoon, your Honor.  Kim

 6     Dougherty on behalf of the plaintiffs' steering committee.  I

 7     don't anticipate having a speaking role today.

 8            THE COURT:  Okay.  Now we come to -- I'm sorry, Mr.?

 9            MR. FERN:  Mr. Fern, your Honor.  Good afternoon.

10     Special counsel for the trustee.

11            MR. RABINOVITZ:  Dan Rabinovitz on behalf of Medical

12     Sales --

13            THE COURT:  I'm sorry, I should know that by now.

14            MR. RABINOVITZ:  Dan Rabinovitz on behalf of Medical

15     Sales Management, Inc., your Honor.  Good afternoon.

16            MR. KLARFELD:  Good afternoon, your Honor.  Joshua

17     Klarfeld on behalf of GDC.

18            THE COURT:  Tell me your name again, please.  Just

19     remain seated.  Is there only one microphone on that table?  I

20     guess there is.

21            COURTROOM DEPUTY CLERK URSO:  Yes, Judge.

22            MR. KLARFELD:  Joshua Klarfeld.

23            THE COURT:  Hartfelt?

24            MR. KLARFELD:  Klarfeld, yes.

25            MR. MORIARTY:  Matthew Moriarty for Ameridose.
```

```
1              THE COURT:  Okay.  The bankruptcy group.
2              MR. ELLIS:  Which is not me, your Honor.  Fredric
3    Ellis for the plaintiffs.
4              MR. GOTTFRIED:  Michael Gottfried for the trustee,
5    Paul Moore.
6              MR. COREN:  Mike Coren for the official creditor's
7    committee.
8              MS. TAYLOR:  Kiersten Taylor, your Honor, counsel for
9    the official creditor's committee.
10             (Automated telephone disruption.)
11             THE COURT:  They got us.
12             MR. BUSCH:  Your Honor, Steven Busch for the
13   defendant Insight Health Corp., and I do have a few comments
14   during the status conference today.  Thank you.
15             THE COURT:  Okay.  There you are.  Mr. Rehnquist.
16   And Mr. --
17             MR. BRACERAS:  Braceras.
18             THE COURT:  Okay.  That's it, right?
19             Let me go through the agenda as you have presented
20   it, and that means Ms. Johnson goes first, right?
21             MS. JOHNSON:  Mr. Sobol.
22             THE COURT:  Mr. Sobol goes first.
23             MR. SOBOL:  Ms. Johnson will handle most of the
24   matters this afternoon, but I'll handle this one, I think.
25             THE COURT:  By the way, in case any of you -- those
```

```
1    of you who were here yesterday are interested, the jury was

2    sent out again, as you heard yesterday.  They came back this

3    morning after a while and said they were hung.  Then we sent

4    them out again on an *Allen* charge and then they came back with

5    a note telling me that they were irrevocably unable to decide,

6    despite the law that I gave them again and the evidence, and

7    they signed it, "The jury," and each individual jurors signed

8    the note.

9              (Laughter.)

10             THE COURT:  There was no doubt.  Okay.

11             So, carry on, Mr. Sobol.

12             MR. SOBOL:  Thank you very much, your Honor.

13             Agenda Item A(1), The status of the settlement.  It's

14   obviously clear.  You can tell by the agenda itself, there's a

15   deadline for objection and there's a date for evidentiary

16   hearing before Judge Boroff in the middle of July.

17             I think what's important to bring to your attention

18   is what's that about and what it's not about so that you can

19   put it in context for the rest of what else is before you.

20             So, the proposed settlement that is the subject of

21   that motion relates to NECC, to certain entities owned and

22   controlled by the individuals who own and control NECC, and

23   with the so-called "insiders," several of the individuals who

24   own and controlled NECC.

25             That proposed settlement does not involve any other
```

1    parties.  It also does not involve at this stage an additional

2    related party, Ameridose.  You may recall, there were two

3    companies undertaking activities to provide pharmaceutical

4    products or compounded products, New England Compounding

5    Company and then a related company, Ameridose.

6           At this stage there is no proposed settlement with

7    Ameridose and, as far as I know, no one is in the position of

8    making any representations to you or to Judge Boroff about

9    whether there will be an Ameridose settlement and if so, when.

10          THE COURT:  Why is that?

11          MR. SOBOL:  I'm not in a position to get into that in

12   open court, your Honor.

13          I guess I should add -- I don't guess.  I should add

14   that the proposed settlement does involve one of the insurers

15   for NECC and the individuals who own or controlled NECC.

16   That's by way of status there.

17          THE COURT:  Well, is there a next step in the

18   bankruptcy court with respect to Ameridose?

19          MR. SOBOL:  There is not.  At this point my

20   understanding is that Ameridose is not a bankrupt entity.  It

21   is a separate -- according at least to Ameridose and some of

22   the individuals, they contend that Ameridose is a separate

23   legal entity.  There are claims that are pending in this Court

24   against Ameridose.  There are two declaratory judgment actions

25   brought by the insurers of Ameridose pending before Judge

1    Saylor.

2            And so, later on in the agenda -- and the reason that

3    I, obviously, identified this carve-out is that I plan on

4    making yet another pitch, if you will, that we commerce

5    discovery with respect to the case as a whole, including

6    discovery that may implicate some of the people or parties

7    that are a part of the proposed settlement because there's a

8    need to move forward with the litigation with respect to other

9    parties, not with respect to them.  That's why I addressed the

10   carve-out there.

11           I will say that in terms of the settlement itself,

12   though, with NECC and the individuals and the other related

13   entities, that seems to be moving along as a matter of course.

14   Judge Boroff has issued -- has approved notice.  Notice has

15   been going out.  People are preparing for receiving

16   objections, if any, and going forward with the hearing in the

17   middle of July.  If that proceeds according to the plan,

18   there'll also be some requests made by way of motion to you to

19   augment that, as we previously have indicated in the papers

20   before you.  So, the balance of it is moving ahead according

21   to plan.

22           THE COURT:  Thank you.  Now we turn to the status of

23   mediation.

24           MS. JOHNSON:  Yes, your Honor.

25           As we reported to you last time, there is a proposed

1    settlement with ARL.  That is well in the works and on its way

2    to being fully papered.  I understand there may be a couple of

3    nuances, but that is substantially complete.

4         Liberty, who is another one of the, what we call,

5    national defendants -- this was the defendant that built the

6    clean room -- had been mediating.  Liberty has recently filed

7    its notice to opt out of mediation.  Meaning, liberty will no

8    longer be mediating its claims and, therefore, the plaintiffs'

9    steering committee will be litigating against Liberty.

10        We are considering what our next steps will be in

11   that direction, your Honor, but want to make sure that you're

12   aware that they've now shifted from the mediation to

13   litigation camp.

14        As to Victory, mediation discussions are ongoing.

15   Same for Inspira and the Florida clinics.

16        THE COURT:  And the status of the insurance

17   declaratory actions is that they're going on?

18        MS. JOHNSON:  They're going on.

19        I will bring to your attention, your Honor, that

20   there is a hearing on the plaintiffs' steering committee's

21   motion to intervene as well as, I believe, a motion to stay in

22   that action that is set for June 24th between Judge Saylor.

23        THE COURT:  Who is seeking a stay?

24        MS. JOHNSON:  The -- Ameridose and the insurers, I

25   believe.  At least one of the insurers, if not both, your

1    Honor.

2          One of the discussions there that Judge Saylor will

3    be hearing has to do with whether there will be some discovery

4    taken in the MDL and how discovery in the MDL may or may not

5    be related to discovery that is done in insurance declaratory

6    judgment actions.

7          There are two additional...

8          (Discussion off the record.)

9          MS. JOHNSON:  I apologize.  I've been corrected by

10   Ms. Martin, who is another plaintiffs' steering committee

11   member, who tells me that the insurers have not moved to stay

12   the case.  The insurers want to proceed.  It is only Ameridose

13   and the individuals who are participating in that action that

14   have asked for stay.

15         There are two other insurance declaratory judgment

16   actions.  One involves ARL.  That will be resolved as part of

17   the ARL settlement.

18         And, finally, there's an insurance declaratory

19   judgment action that's filed by Star, who is the insurer for

20   Michigan Pain Specialists.  There's an awful lot of plaintiffs

21   with claims against Michigan Pain Specialists.  The

22   plaintiffs' steering committee is considering whether to

23   intervene in that action, but we may.

24         THE COURT:  So, that's it?

25         MS. JOHNSON:  That's it, your Honor, yes.

1          THE COURT:  Now, with respect to discovery, I gather

2     that Judge Boal has mostly taken care of that, right?

3          MS. JOHNSON:  I believe that that's largely true,

4     your Honor, yes.  There are a couple of --

5          THE COURT:  Is there anything you want me to do with

6     respect to that?

7          MS. JOHNSON:  Yes.

8          THE COURT:  What?

9          MS. JOHNSON:  Mr. Sobol would like to address, but

10    then would like you to agree with him, that discovery as to

11    the affiliated defendants should be open.

12          The other thing I would bring to your attention...

13          (Discussion off the record.)

14          MS. JOHNSON:  And there's one brief subject related

15    to the Tennessee issues that Mr. Gastel would like to address.

16          MR. GASTEL:  As your Honor will recall -- this is Ben

17    Gastel, by the way, on behalf of plaintiffs' steering

18    committee.

19          Your Honor will recall, you referred this matter to

20    Judge Boal.  In the last couple of days the various Tennessee

21    defendants have filed a motion to supplement the briefing on

22    the discovery plan and trial plan that you have referred to

23    Judge Boal seeking 25 pages of additional briefing.

24          This issue has been pretty well-briefed in the past.

25    I went through the docket this morning and found that there

1    are 307 pages on file on this issue already and --

2              THE COURT:  You mean briefs?  375 pages of briefs?

3              MR. GASTEL:  There are over 300 pages of briefing on

4    this matter already, your Honor.

5              We do not necessarily oppose supplemental briefing,

6    but we think 25 pages might be a little bit too much, given

7    this stage of briefing on this matter and --

8              THE COURT:  This is an issue before Judge Boal?

9              MR. GASTEL:  Yes, your Honor.  Although I think that

10   there's going to have to be a ruling on the supplemental

11   briefing prior to us meeting with Judge Boal and this is

12   really our only opportunity to bring it up, which is why I

13   bring it up now, on whether or not your Honor or Judge Boal

14   would like 25 pages of additional briefing on this matter.

15             MS. GREER:  Your Honor --

16             THE COURT:  Well, it's not clear to me why I should

17   rule on it if the matter is before her.

18             MR. GASTEL:  That's a fair point, your Honor.

19             THE COURT:  So, I will not and, therefore, I don't

20   need to hear you.  If she has any objection to 25 more, then

21   she'll deal with it.

22             MR. GASTEL:  Thank you, your Honor.

23             THE COURT:  Thank you.

24             Now, Mr. Sobol.

25             MR. SOBOL:  Thank you, your Honor.

 1           To put in context my position with respect to

 2   discovery, I think it's probably important for us first to

 3   identify who is actively litigating the cases.  So, I've

 4   already identified the issue of Ameridose.

 5           Discovery with respect to Ameridose and the

 6   individual insiders is stayed, but there is a case that cannot

 7   be represented to you right now is settled or is about to be

 8   settled or when it's going to be settled.  So, we have

 9   Ameridose.  Also, there is in front of Judge Saylor, of

10   course, the two declaratory judgment actions with respect to

11   Ameridose.

12           There's active litigation with respect to Saint

13   Thomas, as you know, with respect to the New Jersey clinics.

14   Liberty has opted out of mediation and will be litigating.

15           I'm not going to -- I'm going to allow counsel for

16   UniFirst to address the status of where UniFirst is or is not

17   in terms of litigating or other, but because there are active

18   litigations with respect to all of those entities, number one,

19   and because, number two, the clock is ticking with respect to

20   putting money into this pot -- you know, Judge Boroff has a

21   hearing in the middle of July -- if there's going to be money

22   around to be put into the pot this summer.  If not, you know,

23   earlier in the summer.  My hands are tied.

24           So, now I'm addressing, really, on Page 3, 8(b) at

25   the bottom of the page.  The plaintiffs' motion to partially

1    lift discovery stay against the affiliated defendants.

2           So, my position with respect to that motion has been

3    on the docket for many, many months now.  Judge Saylor has

4    shot me down with respect to it.  You've done the same.  It's

5    completely within both of your discretion to do it, but at

6    this point what I'm suggesting quite strongly is enough time

7    has now gone by.  There is a need to make sure that we have

8    all the documents from the individuals and from Ameridose.  We

9    need to make sure that we have also formal discovery with

10   respect to NECC.  I'd like to be able to make sure that we are

11   available to come to take discovery here so that we can also

12   indicate to Judge Saylor that you're permitting discovery to

13   go forward so that there's no reason for Ameridose and the

14   individuals who run Ameridose to drag their heels with respect

15   to those two declaratory judgment actions, and I'd like to be

16   able to do all this this summer so that if any of these

17   parties or the other parties that I mentioned have any reason

18   to put money into this pot, be in a position to be able to do

19   so.

20          I recognize completely the defense's argument in this

21   regard, which they have made many times.  The first time

22   around when I filed this motion last -- I think it was in the

23   early fall or thereabouts when I was pressing this, the

24   position was, Well, Mr. Sobol and others, let's wait to see

25   whether or not we have an agreement in principle with the

```
1    individuals.  Let's spend our time and energy there.  I fought
2    it.  They won.  Fair enough.  They waited until there was an
3    agreement in principle.  Then I came back --
4              THE COURT:  In agreement in principle as to what?
5              MR. SOBOL:  The NECC and the insider group were
6    indicating don't take discovery with respect to us until we
7    have an agreement -- to see whether or not we can work out an
8    agreement in principle.  Even though there would be the need
9    for taking discovery against them, anyway, being that we had
10   an agreement, we waited.
11             Then after we got the principle in agreement
12   principle, their position was, Well, now that we have the
13   agreement in principle, let's wait until we undertake the
14   settlement agreement.
15             I objected to that.  It's always easier to act just
16   like Congress and push the ball down the court a little bit
17   further.  And so, we waited for that.
18             Now we have an agreement written.  Then the position
19   was, Well, now that we have a settlement agreement that's
20   written, let's wait for Judge Boroff to see whether or not
21   he'll endorse it or not in the middle of July.
22             I said, Well, can't we at least start some things
23   going and send out requests for productions and start
24   negotiating those?  And I was shot down with respect to that.
25             So, I would suggest that now, finally, the time has
```

1   come, that everything is shaking out in terms of where we're

2   going to need to litigate or not and I need to be in the

3   position to make one final push with respect to discovery

4   against these entities and everybody else that is out there to

5   see if I can put any more money in this pot or whether the

6   remaining defendants will be the usual MDL, and that's our

7   position with respect to that.  Thank you.

8           THE COURT:  Yes, Mr. Gottfried.

9           MR. GOTTFRIED:  Thank you, your Honor.

10          The trustee's position has been and continues to be

11   that lifting the discovery stay is premature.

12          THE COURT:  When will it be mature?

13          MR. GOTTFRIED:  Well, I think the appropriate time to

14   take this up is after Judge Boroff has either approved the

15   settlement or not approved the settlement.  We filed --

16          THE COURT:  So, if I were to end the stay effective

17   July 25th?

18          MR. GOTTFRIED:  Well, let me explain for one second.

19          I had filed a plaintiff support agreement and the

20   settlement agreements with this Court and, as you may be

21   aware, they require the trustee within ten days of the

22   bankruptcy court approving the settlement to file a motion,

23   which was characterized in the settlement documents as MDL

24   stay motion, and I think the context of that motion -- which

25   addresses what the scope of discovery would be, certainly what

```
1    the parties have agreed to present to your Honor as to what

2    the scope of discovery should be and how it could go forward

3    is that point in time.

4          So, I think the answer to Mr. Sobol is it's

5    premature.  We're going to be coming back here in August.  At

6    that point Judge Boroff will have filed his -- made his

7    decision, presumably.  Hopefully, he'll approve it.  The

8    trustee will have filed his motion, as required under the

9    settlement documents.  The parties will have an opportunity to

10   respond to that, and then the issue will be fully ripe for the

11   Court at the August status conference.  So, I think the stay

12   should remain in place.

13         THE COURT:  Will you come to this Court on April 4th

14   or thereafter -- ten days, you said, right?

15         MR. GOTTFRIED:  Yes, it's filed in this Court.

16         THE COURT:  But the bankruptcy court will act by July

17   24th?

18         MR. GOTTFRIED:  I don't know when Judge Boroff -- but

19   the hearing is on July 14th.

20         THE COURT:  July 14th.

21         MR. GOTTFRIED:  Yes.  So, within ten days of him

22   entering an order on the settlement.  It could be July 14th,

23   but ten days after an order enters approving the settlement,

24   we are obligated to file this MDL stay motion, which will

25   specifically comply with the parameters of the parties'
```

1    settlement agreement, which, by the way, the PSC has signed

2    onto to support this agreement, and in that context we think,

3    with the oppositions, if any, to that motion, that's the

4    proper time for the Court to --

5         THE COURT:  Does the agreement call for a motion that

6    defines the parameters of discovery at that stage?

7         MR. GOTTFRIED:  It sets some parameters for it, yes.

8         THE COURT:  Is there any reason why the parties

9    cannot now work out some of the parameters so that an order

10   can enter in accordance with the agreement as soon as the

11   agreement is signed or the den days after that?

12        MR. GOTTFRIED:  Certainly the parties could have

13   those discussions.

14        THE COURT:  Any reason why that can't be done, Mr.

15   Sobol?  So you're all already to go.

16        MR. SOBOL:  We already have -- the order that is

17   contemplated to be presented to you opens the door for

18   discovery.  That's the only parameter.  And there's no

19   agreement right now that it can't be lifted earlier.

20        So, the only parameters is that -- what the proposed

21   order is is that you allow -- make sure that you allow

22   discovery to go forward.  The only thing that you would stay

23   would be dispositive motions against NECC and the insiders who

24   are contributing money.

25        So, put differently, eventually ten days after the --

| | |
|---|---|
| 1 | Judge Boroff orders, we're going to be before you with an |
| 2 | agreed motion to open discovery.  That's what the parties are |
| 3 | going to come to you with, an agreed motion to -- |
| 4 | THE COURT:  Well, why isn't that the way to do it? |
| 5 | MR. SOBOL:  Because there's no reason for us to wait |
| 6 | now.  There hasn't been.  There's been no agreement in place |
| 7 | that we should be waiting and I want to -- |
| 8 | THE COURT:  The agreement that says you will do it at |
| 9 | a particular time, doesn't that imply that you won't do it at |
| 10 | another time? |
| 11 | MR. SOBOL:  No.  No.  Because they know that I've |
| 12 | been screaming and yelling about this for half a year, or |
| 13 | eight months.  No, there's no agreement whatsoever that there |
| 14 | is a stay of discovery now.  This motion has been pending and |
| 15 | we've been fighting over it ever since.  They want to drag |
| 16 | their heels and not do discovery.  I do. |
| 17 | I finally got them to say, well, once Judge Boroff |
| 18 | enters -- no matter what, you're going to agree that discovery |
| 19 | goes forward and I'll not move for summary judgment |
| 20 | indefinitely against these people, but that's it. |
| 21 | And if we wait until the middle of July, we don't |
| 22 | know what Judge Boroff will rule then.  He might want to have |
| 23 | an evidentiary hearing, which means it might be in September, |
| 24 | right.  And I'm still sitting around here now with these |
| 25 | victims two years, two years without having done any discovery |

1    at all against the people who, you know, caused these people

2    to get injured in the first place.  It will be two years

3    before I end up being able to get formal discovery from these

4    people.

5              THE COURT:  Anybody else who wants to speak to this?

6              MR. FERN:  Frederick Fern.

7              Though Mr. Sobol is correct there has been no formal

8    discovery, what he has not advised the Court of, there has

9    been -- every piece of informal discovery he has requested has

10   been complied with.  We have given him close to 45,000 pages

11   of documents and 22 different productions, encompassing about

12   7400 individual documents, which are -- 45,000 pages of

13   documents have been provided to him.

14             If the individuals have resolved this case by making

15   a major contribution to the compensation pool, if the NECC

16   insurers have resolved the case by making a major contribution

17   to the pool, what are we doing discovery for against the

18   individuals and the bankrupt NECC entities?

19             THE COURT:  I don't know.

20             MR. SOBOL:  Well, the reason --

21             THE COURT:  There must be a good reason.

22             MR. SOBOL:  There is a very good reason, because

23   there are other defendants that are out there and these are

24   the people that control the information.

25             And Mr. Fern is absolutely right.  There's been some

1  informal document discovery with respect to NECC, but nothing

2  with respect to Ameridose or MSM or the individuals, and by

3  the same time that I'm sitting here with no discovery against

4  Ameridose, the individuals and Ameridose are defending a

5  declaratory judgment action saying, Yeah, we're a separate

6  entity and, you know, making concessions to the insurer

7  declaratory judgment action that are against the interests of

8  my clients.

9          So, yeah, I have -- I'm not trying to get liability

10  against the Caddens, the Conigliaros, right.  They basically

11  have rolled over on that issue generally and putting their

12  money in, but they're the ones who have the information about

13  whether or not -- what they were doing with Saint Thomas, what

14  they were doing with Liberty, what they were doing with the

15  New Jersey clinics, what Ameridose's complicity is in this,

16  what they were doing with the Ohio clinics, what they were

17  doing with Maryland.  I'm supposed to sit around for two years

18  with no information from them at all about this.  It's not

19  acceptable.

20          THE COURT:  I'll look at it.

21          MR. SOBOL:  Thank you.

22          MR. MORIARTY:  Your Honor, I represent Ameridose.

23          And in many of the briefings, we have been the

24  spokespeople for a lot of the affiliated defendants and we are

25  in a different situation than the discussions that you just

1    heard and I believe if you will indulge me, you need to hear a

2    little bit about this.

3              THE COURT:  Go ahead.

4              MR. MORIARTY:  So, a year ago we collectively saw

5    somewhat of the probable direction of this litigation.  That's

6    limited asset case and settlements being the goal.  That's why

7    CMO6 exists.  That's why CMO6 has a stay that can only be

8    lifted upon a showing of good cause.  Now, legally --

9              THE COURT:  Who issued the stay?

10             MR. MORIARTY:  Judge Saylor issued the stay.

11             THE COURT:  Okay.

12             MR. MORIARTY:  And our brief points out the factors

13   that are required for them to prove, if they want to lift this

14   stay, what they have to show, and all they have come in with,

15   as well as the Tennessee defendants who have joined the PSC in

16   this effort, is sweeping generalizations that discovery is

17   inevitable and it's necessary, but they haven't met their

18   burden, and let me get into the facts of why they haven't met

19   their burden.

20             THE COURT:  Briefly, right?

21             MR. MORIARTY:  Absolutely, your Honor.

22             So, when you think about discovery, just like you

23   think about fishing, things should be targeted, not just

24   generally throw something in the water and see what you find.

25             If we look at the pleadings, the scientific articles

1   and the documents that are coming out of the FDA and CDC, they

2   all talk about two key facts.  One is that the main drug at

3   issue in this litigation is MPA.  And, number two, the company

4   that compounded MPA is NECC, not Ameridose, not GDC, not MSM.

5   That is a key, key factor, because Ameridose, if it didn't

6   make the drug, distribute the drug or store the drug,

7   immediately falls into this category of what we would call

8   commonly a peripheral defendant, and we all know from our work

9   in this business and when you start taking discovery from

10  peripheral defendants, the yield and the cost don't match up.

11  Costs a lot.  Yield is very low.

12          So, under these circumstances -- in a normal case you

13  might do this kind of discovery.  This is not a normal case.

14  It's still got a stay.  It has still has limited assets.  So,

15  you have to think harder about lifting the stay because it may

16  yield little for the cost involved.

17          The goal is still settlements, and they haven't shown

18  at all how discovery against Ameridose furthers their claims

19  in the case or furthers the Tennessee defendants' or the New

20  Jersey defendants' defenses.

21          I sat here in this courtroom yesterday and watched

22  all the arguments by the New Jersey and Tennessee defendants.

23  There were a couple of things that came out of that that are

24  instructive for all of us.

25          One is, if those motions are granted, those people

1    won't even be around and one of the main reasons to do

2    discovery is gone.

3         The other thing is we don't even know who the

4    defendants are, what these claims are.  So, there's another

5    reason not to jump right into discovery.

6         THE COURT:  How will you find it out?

7         MR. MORIARTY:  Well, first of all, your Honor is

8    going to have to rule on all those Tennessee motions.  That's

9    one thing.

10        But the other thing is this.  Let's assume that the

11   Tennessee and New Jersey motions are all denied.  Not one

12   single deposition has taken place in any of those cases.

13   Doesn't it make a lot more sense, instead of lifting a stay

14   and doing helter skelter discovery that's going to cost a lot

15   of money against peripheral defendants, doesn't it make more

16   sense to see what develops in Tennessee or New Jersey in

17   depositions, in document production, as those theories develop

18   and then decide whether discovery against people who didn't

19   make, distribute or store the drug makes any sense whatsoever.

20        We have time, your Honor, and I know Mr. Sobol has

21   been patient.  He's also been urging that this be done for

22   many months, but that doesn't make his arguments today any

23   more compelling.  There are still excellent reasons why

24   discovery should not start against affiliated defendants and,

25   quite frankly, this system, as CMO6 was designed, it has

1    worked very well and if it isn't broke, there's no reason to

2    fix it right now.

3              THE COURT:  Thank you.

4              Somebody in the back wanted to speak.

5              MR. HERMES:  Your Honor, my name is Peter Hermes and

6    I represent Liberty Industries.  I've heard Mr. Sobol

7    mention --

8              THE COURT:  Why don't you sit down there.  Is there a

9    chair for you?

10             MR. HERMES:  There is not, your Honor, unless

11   somebody gives me a chair.  Thank you, sir.

12             Mr. Sobol and Ms. Parker have mentioned that the --

13             THE COURT:  I'm sorry.  Tell me again who you are.

14             MR. HERMES:  Liberty Industries, your Honor.  Liberty

15   Manufacturers is alleged to have manufactured the clean room

16   in which the MPA was compounded.

17             THE COURT:  Oh, yes.  And your name?

18             MR. HERMES:  Peter Hermes, H-e-r-m-e-s.

19             THE COURT:  Okay.  Got it.

20             MR. HERMES:  Liberty last saw that clean room, your

21   Honor, in 2006 and it was certified every six months

22   thereafter by NECC to be operating properly.

23             Liberty is a defendant in a declaratory judgment

24   action in Connecticut by the sole insurer who is paying for

25   its defense.  I am not handling that case.  I can tell you

1   that the insurance policy has an installation exclusion, a

2   fungi exclusion and an organic pathogen exclusion.

3          The course of that action in the Federal District

4   Court in Connecticut may result in a declaration in relatively

5   short order that there is no insurance coverage.

6          In the interim period, my task, because the mediation

7   was unsuccessful, is to attempt to defend Liberty, which means

8   to obtain that information which supports its defenses, and

9   among the affiliated defendants, there are individuals who ran

10  NECC, who have knowledge of what went on there, and in several

11  of the states, your Honor, unlike Massachusetts where we have

12  joint and several liability, the states in which actions have

13  been commenced against my client in particular, Indiana and

14  Florida, there is several liability, and Liberty has the right

15  to put before the jury a non-party for a determination of the

16  percentage of that party's liability and reduction of

17  Liberty's responsibility.

18         That is why I am on a short-time leash to get

19  discovery with respect to those parties in order to defend my

20  client before it finds itself with no money to pay for the

21  defense and no insurance should the declaratory judgment be

22  determined adversely to us.

23         THE COURT:  So, you're with Mr. Sobol?

24         MR. HERMES:  Well --

25         MR. SOBOL:  In an odd way.

```
1              THE COURT:  In an odd way.

2              MR. HERMES:  It is perhaps the only time we will

3     speak in support of the same motion.  However, the discovery

4     that I am seeking --

5              THE COURT:  I hope not.

6              MR. HERMES:  -- or will be seeking will be broader

7     than that and not have the limitations that I understand is in

8     the committee's motion.

9              My client will come before this Court shortly, your

10    Honor, to seek a scheduling conference.  My client, if your

11    Honor doesn't rule on this motion, will file its own motion to

12    open up discovery.  My client is -- this is -- my client is --

13    it's called a national defendant.  What a national defendant

14    in this context means is a peripheral company that is owned by

15    two individuals that has very limited assets.  This is a

16    death-of-the-company case for my client.  I need to move

17    forward because we were unable to have a success at the

18    mediation and, in fact, it may be that my client is headed

19    straight to the bankruptcy court.

20             Imagine, your Honor, what will happen if there is a

21    bankruptcy in Connecticut and the stay in that court, how it

22    affects these proceedings, particularly if my client should

23    happen, for instance, to oppose settlements or file other

24    motions here.  My client needs to go forward, your Honor.

25             THE COURT:  Thank you.  Okay.  Do you want to be
```

1    heard on discovery?

2           MR. COREN:  Yes, your Honor.  Michael Coren on behalf

3    of the official creditor's committee.

4           Your Honor, we're sort of -- have a middle-of-the-

5    road position and it very much seems to be -- maybe the Court

6    will -- your suggestion earlier that we --

7           THE COURT:  Excuse me for interrupting.

8           Is this an issue I should decide or that Judge Boal

9    should decide?

10          MR. COREN:  Well, that's my point.  I think this is

11   an issue that we need to take some direction from Judge Boal

12   who has --

13          THE COURT:  Well, in that case, why are you arguing

14   here it here?

15          MR. COREN:  Excuse me.  I meant to say Judge Boroff.

16   I get the B's confused, your Honor.

17          I think this is some -- we need to take some

18   direction at this time from Judge Boroff on the settlement

19   with the insiders, which we have scheduled for the 14th at the

20   hearing.  I think if we put this off for a month, we'll have

21   much more clarity.  I hate to ask for another month because

22   I'm very sympathetic to what Mr. Sobol is saying because I

23   represent a -- you know, a person who died in Maryland from

24   it.  So, I understand what it means, sir, to have someone have

25   a death-knell case and want to get going forward.

1          Having said that, in my creditor's committee hat, I

2     need to take a look at what it's going to take to get the

3     settlement approved in an orderly fashion by Judge Boroff.

4     So, I ask that we put this decision off for the next cycle and

5     come back to you once we understand where Judge Boroff is

6     going.

7          THE COURT:  There is one other person who wishes to

8     be heard?  You wish to be heard?  Behind you.  Somebody has

9     been lifted from his chair and now it has become --

10          MR. COREN:  Musical chairs.

11          MR. DAILEY:  Your Honor, William Dailey.  I represent

12     the so-called insiders, the members of the Conigliaro family,

13     Barry Cadden and Glenn Chin.

14          As Mr. Gottfried mentioned, parameters have been

15     established here.  The people I am representing have

16     contributed mightily to the settlement from their personal

17     funds, perhaps amounts that none of us have ever seen before

18     contributed personally to the resolution of a civil case.

19          It is our hope -- and we had relied on this -- that,

20     as Mr. Gottfried mentioned, certain parameters have been set

21     out, certain things were going to happen in order, and we

22     would hope that that plan would stay in place, whether it's

23     for a month or whether it's for two months.

24          As Mr. Fern has indicated, 45,000 documents have been

25     produced by the folks that I represent or their company, and

1   to think that no activity has occurred is just not right.  We

2   would hope that the Court would respect what people have done

3   as part of the settlement agreement and let it stay in place.

4            THE COURT:  Okay.  Thank you.

5            MR. GOTTFRIED:  One more thing, if I could.

6            THE COURT:  That is the last.

7            MR. GOTTFRIED:  The agenda itself, Item 4(a),

8   indicates that documents NECC produced to PSC informally are

9   now available in the document repository to those parties who

10  have requested and paid for access or are otherwise in the

11  process of being produced to requesting defendants.  So,

12  discovery is ongoing, as Mr. Fern outlined.  People can get

13  the discovery.

14           When you go and look at this, I urge you to look, for

15  example, at the plan support agreements, Section 3.2 stay of

16  MDL proceedings, and that defines the parameters that were

17  just described to the Court that we would be seeking in our

18  motion to stay after Judge Boroff, hopefully, approves the

19  settlement.

20           You've heard lots of different perspectives on what

21  discovery should go forward and what shouldn't, and I think

22  having the motion filed by the trustee ten days after the

23  settlement is approved and getting the various oppositions to

24  that is the best time for you to have all the issues in front

25  of you and all the perspectives and then make a decision.

1          So, I don't think -- where discovery is available to

2     folks right now, as the agenda indicates, that asking that

3     this be stayed until Judge Boroff acts, the trustee does what

4     he's committed to do under the proposed settlement, I think

5     that's the time to deal with it.

6          THE COURT:  I had not intended to spend the afternoon

7     on discovery.  Judge Boal has it because I hate it.

8          So, in any event, I will deal with it.  I will talk

9     with Judge Boal about it, and we will make a decision one way

10    or the other, either to wait until June 14th and the ten days

11    thereafter, assuming that Judge Boroff will act quickly on the

12    settlement, or we will make another order, but something will

13    happen, and I thank you all for your good arguments.

14         Now, we go on to five.  We've really covered the --

15    Mr. Dailey, I think you're being evicted.

16         MS. JOHNSON:  Turning to the status of the litigation

17    track order, which is No. 5.  There are really two things

18    there to address.

19         THE COURT:  Let me ask you about the first one, King

20    against -- there is a motion to dismiss or the motion to

21    withdraw.

22         As I understood it, counsel wanted to withdraw on the

23    grounds that she could not ethically continue in the case.  Is

24    that not correct?

25         MS. JOHNSON:  I believe that is correct, your Honor.

```
 1              THE COURT:  Is there a duty about --
 2              MR. SMALLEY:  Your Honor, I am on the phone.  I'm
 3     sorry for interrupting.  This is Bernard Smalley from the
 4     Tucker Law Group.
 5              THE COURT:  I'm sorry.  You're not in the courtroom?
 6              MR. SMALLEY:  No, I am not, your Honor.  I have filed
 7     a motion for leave to argue the motion telephonically.
 8              THE COURT:  Okay.  And what is your name, again,
 9     please?
10              MR. SMALLEY:  My name, your Honor, is Bernard
11     Smalley.
12              THE COURT:  Mr. Smalley?
13              MR. SMALLEY:  Yes, Smalley S-m-a-l-l-e-y.
14              THE COURT:  Okay.  And whom do you represent?
15              MR. SMALLEY:  I represent Ms. King.  And given the
16     nature of the motion that's requested, I have also asked that
17     Ms. King be present, also telephonically on the phone this
18     afternoon, with your Honor's permission.
19              THE COURT:  Let me ask counsel who are here and who
20     understand the situation, is there any reason why this motion
21     should not be allowed if there is, indeed, an ethical issue?
22     Does anybody object to that?
23              MR. WALKO:  Your Honor, Matthew Walko on behalf of --
24              THE COURT:  Find a place to sit where there is a
25     microphone because Mr. Smalley can't hear you otherwise.
```

1          MR. SMALLEY:  Thank you, your Honor.  And Ms. King is

2     on the phone as well.

3          MS. KING:  I'm here, too.

4          THE COURT:  Okay.  So, we now have Mr. -- I'm sorry.

5          MR. WALKO:  Matthew Walko on behalf of Hahnemann

6     University Hospital and Tenet Health System Hahnemann LLC, the

7     defendants.

8          We have prepared an opposition to the motion to

9     withdraw, which you have before you, your Honor, and we do

10    oppose the motion.  It's our position that the facts upon

11    which the lawsuit was brought against our defendants are now

12    known to be false and that the matter should have been

13    voluntarily dismissed as a matter of ethics and that the --

14    that there is no true conflict because the plaintiff's client

15    admits that she did not get steroids that were sold by the

16    NECC defendants.

17         MS. KING:  I --

18         THE COURT:  Hold it.  Ms. King, hold it.  You are not

19    allowed to speak right now.

20         MS. KING:  I'm sorry.

21         THE COURT:  You still have a lawyer and we have the

22    lawyers speaking for their clients.

23         If that's the case and the lawyer needs to get out,

24    should not the lawyer -- are you saying that the lawyer was in

25    cahoots with Ms. King in this?

1          MR. WALKO:  I do not know -- I do not make an

2    assertion as to what was known prior to filing suit, but based

3    upon the admitted pleadings before the Court and the motion to

4    withdraw itself, it appears very plain that plaintiff's

5    counsel now knows that these two defendants did not get any of

6    the tainted steroids.

7          THE COURT:  So, why under those circumstances should

8    I deny counsel's request to get out from the case?  I mean,

9    especially if this is a fraudulent case, then doesn't she as

10   counsel have an obligation not to continue with it?

11         MR. WALKO:  Yes, your Honor, and we would argue that

12   the obligation is ethically to dismiss the case.

13         THE COURT:  Well, I don't have the facts on that.  I

14   know that you assert them, but at the moment all I have before

15   me is a motion to dismiss based on ethical considerations, and

16   if you're right, those ethical considerations are certainly

17   there.  I mean, unless you're saying that she was in concert

18   with her client in bringing an illegitimate lawsuit.

19         MR. WALKO:  We're not making that assertion, your

20   Honor.  There is another motion before the Court, which is the

21   motion for summary judgment.

22         THE COURT:  Well, that's a separate issue.

23         MR. WALKO:  Exactly.

24         THE COURT:  That's a separate issue.

25         Mr. Smalley, what is your position?  Mr. Smalley are

1   you there?

2          MR. SMALLEY:  Was that directed to me?

3          THE COURT:  Yes.  I'm asking you, what's your

4   position on this?

5          MR. SMALLEY:  My position is that we should be

6   allowed to withdraw.

7          THE COURT:  And is somebody coming in?

8          MR. SMALLEY:  As of this point, your Honor -- and Ms.

9   King is on the phone.  We have given her the opportunity to

10  get new counsel.  We originally advised her of our position

11  and the reasons for it.

12         And I did want to state for the record what the

13  timing was.  We had asked for certain limited discovery, which

14  local counsel here in Philadelphia, who represent Hahnehmann

15  Hospital here locally, provided us.  It is based upon that

16  after-acquired information, acquired after the lawsuit was

17  filed, that we then spoke with our client and thereafter filed

18  the motion to withdraw, after our client did not allow us

19  permission to dismiss the case, and that's the factual context

20  which brings us here today.

21         THE COURT:  Well, it seems to me that, first of all,

22  it's necessary for Ms. King to have a lawyer, especially under

23  these circumstances where there are charges of some kind of

24  fraud, and I would allow the motion to withdraw upon the

25  filing of an appearance by successor counsel.

1            MR. SMALLEY:  Well, I am not aware, your Honor, of an

2     allegation of fraud as part of --

3            THE COURT:  Well, it was just made.  Not on the part

4     of the lawyers.

5            MR. SMALLEY:  Okay.  And I don't believe there's been

6     an allegation of fraud on behalf of my now-client, Ms. King.

7            THE COURT:  Well, whatever there is, I'll think about

8     it and I'll make a ruling on it within the next day or so.

9            MR. SMALLEY:  Thank you, your Honor.

10            THE COURT:  Thank you.  Thank you, too.

11            MR. WALKO:  Thank you, your Honor.

12            The only other matter that's pending on this

13     particular -- on Ms. King's case is the motion for summary

14     judgment and the motions --

15            THE COURT:  That's not ripe, is it?

16            MR. WALKO:  There's motions just pending as to

17     whether there's going to be an extension of time for a

18     response and whether the Court is going to set a hearing on

19     that motion.

20            THE COURT:  Well, that we won't have to deal with in

21     connection with -- if counsel remains, then counsel will have

22     to respond to and I'll set a timeline.

23            MR. WALKO:  Thank you.

24            MR. SMALLEY:  It is our position, your Honor, that it

25     is not ripe at this time.

1          THE COURT:  I understand that you're in an awkward

2     position.  I'm trying to figure a way out.

3          MR. SMALLEY:  Thank you.

4          THE COURT:  Thank you.  Okay.  That takes care of A.

5          MS. JOHNSON:  Yes, your Honor.

6          Turning to B.  We wanted to identify to the Court the

7     motions to dismiss or other dispositive motions that we

8     believe would be ripe by the August status conference.

9          As a reminder to -- mostly to counsel on the phone,

10    there is no July status conference.  The next time we will see

11    your Honor is in August.

12         THE COURT:  Fairly early August.  I think we had set

13    a date for sometime around the 18th or 20th or something like

14    that.  I won't be able to do that.  I have to do it before

15    that.

16         MS. JOHNSON:  I'll share with the Court, if it's

17    helpful, in discussing with counsel for Saint Thomas, I -- we

18    realized together that the American Bar Association meeting is

19    actually in Boston.

20         THE COURT:  At the same time?

21         MS. JOHNSON:  Yes.

22         THE COURT:  All those fascinating panel discussions?

23         MS. JOHNSON:  Well, I believe that's the 7th and 8th

24    of August, your Honor.  So, there may be some efficiency if we

25    were able to schedule our status conference for that same week.

```
1              COURTROOM DEPUTY CLERK URSO:  We could do it on the
2    7th.
3              THE COURT:  What day of the week is that?
4              COURTROOM DEPUTY CLERK URSO:  The 7th is a Thursday,
5    Judge.
6              THE COURT:  Ms. Johnson, what is the day of the lunch
7    for the -- of the Commission of Women?
8              MS. GREER:  Your Honor, that is on a Sunday.
9              THE COURT:  It's not on a Sunday, is it?
10             MS. GREER:  There are two.  The National Conference
11   of Women's Bar Association is on the 8th.
12             THE COURT:  No.  The status of the -- the Commission
13   on the Status of Women within the Bar Association has a big
14   lunch at which they give some award.
15             MS. GREER:  The Mary Brent --
16             THE COURT:  Brent, Margaret Brent Award.
17             MS. GREER:  That is going to be on a Sunday, August
18   9th or 10th.
19             THE COURT:  So, it would not interfere with this.
20             MS. GREER:  No.
21             THE COURT:  My former colleague is being honored, so
22   I probably have to go.
23             MR. SOBOL:  You would like to go.
24             THE COURT:  Okay.  So, the 7th -- you want to do it
25   -- when can we do it?
```

1          COURTROOM DEPUTY CLERK URSO:  We can do August 7th,

2     at 2:30.

3          THE COURT:  Okay.  So, the next status conference

4     will be on August 7th, at 2:30, and I will not hear -- what?

5          COURTROOM DEPUTY CLERK URSO:  That's going to take up

6     the July 17th status and we're going to do August 7th, at

7     2:30.

8          THE COURT:  Right.

9          COURTROOM DEPUTY CLERK URSO:  Okay.

10         MS. JOHNSON:  I believe --

11         THE COURT:  I will try not to have a hung jury.

12         MS. JOHNSON:  I believe, your Honor, that would also

13    replace what they have scheduled for the August 14th status.

14         THE COURT:  Yes.  Moved from August 14th to August

15    7th and skip, as we had previously decided, July.

16         COURTROOM DEPUTY CLERK URSO:  Okay.

17         MS. JOHNSON:  Thank you, your Honor.

18         And we've given you there on 5b., a list of the

19    motions that we believe to be ripe for argument.

20         THE COURT:  Now, they all need argument?

21         MS. JOHNSON:  Not quite, your Honor.  Let me break it

22    down into groups for you.

23         So, there's a group of Ohio motions to dismiss that

24    involve some similar issues.  That would be Cincinnati Pain,

25    BKC, and the APAC motions.  Those are all Ohio motions.

```
 1            THE COURT:  They need to be heard, or not?

 2            MS. JOHNSON:  Yes, your Honor.

 3            THE COURT:  I'm sorry.  Item 2?

 4            MS. JOHNSON:  Item 2, 3, and then if you turn the

 5   page, 6.

 6            THE COURT:  BKC is the one that we just put off.

 7            MS. JOHNSON:  Correct, your Honor.  Then we have --

 8            MR. ABELN:  Your Honor, I'm sorry.  Anthony Abeln on

 9   behalf of Apex defendants.

10            Just a point of clarification.  Those are Illinois

11   defendants.  Cincinnati Pain Management and BKC, those are Ohio.

12            MS. JOHNSON:  I apologize.

13            THE COURT:  Apex is Illinois?

14            MR. ABELN:  Illinois.

15            THE COURT:  But you want argument, too?

16            MR. ABELN:  Correct.

17            MS. JOHNSON:  Then we have one Texas motion, your

18   Honor.  That would be No. 7, which is Dallas Back Pain.

19            Then also listed there, but which does not need

20   argument, would be No. 1, the Tennessee clinic defendants

21   motion on summary judgment.  I understand that we have

22   submitted our 56(d) and there's agreement that that should be

23   decided on the papers.

24            THE COURT:  So, only the 56(d) motion is to be

25   decided?
```

```
 1              MS. JOHNSON:  Yes, your Honor.
 2              THE COURT:  Not the summary judgment motion itself?
 3              MS. JOHNSON:  If you deny -- if you grant the 56(d),
 4    then we will take discovery.  If you deny the 56(d), then I
 5    believe the summary judgment motion -- we have asked for an
 6    opportunity to respond on the substance of that.
 7              THE COURT:  Okay.  Now, what about 4 and 5?
 8              MS. JOHNSON:  On 4, I believe it is technically
 9    correct that the UniFirst motion to dismiss will be fully
10    briefed by then.  I've not discussed with Mr. Braceras, and I
11    should have, whether that should be set for argument in
12    August.  I think the suggestion is that it not be and we
13    address that later.
14              MR. BRACERAS:  I think that's correct, your Honor.
15    We've been having productive talks with the PSC.
16              THE COURT:  Okay.  And Dr. Nitesh Bhagat.
17              MS. JOHNSON:  Yes, your Honor.  That should also be
18    set for argument.
19              THE COURT:  That should be set for argument?
20              MS. JOHNSON:  Yes, your Honor.
21              THE COURT:  So, that's it for that bunch.
22              Okay.  Appeals.
23              MS. JOHNSON:  Briefing is ongoing, your Honor.
24              THE COURT:  We have set the future status conference
25    for August 7th, at 2:30.  And the fully-briefed motions I
```

1    should just do, right?

2          MS. JOHNSON:  Your Honor, if I could.  Would it be

3    possible to schedule the September and October status

4    conferences?

5          THE COURT:  Sure.

6          COURTROOM DEPUTY CLERK URSO:  Any time you're looking

7    for, specific dates that I can see if I can accommodate?

8          MR. SOBOL:  We're doing Thursdays, right?  So, either

9    September 18 or September 25.

10          COURTROOM DEPUTY CLERK URSO:  I can do September two

11    five, at 2:30.

12          MR. FERN:  Your Honor, that's the first day of the

13    Jewish New Year holiday.  Thank you.

14          THE COURT:  Don't do it then.

15          Are you trying to mislead us, Mr. Sobol?

16          MR. SOBOL:  No.  I've got a Red Sox game that day.

17          MR. FERN:  I'm in a different pew that day, your

18    Honor.

19          (Laugher.)

20          COURTROOM DEPUTY CLERK URSO:  We can do September

21    18th, at 3:00.  Do you want to do that?

22          MR. SOBOL:  Yes.

23          COURTROOM DEPUTY CLERK URSO:  9/18.  Okay.

24          THE COURT:  And then in October?

25          COURTROOM DEPUTY CLERK URSO:  And then October, we

1    can do --

2           THE COURT:  We have some holidays then, too.

3           COURTROOM DEPUTY CLERK URSO:  Thanksgiving would be

4    -- no, it's not.  So, we can do the 16th.  We can do October

5    16th, at 2:00, or October 23rd, at 2:00.  That's both

6    Thursdays, either or.

7           MR. SOBOL:  16th is National Boss Day, your Honor.

8           THE COURT:  National Boss Day?  You'd rather be here,

9    would you?

10           MR. SOBOL:  I would.  Anywhere other than the office.

11           COURTROOM DEPUTY CLERK URSO:  All right.  So, do you

12    want to do 10/16, at 2:00?

13           MR. SOBOL:  Yes.

14           MR. KLARFELD:  That's actually the end of one of the

15    Jewish holidays.  Is it possible to --

16           COURTROOM DEPUTY CLERK URSO:  How about 10/23, at

17    2:00?  So, we're going 10/23 at 2:00, okay?

18           THE COURT:  That's probably the beginning of another.

19           MR. KLARFELD:  No.  That's the end.

20           THE COURT:  10/23, at 2:00, Lisa?

21           COURTROOM DEPUTY CLERK URSO:  Yes, Judge.

22           THE COURT:  Okay.

23           MS. JOHNSON:  Thank you, your Honor.

24           Turning then to fully-briefed motions.  No. 8 is to

25    be decided.  8(a) is to be decided on the papers.  8(b) Mr.

1    Sobol previously addressed.

2         THE COURT:  Let me talk about 8(a) for a moment.

3         As I understand it, the issue -- one of the issues

4    has to do with some reference to the bankruptcy court, and I

5    wonder why it would not be possible to allow the rest of the

6    motion subject to the trustee and the plaintiffs working out a

7    procedure for dealing with the settlement funds in the

8    bankruptcy case.

9         MR. SOBOL:  If I may, your Honor.  I want to make

10   sure we identify the issues and then I think I'll answer your

11   question.

12        So, one of the two fundamental issues in that motion

13   is at what point are funds segregated from contributions to be

14   set aside for a common-benefit fate.

15        A separate issue has been raised by the creditor's

16   committee as to whether or not they want to be entitled to

17   some money and have a shadow of the PSC or something like

18   that.  So, I'm not going to address the second of those two.

19        With respect to the first of those two issues, as a

20   practical matter, since we're this far down the road, I

21   think -- speaking candidly, I think that it almost makes

22   inevitable, at least as to the funds that are being made

23   available by NECC and the insiders, that those funds will

24   likely be set aside from a tort trust created as a part of the

25   bankruptcy plan.

```
 1          So, my earlier view that -- much early on that we
 2   should segregate the money before it even pours into the
 3   bankruptcy at all, but given the pendency of time, I think
 4   that's the way it should now go.  So, I think you're right.
 5   With respect to the first of those two issues, the PSC would
 6   work out with the -- with Mr. Moore and his office how -- an
 7   agreement about how that money should be set aside in the tort
 8   trust for those purposes.
 9          THE COURT:  Right.
10          MR. SOBOL:  The second of those two issues remains
11   under advisement with you and I won't address unless you would
12   like to.  So, the second issue on this issue being -- which,
13   again, has been raised by the creditor's committee, the
14   creditor's committee sees itself as wanting to have some -- a
15   ruling by you now that they have some entitlement to the
16   money, and the PSC's position being --
17          THE COURT:  Well, I don't think that has anything to
18   do with this particular issue.  I mean, the amount of money
19   that is being set aside under this motion, as I understand it,
20   is something like eight percent.
21          MR. SOBOL:  Correct.
22          THE COURT:  It is not a final determination that
23   eight percent will be used for these purposes.  It's simply a
24   set-aside with the final judgment to be made later so that it
25   ultimately becomes available.  So, I don't understand why
```

1    anybody should object to that.

2            And I understand that certain rules as to how this

3    was to be done and what needed to be done in order to be a

4    proper claimant for the eight percent, or whatever, has

5    already been made, and I would think that everybody who wants

6    to make a claim to this money will need to follow those rules.

7            MR. SOBOL:  That is the position of the PSC.  In

8    order words --

9            THE COURT:  Well, I don't know who objects to that.

10            MR. COREN:  Your Honor, Michael Coren, on behalf

11    creditor's committee.

12            Your Honor, in working out the different -- one,

13    we're not a shadow of PSC.  We're a statutory committee with

14    statutory obligations by Congress.  We have equal dignity to

15    the Article III PSC in terms of the issues that we have to

16    address.

17            There is overlap.  There are times that the lawyer

18    representatives of the committee members do work that is

19    common-benefit work and that should have the same, equal

20    consideration before the Court on that allocation.  If it's a

21    common benefit bestowed, it's a common benefit bestowed.

22            As I argued before, there is some overlap.  It's

23    unfortunately necessary, but there are obligations that the

24    committee has to do and that committee member is one of the

25    attorneys, such as myself or Anne Andrews, the other co-chair,

1    and many other committee members that were doing work and it

2    gives a common benefit.  It bestows a common benefit.

3           For example, the affidavit that was presented to you

4    yesterday in connection with that Premier rose out of

5    committee obligations.  That's why I was the affiant or the

6    declarant --

7           THE COURT:  I don't understand exactly what you want.

8           MR. COREN:  What it is, is that where we -- that our

9    time that bestows a common benefit gets equal consideration to

10   the PSC members.

11          The difference that we have between Mr. Sobol and the

12   committee is who assigns the committee members.  The committee

13   has a statutory obligation and the members of the committee

14   allocate who does what and, therefore, to the extent that we

15   are doing work consistent with the obligations that we have as

16   committee members, that is the assignment of the work and that

17   gets equal consideration.

18          THE COURT:  But -- I mean, this motion isn't asking

19   for a distribution of this fund.  It is simply asking for a

20   set-aside so that money will be available for distribution on

21   whatever basis is the appropriate basis to make such

22   distribution to counsel.

23          MR. COREN:  Yes, and I agree with you there.

24          There's a couple of wrinkles, though, in the PSC's

25   order where our time -- the common-benefit work by the

```
1    committee doesn't get considered unless Mr. Sobol is the one

2    who assigns it, and that infringes upon the statutory

3    committee's obligation to do its management and that's why we

4    object.

5              THE COURT:  I don't understand why that has to be

6    resolved now in connection with the set-aside and if there's

7    language in the order setting aside that says that, which I

8    didn't see, frankly, then maybe that should come out.  I mean,

9    the set-aside is simply to make sure the money is there.

10             I do think, however, to the extent that the

11   creditor's committee adds to the funds and does various things

12   that would entitle it ultimately to a recovery from that fund,

13   I think that they need to follow the already-existing order as

14   to the documentation of their claim.

15             MR. COREN:  In terms of time keeping, that's fine, as

16   long as we're able to do a catch-up, your Honor, and we would

17   ask for that leave.

18             MR. SOBOL:  If I may, your Honor.

19             THE COURT:  Well, the order as to how it's to be done

20   has been in existence for some long period of time, early

21   orders of Judge Saylor.

22             MR. COREN:  At a time where we were working -- where

23   we were working out how the two committees were going to work

24   together.  There was an operating agreement there and we feel

25   that -- what we're suggesting is that we do our own
```

1    assignments and submit the time.  It's consistent with the

2    agreement that was worked out with the PSC.  It's part of the

3    motion papers submitted to your Honor.

4              THE COURT:  Okay.  Well, it seems to me that it's

5    time to set aside, and to the extent that there are particular

6    funny little wrinkles, let me know within a week or two how

7    you want me to handle those, but I think they need to be

8    handled and I do believe that Judge Saylor's order made very

9    early in this litigation should probably cover the manner in

10   which ultimately distributions are done and the underlying

11   reason for getting distribution should be in accordance with

12   that order.

13             So, I am in general allowing the motion, which is

14   Docket No. 790.  I will not now sign an order until you

15   present one that you can all agree to.

16             MR. COREN:  Very well, your Honor.  Thank you.

17             THE COURT:  Okay.  Ms. Johnson, you're next.

18             MS. JOHNSON:  So, we've dealt with 8(a) and 8(b),

19   your Honor.

20             I think for today's purposes, there are a series of

21   motions that you heard yesterday.  We don't need to address

22   those, unless your Honor --

23             THE COURT:  And 8(a) we've already dealt with, too,

24   haven't we?

25             MS. JOHNSON:  Yes, that's correct.

```
1              And if we look at No. 10, on Page 5, we've
2     addressed the motion --
3              THE COURT:  Motion for extension of time and briefing
4     schedules, do I need to do anything about that?
5              MS. JOHNSON:  We would appreciate if you would allow
6     those motions to extend --
7              THE COURT:  All of them?
8              MS. JOHNSON:  Yes, your Honor.
9              THE COURT:  And are there specific dates?
10             MS. JOHNSON:  There are dates in those orders, yes.
11             THE COURT:  And nobody, I assume, will object.
12             MS. JOHNSON:  As far as I know, no one will.
13             THE COURT:  Okay.
14             MS. JOHNSON:  We've already addressed -- under 10(a)
15    we've already addressed the motion to withdraw as counsel for
16    Ms. King, which I think only leaves -- there are two motions
17    -- two matters that are related to Insight.  I don't know if
18    counsel for Insight wishes to address.
19             MR. BUSCH:  Thank you, your Honor.  Steve Busch,
20    representing Insight Health Corporation, and we tendered to
21    the Court a request for a supplemental order to effectuate a
22    transfer --
23             THE COURT:  Tell me what the problem is, because I
24    thought by making an order that the cases be transferred, that
25    was all I needed to do.
```

```
1          MR. BUSCH:  It was as to the cases that you listed,

2     which are the 20 cases that were in state court.  There are,

3     Judge, an additional ten cases that -- with 107 plaintiffs

4     that we would --

5          THE COURT:  Give me a list and I'll make a

6     supplemental order to that effect, if you haven't already done

7     it.

8          MR. BUSCH:  We provided a proposed order with that

9     list, your Honor.

10         THE COURT:  And nobody objects?

11         MR. BUSCH:  15 minutes, I guess, at 1:45 this

12    afternoon, Mr. Lichtenstein and Brent Brown, who represent 47

13    of the plaintiffs in three cases, Bell, Austin, Neal, filed an

14    objection.  I received an email from one of my colleagues.

15         As I read their objection, those are arguments that

16    were previously made in opposition to the trustee's motion,

17    with one exception.  They've taken exception to language that

18    your Honor included in the June 5th order that they read as

19    seeking injunctive relief.  We don't read it that way, and I

20    don't think that --

21         THE COURT:  No.  I specifically thought injunctive

22    relief was moot in light of the fact that the reason for the

23    injunction was that the parties thought there would be delay

24    in ordering the transfer and somehow plaintiff's counsel would

25    do something to muck it up.  So, when the transfer order came,
```

1    I figured there was no need for an injunction because there

2    was no longer any opportunity to muck it up.

3            MR. BUSCH:  Understood, Judge.

4            THE COURT:  Except there is now with respect to the

5    107, which I didn't know about.

6            MR. BUSCH:  Yes.  So, we would ask you to enter the

7    proposed order, with the list of ten additional cases to be

8    transferred.  Those are in process, but in order to get all of

9    the Virginia cases before your Honor at one time, we think it

10   would be helpful to --

11           THE COURT:  Are they all pending in the city, county

12   court of Roanoke or whatever it's called?

13           MR. BUSCH:  No, Judge.  These ten cases were filed in

14   Roanoke.  They were removed by Ameridose under its related-to

15   jurisdiction, but your memorandum decision of May 15th found

16   related-to jurisdiction based upon Insight Health Corp's proof

17   of claim and the plaintiff's proof of claim and, therefore, in

18   fact nine of these ten cases were on Mr. Gottfried's, the

19   trustee's, list of cases initially to be transferred, and

20   there was confusion with regard to the cases that ended up

21   attached to your June 5th order, and this is a way to clean it

22   up.

23           THE COURT:  But you've given me an order to sign now

24   that correctly identifies the cases and the court?

25           MR. BUSCH:  That is correct, your Honor, and that

```
1    proposed order is -- I'm sorry.  I think I've got it right in
2    front of me, Judge.
3              THE COURT:  I have Docket No. 1149.
4              MR. SOBOL:  If I may, your Honor.
5              MR. BUSCH:  There was a joinder and, your Honor, yes,
6    it's -- the actual proposed order for the additional cases to
7    be transferred is Docket No. 1193-6, and there was a joint
8    joinder that was filed in support of this motion, supplemental
9    transfer order and --
10             THE COURT:  Adding more?
11             MR. BUSCH:  No.  No.  The joint joinder was by the
12   trustee's counsel and counsel for the unsecured creditor
13   committee.  So they joined in the request for the supplemental
14   transfer order, Judge.
15             THE COURT:  Okay.
16             MR. SOBOL:  If I may, your Honor.
17             Just to make sure that various counsel in Virginia
18   have an opportunity to respond, what I would suggest is that
19   if you were to order any response by any interested party be
20   filed by the close of business on Monday to 1193-6, that will
21   provide people an opportunity to make sure that you have
22   whatever is they have to say before this order gets entered,
23   to make sure nothing improperly occurs and then --
24             THE COURT:  Okay.  I'll decide it after Monday.
25             MR. SOBOL:  Thank you.
```

1          MR. BUSCH:  Judge Zobel, we have no additional

2    comments to offer in light of your comments with regard to the

3    emergency motion with regard -- you previously said you would

4    pass on that.  Thank you.

5          THE COURT:  Thank you.

6          The emergency motion is moot, isn't it?

7          MR. BUSCH:  It may be moot, your Honor.  Those cases

8    have -- the case files have not yet been transferred from

9    Roanoke, Virginia.

10         THE COURT:  They're still there?

11         MR. BUSCH:  They're still there.

12         MR. SOBOL:  We may have constitutional --

13         THE COURT:  You want me to send the marshal?

14         MR. BUSCH:  Your Honor, I think it will all get

15   worked out.

16         THE COURT:  Thank you.

17         MR. MORIARTY:  Your Honor, just speaking for

18   Ameridose, we're the ones who removed the ten cases.  There

19   are only nine left, and the reason is that between your orders

20   and a decision by the JPML in the Chance Baker case, pretty

21   much every argument that the Virginia plaintiffs have made to

22   oppose the transfer here have been rejected either by you or

23   the JPML.

24         THE COURT:  I thought they were --

25         MR. MORIARTY:  So, the Chance Baker case is already

1    here, leaving nine cases left, which include the Bell, Austin,

2    Neal, and then several others.

3            THE COURT:  I thought that the Multiple District

4    Panel isn't hearing the objections until sometime later.

5            MR. MORIARTY:  Well, one of the cases was running

6    ahead and they already heard the objections by the plaintiffs

7    in the Chance Baker case and they issued an opinion rejecting

8    any objection to the transfer here.  So, the Chance Baker case

9    has been transferred here and then the plaintiffs, presumably,

10   will urge you to remand the case.  They will push their motion

11   for remand here in that case, but they're still trying --

12           THE COURT:  That's not before me now.

13           MR. MORIARTY:  They're still trying to hang on to

14   Judge Urbanski in the Western District, hoping that he will

15   remand the cases to state court, and that is what Mr. Busch's

16   motion is designed to do, is to just get these cases all here

17   together.

18           THE COURT:  Well, that's a reasonable thing to do,

19   isn't it?

20           MR. MORIARTY:  It's a very reasonable thing to do and

21   we fully support --

22           THE COURT:  So, we'll do what you and Mr. Busch want.

23           MR. MORIARTY:  Thank you.

24           MR. BUSCH:  Thank you, your Honor.

25           THE COURT:  What's next, Ms. Johnson?

1        MS. JOHNSON:  I believe that's everything, your

2    Honor.  There is a list here of motions referred to Judge

3    Boal, but nothing else that requires your attention.

4        THE COURT:  Okay.

5        MR. SOBOL:  Thank you.

6        THE COURT:  So, we will meet again in July.  And, in

7    the meantime, I will do some of the tasks that you have

8    assigned to me.  And, as always, I thank especially Ms.

9    Johnson for your good outline, and everybody else for your

10   presence and assistance.  Thank you.

11       MR. SOBOL:  Thank you, your Honor.

12       (Adjourned, 3:52 p.m.)

13

14           C E R T I F I C A T E

15       I, Catherine A. Handel, Official Court Reporter of the

16   United States District Court, do hereby certify that the

17   foregoing transcript, from Page 1 to Page 57, constitutes to the

18   best of my skill and ability a true and accurate transcription of

19   my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

20   Re: New England Compounding Pharmacy, Inc., Products Liability

21   Litigation.

22

23   June 29, 2014          /s/Catherine A. Handel
     Date                   Catherine A. Handel, RPR-CM, CRR
24

25