<pre>
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2


 3


 4   IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
     PHARMACY CASES LITIGATION          )
 5                                      )
                                        )
 6                                      )
                                        )
 7                                      )
                                        )
 8
             BEFORE:  THE HONORABLE RYA W. ZOBEL AND
 9                    THE HONORABLE JENNIFER C. BOAL

10


11


12                    **STATUS CONFERENCE**

13


14


15


16          John Joseph Moakley United States Courthouse
                       Courtroom No. 17
17                    One Courthouse Way
                      Boston, MA 02210
18
                       August 7, 2014
19                      2:30 p.m.

20


21


22          Catherine A. Handel, RPR-CM, CRR
                    Official Court Reporter
23        John Joseph Moakley United States Courthouse
                  One Courthouse Way, Room 5205
24                    Boston, MA 02210
                E-mail: hhcatherine2@yahoo.com
25
</pre>

```
 1      APPEARANCES:

 2      For The Plaintiffs:

 3          Hagens, Berman, Sobol, Shapiro LLP, by THOMAS M. SOBOL, ESQ.
        (appearing telephonically) and KRISTEN JOHNSON, ESQ., 55
 4      Cambridge Parkway, Suite 301, Cambridge, Massachusetts 02142;

 5          Janet, Jenner & Suggs, LLC, KIMBERLY A. DOUGHERTY, ESQ., 75
        Arlington Street, Suite 500, Boston, Massachusetts  02116;
 6
            Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ., 366 Elm
 7      Avenue, SW, Roanoke, Virginia 24016;

 8          Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,
        ESQ., 227 Second Avenue North, Nashville, Tennessee 37201-1631;
 9
            Cohen, Placitella & Roth, P.C., by MICHAEL COREN, ESQ., 2
10      Commerce Square, 2001 Market Street, Suite 2900, Philadelphia,
        Pennsylvania 19103;
11
            Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
12      Street, Suite 500, Boston, Massachusetts 02114;

13          Law Offices of Mark Zamora and Associates, MARK ZAMORA,
        ESQ., 5 Concourse Parkway, Suite 2350, Atlanta, Georgia 30328;
14
            Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K.
15      MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, New York
        10013-1413;
16
            Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
17      ESQ., 150 Fourth Avenue North, Suite 1650, Nashville, Tennessee
        37219;
18
            Saltz Mongeluzzi Barrett & Bendesky, P.C., by MARY T.
19      GIDARO, ESQ., One Liberty Place, 52nd Floor, 1650 Market Street,
        Philadelphia, Pennsylvania 19103;
20

21
         FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
22
            Brown Rudnick, by DAVID J. MOLTON, ESQ., Seven Times Square,
23      New York, New York 10036;

24          Harris Beach PLLC, by FREDERICK H. FERN, ESQ., 100 Wall
        Street, New York, New York 10005;
25
```

<u>FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF NECP, INC.:</u>

Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High Street, Suite 2400, Boston, Massachusetts 02110-1724;

<u>FOR THE DEFENDANTS:</u>

Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ., 1150 Huntington Building, 925 Euclid Avenue, Cleveland, Ohio 44115-1414;

Michaels, Ward & Rabinovitz LLP, by DAN RABINOVITZ, ESQ., One Beacon Street, Boston, Massachusetts 02108;

Todd & Weld LLP, by CORRINA L. HALE, ESQ., 28 State Street, 31st Floor, Boston, Massachusetts 02109;

Ulmer & Berne LLP, by JOSHUA A. KLARFELD, ESQ., 1660 West 2nd Street, Suite 1100, Cleveland, Ohio 44113-1448;

Fulbright & Jaworski, LLP, by MARCY H. GREER, ESQ., 98 San Jacinto Blvd, Suite 1100, Austin, Texas 78701;

Fulbright & Jaworski, LLP, by ADAM T. SCHRAMEK, ESQ., 801 Pennsylvania Avenue, Washington, DC 20004;

Goodwin Procter LLP, by JAMES REHNQUIST, ESQ., and ROBERTO M. BRACERAS, ESQ., Exchange Place, 53 State Street, Boston, Massachusetts 02109;

McGuire Woods LLP, by STEPHEN D. BUSCH, ESQ., One James Center, 901 East Cary Street, Richmond, Virginia 23219-4030;

Smith Duggan Buell & Rufo LLP, by MATTHEW WALKO, ESQ., Lincoln North, 55 Old Bedford Road, Lincoln, Massachusetts 01773;

Sloane & Walsh LLP, by ROBERT H. GAYNOR, ESQ., Three Center Plaza, Boston, Massachusetts 02108;

Hermes, Netburn, O'Connor & Spearing, P.C., by PETER G. HERMES, ESQ., 265 Franklin Street, 7th Floor, Boston, Massachusetts 02110-3113;

```
 1      VIA PHONE FOR THE PLAINTIFFS:

 2      Thomas M. Sobol
        Daniel L. Clayton
 3      James Stephen King
        Nicole L. Kreklau
 4      Timothy A. Housholder
        James E. Girards
 5      Karen Schaeffer
        Harry Roth
 6      Dustin Clint Daniel
        Robert W. Briley
 7      Kristine Osterday
        Ned Mulligan
 8      Mark Dancer
        Daniel Myers
 9      Deborah Gresco-Blackburn
        Michael R. Hugo
10      Rebecca Blair
        Brian Schuette
11      Doug Jones
        Steven D. Resnick
12      Marc E. Lipton
        Ed Jazlowiecki
13      Laura Pittner
        John Lyons
14      Mitchell A. Toups
        Jonathan R. Krohnfeldt
15      Bryan L. Bleichner
        Bob Tyler
16      Lauren Ellerman
        Alyson Oliver
17      Douglas Small
        Stephen W. Mullins
18      Rob Randall
        Elliot L. Olsen
19      Sharon Houston
        George Nolan
20      Stephanie Arndt
        Anthony V. Agudelo
21      Norman H. Rosen
        Bernard Smalley
22      Kathleen Kirkpatrick
        Neal A. Markowitz
23      Dan Gustafson
        Bridget Stratton
24      Erin M. Amos
        Greg Lyons
25      Forest Horne
        David Paxton
```

1

2

<u>VIA PHONE FOR THE DEFENDANTS:</u>

3     Scott Sexton
      Bill Leader
4     Rob Jenner
      James F. Neale
5     Adam C. Ponte
      Kathleen A. McCann
6     Brooke Hastings

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2        (The following proceedings were held in open court before

 3   the Honorable Rya W. Zobel, United States District Court Judge,

 4   and the Honorable Jennifer C. Boal, Magistrate Judge, United

 5   States District Court, District of Massachusetts, at the John J.

 6   Moakley United States Courthouse, One Courthouse Way, Boston,

 7   Massachusetts, on August 7, 2014.)

 8             THE COURT:  All right.  Some of you inadvertently

 9   wandered into a sentencing.  It was interesting, wasn't it?

10             MR. COREN:  Yes, it was.

11             THE COURT:  Sad, too.

12             In any event, Magistrate Judge Boal has joined me

13   today and I think it helps her to be participating in these

14   conferences and she will get a large part of the work that

15   needs to be done by the time we finish here today.

16             So, let me start by reviewing who is here.  Mr.

17   Sobol?

18             MS. PARKER:  Mr. Sobol is participating by phone

19   today, your Honor.

20             THE COURT:  Well, Mr. Sobol, are you there?

21             MR. SOBOL:  Yes, I am.

22             THE COURT:  You're barely there.

23             COURTROOM DEPUTY CLERK URSO:  Judge, I turned it down

24   a little bit.

25             THE COURT:  It's okay.  Ms. Johnson?
```

```
 1              MS. JOHNSON:  Yes, your Honor.

 2              THE COURT:  Mr. Gastel?

 3              MR. STRANCH:  He actually had a baby this morning at

 4   2:00 a.m.

 5              THE COURT:  He did?

 6              MR. STRANCH:  Yes.  It's amazing.

 7              THE COURT:  So, Mr. Stranch.

 8              MR. STRANCH:  That's correct, your Honor.  Good

 9   afternoon.

10              THE COURT:  And let's see.  Mr. Clayton -- no.

11              MR. CHALOS:  No.  Mark Chalos, your Honor.

12              THE COURT:  Mr. --

13              MR. FENNELL:  Patrick Fennell, Plaintiffs' Steering

14   Committee.

15              THE COURT:  And over here on my right Mr. -- I'm

16   sorry?

17              MR. FERN:  Mr. Fern, your Honor, from Harris Beach.

18              THE COURT:  Fern?

19              MR. FERN:  Fern, F-e-r-n.  Good afternoon, your

20   Honor, Judges.

21              THE COURT:  By the time we finish with this case, I

22   will know you all from one meeting to the next.

23              And you are?

24              MR. RABINOVITZ:  Dan Rabinovitz For MSN.

25              MR. GAYNOR:  Robert Gaynor, your Honor.
```

```
1              THE COURT:  I'm sorry?

2              MR. GAYNOR:  For the individuals.

3              THE COURT:  Your name?

4              MR. GAYNOR:  Gaynor.

5              THE COURT:  Gaynor.

6              MR. KLARFELD:  Good afternoon, your Honor.  Joshua

7    Klarfeld for GDC.

8              MR. MORIARTY:  Matthew Moriarty for Ameridose.

9              THE COURT:  In the back.

10             MR. BUSCH:  Stephen Busch for Insight Health Corp.

11   Good afternoon, your Honor.

12             THE COURT:  And Mr. Gottfried?

13             MR. COREN:  I'm Michael Coren, co-chair of the

14   Official Creditors' Committee.

15             MR. MOLTON:  Your Honor, David Molton, counsel to the

16   Official Creditors' Committee.

17             THE COURT:  Now Mr. Gottfried.

18             MR. GOTTFRIED:  Thank you, your Honor.

19             MR. ELLIS:  And Rick Ellis for plaintiffs, your

20   Honor.

21             THE COURT:  Anybody else I need to know?  Oh, Mr.

22   Rehnquist and Mr. Braceras.

23             MR. REHNQUIST:  Good afternoon, your Honor.

24             THE COURT:  I'm sorry?

25             MR. REHNQUIST:  Yes, for UniFirst.  Good afternoon.
```

```
 1              THE COURT:  Right.  That's it.
 2              Okay.  Ms. Johnson, will you please proceed as you
 3      usually do.
 4              MS. JOHNSON:  Thank you, your Honor.
 5              We'll start with agenda Item No. 1, which is the
 6      status of mediation efforts.  As to the following list,
 7      mediation is ongoing:
 8              ARL, which is the testing company.  Victory, which is
 9      an HVAC --
10              THE COURT:  ARL is the one that had opted out the
11      last report and has now come back in again?
12              MS. JOHNSON:  No, your Honor.  At the last status
13      conference we reported that Liberty had opted out.  Liberty is
14      still out of mediation.
15              THE COURT:  Can we do anything to get them back in
16      again?
17              MR. HERMES:  Your Honor, Peter Hermes for Liberty.
18              Somebody needs to say, "Yes."
19              THE COURT:  Well, I thought the object of the
20      mediation was to get to, "Yes."
21              MR. HERMES:  A lot of people have said, "Yes" and one
22      person has not said, "Yes" as yet, your Honor.
23              THE COURT:  Well, what can we do?
24              MR. HERMES:  He has to change his mind, your Honor.
25      I can't say anything further about the mediation, I don't
```

1    believe.

2              MS. JOHNSON:  Because of --

3              THE COURT:  Well, should we ask him to come in here?

4              MS. JOHNSON:  Your Honor, at this time I believe that

5    efforts are being made to attempt to resolve that issue and to

6    bring Liberty back into the mediation to reach a successful

7    resolution.  Because of the mediation privilege, I'm not

8    willing to go beyond what Mr. Hermes has said, but we are

9    trying to work on that.

10             THE COURT:  But if there is an issue, maybe they

11   should be invited to come to the next conference.

12             MS. JOHNSON:  We appreciate that, your Honor, and

13   will take that into consideration.

14             Yes.  So, mediation is ongoing with respect to the

15   following entities, your Honor:

16             ARL; Victory; Insight, which is a Virginia pain

17   clinic; Inspira, which is a New Jersey pain clinic.

18             And good news, UniFirst, the remaining national

19   defendant, has agreed to try to mediate and we're looking at

20   dates in October for that.

21             And bad news, a Florida clinic has since the last

22   status conference opted out of the mediation program.  We

23   understand that is a result of an effort to mediate that was

24   unsuccessful.  We understand that there are other Florida

25   entities who may or may not opt out following that effort.

1          MR. COREN:  Your Honor, Mike Coren, one of the

2     co-chairs.

3          Actually, there's a little bit more good news.

4          COURTROOM DEPUTY CLERK URSO:  Can you speak into the

5     microphone, please?

6          THE COURT:  We all need to do this sitting down

7     because the microphones don't reach.

8          MR. COREN:  Thank you, your Honor.  As I started to

9     say, Mike Coren, co-chair of the creditors' committee.

10         There's somewhat more good news in that we're pleased

11    to report that as a result of the mediation conducted by

12    Professor Green, defendant Inspira Health, the trustee, the

13    Official Creditors' Committee, PSC, have reached a settlement

14    agreement in principle.  The settlement will be implemented as

15    part of the Chapter 11 bankruptcy plan, if and when approved.

16    The parties are in the process of trying to reach settlement

17    agreement.

18         THE COURT:  Inspira is New Jersey?

19         MR. COREN:  That is correct, your Honor.  It was one

20    of the large healthcare regional facilities there.

21         I must say, we must commend Professor Green for his

22    able mediation over two days bringing the parties together.

23    He should be applauded and we thank him.

24         THE COURT:  Okay.  Anything else, Ms. Johnson, with

25    respect to your Item 1?

```
1              MS. JOHNSON:  Mr. Sobol may wish to be heard on that,
2    your Honor.  I'm not sure.
3              THE COURT:  I'm sorry, who wishes to be heard?
4              MS. JOHNSON:  Mr. Sobol, by phone.
5              THE COURT:  Mr. Sobol?
6              MR. SOBOL:  Yes.  Good afternoon, your Honor.
7              All the reports that have been provided to you are
8    essentially correct.  The mediations are all at different
9    stages and I simply want to be a little bit cautious and not
10   over-promise and under-deliver.
11             There are one or two or three that are at various
12   stages and the parties are hopeful that there will be
13   resolution in the next few weeks, including Inspira, but,
14   again, I just want to make sure that we don't over-promise.
15             We're having some issues in some other ones that we
16   thought had progressed very far and we're continuing to work
17   on them.  The long and short of it is, I think that shortly
18   after Labor Day, we should all have a very good sense where we
19   are with all of these things.  I don't want to over-promise.
20   That's all.
21             THE COURT:  Well, maybe we can have a celebratory
22   meeting in September.
23             MR. SOBOL:  That would be wonderful.  I'll even come
24   to you in person that time.
25             THE COURT:  Wonderful.  Okay.
```

```
 1              So, that's it, Ms. Johnson?
 2              MS. JOHNSON:  Yes, your Honor.  I think that takes us
 3    to Item No. 2.
 4              THE COURT:  Right.
 5              MS. JOHNSON:  The status of the insurance declaratory
 6    judgment actions.  There are two declaratory judgment actions
 7    pending before Judge Saylor that deal with insurance policies
 8    issued to affiliated defendant Ameridose.  There is a status
 9    conference in those actions scheduled for September 11th.
10    Those actions are currently stayed.
11              There is also a declaratory judgment involving
12    Liberty that is pending in the District of Connecticut.  I
13    don't know that that has been brought to the Court's attention
14    before.  So, we just mention it, and no further report.
15              THE COURT:  Now -- do you have more?
16              MS. JOHNSON:  I do not, your Honor.
17              THE COURT:  Okay.  Item 3 is the status of discovery,
18    and I will refer everything in Item 3 to Magistrate Judge
19    Boal, who has been handling these matters before.  She's
20    familiar with them and she will do it with great dispatch.
21    That brings us down --
22              MR. GOTTFRIED:  Your Honor --
23              MS. JOHNSON:  If I could, your Honor, we fully
24    appreciate and approve and have no problem with Judge Boal
25    handling discovery matters as a general matter.
```

1    There are, I believe, three issues in front of you

2    that may look like discovery issues, but may be something that

3    the Court would like to address.  They relate to defendant

4    Insight.

5    THE COURT:  Yes, I have those.  That was number --

6    it's a different number.

7    MS. JOHNSON:  No. 12, your Honor.

8    THE COURT:  No. 11.  There's an 11 -- no.

9    MS. JOHNSON:  It would be No. 12 on Page 4.

10   THE COURT:  Yes, 12.

11   MS. JOHNSON:  I understand that Mr. Fennell may wish

12   to be heard for the Plaintiffs' Steering Committee and that

13   Mr. Busch may wish to be heard on that for defendant Insight,

14   whether now or later.

15   THE COURT:  Why don't we do that when we get there in

16   the order.  Okay.  So, Item 3 all goes to Judge Boal.

17   MR. GOTTFRIED:  Your Honor, Attorney Gottfried for

18   the trustee.

19   Sort of similar to what Ms. Johnson said, the motion

20   for stay may strike the Court facially as being about

21   discovery, but really goes to the implementation of the

22   settlements that were approved by Judge Boroff last Friday.

23   There's issues in that motion that go to whether dispositive

24   motions can be filed, the type of pre-judgment security people

25   can go, and I think, as indicated on the agenda, the trustee

```
 1    is prepared to draft that motion and circulate and receive
 2    comments from the affiliated defendants in hopes to get that
 3    draft to the PSC and the Official Creditors' Committee,
 4    hopefully, by tomorrow.  We are supposed to file it within ten
 5    business days of the date of the settlement.  That may be
 6    something that, when you see it, is more appropriate because
 7    it really relates to the implementation of the settlement than
 8    the interplay with the bankruptcy court for this Court to
 9    keep.  Obviously, whatever you decide is fine, but I wanted to
10    bring that to your attention, that it's really more about
11    implementation of the settlement than a pure discovery issue.
12            MR. MOLTON:  Your Honor, David Molton, for the
13    Creditors' Committee.
14            What Mr. Gottfried said is true.  That motion is part
15    of Insight's settlement agreement approved by Judge Boroff
16    where the orders came back in the past week.  I think they're
17    integral for proceeding with the plan and, accordingly, we
18    would agree with Mr. Gottfried and support his requests that,
19    at least for the present time, that stays with your Honor.
20            THE COURT:  Are there any matters pending with
21    respect to that at the moment?
22            MR. SOBOL:  If I may, your Honor.
23            THE COURT:  Oh, Mr. Sobol, is that you?
24            MR. SOBOL:  Yes.
25            THE COURT:  Okay.
```

```
1              MR. SOBOL:  There are no particular matters pending
2    with respect to the so-called stay motion that will be filed
3    shortly, but under the assumption that the stay motion tracks
4    the language of the underlying settlement agreements with the
5    insiders, I believe that all parties expect that that motion
6    will be functionally assented to --
7              THE COURT:  Well, that's what I thought.
8              MR. SOBOL:  -- non-participants that might want to
9    chime in, but I think that you -- once the motion is filed and
10   the objection period expires, there are no objections that
11   will be ripe to be ruled upon.
12             MR. GOTTFRIED:  That certainly would be the trustee's
13   hope, that it would be essentially accented to since the PSC
14   and the Creditors' Committee's reported --
15             THE COURT:  Well, when I said that all of the items
16   under Paragraph 3 go to Judge Boal, which of the items are
17   what you're now referring to as pertaining to the settlement?
18             MR. MOLTON:  Your Honor, 3(a)(iii) on Page 1 is the
19   one.  And this is David Molton for those on the --
20             THE COURT:  Well, let's wait and see.  If it's agreed
21   on, then it's not an issue.  If it's not agreed on, then I
22   will decide whether Judge Boal or I will do it, okay?
23             MR. GOTTFRIED:  Understood, your Honor.
24             THE COURT:  All right.  Now, No. 4, status of the
25   litigation track.  We had agreed earlier that we would have a
```

```
1    conference, you know, another conference, I think on September
2    18th and not October 30.  I would propose that any motions
3    that are ripe at that point we hear on September 17th.  So
4    that we do what we did the last time, have a hearing on
5    motions separate and apart from these up-to-date notices of
6    what's going on, and we could do it on September 17th, at 2
7    o'clock.  Is that right, Lisa?
8              COURTROOM DEPUTY CLERK URSO:  Yes.
9              THE COURT:  That seemed to be okay.
10             COURTROOM DEPUTY CLERK URSO:  I thought we were going
11   to do --
12             THE COURT:  The conference on the 18th.
13             COURTROOM DEPUTY CLERK URSO:  Yes.  I thought --
14             THE COURT:  And motions on the 17th.
15             COURTROOM DEPUTY CLERK URSO:  I thought it was in
16   October we were going to do the motions.
17             THE COURT:  No.  October 17th --
18             COURTROOM DEPUTY CLERK URSO:  We have a sentencing
19   and a motion hearing on the 17th.
20             THE COURT:  Well, my calendar was totally empty.  So,
21   that's why I choose the 17th, but I think it makes sense
22   because people who come from out of town don't want to have to
23   spend an extra day.  So, we'll just work it out.  We'll do it
24   on September 17th, at 2:00, and I'll deal with these other
25   matters separately.  That, I think, covers No. 4.
```

1           Status of the bankruptcy.  Is there anything other
2    than the fact that we now have a settlement agreement?
3           MR. GOTTFRIED:  I think that is, obviously, the
4    single most important report, which is that the settlement was
5    approved by Judge Boroff last Friday.
6           THE COURT:  However, this item on the agenda has a
7    bunch of other things, like Liberty and UniFirst and Tennessee
8    Clinic.
9           MR. GOTTFRIED:  That relates to -- I'll be happy to
10   address that, your Honor.  What that relates to is the
11   trustee's notice regarding further relief from the
12   preservation order.
13          To give the Court a brief background, Judge Saylor
14   originally entered an order preserving all evidence at the
15   beginning of the case before the bankruptcy was filed.  The
16   trustee back on May 13th of 2013 filed a motion for relief
17   from the preservation order, at that time focused principally
18   on being able to return leased equipment so he would not have
19   to continue to pay the cost of leasing.
20          The filing of that motion resulted in the dialogue
21   between the U.S. Attorney's Office and the trustee, whereby
22   not only did they agree to a joint order with respect to the
23   leased equipment, but they also agreed to a protocol whereby
24   the trustee could in the future seek to dispose of additional
25   property, ultimately give up the premises, and move forward in

1    that way.

2          That order was entered by Judge Saylor and then

3    pursuant to that order, back on June 5th, the trustee filed

4    the notice that that order required to allow him to

5    essentially vacate the premises and dispose of the remaining

6    equipment in the premises, and the reason for that is many

7    fold.

8          Some of the equipment may have value and could

9    provide a value to the estate.  For example, there's a crimper

10   there that has never been taken out of shrink wrap that may

11   have substantial value.  There's also expense in maintaining

12   the property.  It needs to be heated.  It needs to be insured.

13   There's a security system, things of that nature that run

14   monthly substantial expenses for the estate.

15         So, at this point where we're more than two years

16   after the fact, our view was that there literally is no

17   evidentiary value to anything that was left in the premises.

18   We have, as we've indicated in our papers, preserved what we

19   believe are the relevant ESI and documents.  Mr. Fern's office

20   has done that.  We think it's time to, essentially, let the

21   premises go.  As a result, we've since filed the appropriate

22   notice.

23         Judge Saylor's order had two interesting components

24   to it:  One, if someone wanted to object, they had to identify

25   specifically what it is they wanted to preserve; and, two,

1    there was a requirement that their solution for that not

2    require the trustee to continue to fund the preservation.

3            In accordance with the order, three parties filed

4    objections or preservation requests.  We would submit to the

5    Court, none of them complied with Judge Saylor's order because

6    they neither identified specifically what they wanted to

7    preserve, nor did they indicate how they were going to pay for

8    it.

9            We started talking to those parties in an effort to

10   resolve it by agreement.  They all indicated that, Well, we

11   really would like to see the premises and maybe after we see

12   them -- some said, if we just get to see them, we'll accent to

13   the order.

14           Proving that no good deed goes unpunished, we agreed

15   to let them all tour the premises, to video the premises.

16   Other people stepped forward and said, Well, we didn't file a

17   preservation request, but we'll file a motion to file one

18   late.  So, you should let us see the premises.

19           So, ultimately six different parties got to see the

20   premises for three hours apiece.  Not surprisingly, after they

21   did, no one agreed to withdraw their preservation requests.

22           We filed a response to the preservation requests just

23   the other day in front of the Court.  Our request is the same.

24   We believe we've preserved the relevant evidence, the ESI and

25   the documents.  We don't believe any of the equipment in the

1    premises or the premises themselves, more than two and a half

2    years after the fact, has evidentiary value.

3           The Court, I'm sure, is aware of many crime scenes

4    that have been returned to their natural state well before

5    trial on the merits, whether it be Boylston Street or any

6    other number of other crime scenes, potential crime scenes.

7           So, we would like to stop paying for the security and

8    the heat and the phone and -- which is part of the security

9    system, and the insurance, and we would like to get what we

10   can for what's left there and preserving, like I said, the

11   documents and the ESI.

12          The other thing that we did try to facilitate was --

13   PSC was there for four days, took video through our efforts

14   and working with the PSC.  Those videos remain available to

15   the folks who raised the preservation requests.

16          So, our view is it's simply time.  It's time to allow

17   the trustee relief from the preservation order to sell what he

18   can sell and to give up the premises.

19          THE COURT:  What's the cost -- monthly cost of the

20   maintaining?

21          MR. GOTTFRIED:  My understanding -- and this is an

22   approximation -- approximately $5,000, $6,000 a month, your

23   Honor, between the various out-of-pocket things that we're

24   paying.

25          THE COURT:  What is the estimate on the value of what

1     you can get rid of?

2         MR. GOTTFRIED:  I don't know for sure.  The crimper,

3     in particular, is unused and in shrink wrap.  I've been

4     told -- I'm not representing this -- that it could be -- might

5     have been new worth maybe seven figures.  So, our hope is that

6     there'll be at least some value and at least it will be an

7     expense that we are no longer paying.

8         MR. BRACERAS:  Your Honor, if I could be heard on

9     this issue?  Mr. Gottfried --

10         THE COURT:  For the record, this is Mr. Braceras for?

11         MR. BRACERAS:  UniFirst.  Thank you, your Honor.

12         Mr. Gottfried just filed his motion or reply, I

13     believe, two days ago, and if the Court permits, we would like

14     perhaps a week to respond to that.  I think that this is

15     something that perhaps also can be referred to Magistrate

16     Judge Boal.

17         THE COURT:  Well, what's the problem?  Why can't they

18     get rid of the stuff?

19         MR. BRACERAS:  The problem -- I don't think there is

20     a problem and, in fact, Mr. Gottfried has misstated many of

21     the facts here.

22         The fact is he could sell the crimper and he could

23     close down the laboratory, the pharmacy, as far as we're

24     concerned, but during our tour of the premises, we found --

25     there were, you know, hundreds of pages and pages of hard

1    documents scattered throughout the offices, including in Mr.

2    Cadden's office.  Some of these papers, just by skimming

3    through them on our tour, are plainly relevant to the

4    litigation.  In any civil discovery these would be papers that

5    would have to be produced, have to be preserved and produced.

6    There are also a lot of computers there.  There are video

7    cameras.

8          So, we did, in fact, provide by -- I think it was by

9    email -- maybe it was less formal than Mr. Gottfried would

10   like, but we provided by email a request to Mr. Gottfried's

11   colleague, Mr. Johnson, and we said, Look, we're not

12   interested in preserving the crimper.  We're not interested in

13   preserving the rest of the premises.  All we want is copies of

14   all of the documents that are in the building, copies of the

15   hard drives, copies of the video cameras that -- as your Honor

16   is aware, the videos in this case are relevant and have been

17   used by the PSC in their complaint.  So, we want copies of

18   those.

19         And we offered to pay for it.  We said that our

20   people would go in.  They could have somebody watching us.  We

21   will pay for people to go in.  We'll have a vendor.  We'll

22   hire a vendor to go in and make all the copies, do all the

23   computer forensics and make those copies, copy any videos that

24   are there, and that's all we ask for, and in any civil

25   litigation we would be entitled to get that.

1          Now, in his papers that he just filed, there's sort

2     of a remarkable statement where the trustee says that they've

3     produced --

4          THE COURT:  Excuse me.

5          What is the document you're referring to?  Because

6     the one that is listed in the agenda is an older document.  It

7     was not just filed.

8          MR. GOTTFRIED:  1308.

9          THE COURT:  1308?

10         MS. JOHNSON:  That would be No. 5(e), your Honor.

11         MR. BRACERAS:  It was filed on August 5th.

12         THE COURT:  Okay.

13         MR. BRACERAS:  So, in this document the trustee takes

14    the position that he's preserved all the documents that he

15    believes have evidentiary value, but in any civil litigation

16    we're entitled to all the documents, and we saw that there are

17    documents directly relevant to this case, and we will pay for

18    it.

19         THE COURT:  Assuming they get to do this, how long

20    will it take to get it done?

21         MR. BRACERAS:  To get a vendor in there, a week, two

22    weeks.

23         MR. GOTTFRIED:  Your Honor, I think we're -- the

24    point that needs to be made is we're conflating preservation

25    with production, and we're absolutely willing to preserve and

1    say we'll preserve the papers that are in the premises.  And

2    so, that's all we're asking.  If it's not the loan papers, for

3    example -- we want to get rid of the equipment.  We want to

4    get rid of the premises.  We'll preserve the papers on the

5    premises.

6         Production is something that should be addressed in

7    discovery.  There's a stay currently in place.  And so, you

8    know, our view -- and we say this in our opposition -- or in

9    our responsive papers, is that this is about preservation.

10   It's not about production.  Production, there's always these

11   motions filed, lifting the stay, and our motion to be filed,

12   quite frankly, we've said on August 14th, which would govern

13   that.

14        The only issue here is, can the trustee finally get

15   rid of the premises?  Can he start saving that money to the

16   estate?  And we're not getting rid of any papers.  All the

17   papers will be preserved.  The issue is that more than two

18   years after the fact, can we get rid of this stuff?

19        MR. BRACERAS:  And, your Honor, on this point, is

20   that the trustee can't have it both ways.  They can't complain

21   about the cost of preservation -- and we offered, we will pay

22   to go in and just make copies of it.  And then say, Hey, we're

23   not going to produce it.  We don't want to give you access to

24   it.

25        So, if they're willing to preserve all the papers in

```
 1    there -- and not just the papers, the hard drives, the video
 2    cameras, any videotapes in the video cameras -- then I think
 3    we can reach a resolution on this.
 4                THE COURT:  You represent who?
 5                MS. GREER:  Your Honor, Marcy Greer.
 6                THE COURT:  Could you please find a microphone and
 7    sit next to it?
 8                MS. GREER:  sure.
 9                THE COURT:  I'm sorry.  Mr. Braceras spoke without a
10    microphone, too.
11                MR. BRACERAS:  I try to be loud enough, your Honor.
12                THE COURT:  Well, I don't think that works.
13                Go ahead.  I'm sorry, your name again?
14                MS. GREER:  Marcy Greer for the Saint Thomas entities
15    and the Ascension parties.
16                I just want to give the Court a little bit of
17    context.  This process has been very rushed from our
18    standpoint.  We were told -- we filed -- we sent a
19    preservation notice and said we don't even know what we're
20    asking to preserve because we've never been on the premises.
21    We've never had access to the videos.  We have never had
22    access to the photos.  It's been a crime scene that we have
23    been prohibited from getting into.
24                We were given a very short timeframe and said, You
25    can come up on one of two days and bring whoever you want.
```

1    This is your one chance to get in there.  And so, we had to

2    scramble to get there by July 7th.  We did not get any of the

3    photos or the video that the PSC took in realtime after it

4    happened until after -- we got some of the photos -- because

5    they were held up in a firewall.  So, we didn't actually see

6    them.  We just got the videos.  So, we have not had time to

7    fit everything together.

8            In addition to the things that Mr. Braceras has

9    described, there are pieces of equipment that we are trying to

10   piece together and put together with the video that we got

11   from the PSC and we need a little bit of time to go through

12   that so that we can make a proper preservation request that is

13   very specific in detail.

14           It may be that we can resolve all of this, but I

15   don't think that we need a fire drill and a decision today so

16   that they can sell the property, considering how rushed this

17   process has been.  We need a little bit of time to --

18           THE COURT:  How much time?

19           MS. GREER:  -- fit the pieces together.

20           THE COURT:  How much time?

21           MS. GREER:  What do you think?

22           MR. SCHRAMEK:  Your Honor, Adam Schramek, also for

23   Saint Thomas and Ascension.

24           Your Honor, the problem is with the bankruptcy stay

25   in place, we have no discovery from NECC.  No discovery --

```
 1            THE COURT:  How much time?

 2            MR. SCHRAMEK:  Well, we have the stay lifted and then

 3   60 days to take discovery of the affiliated parties to see

 4   what we do need to know.  For example, we were led to the

 5   backside where the recycling area is and there were, I'd say,

 6   100 plus banker's boxes of documents, and they said, There,

 7   that's part of your inspection.

 8            I said, Well, what's in here?  Has it been copied?

 9   It looked like, you know, sort of prescriptions.  I don't know

10   what this is.  They said, We're not answering any questions.

11   You have three hours.  Here are 100 boxes for you to look at.

12            Well, what are these boxes?  Have they been copied?

13   We were told nothing.

14            We were walked through the remnants of a clean room,

15   and they said, This isn't part of your tour.  We just have to

16   walk through here to get to the boxes.  I said, Well, whose

17   clean room is this?  Is this UniFirst's clean room?  Is

18   this -- what is this?  They said, You can't know.  We can't

19   tell you.  This is all -- you got three hours.

20            So, Judge, until the discovery stay is lifted from

21   the affiliated defendants and NECC so we have the context of

22   what we're looking at so we can have our expert understand

23   where was the MPA manufactured, should we be in container one,

24   two or three?  What were the issues?  We have no discovery.

25   We're told to go look at a clean room we have never seen
```

```
1    before for three hours and then I'm going to get rid of it
2    all.  Your Honor, we don't --
3            THE COURT:  Should I have the next hearing in the
4    clean room?
5            MR. SCHRAMEK:  Your Honor, I think it would be very
6    telling if we could have it in the clean room.
7            (Laughter.)
8            MR. GOTTFRIED:  Your Honor, with all due respect to
9    my brother --
10           THE COURT:  Hold it one second, Mr. Gottfried.
11           You're done?
12           MR. SCHRAMEK:  Your Honor, I would just say that it's
13   a little unfair, we believe, from our point of view, to be
14   told, We're going to get rid of everything.  We've not been
15   able to talk to one affiliated defendant or NECC or obtain any
16   discovery from them.  So, they want to keep the stay and get
17   rid of everything and at the back end tell us, Well, you
18   should have looked at that previously.  We have no context of
19   what to look at other than a walk-through.
20           THE COURT:  I assume that those who want time to do
21   all of this are prepared to pay for the cost of keeping it?
22           MR. SCHRAMEK:  Your Honor, I think that's a
23   discussion that -- you know, that we can have.  We feel like
24   we've been wanting discovery for six months and they've been
25   paying the costs without any concern.  Let's lift the stay and
```

```
 1    give us a few months with the stay lifted and then if we're
 2    unable to get our discovery, then we'll come in and talk about
 3    it.
 4              THE COURT:  We've gone from 60 days to a few months?
 5              MR. SCHRAMEK:  Well, your Honor, whatever the Court
 6    feels is appropriate we're willing to abide by.  We just want
 7    some discovery first, then access to the clean room if we need
 8    it.  We're just asking about preservation while we get the
 9    information from the defendants who have been subject to this
10    stay, to know whether or not we need to get back in.  What
11    does our expert need to look at?  How was the MPA being
12    produced?
13              There was a giant bottling piece of equipment in one
14    of the clean -- in one of the parts of the clean room.  Was
15    that there at the time?  How was that used?  What's the
16    history there?  We may need parts of that bottling equipment
17    to be tested.  We don't know because we haven't been able to
18    have any discovery.
19              THE COURT:  Okay.  Got it.
20              Ms. Johnson, did you want to say something?
21              MS. JOHNSON:  No, not yet.
22              THE COURT:  Mr. Gottfried.
23              MR. GOTTFRIED:  Just two things briefly.
24              So you have this in mind, I think it was three months
25    ago we agreed that all of the informal discovery that we had
```

1    provided to the PSC, some 44,000 pages, could be made

2    available to all the parties to the case.

3          So, to the extent that they haven't looked at that

4    discovery, to the extent that they haven't digested it in

5    three months, I don't know what to say about that, but they've

6    certainly had access to it.

7          That discovery is not random discovery.  That was

8    discovery that was produced initially in response to a

9    document request from the PSC and then, as I understand it,

10   there were as many as 21 separate original requests the

11   trustee responded to in a variety of different contexts,

12   whether they be requests to facilitate mediation, or

13   otherwise.

14         We then have gone above and beyond that.  In addition

15   to the discovery they had, we worked with the PSC to make sure

16   that the video was available and that the stills were

17   available.  Then we agreed that they could come tour the

18   premises.

19         The point is that -- he talked about testing

20   equipment.  This was a facility that was shut down, I believe,

21   October 2012.  I can't possibly imagine what benefit there

22   would be to test a piece of equipment now at this late date.

23         We've talked about this with the U.S. Attorney.  They

24   have no objection to this.  They've given all their notices to

25   the people they think they need to give notice to.  There is

1    no evidentiary value to anything that's there.  This is just a

2    burden on the estate and we should be -- we've preserved all

3    of the ESI.  We've indicated we've preserved that.  We're

4    preserving the documents, but the facility should be allowed

5    to go and we should be allowed to sell the stuff.

6              THE COURT:  So, you're proposing to preserve the

7    documents where?

8              MR. GOTTFRIED:  We would -- well, right now all the

9    ESI, Harris Beach has that.  They are the trustee's special

10   counsel.  They went in and collected that information and we

11   would preserve it in a central warehouse.  We're not going to

12   throw any papers away.  That's the one thing I want to be

13   clear about.  We're preserving the papers.  This is about --

14             THE COURT:  And the hard drives?

15             MR. GOTTFRIED:  The hard drives we're not throwing

16   away.  Those will be available.

17             THE COURT:  Okay.  Thank you.  I will think about it.

18             MR. GOTTFRIED:  Thank you, your Honor.

19             MS. JOHNSON:  If I may, your Honor.

20             THE COURT:  Yes.

21             MS. JOHNSON:  Thank you.

22             Three quick comments.  The first is that the

23   Plaintiffs' Steering Committee did not object to the trustee's

24   notice relating to the preservation issues.  We did attend the

25   additional inspections when various defendants were present on

1    the premises.

2            The second point is that the -- we completely agree

3    with the Court's suggestion that if there are additional costs

4    related to the defendants' preservation concerns, that it may

5    be appropriate for the defendants to shoulder those costs, and

6    I particularly appreciate Mr. Braceras' offer to pay for

7    collecting of that ESI.  It sounds like it makes sense for

8    that to be something that's considered in the ongoing meet and

9    confer.

10           And the third, I understand, your Honor, that you

11   intend to refer discovery matters to Judge Boal and we support

12   that.  It occurs to me that because some of these discovery

13   concerns have been raised now in addressing this issue, it may

14   be helpful for the Court to understand what was contemplated

15   by the bankruptcy settlement agreements about discovery that

16   may be taken from NECC.

17           So, I have a copy of the settlement agreement here.

18   If I may hand that up to the bench.

19           (Attorney Johnson hands documents to the Court.)

20           THE COURT:  Do you, by chance, have one copy for

21   Judge Boal?

22           MS. JOHNSON:  I do, your Honor.

23           THE COURT:  Thank you.

24           MS. JOHNSON:  There are two places in the agreement

25   where discovery is addressed.  I suggest that the Court turn

1    to the second pink tab, which says, "The terms of the MDL stay

2    order, which is forthcoming," we discussed that earlier, "as

3    requested by the MDL stay motion shall include" -- and I'll

4    jump to Roman III.

5          "The permissibility of discovery against the estate

6    parties, the contributors and the contributor and affiliate

7    released parties, but only to the extent the discovery is

8    relevant to the prosecution or defense of claims against

9    defendants other than the estate parties, the contributors and

10   the contributor and affiliate released parties."

11          I mention this specifically because I understand --

12   and certainly the PSC has filed the motion to lift the stay of

13   discovery as to the affiliated defendants -- that many parties

14   are about to request from this Court additional discovery and

15   I share with the Court what it is that has been contemplated

16   and agreed to by the parties of the insider settlement

17   agreement.

18          THE COURT:  Thank you.

19          But how does one decide at this stage which of the

20   documents are relevant?  I guess we don't have to do that if

21   we preserve all documents and the hard drives, and the like,

22   right?  Once they're preserved, then the discovery proceeds as

23   it always would.  And then the only question is whether any of

24   the machinery or whatever the devices are, are in any way

25   relevant to any defenses to the case.  Is that about right,

```
1    Mr. Gottfried?
2           MR. GOTTFRIED:  I think that's right.  I think if you
3    de-couple preservation from production.  Production is
4    something that would be dealt with in the context, presumably,
5    of a specific request, assuming the Court were to enter the
6    stay order in the context of this language in the stay order,
7    which is precisely what we're going to be seeking, is that the
8    Court enter an order in accordance with the settlement
9    agreement, all points, A(2) and (3), and I think that can be
10   done in the context of a specific request, but at this point
11   we're saying it's really about preservation.  Production,
12   obviously, would be dealt with at a later date and that was my
13   point about not conflating those points now.
14          THE COURT:  I think I understand Mr. Gottfried's
15   point of view, Mr. Braceras' and Ms. Greer's and Mr.
16   Schramek's.
17          MR. BRACERAS:  Your Honor, just one thing.
18          THE COURT:  Mr. Braceras, I do know that you like to
19   have the last word and, of course, you can.
20          MR. BRACERAS:  Sorry, your Honor.
21          THE COURT:  That's okay.
22          MR. BRACERAS:  Is the videotapes, hard drives,
23   documents and the videotapes...
24          MR. GOTTFRIED:  Our motion in the footnote says we
25   preserve whatever videotapes existed.
```

```
 1              THE COURT:  Okay.
 2              MR. FERN:  Judge, if I can.  Frederick Fern.
 3              I probably have more personal knowledge of what took
 4    place at or about the time of the recall since I was on the
 5    premises at the time.
 6              My team went in and we preserved and collected all of
 7    the ESI from the main computers, from the PCs, from personal
 8    PDAs that were available.  All of that was preserved and
 9    collected.
10              Though Mr. Braceras may have seen towers of
11    computers, there's no hard drives in those computers.  We made
12    forensic copies which are in my database.  About ten days
13    thereafter the federal agents came in pursuant to a search
14    warrant and executed that search warrant and took out all of
15    the hard drives.  They're in their possession.  As to the
16    videotapes --
17              THE COURT:  Do you have copies of them?
18              MR. FERN:  We made copies before they were taken,
19    Judge, and pursuant to those copies is how we've been able to
20    produce the 44,000 pages of documents that we have produced
21    during informal discovery over the last 20 months or so.
22              As to the videotapes of the surveillance tapes, they
23    were on a 30-day loop.  Anything prior to 30 days was
24    automatically erased.  We have the 30 days from about October
25    5th or so through September 5th of 2012.  We've preserved
```

```
 1   those, collected those, and those are in our database.
 2             THE COURT:  30 months' worth?
 3             MR. FERN:  30 days' worth, Judge.
 4             THE COURT:  You said from October --
 5             MR. FERN:  From October 2012 to September 2012.  So,
 6   a month going back.  So, to do it right, from September
 7   through October 2012, we have 30 days of videotape that were
 8   still viable at the time we went in and did the preservation
 9   and collection.
10             There is -- going in and looking at the equipment,
11   Judge, there is nothing in the same condition as it was in
12   October of 2012.  There's been no air conditioning.  There's
13   been no vent.  There's been no negative air pressure.  No one
14   has been working in there.  So, it's fair to say that there's
15   nothing in the same condition, which is a similar argument
16   that Magistrate Boal heard back in Christmastime of 2012, when
17   we -- when the PSC wanted to do their inspection and the
18   Magistrate, in her infinite wisdom, gave them a four-day
19   inspection with videos, experts, drilling, and the PSC took
20   whatever they wanted to do at the time.
21             It's fair to say that the evidence they collected
22   back then is a much fairer representation of what the clean
23   room looked like at the time of the alleged negligence than it
24   does 20 months later, with no one being in there.
25             It's very -- the rhetoric I'm hearing from the people
```

1    in the room, Judge, to what end?  There's no doubt that there

2    was contamination which emanated from the clean room back in

3    September -- or the summer of 2012.  Going in now and forcing

4    the trustee to continue to preserve either the equipment or

5    anything else in the clean room is just -- I don't understand

6    to what end and to what purpose is it going to serve.  Is it

7    going to help to defend their case?  Is it going to help to

8    prosecute their case against NECC?  I don't understand.  I

9    understand the lawyers' need to gather everything that they

10   can and not take no for an answer, but I think the Judge --

11   the Court here has to take that under consideration as to what

12   -- the cost of it, the effort to be gained and what's going to

13   come out at the end.  We have preserved everything that was

14   viable back on September 28th of 2012, the day of the very

15   first recall and what we have --

16           THE COURT:  By "viable" --

17           MR. FERN:  -- the Federal Government has.

18           THE COURT:  By "viable" you mean everything that was

19   not partially destroyed or disfigured, or what?

20           MR. FERN:  Judge, when we were in there, this was a

21   working environment.  There were still employees on the

22   premises.

23           THE COURT:  But what does "viable" mean in this

24   context?

25           MR. FERN:  Anything that was available for us to

1  preserve and collect, we preserved and collected.

2         Now, as to documents that are still on the tables and

3  desks there, Judge, I have not been there since Christmas of

4  -- actually, December 22nd, 2012.  I do not know what's still

5  on the tables of those people.

6         If the Court orders and if the other parties are

7  willing to pay for it, we can go back in.  My team is familiar

8  with the premises.  I had 30 people there scanning documents,

9  making forensic copies of ESI with -- if someone else is

10 willing to incur the cost, we could go back in and finish

11 whatever -- whatever material that's on the desks that the

12 defendants saw during their recent inspections of the

13 premises.

14        THE COURT:  Okay.  I will take the matter under

15 advisement.

16        MR. GOTTFRIED:  Thank you, your Honor.

17        THE COURT:  That is the matters.  There are a whole

18 bunch of them.

19        Status of appeals, is there anything to report?

20        MS. JOHNSON:  Yes, your Honor.  There are currently

21 three appeals pending before the First Circuit, all relating

22 to orders of this Court transferring cases from state courts

23 pursuant to bankruptcy jurisdiction.

24        The first of those is an appeal from Judge Saylor's

25 original order on that transfer issue.  I understand the

1    briefing on that will be completed soon, but there is not yet

2    any oral argument scheduled.

3            There is also a second independent appeal from this

4    Court's order more recently transferring some additional

5    cases.

6            And, finally, there's a petition for mandamus.  There

7    is no briefing schedule set yet as to the second and third

8    matters before the First Circuit, and it seems to be unclear

9    at this point in time whether the First Circuit will wait and

10   hear all three of those at the same time or whether it will

11   take them as the briefing schedules become complete in turn.

12           THE COURT:  Okay.  Further status conferences.  I

13   think we have agreed on September 18th at 3:00 and October

14   23rd at 2:00.

15           MS. JOHNSON:  We would request, if possible, that we

16   could schedule for November and December so that we have dates

17   around the holidays.

18           MR. STRANCH:  Your Honor, would it be possible to

19   have that -- that other status conference after Thanksgiving?

20   I've got a three-week trial starting the first of November and

21   I know some other PSC members are going to be out of touch

22   early in November as well.

23           THE COURT:  I think that's a good idea probably, but

24   then we should probably skip December.  December comes in the

25   middle of the --

1          COURTROOM DEPUTY CLERK URSO:  Judge, Thanksgiving is
2     the last week of November, November 27th.
3          THE COURT:  So, we'll do it the first week of
4     December.
5          MR. STRANCH:  Perfect.  Thank you, your Honor.
6          COURTROOM DEPUTY CLERK URSO:  Okay.  Judge, what are
7     you looking at?  We have another MDL coming in on Thursday,
8     December 4th.
9          (Discussion off the record at the bench.)
10          MR. STRANCH:  Your Honor, that's actually us on
11     December 4.  I'm already going to be here.  I would love to do
12     them both at the same time.
13          THE COURT:  Is it Prograf?
14          MR. STRANCH:  Yes, your Honor.
15          MS. JOHNSON:  Yes, your Honor.
16          THE COURT:  Can we do them both on the same day?
17     Prograf won't take very long.
18          MR. STRANCH:  No, it will not.
19          THE COURT:  One at 2:00, the other at 2:30.  This one
20     at 2:30.  This is December 4th?
21          COURTROOM DEPUTY CLERK URSO:  This is December 4th,
22     yes.
23          (Discussion off the record at the bench.)
24          THE COURT:  Now, with respect to Part B, Paragraph 8,
25     I propose that all motions that are ripe for hearing by

1  September 17th be heard on September 17th, and I would ask Ms.

2  Johnson or somebody to give me a list of them maybe a week or

3  so before so that I can prepare for the hearing.

4          MS. JOHNSON:  We're happy to do that, your Honor.  In

5  fact, we had intended to file a list maybe next week

6  identifying them.  We can hold that a little so that we make

7  sure that we capture everything that's ready.  There is one --

8          THE COURT:  And there was a misunderstanding by some

9  counsel about hearing certain motions today.  I do not recall

10  having scheduled any motion hearing today.  So, I didn't hear

11  them.  Although they asked if they can participate by

12  telephone and I said that was fine.  So, whatever needs to be

13  heard please put on the list and we'll hear it.

14          MS. JOHNSON:  Yes, your Honor.  There is --

15          THE COURT:  What that means is that Prograf will, in

16  fact, have to take maybe five minutes or so, right?

17          MR. STRANCH:  Yes.  I'll be quick, I hope, your

18  Honor.

19          MS. JOHNSON:  Is that a pretrial conference?

20          MR. STRANCH:  Final pretrial conference.

21          COURTROOM DEPUTY CLERK URSO:  Yes.

22          MS. JOHNSON:  Okay.  There is one matter, your Honor,

23  and where counsel are present today and are prepared to argue,

24  if the Court wishes, though I've spoken with both Ms. Gidaro

25  who is counsel for the plaintiffs and Mr. Lang who is counsel

1    for the defendants, both of whom have agreed and have no

2    objection to waiting until September if the Court would

3    prefer.

4              THE COURT:  I would prefer that because I'm not

5    prepared.  I haven't looked at the papers.  So, I can't really

6    participate in the argument at all.  So, I would prefer that

7    and I thank counsel for their consideration.  Okay.

8              MS. JOHNSON:  The only other --

9              THE COURT:  Any motions that do not require hearing,

10   let me know about them and we'll just do them in the normal

11   course as soon as they're ripe.  I mean, I can't imagine why I

12   need to hear argument on motions to amend, for instance, but

13   maybe.  Whatever you decide, I will accept.

14             MR. STRANCH:  Your Honor, the motion to amend, we

15   think that there is a good chance that that may actually be

16   able to be resolved and be basically assented to.

17             THE COURT:  That's fine.

18             MR. STRANCH:  That may not be something that you need

19   to worry about anymore.

20             THE COURT:  Now, is that it on the -- on Paragraph 8?

21             MS. JOHNSON:  That takes care of, your Honor, 8, yes.

22             THE COURT:  Now, with respect to 9, I have received

23   not an agreed proposal, but two separate proposals.  I will

24   review them and I will decide which one I go with or how I try

25   to assimilate the two of them into one.

1          MR. COREN:  Thank you, your Honor.

2          THE COURT:  So, that's Paragraph 9(a).

3          9(b) is the PSC's motion for leave to file reply,

4     which is allowed.  It is Document No. 1290.

5          And Paragraph C, a joint motion of the unsecured

6     creditors to file a sur-reply, Docket No. 1293, and that is

7     allowed as well.

8          Paragraph 10, the trustee's motion for entry of a

9     supplemental order transferring an additional case and related

10    thereto, I think, is Insight Health's motion for entry of a

11    supplemental order transferring additional personal injury

12    cases.  The first one of these was 1252 and the second, 1300.

13    Is there any opposition to either of these?

14          (No response.)

15          THE COURT:  So, they'll be allowed.  They are

16    allowed.

17          11 is discovery motions, which, as I previously

18    indicated, I would all refer to Judge Boal.

19          12 is the entry of a case management.  It is called,

20    "Entry of Case Management Order Regarding Virginia Matters,"

21    No. 1188, and an opposition.

22          What is not clear to me is that, as I read the motion

23    for entry of a case management order, it is simply an order

24    that would allow use of already-produced discovery by all

25    parties who are coming in.  Whereas, Insight appears to regard

1    it as something all together different, and I'm not exactly

2    sure why there is such a difference.  If anybody wants to

3    address it, I'm happy to hear it.

4            MR. FENNELL:  Your Honor, this is Patrick Fennell for

5    the Plaintiffs' Steering Committee.

6            THE COURT:  Okay.

7            MR. FENNELL:  I'll be happy to speak to that.

8            THE COURT:  I mean, tell me whether I'm correctly

9    interpreting the order as PSC has described it.

10           MR. FENNELL:  Right.  The scope of the original case

11   management order that the PSC asked for in its June motion is

12   a little bit broader than just discovery.  It also addresses

13   some orders that were entered by the state court in a couple

14   of cases that were -- spent a lot of time in state court

15   before being either resolved or transferred into the MDL.

16           So, in that -- in our motion -- in the PSC's motion,

17   we have asked the Court to issue an order ruling that the

18   discovery in those two cases, those two state court cases, can

19   be spread across all of the Virginia cases.  So, the discovery

20   is the one issue, but the other issue is rulings on certain

21   things, motions -- dispositive motions and those kinds of

22   things.

23           THE COURT:  So, Insight is correct that, in fact, the

24   motion asks for more than the opening of discovery to other

25   cases that are coming into this case?

1          MR. FENNELL:  It is more than just discovery, yes,

2     your Honor, but --

3          THE COURT:  Is there objection to the discovery

4     portion of the PSC's motion?

5          MR. FENNELL:  I'm sure that Mr. Busch can speak to

6     that, your Honor.

7          On a more immediate concern, though, is the filing

8     that the PSC filed yesterday asking the Court to schedule that

9     motion for oral argument and, if I may, your Honor, I would

10    like to provide the Court a little bit of background as to why

11    it is urgent, in our view, that that motion be heard soon.

12         The Virginia plaintiffs' attorneys, representing

13    about 152 plaintiffs, do have claims against Insight Health

14    Corporation and some other Virginia defendants are moving very

15    rapidly toward a mediation.  We've agreed on a schedule.

16    We've agreed on a location.  We have had co-mediators,

17    Professor Green and a retired judge, Stanley Klein from

18    Virginia, working with us for several weeks, now, preparing

19    for this mediation, and there is an issue that the PSC is

20    concerned about, because it has to do with the discovery issue

21    that is raised in our motion for case management order and

22    that is this:

23         The plaintiffs in Virginia have requested that the

24    discovery which is the subject of the PSC's motion -- case

25    management order be shared with the plaintiffs simply now for

1    the time being just for the purposes of conducting this

2    mediation, and Insight's position on this is that it does not

3    want that discovery shared with all of the plaintiffs or even

4    the mediators for the purposes of conducting that mediation,

5    and there are a lot of Virginia plaintiffs and their counsel

6    who are very concerned and the PSC is concerned that without

7    full access to that discovery, the mediation is very, very --

8    it's on very tender ground.  Its chances of success will be

9    minimal, if there's any at all, if we even get to mediation.

10          So, the PSC is concerned and has requested in the

11    motion, in the document that it filed yesterday, that we

12    schedule oral argument for the purpose of getting an order

13    entered on the discovery issue soon.  We are scheduled to

14    begin our mediation on September 11th and we would like to

15    have oral argument in time for the Court to make a ruling on

16    the discovery issue so that it can make a difference in this

17    mediation.

18          THE COURT:  What is the docket number of the most

19    recent filing?

20          MR. FENNELL:  There was a filing yesterday, Docket

21    No. 1311 --

22          THE COURT:  Okay.

23          MR. FENNELL:  -- which was the request for oral

24    argument and it was also styled as a "supplemental memorandum

25    in support," and then today we filed a declaration from Scott

1    Sexton, who was one of the Virginia attorneys, in support of

2    that filing yesterday.

3            THE COURT:  Does anybody wish to be heard on behalf

4    of Insight?

5            MR. BUSCH:  Thank you, your Honor.  Again, Stephen

6    Busch for Insight Health Corp.

7            And, first, Judge, what is going on right here with

8    the filing of this supplemental brief yesterday -- which, by

9    the way, was filed after I was already at the airport on my

10   way up here and I think Mr. --

11           THE COURT:  How much time do you want to file a

12   sur-reply or the sur-sur, or whatever, reply?

13           MR. BUSCH:  Your Honor, I think the real issue before

14   the Court on this is the bootstrapping of a dispute over the

15   exchange of mediation materials to a preexisting motion for a

16   case management order, and that's the real issue.

17           THE COURT:  Well, what is it that you object to in

18   the so-called case management order?

19           MR. BUSCH:  Well, one thing --

20           THE COURT:  If, in fact, it was as I thought it was,

21   simply a request to make available existing -- produce

22   discovery to new parties, would you object to that?

23           MR. BUSCH:  Judge, I think your question is the exact

24   reason I don't think this matter is teed up appropriately

25   before the Court.

1         We have been in touch with Professor Green.  He has

2    offered to work with the parties to resolve the exchange

3    mediation materials.  We have offered dates for next week to

4    do that.  I haven't seen any of the plaintiffs who have

5    declined to take him up on that opportunity, and our view is

6    that we should work this out with the mediator, like you do

7    with any other issue, by exchanging information.  I want the

8    record to be very clear that we have agreed that any

9    information that was not subject to a protective order and

10   could be shared should be shared with the plaintiffs and we

11   have encouraged them to do that.

12        What this really is, your Honor, is an effort to set

13   aside a protective order in state court and we think there

14   needs to be a record and a separate argument of that and we

15   think if we don't work it out with Professor Green next week,

16   that they ought to file a motion to set aside the protective

17   order in the state, not filed in state court, but to set aside

18   the protection of what was filed in state court.

19        We want to have a successful mediation, just like

20   they do.  We put a lot of resources into this.  We've

21   indicated that they can share the discovery that was taken in

22   these cases that is not subject to a protective order.  If

23   they think there is information that is subject to a

24   protective order that they want access to and we don't work it

25   out with Professor Green, they should file a motion.  They

1    shouldn't try to bootstrap it on a case management order.

2           And I would also add, Judge, that we set up a

3    briefing schedule in this case management order.  We gave them

4    an opportunity to file a reply, which is not permitted by

5    these local rules.  They filed this document last night,

6    inconsistent with what that order was that your Honor entered.

7           And I should finally say that there has been no meet-

8    and-confer on this issue and I don't know if that means that

9    the PSC thinks that the local rule requiring meet-and-confer

10   doesn't apply at all or just doesn't apply to them.

11          THE COURT:  Let me just be clear that I understand

12   the issue.  Is the issue only such discovery as is subject to

13   a state order -- protective order?  Is that the only issue?

14          MR. BUSCH:  Your Honor --

15          MR. FENNELL:  For the mediation it is, your Honor.

16          Mr. BUSCH:  Your Honor, I think that you've already

17   smoked out the fact that the case management order raises a

18   whole bunch of different issues.

19          THE COURT:  I didn't smoke that out.  Insight says

20   that, but, as I read the original order of the PSC, it was --

21   the original motion, it was a motion to allow discovery that

22   had been produced heretofore to be made available to other new

23   parties who are coming into the case.

24          MR. BUSCH:  And, your Honor, we've already

25   committed --

```
1              THE COURT:  Let me just finish.
2              So, if that is the issue, then I don't see what the
3    problem should be.  Then you have narrowed the issue somewhat
4    by saying that you do not object to the production to new
5    parties of all discovery except that which is subject to a
6    state protective order; is that correct?
7              MR. BUSCH:  That is correct.  And we put that in
8    writing to the Virginia plaintiffs and the Plaintiffs'
9    Steering Committee.  We said --
10             THE COURT:  So, at the moment you don't object to
11   their turning over -- to allowing their motion, as I
12   understand it, to allow them to turn over materials that were
13   produced for the then-existing parties to any new parties so
14   long as it's not subject to a protective order?
15             MR. BUSCH:  That is correct.
16             THE COURT:  And there is an issue with respect to the
17   protective order that you say that Eric Green is trying to
18   work out with the parties?
19             MR. BUSCH:  That is correct.
20             THE COURT:  Do the plaintiffs agree that's the case?
21             MR. FENNELL:  Yes, your Honor.  We're happy to try
22   and work this out with Insight.  We've been working on this
23   issue now pretty hard for --
24             THE COURT:  Are you talking about the same issue as I
25   understand it?
```

```
1              MR. FENNELL:  Absolutely, your Honor.

2              THE COURT:  Okay.

3              MR. FENNELL:  And all the PSC is requesting right now

4    is in the event that we cannot work this out through Professor

5    Green or any other manner, we would like to have oral argument

6    on the issue of whether this discovery --

7              THE COURT:  Okay.

8              MR. FENNELL:  -- should be made available to all of

9    the plaintiffs in Virginia for this mediation.

10             THE COURT:  I suggest that you let me know if you

11   break -- if the discussions with Mr. Green -- Professor Green

12   break down.  You'll file a motion.  I'll hear you.  And that's

13   fine.

14             But the only issue is discovery previously produced

15   that is subject to a protective order and whether that should

16   be turned over to the new parties, right?

17             MR. FENNELL:  For purposes of preparing for this

18   mediation, yes, ma'am.

19             THE COURT:  Okay.  Well, that's all we're talking

20   about.

21             MR. BUSCH:  And, your Honor, to be clear, on one

22   point --

23             THE COURT:  I suppose once it's produced, if the

24   mediation fails, everybody has it, right?

25             MR. FENNELL:  Right.
```

1          The original request for the case management order --

2     we did request some rulings on some orders that came from the

3     state court.  That's not important for purposes of conducting

4     this mediation.

5          THE COURT:  At the moment we don't worry about it.

6          MR. FENNELL:  Right.

7          MR. BUSCH:  And, your Honor, to be clear on one

8     particular point, while we certainly told --

9          THE COURT:  Every time I think it's clear and you

10    tell me that there's something else that needs to be discussed

11    for clarity, I failed.

12         MR. BUSCH:  Well, since there hasn't been an argument

13    on the motion, the specific relief in the form in which they

14    requested --

15         THE COURT:  We're not doing that.  We're narrowing it

16    down now and we understand that there's no problem in turning

17    over any discovery to new parties that is not subject to a

18    protective order and that the discovery that is subject to a

19    protective order will be worked out with Eric Green.  To the

20    extent it cannot be, I will get a motion and hear it.

21         MR. BUSCH:  Right.

22         And the point I wanted to make, Judge, is that the --

23    I don't want to use the term "lead" because they've been in

24    this the longest, but the Gentry Locke Rakes & Moore law firm

25    had the first case that was resolved.  They have 18 of these

```
1    cases.  They've taken most of these depositions.  They were

2    the authors of the protective order and --

3              THE COURT:  They want to get paid?

4              MR. BUSCH:  -- at least the first one is -- we have

5    told them repeatedly they are permitted to share information

6    that's not protected and it should be done by them at their

7    expense and they shouldn't try to shift that onto my client.

8    I just want to be clear on that.

9              THE COURT:  I understand.  I knew it had to do with

10   money.

11             Okay.  So, that takes care of Paragraph 12.

12             13, motions for extension of time.  I don't think we

13   really have any major issues on that, do we?

14             MS. JOHNSON:  No, your Honor, I do not believe so.

15             I will note on those, though, for the first time

16   there is an opposition to an extension of time.  If you look

17   at No. 13(iii), there is an opposition to that request for

18   extension of time, and I believe that counsel on that matter

19   are either present in the courtroom or available by phone, if

20   you would like to speak with them.

21             THE COURT:  Are they here?  Are they on the phone?

22             Oh, you're here.

23             MR. WALKO:  For the defendants who oppose, we rest on

24   the briefs unless the Court would like to hear.

25             Matthew Walko for defendants Hahnemann University
```

 1     Hospital and Tenet HealthSystem.

 2            THE COURT:  There's a serious objection to an

 3     extension of time?

 4            MR. WALKO:  Yes, because it relates to a prior motion

 5     that is waiting decision having to do with the request for

 6     withdrawal of plaintiffs' counsel.  The determination of that

 7     motion will make a difference as to what you resolve in the

 8     extension of time.  All we ask is that the Court address it

 9     and if it grants any relief, that a date certain be indicated.

10            THE COURT:  Okay.  I'll decide it.

11            Dispositive motions, we've talked about those.  You

12     will give me the list of those that are ready, I guess about a

13     week before we do them.

14            MS. JOHNSON:  Yes, your Honor.

15            THE COURT:  Motions already heard.  We are working

16     very hard on those.  Unfortunately, they're complicated and

17     it's a long opinion and you will have it, hopefully, next

18     week.

19            Now, I thought I had ruled on the motion for the

20     Tucker Law Group to withdraw in the Norma King case, but I

21     think I haven't, right?

22            MS. JOHNSON:  You have not issued a written order on

23     that.

24            THE COURT:  Okay.  So, I will do that as well.

25            With respect to Part C.

1          MS. JOHNSON:  The only thing in Part C that may be

2     worth mentioning, your Honor, today would be No. 17, Insight's

3     motion to strike 18 state court orders, and I only mention

4     that because that relates to some of the other matters we've

5     addressed earlier today.

6          THE COURT:  Well, Ms. Johnson, what should I do with

7     that?

8          MS. JOHNSON:  Well, I was going to say you should

9     deny it.  I don't mean to be flip, your Honor.

10         (Laughter.)

11         THE COURT:  I don't have the authority.

12         MR. BUSCH:  Judge, I may speak to this.  Steve Busch

13    on behalf of Insight Health Corp.

14         We filed a motion and, obviously, as you know because

15    you've spent a lot of time and are dedicated, while

16    participating in a mediation process, we gave the opposing

17    counsel an extension of time to respond and we're happy to

18    give them a further extension of time to deal with this.

19         THE COURT:  So, we should just ignore this motion

20    until the mediation is finished.

21         MR. BUSCH:  I think that would probably make a lot of

22    sense, Judge.

23         THE COURT:  Okay.

24         MS. JOHNSON:  The reason I mention it, your Honor,

25    really, is because there are three currently-pending motions

1   relating to the Insight matters that may sound like discovery

2   matters, but may be things that your Honor chooses.  Those

3   would be numbers -- agenda No. 12, PSC's motion for entry of

4   case management order.  Agenda No. 17 --

5           THE COURT:  Well, that one may be related to the

6   mediation.  So, I think that one should proceed as we decided

7   before.

8           MS. JOHNSON:  Yes, your Honor.

9           THE COURT:  But this one we're talking about now, we

10  should ignore until the mediation is done, hopefully,

11  successfully, in which case, I don't have to do anything with

12  it.

13          MS. JOHNSON:  Yes, your Honor, we agree with that

14  one.

15          THE COURT:  Okay.

16          MS. JOHNSON:  The only other matter related to -- the

17  motion to amend related would be No. 3(b), which we discussed

18  previously.

19          THE COURT:  Okay.

20          MR. BUSCH:  Judge, there's, likewise, No. 22, which

21  is Insight Health Corporation's motion for reconsideration

22  that has to do with the request for admissions in the state

23  court and a partial summary judgment and I think, likewise,

24  that matter could be continued to the backside of the

25  mediation.

1          THE COURT:  That's anther one to be ignored.

2          MR. BUSCH:  Not to be ignored, necessarily, but

3    perhaps to be put off for another day.

4          THE COURT:  Is there anything else that we need to

5    talk about today that is not on the agenda?

6          (No response.)

7          THE COURT:  As always, I thank you for your help and

8    we will meet again on September 17th, those of you who have

9    motions, and on the 18th, those of you who do not.

10          MS. JOHNSON:  Thank you, your Honor.

11          MR. STRANCH:  Thank you, your Honor.

12          (Adjourned, 3:37 p.m.)

13

14                C E R T I F I C A T E

15          I, Catherine A. Handel, Official Court Reporter of the

16    United States District Court, do hereby certify that the

17    foregoing transcript, from Page 1 to Page 58, constitutes to the

18    best of my skill and ability a true and accurate transcription of

19    my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

20    Re: New England Compounding Pharmacy, Inc., Products Liability

21    Litigation.

22

23    August 10, 2014          /s/Catherine A. Handel
      Date                     Catherine A. Handel, RPR-CM, CRR
24

25