UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | ) ) ) MDL No. 1:13-md-2419-RWZ |
| | ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| | ) |
| 1:14-cv-12905-RWZ: Epperly v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12908-RWZ: McFarlane v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12910-RWZ: Smith v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12916-RWZ: Kalinoski v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12917-RWZ: Filson v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12919-RWZ: Bradley v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12924-RWZ: Foutz v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12927-RWZ: Whitlow v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12928-RWZ: Harris v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12929-RWZ: Smith v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12930-RWZ: Holbrook v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12931-RWZ: Courtney v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12938-RWZ: Brown v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12939-RWZ: Shuck v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12940-RWZ: White v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12941-RWZ: Brown v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12942-RWZ: Artis v. Insight Health Corp., *et al.* | ) |
| 1:14-cv-12978-RWZ: Bender v. Insight Health Corp., *et al.* | ) |
| | ) |

## MEMORANDUM IN OPPOSITION TO INSIGHT HEALTH CORP.'S MOTION TO STRIKE EIGHTEEN STATE COURT ORDERS AS VOID AB INITIO

These cases arrived at this Court through the Trustee's Motion to Transfer, which sought only a removal and transfer that would "not affect any substantive rights that the plaintiffs and other non-debtor parties have or assert in the Pending Actions." (MDL Doc. # 37, at 2). This Court's June 5, 2014 Order (Doc. # 1173) allowed that requested relief. Insight's Motion to Strike seeks to do just the opposite --- to re-litigate state law matters and motions on Virginia law that have already been decided, hoping for a different result.

1

The Court should deny Insight's Motion for at least three reasons. First, Insight's facts are incorrect. For this reason, substantial attention is directed to the facts in this memorandum. Second, Insight's Motion is built erroneously upon a strawman assertion that these cases were removed from Roanoke City Circuit Court under 28 U.S.C. § 1446. This Court acted under a different statute, 28 U.S.C. § 157(b)(5) --- the same statute included in the Trustee's underlying motion that was granted by this Courts June 5, 2014 Order. Third, Insight attempts to invoke the protection of the automatic bankruptcy stay under 11 U.S.C. § 362, which obviously does not apply to unrelated, non-debtor defendants such as Insight.

## Relevant Facts, Background and Procedure

Plaintiffs represented by Gentry, Locke, Rakes, & Moore, LLP (the "Gentry Locke Plaintiffs") filed nineteen cases[1] asserting state law claims in Roanoke, Virginia against Insight Health Corporation, Inc. ("Insight"), Image Guided Pain Management, and its physician owners and employees, Dr. Mathis and Dr. O'Brien (collectively "IGPM"). Insight is one of the nation's largest medical imaging organizations. It is a sophisticated company, owned by a multi-billion dollar private equity firm, Black Diamond Capital Management. (**Exhibit 1**, Insight Press Release, previously marked as Dep. Ex. 126). In 2010, it purchased a hospital-owned imaging clinic in Roanoke, Virginia and then contracted with IGPM to provide radiological services at its Insight Imaging-Roanoke facility. (Case 12917, Doc. #6, ¶ 9, 14).

The Gentry Locke Plaintiffs' state court complaints contain a negligence count and were accompanied by a certification under Virginia Code Section 8.01-581.1 — the Virginia medical malpractice statute. The complaints plainly alleged that Insight and IGPM had a "healthcare provider-patient relationship" with each plaintiff (e.g., **Exhibit 2**, original Filson Complaint, p. 7,

---

[1] One of which, *Wingate v. Insight Health Corp., et al.*, has already been resolved.

2

¶50).[2] The first 11 Gentry Locke Plaintiffs' cases were filed in rapid succession between December 27, 2012 and January 8, 2013. The remaining 8 complaints followed shortly thereafter, but all of the cases contained exactly the same factual allegations and legal causes of action, differentiated only by specific medical information relating to each individual plaintiff.

Insight filed demurrers (motions to dismiss) the Complaints in each of the Gentry Locke cases asserting, among other things, that the Plaintiffs' negligence and gross negligence allegations against "Insight Imaging – Roanoke" were really just against IGPM.[3] It denied the existence or proper allegation of a patient relationship with the Plaintiffs (e.g., **Exhibit 3**, Demurrer to Filson Complaint, at 4).[4] It filed substantively identical demurrers in all of the other Gentry Locke cases.

In February 2013, Insight fleshed-out this non-provider defense theory by announcing to counsel for all parties (including co-defendant IGPM) that it was not a "healthcare provider." It did so for two reasons that it deemed strategic at the time for purposes of avoiding liability: (1) it sought to place all blame for medical decisions solely on IGPM, the physician defendants (as it still does); and (2) it sought to deny that it had any patient-provider relationship (and corresponding duty) with the plaintiffs. Rather, it took the position that it was simply a manager for IGPM's medical practice.

Being a "healthcare provider" under Virginia law is a privileged status, providing a cap on damages liability and increased evidentiary standards for expert testimony. However, this status

---

[2] Amended Complaints have since been filed restructuring these allegations in light of the contrary position taken by Insight. (e.g., MDL Case 12917, Doc. #6 – Filson Amended Complaint).

[3] Insight was represented by Bonner Kiernan, a well-known firm specializing in litigation defense, with offices in Washington, D.C., Connecticut, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, Rhode Island and Virginia.

[4] "The Complaint further alleges that the epidural steroid injection was administered by Dr. O'Brien …. the Plaintiff's Complaint fails to allege any facts that would support a contention that there was a duty owed by [Insight] to the decedent."

also comes with specialized duties.  Insight purposefully sought to pass those duties off on IGPM and deny the existence of any such duties to the plaintiffs. Insight's calculated decision to shun "provider" status in these cases had nothing to do with any level of ignorance regarding its own business.

After Insight announced its non-healthcare provider status, 11 of the Gentry Locke Plaintiffs sent Requests for Admission to Insight on February 7, 2013, asking it to correspondingly either admit that it was a healthcare provider or admit that it was not. (**Exhibit 4**).[5]  Insight subsequently filed a Memorandum in support of its demurrer in Wingate, asserting that the Plaintiffs' negligence cause of action should be dismissed against Insight because there was no provider-patient relationship. (**Exhibit 5**, 2/25/14 Insight Memorandum in Support at 14). Shortly thereafter, it responded consistently to the healthcare provider Requests for Admission (in the first 11 cases) by both denying that it was a healthcare provider, and admitting that it was not healthcare provider. (e.g., **Exhibit 6**). Insight's regret for this strategic decision accounts for most of the tempest generated by Insight in its prior "Emergency" Motion with this Court (Doc. # 1149); and, it accounts for most of its present Motion to Strike.

Procedural History:

On February 27, 2013, counsel for all parties met with the Roanoke City Circuit Court Judge and conducted a preliminary planning conference relating not only to the lead Wingate case, but also the other cases that were rapidly filling the Court's docket. [6]  The Judge explained that the Circuit Court was short-staffed with the recent loss of judges.  He indicated that he would be hearing all of the Insight-related cases due to the efficiencies that this would allow.  He requested

---

[5] (1) Admit you are a healthcare provider as defined in Virginia Code § 8.01-581.1.; (2) Admit you are not a healthcare provider as defined in Virginia Code § 8.01-581.1.

[6] As of that date, the defendants had already filed responsive pleadings to 11 of the Gentry Locke Plaintiffs' cases, but two more complaints had been filed and served.

4

cooperation from the parties and their counsel; and, he indicated that he did not want to duplicate work on these cases.  At that time, the plaintiffs proposed a plan to use the Wingate case as the "lead" case and conduct matters in a way that would not needlessly duplicate work.  All of the counsel indicated their consent to this general plan; and the cases proceeded in this manner. (Decl. of Sexton, MDL Doc. # 1161, ¶ 7).[7]

On February 27, 2013, Insight also argued its noticed demurrers in the Wingate case. Insight's arguments focused on whether NECC was a necessary party. As to the merits of its demurrers, Insight simply referred the Court to its written submissions. As of that date, Insight had filed <u>identical</u> demurrers in 11 cases. It went on to file <u>identical</u> demurrers in all of the remaining 8 cases over the next months. (Id. at ¶ 8).  Following that hearing and planning conference, the parties endorsed a Protective Order allowing discovery in the Wingate case to apply to <u>all</u> of the Gentry Locke "Meningitis Litigations" (**Exhibit 7**).[8]

On March 7, 2013, 11 of the Gentry Locke Plaintiffs moved for partial summary judgment as to Insight's healthcare provider status. (**Exhibit 8**).[9]  Each of those motions was noticed and heard on April 5, 2013. Hours prior to the hearing on April 5, 2013 (and, without prior notice or warning), Insight filed a notice of removal to federal court in the Wingate case, but not the other 10 cases noticed that day for hearing on partial summary judgment. Accordingly, the Circuit Court

---

[7] Insight now denies such an agreement, but counsel for the other defendants affirm that such an agreement was, in fact, made.  Arguing to the contrary (as Insight does), starkly defies both the objective evidence and common sense. Doubtless, Insight has never encountered any busy judges who desire or allow multiple hearings of the exact same arguments on the exact same pleadings. It should be noted that the "declaration" that Insight relies upon for this contrary position is provided by Clint Shaw, who is a partner in Bonner Kiernan – a firm that is believed to be presently the object of legal malpractice claims by Insight.

[8] "Meningitis Litigations" are defined in the Protective Order as "this action and other actions on which counsel for the Plaintiff heretofore have been retained to pursue the same legal claims and substantially similar factual claims presented in this action against the same parties hereto with the same defense counsel." Id. at ¶ 2.

[9] To avoid unnecessary duplication, references to representative documents in this Memorandum will refer to the Filson case.  Identical pleadings exist in Bradley, Epperly, Filson, Foutz, Harris, Kalinoski, McFarlane, Smith, J., Smith, R., and Whitlow.  These cases are also referenced as the "10 non-Wingate cases."

5002/684/6757476v5

called the 10 non-Wingate cases for hearing on the issue of partial summary judgment. (Decl. of Sexton, MDL Doc. # 1161, ¶ 10; **Exhibit 9**, Tr. 4/5/13 Hearing, at 1 - 5). At that hearing, Insight objected only that the requested relief was "advisory," but otherwise plainly stipulated that it was not a healthcare provider. (Id. at 29-30).[10] At that hearing, Insight supplemented its admissions by affirmatively waiving any defense to damages provided by the medical malpractice cap: **"We're not subject to the cap. We can't use that as an affirmative defense or a defense to damages."**[11] The Circuit Court granted the motions for partial summary judgment from the bench, and orders were subsequently tendered and entered.

April 5, 2013 had also been reserved as a hearing date for the IGPM demurrers. Since Insight filed the Wingate notice of removal immediately prior to the hearing, the Circuit Court indicated a desire to go forward with the substantively identical demurrer hearings as to the other non-Wingate cases that had not been removed. The Court asked if there was any objection to such a process. Insight offered no objection; and co-defendant IGPM advocated for proceeding with argument on the other cases because they were "basically identical." (Id. at ¶ 11; **Exhibit 9**, Tr. 4/5/13 Hearing, at 37 - 39).[12] The Circuit Court Judge stated his understanding that the issues were "common to all cases." With no objection, the Court then heard oral argument on the demurrer's filed and briefed by IGPM. Insight's counsel indicated that he would like the opportunity to review the transcript of the hearing and possibly offer supplemental submissions if he felt those were necessary. The Circuit Court agreed to Insight's request, with the limitation that

[10] Insight Counsel: **"Well, Your Honor, actually what they're asking essentially is are we or are we not a healthcare provider. We're saying we're not a healthcare provider. We're not subject to the cap. We can't use that as an affirmative defense or a defense to damages." (Exhibit 9**, at 30)
[11] Id.
[12] Court: "… I don't intend to deal with the demurrer on Wingate [which was removed that day], but my understanding is like your partial summary judgment, that this was common to all cases … *mutatis mutandis*, as we say." Id. at 38. Defense Counsel for IGPM: "And, I'd be willing to stipulate that these motions don't turn on some of the minute factual differences between the cases." Id.

any supplemental submissions were to be filed within a reasonable time. (Id. at 74-77). Insight never filed such a submission nor did it ever indicate a desire to do so. (Decl. of Sexton, MDL Doc. # 1161, at ¶ 12). Through this process, the Roanoke Circuit Court essentially gave Insight another chance to argue its demurrers or piggy-back onto those filed by IGPM – all of which everyone agreed were identical among the cases.

In the next days, Insight noticed the removal of the remaining non-Wingate cases. But, the federal court in Roanoke remanded all the cases a month later on May 10, 2013. (Id. at ¶ 13). In the meantime, numerous key fact depositions were taken, essentially insuring Insight's culpability for the injuries at issue. Thereafter, on June 26, 2013, Insight filed Motions for Leave to Amend its Admissions (in 11 cases) and for Reconsideration of Partial Summary Judgment (in the 10 non-Wingate cases). (**Exhibit 10**).[13] Those motions were noticed for hearing in all of those cases on July 9, 2013.[14] In its Motions, Insight asserted that it had only recently learned that it was a healthcare provider due to facts that it discovered about its employees and their functions during depositions that occurred in May, 2013. (Id. at 4).[15] No one believed Insight's excuse for a litany of reasons, such as: (a) Insight's company name prominently features the word "Health"; (b) Insight maintains "Healthcare Professional Liability" insurance policies to whom Insight gave immediate notice of these complaints (e.g., **Exhibit 12,** 2/4/13 Response from insurance carrier); and (c) Insight advertises to the public as a healthcare provider to "patients" (**Exhibit 13**). Insight knew who it was and what it did before and after any depositions in these cases. What Insight actually had learned in the interim was that it was in trouble on liability.

---

[13] Even in its Motions, Insight still maintained that it was an independent contractor of the physicians, rather than the other way around.

[14] **Exhibit 11**, Identical notices were filed in all 10 non-Wingate cases.

[15] Bear in mind, IGPM has only two employees, Dr. Mathis and Dr. O'Brien. Everything that they do not do is done by Insight --- as Insight plainly knew all along.

Much is made by Insight that the Roanoke Court never indicated any intent to apply rulings from one case to the others. However, the transcript of the July 9, 2013 hearing on Insight's Motions for Leave to Amend and for Reconsideration stands in stark contrast to such allegations:

> THE COURT: … I don't mean to make light of it. I am not disparaging the numbers in the notice, but, really, at this juncture <u>if I am going to do it I am going to do it for everybody in every case, and if I am not going to do it I am not going to do it for any cases</u>. I mean, the notice, *vis-à-vis* notices, seems to me doesn't really matter… The issue is the same regardless, isn't it?

(**Exhibit 14**, 7/9/14 Transcript, p. 15, line 23 - p. 16, line 12, emphasis added). At that July 9, 2013 Roanoke hearing, Insight's oral argument tracked the incredible arguments contained within its motions. There is no question that the transcript from the July 9, 2013 hearing indicates the Roanoke Court's intent to apply all legal rulings equally to all cases – <u>to which position Insight lodged no objection</u>.

On October 31, 2013, the Roanoke Circuit Court issued its rulings on the outstanding motions by letter opinion styled in the Wingate case, but substantively resolving the identical issues raised by the demurrers and motions in all of the cases. That 25 page single-spaced opinion methodically addresses all of the issues raised by the parties. (**Exhibit 15**; and Decl. of Sexton, MDL Doc. # 1161, at ¶ 16). There, the Court indicated that it would deny Insight's motions to withdraw and change its admissions and to reconsider summary judgments previously entered on the healthcare provider issue. It found that Insight had "not met its burden under the first prong of Rule 4:11(b),"[16] and denied its motion to amend admissions. It also denied all but one of the demurrers, granting it in part to the fraud count (with leave to amend).

---

[16] (b) *Effect of Admission*. – Any matter admitted under this Rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission … the court may permit withdrawal or amendment <u>when the presentation of the merits will be subserved thereby</u> and the party who obtained the admission fails to satisfy the

8

Case 1:13-md-02419-RWZ   Document 1326   Filed 08/11/14   Page 9 of 17

Thereafter, only the Wingate order was entered as to these issues. By agreement, all counsel elected to delay the entry of orders in the other cases so as to somewhat lessen the already large burden on all of the lawyers. IGPM, particularly, expressed a concern about not being flooded with 19 amended complaints that would require simultaneous substantive responses. (Id., at ¶ 17). Delaying omnibus orders in the other cases allowed a temporary delay of the amended complaints required in order to cure the demurrer that the Court had sustained as to the plaintiffs' fraud count (additional specificity). This also allowed focus to remain on the lead Wingate case, which was in full speed with final depositions, expert disclosures, and an amended complaint. In all that followed, orders were simply never presented in the other cases. (Id.)

This left orders to be entered: (a) in 18 cases on IGPM's demurrers (to which IGPM lodged no objection, and still does not)[17]; (b) in 10 cases on Insight's Motion to Amend Requests for Admissions and Motion to Reconsider Partial Summary Judgment (to which Insight factually cannot argue that such issues were not previously argued in a hearing where Judge Dorsey said **on the record** that his rulings as to one would apply to all); and (c) in 18 cases on Insight's demurrers that were identical to the ones filed and argued in the Wingate case.

In late December 2013, the Trustee renewed his motion to transfer these cases to Boston; and, the Wingate case was resolved in short order. After the Wingate case was resolved and dismissed in February 2014, the parties were focused primarily on whether the Trustee's motion as to the other cases would be successful. Insight's counsel objected to setting any Roanoke trial dates until after the Plaintiffs filed amended complaints. In so doing, Insight's counsel implicitly acknowledged the effect of the prior rulings by the Court as well as expectation that corresponding

---

court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits. Rule 4:11(b) (emphasis added).

[17] IGPM, of course, preserves objections as to the substantive merit of the Roanoke Circuit Court's rulings as to the issues raised by its demurrers.

9

orders would be entered. In fact, the entry of the outstanding demurrer orders was a necessary condition precedent to the filing of any amended complaints in these cases – the filing of which Insight insisted upon (with current counsel) prior to scheduling trials in these other cases. (Id. at 19). Throughout this process, Insight never indicated any notion of re-arguing the previously addressed motions.

Approximately mid-week during the week of May 12 (after Judge Zobel announced on May 13, 2014 that she would be granting the Trustee's Motion), opposing counsel communicated Insight's plan to have the Boston court revisit issues on which orders were not yet entered in the Roanoke City Circuit Court.  Prior to this time, plaintiffs' counsel had been unaware of any such plan. (Id. at 22). But, this conversation with Insight counsel alerted plaintiffs' counsel to the need to present outstanding orders on these issues in the Roanoke Circuit Court. (Id. at 23).

Gentry Locke immediately prepared orders on the Roanoke Court's previous rulings, filed them with the Roanoke City Circuit Court, and sought a hearing for presentment.  Defendant IGPM had no objection to the orders, but Insight did. Moreover, Insight's schedule prevented prompt presentation of the orders during the requested time frame (May 16, 2014), requiring instead that the presentment hearing be delayed for 6 weeks until June 27, 2014. (Id. at ¶ 24-25). Meanwhile, the Gentry Locke Plaintiffs simultaneously alerted the Massachusetts District Court that these orders were pending before the Roanoke Court (MDL Doc. # 1142, at 7-8); and Insight moved this Court for an "emergency" injunction to prevent entry of these outstanding orders (ECF # 1149) – but this Court did not grant that injunction.

Rather, this Court entered an Order on June 5, 2014, granting the Trustee's renewed motion to transfer pursuant to 28 U.S.C. §§ 157(b)(5) and 1334. Because neither of those statutes supplies a removal or transfer process, the June 5 Order essentially enjoined the Roanoke Court to

10

transfer the cases "promptly." The Notice of Removal required by the June 5 Order and filed with the Roanoke City Circuit Court states only that "[p]ursuant to 28 U.S.C. § 157(b)(5), the entire court case file pertaining to this action shall be transferred from the Roanoke City Circuit Court to the clerk of the District of Massachusetts." (e.g., **Exhibit 16**, Notice filed in Filson).

After conducting a telephone conference with all counsel on June 17, 2014, the Roanoke Circuit Court issued a letter/order on June 20, 2014, noting that the files were "presently incomplete due to orders not having been tendered on certain rulings that were previously made." (**Exhibit 17**). Judge Dorsey's letter acknowledged argument by Insight that the Court was "without jurisdiction to enter orders, even orders reflecting prior rulings, without which these files are incomplete." (Id.). The same letter ordered the Clerk of the Roanoke City Circuit Court to transfer the cases after receipt of the orders that he would enter on June 27, 2014. On June 27, 2014, Judge Dorsey entered orders in each of the cases at issue, confirming the Court's prior rulings and specifically incorporating the Court's October 31, 2013 letter opinion in the Wingate case. (e.g., **Exhibit 18**).[18] The cases were thereafter transferred, complying with the injunctive Order of this Court. Insight makes no argument that this action by the Roanoke Court was not done "promptly" as required by the June 5 Order; and, Insight makes no argument that this Court's June 5 Order expressly prohibited the Roanoke Court from entering outstanding orders on previous rulings.

The reality of the procedural history in these cases is that the orders at issue: (1) plainly reflect prior decisions already made by the Roanoke City Circuit Court; and (2) would have been entered prior to June 5, 2014 were it not for Insight's efforts to prevent such. The Roanoke

---

[18] In persisting with its argument that Insight intended to separately argue each and every case on these identical motions (and, consequently never agreed to the 2/27/13 litigation plan that rulings in one would apply to all), Insight must disregard judicial statements in hearing transcripts, the June 20, 2014 letter from Judge Dorsey, and the content of the actual orders (incorporating the Wingate letter opinion).

11

Court's June 20 letter/order and its subsequent orders implementing prior rulings reflect the accuracy of the litigation plan announced early on in these cases at the first preliminary conference.[19] Insight is the only party to those discussions that remembers this any differently.

## Legal Argument and Authority

1. This Court acted under § 157(b)(5), not 28 U.S.C. § 1446; and jurisdiction under 28 U.S.C. is not exclusive.

Insight makes two primary claims in support of its argument that the Roanoke court's actions are void *ab initio*. First, it mischaracterizes this Court's jurisdiction as "exclusive." The applicable statute plainly states that it is not. 28 U.S.C. § 1334(b). Second, it argues that entry of the orders at issue violated the "proceed no further" directive contained in 28 U.S.C. § 1446. Insight's argument and supporting case law are misplaced, because the Court did not act under 28 U.S.C. § 1446 and Insight did not file a notice of removal under § 1446.

Rather, this Court expressly relied on 28 U.S.C. §§ 157(b)(5) and 1334 in its order exercising "related to" jurisdiction over these eighteen cases. (Doc. # 1173). So too, Insight filed notices of removal that same day in the Virginia state court, citing only Section 157(b)(5). (**Exhibit 16**, June 5, 2014 Notice, *Filson v. Insight Health Corp., et al.*). Citation to 28 U.S.C. § 1446 appears nowhere in either of those documents for good reason. That is because § 1446 does not and cannot apply to the Court's acts in issuing the June 5, 2014 Order. Section 1446 is the procedural vehicle that governs traditional removal to the local federal court by a defendant within 30 days of receipt of summons. 28 U.S.C. § 1446 (2013). Section 1446 does not govern this situation, where this Federal District Court exercised "related to" jurisdiction under 28 U.S.C. §

---

[19] As counsel for Insight noted in the June 5, 2014, hearing, it did not represent Insight at the time of the agreement in question and is not in position to argue that the agreement was not reached, except by way of a statement issued by counsel that no longer represents Insight.

157(b)(5) over state court cases pending in a different state's court system. Notably, Insight offers citation to no case law to the contrary.

Thus, Insight's whole argument regarding whether Judge Dorsey's orders were "ministerial" or substantive is misplaced, as is the case law cited by Insight.  Section 1446 contains the admonition that the state court "proceed no further" unless in doing so the state court carries out ministerial duties or enters ministerial orders.  Neither Section 1334 nor 157(b)(5) contains such a stricture to "proceed no further."  The Roanoke court's actions fully comply with § 157 and § 1334.  Thus, no further analysis is required regarding § 1446. Even if § 1446 applied to these cases (which it does not), the acts by the Roanoke Court in entering orders on issues previously decided and announced would certainly qualify as ministerial.

In its Order, this Court enjoined the Roanoke court only to send the above-captioned cases here "promptly."  Indeed, Insight had previously argued to this Court that it had such authority "under the All Writs Act, . . . to issue an injunction in aid of its jurisdiction."   (June 5, 2014 hearing, 8).  Moreover, that same day the Court questioned in oral argument what exact orders the Roanoke court had made, and whether all of them were properly on the record.  The Court asked "why should I decide as to what the [Roanoke] Judge decided when the Judge can do that directly?"  (*Id.*)  The Roanoke Court has now clarified any confusion in that regard, but Insight does not like the answer.  The Roanoke Court also obeyed this Court's § 157(b)(5) directive and sent the cases here promptly.  The Roanoke court's actions were both appropriate and compliant with this Court's Order.

2. The automatic stay applies to the bankruptcy debtor or its estate—not to an unrelated non-debtor.

13

5002/684/6757476v5

Insight devotes three pages of its argument to the notion that Judge Dorsey's actions in entering the orders at issue somehow violated the automatic stay imposed under 11 U.S.C. § 362. As Insight must know, the automatic stay applicable to NECC (the bankruptcy debtor) has no stay effect on cases against Insight. It has never been so extended, and it would be wildly inappropriate to do so.

Congress passed legislation establishing the automatic stay in order to prevent creditors from acting on the property of a bankruptcy debtor. *See, e.g.*, Explanatory Notes to 11 USCS § 362, House Judiciary Report ("the purpose of the automatic stay[] . . . is debtor protection from his creditors."). The plain language of § 362 makes clear the stay applies as it relates to the debtor and the bankruptcy estate only, as the stay prevents:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding **against the debtor** that was or could have been commenced before the commencement of the case under this title, or to recover a claim **against the debtor** that arose before the commencement of the case under this title;

> (2) the enforcement, **against the debtor** or **against property of the estate**, of a judgment obtained before the commencement of the case under this title;

> (3) any act to obtain possession of **property of the estate** or of property from the estate or to exercise control over **property of the estate**;

> (4) any act to create, perfect, or enforce any lien against **property of the estate**;

> (5) any act to create, perfect, or enforce **against property of the debtor** any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

> (6) any act to collect, assess, or recover a claim **against the debtor** that arose before the commencement of the case under this title;

> (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title **against any claim against the debtor**; and
> (8) the commencement or continuation of a proceeding before the United States Tax Court **concerning a tax liability of a debtor** that is a corporation for a taxable

14

period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

11 USCS § 362.  Courts within the First Circuit have not departed from this plain language. Rather, they have consistently held that "the § 362 stay by its literal language and legislative history applies only to actions against debtors and cannot be applied to claims against nondebtor codefendants." *In re Safeguard Mfg. Co.*, 25 B.R. 415, 417 (Bankr. D. Conn. 1982) (citing *Globe Construction Co. v. Oklahoma City Housing Auth.*, 571 F.2d 1140 (10th Cir. 1978); and *In re Magnus Harmonica Corp.*, 233 F.2d 803 (3d Cir. 1956) (other internal citations omitted); *see also In re James Hunter Machine Co.*, 31 BR 528 (Bankr. D. Mass 1983).  In the *Safeguard* case, the defendant seeking protection under § 362's stay argued that it should be included in the automatic stay because it had made a claim for indemnification against its co-defendant, the bankruptcy debtor.  The court nevertheless declined to extend the stay to that non-debtor defendant even with the indemnification claim pending. *In re Safeguard*, 25 B.R. at 418.

As stated above, NECC is not even a co-defendant in these cases, so the § 362 stay is even further removed than in *In re Safeguard Mfg. Co.*.  Further, Insight has not sought § 362 protection and neither the Bankruptcy Court nor this Court have awarded such.  Reference to the automatic stay in this Court's June 5, 2014 Order plainly does not extend such relief:

> . . . this Order shall not modify or in any way affect the automatic stay that applies to the Pending Actions under 11 U.S.C. § 362 . . .  this Order is entered without prejudice to any position that the Trustee may take regarding whether 11 U.S.C. §§ 105 and 362 operate to stay any Pending Action or to render null and void the post-petition filing of any Pending Action.

(ECF No. 1173, 2). Certainly, the automatic stay applied to the "Pending Actions" by prohibiting Insight from filing third party complaints against NECC --- and it still does.  NECC was not a party to these actions, and it still cannot be joined in them.

15

## Conclusion

Insight's motion seeks to have another bite at the apple and re-argue prior rulings simply by virtue of being in another Court.  Insight even thinks it should have another chance to re-file, re-brief and re-argue its <u>preliminary motions to dismiss,</u> which were argued a year and a half ago in Roanoke state court.  Granting Insight's motion would mean pushing the reset button on every one of these 18 cases.  The Roanoke court was simply organizing the case files before obeying this Court's injunction under § 157(b)(5) when Judge Dorsey entered outstanding orders to reflect what that Court described as "rulings that were previously made."  Nothing the Roanoke Court did was improper; and the June 27, 2014 orders should stand.  The Court should deny Insight's motion and move these cases forward, not backward.

WHEREFORE, the plaintiffs in the above-captioned eighteen cases respectfully ask the Court to deny Insight Health Corporation's Motion to Strike Eighteen State Court Orders as void *Ab Initio.*

Dated: August 11, 2014

RESPECTFULLY SUBMITTED,

/s/ J. Scott Sexton
J. Scott Sexton, Esq. (VSB No. 29284)
H. David Gibson (VSB No. 40641)
James J. O'Keeffe (VSB No. 48620)
GENTRY LOCKE RAKES & MOORE, LLP
10 Franklin Road, S.E., Suite 800
P. O. Box 40013
Roanoke, Virginia 24022-0013
(540) 983-9300
FAX (540) 983-9400
sexton@gentrylocke.com
gibson@gentrylocke.com
okeeffe@gentrylocke.com

16

5002/684/6757476v5

Counsel for Roanoke Gentry Locke Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access this filing through the Court's system, and notice of this filing will be sent to those parties by operation of the Court's CM/ECF system.

Dated: August 11, 2014                                        /s/ J. Scott Sexton

17

5002/684/6757476v5