# Exhibit 2

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE CITY OF ROANOKE

| | |
|---|---|
| **BARBARA J. FILSON,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )    Case No: _CL12-2575_ |
| | ) |
| **INSIGHT HEALTH CORP.,** | ) |
| **CT Corporation System, Its Registered Agent** | ) |
| **4701 Cox Road, Suite 301** | ) |
| **Glen Allen, Virginia 23060** | ) |
| **(Henrico County)** | ) |
| | ) |
| **JOHN M. MATHIS, M.D.,** | ) |
| **2923 Franklin Rd., S.W.** | ) |
| **Roanoke, Virginia 24014** | ) |
| **(Roanoke City)** | ) |
| | ) |
| **ROBERT F. O'BRIEN, M.D.,** | ) |
| **2923 Franklin Rd., S.W.** | ) |
| **Roanoke, Virginia 24014** | ) |
| **(Roanoke City)** | ) |
| | ) |
| **AND** | ) |
| | ) |
| **IMAGE GUIDED PAIN MANAGEMENT,** | ) |
| **P.C.,** | ) |
| **Heman A. Marshall, Esq., Its Registered Agent** | ) |
| **Woods Rogers, PLC** | ) |
| **Wells Fargo Tower, 14th Floor** | ) |
| **Roanoke, Virginia 24011** | ) |
| **(Roanoke City)** | ) |
| | ) |
| *Defendants.* | ) |

CIRCUIT COURT
Received & Filed
*1:44 pm*
DEC 28 2012
By _____
Deputy Clerk
CITY OF ROANOKE

## <u>COMPLAINT</u>

COMES NOW Barbara J. Filson, by counsel, and files this Complaint against the

Defendants and states as follows:

1

## PARTIES

1.    Mrs. Filson is a citizen of the Commonwealth of Virginia.

2.    Insight Imaging-Roanoke is located at 2923 Franklin Road, S.W. Roanoke, Virginia 24014.

3.    Insight Imaging-Roanoke is a registered fictitious name of Image Guided Pain Management, P.C. ("Image Guided").

4.    Insight Health Corp. ("Insight Health") transacts business in the Commonwealth of Virginia under the fictitious name of Insight Imaging-Roanoke.

5.    Insight Health has not registered the fictitious name of Insight Imaging-Roanoke in violation of Virginia Code §§ 59.1-69 and 59.1-70.

6.    At all times and places pertinent to this action, Insight Health transacted business in the Commonwealth of Virginia under the fictitious name of Insight Imaging-Roanoke.

7.    At all times and places pertinent to this action, Insight Health owned, operated and controlled Insight Imaging-Roanoke.

8.    Unless otherwise specified in this Complaint, references to Insight Imaging-Roanoke include Image Guided and Insight Health.

9.    At all times and places pertinent to this action, Insight Health made the actual decisions and arrangements relating to the selection, procurement, and preparation of drugs administered at Insight Imaging-Roanoke, including the epidural steroid drug which is at issue in this case.

10.    Insight Health is incorporated in the State of Delaware.

11.    Insight Health's principal place of business is in the State of California.

2

12.     At all times and places pertinent to this action, Insight Health advertised to the public that it was a national provider of diagnostic imaging services.

13.     At all times and places pertinent to this action, Insight Health advertised to the public that it was committed to providing the best imaging experience possible, and it called this "Patients First care".

14.     At all times and places pertinent to this action, Insight Health advertised to the public that one of its core values was to "do the right thing".

15.     At all times and places pertinent to this action, Insight Health advertised to the public that one of its core values was integrity.

16.     At all times and places pertinent to this action, Insight Health advertised to the public that one of its core values was ethics.

17.     At all times and places pertinent to this action, Insight Health advertised to the public that one of its core values of doing the right thing, integrity, and ethics took priority over profits.

18.     At all times and places pertinent to this action, Insight Health advertised to the public that one of its core values of doing the right thing, integrity, and ethics took priority over expediency.

19.     At all times and places pertinent to this action, Insight Health advertised to the public that it offered the highest quality of care through a network of outpatient imaging centers and mobile facilities.

20.     At all times and places pertinent to this action, Insight Health advertised to the public that one of its centers was Insight Imaging-Roanoke, located at 2923 Franklin Road, S.W. Roanoke, Virginia 24014.

3

21.     At all times and places pertinent to this action, Insight Health advertised to the public that one of the modalities that it provided at Insight Imaging-Roanoke was pain management image-guided therapeutics.

22.     Insight Health procured, received, and provided to Mrs. Filson the epidural steroid injection which is at issue in this case.

23.     Dr. John M. Mathis ("Dr. Mathis") is a citizen of the Commonwealth of Virginia.

24.     At all times and places pertinent to this action, Insight Imaging-Roanoke allegedly designated Dr. Mathis as its medical director.

25.     At all times and places pertinent to this action, Insight Imaging-Roanoke allegedly held Dr. Mathis out to the public as its medical director.

26.     On information and belief, Dr. Mathis would allege that Insight Imaging-Roanoke designated him as its medical director without his permission or consent.

27.     On information and belief, Dr. Mathis would allege that Insight Imaging-Roanoke held him out to the public as its medical director without his permission or consent.

28.     On information and belief, Dr. Mathis would allege that Insight Imaging-Roanoke never asked him to be its medical director.

29.     On information and belief, Dr. Mathis would allege that he never gave his permission or consent to be Insight Imaging-Roanoke's medical director.

30.     On information and belief, Dr. Mathis would allege that he was never compensated to be Insight Imaging-Roanoke's medical director.

31.     On information and belief, Dr. Mathis would allege that he never acted as Insight Imaging-Roanoke's medical director.

4

32.     If Dr. Mathis agreed to be or acted as the medical director of Insight Imaging-Roanoke during the times and places pertinent to this action, then he was ultimately responsible for Insight Imaging-Roanoke's choices regarding the procurement of drugs, such as Mrs. Filson's epidural steroid drug which is at issue in this case.

33.     If Dr. Mathis did not agree to be or act as the medical director of Insight Imaging-Roanoke during the times and places pertinent to this action, then Insight Imaging-Roanoke falsely designated and held out Dr. Mathis to the public as its medical director, and Insight Health delegated to non-medical staff the important patient care function of choosing safe and effective drugs for its patients.

34.     At all times and places pertinent to this action, Dr. Mathis was an employee and/or agent of Insight Imaging-Roanoke acting in the course and scope of his employment or agency.

35.     At all times and places pertinent to this action, Insight Imaging-Roanoke acted through its employees and agents including, but not limited to, Dr. Mathis.

36.     At all times and places pertinent to this action, Insight Imaging-Roanoke was vicariously liable for Dr. Mathis' actions and omissions.

37.     Dr. Robert F. O'Brien ("Dr. O'Brien") is a citizen of the Commonwealth of Virginia.

38.     Dr. O'Brien performed Mrs. Filson's epidural steroid injection at Insight Imaging-Roanoke.

39.     At all times and places pertinent to this action, Dr. O'Brien was an employee and/or agent of Insight Imaging-Roanoke acting in the course and scope of his employment or agency.

5

40.     At all times and places pertinent to this action, Insight Imaging-Roanoke acted through its employees and agents including, but not limited to, Dr. O'Brien.

41.     At the times and places pertinent to this action, Insight Imaging-Roanoke was vicariously liable for Dr. O'Brien's actions and omissions.

42.     At all times and places pertinent to this action, Insight Imaging-Roanoke also did business through other employees and agents located in Roanoke and other places in the United States including, but not limited to, Paul Hellkamp, secretaries, nurses, technicians, staff, and personnel.

43.     At the times and places pertinent to this action, Insight Imaging-Roanoke was vicariously liable for the actions and omissions of its other employees and agents located in Roanoke and other places in the United States including, but not limited to, Paul Hellkamp, secretaries, nurses, technicians, staff, and personnel.

44.     Image Guided is incorporated in the Commonwealth of Virginia.

45.     Image Guided's principal place of business is in the City of Roanoke, Virginia.

<u>JURISDICTION AND VENUE</u>

46.     Subject matter jurisdiction is proper pursuant to Virginia Code § 17.1-513.

47.     Personal jurisdiction over Insight Health is proper pursuant to at least Virginia Code §§ 8.01-328.1(A)(1), (2), (3), (4) & (6).

48.     Personal jurisdiction over Image Guided, Dr. Mathis, and Dr. O'Brien is proper pursuant to at least Virginia Code §§ 8.01-328.1(A)(1), (2), (3) & (6).

49.     Venue is proper pursuant to Virginia Code §§ 8.01-262(1) & (2).

6

FACTS

50.   At all times and places pertinent to this action, Insight Imaging-Roanoke and its employees and agents had a healthcare provider-patient relationship with Mrs. Filson.

51.   Insight Imaging-Roanoke and its employees and agents owed Mrs. Filson numerous duties including, without limitation, the following: to act as reasonable and prudent healthcare providers; to provide the best imaging experience possible; to act ethically; to act with integrity; to do the right thing; to place patient care first; to place ethics, integrity, doing the right thing, and patient care above profits; and to ensure that the drugs that they gave to patients were safe and effective.

52.   At all times and places pertinent to this action, Mrs. Filson relied upon the advice and treatment provided by Insight Imaging-Roanoke and its employees and agents, which had specialized training and superior knowledge regarding treatment, use of drugs, and the source of drugs.

53.   Insight Imaging-Roanoke and its employees and agents intended to and in fact did use methylprednisolone acetate in epidural steroid injections, including the injection provided to Mrs. Filson which is at issue in this case.

54.   The use of methylprednisolone acetate in epidural steroid injections by Insight Imaging-Roanoke and its employees and agents has never been approved by the Food and Drug Administration ("FDA").

55.   Insight Imaging-Roanoke and its employees and agents knew, or should have known, that the use of methylprednisolone acetate in epidural steroid injections has never been approved by the FDA.

7

56.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that use of methylprednisolone acetate in epidural steroid injections is an off-label use.

57.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, the importance of purchasing safe and effective drugs for their patients and this importance was greatly heightened by the fact that the use of methylprednisolone acetate in epidural steroid injections has never been approved by the FDA.

58.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, the danger to which their patients would be exposed if they purchased unsafe and/or ineffective drugs for its patients.

59.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that the best way of ensuring safe and effective drugs for their patients was to purchase such drugs from an FDA-regulated manufacturer or an accredited pharmacy that complied with all federal and state laws.

60.     Insight Imaging-Roanoke and its employees and agents assumed the responsibility for purchasing safe and effective drugs for its patients, including Mrs. Filson.

61.     Insight Imaging-Roanoke and its employees and agents assumed the responsibility for verifying that the pharmacy from which they purchased drugs was safe, reliable, accredited and in compliance with all federal and state laws.

62.     New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center ("NECC") was a compounding pharmacy located in Framingham, Massachusetts.

63.     Compounding pharmacies are generally small operations that engage in mixing (or "compounding") drug products for specific patients, pursuant to a valid prescription.

8

64.     Because they typically compound drug products in forms that are not commercially available, compounding pharmacies are not regulated by the FDA.

65.     Rather, compounding pharmacies are generally regulated under state law applicable to pharmacies and pharmacists.

66.     Although NECC operated in Massachusetts, it was also required to comply with Virginia law in order to fill prescriptions in Virginia.

67.     NECC was required to be licensed and registered with the Virginia Board of Pharmacy.

68.     Methylprednisolone acetate is a knock-off of the brand name drug, Depo-Medrol, which is manufactured by the FDA-regulated company, Pharmacia & Upjohn Company, a Division of Pfizer, Inc. ("Pfizer").

69.     Other FDA-regulated drug manufacturers produce sterile generic versions of methylprednisolone acetate (with and without preservatives) in facilities that are also regulated, controlled, and inspected by the FDA.

70.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that sterile methylprednisolone acetate (with and without preservatives) may be purchased in generic from FDA-regulated drug manufacturers in the United States.

71.     Rather than producing small quantities of this knock-off Depo-Medrol, NECC engaged in the very risky process of producing and marketing vast batches of this drug, thousands at a time.

72.     NECC did so through a process of taking non-sterile ingredients and placing them into an aqueous mixture that then had to be rendered sterile.

9

73.     Even without the large batches, NECC's process made the methylprednisolone acetate a high risk compound.

74.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that NECC engaged in the process of producing and marketing vast batches of this drug.

75.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that NECC's process made the methylprednisolone acetate a high risk compound.

76.     NECC acted as a wholesale distributor by selling large quantities of methylprednisolone acetate.

77.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that NECC acted as a wholesale distributor by selling large quantities of methylprednisolone acetate.

78.     Under Virginia law, compounding pharmacists must ensure compliance with USP-NF standards (United States Pharmacopeial National Formulary).  Virginia Code §54.1-3410.2(E).

79.     NECC failed to comply with USP-NF standards.

80.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that NECC was not compliant with USP-NF standards.

81.     Moreover, pharmacists and pharmacies may not engage in "the regular compounding or the compounding of inordinate amounts of any drug products that are essentially copies of commercially available drug products."  Virginia Code §54.1-3410.2(H)(2).

82.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that NECC was producing enormous batches of commercially available methylprednisolone acetate, which NECC then sold in bulk.

10

83.     Within just two months during the general time frame pertinent to this action, Insight Imaging-Roanoke alone purchased and injected over 600 doses of methylprednisolone acetate from NECC.

84.     Such large-scale production of methylprednisolone acetate, a commercially available drug, is illegal under Virginia Code § 54.1-3410.2(H)(2).

85.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that NECC's large-scale production of methylprednisolone acetate and subsequent sale without individual prescriptions violated Virginia law.

86.     NECC is not accredited by the Pharmacy Compounding Accreditation Board ("PCAB") or any other similar organizations, such as The Joint Commission, that offer independent assurance as to the quality and competence of compounding pharmacies that meet certain requirements.

87.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that NECC was not an accredited compounding pharmacy.

88.     There are accredited compounding pharmacies in the Commonwealth of Virginia and the United States, but Insight Imaging-Roanoke and its employees and agents chose not to purchase drugs from them, electing instead to buy methylprednisolone acetate from an unaccredited, wholesale distributor pharmacy facility in Massachusetts—a state known to have less stringent enforcement standards for compounding pharmacies than the Commonwealth of Virginia.

89.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that there are accredited compounding pharmacies in the Commonwealth of Virginia and the United States.

11

90.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that Massachusetts, the state in which NECC was located, had less stringent enforcement standards for compounding pharmacies than the Commonwealth of Virginia.

91.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that the methylprednisolone acetate that it sought to purchase was to be used in epidural steroid injections allowing direct contact with patients' central nervous systems, including Mrs. Filson's central nervous system

92.     NECC produced methylprednisolone acetate without preservatives.

93.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that NECC produced methylprednisolone acetate without preservatives.

94.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that preservative free methylprednisolone acetate heightens the danger of the drug if it is not produced to the highest standards including a highly sterile environment.

95.     Sterilization techniques, quality control measures, highly sterile environments and sterility testing are crucial to properly producing methylprednisolone acetate without preservatives.

96.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that sterilization techniques, quality control measures, highly sterile environments, and sterility testing were crucial to the methylprednisolone acetate that they were going to inject in its patients' spinal canals.

97.     Insight Imaging-Roanoke and its employees and agents knew, or should have known, that NECC was an unaccredited compounding pharmacy producing a high-risk compound, starting with non-sterile components.

12

98.     NECC's drug production operations took place in an aged building surrounded by a waste recycling center owned by one of the co-owners of NECC, Gregory Conigliaro.

99.     NECC's drug production facility received many varieties of garbage and waste that were sorted, stored, and manipulated just outside the back door of the NECC facility.

100.    These waste products include used mattresses, recycled on-site from sources such as hospitals, prisons, hotels, and dormitories.

101.    A photograph of NECC's facility is attached as **Exhibit A**.

102.    It is difficult to distinguish where NECC ends and the waste recycling center begins, if there is such a distinction in fact; but the waste facility lists its address as 701 Waverly Street, Framingham, Massachusetts while NECC lists its address as 697 Waverly Street.

103.    The marketing company for NECC, however, lists its address as the same as the waste facility.

104.    Insight Imaging-Roanoke and its employees and agents knew, or should have known, that NECC's drugs and production processes were unsanitary, unsterile, and lacked adequate quality control measures, and that NECC operated in a facility surrounded by a garbage and waste center.

105.    Other image guided pain management clinics in the Roanoke area recognized NECC as a dangerous source of methylprednisolone acetate.

106.    These other clinics chose to pay more to obtain methylprednisolone acetate from reliable sources, specifically rejecting the lower prices offered by NECC.

107.    Insight Imaging-Roanoke and its employees and agents knew, or should have known, that NECC was a dangerous source of methylprednisolone acetate.

13

108.    On information and belief, NECC charged Insight Imaging-Roanoke less for methylprednisolone acetate than did Pfizer, other FDA approved manufacturers of the generic, and other accredited or reliable compounding pharmacies.

109.    At all times and places pertinent to this action, Insight Imaging-Roanoke was one of only two pain management clinics in the Commonwealth of Virginia that chose to purchase methylprednisolone acetate from NECC.

110.    Under Virginia Code §54.1-3435.01(A), non-resident pharmacies that engage in wholesale distribution of prescription drugs into the Commonwealth of Virginia must register with and be licensed by the Virginia Board of Pharmacy, in addition to registering as a non-resident pharmacy.

111.    NECC was registered in the Commonwealth of Virginia as a non-resident pharmacy, but it is not and was not registered as a wholesale distributor of prescription drugs as required by Virginia Code §54.1-3435.01(A).

112.    Insight Imaging-Roanoke and its employees and agents knew, or should have known, that NECC was not registered to distribute prescription drugs wholesale in the Commonwealth of Virginia.

113.    Insight Imaging-Roanoke and its employees and agents knew that the methylprednisolone acetate that they would purchase from a pharmacy would be injected directly into patients' spinal canals so as to enter the central nervous system.

114.    Insight Imaging-Roanoke and its employees and agents knew, or should have known, that the central nervous system is a relatively closed system, making treatment options more difficult in the event of an adulterated invasion.

14

115.    Insight Imaging-Roanoke and its employees and agents knew, or should have known, that the methylprednisolone acetate that they would purchase from a pharmacy acts as an immune system suppressing agent, thus weakening the patient's natural ability to fight off pathogens that could possibly be included in the injection.

116.    Despite what Insight Imaging-Roanoke and its employees and agents knew, or should have known, concerning NECC, they chose to purchase methylprednisolone acetate from NECC, which was an unaccredited, sprawling compounding pharmacy that: (a) produced its drugs in the same complex as a waste facility; (b) produced the drugs in bulk batches (making mistakes more likely); (c) did not properly sterilize the drugs; (d) did not operate with adequate quality control measures; (e) did not operate in a sterile environment; (f) did not have adequately representative samples of the drugs independently tested by an FDA-approved testing facility before releasing them for distribution; (g) did not comply with USP-NF standards; and (h) violated several provisions of Virginia statutes designed to protect Virginia citizens from substandard and adulterated prescription drugs.

117.    Despite what Insight Imaging-Roanoke and its employees and agents knew, or should have known, concerning NECC, they voluntarily purchased methylprednisolone acetate from NECC in order to inject it into their patients' spinal canals, including Mrs. Filson's spinal canal.

118.    In addition, notwithstanding such knowledge, they voluntarily purchased methylprednisolone acetate wholesale from NECC without prescriptions.

119.    On information and belief, Drs. Mathis and O'Brien would allege that this purchasing decision was made without their advice, consent, or knowledge.

15

120.    On information and belief, Drs. Mathis and O'Brien would allege that at the times and places pertinent to this action they never knew that Insight Imaging-Roanoke and its employees and agents were purchasing the methylprednisolone acetate from NECC.

121.    On information and belief, Drs. Mathis and O'Brien would allege that at the times and places pertinent to this action they never knew that the epidural steroid drug that they were injecting into patients' spinal canals, including Mrs. Filson's spinal canal, came from NECC.

122.    On information and belief, Drs. Mathis and O'Brien would allege that they never would have used the methylprednisolone acetate from NECC, including with Mrs. Filson, if they had been informed that NECC was not an accredited compounding pharmacy.

123.    On information and belief, Drs. Mathis and O'Brien would allege that they never would have used the methylprednisolone acetate from NECC, including with Mrs. Filson, if they had been informed that NECC did not comply with all federal and state laws.

124.    On information and belief, Drs. Mathis and O'Brien would allege that they never would have used the methylprednisolone acetate from NECC, including with Mrs. Filson, if they had been informed that it was being produced in a facility located beside a garbage and waste facility.

125.    On information and belief, Drs. Mathis and O'Brien would allege that they never would have used the methylprednisolone acetate from NECC, including with Mrs. Filson, if they had been informed that it was being produced in a facility that did not comply with USP-NF standards.

126.    On information and belief, Drs. Mathis and O'Brien would allege that the actions of Insight Imaging-Roanoke and its employees and agents deprived them from making informed and reasonable patient care decisions on behalf of their patients, including Mrs. Filson,

16

concerning the information, and lack thereof, that they were provided concerning the epidural steroid drug.

127.     In addition to Insight Imaging-Roanoke and its employees and agents apparently withholding information from Drs. Mathis and O'Brien, Insight Imaging-Roanoke and its employees and agents did not inform their patients, including Mrs. Filson, that they were receiving a knock-off drug produced from a compounding pharmacy, much less a compounding pharmacy with the characteristics and problems as described in the preceding paragraphs.

128.     On the contrary, Insight Imaging-Roanoke and its employees and agents provided their patients, including Mrs. Filson, with invoices that falsely itemized the drug as "Depo-Medrol", the trademarked name brand drug manufactured by Pfizer.

129.     The same invoices from Insight Imaging-Roanoke also falsely reference the National Drug Code 0703-0051-01 (or an abbreviation of such code).

130.     A redacted true and correct copy of this invoice is attached as **Exhibit B**.

131.     Insight Imaging-Roanoke and its employees and agents also provided Mrs. Filson and other patients with literature indicating that the injection that they had received was Depo-Medrol, the trademarked name brand drug produced by Pfizer.

132.     A representative copy of this literature is attached as **Exhibit C.**

133.     Further, Insight Imaging-Roanoke and its employees and agents falsely coded methylprednisolone acetate on Mrs. Filson's medical and billing records using billing code J1040, the HCPCS code for the name brand drug produced by FDA-regulated Pfizer, as well as other FDA-regulated generic drug producers, such as Teva Parenteral Medicines, Inc., a/k/a SICOR Pharmaceuticals.

17

134.   A compounded drug should not be billed with the J codes meant for commercially prepared, preservative free drugs.

135.   Rather, the "unlisted" code, J3490, should be provided along with the name of the drug and the dosage administered.

136.   Insight Imaging-Roanoke and its employees and agents falsely coded methylprednisolone acetate on Mrs. Filson's medical and billing records using the National Drug Code, 0703-0051-01, a unique product code that contains an FDA-assigned labeler code unique to the manufacturer of the drug.

137.   Rather than disclosing that the methylprednisolone acetate injected into Mrs. Filson was a compounded drug from NECC, Insight Imaging-Roanoke and its employees and agents falsely used the unique NDC code assigned to the FDA-regulated drug manufacturer, Teva Parenteral Medicines, Inc., for single dose, 80 mg/mL, preservative free, methylprednisolone acetate.

138.   A copy of a representative label for the Teva Parenteral drug is attached for reference as **Exhibit D.**

139.   However, Teva Parenteral Medicines, Inc., a leading generic drug manufacturer, had nothing to do with the epidural steroid injection that was provided to Mrs. Filson.

140.   Any reference in the records from Insight Imaging-Roanoke and its employees and agents to this Teva national drug code is simply false and completely misleading.

141.   Similarly, Dr. O'Brien's medical documentation states that the drug injected into Mrs. Filson's spinal canal was "Depo-Medrol", the name brand drug produced by Pfizer.

18

142.    On information and belief, Dr. O'Brien would allege that he referenced "Depo-Medrol" to indicate the name brand drug produced by Pfizer or a drug produced to the same high quality standards.

143.    Mrs. Filson never received Depo-Medrol or a drug produced to the same high quality standards from Insight Imaging-Roanoke and its employees and agents.

144.    A true and correct copy of Dr. O'Brien's report is attached as **Exhibit E.**

145.    This report was provided to Mrs. Filson's primary care physician who was serving as Mrs. Filson's agent.

146.    Insight Imaging-Roanoke and its employees and agents uniformly misrepresented that the knock-off drug obtained from NECC and injected into Mrs. Filson's spinal canal was, in fact, the name brand drug produced by Pfizer from an FDA-regulated laboratory and/or they misrepresented that it was the generic drug produced by the FDA-regulated laboratory, Teva Parenteral Medicines, Inc. Both representations were false.

147.    A redacted true and correct copy of a representative page from Mrs. Filson's medical/billing records from Insight Imaging-Roanoke is attached as **Exhibit F.**

148.    At all times and places pertinent to this action, the methylprednisolone acetate that Insight Imaging-Roanoke and its employees and agents voluntarily purchased from NECC and then sold and provided to their patients, including Mrs. Filson, was contaminated with fungus, mold, and/or other contaminants.

Mrs. Filson's Medical Timeline

149.    Mrs. Filson lives in Roanoke, Virginia.   In July, 2012 she was experiencing significant leg pain which she was informed was attributed to a bulging disc in her back.

19

150.   In August, Ms. Filson's family practice physician, Dr. Matthew Billups, referred her to Insight Imaging-Roanoke for a series of epidural steroid injections as a means of treating the leg pain.

151.   The typical method for receiving such an epidural steroid injection requires radiological facilities that allow the proper placement of the shot in exactly the right place with the assistance of equipment such as a fluoroscope.   An anaesthesiologist or an interventional radiologist usually performs such a procedure.

152.   Mrs. Filson received epidural steroid injections from Insight Imaging-Roanoke on August 16, August 30, and September 14, 2012.   Dr. O'Brien administered each injection of methylprednisolone acetate.

153.   On or about September 21, 2012, Ms. Filson began to experienced numbness in her vaginal and rectal areas.

154.   On October 3, 2012, Mrs. Filson began experiencing severe headaches and neck pain.   Late that night, she received a voice message left by Insight Imaging-Roanoke that it was very important for her to call back as soon as possible.

155.   The next morning, Mrs. Filson immediately called Insight Imaging-Roanoke.   An employee of Insight Imaging-Roanoke told her that if she was experiencing headaches and neck pain, she should go to the emergency room as the injections she received may have come from a batch of drugs that contained fungal pathogens.

156.   As quickly as possible after getting off the phone, on October 4, 2012, Mrs. Filson went to the emergency room at Lewis-Gale Medical Center in order to be tested for fungal meningitis.   The medical staff at the hospital performed a spinal tap, and she was diagnosed with fungal meningitis.   She was immediately admitted to the hospital for treatment.

20

157. Mrs. Filson spent the next week at Lewis-Gale Medical Center being treated for fungal meningitis. She was then transferred to Mary Washington Medical Center in Fredericksburg, Virginia in order to be near her daughter, who lives in Fredericksburg.

158. Mrs. Filson suffered extremely painful headaches and numbness and pain in the sides of her upper right and left legs and numbness in her feet. She was also diagnosed with saddle anaesthesia. She spent the next month confined to a hospital bed at Mary Washington, then was finally released on November 12, 2012.

159. Throughout the period of her hospitalization (October 4 – November 12, 2012), Ms. Filson endured a litany of invasive and painful tests, excruciating side effects from treatments, and the attendant physical and emotional pain and suffering caused by her impaired medical condition. All of this harm, damage, pain and suffering was caused by and related to the fungal meningitis and the treatment she received to combat this illness.

160. Mrs. Filson's fungal meningitis was a direct and proximate result of receiving from the defendants tainted methylprednisolone acetate contaminated with fungus, mold and/or other contaminants, injected into her spinal cavity.

161. As a proximate result of the defendants' actions, Mrs. Filson has suffered and continues to suffer serious bodily harm, mental anguish, economic loss (including but not limited to medical expenses) and other damages.

162. Mrs. Filson's fungal meningitis was caused by the three epidural steroid injections that she received on August 16th, August 30th, and September 14th, 2012 from Insight Imaging-Roanoke, administered by Dr. O'Brien.

163.   Mrs. Filson's fungal meningitis was the result of the actions by Insight Imaging-Roanoke and its employees and agents in purchasing a contaminated and adulterated drug from a highly questionable compounding pharmacy and then providing it to Mrs. Filson.

164.   This lawsuit seeks fair compensation to the fullest extent permitted under the law of the Commonwealth of Virginia for Mrs. Filson's unnecessary infection and personal injury.

## COUNT I – NEGLIGENCE *PER SE*

165.   The preceding paragraphs are hereby incorporated as if they were fully set forth herein.

166.   Virginia Code § 8.01-221 establishes that a person who is harmed by violation of a statute may recover for such harm.

167.   Virginia law also establishes that:

> . . . the violation of a statute or municipal ordinance adopted for public safety constitutes negligence because the violation is the failure to abide by a particular standard of care prescribed by a legislative body.  A party relying on negligence *per se* does not need to establish common law negligence provided the proponent of the doctrine produces evidence supporting a determination that the opposing party violated a statute enacted for public safety, that the proponent belongs to the class of persons for whose benefit the statute was enacted and the harm suffered was of the type against which the statute was designed to protect, and that the statutory violation was a proximate cause of the injury.  Halterman v. Radisson Hotel Corp., 259 Va. 171, 176-77, 523 S.E. 2d 823, 825 (2000); Virginia Elec. & Power Co. v. Savoy Constr. Co., 224 Va. 36, 45, 294 S.E. 2d 811, 817 (1982).

Schlimmer v. Poverty Hunt Club, 268 Va. 74, 78-79, 597 S.E.2d 43, 46 (2004) (quotations omitted).

168.   Virginia Code §§ 54.1-3400 *et seq.* (collectively known as "The Drug Control Act") are statutes enacted for public safety, in that they protect the public from the release of substandard and otherwise unreasonably dangerous pharmaceutical drugs and drugs into the stream of Virginia commerce.

22

169.    As a Virginia citizen and consumer of a drug regulated by the Virginia Drug Control Act, Mrs. Filson belongs to the class of persons for whose benefit those statutes were enacted.

170.    A drug is deemed adulterated under Virginia law if it has been produced, prepared, packed, or held under insanitary conditions whereby it has been rendered injurious to health.  Va. Code § 54.1-3461(A)(2).

171.    Additionally, a drug is considered adulterated if it purports to be a drug recognized in an official compendium, but fails to meet the quality or purity standards set forth in the compendium or the federal act.  Va. Code § 54.1-3461(B).

172.    By holding and offering for sale an adulterated drug to its patients, including Mrs. Filson, Insight Imaging-Roanoke and its employees and agents violated Virginia Code § 54.1-3457(1), which is part of the Virginia Drug Control Act.

173.    By receiving an adulterated drug in commerce and then delivering the drug for pay to its patients, including Mrs. Filson, Insight Imaging-Roanoke and its employees and agents violated Virginia Code § 54.1-3457(3), which is part of the Virginia Drug Control Act.

174.    Mrs. Filson contracted fungal meningitis as the result of the actions of Insight Imaging-Roanoke and its employees and agents in receiving, holding, selling, and providing to her an adulterated drug.

175.    The adulterated drug injected into Mrs. Filson's spinal canal contained fungal pathogens that proximately caused her to develop fungal meningitis.

176.    Death or injury of a patient resulting from consumption of or contact with adulterated drugs belongs to the category of harms against which the Virginia Drug Control Act was designed to protect.

23

177.    Death or injury of a patient resulting from consumption of or contact with adulterated drugs distributed wholesale by an entity engaging in the wholesale distribution of prescription drugs in the Commonwealth of Virginia without a valid license belongs to the category of harms against which Virginia Drug Control Act was designed to protect.

178.    Therefore, each of the violations of the above statutes (Virginia Code § 54.1-3457(1), and Virginia Code § 54.1-3457(3)) by Insight Imaging-Roanoke and its employees and agents constitutes negligence *per se*, and Mrs. Filson is entitled to the recovery of damages for her unnecessary infection and personal injury caused by that negligence *per se*.

### COUNT II – VIRGINIA CONSUMER PROTECTION ACT

179.    The preceding paragraphs are hereby incorporated as if they were fully set forth herein.

180.    Mrs. Filson engaged in a consumer transaction with Insight Imaging-Roanoke and its employees and agents as defined in Virginia Code § 59.1-198.

181.    Insight Imaging-Roanoke and its employees and agents were suppliers of the tainted methylprednisolone acetate injected into Mrs. Filson's spinal canal.

182.    Insight Imaging-Roanoke and its employees and agents violated Virginia Code § 59.1-200, which prohibits suppliers from misrepresenting goods as those of another, misrepresenting the source, sponsorship, approval or certification of goods, and misrepresenting that goods are of a particular standard, quality, grade or model.

183.    These willful violations by Insight Imaging-Roanoke and its employees and agents resulted in Mrs. Filson's fungal meningitis.

24

184.   Mrs. Filson is entitled to the recovery damages of damages for her unnecessary infection and personal injury, which occurred as the result of the violations of Virginia Code § 59.1-200 by Insight Imaging-Roanoke and its employees and agents.

185.   Further, Mrs. Filson is entitled to treble damages and an award of attorneys' fees, costs, and expenses incurred in this matter.

## COUNT III –NEGLIGENCE

186.   The preceding paragraphs are hereby incorporated as if they were fully set forth herein.

187.   Insight Imaging-Roanoke and its employees and agents had a duty to exercise reasonable care to ensure that the drugs that they purchased in order to sell and inject in their patients, including Mrs. Filson, came from drug companies that complied with Virginia laws regarding pharmaceutical drugs ("The Virginia Drug Control Act" statutes).

188.   Insight Imaging-Roanoke and its employees and agents had a duty to exercise reasonable care to ensure that their purchase of the drug they provided to Mrs. Filson complied with the Virginia Drug Control Act.

189.   Insight Imaging-Roanoke and its employees and agents had a duty to exercise reasonable care to ensure that the drugs they purchased in order to sell and administer to their patients, including Mrs. Filson, were purchased from drug manufacturers that utilized proper quality control, safety, and sterility measures in order to minimize the possibility that the drugs would become adulterated.

190.   Insight Imaging-Roanoke and its employees and agents had a duty to inform the doctors practicing at it, including Drs. Mathis and O'Brien, about the purchasing decisions by Insight Imaging-Roanoke to obtain drugs from NECC and about NECC.  To the extent that they

25

did not do so, they violated their duty and their violation prevented the doctors practicing at it, including Drs. Mathis and O'Brien, from making knowledgeable and professionally reasonable decisions to reject such drug on behalf of Mrs. Filson and their other patients.

191.  Insight Imaging-Roanoke and its employees and agents had a duty to provide adequate medical oversight regarding the purchase of drugs such as the one at issue in this case. To the extent that Insight Imaging-Roanoke had no official medical director during the time and places pertinent to this action, then they delegated to non-medical staff the important patient care function of choosing safe drugs for their patients.

192.  Insight Imaging-Roanoke and its employees and agents had a duty to exercise reasonable care to avoid injecting Mrs. Filson with adulterated drugs.

193.  Insight Imaging-Roanoke and its employees and agents had a duty to know what they were injecting into patients, including Mrs. Filson.

194.  Insight Imaging-Roanoke and their employees and agents had a duty to provide Mrs. Filson reasonable care and treatment when she came to them for treatment.

195.  Insight Imaging-Roanoke and its employees and agents had a duty to obtain informed consent from Mrs. Filson for the procedure performed on her, adequately and accurately describing to her the nature of the procedure, as well as the risks of such procedure.

196.  In this case, where the methylprednisolone acetate came from an unaccredited, mass producing, out-of-state, compounding pharmacy, (unregulated by the FDA and surrounded by a garbage and waste facility), Insight Imaging-Roanoke and its employees and agents had a duty to inform Mrs. Filson of the source of the drug and the dangers associated therewith.

197.  Insight Imaging-Roanoke and its employees and agents breached their duties to Mrs. Filson in many respects:

26

a. They failed to exercise reasonable and prudent care to ensure that the drug they purchased and provided to Mrs. Filson was made in compliance with Virginia pharmaceutical laws;

b. They failed to exercise reasonable and prudent care to ensure that the drug they purchased and provided to Mrs. Filson was sold to them in compliance with Virginia pharmaceutical laws;

c. They failed to know and understand the source and supply of the drug they provided to Mrs. Filson;

d. They failed to exercise reasonable and prudent care to ensure that the drug they provided to Mrs. Filson was produced in sanitary, sterile conditions;

e. They failed to properly inform Mrs. Filson that the epidural steroid injection was an "off-label" application of the drug at issue, not approved by the FDA for such an application;

f. They failed to properly inform Mrs. Filson of the risks and dangers associated with the injection of the drug; and they failed to inform her that they had obtained the drug from NECC, the mass-producing, unaccredited, non-FDA regulated compounding pharmacy surrounded by a garbage recycling facility;

g. Alternatively to the preceding allegation, to the extent that Insight Health unilaterally made the decision to purchase the tainted steroid and kept important information regarding the actual source and identity of the methylprednisolone acetate from Drs. Mathis and O'Brien, it failed to exercise reasonable and prudent care to ensure that Mrs. Filson's physician was adequately informed so as to allow her doctor to make knowledgeable and professionally reasonable decisions to reject such drug on behalf of Mrs. Filson and other similarly situated patients;

h. They failed to exercise reasonable care to avoid injecting Mrs. Filson with an adulterated drug;

i. To the extent that Insight Imaging – Roanoke had no official medical director (who would have reviewed the source and supply of drugs) during the time periods relevant to this proceeding, then all or some of the defendants delegated to non-medical staff the important patient care function of choosing safe drugs for patients; and they deviated from the standard of care and breached their duties in so doing;

j. They failed to act ethically;

k. They failed to act with integrity;

l. They failed to put patient care first;

m. They failed to do the right thing;

27

n.  They put profits over ethics;

o.  They put profits over integrity;

p.  They put profits over patient care; and

q.  In such other manners as may be shown through discovery and at trial.

198.    The negligence of Insight Imaging-Roanoke and its employees and agents proximately caused Mrs. Filson's fungal meningitis.

199.    Mrs. Filson is entitled to the recovery of damages for her unnecessary infection and personal injury caused by the negligent acts and omissions of Insight Imaging-Roanoke and its employees and agents.

## COUNT IV – GROSS NEGLIGENCE

200.    The preceding paragraphs are hereby incorporated as if they were fully set forth herein.

201.    The foregoing acts and omissions by Insight Imaging-Roanoke and its employees and agents went beyond mere thoughtlessness, inadvertence or error of judgment.

202.    Rather, the actions of Insight Imaging-Roanoke and its employees and agents did not meet even the most minimal diligence to ensure that they were not injecting adulterated and tainted drugs directly into the bodies of their patients, including Mrs. Filson.

203.    The acts and omissions of Insight Imaging-Roanoke and its employees and agents constituted such utter disregard for the rights of others, and such utter disregard for prudence, that they amount to complete neglect of the safety of patients, including Mrs. Filson.

204.    The acts and omissions of Insight Imaging-Roanoke and its employees and agents were a heedless and palpable violation of their legal duties respecting the life and rights of Mrs. Filson.  Frazier v. City of Norfolk, 234 Va. 388, 393, 362 S.E.2d 688, 691 (1987).

28

205.    Mrs. Filson's fungal meningitis occurred as a proximate result of the grossly negligent acts and omissions of Insight Imaging-Roanoke and its employees and agents.

206.    Mrs. Filson is entitled to the recovery of damages for her unnecessary infection and personal injury caused by the grossly negligent acts and omissions of Insight Imaging-Roanoke and its employees and agents.

**COUNT V – FRAUD**

207.    The preceding paragraphs are hereby incorporated as if they were fully set forth herein.

208.    Insight Imaging-Roanoke and its employees and agents did not inform their patients, including Mrs. Filson, that they were providing drugs produced from a compounding pharmacy, much less a compounding pharmacy with the characteristics and problems described in the preceding paragraphs.

209.    Insight Imaging-Roanoke and their employees and agents had a duty to inform their patients of these facts which were possessed solely by them and which they knew were unknown to Mrs. Filson and other patients.

210.    The decision by Insight Imaging-Roanoke and its employees and agents not do so constituted actual and/or constructive fraud.

211.    Insight Imaging-Roanoke and its employees and agents had a duty to adequately inform the doctors practicing at it, including Drs. Mathis and O'Brien, about the purchasing decisions by Insight Imaging-Roanoke to obtain drugs from NECC and about NECC. To the extent that they did not do so, they violated their duty and their violation prevented the doctors practicing at it, including Drs. Mathis and O'Brien, from making knowledgeable and professionally decisions to reject such drugs on behalf of Mrs. Filson and their other patients.

29

212.    Insight Imaging-Roanoke and its employees and agents provided patients, such as Mrs. Filson, with written false documentation asserting that the drug injected was, in fact, the name brand drug produced by the FDA-regulated manufacturer, Pfizer.

213.    Also, Insight Imaging-Roanoke and its employees and agents provided patients, such as Mrs. Filson, with written false drug code documentation asserting that the drug injected into the patient was, in fact, the generic version of the drug produced by the FDA-regulated manufacturer, Teva Parenteral Medicines, Inc., National Drug Code, 0703-0051-01 (single dose, 80 mg/mL, preservative free, methylprednisolone acetate).

214.    Within the context of the healthcare provider-patient relationship, Mrs. Filson relied upon the superior knowledge of Insight Imaging-Roanoke and its employees and agents concerning the drug, source of the drug, and cost of the drug in accepting their representation that the methylprednisolone acetate was safe and effective.

215.    Insight Imaging-Roanoke and its employees and agents provided Mrs. Filson with a knock-off drug obtained from an unaccredited compounding pharmacy, unregistered to distribute wholesale in Virginia, and not preferred by insurance companies – including Mrs. Filson's insurance company, without disclosing information about its source.

216.    In so doing, Insight Imaging-Roanoke and its employees and agents concealed facts material to Mrs. Filson's treatment, knowing Mrs. Filson acted on the belief that no such facts existed, and that Mrs. Filson relied upon it to obtain and inject safe drugs.

217.    By representing that the drug injected was obtained from an FDA-regulated manufacturer, Insight Imaging-Roanoke and its employees and agents misrepresented a material fact regarding Mrs. Filson's treatment.

218. Rather than properly informing its patients, including Mrs. Filson, of these crucial facts, Insight Imaging-Roanoke and its employees and agents falsely represented the drug at issue as "Depo-Medrol," the trademarked name brand used by Pfizer; and falsely coded it as the generic version of the drug produced by the FDA-regulated manufacturer, Teva Parenteral Medicines, Inc., National Drug Code, 0703-0051-01 (single dose, 80 mg/mL, preservative free, methylprednisolone acetate).

219. This pattern of deception by Insight Imaging-Roanoke and its employees and agents was repeated to Mrs. Filson's primary care physician.

220. This pattern of deception by Insight Imaging-Roanoke and its employees and agents was also repeated for billing purposes to Mrs. Filson's insurance company, where Insight Imaging-Roanoke falsely used the National Drug Code, 0703-0051-01, a unique product code assigned to the completely unrelated FDA-regulated drug manufacturer, Teva Parenteral Medicines, Inc.

221. Insight Imaging-Roanoke also used an HCPCS "J" code inappropriate and misleading for compounded drugs.

222. Such actions by Insight Imaging-Roanoke and its employees and agents show affirmative misrepresentations of the identity of the drug provided to Mrs. Filson and a knowing, deliberate decision not to disclose the source of the "drug" provided to Mrs. Filson.

223. As a third party payor and agent authorized to receive medical invoices for processing on behalf of Mrs. Filson, misrepresentations to her health insurer constitute misrepresentations to Mrs. Filson.

224. Mrs. Filson's health insurer, like many such third-party payors, maintains policies discouraging the use of compounded drugs.

31

225.    For example, Anthem Blue Cross states as follows:

Compounded medications are customized medication(s) … that are not commercially available … However, they are not approved by the U.S. Food and Drug Administration (FDA) nor are they approved by our Pharmacy and Therapeutics process. **Since there is limited oversight in the preparation of these compounded medications, there is a possibility that patients may be put at risk when prescribed a compounded medication that is not subject to quality testing that validates purity, stability or dosage…** Thus, due to the lack of data to adequately review these medications, compounded medications are considered **non-preferred**… They may also require prior authorization of benefits for coverage through a participating network pharmacy…

226.    On information and belief, Insight Imaging-Roanoke and its employees and agents knew that using drugs from compounding pharmacies would present billing issues and problems with reimbursement.

227.    On information and belief, Insight Imaging-Roanoke and its employees and agents knew that properly coding the drugs injected into Mrs. Filson and other patients would cause concerns and "red flags" with insurance companies, such as the one serving Mrs. Filson.

228.    Accordingly, on information and belief, Insight Imaging-Roanoke and its employees and agents specifically chose to falsely describe the drugs provided as part of a scheme and common practice or design, intended to prevent insurance companies from realizing the nature and source of the drugs being injected into patients, such as Mrs. Filson.

229.    Insurance companies, such as the one serving Mrs. Filson, act as a protective information source and gatekeeper for their customers.

230.    Here, Insight Imaging-Roanoke and its employees and agents engaged in the same pattern of behavior (and the same specific misrepresentations to patients, referring primary care physicians, and insurers provided by the defendants to Mrs. Filson, her doctor and her insurer) with many other patients receiving epidural steroid injections.

32

231.   These specific actions relating to Mrs. Filson and the prolonged pattern of deception prevented Mrs. Filson's insurer from properly performing its protective role. As a result, Insight Imaging-Roanoke was able to continue its practice of purchasing methylprednisolone acetate from NECC and passing it off as a manufactured and safe drug.

232.   Under these circumstances, misrepresentations to Mrs. Filson's insurer – particularly as part of a pattern of conduct – constituted misrepresentations to Mrs. Filson that were material and relied upon to her detriment.

233.   Insight Imaging-Roanoke and its employees and agents misrepresented that the knock-off drug obtained from NECC and injected into Mrs. Filson's spinal canal was, in fact, the name brand drug produced by Pfizer from an FDA-regulated laboratory; they misrepresented the code for such drug as the generic drug produced by the FDA-regulated laboratory, Teva Parenteral Medicines, Inc.

234.   These representations (and the pattern of which they were a part) were false and deceptive, were relied upon to the detriment of Mrs. Filson (and/or her agent insurer) and other patients, and caused harm to Mrs. Filson.

235.   Insight Imaging-Roanoke and its employees and agents knew, or should have known, these representations to be false.

236.   These representations and the pattern of similar behavior by Insight Imaging-Roanoke and its employees and agents constitute actual or constructive fraud.

## CERTIFICATION PURSUANT TO VIRGINIA CODE § 8.01-20.1

237.   Mrs. Filson certifies that she complied with Virginia Code § 8.01-20.1 before requesting service of process upon the defendants.

## REQUEST FOR TRIAL BY JURY

33

238.   Mrs. Filson requests trial by jury on all issues.

## **PRAYER FOR RELIEF**

WHEREFORE, Barbara J. Filson, by counsel, moves this Court for judgment against the defendants, jointly and severally, in the amount of five million dollars ($5,000,000) plus her taxable costs with pre-verdict interest from August 16, 2012 and post-verdict interest on all of these amounts, as well as $350,000 in punitive damages, trebled damages, attorney's fees, and costs.

BARBARA J. FILSON,

By Counsel

J. Scott Sexton, Esq. (VSB No. 29284)
Anthony M. Russell, Esq. (VSB No. 44505)
Charles H. Smith, III, Esq. (VSB No. 32891)
H. David Gibson, Esq. (VSB No. 40641)
Benjamin D. Byrd, Esq. (VSB No. 76560)
Daniel R. Sullivan, Esq. (VSB No. 81550)
GENTRY LOCKE RAKES & MOORE, LLP
10 Franklin Road, S.E., Suite 800
P. O. Box 40013
Roanoke, Virginia 24022-0013
(540) 983-9300
FAX (540) 983-9400
sexton@gentrylocke.com
russell@gentrylocke.com
smith@gentrylocke.com
gibson@gentrylocke.com
byrd@gentrylocke.com
sullivan@gentrylocke.com

*Counsel for Barbara J. Filson*

34



Copyright © 2012 Gentry Locke Rakes & Moore, LLP
All rights reserved

**EXHIBIT A**

MAKE CHECKS PAYABLE TO:

Insight Imaging Roanoke
PO Box 843086

Los Angeles, CA 900843086

| STATEMENT DATE | PAY THIS AMOUNT | ACCOUNT NBR |
|---|---|---|
| 12/05/12 | CONTINUED | |
| | SHOW AMOUNT PAID HERE | $ |

STATEMENT

ADDRESSEE:

լսիլիսիլիայիստասիլիսիսիսի
FILSON, BARBARA JEAN

REMIT TO:

Insight Imaging Roanoke
PO Box 843086
Los Angeles, CA 900843086

☐ Please check box if above address is incorrect or insurance information has changed, and indicate change(s) on reverse side.

PLEASE DETACH AND RETURN TOP PORTION WITH YOUR PAYMENT

| DATE | DESCRIPTION OF SERVICE | AMOUNT | INSUR BALANCE | PATIENT BALANCE | BALANCE |
|---|---|---|---|---|---|
| 09/21/12 | PAYMENT | | | | |
| 09/25/12 | PAYMENT | | | | |
| 08/16/12 | 00703005101M - DEPO-MEDROL, METHYLPREDNISOLONE | | | | |
| 09/21/12 | PAYMENT | | | | |
| 09/21/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 09/25/12 | PAYMENT | | | | |
| 08/16/12 | 00409488820M - SODIUM CHLORIDE INJECTION | | | | |
| 09/10/12 | PAYMENT | | | | |
| 09/11/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 09/21/12 | PAYMENT | | | | |
| 09/25/12 | PAYMENT | | | | |
| 08/16/12 | $A4649S - SURGICAL SUPPLY; MISCELLANEOUS | | | | |
| 09/10/12 | PAYMENT | | | | |
| 09/11/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 09/21/12 | PAYMENT | | | | |
| 09/25/12 | PAYMENT | | | | |
| 08/16/12 | $S0020M - INJECTION, BUPIVICAINE HYDROCHLORIDE, 30 ML | | | | |
| 09/25/12 | PAYMENT | | | | |
| 10/05/12 | PAYMENT | | | | |
| 10/05/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| | ENCOUNTER TOTAL | | $0.00 | $0.00 | $0.00 |
| 08/30/12 | ENCOUNTER FOR BARBARA WITH OBRIEN MD, ROBERT | | | | |
| 08/30/12 | 64483-G - INJ ANES/STEROID EPIDUR; LUMB/SAC 1 LEVEL | | | | |
| 09/28/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 09/28/12 | PAYMENT | | | | |
| 10/03/12 | PAYMENT | | | | |
| 10/29/12 | PAYMENT | | | | |
| 08/30/12 | 00270141125C - ISOVUE M 200 BRACCO (QTY 2) | | | | |
| 09/17/12 | PAYMENT | | | | |

| ACCOUNT NBR | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120 DAYS | TOTAL ACCOUNT BALANCE |
|---|---|---|---|---|---|---|
| | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

MESSAGE:

PLEASE PAY
THIS AMOUNT »»»» CONTINUED

** PAYMENT DUE UPON RECEIPT * THANK YOU **
STATEMENT

PAGE: 2

**EXHIBIT B**

MAKE CHECKS PAYABLE TO:

**Insight Imaging Roanoke**
PO Box 843086

Los Angeles, CA 900843086

| STATEMENT DATE | PAY THIS AMOUNT | ACCOUNT NBR |
|---|---|---|
| 12/05/12 | CONTINUED | |
| | SHOW AMOUNT PAID HERE $ | |

STATEMENT

ADDRESSEE:

Ihhhhhhhhhllhhhhhh
FILSON, BARBARA JEAN

REMIT TO:

**Insight Imaging Roanoke**
PO Box 843086
Los Angeles, CA 900843086

☐ Please check box if above address is incorrect or insurance information has changed, and indicate change(s) on reverse side.

PLEASE DETACH AND RETURN TOP PORTION WITH YOUR PAYMENT

| DATE | DESCRIPTION OF SERVICE | AMOUNT | INSUR BALANCE | PATIENT BALANCE | BALANCE |
|---|---|---|---|---|---|
| 09/18/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 09/28/12 | PAYMENT | | | | |
| 10/03/12 | PAYMENT | | | | |
| 08/30/12 | 00703005101M - DEPO-MEDROL, METHYLPREDNISOLONE | | | | |
| 09/28/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 09/28/12 | PAYMENT | | | | |
| 10/03/12 | PAYMENT | | | | |
| 08/30/12 | 00409488820M - SODIUM CHLORIDE INJECTION | | | | |
| 09/17/12 | PAYMENT | | | | |
| 09/18/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 09/28/12 | PAYMENT | | | | |
| 10/03/12 | PAYMENT | | | | |
| 08/30/12 | $A4649S - SURGICAL SUPPLY; MISCELLANEOUS | | | | |
| 09/17/12 | PAYMENT | | | | |
| 09/18/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 09/28/12 | PAYMENT | | | | |
| 10/03/12 | PAYMENT | | | | |
| 08/30/12 | $S0020M - INJECTION, BUPIVICAINE HYDROCHLORIDE, 30 ML | | | | |
| 10/03/12 | PAYMENT | | | | |
| 10/15/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 10/15/12 | PAYMENT | | | | |
| | ENCOUNTER TOTAL | | $0.00 | $0.00 | $0.00 |
| 09/14/12 | ENCOUNTER FOR BARBARA WITH OBRIEN MD, ROBERT | | | | |
| 09/14/12 | 64483-G - INJ ANES/STEROID EPIDUR; LUMB/SAC 1 LEVEL | | | | |
| 10/15/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 10/15/12 | PAYMENT | | | | |
| 10/18/12 | PAYMENT | | | | |
| 11/13/12 | PAYMENT | | | | |
| 09/14/12 | 00270141125C - ISOVUE M 200 BRACCO (QTY 2) | | | | |

| ACCOUNT NBR | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120 DAYS | TOTAL ACCOUNT BALANCE |
|---|---|---|---|---|---|---|
| | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

MESSAGE:

PLEASE PAY
THIS AMOUNT »»»» CONTINUED

** PAYMENT DUE UPON RECEIPT * THANK YOU **
STATEMENT

MAKE CHECKS PAYABLE TO:

Insight Imaging Roanoke
PO Box 843086

Los Angeles, CA 900843086

| STATEMENT DATE | PAY THIS AMOUNT | ACCOUNT NBR |
|---|---|---|
| 12/05/12 | $0.00 | |
| | SHOW AMOUNT PAID HERE $ | |

STATEMENT

ADDRESSEE:

FILSON, BARBARA JEAN

REMIT TO:

Insight Imaging Roanoke
PO Box 843086
Los Angeles, CA 900843086

☐ Please check box if above address is incorrect or insurance information has changed, and indicate change(s) on reverse side.

PLEASE DETACH AND RETURN TOP PORTION WITH YOUR PAYMENT

| DATE | DESCRIPTION OF SERVICE | AMOUNT | INSUR BALANCE | PATIENT BALANCE | BALANCE |
|---|---|---|---|---|---|
| 10/01/12 | PAYMENT | | | | |
| 10/05/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 10/15/12 | PAYMENT | | | | |
| 10/18/12 | PAYMENT | | | | |
| 09/14/12 | 00703005101M - DEPO-MEDROL, METHYLPREDNISOLONE | | | | |
| 10/15/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 10/15/12 | PAYMENT | | | | |
| 10/18/12 | PAYMENT | | | | |
| 09/14/12 | 00409488820M - SODIUM CHLORIDE INJECTION | | | | |
| 10/01/12 | PAYMENT | | | | |
| 10/05/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 10/15/12 | PAYMENT | | | | |
| 10/18/12 | PAYMENT | | | | |
| 09/14/12 | 00409155910M - MARCAINE BUPIVACAINE | | | | |
| 10/15/12 | PAYMENT | | | | |
| 10/15/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 10/18/12 | PAYMENT | | | | |
| 09/14/12 | $A4649S - SURGICAL SUPPLY; MISCELLANEOUS | | | | |
| 10/01/12 | PAYMENT | | | | |
| 10/05/12 | INSURANCE WRITE OFF (CREDIT) | | | | |
| 10/15/12 | PAYMENT | | | | |
| 10/18/12 | PAYMENT | | | | |
| | ENCOUNTER TOTAL | | $0.00 | $0.00 | $0.00 |

| ACCOUNT NBR | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120 DAYS | TOTAL ACCOUNT BALANCE |
|---|---|---|---|---|---|---|
| | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

MESSAGE:

| PLEASE PAY THIS AMOUNT »»»» | $0.00 |
|---|---|

** PAYMENT DUE UPON RECEIPT * THANK YOU **
STATEMENT

John M. Mathis, M.D.,M.Sc

**INSIGHT**
IMAGING

INSIGHT IMAGING - ROANOKE
2923 FRANKLIN ROAD S.W.
ROANOKE  VA 24014

Tel: 540.581.0882
Fax: 540.581.0881

www.insighthealth.com

Date:_____

Injection dosage:  Depo-Medrol  80mg  /  40mg

Steroids typically take 12 to 24 hours before they start to work.
Maximum effect can take up to 7 – 10 days.

Call Insight Imaging (540-581-0882) in a week if symptoms have
not subsided to schedule another injection.  If you already have an
appointment scheduled with Insight, keep that appointment unless
otherwise directed by your physician.

If your pain has completely resolved, and you no longer need
your follow up appointment, please call Insight Imaging to
cancel your future injection.

Continue to take pain meds if needed.
Heat or ice may be used as well.

Symptoms can worsen before seeing improvement.

****Call your Doctor that monitors your Diabetes or Blood
Pressure if you feel you are higher than the guidelines set by your
physician.

**EXHIBIT C**

PRINCIPAL DISPLAY PANEL

TEVA

80 mg/mL

Suspension USP
ACETATE Injectable
MethylPREDNISolone

Rx only    NDC 0703-0051-01

---

NDC 0703-0051-01          Rx only

**MethylPREDNISolone
ACETATE Injectable
Suspension USP**

80 mg/mL

For IM, Intrasynovial and
Soft Tissue Injection Only.

NOT for IV use.

Sterile

1 mL Single Dose Vial

---

Each mL contains: 80 mg
methylprednisolone acetate USP,
28 mg polyethylene glycol
3350 and 0.189 mg
myristyl-gamma-picolinium
chloride. Sodium chloride
was added to adjust
tonicity.

When necessary, pH was
adjusted with sodium
hydroxide and/or
hydrochloric acid.

**Usual Dosage:** See package
insert for full prescribing
information.

Rev. A 11/2011

Teva Pharmaceuticals USA
Sellersville, PA 18960

---

NDC 0703-0051-01          Rx only

**MethylPREDNISolone
ACETATE Injectable
Suspension USP**

80 mg/mL

For IM, Intrasynovial and
Soft Tissue Injection Only.

NOT for IV use.

Sterile

1 mL Single Dose Vial

---

Store at
20° to 25°C (68° to 77°F)
[See USP Controlled Room
Temperature].

**Shake well immediately
before using.**

**Store upright.**

See bottom panel for lot
number and expiration date.

0703-0051-01
0

N3

---

TEVA    TEVA    TEVA    TEVA

X12-X10-757

**EXHIBIT D**



**Insight Imaging – Roanoke**
2923 Franklin Road
Roanoke, VA 22206
PH# 540.581.0882
FAX# 540.581.0881

| | |
|---|---|
| **PATIENT NAME:** | FILSON, BARBARA |
| **PATIENT DOB:** | |
| **DATE OF EXAM:** | 08/16/2012 |
| **REQUESTED BY:** | MATTHEW BILLUPS, MD |

**EXAM:   INJ 1 NOT LYTIC-W/WO CM-DX/TX-EPIDUR; LUMB/SAC**

CLINICAL HISTORY: Lumbar radiculopathy.

INJECTION SITE:   The study was performed from the right at L3-4.

TECHNIQUE:   After informed consent was obtained, the patient was brought to the fluoroscopy suite. Preliminary fluoroscopy was performed. Entry site and angulation were determined.

Following sterile preparation and drape and with the use of lidocaine as a local anesthetic, a 25-gauge spinal needle was advanced to the posterior epidural space. Small puffs of contrast were administered. Once needle tip location was confirmed in the posterior epidural space, a mixture of Depo-Medrol and dilute Marcaine was administered. A total of 80 mg of Depo-Medrol was given. The patient tolerated the procedure well and left the department in stable condition.

IMPRESSION:
SUCCESSFUL LUMBAR EPIDURAL STEROID INJECTION.

Thank you for this referral.

Robert F. O'Brien, M.D.
RFO/lk
D: 08/16/2012 08:02:38PDT
T: 08/16/2012 08:08:01PDT
Doc ID: 11964781/Insight Job ID: 2185789/NTS Job ID: 2185789/10193597
10193597
Document authenticated by Robert F. O'Brien, M.D., on 08/16/2012 09:03:32PDT

Please be advised that if a signature is not affixed to this document, via manual or electronic document authentication, the information contained herein should be considered preliminary in nature, still subject to change, and should not be relied upon.

EXHIBIT E


**INSIGHT**
IMAGING
Results. Right. Now.

**Insight Imaging – Roanoke**
2923 Franklin Road
Roanoke, VA 22206
PH# 540.581.0882
FAX# 540.581.0881

**PATIENT NAME:**   FILSON, BARBARA
**PATIENT DOB:**
**DATE OF EXAM:**   08/30/2012
**REQUESTED BY:**   JASON PEERY, PA

**EXAM:**   **INJ ANES/STEROID EPIDUR; LUMB/SAC 1 LEVEL**

CLINICAL HISTORY:  Lumbar radiculopathy.

TECHNIQUE:  After informed consent was obtained, the patient was brought to the fluoroscopy suite. Preliminary fluoroscopy was performed. Entry site and angulation were determined.

Following sterile preparation and drape, with the use of lidocaine as a local anesthetic, a 25-gauge needle was advanced under fluoroscopic guidance to the right L4-5 neural foramen. A small amount of contrast was administered confirming the extravascular location. A mixture of Depo-Medrol and dilute Marcaine was administered. A total of 40 mg of Depo-Medrol was given.

The patient tolerated the procedure well and left the department in stable condition.

IMPRESSION:
SUCCESSFUL RIGHT L4-5 TRANSFORAMINAL LUMBAR EPIDURAL STEROID INJECTION.

Thank you for this referral.

Robert F. O'Brien, M.D.
RFO/lk
D: 08/30/2012 07:16:40PDT
T: 08/30/2012 08:33:36PDT
Doc ID:  12049638/Insight Job ID:  2275438/NTS Job ID: 2275438/10231923
10231923
Document authenticated by Robert F. O'Brien, M.D., on 08/30/2012 08:44:43PDT

Please be advised that if a signature is not affixed to this document, via manual or electronic document authentication, the information contained herein should be considered preliminary in nature, still subject to change, and should not be relied upon.



**Insight Imaging – Roanoke**
2923 Franklin Road
Roanoke, VA 22206
PH# 540.581.0882
FAX# 540.581.0881

---

**PATIENT NAME:**     FILSON, BARBARA
**PATIENT DOB:**
**DATE OF EXAM:**     09/14/2012
**REQUESTED BY:**     JASON PEERY, PA

**EXAM:     INJ ANES/STEROID EPIDUR; LUMB/SAC 1 LEVEL**

CLINICAL HISTORY: Lumbar radiculopathy.

TECHNIQUE: After informed consent was obtained, the patient was brought to the fluoroscopy suite. Preliminary fluoroscopy was performed. Entry site and angulation were determined.

Following sterile preparation and drape, with the use of lidocaine as a local anesthetic, a 25-gauge needle was advanced under fluoroscopic guidance to the right L4-5 neural foramen. A small amount of contrast was administered confirming the extravascular location. A mixture of Depo-Medrol and dilute Marcaine was administered. A total of 40 mg of Depo-Medrol was given.

The patient tolerated the procedure well and left the department in stable condition.

IMPRESSION:
SUCCESSFUL RIGHT L4-5 TRANSFORAMINAL LUMBAR EPIDURAL STEROID INJECTION.

Thank you for this referral.

Robert F. O'Brien, M.D.
RFO/pd
D: 09/14/2012 11:59:00PDT
T: 09/14/2012 12:28:52PDT
Doc ID: 12139605/Insight Job ID: 2373072/NTS Job ID: 2373072/10258646
10258646
Document authenticated by Robert F. O'Brien, M.D., on 09/14/2012 12:36:50PDT

Please be advised that if a signature is not affixed to this document, via manual or electronic document authentication, the information contained herein should be considered preliminary in nature, still subject to change, and should not be relied upon.



EXHIBIT F



## Procedure Completion

Exam 1 of 1

Send HL7 | Hx (0)

**Patient**
Name ELLSON                    BARBARA          DOB
Phone                          Sex F   Age 63   SSN

**Visit**
Service Date 8/30/2012
Appt Type S

**Is Patient Pregnant**
○ Yes   Date of LMP
◉ No   MM/DD/YYYY

| Accession | CPT Code | CPT Description | Modality | Start Time | End Time |
|---|---|---|---|---|---|
| 10231923 | 64483 | TRNSFORAMEN LS | SPC | 10:15 AM | 10:45 AM |

**Performed Procedure - 10231923**

Prim Diag S&S   LOW BACK PAIN                    ED

**Additional Charges**
☑ HCPCS: A4649 - SURGICAL SUPPLY, MISCELLANEOUS
☑ 77003 - FLUOROSCOPIC GUIDANCE AND LOCALIZATION C

CPT Cd/Desc 64483        TRNSFORAMEN LS          Copy
Start/End 10:15 AM   10:25 AM              Qty   1
Contrast Seq w/        Seq w/o               Total   0
Radiologist OBRIEN              ROBERT
Radiation Dose No Dose Available       DLP mGy-cm   Misc. Info
Cancellation

**Contrast/Isotope/Sedation/Supplies**

| Bill Qty | HCPCS Cd | HCPCS Description | NDC | Accession |
|---|---|---|---|---|
| 2 | Q9966 | LOW OSMOLAR CONTRAST MATERIAL, 200-299 MG/ML IODINE | 00270141125 | 10231923 |
| 1 | J1040 | INJECTION, METHYLPREDNISOLONE ACETATE, 80 MG | 00703005101 | 10231923 |
| 1 | A4216 | STERILE WATER, SALINE AND/OR DEXTROSE, DILUENT/FLUSH, | 00409488820 | 10231923 |
| 1 | J3490 | UNCLASSIFIED DRUGS | 00409155910 | 10231923 |

Contrast
Seq/Med
Isotope
Supply

Edit
Delete

**Sedation/Meds**
Brand DEPO-MEDROL, METHYLPREDNISOLONE
Strength 80 MG/ML   Route EPIDURAL        Delivery 1 VIL
NDC # 00703005101              Amt Admin   1   ML
Sedation Note
Lot # 02232012              Exp. Dt 12/26/2012
Admin By RFO      [Initials]

Ok
Cancel

