# Exhibit 10

VIRGINIA

### IN THE CIRCUIT COURT FOR THE CITY OF ROANOKE

BARBARA J. FILSON,                              )
                                                )
        Plaintiff,                             )
                                                )
v.                                              )    Case No. CL12-2575
                                                )
INSIGHT HEALTH CORP., *et al.*,                 )
                                                )
        Defendants.                            )

### DEFENDANT INSIGHT HEALTH CORP.'S
### MOTION FOR LEAVE TO AMEND ADMISSIONS AND
### FOR RECONSIDERATION OF PARTIAL SUMMARY JUDGMENT

      Defendant Insight Health Corp. (hereinafter "Insight") requests that this Court grant it leave to amend its admissions to Requests Nos. 1 and 2 of Plaintiff's Request for Admissions. Defendant Insight further requests this Court to reconsider partial summary judgment on the issue of limitation of damages because as a "health care provider" under the Virginia Medical Malpractice Act (hereinafter "VMMA" or the "Act"), Insight is protected by the damages cap provided therein.

### INTRODUCTION

      Plaintiff filed the instant suit on or about December 12, 2012.  On February 22, 2013, Plaintiff propounded a Request for Admissions, and Insight timely responded as follows:

    Request No. 1:    Admit you are a health care provider as defined in Virginia Code § 8.01-581.1.

    Response:    Denied.

    Request No. 2:    Admit you are not a health care provider as defined in Virginia Code § 8.01-581.1.

    Response:    Admitted.

Plaintiff filed a motion on March 8, 2013, asking the court to grant partial summary judgment on the issue of limiting damages under the VMMA based on Insight's admissions to the above requests. On June 6, 2013, this Court Granted Plaintiff's motion.

Information obtained during recent depositions demonstrates that Insight's admissions to the above requests were incorrect. For the reasons set forth below, Insight seeks leave from the court to amend its response to Request No. 1 to "Admitted" and Request No. 2 to "Denied." Moreover, Insight requests that the Court reconsider partial summary judgment, because Insight is a health care provider under the VMMA, and is thus subject to the damages cap.

## ARGUMENT

**I.      THE COURT SHOULD PERMIT INSIGHT TO AMEND ITS ADMISSION THAT IT IS NOT A HEALTH CARE PROVIDER UNDER THE VIRGINIA MEDICAL MALPRACTICE ACT.**

Pursuant to Rule 4:11(b) of the Virginia Supreme Court Rules, any matter admitted under the provisions of Rule 4:11 is "conclusively established unless the court on motion permits withdrawal or amendment of the admission." A trial court may exercise its discretion to permit such withdrawal or amendment (1) "when the presentation of the merits of the action will be subserved thereby[;]" and (2) "the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits." Va. Sup. Ct. R. 4:11(b); *see also Shaheen v. County of Mathews*, 265 Va. 462, 473, 579 S.E.2d 162 (2003).

### A.      The Court Should Permit Amendment Because Insight's Admission is Inconsistent with the Facts.

In demonstrating whether the amendment will "subserve" the presentation of the merits of the action, the moving party must show that amendment will "facilitate the development of the

278806-1

case in reaching the truth." *Adventis, Inc. v. Big Lots Stores, Inc.*, 2006 U.S. Dist. LEXIS 68332, at *7 (W.D.Va. Sep. 11, 2006) (applying the same two-prong test for withdrawal of admission under Fed. R. Civ. P. 36(b)); *see also Shaheen*, 265 Va. 462, 474 (permitting withdrawal where it would assist in ascertaining the truth and development of the merits). Amendment should be permitted particularly where an admission is made inadvertently, or the admission is contrary to the record. *See McClanahan v. Aetna Life Ins. Co.*, 144 F.R.D. 316, 320 (W.D. Va. 1992) (finding that when an admission is made inadvertently, or new evidence is discovered after the admission despite due diligence, Rule 36(b) withdrawal should be allowed); *FDIC v. Prusia*, 18 F.3d 637 (8th Cir. 1994) (holding that permitting an amendment of responses to requests for admissions is in the interest of justice if the record demonstrates that the "admitted" facts are contrary to actual facts); *Ropfogel v. U.S.*, 138 F.R.D. 579 (D. Kan. 1991) (finding that a court may allow an amendment or withdrawal of admissions when the admission is no longer true because of changed circumstances . . .[or] that the court may look to whether the admission is contrary to the record of the case).

Insight incorrectly admitted that it was not a health care provider as defined in Virginia Code § 8.01-581.1. *See* Insight's Objections and Responses to Plaintiff's First Request for Admissions, Requests Nos. 1 and 2, attached hereto as Exhibit A. Plaintiff's Complaint primarily centers on allegations of Insight's negligence in procuring methylprednisolone acetate from NECC and fraud in billing for the steroid injections. *See generally* Complaint. In attempting to gain an understanding of Plaintiff's allegations, Insight's initial investigation focused on procurement and billing practices, and not on whether Insight qualified as a health care provider. When Insight's responses to Plaintiff's Request for Admissions were due, even before Insight's Answer to the Complaint was due, Insight naturally looked to the language of

278806-1

the Management Services Agreement (hereinafter "MSA") that it entered into with IGPM. The plain language of the MSA supports the conclusion that Insight is an independent contractor of IGPM, and that Insight is "in the business of providing equipment, management, administrative, and other *non-medical support services* to medical practices." Management Services Agreement, attached hereto as Ex. B, at 1. The MSA further states in Section 7.8 that Insight "is not authorized or qualified to engage in any activity which constitutes the practice of medicine." Under the MSA, Insight is obligated to provide support services to IGPM, including the following: (1) advertising and sales/marketing management; (2) ordering of necessary supplies and materials; (3) fiscal and billing services; and (4) maintenance of patient and administrative records. The language of the Agreement appeared to support the conclusion that Insight was not a health care provider under the VMMA. Thus, when Plaintiff propounded its Request for Admissions in early February 2013, just one month after Insight was served with Plaintiff's Complaint, Insight incorrectly admitted that it was not a health care provider under the Act.

Facts recently uncovered during discovery, however, show that Insight's functions went beyond simply providing non-medical, ministerial support services. For instance, during the depositions of Karen DeLong and Sharon Boros, conducted on May 8th and 9th, 2013, respectively, DeLong and Boros testified that each are employed by Insight as pain medicine technologists and CT technologists. Deposition of Karen DeLong, attached hereto as Exhibit C, at 13; Deposition of Sharon Boros, attached hereto as Exhibit D, at 1. According to Insight technologists, their duties include not only interviewing patients about their medical history, taking blood pressure readings, and assisting the physicians in obtaining informed consent, Ex. C at 19-20; Ex. D at 49, but also assisting with the preparation of medications for injection by drawing the pharmaceuticals into the syringes for the physicians. Ex. C at 13-15; Ex. D at 61.

278806-1

With respect to the steroid injections at issue in this case, the Insight technologists often draw the steroid into the syringe, and if needed, add saline and any other pharmaceuticals required to dilute the steroid injection. Ex. C at 14-15; Ex. D at 61-69. The technologists also take x-rays of the patient before each steroid injection procedure, Ex. C at 13, 17; Ex. D at 71, and they assist the physicians in performing each procedure, which includes adjusting the patient as directed by the physician, positioning the camera, and rotating the camera so the physician can see the precise injection point and properly execute the procedure. Ex. D at 72-75. In fact, DeLong and Boros are licensed by the Commonwealth of Virginia's Department of Health Professions as Radiologic Technologists. *See* Licenses attached hereto as Exhibit E.

The depositions of Drs. O'Brien and Mathis, conducted only one month ago, confirmed what was discerned during the depositions of DeLong and Boros: that there is evidence that would suggest Insight is a "health care provider" under the Act. Dr. Mathis explained in his testimony that Boros and Delong were licensed technologists and that becoming a licensed technologist requires specialized training. Deposition of Dr. John Mathis, attached hereto as Exhibit F, at 93-96. Both physicians confirmed that it was the responsibility of Insight's technologists to draw the medications used in the epidural steroid injections. *See* Ex. F at 136; Deposition of Robert O'Brien, attached hereto as Exhibit G, at 13.

Furthermore, Plaintiff's increasing focus on microbiology reports that accompanied the shipments of medication from NECC also became apparent during the depositions of Insight's technologists and the physicians. During the course of discovery, Plaintiff learned that microbiology reports were usually contained in the shipments of methylprednisolone acetate. The microbiology reports contained the results of third party testing of the drug's sterility. *See* Ex. D at 17-18. In her deposition, Boros testified that she and the other Insight technologists

5

typically kept these reports on file. *See* Ex. D at 18-19. Boros also testified that she noticed the possibility of a report not having been sent with a shipment from NECC, but after following up with DeLong, it was her understanding that Paul Hellkamp, Insight's manager, had the report. *See* Ex. D at 21-24.

Plaintiff extensively questioned DeLong, Boros, and Dr. Mathis on the issue of the missing reports, *see* Ex. C at 67-87; Ex. D at 17-40, 91-92, 99-105; Ex. F at 137-143, 155-161, 179-180, suggesting that Plaintiff is pursuing a new theory of negligence, particularly that Insight was negligent in using methylprednisolone acetate from shipments that did not have an accompanying microbiology report containing the results of third party sterility testing, and that Insight was aware of the possibility of a missing report, but failed to properly follow up on this concern. In doing so, Plaintiff will necessarily have to argue that the Insight technologists had specialized training and experience and that their duties were more than simply ministerial. Thus, Insight seeks to ensure that it will have the protection of the damages cap under the Act for its potential vicarious liability of the acts and omissions of a licensed Insight technologist.

Rather than let the case progress further based on an erroneous admission, Insight requests that the Court allow it to amend its responses to accurately reflect the facts and testimony revealed during discovery. Permitting Insight to amend its admission would advance the truth and further the presentation of the merits in this action. Accordingly, Insight satisfies the first prong of the test for amendment. *See Shaheen*, 265 Va. at 474; *McClanahan*, 144 F.R.D. at 320.

## B.    Amendment Will Not Prejudice Plaintiff.

Under the second prong, a party is prejudiced by amendment or withdrawal if that party is now any less able to obtain the evidence required to prove the matter which was admitted than

278806-1

it would have been at the time the admission was made. *Adventis, Inc.*, 2006 U.S. Dist. LEXIS 68332, at *8. "'Prejudice' is not simply that the party [that] initially obtained the admission will now have to convince the fact finder of its truth, but rather, relates to the special difficulties a party may face caused by the sudden need to obtain evidence upon withdrawal or amendment of admission." *Kerry Steel, Inc. v. Paragon Industries, Inc.*, 106 F.3d 147 (6th Cir. 1997); *see also Shaheen*, 265 Va. at 474 (noting that the burden of addressing the merits does not establish "prejudice"). Special difficulties weighing against withdrawal includes the unavailability of witnesses, but not mere inconvenience. *Adventis, Inc.*, 2006 U.S. Dist. LEXIS 68332, at *9; *Shaheen*, 265 Va. at 474.

Permitting Insight to amend its admission at this early juncture does not prejudice Plaintiff. Trial here is at least ten months away, and both parties are still in the early stages of discovery. Although amendment would put in dispute a new issue, Plaintiff has more than sufficient time to conduct discovery on whether Insight is a health care provider. In *Adventis*, the defendant moved to withdraw an admission a mere three months before trial. The court highlighted the importance of the fact that the motion was made several months before trial, and concluded that "the late stage in litigation [did not] reach[] the level of prejudice that would prevent the court from exercising its discretion to allow the amendments." 2006 U.S. Dist. LEXIS 68332, at *13-14. Here, Plaintiff has considerably more than three months to conduct discovery, and thus is not prejudiced.

Furthermore, while Plaintiff has already conducted discovery on this issue, including the depositions of key Insight employees, Plaintiff has affirmatively left open its depositions of those employees. Indeed, it was this very discovery that brought to light the inaccuracy of Insight's admission. Moreover, Plaintiff has not relied on Insight's admission to the extent that it would

7

be prejudicial to allow amendment. *See FDIC v. Prusia*, 18 F.3d at 637 (holding that the "mere fact that a party may have prepared a summary judgment motion in reliance on an opposing party's erroneous admission does not constitute 'prejudice' such as will preclude grant of a motion to withdraw admissions"). Amendment would neither create difficulties in Plaintiff's ability to maintain its action nor obtain evidence, and thus the Court should permit amendment.

## II.   INSIGHT IS A HEALTH CARE PROVIDER AS DEFINED BY THE ACT.

Defendant asks the Court to reconsider its decision granting partial summary judgment on the issue of whether the damages cap under the Act applies to Insight. Insight is a health care provider as defined in the statute, and is thus protected by the cap. At the very least, whether Insight is a health care provider is a genuine issue of material fact and thus should be left to the fact-finder to decide.

Under section 8.01-581.1 of the Virginia Medical Malpractice Act, the definition of "health care providers" includes the following:

> (i) a person, corporation, facility or institution licensed by this Commonwealth to provide health care or professional services . . . (ii) a professional corporation, all of whose shareholders or members are so licensed; (iii) a partnership, all of whose partners are so licensed; . . . (v) a professional limited liability company . . .; (vi) a corporation, partnership, limited liability company or any other entity, except a state-operated facility, which employs or engages a licensed health care provider and which primarily renders health care services; or (vii) a director, officer, employee, independent contractor, or agent of the persons or entities referenced herein, acting within the course and scope of his employment or engagement as related to health care or professional services.

Virginia courts interpret the various provisions of the statute broadly. *Japell v. Arlington Health Found.*, 199 Va. Cir. LEXIS 375, *6-7 (Dec. 2, 1998); *see also Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 861 (4th Cir. ) (describing the Virginia Supreme Court's broad interpretation of the VMMA in three separate cases). The statute has been amended several times by the Virginia legislature, each time increasing the number of entities that fall within the definition of "health

8

care providers" and thereby expanding the protection of the damages cap. *Bragg v. Kron*, 145 F. Supp. 2d 737, 740 (W.D.Va. 2001).

Insight qualifies as a health care provider under the Act because it is a corporation that directly employs radiology technologists who are also licensed in this state. Alternatively, Insight is an independent contractor of IGPM, a professional corporation of physicians licensed in the Commonwealth, and thus is a health care provider under the statute.

### A. **Insight Is A Corporation that Employs Licensed Health Care Providers and Primarily Renders Health Care Services.**

In order to satisfy the definition of "health care provider" under prong (vi), an entity must be (a) a corporation or other entity (b) which employs or engages a licensed health care provider, and (c) which primarily renders health care services. Va. Code § 8.01-581.1(vi). Insight satisfies all these elements.

Insight is a corporation that directly employs licensed radiology technologists to assist the physicians in performing medical services. Insight's radiology technologists are licensed medical professionals in the Commonwealth of Virginia, *see* Ex. E, and possess specialized training and education in imaging. Sharon Boros attended the Pittsburgh Medical School of Imaging, Ex. D at 116, and Karen DeLong attended Virginia Western for Radiology Technology. Ex. C at 10. Virginia courts have recognized that the definition of "health care provider" is not limited to physicians. *See, e.g.*, *Whitney v. Anthem Servs.*, 69 Va. Cir. 190, 193 (2005) (noting that "provider" under the VMMA also included "dentists, . . . registered nurses, hospitals, and many other health care professionals" and thus concluding "provider" in a Provider Agreement included a certified registered nurse anesthesist in a dentist's office who provided general anesthesia services).

9

278806-1

Moreover, Insight renders health care services. Insight assists Drs. Mathis and O'Brien in the provision of medical services to their patients, including pain management treatment. Indeed, DeLong and Boros perform duties such as taking x-rays, preparing steroids for injection into patients, and assisting the physicians during the treatment process. *See supra,* at 4-5. Even if some of the duties performed by Insight's technologists could be performed by non-medical personnel, using x-ray machines, and drawing and combining steroids with other pharmaceuticals, and operating the camera as the physician administers the treatment, *see id.,* those duties involve a level of medical and professional training and expertise sufficient to constitute "health care" under the VMMA. *See Japell v. Arlington Health Found.,* 199 Va. Cir. LEXIS 375, *8 (Dec. 2, 1998) (determining that although blood collection, screening, and testing could be performed by individuals who did not fall within the Act's definition of "health care providers," the procedures involved medical and professional qualities and thus amounted to health care).

In *Pulliam v. Coastal Emergency Servs.,* 257 Va. 1 (1999), the Virginia Supreme Court determined that Coastal, a corporation that contracted with a hospital to staff its emergency department with physicians was a health care provider. Coastal performed a number of administrative services for the emergency department, including contracting with and paying physicians for their services, providing for the departments budgetary needs, and billing patients. *Id.* at 23-24. Coastal itself owned "no emergency room facility or equipment and employ[ed] no support personnel such as nurses or technologists," nor did it perform any medical services; Coastal simply staffed the emergency department. Nevertheless, the Court concluded that Coastal "primarily render[ed] health care services," because Coastal "provide[d] emergency physicians to staff emergency departments of hospitals for the purpose of rendering health care

services in such departments." *Id.* at 24.   The physicians acted as agents of Coastal in the provision of health care.  *Id.*  Here, Insight not only provides administrative services to IGPM, but it also provides IGPM with radiology technologists, all for the purpose of providing medical services including pain management treatment to IGPM's patients. *See supra*, at 4-5.  Moreover, Insight's radiology technologists act as Insight's agents in rendering health care services, and it was in that capacity that DeLong rendered health care services to Plaintiff when he received the injection of methylprednisolone acetate.  Accordingly, Insight satisfies the definition of health care provider under the Act and is protected by the cap.

### B.   <u>Alternatively, Insight Is An Independent Contractor of IGPM, a Professional Corporation Under the Act.</u>

A fact-finder could also reasonably conclude that Insight is a health care provider under prong (vii) of the Act.  The employee, independent contractor, or agent of an entity satisfying the Act's definition of health care provider and acting within the scope of its engagement as related to health care or professional services is also a "health care provider" itself.  Va. Code § 8.01-581.1(vii).

IGPM is a professional corporation whose shareholders are Drs. O'Brien and Mathis, both of whom are licensed physicians in the Commonwealth.  As such, IGPM is a "health care provider under prong (ii). *See* Va. Code § 8.01-581.1(ii) ("'Health care provider' means . . . (ii) a professional corporation, all of whose shareholders or members are so licensed").  Drs. O'Brien and Mathis are also health care providers under the statute, given that they are physicians licensed in Virginia.  *Id.* § 8.01-581.1(i). According to the MSA between IGPM and Insight, Insight is an "independent contractor" performing services for IGPM/Drs. O'Brien and Mathis. *See* Ex. B § 7.9.

11                                                             278806-1

In *Khadim v. Laboratory Corp. of America*, 838 F. Supp. 2d 448 (W.D.Va. 2011), Plaintiffs brought suit against a laboratory for erroneous prenatal genetic testing results for Plaintiffs' then un-born child. *Id.* at 450. Plaintiff's physician performed the amnioscentesis procedure, and LabCorp performed the genetic testing requested by the physician. *Id.* at 467. The court concluded that LabCorp functioned as an independent contractor to the physician because it was "employed to do a piece of work without restriction as to the means to be employed," and thus constituted a health care provider under the VMMA. Likewise, Insight was employed by IGPM and the physicians to perform support services. Insight employed its own staff to carry out those support services, including radiology technologists who assisted the physicians in the provision of pain management to their patients. Accordingly, Insight is an independent contractor, qualifying as a health care provider under the statute.

## CONCLUSION

For the reasons set forth above, Insight respectfully requests this Court to permit amendment of its responses to Plaintiff's Requests for Admissions No. 1 and 2, and reconsider Partial Summary Judgment on the issue of limitations of damages under the VMMA.

Dated this 26th day of June, 2013.     Respectfully submitted,

BONNER KIERNAN TREBACH & CROCIATA, LLP

Christopher E. Hassell, Esq. (VSB No.30469)
Clinton R. Shaw, Jr., Esq. (VSB No. 37498)
1233 20th Street, N.W., Suite 800
Washington, D.C. 20036
Telephone: (202) 712-7000
Fax: (202) 712-7100
chassell@bonnerkiernan.com
cshaw@bonnerkiernan.com
Counsel for Defendant Insight Health Corp.

12

278806-1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that I caused the foregoing MOTION FOR LEAVE TO AMEND

ADMISSIONS AND FOR RECONSIDERATION OF PARTIAL SUMMARY JUDGMENT of

INSIGHT HEALTH CORP., to be served via regular mail and email on this 26th day of June,

2013 to:

J. Scott Sexton, Esq.
Gentry Locke Rakes & Moore, LLP
10 Franklin Road, S.E., Suite 800
P.O. Box 40013
Roanoke, Virginia 24022-0013
P 540.983.9300
F 540.983.9400
sexton@gentrylocke.com

and

Rebecca Herbig, Esq.
Bowman and Brooke LLP
1111 East Main Street, Suite 2100
Richmond, VA 23219
P 804.649.8200
F 804.804.649.1762
rebecca.herbig@bowmandandbrooke.com

and

John Jessee, Esq.
LeClair Ryan
1800 Wells Fargo Tower, Drawer 1200
Roanoke, Virginia 24006
P 540.510.3018
F 540.510.3050
john.jessee@leclairryan.com

Clinton R. Shaw Jr.

13

278806-1

VIRGINIA

## IN THE CIRCUIT COURT FOR THE CITY OF ROANOKE

SHARON G. WINGATE,                       )
EXECUTOR OF THE ESTATE OF                )
DOUGLAS GRAY WINGATE, DECEASED,          )
                                         )
         Plaintiff,                      )
                                         )
              v.                         )          Case No. CL12-2547
                                         )
INSIGHT HEALTH CORP.,                    )
JOHN MATHIS, M.D.,                       )
ROBERT F. O'BRIEN, M.D.,                 )
and                                      )
IMAGE GUIDED PAIN MANAGEMENT,            )
P.C.,                                    )
                                         )
         Defendants.                     )

### DEFENDANT INSIGHT HEALTH CORPORATION'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS

COMES NOW Defendant, Insight Health Corp., (hereinafter referred to as "Insight Health"), by and through counsel, Bonner Kiernan Trebach & Crociata, LLP, and hereby submits their Responses to Plaintiff's Requests for Admissions as follows:

### RESPONSES TO ADMISSIONS

1.     Admit you are a health care provider as defined in Virginia Code § 8.01-581.1.

**RESPONSE:**

Denied.

2.     Admit you are not a health care provider as defined in Virginia Code § 8.01-581.1.

**RESPONSE:**

Admitted.

3.     Admit Insight Health Corp. transacts business in the Commonwealth of Virginia under the name of Insight Imaging-Roanoke.

RESPONSE:

Defendant denies it transacts business in the Commonwealth of Virginia under the name of Insight Imaging-Roanoke.  Insight Imaging-Roanoke is a fictitious name registered to Image Guided Pain Management, P.C. ("IGPM").  IGPM has a non-exclusive license from Insight Health Corp. to use the name Insight Imaging for the purpose of identifying, advertising and promoting IGPM.

4.     Admit the document attached as Exhibit A is a true and correct printout from your website.

RESPONSE:

Defendant admits the document attached as Exhibit A is a true and correct printout from its website.  Insight Health Corp., pursuit to its Management Agreement with IGPM, provides IGPM with advertising and marketing services.  IGPM has a non-exclusive license from Insight Health Corp. to use the name Insight Imaging for the purpose of identifying, advertising and promoting IGPM.  Insight Imaging-Roanoke is a fictitious name registered to Image Guided Pain Management, P.C.  Insight Health Corp. advertises and markets IGPM d/b/a Insight Imaging-Roanoke on its website.

5.     Admit www.insighthealth.com is your domain name.

RESPONSE:

Admitted.

2

273140-1

6.     Admit Insight Imaging-Roanoke is located at 2923 Franklin Road, S.W. Roanoke, Virginia 24014.

**RESPONSE:**

**This Defendant admits that Image Pain Guided Management, P.C., which has the fictitious name Insight Imaging-Roanoke, runs it practice out of the building located at 2923 Franklin Road, S.W., Roanoke, Virginia 24014.**

7.     Admit Douglas Gray Wingate died on September 18, 2012.

**RESPONSE:**

**Admitted.**

8.     Admit Douglas Gray Wingate died as a result of acute fungal meningitis.

**RESPONSE:**

**Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.**

9.     Admit Douglas Gray Wingate developed fungal meningitis as a result of complications from a spinal injection as noted in his certificate of death which is attached hereto as Exhibit B.

**RESPONSE:**

**Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.**

10     Admit Douglas Gray Wingate received an epidural steroid injection on September 6, 2012.

273140-1

RESPONSE:

Admitted.

11.     Admit Douglas Gray Wingate received an epidural steroid injection on September 6, 2012 at Insight Imaging-Roanoke.

RESPONSE:

**Defendant admits that Mr. Wingate received an epidural steroid injection performed by Dr. O'Brien in the building located at 2923 Franklin Road, S.W., Roanoke, Virginia 24014.**

12.     Admit the epidural steroid injection administered to Douglas Gray Wingate on September 6, 2012 contained Methylprednisolone acetate made by the New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center.

RESPONSE:

Admitted.

13.     Admit the Methylprednisolone acetate in the epidural steroid injection administered to Douglas Gray Wingate on September 6, 2012 was not made by Teva Parental Medicines, Inc.

RESPONSE:

Admitted.

14.     Admit the epidural steroid injection administered to Douglas Gray Wingate on

4

273140-1

September 6, 2012 contained, in part, a fungus.

RESPONSE:

Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.

15.    Admit the document attached as Exhibit C is a letter you sent to Douglas Wingate.

RESPONSE:

This Defendant admits that Exhibit C is a letter sent to Mr. Wingate by Dr. Mathis and Mr. Hellkamp.  Defendant further admits Mr. Hellkamp is an employee of this Defendant.

16.    Admit Paul Hellkamp is your employee.

RESPONSE:

Admitted.

17.    Admit the epidural steroid injection administered to Douglas Gray Wingate on September 6, 2012 contained, in part, adulterated Methylprednisolone acetate.

RESPONSE:

Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.

18.    Admit that you violated Virginia Code § 54.1-3461(A)(2) by injecting Douglas Gray Wingate with adulterated Methylprednisolone acetate on September 6, 2012.

RESPONSE:

Denied.


19.    Admit that Douglas Gray Wingate developed fungal meningitis as a result of your violation of Virginia Code § 54.1-3461(A)(2).

RESPONSE:

**Denied.**


20.    Admit the epidural steroid injection administered to Douglas Gray Wingate on September 6, 2012 caused him to develop fungal meningitis.

RESPONSE:

**Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.**


21.    Admit the attached medical records (Exhibit D) are true and accurate copies of Douglas Gray Wingate's medical records.

RESPONSE:

**Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.**


22.    Admit the attached medical records were made by a person(s) with knowledge in the course of a regularly conducted business activity.

RESPONSE:

273140-1

Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.

23.    Admit the attached medical records were made as part of a regular practice of business activity.

**RESPONSE:**

Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.

24.    Admit Exhibit B is a true and correct copy of Douglas Gray Wingate's certificate of death.

**RESPONSE:**

Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.

25.    Admit Exhibit B was made by a person(s) with knowledge in the course of a regularly conducted business activity.

**RESPONSE:**

Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.

26.    Admit Exhibit B was made as part of a regular practice of business activity.

**RESPONSE:**

273140-1

Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.

27.    Admit the attached Report of Autopsy (Exhibit E) is a true and accurate copy of the Report of Autopsy prepared by Amy Tharp, M.D.

**RESPONSE:**

Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.

28.    Admit Exhibit E was made by a person(s) with knowledge in the course of a regularly conducted business activity.

**RESPONSE:**

Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.

29.    Admit Exhibit E was made as part of a regular practice of business activity.

**RESPONSE:**

Upon reasonable inquiry, this Defendant lacks the information known or readily obtainable by it to admit or deny this request.

30.    Admit a cerebrospinal (or CSF) slant culture obtained prior to Mr. Wingate's death began to grow a fungus.

**RESPONSE:**

Upon reasonable inquiry, this Defendant lacks the information known or readily

273140-1

obtainable by it to admit or deny this request.

31.    Admit that fungus was later confirmed to be Exserohilum.

**RESPONSE:**

This Defendant lacks sufficient knowledge or information to admit or deny this request.

32.    Admit Exserohilum is a fungus.

**RESPONSE:**

This Defendant lacks sufficient knowledge or information to admit or deny this request.

33.    Admit you caused Mr. Wingate to have Exserohilum in his cerebrospinal fluid.

**RESPONSE:**

Denied.

34.    Admit the National Drug Code is a unique product identifier used in the United States for drugs intended for human use.

**RESPONSE:**

Admitted.

35.    Admit National Drug Code 0703-0051-01 is a unique product code for generic Depo Medrol made by Teva Parental Medicines, Inc.

273140-1

RESPONSE:

Admitted.


36.    Admit National Drug Code 0703-0051-01 is a unique product code for preservative free Methylprednisolone acetate made by Teva Parental Medicines, Inc.

RESPONSE:

**This Defendant lacks sufficient knowledge or information to admit or deny this request.**

37.    Admit National Drug Code 0703-0051-01 is not a product code for Methylprednisolone acetate made by New England Pharmacy, Inc. d/b/a New England Compounding Center.

RESPONSE:

Admitted.


Date:   February 22, 2013

BONNER KIERNAN TREBACH & CROCIATA, LLP

Christopher E. Hassell, Esquire VSB#30469
Brian J. Gerling, Esquire VSB #75817
Clinton R. Shaw, Jr. VSB#37498
1233 20th Street, NW, 8th Floor
Washington, DC  20036
p(202) 712-7000
f(202) 712-7100
chassell@bonnerkiernan.com
bgerling@bonnerkiernan.com

*Counsel for Insight Health Corp.*

273140-1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused to be served the foregoing Responses to Plaintiff's Requests for Admissions via regular mail and email this 22nd day of February, 2013 to:

J. Scott Sexton
Gentry Locke Rakes & Moore, LLP
10 Franklin Road, S.E., Suite 800
P.O. Box 40013
Roanoke, Virginia 24022-0013
p540.983.9300
f540.983.9400
sexton@gentrylocke.com

and

Rebecca Herbig
Bowman and Brooke LLP
1111 East Main Street, Suite 2100
Richmond, VA 23219
p804.649.8200
f804. 804.649.1762
rebecca.herbig@bowmandandbrooke.com

and

New England Compounding Center
Its Registered Agent of Process: CT Corporation System
4701 Cox Road
Suite 301
Glen Allen, Virginia, 23060
and

John Jessee
LeClair Ryan
1800 Wells Fargo Tower, Drawer 1200
Roanoke, Virginia 24006
p540.510.3018
f540.510.3050
john.jessee@leclairryan.com

Clinton R. Shaw, Jr.

# MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement ("Agreement"), dated as of this 8th day of July, 2010 ("Effective Date"), is made by and between Image Guided Pain Management, P. C., a Virginia professional corporation ("Medical Group"), and InSight Health Corp., a Delaware corporation ("Manager").

WHEREAS, Manager is in the business of providing equipment, management, administrative, and other non-medical support services to medical practices;

WHEREAS, Medical Group maintains a medical practice at 2923 Franklin Road Roanoke, Virginia (the "Medical Practice"); and

WHEREAS, Medical Group desires to retain Manager to provide certain necessary services, and Manager desires to provide the same to Medical Group, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and covenants as set forth in this Agreement, the parties agree as follows:

## ARTICLE 1.
## ENGAGEMENT OF MANAGER

Medical Group hereby engages Manager, and Manager hereby accepts such engagement, subject to the terms and conditions of this Agreement to provide the Services (as defined below). During the term of this Agreement, the parties agree that Manager will be the exclusive provider of the Services to Medical Group and the Medical Practice. Title to all property, including information systems and intellectual property, provided by Manager under this Agreement, shall remain the sole property of Manager.

## ARTICLE 2.
## MANAGER SERVICES; MEDICAL GROUP OBLIGATIONS

With respect to the Medical Practice, Manager shall provide Medical Group the services set forth on Exhibit A, attached hereto, which may be amended from time to time by mutual written agreement of the parties (the "Services"). With respect to the Medical Practice, Medical Group shall fulfill the obligations set forth on Exhibit B, attached hereto, which may be amended from time to time by mutual written agreement of the parties (the "Obligations"). Concurrently with the execution of this Agreement, Manager and Medical Group shall execute the Business Associate Agreement in the form of Exhibit E attached to this Agreement.

## ARTICLE 3.
## INSURANCE

Manager shall maintain professional and comprehensive general liability insurance coverage, with limits not less than that required in the State of Virginia, and in no event less than



IHC000692

PROTECTED DISCOVERY
MATERIAL

One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) annual aggregate during the term of this Agreement. Upon request, Manager shall provide current certificates of insurance evidencing such coverage to Medical Group. Medical Group shall maintain professional and comprehensive general liability insurance coverage covering Medical Group, and shall cause all physicians who provide services in connection with, related to, or arising from medical imaging performed at the Medical Practice (whether as a supervising, reading or interpreting physician or otherwise) to maintain professional liability insurance coverage, in both cases with limits not less than that required in the State of Virginia, and in no event less than One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) annual aggregate during the term of this Agreement. Medical Group shall, upon request, provide current certificates of insurance evidencing such coverage to Manager. If any of the above policies of insurance are cancelled, terminated or altered, Manager or Medical Group shall immediately notify each other. If any of the above policies of insurance are maintained on a claims made basis, such party shall purchase and maintain continuous coverage upon expiration or termination of this Agreement for three (3) years.

## ARTICLE 4.
## FEES; BANK ACCOUNTS; AND BILLING

**SECTION 4.1. Manager's Compensation; Disbursements.** As compensation for the Services rendered hereunder, Medical Group shall pay to Manager the fees and costs set forth on Exhibit D. On or before the 10th day of each month, Manager shall submit an invoice to Medical Group regarding all payments due from Medical Group to Manager for services provided by Manager during the preceding month hereunder. Manager shall submit a report with each such invoice that delineates all collections from the preceding month upon which such invoice is based and that provides a specific calculation of such payments due to Manager in accordance with Exhibit D hereto. On or before the 15th day of each month, Medical Group shall remit payment to Manager pursuant to such invoice and report; and Manager is hereby expressly authorized to, and shall, disburse from the Operating Account (as defined below) the amount of such invoice to Manager. Upon 24-hours notice to Manager, Medical Group shall have unrestricted access to the Operating Account. Medical Group shall have the right, upon reasonable notice, at its sole expense, to audit from time to time both the Operating Account and Manager's records relating to the calculation of such payments to Manager. The parties acknowledge and agree that the compensation set forth herein represents the fair market value of the Services provided hereunder negotiated in an arm's length transaction and has not been determined in a manner that takes into account the volume or value of any referrals.

**SECTION 4.2. Fee Schedule.** Set forth on Exhibit C, attached hereto, is a copy prepared by Manager of Medical Group's schedule of charges applicable to the Medical Practice, incorporating the professional fees of the Medical Group (the "Fee Schedule"). Medical Group represents and warrants to Manager that to the actual knowledge of Medical Group, the amounts set forth in such Fee Schedule with respect only to those procedures currently performed by Medical Group do not exceed the reasonable, usual, and customary charges for services provided



2

IHC000693

PROTECTED DISCOVERY
MATERIAL

in the community surrounding the Medical Practice.  Medical Group shall obtain Manager's approval prior to any changes in or additions to such Fee Schedule.

SECTION 4.3.  **Bank Accounts**.  Medical Group shall open a bank account ("Medical Group's Account") at a bank or other suitable financial institution to be mutually agreed to by the parties (the "Agent") to be used solely for depositing the Medical Practice collections ("Collections").   Medical Group shall instruct the Agent to (i) provide Manager with informational access to the Medical Group's account, so as to track deposits, and (ii) transfer, at the end of each business day, all Collections deposited into Medical Group's Account to such separate second bank account ("Operating Account") as Manager and Medical Group may jointly designate to the Agent from time to time, from which Operating Account Manager shall have the sole right to make withdrawals, except as expressly provided in Section 4.1.  The parties hereto understand and agree that the sole reason to create multiple accounts hereunder is to comply with the requirements of Medicare and other applicable reimbursement programs, and the parties hereto shall modify the use of multiple accounts hereunder as requested by Manager to the extent that Manager reasonably determines that such modifications will comply with Medicare and other applicable reimbursement programs, including the elimination of Medical Group's Account and the sole use of the Operating Account.  Compensation and disbursements from the Operating Account shall be made in accordance with the procedures set forth in Exhibit D.

SECTION 4.4.  **Sole Control**.  Medical Group shall at all times have sole control over Medical Group's Account and may at any time or from time to time make withdrawals from Medical Group's Account or otherwise change the disposition instructions Medical Group may have given to the Agent; provided, however, that in the event that Medical Group makes any withdrawals of Collections from Medical Group's Account, makes any withdrawals from the Operating Account, or changes the disposition instructions given to the Agent without the prior written consent of Manager or otherwise in contravention of this Agreement, Manager shall have the right to terminate this Agreement in accordance with Section 5.2 (Termination) below. Medical Group shall execute such documents as the Agent may reasonably require, including a limited power of attorney, to permit the Agent to receive the Collections, endorse any checks, drafts, notes, money orders, cash, insurance payments, and other instruments relating to such Medical Group collections, deposit the Medical Group collections into Medical Group's Account, and transfer the Collections from Medical Group's Account into the Operating Account.

SECTION 4.5.  **Billing**.  To the extent permitted by law and payment programs, the technical and professional components of the services provided at the Medical Practice shall, as provided above, be billed and collected on a consolidated basis (i.e., global basis), however, the parties acknowledge that certain payors may require that the technical and professional components of the services provided at the Medical Practice be billed separately and shall cooperate with each other to appropriately bill such payors.  Manager represents that all billing and collection practices undertaken with respect to Medical Practice patients shall be undertaken

3



IHC000694

PROTECTED DISCOVERY
MATERIAL

in compliance with all applicable federal and state laws and regulations and shall be consistent with such practices as are customary and usual within the Medical Practice's community. In the event Manager desires to implement any collection practices not deemed customary and usual, such as, for example, imposing a lien upon a patient's primary residence, Manager agrees to do so only upon the prior written consent of Medical Group.

SECTION 4.6. **Third Party Payor Arrangements**. "Third party payors" are defined, for the purposes of this Section, as entities that are authorized to contract for healthcare services under Medicare, Medicaid, or other public or private health and/or hospital care programs, including, insurers, health maintenance organizations, preferred provider organizations, independent practice associations, physician groups, physicians, and employers. "Third party payor arrangements" are defined, for purposes of this Section, as arrangements for the provision of outpatient imaging services with third party payors. Notwithstanding anything to the contrary herein, Medical Group agrees to cooperate as necessary to facilitate the entry into and maintenance of any third party payor arrangements regarding imaging services provided by the Medical Practice during the term of this Agreement, including executing documents to implement such arrangement, and assisting Manager in the preparation of applications, reports, and other submissions to payors and government authorities with respect to such arrangement. Manager may enter into third party payor arrangements on behalf of Medical Group regarding imaging services provided at the Medical Practice under discounted and alternative fee arrangements, subject to the approval of the Medical Practice, which approval may not be unreasonably withheld and shall not be withheld if the reimbursement rates within such arrangements are consistent with market rates in the area for such arrangements.

## ARTICLE 5.
## TERM AND TERMINATION

SECTION 5.1. **Term**. The initial term of this Agreement shall commence on the closing date of that certain asset purchase described in the Asset Purchase Agreement, dated April __, 2010, by and among Manager, Carilion Medical Center, and Odyssey IV, LLC (the "Effective Date"), and shall continue until August 31, 2013, unless sooner terminated as herein provided ("the Initial Term"). Provided that this Agreement has not been earlier terminated, this Agreement shall automatically renew on the same terms and conditions for two (2) renewal periods of five (5) years each, unless either party provides written notice to the other of its intent not to renew at least one hundred eighty (180) days prior to the expiration of the initial term or any renewal period.

SECTION 5.2. **Termination**. This Agreement may be terminated as follows:

(a)     Either party may immediately terminate this Agreement upon the commission of an act of bankruptcy by the other party or upon the other party becoming the subject of a procedure under the Federal Bankruptcy Act, and the same is not dismissed within ninety (90) days.

4        4

IHC000695

PROTECTED DISCOVERY
MATERIAL

**(b)**     Manager may terminate this Agreement on thirty (30) days written notice if Medical Group materially breaches any of its obligations under this Agreement and Medical Group fails to cure such breach within (i) thirty (30) days of receipt of such notice or (ii) a longer period not to exceed ninety (90) days in the event such breach cannot be cured in 30 days and Medical Group is diligently and reasonably pursuing a cure of such breach.  Manager shall set forth in the notice of intended termination required hereby the facts underlying its claim that Medical Group is in breach of this Agreement.  If such breach is remedied in accordance with 5.2(b)(i) or 5.2(b)(ii), as the case may be, this Agreement shall remain in effect unless otherwise terminated hereunder.

**(c)**     Medical Group may terminate this Agreement on thirty (30) days written notice if Manager materially breaches any of its obligations under this Agreement and Manager fails to cure such breach within (i) thirty (30) days of receipt of such notice, or (ii) a longer period not to exceed ninety (90) days in the event such breach cannot be cured in 30 days and Manager is diligently and reasonably pursuing a cure of such breach.  Medical Group shall set forth in the notice of intended termination required hereby the facts underlying its claim that Manager is in breach of this Agreement.

**(d)**     Either party may, upon written notice, immediately terminate this Agreement without liability upon the occurrence of any one of the following events: (i) the other party's conviction of or pleading of no contest or nolo contendre to any felony offense, or any health care related crime, and such noticing party reasonably believes in good faith that such event will materially and adversely affect the Medical Practice or its expected Collections; or (ii) a breach of any representation made by the other party in Section 7.19 below.

**(e)**     Subject to compliance with the procedures set forth in Section 7.21, either party may terminate this Agreement in accordance with Section 7.21.

**SECTION 5.3.  Effects of Expiration or Termination.**  Upon expiration or termination of this Agreement, each party shall deliver to the other any and all property of the other which is in such party's possession or control.  Upon expiration or termination of this Agreement, Medical Group shall, upon Manager's request, immediately vacate the Medical Practice's premises, removing at such time any and all of Medical Group's personal property.  Any personal property that is not removed may be removed and stored by Manager at Medical Group's expense.  Medical Group shall also deliver to Manager any and all property of Manager that is in Medical Group's possession or control.  Following the expiration or termination of this Agreement, the provisions hereof shall continue in effect to the extent they expressly provide therefor.  In addition, following the expiration or termination of this Agreement, the following provisions shall continue in effect:  Article 6 (Indemnification) and Article 7 (Miscellaneous).

**ARTICLE 6.**



IHC000696

PROTECTED DISCOVERY MATERIAL

## INDEMNIFICATION

**SECTION 6.1. Indemnification of Manager.** Medical Group will indemnify and hold harmless Manager, its officers, employees, agents, directors, and affiliates (collectively, "Manager Indemnified Persons") for, and will pay to Manager Indemnified Persons the amount of, any loss, liability, claim, damage (including incidental and consequential damages), expense (including costs of investigation and defense and reasonable attorneys' fees) incurred by Manager Indemnified Persons, whether or not involving a third-party claim, arising, directly or indirectly, from or in connection with any breach by Medical Group or any negligent action, omission or willful misconduct by Medical Group, except to the extent such loss, liability, claim, damage, or expense is a result of the action, omission or willful misconduct of Manager.

**SECTION 6.2. Indemnification of Medical Group.**

(a) Manager will indemnify and hold harmless Medical Group, and its officers, employees, agents, directors, and affiliates (collectively, the "Medical Group Indemnified Persons") for, and will pay to Medical Group Indemnified Persons the amount of, any damages, loss, liability, harm, damage (including incidental and consequential damages), expenses (including costs of investigation and defense and reasonable attorneys' fees), whether or not involving a third-party claim, arising, directly or indirectly, from or in connection with any breach by Manager of any provision of this Agreement or any negligent action, omission or willful misconduct by Manager, except to the extent such loss, liability, claim, damage, or expense is a result of the action, omission or willful misconduct of Medical Group.

(b) Manager agrees that it will fund such indemnity by obtaining, and naming Medical Group as an additional insured on, a so-called "errors and omissions" insurance policy in an amount not less than $1 million per single occurrence/$5 million aggregate on a "claims-made" basis. Manager shall provide evidence of insurance coverage of the above-described indemnification of Medical Group.

## ARTICLE 7.
## MISCELLANEOUS

**SECTION 7.1. Compliance With Laws.** The parties agree that each party will perform its obligations under this Agreement in accordance with applicable federal and state statutes as may be in effect from time to time.

**SECTION 7.2. Access to Books and Records.** Applicable portions of the Federal Social Security Act may require Medical Group to include in this Agreement provisions requiring Manager to allow the Secretary of the Department of Health and Human Services ("Secretary") and other authorized federal officials access to Manager's books and records as they relate to services provided pursuant to this Agreement, and such provisions are hereby incorporated by reference. The availability of such books, documents and records shall be


6                                              C

IHC000697

PROTECTED DISCOVERY
MATERIAL

subject at all times to such criteria and procedures for seeking and obtaining access as may be promulgated by the Secretary, or other authorized federal officials, by rule, regulation or as otherwise provided by applicable law.

SECTION 7.3.   **Confidentiality.**   Each party recognizes and acknowledges that, by virtue of entering into this Agreement, each party may have access to certain information of other party that is confidential and constitutes the valuable, special and unique property of such party, including policies and procedures, operating manuals and processes, financial information, marketing plans and business strategies.   Each party warrants and covenants to the other party that neither it nor any of its employees or independent contractors will at any time, either during or subsequent to the term of this Agreement, disclose to others, use, copy or permit to be copied, without express prior written consent of the other party, except (i) as otherwise permitted hereunder, (ii) as otherwise available to the public, and (iii) as requested by legal, financial and other advisors who agree to keep such information confidential.   Notwithstanding the foregoing, either party may, without the other party's consent, disclose the terms of this Agreement to any third party in response to due diligence requests specifically requesting such disclosure, provided that such third party agrees to keep such information confidential.

SECTION 7.4.   **Notice.**   Whenever notice must be given under the provisions of this Agreement, such notice must be in writing and addressed to the parties at their respective addresses set forth below and shall be deemed to have been duly given if delivered by hand-delivery, first-class registered postage certified mail (with written confirmation of receipt), or by a national commercial overnight delivery service, as follows:

| If to Manager | InSight Health Corp. |
| --- | --- |
| | 26250 Enterprise Court |
| | Suite 100 |
| | Lake Forest, CA  92630-8405 |
| | Attention:  General Counsel |

| If to Medical Group: | Image Guided Pain Management P.C. |
| --- | --- |
| | <u>2923 Franklin Road</u> |
| | <u>Roanoke, VA  24014</u> |
| | Attention:  President |

SECTION 7.5.   **Amendment.**   No modification, waiver, amendment, discharge, or change of this Agreement shall be valid unless in writing and signed by the party against whom enforcement of such modification, waiver, amendment, discharge, or change is sought.

SECTION 7.6.   **Assignment.**   This Agreement shall not be assignable by either party without the prior written consent of the other; provided, however, that Manager may assign this Agreement to a wholly-owned subsidiary of Manager.   This Agreement shall be binding upon the parties and their respective successors, assigns, heirs, transferees, executors, and



C:\Documents and Settings\bobbyob\Local Settings\Temporary Internet Files\Content.IE5\VA0BFDCI\SDR_CLEAN_FINAL_-_RoanokeManagement_Agreement_7_7_2010_final[2].doc

IHC000698

PROTECTED DISCOVERY MATERIAL

administrators.  Nothing in this Section 7.6 is intended to limit Manager from contracting with third parties to perform some or all of the Services.

SECTION 7.7.  **Severability.**  If any one or more of the provisions of this Agreement should be ruled wholly or partly invalid or unenforceable by a court or other government body of competent jurisdiction, then: (a) the validity and enforceability of all provisions of this Agreement not ruled to be invalid or unenforceable shall be unaffected; and (b) the provision(s) held wholly or partly invalid or unenforceable shall be deemed amended, and the court is authorized to reform the provision(s), to the minimum extent necessary to render them valid and enforceable in conformity with the parties' intent.

SECTION 7.8.  **Practice of Medicine.**  The parties acknowledge that Manager is not authorized or qualified to engage in any activity which constitutes the practice of medicine.  To the extent any act or service required by Manager is construed or deemed to constitute the practice of medicine, Manager is released from any obligation to provide that act or service without otherwise affecting the terms of this Agreement.

SECTION 7.9.  **Relationship of the Parties.**  In the performance of the work, duties, and obligations delegated to Manager under this Agreement, it is mutually understood and agreed that Manager is at all times acting and performing as an independent contractor, and nothing in this Agreement creates between Medical Group and Manager an employer/employee relationship or a joint venture relationship.

SECTION 7.10.  **Choice of Law.**  The interpretation of this Agreement shall be governed by the laws of the State of Virginia, without regard to choice of law provisions.

SECTION 7.11.  **Consents, Approvals and Discretion.**  Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by either party or either party must or may exercise discretion, the parties agree that such consent or approval shall not be unreasonably delayed and such discretion shall be reasonably exercised.

SECTION 7.12.  **Force Majeure.**  Neither party shall be liable nor deemed to be in default for any delay or failure in performance under the Agreement or other interruption of service deemed resulting, directly or indirectly, from Acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, failure of transportation, machinery or supplies, vandalism, strikes or any similar cause beyond the reasonable control of either party.  Both parties shall make good faith efforts to perform under this Agreement in the event of any such circumstance.

SECTION 7.13.  **Third Party Beneficiaries.**  Except for indemnification pursuant to Article VI (Indemnification), nothing herein is intended nor shall be construed as creating any rights for any third party that is not a party to this Agreement.



8

IHC000699

PROTECTED DISCOVERY
MATERIAL

SECTION 7.14.   <u>Headings and Construction</u>.   All headings contained in this Agreement are for reference purposes only and are not intended to affect in any way the meaning or interpretation of this Agreement. All words used in this Agreement shall be construed to be of such gender and number as the circumstances require. References to the word "including" do not imply any limitation. This Agreement shall not be construed more strictly against either party hereto by virtue of the fact that this Agreement may have been drafted or prepared by such party or its counsel, it being recognized that each of the parties hereto have contributed substantially and materially to its preparation and that this Agreement has been the subject of and is the product of negotiations between the parties.

SECTION 7.15.   <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, either in original, facsimile or portable document format ("<u>pdf</u>"), and each of which shall be deemed an original, but all of which collectively shall constitute one and the same agreement.

SECTION 7.16.   <u>Waiver</u>.   The waiver by either party of a breach or violation of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach of such provision or any other provision of this Agreement.

SECTION 7.17.   <u>Cumulative Remedies</u>.   Any right, power, or remedy provided under this Agreement to either party hereto shall be cumulative and in addition to any other right, power or remedy provided under this Agreement now or hereafter existing at law or in equity, and may be exercised singularly or concurrently.

SECTION 7.18.   <u>Attorneys' Fees</u>.   In the event that either party breaches this Agreement in any respect and litigation results, the party that substantially prevails in such litigation shall be entitled to recover, in addition to any and all other remedies, which shall be cumulative, the reasonable attorneys' fees, expenses, and costs which it incurs as a result thereof.

SECTION 7.19.   <u>Participation in Federal and State Health Programs</u>.   Each of the parties hereto warrants and represents that it is not debarred, suspended, excluded or otherwise ineligible to participate in any federal or state health program. Each party hereby agrees that it shall notify the other party in writing within five (5) days should it become debarred, suspended, excluded or otherwise ineligible to participate in any federal or state health program. In addition, Medical Group hereby warrants and represents that none of the physicians who will provide services at the Center are, or have been, debarred, suspended, excluded or otherwise ineligible to participate in any federal or state health program, and Medical Group shall notify Manager in writing within five (5) business days should a physician become debarred, suspended, excluded or otherwise ineligible to participate in any federal or state health program. In the event either party receives such notice or becomes aware that the other party has been disbarred, suspended, excluded or otherwise ineligible to participate in any federal or state health program, it may immediately terminate this Agreement upon written notice to the other party.

    9

C:\Documents and Settings\bobbyob\Local Settings\Temporary Internet Files\Content.IE5\VA0BFDC1\SDR_CLEAN_FINAL_-_RoanokeManagement_Agreement_7_7_2010_final[2].doc

IHC000700

PROTECTED DISCOVERY
MATERIAL

**SECTION 7.20.** <u>Covenant Not To Compete</u>. The area within the borders of the County of Roanoke, Virginia, including any independent cities within those borders is referred to in this Agreement as the "Restricted Area". During the term of this Agreement, Medical Group and its affiliated physicians agree that they will not permit their names to be used by, nor engage in or carry on, directly or indirectly, either individually or as an owner, manager, director or officer of any entity, or as an employee, agent, associate, lessor, lessee, manager, contractor, advisor, consultant or participant of any person or entity, any business or operation offering services the same or similar to those offered by the Medical Practice within the Restricted Area.

**SECTION 7.21.** <u>Change in Law</u>. In the event that any governmental body, agency, or any court or administrative tribunal passes, issues or promulgates any new, or change to any existing, law, rule, regulation, standard, interpretation, order, decision or judgment (individually or collectively, "Legal Event"), which, in the good faith judgment of one party (the "Noticing Party") indicates a rule or regulation with which the Noticing Party desires further compliance, then, in either event, the Noticing Party may give the other party written notice of such Legal Event and request that the parties comply with the requirements of this Section 7.21. The Noticing Party shall give written notice to the other party, together with an opinion of counsel, describing the Legal Event(s) and its consequences to the Noticing Party, and the Noticing Party's proposals to amend or modify this Agreement to comply with such Legal Event. Following the Noticing Party's delivery of the written notice and legal opinion, the parties shall negotiate for no more than thirty (30) days in good faith an amendment or modification to this Agreement so as to comply with such Legal Event. If after such good faith negotiations the parties are unable to agree upon an amendment or other modification to this Agreement, then either party may elect to terminate this Agreement upon thirty (30) days written notice to the other party; provided, however, that neither party may terminate this Agreement prior to the effectiveness of the Legal Event (i.e., if for example qualifying legislation were passed on July 1st of a given year, but does not become effective until a later date, the later date would be the earliest that this Agreement could be terminated).

**SECTION 7.22.** <u>Entire Agreement</u>. This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with that certain Shortfall Agreement between the parties hereto and Carilion Medical Center, the associated Escrow Agreement, and any other documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. All exhibits attached hereto and referred to herein are hereby incorporated as though fully set forth herein.

(Signature page follows)

 10

IHC000701

PROTECTED DISCOVERY
MATERIAL

## EXHIBIT A
## SERVICES

Manager shall provide or arrange for the following services to the Medical Practice:

1.   **General Services.**  Manager shall provide overall day-to-day supervision, operation, and sales/marketing management of the Medical Practice.

2.   **Supplies and Materials.**  Manager will order necessary supplies and materials for operation of the Medical Practice.

3.   **Fiscal Services.**  Manager shall provide fiscal services including bookkeeping, budgeting, asset management, patient billings and record keeping, processing of accounts receivable, and managing and administering accounts payable.  Manager shall prepare monthly and annual reports for Medical Group's review in accordance with accepted accounting principles showing revenues and expenses associated with the Medical Practice and the calculation of profits and losses.  Annual reports shall be distributed to Medical Group one hundred twenty (120) days after the end of the fiscal year or as soon as practicable after completion and monthly reports shall be distributed to owners of Medical Group thirty (30) days after the end of the month or as soon as is practicable after completion.

4.   **Third Party Relationships.**  Manager shall assist Medical Group in developing relationships and affiliations with physicians and other specialists, hospitals, networks, health maintenance organizations, and preferred provider organizations, which may result in the expansion of Medical Group's patient base; provided however, that the foregoing shall not be construed as requiring Manager to solicit or generate patients for Medical Group.

5.   **Personnel.**  Manager shall be responsible for providing all non-physician personnel deemed necessary by Manager for the proper and efficient operation of the Medical Practice ("Manager Personnel").  The Manager Personnel provided under this Section 5 shall be qualified, to the reasonable satisfaction of Medical Group, to perform the clinical services required to be performed by them under the professional direction and control of Medical Group in connection with the actual performance of clinical services.  Notwithstanding this Section 5, if Manager is legally prohibited from employing or otherwise retaining non-physician Manager Personnel, the parties hereto shall, as soon as reasonably possible, meet and agree upon a written amendment hereto as necessary to resolve such issue.

6.   **Patient and Administrative Records.**  Manager shall maintain all patient and administrative records and archives, record retrieval and record monitoring systems.  The parties acknowledge that all patient records will be the property of Medical Group.

7.   **Leased Premises.**  Manager shall manage and maintain the leased premises of the Medical Practice in good condition and repair, ordinary wear and tear excepted.

A-1

IHC000702

PROTECTED DISCOVERY
MATERIAL

8.     **Marketing and Advertising.**   Manager shall provide advertising and marketing services for the Medical Practice.   Medical Group agrees to cooperate in such advertising and marketing efforts.

9.     **Compliance.**  Manager shall ensure that the Medical Practice maintains all licenses, registrations and certificates required by federal, state or local law, except for such licenses, registrations and certificates that are the responsibility of the Medical Group's affiliated physicians.  Manager shall assist Medical Group in obtaining all provider numbers reasonably necessary for the Medical Practice's operations.

10.     **Radiology Information Systems ("RIS").**   Manager will provide for outpatient RIS, including hardware and software, necessary to manage the Medical Practice.

11.     **Billing and Collection Functions.**

a.     Medical Group hereby appoints Manager as its billing agent and Manager agrees to bill and collect for all services provided at the Medical Practice during the term of this Agreement, including professional services provided by Medical Group's affiliated physicians. Medical Group agrees and acknowledges that Manager may in turn appoint one or more third parties to act as its billing agent.  Manager will provide the necessary billing and collection system in order to successfully accomplish the routine functions of billing and collecting. Manager will manage the accounts receivable for the Medical Practice.

b.     Manager shall ensure that all orders for imaging services given by any physician or other authorized health care professional, whether written or oral, including orders for additional procedures or tests, are documented in the patient's medical record and comply with any third party payor requirements.  With respect to services furnished by Medical Group to Medicare beneficiaries, Manager shall maintain documentation of such services for seven (7) years from the date of service and, upon request of the Centers for Medicare & Medicaid Services or a Medicare contractor, provide access to that documentation.  The documentation includes written and electronic documents (including the National Provider Identification of the physician or other authorized health care professional who ordered or referred the imaging services ) relating to written orders and requests for payments for imaging services.

c.     Manager represents that all billing and collection practices undertaken with respect to Medical Practice patients shall be undertaken in compliance with all applicable federal and state laws and regulations and shall be consistent with such practices as are customary and usual within the Medical Practice's community. In the event Manager desires to implement any collection practices not deemed customary and usual, such as, for example, imposing a lien upon a patient's primary residence, Manager agrees to do so only upon the prior written consent of Medical Group.

12.     **Equipment.**  Manager shall (i) provide such diagnostic imaging equipment to the Medical Practice as it deems appropriate, in its sole discretion, and (ii) be responsible for

A-2

13

IHC000703

PROTECTED DISCOVERY
MATERIAL

contracting with parties for the maintenance of such equipment. Manager may in its sole discretion remove and/or replace such equipment.

13.     **License.**  Concurrently with the execution of this Agreement, Medical Group and Manager shall execute the License Agreement in the form of Exhibit F attached to this Agreement and incorporated herein by this reference.

14.     **Miscellaneous Duties Excluded From this Agreement.**  Notwithstanding any other provision hereof, it is expressly understood that Manager is not financially obligated with respect to:  (1) principal and interest expenses on any indebtedness of Medical Group, (2) promotional expenses in the form of personal entertainment, (3) preparation for Medical Group of tax returns or other documents required to be prepared by any governmental body having jurisdiction to tax Medical Group net income, (4) payment for any acts or services performed by independent public accountants, (5) payment for any legal services, or (6) payment of any and all taxes on Medical Group, including taxes on Medical Group's income; provided, however, that Manager shall be liable for any of the foregoing expenses to the extent the costs incurred by Medical Group under this Section are solely the result of any changes in Medical Group operations implemented solely as a consequence of this Agreement, such as, for example, failure of Manager to reduce the balance of the Medical Group's Account to zero at the end of a calendar year.

A-3

14

IHC000704

PROTECTED DISCOVERY
MATERIAL

## EXHIBIT B
## OBLIGATIONS

Medical Group shall fulfill the following obligations with respect to the Medical Practice:

1.     **Medical Practice.**  Medical Group shall keep the Medical Practice open and operational from 8 a.m. through 4 p.m., Monday through Friday excepting agreed upon holidays and except as otherwise agreed. Manager agrees to schedule procedures hereunder to permit such office hours to be maintained.

2.     **Physicians.**  Medical Group shall ensure that each physician who provides service at the Medical Practice (whether as a supervising, reading or interpreting physician or otherwise) shall:

A.     Perform clinical duties, including supervision of procedures (including the supervision of non-physician personnel assisting in the performance of procedures), analysis of results of procedures, completing and signing each Medical Practice physician's supervision log, interpretation of studies and consultations, and execution of written reports. All written reports will be prepared in accordance with any third party payor requirements, including Medicare regulations.

B.     Supervise the administration of injections of contrast media or medications, if required, unless state laws permit such injections to be delegated to another licensed professional.

C.     Provide to Manager any and all information necessary to compile and complete records and reports of professional services provided at the Medical Practice reasonably requested by Manager, including daily information of all professional services performed that day, which reports, when completed by Manager, will be reviewed and approved by Medical Group.

D.     Ensure that all imaging procedures performed by Manager Personnel are performed in accordance with all requirements of applicable third party payors, including Medicare, as necessary to obtain all available payments therefor.

E.     Be available as mutually agreed (i) during normal office hours to answer any non-emergency questions from patients regarding procedures performed at the Medical Practice and (ii) at any time to answer emergency questions from patients.

F.     Assist Manager in maintaining clinical services to meet accreditation requirements for the Medical Practice.

G.     When requested, provide objective evaluation of Manager's employees and report instances of known substandard performance of Manager's employees to the regional

B-1



IHC000705

PROTECTED DISCOVERY
MATERIAL

vice president of operations for Manager.

H.    Comply with all federal, state and local laws, rules and regulations and maintain all licenses, registrations and certificates required by federal, state or local law.

I.    Maintain the requisite knowledge, skill and training to provide professional services and related professional medical services, including the oversight of the proper operation and calibration of the equipment used to provide professional services, and the reading and interpretation of all data derived therefrom; and shall have and maintain the specific qualifications, experience and training.  Medical Group shall, upon request by Manager, provide Manager with a complete written list of physicians engaged by Medical Group to perform professional services, and each Physician shall be subject to Manager's reasonable approval, which approval may be withdrawn for good cause at any time.  Medical Group shall ensure that each physician who is delegated medical responsibilities hereunder signs an acknowledgment form as set forth in Exhibit G attached hereto.

3.    **Non-Medical Group Physician Services.**    Manager acknowledges that Medical Group or its Physicians will subcontract interpretations of some studies to other qualified physicians who possess particular expertise in interpreting the study or studies subcontracted, and Manager authorizes same.  In the event that the interpretations of such studies are not provided within a reasonable period of time, Manager may contract with, and refer such studies for interpretation to, other qualified physicians, and notwithstanding any provision in this Agreement to the contrary, the failure of the subcontracted physicians to provide the interpretations within a reasonable period of time shall not be a breach of this Agreement and shall not otherwise serve as a basis for termination of this Agreement.

4.    **Non-Solicitation of Employees.**  Neither Medical Group nor its affiliates shall, during the term of this Agreement and for a period of one (1) year immediately following the expiration or termination of this Agreement, directly or indirectly, call on, solicit, employ, contract with or take away, or encourage or facilitate any other entity to call on, solicit, employ, contract with or take away, or attempt to call on, solicit, employ, contract with or take away any Manager personnel providing services in connection with the Medical Practice.  For purposes of this Section, Manager personnel are persons with whom Manager has had a financial relationship at any time during the then preceding one-year period.

5.    **Interpretations.**  Physician interpretation of diagnostic imaging studies shall be done in a timely fashion in order to provide rapid feedback to the referring physician.  Except as expressly agreed between Medical Group and Manager, the minimum requirements for response times, assuming the reasonable timely performance by Manager's support staff, shall be as follows:

a.  Preliminary interpretation of properly-specified STAT studies shall be made immediately during regular operating hours and the results made available to the referring physician within 60 minutes.

b.  Dictation shall be completed within two hours during normal office hours of

B-2

16

IHC000706

PROTECTED DISCOVERY
MATERIAL

completion of study unless case is properly specified as STAT or is deemed immediately appropriate to process otherwise.

c.  Studies performed on weekends will be dictated starting at 8:00 A.M. on Monday.

B-3

17

IHC000707

PROTECTED DISCOVERY
MATERIAL

**EXHIBIT C**
**FEE SCHEDULE**

C-1

18

IHC000708

PROTECTED DISCOVERY
MATERIAL

| CPT | DESCRIPTION | FEE |
|---|---|---|
| 10022 | FINE NEEDLE ASPIRATION W/ | $200.00 |
| 10160 | PUNCTURE ASPIRATION ABCES | $320.00 |
| 20225 | BONE BX DEEP | $2,373.00 |
| 20501 | INJECTION; SINUS TRACT | $334.00 |
| 20552 | INJ TRIGGER POINT(S) | $155.00 |
| 20553 | INJ TRIGGER POINT 3> MUSC | $110.00 |
| 20600 | ARTHROCENTESIS ASP/INJ SM | $117.00 |
| 20605 | ARTHROCENTESIS INTER JT.B | $170.00 |
| 20610 | INJECTION;MAJOR JOINT | $200.00 |
| 20999 | MUSCULOSKELETAL PROCEDURE | $400.00 |
| 22520 | PERCUT VERTEBROPLASY THOR | $6,444.00 |
| 22521 | PERCUT VERTEBROPLASTY LUM | $5,876.00 |
| 22522 | EA ADD'L VERTEBRAL BODY | $602.00 |
| 23350 | INJECT. SHOULDER ARTHROGR | $520.00 |
| 24220 | INJECTION;ELBOW ARTHROGRA | $520.00 |
| 25246 | INJ PROCEDURE WRIST ARTHR | $540.00 |
| 27093 | HIP ARTHROGRAPHY,INJ | $1,435.00 |
| 27096 | INJ SACROILIAC JT,ARTHROG | $1,145.00 |
| 27370 | INJ PROCE KNEE ARTHROGRAP | $520.00 |
| 36561 | PORT PLCMT;TUNNELED;CVA | $3,621.00 |
| 36571 | PERIPHERALLY CVA PORT; >5 | $3,900.00 |
| 62270 | SPINAL PUNCTURE LUMBAR DI | $194.00 |
| 62273 | INJ EPIDURAL BLOOD CLOT | $550.00 |
| 62284 | LUMBAR MYELOGRAM INJ | $720.00 |
| 62290 | INJ DISKOGRAPHY EA LEVEL | $955.00 |
| 62310 | INJECTION,CERVICAL,SINGLE | $800.00 |
| 62311 | INJECTION LUMBAR SPINE | $710.00 |
| 64405 | INJECTION;GREATER OCCIPIT | $320.00 |
| 64421 | INJ INTERCOSTAL NERVE | $770.00 |
| 64425 | INJ;NERVE BLOCK;ILIOINGUI | $400.00 |
| 64445 | INJ ANES AGENT;SCIATIC NE | $470.00 |
| 64447 | INJ ANES AGENT FEMERAL NE | $470.00 |
| 64450 | INJECTION;OTHER PERIPHERA | $273.00 |
| 64470 | INJ;CERVICAL/THORACIC SP | $1,000.00 |
| 64472 | INJ ANES CERVI/THORAC EA | $410.00 |
| 64475 | INJ;LUMBAR/SACRAL;SINGLE | $910.00 |
| 64476 | LUMBAR/SACRAL EA ADDIT LE | $350.00 |
| 64479 | INJECTION;EPIDURAL CERVIC | $1,060.00 |
| 64480 | INJECTION;CERV/THOR,EA AD | $490.00 |
| 64483 | INJ.LUMBAR OR SACRAL,SING | $1,070.00 |
| 64484 | INJ LUMBAR/SACRAL EA.ADDI | $510.00 |
| 64490 | INJ;CERVICAL/THORACIC,W/G | $307.00 |
| 64493 | INJ;LUMBAR/SACRAL,W/GUIDA | $261.00 |
| 64494 | LUMBAR/SACRAL EA ADDL LEV | $151.00 |
| 64505 | INJECTION,GANGLION | $285.00 |
| 64510 | INJ ANES AGENT STELLATE G | $520.00 |
| 64520 | INJ ANES LUMBAR OR THORAC | $710.00 |
| 64999 | NERVOUS SYSTEM;UNLISTED P | $900.00 |
| 70030 | ORBITS | $77.00 |
| 70100 | MANDIBLE 1-3 VWS | $86.00 |

IHC000709

PROTECTED DISCOVERY
MATERIAL

| CPT | DESCRIPTION | FEE |
|---|---|---|
| 70110 | MANDIBLE 4+VWS | $109.00 |
| 70120 | MASTOIDS 1-2 VWS | $96.00 |
| 70130 | MASTOIDS 3+VWS | $149.00 |
| 70134 | INTERNAL AUDITORY MEATI | $133.00 |
| 70140 | FACIAL BONES < 3VWS | $90.00 |
| 70150 | FACIAL BONES 3VWS | $122.00 |
| 70160 | NASAL BONES 3VWS | $88.00 |
| 70170 | DACRYOCYSTOGRAPHY | $167.00 |
| 70190 | OPTIC FORAMINA | $100.00 |
| 70200 | ORBITS,4 VWS | $129.00 |
| 70210 | SINUSES,PARANASAL,<3VWS | $87.00 |
| 70220 | SINUSES,PARANASAL;3VWS | $115.00 |
| 70240 | SELLA TURCICA | $80.00 |
| 70250 | SKULL < 4VWS | $102.00 |
| 70260 | SKULL,4VWS COMPLETE | $141.00 |
| 70300 | TEETH, SINGLE VIEW | $41.00 |
| 70310 | MOUTH,PARTIAL < FULL | $88.00 |
| 70320 | MOUTH,FULL COMPLETE | $130.00 |
| 70328 | TEMPOROMANDIBULAR JT,UNIL | $84.00 |
| 70330 | TEMPOROMANDIBULAR JT,BILA | $131.00 |
| 70332 | ARTHROGRAPHY;TM JOINT | $267.00 |
| 70336 | MRI TEMP.MANDIBULAR JT AR | $1,123.00 |
| 70350 | CEPHALOGRAM,ORTHODONTIC | $61.00 |
| 70355 | ORTHOPANTOGRAM | $75.00 |
| 70360 | NECK, SOFT TISSUE | $75.00 |
| 70370 | PHARYNX OR LARYNX W/FLUOR | $202.00 |
| 70371 | SPEECH EVALUATION BY VIDE | $303.00 |
| 70373 | LARYNGOGRAPHY,CON/S&I | $243.00 |
| 70380 | CT;ORBIT,SELLA;EAR W/O | $105.00 |
| 70450 | CT HEAD/BRAIN W/O | $600.00 |
| 70460 | CT HEAD/BRAIN W/CONTRAST | $750.00 |
| 70470 | CT HEAD/BRAIN W/WO CONTRA | $900.00 |
| 70480 | CT ORBITS W/O CONTRAST | $675.00 |
| 70481 | CT ORBITS W/CONTRAST | $775.00 |
| 70482 | CT ORBIT/SPF/W/WO CONT | $925.00 |
| 70486 | CT FACIAL W/O CONTRAST | $650.00 |
| 70487 | CT FACIAL W/CONTRAST | $775.00 |
| 70488 | CT FACIAL W/WO CONTRAST | $925.00 |
| 70490 | CT NECK W/O CONTRAST | $675.00 |
| 70491 | CT NECK W/CONTRAST | $775.00 |
| 70492 | CT NECK W/WO CONTRAST | $925.00 |
| 70496 | CTA HEAD W/WO CONTRAST | $1,325.00 |
| 70498 | CTA NECK W/WO CONTRAST | $1,441.00 |
| 70540 | MRI ORBIT FACE,NECK W/O | $1,100.00 |
| 70542 | MRI ORBIT,FACE,NECK W/CON | $1,300.00 |
| 70543 | MRI ORBIT,FACE,NECK W/WO | $2,325.00 |
| 70544 | MRA HEAD W/O CONTRAST | $1,100.00 |
| 70545 | MRA HEAD W/ CONTRAST | $1,100.00 |
| 70546 | MRA HEAD W/O W/ CONTRAST | $2,075.00 |
| 70547 | MRA NECK W/O CONTRAST | $1,100.00 |
| 70548 | MRA NECK W/CONTRAST | $1,100.00 |

IHC000710

PROTECTED DISCOVERY
MATERIAL

| CPT | DESCRIPTION | FEE |
|---|---|---|
| 70549 | MRA NECK W/O CONTRAST | $2,075.00 |
| 70551 | MRI BRAIN W/O CONTRAST | $1,125.00 |
| 70552 | MRI BRAIN W/CONTRAST | $1,350.00 |
| 70553 | MRI BRAIN W/WO CONTRAST | $2,400.00 |
| 71010 | CHEST,PA | $72.00 |
| 71015 | CHEST STERO,FRONTAL | $85.00 |
| 71020 | CHEST 2 VWS | $108.00 |
| 71021 | CHEST,2VWS W/APICAL LORDO | $114.00 |
| 71022 | CHEST,2VWS W/OBLIQUE | $128.00 |
| 71023 | CHEST,2VWS W/FLUOR | $174.00 |
| 71030 | CHEST,COMPLETE MIN 4VWS | $132.00 |
| 71034 | CHEST COMPLETE W/FLUORO | $253.00 |
| 71035 | CHEST DECUBITUS,BUCKY | $94.00 |
| 71040 | BRONCHOGRAPHY,UNILAT | $265.00 |
| 71060 | BRONCHOGRAPHY,BILAT | $384.00 |
| 71100 | RIBS,RT 2VWS | $93.00 |
| 71101 | RIBS,RT W/CHEST 3VWS | $113.00 |
| 71110 | RIBS, BIL 3VWS | $120.00 |
| 71111 | RIBS,BIL W/CHEST 4VWS | $148.00 |
| 71120 | STERNUM, 2VWS MIN | $97.00 |
| 71130 | STERNOCLAVICULAR JT 3VWS | $107.00 |
| 71250 | CT CHEST W/O CONTRAST | $775.00 |
| 71260 | CT CHEST W/CONTRAST | $900.00 |
| 71270 | CT CHEST W/WO CONTRAST | $1,100.00 |
| 71275 | CTA, CHEST W/WO CONTRAST | $1,500.00 |
| 71550 | MRI CHEST W/O CONTRAST | $1,100.00 |
| 71551 | MRI CHEST W/CONTRAST | $1,325.00 |
| 71552 | MRI CHEST W/ W/O CONTRAST | $2,350.00 |
| 71555 | MRA CHEST W/ W/O CONTRAST | $1,175.00 |
| 72010 | SPINE SURVEY ANT & LAT | $186.00 |
| 72020 | SPINE,SINGLE VW | $68.00 |
| 72040 | SPINE, CERVICAL 2 OR 3VWS | $103.00 |
| 72050 | SPINE CERVICAL, 4VWS | $147.00 |
| 72052 | SPINE,CERV W/OBL/FLEX/EXT | $184.00 |
| 72069 | SPINE, THORACOLUMBAR (SCO | $95.00 |
| 72070 | SPINE, THORACIC 2VWS | $98.00 |
| 72072 | SPINE, THORACIC;3 VWS | $110.00 |
| 72074 | SPINE THORACIC;4VWS | $130.00 |
| 72080 | SPINE,THORACOLUMBAR 2VWS | $102.00 |
| 72090 | SPINE,SCOLIOSIS INCL/SUPI | $128.00 |
| 72100 | SPINE,LUMBAR 2or3VWS | $108.00 |
| 72110 | SPINE,LUMBAR 4VWS | $151.00 |
| 72114 | SPINE,LUMBOSACRAL;BENDING | $196.00 |
| 72120 | SPINE,LUMBOSACRAL;BENDING | $135.00 |
| 72125 | CT CERVICAL SPINE W/O CON | $775.00 |
| 72126 | CT CERVICAL SP W/CONT | $900.00 |
| 72127 | CT CERVICAL SP W/WO CONTR | $1,100.00 |
| 72128 | CT THORACIC SPINE W/O | $775.00 |
| 72129 | CT THORACIC SPINE W/CONTR | $900.00 |
| 72130 | CT LUMBAR SPINE W/WO CONT | $1,100.00 |
| 72131 | CT LUMBAR W/O CONTRAST | $775.00 |

IHC000711

PROTECTED DISCOVER
MATERIAL

| CPT | DESCRIPTION | FEE |
|---|---|---|
| 72132 | CT LUMBAR SP W/CONT | $900.00 |
| 72133 | CT LUMBAR SPINE W/WO CONT | $1,075.00 |
| 72141 | MRI CERVICAL SPINE W/O CO | $1,150.00 |
| 72142 | MRI CERVICAL SP W/CONTRAS | $1,375.00 |
| 72146 | MRI SPINAL THORACIC W/O C | $1,250.00 |
| 72147 | MRI THORACIC SP W/CONTRAS | $1,375.00 |
| 72148 | MRI SPINAL LUMBAR W/O | $1,225.00 |
| 72149 | MRI LUMBAR SP W/CONTRAST | $1,350.00 |
| 72156 | MRI SPINAL CERVICAL W0/W | $2,425.00 |
| 72157 | MRI THORACIC SP WO/W CONT | $2,425.00 |
| 72158 | MRI LUMBAR SP W/WO CONTRA | $2,400.00 |
| 72159 | MRA SPINE W/ W/O CONTRAST | $1,275.00 |
| 72170 | X-RAY EXAM OF PELVIS | $77.00 |
| 72190 | PELVIS;COMPLETE 3VWS | $109.00 |
| 72191 | CTA;PELVIS W/WO CONTRAST | $1,500.00 |
| 72192 | CT PELVIS WO/CONTRAST | $775.00 |
| 72193 | CT PELVIS W/CONTRAST | $875.00 |
| 72194 | CT PELVIS W/WO CONTRAST | $1,025.00 |
| 72195 | MRI PELVIS W/O CONTRAST | $1,100.00 |
| 72196 | MRI PELVIS WITH CONTRAST | $1,325.00 |
| 72197 | MRI PELVIS W/O W/ CONTRAS | $2,350.00 |
| 72198 | MRA PELVIS W/ W/O CONTRAS | $1,175.00 |
| 72200 | SACROILIAC JOINTS <3VWS | $83.00 |
| 72202 | SACROILIAN JOINTS 3+VWS | $99.00 |
| 72220 | SACRUM & COCCYX; 2VWS | $86.00 |
| 72240 | MYELOGRAPHY;CERVICAL S&I | $670.00 |
| 72255 | MYELOGRAPHY;THORACIC S&I | $605.00 |
| 72265 | MYELOGRAPHY;LUMBOSACRAL | $580.00 |
| 72270 | MYELOGRAPHY;SPINAL CANAL | $860.00 |
| 72291 | VERTEBROPLASTY UNDER FLUO | $888.00 |
| 72295 | DISKOGRAPHY LUMBAR S&I | $640.00 |
| 73000 | CLAVICLE,RT COMPLETE | $82.00 |
| 73010 | SCAPULAR,RT | $82.00 |
| 73020 | SHOULDER,RT 1V | $69.00 |
| 73030 | SHOULDER,RT 2+VWS | $86.00 |
| 73040 | SHOULDER,RT ARTHROGRAPHY | $309.00 |
| 73050 | ACROMIOCLAVICULAR JTS;BIL | $103.00 |
| 73060 | HUMERUS,RT 2VWS | $85.00 |
| 73070 | ELBOW,RT 2VWS | $77.00 |
| 73080 | ELBOW,RT COMPLETE 3VWS | $77.00 |
| 73085 | ELBOW,RT ARTHROGRAPHY | $287.00 |
| 73090 | FOREARM,RT 2VWS | $78.00 |
| 73092 | UPPER EXTREMITY,RT INFANT | $78.00 |
| 73100 | WRIST,RT 2VWS | $79.00 |
| 73110 | WRIST,RT 3VWS | $92.00 |
| 73115 | WRIST,RT ARTHROGRAPHY | $286.00 |
| 73120 | HAND,RT 2VWS | $77.00 |
| 73130 | HAND,RT 3VWS | $87.00 |
| 73140 | FINGER(S)RT 2VWS | $76.00 |
| 73200 | CT UPPER EXTREMITY W/O CO | $675.00 |
| 73201 | CT UPPER EXT W/CONT | $775.00 |

IHC000712

PROTECTED DISCOVERY
MATERIAL

| CPT | DESCRIPTION | FEE |
|---|---|---|
| 73202 | CT UPPER EXT W/WO CONT | $925.00 |
| 73206 | CTA;UPPER EXT. W/WO CONTR | $1,375.00 |
| 73218 | MRI UPPER EXTREMITY W/O C | $1,100.00 |
| 73219 | MRI UPPER EXTREMITY W/CON | $1,300.00 |
| 73220 | MRI,UPPER EXT W/WO CONTRA | $2,350.00 |
| 73221 | MRI RT JT UPPER EXT W/O | $1,100.00 |
| 73222 | MRI,JT UPPER EXTREMITY W/ | $1,325.00 |
| 73223 | MRI UPPER EXT JT W/WO CON | $2,350.00 |
| 73225 | MRA UPPER EXTREMITY RT | $1,480.00 |
| 73500 | HIP,RT 1VW | $74.00 |
| 73510 | HIP,RT 2VWS | $100.00 |
| 73520 | HIPS,BILATERAL 2VWS EA | $113.00 |
| 73525 | HIP,RT ARTHROGRAPHY | $287.00 |
| 73540 | PELVIS & HIPS,INFANT 2VWS | $101.00 |
| 73542 | SACROILIAC JT,ARTHROGRAPH | $84.00 |
| 73550 | FEMUR,RT 2VWS | $90.00 |
| 73560 | KNEE,1-2 VIEWS | $0.00 |
| 73562 | KNEE,RT 3VWS | $91.00 |
| 73564 | KNEE,RT COMPLETE 4+VWS | $108.00 |
| 73565 | KNEES,BILAT STANDING AP | $84.00 |
| 73580 | KNEE,RT ARTHROGRAM | $355.00 |
| 73590 | TIBIA & FIBULA,RT (LEG) | $79.00 |
| 73592 | LOWER EXTREMITY,RT INFANT | $78.00 |
| 73600 | ANKLE,RT 2VWS | $77.00 |
| 73610 | ANKLE,RT COMPLETE 3VWS | $87.00 |
| 73615 | ANKLE,RT ARTHROGRAPHY S&I | $295.00 |
| 73620 | FOOT,RT 2VWS | $76.00 |
| 73630 | FOOT,RT COMPLETE 3VWS | $87.00 |
| 73650 | CALCANEUS,RT (HEEL) | $75.00 |
| 73660 | TOE(S),RT | $74.00 |
| 73700 | CT LOWER EXTREMITY W/O CO | $675.00 |
| 73701 | CT LOWER EXTR W/CONTRAST | $775.00 |
| 73702 | CT LOWER EXTREMITY W/WO C | $925.00 |
| 73706 | CTA LOWER EXT W/WO CONTRA | $1,375.00 |
| 73718 | MRI LOWER EXTRMTY JT W/O | $1,100.00 |
| 73719 | MRI LOWER EXTMTY W/ CONTR | $1,325.00 |
| 73720 | MRI LOWER EXTMTY W/O W/ C | $2,350.00 |
| 73721 | MRI JT,RT LOWER EXTRMTY W | $1,100.00 |
| 73722 | MRI JT LOWER EXTREMITY W/ | $1,325.00 |
| 73723 | MRI JT LOWER EXTRMTY W/W/ | $2,350.00 |
| 73725 | MRA LOWER EXTREMITY W/ W/ | $1,175.00 |
| 74000 | ABDOMEN, SINGLE VIEW | $76.00 |
| 74010 | ABDOMEN, MULTIPLE VWS | $104.00 |
| 74020 | ABDOMEN, COMPLETE | $113.00 |
| 74022 | ABDOMINAL SERIES, COMPLET | $134.00 |
| 74096 | CTA HEAD W/WO CONTRAST | $1,325.00 |
| 74150 | CT ABDOMEN W/O CONTRAST | $750.00 |
| 74160 | CT ABDOMEN W/CONTRAST | $900.00 |
| 74170 | CT ABDOMEN W/WO CONTRAST | $1,075.00 |
| 74175 | CTA,ABDOMEN W/WO CONTRAST | $1,500.00 |
| 74181 | MRI ABDOMEN W/O CONTRAST | $1,125.00 |

IHC000713

PROTECTED DISCOVERY
MATERIAL

| CPT | DESCRIPTION | FEE |
|---|---|---|
| 74182 | MRI ABDOMEN WITH CONTRAST | $1,325.00 |
| 74183 | MRI ABDOMEN W/WO CONT | $2,350.00 |
| 74185 | MRA ABDOMEN W/WO CONTRAST | $1,175.00 |
| 74210 | ESOPHAGUS,PARTIAL ESOPHAG | $208.00 |
| 74220 | ESOPHAGUS | $233.00 |
| 74230 | SWALLOWING FUNCTION | $245.00 |
| 74240 | UPPER GI;W/O KUB | $292.00 |
| 74241 | UPPER GI W/KUB | $308.00 |
| 74245 | UPPER GI W/SMALL BOWEL | $460.00 |
| 74246 | UPPER GI W/AIR CONTRAST | $330.00 |
| 74247 | UPPER GI W/KUB | $342.00 |
| 74249 | UPPER GI W/SMALL BOWEL | $492.00 |
| 74250 | SMALL BOWEL SERIES | $265.00 |
| 74251 | SMALL BOWEL VIA ENTEROCLY | $496.00 |
| 74260 | DUODENOGRAPHY,HYPOTONIC | $496.00 |
| 74270 | COLON;BARIUM ENEMA | $343.00 |
| 74280 | COLON;BARIUM ENEMA W/AIR | $515.00 |
| 74283 | THERAPEUTIC ENEMA | $526.00 |
| 74290 | CHOLECYSTOGRAPHY,ORAL | $166.00 |
| 74291 | CHOLECYSTOGRAPHY REPEAT ( | $132.00 |
| 74340 | GASTROINTESTINAL TUBE | $412.00 |
| 74355 | ENTEROCLYSIS TUBE PLCMENT | $447.00 |
| 74360 | INTRALUMINAL DILATION | $479.00 |
| 74400 | UROGRAPHY,IVP | $297.00 |
| 74410 | UROGRAPHY;INFUSION | $316.00 |
| 74415 | UROGRAPHY, IVP W/NEPH | $358.00 |
| 74425 | UROGRAPHY, ANTEGRADE | $221.00 |
| 74430 | CYSTOGRAPHY; 3VWS | $205.00 |
| 74450 | URETHROCYSTOGRAPHY,RETROG | $235.00 |
| 74455 | URETHROCYSTOGRAPHY, VOIDI | $250.00 |
| 74470 | RENAL CYST;TRANSLUMBAR | $242.00 |
| 74710 | PELVIMETRY | $137.00 |
| 74740 | HYSTEROSALPINGOGRAPHY | $216.00 |
| 75552 | MRI MYOCARDIUM W/O CONTRA | $1,150.00 |
| 75553 | MRI HEART W/ CONTRAST | $1,200.00 |
| 75554 | CARDIAC MRI FOR FUNCTION | $1,175.00 |
| 75555 | CARDIAC MRI FUNCTION LIMI | $1,175.00 |
| 75556 | CARDIAC MRI FOR VELOCITY | |
| 75635 | CTA,ABDOMINAL AORTA RUNOF | $1,925.00 |
| 76000 | FLUOROSCOPY UP TO ONE HOU | $150.00 |
| 76005 | FLUOR GUIDANCE/LOC;NEEDLE | $230.00 |
| 76012 | FLUORO GUIDANCE VERTEBROP | $210.00 |
| 76080 | FISTULA OR SINUS TRACT | $165.00 |
| 76093 | MRI BREAST UNILAT WO/W CO | $1,700.00 |
| 76094 | MRI BREAST BILAT BREAST W | $1,225.00 |
| 76375 | CORONAL SAGITTAL RECONSTR | $400.00 |
| 76380 | CT,LIMITED/FOLLOWUP | $500.00 |
| 76390 | MAGNETIC RESONANCE SPECTR | $1,125.00 |
| 76393 | MR GUIDANCE NEEDLE BIOPSY | $1,125.00 |
| 76394 | MR GUIDANCE TISSUE ABLATI | $1,500.00 |
| 76400 | MRI BONE MARROW BLOOD SUP | $1,150.00 |

IHC000714

PROTECTED DISCOVER
MATERIAL

| CPT | DESCRIPTION | FEE |
|---|---|---|
| 76498 | MRI UNLISTED PROCEDURE | |
| 76536 | ULTRASOUND, THYROID | $239.00 |
| 76604 | US;CHEST | $240.00 |
| 76645 | US BREAST(S) BIL OR UNIL | $200.00 |
| 76700 | ULTRASOUND, ABDOMEM | $337.00 |
| 76705 | ULTRASOUND, ABDOMEN | $245.00 |
| 76770 | ULTRASOUND,RETROPERITONEA | $300.00 |
| 76775 | US RETROPERITONEAL;LIMITE | $266.00 |
| 76801 | ULTRASOUND,TRANSABDOMINAL | $379.00 |
| 76817 | ULTRASOUND,UTERUS;TRANSVA | $278.00 |
| 76830 | ULTRASOUND,TRANSVAGINAL | $270.00 |
| 76856 | ULTRASOUND, PELVIC | $270.00 |
| 76857 | LIMITED ULS PELVIS | $244.00 |
| 76870 | US SCROTUM & CONTENTS | $262.00 |
| 76880 | EXTREMITY, NON-VASUCULAR | $245.00 |
| 76942 | US GUIDANCE NEEDLE PLCMT | $410.00 |
| 77001 | FLUOR GUID;CVC PLCMENT | $269.00 |
| 77002 | FLUORO GUID NEEDLE PLACEM | $206.00 |
| 77003 | FLUORO GUID/LOC NEEDLE/CA | $230.00 |
| 77058 | MRI BREAST W/WO CONT | $2,375.00 |
| 77059 | MRI BREAST BILAT W/WO | $2,732.00 |
| 77071 | MANUAL APPLICATION STRESS | $97.00 |
| 77072 | BONE AGE STUDIES | $67.00 |
| 77073 | BONE LENGTH STUDIES | $116.00 |
| 77074 | OSSEOUS SURVEY;LIMITED | $191.00 |
| 77075 | OSSEOUS SURVEY COMPLETE | $273.00 |
| 77076 | OSSEOUS SURVEY,INFANT | $221.00 |
| 77077 | JOINT SURVEY,1VW 2+JTS | $136.00 |
| 77080 | BONE DENSITY;1+SITES | $229.00 |
| 77081 | BONE DENSITY;APPENDICULAR | $96.00 |
| 77082 | BONE DENSITY;VERTEBRAL FX | $92.00 |
| 93880 | DUPLEX SCAN;EXTRACRANIAL | $531.00 |
| 93926 | DUPLEX DOPPLER LOWER EXT | $321.00 |
| 93931 | DOPPLER UPPER/EXT ARTERY; | $450.00 |
| 93970 | DUPLEX SCAN,BILAT EXTREMI | $521.00 |
| 93971 | DOPPLER OF EXT VEINS; UNI | $460.00 |
| 93975 | DUPLEX SCAN COMPLETE STUD | $847.00 |
| 93976 | DUPLEX SCAN AORTA | $521.00 |
| 99201 | OFFICE VISIT STRAIGHTFORW | $110.00 |
| 99212 | OV EST PATIENT STRAIGHTFO | $110.00 |
| 99241 | OFFICE CONSULT LIMITED/MI | $160.00 |
| 99242 | CONSULT OFFICE;NEW/ESTAB | $267.00 |
| 99271 | CONFIRMATORY CONSULTATION | $150.00 |
| G0389 | ULTRASOUND; SCREENING AAA | $260.00 |
| J1020 | INJ,METHYLPREDNIOSOLONE;2 | $10.00 |
| J1030 | DEPO MEDROL 40 MG | $20.00 |
| J1040 | DEPO MEDROL 80 MG | $40.00 |
| J1200 | DIPHENHYDRAMINE HCL INJ 5 | $2.00 |
| J1610 | GLUCAGON,1 MG | $90.00 |
| J2000 | LIDOCAINE | $10.00 |
| J2001 | LIDOCAINE | $10.00 |

IHC000715

PROTECTED DISCOVERY
MATERIAL

| CPT | DESCRIPTION | FEE |
|---|---|---|
| J2300 | INJ;NALBUPHINE 10mg | $4.00 |
| J2550 | INJ;PROMETHAZINE;UP TO 50 | $10.00 |
| J2912 | SODIUM CHLORIDE | $20.00 |
| J3490 | MARCAINE | $14.00 |
| Q9945 | LOW OSMOLAR CONTRAST;UP T | $0.75 |
| Q9946 | OSMOLAR CONTRAST 150-199 | $0.75 |
| Q9947 | OSMOLAR CONTRAST 200-249 | $0.75 |
| Q9948 | OSMOLAR CONTRAST 250-299 | $0.75 |
| Q9949 | LOW OSMOLAR CONT. 300-349 | $0.75 |
| Q9950 | LOW OSMOLAR CONT. 350-399 | $0.75 |
| Q9951 | OSMOLAR CONTRAST 400> MG | $0.75 |
| Q9952 | MRI IV CONTRAST INJECTION | $5.00 |
| Q9965 | LOW-OSM CONTRAST;100-199 | $5.00 |
| Q9966 | LOW-CONTRAST; 200-299 | $3.00 |
| Q9967 | LOW-OSM CONTRAST; 300-399 | $1.00 |
| S0020 | BUPIVICAINE | $20.00 |

IHC000716

PROTECTED DISCOVERY
MATERIAL

## EXHIBIT D
## COMPENSATION; DISBURSEMENTS

1.  Fee Payable to the Manager.

On or before the 15th day of each month, Medical Group shall remit payment to Manager, and Manager is hereby expressly authorized to, and shall, disburse from the Operating Account to the Manager the amount equal to (i) one hundred percent (100%) of all amounts collected by Medical Group (including amounts billed in the names of Medical Group or Physicians) during the prior month for services rendered to Medical Group patients less (ii) an amount (the "Medical Group Payment") equal to the product of the individual work relative value units ("RVUs") worked by Physicians during the applicable period multiplied by $62.7889.

2.  Amount to be Disbursed to the Medical Group.

a.   The Medical Group shall be entitled to receive from Collections in any month an amount equal to the Medical Group Payment.

b.   Pursuant to that certain Shortfall Agreement, of even date herewith (the "Shortfall Agreement"), between the Medical Group, the Manager and Carilion Medical Center ("CMC"), in the event the Medical Group Payment for any month during the Initial Term hereof is less than the amount that would have been payable to the Medical Group pursuant to the terms of that certain Professional Services Agreement dated August 22, 2008 between CMC and the Medical Group (the "PSA"), CMC shall pay to the Medical Group such shortfall (the "Shortfall Payment").

c.   Pursuant to the requirements of the Shortfall Agreement, the Medical Group Payment and the Shortfall Payment shall be paid into an escrow account by the Manager and CMC, respectively, and the Escrow Agent (as defined in the Shortfall Agreement) shall pay such amount to the Medical Group; provided, however, that upon termination of the Shortfall Agreement, the Medical Group Payment shall be disbursed to an account designated by Medical Group.

IHC000717

PROTECTED DISCOVERY
MATERIAL