EXHIBIT E
BUSINESS ASSOCIATE AGREEMENT

BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("**Agreement**"), dated as of July 8, 2010, is entered into by and between Image Guided Pain Management, P. C., a Virginia professional corporation ("**Covered Entity**"), and InSight Health Corp. on behalf of itself and all its subsidiaries and affiliates (collectively, the "**Business Associate(s)**"), (each a "**Party**" and collectively the "**Parties**").

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein, the parties hereto, intending to be legally bound hereby, agree as follows:

1. <u>Definitions</u>.

   a.   **HIPAA** shall refer to the federal privacy and security regulations at 45 C.F.R. parts 160 and 164.  All capitalized terms used herein that are not otherwise defined shall have the meanings described in HIPAA.

   b. **Privacy Rule** shall mean the HIPAA regulation that is codified at 45 C.F.R. Parts 160 and 164, Subparts A and E.

   c. **Security Rule** shall mean the HIPAA Regulation that is codified at 45 C.F.R. Parts 160 and 164, Subparts A and C.

2. **Obligations of Business Associate**. Business Associate, except as is expressly permitted and necessary to perform its obligations under any existing contracts and any contract it may enter with Covered Entity (the "**Underlying Contracts**") or as otherwise specified herein, shall comply with the Privacy Rule and the Security Rule and shall not use or disclose Protected Health Information ("**PHI**") obtained from Covered Entity.   Nothing in this Agreement shall prohibit Business Associate's disclosure to Covered Entity of PHI received from or created or received on behalf of Covered Entity.  With regard to its use and/or disclosure of PHI obtained from Covered Entity, Business Associate agrees:

   a. <u>Prohibition on Unauthorized Health Information Use or Disclosure</u>.  Business Associate will neither use nor disclose any PHI received by Business Associate from Covered Entity for fundraising or marketing purposes or for other purposes, except as permitted or required by this Agreement.   Business Associate may use PHI in the proper management and administration of Business Associate's business, to carry out its legal responsibilities as permitted under HIPAA, or for Data Aggregation purposes for the Health Care Operations of Covered Entity.  Business Associate will not use or further disclose PHI received by Business Associate from Covered Entity in a manner that would violate the requirements of HIPAA.

E-1

*20*

IHC000718

PROTECTED DISCOVE
MATERIAL

b. <u>Health Information Safeguards</u>. Business Associate will comply with the documentation requirements of the Security Rule and will use appropriate safeguards to prevent the use or disclosure of PHI received by Business Associate from Covered Entity, other than as permitted or required by this Agreement.

c. <u>Subcontractors and Agents</u>. Business Associate will ensure that any agents, including subcontractors, to whom it provides PHI received by Business Associate from Covered Entity, agree in writing to the same restrictions and conditions that apply to Business Associate under this Agreement with respect to such information and, if required, implement the safeguards required by paragraph b above with respect to Electronic PHI.

d. <u>Access to Health Information by Individuals</u>. To the extent applicable, Business Associate will make available PHI received by Business Associate from Covered Entity, and which is maintained by Business Associate and in Business Associate's custody or control in accordance with, and to the extent required by, HIPAA. Business Associate shall notify Covered Entity of any proposed disclosure of PHI to any third party and the reason such disclosure is permitted. If Covered Entity objects to such disclosure, Business Associate shall not disclose such PHI until Covered Entity agrees such disclosure is appropriate.

e. <u>Accounting to Department of Health and Human Services ("HHS")</u>. At the request of HHS or Covered Entity, Business Associate will make its internal practices, books and records relating to the use and disclosure of PHI received by Business Associate from Covered Entity, available to HHS for the purpose of determining Covered Entity's compliance with HIPAA. Business Associate will promptly notify Covered Entity of any request made by HHS hereunder.

f. <u>Amendment of PHI</u>. To the extent applicable, Business Associate will, within 10 days of receipt of notice from Covered Entity, make available PHI received by Business Associate from Covered Entity, and which is maintained by Business Associated and in Business Associate's custody or control, and incorporate any amendments to such PHI in accordance with, and to the extent required by HIPAA.

g. <u>Accounting of Disclosures</u>. To the extent applicable and as required, Business Associate will, within 10 days of receiving a written request from the Covered Entity, provide to the Covered Entity such information as is requested by the Covered Entity and necessary to enable the Covered Entity to respond to a request by an individual for an accounting of the disclosures of the individual's PHI in accordance with HIPAA.

h. <u>Reporting of Unauthorized Use or Disclosure</u>. To the extent required under HIPAA, Business Associate will promptly notify Covered Entity in writing of any use or disclosure of PHI received by Business Associate from Covered Entity which is not authorized or permitted by this Agreement.

i. <u>Obligations Upon Termination of Agreement</u>. Upon the termination or expiration of this Agreement for any reason, Business Associate shall at Company's expense, if feasible, return or destroy all PHI received by Business Associate from Covered Entity or created or received by Business Associate on behalf of Covered Entity that Business Associate still maintains in any form and retain no copies of such PHI or, if such return or destruction is not feasible, Business Associate shall notify Covered Entity in writing detailing the reason

E-2

IHC000719

PROTECTED DISCOVERY
MATERIAL

such destruction or return of PHI is infeasible and the protections of this Agreement shall be extended to such PHI and any further use and disclosure of such PHI shall be limited to those purposes that make the return or destruction of the information infeasible. Business Associate's obligations to protect PHI received by Business Associate from Covered Entity shall survive the termination of this Agreement for any reason. If Covered Entity elects to have such PHI destroyed, Business Associate shall certify in writing to Covered Entity that such PHI has been destroyed.   Notwithstanding anything to the contrary, the storage or maintenance of any PHI with third parties after the termination of this Agreement shall be the responsibility of Covered Entity and not Business Associate.

j.   Indemnification.   Business Associate will defend and indemnify Covered Entity from and against any and all claims, damages, liabilities, losses and expenses (including reasonable attorney's fees) based on or arising out of the alleged or actual improper use or disclosure of PHI by Business Associate.

**3.   Effect of Changes of HIPAA Privacy Regulation.**   The terms of this Agreement have been included based solely on the understanding by the Parties that they are required by HIPAA.   To the extent that any relevant provision of HIPAA is later eliminated or held to be invalid by a court of competent jurisdiction, the corresponding term or terms in this Agreement shall be deemed of no force and effect for any purpose and severable from the other remaining terms of this Agreement.   To the extent that any relevant provision of HIPAA is materially amended in a manner that changes the obligations of business associates or covered entities that are embodied in term(s) of this Agreement, the Parties agree to negotiate in good faith appropriate amendment(s) to this Agreement to give effect to such revised obligations. In addition, the terms of this Agreement should be construed in light of any interpretation and/or guidance on HIPAA issued by HHS from time to time.

**4.   Term and Termination.**   This Agreement shall become effective on July 8, 2010 and shall continue in effect until terminated as provided herein.   Either party may terminate this Agreement if it determines that the other party has breached a material term of this Agreement. In such event, non-breaching party may terminate this Agreement and any Underlying Contracts, if breaching party fails to cure such breach within 30 days after receipt of written notice.   Either party may terminate this Agreement without cause immediately on written notice if there is no Underlying Contract that requires use of PHI by Business Associate then in effect between the parties.

**5.   Entire Agreement; Amendment and Waiver.**   This Agreement and the Underlying Contracts contain the full and complete expression of the rights and obligations of the parties regarding the subject matter hereof and it shall supersede all other agreements, written or oral, heretofore made by the parties regarding the subject matter hereof.   This Agreement may be modified only in writing, executed by both parties. The waiver by either party of a breach or violation of any provision of this Agreement shall not be construed to be a continuing waiver or a waiver of any subsequent breach of either the same or any other provision of this Agreement. Nothing express or implied in this Agreement is intended to or shall confer upon any person other than the Parties and their respective successors and assigns of the Parties, any rights, remedies, obligations, or liabilities whatsoever.

E-3

22

IHC000720

PROTECTED DISCOVERY
MATERIAL

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

COVERED ENTITY:                          BUSINESS ASSOCIATE:

Image Guided Pain Management, P. C.        InSight Health Corp.

By:_____ M V        By:_____

Name: _____ *Robert F. O'Brien M V)*        Name: _____

Title: _____ *President*        Title: _____

*7/22/10*

E-4

*23*

IHC000721

PROTECTED DISCOVERY
MATERIAL

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

COVERED ENTITY:                          BUSINESS ASSOCIATE:

Image Guided Pain Management, P.C.          InSight Health Corp.

By:_____          By:_____

Name:_____          Name: _____T Lindsay_____

Title:_____          Title: _____VP_____

4

IHC000722

PROTECTED DISCOVERY
MATERIAL

EXHIBIT F
## LICENSE AGREEMENT

This License Agreement ("Agreement") is dated as of ___7 /22 , 2010 (the "Effective Date") between InSight Health Corp., a Delaware corporation ("Manager"), and Image Guided Pain Management, P. C., a Virginia professional corporation ("Medical Group").

### RECITALS

A. Manager has certain common law rights to the name "Insight Imaging" (the "**Trade Name**"), including any and all corresponding logos or similar marks and all usage of the Trade Name in connection with business cards, marketing materials, letterhead and other similar uses. Except as set forth in this Agreement, Medical Group has no statutory or common law rights in or to the Trade Name.

B. Manager will manage the medical practice located at 2923 Franklin Road,, Roanoke, Virginia (the "**Medical Practice**") under a Management Services Agreement between Manager and Medical Group that will be dated of even date herewith (the "MSA").

C. Medical Group desires to utilize the Trade Name, and Manager desires to permit Medical Group to utilize the Trade Name in connection with the MSA, each doing so pursuant to the terms and conditions of this Agreement.

### AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Grant**. On the terms and subject to the conditions of this Agreement, Manager hereby grants to Medical Group, and Medical Group hereby accepts, a non-exclusive, non-assignable, non- transferable license solely to use the Trade Name (the "**License**"), consistent with the terms and conditions of this Agreement. Medical Group acknowledges and agrees that Manager authorized Medical Group to use the Trade Name when Medical Group executed the MSA and that such use is contingent upon Medical Group's execution of this Agreement.

2. **Use**. Medical Group may use the Trade Name for the purpose of identifying, advertising and promoting the Medical Practice and for no other purpose.

3. **Transferability**. Medical Group may not effect or allow or cause to occur any sale, conveyance, sub-license, security interest, encumbrance, mortgage, lien or other voluntary or involuntary transfer, whether by operation of law or otherwise, of any beneficial, collateral or other interest in or to the License.

24

IHC000723

PROTECTED DISCOVERY
MATERIAL

4. **Retention and Protection of Rights.**   Medical Group acknowledges that, as between Manager and Medical Group, Manager retains exclusive title to and ownership of the Trade Name.  Manager does not grant to Medical Group any right, title or interest in or to the Trade Name, other than the rights granted hereby, or any right to engage in any activity which, absent the License, would constitute, induce or contribute to infringement of the right, title or interest of Manager in the Trade Name.  Medical Group will not challenge anywhere in the United States the validity or enforceability of the Trade Name. Medical Group will immediately notify Manager in writing if it obtains knowledge of any use or intended use by any third party of any name, mark, logo or design identical to or confusingly similar to the Trade Name. Medical Group will not at any time during or after the term of the License, claim any right, title or interest in or to the Trade Name except such rights as are provided in this Agreement.

5. **Term and Termination.**   The License will be effective upon the Effective Date and will terminate upon the termination of this Agreement. This Agreement will terminate automatically upon the termination of the MSA.  Notwithstanding the termination of this Agreement, Medical Group, through Manager, may still bill and collect under the Trade Name for services provided by Medical Group at the Medical Practice prior to the termination of the MSA.

6. **Indemnification.**   Medical Group will defend, indemnify and hold Manager harmless for, from and against all claims, liabilities, fees, costs, (including any attorneys' fees and costs), expenses, damages, fines, penalties or other harm that arises out of Medical Group's use or misuse of the Trade Name.

7. **Non-Alienation.**   This Agreement is personal in its nature, and neither party will, without the prior written consent of the other, assign or transfer this Agreement or any rights or obligations hereunder, except that Manager may assign or transfer this Agreement to a successor entity in the event of a merger, consolidation, or transfer or sale of all or a substantial part of the assets of Manager; provided that, in the case of any such assignment or transfer, this Agreement will, subject to the provisions hereof, be binding upon and inure to the benefit of such successor entity and such successor entity will discharge and perform all the obligations of Manager hereunder.

8. **Entire Agreement.**   This Agreement constitutes the parties' entire agreement with respect to the subject matter hereof. There are no restrictions, promises, representations, warranties, covenants, or understandings other than those expressly set forth herein. This Agreement supersedes all prior agreements or understandings between the parties, and may not be modified or amended in any manner other than as set forth herein.

9. **Governing Law and Dispute Resolution.**

   a. **Governing Law.**  This Agreement will be construed in accord with and any dispute or controversy arising from any breach or asserted breach of this Agreement will be governed by the laws of the State of Virginia.

F-2

25

IHC000724

PROTECTED DISCOVERY
MATERIAL

b. **Informal Resolution**.   Disputes between the Manager and Medical Group will be resolved, to the extent possible, by informal meetings and discussions between the parties.

c. **Attorneys' Fees.**  In the event that either party breaches this Agreement in any respect, the prevailing party shall be entitled to recover, in addition to any and all other remedies, which shall be cumulative, the reasonable attorneys' fees, expenses, and costs which it incurs as a result thereof.

d. **MUTUAL WAIVER OF JURY TRIAL**.  THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO ENFORCE OR DEFEND ANY RIGHTS OR REMEDIES UNDER THIS AGREEMENT OR ANY OTHER AGREEMENT. THIS PROVISION SHALL SURVIVE ANY TERMINATION OR EXPIRATION OF THIS AGREEMENT.

e. **Survivability**.   The obligations in this Section 9 will continue following the termination or expiration of this Agreement.

10. **Notice.**  Whenever notice must be given under the provisions of this Agreement, such notice must be in writing and addressed to the parties at their respective addresses set forth below and shall be deemed to have been duly given if delivered by hand-delivery, first-class registered postage certified mail (with written confirmation of receipt), or by a national commercial overnight delivery service, as follows:

If to Manager:          InSight Health Corp.
                        26250 Enterprise Court
                        Suite 100
                        Lake Forest, CA  92630-8405
                        Attention:  General Counsel

If to Medical Group:    Image Guided Pain Management, P. C.
                        2923 Franklin Road
                        Roanoke, VA  24014
                        Attention:  President

11. **Amendment, Modification, Or Waiver of Agreement**.   No amendment, modification, or waiver of this Agreement will be valid unless the amendment, modification, or waiver is in writing and signed by Manager and Medical Group. The failure of any party at any time to insist upon the strict performance of any provision of this Agreement will not be construed as a waiver of the right to insist upon the strict performance of the same provision at any future time.

26

IHC000725

PROTECTED DISCOVERY
MATERIAL

12. **No Rule of Strict Construction.**   The language of this Agreement will be deemed to have been approved by both parties, and no rule of strict construction will be applied against either party.

13. **No Third-Party Beneficiaries.**   Nothing in this Agreement will be construed to give any rights or benefits in this Agreement to anyone other than Manager and Medical Group. All duties and responsibilities undertaken under this Agreement will be for the sole and exclusive benefit of Manager and Medical Group, and not for the benefit of any other party.

14. **Severability.**   If any provision in this Agreement is determined to be invalid or unenforceable by a court or arbitrator of competent jurisdiction. The parties desire and agree that the remaining provisions of the Agreement will nevertheless continue to be valid and enforceable.

15. **Incorporation of Recitals.**   All recitals are an integral part of this Agreement and are hereby incorporated in this Agreement.

   **IN WITNESS WHEREOF,** each party executed this Sublicense Agreement as of the date first written above.

InSight Health Corp.,                    Image Guided Pain Management, P.C.
a Delaware corporation                   a Virginia professional corporation


By: _____             By: _____

_____T Lindsay_____             _____
Print Name                               Print Name

_____VP_____             _____
Office or Title                          Office or Title

4

IHC000726

PROTECTED DISCOVERY
MATERIAL

12. **No Rule of Strict Construction**.   The language of this Agreement will be deemed to have been approved by both parties, and no rule of strict construction will be applied against either party.

13. **No Third-Party Beneficiaries**.   Nothing in this Agreement will be construed to give any rights or benefits in this Agreement to anyone other than Manager and Medical Group. All duties and responsibilities undertaken under this Agreement will be for the sole and exclusive benefit of Manager and Medical Group, and not for the benefit of any other party.

14. **Severability**.   If any provision in this Agreement is determined to be invalid or unenforceable by a court or arbitrator of competent jurisdiction. The parties desire and agree that the remaining provisions of the Agreement will nevertheless continue to be valid and enforceable.

15. **Incorporation of Recitals**.   All recitals are an integral part of this Agreement and are hereby incorporated in this Agreement.

**IN WITNESS WHEREOF**, each party executed this Sublicense Agreement as of the date first written above.

**InSight Health Corp.**
a Delaware corporation

**Image Guided Pain Management, P. C.,**
a Virginia professional corporation

_____
Signature

_____
Signature

_____
Print Name

_____
Print Name

_____
Office or Title

_____
Office or Title

F-4

IHC000727

PROTECTED DISCOVERY
MATERIAL

EXHBIT G
PHYSICIAN ACKNOWLEDGMENT

I, _Robert F. O'Brien_, have been engaged by Image Guided Pain Management, P. C., a Virginia professional corporation ("**Medical Group**"), to provide professional services at Medical Group's facility located at 2923 Franklin Road, Roanoke, VA  24014 (the "**Medical Practice**").  With respect to my provision of professional services at and for Medical Practice, I hereby acknowledge and agree that:

1.      I will maintain all of the qualifications and requirements and shall perform those obligations delegated to me by Medical Group.  I will inform Medical Group and Manager (as defined below) immediately of any of the following: (i) any malpractice settlement, settlement allocation, judgment, verdict or decree against me; (ii) any investigation or disciplinary proceeding or action instituted against me by any licensure board, hospital, medical school, healthcare facility or entity, professional society or association, third party payor, professional review committee or body, or governmental agency; (iii) any criminal complaint, indictment or criminal proceeding in which I am named as a defendant; (iv) any investigation or proceeding, whether administrative, civil or criminal, relating to an allegation against me involving or related to (a) billing improprieties, (b) violations of the rules of the Medicare or Medicaid program, or (c) potential violations of any federal or state law prohibiting kick-backs, fee-splitting, false claims, or referrals to entities or individuals with which I or my immediate family has a financial or ownership interest; (v) any allegation known by , or any investigation or proceeding based on any allegation, against me, of violating professional ethics or standards, or engaging in illegal, immoral or other misconduct (of any nature or degree), relating to the practice of medicine; (vi) my debarment, suspension, denial or exclusion from any federal, state or third party payment program; and (vii) any suspension or revocation of (a) my license to practice medicine in any state, (b) my state or federal controlled substances registration, (c) my medical staff privileges at any hospital or other healthcare entity, (d) my board certification or recertification, (e) my malpractice insurance, or (f) any condition that impairs or may impair my ability to practice medicine.

2.      I understand that I will be providing professional services at the Medical Practice as an employee or independent contractor of Medical Group and not for InSight Health Corp. ("Manager") and I will look solely to Medical Group for compensation for my professional services.  In consideration of the compensation provided to me by Medical Group and as an inducement for Manager to provide non-medical services at the Medical Practice, I specifically agree to be bound by the non-competition provision contained in Section 7.20 of the Agreement.

3.      I (either individually or as an employee of Medical Group) will maintain comprehensive professional liability insurance covering me with liability limits of not less than $1,000,000 per occurrence and $3,000,000 annual aggregate.

4.      (a)      I acknowledge that Manager may for good cause withdraw its approval regarding my provision of professional services on behalf of Medical Group at the Medical Practice, and I will cease to provide such professional services and take such other actions as may be reasonably requested by Manager or Medical Group upon the withdrawal of such approval.

28

IHC000728

PROTECTED DISCOVERY MATERIAL

(b)  For purposes of 4(a), "good cause" means:

(i)  conviction of a felony, or of a crime involving moral turpitude;

(ii)  debarment, suspension, denial or exclusion from any federal, state or third party payment program;

(iii)  suspension or revocation of: my license to practice medicine in Virginia; my state or federal controlled substances registration; my medical staff privileges at any hospital or other healthcare entity resulting from an issue or issues directly related to patient care; or my malpractice insurance;

(iv)  any condition that substantially impairs my physical or mental ability to practice medicine.

AGREED AND ACCEPTED on this 22ⁿ day of July , 2010.

_____
(Signature)

_____
Robert F. Obrien
(Name)

G-2

29

IHC000729

PROTECTED DISCOVERY
MATERIAL

EXHBIT G
PHYSICIAN ACKNOWLEDGMENT

I, _John Mathis_, have been engaged by Image Guided Pain Management, a Virginia professional corporation ("**Medical Group**"), to provide professional services at Medical Group's facility located at 2923 Franklin Road, Roanoke, VA   24014 (the "**Medical Practice**"). With respect to my provision of professional services at and for Medical Practice, I hereby acknowledge and agree that:

1.        I will maintain all of the qualifications and requirements and shall perform those obligations delegated to me by Medical Group.  I will inform Medical Group and Manager (as defined below) immediately of any of the following: (i) any malpractice settlement, settlement allocation, judgment, verdict or decree against me; (ii) any investigation or disciplinary proceeding or action instituted against me by any licensure board, hospital, medical school, healthcare facility or entity, professional society or association, third party payor, professional review committee or body, or governmental agency; (iii) any criminal complaint, indictment or criminal proceeding in which I am named as a defendant; (iv) any investigation or proceeding, whether administrative, civil or criminal, relating to an allegation against me involving or related to (a) billing improprieties, (b) violations of the rules of the Medicare or Medicaid program, or (c) potential violations of any federal or state law prohibiting kick-backs, fee-splitting, false claims, or referrals to entities or individuals with which I or my immediate family has a financial or ownership interest; (v) any allegation known by , or any investigation or proceeding based on any allegation, against me, of violating professional ethics or standards, or engaging in illegal, immoral or other misconduct (of any nature or degree), relating to the practice of medicine; (vi) my debarment, suspension, denial or exclusion from any federal, state or third party payment program; and (vii) any suspension or revocation of (a) my license to practice medicine in any state, (b) my state or federal controlled substances registration, (c) my medical staff privileges at any hospital or other healthcare entity, (d) my board certification or recertification, (e) my malpractice insurance, or (f) any condition that impairs or may impair my ability to practice medicine.

2.        I understand that I will be providing professional services at the Medical Practice as an employee or independent contractor of Medical Group and not for InSight Health Corp. ("Manager") and I will look solely to Medical Group for compensation for my professional services.  In consideration of the compensation provided to me by Medical Group and as an inducement for Manager to provide non-medical services at the Medical Practice, I specifically agree to be bound by the non-competition provision contained in Section 7.20 of the Agreement.

3.        I (either individually or as an employee of Medical Group) will maintain comprehensive professional liability insurance covering me with liability limits of not less than $1,000,000 per occurrence and $3,000,000 annual aggregate.

4.        (a)        I acknowledge that Manager may for good cause withdraw its approval regarding my provision of professional services on behalf of Medical Group at the Medical Practice, and I will cease to provide such professional services and take such other actions as may be reasonably requested by Manager or Medical Group upon the withdrawal of such approval.

IHC000730

PROTECTED DISCOVERY
MATERIAL

(b)  For purposes of 4(a), "good cause" means:

(i)  conviction of a felony, or of a crime involving moral turpitude;

(ii)  debarment, suspension, denial or exclusion from any federal, state or third party payment program;

(iii)  suspension or revocation of: my license to practice medicine in Virginia; my state or federal controlled substances registration; my medical staff privileges at any hospital or other healthcare entity resulting from an issue or issues directly related to patient care; or my malpractice insurance;

(iv)  any condition that substantially impairs my physical or mental ability to practice medicine.

AGREED AND ACCEPTED on this 18 day of October, 2010.

_John M. Mathis, MD_
(Signature)

John Mathis MD
(Name)

G-2

IHC000731

PROTECTED DISCOVERY
MATERIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

------------------------------------
SHARON G. WINGATE, Executor of      :
The Estate of Douglas Gray          :
Wingate, Deceased,                  :
                                    :
              Plaintiff,            :
                                    :
      -vs-                          :   Case No.
                                    :   7:13-cv-142
INSIGHT HEALTH CORP.,               :
                                    :
              Defendant/Cross-Claim :
              Defendant,            :
                                    :
      -vs-                          :
                                    :
JOHN M. MATHIS, MD,                 :
ROBERT F. O'BRIEN, MD, and IMAGE    :
GUIDED PAIN MANAGEMENT, PC,         :
                                    :
              Defendants/Cross-Claim :
              Plaintiffs.           :
------------------------------------


                        May 8, 2013
                        9:15 A.M.



              DEPOSITION OF:

              KAREN DeLONG



         Central Virginia Reporters
              P.O. Box 12628
              Roanoke, VA 24027
              (540) 380-5017

DeLong (Byrd)

1     Q  Is that the area in between Wasena
2  Avenue and Grandin, in that area?
3     A  It's in Grandin.
4     Q  Are you closer to the Grandin Road
5  area or more towards, you know, the bridge coming
6  from 11?
7     A  Closer to the bridge.
8     Q  Now, could you walk me through a
9  little bit about your educational background, where
10  you went to high school, after high school, that
11  sort of thing?
12     A  I went to Franklin County High
13  School. I graduated in '81. Then I went to
14  Virginia Western. I graduated in '95.
15     Q  What did you go to Virginia Western
16  for?
17     A  Radiology technology.
18     Q  What did you do in between graduating
19  from Franklin County and going to Virginia Western?
20     A  I was a boat mechanic.
21     Q  Where was that?
22     A  Webster Marina down at Smith Mountain
23  Lake, All Seasons Marine, and Smith Mountain Yacht
24  Club; certified mariner mechanic.

1     Q  How long have you been -- you are
2  working as a radiology technician right now; is
3  that right?
4     A  Technologist, yes.
5     Q  How long have you been in that field?
6     A  Since '93.
7     Q  Have you ever given a deposition
8  before?
9     A  No, I have not.
10     Q  Now, are you employed currently?
11     A  Yes, I am.
12     Q  Where do you work?
13     A  Insight Imaging.
14     Q  Is that a facility on Franklin?
15     A  Yes.
16     Q  How long have you been working at
17  that facility?
18     A  Going on eight years.
19     Q  So that would take you back to about
20  2005?
21     A  I believe so.
22     Q  When you first started working at --
23  I'm going to call it the Franklin Road facility.
24  When you started working at the Franklin Road

1  facility, who were you employed by?
2     A  Center for Advanced Imaging.
3     Q  At some point, did your employer
4  change?
5     A  Carilion obtained Center for Advanced
6  Imaging.
7     Q  When was that?
8     A  I'm not sure.
9     Q  Was it around 2008?
10     A  Yes.
11     Q  And then Insight Health Corp.
12  obtained the facility?
13     A  Correct.
14     Q  And you are an employee of Insight
15  Health Corp.?
16     A  Correct.
17     Q  How long have you been an employee of
18  Insight Health Corp.?
19     A  Since they took over.
20     Q  Around 2010?
21     A  Yes.
22     Q  Now, the Franklin Road facility, that
23  is -- there's some car dealerships around that
24  area?

1     A  Yes.
2     Q  And I think there's, what, a Valero
3  gas station somewhere near there?
4     A  Next door.
5     Q  Now, if you could, educate us and
6  tell us about your job duties at the Franklin Road
7  facility since you started working there from, we
8  thought, maybe around 2005 up until the present
9  day. And if your job duties have changed at all
10  since then, let us know about that.
11     A  An x-ray tech, I do pain management
12  and CT as well.
13     Q  What do your duties as an x-ray tech
14  involve?
15     A  Taking x-rays of patients.
16     Q  Then do you take -- is this done on a
17  digital system or do you have plain films?
18     A  Digital system, yes.
19     Q  What about your pain management
20  duties, can you tell me a little bit about that?
21     A  I prepare trays for our doctors to
22  inject patients.
23     Q  What is involved with preparing the
24  trays for the doctors to inject patients?

Central Virginia Reporters, LLC (540) 380-5017

e1506ce9-791d-44fs-bbd5-84b2f331a5da

DeLong (Byrd)

1    A   It's done in a sterile fashion,
2  pretty much draw up the drugs for whatever
3  particular type of injection we are doing.
4    Q   So when you say draw up the drugs,
5  you take, say, a vial of medication, in this case
6  methylprednisolone acetate, you put a needle into
7  that vial and withdraw medication?
8    A   Correct.
9    Q   Where is that done in the facility?
10    A   In the room, the exam room, procedure
11  room.
12    Q   Then do you give that needle with the
13  methylprednisolone acetate in it to the doctor?
14    A   It's on the tray and the needle is
15  discarded, so it's just a syringe.  He uses other
16  needles for the patient itself.
17    Q   Can you walk us through the whole
18  process of preparing the tray from start to finish?
19    A   You open a sterile tray, of course
20  you do it in a sterile fashion, what have you.
21  Each vial has a cap on it.  You put on your sterile
22  gloves, pop the cap, draw up the drugs.  Then you
23  just do individuals, you do lidocaine, contrast,
24  and then your steroid, what have you.

1    Q   Where is the doctor while all this is
2  being done?
3    A   Usually in his office.
4    Q   So would the doctor then come in when
5  your work as far as preparing the tray is complete?
6    A   After I prepared the patient, yes.
7    Q   Is that different from preparing the
8  tray?
9    A   Correct.
10    Q   How so?
11    A   You prepare the patient and then you
12  get the patient on the table and you clean off
13  whichever area, whether it be the lower back or the
14  neck or what have you, in a sterile fashion, put a
15  sterile drape on it, get the x-ray ready for the
16  doctor, and then they come in, put the sterile
17  gloves on, and do the procedure.
18    Q   The doctors themselves don't draw the
19  medication?
20    A   No, sir.
21    Q   How long has that been the case?
22    A   Since I have been doing exams with
23  Dr. Mathis and Dr. O'Brien since 1999.
24    Q   Where were you working with

1  Dr. Mathis and O'Brien before the Center for
2  Advanced Imaging?
3    A   Lewis-Gale Hospital in original
4  radiology there.
5    Q   Walk me through your employment
6  history prior to working at the Center for Advanced
7  Imaging.  You said you were at LewisGale?
8    A   When I received my degree at Virginia
9  Western, I went to work at Lewis-Gale Clinic.  I
10  was there until 1999 when I went to work with
11  Dr. Mathis and Dr. O'Brien at Lewis-Gale Hospital.
12  I was the lead tech in interventional there.  I was
13  there until they bought their own facility or
14  gathered up their own facility on advanced imaging,
15  and they recruited me there to work with them then.
16    Q   Now, what training did you receive as
17  far as the preparation of the trays for patients in
18  your employment for the Center for Advanced
19  Imaging?
20    A   I did on-the-job training at
21  Lewis-Gale Hospital.
22    Q   Was there a policy put in place when
23  you came to the Center for Advanced Imaging about
24  how the trays would be prepared, like a written

1  policy?
2    A   I do not know that answer.
3    Q   Was there -- were you given any
4  direction by Drs. Mathis or O'Brien about how the
5  tray preparation would work?
6    A   It was carried over from LewisGale
7  the way I did it there.
8    Q   Was there a written policy about that
9  at LewisGale?
10    A   I do not know that answer.
11    Q   So when you started at LewisGale and
12  started preparing the trays, how did you know how
13  to do it in that fashion?
14    A   I was trained by the other
15  technologist there.
16    Q   So handed down from one generation to
17  the next?
18    A   Correct.
19    Q   Now, what is your involvement -- you
20  said you had some CT duties.  Can you tell me what
21  that involves?
22    A   Doing computed tomography on
23  different patients.  You do prep, inject x-ray dye
24  if need be or what have you.

5  (Pages 14 to 17)

DeLong (Byrd)

**Page 18**

1    Q    You take them into the scanning area?
2    A    Yes.  We interview them and do our
3  procedure.
4    Q    Now, regarding the patient prep, I'm
5  going to ask you some questions today and I want to
6  kind of limit it more to epidural steroid
7  injections.  Do you know what those are?  I know
8  this may seem like a dumb question, and you're like
9  what --
10    A    What's the question?
11    Q    Do you know what an epidural steroid
12  injection is?
13    A    Yes, I do.
14    Q    Okay.  And you may get asked some
15  questions that the answer is so obvious you may say
16  why is this fool asking it, but it's just kind of
17  what we have to do.  I apologize for some of those
18  questions in advance.
19       Can you tell us what an epidural steroid
20  injection is?
21    A    It's an injection into the epidural
22  space where all the nerve roots exit the spine.
23  You put steroids in there hopefully to reduce
24  inflammation in the nerve roots to relieve the

**Page 19**

1  pain.
2    Q    I'm going to refer to that as an ESI
3  throughout the rest of the day to try to save some
4  time.  When I'm saying ESI, I'm referring to
5  epidural steroid injection.
6       Is that a service that Drs. Mathis and
7  O'Brien performed at the Franklin Road facility?
8    A    Yes, it is.
9    Q    How long had they been doing that as
10  far as you know at that facility?  Is that
11  something that was being done since you got there?
12    A    Yes.
13    Q    Would you assist in that process?
14    A    Sorry?
15    Q    Would you assist at all in the
16  process of an ESI for a patient?
17    A    Yes.
18    Q    In what way?
19    A    Preparing the patient, preparing the
20  x-ray, sometimes interviewing the patients, do the
21  exit interview so to speak, give them their
22  discharge instructions, that type of stuff.
23    Q    Regarding the interview of the
24  patients, what would that involve?

**Page 20**

1    A    We had a list of different questions,
2  allergies, current medical history, pretty much
3  just common knowledge of the patient, are they
4  allergic to anything, that type of stuff.
5    Q    Did someone obtain the consent from
6  the patient to undergo that process and perform
7  that process?
8    A    The doctor's consent.
9    Q    When you would interview the patients
10  and prepare the patients, would you ever talk to
11  them about the medication that they were going to
12  receive as part of the injection?
13    A    It's a steroid.
14    Q    Would you tell them who made the
15  medication?
16    A    No.
17    Q    Would you ever tell them what type of
18  medication as far as Depo-Medrol, a generic form of
19  that made by Teva or NECC?
20    A    No.
21    Q    Do you know if anybody at the
22  Franklin Road facility would have those discussions
23  with the patients as far as who made the medication
24  that they were going to receive?

**Page 21**

1    A    No.
2    Q    And do you know if anyone at the
3  Franklin Road facility would tell the patients the
4  name of the medication they were going to receive
5  when they were going to get an ESI?
6    A    Yes, they would.
7    Q    Who would do that?
8    A    The doctors would.
9    Q    Doctors -- I'm sorry, go ahead.
10    A    Usually if it was Dr. Mathis, he
11  would say methylprednisolone.  Dr. O'Brien never
12  called medication unless it was specifically asked,
13  which it never was that I remember he consented.
14  He would always say a steroid similar to cortisone
15  that's safe to use around the spine.
16    Q    Did anyone ever tell any of the
17  patients as far as you know that they were going to
18  receive Depo-Medrol when they were getting the
19  ESIs?
20    A    Not that I recall.
21    Q    Now, you talked about there's an exit
22  interview as well?
23    A    Just telling them the things to do
24  for the day, take it easy for the rest of the day,

DeLong  (Byrd)

Page 66

1    regulated?
2        A    I think the company adopted that
3    policy we are not using anything except for FDA
4    regulated materials.
5        Q    When you say "the company," do you
6    mean Insight Health Corp. at the corporate level?
7        A    Yes.
8        Q    Who made that decision, if you know?
9        A    I don't know.
10       Q    How did you learn of that?
11       A    Through corporate.
12       Q    Who from corporate?
13       A    I don't know.
14       Q    Did it come down from Paul Hellkamp?
15       A    Correct.
16       Q    Did you all have a group meeting
17   where you all discussed that?
18       A    No.
19       Q    When did you learn that decision had
20   been made?
21       A    When we started back doing epidurals.
22       Q    When did you start back doing
23   epidurals?
24       A    I don't remember the date.

Page 68

1        A    How many vials we received and what
2    product.
3        Q    What was the last part?
4        A    What product.
5        Q    So it would say 200 vials of
6    methylprednisolone acetate, 80 milligrams or words
7    to that effect?
8        A    Correct.
9        Q    And the bill would be obviously the
10   invoice for the product that had been provided?
11       MR. SHAW:  Objection, form.
12
13   BY MR. BYRD:
14       Q    Is that right?
15       A    Is that a question?
16       Q    Is that correct?
17       A    Can you repeat that?
18       Q    The bill is self-explanatory, it's
19   the invoice for the product?
20       A    Correct.
21       Q    Tell me what -- was it the
22   microbiology report?
23       A    Correct.
24       Q    Can you tell me what that is?

Page 67

1        Q    Was it in 2013?
2        A    Yes.
3        Q    So some time within the last five
4    months, give or take?
5        A    Correct.
6        Q    And do you know if the Franklin Road
7    facility buys any medication from a compounding
8    pharmacy today?
9        A    Absolutely not.
10       Q    Is there someone responsible for
11   checking into the suppliers of medications to see
12   if they are compound versus FDA regulated?
13       A    I do not know that answer.
14       Q    Do you know who would know?  Would it
15   be Paul Hellkamp?
16       A    Yes.
17       Q    Now, when you all would get these
18   boxes of medication from NECC, would there be
19   anything in the box other than the package of
20   medication?
21       A    The packing slip, the bill was in
22   there at one time, the microbiology report was in
23   there at one time.
24       Q    What would be on the packing slip?

Page 69

1        A    Not a hundred percent.  It just said
2    that the drug itself had been tested prior to.
3        Q    Sterility tested?
4        A    Correct.
5        Q    Would the results of that sterility
6    testing be on there?
7        A    It would say sterile or that would be
8    it.
9        Q    How long had you all been getting
10   these reports with the package of the
11   methylprednisolone acetate from NECC?
12       A    To my knowledge, the first time we
13   got medication.
14       Q    Was that around 2007?
15       A    I'm bad with dates.  I'm going to
16   guess.
17       Q    It's all right.  Now, are the
18   microbiology reports kept?
19       A    They are filed in the cabinet.
20       Q    Who files them?
21       A    Whoever opens the box.
22       Q    Where is the cabinet?
23       A    It was in the pain management
24   interviewing room.

Central Virginia Reporters, LLC  (540) 380-5017

e1585ce9-791d-44fe-bbd5-54b2f331a5da

DeLong (Byrd)

Page 70

1    Q   You yourself, I take it, would open
2    boxes of medication from NECC?
3        A   Yes.
4        Q   Was there ever a time that you opened
5    a box of medication from NECC that did not have the
6    microbiology report?
7        A   I do not remember that specifically.
8        Q   Do you have a general recollection of
9    that happening?
10       A   Things were changing and sometimes
11   they would have a bill in there or they wouldn't
12   have a bill in there or what have you. I just took
13   all the paperwork and put it in Paul's in-box.
14       Q   So any thing that came in the package
15   of methylprednisolone acetate from NECC, you would
16   take to Paul Hellkamp?
17       A   Correct.
18       Q   Was there ever a time that you were
19   made aware of medication coming in from NECC that
20   was open by, say, someone else that did not have
21   the microbiology report?
22       A   I believe Sharon had mentioned that
23   at one point.
24       Q   When did that happen?

Page 71

1        A   I don't remember.
2        Q   Was it before or after the meningitis
3    outbreak?
4        A   Before.
5        Q   How soon before?
6        A   I do not know.
7        Q   You said Sharon mentioned that. Did
8    she mention it to you?
9        A   Yes.
10       Q   Was this at the Insight facility?
11       A   Yes.
12       Q   What did you say to Sharon?
13       A   I said they had probably sent it to
14   Paul.
15       Q   Do you know if you checked -- let me
16   ask it this way. Start over. Did you check with
17   Paul about that?
18       A   I did not.
19       Q   Did Sharon check with Paul about
20   that?
21       A   I do not know.
22       Q   Did you tell Sharon to look into it?
23       A   No, I did not.
24       Q   Did you call NECC?

Page 72

1        A   No, I did not.
2        Q   Did you talk to anybody about where
3    the microbiology report was?
4        A   I did not.
5        Q   What happened with the medication?
6        MR. SHAW: Objection to form.
7
8    BY MR. BYRD:
9        Q   The medication that came in the
10   package without the microbiology report that Sharon
11   mentioned to you --
12       MR. SHAW: Objection.
13
14   BY MR. BYRD:
15       Q   -- do you know what happened to
16   that --
17       MR. BYRD: Hold on counsel.
18
19   BY MR. BYRD:
20       Q   Do you know what happened to that
21   medication?
22       MR. SHAW: Objection to form of the
23   question, foundation, and I believe --
24       MR. BYRD: Okay, if you are going to

Page 73

1    talk, shes' going to leave the room.
2        So, ma'am, unhook your mic, please
3    leave the room, and then he can make his
4    objection on the record. You can just go
5    in that room over there.
6
7        (The witness left the deposition
8    room.)
9
10       MR. SHAW: Objection. It also
11   assumes evidence not in test -- not
12   testified to --
13       MR. BYRD: Facts not in evidence?
14       MR. BYRD: Facts not in evidence and
15   evidence not testified to by this witness.
16       MR. BYRD: Okay, I'm going to get
17   the --
18       MR. SHAW: I will get her.
19
20       (The witness returned to the
21   deposition room.)
22
23   BY MR. BYRD:
24       Q   Now, after Sharon came to you and

DeLong (Byrd)

1 told you about this package and there not being a
2 microbiology report, I believe you said, well, they
3 probably sent it to Paul. Do you know if that
4 medication was used at the Franklin Road facility?
5      A   I was in CT then. I would assume so,
6 but I do not know. But if I had to guess, yes.
7      Q   Why did you think maybe they
8 had sent it to Paul?
9      A   Because they had gotten inconsistent
10 with their paperwork of whether it was coming in
11 the box or not.
12      Q   How else would they send it?
13      A   I don't know. I would assume in the
14 mail. I don't know that answer.
15      Q   Do you remember another time where
16 medication had come in from NECC without the
17 microbiology report?
18      A   No, I don't.
19      Q   Just this one time?
20      A   As far as I know.
21      MR. SHAW: Objection, again assumes
22 facts not in evidence.
23      MR. BYRD: All right.
24

1      A   No.
2      Q   Who is Sharon's supervisor?
3      A   Paul, Paul Hellkamp.
4      Q   So do you know why she came to you?
5      A   I had trained her.
6      Q   How long had Sharon been at the
7 Franklin Road facility prior to this happening?
8      A   I don't know. I'm not sure when she
9 was hired. I'm thinking the first of the year.
10      Q   Of 2012?
11      A   I think so. I'm not sure.
12      Q   I may have asked this question
13 already and if I have, I apologize: How long had
14 the inconsistency with the NECC paperwork been
15 going on?
16      A   Several months. I don't know.
17      Q   Leading up to whenever this was that
18 Sharon came to talk to you?
19      A   Yes.
20      Q   Did Paul Hellkamp ever talk to folks
21 at NECC, do you know?
22      A   I do not know.
23      Q   Do you know if he would send e-mails
24 or faxes to them?

1 BY MR. BYRD:
2      Q   Now, I would like to ask you a few
3 more questions about this. Do you know the lot
4 number or batch number for that package that Sharon
5 came to you about?
6      A   I do not.
7      Q   When you said that NECC had gotten
8 inconsistent with their paperwork, can you tell me
9 what you mean by that?
10      A   Sometimes they wouldn't have the
11 invoice in there, that type stuff.
12      Q   When did that begin?
13      A   I'm not a hundred percent sure.
14      Q   Did you go and look at the
15 medication, the vials yourself when Sharon had come
16 to you about the microbiology report?
17      A   No, I did not.
18      Q   Do you know if she looked at the
19 vials?
20      A   I do not know.
21      Q   Did anyone tell the doctors about
22 that, Drs. Mathis or O'Brien?
23      A   I do not know.
24      Q   But you didn't yourself?

1      A   I do not know.
2      MR. SHAW: Objection, form of the
3 question.
4
5 BY MR. BYRD:
6      Q   Do you know if NECC would ever call
7 Paul Hellkamp?
8      MR. SHAW: Objection, form of the
9 question.
10      THE WITNESS: I do not know. They
11 would call me and verify my orders and let
12 me know when shipment would be expected.
13
14 BY MR. BYRD:
15      Q   Orders that you had placed?
16      A   That I faxed to them, yes.
17      Q   Would -- do you know if NECC would
18 call Sharon?
19      A   I don't think so. I don't know.
20      Q   Why don't you think so?
21      A   She wasn't a contact person on the
22 list.
23      Q   Did you handle all the placing of the
24 orders to NECC?

Central Virginia Reporters, LLC (540) 380-5017

e1505ce9-791e-44fa-bbd5-04b2f331a5da

DeLong (Byrd)

Page 78

1  A  Not all of them.
2  Q  Who else would handle those, that
3  job?
4  A  Whoever was in pain management and if
5  we needed a drug.
6  Q  Who would that include?
7  A  Sharon or Mary back in the day.
8  Q  Do you keep records of the lot --
9  does the facility at Franklin Road keep records of
10  the lot number for the medication received from
11  NECC, do you know that?
12  A  It's documented on where we put in
13  the amount of drugs that we use.
14  Q  What --
15  A  On the computer system.
16  Q  Can you explain the computer system
17  that you use to me as far as where that would be
18  documented?  Is it in a patient specific record, is
19  it a vendor record, where is that?
20  A  Patient specific.
21  Q  You had mentioned earlier something
22  about putting papers you got from NECC in Paul's
23  box.
24  A  Uh-huh.

Page 79

1  Q  When did you start doing that as
2  opposed to putting it in the pain management room?
3  A  We always put the papers in his box.
4  Q  Would you make copies of them and put
5  them in the box?
6  A  No.  All the billings and all that
7  stuff went in his box.
8  Q  You gave the billing to him, to Paul?
9  A  Uh-huh.
10  Q  Where would you put the microbiology
11  reports if you can --
12  A  In pain management if I opened it.
13  Q  Is that where -- and this is if you
14  know.  But is that where the microbiology reports
15  were supposed to go in the pain management room?
16  A  That's where we decided to put them.
17  Q  Are the microbiology reports that you
18  all received from NECC, are those still at the
19  Insight facility on Franklin Road?
20  A  I do not know that answer.  I'm
21  guessing.
22  Q  When was the last time that you
23  looked at microbiology report from NECC?
24  A  I looked at one the other day.

Page 80

1  Q  What do you mean the other day?
2  MR. SHAW:  I'm going to object to the
3  extent this calls for --
4  MR. BYRD:  I'm just asking when it
5  happened.  I'm not asking for
6  conversations between you all.
7
8  BY MR. BYRD:
9  Q  When did that happen?
10  A  A few days ago.
11  Q  If this involves communications with
12  your attorney, don't tell me what you said.  Why
13  did you look at that?
14  MR. SHAW:  Objection, form of the
15  questions and that does invade
16  attorney/client privilege.
17
18  BY MR. BYRD:
19  Q  And if you -- if it was -- I don't
20  want to know what you said to your attorneys.  I'm
21  just asking why.
22  MR. SHAW:  Counsel, pretty much I'm
23  going to have to ask you to go off the
24  record if you are going to continue with

Page 81

1  this line of questionings about
2  conversations she's had with her counsel.
3  MR. BYRD:  I'm not asking her about
4  conversation.  I'm asking her why.  If the
5  answer is it was because of a
6  conversation, she can say that.  I don't
7  want the substance.
8  MR. SHAW:  Fair enough.
9  MR. BYRD:  The question is fairly
10  clear.
11
12  BY MR. BYRD:
13  Q  Now, why did you look at the
14  microbiology report?
15  A  Conversation.
16  Q  With your counsel?
17  A  Correct.
18  MR. BYRD:  Period, full stop, not
19  going forward.
20  MR. SHAW:  Thank you, counsel.
21
22  BY MR. BYRD:
23  Q  Now, prior to that, when was the last
24  time you had looked at a microbiology report from

21  (Pages 78 to 81)

Central Virginia Reporters, LLC (540) 380-5017

e1505ca9-791d-44fe-bad5-84b2f331a9da

DeLong (Byrd)

Page 82

1  NECC?
2      A    Before the meningitis.
3      Q    Before the outbreak?
4      A    Correct. When they called and told
5  us that medication had particles in it.
6      Q    And when you say "they," you mean
7  somebody from NECC?
8      A    Yes.
9      Q    What led you to go back and look at
10  the microbiology reports?
11      A    When they said it had fungal
12  meningitis in it, that's when we gathered all our
13  stuff together.
14      Q    What was in -- how many microbiology
15  reports were in that file?
16      A    I do not know. That was taken care
17  of by Paul.
18      Q    Paul looked at all that?
19      A    Correct.
20      Q    Were any microbiology reports for
21  lots that you all had received missing, if you
22  know?
23      A    That was taken care of by Paul.
24      Q    So you don't know if --

Page 83

1      A    No.
2      Q    Other than possibly the one we
3  discussed?
4      A    Possibly, yes.
5      Q    Did you later become aware of
6  microbiology reports for lots of medication from
7  NECC that had gone missing or were never given to
8  the -- given to you all at the Franklin Road
9  facility?
10      MR. SHAW: Objection form.
11      THE WITNESS: Later on I learned
12  that, yes.
13
14  BY MR. BYRD:
15      Q    When did you learn that?
16      A    After the fact.
17      Q    Do you remember month?
18      A    I don't remember.
19      Q    And can you tell me the circumstances
20  of how that came about?
21      MR. SHAW: Objection to form. You
22  may answer.
23      THE WITNESS: I don't remember that
24  answer either.

Page 84

1
2  BY MR. BYRD:
3      Q    Was it a group meeting?
4      A    Just --
5      MR. SHAW: Objection to form.
6      THE WITNESS: Where Paul had came and
7  asked if there was any other reports.
8
9  BY MR. BYRD:
10      Q    Paul came and asked you?
11      A    Correct.
12      Q    This was at the Franklin Road
13  facility?
14      A    Correct.
15      Q    Did he say why he was asking for it?
16      A    I don't recall that.
17      Q    Did you ask him why?
18      A    I don't recall I did that either.
19      Q    Then at some point though you learned
20  there were some missing microbiology reports?
21      MR. SHAW: Objection, form and also
22  assumes fact not in evidence.
23
24

Page 85

1  BY MR. BYRD:
2      Q    Go ahead.
3      A    Yes.
4      Q    Did you undertake any efforts to try
5  to locate them?
6      A    I did look for them, yes.
7      Q    Do you know for what lots they were?
8      A    No, I do not.
9      Q    Do you remember if it was lots 5 -- a
10  lot number of 52120127?
11      MR. SHAW: Objection, asked and
12  answered.
13
14  BY MR. BYRD:
15      Q    Go ahead.
16      A    I know we did have one for that lot.
17      Q    Did you have a microbiology report
18  for the lot number of 6292012?
19      A    Not sure, but I don't think we did.
20      Q    What about did you have a
21  microbiology report for August 12, 2012?
22      A    I don't think we did.
23      Q    I would like you to tell me, if you
24  could, the steps you took to try to locate the

22 (Pages 82 to 85)

e1505ce9-791d-44fe-b5d5-84b2f331a5de

DeLong (Byrd)

**Page 86**

1 microbiology reports?
2     A   I went to my file cabinet. I went
3 through pain management. I went through where his
4 box is kept. That's it.
5     Q   I take it you -- well, let me ask it
6 this way:  Did you notice that any microbiology
7 reports were missing when you had done that?
8     Let me try again.  When you were looking
9 through your file, I take it then that you had
10 looked at some microbiology reports that were in
11 that file from NECC; is that correct?
12     A   Actually no. Paul looked through
13 them. He took all the reports. He said he was
14 missing X and X.
15     Q   Did you try to find whatever X and X
16 were?
17     A   I did.
18     Q   Tell me steps that you took to try to
19 find X and X.
20     A   I went through the file cabinet, went
21 through my room, went through his in-box.
22     Q   And you couldn't find them?
23     A   No, I could not.
24     Q   Do you know if anyone else at Insight

**Page 87**

1 looked for -- and I'm just going to use the term
2 you used -- X and X?
3     A   I believe Sharon looked.
4     Q   Did anyone from corporate look?
5     A   I do not know that answer.
6     Q   I'm going to show you what was marked
7 yesterday as Exhibit No. 14. I'm going to ask you
8 if you can identify that?
9     A   Yes, I can.
10     Q   What is that?
11     A   That's where we put in our -- what we
12 used medication-wise.
13     Q   Is that the RIS system?
14     A   Yes.
15     Q   Can you tell me what portion of that
16 screen, I guess, you would fill out, if anything?
17     A   We would validate the procedure and
18 then we put in all the drugs down here or
19 medications.
20     Q   Would you also put in the lot number?
21     A   We did.
22     Q   You can see this is for --
23     MR. SHAW:  Is this 14?
24     MR. BYRD:  Yes.

**Page 88**

1     MR. SHAW:  Thank you.
2
3 BY MR. BYRD:
4     Q   You can see the name of the patient
5 is Douglas Wingate?
6     A   Yes.
7     Q   What lot number did he have?
8     A   06292012.
9     Q   Did you -- did you fill out -- did
10 you fill in that information for Wingate down in. I
11 guess it's the bottom right-hand area?
12     A   Yes, I did, if I was the tech that
13 day.
14     Q   Do you know if you were the tech that
15 day?
16     A   It would be in the notes.
17     Q   In Dr. O'Brien's or Mathis' notes?
18     A   No. It would be on the interview
19 notes.
20     Q   Who prepares the interview notes?
21     A   I would have to see the form.
22     Q   Who is responsible for preparing the
23 form?
24     A   Depends on who is back there at the

**Page 89**

1 time. Typically Shawn would interview, and I would
2 sign off on what she gathered.
3     Q   I'm going to hand you what was marked
4 yesterday as Exhibit 8 and Exhibit 10. I'm going
5 to ask you if you can identify those?
6     A   Yes.
7     Q   Tell me what Exhibit 8 is and then.
8 if you would, tell me what Exhibit 10 is.
9     A   Eight is a consent form for the
10 procedure, and 10 is where we had interviewed the
11 patient.
12     Q   Did you fill out any part of Exhibit
13 8?
14     A   No, I did not.
15     Q   What about Exhibit 10?
16     A   No, did not.
17     Q   So from looking, is that -- are those
18 the sheets you were talking about earlier about the
19 interview?
20     A   Correct.
21     Q   From looking at those, then would it
22 be fair to say that you were not involved in
23 Mr. Wingate's injection?
24     A   That would be incorrect.

CASE NO.:
7:13-CV-162

(PSC) IN RE: NEW ENGLAND COMPOUNDING PHARMACY, INC., ET AL.

Defendants/Cross-Claim
Plaintiffs

DATE, 2014
10:03 A.M.

DEPOSITION OF:

WITNESS NAME

CENTRAL VIRGINIA REPORTERS
P.O. BOX 12608
ROANOKE, VA 23027

Page 46

A.   No patient that I picked up.

Q.   Okay.   And then there is this one time, does that last part that he's there for one shot?

A.   That means that his prescription or his order was for one injection.

Q.   And at this point when you were looking at him ... did you have already seen his prescription or are you just asking him?

A.   I would have received it with the package.

Q.   Okay.   And in this case -- let me show you Exhibit 7 that come in earlier.

A.   Okay.

Q.   Is that the order form for Mr. Wingate or the prescription?

A.   Yes.

Q.   So, as part of your job in the patient ... you would have seen a copy of that, so you ... looking at that as you are talking to the patient?

A.   Correct.

Q.   And then there is another line on here that shows who their referring physician is and that is just whoever did the order, correct?

A.   Correct.

---

Page 48

... received contrast, so I must not have returned back up to it.

Q.   All right.   What was Mr. Wingate's chief complaint?

A.   His chief complaint -- ... left side neck, lateral shoulder, lateral ... to ... pain.

Q.   All right.   And you don't specifically remember any conversations you had with him that day?

A.   No, nothing that I have not written down.   I would not remember anything else.

Q.   Okay.   All right.

A.   Up here I put that "one time" where I wrote "return to doc if not released", so I would have told him because he was ordered for one injection that he would need to follow-up with his physician.

Q.   All right.   And then under ... Assessment Record there is --

A.   Assessment Record ...

Q.   The radiologist would be Room 17B, huh?

A.   Correct.

Q.   And you would confirm that he had someone to drive him?

A.   Correct.

Q.   And then what does "Pain meds PRN" mean?

---

Page 47

Q.   And then what does the next entry mean, "No CSP?"

A.   "No CSP."   The next entry refers -- it says.   ... and I see these are dates and types.

Q.   All right.

A.   So, if the patient had a surgery in the body part that we were injecting you would record it.   If he did not have any, you would record that also.   So, I recorded that he had no cervical spine surgery.

Q.   Okay.   And then under "Allergies" it says, "NKDA"?

A.   That stands for no known drug allergies.

Q.   And the contrast allergy, there's a question mark.

A.   I had put a question mark.

Q.   He didn't know if he was allergic to any contrast materials?

A.   I don't remember exactly why I put that at the time.

Q.   Okay.

A.   I have a theory, but it's not positive.

Q.   What is your theory?

A.   Well, to the best of my recollection I would ... he said that he wasn't sure and then I put in when he ...

---

Page 49

A.   I would inquire about any medication he was taking at the time and he would have told me the medications.   If he did not know the exact name of his medication I would just write what the medication was for.   So, he was taking prn meds and PRN means as needed.

Q.   Okay.   And then you have a certain series of questions about medical history that you would ask each patient, correct?

A.   Correct.

Q.   And would you personally take his blood pressure?

A.   Correct.

Q.   And you did that that day and recorded his actual blood pressure?

A.   Yes.

Q.   All right.   What does the "RM" mean?

A.   Roanoke Memorial.

Q.   That is where he had had his previous ESI?

A.   Yes.

Q.   Okay.   And then are these your initials in the right-hand corner where it says "Injectionist Signature"?

A.   Uh-huh.

Q.   Okay.   Now, this next document -- did I give you that on ...

Page 58

```
 1         Q    the same.
 2         Q    And that's where this patient was to receive
 3    his ESI, correct?
 4         A    Correct.
 5         Q    And did -- was the procedure in the prep room
 6    different if they were, for example, going to be a lumbar ESI?
 7         A    No, it was the same.
 8         Q    Same needles, same --
 9         A    What do you mean?
10         Q    I mean, would the prep tray look the same?
11         A    No.
12         Q    Okay. Tell me how it would be different?
13         A    There would be different medications on the
14    prep tray. Each procedure requires a different thing.
15         Q    Can you give me some examples?
16         A    For example, there it a thing a we a one called
17    Marcaine. You would not give Marcaine to a patient receiving
18    a cervical epidural. You would give Marcaine, to a patient
19    receiving a lumbar epidural. Besides that, it's pretty much
20    the same.
21         Q    Do you know why that is?
22         A    Yes. Well, I believe that I do.
23         Q    What is your understanding?
24         A    Marcaine is a numbing agent anesthetic and you
```

Page 60

```
 1    a ... that you g... ... ... ... ... ... so I
 2    know the proper word for the tail.
 3         Q    Okay. The syringe we did have a tail?
 4         A    It's a connector. It would be to connect the
 5    epidural needle to the syringe with the contrast in it.
 6         Q    All right. And would all of these --
 7         A    There's more.
 8         Q    Go ahead. Well, can I stop you for a second?
 9    Would all of those things that you just described be on the
10    tray already when you opened it or would you --
11         A    No, that's what I made.
12         Q    All right. So, you are making this tray with
13    these items, where did you get the items that you described so
14    far, the syringes, the Lidocaine?
15         A    You mean ultimately? What do you mean by where
16    did I get them?
17         Q    When you are creating this tray, where are you
18    retrieving these things from?
19         A    in my room, in the drawer.
20         Q    Okay. All right. And so this tray, before you
21    start this procedure, is covered with a white drape or do you
22    cover it?
23         A    I cover it with a white drape. It starts with
24    the silver rail tray on wheels.
```

Page 59

```
 1    was don't want to inject that cervical in case it could make
 2    some nerves.
 3         Q    All right. So, in your job in the actual
 4    procedure room --
 5         A    Okay.
 6         Q    -- you described preparing a --
 7         A    Sterile tray.
 8         Q    -- a sterile tray?
 9         A    Uh-huh.
10         Q    What all would be on a sterile tray?
11         A    Okay. On the sterile tray you would have a --
12    first of all, you would have a sterile white drape. Then all
13    the following items I'm going to refer to are sterile.
14         Q    Okay.
15         A    So, you would have for this. The cervical  you
16    would have a 10cc syringe with a 25 gauge needle attached to
17    it with --
18         Q    25 gauge?
19         A    The label. Blue. That would have Lidocaine,
20    fingers to film, bicarbonate in it. To the right of that an
21    the tray you would have a tourniquet. To the right of that on
22    the tray you would have the epidural needle.
23         Q    Okay.
24         ?    To the right of that you would have contrast
```

Page 61

```
 1         Q    On wheels?
 2         A    Yes.
 3         Q    Okay. I get it.
 4         A    So, when I open the epidural tray it's covered
 5    in a white sterile cloth. That's the first thing, when you
 6    open it I too spread that out.
 7         Q    Okay.
 8         A    And inside would be the tray with your needles
 9    and syringes in it.
10         Q    I get it.
11         A    And then you would then transfer, you know, the
12    pharma vehicles for whatever you were doing into the syringes
13    and then lay them on the tray.
14         Q    All right. So, let's go -- you were telling me
15    what else was on the tray and I stopped you at the contrast
16    and you were describing a connector tail.
17         A    Correct.
18         Q    And that's where we ended.
19         A    And then to the right of that would have been
20    the contrast.
21         ?    ... that that would not have to even without
22         ?    It was different with various ... whatever ...
23    that you make a needles.
24         Q    All right. So, once you would have and my what it
```

Q [illegible]
What happens once he gets contrast?
A Once he gets contrast -- do you know what I forgot to tell you, he would numb it first. He would do the numbing. He would do the [illegible] and then he would [illegible] numbing stuff. He would tell the patient: Here's a little stick and a sting, we're going to give you the numbing [illegible]. Then he would give the numbing agent and then [illegible] it around and then he would find the exact spot that he wanted and then he would insert his needle.
Then he would take a shot and look at it and that would be a continuous pattern until he got exactly where he thought he wanted it as far as position.
Then I would rotate the camera to the right or the left so that he could then see how deep he was going. Do you know what I'm saying?
Q Right.
A Because from the top you can't tell.
Q Right.
A So then once again he would be taking pictures as he is doing it just to see where he's going.
Q Okay.
A Once he has established that he's in the correct position, you inject a little bit of contrast and he

would look up on the screen to make sure it looked like it was supposed to look.
Q Now, what do you see on the screen, if you have ever seen it, when the contrast goes in?
A I just see black. I see a black line.
Q Okay. But that tells him where he is?
A Uh-huh, it tells the physician where he's at. Then he tells the patient: Are you okay? I found the right spot. I'm going to be giving you the medicine. You could have some pressure or pain while we are doing this. Keep me informed.
Then he gives them the steroid. Then when he is done, he puts his things over.
Q When he's done he takes his syringe --
A Correct, he takes his syringe out, [illegible] the needle, and he drops it on the sterile tray and he picks up a white cloth, you know, a sterile thing, and he puts it over top of the site and then holds some pressure [illegible].
Q The doctor himself puts some pressure [illegible]?
A Uh-huh.
Q All right.
A And then when he's done, I [illegible] will [illegible] and the doctor will leave and [illegible] [illegible].

Q [illegible] Typically, this procedure [illegible], from when the doctor comes in to [illegible]?
A Well, it's very variable.
Q [illegible]
A [illegible] depends on the patient, the difficulty [illegible], whether they've had [illegible]. It's [illegible] variable.
Q Okay. What is the shortest you would estimate?
A Maybe the shortest would be 15 minutes.
Q Okay. And the longest reasonably?
A Maybe a half -- well, for the patient total in [illegible]. I once had a patient, you know, almost pass out one time, so that patient was in there about a half-hour.
Q Why would somebody almost pass out?
A [illegible]
Q [illegible]?
A [illegible] a lot of patients [illegible] something like that. They haven't eaten, [illegible] reasons.
Q Okay. So this prep that you described, it sounds pretty detailed?
A Uh-huh.
Q Had you done things like that before at your

[illegible]?
A [illegible]
Q Okay. And it is something that you take very [illegible]?
A [illegible]
MR. [illegible]: Let's go off the Record for a [illegible].

(A recess was taken. Following the recess the Parties returned to the [illegible] and the Deposition continued.)

BY MR. [illegible]:
Q [illegible] back from our break, Mrs. Boros. I'm [illegible] the documents that were marked earlier as Exhibits [illegible] and [illegible]. Do you have those before you?
A [illegible]
Q Okay. All right. Do you recognize these [illegible]?
A [illegible]
Q [illegible] Exhibit 13 is [illegible]
[illegible] always some sort of confusion [illegible] they had their injection,

Q    Approximately how many times would you say you have spoken to Paul Hellkamp about the missing microbiology reports?

A    Approximately how many times?  Separate times or do you mean for the same day?

Q    Well, it could be separate times on the same day.

A    Five or six.

Q    When is the most recent time you recall speaking to Mr. Hellkamp about the missing microbiology reports?

A    To him?  To him or with him?

Q    With him.

A    Be more specific.

Q    When is the last time you recall speaking with Paul Hellkamp about the missing microbiological reports or reports that were reported?

A    Sunday.

Q    And do you recall what you said to Mr. Hellkamp or what he said to you about those reports?

     MR. SHAW:  I am going to object to the extent that it calls for discussion had with the attorney and attorney/client privilege.

---

2        A    Yes.

3        Q    Okay.  And did you have a role in determining this, for entry is starting a little low, we better order some more?

5        A    Yes.

6        Q    What kind of rule of thumb would you use to think: Hey, I better keep some more of his medicine.

9        A    When you had 100 bottles left.

10       Q    Okay.  In the months leading up to the methylprednisolone — strike that.  In the months leading up to the meningitis outbreak —

13       A    Okay.

14       Q    — and specifically in the two months prior to that, did you order the medication from NECC?

16       A    What two months would that have been?

17       Q    That would be August and September.

18       MR. SEXTON: Of 2012.

19       MR. SEXTON: Of 2012, yes.

20       THE WITNESS:  I would have to see the schedule and when I was at — I don't think I did, but I would have to see the schedule to be a 100-percent sure.

---

BY MR. SEXTON:

Q    Okay.  Let me just ask you some foundational questions for this if I can.  In the last conversation that you were attending that you had with Paul Hellkamp about this issue was counsel present?

A    Yes

Q    Okay.  And prior to that conversation where counsel was present can you just roughly tell me when was the next to the last conversation that you remember having with Paul?

A    That would be really hard to establish.

Q    You can tell me by months, too.

A    It's really hard to establish when it was over, the issue was over, you know.

Q    We looked and we can't find it —

A    Yeah.

Q    Have you ever worked with a lady named Mary Cormier?

A    No.

Q    While you were working in the pain management ... would ever have my occasions where you would ... at a glorified store next to the ESI drug?

A    We, not that I can recall, but I can't remember.

Q    As you are recalling it, would there have ...

---

BY MR. SEXTON:

2        Q    And do you recall, with regard to the lots that had missing microbiological reports, if you were the technician, personally ordered and did receive that one from New England?

5        A    I wouldn't remember that either.  I would have no way of knowing that.

8        Q    Were there records that were kept when you-all would order these medications from New England?

10       A    Yes.  I would keep a record of that.

11       Q    Okay.  Would you keep the order form that you faxed to them?

13       A    I would keep a copy of the form and a copy of the order I sent that I had sent.

15       Q    And how would you file that?

16       A    I would file that in the pain management ... in our pain management in that file cabinet that I told you about before.

18       Q    Right.  And was this a folder for these orders?

20       A    ...

21       Q    Okay.  And how ... on the ... for those ... state the destinations upon approval, once you're sending it?

23       A    In the front or the door?  I don't know if ...



THE AMERICAN REGISTRY OF
RADIOLOGIC  TECHNOLOGISTS®
USE ORIGINAL CARD FOR VERIFICATION

I.D. Number                                                                              Valid Thru End Of

291569                                                                                    JUN-2014

KAREN F DE LONG, R.T.(R)(CT)(VI)(ARRT)
2438 WESTOVER AVE SW
ROANOKE, VA 24015-2221

                                                                              CE Biennium
                                                                              06/01/2013
*Status-In CE Compliance                                     05/31/2015
                                                                                         15$

# COMMONWEALTH OF VIRGINIA
## DEPARTMENT OF HEALTH PROFESSIONS
*Dianne L. Reynolds-Cane, M.D., Director*

William L. Harp, M.D.
Executive Director
(804) 367-4600

### BOARD OF MEDICINE

9960 Mayland Drive, Suite 300
Richmond, VA 23233-1463
www.dhp.virginia.gov/medicine

License to Practice As A
Radiologic Technologist

Karen Delong

Issued
09/09/1997

Expires
06/30/2015

Number
0120001400

To Provide Information or File a
Complaint About a Licensee, Call: 1-800-533-1560

Verify Credentials | ARRT - The American Registry of Radiologic Technologists          Page 1 of 1

## ARRT - VERIFY CREDENTIALS

NOTE: This directory is continuously updated throughout the day. The ARRT provides this information regarding technologist registration status and considers it to be a primary source of Registered Technologist verification.

| | |
|---|---|
| Name | SHARON L BOROS |
| City, State, Zip | ROCKY MOUNT, VA 24151-5403 |
| Credentials | R.T.(CT)(ARRT) |
| Valid Thru | 2/2014 |
| CE Biennium | 2/1/2013 to 1/31/2015 |

Credential Description

Copyright 2013 The American Registry of Radiologic Technologists®

PLEASE VERIFY THAT ALL INFORMATION IS CORRECT. NOTE
ANY CORRECTIONS ON THE REVERSE SIDE OF THIS FORM.

ARRT ID# 276882

THE AMERICAN REGISTRY OF
RADIOLOGIC TECHNOLOGISTS®
USE ORIGINAL CARD FOR VERIFICATION

Valid Thru End Of

FEB-2013

CE Biennium
02/01/2011
01/31/2013

I.D. Number
276882

SHARON L BOROS, R.T.(CT) (ARRT)
223 CROSSBOW LN
ROCKY MOUNT, VA 24151-5403

•Status-In CE Compliance•

SEE BACK OF CARD FOR REGISTRATION CATEGORIES

BEND & LIFT

THE AMERICAN REGISTRY OF
RADIOLOGIC TECHNOLOGISTS®

1255 NORTHLAND DRIVE
ST. PAUL, MN 55120-1155
TELEPHONE (651) 687-0048
www.arrt.org
Your CE Biennium Period is :
2/01/2011 Thru 1/31/2013

SHARON L BOROS, R.T.
223 CROSSBOW LN
ROCKY MOUNT, VA 24151-5403

Categories Renewed: CT



COMMONWEALTH OF VIRGINIA
DEPARTMENT OF HEALTH PROFESSIONS

*Diane L. Reynolds-Cane, M.D., Director*

9960 Mayland Drive, Suite 300
Richmond, VA 23233-1463
www.dhp.virginia.gov/medicine

Number
0120007424

BOARD OF MEDICINE

License to Practice As A
Radiologic Technologist
Sharon Boros

Expires
02/28/2015

To Provide Information or File a
Complaint About a Licensee, Call: 1-800-533-1560

William L. Harp, M.D.
Executive Director
(804) 367-4600

Issued
03/31/2013

V I R G I N I A:

IN THE CIRCUIT COURT
FOR THE CITY OF ROANOKE

- - - - - - - - - - - - - - - -

SHARON G. WINGATE,                    :
Executor of the Estate of             :
DOUGLAS GRAY WINGATE,                 :
Deceased,                             :
                                      :
        Plaintiff,                    :
                                      :   Case No.: Cl12-2547
vs.                                   :
                                      :
INSIGHT HEALTH CORP.,                 :
                                      :
        Defendant/                    :
        Cross-Claim Defendant,        :
                                      :
vs.                                   :
                                      :
JOHN M. MATHIS, M.D., ROBERT          :
F. O'BRIEN, M.D., and IMAGE           :
GUIDED PAIN MANAGEMENT, PC,           :
                                      :
        Defendant/                    :
        Cross-Claim Plaintiff,        :

- - - - - - - - - - - - - - - -

MAY 22, 2013
9:30 A.M.

DEPOSITION OF:

ROBERT F. O'BRIEN, MD

CENTRAL VIRGINIA REPORTERS
P.O. BOX 12628
ROANOKE, VA 24027
(540) 380-5017

bd481722-8b92-42f3-8952-935291178ca7

1    Q    Now, there are other people who work at the

2  Franklin Road facility; is that right?

3    A    That's right.

4    Q    And those people, like Karen DeLong and Sharon

5  Boros, are employees of Insight?

6    A    That's correct.

7    Q    And they had responsibility for drawing

8  medications that would be used in the ESIs?

9    A    Yes.

10    Q    And you were I guess relying on those

11  employees of Insight to carry out those functions and do it

12  appropriately?

13    A    Yeah.  I rely on the entire setup that

14  precedes my involvement; the ordering of the medicines, the,

15  the scheduling of the patient, the checking to see that the

16  order and the, if there's a precert, precertification

17  requirement, all that stuff is in order, and that there's a

18  sterile tray, and that the lights are working in the room,

19  and that the computer's there.  So everything that precedes

20  my involvement I depend upon other people.

21    Q    And you relied on or did you rely on Insight

22  to purchase the medication and to purchase safe medication?

23    A    Yes, absolutely.

24    Q    When Sharon Boros came on staff at Insight,