UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  NEW ENGLAND COMPOUNDING     )   MDL NO. 13-02419-RWZ
PHARMACY CASES LITIGATION           )
                                    )
                                    )
                                    )
                                    )
                                    )
                                    )


BEFORE:  THE HONORABLE RYA W. ZOBEL


**STATUS CONFERENCE**


John Joseph Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, MA 02210


September 18, 2014
3:00 p.m.


Catherine A. Handel, RPR-CM, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 5205
Boston, MA 02210
E-mail: hhcatherine2@yahoo.com

```
 1      APPEARANCES:

 2      For The Plaintiffs:

 3           Hagens, Berman, Sobol, Shapiro LLP, by KRISTEN JOHNSON,
        ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, MA 02142;
 4

 5           Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K.
        MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, NY
 6      10013-1413;

 7

 8           Lipton Law, by MARC E. LIPTON, ESQ., 18930 West Ten Mile
        Road, Southfield, MI 48075;

 9

10           Janet, Jenner & Suggs, LLC, KIMBERLY A. DOUGHERTY, ESQ., 75
        Arlington Street, Suite 500, Boston, MA 02116;

11

12           Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ., 366 Elm
        Avenue, SW, Roanoke, VA 24016;

13

14           Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,
        IV, ESQ., and BEN GASTEL, ESQ., ESQ., 227 Second Avenue North,
        Nashville, TN 37201-1631;

15

16           Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
        Street, Suite 500, Boston, MA 02114;

17

18

19

20      FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

21           Brown Rudnick, by DAVID J. MOLTON, ESQ., Seven Times Square,
        New York, NY 10036;

22

23           Brown Rudnick, by KIERSTEN A. TAYLOR, ESQ., One Financial
        Center, Boston, MA  02111;

24

25      (Appearances continued on the next page.)
```

1    <u>For the Defendants:</u>

2        Harris Beach PLLC, by FREDERICK H. FERN, ESQ., 100 Wall
     Street, New York, NY 10005;
3
         Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ.,
4    1150 Huntington Building, 925 Euclid Avenue, Cleveland, OH
     44115-1414;
5
         Sloane & Walsh LLP, by ROBERT H. GAYNOR, ESQ., Three Center
6    Plaza, Boston, MA 02108;

7        Todd & Weld LLP, by CORRINA L. HALE, ESQ., 28 State Street,
     31st Floor, Boston, MA 02109;
8
         Ulmer & Berne LLP, by JOSHUA A. KLARFELD, ESQ., 1660 West
9    2nd Street, Suite 1100, Cleveland, OH 44113-1448;

10       Hermes, Netburn, O'Connor & Spearing, P.C., by PETER G.
     HERMES, ESQ., and DIANNE E. RICARDO, ESQ., 265 Franklin Street,
11   7th Floor, Boston, MA 02110-3113;

12       Michaels, Ward & Rabinovitz LLP, by DANIEL M. RABINOVITZ,
     ESQ., One Beacon Street, Second Floor, Boston, MA 02108;
13
         Goodwin Procter LLP, by JAMES REHNQUIST, ESQ., and ROBERTO
14   M. BRACERAS, ESQ., Exchange Place, 53 State Street, Boston, MA
     02109;
15
         Smith Duggan Buell & Rufo LLP, by MATTHEW J. WALKO, ESQ.,
16   Three Center Plaza, Suite 800, Boston, MA 02108;

17       BLUMBERG & WOLK, by CHRISTOPHER M. WOLK, ESQ., 158 Delware
     Street, P.O. Box 68, Woodbury, NJ 08096;
18
         McGuire Woods LLP, by CHRISTOPHER TRIBLE, ESQ., One James
19   Center, 901 E. Cary Street, Richmond, VA 23219;

20       Fulbright & Jaworski LLP, by ADAM T. SCHRAMEK, ESQ., 98 San
     Jacinto Boulevard, Suite 1100, Austin, TX;
21

22   <u>FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
     NECP, INC.:</u>
23
         Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
24   Street, Suite 2400, Boston, MA 02110-1724;

25

```
1                      P R O C E E D I N G S
2          (The following proceedings were held in open court before
3    the Honorable Rya W. Zobel, United States District Court Judge,
4    United States District Court, District of Massachusetts, at the
5    John J. Moakley United States Courthouse, One Courthouse Way,
6    Boston, Massachusetts, on September 18, 2014.)
7              THE COURT:  Now I'm having a conversation with eight
8    other people that doesn't include you.
9              Now, for the Plaintiffs' Steering Committee, Ms.
10   Parker.  I'm sorry, I kept calling you by your former name all
11   day yesterday.
12             MS. JOHNSON:  That's perfectly fine, your Honor.
13   It's Ms. Johnson.
14             THE COURT:  You prefer Johnson or Parker?
15             MS. JOHNSON:  Johnson.
16             THE COURT:  Johnson.  Then I was right yesterday and
17   wrong today.
18             And Mr.?
19             MR. STRANCH:  Stranch.
20             THE COURT:  Stranch.
21             MR. GASTEL:  Mr. Gastel, Ben Gastel, on behalf of
22   plaintiffs, your Honor.
23             THE COURT:  Okay.
24             MR. LIPTON:  Marc Lipton, your Honor.
25             COURTROOM DEPUTY CLERK URSO:  Are you going to speak?
```

```
 1              MS. DOUGHERTY:  I don't anticipate unless there are
 2    any questions about --
 3              COURTROOM DEPUTY CLERK URSO:  Okay.  There's not.
 4              MS. DOUGHERTY:  There's not enough chairs, but Kim
 5    Dougherty on behalf of the Plaintiffs' Steering Committee.
 6              THE COURT:  I'm sorry?
 7              MS. DOUGHERTY:  Kim Dougherty on behalf of the
 8    Plaintiffs' Steering Committee as well.
 9              THE COURT:  Okay.  Thank you.
10              Now for the defendants.
11              MR. FERN:  Your Honor, good afternoon.  Frederick
12    Fern.
13              THE COURT:  Mr. Fern, okay.
14              MR. GAYNOR:  Robert Gaynor, your Honor.
15              THE COURT:  I'm sorry, your last name?
16              MR. GAYNOR:  Gaynor.
17              THE COURT:  Gaynor?
18              MR. GAYNOR:  Gaynor with a G.
19              MR. RABINOVITZ:  Dan Rabinovitz for Medical Sales
20    Management, Inc., your Honor.
21              MR. KLARFELD:  Good afternoon, your Honor.  Joshua
22    Klarfeld on behalf of GDC.
23              THE COURT:  Your last name?  I'm sorry.
24              MR. KLARFELD:  Klarfeld.
25              THE COURT:  Klarfeld?
```

```
 1              MR. KLARFELD:  Yes, ma'am.

 2              MR. MORIARTY:  Good afternoon, your Honor.  Matthew

 3      Moriarty for Ameridose.

 4              THE COURT:  This case has to go on long enough so

 5      that I get to remember everybody's name.  Of course, by that

 6      time I'll be incompetent.

 7              (Laughter.)

 8              THE COURT:  All right.  Now for the bankruptcy guys.

 9              MR. GOTTFRIED:  Michael Gottfried for the trustee.

10              MS. TAYLOR:  Kiersten Taylor for the creditors'

11      committee.

12              MR. ELLIS:  Rick Ellis for plaintiffs.

13              THE COURT:  I'm sorry.  Your last name?

14              MR. ELLIS:  Rick Ellis for plaintiffs.

15              THE COURT:  Oh, Mr. Ellis.

16              MR. ELLIS:  Yes.

17              MR. TRIBLE:  Good afternoon, your Honor.  Chris

18      Trible for Insight Health Corp.

19              THE COURT:  Okay.  And over here.

20              MR. HERMES:  Peter Hermes, your Honor, for Liberty

21      Industries.

22              MS. RICARDO:  Diane Ricardo for Liberty Industries.

23              THE COURT:  And Mr. Braceras and -- oh, yes.  Mr.

24      Braceras and Mr. Rehnquist for --

25              MR. REHNQUIST:  Unifirst.  Good afternoon, your
```

1    Honor.

2              THE COURT:  That's it, right, for those directly

3    participating?  Ms. Johnson.

4              MS. JOHNSON:  Thank you, your Honor.

5              First, I will turn to the status of the mediation

6    efforts and I would like to just sketch an overview of the

7    parties who are participating in mediation or actively trying

8    to resolve claims against them.

9              First, we have entities and individuals who settled

10   through the NECC bankruptcy settlement.  Those include NECC,

11   the Caddens, the Conigliaros and NECC's insurers.  Then we

12   have defendants who are mediating through bankruptcy channels.

13   Those include national defendants, ARL, Victory, and Unifirst.

14   There are also clinic defendants who are mediating.  Those

15   include Inspira, Insight and High Point Surgery Center.

16             THE COURT:  Those are the Virginia cases?

17             MS. JOHNSON:  Insight is the Virginia cases.  High

18   Point Surgery Center is from North Carolina and they are new

19   entries to the mediation program.

20             Then there are two defendants who are otherwise

21   actively trying to resolve claims against them.  That would

22   include Michigan Pain Specialist, which I believe Mr. Lipton

23   may want to address, and Liberty and Mr. Hermes may want to

24   address that with the Court.

25             So, who are the litigating defendants if those are

1   the mediating or otherwise settling defendants?  And with the

2   Court's permission, I'll hand up an exhibit.

3                (Attorney Johnson hands documents to the Court.)

4                MS. JOHNSON:  So, currently, your Honor, all of the

5   national defendants are either in mediation or, in the

6   instance of Mr. Hermes' client, Liberty, trying to resolve

7   claims against them, which leaves us with clinic defendants.

8                And if you take a look at what I've sent up, this is

9   a list prepared by counsel.  I sure hope it's accurate, but

10  I'm not going to swear.  We may have missed a case or two,

11  despite our best efforts, but this was an effort to identify

12  the number of cases filed against each clinic who is a named

13  defendant in the MDL.

14               You'll notice here that there are ten clinics who are

15  named as a defendant in a single case, in a single civil

16  action.  There are six clinics that are named in two civil

17  actions.  There are three clinics that are named in three

18  civil actions, and a single clinic who is named in four civil

19  actions.

20               So, if you look at the list, we've drawn a big black

21  line there.  There are five clinics who are named in ten or

22  more civil actions in the MDL.  Those include St. Thomas,

23  Insight, which is the Virginia cases your Honor mentioned, and

24  Insight, again, is mediating; Specialty Surgery Center, which

25  is a Tennessee clinic defendant; Premier, which is a New

1    Jersey clinic; and Inspira, who is also mediating.

2            Three of those clinics who are not mediating there

3    were the subject of an order entered by this Court dealing

4    with motions to dismiss and other dispositive motions

5    recently.  So, that's the landscape, your Honor.

6            THE COURT:  Do you anticipate there to be more cases

7    filed against those below the black line or does this appear

8    to be the ultimate -- more or less, the ultimate universe?

9            MS. JOHNSON:  It's a little difficult to say for a

10   couple of reasons, your Honor.  There are two-year statute of

11   limitations that are coming up soon.  I'll be vague and not

12   give my personal opinion on when those run, but certainly

13   cases may be filed soon.

14           There has also been decisions by some plaintiffs here

15   to file cases against clinics separately in state court

16   proceedings.  In those instances where a plaintiff has named a

17   clinic defendant in a state court proceeding, those cases

18   likely will stay in state court and not be subject to this

19   Court's order on transfer.

20           For some states, Indiana in particular, there are a

21   number of cases against Indiana clinics filed and proceeding

22   in Indiana state courts quite actively.  So, for example, not

23   to pick on Indiana, I don't expect we'll see a large influx of

24   Indiana cases.

25           One thing I should be -- let me finish.  There are

```
 1    also six-year statute of limitations involved in this case.
 2    So, I can't speak to and have not had conversations, frankly,
 3    with plaintiffs' lawyers from the six-year states to have a
 4    sense of whether they intend to bring cases to the MDL or to
 5    stay in state court.
 6             I should mention that this list that I've provided
 7    you does not speak, for example, to the number of cases filed
 8    against Unifirst or other national defendants.
 9             I do want to be clear with the Court that there were
10    more cases filed in this MDL than this list may suggest.  This
11    is just an effort to break out the clinic specific defendants.
12             THE COURT:  Okay.  All right.  Is there anything that
13    the Court should do with respect to the mediation efforts of
14    any of the defendants and plaintiffs?
15             MS. JOHNSON:  I'll let Mr. Hermes speak to that.  I
16    can see him standing up.
17             MR. HERMES:  Your Honor, if I may.
18             Liberty has made a settlement proposal and I think
19    it's fair to say it's met with mixed results.  Mr. Lipton can
20    describe the position of Plaintiffs' Steering Committee with
21    respect to that.  My client --
22             THE COURT:  What is Liberty's position in this?
23             MR. HERMES:  Liberty supplied the walls, floors --
24    the walls and the ceilings for the clean rooms in which the
25    product was compounded.  Last was on the site in 2008.
```

1          THE COURT:  Well, Liberty is the entity that made the

2     offer of judgment?

3          MR. HERMES:  Correct, your Honor.

4          The point I would make is the last time we were here,

5     I suggested that perhaps we needed one more party to get to a

6     yes, and the Court, I believe, offered its assistance or

7     indicated it might be willing to offer assistance to the

8     parties to see if we could get to yes.  I think we're in a

9     position where my client would like that assistance from the

10    Court, if we can.

11         The alternative is that my client has filed one

12    motion for summary judgment.  The count of cases as of today

13    is 136.  It will be filing motions in those cases, and it has

14    a problem that the summary judgment deadline in its insurance

15    case is mid January of 2015.  In that case, my client is faced

16    with a fungus exclusion, an organic pathogen exclusion, and an

17    installation exclusion.

18         The money that is available now, I can guarantee,

19    will not be available very much longer because it's just a

20    very problematic insurance case and the insurer may decide to

21    devout its resources to its declaratory judgment action.  If

22    it's to be done, it needs to be done now, your Honor.  So, if

23    the Court can assist us, fine.  If not, there's another tact.

24    I have to try and pull off several series of miracles on

25    behalf of my client before the insurer cuts off the flow of

1    dollars.  So, that's the situation in which it finds itself.

2              THE COURT:  Mr. Lipton.

3              MR. LIPTON:  Your Honor, I think Mr. Hermes -- I

4    think Mr. Hermes summarized it well.

5              THE COURT:  Why don't you sit down and talk into the

6    microphone.  You can pull it toward you.  There you go.

7              MR. LIPTON:  Mr. Hermes summarized it well.

8              The PSC is more than, you know, comfortable meeting

9    with the Court in however the Court handles that, here, in

10   chambers, outside chambers, on the record, off the record, in

11   an effort to try to bridge whatever gaps remain between the

12   four entities that were involved in the facilitation of

13   Liberty.

14             THE COURT:  Okay.  Let me think about that.  I'm a

15   bit reluctant to be a mediator.  When I was talking about

16   providing help, I was not thinking about actually mediating a

17   result, but there's no reason why I couldn't get a magistrate

18   judge, for example, to do that if the parties are willing.

19             MR. GOTTFRIED:  Your Honor, the only thing I would

20   say to the Court is that the parties did participate in a

21   mediation, which has been terminated.  So, mediation was

22   attempted by these parties.  Liberty has withdrawn from the

23   mediation.  Obviously, if the Court wants us to see a

24   magistrate judge, the trustee would participate, but, you

25   know, we have mediated.

```
 1              THE COURT:  Well, maybe what I should do is think
 2      about it and talk to the parties involved separately and see
 3      what they have in mind.
 4              MR. LIPTON:  That's probably best.  At least that's
 5      fine by the PSC, your Honor.
 6              THE COURT:  So, that's what we'll do.  We'll have a
 7      conversation simply to understand what you have in mind so
 8      that I can understand that I can properly do this and still
 9      run the case.  That's my concern, okay?
10              MR. HERMES:  Thank you, your Honor.
11              THE COURT:  And I'll let you know about that.  Ms.
12      Urso will suggest times to you when we might have a telephone
13      conference or something like that or even get together in
14      person.  All right?
15              Now, what's next, Ms. Johnson?
16              MS. JOHNSON:  That brings us to No. 2, your Honor,
17      the status of insurance declaratory judgment action.  Mr.
18      Hermes has addressed 2(b) dealing with the Liberty declaratory
19      judgment action.
20              There are also declaratory judgment actions going on
21      in this courthouse before Judge Saylor involving Ameridose's
22      insurance coverage.  Those actions are, as I understand it,
23      currently stayed with the status conference scheduled for
24      November 24th.
25              THE COURT:  Stayed pending what?
```

1          MS. JOHNSON:  I believe it's stayed pending a change

2     in circumstances, your Honor.

3          THE COURT:  Okay.

4          MS. JOHNSON:  But Judge Saylor has indicated that he

5     intends to meet regularly on those and as soon as something

6     shifts, he will take up those issues.

7          THE COURT:  Okay.

8          MS. JOHNSON:  I think that brings us to No. 3, status

9     of discovery.  Judge Boal issued a series of orders this

10    morning, including MDL Order 9 and 10 that deal with much of

11    the discovery that is set out in this agenda.  So, I would

12    suggest that 3(a)(i), the PSC's motion to lift stay against

13    the affiliated defendants, and 3(a)(ii), Liberty's motion to

14    lift discovery stay against the affiliated defendants, have

15    both been resolved by those motions.  They were both denied

16    without prejudice.

17         With reference to, let's see, 3(a)(iii), which is the

18    trustee's motion for entry of an order limiting discovery and

19    staying the proceedings with respect to the NECC insiders and

20    related settling parties, that motion, your Honor, I believe,

21    is in front of you and I expect that the trustee's counsel may

22    wish to be heard on that.

23         THE COURT:  Okay.

24         MR. GOTTFRIED:  May I be heard, your Honor?

25         THE COURT:  Yes.

1           MR. GOTTFRIED:  Thank you, your Honor.

2           As the Court is aware, we filed our motion for entry

3    of the stay on August 14th, following the approval of the

4    settlement agreement by bankruptcy court under Rule 9019.  The

5    stay that we sought was precisely the stay that we agreed to

6    seek in the settlement agreement and which both the PSC and

7    the creditors' committee supported and ultimately Judge Boroff

8    approved.  It's obviously for this Court to decide whether the

9    stay should be entered.

10          It's the trustee's position that the trustee strongly

11   urges the Court to enter the stay exactly as it appears in the

12   settlement agreement.  It believes that there are a number of

13   good reasons why the Court should do that.

14          First of all, it's important to note that the

15   discovery -- that the stay does not prevent discovery, but it

16   really allows the settling parties to get the benefit of the

17   bargain for coming up and settling the case, and it does that

18   by requiring that the discovery that does take place be

19   focused and narrow and not relate to establishing liability

20   ultimately and bringing a claim against these defendants, who,

21   if the settlement is ultimately approved as part of a

22   bankruptcy plan, will be getting releases, third-party

23   releases, but, rather, to the extent parties legitimately need

24   the discovery to pursue a defense they may have.

25          You've seen in some of the oppositions people have

1    suggested that they may want to assert comparative fault.  We

2    would say there's nothing about our stay as approved by the

3    bankruptcy court that would prohibit a party from seeking that

4    discovery and that the way to proceed is for the stay to be

5    entered, for the parties to meet and confer pursuant to the

6    rules, and see that -- whether in addition to the 44,000 pages

7    of documents that have already been produced, there are

8    additional items of discovery that they may need.

9           It would be our hope that those requests would be

10   targeted and focused and that we could simply agree to them

11   and the Court would not be accessed at all to deal with these

12   requests.

13          To the extent there is some disagreement between the

14   parties, whether it be with respect to the stay or just

15   generally whether the discovery is targeted and focused and

16   relevant, our view is that the best way for the Court to

17   address those questions is not in the abstract with objections

18   to our stay, but, rather, in the context of a specific request

19   after a meet-and-confer.

20          So, in terms of the orderly administration of the

21   case, our view is that the stay absolutely is salutary and

22   provides for that.

23          The stay also prevents cases from going forward

24   against these parties.  It prevents pre-judgment security.  It

25   prevents dispositive relief and, again, that's all salutary in

1   connection with encouraging parties to settle and for them to

2   get the benefit of the bargain.  So, we think that makes great

3   sense from a case administration standpoint.

4           It's the trustee's expectation that he will be filing

5   his plan at the end of this month and that that plan, assuming

6   that we're able to actually make that happen, might be heard

7   by Judge Boroff, at least in the first hearing, sometime in

8   early November we would anticipate.

9           So, in terms of the cases not proceeding against

10  these parties, we're probably talking ultimately about a

11  relatively short period of time where we should know, whether

12  it be four months or five months from now, that the plan has

13  been approved and is in place and they have their releases or

14  not.  So, I think the stay, again, makes sense with respect to

15  those issues in terms of the administration of the case.

16          THE COURT:  So, that is the issue that is also

17  covered in Paragraph 12(c) that starts on Page 3?

18          MR. GOTTFRIED:  Yes.

19          THE COURT:  At the bottom.

20          MR. GOTTFRIED:  Yes, your Honor.  This motion in the

21  agenda appears twice.  So, it's in this general report and

22  then it's also, obviously, in more detail with all the

23  relevant filings, are in 12(c), that is correct.

24          THE COURT:  Ms. Johnson, do the plaintiffs agree to

25  such a stay, limited stay and limited discovery order?

```
 1              MS. JOHNSON:  They do, your Honor.  The Plaintiffs'
 2    Steering Committee supports the motion and, in particular, the
 3    language that's included that provides that discovery shall be
 4    permissible to the extent the discovery is relevant to the
 5    prosecution, defense of claims against defendants other than
 6    the state parties, contributors and contributor and affiliated
 7    released parties.
 8              THE COURT:  Is there any reason why I can't decide it
 9    on the -- what appears to be fairly voluminous papers that
10    have been filed by those who object?
11              (No response.)
12              THE COURT:  Okay.  That one I should decide now?
13              MR. GOTTFRIED:  Yes, your Honor.
14              THE COURT:  Okay.
15              MS. TAYLOR:  Your Honor, just briefly for the record.
16    Kiersten Taylor for the creditors' committee.
17              I just want to put on the record that the creditors'
18    committee also fully supports the relief requested by the
19    trustee's motion.
20              THE COURT:  I got lots of allies, then, if I also
21    agree.  If I don't agree, then I got lots of allies on the
22    other side, do I not?
23              MR. GOTTFRIED:  Well, your Honor, if I can just say
24    two more things.  I understand you're going to decide it on
25    the papers.
```

1          One is, there are only three defendants who have

2     filed objections to this.  So, there's not lots of allies on

3     the other side.

4          And, second, I think it's important for you to know

5     that if this stay is entered, that triggers the funding of the

6     settlements, which is about $50 million could be funded if

7     this occurs.  So, there's a number of other salutary reasons

8     why entering the stay as the settlement agreement contemplates

9     and was carefully negotiated with the steering committee and

10    the creditors' committee for entering the stay, and certainly

11    urge the Court to do so.

12          THE COURT:  Okay.  Is there anyone here who wants to

13    be heard?  Mr. Hermes, you are an opponent, as I understand it.

14          MR. HERMES:  Your Honor, the point that was made in

15    Liberty's opposition was that to the degree Liberty needs to

16    prove liability or responsibility on the part of the settling

17    defendants in order to get an allocation of responsibility to

18    them in a case against it, it wants to be able to get

19    discovery with respect to that.  The language, in my opinion,

20    was unclear as to whether it would permit that.

21          I understand that there was a reply filed in which

22    the moving party has indicated that it doesn't object to that

23    kind of discovery.  In other words, to ask someone at NECC

24    about their responsibility so a jury might allocate a

25    percentage to them, not so that a judgment would be entered,

```
 1    but a percentage in reduction of Liberty's responsibility.
 2    That's the basis for the opposition.
 3               THE COURT:  Okay.
 4               MR. HERMES:  And I would ask that the Court recognize
 5    that objection and, apparently, some agreement with that in
 6    its action on the motion.
 7               THE COURT:  Okay.  So, that's up to me now.
 8               Next we have the ongoing discussions concerning
 9    common discovery?
10               MS. JOHNSON:  Yes, your Honor.
11               I believe most, if not all, of that was resolved by
12    Judge Boal's orders earlier this morning.  There are two
13    points of perhaps clarification that the Plaintiffs' Steering
14    Committee may be seeking from that order.
15               Since I understand -- well, the Plaintiffs' Steering
16    Committee hasn't decided exactly what format you put that in,
17    whether it's for reconsideration or clarification or even
18    appeal to your Honor.  If I could just flag those quickly for
19    you.
20               The first, the common discovery order provides that
21    plaintiffs shall serve plaintiffs' profile forms and medical
22    authorizations within 60 days, and the form of the profile
23    form has been agreed to and the authorizations are set.
24    There's no question of that.
25               There are plaintiffs in this MDL who are only
```

1    litigating against defendants that have either settled or

2    mediating or otherwise actively trying to resolve claims

3    against them.  We suggest it's a little unclear to the

4    Plaintiffs' Steering Committee whether a -- if a plaintiff is

5    not suing any litigating defendants but is suing only

6    defendants who are in the process of hopefully settling, does

7    that plaintiff need to complete a plaintiff profile form

8    within that 60-day window?

9          We can see reasons why perhaps they should.  We can

10   see reasons why perhaps they should not be required to do so.

11   It is quite a bit of work for victims who may not otherwise

12   need to do that.  So, that's one clarification we may be

13   seeking from the Court on that.

14         The second -- and I'll point out that that may apply

15   mostly to defendant Unifirst.  I've not spoken to counsel for

16   Unifirst on what their thoughts are about that.  So, we just

17   really put that out there for consideration.

18         The second has to do with initial disclosures.  The

19   order provides that the parties will serve initial

20   disclosures.

21         Conversations that the Plaintiffs' Steering Committee

22   has had with defense counsel in negotiating some of this

23   language, it was clear, I believe, that we were contemplating

24   one set of, let's call them, master initial disclosures, from

25   the plaintiffs' side for each defendant.  So, there would be a

```
1    Saint Thomas initial disclosures from the plaintiffs.  There
2    would be a Unifirst initial disclosures from the plaintiffs.
3            I think that's perhaps not as clear from the language
4    of the order, but I would want to confirm with Judge Boal and
5    the parties, of course, that that's what everyone understands.
6            THE COURT:  Okay.  Now, Judge Boal has taken care of
7    all of (b), correct?
8            MS. JOHNSON:  Correct, your Honor.  In fact, I think
9    she has resolved everything that has been referred to her at
10   this point.
11           THE COURT:  Now, the preservation order has to do
12   with the stuff in the building?
13           MR. GOTTFRIED:  Again, your Honor --
14           COURT REPORTER:  I'm sorry?
15           THE COURT:  I thought I dealt with that.
16           MR. GOTTFRIED:  You did.  And I think that what the
17   trustee would like to do is have Mr. Fern give you a status
18   report on his compliance with your order.
19           THE COURT:  Oh, right.  Right.
20           MR. GOTTFRIED:  And then I would pick it up from
21   there, but I think we should start with Mr. Fern's status
22   report, with the Court's permission.
23           THE COURT:  I'm sorry, I hope it wasn't too much work
24   for you.
25           MR. FERN:  Judge, it was my pleasure to comply with
```

1    the Court's directive.  In fact, it wasn't that much effort

2    because at the time of our collection in the fall of 2002, we

3    had kept -- we had done a very specific job trying to track

4    where everything came from and where it came from, who it came

5    from, and what it was, down to a folder designation of what

6    was inside of each folder.

7            We filed a compliance notice with the Court this

8    morning consistent with your last order as to what was

9    preserved and collected.

10           What was submitted to -- in order to have all the

11   parties have access to that information and not to burden the

12   Court and, also, your Honor, not to make it publicly available

13   to those who did not sign on to the protective order under the

14   third amended protective order that Judge Saylor issued, we

15   filed that with -- into the U.S. Legal repository earlier this

16   morning in the concordance format as they requested.  That

17   document was approximately 278 pages, which represented 1.25

18   terabytes of information.

19           Your Honor, I do not know how much 1.25 terabytes is,

20   but I understand it would fill more than a truckload of

21   documents.  That is now with U.S. Legal.  Everybody who has

22   access to U.S. Legal, which I understand from the PSC, is all

23   of the defendants who have paid their -- excuse me -- all of

24   the national defendants and clinic defendants who have paid

25   the minor $3,000 fee can have access to that.  That includes

1    all information that we collected from 2009 through the close

2    of business there in October of 2012.

3         I had made a unilateral decision back at that time

4    that anything prior to 2009 was not relevant, but I'm also

5    glad to report, Judge, that has not been destroyed.  Anything

6    prior to 2009 is still on the premises in Framingham and is

7    available if anybody thinks it is in any way relevant to their

8    defense or prosecution of the case.

9         I'd like to report, Judge, earlier this morning

10   myself and my partner, Alan Winchester, who runs our E

11   information department at Harris Beach, visited the premises

12   at NECC.  We reviewed what we had done.  There was some noise

13   last time by Mr. Braceras and others about loose documents

14   that were on Barry Cadden's desk.  All of that had previously

15   been preserved and collected.

16        There were documents on pallets, shrink wrapped, in

17   the back storage room that some defendants thought had not

18   been collected.  In fact, they are collected and they appear

19   on the inventory index that we filed with U.S. Legal.

20        There were some other raised issues about some

21   miscellaneous documents that were on pin boards around

22   people's cubicles.  I looked at that, your Honor.  That was

23   menus.  Those were phone lists.  There was nothing of

24   relevance --

25             THE COURT:  You decided not to --

1          MR. FERN:  I decided not to -- Judge, there was

2     nothing there.  I personally looked at every -- all the

3     documents on about 15 different cubicles.  There was nothing

4     there of relevance.  The stuff that was on their desk, working

5     papers at the time of the closure, had already been preserved

6     and collected and are listed on the inventory index.

7          Judge, all the servers had previously been collected,

8     all the ESI, whether it be on personal computers, PCs,

9     laptops, remote phones, or others, had also been collected.

10    Everything, Judge, that I think is relevant -- is relevant

11    and, perhaps, it's my unilateral decision, but if any

12    defendant thinks that of the 1.25 terabytes of information

13    that appears on that index doesn't have what they need, I want

14    them to tell us what there is that is not there and --

15    otherwise, I hope that this Court would grant the trustee's

16    motion to have relief from the preservation order so we can go

17    ahead and liquidate the premises and we can move forward in

18    closing up this estate.

19          THE COURT:  Did anybody take any of the machinery or

20    wasn't the trustee --

21          MR. FERN:  The machinery is still on the premises,

22    Judge, the first way I found it in October of 2012.  Nothing

23    has been moved out of there except for what's been taken by

24    the Federal Government.

25          THE COURT:  Mr. Braceras, is there anything more you

1  need?

2      MR. BRACERAS:  Judge, you know, when -- I take it --

3      COURT REPORTER:  I'm sorry, I'm having trouble

4  hearing you.

5      MR. BRACERAS:  I'm sorry.

6      I'm just taking Mr. Fern's comment as a compliment

7  for me making noise.

8      I guess the only concern I have, based on the

9  representations, your Honor, is that Mr. Fern said the cutoff

10 date was 2009.  Now, in normal civil litigation you get more

11 than just the last three years and Unifirst was --

12     THE COURT:  2009 goes back five years.

13     MR. BRACERAS:  Well, from the event, which was 2012.

14     So, Unifirst was retained in 2008.  So, you could

15 imagine there being significant relevant documents in 2008

16 from the initial engagement of Unifirst by NECC.

17     THE COURT:  What is the time when the fungus-laden

18 steroids went out of the Framingham place?

19     MR. BRACERAS:  2012.

20     MR. FERN:  May 2012, June 2012 and September 2012,

21 Judge, were the three lots which were found to be contaminated

22 by the CDC and --

23     THE COURT:  So, what relevance is 2008?  I mean, 2009

24 was three years before the incident.

25     MR. BRACERAS:  Well, the relevance there is that

```
 1    formed the relationship between NECC and Unifirst.  That's
 2    when they had the negotiations about the contract that hired
 3    Unifirst.  It defined the scope and -- the scope of the
 4    responsibilities of Unifirst.  So, that's quite --
 5              THE COURT:  But you must have that documentation on
 6    your own.
 7              MR. BRACERAS:  We have some of the contracts, but you
 8    want to see what other documents that NECC had.
 9              THE COURT:  So, what do you want me to do?  What do
10    you want Mr. Fern to do?
11              MR. BRACERAS:  I guess -- maybe he already has it,
12    but he said there was a cutoff of 2009 for documents.  If
13    there were documents in Mr. Cadden's office from 2008, we want
14    to see them.
15              MR. FERN:  Judge, Mr. Braceras misunderstood what I
16    said.  Everything in Mr. Cadden's office was collected and
17    preserved.  What wasn't -- the 2009 cutoff was documents
18    regarding clinics and patient information which I found did
19    not have any relevance.
20              That information -- if Mr. Braceras wants to look at
21    it -- I don't want to speak for the trustee.  If he wants to
22    send associates down there to go through what he thinks to be
23    documents that he needs for his defense, I assume some
24    accommodation can be made.
25              Judge, I also misspoke a moment ago and I want to
```

```
 1    correct it.  I was correct saying that it was 2012.  It was
 2    September 2012 and June 2012, are the two lots that the CDC
 3    found to have contamination.  There was a May lot that was
 4    part of the initial recall, but that was never found to be
 5    actually contaminated by CDC or the FDA.
 6         MS. JOHNSON:  We disagree with that, your Honor.
 7    Although I don't think it matters for purposes of this
 8    conversation.
 9         THE COURT:  Mr. Braceras, is there any reason why,
10    given this representation, they cannot get rid of the stuff?
11         MR. BARCERAS:  For the documents, I think that if
12    we're just talking about the patient clinic documents before
13    2009, we don't have --
14         THE COURT:  Okay.  So, that's -- does anybody else
15    now have further objections about the notice to close down the
16    place?
17         MR. TRIBLE:  Your Honor, Chris Trible on behalf of
18    Insight Health Corporation.
19         We don't have a specific objection, but to the extent
20    that there are records that would pertain to that our client
21    which had a relationship that predates 2009, I'd like the
22    opportunity to discuss that with Mr. Fern.
23         THE COURT:  Well, you can talk to Mr. Fern about it,
24    but I'm going to enter the order unless there's some reason
25    not to.  Yes.
```

1        MR. SCHRAMEK:  Your Honor, Adam Schramek on behalf of

2    the St. Thomas entities and the Ascension parties.

3        Just for the Court's context, we've had some

4    conversations back and forth with the trustee.  We've asked

5    about the cost of preserving some of the items.  We've had

6    some disagreements about that cost.  For example --

7        THE COURT:  What items, for instance?

8        MR. SCHRAMEK:  Well, first we asked about the cost of

9    preserving the entire premises, now that we're going to have

10   nine months of fact discovery and four months of expert

11   discovery on the back end.  We said, Well, that's, you know, a

12   little over a year.  How much would it be to preserve the

13   premises for a year?  In case we have experts who want to do

14   walk-throughs.  You know, expert discovery hasn't even begun

15   yet.

16       And the last time you might recall that this Court

17   asked the same question and the representation was made it was

18   between $5,000 to $6,000 in out-of-pocket cost to preserve the

19   premise.  And so, we asked them, Okay.  Well, can you give us

20   an exact amount?  We'll go back with the defendants and we'll

21   see if we want to pay that cost to preserve it for our

22   experts.

23       The response we got back was that it was actually

24   going to be closer to $30,000 a month because they were going

25   to require us to start paying $20,000 a month to essentially

1    the insiders, Mr. Cadden, Mr. Conigliaro, for the original

2    cost of keeping open the NECC premises.

3            We don't think that's appropriate.  We have made that

4    point to them, and I think we're going to be discussing that

5    issue further in the next few days.

6            And we also made the point, Well, if we can't keep

7    all of the premises, then, yes, we're going to give you a list

8    of the things we want, such as the autoclaves, which are two

9    microwave-size pieces of equipment, such as one of the bottle

10   fillers that we're very interested in preserving for future

11   reference, and we're going to have to negotiate where that is

12   kept.  And we, of course, will pay that.  We'll -- in fact, we

13   have our -- one of our other counsel has already picked some

14   locations and air-conditioned units and -- where we can keep

15   it.  So, there are discussions ongoing, and we do believe that

16   probably by the next status hearing we'll have all of those

17   points resolved.

18           THE COURT:  Okay.

19           MR. GOTTFRIED:  Your Honor --

20           THE COURT:  Mr. Gottfried.

21           MR. GOTTFRIED:  If you have something to say, I'll

22   wait.

23           MR. FERN:  Judge, before you were involved in this

24   case, in December of 2012, the PSC had a four-day inspection

25   ordered by Magistrate Boal of the premises.  They had all kind

1    of experts who did all kind of testing, perhaps the same kind

2    of testing that the St. Thomas entities or the Insight

3    entities are speaking of.  That's already been done closer in

4    time to when the actual contamination took place.  I would

5    think it would be more relevant then.  When I was in there

6    today, Judge, there's no air conditioning and no lights on.

7    Who knows what type of bacterial or other contamination are on

8    those autoclaves or bottle fillers that St. Thomas is now

9    requesting.

10           THE COURT:  And you go wandering into this?

11           MR. FERN:  Excuse me, your Honor?

12           THE COURT:  And you go wandering into this?

13           MR. FERN:  Judge, a person's normal body mechanisms

14   have enough defense power to fight off any bacteria there.

15   These people got sick because it was injected into the spinal

16   column.

17           MS. JOHNSON:  Since the guy I walked around with in

18   his bunny suit for three days.

19           MR. FERN:  As you did.

20           MS. JOHNSON:  I sure did.

21           THE COURT:  Well, as I understand it, there are some

22   parties, but in general all the parties are full of admiration

23   for Mr. Fern for having saved all of these things for them to

24   look at, but there are a few that they may not have, and

25   particularly for some of the defendants, the clinic

1    defendants, the ability to have their experts go, and there's

2    negotiation about that.  So, I will postpone doing anything

3    with this until next month, but by that time I would like the

4    negotiations to be done.  I would like to issue an order so

5    that they can get rid of these things.

6         MR. GOTTFRIED:  Your Honor, I just want to say two

7    things, if I can.

8         The trustee first sought relief from the preservation

9    order in May of 2013.  These parties have been out to the

10   premises, now, twice.  You gave everyone an opportunity to go

11   out.  They went out again in August.

12        The trustee does not want to pay one penny out of the

13   estate, taking it from victims so that these people can

14   preserve these premises.  The costs are what they are.  We

15   were asking the Court what the costs were.  You said I don't

16   really know.  Approximately this.

17        The fact of the matter is, it's an electric bill.

18   Some months it's higher.  Some months it's lower.  I've given

19   them an approximation of $7,490.  If they want to keep the

20   whole thing open, you know what?  It's going to be whatever it

21   is, and they'll have to pay it if they comply with your order

22   that says they're going to pay it.

23        In terms of the rent, the trustee as part of his

24   resolution with GDC was able to stay there rent-free, but GDC

25   has not agreed that once the trustee is ready to abandon the

```
 1    premises and has now sought Court approval to abandon it, that
 2    it's going to not get any money for its premises and the rent
 3    was $20,000, and that was tapered down.  First it was 20.
 4    Then it was half.  Then it was zero.  And GDC has simply
 5    informed us that once you're ready to abandon ship and they
 6    want to take it over, we're not going to give it to them rent-
 7    free.
 8              So, the trustee's position is they have not complied
 9    with your order.  They have not said (A) we're going to pay
10    whatever it costs to retain it and if we don't want the whole
11    thing, here's what we want and here's our plan for it.  And we
12    need to move on.  We're running costs every month and it
13    really needs to come to an end.
14              They have five people on the email they sent me
15    trying to negotiate this, but they're, you know, complaining
16    about the cost of carrying this.
17              All the ESI, all the documents, everything that's
18    even plausibly relevant has been preserved.  If there's
19    something more they want, tell us and we'll make arrangements
20    to preserve it, but it really does have to end.
21              THE COURT:  You will finish this discussion with the
22    trustee before the next meeting because the next meeting will
23    be it.  That applies to you, too, to the extent that you're --
24              MR. BRACERAS:  Yes, your Honor.
25              THE COURT:  Okay.  So, that's it on preservation.
```

```
1   What next, Ms. Johnson?

2        MS. JOHNSON:  That brings us to No. 5, your Honor,

3   status of litigation track.  We've already addressed who the

4   litigating defendants are currently and we've also talked

5   about Judge Boal's order on common discovery, which really

6   sets forward a schedule and deadlines for the parties to move

7   this case through litigation.

8        I think all that remains is to discuss whether to

9   schedule argument on certain motions that will be ripe for

10  argument by the next status conference.

11       THE COURT:  Well, that you will tell me, right?  You

12  will tell me which motions need to be argued when you know

13  what motions they are.

14       Should we set aside time as we did this time for

15  hearing on motion or combine it with the status conference?  I

16  think it makes sense to have a separate motion hearing,

17  actually.

18       MS. JOHNSON:  I think it does, your Honor.  I felt a

19  little bad this time around because we thought there would be

20  more to argue and, therefore, warranted setting aside a

21  separate date.

22       THE COURT:  It doesn't matter.  I don't mind.  If I

23  hear this motion or another motion, it doesn't make any

24  difference.  I'm happy to set the time aside.

25       MS. JOHNSON:  I have had at least one defense
```

```
 1    attorney raise with me whether it would be possible to
 2    schedule, if it's two hearings, closer in time so that,
 3    perhaps, people can make a shorter trip to Boston.  I don't
 4    know whether --
 5              THE COURT:  Well, we did it on two days this time
 6    around.
 7              MS. JOHNSON:  We did, your Honor.
 8              THE COURT:  They want it all on one day?
 9              MS. JOHNSON:  I think that would be some attorneys'
10    preference.
11              THE COURT:  The next conference is October 23rd?
12              MS. JOHNSON:  Yes, your Honor.
13              COURTROOM DEPUTY CLERK URSO:  Yes.
14              THE COURT:  What are we doing on that day, Lisa?
15              COURTROOM DEPUTY CLERK URSO:  Judge, I just have that
16    at 2:00.
17              THE COURT:  So, we can do it at the same time.  We
18    have the motions -- which way would you want to do it, status
19    conference first, motions second?
20              MS. JOHNSON:  Let's do motions first, if we could.
21    That way, by the time we get to the status conference --
22              THE COURT:  That's good.  Then I can make the motion
23    shorter.
24              MS. JOHNSON:  Exactly.
25              THE COURT:  So, we'll do the motions at 2:00 and set
```

1    the status conference at 2:15.

2              (Laughter.)

3              COURTROOM DEPUTY CLERK URSO:  Okay.

4              MS. JOHNSON:  I like it, your Honor.

5              THE COURT:  You'll tell me what the time should be

6    for the beginning of the status conference after you talk to

7    all the lawyers.

8              MS. JOHNSON:  We will all do our best to get the list

9    of motions to be addressed sooner in this time.

10             COURTROOM DEPUTY CLERK URSO:  Thank you.

11             MS. JOHNSON:  I think that brings us to status of the

12   bankruptcy, your Honor.  Mr. Gottfried, did you want to

13   address that?

14             MR. GOTTFRIED:  Sure.

15             I think I've already mentioned to the Court that

16   we're proceeding with our work and our consultations with

17   respect to the plan and the disclosure statement.  The current

18   timeframe is we're hoping we'll get it all filed by the end of

19   the month.  I think statutorily there's a 28-day notice

20   period.

21             So, our thought would be if we could hit that

22   deadline -- hopefully, there'll be a hearing in front of Judge

23   Boroff in early November, mid November.  So, that work is

24   proceeding on pace and we will continue to keep the Court

25   apprised.

```
 1              THE COURT:  Thank you.
 2              MS. JOHNSON:  In terms of the status of appeals, your
 3     Honor, there are a series of three related appeals all
 4     relating to -- stemming from plaintiffs' appeals relating to
 5     Insight and the jurisdictional power issue.  Those are
 6     proceeding in the First Circuit.  I did not check the docket
 7     this morning before I came, I confess, but last time that I
 8     had looked at that, the briefing was ongoing and the
 9     expiration of the latest brief was quite some time down the
10     road.
11              THE COURT:  Well, the First Circuit is even more
12     amenable to extensions than I am.  So, it can take a long time
13     to get through there.
14              MS. JOHNSON:  That brings us to No. 8, schedule for
15     future status conferences.
16              THE COURT:  Yes.
17              MS. JOHNSON:  The Court has just set arguments for 2
18     o'clock on October 23rd, for the status conference to follow,
19     and we also have 2:30 set for December 4th.  It may make sense
20     to schedule the January conference, as is our usual course.
21              THE COURT:  Was this a date that we chose last time
22     or that you inserted?
23              MS. JOHNSON:  No.  We chose those last time, your
24     Honor.
25              THE COURT:  So, December 4th we will stick with,
```

```
1    right?
2            MS. JOHNSON:  Yes, your Honor.  I was wondering what
3    the Court --
4            THE COURT:  Of course, if there are motions that need
5    to be heard, we'll do the same thing.
6            MS. JOHNSON:  Yes.
7            COURTROOM DEPUTY CLERK URSO:  They want to schedule
8    the January one.
9            THE COURT:  Oh, okay.
10           COURTROOM DEPUTY CLERK URSO:  But what day?  Do you
11   have a day, a day that you're looking at?
12           MS. JOHNSON:  I think the second week in January,
13   your Honor.
14           COURTROOM DEPUTY CLERK URSO:  Second week?  We could
15   do -- I mean, is this going to just be -- we could do the 8th.
16   We could do January 8th, at 2:30.
17           MS. JOHNSON:  January 8th would work for the
18   plaintiffs, your Honor.
19           THE COURT:  What do we have at 2:00?
20           COURTROOM DEPUTY CLERK URSO:  We have a short
21   pretrial on a criminal matter that is just going to be
22   probably to get a jury trial date.  So, you want to have it at
23   2:00?  And then we'll just have a sidebar for the pretrial
24   real quick.
25           THE COURT:  Yes.
```

```
 1              We'll say 2 o'clock, but it may be 2:05 because we
 2    have to talk to a criminal case.
 3              COURTROOM DEPUTY CLERK URSO:  Is that good for all
 4    counsel?  Okay.
 5              THE COURT:  So, January 8th at --
 6              COURTROOM DEPUTY CLERK URSO:  At 2:00, yes, Judge.
 7              MR. STRANCH:  Your Honor, could we actually do it on
 8    the 7th instead of the 8th?  Is that possible?  I apologize.
 9    I teach a class at Nashville School of Law and that's the
10    first day.
11              COURTROOM DEPUTY CLERK URSO:  Well, how long -- I
12    mean, we have three conferences scheduled.  I mean, if we --
13    we have two at 2:00 and one at 2:30, just for the scheduling,
14    not that they might not go away.  I mean -- can we do it at
15    2:30 on the 7th?
16              THE COURT:  Sure.
17              COURTROOM DEPUTY CLERK URSO:  We could do it 2:30 on
18    the 7th.
19              MR. STRANCH:  Thank you.
20              THE COURT:  Is that okay with the rest of the group?
21              (No response.)
22              COURTROOM DEPUTY CLERK URSO:  Okay.
23              THE COURT:  And that, again, will leave time for any
24    motion hearings if we need to do that.  At the moment, we
25    don't anticipate any motions then, do you?
```

```
 1              MS. JOHNSON:  I couldn't speak to that.  None.
 2              THE COURT:  Now we come to the fully-briefed motions,
 3    which I think we'll either go without argument or with
 4    argument, and you will tell me at what point which is which,
 5    right?
 6              MS. JOHNSON:  Yes.  So, between yesterday's hearing
 7    and the agreement to put things off, I think we can -- I don't
 8    want to say ignore, but I don't think we need to address 9, 10
 9    or 12.  I think those have all been addressed now.  I think
10    that leaves us 11, the Plaintiffs' Steering Committee's motion
11    to amend previously-filed complaints.
12              THE COURT:  I thought I allowed that yesterday.
13              MS. JOHNSON:  I'm told that you did not, your Honor.
14              THE COURT:  Oh.
15              MR. FERN:  Your Honor, I think -- your Honor, I was
16    here yesterday.  I think those were the three cases, Ramos,
17    Rivera and Pennington, when you allowed that individual
18    plaintiff's lawyer from New Jersey to amend.
19              MS. JOHNSON:  Thank you, Mr. Fern.  That's right.
20    This is a different motion to amend.
21              The Plaintiffs' Steering Committee has now submitted,
22    I understand, a jointly-proposed order that would permit
23    amendments of certain short form complaints for plaintiffs
24    identified in the complaint itself an intention to amend when
25    certain notice -- time notice had elapsed.  So, there is a
```

1    jointly-proposed order in the front of you.  It's Docket No.

2    1397, but there is no opposition to that.

3           THE COURT:  Okay.

4           MS. JOHNSON:  I think that takes us to 13, your

5    Honor.  My understanding, 13 is the motion for entry of case

6    management order relating to Virginia matters.  My

7    understanding is there's agreement to put that off until the

8    Insight mediation is concluded, one way or the other.

9           THE COURT:  Okay.

10          MS. JOHNSON:  No. 14 lists a number of motions for

11   extension of time or to adjust briefing schedules.

12          THE COURT:  Is there any reason why I should not sort

13   of as a matter of course in this case allow motions for

14   extension of time or would that simply create total lack of

15   discipline?

16          MS. JOHNSON:  It's a funny question for me, your

17   Honor, because if Mr. Sobol ever heard me tell a judge that

18   she should as a routine matter grant motions for extension of

19   time, I would be fired.  That said --

20          MR. LIPTON:  No one is my boss.  I would be happy to

21   address that.

22          THE COURT:  Well, I was looking at the docket sheet

23   and there is a pile of motions that just appear.  There is the

24   motion to extend time, the motion to file replies, further

25   replies, sur-replies, sur-sur-replies, and then there are

1    motions to seal.  There are relatively few motions to seal in

2    this case.  And -- oh, then there is a motion to file

3    excessive briefs.  That means more than the number of pages

4    that I think are necessary.

5         It just seems just a waste of time for you to have to

6    file these motions and for me to have to deal with them

7    because I won't just allow them.  I'll have to look at the

8    papers and look at the docket and figure out what makes sense.

9         So, I would like some assistance from counsel about

10   these that are really sort of mechanical motions in a way, but

11   they're not because they affect the process of the case.

12        MS. JOHNSON:  On specifically the motions to extend

13   time, your Honor, in this particular case, several of those --

14   I can't quite say all of them -- several of those have to do

15   with agreements that relate to various mediations.  So, for

16   example, you routinely see --

17        THE COURT:  That should clearly be allowed.

18        MS. JOHNSON:  Yes.  So, I think you routinely see

19   Unifirst and the PSC filing things asking you to kick out

20   deadlines.  Those I would suggest should be allowed.

21        Most of what's here listed under 14 are negotiations

22   between plaintiffs and defense counsel who are either dealing

23   with mediations or things like whether documents have been

24   produced.  I would suggest that those as a general matter

25   should be allowed, at least the first, maybe the second time

1    an extension is requested.  Perhaps it makes sense so that

2    things don't get wildly out of hand, that the, say, third time

3    an extension is requested --

4           THE COURT:  Can we agree on some sort of a protocol?

5    So that counsel, when they file a motion for extension, tell

6    me why pursuant to the protocol it should be allowed, and then

7    it's allowed.

8           MR. BRACERAS:  Or all joint motions should be

9    allowed.

10          THE COURT:  Yes.

11          MS. JOHNSON:  So, I would suggest, your Honor, that

12   with this in mind, perhaps the Plaintiffs' Steering Committee

13   and the defendants can discuss what are appropriate protocols

14   for those types of motions.

15          THE COURT:  Fantastic.

16          MS. JOHNSON:  We'll submit something to your Honor.

17          THE COURT:  I knew you would understand.

18          MS. JOHNSON:  Anything to make your life easier, your

19   Honor.

20          THE COURT:  I appreciate that.

21          Now, how about these motions that get the sur-sur-

22   reply?  I do not appreciate them.  I mean, it's not clear to

23   me why you need to have anything beyond a reply.

24          MS. JOHNSON:  I would agree with that as a general

25   proposition, your Honor.  I think all the plaintiffs would

1    agree.

2            THE COURT:  So, as a general proposition, that's what

3    will be, and there will have to be some reason why we go to

4    more.

5            With respect to excessive briefs, I don't think we

6    ought to have them either.

7            MS. JOHNSON:  I agree.

8            THE COURT:  No excessive briefs.  No request for

9    excessive briefs.

10           And motions to seal.  Well, those -- there are not

11   too many in this case, but there are a few and they cause

12   difficulties for the Clerk and for the system.  So, try to

13   keep them down as well.  I appreciate all of that.

14           Now, I think that brings us to 15, and with -- well,

15   let me go back a moment to 14.

16           Should all of these motions for extension of time be

17   allowed or would they under the proposed protocol fail?

18           MS. JOHNSON:  I would suggest that at this point they

19   should all be allowed.  None of those are opposed.  I

20   understand they're all jointly agreed upon.

21           THE COURT:  So, they're all allowed.

22           And, Lisa, do you want me to read you out the docket

23   numbers?

24           COURTROOM DEPUTY CLERK URSO:  Well, I'll just -- do

25   you have them written?

```
 1              THE COURT:  It's 14.

 2              COURTROOM DEPUTY CLERK URSO:  Yes.

 3              THE COURT:  All of 14 from i to x.

 4              COURTROOM DEPUTY CLERK URSO:  i to x, okay.  So, No.

 5  14, one four?

 6              THE COURT:  On the docket sheet -- I mean, on the

 7  program.

 8              COURTROOM DEPUTY CLERK URSO:  I thought you meant on

 9  the docket sheet.

10              THE COURT:  No.

11              COURTROOM DEPUTY CLERK URSO:  On the program, okay.

12              THE COURT:  No.  These are all in the thousands.

13              COURTROOM DEPUTY CLERK URSO:  Okay.  That's what I

14  thought, Judge.  Okay.

15              THE COURT:  Okay.  Now we come to No. 15, summary

16  judgment by Hahnemann University Hospital.

17              MS. JOHNSON:  Yes, your Honor.  I understand that

18  counsel for Hahnemann and Tenent Healthsystem wish to be heard

19  on this motion.

20              MR. WALKO:  Thank you.

21              THE COURT:  Are we hearing the substance of the

22  motion --

23              MR. WALKO:  Your Honor, that is --

24              THE COURT:  -- the merits of the motion or are we

25  talking about a procedural issue?
```

```
 1          MR. WALKO:  There is a procedural issue that is
 2   related and then if your Honor would like to hear a little bit
 3   about the substance, I can address that.  The plaintiffs'
 4   counsel is --
 5          THE COURT:  I'm not terribly keen on hearing the
 6   merits because we have separate hearings for merits of
 7   motions, but if there are procedural issues, by all means,
 8   tell me about them.
 9          MR. WALKO:  I'll tell you about the procedural
10   issues.
11          Plaintiffs' counsel was allowed to withdraw from the
12   case.  Your Honor indicated that the opposition to my client's
13   defendant's summary judgment motion should be filed by the 3rd
14   of September.  No additional opposition was filed from the
15   letter opposition filed by the pro se plaintiff earlier this
16   year, and those are Docket 21 and the motion is Docket 16 in
17   the King case.
18          Your Honor also issued an order in August and the
19   context of allowing plaintiff's counsel to withdraw that
20   indicated that there would be dismissal of the plaintiff's
21   case if counsel did not appear, and counsel did not appear
22   and --
23          THE COURT:  This is the single plaintiff in
24   Philadelphia somewhere?
25          MR. WALKO:  That's correct, your Honor.
```

1          And my understanding is that your Honor was not

2    ordering that because a pro se plaintiff didn't have counsel

3    that the case was going to be dismissed, but that since there

4    was no additional opposition papers to the motion for summary

5    judgment, that summary judgment would enter and the case would

6    be over if she didn't get new counsel.

7          Then there's this letter request that was filed and

8    we got notice of yesterday -- or two days ago where the pro se

9    plaintiff wants additional time to get new counsel and in her

10   letter she made a representation that she just found out about

11   the need to get new counsel, and the motion to withdraw as

12   counsel was back in March.  She participated in that

13   conference call with counsel on the line when we argued the

14   motion in June.

15         It's our position that no additional time needs to be

16   granted to allow her to try to get counsel.  The summary

17   judgment motion is based on the fact that the steroids that

18   were administered in 2010 were bought from different

19   companies, Pfizer and Bristol Meyers.

20         THE COURT:  So, the issue at the moment is simply

21   what to do about this pro se and whether to give her

22   additional time to find a lawyer or simply proceed with what I

23   previously suggested, that if there is no opposition to the

24   motion, it will be allowed without opposition.

25         MR. WALKO:  Well, there is an opposition, but it was

1    -- it's just a letter by her.  It's not -- there's no

2    evidence.  It's just -- it is what it is.

3          THE COURT:  One of the -- you know, one of the

4    privileges of senior status is that you can -- you have some

5    say over what kind of cases you don't want, and I have

6    instructed the clerks to give me no more pro se cases.  They

7    are the most difficult, the most time consuming, and the most

8    unsatisfactory cases to deal with.  I feel for some of them,

9    but it is very difficult.  So, here we are, with a very

10   difficult client.  They push.  They push.

11         And so, I need to decide whether to give her another

12   day or two, right?

13         MR. WALKO:  She asked for a date in November to get

14   new counsel, your Honor.

15         THE COURT:  Okay.  So, that is the letter request (b)

16   and the --

17         MR. WALKO:  Correct.

18         THE COURT:  And (a) is the putative opposition to the

19   motion for summary judgment.

20         MR. WALKO:  Yes.

21         THE COURT:  Okay.  So, I will deal with that.

22         MR. WALKO:  Thank you, your Honor.

23         THE COURT:  Thank you.

24         Now the ones on October 23rd as listed here, that may

25   well change.

```
 1              MS. JOHNSON:  It may, your Honor, yes.

 2              THE COURT:  And you will give me the appropriate list

 3    for that.

 4              MS. JOHNSON:  Yes, we will.

 5              THE COURT:  And briefing in progress is information

 6    only?

 7              MS. JOHNSON:  Yes.  All of those are in progress.  I

 8    don't think there's anything there that the Court needs to

 9    address today.  One that the Court may -- well, has already

10    addressed was Liberty's offer of judgment.

11              THE COURT:  Well, there is one, No. 21.  There is

12    another motion to withdraw as counsel, which is agreed by both

13    the client and the lawyer, as I read the papers.  So, I should

14    probably allow that.

15              MS. JOHNSON:  Yes, your Honor.

16              THE COURT:  Okay.  And the Liberty offer of judgment

17    issue may go away and if not, we can deal with it October

18    23rd, or whatever the date.

19              MR. HERMES:  It goes away tomorrow because tomorrow

20    is two weeks and --

21              THE COURT:  Okay.  So, that one is --

22              MR. HERMES:  It's probably self-liquidating unless

23    somebody wants to push that motion, in which case we will

24    oppose it.

25              MS. TAYLOR:  Your Honor, briefly with respect to
```

1    Liberty's offer of judgment.  I don't believe under the Rules

2    an official -- formal response --

3            COURT REPORTER:  I'm sorry, I can't hear you.

4            MS. TAYLOR:  With respect to Liberty's offer of

5    judgment, I don't believe that under the Rules a formal

6    response is required if it's withdrawn tomorrow.  However, to

7    the extent a formal response is required or asked for or

8    sought, the creditors' committee rejects Liberty's offer.

9            THE COURT:  Well, I'll talk with the parties, anyhow,

10   at some point soon.

11           That's it.  Does anybody have anything else, either

12   here or on the phone?

13           (No response.)

14           MR. WOLK:  Christopher Wolk from Blumberg & Wolk on

15   behalf of the Premier defendants.

16           At the beginning of the conference, Ms. Johnson

17   handed the Court an exhibit.  Some of us in the cheap seats

18   didn't get a copy and also some on the phone didn't get a

19   copy.  Can we make that part of the docket and have that

20   filed?

21           MS. JOHNSON:  We will file that when I get back to my

22   office, your Honor.

23           MR. WOLK:  That would be great.

24           MS. JOHNSON:  I'm also happy to give you a copy.

25           MR. WOLK:  I'll take one, but there's a couple of

1    people on the phone that don't have one.  Thank you, Judge.

2              THE COURT:  Anything else?

3              MR. HERMES:  Your Honor, just with respect to the

4    last item, Liberty's motion to seal.  That motion is required

5    as a result of the third amended protective order with respect

6    to putting ink to the motion for summary judgment, various

7    documents.  I've had responses from the PSC and from the

8    trustee with respect to certain of the documents, but that's

9    why it's there.  It is compelled because of the terms of that

10   existing order.  I have no real desire to go into the morass

11   of sealing or unsealing.

12             THE COURT:  Okay.  Thank you very much, as always,

13   and I'll see you in October.

14             MS. JOHNSON:  Thank you.

15             (Adjourned, 4:18 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2          I, Catherine A. Handel, Official Court Reporter of the

3    United States District Court, do hereby certify that the

4    foregoing transcript, from Page 1 to Page 51, constitutes to the

5    best of my skill and ability a true and accurate transcription of

6    my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

7    Re: New England Compounding Pharmacy, Inc., Products Liability

8    Litigation.

9

10   September 21, 2014          /s/Catherine A. Handel
     Date                        Catherine A. Handel, RPR-CM, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25