UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
PHARMACY CASES LITIGATION          )
                                   )
                                   )
                                   )
                                   )
                                   )
                                   )



BEFORE:  THE HONORABLE RYA W. ZOBEL
                   AND
         THE HONORABLE JENNIFER C. BOAL



**STATUS CONFERENCE AND**
**MOTION HEARING**



John Joseph Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, MA 02210


October 23, 2014
2:00 p.m.


Catherine A. Handel, RPR-CM, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 5205
Boston, MA 02210
E-mail: hhcatherine2@yahoo.com

APPEARANCES:

For The Plaintiffs:

    Hagens, Berman, Sobol, Shapiro LLP, by KRISTEN A. JOHNSON, ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, MA 02142;

    Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K. MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, NY 10013-1413;

    Janet, Jenner & Suggs, LLC, by KIMBERLY A. DOUGHERTY, ESQ., and LISA LEE, ESQ., 31 St. James Avenue, Suite 365, Boston, MA 02116;

    Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ., 366 Elm Avenue, SW, Roanoke, VA 24016;

    Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH, IV, ESQ., 227 Second Avenue North, Nashville, TN 37201-1631;

    Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac Street, Suite 500, Boston, MA 02114;

FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

    Brown Rudnick, by KIERSTEN A. TAYLOR, ESQ., One Financial Center, Boston, MA  02111;

For the Defendants:

    Harris Beach PLLC, by FREDERICK H. FERN, ESQ., 100 Wall Street, New York, NY 10005;

    Tucker & Ellis LLP, by RICHARD A. DEAN, ESQ., 950 Main Avenue, Suite 1100, Cleveland, OH 44113-7213;

    (Appearances continued on the next page.)

```
 1     APPEARANCES: (Cont'd)

 2
       For the Defendants:
 3
           Morrison Mahoney LLP, by ANTHONY E. ABELN, ESQ., 250 Summer
 4     Street, Boston, MA 02210;

 5         McGuire Woods LLP, by CHRISTOPHER TRIBLE, ESQ., One James
       Center, 901 E. Cary Street, Richmond, VA 23219;
 6
           Todd & Weld LLP, by CORRINA L. HALE, ESQ., One Federal
 7     Street, Boston, MA 02110;

 8         Hermes, Netburn, O'Connor & Spearing, P.C., by PETER G.
       HERMES, ESQ., and KARA A. LORIDAS, ESQ., 265 Franklin Street,
 9     7th Floor, Boston, MA 02110-3113;

10         Fulbright & Jaworski LLP, by YVONNE K. PUIG, ESQ., 98 San
       Jacinto Boulevard, Suite 1100, Austin, TX 78701-4255;
11
           Michaels, Ward & Rabinovitz LLP, by DANIEL M. RABINOVITZ,
12     ESQ., One Beacon Street, Second Floor, Boston, MA 02108;

13         Blumberg & Wolk LLC, by JAY J. BLUMBERG, ESQ., 158 Delaware
       Street, Woodbury, NJ 08096;
14
           Sloane & Walsh LLP, by JOHN P. RYAN, ESQ., Three Center
15     Plaza, Boston, MA 02109;

16         Goodwin Procter LLP, by JAMES REHNQUIST, ESQ., and ROBERTO
       M. BRACERAS, ESQ., Exchange Place, 53 State Street, Boston, MA
17     02109;

18         Smith Duggan Buell & Rufo LLP, by BARBARA HAYES BUELL, ESQ.,
       55 Old Bedford Road, Suite 300, Lincoln, MA 01773;
19

20

21     FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
       NECP, INC.:
22

23         Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
       Street, Suite 2400, Boston, MA 02110-1724;
24

25
```

```
 1                        P R O C E E D I N G S

 2          (The following proceedings were held in open court before

 3   the Honorable Rya W. Zobel, United States District Court Judge,

 4   and the Honorable Jennifer C. Boal, Magistrate Judge, District

 5   of Massachusetts, at the John J. Moakley United States

 6   Courthouse, One Courthouse Way, Boston, Massachusetts, on

 7   October 23, 2014.)

 8              THE COURT:  Good afternoon.  Please be seated.

 9              I think you all know Magistrate Judge Boal who has

10   been doing a yoman's service in this case and on your behalf.

11   So, I'm happy that she could join us today.

12              And thank you for the list of counsel, which is very

13   helpful as always, as well as for the agenda.

14              There are lots of people on the phone and everybody

15   who speaks or coughs has to do it through a microphone.

16              MS. JOHNSON:  Good afternoon, your Honor.

17              THE COURT:  So, please start.

18              MS. JOHNSON:  Are we starting with the agenda or with

19   the argument?

20              THE COURT:  Yes.  Are we having the motion hearing

21   first?

22              MS. JOHNSON:  We had understood that there was a

23   motion hearing on two discrete motions.  I think it's only

24   two.  And we anticipated not going first, but can do it at

25   your Honor's convenience, of course.
```

```
 1              THE COURT:  Well, I assume because there were so many

 2    counsel here, that we would go forward with the agenda and

 3    then whoever isn't involved with the motion hearing can

 4    depart.

 5              Who is here on the motions only?

 6              MR. ABELN:  Your Honor, this is Anthony Abeln on

 7    behalf of BKC and APAC on the --

 8              THE COURT:  I'm sorry?

 9              MR. ABELN:  The moving party on the motions to

10    dismiss.  Waiting until the end is fine with me, your Honor.

11              THE COURT:  Well, it makes a certain amount of sense

12    because not everybody is interested in the motions, right?

13              So, why don't you go ahead with your usual running

14    with the agenda.

15              MS. JOHNSON:  Thank you, your Honor.  Kristen Johnson

16    for the Plaintiffs' Steering Committee.

17              First on the agenda is the status of mediation

18    efforts.  The PSC and UniFirst have concluded their mediation

19    without an agreement.  We also --

20              THE COURT:  I'm sorry.  Which parties are these,

21    UniFirst?

22              MS. JOHNSON:  UniFirst, who is the company that

23    cleans -- as we like to say, the company who cleans the clean

24    room.

25              We also have had another withdrawal from the
```

```
 1    mediation program.  It's a little bit different.  That was a
 2    clinic who had not yet been sued in the MDL, as I understand
 3    it, but opted in the mediation program early.  They've now
 4    withdrawn.  And I believe there's a -- later down the agenda
 5    you'll see there's a request that they be removed from the
 6    service list in this case, those attorneys, because they're
 7    not a named defendant.
 8           THE COURT:  Are they planning to be -- is there
 9    somebody planning to sue them?
10           MS. JOHNSON:  I cannot speak for all of the
11    plaintiffs' lawyers that might be thinking about it, but as
12    far as I'm aware, no, no one is planning to sue them.
13           THE COURT:  So, there should be no reason to not
14    allow their motion to get off the service list -- or their
15    request.  It wasn't a motion, a request.
16           MS. JOHNSON:  We have no objection to them being
17    removed from the service list.
18           THE COURT:  Does anybody object to it?
19           (No response.)
20           THE COURT:  I have forgotten what item it was.  It
21    was at the tail end of the agenda.
22           MS. JOHNSON:  I think we'll find it as we go, your
23    Honor.  I apologize.
24           (Pause.)
25           MS. JOHNSON:  I apologize, your Honor.  I'm not
```

```
 1   seeing it.
 2           THE COURT:  I saw it earlier today.  Okay.  We'll get
 3   there.
 4           MS. JOHNSON:  Thank you.
 5           In terms of the Insight mediation, I'll ask Mr.
 6   Fennell to address that.
 7           MR. FENNELL:  Your Honor, Patrick Fennell,
 8   representing the Plaintiffs' Steering Committee and plaintiffs
 9   in Virginia.
10           We have been engaged in Virginia in mediation with
11   Insight Health Corporation as well as Image Guided Pain
12   Management and two of the doctors who are defendants in the
13   Virginia cases.
14           Mediation is still ongoing.  We've made significant
15   progress, but we still have some issues to work out and we're
16   still negotiating to try and get this thing wrapped up, but
17   we're still working on it.
18           THE COURT:  So, by the time of the next meeting in
19   early December, you will be able to tell us that the case is
20   settled?
21           MR. FENNELL:  We certainly hope that would be the
22   case, your Honor.
23           THE COURT:  Thank you.  Okay.
24           MS. JOHNSON:  That takes us to No. 2, the status of
25   the insurance declaratory judgment action.  There are others.
```

1    We have listed only those that are either pending in this

2    courthouse or something we've discussed recently with the

3    Court.

4         In terms of the actions involving Ameridose's

5    insurance coverage, those are proceeding in front of Judge

6    Saylor, and there is a status conference set for November to

7    address those.

8         There is a stay in place at the moment, your Honor,

9    but we do have regular meetings with Judge Saylor to advise

10   him of the status of the settlements and other items that

11   might affect that.

12        The second is the insurance declaratory judgment

13   actions involving Liberty, one of the defendants in the MDL.

14   That is proceeding apace.  There is a January 15th deadline

15   for discovery and their anticipated summary judgment motions.

16        The Plaintiff's Steering Committee has not moved to

17   intervene in that case.  We don't see a reason to do that at

18   this time.  We are watching --

19        THE COURT:  The insurance coverage case?

20        MS. JOHNSON:  Yes, that's correct.

21        THE COURT:  Okay.

22        MS. JOHNSON:  That brings us to No. 3, status of

23   discovery.

24        The PSC had a suggestion and rather than file a

25   motion, we thought we would raise it informally, and I'm quite

1    glad that Judge Boal is here as well.

2           Now that discovery is beginning, the parties have

3    exchanged initial disclosures as the first step and that we

4    have a schedule at MDL Order 9 that Judge Boal has entered and

5    we're following that schedule.  Now that things are underway,

6    it's becoming clear that there will be, unfortunately, some

7    matters that will require Judge Boal's attention in terms of

8    discovery disputes.

9           And the Plaintiffs' Steering Committee wants to raise

10   the possibility of having regular status conferences before

11   Judge Boal to address those issues, now that we're actually

12   seeing them come up in practice.

13          MAGISTRATE JUDGE BOAL:  That would be fine, and I

14   assume for the parties' convenience, what I should do is set

15   them for the morning of the same date that Judge Zobel has

16   scheduled afternoon conferences.  Would that be the most

17   convenient for that everyone?

18          MS. JOHNSON:  Yes, your Honor.  Thank you.

19          THE COURT:  Is the interval appropriate, that is from

20   one conference to the other, that we have?  Is that

21   appropriate for the discovery?

22          MS. JOHNSON:  I think that certainly makes sense for

23   the time being and if there's any reason that we think that

24   should be revisited, we'll bring that to the Court's

25   attention.

```
 1              THE COURT:  Okay.  Incidentally, I have today
 2    referred to Judge Boal a couple of pending motions.  I think
 3    they were 1468 and 1478, I believe, are now with her.
 4              MS. JOHNSON:  I actually have copies of those, your
 5    Honor, if you would like those.  I'll hand those up.
 6              THE COURT:  Do you have copies of the motion?  Is
 7    that what you said?
 8              MS. JOHNSON:  Yes.
 9              THE COURT:  We have them.
10              MAGISTRATE JUDGE BOAL:  We're all set.
11              THE COURT:  Thank you.
12              MS. JOHNSON:  In terms of discovery for the
13    affiliated defendants, the Court has ruled and imposed a --
14    has stayed the actions against the affiliated defendants, with
15    an exception for some limited discovery.  The parties are
16    working through -- at least on the plaintiffs' side of things,
17    are working through how to move forward and what our next
18    steps are to accomplish what would be the appropriate
19    discovery contemplated by that agreement.  The PSC has not yet
20    served anything on Ameridose or any of those other parties
21    yet, but we're in the process of considering that.
22              On MDL Order No. 9, which is the order addressing
23    common discovery, the plaintiffs have filed a motion for
24    clarification asking the Court to clarify -- I think it's
25    three discrete issues that came up in the -- as we started to
```

```
 1    carry out the discovery process set forth therein.  I
 2    understand it's just been referred to your Honor.  I'm not
 3    sure if you want to discuss the substance of that today.  I
 4    don't mean to put you on the spot.
 5              MAGISTRATE JUDGE BOAL:  I thought it was fairly
 6    straightforward and there's no opposition.  So, I -- and,
 7    also, I don't think I need argument on it.  I think there's a
 8    motion for argument.  If I did need argument, I would schedule
 9    it for December 4th, at 11:30, which I think is the same day
10    as Judge Zobel scheduled a conference, but I actually don't
11    think I need oral argument.  So, I will just go ahead and rule
12    on that.
13              And then just jumping ahead to the motion to compel
14    insurance agreements, that one is much more complicated.  So,
15    I think I will probably need oral argument.  That's just based
16    on a preliminary review of the papers.  And so, again, I would
17    schedule that for December 4th, at 11:30.
18              THE COURT:  That is Subparagraph (d) of 3.  A3.
19              MS. JOHNSON:  If I may just point out one issue on
20    timing, your Honor.
21              There has been no objection to not holding oral
22    argument on the motion to clarify.  There is a deadline,
23    though, involved in that motion that is November 17th.  That's
24    the deadline to provide plaintiff profile forms.  As currently
25    written, it reads as though it's for all plaintiffs.  We've
```

asked you to clarify whether plaintiffs who are not suing a
party who is actually litigating should also abide by that
deadline, and to set your mind at ease, all plaintiffs'
lawyers have been advised that this is a deadline that applies
to everyone.  The PSC has been very clear that everyone should
get their ducks in a row and be ready to go, but to the extent
that that's an issue your Honor wanted to address, I just
wanted to inform you of the timing.

            MAGISTRATE JUDGE BOAL:  That's helpful.  Thank you.

            MR. STRANCH:  Your Honor, Gerard Stranch for the PSC.

            We've got a grooming issue with setting of
depositions and we may need to move --

            THE COURT:  That's Subparagraph (c)?

            MR. STRANCH:  Yes.  That's the next one up on the
list.

            THE COURT:  Okay.  Is that for Judge Boal or for me?

            MR. STRANCH:  Well, we'll file it -- it sounds like,
based on what the Court has been doing, it's probably going to
end up with Judge Boal.

            THE COURT:  That's very helpful.

            MR. STRANCH:  We're happy to jump right ahead to
there.

            Basically, the problem we're having is getting dates
set aside so that we can slot depositions and, as you can
imagine, there's a large number of lawyers in this litigation

1    and we need to set dates aside so that we don't have

2    scheduling conflicts down the road.  We've got a window to do

3    that discovery in and we're running into problems.

4            We've got some defendants that are refusing to

5    provide dates, but will only do it if we say specifically

6    which witness we want to take on a specific date, and they're

7    taking 30 days before they'll meet with us to meet and confer

8    about it, and the dates they're offering are six, almost seven

9    months out, and that doesn't leave us any time at the end of

10   the discovery window to do follow-on discovery if we need to.

11           So, we may be moving to amend the deposition protocol

12   to require people to provide dates when the attorneys are

13   available so that we can try to slot these in and not run into

14   a situation where we have to move to extend the discovery time

15   period because people weren't available or we end up fighting

16   on whether depos go forward because a certain lawyer is not

17   available or not.

18           We just think it makes more sense that people provide

19   dates that they're available and then we can fill in who is

20   going to be deposed on which days, and that's a brewing issue

21   we've got and I want to bring it to the Court's attention.  I

22   hope we can work through it.  We're trying, but we may not

23   just be able to.

24           MAGISTRATE JUDGE BOAL:  All right.  I appreciate the

25   preview and, hopefully, you can work it out and if not, I will

1    deal with it on the papers.

2          MS. JOHNSON:  That brings us to small (e).  I believe

3    Mr. Gottfried would like to address that.

4          MR. GOTTFRIED:  Good afternoon, your Honor.

5          THE COURT:  How are you?

6          MR. GOTTFRIED:  This is the trustee's request to get

7    relief from the preservation order.  As you may recall, you

8    had asked us to try to resolve this by agreement today.

9          THE COURT:  Just getting rid of the stuff in the

10   building?

11         MR. GOTTFRIED:  Yes.  And if we couldn't resolve it,

12   you would decide it today.

13         I can report to you that I've had conversations with

14   UniFirst, who is one of the parties.  I believe it's fair to

15   say that with respect to issues with respect to preservation

16   of documents and ESI, we have no dispute.  I am hopeful that

17   the other parties would agree with that as well.  I'll let

18   them speak for themselves.

19         I believe that between the scanning and the other

20   representations that the trustee has made in letters, that the

21   document issues are resolved.

22         So, what remains is a request, from our perspective,

23   that some 14 items be retained -- be stored off-site,

24   apparently, in the custody of some of these defendants in a

25   storage locker in Northborough, Mass, because they may have

1    some value, I gather, as exemplars.

2         I don't think there's any legitimate dispute that

3    they don't have any evidentiary value in terms of testing.  I

4    mean, they certainly have had, pursuant to this Court's

5    guidance, two opportunities to go out to the site.  They

6    videotaped.  Some have had experts go out there.

7         So, I think really now what we're talking about is

8    exemplars, and from the trustee's position, this issue

9    operates on two levels:

10        The first level is the burden that this proposal

11   would put on the estate and whether keeping them as exemplars

12   as opposed to using photographs or videos is worthwhile.

13        Just to give the Court a sense of what we're talking

14   about, one of the items, for example, is a hood that is built

15   into the wall, which we would say has not even been used in

16   compounding MPA.  It would have to be ripped out of the wall.

17   Then apparently taken to the storage locker and put there.

18   What value that has, if anything, I don't know, but the

19   trustee --

20        THE COURT:  What does the trustee expect to do with

21   the building itself?

22        MR. GOTTFRIED:  Well, he's a tenant.  He's renting

23   there.  So, what he would do if you granted him relief today

24   is he would file a motion with Judge Boroff for permission --

25        THE COURT:  To get out of the lease?

1          MR. GOTTFRIED:  -- to get out of lease, to vacate the

2    premises, and ultimately he would sell the contents.

3          Candidly, if at that point in time someone wanted

4    something as an exemplar, they would be free to bid on it, but

5    the idea that it should be part of a preservation order that

6    he who is statutorily charged with, you know, taking

7    possession, custody and control of these items, you know, and

8    that he would have to continue to operate maybe two years or

9    three years down the line when there's a trial and then and

10   only then at that point dispose of them seems to be an unfair

11   burden for the value of an exemplar.

12         So, I mean, our position, in a nutshell, is that as

13   an exemplar, that should be outside the preservation order.

14   The burden on the estate is significant to do it.  It

15   certainly shouldn't be put in the custody of one particular

16   defendant so other defendants can worry about where it's going

17   in a storage locker.  And so, we would ask that the Court

18   grant the trustee's motion.

19         We've given people tons of opportunity to go out

20   there and look at stuff, videotape it, examine it, you know.

21   We really are down to a very small number of items.  One of

22   these is a bench that's eight feet long that probably weighs a

23   ton.  How they would get that into your courtroom as an

24   exemplar is beyond me.

25         You know, something else they've asked to preserve is

```
1    someone's diploma.  I don't know why a picture of the diploma
2    is not sufficient.  This isn't a very well thought out
3    request.  It's burdensome on the estate.  We should be allowed
4    to approach Judge Boroff, file a motion, liquidate these
5    assets and move on.
6              As you'll hear in the bankruptcy report, your Honor,
7    we are very, very close to filing a plan, we're hopeful
8    certainly within the next two weeks.  We're making progress on
9    some of these mediations and it's hopeful that we'll be moving
10   forward very rapidly to proceed with wrapping this up.
11             So, we would ask again that -- as you indicated, that
12   you would take a look at this and, hopefully, enter the order.
13   Thank you very much.
14             THE COURT:  So, have you filed a proposed order that
15   follows your suggestion?
16             MR. GOTTFRIED:  Yes.  We filed -- we followed the
17   procedure that Judge Saylor had outlined and we gave the
18   appropriate notice.  So, if you --
19             THE COURT:  So, what you now -- is there a proposed
20   order to allow you to get rid of the building, to terminate
21   the -- to go to the bankruptcy court to terminate the lease?
22             MR. GOTTFRIED:  I believe so.  I will double-check
23   and get that to the Clerk if I haven't done that, your Honor.
24             THE COURT:  Okay.  So, UniFirst -- I think you're the
25   one who is mostly objecting.
```

```
1              MR. BRACERAS:  It's actually not.

2              THE COURT:  I'm sorry?

3              MR. BRACERAS:  Actually, it's not us that's primarily

4     objecting.

5              THE COURT:  So, you don't care if the lease is

6     terminated?

7              MR. BRACERAS:  We don't care if the lease is

8     terminated.  We've been discussing -- I think we're almost in

9     agreement with Mr. Gottfried with respect to preserving just

10    the two autoclaves, which I dispute that they would just be

11    exemplars.  I think they would actually be useful exhibits.

12    We agree there's no microbiological evidence that you would

13    get from them now, but these really would be critical items

14    that NECC could have used to sterilize the product and it's

15    something that what is an autoclave that to put in front of a

16    jury would be useful and I think it wouldn't be much of a

17    burden.  It's about this big (indicating), and we've talked --

18    I think there's some agreement that we can reach agreement on

19    the two autoclaves.

20             THE COURT:  Who is objecting?  Is anybody objecting

21    to the termination of the lease?

22             MS. PUIG:  Your Honor, Yvonne Puig on behalf of St.

23    Thomas entities.

24             Your Honor, to be clear, not with respect to

25    termination of the lease --
```

```
1              THE COURT:  I'm sorry.  Whom do you represent?

2              MS. PUIG:  The St. Thomas entities.

3              THE COURT:  Okay.

4              MS. PUIG:  Our concern relates to some of the

5    contents and our request --

6              THE COURT:  Some of the contents of what?

7              MS. PUIG:  The contents of the leased space.  And we

8    have --

9              THE COURT:  The papers, right?

10             MS. PUIG:  Yes, some are papers and some are

11   equipment.

12             THE COURT:  Well, I thought that the papers had all

13   been videotaped at the time that all of this closed and made

14   available to all counsel.  Is there more that you're looking

15   for than that?

16             MS. PUIG:  Your Honor, we're looking for preservation

17   of the originals, and the letter from the trustee dated

18   October 22nd merely states that documents that have not been

19   scanned by Harris Beach will be put in storage and will be

20   retained until the trustee receives permission from the

21   bankruptcy court to dispose of them.

22             Your Honor, our offer -- our question and our

23   suggestion here is very straightforward and is in compliance

24   with this Court's order in August, and that is -- we had given

25   a list of what we want preserved.
```

1          Secondly, we will pay for it in a secured humidity-

2     controlled environment.  We will pay for it during the

3     pendency of the litigation or unless there is an agreement not

4     to preserve those items.  It is quite straightforward.  It is

5     not in any way a burden on the estate and will not in any way

6     prohibit the sale, lease or other disposition of the leased

7     premises.  It is premature today, as the trustee would

8     suggest, to argue both discoverability and admissibility of

9     these items.

10          THE COURT:  No, he's not doing that.  He just wants

11     to be able to dispose of them in some way to somebody other

12     than the estate, right?

13          MS. PUIG:  And our proposal outlines that, your

14     Honor, and we have tried both in writing to try to --

15          THE COURT:  Let me find out from Mr. Gottfried what

16     objections he might have.

17          MR. GOTTFRIED:  So, the issue, in a nutshell, is,

18     your Honor, we have an obligation to be -- possession, custody

19     and control of these items and ultimately to dispose of them

20     under the supervision of the bankruptcy court.

21          So, the first point is many of these items were not

22     even used in compounding.  So, this is a grossly overbroad

23     list.

24          THE COURT:  You're talking about papers?

25          MR. GOTTFRIED:  Papers.  Again, I --

```
 1          THE COURT:  But I understood this had to do with
 2   papers.  Are you talking about something other than papers?
 3          MS. PUIG:  Yes, your Honor, both papers and
 4   equipment, limited equipment list that was provided to the
 5   trustee.
 6          THE COURT:  Well, the equipment problem is, as Mr.
 7   Gottfried outlined before, that if one defendant has it, it's
 8   kind of unfair to the other defendants.
 9          MS. PUIG:  Your Honor, we've made that opportunity
10   available to the other defendants to join with us in the cost
11   of moving and retention.  That has been declined except for a
12   very few co-defendants.  This is not an attempt by the St.
13   Thomas entities to sequester, damage or do anything else to
14   the equipment.  We believe that the equipment is needed and
15   necessary in our defenses and affirmative defenses in this
16   lawsuit.
17          THE COURT:  Tell me, please, what are the number of
18   -- are there any motions pertaining to this issue?  If so,
19   could I have the docket numbers, please, so I can look at
20   them?  Is there anything for me to rule on other than the
21   broad concept of non-preservation?
22          MR. GOTTFRIED:  Your Honor, the dockets are at Item
23   18 in Subparagraph -- under B, fully-briefed motions.  We've
24   referred the Court to Dockets 1174 and 1308.
25          THE COURT:  Okay.  Item No. 18, right?
```

```
 1              MR. GOTTFRIED:  Yes.

 2              THE COURT:  And has St. Thomas filed any motions in

 3    this regard?

 4              MS. PUIG:  Your Honor, we have.

 5              THE COURT:  Are they included in these numbers?

 6              MS. PUIG:  Your Honor, we had filed today, actually,

 7    a notice regarding status of preservation discussions with the

 8    trustee and outlining all of our attempts --

 9              THE COURT:  That must be around 1502 or 03 if you

10    filed them today.

11              MS. PUIG:  Yes.  Yes, your Honor.

12              THE COURT:  Yes?

13              MR. GOTTFRIED:  I have not seen that yet, your Honor.

14              THE COURT:  Okay.  I'll have a look at it.  And these

15    are motions on which I can rule to achieve what one or the

16    other of you wants, right?

17              MR. GOTTFRIED:  I believe so.  I'll look and see what

18    they filed, I mean, to respond to it.  If I do, I'll do so --

19              MS. PUIG:  Yes, your Honor.  Thank you.

20              MR. BRACERAS:  And, your Honor, I think that there's

21    still some room for agreement here, at least with respect to

22    the autoclaves.  I think that was what our --

23              THE COURT:  Well, I suppose your client, Mr.

24    Braceras, and their client can get together and buy the damn

25    thing.
```

1          MS. PUIG:  And we're happy to do that, your Honor,

2     and we've invited the trustee to have a discussion on it and

3     -- multiple outreach and have had no reply.  Thank you.

4          THE COURT:  Well, then why don't you let me know

5     within a week what disposition you have agreed on and then I

6     won't have to deal with that, and if you have agreed on

7     something, the two of you and Mr. Gottfried, then that's done,

8     and then let me know what else of Docket Nos. 1468 -- well,

9     it's 1468, whatever was filed today.  The others are

10    supporting documents.

11         MS. PUIG:  Thank you, your Honor.  We're happy to do

12    that.

13         THE COURT:  Okay.

14         MS. PUIG:  And report back to the Court.

15         THE COURT:  And report by -- that would be then

16    October 20 -- October 29th -- no.  October 30th.

17         COURTROOM DEPUTY CLERK URSO:  30th, yes.

18         THE COURT:  All right.  What next?  Ms. Johnson.

19         MS. JOHNSON:  That brings us to 4, status of

20    litigation track.  Item (a) has already been addressed.

21         THE COURT:  Right.

22         MS. JOHNSON:  Item (b), just to inform the Court,

23    Liberty has filed motions for summary judgment in multiple

24    cases.

25         THE COURT:  I have seen that.

1          MS. JOHNSON:  The Plaintiffs' Steering Committee has

2     an agreement with Liberty that our response will be filed on

3     October -- yes, 31st, October 31st.  I note -- and maybe I'm

4     being overly cautious here -- the agenda says, "Oppositions to

5     each motion."  I don't know whether there's a 56(d) component

6     that may accompany that response.  I don't want to mislead

7     anyone by saying "oppositions in writing."

8          That brings us to Item (c).

9          MR. HERMES:  Excuse me, your Honor, if I may.  Peter

10    Hermes on behalf of Liberty Industries.

11         THE COURT:  I am truly sorry to see this result, but

12    there we are.  So...

13         MR. HERMES:  One of the interesting things here is

14    that we now have a drop-dead date in the bankruptcy court in

15    Connecticut with -- or, rather, in the district court in

16    Connecticut with respect to the insurance action.  My guess is

17    that it will end on or about January 15.

18         To the extent I understand the difference between an

19    opposition and a response which says we haven't had discovery,

20    no one has communicated with my client regarding discovery,

21    but if the Plaintiffs' Steering Committee wants a deposition

22    of witnesses from Liberty during the month of November, state

23    the date and we will be there.  My client does not intend to

24    delay in any respect the determination of its motions and if

25    the Plaintiffs' Steering Committee or particular plaintiff's

```
1   counsel wants discovery, it is welcomed to ask for it and we
2   will produce the people.
3        The Plaintiffs' Steering Committee has had all of
4   Liberty's documents for a period of time, which may be as long
5   as nine months and certainly no shorter than six months.
6   Whatever the offer that was will go away either upon the
7   denial of Liberty's motion for summary judgment in this
8   proceeding or the granting of the motion for summary judgment
9   as to insurance.
10        And it has been suggested that my statements
11   regarding Liberty's filing of bankruptcy proceedings is a
12   bluff.  There is no bluff here, your Honor.  If A happens, B
13   will follow.  If someone wants to find that out, then we can
14   pursue it and see what happens when A happens and we'll see
15   that B follows.
16        So, I'm asking the Court if it can -- I understand
17   the Court has other matters before it -- to deal with the
18   Liberty motions for summary judgment as promptly as possible
19   under all the circumstances.
20        THE COURT:  Well, at the moment, we have an
21   opposition by October 31st and then we don't need to have any
22   hearing on it.  I should just decide it, right?
23        MS. JOHNSON:  I'm sorry to say this.  The Plaintiffs'
24   Steering Committee member who has primarily been working on
25   the Liberty issues is not with us today.  I believe that it is
```

```
1   fair to say we do not need arguments on this issue.  In
2   speaking with Mr. Lipton, if he fees otherwise, we may move
3   for oral argument on that as a legal issue.  I will let your
4   Honor know.
5           THE COURT:  Okay.
6           MS. JOHNSON:  That brings us to Item (c), and this is
7   by way of informing the Court, really.  The Plaintiffs'
8   Steering Committee, now that UniFirst -- now that we're no
9   longer mediating with UniFirst, intends to amend the master
10  complaint, which includes allegations against UniFirst.  The
11  local rules require that we provide the actual proposed
12  amended complaint when we file that.  So, we haven't moved
13  yet, but we are in the works of putting that together and hope
14  to have that filed with the Court very shortly.
15          We then will discuss with Mr. Braceras to the extent
16  that he may oppose.  He may not oppose.  He hasn't seen it.
17  I'm not going to put him on the spot, but we will certainly
18  talk and try and come up with some reasonable briefing
19  schedule if that motion to amend is allowed.
20          THE COURT:  The briefing schedule on what?
21          MS. JOHNSON:  I apologize, your Honor.  UniFirst has
22  filed motions to dismiss already targeting the original master
23  complaint and I'm assuming for these purposes, they will do
24  the same to the master complaint.
25          THE COURT:  Okay.
```

```
 1              MR. BRACERAS:  Okay.

 2              MS. JOHNSON:  That brings us to Item (d), and this is

 3     the request for --

 4              THE COURT:  "D" as in David?

 5              MS. JOHNSON:  "D" as in David, yes.

 6              THE COURT:  I didn't understand that one.

 7              MS. JOHNSON:  This is the request for removal that we

 8     addressed earlier.

 9              THE COURT:  That is the part you talked about

10     earlier?

11              MS. JOHNSON:  Yes.

12              THE COURT:  That will be allowed.

13              MS. JOHNSON:  And I will ask Mr. Stranch to address

14     (e) and (f), which address the Tennessee-related issues.

15              MR. STRANCH:  As you can see, your Honor, the --

16     we've gotten the Tennessee cases moving.  The defendants have

17     started to file answers.

18              The process that we worked through with the

19     defendants on the answers was that the defendants would file a

20     single answer to the master complaint and then we selected a

21     representative case from each one of the clinics that was in a

22     short form and they filed the -- they filed an answer to those

23     complaints as well.

24              That's been helpful for us because it gives us a full

25     answer relating to the clinics, because the master complaint
```

1    does not name the clinics.  And so, that gives us an answer as

2    to the claims --

3         THE COURT:  Explain again.  There will be a master

4    complaint and one answer on behalf of all of the defendants

5    with respect to each of the claims, but only one --

6         MR. STRANCH:  Yes.  And what we did is we -- they

7    will file one answer to the master complaint per defendant,

8    and they've done that.  And then, additionally, we've had them

9    file an answer to short form complaints that we had that we

10   also filed because that's where the actual substantive

11   allegations against the clinics are located.

12        THE COURT:  Then there'll be one answer for each?

13        MR. STRANCH:  That's right.  So, Stop & See, the

14   Little St. Thomas filed one.  The Specialty Surgery, which is

15   in Cookeville, filed one, and that's what -- that's the

16   process we worked out, your Honor.  That way we actually do

17   get an answer that addresses the factual allegations against

18   the clinic defendants and the doctor defendants, because

19   otherwise they would be just being answered the master

20   complaint and we wouldn't know what their position on many of

21   those issues of factual allegations were and that's the

22   process we worked out.

23        THE COURT:  Is there a document on record that

24   describes this process?

25             Let me explain to you.  This morning as I was

1    reviewing the docket for this and the papers filed, I came

2    across one group of, I think, 30-some odd filings on behalf of

3    different cases in the multi-district case, and I've asked the

4    Clerk's Office to see what can be done, because there's such

5    an unbelievable waste of numbers.  We are now over 1500, but

6    they include these 30 separate documents.

7            And I think part of the problem appears to be our

8    system that doesn't allow plaintiff or doesn't allow the

9    filing party to file once and then have a bunch of different

10   people -- necessary parties listed in some way, and I gather

11   that the problem -- the way we tried to deal with it now by

12   listing everything resulted from a multi-district case that

13   Judge Saris had where everything was filed in the master

14   docket and then when the cases were sent back to the original

15   districts, there was nothing and they had to receive the

16   entire 1500 or by that time it was probably more in that case

17   and plow through them.

18           So, I've asked the Clerk's Office to see if there is

19   some way in which we can address both issues, not multiplying

20   the master docket by 30 copies of the same thing with a

21   different plaintiff or defendant, and at the same time, allow

22   a docket, if it does go back, to be illuminated in some way

23   and illuminating.

24           MR. STRANCH:  The PSC will be happy to work with the

25   defendants or the Clerk to try to make that happen, because we

```
 1    agree that no judge is going to like anyone in this case if
 2    they get sent a 5,000-entry docket sheet for a case that
 3    really only needs about 10 or 15 items.
 4              THE COURT:  Yes.  Well, I'll wait to hear what the
 5    Clerk's Office suggests and then perhaps I will suggest that
 6    they talk with you and defense counsel at the same time.
 7              MR. STRANCH:  I'd be happy to do that.
 8              THE COURT:  So, I appreciate your effort to do that
 9    and we'll cooperate to the extent we can.
10              MR. STRANCH:  And to answer your question you asked
11    at the beginning, we do have in writing the procedure that we
12    worked with.  It's not on file with the Court.  It's --
13              THE COURT:  It doesn't matter unless a problem
14    arises, in which case, I suppose you can file them.
15              MR. STRANCH:  Yes.  And we're in agreement that
16    everything has been done correctly so far.
17              MS. JOHNSON:  That brings us to the PSC's forthcoming
18    motion for protocol.  Mr. Fennell can address that.
19              MR. FENNELL:  Your Honor, Patrick Fennell for the
20    Plaintiffs' Steering Committee.
21              I believe at the last status conference in September,
22    your Honor requested assistance in formulating some type of
23    protocol for dealing with frequently-filed motions, requests
24    for extensions of deadlines, requests for extensions -- or
25    removal of page limitations, and requests for leave to file
```

1   replies and sur-replies.

2          We have -- we prepared a draft protocol and

3   circulated it to all defense counsel last week.  We held a

4   conference call on it last week and submitted additional

5   drafts and we've received input from the defense bar on that

6   draft and we're right now in the process of working out our

7   differences and I'm confident that we'll be able to have a

8   draft standing order to submit to your Honor for your

9   consideration and it will deal with all of those things, the

10  requests for replies and sur-replies, page limitations,

11  deadline extensions and motions to seal documents.

12          THE COURT:  I much appreciate that.  Thank you.

13          MR. FENNELL:  Yes, your Honor.

14          THE COURT:  Now, Ms. Johnson, Premier defendants.

15          MS. JOHNSON:  The Premier defendants are a New Jersey

16  clinic who is litigating.  There's also a New Jersey --

17          THE COURT:  That's the same thing as the St. Thomas?

18          MS. JOHNSON:  Yes.  We're working with the New Jersey

19  defendants in those cases to identify what I understand would

20  be representative cases for them to answer.  That process is

21  in the works.  I don't think we have quite ironed out all the

22  details, but we will.

23          THE COURT:  Okay.  Mr. Gottfried.

24          MR. GOTTFRIED:  As I previewed in the preservation

25  section, we are very close to filing the plan, probably in the

1    next two weeks, and that's the most important thing in the

2    bankruptcy, your Honor.

3              THE COURT:  Well, good and short.  Thank you.

4              The disposition of assets, I think we've talked about

5    that, right, or is it a different issue?

6              MR. DEAN:  Your Honor, Richard Dean.

7              I think this was just a report item to let you know,

8    to call the Court's attention to the fact that we filed the

9    notice.  It was just filed a few days ago.

10             I think what you may have been referring to is there

11   was a discovery dispute with the Tennessee clinic defendants

12   that's listed later on and that we've reached an agreement on,

13   which is Item 16.  We can reinforce that when we get there,

14   but I don't think there's any -- I think this was just here to

15   bring this filing to the Court's attention.  I don't think

16   there's anything to discuss today.

17             THE COURT:  Nothing to do about it, nothing to

18   discuss?

19             MR. DEAN:  Right, I don't think so.

20             THE COURT:  Okay.  Thank you.  Status of appeals.

21             MS. JOHNSON:  Mr. Fennell.

22             MR. FENNELL:  Yes, your Honor.

23             The First Circuit has consolidated the several issues

24   that were noted for appeal and I believe they have -- they

25   have a briefing schedule on that.  I'm not exactly sure what

1    the briefing schedule is, but they are progressing on that,

2    but, as I said, they consolidated the several appeals into

3    one.

4              They issued an order recently asking -- specifically

5    asking the parties to address some issues that were apparently

6    concerning the judges on the appellate court.  So, I think the

7    briefing is underway and progressing.

8              THE COURT:  Thank you.

9              Now, future status conferences.  You had suggested

10   December 4th.  So, maybe we had already set that.  That's

11   fine.  Unfortunately, January 7th wouldn't work for me.  I

12   have to go to a judicial conference committee on the 7th for

13   meetings on the 8th and 9th.  So, Lisa suggested January --

14   yes, January -- was it 16th?

15             COURTROOM DEPUTY CLERK URSO:  No.  14th, Judge, the

16   following week.

17             THE COURT:  Will that work?

18             COURTROOM DEPUTY CLERK URSO:  Or the 15th.

19             MS. JOHNSON:  I apologize.  I don't have my calendar.

20             THE COURT:  That may be difficult.  The 7th, 8th and

21   9th are not possible for me, and the 6th is a Tuesday when we

22   have a court meeting.

23             MS. JOHNSON:  That works for the Plaintiffs' Steering

24   Committee, your Honor.  I'm hesitating because I thought the

25   Prograf trial started that week and I wasn't sure whether that

```
1    would overlap.
2            MR. STRANCH:  It does.
3            THE COURT:  The trial won't do everything because
4    there will be an afternoon meeting, in any event, and the
5    trial will stop at 1:00.
6            MS. JOHNSON:  Okay.  Thank you, your Honor.
7            THE COURT:  So, January -- was it the 14th, Lisa?
8            COURTROOM DEPUTY CLERK URSO:  14th, yes, the
9    following -- yes.  They wanted it on the 7th.  I was thinking
10   the following week on that Wednesday.  We have nothing in the
11   afternoon.
12           THE COURT:  Any problem with that, Mr. Stranch?
13           MR. STRANCH:  No, your Honor.
14           THE COURT:  So, we will have the next meeting at
15   2 o'clock on January 14th.  Is that okay for you?  And we
16   don't need to set a date beyond that at the moment, right?
17           MS. JOHNSON:  I think that gets us through the
18   holidays, which was really the concern, setting those January
19   and December dates.  So, I appreciate that, your Honor.
20           THE COURT:  So, December 4th and December 14th.
21   Actually, I think on December 4th I also have Prograf coming
22   in.  We're going to put that in the morning on the theory that
23   that has fewer lawyers than this case does.  So, we will move
24   it into the morning, but keep this one on at 2:00.
25           MR. STRANCH:  Thank you, your Honor.
```

```
1              MS. JOHNSON:  That brings us to fully-briefed

2    motions, your Honor.

3              THE COURT:  Okay.  Now, with respect to No. 9, that

4    is in draft.  I would be able to get it to you next week.

5              MS. JOHNSON:  Thank you.

6              THE COURT:  At the latest.

7              MS. JOHNSON:  Item 10 I'll ask Mr. Stranch to

8    address.

9              THE COURT:  The motion to amend.

10             MR. STRANCH:  Your Honor, these were motions that

11   were filed to amend the short form complaints to add in

12   certain claims where we had to provide notice and then there

13   was a delay and then we could file it.

14             As you can see, there were some initial oppositions,

15   but we worked with the parties that opposed that motion and

16   have worked out an agreed-upon order that disposes of the

17   motion, and that's at Docket 1397, and that's the agreement

18   that we reached with the defendants that were affected by this

19   and have presented that to the Court, and we don't believe we

20   need argument on it.  It's an agreed-to motion at this time.

21             THE COURT:  I think I've signed it.

22             MR. STRANCH:  Okay.  Wonderful.

23             THE COURT:  I think.

24             MR. STRANCH:  And then 11(a) is the motion to compel

25   insurance agreements.  We've already discussed that's been
```

1    referred to Judge Boal and I believe I heard Judge Boal say

2    that she would be hearing that at 11:30 on the 4th.

3         THE COURT:  I haven't signed it, but I have it right

4    here.  I thought I had.

5         MAGISTRATE JUDGE BOAL:  Does that now conflict with

6    the other conference before Judge Zobel?

7         MR. STRANCH:  We'll figure it out.  I'll have someone

8    else from our office argue if we need to.  We'll work through

9    that.

10        And we may -- given now that there is a delay between

11   now and when that motion will be heard, we may file a reply.

12   We were going to not file the reply, just address it at oral

13   argument today, but since it's been put off, we'll file a

14   reply, but hopefully hope to narrow the issues that the Court

15   will be hearing argument on.

16        MS. JOHNSON:  On No. 12, I believe that we do not

17   need to address that because the Virginia mediation is

18   proceeding.  So, I continue to list it to identify it, but it

19   doesn't need to be heard.

20        THE COURT:  Okay.

21        MS. JOHNSON:  No. 13 deals with motions for extension

22   of time.  As Mr. Fennell said, we're hoping to get the Court

23   protocol so you will not have to see these kinds of motions on

24   the agenda in the future.

25        THE COURT:  Is there objection to any -- to the

1    extent that I have to deal with them?  Do we wait for the

2    protocol?

3            MS. JOHNSON:  No.  On this one, your Honor, there is

4    no objection and we would suggest that it could be allowed.

5            THE COURT:  Okay, Lisa.  That's No. 1419.

6            COURTROOM DEPUTY CLERK URSO:  Mm-hmm.

7            THE COURT:  Now, the Hahnemann motion.  Does anybody

8    have anything to say about it?  In a sense, Ms. King has

9    already answered it.

10           MS. BUELL:  Yes, your Honor.  This is Barbara Hayes

11   Buell.  I represent the Hahnemann Hospital.

12           THE COURT:  I'm sorry.  Barbara?

13           MS. BUELL:  Hayes.

14           THE COURT:  Hayes?

15           MS. BUELL:  My sir name is Buell, B-u-e-l-l.

16           THE COURT:  Buell, okay.  Sorry.

17           MS. BUELL:  Yes, in a sense, Ms. King has already

18   answered and I would ask that you rule, your Honor.  I think

19   the answer is inadequate.  I think that --

20           THE COURT:  Well, part of the problem is that it is a

21   summary judgment motion.

22           MS. BUELL:  Yes.

23           THE COURT:  There is an affidavit, I believe, by one

24   of the doctors about the fact that they didn't -- that she

25   never got any of the NECC stuff.

```
1              MS. BUELL:  Exactly.

2              THE COURT:  Well, I'll collect all the papers and

3    look at it.  I mean, obviously, if it's enough, I will do it,

4    but she's had an immense amount of time already to find a new

5    lawyer.  It's been months.  I doubt that she will find anybody

6    else.

7              MS. BUELL:  I doubt that she will, your Honor.

8              THE COURT:  To the extent that she has already filed

9    some kind of a response, can I -- I think I should probably

10   deny the motion for additional time and give her ten days to

11   file any additional papers that she wants to file, just to be

12   sure that she knows.

13             MS. BUELL:  That would be certainly a very reasonable

14   thing to do, your Honor.  Yes, she certainly has known since

15   March that she needed to find a new lawyer.  No one has

16   approached me.  No one has filed an appearance, and we really

17   would like to be out of this case since we do not belong in it.

18             MS. JOHNSON:  If I may, your Honor.

19             THE COURT:  Okay, I'll do that.  I'll rule on her

20   motion for more time.  In point of fact, she wanted until

21   November 12th, which is not far away, and I could allow that

22   motion and tell her that at that point she's dead.

23             MS. BUELL:  Okay.

24             THE COURT:  I think that makes --

25             MS. BUELL:  Not in the those words, I trust.
```

```
 1              THE COURT:  I'm sorry?
 2              MS. BUELL:  Not in those words, I trust.
 3              THE COURT:  No.  The case is dead.
 4              MS. BUELL:  Yes.
 5              THE COURT:  So, I will allow that motion and -- but
 6     make sure that if there is no lawyer, that's the end of the
 7     case.
 8              MS. BUELL:  Yes, although --
 9              THE COURT:  That is, I will rule on the motion for
10     summary judgment on the papers that I then have.
11              MS. BUELL:  Yes.  And not because she doesn't have a
12     lawyer, but simply because she hasn't made an appropriate
13     argument.
14              THE COURT:  Right.  Well, the lawyer is part of it.
15     I mean, she has -- since she has filed a response, I will tell
16     her that either a lawyer by the 12th or whatever additional
17     papers she wants to file on the 12th.  The issue is decided.
18              MS. BUELL:  Very good.
19              MS. JOHNSON:  And, your Honor, the Plaintiffs'
20     Steering Committee will make sure that that plaintiff receives
21     notice of this Court's order as soon as we can.
22              THE COURT:  Well, that is a good idea.  Then I won't
23     have to make an additional order beyond that which I will
24     endorse on the document that seeks the additional time.
25              MS. JOHNSON:  Yes.  Thank you, your Honor.
```

```
 1                MS. BUELL:  Thank you, your Honor.

 2                MS. JOHNSON:  I believe that brings us to 15 and

 3      these are the motions that I believe counsel is prepared to

 4      argue today, the BKC and the APAC motions.

 5                THE COURT:  Okay.  And then there is an unopposed

 6      motion to dismiss, which is in the case number, Lisa,

 7      13-10558, and that's allowed.

 8                COURTROOM DEPUTY CLERK URSO:  Okay.

 9                MR. DEAN:  Your Honor, Richard Dean again.

10                On 16, that item appeared on the agenda and

11      subsequent to that, Ameridose and the only objecting party

12      have reached agreements.  So, there's no need for you to

13      decide anything on No. 16.

14                THE COURT:  So, Docket No. 1090 has been resolved?

15                MR. DEAN:  Yes.

16                THE COURT:  The supplemental order transferring

17      additional personal injury cases, is there objection to that?

18      It's No. 17 on the list, Docket No. 1477.

19                MR. GOTTFRIED:  I'm not aware of any objection.

20                MR. TRIBLE:  Your Honor, this is Chris Trible.  I'm

21      counsel for Insight Health Corp.

22                These are four additional cases that have been filed

23      in state court in Virginia.  The plaintiff's firm is the

24      Miller firm.  They consented to the transfer of these cases to

25      this Court.  I'm preserving their objections, but
```

```
 1    acknowledging this Court's prior order transferring similarly-

 2    situated cases.  So, that's why this has been presented as an

 3    assented-to motion for entry of supplemental transfer of

 4    order.

 5              THE COURT:  So, it should be allowed?

 6              MR. TRIBLE:  That would be our position, your Honor.

 7              THE COURT:  Okay.  No. 1477 is allowed, Lisa.  That's

 8    Docket No. 1477.

 9              COURTROOM DEPUTY CLERK URSO:  Yes.

10              THE COURT:  Now the trustee's notice regarding

11    further relief.  Have we already dealt with that?

12              MS. JOHNSON:  Yes.

13              MR. GOTTFRIED:  Yes, your Honor.

14              THE COURT:  The letter concerning the motion for

15    leave to amend the short form.  That was -- we dealt with this

16    before, I think, wasn't it?

17              MS. JOHNSON:  I apologize, I haven't read that

18    letter, your Honor.  So, I'm not sure what the contents of the

19    letter is.  Ms. Gidaro argued motions that I believe were

20    addressed before your Honor at, I think, the last status

21    conference.  I believe the resolution there involved Ms.

22    Barrett filing motions to amend complaints to take care of

23    some procedural issues.  So, I'm not sure specifically what

24    this letter speaks to.

25              THE COURT:  Well, I don't think it -- my recollection
```

```
1    is it doesn't object to anything.  Is anybody here who may
2    have had responsibility for the letter?
3              MS. JOHNSON:  I do not see --
4              MR. BLUMBERG:  Your Honor, this is Jay Blumberg for
5    the Premier defendants, who I believe are the defendants who
6    they are asking to amend to include, and we did not object to
7    them amending the short form complaints to add, I believe,
8    some doctors that they had not added previously.  I don't
9    think the Court has ruled on it, but I --
10             THE COURT:  I mean -- well, it was a letter
11   concerning an unopposed motion, which after the letter remains
12   unopposed.
13             MR. BLUMBERG:  Correct.
14             THE COURT:  Okay.
15             MS. JOHNSON:  So, I would suggest that the motion
16   could be granted.  I'm not sure what needs to be done --
17             THE COURT:  So, the motion is 1453, and that is
18   allowed, without opposition.
19             MR. BLUMBERG:  Correct.  They were just waiting for
20   that so that they could actually amend the complaints.
21             THE COURT:  Okay.  Thank you.
22             MS. JOHNSON:  Thank you.
23             That brings us to briefing in progress, your Honor.
24   There are, obviously, a number of dispositive motions that are
25   in progress.  By the next status conference I expect that
```

```
1    we'll --
2            THE COURT:  We're sort of dribbling these out.  So, I
3    shouldn't be unhappy when I get them, right?
4            MS. JOHNSON:  No, you would not be unhappy when you
5    get them.
6            I do think it probably makes sense to set oral
7    argument at the next status conference for those motions that
8    will be ready to be argued.
9            THE COURT:  That would be the November -- the
10   December date.
11           MS. JOHNSON:  Yes.
12           THE COURT:  The December 4 date.
13           MS. JOHNSON:  Yes.  And the Plaintiffs' Steering
14   Committee is happy to file a notice identifying which motions
15   are ready for that date and we will do our best to get that to
16   the Court early so that we all understand what's being argued
17   on that date.  I know we have not always done our best on
18   that, your Honor, but we will do better.
19           THE COURT:  Okay.  That takes care of all of 21,
20   right?
21           MS. JOHNSON:  Yes.
22           THE COURT:  Do we -- you don't know yet how many of
23   those there will be and whether we can do it as we're doing
24   today both at the -- the same part of the day?
25           MS. JOHNSON:  I'm told that at least three of those
```

1  should be ready for oral motion at the next December status

2  conference.  That would be Cincinnati, Encino and Glaser or

3  *Glaser*, (a), (d) and (e).  I don't know what the schedule we

4  might work out with UniFirst will look like.  It's possible

5  that will be ready to go.  I'm not sure.

6          THE COURT:  So, we could have the status conference

7  and then the motions, as we're doing today.

8          MS. JOHNSON:  Yes, I think that would work very well,

9  your Honor.

10          THE COURT:  All right.  Now, Insight's motion for

11  reconsideration.

12          MS. JOHNSON:  I apologize, your Honor.  Mr. Fennell

13  has reminded me, going back one, Item (c), 21(c), Image Guided

14  Pain is part of the Virginia mediation.  So, that's not

15  something, hopefully, that the Court will ever have to hear.

16          THE COURT:  So, (d) will not be on, for sure.

17          MS. JOHNSON:  (c).

18          THE COURT:  (c)?

19          MS. JOHNSON:  Charley.

20          THE COURT:  I haven't checked (c).  You had (b), (d)

21  and (e), right?

22          MS. JOHNSON:  (a), (d) as in dog, and (e) we think

23  will be ready for argument in December.  (c) Hopefully, you

24  will never have to hear.

25          THE COURT:  Okay.

1          MS. JOHNSON:  The same with 22, which also involves

2     the Virginia mediation.

3          THE COURT:  So that one is, at the moment, dormant?

4          MS. JOHNSON:  Yes, your Honor.

5          23 I don't think we need to address.  Nor -- I don't

6     know whether Mr. Hermes wants to address 24 or 25.

7          MR. HERMES:  Your Honor, motions 24 and 25 are in

8     connection with the Liberty motions for summary judgment and

9     they relate to putting documents before the Court because of

10    prior orders concerning how documents noted as being

11    proprietary or confidential must be dealt with.  So, it's not

12    something that Liberty wished to do, but was required to do.

13         THE COURT:  Well, are they proprietary?  And do they

14    need to be sealed from your perspective?

15         MR. HERMES:  From Liberty's perspective -- it is not

16    Liberty's documents.  From Liberty's perspective, no.  I

17    believe that either the Steering Committee or the Creditor's

18    Committee or the trustee has identified one document that they

19    believe is proprietary or confidential.  There was also a

20    statement that certain scientific hair analysis documents

21    might be confidential.  Scientific hair analysis counsel has

22    indicated that he does not wish to contend that they're

23    confidential.  So --

24         THE COURT:  Why don't we agree that the -- that all

25    the documents -- that none of the documents will be sealed

1  unless somebody identifies a need from their perspective to

2  seal it so long as Liberty doesn't need to have them sealed?

3        MR. HERMES:  There was only one document and one of

4  the other parties made reference to that.  I can't, as I'm

5  standing here this afternoon, identify that for the Court, but

6  it related to documents related to a certain lot of drugs that

7  were manufactured or compounded.

8        THE COURT:  Well, why don't you give me a list by the

9  end of next week of the documents that you want to have sealed

10  and that anybody else wants to have sealed and, otherwise, the

11  motion is denied.

12        MR. HERMES:  Fine.

13        THE COURT:  That is, the motion will be allowed only

14  as to the specifically-identified documents and you'll collect

15  which ones they are and you'll let me know.

16        MR. HERMES:  Correct, your Honor, I will do that.

17        THE COURT:  Thank you.

18        MR. HERMES:  Thank you.

19        THE COURT:  And there is also a motion to extend time

20  to respond.  I don't know how far -- how long you want given

21  Mr. Hermes' press for time.

22        MS. JOHNSON:  I think that only got extended up until

23  the October 31st date that we've agreed to, your Honor, not

24  beyond.

25        THE COURT:  Okay.  So, that's fine.

```
 1            Anything else?  Does anybody have anything else on

 2    the agenda that we haven't covered or we should cover more

 3    thoroughly?

 4            (No response.)

 5            THE COURT:  Thank you all, except for those of you

 6    who want to stay and argue.

 7            Thank you again.  Particularly, Ms. Johnson and her

 8    crew.

 9            (Pause.)

10            THE COURT:  Now, there are two motions, one by BKC

11    Pain Specialists, Dr. Katabay and -- Drs. Katabay and Batra,

12    and that has to do with a bunch of Ohio defendants, and then

13    the other one is by Advanced Pain & Anesthesia Consultants

14    doing business in some way and Dr. Chang which comes from

15    Illinois.

16            Now, the Ohio motion was filed first.  So, perhaps we

17    should go to that first, unless you have some thought of doing

18    it the other way around.

19            MR. ABELN:  Your Honor, we had just spoken --

20            THE COURT:  Why don't you remain seated and then you

21    don't have to crouch.

22            MR. ABELN:  It wasn't built for my size, your Honor.

23            THE COURT:  I'm sorry?

24            MR. ABELN:  The microphone wasn't built for my size,

25    apparently, but --
```

```
1              THE COURT:  That's true.
2              MR. ABELN:  The plaintiffs' -- Ms. Dougherty and I
3    had spoken beforehand and she had hoped that we could perhaps
4    proceed with APAC first.
5              THE COURT:  Fine with me.
6              You're not seriously pressing the personal
7    jurisdiction issue, are you?
8              MR. ABELN:  Your Honor, what we actually -- one of
9    the things we wanted to address right away was that we had
10   reached an agreement with Plaintiffs' Steering Committee
11   regarding that beforehand and we're working out a stipulation
12   in that regard that we anticipate having settled within about
13   ten days.
14             THE COURT:  The whole motion or just that piece?
15             MR. ABELN:  Relative to the personal jurisdiction
16   piece.
17             THE COURT:  Okay.
18             MR. ABELN:  And so, we anticipate filing something
19   within about ten days on that point.
20             In terms of the entire motion, your Honor -- we also
21   actually agreed with Plaintiff's Steering Committee on a
22   stipulation of dismissal, without prejudice, as to the claims
23   on battery, conspiracy and agency, and that would work both as
24   to the Ohio defendants as well as the Illinois defendants.
25             THE COURT:  Battery, agency, and what?
```

```
 1              MR. ABELN:  Conspiracy.

 2              THE COURT:  Conspiracy.  Well, I think that's a wise

 3      thing to do.  And there will be a stipulation concerning

 4      jurisdiction?

 5              MR. ABELN:  Correct, your Honor.

 6              Again, on a number of these other issues, your Honor,

 7      we'll rest on the papers, but I wanted to specifically focus

 8      the Court's attention both in the APAC cases and Illinois and

 9      in the Ohio cases on the --

10              THE COURT:  You arguing both?

11              MR. ABELN:  I'm arguing both.  We represent both

12      defendants, your Honor.

13              THE COURT:  Okay.

14              MR. ABELN:  On some specific state-based issues that

15      are raised in both motions and, in particular, those would be

16      the Consumer Protection and the Product Liability Act claims

17      for both states, but dealing with APAC first in Illinois, I'd

18      like to just briefly highlight some issues first on the

19      consumer protection end.

20              THE COURT:  Excuse me one moment.

21              (Discussion off the record at the bench.)

22              THE COURT:  Okay.  I have to be ready to make notes,

23      just in case.

24              MR. ABELN:  Just in case, your Honor.

25              As to the consumer protection claim, first of all,
```

1    the statute is specifically built in Illinois to not apply to

2    claims that seek recovery for injury to a person.  We're only

3    dealing in Illinois under the Illinois Consumer Fraud and

4    Deceptive Business Practices Act for actual economic damages.

5    In fact, the language specifically states that "nothing in

6    this act shall apply to," Sub 5, "claims seeking damages for

7    conduct that results in bodily injury, death or damage to

8    property other than property that is the subject of the

9    practice claims."

10          But here, obviously, we're dealing with a claim of

11   personal injury, bodily injury as to the specific plaintiffs

12   in the two claims that we're dealing with today in the

13   Illinois cases.

14          On that note, obviously, the claim for -- the claim

15   under the Illinois Consumer Fraud and Deceptive Businesses Act

16   would only allay insofar as there are any economic damages and

17   here there are no real economic damages listed.

18          Secondly, though, under the law interpreting it,

19   specifically in Illinois, the practice of medicine has been

20   deemed to be not the equivalent of ordinary commercial

21   enterprise, and that's in the *Evanston Hospital* case, 627

22   North East 2d 29.  Specifically, it's noted that the Consumer

23   Fraud Act was intended to reach practices of the type which

24   affects consumers generally, not particularly in this case

25   where there's no sense that the doctors marketed, put out MPA

1    in any way.

2          The language specifically was addressed again later

3    in 2006, where the court found that because the plaintiff was

4    not challenging the quality of the medical care itself that

5    was provided, that the Consumer Protection Act wasn't

6    implicated in any way.  Essentially, in *The Hill vs. Sisters*

7    *of St. Francis Health Services* act -- or case, the claim

8    specifically focused on billing, which the court found fell

9    within the exception to the *Evanston* act -- the *Evanston* case.

10         Again, here we're not dealing with a billing issue.

11   We're dealing with a personal injury issue.  So, to the extent

12   that there is any damage that's allowed under the Consumer

13   Protection Act in Illinois, it's limited to those non-

14   economic damages.

15         Now, your Honor, in terms of structure of the

16   argument, I didn't know if you wanted to go --

17         THE COURT:  It's your argument.

18         MR. ABELN:  -- go to the plaintiff on the consumer

19   protection argument and then come back on the product

20   liability.

21         THE COURT:  No.  Why don't you keep going.

22         MR. ABELN:  Thank you, your Honor.

23         Now, as to the product liability issue, it's

24   established, we argue, under Illinois law, that there's no

25   product liability for the provision of medical care in the

1    course of medical care itself.

2         APAC and the individual defendant named in the APAC

3    case, Dr. Chang, are not in the business of selling MPA.

4    Rather, it's provided as part of the medical care and

5    treatment, again, as noted in the Consumer Protection Act.

6         The strict liability --

7         THE COURT:  If a doctor were to sell pills, not just

8    give away what the doctor got from the pharmaceutical company

9    but actually sell them, would the consumer -- would the

10   product liability statute still protect against a suit?

11        MR. ABELN:  Well, your Honor, I think what's an

12   interesting case that we cited in our brief is the *Stiffler*

13   case, which was decided in the Seventh Circuit, and that

14   specifically highlights the fact that, you know, you're

15   dealing with a -- you're dealing with a case where -- that was

16   a prosthetic case where the hospital provided a prosthesis to

17   the patient.  The hospital never placed the prosthesis, the

18   Court found, in the stream of commerce.

19        THE COURT:  So, the plaintiff was able to bring that

20   action as a product liability action?

21        MR. ABELN:  Well, your Honor, in *Stiffler* the

22   plaintiff was not allowed to proceed under strict liability.

23   It didn't extend to strict liability under *Stiffler*, a strict

24   liability claim under those circumstances.  What the --

25        THE COURT:  So, when you say that there is no

1    possibility of a product liability claim with respect to

2    medical issues, does that mean -- does that include

3    negligence?

4            MR. ABELN:  No, your Honor.  There is specific

5    statutory provisions that allow for a medical case to proceed

6    against a physician on negligence.

7            THE COURT:  Not medical malpractice.  I'm asking

8    whether there could be a negligent product liability case if

9    the doctor sells products.

10           MR. ABELN:  Your Honor, I was specifically addressing

11   in this not the negligence end -- and this will -- this sort

12   of preemption of all common law claims actually arises in the

13   Ohio statute.

14           THE COURT:  So, you are at the moment simply

15   addressing the strict liability part of product --

16           MR. ABELN:  Simply addressing the strict liability

17   and the products liability claim itself.

18           In terms of the negligence action, we also raised

19   that in our brief in terms of the existence of duty and

20   causation and I think that's a separate argument that can be

21   addressed, and if your Honor has questions about it, I can

22   certainly address it, but I --

23           THE COURT:  I was trying to understand the narrowness

24   or the breadth of your argument.

25           MR. ABELN:  Correct, narrow to the product liability

1    claim itself, your Honor.

2           So, again, under the *Stiffler* case, it noted that

3    this prosthesis was not placed in the stream of commerce.  So,

4    you're not dealing in the circumstance where this medical --

5    this medical provider, this hospital in that case, was deemed

6    to be a seller.

7           Now, the caselaw has sort of -- and plaintiff cites

8    to *Cunningham* in Illinois specifically as a basis for the

9    allegation that strict liability does go forward, different

10   case dealing with the hospital specifically, and it was also

11   decided before the institution of the UCC's Predominant Sale

12   of Goods Test, which came out later on down the line, which is

13   addressed in the *Brand* case, and I think the Predominant Sale

14   of Goods Test is informative as to how to interpret whether or

15   not a product liability case survives in Illinois specifically

16   in terms of medical provider at all.

17          Here, you have physicians who are using their

18   clinical judgment, who are deciding based on symptomatology of

19   a patient that they should proceed in one way, shape or form.

20   One method that they used was an injection, one method that

21   they used was injection using the MPA that ended up being

22   allegedly tainted in this case.

23          So, in that sense, using the Predominant Sale of

24   Goods analysis under the UVC -- UCC, the product liability

25   case fails.  It failed that test.

 1          But, your Honor, in terms of a strict liability

 2    analysis as well, Illinois focuses in on restatement of 402(a)

 3    for a determination as to whether or not any seller is deemed

 4    to be liable under a strict liability theory.

 5          And so, number one, you have to make the

 6    determination as to whether or not in Illinois these doctors

 7    were sellers, and one of the key analyses is whether or not --

 8    not simply a product was transacted, but whether or not the

 9    sale was performed as part of -- whether or not the physician

10    sold and marketed a product.

11          Specifically, under Comment F, that it's the

12    occasional seller -- it not an occasional seller, but those

13    who actually go out and market their products that they're

14    deemed to be sellers, and I think here you're in a

15    circumstance where as a matter of law, it's appropriate to

16    determine that these doctors were not sellers under the

17    restatement.  They weren't marketing their product.  They were

18    utilizing this as part of their clinical treatment and,

19    otherwise, it's, you know, frankly, your Honor, extending the

20    duty, as we note in the negligence, extending a responsibility

21    to physicians that's well beyond the scope that the law

22    intended.

23          Going back to *Cunningham*, which is cited in

24    plaintiffs' brief as well, the legislature in Illinois

25    recognized the risk of extending strict liability.  In that

1     case it was blood testing specifically.  After the decision

2     comes -- or blood bank specifically where the blood was sold

3     to the hospital -- or provided by the hospital.

4           The legislature steps in directly afterwards and

5     abrogates it as to that specific blood issue.  The legislature

6     recognized that that was extending things too far, and for

7     that I would say, your Honor, the --

8           THE COURT:  It may have been lobbied by some

9     particular interest group.

10          MR. ABELN:  Your Honor, it may very well have been,

11    but there was a legislative determination of that --

12          THE COURT:  As to blood.

13          MR. ABELN:  Specifically as to blood in that case and

14    -- which raises the question as to whether or not further

15    extension -- in the 41 years since, there hasn't been an

16    extension of strict liability beyond that *Cunningham* decision,

17    which raises the issue as to why -- as to whether or not this

18    is extending that responsibility out remains a decision for

19    legislature and not for -- not for a court interpreting that

20    41-year-old case.

21          THE COURT:  Thank you.

22          MR. ABELN:  So -- and one more small point on the

23    Illinois cases, too.  To the extent that a failure to warn

24    claim is supported here, the duty in terms of a failure to

25    warn that's been constructed by plaintiffs, the Plaintiffs'

```
 1    Steering Committee, is one that arises out of -- they cite to
 2    a Frye case.
 3              (Telephone ringing.)
 4              THE COURT:  Excuse me.
 5              MR. ABELN:  Of course.
 6              (Discussion off the record at the bench.)
 7              THE COURT:  Go ahead.
 8              MR. ABELN:  The failure to warn --
 9              THE COURT:  Unless Loretta is here.
10              (Laughter.)
11              MR. ABELN:  I'm sorry, your Honor.  That must be for
12    me.
13              Your Honor, again, under the failure to warn claim,
14    Plaintiffs' Steering Committee constructs a legal analysis
15    which essentially inverts the Learned Intermediary Doctrine to
16    construct a duty on the doctor to warn rather than a --
17    constructed a flow between manufacturer and physician as to
18    actual warnings.
19              And on that, your Honor, I would leave the rest to
20    the brief as to the Illinois cases.
21              THE COURT:  Thank you.
22              MR. ABELN:  Thank you.
23              THE COURT:  Ms. Johnson, are you doing this?
24              MS. JOHNSON:  No, your Honor.  Ms. Dougherty and Ms.
25    Lee.
```

```
1              THE COURT:  I'm sorry?

2              MS. JOHNSON:  Ms. Dougherty for APAC and Ms. Lee for

3   BKC.

4              THE COURT:  Okay.  So, Ms. Dougherty, you go.

5              MS. DOUGHERTY:  Good afternoon, your Honor.  Thank

6   you.  I represent the Plaintiffs' Steering Committee and

7   plaintiffs in the matters addressed here with APAC,

8   specifically Mr. Musselwhite and Mr. Kennedy in these cases

9   here.

10             One thing I'd like to draw specifically to your

11  attention, your Honor, is that each and every issue that has

12  been addressed by APAC has been previously decided by you when

13  you had looked at the master complaint and the allegations,

14  and you found specifically that the allegations set forth in

15  the master complaint had been sufficient for the plaintiffs to

16  move forward, and just to remind you that that's the stage

17  that we're at here.  We are at the motion to dismiss --

18             THE COURT:  Yes, but we're just talking about

19  specific Illinois statutes.

20             MS. DOUGHERTY:  And we'll address that as well, your

21  Honor, but to the extent that what we're looking at here is

22  whether or not the plaintiffs have set forth sufficient

23  allegations that will entitle them some plausibility of

24  entitlement to relief here, that's where we are.  We're not

25  here to provide evidentiary arguments and things like that.
```

1    So, I think --

2            THE COURT:  I didn't understand him to do that.  I

3    understand what you're saying.

4            MS. DOUGHERTY:  Yes.  So, your Honor, we do believe

5    that some of the arguments that have been made and some of the

6    issues that have been raised and some of the issues that

7    haven't actually been raised by my brother counsel but that

8    are raised in his brief were addressed in more detail by you

9    in a very -- more similar to the issues that have already been

10   resolved and I'll get to those later.

11           THE COURT:  Not much later.

12           MS. DOUGHERTY:  I'm sorry?

13           THE COURT:  Not much later.

14           MS. DOUGHERTY:  Not much later, yes.

15           One of the issues that we initially started

16   discussing here was the Consumer Fraud Act and the Consumer

17   Protection Act, and the plaintiffs do not believe that this

18   law is as limited as we've heard here from defense counsel.

19           The violation of the act actually includes a variety

20   of different things, including deception, fraud, false

21   pretenses, false promises, even misrepresentations or

22   concealments of facts, and those are specifically the types of

23   allegations that the plaintiffs have made in their complaint

24   to specifically set forth that we believe that APAC failed to

25   provide information to the plaintiffs.  They misrepresented

1    information to the plaintiffs and in doing so, the plaintiffs

2    relied upon that, had these injections and were critically

3    injured.

4           Those allegations are included in the master

5    complaint at Paragraphs 243, 247, 251, 253.  There are a

6    myriad of different allegations that set forth here

7    specifically where the patients were told that they were

8    getting an FDA-approved drug, DepoMedrol, where, in fact, they

9    were getting a drug that was not approved by the FDA and they

10   were getting a compounded drug.  They were not advised of the

11   alternatives of an FDA-approved drug, an FDA-approved drug

12   that would have potentially not been preservative-free and, in

13   fact, when they are preservative-free, they're open to

14   contamination.  The --

15          THE COURT:  Excuse me.

16          Counsel for the defendants suggested that that

17   statute does not apply to physical injury, only economic

18   injury, but you are certainly claiming for physical injury by

19   the alleged wrongdoing that you've just outlined, yes?

20          MS. DOUGHERTY:  Some of the allegations that we have

21   are particular to personal injury, but there are also economic

22   damages as well.  These plaintiffs were separately billed.

23   One for --

24          THE COURT:  Are you claiming physical injuries under

25   the consumer protection statute?

```
 1            MS. DOUGHERTY:  Under the consumer protection
 2  statute, the economic injuries that we were talking about
 3  relate to the amount that was billed to the plaintiffs.  They
 4  were billed separately for DepoMedrol at $60.
 5            THE COURT:  Okay.  But is that what you're claiming
 6  as damages under the consumer protection statute or are you
 7  also including damages for physical injury under that statute?
 8            MS. DOUGHERTY:  Under that particular statute, we are
 9  claiming the economic damages --
10            THE COURT:  Only?
11            MS. DOUGHERTY:  -- that were suffered, your Honor.
12            THE COURT:  Only?
13            MS. DOUGHERTY:  Yes.  And those damages also included
14  $1500 for each injection done by the physician.  So, there are
15  certainly economic damages that have been suffered here that
16  have been ignored and that have been set forth in the
17  plaintiffs' complaints.
18            With respect to the product liability count -- you
19  asked, your Honor, whether or not there was a negligence
20  component to the Product Liability Act and we believe that
21  there is.  So that the issue here that is being addressed is
22  not the negligent element -- negligence element of that act,
23  but instead just the strict liability elements of that act.
24            Under Illinois law, one who sells any product in a
25  defective condition, unreasonably dangerous to the user is
```

1    subject to liability for physical harm that is caused by it to

2    the ultimate user if they engaged in the business of selling

3    that product and it's expected to and does reach the user

4    without substantial change.

5         And, again, I think the law that you're hearing is

6    being read a little bit too narrowly.  There is law to

7    support, in fact, that these -- the hospital and Dr. Chang

8    were both sellers and also the fact that they dispensed the

9    drug is sufficient in order to fall under the Product

10   Liability Act, particularly if they sold the plaintiffs the

11   DepoMedrol and they separately billed for their medical

12   services when they injected plaintiffs.

13        Under the *Cunningham* case that was referenced by

14   defense counsel, the court there specifically said, "The

15   dispensation of a drug and other medications by hospitals or

16   other entities where injury or disease resulting from the

17   existence of deleterious contaminates therein would most

18   assuredly result in the application of strict liability

19   theory."

20        And I know that defense counsel would like to guess

21   and to have us all surmise as to what happened next with the

22   legislature, but there is no actual specific law that says the

23   legislature had come in to overturn *Cunningham* and, in fact,

24   we believe that dispensation along with these defendants being

25   sellers is sufficient for us to move forward against APAC for

1    a product liability claim.

2         The *Stiffler* case that's been relied upon by defense

3    counsel is also a case that we think is inapposite here.  It's

4    a prosthetic, and specifically in that court, the case -- the

5    court held that the plaintiff could not proceed against the

6    hospital because the hospital was in no better position than

7    Stiffler to examine the product and discover the defect.

8         Whereas, in this case the plaintiffs never had an

9    opportunity to ever see what was being injected into their

10   backs.  The plaintiffs never had the opportunity, as the

11   clinics did, to go to NECC and see what was going on in their

12   facilities and see the filth that was going on there.

13   Whereas, here we have different allegations where that is

14   precisely what could have been done.

15        So, we believe that we have sufficient allegations

16   set forth in our complaint, numerous paragraphs that would

17   allow us to proceed also under the Product Liability Act and,

18   again, that's also a claim that your Honor had allowed

19   plaintiffs to proceed under in other cases.

20        The failure to warn claim, again, was also well

21   reasoned by you, your Honor, and we believe that, again --

22        THE COURT:  Then we don't need to discuss it anymore,

23   right?

24        MS. DOUGHERTY:  Precisely.  We think that you should

25   rule exactly as you had done with the Tennessee and New Jersey

1    cases.

2           As you know, the plaintiffs have set forth multiple

3    allegations about the fact that they were never informed of

4    the risks and the potential alternatives.  There were actual

5    misrepresentations that were made to them about the drugs,

6    about -- they weren't informed about potential injuries that

7    they could suffer from being injected directly into the

8    epidural space.

9           Our allegations are set forth in Paragraphs 48 to 55

10   and 151 to 206, your Honor, setting forth all the reasons why

11   we believe we should be able to move forward on our failure to

12   warn claim because, in fact, we do not believe that the

13   defendants here provided informed consent.  So, in order for

14   consent to be provided, it must be informed, and in this case

15   it was not informed because the defendants failed to tell the

16   plaintiffs about all of the risks associated and actively

17   misrepresented to them what they were receiving in terms of an

18   FDA-approved drug.

19          THE COURT:  Thank you.  Is that it?

20          MS. DOUGHERTY:  Just briefly, your Honor, punitive

21   damages was raised in the papers.  It wasn't addressed --

22          THE COURT:  He didn't talk about it.

23          MS. DOUGHERTY:  I'm sorry?

24          THE COURT:  He didn't talk about it.

25          MS. DOUGHERTY:  He did not.  We believe you, again,

1    should rule the way that you have previously on that and allow

2    us to proceed because we have sufficiently pled punitive

3    damages.

4           With respect to the negligence and causation issues,

5    again, he did not raise it.  We believe that --

6           THE COURT:  In that case, you don't have to raise it

7    either.

8           MS. DOUGHERTY:  Okay.  I believe we've addressed it

9    in our papers.

10          THE COURT:  You might encourage him to do a rebuttal.

11          MS. DOUGHERTY:  I'm sorry?

12          THE COURT:  You might just encourage him to do a

13   rebuttal.

14          MS. DOUGHERTY:  At any rate, we just wanted to just

15   state that we believe we've sufficiently pled those issues as

16   well.

17          THE COURT:  Now we go to Illinois or are we

18   rebutting?

19          MR. ABELN:  We only need one sentence for rebuttal,

20   if that's okay, your Honor.

21          On the consumer protection claim, they noted that

22   there was a misrepresentation claim in the master complaint,

23   sort of facts that would support that.  That's still captured

24   within that *Evanston vs. Crane* case.  A misrepresentation

25   claim was part of that case as well and the court still found

1    that there was a -- the healthcare provision, not the consumer

2    protection claim.

3            THE COURT:  Okay.  Now Illinois -- no.  Ohio.  I'm

4    sorry.

5            MR. ABELN:  Ohio.

6            And, your Honor, again, the agency, battery and

7    conspiracy claims are out by agreement.  And here, again,

8    we're dealing with two specific statutes.

9            THE COURT:  Here, one of the things that you

10   apparently are talking about -- apparently relying on is --

11   there's some affidavit that the plaintiff never received any

12   of the NECC steroids.  That's not an argument you're making

13   now in the motion to dismiss, is it?

14           MR. ABELN:  No.  I'm resting on the papers on those,

15   your Honor, and to the extent that a factual issue has been

16   raised as to that, that becomes a non-issue.

17           THE COURT:  Okay.  So, that one is not really before

18   me today.

19           MR. ABELN:  Correct, your Honor.

20           As to the -- starting, I guess, with the product

21   liability law, your Honor.  The Ohio Product Liability Act

22   statute is actually far more expansive than even the Illinois

23   law and the Tennessee law.  It explicitly eliminates all

24   common law product liability claims, and it has included

25   negligence, gross negligence, negligence per se, negligent

1   misrepresentation, and so on.

2        The statutory scheme also specifically excludes a

3   provider of -- quote, "a provider of professional services

4   who, incidental to a professional transaction, the essence of

5   which is the furnishing of judgment, skill or service, sells

6   or uses a product."

7        So, we have a specific statutory provision here that

8   precludes the -- any instance of a professional -- provision

9   of a professional service with an incidental product.  And I

10  think here, obviously, is sort of the textbook case of that

11  where you have a physician -- two physicians -- the case that

12  we're dealing with, BKC, to be clear, we're dealing with two

13  physicians who are in a professional practice of just those

14  two physicians.  This is not a hospital.  This is not an

15  institutional setting.  This is, essentially, a professional

16  organization of two physicians who had their clients brought

17  in, who evaluated their complaints of pain, and provide them

18  with services, how to relieve their pain.  One of the

19  techniques they used is an injection.  Incidental to that is

20  the use of MPA.

21       So, I think you have a textbook statutory issue here

22  where the -- the BKC defendants do not rise to the level of a

23  supplier, because this is under the definitional phrase -- the

24  definitional section of the statute of a supplier where they

25  could become liable for the placement of this product in the

1   stream of commerce.

2          And the case that's cited by the plaintiff in this

3   case is the *Saylor* case which does not address the specific

4   exclusion, this exemption, and, as such, essentially is --

5   actually, the court is a little bit surprised, I think, in

6   that decision that it wasn't raised, but I think you have a

7   clear scenario here where the statute precludes the case from

8   going forward on the product liability end as to these

9   defendants.

10          As to the -- again, the consumer protection claim,

11  again, you're also in a scenario where you have another

12  expansive statute.  You have -- number one, the statute

13  specifically lays out that a consumer transaction does not

14  include transactions between physicians and their patients,

15  and the transaction --

16          THE COURT:  The statute says that explicitly?

17          MR. ABELN:  Transactions between physicians and their

18  patients.  And if you go to the end of the -- that sort of

19  definitional structure itself, it lists out an exclusion to

20  that line specifically for veterinarians and where it says,

21  "and transactions between veterinarians and their patients

22  specifically that pertain to medical treatment but not

23  ancillary services."

24          In this case you have the much broader exclusion that

25  includes any transaction between the patient and --

```
 1              THE COURT:  So, for people, it's any transaction that

 2    excludes.  For dogs, it's any transaction except ancillary

 3    ones?  Is that what you're saying?

 4              MR. ABELN:  I've been struggling with the language

 5    "veterinarians and their patients" myself, your Honor, but the

 6    specific language -- and I think that has likely more to do

 7    with farming issues than anything else, but here you've got a

 8    situation where the statute clearly --

 9              THE COURT:  But that's a distinction.

10              MR. ABELN:  That is a distinction.

11              THE COURT:  Okay.

12              MR. ABELN:  It's a clear distinction in the structure

13    of the language of the statute.

14              Now, No. 2, and, again, sort of going as to -- part

15    of what we discussed -- because there's, obviously, all

16    similar structures in consumer protection statutes as well as

17    product liability statutes.  You've got a consumer protection

18    statute in Ohio that specifically indicates that it excludes

19    -- excludes personal injury claims, and to the extent that

20    there are any noneconomic damages, they're, in any event,

21    capped at $5,000.

22              And the exclusion in Whittaker vs. MTL Automotive

23    that specifically cites that -- that bars a claim under the

24    Consumer Protection Act to the extent that it requires proof

25    of personal injury.  So, here, again, I think we fall within
```

1    that exclusion in terms of the Ohio doctors.

2         Three, going back, to the extent that the product

3    liability -- that this Court deems that the product liability

4    claim survives under -- in any way under the Product Liability

5    Act, in Ohio the Consumer Protection Act -- I'm sorry -- the

6    product liability statute preempts appeal.  It incorporates

7    within it the consumer protection claims as well as the common

8    law claims and there are two specific cases, the *Chanel* case

9    and the *Hendricks* case, both of which were not raised in the

10   brief.

11        (Telephone ringing.)

12        THE COURT:  Is this on the big phone?  Hello?

13        MR. ABELN:  They may be looking for Loretta again.

14        THE COURT:  Are you Loretta?

15        (Laughter.)

16        (Discussion off the record.)

17        THE COURT:  Carry on, please.

18        MR. ABELN:  It's quite all right.

19        THE COURT:  And conclude.

20        MR. ABELN:  Yes, ma'am.

21        The two cases, specifically *Hendricks* and *Chanel,*

22   indicate that the Consumer Protection Act claims were

23   preempted where the product liability claims were raised.

24        And, your Honor, on that note, given your interest in

25   conclusion, I'll turn it over to the defendant -- or to the

1    plaintiffs.

2              THE COURT:  Thank you.

3              Now, who will speak for BKC?

4              By the way, what does the "C" stand for?  I can

5    figure out the "B" and "K."

6              MR. ABELN:  You would ask me that, your Honor.

7              THE COURT:  Of course, you're fully prepared to

8    answer, right?

9              MR. ABELN:  Your Honor, I can file a supplemental

10   brief on that, if you would like.

11             THE COURT:  That's okay.

12             MR. ABELN:  Thank you, your Honor.

13             THE COURT:  I'll just remain curious.

14             All right.  And who will speak for plaintiffs against

15   BKC?

16             MS. LEE:  Your Honor, Lisa Lee for the plaintiffs.

17             THE COURT:  Lisa?

18             MS. LEE:  Lee.

19             THE COURT:  Lee, L-e-e?

20             MS. LEE:  Yes, your Honor.

21             THE COURT:  Okay.

22             MS. LEE:  I would just like to reiterate what

23   Attorney Dougherty has already discussed, that your Honor has

24   already decided these same issues and that plaintiffs have met

25   the burden for many of the same claims that defendants are now

1    bringing for their motion to dismiss.

2            I'd like to start with the consumer protection claim.

3    Plaintiffs do concede dismissal of the consumer protection

4    counts against Drs. Katabay and Batra, as physicians are

5    exempted from the Ohio Consumer Sales Practices Act, but

6    similarly to the Tennessee defendants' motion to dismiss, the

7    heart of the consumer protection is not the failure --

8            COURT REPORTER:  I'm sorry, you are losing me.

9            MS. LEE:  I'm sorry.

10           -- failure to properly administer MPA, which is an

11   allegation related to the provision of healthcare services,

12   but that the defendants sold the MPA to plaintiffs on the

13   basis of false and incomplete information.

14           In the case *Summa Health Systems vs. Vinigre*, the

15   Court clearly stated that while transactions with physicians

16   are exempted from the Ohio Consumer Sales Practices Act,

17   transactions between a service provider such as a hospital --

18   and we would allege in this case a clinic --

19           THE COURT:  Let me ask you, if an ophthalmologist

20   does a cataract surgery and inserts a lens, is that a sale of

21   that lens to the patient?

22           MS. LEE:  If they were to charge the patient for that

23   lens, yes, we would allege that would be a sale.

24           THE COURT:  You allege it, but is that the common

25   understanding of what the doctor does?

1          MS. LEE:  We're not -- it's not against the doctor,

2     your Honor.  It's against the clinic itself, not the doctor.

3          THE COURT:  Well, the doctors are defendants, too.

4          MS. LEE:  Right, your Honor, but we actually conceded

5     -- we're conceding dismissal of the counts for the consumer

6     protection against Dr. Katabay and Dr. Batra, not against BKC.

7          THE COURT:  You have not claimed against the doctors

8     for selling?

9          MS. LEE:  We did in our short form complaint, but an

10    analysis of Ohio law, the statute clearly states that

11    physicians are exempted.  And so, the plaintiffs concede.  So,

12    that count against the --

13         THE COURT:  You conceded that in your papers or are

14    you just conceding it now?

15         MS. LEE:  We're conceding it now, your Honor.

16         THE COURT:  So, what are you conceding with respect

17    to the claims against the doctors?

18         MS. LEE:  We're conceding the claim of -- alleging

19    consumer protection violation against the doctors.

20         THE COURT:  So, no consumer protection against the

21    doctors?

22         MS. LEE:  Yes, your Honor.  Just against --

23         THE COURT:  How about product liability?

24         MS. LEE:  We will be moving forward with product

25    liability claims against the doctors.

1          THE COURT:  They are liable for product liability?

2          MS. LEE:  Yes, your Honor.

3          THE COURT:  On the grounds that they sold the stuff

4    or sold the --

5          MS. LEE:  On the grounds that they're considered a

6    supplier as defined by the Ohio Product Liability Act.

7          THE COURT:  Okay.

8          MS. LEE:  So, while transactions with physicians are

9    exempted from the Ohio Consumer Sales Practices Act, a

10   transaction between a service provider such as a hospital and

11   a consumer is not clearly exempted, as stated by the Ohio

12   courts in the --

13         COURT REPORTER:  I'm sorry, I didn't understand.

14         THE COURT:  You're reading it and you're reading it

15   too fast.

16         MS. LEE:  Sorry, your Honor.

17         THE COURT:  I can't understand it either and it's

18   late in the day and the reporter has been very busy.

19         MS. LEE:  -- *Summa Health vs. Vinigre*, the Ohio court

20   there clearly stated that, "While transactions with physicians

21   are exempted from the Ohio Consumer Sales Practices Act, a

22   transaction between a service provider, such as a hospital,

23   and a consumer is not clearly exempted."

24         And the only other case that defendants rely upon in

25   their brief for their argument is *Chiropractic Clinic of Solon*

1    *vs. Kutsko*, which we would argue is different from the case at

2    bar, as the allegation in that case was related to whether or

3    not the true bill was medically necessary, which is, again, an

4    allegation related to provision of healthcare services versus

5    ours, which is based off of false and, you know, incomplete

6    information and misrepresentation.

7          Furthermore, in the case of *Elder vs. Fischer*, the

8    Ohio court analyzed the legislative intent of the Ohio

9    Consumer Sales Practices Act and determined that the

10   legislature did not specifically exclude healthcare facilities

11   and concluded that the legislature, if they had wanted to

12   exclude such from the act, it would have done so and that the

13   court was not going to supply an exception where there was

14   none by statute.

15         In terms of the products liability claim, your Honor,

16   plaintiffs argue that the defendants are suppliers as defined

17   under the Ohio Products Liability Act.

18         Defendants seem to rely on the -- there's an

19   exception to who is considered a supplier under the act and

20   whether or not the sale of that product is incidental to the

21   service, and plaintiffs would contend that MPA was not

22   incidental.  It was part and parcel of the service that was

23   given to the plaintiffs and, thus, they would fall under the

24   definition of supplier within the meaning of the OPLA.

25         Additionally, the Ohio courts have found that

1    supplier liability is not limited to an actual sale in the

2    traditional sense.  The only question that they find relevant

3    is whether the seller facilitated placing the product into the

4    stream of commerce, and plaintiffs sufficiently alleged that

5    the defendants facilitated placing the MPA into the stream of

6    commerce by purchasing it from NECC and administering it and

7    then billing the plaintiffs and their insurers for the product

8    itself.

9            The case that defendants argue is different, *Saylor*

10   *vs. Providence Hospital*.  It's clearly seen that courts in

11   Ohio have found hospitals to be liable under the OPLA.  That

12   was a case where a patient had undergone a procedure to

13   implant a plate and screws into his back, and defendants argue

14   that they weren't in the business of supplying or selling

15   those plates and screws, but the court found that they did

16   place those products in the stream of commerce and the

17   plaintiffs were allowed to bring forth claims under the OPLA.

18           THE COURT:  Thank you.  Anything else?

19           MR. ABELN:  No, your Honor.  Thank you.

20           THE COURT:  All right.  We are adjourned until

21   December 4th.  Thank you all very much.

22           MS. JOHNSON:  Thank you, your Honor.

23           MR. ABELN:  Thank you, your Honor.

24           MS. DOUGHERTY:  Thank you, your Honor.

25           (Adjourned, 3:42 p.m.)

```
1                    C E R T I F I C A T E

2          I, Catherine A. Handel, Official Court Reporter of the

3    United States District Court, do hereby certify that the

4    foregoing transcript, from Page 1 to Page 76, constitutes to the

5    best of my skill and ability a true and accurate transcription of

6    my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

7    Re: New England Compounding Pharmacy, Inc., Products Liability

8    Litigation.

9

10     October 28, 2014          /s/Catherine A. Handel
       Date                      Catherine A. Handel, RPR-CM, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```