# EXHIBIT B

*CORRECTED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF NEW ENGLAND COMPOUNDING PHARMACY, INC. DATED DECEMBER 3, 2014*

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. ACCORDINGLY THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING PHARMACY, INC.,<br><br>             Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

**CORRECTED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF**
**NEW ENGLAND COMPOUNDING PHARMACY, INC. DATED DECEMBER 3, 2014**

- Distribution Record Date: _____, 2014.
- Voting Deadline: _____, 2014 at 4:00 p.m. prevailing Eastern Time.
- Confirmation Objection Deadline: _____, 2014 at X:XX p.m. prevailing Eastern Time.
- Confirmation Hearing: _____, 2014 at XX:XX a.m. prevailing Eastern Time.

**DUANE MORRIS LLP**

Paul D. Moore, Esq.
100 High Street
Suite 2400
Boston, MA 02110
Telephone: (857) 488-4200
Facsimile: (857) 401-3057

*Chapter 11 Trustee*

**BROWN RUDNICK LLP**

William R. Baldiga, Esq.
Kiersten A. Taylor, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201

David J. Molton, Esq.
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

*Counsel to the Official Committee*
*of Unsecured Creditors*

Dated: [_____], 2014

UNLESS OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT, CAPITALIZED TERMS USED HEREIN HAVE THE MEANINGS ASCRIBED TO THEM IN THE JOINT CHAPTER 11 PLAN OF NEW ENGLAND COMPOUNDING PHARMACY, INC. DATED DECEMBER 3, 2014.

THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN.  NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS AND THE STATEMENTS REFLECTED HEREIN OR THEREIN, RESPECTIVELY.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THE DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

*THE PLAN CONTAINS RELEASES AND INJUNCTIONS FOR THE BENEFIT OF THE DEBTOR AND ITS ESTATE, THE ESTATE REPRESENTATIVE(S) AND CERTAIN THIRD PARTIES.  IF THE PLAN IS CONFIRMED, ALL PERSONS AND ENTITIES WILL BE BOUND BY THE RELEASE PROVISIONS OF SECTION 10.05 OF THE PLAN AND THE INJUNCTIONS PROVIDED FOR IN SECTION 10.06 OF THE PLAN.  SUCH RELEASES AND INJUNCTIONS OPERATE TO FOREVER DISCHARGE AND BAR ANY AND ALL PERSONS AND ENTITIES FROM ASSERTING ANY AND ALL CLAIMS, DEBTS, OBLIGATIONS, DEMANDS, LIABILITIES, SUITS, JUDGMENTS, DAMAGES, RIGHTS AND CAUSES OF ACTION AGAINST THE DEBTOR AND ITS ESTATE, THE ESTATE REPRESENTATIVE(S), THE SHAREHOLDER AND AFFILIATE RELEASED PARTIES, AND THE UNAFFILIATED CONTRIBUTING PARTIES.  PARTIES IN INTEREST ENTITLED TO VOTE ON THE PLAN SHOULD REVIEW CAREFULLY SECTIONS 10.05 AND 10.06 OF THE PLAN, TOGETHER WITH SECTIONS 12.5 AND 12.6 OF THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.*

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THE DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THE DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THE DISCLOSURE STATEMENT SINCE THE DATE OF THE DISCLOSURE STATEMENT OR THE DATES OTHERWISE NOTED.  EACH HOLDER OF A CLAIM OR EQUITY INTEREST ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND DISCLOSURE STATEMENT IN THEIR

i

ENTIRETY BEFORE CASTING A BALLOT.  THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  ENTITIES DESIRING SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO ONE IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE DISCLOSURE STATEMENT.  NO REPRESENTATIONS CONCERNING THE ESTATE OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THE DISCLOSURE STATEMENT.  ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT OR THE DOCUMENTS ATTACHED TO THE DISCLOSURE STATEMENT AND THE PLAN, SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR EQUITY INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE. THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THE DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, UNLESS SPECIFICALLY INDICATED OTHERWISE.

**THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON _____, 2014 AT XX:XX _.M. PREVAILING EASTERN TIME BEFORE THE HONORABLE HENRY J. BOROFF, UNITED STATES COURTHOUSE, 300 STATE STREET, BERKSHIRE COURTROOM, THIRD FLOOR, SPRINGFIELD, MASSACHUSETTS 01105-2925.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT OF THE CONFIRMATION HEARING.**

**TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY DONLIN, RECANO & COMPANY, INC., THE APPOINTED VOTING AGENT, NO LATER THAN 4:00 P.M. PREVAILING EASTERN TIME, ON _____, 2014.**

 

 

      **OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND
SERVED ON OR BEFORE X:XX P.M. PREVAILING EASTERN TIME, ON _____,
2014.  UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND
FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER, THEY
MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## <u>TABLE OF CONTENTS</u>

ARTICLE I INTRODUCTION ........................................................................................................1

    Section 1.1    Events Precipitating the Chapter 11 Case ................................ 1
    Section 1.2    Plan Overview ........................................................................ 2
    Section 1.3    Disclosure Statement Contents............................................... 3

ARTICLE II GENERAL INFORMATION REGARDING NECC ...........................................4

    Section 2.1    NECC Ownership and Board of Directors. ............................ 4

ARTICLE III THE CHAPTER 11 CASE ..................................................................................4

    Section 3.1    Overview of Chapter 11 ......................................................... 4
    Section 3.2    Administration of the Chapter 11 Case ................................. 5
    Section 3.3    The Adversary Proceeding .................................................... 6
    Section 3.4    The Settlements ..................................................................... 6
    Section 3.1    Preference Analysis and Other Potential Avoidance Actions ............. 17

ARTICLE IV ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX
    CLAIMS ...............................................................................................................18

    Section 4.1    Administrative Expenses....................................................... 18
    Section 4.2    Priority Tax Claims ............................................................... 20

ARTICLE V CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS .........................20

    Section 5.1    Classification of Claims and Equity Interest ........................ 20

ARTICLE VI TREATMENT OF CLAIMS AND EQUITY INTERESTS ...............................21

    Section 6.1    Class A – Priority Non-Tax Claims ...................................... 21
    Section 6.2    Class B – Miscellaneous Secured Claims ............................. 22
    Section 6.3    Class C – General Unsecured Claims..................................... 22
    Section 6.4    Class D – Tort Claims ........................................................... 22
    Section 6.5    Class E – Subordinated Claims ............................................. 24
    Section 6.6    Class F – Equity Interests ..................................................... 25

ARTICLE VII SETTLEMENT OF TORT CLAIMS AND THE NECC TORT TRUST ...........25

    Section 7.1    Settlement and Compromise. ................................................ 25
    Section 7.2    Exhaustion of Insurance Policies .......................................... 25
    Section 7.3    Execution of Tort Trust Agreement. ..................................... 26
    Section 7.4    Purpose of Tort Trust. ........................................................... 26
    Section 7.5    Assets of the Tort Trust. ....................................................... 26
    Section 7.6    Governance of the Tort Trust. ............................................... 26
    Section 7.7    Role of the Tort Trustee. ....................................................... 26

Section 7.8    Investments. ................................................................................ 27
Section 7.9    Fees, Costs and Expenses of the Tort Trust. ........................................ 27
Section 7.10   Distribution of the Tort Trust Assets ................................................... 28
Section 7.11   Resolving Liens Other than Imposed by the Medicare Act and
               States' Medicaid and Worker Compensation Statutes.  Before
               disbursing any Tort Trust Assets to a Tort Trust Beneficiary, the
               Tort Trustee shall ensure that other liens that the Tort Trustee
               has received notice of have been resolved or have been
               otherwise satisfied.  To that end, the Tort Trustee shall provide
               notice of the existence of any such lien(s) to the Tort Trust
               Beneficiary and, if applicable, his or her attorney, and it shall be
               the Tort Trust Beneficiary's (or his or her attorney's)
               responsibility to resolve such lien(s) against the Tort Trust
               Beneficiary's anticipated distribution of Tort Trust Assets
               within 120 days of notice from the Tort Trustee.  If the lien has
               not been settled or otherwise resolved within this 120-day time
               period, with the Tort Trust Beneficiary's consent, the Tort
               Trustee may retain a firm with experience in resolving liens to
               satisfy the Tort Trust's Beneficiary's obligations as represented
               by the lien(s).  Any payments made to resolve such lien(s),
               together with the fees paid to the lien resolution firm, shall be
               deducted from the Tort Trust Beneficiary's distribution of Tort
               Trust Assets prior to disbursement of the balance. .............................. 30
Section 7.12   Time of Tort Trust Distributions. ......................................................... 30
Section 7.13   Tax Treatment of Tort Trust. ................................................................ 30
Section 7.14   Resolution of the Claims of Minors In Accordance With the
               Tort Trust. ............................................................................................ 33
Section 7.15   Access to Claims Information. .............................................................. 33
Section 7.16   Distribution of Surplus. ........................................................................ 33
Section 7.17   Payments to Post-Effective Date Debtor. .............................................. 34

ARTICLE VIII MEANS FOR IMPLEMENTATION AND EXECUTION OF THE
PLAN ........................................................................................................................... 34

Section 8.1    Management of the Post-Effective Date Debtor .................................... 34
Section 8.2    Duties and Powers of the Post-Confirmation Officer ........................... 34
Section 8.3    Other Actions ........................................................................................ 36
Section 8.4    Expense Fund ........................................................................................ 36
Section 8.5    Distributions Under the Plan ................................................................ 37
Section 8.6    Disallowance of Multi-Claimant Proofs of Claim ............................... 38
Section 8.7    Procedures for Treating Disputed Claims ............................................ 38
Section 8.8    Closing of the Chapter 11 Case ............................................................ 39
Section 8.9    Cancellation of Existing Agreements .................................................... 39
Section 8.10   Continued Corporate Existence ............................................................ 39
Section 8.11   Effectuating Documents and Further Transactions ............................. 40

ARTICLE IX PROVISIONS GOVERNING DISTRIBUTIONS ................................................. 40

Section 9.1     Distribution Record Date.................................................................. 40
Section 9.2     Delivery of Distributions and Undeliverable Distributions ................ 40
Section 9.3     De Minimus Distributions ................................................................. 40
Section 9.4     Transactions on Business Days ......................................................... 41
Section 9.5     Allocation of Plan Distribution Between Principal and Interest .......... 41
Section 9.6     Withholding and Reporting Requirements.......................................... 41

ARTICLE X EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..............................41

Section 10.1    Executory Contracts and Unexpired Leases...................................... 41
Section 10.2    Insurance Policies and Agreements.................................................... 41
Section 10.3    Approval of Rejection of Executory Contracts and Unexpired
                Leases ............................................................................................... 42
Section 10.4    Rejection Claims ............................................................................... 42
Section 10.5    Rejection Claims of Officers and Directors of the Debtor .................. 42

ARTICLE XI EFFECTIVENESS OF THE PLAN ..............................................................42

Section 11.1    Conditions to Confirmation ............................................................... 42
Section 11.2    Date of Effective Date ....................................................................... 43
Section 11.3    Satisfaction of Conditions ................................................................. 43
Section 11.4    Occurrence of Effective Date ............................................................ 43
Section 11.5    Substantial Consummation Upon Effective Date................................ 43

ARTICLE XII EFFECT OF CONFIRMATION ..................................................................43

Section 12.1    Vesting of Assets............................................................................... 43
Section 12.2    Binding Effect ................................................................................... 43
Section 12.3    Exculpations and Limitation of Liability ........................................... 43
Section 12.4    Preservation and Non-Waiver of Estate Defenses and
                Objections and Related Rights Reserved for the Debtor, its
                Successors in Interest, Creditors and Parties in Interest...................... 44
Section 12.5    Releases ............................................................................................ 45
Section 12.6    Injunction.......................................................................................... 48
Section 12.7    Covenant Not to Sue.......................................................................... 50
Section 12.8    Covenant Not to Sue (Shareholder and Affiliate Released
                Parties).............................................................................................. 50
Section 12.9    Terms of Pre-Plan Injunction and Stays ............................................ 50

ARTICLE XIII RETENTION OF JURISDICTION .............................................................50

Section 13.1    Jurisdiction of Bankruptcy Court ...................................................... 50

ARTICLE XIV MISCELLANEOUS PROVISIONS............................................................52

Section 14.1    Reporting of Shareholder Settlement Payments.................................. 52
Section 14.2    Tax Information to be Provided to Shareholders ................................ 52
Section 14.3    Refunds............................................................................................. 52

iii

Section 14.4    Withdrawal of the Reference............................................................... 52
Section 14.5    Dissolution of the Official Committee ................................................ 52
Section 14.6    Quasi-Judicial Immunity. ................................................................... 53
Section 14.7    Payment of Statutory Fees .................................................................. 53
Section 14.8    Effectuating Documents and Further Transactions ............................. 53
Section 14.9    Exemption from Transfer Taxes........................................................... 53
Section 14.10   Elimination of Vacant Classes ............................................................ 53
Section 14.11   Nonconsensual Confirmation. ............................................................. 53
Section 14.12   Modification of Plan............................................................................ 53
Section 14.13   Revocation or Withdrawal of Plan ...................................................... 54
Section 14.14   Severability. ........................................................................................ 54
Section 14.15   Schedules and Exhibits ....................................................................... 54
Section 14.16   Successors and Assigns ....................................................................... 54
Section 14.17   Notices ................................................................................................. 54
Section 14.18   No Admission ...................................................................................... 55

ARTICLE XV SOLICITATION; VOTING PROCEDURES.................................................55

Section 15.1    Parties Entitled to Vote ....................................................................... 55
Section 15.2    Voting Procedures ............................................................................... 56
Section 15.3    Fiduciaries and Other Representatives ................................................ 60
Section 15.4    Agreements Upon Furnishing Ballots ................................................. 60
Section 15.5    Waivers of Defects, Irregularities, Etc ............................................... 60
Section 15.6    Withdrawal of Ballots; Revocation ..................................................... 60
Section 15.7    Further Information; Additional Copies............................................... 61

ARTICLE XVI CONFIRMATION PROCEDURES ..........................................................61

Section 16.1    The  Confirmation  Hearing  ............................................................... 61
Section 16.2    Statutory Requirements for Confirmation of the Plan......................... 62

ARTICLE XVII BEST INTERESTS OF CREDITORS AND LIQUIDATION ........................64

Section 17.1    Best Interests of Creditors Test .......................................................... 64
Section 17.2    Liquidation Analysis ........................................................................... 65

ARTICLE XVIII ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
OF THE PLAN .......................................................................................................66

Section 18.1    Liquidation Under Chapter 7............................................................... 66
Section 18.2    Alternative Plan ................................................................................... 66

ARTICLE XIX CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES OF THE PLAN................................................................................67

Section 19.1    Federal Income Tax Consequences to Holders of Claims and
Equity Interests ................................................................................... 68

ARTICLE XX RISK FACTORS ...................................................................................... 72

    Section 20.1    Third Party Releases and Injunctions ................................................... 72
    Section 20.2    Risks Related to Projections and Estimates ......................................... 72
    Section 20.3    Claims Estimations ............................................................................... 73
    Section 20.4    Objections to Classification ................................................................. 73
    Section 20.5    Failure to Receive Requisite Acceptances ........................................... 73
    Section 20.6    Failure to Confirm the Plan ................................................................. 74
    Section 20.7    Failure to Consummate the Plan .......................................................... 74
    Section 20.8    Nonoccurrence of Effective Date of Plan ............................................ 74

ARTICLE XXI RECOMMENDATION AND CONCLUSION ...................................................... 74

Case 1:13-md-02419-RWZ Document 1578-3 Filed 12/04/14 Page 11 of 146

## TABLE OF EXHIBITS

Exhibit

Plan ........................................................................................................................... A

THE PLAN PROPONENTS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

# ARTICLE I
# INTRODUCTION

New England Compounding Pharmacy, Inc. ("NECC" or the "Debtor"), the Debtor in this Chapter 11 Case, operated as a compounding pharmacy. On December 21, 2012 (the "Petition Date"), NECC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"). On January 18, 2013, the Official Committee was appointed. On January 25, 2013, Paul D. Moore was appointed as the Chapter 11 Trustee for NECC. On November 25, 2014, the Plan Proponents filed the Plan, a copy of which is attached hereto as **Exhibit A**. On _____, 2014, the Bankruptcy Court entered the Disclosure Statement Order, having found it contained information of a kind and in sufficient detail to enable the holders of Claims and Equity Interests that are entitled to vote on the Plan to make an informed judgment about the Plan.

Section 1.1    Events Precipitating the Chapter 11 Case.  Beginning in September 2012, reports began to surface of several patients who contracted fungal meningitis (the "Outbreak") after receiving injections of preservative-free methylprednisolone acetate ("MPA") compounded by NECC. An investigation was initiated by the Massachusetts Department of Public Health ("MDPH") and, two days later, on September 26, 2012, NECC issued a voluntary recall of three suspect lots, containing approximately 18,000 doses of MPA that NECC had distributed to hospitals, clinics, and doctor's offices, and were administered to approximately 14,000 patients. The Centers for Disease Control and Prevention ("CDC") reported that, as of October 23, 2013, 64 people had died and 751 individuals had fallen ill.[1]

In response to October 2, 2012 findings from the United States Food and Drug Administration ("FDA") and the MDPH, the Massachusetts Board of Registration in Pharmacy (the "Board") voted to request a voluntary surrender of NECC's pharmacy license. NECC surrendered its license effective at noon on October 3, 2012, and further instituted a voluntary recall of all of its intrathecal medications, which are designed for injection near the spinal cord or brain. The FDA and the CDC recommended that all health care providers cease using, and remove from inventory, any NECC products. At the behest of the MDPH, NECC issued an immediate recall of all of its products. There remain ongoing proceedings to revoke or otherwise take action against the licenses of NECC's pharmacists. Approximately three months prior to the Petition Date, NECC suspended the operation of its business. NECC also surrendered its Massachusetts pharmacy license and laid off most of its employees. The MDPH has temporarily barred former pharmacists for NECC from practicing pharmacology.

On the Petition Date, NECC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. NECC has stated that it initiated this Chapter 11 Case in response to the volume and wide geographic distribution of the lawsuits with which it was confronted. The Outbreak has resulted in thousands of claims from personal injury claimants against NECC and others. As of October 13, 2014, approximately 555 separate lawsuits had been joined in the

---

[1]    Reported at http://www.cdc.gov/HAI/outbreaks/meningitis-map-large.html#casecount_table. The CDC has not updated the case counts since October 23, 2013 and indicates that further updates to the case counts are not anticipated.

MDL Proceeding pending before the Honorable Rya W. Zobel, United States District Court Judge, in the MDL Court. Approximately 3,770 proofs of claims have been filed in NECC's Chapter 11 Case, approximately 3,500 of which are for damages for death or personal injuries resulting from the Outbreak.

Section 1.2    Plan Overview.    The Plan is a plan of liquidation. The primary objective of the Plan is to compensate those victims that have suffered personal injury and/or death due to allegedly contaminated drugs compounded by NECC.

The Plan has been funded in part by contributions from NECC's shareholders, affiliated entities, their insurers, and clinics and healthcare providers that administered tainted NECC drugs (collectively referred to as the "Contributing Parties"). In exchange for such funding contributions, claims against the Contributing Parties shall be released, and future claims enjoined, pursuant to the Plan and in accordance with the terms of the Settlement Agreements previously entered into by the Chapter 11 Trustee (described in Section 3.4 of this Disclosure Statement).

The amount of each distribution to a holder of an Allowed Claim will depend on which Class the Allowed Claim is in and the treatment afforded to that Class under the Plan.

Pursuant to the Plan, assets of the Debtor will be converted into Cash. The monetized assets of the Debtor will be used to satisfy in full all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims (Class A) and Miscellaneous Secured Claims (Class B). Because holders of such Claims shall be paid in full, their Claims are deemed Unimpaired and they are presumed to accept the Plan. Thus, they will not be solicited to vote to accept or reject the Plan.

The Plan Proponents estimate that claims in Class C (General Unsecured Claims) aggregate approximately $900,000 and that holders of Class C Claims will receive distributions equal to approximately 90% of the amount of their Allowed General Unsecured Claims. In the Schedules and Statement of Financial Affairs filed with the Bankruptcy Court, the Debtor scheduled such Class C Claims in the amount of $885,514.19, some $200,000 of which was allegedly payable to an affiliate of the Debtor, Medical Sales Management. Class C Proofs of Claim thereafter filed by NECC creditors significantly increased that amount to an aggregate of $7.85 million. The increase, however, is largely the result of two claims, aggregating, $6.83 million, which the Plan Proponents believe are subject to disallowance, in whole or substantial part. If that proves to be the case, and those claims are disallowed, the scheduled and filed Class C Claims would aggregate $1,025,500.

Holders of claims in Class D (Tort Claims) will receive shares of a beneficial interest in the Tort Trust. All claims holders of Class D Claims have against the Contributing Parties are being channeled into the Tort Trust, where they will be satisfied from the net proceeds of the settlements reached between the Chapter 11 Trustee and the Contributing Parties (the settlements are described in Section 3.4) in accordance with the terms of the Plan, the Tort Trust Documents, and the applicable "Claims Resolution Facility Procedure" or "Provider Claims Resolution Facility Procedures." The Plan Proponents estimate that in total, the Tort

Trust will have more than $[__]² million available for distribution to Tort Claimants who timely filed proofs of claim and the required supporting documentation, or were deemed to have done so.  ***In exchange for a share of the beneficial interest in the Tort Trust, all claims the Tort Trust Beneficiaries may hold against any and all of the Contributing Parties (other than Ameridose, LLC) will be released, and Tort Trust Beneficiaries will be forever barred, estopped and enjoined from asserting those claims against the Contributing Parties.***

Because holders of General Unsecured Claims (Class C) will receive distributions anticipated to be less than the full value of their Claims, and holders of Tort Claims (Class D) will receive distributions that may or may not satisfy their Claims in full, Claims in Classes C and D are Impaired, and the holders of those Claims are entitled to vote to accept or reject the Plan.

Holders of Subordinated Claims (Class E) are not expected to receive a meaningful distribution, if any, under the Plan.  Their Claims are therefore Impaired, and the holders of Class E Claims are entitled to vote to accept or reject the Plan.

Holders of Equity Interests (Class F) will not receive any distribution under the Plan.  However, they will be permitted to retain their Equity Interests pursuant to the Shareholder Settlement Agreement (but without any rights of control over the Debtor or the Estate).  Therefore, their Interests are not deemed to be impaired, and they are deemed to accept the Plan and will not be solicited to vote to accept or reject the Plan.

Section 1.3    <u>Disclosure Statement Contents</u>.  The Disclosure Statement sets forth certain detailed information regarding NECC's history and significant events that have occurred, and are expected to occur, during this Chapter 11 Case.  The Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims and Equity Interests must follow for their votes to be counted.

The Plan Proponents are furnishing the Disclosure Statement pursuant to Bankruptcy Code section 1121(c) and in connection with the solicitation of votes to accept or reject the Plan, as it may be amended or supplemented from time to time in accordance with the Bankruptcy Code or Bankruptcy Rules.

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF HOLDERS OF CLAIMS AND RECOMMENDS THAT ALL SUCH HOLDERS WHOSE VOTES ARE BEING SOLICITED VOTE TO ACCEPT THE PLAN.**

---

² [NTD: Current number to be inserted prior to mailing]

## ARTICLE II
## GENERAL INFORMATION REGARDING NECC

      Section 2.1      NECC Ownership and Board of Directors.

.Collectively, as of and at all relevant times prior to the Petition Date, Barry Cadden, Lisa Conigliaro Cadden, Carla Conigliaro, and Gregory Conigliaro held 100% of the shares of NECC and were the sole members of NECC's board of directors.  Their respective ownership shares and relevant titles at NECC are as follows:

      **(i)**    Barry Cadden  As of the Petition Date, Barry Cadden owned a 17.5% interest in NECC, and served as a director and President of NECC.  Prior to October 2012, he served as Head Pharmacist, and Director of Pharmacy at NECC.

      **(ii)**    Lisa Conigliaro Cadden  Lisa Conigliaro Cadden is the spouse of Barry Cadden.  As of the Petition Date, Mrs. Cadden owned a 17.5% interest in NECC, and served as a director of NECC.

      **(iii)**    Carla Conigliaro  As of the Petition Date, Carla Conigliaro owned a 55.0% interest in NECC, and served as a director of NECC.

      **(iv)**    Gregory Conigliaro  As of the Petition Date, Gregory Conigliaro owned a 10% interest in NECC, and was a director and Treasurer, Secretary, and Vice President of NECC.  Prior to October 2012, he provided business support for NECC.

## ARTICLE III
## THE CHAPTER 11 CASE

      Section 3.1    Overview of Chapter 11.  Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Chapter 11 authorizes a debtor to reorganize or liquidate its business for the benefit of its creditors, interest holders, and other parties in interest. Commencing a Chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  Alternatively, a trustee may be appointed as the legal representative of a debtor's estate.  As stated below, pursuant to the Bankruptcy Court's January 25, 2013 order, Paul D. Moore was appointed and serves as the Chapter 11 Trustee in this Chapter 11 Case.

      The principal objective of a Chapter 11 case is to consummate a plan of reorganization or liquidation.  A plan of reorganization or liquidation sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities thereunder, any person acquiring property under the plan, any creditor or interest holder of a debtor, and any other person or entity the bankruptcy court may find to be bound by such plan.  Chapter 11 requires that a plan treat

similarly situated creditors and similarly situated interest holders equally, subject to the priority provisions of the Bankruptcy Code.

A bankruptcy court order confirming a plan of reorganization or liquidation provides for the treatment of debt that arose prior to the commencement of the Chapter 11 Case in accordance with the terms of the confirmed plan of reorganization or liquidation.

Prior to soliciting acceptances of a proposed plan of reorganization or liquidation, Bankruptcy Code section 1125 requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization or liquidation. This Disclosure Statement is submitted in accordance with Bankruptcy Code section 1125.

Section 3.2     Administration of the Chapter 11 Case.

(a)     First-Day Motions.  On the Petition Date, or soon thereafter, NECC filed several first-day motions, the object of which was to streamline the transition to operating as a debtor-in-possession under chapter 11.  The first-day motions requested, among other things, (i) an order prohibiting utilities from discontinuing, altering or refusing service and (ii) authority to retain and employ certain bankruptcy professionals.  NECC also filed motions seeking relief from certain administrative requirements of the Bankruptcy Code.

(b)     Appointment of Official Committee.  The Official Committee was appointed by the United States Trustee (the "UST") on January 18, 2013.  The Official Committee is composed of (as of the date of this Disclosure Statement): (i) Brenda Bansale; (ii) Robert Cole; (iii) Victor Davis; (iv) Kathleen Distler; (v) Katrina Eldreth; (vi) Meghan A. Handy; (vii) Danny Swartzell; (viii) Bertram Walker Bryant, Jr.; and (ix) NStar Electric Company.  The Official Committee retained Brown Rudnick LLP to represent the interests of holders of general unsecured claims in this Chapter 11 Case and Perkins Coie, LLP as special insurance coverage counsel.

(c)     Appointment of Chapter 11 Trustee.  On January 24, 2013, the Bankruptcy Court entered an order appointing a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.  On January 25, 2013, the UST filed an Application for and Certificate of Appointment of Chapter 11 Trustee (the "UST Application") requesting the appointment of Paul D. Moore as chapter 11 trustee.  The UST Application was granted by order of the Bankruptcy Court entered the same day.  Thereafter, on February 1, 2013, the Chapter 11 Trustee filed his Verified Statement Pursuant to Rule 2007.1 of Paul D. Moore in Support of Application for and Certificate of Chapter 11 Trustee.  The Chapter 11 Trustee serves as the sole representative of the NECC estate.

(d)     Retention of Professionals.  NECC and the Chapter 11 Trustee have filed, and the Bankruptcy Court has granted, several applications to retain professionals in these Cases. Specifically, the Chapter 11 Trustee has retained Duane Morris LLP as his general bankruptcy and restructuring counsel, Harris Beach PLLC as special counsel, and Mesirow Financial Consulting, LLC as his financial advisor.  Additionally, the Bankruptcy Court approved Brown Rudnick LLP's retention application to serve as counsel to the Official Committee.

5

The Debtor retained Donlin, Recano & Company, Inc. to serve as the claims, noticing and balloting agent in this Chapter 11 Case. Following his appointment, the Chapter 11 Trustee, as successor-in-interest to the Debtor and as estate representative, elected to keep Donlin, Recano & Company, Inc. as his claims, noticing and balloting agent.

Section 3.3    The Adversary Proceeding.    On January 24, 2013, the Official Committee, on behalf of NECC's bankruptcy estate, commenced an adversary proceeding in the Bankruptcy Court (Adv. Proc. No. 13-01040) (the "Adversary Proceeding"). In its complaint, the Official Committee sought to avoid certain payments to or for the benefit of NECC insiders as preferential and constructively fraudulent transfers. The Official Committee also sought to disallow claims that NECC insiders might assert against NECC and to recover damages attributable to alleged breaches of fiduciary duties of loyalty and care that the insiders allegedly owed to NECC in their capacity as directors of NECC. Following his appointment, the Chapter 11 Trustee was substituted for the Official Committee as the plaintiff in the Adversary Proceeding.

Section 3.4    The Settlements and the Settlement Agreements.

(a)    The National Settlement Agreements.    The Chapter 11 Trustee has entered into the following agreements with certain so-called "National Defendants" (*i.e.*, individuals or entities against whom every Tort Claimant may have a claim, such as NECC's owners or the company that provided sterility testing services for NECC products):

1. that certain Ameridose, LLC Insurance Settlement, Release and Injunction Agreement (the "Ameridose Settlement Agreement") by and among the Chapter 11 Trustee, Ameridose, and Ameridose's primary and first excess liability insurance carrier, PMIC;

2. that certain GDC Insurance Settlement and Release Agreement (the "GDC Settlement Agreement") by and among the Chapter 11 Trustee and GDC, Preferred Mutual, and the Individual GDC Insureds;

3. that certain Plan Support and Settlement Agreement (the "PMIC/Maxum Settlement Agreement") by and among the Chapter 11 Trustee and NECC's primary and excess liability insurance carriers, PMIC and Maxum, and the Individual NECC Insureds covered under the PMIC/Maxum Policies;

4. that certain Plan Support and Funding Agreement (the "Shareholder Settlement Agreement") by and among the Chapter 11 Trustee and the Shareholders; and

5. that certain Settlement and Release Agreement (the "Victory Settlement Agreement") by and among the Chapter 11 Trustee, Victory, Netherlands Insurance, and Peerless Insurance.

The Shareholder Settlement Agreement, the GDC Settlement Agreement and the PMIC/Maxum Settlement Agreement were each approved by an order of the Bankruptcy Court entered July 31, 2014.

The terms of the settlements with National Defendants are briefly summarized below:

       **(i)**    <u>Ameridose Settlement</u>.  On November 24, 2014, the Chapter 11 Trustee, in consultation and cooperation with the Official Committee and the Plaintiffs' Steering Committee, entered into the Ameridose Settlement Agreement with Ameridose, LLC ("<u>Ameridose</u>") and its primary and first excess insurer Pharmacists Mutual Insurance Company ("<u>PMIC</u>").  Ameridose is an affiliate of the Debtor, whose membership interests are all owned by the Debtor's Shareholders.  The Ameridose Settlement Agreement resolved a dispute regarding the coverage liability of PMIC, Ameridose's primary and excess general liability insurance carrier under insurance policies it issued to Ameridose (the "<u>Ameridose Policies</u>").

       Under the Ameridose Settlement Agreement, PMIC will make payment to the Chapter 11 Trustee in the amount of $10,000,000 (the "<u>Ameridose Settlement Payment</u>") for eventual distribution to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 Case.

       The Ameridose Settlement Agreement also provides for the following:

- On the Effective Date, the limits of liability under the Ameridose Policies shall be deemed exhausted and paid in full.

- The Plan is required to provide the settling parties with general releases on the Plan Effective Date (as defined in the Ameridose Settlement Agreement),[3] and an injunction permanently barring and enjoining any person or entity from pursuing "Drug Claims"[4] against the settling parties.  Accordingly, pursuant to the Ameridose Settlement Agreement, Ameridose and PMIC are receiving the benefit of the release and injunction provisions in Section 10.05 and 10.06 of the Plan, except, as to Ameridose, for those claims which may be necessary to secure the proceeds to second and third level excess insurance policies assigned to the Chapter 11 Trustee pursuant to the agreement.

- Ameridose and PMIC agree to support and not oppose or object to the Plan.

---

[3]    "Plan Effective Date" is defined in the Ameridose Settlement Agreement to mean the later of (i) the first business day following fourteen (14) days after the Bankruptcy Court's entry of the Confirmation Order, provided that the Confirmation Order is not subject to a stay by any court of competent jurisdiction as of such date, and (ii) the first business day on which all other conditions to the effective date of the Plan as set forth therein have been satisfied or waived.

[4]    "Drug Claims" are defined in the Ameridose Settlement Agreement to include any and all Claims asserted or that could be asserted by any person for personal injury, tort, wrongful death, medical monitoring, or any other economic or noneconomic injury or damage, based upon, arising out of or in any way related to the business operations of NECC or Ameridose, including, but not limited to, the actual or alleged compounding, production, sale or distribution of injectable methylpredinisolone acetate or any other drugs or products.

- Upon the Effective Date, Ameridose and PMIC shall be deemed to have (i) waived, relinquished and released any and all Claims against the Debtor or its estate and (ii) unconditionally assigned to the Chapter 11 Trustee any and all claims they may have between them and against any persons not a party to the agreement, including any claims for coverage, indemnification, contribution or subrogation, that are based upon or arise out of the settled claims, and assign its rights under the second and third excess policies that are the subject of the actions styled, *Ironshore Specialty Insurance Company v. Ameridose, LLC, et al.*, Dkt No. 13-cv-13000-FDS (D. Mass. 2013), and *Certain Underwriters at Lloyd's London v. Ameridose, LLC, et al.*, Dkt No. 13-cv-12609-FDS (D. Mass. 2013).

**(ii)** GDC Settlement. On April 30, 2014, the Chapter 11 Trustee, in consultation and cooperation with the Official Committee and the Plaintiffs' Steering Committee, entered into the GDC Settlement Agreement with GDC Properties Management ("GDC"), its insurer Preferred Mutual, and certain insiders of GDC, who are also NECC insiders. GDC is the Debtor's landlord at its former principal place of business in Framingham, Massachusetts. The GDC Settlement Agreement resolves the Debtor's estate's claims and potential claims against GDC, Preferred Mutual and the other settling parties. The Bankruptcy Court approved the GDC Settlement Agreement by order dated July 31, 2014.

Pursuant to the terms of the GDC Settlement Agreement, on August 18, 2014, Preferred Mutual made a payment to the Chapter 11 Trustee in the amount of $3,750,000 (the "GDC Settlement Payment"). The GDC Settlement Payment is being held in an escrow account established by the Chapter 11 Trustee. Under the terms of the GDC Settlement Agreement, the GDC Settlement Agreement will be released to the Chapter 11 Trustee on the Effective Date, for distribution to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 Case.

The GDC Settlement Agreement also provides for the following:

- The Plan is required to provide the settling parties with a release of all "Settled Claims" as defined in the agreement[5] on the Effective Date, and an injunction permanently barring and enjoining any person or entity from pursuing such Claims. Accordingly, pursuant to the GDC Settlement Agreement, GDC, Preferred Mutual and the other settling parties are receiving

---

[5]     "Settled Claims" is defined in the GDC Settlement Agreement to include any and all Claims asserted or that could be asserted by or on behalf of any person against GDC, Preferred Mutual, those insured by insurance policies issued by Preferred Mutual to GDC, the Chapter 11 Trustee, the Debtor and/or its estate, based upon, arising out of or in any way relating to (i) the Debtor or the business operations of the Debtor, including, but not limited to, the actual or alleged compounding, production, sale or distribution of injectable MPA or any other drugs or products, (ii) GDC or the business operations of GDC, and/or (iii) the insurance policies issued by Preferred Mutual to GDC.

the benefit of the release and injunction provisions in Section 10.05 and 10.06 of the Plan.

- The settling parties agree to support and not oppose or object to the Plan.

- Upon the Effective Date, each settling party shall be deemed to have (i) waived, relinquished and released any and all Claims against the Debtor or its estate and (ii) unconditionally assigned to the Chapter 11 Trustee any and all claims they may have between them and against any persons not a party to the agreement, including any claims for indemnification, contribution or subrogation, that are based upon or arise out of the Settled Claims.

          **(iii)**    PMIC/Maxum Settlement. On May 2, 2014, the Chapter 11 Trustee, in consultation and cooperation with the Official Committee and the Plaintiffs' Steering Committee, entered into the PMIC/Maxum Settlement Agreement with Pharmacists Mutual Insurance Company ("PMIC"), Maxum Indemnity Company ("Maxum") and certain individuals as insureds under insurance policies (the "Individual Insureds") issued by PMIC and/or Maxum. The PMIC/Maxum Settlement Agreement resolved a dispute regarding the coverage liability of PMIC, the Debtor's primary and first level excess general liability insurance carrier and certain individuals' professional liability insurer, and Maxum, the Debtor's second level excess liability insurance carrier, under insurance policies they issued to the Debtor and the Individual Insureds (the "Policies"). The Bankruptcy Court approved the PMIC/Maxum Settlement Agreement by order dated July 31, 2014.

          Pursuant to the terms of the PMIC/Maxum Settlement Agreement, on August 21, 2014, PMIC made payments to the Chapter 11 Trustee in the amount of $15 million (the "PMIC Settlement Payment") and on September 2, 2014, Maxum made a payment to the Chapter 11 Trustee in the amount of $10.2 million (collectively, the "PMIC/Maxum Settlement Payments"). The PMIC/Maxum Settlement Agreement requires that the PMIC/Maxum Settlement Payments be held in a separate, interest-bearing account until the Effective Date and, on such date, the PMIC/Maxum Settlement Payments shall be deemed irrevocably and indefeasibly paid to the Chapter 11 Trustee for distribution to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 Case.

          The PMIC/Maxum Settlement Agreement also provides for the following:

- On the Effective Date, the limits of liability under all PMIC insurance policies issued to the Debtor and certain individual professional liability policies for policy years 2011 and 2012 shall be deemed exhausted and paid in full.

- Until the Effective Date, PMIC shall continue to provide a defense to all Claims for all those who are insureds under the PMIC insurance policies or otherwise entitled to be provided coverage for defense costs under those policies.

9

- Other than with respect to PMIC's obligation to provide continuing defense coverage as described above its obligations on account of policies issued by PMIC to Ameridose (a Debtor affiliate), and its obligations under the PMIC/Maxum Settlement Agreement, PMIC and Maxum shall receive a release of and the benefit of an injunction against any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction, event or other activity that occurred prior to the Effective Date, in any way relating to or in connection with (i) the Debtor, the Drugs, or any and all products of and/or distributed by the Debtor, or (ii) the Debtor's estate, the Chapter 11 Case, the Plan, the Disclosure Statement, the PMIC/Maxum Settlement Agreement, and/or the Policies.   Accordingly, pursuant to the PMIC/Maxum Settlement Agreement, PMIC and Maxum are receiving the benefit of the release and injunction provisions in Section 10.05 and 10.06 of the Plan.

- PMIC and Maxum shall preserve and be deemed to assign to the Chapter 11 Trustee, for the benefit of the Debtor's estate, all Claims for contribution, indemnification, subrogation and similar matters, and shall waive and shall not assert against the Debtor's estate any Claims not otherwise assigned to the Chapter 11 Trustee pursuant to the agreement.

- The settling parties agree to support and not oppose or object to the Plan.

      **(iv)**   <u>Shareholder Settlement</u>.   On May 2, 2014, the Chapter 11 Trustee, in consultation and cooperation with the Official Committee and the Plaintiffs' Steering Committee, entered into the Shareholder Settlement Agreement with the Debtor's Shareholders – namely, Barry Cadden, Lisa Conigliaro Cadden, Carla Conigliaro, and Gregory Conigliaro.   The Shareholder Settlement Agreement resolves the claims and potential claims of the Debtor's estate against the Shareholders, subject to confirmation and consummation of the Plan.   That Settlement Agreement provides a substantial form of funding for Creditor distributions under the Plan.   The Bankruptcy Court approved the Shareholder Settlement Agreement, and the related Shareholder Escrow and Control Agreement, by order dated July 31, 2014 (the "Shareholder Settlement Agreement Order").

      Pursuant to the terms of the Shareholder Settlement Agreement, the Shareholder Settlement Monies will be released from the Shareholder Escrow Accounts to the Chapter 11 Trustee on the Effective Date, if the Confirmation Order is a final, non-appealable order on that date, and such funds will be immediately available for distribution in accordance with the Plan. If on the Effective Date the Confirmation Order is the subject of an appeal, but no stay of the Confirmation Order has been issued by a court of competent jurisdiction as of such date, approximately $10 million of the Shareholder Settlement Monies will be released from the Shareholder Escrow Accounts to the Chapter 11 Trustee, with the remaining funds released when the Confirmation Order becomes a final, non-appealable order.   Upon their release, the Chapter 11 Trustee shall use the Shareholder Settlement Monies solely to make distributions to creditors

under the Plan, including pursuant to the NECC Tort Trust, and to satisfy the costs and expenses of the administration of the Chapter 11 Case.

Under the Shareholder Settlement Agreement, the Shareholders shall also provide the following consideration to the Chapter 11 Trustee, for the benefit of the Debtor's estate:

- 75% of the net funds realized by each Shareholder from the sale or other disposition of their respective equity interests in or assets of NECC affiliates Alanus Pharmaceutcal, LLC, Ameridose LLC ("Ameridose"), Medical Sales Management, Inc. and/or Medical Sales Management, SW, Inc. (collectively, the "Pharmaceutical Entities");

- On the Plan Effective Date (as defined in the Shareholder Settlement Agreement),[6] all interests of each Shareholder in policies of insurance or rights therein that provide, or may provide, coverage for the Debtor, any Shareholder or any entity in which any of the Shareholders hold an interest and the proceeds thereof (with exception of proceeds that represent reimbursement or payment of defense costs);

- 90% of certain federal, state and local tax refunds to which the Shareholders or their spouses are entitled on account of the payment of the Shareholder Settlement Monies, net of reasonable costs and expenses incurred by the Shareholders in seeking such refunds; and

- 100% of any assets determined to be "Non-Disclosed Assets"[7] as that term is defined in the Shareholder Settlement Agreement.

The Shareholder Settlement Agreement further obligates the Shareholders to provide, for six (6) months following the Plan Effective Date, reasonable cooperation to bring about a sale of Ameridose or its assets in a process that is acceptable to the Chapter 11 Trustee (in and after consultation with the Official Committee and the Plaintiffs' Steering Committee) or approved by the Bankruptcy Court, and provides the Chapter 11 Trustee with the discretion to undertake such efforts as he deems appropriate to bring about a sale or other disposition of the Pharmaceutical Entities or of their assets (including Ameridose, if not sold by the sixth month following the Effective Date). The Trustee's rights to market and sell the Pharmaceutical Entities will expire

---

[6]     The Shareholder Settlement Agreement defines "Plan Effective Date" as the later of: (i) the first Business Day following fourteen (14) days after the Bankruptcy Court's enter of the Confirmation Order, provided that a court of competent jurisdiction has not entered a stay of the Confirmation Order as of such date (in which instance, the Plan Effective Date will not occur until such stay is dissolved), and (ii) the first Business Day on which all other conditions to the effective date of the Plan have been satisfied or waived.

[7]     "Non-Disclosed Assets" generally are assets of the Shareholders or their respective spouses with a value of $100,000 or more that were not disclosed to the Trustee prior to execution of the Shareholder Settlement Agreement.

eighteen (18) months after the Effective Date with respect to Ameridose, and twelve (12) months after the Effective Date with respect to the other Pharmaceutical Entities.

In exchange for the consideration provided by the Shareholders under the Shareholder Settlement Agreement, the agreement requires the Plan to provide for a release, on the Effective Date, of the Shareholder and Affiliate Released Parties[8] from any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction, event or other activity that occurred prior to the Effective Date, in any way relating to or in connection with (i) the Debtor or the Debtor's operations or activities, including but not limited to the compounding, sale and/or distribution or dispensing of the Drugs, (ii) the Shareholder and Affiliate Released Parties' management, control or ownership of, or the employment by, the Debtor, and (iii) the Debtor's estate, the Chapter 11 Case, and the Adversary Proceeding. Accordingly, pursuant to the Shareholder Settlement Agreement, the Shareholder and Affiliate Released Parties are receiving the benefit of the release and injunction provisions in Section 10.05 and 10.06 of the Plan.

Under the Shareholder Settlement Agreement, each Shareholder, as of the Effective Date, will be deemed to have waived, relinquished and released (i) any and all Claims, of any kind or character, if any, he or she holds against the Debtor or its estate, and (ii) any and all rights to distributions or recoveries, of any kind or character, if any, on account of such Claims including, without limitation, pursuant to the Plan. In addition, as of the date the Confirmation Order becomes a Final Order, each Shareholder will be deemed to have unconditionally assigned and transferred to the Chapter 11 Trustee any and all Claims that he or she holds against any person or entity, including, without limitation, any affiliate of the Debtor or any other Shareholder, in any way relating to or in connection with the Debtor or any and all products of and/or distributed by the Debtor.

Pursuant to the Shareholder Settlement Agreement, the Shareholder Settlement Agreement Order stays the Adversary Proceeding through the earlier of the date the Adversary Proceeding is dismissed in accordance with the Shareholder Settlement Agreement or termination of the agreement. In addition, the Shareholder Settlement Agreement required the Chapter 11 Trustee to seek an order of the MDL Court staying the MDL Proceeding as against the Shareholders and Affiliate Released Parties through the earlier of the Effective Date or termination of the agreement (the "MDL Stay Order"). On August 14, 2014, the Chapter 11 Trustee filed a motion with the MDL Court for entry of the MDL Stay Order. On October 9, 2014, the MDL Court granted the MDL Stay Motion and entered the MDL Stay Order.

---

[8] The "Shareholder and Affiliate Released Parties" are the Shareholders, and the respective spouses, children, parents, and other nuclear family members of each Contributor, all trusts under which the Shareholders or their spouses or family members are settlors, trustees, or beneficiaries, the Affiliated Entities set forth in Schedule 1.07 to the Plan, and any other entities in which the Shareholders or their spouses, children or other nuclear family members hold an interest, and those entities' successors, assigns, and predecessors.

The Shareholder Settlement Agreement requires that on or before the first Business Day immediately following fourteen (14) days after the date on which the Shareholder Settlement Agreement Order and the MDL Stay Order had both entered and are in effect, the Shareholders direct Shareholder Settlement Monies to the Chapter 11 Trustee, in trust, to be delivered to the Shareholder Escrow Accounts, in the following amounts: (i) in the case of Barry Cadden and Lisa Conigliaro Cadden, $21,000,000; (ii) in the case of Carla Conigliaro, $24,000,000; and (iii) in the case of Gregory Conigliaro, $2,750,000. These transfers were made on or about October 23, 2014. The Shareholders also agreed under the Shareholder Settlement Agreement to support and not oppose or object to the Plan.

          **(v)**   <u>Victory Settlement</u>.  On November 11, 2014, the Chapter 11 Trustee, in consultation and cooperation with the Official Committee and the Plaintiffs' Steering Committee, entered into the Victory Settlement Agreement with Victory, Netherlands Insurance and Peerless Insurance. Prior to the Petition Date, Victory had installed and monitored ventilation systems at NECC.

Under the Victory Settlement Agreement, Peerless Insurance and Netherlands Insurance (collectively referred to as the "<u>Insurers</u>") will make payments to the Chapter 11 Trustee in the amount of $5,500,000 (the "<u>Victory Settlement Payment</u>") for eventual distribution to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 Case.

The Victory Settlement Agreement also provides for the following:

- The Plan is required to provide the settling parties with general releases on the Plan Effective Date (as defined in the Victory Settlement Agreement),[9] and an injunction permanently barring and enjoining any person or entity from pursuing the settled claims against the settling parties. Accordingly, pursuant to the Victory Settlement Agreement, Victory and the Insurers are receiving the benefit of the release and injunction provisions in Section 10.05 and 10.06 of the Plan.

- Victory and the Insurers agree to support and not oppose or object to the Plan.

Upon the Plan Effective Date, Victory and the Insurers shall be deemed to have waived, relinquished, and released (i) any and all claims (whether or not a proof of claim is filed) of any kind or character it holds against the Debtor or its estate, and (ii) any and all rights to distributions or recoveries, of any kind or character, on account of such claims including, without limitation, pursuant to the Plan and to have unconditionally assigned to the Chapter 11 Trustee

---

[9]    "Plan Effective Date" is defined in the Victory Settlement Agreement to mean the later of (i) the first business day following fourteen (14) days after the Bankruptcy Court's entry of the Confirmation Order, provided that the Confirmation Order is not subject to a stay by any court of competent jurisdiction as of such date, and (ii) the first business day on which all other conditions to the effective date of the Plan as set forth therein have been satisfied or waived.

any and all Claims that they may have between them and against any Persons not a Party to this Agreement (including any claims for indemnification, contribution or subrogation) that are based upon or arise out of the Settled Claims.

(b)    The Provider Settlement Agreements.  In addition to the settlements with National Defendants, the Chapter 11 Trustee has entered into the following settlement agreements with certain clinics and other healthcare provider that administered tainted NECC drugs (the so-called "Provider Defendants"):

1.  That certain Settlement and Release Agreement (the "High Point Settlement Agreement") by and among the Chapter 11 Trustee, High Point, and Ironshore; and

2.  That certain Settlement and Release Agreement (the "Inspira Settlement Agreement") by and among the Chapter 11 Trustee, Inspira, Lexington, and Ironshore.

The terms of the settlements with the Provider Defendants are briefly summarized below:

(i)    High Point Settlement.   On December 3, 2014, the Chapter 11 Trustee, in consultation and cooperation with the Official Committee and the Plaintiffs' Steering Committee, entered into the High Point Settlement Agreement with High Point and Ironshore. Prior to the Petition Date, High Point was among the clinics that received and administered the tainted NECC MPA.

Under the High Point Settlement Agreement, High Point and Ironshore will make payments to the Chapter 11 Trustee in the amount of $3,500,000 (the "High Point Settlement Payment") for eventual distribution to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 Case.

The High Point Settlement Agreement also provides for the following:

- The Plan is required to provide the settling parties with general releases on the Plan Effective Date and an injunction permanently barring and enjoining any person or entity from pursuing the settled claims against the settling parties. Accordingly, pursuant to the High Point Settlement Agreement, High Point and Ironshore will receive the benefit of the release and injunction provisions in Sections 10.05 and 10.06 of the Plan.

- High Point and Ironshore agree to support and not oppose or object to the Plan.

Upon the Plan Effective Date,[10] High Point and Ironshore shall be deemed to have waived, relinquished, and released (i) any and all claims (whether or not a proof of claim is filed) of any

---

[10]    "Plan Effective Date" is defined in the High Point Settlement Agreement to mean the later of (i) the first business day following fourteen (14) days after the Bankruptcy Court's entry of the Confirmation Order, and (ii) the first business day on which all other

kind or character it holds against the Debtor or its estate, and (ii) any and all rights to distributions or recoveries, of any kind or character, on account of such claims including, without limitation, any and all rights to distributions or recoveries those entities have pursuant to the Plan, and to have unconditionally assigned to the Chapter 11 Trustee any and all claims they may have had between them and against any persons not a party to the High Point Settlement Agreement (including any claims for indemnification, contribution or subrogation) that are based upon or arise out of the Settled Claims.[11]

        **(ii)**    <u>Inspira Settlement</u>.  On December 3, 2014, the Chapter 11 Trustee, in consultation and cooperation with the Official Committee and the Plaintiffs' Steering Committee, entered into the Inspira Settlement Agreement with Inspira, Lexington, and Ironshore.  Prior to the Petition Date, Inspira was among the clinics that received and administered the tainted NECC MPA.

Under the Inspira Settlement Agreement, Inspira, Lexington, and Ironshore will make payments to the Chapter 11 Trustee in the amount of $16,000,000 (the "<u>Inspira Settlement Payment</u>") for eventual distribution to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 Case.

The Inspira Settlement Agreement also provides for the following:

- The Plan is required to provide Inspira, Lexington, Ironshore, and Juno with general releases on the Plan Effective Date and an injunction permanently barring and enjoining any person or entity from pursuing the settled claims against the settling parties.  Accordingly, pursuant to the Inspira Settlement Agreement, Inspira, Lexington, Ironshore, and Juno will receive the benefit of the release and injunction provisions in Sections 10.05 and 10.06 of the Plan.

- Inspira, Lexington, and Ironshore agree to support and not oppose or object to the Plan.

Upon the Plan Effective Date,[12]  Inspira, Lexington, Ironshore, and Juno Assurance shall be deemed to have waived, relinquished, and released (i) any and all claims (whether or not a proof

---

conditions to the effective date of the Plan as set forth therein, and to the effective date of the Plan as set forth therein have been satisfied or waived.

[11]    "Settled Claims" is defined in the High Point Settlement Agreement to mean "any and all Claims asserted or that could be asserted by or on behalf of any Person in any capacity whatsoever against High Point and/or Ironshore based upon, arising out of or in any way relating to (i) the NECC Claims, and/or (ii) the Policy, including, but not limited to, Insurance Coverage Claims, Direct Action Claims and/or Extra-Contractual Claims."

[12]    "Plan Effective Date" is defined in the Inspira Settlement Agreement to mean the later of (i) the first business day following fourteen (14) days after the Bankruptcy Court's entry of the Confirmation Order, and (ii) the first business day on which all other conditions to

of claim is filed) of any kind or character it holds against the Debtor or its estate, and (ii) any and all rights to distributions or recoveries, of any kind or character, on account of such claims including, without limitation, any and all rights to distributions or recoveries those entities have pursuant to the Plan, and to have unconditionally assigned to the Chapter 11 Trustee any and all claims they may have had between them and against any persons not a party to the Inspira Settlement Agreement (including any claims for indemnification, contribution or subrogation) that are based upon or arise out of the Settled Claims.[13]

   (c) <u>Tennessee Board of Pharmacy Settlement</u>.  In addition to the National Settlements and the Provider Settlements, on May 12, 2014, the Chapter 11 Trustee, in consultation with the Official Committee and the Plaintiffs' Steering Committee, entered into that certain Proposed Settlement Agreement and Order (the "<u>Tennessee Settlement Agreement</u>") by and among the Chapter 11 Trustee, Barry J. Cadden, and the Tennessee Board of Pharmacy (the "<u>Pharmacy Board</u>").  The Tennessee Settlement Agreement resolved the proceedings commenced by Tennessee Department of Health (the "<u>Division</u>") and the Pharmacy Board against NECC's bankruptcy estate and Mr. Cadden, seeking civil penalties against NECC and Mr. Cadden for alleged violations of certain Tennessee statutes and regulations governing the practice of pharmacy.

   The Tennessee Settlement Agreement provides for the following:

- <u>Permanent Surrender of Licenses</u>: Any and all licenses granted by the Pharmacy Board to NECC or Mr. Cadden were deemed to be voluntarily and irrevocably surrendered;

- <u>Resolution of Proceedings</u>: Any and all proceedings against NECC and Mr. Cadden and available to the Division, the Pharmacy Board or the State of Tennessee relating to the subject matter of the then-pending administrative proceedings, were conclusively resolved pursuant to the terms of the Tennessee Settlement Agreement;

- <u>Allowed Claim</u>: In full satisfaction of any and all fines, penalties or assessments available to the Pharmacy Board against NECC or Mr. Cadden, the Pharmacy Board received an allowed general unsecured claim in the amount of $5,000,000 (the "<u>Tennessee Settlement Amount</u>"), **which claim is subordinate, for purposes of voting and distribution, to the claims of tort claimants and other general unsecured creditors of NECC**.  Additionally, to the extent other states assert claims under their applicable regulatory

---

the effective date of the Plan as set forth therein, and to the effective date of the Plan as set forth therein have been satisfied or waived.

[13] "Settled Claims" is defined in the Inspira Settlement Agreement to mean "any and all Claims asserted or that could be asserted by or on behalf of any Person in any capacity whatsoever against Inspira and/or any of the Insurers based upon, arising out of or in any way relating to (i) the NECC Claims, and/or (ii) the Policies, including, but not limited to, Insurance Coverage Claims, Direct Action Claims and/or Extra-Contractual Claims."

schemes and such claims are settled for an allowed general unsecured claim subject to the same subordination as described in the immediately preceding sentence, such claims will be satisfied from the Tennessee Settlement Amount on a pro rata basis.

- Dismissal of Administrative Proceedings: The administrative proceedings commenced by the Pharmacy Board and the Division, which were pending at the time of the execution of the Tennessee Settlement Agreement, were dismissed with prejudice.

The Tennessee Settlement Agreement was approved by an order of the Bankruptcy Court entered July 31, 2014.

(d)   ARL Settlement In Principle. The Chapter 11 Trustee has reached a settlement in principle with  ARL BioPharma Inc. d/b/a Analytical Research Laboratories ("ARL"), the company that provided sterility testing services to NECC.  Subject to final documentation of the settlement agreement, ARL and its insurer will make a payment to the Chapter 11 Trustee in the amount of $6,400,000 for eventual distribution to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 Case.[14]

Section 3.1   Preference Analysis and Other Potential Avoidance Actions.  The Bankruptcy Code preserves a debtor's right to prosecute claims and causes of action, which exists outside of bankruptcy, and also empowers a debtor to prosecute certain claims which are established by the Bankruptcy Code, including claims to avoid and recover preferential transfers and fraudulent conveyances.  As described below, and except as otherwise provided in the Shareholder Settlement Agreement, the GDC Settlement Agreement, the PMIC/Maxum Settlement Agreement and the Plan, the Plan preserves all of the estate's rights in respect of all avoidance actions.

To date, the Plan Proponents have not conclusively identified and/or investigated all potential avoidance actions.  NECC's Schedules, initially filed with the Bankruptcy Court on January 18, 2013, purported to identify all transfers made by NECC within 90 days (one year for insiders) prior to the Petition Date.  The Plan Proponents, together with their counsel and advisors, continue to investigate such transfers and to determine whether any additional transfers may have been omitted from NECC's Schedules.

Certain payments made in the ninety (90) days immediately preceding the Petition Date by the Debtor to or for the benefit of creditors, on account of an antecedent debt, may be recoverable by the Chapter 11 Trustee as voidable preferences pursuant to sections 547 and 550 of the Bankruptcy Code.  The 90-day period is extended to one (1) year prior to the Petition Date for payments made to or for the benefit of Insiders.  The proceeds of any such recoveries are property of the Estate that the Trustee may use in accordance with the Bankruptcy Code,

---

[14]   A final, executed copy of the settlement agreement with ARL will be included in the Plan Supplement, and this Disclosure Statement may be amended to describe that settlement in further detail.

including, as appropriate, to increase distributions under the Plan. Parties who return avoidable preferences generally are entitled to an Allowed general unsecured claim in the amount of the avoided preference repaid to the Estate.

The Chapter 11 Trustee has identified payments in the gross amount of $1,441,170.53 that appear to have been made by the Debtor to multiple transferees during the applicable preference periods. That total, however, does not necessarily reflect voidable transfers on account of an antecedent debt; the Chapter 11 Trustee anticipates that some or all of the transferees will be able to assert partial or complete defenses to any attempt to recover the potentially avoidable payments. Based upon the Chapter 11 Trustee's analysis to date, preference recoveries likely will not exceed $500,000 and, in all likelihood, will be significantly less.

The Trustee continues to review and analyze these potential preferences, and, where appropriate, is making demand upon the identified transferees to turnover the allegedly preferential payments each has received. The Chapter 11 Trustee intends to commence appropriate adversary proceedings to recover allegedly preferential payments prior to the expiration of the deadline for the filing of such adversary proceedings, which Bankruptcy Code section 546(a) generally defines as "2 years after the [Petition Date]."

Under the Plan, the liability of all potential transferees, other than those Entities receiving releases under the Plan, is preserved and will be transferred to the Tort Trustee on the Effective Date. The claims for avoidance of these potential preferences will become property of the Tort Trust, and will be used and distributed in accordance with the Plan, the Tort Trust Agreement and the Claims Resolution Facility Procedures.

**IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, HOLDERS OF CLAIMS AND INTERESTS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM NECC WITHIN NINETY (90) DAYS PRIOR TO THE PETITION DATE) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES SOME CAUSES OF ACTION, AND THAT THE PLAN AUTHORIZES THE PROSECUTION OF THESE CAUSES OF ACTION.**

**ARTICLE IV**
**ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS**

Section 4.1    Administrative Expenses.

(a)    Generally.    Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment or as otherwise provided herein, on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable, the Chapter 11 Trustee or the Post-Confirmation Officer (as may be applicable from time to time) shall pay to each holder of an Allowed Administrative Expense Claim, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim. Notwithstanding the

foregoing, Administrative Expense Claims that represent liabilities incurred by the Chapter 11 Trustee in the ordinary course of the Debtor's business during the Chapter 11 Case shall be paid in the ordinary course of business and in accordance with any terms and conditions of any agreements relating thereto.

        (b)     <u>Deadlines to Assert Administrative Expense Claims</u>.

        **(i)**     <u>Pre-Confirmation Date Administrative Expense Claims</u>.  Except for applications by professionals under section 330 of the Bankruptcy Code and fees payable pursuant to 28 U.S.C. § 1930, all requests for payment of Administrative Expense Claims for which an earlier deadline has not been previously set or imposed by Local Rule 3002-1 shall be filed and served on each of the Plan Proponents no later than thirty (30) days after entry of the Confirmation Order.

        **(ii)**     <u>Administrative Expense Claims for Professional Fees</u>.  All applications by professionals retained pursuant to sections 327, 328 and 1103 of the Bankruptcy Code for allowance and payment of fees and reimbursement of expenses pursuant to section 330 of the Bankruptcy Code for final compensation for services rendered and for reimbursement of expenses incurred in connection with this Chapter 11 Case shall be filed no later than sixty (60) days after the Effective Date.

        As of the date of this Disclosure Statement, Duane Morris LLP, as counsel to the Chapter 11 Trustee, has incurred approximately $3.4 million in professional fees and expenses.  Certain of these fees are on account of the Chapter 11 Trustee's services acting as his own counsel for the estate and not for performance of any duties generally performed by a trustee without the assistance of an attorney or accountant for the estate.  The Chapter 11 Trustee also spent significant time and effort performing duties that might be deemed to be generally performed by a trustee without the assistance of an attorney or accountant for the estate.  If billed at the Chapter 11 Trustee's hourly rate applicable to the case, such services would have aggregated approximately $835,000.  The Bankruptcy Code provides that compensation for such services is payable, after consideration of various factors, on a commission basis applying various percentages, capped at an amount not to exceed three (3) percent of monies in excess of $1,000,000, upon all monies disbursed or turned over by the Chapter 11 Trustee to parties in interest, excluding the debtor.  Duane Morris LLP anticipates that it will incur approximately $2 million in additional professional fees and expenses as counsel to the Chapter 11 Trustee between the date of this Disclosure Statement and the Effective Date  Additional fees attributable to the Trustee's services as Trustee between the date of the Disclosure Statement and the Effective Date will be subject to the cap of 3% of the amount of moneys the Trustee shall have disbursed or turned over to parties in interest during the Chapter 11 case.

        As of the date of this Disclosure Statement, Mesirow Financial Consulting, LLC, as the Trustee's financial advisor, has incurred approximately $420,000 in professional fees and expenses.  Mesirow Financial Consulting, LLC anticipates that it will incur approximately $750,000 in additional fees and expenses between the date of this Disclosure Statement and the Effective Date.

As of the date of this Disclosure Statement, Brown Rudnick LLP, as counsel to the Official Committee, has incurred approximately $3.3 million in professional fees and expenses. Brown Rudnick LLP anticipates that it will incur approximately $1.25 million in additional professional fees and expenses between the date of this Disclosure Statement and the Effective Date.

As of the date of this Disclosure Statement, Perkins Coie, LLP, as special insurance coverage counsel to the Committee, has incurred approximately $98,000 in professional fees and expenses. The Plan Proponents anticipate that Perkins Coie, LLP, will incur no additional professional fees and expenses between the date of this Disclosure Statement and the Effective Date.

(c) <u>Amount of Administrative Expense Claims</u>. The Plan Proponents cannot estimate at this time what the amount of Allowed Administrative Expense Claims will aggregate on the Effective Date because the applicable deadlines for the assertion of Administrative Expense Claims, referenced above, have not yet passed. The Plan Proponents do not believe that there will be a material amount of Administrative Expense Claims other than professional fees as described above. The Chapter 11 Trustee has paid in the ordinary course of business all such expenses of the Debtor since his appointment, and, to the best of his knowledge, the Debtor paid all such expenses prior to the Chapter 11 Trustee's appointment.

Section 4.2 <u>Priority Tax Claims</u>. The Plan Proponents believe that there will not be any material amount of Allowed Priority Tax Claims. However, the Plan provides that, except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable, the Post-Confirmation Officer shall pay to each holder of an Allowed Priority Tax Claim, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.

## ARTICLE V
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Section 5.1 <u>Classification of Claims and Equity Interests</u>. The classification of the Claims and Equity Interests listed below shall be for all purposes, including voting, confirmation and distribution pursuant to the Plan.

| Class | Description | Status | Entitled to Vote | Projected Recovery |
|-------|-------------|--------|------------------|--------------------|
| Class A | Priority Non-Tax Claims | Unimpaired | Deemed to have accepted the Plan | 100% |
| Class B | Miscellaneous Secured Claims | Unimpaired | Deemed to have accepted the Plan | 100% |
| Class C | General Unsecured Claims | Impaired | Entitled to Vote | 90% |
| Class D | Tort Claims | Impaired | Entitled to Vote | To be determined in accordance with the Claims Resolution Facility Procedures and/or the Provider Claims Resolution Facility Procedures |
| Class E | Subordinated Claims | Impaired | Entitled to Vote | 0% |
| Class F | Equity Interests | Unimpaired | Deemed to have accepted the Plan | 0% |

A Claim or Equity Interest shall be placed in a particular Class only to the extent that such Claim or Equity Interest falls within the description of such Class, and shall be classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. For the avoidance of doubt, a Claim shall receive distributions pursuant to the Plan only to the extent that the Claim is an Allowed Claim in such Class and the Claim has not been paid, released, or otherwise settled or compromised prior to the Effective Date.

## ARTICLE VI
## TREATMENT OF CLAIMS AND EQUITY INTERESTS

Section 6.1    Class A – Priority Non-Tax Claims.

(a)    Treatment.    The Plan Proponents believe that there will not be any material amount of Allowed Priority Non-Tax Claims. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment of such Claim, on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, in complete settlement, satisfaction and discharge of its Class A Claim, an amount in Cash equal to the Allowed amount of such Priority Non-Tax Claim.

(b)    Impairment and Voting.  Class A is unimpaired, and accordingly, the holders of Claims in Class A are conclusively presumed to have accepted the Plan and are not entitled to vote.

Section 6.2    Class B – Miscellaneous Secured Claims.

(a)    Treatment.    Except to the extent that a holder of an Allowed Miscellaneous Secured Claim agrees to a different treatment of such Claim, on the later of the Effective Date and the date such Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Miscellaneous Secured Claim shall receive, in complete settlement, satisfaction and discharge of its Class B Claim, at the Estate Representative's election, (i) payment in full in Cash of such holder's Allowed Miscellaneous Secured Claim, (ii) the Debtor's interest in the Collateral securing such holder's Allowed Miscellaneous Secured Claim or (iii) such other treatment rendering such holder's Allowed Miscellaneous Secured Claim Unimpaired.  The Plan Proponents believe there will not be a material amount of Miscellaneous Secured Claims.

(b)    Impairment and Voting.  Class B is Unimpaired, and accordingly, the holders of Claims in Class B are conclusively presumed to have accepted the Plan and are not entitled to vote.

Section 6.3    Class C – General Unsecured Claims.

(a)    Treatment.  On the later of the Effective Date and the date such General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed General Unsecured Claim shall receive, in complete settlement, satisfaction and discharge of its Class C Claim, its Pro Rata Share of the Class C Cash.

(b)    Impairment and Voting.  Class C is Impaired, and accordingly, the holders of Claims in Class C are entitled to vote to accept or reject the Plan.

**Estimated Amount of General**        **$1,025,500**
**Unsecured Claims:**

**Projected Percentage Recovery:**        **90%**

Section 6.4    Class D – Tort Claims.

(a)    Treatment.  Each holder of a qualified Tort Claim (as determined by procedures set forth in the Tort Trust Agreement, the Claims Resolution Facility, and a Provider Claims Resolution Facility, if applicable) shall be enjoined from pursuing any Claim against the Debtor, the Estate, the Chapter 11 Trustee and the Contributing Parties, and shall receive, in complete settlement, satisfaction and discharge of his or her Class D Claim, a share of the beneficial interests in the Tort Trust (as determined by the procedures set forth in the Tort Trust Agreement, the Claims Resolution Facility Procedure, and a Provider Claims Resolution Facility Procedures, if applicable).

Except as otherwise provided in the Plan, each Tort Claimant (as determined by procedures set forth in the Tort Trust Agreement, the Claims Resolution Facility, and a Provider Claims Resolution Facility, if applicable) remains entitled to any recovery from third parties or liability insurance proceeds, to the extent any such third parties are not released by or protected under the injunction pursuant to the Plan, that may be liable on or otherwise available to satisfy such Tort Claims in whole or in part; *provided*, *however*, that notwithstanding anything herein or in the Tort Trust Documents to the contrary, to the extent that (a) a Tort Claimant realizes a recovery from an third party, other than in accordance with this Plan and pursuant to the Tort Trust Agreement, on account of the Tort Claimant's Tort Claim, and (b) such third party has filed a timely proof of claim against the Estate for contribution or indemnity based in whole or in part on its actual or potential liability obligations to such Tort Claimant, (x) such third party's payment to such Tort Claimant shall be presumed to be solely on account of that third party's own liability to such Tort Claimant, and shall not be deemed to be a payment of the Tort Claim in full within the meaning of section 509(c) of the Bankruptcy Code until so agreed by the Tort Trustee or otherwise so determined by the Bankruptcy Court, and (y) any distribution from the Tort Trust to which such Tort Claimant would otherwise be entitled shall be reserved until such time as the third party's claim is resolved.

An Entity that is liable with the Debtor on, or that has secured, an Allowed Tort Claim, and that pays such Allowed Tort Claim in full, shall, to the extent provided by Section 509 of the Bankruptcy Code, be subrogated to the rights of the holder of such Allowed Tort Claim under and for purposes of this Plan, and such subrogated Claim shall be treated as a Class D Claim in accordance with this Plan, and to the extent that the Entity's payment of the Allowed Tort Claim is not a payment in full, such Entity shall be treated in accordance with Section 509 of the Bankruptcy Code, including, but not limited to, subordination of such Entity's Claim(s) in accordance therewith.

On August 13, 2014, the MDL Court entered MDL Order No. 8, *Establishing Assessment for Common Benefit Fund*, which provides for a prospective contingent assessment of eight percent (8%) upon recoveries on plaintiffs' claims in the MDL Proceeding to be used to compensate attorneys who have performed work deemed to benefit all parties to the MDL Proceeding. It is currently unknown whether this assessment (i) will remain at 8%, or will be modified to some lesser or greater percentage or (ii) will be made upon transfer of the settlement funds to the Tort Trust (as currently ordered in MDL Order No. 8), or upon an individual plaintiff's distribution, if any, from the Tort Trust, or upon his or her attorney's fees, or a portion of both.

***Holders of Class D Claims may be required to submit additional documentation regarding their Claim as provided by the Claims Resolution Facility Procedures and, if applicable, the Provider Claims Resolution Facility Procedures. HOLDERS OF CLASS D CLAIMS SHALL BE SUBJECT TO RELEASES AND INJUNCTIONS PRECLUDING PURSUIT OF ANY CLAIM AGAINST THE DEBTOR, THE ESTATE, THE CHAPTER 11 TRUSTEE AND THE CONTRIBUTING PARTIES. HOLDERS OF CLASS D CLAIMS SHOULD CAREFULLY REVIEW SECTIONS 10.05 AND 10.06 OF THE PLAN, TOGETHER WITH SECTIONS 12.5 AND 12.6 OF THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.***

(b)   <u>Impairment and Voting</u>.  Class D is Impaired, and accordingly, the holders of Claims in Class D are entitled to vote to accept or reject the Plan.

The Plan establishes the Claims Resolution Facility and several Provider Claims Resolution Facilities for evaluating individual Tort Claims and determining the amount of the distributions to be made to Tort Claimants pursuant to the Plan, the procedures for which include a settlement matrix consisting of seven "Base Point Categories" (*e.g.,* death after MPA injection <u>and</u> (1) spinal or paraspinal fungal infection and/or (2) fungal meningitis), each of which is attributed a base point score.  For base point categories (I) through (VI), there are also a number of upward adjustments available based on an individual Claimant's circumstances (*e.g.*, length of anti-fungal treatment, complications from anti-fungal treatment, etc.) which may enhance an individual Tort Claimant's point total and, therefore, the individual's ultimate distribution.

Approximately 3,350 Tort Claims were timely filed, or were deemed timely filed per orders of the Bankruptcy Court.  By their nature, such claims are, in whole or in substantial part, in an unliquidated amount, but undoubtedly comprise the most substantial claims against NECC's estate.

The amount of the distribution that will ultimately be made to each individual Tort Claimant is based on that Tort Claimant's point total.  To calculate the amount of each Tort Claimant's distribution, a dollar value will be attributed to each point.  However, the dollar value of each point cannot be finally determined until all costs of administering the Tort Trust are known and all Tort Claims have been resolved pursuant to the Claims Resolution Facility Procedures.  Recognizing the need to make distributions to Tort Claimants as quickly as possible, the Claims Resolution Facility Procedures provide for both an initial and final payment to Tort Claimants.

Section 6.5    <u>Class E – Subordinated Claims</u>.

(a)   <u>Treatment</u>.  Subordinated Claims in Class E shall be automatically subordinated by confirmation of the Plan for purposes of distribution under the Plan to other general unsecured claims without the need for further order or notice.  Each holder of an Allowed Class E Claim shall be deemed, on the Effective Date, to have exchanged such claim for a Pro Rata Share of Class E Cash, if any, in full satisfaction of such claim.  It is not anticipated that holders of Class E Claims will receive any distributions under the Plan.

As described in Section 6.4(a) above, and pursuant to Sections 502 and 509 of the Bankruptcy Code, an Entity (such as a pain clinic or hospital) that is liable with the Debtor on, or has secured, a Tort Claim (and as such holds a Subordinated Claim), and that pays such Tort Claim in full, will be subrogated to the rights of the holder of that Tort Claim, including that holder's rights, if any, to distributions under the Plan pursuant to the Tort Trust Documents.  If, however, such Entity does not pay such Tort Claim in full, such Entity's claim will continue to be treated as a Subordinated Claim.

***CERTAIN HOLDERS OF CLASS E CLAIMS HAVE AGREED TO RELEASES AND INJUNCTIONS PRECLUDING PURSUIT OF ANY CLAIM, INCLUDING CLASS E***

24

***CLAIMS, AGAINST THE DEBTOR, THE ESTATE, THE CHAPTER 11 TRUSTEE AND THE CONTRIBUTING PARTIES.***

(b)    <u>Impairment and Voting</u>.  Class E is Impaired, and accordingly, the holders of Claims in Class E are entitled to vote to accept or reject the Plan.

Section 6.6    <u>Class F – Equity Interests</u>.

(a)    <u>Treatment</u>.  Class F consists of all Equity Interests in NECC.  Equity Holders shall (i) retain, albeit without any rights of control over the Debtor, the Post-Effective Date Debtor, the Estate, or any of their officers or directors, including the Post-Confirmation Officer, or any other rights generally afforded to Interests, their respective Interests in the Debtor to the extent they are entitled to retain such interests under the Shareholder Settlement Agreement, but (ii) shall receive no distributions under the Plan on account of the same.

(b)    <u>Impairment and Voting</u>.  Class F is Unimpaired.  Holders of Claims in Class F will be treated in the manner agreed to in the Shareholder Settlement Agreement. Therefore, they are deemed to have accepted the Plan and are not entitled to vote.

## ARTICLE VII
## SETTLEMENT OF TORT CLAIMS AND THE NECC TORT TRUST

Section 7.1    <u>Settlement and Compromise</u>.    To the extent any Settlement Agreements have not been previously approved by the Bankruptcy Court, the entry of the Confirmation Order shall constitute approval of such Settlement Agreements by the Bankruptcy Court and the Bankruptcy Court's finding that as required under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, the Settlement Agreements are in the best interest of the Debtor, the Estate and all holders of Claims in the Chapter 11 Case, are fair, equitable and reasonable, and have been entered into in good faith by all parties thereto.  Upon the occurrence of the conditions to effectiveness set forth in each of the Settlement Agreements, the Settlement Agreements shall be binding and enforceable against the parties to the Settlement Agreements in accordance with their terms.  To the extent not previously approved by the Bankruptcy Court, copies of the Settlement Agreements (without signature pages) will be included in the Plan Supplement, and the provisions thereof are incorporated into the Plan, as if the same were fully set forth therein.

The Shareholder Settlement Agreement, the PMIC/Maxum Settlement Agreement, the GDC Agreement and the Tennessee Settlement Agreement have previously been approved by orders of the Bankruptcy Court at Docket Numbers 972, 971, 970 and 973 respectively.

Section 7.2    <u>Exhaustion of Insurance Policies</u>.

(a)    On the Effective Date, the NECC Policies shall be deemed completely exhausted and any and all of PMIC's and Maxum's obligations under the NECC Policies shall be, and are deemed to be, extinguished.

     (b)    On the Effective Date, the Ameridose Primary Policies shall be deemed completely exhausted and any and all of PMIC's obligations under the Ameridose Policies shall be, and are deemed to be, extinguished.

     Section 7.3    <u>Execution of Tort Trust Agreement</u>.  On or before the Effective Date, the Estate Representative, on behalf of the Debtor and on behalf of the Tort Trust Beneficiaries and holders of Allowed Class E Claims, the Tort Trustee and the Resident Tort Trustee shall execute the Tort Trust Agreement, and shall perform all other necessary steps to establish the Tort Trust.

     Section 7.4    <u>Purpose of Tort Trust</u>.  The Tort Trust shall be established for the sole purpose of implementing this Plan on behalf of, and for the benefit of, Tort Trust Beneficiaries and holders of Allowed Class E Claims, and to serve as a mechanism for liquidating, converting to Cash and distributing the Tort Trust Assets for the benefit of Tort Trust Beneficiaries and holders of Allowed Class E Claims, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the Tort Trust. The Tort Trust is organized and established as a trust pursuant to which the Tort Trustee, subject to the terms and conditions contained in the Tort Trust Agreement and in this Plan, is to hold the Tort Trust Assets and dispose of the same in accordance with the Tort Trust Agreement and this Plan in accordance with Treasury Regulation section 301.7701-4(d).

     Section 7.5    <u>Assets of the Tort Trust</u>.  The Tort Trust shall consist of (i) the Initial Tort Trust Assets, which the Estate Representative shall deliver, transfer or cause to be delivered or transferred, as applicable, to the Tort Trust, (ii) the Additional Tort Trust Assets, which, following the Confirmation Date and as soon after receipt as is reasonably practicable, the Estate Representative shall deliver or cause to be delivered to the Tort Trust, and (iii) any additional assets disbursed to the Tort Trust from the Shareholder Settlement QSF Account or the Shareholder Settlement Non-QSF Accounts.

     Section 7.6    <u>Governance of the Tort Trust</u>.  The Tort Trust will be administered by the Tort Trustee.  Subsequent appointments of Tort Trustee(s) shall be made in accordance with the provisions of the Tort Trust Agreement and the Plan.  Decisions with respect to all matters shall be made by the Tort Trustee, subject to the terms of the Tort Trust Agreement.  The Tort Trust Agreement shall govern the removal of any Tort Trustee and appointment of any successor Tort Trustee.  The Tort Trust Agreement specifies that the Tort Trustee shall be a resident of the United States.

     Section 7.7    <u>Role of the Tort Trustee</u>.  In furtherance of, and consistent with the purpose of, the Tort Trust and the Plan, the Tort Trustee shall, subject to the terms of the Plan and the Tort Trust Agreement, (i) have the power and authority to hold, manage, sell and distribute the Tort Trust Assets as set forth herein and in the Tort Trust Agreement, (ii) have the power and authority to hold, manage, sell and distribute Cash or non-Cash Tort Trust Assets obtained through the exercise of its power and authority, (iii) have the power and authority to investigate, assert, prosecute and resolve, in the names of the Debtor and/or the name of the Tort Trust, the Estate Causes of Action in its sole and absolute discretion and (iv) have the power and authority to perform such other functions as are provided in the Plan or Tort Trust Agreement.

The Tort Trustee shall be responsible for all decisions and duties with respect to the Tort Trust and the Tort Trust Assets, subject to the terms of the Plan and the Tort Trust Agreement. Subject to the provisions of the Tort Trust Agreement, in all circumstances, the Tort Trustee shall act in furtherance of the purpose of the Tort Trust, and shall use commercially reasonable efforts to dispose of the Tort Trust Assets and to make timely distributions and not unduly prolong the duration of the Tort Trust.

Section 7.8    Investments. Investments of all assets, including monies, held in the Tort Trust shall be administered, subject to the limitations and provisions set forth in Section 5.08 of the Plan, in view of the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs, and with the understanding that it is intended that distributions from the Tort Trust to Tort Trust Beneficiaries, which will have the effect of liquidating and terminating the Tort Trust, will commence immediately upon or soon after the Effective Date of the Plan and will be completed soon thereafter. The Tort Trustee shall invest and reinvest the principal and income of the Tort Trust and keep the funds of the Tort Trust invested in interest-bearing accounts at an approved depository institution to be selected from the United States Trustee's List of Authorized Depositories for Bankruptcy Cases filed in Region One, dated July 26, 2013. Each account shall be treated as a single fund without distinction between principal and income. For purposes of this paragraph, "interest-bearing account" may include a money fund whose objectives are current income consistent with liquidity and low risk, the maintenance of a portfolio of high quality, short-term money market instruments, and maintenance of a constant $1.00 net asset value per share, to the extent the Tort Trustee determines that such fund is consistent with provisions for investment set forth in IRS Revenue Procedure 94-45 or any successor guidance issued by the IRS. All investments shall be made so as to at all times provide sufficient liquidity to meet the anticipated cash needs of the Tort Trust as set forth herein. In investing, reinvesting, exchanging, selling and managing the Tort Trust accounts, the Tort Trustee shall discharge its duties with respect to said accounts solely in the interest of the accomplishment of the purposes and objectives of the Tort Trust. Notwithstanding the foregoing, the Tort Trustee shall make continuing efforts to make timely distributions and not unduly prolong the duration of the Trust, consistent with the limitations set forth in IRS Revenue Procedure 94-45 or any applicable successor authority.

Section 7.9    Fees, Costs and Expenses of the Tort Trust.

(a)    The Tort Trust shall pay all reasonable fees, costs and expenses of the Tort Trust that are (a) incurred in connection with the administration of the Tort Trust, the protection, preservation, liquidation and distribution of Tort Trust Assets, and the costs of investigating, prosecuting, resolving and/or settling any Claims of Tort Trust Beneficiaries and holders of Allowed Class E Claims (including but not limited to Disputed Claims or any Disputed Ownership Fund under Section 5.12 of the Plan), any tax liability imposed on the Tort Trust rather than on the Disputed Claims Reserve, Disputed Ownership Fund, or the Expense Fund, if any, and any fees, costs and expense of any and all professionals retained by the Tort Trustee and persons to be compensated from the Claims Resolution Facility and the Provider Claims Resolution Facilities), (b) obligations or other liabilities incurred or assumed by the Tort Trust (including but not limited to any Reserves established by the Tort Trust) (c) reasonably necessary to meet contingent liabilities and to maintain the value of the Tort Trust Assets during

liquidation, and (d) reasonably necessary to satisfy any other obligations of the Tort Trust set forth in the Plan, the Confirmation Order or the Tort Trust Documents.

(b)    The Tort Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings, and shall be reimbursed for his or her reasonable expenses, including travel expenses, reasonably required and incurred in the performance of his or her duties, in each case subject to the terms and provisions of the Plan and the Tort Trust Documents.

(c)    Subject to the terms and provisions of the Plan and the Tort Trust Documents, the Tort Trustee may retain and reasonably compensate counsel and other professionals on such ordinary and customary and commercially reasonable terms as the Tort Trust deems appropriate, without Bankruptcy Court approval.

(d)    The Tort Trustee may retain such law firms or attorneys, experts, advisors, consultants, investigators, appraisers, auctioneers, corporate management services, or other persons or professional firms as the Tort Trustee determines, in his or her sole discretion, are necessary, desirable or appropriate to aid in the performance of his or her duties, without the need for further order or notice.  The Tort Trustee may pay or appropriate funds necessary to pay the professionals for services rendered and expenses incurred after the Effective Date without any need for filing fee applications under the Bankruptcy Code or approval of any court.  The Tort Trustee may retain any professional who represented the Official Committee or the Chapter 11 Trustee in the Chapter 11 Case.

Section 7.10    Distribution of the Tort Trust Assets.  The Tort Trustee shall distribute the proceeds of the Tort Trust Assets in accordance with this Plan, the Confirmation Order, the Tort Trust Documents and the Claims Resolution Facility Procedures. In connection with such distributions, and except as provided below in this Section 5.10, the Tort Trust shall be responsible for all reimbursement and reporting obligations imposed by the Medicare Act for the repayment of any claim related conditional payments made under Medicare Part A, B, C and D ("Conditional Payment") or any state's Medicaid or Workers Compensation statute. Before disbursing any Tort Trust Assets to any Tort Trust Beneficiary, the Tort Trustee may enter into a global resolution with the Centers for Medicare and Medicaid Services ("CMS") to reimburse all Medicare Part A, B, C and D liens that are subject to repayment for Conditional Payments made pursuant to 42 USC 1395y(b) and the accompanying Medicare Part C and Part D statutes and Medicare reporting obligations pursuant to 42 USC 1395y(b)(8).

Pursuant to 42 USC 1395y(b)(8), defined Responsible Reporting Entities ("RREs") must report claims to CMS in the manner and time specified by the statute.  If a global resolution with CMS cannot be reached, the Tort Trustee is authorized to enter into a separate agreement with each RRE to report on their behalf and if a separate agreement with an RRE is not reached, the Tort Trustee shall provide all of the information required for proper reporting under 42 USC 1395y(b)(8) to the appropriate RRE(s) or their authorized agent before disbursing any funds to any Tort Trust Beneficiary. If a global resolution is not reached and the Tort Trustee does not enter into an agency agreement with the appropriate RRE(s) before disbursing any funds to any Tort Trust Beneficiary (i) the Tort Trustee will collect the Tort Trust Beneficiary's first name, last name, date of birth, gender, social security number and any other information

required for proper reporting of the claim to CMS pursuant to 42 USC 1395y(b)(8) and the Medicare Mandatory Insurer Reporting User Guide; and (ii) the Tort Trustee will provide all of the information required for reporting to the RREs within five (5) days of any Final Determination (as that term is used in the Claims Resolution Facility Procedures) of any claim.

In addition, if a global resolution with CMS cannot be reached, before disbursing any funds to any Tort Trust Beneficiary, (i) the Tort Trustee shall determine, or retain an appropriately qualified firm to determine whether any Conditional Payment has been made to or on behalf of the Tort Trust Beneficiary to whom a distribution of Tort Trust Assets will be made, and if any Conditional Payment has been made to or on behalf of such a Tort Trust Beneficiary, the Tort Trustee shall, within the time period called for by the Medicare Act, (a) reimburse the Medicare Trust fund, the appropriate Medicare plan or their authorized contractor for the appropriate amount and (b) submit the required information for the Tort Trust Beneficiary to the appropriate agency of the United States government; and (ii) the Tort Trustee shall otherwise comply with any requirements (including, but not limited to, any reporting or payment requirements) of any other federal or state governmental health insurance program and any state's Medicaid or Workers Compensation statute. Prior to the Tort Trustee reimbursing any Medicare Part A, B, C and D plan requiring repayment the Tort Trustee shall provide notice of the existence of any Conditional Payment(s) and/or other lien(s) to the Tort Trust Beneficiary and, if applicable, his or her attorney. The Tort Trust Beneficiary and/or his or her attorney may elect to negotiate the amount of the alleged conditional payments within 120 days of notice from the Tort Trustee, or prior to any deadline imposed by the Medicare Part A, B, C and D for reimbursement, whichever is sooner. If the Tort Trust Beneficiary or his or her attorney elect not to negotiate the alleged lien amounts, or the other lien(s) are not resolved within the time periods specified, with the Tort Trust Beneficiary's consent, the Tort Trustee may utilize the firm with experience in resolving liens to satisfy the Tort Trust Beneficiary's obligations represented by the Conditional Payment(s) and/or other lien(s). Upon receiving confirmation of the final Medicare Part A, B, C and D amount requiring repayment, the Tort Trustee will reimburse the appropriate Medicare Part A, B, C and D plan or their authorized contractor. Any payments made to resolve such obligations of the Tort Trust Beneficiary, together with the fees paid to the lien resolution firm, shall be deducted from the Tort Trust Beneficiary's distribution of Tort Trust Assets prior to disbursement of the balance to the Tort Trust Beneficiary or his or her counsel.

The Trustee, the Post-Effective Date Debtor and the Post-Confirmation Officer shall have no responsibility or liability for (i) the creation, existence, operation or administration of the Tort Trust; (ii) any acts or omissions of the Tort Trustee in administering the Tort Trust; (iii) any reimbursement and reporting obligations under the Medicare Act or any state's Medicaid or Workers Compensation statute; or (iv) any payment or non-payment of Claims. The Tort Trust shall indemnify and hold harmless the Trustee, the Post-Effective Date Debtor and the Post- Confirmation Officer from any and all claims, losses, causes of action, demands, liabilities, expenses, fees, including, but not limited to, attorneys' fees, and costs of any kind arising from or relating to (i) the creation, existence, operation or administration of the Tort Trust; (ii) any acts or omissions of the Tort Trustee in administering the Tort Trust; (iii) any reimbursement or reporting obligations under the Medicare Act or any state's Medicaid or Workers Compensation statute or (iv) any payment or non-payment by the Tort Trust to any Tort Trust Beneficiary. Prior

to making any Tort Trust Distribution, the Tort Trust shall retain sufficient funds to meet the fees, costs and expenses of the Tort Trust.

Section 7.11    Resolving Liens Other than Imposed by the Medicare Act and States' Medicaid and Worker Compensation Statutes. Before disbursing any Tort Trust Assets to a Tort Trust Beneficiary, the Tort Trustee shall ensure that other liens that the Tort Trustee has received notice of have been resolved or have been otherwise satisfied. To that end, the Tort Trustee shall provide notice of the existence of any such lien(s) to the Tort Trust Beneficiary and, if applicable, his or her attorney, and it shall be the Tort Trust Beneficiary's (or his or her attorney's) responsibility to resolve such lien(s) against the Tort Trust Beneficiary's anticipated distribution of Tort Trust Assets within 120 days of notice from the Tort Trustee. If the lien has not been settled or otherwise resolved within this 120-day time period, with the Tort Trust Beneficiary's consent, the Tort Trustee may retain a firm with experience in resolving liens to satisfy the Tort Trust's Beneficiary's obligations as represented by the lien(s). Any payments made to resolve such lien(s), together with the fees paid to the lien resolution firm, shall be deducted from the Tort Trust Beneficiary's distribution of Tort Trust Assets prior to disbursement of the balance.

Section 7.12    Time of Tort Trust Distributions. Subject to the Claims Resolution Facility Procedures and the Provider Claims Resolution Facility Procedures, the Tort Trustee shall have the sole and absolute discretion to determine the timing of distributions of the proceeds of the Tort Trust in the most efficient and cost-effective manner possible; provided, however, that the Tort Trustee's discretion shall be exercised in a manner consistent with the express requirements of the Plan and the requirements of taxation as a grantor trust under applicable IRS guidelines, rulings or other controlling authorities.

Section 7.13    Tax Treatment of Tort Trust.

(a)    Tort Trust Assets Treated as Owned by Certain Creditors. For all United States federal income tax purposes, all parties (including the Post-Confirmation Officer, the Estate Representative, the Tort Trustee, the Resident Tort Trustee, the Settlement Administrator(s), Tort Trust Beneficiaries and holders of Allowed Class E Claims) shall treat the transfer of the Tort Trust Assets to the Tort Trust  as (a) a transfer of the Tort Trust Assets (subject to any obligations related to those assets) directly to the Tort Trust Beneficiaries and holders of Allowed Class E Claims, followed by (b) the transfer by such Tort Trust Beneficiaries and holders of Allowed Class E Claims of such Tort Trust Assets (other than the Tort Trust Assets allocable to a Contested Claims Reserve or a Disputed Ownership Fund, each as described in Section 5.13(v) of the Plan) to the Tort Trust in exchange for beneficial interests in the Tort Trust. Accordingly, the Tort Trust Beneficiaries and holders of Allowed Class E Claims shall be treated for federal income tax purposes (and, to the extent permitted, for state and local income tax purposes) as the grantors and owners of their respective shares of the Tort Trust Assets (other than the Tort Trust Assets allocable to an Expense Fund, if any, Contested Claims Reserve or a Disputed Ownership Fund as described in Section 5.13(v) of the Plan).

(b)    Exemption from Transfer Taxes. Pursuant to section 1146(a) of the Bankruptcy Code, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer from the Estate, the Post-Effective Date Debtor or the Post-

Confirmation Officer to the Tort Trust or any other Person or any government, governmental agency or any subdivision, department or other instrumentality thereof, pursuant to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Without limiting the foregoing, any issuance, transfer or exchange of a security or any making or delivery of an instrument of transfer pursuant to the Plan shall be exempt from the imposition and payment of any and all transfer taxes (including but not limited to any and all stamp taxes or similar taxes and any interest, penalties and addition to the tax that may be required to be paid in connection with the consummation of the Plan) pursuant to sections 1146(a), 505(a), 106 and 1141 of the Bankruptcy Code.

(c)      Tax Reporting.

(i)      The Tort Trustee shall serve as the "Qualified Settlement Fund Administrator" of the Shareholder Settlement QSF Account and in such capacity shall have the exclusive responsibility and obligation to file all required tax returns and to otherwise administer all funds from or deposited into a "Qualified Settlement Fund" for the benefit of Tort Trust Beneficiaries.

(ii)      The Tort Trustee shall file returns for the Tort Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 5.13(iii) of the Plan.  The Tort Trustee shall also annually send to each record holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and shall instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns.  The Tort Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Tort Trust that are required by any Governmental Unit.

(iii)      Tort Trust taxable income or loss shall be allocated pro rata based on the total of Allowed and Disputed Claims of the Tort Trust Beneficiaries at the end of the taxable year.  Tort Trust taxable income or loss allocated to Disputed Claims shall be allocated to the Contested Claims Reserve or Disputed Ownership Fund (each as described in Section 5.12(v) of the Plan) (whichever applies), and reported to taxing authorities appropriately, as described further herein.

(iv)      As soon as possible after the Effective Date, the Tort Trustee shall make a good faith valuation of the Tort Trust Assets.  Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties (including the Estate Representative, the Official Committee, the Tort Trustee, the Tort Trust Beneficiaries and holders of Allowed Class E Claims) for all state and federal income tax purposes.  The Tort Trust also shall file (or cause to be filed) any other statements, returns or disclosures relating to the Tort Trust that are required by any governmental unit.

(v)    The Tort Trustee may request an expedited determination of taxes of the Tort Trust under Section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the Tort Trust for all taxable periods through the termination of the Tort Trust.

(d)    <u>Withholding of Taxes and Reporting Related to Tort Trust Operations</u>. The Tort Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the Tort Trust shall be subject to any such withholding and reporting requirements.  The Tort Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with any such withholding, payment, and reporting requirements.  All amounts properly withheld from distributions to a Tort Trust Beneficiary or holder of an Allowed Class E Claim as required by applicable law and paid over to the applicable taxing authority for the account of such Claimant shall be treated as part of the distributions to such Tort Trust Beneficiary or holder of an Allowed Class E Claim.  To the extent that the operation of the Tort Trust or the liquidation of the Tort Trust Assets creates a tax liability imposed on the Tort Trust, including the Contested Claims Reserve described in Section 5.12(v) hereof, the Tort Trust shall timely pay such tax liability and any such payment shall be considered a cost and expense of the operation of the Tort Trust payable without Bankruptcy Court order.  Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder.  All Tort Trust Beneficiaries and holders of Allowed Class E Claims shall be required to provide any information necessary to effect the withholding of such taxes.

(e)    <u>Reporting Related to Contested Claims Reserve</u>.  Notwithstanding any other provision of the Tort Trust Agreement to the contrary, subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, the Tort Trustee may treat any Tort Trust Asset allocable to, or retained on account of, a "Contested Claims Reserve" as held by one or more discrete entities for federal, and state and local, income tax purposes, subject to an allocable share of all expenses and obligations of the Tort Trust, on account of such contested Claims.  The Tort Trustee may, in the his sole discretion, file a tax election to treat any Contested Claims Reserve as a Disputed Ownership Fund within the meaning of Treasury Regulation Section 1.468B-9 for United States federal income tax purposes rather than to tax such reserve as a part of the Tort Trust.  All Tort Trust Beneficiaries, and all holders of Contested Claims, shall be bound by such income tax treatment.

(f)    <u>Qualified Settlement Fund Matters</u>.  The Qualified Settlement Fund ("QSF") is intended to be established in accordance with Treasury Regulation Section 1.468B-4.  Such treatment provides significant income tax benefits for the Debtor and the claimants.  The QSF will receive assets from various sources (the "Transferors") including the qualified settlement funds established under the Shareholder Escrow and Control Agreement as well as funds from other sources, primarily the Debtor.  All Tort Trust Assets transferred from the QSF to the Tort Trust shall be treated for all purposes as amounts distributed to claimants for which the QSF was established in accordance with Treasury Regulation Section 1.468B-4; likewise all such funds shall be reported as excludable from gross income of the claimants to the extent permitted under Section 104(a)(2) (or any other provision) of the Tax Code.  In no event will the QSF distribute, or be deemed to have distributed any assets back to the Transferors.

Section 7.14    Resolution of the Claims of Minors In Accordance With the Tort Trust.

(a)    In connection with any Tort Claims in which the holder is a minor, the Tort Trustee shall notify the parent, guardian, guardian ad litem, adult spouse, next friend, or other representative of the minor of the proposed distribution to such minor. Such parent, guardian, guardian ad litem, adult spouse, next friend, or other representative of the minor shall move for approval of the allocation within ninety (90) days of his or her notification by the Tort Trustee of the proposed distribution.

(b)    In the event that the parent, guardian, guardian ad litem, adult spouse, next friend, or other representative of the minor does not so move for approval of the allocation within ninety (90) days of his or her notification by the Tort Trustee of the proposed distribution, the Tort Trustee shall submit the proposed distribution to the holder to the District Court for approval in accordance with Section 140C1/2 of Chapter 231 of the Massachusetts General Laws and request that the District Court hold a hearing on the petition, and the petitioner and the Tort Claim holder may attend any such hearing. The Tort Trustee shall request the District Court to determine whether the proposed distribution is in the Tort Claim holder's best interests and, if the proposed distribution is approved, that determination shall be embodied in an order which shall have the effect of a judgment. Upon approval of the proposed distribution to such holder of a Tort Claim, the Tort Trustee shall request the District Court to authorize payment to the counsel of the minor, if any, of fees and disbursements to be paid from the distribution and further shall order that the remainder of the distribution be distributed in a manner that will best protect the interest of the minor.

Section 7.15    Access to Claims Information. Upon request made to the Estate Representative on or after the Effective Date by the Tort Trustee, the Settlement Administrator(s) or the Special Master, the Estate Representative shall deliver to the Tort Trustee, the Settlement Administrator(s) or the Special Master , as applicable, on an un-redacted basis, to the relevant Patient Lists and all proofs of claim and supporting documentation (including the PITWD Addenda) for purposes of effectuating the Tort Trust and distributions to holders of Allowed Class D Claims or Allowed Class E Claims. The Confirmation Order shall include all findings and orders necessary to permit or facilitate such delivery and access, including with respect to the confidentiality of the Patient Lists and the PITWD Addenda, subject to any further orders of the Bankruptcy Court.

Section 7.16    Distribution of Surplus. The Tort Trustee shall make all payments required to be paid to holders of Allowed Class D Claims or Allowed Class E Claims under the Plan, in accordance with the terms and conditions of the Tort Trust Agreement, the Claims Resolution Facility Procedures and the Provider Claims Resolution Facility Procedures. If and only if the Tort Trustee has made distributions to Tort Trust Beneficiaries sufficient to satisfy in full the Claims of each and every Tort Trust Beneficiary (as determined by the Tort Trustee, subject to the MDL Court's review of such determination), the Tort Trustee shall distribute to the holders of Allowed Class E Claims their Pro Rata Share of the remaining Cash, if any, of the Tort Trust.

33

Section 7.17    Payments to Post-Effective Date Debtor. The Post-Confirmation Officer may from time to time request that monies be transferred to the Post-Effective Date Debtor from the Tort Trust for use and distribution as he deems appropriate in accordance with the Plan, and the Tort Trustee shall promptly comply with any and all such request(s).

## ARTICLE VIII
## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

Section 8.1    Management of the Post-Effective Date Debtor.

(a)    Post-Confirmation Officer. On the Effective Date, (a) the authority, power and incumbency of the persons then acting as directors and officers of the Debtor, and that of the Chapter 11 Trustee, shall be terminated, (b) such directors, officers and the Chapter 11 Trustee shall be deemed to have been discharged pursuant to Bankruptcy Code section 350(a) and (c) Paul D. Moore, Esq. shall be appointed as the sole officer and director of NECC to serve in accordance with the certificate of incorporation and the bylaws of NECC, as such may be amended to carry out the provisions of the Plan. The Shareholders shall not have the power or ability to remove the Post-Confirmation Officer or to affect any decision thereof.

(b)    Compensation. The Post-Confirmation Officer shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings without any need for filing fee applications under the Bankruptcy Code or approval of any court.

(c)    Indemnification. The Post-Confirmation Officer shall have quasi-judicial immunity to the fullest extent allowed by law and shall have no liability to the Debtor or its creditors, except for willful misconduct. The Tort Trustee shall indemnify and hold harmless the Post-Confirmation Officer for any losses incurred in his or her capacity as such, except to the extent such losses were the result of the Post-Confirmation Officer's willful misconduct.

(d)    Successor. In the event the Post-Confirmation Officer dies, is terminated or resigns for any reason, the Bankruptcy Court shall designate a successor on motion of any party in interest.

Section 8.2    Duties and Powers of the Post-Confirmation Officer. The Post-Confirmation Officer shall have the power and authority to implement and administer the Plan, including:

(a)    Claims. The Post-Confirmation Officer may object to, compromise or settle any or all Claims (with the exception of Class D Claims) against the Debtor or the Estate.

(b)    Selling, Monetizing or Liquidating Assets. The Post-Confirmation Officer may, but is not required to, sell, monetize or liquidate any assets, including, but not limited to, (a) the Affiliated Entities, (b) any assets transferred to the Estate Representative in accordance with the Settlement Agreements, (c) the Estate Representative's entitlement to receive such assets in accordance with the Settlement Agreements, (d) any assets the Estate Representative is entitled to sell for the benefit of the Estate in accordance with the Settlement Agreements, and

(e) any rights of the Estate Representative to sell, monetize, or liquidate any assets in accordance with the Settlement Agreements.

(c) <u>Abandoning Assets</u>. The Post-Confirmation Officer may abandon or donate any assets, if he concludes in his sole discretion that they are of no benefit or inconsequential value without the need for further order or notice.

(d) <u>Retention of Professionals</u>. After the Effective Date, the Post-Confirmation Officer may retain such law firms or attorneys, experts, advisors, consultants, investigators, appraisers, auctioneers, corporate management services, or other persons or professional firms as the Post-Confirmation Officer determines, in his or her sole discretion, are necessary, desirable or appropriate to aid in the performance of his or her duties, without the need for further order or notice. The Post-Confirmation Officer may pay or appropriate funds necessary to pay the professionals for services rendered and expenses incurred after the Effective Date without any need for filing fee applications under the Bankruptcy Code or approval of any court.

(e) <u>Books and Records</u>. The Post-Confirmation Officer shall maintain the Debtor's books and records, maintain accounts, make distributions and take other actions consistent with the Plan and the implementation hereof. The Post-Confirmation Officer shall have the responsibility of storing and maintaining the Debtor's books and records only until such time as he deems, in his sole discretion and subject to the *Agreed Order Granting Relief from Preservation Order to Permit Chapter 11 Trustee to Sell or Otherwise Dispose of Remaining NECC Property* (MDL Docket No. 1538), such books and records may be abandoned or destroyed, and the Post-Confirmation Officer shall have no liability to any party on account of such abandonment or destruction; provided, however, that the Post-Confirmation Officer shall neither abandon nor destroy any such books or records a Shareholder or his or her counsel reasonably requests to be maintained pursuant to the Shareholder Settlement Agreement. In addition to the materials to be provided to the Tort Trustee pursuant to Section 5.14 of the Plan, at the time such materials are provided to the Tort Trustee pursuant to Section 5.14 of the Plan, the Post-Confirmation Officer shall provide the Tort Trustee with such of the Debtor's books and records as the Tort Trustee may reasonably request in connection with the administration of the Claims Resolution Facility and the Provider Claims Resolution Facilities, if any, and the Post-Confirmation Officer shall have no liability to any party on account of such provision. The Post-Confirmation Officer shall retain the right to access and copy any records provided to the Tort Trustee. For purposes of this section, books and records include computer generated or computer maintained books and records and computer data, as well as electronically generated or maintained books and records or data, together with books and records of the Debtor maintained by or in possession of third parties and all of the claims and rights of the Debtor in and to their books and records, wherever located.

(f) <u>Agreements</u>. The Post-Confirmation Officer may enter into any agreement or execute any document which he deems to be required by or consistent with the Plan or necessary or appropriate to its implementation and perform all of obligations of the Post-Effective Date Debtor.

(g) <u>Investment Power</u>. Management of all assets and investments of the Post-Effective Date Debtor's Cash shall be administered, subject to the limitations and provisions set forth herein, in view of the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs. The Post-Confirmation Officer shall invest and reinvest the Post-Effective Date Debtor's Cash and keep the Post-Effective Date Debtor's Cash invested in interest-bearing accounts at an approved depository institution to be selected from the United States Trustee's List of Authorized Depositories for Bankruptcy Cases filed in Region One, dated July 26, 2013. Each account shall be treated as a single fund without distinction between principal and income. For purposes of this paragraph, "interest-bearing account" includes a money fund whose objectives are current income consistent with liquidity and low risk, the maintenance of a portfolio of high quality, short-term money market instruments and maintenance of a constant $1.00 net asset value per share. All investments shall be made so as to at all times provide sufficient liquidity to meet the anticipated cash needs of the Post-Effective Date Debtor as set forth herein.

(h) <u>Tax Obligations</u>. The Post-Confirmation Officer shall (a) endeavor to complete and file, the Debtor's or the Post-Effective Date Debtor's, as applicable, federal and state tax returns, (b) request, if necessary, an expedited determination of any unpaid tax liability of the Debtor under Bankruptcy Code section 505 for all taxable periods of the Debtor ending after the Petition Date as determined under applicable tax laws and (c) represent the interest and account of the Debtor, its Estate or the Post-Effective Date Debtor, as applicable, before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit, in all respects consistently with the Shareholder Settlement Agreement and the Shareholder Escrow and Control Agreement.

(i) <u>Reporting Duties</u>. The Post-Confirmation Officer shall be responsible for filing informational returns on behalf of the Debtor or the Post-Effective Date Debtor, as applicable, and any other statements, returns or disclosures relating to the Debtor or the Post-Effective Date Debtor, as applicable, that are required by any governmental unit or applicable law.

(j) <u>Reasonable Fees and Expenses</u>. The Post-Confirmation Officer may incur and pay and satisfy any reasonable and necessary fees and expenses in connection with the performance of his duties under the Plan without the need for further order or notice.

Section 8.3    <u>Other Actions</u>. The Post-Confirmation Officer may take all other actions not inconsistent with the provisions of the Plan which the Post-Confirmation Officer deems reasonably necessary or desirable with respect to administering the Plan.

Section 8.4    <u>Expense Fund</u>. On or after the Confirmation Date, if he deems advisable in his sole discretion, the Estate Representative shall transfer the Expense Fund Amount to the Expense Fund Administrator. The Expense Fund, and earnings thereon, may be used for, inter alia, payment of Allowed Class C Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, the post-confirmation fees and expenses, including applicable income taxes, of the Estate Representative, fees and expenses, including applicable income taxes, of the Expense Fund, and such other fees or expenses of the Debtor and the Estate as determined by the Estate Representative on or before the date he

transfers the Expense Fund Amount to the Expense Fund Administrator.  The allocation and disbursement of the Expense Fund shall be made in accordance with such determination.  To the extent that a portion of the Expense Fund is not disbursed, or otherwise held in reserve to fund the costs and expenses described herein, in the sole judgment of the Expense Fund Administrator, such portion shall be transferred to the Tort Trust, and shall be subject to the terms thereof.  In no event shall any amount transferred to the Expense Fund revert to the Debtor or the Estate Representative.  The Debtor or the Estate Representative shall have no rights in the Expense Fund except as determined by the Expense Fund Administrator in accordance with this Section 6.04.  For all applicable income tax purposes, the Expense Fund Administrator shall file income tax returns for the Expense Fund as a complex trust or other tax entity as determined by the Expense Fund Administrator, and the Expense Fund shall be subject to and shall pay tax on its taxable income, if any..

Section 8.5     Distributions Under the Plan.

(a)     Disbursing Agent.  All distributions under the Plan to holders of Allowed Class A, B and C Claims shall be made in accordance with the terms of the Plan by the Post-Confirmation Officer or the Expense Fund Administrator, as applicable.  Distributions to holders of Allowed Class D and E Claims shall be made by the Tort Trustee in accordance with the terms and provisions of the Plan and the Tort Trust Documents.

(b)     Effective Date Payments.  On the Effective Date, or as soon thereafter as reasonably practicable, the Post-Confirmation Officer shall remit, to each holder of an Allowed Class A, B or C Claim (as of the Distribution Record Date) the distribution provided for such Claim under the Plan.

(c)     Distribution of Cash.  At the option of the Post-Confirmation Officer or the Tort Trustee, as the case may be, any Cash payment to be made hereunder may be by check or wire transfer.

(d)     Currency.  Where a Claim has been denominated in foreign currency on a proof of claim, the Allowed amount of such Claim shall be calculated in currency of the United States of America based upon the conversion rate in place as of the Petition Date and in accordance with section 502(b) of the Bankruptcy Code.

(e)     Retention of Cash.  In making the distributions under the Plan to holders of Allowed Claims in Class A, B or C, the Post-Confirmation Officer shall at all times, and subject to Section 6.04 hereof, and taking into account the Cash, if any, available in the Expense Fund for the purposes set forth in Section 6.04 hereof, retain sufficient Cash as he determines in his sole discretion is reasonably necessary to (a) satisfy all Allowed or Disputed Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims, (b) meet the reasonably necessary administrative expenses of the Post-Effective Date Debtor, including the fees of the Post-Confirmation Officer and (c) satisfy all Disputed Claims (except Disputed Tort Claims).

(f)     Distribution of Shareholder Settlement Non-QSF Monies.  The Estate Representative shall direct the distribution of the Shareholder Settlement Non-QSF Monies, if

37

any, as he determines appropriate in his sole discretion pursuant to the Plan, including, without limitation, for transfer to the Estate and/or for the satisfaction of Administrative Expense Claims.

(g)     Interim Distributions.  The Post-Confirmation Officer may, but shall not be required to, make interim distributions on account of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and wind down costs and expenses.  For the avoidance of doubt, the Post-Confirmation Officer shall make no interim distributions to holders of Class D or E Claims, but instead all such interim distributions, if any, shall be made by the Tort Trustee in accordance with the Tort Trust Documents.

(h)     Final Distributions.  As soon as reasonably practicable after the resolution of all Disputed Non-Tort Claims, the Post-Confirmation Officer shall (i) to the extent not previously paid, pay all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and wind down costs and expenses; and (ii) to the extent the Post-Effective Date Debtor has remaining Cash after the payments made in accordance with (i) above, distribute such remaining Cash to the Tort Trust.  For the avoidance of doubt, the Post-Confirmation Officer shall make no final distributions to holders of Class D or E Claims, but instead all such final distributions, if any, shall be made in accordance with the Tort Trust Agreement and Claims Resolution Facility Procedures.

Section 8.6     Disallowance of Multi-Claimant Proofs of Claim.  In accordance with paragraph 10 of the Bar Date Order, Claims evidenced by (i) "Multi-Claimant PITWD Claims" (*i.e.*, by proofs of claim joining or on behalf of two (2) or more claimants) submitted without the prior approval of the Bankruptcy Court, or (ii) by proofs of claim purporting to be on behalf of a class of claimants shall be and are hereby disallowed to the extent not previously disallowed; provided, however, that proofs of claim joining or on behalf of two (2) claimants, one of whose sole Claim is a Class D Consortium Claim, shall not be disallowed pursuant to Section 6.06 of the Plan.

Section 8.7     Procedures for Treating Disputed Claims.

(a)     Estimation of Claims.  The Post-Confirmation Officer may at any time request that the Bankruptcy Court estimate any Claim in Class A, B or C pursuant to section 502(c) of the Bankruptcy Code.  The Tort Trustee may at any time request that the Bankruptcy Court estimate any Claim in Class D or Class E pursuant to section 502(c) of the Bankruptcy Code.  In the event that the Bankruptcy Court estimates any Disputed Claim in Classes A, B, C, D or E, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Post-Confirmation Officer or the Tort Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims in Classes A, B, C, D or E may be estimated and subsequently disallowed, reduced, compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

(b)     Resolution of Disputed Claims

(i) To the extent that a Disputed Claim in Classes A, B, C or E is not Allowed or becomes an Allowed Claim in an amount less than the amount of the Disputed Claim set forth in the proof of claim, or as previously estimated by the Bankruptcy Court, the excess of the amount of Cash that would have been distributed to the holder of the Disputed Claim in Classes A, B, C or E if the Claim had been Allowed in full over the amount of Cash actually distributed on account of such Disputed Claim shall be available Cash.

(ii) Holders of Disputed Claims in Classes A, B, C or E shall not be entitled to interest if such Disputed Claim becomes an Allowed Claim except to the extent such holder is entitled to interest pursuant to federal or state law.

Section 8.8    Closing of the Chapter 11 Case.    When all Disputed Non-Tort Claims have become Allowed Claims or have been disallowed by Final Order, the Tort Trustee and/or the Post-Confirmation Officer if he or she so elects in his or her sole discretion, may seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

Section 8.9    Cancellation of Existing Agreements.    Except for purposes of evidencing a right to distributions under the Plan or otherwise provided thereunder, on the Effective Date all of the agreements and other documents, except for and other than the Tort Trust Documents, the Settlement Agreements and insurance policies issued to, or insurance agreements entered into by the Debtor prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct), evidencing the Claims or rights of any holder of a Claim against the Debtor, including any notes evidencing such Claims, shall be deemed cancelled.

Section 8.10    Continued Corporate Existence.    The Post-Effective Date Debtor shall continue to exist after the Effective Date, with all powers of a corporation under the laws of the Commonwealth of Massachusetts except for shareholder management.  The Post-Effective Date Debtor's certificate of incorporation and bylaws shall be deemed amended to include a provision prohibiting the issuance of non-voting equity securities, thereby satisfying the requirements of Bankruptcy Code section 1123(a)(6).  The Post-Confirmation Officer, as the sole officer and director of the Post-Effective Date Debtor, shall perform each of the actions provided for under the Plan without any requirement of further action by or consent or vote of the Shareholders.  At the discretion of the Post-Confirmation Officer, the Post-Effective Date Debtor shall be authorized, only following the completion of all disbursements to holders of Allowed Claims in Classes A, B and C, other transfers and other actions required under the Plan, including without limitation, the sale, monetization or liquidation of the assets, including, but not limited to, any assets transferred to the Estate in accordance with the Settlement Agreements and any assets to which the Estate Representative is entitled to sell for the benefit of the Estate in accordance with the Settlement Agreements, or to file certificates of cancellation or dissolution. The filing of such certificates of cancellation or dissolution shall be deemed authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without express or implied limitation, any action by the Shareholders.  After the Effective Date, the Shareholders shall have no power or authority with respect to the management, operation or other functions of the Post-Effective Date Debtor.

Section 8.11    Effectuating Documents and Further Transactions.    Upon the Effective Date, the Estate Representative is authorized and directed to execute, deliver, file or record such contracts, releases and other agreements or documents and take such actions as he may deem to be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## ARTICLE IX
## PROVISIONS GOVERNING DISTRIBUTIONS

Section 9.1    Distribution Record Date.  (i) As of the close of business on the Distribution Record Date, the claim ledgers for each of the Classes of Claims or Equity Interests shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Equity Interests; (ii) the Debtor, the Chapter 11 Trustee, the Post-Confirmation Officer and the Tort Trustee, as the case may be, shall have no obligation to recognize any transfer of Claims or Equity Interests entered on the docket of the Bankruptcy Court on or after the Distribution Record Date; and (iii) the Debtor, the Chapter 11 Trustee, the Post-Confirmation Officer and the Tort Trustee, as the case may be, shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the claim and/or their attorneys as of the close of business on the Distribution Record Date, to the extent applicable.

Section 9.2    Delivery of Distributions and Undeliverable Distributions.  Subject to Bankruptcy Rule 9010 and the provisions of Section 6.05 hereof, all distributions to any holder of an Allowed Claim in Class A, B or C shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor unless the Chapter 11 Trustee and/or the Post-Confirmation Officer has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim by such holder that contains an address for such holder different from the address reflected on such Schedules for such holder.  In the event that any distribution to any holder of an Allowed Claim in Class A, B or C is returned as undeliverable, no further distributions to such holder shall be made unless and until the Chapter 11 Trustee and/or the Post-Confirmation Officer is notified of such holder's then-current address, at which time all missed distributions shall be made to such holder, without interest.  All demands for undeliverable distributions shall be made on or before ninety (90) days after the date such undeliverable distribution was initially made.  Thereafter, in accordance with section 347(b) of the Bankruptcy Code, the amount represented by such undeliverable distribution shall irrevocably revert to the Debtor, and any Claim in respect of such undeliverable distribution shall be discharged and forever barred from assertion against the Debtor and its property.  **No distribution shall be made to any Claimant in Class A, B or C and the Claimant's Claim shall be disallowed without further order of the Bankruptcy Court, if such Claimant has not delivered a signed form W-9 to the Post-Confirmation Officer within sixty (60) days of the Effective Date.**

Section 9.3    De Minimus Distributions.  The Post-Confirmation Officer shall not be required to, but may in his sole and absolute discretion, make distributions to any holder of an Allowed Claim in Class A, B, or C of Cash in an amount less than twenty-five (25) dollars. When distributions do not reach the $25.00 payment threshold, such payment that would have been made will be reserved for the benefit of such claimant until subsequent distribution(s), if any, exceed the threshold on a cumulative basis.

40

Section 9.4    Transactions on Business Days.  If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

Section 9.5    Allocation of Plan Distribution Between Principal and Interest.  All distributions in respect of any Allowed Claim shall be allocated first to the principal amount of such Allowed Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

Section 9.6    Withholding and Reporting Requirements.  The Post-Confirmation Officer shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local or foreign tax authority but only with respect to Classes A, B or C, and all distributions under the Plan to Class A, B or C shall be subject to any such withholding and reporting requirements.  The Tort Trustee shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local or foreign tax authority but only with respect to Classes D or E, and all distributions under the Plan or the Tort Trust Documents to holders of Allowed Class D Claims or Allowed Class E Claims shall be subject to any such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution, and under no circumstances shall the Chapter 11 Trustee or the Post-Confirmation Officer have or incur any liability with respect to the satisfaction and payment of any such tax obligations, or the non-payment or failure by any such holder to satisfy any such tax obligation.

## ARTICLE X
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 10.1    Executory Contracts and Unexpired Leases.   On the Effective Date, all executory contracts and unexpired leases to which the Debtor is or may be deemed a party, ***except for and other than the Tort Trust Documents, the Settlement Agreements (including the insurance policy rights assigned to the Debtor pursuant thereto) and insurance policies issued to, or insurance agreements entered into by the Debtor prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct)***, shall be deemed rejected as of the Effective Date, without the need for any further action by the Post-Confirmation Officer  except for an executory contract or unexpired lease that (i) has been assumed or rejected pursuant to Final Order of the Bankruptcy Court entered prior to the Effective Date or (ii) is the subject of a separate motion to assume or reject filed under section 365 of the Bankruptcy Code by the Debtor prior to the Effective Date.

Section 10.2    Insurance Policies and Agreements.   Except as set forth in the Settlement Agreements or the Confirmation Order, insurance policies issued to, or insurance agreements entered into by the Debtor prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct) shall continue in effect after the Effective

Date.  To the extent that such insurance policies or agreements (including, without limitation, any policies covering directors' or officers' conduct) are considered to be executory contracts, then, notwithstanding anything to the contrary herein, the Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding that each such assumption is in the best interests of the Debtor and its Estate.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to each such insurance policy or agreement.  To the extent that the Bankruptcy Court determines otherwise as to any such insurance policy or agreement, the Plan Proponents reserve the right to seek the rejection of such insurance policy or agreement or other available relief.

Section 10.3  <u>Approval of Rejection of Executory Contracts and Unexpired Leases</u>.  Entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected as of the Effective Date pursuant to the Plan.

Section 10.4  <u>Rejection Claims</u>.  In the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor, or any property to be distributed under the Plan unless a proof of claim is filed with the Bankruptcy Court and served upon the Post-Confirmation Officer on or before the date that is thirty (30) days after the Confirmation Date.

Section 10.5  <u>Rejection Claims of Officers and Directors of the Debtor</u>.  Notwithstanding section 8.04 of the Plan, in consideration for the releases and injunctions provided in the Plan and the Settlement Agreements, (i) all contracts or agreements between the Debtor and the former and current officers or directors of the Debtor, with the exception of the Settlement Agreements, are deemed rejected as of the Effective Date, without the need for any further action by the Post-Confirmation Officer and (ii) the claims of such former and current officers or directors of the Debtor, if any, resulting from such rejection are hereby deemed waived.

**ARTICLE XI**
**EFFECTIVENESS OF THE PLAN**

Section 11.1  <u>Conditions to Confirmation</u>.  The Plan shall not be confirmed unless the Confirmation Order (i) is in a form and substance satisfactory to the Chapter 11 Trustee and the Official Committee and is otherwise consistent and in accord with the Settlement Agreements, and (ii) is in a form acceptable to the Shareholders as to the matters relating to the Shareholder Settlement Agreement and (iii) approves and implements, among other things, (a) the Settlement Agreements, to the extent any of the Settlement Agreements have not otherwise or previously been approved by the Bankruptcy Court, and (b) the releases and injunctions set

forth in sections 10.05 and 10.06 of the Plan. The foregoing conditions to confirmation of the Plan are material and non-waivable.

Section 11.2 Date of Effective Date. The Effective Date shall occur on the later of: (i) the first Business Day following (14) days after the Confirmation Date, provided that a court of competent jurisdiction has not entered a stay of the Confirmation Order as of such date (in which instance, the Effective Date will not occur until such stay is dissolved); and (ii) the first Business Day on which all other conditions to the Effective Date have been satisfied or waived.

Section 11.3 Satisfaction of Conditions. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

Section 11.4 Occurrence of Effective Date. The Plan Proponents shall cause the Effective Date to occur as soon as is practicable.

Section 11.5 Substantial Consummation Upon Effective Date. On the Effective Date, the Plan will be deemed to be substantially consummated under the applicable sections of the Bankruptcy Code.

## ARTICLE XII
## EFFECT OF CONFIRMATION

Section 12.1 Vesting of Assets.

(a) As of the Effective Date, the property of the Estate shall vest in the Post-Effective Date Debtor or such other Entity as provided in the Plan.

(b) From and after the Effective Date, the Post-Confirmation Officer or Tort Trustee, as the case may be, may dispose of, or cause to be disposed of, the assets of the Post-Effective Date Debtor and the Tort Trust, respectively, free of any restrictions of the Bankruptcy Code, but in accordance with the provisions, as the case may be, of the Plan and the Tort Trust Documents.

(c) As of the Effective Date, all assets of the Post-Effective Date Debtor and the Tort Trust shall be free and clear of all Claims, except as otherwise provided in the Plan or the Confirmation Order.

Section 12.2 Binding Effect. Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and its respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such Claim or Equity Interest has been filed or asserted against the Debtor and whether or not such holder has accepted the Plan.

Section 12.3 Exculpations and Limitation of Liability. As of the Effective Date, none of (i) the Chapter 11 Trustee, (ii) the Official Committee or (iii) the members, representatives, accountants, financial advisors, consultants and attorneys of the Entities

described in (i) and (ii) of this paragraph shall have or incur any liability to any person for any act taken or omission in connection with or related to the Chapter 11 Case, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administrating the Plan (including soliciting acceptances or rejections thereof), (ii) the Disclosure Statement or any contract, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan or the Disclosure Statement, or (iii) any distributions made pursuant to the Plan, except for any acts determined by Final Order to have constituted willful misconduct, bad faith or gross negligence.

Section 12.4    Preservation and Non-Waiver of Estate Defenses and Objections and Related Rights Reserved for the Debtor, its Successors in Interest, Creditors and Parties in Interest.

(a)    No Limitation on Defenses, Set-Off or Right to Subordination as to Claims Against the Estate.  Nothing in the Plan (other than the provisions of Sections 10.03 and 10.05 thereof), the Confirmation Order or the Settlement Agreements shall alter, enhance, waive, release or otherwise impair or preclude any of the Estate's defenses, rights to set-off and/or rights to compel subordination as to any Claim or Administrative Expense Claim of any type asserted against the Estate, as otherwise allowed by law, including the right to assert as a defense, set-off or subordination, any claim that would ordinarily or otherwise have to be asserted in or brought by a cross-claim, cross-complaint or separate action.

(b)    No Limitation on Right to Object to Claims or Administrative Expense Claims.

(i)    Nothing in the Plan (other than the provisions of Sections 10.03 and 10.05 thereof) the Confirmation Order or the Settlement Agreements shall alter, enhance, waive, release or otherwise impair or preclude the right and ability of (a) the Estate Representative and all his or her successors in interest to object to any Class A, B, C or E Claim or Administrative Expense Claim, (b) the Tort Trustee and all his or her successors in interest to object to any Class E Claim, or (c) the Official Committee or any other Creditor or party in interest to object to any Class A, B, C or E Claim or Administrative Expense Claim (collectively, the "Permitted Objections").  The Permitted Objections may include, as part of any objection to any Class A, B, C or E Claim or Administrative Expense Claim, a prayer for denial or disallowance of the Class A, B, C or E Claim or Administrative Expense Claim, reduction in amount by off-set, disgorgement of amounts previously paid and/or equitable subordination, as otherwise allowed by law, on any ground that could have been brought by way of lawsuit, adversary proceeding or contested matter but for (a) the releases contained in the Settlement Agreements, (b) the exculpation contained in section 10.03 of the Plan (c) the releases and injunctions contained in sections 10.05 and 10.06 of the Plan,  (d) the covenant not to sue contained in section 10.08 of the Plan or (e) the Confirmation Order.  In addition, the makers of the Permitted Objections may utilize whatever remedies and procedural vehicles are otherwise available under the law, including, if necessary, an adversary proceeding, provided that the makers of the Permitted Objections, consistent with the covenant not to sue contained in section 10.07 of the Plan, shall not seek any affirmative recovery or relief beyond denial, disallowance, disgorgement of amounts previously paid, reduction or subordination of the Class A, B, C or E

Claim or Administrative Expense Claim at issue.  Objections to Class E Claims shall be heard and determined by the Bankruptcy Court.

        **(ii)**      Nothing in the Plan, the Confirmation Order or the Settlement Agreements shall alter, enhance, waive, release or otherwise impair or preclude the right and ability of the Chapter 11 Trustee or other Estate Representative, and all his or her successors in interest, to object to any Claim (including any Class D Claim) either for the purpose of determining the holder of such Claim's eligibility to vote on the Plan or the amount of such Claim.  For the avoidance of doubt, with respect to a Class D Claim, such objection(s), if any, shall not include a prayer for denial or disallowance of the subject Class D Claim.

        Section 12.5  <u>Releases</u>.  Under Section 10.05 of the Plan, the Debtor (and Estate Representative), the Shareholder and Affiliate Released Parties, the Unaffiliated Contributing Parties, and the Tort Claimants grant and/or receive releases, which releases shall take effect on the Effective Date.  The releases provide for a full release of any and all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action that relate in any way to, among other things, the Debtor, the Drugs, this Chapter 11 Case, the Policies and the Settlement Agreements.  The releases set forth in Section 10.05 of the Plan were negotiated as part of the Settlement Agreements.  Such releases constitute a major component of the consideration given to the counterparties to the Settlement Agreements in exchange for their financial contributions to the estate, which shall fund distributions to Claimants.  Holders of Claims and Equity Interests should review the specific release provisions before determining whether to vote to accept or reject the Plan.

        The specific release provisions in Section 10.05 of the Plan are set forth below:

        **(i)**      **<u>Releases by the Debtor and Estate Representative(s)</u>.  Except as set forth in section 10.05(i) of this Plan, and subject in all respects to the provisions of Section 10.04 of this Plan, on the Effective Date, the Debtor, the Chapter 11 Trustee, the Estate Representative(s) and the Estate shall unconditionally release, and hereby are deemed to forever unconditionally release, the Shareholder and Affiliate Released Parties, the Other Contributing Parties, including, without limitation, GDC, the Individual GDC Insureds and Preferred Mutual, and the Tort Claimants from any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and Estate Causes of Action, whatsoever (other than the right to enforce the obligations under this Plan, the Settlement Agreements and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, transfer event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, the Debtor's estate, the Policies, GDC, and the negotiation or funding of the Settlement Agreements.**

        **(ii)**      **<u>Releases in Favor of the Debtor and Estate Representative(s)</u>. Subject in all respects to the provisions of Section 10.04 of this Plan, on the Effective Date,**

each of the Debtor, the Chapter 11 Trustee, the Estate Representative(s), and the Estate shall be forever and unconditionally released from any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever by all Entities (other than the right to enforce the obligations under this Plan, the Settlement Agreements and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, any prepetition act or omission of the Debtor, the Debtor's estate, the Policies, GDC and the negotiation or funding of the Settlement Agreements.

(iii)    **Releases by Shareholder and Affiliate Released Parties**. Subject in all respects to the provisions of Section 10.04 of this Plan and the Shareholder Settlement Agreement, on the Effective Date, each of the Shareholder and Affiliate Released Parties shall unconditionally release, and hereby are deemed to forever unconditionally release, each of the Debtor, the Debtor's estate, the Chapter 11 Trustee, the Estate Representative(s), the Official Committee, the Official Committee members, the Tort Claimants, the Other Contributing Parties, including, without limitation, GDC, the Individual GDC Insureds, Preferred Mutual, and the foregoing persons' and entities' respective attorneys and advisors (solely in their respective capacities as such) from any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, transfer, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, the Debtor's estate, the Policies, GDC and the negotiation or funding of the Settlement Agreements; provided, however, that this release shall not apply to any Claims assigned by the Shareholder and Affiliate Released Parties to the Debtor or to the Chapter 11 Trustee pursuant to a Settlement Agreement, nor shall it apply to the right to enforce the obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder.

(iv)    **Releases in Favor of Shareholder and Affiliate Released Parties (Other than Ameridose)**. Subject in all respects to the provisions of Section 10.04 of this Plan, on the Effective Date, the Shareholder and Affiliate Released Parties (other than Ameridose), as well as their respective attorneys and advisors (solely in their respective capacities as such), shall be forever and unconditionally released from any and all Tort Claims, Estate Causes of Action, Contributor and Affiliate Released Claims, and all other Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or

omission, transaction, transfer, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, the Debtor's estate, the Policies, GDC and the negotiation or funding of the Settlement Agreements; provided, however, that the right to enforce the obligations under the Shareholder Settlement Agreement, the Shareholder Escrow Agreement and this Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder, and the right to enforce the provisions of the Shareholder Settlement Agreement with regard to "Non-Disclosed Assets" (as defined therein), shall be expressly preserved by the Estate Representative in accordance with the terms of the Shareholder Settlement Agreement.

(v)     **Releases by Other Contributing Parties.**  Subject in all respects to the provisions of Section 10.04 of this Plan, on the Effective Date, each Other Contributing Party including, without limitation, GDC, the Individual GDC Insureds and Preferred Mutual,  shall unconditionally release, and hereby are deemed to forever unconditionally release, each of the Debtor, the Debtor's estate, the Chapter 11 Trustee, the Estate Representative(s) the Official Committee, the Official Committee members, the Tort Claimants,  the  Shareholder  and  Affiliate  Released  Parties,  each  additional  Other Contributing Party, and the foregoing persons' and entities' respective attorneys and advisors (solely in their respective capacities as such) from any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, the Debtor's estate, the Policies, GDC, and the negotiation or funding of the Settlement Agreements; provided, however, that this release shall not apply to any Claims assigned by the Other Contributing Parties to the Debtor pursuant to a Settlement Agreement, nor shall it apply to the right to enforce the obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder in their favor.

(vi)     **Releases in Favor of Other Contributing Parties (Other than Ameridose).**  Subject in all respects to the provisions of Section 10.04 of this Plan, on the Effective Date each Other Contributing Party (other than Ameridose), including, without limitation, GDC, the Individual GDC Insureds and Preferred Mutual, shall be forever and unconditionally released from any and all Estate Causes of Action, Tort Claims, NECC Claims, and all other Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, the

47

Debtor's estate, the Policies, GDC and the negotiation or funding of the Settlement Agreements; **provided, however,** that this release shall not in any way limit the right of the Estate Representative to enforce the obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder in the Estate's favor.

(vii) **Releases by Tort Claimants.** **Subject in all respects to the provisions of Section 10.04 of this Plan, on the Effective Date, each Tort Claimant shall unconditionally release, and hereby is deemed to forever unconditionally release each of the Debtor, the Debtor's estate, the Chapter 11 Trustee, the Estate Representative(s), the Official Committee, the Official Committee members, the Other Contributing Parties (other than Ameridose), including, without limitation, GDC, the Individual GDC Insureds and Preferred Mutual, the Shareholder and Affiliate Released Parties (other than Ameridose), all parties released under the Settlement Agreements, and the foregoing persons' and entities' respective attorneys and advisors (solely in their capacities as such) from the Tort Claims, the NECC Claims, the Contributor and Affiliate Released Claims, and any and all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, the Debtor's estate, the Policies, GDC and the negotiation of the Settlement Agreements; provided, however, that this release shall not apply to the right to enforce the obligations under the Plan, the Settlement Agreement,  and the contracts, instruments, releases and other agreements and documents delivered thereunder in their favor.**

Section 12.6    Injunction.  Section 10.06 of the Plan grants injunctions in favor of the Debtor, the Shareholder and Affiliate Released Parties and the Other Contributing Parties, which injunctions shall take effect on the Effective Date.  The injunctions bar all Persons and Entities from asserting any and all claims, causes of action, damages, demands, liabilities, expenses, fees and costs that relate in any way to, among other things, the Debtor, the Drugs, this Chapter 11 Case, the Policies and the Settlement Agreements.  The injunctions set forth in Section 10.06 of the Plan were negotiated as part of the Settlement Agreements.  Such injunctions constitute a major component of the consideration given to the counterparties to the Settlement Agreements in exchange for their financial contributions to the estate, which shall fund distributions to Claimants.  All parties should review the specific injunction provisions before determining whether to vote to accept or reject the Plan.

The specific injunction provisions in Section 10.06 of the Plan are set forth below:

(i) **Injunction in Favor of the Debtor and Estate Representative(s).** **Except as to the rights and claims created or expressly preserved by this Plan, the Settlement Agreements the Shareholder Escrow Agreement, and the Confirmation Order, upon the Effective Date, the Debtor, the Chapter 11 Trustee, and the Estate Representative(s) shall have and be entitled to an injunction forever barring and**

48

enjoining all Persons and/or Entities from asserting against the Debtor any past, present and future rights, interests, obligations, claims, causes of action, damages (including punitive damages), demands (including demands for contribution, indemnity or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees and other professional fees) and costs of any kind or any type whatsoever, whether known or unknown, whether foreseen or unforeseen, whether direct or indirect, contingent or actual, whether liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, event or circumstance from the beginning of the world to the Effective Date, in any way relating to or in connection with (i) the Debtor, the Drugs or any and all products of and/or distributed by the Debtor, or (ii) the Debtor's estate, the Chapter 11 Case, this Plan, the Disclosure Statement, the Settlement Agreements and/or the Policies, except with regard to the claims and rights expressly reserved pursuant to Section 10.05 above.

(ii)    **Injunction in Favor of Shareholder and Affiliate Released Parties**.  Upon the Effective Date, all Persons or Entities shall be permanently barred, enjoined, and restrained from commencing, prosecuting, continuing or asserting, either derivatively or on behalf of themselves, in any court, arbitration proceeding, administrative agency, or other forum in the United States of America or elsewhere, any and all Claims released pursuant to Section 10.05 above or under the Shareholder Settlement Agreement, whether the Person or Entity had actual or constructive notice of the terms of the Shareholder Settlement Agreement, Plan or Confirmation Order or otherwise, except that this injunction shall not apply to the right of the acting Estate Representative to enforce the Substitute Lien and the obligations and the acting Estate Representative's rights under the Shareholder Settlement Agreement, the Escrow Agreement, the Plan, and the Confirmation Order.

(iii)    **Injunction in Favor of the Other Contributing Parties**.  Except as to the rights and claims created or expressly preserved by this Plan, the Settlement Agreements, the Escrow Agreement and the Confirmation Order, upon the Effective Date, the Other Contributing Parties, including, without limitation, GDC, the Individual GDC Insureds and Preferred Mutual, shall have and be entitled to an injunction forever barring and enjoining all Persons and/or Entities from asserting against the Other Contributing Parties any past, present and future rights, interests, obligations, claims, causes of action, damages (including punitive damages), demands (including demands for contribution, indemnity or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees and other professional fees) and costs of any kind or any type whatsoever, whether known or unknown, whether foreseen or unforeseen, whether contingent or actual, whether direct or indirect, liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, event or circumstance from the beginning of the world to the Effective Date, in any way relating to or in connection with (i) the Debtor, the Drugs or any

**and all products of and/or distributed by the Debtor, or (ii) the Debtor's estate, the Chapter 11 Case, the Plan, the Disclosure Statement, the Settlement Agreements and/or the Policies.**

Section 12.7 <u>Covenant Not to Sue</u>. Except as set forth in Sections 10.04 and 10.05 of the Plan and except as to the rights and claims created or expressly preserved by the Plan, neither the Chapter 11 Trustee, the Estate Representative, the Debtor, the Tort Trustee nor any successor in interest will commence or prosecute any lawsuit, adversary proceeding or contested matter that includes a prayer for damages or for equitable relief against the Settling National Insurers or the Shareholders or Affiliate Released Parties relating to, concerning or arising from the (i) the Debtor, the Drugs or any and all products of and/or distributed by the Debtor, or (ii) the Debtor's estate, the Chapter 11 Case, the Plan, the Disclosure Statement, the Settlement Agreements and/or the Policies.

Section 12.8 <u>Covenant Not to Sue (Shareholder and Affiliate Released Parties)</u>. Each of Shareholder and Affiliate Released Parties covenants and agrees not to commence or continue against the Estate Parties any action or proceeding of any nature whatsoever with respect to claims released by the Shareholder and Affiliate Released Parties in Section 10.05 of the Plan and in the Settlement Agreements, and the Estate Parties covenant and agree not to commence or continue against the Shareholder and Affiliate Released Parties, any action or proceeding of any nature whatsoever with respect to Contributor and Affiliate Released Claims.

Section 12.9 <u>Terms of Pre-Plan Injunction and Stays</u>. Unless otherwise provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise under applicable law, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

**ARTICLE XIII**
**RETENTION OF JURISDICTION**

Section 13.1 <u>Jurisdiction of Bankruptcy Court</u>. Except as otherwise explicitly set forth in the Plan or the Tort Trust Documents as to those matters which are to be considered and determined by the District Court pursuant to an order withdrawing the reference as to those matters, the Bankruptcy Court shall retain original and exclusive jurisdiction of matters arising under, arising out of or related to the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for all matters, to the maximum extent permitted by law, including for, among other things, the following purposes:

(a) To determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date, including, without limitation, any proceeding relating to an Estate Cause of Action;

(b) To consider Disputed Claims, including objections, allowance, classification, priority, compromise, estimation or payment of any Claim, including Class E Claims;

(c)     To hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for allowance and payment of Administrative Expense Claims, including awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

(d)     To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(e)     To issue injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Settlement Agreements, the Confirmation Order or any other order of the Bankruptcy Court;

(f)     To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(g)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated by any of the foregoing, or any agreement or other document governing or relating to any of the foregoing;

(h)     To take any action and issue such orders as may be necessary to construe, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation;

(i)     To recover all assets of the Debtor and property of the Estate, wherever located;

(j)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(k)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, matters with respect to any taxes payable by a trust established in furtherance of the Plan, including the Tort Trust);

(l)     To hear and determine any motions intended to directly or indirectly transfer venue of all or any part of the Chapter 11 Case;

(m)     To hear and determine any other matters related to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Support Funding Agreement, the Estate Causes of Action, the Tort Trust Documents and related documents and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and

(n)     To enter a final decree closing the Chapter 11 Case.

51

For the avoidance of doubt, nothing in the Plan shall be construed to expand or limit the Bankruptcy Court's jurisdiction beyond that permitted under applicable law.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

Section 14.1  Reporting of Shareholder Settlement Payments.  Pursuant to Section 10.3(a) of the Shareholder Settlement Agreement, to the fullest extent permitted by law, all Shareholder Settlement Payments shall be characterized and reported for all tax purposes as contributions of capital by the Shareholders in accordance with their respective ownership positions in NECC, and the acting Estate Representative shall timely prepare true and accurate Schedule K-1s containing all information as required by the Tax Code and the IRS to enable the Contributors to apply for and collect tax refunds in accordance with the Shareholder Settlement Agreement.

Section 14.2  Tax Information to be Provided to Shareholders.  Pursuant to Section 10.3(b) of the Shareholder Settlement Agreement, the Estate Representative shall provide full and accurate copies of any and all income tax returns, as supplemented or amended, filed on behalf of the Debtor to each Shareholder within fourteen (14) days of filing thereof, as well as any additional related information required by the Shareholders to accurately prepare or amend their personal tax returns and receive "Net Tax Refunds" (as defined in the Shareholder Settlement Agreement), with such returns and related information to be maintained as confidential and subject to the provisions of the Protocol Order.

Section 14.3  Refunds.  Pursuant to Section 10.3(d) of the Shareholder Settlement Agreement, all procedural or computational decisions and judgments related to the "Refund Claims," the "Refunds" and "Net Tax Refunds" (as such terms are defined in the Shareholder Settlement Agreement) shall be made so as to (i) maximize the amount of the Refund Claims, the Refunds and the Net Tax Refunds consistent with applicable laws, including, without limitation, the 10-year loss carryback provisions for product liability matters and (ii) accelerate the timing of the filing of the Refund Claims and the receipt of the Refunds and the Net Tax Refunds to the extent reasonably possible and in compliance with applicable laws.

Section 14.4  Withdrawal of the Reference.  The rights of the Plan Proponents to move, pursuant to 28 U.S.C § 157(d), Bankruptcy Rule 5011, and Local Rule 5011-1, for a withdrawal of the reference to the Bankruptcy Court of those matters under this Plan or the Tort Trust Documents which are to be considered and determined by the District Court, shall be and hereby are expressly preserved, and such motion may be made at any time subsequent to the filing of this Plan.

Section 14.5  Dissolution of the Official Committee.  The Official Committee shall dissolve on the Effective Date; provided, however, that (i) the Official Committee shall continue to exist after the Effective Date for the purposes of opposing any pending appeals of the Confirmation Order and taking any actions related thereto, and the Official Committee's professionals may seek compensation for and reimbursement of expenses related to such opposition and actions, if any, from the Post-Effective Date Debtor, and (ii) after dissolution of the Official Committee, the Official Committee's professionals shall retain their rights to pursue,

review and object to any applications for compensation and reimbursement of expenses filed in accordance with Sections 2.01 and 2.02 of the Plan.

      Section 14.6   <u>Quasi-Judicial Immunity</u>.  The Confirmation Order shall provide that the Post-Confirmation Officer, the Estate Representative, the Tort Trustee, the Settlement Administrator(s) and the Special Master are entitled to quasi-judicial immunity to the fullest extent allowed by law in connection with their implementation of the Confirmation Order, the Plan, the Tort Trust Agreement, the Claims Resolution Facility and the Provider Claims Resolution Facilities.

      Section 14.7   <u>Payment of Statutory Fees</u>.  On the Effective Date, and thereafter as may be required, the Tort Trustee shall pay all fees payable pursuant to 28 U.S.C. § 1930, including all quarterly fees pursuant to 28 U.S.C. § 1930 that become due after the Effective Date.

      Section 14.8   <u>Effectuating Documents and Further Transactions</u>.  The Chapter 11 Trustee, up to the Effective Date, and the Post-Confirmation Officer, subsequent to the Effective Date, are authorized to execute, deliver, file or record such contracts, releases and other agreements or documents and take such actions as the Chapter 11 Trustee or the Post-Confirmation Officer, as the case may be, deem to be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

      Section 14.9   <u>Exemption from Transfer Taxes</u>.  Pursuant to section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any bills of sale, or assignments executed in connection with any disposition of assets contemplated by the Plan (including transfers of assets to and by the Tort Trust) shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

      Section 14.10   <u>Elimination of Vacant Classes</u>.  Any Class that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 or as to which no vote is cast shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

      Section 14.11   <u>Nonconsensual Confirmation</u>.  In the event any Impaired Class of Claims does not accept the Plan in accordance with section 1126 of the Bankruptcy Code, the Plan Proponents shall request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.  Subject to section 1127 of the Bankruptcy Code, the Plan Proponents reserve the right to modify the Plan to the extent that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

      Section 14.12   <u>Modification of Plan</u>.  The Plan may be amended, modified or supplemented by the Plan Proponents in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. Prior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and

modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.  In addition, after the Effective Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under the Plan, the Post-Confirmation Officer may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order.  Notwithstanding the foregoing, without the prior express consent of the Contributing Parties, the Plan may not be amended pursuant to this paragraph if after such amendment, the Plan would not include the releases and injunctions in favor of the Contributing Parties.

Section 14.13  Revocation or Withdrawal of Plan.  The Plan Proponents, upon their unanimous consent and agreement, reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date.  If the Plan Proponents take such action, the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any other person in any further proceedings involving the Debtor.

Section 14.14  Severability.  If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Plan Proponents, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation, except to the extent that such holding, alteration or interpretation, invalidates a condition to effectiveness of the Plan, including the releases and injunctions provided for in Sections 10.04 and 10.05.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms, and upon the Effective Date all such provisions are accordingly non-severable.

Section 14.15  Schedules and Exhibits.  The schedules and exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

Section 14.16  Successors and Assigns.  All the rights, benefits and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person.

Section 14.17  Notices.  Any notice required or permitted to be provided to the Chapter 11 Trustee or the Official Committee under the Plan to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    if to the Chapter 11 Trustee, to:

DUANE MORRIS LLP
100 High Street, Suite 2400
Boston, MA 02110
Attn:          Paul D. Moore, Esq.
Telephone:   (857) 488-4200
Facsimile:    (857) 401-3057
Email:         pdmoore@duanemorris.com


(b)    if to the Official Committee, to:

BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
Attn:          William R. Baldiga, Esq.
                Kiersten A. Taylor, Esq.
Telephone:   (617) 856-8200
Facsimile:    (617) 856-8201
Email:         wbaldiga@brownrudnick.com
                ktaylor@brownrudnick.com
-and-

BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Attn:          David J. Molton, Esq.
Telephone:   (212) 209-4800
Facsimile:    (215) 209-4801
Email:         dmolton@brownrudnick.com

Section 14.18  No Admission.  Notwithstanding anything in the Plan or this Disclosure Statement to the contrary, nothing contained in the Plan or this Disclosure Statement shall be deemed as an admission by the Plan Proponents with respect to any matter set forth therein including, without limitation, liability on any Claim or the propriety of any Claim classification.

## ARTICLE XV
## SOLICITATION; VOTING PROCEDURES

Section 15.1  Parties Entitled to Vote.  Under section 1124 of the Bankruptcy Code, a Class of Claims or interests is deemed to be "Impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such Claim or interest, the Plan cures all existing defaults (other than defaults resulting from the

occurrence of events of bankruptcy) and reinstates the maturity of such Claim or interest as it existed before the default.

In general, a holder of a Claim or Interest may vote to accept or to reject a plan if the Claim or interest is "Allowed," which means generally that no party-in-interest has objected to such Claim or Interest, and the Claim or interest is Impaired by the Plan (holders of claims or interest that are or temporarily allowed for voting purposes may also vote to accept or reject a plan).  Each holder of a Claim or Equity Interest in the following Classes is Impaired and is entitled to vote either to accept or reject the Plan: Class C; Class D; and Class E.

If, however, the holder of an Impaired Claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such Claims and interests do not actually vote on the plan.  No classes are deemed to reject the Plan.

Finally, if a Claim or interest is not Impaired by the plan, the Bankruptcy Code deems the holder of such Claim or interest to have accepted the plan and, accordingly, holders of such Claims and interests are not entitled to vote on the plan. Class A, Class B and Class F are unimpaired and are deemed to have accepted the Plan and are not entitled to vote in respect of the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Section 15.2    Voting Procedures.

(a)    Ballots and Voting Deadline.  All votes to accept or reject the Plan must be cast by using the ballot enclosed with this Disclosure Statement.  No other votes will be counted.

Ballots must be received by the voting agent no later than _____, 2014 at 4:00 p.m. prevailing Eastern time (the "Voting Deadline") unless the solicitation is terminated early or extended by the Plan Proponents prior to this Voting Deadline. Except to the extent requested by the Plan Proponents or as permitted by the Bankruptcy Court pursuant to Bankruptcy Rule 3018, ballots received after the Voting Deadline will not be counted or otherwise used in connection with the Plan Proponents' request for confirmation of the Plan (or any permitted modification thereof).

In accordance with Bankruptcy Rule 3018(c), the ballots are based on Official Form No. 14, which has been modified as necessary to meet the particular needs of this Chapter 11 Case.

If you are entitled to vote on the Plan, a ballot is enclosed with this Disclosure Statement.  If you are not entitled to vote on the Plan, you will receive a Notice of Non-Voting Status.

If you hold multiple Claims, you will receive separate ballots that must be used for each of your Claims in a voting Class. Please sign and complete a separate ballot with respect to each Claim, and return your ballot(s) directly to the voting agent, Donlin, Recano & Company, Inc., at one of the following addresses:

| **If by First Class Mail:** | **If by Hand Delivery or Overnight Mail:** |
|---|---|
| Donlin, Recano & Company, Inc.<br>**Re: New England Compounding Pharmacy, Inc.**<br>Attn: Voting Department<br>P.O. Box 2034, Murray Hill Station<br>New York, NY 10156-0701 | Donlin, Recano & Company, Inc.<br>**Re: New England Compounding Pharmacy, Inc.**<br>Attn: Voting Department<br>6201 15th Ave<br>Brooklyn, NY 11219 |

**To be counted, your ballot(s) must be actually received by the voting agent no later than _____, 2014 at 4:00 p.m. prevailing Eastern time. Only ballots with original signatures will be counted. Ballots with copied signatures will NOT be accepted or counted. You may not submit a ballot electronically, including via email or facsimile.**

**If delivery of a ballot is by mail, it is recommended that voters use an air courier with guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to ensure timely delivery. The method of such delivery is at the election and risk of the voter.**

Pursuant to the Disclosure Statement Order, the Bankruptcy Court (a) approved the Disclosure Statement as containing adequate information, (b) approved, among other things, the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan and certain vote tabulation procedures, (c) established the deadline for filing objections to the Plan and (d) scheduled the Confirmation Hearing. The Bankruptcy Court set _____, 2014, as the Distribution Record Date. Accordingly, only holders of Claims in the voting Classes as of the Distribution Record Date will receive a ballot and be allowed to vote on the Plan.

If you (a) did not receive a ballot and believe you are entitled to one; (b) received a damaged ballot; (c) lost your ballot; (d) have any questions concerning this Disclosure Statement, the Plan, or the procedures for voting on the Plan, or the solicitation packet of materials you received; or (e) if you wish to obtain a paper copy of the Plan, this Disclosure Statement or any exhibits to such documents, please contact the voting agent at:

| If by First Class Mail: | If by Hand Delivery or Overnight Mail: |
|---|---|
| Donlin, Recano & Company, Inc.<br>**Re: New England Compounding Pharmacy, Inc.**<br>Attn: Voting Department<br>P.O. Box 2034, Murray Hill Station<br>New York, NY 10156-0701 | Donlin, Recano & Company, Inc.<br>**Re: New England Compounding Pharmacy, Inc.**<br>Attn: Voting Department<br>6201 15th Ave<br>Brooklyn, NY 11219 |
| **If by E-Mail** | **If by Phone** |
| Balloting@donlinrecano.com | (212) 771-1128 |

(b) <u>Voting</u>. Ballots cast by alleged holders of Claims in a voting Class (other than any holder of a non-voting Claim) whose Claims (i) are not Allowed, (ii) are not listed on NECC's Schedules, or (iii) are listed as disputed, contingent and/or unliquidated on NECC's Schedules, and who have timely filed proofs of Claim in unliquidated or unknown amounts that are not the subject of an objection will have their ballots counted towards satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code, but will NOT have their ballots counted toward satisfying the aggregate Claim amount requirement.

If, prior to the Voting Deadline, the Chapter 11 Trustee has filed an objection to fully disallow or expunge any proof of Claim, the applicable claimant's vote will not be counted for any purpose with respect to the Plan or the Confirmation Hearing unless and until such claimant obtains an order from the Bankruptcy Court providing otherwise and if, prior to the Voting Deadline, the Chapter 11 Trustee has filed an objection seeking to disallow or expunge partially any proof of Claim that has been filed, the applicable claimant's vote will be counted for all purposes with respect to the Plan or the Confirmation Hearing solely to the extent of the undisputed portion of such Claim, unless and until such claimant obtains an order from the Bankruptcy Court providing otherwise. As set forth in the Disclosure Statement Order, motions for Claims to be temporarily allowed for voting purposes must be served on the Plan Proponents and filed with the Bankruptcy Court, on or before the _____ day after the later of (i) service of notice of the Confirmation Hearing and (ii) service of notice of an objection, if any, to such Claim.

The Plan Proponents have established special voting and tabulation procedures for holders of Class D Tort Claims. Because individual assessments of the value of Tort Claims can vary, the Plan Proponents have established, with the approval of the Bankruptcy Court, a fixed set of values to be used solely in connection with determining the amount of such Claims for voting purposes. These fixed values apply to all Tort Claims.

Each individual holder of a Tort Claim is entitled to a vote in a specified dollar amount based upon the injury level described on the ballot for such Tort Claim. Each of four designated injury levels will be assigned a different dollar value for voting purposes, based upon the severity of the injury and consistent with the values set forth in the Claims Resolution Facility Procedures proposed in the Plan for the corresponding injury levels.

58

Only one injury level may be selected for each holder of a Tort Claim. In the event that more than one injury level is selected by or on behalf of a holder of a Tort Claim, the Claims and Noticing Agent shall count solely the selected injury level with the highest value for voting purposes. In the event that no injury level is selected by or on behalf of a holder of a Tort Claim, the Voting Agent shall value the Tort Claim the lowest injury category dollar value for voting purposes.

This approach, which will not be binding on a claimant, the Plan Proponents, the NECC Tort Trust or any other party for any purpose other than voting, will eliminate the need to make any individual valuation (whether by estimation or otherwise) regarding Tort Claims. The Voting Procedures require the following certifications by or on behalf of each holder of a Tort Claim, under penalty of perjury in accordance with 28 U.S.C. §1746: (a) that the claimant has been exposed to a contaminated NECC product so that such claimant holds a Tort Claim, as defined in the Plan and described in the Disclosure Statement; and (b) that the holder of such Tort Claim meets the criteria for the injury level asserted on such holder's Ballot.

The transferee of a transferred Claim is entitled to cast a ballot on account of such transferred Claim only if (a) all actions necessary to effect the transfer of the Claim pursuant to Bankruptcy Rule 3001(e) have been completed by 5:00 p.m. (prevailing Eastern Time) on the day prior to the Distribution Record Date or (b) the transferee files by the Distribution Record Date: (i) documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (ii) a sworn statement of the transferor supporting the validity of the transfer. If a portion of a single Claim has been transferred to a transferee, all holders of any portion of such single Claim will be (a) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth in the Disclosure Statement Order) and (b) required to vote every portion of such Claim collectively to either accept or reject the Plan. In the event that a group of ballots received from the holders of multiple portions of a single Claim partially rejects and partially accepts the Plan, such ballots will NOT be counted or included in the tabulation of votes.

Section 1126(c) of the Bankruptcy Code defines "acceptance" of a plan by a Class of claims as acceptance by creditors in that Class that hold at least two-thirds in dollar amount and represent more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.

The Plan Proponents reserve the right to amend or modify the Plan at any time prior to confirmation. Amendments or modifications to the Plan that do not materially and adversely affect the treatment of Claims may be approved by the Bankruptcy Court at the Confirmation Hearing without the necessity of re-soliciting votes. In the event re-solicitation is required, the Plan Proponents will furnish new solicitation packets which shall include new ballots to be used to vote to accept or reject the Plan, as amended.

**ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT CAREFULLY AND IN THEIR ENTIRETY. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE**

**ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.**

Section 15.3  <u>Fiduciaries and Other Representatives</u>.  If a ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, unless otherwise determined by the Plan Proponents, must submit proper evidence satisfactory to the Plan Proponents of authority to so act.  Authorized signatories should submit the separate ballot of each beneficial owner for whom they are voting.

Section 15.4  <u>Agreements Upon Furnishing Ballots</u>.  The delivery of an accepting ballot to the Claims and Noticing Agent by a holder of eligible Claims pursuant to one of the procedures set forth above will constitute the agreement of such holder to accept (a) all of the terms of, and conditions to the solicitation and (b) the terms of the Plan; <u>provided</u>, <u>however</u>, all parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

Section 15.5  <u>Waivers of Defects, Irregularities, Etc</u>.  Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots will be determined by the Claims and Noticing Agent and the Plan Proponents in their sole discretion, which determination will be final and binding.  Effective withdrawals of ballots must be delivered to the Claims and Noticing Agent prior to the Voting Deadline.  The Plan Proponents reserve the absolute right to contest the validity of any such withdrawal. The Plan Proponents also reserve the right to reject any and all ballots not in proper form, the acceptance of which would, in the opinion of the Plan Proponents or their counsel, be unlawful.  The Plan Proponents further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular ballot.  The interpretation (including of the ballot and the respective instructions thereto) by the Plan Proponents, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Plan Proponents (or the Bankruptcy Court) determine.  Neither the Plan Proponents nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished will be invalidated.

Section 15.6  <u>Withdrawal of Ballots; Revocation</u>.  Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Claims and Noticing Agent at any time prior to the Voting Deadline.  A notice of withdrawal, to be valid, must: (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s); (ii) be signed by the withdrawing party in the same manner as the ballot being withdrawn; (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn; and (iv) be received by the Claims and Noticing Agent in a timely manner at the address set forth in the ballot.  Prior to the Confirmation Hearing, the Plan Proponents intend to consult with the Claims and Noticing Agent

to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Plan Proponents expressly reserve the absolute right to contest the validity of any such withdrawals of ballots.

A purported notice of withdrawal of ballots which is not received in a timely manner by the Claims and Noticing Agent will not be effective to withdraw a previously cast ballot. Any party who has previously submitted to the Claims and Noticing Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change his or its vote by submitting to the Claims and Noticing Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

Section 15.7   Further Information; Additional Copies. If you have any questions or require further information about the voting procedure for voting your Claim or about the solicitation package, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact the Claims and Noticing Agent:

| **If by First Class Mail:** | **If by Hand Delivery or Overnight Mail:** |
|---|---|
| Donlin, Recano & Company, Inc.<br>**Re: New England Compounding Pharmacy, Inc.**<br>Attn: Voting Department<br>P.O. Box 2034, Murray Hill Station<br>New York, NY 10156-0701 | Donlin, Recano & Company, Inc.<br>**Re: New England Compounding Pharmacy, Inc.**<br>Attn: Voting Department<br>6201 15th Ave<br>Brooklyn, NY 11219 |
| **If by E-Mail** | **If by Phone** |
| Balloting@donlinrecano.com | (212) 771-1128 |

# ARTICLE XVI
# CONFIRMATION PROCEDURES

Section 16.1   The Confirmation Hearing. Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Bankruptcy Code section 1128(b) provides that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on _____, 2014 at XX:XX _.m. prevailing Eastern Time before the Honorable Henry J. Boroff, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Massachusetts, United States Courthouse, 300 State Street, Berkshire Courtroom, Third Floor, Springfield, Massachusetts 01105-2925. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment of the Confirmation Hearing.

Objections to confirmation of the Plan must be filed and served on or before X:XX p.m. prevailing Eastern Time, on _____, 2014.  Unless objections to confirmation are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.

Section 16.2    Statutory Requirements for Confirmation of the Plan.

(a)    At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Bankruptcy Code section 1129 have been satisfied.  The Plan Proponents believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

A.    The Plan complies with the applicable provisions of the Bankruptcy Code.

B.    The Plan Proponents will have complied with the applicable provisions of the Bankruptcy Code.

C.    The Plan has been proposed in good faith and not by any means forbidden by law.

D.    Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, this Chapter 11 Case, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan.

E.    The Plan Proponents have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as Post-Confirmation Officer and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policy.

F.    The Plan Proponents have disclosed the identity of any insider (as defined in Bankruptcy Code section 101) that will be employed or retained to assist the Post-Confirmation Officer, and the nature of any compensation for such insider.

G.    The Plan does not propose any rate change that is subject to approval by a governmental regulatory commission.

H.    Either each holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the holder would receive or retain if NECC were liquidated on that date under chapter 7 of the Bankruptcy Code.

I.  Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to Bankruptcy Code section 1129(b).

J.  Except to the extent that the holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims, Priority Tax Claims and Priority Non-Tax Claims will be paid in full, in Cash, on the Effective Date, or as soon thereafter as practicable.

K.  At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class.

L.  Confirmation of the Plan is not likely to be followed by the liquidation of the Debtor or any successor thereto under the Plan unless such liquidation is proposed in the Plan.

M.  All fees of the type described in 28 U.S.C. §1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

N.  The Debtor has no retirement benefit obligations.

O.  All transfers of property under the Plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

The Plan Proponents believe, and at the Confirmation Hearing will demonstrate, that: (i) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code; (ii) the Plan Proponents have complied or will have complied with all of the requirements of Chapter 11; and (iii) the Plan has been proposed in good faith.

(b)  Acceptance by Impaired Classes.  The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each Class of Claims or interests that is Impaired under a plan accept the plan.  A Class that is not Impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such Class is not required.  A Class is Impaired unless a plan (i) leaves unaltered the legal, equitable and contractual rights to which the Claim or interest entitles the holder of that Claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or interest after the occurrence of a default (A) cures any such default that occurred before or after the commencement of the case under Chapter 11, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such Claim or interest as such maturity existed before such default; (C) compensates the holder of such Claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (D) if such Claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to

operate a nonresidential real property lease subject to section 365(b)(l)(A), compensates the holder of such Claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such Claim or interest entitles the holder of such Claim or interest.

      (c)    <u>Confirmation Without Acceptance by All Impaired Classes</u>.  Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan, even if an Impaired Class entitled to vote on the plan has not accepted it, provided that the plan has been accepted by at least one Impaired Class.  No Classes are deemed to reject the Plan.  However, the Plan Proponents cannot guarantee that all Impaired Classes will accept the Plan.  If any Impaired Class does not accept the Plan, the Plan Proponents intend to seek confirmation of the Plan pursuant to Bankruptcy Code section 1129(b).  Bankruptcy Code section 1129(b) provides that, notwithstanding an Impaired Class's failure to accept a plan of reorganization, a plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or interests that is Impaired under, and has not accepted, the plan.

      The condition that a plan be "fair and equitable" with respect to a non-accepting Class of secured claims includes the following requirements: (a) the plan provides that holders of such Claims retain the liens securing such Claims, whether the property subject to such liens is retained by a debtor or transferred to another entity, to the extent of the allowed amount of such Claims and that each holder of a Claim of such Class receive on account of such Claims deferred cash payments totaling at least the allowed amount of such Claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; (b) the plan provides for the sale, subject to 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such Claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under (a) or (c) of this paragraph; or (c) the plan provides for the realization by such holders of the indubitable equivalent of such Claims.

      The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the following requirement that either: (a) the plan provides that each holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the effective date of the plan, equal to the allowed amount of such Claim; or (b) the holder of any Claim or interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or interest any property.

## ARTICLE XVII
## BEST INTERESTS OF CREDITORS AND LIQUIDATION

      Section 17.1    <u>Best Interests of Creditors Test</u>.  The Bankruptcy Code requires that the Bankruptcy Court find that the Plan is in the best interests of all holders of Claims and Equity Interests that are Impaired by the Plan and that have not accepted the Plan as a requirement to confirm the Plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires the Bankruptcy Court to find either that all members of an impaired Class of Claims or interests have accepted the plan or that the plan will provide a

member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

In Chapter 7 liquidation cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior Class receiving any payments until all amounts due to senior Classes have been paid fully or any such payment is provided for:

A.    Secured creditors (to the extent of the value of their collateral).

B.    Administrative and other priority creditors.

C.    Unsecured creditors.

D.    Debt expressly subordinated by its terms or by Final Order of the Bankruptcy Court.

E.    Interest holders.

For the reasons set forth in Section 17.2 below, the Plan Proponents believe that the value of any distributions in a Chapter 7 case would be less than the value of distributions under the Plan.   Accordingly, the Plan Proponents believe that the "best interests" test of Bankruptcy Code section 1129 is satisfied.

Section 17.2    Liquidation Analysis.  The Plan Proponents believe that liquidation under Chapter 11 is more beneficial to the holders of Claims and Equity Interests than a liquidation under Chapter 7.  The Plan provides for third party releases for the benefit of certain settling parties who, in exchange for such releases and certain other consideration, have agreed to contribute considerable funds to the estate for the benefit of creditors (particularly the Tort Claimants).  The Plan Proponents believe that the settling parties are unwilling to settle and pay the amounts they are contributing under the Plan without these third party releases.  Thus, only through the Plan, confirmed under Chapter 11, could creditors receive the benefits of the various Settlement Agreements.

The Plan Proponents believe the settlements result in a greater recovery for creditors than would litigation by a Chapter 7 trustee against the settling parties.  The Plan Proponents strongly believe that the settlements negotiated by the Chapter 11 Trustee result in a greater recovery to the estate than is likely to be achieved via litigation in the absence of a settlement.  Among other things, the settlements, as incorporated in the Plan, provide the estate with certain tax-related payments that would not otherwise be available to the estate through traditional litigation.  Additionally, the settlements provide for payments to the estate from NECC's insurers, which, outside of the Plan, would likely contest or deny coverage under the applicable Policies, thereby potentially diminishing the amounts to be recovered by the NECC estate (and, ultimately, its creditors).

Moreover, there would be considerable additional delay if this case were converted to Chapter 7.  The time required to complete litigation is expected to be years.  Thus,

the Plan Proponents believe that liquidation under Chapter 7 would result in smaller distributions to creditors than those provided for in the Plan with more delay because of: (a) the significant decrease in creditor recoveries, as confirmation triggers the effectiveness of the contemplated settlements; (b) the litigation risks are not insignificant; and (c) additional administrative expenses involved in the appointment of a Chapter 7 trustee.

The costs of liquidation under Chapter 7 of the Bankruptcy Code would include the fees payable to a Chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.  The foregoing types of claims and other claims that might arise in a Chapter 7 liquidation case or result from the pending Chapter 11 Case, including any unpaid expenses incurred by the Chapter 11 Trustee and the Official Committee during this case, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available for distribution to holders of allowed general unsecured claims.

To determine if the Plan is in the best interests of each impaired class, the value of the distributions from the proceeds of a liquidation of NECC's unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, are then compared with the value of the property offered to such Classes of Claims and Equity Interests under the Plan.

After considering the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to the holders of Claims and interests in this Chapter 11 Case, including the increases in Claims which could be satisfied on a priority basis or on parity with creditors in this Chapter 11 Case, the Plan Proponents have determined that confirmation of the Plan will provide each holder of an allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to a liquidation under Chapter 7 of the Bankruptcy Code.

## ARTICLE XVIII
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include: (a) liquidation under Chapter 7 of the Bankruptcy Code; and (b) an alternative plan.

Section 18.1    Liquidation Under Chapter 7.  If no plan can be confirmed, the Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed (or elected) to liquidate NECC's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of holders of Claims and interests is set forth above in Section 17.2.

Section 18.2    Alternative Plan.  If the Plan is not confirmed, the Bankruptcy Court could confirm a different plan.  A different plan might also involve an orderly liquidation of NECC's assets.  However, the Plan Proponents believe that the Plan, as described herein, enables holders of Claims and Equity Interests to realize the highest and best value under the

circumstances as a result of the Shareholder Settlement Agreement, the GDC Settlement Agreement and the PMIC/Maxum Settlement Agreement.  The Plan Proponents believe that any alternative form of a Chapter 11 plan is a much less attractive alternative to creditors than the Plan because of the far greater returns and certainty provided by the Plan.  Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs.

## ARTICLE XIX
## CERTAIN UNITED STATES FEDERAL INCOME TAX
## CONSEQUENCES OF THE PLAN

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN NECC SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF PROCEEDS FROM CLAIMS INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN (NON-US) TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

The following discussion addresses certain United States Federal income tax consequences of the consummation of the Plan.  This discussion is based upon the United States Tax Code, as amended, existing and proposed regulations thereunder, current administrative rulings, and judicial decisions as in effect on the date hereof, all of which are subject to change, possibly retroactively.  No rulings or determinations by the Internal Revenue Service have been obtained or sought by the Plan Proponents with respect to the Plan.  An opinion of counsel has not been obtained with respect to the tax aspects of the Plan.  This discussion does not purport to address the federal income tax consequences of the Plan to particular classes of taxpayers (such as foreign persons, S corporations, mutual funds, small business investment companies, regulated investment companies, broker-dealers, insurance companies, tax-exempt organizations and financial institutions) or the state, local or foreign income and other tax consequences of the Plan.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED TO OR WRITTEN TO BE USED, AND CANNOT BE USED, BY SUCH HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE PLAN; AND (C) SUCH HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

Section 19.1   Federal Income Tax Consequences to Holders of Claims and Equity Interests.

(a)   Holders of Claims, other than Claims for Personal Injury or Wrongful Death, and Holders of Equity Interests.  Subject to the discussion below for Claims for personal injury or  wrongful death, a holder of an allowed Claim or Equity Interest will generally recognize ordinary income to the extent that the amount of cash or property received (or to be received) under the Plan is attributable to interest that accrued on a claim but was not previously paid by NECC or included in income by the holder of the Allowed Claim or Equity Interest.  A holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the holder's adjusted basis in its claim and the amount realized by the holder upon consummation of the Plan that is not attributable to accrued but unpaid interest.  The amount realized will equal the sum of cash and the fair market value of other consideration received (or to be received).

Subject to the discussion below for Claims for personal injury or wrongful death, the character of any gain or loss that is recognized will depend upon a number of factors, including the status of the holder, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the holder has previously claimed a bad debt deduction with respect to the Claim, and the holder's holding period of the Claim.  If the Claim or Equity Interest in the holder's hands is a capital asset, interests will constitute long-term capital gain or loss if the holder held such Claim for longer than one year or short-term capital gain or loss if the holder held such Claim for one year or less.  If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation.

A holder of an Allowed Claim, other than an Allowed Claim for personal injury or wrongful death, who receives, in respect of its claim, an amount that is less than its tax basis in such claim may be entitled to a bad debt deduction under section 166(a) of the Tax Code or a worthless securities deduction under section 165(g) of the Tax Code.  The rules governing the character, timing, and amount of these deductions depend upon the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed.  Accordingly, such holders are urged to consult their tax advisors with respect to their ability to take such a deduction if either: (1) the holder is a corporation; or (2) the Claim constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the holder or (b) a debt the loss from the worthlessness of which is incurred in the holder's trade or business.  A holder that has previously recognized a loss or deduction in respect of its claim or equity interest may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the holder's adjusted basis in such Claim.

Holders of Claims, other than Claims for personal injury or wrongful death who were not previously required to include any accrued but unpaid interest in their gross income on a Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest.  Holders previously required to include in their gross income any accrued but unpaid interest on a claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.  Under the Plan, to the extent that any allowed Claim entitled to a distribution is comprised of indebtedness and accrued

68

but unpaid interest thereon, such distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the distribution exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

A holder of a Claim constituting any installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of section 453(b) of the Tax Code. Whether the holder of a Claim, other than a Claim for personal injury or wrongful death, will recognize a loss, a deduction for worthless securities or any other tax treatment will be depend upon facts and circumstances that are specific to the nature of the holder and its Claim. Accordingly, holders of such Claims should consult their own tax advisors.

Holders of Equity Interests will not receive any cash or property under the Plan. Whether the holder of Equity Interests will recognize a loss, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Equity Interests. Accordingly, holders of Equity Interests should consult their own tax advisors.

(b)     <u>Holders of Claims for Personal Injury or Wrongful Death</u>.  Subject to the terms of the Plan, holders of Claims for personal injury or wrongful death will receive their share of beneficial interests in the Tort Trust.

**(i)**     <u>Classification of the Liquidating Trust</u>

The Tort Trust is intended to qualify as, and the discussion below assumes that the Tort Trust will be respected as, a liquidating trust for U.S. federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead treated as a grantor trust, i.e., a pass-through entity.  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as such for U.S. federal income tax purposes.  In Revenue Procedure 94-45, the IRS set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Title 11 plan. In general, the Tort Trust has been structured with the intention of complying with the criteria of Revenue Procedure 94-45.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtor, the  Estate Representative, the Official Committee, the Tort Trustee and the Tort Trust Beneficiaries), are required to treat, for U.S. federal income tax purposes, the Tort Trust as a grantor trust of which the Tort Trust Beneficiaries are the owners and grantors.

No ruling has been requested from the IRS, and no opinion of counsel has been requested concerning the tax status of the Tort Trust as a grantor trust.  There can be no assurance that the IRS will treat the Tort Trust as a grantor trust.  If the IRS were to challenge successfully such classification, the federal income tax consequences to the Tort Trust, and the Tort Trust Beneficiaries could be materially different than is discussed herein (including the potential for an entity level tax on the income of the Tort Trust).

For all United States federal income tax purposes, all parties (including the Debtor, the  Estate Representative, the Official Committee, the Tort Trustee, the Tort Trust Beneficiaries and holders of Allowed Class E Claims) shall treat the transfer of the Tort Trust Assets to the Tort Trust as (i) a transfer of the Tort Trust Assets (subject to any obligations related to those assets) directly to the Tort Trust Beneficiaries and holders of Allowed Class E Claims, followed by (ii) the transfer by such Tort Trust Beneficiaries and holders of Allowed Class E Claims of such Tort Trust Assets (other than the Tort Trust Assets allocable to Contested Claims or a Disputed Ownership Fund) to the Tort Trust in exchange for beneficial interests in the Tort Trust.  Accordingly, the Tort Trust Beneficiaries and holders of Allowed Class E Claims shall be treated for U.S. federal income tax purposes (and, to the extent permitted, for state and local income tax purposes) as the grantors and owners of their respective shares of the Tort Trust Assets (other than the Tort Trust Assets allocable to Contested Claims or a Disputed Ownership Fund).

The Tort Trustee shall file returns for the Tort Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) in accordance with the Plan.  The Tort Trustee shall also annually send to each record holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and shall instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns.  The Tort Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Tort Trust that are required by any Governmental Unit.

Allocations of Tort Trust taxable income, if any, shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Tort Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Tort Trust interests, taking into account all prior and concurrent distributions from the Tort Trust. Similarly, taxable loss of the Tort Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Tort Trust Assets.  The tax book value of the Tort Trust Assets for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

As soon as possible after the Effective Date, the Tort Trustee shall make a good faith valuation of the Tort Trust Assets.  Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties (including the Debtor, the Estate Representative, the Official Committee, the Tort Trustee, the Tort Trust Beneficiaries and holders of Allowed Class E Claims) for all federal income tax purposes.

The Tort Trust Assets will include the Tort Trust's interest on behalf of the holders of Claims for personal injury and wrongful death, in a qualified settlement fund ("QSF") established under the Plan.  The Tort Trustee will serve as the QSF administrator of the QSF. The Tort Trustee shall have the responsibility and obligation to file all required tax returns and otherwise to administer the QSF as required by the Tax Code, applicable Treasury Regulations and other tax authority.

The income tax consequences of amounts received by holders of personal injury Claims or wrongful death Claims will depend on the individual nature of each such Claim and the particular circumstances and facts applicable to such holder. To the extent that holders of personal injury Claims or wrongful death Claims receive amounts as damages on account of physical injuries or physical sickness, including wrongful death, such payments should not constitute gross income to such recipients under Section 104 of the Internal Revenue Code, except to the extent that such payments are attributable to medical expense deductions allowed to such holders under Section 213 of the Internal Revenue Code for a prior taxable year. o To the extent that any payments from the Tort Trust to holders of personal injury claims or wrongful death Claims constitute payments the nature of which are not excludable from income under Section 104 of the Internal Revenue Code (or any other provision of the Internal Revenue Code, such as interest income), such payments will be includible as gross income to such holders.

The Tort Trustee may request an expedited determination of taxes of the Tort Trust, or any entities created therein, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Tort Trust for all taxable periods through the dissolution of the Tort Trust.

### (ii)    Information Reporting and Backup Withholding

In connection with the Plan and all distributions under the Plan, the Tort Trust shall comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local or foreign taxing authority, and all distributions under the Plan shall be subject to any such withholding, payment, and reporting documents. The Tort Trustee is authorized to take any and all actions that may be necessary or appropriate to comply with such requirements, including requiring all holders of Allowed Claims to provide any information necessary to effect such information reporting and tax withholding. No distribution will be made to a holder pursuant to the Plan unless and until such holder has made satisfactory arrangements for the payment and satisfaction of applicable withholding tax obligations, to the extent applicable. All amounts withheld from distributions to a Tort Trust Beneficiary and paid over to the applicable taxing authority, if any, will be treated as a distribution to such holder.

The holder of an Allowed Claim may be subject to backup withholding (currently at the applicable withholding rate of 28%) with respect to distributions made pursuant to the Plan unless the holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that such holder is not subject to backup withholding. Backup withholding is not an additional tax, but is an advance payment that may be refunded to the extent it results in an overpayment of tax.

### (iii)    Disputed Ownership Fund

The Tort Trustee may create separate reserves for Contested Claims. The Tort Trustee may file a tax election to treat any such reserve as a Disputed Ownership Fund ("DOF") within the meaning of Treasury Regulation Section 1.468B-9 for United States federal income tax purposes rather than to tax such reserve as a part of the Tort Trust. If such an election is

made, the Tort Trust shall comply with all U. S. federal, and state and local, tax reporting and tax compliance requirements as may be applicable to the DOF, including but not limited to, the filing of a separate U.S. federal income tax return for the DOF and the payment of U.S. federal and/or state or local income tax due. If the Tort Trustee makes a DOF election, all parties would be required to report consistently with such tax treatment. Any tax liability of the DOF would reduce the distributions to holders of Allowed Claims.

TORT TRUST BENEFICIARIES ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THEIR FEDERAL INCOME TAX REPORTING AS A RESULT OF RECEIVING AND HOLDING BENEFICIAL INTERESTS IN THE TORT TRUST.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE XX
## RISK FACTORS

HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

Section 20.1   Third Party Releases and Injunctions. If the Plan is confirmed, all persons and entities, including all holders of Claims and Equity Interests, will be bound by the release provisions of Section 10.05 of the Plan and the injunctions provided for in Section 10.06 of the Plan. Such releases and injunctions operate to effectively bar any and all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action against the Debtor, the Estate Representative(s), the Shareholder and Affiliate Released Parties, and the Unaffiliated Contributing Parties. Holders of Claims and Equity Interests should review carefully Sections 10.05 and 10.06 of the Plan, together with Sections 12.5 and 12.6 of this Disclosure Statement, prior to voting to accept or reject the Plan.

Section 20.2   Risks Related to Projections and Estimates. All statements other than statements of historical facts included in this Disclosure Statement and any materials incorporated by reference herein, and plans and objectives including but not limited to statements using words such as "anticipates," "expects," "estimates," "believes," and "likely" are forward-looking statements. The Plan Proponents believe that their current views and expectations are

based on reasonable assumptions; however, there are significant risks and uncertainties that could significantly affect expected results.  Important factors that could cause actual results to differ materially from those in the forward-looking statements are disclosed throughout this Disclosure Statement and include, without limitation, the risk factors discussed herein, the success in the liquidation process, and written and oral forward-looking statements attributable to the Plan Proponents, or persons acting on their behalf, are expressly qualified in their entirety by the statements made herein.  The Plan Proponents do not intend to update or otherwise revise the forward-looking statements contained herein to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

Section 20.3  Claims Estimations.  There can be no assurance that the estimated amount of Claims and Equity Interests set forth herein or in the Plan are correct, and the actual allowed amounts of Claims and Equity Interests may differ from estimates.  The estimated amounts are subject to certain risks, uncertainties and assumptions.  Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, the actual allowed amounts of Claims and Equity Interests may vary from those estimated therein.

Section 20.4  Objections to Classification.  Bankruptcy Code section 1122 provides that a Plan may place a Claim or interest in a particular Class only if such Claim or interest is substantially similar to the other claims or interests of such Class.  The Plan Proponents believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Equity Interest of a particular Class unless the holder of a particular Claim or Equity Interest agrees to a less favorable treatment of its Claim or Equity Interest.  The Plan Proponents believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

Section 20.5  Failure to Receive Requisite Acceptances.  If the requisite acceptances are received, the Plan Proponents intend to seek, as promptly thereafter as practicable, confirmation of the Plan.  If the requisite acceptances are not received, the Plan Proponents may seek confirmation of the Plan notwithstanding the dissent of certain Classes of Claims or Equity Interests.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims or interests if it determines that the rejecting Class is being treated appropriately given the relative priority of the Claims or interests in such Class.  In order to confirm a plan against a dissenting class, the Bankruptcy Court must also find that at least one Impaired Class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such class.

Section 20.6   Failure to Confirm the Plan.   Even if the requisite acceptances are received and, with respect to those Classes deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which as a court of equity may exercise substantial discretion, may choose not to confirm the Plan.   Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by the liquidation or the need for further financial reorganization of the debtor unless, as is the case here, the Plan provides for such liquidation or reorganization and that the value of distributions to dissenting holders of Claims and Equity Interests may not be less than the value such holders would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.   Although the Plan Proponents believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Additionally, the solicitation must comply with the requirements of section 1126(b) of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to the length of the solicitation period, compliance with applicable non-bankruptcy law, if any, and in the absence of applicable nonbankruptcy law, the adequacy of the information contained in this Disclosure Statement (as defined in section 1125(a) (1) of the Bankruptcy Code).   If the Bankruptcy Court were to find that the solicitation did not so comply, all acceptances received pursuant to the solicitation could be deemed invalid and the Plan Proponents could be forced to re-solicit acceptances under section 1125(b) of the Bankruptcy Code, in which case confirmation of the Plan could be delayed and possibly jeopardized.   The Plan Proponents believe that the solicitation complies with the requirements of section 1126(b) of the Bankruptcy Code, that duly executed ballots will be in compliance with applicable provisions of the Bankruptcy Code, and that if the requisite acceptances are received, the Plan should be confirmed by the Bankruptcy Court.

Section 20.7   Failure to Consummate the Plan.   Consummation of the Plan is conditioned upon, among other things, entry of the Confirmation Order and the occurrence of the Effective Date.   As of the date of this Disclosure Statement, there can be no assurance that any or all of the foregoing conditions will be met or that the other conditions to consummation, if any, will be satisfied.   Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

Section 20.8   Nonoccurrence of Effective Date of Plan.   Even if all Classes of Claims and Equity Interests that are entitled to vote accept the Plan, the Plan may not become effective.   The Plan sets forth conditions to the occurrence of the Effective Date of the Plan which may not be satisfied.  The Plan Proponents believe that all requirements for consummation under the Plan will be satisfied.   There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for consummation of the Plan have been satisfied.

## ARTICLE XXI
## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, it is the opinion of the Plan Proponents that the confirmation and consummation of the Plan is preferable to all other alternatives discussed herein because it will result in a larger distribution to the holders than would otherwise result in liquidation under Chapter 7 of the Bankruptcy Code.   It also will help

ensure that the sums available to satisfy claims against NECC's estate will be distributed fairly and equitably, in accordance with the Bankruptcy Code's principles of equitable distribution. Absent confirmation and consummation of the Plan, such sums likely would be exhausted in a race to the courthouse by competing claimants and paid to those who succeeded in that race, at the expense of those who did not. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to the holders of allowed Claims and Equity Interests.

**ACCORDINGLY, FOR ALL OF THE REASONS SET FORTH HEREIN, THE PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS WHO ARE ENTITLED TO VOTE ON THE PLAN TO SUPPORT CONFIRMATION OF THE PLAN AND VOTE TO ACCEPT THE PLAN.**

Dated: _____, 2014
    Boston, Massachusetts


                                    PAUL D. MOORE, AS CHAPTER 11 TRUSTEE
                                    OF NEW ENGLAND COMPOUNDING
                                    PHARMACY, INC. D/B/A NEW ENGLAND
                                    COMPOUNDING CENTER


                                    _____



                                    OFFICIAL COMMITTEE OF UNSECURED
                                    CREDITORS


                                    By: _____
                                        Name:
                                        Title:

61779791

Case 1:13-md-02419-RWZ  Document 1572-2  Filed 12/04/14  Page 88 of 146

Case 12-19882  Doc 1058-1  Filed 12/03/14  Entered 12/03/14 20:20:37  Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 1 of 59

# EXHIBIT A

Case 1:13-cv-02419-RWZ Document 572-2 Filed 12/04/14 Page 89 of 146
Case 12-19882 Doc 1058-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy Inc.) Page 2 of 59

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| In re:<br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

## JOINT CHAPTER 11 PLAN OF NEW ENGLAND COMPOUNDING PHARMACY, INC.

**DUANE MORRIS LLP**

Paul D. Moore, Esq.
100 High Street
Suite 2400
Boston, MA 02110
Telephone: (857) 488-4200
Facsimile: (857) 401-3057

*Chapter 11 Trustee*

**BROWN RUDNICK LLP**

William R. Baldiga, Esq.
Kiersten A. Taylor, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201


David J. Molton, Esq.
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

*Counsel to the Official Committee
of Unsecured Creditors*

Dated: December 3, 2014

Case 1:13-md-02419-RWZ   Document 1572-2   Filed 12/04/14   Page 90 of 146
Case 12-19882   Doc 1058-1   Filed 12/03/14   Entered 12/03/14 20:20:37   Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 3 of 59

## TABLE OF CONTENTS

**ARTICLE I. DEFINITIONS AND INTERPRETATION** ........................................................................ 1

**ARTICLE II. ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS** ........... 18

    2.01    Administrative Expense Claims................................................................. 18

    2.02    Deadlines to Assert Administrative Expense Claims. ................................ 18

    2.03    Priority Tax Claims ................................................................................. 19

**ARTICLE III. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS** ............................... 19

    3.01    Classification of Claims and Equity Interests ......................................... 19

**ARTICLE IV. TREATMENT OF CLAIMS AND EQUITY INTERESTS** ....................................... 20

    4.01    Class A - Priority Non-Tax Claims .......................................................... 20

    4.02    Class B - Miscellaneous Secured Claims ................................................ 20

    4.03    Class C - General Unsecured Claims ...................................................... 20

    4.04    Class D - Tort Claims ............................................................................. 20

    4.05    Class E - Subordinated Claims ............................................................... 21

    4.06    Class F - Equity Interests ....................................................................... 21

**ARTICLE V. SETTLEMENT OF TORT CLAIMS  AND THE NECC TORT TRUST** .................. 22

    5.01    Settlement and Compromise ................................................................... 22

    5.02    Exhaustion of Insurance Policies ........................................................... 22

    5.03    Execution of Tort Trust Agreement ........................................................ 22

    5.04    Purpose of Tort Trust ............................................................................. 22

    5.05    Assets of the Tort Trust .......................................................................... 22

    5.06    Governance of the Tort Trust .................................................................. 23

    5.07    Role of the Tort Trustee .......................................................................... 23

    5.08    Investments ........................................................................................... 23

    5.09    Fees, Costs and Expenses of the Tort Trust ............................................ 24

    5.10    Distribution of the Tort Trust Assets ....................................................... 24

    5.11    Resolving Liens Other than Imposed by the Medicare Act and States' Medicaid and Worker Compensation Statutes........................................................................ 26

    5.12    Time of Tort Trust Distributions............................................................. 26

    5.13    Tax Treatment of Tort Trust ................................................................... 26

    5.14    Resolution of the Claims of Minors In Accordance With the Tort Trust ................. 29

    5.15    Access to Claims Information ................................................................. 29

    5.16    Distribution of Surplus .......................................................................... 30

Case 1:13-md-02419-RWZ Document 1572-2 Filed 12/04/14 Page 4 of 146
Case 12-19882 Doc 1058-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 4 of 59

| | | | |
|---|---|---|---|
| 5.17 | Payments to Post-Effective Date Debtor | | 30 |

**ARTICLE VI. MEANS FOR IMPLEMENTATION AND EXECUTION OF THIS PLAN ............ 30**

| 6.01 | Management of the Post-Effective Date Debtor | 30 |
| 6.02 | Duties and Powers of the Post-Confirmation Officer | 31 |
| 6.03 | Other Actions | 33 |
| 6.04 | Expense Fund | 33 |
| 6.05 | Distributions Under this Plan | 33 |
| 6.06 | Disallowance of Multi-Claimant Proofs of Claim | 34 |
| 6.07 | Procedures for Treating Disputed Claims | 34 |
| 6.08 | Closing of the Chapter 11 Case | 35 |
| 6.09 | Cancellation of Existing Agreements | 35 |
| 6.10 | Continued Corporate Existence | 35 |
| 6.11 | Effectuating Documents and Further Transactions | 36 |

**ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS ................................................... 36**

| 7.01 | Distribution Record Date | 36 |
| 7.02 | Delivery of Distributions and Undeliverable Distributions | 36 |
| 7.03 | De Minimus Distributions | 37 |
| 7.04 | Transactions on Business Days | 37 |
| 7.05 | Allocation of Plan Distribution Between Principal and Interest | 37 |
| 7.06 | Withholding and Reporting Requirements | 37 |

**ARTICLE VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................. 38**

| 8.01 | Executory Contracts and Unexpired Leases | 38 |
| 8.02 | Insurance Policies and Agreements | 38 |
| 8.03 | Approval of Rejection of Executory Contracts and Unexpired Leases | 38 |
| 8.04 | Rejection Claims | 38 |
| 8.05 | Rejection Claims of Officers and Directors of the Debtor | 39 |

**ARTICLE IX. EFFECTIVENESS OF THIS PLAN ......................................................................... 39**

| 9.01 | Conditions to Confirmation | 39 |
| 9.02 | Date of Effective Date | 39 |
| 9.03 | Satisfaction of Conditions | 39 |
| 9.04 | Occurrence of Effective Date | 39 |
| 9.05 | Substantial Consummation Upon Effective Date | 39 |

**ARTICLE X. EFFECT OF CONFIRMATION ................................................................................ 39**

10.01 Vesting of Assets ..................................................................................... 39

10.02 Binding Effect ......................................................................................... 40

10.03 Exculpations and Limitation of Liability ................................................. 40

10.04 Preservation and Non-Waiver of Estate Defenses and Objections and Related Rights Reserved for the Debtor, its Successors in Interest, Creditors and Parties in Interest 40

10.05 Releases ................................................................................................. 41

10.06 Injunctions ............................................................................................. 44

10.07 Covenant Not to Sue .............................................................................. 46

10.08 Covenant Not to Sue (Shareholder and Affiliate Released Parties) .......... 46

10.09 Terms of Pre-Plan Injunction and Stays ................................................ 46

**ARTICLE XI. RETENTION OF JURISDICTION** ............................................... **46**

11.01 Jurisdiction of Bankruptcy Court ........................................................... 46

**ARTICLE XII. MISCELLANEOUS PROVISIONS** .............................................. **48**

12.01 Reporting of Shareholder Settlement Payments ..................................... 48

12.02 Tax Information to be Provided to Shareholders ..................................... 48

12.03 Refunds ................................................................................................. 48

12.04 Withdrawal of the Reference .................................................................. 48

12.05 Dissolution of the Official Committee ..................................................... 48

12.06 Quasi-Judicial Immunity ........................................................................ 49

12.07 Payment of Statutory Fees ..................................................................... 49

12.08 Effectuating Documents and Further Transactions .................................. 49

12.09 Exemption from Transfer Taxes .............................................................. 49

12.10 Elimination of Vacant Classes ............................................................... 49

12.11 Nonconsensual Confirmation ................................................................. 49

12.12 Modification of Plan .............................................................................. 49

12.13 Revocation or Withdrawal of Plan .......................................................... 50

12.14 Severability ........................................................................................... 50

12.15 Schedules and Exhibits .......................................................................... 50

12.16 Successors and Assigns .......................................................................... 50

12.17 Notices .................................................................................................. 51

12.18 No Admission ........................................................................................ 51

**ARTICLE XIII. CONFIRMATION REQUEST** .................................................... **51**

Case 1:13-cv-02419-RWZ Document 572-2 Filed 12/04/14 Page 93 of 146
Case 1:13821-02419-RWZ Doc 1058-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy    Inc.)    Page 6 of 59

Paul D. Moore, as chapter 11 trustee (the "**Chapter 11 Trustee**") of New England Compounding Pharmacy, Inc., a Massachusetts corporation, the above-captioned debtor (the "**Debtor**") and the Official Committee of Unsecured Creditors (the "**Official Committee**" and together with the Chapter 11 Trustee, the "**Plan Proponents**") propose the following chapter 11 plan (the "**Plan**") pursuant to section 1121(a) of title 11 of the United States Code (the "**Bankruptcy Code**"). This Plan proposes to resolve all Claims against and Equity Interests in the Debtor. ***IN PARTICULAR, CREDITORS AND PARTIES IN INTEREST SHOULD REVIEW SECTIONS 10.05 AND 10.06 OF THIS PLAN, WHICH PROVIDE FOR THIRD-PARTY RELEASES AND INJUNCTIONS THAT MAY AFFECT THE RIGHT TO PURSUE CLAIMS AGAINST NON-DEBTOR PARTIES AFTER THE PLAN IS CONFIRMED.*** The Plan Proponents reserve the right to, among other things, alter, amend, modify, revoke or withdraw this Plan prior to the Effective Date as set forth in section 12.12 and 12.13 of this Plan.

## ARTICLE I.
## DEFINITIONS AND INTERPRETATION

### A.    Definitions.

The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

**1.01    *Additional Tort Trust Assets*.**  Any Cash or Cash equivalent realized by the Estate Representative, solely in his capacity as such, after the Confirmation Date from or as a result of Settlement Agreements, including, but not limited, to the Tax Contributions (as defined in the Shareholder Settlement Agreement), and the proceeds of the sale, monetization or liquidation of Estate assets or other assets that the Estate Representative is entitled to sell for the benefit of the Estate in accordance with the Settlement Agreements or Section 6.02 hereof, together with all earnings thereon, less the amount the Estate Representative determines should be reserved as Cash.

**1.02    *Administrative Expense Claim*.**  Any right to payment constituting a cost or expense against either of the Debtor or its Estate, that is given administrative priority status pursuant to sections 503(b) and 507(a)(1) and (2) of the Bankruptcy Code, including, without limitation, the actual and necessary costs and expenses of preserving the Estate from or after the Petition Date, professional fees and expenses incurred by the Debtor, the Chapter 11 Trustee and the Official Committee, any indebtedness or obligations properly incurred or assumed by the Debtor from or after the Petition Date and any fees or charges assessed against the Estate under 28 U.S.C. § 1930.

**1.03    *Adversary Proceeding*.**  The adversary proceeding in the Bankruptcy Court in which the Chapter 11 Trustee is asserting various claims and causes of action against the Adversary Proceeding Defendants, and certain other defendants, styled as *Moore v. Cadden, et al.*, Adversary Proceeding No. 13-01040 (Bankr. D. Mass.).

**1.04    *Adversary Proceeding Defendants*.**    The Shareholders and the Affiliate Defendants.

     **1.05** *Affiliate Defendants.* Ameridose, LLC, GDC Properties Management, LLC and Medical Sales Management, Inc.

     **1.06** *Affiliated Entities*. The Entities set forth in Schedule 1.06 hereto, affiliates of NECC or the Shareholders.

     **1.07** *Allowed.* (i) Any Claim against the Debtor which has been listed by the Debtor in the Schedules, as such Schedules may be amended by the Chapter 11 Trustee from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (ii) any timely filed Claim as to which no objection to allowance has been interposed or as to which other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, or (iii) any Claim expressly allowed by a Final Order or under and in accordance with this Plan (only to the extent so allowed).

     **1.08** *Ameridose*. Ameridose LLC.

     **1.09** *Ameridose Excess Policies*. (i) The Commercial Excess/Umbrella Liability Policy PMIC issued to Ameridose, as named insured, under policy number UCL 0083404 04, for the policy period of March 1, 2011 to March 1, 2012; and (ii) the Commercial Excess/Umbrella Liability Policy PMIC issued to Ameridose, as named insured, under policy number UCL 0083404 05, for the policy period of March 1, 2012 to March 1, 2013.

     **1.10** *Ameridose Parties.* Ameridose, and any of its directors, officers, members, shareholders, insurers, owners, principals, employees, attorneys, predecessors, successors and assigns, that are released from Claims under the Ameridose Settlement Agreement.

     **1.11** *Ameridose Policies*. The Ameridose Excess Policies and the Ameridose Primary Policies.

     **1.12** *Ameridose Primary Policies*. (i) The Businessowners Special Policy PMIC issued to Ameridose, as named insured, under policy number BOP 0083404 05, for the policy period of March 1, 2011 to March 1, 2012; and (ii) the Businessowners Special Policy PMIC issued to Ameridose, as named insured, under policy number BOP 0083404 06, for the policy period of March 1, 2012 to March 1, 2013.

     **1.13** *Ameridose Settlement Agreement*. The Ameridose, LLC, Insurance Settlement, Release and Injunction Agreement dated as of November 24, 2014 by and among the Chapter 11 Trustee, PMIC (but no other Ameridose insurer), and Ameridose, substantially in the form included in the Plan Supplement.

     **1.14** *Ameridose Settlement Payment*. Cash in the amount of $10,000,000 to be paid to the Estate pursuant to the Ameridose Settlement Agreement.

     **1.15** *Bankruptcy Code.* Title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

Case 1:13-cv-02419-RWZ   Document 572-2   Filed 12/04/14   Page 95 of 146
Case 1-19882-02419-RWZ   Doc 1058-1   Filed 12/03/14   Entered 12/03/14 20:20:37   Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 8 of 59

    **1.16**   ***Bankruptcy Court.***  The United States Bankruptcy Court for the District of Massachusetts, having jurisdiction over the Chapter 11 Case.

    **1.17**   ***Bankruptcy Rules.***  The Federal Rules of Bankruptcy Procedure as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Case, and any Local Rules of the Bankruptcy Court.

    **1.18**   ***Bar Date.***  January 15, 2014 at 4:00 p.m. (Prevailing Eastern Time).

    **1.19**   ***Bar Date Order.***  In the Chapter 11 Case, the *Order (I) Establishing Deadline for Submitting Proofs of Claim, (II) Approving Certain Additional Requirements and Procedures for Personal Injury Tort and Wrongful Death Claims and (III) Approving Form and Manner of Notice Thereof* dated September 27, 2013, together with all exhibits thereto [Chapter 11 Case Docket No. 582].

    **1.20**   ***Business Day.***  Any day other than a Saturday, a Sunday or any other day on which banking institutions in Boston, Massachusetts are required or authorized to close by law or executive order.

    **1.21**   ***Cash.***  Legal tender of the United States of America.

    **1.22**   ***Chapter 11 Case.***  The case under chapter 11 of the Bankruptcy Code commenced by the Debtor on December 21, 2012 in the Bankruptcy Court and styled as *In re New England Compounding Pharmacy, Inc.*, Case No. 12-19882.

    **1.23**   ***Chapter 11 Trustee.***  Paul D. Moore, solely in his capacity as chapter 11 trustee for the Debtor.

    **1.24**   ***Claim.***  The meaning set forth in section 101(5) of the Bankruptcy Code.

    **1.25**   ***Claimant***.  A holder of a Claim.

    **1.26**   ***Claims Resolution Facility.***  The Personal Injury and Wrongful Death Claims Resolution Facility established by the Claims Resolution Facility Procedures.

    **1.27**   ***Claims Resolution Facility Procedures***.  The Claims Resolution Facility Procedures substantially in the form included in the Plan Supplement.

    **1.28**   ***Class.***  Any group of Claims or Equity Interests classified by this Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

    **1.29**   ***Class C Cash.***  Cash in an aggregate amount equal to 90% of the Allowed Class C Claims.

    **1.30**   ***Class C Claims***.  General Unsecured Claims that are classified under Class C.

**1.31** **_Class D Claims._**  Tort Claims that are classified under Class D, including Tort Claims held by any Entity that is subrogated to the rights of a Tort Claimant pursuant to section 4.04(iii) hereof.

**1.32** **_Class D Consortium Claim._**  Any Class D Claim arising from loss of consortium.

**1.33** **_Class D Estate Claim._**  Any Class D Claim filed on behalf of a decedent's estate.

**1.34** **_Class E Cash._**  The Cash, if any, remaining in the Tort Trust after all Allowed Tort Claims, fees, expenses and any other payments required to be paid or satisfied therefrom have been fully paid or satisfied.

**1.35** **_Class E Claims._**  Subordinated Claims that are classified under Class E.

**1.36** **_Collateral._**  Any property or interest in property of the estate of the Debtor subject to a lien, charge or other encumbrance to secure the payment or performance of a Claim, which lien, charge or other encumbrance is not subject to avoidance under the Bankruptcy Code.

**1.37** **_Common Benefit Fund._**  The common benefit fund to be created pursuant to Order No. 8 of the MDL Court in the MDL Proceeding, dated August 13, 2014 [MDL Proceeding Docket No. 1333].

**1.38** **_Conditional Payment._**  Any payment made pursuant to Section 1395y(b)(2) of the Medicare Act.

**1.39** **_Confirmation Date._**  The date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 11 Case.

**1.40** **_Confirmation Hearing._**  The hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan.

**1.41** **_Confirmation Order._**  The order confirming this Plan.

**1.42** **_Contributing Parties._**  The Shareholders and the Other Contributing Parties.

**1.43** **_Contributor and Affiliate Released Claims_**.  Contributor and Affiliate Released Claims has the meaning set forth in the Shareholder Settlement Agreement.

**1.44** **_Creditor._**  Creditor has the meaning set forth in section 101(10) of the Bankruptcy Code.

**1.45** **_Debtor._**  New England Compounding Pharmacy, Inc., as debtor in the Chapter 11 Case.

**1.46** **_Disclosure Statement._**  The disclosure statement relating to this Plan, including, without limitation, all exhibits thereto, as may be amended or modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code

Case 1:13-cv-02419-RWZ   Document 572-2   Filed 12/03/14   Page 97 of 146
Case 1-13882   Doc 1058-1   Filed 12/03/14   Entered 12/03/14 20:20:37   Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 10 of 59

**1.47**   ***Disclosure Statement Hearing.***   The hearing held by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code to consider approval of the Disclosure Statement.

**1.48**   ***Disclosure Statement Order.***   The order of the Bankruptcy Court entered pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b) approving the Disclosure Statement.

**1.49**   ***Disputed.***   With respect to any Claim which has not been Allowed pursuant to this Plan or a Final Order:

(a)   if no proof of claim has been filed by the applicable deadline: (i) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent or unliquidated; or (ii) a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent or unliquidated, but as to which the Chapter 11 Trustee, the Tort Trustee, the Official Committee or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order;

(b)   if a proof of claim or request for payment of an Administrative Expense Claim, other than applications by professionals under section 330 of the Bankruptcy Code and fees payable pursuant to 28 U.S.C. § 1930, has been filed by the applicable deadline set by the Bankruptcy Court for the same: (i) a Claim or Administrative Expense Claim for which no corresponding Claim has been or hereafter is listed on the Schedules; (ii) a Claim or Administrative Expense Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted in the proof of claim varies from the nature and amount of such Claim as listed on the Schedules; (iii) a Claim or Administrative Expense Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent or unliquidated; or (iv) a Claim or Administrative Expense Claim for which a timely objection or request for estimation is interposed by the Chapter 11 Trustee, the Official Committee or other party in interest which has not been withdrawn or determined by a Final Order.

**1.50**   ***Distribution Record Date.***   The date of entry of the Disclosure Statement Order, fixed pursuant to Bankruptcy Rule 3018(a).

**1.51**   ***District Court.***   The Article III court in and for the District of Massachusetts, including, but not limited, to the District Court for the District of Massachusetts.

**1.52**   ***Drugs.***   MPA and other products compounded, designed, marketed, sold, distributed, fabricated, advertised, supplied, produced, or formulated by the Debtor.

**1.53**   ***Effective Date.***   The date upon which all conditions to effectiveness set forth in Section 9.02 of this Plan have been satisfied or waived.

**1.54**   ***Entity.***   An individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government or any political subdivision thereof, or other person.

Case 1:13-md-02419-RWZ   Document 1572-2   Filed 12/04/14   Page 98 of 146
Case 12-19882   Doc 1053-1   Filed 12/03/14   Entered 12/03/14 20:20:37   Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 11 of 59

**1.55** *Equity Holder.*  Holder of an Equity Interest.

**1.56** *Equity Interest.*  The interest of any holder of an equity security of NECC represented by any issued and outstanding shares evidencing a present ownership interest in NECC, all other interests in NECC of any type (including, without limitation, warranty, options and instruments subject to conversion to interests), and any claims arising out of or pursuant to such interests.

**1.57** *Escrow Agreement(s).*  The escrow agreement(s), if any, entered into by and between an escrow agent, the Chapter 11 Trustee and one or more of the Contributing Parties.

**1.58** *Estate.*  The estate of the Debtor created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

**1.59** *Estate Causes of Action.*  All of the Estate's claims for relief, causes of action, contested matters and lawsuits, whether known or unknown, existing or hereafter arising, in law, equity or otherwise, based in whole or in part on any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Case, including through the Effective Date, including, without limitation, (i) those arising under chapter 5 of the Bankruptcy Code, (ii) any avoidance or fraudulent transfer or conveyance under applicable state law, and (iii) those relating to the compounding, design, marketing, sale, distribution, fabrication, advertising, supply, production, formulation, use, administration, labeling or ingestion of any product produced, sold and/or distributed by the Debtor, including, but not limited to, the Drugs, and all insurance policies owned by the Debtor; *provided, however*, that Estate Causes of Action shall not include any causes of action the Estate may hold against any Estate Representative.

**1.60** *Estate Parties.*  The Trustee, the Debtor, Estate, the Official Committee, the Estate Representative(s), and each of their respective successors and assigns.

**1.61** *Estate Representative.*  The Chapter 11 Trustee or any successor in interest to the Chapter 11 Trustee in such capacity, including but not limited to the Post-Confirmation Officer, whether such successor is appointed under this Plan, the Confirmation Order or otherwise.

**1.62** *Expense Fund.*  The fund that may be established within the Tort Trust under, and subject to the provisions of, Section 6.04 hereof.

**1.63** *Expense Fund Administrator.*  The person that may be appointed by the Estate Representative to administer the Expense Fund, solely in his or her capacity as such.

**1.64** *Expense Fund Amount.*  Cash in such amount as the Estate Representative, in consultation with the Official Committee (if the Official Committee has not been dissolved), determines to be necessary or appropriate to be paid to the Expense Fund Administrator to fund any Expense Fund that may be established within the Tort Trust.

**1.65** *Final Order.*  An order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the applicable subject matter hereof which has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review,

reargument, stay or rehearing is pending, or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending; provided, however, that the possibility that a motion pursuant to Rules 59 and 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9023 and 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

**1.66** **_GDC._**  GDC Properties Management, LLC, and any of its directors, officers, members, managers, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting solely in their respective capacity as such.

**1.67** **_GDC Policies._**  (i) The Commercial Lines Insurance Policy Preferred Mutual issued to GDC, as named insured, under policy number CPP 0150530884 for the policy periods of September 27, 2011 to September 27, 2012, (ii) the Commercial Lines Insurance Policy Preferred Mutual issued to GDC, as named insured, under policy number CPP 0160530884 for the policy periods of September 27, 2012 to September 27, 2013, and (iii) any other known or unknown insurance policies issued by Preferred Mutual to GDC prior to April 30, 2014.

**1.68** **_GDC Released Parties._**  All Persons and Entities released from Claims under the GDC Settlement Agreement.

**1.69** **_GDC Settlement Agreement._**  The GDC Insurance Settlement and Release Agreement dated as of April 30, 2014 by and among the Chapter 11 Trustee, GDC and the Individual GDC Insureds and Preferred Mutual [Chapter 11 Case Docket No. 714-2], as approved by the Bankruptcy Court at Chapter 11 Case Docket No. 970.

**1.70** **_GDC Settlement Payment._**  Cash in the amount of $3,750,000 paid to the Estate pursuant to the GDC Settlement Agreement.

**1.71** **_General Unsecured Claim._**  General unsecured claims that are not Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claim, Miscellaneous Secured Claims, Tort Claims or Subordinated Claims.

**1.72** **_High Point._**  High Point Surgery Center, Surgery Center Associates of  High Point, LLC, and High Point Regional Health f/k/a High Point Regional Health System, d/b/a High Point Regional Hospital, and all of their respective directors, officers, members, shareholders, owners, principals, employees, medical staff, contractors, attorneys, affiliates, parents, subsidiaries, predecessors, successors  and assigns,  each acting in their respective capacity as such.

**1.73** **_High Point Policy._**  The Healthcare Organizations Lead Excess & Umbrella Policy,  Policy Number 001220600 issued by Ironshore to High Point Regional Health System, as named insured.

**1.74**   *High Point Settlement Agreement*.   The Settlement and Release Agreement dated as of December 3, 2014 by and among the Chapter 11 Trustee, High Point, and Ironshore.

**1.75**   *High Point Settlement Payment.*   Cash in the amount of $3,500,000 paid to the Estate pursuant to the High Point Settlement Agreement.

**1.76**   *Impaired.*   Any Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.77**   *Individual GDC Insureds.*   Any of GDC's directors, officers, members, managers, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, who are or may be an "insured" under the GDC Policies, including, but not limited to, Gregory Conigliaro and Douglas Conigliaro, each acting solely in his, her, or its respective capacity as such.

**1.78**   *Individual Insureds.*   The Individual NECC Insureds and the Individual GDC Insureds.

**1.79**   *Individual NECC Insureds.*   Barry J. Cadden, Lisa M. Conigliaro Cadden, Gregory Conigliaro, Carla Conigliaro, Glenn Chin, Christopher Leary, Jill Keough, Gene Svirskiy and Kathy Chin, each solely in his or her capacity as an "insured" under the Maxum Policies and/or the PMIC NECC Policies.

**1.80**   *Initial Tort Trust Assets.*   (i) The Shareholder Settlement QSF Monies (less the amount the Tort Trustee, in his capacity as qualified settlement fund administrator, determines should be reserved in the Shareholder Settlement QSF Account), (ii) the National Settlement Payments (less the amount the Estate Representative determines should be reserved as Cash or paid to the Shareholder Settlement QSF Account, which payments shall be deemed to have been made pursuant to this Plan.   As such, these payments will be considered to have been made pursuant to a "court order" necessary to satisfy the requirements of Internal Revenue Code section 468B), (iii) an amount of each of the Provider Settlement Payments to be provided by and in each Provider Settlement Agreement, and (iv) the Estate Causes of Action.

**1.81**   *Inspira.*   Inspira Health Network, Inc.(f/k/a South Jersey Health System, Inc.), Inspira Medical Centers, Inc. (f/k/a South Jersey Hospital, Inc.) and all of their respective directors, officers, members, shareholders, owners, principals, employees, including, but not limited to Joseph Alessandrini and Paul Abrams, attorneys, affiliates, predecessors, parents, subsidiaries, including, but not limited to, Juno Assurance, successors and assigns, each acting in their respective capacity as such. For purposes of this Plan, the affiliates of Inspira are the following: Inspira Medical Center Woodbury, Inc., Inspira HomeCare & HospiceCare, Inc., Inspira Health Network LIFE, Inc., Inspira Health Network Medical Group, P.C., Inspira Health Network Urgent Care, P.C., Cooper Bone & Joint at Woodbury, P.C., Oak & Main Surgicenter, LLC, Inspira Health Network Foundation Cumberland/Salem, Inc.,  Inspira Health Network Foundation Gloucester County, Inc., The Kidney Center at Vineland, LLC, The Kidney Center at Millville, LLC, Inspira Help Services, Inc., Inspira Health Partners, LLC, Red Bank Development Corporation, Inspira Health Management Corporation, Juno Assurance, Ltd., Inspira Management Services, LLC, Inspira Health

8

Connections, P.C., Tri-County Cardiovascular Services, P.C., Gloucester County Surgery Center, LLC, Woodbury Medical Center Associates, LLP, Inspira Home Care Services Woodbury, Inc., Advanced MRI II, LLC, Inspira Care Connect, LLC, The Healthy Cumberland Initiative, Inc., and The Healthy Gloucester Initiative, Inc.

      **1.82**    ***Inspira Policies.***  The Ironshore Inspira Policies, the Juno Inspira Policies, and the Lexington Inspira Policies.

      **1.83**    ***Inspira Settlement Agreement.***  The Settlement and Release Agreement dated as of December 3, 2014 by and among the Chapter 11 Trustee, Inspira, Lexington Insurance, and Ironshore Specialty Insurance.

      **1.84**    ***Inspira Settlement Payment.***  Cash in the amount of $16,000,000 paid to the Estate pursuant to the Inspira Settlement Agreement.

      **1.85**    ***Interim Bar Date Order.***  In the Chapter 11 Case, the *Interim Order Regarding Chapter 11 Trustee's Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and for related Relief Concerning Noticing by Notice Intermediaries*, dated July 29, 2013 [Chapter 11 Case Docket No. 412].

      **1.86**    ***Ironshore.***  Ironshore Specialty Insurance Company solely in its capacity as issuer of, or in any other capacity that may arise from or be connected with, the High Point Policy and as an insurer to High Point (and any other person(s) or entity(ies) that may be insured under the High Point Policy) and all of its directors, officers, members, shareholders, owners, principals, employees, attorneys, affiliates, predecessors, parents, subsidiaries, successors and assigns, each acting solely in their respective capacities as such.

      **1.87**    ***Ironshore Inspira Policies.***  (i) The Insurance Policy issued by Ironshore Specialty Insurance to Inspira for the policy period of 11/1/2011 to 11/1/2012 (No. 000791702), and (ii) any other known or unknown insurance policies issued by Ironshore Specialty Insurance to Inspira prior to December 3, 2014.

      **1.88**    ***Ironshore Specialty Insurance.***  Ironshore Specialty Insurance Company solely in its capacity as issuer of, or in any other capacity that may arise from or be connected with, the Ironshore Ironshore Policy and as an insurer to Inspira (and any other person(s) or entity(ies) that may be insured under the Inspira Ironshore Policy) and all of its directors, officers, members, shareholders, owners, principals, employees, attorneys, affiliates, predecessors, parents, subsidiaries, successors and assigns, each acting in their respective capacity as such.  For purposes of this Agreement, the affiliates of Ironshore Specialty Insurance are the following: Ironshore Insurance Services, LLC, Ironshore Holdings, (US), Inc., Ironshore Specialty Insurance Company, IronHealth, and Ironshore Indemnity.

      **1.89**    ***Juno Assurance.***  Juno Assurance, Ltd., solely in its capacity as issuer of the Juno Policy, and all of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, parents, subsidiaries, successors and assigns, each acting in their respective capacity as such.

**1.90** *Juno Inspira Policies.* (i) The Healthcare Professional Liability and Healthcare General Liability Insurance Policy issued by Juno Assurance to Inspira for the policy period of 11/1/2011 to 11/1/2012 (No. 2011HPLGL02), and (ii) any other known or unknown insurance policies issued by Juno Assurance to Inspira prior to December 3, 2014.

**1.91** *Liberty Mutual.* Liberty Mutual Insurance, solely in its capacity as successor-in-interest to Netherlands Insurance and Peerless Insurance

**1.92** *Lexington Insurance.* Lexington Insurance Company, solely in its capacity as issuer of , or in any other capacity that may arise from or be connected with, the Lexington Policy, and as an insurer to Inspira (and any other additional insured under the Lexington Inspira Policy) and all of Lexington Insurance Company's directors, officers, members, shareholders, owners, principals, employees, attorneys, affiliates, predecessors, parents, subsidiaries, successors and assigns, each acting in their respective capacity as such. For purposes of this Plan, the affiliate of Lexington Insurance is the following: American International Group, Inc. and its direct and indirect subsidiaries.

**1.93** *Lexington Inspira Policy.* (i) The Excess Healthcare Professional Liability and Healthcare Umbrella Liability Insurance Policy issued by Lexington Insurance to Inspira for the policy period of 11/1/2011 to 11/1/2012 (No. 6796471), and (ii) any other known or unknown insurance policies issued by Lexington Insurance to Inspira prior to the December 3, 2014.

**1.94** *Local Rules.* The Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Massachusetts, or, in the singular, a specific Local Rule of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Massachusetts.

**1.95** *Maxum.* Maxum Indemnity Company, solely in its capacity as issuer of the Maxum Policies.

**1.96** *Maxum Policies.* The Commercial Excess Liability Policies Maxum issued to NECC, as named insured, under policy number EXC 6013127-01 for the period of June 25, 2010 to January 1, 2012, and the Commercial Excess Liability Policy Maxum issued to NECC, as named insured, under policy number EXC 6013127-02 for the period of January 1, 2012 to January 1, 2013.

**1.97** *MDL Court.* The United States District Court, District of Massachusetts, where the MDL Proceeding is pending.

**1.98** *MDL Proceeding.* The multidistrict litigation in the MDL Court entitled *In re New England Compounding Pharmacy, Inc., Products Liability Litigation*, designated as Case No. 1:13-md-2419-RWZ, formed pursuant to the Order of February 12, 2013, by the Judicial Panel on Multidistrict Litigation, pending in the MDL Court.

**1.99** *Miscellaneous Secured Claims.* Any claims against the Debtor secured by Collateral.

**1.100** *Medicaid.*   Any medical assistance program jointly financed by the federal and state governments, codified at 42 U.S.C. § 1396, *et seq*., and the regulations promulgated thereunder at 42 C.F.R. § 435.2 *et seq*.

**1.101** *Medicare Act.*   The Medicare Secondary Payer Act, codified at 42 U.S.C. § 1395y, and the regulations promulgated thereunder, codified at 42 C.F.R. § 411.1 *et seq*.

**1.102** *MPA.*   Methylprednisolone acetate.

**1.103** *National Contributing Parties.*   The Entities listed at Schedule 1.103 hereto.

**1.104** *National Settlement Administrator(s).*   The person(s) appointed in and by the Claims Resolution Facility Procedures to facilitate, effectuate and implement the purpose and provisions of the Claims Resolution Facility.

**1.105** *National Settlement Agreements.*   Any settlement agreement entered into between the Chapter 11 Trustee and one or more National Contributing Parties on or before the date on which the Plan Supplement is filed, including, without limitation the Ameridose Settlement Agreement, GDC Settlement Agreement, and the PMIC/Maxum Settlement Agreement; *provided*, *however*, that National Settlement Agreements shall not include the Shareholder Settlement Agreement.

**1.106** *National Settlement Payments.*   Any payment funded or to be paid to the Estate by a National Contributing Party pursuant to a National Settlement Agreement, including, without limitation, the Ameridose Settlement Payment, the GDC Settlement Payment, the PMIC/Maxum Settlement Payment and the Victory Settlement Payment; *provided*, *however*, that National Settlement Payments shall not include the Shareholder Settlement Monies.

**1.107** *NECC.*   Debtor New England Compounding Pharmacy, Inc. a/k/a New England Compounding Company.

**1.108** *NECC Claims*.   The term NECC Claims shall have the meaning set forth in the Shareholder Settlement Agreement

**1.109** *NECC Parties.*   The term NECC Parties shall have the meaning set forth in the Shareholder Settlement Agreement.

**1.110** *NECC Policies.*   The Maxum Policies and the PMIC NECC Policies.

**1.111** *Netherlands Insurance.*   The Netherlands Insurance Company, solely in its capacity as an issuer of the Netherlands Victory Insurance Policy, and all of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting in their respective capacity as such, and Liberty Mutual.

**1.112** *Netherlands Victory Policies.*   (i) The Commercial General Liability Insurance Policy issued by Netherlands Insurance to Victory for the policy period of 7/2/12 – 7/2/13 (No. CBP8690539), and (ii) any other known or unknown insurance policies issued by Netherlands Insurance to Victory prior to November 11, 2014.

Case 1:13-md-02419-RWZ   Doc 1053-1   Filed 12/05/14   Entered 12/05/14 20:20:37   Desc
Case 1:13-md-02419-RWZ   Document 1573   Filed 12/04/14   Page 84 of 146
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 17 of 59

**1.113   *Non-Tort Claims.*** Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Miscellaneous Secured Claims, General Unsecured Claims and Subordinated Claims.

**1.114   *Objection Deadline.*** The date set forth in the order of the Bankruptcy Court by which a holder of a Claim or a holder of an Equity Interest or other party in interest may file an objection to confirmation of this Plan.

**1.115   *Official Committee.*** The Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code, including the members thereof and each of their respective attorney representatives, each in his or her capacity as such.

**1.116   *Other Contributing Parties.*** The National Contributing Parties, the Provider Contributing Parties, and any and all Persons or Entities released under the National Settlement Agreements and the Provider Settlement Agreements, including but not limited to, the Ameridose Parties, the GDC Released Parties, and the PMIC/Maxum Released Parties.

**1.117   *Patient Lists.*** The lists required to be provided to the Chapter 11 Trustee, counsel to the Official Committee, and lead counsel to the Plaintiffs' Steering Committee pursuant to paragraph 2 of the Interim Bar Date Order.

**1.118   *Peerless Insurance*.** Peerless Insurance Company, solely in its capacity as issuer of the Peerless Victory Insurance Policy, and all of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting in their respective capacity as such, and Liberty Mutual

**1.119   *Peerless Victory Policies.*** (i) The Commercial Umbrella Liability Insurance Policy issued by Peerless Insurance to Victory for the policy period of 7/2/12 – 7/2/13 (No. CU8691139), and (ii) any other known or unknown insurance policies issued by Peerless Insurance to Victory prior to November 11, 2014.

**1.120   *Person.*** Person has the meaning set forth in section 101(41) of the Bankruptcy Code.

**1.121   *Petition Date.*** December 21, 2012.

**1.122   *PITWD Addendum*.** The confidential Personal Injury or Wrongful Death Claim Information Form required by the Bankruptcy Court pursuant to the Bar Date Order to be submitted by all creditors asserting a personal injury tort or wrongful death claim arising from exposure to NECC products.

**1.123   *Plaintiffs' Steering Committee.*** The committee of plaintiffs' counsel appointed pursuant to order of the MDL Court entered on April 9, 2013, as may be amended by the MDL Court.

**1.124   *Plan.*** This Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc., as may be amended or modified from time to time.

**1.125** *Plan Proponents.* The Chapter 11 Trustee and the Official Committee.

**1.126** *Plan Supplement*. The supplemental appendix to this Plan, to be filed no later than ten (10) days prior to the Disclosure Statement Hearing, which will contain, among other things, draft documents, forms of documents, term sheets or other instruments or signed copies, as the case may be, of the Plan Supplement Documents.

**1.127** *Plan Supplement Documents*. The documents, forms of documents, term sheets and instruments (including any amendments, supplements or modifications thereto) included in the Plan Supplement and which may be executed, delivered and/or performed in connection with the consummation of this Plan, including, without limitation, the Tort Trust Agreement, the Shareholder Escrow and Control Agreement, the Claims Resolution Facility Procedures, the Provider Claims Resolution Facility Procedures, if any, and the Settlement Agreements.

**1.128** *Policies*. The Ameridose Policies, the GDC Policies, the High Point Policy, the Inspira Policies, the NECC Policies, and the Victory Policies.

**1.129** *Post-Effective Date Debtor*. The Debtor, from and after the Effective Date.

**1.130** *Post-Confirmation Officer*. Paul D. Moore in his capacity as sole post-confirmation officer of the Debtor or the Post-Effective Date Debtor, as applicable.

**1.131** *PMIC*. Pharmacists Mutual Insurance Company, solely in its capacity as issuer of the PMIC NECC Policies or the Ameridose Policies, as applicable.

**1.132** *PMIC/Maxum Released Parties*. All Persons or Entities released from Claims under the PMIC/Maxum Settlement Agreement.

**1.133** *PMIC/Maxum Settlement Agreement*. The Plan Support and Settlement Agreement dated as of May 2, 2014, by and among the Chapter 11 Trustee, PMIC, Maxum and the Individual NECC Insureds [Chapter 11 Case Docket No. 714-2], as approved by the Bankruptcy Court at Chapter 11 Case Docket No. 971.

**1.134** *PMIC/Maxum Settlement Payment*. Cash in the amount of $25,200,000 paid to the Estate pursuant to the PMIC/Maxum Settlement Agreement.

**1.135** *PMIC NECC Policies*. The Special Businessowners Policy PMIC issued to NECC, as named insured, under policy number BOP 0068490 07, the Commercial Umbrella/Excess Liability Policy PMIC issued to NECC as named insured under policy number UCL 0068490 07, both with a policy period of January 1, 2011 to January 1, 2012, the Special Businessowners Policy PMIC issued to NECC as named insured under policy number BOP 0068490 08, the Commercial Umbrella/Excess Liability Policy PMIC issued to NECC as named insured under policy number UCL 0068490 08, both with a policy period of January 1, 2012 to January 1, 2013 and the Individual Pharmacist Professional Liability Policies PMIC issued to Barry J. Cadden (Policy No. PHL 0072481), Lisa M. Conigliaro Cadden (Policy No. PHL 0072480), Glenn Chin (Policy No. PHL 0072483), C. Leary (Policy No. PHL 0122124), G. Svirskiy (Policy No. PHL 0096033), J. Keough (Policy No. PHL 0105223) and K. Chin (Policy No. PHL 0096806) as named insureds.

13

**1.136** *Preferred Mutual.* Preferred Mutual Insurance Company, solely in its capacity as issuer of the GDC Policies, and any of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting solely in its respective capacity as such.

**1.137** *Priority Non-Tax Claim.* Any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

**1.138** *Priority Tax Claim.* Any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.139** *Priority Claims.* Priority Non-Tax Claims and Priority Tax Claims.

**1.140** *Pro Rata Share.* A proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the consideration distributed on account of all Allowed Claims in such Class to the amount of all Allowed Claims in such Class.

**1.141** *Protocol Order.* The *Agreed-Upon Order Establishing Protocol for Settlement Negotiations and Communication* [Adversary Proceeding Docket No. 96] entered in the Adversary Proceeding.

**1.142** *Provider Claims Resolution Facility(s).* The claims resolution facility or facilities, if any, established by the Provider Claims Resolution Facility Procedures.

**1.143** *Provider Claims Resolution Facility Procedures.* The Provider Claims Resolution Facility Procedures substantially in the form(s) included in the Plan Supplement.

**1.144** *Provider Contributing Parties.* The Entities listed on Schedule 1.144 hereto.

**1.145** *Provider Settlement Administrator(s).* The person(s) to be appointed in and by the Provider Claims Resolution Facility Procedures to facilitate, effectuate and implement the purpose and provisions of the Provider Claims Resolution Facility(s).

**1.146** *Provider Settlement Agreements.* The settlement agreement(s) entered into between the Chapter 11 Trustee and one or more Provider Contributing Parties on or before the date on which the Plan Supplement is filed, including, but not limited to, the High Point Settlement Agreement and the Inspira Settlement Agreement.

**1.147** *Provider Settlement Payments.* Any payment made or to be made to the Estate by a Provider Contributing Party pursuant to a Provider Settlement Agreement.

**1.148** *Resident Tort Trustee.* The Delaware resident trustee appointed by the Chapter 11 Trustee pursuant to the Tort Trust Agreement, including any successor.

**1.149** *Schedules.* The schedules of assets and liabilities and the statements of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007,

and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended through the Confirmation Date.

**1.150** ***Settlement Administrators***.  The National Settlement Administrator(s) and the Provider Settlement Administrator(s).

**1.151** ***Settlement Agreements.***  The National Settlement Agreements, the Provider Settlement Agreements, and the Shareholder Settlement Agreement.

**1.152** ***Settling National Insurers***.  PMIC, Maxum and Preferred Mutual, collectively, solely in their capacities as insurers of NECC, the Individual Insureds, or GDC, as applicable.

**1.153** ***Shareholder and Affiliate Released Parties***.  The Contributor and Affiliate Released Parties, as that term is defined in the Shareholder Settlement Agreement.

**1.154** ***Shareholder Escrow Accounts***.  The escrow accounts established in the Shareholder Escrow and Control Agreement.

**1.155** ***Shareholder Escrow Agent***.  Citizens Bank, N.A., as escrow agent appointed pursuant to the Shareholder Escrow Agreement.

**1.156** ***Shareholder Escrow and Control Agreement***.  The Escrow and Control Agreement dated as of August 20, 2014, by and among the Chapter 11 Trustee, the Shareholders and the Shareholder Escrow Agent, substantially in the form included in the Plan Supplement.

**1.157** ***Shareholder Settlement Agreement***.  The Plan Support and Funding Agreement dated as of May 2, 2014 by and among the Chapter 11 Trustee, on the one hand, and the Shareholders on the other hand (Chapter 11 Case Docket No. 712-2), as approved by the Bankruptcy Court at Chapter 11 Case Docket No. 972.

**1.158** ***Shareholder Settlement Monies***.  The monies from time to time in the Shareholder Escrow Accounts, including, but not limited to, the Tax Contributions (as defined in the Shareholder Settlement Agreement).

**1.159** ***Shareholder Settlement Non-QSF Accounts***.  The Shareholder Escrow Accounts other than the Shareholder Settlement QSF Account, if any.

**1.160** ***Shareholder Settlement Non-QSF Monies***.  The Shareholder Settlement Monies, if any, from time to time in the Shareholder Settlement Non-QSF Accounts.

**1.161** ***Shareholder Settlement QSF Account***.  The qualified settlement fund, if any, established pursuant to the Shareholder Escrow and Control Agreement, which may pay any expenses permitted to be paid by a qualified settlement fund under applicable law.

**1.162** ***Shareholder Settlement QSF Monies***.  The Shareholder Settlement Monies from time to time in the Shareholder Settlement QSF Account.

Case 1:13-md-02419-RWZ Document 1573-2 Filed 12/04/14 Page 89 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 21 of 59

**1.163   Shareholders.**   Barry Cadden, Lisa Conigliaro Cadden, Gregory Conigliaro and Carla Conigliaro.

**1.164   Special Master.**   The person appointed pursuant to the Claims Resolution Facility Procedures to provide for an appeal process in and for the Claims Resolution Facility.

**1.165   Subordinated Claims.**   All general unsecured claims, whenever arising, (i) for reimbursement, contribution or indemnity of an Entity that is liable with the Debtor on, or that has secured, the Claim of a Tort Claimant, or (ii) which are subordinated to other general unsecured claims by agreement or by applicable law

**1.166   Supplemental Bar Date.**   May 5, 2014.

**1.167   Supplemental Bar Date Notice.**   The *Notice of Supplemental Deadline for Filing Claims* in the Chapter 11 Case, dated March 5, 2014.

**1.168   Supplemental Bar Date Order.**   The endorsed order dated February 24, 2014 [Chapter 11 Case Docket No. 699] establishing the Supplemental Bar Date.

**1.169   Tax Code.**   Title 26 of the United States Code, as amended from time to time.

**1.170   Tennessee Settlement Agreement.**   The *Proposed Settlement Agreement and Order* dated as of May 12, 2014 among the Chapter 11 Trustee and Barry J. Cadden on one hand, and the Tennessee Board of Pharmacy, on the other hand [Chapter 11 Case Docket No. 729-2], as approved by the Bankruptcy Court at Chapter 11 Case Docket No. 973.

**1.171   Tort Claims.**   Any and all Claims, causes of action, civil actions and demands for or based on personal injury or wrongful death relating to the compounding, preparation, design, marketing, sale, distribution, fabrication, advertising, supply, production, formulation, use, administration, labeling or ingestion of any product produced, sold or distributed by the Debtor, including, but not limited to, the Drugs (notwithstanding the identity of any subsequent marketer, distributor, retailer, wholesaler, other seller or administrator of such product), including, but not limited to, those civil actions pending in the MDL Proceeding or in any state court; *provided*, *however*, that Tort Claims shall not include Estate Causes of Action as against the Shareholders and Affiliate Released Parties, including, without limitation, the Estate Claims asserted against the Shareholders and Affiliate Released Parties in the Adversary Proceeding.

**1.172   Tort Claimants.**   The holders of Allowed Tort Claims, or, in the singular, one such holder.

**1.173   Tort Trust.**   The trust established pursuant to Section 5.03 of this Plan.

**1.174   Tort Trustee.**   The trustee of the Tort Trust appointed by the Official Committee and the Plaintiffs' Steering Committee pursuant to the Tort Trust Agreement in accordance with this Plan, to be identified in the Plan Supplement, or any successor.

**1.175   Tort Trust Advisory Board.**   A three (3) member committee comprised of Kimberly Dougherty, Fredric L. Ellis and Harry M. Roth.

**1.176  *Tort Trust Agreement.*** The Tort Trust Agreement to be entered into by the Estate Representative, the Tort Trustee and the Resident Tort Trustee, executed in connection with this Plan, to be included in the Plan Supplement.

**1.177  *Tort Trust Assets.*** The Initial Tort Trust Assets and the Additional Tort Trust Assets.

**1.178  *Tort Trust Beneficiaries.*** Holders of Allowed Tort Claims, including Entities that are subrogated to the rights of such a Holder of an Allowed Tort Claim pursuant to section 4.01(iv) hereof.

**1.179  *Tort Trust Certificate.*** The Certificate of Trust forming the Tort Trust.

**1.180  *Tort Trust Documents.*** The Tort Trust Agreement, the Tort Trust Certificate, the Claims Resolution Facility Procedures, and the Provider Claims Resolution Facility Procedures.

**1.181  *Treasury Regulations.*** Regulations (including temporary and proposed) promulgated under the Tax Code by the United States Treasury Department, as amended from time to time.

**1.182  *Unimpaired.*** Any Class that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

**1.183  *U.S. Trustee.*** The Office of the United States Trustee for Region 1.

**1.184  *Victory.*** Victory Mechanical Services, Inc., Victory Heating & Air Conditioning Co., Inc., Victory LLC, Victory Heating and Air Conditioning Business Trust, Victory Mechanical Services Business Trust, and all of their respective directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting in their respective capacity as such.

**1.185  *Victory Policies.*** The Netherlands Victory Policies and the Peerless Victory Insurance Policies.

**1.186  *Victory Settlement Agreement.*** That certain Settlement and Release Agreement by and among the Chapter 11 Trustee, Victory, Netherlands Insurance, and Peerless Insurance, dated as of November 11, 2014.

**1.187  *Victory Settlement Payment.*** Cash in the amount of $5,500,000.00, to be paid to the Estate pursuant to the Victory Settlement Agreement, plus any additional amounts to be paid to the Estate pursuant to the Victory Settlement Agreement.

### B.    Interpretation; Application of Definitions and Rules of Construction.

**1.188  *Rules of Interpretation.*** The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural and

17

pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to this Plan. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

**1.189** *Computation of Time.* In computing any period of time prescribed or allowed by this Plan, the provisions of the Bankruptcy Rule 9006(a) shall apply.

**1.190** *Governing Law.* Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, agreement or other document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflicts of law thereof.

## ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims, as described below, have not been classified.

**2.01** *Administrative Expense Claims.* Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment or as otherwise provided herein, on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable, the Chapter 11 Trustee or the Post-Confirmation Officer (as may be applicable from time to time) shall pay to each holder of an Allowed Administrative Expense Claim, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim. Notwithstanding the foregoing, Administrative Expense Claims that represent liabilities incurred by the Chapter 11 Trustee in the ordinary course of the Debtor's business during the Chapter 11 Case shall be paid in the ordinary course of business and in accordance with any terms and conditions of any agreements relating thereto.

**2.02** *Deadlines to Assert Administrative Expense Claims.*

**(i)** **Pre-Confirmation Date Administrative Expense Claims.** Except for applications by professionals under section 330 of the Bankruptcy Code and fees payable pursuant to 28 U.S.C. § 1930, all requests for payment of Administrative Expense Claims for which an earlier deadline has not been previously set or imposed by Local Rule 3002-1 shall be filed and served on each of the Plan Proponents no later than thirty (30) days after entry of the Confirmation Order.

**(ii)** **Professional Fees.** All applications by professionals retained pursuant to sections 327, 328 and 1103 of the Bankruptcy Code for allowance and payment of fees and reimbursement of expenses pursuant to section 330 of the Bankruptcy Code for final compensation for services rendered and reimbursement of expenses incurred in connection with this Chapter 11 Case shall be filed no later than sixty (60) days after the Effective Date. Such fee

Case 1:13-md-02419-RWZ Document 1573-2 Filed 12/04/14 Page 37 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy    Inc.)    Page 24 of 59

applications shall seek approval of all fees and expenses incurred or to be incurred by such professionals on or before the Effective Date and may include an estimate of fees and costs incurred after the Effective Date, including fees and expenses incurred in preparation and resolution of the fee application.  Notwithstanding anything to the contrary contained in this Plan, the Settlement Agreements or the Confirmation Order, the Chapter 11 Trustee's and the Official Committee's post-petition professionals shall have the right to appear and be heard on all matters related to applications for final compensation of professional persons for services rendered and reimbursement of expenses incurred on or before the Effective Date.

(iii)    **Statutory Fees.**  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid in accordance with Section 12.07 of this Plan without the need to file any request for payment.

(iv)    **Effect of Failure to Timely File Claim or Request for Payment.**  Any holders of Administrative Expense Claims who are required to file an application or request for payment of such Claims and who do not file such application or request by the applicable deadline shall be forever barred from asserting such Administrative Expense Claim against the Debtor or the Estate, or receiving any distribution on account of such Claim under this Plan.

2.03    *Priority Tax Claims.*  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable, the Post-Confirmation Officer shall pay to each holder of an Allowed Priority Tax Claim, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.

## ARTICLE III.
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

3.01    *Classification of Claims and Equity Interests.*  The classification of the Claims and Equity Interests listed below shall be for all purposes, including voting, confirmation and distribution pursuant to this Plan.

| Class | Description | Status | Entitled to Vote |
|---|---|---|---|
| Class A | Priority Non-Tax Claims | Unimpaired | Deemed to have accepted this Plan |
| Class B | Miscellaneous Secured Claims | Unimpaired | Deemed to have accepted this Plan |
| Class C | General Unsecured Claims | Impaired | Entitled to Vote |
| Class D | Tort Claims | Impaired | Entitled to Vote |
| Class E | Subordinated Claims | Impaired | Entitled to Vote |
| Class F | Equity Interests | Unimpaired | Deemed to have accepted this Plan |

19

Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Case 1:13-md-02419-RWZ Document 1573-2 Filed 12/04/14 Page 12 of 46
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy    Inc.)    Page 25 of 59

# ARTICLE IV.
## TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.01**    ***Class A - Priority Non-Tax Claims.***    Allowed Priority Non-Tax Claims in Class A are Unimpaired.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment of such Claim, on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Claim shall receive, in complete settlement, satisfaction and discharge of its Class A Claim, an amount in Cash equal to the Allowed amount of such Priority Non-Tax Claim.

**4.02**    ***Class B - Miscellaneous Secured Claims.***    Allowed Miscellaneous Secured Claims in Class B are Unimpaired.  Except to the extent that a holder of an Allowed Miscellaneous Secured Claim agrees to a different treatment of such Claim, on the later of the Effective Date and the date such Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Miscellaneous Secured Claim shall receive, in complete settlement, satisfaction and discharge of its Class B Claim, at the Estate Representative's election, (i) payment in full in Cash of such holder's Allowed Miscellaneous Secured Claim, (ii) the Debtor's interest in the Collateral securing such holder's Allowed Miscellaneous Secured Claim or (iii) such other treatment rendering such holder's Allowed Miscellaneous Secured Claim Unimpaired.

**4.03**    ***Class C - General Unsecured Claims.***    Allowed General Unsecured Claims in Class C are Impaired.  On the later of the Effective Date and the date such General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed General Unsecured Claim shall receive, in complete settlement, satisfaction and discharge of its Class C Claim, its Pro Rata Share of the Class C Cash.

**4.04**    ***Class D - Tort Claims***.

**(i)**    Tort Claims in Class D are Impaired.  Each Tort Claimant shall be enjoined from pursuing any Claim against the Debtor, the Estate, the Chapter 11 Trustee and/or the Contributing Parties as set forth in Section 10.06 below, and Allowed Tort Claims shall be channeled to the Tort Trust, and each Tort Claimant shall receive, in complete settlement, satisfaction and discharge of his or her Allowed Tort Claim, a share of the beneficial interests in the Tort Trust.

**(ii)**    Except as otherwise provided herein, each Tort Claimant remains entitled to any recovery from third parties or liability insurance proceeds, to the extent any such third parties are not released by or protected under the injunction pursuant to this Plan, that may be liable on or otherwise available to satisfy such Tort Claims in whole or in part; *provided, however*, that notwithstanding anything herein or in the Tort Trust Documents to the contrary, to the extent that (a) a Tort Claimant realizes a recovery from any third party, other than in accordance with this Plan and pursuant to the Tort Trust Agreement, on account of the Tort Claimant's Tort Claim, and (b) such third party  has filed a timely proof of claim against the Estate for contribution or indemnity based in whole or in part on its actual or potential liability

obligations to such Tort Claimant, (x) such third party's payment to such Tort Claimant shall be presumed to be solely on account of that third party's own liability to such Tort Claimant, and shall not be deemed to be a payment of the Tort Claim in full within the meaning of section 509(c) of the Bankruptcy Code until so agreed by the Tort Trustee or otherwise so determined by the Bankruptcy Court, and (y) any distribution from the Tort Trust to which such Tort Claimant would otherwise be entitled shall be reserved until such time as the third party's claim is resolved.

        **(iii)**     An Entity that is liable with the Debtor on, or that has secured, an Allowed Tort Claim, and that pays such Allowed Tort Claim in full, shall, to the extent provided by Section 509 of the Bankruptcy Code, be subrogated to the rights of the holder of such Allowed Tort Claim under and for purposes of this Plan, and such subrogated Claim shall be treated as a Class D Claim in accordance with this Plan, and to the extent that the Entity's payment of the Allowed Tort Claim is not a payment in full, such Entity shall be treated in accordance with Section 509 of the Bankruptcy Code, including, but not limited to, subordination of such Entity's Claim(s) in accordance therewith.

        ***(iv)***    ***Holders of Class D Claims may be required to submit additional documentation regarding their Claim as provided by the Claims Resolution Facility Procedures and, if applicable, the Provider Claims Resolution Facility Procedures. HOLDERS OF CLASS D CLAIMS SHALL BE SUBJECT TO RELEASES AND INJUNCTIONS PRECLUDING PURSUIT OF ANY CLAIM AGAINST CERTAIN PARTIES IN ACCORDANCE WITH SECTIONS 10.05 AND 10.06 HEREOF.***

      **4.05**   ***Class E - Subordinated Claims.***  Claims in Class E are Impaired.  Subordinated Claims in Class E shall be, and hereby are, automatically subordinated by confirmation of this Plan for purposes of distribution under this Plan to other general unsecured claims, specifically, Class D Claims and Class C Claims, without the need for further order or notice.  Each holder of an Allowed Class E Claim shall be deemed to have exchanged such Claim for a Pro Rata Share of Class E Cash, if any, in full satisfaction of such Claim.  It is not anticipated that holders of Class E Claims will receive any distributions under this Plan.  ***EXCEPT AS PROVIDED PURSUANT TO SEPARATE ORDER OR AGREEMENT, CERTAIN HOLDERS OF CLASS E CLAIMS SHALL BE SUBJECT TO RELEASES AND INJUNCTIONS PRECLUDING PURSUIT OF ANY CLAIM, INCLUDING CLASS E CLAIMS, AGAINST CERTAIN PARTIES IN ACCORDANCE WITH SECTIONS 10.05 AND 10.06 HEREOF.***

      **4.06**   ***Class F - Equity Interests.***  Equity Interests are Unimpaired.  Equity Holders shall (i) retain, albeit without any rights of control over the Debtor, the Post-Effective Date Debtor, the Estate, or any of their officers or directors, including the Post-Confirmation Officer, or any other rights generally afforded to Interests, their respective Interests in the Debtor to the extent they are entitled to retain such interests under the Shareholder Settlement Agreement, but (ii) shall receive no distributions under this Plan on account of the same.

Case 1:13-md-02419-RWZ Document 1573-2 Filed 12/04/14 Page 34 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 27 of 59

## ARTICLE V.
## SETTLEMENT OF TORT CLAIMS
## AND THE NECC TORT TRUST

**5.01** *Settlement and Compromise.* To the extent any Settlement Agreements have not been previously approved by the Bankruptcy Court, the entry of the Confirmation Order shall constitute approval of such Settlement Agreements by the Bankruptcy Court and the Bankruptcy Court's finding that, as required under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, the Settlement Agreements are in the best interest of the Debtor, the Estate and all holders of Claims in the Chapter 11 Case, are fair, equitable and reasonable, and have been entered into in good faith by all parties thereto. Upon the occurrence of the conditions to effectiveness set forth in each of the Settlement Agreements, the Settlement Agreements shall be binding and enforceable against the parties to the Settlement Agreements in accordance with their terms. To the extent not previously approved by the Bankruptcy Court, copies of the Settlement Agreements (without signature pages) will be included in the Plan Supplement, and the provisions thereof are incorporated into this Plan, as if the same were fully set forth herein.

**5.02** *Exhaustion of Insurance Policies.*

**(i)** On the Effective Date, the NECC Policies shall be deemed completely exhausted and any and all of PMIC's and Maxum's obligations under the NECC Policies shall be, and are deemed to be, extinguished.

**(ii)** On the Effective Date, the Ameridose Primary Policies shall be deemed completely exhausted and any and all of PMIC's obligations under the Ameridose Policies shall be, and are deemed to be, extinguished.

**5.03** *Execution of Tort Trust Agreement.* On or before the Effective Date, the Estate Representative, on behalf of the Debtor and on behalf of the Tort Trust Beneficiaries and holders of Allowed Class E Claims, the Tort Trustee and the Resident Tort Trustee shall execute the Tort Trust Agreement, and shall perform all other necessary steps to establish the Tort Trust.

**5.04** *Purpose of Tort Trust.* The Tort Trust shall be established for the sole purpose of implementing this Plan on behalf of, and for the benefit of, Tort Trust Beneficiaries and holders of Allowed Class E Claims, and to serve as a mechanism for liquidating, converting to Cash and distributing the Tort Trust Assets for the benefit of Tort Trust Beneficiaries and holders of Allowed Class E Claims, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the Tort Trust. The Tort Trust is organized and established as a trust pursuant to which the Tort Trustee, subject to the terms and conditions contained in the Tort Trust Agreement and in this Plan, is to hold the Tort Trust Assets and dispose of the same in accordance with the Tort Trust Agreement and this Plan in accordance with Treasury Regulation section 301.7701-4(d).

**5.05** *Assets of the Tort Trust.* The Tort Trust shall consist of (i) the Initial Tort Trust Assets, which the Estate Representative shall deliver, transfer or cause to be delivered or transferred, as applicable, to the Tort Trust, (ii) the Additional Tort Trust Assets, which,

following the Confirmation Date and as soon after receipt as is reasonably practicable, the Estate Representative shall deliver or cause to be delivered to the Tort Trust, and (iii) any additional assets disbursed to the Tort Trust from the Shareholder Settlement QSF Account or the Shareholder Settlement Non-QSF Accounts.

   **5.06   _Governance of the Tort Trust._**   The Tort Trust will be administered by the Tort Trustee.   Subsequent appointments of Tort Trustee(s) shall be made in accordance with the provisions of the Tort Trust Agreement and this Plan.   Decisions with respect to all matters shall be made by the Tort Trustee, subject to the terms of the Tort Trust Agreement.   The Tort Trust Agreement shall govern the removal of any Tort Trustee and appointment of any successor Tort Trustee.   The Tort Trust Agreement specifies that the Tort Trustee shall be a resident of the United States.

   **5.07   _Role of the Tort Trustee._**   In furtherance of, and consistent with the purpose of, the Tort Trust and this Plan, the Tort Trustee shall, subject to the terms of this Plan and the Tort Trust Agreement, (i) have the power and authority to hold, manage, sell and distribute the Tort Trust Assets as set forth herein and in the Tort Trust Agreement, (ii) have the power and authority to hold, manage, sell and distribute Cash or non-Cash Tort Trust Assets obtained through the exercise of its power and authority, (iii) have the power and authority to investigate, assert, prosecute and resolve, in the names of the Debtor and/or the name of the Tort Trust, the Estate Causes of Action in its sole and absolute discretion and (iv) have the power and authority to perform such other functions as are provided in this Plan or Tort Trust Agreement.   The Tort Trustee shall be responsible for all decisions and duties with respect to the Tort Trust and the Tort Trust Assets, subject to the terms of this Plan and the Tort Trust Agreement.   Subject to the provisions of the Tort Trust Agreement, in all circumstances, the Tort Trustee shall act in furtherance of the purpose of the Tort Trust, and shall use commercially reasonable efforts to dispose of the Tort Trust Assets and to make timely distributions and not unduly prolong the duration of the Tort Trust.

   **5.08   _Investments._**   Investments of all assets, including monies, held in the Tort Trust shall be administered, subject to the limitations and provisions set forth in this Section 5.08, in view of the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs, and with the understanding that it is intended that distributions from the Tort Trust to Tort Trust Beneficiaries, which will have the effect of liquidating and terminating the Tort Trust, will commence immediately upon or soon after the Effective Date of the Plan and will be completed soon thereafter.   The Tort Trustee shall invest and reinvest the principal and income of the Tort Trust and keep the funds of the Tort Trust invested in interest-bearing accounts at an approved depository institution to be selected from the United States Trustee's List of Authorized Depositories for Bankruptcy Cases filed in Region One, dated July 26, 2013.   Each account shall be treated as a single fund without distinction between principal and income.   For purposes of this paragraph, "interest-bearing account" may include a money fund whose objectives are current income consistent with liquidity and low risk, the maintenance of a portfolio of high quality, short-term money market instruments, and maintenance of a constant $1.00 net asset value per share, to the extent the Tort Trustee determines that such fund is consistent with provisions for investment set forth in IRS Revenue Procedure 94-45 or any successor guidance issued by the IRS.   All investments shall be made so as to at all times provide sufficient liquidity to meet the anticipated cash needs of the Tort Trust

as set forth herein.  In investing, reinvesting, exchanging, selling and managing the Tort Trust accounts, the Tort Trustee shall discharge its duties with respect to said accounts solely in the interest of the accomplishment of the purposes and objectives of the Tort Trust.  Notwithstanding the foregoing, the Tort Trustee shall make continuing efforts to make timely distributions and not unduly prolong the duration of the Trust, consistent with the limitations set forth in IRS Revenue Procedure 94-45 or any applicable successor authority.

**5.09** *Fees, Costs and Expenses of the Tort Trust*.

(i)     The Tort Trust shall pay all reasonable fees, costs and expenses of the Tort Trust that are (a) incurred in connection with the administration of the Tort Trust, the protection, preservation, liquidation and distribution of Tort Trust Assets, and the costs of investigating, prosecuting, resolving and/or settling any Claims of Tort Trust Beneficiaries and holders of Allowed Class E Claims (including but not limited to Disputed Claims or any Disputed Ownership Fund under Section 5.12 of this Plan), any tax liability imposed on the Tort Trust rather than on the Disputed Claims Reserve, Disputed Ownership Fund, or the Expense Fund, if any, and any fees, costs and expense of any and all professionals retained by the Tort Trustee and persons to be compensated from the Claims Resolution Facility and the Provider Claims Resolution Facilities), (b) obligations or other liabilities incurred or assumed by the Tort Trust (including but not limited to any Reserves established by the Tort Trust) (c) reasonably necessary to meet contingent liabilities and to maintain the value of the Tort Trust Assets during liquidation, and (d) reasonably necessary to satisfy any other obligations of the Tort Trust set forth in this Plan, the Confirmation Order or the Tort Trust Documents.

(ii)     The Tort Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings, and shall be reimbursed for his or her reasonable expenses, including travel expenses, reasonably required and incurred in the performance of his or her duties, in each case subject to the terms and provisions of this Plan and the Tort Trust Documents.

(iii)     Subject to the terms and provisions of this Plan and the Tort Trust Documents, the Tort Trustee may retain and reasonably compensate counsel and other professionals on such ordinary and customary and commercially reasonable terms as the Tort Trust deems appropriate, without Bankruptcy Court approval.

(iv)     The Tort Trustee may retain such law firms or attorneys, experts, advisors, consultants, investigators, appraisers, auctioneers, corporate management services, or other persons or professional firms as the Tort Trustee determines, in his or her sole discretion, are necessary, desirable or appropriate to aid in the performance of his or her duties, without the need for further order or notice.  The Tort Trustee may pay or appropriate funds necessary to pay the professionals for services rendered and expenses incurred after the Effective Date without any need for filing fee applications under the Bankruptcy Code or approval of any court.  The Tort Trustee may retain any professional who represented the Official Committee or the Chapter 11 Trustee in the Chapter 11 Case.

**5.10** *Distribution of the Tort Trust Assets.*   The Tort Trustee shall distribute the proceeds of the Tort Trust Assets in accordance with this Plan, the Confirmation Order, the Tort

Trust Documents and the Claims Resolution Facility Procedures. In connection with such distributions, and except as provided below in this Section 5.10, the Tort Trust shall be responsible for all reimbursement and reporting obligations imposed by the Medicare Act for the repayment of any claim related conditional payments made under Medicare Part A, B, C and D ("Conditional Payment") or any state's Medicaid or Workers Compensation statute. Before disbursing any Tort Trust Assets to any Tort Trust Beneficiary, the Tort Trustee may enter into a global resolution with the Centers for Medicare and Medicaid Services ("CMS") to reimburse all Medicare Part A, B, C and D liens that are subject to repayment for Conditional Payments made pursuant to 42 USC 1395y(b) and the accompanying Medicare Part C and Part D statutes and Medicare reporting obligations pursuant to 42 USC 1395y(b)(8).

Pursuant to 42 USC 1395y(b)(8), defined Responsible Reporting Entities ("RREs") must report claims to CMS in the manner and time specified by the statute.  If a global resolution with CMS cannot be reached, the Tort Trustee is authorized to enter into a separate agreement with each RRE to report on their behalf and if a separate agreement with an RRE is not reached, the Tort Trustee shall provide all of the information required for proper reporting under 42 USC 1395y(b)(8) to the appropriate RRE(s) or their authorized agent before disbursing any funds to any Tort Trust Beneficiary. If a global resolution is not reached and the Tort Trustee does not enter into an agency agreement with the appropriate RRE(s) before disbursing any funds to any Tort Trust Beneficiary (i) the Tort Trustee will collect the Tort Trust Beneficiary's first name, last name, date of birth, gender, social security number and any other information required for proper reporting of the claim to CMS pursuant to 42 USC 1395y(b)(8) and the Medicare Mandatory Insurer Reporting User Guide; and (ii) the Tort Trustee will provide all of the information required for reporting to the RREs within five (5) days of any Final Determination (as that term is used in the Claims Resolution Facility Procedures) of any claim.

In addition, if a global resolution with CMS cannot be reached, before disbursing any funds to any Tort Trust Beneficiary, (i) the Tort Trustee shall determine, or retain an appropriately qualified firm to determine whether any Conditional Payment has been made to or on behalf of the Tort Trust Beneficiary to whom a distribution of Tort Trust Assets will be made, and if any Conditional Payment has been made to or on behalf of such a Tort Trust Beneficiary, the Tort Trustee shall, within the time period called for by the Medicare Act, (a) reimburse the Medicare Trust fund, the appropriate Medicare plan or their authorized contractor for the appropriate amount and (b) submit the required information for the Tort Trust Beneficiary to the appropriate agency of the United States government; and (ii) the Tort Trustee shall otherwise comply with any requirements (including, but not limited to, any reporting or payment requirements) of any other federal or state governmental health insurance program and any state's Medicaid or Workers Compensation statute. Prior to the Tort Trustee reimbursing any Medicare Part A, B, C and D plan requiring repayment the Tort Trustee shall provide notice of the existence of any Conditional Payment(s) and/or other lien(s) to the Tort Trust Beneficiary and, if applicable, his or her attorney. The Tort Trust Beneficiary and/or his or her attorney may elect to negotiate the amount of the alleged conditional payments within 120 days of notice from the Tort Trustee, or prior to any deadline imposed by the Medicare Part A, B, C and D for reimbursement, whichever is sooner.  If the Tort Trust Beneficiary or his or her attorney elect not to negotiate the alleged lien amounts, or the other lien(s) are not resolved within the time periods specified, with the Tort Trust Beneficiary's consent, the Tort Trustee may utilize the firm with experience in resolving liens to satisfy the Tort Trust Beneficiary's obligations represented by

Case 1:13-md-02419-RWZ Document 1573-2 Filed 12/04/14 Page 31 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 31 of 59

the Conditional Payment(s) and/or other lien(s). Upon receiving confirmation of the final Medicare Part A, B, C and D amount requiring repayment, the Tort Trustee will reimburse the appropriate Medicare Part A, B, C and D plan or their authorized contractor.  Any payments made to resolve such obligations of the Tort Trust Beneficiary, together with the fees paid to the lien resolution firm, shall be deducted from the Tort Trust Beneficiary's distribution of Tort Trust Assets prior to disbursement of the balance to the Tort Trust Beneficiary or his or her counsel.

The Trustee, the Post-Effective Date Debtor and the Post-Confirmation Officer shall have no responsibility or liability for (i) the creation, existence, operation or administration of the Tort Trust; (ii) any acts or omissions of the Tort Trustee in administering the Tort Trust; (iii) any reimbursement and reporting obligations under the Medicare Act or any state's Medicaid or Workers Compensation statute; or (iv) any payment or non-payment of Claims. The Tort Trust shall indemnify and hold harmless the Trustee, the Post-Effective Date Debtor and the Post-Confirmation Officer from any and all claims, losses, causes of action, demands, liabilities, expenses, fees, including, but not limited to, attorneys' fees, and costs of any kind arising from or relating to (i) the creation, existence, operation or administration of the Tort Trust; (ii) any acts or omissions of the Tort Trustee in administering the Tort Trust; (iii) any reimbursement or reporting obligations under the Medicare Act or any state's Medicaid or Workers Compensation statute or (iv) any payment or non-payment by the Tort Trust to any Tort Trust Beneficiary. Prior to making any Tort Trust Distribution, the Tort Trust shall retain sufficient funds to meet the fees, costs and expenses of the Tort Trust.

**5.11** ***Resolving Liens Other than Imposed by the Medicare Act and States' Medicaid and Worker Compensation Statutes.***  Before disbursing any Tort Trust Assets to a Tort Trust Beneficiary, the Tort Trustee shall ensure that other liens that the Tort Trustee has received notice of have been resolved or have been otherwise satisfied.  To that end, the Tort Trustee shall provide notice of the existence of any such lien(s) to the Tort Trust Beneficiary and, if applicable, his or her attorney, and it shall be the Tort Trust Beneficiary's (or his or her attorney's) responsibility to resolve such lien(s) against the Tort Trust Beneficiary's anticipated distribution of Tort Trust Assets within 120 days of notice from the Tort Trustee.  If the lien has not been settled or otherwise resolved within this 120-day time period, with the Tort Trust Beneficiary's consent, the Tort Trustee may retain a firm with experience in resolving liens to satisfy the Tort Trust's Beneficiary's obligations as represented by the lien(s).  Any payments made to resolve such lien(s), together with the fees paid to the lien resolution firm, shall be deducted from the Tort Trust Beneficiary's distribution of Tort Trust Assets prior to disbursement of the balance.

**5.12** ***Time of Tort Trust Distributions.***  Subject to the Claims Resolution Facility Procedures and the Provider Claims Resolution Facility Procedures, the Tort Trustee shall have the sole and absolute discretion to determine the timing of distributions of the proceeds of the Tort Trust in the most efficient and cost-effective manner possible; *provided*, *however*, that the Tort Trustee's discretion shall be exercised in a manner consistent with the express requirements of this Plan and the requirements of  taxation as a grantor trust under applicable IRS guidelines, rulings or other controlling authorities.

**5.13** ***Tax Treatment of Tort Trust***.

(i)      **Tort Trust Assets Treated as Owned by Certain Creditors.**  For all United States federal income tax purposes, all parties (including the Post-Confirmation Officer, the Estate Representative, the Tort Trustee, the Resident Tort Trustee, the Settlement Administrator(s), Tort Trust Beneficiaries and holders of Allowed Class E Claims) shall treat the transfer of the Tort Trust Assets to the Tort Trust  as (a) a transfer of the Tort Trust Assets (subject to any obligations related to those assets) directly to the Tort Trust Beneficiaries and holders of Allowed Class E Claims, followed by (b) the transfer by such Tort Trust Beneficiaries and holders of Allowed Class E Claims of such Tort Trust Assets (other than the Tort Trust Assets allocable to a Contested Claims Reserve or a Disputed Ownership Fund, each as described in Section 5.13(v) hereof) to the Tort Trust in exchange for beneficial interests in the Tort Trust.  Accordingly, the Tort Trust Beneficiaries and holders of Allowed Class E Claims shall be treated for federal income tax purposes (and, to the extent permitted, for state and local income tax purposes) as the grantors and owners of their respective shares of the Tort Trust Assets (other than the Tort Trust Assets allocable to an Expense Fund, if any, Contested Claims Reserve or a Disputed Ownership Fund as described in Section 5.13(v) hereof).

(ii)      **Exemption from Transfer Taxes.**  Pursuant to section 1146(a) of the Bankruptcy Code, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer from the Estate, the Post-Effective Date Debtor or the Post-Confirmation Officer to the Tort Trust or any other Person or any government, governmental agency or any subdivision, department or other instrumentality thereof, pursuant to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Without limiting the foregoing, any issuance, transfer or exchange of a security or any making or delivery of an instrument of transfer pursuant to this Plan shall be exempt from the imposition and payment of any and all transfer taxes (including but not limited to any and all stamp taxes or similar taxes and any interest, penalties and addition to the tax that may be required to be paid in connection with the consummation of this Plan) pursuant to sections 1146(a), 505(a), 106 and 1141 of the Bankruptcy Code.

(iii)      **Tax Reporting.**

(1)      The Tort Trustee shall serve as the "Qualified Settlement Fund Administrator" of the Shareholder Settlement QSF Account and in such capacity shall have the exclusive responsibility and obligation to file all required tax returns and to otherwise administer all funds from or deposited into a "Qualified Settlement Fund" for the benefit of Tort Trust Beneficiaries.

(2)      The Tort Trustee shall file returns for the Tort Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 5.13(iii).  The Tort Trustee shall also annually send to each record holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and shall instruct all such holders to report such items on their federal income tax returns

27

or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns.  The Tort Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Tort Trust that are required by any Governmental Unit.

(3)	Tort Trust taxable income or loss shall be allocated pro rata based on the total of Allowed and Disputed Claims of the Tort Trust Beneficiaries at the end of the taxable year.  Tort Trust taxable income or loss allocated to Disputed Claims shall be allocated to the Contested Claims Reserve or Disputed Ownership Fund (each as described in Section 5.13(v) hereof) (whichever applies), and reported to taxing authorities appropriately, as described further herein.

(4)	As soon as possible after the Effective Date, the Tort Trustee shall make a good faith valuation of the Tort Trust Assets.  Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties (including the Estate Representative, the Official Committee, the Tort Trustee, the Tort Trust Beneficiaries and holders of Allowed Class E Claims) for all state and federal income tax purposes.  The Tort Trust also shall file (or cause to be filed) any other statements, returns or disclosures relating to the Tort Trust that are required by any governmental unit.

(5)	The Tort Trustee may request an expedited determination of taxes of the Tort Trust under Section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the Tort Trust for all taxable periods through the termination of the Tort Trust.

(iv)	**Withholding of Taxes and Reporting Related to Tort Trust Operations.**  The Tort Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the Tort Trust shall be subject to any such withholding and reporting requirements.  The Tort Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with any such withholding, payment, and reporting requirements.  All amounts properly withheld from distributions to a Tort Trust Beneficiary or holder of an Allowed Class E Claim as required by applicable law and paid over to the applicable taxing authority for the account of such Claimant shall be treated as part of the distributions to such Tort Trust Beneficiary or holder of an Allowed Class E Claim.  To the extent that the operation of the Tort Trust or the liquidation of the Tort Trust Assets creates a tax liability imposed on the Tort Trust, including the Contested Claims Reserve described in Section 5.12(v) hereof, the Tort Trust shall timely pay such tax liability and any such payment shall be considered a cost and expense of the operation of the Tort Trust payable without Bankruptcy Court order.  Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder.  All Tort Trust Beneficiaries and holders of Allowed Class E Claims shall be required to provide any information necessary to effect the withholding of such taxes.

(v)	**Reporting Related to Contested Claims Reserve.**  Notwithstanding any other provision of the Tort Trust Agreement to the contrary, subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, the Tort Trustee may treat any Tort Trust Asset allocable to, or retained on account of, a "Contested Claims Reserve" as held by one or more discrete entities for federal, and state and local, income tax

28

purposes, subject to an allocable share of all expenses and obligations of the Tort Trust, on account of such contested Claims.  The Tort Trustee may, in the his sole discretion, file a tax election to treat any Contested Claims Reserve as a "Disputed Ownership Fund" within the meaning of Treasury Regulation Section 1.468B-9 for United States federal income tax purposes rather than to tax such reserve as a part of the Tort Trust.  All Tort Trust Beneficiaries, all holders of Allowed Class E Claims, and all holders of Contested Claims, shall be bound by such income tax treatment.

**(vi)      Qualified Settlement Fund Matters.**  To the maximum extent permitted by law, all Tort Trust Assets transferred to the Tort Trust from a qualified settlement fund, including without limitation any and all qualified settlement funds established under the Shareholder Escrow and Control Agreement, shall be treated for all purposes as amounts distributed to claimants for which the fund was established in accordance with Treasury Regulation Section 1.468B-4, and shall be reported as excludable from gross income to the extent permitted under section 104(a)(2) of the Tax Code.  In no event shall amounts transferred to the Tort Trust under the Shareholder Escrow and Control Agreement be treated as deemed distributions to the transferors to any qualified settlement fund established under the Shareholder Escrow and Control Agreement.

**5.14      *Resolution of the Claims of Minors In Accordance With the Tort Trust*.**

**(i)**      In connection with any Tort Claims in which the holder is a minor, the Tort Trustee shall notify the parent, guardian, guardian ad litem, adult spouse, next friend, or other representative of the minor of the proposed distribution to such minor.  Such parent, guardian, guardian ad litem, adult spouse, next friend, or other representative of the minor shall move for approval of the allocation within ninety (90) days of his or her notification by the Tort Trustee of the proposed distribution.

**(ii)**      In the event that the parent, guardian, guardian ad litem, adult spouse, next friend, or other representative of the minor does not so move for approval of the allocation within ninety (90) days of his or her notification by the Tort Trustee of the proposed distribution, the Tort Trustee shall submit the proposed distribution to the holder to the District Court for approval in accordance with Section 140C1/2 of Chapter 231 of the Massachusetts General Laws and request that the District Court hold a hearing on the petition, and the petitioner and the Tort Claim holder may attend any such hearing.  The Tort Trustee shall request the District Court to determine whether the proposed distribution is in the Tort Claim holder's best interests and, if the proposed distribution is approved, that determination shall be embodied in an order which shall have the effect of a judgment.  Upon approval of the proposed distribution to such holder of a Tort Claim, the Tort Trustee shall request the District Court to authorize payment to the counsel of the minor, if any, of fees and disbursements to be paid from the distribution and further shall order that the remainder of the distribution be distributed in a manner that will best protect the interest of the minor.

**5.15      *Access to Claims Information*.**  Upon request made to the Estate Representative on or after the Effective Date by the Tort Trustee, the Settlement Administrator(s) or the Special Master, the Estate Representative shall deliver to the Tort Trustee, the Tort Trustee, the Settlement Administrator(s) or the Special Master, as applicable, on an un-redacted basis, the

Case 1:13-md-02419-RWZ Document 1573-2 Filed 12/04/14 Page 122 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy    Inc.)    Page 35 of 59

relevant Patient Lists and all proofs of claim and supporting documentation (including the PITWD Addenda) for purposes of effectuating the Tort Trust and distributions to holders of Allowed Class D Claims or Allowed Class E Claims. The Confirmation Order shall include all findings and orders necessary to permit or facilitate such delivery and access, including with respect to the confidentiality of the Patient Lists and the PITWD Addenda, subject to any further orders of the Bankruptcy Court.

**5.16    *Distribution of Surplus*.** The Tort Trustee shall make all payments required to be paid to holders of Allowed Class D Claims or Allowed Class E Claims under this Plan, in accordance with the terms and conditions of the Tort Trust Agreement, the Claims Resolution Facility Procedures and the Provider Claims Resolution Facility Procedures. If, and only if, the Tort Trustee has made distributions to Tort Trust Beneficiaries sufficient to satisfy in full the Claims of each and every Tort Trust Beneficiary (as determined by the Tort Trustee, subject to the MDL Court's review of such determination), then the Tort Trustee shall distribute to the holders of Allowed Class E Claims their Pro Rata Share of the remaining Cash, if any, of the Tort Trust.

**5.17    *Payments to Post-Effective Date Debtor*.** The Post-Confirmation Officer may from time to time request that monies be transferred to the Post-Effective Date Debtor from the Tort Trust for use and distribution as he deems appropriate in accordance with this Plan, and the Tort Trustee shall promptly comply with any and all such request(s).

**ARTICLE VI.**
**MEANS FOR IMPLEMENTATION AND EXECUTION OF THIS PLAN**

**6.01    *Management of the Post-Effective Date Debtor*.**

(i)    **Post-Confirmation Officer.** On the Effective Date, (a) the authority, power and incumbency of the persons then acting as directors and officers of the Debtor, and that of the Chapter 11 Trustee, shall be terminated, (b) such directors, officers and the Chapter 11 Trustee shall be deemed to have been discharged pursuant to Bankruptcy Code section 350(a) and (c) Paul D. Moore, Esq. shall be appointed as the sole officer and director of NECC to serve in accordance with the certificate of incorporation and the bylaws of NECC, as such may be amended to carry out the provisions of this Plan. The Shareholders shall not have the power or ability to remove the Post-Confirmation Officer or to affect any decision thereof.

(ii)    **Compensation.** The Post-Confirmation Officer shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings without any need for filing fee applications under the Bankruptcy Code or approval of any court.

(iii)    **Indemnification.** The Post-Confirmation Officer shall have quasi-judicial immunity to the fullest extent allowed by law and shall have no liability to the Debtor or its creditors, except for willful misconduct. The Tort Trustee shall indemnify and hold harmless the Post-Confirmation Officer for any losses incurred in his or her capacity as such, except to the extent such losses were the result of the Post-Confirmation Officer's willful misconduct.

30

    **(iv)** **Successor.** In the event the Post-Confirmation Officer dies, is terminated or resigns for any reason, the Bankruptcy Court shall designate a successor on motion of any party in interest.

   **6.02** ***Duties and Powers of the Post-Confirmation Officer.*** The Post-Confirmation Officer shall have the power and authority to implement and administer this Plan, including:

    **(i)** **Claims.** The Post-Confirmation Officer may object to, compromise or settle any or all Claims (with the exception of Class D Claims) against the Debtor or the Estate.

    **(ii)** **Selling, Monetizing or Liquidating Assets.** The Post-Confirmation Officer may, but is not required to, sell, monetize or liquidate any assets, including, but not limited to, (a) the Affiliated Entities, (b) any assets transferred to the Estate Representative in accordance with the Settlement Agreements, (c) the Estate Representative's entitlement to receive such assets in accordance with the Settlement Agreements, (d) any assets the Estate Representative is entitled to sell for the benefit of the Estate in accordance with the Settlement Agreements, and (e) any rights of the Estate Representative to sell, monetize, or liquidate any assets in accordance with the Settlement Agreements.

    **(iii)** **Abandoning Assets.** The Post-Confirmation Officer may abandon or donate any assets, if he concludes in his sole discretion that they are of no benefit or inconsequential value without the need for further order or notice.

    **(iv)** **Retention of Professionals.** After the Effective Date, the Post-Confirmation Officer may retain such law firms or attorneys, experts, advisors, consultants, investigators, appraisers, auctioneers, corporate management services, or other persons or professional firms as the Post-Confirmation Officer determines, in his or her sole discretion, are necessary, desirable or appropriate to aid in the performance of his or her duties, without the need for further order or notice. The Post-Confirmation Officer may pay or appropriate funds necessary to pay the professionals for services rendered and expenses incurred after the Effective Date without any need for filing fee applications under the Bankruptcy Code or approval of any court.

    **(v)** **Books and Records.** The Post-Confirmation Officer shall maintain the Debtor's books and records, maintain accounts, make distributions and take other actions consistent with this Plan and the implementation hereof. The Post-Confirmation Officer shall have the responsibility of storing and maintaining the Debtor's books and records only until such time as he deems, in his sole discretion and subject to the *Agreed Order Granting Relief from Preservation Order to Permit Chapter 11 Trustee to Sell or Otherwise Dispose of Remaining NECC Property* [MDL Docket No. 1538], such books and records may be abandoned or destroyed, and the Post-Confirmation Officer shall have no liability to any party on account of such abandonment or destruction; *provided*, *however*, that the Post-Confirmation Officer shall neither abandon nor destroy any such books or records a Shareholder or his or her counsel reasonably requests to be maintained pursuant to the Shareholder Settlement Agreement. In addition to the materials to be provided to the Tort Trustee pursuant to Section 5.14 of this Plan, at the time such materials are provided to the Tort Trustee pursuant to Section 5.14 of this Plan, the Post-Confirmation Officer shall provide the Tort Trustee with such of the Debtor's books and

31

Case 1:13-md-02419-RWZ   Document 1572   Filed 12/04/14   Page 37 of 146
Case 12-19882   Doc 1053-1   Filed 12/03/14   Entered 12/03/14 20:20:37   Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 37 of 59

records as the Tort Trustee may reasonably request in connection with the administration of the Claims Resolution Facility and the Provider Claims Resolution Facilities, if any, and the Post-Confirmation Officer shall have no liability to any party on account of such provision. The Post-Confirmation Officer shall retain the right to access and copy any records provided to the Tort Trustee. For purposes of this section, books and records include computer generated or computer maintained books and records and computer data, as well as electronically generated or maintained books and records or data, together with books and records of the Debtor maintained by or in possession of third parties and all of the claims and rights of the Debtor in and to their books and records, wherever located.

(vi)     **Agreements.**     The Post-Confirmation Officer may enter into any agreement or execute any document which he deems to be required by or consistent with this Plan or necessary or appropriate to its implementation and perform all of obligations of the Post-Effective Date Debtor.

(vii)     **Investment Power.**     Management of all assets and investments of the Post-Effective Date Debtor's Cash shall be administered, subject to the limitations and provisions set forth herein, in view of the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs. The Post-Confirmation Officer shall invest and reinvest the Post-Effective Date Debtor's Cash and keep the Post-Effective Date Debtor's Cash invested in interest-bearing accounts at an approved depository institution to be selected from the United States Trustee's List of Authorized Depositories for Bankruptcy Cases filed in Region One, dated July 26, 2013. Each account shall be treated as a single fund without distinction between principal and income. For purposes of this paragraph, "interest-bearing account" includes a money fund whose objectives are current income consistent with liquidity and low risk, the maintenance of a portfolio of high quality, short-term money market instruments and maintenance of a constant $1.00 net asset value per share. All investments shall be made so as to at all times provide sufficient liquidity to meet the anticipated cash needs of the Post-Effective Date Debtor as set forth herein.

(viii)     **Tax Obligations.**     The Post-Confirmation Officer shall (a) endeavor to complete and file the Debtor's or the Post-Effective Date Debtor's, as applicable, federal and state tax returns, (b) request, if necessary, an expedited determination of any unpaid tax liability of the Debtor under Bankruptcy Code section 505 for all taxable periods of the Debtor ending after the Petition Date as determined under applicable tax laws and (c) represent the interest and account of the Debtor, its Estate or the Post-Effective Date Debtor, as applicable, before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit, in all respects consistently with the Shareholder Settlement Agreement and the Shareholder Escrow and Control Agreement.

(ix)     **Reporting Duties.**     The Post-Confirmation Officer shall be responsible for filing informational returns on behalf of the Debtor or the Post-Effective Date Debtor, as applicable, and any other statements, returns or disclosures relating to the Debtor or the Post-Effective Date Debtor, as applicable, that are required by any governmental unit or applicable law.

Case 1:13-cv-02419-RWZ Document 15-2 Filed 12/04/14 Page 125 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy Inc.)   Page 38 of 59

      **(x)**    **Reasonable Fees and Expenses.**  The Post-Confirmation Officer may incur and pay and satisfy any reasonable and necessary fees and expenses in connection with the performance of his duties under this Plan without the need for further order or notice.

      **6.03**   *Other Actions.*  The Post-Confirmation Officer may take all other actions not inconsistent with the provisions of this Plan which the Post-Confirmation Officer deems reasonably necessary or desirable with respect to administering this Plan.

      **6.04**   *Expense Fund.*  On or after the Confirmation Date, if he deems advisable in his sole discretion, the Estate Representative shall transfer the Expense Fund Amount to the Expense Fund Administrator.  The Expense Fund, and earnings thereon, may be used for, *inter alia*, payment of Allowed Class C Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, the post-confirmation fees and expenses, including applicable income taxes, of the Estate Representative, fees and expenses, including applicable income taxes, of the Expense Fund, and such other fees or expenses of the Debtor and the Estate as determined by the Estate Representative on or before the date he transfers the Expense Fund Amount to the Expense Fund Administrator.  The allocation and disbursement of the Expense Fund shall be made in accordance with such determination.  To the extent that a portion of the Expense Fund is not disbursed, or otherwise held in reserve to fund the costs and expenses described herein, in the sole judgment of the Expense Fund Administrator, such portion shall be transferred to the Tort Trust, and shall be subject to the terms thereof.  In no event shall any amount transferred to the Expense Fund revert to the Debtor or the Estate Representative.  The Debtor or the Estate Representative shall have no rights in the Expense Fund except as determined by the Expense Fund Administrator in accordance with this Section 6.04.  For all applicable income tax purposes, the Expense Fund Administrator shall file income tax returns for the Expense Fund as a complex trust or other tax entity as determined by the Expense Fund Administrator, and the Expense Fund shall be subject to and shall pay tax on its taxable income, if any.

      **6.05**   *Distributions Under this Plan*.

      **(i)**    **Disbursing Agent.**  All distributions under this Plan to holders of Allowed Class A, B and C Claims shall be made in accordance with the terms of this Plan by the Post-Confirmation Officer or the Expense Fund Administrator, as applicable.  Distributions to holders of Allowed Class D and E Claims shall be made by the Tort Trustee in accordance with the terms and provisions of the Plan and the Tort Trust Documents.

      **(ii)**    **Effective Date Payments.**  On the Effective Date, or as soon thereafter as reasonably practicable, the Post-Confirmation Officer shall remit, to each holder of an Allowed Class A, B or C Claim (as of the Distribution Record Date) the distribution provided for such Claim under this Plan.

      **(iii)**    **Distribution of Cash.**  At the option of the Post-Confirmation Officer or the Tort Trustee, as the case may be, any Cash payment to be made hereunder may be by check or wire transfer.

(iv)    **Currency.**  Where a Claim has been denominated in foreign currency on a proof of claim, the Allowed amount of such Claim shall be calculated in currency of the United States of America based upon the conversion rate in place as of the Petition Date and in accordance with section 502(b) of the Bankruptcy Code.

(v)    **Retention of Cash.**  In making the distributions under this Plan to holders of Allowed Claims in Class A, B or C, the Post-Confirmation Officer shall at all times, and subject to Section 6.04 hereof, and taking into account the Cash, if any, available in the Expense Fund for the purposes set forth in Section 6.04 hereof, retain sufficient Cash as he determines in his sole discretion is reasonably necessary to (a) satisfy all Allowed or Disputed Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims, (b) meet the reasonably necessary administrative expenses of the Post-Effective Date Debtor, including the fees of the Post-Confirmation Officer and (c) satisfy all Disputed Claims (except Disputed Tort Claims).

(vi)    **Distribution of Shareholder Settlement Non-QSF Monies.**  The Estate Representative shall direct the distribution of the Shareholder Settlement Non-QSF Monies, if any, as he determines appropriate in his sole discretion pursuant to this Plan, including, without limitation, for transfer to the Estate and/or for the satisfaction of Administrative Expense Claims.

(vii)    **Interim Distributions.**  The Post-Confirmation Officer may, but shall not be required to, make interim distributions on account of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and wind down costs and expenses.  For the avoidance of doubt, the Post-Confirmation Officer shall make no interim distributions to holders of Class D or E Claims, but instead all such interim distributions, if any, shall be made by the Tort Trustee in accordance with the Tort Trust Documents.

(viii)    **Final Distributions.**    As soon as reasonably practicable after the resolution of all Disputed Non-Tort Claims, the Post-Confirmation Officer shall (i) to the extent not previously paid, pay all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims and wind down costs and expenses; and (ii) to the extent the Post-Effective Date Debtor has remaining Cash after the payments made in accordance with (i) above, distribute such remaining Cash to the Tort Trust.  For the avoidance of doubt, the Post-Confirmation Officer shall make no final distributions to holders of Class D or E Claims, but instead all such final distributions, if any, shall be made in accordance with the Tort Trust Agreement and Claims Resolution Facility Procedures.

6.06    ***Disallowance of Multi-Claimant Proofs of Claim.***  In accordance with paragraph 10 of the Bar Date Order, Claims evidenced by (i) "Multi-Claimant PITWD Claims" (*i.e.*, by proofs of claim joining or on behalf of two (2) or more claimants) submitted without the prior approval of the Bankruptcy Court, or (ii) by proofs of claim purporting to be on behalf of a class of claimants shall be and are hereby disallowed to the extent not previously disallowed; *provided*, *however*, that proofs of claim joining or on behalf of two (2) claimants, one of whose sole Claim is a Class D Consortium Claim, shall not be disallowed pursuant to this Section 6.06.

6.07    ***Procedures for Treating Disputed Claims.***

Case 1:13-md-02419-RWZ Document 1573-2 Filed 12/04/14 Page 37 of 146
Case 12-19882 Doc 1053-1 Filed 12/05/13 Entered 12/05/13 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 40 of 59

    **(i)**     **Estimation of Claims.**   The Post-Confirmation Officer may at any time request that the Bankruptcy Court estimate any Claim in Class A, B or C pursuant to section 502(c) of the Bankruptcy Code.  The Tort Trustee may at any time request that the Bankruptcy Court estimate any Claim in Class D or Class E pursuant to section 502(c) of the Bankruptcy Code.  In the event that the Bankruptcy Court estimates any Disputed Claim in Classes A, B, C, D or E, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Post-Confirmation Officer or the Tort Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims in Classes A, B, C, D or E may be estimated and subsequently disallowed, reduced, compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

    **(ii)**     **Resolution of Disputed Claims.**

    (1)     To the extent that a Disputed Claim in Classes A, B, C or E is not Allowed or becomes an Allowed Claim in an amount less than the amount of the Disputed Claim set forth in the proof of claim, or as previously estimated by the Bankruptcy Court, the excess of the amount of Cash that would have been distributed to the holder of the Disputed Claim in Classes A, B, C or E if the Claim had been Allowed in full over the amount of Cash actually distributed on account of such Disputed Claim shall be available Cash.

    (2)     Holders of Disputed Claims in Classes A, B, C or E shall not be entitled to interest if such Disputed Claim becomes an Allowed Claim except to the extent such holder is entitled to interest pursuant to federal or state law.

    **6.08**    *Closing of the Chapter 11 Case.*   When all Disputed Non-Tort Claims have become Allowed Claims or have been disallowed by Final Order, the Tort Trustee and/or the Post-Confirmation Officer may, if he or she so elects in his or her sole discretion, seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

    **6.09**    *Cancellation of Existing Agreements.*  Except for purposes of evidencing a right to distributions under this Plan or otherwise provided hereunder, on the Effective Date all of the agreements and other documents, ***except for and other than the Tort Trust Documents, the Settlement Agreements and insurance policies issued to, or insurance agreements entered into by the Debtor prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct)***, evidencing the Claims or rights of any holder of a Claim against the Debtor, including any notes evidencing such Claims, shall be deemed cancelled.

    **6.10**    *Continued Corporate Existence.*  The Post-Effective Date Debtor shall continue to exist after the Effective Date, with all powers of a corporation under the laws of the Commonwealth of Massachusetts except for shareholder management.  The Post-Effective Date Debtor's certificate of incorporation and bylaws shall be deemed amended to include a provision prohibiting the issuance of non-voting equity securities, thereby satisfying the requirements of Bankruptcy Code section 1123(a)(6).  The Post-Confirmation Officer, as the sole officer and

Case 1:13-md-02419-RWZ Document 1573-2 Filed 12/04/14 Page 39 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 41 of 59

director of the Post-Effective Date Debtor, shall perform each of the actions provided for under this Plan without any requirement of further action by or consent or vote of the Shareholders. At the discretion of the Post-Confirmation Officer, the Post-Effective Date Debtor shall be authorized, only following the completion of all disbursements to holders of Allowed Claims in Classes A, B and C, other transfers and other actions required under this Plan, including without limitation, the sale, monetization or liquidation of the assets, including, but not limited to, any assets transferred to the Estate in accordance with the Settlement Agreements and any assets to which the Estate Representative is entitled to sell for the benefit of the Estate in accordance with the Settlement Agreements, or to file certificates of cancellation or dissolution. The filing of such certificates of cancellation or dissolution shall be deemed authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without express or implied limitation, any action by the Shareholders. After the Effective Date, the Shareholders shall have no power or authority with respect to the management, operation or other functions of the Post-Effective Date Debtor.

**6.11** ***Effectuating Documents and Further Transactions.*** Upon the Effective Date, the Estate Representative is authorized and directed to execute, deliver, file or record such contracts, releases and other agreements or documents and take such actions as he may deem to be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

## ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTIONS

**7.01** ***Distribution Record Date.*** (i) As of the close of business on the Distribution Record Date, the claim ledgers for each of the Classes of Claims or Equity Interests shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Equity Interests; (ii) the Debtor, the Chapter 11 Trustee, the Post-Confirmation Officer and the Tort Trustee, as the case may be, shall have no obligation to recognize any transfer of Claims or Equity Interests entered on the docket of the Bankruptcy Court on or after the Distribution Record Date; and (iii) the Debtor, the Chapter 11 Trustee, the Post-Confirmation Officer and the Tort Trustee, as the case may be, shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the claim and/or their attorneys as of the close of business on the Distribution Record Date, to the extent applicable.

**7.02** ***Delivery of Distributions and Undeliverable Distributions.*** Subject to Bankruptcy Rule 9010 and the provisions of Section 6.05 hereof, all distributions to any holder of an Allowed Claim in Class A, B or C shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor unless the Chapter 11 Trustee and/or the Post-Confirmation Officer has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim by such holder that contains an address for such holder different from the address reflected on such Schedules for such holder. In the event that any distribution to any holder of an Allowed Claim in Class A, B or C is returned as undeliverable, no further distributions to such holder shall be made unless and until the Chapter 11 Trustee and/or the Post-Confirmation Officer is notified of such holder's then-current address, at which time all missed distributions shall be made to such holder, without interest. All demands for undeliverable distributions shall be made on or before

Case 1:13-md-02419-RWZ Document 1572-2 Filed 12/04/14 Page 129 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy    Inc.)    Page 42 of 59

ninety (90) days after the date such undeliverable distribution was initially made.  Thereafter, in accordance with section 347(b) of the Bankruptcy Code, the amount represented by such undeliverable distribution shall irrevocably revert to the Debtor, and any Claim in respect of such undeliverable distribution shall be discharged and forever barred from assertion against the Debtor and its property.  **No distribution shall be made to any Claimant in Class A, B or C and the Claimant's Claim shall be disallowed without further order of the Bankruptcy Court, if such Claimant has not delivered a signed form W-9 to the Post-Confirmation Officer within sixty (60) days of the Effective Date.**

      **7.03**   *De Minimus Distributions*.  The Post-Confirmation Officer shall not be required to, but may in his sole and absolute discretion, make distributions to any holder of an Allowed Claim in Class A, B, or C of Cash in an amount less than twenty-five (25) dollars.  When distributions do not reach the $25.00 payment threshold, such payment that would have been made will be reserved for the benefit of such claimant until subsequent distribution(s), if any, exceed the threshold on a cumulative basis.

      **7.04**   *Transactions on Business Days.*  If the Effective Date or any other date on which a transaction may occur under this Plan shall occur on a day that is not a Business Day, the transactions contemplated by this Plan to occur on such day shall instead occur on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

      **7.05**   *Allocation of Plan Distribution Between Principal and Interest.*  All distributions in respect of any Allowed Claim shall be allocated first to the principal amount of such Allowed Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

      **7.06**   *Withholding and Reporting Requirements.*  The Post-Confirmation Officer shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local or foreign tax authority but only with respect to Classes A, B or C, and all distributions under this Plan to Class A, B or C shall be subject to any such withholding and reporting requirements.  The Tort Trustee shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local or foreign tax authority but only with respect to Classes D or E, and all distributions under this Plan or the Tort Trust Documents to holders of Allowed Class D or Allowed Class E Claims shall be subject to any such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution, and under no circumstances shall the Chapter 11 Trustee or the Post-Confirmation Officer have or incur any liability with respect to the satisfaction and payment of any such tax obligations, or the non-payment or failure by any such holder to satisfy any such tax obligation.

Case 1:13-md-02419-RWZ Document 1572-2 Filed 12/04/14 Page 130 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy    Inc.)    Page 43 of 59

# ARTICLE VIII.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.01** *Executory Contracts and Unexpired Leases*.  On the Effective Date, all executory contracts and unexpired leases to which the Debtor is or may be deemed a party, except for and other than the Tort Trust Documents, the Settlement Agreements (including the insurance policy rights assigned to the Debtor pursuant thereto)and insurance policies issued to, or insurance agreements entered into by, the Debtor prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct), shall be deemed rejected as of the Effective Date, without the need for any further action by the Post-Confirmation Officer except for an executory contract or unexpired lease that (i) has been assumed or rejected pursuant to Final Order of the Bankruptcy Court entered prior to the Effective Date or (ii) is the subject of a separate motion to assume or reject filed under section 365 of the Bankruptcy Code by the Debtor prior to the Effective Date.

**8.02** *Insurance Policies and Agreements*.  Except as set forth in the Settlement Agreements or the Confirmation Order, insurance policies issued to, or insurance agreements entered into by, the Debtor prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct) shall continue in effect after the Effective Date.  To the extent that such insurance policies or agreements (including, without limitation, any policies covering directors' or officers' conduct) are considered to be executory contracts, then, notwithstanding anything to the contrary herein, this Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding that each such assumption is in the best interests of the Debtor and its Estate.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to each such insurance policy or agreement.  To the extent that the Bankruptcy Court determines otherwise as to any such insurance policy or agreement, the Plan Proponents reserve the right to seek the rejection of such insurance policy or agreement or other available relief.

**8.03** *Approval of Rejection of Executory Contracts and Unexpired Leases.*  Entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected as of the Effective Date pursuant to this Plan.

**8.04** *Rejection Claims.*  In the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to this Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor, or any property to be distributed under this Plan unless a proof of claim is filed with the Bankruptcy Court and served upon the Post-Confirmation Officer on or before the date that is thirty (30) days after the Confirmation Date.

38

Case 1:13-md-02419-RWZ Document 1573-2 Filed 12/04/14 Page 131 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 44 of 59

**8.05**   ***Rejection Claims of Officers and Directors of the Debtor.***   Notwithstanding section 8.04 of this Plan, in consideration for the releases and injunctions provided in this Plan and the Settlement Agreements, (i) all contracts or agreements between the Debtor and the former and current officers or directors of the Debtor, with the exception of the Settlement Agreements, are deemed rejected as of the Effective Date, without the need for any further action by the Post-Confirmation Officer and (ii) the claims of such former and current officers or directors of the Debtor, if any, resulting from such rejection are hereby deemed waived.

### ARTICLE IX.
### EFFECTIVENESS OF THIS PLAN

**9.01**   ***Conditions to Confirmation.***   This Plan shall not be confirmed unless the Confirmation Order (i) is in a form and substance satisfactory to the Chapter 11 Trustee and the Official Committee and is otherwise consistent and in accord with the Settlement Agreements, (ii) is in a form acceptable to the Shareholders as to the matters relating to the Shareholder Settlement Agreement, and (iii) approves and implements, among other things, (a) the Settlement Agreements, to the extent any of the Settlement Agreements have not otherwise or previously been approved by the Bankruptcy Court, and (b) the releases and injunctions set forth in sections 10.05 and 10.06 of this Plan.   The foregoing conditions to confirmation of this Plan are material and non-waivable.

**9.02**   ***Date of Effective Date.***   The Effective Date shall occur on the later of: (i) the first Business Day following (14) days after the Confirmation Date, provided that a court of competent jurisdiction has not entered a stay of the Confirmation Order as of such date (in which instance, the Effective Date will not occur until such stay is dissolved); and (ii) the first Business Day on which all other conditions to the Effective Date have been satisfied or waived.

**9.03**   ***Satisfaction of Conditions.***   Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**9.04**   ***Occurrence of Effective Date.***   The Plan Proponents shall cause the Effective Date to occur as soon as is practicable.

**9.05**   ***Substantial Consummation Upon Effective Date.***   On the Effective Date, this Plan will be deemed to be substantially consummated under the applicable sections of the Bankruptcy Code.

### ARTICLE X.
### EFFECT OF CONFIRMATION

**10.01**   ***Vesting of Assets.***

**(i)**   As of the Effective Date, the property of the Estate shall vest in the Post-Effective Date Debtor or such other Entity as provided in this Plan.

**(ii)**   From and after the Effective Date, the Post-Confirmation Officer or Tort Trustee, as the case may be, may dispose of, or cause to be disposed of, the assets of the Post-

Case 1:13-md-02419-RWZ Document 1573-2 Filed 12/04/14 Page 132 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy Inc.)   Page 45 of 59

Effective Date Debtor and the Tort Trust, respectively, free of any restrictions of the Bankruptcy Code, but in accordance with the provisions, as the case may be, of this Plan and the Tort Trust Documents.

(iii)    As of the Effective Date, all assets of the Post-Effective Date Debtor and the Tort Trust shall be free and clear of all Claims, except as otherwise provided in this Plan or the Confirmation Order.

**10.02  *Binding Effect.***   Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Effective Date, the provisions of this Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and its respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under this Plan, whether or not such Claim or Equity Interest has been filed or asserted against the Debtor and whether or not such holder has accepted this Plan.

**10.03  *Exculpations and Limitation of Liability.***   As of the Effective Date, none of (i) the Chapter 11 Trustee, (ii) the Official Committee or (iii) the members, representatives, accountants, financial advisors, consultants and attorneys of the Entities described in (i) and (ii) of this paragraph shall have or incur any liability to any person for any act taken or omission in connection with or related to the Chapter 11 Case, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administrating this Plan (including soliciting acceptances or rejections thereof), (ii) the Disclosure Statement or any contract, release or other agreement or document entered into or any action taken or omitted to be taken in connection with this Plan or the Disclosure Statement, or (iii) any distributions made pursuant to this Plan, except for any acts determined by Final Order to have constituted willful misconduct, bad faith or gross negligence.

**10.04  *Preservation and Non-Waiver of Estate Defenses and Objections and Related Rights Reserved for the Debtor, its Successors in Interest, Creditors and Parties in Interest.***

(i)    **No Limitation on Defenses, Set-Off or Right to Subordination as to Claims Against the Estate.**   Nothing in this Plan (other than the provisions of sections 10.03 and 10.05 hereof) the Confirmation Order or the Settlement Agreements shall alter, enhance, waive, release or otherwise impair or preclude any of the Estate's defenses, rights to set-off and/or rights to compel subordination as to any Claim or Administrative Expense Claim of any type asserted against the Estate, as otherwise allowed by law, including the right to assert as a defense, set-off or subordination, any claim that would ordinarily or otherwise have to be asserted in or brought by a cross-claim, cross-complaint or separate action.

(ii)    **No Limitation on Right to Object to Claims or Administrative Expense Claims.**

(1)    Nothing in this Plan (other than the provisions of Sections 10.03 and 10.05 hereof) the Confirmation Order or the Settlement Agreements shall alter, enhance, waive, release or otherwise impair or preclude the right and ability of (a) the Estate Representative and all his or her successors in interest to object to any Class A, B, C or E Claim or Administrative Expense Claim, (b) the Tort Trustee and all his or her successors in interest to

object to any Class E Claim, or (c) the Official Committee or any other Creditor or party in interest to object to any Class A, B, C or E Claim or Administrative Expense Claim (collectively, the "Permitted Objections").  The Permitted Objections may include, as part of any objection to any Class A, B, C or E Claim or Administrative Expense Claim, a prayer for denial or disallowance of the Class A, B, C or E Claim or Administrative Expense Claim, reduction in amount by off-set, disgorgement of amounts previously paid and/or equitable subordination, as otherwise allowed by law, on any ground that could have been brought by way of lawsuit, adversary proceeding or contested matter but for (a) the releases contained in the Settlement Agreements, (b) the exculpation contained in section 10.03 of this Plan (c) the releases and injunctions contained in sections 10.05 and 10.06 of this Plan,  (d) the covenant not to sue contained in section 10.08 of this Plan or (e) the Confirmation Order.  In addition, the makers of the Permitted Objections may utilize whatever remedies and procedural vehicles are otherwise available under the law, including, if necessary, an adversary proceeding, provided that the makers of the Permitted Objections, consistent with the covenant not to sue contained in section 10.07 of this Plan, shall not seek any affirmative recovery or relief beyond denial, disallowance, disgorgement of amounts previously paid, reduction or subordination of the Class A, B, C or E Claim or Administrative Expense Claim at issue.  Objections to Class E Claims shall be heard and determined by the Bankruptcy Court.

(2)      Nothing in this Plan (other than the provisions of sections 10.03 and 10.05 hereof) the Confirmation Order or the Settlement Agreements shall alter, enhance, waive, release or otherwise impair or preclude the right and ability of the Chapter 11 Trustee or other Estate Representative, and all his or her successors in interest, to object to any Claim (including any Class D Claim) either for the purpose of determining the holder of such Claim's eligibility to vote on this Plan or the amount of such Claim.  For the avoidance of doubt, with respect to a Class D Claim, such objection(s), if any, shall not include a prayer for denial or disallowance of the subject Class D Claim.

10.05   *Releases.*

(i)      __Settlement Agreement Releases Supplemented; No Impact on Rights to Object__.  The following releases shall be in addition to and are intended to supplement any releases included in the Settlement Agreements as between the parties to such Settlement Agreements.  Except as expressly set forth in the Settlement Agreements, nothing in this Plan or the releases set forth herein shall affect any rights of the Chapter 11 Trustee, the Post-Confirmation Officer, any Estate Representative(s) or the Official Committee to object to the allowance, amount, priority or secured status of the claims of any party receiving a release under this Plan as provided in sections 502, 503, 506, 507, 509 or 510 of the Bankruptcy Code, including with respect to any right of setoff or recoupment.

(ii)      __*Releases by the Debtor and Estate Representative(s).*__  *Except as set forth in section 10.05(i) of this Plan, and subject in all respects to the provisions of section 10.04 of this Plan, on the Effective Date, the Debtor, the Chapter 11 Trustee, the Estate Representative(s) and the Estate shall unconditionally release, and hereby are deemed to forever unconditionally release, the Shareholder and Affiliate Released Parties, the Other Contributing Parties,  including, without limitation, GDC, the Individual GDC Insureds and Preferred Mutual, and the Tort Claimants from any and all Claims, debts, obligations,*

41

*demands, liabilities, suits, judgments, damages, rights and Estate Causes of Action, whatsoever (other than the right to enforce the obligations under this Plan, the Settlement Agreements and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, transfer event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, the Debtor's estate, the Policies, GDC, and the negotiation or funding of the Settlement Agreements.*

(iii)    **Releases in Favor of the Debtor and Estate Representative(s).**  *Subject in all respects to the provisions of section 10.04 of this Plan, on the Effective Date, each of the Debtor, the Chapter 11 Trustee, the Estate Representative(s), and the Estate shall be forever and unconditionally released from any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever by all Entities (other than the right to enforce the obligations under this Plan, the Settlement Agreements and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, any prepetition act or omission of the Debtor, the Debtor's estate, the Policies, GDC and the negotiation or funding of the Settlement Agreements.*

(iv)    **Releases by Shareholder and Affiliate Released Parties.**  *Subject in all respects to the provisions of section 10.04 of this Plan and the Shareholder Settlement Agreement, on the Effective Date, each of the Shareholder and Affiliate Released Parties shall unconditionally release, and hereby are deemed to forever unconditionally release, each of the Debtor, the Debtor's estate, the Chapter 11 Trustee, the Estate Representative(s), the Official Committee, the Official Committee members, the Tort Claimants, the Other Contributing Parties, including, without limitation, GDC, the Individual GDC Insureds, Preferred Mutual, and the foregoing persons' and entities' respective attorneys and advisors (solely in their respective capacities as such) from any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, transfer, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, the Debtor's estate, the Policies, GDC and the negotiation or funding of the Settlement Agreements; provided, however, that this release shall not apply to any Claims assigned by the Shareholder and Affiliate Released Parties to the Debtor or to the Chapter 11 Trustee pursuant to a Settlement Agreement, nor shall it apply to the right to enforce the obligations under the Plan, the Settlement Agreements,  and the contracts, instruments, releases and other agreements and documents delivered thereunder.*

42

        **(v)**     **Releases in Favor of Shareholder and Affiliate Released Parties (Other than Ameridose)**. *Subject in all respects to the provisions of section 10.04 of this Plan, on the Effective Date, the Shareholder and Affiliate Released Parties (other than Ameridose), as well as their respective attorneys and advisors (solely in their respective capacities as such), shall be forever and unconditionally released from any and all Tort Claims, Estate Causes of Action, Contributor and Affiliate Released Claims, and all other Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, transfer, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, the Debtor's estate, the Policies, GDC and the negotiation or funding of the Settlement Agreements; provided, however, that the right to enforce the obligations under the Shareholder Settlement Agreement, the Shareholder Escrow Agreement and this Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder, and the right to enforce the provisions of the Shareholder Settlement Agreement with regard to "Non-Disclosed Assets" (as defined therein), shall be expressly preserved by the Estate Representative in accordance with the terms of the Shareholder Settlement Agreement.*

        **(vi)**     **Releases by Other Contributing Parties**. *Subject in all respects to the provisions of section 10.04 of this Plan, on the Effective Date, each Other Contributing Party including, without limitation, GDC, the Individual GDC Insureds and Preferred Mutual, shall unconditionally release, and hereby are deemed to forever unconditionally release, each of the Debtor, the Debtor's estate, the Chapter 11 Trustee, the Estate Representative(s) the Official Committee, the Official Committee members, the Tort Claimants, the Shareholder and Affiliate Released Parties, each additional Other Contributing Party, and the foregoing persons' and entities' respective attorneys and advisors (solely in their respective capacities as such) from any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, the Debtor's estate, the Policies, GDC, and the negotiation or funding of the Settlement Agreements; provided, however, that this release shall not apply to any Claims assigned by the Other Contributing Parties to the Debtor pursuant to a Settlement Agreement, nor shall it apply to the right to enforce the obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder in their favor.*

        **(vii)**     **Releases in Favor of Other Contributing Parties (Other than Ameridose)**. *Subject in all respects to the provisions of section 10.04 of this Plan, on the Effective Date, each Other Contributing Party (other than Ameridose), including, without limitation, GDC, the Individual GDC Insureds and Preferred Mutual, shall be forever and*

*unconditionally released from any and all Estate Causes of Action, Tort Claims, NECC Claims, and all other Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, the Debtor's estate, the Policies, GDC and the negotiation or funding of the Settlement Agreements; provided, however, that this release shall not in any way limit the right of the Estate Representative to enforce the obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder in the Estate's favor.*

        **(viii)**   **Releases by Tort Claimants**.  *Subject in all respects to the provisions of section 10.04 of this Plan, on the Effective Date, each Tort Claimant shall unconditionally release, and hereby is deemed to forever unconditionally release each of the Debtor, the Debtor's estate, the Chapter 11 Trustee, the Estate Representative(s), the Official Committee, the Official Committee members, the Other Contributing Parties (other than Ameridose), including, without limitation, GDC, the Individual GDC Insureds and Preferred Mutual, the Shareholder and Affiliate Released Parties (other than Ameridose), all parties released under the Settlement Agreements, and the foregoing persons' and entities' respective attorneys and advisors (solely in their capacities as such) from the Tort Claims, the NECC Claims, the Contributor and Affiliate Released Claims, and any and all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or to the Debtor's products, including, without limitation, the Drugs, the Chapter 11 Case, this Plan, the Disclosure Statement, the Debtor's estate, the Policies, GDC and the negotiation of the Settlement Agreements; provided, however, that this release shall not apply to the right to enforce the obligations under the Plan, the Settlement Agreement, and the contracts, instruments, releases and other agreements and documents delivered thereunder in their favor.*

    **10.06**  *Injunctions.*

        **(i)**   **No Impact on the Rights of the Parties to the Settlement Agreements**. Nothing in this section 10.06 or otherwise in this Plan or the Confirmation Order, shall affect, release or otherwise limit the rights and duties of the parties to the Settlement Agreements to enforce or comply with the provisions of the Settlement Agreements.  The rights and duties of the parties under the Settlement Agreements are set forth in and shall be governed by the Settlement Agreements.

        **(ii)**   **Injunction in Favor of the Debtor and Estate Representative(s)**. **Except as to the rights and claims created or expressly preserved by this Plan, the**

Case 1:19-md-02419-RWZ   Document 1573   Filed 12/04/14   Page 37 of 46
Case 12-19882   Doc 1053-1   Filed 12/03/14   Entered 12/03/14 20:20:37   Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 50 of 59

Settlement Agreements the Shareholder Escrow Agreement, and the Confirmation Order, upon the Effective Date, the Debtor, the Chapter 11 Trustee, and the Estate Representative(s) shall have and be entitled to an injunction forever barring and enjoining all Persons and/or Entities from asserting against the Debtor any past, present and future rights, interests, obligations, claims, causes of action, damages (including punitive damages), demands (including demands for contribution, indemnity or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees and other professional fees) and costs of any kind or any type whatsoever, whether known or unknown, whether foreseen or unforeseen, whether direct or indirect, contingent or actual, whether liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, event or circumstance from the beginning of the world to the Effective Date, in any way relating to or in connection with (i) the Debtor, the Drugs or any and all products of and/or distributed by the Debtor, or (ii) the Debtor's estate, the Chapter 11 Case, this Plan, the Disclosure Statement, the Settlement Agreements and/or the Policies, except with regard to any claims and rights expressly reserved pursuant to Section 10.05 above.

(iii)     **Injunction in Favor of Shareholder and Affiliate Released Parties**. Upon the Effective Date, all Persons or Entities shall be permanently barred, enjoined, and restrained from commencing, prosecuting, continuing or asserting, either derivatively or on behalf of themselves, in any court, arbitration proceeding, administrative agency, or other forum in the United States of America or elsewhere, any and all Claims released pursuant to Section 10.05 above or under the Shareholder Settlement Agreement, whether the Person or Entity had actual or constructive notice of the terms of the Shareholder Settlement Agreement, Plan or Confirmation Order or otherwise, *except that* this injunction shall not apply to the right of the acting Estate Representative to enforce the Substitute Lien and the obligations and the acting Estate Representative's rights under the Shareholder Settlement Agreement, the Escrow Agreement, the Plan, and the Confirmation Order.

(iv)     **Injunction in Favor of the Other Contributing Parties**.  Except as to the rights and claims created or expressly preserved by this Plan, the Settlement Agreements, the Escrow Agreement and the Confirmation Order, upon the Effective Date, the Other Contributing Parties, including, without limitation, GDC, the Individual GDC Insureds and Preferred Mutual, shall have and be entitled to an injunction forever barring and enjoining all Persons and/or Entities from asserting against the Other Contributing Parties any past, present and future rights, interests, obligations, claims, causes of action, damages (including punitive damages), demands (including demands for contribution, indemnity or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees and other professional fees) and costs of any kind or any type whatsoever, whether known or unknown, whether foreseen or unforeseen, whether contingent or actual, whether direct or indirect, liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or

45

Case 1:13-md-02419-RWZ Document 1573-2 Filed 12/04/14 Page 139 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 51 of 59

equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, event or circumstance from the beginning of the world to the Effective Date, in any way relating to or in connection with (i) the Debtor, the Drugs or any and all products of and/or distributed by the Debtor, or (ii) the Debtor's estate, the Chapter 11 Case, the Plan, the Disclosure Statement, the Settlement Agreements and/or the Policies.

**10.07  *Covenant Not to Sue.*** Except as set forth in sections 10.04 and 10.05 of this Plan and except as to the rights and claims created or expressly preserved by this Plan, neither the Chapter 11 Trustee, the Estate Representative, the Debtor, the Tort Trustee nor any successor in interest will commence or prosecute any lawsuit, adversary proceeding or contested matter that includes a prayer for damages or for equitable relief against the Settling National Insurers or the Shareholders or Affiliate Released Parties relating to, concerning or arising from the (i) the Debtor, the Drugs or any and all products of and/or distributed by the Debtor, or (ii) the Debtor's estate, the Chapter 11 Case, this Plan, the Disclosure Statement, the Settlement Agreements and/or the Policies.

**10.08  *Covenant Not to Sue (Shareholder and Affiliate Released Parties).*** Each of Shareholder and Affiliate Released Parties covenants and agrees not to commence or continue against the Estate Parties any action or proceeding of any nature whatsoever with respect to claims released by the Shareholder and Affiliate Released Parties in section 10.05 above and in the Settlement Agreements, and the Estate Parties covenant and agree not to commence or continue against the Shareholder and Affiliate Released Parties, any action or proceeding of any nature whatsoever with respect to Contributor and Affiliate Released Claims.

**10.09  *Terms of Pre-Plan Injunction and Stays.*** Unless otherwise provided in this Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise under applicable law, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

## ARTICLE XI.
## RETENTION OF JURISDICTION

**11.01  *Jurisdiction of Bankruptcy Court.*** Except as otherwise explicitly set forth in this Plan or the Tort Trust Documents as to those matters which are to be considered and determined by the District Court pursuant to an order withdrawing the reference as to those matters, the Bankruptcy Court shall retain original and exclusive jurisdiction of matters arising under, arising out of or related to the Chapter 11 Case and this Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for all matters, to the maximum extent permitted by law, including for, among other things, the following purposes:

      **(i)** To determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date, including, without limitation, any proceeding relating to an Estate Cause of Action;

Case 1:13-cv-02419-RWZ Document 15-2 Filed 12/05/14 Page 139 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 52 of 59

    **(ii)** To consider Disputed Claims, including objections, allowance, classification, priority, compromise, estimation or payment of any Claim, including Class E Claims;

    **(iii)** To hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for allowance and payment of Administrative Expense Claims, including awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

    **(iv)** To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

    **(v)** To issue injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of this Plan, the Settlement Agreements, the Confirmation Order or any other order of the Bankruptcy Court;

    **(vi)** To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

    **(vii)** To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments contemplated by any of the foregoing, or any agreement or other document governing or relating to any of the foregoing;

    **(viii)** To take any action and issue such orders as may be necessary to construe, enforce, implement, execute and consummate this Plan or to maintain the integrity of this Plan following consummation;

    **(ix)** To recover all assets of the Debtor and property of the Estate, wherever located;

    **(x)** To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

    **(xi)** To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, matters with respect to any taxes payable by a trust established in furtherance of this Plan, including the Tort Trust);

    **(xii)** To hear and determine any motions intended to directly or indirectly transfer venue of all or any part of the Chapter 11 Case;

    **(xiii)** To hear and determine any other matters related to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Support Funding Agreement, the Estate

Case 1:13-cv-02419-RWZ Document 57-2 Filed 12/04/14 Page 49 of 146
Case 12-19882 Doc 1053-1 Filed 12/05/14 Entered 12/05/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 53 of 59

Causes of Action, the Tort Trust Documents and related documents and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and

(xiv)   To enter a final decree closing the Chapter 11 Case.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

**12.01**   *Reporting of Shareholder Settlement Payments*.   Pursuant to Section 10.3(a) of the Shareholder Settlement Agreement, to the fullest extent permitted by law, all Shareholder Settlement Payments shall be characterized and reported for all tax purposes as contributions of capital by the Shareholders in accordance with their respective ownership positions in NECC, and the acting Estate Representative shall timely prepare true and accurate Schedule K-1s containing all information as required by the Tax Code and the IRS to enable the Contributors to apply for and collect tax refunds in accordance with the Shareholder Settlement Agreement.

**12.02**   *Tax Information to be Provided to Shareholders*.   Pursuant to Section 10.3(b) of the Shareholder Settlement Agreement, the Estate Representative shall provide full and accurate copies of any and all income tax returns, as supplemented or amended, filed on behalf of the Debtor to each Shareholder within fourteen (14) days of filing thereof, as well as any additional related information required by the Shareholders to accurately prepare or amend their personal tax returns and receive "Net Tax Refunds" (as defined in the Shareholder Settlement Agreement), with such returns and related information to be maintained as confidential and subject to the provisions of the Protocol Order.

**12.03**   *Refunds*.   Pursuant to Section 10.3(d) of the Shareholder Settlement Agreement, all procedural or computational decisions and judgments related to the "Refund Claims," the "Refunds" and "Net Tax Refunds" (as such terms are defined in the Shareholder Settlement Agreement) shall be made so as to (i) maximize the amount of the Refund Claims, the Refunds and the Net Tax Refunds consistent with applicable laws, including, without limitation, the 10-year loss carryback provisions for product liability matters and (ii) accelerate the timing of the filing of the Refund Claims and the receipt of the Refunds and the Net Tax Refunds to the extent reasonably possible and in compliance with applicable laws.

**12.04**   *Withdrawal of the Reference*.   The rights of the Plan Proponents to move, pursuant to 28 U.S.C § 157(d), Bankruptcy Rule 5011, and Local Rule 5011-1, for a withdrawal of the reference to the Bankruptcy Court of those matters under this Plan or the Tort Trust Documents which are to be considered and determined by the District Court, shall be and hereby are expressly preserved, and such motion may be made at any time subsequent to the filing of this Plan.

**12.05**   *Dissolution of the Official Committee.*   The Official Committee shall dissolve on the Effective Date; *provided*, *however*, that (i) the Official Committee shall continue to exist after the Effective Date for the purposes of opposing any pending appeals of the Confirmation Order and taking any actions related thereto, and the Official Committee's professionals may seek compensation for and reimbursement of expenses related to such opposition and actions, if any, from the Post-Effective Date Debtor, and (ii) after dissolution of the Official Committee, the

Case 1:13-cv-02419-RWZ Document 15-2 Filed 12/03/14 Page 47 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy   Inc.)   Page 54 of 59

Official Committee's professionals shall retain their rights to pursue, review and object to any applications for compensation and reimbursement of expenses filed in accordance with Section 2.01 and 2.02 of this Plan.

      **12.06** *Quasi-Judicial Immunity*. The Confirmation Order shall provide that the Post-Confirmation Officer, the Estate Representative, the Tort Trustee, the Settlement Administrator(s) and the Special Master are entitled to quasi-judicial immunity to the fullest extent allowed by law in connection with their implementation of the Confirmation Order, this Plan, the Tort Trust Agreement, the Claims Resolution Facility and the Provider Claims Resolution Facilities.

      **12.07** *Payment of Statutory Fees.* On the Effective Date, and thereafter as may be required, the Tort Trustee shall pay all fees payable pursuant to 28 U.S.C. § 1930, including all quarterly fees pursuant to 28 U.S.C. § 1930 that become due after the Effective Date.

      **12.08** *Effectuating Documents and Further Transactions.* The Chapter 11 Trustee, up to the Effective Date, and the Post-Confirmation Officer, subsequent to the Effective Date, are authorized to execute, deliver, file or record such contracts, releases and other agreements or documents and take such actions as the Chapter 11 Trustee or the Post-Confirmation Officer, as the case may be, deem to be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

      **12.09** *Exemption from Transfer Taxes.* Pursuant to section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of or in connection with this Plan, including any bills of sale, or assignments executed in connection with any disposition of assets contemplated by this Plan (including transfers of assets to and by the Tort Trust) shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

      **12.10** *Elimination of Vacant Classes.* Any Class that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 or as to which no vote is cast shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

      **12.11** *Nonconsensual Confirmation.* In the event any Impaired Class of Claims does not accept this Plan in accordance with section 1126 of the Bankruptcy Code, the Plan Proponents shall request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code. Subject to section 1127 of the Bankruptcy Code, the Plan Proponents reserve the right to modify this Plan to the extent that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

      **12.12** *Modification of Plan.* The Plan may be amended, modified or supplemented by this Plan Proponents in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. Prior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and modifications to this

Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.  In addition, after the Effective Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under this Plan, the Post-Confirmation Officer may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order.  Notwithstanding the foregoing, without the prior express consent of the Contributing Parties, this Plan may not be amended pursuant to this paragraph if after such amendment, this Plan would not include the releases and injunctions in favor of the Contributing Parties.

**12.13** *Revocation or Withdrawal of Plan.*  The Plan Proponents, upon their unanimous consent and agreement, reserve the right to revoke or withdraw this Plan at any time prior to the Confirmation Date.  If the Plan Proponents take such action, this Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any other person in any further proceedings involving the Debtor.

**12.14** *Severability.*  If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Plan Proponents, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation, except to the extent that such holding, alteration or interpretation, invalidates a condition to effectiveness of this Plan, including the releases and injunctions provided for in Sections 10.04 and 10.05.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms, and upon the Effective Date all such provisions are accordingly non-severable.

**12.15** *Schedules and Exhibits.*  The schedules and exhibits to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

**12.16** *Successors and Assigns.*  All the rights, benefits and obligations of any person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person.

Case 1:13-cv-02419-RWZ Document 15-2 Filed 12/04/14 Page 143 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy Inc.) Page 56 of 59

**12.17** *Notices*.  Any notice required or permitted to be provided to the Chapter 11 Trustee or the Official Committee under this Plan to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in this Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

if to the Chapter 11 Trustee, to:

DUANE MORRIS LLP
100 High Street, Suite 2400
Boston, MA 02110
Attn:         Paul D. Moore, Esq.
Telephone:    (857) 488-4200
Facsimile:    (857) 401-3057
Email:        pdmoore@duanemorris.com

if to the Official Committee, to:

BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
Attn:         William R. Baldiga, Esq.
              Kiersten A. Taylor, Esq.
Telephone:    (617) 856-8200
Facsimile:    (617) 856-8201
Email:        wbaldiga@brownrudnick.com
              ktaylor@brownrudnick.com
-and-

BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Attn:         David J. Molton, Esq.
Telephone:    (212) 209-4800
Facsimile:    (215) 209-4801
Email:        dmolton@brownrudnick.com

**12.18** *No Admission.*  Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed as an admission by the Plan Proponents with respect to any matter set forth herein including, without limitation, liability on any Claim or the propriety of any Claim classification.

### ARTICLE XIII.
### CONFIRMATION REQUEST

**13.01**  The Plan Proponents request confirmation of this Plan under section 1129(b) of the Bankruptcy Code.

Case 1:13-cd-02419-RWZ-1 Document 1573-2 Filed 12/04/14 Page 144 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy Inc.) Page 57 of 59

**Schedule 1.06**

**Affiliated Entities**

1. 203 Flanders Road, LLC

2. 205 Flanders Road, LLC

3. Alaunus Pharmaceutical, LLC

4. Ameridose, LLC

5. Cadden Family-2012, LLC

6. Cardo Properties, LLC

7. Conigliaro Block, Inc.

8. Conigliaro Family Investments, LLC

9. Conigliaro Industries, Inc.

10. GDC Holdings, Inc.

11. GDC Properties Management, LLC

12. Hunter Holdings, LLC

13. L & S Creations, Inc.

14. Medical Sales Management, Inc.

15. Medical Sales Management, SW, Inc.

16. Nationwide Foam, Inc.

17. Nationwide Recycling Sales Management, Inc.

18. Physicians Choice Medical Marketing, LLC

19. Stone House Realty Group, LLC

Case 1:13-md-02419-RWZ Document 1573-2 Filed 12/04/14 Page 145 of 146
Case 12-19882 Doc 1053-1 Filed 12/03/14 Entered 12/03/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy Inc.) Page 58 of 59

## Schedule 1.103

## National Contributing Parties[1]

1. Ameridose, as defined in Section 1.08 of the Plan

2. GDC, as defined in Section 1.66 of the Plan

3. The Individual GDC Insureds, as defined in Section 1.77 of the Plan

4. Maxum, as defined in Section 1.95 of the Plan

5. Netherlands Insurance, as defined in Section 1.111 of the Plan

6. Peerless Insurance, as defined in Section 1.118 of the Plan

7. PMIC, as defined in Section 1.131 of the Plan

8. Preferred Mutual, as defined in Section 1.136 of the Plan

9. Victory, as defined in Section 1.184 of the Plan

---

[1] Each National Contributing Party is a National Contributing Party solely in the capacity indicated in the Plan.

Case 1:13-md-02419-RWZ Document 1573-2 Filed 12/04/14 Page 46 of 146
Case 12-19882 Doc 1053-1 Filed 12/05/14 Entered 12/05/14 20:20:37 Desc
Exhibit A (Joint Chapter 11 Plan of New England Compounding Pharmacy    Inc.)    Page 59 of 59

## Schedule 1.144

## Provider Contributing Parties[2]

1. High Point, as defined in Section 1.72 of the Plan

2. Inspira, as defined in Section 1.81 of the Plan

3. Ironshore, as defined in Section 1.86 of the Plan

4. Ironshore Specialty Insurance, as defined in Section 1.88 of the Plan.

5. Juno Assurance, as defined in Section 1.89 of the Plan

6. Lexington Insurance, as defined in Section 1.92 of the Plan

61143946

---

[2]    Each Provider Contributing Party is a Provider Contributing Party solely in the capacity indicated in the Plan.