```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS



                                         )
                                         )
  IN RE:  NEW ENGLAND COMPOUNDING        )  MDL NO. 13-02419-RWZ
  PHARMACY CASES LITIGATION              )
                                         )
                                         )
                                         )
                                         )


  BEFORE:  MAGISTRATE JUDGE JENNIFER C. BOAL



                         MOTION HEARING




        John Joseph Moakley United States Courthouse
                       Courtroom No. 11
                      One Courthouse Way
                       Boston, MA 02210


                       December 4, 2014
                         11:42 a.m.
```

Valerie A. O'Hara, FCRR, RPR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

```
 1   APPEARANCES:

 2   For The Plaintiffs:

 3        Hagens, Berman, Sobol, Shapiro LLP, by
     EDWARD NOTARGIACOMO, ESQ., 55 Cambridge Parkway, Suite 301,
 4   Cambridge, Massachusetts  02142;

 5        Lieff, Cabraser, Heimann & Bernstein, LLP, by
     MARK P. CHALOS, ESQ., 150 Fourth Ave North,
 6   Suite 1650, Nashville, Tennessee 37219;

 7        Lieff, Cabraser, Heimann & Bernstein, LLP, by
     ANNIKA K. MARTIN, ESQ., 250 Hudson Street, New York,
 8   New York  10013-1413;

 9   For the St. Thomas Entities:

10        Fulbright & Jaworski LLP, by YVONNE K. PUIG, ATTORNEY, and
     ERIC J. HOFFMAN, ESQ., 98 San Jacinto Boulevard, Suite 1100,
11   Austin, Texas  78701-4255;

12        Nutter, McClennen & Fish LLP, by SARAH P. KELLY, ATTORNEY,
     Seaport West, 155 Seaport Boulevard, Boston, Massachusettts
13   02210-2604.

14   VIA TELEPHONE:

15   For Insight Health Corp.:

16        McGuireWoods, LLP, by CHRISTOPHER E. TRIBLE, ESQ.,
     One James Center, 901 Easy Cary Street,
17   Richmond, Virginia  23219.

18

19

20

21

22

23

24

25
```

```
 1                        PROCEEDINGS
 2           THE CLERK:  All rise.  Today is December 4, 2014.  On
 3   the record in in re:  New England Compounding Incorporated
 4   Products Liability Litigation, Case Number 13-MD-02419.  Will
 5   counsel please identify themselves for the record.
 6           MR. NOTARGIACOMO:  Good afternoon, your Honor,
 7   Ed Notargiacomo from Hagens, Berman, Sobol, Shapiro for the
 8   plaintiffs' steering committee.
 9           MS. PUIG:  Yvonne Puig, your Honor, on behalf of the
10   St. Thomas Entities along with co-counsel Sarah Kelly from the
11   Nutter firm and Eric Hoffman from my firm, Norton Rose
12   Fulbright.
13           MR. CHALOS:  Mark Chalos on behalf of the plaintiffs'
14   steering committee.
15           MS. ANNIKA MARTIN:  Good morning, Annika Martin on
16   behalf of the plaintiffs' steering committee.
17           THE COURT:  We're here just to hear the motion to
18   compel insurance agreement, so I'll hear from the plaintiff
19   first.
20           MR. CHALOS:  Thank you, your Honor, Mark Chalos on
21   behalf of the plaintiffs' steering committee.  Right, we are
22   here on this motion, your Honor.  I'm not sure really why we're
23   even disputing this, but we are, so that's where we find
24   ourselves.  The Rule 26 mandatory initial disclosures are clear
25   that a party has an obligation to produce to the other side any
```

1     insurance agreement under which an insurance business may be

2     liable to satisfy all or part of a possible judgment in the

3     action or to indemnify or to reimburse for payments made to

4     satisfy a judgment.  That's Rule 26(a)(1)(a)(4).

5          The advisory committee notes to that rule make it

6     clear that the purpose of this disclosure is to enable counsel

7     for both sides to make the same realistic appraisal of the case

8     so that settlement and litigation strategy are based on

9     knowledge and not speculation.

11:44AM 10          In an MDL, that's particularly important.  It's

11     particularly important that all parties have information, full

12     information, about the relevant insurance agreements.  We have

13     to craft a strategy that affects not just one or two cases but

14     in the case of the St. Thomas Entities 100 or so cases.

15          They have produced a certificate with -- it's in the

16     filings, it's Document 1470-3, and they call it a certificate

17     of coverage, and it lists some of the defendants here as being

18     covered.  It's, you know, appears like an insurance

19     declarations page, and they've said, well, we're not going to

11:45AM 20     produce the underlying policies, we're not going to produce the

21     underlying agreements that are reflected in the certificate of

22     coverage, and they're saying this is not insurance, this is a

23     trust.

24          Entities pay money periodically into this trust.  It

25     spreads risk over a number of entities.  If there is a

|       |                                                                      |
|-------|----------------------------------------------------------------------|
| 1     | triggering event giving liability to one of the members of this      |
| 2     | trust, then the trust pays for their indemnity, it pays the          |
| 3     | indemnity, it pays for their liability.  They're calling that        |
| 4     | something other than insurance, but if you look at the facts         |
| 5     | and you look at this for one starting with the certificate of        |
| 6     | coverage, it says, again, this is 1470-3, toward the bottom, it      |
| 7     | says, "Except where otherwise required by law, all insureds          |
| 8     | share the same limits of liability."                                 |
| 9     | It's clearly contemplating this as being insurance.          |
| 11:46AM 10 | If you look at the declaration that these entities filed, and  |
| 11    | this is Document 1494-1, it's a declaration of a person named        |
| 12    | Janet Roth.  She identifies herself as an insurance consultant,      |
| 13    | and then she goes on to describe this agreement, and she says       |
| 14    | this is a program where members -- and the members include the      |
| 15    | defendants here, the ones who are refusing to produce these         |
| 16    | documents -- they fund the trust.                                   |
| 17    | In other words, they pay premiums.  A premium is            |
| 18    | defined in *Webster's* as just money paid for the insurance.         |
| 19    | They pay the expenses of this trust, and when there's a claim,      |
| 11:46AM 20 | the trust pays for the claim.                                   |
| 21    | They also go on to use some definitions of insurance        |
| 22    | in their filings, and it's clear that even under their              |
| 23    | definitions, they are talking about a policy of insurance here.     |
| 24    | Other entities also pay into this risk-sharing arrangement.         |
| 25    | I want to find, your Honor, very quickly the                |

1   definition that they use.  They refer to the Keeton treatise,
2   and they say, they define insurance thusly in that document and
3   they cited to the Court, "Insurance is an arrangement for the
4   transfer and distribution of risk," period.
5           That's what's happening here.  These entities are
6   transferring the risk from themselves to this trust that's
7   administered by this insurance group, as we see from the
8   declaration, from the insurance consultant, and the risk is
9   distributed among a number of entities, and it's clear from the
10  face of that certificate of insurance that there are a number
11  of entities that are implicated here.
12          They have cited as a legal basis.  Now, we've cited in
13  our brief a number of cases, I think several, I think, five,
14  six, eight, ten, something like that, that support our
15  position, which is an agreement among a number of entities to
16  spread and share risk for which the covered entity pays money
17  and receives back insurance, that that's disclosable under this
18  provision for the policy reasons stated in the advisory
19  committee notes.  They've cited two cases.
20          THE COURT:  When you mention the advisory committee
21  notes --
22          MR. CHALOS:  Yes, your Honor.
23          THE COURT:  -- what you've omitted is the advisory
24  committee note from 1970 that says, and I quote, "The rule does
25  not cover the business concern that creates a reserve fund for

1   purposes of self-insurance."

2            MR. CHALOS:  Right, and I was getting there, your

3   Honor.  I wasn't intending to omit that.  I can address that.

4   It's clear from that provision and also from some other cases,

5   including the case that they've cited, that a self-insured

6   fund, disclosure of a self-insured fund is another way of

7   finding out the financial condition of an entity, so if you

8   have an entity and they say we put $100 million aside in a bank

9   account, that's our self-insurance, that's what we use to pay

11:49AM 10   claims against us.

11           Disclosure of that and any documents related to that

12   is essentially disclosure of their financial condition, or at

13   least partly disclosure of their financial condition, and I

14   think the advisory committee note makes it clear that this is

15   not intended as a back door to discover something you couldn't

16   otherwise get, which is how much money do they have in the

17   bank, and here this isn't a self-insurance.

18           This isn't them putting it into a bank account, this

19   is these entities and other entities, and I think that's an

11:49AM 20   important part of this, pay money into this other entity and

21   saying should there be a claim made up to a certain amount of

22   money, you have to pay it on our behalf.  That's insurance,

23   period.  This isn't self-insurance, self-insurance is this

24   entity putting money in a bank and only this entity.  Once you

25   commingle that with other entities, it loses its character of

1  self-insurance and becomes insurance because there's yourself,
2  but there are also others, and that's a mutual, that's an
3  insurance, period.
4          So they've cited two cases.  They've cited a Michigan
5  case, it's a state case, state court case interpreting
6  Michigan's rule.  The language of the Michigan rule is similar.
7  Some of the operative words are the same, although it's in a
8  different context.  That's not a mandatory disclosure, that's
9  within the context of defining discoverable documents.  The
11:50AM 10  Michigan court interpreted that Michigan State Court procedural
11  rule in a way that supports their position.  It doesn't support
12  our position.  We think it's distinguishable.  It's a Michigan
13  state court defining and interpreting a Michigan state rule,
14  and we think it's not binding on this Court and it's
15  distinguishable.
16          They only cited one other case.  It's the *Resolution*
17  *Trust* case which arose from an administrative action.
18  Resolution Trust was attempting to find out how much money a
19  potential defendant had, and they sought a variety of
11:51AM 20  documents.  At some point the other entity said, you know,
21  you're asking for too much.  Pursuant to the administrative
22  procedures, they filed a District Court action, and the
23  District Court stopped this information-gathering by the
24  Resolution Trust against essentially a nonparty at that point,
25  the accounting firm.

                 1          We think it's distinguishable.  It's not in the
                 2   context of a litigation like this one, and it certainly arises
                 3   in a very different context.  It was in pre-suit discovery to
                 4   try to find out how much money they had or how much money was
                 5   available.  Here, it's a very different situation, so why do we
                 6   need these documents?  Why will they advance this litigation?
                 7          The advisory committee makes it clear that this kind
                 8   of information is what ought to be disclosed in order to help
                 9   cases get settled, help parties evaluate available funds for
    11:52AM     10   settlement.  Part of what we're doing here in this MDL is
                11   seeking a resolution.  There's never going to be enough money
                12   to compensate all these families who have lost loved ones.
                13   There's never going to be enough money to compensate lives
                14   irrevocably changed because of the actions of some entities,
                15   but we all are working toward a resolution.
                16          You saw, I think, I'm sure that you saw the bankruptcy
                17   plan that was filed last night.  That's a comprehensive
                18   settlement involving a number of entities.  The entities here
                19   have chosen not to resolve their cases yet, but without this
    11:52AM     20   information, it makes it much more difficult for us and for the
                21   families to evaluate the circumstances of the insurance
                22   available to settle these cases if we ever get to that point or
                23   it may be that they pay a judgment at some point, but we need
                24   to know that.  That will advance significantly, I think, this
                25   entire litigation.

1              If your Honor looks at the certificate of coverage, it
2       says -- this is again Document 1470-3, it makes it clear that
3       the coverage is "subject to all the terms, exclusions and
4       conditions of such coverage."  And that's clear they're talking
5       about another document there, they're talking about the terms
6       of the agreement.
7              There are going to be excluded events, there are going
8       to be, I'm sure, questions at some point about whether, you
9       know, for example, products liability claims are covered, who's
10      exactly covered for what conduct, we don't know yet, there's an
11      agency claim here.  We need to see those documents, understand
12      that.
13             Another example, it says their limits are $10 million
14      for each medical incident.  We don't know if medical incident
15      is a defined term in the contracts.  It may be, it may not be,
16      we may have to look to other sources.  They know it, we don't
17      know, and we don't know if we're talking about $10 million
18      total.  It says that there's unlimited aggregate, so maybe that
19      10 million is all there is.  It may be that each medical
20      incident is defined a different way, and there's significantly
21      more insurance coverage available, so these are the questions
22      that we need answered that will significantly help us evaluate
23      it, and that's our obligation as members of the plaintiffs'
24      steering committee.
25             On the flip side, what's the harm?  If they produce

1    this document to us, it's either going to be admissible or not.
2    You know, the law will determine that, but to just tell us this
3    information, produce the documents, you know, there are
4    protective orders in this case.  There are other ways to
5    protect if they are concerned about competitively sensitive
6    information, but otherwise there's no harm.  They're giving us
7    an agreement, and it tells us how much insurance is available
8    and under what conditions it's available, and that's it.
9              There's no harm to them in any way for turning that
11:55AM 10   over, particularly in light of the protections the Court has
11   put in place, so we think that they ought to produce it,
12   they're required under the mandatory initial disclosures, it's
13   certainly relevant, and it certainly will advance this
14   litigation, so we ask your Honor to grant our motion.  Thank
15   you.
16             THE COURT:  All right.  Are you no longer pressing the
17   argument that I already made this decision?
18             MR. CHALOS:  Already made the decision --
19             THE COURT:  Your papers in part said that I, in the
11:55AM 20   order about subpoenas, had already ruled on this issue?
21             MR. CHALOS:  Right, we are persisting in that
22   argument.
23             THE COURT:  Because I don't think I did.
24             MR. CHALOS:  I don't know that's a particularly good
25   argument, but we're persisting in it.

1           THE COURT:  You're not withdrawing it at this point?

2           MR. CHALOS:  We're not withdrawing it, it's in our

3   papers, we'll stand on that, but the mandatory initial

4   disclosure provision controls, and I think the language in the

5   subpoena really mirrored that to a large extent.  Whether it

6   applies to these guys, I'm not sure, but we're primarily

7   advancing our mandatory initial disclosure argument.

8           THE COURT:  All right.  I had also understood you were

9   presenting another argument in terms of relevance that it was

10  relevant to proving vicarious liability?

11          MR. CHALOS:  We think it's relevant potentially.  Now,

12  you know, we're sort of shooting in the dark here because we

13  haven't seen the documents, but we can certainly imagine how it

14  would be relevant to the agency claims, meaning there are --

15          THE COURT:  Even if, I'll use the acronym Stop & See

16  is not a member of the trust?

17          MR. CHALOS:  Right.  The inter-relationship between

18  the St. Thomas Entities is one that we've taken up with

19  Judge Zobel.  They've moved for dismissal.  Now, the two top

20  entities, the Ascension, sort of parent of parent of parent

21  entities, the claims against them were dismissed, and I think

22  there are two entities against whom the claims were dismissed.

23  The rest of those claims were not dismissed, and Judge Zobel

24  found that there was a plausible factual basis to persist in

25  those claims.  We don't know what these documents say so we

1    don't know what we don't know, but the inter-relationship
2    between entities that are clearly members of this insurance
3    arrangement, that is a relevant -- that is relevant information
4    to our claims, the inter-relationship between these entities,
5    and we don't know what these documents say, but we believe that
6    there's separate grounds for relevance, and they would be
7    discoverable just pursuant to a standard request for
8    production, but I don't know that we even need to get there.
9    The mandatory initial disclosures, I think, make clear that
11:57AM 10    these ought to be disclosed.
11             THE COURT:  All right.
12             MS. PUIG:  Thank you, your Honor.  To be clear, it is
13    our contention that unlike what has been alleged in the
14    pleadings by the PSC, we are not in violation of any order of
15    this Court.  When the Court took this matter up on
16    November 7th, the St. Thomas Entities were not in play at that
17    time.  No existing subpoena had been issued to the St. Thomas
18    Entities for the information that was requested, and it is our
19    contention that the Court's prior order did not cover us, so
11:58AM 20    the suggestion in the pleading that we were somehow in
21    violation of this Court's order is clearly erroneous.
22             Secondly, the suggestion that the amount of time in
23    question that has elapsed since the issuance of the original 85
24    subpoenas to this day is also incorrect.
25             Your Honor, our parties do not contest that Rule 26

1     allows the discovery of insuring agreements.  We have clearly
2     provided that which we believe comes within the ambit of
3     Rule 26.  A trust agreement is not an insurance agreement, so
4     repeatedly calling it that in pleadings or in oral argument
5     here today before the Court doesn't make it so.
6          In fact, the Court correctly pointed out that the
7     advisory committee notes of 1970 specifically address a
8     self-insurance arrangement, and it is excluded from discovery
9     under Rule 26.
11:59AM 10    Mr. Chalos is correct that we did cite two
11    definitions, the Keeton definition as well as a traditional
12    Appleman's definition that involves the payment of premiums and
13    the transfer of risk.
14         Here, no premiums have been paid, despite the
15    allegations that cooperation in a trust agreement is the paying
16    of premium and the transfer of risk.  It is not under any
17    definition, and we believe this trust agreement is the very
18    type of self-insurance agreement that Rule 26 advisory
19    committee notes of 1970 would state is not discoverable.
12:00PM 20    It is true, your Honor, that we cited both the
21    *Resolution Trust* case as well the *Gillette* case, and while the
22    *Gillette* case is a state court case in Michigan rendered
23    May 23rd, 2011, it is illustrative to this Court for the follow
24    two reasons:
25         The hospital there, Providence, participates in the

1    very trust agreement that is at issue before you this morning,
2    your Honor.  Secondly, the Court held that as a trust
3    agreement, and I take issue with the characterization that the
4    Michigan rule is very different from or substantially different
5    from the Federal Rule.
6         It is, in fact, virtually identical in the respects
7    that this Court would consider this morning.  In particular,
8    and I will draw the Court's attention, our response, the
9    *Gillette* case is included in document 1494, I think it is
10   important to note that the Court in its opinion stated
11   plaintiff is not entitled to prejudgment discovery of defendant
12   hospital's self-insured trust fund in order to assist plaintiff
13   in negotiating a settlement of her claim since such information
14   is neither relevant nor likely to lead to admissible evidence
15   under the rule.
16        Your Honor, I find it extremely interesting and
17   noteworthy that in the PSC's motion to compel at paragraph 17
18   and 18, the very reason cited by the PSC under paragraph 18
19   found at page 6, in other words, the PSC needs these agreements
20   to ensure it can properly appraise the value of the case and
21   conduct meaningful settlement negotiations.
22        The very language in the motion to compel is that very
23   language that the Michigan Court found compelling as bringing
24   it as an exclusion under Rule 26.  What the PSC is seeking here
25   is really post-judgment discovery into the financial condition

1    of the St. Thomas Entities, and that is clearly prohibited at
2    this time.
3             Your Honor, given the clear and unambiguous reading of
4    Rule 26 when taken together with the 1970 advisory committee
5    notes, when taken together with the case law that has ruled on
6    this very trust agreement under this very circumstance, the
7    plain definitions of insurance and self-insurance being the
8    payment of a premium to transfer risk, it is eminently clear
9    that the trust agreement sought by the PSC is not discoverable,
10   and we would ask the Court to deny the PSC's motion to compel.
11   Thank you.
12            THE COURT:  So I think the hard thing here and
13   cognizant of the advisory committee note that I mentioned
14   before, when I hear the PSC's questions, they strike me not
15   necessarily about the financial ability of your clients but
16   what are the terms of the agreement, so are products liability,
17   for example, excluded?  That would certainly be the type of
18   information that would be answered if production of a policy
19   was ordered, so why shouldn't those types of questions, putting
20   aside the financial condition of your clients be answered?
21            MS. PUIG:  Your Honor, again, we think *Gillette* is
22   illustrative and that it finds that it's not relevant.  Here,
23   there are a number of entities contributing and collaborating
24   to a self-insurance trust.  The questions that are being posed
25   relate to, and, again, I will cite to the motion to compel,

1  they state that the relevance argument is particularly tied to
2  any agency claims regarding Stop & See.  Stop & See is not
3  covered under the trust.
4      How do we know that?  We've alleged it's not covered
5  under the trust, and as well, it's two hands clapping.  If they
6  were covered under the trust, Stop & See would be here today
7  joining in the response to the motion to compel, and so their
8  only claim to relevance is the agency claim with Stop & See.
9      Judge Zobel has already stated that there is no
12:04PM 10  relevance, and the vicarious liability and alter ego liability
11  claims have been resolved and dismissed.  In fact, we're
12  pressing for a Rule 54 certification at the hearing later today
13  with Judge Zobel, so the suggestion that, well, we want to sort
14  of get into and mix it up on this agency argument is but an
15  attempt at a second bite at the apple on the motion to dismiss.
16      THE COURT:  And then if you could just answer the
17  PSC's question, what's the harm?
18      MS. PUIG:  Your Honor, it's not relevant, it's not
19  discoverable under Rule 26.  This is a document that is an
12:05PM 20  agreement entered into by other members who are a part of it.
21  It's not been disclosed in other litigation.  We consider it to
22  be confidential insuring, not insuring, but a confidential
23  arrangement of the members and do not tender it.  Their
24  argument has been to us, and I want to say in compliment that
25  we have dealt with this in good faith for months.  We spoke

1   with Ben Gastel at the last hearing in an attempt to avoid this
2   taking up the Court's time today, but our clients feel so
3   strongly that it is not discoverable and that this is not a
4   show cause order why can't I see it, but rather strict
5   compliance with the rules and that it is not an insuring
6   agreement, it is a trust agreement, your Honor.
7           THE COURT: And the protective order wouldn't answer
8   the confidentiality concerns?
9           MS. PUIG: No, we're very concerned about it, your
10  Honor, and we shared that concern consistently with the PSC,
11  and that's why we're here today taking up the Court's time.
12          MR. CHALOS: Yes, I'll be brief. This is also very
13  important to my clients as well, and they take this very
14  seriously, and they're very concerned about what funds are
15  available to pay for the harm that's been caused to them. I
16  want to correct something that Ms. Puig said. She said that
17  there were some entities that were dismissed by Judge Zobel.
18  That's true with respect to two of the Ascension entities.
19  That's not true with respect to St. Thomas Health, St. Thomas
20  Network and St. Thomas Hospital, and they're members of this
21  insurance arrangement as well.
22          THE COURT: That's why we're here.
23          MR. CHALOS: Right, exactly, your Honor, so I wanted
24  to just make that correction. A couple quick points. It's
25  really something seems to me to be the height of semantics. On

1    the very front page of their document, 1494, this is their
2    opposition, they refer to this as a pooled self-insurance
3    reserve, which seems oxymoronic to me.  If it's self-insured,
4    it's your money.  Once it becomes pooled, it is no longer your
5    self-insurance, it is yours and others' funds commingling.  She
6    said that they don't pay premium.  "Premium" defined by
7    *Webster's* is the price of insurance.  The second definition is
8    the amount paid for insurance, and the third is consideration
9    paid for a contract of insurance.
12:07PM 10          They say in their declaration, this is the insurance
11   consultant Janet Roth's declaration, Document 1494-1, she says
12   that the members fund the trust and pay its expenses.  That is
13   an amount paid to this separate entity.  That is consideration
14   paid to the separate entity, and what they get back is
15   insurance for when claims are made, so, I mean, we can go back
16   and forth about whether there's a such thing as a pool, self-,
17   you know, whatever they say, but it's insurance, and we think
18   we're entitled to the documents.  Thank you, your Honor.
19          THE COURT:  Thank you.  Anything further?
12:08PM 20          MS. PUIG:  Thank you, your Honor, we stand on our
21   arguments.
22          THE COURT:  I will take it under advisement, and I
23   will see many of you later.
24          THE CLERK:  All rise.  Court is in recess.
25          (Whereupon, the hearing was adjourned at 12:08 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

    I do hereby certify that the foregoing transcript, Pages 1 through 20 inclusive, was recorded by me stenographically at the time and place aforesaid in MDL NO. 13-2419-RWZ, In Re: NEW ENGLAND COMPOUNDING PHARMACY CASES LITIGATION and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

    Dated this December 11, 2014.

    s/s Valerie A. O'Hara

    _____

    VALERIE A. O'HARA
    OFFICIAL COURT REPORTER