```
 1                    UNITED STATES DISTRICT COURT
 2                    DISTRICT OF MASSACHUSETTS

 3


 4
     IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
 5   PHARMACY CASES LITIGATION          )
                                        )
 6                                      )
                                        )
 7                                      )
                                        )
 8                                      )

 9


10
               BEFORE:  THE HONORABLE RYA W. ZOBEL and
11                      THE HONORABLE JENNIFER C. BOAL

12


13


14                        STATUS CONFERENCE AND
                          MOTION HEARING
15


16
          John Joseph Moakley United States Courthouse
17                        Courtroom No. 12
                          One Courthouse Way
18                        Boston, MA 02210

19
                          January 14, 2015
20                          2:00 p.m.

21


22             Catherine A. Handel, RPR-CM, CRR
                      Official Court Reporter
23          John Joseph Moakley United States Courthouse
                  One Courthouse Way, Room 5205
24                      Boston, MA 02210
                 E-mail: hhcatherine2@yahoo.com
25
```

```
 1     APPEARANCES:

 2
       For The Plaintiffs:
 3

 4         Hagens, Berman, Sobol, Shapiro LLP, by KRISTEN JOHNSON,
       ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, MA 02142;
 5
           Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
 6     ESQ., One Nashville Place, 150 Fourth Avenue, North, Suite 1650,
       Nashville, TN 37219-2423;
 7
           Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K.
 8     MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, NY
       10013-1413;
 9
           Janet, Jenner & Suggs, LLC, KIMBERLY A. DOUGHERTY, ESQ., 75
10     Arlington Street, Suite 500, Boston, MA 02116;

11         Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ., 366 Elm
       Avenue, SW, Roanoke, VA 24016;
12
           Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,
13     IV, ESQ., and BEN GASTEL, ESQ., ESQ., 227 Second Avenue North,
       Nashville, TN 37201-1631;
14
           Cohen, Placitella & Roth, P.C., by MICHAEL COREN, ESQ.,
15     2 Commerce Square, 2001 Market Street, Suite 2900, Philadelphia,
       PA 19103;
16
           Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
17     Street, Suite 500, Boston, MA 02114;

18

19
       FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
20

21         Brown Rudnick, by KIERSTEN A. TAYLOR, ESQ., One Financial
       Center, Boston, MA  02111;
22

23

24     (Appearances continued on the next page.)

25
       APPEARANCES (Cont'd):
```

```
 1

 2      For the Defendants:

 3          Harris Beach PLLC, by FREDERICK H. FERN, ESQ., 100 Wall
        Street, New York, NY 10005;
 4
            Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ.,
 5      1150 Huntington Building, 925 Euclid Avenue, Cleveland, OH
        44115-1414;
 6
            Todd & Weld LLP, by CORRINA L. HALE, ESQ., 28 State Street,
 7      31st Floor, Boston, MA 02109;

 8          Fulbright & Jaworski, LLP, by ADAM T. SCHRAMEK, ESQ., 98
        San Jacinto Blvd, Suite 1100, Austin, TX 78701;
 9
            Blumberg & Wolk LLC, by JAY J. BLUMBERG, ESQ., 158 Delaware
10      Street, Woodbury, NJ 08096;

11          Goodwin Procter LLP, by ROBERTO M. BRACERAS, ESQ., Exchange
        Place, 53 State Street, Boston, MA 02109;
12
            Sloane & Walsh LLP, by ROBERT H. GAYNOR, ESQ., Three Center
13      Plaza, Boston, MA 02108;

14          Hermes, Netburn, O'Connor & Spearing, by SCOTT S. SPEARING,
        ESQ., and KARA A. LORIDAS, ESQ., 265 Franklin Street, 7th Floor,
15      Boston, MA 02110;

16          Donovan & Hatem, LLP, by KENNETH B. WALTON, ESQ., Two
        Seaport Lane, Boston, MA 02210;
17
            Gideon, Cooper & Essary, PLLC, by CHRIS J. TARDIO, ESQ.,
18      315 Deaderick Street, Suite 1100, Nashville, TN 37238
        (Appearing telephonically);
19
            Pessin Katz Law, P.A., by GREGORY K. KIRBY, ESQ., 901
20      Dulaney Valley Road, Suite 400, Towson, MD 21204 (Appearing
        telephonically);
21

22      FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
        NECP, INC.:
23

24          Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
        Street, Suite 2400, Boston, MA 02110-1724.
25
```

```
 1                    P R O C E E D I N G S
 2         (The following proceedings were held in open court before
 3    the Honorable Rya W. Zobel United States District Court Judge,
 4    and the Honorable Jennifer C. Boal, Magistrate Judge, United
 5    States District Court, District of Massachusetts, at the John J.
 6    Moakley United States Courthouse, One Courthouse Way, Boston,
 7    Massachusetts, on January 14, 2015.)
 8              THE COURT:  Good afternoon.  Please be seated.
 9              COURTROOM DEPUTY CLERK URSO:  This is In Re: New
10    England Compounding.  It's MD 13-2419.
11              THE COURT:  Okay.  So, we have for the plaintiffs,
12    Ms. Johnson.
13              MS. JOHNSON:  Good afternoon, your Honor.
14              THE COURT:  Mr.?
15              MR. CHALOS:  Mark Chalos, your Honor, for the
16    plaintiff.
17              THE COURT:  I'm sorry?
18              MR. CHALOS:  Mark Chalos.
19              THE COURT:  Mr. Chalos?
20              MR. CHALOS:  Yes.
21              MR. STRANCH:  Gerald Stranch.
22              THE COURT:  Mr. Sobol -- No.  Mr. Stranch.
23              MR. STRANCH:  Stranch.
24              THE COURT:  Stranch, right.
25              MR. FENNELL:  Patrick Fennell.
```

```
1              THE COURT:  Mr. Fennell.  And?

2              MR. ELLIS:  Rick Ellis.

3              MR. GASTEL:  Ben Gastel.

4              THE COURT:  Van Gastel?

5              MR. GASTEL:  Ben Gastel.

6              MS. DOUGHERTY:  Good afternoon, your Honor.  Kim

7    Dougherty for the Plaintiffs' Steering Committee.

8              THE COURT:  And anybody else?  For the trustee?

9              MR. GOTTFRIED:  Michael Gottfried, your Honor.

10             THE COURT:  Mr. Gottfried.

11             MR. COREN:  Good afternoon, your Honor.  Michael

12   Coren, co-chair Official Creditors' Committee.

13             THE COURT:  Corey?

14             MR. COREN:  Coren, your Honor.

15             MS. TAYLOR:  Kiersten Taylor, your Honor, Creditor's

16   Committee.

17             THE COURT:  Okay.  Now the defendants.

18             MR. FERN:  Good afternoon, Judge.  Frederic Fern,

19   special counsel for the trustee.

20             MR. GAYNOR:  Good afternoon, your Honor.  Robert

21   Gaynor for the individual defendants.

22             MR. MORIARTY:  Matthew Moriarty for Ameridose.

23             THE COURT:  Anybody else that needs to be recorded?

24             MR. SPEARING:  Good afternoon, your Honor.  Scott

25   Spearing for Liberty Industries.
```

```
 1              THE COURT:  That's it.
 2              MR. SCHRAMEK:  Your Honor, Adam Schramek for the
 3   Saint Thomas and the Ascension Parties.
 4              THE COURT:  Anybody else?
 5              MR. WALTON:  Your Honor, Ken Walton for ARL.
 6              THE COURT:  That's it.
 7              MR. ORLANDO:  Steven Orlando for BKC Clinic and CCM
 8   Clinic.
 9              THE COURT:  Do you have a motion to argue?
10              MR. ORLANDO:  No.
11              THE COURT:  Let me get only the names of people who
12   are actually going to argue.  Anybody else?
13              (No response.)
14              THE COURT:  Okay.  Now, Ms. Johnson's agenda put at
15   the head of it -- and, of course, I've always do what she
16   says -- the hearing on motions.
17              So, the Ascension Parties' motion to certify pursuant
18   to Rule -- enter judgment pursuant to Rule 54.  Do I need to
19   hear argument on that?
20              MR. SCHRAMEK:  Your Honor, Adam Schramek for the
21   Ascension Parties.
22              We're certainly here to provide argument, if you
23   would like to hear it.  We did file the papers.  We actually
24   think it might be helpful to make a few points in argument if
25   you would entertain us.
```

```
 1              THE COURT:  Go ahead.

 2              MR. SCHRAMEK:  Your Honor, there were --

 3              THE COURT:  But don't take more than ten minutes,

 4   please.

 5              MR. SCHRAMEK:  It won't be, your Honor.

 6              Would you like me to go to a microphone?

 7              THE COURT:  That is probably a good idea, simply

 8   because the people on the telephone won't hear you unless you

 9   do that, and do be seated.  It's easier to use the microphone.

10              MR. SCHRAMEK:  Your Honor, the Ascension Parties did

11   file a motion pursuant to Rule 54(b) to make it a final order,

12   this Court's August 29th, 2013 order.

13              As the Court may require, you dismissed the Ascension

14   Parties, finding there had been no vicarious liability claims

15   asserted against them as a matter of law on the pleadings

16   under alter ego or agency theory.

17              THE COURT:  What makes Ascension different from any

18   other defendant who might get out of the case on such a

19   motion?

20              MR. SCHRAMEK:  Your Honor, the --

21              THE COURT:  If it isn't different or even if it is

22   different, we're going to have a whole series of Rule 54

23   decisions?

24              MR. SCHRAMEK:  Well, your Honor, there are a couple

25   of things, I think, that are important.  One is really which
```

1    is known as the finality prong, which is are you really out?

2    Have all claims against you been dismissed or only partial

3    claims been dismissed?

4           I believe most of the parties that have filed motions

5    to dismiss, not all of the claims have been dismissed.  So,

6    they're still in the proceeding.  That's a very different

7    position from where Ascension is in.

8           Now, if another party, in fact, were to prevail on a

9    motion to dismiss and had been filed in multiple lawsuits in

10   this MDL proceeding, we think it is important in fairness and

11   equity, which is one of the considerations, for that party to

12   have the opportunity to get out, to not have to be in this

13   very complicated MDL process, have the status hearings, and

14   wait until one day when maybe their case will be selected as a

15   Bellwether or beyond.

16          Right now Ascension is the only party in that

17   position.  So, I don't think it creates this precedent of

18   everyone filing these motions.

19          And if you look at the second prong, your Honor,

20   which is no just reasons for delay, there is no substantial

21   interrelation between the remaining claims and the dismissed

22   claims.  That's the other thing the courts really look at.

23          As this Court might remember, in the *Nigro* case,

24   which was decided and went up to the First Circuit, the First

25   Circuit laid out those elements and affirmed this Court's

```
1    decision to let one party out while one individual --

2              THE COURT:  That's the case of the lawyers who got

3    sued?

4              MR. SCHRAMEK:  That's right, your Honor.  One of the

5    lawyers was a special master.  It was a will contest, and you

6    decided they were immune from suit and, accordingly, let them

7    out and said, look, they had a -- you know, this is a

8    reputational issue, right.  The lawyer that was involved in

9    this lawsuit has a problem with his reputation.

10             THE COURT:  It was an insanity case.

11             MR. SCHRAMEK:  I wasn't there, so I can't tell you

12   that, your Honor.

13             But we do think there are some reputational issues.

14   They're very different, of course, but there are reputational

15   issues within a national healthcare system like Ascension

16   continuing to be involved in and named and getting all the

17   dockets on an MDL, which this Court has decided that there are

18   no claims against it.  So, we do believe both under equities

19   and no just reason for delay, that that's appropriate.  And,

20   importantly, there's no relationship -- factual relationship

21   between the remaining claims.

22             The claim against Ascension, which is, you know, the

23   parent and grandparent company out of St. Louis, Missouri,

24   this Court, I think properly, concluded that there was just no

25   basis to hold them responsible for the -- you know, based
```

 1    merely on the fact that they owned this hospital in Tennessee.

 2            So, the remaining facts are going to be the

 3    relationship between the hospital and the relationship between

 4    the clinic, which was on the hospital grounds, Stop & See.

 5    So, the case is going forward on an agency theory about the

 6    relationship between the hospital and the clinic.  What did

 7    the signage look like?  What did the name tags the doctors

 8    have say?  All of those sorts of things the PSC has focused on

 9    that have nothing to do with their theory as to how they could

10    somehow pierce the veil all the way up to St. Louis.

11            The only thing that they focused on or could point to

12    this Court when we had that hearing was the fact that on the

13    federal tax forms, Ascension listed Saint Thomas, you know,

14    Network or Health System as an owned entity or affiliated

15    entity.  This Court said, look, that's not enough.  Do you

16    have anything or don't you?  They didn't have anything.

17            So, discovery won't help them.  There's nothing left.

18    There's no relationship between the claims remaining and the

19    claims dismissed and, accordingly, we believe, under the

20    precedent of the First Circuit, under cases we cited, that

21    this is the right decision that we would ask the Court to

22    enter to allow Ascension to be out of this MDL.

23            If the PSC wants to appeal that issue, let them

24    appeal it now.  Let that matter be resolved, once and for all.

25    We think the First Circuit would, of course, clearly affirm

1   this Court's decision based on what their arguments were, but

2   if they want to test it, let them test it now.  Let's not wait

3   for months and maybe years until all 41 cases in which

4   Ascension was sued and which this Court has decided those 41

5   cases did not state a claim, make them continue to participate

6   in the process.  Thank you, your Honor.

7          THE COURT:  Thank you.

8          Anyone opposing the motion?

9          MR. GASTEL:  Ben Gastel on behalf of the PSC, your

10  Honor.  I'll be very short.

11          I think missing from Ascension's argument is the

12  strong federal policy that disfavors piecemeal appellate

13  process.  Here, we have Ascension who is only one piece of the

14  liability puzzle as it relates to the Saint Thomas Clinic.  We

15  did assert vicarious liability claims against Ascension, but

16  Ascension's ultimate liability in this case is inexplicably

17  intertwined with the liability of Saint Thomas Clinic and the

18  Saint Thomas Entities.

19          Those cases remain pending before this Court and are

20  ongoing in discovery.  We think that the overlap of the claims

21  against Ascension and the overlap -- the ongoing claims

22  against Saint Thomas Clinic and the Saint Thomas Entities make

23  this particular issue fall squarely within that federal policy

24  against piecemeal litigation and because the cases against

25  Saint Thomas Clinic and Saint Thomas Entities are ongoing, we

1  would maintain that Ascension should simply wait until the

2  cases against those other entities are fully resolved before

3  -- so that the entire sort of liability puzzle as it relates

4  to the Saint Thomas Clinic, the Saint Thomas Entities and

5  Ascension can go up on appeal, if necessary, to the First

6  Circuit.

7          THE COURT:  Thank you.  Anybody else?

8          MR. SCHRAMEK:  Just in reply, your Honor -- oh, I'm

9  sorry.  In reply, they are factually distinct issues.  The

10  issues of Saint Thomas and the clinic have nothing to do with

11  the issue of whether the Ascension parent can be held

12  responsible, and if this Court were to look at the case they

13  cited for their support, *Spiegel vs. Tufts University*, that's

14  a case where a professor was denied tenure and -- I believe it

15  was a she -- asserted breach of contract, civil rights claims

16  as well as misrepresentation claims and three of the -- two of

17  the three claims were dismissed and the remaining claim was

18  the civil rights claim.

19          And what the First Circuit said is, Wait a minute.

20  The civil rights claim and the breach of contract claim, they

21  were all based on the same facts.  They incorporated by

22  reference the same fact section.  It was all saying she should

23  have made tenure and what were the facts and circumstances of

24  her not making tenure.

25          In fact, your Honor -- and so, they said, Well, that

1    one doesn't make sense to sever off and appeal immediately the

2    other causes of action when the same factual nucleolus was

3    still being tried.  That's not what we have here.  That was

4    the only case that they cited for that inexplicably

5    intertwined.  We have a very different situation, with a

6    completely different party.  It has nothing to do with the

7    claims left here, which is the agency claims between the

8    clinic and the hospital.

9            THE COURT:  Thank you.  I will take the papers on it.

10           The next motion on the list is that which the

11   Plaintiffs' Steering Committee appealed from a decision by

12   Judge Boal.  Is there any question but that the standard of

13   review is clear error?

14           MR. CHALOS:  Your Honor, that's me, Mark Chalos for

15   plaintiffs.

16           Your Honor, we can accept that that is the standard.

17           THE COURT:  Okay.  I think what I would like to do

18   with this is to order the defendant party in this case, Saint

19   Thomas Entities, to produce the trust agreement for an in

20   camera inspection by the Court and then I will deal with the

21   motion.

22           So, I'm not sure it's useful to have argument now

23   until I know really what it is we're talking about.  And the

24   review will be on the basis of clear error.  Any problem with

25   that?

```
 1              MR. SCHRAMEK:  Well, your Honor -- this is Adam
 2     Schramek.
 3              I was prepared to argue the motion today as well on
 4     that point, and I would simply say that the review being clear
 5     error, I believe it should be made on the record that was
 6     actually presented to Judge Boal and I don't think the PSC
 7     should have an opportunity to go and have additional discovery
 8     or an additional procedure that they never asked Judge Boal
 9     for.  They asked -- we provided a briefing.  We had an
10     affidavit.  They never asked Judge Boal for us to submit
11     documents in camera.  They went forward with Judge Boal on the
12     record that they developed and we believe it's having been
13     referred to Judge Boal, it's appropriate for the clear-error
14     review to be on that record.
15              THE COURT:  Well, then I'll have her do the review of
16     the document.  I would still ask you to produce the document
17     and then she can review it and then it can come to me after
18     that, okay?
19              MR. CHALOS:  Okay with us.
20              THE COURT:  So, would the defendant please review it
21     for in camera inspection by Judge Boal.  And the case is back
22     in your hands.
23              Okay.  Then, finally, Liberty Industries' motion for
24     reconsideration of the denial of summary judgment.
25              MR. SPEARING:  Yes, your Honor.
```

```
 1            THE COURT:  I understand the difficulties you have
 2    with the short time that we gave the other side, but that
 3    short time was dictated by Liberty's constantly telling us how
 4    we're going to go into the bankruptcy the next minute and we
 5    were simply trying to accommodate the very tight schedule
 6    before Liberty would go under.
 7            MR. SPEARING:  Yes, your Honor.  I understand that.
 8            The timing is just one part of the issue that we
 9    would like to raise in the motion for reconsideration.
10            THE COURT:  You go right ahead.
11            MR. SPEARING:  Thank you, your Honor.
12            The most important part of this, if you look at it,
13    is what Liberty believes to be the -- not only was the
14    opposition untimely by the PSC, but it was based, in large
15    part, upon this affidavit of Dr. Austin, Jr., and we believe
16    that affidavit was inadmissible for a variety of reasons.
17    Most importantly was it was unsworn to.  It was not subscribed
18    under the pains and penalties of perjury and it didn't meet
19    the requirements of Rule 56, nor did it meet the requirements
20    of 28 U.S.C. 1746.
21            If you look at the way the affidavit was drafted,
22    your Honor, by Dr. Austin, there's no argument, I don't think,
23    that the affidavit was not signed under the pains and
24    penalties of perjury.  I don't believe the plaintiffs say
25    that.  What they say in their opposition is basically that
```

1    that's just a mere formality and the --

2              THE COURT:  Excuse me one moment.

3              Did anybody on the telephone hear?  Can they hear the

4    argument?  Is anybody there?

5              UNIDENTIFIED SPEAKER:  Very soft, your Honor.

6              THE COURT:  I'm sorry, I forgot to ask you to find a

7    -- does the witness box one work, Lisa?

8              COURTROOM DEPUTY CLERK URSO:  Yes, Judge.

9              THE COURT:  So, maybe you can just go over there.

10             MR SPEARING:  Sure.

11             THE COURT:  Thank you very much.  Sorry about that.

12             UNIDENTIFIED SPEAKER:  Thank you, your Honor.

13             THE COURT:  The next time I'm negligent like that,

14   just whistle.

15             MR. SPEARING:  May I sit, your Honor?

16             THE COURT:  Of course.

17             Before you began to hear what counsel had to say, he

18   described the inadequacies of the affidavit, which was neither

19   sworn and in various other respects, he says, defective.  He

20   will now continue with that list.

21             MR. SPEARING:  Thank you, your Honor.

22             Basically, under Rule 56(c)(4), a declaration must be

23   sworn to or otherwise subscribed under the pains and penalties

24   of perjury, it must be based on personal knowledge, and it has

25   to have facts that would be admissible, and we believe that

```
1    the Austin affidavit fails on all three of those levels.

2            As I said originally, the affidavit was not

3    subscribed to under the pains and penalties.  That's not a

4    mere formality, as the PSC would have us think.  I think the

5    clear law in this circuit and this district is that a sworn

6    affidavit -- if it's not sworn to by oath, then it has to be

7    under the pains and penalties of perjury.  It's the only way

8    in which evidence can be admissible for the proceeding.

9    Without that the affidavit must fail because there's no truth

10   aspect to the affidavit.

11           The affidavit also fails because it's very difficult

12   to see how it's based on the personal knowledge of Dr. Austin.

13   If we look back, the affidavit is -- or the declaration is

14   based entirely -- or almost entirely on the observations made

15   by Dr. Austin and his father, who is also named Dr. Austin,

16   during the plaintiffs' visit to the NECC facility back in

17   December of 2012.

18           As you read through the affidavit, it's very

19   difficult to see what is Dr. Austin, Jr.'s observation as

20   compared to that of his father, and if you go through there,

21   their opening paragraph -- or the opening paragraphs, one of

22   them says, "In preparation of this declaration, I considered

23   the observations made by Dr. Philip Austin, Austin, Jr.,

24   Austin, Sr., and me."

25           Other parts of the declaration go on to say that,
```

1    "Our observations led us to conclude that the contaminated MPA

2    would most likely be compounded in the main area of the 2006

3    clean room."

4         It also goes on to say that, "During our inspection

5    of the clean room, although we have been provided with

6    additional information since our initial investigation, we

7    still believe that the defects in the design and construction

8    of the clean rooms played a key role in the contamination of

9    the vials of the MPA."

10        I would submit, your Honor, that Dr. Austin, Jr.,

11   cannot incorporate his father's observation or conclusions

12   into his declaration and that's just not proper, and for that

13   reason, the declaration must also fail.

14        The other thing that -- because this declaration is

15   made upon the observations made during this site visit, Dr.

16   Austin, junior or senior, has no basis for any information

17   prior to that date, December 2012.  Therefore, they have no

18   information -- personal information on which they can say what

19   the clean rooms looked like when they were delivered to NECC

20   by Liberty back in '06 and '08 or any time before December

21   2012.

22        So, these conclusory statements made in Dr. Austin's

23   declaration that Liberty knew or should have known what the

24   rooms are going to be used for or that -- where the MPA was

25   actually compounded, he has no basis for those statements and

1    they can't be taken into effect, it's our opinion, in this

2    declaration.

3         I think the most telling aspect of the declaration is

4    Dr. Austin's conclusion where he states, "Due to a number of

5    possible causes for contamination during the compounding

6    process, it is unlikely that any definitive path of fungal

7    contamination from an originating source or its final

8    destination in the vials will be able to be identified."

9         So, clearly, Dr. Austin cannot give them the causal

10   connection between anything Liberty did to cause this alleged

11   contamination.  He states right out in his declaration that he

12   cannot make such a statement.  Therefore, it goes against the

13   PSC's conclusions that Liberty is liable for anything in this

14   matter.

15        It seems to me, your Honor, that the declaration is

16   defective for the various reasons we said.  It's our hope that

17   the Court will reconsider its ruling on the motion for summary

18   judgment and rule in favor of Liberty Industries and the

19   summary judgment in favor of Liberty.  Thank you.

20        THE COURT:  Thank you.

21        Who will argue against?  Ms. Johnson?

22        MS. JOHNSON:  I will, your Honor.

23        First, we'll observe that the standard for

24   reconsideration on a motion for summary judgment requires

25   manifest error of law or newly-discovered evidence.

```
 1              THE COURT:  An affidavit that is unsigned, it's sort
 2   of a manifest error of law, isn't it?
 3              MS. JOHNSON:  It's not great, your Honor, but let me
 4   tell you why that doesn't matter.
 5              In terms of the affidavit itself, the Court will
 6   remember, which you alluded to earlier, the procedural posture
 7   here is a bit unusual.  Expert reports are not formally due
 8   according to the case management schedule for some months yet.
 9              The Court asked -- ordered the PSC to oppose
10   Liberty's motion for summary judgment within five days, which
11   was appropriate given the circumstances.  The PSC has no
12   complaint with that order, your Honor.
13              However, given that short turnaround, it did mean we
14   had to act with all due dispatch.  The lack of a signature was
15   an oversight and it is one that can be easily corrected, your
16   Honor, and the PSC is happy to do that.  I'm remiss for not
17   having brought a signed copy with me today, frankly, but that
18   can be corrected.
19              In terms of Dr. Austin's personal knowledge, both Dr.
20   Austins were present personally during the inspection of the
21   NECC facility.  Both Dr. Austins are experienced with clean
22   rooms.  One Dr. Austin is younger than the other and may,
23   arguably, be the less experienced, but I'll note that Liberty
24   has not filed a *Daubert* motion or a formal motion under Rule
25   702 --
```

1          THE COURT:  They haven't had time.

2          MS. JOHNSON:  Excuse me?

3          THE COURT:  They haven't had time.

4          MS. JOHNSON:  That may well be, your Honor.

5          We would suggest that even without Dr. Austin's

6     affidavit, that there are material questions of fact presented

7     by the issue and we think, frankly, that the Court's well-

8     reasoned decision earlier should stand.

9          To be blunt, we don't see anything newly presented in

10    either the proposed reply or the motion for reconsideration

11    which should warrant the Court reconsidering.

12         THE COURT:  Thank you.

13         MR. SPEARING:  May I reply briefly, your Honor?

14         The fact that it's been now three weeks and we

15    haven't seen any kind of sworn affidavit from this gentleman I

16    think is telling.

17         The lawyers in the PSC committee know how to file a

18    declaration that's proper.  This one was not proper.  It's not

19    proper now, and there are time revisions involved.  There's

20    time standards involved here.  The PSC never seems to make any

21    of the time elements here.  They never meet the time

22    requirements.

23         It seems to me that the fact that they could have a

24    signed statement from this gentleman doesn't really get them

25    over the hurdle, and without the declaration, your Honor, the

1   motion -- the opposition must fail and Liberty's motion must

2   succeed.  There is no disputed fact without this purported

3   declaration from the purported expert.

4           THE COURT:  Thank you.  I will take these papers as

5   well.

6           MR. SPEARING:  Thank you, your Honor.

7           MR. BRACERAS:  Your Honor, on behalf of Unifirst,

8   just one note.

9           We are not opposing the summary judgment motion here,

10  but to the extent the Court does reconsider its order and

11  allows Liberty's motion for summary judgment, we would just

12  like to note for the record that we would like Liberty to

13  remain in the case as a nonparty for the purpose of

14  allocating --

15          THE COURT:  I'm sorry, you would like what?

16          MR. BRACERAS:  Liberty to remain in the case as a

17  nonparty for the purpose of allocating fault at trial.

18          (Whistling.)

19          UNIDENTIFIED SPEAKER:  We can't hear.

20          (Laughter.)

21          THE COURT:  For this very important argument, you

22  want the nonparty to be available --

23          MR. BRACERAS:  I just want to note --

24          THE COURT:  -- for assignment of liability and

25  damages?

```
 1                    MR. BRACERAS:  I --

 2               THE COURT:  Wait a minute.  You can't -- you won't be

 3     heard.  You have to go to a microphone.  There's one over here

 4     by --

 5               MR. BRACERAS:  Thanks, your Honor.

 6               THE COURT:  Start again, will you?

 7               MR. BRACERAS:  Your Honor --

 8               THE COURT:  This is Mr. Braceras representing

 9     Unifirst.

10               MR. BRACERAS:  Yes.  On behalf of Unifirst, we do not

11     object to the motion for summary judgment.  We don't take a

12     position with respect to the motion for reconsideration.

13     Frankly, we don't have standing to do so, but under Indiana

14     law, there's a provision that we're required to note for the

15     record that we request that Liberty remain in the case as a

16     nonparty, even if the Court grants the summary judgment

17     motion, solely for the purpose of allocating fault at trial.

18     Basically, so that they can be on a verdict form in a

19     comparative negligent state for allocating fault.

20               THE COURT:  Which they then don't pay, or what?

21               MR. BRACERAS:  That's true, your Honor.  Then if

22     they're dismissed, they wouldn't pay, but there is no reason

23     for the other parties that remain in the case to pay more

24     simply because they are no longer in the case.

25               So, it's not a motion on our behalf.  We just have to
```

1    note this for the record to the extent that the Court allows

2    the motion --

3           THE COURT:  Well, what is the point of that?  They

4    remain a nonparty, which means that they're not really in the

5    case, but if the case goes to trial, then the jury is entitled

6    to determine whether Liberty has some fault, shares some fault

7    with Unifirst?

8           MR. BRACERAS:  Exactly, your Honor.

9           THE COURT:  Is that the issue?

10          MR. BRACERAS:  Exactly.

11          THE COURT:  But as a nonparty, they would not then be

12   liable for their fault?

13          MR. BRACERAS:  Not if they were already dismissed by

14   this Court out of the case.

15          THE COURT:  Which if the motion is allowed would be

16   the case, right?

17          MR. BRACERAS:  That's correct.

18          THE COURT:  So, the only object of this would be to

19   reduce the amount that Unifirst pays without -- and the

20   plaintiffs pay the rest --

21          MR. BRACERAS:  And there's caselaw --

22          THE COURT:  -- or they eat the rest.

23          MR. BRACERAS:  And, your Honor, there's caselaw,

24   *Rausch vs. Reinhold*, Indiana Court of Appeals, 1999 decision

25   directly on this, your Honor.  So, again, we don't --

```
 1              (Telephone ringing.)

 2              THE COURT:  Excuse me one second.

 3              Is this our phone?

 4              COURTROOM DEPUTY CLERK URSO:  No, Judge.

 5              MR. BRACERAS:  We don't think the Court has to decide

 6     anything at this time.  We just need to put this on the record

 7     and --

 8              THE COURT:  So, I don't have to do anything with it?

 9              MR. BRACERAS:  No, you do not.

10              THE COURT:  Okay.  Do you wish to say anything about

11     that?

12              MR. SPEARING:  I'm not so sure I read the statute the

13     same way.

14              I understand that Liberty could be on a jury verdict

15     form once it's dismissed from the case.  I don't think it

16     needs to be -- continue to be a part of the MDL in order to do

17     that, but I suspect we could re-argue about that after we win

18     and we do a 54(b) motion.

19              THE COURT:  Well, in that case, why don't we just

20     leave it that you two will work this out?

21              (Laughter.)

22              THE COURT:  I'm serious.  I mean, if there's nothing

23     that I have to do, then it's -- Liberty agrees to work it out

24     with Unifirst.

25              MR. SPEARING:  Your Honor --
```

```
 1              THE COURT:  Wait one minute.

 2              Is there any reason why that couldn't be done?

 3              MR. SPEARING:  No, your Honor.  If we prevail on the

 4    motion for summary judgment, we could work that out.

 5              MR. GASTEL:  Your Honor, this is Ben Gastel on behalf

 6    of the PSC.

 7              I think this issue raises very complex issues under

 8    both Indiana law and also raises an Erie issue.

 9              THE COURT:  But if we don't have to do anything about

10    it, then why do we worry?

11              MS. JOHNSON:  I think that's precisely right, your

12    Honor.  The PSC's position would be that this is not the time

13    to be deciding the effect of a summary judgment dismissal on

14    the contributory fault issue.

15              THE COURT:  I'm not deciding it.  They're going to

16    work it out and whatever -- however they work it out, there's

17    nothing I can say about it.

18              MR. SCHRAMEK:  Your Honor, this is Adam Schramek for

19    the Saint Thomas Entities.

20              Tennessee law has a similar issue to what Mr.

21    Braceras raised.  We also filed a motion.  We called it a

22    motion --

23              THE COURT:  So, we should say Ascension is going to

24    be in as a nonparty if --

25              MR. SCHRAMEK:  No.  No.  This is --
```

1          (Laughter.)

2          THE COURT:  You have backed yourself into another

3     corner.

4          MR. SCHRAMEK:  If the PSC wants to list them as a

5     non-recoverable party, sure, we'll put them on the jury

6     charge.

7          But the point of this process, your Honor, is because

8     under the laws of Tennessee, in particular, and Indiana as

9     well, you're only supposed to recover the allocation of fault

10    attributable to each defendant and/or nonparty who may bear

11    responsibility.

12         The reason we filed our motion for clarification and

13    we are asking the Court for relief, the relief we're asking

14    for is essentially a notation in whatever order this Court

15    enters, whether it be a footnote or reference, that says this

16    order on summary judgment between the PSC and Liberty has no

17    effect on any other party or no effect on the Saint Thomas

18    Entities, and the reason for that, your Honor, is because,

19    one, Liberty is not a defendant in any of our cases.  So,

20    they've never been sued, Liberty, in our cases, in the

21    Tennessee cases.  So, this summary judgment that's being

22    filed, we didn't have standing to participate in.  We haven't

23    argued.  We haven't put forward --

24         THE COURT:  Well, then why worry about it if they're

25    not in any of your cases?

```
 1            MR. SCHRAMEK:  Well, your Honor, the concern was, PSC
 2   -- we reached out to them about this issue and they would not
 3   necessarily agree to that.  They --
 4            THE COURT:  Agree to what?
 5            MR. SCHRAMEK:  -- preserve the argument that perhaps
 6   the summary judgment does preclude us from putting them on the
 7   jury charge.  That was the issue we raised with the PSC, and
 8   we said, Look, we don't have standing.  We can't do this.  So,
 9   we filed our motion for clarification to say, your Honor,
10   whatever you do, we just want it to be without prejudice to
11   our rights in our cases because we're listing them as a
12   nonparty, and we may be --
13            THE COURT:  Well, what do you want me to do?
14            MR. SCHRAMEK:  Again, your Honor, we would simply ask
15   that in any order -- to the extent you would grant Liberty's
16   motion, we simply wanted something that would -- one sentence
17   in there or a footnote that says this in no way affects the
18   Tennessee cases in which Liberty has not been sued as a party.
19            MS. JOHNSON:  If I may, your Honor.
20            MR. SCHRAMEK:  That's it, your Honor.  So that we
21   have a fight later down the road as to what your order meant.
22   We're just trying to bring it up now to avoid a big fight
23   later on collateral estoppel and --
24            THE COURT:  And to avoid paying anything.
25            Mr. Braceras, see what you've done.
```

```
1              MR. BRACERAS:  Sorry, but we also want to avoid
2     paying anything.
3              THE COURT:  Of course.
4              MR. BRACERAS:  In this respect, I may agree with Ms.
5     Johnson that it's not so much a matter of Liberty and Unifirst
6     or Liberty and the Ascension Parties reaching an agreement.
7     It really is down the road what is the broader impact of any
8     ruling on the summary judgment, and I think what the -- not to
9     speak for the Ascension Parties or Saint Thomas, but I think
10    what's important for the defendants that remain in the case is
11    simply to note for the record and raise for the Court that for
12    Unifirst for all of the jurisdictions in which we're entitled
13    to put Liberty on the verdict form, we don't want to be
14    precluded from doing that, and I don't think you have to
15    decide anything at this time on that.  We just want it to be
16    noted for the record that -- so that down the road we're
17    arguing this, there's not an argument by the PSC that we
18    waived this in any way by not trying to intervene in the
19    summary judgment motion.  We're -- frankly, we don't have
20    standing to intervene.
21             THE COURT:  Well, you may not want me to do anything,
22    but Mr. Schramek does.
23             MR. BRACERAS:  He does.
24             THE COURT:  Right.  I'll think about it.
25             MR. SCHRAMEK:  Thank you, your Honor.
```

```
1              MS. JOHNSON:  If I may, your Honor, just two points.

2         The PSC's perspective is this will come up in

3    multiple situations potentially, but at this point in time the

4    issue is not ripe to be decided and when it becomes ripe, it

5    should really be briefed so that your Honor has the benefit of

6    the caselaw on point.

7              THE COURT:  How is it going to come up?  What's the

8    vehicle by which I will decide this?

9              MS. JOHNSON:  Pretrial activity leading up to a

10   potential Tennessee trial, your Honor, would be the logical

11   place to address this issue.  If at that point in time Saint

12   Thomas or Ascension wishes to list Liberty as a contributing

13   party -- contributing nonparty, I guess is the language, that

14   would be the point in time to address it.

15             THE COURT:  Well, would not Ascension be in the same

16   position?  Assume it gets out, then can it still be listed as

17   a non-contributing party?

18             MR. SCHRAMEK:  Your Honor, that has never been raised

19   as an issue.

20             THE COURT:  Well, it's been raised right now.

21             MR. SCHRAMEK:  Well, let me explain --

22             THE COURT:  You participated in the raising of it.

23             MR. SCHRAMEK:  Let me put a finer point on it, Judge,

24   if I could, and see if I can maybe bring a little focus --

25             THE COURT:  I'm just trying to understand it.
```

1        MR. SCHRAMEK:  In our cases in which Ascension was a

2   party, you have adjudicated that they have no liability and

3   should be dismissed.  We are bound by that decision.  They're

4   not going on the jury charge.  Liberty has not been --

5        THE COURT:  But Liberty is in the same position.

6        MR. SCHRAMEK:  And that's my --

7        THE COURT:  Assume its motion for reconsideration is

8   allowed.  Then it is in precisely the same position that

9   you're in.

10       MR. SCHRAMEK:  Well, here's the difference.  Those

11  summary judgments are not pending in our cases.  We didn't

12  have the chance to respond.  I didn't have a chance to give

13  you my expert's signed declaration or evidence as to why

14  Liberty should not be dismissed.

15       Quite frankly, your Honor, we don't want to be bound

16  by what the PSC has done.  If this claim gets dismissed for

17  the way they've developed it and the arguments they've made on

18  liability, we want the opportunity to make our own arguments,

19  present our own evidence and present our own experts.  That's

20  the difference.

21       They've had their chance and you're making the

22  decision.  We haven't had the chance.  We didn't participate

23  in this process and if they were wrong, we want to make sure

24  we have the chance to put forward the evidence perhaps they

25  should have.

```
 1              THE COURT:  But the basis of the motion -- the
 2   primary basis of the motion of Liberty is that the evidence
 3   that was submitted was improperly submitted and, therefore,
 4   they're entitled to summary judgment because none of that
 5   evidence has -- can count for anything because it was
 6   improper.
 7              MR. SCHRAMEK:  That's right.
 8              THE COURT:  Doesn't that put Liberty in the same
 9   position as you?
10              And it is in that position that Mr. Braceras was
11   arguing that Liberty should remain as a non-contributing party
12   simply to reduce their liability.
13              MR. SCHRAMEK:  The key distinction here is that with
14   respect to the cases in which the motions were filed and the
15   decisions are made, everyone is bound by those decisions, but
16   that doesn't necessarily -- quite frankly, your Honor, if the
17   PSC has not put forward the evidence and arguments to
18   establish liability in response to these motions for summary
19   judgment, then this Court would, I believe, be correct in
20   dismissing it from those cases.
21              But in the Tennessee cases, if we put forward
22   evidence and expert testimony that established actually they
23   do bear some fault, the PSC simply didn't provide it or
24   provide it to you when the issue was ripe for decision, then
25   they've lost their chance at a potential recovery.
```

1          Again, we're saying we believe -- and I'll go on the

2     record.  We believe Liberty has responsibility here.  We

3     believe they have liability.  I participated in the deposition

4     of two of their witnesses.  We didn't have the chance to brief

5     to the Court why we think they have liability.  So, that was

6     really the motion for clarification.

7          So, to the extent this Court believes that this

8     decision is going to affect everybody, once and for all,

9     that's not how we see it.  That's not how we believe the

10    procedure is, but if that's the case, we wanted the

11    opportunity to participate or a footnote that says this

12    decision only applies to the cases in which it was filed and

13    does not impact in any way other parties who did not

14    participate in the briefing.

15         THE COURT:  Okay.  I think I understand what you're

16    saying.  I'll do the best I can.

17         MR. SPEARING:  Just one thing, your Honor.

18         This motion for summary judgment we're talking about

19    is only in this Indiana case, Lambert, and the 98 other -- 99

20    other Indiana cases.  No Tennessee motions have been filed

21    yet.  They may be filed in the future, at which time Ascension

22    or whoever wants to can do what they have a right to do.  I

23    think with respect to this one, this is a non-issue, except to

24    the extent Mr. Braceras wants to bring that issue up.

25         THE COURT:  Okay.  Thank you all.

1           Now, Ms. Johnson, that brings me to another point

2    that I've been concerned about, which is that we get this

3    series of motions to dismiss which are, admittedly, based on

4    state law for the most part, but the state laws are quite

5    similar and I would like to find some mechanism whereby we

6    don't get another one every month.  There has to be a way in

7    which we can combine the state defendant -- the defendants'

8    motions to dismiss based on state laws that are very similar,

9    which we can deal with one opinion -- well, there's some

10   differences as they may exist, but I would like to cut down on

11   the number of motions to dismiss.

12           MS. JOHNSON:  Yes, your Honor, and that's actually

13   one of the things I was hoping to address with the Court

14   today, so I'm glad you raised it first.  I think there are two

15   things to address on that:

16           One is that plaintiffs' counsel are actually in the

17   process of speaking with defense counsel who are filing new

18   motions to dismiss about whether or not the Court's earlier

19   decisions on similar state law issues may functionally moot

20   some of the claims that are presented in these new motions to

21   dismiss.  So, that is a meet-and-confer process that's one

22   thing that can and is being done here.

23           Something else that could be done would be a revised

24   scheduling order for filing motions to dismiss that attempted

25   to bring some sort of order and timing to this so that they're

1    not quite as piecemeal.

2            In terms of the second, that's another effort that

3    the PSC is undertaking to think about ourselves first and then

4    discuss with defense counsel what may be appropriate in that

5    respect.

6            THE COURT:  There's another piece to this.  There are

7    some claims in the complaint that probably should go.

8            MS. JOHNSON:  Yes, your Honor.

9            THE COURT:  And it may be that the Plaintiffs'

10   Steering Committee needs to get rid of some additional claims

11   in addition to assault and battery and some of the others that

12   are gone and that they agree are gone.

13           MS. JOHNSON:  Yes, your Honor, I agree, and that

14   would be a third piece that we would be was looking at.

15           THE COURT:  Okay.

16           MS. JOHNSON:  The PSC had hoped to present to the

17   Court -- I'm sorry.  The PSC will present to the Court before

18   the next status conference something along the lines of a

19   status report that will make some suggestions for how some of

20   these issues may be dealt with.  We expect that that will

21   include an identification of cases on file in the MDL,

22   including defendants who are still part of the ongoing

23   litigation in the MDL.  It will, hopefully, make some

24   observations about scheduling and some changes that may or may

25   not be needed, in addition to potential amendments to the

1    master complaint.

2         So, we will get that to the Court well in advance of

3    the next status conference and much of that will be as a

4    result of meet-and-confers with defendants to make sure that

5    we've included their perspectives as well to the extent that

6    we can agree.

7         THE COURT:  Well, that would be very helpful and I

8    will thank you all at the appropriate time you've done it.

9         MS. JOHNSON:  Thank you, your Honor.

10        MR. COREN:  Your Honor, I propose that -- for

11   example, yesterday Box Hill, which has -- which is a small

12   clinic outside of Aberdeen, Maryland, which has a fair number

13   of death cases and $3 million aggregate policy, filed a joint

14   motion to dismiss which raises literally, once again, the same

15   issues you decided in Tennessee, decided on Premier, decided

16   this yesterday or this morning in Ohio and other cases, and it

17   just seems that -- you know, we try to say would your Honor

18   entertain a stipulation where the parties who have this could

19   say, Look, your Honor's rulings in the proceeding -- for

20   example, battery, your Honor's decision --

21        THE COURT:  It's dead wrong, but we won't battle it

22   now.

23        MR. COREN:  We won't -- exactly right.  So that way

24   we don't have to, you know, press upon your court's and your

25   clerk's time and have -- even doing the same opinion again,

```
1    and if you could order the parties to sit down who filed these
2    things, to see if we could narrow those things down, I think
3    between now and in addition to what the PSC is doing, those
4    who have these cases, like my firm in Box Hill and Pete
5    Angela's firm, which have all the cases, we could -- you know,
6    if we're told to do it and get it done and see if we can get
7    it done by next month, I think we can make some progress and
8    staying our need to respond to the motion.
9              THE COURT:  I think I understood Ms. Johnson
10   correctly to suggest that she would consult with counsel for
11   the defendants and come up with a protocol for dealing with
12   these motions in a more -- well, expeditious and efficient way
13   than we have been.  So, I invite you to participate in her
14   effort to do that.
15             MR. COREN:  And we have.
16             THE COURT:  And I regard it as your effort as well.
17             MR. COREN:  Yes.  And that's exactly the way we
18   treated it.  It's been hand-in-glove working with the PSC as
19   well as the individual law firms who have had the cases from
20   -- it's a concerted effort there.
21             Meanwhile, is it fair to say that until we work that
22   out, our responses to those motions on behalf of plaintiff are
23   held in abeyance?
24             THE COURT:  Yes.
25             MR. COREN:  Thank you, your Honor.
```

```
 1                THE COURT:  Okay.  Ms. Johnson, now we go to your
 2      agenda.
 3                MS. JOHNSON:  Thank you, your Honor.
 4                We'll start off with the status of mediation efforts.
 5      As the Court is aware, we reported last time that a proposed
 6      plan of reorganization had been filed with the bankruptcy
 7      court.  The bankruptcy court has now set a hearing on February
 8      24th, which means that the deadline for the trustee to file
 9      supplements announcing any additional settlements that would
10      be part of that proposed plan is the 13th of February.
11                As a practical matter, we think that means that any
12      additional settlements that contemplate contribution being
13      made to the bankruptcy pot in exchange for channeling
14      junctions, and the like, would need to be resolved by February
15      6th.  So that is the internal, as a practical matter, drop-
16      dead date now for concluding and resolving mediations.  There
17      are --
18                THE COURT:  Are there any in the pipeline that will
19      meet that deadline?
20                MS. JOHNSON:  I certainly hope so, your Honor.  That
21      is the best I think I can say publicly on that.
22                THE COURT:  Okay.
23                MS. JOHNSON:  That brings us to Item No. 2, the
24      status of the insurance declaratory judgment actions.  As to
25      the two matters that are proceeding before Judge Saylor
```

1   dealing with Ameridose's insurance policies, there is briefing

2   on a request for -- to lift the discovery stay on those

3   actions ongoing.  That has not been decided yet, but that

4   briefing is in process.

5        There is also a discovery -- excuse me -- an

6   insurance declaratory judgment action relating to Liberty.

7   There's been an extension of time for Liberty to respond --

8        THE COURT:  Where is that pending?

9        MS. JOHNSON:  Connecticut, your Honor.  Right,

10  Connecticut?

11       MR. SPEARING:  It's in Connecticut.

12       MS. JOHNSON:  Thank you.

13       There has been an extension of time for Liberty to

14  respond to the summary judgment pleading there.  They now have

15  until January 28th to respond.  So, we may have a further

16  update on that before the next status conference.

17       That brings us to discovery.  Under 3(a), the PSC had

18  filed a motion to compel, but we have now withdrawn that

19  motion to compel.  So that need not be decided at this point

20  in time.

21       And I believe Mr. Stranch wanted to just flag for the

22  Court two potential discovery issues that may or may not --

23  you may or may not see papers from the PSC on before the next

24  status conference.

25       MR. STRANCH:  Good afternoon, your Honor.

1          There's a couple of things that I wanted to update

2     the Court with as it relates to discovery in the Tennessee

3     litigation that's going forward.

4          The first thing is we did withdraw the motion as it

5     relates to interrogatories.  We met and conferred and there

6     were supplemental responses produced and we have agreed to

7     withdraw it.

8          However, there's still a dispute over certain

9     documents that are tied in with those interrogatories being

10    produced.  And so, that will probably be briefed and brought

11    to the Court.  We hope that that will be filed soon enough so

12    that it can be heard by Judge Boal in February, if Judge Boal

13    is going to set a hearing in tandem with the February

14    conference.

15         In addition to that, your Honor, we have brewing

16    another issue relating to document production in that the

17    document productions are not yet complete for any of the

18    electronically-stored information.  We've received some paper

19    documents, but the -- but literally nothing from the

20    electronic production, and we've already set aside deposition

21    dates in February and March and April and --

22         THE COURT:  Is this from all defendants or --

23         MR. STRANCH:  This is from the Tennessee defendants.

24         We've been told -- the dates keep getting pushed

25    back.  First they were going to be before Christmas, then

1    right after Christmas.  Now the deadline is supposed to be

2    this Friday.

3           THE COURT:  Well, it can be before Christmas again.

4           (Laughter.)

5           MR. STRANCH:  Yes.

6           And, you know, if we don't have them by this Friday,

7    as we've agreed to, then we're probably going to have to file

8    a motion that will need to be heard in February as well

9    because it's going to throw off the deposition schedule that

10   we've set up and it's going to continue to introduce

11   additional delay into the case which we're hoping to avoid.

12          One last issue that we've got, and this may be

13   directed to Judge Boal.  There is a dispute over the release

14   of tax information releases that the Court ordered as part of

15   the -- as part of the plaintiff profile files.

16          The PSC had understood that if someone is not

17   claiming lost wages, then there's no need to release all their

18   tax returns.

19          The defendants -- certain defendants are taking the

20   position that everyone has to do it regardless of whether

21   they're claiming lost wages or not.  And so, that's an issue

22   that's going to be briefed to the Court.  We've reached an

23   impasse.  Unless the Court wishes to just say what the Court's

24   position on that is, but that's the issue that will be coming

25   as well.

```
1              THE COURT:  She'll take care of it.

2              MR. STRANCH:  Okay.  Will those issues -- if we can

3    get them briefed before the February conference, will there be

4    a hearing with Judge Boal in February?

5              MAGISTRATE JUDGE BOAL:  It depends how far in advance

6    of the February 28th hearing.

7              MR. STRANCH:  Let's put it this way:  How far in

8    advance do you need it fully briefed so that we can have it

9    heard in February?

10             MAGISTRATE JUDGE BOAL:  I thought I wrote the date

11   down, but what is the date of the February?

12             MR. CHALOS:  February 17th.

13             MAGISTRATE JUDGE BOAL:  17th.  So, if possible, I

14   would like some time to review it.  So, if it could be fully

15   briefed -- I don't know if you can get it done in two weeks.

16             (Discussion off the record at the Bench.)

17             MAGISTRATE JUDGE BOAL:  So, when do you think you

18   would be able to file it, in the next week?

19             MR. STRANCH:  Hopefully, before the end of next week.

20             MAGISTRATE JUDGE BOAL:  So, it's possible?

21             MR. STRANCH:  Yes.

22             MAGISTRATE JUDGE BOAL:  It's hard to say without

23   seeing the papers, but we'll try to fit it in in February.

24             MR. STRANCH:  We appreciates it, your Honor.

25             THE COURT:  You just file it as soon as possible.
```

1          MR. STRANCH:  We will.

2          THE COURT:  And the opposition is to be done as soon

3     as possible thereafter, like about the next day.

4          MS. JOHNSON:  We're getting quite good at that, your

5     Honor.

6          THE COURT:  All right.  Ms. Johnson.

7          MS. JOHNSON:  I believe that brings us to No. 4, the

8     status of the litigation track.

9          I've already mentioned to the Court the PSC's -- that

10    the PSC will file a status report that may make some

11    additional suggestions in terms of scheduling, and the like,

12    on the litigation track.

13          To flag one thing I expect to feature prominently in

14    that status report is a need for trial dates and to be direct

15    about it, your Honor, by the next status conference, we will

16    know who is settling through the trustee's bankruptcy process

17    and who has not.  We will then have a very clear sense from

18    the PSC's perspective about who the defendants are remaining

19    in the MDL and what is left to be litigated.

20          Once we have that information, we think that the best

21    way to drive this forward effectively and efficiently is to

22    set trial dates and to hold people to those trial dates to the

23    extent practical, of course.

24          THE COURT:  When would you anticipate you would want

25    to have the first set of trials?

1          MS. JOHNSON:  As much as I would like to say 2015, I

2    think given the realities of some discovery in these cases, we

3    may be looking at early 2016.

4          THE COURT:  Really?

5          MS. JOHNSON:  That's the best answer I can give you

6    today, your Honor, but I assure you that in the process of

7    sitting down to write this out, we will try and figure out a

8    way to get 2015.

9          THE COURT:  You should try to do it before Christmas.

10         MS. JOHNSON:  Absolutely, your Honor.

11         MR. STRANCH:  We will have a case ready before

12   Christmas.

13         MS. JOHNSON:  Absolutely, your Honor, we will do

14   that.

15         THE COURT:  Okay.  That is 2015.

16         MS. JOHNSON:  Yes, Christmas 2015.

17         MR. STRANCH:  Oh, yes.

18         MS. JOHNSON:  Excellent.

19         That brings us, then, to 4(a).  We discussed at the

20   last status conference appointing a pro se liaison.  The PSC

21   is actually meeting to discuss people that have been nominated

22   for that position tomorrow.  So, we hope to have a filing to

23   the Court before the next --

24         THE COURT:  How many pro se's are there?

25         MS. JOHNSON:  Well, it depends, your Honor, on

1    whether you're talking about people who have filed proofs of

2    claim in the bankruptcy who are pro se or whether you're

3    talking about pro se plaintiffs in this MDL.

4              THE COURT:  Well, what are you talking about?

5              MS. JOHNSON:  Well, that's part of the discussion,

6    frankly, your Honor.  There is a need we think for

7    coordination with both.  There may be some mechanisms in the

8    bankruptcy that already allowed for that to be done, but

9    that's part of the discussion.

10             But, in any event, we hope to provide you with a

11   submission asking for appointment of someone to that role and

12   a definition of what that role would be in the very near

13   future.

14             THE COURT:  Okay.

15             MS. JOHNSON:  4(b).  The PSC had submitted some

16   letter inquiries to the Court about the possibility of a

17   special master appointment, and the Court had issued an

18   electronic order suggesting that it may be looking into

19   potential appointments there.  So, we wanted to share with you

20   by way of an update.

21             The trustee and the Creditor's Committee and the

22   Plaintiffs' Steering Committee have been looking for, and we

23   think have a recommendation, as to who an appropriate special

24   master may be there, but we're also very interested in hearing

25   from the Court if the Court has a suggestion of its own.

1          The timing of that is in line with what we have

2    discussed previously, which is if the drop-dead date for

3    settlement is February 6th, that would really be the drop-dead

4    date to identify a special master as well.  We would hope that

5    if the Court had news on that sooner than February 6th would

6    be better, but, in any event, that would be sort of the

7    timeframe.

8          THE COURT:  Well, is there any reason not to let you

9    know today who Judge Boal is thinking of?

10          MS. JOHNSON:  No.  That would be wonderful, your

11    Honor.

12          MAGISTRATE JUDGE BOAL:  So, we had -- I understand

13    that the PSC had initially proposed that I do it.  That raised

14    certain issues with whether I could continue participating in

15    discovery as well as the settlement process.

16          So, after discussing it with Judge Zobel, we thought

17    that Magistrate Judge Neiman might be an excellent candidate.

18    He has now retired as a regular magistrate judge, but has been

19    called back on recall.  So, he is available.  He would be

20    interested.  He has more time than if he has a full complement

21    as a magistrate judge and he wouldn't cost the parties

22    anything, and he's excellent, too, in my humble opinion.

23          So, that seemed to me -- or to us a good possibility.

24    Obviously, we will need to give notice to everybody.

25          I think some of the issues that are not resolved that

1    I was concerned about but I think that everybody could fashion

2    a solution to are whether or not his decision as -- his

3    decisions as the settlement administrator would need final

4    approval from Judge Zobel.

5          As I look at the enabling statutes, 28 U.S.C. 636 for

6    magistrate judges or Federal Rule 53 of Civil Procedure or the

7    local magistrate judge rules, it seems to me that Judge Zobel

8    would need to sign off if this is going to go through a court

9    procedure on any final determination -- well, I guess "final"

10   would be the wrong word, but any determination made by

11   Magistrate Judge Neiman.  How that was reviewed by Judge Zobel

12   I think is open to discussion under what is standard.  If he's

13   appointed as a special master, I think there's a possibility

14   of full evidentiary hearings potentially on his findings, but

15   I think there are ways to streamline his decision-making

16   process for Judge Zobel's review.  So, that was our thinking.

17         THE COURT:  But I think you also mentioned that you

18   thought that the review process, even by a private person,

19   would be subject to some kind of review by the Court.

20         MAGISTRATE JUDGE BOAL:  Yes, I agree.

21         THE COURT:  So, I think there's not a substantial

22   difference between the magistrate judge doing this and

23   somebody in the private sector who you choose, at least in

24   that respect.

25         MS. JOHNSON:  Let me first thank the Court for going

1    through that process and for providing us.

2          My initial reaction -- but it's only that, I speak

3    only for myself -- that sounds like a wonderful vehicle.  I

4    would be honored to have Judge Neiman participate in this

5    process.

6          I do think as a formal matter, we would need to

7    consider that and look into the issues that you've raised as

8    well, but we're very appreciative and appreciate Judge

9    Neiman's interest in this as well.

10         MAGISTRATE JUDGE BOAL:  So, he's on recall status

11   now.  So, in terms of your timing, I assume you'll report back

12   to us as to whether or not that is acceptable or appropriate.

13         MS. JOHNSON:  We certainly will, your Honor, and I --

14   we would not wait until the next status conference to do that.

15   We would act very quickly on this.

16         THE COURT:  That's fine.  Thank you.

17         MS. JOHNSON:   Thank you.

18         And that brings us to 4(c), the Premier defendants

19   assented-to motion to allow master answers.  There is a -- we

20   addressed this at the last status conference, your Honor.  I

21   actually have a copy of the proposed order.  This is an

22   assented-to motion that we addressed last time.  If I may hand

23   that up.

24         THE COURT:  Yes.

25         (Attorney Johnson hands document to the Court. )

```
 1              THE COURT:  It's answers to the complaint, right?
 2              MS. JOHNSON:  Yes.  So, your Honor, this is an order
 3     that is formally permitting master answers to be filed in
 4     response to the New Jersey complaints and also permitting
 5     master affidavits of merit as well, and for the record it's
 6     ECF No. 1553-1.
 7              THE COURT:  Now, this is something that I need to act
 8     on?
 9              MS. JOHNSON:  Yes, your Honor.  The parties have
10     already filed the master answers and the --
11              THE COURT:  Is there any reason not to approve it?
12              MS. JOHNSON:  As a procedural matter, you have not
13     entered the order permitting us to do that.
14              THE COURT:  So, just approve it?
15              MS. JOHNSON:  Yes, please.
16              THE COURT:  I'll read it before I approve it.
17              MS. JOHNSON:  Thank you, your Honor.
18              And then I believe that brings us to the status of
19     the bankruptcy and I turn to Mr. Gottfried for that.
20              MR. GOTTFRIED:  Good afternoon, your Honor.
21              As you've already heard and I think it's really more
22     for emphasis, the Court has set the hearing on the disclosure
23     statement for February 24th.  The trustee is planning on
24     filing a supplement on the 13th.  And so, we really are at the
25     fork in the road.  Those who are interested in concluding
```

1    their settlements need to do so now in order to be part of

2    that process.

3         It's simply the situation where the trustee doesn't

4    expect and believes there will be no further people

5    participating in the bankruptcy process who are not part of

6    the disclosure statement that ultimately gets approved and

7    served on the parties after Judge Boroff approves it.

8         So, if you are interested in pursuing a bankruptcy

9    solution, now is the time and the time is running short.  I

10   think that's really the bankruptcy message.

11        MR. COREN:  Your Honor, Mike Coren for the Creditor's

12   Committee.

13        I just can amplify on that February 6th date and what

14   it really means.  Professor Green and Carmen Reiss and the

15   various -- the PSC and the various state groups, where there

16   are large pods of cases, for example, Premier, which is in

17   front of you, your Honor, because there was a great number of

18   cases and different complaints, the parties got together and

19   have a solution, but that is a classic type of case where,

20   oddly -- and just there's no real good explanation why

21   Professor -- why we're not in front of Professor Green between

22   now and February 6th.

23        Mr. Blumberg is here in the courtroom.  Maybe he

24   could explain why there's no interest, but it's -- there's

25   about 30 to 35 cases pending.  Some of them are very

```
 1    significant.  They have an overlap with the Inspira case,
 2    which your Honor is familiar with because it's one of the
 3    settling parties in the bankruptcy, and it's just one of those
 4    logical -- you know, logical pods of cases that really scream
 5    out for Professor Green to be working on the parties, but he
 6    can't do anything unless we get the insurance carrier -- or
 7    their interest there, and it just makes sense in there.  Box
 8    Hill, eight cases, four death cases, why isn't there
 9    discussions for this bankruptcy solution?  We're at a loss.
10              THE COURT:  What can I do?
11              MR. COREN:  Maybe get the parties here in front of
12    you and explore, you know, with Professor Green under your
13    auspices, like Insight, to make progress like progress was
14    made in Insight.  Professor Green is very good at getting
15    parties together, but until, you know, there's some impetus to
16    get the parties' tuchuses to Boston or New York or wherever
17    Professor Green will see them, it's hard for him to do what he
18    does very well or what Carmen Reiss does very well or
19    Geronemus does very well.
20              COURT REPORTER:  I'm sorry?
21              MR. COREN:  Carmen Reiss or David Geronemus.
22              THE COURT:  You need to spell that.
23              MS. JOHNSON:  G-e-r-o-n-e-m-u-s.
24              MR. COREN:  He's also one of the mediators.
25              THE COURT:  Carmen Reiss I think is R-e-i-s or
```

1    R-i-e-s, I believe.

2           MS. JOHNSON:  R-e-i-s-s, I believe.

3           THE COURT:  Excuse me one moment.

4           Are there any counsel on the telephone who represent

5    the parties that were just mentioned who have not yet gone

6    before Professor Green?

7           MR. COREN:  Mr. Blumberg is in the courtroom.

8           MR. KIRBY:  I'm here.  This is Greg Kirby.  I

9    represent Box Hill.

10          THE COURT:  Okay.  Counsel in the courtroom is about

11   to address this issue and then you're next.

12          MR. BLUMBERG:  This is Jay Blumberg and I represent

13   the Premier defendants from New Jersey.

14          With all due respect, we understand the ramifications

15   of going forward in litigation.  We understand that there are

16   opportunities for us to participate in mediation.  We have

17   discussed that at length, and at this point in time we are

18   just simply not interested in pursuing mediation.  We don't

19   believe we did anything wrong, and for that reason, we are not

20   participating in the mediation.

21          If the Court orders us to be in front of you and I

22   have to bring my clients or my insurance carriers in front of

23   you, we'll do that, but we've been doing this a long time.  We

24   know what the issues are.  We know the ramifications of

25   participating in litigation, and they have chosen at this

```
1    point not to participate.
2              THE COURT:  Well, that's their choice, I suppose.
3              It seems to me that the view is not -- the correct
4    view is not as much as we have done nothing wrong as is the
5    risk of being found to have done something wrong.  I mean,
6    that's the real question.  And you may be as innocent as you
7    say you are, but a jury can say otherwise and it's the risk
8    that the mediation ultimately is designed to eliminate, but
9    it's your choice, your judgment, and I don't think I can force
10   you to abandon your judgment.
11             MR. BLUMBERG:  That's true --
12             THE COURT:  Which I'm not inclined to do that.
13             MR. BLUMBERG:  That's true in every case that we
14   have, your Honor, and I agree with you.  I think --
15             THE COURT:  I know, but it's never -- you know, the
16   interesting thing is that counsel don't talk about it in terms
17   of risk.  They talk about, We've done nothing wrong --
18             MR. BLUMBERG:  Well --
19             THE COURT:  -- and maybe that imports the degree of
20   the acknowledgment of risk.
21             MR. BLUMBERG:  I've been retained by an insurance
22   company.  What they do for a living is evaluate risk and
23   they're the ones that are making most of the decisions as to
24   whether we go forward or not.
25             THE COURT:  Okay.  It was a good effort, but --
```

```
 1              MR. COREN:  It was, your Honor, and I thank you.

 2              THE COURT:  Now, there was somebody on the phone who

 3    also wanted to say something about this and I've forgotten

 4    your name, I'm sorry.

 5              MR. COREN:  Mr. Kirby.

 6              MR. KIRBY:  This is Greg Kirby, representing Box Hill.

 7              I don't necessarily want to say anything.  We respect

 8    your comment.  We've also been at this for a long time and I

 9    couldn't say anything better than Mr. Blumberg.  So, I'll just

10    adopt what he said.

11              THE COURT:  Who are your clients?

12              MR. KIRBY:  Box Hill Surgery Center and Dr.

13    Bhambhani.

14              THE COURT:  Okay.  Well, there we are.

15              MR. COREN:  Onward we go, your Honor.

16              THE COURT:  Right.

17              MS. JOHNSON:  Your Honor, I would like to acknowledge

18    the Court's assistance in holding an all-day mediation to

19    attempt to resolve the matter earlier this month.  Despite the

20    fact that that -- I cannot report that that mediation has

21    resolved, but we did find it to be extremely helpful and very

22    much appreciated the Courts' involvement as well as the

23    mediator's involvement in that.

24              THE COURT:  Judge Boal, too.

25              MS. JOHNSON:  Yes.  Sorry, that was a plural
```

1    "Courts'."

2            THE COURT:  Thank you.

3            You want to meet again on February 17th?  Is this the

4    time we have set already, Lisa?

5            COURTROOM DEPUTY CLERK URSO:  Yes.

6            THE COURT:  So, we're on for February 17th.

7            COURTROOM DEPUTY CLERK URSO:  At 2:00, with motions.

8            THE COURT:  Judge Boal at 11:30 and Judge Boal and

9    Judge Zobel at 2:00.  Okay.

10           And will there be a motion hearing at that time?

11           COURTROOM DEPUTY CLERK URSO:  Yes.  In my little

12   notes, we have motions first.  I wrote a little note.

13           THE COURT:  To start?

14           COURTROOM DEPUTY CLERK URSO:  Motions to start first.

15           MS. JOHNSON:  It is unclear to me at this point, your

16   Honor, whether we will be requesting oral argument on any

17   motions at that time in light of your suggestion that we

18   revisit some of the motions to dismiss timing, but we will try

19   to let you know as soon as we can on that.

20           THE COURT:  Thank you.

21           MS. JOHNSON:  I think that brings us to (C) and

22   agenda item No. 8, fully-briefed motions.  I don't think we

23   need to address everything on this list, your Honor, but there

24   are a couple I would draw to your attention.

25           No. 8, the Plaintiffs' Steering Committee had much

1    earlier in time moved for entry of a case management order

2    addressing some Virginia matters.  By agreement of the parties

3    when they entered into mediation, they agreed not to press

4    that order, but it does continue to appear on this list.

5         If the mediation with Insight does not resolve

6    successfully, the PSC expects to inform the Court and ask that

7    the Court turn to and address that order.

8         THE COURT:  All right.

9         (Discussion off the record.)

10        MS. DOUGHERTY:  Your Honor, Kim Dougherty on behalf

11   of the Luna matter, No. 10.

12        You may recall, we had argument with respect to the

13   motion to dismiss at the last hearing and there were issues

14   related to the probate and the estate.

15        We did notify the Court and defense counsel through

16   our sur-reply and also through communications with defense

17   counsel that Ms. Luna has been officially appointed personal

18   representative of the estate.  We have a meet-and-confer

19   scheduled for next week to see if, in fact, any other issues

20   remain that need to be resolved between the parties and,

21   hopefully, we can file something jointly shortly thereafter.

22        THE COURT:  At that point these motions are ripe for

23   decision or are you going to try to settle with -- is she

24   trying to settle with the defendant?

25        MS. DOUGHERTY:  You asked us to communicate and

1    resolve any issues that we can among ourselves and report back

2    to you.  So, we're going to attempt to do that, your Honor.

3         With respect to No. 11, those both parties have

4    agreed can be decided on the papers.  Just brief background on

5    that.  They are just consolidating two dockets that relate to

6    the same exact plaintiff.

7         We had originally filed in accordance with the orders

8    of the Court for Bellwether selection cases directly into the

9    MDL.  We followed up to file also in the federal court in the

10   home state in Tennessee and also in Ohio and just to protect

11   our personal jurisdiction issues.  Those were then transferred

12   to this Court.

13        We have asked that the Court now consolidate the

14   cases, one that was filed for the Bellwether purposes and

15   then, two, the one that was transferred into the MDL from the

16   out-of-state court, just so that we have one docket for those

17   matters, and those are all listed in No. 11, your Honor, and

18   defense counsel said they would rest on the papers as well.

19        THE COURT:  Okay.  Are the defendants proposing --

20   Ameridose, I guess, is the primary defendant -- filing any

21   opposition or has it been filed?  I mean, are they ready for

22   decision now, these motions?

23        MS. DOUGHERTY:  Yes, your Honor.  Ameridose has not

24   filed an opposition.  The only ones that have oppositions are

25   the Tennessee cases, Carter, Patel and Seiber, and those have

1   been filed and are noted in 11(a).

2          MR. TARDIO:  Your Honor, Chris Tardio on behalf of

3   the BKC clinics defendants.

4          We filed -- I guess, technically, it's an opposition.

5   We don't have any opposition to cleaning up the docket and

6   getting these under one docket number.

7          The issue is by consolidating them, the later-filed

8   cases just go away.  There needs to be a dismissal order of

9   the later-filed duplicative case to achieve what I think the

10  plaintiffs are trying to achieve.

11         THE COURT:  And you're prepared to do that?

12         MS. DOUGHERTY:  Your Honor, we just want to ensure

13  that it incorporates and adopts by reference our long-form

14  complaint which was also filed in the other state.  If we can

15  get agreement from counsel that by doing that, we're not

16  waiving any issues, and with respect to jurisdiction, perhaps

17  we can work it out and also with respect to the statute of

18  limitations.

19         THE COURT:  So, I won't decide this today.

20         MS. DOUGHERTY:  Yes.  Thank you.

21         THE COURT:  Thank you.

22         MS. JOHNSON:  I think we can turn, then, to the

23  briefing in progress.  I think there are only two to flag for

24  the Court there.  No. 12, that's a motion by Insight.  Again,

25  the parties have agreed not to press that issue while the

1    mediation is ongoing.

2             And then if we turn to No. 15, there's a motion by

3    ARL that ARL counsel or Mr. Ellis may want to address briefly.

4             MR. WALTON:  Good afternoon, your Honor.  Ken Walton

5    for ARL.

6             Your Honor, we have settled with the PSC and the

7    trustee, and what we filed is a motion to stay this proceeding

8    as to us, my client, ARL.

9             Just a couple of things, your Honor.  The motion

10   filed on December 31st offered the deadline for filing

11   oppositions is today.  So, conceivably, you know, that could

12   happen after this hearing.  Mr. Ellis from the PSC advised me

13   that as of 1 o'clock today, no oppositions had been filed.

14            The reason I just want to touch on the motion briefly

15   is just to emphasize the motion in form is entirely consistent

16   with prior motions filed with the Court and the order that

17   we've attached is consistent with prior orders issued by this

18   Court, including the one on October 9th, 2014.

19            I don't know if any oppositions will be filed today.

20   I can't speak to that, but even if there are, your Honor, we

21   would ask, respectfully, that you issue a prompt ruling on the

22   motion because -- for this reason:

23            This stay is a material term of our settlement

24   agreement.  We do want to be part of the bankruptcy wrap-up on

25   February 24th.  So, not having an order issuing this stay --

1    which is very important because, you know, just being part of

2    this proceeding with all these lawyers, it does require kind

3    of a daily monitoring that costs my client money, frankly.

4    So, that's --

5           THE COURT:  But you meet so many nice people in the

6    process.

7           MR. WALTON:  I do.  It's been a great experience,

8    your Honor, but we would like to wrap it up.

9           THE COURT:  So, what do I need in order to decide

10   this?

11          MR. WALTON:  Well, your Honor, I think we have

12   attached to the motion the actual order and it's --

13          THE COURT:  I seem to have all the other papers

14   pertaining to this except that one, 1620.

15          MR. WALTON:  I can rip it off and hand it up.

16          THE COURT:  No.  I can find it.  Just tell me what I

17   need to do.

18          MR. WALTON:  Actually, your Honor, just enter the

19   order, if acceptable to the Court, obviously.

20          THE COURT:  This is an exhibit to Docket No. 1620 or

21   21?

22          MR. ELLIS:  Exhibit 2, your Honor.

23          THE COURT:  Exhibit 2 to 1620?

24          MR. ELLIS:  Yes.

25          MR. WALTON:  Yes, your Honor, Exhibit 2 to 1620.

 1              MR. ELLIS:  And, your Honor, the PSC has filed a

 2    joinder to this motion and --

 3              THE COURT:  I have that.

 4              MR. ELLIS:  And the trustee and the Creditor's

 5    Committee also filed a joinder to the motion.  So, we would

 6    ask that it also be allowed.

 7              THE COURT:  Is there anybody who is objecting to it?

 8              MR. ELLIS:  The objections are not due until the end

 9    of today, but as of -- before I left for court, there had been

10    no oppositions.

11              THE COURT:  All right.

12              MR. WALTON:  And, your Honor, if I may.  Again, I

13    probably shouldn't argue something when there is no

14    opposition.

15              The last time this motion came up, the only

16    objection -- my understanding, the only objection was that the

17    party objecting didn't want to be prohibited from discovery

18    relating to their cases, and to address that issue, we put a

19    carve-out in this order saying if you can show the Court that

20    you have necessary discovery as it relates to my client, that

21    that would be permissible.  So, we have addressed the one

22    objection that was raised previously.

23              THE COURT:  Thank you.

24              MR. WALTON:  Thank you, your Honor.

25              MR. GOTTFRIED:  And, your Honor, the trustee joins in

1     this motion.

2           MS. TAYLOR:  As does the Creditor's Committee, your

3     Honor.

4           MR. WALTON:  Thank you, your Honor.

5           THE COURT:  That's it.

6           MS. JOHNSON:  Except for scheduling, your Honor, if

7     we could schedule the March and April conferences.  I have

8     many parents pointing out that spring break falls within those

9     timeframes.  Perhaps we could get some time --

10          THE COURT:  They could bring their children.

11          (Laughter.)

12          MS. JOHNSON:  What an education it would be.

13          COURTROOM DEPUTY CLERK URSO:  So, schedule for March?

14    I'm sorry, did you say a date?

15          MS. JOHNSON:  Perhaps the 11th or 12th of March.

16          COURTROOM DEPUTY CLERK URSO:  Okay.  I could move

17    something.  I mean, if that's agreeable, the 12th I could do.

18    I could move something.

19          MS. JOHNSON:  I understand that does not work for

20    some counsel.  Perhaps any day the following week?

21          COURTROOM DEPUTY CLERK URSO:  Well, I was just

22    looking -- that's spring break.  Okay.

23          So, the following week or the 23rd, the week of the

24    23rd?

25          (Discussion off the record.)

```
 1              MS. JOHNSON:  The week of the 23rd would be great.

 2              COURTROOM DEPUTY CLERK URSO:  Okay.  Well, I have

 3    stuff scheduled, but what day would work best for counsel?

 4    Because I could move what I have on.

 5              MS. JOHNSON:  I think we try to do Wednesdays or

 6    Thursdays to accommodate people coming in from out of town,

 7    generally.

 8              COURTROOM DEPUTY CLERK URSO:  Well, if we could do

 9    the Wednesday, that would be easier on the Court's schedule,

10    but, if not, obviously Thursday.

11              THE COURT:  Can we move what we have on Thursday to

12    Wednesday?

13              COURTROOM DEPUTY CLERK URSO:  Yes, but -- we could,

14    Judge.

15              (Discussion off the record at the Bench.)

16              THE COURT:  We have a problem of a multi-defendant

17    case and we cannot sentence the guys who have pleaded at the

18    same time.  We have to --

19              COURTROOM DEPUTY CLERK URSO:  Some of them.

20              THE COURT:  Some of them.  So, that's why a whole

21    pile of days are being used up by sentencing for people who

22    can't meet in the courtroom.

23              MR. FERN:  Wednesday is fine.

24              COURTROOM DEPUTY CLERK URSO:  Okay.  We could do

25    Wednesday, at 2:00.
```

```
 1              MR. FERN:  3/25?

 2              COURTROOM DEPUTY CLERK URSO:  3/25, at 2:00, yes.

 3              THE COURT:  Do we assume, again, that we will have a

 4     brief motion hearing where any motions require a hearing

 5     before we get to the rest of the agenda?

 6              MS. JOHNSON:  That seems to work well, your Honor, so

 7     long as that works for the Court.

 8              THE COURT:  You will, in the meantime, also work on a

 9     protocol for combining some of these state law cases into one

10     hearing rather than ten.

11              MS. JOHNSON:  Yes, we will do that.

12              COURTROOM DEPUTY CLERK URSO:  I'm sorry.  Did you say

13     you wanted to do April also or were we just going to do March?

14              MS. JOHNSON:  If we could do April, that would be

15     fine.

16              COURTROOM DEPUTY CLERK URSO:  Okay.  What are we

17     looking at there?  Because April is vacation also, right, the

18     20th?  The week of the 20th, that's vacation, correct?

19              MS. JOHNSON:  Yes.  So, I suppose the 15th.

20              COURTROOM DEPUTY CLERK URSO:  Well, both of those --

21     we have nothing on either one of the 15th or the 16th.  So,

22     whichever is better for counsel.

23              MR. FERN:  Thursday is the 16th?

24              MR. GOTTFRIED:  15th.

25              THE COURT:  I'm sorry, which date in April?
```

```
 1              COURTROOM DEPUTY CLERK URSO:  It was the 15th or 16th
 2    they were looking for.  Either day is available for us, but
 3    some said the 16th they can't.
 4              UNIDENTIFIED SPEAKER:  The 15th is the Women's
 5    Conference in Austin that -- from all over the country and
 6    there are several of us --
 7              THE COURT:  So, another week.
 8              COURTROOM DEPUTY CLERK URSO:  And then school
 9    vacation week is the April 20th week.
10              MS. JOHNSON:  I think we could look at the week of
11    the 27th.
12              COURTROOM DEPUTY CLERK URSO:  Okay.  Well, the same
13    thing is available there.  I mean --
14              THE COURT:  That's when the men are meeting.
15              (Laughter.)
16              MS. JOHNSON:  We don't need them.
17              COURTROOM DEPUTY CLERK URSO:  What about April 29th,
18    at 2:00?
19              MS. JOHNSON:  That would be great.
20              THE COURT:  What's the day, Lisa?
21              COURTROOM DEPUTY CLERK URSO:  4/29, at 2:00.
22              THE COURT:  And the next meeting is actually February
23    17th, I think.  Yes, February 17th, at 2:00.
24              COURTROOM DEPUTY CLERK URSO:  Yes, at 2:00.  So, then
25    4/29, at 2:00, okay.
```

1            MS. JOHNSON:  Judge Boal, if I may ask, should we

2    anticipate that there may be discovery conferences on those

3    same dates, understanding that may change depending on what's

4    before you?

5            MAGISTRATE JUDGE BOAL:  Yes.

6            MS. JOHNSON:  Thank you.

7            THE COURT:  Does anybody have anything else?

8            (No response.)

9            THE COURT:  Mr. Stranch, you're just scratching your

10   head, you're not waving your hand?

11           MR. STRANCH:  No.

12           THE COURT:  Okay.  We are adjourned.  And, again, I

13   thank you very much.

14           MS. JOHNSON:  Thank you, your Honor.

15           MR. STRANCH:  Thank you, your Honor.

16           THE COURT:  And Court is in recess.

17           (Adjourned, 3:19 p.m.)

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2         I, Catherine A. Handel, Official Court Reporter of the

 3    United States District Court, do hereby certify that the

 4    foregoing transcript, from Page 1 to Page 66, constitutes to the

 5    best of my skill and ability a true and accurate transcription of

 6    my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

 7    Re: New England Compounding Pharmacy, Inc., Products Liability

 8    Litigation.

 9

10    January 20, 2015          /s/Catherine A. Handel
      Date                      Catherine A. Handel, RPR-CM, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```