# **EXHIBIT B**

**Provider Claims Resolution Facility Procedures**

# **EXHIBIT B-1**

## **High Point Claims Resolution Facility Procedures**

**EXHIBIT B-1 TO THE TORT TRUST AGREEMENT:**
**HIGH POINT PERSONAL INJURY**
**CLAIMS RESOLUTION FACILITY PROCEDURES**

The HIGH POINT PERSONAL INJURY CLAIMS RESOLUTION FACILITY ("High Point Facility") for High Point personal injury claimants (each a "High Point Claimant," and collectively, the "High Point Claimants") is established under, pursuant to, and adjunct to the *Joint Chapter 11 Plan of New England Compounding Center*, dated December 3, 2014 (the "Plan") and the NECC Tort Trust Agreement, with the High Point Settlement Funds to be held by the Tort Trustee as a segregated fund.   Any person making application or given the right under the Plan to make application for a share of the funds being distributed by these High Point Personal Injury Claims Resolution Facility Procedures ("CRFP") shall be bound by the provisions of these CRFP and to the allocation processes provided in these CRFP.   Unless the context otherwise requires, all capitalized terms used and not otherwise defined in these CRFP will have the meanings assigned to them in the Plan or the NECC Tort Trust Agreement.

**I.     GENERAL PROVISIONS**

1.     The ethics of carrying out these CRFP, including whether Rule 1.8(g) is applicable, will be examined by either a reputed ethicist or the North Carolina Bar Association, with a written ethics opinion or determination to be obtained prior to carrying out these CRFP. If necessary, these CRFP will be modified to meet or carry out the terms of the resulting ethics opinion or determination.

2.     Each High Point Claimant who has timely filed a Proof of Claim or PITWD Addendum in the Chapter 11 Case (as defined herein) asserting a personal injury or wrongful death claim arising from the injection(s), at or by High Point Surgery Center, Surgery Center Associates

of High Point, LLC, High Point Regional Health f/k/a High Point Regional Health System d/b/a High Point Regional Hospital (collectively "<u>High Point</u>") of contaminated drugs compounded by New England Compounding Center, Inc. ("<u>NECC</u>") shall have the right to make a claim for a share of High Point Settlement Funds allocated under the Plan and the High Point Settlement Agreement to the High Point Facility for distribution.

3.      These CRFP set forth a process to assign values to each High Point Claimant's claim for the purpose of allocating the High Point Settlement Amount (as defined herein) (after reduction for expenses and other reserves) among the High Point Claimants, as provided for and set forth in the Tort Trust Agreement.

4.      The execution of the High Point Settlement Agreement and the Plan Effective Date are both prerequisites to the effectiveness of these CRFP.

## II.   GUIDELINES, PROCESSES AND PROCEDURES

### A.   <u>Appointment of High Point Settlement Administrator</u>

5.      Pursuant to the Plan and the Tort Trust Agreement, a "High Point Settlement Administrator," a neutral allocator, is charged with evaluating each High Point Claimant's claim in accordance with the guidelines and procedures contained herein, *i.e.*, the designated neutral allocator is charged with reviewing and making determinations as to the allocation of the net High Point Settlement Amount to each High Point Claimant pursuant to the process set forth herein.

6.      Multiple candidates were interviewed for the position of High Point Settlement Administrator for these CRFP.   Based on the merits and economics of his proposal, attorney Ed Gentle and his firm, Gentle, Turner, Sexton, Debrosse & Harbison (the "<u>High Point Settlement Administrator</u>") has been retained as the High Point Settlement Administrator under these CRFP.

The High Point Settlement Administrator will have immunity as provided for the Provider Settlement Administrators in the Tort Trust Agreement. The High Point Settlement Administrator will allocate values to each High Point Claimant's claim pursuant to the process set forth herein, and his decisions will be final and binding. If Mr. Gentle and his firm no longer able to serve as Settlement Administrator for whatever reason, the District Court  shall appoint a successor Settlement Administrator.

### B.    Assistance for High Point Claimants Without Lawyers

7.      Certain High Point Claimants are not represented by counsel.  To provide these individuals with assistance in participating in the allocation process described in these CRFP, the High Point Settlement Administrator may retain staff from outside his company (the "Facilitators") to assist unrepresented High Point Claimants in timely submitting Compensation Claim Forms and, where appropriate, the High Point Compensation Claim Form Addendum, and other required documentation.

8.       Any costs incurred by Facilitators in assisting specific unrepresented High Point Claimant's claim will be deducted from that unrepresented High Point Claimant's distribution, if any, pursuant to these CRFP.

9.      Unrepresented High Point Claimants have ultimate responsibility for retrieving and producing their medical records and any other evidence requested or required under these CRFP to substantiate their claims.

### C.    National Claims Resolution Procedures

10.      Attorneys Rick Ellis, Kim Dougherty, Marc Lipton, Harry Roth and Mark Zamora have created a system to compensate victims from the National Settlement Fund (as

3

defined in the Tort Trust Agreement).  With the assistance of consulting infectious disease physicians who have treated hundreds of patients injured by NECC's contaminated injections, the Matrix Committee reviewed the published literature concerning the outbreak and designed the Claims Resolution Facility Procedures to be used in the processing of claims in the National Settlement (the "National Procedures"). *See **Exhibit B to the Tort Trust Agreement***.[1]  The National Procedures were designed to allocate the net funds in the National Settlement Fund to all Tort Claimants who are qualified to seek distributions from the Tort Trust.  Due to the limited funds that will be available to claimants from the National Settlement Fund, a primary goal in drafting the National Procedures was balancing the need to compensate differently situated claimants differently, while also minimizing the administrative expenses of reviewing and approving claims.

11.     Within 14 days of the Plan Effective Date, or as soon as practicable thereafter, the High Point Settlement Administrator shall mail a NECC National Compensation Program Claim Form ("National Compensation Claim Form"), together with instructions, National Base Point Category and Adjustment Calculation Work Sheet, a High Point Supplemental Claim Form, together with High Point supplemental instructions, a High Point Supplemental Base Point Category and Adjustment Calculation Worksheet, a set of Frequently Asked Questions, and a W-9 Form to each Potential High Point Claimant[2] along with a cover letter explaining that 1) the Claimant's submission to the High Point Settlement Administrator of the National Compensation

---

[1] *See* Section IV.B-J of ***Exhibit B to the NECC Tort Trust Agreement: Claims Resolution Facility Procedures***. The High Point Claimants have made an amendment to Category IV and to the Acute Renal Insufficiency adjustment of the National Procedures to reflect point allocation based upon severity of injury in Paragraph 20 below (the "Category IV Amendment" and the "Acute Renal Insufficiency Amendment").

[2] "Potential High Point Claimant" is defined as any claimant who identified High Point on their Proof of Claim or PITWD Addendum.

4

Claim Form is a separate and distinct requirement for the High Point Settlement, 2) to be eligible to receive compensation from the National Settlement Fund the Claimant must also submit a National Compensation Claim Form to the National Settlement Administrator. The cover letter shall also provide the address to submit such a National Compensation Claim Form to the National Settlement Administrator, the deadline for submitting such a Claim Form and provide the name of a contact person the potential High Point Claimant may call with any questions about the distinct filing requirements for the two settlements. To the extent practicable, this mail out will be coordinated with the mail out by the National Settlement Administrator in conjunction with the National Compensation Claim Form packets.

**Procedures for Filing Compensation Claim Forms**

12.     To receive compensation from the High Point Settlement Fund, High Point Claimants must submit a completed and signed National Compensation Claim Form (or a copy of same), a completed and signed High Point Supplemental Claim Form and a completed and signed W-9 Form to the High Point Settlement Administrator, together will all supporting documentation required, on or before 120 days after Effective Date, or within 106 days after the High Point Claim Form Package mail out to Potential High Point Claimants, whichever is later, at 5:00 P.M., Eastern Standard Time.   All National Compensation Claim Forms and High Point Supplemental Claim Forms must be received by the High Point Settlement Administrator by this date and time.   No National Compensation Claim Forms or High Point Supplemental Claim Forms may be accepted by the High Point Settlement Administrator after this date and time, except upon a showing of excusable neglect as determined by the High Point Settlement Administrator.   No National Compensation Claim Forms or High Point Supplemental Claim Forms shall be accepted by the

5

High Point Settlement Administrator after the date the High Point Settlement Administrator has calculated the Proposed Final Allocation, pursuant to Paragraph 24 below.  The High Point Settlement Administrator may also accept as timely National Compensation Claim Forms that are submitted in error (but which are otherwise timely) to the National Settlement Administrator, the Bankruptcy Court, the District Court, or Donlin Recano. Timely received incomplete Claim Forms shall be considered timely filed, if completed within a reasonable time thereafter.

13. The filing of a National Compensation Claim Form and High Point Supplemental Claim Form also constitutes participation by that High Point Claimant's estate and family members in the primary High Point Claim or the Class D Estate Claims and Class D Consortium Claims of family members shall be deemed released by the treatment afforded the primary High Point Claimant under and in accordance with this CRFP.

**Determination of Eligible Claims Based on Previously Submitted PITWD Addenda in The NECC Bankruptcy Case and a Completed W-9 Form**

14. In order to be eligible to receive compensation from the High Point Settlement Fund, a Tort Trust Beneficiary must have previously filed in the Chapter 11 Case a timely Proof of Claim or a Personal Injury and Wrongful Death Claim Information Form ("PITWD Addendum"), or had a timely Proof of Claim or PITWD Addendum filed on his or her behalf (the Proof of Claim and PITWD Addenda so filed, collectively, "Timely Proof of Claims or PITWD Addenda"). Proofs of Claim and PITWD Addenda that were allowed by the Bankruptcy Court to be filed after the Bar Date will be deemed to be Timely Proofs of Claim or PITWD Addenda.

15. The High Point Settlement Administrator shall conduct an initial review of all High Point Supplemental Claim Forms and the Timely Proofs of Claim and PITWD Addenda filed by or on behalf of each High Point Claimant.   If no Timely Proof of Claim or PITWD Addendum

was filed by or on behalf of a given High Point Claimant, the High Point Settlement Administrator shall make a final determination denying the Claim and shall notify the High Point Claimant of such final denial and the procedure to request reconsideration by the High Point Settlement Administrator. Any such requests for reconsideration shall be made within 60 days of notice to the Claimant of such a denial.   Notwithstanding anything contained herein to the contrary, a High Point Claimant receiving such a final denial may file a request for reconsideration in accordance with the provisions of Paragraphs 31-36 below.

16.     While conducting the initial review described in Paragraph 15, above, the High Point Settlement Administrator shall also determine if the Claim Form is complete and if the High Point Claimant submitted a completed W-9 form with his or her High Point Supplemental Claim Form.   If the Claim Form is incomplete or a completed W-9 form was not submitted by a High Point Claimant, the High Point Settlement Administrator shall notify the High Point Claimant that one must be submitted within 90 days of such notice or the claim will be finally denied.   In the event of such a final denial, the High Point Settlement Administrator shall notify the High Point Claimant of the final denial and the procedure to request reconsideration.   Notwithstanding anything contained herein to the contrary, a High Point Claimant receiving such a final denial may file a request for reconsideration in accordance with the provisions of Paragraphs 31-36 below.

17.     All High Point Claims not denied for lack of a Timely Proof of Claim or PITWD Addendum or lack of a completed W-9 form shall be deemed to be "Eligible High Point Claims" and persons holding such Eligible High Point Claims shall be deemed "Eligible High Point Beneficiaries."

**Eligible High Point Claims Involving Injections From One or More of The Three Contaminated MPA Lots**

7

18.     In order for an Eligible High Point Claim to qualify for any of the seven Base Point Categories described in Section IV.B of the National Procedures as amended by the High Point Category IV Amendment (and thus to be deemed a "Qualified Claim"), the Eligible High Point Beneficiary must submit to the High Point Settlement Administrator medical or other records documenting that the Eligible High Point Beneficiary received an injection or injections from one or more of lots 05212012@68, 06292012@26 or 08102012@51 (the "Three Contaminated MPA Lots") of preservative-free methylprednisolone acetate ("MPA") compounded by New England Compounding Pharmacy ("NECC"), *i.e.* a letter from High Point or the North Carolina Department of Health and Human Services informing the Eligible High Point Beneficiary that he/she had received an injection from one of the Three Contaminated MPA Lots. Alternatively, if the Eligible High Point Beneficiary (on the Supplemental High Point Compensation Claim Form) has requested that the High Point Settlement Administrator review the list of patients who received an injection from one of the Three Contaminated MPA Lots that High Point submitted to the Chapter 11 Trustee pursuant to the *Interim Order Regarding Chapter 11 Trustee's Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and for Related Relief Concerning Notice by Notice Intermediaries* [Bankr. Dkt. No. 412] (the "High Point Patient List"), and the North Carolina list of NECC death, stroke, fungal meningitis, spinal or paraspinal infection and/or peripheral joint infection cases (the "North Carolina NECC List"), and if these lists are available to the High Point Settlement Administrator, the High Point Settlement Administrator shall review the High Point Patient List and North Carolina NECC list in order to determine if the Eligible High Point Beneficiary's name is on one of such list(s).   If the Eligible

8

High Point Beneficiary's name was listed on any such list, this will provide the necessary proof of injection from one of the Three Contaminated MPA Lots.

**D.**   **High Point Claims Resolution Procedures**

19.     These CRFP are designed to allocate only the proceeds of the High Point settlement net proceeds after payment to the Tort Trustee and other expenses and assessments, which net proceeds will be segregated and used solely to satisfy the Qualified Claims of High Point Claimants in connection with injections of contaminated MPA received at or from High Point who have timely submitted Proofs of Claim or PITWD Addenda in the Chapter 11 Case and have engaged in the process set forth herein in seeking a share of the High Point Settlement Amount.  However, as more fully described below, the National Procedures will serve as the foundation for scoring the High Point Claimants' claims.

**E.**   **Settlement Facilitation and Allocation Determination**

Step 1 - Presentation of Claimant's Proposed Allocation

20.     As Claims are received, The High Point Settlement Administrator will first score the High Point Claimants' claims pursuant to the National Procedures as amended by the High Point Category IV Amendment and Acute Renal Insufficiency Amendment. The Category IV Amendment is as follows:

      a.   High Point Claimants qualifying under Category IV, under the National Procedures but with anti-fungal use of less than 30 days, will be allocated a total of 5 points as the Category IV Base Points instead of the 20 Base Points set forth in the National Procedures, prior to any potential adjustments.

9

     b.   High Point Claimants qualifying under Category IV, under the National Procedures but with anti-fungal use of less than 60 days, will be allocated a total of 10 points as the Category IV Base Points instead of the 20 Base Points set forth in the National Procedures, prior to any potential adjustments.

     c.   High Point Claimants qualifying under Category IV, under the National Procedures but with anti-fungal use of less than 90 days, will be allocated a total of 15 points as the Category IV Base Points instead of the 20 Base Points set forth in the National Procedures, prior to any potential adjustments.

The Acute Renal Insufficiency Amendment is as follows:

     a.   A High Point Claimant qualifying for Category I, II, III, IV, V or VI under the National Procedures shall be allocated an additional 5 points if the High Point Claimant suffered acute renal insufficiency after treatment with amphotericin B or if the High Point Claimant suffered acute renal insufficiency requiring temporary dialysis after treatment with amphotericin B, or 10 additional points if the High Point Claimant suffered acute renal insufficiency requiring permanent dialysis after treatment with amphotericin B.

     b.   Proof of acute renal insufficiency shall be as set forth in the National Procedures.

21.     In scoring the High Point Claimants' claims, the High Point Settlement Administrator will ask each High Point Claimant (and his or her attorney, if the High Point Claimant is represented) to present the High Point Claimant's proposed score. The High Point Settlement Administrator may agree with a High Point Claimant, to accept and adopt a Claimant's Matrix Score determined by the National Settlement Administrator, if one has been calculated, and

10

adjusted, where applicable by the High Point Settlement Administrator, by the Category IV Amendment and/or Acute Renal Insufficiency Amendment set forth above in Paragraph 20. Claimants, and if represented, their counsel will submit all records as directed by the High Point Settlement Administrator within 60 days of the request. With this request, the High Point Settlement Administrator will also disclose to each High Point Claimant and to his or her counsel, if represented, the allocation process set forth in these procedures, and that the High Point settlement is subject to Court approval.

22.     The High Point Settlement Administrator will also consider submissions on behalf of Claimants for certain defined injuries not provided for in the National Procedures.   The only High Point Supplemental injuries that may be claimed, proof required for same and allowable points for same, are as follows:

### a.   **Worsening Arthritic Condition (3 points)**

Proof of worsening arthritic condition shall consist of: 1) lumbar puncture medical records documenting greater than 5 White Blood Cells, adjusting for presence of red blood cells by subtracting 1 white blood cell for every 500 red blood cells present, regardless of glucose or protein level, on the Cerebrospinal Fluid white blood cell count within 90 days of injection with MPA from a contaminated lot; and 2) medical records documenting worsening arthritic condition requiring treatment where no treatment was previously required or more aggressive treatment, e.g. a change from oral medication to injections, within 30 days of the documentation of greater than 5 White Blood Cells, adjusting for presence of red blood cells by subtracting 1 white blood cell for every 500 red blood cells present, regardless of glucose or protein level, on the Cerebrospinal Fluid white blood cell count.

### b.   **Worsening Sacroiliac Condition (3 points)**

Proof of worsening sacroiliac condition shall consist of: 1) lumbar puncture medical records documenting greater than 5 White Blood Cells, adjusting for presence of red blood cells by subtracting 1 white blood cell for every 500 red blood cells present, regardless of glucose or protein level, on the Cerebrospinal Fluid white blood cell count within 90 days of injection with MPA from a contaminated lot; and 2) medical records documenting a new or worsening sacroiliac condition requiring more aggressive treatment, e.g. surgery where it was not previously required,

11

within 30 days of the documentation of greater than 5 White Blood Cells, adjusting for presence of red blood cells by subtracting 1 white blood cell for every 500 red blood cells present, regardless of glucose or protein level, on the Cerebrospinal Fluid white blood cell count.

23.     Any High Point Claimant asserting such additional injuries will have the burden of proving by the preponderance of the evidence that the additional injury was caused by the contaminated MPA injection and of producing medical records that adequately support the additional injury in order to meet the proof requirements as set forth above in Paragraph 22.   In addition, every High Point Claimant will submit a duly executed HIPAA authorization along with the Declaration. Every High Point Claimant must also submit any tests or exams – including, but not limited to, MRIs, CT scans and lumbar punctures – that may have been arranged by counsel to a High Point Claimant, whether or not disclosed in mediation, all medical records relevant to the issues before the High Point Settlement Administrator, complete reports and tests, toxicology, radiology and other diagnostic and laboratory data and any other documents with material information for the valuation of the matter, and any records of pre-existing medical conditions. All records must be submitted in chronological order and Bates stamped for review and reference. The High Point Settlement Administrator may require High Point Claimants to execute such additional HIPAA authorizations to request any additional records as the High Point Settlement Administrator deems necessary, at the individual High Point Claimant's expense.

24.     After all Claims have been reviewed, the High Point Settlement Administrator will calculate the score for each Qualified Claim and will compute an allocation (the "Proposed Final Allocation") of the High Point Settlement Amount among the Qualified Claims and share the results with each of the High Point Claimants and his or her counsel.

25.     After completing the Proposed Final Allocation, the High Point Settlement Administrator will send a letter disclosing to each High Point Claimant and his or her counsel, if represented, their Proposed Final Allocation (the "Proposed Final Allocation Letter").

26.     The Proposed Final Allocation Letter will disclose a "holdback" amount of 10% will be withheld pending the Request for Reconsideration process. The Proposed Final Allocation Letter will explain that this holdback is reserved for Claimant Requests for Reconsideration of the Proposed Final Allocations.

27.     To facilitate High Point Claimant review of the Proposed Final Allocations, the High Point Settlement Administrator will answer Claimant questions concerning the Proposed Final Allocations.   Each High Point Claimant will have the opportunity to discuss the Proposed Final Allocations with the High Point Settlement Administrator.

Step Two - Initial Payments On Qualified Claims

28.     High Point Claimants not seeking a Request for Reconsideration must advise the High Point Settlement Administrator in writing of his or her acceptance of the Proposed Final Allocation within 30 days of the date of the Proposed Final Allocation. If the High Point Claimant does not advise in writing that he or she accepts the Proposed Final Allocation or request reconsideration with 30 days, the Proposed Final Allocation will be deemed accepted.

29.     If a completed W-9 form has been received by the High Point Settlement Administrator and the High Point Claimant advises that he or she accepts the Proposed Final Allocation, the High Point Settlement Administrator shall notify the Tort Trustee of the Allowed Claim and that a check should be sent to the High Point Beneficiary (or, if represented by an attorney, made payable jointly to the High Point Beneficiary and the attorney or law firm and sent

13

to the attorney) in the amount of the Initial Claim Value, subject to the provisions of the Plan and the Tort Trust Agreement.

30.     Notwithstanding anything herein to the contrary, no distribution shall be made to a High Point Beneficiary if such High Point Beneficiary has not returned a signed form W-9 to the High Point Settlement Administrator

### Step Three – The Request for Reconsideration Process

31.     The Proposed Final Allocation Letter set forth in Paragraphs 25-26 will inform each High Point Claimant of their right to request reconsideration and a deadline of 30 days within which to request reconsideration.   Only requests for reconsideration which allege an error in calculation of the Proposed Final Allocation will be considered. The High Point Claimant must provide or further explain evidence substantiating the proposed adjustment of the Proposed Final Allocation.

32.     If a High Point Claimant requests reconsideration of his or her Proposed Final Allocation, the High Point Settlement Administrator will allow the High Point Claimant to provide any additional commentary or documentation for the High Point Settlement Administrator's review.   The High Point Settlement Administrator will then have a hearing by phone, in which the High Point Claimant and/or his or her counsel, if represented, may participate.   The High Point Claimant requesting reconsideration will have the burden of proving, by a preponderance of the evidence, the error which requires an adjustment to his or her Proposed Final Allocation. The High Point Settlement Administrator will issue a decision letter for each High Point Claimant who filed a request for reconsideration.

33.     The 10% holdback set aside for requests for reconsideration shall be allocated by the High Point Settlement Administrator to correct any errors in calculating allocation raised in the request for reconsideration process.  After the request for reconsideration process is completed, and the High Point Claimants Proposed Final Allocation is finalized, the remainder of the holdback, if any, will be ratably assigned to the High Point Claimants in the proportion of their awards.

34.     It is anticipated that the High Point Settlement Administrator will complete the request for reconsideration process, if applicable, approximately fifteen (15) calendar days after receipt of the High Point Claimants Requests for Reconsideration.

35.     After these steps are carried out, the allocation of the High Point Settlement Amount will be finalized in a "Final Certified Allocation Schedule," which will be delivered by the High Point Settlement Administrator to the Tort Trustee along with W-9 Forms for each High Point Claimant who is to receive payment.  At this point, the High Point Settlement Administrator's work to allocate the High Point Settlement Amount will be completed.

36.      As soon as the funds from the High Point Settlement Amount are available, W-9 Forms provided for Approved Claims and liens resolved, the Tort Trustee will deliver the funds to the High Point Claimants as soon as practicable, in accordance with the Tort Trust Agreement. The Tort Trustee's disbursement of funds to High Point Claimants is not contingent upon the disbursement of the funds from the National Fund.

III.    LIEN RESOLUTION

37.     Before the Tort Trustee may make distribution of the Settlement Amount to High Point Claimants (net of fees and expenses), liens, both governmental and private, need to be

resolved. The High Point Settlement Administrator will provide lien resolution services for the High Point Claimants who elect to engage the High Point Settlement Administrator for these services with respect to both government and private liens, taking advantage, to the extent possible, of the laws of the state of North Carolina.

## IV.     MISCELLANEOUS

### A.     Notices to the High Point Settlement Administrator

38.     All notices, requests and communications to or upon the High Point Settlement Administrator, to be effective, will be in writing, and unless otherwise expressly provided herein, will be deemed to have been duly given or made when actually delivered to the High Point Settlement Administrator at the addresses set forth below:

Edgar C. Gentle, III
Gentle, Turner, Sexton, Debrosse & Harbison
Suite 100 – 501 Riverchase Parkway East
Hoover, AL 35244
Tel: (205) 716-3000
Fax: (205) 716-3010
Email: escrowagen@aol.com

### B.     Compensation of High Point Settlement Administrator

39.     The below budget assumes that the number of High Point Claimants totals 21 or less. The High Point Settlement Administrator will be compensated as follows: $10,000 from the proceeds of the High Point Settlement Amount.   The High Point Settlement Administrator will be paid half upon beginning services and the balance upon completion.   If High Point Claimants, or their counsel, if represented, decide to engage the High Point Settlement Administrator for lien resolution services, the High Point Settlement Administrator will charge $500 per Claimant for the High Point Claimants who elect to use his services (or $10,500 if all High Point Claimants elect to

engage him for lien resolution services) from the proceeds of each individual High Point Claimant's Settlement Amount. If a successor High Point Settlement Administrator must be appointed, the MDL Court will make its best effort to appoint an Administrator that will provide serves at the same rate as Mr. Gentle. The High Point Claimants may make recommendations regarding who should be appointed as the successor High Point Settlement Administrator to the MDL. The High Point Settlement Administrator is not responsible for preparing the checks to the High Point Claimants, or for financial and tax matters, if any, relative to the High Point Settlement Fund.

**C.** **Prevention and Detection of Fraud**

40. The High Point Settlement Administrator may institute claim auditing procedures and other procedures to detect and prevent the allowance of fraudulent claims. All claims must be signed under the pains and penalties of perjury. The submission of a fraudulent claim will violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and subject those responsible to criminal prosecution in the federal courts. If the High Point Settlement Administrator determines that a claim is fraudulent, the High Point Settlement Administrator shall deny the claim and so inform the High Point Claimant and the Tort Trustee.

41. As set forth above, the High Point Settlement Administrator shall have the authority to request any High Point Claimant to submit additional medical, hospital, facility or other records in order to make a determination of allowance or denial of any claim. If any High Point Claimant refuses to or fails to respond to such a request within ninety (90) days or if the High Point Settlement Administrator determines that a High Point Claimant's response is inadequate,

17

the High Point Settlement Administrator shall take such actions as he or she deems appropriate on the claim and notify the High Point Claimant of the action and basis therefore.

42.     The High Point Settlement Administrator may conduct random audits to verify supporting documentation submitted (including death certificates, medical and other records) by randomly selecting claims and may audit individual claims or groups of claims.

**D.     Ethics Expert Expense**

43.     Any expense incurred for review of these CRFPs by an ethics expert shall be set aside by the Tort Trustee for reimbursement of such expense to the party that expends it on behalf of all High Point Claimants. The party that expends the expense on behalf of all High Point Claimants shall provide a receipt to the High Point Settlement Administrator prior to the Plan Effective Date. The High Point Settlement Administrator will provide the receipt to the Tort Trustee and the Tort Trustee will reimburse that party that incurred the costs for the expert review on behalf of all High Point Claimants within 30 days of the Plan Effective Date.

**<u>EXHIBIT B-2</u>**

**<u>Insight Claims Resolution Facility Procedures</u>**

**EXHIBIT B-2 TO THE TORT TRUST AGREEMENT:**

**INSIGHT CLAIMS RESOLUTION FACILITY PROCEDURES ("ICRFP")**

**INTRODUCTION AND GENERAL PROVISIONS**

An INSIGHT CLAIMS RESOLUTION FACILITY FOR PERSONAL INJURY AND WRONGFUL DEATH CLAIMS (the "ICRF") is hereby established in accordance with the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. (the "Plan"), the  Tort Trust Agreement (the "Tort Trust Agreement"), the latter of which establishes the Tort Trust (the "Tort Trust"), and the Provider Settlement Agreement dated February 12, 2015 (the "Settlement Agreement") by and between Insight Health Corp. ("Insight"), its insurers Lexington Insurance Company ("Lexington") and Darwin Select Insurance Company ("Darwin") (collectively, the "Insight Insurers"), Image Guided Pain Management, PC ("IGPM"), Dr. John M. Mathis, ("Mathis"), Dr. Robert F. O'Brien ("O'Brien") (collectively, the "Doctors"), their common insurer, Medical Mutual Insurance Company of North Carolina ("Medical Mutual"), Virginia Plaintiffs,[1] and Paul D. Moore, in his capacity as Trustee for the NECC Chapter 11 bankruptcy estate (the "NECC Trustee").[2] Collectively, Insight, IGPM, and the Doctors are referenced herein as "Virginia Insight Providers." The Settlement Agreement resulted from a lengthy mediation

---

[1]    Virginia Plaintiffs and their counsel are identified in Attachment A. These Virginia Plaintiffs filed timely lawsuits against the Virginia Insight Providers and participated directly in lengthy mediation process that resulted in the Settlement Amount as defined in the Settlement Agreement.

[2]    Unless otherwise defined herein, all capitalized terms used in these ICRFP and not otherwise defined herein shall have the meanings assigned to them in the Settlement Agreement, the Plan, and/or the Tort Trust Agreement.

1

process that formally began on August 22, 2014 and continued until the date of the Settlement Agreement (the "Virginia Mediation"). Counsel for the Virginia Plaintiffs participated in the Virginia Mediation and are referred to herein as "Virginia Counsel."

      A.     <u>Virginia Claimants</u>.

Pursuant to the Settlement Agreement, "Claimant(s)" mean the Virginia Plaintiffs and all other persons who have filed timely proofs of claim or PITWD Addenda in the NECC Chapter 11 Case, or who have been granted leave to file a late claim, and have NECC Claims[3] against Insight, IGPM and/or the Doctors for personal injury or wrongful death arising out of the injection(s) of methylprednisolone acetate ("MPA") obtained from New England Compounding Pharmacy, Inc. ("NECC"), lot ##s 05212012@68, 06292012@26, or 08102012@51, (the "Three Contaminated MPA Lots") at the Insight Imaging clinic in Roanoke, Virginia. Claimant(s) demonstrating the eligibility requirements set forth herein are "Eligible Virginia Claimants." "Claimants" include decedents and estate administrators or executors and any person meeting the eligibility requirements of Section III. Any person whose only claim is one for loss of consortium damages associated with another person or relative's injection is not an Eligible Virginia Claimant and cannot recover under this ICRFP. If the loss of consortium claim is only a part of an otherwise Eligible Claim, then the Claimant shall not be deemed ineligible, but there

---

[3] **"NECC Claims"** means any and all Claims asserted or that could be asserted by any Person against Insight, IGPM, the Doctors and/or any of the Insurers for personal injury, tort, wrongful death, medical monitoring, or any other economic or noneconomic injury or damage, based upon, arising out of or in any way related to the purchase or administration by or on behalf of Insight, IGPM and/or the Doctors of injectable methylprednisolone acetate or any other drugs or products compounded, produced, sold or distributed by or on behalf of NECC.

2

shall be no award of points under the Matrix for such a claim of loss. Similarly, other than the estate of a decedent, any person whose only claim is one for loss of economic damages associated with another person or relative's injection is not an Eligible Virginia Claimant and cannot recover under this ICRFP. The filing of a Virginia Claimant Compensation Claim Form (as defined below) constitutes participation by the  Virginia Claimant's family members in the primary Claim, or the Class D Estate Claim,, and the Class D Consortium Claims of such family members shall be deemed released by the treatment afforded to the Virginia Claimant pursuant to these ICRFP.

      B.    <u>Virginia Provider Fund</u>.

As defined and provided in the Settlement Agreement, certain portions of the Settlement Amount are to be segregated and held for the benefit of the Claimants. This segregated fund is defined as the "ICRFP Segregated Amount" (which, under the Tort Trust, is a Provider Fund). The funds comprising the ICRFP Segregated Amount are referred to herein as the "Virginia Provider Fund." The Settlement Agreement and the payments to be made to the Claimants under these ICRFP do not and will not result in "payment in full" to any of the Claimants for their NECC-related claims as that term is defined under 11 U.S.C. §§ 509(c)  and 502(c).

      C.    <u>Discrete Virginia Provider Fund</u>.

The ICRF is established in addition to and separate from the Claims Resolution Facility provided in the Plan (1) to evaluate claims by the Claimants according to the procedures established herein, with the least practicable cost, (2) to determine a fair and equitable

3

compensation amount to be distributed from the Virginia Provider Fund for each Qualified Virginia Claim (as defined herein), and (3) to effectuate such distributions to Qualified Virginia Claimants (as defined herein) as expeditiously as possible.

      D.     <u>Appointment of the Insight Provider Settlement Administrator.</u>

To facilitate, effectuate and implement the purposes of these ICRFP, Hon. Diane M. Strickland (Ret. Circuit Court) is hereby retained and appointed as Insight Provider Settlement Administrator ("IPSA") to execute the functions described herein in accordance with the terms of these ICRFP, the Tort Trust Agreement and any applicable order of the MDL Court.  The IPSA shall oversee all aspects of the ICRF and shall distribute to the Tort Trustee written instructions for the distribution of Virginia Provider Funds to Qualified Claimants. In the event that the IPSA resigns or is removed from office or is otherwise unable to perform the functions of the IPSA, a successor IPSA shall be recommended by Virginia Counsel subject to confirmation by the MDL Court and opportunity to be heard.  The IPSA shall receive reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings and shall be reimbursed by the Virginia Provider Fund for her reasonable expenses, including travel expenses, reasonably required and incurred in the performance of her duties in accordance with the provisions of these ICRFP and the provisions of any retention agreement between the Tort Trustee and the IPSA. The IPSA and those engaged by her hereunder shall be afforded the rights and privileges of Provider Settlement Administrators under the Tort Trust Agreement, including indemnification as set forth therein.

4

E.    Additional specific authority of the IPSA.

The IPSA shall be delegated and assigned full authority to act as follows or in any other manner reasonably required in performance of her tasks and responsibilities:

1.   The IPSA may engage Edgar C. Gentle, III, his firm, or another qualified third party consultant with experience in the administration of mass tort settlements (the "Delegated Consultant"), to provide the administrative assistance required to communicate with Claimants, to receive and process claims, to provide advice on forms, procedures and awards under these ICRFP, to negotiate and resolve liens if requested to do so (consistent with these ICRFP, the Plan and the Tort Trust Agreement), and any other administrative or clerical tasks assigned by the IPSA in the performance of her duties; and the expenses of such shall be paid by the Virginia Provider Fund in the same manner as if such costs and expenses were incurred directly by the IPSA.

2.   In connection with the Delegated Consultant, the IPSA may alter the claims procedures set forth in these ICRFP in such a way as she and the Delegated Consultant shall deem expeditious and fair; provided however, that no procedural modifications shall substantively alter the point allocation amounts, the eligibility requirements, the grounds for appeal, or the substantive rights and penalties as set

5

forth in these ICRFP (including those within the  Points Matrix (Attachment B), and the Standards of Proof (Attachment C)).

3. The IPSA may receive and maintain the confidentiality of copies of PITWD Addenda and other confidential information for Claimants under the Virginia Provider Fund.

4. The IPSA may adopt a Virginia Claimant Compensation Claim Form that shall be the required means for making a claim for a distribution from the Virginia Provider Fund.

5. To the extent not set forth in this ICRFP, the IPSA may establish the standards of proof that will be permitted to establish eligibility to make a claim and the existence of each element of damages, claims or point calculations under these ICRFP.

6. To the extent not otherwise set forth herein, the IPSA may set deadlines relating to claims against the Virginia Provider Fund.

7. The IPSA may make determinations on eligibility of Claimants to make claims against, or receive compensation from the Virginia Provider Fund, including determinations as to whether such Claimants are Eligible Virginia Claimants and whether such Claimants hold Qualified Virginia Claim(s) (as defined below).

8. The IPSA may make awards, deny claims and assess costs under these ICRFP, all of which will become final if not appealed to the Appeals IPSA (defined below).

9. The IPSA may entertain petitions to correct errors or mistakes in connection with claims, awards or denials under these ICRFP.

6

10. In coordination with the MDL Court, and subject to confirmation and approval by the MDL Court, the IPSA may conduct hearings and make recommendations for approval of wrongful death settlements and distributions; and propose distribution to the statutory beneficiaries if required. Any petition for approval may be filed within the MDL Court without initiating a separate proceeding. These ICRFP anticipate that statutory approval of wrongful death settlements and settlements for persons under disability may be sought and obtained after the Claimant submits a timely Virginia Compensation Claim Form, and such approval shall not be dependent upon quantifying the specific dollar amount to which the Claimant (or beneficiaries) shall be entitled to receive. To the extent that any associated procedure shall require the convening of parties before the MDL Court, these ICRFP anticipate that such proceedings shall be conducted telephonically if at all possible. These ICRFP further anticipate that multiple applications for approval may be joined in collective motions.

11. To the extent required for approval of settlements for the Virginia Plaintiffs or other Claimants, the IPSA may appoint guardians *ad litem,* conduct hearings and make recommendations for approval of settlements and distributions involving minors or other persons under disability, subject to confirmation and approval by the MDL Court. Any petition for approval under § 8.01-424 may be filed within the case or matter file under which the IPSA is appointed within the MDL Court without initiating a separate proceeding.

7

12. The IPSA may make recommendations on the reduction or waiver of liens, if any, that may be asserted by private insurers or workers compensation carriers as may deemed appropriate. Subject to confirmation and approval by the MDL Court, the IPSA may conduct hearings associated therewith, and make associated reports and recommendations.

13. The IPSA may perform such other duties as are required under these ICRFP or as the MDL Court may direct or assign.

F.      Appeals Insight Provider Settlement Administrator.

To facilitate, effectuate and implement the purposes of these ICRFP, Hon. Lawrence G. Koontz (Ret. Virginia Supreme Court) is hereby retained and appointed as Appeals Insight Provider Settlement Administrator ("Appeals IPSA") to execute the appeals functions described herein in accordance with the terms of these ICRFP, the Tort Trust and any applicable order of the MDL Court.  The Appeals IPSA shall hear and decide all appeals from decisions of the IPSA as specified in these ICRFP. In the event that the Appeals IPSA resigns or is removed from office or is otherwise unable to perform the functions of the Appeals IPSA, the Virginia Counsel shall recommend a successor, subject to confirmation by the MDL Court, after notice and opportunity to be heard. The Appeals IPSA shall receive reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings and shall be reimbursed by the Virginia Provider Fund for his reasonable expenses, including travel expenses, reasonably required and incurred in the performance of his duties in accordance with the

8

provisions of these ICRFP and the provisions of any retention agreement between the Tort Trustee and the Appeals IPSA.  To the extent required in the execution of his duties, the Appeals IPSA may receive confidential Claimant information in the same manner as provided for the IPSA.

   G. <u>Authority of the Appeals IPSA</u>.

The IPSA shall be delegated and assigned full authority to act as follows:

1. consult with the IPSA in the development of Appeals Forms to be used if a Claimant elects to contest a proposed Award and files an appeal;

2. receive and decide all appeals filed and dismiss any appeal that is not filed in a timely manner;

3. make final and binding decisions on appeals as deemed appropriate, which may involve denying relief or providing some or all of the relief requested;

4. report all decisions made on appeals to all Qualified Virginia Claimants, including by providing such notice to Virginia Counsel; and

5. take such other acts as the MDL Court may direct or assign.

   H. <u>Notice under ICRFP</u>.

If the Claimant is represented by an attorney as indicated on such Claimant's Virginia Compensation Claim Form, then "notice" as required in these ICRFP  shall be provided to the attorney at the addresses (electronic or otherwise) listed on the Claimant's Virginia Compensation Claim Form unless updated by the Claimant. Notice to Claimants, including

9

Eligible or Qualified Virginia Claimants, not represented by counsel shall be made to the Claimant's address on the Claimant's Virginia Compensation Claim Form. Distributions of funds awarded from the Virginia Provider Fund to Eligible or Qualified Virginia Claimants who are represented by attorneys shall be made payable jointly to the Qualified Virginia Claimant and the attorney (or law firm).  If an Eligible or Qualified Virginia Claimant is not represented by an attorney, distributions shall be made payable to the Qualified Virginia Claimant.

       I.       <u>Change of Address</u>.

All Claimants and/or his or her attorney shall be solely responsible for notifying the IPSA (and/or her Delegated Consultant) of address changes for the Claimant or the attorney and any other changes with respect to the information provided by the Claimant on a completed W-9 form.

## PROCEDURES OF THE INSIGHT CLAIMS RESOLUTION FACILITY

Pursuant to the Plan, the Tort Trust Agreement, and the Settlement Agreement, the Tort Trustee shall make distributions as per the terms of the Tort Trust Agreement and these ICRFP. Each Eligible Virginia Claimant shall receive his or her individually allocated distribution of the Virginia Provider Fund Net Proceeds as directed under these ICRFP, the Tort Trust Agreement and the awards granted hereunder.  Awards shall be determined by the IPSA, based upon the factors, methodologies and procedures set forth herein. Appeals shall be based solely upon the factors, methodologies and procedures set forth herein.

10

I.      **Distribution of Virginia Compensation Claim Forms**

Immediately following the Effective Date, the IPSA or her Delegated Consultant shall request information ("Claim Criteria Data") from the Estate Representative (as defined in the Plan) under Section 5.15 of the Plan, including information sufficient to provide the IPSA or her Delegated Consultant with the names and addresses of any persons who claims to have received treatment at the Insight Imaging clinic in Roanoke, Virginia and previously have filed in the NECC Chapter 11 Case a timely Proof of Claim ("POC") or Personal Injury Tort and Wrongful Death Claim Information Form ("PITWD Addendum"). POC's and PITWD Addenda that were not filed before the Bar Date (January 15, 2014 at 4:00 PM, EST) or as ordered and allowed by the Bankruptcy Court thereafter, will be conclusively deemed to be un-timely. Within 30 days after receiving such Claim Criteria Data the IPSA (or her Delegated Consultant) shall mail the Claimants a Virginia Fund Compensation Program Claim Form ("Virginia Compensation Claim Form"), together with instructions, a Base Point Category and Adjustment Calculation Worksheet, and a W-9 Form. As to the Claimants who are Virginia Plaintiffs, notice and delivery may be accomplished by providing the same documents to counsel for the Virginia Plaintiffs. To the extent orders are entered allowing individuals to file a POC after the Effective Date and such individuals claim to have an NECC Claim arising out of treatment at the Insight Imaging clinic in Roanoke, Virginia (referred to herein as "Late Allowed POC Claimants"), the IPSA (or her

11

Delegated Consultant) shall mail the Late Allowed POC Claimant the Virginia Compensation Form within 60 days of such order. The Virginia Compensation Claim Form shall be structured so as to first establish whether the Claimant or Late Allowed POC Claimant holds an Eligible and/or Qualified Virginia Claim; and, if not, to instruct the Claimant or Late Allowed POC Claimant to submit only the minimum information necessary.

## II.    Procedures for timely filing Virginia Compensation Claim Forms

A.    <u>Claimants must submit timely Virginia Compensation Claim Forms on or before the Virginia Claim Due Date</u>.

To be eligible to receive compensation from the Virginia Provider Fund, Claimants must submit a completed and signed Virginia Compensation Claim Form as directed by the IPSA, together will all supporting documentation required, on or before 90 days from the date on which the Virginia Compensation Claim Form was mailed ("Virginia Claim Due Date"). All Virginia Compensation Claim Forms must be postmarked or received by the IPSA or her Delegated Consultant by the Virginia Claim Due Date. A Virginia Compensation Claim Form that is not received by Virginia Claim Due Date, or not placed in the U.S. mail with a postmarked date no later than such date, shall be denied, unless the IPSA finds excusable neglect. The IPSA and/or her Delegated Consultant shall have no further obligation to review or calculate points, categories or damages for any Claim found to be untimely, and absent a successful appeal to the Appeals VSPA, then that Claimant shall be barred from making any recovery from the Virginia Provider Fund. Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

The IPSA or her Designated Consultant shall make a final determination of late filing and shall promptly notify the Claimant of such final decision and the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a final determination of late filing may file an appeal with the Appeals IPSA within 30 days of such ruling. The sole ground for reversal on appeal of any such final determination of late filing shall be proof that the Claimant's Virginia Compensation Claim Form was timely postmarked or timely received contrary to the finding of the IPSA and/or the Delegated Consultant.

     B.     <u>No Delay or Retention for Potential Late Allowed POC Claimants</u>.

The IPSA shall not specially retain any funds for the purpose of compensating Late Allowed POC Claimants, nor shall the IPSA or Delegated Consultant delay or alter Tentative Matrix Awards or Final Matrix Awards based upon the filing of such claims. If such claim is not received in sufficient time and form to be competed and included in the Tentative Matrix Award without delaying or disrupting that process, then any recovery for such Late Allowed POC Claimant shall be based solely upon such Claimant's point share of the Retention Pool (if any) in comparison with all other Claimants' point shares for such pool. Any award to Late Allowed POC Claimants shall be made without regard to funds already distributed under these ICRFP.

     C.     <u>Certification Requirements</u>.

All claims must be signed by the Claimant under the penalties of perjury. The submission of a fraudulent claim will violate the criminal laws of the United States, including the criminal

provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and subject those responsible to criminal prosecution in the federal courts. If the IPSA determines that a claim is fraudulent, the claim shall be denied and the IPSA shall so inform the Claimant, and, if the Claimant does not appeal or after all appeals have been resolved against the Claimant, the Tort Trustee.

Each Claimant must also certify that he/she has not transferred his or her right to recover from the Virginia Insight Providers with respect to his or her Claim such that the Claim can be asserted by another person or entity.  The fact that a Claimant has executed a "subrogation" agreement with a health insurer or that a statutory provision grants to any governmental entity or workers compensation provider rights of subrogation shall not of itself be construed as a transfer of the Claimant's right to recover.

### D.      Certification of Counsel.

Where any Claimant is represented by counsel in submitting a Virginia Compensation Claim Form and associated documentation for recovery under the Virginia Provider Fund, such counsel's submission of the Claim Form on such Claimant's behalf shall constitute a certification that the Claim Form is filed  consistent with the same standards that apply under Rule 1:4(a) of the Rules of the Supreme Court of Virginia and/or Rule 11 of the Federal Rules of Civil Procedure when a pleading is filed in state or federal courts.

## III.    Eligibility and Qualification Threshold Requirements

Each Virginia Compensation Claim Form received in a timely manner shall be subject to an initial limited review by the IPSA and/or her Delegated Consultant to make a threshold

decision on whether the eligibility and classification requirements set forth in this Section III(A) and (B) are satisfied.

A.    **Claim Eligibility Criteria and Requirements.**

1.  <u>Virginia Plaintiffs</u>.  In order to be eligible to receive compensation from the Virginia Provider Fund, a Claimant must be one of the Virginia Plaintiffs <u>or</u> meet one of the other criteria for eligibility noted in Sections III(A)(2) or (3), below.

2.  <u>Timely POC/PITWD Filing Requirement</u>. Except as permitted and set forth in Sections III(A)(1) and III(A)(3), Claimants must demonstrate that s/he has (a) timely filed a POC or PITWD Addendum in the NECC Chapter 11 Case, (b) had a timely POC or PITWD Addendum filed on his or her behalf, or (c) received permission by Bankruptcy Court order allowing late filing of the POC and PITWD Addendum, and filed such POC or PITWD Addendum in a timely manner.

3.  <u>Alternative: Claim against Virginia Insight Providers is not time-barred</u>. An exception to the requirement in Section III(A)(2) may be applied for person(s) demonstrating that his/her NECC Claims against the Virginia Insight Providers are not barred by the applicable statute of limitations. In this regard, if the person did not file a civil action against one or more of the Virginia Insight Providers on or before September 25, 2014 <u>and</u> if the asserted claim does not involve a person who died within the two years following injection from the Three Contaminated MPA Lots at the Insight

15

Imaging Clinic in Roanoke, then such claim shall be deemed barred by the applicable statute of limitations.

4. The NECC Estate Representative shall provide the IPSA with information requested pursuant to Section 5.15 of the Plan, sufficient to provide the IPSA or her Delegated Consultant with POC's and PITWD Addenda submitted on behalf of Claimants and access to information sufficient to determine if a Claimant meets the Timely POC/PITWD filing requirement set forth in III(A)(2) above. If no timely POC or PITWD Addendum was filed by or on behalf of a given Claimant who does not meet the exceptions of Sections III(A)(1) or III(A)(3), then the IPSA shall deny that Claimant's claim and shall notify the Claimant that such determination is final, unless appealed and shall provide the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a denial determination may file a written appeal with the Appeals IPSA within 30 days of the date the determination was issued. The sole ground for reversal of any such final denial on appeal shall be proof that the Claimant filed a timely POC or PITWD Addendum contrary to the finding of the IPSA and/or the Delegated Consultant. Absent a timely appeal and subsequent reversal, the determination is final, and the Claimant will not be entitled to a payment from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery

16

through the Claims Resolution Facility established by the National Settlement Administrator.

5. All Claimants must submit a completed W-9 form with his or her Virginia Compensation Claim Form.  If a completed W-9 form is not submitted by a Claimant, the IPSA shall notify the Claimant that one must be submitted (postmarked or received) within 30 days of the date of such deficiency notice or the claim shall be denied unless otherwise excused by the IPSA.  In the event of such a denial, the IPSA shall notify the Claimant of the denial and the procedure to appeal to the Appeals IPSA.  Notwithstanding anything contained herein to the contrary, a Claimant receiving such a denial notice may file a written appeal with the Appeals IPSA within 30 days of the date of mailing of such ruling. The sole ground for reversal of any such final denial on appeal shall be proof that the Claimant's completed W-9 form was timely postmarked or received contrary to the finding of the IPSA and/or the Delegated Consultant. Absent a timely appeal and subsequent reversal, the determination is final, and the Claimant will not be entitled to a payment from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

6. All claims asserted by a timely Virginia Compensation Claim Form and not denied for failure to comply with the requirements of this Section shall be deemed to be

17

"Eligible Claims" and persons holding such Eligible Claims shall be deemed "Eligible Virginia Claimant(s)."

B.    **Additional Requirements for Qualified Virginia Claim: proof of exposure through injection from one or more of the Three Contaminated MPA Lots at Insight Imaging in Roanoke, VA and viability of claims against Virginia Insight Providers.**

After the threshold determination that a Claimant is an Eligible Virginia Claimant, the IPSA or her Delegated Consultant shall further confirm two additional facts in order for the person to be a Qualified Virginia Claimant entitled to participate in substantive points analysis and special circumstances petitions under these ICRFP.

1.    Injection Proof. First, the medical or other records submitted by or on behalf of such Eligible Virginia Claimant must establish that the Claimant received injection(s) at the Insight Imaging clinic in Roanoke, Virginia, from one or more of the Three Contaminated MPA Lots or, alternatively, that such injection is established either by the Claim Criteria Data for such Claimant or because such Claimant's name appears on the "Insight List" [as that term is defined in ¶II of Attachment C] ("Injection Proof").

2.    Viability Proof. Next, The Eligible Virginia Claimant must demonstrate that s/he filed a timely lawsuit in federal or state court against one or more of the Virginia Insight Providers alleging injury or death as a result of such injection(s) or is otherwise not time-barred from doing so under the applicable Virginia statute of

18

limitations due to death ("Viability Proof"). Lawsuits shall be deemed untimely if they were not filed against one or more of the Virginia Insight Providers on or before September 25, 2014. A date-stamped copy of a filed Complaint, showing filing on or before September 25, 2014, shall be sufficient Viability Proof.  If no such lawsuit has been filed and the statute of limitations has not been tolled or extended by death, then the claim is barred. For those persons who received injection(s) from one of the Three Contaminated MPA Lots at Insight Imaging in Roanoke and then died before September 25, 2014, the IPSA shall calculate the appropriate statute of limitations for determining whether such claims are viable or barred.

3. <u>Qualified Virginia Claim(s)</u>. Eligible Virginia Claimants who meet the requirements for Injection Proof and Viability Proof, qualify for all distributions under the Virginia Provider Fund for recovery under the Points Matrix (**Attachment B**), and qualify for the Special Circumstances Petition process set forth herein (Section V(G)). Such claims are designated as "Qualified Virginia Claim(s)" and such Claimants are designated hereafter as "Qualified Virginia Claimants."

4. <u>Release of Virginia Providers</u>. In order to receive an award under these ICRFP, all Qualified Virginia Claimants must execute a release of all NECC Claims against the Virginia Providers.

19

C. **Summary rulings on Injection Proof and Viability Proof.**

1. <u>Injection Proof Rulings</u>. If an Eligible Virginia Claimant fails to present Injection Proof  (See Attachment C, §II), the IPSA shall promptly make a ruling denying that Claimant's claim and shall notify the Claimant of such denial and the procedure to appeal to the Appeals IPSA.   Notwithstanding anything contained herein to the contrary, a Claimant receiving such a final ruling may file a written appeal with the Appeals IPSA within 30 days of the date of such ruling. The sole ground for reversal of any such denial on appeal shall be proof (in any form allowed by Attachment C, § II) that the Claimant received injection(s) from the one or more of the Three Contaminated MPA Lots at Insight Imaging in Roanoke contrary to the finding of the IPSA and/or the Delegated Consultant. Absent a timely appeal and subsequent reversal, the determination is final and the Claimant shall receive no award from the Virginia Provider Fund.   Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

2. <u>Viability Proof Rulings</u>. If an Eligible Virginia Claimant fails to present Viability Proof, the IPSA and/or her Delegated Consultant shall promptly issue a ruling notifying the Claimant that his/her claim does not satisfy the Viability Proof requirements and awarding such Claimant one-half (1/2) point, which shall be the

20

sole award provided under this ICRFP and the Virginia Provider Fund. Any Eligible Virginia Claimant who fails to satisfy Viability Proof shall not be eligible to participate under Section V(G) (Special Circumstances Petition procedures). The IPSA and/or her Delegated Consultant shall have no further obligation to assess or consider factors that would qualify such Claimant(s) for additional points if such Eligible Claims were otherwise viable (i.e., not time barred). The IPSA and/or her Delegated Consultant shall promptly notify the Claimant of such ruling and the procedure to appeal to the Appeals IPSA.  Notwithstanding anything contained herein to the contrary, a Claimant receiving such a ruling may file a written appeal with the Appeals IPSA within 30 days of such ruling. The sole ground for reversal of any such Viability Proof ruling on appeal shall be proof that the Claimant has a viable claim against one or more of the Virginia Insight Providers arising from injection of one or more of the Three Contaminated MPA Lots at the Roanoke Insight Imaging clinic (i.e., that such claim(s) is/are not barred by the statute of limitations), contrary to the finding of the IPSA and/or the Delegated Consultant. Absent a timely appeal and subsequent reversal, the determination is final and the Claimant shall receive a final award of ½ point and shall participate in distributions based solely upon such point assignment.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

21

**D.** **Administrative Review of forms and documentation submitted by Qualified Virginia Claimants and opportunity to correct errors.**

1. Review by Delegated Consultant. The claims handling and processing aspects of this ICRFP shall be handled primarily by the Delegated Consultant. The Delegated Consultant shall review all Virginia Compensation Claim Forms and associated documentation submitted by Qualified Virginia Claimants. The primary purpose of this review is to identify clerical errors, to identify missing documents required to support assertion(s) made by the Qualified Virginia Claimant, and to ensure that Qualified Virginia Claims are properly classified.

2. Errors or Deficiencies in Claim Submissions. If the Delegated Consultant detects errors in the forms, documents and/or information submitted by a Qualified Virginia Claimant, he may elect to do any of the following:

   a) If the error or deficiency  can be cured or corrected without additional information from the Qualified Virginia Claimant, then the Delegated Consultant may cure or correct the error or deficiency using information supplied in the initial filings by the Qualified Virginia Claimant, and shall notify the Claimant's counsel (the Claimant, if unrepresented) of the error or deficiency, and of the cure or correction; or, alternatively, he may notify the Claimant's counsel (the Claimant, if unrepresented) of the error or

22

deficiency and allow opportunity for cure according to the process in subparagraph (b);

b) If the error or deficiency is deemed one that cannot be cured or corrected without additional information from the Qualified Virginia Claimant, the Delegated Consultant shall send notice of the deficiency to such Claimant's counsel (the Claimant, if unrepresented), allowing a <u>minimum of 45 days</u> within which to correct the deficiency and file a Corrected Virginia Compensation Claim Form and any supplemental or corrected information in the manner requested by the Delegated Consultant. If the Claimant fails to submit sufficient corrections or additional information within the time specified (or an extended time period as allowed by the IPSA or the Delegated Consultant), then the Delegated Consultant shall do one of the following:

(i) Award points under the Points Matrix for only such portions of the Qualified Virginia Claim as are adequately supported by required documentation and issue a denial as such portions of the Claim that are not supported by the submitted materials; or

23

    (ii)  If the procedure outlined in the previous subparagraph is not feasible, the Delegated Consultant may treat the claim as a Base Category VII claim under the Points Matrix, allowing only such additional points (if any) as are supported by the submitted materials.

**IV.**  **The Points Matrix for assessing points for Qualified Virginia Claims (summary)**.

Qualified Virginia Claims shall be assigned points based on the criteria set forth in the Matrix attached hereto as **Attachment B** (the "Points Matrix"). The Points Matrix establishes seven base point categories in the same manner as the Claims Resolution Facility Procedures administered by the National Settlement Administrator (the "Base Point Categories"). The Matrix provides for additional points for death case adjustments, past medical bills and lost wages, total number of lumbar punctures, days of antifungal treatment, stroke/renal failure, all as more specifically described in the Points Matrix. The standards of proof required for the award of points are set out in **Attachment C** hereto. Calculations of points attributable to any Qualified Virginia Claim under the Points Matrix shall not be reduced, limited or barred in the event that an otherwise Qualified Virginia Claimant happens to die after January 1, 2015.

24

**V.      Determination of points and payments under the Points Matrix**

A.      <u>Confirmation of Points for Qualified Virginia Claimants</u>.

As soon as practicable after the Virginia Claim Due Date, the Delegated Consultant and/or the IPSA shall segregate the Qualified Virginia Claims for points analysis and confirmation under the Points Matrix. The Delegated Consultant shall either (i) accept the points calculations submitted with the Virginia Compensation Claim Form as verified; or (ii) make a revised point calculation based on the Points Matrix or the other terms of these ICRFP. The Delegated Consultant shall then total the resulting points awards for all Qualified Virginia Claimants, together with points awarded to Claimants under Sections III(C)(2) (non-viable claims), to determine the "Tentative Total Points".

B.      <u>Calculation of Tentative Point Value</u>.

The IPSA or her Delegated Consultant shall consult with the Tort Trustee to determine the amount of Virginia Provider Fund available for disbursement to Claimants (the "Virginia Provider Fund Net Trust Proceeds"). The Virginia Provider Fund Net Trust Proceeds shall then be reduced by 20%. This subtotal shall then be increased by an amount equal to the funds applied to the Expense Trust under Section VII (initially $700,000), in order to reach a total <u>first distribution amount</u> (the "First Distribution Net Proceeds"). The remaining 20% of the Virginia Provider Fund Net Trust Proceeds, less the amounts applied to the Expense Trust under Section VII, shall be held separately and retained as the "Special Circumstances Pool."

25

The Delegated Consultant shall divide the First Distribution Net Proceeds by the Tentative Total Points in order to obtain a calculated "Tentative Point Value":

[(**Virginia Provider Fund Net Trust Proceeds x .80**) **plus an amount equal to funds applied to the Expense Trust (e.g. $700,000** ) **= First Distribution Net Proceeds**]

[**First Distribution Net Proceeds ÷ Tentative Total Points = Tentative Point Value**]

C.    <u>Tentative Matrix Award</u>.

The Delegated Consultant shall issue written a Matrix Award Form to each Qualified Virginia Claimant informing such person of the total number of points awarded to him/her under the Points Matrix and the tentative award amount obtained by multiplying the Qualified Virginia Claimant's total points by the Tentative Point Value ("Tentative Matrix Award"). The Delegated Consultant shall also provide each Qualified Virginia Claimant with a disclosure of the tentative points and awards proposed to be made to all other Eligible and Qualified Virginia Claimants, but without disclosing the names of the other individuals. For the Virginia Plaintiffs or other represented Qualified Virginia Claimants, the Tentative Matrix Award listing shall identify the individual recipients by reference to Claimant's counsel. Notwithstanding the appeals process noted below, mathematical and other such errors which require no substantive analysis may be submitted promptly to the Delegated Consultant or IPSA for modification within the 30 days following the date of the Tentative Matrix Award. Appropriate modifications or corrections may be made accordingly.

26

D.    <u>Acceptance or Appeal of Tentative Matrix Award</u>.

In order to contest a Tentative Matrix Award, within 30 days of the date of the Matrix Award Form, each Qualified Virginia Claimant must file a written appeal. Absent extraordinary circumstances (as determined solely by the IPSA), if no appeal as provided for in the next paragraph is postmarked or received within the 30-day period, then the IPSA and/or her Delegated Consultant shall be authorized to declare that the point allocation for such Qualified Virginia Claimant has been accepted, and that person will be paid based upon the points set forth in his/her Matrix Award Form.

The Tentative Matrix Award Form shall notify the Qualified Virginia Claimant of the procedure to appeal the Tentative Matrix Award to the Appeals IPSA.  Notwithstanding anything contained herein to the contrary, a Qualified Virginia Claimant receiving such a Tentative Matrix Award may file a written appeal with the Appeals IPSA within 30 days of the date of such Award. The sole ground for reversal or modification of a Tentative Matrix Award on appeal shall be proof that a factual or mathematical error was made in the number of points originally awarded. Absent a timely appeal and subsequent reversal, a Tentative Matrix Award will be final and binding.

If no timely appeal is filed by any of the Qualified Virginia Claimants regarding their respective Tentative Matrix Awards, then such awards shall be deemed final in all respects and the IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to each of the respective Qualified Virginia Claimants and their

27

counsel (or, if unrepresented to the Qualified Virginia Claimant only) in the amounts indicated on the Tentative Matrix Award Forms based upon the Tentative Point Value. If a timely appeal is filed to any Tentative Matrix Award asserting that an incorrect number of points were assigned, then all Tentative Matrix Awards shall be suspended until a final decision is made on all appeals, allowing confirmation or recalculation of the Tentative Point Value. If any such appeals alter the Tentative Total Points, then the calculation set forth in Section V(B) shall be recalculated based upon the Final Total Points following appeals:

**[First Distribution Net Proceeds ÷ Final Total Points after appeal = Final Point Value]**

  E.  <u>Reissuance of Final Matrix Award notifications following appeal period</u>.

  If appeals are filed regarding the Tentative Matrix Awards, resulting in recalculation of Final Total Points as set forth in Section V(D), the Delegated Consultant shall re-issue Final Matrix Award Forms to each Qualified Virginia Claimant informing each such person of the new total number of points awarded under the Points Matrix and the Final Point Value, the new dollar value of each point based on that new point total.  Such  Final Matrix Award Form shall set forth the amount of Final Matrix Award, which shall be the dollar amount obtained by multiplying that person's final number of   Matrix Points  by the Final Point Value. The Delegated Consultant shall also provide each Claimant and counsel with a disclosure of the final points and Matrix Awards being made to all other Claimants in the same manner as specified in Section V(C). The IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to the respective Claimants and their counsel (or, if unrepresented to the

28

Claimant only) in the amounts indicated on the Final Matrix Award Forms. These and any other awards in this VPCRF shall be subject to satisfying the lien requirements reflected in the Settlement Agreement and in §§ 5.10 and 5.11 of the Plan.

F.     Assessments of Special Costs.

Some Claimants' awards may require additional administrative steps and attention, resulting in costs associated only with such awards. For claims where (i) approval of the settlement or distribution must be separately made (e.g., wrongful death claims, persons under disability, etc.), and (ii) such approval steps require evidentiary hearings with the IPSA beyond mere presentation of the settlement and agreement by the beneficiaries thereto, then the costs of such proceedings shall be assessed against such Claimant's award. For claims where a guardian ad litem is required for any proceeding associated with a Claimant's award, such costs shall be assessed solely against the Claimant's award. Similar assessments shall be allowed for other cases that require specific attention or hearing by the IPSA as part of the claim or award process, apart from Appeals and Special Circumstances Petitions which are addressed separately. For claims where lien resolution services are provided by the Delegated Consultant (or similar third party service provider), the costs of such lien resolution services shall be assessed against the Claimants' award.

G.     Petitions for Special Circumstances

In addition to the Matrix Award, if a Qualified Virginia Claimant, who did not include as part of his/her Claim a request for 10 additional points for "Other Factors," and desires to seek a

29

supplemental award from the Special Circumstances Pool, then within the same 30 day period for appealing the Tentative Matrix Award notifications, the Qualified Virginia Claimant must also file a Special Circumstances Petition with the IPSA, who shall establish the forms, documents, and procedures to be used for a Special Circumstances Petition. Each Special Circumstances Petition shall not exceed 5 pages, and shall be deemed filed by postmark date or, if not mailed, by date received.

Any Qualified Virginia Claimant who files a Special Circumstances Petition must directly pay, or agree to have his/her Matrix Award reduced by $2,000, which will serve as a filing and processing fee. Qualified Virginia Claimants filing a Special Circumstances Petition will otherwise retain the Matrix Award, and any Award for Special Circumstances shall be in addition thereto and shall be made in the reasonable discretion of the IPSA based on unique factors and circumstances relating to the Claimant's case. If a Special Circumstances Petition is not filed in a timely manner, it shall be denied and no special award from the Special Circumstances Pool shall be made to that individual.  On timely filed petitions, it is anticipated that the IPSA may meet with such Claimants if requested.

1.   <u>Purpose and Standards</u>.

The purpose of the Special Circumstances Petition is to address those situations where the Points Matrix structure is inadequate to fairly account for all harm and loss suffered by some individuals whose unique circumstances make their situation different from others in the same Claims Category.  Those who filed a request for an award of additional points for "Other

30

Circumstances" as part of their initial Claim submitted to the IPSA are not eligible to submit a Special Circumstances Petition.  Merely filing a Special Circumstances Petition will not entitle the Qualified Virginia Claimant to an award from the Special Circumstances Pool as the IPSA has the discretion to act on each Petition as deemed appropriate.

In making decisions on Special Circumstances Petitions, the IPSA will be making a discretionary decision guided and informed by the same criteria listed in the Points Matrix, such as Claims Category, Death Case adjustments based on statutory beneficiaries, past medical expenses, future medical expenses, past lost wages, future lost wages, number of lumbar punctures, days of Anti-Fungal Treatment, as well as medical complications, permanent impairments, the impact of third party liens, and other appropriate circumstances which may not be fully reflected in the Points Matrix.

Just as there is no requirement that the IPSA make a Special Circumstances Award to each person who files a Special Circumstances Petition, there is no expectation or requirement that the IPSA will use or distribute the full Special Circumstances Pool to those who may file petitions when making Special Circumstances Awards.  The goal and purpose of this process is to ensure that persons who are similarly situated be treated the same to the extent possible, understanding there can be unique cases that deserve separate treatment.

2.      No Special Circumstances Awards until all petitions are considered.

31

The IPSA shall consider all timely filed Special Circumstances Petitions before making any awards on any Special Circumstance Petitions in order to avoid any possible preference for early filers.  The IPSA shall provide a list of all Qualified Virginia Claimants who have filed Special Circumstances Petitions and distribute the same to all such Claimants.

3.   Special Circumstances Award Notifications.

Once the IPSA has considered all of the Special Circumstances Petitions, she shall calculate Special Circumstances Awards in her discretion and provide such information to the Delegated Consultant.   The Delegated Consultant shall then prepare Special Circumstances Award Forms notifying each of the Qualified Virginia Claimants (and his/her counsel if represented) who filed Special Circumstances Petitions. The Special Circumstances Award Form shall notify the Qualified Virginia Claimant of the procedure to appeal the Special Circumstances Award to the Appeals IPSA.  A copy of the Special Circumstances Award Forms shall be sent simultaneously by the Delegated Consultant to Virginia Counsel and to all other Qualified Virginia Claimants, protecting the personally-identifying information of each such person if they have not given consent to disclose his/her identity.   Notwithstanding anything contained herein to the contrary, any Qualified Virginia Claimant receiving such a Special Circumstances Award may file a written appeal with the Appeals IPSA within 30 days of such award. The sole ground for reversal or modification of a Special Circumstances Award on appeal shall be abuse of discretion by the IPSA. "Abuse of discretion" for such appeal(s) may be demonstrated, among other ways, by establishing that the appealing person's Special

32

Circumstances Award is grossly unfair to that person based on a comparison of the Matrix and Special Circumstances Awards for other similar Qualified Virginia Claimants in the same Claims Category. To the extent necessary, the Appeals IPSA may review the Special Circumstances petitions of other similar Qualified Virginia Claimants in making such an assessment.

4. Acceptance or Appeal of Special Circumstances Award.

In order to contest a Special Circumstances Award, within 30 days of the date of the Special Circumstances Award, each such Qualified Virginia Claimant must file a written appeal. Absent extraordinary circumstances (as determined solely by the IPSA), if no appeal as provided for in the preceding paragraph is postmarked or received within the 30-day period, then the IPSA and/or her Delegated Consultant shall be authorized to declare that the Special Circumstances Award for such Qualified Virginia Claimant has been accepted. The only person who may file an appeal to a Special Circumstances Award is a Qualified Virginia Claimant who filed a Special Circumstances Petition.  If no timely appeal is filed by any of the Qualified Virginia Claimants regarding their respective Special Circumstances Awards, then all such awards shall be deemed final in all respects. If a timely appeal is noted regarding any Special Circumstances Award, then all other Special Circumstances Awards shall be held in abeyance pending resolution of such appeal.

5. Final Special Circumstances Calculation.

When all appeals (if any) have been completed and any corresponding modifications of Special Circumstances Awards have been made, the IPSA shall compile a final list of all Awards

33

for Special Circumstances, providing a total amount to be distributed from the Special Circumstances Pool (the "Total Final Special Circumstances Distribution Amount"). Such information shall be submitted to each Claimant and counsel in the same manner as specified in section V(c). The IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to the respective Qualified Virginia Claimants and their counsel (or, if unrepresented to the Qualified Virginia Claimant only) in the amounts indicated on the final Special Circumstances Award forms. Such distributions may or may not be included with final distributions (if any) from the Remaining Retention Pool, provided that no substantial delay shall be required in order to combine such distributions.

6.    <u>Calculation of Remaining Retention Pool</u>.

The IPSA and Delegated Consultant shall calculate the amount remaining (if any) in the Special Circumstances Pool after deducting the Total Final Special Circumstances Distribution Amount. In consultation with the Tort Trustee, the IPSA shall then determine what (if any) funds remain to be distributed from the Virginia Provider Fund. This may include any funds remaining in the Special Circumstances Pool after all such awards, funds available in the Expense Trust, all interest accumulated but not previously distributed, as well as funds distributable to the Eligible and Qualified Virginia Claimants from the Insight Holdback. The total of all such sums, less any amounts necessary for remaining estimated expenses of the ICRFP, shall be the "Remaining Retention Pool."

34

H.     Final Distributions from Remaining Retention Pool.

Once the amount of the Remaining Retention Pool (if any) has been calculated, then a Remaining Retention Pool Point Value shall be calculated by the Delegated Consultant by dividing the funds held in the Remaining Retention Pool by the total amount of Final Matrix Award points awarded to all Qualified Virginia Claimants (plus points awards for any Late Allowed POC Claimant Claim Forms have been filed in the intervening period, if any), obtaining a Remaining Retention Pool Point Value. Distributions to each such Eligible and Qualified Virginia Claimant shall then be calculated by multiplying such person's Total Matrix Points by the Remaining Retention Pool Point Value, which amounts shall be reflected in notices provided to each such person.   The IPSA shall provide written notice to the Tort Trustee directing that payments be made to the respective Qualified Virginia Claimants and their counsel (or, if unrepresented to the Eligible and/or Qualified Virginia Claimant only) in the amounts indicated on the Final Distribution Award notices. Such distributions may, if practical, be combined with Special Circumstances Distributions.

I.     Subsequent distributions of any remaining Virginia Provider Fund amounts to be made in the same manner as distributions from the Remaining Retention Pool.

Should any additional funds become available for distribution from the Virginia Provider Fund, (including any funds payable to the Eligible and/or Qualified Virginia Claimants under the Insight Holdback), the procedures and distributions noted for the distributions from the Remaining Retention Pool shall be applied; and such calculations and awards shall be made as promptly as practicable. No appeals shall be allowed from any such subsequent awards.

35

## VI.   Appeals Procedures

A.   <u>Confirmation of Points for Qualified Virginia Claimants</u>.

Appeals shall be made to the Appeals IPSA in the following manner:

1. <u>Forms</u>. Appeals forms shall be supplied with any notice of an appealable decision from the IPSA or Delegated Consultant. Such appeals must be filed (postmarked or received) within 30 days of the date of notice of an appealable decision. Petitions for appeal shall not exceed 10 pages, and must set forth the basis for the appeal, contain a statement of requested relief, and attach any documents relating to the appeal.

2. <u>Fees</u>. Any appeal shall require a filing fee of $750, payable to the Delegated Consultant. The Delegated Consultant shall hold such fees in trust in order offset the costs of appeal to the Virginia Provider Fund. An appealing Qualified Virginia Claimant may satisfy the appeal fee by  agreeing to have his/her Matrix Award reduced by the amount of the appeal fee, but only in circumstances where a Matrix Award is reasonably anticipated in at least the amount of $750.

36

a.  If the appealing Qualified Virginia Claimant prevails on his/her appeal, then $500 of the $750 appeal fee shall be refunded to the prevailing appellant, reducing the appeal fee to $250.

b.  Before the final distribution from the Virginia Provider Fund, the Delegated Consultant or IPSA shall disburse all appeal fees collected under this Section (if any) to the Tort Trustee to be deposited into the Virginia Provider Fund and distributed to Qualifying Virginia Claimants or paid to reimburse costs and expenses incurred in connection with or reimbursable under these ICRFP.

3. <u>Hearings</u>.  Appeals may be decided with or without hearings, as determined in the sole discretion of the Appeals IPSA.

4. <u>Content of record on appeal</u>.  The record on appeal is limited to the record in the proceedings resulting in the appeal. Unless otherwise specified in these ICRFP, the appealing Claimant may not submit, nor may the Appeals IPSA consider, any facts or evidence not previously presented by the Qualified Virginia Claimant to the IPSA or Delegated Consultant as part of the claims process that resulted in the notice or decision being appealed.

5. <u>Basis for reversal or modification of rulings on appeal</u>. The grounds for appeal are specified within applicable sections of these ICRFP that give rise to appeals. To

37

the extent that such grounds are not specified and an appeal is otherwise authorized or allowed, the basis for reversal or modification shall only be factual error.

**VII.    Liens, attorneys' fees, and engagement of Delegated Consultant for lien resolution.**

Any awards in this VPCRF shall be subject to satisfying the lien requirements reflected in the Settlement Agreement Addendum 2 and the Plan (§§ 5.10 and 5.11). Liens that are subject to court adjustment may be heard and decided by the IPSA, subject to MDL Court approval. Settlements that require lien holder approval unless approved by a court may also be heard and decided by the IPSA, subject to MDL Court approval.

All notices of award to Eligible and Qualified Virginia Claimants under these ICRFP shall disclose  that the award amount is subject to payment of liens and (if applicable) attorneys' fees and expenses pursuant to engagement agreements between the Qualified Virginia Claimant and his/her counsel. Payment of such liens shall be made by the Tort Trustee, unless after the amount of the lien has been negotiated and agreed upon, the Qualified Virginia Claimant is represented by counsel and such counsel agrees to make such payments to the lienholder to the satisfaction of the Tort Trustee and the IPSA.

To the extent that liens are not resolved by the Tort Trustee globally as indicated in §§ 5.10 and 5.11 of the Plan or by Virginia Claimants or their counsel, the Delegated Consultant shall be deemed engaged by the affected Claimants for the purposes of resolving any liens in

38

connection with distributions to such Claimants, provided, however, that, for those Qualified Virginia Claimants represented by counsel, the Delegated Consultant shall be engaged for purposes of resolving liens only upon written instruction by such counsel.  Notwithstanding the foregoing, if the distribution due an Eligible Claimant under these ICRFP is less than the amount owed on the lien, the Delegated Consultant shall discuss the circumstances with the Eligible Claimant prior to any engagement.

## VIII.  Payments of Administrative Expenses

The IPSA shall request from the Tort Trustee an initial expense distribution from the Virginia Provider Fund in the amount of $700,000. It is anticipated that such funds shall be held by the Delegated Consultant in trust (the "Expense Trust") for the payment of "Allowed Expenses," as defined below. Allowed Expenses shall include the fees and costs incurred by the Delegated Consultant, the IPSA, and the Appeals IPSA, all in accordance with agreements that shall be executed in connection therewith. Additional expense distributions may be requested from the Tort Trustee as authorized by the IPSA and shall be deposited in the Expense Trust with the Delegated Consultant in the same manner.

Any fees collected (as opposed to deductions from Awards) in connection with appeals or Special Circumstances petitions, shall be deposited with the Delegated Consultant to be held in the same manner. If any such funds are remaining and will not be used for expenses, they shall be forwarded to the Tort Trustee for the Virginia Provider Fund prior to the final distribution to

39

the Eligible and/or Qualified Virginia Claimants and included within such funds for distribution to such individuals.

## IX.     Final Accounting

Following the final distributions from the Remaining Retention Pool and /or Special Circumstances Pool, the IPSA and/or Delegated Consultant shall furnish a statement reflecting all payments to each Eligible and Qualifying Virginia Claimant as well as the costs distributed from the Virginia Provider Fund. Such statement shall be made available to all Eligible and Qualified Virginia Claimants and their counsel, and distributed as further required by the IPSA or the MDL Court.

## X.     Claims Assistance

The IPSA and Delegated Consultant are authorized to establish a claims assistance procedure for providing information and claims assistance to Claimants and their counsel. Such assistance shall be staffed by employees of the Delegated Consultant in a manner to provide assistance regarding ICRFP procedures, eligibility requirements, submission requirements (including the documentation required), denials, deficiencies, the process for curing deficiencies, and other procedural and substantive issues.

ATTACHMENT B

# Points Matrix

**The point assignments made within this Matrix and the Standards of Proof applicable thereto are used solely as tools for proportioning the funds available for distribution to the Claimants under these ICRFP. Such points are in no way to be used for earmarking particular portions of any Claimant's award.**

    I.    <u>Seven Claim Base Categories</u>.

This Matrix adopts seven categories of claims which are based on the criteria used in the NECC Claims Resolution Facility Procedures. Eligibility for classification within each category shall be governed by the standards of proof in <u>Attachment C</u>. The terms used in this Matrix assume eligibility requirements set forth in these ICRFP. No Claimant failing to establish the criteria for one of the following Base Categories shall be allowed to participate in the ICRFP distributions.

CATEGORY I:    Death after injection from one of the Three Contaminated MPA Lots at Insight Imaging in Roanoke, Virginia ("MPA injection") and fungal meningitis and/or spinal or paraspinal fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis).

CATEGORY II:    Fungal meningitis with a secondary or related spinal or paraspinal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis) after MPA injection.

CATEGORY III:    Fungal meningitis without secondary infection after a MPA injection.

41

CATEGORY IV:   Spinal or paraspinal (non-meningitis) fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis) after MPA injection.

CATEGORY V:   Fungal Peripheral joint infection (e.g., hip, knee, shoulder, elbow and/or ankle) after MPA injection.

CATEGORY VI:   MPA injection followed by documented symptoms associated with fungal meningitis or other fungal infection, i.e. headache, word-finding difficulty, fever, photophobia, nausea/vomiting, neck stiffness or pain, back pain, urine retention, slurred speech, limb weakness, numbness and/or pain at the injection site, resulting in medical treatment that includes at least one lumbar puncture.

CATEGORY VII:   MPA injection.

II.   <u>Point Allocations</u>.

    A.   <u>Base Points by Category</u>.  Claimants proving that they qualify for these respective Base Categories shall be awarded the following base points:

        i.   CATEGORY I:        60 points

        ii.   CATEGORY II:       50 points

        iii.   CATEGORY III:      40 points

        iv.   CATEGORY IV:      20 points

        v.   CATEGORY V:       20 points

        vi.   CATEGORY VI:      5 points

vii. CATEGORY VII:     2 points

B.  Death Case Adjustments

In Category I cases, the Claimant will be entitled to the following additional points based upon the surviving beneficiaries as defined by Virginia law (Va. Code § 8.01-50, et. seq.): Specifically:

If decedent was survived by a spouse or child, who was under the age of 21 at the time of death, who was a student and still dependent on parent for support, then the Claimant will receive an additional 100 points for each.

If decedent was survived by an adult child, then the Claimant will receive an additional 30 points per child.

If decedent was not survived by a spouse or child, but was survived by a parent, sibling, or a grandchild where the parent was a deceased child of the decedent, then the Claimant will receive 10 points for each of these surviving family members.

C.  Past Medical Bills and Wage Loss

As part of each claim, and subject the standards of proof requirements set forth in Attachment C, a Claimant shall be awarded points for documented medical expenses incurred and for lost wages caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA Lots.  The cut-off date for claims for past medical bills and lost wages shall be February 28, 2015.

For each $1000 of either past medical bills related to medical treatment or lost wages caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA

43

Lots, the Claimant will receive 1 pt. per $1000, or a pro rata portion thereof, of all documented medical bills or lost wages incurred through February 28, 2015.  For example, if a Claimant incurred $112,346 in past medical expenses, and $13,500 in lost wages as of February 28, 2015, then the Claimant would receive 112.346 points for past medicals, and 13.5 points for lost wages for a total of 125.846 points under this Criteria II.C.

D.  <u>Future Medical Bills and Future Wage Loss</u>

As part of each claim, and subject to the specific standard proof set forth in <u>Attachment C</u>, a Claimant may be awarded points for properly established claims for future medical treatment and expenses and for lost future wages that will be incurred after February 28, 2015 where such damages are a result of illness and/or complications arising from the injection with the Contaminated Lots.  For each $1000 of either future medical bills or future lost wages resulting from Claimant's injuries related to the medical condition(s) caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA Lots, the Claimant will receive 1/3 pt. per $1000, or a pro rata portion thereof, of all future economic damages.  Claims for future non-medical economic damages shall be treated uniformly with a 4.0% discount rate (less than 10 years) and 4.5% discount rate (if greater than 10 years) and a 2% growth rate (if less than 10 years) and 2.5% growth rate (if greater than 10 years).  For future medical expenses extending into the future for more than two years, the same discount rates shall apply, but the growth rate shall be 5.25%.

44

E.   Total Number of Lumbar Punctures

As part of each claim, other than Category VII claims, and subject to
the specific standard proof set forth in Attachment C, for each lumbar
puncture the Claimant received, the Claimant will be awarded 2 pts.

F.   Anti-Fungal Treatment

As part of each claim, and subject to the specific standard proof set
forth in Attachment C, for each day the Claimant was administered or
took anti-fungal medication (IV or orally), the Claimant will receive ¼
pt.

G.   Stroke

As part of each claim, and subject to the specific standard of proof set
forth in Attachment C, if the Claimant suffered a documented stroke
which is linked to a fungal meningitis diagnosis, then that Claimant
will receive 30 additional points.

H.   Renal Failure

As part of each claim, and subject to the specific standard of proof set
forth in Attachment C, if the Claimant has suffered from Stage 3, 4, or 5
renal failure which is linked to a fungal infection or to a diagnosis of
fungal meningitis, then the Claimant shall receive 30 additional points.

I.   Other Factors

As part of any claim, any Claimant may, as part of the initial Claim
submission, include a two page written request to the IPSA for an

45

award of up to an additional 10 points based on what the Claimant considers to be the unusual circumstances of his/her situation, which the Claimant feels are not adequately addressed by the points otherwise assigned by the Matrix.  Any Claimant who files a request for an award of "Other Factors" points as part of his/her Claim, shall be disqualified from making a Special Circumstances Petition, and receiving a Special Circumstances Award.

Simply filing an "Other Factors" request with a Claim does not mean the IPSA will automatically award extra points, and the maximum number of points that may be awarded to any Claimant under this provision shall be 10 additional points.

The IPSA shall consider the written requests that are submitted, and may in her sole discretion,  determine the correct number of additional points to be awarded in connection with each Claimant's "other factors" request.  In doing so, the IPSA may consider the other awards being made to similarly situated Claimants in the same Claim Category, and the nature of unusual circumstances presented in an effort to assess whether the Claimant's Matrix Award based on points otherwise awarded treat the Claimant fairly.

J.  Time-Barred Claims

Any Claimant who submits a claim, but who is found not to have filed a timely civil claim in state or federal court alleging a tort claim against Insight relating to or arising from that individual or his/her decedent having received an injection from one or more of the Three Contaminated MPA Lots at the Insight Imaging clinic in Roanoke, Virginia, will receive an award of only one-half (1/2) point to reflect the fact that the claim is not viable because it is time barred. Time-barred

46

Claimants are excluded from participation in the Special Circumstances petition process.

III.   <u>Examples of Application of Matrix</u>.

Once the "point value" is determined by the IPSA or Delegated Consultant, the Matrix Award is a simple mathematical calculation of multiplying the number of points assigned by the "point value" for the "Matrix Award."

Points in non-death cases would be determined under the Matrix as follows:

Category +

1 pt. per $1000 of past economic damage +

1/3 pt. per $1000 of future economic damage +

2 pts. for each lumbar puncture +

1/4 pt. per day on antifungal medications +

30 points for a stroke or chronic stage 3, 4 or 5 renal failure +

Extra points (up to 10 pts.) for "other factors" =

TOTAL POINTS

NOTE: Category I cases will receive additional points set forth above if decedent was survived by statutory beneficiaries.

Example: A Category II case with $150,000.00 of past medical bills and past wage loss with $45,000.00 of future medicals where Claimant had 5 lumbar punctures and 100 days of antifungal treatment would receive:

47

| | | |
|---|---|---|
| Category II | = | 50 points |
| $150,000 past economics | = | 150 points |
| $45,000 future economics | = | 15 points |
| 5 lumbar punctures | = | 10 points |
| 100 days of antifungals | = | 25 points |
| TOTAL | = | 250 points |

If the "point value" determined by the IPSA is $700.00, then the Matrix Award in this example would be $175,000.00.

IV.    Special Circumstances Petition.

The Claims Process includes an opportunity for those with exceptional and/or unique circumstances which make the Matrix Award inadequate to file a petition with the IPSA for a potential supplemental discretionary award from the Retention Pool.  There is a $2,000 fee required of anyone who desires to file a Special Circumstances Petition, and there is no guarantee of a Special Circumstances Award simply because the petition is filed.  For details, see Section V(G) of these ICRFP.

V.    Appeal Rights.

There is a limited right of appeal of a Matrix Award and/or a Special Circumstances Award as set forth in these ICRFP.

48

ATTACHMENT C

Standards of Proof

The following standards of proof will be used to evaluate claims submitted under these ICRFP.

I.    Claims Forms.  Each Claimant must submit a completed Claims Form signed under oath by the Claimant or an authorized representative.

II.    MPA Injection.  Medical or other records documenting an injection from one or more of Lots 05212012@68, 06292012@26 or 08102012@51 of preservative-free Methylprednisolone Acetate ("MPA") compounded by New England Compounding Pharmacy ("NECC") (the "Three Contaminated MPA Lots "), including, e.g.: a letter from Insight informing the Claimant or (where a representative is filing a claim on behalf of another person), the person that s/he received an injection from one or more of the Three Contaminated MPA Lots.  Alternatively the Claimant may request that the Delegated Consultant or IPSA review the list of patients who received an injection from one or more of the Three Contaminated MPA Lots that Insight submitted to the Trustee in 2013 in order to establish the necessary proof of injection (the "Insight List").

III.    Claim Categories.  The seven Base Categories (I – VII) may be established by submitting the following documents, in addition to evidence of a MPA injection (Section II above):

    A.    Category I (Death After MPA Injection).  (a) A certified death certificate documenting death as occurring after injection from one of the Three Contaminated MPA Lots  with the immediate or underlying cause of death containing one of the following words or phrases: meningitis, meningoencephalitis, encephalitis, epidural injection, methylprednisolone injection, steroid injection, exserohilum, aspergillus, abscess, or arachnoiditis; or (b) (i) a certified death certificate and medical documentation of a diagnosis of fungal meningitis, meningoencephalitis, encephalitis after injection from one or more of the Three Contaminated MPA Lots , and (ii)

49

documentation that the Claimant received Anti-Fungal Treatment; or (c) a certified death certificate and medical documentation of a diagnosis of spinal or paraspinal fungal infection (vertebral osteomyelitis, discitis, sacroiliitis or epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of epidural clumping or unevenness of nerve routes after an MRI) after a spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , plus documentation that the Claimant received Anti-Fungal Treatments; or (d) a death certificate and medical documentation that the Claimant suffered cerebrovascular accident/stroke occurring (but not a transient ischemic attack only) on or before December 31, 2012, after injection from one or more of the Three Contaminated MPA Lots ; or (e) a certified death certificate and proof that the Claimant was listed on the Virginia NECC List of death cases.  If such proof is presented for deaths occurring before September 30, 2013, the IPSA shall presume that the death was the result of the MPA injection or complications arising therefrom unless there is cause to believe that the death was a result of an unrelated event (i.e., auto accident, unrelated illness).  For deaths occurring after September 30, 2013, where there is reason to believe that the death resulted from an unrelated event, a certified death certificate and other such proof deemed sufficient by the IPSA to establish the death was the result of a MPA injection or complications arising therefrom.

   B. <u>Category II (Fungal Meningitis Plus Secondary Fungal Infection)</u>.  Medical documentation of (a) (i) a diagnosis of fungal meningitis, meningoencephalitis, encephalitis after injection from one or more of the Three Contaminated MPA Lots , and (ii) a diagnosis of spinal or paraspinal fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of abnormal thickening, intradural clumping or unevenness of nerve roots after MRI) after spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , <u>plus</u> documentation that the Claimant received Anti-Fungal Treatment; or (b) proof that the Claimant was listed on both the Virginia NECC List of NECC's fungal meningitis or stroke cases and

50

was listed on the Virginia NECC List of NECC's spinal or paraspinal fungal infection cases, or was listed on the Virginia NECC List of NECC's fungal meningitis and spinal or paraspinal injection cases.

C.     Category III (Fungal Meningitis).   May be established by presenting medical documentation of (a) (i) diagnosis of fungal meningitis, meningoencephalitis or encephalitis after injection from one or more of the Three Contaminated MPA Lots, and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia NECC List of NECC stroke or fungal meningitis cases.

D.     Category IV (Spinal or Paraspinal Fungal Infection (But Not Meningitis)). May be proved by medical documentation of (a) (i) a diagnosis of spinal or paraspinal fungal injection (including vertebral osteomyelitis, discitis, sacroiliitis, epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of abnormal thickening, intradural clumping or unevenness of nerve roots after MRI, after a spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia List of spinal or paraspinal fungal infection cases.

E.     Category V (Fungal Peripheral joint infection (But Not Meningitis)).   May be proved by medical documentation of (a) (i) a diagnosis of fungal peripheral joint infections after joint injection from one or more of the Three Contaminated MPA Lots, and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia NECC List of peripheral joint infection cases.

F.     Category VI (Symptoms and at Least One Lumbar Puncture).   May be established by presenting contemporaneous medical records documenting that the Claimant suffered on or before March 31, 2013 from one or more of the symptoms listed in the definition of Category VI in §I of Attachment B, after an injection from one or

51

more of the Three Contaminated MPA Lots, and medical records documenting at least one lumbar puncture prior to April 30, 2013.

G.   Category VII (Symptoms and Lumbar Puncture not required).   Only requires injection from one or more of the Three Contaminated MPA Lots.

IV.   Medical Conditions.

A.   Arachnoiditis may be established by medical records that document (a) the diagnosis of an arachnoiditis, or there must be documentation of intradural clumping or unevenness of nerve roots after MRI after an injection from one or more of the Three Contaminated MPA Lots, and (b) antifungal treatment.

B.   "Anti-Fungal Treatment" as used in these standards of proof requires presentation of medical records documenting the length of treatment with Amphotericin B, Voriconazole, Posaconazole, Itraconazole and/or Isavuconazole after injection from one or more of the Three Contaminated MPA Lots.

C.   Lumbar puncture adjustment will require medical records documenting one or more lumbar punctures after injection from one or more of the Three Contaminated MPA Lots and before December 31, 2014.

D.   Stroke adjustment requires medical documentation of a diagnosis of cerebrovascular accident/stroke (but not a transient ischemic attack only) after injection from one or more of the Three Contaminated MPA Lots and a diagnosis of fungal meningitis.  If the cerebrovascular accident/stroke occurred on or before December 31, 2012, the IPSA may presume that the stroke was the result of the MPA injection or complications arising therefrom unless there is reason to believe that the stroke was the result of an unrelated event (i.e., the Claimant has a past history of strokes).  For strokes where there is a reason to believe that it is unrelated to the MPA injection or complications arising therefrom, or for strokes occurring after December 31, 2012, proof deemed sufficient by the IPSA that the stroke was the result of the MPA injection or complications therefrom is required.

52

E.      Renal Failure adjustment may be established by any of the following records that show that the kidney disease is linked to an injection of one or more of the Three Contaminated MPA lots, or complications arising therefrom either by: (i)  medical records or a treating physician statement that state that the Claimant or decedent suffers or suffered  from Stage 3, 4, or 5 kidney disease which began within 12 months after injection from one or more of the Three Contaminated MPA Lots or the kidney disease is linked to an injection of one or more of the Three Contaminated MPA lots, or complications arising therefrom or (ii) medical records documenting acute renal insufficiency within 30 days of the first treatment with amphotericin B.   Proof of acute renal insufficiency shall consist of medical records documenting a glomerular filtration rate ("GFR") of <60 within 30 days following treatment with amphotericin B.   The applicable GFR score is the GFR score listed for the patient's race (non-African American or African American).   If GFR scores are not available, medical records documenting a Creatinine Clearance ("CrCl") level within 30 days after the first treatment with amphotericin B, where such CrCl level is commensurate with a GFR of less <60 is sufficient.

F.      Vertebral osteomyelitis may be established by medical records that document (a) a diagnosis of vertebral osteomyelitis after injection from one or more of one or more of the Three Contaminated MPA Lots, and (b) antifungal treatment.

V.      <u>Death Adjustments</u>.  Any administrator or executor making a claim on behalf of a decedent who seeks an award of additional points based upon surviving beneficiaries shall provide documentary evidence of dependent and/or adult children as of the date of death.

A.      <u>Dependent Child</u>.  For Dependent Children Adjustment:

(1)      A child is considered to have been dependent on the decedent if he or she is: (a) under the age of 21 as of the date of death and listed as a qualifying dependent child on the decedent's 2011 or 2012 federal income tax return; or (b) a natural or legitimate child under the age of 21 as of the date of death; or (c) an adopted

53

child under the age of 21 as of the date of death; or (d) a stepchild under the age of 21 as of the date of death who lived with the decedent in a regular parent-child relationship at the time of the decedent's death or there are reasons why the stepchild did not live with the decedent (i.e., medical reasons, to attend school or other similar reasons); or (e) under the age of 21 as of the date of death who lived with the decedent in a regular parent-child relationship at the time of the decedent's death or did not live with the decedent because of medical reasons, to attend school or other similar reasons, and to whose support the decedent made regular and substantial contributions.

(2)     Proof that a child was under 21 as of the date of death may be provided by submitting the decedent's 2011 or 2012 federal tax return listing the child as a dependent and listing the child's date of birth, or by submitting a certified birth certificate of the child.

(3)     Proof of dependency may be provided as follows: (a) a copy of the decedent's federal tax return for 2011 or 2012, listing the child (ren) as a qualifying dependent child and listing his or her date of birth; (b) a certified birth certificate that indicates that a child was a natural or legitimate child of the decedent. In the event that decedent's name does not appear on the birth certificate, proof may be provided by documentation evidencing a judicial determination of support; (c) for domestic adoptions, a copy of a revised birth certificate showing the decedent as a parent. For foreign adoptions, proof may be provided by submitting a copy of the adoption decree and, if applicable, documentation showing the child's change of name.  Since rules for foreign adoptions vary by country, alternative and/or additional documentation may be required by the Settlement Administrator; (d) for a child that was a stepchild, a certificate of marriage, evidencing the marriage of the child's biological parent and the decedent, and a certified birth certificate or documentation evidencing a judicial determination of support and a signed statement from a person with direct knowledge that verifies that the stepchild lived with the decedent in a regular parent-child relationship at the time of decedent's death or describing the reasons why the stepchild did not live with the decedent (i.e., for medical reasons, to attend school, or for other

54

similar reasons); (e) if dependency is claimed on the basis of the decedent having made regular and substantial contributions to the support of the child, a signed statement from a person with direct knowledge that verifies that the child (or children) lived with the decedent in a regular parent-child relationship at the time of the decedent's death or describing the reasons why the child did not live with the decedent (i.e., for medical reasons, to attend school, or for other similar reasons) and one or more of the following proofs: (1) evidence of eligibility as a dependent child for benefits under State or Federal programs; (2) cancelled checks, money orders, or receipts for periodic payments received from the decedent for or on behalf of the child; (3) evidence of goods or services that show regular contributions of considerable value from the decedent for or on behalf of the child; or (4) proof of coverage of the child as a family member under the decedent's Federal Employees Health Benefits enrollment or private health insurance.

B.      Spouse.  For Spousal Adjustment, the decedent's certified death certificate.

C.      Adult Children.  For Adult Children Adjustment, listing of name, date of birth, and current address of each surviving natural or adopted adult child as of decedent's date of death on the Claims Form and a copy of the decedent's obituary identifying the surviving natural or adopted adult child(ren), or a signed statement from a person with direct knowledge that the decedent was survived by a natural or adopted adult child(ren) and identifies the surviving adult child(ren).

D.      Siblings.  For Siblings Adjustment, listing of name, date of birth, and current address of each surviving sibling as of decedent's date of death on the Claims Form and a copy of the decedent's obituary identifying the surviving sibling, or a signed statement from a person with direct knowledge that the decedent was survived by a sibling and identifies the surviving sibling.

VI.      Past Medical Bills.  For Claimants seeking an award based on past medical bills, the Claimant will need to supply a statement from either the treating physician or a physician qualified to offer the opinion that the medical treatment and the expenses presented are related to the care and treatment provided to the Claimant after receiving

55

an injection from one or more of the Three Contaminated MPA Lots , and that the treatment, care and medical expenses are connected to the medical conditions that are causally connected to the injection from one or more of the Three Contaminated MPA Lots .

VII.   Claim for Past Lost Wages.  Any Claimant who is making a claim for lost wages of less than $2,000.00 may do so by providing a signed statement from his or her employer stating the time missed from work (which the Claimant attributes to the complications resulting from having received an injection of MPA from one or more of the Three Contaminated MPA Lots) and the rate(s) of pay during such period(s) of missed work, or by producing employment records of the same.

For lost wages claims in excess of $2,000.00, the Claimant may provide either a federal tax return for 2011 (filed either jointly or individually) or the Claimant's 2011 W-2s, 1099s and/or 10-Ks, and the same documentation for each of the years 2012, 2013 and 2014, plus a statement from the Claimant's current or past employer (if self-employed, a statement by the Claimant) that the Claimant missed time from work during the time periods or by producing employment records of same; Claimant shall also produce documentation from either his/her treating physician or a qualified physician that the reason for termination or the inability to work was due to medical complications related to the MPA injection.

VIII.   Future Medical Expenses.  Any Claimant who makes a claim for Future Medical Expenses must provide a letter or statement from a treating physician or other qualified physician supporting such claim. In addition, if a Claimant seeks Future Medical Expenses in excess of $50,000 and for a period of greater than two (2) years into the future, then the Claimant must provide a life care plan prepared by an individual who has been previously qualified to provide opinion testimony on this topic in a Virginia state court. In addition, any claim for Future Medical Expenses to be incurred over a period greater than two (2) years must include a growth rate of 5.25% and a discount

56

rate of 4% (if less than 10 years) and a discount rate of 4.5% (if greater than 10 years). Otherwise, such proof may be established with statements from treating physicians.

IX.   <u>Future Lost Wages</u>.  Any Claimant who makes a claim for Future Lost Wages must provide a letter or statement from a treating physician or other qualified physician supporting such claim.  Any Claimant seeking an award for future lost wages and/or other employment benefits in excess of $50,000 and for a period greater than two (2) years and involves projected growth of wages and/or employment benefits must apply a wage/benefits growth rate of 2% (if less than 10 years) and 2.5% (if greater than 10 years) <u>or</u> provide a report from a qualified economist or other expert who has previously been qualified to provide such opinion testimony in a Virginia state court justifying application of any other rate. Claims greater than two (2) years must also apply a discount rate of 4% (if less than 10 years) and a discount rate of 4.5% (if greater than 10 years).  If more than five years of Future Lost Wages are sought, the Claimant must submit the opinion of a vocational rehabilitation expert or other qualified expert addressing any mitigating employment factors such as the ability to obtain other employment in another field.

57

**EXHIBIT B-3**

**Inspira Claims Resolution Facility Procedures**

**EXHIBIT B-3 TO THE TORT TRUST AGREEMENT:**
**INSPIRA PERSONAL INJURY**
**CLAIMS RESOLUTION FACILITY PROCEDURES ("ICRFP")**

The INSPIRA CLAIMS RESOLUTION FACILITY ("ICRF") for Inspira personal injury claimants (each an "Inspira Claimant" and collectively the "Inspira Claimants") is established under and pursuant and adjunct to the *Joint Chapter 11 Plan of New England Compounding Center* ("NECC"), dated December 3, 2014 (the "Plan") and the Tort Trust Agreement (establishing the "Tort Trust"), with the Inspira Settlement Funds to be held by the Tort Trustee as a segregated fund. Any person making application or given the right under the Plan to make application for a share of the funds being distributed by these Inspira Claims Resolution Facility Procedures ("ICRFP") shall be bound by the provisions of these ICRFP and to the allocation processes provided in these ICRFP. Unless the context otherwise requires, all capitalized terms used and not otherwise defined in these ICRFP will have the meanings assigned to them in the Plan or Tort Trust Agreement.

I.      **GENERAL PROVISIONS**

1.      The ethics of carrying out these ICRFP, including whether ABA Model Rule 1.8(g) is applicable, will be examined by either a reputed ethicist or the New Jersey Bar Association, with a written ethics opinion or determination to be obtained prior to carrying out these ICRFP. If necessary, these ICRFP will be modified to meet or carry out the terms of the resulting ethics opinion or determination.

2.      Each Inspira Claimant who has timely filed a bankruptcy Proof of Claim ("POC") or a "PITWD Addendum" in the Chapter 11 Case and whose POC or PITWD Addendum asserts a personal injury or wrongful death claim arising from an injection of

contaminated drugs compounded by NECC at a New Jersey health care facility operated by Inspira Health Network, Inc. (f/k/a South Jersey Health System, Inc.) and/or Inspira Medical Centers, Inc. (f/k/a South Jersey Hospital, Inc.) (collectively "Inspira") shall have a right to make a claim for a share of the Inspira Settlement Funds allocated under the Plan and the Inspira Settlement Agreement to the ICRF for distribution. The Inspira Settlement Administrator may find a claim is eligible where he finds that a Claimant has timely filed a POC or PITWD Addendum, which requirement is not waivable, and notwithstanding anything stated or omitted in the POC or the PITWD Addendum the Claimant holds a valid personal injury or wrongful death claim under New Jersey law arising from treatment at an Inspira clinical facility with a contaminated NECC Drug. Each of the items of eligibility specified in this paragraph must be met in order to share in the funds being distributed pursuant to these ICRFP.

3.      These ICRFP set forth a process to assign values to each Inspira Claimant's claim for the purpose of allocating the Inspira Settlement Amount (as defined herein) among the Inspira Claimants and then, after reduction for expenses and other reserves associated with the administration of these ICRFP and allocation processes, making payment to the Claimants of their share of the Inspira Settlement Amount as determined by these ICRFP.

4.      The execution of the Inspira Settlement Agreement and the confirmation of the Plan are both prerequisites and conditions precedent to the effectiveness of these ICRFP.

## II.    GUIDELINES, PROCESSES AND PROCEDURES OF THESE ICRFP

### A.    Appointment of Inspira Settlement Administrator

5.      On and as of the Plan Effective Date, Edgar C. Gentle, Esquire and the firm of Gentle, Turner, Sexton, Debrosse & Harbison shall be deemed appointed and shall serve as the "Inspira Settlement Administrator" of these ICRFP. Should Mr. Gentle, or his firm, refuse or not

be able to fulfill this appointment, the District Court shall, on motion of the PSC or any counsel representing an Inspira Claimant, appoint a replacement Inspira Settlement Administrator to act in his place and stead.

6.      The Inspira Settlement Administrator shall stand in a fiduciary capacity to the Inspira Claimants, and his actions or failures to act in such capacity shall be governed by and under the laws of the State of New Jersey. He shall also be deemed a mediator of the parties' allocation claims and shall be entitled to the rights, privileges and immunities mediators have under the New Jersey Uniform Mediation Act, N.J.S.A. 2A:23C-1 *et seq*, and have immunity as provided for Provider Settlement Administrators in the Tort Trust Agreement.

7.      The Inspira Settlement Administrator shall serve as a neutral allocator and shall review and evaluate each Inspira Claimant's claim in accordance with the guidelines and procedures contained in these ICRFP. Thereafter, the Inspira Settlement Administrator shall make binding determinations as to the allocation of the net Inspira Settlement Amount to each Claimant. The Inspira Settlement Administrator will have sole discretion to allocate values to each Inspira Claimant's claim, and his decisions will be final and binding.

B.      Ethical Considerations

8.      The Inspira Settlement Administrator in the discharge of his fiduciary duties shall at all times be cognizant of and conform to all applicable New Jersey ethical responsibilities and obligations regarding allocation of funds among multiple interested parties, in accordance with the ethics opinion or determination obtained pursuant to Paragraph 1 above.

C.      **Assistance for Inspira Claimants Without Lawyers**

9.      Where an Inspira Claimant is not represented by counsel, the Inspira Settlement Administrator may retain staff from an outside company or firm (the "Facilitators") to assist each

3

unrepresented Inspira Claimant in timely submitting his or her National Compensation Claim Form, Inspira Supplemental Compensation Claim Form and other required documentation.

10.      Any costs incurred by Facilitators in assisting with the evaluation of a given unrepresented Claimant's claim will be deducted from the Claimant's recovery, if any, pursuant to these ICRFP. Any Facilitator costs not recovered from a Claimant as provided in this paragraph shall be treated as an administrative cost of the ICRF.

11.      Unrepresented Claimants are ultimately responsible for retrieving and producing their medical records and any other evidence required under these ICRFP to substantiate their claims.

### D.      Compliance with National Claims Resolution Facility Procedures

12.      The NECC National Compensation Program point system (the "Matrix") contained in the Claims Resolution Facility Procedures (*Exhibit A to the Trust Agreement*) (the "National Procedures") will be used by the Inspira Settlement Administrator as the starting point for the base allocation of the Inspira Settlement Amount among the Inspira Claimants eligible to participate.

13.      Within 14 days of the Plan Effective Date, or as soon thereafter as practicable, the Inspira Settlement Administrator shall mail or cause to be mailed the following documents to each known person eligible to be an Inspira Claimant or anyone in good faith requesting such documents: (i) an NECC National Compensation Program Claim Form ("National Compensation Claim Form") together with instructions; (ii) an Inspira Supplemental Claim Form together with instructions, (iii) the Inspira Base Point Category and Adjustment Calculation Worksheet; (iv) a copy of these ICRFP; (v) a set of Frequently Asked Questions; and (vi) a W-9 Form. The Inspira Settlement Administrator shall also prepare and send an explanatory cover letter with the above

4

materials. The Inspira Settlement Administrator may retain a firm to print and/or send these materials specific to the administration of these ICRFP if the Inspira Settlement Administrator believes cost savings are achievable by doing so. The explanatory cover letter to Inspira Claimants shall explain that 1) the Inspira Claimant's submission to the Inspira Settlement Administrator of the National Compensation Claim Form is a separate and distinct requirement for the Inspira Settlement, and 2) to be eligible to receive compensation from the National Settlement Fund the Inspira Claimant must also submit a National Compensation Claim Form to the National Settlement Administrator. The cover letter shall also provide the address to submit such a National Compensation Claim Form to the National Settlement Administrator, the deadline for submitting such a Claim Form and the name of a contact person the potential Inspira Claimant may call with any questions about the distinct filing requirements for the two settlements. To the extent practicable, this mailing will be coordinated by the National Settlement Administrator of the National Compensation Claim Form Packets.

### Procedures for Filing Compensation Claim Forms

14.     To receive compensation from the Inspira Settlement Fund, Inspira Claimants must submit the following to the Inspira Settlement Administrator: (i) a completed and signed National Compensation Claim Form (which may be a copy of the form submitted to the National Settlement Administrator); (ii) a completed and signed Inspira Supplemental Claim Form; (iii) an Inspira Base Point Category and Adjustment Calculation Worksheet; and (iii) a completed and signed W-9 Form, together with all supporting documentation required, on or before 120 days after the Plan Effective Date or within 106 days after the mailing of the Inspira Claim Form Packets to Claimants, whichever is later, at 5:00 P.M., Eastern Standard Time. All National Compensation Claim Forms and Inspira Supplemental Claim Forms must be received by the

5

Inspira Settlement Administrator by this date and time. No National Compensation Claim Forms or Inspira Supplemental Claim Forms may be accepted by the Inspira Settlement Administrator after this date and time, except upon a showing of excusable neglect as determined by the Inspira Settlement Administrator. No National Compensation Claim Forms or Inspira Supplemental Claim Forms shall be accepted by the Inspira Settlement Administrator after the date the Inspira Settlement Administrator has calculated the Proposed Final Allocation, pursuant to Paragraph 26 below. The Inspira Settlement Administrator may also accept as timely National Compensation Claim Forms or Inspira Supplemental Claim Forms that are submitted in error (but which are otherwise timely) to the National Settlement Administrator, the Bankruptcy Court, the District Court or Donlin Recano. Timely received incomplete Claim Forms shall be considered timely filed, if completed within a reasonable time thereafter.

15.     The filing of a National Compensation Claim Form and Inspira Supplemental Claim Form also constitutes participation by that Inspira Claimant's family members in the primary Inspira Claim or the Class D Estate Claim, and Class D Consortium Claims of family members shall be deemed released by the treatment afforded the primary Inspira Claimant under and in accordance with these ICRFP.

**Initial Eligibility Determination**

16.     To receive compensation from the Inspira Settlement Fund, an Inspira Claimant must meet the eligibility requirements set forth in paragraph 1. All POCs and/or PITWD Addenda that were allowed by the Bankruptcy Court to be filed after the Bar Date will be deemed to be Timely POCs and/or PITWD Addenda.

17.     The Inspira Settlement Administrator shall conduct an initial review of all Inspira Supplemental Claim Forms and the Timely POCs and PITWD Addenda filed by or on behalf of each Inspira Claimant. If no timely POC or PITWD Addendum was filed by or on behalf of a given Inspira Claimant, the Inspira Settlement Administrator shall immediately make a final determination denying that Inspira Claimant's Claim and shall immediately notify the Inspira Claimant of such final denial and the procedure to request reconsideration of the denial. Notwithstanding anything contained herein to the contrary, an Inspira Claimant's receiving such a final denial may file a request for reconsideration in accordance with the provisions of Paragraphs 28 & 29 below.

18.     At the same time the initial eligibility review is conducted as provided for in paragraph 17 above, the Inspira Settlement Administrator shall also determine if the Inspira Claimant submitted a completed W-9 form with his or her Inspira Supplemental Claim Form or otherwise did not complete the Claim Form. If a completed W-9 form or completed Claim Form was not submitted by an Inspira Claimant, the Inspira Settlement Administrator shall notify the Inspira Claimant that one must be submitted within 90 days of such notice or the claim will be finally denied. In the event of such a final denial, the Inspira Settlement Administrator shall notify the Inspira Claimant of the final denial and the procedure to request reconsideration. Notwithstanding anything contained herein to the contrary, an Inspira Claimant's receiving such a final denial may file a request for reconsideration in accordance with the provisions of Paragraphs 28 & 29 below.

19.     All Inspira Claims not denied for lack of a Timely POC or PITWD Addendum or lack of a completed W-9 form shall be deemed to be "Eligible Inspira Claims" and persons holding such Eligible Inspira Claims shall be deemed "Eligible Inspira Claimants."

7

**ICRFP Allocation Processes and Procedures - Base Allocation**

20.     *Determination of Base Matrix Score.* The Inspira Settlement Administrator, as the first step of determining Eligible Inspira Claimants' allocations, will score the Eligible Inspira Claimants' claims pursuant to the National Procedures and in accordance with its rules and presumptions to determine each Eligible Inspira Claimant's Base Matrix Claim. In scoring the  claims, the Inspira Settlement Administrator will ask each Eligible Inspira Claimant (and his or her attorney, if the claimant is represented) to complete an Inspira Base Point and Adjustments Calculation Worksheet, which will present the Claimant's proposed score. Claimants and their counsel, if represented, will submit all records and Matrix worksheets as directed by the Inspira Settlement Administrator to facilitate Matrix scoring. Additional records of new and/or ongoing medical evaluation and treatment may be provided on a rolling basis, as needed, to supplement the claim so long as such records are submitted on or before [insert date 150 days after the Plan Effective Date] at 5:00 P.M., Eastern Standard Time. The Inspira Settlement Administrator may agree with a Claimant to accept and adopt a Claimant's Matrix Score determined by the National Settlement Administrator if one has been calculated.

21.     Except as provided in Paragraph 22 below, in order for an Eligible Inspira Claim to qualify for any of the seven Base Point Categories described in Section IV.B of the National Procedures (and thus to be deemed a "Qualified Claim"), the Eligible Inspira Claimant must submit to the Inspira Settlement Administrator medical or other records documenting that the Inspira Claimant received an injection or injections from one or more of lots 05212012@68, 06292012@26 or 08102012@51 (the "Three Contaminated MPA Lots") of preservative-free methylprednisolone acetate ("MPA") compounded by NECC, i.e., a letter from Inspira or the New Jersey Department of Health and Human Services informing the Inspira Claimant that he or

8

she had received an injection from one of the Three Contaminated MPA Lots; or Inspira records showing the Claimant received MPA from one of the Three Contaminated MPA lots during a procedure at an Inspira facility; or the appearance of his or her name on a list of patients administered an injection of MPA from one of the Three Contaminated MPA lots at an Inspira facility prepared by Inspira or the New Jersey Department of Health. If the Inspira Claimant on the Inspira Supplemental Claim Form requests that the Inspira Settlement Administrator review the list of patients who received an injection from one of the Three Contaminated MPA Lots that Inspira submitted to the Chapter 11 Trustee pursuant to the Interim Order Regarding Chapter 11 Trustee's Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and for Related Relief Concerning Notice by Notice Intermediaries [Bankr. Dkt. No. 412] (the "Inspira Patient List"), or any list of NECC stroke, fungal meningitis, spinal or paraspinal infection and/or peripheral joint infection cases prepared by the New Jersey Department of Health (the "New Jersey NECC List"), and if these lists are available to the Inspira Settlement Administrator, the Inspira Settlement Administrator shall review the relevant Inspira Patient List and/or New Jersey NECC List in order to determine if the Inspira Claimant's name is on one of such lists. If the Inspira Claimant's name is listed on any such list, this will provide the necessary proof of injection from one of the Three Contaminated MPA Lots.

22.     If an Inspira Claimant claims exposure to a contaminated NECC Drug other than one of the Three Contaminated MPA Lots, the Base Matrix Score calculation and proof of exposure shall be handled and scored in the same manner as the National Procedures.

23.     The Base Matrix Score calculated by the Inspira Settlement Administrator shall be final and binding unless the Eligible Inspira Claimant timely requests reconsideration and

establishes grounds for modifying the Inspira Settlement Administrator's determination in accordance with Paragraphs 28 & 29 below.

**ICRFP Allocation Processes and Procedures – Base Matrix Score Adjustments**

24.     After an Eligible Inspira Claimant's Base Matrix Score has been determined by the Inspira Settlement Administrator, the Inspira Settlement Administrator will then consider, if requested by an Inspira Claimant in his or her Inspira Supplemental Claim Form, whether to make an upward adjustment to his or her Matrix Base Score for certain defined injuries and losses that are not provided for in the National Procedures. These injuries and losses are set forth in Table 1 below ("Inspira Supplemental Injury Claims"), and only these specific injuries and losses may be considered by the Inspira Settlement Administrator as a basis for making an upward adjustment to an Inspira Claimant's Base Matrix Score for purposes of allocation of the Inspira Settlement Fund and only this fund. The Inspira Settlement Administrator shall have sole discretion to serve as factfinder and to make eligibility determinations based on New Jersey law, and his decisions shall be final and binding.

25.     An Inspira Claimant claiming an adjustment for an Inspira Supplemental Injury Claim will have the burden of making timely application, proving by the preponderance of the evidence, and in accordance with New Jersey law, that the additional injury or loss claimed was caused by a contaminated NECC Drug and producing medical records and any necessary reports or evidence that support the existence of the eligible injury or loss by a preponderance of evidence. The Inspira Settlement Administrator may rely on the records and any reports submitted in making his decisions or determinations. In addition, each Inspira Claimant must submit to the Inspira Settlement Administrator, if requested, a duly executed HIPAA authorization to permit the Inspira Settlement Administrator to obtain records should he

10

determine, in his discretion, there is a need for such records. Each Inspira Claimant must submit any tests or exams – including, but not limited to, MRIs, CT scans and lumbar punctures – that may have been arranged by counsel to an Inspira Claimant, whether or not disclosed in mediation, all medical records relevant to the issues before the Inspira Settlement Administrator, complete reports and tests, toxicology, radiology and other diagnostic and laboratory data and any other documents with material information for the valuation of the matter. All records must be submitted in chronological order and Bates stamped for review and reference. The Inspira Settlement Administrator may require Inspira Claimants to obtain other records (or as indicated above to execute and provide authorizations) in order for the Inspira Settlement Administrator to request any additional records determined necessary to evaluate a claim. Any record acquisition costs incurred in obtaining the records relating to an individual Inspira Claimant shall be deducted from that Claimant's recovery, if any. The Inspira Settlement Administrator, in his discretion as factfinder, may obtain one or more reports from an independent medical expert(s), whose compensation shall be deducted from Claimant's recovery, if any.

Table 1

Inspira Supplemental Injury Claims

| Category | Point Value/Proof Required |
|---|---|
| *Loss of Consortium* | **3 pts.** if Claimant in Base Point Category II, III, IV or V was married at the time of administration of contaminated NECC Drug(s), provided that the Claimant certifies under oath on the Inspira Supplemental Claim Form that he or she was married at the time of administration of contaminated NECC Drug(s) |
| *Future Lost Earning Capacity* | The Inspira Settlement Administrator may consider and make awards for future lost earning capacity for Claimants in Base Point Categories II, III, IV or V in accordance with the following procedures: |

11

| | |
|---|---|
| | (1) Any Claimant claiming future lost earning capacity must timely advise the Inspira Settlement Administrator of such claim on his or her Inspira Supplemental Claim Form.<br><br>(2) The Claimant must (a) submit proof of entitlement for an award of future lost earnings (including, but not limited to, medical reports regarding disability and tax records) to the Inspira Settlement Administrator; and (b) must convince the Inspira Settlement Administrator by a preponderance of the evidence that a contaminated NECC Drug caused the future lost earning capacity.<br><br>(3) In order to be entitled to an award for future lost earning capacity, the Claimant must obtain from an economist a loss of future earning capacity assessment ("Assessment Report"), which shall be made in accordance with New Jersey law. Claimant is responsible for providing the economist with information (including, but not limited to, medical reports regarding disability and tax records) needed to make the Assessment Report. The Assessment Report shall be a dollar amount with an explanation of how the amount was determined.<br><br>(4) The Inspira Settlement Administrator, in his discretion as factfinder, may obtain one or more reports from an independent medical expert(s) and/or independent economist(s), whose compensation shall be deducted from Claimant's recovery, if any.<br><br>(5) Beginning at $5,000 future net loss, the Inspira Settlement Administrator shall award ¼ point for every $5,000 of future net loss up to 10 points. Therefore, future losses under $5,000 shall receive 0 points, and future losses of $200,000 or greater shall receive 10 points. Claims for future lost earning capacity shall be treated uniformly as directed by the Inspira Settlement Administrator. If such claims are to be reduced to present value, then all such claims shall be so reduced. Conversely, if reduction to present value is not required, then all such claims shall not be so reduced.<br><br>(6) The Inspira Settlement Administrator, based upon the information provided, shall make a determination and advise the Claimant or Claimant's counsel, if represented. |
| *Blood Patch* | **½ point** for Claimants in Base Point Categories I, II, III, IV, V |

| | |
|---|---|
| | or VI for each blood patch associated with a diagnostic lumbar puncture after injection from from one of the Three Contaminated MPA Lots, provided the Claimant presents medical records documenting blood patch within 14 days after lumbar puncture |
| *Heart Attack / Myocardial Infarction* | **up to 10 points** for Claimants in Base Point Categories I, II or III, IV or V, provided the Claimant presents proof of (1) diagnosis of fungal meningitis or fungal infection after injection from one of the Three Contaminated MPA Lots; (2) use of anti-fungal medication to treat fungal meningitis or fungal infection; (3) post-fungal meningitis or post-fungal infection diagnosis of heart attack/myocardial infarction based upon objective diagnostic study and confirmed by a Board Certified cardiologist; and (4) confirmation by a Board Certified cardiologist that heart attack/myocardial infarction was caused by administration of anti-fungal medication<br><br>Points based upon treatment options as defined by the American College of Cardiology: medication management only = **3 points**; percutaneous coronary intervention (PCI), such as angioplasty or stenting and with full recovery = **5 points**; coronary artery bypass graft surgery (CABG) with full recovery = **8 points**; PCI or CABG without full recovery, as documented by objective diagnostic testing showing ongoing cardiac dysfunction = **10 points** |
| *Congestive Heart Failure* | **up to 10 points** for Claimants in Base Point Categories I, II or III, provided the Claimant presents proof of (1) diagnosed fungal meningitis after injection from one of the Three Contaminated MPA Lots; (2) administration of IV saline after fungal meningitis developed; (3) administration of IV amphotericin after fungal meningitis developed; (4) diagnosis of cardiac dysfunction, such as diastolic dysfunction, based upon objective diagnostic study, such as echocardiogram, and confirmed by a Board Certified cardiologist; (5) confirmation by a Board Certified cardiologist that congestive heart failure was caused by administration of IV saline and IV amphotericin after fungal meningitis developed; and (6) no history of cardiac dysfunction or event<br><br>For cardiac dysfunction, based upon the American College of Cardiology criteria: stage B (asymptomatic heart failure) = **3 points**; stage C (symptomatic heart failure) = **5 points**; stage D (end-stage heart failure) = **8 points**. Additionally, an extra **1/2 point** is added for any subsequent episodes of congestive heart failure after the initial failure to a **maximum of 10 total** |

| | |
|---|---|
| | **points**. |
| *Movement Disorder* | **10 points** for Claimants in Base Point Categories I, II or III, provided the Claimant presents proof of (1) diagnosed fungal meningitis after injection from one of the Three Contaminated MPA Lots; (2) use of anti-fungal medication to treat fungal meningitis; (3) post-fungal meningitis diagnosis of movement disorder by a Board Certified neurologist; (4) confirmation by a Board Certified neurologist that movement disorder was caused by fungal meningitis and/or anti-fungal treatment; (5) no history of movement or seizure disorder; and (6) no family history of movement or seizure disorder noted in Claimant's medical chart |
| *Severe Allergic Reaction* | **1 point**, provided the Claimant presents proof of (1) allergic reaction such as hives, rash, or blistering (2) during treatment with anti-fungal medication (3) requiring a change in administration of anti-fungal medication |

**ICRF Allocation Processes and Procedures – Determination of Allocation Scores**

26.     Following determination of all adjustments to Base Matrix Score, the Inspira Settlement Administrator will then calculate the proposed total score for each Inspira Claimant and then, using those scores, will compute an allocation (the "Proposed Final Allocation") of the Inspira Settlement Amount based upon the result obtained according to the following formula: (i) calculate the sum of all points subject to the Proposed Final Allocation ("Summed Points"); (ii) divide the Inspira Fund Net Trust Proceeds (i.e., the amount available for distribution to Inspira Claimants at the time the computation is made) by the number of Summed Points; and (iii) determine a value for each Inspira Claimant's Proposed Final Allocation.

**ICRF Allocation Processes and Procedures – Claimant Notification; Reconsideration Process**

27.     After completing the above steps, the Inspira Settlement Administrator will send a letter informing each Inspira Claimant and his or her counsel, if represented, of his or her Proposed Final Allocation (the "Proposed Settlement Letter").

14

28.     The Proposed Settlement Letter will also inform each Inspira Claimant a right and a deadline of 60 days within which to request reconsideration of the Proposed Final Allocation. Only requests for reconsideration that provide or further explain evidence substantiating the proposed adjustment of the score will be considered.

29.     Inspira Claimants shall have 10 days from the date of the Proposed Final Allocations Letter to request a private conference with the Inspira Settlement Administrator either (i) to discuss his or her Proposed Final Allocation with the Inspira Settlement Administrator or (ii) to provide any general comments for adjustment of the allocation. The Inspira Settlement Administrator will allow an Inspira Claimant requesting reconsideration to provide any additional commentary or documentation for the Inspira Settlement Administrator's review. The Inspira Settlement Administrator will then have a reconsideration hearing by phone, in which the Claimant and his or her counsel, if represented, participate. The Inspira Claimant requesting reconsideration will have the burden of proving by the preponderance of the evidence that the reasons for the request are valid. The Inspira Settlement Administrator will issue a decision letter for each Inspira Claimant requesting reconsideration.

30.     After these steps are carried out, the allocations of the Inspira Settlement Amount will be finalized in a "Final Certified Allocation Schedule" using the same methodology and formula as in Paragraph 26 above and a copy sent to each Eligible Inspira Claimant or, if represented, to his or her counsel. The Final Certified Allocation Schedule shall be delivered by the Inspira Settlement Administrator to the Tort Trustee along with W-9 Forms for each Inspira Claimant who is to receive payment and the certified expenses to be charged against the Inspira Claimant's Allocation Amount.

31.     As soon as the funds from the Inspira Settlement Amount are available for distribution, the Final Certified Allocation Schedule having been delivered, and the W-9 Forms provided, the Tort Trustee will deliver the funds to the Inspira Claimants and pay the Inspira Settlement Administrator his fees and reimburse his expenses as soon as practicable. The Tort Trustee's disbursement of funds to Inspira Claimants is not contingent upon the administration and disbursement of the funds in the National Fund, and payments pursuant to these ICRFP shall be made as soon as reasonably practicable.

**ICRF Allocation Processes and Procedures – Lien Resolution**

32.     Before the Tort Trustee may make a distribution of the Settlement Amount to an Eligible Inspira Claimant, any and all liens, both governmental and private, need to be resolved. The Inspira Settlement Administrator will provide lien resolution services for the Inspira Claimants who elect to engage the Inspira Settlement Administrator for these services with respect to both government and private liens, taking advantage, to the extent possible, of the laws of the state of New Jersey.

**ICRF Allocation Processes and Procedures – MISCELLANEOUS**

**Notices to the Inspira Settlement Administrator**

33.     All notices, requests and communications to or upon the Inspira Settlement Administrator, to be effective, will be in writing , and unless otherwise expressly provided herein, will be deemed to have been duly given or made when actually delivered , to the Inspira Settlement Administrator at the addresses set forth below:

Edgar C. Gentle, III
Gentle, Turner, Sexton, Debrosse & Harbison
Suite 100 – 501 Riverchase Parkway East
Hoover, AL 35244
Tel: (205) 716-3000

16

## Compensation of Inspira Settlement Administrator

34.     The following compensation assumes there are 61 or fewer Claimants. The Inspira Settlement Administrator will be compensated as follows: $250 per hour for Edgar C. Gentle, III and other partners, $150 per hour for associates and $50 per hour for assistants, but with charges to be capped at $350 for each of the Inspira Claimants (inclusive of the Inspira Settlement Administrator's expenses), or a total of $21,350 from the proceeds of the Inspira Settlement Amount. The Inspira Settlement Administrator will be paid half of the capped amount by the Tort Trustee from the Inspira Settlement Amount upon beginning services and the balance upon completion. If Inspira Claimants, or their counsel, if represented, decide to engage the Inspira Settlement Administrator for lien resolution services, the Inspira Settlement Administrator will charge each Inspira Claimant $500 (or $30,500 if all Inspira Claimants require lien resolution services) from the proceeds of the Inspira Settlement Amount. For such lien resolution services, the Inspira Settlement Administrator will be paid half upon beginning services and the balance upon completion. The Inspira Settlement Administrator is not responsible for preparing the checks to the Inspira Claimants, or for financial and tax matters relative to the Inspira Settlement Fund.

## Prevention and Detection of Fraud

35.     The Inspira Settlement Administrator may institute claim auditing procedures and other procedures to detect and prevent the allowance of fraudulent claims. All claims must be signed under the pains and penalties of perjury. The submission of a fraudulent claim will violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and subject those responsible to criminal prosecution in the

17

federal courts. If the Inspira Settlement Administrator determines that a claim is fraudulent, the Inspira Settlement Administrator shall deny the claim and so inform the Inspira Claimant and the Tort Trustee.

36.     As set forth above, the Inspira Settlement Administrator shall have the authority to request any Inspira Claimant to submit additional medical, hospital, facility or other records in order to make a determination of allowance or denial of any claim. If any Inspira Claimant refuses to or fails to respond to such a request within ninety (90) days or if the Inspira Settlement Administrator determines that an Inspira Claimant's response is inadequate, the Inspira Settlement Administrator shall take such actions as he deems appropriate on the claim and notify the Inspira Claimant of the action and basis therefore.

37.     The Inspira Settlement Administrator may conduct random audits to verify supporting documentation submitted (including death certificates, medical and other records) by randomly selecting claims and may audit individual claims or groups of claims.

**Common Benefit Fund Provision**

38.     All payments to Claimants shall be subject to and made in accordance with the MDL Case Management Orders pertaining to Common Benefit Funds, including MDL Order No. 8 Establishing Assessment for Common Benefit Fund [Doc. 1333].

[Remainder of page left intentionally blank]

18