## EXHIBIT 5

**Insight Settlement Agreement**

## SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement (the "Agreement") is made and entered by, between and among Insight Health Corp. ("Insight", as defined below), its insurers Lexington Insurance Company ("Lexington") and Darwin Select Insurance Company ("Darwin") (collectively, the "Insight Insurers"), Image Guided Pain Management, PC ("IGPM"), Dr. John M. Mathis, ("Mathis"), Dr. Robert F. O'Brien ("O'Brien") (collectively, the "Doctors"), their common insurer, Medical Mutual Insurance Company of North Carolina ("Medical Mutual"), Virginia Plaintiffs,[1] and Paul D. Moore, in his capacity as Trustee for the NECC Chapter 11 bankruptcy estate (the "NECC Trustee").

## RECITALS

WHEREAS, on December 21, 2012, NECC (as defined below) filed a voluntary petition under the Bankruptcy Code in the Bankruptcy Court, thereby commencing the Bankruptcy Case (each as defined below);

WHEREAS, on January 18, 2013, the UST (as defined below) appointed the Creditors' Committee (as defined below);

WHEREAS, upon application by the UST, Paul D. Moore was appointed to serve as chapter 11 trustee for NECC's estate on or about January 25, 2013, with the approval of the Bankruptcy Court (as defined below);

WHEREAS, on February 12, 2013, the Judicial Panel on Multidistrict Litigation entered an order transferring certain litigation actions against NECC and other third-parties to the MDL Court (as defined below) for consolidated pretrial proceedings;

WHEREAS, on April 9, 2013, the MDL Court entered an order establishing the seven-attorney Plaintiffs' Steering Committee (as defined below) to organize, simplify, and streamline the handling of the MDL Proceeding on behalf of all plaintiffs to actions therein, and appointed Thomas Sobol of Hagens Berman Sobol Shapiro LLP as lead counsel for the Plaintiffs' Steering Committee;

WHEREAS, Insight and IGPM have been named as defendants in numerous lawsuits asserting Claims (as defined below), and may have additional Claims made against them, including, without limitation, Claims seeking damages for injuries arising from the alleged contamination of certain lots of injectable methylprednisolone acetate compounded at and distributed by NECC or any other drugs or products compounded, produced, sold or distributed by NECC;

WHEREAS, Lexington issued Policy numbers 6794285 and 6794284 to Insight as named insured (the "Lexington Policies");

---

[1]     Virginia Plaintiffs are those parties identified in Attachment D to the August 22, 2014 Mediation Agreement and attached hereto as **Exhibit A.** The Virginia Plaintiffs execute this Agreement either personally or by an attorney in fact, for whom a properly executed power of attorney shall be provided.

WHEREAS, Darwin issued Policy number 0307-3978 to Insight as named insured (the "Darwin Policy");

WHEREAS, Medical Mutual issued Policy number PG116945 to IGPM and the Doctors as named insureds (the "Medical Mutual Policy");

WHEREAS, the NECC Trustee, Insight, the Insight Insurers, IGPM, and Medical Mutual may have Claims against each other and others as a result of the NECC Claims and based upon theories of contract, subrogation, equitable indemnification, contribution and/or other claims;

WHEREAS, on December 20, 2013, Insight filed a proof of claim in the Bankruptcy Case (Claim No. 323) (subsequently amended on December 30, 2013 (Claim No. 561), and on January 15, 2014 (Claim No. 2817)), asserting a contingent and unliquidated Claim against NECC arising from NECC's alleged obligations and liabilities to Insight as a result of the NECC Claims, including, without limitation, NECC's alleged contribution and/or indemnity obligations to Insight (the "Indemnity Claim");

WHEREAS, Insight, the Insight Insurers, IGPM, and Medical Mutual have engaged in good faith settlement discussions among themselves and with the Virginia Plaintiffs, the NECC Trustee, the Creditors' Committee (as defined below) and the Plaintiffs' Steering Committee (as defined below) in an effort to fully and finally compromise and resolve their respective potential liability for the NECC Claims (as defined below);

WHEREAS, the Parties believe that, if their disputes and other remaining issues are not resolved now, future proceedings would be protracted and expensive, involve complex issues of liability and/or damages, and involve substantial expense and the uncertainties and risks inherent in litigation; and

WHEREAS, the Creditors' Committee and the Plaintiffs' Steering Committee (each as defined below) support this Agreement and the compromise and settlement embodied herein, as reflected in the *Addenda No. 1 and No. 2 to Settlement and Release Agreement* attached hereto.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the adequacy and sufficiency of which is hereby acknowledged by the Parties, and intending to be legally bound hereby, the Parties agree as follows:

I.      **Definitions**.  The following definitions as well as those contained in the recitals shall apply to the capitalized terms used in this Agreement:

a.      **"Agreement"** has the meaning set forth above in the preamble, including the Exhibits and addenda attached hereto.

b.      **"Bankruptcy Case"** means the Chapter 11 case filed by NECC in the Bankruptcy Court captioned as *In Re: New England Compounding Pharmacy, Inc.*, Case No. 12-19882 (HJB).

c.  **"Bankruptcy Code"** means Title 11 of the United States Code, 11 U.S. C. §§ 101 *et seq.*, as it may be amended.

d.  **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Massachusetts, Eastern Division.

e.  **"Bankruptcy Rules"** means collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court.

f.  **"Bar Date"** means January 15, 2014 at 4:00 p.m. (Prevailing Eastern Time).

g.  **"Claim"** means any past, present or future claim, demand, action, cause of action, suit or liability of any kind or nature whatsoever (including claims for equitable or contractual indemnification or contribution), whether at law or in equity, pursuant to a statute, rule or regulation, known or unknown, asserted or unasserted, anticipated or unanticipated, accrued or unaccrued, fixed or contingent, which has been asserted, could have been asserted, or that may in the future be asserted, by or on behalf of any Person, whether seeking damages (including compensatory, punitive or exemplary damages) or equitable, mandatory, injunctive or any other type of relief, including cross-claims, counter-claims, third-party claims, suits, lawsuits, administrative proceedings, notices of liability or potential liability (including Potentially Responsible Party or "PRP" notices), arbitrations, actions, rights, requests, demands for payment, causes of action, orders, or judgments, including without limitation, any "claim" as that term is defined in the Bankruptcy Code, 11 U. S. C. § 101(5).

h.  **"Claimants"** mean the Virginia Plaintiffs and all other persons who have filed timely proofs of claims in the Bankruptcy Case, or who have been granted leave to file a late claim, and have NECC Claims (as defined below) against Insight, IGPM and/or the Doctors and/or the Insight Insurers or Medical Mutual.

i.  **"Confirmation Order"** means the order confirming the Plan which (i) authorizes and approves this Agreement (as incorporated into the Plan) and (ii) includes the Plan Release and the Plan Injunction, without any material changes or modifications that would be adverse to the Parties hereto, or the exclusion of the Claimants.

j.  **"Creditors' Committee"** means the official committee of unsecured creditors appointed in the Bankruptcy Case and any of its retained legal counsel or other professionals.

k.  **"Defendants"** means Insight, IGPM, and the Doctors, collectively.

l.  **"Deemed Allocations"** has the meaning set forth in Section II(B) hereof.

m.  **"DRC"** means Donlin Recano & Company, Inc. the Debtor's Claims and Noticing Agent.

n.  **"Escrow"** means the escrow account to be established by the NECC Trustee at an FDIC insured bank listed on the United States Trustee's List of Authorized Depositories for Bankruptcy Cases filed in Region One, dated July 26, 2013, to hold the Settlement Amount

pursuant to the terms of an escrow agreement to be agreed upon by the Parties pending the satisfaction of all conditions to the effectiveness of this Agreement set forth in Section VIII hereof, or the Termination Date of this Agreement, whichever comes first.

o. **"Execution Date"** means the first date upon which the Parties have executed this Agreement, including, without limitation, the execution of the Exhibits and Addenda attached hereto.

p. **"Expense Allocation"** means the Settlement Amount paid by Medical Mutual, all of which is made solely for litigation expenses, with the full amount of the payment to be applied for use in reimbursing the allowable costs incurred by the NECC Trustee, the Creditors' Committee, and other allowable fees and administrative expenses in the Bankruptcy Case.

q. **"ICRFP Segregated Amount"** has the meaning set forth in Section II(A) hereof

r. **"Indemnity Claim"** has the meaning set forth in the Recitals.

s. **"Insight"** means Insight Health Corp.; provided that for the purposes of all releases required by this Agreement, "Insight" means Insight Health Corp., Insight Health Services Corp., Insight Services Holdings Corp., and all direct and indirect affiliates and their present and former officers, directors, agents and employees, in their capacities as such.

t. **"Insight Bankruptcy Notice"** has the meaning set forth in Section IX(A) hereof.

u. **"Insight Claims Resolution Facility Procedures" and/or "ICRFP"** means the document attached hereto as **Exhibit B**.

v. **"Insight Holdback," "Insight Holdback Contingencies" and "Insight Holdback Escrow"** have the meanings set forth in Section II(B).

w. **"Insight Insurers"** means, collectively, Lexington and Darwin.

x. **"Insight Policies"** means, collectively, the Lexington Policies and the Darwin Policy.

y. **"Insurers"** means, collectively, Lexington, Darwin and Medical Mutual.

z. **"Interim Insight Escrow"** means an escrow established for the purpose of holding the Settlement Amount (as defined below) if the Settlement Amount were to become due and payable before five days after entry of the Confirmation Order (as defined below).

aa. **"MDL Common Benefit Reserves"** has the meaning set forth in Section II(C) hereof.

bb. **"MDL Court"** means the United States District Court for the District of Massachusetts (at Boston) presiding over the MDL Proceeding.

cc. **"MDL Proceeding"** means the matter entitled *In Re: New England Compounding Pharmacy, Inc. Product Liability Litigation*, MDL Docket No. 2419, Master File No. 1: 13-MD-02419-RWZ.

dd. **"NECC"** or **"Debtor"** means the debtor New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, and any of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting in their respective capacity as such.

ee. **"NECC Claims"** means any and all Claims asserted or that could be asserted by any Person against Insight, IGPM, the Doctors and/or any of the Insurers for personal injury, tort, wrongful death, medical monitoring, or any other economic or noneconomic injury or damage, based upon, arising out of or in any way related to the purchase or administration by or on behalf of Insight, IGPM and/or the Doctors of injectable methylprednisolone acetate or any other drugs or products compounded, produced, sold or distributed by or on behalf of NECC.

ff. **"NECC Tort Trust"** means the trust created by the Plan which will be funded by assets of the NECC estate, including, *inter alia*, portions of the Settlement Amount from Insight and/or the Insight Insurers and which establishes procedures for the resolution and payment of all NECC Claims, including NECC Claims against Insight, IGPM, the Doctors and/or the Insurers.

gg. **"NECC Tort Trustee"** means the trustee of the NECC Tort Trust.

hh. **"NECC Tort Trust Agreement"** means the agreement governing the NECC Tort Trust.

ii. **"NECC Trustee"** means Paul D. Moore solely in his capacity as the Chapter 11 Trustee for debtor New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center and not individually, and any retained attorneys or other professionals acting on his behalf.

jj. **"Non-Insight Unsegregated Amount"** has the meaning set forth in Section II(A) hereof.

kk. **"Parties"** means, collectively, the Virginia Plaintiffs, NECC Trustee, Insight, IGPM, the Doctors, and the Insurers.

ll. **"Patient List"** means the lists required to be provided to the Chapter 11 Trustee, counsel to the Official Committee, and lead counsel to the Plaintiffs' Steering Committee by Insight pursuant to paragraph 2 of the *Interim Order Regarding Chapter 11 Trustee's Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and for related Relief Concerning Noticing by Notice Intermediaries*, dated July 29, 2013 [Bankruptcy Case Docket No. 412].

mm. **"Person"** means an individual, including, but not limited to, Claimants, a corporation, a partnership, an association, a limited liability company, a proprietorship, a joint venture, a trust, an estate, trustee, executor, administrator, legal representative, or any other entity or organization.

nn. **"Plaintiffs' Steering Committee"** means the attorneys identified in MDL Order No. 2: Order Appointing Lead Counsel, Federal-State Liaison Counsel and Plaintiffs' Steering Committee and such committee's designated counsel.

oo. **"Plan"** means the Chapter 11 plan of reorganization or liquidation for NECC prepared, filed, noticed and solicited by the NECC Trustee, at his own cost and expense, which is consistent with, incorporates and effectuates the terms and provisions of this Agreement without any material changes or modifications with respect to the rights of the Parties hereto, and which includes, incorporates and implements in all material respects the NECC Tort Trust, the Plan Release and the Plan Injunction.

pp. **"Plan Effective Date"** means the later of (i) the first business day following fourteen (14) days after the Bankruptcy Court's entry of the Confirmation Order, provided that the Confirmation Order is not subject to a stay by any court of competent jurisdiction as of such date, and (ii) the first business day on which all other conditions to the effective date of the Plan as set forth therein, and to the effectiveness of this Agreement as set forth in Section VIII hereof, have been satisfied or waived.

qq. **"Plan Injunction"** means the permanent injunction forever barring and enjoining all Persons from commencing, continuing or prosecuting any NECC Claims against Insight, IGPM, the Doctors and/or the Insurers, as incorporated in the Plan and Confirmation Order.

rr. **"Plan Proponents"** means, collectively, the NECC Trustee and the Creditors' Committee.

ss. **"Plan Release"** means a release to be included in the Plan and Confirmation Order pursuant to which the NECC Claims are deemed to have been waived and/or released by any and all Claimants and any other Person asserting NECC Claims against the Parties.

tt. **"Settlement Amount"** means the sum of $40,000,000 (USD) to be paid by Insight, Lexington, Darwin, and Medical Mutual as follows:

    a.  Insight: $7,000,000.

    b.  Lexington: $21,500,000.

    c.  Darwin: $10,000,000.

    d.  Medical Mutual: $1,500,000 (for reimbursement of Expense Allocation).

uu. **"Termination Date"** has the meaning set forth in Section VIII hereof.

vv. **"Termination Notice"** has the meaning set forth in Section IX(A) hereof.

ww. **"Unsegregated Amount"** has the meaning set forth in Section II(A) hereof.

xx. **"UST"** means the Office of the United States Trustee.

yy.     **"Virginia Attorneys"** means the attorneys for the Virginia Plaintiffs.

zz.     **"Wingate Settlement"** has the meaning set forth in Addendum No. 1 hereof.

**II.     Payment of Settlement Amount**

A.     Within sixty (60) days of the Execution Date or within five (5) days after entry of the Confirmation Order (whichever occurs first), Insight, Lexington, Darwin and Medical Mutual shall each pay (or cause to be paid) their respective portions of the Settlement Amount in immediately available funds.   To the extent that payment is due before the fifth day after entry of the Confirmation Order, then (i) such funds shall be paid by the payors directly to the Interim Insight Escrow to be established, at the expense of Insight, by Insight, Lexington, Darwin, Medical Mutual and counsel to the Virginia Plaintiffs and (ii) on the fifth day after entry of the Confirmation Order, the applicable Parties shall instruct the agent to the Interim Insight Escrow to disburse the Settlement Amount from the Interim Insight Escrow to the NECC Trustee in accordance with the following wire transfer instructions:

> Eastern Bank
> Boston, MA
> ABA #: 011301798
> Account #: 600830079
> Account Name: Duane Morris LLP IOLTA Account
> Reference made to either NECC or Paul D. Moore

, in which case, the Settlement Amount shall be held by the NECC Trustee in trust and in a segregated account for disbursement into the Escrow and subsequently for distribution exclusively in accordance with the terms of this Agreement.  If, however, payment is due after the fifth day after entry of the Confirmation Order, then such funds shall be paid by the payors directly to the NECC Trustee and the NECC Estate in accordance with the wire transfer instructions set forth above, in which case, before any such transfer of the Settlement Amount into Escrow, the Settlement Amount shall be held by the NECC Trustee in trust and in a segregated account for disbursement into the Escrow and distribution exclusively in accordance with the terms of this Agreement.  Upon receipt of the Settlement Amount, and until the earlier to occur of the Plan Effective Date or the Termination Date, the NECC Trustee shall hold the Settlement Amount in the interest bearing Escrow separate and apart from any other assets of the Debtor's estate.   All fees and expenses related to the Escrow shall be paid from the escrowed funds, and not by the Debtor's estate, and such fees and expenses shall not reduce the Unsegregated Amount.  Subject to the provisions of Section IX(A) hereof, on the Plan Effective Date, the Settlement Amount (less the Insight Holdback), together with all accrued interest thereon, shall be, and shall be deemed, irrevocably and indefeasibly paid to the NECC Trustee to be used and applied only in accordance with the terms of this Agreement, and on such date the

NECC Trustee shall make the allocations set forth below. The Parties intend and agree that the Settlement Amount shall be protected from collateral attack and reach by the Debtor's creditors or any other Persons whatsoever; and that such funds shall be therefore held in a legal manner that protects such funds from the reach of others to the full extent permitted by law. As a material term of this Agreement, the Parties agree and acknowledge that the Plan and the NECC Tort Trust Agreement shall provide that $35,687,5000 (*i.e.*, an amount equaling 89.2188% of the Settlement Amount) of funds delivered to and held in the NECC Tort Trust shall be segregated and, together with interest thereon, used to satisfy NECC Claims against Insight, IGPM and the Doctors only in the manner specified in the ICRFP (the "ICRFP Segregated Amount"); provided, however that $4,312,500 (*i.e.*, an amount equaling 10.781% of the Settlement Amount) of the Settlement Amount, $3,312,500 of which shall be funded by monies other than the portion of the Settlement Amount paid by Insight, shall not be so segregated, and may be used for, *inter alia*, the payment of the costs and expenses of the administration of the Bankruptcy Case or distribution to other creditors, including Tort Claimants (as such term is defined in the Plan) and general unsecured creditors, pursuant to the Plan (the "Unsegregated Amount", and the $3,312,500 thereof funded by monies other than the portion of the Settlement Amount paid by Insight, the "Non-Insight Unsegregated Amount"). The Expense Allocation shall be included within (not in addition to) the Unsegregated Amount.

B.    Insight Holdback: From the Settlement Amount, $4,250,000 shall be designated as the "Insight Holdback." Notwithstanding the occurrence of the Plan Effective Date, the Insight Holdback shall continue to be held in an interest-bearing escrow (the "Insight Holdback Escrow") pending the occurrence of either one of the following: (i) entry of a final and non-appealable order confirming the Plan; or (ii) September 25, 2016; provided, however, that if a Holdback Claim (as defined below) is filed on or before the earlier to occur of either (i) or (ii), the Insight Holdback shall be retained in the Insight Holdback Escrow until such time as the Holdback Claim is dismissed with prejudice (the "Insight Holdback Contingencies"). The Insight Holdback Escrow shall be used exclusively for the satisfaction of settlements and/or judgments related to lawsuits filed before the first to occur of either of the Insight Holdback Contingencies by any Person other than the Virginia Plaintiffs alleging an NECC Claim that is not barred by the appropriate statute of limitations against Insight ("Holdback Claims"). The Insight Holdback shall not be subject to claims for any other purpose including payment of defense costs or attorneys' fees Insight may incur in responding to or resolving any such Holdback Claims, or any other cost, expense or assessment incurred by Insight or any other party. The Insight Holdback shall be deemed funded as follows: (a) $1 million from that portion of the MDL Common Benefit Reserves allocation described in Section II(C)(2) below; (b) $1 million from the Unsegregated Amount; and (c) $2,250,000 million from the ICRFP Segregated Amount (the "Deemed Allocations"). If any Holdback Claim is filed prior to

entry of a final and non-appealable order denying any aspect of the Plan relating to any part of this Agreement, including, without limitation, any denial of the Plan Release and Plan Injunction, Insight will file appropriate motions to remove such case(s) to federal court and transfer it/them to the MDL Court as under that Court's "related-to" jurisdiction. Insight shall also move to stay any and all such Holdback Claim cases until entry of a final and non-appealable order confirming or denying confirmation of the Plan.  Insight will not settle any such Holdback Claims prior to receipt of a final and non-appealable Confirmation Order, which shall, among other things, deny or confirm the Plan as it relates to this Agreement, the Plan Release and the Plan Injunction absent compliance with (4) and the last sentence of this paragraph set forth below. Upon satisfaction of either of the Insight Holdback Contingencies, any remaining Insight Holdback funds (including all accrued interest) shall be released from the Escrow and distributed by the Estate Representative (as defined in the Plan), or if there is no such Estate Representative, the NECC Tort Trustee, in proportion to the Deemed Allocations. Any payment made from the Insight Holdback shall be borne proportionably in respect to the Deemed Allocations.  Upon Insight providing to the escrow agent for the Insight Holdback Escrow a copy of a court order (i) approving the settlement of or (ii) evincing a judgment with respect to any Holdback Claim(s), such escrow agent shall disburse from the Insight Holdback Escrow such amounts as are necessary to satisfy the settlement or judgment of such Holdback Claim(s). Copies of any such disbursement request(s) shall be provided to counsel for the Virginia Plaintiffs. Insight agrees that: (1) it shall not give any independent notice of this Agreement, the terms hereof or the potential existence of Holdback Claims to Persons (as that term is defined in the Plan) who may possess Holdback Claims; (2) it shall promptly notify the Estate Representative (as defined in the Plan), or if there is no such Estate Representative, the NECC Tort Trustee and counsel for the Virginia Plaintiffs of the receipt of any demand or the filing of a lawsuit by any party claiming to assert a Holdback Claim; and (3) to the extent such Holdback Claims arise, Insight shall, in coordination with the NECC Tort Trustee or any successor thereto, attempt to resolve such Holdback Claims under the ICRFP prior to paying such claims from the Insight Holdback; and (4) no settlement shall be made of any Holdback Claims without the consent of the Estate Representative (as defined in the Plan), or if there is no such Estate Representative, the NECC Tort Trustee, which consent shall not be unreasonably withheld, until entry of a final and non-appealable order denying confirmation of the Plan as it relates to this Agreement, the Plan Release and/or the Plan Injunction.  To the extent that a final and non-appealable order is entered denying confirmation of the Plan as it relates to this Agreement, the Plan Release and/or the Plan Injunction, Insight would thereafter be permitted to settle Holdback Claims, provided that it agrees to pay only reasonable compensation to the holders of such Holdback Claims.

C.   MDL Common Benefit Reserves. "MDL Common Benefit Reserves" are those funds (8%) reserved from the Settlement Amount under Order No. 8 of the MDL

Court in the MDL Proceeding for the payment of common benefit expenses, costs and attorneys' fees through the MDL Court. Any MDL Common Benefit Reserves assessment shall be made only with regard to the Settlement Amount, less the Unsegregated Amount. Upon entry of an appropriate order allocating the MDL Common Benefit Reserves in the manner set forth in Addendum No. 1 to this Agreement, and confirming that the Wingate Settlement (as defined in Addendum No. 1 to this Agreement) is not subject to assessment within the MDL Proceeding, the Virginia Attorneys agree to assign their interest in such funds ($1,784,375) to the ICRFP Segregated Amount for the benefit of the Claimants under the ICRFP, and also to waive the right to assert claims for common benefit attorneys' fees against the ICRFP Segregated Amount and the ICRFP. The Virginia Attorneys do not waive their right to assert claims for common benefit attorney fees and expenses from funds other than the ICRFP Segregated Amount and the ICRFP.

## III.   Virginia Releases

A.   In consideration of the payment of the Settlement Amount and the allocation of the ICRFP Segregated Amount pursuant to Section II(A) hereof, Insight, IGPM, the Doctors, and the Virginia Plaintiffs agree to execute mutual releases in the form attached hereto as **Exhibit C**, to be effective only upon both the payments and allocations in Section II(A) and the occurrence of the Plan Effective Date.

B.   Upon the payment of the Settlement Amount and the allocation of the ICRFP Segregated Amount pursuant to Section II(A) hereof and the occurrence of the Plan Effective Date, the Virginia Plaintiffs agree to dismiss their pending lawsuits against Insight, IGPM and the Doctors, with prejudice; and IGPM, the Doctors and Insight agree to dismiss any and all cross-claims against each other with prejudice; provided, however, that no release of a claim requiring court approval shall be effective unless and until such court approval is obtained.

C.   As permitted under Va. Code § 8.01-35.1, the waivers, releases, and/or dismissals by the Virginia Plaintiffs under this section shall not waive, release or discharge claims the Virginia Plaintiffs have or may have against any other parties or joint tortfeasors who are not Parties to this Agreement.

## IV.   Bankruptcy Related Obligations

A.   As soon as reasonably practicable after the Execution Date, the NECC Trustee shall amend the Plan and the disclosure statement related thereto to incorporate the terms of this Agreement in a manner necessary to satisfy the requirements of 11 U.S.C. §§ 1123, 1125, 1127, and 1129, and thereafter prepare, file, and provide notice and solicit (following approval of a disclosure statement) approval and confirmation of the Plan and the entry of the Confirmation Order, as ordered by the Bankruptcy Court, that (i) approves this Agreement without any material changes or modifications that would be adverse to the Parties hereto, and (ii)

includes the terms and provisions of the Plan Release and the Plan Injunction, without any material changes or modifications that would be adverse to the Parties hereto. The NECC Trustee shall provide notice of the hearing to consider confirmation of the Plan, as ordered by the Bankruptcy Court, with an opportunity to object and be heard, which notice shall be served upon all persons on the Patient List. The NECC Trustee shall also undertake all commercially reasonable efforts to defend the Confirmation Order in the event of a direct appeal of that order.

B.    The claim form for distribution from the NECC Tort Trust and the ICRFP shall include a provision that each Claimant, by signing and submitting the claim form, understands and confirms that the Plan provides for a general release of NECC Claims against Other Contributing Parties, as that term is defined in the Plan, which includes Insight, IGPM, the Doctors and the Insurers.

C.    The Plan, the Confirmation Order and any other related documents, pleadings, notices or orders (including any disclosure statement), insofar as they effectuate or relate to the rights, benefits and obligations provided for by this Agreement, shall each be in a form that is reasonably satisfactory to Insight, IGPM, the Doctors and the Insurers, and shall each be provided to Insight, IGPM, the Doctors and the Insurers in draft for review and comment a reasonable time prior to their filing with the Bankruptcy Court or the MDL Court or otherwise being publicly disclosed; provided, however, that no such documents, pleadings, notices or orders shall propose or accomplish a reduction in the rights accorded to the Virginia Plaintiffs or Claimants hereunder without the express consent of the Virginia Attorneys.

D.    Each of Insight, IGPM, the Doctors, the Virginia Plaintiffs and the Insurers hereby agrees with respect to any Plan (as defined herein) to:

i.    so long as its vote has been properly solicited pursuant to sections 1125 and 1126 of the Bankruptcy Code, timely vote any and all Claims (to the extent filed) that it is entitled to vote, now or hereafter beneficially owned by such Party (subject to Section IV hereof), to accept the Plan in accordance with the applicable procedures set forth in the solicitation materials accompanying the Plan, and timely return a duly executed ballot in connection therewith. A copy of the vote solicitation package shall be sent the notice addresses in Section IX(O);

ii.   not withdraw or revoke its tender, consent or vote with respect to the Plan, except as otherwise expressly permitted pursuant to this Agreement; and

iii.  not:

1.  oppose or object to the Plan or the solicitation or consummation of the Plan and the transactions contemplated by the Plan, whether directly or indirectly;

2.  join in or support any objection to the Plan or to the solicitation of the Plan;

3.  initiate any legal proceedings that are inconsistent with or that would delay, prevent, frustrate or impede the approval, confirmation or consummation of the Plan, or otherwise commence any proceedings to oppose the Plan, or take any other action that is barred by or likely to frustrate this Agreement;

4.  vote for, consent to, support or participate in the formulation of any other restructuring or settlement of Claims, any other transaction involving any plan of reorganization or liquidation (with the exception of the Plan) under applicable bankruptcy or insolvency laws, whether domestic or foreign, in respect of the Debtor or its affiliates, except as otherwise expressly contemplated pursuant to this Agreement;

5.  directly or indirectly seek, solicit, or enter into any agreements relating to, any restructuring, plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, transaction, sale, disposition or restructuring of the Debtor or its affiliates (or substantially all of their assets or stock) other than the Plan or as otherwise set forth in this Agreement (any such plan or other action as described in clauses (4) and (5) immediately above, an "Alternative Plan"); or

6.  enter into any letter of intent, memorandum of understanding or agreement in principle relating to any Alternative Plan.

## V.    Waiver and Release of Bankruptcy Claims

Subject to Section VI(E) hereof, upon the Plan Effective Date, and so long as this Agreement has not terminated, each of Insight, IGPM, the Doctors and the Insurers hereby waives, relinquishes and releases (i) any and all Claims (whether or not a proof of claim is filed) of any kind or character it holds against the NECC Trustee and the Debtor or its estate (including, without limitation, the Indemnity Claim), and (ii) any and all rights to distributions or recoveries, of any kind or character, on account of such Claims including, without limitation, pursuant to the Plan.

## VI.    Other Releases

A.     Subject only to the conditions set forth in Section VIII hereof, and without any further action by the Parties, each of the Debtor and the NECC Trustee hereby fully, finally and completely, remises, releases, acquits and forever discharges Insight, IGPM and the Doctors of and from the NECC Claims.

B.     Subject only to the conditions set forth in Section VIII hereof, and without any further action by the Parties, each of Insight, IGPM, the Doctors and the Insurers hereby fully, finally and completely, remises, releases, acquits and forever discharges all Claims against Claimants, the NECC Trustee, the Debtor, its estate, the Plaintiffs' Steering Committee and the Creditors' Committee that are based upon or arise out of the NECC Claims.

C.     Upon the satisfaction of the conditions set forth in Section VIII hereof, Insight, IGPM, the Doctors and the Insurers shall be deemed to have unconditionally assigned to the NECC Trustee any and all Claims that they may have between them (to the extent not otherwise released under this Agreement, the Plan and/or the Confirmation Order) and against any Persons not a Party to this Agreement (including any claims for indemnification, contribution or subrogation) that are based upon or arise out of the NECC Claims; provided, however, that Insight does not hereby assign any claims that it may have under, in relation to, or arising from policies issued by the Insight Insurers relating to the NECC Claims.

D.     Nothing in this Section VI or any other provision of this Agreement is intended to, nor shall it be construed to, have any effect on, or constitute a release, waiver, assignment or discharge of, the Insurers' rights or Claims for reinsurance in connection with the Policies and/or the NECC Claims, all of which are expressly reserved by Insurers.

E.     Nothing in this Section VI or any other provision of this Agreement is intended to, nor shall it be construed to, have any effect on, or constitute a release, waiver or discharge of, the Parties' respective rights, obligations, remedies or Claims created under this Agreement.

F.     The Parties hereto acknowledge that they are aware that they may hereafter discover facts different from or in addition to those they now know or believe to be true with respect to the NECC Claims, causes of action, rights, obligations, and liabilities herein released, and each agrees that the within release shall be and remain in effect in all respects as a complete release as to all matters released herein, notwithstanding any such different or additional facts.

## VII.    Representations and Warranties of the Parties

Each of the Parties separately represents and warrants to each of the other Parties as follows:

A. It has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to the entry of the Confirmation Order;

B. The execution and delivery of this Agreement, and the performance of the obligations contemplated by this Agreement, have been approved by duly authorized representatives of the Party, and by all other necessary actions of the Party, subject only to the entry of the Confirmation Order;

C. It has expressly authorized its undersigned representative to execute this Agreement on the Party's behalf as its duly authorized agent;

D. The making and performance of this Agreement will not violate any provision of the Party's respective articles of incorporation, membership agreement, charter or bylaws, where applicable;

E. It has read the entire Agreement and the contents hereof; it understands that the terms hereof are contractual and not merely recitals; it has signed this Agreement of its own free act and will; and in making this Agreement, it has obtained the advice of its own legal counsel;

F. It has not previously assigned or transferred, or purported to assign or transfer to any other Person, any right or Claim that is the subject matter of this Agreement;

G. This Agreement has been negotiated, executed and delivered in good faith, with the assistance of its own legal counsel, pursuant to good faith arm's-length negotiations, and for good and valuable consideration; and

H. As to Insight, IGPM, the Doctors and the Insurers, each has conducted diligent good faith searches for any insurance policies that may have been issued by Insurers that provide insurance coverage and/or other benefits to Insight, IGPM, or the Doctors for the NECC Claims, and that they are unaware of any such insurance policies other than the Policies specifically identified herein.

I. As to the NECC Trustee, he has provided the Patient List to DRC and has been informed by DRC that all persons on the Patient List were served with notice of the Bar Date.

## VIII.   Conditions to Effectiveness of this Agreement.

Upon the Execution Date, this Agreement shall be binding upon the Parties in accordance with its terms; provided, however, that the obligations of the NECC Trustee and the Debtor's estate under this Agreement are expressly subject to and conditioned upon entry of the Confirmation Order; and provided, further, that the effectiveness and finality of the provisions of this Agreement concerning the Releases (Section VI and Section III) are expressly conditioned upon and subject to the following:

a.  The payment of the Settlement Amount to the NECC Trustee and the NECC estate by Insight, IGPM, and the Insurers;

b.  The occurrence of the Plan Effective Date; and

c.  Receipt of individual signed releases from the Virginia Plaintiffs and the effectiveness thereof and, where required, (1) court approval of settlements in the MDL Proceeding by Insight, IGPM, the Doctors and the Insurers, and (2) for any Claimants who have received benefits under the Virginia Workers' Compensation Act, the consent of any person or entity entitled to assert a lien against Claimants' recovery, and where necessary, approval by the Virginia Workers' Compensation Commission.

For the avoidance of doubt, and without diminishing any other condition to the effectiveness of this Agreement or the Plan, it is expressly understood and agreed by the Parties that the Plan Release and the Plan Injunction as well as the allocations in Section II(A) are material, non-waiveable conditions to the payment of the Settlement Amount and the effectiveness of this Agreement, and that they will also be made material, non-waiveable conditions to the effectiveness of the Plan.

In the event that: (a) the Plan Effective Date does not occur within one (1) year from the Execution Date; (b) the Bankruptcy Court denies confirmation of the Plan and such denial cannot be cured by amending the Plan in a manner that is either (i) not materially inconsistent with this Agreement or (ii) otherwise agreed to by the Parties; or (c) the Plan is withdrawn, then this Agreement shall immediately terminate and be of no further force or effect (the date of such termination, the "Termination Date"); provided, however, that such termination may be waived by unanimous written consent of the Parties. Notwithstanding any other provision of this Agreement, upon the Termination Date, the Parties shall be restored to the same position they were in immediately prior to the Execution Date without waiver of any rights, claims, defenses or remedies that the Parties may have against each other. Within fifteen (15) days of the Termination Date, the Settlement Amount, plus any and all interest accrued thereon, shall be refunded to Insight, IGPM, the Doctors and the Insurers in proportion to each of their contributions.

## IX.   Other Provisions.

### A.   Preference Mitigation

i.   If Insight files a petition under the Bankruptcy Code, or is made the subject of an involuntary proceeding under the Bankruptcy Code (the Parties agree that they shall not seek to commence such a proceeding against Insight), at any time on or within ninety (90) days of Insight's delivery of its portion of the Settlement Amount to either the Interim Insight Escrow or the NECC Trustee, as applicable, pursuant to the first sentence of Section II(A) hereof, Insight shall provide notice of such filing or proceeding to the other Parties (the "Insight Bankruptcy Notice"). The

Virginia Plaintiffs, in their sole discretion, may elect, by providing notice to the Parties of their election, to treat this Agreement as void *ab initio* (the "Termination Notice") within 90 days of the date of receipt of such Insight Bankruptcy Notice.   Such Termination Notice shall trigger a Termination Date in the same manner as provided in Section VIII hereof. Other than the Non-Insight Unsegregated Amount, which shall be disbursed from Escrow to the NECC Trustee and the NECC estate on the Plan Effective Date for the payment of the costs and expenses of the administration of the Bankruptcy Case or distribution to other creditors, the Settlement Amount shall not be disbursed from Escrow until ninety-one (91) days after Insight has delivered its portion of the Settlement Amount; provided, however, that, if Insight files or is made subject to bankruptcy during such time, the Settlement Amount (other than the Non-Insight Unsegregated Amount) shall remain in Escrow and shall not be disbursed until (i) the time for delivering the Termination Notice has lapsed or (ii) the Virginia Plaintiffs determine not to deliver such Termination Notice.

ii.      This Agreement is the product of ten (10) days of mediation and extensive negotiation between, among others, Insight and the Virginia Plaintiffs over a six (6) month process.   To the extent permitted by applicable law, Insight waives its right to object to any motion for relief from the automatic stay imposed by 11 U.S.C. 362(a) filed by the Virginia Plaintiffs to exercise their rights in this paragraph. This is a material term to this Agreement. If the Virginia Plaintiffs file a motion for relief from stay within the 90 day period to deliver a Termination Notice as set forth above, such 90 day period shall be extended to the date 30 days after such stay is lifted

iii.     The Parties acknowledge and agree that, notwithstanding any terms of escrow agreement(s) providing to the contrary, the Settlement Amount shall at all times from and after the delivery thereof to the Interim Insight Escrow or the NECC Trustee by Insight, Lexington, Darwin and Medical Mutual pursuant to the first sentence of Section II(A) hereof, be used exclusively for the purposes described, and in the manners provided, in this Agreement, the Plan and the NECC Tort Trust Agreement, and that upon Insight's delivery of its portion of the Settlement Amount, such amounts would not constitute "property of" Insight's bankruptcy "estate" as those terms are used in, *inter alia*, section 362(a) and section 541 of the Bankruptcy Code.

B.   **Informed Consent and Knowledge**. The Parties expressly warrant and represent that they have had the benefit of the professional advice of attorneys of their own choosing, that they are fully satisfied with that advice, and that they have not relied on any statement or representation of other Parties to this Agreement

regarding the specific matters in dispute. The Parties also represent and acknowledge that, in executing this Agreement, they do not rely and have not relied upon any representation or statement made by any other Party or any of their agents, representatives, or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as specifically stated in this Agreement.

C.   **No Precedent**. The Parties stipulate that they have entered into this Agreement only for their own business reasons based on the unique circumstances presented by the NECC Claims, and that this Agreement creates no binding legal or factual precedent for themselves or others in any future case. This Agreement does not constitute an admission of coverage or noncoverage, and is not based upon language in the Policies.

D.   **Confidentiality.**  For themselves, their agents and attorneys, the Parties agree to the following provisions.   Until September 25, 2016 the NECC Trustee, Creditors' Committee, Plaintiffs' Steering Committee, the Virginia Plaintiffs (and the Virginia Attorneys), Insight (and its attorneys), IGPM, the Doctors (and their attorneys) shall refrain from discussing the terms of this Settlement Agreement with the media, from making any announcement regarding the terms of this Settlement Agreement, or from otherwise communicating to the general public by use of press release, websites, blogs the internet or any other electronic medium unless all parties agree to the content of the disclosure; provided, however, that at any time after the Execution Date:

1.   the Parties may inform the Bankruptcy Court and/or the MDL Court that they have entered into this Agreement;

2.   the Plan Proponents may disclose to any court, person or entity the fact that they have reached a settlement, the settlement amount, and such other terms of this Agreement as may be reasonably necessary or appropriate, in their sole discretion, to implement this Agreement and to facilitate the obtaining of approval, in the bankruptcy court or in any other court, including, but not limited to, the MDL Court and any court having appellate jurisdiction over the bankruptcy court, of the Plan and/or the disclosure statement related thereto and the confirmation order to be entered in accordance therewith;

3.   the Parties and their counsel may disclose any terms of the Settlement Agreement necessary to implement the ICRFP and any associated legal proceedings, none of which shall occur under seal;

4.   the Parties and their counsel may communicate such terms of this Agreement as may be necessary for negotiating any liens or payments associated with this Agreement (including with public entities);

5.  the PSC may disclose that a settlement has been reached, the settlement amount, and such other terms of this Agreement as may be reasonably necessary or appropriate to effectuate allocations of the MDL Common Benefit Reserves or other obligations contained within this Agreement; and

6.  The Parties and their counsel may engage in communications not directed to the general public.

The sole and exclusive available remedy to any Party for any breach or threatened breach of the confidentiality obligations imposed hereby and/or by the Settlement Agreement shall be the right of that Party to seek an injunction against the allegedly breaching party restraining such breach or threatened breach, each party to bear its own costs and expenses.

The Parties understand that the Settlement Agreement, in full and unredacted form, shall be included in the Plan Supplement to be publically filed on the Chapter 11 Case docket on or about February 13, 2015, and that this Agreement and its terms shall be summarized and discussed in the Plan, as amended, and in the disclosure statement related thereto.  This Agreement shall thereafter be publically available, and this Agreement and its terms may be freely used by the Plan Proponents and any Party in connection with, *inter alia*, confirmation of the Plan and any related proceedings (including, but not limited to, any appeal of the order confirming Plan).

After September 25, 2016, counsel for the parties will not communicate in any manner to the media and the general public regarding the terms of this Settlement Agreement.

The consideration for this provision is the parties' mutual agreement; no money was paid by any of the parties for this provision.

Notwithstanding the foregoing, the Virginia Attorneys shall be permitted to submit for publication an announcement of a settlement in a products liability case in the amount of $40 million, highlighting among other things the cooperation among the nine law firms representing the individual plaintiffs.  In any such announcement, the Virginia Attorneys shall not mention the names of any parties or defense counsel involved in the case, the name or nature of the products involved, the venue in which such case was pending, case numbers, MDL number, or the name of the presiding judge.  Counsel for Defendants shall be given the opportunity to review any such announcement consistent with the terms of this provision.

Notwithstanding the foregoing, Defendants  shall be permitted to make a public statement regarding the settlement in the event the Virginia Attorneys submit for publication an announcement of settlement as authorized above.   The Virginia

Attorneys shall be given an opportunity to review any such announcement consistent with the terms of this confidentiality provision.

E. **Cooperation.** Each Party agrees to take such steps and to execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Person not a Party hereto to invalidate, interpret or prevent the validation, enforcement or carrying out of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant and covenant to cooperate in opposing such action or proceeding.

F. **Defense of Plan Release and Injunction.** The NECC Trustee agrees to undertake commercially reasonable efforts to defend the Confirmation Order and the releases and injunctions contained in the Plan, including, but not limited to, the Plan Release and the Plan Injunction, from any collateral attack or challenge, whether related to NECC Claims or otherwise; provided, however, that the NECC Trustee shall not be required to incur more than $100,000.00 in the aggregate in fees and expenses in doing so; provided, further, however, that as used in this Section IX.F., "collateral attack or challenge" shall not include any direct appeal of the Confirmation Order.

G. **Entire Agreement.** Excepting only agreements, understandings and reservations between Insight and Lexington regarding Lexington's obligations in addition to its partial funding of the Settlement Amount, this Agreement sets forth the entire agreement between the Parties and fully supersedes any and all prior agreements and understandings, written or oral, between and among the Parties pertaining to the subject matter hereof. Except as explicitly set forth in this Agreement, there are no representations, warranties, promises or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Agreement or alter or supplement its terms. Any statements, promises or inducements, whether made by any Party or the agent of any Party, that are not contained in this Agreement or excepted from this clause, shall not be valid or binding. This Agreement shall have perpetual existence, except as otherwise provided herein.

H. **Amendment/Modification.** No amendment or modification of this Agreement shall be binding or enforceable unless in writing and signed by the Parties and, if required, approved by the Bankruptcy Court.

I. **Construction.** This Agreement is the jointly-drafted product of good faith arm's length negotiations between the Parties with the benefit of advice from their own respective legal counsel and each of them has had sufficient opportunities to propose and negotiate changes to this Agreement prior to its execution. As such, no Party will claim that any ambiguity in this Agreement shall be construed

against any other Party by reason of their identity as a drafter or insurer.  The following rules of construction shall also apply to this Agreement:

1. The Recitals and Definitions to this Agreement are a material part of this Agreement having the same force and effect as a mutual representation, warranty and covenant of the Parties;

2. Unless the context of this Agreement otherwise requires, (a) words of any gender include each other gender, and the word "it" may refer to a Person as the context requires; (b) words used in the singular or plural also include the plural or singular number, respectively; (c) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (d) the words "include,' "includes" or "including" shall be deemed to be followed by the words "without limitation;" (e) the word "or" shall be disjunctive but not exclusive; (f) the words "any" or "all" shall mean "any and all";

3. References to the Policies, agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto; and

4. References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating or amending or replacing the statute or regulation.

J. **Applicable Law.**  Except as otherwise provided in individually signed releases executed by the Parties, this Agreement shall be interpreted and construed in accordance with  the laws of the Commonwealth of Massachusetts, without regard to the conflict of laws provisions of the Commonwealth of Massachusetts, except to the extent that any particular provision hereof may be governed by the Bankruptcy Code and Rules. Each of the Parties hereby irrevocably consents to the exclusive jurisdiction of the Bankruptcy Court with respect to any action to enforce the terms and provisions of this Agreement, and expressly waives any right to commence any such action in any other forum (unless such Courts do not have or refuse to exercise such jurisdiction). This Agreement is intended to be and shall have the effect of a document executed under seal in accordance with the laws of the Commonwealth of Massachusetts.

K. **No Admissions/Not Evidentiary**.  This Agreement is not and shall not be construed as an admission or concession of coverage, responsibility, liability, non-liability or wrongdoing by any Party to this Agreement.  No part of this Agreement or negotiations in connection therewith may be used in any action or proceeding as evidence of the rights, duties or obligations of any Party, except to enforce the terms of this Agreement.

L. **Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto, and their respective successors, permissible assigns,

agents, employees and legal representatives, including, without limitation, NECC and its bankruptcy estate, any trust or trustee, responsible Person, estate administrator, representative or similar Person appointed for NECC in connection with the Bankruptcy Case, the Plan or any subsequent Chapter 7 case.  Except as expressly provided in this Agreement, neither this Agreement nor any of the rights and obligations set forth herein shall be assigned by any Party without the prior written consent of the other Parties, which consent shall not be unreasonably withheld.

M.    **No Rights of Third Parties.**    All Persons expressly included within the definitions of Insight, IGPM, the Doctors, the Insurers, the Virginia Plaintiffs and NECC Trustee, are intended beneficiaries of this Agreement.  The Parties agree that, except as set forth in the prior sentence or otherwise expressly set forth in this Agreement, there are no intended third party beneficiaries to this Agreement.

N.    **Enforcement of Agreement**.    The Parties hereby acknowledge that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by any Party and that such breach shall cause the non-breaching Parties irreparable harm.  Accordingly, the Parties agree that in the event of any breach or threatened breach of this Agreement by any of the Parties, the Parties, in addition to any other remedies at law or in equity that they may have, shall be entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance.

O.    **Captions and Headings**.  Captions and headings to paragraphs or sections in this Agreement are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof.

P.    **Notice**. Unless another Person is designated in writing for receipt of notices hereunder, notices to the respective Parties shall be sent to the following Persons to the extent so designated below.  All notices shall be sent via email and by either (i) overnight courier or (ii) fax, and shall be deemed effective upon receipt.

<u>As to the NECC Trustee:</u>

Paul D. Moore
Duane Morris LLP
100 High Street Suite 2400
Boston, MA 02110
Tel: 857-488-4200
Fax: 857-401-3057
Email: pdmoore@duanemorris.com

<u>With Copy To:</u>

Michael R. Gottfried
Duane Morris LLP
100 High Street Ste 2400
Boston, MA 02110
Tel: 857-488-4200
Fax: 857-401-3057
Email: mrgottfried@duanemorris.com

As to Insight:

Henri G. Minette, Esquire
General Counsel
Insight Health Corp.
5775 Wayzata Boulevard, Suite 400
Minneapolis, MN  55416
Telephone: (952) 738-4814
Facsimile: (952) 847-1152
Email: henri.minette@cdirad.com

With Copy To:

Stephen D. Busch, Esquire
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA  23219
Telephone: (804) 775-4378
Facsimile: (804) 698-2024
Email: sbusch@mcguirewoods.com

As to Lexington:

Stephen Ruocco
AIG Claims Inc. – Healthcare
101 Hudson Street,
Jersey City, New Jersey
Telephone: (201) 631-7769
Facsimile: (201) 631-5006
Email: Stephen.Ruocco@aig.com
All communications to be marked "PERSONAL AND CONFIDENTIAL"

With Copy To:

Jennifer A. Schmidt
Senior Complex Claims Director
AIG Claims Inc.
500 West Madison #3000
Chicago, Illinois  60661
Telephone: (312) 930-5547
Facsimile: (866) 443-0149
Email: Jennifer.Schmidt@aig.com

Michael Davis, Esquire
Zeichner Ellman Krause
1211 Avenue of the Americas,
40th Floor
New York, NY 10036
Telephone: (212) 223-0400
Facsimile: (212) 753-0396
Email: mdavis@zeklaw.com

As to Darwin Select Insurance Company:

Thomas S. Reed
Assistant Vice President
Senior Technical Specialist, Medical Liability Claims
Allied World National Assurance Co.
311 S. Wacker Drive, Suite 1100
Chicago, IL 60606
Telephone: (312) 646-7725
Facsimile: (312) 922-1159
Email: thomas.reed@awac.com

With Copy To:

Charles A. Jones, Esquire
Troutman Sanders LLP
401 9th Street, NW
Washington, DC 20004
Telephone: (202) 662-2074
Facsimile: (202) 654-5822
Email: tony.jones@troutmansanders.com

As to IGPM, Mathis, and O'Brien:

John T. Jessee
Attorney at Law, Esq.
LeClair Ryan
1800 Wells Fargo Tower, Drawer 1200
Roanoke, Virginia 24006
Telephone: (540) 510-3018
Facsimile: (540) 510-3050 Fax
Email: John.Jessee@leclairryan.com

For FedEx/UPS Deliveries
10 So. Jefferson Street, 18th Floor
Roanoke, Virginia 24011
Telephone: (540) 510-3000

As to Medical Mutual:

David Sousa
Chief Operating Officer & General Counsel
700 Spring Forest Road, Suite 400
Raleigh, NC 27609
Telephone: (919) 878-7609
Facsimile: (919)878- 7550
Email: David.Sousa@mmicnc.com

As to Virginia Plaintiffs

To the Virginia Attorneys' notice addresses set forth in Schedule IX(P).

Q.     **Execution and Delivery.**  This Agreement may be executed in one or more counterparts, all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by email and facsimile, which shall be deemed the same as originals.

R.     **Stay of Pending Appeal.** Within five (5) days of the Execution Date, the Virginia Plaintiffs shall request, and shall make commercially reasonable efforts to obtain, a stay of their appeals and mandamus petition(s) pending in the U.S. First Circuit Court of Appeals.  Upon the Plan Effective Date, the Virginia Plaintiffs shall notify the U.S. First Circuit Court of Appeals that the case has been resolved and cause the appropriate motion to be filed so their appeals and mandamus petition pending in the U.S. First Circuit Court of Appeals will be dismissed.

S.     **Claimants' Rights as Tort Claimants not Reduced.**  This Agreement and Claimants' corresponding entitlement to receive funds or payments in settlement

of claims against Insight, IGPM, or the Doctors from the ICRFP Segregated Amount, shall not constitute a bar, limit, offset or otherwise reduce the payments Claimants are otherwise entitled to receive as Tort Claimants (as defined in the Plan) under the Plan, the Claims Resolution Facility Procedures (as defined in the Plan), and related documents.

**[Signature Pages Follow]**

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

**Paul D. Moore, as Chapter 11 Trustee for
New England Compounding Pharmacy, Inc.
d/b/a New England Compounding Center
and not individually**

Dated: 2/5/15

Insight Health Corp.

_____

By:
Dated:

Lexington Insurance Company

_____

By:
Dated:

Darwin Select Insurance Company

_____

By:
Dated:

Image Guided Pain Management, PC

_____

By:
Dated:

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

**Paul D. Moore, as Chapter 11 Trustee for
New England Compounding Pharmacy, Inc.
 d/b/a New England Compounding Center
and not individually**

Dated: _____

Insight Health Corp.

By: Robert J. Baumgartner, Exec. Chairman, CEO
Dated: 2-5-2015

Lexington Insurance Company

By: _____
Dated:

Darwin Select Insurance Company

By: _____
Dated:

Image Guided Pain Management, PC

By: _____
Dated:

IN WITNESS WHEREOF, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

Paul D. Moore, as Chapter 11 Trustee for
New England Compounding Pharmacy, Inc.
 d/b/a New England Compounding Center
and not individually

_____
Dated:


Insight Health Corp.

_____
By:
Dated:


Lexington Insurance Company

_____
By:
Dated:  2/6/2015


Darwin Select Insurance Company

_____
By:
Dated:


Image Guided Pain Management, PC

_____
By:
Dated:

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

**Paul D. Moore, as Chapter 11 Trustee for**
**New England Compounding Pharmacy, Inc.**
**d/b/a New England Compounding Center**
**and not individually**

_____

Dated:


Insight Health Corp.

_____

By:
Dated:


Lexington Insurance Company

_____

By:
Dated:


Darwin Select Insurance Company

_____

By: Thomas S. Reed
Dated: 2|6|15


Image Guided Pain Management, PC

_____

By:
Dated:

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

**Paul D. Moore, as Chapter 11 Trustee for
New England Compounding Pharmacy, Inc.
 d/b/a New England Compounding Center
and not individually**

_____

Dated:


Insight Health Corp.

_____

By:
Dated:


Lexington Insurance Company

_____

By:
Dated:


Darwin Select Insurance Company

_____

By:
Dated:


Image Guided Pain Management, PC

_____

By: Counsel
Dated: Feb 5, 2015


Page 26 of 27

*Signatures to Settlement and Release Agreement (Continued)*

Medical Mutual Insurance Company of North Carolina

By: David A Sowda
Dated: 2/6/15

Dr. John M. Mathis

_____
Dated:

Dr. Robert F. O'Brien

_____
Dated:

Virginia Plaintiffs, as indicated on Plaintiffs' Signature Attachment.

*Signatures to Settlement and Release Agreement (Continued)*

Medical Mutual Insurance Company of North Carolina

_John M. Mathis, MD_

By:

Dated:

Dr. John M. Mathis

_2/6/2015_

Dated:

Dr. Robert F. O'Brien


Dated:


Virginia Plaintiffs, as indicated on Plaintiffs' Signature Attachment.

*Signatures to Settlement and Release Agreement (Continued)*

Medical Mutual Insurance Company of North Carolina

_____
By:
Dated:

Dr. John M. Mathis


_____
Dated:

Dr. Robert F. O'Brien

_____
Dated:


Virginia Plaintiffs, as indicated on Plaintiffs' Signature Attachment.

Page 27 of 27

## PLAINTIFFS' SIGNATURE ATTACHMENT

A.  **Brown & Jennings, PLC** – P. Brent Brown, Esq. (16 Virginia Plaintiffs)
    **The Professional Arts Building**
    **30 Franklin Road Southwest**
    **Roanoke, Virginia  24011**

_____
Nora Bell

_____
Alma Eden

_____
Thomas Goodwin

_____
Jimmy Green

_____
Patricia Jennings

_____
Susan Kincanon

_____
Ashlee Lakin

_____
Virginia Milne

_____
Lori Morris

_____
Deborah Rogers

_____
David Rose

_____
Joseph Smith

_____
Vicki Uthus

## PLAINTIFFS' SIGNATURE ATTACHMENT

A.  **Brown & Jennings, PLC** – P. Brent Brown, Esq. (16 Virginia Plaintiffs)
**The Professional Arts Building**
**30 Franklin Road Southwest**
**Roanoke, Virginia  24011**

_____
Nora Bell

_____
Alma Eden

_____
Thomas Goodwin

_____
Jimmy Green

_____
Patricia Jennings

_____
Susan Kincanon

_____
Ashlee Lakin

_____
Virginia Milne

_____
Lori Morris

_____
Deborah Rogers

_____
David Rose

_____
Joseph Smith

_____
Vicki Uthus

5002/684/6978725v1

_____
Regina Waddell

_____
Doris West

Judith Williams

## PLAINTIFFS' SIGNATURE ATTACHMENT

B.    <u>Crandall & Katt</u> – Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
366 Elm Avenue Southwest
Roanoke, Virginia 24016

_____
Lisa A. Agnew

_____
Hilda Allen

_____
Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased

_____
David A. Barley, Jr.

_____
Virginia L. Berger

_____
Viola Mills Bowling

_____
Anna D. Boyd

_____
Brenda G. Brewster

_____
Vonda K. Broom

_____
Ann D. Brown

_____
Sybil A. Brown

_____
Wilma Brumfield

_____
Marvin J. Clark

PLAINTIFFS' SIGNATURE ATTACHMENT

B.  Crandall & Katt – Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
366 Elm Avenue Southwest
Roanoke, Virginia  24016


_____
Lisa A. Agnew

_____
Hilda Allen

_____
Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased

_____
David A. Barley, Jr.

_____
Virginia L. Berger

_____
Viola Mills Bowling

_____
Anna D. Boyd

_____
Brenda G. Brewster

_____
Vonda K. Broom

_____
Ann D. Brown

_____
Sybil A. Brown

_____
Wilma Brumfield

_____
Marvin J. Clark

## PLAINTIFFS' SIGNATURE ATTACHMENT

B.    <u>Crandall & Katt</u> – Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
366 Elm Avenue Southwest
Roanoke, Virginia 24016


_____
Lisa A. Agnew


_____
Hilda Allen


_____
Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased


_____
David A. Barley, Jr.


_____
Virginia L. Berger


_____
Viola Mills Bowling


_____
Anna D. Boyd


_____
Brenda G. Brewster


_____
Vonda K. Broom


_____
Ann D. Brown


_____
Sybil A. Brown


_____
Wilma Brumfield


_____
Marvin J. Clark

PLAINTIFFS' SIGNATURE ATTACHMENT

B.   <u>Crandall & Katt</u> – Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
366 Elm Avenue Southwest
Roanoke, Virginia  24016


_____
Lisa A. Agnew


_____
Hilda Allen


_____
Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased

_____
David A. Barley, Jr.


_____
Virginia L. Berger


_____
Viola Mills Bowling


_____
Anna D. Boyd


_____
Brenda G. Brewster


_____
Vonda K. Broom


_____
Ann D. Brown


_____
Sybil A. Brown


_____
Wilma Brumfield


_____
Marvin J. Clark

PLAINTIFFS' SIGNATURE ATTACHMENT

B.      Crandall & Katt – Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
        366 Elm Avenue Southwest
        Roanoke, Virginia  24016


        _____
        Lisa A. Agnew


        _____
        Hilda Allen


        _____
        Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased


        _____
        David A. Barley, Jr.

        _____
        Virginia L. Berger


        _____
        Viola Mills Bowling


        _____
        Anna D. Boyd


        _____
        Brenda G. Brewster


        _____
        Vonda K. Broom


        _____
        Ann D. Brown


        _____
        Sybil A. Brown


        _____
        Wilma Brumfield


        _____
        Marvin J. Clark

PLAINTIFFS' SIGNATURE ATTACHMENT

B.     Crandall & Katt – Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
       366 Elm Avenue Southwest
       Roanoke, Virginia  24016


_____
Lisa A. Agnew


_____
Hilda Allen


_____
Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased


_____
David A. Barley, Jr.


_____
Virginia L. Berger

*Viola Mills Bowling*
_____
Viola Mills Bowling


_____
Anna D. Boyd


_____
Brenda G. Brewster


_____
Vonda K. Broom


_____
Ann D. Brown


_____
Sybil A. Brown


_____
Wilma Brumfield


_____
Marvin J. Clark

PLAINTIFFS' SIGNATURE ATTACHMENT

B.     Crandall & Katt – Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
       366 Elm Avenue Southwest
       Roanoke, Virginia  24016


_____
Lisa A. Agnew


_____
Hilda Alien


_____
Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased


_____
David A. Barley, Jr.


_____
Virginia L. Berger


_____
Viola Mills Bowling


_____
Anna D. Boyd


_____
Brenda G. Brewster


_____
Vonda K. Broom


_____
Ann D. Brown


_____
Sybil A. Brown


_____
Wilma Brumfield


_____
Marvin J. Clark

PLAINTIFFS' SIGNATURE ATTACHMENT

B.      Crandall & Katt – Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
        366 Elm Avenue Southwest
        Roanoke, Virginia  24016


_____
Lisa A. Agnew


_____
Hilda Allen


_____
Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased


_____
David A. Barley, Jr.


_____
Virginia L. Berger


_____
Viola Mills Bowling


_____
Anna D. Boyd

_____
Brenda G. Brewster


_____
Vonda K. Broom


_____
Ann D. Brown


_____
Sybil A. Brown


_____
Wilma Brumfield


_____
Marvin J. Clark

## PLAINTIFFS' SIGNATURE ATTACHMENT

B.   <u>Crandall & Katt</u> – Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
     366 Elm Avenue Southwest
     Roanoke, Virginia  24016

_____
Lisa A. Agnew

_____
Hilda Allen

_____
Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased

_____
David A. Barley, Jr.

_____
Virginia L. Berger

_____
Viola Mills Bowling

_____
Anna D. Boyd

_____
Brenda G. Brewster

_____
Vonda K. Broom

_____
Ann D. Brown

_____
Sybil A. Brown

_____
Wilma Brumfield

_____
Marvin J. Clark

PLAINTIFFS' SIGNATURE ATTACHMENT

B.      Crandall & Katt -- Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
        366 Elm Avenue Southwest
        Roanoke, Virginia  24016


_____
Lisa A. Agnew


_____
Hilda Allen


_____
Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased


_____
David A. Barley, Jr.


_____
Virginia L. Berger


_____
Viola Mills Bowling


_____
Anna D. Boyd


_____
Brenda G. Brewster


_____
Vonda K. Broom

*Ann D. Brown*
_____
Ann D. Brown


_____
Sybil A. Brown


_____
Wilma Brumfield


_____
Marvin J. Clark

PLAINTIFFS' SIGNATURE ATTACHMENT

B.   <u>Crandall & Katt</u> – Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
366 Elm Avenue Southwest
Roanoke, Virginia  24016


_____
Lisa A. Agnew


_____
Hilda Allen


_____
Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased


_____
David A. Barley, Jr.


_____
Virginia L. Berger


_____
Viola Mills Bowling


_____
Anna D. Boyd


_____
Brenda G. Brewster


_____
Vonda K. Broom


_____
Ann D. Brown

*Sybil A. Brown* (signature)
_____
Sybil A. Brown


_____
Wilma Brumfield


_____
Marvin J. Clark

PLAINTIFFS' SIGNATURE ATTACHMENT

B.   <u>Crandall & Katt</u> – Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
     366 Elm Avenue Southwest
     Roanoke, Virginia  24016


_____
Lisa A. Agnew


_____
Hilda Allen


_____
Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased


_____
David A. Barley, Jr.


_____
Virginia L. Berger


_____
Viola Mills Bowling


_____
Anna D. Boyd


_____
Brenda G. Brewster


_____
Vonda K. Broom


_____
Ann D. Brown


_____
Sybil A. Brown

*Wilma Brumfield* (signature)
_____
Wilma Brumfield


_____
Marvin J. Clark

## PLAINTIFFS' SIGNATURE ATTACHMENT

B.   Crandall & Katz – Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
366 Elm Avenue Southwest
Roanoke, Virginia 24016

_____

Lisa A. Agnew

_____

Hilda Allen

_____

Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased

_____

David A. Barley, Jr.

_____

Virginia L. Berger

_____

Viola Mills Bowling

_____

Anna D. Boyd

_____

Brenda G. Brewster

_____

Vonda K. Broom

_____

Ann D. Brown

_____

Sybil A. Brown

_____

Wilma Brumfield

_____

Marvin J. Clark

5002/684/6978725v1

*Robert E. Clark*

_____
Robert E. Clark

_____
Michael D. Clemons

_____
Rebecca Clodfelter

_____
Carol S. Collins

_____
John D. Collins, Sr.

_____
Edward L. Conner

_____
Oscar J. Craggett

_____
Donald G. Crawford

_____
Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

_____
Harry M. English

_____
Eduardo S. Figueredo

_____
Girard S. Forry

_____
Christy A. Fralin

_____
Amanda J. Galarneau

_____
Atlas L. Gaskins

_____
Robert E. Clark

_____
Michael D. Clemons

_____
Rebecca Clodfelter

_____
Carol S. Collins

_____
John D. Collins, Sr.

_____
Edward L. Conner

_____
Oscar J. Craggett

_____
Donald G. Crawford

_____
Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

_____
Harry M. English

_____
Eduardo S. Figueredo

_____
Girard S. Forry

_____
Christy A. Fralin

_____
Amanda J. Galarneau

_____
Atlas L. Gaskins

Robert E. Clark
_____

Michael D. Clemons
_____

*Rebecca Clodfelter*
_____
Rebecca Clodfelter

Carol S. Collins
_____

John D. Collins, Sr.
_____

Edward L. Conner
_____

Oscar J. Craggett
_____

Donald G. Crawford
_____

Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased
_____

Harry M. English
_____

Eduardo S. Figueredo
_____

Girard S. Forry
_____

Christy A. Fralin
_____

Amanda J. Galarneau
_____

Atlas L. Gaskins
_____

Robert E. Clark

Michael D. Clemons

Rebecca Clodfelter

*Carol S. Collins*
Carol S. Collins

John D. Collins, Sr.

Edward L. Conner

Oscar J. Craggett

Donald G. Crawford

Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

Harry M. English

Eduardo S. Figueredo

Girard S. Forry

Christy A. Fralin

Amanda J. Galarneau

Atlas L. Gaskins

_____

Robert E. Clark

_____

Michael D. Clemons

_____

Rebecca Clodfelter

_____

Carol S. Collins

_____

John D. Collins, Sr.

_____

Edward L. Conner

_____

Oscar J. Craggett

_____

Donald G. Crawford

_____

Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

_____

Harry M. English

_____

Eduardo S. Figueredo

_____

Girard S. Forry

_____

Christy A. Fralin

_____

Amanda J. Galarneau

_____

Atlas L. Gaskins

_____
Robert E. Clark

_____
Michael D. Clemons

_____
Rebecca Clodfelter

_____
Carol S. Collins

_____
John D. Collins, Sr.

_Edward L. Conner_
Edward L. Conner

_____
Oscar J. Craggett

_____
Donald G. Crawford

_____
Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

_____
Harry M. English

_____
Eduardo S. Figueredo

_____
Girard S. Forry

_____
Christy A. Fralin

_____
Amanda J. Galarneau

_____
Atlas L. Gaskins

_____

Robert E. Clark

_____

Michael D. Clemons

_____

Rebecca Clodfelter

_____

Carol S. Collins

_____

John D. Collins, Sr.

_____

Edward L. Conner

_____

Oscar J. Craggett

_____

Donald G. Crawford

_____

Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

_____

Harry M. English

_____

Eduardo S. Figueredo

_____

Girard S. Forry

_____

Christy A. Fralin

_____

Amanda J. Galarneau

_____

Atlas L. Gaskins

Robert E. Clark

Michael D. Clemons

Rebecca Clodfelter

Carol S. Collins

John D. Collins, Sr.

Edward L. Conner

Oscar J. Craggett

Donald G. Crawford

Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

Harry M. English

Eduardo S. Figueredo

Girard S. Forry

Christy A. Fralin

Amanda J. Galarneau

Atlas L. Gaskins

_____

Robert E. Clark

_____

Michael D. Clemons

_____

Rebecca Clodfelter

_____

Carol S. Collins

_____

John D. Collins, Sr.

_____

Edward L. Conner

_____

Oscar J. Craggett

_____

Donald G. Crawford

_Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased_

Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

_____

Harry M. English

_____

Eduardo S. Figueredo

_____

Girard S. Forry

_____

Christy A. Fralin

_____

Amanda J. Galarneau

_____

Atlas L. Gaskins

_____
Robert E. Clark

_____
Michael D. Clemons

_____
Rebecca Clodfelter

_____
Carol S. Collins

_____
John D. Collins, Sr.

_____
Edward L. Conner

_____
Oscar J. Craggett

_____
Donald G. Crawford

_____
Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

_Harry M. English_
Harry M. English

_____
Eduardo S. Figueredo

_____
Girard S. Forry

_____
Christy A. Fralin

_____
Amanda J. Galarneau

_____
Atlas L. Gaskins

_____

Robert E. Clark

_____

Michael D. Clemons

_____

Rebecca Clodfelter

_____

Carol S. Collins

_____

John D. Collins, Sr.

_____

Edward L. Conner

_____

Oscar J. Craggett

_____

Donald G. Crawford

_____

Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

_____

Harry M. English

_____

Eduardo S. Figueredo

_____

Girard S. Forry

_____

Christy A. Fralin

_____

Amanda J. Galarneau

_____

Atlas L. Gaskins

_____

Robert E. Clark

_____

Michael D. Clemons

_____

Rebecca Clodfelter

_____

Carol S. Collins

_____

John D. Collins, Sr.

_____

Edward L. Conner

_____

Oscar J. Craggett

_____

Donald G. Crawford

_____

Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

_____

Harry M. English

_____

Eduardo S. Figueredo

_____

Girard S. Forry

_____

Christy A. Fralin

_____

Amanda J. Galarneau

_____

Atlas L. Gaskins

_____
Robert E. Clark

_____
Michael D. Clemons

_____
Rebecca Clodfelter

_____
Carol S. Collins

_____
John D. Collins, Sr.

_____
Edward L. Conner

_____
Oscar J. Craggett

_____
Donald G. Crawford

_____
Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

_____
Harry M. English

_____
Eduardo S. Figueredo

_____
Girard S. Forry

_____
Christy A. Fralin

_____
Amanda J. Galarneau

_____
Atlas L. Gaskins

Robert E. Clark

Michael D. Clemons

Rebecca Clodfelter

Carol S. Collins

John D. Collins, Sr.

Edward L. Conner

Oscar J. Craggett

Donald G. Crawford

Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

Harry M. English

Eduardo S. Figueredo

Girard S. Forry

Christy A. Fralin

Amanda J. Galarneau

Atlas L. Gaskins

_____
Robert E. Clark

_____
Michael D. Clemons

_____
Rebecca Clodfelter

_____
Carol S. Collins

_____
John D. Collins, Sr.

_____
Edward L. Conner

_____
Oscar J. Craggett

_____
Donald G. Crawford

_____
Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased

_____
Harry M. English

_____
Eduardo S. Figueredo

_____
Girard S. Forry

_____
Christy A. Fralin

_____
Amanda J. Galarneau

_____
Atlas L. Gaskins

_____
Kenneth E. Hall

_____
Robin A. Hannabass

_____
Anthony J. Jarrett

_____
Denise Jones

_____
Theron L. Lester

_____
Bobby S. Lugar

_____
James W. Matthews

_____
Virginia C. Miller

_____
Patricia A. Mitchell

_____
Gregory Muse

_____
Danny Nicely

_____
John D. Nicely

_____
Sharon G. Nipper

_____
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

_____
Charles P. Perdue, Sr.

Kenneth E. Hall

_Robin A. Hannabass_

Robin A. Hannabass

_____
Anthony J. Jarrett

_____
Denise Jones

_____
Theron L. Lester

_____
Bobby S. Lugar

_____
James W. Matthews

_____
Virginia C. Miller

_____
Patricia A. Mitchell

_____
Gregory Muse

_____
Danny Nicely

_____
John D. Nicely

_____
Sharon G. Nipper

_____
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

_____
Charles P. Perdue, Sr.

_____

Kenneth E. Hall


_____

Robin A. Hannabass

_____

Anthony J. Jarrett


_____

Denise Jones


_____

Theron L. Lester


_____

Bobby S. Lugar


_____

James W. Matthews


_____

Virginia C. Miller


_____

Patricia A. Mitchell


_____

Gregory Muse


_____

Danny Nicely


_____

John D. Nicely


_____

Sharon G. Nipper


_____

Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased


_____

Charles P. Perdue, Sr.

_____
Kenneth E. Hall

_____
Robin A. Hannabass

_____
Anthony J. Jarrett

_____
Denise Jones

_____
Theron L. Lester

_____
Bobby S. Lugar

_____
James W. Matthews

_____
Virginia C. Miller

_____
Patricia A. Mitchell

_____
Gregory Muse

_____
Danny Nicely

_____
John D. Nicely

_____
Sharon G. Nipper

_____
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

_____
Charles P. Perdue, Sr.

_____
Kenneth E. Hall

_____
Robin A. Hannabass

_____
Anthony J. Jarrett

_____
Denise Jones

_____
Theron L. Lester

_____
Bobby S. Lugar

_____
James W. Matthews

_____
Virginia C. Miller

_____
Patricia A. Mitchell

_____
Gregory Muse

_____
Danny Nicely

_____
John D. Nicely

_____
Sharon G. Nipper

_____
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

_____
Charles P. Perdue, Sr.

_____
Kenneth E. Hall

_____
Robin A. Hannabass

_____
Anthony J. Jarrett

_____
Denise Jones

_____
Theron L. Lester

_____
Bobby S. Lugar

_____
James W. Matthews

_____
Virginia C. Miller

_____
Patricia A. Mitchell

_____
Gregory Muse

_____
Danny Nicely

_____
John D. Nicely

_____
Sharon G. Nipper

_____
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

_____
Charles P. Perdue, Sr.

_____
Kenneth E. Hall

_____
Robin A. Hannabass

_____
Anthony J. Jarrett

_____
Denise Jones

_____
Theron L. Lester

_____
Bobby S. Lugar

_James W. Matthews_
James W. Matthews

_____
Virginia C. Miller

_____
Patricia A. Mitchell

_____
Gregory Muse

_____
Danny Nicely

_____
John D. Nicely

_____
Sharon G. Nipper

_____
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

_____
Charles P. Perdue, Sr.

Kenneth E. Hall

Robin A. Hannabass

Anthony J. Jarrett

Denise Jones

Theron L. Lester

Bobby S. Lugar

James W. Matthews

*Virginia C. Miller*
Virginia C. Miller

Patricia A. Mitchell

Gregory Muse

Danny Nicely

John D. Nicely

Sharon G. Nipper

Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

Charles P. Perdue, Sr.

5002/684/6978725v1

_____
Kenneth E. Hall

_____
Robin A. Hannabass

_____
Anthony J. Jarrett

_____
Denise Jones

_____
Theron L. Lester

_____
Bobby S. Lugar

_____
James W. Matthews

_____
Virginia C. Miller

_____
Patricia A. Mitchell

_____
Gregory Muse

_____
Danny Nicely

_____
John D. Nicely

_____
Sharon G. Nipper

_____
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

_____
Charles P. Perdue, Sr.

_____
Kenneth E. Hall

_____
Robin A. Hannabass

_____
Anthony J. Jarrett

_____
Denise Jones

_____
Theron L. Lester

_____
Bobby S. Lugar

_____
James W. Matthews

_____
Virginia C. Miller

_____
Patricia A. Mitchell

_____
Gregory Muse

_____
Danny Nicely

_____
John D. Nicely

_____
Sharon G. Nipper

_____
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

_____
Charles P. Perdue, Sr.

---
Kenneth E. Hall

---
Robin A. Hannabass

---
Anthony J. Jarrett

---
Denise Jones

---
Theron L. Lester

---
Bobby S. Lugar

---
James W. Matthews

---
Virginia C. Miller

---
Patricia A. Mitchell

---
Gregory Muse

*Danny K. Nicely*
Danny Nicely

---
John D. Nicely

---
Sharon G. Nipper

---
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

---
Charles P. Perdue, Sr.

_____
Kenneth E. Hall

_____
Robin A. Hannabass

_____
Anthony J. Jarrett

_____
Denise Jones

_____
Theron L. Lester

_____
Bobby S. Lugar

_____
James W. Matthews

_____
Virginia C. Miller

_____
Patricia A. Mitchell

_____
Gregory Muse

_____
Danny Nicely

_____
John D. Nicely

_____
Sharon G. Nipper

_____
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

_____
Charles P. Perdue, Sr.

_____
Kenneth E. Hall

_____
Robin A. Hannabass

_____
Anthony J. Jarrett

_____
Denise Jones

_____
Theron L. Lester

_____
Bobby S. Lugar

_____
James W. Matthews

_____
Virginia C. Miller

_____
Patricia A. Mitchell

_____
Gregory Muse

_____
Danny Nicely

_____
John D. Nicely

_____
Sharon G. Nipper

_____
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

_____
Charles P. Perdue, Sr.

_____
Kenneth E. Hall

_____
Robin A. Hannabass

_____
Anthony J. Jarrett

_____
Denise Jones

_____
Theron L. Lester

_____
Bobby S. Lugar

_____
James W. Matthews

_____
Virginia C. Miller

_____
Patricia A. Mitchell

_____
Gregory Muse

_____
Danny Nicely

_____
John D. Nicely

_____
Sharon G. Nipper

_Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased_
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

_____
Charles P. Perdue, Sr.

_____
Kenneth E. Hall

_____
Robin A. Hannabass

_____
Anthony J. Jarrett

_____
Denise Jones

_____
Theron L. Lester

_____
Bobby S. Lugar

_____
James W. Matthews

_____
Virginia C. Miller

_____
Patricia A. Mitchell

_____
Gregory Muse

_____
Danny Nicely

_____
John D. Nicely

_____
Sharon G. Nipper

_____
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased

_____
Charles P. Perdue, Sr.

Nancy F. Phillips

Michelle H. Powell

Vicki G. Scott

Christopher Sherrill

James S. Shrewsbury

Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

Lloyd Smith

Jackie L. Stevens

David Stover

Johnny Taylor, Sr.

Daniel A. Turner

David Underwood

Luz E. Velez

Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

Donna M. West

Nancy F. Phillips

_Michelle H. Powell_

Michelle H. Powell

Vicki G. Scott

Christopher Sherrill

James S. Shrewsbury

Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

Lloyd Smith

Jackie L. Stevens

David Stover

Johnny Taylor, Sr.

Daniel A. Turner

David Underwood

Luz E. Velez

Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

Donna M. West

_____
Nancy F. Phillips

_____
Michelle H. Powell

_____
Vicki G. Scott

_____
Christopher Sherrill

_____
James S. Shrewsbury

_____
Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

_____
Lloyd Smith

_____
Jackie L. Stevens

_____
David Stover

_____
Johnny Taylor, Sr.

_____
Daniel A. Turner

_____
David Underwood

_____
Luz E. Velez

_____
Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

_____
Donna M. West

_____
Nancy F. Phillips

_____
Michelle H. Powell

_____
Vicki G. Scott

_____
Christopher Sherrill

_____
James S. Shrewsbury

_____
Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

_____
Lloyd Smith

_____
Jackie L. Stevens

_____
David Stover

_____
Johnny Taylor, Sr.

_____
Daniel A. Turner

_____
David Underwood

_____
Luz E. Velez

_____
Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

_____
Donna M. West

_____
Nancy F. Phillips

_____
Michelle H. Powell

_____
Vicki G. Scott

_____
Christopher Sherrill

_____
James S. Shrewsbury

_____
Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

_____
Lloyd Smith

_____
Jackie L. Stevens

_____
David Stover

_____
Johnny Taylor, Sr.

_____
Daniel A. Turner

_____
David Underwood

_____
Luz E. Velez

_____
Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

_____
Donna M. West

Nancy F. Phillips
_____

Michelle H. Powell
_____

Vicki G. Scott
_____

Christopher Sherrill
_____

James S. Shrewsbury
_____

*Sharon W. Bishop*
Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

Lloyd Smith
_____

Jackie L. Stevens
_____

David Stover
_____

Johnny Taylor, Sr.
_____

Daniel A. Turner
_____

David Underwood
_____

Luz E. Velez
_____

Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased
_____

Donna M. West
_____

_____
Nancy F. Phillips

_____
Michelle H. Powell

_____
Vicki G. Scott

_____
Christopher Sherrill

_____
James S. Shrewsbury

_____
Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

_____
Lloyd Smith

_____
Jackie L. Stevens

_____
David Stover

_____
Johnny Taylor, Sr.

_____
Daniel A. Turner

_____
David Underwood

_____
Luz E. Velez

_____
Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

_____
Donna M. West

_____
Nancy F. Phillips

_____
Michelle H. Powell

_____
Vicki G. Scott

_____
Christopher Sherrill

_____
James S. Shrewsbury

_____
Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

_____
Lloyd Smith

_____
Jackie L. Stevens

_____
David Stover

_____
Johnny Taylor, Sr.

_____
Daniel A. Turner

_____
David Underwood

_____
Luz E. Velez

_____
Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

_____
Donna M. West

_____
Nancy F. Phillips

_____
Michelle H. Powell

_____
Vicki G. Scott

_____
Christopher Sherrill

_____
James S. Shrewsbury

_____
Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

_____
Lloyd Smith

_____
Jackie L. Stevens

_____
David Stover

_____
Johnny Taylor, Sr.

_____
Daniel A. Turner

_____
David Underwood

_____
Luz E. Velez

_____
Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

_____
Donna M. West

_____
Nancy F. Phillips

_____
Michelle H. Powell

_____
Vicki G. Scott

_____
Christopher Sherrill

_____
James S. Shrewsbury

_____
Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

_____
Lloyd Smith

_____
Jackie L. Stevens

_____
David Stover

_____
Johnny Taylor, Sr.

_____
Daniel A. Turner

_____
David Underwood

_____
Luz E. Velez

_____
Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

_____
Donna M. West

_____
Nancy F. Phillips

_____
Michelle H. Powell

_____
Vicki G. Scott

_____
Christopher Sherrill

_____
James S. Shrewsbury

_____
Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

_____
Lloyd Smith

_____
Jackie L. Stevens

_____
David Stover

_____
Johnny Taylor, Sr.

_____
Daniel A. Turner

_____
David Underwood

_____
Luz E. Velez

_____
Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

_____
Donna M. West

_____
Nancy F. Phillips

_____
Michelle H. Powell

_____
Vicki G. Scott

_____
Christopher Sherrill

_____
James S. Shrewsbury

_____
Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

_____
Lloyd Smith

_____
Jackie L. Stevens

_____
David Stover

_____
Johnny Taylor, Sr.

_____
Daniel A. Turner

_____
David Underwood

_____
Luz E. Velez

_____
Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

_____
Donna M. West

_____
Nancy F. Phillips

_____
Michelle H. Powell

_____
Vicki G. Scott

_____
Christopher Sherrill

_____
James S. Shrewsbury

_____
Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

_____
Lloyd Smith

_____
Jackie L. Stevens

_____
David Stover

_____
Johnny Taylor, Sr.

_____
Daniel A. Turner

_____
David Underwood

_____
Luz E. Velez

_____
Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

_____
Donna M. West

_____
Nancy F. Phillips

_____
Michelle H. Powell

_____
Vicki G. Scott

_____
Christopher Sherrill

_____
James S. Shrewsbury

_____
Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

_____
Lloyd Smith

_____
Jackie L. Stevens

_____
David Stover

_____
Johnny Taylor, Sr.

_____
Daniel A. Turner

_____
David Underwood

_____
Luz E. Velez

_____
Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

_____
Donna M. West

_____

Nancy F. Phillips

_____

Michelle H. Powell

_____

Vicki G. Scott

_____

Christopher Sherrill

_____

James S. Shrewsbury

_____

Sharon W. Bishop, Exec. of the Estate of Kathy W. Sinclair, Deceased

_____

Lloyd Smith

_____

Jackie L. Stevens

_____

David Stover

_____

Johnny Taylor, Sr.

_____

Daniel A. Turner

_____

David Underwood

_____

Luz E. Velez

_____

Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased

_____

Donna M. West

_Barbara Whittaker_

Barbara Whittaker

_____

Cheryl D. Williams

_____

Darlene S. Wood

_____

Beverly B. Woody

Barbara Whittaker

_Cheryl D. Williams_
Cheryl D. Williams

Darlene S. Wood

Beverly B. Woody

_____
Barbara Whittaker


_____
Cheryl D. Williams

_____
Darlene S. Wood


_____
Beverly B. Woody

_____

Barbara Whittaker

_____

Cheryl D. Williams

_____

Darlene S. Wood

_____

Beverly B. Woody

PLAINTIFFS' SIGNATURE ATTACHMENT

C.    Cranwell & Moore – Keith Moore, Esq. (10 Virginia Plaintiffs)
      111 W. Virginia Avenue
      Vinton, Virginia  24179

Lynda Bradfield

Brian G. Caddell

Kathy N. Cole

Carolyn D. Fidler

Richard W. Henegar

Donny L. Jones

Dana M. King

Elizabeth Kirkpatrick

Curtis L. Shell

Susan Thurlow

PLAINTIFFS' SIGNATURE ATTACHMENT

D.    <u>Frith & Ellerman, PLC</u> – Dan Frith, Esq. and Lauren Ellerman, Esq.
      (3 Virginia Plaintiffs)
      303 Washington Avenue, SW
      Roanoke, Virginia 24016

_____
Chance E. Baker

_____
Patrick O. Johnston

_____
Ferman W. Wertz

PLAINTIFFS' SIGNATURE ATTACHMENT

D.    <u>Frith & Ellerman, PLC</u> – Dan Frith, Esq. and Lauren Ellerman, Esq.
      (3 Virginia Plaintiffs)
      303 Washington Avenue, SW
      Roanoke, Virginia  24016


_____
Chance E. Baker


_____
Patrick O. Johnston

_____
Ferman W. Wertz

# PLAINTIFFS' SIGNATURE ATTACHMENT

E.   **Gentry Locke Rakes & Moore, LLP** – J. Scott Sexton, Esq., W. David Paxton, Esq.,
     **(18 Virginia Plaintiffs)**
     **10 Franklin Road, SE**
     **Suite 800**
     **Roanoke, Virginia  24011**


Sandra F. Artis

Dana M. Bradley

Ronnie A. Brown, Jr.

Ronald T. Courtney

Trudy Epperly

Barbara Filson

Zachary L. Foutz

Ben Foutz (also signing for Zachary Foutz)

Andrea Foutz (also signing for Zachary Foutz)

Robert E. Harris, Jr.

Julian D. Holbrook

Robert Dana Bender, Executor of the Estate of Ralph J. Irace, Jr., Deceased

PLAINTIFFS' SIGNATURE ATTACHMENT

E.     <u>Gentry Locke Rakes & Moore, LLP</u> – J. Scott Sexton, Esq., W. David Paxton, Esq.,
(18 Virginia Plaintiffs)
10 Franklin Road, SE
Suite 800
Roanoke, Virginia  24011

_____

Sandra F. Artis

_____

Dana M. Bradley

_____

Ronnie A. Brown, Jr.

_____

Ronald T. Courtney

_____

Trudy Epperly

_____

Barbara Filson

_____

Zachary L. Foutz

_____

Ben Foutz (also signing for Zachary Foutz)

_____

Andrea Foutz (also signing for Zachary Foutz)

# PLAINTIFFS' SIGNATURE ATTACHMENT

E.     <u>Gentry Locke Rakes & Moore, LLP</u> – J. Scott Sexton, Esq., W. David Paxton, Esq.,
(18 Virginia Plaintiffs)
10 Franklin Road, SE
Suite 800
Roanoke, Virginia  24011


_____
Sandra F. Artis


_____
Dana M. Bradley


_____
Ronnie A. Brown, Jr.


_____
Ronald T. Courtney


_____
Trudy Epperly

*Barbara Filson*
_____
Barbara Filson


_____
Zachary L. Foutz


_____
Ben Foutz (also signing for Zachary Foutz)


_____
Andrea Foutz (also signing for Zachary Foutz)

_____
Robert E. Harris, Jr.

*Julian D. Holbrook*
_____
Julian D. Holbrook


_____
Robert Dana Bender, Executor of the Estate of Ralph J. Irace, Jr., Deceased


_____
Chester T. Kalinoski


_____
Pauline R. McFarlane


_____
Odessa M. C. Shuck


_____
James W. Smith, Jr.


_____
Randolph E. Smith


_____
Patricia S. Brown, Executor of the Estate of Louise B. Spicer, Deceased


_____
Jenae S. Patsell, Executor of the Estate of Louise B. Spicer, Deceased


_____
John D. Spicer, Executor of the Estate of Louise B. Spicer, Deceased


_____
Rose M. White

_____
Robert E. Harris, Jr.


_____
Julian D. Holbrook

_____
Robert Dana Bender, Executor of the Estate of Ralph J. Irace, Jr., Deceased


_____
Chester T. Kalinoski


_____
Pauline R. McFarlane


_____
Odessa M. C. Shuck


_____
James W. Smith, Jr.


_____
Randolph E. Smith


_____
Patricia S. Brown, Executor of the Estate of Louise B. Spicer, Deceased


_____
Jenae S. Patsell, Executor of the Estate of Louise B. Spicer, Deceased


_____
John D. Spicer, Executor of the Estate of Louise B. Spicer, Deceased


_____
Rose M. White

Chester T. Kalinoski

Pauline R. McFarlane

Odessa M. C. Shuck

James W. Smith, Jr.

Randolph E. Smith

Patricia S. Brown, Executor of the Estate of Louise B. Spicer, Deceased

Jenae S. Patsell, Executor of the Estate of Louise B. Spicer, Deceased

John D. Spicer, Executor of the Estate of Louise B. Spicer, Deceased

Rose M. White

Richard A. Whitlow

PLAINTIFF'S SIGNATURE ATTACHMENT

F.    Hall & Sethi, PLC – Robert T. Hall Esq. (1 Virginia Plaintiff)
      12120 Sunset Hills Road #150
      Reston, Virginia  20190


      Carolyn M. Carr

## PLAINTIFFS' SIGNATURE ATTACHMENT

G.    **Lichtenstein Fishwick, PLC – John E. Lichtenstein, Esq., John P. Fishwick, Esq.,
Greg L. Lyons, Esq. (31 Virginia Plaintiffs)
Liberty Trust Building
Suite 400
101 South Jefferson Street
Roanoke, Virginia  24004**

_____
Gladys G. Austin

_____
Richard D. Blankenship

_____
Cheryl Brogan

_____
Kimberly Chitwood

_____
Christopher Compton

_____
Shirley Doyle

_____
Renate Farris

_____
Nancy Goodfellow

_____
Larry Hall

_____
Frank Haranzo, Jr.

_____
Susanne Hastings

PLAINTIFFS' SIGNATURE ATTACHMENT

G.     **Lichtenstein Fishwick, PLC** – John E. Lichtenstein, Esq., John P. Fishwick, Esq.,
       **Greg L. Lyons, Esq. (31 Virginia Plaintiffs)**
       **Liberty Trust Building**
       **Suite 400**
       **101 South Jefferson Street**
       **Roanoke, Virginia  24004**

_____
Gladys G. Austin

_____
Richard D. Blankenship

_____
Cheryl Brogan

_____
Kimberly Chitwood

_____
Christopher Compton

_____
Shirley Doyle

_____
Renate Farriss

_____
Nancy Goodfellow

_____
Larry Hall

_____
Frank Haranzo, Jr.

_____
Susanne Hastings

## PLAINTIFFS' SIGNATURE ATTACHMENT

G.   **Lichtenstein Fishwick, PLC** – John E. Lichtenstein, Esq., John P. Fishwick, Esq.,
   **Greg L. Lyons, Esq. (31 Virginia Plaintiffs)**
   **Liberty Trust Building**
   **Suite 400**
   **101 South Jefferson Street**
   **Roanoke, Virginia  24004**

_____
Gladys G. Austin

_____
Richard D. Blankenship

*Michael Lee Brogan*
Cheryl Brogan *by Michael Lee Brogan, Power of Attorney and Attorney-in-Fact*

_____
Kimberly Chitwood

_____
Christopher Compton

_____
Shirley Doyle

_____
Renate Farris

_____
Nancy Goodfellow

_____
Larry Hall

_____
Frank Haranzo, Jr.

_____
Susanne Hastings

## PLAINTIFFS' SIGNATURE ATTACHMENT

G.   **Lichtenstein Fishwick, PLC** – **John E. Lichtenstein, Esq., John P. Fishwick, Esq., Greg L. Lyons, Esq. (31 Virginia Plaintiffs)**
**Liberty Trust Building**
**Suite 400**
**101 South Jefferson Street**
**Roanoke, Virginia  24004**

_____
Gladys G. Austin

_____
Richard D. Blankenship

_____
Cheryl Brogan

_____
Kimberly Chitwood

_____
Christopher Compton

_____
Shirley Doyle

_____
Renate Farris

_____
Nancy Goodfellow

_____
Larry Hall

_____
Frank Haranzo, Jr.

_____
Susanne Hastings

# PLAINTIFFS' SIGNATURE ATTACHMENT

G.     **Lichtenstein Fishwick, PLC** – John E. Lichtenstein, Esq., John P. Fishwick, Esq.,
       **Greg L. Lyons, Esq. (31 Virginia Plaintiffs)**
       **Liberty Trust Building**
       **Suite 400**
       **101 South Jefferson Street**
       **Roanoke, Virginia  24004**

_____
Gladys G. Austin

_____
Richard D. Blankenship

_____
Cheryl Brogan

_____
Kimberly Chitwood

_____
Christopher Compton

_____
Shirley Doyle

_____
Renate Farris

_____
Nancy Goodfellow

_____
Larry Hall

_____
Frank Haranzo, Jr.

_____
Susanne Hastings

## PLAINTIFFS' SIGNATURE ATTACHMENT

G.   **Lichtenstein Fishwick, PLC** – John E. Lichtenstein, Esq., John P. Fishwick, Esq.,
     **Greg L. Lyons, Esq. (31 Virginia Plaintiffs)**
     **Liberty Trust Building**
     **Suite 400**
     **101 South Jefferson Street**
     **Roanoke, Virginia  24004**

_____
Gladys G. Austin

_____
Richard D. Blankenship

_____
Cheryl Brogan

_____
Kimberly Chitwood

_____
Christopher Compton

_____
Shirley Doyle

_____
Renate Farris

_____
Nancy Goodfellow

_____
Larry Hall

_____
Frank Haranzo, Jr.

_____
Susanne Hastings

## PLAINTIFFS' SIGNATURE ATTACHMENT

G.     **Lichtenstein Fishwick, PLC** – John E. Lichtenstein, Esq., John P. Fishwick, Esq.,
       **Greg L. Lyons, Esq. (31 Virginia Plaintiffs)**
       **Liberty Trust Building**
       **Suite 400**
       **101 South Jefferson Street**
       **Roanoke, Virginia  24004**


_____
Gladys G. Austin


_____
Richard D. Blankenship


_____
Cheryl Brogan


_____
Kimberly Chitwood


_____
Christopher Compton


_____
Shirley Doyle


_____
Renate Farris


_____
Nancy Goodfellow


_____
Larry Hall


_____
Frank Haranzo, Jr.

_Susanne Hastings_
Susanne Hastings

_____
Jacob Helm

_____
Norma Hurley

_____
Mabel Hutcherson

_____
Stuart Katz

_____
Melissa Marshall

_____
John Marsinko

_____
Jane McKeon

_____
Arnold Moon

_____
Rosanne Moon

_____
William L. Neal, Admin. of Estate of Lucy Byrd Neal

_____
Angela Norman

_____
Sharon Overstreet

_____
Mary Radford

_____
Audrey Ransome

_____
Nosworthy Reid

_____
Jacob Helm

_____
Norma Hurley

*(Mrs Hutcherson)*   GUARDIAN AND CONSERVATOR
_____   FOR MABel Hutcherson. 2/9/15
Mabel Hutcherson

_____
Stuart Katz

_____
Melissa Marshall

_____
John Marsinko

_____
Jane McKeon

_____
Arnold Moon

_____
Rosanne Moon

_____
William L. Neal, Admin. of Estate of Lucy Byrd Neal

_____
Angela Norman

_____
Sharon Overstreet

_____
Mary Radford

_____
Audrey Ransome

_____
Nosworthy Reid

_____
Jacob Helm

_____
Norma Hurley

_____
Mabel Hutcherson

_____
Stuart Katz

_____
Melissa Marshall

_____
John Marsinko

_____
Jane McKeon

_____
Arnold Moon

_____
Rosanne Moon

_____
William L. Neal, Admin. of Estate of Lucy Byrd Neal

_____
Angela Norman

_____
Sharon Overstreet

_____
Mary Radford

_____
Audrey Ransome

_____
Nosworthy Reid

_____
Jacob Helm

_____
Norma Hurley

_____
Mabel Hutcherson

_____
Stuart Katz

_____
Melissa Marshall

_____
John Marsinko

_____
Jane McKeon

_____
Arnold Moon

_____
Rosanne Moon

_____
William L. Neal, Admin. of Estate of Lucy Byrd Neal

_____
Angela Norman

_____
Sharon Overstreet

_____
Mary Radford

_____
Audrey Ransome

_____
Nosworthy Reid

_____
Jacob Helm

_____
Norma Hurley

_____
Mabel Hutcherson

_____
Stuart Katz

_____
Melissa Marshall

_____
John Marsinko

_____
Jane McKeon

_____
Arnold Moon

_____
Rosanne Moon

_____
William L. Neal, Admin. of Estate of Lucy Byrd Neal

_____
Angela Norman

_____
Sharon Overstreet

_____
Mary Radford

_____
Audrey Ransome

_____
Nosworthy Reid

5002/684/6978725v1

Jacob Helm
_____

Norma Hurley
_____

Mabel Hutcherson
_____

Stuart Katz
_____

Melissa Marshall
_____

John Marsinko
_____

Jane McKeon
_____

Arnold Moon
_____

Rosanne Moon
_____

William L. Neal, Admin. of Estate of Lucy Byrd Neal
_____
Angela Norman

Sharon Overstreet
_____

Mary Radford
_____

Audrey Ransome
_____

Nosworthy Reid
_____

5002/684/6978725v1

_____
Larry Rice

_____
Deanna Smith

_____
Stevie Thomas

_____
Brenda Varley

_____
Christine Wheeler

_____
Larry Rice

_____
Deanna Smith


_____
Stevie Thomas


_____
Brenda Varley

_____
Christine Wheeler

Larry Rice

_____

Deanna Smith

_Stevie Thomas_
Stevie Thomas

_____

Brenda Varley

_____

Christine Wheeler

5002/684/6978725v1

Larry Rice

Deanna Smith

Stevie Thomas

Brenda Varley

Christine Wheeler

PLAINTIFFS' SIGNATURE ATTACHMENT

H.   Miller Law Firm – Jeff Travers, Esq., Willard Moody, Esq. (5 Virginia Plaintiffs)
     The Sherman Building
     108 Railroad Avenue
     Orange, Virginia 22960

     _____
     Amanda R. Cuddy

     _____
     Toni L. Huff

     _____
     Tracy Webber (Power of Attorney for Basil E. Proffitt)

     _____
     Margaret W. Vineyard

     _____
     Mary S. Walker

PLAINTIFFS' SIGNATURE
ATTACHMENT

H.     Miller Law Firm – Jeff
Travers, Esq., Willard Moody,
Esq. (5 Virginia Plaintiffs)
        The Sherman Building
        108 Railroad Avenue
        Orange, Virginia  22960


_____
Amanda R. Cuddy

_____
Toni L. Huff

PLAINTIFFS' SIGNATURE ATTACHMENT

H.    <u>Miller Law Firm</u> – Jeff Travers, Esq., Willard Moody, Esq. (5 Virginia Plaintiffs)
      The Sherman Building
      108 Railroad Avenue
      Orange, Virginia  22960


_____
Amanda R. Cuddy


_____
Toni L. Huff


_____
Tracy Webber (Power of Attorney for Basil E. Proffitt)


_____
Margaret W. Vineyard


_____
Mary S. Walker

PLAINTIFFS' SIGNATURE ATTACHMENT

H.    Miller Law Firm – Jeff Travers, Esq., Willard Moody, Esq. (5 Virginia Plaintiffs)
      The Sherman Building
      108 Railroad Avenue
      Orange, Virginia  22960


      _____
      Amanda R. Cuddy


      _____
      Toni L. Huff


      _____
      Tracy Webber (Power of Attorney for Basil E. Proffitt)


      _Margaret W. Vineyard_
      Margaret W. Vineyard


      _____
      Mary S. Walker

PLAINTIFFS' SIGNATURE ATTACHMENT

H.    <u>Miller Law Firm</u> – Jeff Travers, Esq., Willard Moody, Esq. (5 Virginia Plaintiffs)
      The Sherman Building
      108 Railroad Avenue
      Orange, Virginia  22960


_____
Amanda R. Cuddy


_____
Toni L. Huff


_____
Tracy Webber (Power of Attorney for Basil E. Proffitt)


_____
Margaret W. Vineyard


*Mary S. Walker*
_____
Mary S. Walker

PLAINTIFFS' SIGNATURE ATTACHMENT

I.     <u>Wilson, Updike & Nicely</u> – Nolan Nicely, Esq. (7 Virginia Plaintiffs)
       228 N. Maple Avenue
       Covington, Virginia  24426

_____
Linda C. Boggs

_____
Kimberly E. Brown

_____
Jean E. Clemons

_____
Forest G. Linthicum

_____
Treva D. Morris

_____
Allison M. Stoots

_____
Denia Reid Taliaferro

Doc ID: 6994caedb81bd982db7035fcf54de7776e3487c0

**Schedule IX(P)**

**Virginia Attorneys' Notice Addresses**

A.   **Brown & Jennings, PLC** – P. Brent Brown, Esq. (16 Virginia Plaintiffs)
     **The Professional Arts Building**
     **30 Franklin Road Southwest**
     **Roanoke, Virginia  24011**
     Nora Bell
     Alma Eden
     Thomas Goodwin
     Jimmy Green
     Patricia Jennings
     Susan Kincanon
     Ashlee Lakin
     Virginia Milne
     Lori Morris
     Deborah Rogers
     David Rose
     Joseph Smith
     Vicki Uthus
     Regina Waddell
     Doris West
     Judith Williams

B.   **Crandall & Katt** – Patrick T. Fennell, Esq. (62 Virginia Plaintiffs)
     **366 Elm Avenue Southwest**
     **Roanoke, Virginia  24016**
     Lisa A. Agnew
     Hilda Allen
     Tosha Andrews, Admin. of Estate of Sara C. Andrews, Deceased
     David A. Barley, Jr.
     Virginia L. Berger
     Viola Mills Bowling
     Anna D. Boyd
     Brenda G. Brewster
     Vonda K. Broom
     Ann D. Brown
     Sybil A. Brown
     Wilma Brumfield
     Marvin J. Clark
     Robert E. Clark
     Michael D. Clemons
     Rebecca Clodfelter
     Carol S. Collins

John D. Collins, Sr.
Edward L. Conner
Oscar J. Craggett
Donald G. Crawford
Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy, Deceased
Harry M. English
Eduardo S. Figueredo
Girard S. Forry
Christy A. Fralin
Amanda J. Galarneau
Atlas L. Gaskins
Kenneth E. Hall
Robin A. Hannabass
Anthony J. Jarrett
Denise Jones
Theron L. Lester
Bobby S. Lugar
James W. Matthews
Virginia C. Miller
Patricia A. Mitchell
Gregory Muse
Danny Nicely
John D. Nicely
Sharon G. Nipper
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons, Deceased
Charles P. Perdue, Sr.
Nancy F. Phillips
Michelle H. Powell
Vicki G. Scott
Christopher Sherrill
James S. Shrewsbury
Sharon W. Bishop,Exec. of the Estate of Kathy W. Sinclair, Deceased
Lloyd Smith
Jackie L. Stevens
David Stover
Johnny Taylor, Sr.
Daniel A. Turner
David Underwood
Luz E. Velez
Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased
Donna M. West
Barbara Whittaker
Cheryl D. Williams
Darlene S. Wood
Beverly B. Woody

C.   **Cranwell & Moore – Keith Moore, Esq. (10 Virginia Plaintiffs)**
     **111 W. Virginia Avenue**
     **Vinton, Virginia  24179**
     Lynda Bradfield
     Brian G. Caddell
     Kathy N. Cole
     Carolyn D. Fidler
     Richard W. Henegar
     Donny L. Jones
     Dana M. King
     Elizabeth Kirkpatrick
     Curtis L. Shell
     Susan Thurlow

D.   **Frith & Ellerman, PLC – Dan Frith, Esq. and Lauren Ellerman, Esq.**
     **(3 Virginia Plaintiffs)**
     **303 Washington Avenue, SW**
     **Roanoke, Virginia  24016**
     Chance E. Baker
     Patrick O. Johnston
     Ferman W. Wertz

E.   **Gentry Locke Rakes & Moore, LLP – J. Scott Sexton, Esq., W. David Paxton, Esq.,**
     **(18 Virginia Plaintiffs)**
     **10 Franklin Road, SE**
     **Suite 800**
     **Roanoke, Virginia  24011**
     Sandra F. Artis
     Dana M. Bradley
     Ronnie A. Brown, Jr.
     Ronald T. Courtney
     Trudy Epperly
     Barbara Filson
     Zachary L. Foutz
     Robert E. Harris, Jr.
     Julian D. Holbrook
     Ralph J. Irace, Jr., Deceased
     Chester T. Kalinoski
     Pauline R. McFarlane
     Odessa M. C. Shuck
     James W. Smith, Jr.
     Randolph E. Smith
     Louise B. Spicer, Deceased
     Rose M. White

Richard A. Whitlow

F.   **Hall & Sethi, PLC – Robert T. Hall Esq. (1 Virginia Plaintiff)**
     **12120 Sunset Hills Road #150**
     **Reston, Virginia  20190**
     Carolyn M. Carr

G.   **Lichtenstein Fishwick, PLC – John E. Lichtenstein, Esq., John P. Fishwick, Esq.,**
     **Greg L. Lyons, Esq. (31 Virginia Plaintiffs)**
     **Liberty Trust Building**
     **Suite 400**
     **101 South Jefferson Street**
     **Roanoke, Virginia  24004**
     Gladys G. Austin
     Richard D. Blankenship
     Cheryl Brogan
     Kimberly Chitwood
     Christopher Compton
     Shirley Doyle
     Renate Farris
     Nancy Goodfellow
     Larry Hall
     Frank Haranzo, Jr.
     Susanne Hastings
     Jacob Helm
     Norma Hurley
     Mabel Hutcherson
     Stuart Katz
     Melissa Marshall
     John Marsinko
     Jane McKeon
     Arnold Moon
     Rosanne Moon
     William L. Neal, Admin. of Estate of Lucy Byrd Neal
     Angela Norman
     Sharon Overstreet
     Mary Radford
     Audrey Ransome
     Nosworthy Reid
     Larry Rice
     Deanna Smith
     Stevie Thomas
     Brenda Varley
     Christine Wheeler

H.   **Miller Law Firm** – Jeff Travers, Esq., Willard Moody, Esq. (5 Virginia Plaintiffs)
     **The Sherman Building**
     **108 Railroad Avenue**
     **Orange, Virginia  22960**
     Amanda R. Cuddy
     Toni L. Huff
     Basil E. Proffitt
     Margaret W. Vineyard
     Mary S. Walker

I.   **Wilson, Updike & Nicely** – Nolan Nicely, Esq. (7 Virginia Plaintiffs)
     **228 N. Maple Avenue**
     **Covington, Virginia  24426**
     Linda C. Boggs
     Kimberly E. Brown
     Jean E. Clemons
     Forest G. Linthicum
     Treva D. Morris
     Allison M. Stoots
     Denia Reid Taliaferro

**Exhibit A**

**Attachment D to the August 22, 2014 Mediation Agreement**

MEDIATION AGREEMENT
*In Re: New England Compounding Center Pharmacy, Inc.*
*Products Liability Litigation*
Virginia Insight Plaintiffs v Insight & IGPM
August 22, 2014

Attachment D
List of 153 Individuals Represented by Nine Virginia Firms
("Virginia Insight Plaintiffs")

A.   Brown & Jennings, PLC – P. Brent Brown, Esq. (16 Clients)
     Nora Bell
     Alma Eden
     Thomas Goodwin
     Jimmy Green
     Patricia Jennings
     Susan Kincanon
     Ashlee Lakin
     Virginia Milne
     Lori Morris
     Deborah Rogers
     David Rose
     Joseph Smith
     Vicki Uthus
     Regina Waddell
     Doris West
     Judith Williams

B.   Crandall & Katt – Patrick T. Fennell, Esq. (62 Clients)
     Lisa A. Agnew
     Hilda Allen
     Tosha Andrews, Admin. of Estate of Sara C. Andrews
     David A. Barley, Jr.
     Virginia L. Berger
     Viola Mills Bowling
     Anna D. Boyd
     Brenda G. Brewster
     Vonda K. Broom
     Ann D. Brown
     Sybil A. Brown
     Wilma Brumfield
     Marvin J. Clark
     Robert E. Clark
     Michael D. Clemons
     Rebecca Clodfelter
     Carol S. Collins

10

John D. Collins, Sr.
Edward L. Conner
Oscar J. Craggett
Donald G. Crawford
Tamela M. Miller, Exec. of the Estate of Sydney M. Creasy
Harry M. English
Eduardo S. Figueredo
Girard S. Forry
Christy A. Fralin
Amanda J. Galarneau
Atlas L. Gaskins
Kenneth E. Hall
Robin A. Hannabass
Anthony J. Jarrett
Denise Jones
Theron L. Lester
Bobby S. Lugar
James W. Matthews
Virginia C. Miller
Patricia A. Mitchell
Gregory Muse
Danny Nicely
John D. Nicely
Sharon G. Nipper
Debra P. Buchanan, Exec. of the Estate of Jean H. D. Parsons
Charles P. Perdue, Sr.
Nancy F. Phillips
Michelle H. Powell
Vicki G. Scott
Christopher Sherrill
James S. Shrewsbury
Sharon W. Bishop, Admin. of the Estate of Kathy W. Sinclair
Lloyd Smith
Jackie L. Stevens
David Stover
Johnny Taylor, Sr.
Daniel A. Turner
David Underwood
Luz E. Velez
Larry D. Gaskins, Exec. of Estate of Miriam Warren, Deceased
Donna M. West
Barbara Whittaker
Cheryl D. Williams
Darlene S. Wood
Beverly B. Woody

11

C.   <u>Cranwell & Moore</u> – Keith Moore, Esq. (10 Clients)
Lynda Bradfield
Brian G. Caddell
Kathy N. Cole
Carolyn D. Fidler
Richard W. Henegar
Donny L. Jones
Dana M. King
Elizabeth Kirkpatrick
Curtis L. Shell
Susan Thurlow

D.   <u>Frith & Ellerman, PLC</u> – Dan Frith, Esq. and Lauren Ellerman, Esq.
(3 Clients)
Chance E. Baker
Patrick O. Johnston
Ferman W. Wertz

E.   <u>Gentry Locke Rakes & Moore, LLP</u> – J. Scott Sexton, Esq., W. David
Paxton, Esq., Charles H. Smith, III, Esq., Anthony M. Russell, Esq.
(18 Clients)
Sandra F. Artis
Dana M. Bradley
Ronnie A. Brown, Jr.
Ronald T. Courtney
Trudy Epperly
Barbara Filson
Zachary L. Foutz
Robert E. Harris, Jr.
Julian D. Holbrook
Ralph J. Irace, Jr., Deceased
Chester T. Kalinoski
Pauline R. McFarlane
Odessa M. C. Shuck
James W. Smith, Jr.
Randolph E. Smith
Louise B. Spicer, Deceased
Rose M. White
Richard A. Whitlow

F.   <u>Hall & Sethi, PLC</u> – Robert T. Hall Esq. (1 Client)
Carolyn M. Carr

G.   <u>Lichtenstein Fishwick, PLC</u> – John E. Lichtenstein, Esq., John P. Fishwick,
Esq., Greg L. Lyons, Esq. (31 Clients)
Gladys G. Austin

5002/684/6779020v9

Richard D. Blankenship
Cheryl Brogan
Kimberly Chitwood
Christopher Compton
Shirley Doyle
Renate Farris
Nancy Goodfellow
Larry Hall
Frank Haranzo, Jr.
Susanne Hastings
Jacob Helm
Norma Hurley
Mabel Hutcherson
Stuart Katz
Melissa Marshall
John Marsinko
Jane McKeon
Arnold Moon
Rosanne Moon
William L. Neal, Admin. of Estate of Lucy Byrd Neal
Angela Norman
Sharon Overstreet
Mary Radford
Audrey Ransome
Nosworthy Reid
Larry Rice
Deanna Smith
Stevie Thomas
Brenda Varley
Christine Wheeler

H.   **Miller Law Firm** – **Jeff Travers, Esq., Willard Moody, Esq. (5 Clients)**
Amanda R. Cuddy
Toni L. Huff
Basil E. Proffitt
Margaret W. Vineyard
Mary S. Walker

I.   **Wilson, Updike & Nicely** – **Nolan Nicely, Esq. (7 Clients)**
Linda C. Boggs
Kimberly E. Brown
Jean E. Clemons
Forest G. Linthicum
Treva D. Morris
Allison M. Stoots
Denia Reid Taliaferro

13

**Exhibit B**

**Insight Claims Resolution Facility Procedures**

**INSIGHT CLAIMS RESOLUTION FACILITY PROCEDURES ("ICRFP")**

**INTRODUCTION AND GENERAL PROVISIONS**

An INSIGHT CLAIMS RESOLUTION FACILITY FOR PERSONAL INJURY AND WRONGFUL DEATH CLAIMS (the "ICRF") is hereby established in accordance with the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. (the "Plan"), the Tort Trust Agreement (the "Tort Trust Agreement"), the latter of which establishes the Tort Trust (the "Tort Trust"), and the Provider Settlement Agreement dated February __, 2015 (the "Settlement Agreement") by and between Insight Health Corp. ("Insight"), its insurers Lexington Insurance Company ("Lexington") and Darwin Select Insurance Company ("Darwin") (collectively, the "Insight Insurers"), Image Guided Pain Management, PC ("IGPM"), Dr. John M. Mathis, ("Mathis"), Dr. Robert F. O'Brien ("O'Brien") (collectively, the "Doctors"), their common insurer, Medical Mutual Insurance Company of North Carolina ("Medical Mutual"), Virginia Plaintiffs,[1] and Paul D. Moore, in his capacity as Trustee for the NECC Chapter 11 bankruptcy estate (the "NECC Trustee").[2] Collectively, Insight, IGPM, and the Doctors are referenced herein as "Virginia Insight Providers." The Settlement Agreement resulted from a lengthy mediation

---

[1]      Virginia Plaintiffs and their counsel are identified in Attachment A. These Virginia Plaintiffs filed timely lawsuits against the Virginia Insight Providers and participated directly in lengthy mediation process that resulted in the Settlement Amount as defined in the Settlement Agreement.

[2]      Unless otherwise defined herein, all capitalized terms used in these ICRFP and not otherwise defined herein shall have the meanings assigned to them in the Settlement Agreement, the Plan, and/or the Tort Trust Agreement.

1

process that formally began on August 22, 2014 and continued until the date of the Settlement Agreement (the "Virginia Mediation"). Counsel for the Virginia Plaintiffs participated in the Virginia Mediation and are referred to herein as "Virginia Counsel."

    A.    <u>Virginia Claimants.</u>

    Pursuant to the Settlement Agreement, "Claimant(s)" mean the Virginia Plaintiffs and all other persons who have filed timely proofs of claim or PITWD Addenda in the NECC Chapter 11 Case, or who have been granted leave to file a late claim, and have NECC Claims[3] against Insight, IGPM and/or the Doctors for personal injury or wrongful death arising out of the injection(s) of methylprednisolone acetate ("MPA") obtained from New England Compounding Pharmacy, Inc. ("NECC"), lot ##s 05212012@68, 06292012@26, or 08102012@51, (the "Three Contaminated MPA Lots") at the Insight Imaging clinic in Roanoke, Virginia. Claimant(s) demonstrating the eligibility requirements set forth herein are "Eligible Virginia Claimants." "Claimants" include decedents and estate administrators or executors and any person meeting the eligibility requirements of Section III. Any person whose only claim is one for loss of consortium damages associated with another person or relative's injection is not an Eligible Virginia Claimant and cannot recover under this ICRFP. If the loss of consortium claim is only a part of an otherwise Eligible Claim, then the Claimant shall not be deemed ineligible, but there

---

[3] **"NECC Claims"** means any and all Claims asserted or that could be asserted by any Person against Insight, IGPM, the Doctors and/or any of the Insurers for personal injury, tort, wrongful death, medical monitoring, or any other economic or noneconomic injury or damage, based upon, arising out of or in any way related to the purchase or administration by or on behalf of Insight, IGPM and/or the Doctors of injectable methylprednisolone acetate or any other drugs or products compounded, produced, sold or distributed by or on behalf of NECC.

2

shall be no award of points under the Matrix for such a claim of loss.  Similarly, other than the estate of a decedent, any person whose only claim is one for loss of economic damages associated with another person or relative's injection is not an Eligible Virginia Claimant and cannot recover under this ICRFP. The filing of a Virginia Claimant Compensation Claim Form (as defined below) constitutes participation by the  Virginia Claimant's family members in the primary Claim, or the Class D Estate Claim,, and the Class D Consortium Claims of such family members shall be deemed released by the treatment afforded to the Virginia Claimant pursuant to these ICRFP.

B.    Virginia Provider Fund.

As defined and provided in the Settlement Agreement, certain portions of the Settlement Amount are to be segregated and held for the benefit of the Claimants. This segregated fund is defined as the "ICRFP Segregated Amount" (which, under the Tort Trust, is a Provider Fund). The funds comprising the ICRFP Segregated Amount are referred to herein as the "Virginia Provider Fund." The Settlement Agreement and the payments to be made to the Claimants under these ICRFP do not and will not result in "payment in full" to any of the Claimants for their NECC-related claims as that term is defined under 11 U.S.C. §§ 509(c)  and 502(c).

C.    Discrete Virginia Provider Fund.

The ICRF is established in addition to and separate from the Claims Resolution Facility provided in the Plan (1) to evaluate claims by the Claimants according to the procedures established herein, with the least practicable cost, (2) to determine a fair and equitable

3

compensation amount to be distributed from the Virginia Provider Fund for each Qualified Virginia Claim (as defined herein), and (3) to effectuate such distributions to Qualified Virginia Claimants (as defined herein) as expeditiously as possible.

      D.    <u>Appointment of the Insight Provider Settlement Administrator</u>.

To facilitate, effectuate and implement the purposes of these ICRFP, Hon. Diane M. Strickland (Ret. Circuit Court) is hereby retained and appointed as Insight Provider Settlement Administrator ("IPSA") to execute the functions described herein in accordance with the terms of these ICRFP, the Tort Trust Agreement and any applicable order of the MDL Court. The IPSA shall oversee all aspects of the ICRF and shall distribute to the Tort Trustee written instructions for the distribution of Virginia Provider Funds to Qualified Claimants. In the event that the IPSA resigns or is removed from office or is otherwise unable to perform the functions of the IPSA, a successor IPSA shall be recommended by Virginia Counsel subject to confirmation by the MDL Court and opportunity to be heard. The IPSA shall receive reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings and shall be reimbursed by the Virginia Provider Fund for her reasonable expenses, including travel expenses, reasonably required and incurred in the performance of her duties in accordance with the provisions of these ICRFP and the provisions of any retention agreement between the Tort Trustee and the IPSA. The IPSA and those engaged by her hereunder shall be afforded the rights and privileges of Provider Settlement Administrators under the Tort Trust Agreement, including indemnification as set forth therein.

4

E.     <u>Additional specific authority of the IPSA</u>.

The IPSA shall be delegated and assigned full authority to act as follows or in any other manner reasonably required in performance of her tasks and responsibilities:

1.  The IPSA may engage Edgar C. Gentle, III, his firm, or another qualified third party consultant with experience in the administration of mass tort settlements (the "Delegated Consultant"), to provide the administrative assistance required to communicate with Claimants, to receive and process claims, to provide advice on forms, procedures and awards under these ICRFP, to negotiate and resolve liens if requested to do so (consistent with these ICRFP, the Plan and the Tort Trust Agreement), and any other administrative or clerical tasks assigned by the IPSA in the performance of her duties; and the expenses of such shall be paid by the Virginia Provider Fund in the same manner as if such costs and expenses were incurred directly by the IPSA.

2.  In connection with the Delegated Consultant, the IPSA may alter the claims procedures set forth in these ICRFP in such a way as she and the Delegated Consultant shall deem expeditious and fair; provided however, that no procedural modifications shall substantively alter the point allocation amounts, the eligibility requirements, the grounds for appeal, or the substantive rights and penalties as set

5

forth in these ICRFP (including those within the Points Matrix (Attachment B), and the Standards of Proof (Attachment C)).

3. The IPSA may receive and maintain the confidentiality of copies of PITWD Addenda and other confidential information for Claimants under the Virginia Provider Fund.

4. The IPSA may adopt a Virginia Claimant Compensation Claim Form that shall be the required means for making a claim for a distribution from the Virginia Provider Fund.

5. To the extent not set forth in this ICRFP, the IPSA may establish the standards of proof that will be permitted to establish eligibility to make a claim and the existence of each element of damages, claims or point calculations under these ICRFP.

6. To the extent not otherwise set forth herein, the IPSA may set deadlines relating to claims against the Virginia Provider Fund.

7. The IPSA may make determinations on eligibility of Claimants to make claims against, or receive compensation from the Virginia Provider Fund, including determinations as to whether such Claimants are Eligible Virginia Claimants and whether such Claimants hold Qualified Virginia Claim(s) (as defined below).

8. The IPSA may make awards, deny claims and assess costs under these ICRFP, all of which will become final if not appealed to the Appeals IPSA (defined below).

9. The IPSA may entertain petitions to correct errors or mistakes in connection with claims, awards or denials under these ICRFP.

6

10. In coordination with the MDL Court, and subject to confirmation and approval by the MDL Court, the IPSA may conduct hearings and make recommendations for approval of wrongful death settlements and distributions; and propose distribution to the statutory beneficiaries if required. Any petition for approval may be filed within the MDL Court without initiating a separate proceeding. These ICRFP anticipate that statutory approval of wrongful death settlements and settlements for persons under disability may be sought and obtained after the Claimant submits a timely Virginia Compensation Claim Form, and such approval shall not be dependent upon quantifying the specific dollar amount to which the Claimant (or beneficiaries) shall be entitled to receive. To the extent that any associated procedure shall require the convening of parties before the MDL Court, these ICRFP anticipate that such proceedings shall be conducted telephonically if at all possible. These ICRFP further anticipate that multiple applications for approval may be joined in collective motions.

11. To the extent required for approval of settlements for the Virginia Plaintiffs or other Claimants, the IPSA may appoint guardians *ad litem,* conduct hearings and make recommendations for approval of settlements and distributions involving minors or other persons under disability, subject to confirmation and approval by the MDL Court. Any petition for approval under § 8.01-424 may be filed within the case or matter file under which the IPSA is appointed within the MDL Court without initiating a separate proceeding.

7

12. The IPSA may make recommendations on the reduction or waiver of liens, if any, that may be asserted by private insurers or workers compensation carriers as may deemed appropriate. Subject to confirmation and approval by the MDL Court, the IPSA may conduct hearings associated therewith, and make associated reports and recommendations.

13. The IPSA may perform such other duties as are required under these ICRFP or as the MDL Court may direct or assign.

F.     Appeals Insight Provider Settlement Administrator.

To facilitate, effectuate and implement the purposes of these ICRFP, Hon. Lawrence G. Koontz (Ret. Virginia Supreme Court) is hereby retained and appointed as Appeals Insight Provider Settlement Administrator ("Appeals IPSA") to execute the appeals functions described herein in accordance with the terms of these ICRFP, the Tort Trust and any applicable order of the MDL Court.  The Appeals IPSA shall hear and decide all appeals from decisions of the IPSA as specified in these ICRFP. In the event that the Appeals IPSA resigns or is removed from office or is otherwise unable to perform the functions of the Appeals IPSA, the Virginia Counsel shall recommend a successor, subject to confirmation by the MDL Court, after notice and opportunity to be heard. The Appeals IPSA shall receive reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings and shall be reimbursed by the Virginia Provider Fund for his reasonable expenses, including travel expenses, reasonably required and incurred in the performance of his duties in accordance with the

8

provisions of these ICRFP and the provisions of any retention agreement between the Tort Trustee and the Appeals IPSA.  To the extent required in the execution of his duties, the Appeals IPSA may receive confidential Claimant information in the same manner as provided for the IPSA.

G.     Authority of the Appeals IPSA.

The IPSA shall be delegated and assigned full authority to act as follows:

1.  consult with the IPSA in the development of Appeals Forms to be used if a Claimant elects to contest a proposed Award and files an appeal;

2.  receive and decide all appeals filed and dismiss any appeal that is not filed in a timely manner;

3.  make final and binding decisions on appeals as deemed appropriate, which may involve denying relief or providing some or all of the relief requested;

4.  report all decisions made on appeals to all Qualified Virginia Claimants, including by providing such notice to Virginia Counsel; and

5.  take such other acts as the MDL Court may direct or assign.

H.     Notice under ICRFP.

If the Claimant is represented by an attorney as indicated on such Claimant's Virginia Compensation Claim Form, then "notice" as required in these ICRFP  shall be provided to the attorney at the addresses (electronic or otherwise) listed on the Claimant's Virginia Compensation Claim Form unless updated by the Claimant. Notice to Claimants, including

9

Eligible or Qualified Virginia Claimants, not represented by counsel shall be made to the Claimant's address on the Claimant's Virginia Compensation Claim Form. Distributions of funds awarded from the Virginia Provider Fund to Eligible or Qualified Virginia Claimants who are represented by attorneys shall be made payable jointly to the Qualified Virginia Claimant and the attorney (or law firm). If an Eligible or Qualified Virginia Claimant is not represented by an attorney, distributions shall be made payable to the Qualified Virginia Claimant.

I.      Change of Address.

All Claimants and/or his or her attorney shall be solely responsible for notifying the IPSA (and/or her Delegated Consultant) of address changes for the Claimant or the attorney and any other changes with respect to the information provided by the Claimant on a completed W-9 form.

## PROCEDURES OF THE INSIGHT CLAIMS RESOLUTION FACILITY

Pursuant to the Plan, the Tort Trust Agreement, and the Settlement Agreement, the Tort Trustee shall make distributions as per the terms of the Tort Trust Agreement and these ICRFP. Each Eligible Virginia Claimant shall receive his or her individually allocated distribution of the Virginia Provider Fund Net Proceeds as directed under these ICRFP, the Tort Trust Agreement and the awards granted hereunder. Awards shall be determined by the IPSA, based upon the factors, methodologies and procedures set forth herein. Appeals shall be based solely upon the factors, methodologies and procedures set forth herein.

10

I.       **Distribution of Virginia Compensation Claim Forms**

Immediately following the Effective Date, the IPSA or her Delegated Consultant shall request information ("Claim Criteria Data") from the Estate Representative (as defined in the Plan) under Section 5.15 of the Plan, including information sufficient to provide the IPSA or her Delegated Consultant with the names and addresses of any persons who claims to have received treatment at the Insight Imaging clinic in Roanoke, Virginia and previously have filed in the NECC Chapter 11 Case a timely Proof of Claim ("POC") or Personal Injury Tort and Wrongful Death Claim Information Form ("PITWD Addendum"). POC's and PITWD Addenda that were not filed before the Bar Date (January 15, 2014 at 4:00 PM, EST) or as ordered and allowed by the Bankruptcy Court thereafter, will be conclusively deemed to be un-timely. Within 30 days after receiving such Claim Criteria Data the IPSA (or her Delegated Consultant) shall mail the Claimants a Virginia Fund Compensation Program Claim Form ("Virginia Compensation Claim Form"), together with instructions, a Base Point Category and Adjustment Calculation Worksheet, and a W-9 Form. As to the Claimants who are Virginia Plaintiffs, notice and delivery may be accomplished by providing the same documents to counsel for the Virginia Plaintiffs. To the extent orders are entered allowing individuals to file a POC after the Effective Date and such individuals claim to have an NECC Claim arising out of treatment at the Insight Imaging clinic in Roanoke, Virginia (referred to herein as "Late Allowed POC Claimants"), the IPSA (or her

11

Delegated Consultant) shall mail the Late Allowed POC Claimant the Virginia Compensation Form within 60 days of such order. The Virginia Compensation Claim Form shall be structured so as to first establish whether the Claimant or Late Allowed POC Claimant holds an Eligible and/or Qualified Virginia Claim; and, if not, to instruct the Claimant or Late Allowed POC Claimant to submit only the minimum information necessary.

II.     **Procedures for timely filing Virginia Compensation Claim Forms**

      A.     <u>Claimants must submit timely Virginia Compensation Claim Forms on or before the Virginia Claim Due Date</u>.

To be eligible to receive compensation from the Virginia Provider Fund, Claimants must submit a completed and signed Virginia Compensation Claim Form as directed by the IPSA, together will all supporting documentation required, on or before 90 days from the date on which the Virginia Compensation Claim Form was mailed ("Virginia Claim Due Date"). All Virginia Compensation Claim Forms must be postmarked or received by the IPSA or her Delegated Consultant by the Virginia Claim Due Date. A Virginia Compensation Claim Form that is not received by Virginia Claim Due Date, or not placed in the U.S. mail with a postmarked date no later than such date, shall be denied, unless the IPSA finds excusable neglect. The IPSA and/or her Delegated Consultant shall have no further obligation to review or calculate points, categories or damages for any Claim found to be untimely, and absent a successful appeal to the Appeals VSPA, then that Claimant shall be barred from making any recovery from the Virginia Provider Fund. Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

12

The IPSA or her Designated Consultant shall make a final determination of late filing and shall promptly notify the Claimant of such final decision and the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a final determination of late filing may file an appeal with the Appeals IPSA within 30 days of such ruling. The sole ground for reversal on appeal of any such final determination of late filing shall be proof that the Claimant's Virginia Compensation Claim Form was timely postmarked or timely received contrary to the finding of the IPSA and/or the Delegated Consultant.

B.    <u>No Delay or Retention for Potential Late Allowed POC Claimants</u>.

The IPSA shall not specially retain any funds for the purpose of compensating Late Allowed POC Claimants, nor shall the IPSA or Delegated Consultant delay or alter Tentative Matrix Awards or Final Matrix Awards based upon the filing of such claims. If such claim is not received in sufficient time and form to be competed and included in the Tentative Matrix Award without delaying or disrupting that process, then any recovery for such Late Allowed POC Claimant shall be based solely upon such Claimant's point share of the Retention Pool (if any) in comparison with all other Claimants' point shares for such pool. Any award to Late Allowed POC Claimants shall be made without regard to funds already distributed under these ICRFP.

C.    <u>Certification Requirements</u>.

All claims must be signed by the Claimant under the penalties of perjury. The submission of a fraudulent claim will violate the criminal laws of the United States, including the criminal

13

provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and subject those responsible to criminal prosecution in the federal courts. If the IPSA determines that a claim is fraudulent, the claim shall be denied and the IPSA shall so inform the Claimant, and, if the Claimant does not appeal or after all appeals have been resolved against the Claimant, the Tort Trustee.

Each Claimant must also certify that he/she has not transferred his or her right to recover from the Virginia Insight Providers with respect to his or her Claim such that the Claim can be asserted by another person or entity.  The fact that a Claimant has executed a "subrogation" agreement with a health insurer or that a statutory provision grants to any governmental entity or workers compensation provider rights of subrogation shall not of itself be construed as a transfer of the Claimant's right to recover.

D.     Certification of Counsel.

Where any Claimant is represented by counsel in submitting a Virginia Compensation Claim Form and associated documentation for recovery under the Virginia Provider Fund, such counsel's submission of the Claim Form on such Claimant's behalf shall constitute a certification that the Claim Form is filed  consistent with the same standards that apply under Rule 1:4(a) of the Rules of the Supreme Court of Virginia and/or Rule 11 of the Federal Rules of Civil Procedure when a pleading is filed in state or federal courts.

## III.     Eligibility and Qualification Threshold Requirements

Each Virginia Compensation Claim Form received in a timely manner shall be subject to an initial limited review by the IPSA and/or her Delegated Consultant to make a threshold

14

decision on whether the eligibility and classification requirements set forth in this Section III(A) and (B) are satisfied.

A.  **Claim Eligibility Criteria and Requirements.**

1.  Virginia Plaintiffs.  In order to be eligible to receive compensation from the Virginia Provider Fund, a Claimant must be one of the Virginia Plaintiffs or meet one of the other criteria for eligibility noted in Sections III(A)(2) or (3), below.

2.  Timely POC/PITWD Filing Requirement. Except as permitted and set forth in Sections III(A)(1) and III(A)(3), Claimants must demonstrate that s/he has (a) timely filed a POC or PITWD Addendum in the NECC Chapter 11 Case, (b) had a timely POC or PITWD Addendum filed on his or her behalf, or (c) received permission by Bankruptcy Court order allowing late filing of the POC and PITWD Addendum, and filed such POC or PITWD Addendum in a timely manner.

3.  Alternative: Claim against Virginia Insight Providers is not time-barred. An exception to the requirement in Section III(A)(2) may be applied for person(s) demonstrating that his/her NECC Claims against the Virginia Insight Providers are not barred by the applicable statute of limitations. In this regard, if the person did not file a civil action against one or more of the Virginia Insight Providers on or before September 25, 2014 and if the asserted claim does not involve a person who died within the two years following injection from the Three Contaminated MPA Lots at the Insight

15

Imaging Clinic in Roanoke, then such claim shall be deemed barred by the applicable statute of limitations.

4.  The NECC Estate Representative shall provide the IPSA with information requested pursuant to Section 5.15 of the Plan, sufficient to provide the IPSA or her Delegated Consultant with POC's and PITWD Addenda submitted on behalf of Claimants and access to information sufficient to determine if a Claimant meets the Timely POC/PITWD filing requirement set forth in III(A)(2) above. If no timely POC or PITWD Addendum was filed by or on behalf of a given Claimant who does not meet the exceptions of Sections III(A)(1) or III(A)(3), then the IPSA shall deny that Claimant's claim and shall notify the Claimant that such determination is final, unless appealed and shall provide the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a denial determination may file a written appeal with the Appeals IPSA within 30 days of the date the determination was issued. The sole ground for reversal of any such final denial on appeal shall be proof that the Claimant filed a timely POC or PITWD Addendum contrary to the finding of the IPSA and/or the Delegated Consultant. Absent a timely appeal and subsequent reversal, the determination is final, and the Claimant will not be entitled to a payment from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery

16

through the Claims Resolution Facility established by the National Settlement Administrator.

5.  All Claimants must submit a completed W-9 form with his or her Virginia Compensation Claim Form.  If a completed W-9 form is not submitted by a Claimant, the IPSA shall notify the Claimant that one must be submitted (postmarked or received) within 30 days of the date of such deficiency notice or the claim shall be denied unless otherwise excused by the IPSA.  In the event of such a denial, the IPSA shall notify the Claimant of the denial and the procedure to appeal to the Appeals IPSA.  Notwithstanding anything contained herein to the contrary, a Claimant receiving such a denial notice may file a written appeal with the Appeals IPSA within 30 days of the date of mailing of such ruling. The sole ground for reversal of any such final denial on appeal shall be proof that the Claimant's completed W-9 form was timely postmarked or received contrary to the finding of the IPSA and/or the Delegated Consultant.  Absent a timely appeal and subsequent reversal, the determination is final, and the Claimant will not be entitled to a payment from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

6.  All claims asserted by a timely Virginia Compensation Claim Form and not denied for failure to comply with the requirements of this Section shall be deemed to be

17

"Eligible Claims" and persons holding such Eligible Claims shall be deemed

"Eligible Virginia Claimant(s)."

B.   **Additional Requirements for Qualified Virginia Claim: proof of exposure through injection from one or more of the Three Contaminated MPA Lots at Insight Imaging in Roanoke, VA and viability of claims against Virginia Insight Providers.**

After the threshold determination that a Claimant is an Eligible Virginia Claimant, the

IPSA or her Delegated Consultant shall further confirm two additional facts in order for the

person to be a Qualified Virginia Claimant entitled to participate in substantive points analysis

and special circumstances petitions under these ICRFP.

1.   <u>Injection Proof</u>. First, the medical or other records submitted by or on behalf of

such Eligible Virginia Claimant must establish that the Claimant received

injection(s) at the Insight Imaging clinic in Roanoke, Virginia, from one or more

of the Three Contaminated MPA Lots or, alternatively, that such injection is

established either by the Claim Criteria Data for such Claimant or because such

Claimant's name appears on the "Insight List" [as that term is defined in ¶II of

Attachment C] ("Injection Proof").

2.   <u>Viability Proof</u>. Next, The Eligible Virginia Claimant must demonstrate that s/he

filed a timely lawsuit in federal or state court against one or more of the Virginia

Insight Providers alleging injury or death as a result of such injection(s) or is

otherwise not time-barred from doing so under the applicable Virginia statute of

18

limitations due to death ("Viability Proof"). Lawsuits shall be deemed untimely if they were not filed against one or more of the Virginia Insight Providers on or before September 25, 2014. A date-stamped copy of a filed Complaint, showing filing on or before September 25, 2014, shall be sufficient Viability Proof. If no such lawsuit has been filed and the statute of limitations has not been tolled or extended by death, then the claim is barred. For those persons who received injection(s) from one of the Three Contaminated MPA Lots at Insight Imaging in Roanoke and then died before September 25, 2014, the IPSA shall calculate the appropriate statute of limitations for determining whether such claims are viable or barred.

3. <u>Qualified Virginia Claim(s)</u>. Eligible Virginia Claimants who meet the requirements for Injection Proof and Viability Proof, qualify for all distributions under the Virginia Provider Fund for recovery under the Points Matrix (**Attachment B**), and qualify for the Special Circumstances Petition process set forth herein (Section V(G)). Such claims are designated as "Qualified Virginia Claim(s)" and such Claimants are designated hereafter as "Qualified Virginia Claimants."

4. <u>Release of Virginia Providers</u>. In order to receive an award under these ICRFP, all Qualified Virginia Claimants must execute a release of all NECC Claims against the Virginia Providers.

19

C.    **Summary rulings on Injection Proof and Viability Proof.**

1.  <u>Injection Proof Rulings</u>. If an Eligible Virginia Claimant fails to present Injection Proof  (See Attachment C, §II), the IPSA shall promptly make a ruling denying that Claimant's claim and shall notify the Claimant of such denial and the procedure to appeal to the Appeals IPSA.   Notwithstanding anything contained herein to the contrary, a Claimant receiving such a final ruling may file a written appeal with the Appeals IPSA within 30 days of the date of such ruling. The sole ground for reversal of any such denial on appeal shall be proof (in any form allowed by Attachment C, § II) that the Claimant received injection(s) from the one or more of the Three Contaminated MPA Lots at Insight Imaging in Roanoke contrary to the finding of the IPSA and/or the Delegated Consultant. Absent a timely appeal and subsequent reversal, the determination is final and the Claimant shall receive no award from the Virginia Provider Fund._   Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

2.  <u>Viability Proof Rulings</u>. If an Eligible Virginia Claimant fails to present Viability Proof, the IPSA and/or her Delegated Consultant shall promptly issue a ruling notifying the Claimant that his/her claim does not satisfy the Viability Proof requirements and awarding such Claimant one-half (1/2) point, which shall be the

20

sole award provided under this ICRFP and the Virginia Provider Fund. Any Eligible Virginia Claimant who fails to satisfy Viability Proof shall not be eligible to participate under Section V(G) (Special Circumstances Petition procedures). The IPSA and/or her Delegated Consultant shall have no further obligation to assess or consider factors that would qualify such Claimant(s) for additional points if such Eligible Claims were otherwise viable (i.e., not time barred). The IPSA and/or her Delegated Consultant shall promptly notify the Claimant of such ruling and the procedure to appeal to the Appeals IPSA.  Notwithstanding anything contained herein to the contrary, a Claimant receiving such a ruling may file a written appeal with the Appeals IPSA within 30 days of such ruling. The sole ground for reversal of any such Viability Proof ruling on appeal shall be proof that the Claimant has a viable claim against one or more of the Virginia Insight Providers arising from injection of one or more of the Three Contaminated MPA Lots at the Roanoke Insight Imaging clinic (i.e., that such claim(s) is/are not barred by the statute of limitations), contrary to the finding of the IPSA and/or the Delegated Consultant. Absent a timely appeal and subsequent reversal, the determination is final and the Claimant shall receive a final award of ½ point and shall participate in distributions based solely upon such point assignment.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

**D.     Administrative Review of forms and documentation submitted by Qualified Virginia Claimants and opportunity to correct errors.**

1.    Review by Delegated Consultant. The claims handling and processing aspects of this ICRFP shall be handled primarily by the Delegated Consultant. The Delegated Consultant shall review all Virginia Compensation Claim Forms and associated documentation submitted by Qualified Virginia Claimants. The primary purpose of this review is to identify clerical errors, to identify missing documents required to support assertion(s) made by the Qualified Virginia Claimant, and to ensure that Qualified Virginia Claims are properly classified.

2.    Errors or Deficiencies in Claim Submissions. If the Delegated Consultant detects errors in the forms, documents and/or information submitted by a Qualified Virginia Claimant, he may elect to do any of the following:

a)     If the error or deficiency  can be cured or corrected without additional information from the Qualified Virginia Claimant, then the Delegated Consultant may cure or correct the error or deficiency using information supplied in the initial filings by the Qualified Virginia Claimant, and shall notify the Claimant's counsel (the Claimant, if unrepresented) of the error or deficiency, and of the cure or correction; or, alternatively, he may notify the Claimant's counsel (the Claimant, if unrepresented) of the error or

22

deficiency and allow opportunity for cure according to the process in subparagraph (b);

b)      If the error or deficiency is deemed one that cannot be cured or corrected without additional information from the Qualified Virginia Claimant, the Delegated Consultant shall send notice of the deficiency to such Claimant's counsel (the Claimant, if unrepresented), allowing a minimum of 45 days within which to correct the deficiency and file a Corrected Virginia Compensation Claim Form and any supplemental or corrected information in the manner requested by the Delegated Consultant. If the Claimant fails to submit sufficient corrections or additional information within the time specified (or an extended time period as allowed by the IPSA or the Delegated Consultant), then the Delegated Consultant shall do one of the following:

(i)      Award points under the Points Matrix for only such portions of the Qualified Virginia Claim as are adequately supported by required documentation and issue a denial as such portions of the Claim that are not supported by the submitted materials; or

23

(ii)     If the procedure outlined in the previous subparagraph is not feasible, the Delegated Consultant may treat the claim as a Base Category VII claim under the Points Matrix, allowing only such additional points (if any) as are supported by the submitted materials.

## IV.     The Points Matrix for assessing points for Qualified Virginia Claims (summary).

Qualified Virginia Claims shall be assigned points based on the criteria set forth in the Matrix attached hereto as **Attachment B** (the "Points Matrix"). The Points Matrix establishes seven base point categories in the same manner as the Claims Resolution Facility Procedures administered by the National Settlement Administrator (the "Base Point Categories"). The Matrix provides for additional points for death case adjustments, past medical bills and lost wages, total number of lumbar punctures, days of antifungal treatment, stroke/renal failure, all as more specifically described in the Points Matrix. The standards of proof required for the award of points are set out in **Attachment C** hereto. Calculations of points attributable to any Qualified Virginia Claim under the Points Matrix shall not be reduced, limited or barred in the event that an otherwise Qualified Virginia Claimant happens to die after January 1, 2015.

24

**V.     Determination of points and payments under the Points Matrix**

    A.     <u>Confirmation of Points for Qualified Virginia Claimants</u>.

As soon as practicable after the Virginia Claim Due Date, the Delegated Consultant and/or the IPSA shall segregate the Qualified Virginia Claims for points analysis and confirmation under the Points Matrix. The Delegated Consultant shall either (i) accept the points calculations submitted with the Virginia Compensation Claim Form as verified; or (ii) make a revised point calculation based on the Points Matrix or the other terms of these ICRFP. The Delegated Consultant shall then total the resulting points awards for all Qualified Virginia Claimants, together with points awarded to Claimants under Sections III(C)(2) (non-viable claims), to determine the "Tentative Total Points".

    B.     <u>Calculation of Tentative Point Value</u>.

The IPSA or her Delegated Consultant shall consult with the Tort Trustee to determine the amount of Virginia Provider Fund available for disbursement to Claimants (the "Virginia Provider Fund Net Trust Proceeds"). The Virginia Provider Fund Net Trust Proceeds shall then be reduced by 20%. This subtotal shall then be increased by an amount equal to the funds applied to the Expense Trust under Section VII (initially $700,000), in order to reach a total <u>first distribution amount</u> (the "First Distribution Net Proceeds"). The remaining 20% of the Virginia Provider Fund Net Trust Proceeds, less the amounts applied to the Expense Trust under Section VII, shall be held separately and retained as the "Special Circumstances Pool."

25

The Delegated Consultant shall divide the First Distribution Net Proceeds by the Tentative Total Points in order to obtain a calculated "Tentative Point Value":

**[(Virginia Provider Fund Net Trust Proceeds x .80) plus an amount equal to funds applied to the Expense Trust (e.g. $700,000) = First Distribution Net Proceeds]**

**[First Distribution Net Proceeds ÷ Tentative Total Points = Tentative Point Value]**

C.    Tentative Matrix Award.

The Delegated Consultant shall issue written a Matrix Award Form to each Qualified Virginia Claimant informing such person of the total number of points awarded to him/her under the Points Matrix and the tentative award amount obtained by multiplying the Qualified Virginia Claimant's total points by the Tentative Point Value ("Tentative Matrix Award"). The Delegated Consultant shall also provide each Qualified Virginia Claimant with a disclosure of the tentative points and awards proposed to be made to all other Eligible and Qualified Virginia Claimants, but without disclosing the names of the other individuals. For the Virginia Plaintiffs or other represented Qualified Virginia Claimants, the Tentative Matrix Award listing shall identify the individual recipients by reference to Claimant's counsel. Notwithstanding the appeals process noted below, mathematical and other such errors which require no substantive analysis may be submitted promptly to the Delegated Consultant or IPSA for modification within the 30 days following the date of the Tentative Matrix Award. Appropriate modifications or corrections may be made accordingly.

26

D.    <u>Acceptance or Appeal of Tentative Matrix Award</u>.

In order to contest a Tentative Matrix Award, within 30 days of the date of the Matrix Award Form, each Qualified Virginia Claimant must file a written appeal. Absent extraordinary circumstances (as determined solely by the IPSA), if no appeal as provided for in the next paragraph is postmarked or received within the 30-day period, then the IPSA and/or her Delegated Consultant shall be authorized to declare that the point allocation for such Qualified Virginia Claimant has been accepted, and that person will be paid based upon the points set forth in his/her Matrix Award Form.

The Tentative Matrix Award Form shall notify the Qualified Virginia Claimant of the procedure to appeal the Tentative Matrix Award to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Qualified Virginia Claimant receiving such a Tentative Matrix Award may file a written appeal with the Appeals IPSA within 30 days of the date of such Award. The sole ground for reversal or modification of a Tentative Matrix Award on appeal shall be proof that a factual or mathematical error was made in the number of points originally awarded. Absent a timely appeal and subsequent reversal, a Tentative Matrix Award will be final and binding.

If no timely appeal is filed by any of the Qualified Virginia Claimants regarding their respective Tentative Matrix Awards, then such awards shall be deemed final in all respects and the IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to each of the respective Qualified Virginia Claimants and their

27

counsel (or, if unrepresented to the Qualified Virginia Claimant only) in the amounts indicated on the Tentative Matrix Award Forms based upon the Tentative Point Value. If a timely appeal is filed to any Tentative Matrix Award asserting that an incorrect number of points were assigned, then all Tentative Matrix Awards shall be suspended until a final decision is made on all appeals, allowing confirmation or recalculation of the Tentative Point Value. If any such appeals alter the Tentative Total Points, then the calculation set forth in Section V(B) shall be recalculated based upon the Final Total Points following appeals:

**[First Distribution Net Proceeds ÷ Final Total Points after appeal = Final Point Value]**

    E.    <u>Reissuance of Final Matrix Award notifications following appeal period</u>.

If appeals are filed regarding the Tentative Matrix Awards, resulting in recalculation of Final Total Points as set forth in Section V(D), the Delegated Consultant shall re-issue Final Matrix Award Forms to each Qualified Virginia Claimant informing each such person of the new total number of points awarded under the Points Matrix and the Final Point Value, the new dollar value of each point based on that new point total. Such Final Matrix Award Form shall set forth the amount of Final Matrix Award, which shall be the dollar amount obtained by multiplying that person's final number of   Matrix Points  by the Final Point Value. The Delegated Consultant shall also provide each Claimant and counsel with a disclosure of the final points and Matrix Awards being made to all other Claimants in the same manner as specified in Section V(C). The IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to the respective Claimants and their counsel (or, if unrepresented to the

28

Claimant only) in the amounts indicated on the Final Matrix Award Forms. These and any other awards in this VPCRF shall be subject to satisfying the lien requirements reflected in the Settlement Agreement and in §§ 5.10 and 5.11 of the Plan.

     F.    <u>Assessments of Special Costs</u>.

Some Claimants' awards may require additional administrative steps and attention, resulting in costs associated only with such awards. For claims where (i) approval of the settlement or distribution must be separately made (e.g., wrongful death claims, persons under disability, etc.), and (ii) such approval steps require evidentiary hearings with the IPSA beyond mere presentation of the settlement and agreement by the beneficiaries thereto, then the costs of such proceedings shall be assessed against such Claimant's award. For claims where a guardian ad litem is required for any proceeding associated with a Claimant's award, such costs shall be assessed solely against the Claimant's award. Similar assessments shall be allowed for other cases that require specific attention or hearing by the IPSA as part of the claim or award process, apart from Appeals and Special Circumstances Petitions which are addressed separately. For claims where lien resolution services are provided by the Delegated Consultant (or similar third party service provider), the costs of such lien resolution services shall be assessed against the Claimants' award.

     G.    <u>Petitions for Special Circumstances</u>

In addition to the Matrix Award, if a Qualified Virginia Claimant, who did not include as part of his/her Claim a request for 10 additional points for "Other Factors," and desires to seek a

29

supplemental award from the Special Circumstances Pool, then within the same 30 day period for appealing the Tentative Matrix Award notifications, the Qualified Virginia Claimant must also file a Special Circumstances Petition with the IPSA, who shall establish the forms, documents, and procedures to be used for a Special Circumstances Petition. Each Special Circumstances Petition shall not exceed 5 pages, and shall be deemed filed by postmark date or, if not mailed, by date received.

Any Qualified Virginia Claimant who files a Special Circumstances Petition must directly pay, or agree to have his/her Matrix Award reduced by $2,000, which will serve as a filing and processing fee. Qualified Virginia Claimants filing a Special Circumstances Petition will otherwise retain the Matrix Award, and any Award for Special Circumstances shall be in addition thereto and shall be made in the reasonable discretion of the IPSA based on unique factors and circumstances relating to the Claimant's case. If a Special Circumstances Petition is not filed in a timely manner, it shall be denied and no special award from the Special Circumstances Pool shall be made to that individual.  On timely filed petitions, it is anticipated that the IPSA may meet with such Claimants if requested.

1.   <u>Purpose and Standards</u>.

The purpose of the Special Circumstances Petition is to address those situations where the Points Matrix structure is inadequate to fairly account for all harm and loss suffered by some individuals whose unique circumstances make their situation different from others in the same Claims Category.  Those who filed a request for an award of additional points for "Other

30

Circumstances" as part of their initial Claim submitted to the IPSA are not eligible to submit a Special Circumstances Petition.  Merely filing a Special Circumstances Petition will not entitle the Qualified Virginia Claimant to an award from the Special Circumstances Pool as the IPSA has the discretion to act on each Petition as deemed appropriate.

In making decisions on Special Circumstances Petitions, the IPSA will be making a discretionary decision guided and informed by the same criteria listed in the Points Matrix, such as Claims Category, Death Case adjustments based on statutory beneficiaries, past medical expenses, future medical expenses, past lost wages, future lost wages, number of lumbar punctures, days of Anti-Fungal Treatment, as well as medical complications, permanent impairments, the impact of third party liens, and other appropriate circumstances which may not be fully reflected in the Points Matrix.

Just as there is no requirement that the IPSA make a Special Circumstances Award to each person who files a Special Circumstances Petition, there is no expectation or requirement that the IPSA will use or distribute the full Special Circumstances Pool to those who may file petitions when making Special Circumstances Awards.  The goal and purpose of this process is to ensure that persons who are similarly situated be treated the same to the extent possible, understanding there can be unique cases that deserve separate treatment.

2.      No Special Circumstances Awards until all petitions are considered.

31

The IPSA shall consider all timely filed Special Circumstances Petitions before making any awards on any Special Circumstance Petitions in order to avoid any possible preference for early filers.  The IPSA shall provide a list of all Qualified Virginia Claimants who have filed Special Circumstances Petitions and distribute the same to all such Claimants.

> 3.     <u>Special Circumstances Award Notifications</u>.

Once the IPSA has considered all of the Special Circumstances Petitions, she shall calculate Special Circumstances Awards in her discretion and provide such information to the Delegated Consultant.  The Delegated Consultant shall then prepare Special Circumstances Award Forms notifying each of the Qualified Virginia Claimants (and his/her counsel if represented) who filed Special Circumstances Petitions. The Special Circumstances Award Form shall notify the Qualified Virginia Claimant of the procedure to appeal the Special Circumstances Award to the Appeals IPSA.  A copy of the Special Circumstances Award Forms shall be sent simultaneously by the Delegated Consultant to Virginia Counsel and to all other Qualified Virginia Claimants, protecting the personally-identifying information of each such person if they have not given consent to disclose his/her identity.  Notwithstanding anything contained herein to the contrary, any Qualified Virginia Claimant receiving such a Special Circumstances Award may file a written appeal with the Appeals IPSA within 30 days of such award. The sole ground for reversal or modification of a Special Circumstances Award on appeal shall be abuse of discretion by the IPSA. "Abuse of discretion" for such appeal(s) may be demonstrated, among other ways, by establishing that the appealing person's Special

32

Circumstances Award is grossly unfair to that person based on a comparison of the Matrix and Special Circumstances Awards for other similar Qualified Virginia Claimants in the same Claims Category. To the extent necessary, the Appeals IPSA may review the Special Circumstances petitions of other similar Qualified Virginia Claimants in making such an assessment.

4.     Acceptance or Appeal of Special Circumstances Award.

In order to contest a Special Circumstances Award, within 30 days of the date of the Special Circumstances Award, each such Qualified Virginia Claimant must file a written appeal. Absent extraordinary circumstances (as determined solely by the IPSA), if no appeal as provided for in the preceding paragraph is postmarked or received within the 30-day period, then the IPSA and/or her Delegated Consultant shall be authorized to declare that the Special Circumstances Award for such Qualified Virginia Claimant has been accepted. The only person who may file an appeal to a Special Circumstances Award is a Qualified Virginia Claimant who filed a Special Circumstances Petition.  If no timely appeal is filed by any of the Qualified Virginia Claimants regarding their respective Special Circumstances Awards, then all such awards shall be deemed final in all respects. If a timely appeal is noted regarding any Special Circumstances Award, then all other Special Circumstances Awards shall be held in abeyance pending resolution of such appeal.

5.     Final Special Circumstances Calculation.

When all appeals (if any) have been completed and any corresponding modifications of Special Circumstances Awards have been made, the IPSA shall compile a final list of all Awards

33

for Special Circumstances, providing a total amount to be distributed from the Special Circumstances Pool (the "Total Final Special Circumstances Distribution Amount"). Such information shall be submitted to each Claimant and counsel in the same manner as specified in section V(c). The IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to the respective Qualified Virginia Claimants and their counsel (or, if unrepresented to the Qualified Virginia Claimant only) in the amounts indicated on the final Special Circumstances Award forms. Such distributions may or may not be included with final distributions (if any) from the Remaining Retention Pool, provided that no substantial delay shall be required in order to combine such distributions.

> 6.   Calculation of Remaining Retention Pool.

The IPSA and Delegated Consultant shall calculate the amount remaining (if any) in the Special Circumstances Pool after deducting the Total Final Special Circumstances Distribution Amount. In consultation with the Tort Trustee, the IPSA shall then determine what (if any) funds remain to be distributed from the Virginia Provider Fund. This may include any funds remaining in the Special Circumstances Pool after all such awards, funds available in the Expense Trust, all interest accumulated but not previously distributed, as well as funds distributable to the Eligible and Qualified Virginia Claimants from the Insight Holdback. The total of all such sums, less any amounts necessary for remaining estimated expenses of the ICRFP, shall be the "Remaining Retention Pool."

H.      Final Distributions from Remaining Retention Pool.

Once the amount of the Remaining Retention Pool (if any) has been calculated, then a Remaining Retention Pool Point Value shall be calculated by the Delegated Consultant by dividing the funds held in the Remaining Retention Pool by the total amount of Final Matrix Award points awarded to all Qualified Virginia Claimants (plus points awards for any Late Allowed POC Claimant Claim Forms have been filed in the intervening period, if any), obtaining a Remaining Retention Pool Point Value. Distributions to each such Eligible and Qualified Virginia Claimant shall then be calculated by multiplying such person's Total Matrix Points by the Remaining Retention Pool Point Value, which amounts shall be reflected in notices provided to each such person.   The IPSA shall provide written notice to the Tort Trustee directing that payments be made to the respective Qualified Virginia Claimants and their counsel (or, if unrepresented to the Eligible and/or Qualified Virginia Claimant only) in the amounts indicated on the Final Distribution Award notices. Such distributions may, if practical, be combined with Special Circumstances Distributions.

I.      Subsequent distributions of any remaining Virginia Provider Fund amounts to be made in the same manner as distributions from the Remaining Retention Pool.

Should any additional funds become available for distribution from the Virginia Provider Fund, (including any funds payable to the Eligible and/or Qualified Virginia Claimants under the Insight Holdback), the procedures and distributions noted for the distributions from the Remaining Retention Pool shall be applied; and such calculations and awards shall be made as promptly as practicable. No appeals shall be allowed from any such subsequent awards.

35

## VI.    Appeals Procedures

A.    <u>Confirmation of Points for Qualified Virginia Claimants</u>.

Appeals shall be made to the Appeals IPSA in the following manner:

1. <u>Forms</u>. Appeals forms shall be supplied with any notice of an appealable decision from the IPSA or Delegated Consultant. Such appeals must be filed (postmarked or received) within 30 days of the date of notice of an appealable decision. Petitions for appeal shall not exceed 10 pages, and must set forth the basis for the appeal, contain a statement of requested relief, and attach any documents relating to the appeal.

2. <u>Fees</u>. Any appeal shall require a filing fee of $750, payable to the Delegated Consultant. The Delegated Consultant shall hold such fees in trust in order offset the costs of appeal to the Virginia Provider Fund. An appealing Qualified Virginia Claimant may satisfy the appeal fee by agreeing to have his/her Matrix Award reduced by the amount of the appeal fee, but only in circumstances where a Matrix Award is reasonably anticipated in at least the amount of $750.

36

    a.   If the appealing Qualified Virginia Claimant prevails on his/her appeal, then $500 of the $750 appeal fee shall be refunded to the prevailing appellant, reducing the appeal fee to $250.

    b.   Before the final distribution from the Virginia Provider Fund, the Delegated Consultant or IPSA shall disburse all appeal fees collected under this Section (if any) to the Tort Trustee to be deposited into the Virginia Provider Fund and distributed to Qualifying Virginia Claimants or paid to reimburse costs and expenses incurred in connection with or reimbursable under these ICRFP.

3. <u>Hearings</u>.  Appeals may be decided with or without hearings, as determined in the sole discretion of the Appeals IPSA.

4. <u>Content of record on appeal</u>.  The record on appeal is limited to the record in the proceedings resulting in the appeal. Unless otherwise specified in these ICRFP, the appealing Claimant may not submit, nor may the Appeals IPSA consider, any facts or evidence not previously presented by the Qualified Virginia Claimant to the IPSA or Delegated Consultant as part of the claims process that resulted in the notice or decision being appealed.

5. <u>Basis for reversal or modification of rulings on appeal</u>. The grounds for appeal are specified within applicable sections of these ICRFP that give rise to appeals. To

the extent that such grounds are not specified and an appeal is otherwise authorized or allowed, the basis for reversal or modification shall only be factual error.

## VII.    Liens, attorneys' fees, and engagement of Delegated Consultant for lien resolution.

Any awards in this VPCRF shall be subject to satisfying the lien requirements reflected in the Settlement Agreement Addendum 2 and the Plan (§§ 5.10 and 5.11). Liens that are subject to court adjustment may be heard and decided by the IPSA, subject to MDL Court approval. Settlements that require lien holder approval unless approved by a court may also be heard and decided by the IPSA, subject to MDL Court approval.

All notices of award to Eligible and Qualified Virginia Claimants under these ICRFP shall disclose that the award amount is subject to payment of liens and (if applicable) attorneys' fees and expenses pursuant to engagement agreements between the Qualified Virginia Claimant and his/her counsel. Payment of such liens shall be made by the Tort Trustee, unless after the amount of the lien has been negotiated and agreed upon, the Qualified Virginia Claimant is represented by counsel and such counsel agrees to make such payments to the lienholder to the satisfaction of the Tort Trustee and the IPSA.

To the extent that liens are not resolved by the Tort Trustee globally as indicated in §§ 5.10 and 5.11 of the Plan or by Virginia Claimants or their counsel, the Delegated Consultant shall be deemed engaged by the affected Claimants for the purposes of resolving any liens in

38

connection with distributions to such Claimants, provided, however, that, for those Qualified Virginia Claimants represented by counsel, the Delegated Consultant shall be engaged for purposes of resolving liens only upon written instruction by such counsel.  Notwithstanding the foregoing, if the distribution due an Eligible Claimant under these ICRFP is less than the amount owed on the lien, the Delegated Consultant shall discuss the circumstances with the Eligible Claimant prior to any engagement.

## VIII.   Payments of Administrative Expenses

The IPSA shall request from the Tort Trustee an initial expense distribution from the Virginia Provider Fund in the amount of $700,000. It is anticipated that such funds shall be held by the Delegated Consultant in trust (the "Expense Trust") for the payment of "Allowed Expenses," as defined below. Allowed Expenses shall include the fees and costs incurred by the Delegated Consultant, the IPSA, and the Appeals IPSA, all in accordance with agreements that shall be executed in connection therewith. Additional expense distributions may be requested from the Tort Trustee as authorized by the IPSA and shall be deposited in the Expense Trust with the Delegated Consultant in the same manner.

Any fees collected (as opposed to deductions from Awards) in connection with appeals or Special Circumstances petitions, shall be deposited with the Delegated Consultant to be held in the same manner. If any such funds are remaining and will not be used for expenses, they shall be forwarded to the Tort Trustee for the Virginia Provider Fund prior to the final distribution to

39

the Eligible and/or Qualified Virginia Claimants and included within such funds for distribution to such individuals.

## IX.   Final Accounting

Following the final distributions from the Remaining Retention Pool and /or Special Circumstances Pool, the IPSA and/or Delegated Consultant shall furnish a statement reflecting all payments to each Eligible and Qualifying Virginia Claimant as well as the costs distributed from the Virginia Provider Fund. Such statement shall be made available to all Eligible and Qualified Virginia Claimants and their counsel, and distributed as further required by the IPSA or the MDL Court.

## X.   Claims Assistance

The IPSA and Delegated Consultant are authorized to establish a claims assistance procedure for providing information and claims assistance to Claimants and their counsel. Such assistance shall be staffed by employees of the Delegated Consultant in a manner to provide assistance regarding ICRFP procedures, eligibility requirements, submission requirements (including the documentation required), denials, deficiencies, the process for curing deficiencies, and other procedural and substantive issues.

40

ATTACHMENT B

# Points Matrix

**The point assignments made within this Matrix and the Standards of Proof applicable thereto are used solely as tools for proportioning the funds available for distribution to the Claimants under these ICRFP. Such points are in no way to be used for earmarking particular portions of any Claimant's award.**

  I.  Seven Claim Base Categories.

This Matrix adopts seven categories of claims which are based on the criteria used in the NECC Claims Resolution Facility Procedures. Eligibility for classification within each category shall be governed by the standards of proof in Attachment C. The terms used in this Matrix assume eligibility requirements set forth in these ICRFP. No Claimant failing to establish the criteria for one of the following Base Categories shall be allowed to participate in the ICRFP distributions.

CATEGORY I:  Death after injection from one of the Three Contaminated MPA Lots at Insight Imaging in Roanoke, Virginia ("MPA injection") and fungal meningitis and/or spinal or paraspinal fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis).

CATEGORY II:  Fungal meningitis with a secondary or related spinal or paraspinal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis) after MPA injection.

CATEGORY III:  Fungal meningitis without secondary infection after a MPA injection.

41

CATEGORY IV:   Spinal or paraspinal (non-meningitis) fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis) after MPA injection.

CATEGORY V:   Fungal Peripheral joint infection (e.g., hip, knee, shoulder, elbow and/or ankle) after MPA injection.

CATEGORY VI:   MPA injection followed by documented symptoms associated with fungal meningitis or other fungal infection, i.e. headache, word-finding difficulty, fever, photophobia, nausea/vomiting, neck stiffness or pain, back pain, urine retention, slurred speech, limb weakness, numbness and/or pain at the injection site, resulting in medical treatment that includes at least one lumbar puncture.

CATEGORY VII:   MPA injection.

II.   Point Allocations.

    A. Base Points by Category.  Claimants proving that they qualify for these respective Base Categories shall be awarded the following base points:

        i.   CATEGORY I:      60 points

        ii.  CATEGORY II:     50 points

        iii. CATEGORY III:    40 points

        iv.  CATEGORY IV:     20 points

        v.   CATEGORY V:      20 points

        vi.  CATEGORY VI:     5 points

42

       vii. CATEGORY VII:    2 points

B. <u>Death Case Adjustments</u>

In Category I cases, the Claimant will be entitled to the following additional points based upon the surviving beneficiaries as defined by Virginia law (Va. Code § 8.01-50, et. seq.): Specifically:

If decedent was survived by a spouse or child, who was under the age of 21 at the time of death, who was a student and still dependent on parent for support, then the Claimant will receive an additional 100 points for each.

If decedent was survived by an adult child, then the Claimant will receive an additional 30 points per child.

If decedent was not survived by a spouse or child, but was survived by a parent, sibling, or a grandchild where the parent was a deceased child of the decedent, then the Claimant will receive 10 points for each of these surviving family members.

C. <u>Past Medical Bills and Wage Loss</u>

As part of each claim, and subject the standards of proof requirements set forth in <u>Attachment C</u>, a Claimant shall be awarded points for documented medical expenses incurred and for lost wages caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA Lots.  The cut-off date for claims for past medical bills and lost wages shall be February 28, 2015.

For each $1000 of either past medical bills related to medical treatment or lost wages caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA

43

Lots, the Claimant will receive 1 pt. per $1000, or a pro rata portion thereof, of all documented medical bills or lost wages incurred through February 28, 2015.  For example, if a Claimant incurred $112,346 in past medical expenses, and $13,500 in lost wages as of February 28, 2015, then the Claimant would receive 112.346 points for past medicals, and 13.5 points for lost wages for a total of 125.846 points under this Criteria II.C.

D.  <u>Future Medical Bills and Future Wage Loss</u>

As part of each claim, and subject to the specific standard proof set forth in <u>Attachment C</u>, a Claimant may be awarded points for properly established claims for future medical treatment and expenses and for lost future wages that will be incurred after February 28, 2015 where such damages are a result of illness and/or complications arising from the injection with the Contaminated Lots.  For each $1000 of either future medical bills or future lost wages resulting from Claimant's injuries related to the medical condition(s) caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA Lots, the Claimant will receive 1/3 pt. per $1000, or a pro rata portion thereof, of all future economic damages.  Claims for future non-medical economic damages shall be treated uniformly with a 4.0% discount rate (less than 10 years) and 4.5% discount rate (if greater than 10 years) and a 2% growth rate (if less than 10 years) and 2.5% growth rate (if greater than 10 years).  For future medical expenses extending into the future for more than two years, the same discount rates shall apply, but the growth rate shall be 5.25%.

44

E.  Total Number of Lumbar Punctures

As part of each claim, other than Category VII claims, and subject to the specific standard proof set forth in Attachment C, for each lumbar puncture the Claimant received, the Claimant will be awarded 2 pts.

F.  Anti-Fungal Treatment

As part of each claim, and subject to the specific standard proof set forth in Attachment C, for each day the Claimant was administered or took anti-fungal medication (IV or orally), the Claimant will receive ¼ pt.

G.  Stroke

As part of each claim, and subject to the specific standard of proof set forth in Attachment C, if the Claimant suffered a documented stroke which is linked to a fungal meningitis diagnosis, then that Claimant will receive 30 additional points.

H.  Renal Failure

As part of each claim, and subject to the specific standard of proof set forth in Attachment C, if the Claimant has suffered from Stage 3, 4, or 5 renal failure which is linked to a fungal infection or to a diagnosis of fungal meningitis, then the Claimant shall receive 30 additional points.

I.  Other Factors

As part of any claim, any Claimant may, as part of the initial Claim submission, include a two page written request to the IPSA for an

45

award of up to an additional 10 points based on what the Claimant considers to be the unusual circumstances of his/her situation, which the Claimant feels are not adequately addressed by the points otherwise assigned by the Matrix. Any Claimant who files a request for an award of "Other Factors" points as part of his/her Claim, shall be disqualified from making a Special Circumstances Petition, and receiving a Special Circumstances Award.

Simply filing an "Other Factors" request with a Claim does not mean the IPSA will automatically award extra points, and the maximum number of points that may be awarded to any Claimant under this provision shall be 10 additional points.

The IPSA shall consider the written requests that are submitted, and may in her sole discretion, determine the correct number of additional points to be awarded in connection with each Claimant's "other factors" request. In doing so, the IPSA may consider the other awards being made to similarly situated Claimants in the same Claim Category, and the nature of unusual circumstances presented in an effort to assess whether the Claimant's Matrix Award based on points otherwise awarded treat the Claimant fairly.

J.   Time-Barred Claims

Any Claimant who submits a claim, but who is found not to have filed a timely civil claim in state or federal court alleging a tort claim against Insight relating to or arising from that individual or his/her decedent having received an injection from one or more of the Three Contaminated MPA Lots at the Insight Imaging clinic in Roanoke, Virginia, will receive an award of only one-half (1/2) point to reflect the fact that the claim is not viable because it is time barred. Time-barred

46

Claimants are excluded from participation in the Special Circumstances petition process.

III.   <u>Examples of Application of Matrix</u>.

Once the "point value" is determined by the IPSA or Delegated Consultant, the Matrix Award is a simple mathematical calculation of multiplying the number of points assigned by the "point value" for the "Matrix Award."

Points in non-death cases would be determined under the Matrix as follows:

Category +

1 pt. per $1000 of past economic damage +

1/3 pt. per $1000 of future economic damage +

2 pts. for each lumbar puncture +

1/4 pt. per day on antifungal medications +

30 points for a stroke or chronic stage 3, 4 or 5 renal failure +

Extra points (up to 10 pts.) for "other factors" =

TOTAL POINTS

NOTE: Category I cases will receive additional points set forth above if decedent was survived by statutory beneficiaries.

Example: A Category II case with $150,000.00 of past medical bills and past wage loss with $45,000.00 of future medicals where Claimant had 5 lumbar punctures and 100 days of antifungal treatment would receive:

47

| | | |
|---|---|---|
| Category II | = | 50 points |
| $150,000 past economics | = | 150 points |
| $45,000 future economics | = | 15 points |
| 5 lumbar punctures | = | 10 points |
| 100 days of antifungals | = | 25 points |
| TOTAL | = | 250 points |

If the "point value" determined by the IPSA is $700.00, then the Matrix Award in this example would be $175,000.00.

IV.    Special Circumstances Petition.

The Claims Process includes an opportunity for those with exceptional and/or unique circumstances which make the Matrix Award inadequate to file a petition with the IPSA for a potential supplemental discretionary award from the Retention Pool.  There is a $2,000 fee required of anyone who desires to file a Special Circumstances Petition, and there is no guarantee of a Special Circumstances Award simply because the petition is filed.  For details, see Section V(G) of these ICRFP.

V.    Appeal Rights.

There is a limited right of appeal of a Matrix Award and/or a Special Circumstances Award as set forth in these ICRFP.

48

## ATTACHMENT C

### Standards of Proof

The following standards of proof will be used to evaluate claims submitted under these ICRFP.

I.    <u>Claims Forms</u>.  Each Claimant must submit a completed Claims Form signed under oath by the Claimant or an authorized representative.

II.   <u>MPA Injection</u>.  Medical or other records documenting an injection from one or more of Lots 05212012@68, 06292012@26 or 08102012@51 of preservative-free Methylprednisolone Acetate ("MPA") compounded by New England Compounding Pharmacy ("NECC") (the "Three Contaminated MPA Lots "), including, e.g.: a letter from Insight informing the Claimant or (where a representative is filing a claim on behalf of another person), the person that s/he received an injection from one or more of the Three Contaminated MPA Lots.  Alternatively the Claimant may request that the Delegated Consultant or IPSA review the list of patients who received an injection from one or more of the Three Contaminated MPA Lots that Insight submitted to the Trustee in 2013 in order to establish the necessary proof of injection (the "Insight List").

III.  <u>Claim Categories</u>.  The seven Base Categories (I – VII) may be established by submitting the following documents, in addition to evidence of a MPA injection (Section II above):

A.    <u>Category I (Death After MPA Injection)</u>.  (a) A certified death certificate documenting death as occurring after injection from one of the Three Contaminated MPA Lots  with the immediate or underlying cause of death containing one of the following words or phrases: meningitis, meningoencephalitis, encephalitis, epidural injection, methylprednisolone injection, steroid injection, exserohilum, aspergillus, abscess, or arachnoiditis; or (b) (i) a certified death certificate and medical documentation of a diagnosis of fungal meningitis, meningoencephalitis, encephalitis after injection from one or more of the Three Contaminated MPA Lots , and (ii)

49

documentation that the Claimant received Anti-Fungal Treatment; or (c) a certified death certificate and medical documentation of a diagnosis of spinal or paraspinal fungal infection (vertebral osteomyelitis, discitis, sacroiliitis or epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of epidural clumping or unevenness of nerve routes after an MRI) after a spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , plus documentation that the Claimant received Anti-Fungal Treatments; or (d) a death certificate and medical documentation that the Claimant suffered cerebrovascular accident/stroke occurring (but not a transient ischemic attack only) on or before December 31, 2012, after injection from one or more of the Three Contaminated MPA Lots ; or (e) a certified death certificate and proof that the Claimant was listed on the Virginia NECC List of death cases.  If such proof is presented for deaths occurring before September 30, 2013, the IPSA shall presume that the death was the result of the MPA injection or complications arising therefrom unless there is cause to believe that the death was a result of an unrelated event (i.e., auto accident, unrelated illness).  For deaths occurring after September 30, 2013, where there is reason to believe that the death resulted from an unrelated event, a certified death certificate and other such proof deemed sufficient by the IPSA to establish the death was the result of a MPA injection or complications arising therefrom.

B.    <u>Category II (Fungal Meningitis Plus Secondary Fungal Infection)</u>.  Medical documentation of (a) (i) a diagnosis of fungal meningitis, meningoencephalitis, encephalitis after injection from one or more of the Three Contaminated MPA Lots , and (ii) a diagnosis of spinal or paraspinal fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of abnormal thickening, intradural clumping or unevenness of nerve roots after MRI) after spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , plus documentation that the Claimant received Anti-Fungal Treatment; or (b) proof that the Claimant was listed on both the Virginia NECC List of NECC's fungal meningitis or stroke cases and

50

was listed on the Virginia NECC List of NECC's spinal or paraspinal fungal infection cases, or was listed on the Virginia NECC List of NECC's fungal meningitis and spinal or paraspinal injection cases.

C.     <u>Category III (Fungal Meningitis)</u>.   May be established by presenting medical documentation of (a) (i) diagnosis of fungal meningitis, meningoencephalitis or encephalitis after injection from one or more of the Three Contaminated MPA Lots, and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia NECC List of NECC stroke or fungal meningitis cases.

D.     <u>Category IV (Spinal or Paraspinal Fungal Infection (But Not Meningitis))</u>. May be proved by medical documentation of (a) (i) a diagnosis of spinal or paraspinal fungal injection (including vertebral osteomyelitis, discitis, sacroiliitis, epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of abnormal thickening, intradural clumping or unevenness of nerve roots after MRI, after a spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia List of spinal or paraspinal fungal infection cases.

E.     <u>Category V (Fungal Peripheral joint infection (But Not Meningitis))</u>.   May be proved by medical documentation of (a) (i) a diagnosis of fungal peripheral joint infections after joint injection from one or more of the Three Contaminated MPA Lots, and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia NECC List of peripheral joint infection cases.

F.     <u>Category VI (Symptoms and at Least One Lumbar Puncture)</u>.   May be established by presenting contemporaneous medical records documenting that the Claimant suffered on or before March 31, 2013 from one or more of the symptoms listed in the definition of Category VI in §I of Attachment B, after an injection from one or

51

more of the Three Contaminated MPA Lots, and medical records documenting at least one lumbar puncture prior to April 30, 2013.

G.     Category VII (Symptoms and Lumbar Puncture not required).     Only requires injection from one or more of the Three Contaminated MPA Lots.

IV.     Medical Conditions.

A.     Arachnoiditis may be established by medical records that document (a) the diagnosis of an arachnoiditis, or there must be documentation of intradural clumping or unevenness of nerve roots after MRI after an injection from one or more of the Three Contaminated MPA Lots, and (b) antifungal treatment.

B.     "Anti-Fungal Treatment" as used in these standards of proof requires presentation of medical records documenting the length of treatment with Amphotericin B, Voriconazole, Posaconazole, Itraconazole and/or Isavuconazole after injection from one or more of the Three Contaminated MPA Lots.

C.     Lumbar puncture adjustment will require medical records documenting one or more lumbar punctures after injection from one or more of the Three Contaminated MPA Lots and before December 31, 2014.

D.     Stroke adjustment requires medical documentation of a diagnosis of cerebrovascular accident/stroke (but not a transient ischemic attack only) after injection from one or more of the Three Contaminated MPA Lots and a diagnosis of fungal meningitis.  If the cerebrovascular accident/stroke occurred on or before December 31, 2012, the IPSA may presume that the stroke was the result of the MPA injection or complications arising therefrom unless there is reason to believe that the stroke was the result of an unrelated event (i.e., the Claimant has a past history of strokes).  For strokes where there is a reason to believe that it is unrelated to the MPA injection or complications arising therefrom, or for strokes occurring after December 31, 2012, proof deemed sufficient by the IPSA that the stroke was the result of the MPA injection or complications therefrom is required.

52

E.     Renal Failure adjustment may be established by any of the following records that show that the kidney disease is linked to an injection of one or more of the Three Contaminated MPA lots, or complications arising therefrom either by: (i) medical records or a treating physician statement that state that the Claimant or decedent suffers or suffered  from Stage 3, 4, or 5 kidney disease which began within 12 months after injection from one or more of the Three Contaminated MPA Lots or the kidney disease is linked to an injection of one or more of the Three Contaminated MPA lots, or complications arising therefrom or (ii) medical records documenting acute renal insufficiency within 30 days of the first treatment with amphotericin B.   Proof of acute renal insufficiency shall consist of medical records documenting a glomerular filtration rate ("GFR") of <60 within 30 days following treatment with amphotericin B.   The applicable GFR score is the GFR score listed for the patient's race (non-African American or African American).   If GFR scores are not available, medical records documenting a Creatinine Clearance ("CrCl") level within 30 days after the first treatment with amphotericin B, where such CrCl level is commensurate with a GFR of less <60 is sufficient.

F.     Vertebral osteomyelitis may be established by medical records that document (a) a diagnosis of vertebral osteomyelitis after injection from one or more of one or more of the Three Contaminated MPA Lots, and (b) antifungal treatment.

V.     <u>Death Adjustments</u>.  Any administrator or executor making a claim on behalf of a decedent who seeks an award of additional points based upon surviving beneficiaries shall provide documentary evidence of dependent and/or adult children as of the date of death.

A.     <u>Dependent Child</u>.  For Dependent Children Adjustment:

(1)     A child is considered to have been dependent on the decedent if he or she is: (a) under the age of 21 as of the date of death and listed as a qualifying dependent child on the decedent's 2011 or 2012 federal income tax return; or (b) a natural or legitimate child under the age of 21 as of the date of death; or (c) an adopted

53

child under the age of 21 as of the date of death; or (d) a stepchild under the age of 21 as of the date of death who lived with the decedent in a regular parent-child relationship at the time of the decedent's death or there are reasons why the stepchild did not live with the decedent (i.e., medical reasons, to attend school or other similar reasons); or (e) under the age of 21 as of the date of death who lived with the decedent in a regular parent-child relationship at the time of the decedent's death or did not live with the decedent because of medical reasons, to attend school or other similar reasons, and to whose support the decedent made regular and substantial contributions.

(2)     Proof that a child was under 21 as of the date of death may be provided by submitting the decedent's 2011 or 2012 federal tax return listing the child as a dependent and listing the child's date of birth, or by submitting a certified birth certificate of the child.

(3)     Proof of dependency may be provided as follows: (a) a copy of the decedent's federal tax return for 2011 or 2012, listing the child (ren) as a qualifying dependent child and listing his or her date of birth; (b) a certified birth certificate that indicates that a child was a natural or legitimate child of the decedent. In the event that decedent's name does not appear on the birth certificate, proof may be provided by documentation evidencing a judicial determination of support; (c) for domestic adoptions, a copy of a revised birth certificate showing the decedent as a parent. For foreign adoptions, proof may be provided by submitting a copy of the adoption decree and, if applicable, documentation showing the child's change of name.  Since rules for foreign adoptions vary by country, alternative and/or additional documentation may be required by the Settlement Administrator; (d) for a child that was a stepchild, a certificate of marriage, evidencing the marriage of the child's biological parent and the decedent, and a certified birth certificate or documentation evidencing a judicial determination of support and a signed statement from a person with direct knowledge that verifies that the stepchild lived with the decedent in a regular parent-child relationship at the time of decedent's death or describing the reasons why the stepchild did not live with the decedent (i.e., for medical reasons, to attend school, or for other

54

similar reasons); (e) if dependency is claimed on the basis of the decedent having made regular and substantial contributions to the support of the child, a signed statement from a person with direct knowledge that verifies that the child (or children) lived with the decedent in a regular parent-child relationship at the time of the decedent's death or describing the reasons why the child did not live with the decedent (i.e., for medical reasons, to attend school, or for other similar reasons) and one or more of the following proofs: (1) evidence of eligibility as a dependent child for benefits under State or Federal programs; (2) cancelled checks, money orders, or receipts for periodic payments received from the decedent for or on behalf of the child; (3) evidence of goods or services that show regular contributions of considerable value from the decedent for or on behalf of the child; or (4) proof of coverage of the child as a family member under the decedent's Federal Employees Health Benefits enrollment or private health insurance.

      B.    <u>Spouse</u>. For Spousal Adjustment, the decedent's certified death certificate.

      C.    <u>Adult Children</u>. For Adult Children Adjustment, listing of name, date of birth, and current address of each surviving natural or adopted adult child as of decedent's date of death on the Claims Form and a copy of the decedent's obituary identifying the surviving natural or adopted adult child(ren), or a signed statement from a person with direct knowledge that the decedent was survived by a natural or adopted adult child(ren) and identifies the surviving adult child(ren).

      D.    <u>Siblings</u>. For Siblings Adjustment, listing of name, date of birth, and current address of each surviving sibling as of decedent's date of death on the Claims Form and a copy of the decedent's obituary identifying the surviving sibling, or a signed statement from a person with direct knowledge that the decedent was survived by a sibling and identifies the surviving sibling.

VI.    <u>Past Medical Bills</u>. For Claimants seeking an award based on past medical bills, the Claimant will need to supply a statement from either the treating physician or a physician qualified to offer the opinion that the medical treatment and the expenses presented are related to the care and treatment provided to the Claimant after receiving

an injection from one or more of the Three Contaminated MPA Lots , and that the treatment, care and medical expenses are connected to the medical conditions that are causally connected to the injection from one or more of the Three Contaminated MPA Lots .

VII.   <u>Claim for Past Lost Wages</u>.  Any Claimant who is making a claim for lost wages of less than $2,000.00 may do so by providing a signed statement from his or her employer stating the time missed from work (which the Claimant attributes to the complications resulting from having received an injection of MPA from one or more of the Three Contaminated MPA Lots) and the rate(s) of pay during such period(s) of missed work, or by producing employment records of the same.

For lost wages claims in excess of $2,000.00, the Claimant may provide either a federal tax return for 2011 (filed either jointly or individually) or the Claimant's 2011 W-2s, 1099s and/or 10-Ks, and the same documentation for each of the years 2012, 2013 and 2014, <u>plus</u> a statement from the Claimant's current or past employer (if self-employed, a statement by the Claimant) that the Claimant missed time from work during the time periods or by producing employment records of same; Claimant shall also produce documentation from either his/her treating physician or a qualified physician that the reason for termination or the inability to work was due to medical complications related to the MPA injection.

VIII.   <u>Future Medical Expenses</u>.  Any Claimant who makes a claim for Future Medical Expenses must provide a letter or statement from a treating physician or other qualified physician supporting such claim. In addition, if a Claimant seeks Future Medical Expenses in excess of $50,000 and for a period of greater than two (2) years into the future, then the Claimant must provide a life care plan prepared by an individual who has been previously qualified to provide opinion testimony on this topic in a Virginia state court. In addition, any claim for Future Medical Expenses to be incurred over a period greater than two (2) years must include a growth rate of 5.25% and a discount

56

rate of 4% (if less than 10 years) and a discount rate of 4.5% (if greater than 10 years). Otherwise, such proof may be established with statements from treating physicians.

IX.    <u>Future Lost Wages</u>.  Any Claimant who makes a claim for Future Lost Wages must provide a letter or statement from a treating physician or other qualified physician supporting such claim.  Any Claimant seeking an award for future lost wages and/or other employment benefits in excess of $50,000 and for a period greater than two (2) years and involves projected growth of wages and/or employment benefits must apply a wage/benefits growth rate of 2% (if less than 10 years) and 2.5% (if greater than 10 years) <u>or</u> provide a report from a qualified economist or other expert who has previously been qualified to provide such opinion testimony in a Virginia state court justifying application of any other rate. Claims greater than two (2) years must also apply a discount rate of 4% (if less than 10 years) and a discount rate of 4.5% (if greater than 10 years).  If more than five years of Future Lost Wages are sought, the Claimant must submit the opinion of a vocational rehabilitation expert or other qualified expert addressing any mitigating employment factors such as the ability to obtain other employment in another field.

57

**Exhibit C**

**Mutual Release**

## Mutual Release

This Mutual Release is executed pursuant to the Settlement and Release Agreement dated _____ by and between the Parties to this Agreement.

1.    Parties.

    A.    "Insight" means Insight Health Corp., Insight Health Services Corp., Insight Services Holdings Corp., and all direct and indirect affiliates.

    B.    "Virginia Plaintiff" means _____(insert name)

    C.    "IGPM" means Image Guided Pain Management, P.C.

    D.    "Doctors" means John M. Mathis, M.D. and Robert F. O'Brien, M.D.

    E.    "Defendants" means Insight, IGPM, and the Doctors, collectively.

    F.    "Parties' Settlement and Release Agreement" means a Settlement and Release Agreement negotiated between and among the Parties to this Agreement, their insurers, and Paul D. Moore, in his capacity as Trustee for the NECC Chapter 11 Bankruptcy Estate.

    G.    "Parties" means for the purpose of this mutual release the entities and individuals identified above in paragraphs A. – E.

2.    Acknowledgements.

The parties ("Parties ") to this Mutual Release (hereafter "Agreement " or "Release ") acknowledge that discovery in these cases is incomplete, and they enter this Agreement despite the possibility that the facts or law may be other than they believe. The Parties have fully investigated this matter to their satisfaction and the satisfaction of their attorneys and agree that should they hereafter discover facts different from or in addition to those now known or believed to be true with respect to any aspect of these matters, this Agreement shall, nevertheless, be and remain in full force and effect in all respects. The Parties assume the risk that the law and facts may be other than what they and their attorneys believe.

3.    Release of Defendants by Virginia Plaintiffs.

    A.    In consideration of payment by Defendants and their insurers of the Settlement Amount (as that term is defined in the Parties' Settlement and Release Agreement ) and compliance with the terms and obligations contained within this Agreement, Virginia Plaintiff ("Releasor") hereby completely releases and forever discharges Defendants from any and all past, present or future claims, demands, obligations, actions, causes of action, wrongful death claims, rights, damages, costs, losses of services, expenses and compensation of any nature whatsoever, whether based on tort, contract, fraud, statutory violation, or other theory of recovery, which the Releasor now has, or which may

hereafter accrue or otherwise be acquired, on account of, or may in any way grow out of, or which relate to NECC Claims (as that term is defined in the Parties' Settlement and Release Agreement).

B.      This Release shall also apply to, benefit, and release all of Defendants' past, present and future (and in each case whether direct or indirect): officers, directors, stockholders, insurers, attorneys, agents, servants, representatives, employees, parents, subsidiaries, affiliates, partners, subcontractors, predecessors and successors in interest, and assigns and all other persons, firms or corporations with whom any of the former have been, are now, or may hereafter be affiliated, each acting in their capacity as such (collectively "Defendant Releasees").

C.      This Release is entered into pursuant to the provisions of Va. Code § 8.01-35.1. Except as specifically noted, this Release does not discharge any claims, demands and causes of action against any persons or entities other than the Defendant Releasees. This Agreement does not apply in any way to, and is made in express reservation of, any claims or potential claims that Releasor has against any persons or entities other than the Defendant Releasees, including joint tortfeasors.

D.      This Release, on the part of the Releasor, shall be a fully binding and complete settlement among the Releasor and the Defendant Releasees and their heirs, assigns and successors and is effective upon the payments from Defendants (and their insurers) and the allocation specified in Section II.A of Parties' Settlement and Release Agreement.

E.      Releasor, after consulting with his/her attorneys, acknowledges and agrees that the release and discharge set forth above is a general release of Defendant Releasees. Releasor expressly waives and assumes the risk of any and all claims for damages against the Defendant Releasees which exist as of this date, but of which the Releasor does not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect Releasor's decision to enter into this Agreement. Releasor further agrees that Releasor will accept payment of the sums distributed herein under the Virginia Provider Claims Resolution Facility Procedures (as described in the Parties' Settlement and Release Agreement) as a complete compromise of matters involving disputed issues of law and fact. It is understood and agreed to by Releasor and Defendants that this settlement is a compromise of a disputed claim, and this Agreement and the payments made by Defendants and their insurers are not to be construed as an admission of liability on the part of Defendants, by whom liability is expressly denied, or any other party. No portion of the payments made hereunder is made for or relates in any way to punitive or exemplary damages. Instead, all monies paid under this Agreement are being paid for compensatory damages due to physical injury as contemplated by IRC § 104(a)(2).F.

F.      Releasor hereby further release each Defendant's insurer from any and all Claims (as that term is defined in the Parties' Settlement and Release Agreement, including both contractual and extra-contractual claims) arising from or relating to the subject matter hereof, including without limitation any claim of misconduct in relation to the Claims of the each Virginia Plaintiffs, to no lesser extent than the release of the Parties hereunder,

Page 2 of 5

together with a release of each such insurers' respective past, present and future officers, directors, stockholders, attorneys, agents, servants, representatives, employees, parents, subsidiaries, affiliates, partners, subcontractors, predecessors and successors in interest, and assigns, each in their capacity as such, and all other persons, firms or corporations with whom any of the former have been, are now, or may hereafter be affiliated in connection with insurance coverage provided to Defendants.

4.    Defendants' Release of Releasor .

A.    Other than claims that may arise out of this Agreement and Releasor's obligations under the Parties' Settlement and Release Agreement,  upon the effectiveness of Releasor's release each Defendant hereby completely releases and forever discharges the Releasor  (and/or Decedent), and his/her heirs, beneficiaries or survivors, from any and all past, present or future claims, demands, obligations, actions, causes of action, rights, damages, costs, losses of services, expenses and compensation of any nature whatsoever, whether based on tort, contract, fraud, statutory violation, or other theory of recovery, which the Defendant, whether individually, jointly, or collectively with the other Defendants,  now has, or which may hereafter accrue or otherwise be acquired, on account of, or may in any way grow out of, or which relate to Releasor for acts, omissions, occurrences, or events occurring on or before the date of execution of this Release.

B.    This Release, on the part of Defendants, upon the effectiveness of Releasor's release shall be a fully binding and complete settlement among the Defendant Releasees and the Releasor, and binds the respective parents, subsidiaries, affiliates, partners, subcontractors, predecessors, successors and assigns of each Defendant.  Moreover, the Release runs in favor of the Releasor (and/or Decedent) and his/her estate, executor, administrator, trust, survivors, heirs, and beneficiaries.

5.    Release of Cross Indemnity Claims by Defendants.

Insight, IGPM, and the Doctors, with the consent of their respective insurance carriers, hereby release, waive and forever discharge each other from and against any and all past, present or future claims, demands, obligations, actions, causes of action, wrongful death claims, rights, damages, costs, losses of services, expenses and compensation of any nature whatsoever, whether based on tort, contract, fraud, statutory violation, contribution, contractual or express indemnity, and/or implied or equitable indemnity or other theory of recovery, which they now have, or which may hereafter accrue or otherwise be acquired, on account of, or may in any way grow out of, or which relate to in any way related to liabilities arising from the claims relating to the Virginia Settlement Funds or related in any way to methylprednisolone acetate or any other products or medications manufactured, compounded, produced, sold or distributed by NECC, or arising from or relating the settlement of the earlier claim by the Estate of Douglas C. Wingate.

6.    Scope of Releases.

The releases, waivers and discharges contained within this Agreement extend and apply to all unknown, unforeseen, unanticipated and unsuspected injuries, damages, losses and liabilities and the consequences of them as well as those now disclosed and known to exist which arise out of or are related in any way to the Releasor's tort claims against the Defendants. The provisions of any state, federal, local or territorial law or statute providing in substance that releases shall not extend to claims, demands, injuries or damages which are unknown or unsuspected to exist at the time to the person(s) or entities executing such release are expressly waived. Notwithstanding any other provision, the Parties specifically reserve the right to pursue any claim that may arise from breach of any provision of this Agreement.

7.    Parties' Commitment to Releases.

The Parties agree to mutually support and defend the validity of this Agreement and the payments, releases and terms expressed herein. The Defendant Releasees are intended third-party beneficiaries entitled to enforce this Agreement.

8.    Acknowledgement of Parties' Settlement and Release Agreement.

The Parties expressly acknowledge the Parties' Settlement and Release Agreement, agree to satisfy the obligations and duties it imposes and incorporate the terms of the Parties' Settlement and Release Agreement, to the extent that it applies to the Parties herein, including but not limited to the confidentiality provisions set forth therein.

9.    Amendment/Modification.

No amendment, waiver or modification of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Parties.

10.    Execution and Delivery.

This Agreement may be executed in one or more counterparts, all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by email and facsimile, which shall be deemed the same as originals.

11.    Governing Law.

This Agreement shall be governed by the law of the Commonwealth of Virginia, without regard to its conflict of laws provisions.

**[Signature Pages Follow]**

Page 4 of 5

VIRGINIA PLAINTIFF:

_____

Typed Name:_____

Date:_____

INSIGHT HEALTH CORP.:

By:_____

Title:_____

Date:_____


IMAGE GUIDED PAIN MANAGEMENT, P.C.:

By:_____

Title:_____

Date:_____


JOHN M. MATHIS, M.D.:

_____

Date:_____


ROBERT F. O'BRIEN, M.D.:

_____

Date:_____

## ADDENDUM NO. 1 TO SETTLEMENT AND RELEASE AGREEMENT

This Addendum No. 1 (the "Addendum No. 1") to the *Settlement and Release Agreement* dated as of February 5, 2015 (the "Agreement") is made as of February 5, 2015 by:

(i)     the Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 case of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center, Case No. 12-19882, pending in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"); and

(ii)    the Plaintiffs' Steering Committee (the "PSC") appointed in the multi-district litigation captioned *In re New England Compounding Pharmacy Cases Litigation*, MDL No. 2419, Case No. 13-cv-02419 (D. Mass.).

Capitalized terms not defined herein shall have the meanings assigned to them in Section 1 of the Agreement.

1.     Each of the Committee and the PSC acknowledges that it has had a sufficient opportunity to discuss and review the Agreement with its counsel, has in fact done so, and fully understands the terms, conditions, and agreements set forth therein.

2.     Each of the Committee and the PSC supports the Agreement and the compromise and settlement embodied therein.

3.     Each of the Committee and the PSC (i) supports, (ii) agrees to take reasonable steps to secure, and (iii) agrees not to oppose or object to the Bankruptcy Court's confirmation of a Plan that incorporates and effectuates the terms and provisions of the Agreement in all material respects.  Notwithstanding the foregoing, each of the Committee, the PSC, and their members reserve all rights in connection with any aspect of the Plan that is not the subject of the Agreement, including, without limitation, the right to object to and/or negotiate provisions of the Plan that are not the subject of the Agreement

4.     The PSC shall petition the MDL Court as soon as practical, and shall take all other steps reasonably necessary, to make the following allocations from the MDL Common Benefit Reserves: (1) $1,784,375, so long as such amount is no more than 5/8ths of the 8% MDL Common Benefit Reserves, to the Virginia Attorneys; and (2) the remainder (i.e. the 3/8ths left estimated at $1,070,625) to be allocated by the MDL Court pursuant to any applicable order thereof. The PSC agrees and shall confirm to the extent necessary that the previously-settled case between Sharon G. Wingate, Executor of the Estate of Douglas G. Wingate and Insight (the "Wingate Settlement") shall not in any way be subject to assessment within the MDL.

5.     The parties to the Agreement are intended beneficiaries of this Addendum No. 1.

6.     Each of the Committee and the PSC agrees to undertake the actions and responsibilities attributed to them in the Agreement.

7.     Nothing in this Addendum No. 1 is intended to or does modify the Agreement in any respect.

*Signature Page to Addendum No. 1 to Settlement and Release Agreement*

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NEW
ENGLAND COMPOUNDING PHARMACY,
INC., BY AND THROUGH ITS COUNSEL
AND CO-CHAIRS

BROWN RUDNICK LLP

By:

David J. Molton, Esq. (admitted *pro hac vice*)
Daniel J. Saval, Esq. (BBO #653906)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com
dsaval@brownrudnick.com

and

William R. Baldiga, Esq. (BBO #542125)
Kiersten A. Taylor, Esq. (BBO #681906)
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
wbaldiga@brownrudnick.com
ktaylor@brownrudnick.com

*Counsel to the Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc.*

Page 2 of 4

*Signature Page to Addendum No. 1 to Settlement and Release Agreement*

ANDREWS & THORNTON

By: _____

Anne Andrews, Esq.
John C. Thornton, Esq.
Karren Schaeffer, Esq.
2 Corporate Park, Ste. 110
Irvine, CA 92606
Telephone: 949 748-1000
aa@andrewsthornton.com
jct@andrewsthornton.com
kschaeffer@andrewsthornton.com

*Counsel for Official Committee of Unsecured*
*Creditors of New England Compounding*
*Pharmacy, Inc. Member and Co-Chair, Katrina*
*Eldreth, obo Ari Gomez*

COHEN PLACITELLA & ROTH P.C.

By: _____

Michael Coren, Esq.
Harry Roth, Esq.
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: 215 567-3500
mcoren@cprlaw.com
hroth@cprlaw.com

*Counsel for Official Committee of Unsecured*
*Creditors of New England Compounding*
*Pharmacy, Inc. Member and Co-Chair,*
*Meghan Handy*

Page 3 of 4

*Signature Page to Addendum No. 1 to Settlement and Release Agreement*

## ANDREWS & THORNTON

By: _____

Anne Andrews, Esq.
John C. Thornton, Esq.
Karren Schaeffer, Esq.
2 Corporate Park, Ste. 110
Irvine, CA 92606
Telephone: 949 748-1000
aa@andrewsthornton.com
jct@andrewsthornton.com
kschaeffer@andrewsthornton.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair, Katrina
Eldreth, obo Ari Gomez*

## COHEN PLACITELLA & ROTH P.C.

By: _____

Michael Coren, Esq.
Harry Roth, Esq.
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: 215 567-3500
mcoren@cprlaw.com
hroth@cprlaw.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair,
Meghan Handy*

*Signature Page to Addendum No. 1 to Settlement and Release Agreement*

**THE PLAINTIFF STEERING COMMITTEE,
BY AND THROUGH ITS LEAD COUNSEL**


HAGENS BERMAN SOBOL SHAPIRO LLP


By: _____
Thomas M. Sobol, Esq.
Kristen Johnson, Esq.
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700
tom@hbsslaw.com
kristenjp@hbsslaw.com

*Plaintiffs' Lead Counsel, for the PSC*

## ADDENDUM NO. 2 TO SETTLEMENT AND RELEASE AGREEMENT

This Addendum No. 2 (the "Addendum No. 2") to the *Settlement and Release Agreement* dated as of February 5, 2015 (the "Agreement") is made as of February 5, 2015 by the NECC Trustee and the Creditors' Committee (collectively, the "Plan Proponents").

Capitalized terms not defined herein shall have the meanings assigned to them in Section 1 of the Agreement, or, if not defined therein, the meanings assigned to them in the Plan.

1.     The Plan Proponents agree that the Plan shall contain the following defined terms, the definitions of which shall not be altered in a way that would be materially adverse to either Insight, IGPM, the Doctors, or the Insurers:

*Entity*.  An individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government or any political subdivision thereof, or other person.

*Person*.  Person has the meaning set forth in section 101(41) of the Bankruptcy Code.

*Other Contributing Parties*.  Entities including, without limitation, Insight, IGPM, the Doctors, and the Insurers.

*Tort Claims*.  Any and all Claims, causes of action, civil actions and demands for or based on personal injury or wrongful death relating to the compounding, preparation, design, marketing, sale, distribution, fabrication, advertising, supply, production, formulation, use, administration, labeling or ingestion of any product produced, sold or distributed by the Debtor, including, but not limited to, MPA and other drugs compounded, designed, marketed, sold, distributed, fabricated, advertised, supplied, produced, or formulated by the Debtor (notwithstanding the identity of any subsequent marketer, distributor, retailer, wholesaler, other seller or administrator of such product), including, but not limited to, those civil actions pending in the MDL Proceeding or in any state court.

*Tort Claimants*.  The holders of Tort Claims, or, in the singular, one such holder.

2.     The Plan Proponents agree that the Plan and/or the NECC Tort Trust Agreement shall contain the following provisions, which shall not be altered in a way that would be materially adverse to either Insight, IGPM, the Doctors, or the Insurers:

*Distribution of the Tort Trust Assets*.  The Tort Trustee shall distribute the proceeds of the Tort Trust Assets in accordance with this Plan, the Confirmation Order, the Tort Trust Documents and the Claims Resolution Facility Procedures.  In connection with such distributions, and except as provided below in this Section 5.10, the Tort Trust shall be responsible for all reimbursement and reporting obligations imposed by the Medicare Act for the repayment of any claim related conditional payments made under Medicare Part A, B, C and D ("Conditional Payment") or any state's Medicaid or Workers Compensation statute. Before disbursing any Tort Trust Assets to any Tort Trust

Beneficiary, the Tort Trustee may enter into a global resolution with the Centers for Medicare and Medicaid Services ("CMS") to reimburse all Medicare Part A, B, C and D liens that are subject to repayment for Conditional Payments made pursuant to 42 USC 1395y(b) and the accompanying Medicare Part C and Part D statutes and Medicare reporting obligations pursuant to 42 USC 1395y(b)(8).

Pursuant to 42 USC 1395y(b)(8), defined Responsible Reporting Entities ("RREs") must report claims to CMS in the manner and time specified by the statute. If a global resolution with CMS cannot be reached, the Tort Trustee is authorized to enter into a separate agreement with each RRE to report on their behalf and if a separate agreement with an RRE is not reached, the Tort Trustee shall provide all of the information required for proper reporting under 42 USC 1395y(b)(8) to the appropriate RRE(s) or their authorized agent before disbursing any funds to any Tort Trust Beneficiary. If a global resolution is not reached and the Tort Trustee does not enter into an agency agreement with the appropriate RRE(s) before disbursing any funds to any Tort Trust Beneficiary (i) the Tort Trustee will collect the Tort Trust Beneficiary's first name, last name, date of birth, gender, social security number and any other information required for proper reporting of the claim to CMS pursuant to 42 USC 1395y(b)(8) and the Medicare Mandatory Insurer Reporting User Guide; and (ii) the Tort Trustee will provide all of the information required for reporting to the RREs within five (5) days of any Final Determination (as that term is used in the Claims Resolution Facility Procedures) of any claim.

In addition, if a global resolution with CMS cannot be reached, before disbursing any funds to any Tort Trust Beneficiary, (i) the Tort Trustee shall determine, or retain an appropriately qualified firm to determine whether any Conditional Payment has been made to or on behalf of the Tort Trust Beneficiary to whom a distribution of Tort Trust Assets will be made, and if any Conditional Payment has been made to or on behalf of such a Tort Trust Beneficiary, the Tort Trustee shall, within the time period called for by the Medicare Act, (a) reimburse the Medicare Trust fund, the appropriate Medicare plan or their authorized contractor for the appropriate amount and (b) submit the required information for the Tort Trust Beneficiary to the appropriate agency of the United States government; and (ii) the Tort Trustee shall otherwise comply with any requirements (including, but not limited to, any reporting or payment requirements) of any other federal or state governmental health insurance program and any state's Medicaid or Workers Compensation statute. Prior to the Tort Trustee reimbursing any Medicare Part A, B, C and D plan requiring repayment the Tort Trustee shall provide notice of the existence of any Conditional Payment(s) and/or other lien(s) to the Tort Trust Beneficiary and, if applicable, his or her attorney. The Tort Trust Beneficiary and/or his or her attorney may elect to negotiate the amount of the alleged conditional payments within 120 days of notice from the Tort Trustee, or prior to any deadline imposed by the Medicare Part A, B, C and D for reimbursement, whichever is sooner. If the Tort Trust Beneficiary or his or her attorney elect not to negotiate the alleged lien amounts, or the other lien(s) are not resolved within the time periods specified, with the Tort Trust Beneficiary's consent, the Tort Trustee may utilize the firm with experience in resolving liens to satisfy the Tort Trust Beneficiary's obligations represented by the Conditional

Payment(s) and/or other lien(s). Upon receiving confirmation of the final Medicare Part A, B, C and D amount requiring repayment, the Tort Trustee will reimburse the appropriate Medicare Part A, B, C and D plan or their authorized contractor. Any payments made to resolve such obligations of the Tort Trust Beneficiary, together with the fees paid to the lien resolution firm, shall be deducted from the Tort Trust Beneficiary's distribution of Tort Trust Assets prior to disbursement of the balance to the Tort Trust Beneficiary or his or her counsel.

The Trustee, the Post-Effective Date Debtor and the Post-Confirmation Officer shall have no responsibility or liability for (i) the creation, existence, operation or administration of the Tort Trust; (ii) any acts or omissions of the Tort Trustee in administering the Tort Trust; (iii) any reimbursement and reporting obligations under the Medicare Act or any state's Medicaid or Workers Compensation statute; or (iv) any payment or non-payment of Claims. The Tort Trust shall indemnify and hold harmless the Trustee, the Post-Effective Date Debtor and the Post- Confirmation Officer from any and all claims, losses, causes of action, demands, liabilities, expenses, fees, including, but not limited to, attorneys' fees, and costs of any kind arising from or relating to (i) the creation, existence, operation or administration of the Tort Trust; (ii) any acts or omissions of the Tort Trustee in administering the Tort Trust; (iii) any reimbursement or reporting obligations under the Medicare Act or any state's Medicaid or Workers Compensation statute or (iv) any payment or non-payment by the Tort Trust to any Tort Trust Beneficiary. Prior to making any Tort Trust Distribution, the Tort Trust shall retain sufficient funds to meet the fees, costs and expenses of the Tort Trust.

***Resolving Liens Other than Imposed By the Medicare Act and States' Medicaid and Worker Compensation Statutes***. Before disbursing any Tort Trust Assets to a Tort Trust Beneficiary, the Tort Trustee shall ensure that other liens that the Tort Trustee has received notice of have been resolved or have been otherwise satisfied. To that end, the Tort Trustee shall provide notice of the existence of any such lien(s) to the Tort Trust Beneficiary and, if applicable, his or her attorney, and it shall be the Tort Trust Beneficiary's (or his or her attorney's) responsibility to resolve such lien(s) against the Tort Trust Beneficiary's anticipated distribution of Tort Trust Assets within 120 days of notice from the Tort Trustee. If the lien has not been settled or otherwise resolved within this 120 day time period, with the Tort Trust Beneficiary's consent, the Tort Trustee may retain a firm with experience in resolving liens to satisfy the Tort Trust's Beneficiary's obligations as represented by the lien(s). Any payments made to resolve such lien(s), together with the fees paid to the lien resolution firm, shall be deducted from the Tort Trust Beneficiary's distribution of Tort Trust Assets prior to disbursement of the balance.

3.     The Tort Trustee shall provide the Parties written evidence of satisfaction of all liens within thirty (30) days of payment of same.

4.     The parties to the Agreement are intended beneficiaries of this Addendum No. 2.

5.     Nothing in this Addendum No. 2 is intended to or does modify the Agreement in any respect.

*Signature Page to Addendum No. 2 to Settlement and Release Agreement*

> **PAUL D. MOORE, AS CHAPTER 11**
> **TRUSTEE FOR**
> **NEW ENGLAND COMPOUNDING**
> **PHARMACY, INC.**
> **D/B/A NEW ENGLAND COMPOUNDING**
> **CENTER**
> **AND NOT INDIVIDUALLY**

*Signature Page to Addendum No. 2 to Settlement and Release Agreement*

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NEW ENGLAND COMPOUNDING PHARMACY, INC., BY AND THROUGH ITS COUNSEL AND CO-CHAIRS**

BROWN RUDNICK LLP

By:

David J. Molton, Esq.  (admitted *pro hac vice*)
Daniel J. Saval, Esq. (BBO #653906)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com
dsaval@brownrudnick.com

and

William R. Baldiga, Esq.  (BBO #542125)
Kiersten A. Taylor, Esq. (BBO #681906)
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
wbaldiga@brownrudnick.com
ktaylor@brownrudnick.com

*Counsel to the Official Committee of Unsecured Creditors of New England Compounding Pharmacy, Inc.*

Page 5 of 6

*Signature Page to Addendum No. 2 to Settlement and Release Agreement*

ANDREWS & THORNTON

By: _____
Anne Andrews, Esq.
John C. Thornton, Esq.
Karren Schaeffer, Esq.
2 Corporate Park, Ste. 110
Irvine, CA 92606
Telephone: 949 748-1000
aa@andrewsthornton.com
jct@andrewsthornton.com
kschaeffer@andrewsthornton.com

*Counsel for Official Committee of Unsecured*
*Creditors of New England Compounding*
*Pharmacy, Inc. Member and Co-Chair, Katrina*
*Eldreth, obo Ari Gomez*

COHEN PLACITELLA & ROTH P.C.

By: _____
Michael Coren, Esq.
Harry Roth, Esq.
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: 215 567-3500
mcoren@cprlaw.com
hroth@cprlaw.com

*Counsel for Official Committee of Unsecured*
*Creditors of New England Compounding*
*Pharmacy, Inc. Member and Co-Chair,*
*Meghan Handy*

61832688 v10-WorksiteUS-030764/0001

Page 6 of 6

*Signature Page to Addendum No. 2 to Settlement and Release Agreement*

**ANDREWS & THORNTON**

By: _____

Anne Andrews, Esq.
John C. Thornton, Esq.
Karren Schaeffer, Esq.
2 Corporate Park, Ste. 110
Irvine, CA 92606
Telephone: 949 748-1000
aa@andrewsthornton.com
jct@andrewsthornton.com
kschaeffer@andrewsthornton.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair, Katrina
Eldreth, obo Ari Gomez*

**COHEN PLACITELLA & ROTH P.C.**

By: _____

Michael Coren, Esq.
Harry Roth, Esq.
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: 215 567-3500
mcoren@cprlaw.com
hroth@cprlaw.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair,
Meghan Handy*

61832688 v10-WorksiteUS-030764/0001