# **EXHIBIT 8**

**Shareholder Escrow and Control Agreement**

## ESCROW AND CONTROL AGREEMENT

This ESCROW AND CONTROL AGREEMENT (this "Agreement") is dated as of the 20th day of August, 2014, by and among:

(a) Paul D. Moore, in his capacity as chapter 11 trustee (together with any successors thereto, including any Estate Representative (as defined below), the "Trustee") for the estate of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center (the "Debtor" or "NECC") appointed in the chapter 11 case of NECC (the "Chapter 11 Case"), Case No. 12-19882, pending in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), and not individually;

(b) Barry and Lisa Cadden (together, the "Caddens");

(c) Carla Conigliaro;

(d) Gregory Conigliaro (together with the Caddens and Carla Conigliaro, the "Contributors"); and

(e) Citizens Bank, N.A., as escrow agent (the "Escrow Agent").

Each of the Trustee, the Contributors and the Escrow Agent are defined as a "Party" and collectively as the "Parties."

## GENERAL PURPOSE

This Escrow and Control Agreement is established to hold and distribute all Escrowed Funds and Tax Escrowed Funds.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## DEFINITIONS

"Additional Contributions" means, inclusive and collectively,

(a) seventy-five percent (75%) of the Pharmaceutical Entity Distributions;

(b) one hundred percent (100%) of any and all Assets determined on or prior to the second anniversary of the Plan Effective Date to be Non-Disclosed Assets and the proceeds thereof;

(c) all interests of each Contributor in policies of insurance or rights therein that provide, or may provide, coverage for NECC, any Contributor, or any Affiliated Entities, in connection with, relating to or arising from the NECC Claims (the "Insurance Policies");

(d)     all proceeds of the Insurance Policies, other than the proceeds of said policies that represent reimbursement or payment of the Contributors or Affiliated Entities' defense costs unless expressly agreed to by the Contributors in writing; and

(e)     the Tax Contributions.

"Adversary Proceeding" means the action captioned *Official Committee of Unsecured Creditors v. Cadden, et al.*, Adv. Pro. 13-01040-JMB (Bankr. D. Mass).

"Affiliated Entities" means the entities set forth in **Exhibit A** to the Funding Agreement.

"Ameridose" means Ameridose LLC.

"Asset" means any interest in any property held, whether outright or beneficially, by any Contributor and/or that Contributor's spouse as of the Disclosure Date plus any property transferred by the Contributor and/or the Contributor's spouse to or for the benefit of any members of his or her family or other Affiliated Entities during the period from January 1, 2012 through December 21, 2012.

"Bankruptcy Code" means chapter 11 of title 11 of the United States Code.

"Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court.

"Base Payment" means: (a) in the case of the Caddens, $21,000,000; (b) in the case of Carla Conigliaro, $24,000,000; and (c) in the case of Gregory Conigliaro, $2,750,000.

"Business Day" means any day that is not a Saturday, a Sunday or a federal holiday in the United States of America.

"Cash Additional Contribution" means Additional Contribution in the form of cash or cash equivalents.

"Claim(s)" means "claim" as defined in section 101(5) of the Bankruptcy Code.

"Committee" means the Official Committee of Unsecured Creditors appointed in the chapter 11 case of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center, Case No. 12-19882, pending in the Bankruptcy Court.

"Confirmation Order" means an order of the Bankruptcy Court approving the Plan.

"Contributions" means, collectively, the Initial Plan Deposits plus the Additional Contributions.

"Contributor and Affiliate Released Parties" means the Contributors, and the respective spouses, children, parents, and other nuclear family members of each Contributor, all trusts under which the Contributors or their spouses or family members are settlors, trustees, or beneficiaries, the Affiliated Entities, and any other entities in which the Contributors' spouses,

2

children or other nuclear family members hold a controlling interest, and those entities' successors, assigns, and predecessors.

"Contributor Judgment" means a Final Order granting judgment for the Contributors and against the Trustee or acting plaintiff in the Adversary Proceeding on all counts and claims set forth in the Adversary Proceeding.

"Court Cases" means any and all cases, Claims, and causes of action currently pending or which may be brought in any forum against NECC, any or all of the Contributors, or any and all of the Contributor and Affiliate Released Parties, any or all of the Affiliated Entities, or any Third-Party Defendants, that involve, arise from, or relate to NECC or the NECC Claims, including, but not limited to, those pending in the MDL Proceeding or the Adversary Proceeding.

"Disclosure Date" means the date of a Contributor's Financial Disclosure, which, in the interests of clarity, for Carla Conigliaro was as of May 1, 2013; for Barry and Lisa Cadden was as of November 1, 2013 and for Gregory Conigliaro, was as of February 28, 2014.

"Disclosure Statement" means the disclosure statement to be filed in connection with the Plan, pursuant to Section 1125 of the Bankruptcy Code, in accordance with the Funding Agreement.

"Disclosure Statement Motion" means a motion to be filed with the Bankruptcy Court requesting approval of the form of Disclosure Statement, in accordance with the Funding Agreement.

"Disclosure Statement Order" means the order of the Bankruptcy Court approving the Disclosure Statement Motion, the Disclosure Statement, and the proposed solicitation procedures for the Plan set forth therein.

"Escrow Accounts" has the meaning set forth in Section 1(d).

"Escrowed Funds" has the meaning set forth in Section 1(b).

"Estate Parties" means the Trustee, the Debtor, the Debtor's bankruptcy estate in the Chapter 11 Case, the Committee, the Estate Representative, and each of their respective successors and assigns.

"Estate Representative" means the Trustee or any successor in interest to the Trustee, whether such successor is appointed under the Plan, Confirmation Order or otherwise.

"Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the applicable subject matter hereof which has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending, or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or

3

rehearing was sought or (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

"Final Order Condition" means the Confirmation Order being a Final Order.

"Final Order Notice" has the meaning set forth in Section 3(a)(i).

"Final Refund" has the meaning set forth in Section 2(c)(ii).

"Financial Disclosures" means, with regard to each Contributor, all documents relating to the Assets of the Contributor and/or the Contributor's spouse provided to the Trustee and/or the Trustee's professionals.

"Funding Agreement" means that certain Plan Support and Funding Agreement, dated as of May 2, 2014, by and among the Trustee and the Contributors, attached hereto as **Exhibit A**.

"Funding Agreement Parties" means the Trustee and the Contributors, as parties to the Funding Agreement.

"Indemnitees" has the meaning set forth in Section 5(b).

"Indemnitors" has the meaning set forth in Section 5(b).

"Initial Plan Deposits" means in respect of each Contributor or Contributors, if married, that Contributor's or Contributors' Base Payment plus any Cash Additional Contributions realized by or on behalf of the Contributor or Contributors as of the date the Rule 9019 Order enters.

"Interim Payment" means funds in an amount equal to (A) $10 million plus (B) the lesser of the amount equal to forty-seven and one half percent (47.5%) of the costs incurred by the Trustee in the copying and service of the Rule 9019 Motion and the Plan Documents and their respective associated documents and $50,000.

"Liabilities" has the meaning set forth in Section 5(b).

"Main Escrow" has the meaning set forth in Section 1(b).

"Main Escrow Account" has the meaning set forth in Section 1(b).

"MDL Proceeding" means the proceedings currently pending under the caption *In re New England Compounding Pharmacy Cases Litigation*, MDL No. 2419, Case No. 13-cv-02419 (D. Mass.)

"MPA" means methylprednisolone acetate and products containing methylprednisolone acetate.

"NECC Claims" means all Claims, rights, causes of action, cases, demands, damages, costs, compensation, contribution, or claims for indemnification of any person or entity including, but not limited to, the Plaintiffs, the Debtor, the NECC Parties, and the Third-Party Defendants, as against any of the Contributors or any of the Contributor and Affiliate Released Parties, on account of the design, compounding, marketing, sale, shipment, advertising, supply, production, formulation, use, labeling and/or injection of any product, including, but not limited to, MPA, produced, compounded, dispensed and/or sold by NECC, by any of the Third-Party Defendants, or any of the Contributor and Affiliate Released Parties, and including, but not limited to, claims alleging breaches of fiduciary duty, fraudulent transfers, or failures to act by any of the Contributors or any of the Contributor and Affiliate Released Parties, and, whether or not those claims or causes of action have been asserted against NECC, any of the Contributors, or any of the Contributor and Affiliate Released Parties, in the Court Cases or otherwise.

"NECC Parties" means the Estate Parties, the PSC, all current or future holders of NECC Claims and any parties acting on their behalf, all current or future Plaintiffs and any parties acting on their behalf, all current or future Third-Party Defendants, and their respective insurers, successors, assigns, principles, agents, and representatives in interest.

"Net Tax Refunds" means: Federal, state and local tax refunds received, regardless of when received, by any of the Contributors and their spouses (if married), (i) resulting from the payment of the Base Payments, plus the payment of the Additional Contributions but excluding Tax Contributions; and (ii) resulting from the disposition of assets or stock (or limited liability company interests) of, or operating losses generated by, the Pharmaceutical Entities: (x) with respect to Ameridose, in 2014 and in any later year or years (or portion thereof) that ends on the date that is eighteen (18) months following the Plan Effective Date; and (y) with respect to any other Pharmaceutical Entities, in 2014 and in any later year or years (or portion thereof) that ends on the date that is twelve (12) months following the Plan Effective Date (collectively, "Refunds");

less

reasonable costs and expenses paid by the Contributors and their spouses (to the extent not reimbursed or reimbursable by insurance or otherwise) in filing and defending their rights to any Refunds;

and increased by

all interest income paid by a governmental authority with respect to any Refunds;

provided however that none of the following shall be included in the definition of "Net Tax Refunds": (a) any tax refund received by a Contributor attributable to the Contributor's or Contributors' funding of any or all of the Tax Contributions; (b) any tax refund received by any of the Contributors attributable to the disposition of assets or stock of, or operating losses generated by, any of the Affiliated Entities that are not Pharmaceutical Entities; and (c) any tax refund received, regardless of when received, by any of the Contributors attributable to the disposition of assets or stock of, or operating losses generated by, the Pharmaceutical Entities: (x) in the case of Ameridose, prior to the year 2014 and after the date that is eighteen (18)

months after the Plan Effective Date, and (y) in the case of any other Pharmaceutical Entities, prior to the year 2014 and after the date that is twelve (12) months after the Plan Effective Date.

"Non-Disclosed Asset" means (i) any Asset having a realizable value equal to or exceeding $100,000 as of the Contributor's Disclosure Date and/or (ii) any combination of Assets to the extent that the aggregate realizable value of those Assets equals or exceeds $100,000, in either case, that was not or were not disclosed or included in the Assets disclosed in the Financial Disclosures on the Disclosure Date or otherwise disclosed in writing to the Trustee prior to the Execution Date. An Asset described in the Financial Disclosures shall not be a Non-Disclosed Asset if the asset is disclosed or included in a Financial Disclosure regardless of the estimate of value for such asset in such Financial Disclosure.

"Non-QSF Accounts" has the meaning set forth in Section 6(a).

"Pharmaceutical Entities" means the Affiliated Entities listed on **Exhibit B** to the Funding Agreement.

"Pharmaceutical Entity Distributions" means the net, after payment of reasonable and customary expenses incurred in connection with the sale and after payment of all taxes attributed to or incurred by the Contributors on account of the sale or other disposition of the Pharmaceutical Entities, proceeds realized or received by each of the Contributors on account of their Claims against or equity interests in the Pharmaceutical Entities from the sale or other disposition of the equity interests in or assets of any of the Pharmaceutical Entities, other than payments of the amounts owed by the Pharmaceutical Entities to the Contributors for wages, employee benefit or similar obligations arising prior to the date of the Funding Agreement solely as set forth in the Financial Disclosures. For the avoidance of doubt, Pharmaceutical Entity Distributions shall not include or be reduced by payments made to the Trustee by any insurers of the Pharmaceutical Entities.

"Plaintiffs" means the plaintiffs in the Court Cases, plus any holders, present or future, of NECC Claims.

"Plan" means a chapter 11 plan for the Debtor to be proposed by the Trustee or proposed jointly by the Trustee and the Committee, in accordance with the Funding Agreement.

"Plan Documents" means the Disclosure Statement, the Plan, the Disclosure Statement Motion, the Disclosure Statement Order, the Confirmation Order, and any and all supplements, exhibits, and amendments thereto.

"Plan Effective Date" means the later of: (i) the first Business Day following fourteen (14) days after the Bankruptcy Court's entry of the Confirmation Order, provided that a court of competent jurisdiction has not entered a stay of the Confirmation Order as of such date (in which instance, the Plan Effective Date will not occur until such stay is dissolved), and (ii) the first Business Day on which all other conditions to the effective date of the Plan have been satisfied or waived.

"Plan Escrowed Funds" has the meaning set forth in Section 1(e).

"PSC" means the Plaintiffs' Steering Committee appointed in the multi-district litigation captioned *In re New England Compounding Pharmacy Cases Litigation*, MDL No. 2419, Case No. 13-cv-02419 (D. Mass.).

"Qualified Settlement Account" has the meaning set forth in Section 6(a).

"Rule 9019 Motion" means the motion filed by the Trustee pursuant to the Funding Agreement requesting that the Bankruptcy Court, *inter alia*, approve the Funding Agreement and the Trustee's entry into this Agreement.

"Rule 9019 Order" means the order of the Bankruptcy Court granting the relief requested in the Rule 9019 Motion.

"Security Balance" has the meaning set forth in Section 2(a).

"Service Parties" has the meaning set forth in Section 2(a).

"Settlement" means the terms of the compromise embodied in the Funding Agreement.

"Substitute Lien" means, collectively, the first-priority lien and security interest granted by the Contributors to the Trustee, on behalf of the Debtor's estate, in any interest now held or hereinafter acquired by the Contributors in (i) the Escrow, (ii) the Plan Escrowed Funds and (iii) property, including property that constitutes general intangibles under the UCC, that at any time constitutes Additional Contributions (including, without limitation, Pharmaceutical Entity Distributions and Tax Contributions) and the proceeds thereof, on the terms and conditions set forth in the Funding Agreement.

"Tax Contributions" means, for each Contributor, an amount equal to ninety percent (90%) of Net Tax Refunds received by the Contributor and the Tax Return Spouse.

"Tax Escrow" has the meaning set forth in Section 1(c).

"Tax Escrow Account" has the meaning set forth in Section 1(c).

"Tax Escrowed Funds" has the meaning set forth in Section 1(c).

"Tax Return Spouse" means the spouse of a married Contributor that executes the Tax Return Spouse Consent Agreement.

"Tax Return Spouse Consent Agreement" means the agreement described in Section 10.3(k) of the Funding Agreement in the form as executed by each Tax Return Spouse.

"Termination" means termination of the Funding Agreement pursuant to Section 11 thereof.

"Third-Party Defendants" means all current, future, or potential defendants in the Court Cases, other than the Contributors and the Contributor and Affiliate Release Parties.

7

"Trustee Judgment" means entered a Final Order granting judgment for the Estate Representative or other plaintiff in the Adversary Proceeding.

"UCC" has the meaning set forth in Section 1(d).

## GOVERNING PROVISIONS

### Section 1.    Appointment of Escrow Agent and Establishment of Escrow Account

(a)    The Contributors and the Trustee hereby appoint the Escrow Agent as the escrow agent under this Agreement, and the Escrow Agent accepts such appointment according to the terms and conditions set forth herein.

(b)    The Escrow Agent shall hold all Contributions transferred to it, other than those Contributions constituting and designated as Tax Contributions (together with any interest or income accrued thereon, the "Escrowed Funds") received from the Trustee or the Contributors in escrow in the following interest bearing account (the "Main Escrow Account" or "Main Escrow"), subject to all provisions of this Agreement:

Account Name:    Citizens Bank, N.A. as Escrow Agent for Paul D. Moore as Chapter 11 Trustee for Estate of New England Compounding Pharmacy, Inc d/b/a New England Compounding Center_Main Escrow

| | |
|---|---|
| Sort Code: | [_____] |
| Account No: | [_____] |
| Swift Code: | CTZIUS33 |
| IBAN: | [ _____] |
| Bank Name: | Citizens Bank, N.A. |
| Address: | 10 Tripps Lane, RTL 125, Riverside RI 02915 |

(c)    The Escrow Agent shall hold all Contributions transferred to it constituting and designated as Tax Contributions (together with any interest or income accrued thereon, the "Tax Escrowed Funds") in escrow in the following interest bearing account (the "Tax Escrow Account" or "Tax Escrow"), subject to all provisions of this Agreement:

Account Name:    Citizens Bank, N.A. as Escrow Agent for Paul D, Moore as Chapter 11 Trustee for Estate of New England Compounding Pharmacy, Inc d/b/a New England Compounding Center        Tax Contributions_Escrow

| | |
|---|---|
| Sort Code: | [_____] |
| Account No: | [_____] |
| Swift Code: | CTZIUS33 |
| IBAN: | [_____] |
| Bank Name: | Citizens Bank, N.A. |

8

Address:        10 Tripps Lane, RTL 125, Riverside, RI 02915

(d)     All parties agree that the Main Escrow Account and the Tax Escrow Account (collectively, the "Escrow Accounts") are "deposit accounts" within the meaning of Article 9 of the Uniform Commercial Code as enacted in the Commonwealth of Massachusetts (the "UCC").

(e)     The Funding Agreement Parties agree that the Escrow Accounts and the Escrowed Funds and the Tax Escrowed Funds on deposit therein (collectively, the "Plan Escrowed Funds") shall be subject to the Substitute Lien on the terms and conditions set forth in the Funding Agreement.

## Section 2. Release of Plan Escrowed Funds.

The Escrowed Funds shall only be released by the Escrow Agent as follows (and the following shall constitute instructions of the Trustee):

(a)     No Termination of Funding Agreement.

(i)     On the fourth (4th) Business Day following the Escrow Agent's receipt from the Trustee or duly acting Estate Representative (hereinafter referred to as the "Notice Party") of written notice: (a) of the occurrence of the Plan Effective Date and further indicating that a Termination has not occurred; and (b) that either the Final Order Condition has been satisfied or the Funding Agreement Parties have waived the Final Order Condition ("Final Order Notice"), that has been simultaneously served by the Notice Party on the Committee (or its successors in interest, if any), the Contributors, and the PSC (collectively, the "Service Parties"), the Escrow Agent shall release all Escrowed Funds from the Main Escrow, plus any interest or income accrued thereon, to the Trustee, for such use and payment as is ultimately provided for in the Plan and Confirmation Order;

(ii)     On the fourth (4th) Business Day following the Escrow Agent's receipt from the Notice Party of written notice: (a) of the occurrence of the Plan Effective Date and further indicating that a Termination has not occurred; and (b) that the Confirmation Order is the subject of a pending appeal but that no stay pending appeal has issued, that has been simultaneously served by the Notice Party on the Service Parties, the Escrow Agent shall release to the Trustee from the Main Escrow funds equal to the Interim Payment, in accordance with the Notice Party's instructions as to the amount of the Interim Payment to be released from the Main Escrow contained within the notice;

(iii)     The balance of the Escrowed Funds in the Main Escrow after release of the Interim Payment to the Trustee in accordance with the preceding provision, together with any interest or income accrued thereon, shall remain held by the Escrow Agent in the Main Escrow until receipt by the Escrow Agent of a properly served Final Order Notice and, in that instance, shall be released in accordance with Section 2(A)(i) above.

(b)     Termination of Funding Agreement.

In the event that the Trustee notifies the Escrow Agent of the Termination of the Funding Agreement, the balance of the Escrowed Funds in the Main Escrow (together with any

9

interest or income accrued thereon, the "Security Balance") shall only be released as follows (and the following shall constitute instructions of the Trustee):

(i)     Within fourteen (14) Business Days after receipt by the Escrow Agent from the Contributors of written notice of the entry of a Contributor Judgment, that was simultaneously served by the Contributors on the Notice Party, the PSC and the Committee (or its successors in interest, if any), the Escrow Agent shall release the entirety of the Security Balance to the Contributors, ratably, in accordance with the instructions provided by the Contributors;

(ii)    Within fourteen (14) Business Days after receipt by the Escrow Agent from the Notice Party of written notice of the entry of a Trustee Judgment, that the Trustee has simultaneously served on the Service Parties, the Escrow Agent shall release from the Main Escrow funds equal to the lesser of: (1) the total amount of the Trustee Judgment; and (2) the balance of the Security Balance, to the Trustee for such use and payment as is ultimately provided for in the Plan and Confirmation Order, with any remaining funds held in the Main Escrow after payment towards the Trustee Judgment to be distributed by the Escrow Agent to the Contributors, ratably, with all such payments to be made in accordance with the instructions provided by the Notice Party and the Contributors, if receiving funds pursuant to this Section 2(B)(ii); or

(iii)   As provided in a joint written directive to the Escrow Agent signed by the Trustee and each Contributor.

(c)     Release of Tax Escrowed Funds

Notwithstanding anything to the contrary in this Agreement, the Plan Escrowed Funds that constitute Tax Escrowed Funds held by the Escrow Agent shall be subject to the Substitute Lien on the terms provided in this Agreement and released only as follows (and the following shall constitute instructions of the Trustee):

(i)     On or before fourteen (14) Business Days after receipt by the Escrow Agent from the Trustee of written notice of the entry of a final non-appealable disallowance (full or partial) by a state, local or federal taxing authority of any Refund that gave rise to a Tax Contribution, that has been simultaneously served on the Notice Party, the PSC, and the Committee (or its successors in interest, if any), the Escrow Agent shall distribute from the Tax Escrowed Funds to the Contributor or Contributors (if married) whose Refund was disallowed (in whole or in part) a payment equal to ninety percent (90%) of the amount owing to the applicable taxing authority on account of the full or partial disallowance of such Net Tax Refund (but only to the extent of such disallowance and only to the extent actually received by the Escrow Agent as Tax Contributions), plus earnings on the foregoing amount, in the amounts instructed by the Trustee;

(ii)    On or before fourteen (14) Business Days after receipt by the Escrow Agent from the Trustee of written notice of a final non-appealable allowance by a state, local or federal taxing authority of a Refund that gave rise to a Tax Contribution ("Final Refund"), that has simultaneously been served on the Service Parties, the Escrow Agent shall release the

amount of the Tax Contribution based on the Final Refund, and all applicable earnings thereon, to the Trustee for such use and distribution as provided for in the Plan and Confirmation Order, in the amounts instructed by the Trustee; or

        (iii)    Within fourteen (14) Business Days after receipt by the Escrow Agent from the Trustee of written notice of the fourth (4th) anniversary of the receipt by the Trustee of the Tax Contributions from any Contributor or Contributor spouse, that has been simultaneously served on the Service Parties, the entire amount of such Tax Contributions, and applicable earnings thereon, shall be released by the Escrow Agent to the Trustee for such use and distribution as provided for in the Plan and Confirmation Order.

      (d)    <u>No Contrary Authority or Direction</u>.  The Escrow Agent agrees to comply in all respects with the instructions delivered to the Escrow Agent by the Trustee governing the release of the Plan Escrowed Funds without further consent of the Contributors (provided that such instructions shall be consistent with the provisions of this Agreement and the Funding Agreement in all respects), and in that regard, shall not permit the withdrawal or other disposition of any funds in the Escrow Accounts by any of the Contributors other than as expressly required above without the Trustee's prior written consent, nor shall the Escrow Agent comply with instructions or other directions concerning the Escrow Accounts or the disposition of Escrowed Funds originated by a third party without the prior written consent of the Parties. For the avoidance of doubt, the Escrow Agent represents that it has not heretofore agreed with any third party to comply with instructions or other directions concerning the Escrow Accounts or the disposition of the Plan Escrowed Funds originated by such third party.

      (e)    <u>Disputes</u>.  The Escrow Agent shall comply with the instructions of the Trustee with regard to release of Plan Escrowed Funds delivered in accordance with this Agreement unless the Trustee's instructions are disputed by any Party to this Agreement in writing delivered to all Parties. In the event of dispute or inconsistent instructions from the Parties, the Escrow Agent may refuse to take further action until directed to do so by joint instruction of the Parties or until the Escrow Agent has received a final determination from the Bankruptcy Court or other court of competent jurisdiction as to where to direct the Plan Escrowed Funds. The Escrow Agent shall have the right to interplead the Parties in the Bankruptcy Court (or, if the Bankruptcy Court determines that it lacks or declines to exercise jurisdiction over the matter, any other court of competent jurisdiction located in Boston, Massachusetts) and request such court determine the respective rights of such Parties, and the reasonable fees, costs and expenses of the Escrow Agent in connection with any such proceedings shall be paid solely from the Plan Escrowed Funds. The same procedure set forth in this paragraph will apply to inconsistent claims or demands of the Parties delivered to the Escrow Agent with regard to the Tax Escrowed Funds whether the Funding Agreement has terminated or otherwise; otherwise, the Escrow Agent shall release the Tax Escrowed Funds in accordance with any undisputed notice and instructions. The Contributors agree not to dispute any instructions served by the Trustee pursuant to Section 2 that are delivered in accordance with the Funding Agreement.

      (f)    <u>Method of Payment</u>.  All payments shall be made by check, unless a timely request for payment by wire transfer is requested by the recipient of funds from the Escrow Agent, with the wire transfer fee to be borne by the recipient.

(g)     Funding Agreement Controls.  As among the Funding Agreement Parties only, in the event of any inconsistency between the terms of this Section 2 and the Funding Agreement (including, but not limited to, Sections 3.3 and 10.2 thereof), the Funding Agreement shall control.

**Section 3.     Control Account and Investment.**

(a)     It is the intent of the Parties that the Trustee have control over the Main Escrow Account and the Tax Escrow Account within the meaning of Section 9-104 of the UCC, and that the Substitute Lien attach and be perfected as to the Plan Escrowed Funds, pending a release of the Substitute Lien.  The Contributors consent to the control by the Trustee over the Main Escrow and the Tax Escrow for the purposes set forth in and in accordance with the Funding Agreement.

(b)     The Escrow Agent shall hold, invest, reinvest, manage, and administer all Plan Escrowed Funds in accordance with the instructions of the Trustee that are made consistent in all respects with this Agreement; provided, that, in the absence of any such instructions, the Plan Escrowed Funds shall be invested in United States Treasury Bills; provided, further, that unless the Bankruptcy Court determines that the requirements of Section 345 of the Bankruptcy Code do not apply or are waived as to the Plan Escrowed Funds, the Plan Escrowed Funds shall be invested in a manner consistent with those requirements.

**Section 4. Duties and Rights of Escrow Agent.**

(a)     The Parties acknowledge and agree that the Escrow Agent (i) shall not be charged with knowledge of any agreement or instrument other than this Agreement, or responsible for determining compliance therewith, and shall not otherwise be bound thereby, (ii) shall be obligated to perform only those duties as are expressly set forth in this Agreement on its part to be performed, and no implied duties or obligations of any kind shall be read into this Agreement against the Escrow Agent, and (iii) shall not be obligated to take any legal or other action hereunder which in its reasonable judgment might cause it to incur any expense or liability unless it shall have been furnished with indemnification acceptable to the Escrow Agent, or which, in its judgment, might subject it to any liabilities or obligations in its individual capacity.

(b)     All of the duties of the Escrow Agent shall be ministerial in nature and in no event shall the Escrow Agent be deemed to owe any fiduciary duty to any Party.  The Contributors and the Trustee each hereby acknowledge that the Escrow Agent does not hereby provide any investment advice of any nature, including as to the safety or security of the Plan Escrowed Funds as deposited with any financial institution.

(c)     The Escrow Agent may rely and shall be protected in acting or refraining from acting upon any written notice, instruction or request furnished to it hereunder and believed by it in good faith to be genuine and to have been signed or presented by the proper Party or Parties.

(d)     In the administration of it duties, the Escrow Agent may execute any of its powers and perform its duties hereunder directly or through agents or attorneys and may consult with

counsel, accountants and other skilled persons to be selected and retained by it. Notwithstanding anything to the contrary contained in this Agreement, the Escrow Agent shall not be liable for any action taken or omitted to be taken by it hereunder or anything done, suffered or omitted by it in accordance with the advice or opinion of such counsel, accountants or other skilled person unless a court of competent jurisdiction by a final, non-appealable order determines that the subject loss to any of the Parties hereto was caused by Escrow Agent's gross negligence or willful misconduct.

(e)    In order to comply with any obligations of financial institutions under applicable law to obtain, verify and record information that identifies each person who opens an account, including particularly laws designed to fight the funding of terrorism and money laundering activities, the Escrow Agent may be entitled to require documentation from any Party to verify its formation, existence and identity, including, but not limited to, licenses, passports, financial statements, and other identification and authorization documents, and the Trustee and the Contributors shall each comply with any such reasonable request.

(f)    The Escrow Agent agrees to subordinate, and hereby does subordinate, in favor of the Trustee any security interest, lien or right of setoff it may have as to the Plan Escrowed Funds, acknowledges that neither it nor any of its subsidiaries has or will assert a lien on the Plan Escrowed Funds, and acknowledges that it has not received notice of any other security interest in the Plan Escrowed Funds, provided, however, that the Escrow Agent may hold or create liens resulting from the fees and expenses of the Escrow Agent or the indemnification obligations provided in Section 5 hereof.

(g)    Except with regard to this Agreement, the Escrow Agent has not entered (and shall not in the future enter) into any control agreement with respect to the Escrow Accounts and the Plan Escrowed Funds with any party.

(h)    Upon receipt of written notice of any lien, encumbrance or adverse claim against the Escrow Accounts or any funds credited thereto, except for the Substitute Lien, the Escrow Agent will make reasonable efforts promptly to notify the Trustee and Contributors thereof.

### Section 5.    Compensation, Reimbursement and Indemnification.

(a)    The Escrow Agent shall be entitled to be paid a fee for its services pursuant to this Agreement as set forth in **Exhibit B** hereto, and shall be reimbursed for its reasonable costs and expenses incurred in the performance of its duties hereunder (including reasonable and necessary counsel fees), which fees, costs and expenses shall be paid or reimbursed solely from the Escrowed Funds.

(b)    Subject to Section 5(c) below, the Contributors and the Trustee, solely on behalf of the Debtor's estate and not individually, (the "Indemnitors") hereby agree to indemnify and hold the Escrow Agent and its directors, officers, agents and employees and attorneys (collectively, the "Indemnitees") harmless from and against any and all claims, liabilities, losses, damages, fines, penalties and expenses, including out-of-pocket and incidental expenses and legal fees and expenses ("Liabilities") that may be imposed on, incurred by, or asserted against the Indemnitees or any of them for following any instructions or other directions upon which

13

Escrow Agent is authorized to rely pursuant to the terms of this Agreement. In addition to and not in limitation of the immediately preceding sentence, the Indemnitors also agree to indemnify and hold the Indemnitees and each of them harmless from and against any and all Liabilities that may be imposed on, incurred by, or asserted against the Indemnitees or any of them in connection with or arising out of Escrow Agent's performance under this Agreement, provided that the Indemnitees have not acted with gross negligence, engaged in willful misconduct or, with respect to 4(c) only, bad faith, in each case, as determined by a final, non-appealable order of a court of competent jurisdiction. Each of the Indemnitors hereby grants to Escrow Agent a lien on the Main Escrow, junior to the Substitute Lien in all respects, to the extent of such Indemnitor's interest therein, to secure such Indemnitor's indemnification obligations to Escrow Agent as described above.

(c)     Notwithstanding anything to the contrary in this Agreement, all amounts payable to the Indemnitees pursuant to this Section 5, including on account of the indemnification obligations in Section 5(b) above, shall be paid solely from the Plan Escrowed Funds then on deposit in the Escrow Accounts, and the Indemnitors shall have no other or further liability to the Indemnitees on account of their indemnification obligations herein; provided, further, that the Escrow Agent shall not have the right to hold back any Plan Escrowed Funds that shall otherwise be released pursuant to Section 2 hereof on account of any Liabilities or potential Liabilities that have not been finally determined as of the date of such release. Anything in this Agreement to the contrary notwithstanding, in no event shall Escrow Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. The provisions of this Section 5 shall survive the termination of this Agreement and the resignation or removal of Escrow Agent for any reason.

(d)     The Escrow Agent shall have no responsibility or liability to Contributors for complying with instructions concerning the Escrow Accounts originated by the Trustee so long as the instructions are in all respects in accordance with Section 2 above.

(e)     The terms of this Section 5 shall survive the termination of this Agreement and the distribution of all of the Plan Escrowed Funds.

### Section 6. Segregation of Plan Escrowed Funds.

(a)     Segregation. Upon direction of the Trustee, the Escrow Agent shall administer the Escrow Accounts so as to: (i) segregate and administer a portion of the Escrow Accounts as a "qualified settlement fund" within the meaning of Treasury Regulation Section 1.468B-1 for the benefit of holders of personal injury claims and wrongful death claims against the Debtor (the "Qualified Settlement Account"); and (ii) segregate and administer the remainder of the Escrow Accounts as separate accounts which may be treated for U.S. federal income tax purposes as separate reporting entities (and one or more of which may be a trust or other entity holding the assets for the benefit of the Debtor's creditors that do not hold personal injury claims or wrongful death claims against the Debtor, as reasonably determined by the Trustee or other Estate Representative) (the "Non-QSF Accounts") in all respects as consistent with this Agreement.

(b)    Expenses.  The Escrow Agent shall keep appropriate books and records with respect to the Qualified Settlement Account and the Non-QSF Accounts, shall report the income and expenses of the Qualified Settlement Account and the Non-QSF Accounts as required by generally accepted accounting standards, shall allocate shared expenses between the Qualified Settlement Account and the Non-QSF Accounts as reasonably requested by the Trustee, and shall file appropriate tax returns and reports for the Qualified Settlement Account and the Non-QSF Accounts and send appropriate statements to the beneficiaries of the Non-QSF Accounts as reasonably requested by the Trustee or other Estate Representative.  The Escrow Agent shall: (A) obtain and use a federal employer identification number for each separate reporting entity, as necessary; and (B) pay all taxes out of the Plan Escrowed Funds to the extent such taxes are due and owing by any such entity.

(c)    The Escrow Agent shall be the qualified settlement fund administrator for all tax purposes.

(d)    The Escrow Agent shall comply with the information reporting and withholding requirements applicable to the Qualified Settlement Account distributions.

### Section 7.  Resignation.

(a)    The Escrow Agent may resign as escrow agent at any time and be discharged of its duties hereunder after thirty (30) days' notice to the other Parties, but only if a successor escrow agent has been appointed by the Contributors and the Trustee prior to the effective date of the Escrow Agent's resignation.  Upon receipt of notice of resignation, the Contributors and the Trustee promptly shall use commercially reasonable efforts to designate a successor escrow agent to serve in accordance with the terms of this Agreement.  If they cannot agree on a successor escrow agent during such thirty (30) day period, the Escrow Agent shall be deemed to be solely a custodian of the Plan Escrowed Funds without further duties and the Escrow Agent may petition the Bankruptcy Court for so long as it retains jurisdiction over the Chapter 11 Case (or, if it determines that it lacks jurisdiction or declines to exercise jurisdiction over the matter, any other court of competent jurisdiction located in Boston, Massachusetts) to have a successor appointed, and the reasonable fees, costs and expenses of the Escrow Agent in connection with any such proceedings shall be paid solely from the Plan Escrowed Funds.  Any successor Escrow Agent shall execute and deliver to the predecessor Escrow Agent, the Contributors and the Trustee an instrument accepting such appointment and the transfer of the Plan Escrowed Funds, and agreeing to the terms of this Agreement, and thereupon such successor Escrow Agent shall, without further act, become vested with all the estates, properties, rights, powers and duties of the predecessor Escrow Agent as if originally named herein.

(b)    Any firm, institution or trust company with which Escrow Agent may merge or consolidate shall be the successor Escrow Agent without further act with notice of such merger to be promptly provided by the Escrow Agent to the Parties.

### Section 8.    Dispute Resolution.

In the event of any dispute with respect to the disposition of the Plan Escrowed Funds, the Escrow Agent is authorized and shall be entitled to retain in its possession without liability to

15

anyone, all or any of the Plan Escrowed Funds until such dispute shall have been settled either by the mutual written agreement of the Parties involved or by a final determination of the Bankruptcy Court for so long as it retains jurisdiction over the Chapter 11 Case (or, if it determines that it lacks jurisdiction or declines to exercise jurisdiction over the matter, any other court of competent jurisdiction located in Boston, Massachusetts) in accordance with Section 2(E) above. The Parties consent to the exclusive jurisdiction of the Bankruptcy Court for so long as it retains jurisdiction over the Chapter 11 Case (or, if it determines that it lacks jurisdiction or declines to exercise jurisdiction over the matter, any other court of competent jurisdiction located in Boston, Massachusetts) as to any dispute as to the Plan Escrowed Funds or this Agreement. The Escrow Agent may, but shall be under no duty whatsoever to, institute or defend any legal proceedings which relate to the Plan Escrowed Funds other than to promptly notify the Parties of the initiation of any such proceedings.

### Section 9. Capacity.

The Parties acknowledge that the Trustee has entered into and signed this Agreement solely in such capacity and not individually and that neither the Trustee nor his firm, partners, employees, agents, advisers or representatives shall incur any personal liability under or in connection with this Agreement.

### Section 10. No Admission or Waiver.

Nothing in this Agreement shall constitute any admission or waiver by any of the Parties of or with respect to any Party's claims, rights and/or positions, including, but not limited to, any claim that any Party may assert with respect to the Plan Escrowed Funds or the Contributions.

### Section 11. Notices; Wiring Instructions.

(a)     All communications under this Agreement shall be in writing and shall be delivered by facsimile, with delivery to immediately follow by hand, or by recognized overnight courier or by registered mail or certified mail, postage prepaid:

**Contributors:**

If to Barry Cadden and Lisa Conigliaro Cadden:

> Harold B. Murphy, Esq.
> Jonathan F.X. O'Brien, Esq.
> Murphy & King, P.C.
> One Beacon Street
> Boston, MA 02108
> hbm@murphyking.com
> jfo@murphyking.com

If to Gregory Conigliaro:

16

Christopher J. Panos, Esq.
Partridge Snow & Hahn LLC
30 Federal Street
Boston, MA 02110
cpanos@psh.com

If to Carla Conigliaro:

>   John J. Monaghan, Esq.
>   Lynne B. Xerras, Esq.
>   Holland & Knight LLP
>   10 St. James Avenue
>   Boston, MA  02116
>   john.monaghan@hklaw.com
>   lynne.xerras@hklaw.com

**Trustee:**

>   Paul D. Moore
>   Duane Morris LLP
>   100 High Street, Suite 2400
>   Boston, MA 02110
>   Telephone: (857) 488-4200
>   Fax Number:  (857) 401 3057
>   E-mail:  PDMoore@duanemorris.com

**Committee:**

>   David J. Molton, Esq.
>   Daniel J. Saval, Esq.
>   Seven Times Square
>   New York, New York 10036
>   Telephone: (212) 209-4800
>   Facsimile: (212) 209-4801
>   dmolton@brownrudnick.com
>   dsaval@brownrudnick.com

**PSC:**

>   Thomas M. Sobol, Esq.
>   Kristen Johnson Parker, Esq.
>   Hagens Berman Sobol Shapiro LLP
>   55 Cambridge Parkway, Suite 301
>   Cambridge, MA  02142
>   (617) 482-3700
>   tom@hbsslaw.com
>   kristenjp@hbsslaw.com

**Escrow Agent: Citizens Bank, N.A.**

> Jean A. Parrillo, VP
> Citizens Bank, N.A.
> 10 Tripps Lane RTL 125
> Riverside, RI 02915
> Telephone: (401)-282-3836
> Fax        (401)-455-5279
> Jean.A.Parrillo@citizensbank.com

(b)      Any notice so addressed shall be deemed to be given:  if delivered by hand, on the date of such delivery; if sent by overnight courier, on the next business day; and if mailed by registered or certified mail, on the third business day after the date of such mailing.

(c)      Any funds to be paid to or by the Escrow Agent hereunder shall be sent by wire transfer pursuant to the following instructions and allocated to the Main Escrow or the Tax Escrow in accordance with Section 1, above:

| | |
|---|---|
| Account Name: | [_____] |
| Sort Code: | [_____] |
| Account No: | [_____] |
| Swift Code: | [_____] |
| IBAN: | [_____] |
| Bank Name: | [_____] |
| Address: | [_____] |

### Section 12.   Termination.

Upon distribution by the Escrow Agent of the entire amount of the Plan Escrowed Funds, this Agreement shall terminate, except for any provisions that expressly survive termination.

### Section 13.   Effectiveness.

This Agreement, once executed, shall become effective and binding on the Parties following entry by the Bankruptcy Court of the Rule 9019 Order.

### Section 14.   Miscellaneous.

(a)      No provision of this Agreement shall be deemed amended or modified unless such an amendment or modification is in writing, dated, and executed by all of the Parties.

(b)      This Agreement shall inure to the benefit of the Parties, and shall be binding upon the Parties and their respective successors and permitted assigns.  Nothing in this Agreement, expressed or implied, is intended to confer any rights, remedies, obligations or liabilities under or

19

by reason of this Agreement on any other person or entity other than the Parties, and their respective successors and assigns. This clause does not affect any right or remedy of any person which exists or is available.

(c)     This Agreement shall be governed by, and construed according to, the laws of the Commonwealth of Massachusetts, without regard to any conflicts of law provision which would require the application of the law of any other jurisdiction.

(d)     If any court of competent jurisdiction should find any particular provision of this Agreement void, illegal or unenforceable, then that provision shall be regarded as severable and stricken from this Agreement, and the remainder of this Agreement shall remain in full force and effect.

(e)     This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument. Facsimile, .PDF or other similar electronic signatures shall be fully effective to bind the parties hereto and shall be deemed to be original signatures.

(f)     THE PARTIES HEREBY WAIVE A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING BETWEEN THEM OR THEIR SUCCESSORS OR ASSIGNS, ARISING UNDER OR IN CONNECTION WITH OR IN ANY WAY RELATED TO THIS AGREEMENT.

(g)     The Escrow Agent shall not be responsible for delays or failures in performance resulting from acts beyond its control.  Such acts shall include but not be limited to strikes, lockouts, riots, acts of war, epidemics, governmental regulations hereafter imposed, casualties, communication line failures, computer viruses or power failures.

(h)     As between the Escrow Agent, on the one hand, and the other Parties, on the other hand, this Agreement constitutes the entire agreement with respect to the subject matter herein. As between the other Parties, this Agreement and the Funding Agreement, as applicable and subject to Section 2(g) hereof, shall govern to the extent of any conflict between those agreements and any other agreement or writing.

(i)     This Agreement is intended to be and shall have the effect of a document executed under seal in accordance with the laws of the Commonwealth of Massachusetts without regard to its conflicts of laws principles.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed and delivered in his, her or its name and on his, her or its behalf as of the date first recited above.

TRUSTEE:

_____

Paul D. Moore, solely in his capacity as Trustee as aforesaid, and not individually

CONTRIBUTORS:

_____

Barry Cadden

_____

Lisa Cadden

_____

Carla Conigliaro

_____

Gregory Conigliaro

[SIGNATURES CONTINUE ON NEXT PAGE]

21

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed and delivered in his, her or its name and on his, her or its behalf as of the date first recited above.

TRUSTEE:

_____

Paul D. Moore, solely in his capacity as Trustee as aforesaid, and not individually

CONTRIBUTORS:

_____

Barry Cadden

_____

Lisa Cadden

_____

Carla Conigliaro

_____

Gregory Conigliaro

[SIGNATURES CONTINUE ON NEXT PAGE]

20

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed and delivered in his, her or its name and on his, her or its behalf as of the date first recited above.

TRUSTEE:

_____
Paul D. Moore, solely in his capacity as Trustee as aforesaid, and not individually

CONTRIBUTORS:

_____
Barry Cadden

_____
Lisa Cadden

_____
Carla Conigliaro

_____
Gregory Conigliaro

[SIGNATURES CONTINUE ON NEXT PAGE]

21

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed and delivered in his, her or its name and on his, her or its behalf as of the date first recited above.

TRUSTEE:

_____

Paul D. Moore, solely in his capacity as Trustee as aforesaid, and not individually

CONTRIBUTORS:

_____

Barry Cadden

_____

Lisa Cadden

_____

Carla Conigliaro

_____

Gregory Conigliaro

[SIGNATURES CONTINUE ON NEXT PAGE]

21

ESCROW AGENT:

CITIZENS BANK, N.A.

By: _____
        Name:      Jean A. Parrillo
        Title:       Vice President

[SIGNATURE PAGE TO ESCROW AGREEMENT]

22

# EXHIBIT A

*PLAN SUPPORT AND FUNDING AGREEMENT*

## PLAN SUPPORT AND FUNDING AGREEMENT

This Plan Support and Funding Agreement (together with all exhibits and schedules attached hereto, the "Agreement") is made and entered into as of May 2, 2014, by and among: (a) Paul D. Moore, in his capacity as duly appointed and acting chapter 11 trustee and not individually (together with any successors thereto, including any Estate Representative, as hereinafter defined, the "Trustee") in the chapter 11 bankruptcy case of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center (the "Debtor" or "NECC"), Case No. 12-19882, (the "Chapter 11 Case"), pending in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), on the one hand; and (b) Barry and Lisa Cadden (together, the "Caddens"); (c) Carla Conigliaro; and (d) Gregory Conigliaro (collectively with the Caddens and Carla Conigliaro, the "Contributors"), on the other hand.

Each of the Trustee and the Contributors are defined as a "Party" and collectively as the "Parties."

Capitalized terms not defined in this introduction or in the recitals to this Agreement shall have the meanings assigned to them in Section 1 of this Agreement.

## RECITALS

WHEREAS, on December 21, 2012 (the "Petition Date"), NECC filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court, thereby commencing the Chapter 11 Case;

WHEREAS, on January 18, 2013, the Office of the United States Trustee (the "UST") appointed an official committee of unsecured creditors in the Chapter 11 Case (the "Committee");

WHEREAS, on January 24, 2013, the Bankruptcy Court granted the Committee standing to bring certain actions on behalf of the Debtor's estate;

WHEREAS, on January 24, 2013, the Committee filed a complaint on behalf of the Debtor's estate in the action captioned *Official Committee of Unsecured Creditors v. Cadden, et al.*, Adv. Pro. 13-01040-JMB (Bankr. D. Mass) (the "Adversary Proceeding");

WHEREAS, the Contributors are defendants in the Adversary Proceeding, and Ameridose LLC ("Ameridose"), GDC Properties Management, LLC ("GDC"), and Medical Sales Management, Inc. ("MSM," and with Ameridose and GDC, the "Reach and Apply Defendants") are named as "Reach and Apply Defendants" in the Adversary Proceeding;

WHEREAS, also on January 24, 2013, the Committee filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief (the "TRO/PI Motion"), Emergency Motion for Attachment on Trustee Process (the "Trustee Process Motion"), Emergency Motion for Reach and Apply Injunction (the "Reach and Apply Motion"), and Emergency Motion for Approval of Real Estate Attachment (the "Real Estate Attachment Motion");

WHEREAS, upon application by the UST, Paul D. Moore was appointed to serve as chapter 11 trustee for the Debtor's estate on or about January 25, 2013, with approval of the Bankruptcy Court;

WHEREAS, on January 28, 2013, after a hearing on January 25, 2013, the Bankruptcy Court issued the following orders with respect to the Committee's motions: (i) an order partially granting the TRO/PI Motion, and temporarily restraining and enjoining the Contributors from transferring, encumbering, assigning, pledging, mortgaging, or spending any asset other than as necessary for ordinary living or legal-representation expenses, except by leave of the Bankruptcy Court (the "TRO Order"); (ii) an order granting the Trustee Process Motion, and thereby ordering the attachment of up to $21,110,344.30 on six bank accounts (the "Accounts") held for the benefit of the Contributors (the "Trustee Process Order"); (iii) an order granting the Reach and Apply Motion, and thereby restraining and enjoining the Reach and Apply Defendants from paying, transferring, distributing, disbursing, or in any way alienating any amounts due or to become due to the Contributors up to the amount of $21,110,344.30 (the "Reach and Apply Order"); and (iv) an order granting the Real Estate Attachment Motion, and thereby authorizing prejudgment writs of attachment on real estate owned by the Contributors in the Commonwealth of Massachusetts in the amount of up to $21,110,344.30 (the "Real Estate Attachment Order");

WHEREAS, on February 12, 2013, the Bankruptcy Court entered a stipulated order, agreed to by the Trustee, the Committee and the Contributors (the "February 2013 Stipulation") in connection with the Real Estate Attachment Order, the TRO Order, the Trustee Process Order and the Reach and Apply Order (collectively, the "Security Orders"), whereby the TRO Order matured into a preliminary injunction and whereby the Trustee was substituted for the Committee as plaintiff in the Adversary Proceeding;

WHEREAS, on February 12, 2013, the Judicial Panel on Multidistrict Litigation entered an order transferring certain litigation actions against NECC, the Contributors, and other third-parties to the United States District Court for the District of Massachusetts (the "MDL Court") for consolidated pretrial proceedings, which actions are currently pending under the caption *In re New England Compounding Pharmacy Cases Litigation*, MDL No. 2419, Case No. 13-cv-02419 (D. Mass.) (the "MDL Proceeding");

WHEREAS, on April 9, 2013, the MDL Court entered an order establishing a seven-attorney Plaintiffs' Steering Committee (the "PSC") to organize, simplify, and streamline the handling of the MDL Proceeding on behalf of all plaintiffs to actions therein, and appointed Thomas Sobol of Hagens Berman Sobol Shapiro LLP as lead counsel for the PSC;

WHEREAS, on April 18, 2013, the Bankruptcy Court entered its *Agreed-Upon Order Establishing Protocol for Settlement Negotiations and Communication* [Adv. Docket No. 96] ("Protocol Order"), which established protocols to maintain the confidentiality of information disclosed in the context of settlement negotiations among the Parties, and which Protocol Order is binding on the Parties, the Reach and Apply Defendants, and Non-Party Participants (as that term is defined in the Protocol Order);

WHEREAS, the Contributors deny that they have any liability in the Adversary Proceeding, the MDL Proceeding or any other action arising out of or relating to the allegations set

2

forth in the Adversary Proceeding or the MDL proceeding, but are, nonetheless desirous of making capital contributions to NECC in order to fund a chapter 11 plan that will result in a distribution to creditors of NECC; and

WHEREAS, the Parties also wish to resolve any and all claims, causes of action, demands, disputes, obligations and other matters of every kind and nature (i) between and among them, and (ii) as may exist or could arise against the Contributors or the Contributor and Affiliate Released Parties (defined below), whether directly or indirectly, on account of harm alleged to have been caused to third-parties by NECC and its products or on account of the Contributor or Contributor and Affiliate Released Parties' shareholdings in, distributions from, positions with, or other relationship with, NECC, whether pending in the Adversary Proceeding, the MDL Proceeding, or other courts of competent jurisdiction, or as may be subsequently be initiated.

NOW, THEREFORE, based on these premises, and in consideration of the mutual promises contained herein and other good and valuable consideration, the adequacy and sufficiency of which the Parties hereby acknowledge, the Parties agree as follows:

**Section 1.**     **Definitions.**

"Additional Contributions" has the meaning set forth in Section 2.2.

"Affiliated Entities" means the Entities set forth in **Exhibit A** hereto.

"Alternative Plan" has the meaning set forth in Section 4(c)(v).

"Asset" means any interest in any property held, whether outright or beneficially, by any Contributor and/or that Contributor's spouse as of the Disclosure Date plus any property transferred by the Contributor and/or the Contributor's spouse to or for the benefit of any members of his or her family or other Affiliated Entities during the period from January 1, 2012 through December 21, 2012.

"Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court.

"Banks" has the meaning set forth in Section 3.1(c).

"Base Payment" means: (a) in the case of the Caddens, $21,000,000; (b) in the case of Carla Conigliaro, $24,000,000; and (c), in the case of Gregory Conigliaro, $2,750,000.

"Business Day" means any day that is not a Saturday, a Sunday or a federal holiday in the United States of America.

"Cash Additional Contribution" means Additional Contribution in the form of cash or cash equivalents.

"Claim(s)" means "claim" as defined in section 101(5) of the Bankruptcy Code.

3

"Confirmation Order" means an order of the Bankruptcy Court approving the Plan in a form acceptable to the Contributors as to the matters relating to this Agreement, implementing the provisions of this Agreement in all material respects.

"Contributions" means, collectively, the Initial Plan Deposits plus the Additional Contributions.

"Contributor Judgment" has the meaning set forth in Section 3.3(b)(v)(A).

"Contributor and Affiliate Released Claims" has the meaning set forth in Section 5(a).

"Contributor and Affiliate Released Parties" means the Contributors, and the respective spouses, children, parents, and other nuclear family members of each Contributor, all trusts under which the Contributors or their spouses or family members are settlors, trustees, or beneficiaries, the Affiliated Entities, and any other entities in which the Contributors' spouses, children or other nuclear family members hold a controlling interest, and those entities' successors, assigns, and predecessors.

"Court Cases" means any and all cases, Claims, and causes of action currently pending or which may be brought in any forum against NECC, any or all of the Contributors, or any and all of the Contributor and Affiliate Released Parties, any or all of the Affiliated Entities, or any Third-Party Defendants, that involve, arise from, or relate to NECC or the NECC Claims, including, but not limited to, those pending in the MDL Proceeding or the Adversary Proceeding.

"Disclosure Date" means the date of a Contributor's Financial Disclosure, which, in the interests of clarity, for Carla Conigliaro was as of May 1, 2013; for Barry and Lisa Cadden was as of November 1, 2013 and for Gregory Conigliaro was as of February 28, 2014.

"Disclosure Statement" means the disclosure statement to be filed in connection with the Plan, pursuant to Section 1125 of the Bankruptcy Code, in the form acceptable to the Parties as to the matters relating to this Agreement in all material respects.

"Disclosure Statement Motion" means a motion to be filed with the Bankruptcy Court requesting approval of the form of Disclosure Statement acceptable to the Parties as to the matters relating to this Agreement in all material respects, and requesting entry of the Disclosure Statement Order by the Bankruptcy Court, to be served on the Notice Parties in the same manner that notice of the hearing on the Rule 9019 Motion was served.

"Disclosure Statement Order" means the order of the Bankruptcy Court approving the Disclosure Statement Motion, the Disclosure Statement, and the proposed solicitation procedures for the Plan set forth therein, in a form that is acceptable to the Parties as to the matters relating to this Agreement in all material respects.

"Enforcement Action" has the meaning set forth in Section 12.7(b).

"Escrow" means any accounts, trusts, "qualified settlement funds" as defined in Treasury Regulation Section 1.468B-1 or other segregated funds, established by the Escrow Agent pursuant

4

to this Agreement and the Escrow Agreement to hold the Plan Deposits, in facilitation or furtherance of this Agreement and the Rule 9019 Order.

"Escrow Agent" means the person or entity designated by the Parties under the Escrow Agreement to serve as escrow agent.

"Escrow Agreement" means the escrow agreement substantially in the form and substance attached hereto as **Exhibit C** to be agreed to in final form by the Parties and filed with the Bankruptcy Court on or before seven (7) days prior to the hearing on the Rule 9019 Motion and executed by the Parties within two (2) Business Days following entry of the Rule 9019 Order, pertaining to the Escrow and the Plan Escrowed Funds, and which includes all of the provisions set forth in Section 3.3(b) hereof, or in such other form as is acceptable to the Parties.

"Escrowed Funds" means all Contributions held by the Escrow Agent, other than the Tax Contributions, plus any interest or income accrued thereon.

"Estate Parties" means the Trustee, the Debtor, the Debtor's bankruptcy estate in the Chapter 11 case, the Committee, the Estate Representative, and each of their respective successors and assigns.

"Estate Representative" means the Trustee or any successor in interest to the Trustee, whether such successor is appointed under the Plan, Confirmation Order or otherwise.

"Estate and Plaintiff Released Claims" has the meaning set forth in Section 5(b).

"Execution Date" means the date on or as of which this Agreement has been signed by all Parties.

"Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the applicable subject matter hereof which has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending, or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

"Final Order Condition" has the meaning set forth in Section 3.3(b)(i).

"Financial Disclosure" means, with regard to each Contributor, all documents relating to the Assets of the Contributor and/or the Contributor's spouse provided to the Trustee and/or the Trustee's professionals.

"Initial Payment Date" shall mean the first Business Day immediately following fourteen (14) days after the date on which the Rule 9019 Order and the MDL Stay Order have both entered and are in effect, in accordance with Sections 3.1 and 3.2 herein.

"Initial Plan Deposit" means, in respect of each Contributor or Contributors, if married, that Contributor's or Contributors' Base Payment plus any Cash Additional Contributions realized by or on behalf of the Contributor or Contributors as of the date the Rule 9019 Order enters.

"Initial Plan Deposit Amount" means, in respect of each Contributor or Contributors (if married), the amount of that Contributor or Contributors' Initial Plan Deposit.

"Injunctions" has the meaning set forth in Section 5.

"Interim Payment" has the meaning set forth in Section 3.3(b)(ii).

"Insurance Policies" has the meaning set forth in Section 2.2(c).

"IRC" means the Internal Revenue Code.

"MDL Stay Motion" has the meaning set forth in Section 3.2.

"MDL Stay Order" has the meaning set forth in Section 3.2.

"MPA" means methylprednisolone acetate and products containing methylprednisolone acetate.

"NECC Claims" means all Claims, rights, causes of action, cases, demands, damages, costs, compensation, contribution, or claims for indemnification of any person or entity including, but not limited to, the Plaintiffs, the Debtor, the NECC Parties, and the Third-Party Defendants, as against any of the Contributors or any of the Contributor and Affiliate Released Parties, on account of the design, compounding, marketing, sale, shipment, advertising, supply, production, formulation, use, labeling and/or injection of any product, including, but not limited to, MPA, produced, compounded, dispensed and/or sold by NECC, by any of the Third-Party Defendants, or any of the Contributor and Affiliate Released Parties, and including, but not limited to, claims alleging breaches of fiduciary duty, fraudulent transfers, or failures to act by any of the Contributors or any of the Contributor and Affiliate Released Parties, and, whether or not those claims or causes of action have been asserted against NECC, any of the Contributors, or any of the Contributor and Affiliate Released Parties, in the Court Cases or otherwise.

"NECC Parties" means the Estate Parties, the PSC, all current or future holders of NECC Claims and any parties acting on their behalf, all current or future Plaintiffs and any parties acting on their behalf, all current or future Third-Party Defendants, and their respective insurers, successors, assigns, principles, agents, and representatives in interest.

"Net Tax Refunds" has the meaning set forth in Section 10.1.

"Non-Disclosed Asset" means (i) any Asset having a realizable value equal to or exceeding $100,000 as of the Contributor's Disclosure Date and/or (ii) any combination of Assets to the

6

extent that the aggregate realizable value of those Assets equals or exceeds $100,000, in either case, that was not or were not disclosed or included in the Assets disclosed in the Financial Disclosures on the Disclosure Date or otherwise disclosed in writing to the Trustee prior to the Execution Date. An Asset described in the Financial Disclosures shall not be a Non-Disclosed Asset if the asset is disclosed or included in a Financial Disclosure regardless of the estimate of value for such asset in such Financial Disclosure.

"Notice Parties" shall mean all parties that are entitled to notice of the hearing on the Rule 9019 Motion and the Disclosure Statement in the Chapter 11 Case in accordance with the Federal Rules of Bankruptcy Procedure and Local Rules for the Bankruptcy Court, including, but not limited to, each of the Debtor's creditors that has filed a proof of claim in the Chapter 11 case (or their counsel), any party that has set forth in writing an intention to assert a claim against the Debtor and/or any Contributor and Affiliate Released Party and which party is known to the Trustee, all parties to the MDL Proceeding (or their counsel), all state and federal agencies with jurisdiction or with oversight authority over the Debtor's business, and the Banks.

"Outside Date" has the meaning set forth in Section 11.1.

"Pharmaceutical Entities" shall mean the Affiliated Entities listed on **Exhibit B** hereto.

"Pharmaceutical Entity Distributions" means the net, after payment of reasonable and customary expenses incurred in connection with the sale and after payment of all taxes attributed to or incurred by the Contributors on account of the sale or other disposition of the Pharmaceutical Entities, proceeds realized or received by each of the Contributors on account of their Claims against or equity interests in the Pharmaceutical Entities from the sale or other disposition of the equity interests in or assets of any of the Pharmaceutical Entities, other than payments of the amounts owed by the Pharmaceutical Entities to the Contributors for wages, employee benefit or similar obligations arising prior to the date hereof solely as set forth in the Financial Disclosures. For the avoidance of doubt, Pharmaceutical Entity Distributions shall not include or be reduced by payments made to the Trustee by any insurers of the Pharmaceutical Entities.

"Plaintiffs" means the plaintiffs in the Court Cases, plus any holders, present or future, of NECC Claims.

"Plan" means a chapter 11 plan for the Debtor to be proposed by the Trustee or proposed jointly by the Trustee and the Committee that is in form and substance consistent in all material respects with this Agreement.

"Plan Deposits" means, collectively, (i) all Initial Plan Deposits and (ii) all Cash Additional Contributions transferred to the Trustee pursuant to Section 2.2 hereof following the Initial Payment Date.

"Plan Documents" means the Disclosure Statement, the Plan, the Disclosure Statement Motion, the Disclosure Statement Order, the Confirmation Order, and any and all supplements, exhibits, and amendments thereto, each of which is in a form acceptable to the Contributors as to the matters relating to this Agreement.

"Plan Effective Date" means the later of: (i) the first Business Day following fourteen (14) days after the Bankruptcy Court's entry of the Confirmation Order, provided that a court of competent jurisdiction has not entered a stay of the Confirmation Order as of such date (in which instance, the Plan Effective Date will not occur until such stay is dissolved), and (ii) the first Business Day on which all other conditions to the effective date of the Plan have been satisfied or waived.

"Plan Escrowed Funds" means, collectively, the Tax Escrowed Funds and the Escrowed Funds.

"Refund Claims" means claims filed with a governmental authority seeking Refunds and interest on Refunds.

"Refunds" has the meaning set forth in Section 10.1.

"Release Events" has the meaning set forth in Section 3.3(b)(vi).

"Releases" has the meaning set forth in Section 5.

"Rule 9019 Motion" means the motion to be filed by the Trustee in accordance with Section 3.1 herein, in a form acceptable to the Contributors in all material respects as to the matters relating to this Agreement, requesting that the Bankruptcy Court:  (i) approve in all material respects, pursuant to Rule 9019 of the Bankruptcy Rules and the salient provisions of the Bankruptcy Code, the terms of this Agreement and any and all terms of the compromise and settlement memorialized in this Agreement; (ii) approve, to the extent necessary under Section 363 of the Bankruptcy Code, the Trustee's entry into the Escrow Agreement and the establishment thereunder of one or more "qualified settlement funds" as defined in Treasury Regulation Section 1.468B-1; (iii) provide that the Plan Escrowed Funds are protected from attachment, liens, collateral attack and reach by the Debtor's creditors or any other persons or entities whatsoever to the full extent permitted by law as set forth in this Agreement; (iv) modify the Security Orders in accordance with this Agreement, (v) order the dissolution of the Security Orders in accordance with this Agreement; (vi) grant the Trustee and approve the Substitute Lien (as defined in Section 3.4 below); (vii) issue a stay of the Adversary Proceeding pending the occurrence of earlier of Termination or the Plan Effective Date in all respects, in accordance with this Agreement; (viii) grant the relief set forth in Section 3.1 below; (ix) determine that notice of the hearing on the 9019 Motion was duly served on, or otherwise provided to pursuant to the Bankruptcy Court's or MDL Court's ECF filing system, all Notice Parties, was appropriate and that no further notice is required; and (x) enter the Rule 9019 Order approving the Rule 9019 Motion and authorizing and directing the Trustee to consummate all aspects of the Settlement in accordance with this Agreement.

"Rule 9019 Order" means an order of the Bankruptcy Court granting the relief requested in the Rule 9019 Motion and approving the terms of this Agreement in all material respects, substantially in the form set forth in **Exhibit D** hereto or in such other form as is acceptable to the Parties.

"Security Balance" has the meaning set forth in Section 3.3(b)(iii).

"Settlement" means the terms of the compromise embodied in this Agreement, as such Agreement may subsequently be modified by the Parties in writing.

"Substitute Lien" has the meaning set forth in Section 3.4.

"Tax Contributions" means, for each Contributor, an amount equal to ninety percent (90%) of Net Tax Refunds received by the Contributor and the Tax Return Spouse, which shall be paid to the Trustee and, promptly thereafter, transferred to the Escrow Agent in accordance with Section 2.2(e) and released pursuant to Section 10.2.

"Tax Dispute" has the meaning set forth in Section 10.4(d).

"Tax Escrowed Funds" means all Tax Contributions remitted to the Escrow Agent in accordance with this Agreement and the Escrow Agreement, together with earnings thereon.

"Tax Return Spouse" shall be the spouse of a married Contributor that executes the Tax Return Spouse Consent Agreement.

"Tax Return Spouse Consent Agreement" means the agreement described in Section 10.3(k) in substantially the forms set forth in Exhibits E and F, and which shall be executed on the Execution Date by the Trustee and the respective persons named therein.

"Termination" has the meaning set forth in Section 11.4.

"Third-Party Defendants" means all current, future, or potential defendants in the Court Cases, other than the Contributors and the Contributor and Affiliate Release Parties.

"Trustee Judgment" has the meaning set forth in Section 3.3(b)(v)(B) herein.

**Section 2.      Plan Deposits and Contributions.**

**Section 2.1.      Payment of Initial Plan Deposits.**  On or before the Initial Payment Date, and provided the Rule 9019 Order is not subject to a stay by a court of competent jurisdiction on such date and the MDL Stay Order has entered and is in effect as required by Section 3.2 below, each Contributor shall deliver, or instruct the applicable Bank or Banks (defined below) to deliver, to the Trustee, in trust, his, her or their respective Initial Plan Deposit in immediately available funds, and promptly upon receipt thereof, the Trustee shall transfer each Initial Plan Deposit to the Escrow Agent.  Any funds on deposit from time to time in the Escrow shall be deemed held in trust for the benefit of those parties entitled to receive distributions therefrom pursuant to Section 3.3 hereof, subject to Section 3.4.

**Section 2.2.      Additional Contributions.**  The Contributors shall transfer to the Trustee in trust, the following (clauses (a)-(e) immediately below, inclusive and collectively, the "Additional Contributions"):

(a)      seventy-five percent (75%) of the Pharmaceutical Entity Distributions to be delivered within seven (7) Business Days of the Contributors' receipt thereof;

(b)     one hundred percent (100%) of any and all Assets determined on or prior to the second anniversary of the Plan Effective Date to be Non-Disclosed Assets and the proceeds thereof within seven (7) Business Days of the Trustee's written demand or, in the event of a dispute as to whether an Asset is or Assets are a Non-Disclosed Asset, within seven (7) Business Days of the issuance of the order of a court of competent jurisdiction making the determination in an Enforcement Action pursuant to Section 12.7(b);

(c)     all interests of each Contributor in policies of insurance or rights therein that provide, or may provide, coverage for NECC, any Contributor, or any Affiliated Entities, in connection with, relating to or arising from the NECC Claims (the "Insurance Policies") to be delivered on the Plan Effective Date;

(d)     all proceeds of the Insurance Policies, other than the proceeds of said policies that represent reimbursement or payment of the Contributors or Affiliated Entities' defense costs unless expressly agreed to by the Contributors in writing to be delivered on the Plan Effective Date; and

(e)     the Tax Contributions, which shall be transferred, held and released in accordance with Section 10.2 below.

**Section 2.3.     Disposition of Pharmaceutical Entities.**

(a)     <u>Ameridose</u>. The Contributors shall provide reasonable cooperation to bring about a sale of Ameridose or its assets in a process that is acceptable to the Trustee (in and after consultation with the Committee and lead counsel to the PSC) or approved by the United States Bankruptcy Court; <u>provided</u>, <u>however</u>, that the undertaking herein shall not subject any Contributor to liability in the event that no sale or other disposition of Ameridose is consummated, and further provided that the obligations of any Contributor under this Section 2.3(a) shall expire at the end of the sixth (6th) month following the Plan Effective Date, at which time Ameridose, as a Pharmaceutical Entity, shall be subject to the provisions of Section 2.3(b).

(b)     <u>Pharmaceutical Entities</u>. Following the Plan Effective Date, the Trustee may, in his sole and absolute discretion, and subject to the provisions for the sale of Ameridose set forth in Section 2.3(a), undertake such efforts as he deems appropriate to bring about a sale or other disposition of the Pharmaceutical Entities or of their assets; <u>provided however</u>, that the Trustee shall have no right to access to or to sell or transfer title to attorney-client privileged communications belonging to any of the Pharmaceutical Entities whether in a stock sale or an asset sale, and the Contributors shall provide the Trustee with full and complete access to all non-privileged business records of the Pharmaceutical Entities pending a sale. From and after the Plan Effective Date, the Contributors (i) shall provide, and shall cause the Pharmaceutical Entities to provide, such cooperation in the Trustee's efforts to bring about a sale or disposition of the Pharmaceutical Entities or of the Pharmaceutical Entities' assets as the Trustee may reasonably request, including, without limitation, cooperating with the Trustee and his professionals in their

10

efforts to obtain access to such non-privileged information and documents, as well as to personnel and employees of the Pharmaceutical Entities, as the Trustee reasonably determines is necessary or advisable to pursue and/or consummate such sale or disposition, and executing such agreements and other documents that are necessary and reasonably requested by the Trustee for the purpose of effecting the transfer of the assets of or equity interests in any of the Pharmaceutical Entities pursuant to this paragraph, and (ii) as of the Plan Effective Date shall appoint the Trustee as their attorney-in-fact, and shall cause the Pharmaceutical Entities to appoint the Trustee as their attorney-in-fact, for the sole and specific purpose of effecting the transfer of the assets of or equity interests in the Pharmaceutical Entities in accordance with this paragraph. Should the Trustee fail to consummate a sale or disposition of the Pharmaceutical Entities or of their assets on or before the end of (i) the eighteenth (18th) month following the Plan Effective Date, in the case of Ameridose and (ii) the twelfth (12th) month following the Plan Effective Date, in the case of all other Pharmaceutical Entities, the Trustee's rights to market and sell the Pharmaceutical Entities or their assets shall expire and any rights of the Trustee, NECC, the NECC estate or NECC's creditors in, or to realize upon, the Pharmaceutical Entities, their assets or in the proceeds of any disposition of the Pharmaceutical Entities or their assets shall expire and be deemed abandoned.

**Section 2.4.**    All Contributions shall constitute, and shall be treated, at all times, as (a) a deposit of the type described in Bankruptcy Rule 3020(a), and (b) a contribution by the Contributors, as shareholders, to the capital of NECC for tax purposes, to the extent permitted by applicable law.

**Section 2.5.**    Promptly upon receipt of Cash Additional Contributions, the Trustee shall transfer such Cash Additional Contributions to the Escrow Agent, at which time such Cash Additional Contributions shall be Plan Escrowed Funds and released in accordance with Section 3.3 hereof.

**Section 2.6.**    Any Contributions deposited to the Escrow shall be deemed held in trust for the benefit of those parties entitled to receive distributions therefrom pursuant to Section 3.3 hereof, subject to Section 3.4.

**Section 2.7.**    The transfer pursuant to Section 2.2 of Additional Contributions that are not Cash Additional Contributions shall be effectuated as of the Plan Effective Date pursuant to an assignment agreement in form and substance reasonably acceptable to the Parties that shall provide for the unconditional assignment and transfer of such Contributions to the Trustee, for the benefit of the Debtor's estate.

**Section 3.    Procedure.**

**Section 3.1.**    **Rule 9019 Motion and Rule 9019 Order.** The Rule 9019 Order shall be effective upon the Bankruptcy Court's entry thereof, and shall provide the following:

(a)    **Stay of Adversary Proceeding**: Through the earlier of the date the Adversary Proceeding is dismissed in accordance with this Agreement or Termination of this

Agreement in accordance with Section 11 herein, the Adversary Proceeding shall be stayed in all respects, including a stay of all discovery from the Contributors and the Contributor and Affiliate Released Parties in the Adversary Proceeding. The stay shall include, but not be limited to, a prohibition against any party seeking any form of prejudgment security, including, but not limited to, and attachments, injunctions, writs or orders of any nature.

(b)   **Direction and Authority Regarding the Chapter 11 Case and Other Court Cases**:   Upon entry of the Rule 9019 Order and through the earlier of the Plan Effective Date or Termination in accordance with Section 11, the Trustee shall be authorized and directed to use commercially reasonable efforts to seek and obtain the following: (i) removal to the MDL Proceeding of all Court Cases in which the Contributors or the Contributor and Affiliate Released Parties are parties to the MDL Proceeding and denial of any motion to remand Court Cases; (ii) denial of any motion pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure or any other motion or proceeding seeking to obtain discovery from the Contributors or the Contributor and Affiliate Released Parties in the Chapter 11 Case; (iii) denial of any motion or proceeding in the MDL Proceeding in which relief is requested that is contrary to the provisions of the MDL Stay Order or this Agreement; (iv) stay of all activity in the Adversary Proceeding, other than ministerial actions that may be required to maintain that proceeding; and (v) denial of motions to lift the MDL Stay; and (vi) enforcement and continuation of the MDL Stay Order through the Plan Effective Date, in accordance with Section 3.2.

(c)   **Partial Dissolution of Security Orders**:   The Security Orders are lifted or modified solely to the extent necessary to permit the Contributors to fund the Initial Plan Deposits, and the third-party financial institutions in control or possession of the Accounts (the "Banks") are authorized and directed to release funds in an amount up to the amount of the Base Payment for each Contributor or Contributors to enable the Contributors to fund his, her or their Initial Plan Deposit in accordance with Section 2.1 hereof, as set forth on the schedule attached hereto as **Exhibit G**.

(d)   **Final Dissolution of Security Orders**:   The Security Orders are dissolved and of no further force and effect upon the Trustee's receipt from or on behalf of each Contributor his, her or their Initial Plan Deposit and the Trustee is authorized and directed to file a notice with the Bankruptcy Court (with a copy to be served on the Banks, the Escrow Agent, the Committee, the Contributors and the PSC) attesting that the Contributors and/or the Banks (on the Contributors' behalf) have paid the Initial Plan Deposits to the Trustee in accordance with this Agreement. Upon the filing of such notice, the Trustee is authorized and directed to take such action as he deems necessary or appropriate to effect the dissolution and release of all Security Orders.

(e)   **Substitute Lien**:   The Trustee (and his successors in interest) is granted and shall hold, on behalf of the Debtor and its estate, the Substitute Lien (as defined in Section 3.4 below).   The Substitute Lien shall be the sole and exclusive pre-judgment security or remedy available to the Trustee, other acting Estate

12

Representatives or to the Plaintiffs, in any forum.  The Substitute Lien and the restrictions herein on the Trustee or Estate Representative seeking prejudgment security or remedy shall survive Termination and expire or be released solely in accordance with the provisions of Sections 3.3 and 3.4 below.

(f)   **Protection of Plan Deposit from Other Liens or Encumbrances**:  The Plan Escrowed Funds are intended to constitute a material part of a fund to be ultimately distributed to personal injury claimants against and other creditors of the Debtor under the Plan and, accordingly, no individual or entity may seek to attach, obtain a lien on or otherwise and reach the funds constituting the Plan Escrowed Funds.

**Section 3.2.   Stay of MDL Proceeding.**

(a)   Within ten (10) Business Days following entry of the Rule 9019 Order, the Trustee shall file a motion with the MDL Court (the "MDL Stay Motion") requesting entry of an order of the MDL Court staying the MDL Proceeding as to the Contributors and the Contributor and Affiliate Released Parties through the earlier of the Plan Effective Date or Termination in accordance with Section 11 ("MDL Stay Order"). The terms of the MDL Stay Order, as requested by the MDL Stay Motion, shall include, but not be limited to, the following terms:

(i)   A prohibition against any party to the MDL Proceeding seeking dispositive relief;

(ii)   A prohibition against any party to the MDL Proceeding seeking any form of prejudgment security, including, but not limited to, any attachments, injunctions, writs or orders of any nature with regard to the Contributors and the Contributor and Affiliate Released Parties; and

(iii)  the permissibility of discovery against the Estate Parties, the Contributors, and the Contributor and Affiliate Released Parties, but only to the extent the discovery is relevant to the prosecution, or defense, of claims against defendants other than the Estate Parties, the Contributors, and the Contributor and Affiliate Released Parties.

(b)  Nothing in this Agreement, the MDL Stay Motion, or the MDL Stay Order, shall prevent or prohibit a party from objecting to a discovery request based on any grounds ordinarily available under the Federal Rules of Civil Procedure, with all such rights being expressly reserved. It is further agreed that so long as the MDL Stay Order contains language consistent with sub-paragraphs (a)(i)-(a)(iii) above, nothing in this Agreement shall provide a basis for the Estate Parties, the Contributors, or the Contributor and Affiliate Released Parties, to claim that by virtue of entering into this Agreement, there is a general prohibition as to all discovery in the MDL Proceeding; and

(c)  Following entry of the MDL Stay Order, to the extent that the Trustee or the Contributors become aware that any person or entity is in violation of the MDL

13

Stay Order or otherwise seeks relief as to the Contributors or any of the other Contributor and Affiliate Released Parties that would be prohibited if such person or entity were a party to the MDL Proceeding, the Trustee shall (i) seek to enforce the MDL Stay Order in all courts of competent jurisdiction; and/or (ii) if those enforcement efforts are unsuccessful or such person or entity is not a party to the MDL Proceeding, seek entry of an order from the Bankruptcy Court or such other court of competent jurisdiction, enjoining any person or entity from taking such action or seeking such relief as to the Contributors or any of the other Contributor and Affiliate Released Party that is proscribed by the MDL Stay Order.

**Section 3.3.    Escrow and Release of Plan Escrowed Funds.**

(a)    **Establishment of Escrow.**

The Plan Escrowed Funds shall be held in the Escrow and released by the Escrow Agent solely in accordance with Section 3.3(b) of this Agreement and the Escrow Agreement, except as set forth in Section 3.3(b)(iv), which shall permit or cause release of Tax Escrowed Funds only in accordance with Section 10.2. The person or entity to serve as Escrow Agent shall be acceptable to all Parties. Each of the Parties agrees to execute the Escrow Agreement within two (2) Business Days following entry of the Rule 9019 Order. Each of the Parties agrees and acknowledges that: (i) all or a portion of the Plan Escrowed Funds may be segregated by the Escrow Agent if to do so would maximize the amount or accelerate the timing of the Refund Claims, the Refunds or the Net Tax Refunds under Section 10 hereof, and, if so segregated, such segregated funds shall, to the maximum extent permitted by law, be treated as one or more "qualified settlement funds" as defined in Treasury Regulation Section 1.468B-1; (ii) to the extent any "qualified settlement fund" is established, the procedural and computational decisions and judgments related to funding the Escrow shall be made so as to constitute "economic performance" by the Debtor and the Contributors in accordance with Treasury Regulation Section 1.468B-3; and (iii) to the extent any "qualified settlement fund" is established, the acting Estate Representative and the Escrow Agent shall comply, or cause the compliance, with all reporting requirements applicable thereto.

(b)    **Release of Plan Escrowed Funds from Escrow.**

The Plan Escrowed Funds, and any interest or income accrued thereon, shall be released as follows:

(i)    On the occurrence of the Plan Effective Date and either (a) the Confirmation Order being a Final Order (the "Final Order Condition") or (b) the Parties having waived the Final Order Condition, within four (4) Business Days following delivery by the Trustee or duly acting Estate Representative of written notice of the occurrence of the Plan Effective Date and occurrence or waiver of the Final Order Condition, with copies of the notice to be served simultaneously on the Committee, the PSC, and the Contributors, the Escrow Agent shall release all Escrowed Funds, plus any interest or income accrued thereon, to the Trustee in accordance with the Escrow Agreement, for such use and payment as is ultimately provided for in the Plan;

(ii)     Notwithstanding the Confirmation Order not being a Final Order on the Plan Effective Date, and provided that the Confirmation Order is the subject of a pending appeal but that no stay pending appeal has issued, within four (4) Business Days following the Trustee or acting Estate Representative's delivery to the Escrow Agent of written notice of the occurrence of the Plan Effective Date, with copies of the notice to be served simultaneously on the Committee, the PSC, and the Contributors, the Escrow Agent shall irrevocably release to the Trustee or acting Estate Representative from the Escrowed Funds an amount equal to (A) $10 million plus (B) the lesser of the amount equal to forty-seven and one half percent (47.5%) of the costs incurred by the Trustee in the copying and service of the 9019 Motion and the Plan Documents and their respective associated documents and $50,000 (collectively the "Interim Payment"). The balance of the Escrowed Funds after release of the Interim Payment, plus any interest or income accrued thereon, shall remain held by the Escrow Agent subject to the Substitute Lien and be released by the Escrow Agent in accordance with the remaining provisions of this Section 3.2(b) and this Agreement. For the avoidance of doubt, as soon as the Confirmation Order becomes a Final Order or the Parties have waived the Final Order Condition, the balance of the Escrowed Funds, plus any interest or income accrued thereon, shall thereupon be released by the Escrow Agent to the Trustee in accordance with Section 3.2(b)(i); or

(iii)     In the event of Termination of this Agreement in accordance with Section 11, following the Trustee's or Contributors' delivery to the Escrow Agent and simultaneously, the other Parties, of a written notice of such termination, the Escrow Agent shall continue to hold Plan Escrowed Funds plus any interest or income accrued thereon, subject to the Substitute Lien (collectively, the "Security Balance"), pending the occurrence of a Release Event (defined below).

(iv)     The Escrow Agent shall only release the Tax Escrowed Funds pursuant to Section 10.2 and Section 3.4 herein.

(v)     In the event of Termination under Section 11 below, the Escrow Agent shall only release the Security Balance as follows:

(A)     To the Contributors, fourteen (14) Business Days after the Contributors' delivery of a written notice to the Estate Representative and  the Escrow Agent with a copy delivered simultaneously to the PSC and the Committee (or its successor), that the Bankruptcy Court or other court of competent jurisdiction has entered a Final Order dismissing the Adversary Proceeding with prejudice or has entered a Final Order granting judgment for the Contributors and against the Trustee or acting plaintiff in the Adversary Proceeding on all counts and claims set forth in the Adversary Proceeding ("Contributor Judgment");

(B)     To the Estate Representative, fourteen (14) Business Days after the Estate Representative's delivery of a written notice to the Escrow Agent, with a copy delivered simultaneously to the Contributors, the PSC and the Committee (or its successor), that the Bankruptcy Court or other court of competent jurisdiction has entered a Final Order granting judgment for the Estate Representative or other

15

plaintiff in the Adversary Proceeding ("Trustee Judgment"), to the extent necessary to satisfy the Trustee Judgment, with the balance of the Security Balance (if any) released to the Contributors and allocated among the Contributors in an amount determined by calculating the percentage of the amount each Contributor's Contributions represents to the total amount of Contributions; or

(C)   As provided in a joint written directive to the Escrow Agent signed by the Estate Representative and each Contributor.

(vi)   The events triggering release of the Security Balance in accordance with subsections 3.3(b)(v)(A), 3.3(b)(v)(B) or 3.3(b)(v)(C) herein shall be referred to as "Release Events".

### Section 3.4.   Substitute Lien.

(a)   Effective upon final dissolution of the Security Orders in accordance with Section 3.1(d) of this Agreement, the Contributors hereby grant the Trustee a first-priority lien and security interest in any interest now held or hereinafter acquired by the Contributors in (i) the Escrow, (ii) the Plan Escrowed Funds and (iii) property, including property that constitutes general intangibles under the Uniform Commercial Code, that at any time constitutes Additional Consideration (including, without limitation, Pharmaceutical Entity Distributions and Tax Contributions) and the proceeds thereof, pending dissolution in accordance with Section 3.4(b) of this Agreement (the liens and security interests granted pursuant to this Section 3.4(a), collectively, the "Substitute Lien"), and the Contributors further acknowledge and agree that the Trustee has "control" of the Escrow within the meaning of § 9-104 of the Uniform Commercial Code.  The Contributors shall direct the Escrow Agent, at all times, to comply with all instructions originated by the Trustee for the disposition of funds on deposit in the Escrow, without any further requirement of further consent by the Contributors or any other party; provided, however, that the Trustee shall in all respects comply with Sections 3.3, 10.2 and the other provisions of this Agreement and the Escrow Agreement.  The Contributors shall notify the Escrow Agent that the Contributors have granted to the Trustee the Substitute Lien.  The Contributors shall direct the Escrow Agent that it shall not release any funds from the Escrow to any party other than as provided in the Escrow Agreement, and the provisions of this Agreement.  The Contributors shall promptly and duly execute and deliver such documents and assurances and take such actions as may be necessary or as the Trustee may deem necessary or desirable in order to further establish, perfect and protect and/or evidence the Substitute Lien.  In furtherance and not in limitation of the foregoing, upon written request therefor, the Contributors shall promptly: (a) execute and deliver to the Trustee deposit account control agreements in form and substance reasonably satisfactory to the Trustee, duly executed and binding upon the Contributors, the Trustee, the Escrow Agent, and, if applicable, any other relevant depositary bank at any time maintaining the Escrow; (b) file or cause to be filed (and the Trustee is hereby authorized to make such filings) UCC-1 financing statements or other similar notices of security interest and lien in favor of the Trustee, and the Contributors hereby authorize the Trustee and/or his agents or representatives to make such filings; and/or (c) join with the Trustee in executing such other notices as are necessary or appropriate under applicable Federal or state law in form and substance reasonably satisfactory to the Trustee and filing the same in all public offices and jurisdictions wherever and whenever requested by the Trustee in his reasonable

16

judgment. Notwithstanding the foregoing and other inconsistent provisions of this Agreement, in the event of full or partial non-appealable disallowance of a Refund, as that term is used in Section 10 below, the Substitute Lien shall be deemed released to the extent necessary to make the payment required to the Contributors in accordance with Section 10.2(a), with such payment to be free from liens and encumbrances.

     (b)   **<u>Dissolution of Substitute Lien</u>**.

Except as set forth in Section 3.4(a) with regard to disallowance of a Refund, the Substitute Lien shall dissolve, be discharged and expire upon, and only upon (i) the release by the Escrow Agent to the Trustee of all Plan Escrowed Funds in accordance with Section 3.3(b)(i); and (ii) if there is no event of Termination, the distribution of all Plan Escrowed Funds to creditors pursuant to the Plan; or (iii) if there is a Termination, the Escrow Agent's release of the Security Balance in accordance with Section 3.3(b)(v).

**Section 4.**   **<u>Support of Plan</u>**. Subject to the terms and conditions of this Agreement, each Contributor (severally and not jointly) agrees:

     (a)   to the extent that the Contributor or any of the Affiliated Entities have timely filed proofs of claim, and so long as his, her or its vote has been properly solicited pursuant to sections 1125 and 1126 of the Bankruptcy Code, to timely vote any and all Claims against NECC that he, she or any of any of the Affiliated Entities is entitled to vote, now or hereafter beneficially owned by such Contributor, to accept the Plan in accordance with the applicable procedures set forth in the solicitation materials accompanying the Plan, and timely return a duly executed ballot in connection therewith; <u>provided, however,</u> that nothing herein shall constitute the assertion of the claim nor require the Contributors to file a proof of claim, nor be deemed as consent of the Contributors to the jurisdiction of the Bankruptcy Court;

     (b)   not to withdraw or revoke his, her or its tender, consent or vote with respect to the Plan, except as otherwise expressly permitted pursuant to this Agreement; and

     (c)   not, unless the Trustee or Estate Representative has breached any of his or her obligations, representations, warranties, or covenants set forth in this Agreement and has not cured such breach within the earlier of ten (10) Business Days after receiving notice thereof or the deadline for taking the required action, or unless the Agreement has been terminated,:

       (i)   oppose or object to the Plan, the Disclosure Statement, or other Plan Documents, or the solicitation or consummation of the Plan and the transactions contemplated by the Plan Documents, whether directly or indirectly;

       (ii)   join in or support any objection to the Plan, Disclosure Statement, or other Plan Documents, or to the solicitation of the Plan;

       (iii)   initiate any legal proceedings that are inconsistent with or that would delay, prevent, frustrate or impede the approval, confirmation or consummation of the Plan, the Disclosure Statement, or other Plan Documents, or otherwise commence any proceedings to

oppose the Plan, the Disclosure Statement, or any of the other Plan Documents, or take any other action that is barred by this Agreement;

(iv)    vote for, consent to, support or participate in the formulation of any other restructuring of Claims, any other transaction involving any plan of reorganization or liquidation (with the exception of the Plan) under applicable bankruptcy or insolvency laws, whether domestic or foreign, in respect of the Debtor, except as otherwise expressly contemplated pursuant to this Agreement;

(v)    directly or indirectly seek, solicit, or enter into any agreements relating to, any restructuring, plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, transaction, sale, disposition or restructuring of the Debtor other than the Plan or as otherwise set forth in this Agreement (any such plan or other action as described in clauses (iv) and (v) immediately above, an "Alternative Plan"); or

(vi)    enter into any letter of intent, memorandum of understanding or agreement in principle relating to any Alternative Plan.

**Section 5.    Plan Releases and Injunctions in Favor of Contributor and Affiliate Released Parties.** The Plan and Confirmation Order shall provide for releases (the "Releases") and injunctions (the "Injunctions") that are materially consistent with the foregoing:

(a)    **Releases in Favor of Contributor and Affiliate Released Parties.** On the Plan Effective Date, the Contributor and Affiliate Released Parties, as well as their respective attorneys and advisors, shall be deemed to be released from any and all 1) NECC Claims, and 2) any other Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action whatsoever, of any person or entity, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction, event or other activity that occurred prior to the Plan Effective Date, in any way relating to or in connection with (i) the Debtor or the Debtor's operations or activities, including but not limited to the compounding, sale and/or distribution or dispensing of MPA, (ii) the Contributor and Affiliate Released Parties' management, control or ownership of, or the employment by, the Debtor, and (iii) the Debtor's estate, the Chapter 11 Case, and the Adversary Proceeding, (with all such released claims being collectively, the "Contributor and Affiliate Released Claims"), *except that* the right to enforce the Substitute Lien and the obligations under this Agreement and the Escrow Agreement, and the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder, and the provisions of this Agreement with regard to Non-Disclosed Assets, shall be expressly preserved by the Estate Representative.

(b)    **Releases by Contributor and Affiliate Released Parties.** On the Plan Effective Date, each of the Contributor and Affiliate Released Parties shall be deemed to forever unconditionally release each of the Estate Parties, the Plaintiffs and their respective attorneys and advisors from any and all Claims, debts, obligations,

18

demands, liabilities, suits, judgments, damages, rights and causes of action whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other activity that occurred prior to the Plan Effective Date, in any way relating to or in connection with (i) the Debtor or the Debtor's operations or activities, including, but not limited to, the compounding, sale and/or distribution of MPA, (ii) the Contributor and the Contributor and Affiliate Released Parties' management of, control of, employment by, or ownership of, the Debtor; (iii) the Debtor's estate, the Chapter 11 Case, the Adversary Proceeding, and (iv) the NECC Claims (collectively, the "Estate and Plaintiff Released Claims"), *except that* the right to enforce the obligations under this Agreement, the Escrow Agreement, the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder, shall be expressly preserved by the Contributor and Affiliate Released Parties.

(c) **Injunction in Favor of Contributor and Affiliate Released Parties.** The Plan and Confirmation Order shall provide that upon the Plan Effective Date, all NECC Parties shall be permanently barred, enjoined, and restrained from commencing, prosecuting, continuing or asserting, either derivatively or on behalf of themselves, in any court, arbitration proceeding, administrative agency, or other forum in the United States of America or elsewhere, any Claim, demand, or cause of action for liability or damages and costs, of whatever kind, nature or description, whether direct or indirect, in law, equity or arbitration, absolute or contingent, in tort, contract, statutory liability or otherwise, (including demands for contribution, indemnity, or otherwise), whether known or unknown, whether foreseen or unforeseen, whether contingent or actual, whether liquidated or unliquidated, against any Contributor and Affiliate Released Party concerning, arising from or in any way relating to or in connection with the Contributor and Affiliate Released Claims, whether the NECC Parties had actual or constructive notice of the terms of the Agreement, Plan or Confirmation Order or otherwise, *except that* this injunction shall not apply to the right of the acting Estate Representative to enforce the Substitute Lien and the obligations and the Trustee's or Estate Representative's rights under this Agreement, the Escrow Agreement, the Plan, and the contracts, instruments, releases and other agreements and documents delivered thereunder.

(d) **Covenants Not to Sue:** The Plan and Confirmation Order shall provide that upon the Plan Effective Date, each of Contributor and Affiliate Released Parties covenants and agrees not to commence or continue against the Estate Parties any action or proceeding of any nature whatsoever with respect to Estate and Plaintiff Released Claims, and that the Estate Parties covenant and agree not to commence or continue against the Contributor and Affiliate Released Parties, any action or proceeding of any nature whatsoever with respect to Contributor and Affiliate Released Claims.

(e) **Attorneys' Fees:** The Confirmation Order shall provide that any person or entity determined to be in violation of the Releases and Injunctions shall pay the

19

attorneys' fees and costs incurred by the Contributor and Affiliate Released Parties or any other person or entity to be released pursuant to Section 5(b) hereof in enforcing the Releases and Injunctions or otherwise defending Contributor and Affiliate Released Claims.

(f) **Dismissal of the Adversary Proceeding**: Within fourteen (14) Business Days of the occurrence of the Confirmation Order becoming a Final Order, the Trustee or acting plaintiff in the Adversary Proceeding shall cause the dismissal of the Adversary Proceeding, with prejudice and without costs.

Notwithstanding anything to the contrary in this Section 5, the Plan Releases and the Plan Injunctions shall not provide for the release of, or an injunction against, any Claims, causes of action or rights of recovery of any person or entity against Ameridose or any insurers of the Debtor or of the Pharmaceutical Entities (including, without limitation, Pharmacists Mutual Insurance Company, Maxum Indemnity Company and Ironshore Specialty Insurance Company), unless such party enters into a separate agreement with the Trustee providing for the inclusion of such party in the Releases and Injunctions. In the event that Ameridose does not enter into a separate agreement providing for the inclusion of Ameridose in the Releases and Injunctions, any and all proceeds received by the Trustee from Ameridose as a result of the sale or disposition of Ameridose or its assets, or as a result of distributions by Ameridose, shall be allocated as among the Trustee and the Contributors such that the Trustee shall retain seventy-five percent (75%) of the amount received and shall deliver the balance to the Contributors pro rata with each Contributor's percentage equity holding in Ameridose.

**Section 6.** **Waiver, Release and Assignment of Claims.** Effective as of the Plan Effective Date, each Contributor hereby waives, relinquishes and releases (i) any and all Claims, of any kind or character, if any, he or she holds against the Debtor or its estate, and (ii) any and all rights to distributions or recoveries, of any kind or character, if any, on account of such Claims including, without limitation, pursuant to a chapter 11 plan for the Debtor (including, without limitation, the Plan). Effective as of the date the Confirmation Order becomes a Final Order, each Contributor unconditionally assigns and transfers to the Trustee any and all Claims that he or she holds against any person or entity, including, without limitation, any affiliate of the Debtor or any other Contributor, in any way relating to or in connection with the Debtor or any and all products of and/or distributed by the Debtor.

**Section 7.** **Representations and Warranties of the Contributors.** To induce the Trustee to enter into and perform their obligations under this Agreement, each Contributor, severally but not jointly, represents, warrants and acknowledges as follows:

(a) *Authority.* The Contributor has all necessary authority to enter into this Agreement.

(b) *Validity.* This Agreement has been duly executed and delivered by Contributor and constitutes the legal, valid and binding agreement of the Contributor, enforceable against the Contributor in accordance with its terms.

(c) *No Conflicts.* The execution, delivery and performance by such Contributor (when such performance is due) of this Agreement does not violate any provision of law,

20

rule or regulation applicable to him or her to the best of the Contributor's knowledge.

(d)  *Contributor Taxes.* In the case of each Contributor, the Contributor has filed (or has had another file on his or her behalf) all state and federal tax returns that he or she was required to file through the 2012 tax year and has paid the Contributor's corresponding taxes calculated as owing thereunder or otherwise determined to be owing. The Contributor has delivered to the Trustee true and accurate copies of all state and federal tax returns filed by or on behalf of such Contributor for years 2004 through 2012.

(e)  *Financial Disclosure.* In the case of each Contributor, the information set forth in that Contributor's Financial Disclosure is complete and accurate as of the Disclosure Date to the best of his or her knowledge after due investigation and inquiry by such Contributor.

(f)  *Debtor Taxes.* To the best of the Contributor's knowledge and belief, the Debtor has filed (or has had another file on its behalf) all tax returns that it was required to file for all tax periods that concluded prior to the Petition Date, and during those periods, the Debtor was classified and qualified as an "S" corporation under the IRC and any applicable state, local, or foreign laws.

(g)  *Plan Deposits.* The funds that shall constitute the Plan Deposit of each Contributor or Contributors (in the case of married Parties) are not subject to any lien, security interest, attachment, encumbrance or other interest held by a third party, other than as provided for in the Security Orders.

(h)  *Equity Interests.* The Contributor (i) is the record and beneficial owner of all of his or her equity interests in NECC and the Pharmaceutical Entities and (ii) has good and valid title to such equity interests, free and clear of any liens or encumbrances.

**Section 8.**    **Representations and Warranties of the Trustee.** To induce the Contributors to enter into and perform their obligations under this Agreement, the Trustee represents, warrants and acknowledges as follows:

(a)  *Validity.* Subject to any Bankruptcy Court approval that may be required, this Agreement has been duly executed and delivered by the Trustee and constitutes the legal, valid and binding agreement of the Trustee, enforceable against the Trustee in accordance with its terms;

(b)  *No Conflicts.* The execution, delivery and performance by the Trustee (when such performance is due) of this Agreement does not (A) subject to the actions, consents and filings referred to in clause (c) below, violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its or their certificates of incorporation or bylaws or other organization documents, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it is a party.

21

(c) *Authorization of Governmental Authorities.* No action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority or regulatory body other than the Bankruptcy Court, is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance of this Agreement by the Trustee.

(d) *Independent Diligence.* The Trustee has conducted his own independent diligence regarding the value of Assets set forth in each Contributor's Financial Disclosure and is not relying upon the values ascribed by the Contributors therein.

(e) *Taxes.* The Debtor has timely filed (or has had another file on its behalf) all tax returns that it was required to file on and following the date of the Trustee's appointment, and the Trustee has not or will not revoke the Debtor's status as an "S" corporation under the IRC and any applicable state, local, or foreign laws.

## Section 9. **Further Assurances.**

(a) The Trustee shall draft, for review and approval by the Contributors as to the matters relating to this Agreement, and, upon such approval by the Contributors, shall file with the Bankruptcy Court and pursue allowance, approval or confirmation of, as applicable, the 9019 Motion, the Disclosure Statement, and the Plan. The Contributors approval of the Disclosure Statement and the Plan shall not be unreasonably withheld.

(b) The Contributors shall each provide assistance consistent with this Agreement to the Trustee as reasonably requested to assist the Trustee in obtaining allowance of the 9019 Motion on a final basis, approval of the Disclosure Statement and confirmation of the Plan, and shall provide such other assistance as the Trustee deems reasonably necessary and appropriate to ensure that the Settlement is consummated.

(c) From and after the Execution Date, the Contributors shall execute agreements as necessary or appropriate and reasonably requested by the Trustee, and in form and substance reasonably acceptable to the Contributors as to the matters relating to their rights, in order to effectuate and consummate the Trustee's settlements with Pharmaceutical Mutual Insurance Company, Maxum Indemnity Company, Preferred Mutual Insurance Company, GDC Properties Management, LLC and Ameridose.

(d) The Trustee and the Contributors shall each move promptly to enforce the provisions of the Rule 9019 Order in any appropriate courts of competent jurisdiction should the Contributors or Trustee become aware that a third-party is in violation of the Rule 9019 Order. The Trustee shall make a diligent effort, with the cooperation of the Contributors, to obtain and enforce the Rule 9019 Order through the Plan Effective Date, whether in the MDL Proceeding or otherwise.

(e) Each Contributor shall provide timely notice to the Trustee or any successor Estate Representative of (i) any action by a third party seeking to attach any or all of the

22

Plan Escrowed Funds, the Net Tax Refunds, or one or more of the Contributor's interest therein, or (ii) any order of attachment granted in favor of a third party in respect of any or all of the Plan Escrowed Funds or one or more of the Contributor's interest therein. The Contributors agree to reasonably cooperate with the Trustee and take such reasonable actions as the Trustee may direct, in each case at the Trustee's sole expense, in connection with the Trustee's efforts to prevent entry of such orders or obtain relief from such orders. The Contributors shall not interfere with or oppose the Trustee's efforts to intervene or seek relief in such actions.

(f)     The Contributors shall not interfere with the Trustee's investigations regarding the NECC Claims, the Debtor's defenses to the NECC Claims, or regarding the potential liability of the Third-Party Defendants, except as he or she determines to be necessary to maintain the Contributor's defense or otherwise protect his or her rights, in any administrative, investigative, or judicial proceeding.

(g)     Following entry of the Rule 9019 Order, the Trustee and the Estate Representative shall provide each Contributor and his or her counsel access to the document depository maintained by the Debtor containing the Debtor's business records and communication files maintained in the ordinary course of the Debtor's business through the Petition Date to enable each Contributor to view and print such non-privileged documents as are determined by a Contributor, in his or her sole discretion, relevant to the Contributor's defense of any and all Claims against him or her, in any other administrative, investigative, or judicial proceeding. The Contributors agree to enter into a confidentiality agreement regarding the use and production of such documents, on reasonable and customary terms.

(h)     In the event that the Rule 9019 Order is reversed or vacated on appeal, the Parties agree and stipulate that, without any further action required by the Parties, (i) the Security Orders shall remain dissolved in all respects; (ii) the restrictions on the Trustee and any Estate Representative seeking additional prejudgment security or remedy set forth in Section 3.1(e) shall remain in effect; and (iii) the Substitute Lien shall remain valid and effective in all respects without any modifications thereto, subject to the terms of this Agreement.

(i)     Unless the Trustee agrees or consents otherwise, each of the Contributors agrees not to transfer, assign, convey, pledge, encumber or otherwise dispose of any of his or her equity interests in (i) NECC, through the date of the last release of all Tax Escrowed Funds to the Estate Representative pursuant to Section 10.2 hereof or (ii) any of the Pharmaceutical Entities, through the date the Trustee's right to sell the Pharmaceutical Entities expires in accordance with Sections 2.3(a) and 2.3(b) hereof.

**Section 10.**    **Taxes and Tax Refunds.**

    **Section 10.1.**    **Net Tax Refunds.**

    (a)    For purposes of this Agreement, "Net Tax Refund" means:

    Federal, state and local tax refunds received, regardless of when received, by any of the Contributors and their spouses (if married), (i) resulting from the payment of the Base Payments, plus the payment of the Additional Contributions described in Section 2.2 but excluding 2.2(e) (Tax Contributions); and (ii) resulting from the disposition of assets or stock (or limited liability company interests) of, or operating losses generated by, the Pharmaceutical Entities: (x) with respect to Ameridose, in 2014 and in any later year or years (or portion thereof) that ends on the date that is eighteen (18) months following the Plan Effective Date; and (y) with respect to any other Pharmaceutical Entities, in 2014 and in any later year or years (or portion thereof) that ends on the date that is twelve (12) months following the Plan Effective Date (all refunds described in this Section 10.1(a) shall be collectively referred to as "Refunds");

    less

    (b)    reasonable costs and expenses paid by the Contributors and their spouses (to the extent not reimbursed or reimbursable by insurance or otherwise) in filing and defending their rights to any Refunds;

    and increased by

    (c)    all interest income paid by a governmental authority with respect to any Refunds;

    provided however that none of the following shall be included in the definition of "Net Tax Refunds": (a) any tax refund received by a Contributor attributable to the Contributor's or Contributors' funding of any or all of the Tax Contributions; (b) any tax refund received by any of the Contributors attributable to the disposition of assets or stock of, or operating losses generated by, any of the Affiliated Entities that are not Pharmaceutical Entities; and (c) any tax refund received, regardless of when received, by any of the Contributors attributable to the disposition of assets or stock of, or operating losses generated by, the Pharmaceutical Entities: (x) in the case of Ameridose, prior to the year 2014 and after the date that is eighteen (18) months after the Plan Effective Date, and (y) in the case of any other Pharmaceutical Entities, prior to the year 2014 and after the date that is twelve (12) months after the Plan Effective Date.

    **Section 10.2.**    **Release of Tax Escrowed Funds from Escrow.**

    Notwithstanding anything to the contrary in this Agreement, the Escrow Agreement shall provide that the Tax Escrowed Funds shall be released as follows, and only as follows:

    (a)    Upon the final non-appealable disallowance (full or partial) by a state, federal or

local taxing authority of the claimed refund that generated the Net Tax Refunds, and notice thereof delivered by the Trustee in accordance with the Escrow Agreement, the Escrow Agent shall timely distribute to the Contributor or Contributors whose Refund has been partially or fully disallowed ninety percent (90%) of the amount owing to the applicable taxing authority on account of the full or partial disallowance of such Net Tax Refund (but only to the extent of such disallowance and only to the extent actually received by the Escrow Agent as Tax Contributions), and, upon receipt of such distribution from the Escrow, the Contributor or Contributors receiving such distribution will promptly pay to the taxing authority the amount owed to the applicable taxing authority;

(b)     Upon the fourth (4th) anniversary of the delivery of the Tax Contributions to the Escrow Agent, the balance of the Tax Escrowed Funds shall be released by the Escrow Agent upon notice as provided in the Escrow Agreement to the Estate Representative for such use and distribution as provided for in the Plan and Confirmation Order; provided, however, a release under this Section 10.2(b) shall be made to the Estate Representative prior to such fourth (4th) anniversary of the delivery of any Tax Contributions upon the issuance by the applicable governmental authority of a non-appealable (by such governmental authority) finding in favor of any Contributor and such Contributor's right to the relevant Net Tax Refunds; or

(c)     Upon Termination, the Tax Escrowed Funds, if any, will be released by the Escrow Agent upon notice as provided in the Escrow Agreement and only pursuant to Section 3.3(b)(iv) and these provisions of Section 10.2.

**Section 10.3.        Tax Covenants.**  The Parties further agree as follows:

(a)     The Plan shall provide that, to the fullest extent permitted by law, all Contributions shall be characterized and reported for all tax purposes as contributions of capital by the Contributors in accordance with their respective ownership positions in NECC, and the acting Estate Representative shall timely prepare true and accurate Schedule K-1s reflecting each Contributor's capital position and allocated net loss on an annual basis to enable the Contributors to apply for and collect tax refunds in accordance with this Agreement;

(b)     The Plan shall require the acting Estate Representative to provide full and accurate copies of any and all income tax returns, as supplemented or amended, filed on behalf of the Debtor to each Contributor within fourteen (14) days of filing thereof, as well as any additional related information required by the Contributors to accurately prepare or amend their personal tax returns and receive Net Tax Refunds, with such returns and related information to be maintained as confidential and subject to the provisions of the Protocol Order;

(c)     The Parties shall agree not to waive or limit any net operating loss carry-back period for any Party, including without limitation for the Debtor or any Contributor;

(d)     Subject to Section 10.4 hereof, all Parties acknowledge and agree that the provisions of this Section 10, and this Agreement with respect to Refund Claims, Refunds and Net Tax Refunds, and all procedural or computational decisions and judgments related thereto, shall be made so as to (i) maximize the amount of the Refund Claims, the Refunds and the Net Tax Refunds consistent with applicable laws, including, without limitation, the 10-year loss carryback provisions for product liability matters and (ii) accelerate the timing of the filing of the Refund Claims and the receipt of the Refunds and the Net Tax Refunds to the extent reasonably possible and consistent with applicable laws;

(e)     Subject to this Agreement, the Contributors shall take such actions determined by the Contributors and their professional advisors to be necessary to promptly and in good faith seek, procure and maximize the Net Tax Refunds for 2014 and such other years as are required by Section 10.1 of this Agreement, under applicable federal, state or local law;

(f)     Each Contributor and his or her spouse shall open one or more bank accounts, or designate existing bank accounts, in either case at a financial institution approved by the Trustee, and shall take such actions as are reasonably requested by the Trustee to cause electronic delivery of the Refunds to such accounts, which bank accounts will be (i) solely in the name of the Contributor and/or the Contributor and his or her spouse, (ii) subject to deposit account control agreements in favor of the Trustee in a form approved by the Parties, (iii) subject to the Substitute Lien solely to the extent of the amount constituting the Tax Contributions, and (iv) subject to release from the Substitute Lien in accordance with this Agreement. Within five (5) Business Days of the deposit of the Refunds into such accounts, the Contributors shall cause that portion of the Refunds constituting the Tax Contributions (calculated with reference to Net Tax Refunds in accordance with Section 10.1 herein) to be delivered to the Trustee as Additional Contributions in accordance with Section 2.2(e) and treated as capital contributions pursuant to Section 2.4, and such Tax Contributions shall be then subject to all of the terms of the Escrow Agreement. If for any reason the IRS or other taxing authority remits Refunds directly to the Contributors or their spouses, then such Refunds shall be subject to the Substitute Lien to the extent of the Tax Contributions, and each Contributor and his or her spouse shall transfer to the Trustee the Tax Contributions associated with such Refunds within four (4) Business Days of his, her or their receipt thereof;

(g)     The Contributors shall have no liability to any of the NECC Parties should a federal, state or local taxing jurisdiction determine that no Net Tax Refund is available to any one of or all the Contributors, or should a taxing jurisdiction determine that the Net Tax Refund is lower than calculated by the Contributors; nothing in this Section 10.3(g) shall be construed to alter, modify or diminish the Contributors' obligations to comply with all other provisions of this Agreement;

(h)     None of the Parties shall revoke (or cause to be revoked or terminated) the Debtor's election to be taxed as an "S" corporation within the meaning of Section 1361 and

26

1362 of the IRC through any tax year relevant to a Net Tax Refund under this Agreement. None of the Contributors shall take or allow any action that would result in the termination of Debtor's status as a validly electing "S" corporation within the meaning of Sections 1361 and 1362 of the IRC through any tax year relevant to a Net Tax Refund under this Agreement;

(i)    The Bankruptcy Court will retain jurisdiction over the tax aspects of this Agreement as set forth in Section 12.7 hereof;

(j)    In the case of each Contributor, the Contributor shall timely file (in accordance with any extension) all federal, state and local tax returns that he or she is required to file for the 2013 tax year and shall pay the Contributor's corresponding taxes calculated as owing thereunder or otherwise determined to be owing. The Contributor shall deliver to the Estate Representative true and accurate copies of all federal, state and local tax returns filed by or on behalf of such Contributor for the 2013 tax year. The Contributors shall timely provide the acting Estate Representative with copies of all individual federal, state and local tax returns filed by them after the Plan Effective Date through any tax year relevant to a Net Tax Refund under this Agreement, as well as copies of all communications received from federal, state and local taxing agencies, claiming or regarding Net Tax Refunds or challenging the Contributor's tax position regarding the Net Tax Refunds, with all such returns and related documents to be maintained as confidential and subject to the provisions of the Protocol Order; and

(k)    Each spouse of a Contributor who is not a party to this Agreement (including, for the avoidance of doubt, the spouses of Carla Conigliaro and Gregory Conigliaro), shall execute his or her respective Tax Return Spouse Consent Agreement in the forms attached hereto as **Exhibits E and F**.

### Section 10.4. <u>Tax Reviews and Disputes</u>.

(a)    The acting Estate Representative shall have the right to review, prior to filing and submission, all tax returns, reports and other documents to be filed, submitted, or furnished to any governmental authority by or on behalf of any Party, including without limitation the Contributors, related to the Refund Claims, the Refunds or the Net Tax Refunds and no such tax returns, reports and other documents shall be filed, submitted or furnished to any governmental authority without the prior written consent of the acting Estate Representative, which consent shall not be unreasonably withheld or denied if such tax returns, reports and other documents reflect compliance with the terms of this Agreement;

(b)    The Contributors shall provide the acting Estate Representative with copies of any notices of IRS or state or local tax audits of any tax returns relating to the Refund Claims, the Refunds, or the Net Tax Refunds within fifteen (15) Business Days of receipt;

(c)    None of the Contributors shall take any position, whether or not in writing, with a

governmental agency, or engage in discussions to settle or compromise a Refund Claim, in a manner that would adversely affect the amount or timing of the Refund Claims, the Refunds or the Net Tax Refunds without the prior written consent of the acting Estate Representative, which consent shall not be unreasonably withheld or denied if such settlement or compromise reflects compliance with the terms of this Agreement; and

(d)    Nothing in this Agreement shall preclude a determination by the acting Estate Administrator that the determination of a governmental agency with respect to any Refund Claim, Refund or Net Tax Refund is unreasonable, unsupported by law or by facts or otherwise incorrect as a matter of law or of fact (a "Tax Dispute"); in case of a Tax Dispute, the Parties shall cooperate and shall take all such action reasonably requested by the acting Estate Administrator to pursue an appeal at the administrative level or in a court of competent jurisdiction until the subject matter of the Tax Dispute is finally determined.

## Section 11.   Termination.

**Section 11.1.   Automatic Termination.** The obligations of the Parties under this Agreement shall automatically terminate upon the occurrence of any of the following: (a) the Rule 9019 Motion is denied (in whole or in part), unless the Contributors approve the form of Rule 9019 Order to be entered by the Court if not materially consistent with the form of order attached hereto as Exhibit D or the Rule 9019 Order is stayed, modified or vacated on appeal; (b) the Bankruptcy Court denies confirmation of the Plan and such denial cannot be cured by amending the Plan in a manner that is either (i) not materially inconsistent with this Agreement or (ii) otherwise agreed to by the Parties; (c) the Plan is withdrawn; (d) the Plan Effective Date fails to occur by the one year anniversary of the date of entry of the Rule 9019 Order (the "Outside Date"), or such extended Outside Date may be agreed in a signed writing by counsel for each and all of the Parties, or, their successors in interest, provided that in the event there is an appeal and stay of the Confirmation Order, the Outside Date shall be deemed extended through and including December 31, 2015. Notwithstanding the foregoing, nothing in this Section 11.1 shall cause an automatic termination under this Agreement by the sole action or omission of one or more of the Contributors; for the avoidance of doubt, the foregoing provision is intended to conform to the "economic performance" requirements under Section 3.3(a) above.

**Section 11.2.   Termination by Trustee.** The Trustee may terminate this Agreement at his sole discretion and election at any point prior to the occurrence of the Plan Effective Date, if (i) one or more of the Contributors has breached any of his, her or their obligations, representations, warranties, or covenants set forth in this Agreement in any material respect and such breach has not been cured within ten (10) Business Days after the Trustee has delivered written notice of such breach to the Contributors and to the Committee, if such breach occurs prior to the Plan Effective Date or (ii) any or all of the Plan Escrowed Funds are seized, levied or claimed by a governmental authority.

**Section 11.3.   Termination by Contributors.** All of the Contributors (but not less than all) may terminate this Agreement as to all Parties at any point prior to the occurrence of the Plan Effective Date if the Trustee or acting Estate Representative has breached any of his or her

obligations, representations, warranties, or covenants set forth in this Agreement in any material respect and such breach has not been cured within ten (10) Business Days after the Contributors have delivered written notice of such breach to the Trustee or his successor in interest.

**Section 11.4.** **Effect of Termination.** In the event this Agreement is terminated as provided above (a "Termination"), except as provided in Sections 3.1, 3.3 and 3.4 above regarding dissolution of the Security Orders, prohibition on the Trustee or Estate Representative seeking additional prejudgment security or remedy, release of the Plan Escrowed Funds, and the grant and continuation of the Substitute Lien, the Parties shall be restored to the same position which they were in immediately prior to the execution of this Agreement, without waiver of any rights, claims or defense and subject to Section 3.3(b) herein; provided, however, that in no event shall any such termination be deemed to release a Party from liability for damages established by a court of competent jurisdiction to have been suffered by any of the other Parties to the Agreement on account of breach. For the avoidance of doubt, Sections 3.1(d), 3.1(e), 3.3(b)(iii), 3.3(b)(iv), 3.3(b)(v), 3.3(b)(vi), and 3.4 above shall survive the termination of this Agreement.

**Section 11.5.** This Agreement may not be terminated by any Party after the later of (i) the release by the Escrow Agent to the Trustee of all Plan Escrowed Funds in accordance with Section 3.3 hereof, and (ii) the distribution of all Escrowed Funds to creditors pursuant to the Plan.

**Section 12.** **Miscellaneous Provisions.**

**Section 12.1.** **Effectiveness.** This Agreement shall become effective upon the Execution Date, subject to approval of the Bankruptcy Court.

**Section 12.2.** **Committee and PSC Rights.** The Parties agree (a) that they shall not amend this Agreement in any respect prior to consulting in good faith with the Committee and the PSC, (b) that the Trustee has provided counsel to the Committee and lead counsel to the PSC with copies of the Financial Disclosures in their capacities as Non-Party Participants as that term is used in the Protocol Order; and (c) the Trustee shall provide the Committee's counsel and lead counsel to the PSC with copies of (i) a fully executed copy of this Agreement and all exhibits, schedules and attachments thereto, and (ii) all notices, demands or other communications delivered pursuant to this Agreement or the Escrow Agreement. The Trustee shall not terminate this Agreement, withdraw the Plan, or sell or otherwise sell the assets or equity in the Pharmaceutical Entities pursuant to Section 2.3 above prior to consulting in good faith with the Committee and lead counsel to the PSC. For the avoidance of doubt, nothing in this Agreement shall impair, waive or otherwise affect the Committee's rights to apply to the Bankruptcy Court for standing or authority to commence or prosecute claims or causes of action on behalf of the Debtor or its estate, other than against any or all of the Contributor and Affiliate Released Parties (so long as this Agreement has not terminated), nor the Trustee's right to oppose any such application by the Committee.

**Section 12.3.** **No Waiver of Privileges.** Nothing herein shall constitute a waiver of any privilege or immunity of any Party under federal, state or other applicable law.

**Section 12.4.** **Enforcement of Agreement.** The Parties hereby acknowledge that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by any Party and that such breach shall cause the non-breaching Parties irreparable

harm. Accordingly, the Parties agree that in the event of any breach or threatened breach of this Agreement by any of the Parties, the Parties, in addition to any other remedies at law or in equity that they may have, shall be entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance.

**Section 12.5.     Costs.**  Except as otherwise provided herein, each Party shall pay his, her or its own fees and costs, including any transfer taxes, in connection with the performance of his, her or its obligations under this Agreement and any proceedings to enforce or interpret the terms and conditions of this Agreement.

**Section 12.6.     Statutes of Limitations.**  The Parties agree and consent that all statutes of limitations, statutes of repose, time limited laches or estoppel defenses or any other state law pre-suit requirements, as to any and all Claims and causes of action either (i) among the Parties, the Estate Parties and/or the Contributor and Affiliate Released Parties, or (ii) by Plaintiffs against the Contributors and/or Contributor and Affiliate Released Parties pertaining to, concerning or related to NECC and/or its products, that had not expired by operation of applicable local, state, or federal law prior to September 5, 2013 shall be tolled through and including the Plan Effective Date.

**Section 12.7.     Governing Law; Jurisdiction.**

(a)     *Governing Law*.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

(b)     *Jurisdiction*.  By his, her or its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for himself or herself that any legal action, suit or proceeding against it with respect to any matter brought by any Party to enforce or interpret the Agreement or the Tax Return Spouse Consent Agreement against another Party or other Parties ("Enforcement Action") shall be brought exclusively in the Bankruptcy Court.  By execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits himself or herself to the exclusive jurisdiction of the Bankruptcy Court with respect to any such Enforcement Action and only with respect to such Enforcement Action.  Only in the event the Bankruptcy Court does not have or refuses to exercise jurisdiction with respect to the Enforcement Action, such proceeding must be brought in the U.S. District Court for the District of Massachusetts or, solely if jurisdiction is lacking in the U.S. District Court, then in the Superior Court of the Commonwealth of Massachusetts for Suffolk County.  EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY ENFORCEMENT ACTION AND ONLY IN ANY ENFORCEMENT ACTION.

**Section 12.8.   No Admission.**  This Agreement is part of a settlement among the Parties.  Nothing herein shall be deemed to be an admission of any kind, including, but not limited to, an admission or concession of coverage, responsibility, actual or intended loss to others, actual or intended gain to Contributors, liability, or non-liability or wrongdoing by any

Party to this Agreement.  To the extent provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, as well as the Protocol Order, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

**Section 12.9.  Notices.**  All notices, demands, or other communications to be provided pursuant to this Agreement shall be in writing and sent by registered or certified mail, return receipt requested or by an overnight delivery service, and by e-mail, if possible, to the Party receiving such communication at the addresses set forth below, or such other address as either Party may designate in writing from time to time:

<u>If to the Trustee:</u>

Paul D. Moore, Esq.
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA 02110
pdmoore@duanemorris.com

<u>If to Barry Cadden and Lisa Conigliaro Cadden:</u>

Harold B. Murphy, Esq.
Murphy & King, P.C.
One Beacon Street
Boston, MA  02108
hbm@murphyking.com
jfo@murphyking.com

<u>If to Gregory Conigliaro:</u>

Christopher J. Panos, Esq.
Partridge Snow & Hahn LLP
30 Federal Street
Boston, MA 02110
cpanos@PSH.com

<u>If to Carla Conigliaro:</u>

John J. Monaghan, Esq.
Lynne B. Xerras, Esq.
Holland & Knight LLP
10 St. James Avenue
Boston, MA  02116
john.monaghan@hklaw.com
lynne.xerras@hklaw.com

Section 12.10. <u>Cooperation</u>. Each Party agrees to take such steps and to execute and deliver any documents as may be reasonably necessary or appropriate to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability, and as otherwise required by the terms of this Agreement in all material respects. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any person or entity not a Party to this Agreement to invalidate, interpret, or prevent the validation, enforcement, or carrying out of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate in opposing such action or proceeding.

Section 12.11. <u>Successors</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and each of their respective successors, heirs and permitted assigns. Except as expressly set forth herein, the Parties do not intend to confer any benefit by or under this Agreement upon any person or entity other than the Parties hereto and their respective successors, heirs and permitted assigns.

Section 12.12. <u>Complete Agreement, Amendments</u>. This Agreement, the Escrow Agreement, and any Exhibits to the Agreement and the Escrow Agreement, contain the entire agreement among the Parties with respect to the matters and transactions contemplated hereby, and shall supersede all negotiations, presentations, warranties, commitments, offers, contracts and writings prior to the date hereof relating to the subject matters hereof. This Agreement shall be interpreted as if drafted jointly by all Parties. This Agreement may be amended, modified, waived, discharged or terminated only by a writing signed by all Parties.

Section 12.13. <u>Descriptive Headings</u>. The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

Section 12.14. <u>Counterparts</u>. This Agreement may be executed by one or more of the Parties on any number of separate counterparts and delivered by facsimile or email, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

Section 12.15. <u>Executed under Seal</u>. This Agreement is intended to be and shall have the effect of a document executed under seal in accordance with the laws of the Commonwealth of Massachusetts.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

*Signature Page to Plan Support and Funding Agreement*

IN WITNESS WHEREOF, the Parties have caused this Plan Support and Funding Agreement to be executed under seal as of the date first written above.

Paul D. Moore, in his capacity as Chapter 11 Trustee
of New England Compounding Pharmacy, Inc.,
d/b/a New England Compounding Center and not
individually

_____

Barry Cadden

_____

Lisa Cadden

_____

Carla Conigliaro

_____

Gregory Conigliaro

33

*Signature Page to Plan Support and Funding Agreement*

IN WITNESS WHEREOF, the Parties have caused this Plan Support and Funding Agreement to be executed under seal as of the date first written above.

_____
Paul D. Moore, in his capacity as Chapter 11 Trustee of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center and not individually

_____
Barry Cadden

_____
Lisa Cadden

_____
Carla Conigliaro

_____
Gregory Conigliaro

33

*Signature Page to Plan Support and Funding Agreement*

IN WITNESS WHEREOF, the Parties have caused this Plan Support and Funding Agreement to be executed under seal as of the date first written above.

_____

Paul D. Moore, in his capacity as Chapter 11 Trustee
of New England Compounding Pharmacy, Inc.,
d/b/a New England Compounding Center and not
individually

_____

Barry Cadden

_____

Lisa Cadden

_____

Carla Conigliaro

_____

Gregory Conigliaro

33

*Signature Page to Plan Support and Funding Agreement*

IN WITNESS WHEREOF, the Parties have caused this Plan Support and Funding Agreement to be executed under seal as of the date first written above.

_____

Paul D. Moore, in his capacity as Chapter 11 Trustee of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center and not individually


_____

Barry Cadden


_____

Lisa Cadden


_____

Carla Conigliaro


_____

Gregory Conigliaro


33

## ADDENDUM TO PLAN SUPPORT AND FUNDING AGREEMENT

This Addendum (the "Addendum") to the *Plan Support and Funding Agreement* dated as of May 2, 2014 (the "Agreement") is made as of May 2, 2014 by:

(i)     the Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 case of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center, Case No. 12-19882, pending in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"); and

(ii)    the Plaintiffs' Steering Committee (the "PSC") appointed in the multi-district litigation captioned *In re New England Compounding Pharmacy Cases Litigation*, MDL No. 2419, Case No. 13-cv-02419 (D. Mass.).

Capitalized terms not defined herein shall have the meanings assigned to them in Section 1 of the Agreement.

1.      Each of the Committee and the PSC acknowledges that it has had a sufficient opportunity to discuss and review the Agreement with its counsel, has in fact done so, and fully understands the terms, conditions, and agreements set forth therein.

2.      Each of the Committee and the PSC is in favor of the Agreement and the compromise and settlement embodied therein.

3.      Each of the Committee and the PSC supports the Bankruptcy Court's approval of the Agreement in all respects and shall support entry of the Rule 9019 Order.

4.      Each of the Committee and the PSC agree (i) to undertake reasonable efforts to enforce the MDL Stay Order pending the Plan Effective Date, (ii) to reasonably assist and support the Trustee in any proceedings in which the Trustee seeks to enforce the MDL Stay Order and/or obtain an injunction against any party pursuant to Section 3.2 of the Agreement, (iii) to oppose the modification of the MDL Stay Order except as on terms agreed to by the Contributors, and (iv) to oppose relief as to the Contributors and the Contributor and Affiliate Released Parties that is prohibited by the MDL Stay Order.

5.      Each of the Committee, the PSC, and their members agree, so long as this Agreement has not been terminated, (i) to support and not oppose or object to those aspects of the Plan that are addressed or contemplated by, or incorporate the provisions of, the Agreement, (ii) to support and not oppose or object to the consummation of the Agreement whether through the Plan, the Disclosure Statement, or any Supplemental Documents, (iii) not to propose an alternate plan that competes with the Plan; and (iv) to afford counsel to the Contributors access to the document repository created and maintained in the MDL Proceeding pursuant to the Case Management Order in effect in that proceeding. Notwithstanding the foregoing, each of the Committee, the PSC and their members reserve all rights in connection with any aspect of the Plan that is not the subject of the Agreement, including, without limitation, the right to object to and/or negotiate provisions of the Plan that are not the subject of this Agreement.

6.      Nothing in this Addendum is intended to or does modify the Agreement in any

respect.

*Signature Page to Addendum to Plan Support and Funding Agreement*

**THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NEW
ENGLAND COMPOUNDING PHARMACY,
INC., BY AND THROUGH ITS COUNSEL
AND CO-CHAIRS**

**BROWN RUDNICK LLP**

By: _____

David J. Molton, Esq. (admitted *pro hac vice*)
Daniel J. Saval, Esq. (BBO #653906)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com
dsaval@brownrudnick.com

and

William R. Baldiga, Esq. (BBO #542125)
Kiersten A. Taylor, Esq. (BBO #681906)
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
wbaldiga@brownrudnick.com
ktaylor@brownrudnick.com

*Counsel to the Official Committee of Unsecured
Creditors of New England Compounding Pharmacy,
Inc.*

ANDREWS & THORNTON

By: _____
Anne Andrews, Esq.
John C. Thornton, Esq.
Karren Schaeffer, Esq.
2 Corporate Park, Ste. 110
Irvine, CA 92606
Telephone: 949 748-1000
aa@andrewsthornton.com
jct@andrewsthornton.com
kschaeffer@andrewsthornton.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair, Katrina
Eldreth, obo Ari Gomez*

COHEN PLACITELLA & ROTH P.C.

By: _____
Michael Coren, Esq.
Harry Roth, Esq.
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: 215 567-3500
mcoren@cprlaw.com
hroth@cprlaw.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair,
Meghan Handy*

ANDREWS & THORNTON

By: _____
Anne Andrews, Esq.
John C. Thornton, Esq.
Karren Schaeffer, Esq.
2 Corporate Park, Ste. 110
Irvine, CA 92606
Telephone: 949 748-1000
aa@andrewsthornton.com
jct@andrewsthornton.com
kschaeffer@andrewsthornton.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair, Katrina
Eldreth, obo Ari Gomez*

COHEN PLACITELLA & ROTH P.C.

By: _____
Michael Coren, Esq.
Harry Roth, Esq.
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: 215 567-3500
mcoren@cprlaw.com
hroth@cprlaw.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair,
Meghan Handy*

THE PLAINTIFF STEERING COMMITTEE,
BY AND THROUGH ITS LEAD COUNSEL


HAGENS BERMAN SOBOL SHAPIRO, LLP

By: _____
Thomas M. Sobol, Esq.
Kristen Johnson Parker, Esq.
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
(617) 482-3700
tom@hbsslaw.com
kristenjp@hbsslaw.com

*Plaintiffs' Lead Counsel, for the PSC*

### Index To Exhibits to Plan Support and Funding Agreement

Exhibit A - List of Affiliated Entities

Exhibit B - List of Pharmaceutical Entities

Exhibit C - Escrow Agreement

Exhibit D - Rule 9019 Order

Exhibit E - Tax Return Spouse Consent Agreement, Douglas Conigliaro

Exhibit F - Tax Return Spouse Consent Agreement, Cynthia Ianzito

Exhibit G - Accounts to be Released from Security Orders Pursuant to section 3.1(c)

## EXHIBIT A - AFFILIATED ENTITIES

1)      **Corporate Entities**

203 Flanders Road, LLC

205 Flanders Road, LLC

Alaunus Pharmaceutical, LLC

Ameridose, LLC

Cadden Family-2012, LLC

Cardo Properties, LLC

Conigliaro Block, Inc.

Conigliaro Family Investments, LLC

Conigliaro Industries, Inc.

GDC Holdings, Inc.

GDC Properties Management, LLC

Hunter Holdings, LLC

L & S Creations, Inc.

Medical Sales Management, Inc.

Medical Sales Management, SW, Inc.

Nationwide Foam, Inc.

Nationwide Recycling Sales Management, Inc.

Physicians Choice Medical Marketing, LLC

Stone House Realty Group, LLC

## EXHIBIT B

### Pharmaceutical Companies

| | Entity Name | Entity Form | State | Date of Organization | Address |
|---|---|---|---|---|---|
| 1 | Alaunus Pharmaceutical, LLC | LLC | MA | 4/23/2009 | 687 Waverly Street Framingham, MA 01702 |
| 2 | Ameridose, LLC | LLC | MA | 2/8/2006 | 205 Flanders Road Westborough, MA 01581 |
| 3 | Medical Sales Management, Inc. | INC. | MA | 6/19/2002 | 697 Waverly Street Framingham, MA 01701 |
| 4 | Medical Sales Management, SW, Inc. | INC. | MA | 12/1/2010 | 697 Waverly Street Framingham, MA 01701 |

**EXHIBIT C - ESCROW AGREEMENT**

EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

**DRAFT**

## ESCROW AND CONTROL AGREEMENT

This ESCROW AND CONTROL AGREEMENT (this "Agreement") is dated as of the [___] day of May, 2014, by and among:

(a) Paul D. Moore, in his capacity as chapter 11 trustee (together with any successors thereto, including any Estate Representative (as defined below), the "Trustee") for the estate of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center (the "Debtor" or "NECC") appointed in the chapter 11 case of NECC (the "Chapter 11 Case"), Case No. 12-19882, pending in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), and not individually;

(b) Barry and Lisa Cadden (together, the "Caddens");

(c) Carla Conigliaro;

(d) Gregory Conigliaro (together with the Caddens and Carla Conigliaro, the "Contributors"); and

(e) [_____], as escrow agent (the "Escrow Agent").

Each of the Trustee, the Contributors and the Escrow Agent are defined as a "Party" and collectively as the "Parties."

## GENERAL PURPOSE

This Escrow and Control Agreement is established to hold and distribute all Escrowed Funds and Tax Escrowed Funds.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## DEFINITIONS

"Additional Contributions" means, inclusive and collectively,

(a) seventy-five percent (75%) of the Pharmaceutical Entity Distributions;

(b) one hundred percent (100%) of any and all Assets determined on or prior to the second anniversary of the Plan Effective Date to be Non-Disclosed Assets and the proceeds thereof;

(c) all interests of each Contributor in policies of insurance or rights therein that provide, or may provide, coverage for NECC, any Contributor, or any Affiliated Entities, in connection with, relating to or arising from the NECC Claims (the "Insurance Policies");

1

## EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

(d)     all proceeds of the Insurance Policies, other than the proceeds of said policies that represent reimbursement or payment of the Contributors or Affiliated Entities' defense costs unless expressly agreed to by the Contributors in writing; and

(e)     the Tax Contributions.

"Adversary Proceeding" means the action captioned *Official Committee of Unsecured Creditors v. Cadden, et al.*, Adv. Pro. 13-01040-JMB (Bankr. D. Mass).

"Affiliated Entities" means the entities set forth in **Exhibit A** to the Funding Agreement.

"Ameridose" means Ameridose LLC.

"Asset" means any interest in any property held, whether outright or beneficially, by any Contributor and/or that Contributor's spouse as of the Disclosure Date plus any property transferred by the Contributor and/or the Contributor's spouse to or for the benefit of any members of his or her family or other Affiliated Entities during the period from January 1, 2012 through December 21, 2012.

"Bankruptcy Code" means chapter 11 of title 11 of the United States Code.

"Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court.

"Base Payment" means: (a) in the case of the Caddens, $21,000,000; (b) in the case of Carla Conigliaro, $24,000,000; and (c) in the case of Gregory Conigliaro, $2,750,000.

"Business Day" means any day that is not a Saturday, a Sunday or a federal holiday in the United States of America.

"Cash Additional Contribution" means Additional Contribution in the form of cash or cash equivalents.

"Claim(s)" means "claim" as defined in section 101(5) of the Bankruptcy Code.

"Committee" means the Official Committee of Unsecured Creditors appointed in the chapter 11 case of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center, Case No. 12-19882, pending in the Bankruptcy Court.

"Confirmation Order" means an order of the Bankruptcy Court approving the Plan.

"Contributions" means, collectively, the Initial Plan Deposits plus the Additional Contributions.

"Contributor and Affiliate Released Parties" means the Contributors, and the respective spouses, children, parents, and other nuclear family members of each Contributor, all trusts under which the Contributors or their spouses or family members are settlors, trustees, or beneficiaries, the Affiliated Entities, and any other entities in which the Contributors' spouses,

## EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

children or other nuclear family members hold a controlling interest, and those entities' successors, assigns, and predecessors.

"Contributor Judgment" means a Final Order granting judgment for the Contributors and against the Trustee or acting plaintiff in the Adversary Proceeding on all counts and claims set forth in the Adversary Proceeding.

"Court Cases" means any and all cases, Claims, and causes of action currently pending or which may be brought in any forum against NECC, any or all of the Contributors, or any and all of the Contributor and Affiliate Released Parties, any or all of the Affiliated Entities, or any Third-Party Defendants, that involve, arise from, or relate to NECC or the NECC Claims, including, but not limited to, those pending in the MDL Proceeding or the Adversary Proceeding.

"Disclosure Date" means the date of a Contributor's Financial Disclosure, which, in the interests of clarity, for Carla Conigliaro was as of May 1, 2013; for Barry and Lisa Cadden was as of November 1, 2013 and for Gregory Conigliaro, was as of February 28, 2014.

"Disclosure Statement" means the disclosure statement to be filed in connection with the Plan, pursuant to Section 1125 of the Bankruptcy Code, in accordance with the Funding Agreement.

"Disclosure Statement Motion" means a motion to be filed with the Bankruptcy Court requesting approval of the form of Disclosure Statement, in accordance with the Funding Agreement.

"Disclosure Statement Order" means the order of the Bankruptcy Court approving the Disclosure Statement Motion, the Disclosure Statement, and the proposed solicitation procedures for the Plan set forth therein.

"Escrow Accounts" has the meaning set forth in Section 1(d).

"Escrowed Funds" has the meaning set forth in Section 1(b).

"Estate Parties" means the Trustee, the Debtor, the Debtor's bankruptcy estate in the Chapter 11 Case, the Committee, the Estate Representative, and each of their respective successors and assigns.

"Estate Representative" means the Trustee or any successor in interest to the Trustee, whether such successor is appointed under the Plan, Confirmation Order or otherwise.

"Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the applicable subject matter hereof which has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending, or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or

3

## EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

rehearing was sought or (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

"Final Order Condition" means the Confirmation Order being a Final Order.

"Final Order Notice" has the meaning set forth in Section 3(a)(i).

"Final Refund" has the meaning set forth in Section 2(c)(ii).

"Financial Disclosures" means, with regard to each Contributor, all documents relating to the Assets of the Contributor and/or the Contributor's spouse provided to the Trustee and/or the Trustee's professionals.

"Funding Agreement" means that certain Plan Support and Funding Agreement, dated as of May 2, 2014, by and among the Trustee and the Contributors, attached hereto as **Exhibit A**.

"Funding Agreement Parties" means the Trustee and the Contributors, as parties to the Funding Agreement.

"Indemnitees" has the meaning set forth in Section 5(b).

"Indemnitors" has the meaning set forth in Section 5(b).

"Initial Plan Deposits" means in respect of each Contributor or Contributors, if married, that Contributor's or Contributors' Base Payment plus any Cash Additional Contributions realized by or on behalf of the Contributor or Contributors as of the date the Rule 9019 Order enters.

"Interim Payment" means funds in an amount equal to (A) $10 million plus (B) the lesser of the amount equal to forty-seven and one half percent (47.5%) of the costs incurred by the Trustee in the copying and service of the Rule 9019 Motion and the Plan Documents and their respective associated documents and $50,000.

"Liabilities" has the meaning set forth in Section 5(b).

"Main Escrow" has the meaning set forth in Section 1(b).

"Main Escrow Account" has the meaning set forth in Section 1(b).

"MDL Proceeding" means the proceedings currently pending under the caption *In re New England Compounding Pharmacy Cases Litigation*, MDL No. 2419, Case No. 13-cv-02419 (D. Mass.)

"MPA" means methylprednisolone acetate and products containing methylprednisolone acetate.

4

### EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

"NECC Claims" means all Claims, rights, causes of action, cases, demands, damages, costs, compensation, contribution, or claims for indemnification of any person or entity including, but not limited to, the Plaintiffs, the Debtor, the NECC Parties, and the Third-Party Defendants, as against any of the Contributors or any of the Contributor and Affiliate Released Parties, on account of the design, compounding, marketing, sale, shipment, advertising, supply, production, formulation, use, labeling and/or injection of any product, including, but not limited to, MPA, produced, compounded, dispensed and/or sold by NECC, by any of the Third-Party Defendants, or any of the Contributor and Affiliate Released Parties, and including, but not limited to, claims alleging breaches of fiduciary duty, fraudulent transfers, or failures to act by any of the Contributors or any of the Contributor and Affiliate Released Parties, and, whether or not those claims or causes of action have been asserted against NECC, any of the Contributors, or any of the Contributor and Affiliate Released Parties, in the Court Cases or otherwise.

"NECC Parties" means the Estate Parties, the PSC, all current or future holders of NECC Claims and any parties acting on their behalf, all current or future Plaintiffs and any parties acting on their behalf, all current or future Third-Party Defendants, and their respective insurers, successors, assigns, principles, agents, and representatives in interest.

"Net Tax Refunds" means: Federal, state and local tax refunds received, regardless of when received, by any of the Contributors and their spouses (if married), (i) resulting from the payment of the Base Payments, plus the payment of the Additional Contributions but excluding Tax Contributions; and (ii) resulting from the disposition of assets or stock (or limited liability company interests) of, or operating losses generated by, the Pharmaceutical Entities: (x) with respect to Ameridose, in 2014 and in any later year or years (or portion thereof) that ends on the date that is eighteen (18) months following the Plan Effective Date; and (y) with respect to any other Pharmaceutical Entities, in 2014 and in any later year or years (or portion thereof) that ends on the date that is twelve (12) months following the Plan Effective Date (collectively, "Refunds");

less

reasonable costs and expenses paid by the Contributors and their spouses (to the extent not reimbursed or reimbursable by insurance or otherwise) in filing and defending their rights to any Refunds;

and increased by

all interest income paid by a governmental authority with respect to any Refunds;

provided however that none of the following shall be included in the definition of "Net Tax Refunds": (a) any tax refund received by a Contributor attributable to the Contributor's or Contributors' funding of any or all of the Tax Contributions; (b) any tax refund received by any of the Contributors attributable to the disposition of assets or stock of, or operating losses generated by, any of the Affiliated Entities that are not Pharmaceutical Entities; and (c) any tax refund received, regardless of when received, by any of the Contributors attributable to the disposition of assets or stock of, or operating losses generated by, the Pharmaceutical Entities: (x) in the case of Ameridose, prior to the year 2014 and after the date that is eighteen (18)

5

EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

months after the Plan Effective Date, and (y) in the case of any other Pharmaceutical Entities, prior to the year 2014 and after the date that is twelve (12) months after the Plan Effective Date.

"Non-Disclosed Asset" means (i) any Asset having a realizable value equal to or exceeding $100,000 as of the Contributor's Disclosure Date and/or (ii) any combination of Assets to the extent that the aggregate realizable value of those Assets equals or exceeds $100,000, in either case, that was not or were not disclosed or included in the Assets disclosed in the Financial Disclosures on the Disclosure Date or otherwise disclosed in writing to the Trustee prior to the Execution Date. An Asset described in the Financial Disclosures shall not be a Non-Disclosed Asset if the asset is disclosed or included in a Financial Disclosure regardless of the estimate of value for such asset in such Financial Disclosure.

"Non-QSF Accounts" has the meaning set forth in Section 6(a).

"Pharmaceutical Entities" means the Affiliated Entities listed on **Exhibit B** to the Funding Agreement.

"Pharmaceutical Entity Distributions" means the net, after payment of reasonable and customary expenses incurred in connection with the sale and after payment of all taxes attributed to or incurred by the Contributors on account of the sale or other disposition of the Pharmaceutical Entities, proceeds realized or received by each of the Contributors on account of their Claims against or equity interests in the Pharmaceutical Entities from the sale or other disposition of the equity interests in or assets of any of the Pharmaceutical Entities, other than payments of the amounts owed by the Pharmaceutical Entities to the Contributors for wages, employee benefit or similar obligations arising prior to the date of the Funding Agreement solely as set forth in the Financial Disclosures. For the avoidance of doubt, Pharmaceutical Entity Distributions shall not include or be reduced by payments made to the Trustee by any insurers of the Pharmaceutical Entities.

"Plaintiffs" means the plaintiffs in the Court Cases, plus any holders, present or future, of NECC Claims.

"Plan" means a chapter 11 plan for the Debtor to be proposed by the Trustee or proposed jointly by the Trustee and the Committee, in accordance with the Funding Agreement.

"Plan Documents" means the Disclosure Statement, the Plan, the Disclosure Statement Motion, the Disclosure Statement Order, the Confirmation Order, and any and all supplements, exhibits, and amendments thereto.

"Plan Effective Date" means the later of: (i) the first Business Day following fourteen (14) days after the Bankruptcy Court's entry of the Confirmation Order, provided that a court of competent jurisdiction has not entered a stay of the Confirmation Order as of such date (in which instance, the Plan Effective Date will not occur until such stay is dissolved), and (ii) the first Business Day on which all other conditions to the effective date of the Plan have been satisfied or waived.

"Plan Escrowed Funds" has the meaning set forth in Section 1(e).

6

**EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT**

"PSC" means the Plaintiffs' Steering Committee appointed in the multi-district litigation captioned *In re New England Compounding Pharmacy Cases Litigation*, MDL No. 2419, Case No. 13-cv-02419 (D. Mass.).

"Qualified Settlement Account" has the meaning set forth in Section 6(a).

"Rule 9019 Motion" means the motion filed by the Trustee pursuant to the Funding Agreement requesting that the Bankruptcy Court, *inter alia*, approve the Funding Agreement and the Trustee's entry into this Agreement.

"Rule 9019 Order" means the order of the Bankruptcy Court granting the relief requested in the Rule 9019 Motion.

"Security Balance" has the meaning set forth in Section 2(a).

"Service Parties" has the meaning set forth in Section 2(a).

"Settlement" means the terms of the compromise embodied in the Funding Agreement.

"Substitute Lien" means, collectively, the first-priority lien and security interest granted by the Contributors to the Trustee, on behalf of the Debtor's estate, in any interest now held or hereinafter acquired by the Contributors in (i) the Escrow, (ii) the Plan Escrowed Funds and (iii) property, including property that constitutes general intangibles under the UCC, that at any time constitutes Additional Contributions (including, without limitation, Pharmaceutical Entity Distributions and Tax Contributions) and the proceeds thereof, on the terms and conditions set forth in the Funding Agreement.

"Tax Contributions" means, for each Contributor, an amount equal to ninety percent (90%) of Net Tax Refunds received by the Contributor and the Tax Return Spouse.

"Tax Escrow" has the meaning set forth in Section 1(c).

"Tax Escrow Account" has the meaning set forth in Section 1(c).

"Tax Escrowed Funds" has the meaning set forth in Section 1(c).

"Tax Return Spouse" means the spouse of a married Contributor that executes the Tax Return Spouse Consent Agreement.

"Tax Return Spouse Consent Agreement" means the agreement described in Section 10.3(k) of the Funding Agreement in the form as executed by each Tax Return Spouse.

"Termination" means termination of the Funding Agreement pursuant to Section 11 thereof.

"Third-Party Defendants" means all current, future, or potential defendants in the Court Cases, other than the Contributors and the Contributor and Affiliate Release Parties.

## EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

"Trustee Judgment" means entered a Final Order granting judgment for the Estate Representative or other plaintiff in the Adversary Proceeding.

"UCC" has the meaning set forth in Section 1(d).

### GOVERNING PROVISIONS

Section 1.    Appointment of Escrow Agent and Establishment of Escrow Account

(a)    The Contributors and the Trustee hereby appoint the Escrow Agent as the escrow agent under this Agreement, and the Escrow Agent accepts such appointment according to the terms and conditions set forth herein.

(b)    The Escrow Agent shall hold all Contributions transferred to it, other than those Contributions constituting and designated as Tax Contributions (together with any interest or income accrued thereon, the "Escrowed Funds") received from the Trustee or the Contributors in escrow in the following interest bearing account (the "Main Escrow Account" or "Main Escrow"), subject to all provisions of this Agreement:

| | |
|---|---|
| Account Name: | [＿＿＿＿＿] |
| Sort Code: | [＿＿＿＿＿] |
| Account No: | [＿＿＿＿＿] |
| Swift Code: | [＿＿＿＿＿] |
| IBAN: | [＿＿＿＿＿] |
| Bank Name: | [＿＿＿＿＿] |
| Address: | [＿＿＿＿＿] |

(c)    The Escrow Agent shall hold all Contributions transferred to it constituting and designated as Tax Contributions (together with any interest or income accrued thereon, the "Tax Escrowed Funds") in escrow in the following interest bearing account (the "Tax Escrow Account" or "Tax Escrow"), subject to all provisions of this Agreement:

| | |
|---|---|
| Account Name: | [＿＿＿＿＿] |
| Sort Code: | [＿＿＿＿＿] |
| Account No: | [＿＿＿＿＿] |
| Swift Code: | [＿＿＿＿＿] |
| IBAN: | [＿＿＿＿＿] |
| Bank Name: | [＿＿＿＿＿] |
| Address: | [＿＿＿＿＿] |

8

EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

(d) All parties agree that the Main Escrow Account and the Tax Escrow Account (collectively, the "Escrow Accounts") are "deposit accounts" within the meaning of Article 9 of the Uniform Commercial Code as enacted in the Commonwealth of Massachusetts (the "UCC").

(e) The Funding Agreement Parties agree that the Escrow Accounts and the Escrowed Funds and the Tax Escrowed Funds on deposit therein (collectively, the "Plan Escrowed Funds") shall be subject to the Substitute Lien on the terms and conditions set forth in the Funding Agreement.

**Section 2. Release of Plan Escrowed Funds.**

The Escrowed Funds shall only be released by the Escrow Agent as follows (and the following shall constitute instructions of the Trustee):

(a) No Termination of Funding Agreement.

(i) On the fourth (4th) Business Day following the Escrow Agent's receipt from the Trustee or duly acting Estate Representative (hereinafter referred to as the "Notice Party") of written notice: (a) of the occurrence of the Plan Effective Date and further indicating that a Termination has not occurred; and (b) that either the Final Order Condition has been satisfied or the Funding Agreement Parties have waived the Final Order Condition ("Final Order Notice"), that has been simultaneously served by the Notice Party on the Committee (or its successors in interest, if any), the Contributors, and the PSC (collectively, the "Service Parties"), the Escrow Agent shall release all Escrowed Funds from the Main Escrow, plus any interest or income accrued thereon, to the Trustee, for such use and payment as is ultimately provided for in the Plan and Confirmation Order;

(ii) On the fourth (4th) Business Day following the Escrow Agent's receipt from the Notice Party of written notice: (a) of the occurrence of the Plan Effective Date and further indicating that a Termination has not occurred; and (b) that the Confirmation Order is the subject of a pending appeal but that no stay pending appeal has issued, that has been simultaneously served by the Notice Party on the Service Parties, the Escrow Agent shall release to the Trustee from the Main Escrow funds equal to the Interim Payment, in accordance with the Notice Party's instructions as to the amount of the Interim Payment to be released from the Main Escrow contained within the notice;

(iii) The balance of the Escrowed Funds in the Main Escrow after release of the Interim Payment to the Trustee in accordance with the preceding provision, together with any interest or income accrued thereon, shall remain held by the Escrow Agent in the Main Escrow until receipt by the Escrow Agent of a properly served Final Order Notice and, in that instance, shall be released in accordance with Section 2(A)(i) above.

(b) Termination of Funding Agreement.

In the event that the Trustee notifies the Escrow Agent of the Termination of the Funding Agreement, the balance of the Escrowed Funds in the Main Escrow (together with any interest or income accrued thereon, the "Security Balance") shall only be released as follows (and the following shall constitute instructions of the Trustee):

9

EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

(i)     Within fourteen (14) Business Days after receipt by the Escrow Agent from the Contributors of written notice of the entry of a Contributor Judgment, that was simultaneously served by the Contributors on the Notice Party, the PSC and the Committee (or its successors in interest, if any), the Escrow Agent shall release the entirety of the Security Balance to the Contributors, ratably, in accordance with the instructions provided by the Contributors;

(ii)     Within fourteen (14) Business Days after receipt by the Escrow Agent from the Notice Party of written notice of the entry of a Trustee Judgment, that the Trustee has simultaneously served on the Service Parties, the Escrow Agent shall release from the Main Escrow funds equal to the lesser of: (1) the total amount of the Trustee Judgment; and (2) the balance of the Security Balance, to the Trustee for such use and payment as is ultimately provided for in the Plan and Confirmation Order, with any remaining funds held in the Main Escrow after payment towards the Trustee Judgment to be distributed by the Escrow Agent to the Contributors, ratably, with all such payments to be made in accordance with the instructions provided by the Notice Party and the Contributors, if receiving funds pursuant to this Section 2(B)(ii); or

(iii)     As provided in a joint written directive to the Escrow Agent signed by the Trustee and each Contributor.

(c)     Release of Tax Escrowed Funds

Notwithstanding anything to the contrary in this Agreement, the Plan Escrowed Funds that constitute Tax Escrowed Funds held by the Escrow Agent shall be subject to the Substitute Lien on the terms provided in this Agreement and released only as follows (and the following shall constitute instructions of the Trustee):

(i)     On or before fourteen (14) Business Days after receipt by the Escrow Agent from the Trustee of written notice of the entry of a final non-appealable disallowance (full or partial) by a state, local or federal taxing authority of any Refund that gave rise to a Tax Contribution, that has been simultaneously served on the Notice Party, the PSC, and the Committee (or its successors in interest, if any), the Escrow Agent shall distribute from the Tax Escrowed Funds to the Contributor or Contributors (if married) whose Refund was disallowed (in whole or in part) a payment equal to ninety percent (90%) of the amount owing to the applicable taxing authority on account of the full or partial disallowance of such Net Tax Refund (but only to the extent of such disallowance and only to the extent actually received by the Escrow Agent as Tax Contributions), plus earnings on the foregoing amount, in the amounts instructed by the Trustee;

(ii)     On or before fourteen (14) Business Days after receipt by the Escrow Agent from the Trustee of written notice of a final non-appealable allowance by a state, local or federal taxing authority of a Refund that gave rise to a Tax Contribution ("Final Refund"), that has simultaneously been served on the Service Parties, the Escrow Agent shall release the amount of the Tax Contribution based on the Final Refund, and all applicable earnings thereon, to the Trustee for such use and distribution as provided for in the Plan and Confirmation Order, in the amounts instructed by the Trustee; or

10

## EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

(iii)     Within fourteen (14) Business Days after receipt by the Escrow Agent from the Trustee of written notice of the fourth (4th) anniversary of the receipt by the Trustee of the Tax Contributions from any Contributor or Contributor spouse, that has been simultaneously served on the Service Parties, the entire amount of such Tax Contributions, and applicable earnings thereon, shall be released by the Escrow Agent to the Trustee for such use and distribution as provided for in the Plan and Confirmation Order.

(d)     No Contrary Authority or Direction. The Escrow Agent agrees to comply in all respects with the instructions delivered to the Escrow Agent by the Trustee governing the release of the Plan Escrowed Funds without further consent of the Contributors (provided that such instructions shall be consistent with the provisions of this Agreement and the Funding Agreement in all respects), and in that regard, shall not permit the withdrawal or other disposition of any funds in the Escrow Accounts by any of the Contributors other than as expressly required above without the Trustee's prior written consent, nor shall the Escrow Agent comply with instructions or other directions concerning the Escrow Accounts or the disposition of Escrowed Funds originated by a third party without the prior written consent of the Parties. For the avoidance of doubt, the Escrow Agent represents that it has not heretofore agreed with any third party to comply with instructions or other directions concerning the Escrow Accounts or the disposition of the Plan Escrowed Funds originated by such third party.

(e)     Disputes. The Escrow Agent shall comply with the instructions of the Trustee with regard to release of Plan Escrowed Funds delivered in accordance with this Agreement unless the Trustee's instructions are disputed by any Party to this Agreement in writing delivered to all Parties. In the event of dispute or inconsistent instructions from the Parties, the Escrow Agent may refuse to take further action until directed to do so by joint instruction of the Parties or until the Escrow Agent has received a final determination from the Bankruptcy Court or other court of competent jurisdiction as to where to direct the Plan Escrowed Funds. The Escrow Agent shall have the right to interplead the Parties in the Bankruptcy Court (or, if the Bankruptcy Court determines that it lacks or declines to exercise jurisdiction over the matter, any other court of competent jurisdiction located in Boston, Massachusetts) and request such court determine the respective rights of such Parties, and the reasonable fees, costs and expenses of the Escrow Agent in connection with any such proceedings shall be paid solely from the Plan Escrowed Funds. The same procedure set forth in this paragraph will apply to inconsistent claims or demands of the Parties delivered to the Escrow Agent with regard to the Tax Escrowed Funds whether the Funding Agreement has terminated or otherwise; otherwise, the Escrow Agent shall release the Tax Escrowed Funds in accordance with any undisputed notice and instructions. The Contributors agree not to dispute any instructions served by the Trustee pursuant to Section 2 that are delivered in accordance with the Funding Agreement.

(f)     Method of Payment. All payments shall be made by check, unless a timely request for payment by wire transfer is requested by the recipient of funds from the Escrow Agent, with the wire transfer fee to be borne by the recipient.

(g)     Funding Agreement Controls. As among the Funding Agreement Parties only, in the event of any inconsistency between the terms of this Section 2 and the Funding Agreement (including, but not limited to, Sections 3.3 and 10.2 thereof), the Funding Agreement shall control.

11

## EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

### Section 3.    Control Account and Investment.

(a)    It is the intent of the Parties that the Trustee have control over the Main Escrow Account and the Tax Escrow Account within the meaning of Section 9-104 of the UCC, and that the Substitute Lien attach and be perfected as to the Plan Escrowed Funds, pending a release of the Substitute Lien.   The Contributors consent to the control by the Trustee over the Main Escrow and the Tax Escrow for the purposes set forth in and in accordance with the Funding Agreement.

(b)    The Escrow Agent shall hold, invest, reinvest, manage, and administer all Plan Escrowed Funds in accordance with the instructions of the Trustee that are made consistent in all respects with this Agreement; provided, that, in the absence of any such instructions, the Plan Escrowed Funds shall be invested in United States Treasury Bills; provided, further, that unless the Bankruptcy Court determines that the requirements of Section 345 of the Bankruptcy Code do not apply or are waived as to the Plan Escrowed Funds, the Plan Escrowed Funds shall be invested in a manner consistent with those requirements.

### Section 4. Duties and Rights of Escrow Agent.

(a)    The Parties acknowledge and agree that the Escrow Agent (i) shall not be charged with knowledge of any agreement or instrument other than this Agreement, or responsible for determining compliance therewith, and shall not otherwise be bound thereby, (ii) shall be obligated to perform only those duties as are expressly set forth in this Agreement on its part to be performed, and no implied duties or obligations of any kind shall be read into this Agreement against the Escrow Agent, and (iii) shall not be obligated to take any legal or other action hereunder which in its reasonable judgment might cause it to incur any expense or liability unless it shall have been furnished with indemnification acceptable to the Escrow Agent, or which, in its judgment, might subject it to any liabilities or obligations in its individual capacity.

(b)    All of the duties of the Escrow Agent shall be ministerial in nature and in no event shall the Escrow Agent be deemed to owe any fiduciary duty to any Party.   The Contributors and the Trustee each hereby acknowledge that the Escrow Agent does not hereby provide any investment advice of any nature, including as to the safety or security of the Plan Escrowed Funds as deposited with any financial institution.

(c)    The Escrow Agent may rely and shall be protected in acting or refraining from acting upon any written notice, instruction or request furnished to it hereunder and believed by it in good faith to be genuine and to have been signed or presented by the proper Party or Parties.

(d)    In the administration of it duties, the Escrow Agent may execute any of its powers and perform its duties hereunder directly or through agents or attorneys and may consult with counsel, accountants and other skilled persons to be selected and retained by it.   Notwithstanding anything to the contrary contained in this Agreement, the Escrow Agent shall not be liable for any action taken or omitted to be taken by it hereunder or anything done, suffered or omitted by it in accordance with the advice or opinion of such counsel, accountants or other skilled person

12

## EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

unless a court of competent jurisdiction by a final, non-appealable order determines that the subject loss to any of the Parties hereto was caused by Escrow Agent's gross negligence or willful misconduct.

(e)     In order to comply with any obligations of financial institutions under applicable law to obtain, verify and record information that identifies each person who opens an account, including particularly laws designed to fight the funding of terrorism and money laundering activities, the Escrow Agent may be entitled to require documentation from any Party to verify its formation, existence and identity, including, but not limited to, licenses, passports, financial statements, and other identification and authorization documents, and the Trustee and the Contributors shall each comply with any such reasonable request.

(f)     The Escrow Agent agrees to subordinate, and hereby does subordinate, in favor of the Trustee any security interest, lien or right of setoff it may have as to the Plan Escrowed Funds, acknowledges that neither it nor any of its subsidiaries has or will assert a lien on the Plan Escrowed Funds, and acknowledges that it has not received notice of any other security interest in the Plan Escrowed Funds, provided, however, that the Escrow Agent may hold or create liens resulting from the fees and expenses of the Escrow Agent or the indemnification obligations provided in Section 5 hereof.

(g)     Except with regard to this Agreement, the Escrow Agent has not entered (and shall not in the future enter) into any control agreement with respect to the Escrow Accounts and the Plan Escrowed Funds with any party.

(h)     Upon receipt of written notice of any lien, encumbrance or adverse claim against the Escrow Accounts or any funds credited thereto, except for the Substitute Lien, the Escrow Agent will make reasonable efforts promptly to notify the Trustee and Contributors thereof.

### Section 5.     Compensation, Reimbursement and Indemnification.

(a)     The Escrow Agent shall be entitled to be paid a fee for its services pursuant to this Agreement as set forth in **Exhibit B** hereto, and shall be reimbursed for its reasonable costs and expenses incurred in the performance of its duties hereunder (including reasonable and necessary counsel fees), which fees, costs and expenses shall be paid or reimbursed solely from the Escrowed Funds.

(b)     Subject to Section 5(c) below, the Contributors and the Trustee, solely on behalf of the Debtor's estate and not individually, (the "Indemnitors") hereby agree to indemnify and hold the Escrow Agent and its directors, officers, agents and employees and attorneys (collectively, the "Indemnitees") harmless from and against any and all claims, liabilities, losses, damages, fines, penalties and expenses, including out-of-pocket and incidental expenses and legal fees and expenses ("Liabilities") that may be imposed on, incurred by, or asserted against the Indemnitees or any of them for following any instructions or other directions upon which Escrow Agent is authorized to rely pursuant to the terms of this Agreement. In addition to and not in limitation of the immediately preceding sentence, the Indemnitors also agree to indemnify and hold the Indemnitees and each of them harmless from and against any and all Liabilities that may be imposed on, incurred by, or asserted against the Indemnitees or any of them in

13

## EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

connection with or arising out of Escrow Agent's performance under this Agreement, provided that the Indemnitees have not acted with gross negligence, engaged in willful misconduct or, with respect to 4(c) only, bad faith, in each case, as determined by a final, non-appealable order of a court of competent jurisdiction. Each of the Indemnitors hereby grants to Escrow Agent a lien on the Main Escrow, junior to the Substitute Lien in all respects, to the extent of such Indemnitor's interest therein, to secure such Indemnitor's indemnification obligations to Escrow Agent as described above.

(c)       Notwithstanding anything to the contrary in this Agreement, all amounts payable to the Indemnitees pursuant to this Section 5, including on account of the indemnification obligations in Section 5(b) above, shall be paid solely from the Plan Escrowed Funds then on deposit in the Escrow Accounts, and the Indemnitors shall have no other or further liability to the Indemnitees on account of their indemnification obligations herein; provided, further, that the Escrow Agent shall not have the right to hold back any Plan Escrowed Funds that shall otherwise be released pursuant to Section 2 hereof on account of any Liabilities or potential Liabilities that have not been finally determined as of the date of such release. Anything in this Agreement to the contrary notwithstanding, in no event shall Escrow Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. The provisions of this Section 5 shall survive the termination of this Agreement and the resignation or removal of Escrow Agent for any reason.

(d)       The Escrow Agent shall have no responsibility or liability to Contributors for complying with instructions concerning the Escrow Accounts originated by the Trustee so long as the instructions are in all respects in accordance with Section 2 above.

(e)       The terms of this Section 5 shall survive the termination of this Agreement and the distribution of all of the Plan Escrowed Funds.

### Section 6. Segregation of Plan Escrowed Funds.

(a)       Segregation.  Upon direction of the Trustee, the Escrow Agent shall administer the Escrow Accounts so as to: (i) segregate and administer a portion of the Escrow Accounts as a "qualified settlement fund" within the meaning of Treasury Regulation Section 1.468B-1 for the benefit of holders of personal injury claims and wrongful death claims against the Debtor (the "Qualified Settlement Account"); and (ii) segregate and administer the remainder of the Escrow Accounts as separate accounts which may be treated for U.S. federal income tax purposes as separate reporting entities (and one or more of which may be a trust or other entity holding the assets for the benefit of the Debtor's creditors that do not hold personal injury claims or wrongful death claims against the Debtor, as reasonably determined by the Trustee or other Estate Representative) (the "Non-QSF Accounts") in all respects as consistent with this Agreement.

(b)       Expenses.  The Escrow Agent shall keep appropriate books and records with respect to the Qualified Settlement Account and the Non-QSF Accounts, shall report the income and expenses of the Qualified Settlement Account and the Non-QSF Accounts as required by generally accepted accounting standards, shall allocate shared expenses between the Qualified

14

EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

Settlement Account and the Non-QSF Accounts as reasonably requested by the Trustee, and shall file appropriate tax returns and reports for the Qualified Settlement Account and the Non-QSF Accounts and send appropriate statements to the beneficiaries of the Non-QSF Accounts as reasonably requested by the Trustee or other Estate Representative. The Escrow Agent shall: (A) obtain and use a federal employer identification number for each separate reporting entity, as necessary; and (B) pay all taxes out of the Plan Escrowed Funds to the extent such taxes are due and owing by any such entity.

(c)     The Escrow Agent shall be the qualified settlement fund administrator for all tax purposes.

(d)     The Escrow Agent shall comply with the information reporting and withholding requirements applicable to the Qualified Settlement Account distributions.

**Section 7.  Resignation.**

(a)     The Escrow Agent may resign as escrow agent at any time and be discharged of its duties hereunder after thirty (30) days' notice to the other Parties, but only if a successor escrow agent has been appointed by the Contributors and the Trustee prior to the effective date of the Escrow Agent's resignation. Upon receipt of notice of resignation, the Contributors and the Trustee promptly shall use commercially reasonable efforts to designate a successor escrow agent to serve in accordance with the terms of this Agreement. If they cannot agree on a successor escrow agent during such thirty (30) day period, the Escrow Agent shall be deemed to be solely a custodian of the Plan Escrowed Funds without further duties and the Escrow Agent may petition the Bankruptcy Court for so long as it retains jurisdiction over the Chapter 11 Case (or, if it determines that it lacks jurisdiction or declines to exercise jurisdiction over the matter, any other court of competent jurisdiction located in Boston, Massachusetts) to have a successor appointed, and the reasonable fees, costs and expenses of the Escrow Agent in connection with any such proceedings shall be paid solely from the Plan Escrowed Funds. Any successor Escrow Agent shall execute and deliver to the predecessor Escrow Agent, the Contributors and the Trustee an instrument accepting such appointment and the transfer of the Plan Escrowed Funds, and agreeing to the terms of this Agreement, and thereupon such successor Escrow Agent shall, without further act, become vested with all the estates, properties, rights, powers and duties of the predecessor Escrow Agent as if originally named herein.

(b)     Any firm, institution or trust company with which Escrow Agent may merge or consolidate shall be the successor Escrow Agent without further act with notice of such merger to be promptly provided by the Escrow Agent to the Parties.

**Section 8.     Dispute Resolution.**

In the event of any dispute with respect to the disposition of the Plan Escrowed Funds, the Escrow Agent is authorized and shall be entitled to retain in its possession without liability to anyone, all or any of the Plan Escrowed Funds until such dispute shall have been settled either by the mutual written agreement of the Parties involved or by a final determination of the Bankruptcy Court for so long as it retains jurisdiction over the Chapter 11 Case (or, if it determines that it lacks jurisdiction or declines to exercise jurisdiction over the matter, any other

15

### EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

court of competent jurisdiction located in Boston, Massachusetts) in accordance with Section 2(E) above. The Parties consent to the exclusive jurisdiction of the Bankruptcy Court for so long as it retains jurisdiction over the Chapter 11 Case (or, if it determines that it lacks jurisdiction or declines to exercise jurisdiction over the matter, any other court of competent jurisdiction located in Boston, Massachusetts) as to any dispute as to the Plan Escrowed Funds or this Agreement. The Escrow Agent may, but shall be under no duty whatsoever to, institute or defend any legal proceedings which relate to the Plan Escrowed Funds other than to promptly notify the Parties of the initiation of any such proceedings.

### Section 9. Capacity.

The Parties acknowledge that the Trustee has entered into and signed this Agreement solely in such capacity and not individually and that neither the Trustee nor his firm, partners, employees, agents, advisers or representatives shall incur any personal liability under or in connection with this Agreement.

### Section 10.   No Admission or Waiver.

Nothing in this Agreement shall constitute any admission or waiver by any of the Parties of or with respect to any Party's claims, rights and/or positions, including, but not limited to, any claim that any Party may assert with respect to the Plan Escrowed Funds or the Contributions.

### Section 11.   Notices; Wiring Instructions.

(a)    All communications under this Agreement shall be in writing and shall be delivered by facsimile, with delivery to immediately follow by hand, or by recognized overnight courier or by registered mail or certified mail, postage prepaid:

**Contributors:**

If to Barry Cadden and Lisa Conigliaro Cadden:

> Harold B. Murphy, Esq.
> Jonathan F.X. O'Brien, Esq.
> Murphy & King, P.C.
> One Beacon Street
> Boston, MA  02108
> hbm@murphyking.com
> jfo@murphyking.com

If to Gregory Conigliaro:

> Christopher J. Panos, Esq.
> Partridge Snow & Hahn LLC
> 30 Federal Street
> Boston, MA 02110
> cpanos@psh.com

16

## EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

If to Carla Conigliaro:

John J. Monaghan, Esq.
Lynne B. Xerras, Esq.
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
john.monaghan@hklaw.com
lynne.xerras@hklaw.com

**Trustee:**

Paul D. Moore
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA 02110
Telephone: (857) 488-4200
Fax Number: (857) 401 3057
E-mail: PDMoore@duanemorris.com

**Committee:**

David J. Molton, Esq.
Daniel J. Saval, Esq.
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com
dsaval@brownrudnick.com

**PSC:**

Thomas M. Sobol, Esq.
Kristen Johnson Parker, Esq.
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700
tom@hbsslaw.com
kristenjp@hbsslaw.com

17

## EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

**Escrow Agent**

[                    ]

(b)     Any notice so addressed shall be deemed to be given:  if delivered by hand, on the date of such delivery; if sent by overnight courier, on the next business day; and if mailed by registered or certified mail, on the third business day after the date of such mailing.

(c)     Any funds to be paid to or by the Escrow Agent hereunder shall be sent by wire transfer pursuant to the following instructions and allocated to the Main Escrow or the Tax Escrow in accordance with Section 1, above:

|               |              |
|---------------|--------------|
| Account Name: | [          ] |
| Sort Code:    | [          ] |
| Account No:   | [          ] |
| Swift Code:   | [          ] |
| IBAN:         | [          ] |
| Bank Name:    | [          ] |
| Address:      | [          ] |

### Section 12.     Termination.

Upon distribution by the Escrow Agent of the entire amount of the Plan Escrowed Funds, this Agreement shall terminate, except for any provisions that expressly survive termination.

### Section 13.     Effectiveness.

This Agreement, once executed, shall become effective and binding on the Parties following entry by the Bankruptcy Court of the Rule 9019 Order.

### Section 14.     Miscellaneous.

(a)     No provision of this Agreement shall be deemed amended or modified unless such an amendment or modification is in writing, dated, and executed by all of the Parties.

(b)     This Agreement shall inure to the benefit of the Parties, and shall be binding upon the Parties and their respective successors and permitted assigns.  Nothing in this Agreement, expressed or implied, is intended to confer any rights, remedies, obligations or liabilities under or by reason of this Agreement on any other person or entity other than the Parties, and their respective successors and assigns.  This clause does not affect any right or remedy of any person which exists or is available.

## EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

(c)     This Agreement shall be governed by, and construed according to, the laws of the Commonwealth of Massachusetts, without regard to any conflicts of law provision which would require the application of the law of any other jurisdiction.

(d)     If any court of competent jurisdiction should find any particular provision of this Agreement void, illegal or unenforceable, then that provision shall be regarded as severable and stricken from this Agreement, and the remainder of this Agreement shall remain in full force and effect.

(e)     This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument. Facsimile, .PDF or other similar electronic signatures shall be fully effective to bind the parties hereto and shall be deemed to be original signatures.

(f)     THE PARTIES HEREBY WAIVE A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING BETWEEN THEM OR THEIR SUCCESSORS OR ASSIGNS, ARISING UNDER OR IN CONNECTION WITH OR IN ANY WAY RELATED TO THIS AGREEMENT.

(g)     The Escrow Agent shall not be responsible for delays or failures in performance resulting from acts beyond its control. Such acts shall include but not be limited to strikes, lockouts, riots, acts of war, epidemics, governmental regulations hereafter imposed, casualties, communication line failures, computer viruses or power failures.

(h)     As between the Escrow Agent, on the one hand, and the other Parties, on the other hand, this Agreement constitutes the entire agreement with respect to the subject matter herein. As between the other Parties, this Agreement and the Funding Agreement, as applicable and subject to Section 2(g) hereof, shall govern to the extent of any conflict between those agreements and any other agreement or writing.

(i)     This Agreement is intended to be and shall have the effect of a document executed under seal in accordance with the laws of the Commonwealth of Massachusetts without regard to its conflicts of laws principles.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

19

## EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed and delivered in his, her or its name and on his, her or its behalf as of the date first recited above.

TRUSTEE:

_____

Paul D. Moore, solely in his capacity as Trustee as aforesaid, and not individually

CONTRIBUTORS:

_____

Barry Cadden

_____

Lisa Cadden

_____

Carla Conigliaro

_____

Gregory Conigliaro

[SIGNATURES CONTINUE ON NEXT PAGE]

20

**EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT**

ESCROW AGENT:

[_____]

By:_____
    Name:
    Title:

[SIGNATURE PAGE TO ESCROW AGREEMENT]

21

EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT


EXHIBIT A – FUNDING AGREEMENT


*E-FILED CONTEMPORANEOUSLY HEREWITH*
*(SEPARATE COPY NOT ATTACHED)*

EXHIBIT C TO PLAN SUPPORT AND FUNDING AGREEMENT

EXHIBIT B - FEE SCHEDULE

[TO BE PROVIDED PRIOR TO THE HEARING ON THE RULE 9019 MOTION]



## CITIZENS
## PRIVATE BANK & TRUST™

## INSTITUTIONAL SERVICES
*Escrow Fee Schedule*

| MINIMUM ANNUAL FEE | $5,000 |
|---|---|

TRANSACTION FEES

| Security Transaction Charge | $25.00 each |
|---|---|
| Wire Fee | $25.00 |

### ✖ Citizens Bank®

Incremental charges may be assessed for additional processing services when Citizens Bank is required to provide extraordinary administrative services. Charges for extraordinary administrative services will be assessed at hourly rates.

IVFL11110K_EscrowFeeSchedules
4/2.17

**EXHIBIT D - RULE 9019 ORDER**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>       Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

**ORDER APPROVING PLAN SUPPORT AND FUNDING AGREEMENT AND
RELATED ESCROW AGREEMENT WITH INSIDERS OF DEBTOR,
AND GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[1] of Paul D. Moore, the duly appointed and acting

chapter 11 Trustee (the "Trustee") in the pending bankruptcy case of New England

Compounding Pharmacy, Inc. (the "Debtor") for an order pursuant to Federal Rule of

Bankruptcy Procedure 9019(a)[2] and section 105 of the U.S. Bankruptcy Code (11 U.S.C. § 101,

et seq.) authorizing the Trustee to enter into, and approving, a Plan Support and Funding

Agreement (the "Funding Agreement") and associated escrow agreement (the "Escrow

Agreement" and, together with the Funding Agreement, the "Agreements") with certain insiders

of the Debtor (the "Contributors"), filed on or about May ___, 2014 [Docket No. _____]; a

hearing having been held before this Court regarding the Motion and any objections thereto (the

"Objections") on _____, 2014 (the "Hearing"); this Court having reviewed and

considered (i) the Motion and the Objections (if any) and (ii) the arguments of counsel, and (iii)

the evidence proffered or adduced, at the Hearing, and the Objections (if any) having been

otherwise resolved, overruled, or withdrawn; and all parties in interest have been heard, or have

---

[1] Unless otherwise defined herein, capitalized terms shall have the same meaning as that ascribed to such terms in the Motion.

[2] Hereinafter, "Bankruptcy Rule 9019."

had the opportunity to be heard, regarding the matters raised by the Motion and relief related thereto; and after due deliberation thereon, this Court hereby concludes, finds and orders that:[3]

### Jurisdiction, Final Order and Statutory Predicates

A.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. 157(b)(1) and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    The predicates for the relief sought in the Motion are Bankruptcy Rule 9019 and Bankruptcy Code Sections 105, 362 and 363.

### Notice

D.    Notice of the Motion and the Hearing (the "Notice of Hearing") was served upon each of the Debtor's creditors (or their counsel) known to the Trustee, all parties in this case who receive electronic service in this case through this Court's Electronic Case Filing ("ECF") system, all parties to the multidistrict litigation in the United States District Court for the District of Massachusetts currently pending under the caption *In re New England Compounding Pharmacy Cases Litigation*, MDL No. 2419, Case No. 13-cv-02419 (D. Mass.) (the "MDL Proceeding") who receive electronic service through its ECF system, all state and federal agencies with jurisdiction or with oversight authority over the Debtor's business, the financial institutions (the "Banks") in control or possession of those accounts (the "Accounts") that were attached or otherwise encumbered through this Court's Orders of January 28, 2013 and February 12, 2013 (collectively, the "Security Orders"), and all other known creditors of the Debtor and its

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rule of Bankruptcy Procedure, as made applicable to this proceeding pursuant to Rule 9014 of the Federal Rule of Bankruptcy Procedure. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2

estate through service by the Trustee or his agents of the Notice of Hearing by first class mail. Therefore, due, adequate and sufficient notice of the Motion and the Hearing has been given to all parties entitled to receive notice as of the date hereof pursuant to Bankruptcy Rule 2002(a)(2), no other or further notice is required, and a reasonable opportunity to object to the Motion and to be heard at the Hearing was given as required by the Bankruptcy Code and the Bankruptcy Rules to all persons entitled to or who received notice.

### Funding Agreement

E.      The Funding Agreement was the product of arms-length negotiations among the Parties, was negotiated and proposed, and entered into by the Parties in good faith and without fraud or collusion.

F.      The Funding Agreement represents the exercise of the Trustee's sound business judgment, is fair and reasonable, and is in the best interests of creditors, the estate, and all parties in interest.  The compromise set forth in the Funding Agreement is fair and reasonable and otherwise satisfies the requirements of Bankruptcy Rule 9019.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Motion is **GRANTED** subject to the provisions of this Order.

2.      Any Objections to the Motion and the relief requested therein that have not been withdrawn, waived, or settled, are denied and overruled on the merits.

3.      The Funding Agreement attached to the Motion as Exhibit B (including all of the related documents, exhibits, schedules, lists and agreements), and the settlements, compromises, and transactions embodied therein, are **APPROVED** in all respects.

4.      The Trustee's entry into the Escrow Agreement attached hereto as Exhibit A is **APPROVED** in all respects.

3

5.      The establishment, pursuant to the Escrow Agreement, of one or more "qualified settlement funds" as defined in Treasury Regulation Section 1.468B-1 to hold Plan Escrowed Funds is hereby **APPROVED**.

6.      Upon entry of this Order, the Security Orders shall be lifted solely to the extent necessary to permit the Contributors to fund the Initial Plan Deposits as set forth herein. Each Bank listed in Exhibit A hereto is directed, on or before the tenth (10th) Business Day following entry of the MDL Stay Order, to release to the Contributors, or the Trustee, if instructed by the Contributors, the funds held in the Accounts on Exhibit B hereto in the amounts listed thereon.

7.      Upon the Trustee's receipt of each Contributor's or Contributors' Initial Plan Deposit, the Security Orders shall be dissolved and of no further force and effect.

8.      The Trustee is authorized and directed to file a notice with this Court (with a copy to be served on the Banks, the Escrow Agent, the PSC, the Contributors and the Committee) attesting that the Contributors and/or the Banks (on the Contributors' behalf) have paid the Initial Plan Deposit to the Trustee in accordance with the Funding Agreement. Upon the filing of such notice, the Trustee is authorized and directed to take all such action as he deems necessary or appropriate to effect the complete dissolution and release of the Security Orders in accordance with the Funding Agreement.

9.      Upon dissolution of the Security Orders, the Trustee (and his successors in interest) shall be deemed to have been granted and shall hold, on behalf of the Debtor and its estate, the Substitute Lien. The Substitute Lien shall be the sole and exclusive pre-judgment security or remedy available to the Trustee, other acting Estate Representatives or to the Plaintiffs, in any forum. The Substitute Lien shall survive Termination and expire or be released solely in accordance with the provisions of the Funding Agreement.

4

10.    The funds that are or may be Plan Escrowed Funds under the Funding Agreement constitute a material part of a fund to be ultimately distributed to personal injury claimants against and other creditors of the Debtor under a Chapter 11 plan for the Debtor, and no individual or entity other than the Trustee (and his successors in interest) shall seek to attach, obtain a lien on or otherwise reach such funds.

11.    The Plan Escrowed Funds may not be released from Escrow except as in accordance with the Funding Agreement and the Escrow Agreement.

12.    Through the earlier of the date the action captioned *Official Committee of Unsecured Creditors v. Cadden, et al.*, Adv. Pro. 13-01040-JMB (Bankr. D. Mass) (the "Adversary Proceeding") is dismissed in accordance with the Funding Agreement or Termination of the Funding Agreement in accordance with Section 11 thereof, the Adversary Proceeding shall be, and hereby is, stayed in all respects. The stay of the Adversary Proceeding shall include, but not be limited to, a stay of all discovery from the Contributors and the Contributor and Affiliate Released Parties in the Adversary Proceeding and a prohibition against any party seeking any form of prejudgment security in the Adversary Proceeding, including, but not limited to, any attachments, injunctions, writs or orders of any nature, as is set forth in the Funding Agreement.

13.    Upon entry of this Order and through the earlier of the Plan Effective Date or Termination in accordance with Section 11 of the Funding Agreement, the Trustee shall be authorized and directed to use commercially reasonable efforts to seek and obtain the following: (i) removal to the MDL Proceeding of all Court Cases in which the Contributors or the Contributor and Affiliate Released Parties are parties to the MDL Proceeding and denial of any motion to remand Court Cases; (ii) denial of any motion or proceeding in the MDL Proceeding

5

in which relief is requested that is contrary to the provisions of the MDL Stay Order or this Agreement; (iii) the stay of all activity in the Adversary Proceeding, other than ministerial actions that may be required to maintain that proceeding; (iv) the denial of motions to lift the MDL Stay; and (v) the enforcement and continuation of the MDL Stay Order through the Plan Effective Date, in accordance with Section 3.2 of the Funding Agreement.

14.    Within ten (10) Business Days following entry of this Order, the Trustee is authorized and directed to file the MDL Stay Motion in the MDL Proceeding requesting entry of an order of the MDL Stay Order in accordance with the Funding Agreement.

15.    The Parties are authorized and directed to consummate all aspects of the transactions embodied in the Funding Agreement, including, but not limited, to execute all documents and to take all necessary or appropriate steps required to effectuate the terms of the Agreements.

16.    This Order shall become effective immediately upon its entry.

17.    This Court shall retain jurisdiction to determine any and all disputes concerning the interpretation, implementation or enforcement of this Order or the Agreements.

18.    The terms and provisions of this Order shall be binding in all respects upon the Debtor, its estate, and its creditors, and all of the Notice Parties.

19.    To the extent there is a conflict between the provisions of this Order and the Funding Agreement, the terms of the Funding Agreement shall govern the interpretation of the salient provision or term.

 

 

_____
Honorable Henry J. Boroff
United States Bankruptcy Judge

Dated: _____, 2014

# EXHIBIT A TO PROPOSED ORDER

## ESCROW AGREEMENT

*E-FILED CONTEMPORANEOUSLY HEREWITH*
*(SEPARATE COPY NOT ATTACHED)*

# EXHIBIT B TO PROPOSED ORDER
## ACCOUNTS TO BE RELEASED FROM SECURITY ORDERS

| Name of Financial Institution | Amount Held | Account Number (last four digits only) | Account Owner |
|---|---|---|---|
| Bank of America, N.A. | $6,590,423.17 | ********3871 (Checking Acct.) | Barry Cadden Lisa Cadden |
| | | ********3871 (Money Market Acct.) | Barry Cadden Lisa Cadden |
| | | ********0144 | Barry Cadden Lisa Cadden |
| | | ********0157 | Barry Cadden Lisa Cadden |
| Charles Schwab & Co., Inc. | $10,000,327.29 | ********6656 | Carla Conigliaro and Douglas Conigliaro |
| Charles Schwab & Co., Inc. | $197,352 | ********1470 | Gregory Conigliaro and Cynthia Ianzito |
| Middlesex Savings Bank | $1,456,951.39 | ********4671 | Carla Conigliaro and Douglas Conigliaro |
| Middlesex Savings Bank | $1,943,207.87 | ********4663 | Gregory Conigliaro and Cynthia Ianzito |
| Middlesex Savings Bank | $11,377 | ********4471 | Gregory Conigliaro and Cynthia Ianzito |
| Middlesex Savings Bank | $262,754 | ********4447 | Gregory Conigliaro and Cynthia Ianzito |

**EXHIBIT E - TAX RETURN SPOUSE CONSENT AGREEMENT**

**DOUGLAS CONIGLIARO**

May 2, 2014

Paul D. Moore, Esq.
Chapter 11 Trustee of New England Compounding Pharmacy, Inc.
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA 02110

Re:     Douglas Conigliaro: Tax Return Spouse Consent Agreement

Dear Sir:

      Reference is hereby made to that certain Plan Support and Funding Agreement, dated as of May 2, 2014 (the "Funding Agreement"), by and among: (a) Paul D. Moore, in his capacity as duly appointed and acting chapter 11 trustee and not individually (together with any successors thereto, including any Estate Representative, the "Trustee") in the chapter 11 bankruptcy case of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center (the "Debtor"), Case No. 12-19882, pending in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), on the one hand; and (b) Barry and Lisa Cadden; (c) Carla Conigliaro; and (d) Gregory Conigliaro, on the other hand. A true and accurate copy of the Funding Agreement is attached hereto as **Exhibit A**.[1]

      The Funding Agreement references certain matters applicable to federal, state and local income tax laws, including without limitation, certain federal, state and local income tax returns filed and to be filed by Carla Conigliaro (the "Taxpayer") and Douglas Conigliaro (the "Tax Return Spouse"), and certain Tax Contributions to be made to the Escrow established under the Funding Agreement. Pursuant to Section 10 of the Funding Agreement, the Taxpayer has undertaken certain obligations, including without limitation, the delivery of this authorized and binding written consent ("Tax Return Spouse Consent Agreement") of the Tax Return Spouse.

In consideration of the promises and other consideration contained in this Tax Return Spouse Consent Agreement, being good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1. The Tax Return Spouse represents, acknowledges and agrees:

    A. To the extent reasonably requested by the Trustee, the Tax Return Spouse shall timely execute an I.R.S. Form 2848, Power of Attorney and Declaration of Representative and a Massachusetts Form M-2848 Power of Attorney and Declaration of Representative, designating the Taxpayer as the representative of the Tax Return Spouse for purposes of seeking Refund Claims, as contemplated in Section 10 of the Funding Agreement. In the absence of such request from the Trustee, the Tax Return Spouse may execute Form 2848 or Form M-2848 declaring the Taxpayer as his representative in requesting Refund Claims.

---

[1] Capitalized terms used herein and not otherwise defined have the meanings assigned thereto in the Funding Agreement.

B. The provisions of Section 10 (excluding Section 10.3(k) thereof) of the Funding Agreement (with respect to Taxes and Tax Refunds) shall apply to the Tax Return Spouse to the fullest extent possible as if expressly set forth herein and all references to a Party or to a Contributor in such Section 10 (excluding Section 10.3(k) thereof) shall be deemed to be a reference to or to include the Tax Return Spouse for all purposes. For the avoidance of doubt, the Tax Return Spouse agrees that all provisions of this Agreement and the Funding Agreement shall be applied so as to maximize the amount of the Refund Claims, the Refunds, and the Net Tax Refunds consistent with applicable law.

C. The Tax Return Spouse shall relinquish all rights to, and pay to the Trustee, or to the extent directed by the Trustee, to the Escrow Agent, all required Tax Contributions as if the Tax Return Spouse were a Contributor party, whether or not Refunds are or have been allocated separately to, or received separately by, such Tax Return Spouse, in all respects in the manner required of and in accordance with Section 10.3(f) of the Funding Agreement, and consistent with Section 2.2 of the Funding Agreement.

D. The provisions of Section 9(i) of the Funding Agreement (with respect to equity interests in NECC and Pharmaceutical Entities, as applicable) shall apply to the Tax Return Spouse to the fullest extent possible as if expressly set forth herein and all references to a Contributor in such Section 9(i) shall be deemed to be a reference to or to include the Tax Return Spouse for all purposes.

E. The provisions of this Tax Return Spouse Consent Agreement shall apply to the Tax Return Spouse without regard to subsequent events (*e.g.*, divorce).

2. This Tax Return Spouse Consent Agreement is intended to supplement, and shall not be construed to limit in any way, the obligations owed by the Parties under the Funding Agreement.

3. All notices, demands, or other communications to be provided pursuant to this Tax Return Spouse Consent Agreement shall be in writing and sent by registered or certified mail, return receipt requested or by an overnight delivery service, and by e-mail, if possible, to the Party receiving such communication at the addresses set forth below, or such other address as either Party may designate in writing from time to time:

If to the Trustee:

Paul D. Moore, Esq.
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA 02110
e-mail: pdmoore@duanemorris.com

If to the Taxpayer:

John J. Monaghan, Esq.
Lynne B. Xerras, Esq.

2

Holland & Knight LLP
10 St. James Avenue
Boston, MA  02116
john.monaghan@hklaw.com
lynne.xerras@hklaw.com

If to the Tax Return Spouse:

David Meier, Esq.
Melinda Thompson, Esq.
Todd & Weld LLP
One Federal Street
Boston, MA  02110
dmeier@toddweld.com
mthompson@toddweld.com

4.   Governing Law; Jurisdiction.

(a)      Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND
CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE
COMMONWEALTH OF MASSACHUSETTS, WITHOUT REGARD TO ANY
CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION
OF THE LAW OF ANY OTHER JURISDICTION.

(b)      Jurisdiction.  By his, her or its execution and delivery of this Agreement, each of
the Parties irrevocably and unconditionally agrees for himself or herself that any legal action,
suit or proceeding against it with respect to any matter brought by any Party to enforce or
interpret the Funding Agreement or the Tax Return Spouse Consent Agreement against
another Party or other Parties ("Enforcement Action") shall be brought exclusively in the
Bankruptcy Court.  By execution and delivery of this Agreement, each of the Parties
irrevocably accepts and submits himself or herself to the exclusive jurisdiction of the
Bankruptcy Court with respect to any such Enforcement Action and only with respect to such
Enforcement Action.  Only  in the event the Bankruptcy Court does not have or refuses to
exercise jurisdiction with respect to the Enforcement Action, such proceeding must be
brought in the U.S. District Court for the District of Massachusetts or, solely if jurisdiction is
lacking in the U.S. District Court, then in the Superior Court of the Commonwealth of
Massachusetts for Suffolk County. EACH PARTY HERETO UNCONDITIONALLY
WAIVES TRIAL BY JURY IN ANY ENFORCEMENT ACTION AND ONLY IN ANY
ENFORCEMENT ACTION.

5.  The provisions of Sections 12.1 (Effectiveness); 12.2 (Committee and PSC Rights); 12.4
(Enforcement of Agreement); 12.10 (Cooperation);  12.11 (Successors);  12.12 (Complete
Amendment, Amendments); 12.14 (Counterparts); and 12.15 (Executed under Seal) of the
Agreement shall apply, *mutatis mutandis*, to this Tax Return Spouse Consent Agreement as if
expressly set forth herein.

3

IN WITNESS WHEREOF, the parties have caused this Consent Agreement to be executed under seal as of the date first written above.


_____
Paul D. Moore, in his capacity as Chapter 11
Trustee of New England Compounding Pharmacy,
Inc., d/b/a New England Compounding Center and
not individually



_____
Douglas Conigliaro, Tax Return Spouse



_____
Carla Conigliaro, Taxpayer

4

IN WITNESS WHEREOF, the parties have caused this Consent Agreement to be executed under seal as of the date first written above.

Paul D. Moore, in his capacity as Chapter 11 Trustee of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center and not individually

_____
Douglas Conigliaro, Tax Return Spouse

_____
Carla Conigliaro, Taxpayer

4

## EXHIBIT F - TAX RETURN SPOUSE CONSENT AGREEMENT

## CYNTHIA IANZITO

May 2, 2014

Paul D. Moore, Esq.
Chapter 11 Trustee of New England Compounding Pharmacy, Inc.
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA 02110

Re:    Cynthia Ianzito: Tax Return Spouse Consent Agreement

Dear Sir:

Reference is hereby made to that certain Plan Support and Funding Agreement, dated as of May 2, 2014 (the "Funding Agreement"), by and among: (a) Paul D. Moore, in his capacity as duly appointed and acting chapter 11 trustee and not individually (together with any successors thereto, including any Estate Representative, the "Trustee") in the chapter 11 bankruptcy case of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center (the "Debtor"), Case No. 12-19882, pending in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), on the one hand; and (b) Barry and Lisa Cadden; (c) Carla Conigliaro; and (d) Gregory Conigliaro, on the other hand.  A true and accurate copy of the Funding Agreement is attached hereto as **Exhibit A**.[1]

The Funding Agreement references certain matters applicable to federal, state and local income tax laws, including without limitation, certain federal, state and local income tax returns filed and to be filed by Greg Conigliaro (the "Taxpayer") and Cynthia Ianzito (the "Tax Return Spouse"),  and certain Tax Contributions to be made to the Escrow established under the Funding Agreement.  Pursuant to Section 10 of the Funding Agreement, the Taxpayer has undertaken certain obligations, including without limitation, the delivery of this authorized and binding written consent ("Tax Return Spouse Consent Agreement") of the Tax Return Spouse.

In consideration of the promises and other consideration contained in this Tax Return Spouse Consent Agreement, being good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1.   The Tax Return Spouse represents, acknowledges and agrees:

A.  To the extent reasonably requested by the Trustee, the Tax Return Spouse shall timely execute an I.R.S. Form 2848, Power of Attorney and Declaration of Representative and a Massachusetts Form M-2848 Power of Attorney and Declaration of Representative, designating the Taxpayer as the representative of the Tax Return Spouse for purposes of seeking Refund Claims, as contemplated in Section 10 of the Funding Agreement. In the absence of such request from the Trustee, the Tax Return Spouse may execute Form 2848 or Form M-2848 declaring the Taxpayer as her representative in requesting Refund Claims.

---

[1] Capitalized terms used herein and not otherwise defined have the meanings assigned thereto in the Funding Agreement.

B.  The provisions of Section 10 (excluding Section 10.3(k) thereof) of the Funding Agreement (with respect to Taxes and Tax Refunds) shall apply to the Tax Return Spouse to the fullest extent possible as if expressly set forth herein and all references to a Party or to a Contributor in such Section 10 (excluding Section 10.3(k) thereof) shall be deemed to be a reference to or to include the Tax Return Spouse for all purposes.  For the avoidance of doubt, the Tax Return Spouse agrees that all provisions of this Agreement and the Funding Agreement shall be applied so as to maximize the amount of the Refund Claims, the Refunds, and the Net Tax Refunds consistent with applicable law.

C.  The Tax Return Spouse shall relinquish all rights to, and pay to the Trustee, or to the extent directed by the Trustee, to the Escrow Agent, all required Tax Contributions as if the Tax Return Spouse were a Contributor party, whether or not Refunds are or have been allocated separately to, or received separately by, such Tax Return Spouse, in all respects in the manner required of and in accordance with Section 10.3(f) of the Funding Agreement, and consistent with Section 2.2 of the Funding Agreement.

D.  The provisions of Section 9(i) of the Funding Agreement (with respect to equity interests in NECC and Pharmaceutical Entities, as applicable) shall apply to the Tax Return Spouse to the fullest extent possible as if expressly set forth herein and all references to a Contributor in such Section 9(i) shall be deemed to be a reference to or to include the Tax Return Spouse for all purposes.

E.  The provisions of this Tax Return Spouse Consent Agreement shall apply to the Tax Return Spouse without regard to subsequent events (*e.g.*, divorce).

2.  This Tax Return Spouse Consent Agreement is intended to supplement, and shall not be construed to limit in any way, the obligations owed by the Parties under the Funding Agreement.

3.  All notices, demands, or other communications to be provided pursuant to this Tax Return Spouse Consent Agreement shall be in writing and sent by registered or certified mail, return receipt requested or by an overnight delivery service, and by e-mail, if possible, to the Party receiving such communication at the addresses set forth below, or such other address as either Party may designate in writing from time to time:

If to the Trustee:

Paul D. Moore, Esq.
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA 02110
e-mail:  pdmoore@duanemorris.com

If to the Taxpayer:

Christopher J. Panos, Esq.
Partridge Snow & Hahn LLP

2

30 Federal Street
Boston, MA 02110
e-mail: cpanos@PSH.com

If to the Tax Return Spouse:

Christopher J. Panos, Esq.
Partridge Snow & Hahn LLP
30 Federal Street
Boston, MA 02110
e-mail: cpanos@PSH.com

4.  Governing Law; Jurisdiction.

    (a)     Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND
CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE
COMMONWEALTH OF MASSACHUSETTS, WITHOUT REGARD TO ANY
CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION
OF THE LAW OF ANY OTHER JURISDICTION.

    (b)     Jurisdiction.  By his, her or its execution and delivery of this Agreement, each of
the Parties irrevocably and unconditionally agrees for himself or herself that any legal action,
suit or proceeding against it with respect to any matter brought by any Party to enforce or
interpret the Funding Agreement or the Tax Return Spouse Consent Agreement against
another Party or other Parties ("Enforcement Action") shall be brought exclusively in the
Bankruptcy Court.  By execution and delivery of this Agreement, each of the Parties
irrevocably accepts and submits himself or herself to the exclusive jurisdiction of the
Bankruptcy Court with respect to any such Enforcement Action and only with respect to such
Enforcement Action.  Only in the event the Bankruptcy Court does not have or refuses to
exercise jurisdiction with respect to the Enforcement Action, such proceeding must be
brought in the U.S. District Court for the District of Massachusetts or, solely if jurisdiction is
lacking in the U.S. District Court, then in the Superior Court of the Commonwealth of
Massachusetts for Suffolk County. EACH PARTY HERETO UNCONDITIONALLY
WAIVES TRIAL BY JURY IN ANY ENFORCEMENT ACTION AND ONLY IN ANY
ENFORCEMENT ACTION.

5.  The provisions of Sections 12.1 (Effectiveness); 12.2 (Committee and PSC Rights); 12.4
(Enforcement of Agreement); 12.10 (Cooperation); 12.11 (Successors); 12.12 (Complete
Amendment, Amendments); 12.14 (Counterparts); and 12.15 (Executed under Seal) of the
Agreement shall apply, *mutatis mutandis*, to this Tax Return Spouse Consent Agreement as if
expressly set forth herein.


    IN WITNESS WHEREOF, the parties have caused this Consent Agreement to be
executed under seal as of the date first written above.

3

IN WITNESS WHEREOF, the parties have caused this Consent Agreement to be executed under seal as of the date first written above.


Paul D. Moore, in his capacity as Chapter 11
Trustee of New England Compounding Pharmacy,
Inc., d/b/a New England Compounding Center and
not individually


_____

Cynthia Ianzito, Tax Return Spouse


_____

Greg Conigliaro, Taxpayer

4

IN WITNESS WHEREOF, the parties have caused this Consent Agreement to be executed under seal as of the date first written above.

_____

Paul D. Moore, in his capacity as Chapter 11 Trustee of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center and not individually

_____

Cynthia Ianzito, Tax Return Spouse

_____

Greg Conigliaro, Taxpayer

4

## EXHIBIT G

## ACCOUNTS TO BE RELEASED FROM SECURITY ORDERS
## PURSUANT TO SECTION 3.1(c)

| Name of Financial Institution | Amount Held | Account Number (last four digits only) | Account Owner |
|---|---|---|---|
| Bank of America, N.A. | $6,590,423.17 | ********3871 (Checking Acct.) | Barry Cadden Lisa Cadden |
| | | ********3871 (Money Market Acct.) | Barry Cadden Lisa Cadden |
| | | ********0144 | Barry Cadden Lisa Cadden |
| | | ********0157 | Barry Cadden Lisa Cadden |
| Charles Schwab & Co., Inc. | $10,000,327.29 | ********6656 | Carla Conigliaro and Douglas Conigliaro |
| Charles Schwab & Co., Inc. | $197,352 | ********1470 | Gregory Conigliaro and Cynthia Ianzito |
| Middlesex Savings Bank | $1,456,951.39 | ********4671 | Carla Conigliaro and Douglas Conigliaro |
| Middlesex Savings Bank | $1,943,207.87 | ********4663 | Gregory Conigliaro and Cynthia Ianzito |
| Middlesex Savings Bank | $11,377 | ********4471 | Gregory Conigliaro and Cynthia Ianzito |
| Middlesex Savings Bank | $262,754 | ********4447 | Gregory Conigliaro and Cynthia Ianzito |

# EXHIBIT B

*ESCROW FEE SCHEDULE*



# CITIZENS
# PRIVATE BANK & TRUST™

## INSTITUTIONAL SERVICES
### *Escrow Fee Schedule*

| | |
|---|---|
| MINIMUM ANNUAL FEE | $5,000 |
| **TRANSACTION FEES** | |
| Security Transaction Charge | $25.00 each |
| Wire Fee | $25.00 |

## ❄ Citizens Bank®

Incremental charges may be assessed for additional processing services when Citizens Bank is required to provide extraordinary administrative services. Charges for extraordinary administrative services will be assessed at hourly rates.

#232

IVFL11110K_EscrowFeeSchedules