1             UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3

4    IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
     PHARMACY CASES LITIGATION          )
5                                       )
                                        )
6                                       )
                                        )
7                                       )
                                        )
8

9

     BEFORE:  MAGISTRATE JUDGE JENNIFER C. BOAL
10

11

                       STATUS CONFERENCE
12

13

14

                John Joseph Moakley United States Courthouse
15                       Courtroom No. 14
                        1 Courthouse Way
16                      Boston, MA 02210

17

                       February 17, 2015
18                        11:30 a.m.

19

20

21

22

23               Valerie A. O'Hara, FCRR, RPR
                      Official Court Reporter
24       John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                    Boston, MA 02210
                 E-mail: vaohara@gmail.com

 1    APPEARANCES:

 2    For The Plaintiffs:

 3         Hagens, Berman, Sobol, Shapiro LLP, by KRISTEN JOHNSON,
      ATTORNEY, 55 Cambridge Parkway, Suite 301, Cambridge,
 4    Massachusetts  02142;

 5         Robinson & Cole, LLP, KIMBERLY A. DOUGHERTY,
      ATTORNEY, One Boston Place, Suite 2500, Boston,
 6    Massachusetts  02108;

 7         Lieff, Cabraser, Heimann & Bernstein, LLP, by
      ANNIKA K. MARTIN ATTORNEY, 250 Hudson Street, 8th Floor,
 8    New York, New York 10013-1413;

 9         Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ.,
      366 Elm Avenue, SW, Roanoke, Virginia 24016;
10
      For the Defendants:
11
           Norton Rose Fulbright US, LLP, by ADAM T. SCHRAMEK, ESQ.,
12    98 San Jacinto Boulevard, Suite 1100, Austin, Texas 78701-4255;

13         Alexander, Dubose, Jefferson & Townsend, LLP, by MARCY
      HOGAN GREER, ATTORNEY, 515 Congress Avenue, Suite 2350, Austin,
14    Texas 78701-3562;

15         Nutter, McClennen & Fish, LLP, by SARAH P. KELLY, ESQ.,
      Seaport West, 155 Seaport Boulevard, Boston, MA 02210-2604;
16
           Goodwin Procter LLP, by ROBERTO M. BRACERAS, ESQ.,
17    Exchange Place, 53 State Street, Boston, Massachusetts 02109;

18         Harris Beach PLLC, by FREDERICK H. FERN, ESQ.,
      100 Wall Street, New York, New York  10005;
19
      VIA PHONE:
20
      For The Plaintiffs:
21
           Branstetter, Stranch & Jennings, PLLC, by BENJAMIN A.
22    GASTEL, ESQ., 227 Second Avenue North, Fourth Floor,
      Nashville, Tennessee 37201-1631;
23
      For the Defendants:
24
           Gideon, Cooper & Essary, PLC, by CHRIS J. TARDIO, ESQ.,
25    315 Deaderick Street, Suite 1100, Nashville, Tennessee 37238;

1    APPEARANCES (CONTINUED) VIA TELEPHONE:

2    For the Defendants:

3        Frith & Ellerman Law Firm, P.C., by ROB DEAN, ESQ., P.O.
     Box 8248, Roanoke, Virginia  24014;

4
         McCarthy, Bouley & Barry, PC, by CLARE F. CARROLL,
5    ATTORNEY, 47 Thorndike Street, Cambridge, Massachusetts 02141;

6        Brewer, Krause, Brooks, Chastain & Burrow, PLLC, by JASON
     A. LEE, ESQ., 611 Commerce Street, Suite 2600, Nashville,
7    Tennessee 37203;

8        FULBRIGHT & JAWORSKI, LLP, by ERIC J. HOFFMAN, ESQ. and
     YVONNE K. PUIG, ATTORNEY, 98 San Jacinto Boulevard, Suite 1100,
9    Austin, Texas 78701.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          PROCEEDINGS

2          THE CLERK:  All rise.  You may be seated.  Today is

3   February 17th, 2015, we're on the record in the matter of

4   New England Compounding Pharmacy, et al, Case Numbers

5   13-md-02419.

6          Counsel, please identify themselves for the record

7   starting with the plaintiffs' steering committee.

8          MS. JOHNSON:  Good morning, your Honor,

9   Kristen Johnson for the plaintiffs' steering committee.

11:39AM 10          MR. FENNELL:  Good morning, your Honor,

11   Patrick Fennell, plaintiffs' steering committee.

12          MS. MARTIN:  Good morning, your Honor, Annika Martin

13   for the plaintiffs' steering committee.

14          MS. DOUGHERTY:  Good morning, your Honor,

15   Kim Dougherty for the plaintiffs' steering committee.

16          THE COURT:  Good morning.

17          MR. SCHRAMEK:  Your Honor, Adam Schramek for the

18   St. Thomas entities.

19          MS. GREER:  Marcy Greer for the St. Thomas entities.

11:39AM 20   Good morning.

21          THE COURT:  Good morning.

22          MS. KELLY:  Sara Kelly for the St. Thomas entities.

23          MR. BRACERAS:  Roberto Braceras for Unifirst.

24          THE COURT:  I understand that we have some people on

25   the phone.

1          MR. GASTEL:  Yes, Judge Boal, this is Ben Gastel on

2    behalf of the plaintiffs' steering committee.  I do apologize

3    for not being in the courtroom today.  It was my intention of

4    being there, but there were no flights that left Nashville

5    yesterday, and I am stranded in my house today.

6          THE COURT:  A familiar feeling to many of us here.

7    Is there anyone else on the phone?

8          MS. CARROLL:  Yes.

9          THE CLERK:  Can the parties on the line please

11:40AM 10    identify themselves for the record.

11          MS. PUIG:  This is Yvonne Puig for St. Thomas

12    entities.

13          MR. DEAN:  Richard Dean for Ameridose.

14          MR. LEE:  Attorney Jason Lee for Specialty Surgery

15    in Nashville, Tennessee.

16          MR. TARDIO:  Your Honor, this is Chris Tardio for

17    the Tennessee Clinic defendants.

18          MR. HOFFMAN:  This is Eric Hoffman for the

19    St. Thomas entities.

11:40AM 20          THE COURT:  All right.  So I assume that's it for

21    people on the phone.  So for the purposes of people on the

22    phone, I would just ask that people stay remain seated and

23    pull the microphones closer to them, and, obviously,

24    Mr. Braceras, we need to make some separate arrangements for

25    you if you wish to speak.

1        Let's start first with the motion for clarification.

2   I've read the parties' papers, and their positions seem

3   fairly well defined, so what I'd like to start to do is ask

4   the plaintiffs' steering committee to respond to St. Thomas'

5   proposal with respect to the first item, and this has to do

6   with releases for the tax returns.

7        As I understand it, St. Thomas has proposed -- well,

8   first they say there's no need for release, but they're fine

9   for not requesting, okay with not requesting release as long

11:41AM 10   as the plaintiffs agree that they would be barred from

11   seeking such relief in the future or the Court ordered as

12   such, so what is the PSC's response?  Obviously, you all have

13   been talking about this for a long time.

14        MR. GASTEL:  Yes, Judge, this is Ben Gastel on

15   behalf of the PSC.  We do not oppose that approach.  We do

16   believe that there should be a sort of opportunity for

17   plaintiffs who could demonstrate good cause as to a change in

18   circumstance that might necessitate bringing a new claim that

19   they didn't previously think that they had, that they should

11:42AM 20   be given an opportunity to demonstrate good cause in the

21   event that they'd like to amend their PTF to provide that

22   information and that sort of rare instance where that might

23   be appropriate.

24        Otherwise we do not propose, or, I'm sorry, we do

25   not oppose the path proposed by the St. Thomas entities on

1    that issue.

2         THE COURT:  So, Mr. Gastel, just a follow-up

3    question on that, and the PSC has been diligent in pursuing

4    quick trials here and trying to push the Court as quickly as

5    it can, and it's appropriate to do so.

6         I mean, we're now two plus years after, if I'm

7    adding this up correctly, since the events.  What would

8    change now in terms of a change in a claim for economic loss?

9         MR. GASTEL:  Sure.  I believe that the Court is

11:43AM 10   aware that some of the health issues that have been

11    associated with being injected with contaminated steriods

12    from NECC, not everybody else's health issue has fully

13    resolved, and as a result, there may be an instance, and I

14    will admit that it is probably rare that this will occur

15    where that sort of ongoing change in medical status might

16    give rise to a change in employment status, although that has

17    not been affected to date for a given plaintiff.

18         And in that sort of rare instance, we think that

19    that plaintiff should not be barred in the sense from

11:44AM 20   pursuing an economic loss that might have accrued after they

21    first filled out their plaintiff profile form.

22         THE COURT:  All right.  So, St. Thomas entities.

23         MR. SCHRAMEK:  Your Honor, Adam Schramek for the

24    St. Thomas entities.  We believe that any Court order at the

25    end of the day is subject to a minimum revision in the future

1    when good cause is brought and a motion brought to the Court

2    and explained.  I don't think that we need to invite those

3    sorts of arguments by explicitly saying in the order there

4    could be exceptions in the future if in fact this really, you

5    know, exception to the exception actually occurs.

6           I think what I'm hearing Mr. Gastel say, and we've

7    spoken on this at length, is that in theory might be someone

8    that would be able to establish some sort of reason.  I don't

9    think that that is a reason to put in the order that anyone

11:45AM 10   for good cause may get relief in the future.

11          If that circumstance occurs, he'll come to me, we'll

12   talk about it.  You know, if we can't agree, we'll bring it

13   to the Court.  I just don't think it requires an exception of

14   the order that says make your decision now, we're two years

15   in, talk to you about fungal meningitis or injections that

16   occurred two years ago, and at this point in time if you

17   don't want to produce your tax records, they can always hedge

18   their bets and just produce their tax records, but if they

19   don't want to produce them, then we'd simply ask for an order

11:45AM 20   that says, you know, you're made your decision, and you're

21   going to have to now live with that decision through the rest

22   of the litigation, particularly given the fact that the

23   aggressive nature of these trial settings the PSC is pushing

24   for.

25          THE COURT:  Mr. Gastel, anything further on that

1      issue?

2              MR. GASTEL:  No, I think I've said my peace on that

3      issue, your Honor.

4              THE COURT:  So, moving onto the second issue, and,

5      again, Mr. Gastel, what about I assume you're still arguing

6      this, the St. Thomas argument about worker's compensation

7      claims, and I guess in my limited experience, often

8      employers -- I think the plaintiffs would have to sign some

9      documents, but employers certainly could push the filing or

11:46AM 10  insurance companies will so that the plaintiff may not

11     realize that they filed a worker's compensation claim?

12             MR. GASTEL:  Well, I mean, again, I think the

13     plaintiffs here are certifying under oath that they haven't,

14     and I think that sort of on the back end requiring that the

15     plaintiffs then produce a release is nothing more a fishing

16     expedition, and I think importantly here, your Honor, the

17     defendants who did these releases wouldn't even know when to

18     send them.

19             Are they going to send 50 worker's compensation

11:46AM 20  releases to every single state worker's comp. physician in an

21     attempt to try to find that one instance where the person

22     didn't remember that they filed a worker's comp. claim, in,

23     you know, 2004, and so we just think that it's sort of an

24     obvious and natural outgrowth of swearing under oath that you

25     didn't file a worker's comp. claim to then sort of be

1    required to provide a release for records that you just swore

2    didn't exist.

3              THE COURT:  All right.  So, St. Thomas.

4              MR. SCHRAMEK:  Your Honor, as I think the Court just

5    mentioned, there are circumstances that are relatively common

6    where worker's comp. claims could get filed where the

7    plaintiff may not recall or may not have known.

8              Mr. Gastel talks about the certification.  Of

9    course, we noted in there it's only to the best of my

11:47AM 10    knowledge, information and belief, hardly sworn under oath

11    that it does not exist and did not happen.

12              With respect to which states to go file it in,

13    first, that's an issue, a decision and a burden on the

14    defendant to decide where they want to go look for those

15    records.  I think in most cases, given what we know about the

16    plaintiffs and their work history from the plaintiff profile

17    forms, there will be one state, which we would likely need to

18    pursue that filing, so we would simply ask that it's not a

19    burdensome procedure, the plaintiffs are already signing

11:48AM 20    authorizations and filling out a lengthy form.  One more

21    signature for this very important discovery we think is

22    appropriate.

23              THE COURT:  Mr. Gastel, anything further on that?

24              MR. GASTEL:  No, although I will say, with my

25    apologies to Mr. Schramek who I assume is in the courtroom,

1    if he could speak a little bit louder into the microphone, I

2    would appreciate it, as I'm having a little bit of difficulty

3    hearing him.  I believe I got the gist of what he said, and I

4    believe I've said my peace on that particular regard.

5         THE COURT:  So, item Number 3, it appears that we

6    have agreement, but the parties would just like me to add

7    that to any order that I might issue.

8         So then moving onto item Number 4, and my question

9    to the PSC is why shouldn't I adopt UniFirst's proposal?  It

11:49AM 10   does seem to me that some of these questions are key

11   questions in the litigation, and, again, after two plus

12   years, it would seem that the plaintiffs should know the

13   answers to these questions, but that UniFirst's proposal

14   seemed like a reasonable compromise.

15        MR. GASTEL:  Well, I guess my problem with the

16   UniFirst proposal, on some level, part of the mechanics of it

17   is I think that the plaintiffs have more or less already sort

18   of promised that they've done the reasonable diligence in

19   answering the forms under oath.

11:49AM 20        If they simply don't remember the answer to a

21   question that is presented only as yes or no or they simply

22   don't know the answer to that, it seems reasonable to allow

23   them to say I don't know, especially since they're swearing

24   to these forms under oath.

25        With regard to saying that I'm not entirely sure how

1    we implement UniFirst's suggestion that they then -- do they

2    also need to certify that they've undertaken a reasonable

3    diligent review of the records at hand on top of swearing

4    under oath?

5         I mean, that seems kind of unreasonable and

6    unworkable in this situation, and that would be our only sort

7    of response to this, to the UniFirst proposal.

8         THE COURT:  All right.  St. Thomas.

9         MR. SCHRAMEK:  Your Honor, of course, part of the

11:50AM 10   plaintiff profile process was having the defendants pursuant

11   to these Court orders forego discovery from plaintiffs at

12   this time in lieu of actually having them at a deposition,

13   sending interrogatories where we could follow up on some of

14   these questions, when we got a "I'm not sure," "I don't

15   remember," and we could press them at deposition, well, let's

16   talk about your medical history, et cetera.

17        When you look at a question such as -- I'm trying to

18   speak into the microphone -- when you look at a question like

19   "Have you ever been told that your injuries were caused by an

11:51AM 20   exposure to an NECC product," I just don't understand how an

21   unknown is ever appropriate to that question.  Either they

22   were told or they weren't told.

23        Your Honor, if I could be frank with the Court, what

24   I think is happening is that a lot of the plaintiffs are

25   sending these forms to their clients, getting them back in

1    the mail with inappropriate answers, and instead of following

2    up with their clients to get the yes/no answer and get it

3    revised, they just forward it on, and so it's really a burden

4    issue of not getting the answer when it's a yes/no answer as

5    opposed to unknown being actually an appropriate response.

6              "Are you claiming that NECC made previous conditions

7    worse?  Yes or no."

8              "Did you have previous conditions that got worse?"

9    Either you did or you didn't.  These are basic yes/no

11:52AM 10   questions that we think that the plaintiffs should be

11   required to answer in order to forego discovery.

12             We're going to be talking about in a couple months

13   or so about a Bellwether selection process, about selecting

14   cases, and plaintiffs based on these forms, and these are

15   very important questions about how we likely would categorize

16   the different groups and select persons for further

17   discovery, so we would ask them simply to answer the

18   question, and if the plaintiffs' attorneys have to follow up

19   with their clients to figure out if it's a yes/no, to give

11:52AM 20   them legal advice as to whether yes or no is the better

21   answer, then, your Honor, that needs to happen, and that

22   needs to happen now.

23             THE COURT:  Mr. Braceras, do you wish to add

24   anything to this?

25             MR. BRACERAS:  Your Honor, we largely are in

1    agreement with St. Thomas.  We think, as we indicated in the

2    brief, that there are certain answers where the plaintiffs

3    are answering unknown where they are obvious questions, so

4    they should be required to exercise some diligence in finding

5    out, it's just not whether you know your driver's license.

6         MS. CARROLL:  Hello, we're having a hard time

7    hearing you.

8         MR. BRACERAS:  It should be knowable to get your

9    driver's license or health insurance policy, and we agree

11:53AM 10   with St. Thomas that some of these answers do not warrant an

11   unknown response.

12        THE COURT:  All right.  Mr. Gastel.

13        MR. GASTEL:  First of all, I very much disagree with

14   Mr. Schramek's characterization that the plaintiffs aren't

15   doing due diligence on these forms.  Obviously, I can't speak

16   to every plaintiff's counsel in this litigation, but I was

17   very actively involved in putting together many of the forms

18   my office did, and I can assure you when a question comes in

19   that is unknown or I don't know or something of that, it is a

11:53AM 20   little bit off-base from the form, there's definitely a

21   process, and we and plaintiff's attorneys take very seriously

22   the need to ensure that these forms are filled out to the

23   best ability of our clients, and the fact that we're just

24   getting them in, not looking at them and sending them to

25   defense counsel I think is just simply wrong.

1       With regard to some of the points, other points that

2  Mr. Schramek made, you know, going to back to the point of

3  whether or not they were told that their problems were from

4  an NECC product, many of these people are filling out this

5  form two years after these conversations with their doctor.

6       Now, I think that it's fair in the instances where

7  somebody doesn't genuinely remember whether or not their

8  doctor said in the room two years ago that yes, this is

9  definitely caused by an NECC product or no, this is not

11:54AM 10  caused by an NECC product, memories fade, and here we are in

11  many instances two, two and a half years after these

12  conversations took place, and I think that it's purposefully

13  within a plaintiff's right to swear under oath that they

14  simply don't remember what that doctor said or didn't say in

15  the room that day, and that goes to many of the other

16  questions.

17       Now, Mr. Braceras pointed out the driver's license

18  issue.  I will admit that in some instances that, you know,

19  plaintiffs should be able to pull out a driver's license and

11:55AM 20  figure out what their license number is, but with that being

21  said, what if somebody doesn't have a driver's license, is

22  that the basis for them swearing under oath that they don't

23  know it?

24       So, again, you know, I think that there's tremendous

25  benefit in having the plaintiff profile form sworn to under

1    oath.  It's sort of imposes upon the plaintiffs and

2    plaintiff's counsel a tremendous burden to ensure that those

3    forms are filled out to the best ability possible, and we

4    think that plaintiffs, if unknown is the truthful and correct

5    answer to a question, should be able to fill that in.  That

6    would be the plaintiff's steering committee's position on

7    that issue.

8           THE COURT:  Ms. Johnson.

9           MS. JOHNSON:  Thank you, your Honor.  Two quick

11:56AM 10    points:  As a procedural matter, plaintiffs' profile forms by

11    and large have all been served already.  Now, there may be

12    some new cases in the last 30 or 60 days, I forget, where

13    that's not yet the case, but for the vast majority of

14    plaintiffs in the MDL, efforts have been made to complete

15    that form thoroughly after doing reasonable diligence with

16    the attorney and the plaintiff in consultation taking very

17    seriously the wording of that form and the obligations

18    attended to that and the requirement that you're signing, I

19    think it's not under oath, that's true, but it does require

11:56AM 20    to the best of your knowledge.

21           I mention the fact that this has been done for two

22    reasons:

23           First, to the extent the Court would require

24    additional waivers on the worker's comp., that would be

25    another round of this process that we would have to engage

1    in, as many plaintiff's attorneys did not submit worker's

2    comp. waivers with I think at least at the time the

3    understandable reading of the Court's order that that may not

4    be necessary if you're not claiming worker's comp.

5         Second, I mention it because I think, in fact, at

6    least in my experience with my plaintiffs and the plaintiffs'

7    lawyers I've spoken with, UniFirst's suggestion here has been

8    implemented, meaning plaintiffs and their counsel have

9    exercised reasonable diligence and reviewed the materials in

11:57AM 10   their possession and made a serious effort to answer these

11   questions honestly.

12        I don't want to waive the victim flag too wildly,

13   but I think it is worth remembering that many of these folks

14   were seriously ill and hospitalized for long periods of time

15   with brain infections.  Not everyone's memory is critical

16   clear, and I would suggest in a circumstance, you know, a

17   plaintiff may well decide the answer is I'm not sure, I just

18   don't remember that well, so...

19        THE COURT:  And so that in some way may answer my

11:58AM 20   next question.  Do you have an idea of the percentage of

21   people that answered unknown to the subject questions, like a

22   ballpark figure?

23        MS. JOHNSON:  I do not, your Honor.

24        THE COURT:  All right.  Because it strikes as we're

25   talking, and I know these were heavily litigated, and there

1    was litigation over that perhaps, so, for example, 34 may be

2    a poorly worded question, right, "Have you ever been told,"

3    right, rather than just asking are any of your injuries,

4    right, and then you could say on what basis?

5         So my next suggestion was whether to ask that

6    question, but you're saying, I would gather, from the

7    plaintiffs' perspective, you don't want a new question to go

8    out?

9         MS. JOHNSON:  If the Court were talking about

11:58AM 10  modifying the plaintiffs' profile forms so that newly filed

11   cases or plaintiffs who have not yet completed it are

12   answering a slightly more clear question, I don't think the

13   PSC would have an objection to that, but we would not suggest

14   that it would be appropriate here to ask all the plaintiffs

15   to answer additional questions at this point.

16        THE COURT:  All right.

17        MS. JOHNSON:  I should also, just as a procedural

18   matter, your Honor, there's also an opportunity for

19   defendants who receive plaintiff profile forms to alert the

11:59AM 20  plaintiff and his counsel, if he has counsel, to

21   deficiencies, and my understanding is that we have received

22   deficiency notices identifying, for example, where a driver's

23   license is missing or a name is not filled in, and plaintiffs

24   and their counsel are working to address those.

25        THE COURT:  Yes.

1        MR. SCHRAMEK:  And, your Honor, we have with

2   diligence every plaintiff profile form we have received, we

3   have sent a letter saying when it didn't contain a worker's

4   comp. form, for example, authorization, we've sent it and

5   said there is a deficiency, and we do need that worker's

6   comp. form.

7        With respect to the yes/no questions, unknown really

8   provides no information.  It doesn't mean are you saying yes,

9   no, or are you saying you don't remember, are you saying,

11:59AM 10   well, I recall someone may have said that, but I can't...

11   There's so many possibilities there, so, 1, we believe yes/no

12   continues to be appropriate.

13        To the extent that the Court concludes that maybe

14   there's another third alternative, we would ask for an

15   explanation.  If it's you can't remember ever being told

16   that, let's have that.  If it's I think someone said it, but

17   I can't swear to you, I think my doctor said it, but I just

18   don't remember for sure, that's an explanation.  That's not

19   one word "unknown" leaving us in the dark as to what that

12:00PM 20   really means.

21        THE COURT:  All right.  So I understand the PSC's

22   argument that they don't want to go back and redo forms, but

23   I understand that.  What about St. Thomas's suggestion to

24   explain the unknown?

25        MS. JOHNSON:  I would suggest, your Honor, that my

1    understanding -- let me back up a minute.  There has been an

2    assumption in this MDL from the beginning that eventually we

3    would be getting into Bellwether cases and cases that we

4    worked up for individual discovery once we had a trial pool

5    of sorts and a plan for moving forward with that.

6         I would suggest given the reality that plaintiffs

7    have already completed these forms and that we'd like to not

8    ask them to do so again, it may be appropriate for defense

9    counsel to probe any unknowns or questions, answers that

12:01PM 10   they're not satisfied with to the extent they can't be cured

11   now, at the point in time where we're working up that

12   individual case for trial.

13        THE COURT:  All right.  Anything further on this

14   motion?

15        (No response)

16        THE COURT:  All right.  So we'll move on.  The next

17   one I have is the PSC's motion to compel, and this involves

18   both the motion to compel -- well, I have to ask some

19   questions about it, a formulary and an index of policies.

12:01PM 20   Who's going to speak for the PSC on that?

21        MR. GASTEL:  That is another thing that I am arguing

22   on behalf of the PSC today, your Honor.

23        THE COURT:  All right.  So my first question is I am

24   confused because the motion and the memorandum switch back

25   and forth as to which entity the materials are requested

1    from, so, for example, in the motion that says the St. Thomas

2    Hospital formulary but in the memo it seems to seek a broader

3    request, and the same problem I had with the index, at one

4    point, the papers say all St. Thomas entities, the motion

5    says just said St. Thomas Hospital, and another document says

6    St. Thomas Health, so what are you seeking from whom?

7         MR. GASTEL:  Well, I could be corrected if I'm wrong

8    on this by counsel for the St. Thomas entities, but I believe

9    that the St. Thomas entities do not maintain a formulary

12:02PM 10    per se applicable to its host of medical facilities, so with

11    regard to the formulary, it's really the St. Thomas Hospital

12    formulary, which, you know, I believe it would also be in the

13    possession, custody and control of all of the St. Thomas

14    entities.

15         The same thing can go for the index.  We're looking

16    for an index of policies that are applicable on the

17    St. Thomas Hospital campus, which, again, should be in the

18    possession, custody and control of all of the St. Thomas

19    entities.

12:03PM 20         THE COURT:  All right.  Then so why are the redacted

21    portions of the St. Thomas Hospital formulary relevant?  As I

22    understand it, and you can correct me if I'm wrong, the

23    plaintiffs that are associated with these defendants were all

24    treated at I think some people refer to it as the STOPNC, the

25    clinic, and then I understand there's also a relationship

1    between the clinic and the hospital and that you have the

2    STOPNC formulary, and you have a redacted St. Thomas Hospital

3    formulary.

4         Why do you need the rest of the drugs on the

5    St. Thomas Hospital formulary?

6         MR. GASTEL:  Sure.  So plaintiffs allege in part

7    that the St. Thomas entities failed to adequately supervise

8    its agent, the St. Thomas Clinic, or as you just described

9    them, STOPNC, which is the acronym for the St. Thomas

12:04PM 10   Outpatient Neurosurgical Clinic, which is the clinic that is

11   on I believe the ninth floor of the St. Thomas Hospital

12   building.

13        It's the clinic where these plaintiffs received

14   their injections in that the plaintiffs here are alleging

15   that the St. Thomas entities fail to adequately supervise

16   that agent to ensure that it purchased safe medicines for its

17   patients.

18        The St. Thomas entities, specifically the St. Thomas

19   Hospital, maintain a list of medications that it believes are

12:05PM 20   safe and effective in treating patients in their hospital,

21   and this motion simply asks that the St. Thomas entities

22   produce that policy, and the relevancy of --

23        THE COURT:  Wait, my question was about the

24   formulary.

25        MR. GASTEL:  Sure.  I apologize, but the formulary,

1    the St. Thomas entities claim that the formulary does not

2    contain a reference to compounding medications, but to the

3    extent that the formulary doesn't actually list compounding

4    medications, it's still relevant to plaintiff's claims in the

5    sense that that suggests that the St. Thomas entities, and

6    specifically the St. Thomas Hospital, understand that the

7    safety protocol associated with purchasing a compounding

8    pharmaceutical is different than its FDA-regulated

9    equivalent.

12:06PM 10         THE COURT:  Right.  But you don't get that from the

11   formulary, you get that from testimony about the formulary,

12   and they've offered to stipulate or respond to a request for

13   an admission that the STH formulary did not make any

14   reference to compounded products.

15         Why from an evidentiary purpose you get what you

16   want about the formulary with respect by their offer of a

17   stipulation or a request for admission?

18         MR. GASTEL:  Again, I don't necessarily think that

19   we can understand the full scope of that without seeing the

12:06PM 20   entire formulary because the idea that it doesn't simply

21   reference compounding medications is not sufficient, and to

22   the extent that other medications that could appear on that

23   formulary, you know, they could appear in terms of -- so the

24   formulary as it's shown provides the name, the generic name

25   and the name brand of the FDA-regulated brand name of the

1    drug and the sort of dosage and type of drug that it is, so,

2    for example, you know, a 32 milligram pill of

3    methylprednisolone is on the portion of the formulary that

4    they've produced.

5          Now it could be that that 32 milligram tablet is

6    available through the brand name equivalent, but it's also

7    possible that the only way to get a 32 milligram tablet is to

8    compound it, if you will, or to dilute it in some form, and

9    so merely by saying that the formulary doesn't reference

12:07PM 10   compounding medications, although it might be true enough

11   that it doesn't say 32 milligram compounded, it is still

12   relevant to the extent that it sort of shows a preference for

13   only purchasing those drugs that are available through a

14   generic or a brand name equivalent.

15         We can't really know the universe of instances where

16   the St. Thomas entities or St. Thomas Hospital believes that

17   a compounded drug without sort of going through a separate

18   safety protocol is appropriate without seeing the entire list

19   of medications, the entire universe of medications that it

12:08PM 20   says here are the ones that are safe to use in the hospital,

21   you don't have to do anything else, you can just go purchase

22   them, so that's why we believe that the entire formulary is

23   necessary because it provides a picture, a window into those

24   instances where and it might be in no instances, and it might

25   be some instances where the St. Thomas Hospital thinks it's

1    okay to purchase the compounded medication and some instances

2    where it doesn't think it's okay to purchase the compounded

3    medication, and there's this other safety mechanism and

4    safety protocol that you have to follow to ensure that the

5    drugs that you're purchasing are safe.

6         THE COURT:  All right.  Thank you.

7         MR. GASTEL:  That's highly relevant to claims

8    involving the claims where you fail to follow the safety

9    protocols to ensure that you purchased a safe compounding

12:09PM 10   drug that was eventually injected into its patients, so

11   that's one instance.

12        The second instance is that the unilateral redaction

13   hardly covers the realm of medications that are relevant in

14   the lawsuit in the sense that the availability of safer

15   FDA-regulated alternatives to NECC compounded MPA is highly

16   relevant to plaintiffs' claims, so if the hospital formulary

17   provides that the use of dexamethazone or other

18   corticosteroids, the existence of those FDA-approved

19   alternatives on the hospital's formulary would be highly

12:09PM 20   relevant to plaintiff's claims, as it would allow them to

21   point to readily accessible alternatives to the dangerous

22   drugs that the St. Thomas Clinic ultimately purchased from

23   NECC and injected into its patients, and so that is why we

24   sort of believe that the unilateral redactions are

25   insufficient and that we should be able to be given a window

1    into the entire formulary in order to be able to fully

2    investigate how the St. Thomas Hospital treated and saw the

3    safety of compounded drugs in relation to their FDA-regulated

4    drug equivalents.

5            MR. SCHRAMEK:  Your Honor, Adam Schramek for

6    St. Thomas.  I think you've now heard how our meet and confer

7    went essentially over this issue.  We start with the concept

8    of STOPNC, which is in a medical plaza building with

9    third-party tenants and doctors and surgery centers, not

12:10PM 10   St. Thomas Hospital.

11           STOPNC has its own formulary.  A couple of weeks

12   ago, we took the deposition of Ms. Schamberg who's the head

13   and director of STOPNC.  We have the STOPNC formulary.

14   STOPNC is the actual entity that provided the injections.

15   Not one injection of compounded MPA from NECC was performed

16   at the hospital.

17           So we start with that issue, and from St. Thomas

18   Hospital's point of view, we don't believe our formulary is

19   even relevant to this issue.  It's uncontroverted what the

12:11PM 20   formulary was for STOPNC, and they have all the policies with

21   respect to the STOPNC formulary and now have the sworn

22   testimony of Ms. Schamberg as to whether the MPA from NECC

23   qualified for their formulary or not, which is the real issue

24   of relevance.

25           So taking one step back from direct relevance and

1    now going on what we would argue is a fishing expedition,

2    they want to go look at the formulary for the hospital.

3    Well, originally, your Honor, we said no, it's not relevant

4    and stood on the objections I just told you, but not wanting

5    to have to come here, wanting to try to work together,

6    wanting to try to get the discovery that reasonably

7    potentially could be relevant, we decided to give them the

8    unredacted portions of our formulary with respect to the drug

9    that is I don't think anyone disagrees the only drug at issue

12:12PM 10   in this litigation, methylprednisolone.

11         We gave them those portions, and, importantly, we

12   also gave them all of our policies and procedures with

13   respect to how you get something on the formulary, how you

14   buy off formulary.  The entire gamut of drug selection

15   process, we gave that to them as well as these relevant

16   portions from the formulary.

17         The Court asked Mr. Gastel why is it that the other

18   drugs on that formulary are relevant, and I would propose to

19   the Court, we did not hear an answer because it's not.

12:12PM 20   Whether or not this formulary has Tylenol, Tylenol 3 with

21   Codeine, Advil, acetaminophen, who cares, your Honor,

22   honestly, who cares?

23         The formulary for a hospital is going to have a wide

24   array of drugs for every possible emergency condition that

25   could come through the door on a Friday night.  That has

1    nothing to do with the limited one type of corticosteroid

2    that was used at a clinic in a medical building that happens

3    to be by the hospital.

4         Your Honor, it's completely irrelevant.  We think

5    we've gone above and beyond.  We've given and given, but

6    we're simply to the point to the entire formulary, there's no

7    relevance to the issues in this case.

8         THE COURT:  All right.  Mr. Gastel, anything further

9    on the formulary?

12:13PM 10         MR. GASTEL:  Can I address just briefly very quickly

11   this idea that the St. Thomas Clinic is separate from the

12   St. Thomas Hospital?  That is their theory.  Our theory is

13   that they're not, that this was a joint venture between the

14   hospital and the Howell-Allen Clinic, of the other owner of

15   this clinic.

16        We've seen documents that suggest that this is a

17   joint venture, and under Tennessee law, you have an

18   affirmative duty to supervise the actions of your agents in

19   that joint venture to ensure that they're carrying out their

12:14PM 20   legal duties, and so to sit there and say that the hospital

21   formulary is somehow not relevant to that claim simply mis --

22   it's simply adopting the defendant's theory of this case and

23   ignoring the plaintiffs' theory of this case, and obviously

24   that's not how discovery works.

25        We get discovery over all matters that are

1    reasonably calculated to lead to the discovery of admissible

2    evidence, and if our theory holds up, then the hospital

3    formulary is highly relevant to the actions of their agent.

4         When Ms. Schamberg realizes she needs to purchase

5    drugs from a different supplier, she doesn't pick up the

6    phone and call all of the people who are at St. Thomas

7    Hospital who have robust knowledge about this process, she

8    just willy-nilly picks up the phone and calls NECC.

9         On the flip side, when the hospital administrator,

12:15PM 10   or, I'm sorry, the clinic administrators sort of realize

11   after the aftermath of this tragedy that they need public

12   relations help and they don't have the expertise in dealing

13   with the media, who do they call, they don't call an outside

14   independent public relations firm, they call the public

15   relations firm inside the hospital, and the hospital happily

16   provides those services to the clinic.

17        So that's what happened on the back end of this

18   tragedy.  What we did to investigate is what should have

19   happened on the front end, and that's why we think the

12:15PM 20   hospital formulary is highly relevant to these claims because

21   these entities are in fact not separate entities.  The clinic

22   is clearly the agent of the hospital, and we get to

23   investigate how they supervised that entity, and part of that

24   supervision should be why didn't you communicate to that

25   clinic what you believed were safe drugs to be using in

1   patients.  That communication never took place, or at least

2   it doesn't appear in the record that it ever took place, and

3   that compromised patient safety and the clinic where these

4   people were ultimately injured.

5          MS. JOHNSON:  Your Honor has some help on this from

6   Judge Zobel as well in terms of competing theories in that

7   Judge Zobel as already denied St. Thomas Hospital and

8   St. Thomas entities' motions to dismiss and allowed the

9   plaintiff's claims to survive on both agency and direct

12:16PM 10   negligence theories as against St. Thomas Hospital.  You also

11   heard Mr. Gastel mention there's some evidence now I gather

12   maybe joint venture theories are appropriate here.

13          This isn't a situation, your Honor, where St. Thomas

14   Clinic and St. Thomas Hospital hold themselves out as one

15   entity.  Their slogan is "One Name, One Healing Community,"

16   right?  So I think some of that may be helpful to the Court

17   in deciding this issue.

18          In terms of the formulary itself, I mean, it's

19   binary.  The formulary for the hospital either does or does

12:17PM 20   not list compounded medications.  As Mr. Gastel points out,

21   it may be that it does list compound medications but that

22   it's not immediately observable without a little poking and

23   prodding and research to determine that that medication is

24   compounded, and if that formulary and the redacted portions

25   do not list compounded medication, speaking strictly with my

1    trial attorney hat on, your Honor, I would always rather have

2    the 100-page formulary that does not list any compounded

3    medications rather than a one-page stipulation to that

4    effect.

5         MR. SCHRAMEK:  And, your Honor, first of all, you

6    know, the advertising campaign that I keep mentioning

7    happened after the outbreak, so not one patient ever saw that

8    "One Healing Community" ad campaign.

9         Putting that aside though, it's because of the fact

12:18PM 10  the agency issue did not survive on the pleadings, a motion

11   to dismiss, and has gone to discovery that we produced all of

12   the hospital's policies and procedures relating to

13   procurement, relating to adding things to the formulary and

14   taking things off, and ultimately produced the formulary

15   lines with respect to methylprednisolone.

16        Again, I have yet to hear one argument as to why it

17   matters whether any of the other drugs or what the other

18   drugs are that have not been produced.  It's completely

19   irrelevant, and it's a complete fishing expedition.  We've

12:18PM 20  offered to stipulate it, and, again, we've given them the

21   lines, the drugs at issue.  There's simply no relevance.

22        THE COURT:  And what about so if I understand

23   correctly the formulary that you did, the redacted formulary

24   from St. Thomas Hospital, so and I think I'm just asking if

25   I'm stating this correctly, it does not contain all the

1    compounded medications that might be on there?

2          MR. SCHRAMEK:  Your Honor, a compounded medication

3    is nothing but a generic medication that a pharmacist has

4    taken and put into a different type of process to be used to

5    a particular patient.  If you can't take the tab, you break

6    it up into a solution and you can inject it, so the formulary

7    is saying what are the approved types of drugs for use at the

8    hospital, and we gave them the heading so they can see what

9    are the other columns, and one column is brand name, and when

12:19PM 10   we get to the discovery on the formulary, which they'll be

11   able to ask all these questions to a witness with what we've

12   given them, all the relevant parts, they'll understand that

13   the reason you put the brand name there is because that's

14   just another piece of information that the doctors and

15   pharmacists use and rely upon.

16          Instead of saying acetaminophen, we say Advil.

17   Well, everybody knows you can go to Target and get Advil or

18   you can get generic, you can get acetaminophen, Tylenol.  You

19   know, it's simply what are the approved drugs for the

12:20PM 20   hospital, and, again, as far as how do you go buy that

21   acetaminophen, what is the exact brand name you might get,

22   that's when you go to your GPO, your group purchasing

23   organization.  That's like your warehouse, and you go I need

24   acetaminophen, and they've already have them for you to pick

25   from and go I'll take this one, I'll take that one, so

1    they're trying to turn this formulary into something relevant

2    to compounding when it simply is not.

3         MS. JOHNSON:  I feel constrained to make two points

4    in response because, frankly, I'm so much shocked by

5    Mr. Schramek's comments.  The first, that a compounded

6    medication is "just a generic medication" belies some of the

7    fundamental problems at issue with St. Thomas Hospital and

8    other clinics approached to purchasing drugs in this case.

9         The FDA has just issued new guidance on compounding

12:20PM 10   within the last I want to say week, maybe three days.

11   Compounded drugs are not just generic drugs.

12        Second point:  Mr. Schramek's comments seems to me

13   to suggest that what may be the case on a formulary is that

14   St. Thomas Hospital is listing the brand name medication and

15   a generic name medication, but, in fact, the product that the

16   hospital is suggesting be dispensed or is in fact dispensed

17   is in fact a compounded product.

18        Now, your Honor, one of the issues in this case, and

19   I can't speak specifically to the Tennessee example because I

12:21PM 20   don't have Tennessee plaintiffs, and I'm less familiar with

21   that, I'm sure Mr. Gastel can chime up, but one issue in this

22   case is that many patients were told they were getting the

23   brand name product when, in fact, they were getting a

24   compounded product.

25        The fundamental difference between those two is that

1    the FDA approves brand name and generic products, and the FDA

2    does not approve compounded products, so one of the issues

3    here, and, again, I'm not pegging this on St. Thomas

4    necessarily, but one of the allegations is that some clinics

5    and doctors dispensed compounded products and told their

6    patients they were brand names, so Mr. Schramek has now just

7    given me an additional argument for why providing this

8    formulary is so important here.

9         MR. SCHRAMEK:  And, your Honor, I would like to

12:22PM 10   point out the fact that clearly this incident has created an

11   entire new plaintiff's theory that really ignores reality.

12   Compounding is nothing but a pharmacist who's approved and

13   regulated by a Board of Pharmacy by a state who can take a

14   prescription and a medication and turn it into another form.

15        Why would you put that on a formulary if a patient,

16   if it needs a particular, let's say a cream, they want a

17   cream, and they want to dilute the cream, you would take that

18   to a pharmacist who would dilute the cream and then would

19   give it to you.

12:22PM 20        The idea of what a formulary is versus what the

21   practice of compounding is are two different things, and, of

22   course, they're trying to mix them as part of this discovery

23   dispute, but, your Honor, we have given them all of the

24   relevant entries, and they can make all these arguments from

25   everything we've given them, and none of these arguments will

1    change or be materially advanced, prove any fact of

2    consequence more likely than not, which is supposed to be the

3    standard for relevance, none of that will change based on

4    what's been redacted because we have given them all of the

5    relevant entries and the policies on how you do something

6    that doesn't match one of the relevant entries by

7    off-formulary.

8            THE COURT:  All right.  Thank you.  Moving onto the

9    policies, so, again, Mr. Gastel, I don't know if you're

12:23PM 10    responding to this.  I think St. Thomas had suggested, and I

11    know you all had a meet and confer, so he's probably had the

12    benefit of the argument, but I'm not sure I have.

13            They've proposed some ways to narrow the request,

14    and I think in terms of relationships, policies that might

15    bear on the relationship or contain definitions of the

16    entities, so why isn't that acceptable to the PSC?

17            MR. GASTEL:  Well, again, we're sort of back into a

18    corner here where we're trying to defend the relevancy of

19    information that we don't necessarily know exists or doesn't

12:24PM 20    exist, so --

21            THE COURT:  But the request I think you've

22    acknowledged was broad, right, I think it asked for all

23    policies and procedures?

24            MR. GASTEL:  Yes, and as a middle ground, to the

25    extent that they didn't want to produce all policies and

1    procedures, we offered to simply say, well, you know, all

2    hospitals maintain an index of your policies and procedures,

3    just produce that index, and we can sort of then have a

4    better understanding of the types of policies that we might

5    think are relevant to the claims, not only the drug

6    procurement side of the equation, but also the sort of agency

7    and vicarious liability side of the equation, and even on the

8    drug procurement side, I want to correct some things that

9    Mr. Schramek has said.

12:24PM 10         He has made continual references that they have

11    produced all of the policies related to procurement, but in

12    the limited policies that they've produced, it references 13

13    other policies and procedures, one, of course, is the

14    formulary that we're fighting about today, and to my

15    knowledge, not all of those 13 policies and procedures have

16    been produced in this litigation, and so that's why the

17    indexes is particularly helpful in this because it lists all

18    of those policies, whether or not they're just procurement

19    policies or those types of ethical policies which we attached

12:25PM 20    to our motion, which are obviously relevant because it's a

21    flat-out admission by the St. Thomas entities that they

22    directly and indirectly control other entities that are not,

23    you know, the same corporate entity as the St. Thomas

24    Hospital or St. Thomas Health or St. Thomas Network, and so

25    that's why we think that the index is an appropriate middle

1    ground to allow us to sort of have the deeper discussion as

2    to what policies or procedures should be produced in this

3    litigation.

4         I think alternatively, you know, the Court can

5    compel them to produce all of their policies, although, you

6    know, we understand that that might be a little bit of an

7    overreaching because if there's a policy as to, you know,

8    what bathrooms that the janitor needs to clean first on the

9    first floor, we don't need that policy, but those procurement

12:26PM 10    policies, we definitely need, the policies like the ethical

11    policy that we already produced with our papers, you know, to

12    show those agency relationships, those policies are the ones

13    we are after.

14         We could very easily sort of look at an index and

15    find out and look and determine what policies we think are

16    relevant to that document request, and then we can sort of

17    have the deeper discussion as to whether or not they should

18    be produced, but it's middle of the road, it's a very sort

19    of routine thing that is given in medical malpractice cases

12:26PM 20    in the State of Tennessee, and we think that it should be

21    produced here.

22         I want to briefly, very briefly touch on the fact

23    that the St. Thomas entities in their papers, they cite to

24    three cases where these types of indexes aren't produced.  We

25    think that those are all wholly distinguishable to our 1983

1    pro se prisoner cases.  We think that those are obviously

2    distinguishable on their face, the medical malpractice case,

3    such as this one, and the third one is a police brutality

4    case where some of the information in the index was withheld

5    under the sort of qualified privilege not to reveal police

6    tactics.

7         Obviously that type of holding is not relevant to

8    what we're seeking in this case, and so we think that those

9    cases are wholly distinguishable and not relevant to the

10   Court's decision.

11        MR. SCHRAMEK:  Your Honor, we hear about this middle

12   of the road approach and how it's done all the time, and yet

13   when I asked the PSC for one case that would show that this

14   is an appropriate case, I didn't get any, and so I did my own

15   legal research and found out that the only cases I could find

16   where any plaintiff even attempted to make a request for an

17   index of everything were prisoner 1983 cases in which the

18   Courts soundly rejected that request, not under any reason

19   other than as inappropriate, overly broad and not relevant

20   under the Federal Rules of Civil Procedure.

21        That decision was made by the Western District of

22   Pennsylvania, by the Eastern District of Arkansas, by the

23   Eastern District of Michigan using language such as a blatant

24   fishing expedition, overly broad and not reasonably tailored.

25   If Mr. Gastel wants to have a discussion about procurement

1    policies, if he thinks there's one we overlooked or didn't

2    produce, he has my number, we will have that conversation

3    whenever he calls, and if I missed something, he will get it

4    the next day because we have no problem turning over the

5    relevant policies and procedures and the relevant

6    information, but what Mr. Gastel and the PSC wants to do is

7    to conduct a fishing expedition into all of the policies.

8         He even admits that this index would be something

9    that would cover things like sick days, making cash deposits

12:29PM 10  or box, training coverage for ER personnel.  What does that

11   have to do with this litigation?  Nothing.

12        The way document requests are supposed to work is he

13   defines the type of policies and procedures he's looking for,

14   we go look for them and we produce them, and that's what the

15   cases we cited said has to happen.

16        We have worked to provide the relevant ones.

17   There's going to be depositions occurring.  He's going to get

18   to ask about policies that might be unwritten, but as far as

19   the ones that are written done and that are hospital policies

12:29PM 20  that are relevant to this litigation, we'll produce those,

21   but, your Honor, we have to draw the line in a fishing

22   expedition.

23        MR. GASTEL:  And I'm very happy to have that

24   conversation with Mr. Schramek, but in order to do so, I need

25   to know what policies exist in order to have a conversation

1    about what ones we think need to be produced.

2          MS. JOHNSON:  Your Honor appropriately challenged me

3    about two weeks ago when I was before you on another matter,

4    and you appropriately asked me whether I thought defendants

5    would pay defense counsel to indulge their curiosity or go

6    off on fishing expeditions, and you were right to do so

7    because I don't think they will, but what I know is that the

8    plaintiffs' steering committee and the plaintiffs' attorneys

9    representing these Tennessee plaintiffs are not going to go

12:30PM 10    off indulging in their whims here if they didn't think there

11    was a reason it was necessary.  It's an index, your Honor.

12    It's an index.  This is not burdensome on the defendants, it

13    potentially leads to relevant discoverable material, and we'd

14    leave it at that.

15          THE COURT:  All right.  Anything else on this topic?

16    So I have reviewed in camera the trust agreement.  I'm just

17    looking at my questions.  I don't think a review of the

18    document changes my view under Rule 26.  Rule 26 and the

19    automatic disclosures calls for production of an insurance

12:31PM 20    agreement under which an insurance business may be liable.

21          Reviewing the trust agreement does not change my

22    opinion that the trust itself is an insurance business.  If

23    that's correct, and doesn't that mean it's not subject to

24    mandatory disclosure, or does the PSC still get it?

25          As I see it, there are two components to it that

1    were in play, whether it's an insurance agreement, and I

2    think the parties have very different views as to what --

3    frankly, I think it falls in between.

4           There's a whole body of case law on self-insurance,

5    and then there's regular old insurance, and it seems to me

6    this falls somewhere in between, but if it's not from an

7    insurance business, does that mean that it's not discoverable

8    at this stage?

9           MS. JOHNSON:  I don't believe that the parties have

12:32PM 10  briefed that issue, your Honor.  I would suggest that it may

11   be appropriate to give us a short, short, opportunity to do

12   that, as that may be helpful in your Honor making her own

13   decision.

14          MR. SCHRAMEK:  Your Honor, I can answer the question

15   as far as from the St. Thomas point of view because of the

16   fact I do think our briefing covered that issue because, one,

17   under Rule 26 to require, to qualify for automatic

18   disclosure, you have to meet every requirement.  It has to be

19   an insurance agreement from an insurance business, and we had

12:32PM 20  the decision already, so if we start with the proposition it

21   doesn't qualify under their correct, the next question

22   becomes is it discoverable under a normal document request.

23   You don't have to automatically produce it, it's not

24   required.

25          Well, that's where I think we get into the issue of

1    Rule 26 is a very narrow exception to the rule that you do

2    not get financial information about how you might collect

3    against a judgment until post judgment, so Rule 26 was carved

4    out of a very narrow part of that, so now if we get to the

5    issue of a document request, 1, there is no document request

6    that would cover the trust, but assuming that they decided to

7    send one, we would be right back here arguing the issue of

8    until you have a judgment, you don't get post judgment

9    discovery until the assets of the defendant's, and a

12:33PM 10  self-insurance trust is one of those assets, just like you

11   don't get to see all of our bank accounts and all of our

12   other holdings, so, your Honor, I'd say if it's not subject

13   to the automatic disclosure, which, again, we do not believe

14   it is, it is not discoverable until after a judgment issues

15   on one case.

16        THE COURT:  All right.  So I can give the PSC time

17   if they'd like to respond to the insurance business.

18        MS. JOHNSON:  Unless Mr. Gastel is prepared to do

19   that today, I'm not sure, your Honor.

12:34PM 20  MR. GASTEL:  I'm sorry, I'm a little confused on the

21   Court's question.  Are you asking whether or not if you

22   determine that it's not, if you determine that it's

23   self-insurance whether it's still Rule 26 automatic

24   disclosure, or are you asking if it's still possibly

25   discoverable through sort of a standard document request?

1      THE COURT:  So there were two questions.  Perhaps I

2  didn't phrase them clearly enough.  One is if I find that the

3  trust participants do not constitute an insurance business,

4  is the PSC out of luck under the Rule 26 automatic

5  disclosure?  As I see it, it has to meet two conditions.

6  It's an insurance agreement, and it was issued, I guess, by

7  an insurance business.

8      So if I find that it's not an insurance business

9  based on what's before me, does that mean that the PSC does

12:34PM 10  not get it under Rule 26?  So that's sort of one group of

11  questions, and then the second question is even if I find

12  that it's not producible under Rule 26, does the PSC have

13  another argument?

14      I think you argued to some extent that it would be

15  relevant under other theories, but I was just asking again

16  because I think your theories were on the vicarious liability

17  is what you may have argued in the previous papers.

18      MR. GASTEL:  Yes.  I mean, I think to the extent

19  that it's not otherwise discoverable under Rule 26(a)(1)

12:35PM 20  initial disclosures that we believe that it could still

21  contain information that is relevant to the claims in the

22  lawsuit already.

23      So, and I think that's really the issue that we

24  would, you know, like an opportunity to brief to the extent

25  that the Court thinks or wants to entertain that type of

1    briefing at this time.

2         THE COURT:  And I also had a follow-up question.

3    I'll set a schedule for the briefing in a moment, but in

4    terms of the production of the document, I understand

5    St. Thomas would object in the sense that they shouldn't have

6    to produce things that are not called for under Rule 26 in

7    terms of automatic disclosure, but when I step back from it,

8    is there other argument in terms of the harm in producing the

9    document?

12:36PM 10         MR. SCHRAMEK:  Your Honor, the trust agreement is

11    something that the clients have maintained is a very

12    important document to them.  It's a very important structure,

13    it's a very important part of their business, and, quite

14    frankly, given the fact this is a MDL with many different

15    plaintiff's attorneys and firms, it does not want that to be

16    freely reviewable unless and until a judgment issues, and in

17    that case, that particular plaintiff subject to a limited

18    confidentiality provision may obtain, you know, it if in fact

19    the judgment isn't -- you know, if it's appropriate at that

12:37PM 20    time.

21         So we do think it's much more than just a document,

22    and my clients, your Honor, I can tell they see significant

23    harm in simply producing this to plaintiff's firms across the

24    country as here's the St. Thomas entity self-insurance trust

25    situation, you know, here's how, you know, payments work, et

45

1   cetera.

2          We don't think it's appropriate, we don't think it's

3   subject to automatic disclosure, and we do think there would

4   be harm, and it's a different type of harm probably, you

5   know, that you might normally would see, but it's a very

6   important harm to my client, your Honor.

7          THE COURT:  All right.

8          MS. JOHNSON:  There is a protective order in place,

9   your Honor.

12:37PM 10         THE COURT:  All right.  So in terms of briefing,

11   when does the PSC think they could get me a brief.

12          MS. JOHNSON:  I think within the week, and we would

13   suggest seven days from today rather than Friday, your Honor,

14   we would suggest that it would make sense to submit short

15   briefs on the same date if your Honor is so inclined.

16          THE COURT:  I think they should have the

17   responsibility to respond to your argument, so I think it

18   would be seven days for the PSC to file any supplemental

19   brief and then seven days after that for anyone else who

12:38PM 20   wants to respond to it.

21          All right.  I think that's it in front of me, or is

22   there anything else that's pending?

23          MS. JOHNSON:  That's all, your Honor.

24          THE COURT:  All right.  So I will take these under

25   advisement, and I will see all of you perhaps later.

1          MS. JOHNSON:  Thank you.

2          THE CLERK:  All rise.  This Court is in recess.

3          (Whereupon, the hearing was adjourned at 12:38 p.m.)

4               C E R T I F I C A T E

5

6    UNITED STATES DISTRICT COURT )

7    DISTRICT OF MASSACHUSETTS ) ss.

8    CITY OF BOSTON )

9

10          I do hereby certify that the foregoing transcript,

11   Pages 1 through 46 inclusive, was recorded by me

12   stenographically at the time and place aforesaid in MDL

13   NO. 13-02419-RWZ, IN RE:  NEW ENGLAND COMPOUNDING

14   PHARMACY CASES LITIGATION and thereafter by me reduced to

15   typewriting and is a true and accurate record of the

16   proceedings.

17          Dated this 20th day of February, 2015.

18

19               s/s Valerie A. O'Hara

20          _____

21          VALERIE A. O'HARA

22          OFFICIAL COURT REPORTER

23

24

25