```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS



                                      )
                                      )
                                      )
     IN RE: FRESENIUS GRANUFLO/       )
     NATURALYTE DIALYSATE             )  1:13-md-02428-DPW
     PRODUCTS LIABILITY LITIGATION    )
                                      )
                                      )
                                      )


     BEFORE:   THE HONORABLE DOUGLAS P. WOODLOCK

               STATUS/SCHEDULING CONFERENCE AND MOTION HEARING




            John Joseph Moakley United States Courthouse
                          Courtroom No. 1
                         One Courthouse Way
                         Boston, MA 02210
                       Monday, March 2, 2015
                             2:30 p.m.




                   Brenda K. Hancock, RMR, CRR
                       Official Court Reporter
            John Joseph Moakley United States Courthouse
                         One Courthouse Way
                         Boston, MA 02210
                          (617)439-3214
```

1    order.  The consequences are whatever they want.  It is just
2    that I want to be certain that, if further development of my
3    reasons are necessary, that I do it because I think that under
4    these circumstances the defendants are not in a position to
5    defend my order, and without suggesting anything untoward, I am
6    not sure that the plaintiffs are in a position to defend the
7    order as well, and if it needs defending, I am going to have to
8    think about whether or not it is necessary to have counsel
9    appointed on that.
10            MR. TARRICONE:  Understood, your Honor.
11            THE COURT:  But I understand that was simply a
12   prophylactic to protect against.
13            MR. TARRICONE:  That's correct, your Honor.
14            THE COURT:  So, I will enter that interim order, and
15   at the same time the final version of 14.  I just held up on
16   the final version of 14.
17            MR. TARRICONE:  Thank you.
18            THE COURT:  So, then I guess I would like to go back
19   on the schedule that was suggested by the Joint Status Report.
20            Bellwether discovery.  Anything going on that I need
21   to deal with.
22            MR. BENNETT:  Your Honor, on behalf of the defendants,
23   I'm involved in it every day, and it seems to be working itself
24   out.
25            THE COURT:  I had a Motion to Dismiss one of your

1  bellwether cases.  Is there any problem with that?
2              MR. BENNETT:  Yes, because that brings us to the first
3  item on the agenda, because it's not just one, it's actually
4  now seven and, perhaps, eight that they wish to dismiss.  It
5  presents a whole monkey wrench into the entire schedule.  They
6  have gotten into discovery, written us letters acknowledging
7  those cases didn't have merit or couldn't get an expert, and
8  they want to dismiss those, and then we need to bring before
9  you how do we work with that within the existing schedule.
10             THE COURT:  Are all of your selections for bellwether
11 disappearing?
12             MR. BENNETT:  Eight out of the ten.  Initially, we
13 were told ten of the ten were going, and then we got down to
14 two left.  So, we have two out of ten.  They have ten out of
15 ten.  And we've made just a proposal that, rather than -- ours
16 were unilaterally dismissed and taken away -- that we would
17 like the right to take away half as many as they took away,
18 which would give them six, so we would strike four of theirs.
19 They would have six, we would have two.  All eight of those are
20 cases that the plaintiff has decided have merit and can
21 proceed, and then we just start doing case-specific discovery
22 right away and stay within your schedule.
23             THE COURT:  Mr. Tarricone?
24             MR. TARRICONE:  Yes.  Your Honor, our position is that
25 the eight cases that are being dismissed are cases that have

1  injuries and causation issues that are outside of the Master
2  Complaint, and they are not even close to being within the
3  Master Complaint, so they are really not representative of the
4  issues that have been litigated on behalf of the group, the
5  Common Benefit Order.
6        THE COURT: Just so I am clear, I just picked up one
7  of them strolling through the cases that I have here. Have the
8  other seven filed Motions to Dismiss with prejudice?
9        MR. BENNETT: Yes. They filed -- I believe they said
10 they were filing conditional Motions to Dismiss with prejudice.
11       MR. TARRICONE: They either have been filed or are
12 about to be filed, but it's --
13       THE COURT: What is a "conditional Motion to Dismiss
14 with prejudice"?
15       MR. TARRICONE: I don't know what the "conditional"
16 aspect of it --
17       MR. BENNETT: I believe they were trying to avoid
18 imposition of standard costs under 1920.
19       THE COURT: So, you haven't agreed to --
20       MR. BENNETT: We haven't agreed to waive costs, and we
21 haven't taken a position either way in the filings. Our
22 position on costs is we're thinking about this, but that the
23 imposition of standard costs under 1920, after we've gone
24 through all the work we've gone through in these cases, which
25 involved production of many documents, extra searches and many

1   things, is appropriate for all the reasons that is in the Rules
2   anyway to incentivize people to get rid of cases that have no
3   merit.  Because where we're in the situation before you now, we
4   have eight cases that --
5           THE COURT:  All right.
6           MR. BENNETT:  And that's our position.  We're just
7   reserving on that.
8           MR. TARRICONE:  Let me address that, your Honor.  It
9   took the Executive Committee some time to get our arms around
10  what all of these cases were about.  In January we began
11  discussions with the defendant about how to address this issue
12  in a global manner, rather than one case at a time, and we
13  believe these eight cases are just clearly outside of the
14  Master Administrative Complaint, which is the first criterion,
15  that since CMO#10 --
16          THE COURT:  Outside of the Complaint in the sense
17  that, now the expert has looked at it, it has got a causation
18  problem because somebody has got pneumonia or something like
19  that?
20          MR. TARRICONE:  It's more than just a causation
21  problem.  Death by sepsis, cases where plaintiffs had refused
22  dialysis because they are in Hospice care.  They're not even
23  close.  And we began a discussion on how to approach it so as
24  to not derail the schedule, and the end of that -- and we've
25  been discussing this right up until yesterday -- we have agreed

```
 1   that, rather than replace cases, as Mr. Bennett stated, the
 2   defendant would strike four of the plaintiffs' picks and six of
 3   the plaintiffs in the other two defense picks, total of eight,
 4   rather than ten.
 5           THE COURT:  I know it is simple arithmetic, but I
 6   missed it.  They get to strike six of your --
 7           MR. TARRICONE:  Four.
 8           THE COURT:  Four of your cases, getting it down to
 9   six.
10           MR. TARRICONE:  Down to six, plus the two remaining
11   defense picks after the other eight dismissals.  Those eight
12   cases would proceed -- under the old process there would have
13   been ten proceeding after whittling down from 20.  Where we
14   disagree is that the plaintiffs believe that we should be able
15   to protect two of the plaintiffs' selections so that the
16   defendant can dismiss four, but two of them are out of the
17   group from which they can dismiss.  So, that's where we're in
18   disagreement.
19           THE COURT:  I would say, "Say it slower," but you said
20   it fairly slowly.  I still am not absorbing it.
21           MR. TARRICONE:  Okay.  We have agreed that, rather
22   than work up 20 cases and then whittle it to ten, that we will
23   move forward with a total of eight cases, the two defense
24   selections that aren't being dismissed, and eight of the
25   plaintiffs -- I'm sorry.
```

1           THE COURT: Six.

2           MR. TARRICONE: -- six of the plaintiffs. And we have

3   agreed that the defendant can choose the four cases to be

4   stricken from the plaintiffs, and the agreement that the

5   plaintiffs requested to do that, we would agree to that if the

6   plaintiffs could protect two of the ten cases, two of the

7   plaintiffs' selections.

8           THE COURT: So, two would be off limits?

9           MR. TARRICONE: Yes.

10          THE COURT: I am a little concerned. The thing, in my

11  experience and understanding, that derails these things is

12  unrepresentative bellwethers, and when outliers are chosen or

13  maintained, then the bellwether process becomes less helpful to

14  everybody concerned, and so parties kind of either believe they

15  are stronger than they are or have unreasonable expectations.

16  So, this is a matter of considerable concern to me on this.

17          Now, it sounds to me like, correct me if I am wrong,

18  but you are going to be choosing the two plaintiffs' cases,

19  there is going to be no striking of the plaintiffs' cases,

20  effectively. They get to knock off four but only the four that

21  you do not want anyway or are less than the two that you do

22  want.

23          MR. TARRICONE: What we're trying to avoid -- the

24  CMO#10 calls for replacement cases and discovery, but that

25  would extend the dates, and I think both parties would like to

1     avoid that.
2            THE COURT:  Well, but what is the alternative to that,
3     Mr. Bennett?  So, they get to protect their cases.  What is the
4     alternative?
5            MR. BENNETT:  The alternative is --
6            THE COURT:  You get to shoot them.
7                            (Laughter)
8            MR. BENNETT:  Well, we view it as reciprocity, because
9     what happens here is they didn't ask us, "Which two would you
10    like us to not dismiss?", and they just dismissed unilaterally
11    eight out of the ten.
12           THE COURT:  But the eight that they are getting rid of
13    would have been lousy bellwether cases, anyway.
14           MR. BENNETT:  I personally reviewed all of them before
15    we picked them, a big group of us did, and we believe that
16    they're actually right in the heart of the thousands of cases
17    that are before you.
18           THE COURT:  Well, let's see the one that I looked at,
19    where I think it was pneumonia, but their expert has a
20    causation problem.
21           MR. BENNETT:  Well, let's talk about the one that they
22    picked.  Before they filed the case they accessed 2,000 pages
23    of medical records to review.  We know we produced those before
24    they were filed.  They filed a Long Form Complaint with Hagens
25    & Berman, who is on the Leadership Committee, attesting that

1   this met it, after reviewing our medical records.  Then we

2   picked this as a case in October of 2014, and it's not until

3   today or last Thursday that we find that it can't go forward.

4           THE COURT:  But it must not have been much of a case

5   if they dismissed it with prejudice.

6           MR. BENNETT:  That's in their view, but we think it

7   fits within the vast mass of the cases that have been filed.

8           THE COURT:  I wonder about its value as a -- unless

9   these people are falling on their sword for the good of the

10  Order, I assume that somebody who dismisses with prejudice is

11  someone who has challenges, let's put it that way.

12          MR. BENNETT:  Yes.  And we think that that is actually

13  typical of the vast mass of the cases.  But our solution takes

14  care of all that, because what our solution leaves is eight

15  cases, every single one of which the plaintiff has signed off

16  on as representative.  It's six that they picked, and that they

17  are not dismissing and though they like, and out of the ten

18  that we picked, it's two that they like, and so where's the

19  harm in ours?  They've unilaterally -- if you look at it on a

20  reciprocal basis, they've stricken eight that they don't like.

21  We think they're within the middle.  They think that they're

22  not.  So, the end result of our proposal, though, is that eight

23  cases go forward, every one of which they've signed off on.

24          THE COURT:  I think the way I look at it is I will end

25  up going with Mr. Bennett's proposal on this.  Let me put it

1   differently.  I have not worked this out entirely, but I will
2   also permit two more of their cases.  They can pick two more
3   cases if they want, you can pick or maintain ones that they may
4   not choose in this process.
5           Maybe I should not be doing this off the seat of my
6   pants, but I will tell you, I just do not want to have wasted
7   time on it.  If I were Mr. Bennett, I would be putting the
8   coat-skin tails up on the wall.  He has got eight out of ten,
9   that is not bad, and we have not even started trying a case.
10          Maybe you ought to pick the ones from now on, and you
11  will just see them fall by the wayside.  But that arch comment
12  to the contrary, I want a fair cross-section, and I do not want
13  to waste time on sure things for either side.  I want ones that
14  you look at, are going to have a chance to look at and say,
15  "Here is our problem, here are the problems in the case, here
16  are the potentials in the case," and if they are too carefully
17  selected that does not happen.  That is my concern.  But I do
18  not see anything nefarious in them knocking off eight of these
19  people, because I just do not think that those cases are going
20  to go, would have gone, if they knocked them off.
21          MR. TARRICONE:  Your Honor, the part I have difficulty
22  with is Mr. Bennett refers to "reciprocity."  We should now
23  dismiss whatever --
24          THE COURT:  I am less interested in reciprocity than I
25  am in a fair cross-section.  I have not gotten into bellwether

1   cases and stuck my nose into the bellwether cases to say these
2   are triable cases, these will give you some sense of what these
3   cases are worth.  But I am getting a sense of people moving to
4   the outliers, and that is no help at all, and that is a waste
5   of my time, too, trying them.
6           MR. TARRICONE:  So, the way we are approaching it, I
7   just want to make sure it is clear to me, so we will proceed
8   with the defendant striking four of the plaintiffs, or are we
9   just going to replace the cases?
10          THE COURT:  I do not know what I think.  I think I
11  want your last-and-final offer on this, and I would like it by
12  the end of the week.
13          MR. TARRICONE:  Okay.
14          THE COURT:  And I want to have it justified in terms
15  of these are a fair cross-section of the cases to be tried from
16  both the defense side and from the plaintiffs' side.
17          MR. BENNETT:  I think we're actually in agreement that
18  those eight would be that.
19          MR. TARRICONE:  Well, the question is how we get to
20  the eight.  I think that's where we're in disagreement.
21          But, your Honor, I think you also mentioned
22  replacement cases, which is what CMO#10 did contemplate.
23          THE COURT:  I am thinking about anything that serves
24  that purpose.  One other thing:  I am not changing the
25  schedules.

```
 1                 MR. TARRICONE:  Understood.
 2                 THE COURT:  We are going forward on this stuff.  In
 3     any event, I think I have made my general views clear.  I do
 4     not know enough about it to have a view, I may never know
 5     enough about it to have a view, but I may have to have a view.
 6     God save us all if that happens.
 7                 MR. TARRICONE:  So, we will submit our -- each side
 8     will submit its last and final proposal, or we will try to work
 9     it out.
10                 THE COURT:  I think you can work it out.
11                 MR. TARRICONE:  I think so.
12                 THE COURT:  If you cannot work it out, I will do my
13     best.  That is all I can ever do.
14                 MR. BENNETT:  We would be happy to come back on
15     Friday, if you wanted to talk to us about our submissions.
16                 THE COURT:  It is not going to be this Friday.
17     Monday.
18                 MR. TARRICONE:  Your Honor, what time Monday?
19                 THE COURT:  9:00, I mean morning, and I would like
20     something by Friday, something in writing that I can look at
21     and get a better feel for.  But you know what I want.
22                 MR. TARRICONE:  Your Honor, the issue of costs.
23     Obviously, the plaintiffs oppose that.
24                 THE COURT:  They have not asked for costs yet.  They
25     have just waved them around.  I do not know whether they will
```

```
 1   think that is a good idea or not, but I have enough to do with
 2   the things that are actually in front of me on this.
 3          MR. BENNETT:  Your Honor, just so I understand, on
 4   Friday more focus on how going forward with these eight would
 5   result in representative cases as opposed to defending on the
 6   facts our prior selections, or both of those topics?
 7          THE COURT:  The eight prior selections, they are gone.
 8   Even I cannot resuscitate them.  They are dismissed with
 9   prejudice.  So, chalk them up to victories, if you want.  I do
10   not care what you chalk them up to, but they are in the
11   rearview mirror now.  So, now I am looking at whatever I have
12   got or whatever proposal I have to be sure that I have got a
13   fair cross-section.
14          MR. TARRICONE:  Your Honor, we will either submit an
15   agreed proposal or competing proposals on Friday.
16          THE COURT:  All right.
17          MR. BENNETT:  Thank you.
18          THE COURT:  But as far as discovery is going, that is
19   continuing on pace, I will leave it at that.
20          MR. BENNETT:  Yes, absolutely.
21          THE COURT:  So, let's, then, go to the Virginia
22   statute of limitations or what is styled as the "Virginia
23   statute of limitations case."  I have tried to familiarize
24   myself with Virginia law, obviously, which seems quite austere
25   and formalistic to me, but if the filing of the case by these
```

1   individuals in their capacity is a nullity, then I am not sure
2   what refining definitions of nonsuit adds to the sum of human
3   knowledge in this area.  I would be of the view, I think, to
4   say with prejudice as to these people in their individual
5   capacity but not in their representative capacity.  That is the
6   degree to which it has been prejudiced.  But they can come back
7   and file again, I think.  I do not know why I should not let
8   them do that.
9           MR. NEWSOM:  So, my view on that, your Honor, is that
10  if you were to dismiss these actions with prejudice, as I
11  submit you should, then that would be a disposition on the
12  merits that would be subject to *res judicata*.
13          THE COURT:  I do not think it is.  I think it is a
14  disposition on the ability of those persons individually to
15  proceed before me.  But they apparently have gotten themselves
16  a new capacity, a new job.  They are representatives.  And in
17  that setting I have not ruled on it.  I have not ruled on the
18  merits of it.  I just have not ruled on it.
19          MR. NEWSOM:  Well, I guess just two things, then, your
20  Honor, very briefly.  Number one, I'm sure you have read this
21  Johnston v. Bazemore case, which seems to say that, when
22  parties get crossways this way, it may seem somewhat unfair,
23  but the Virginia Supreme Court says dismiss them with
24  prejudice.
25          And another case that is not cited in the papers but