UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION _____ THIS DOCUMENT RELATES TO: ALL CASES _____ | ) ) ) ) ) ) ) ) ) ) ) ) MDL No. 2419 Dkt. No 1:13-md-2419 (RWZ) |

**SAINT THOMAS ENTITIES' OPPOSITION TO PLAINTIFFS' STEERING COMMITTEE'S MOTION FOR ENTRY OF CASE MANAGEMENT ORDER SETTING SELECTED CASES FOR EXPEDITED TRIALS**

Saint Thomas West Hospital, formerly known as St. Thomas Hospital, Saint Thomas Network, and Saint Thomas Health (collectively referred to as the "Saint Thomas Entities") file this Opposition to the *Plaintiffs' Steering Committee's Motion For Entry Of Case Management Order Setting Selected Cases For Expedited Trials* and memorandum in support (Docket ## 1716 & 1717) ("Motion" and "Memo") to show the Court as follows:

**PRELIMINARY STATEMENT**

The Saint Thomas Entities have been parties to this multidistrict litigation for 18 months. In that time, they have: (i) been active participants in the status conferences and hearings before the Court; (ii) pursued motions to dismiss that were successful in dismissing several parties outright and narrowing the number and character of the claims against them; (iii) actively participated in Common Issue[1] fact discovery; and (iv) briefed and participated in multiple

---

[1] "Common Issue" discovery is defined in MDL Order No. 9, entered September 18, 2014 (Docket #1425) ("MDL Order 9") at 1 n.1.

1

hearings on a variety of issues relating to discovery, case-management issues, and the bellwether selection process.

The parties have been progressing steadily on Common Issue discovery in accordance with the Court's discovery and case management plan that was adopted on September 18, 2014. The Saint Thomas Entities have answered written master discovery from the PSC and pursued discovery from a number of co-defendants on comparative fault issues. MDL Order 9 sets out an orderly and balanced process for the next few phases of this litigation—Common Issue expert discovery and bellwether selection of representative cases for initial trials.

Although the PSC originally was a proponent of the bellwether process and trumpeted its benefits, it has since made a 180-degree change in position and now asks the Court for an extraordinary single trial involving the lawsuits of six different plaintiffs of the PSC's sole choosing. To the Saint Thomas Entities' knowledge, the PSC did not seek any meaningful input from any defendant in its unilateral decision to seek this relief. Instead, the PSC announced its plan to defense counsel, invited no discussion or compromise, and filed the Motion shortly afterward.

The PSC offers no precedent for the relief it seeks. In fact, the authorities cited previously in the PSC's Bellwether Proposal counsel *against* this type of one-sided process. As Judge Eldon Fallon cautions in his seminal article on multidistrict litigation, bellwether cases should be carefully selected through a specialized process, taking into account the collective input from all parties.[2] Ironically, a principal basis for the PSC's request is the *Granuflo* MDL in which that

---

[2] Eldon E. Fallon, Jeremy T. Grabill & Robert Pitard Wynne, *The Problem of Multidistrict Litigation: Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323 (June 2008) [hereinafter *Bellwether Trials*].

court has expressed frustration with the selection of "outlier" cases by one of the parties,[3] yet that is precisely the risk presented by the PSC's proposal. The PSC offers no reason that its case selections should be adopted and fails to show that these cases are representative of the cases pending against the Saint Thomas Entities, much less the entire MDL. Initial trials of cases selected by only one side dooms the entire process: "[l]ittle credibility will be attached to this process, and it will be a waste of everyone's time and resources"[4] and ultimately derail resolution of the MDL.

Even more astonishing is the PSC's suggestion that the Court try *six* cases involving different individuals in a single trial. The PSC does not make any motion to consolidate these individually filed personal-injury and wrongful-death cases for trial under Federal Rule of Civil Procedure 42. Nor does it cite any authority for such an extraordinary request, presumably because it cannot meet the exacting standards for consolidating these cases for trial.

At the Court's most recent status conference, it asked when the first case could be ready for trial if the MDL continues to proceed on the trajectory set forth in MDL Order 9. The Saint Thomas Entities have further analyzed that issue and believe that, given their assumptions about third-party discovery and other key events and that a bellwether process will be used to select representative cases with the first case being trial-ready by October 2016. The Court has previously set out a schedule for the completion of Common Issue discovery. In Exhibit A to this Opposition, the Saint Thomas Entities have proposed a timeline for a bellwether selection process,

---

[3] PSC's Bellwether Proposal at 11-12.

[4] *In re Yasmin and Yaz (Drospiernone) Mktg., Sales Practices and Prods. Liab. Litig.*, No. 3:09-md-02100-DRH-PMF, 2010 WL 4024778, at *2 (S.D. Ill. Oct. 13, 2010).

Case Specific Issue[5] discovery and development of individual cases, and selection of an initial case to be ready for trial by October 2016.

The Saint Thomas Entities respectfully request that the Court deny the PSC's Motion in its entirety and allow the bellwether selection process to continue pursuant to MDL Order 9 and its proposed Exhibit A.

## BACKGROUND

Before the Saint Thomas Entities became parties to the MDL in September 2013, a number of case management orders were entered at the request of the PSC. These orders affected the rights and obligations of the parties whom the PSC refers to as the "National Defendants" and "Clinic Related Defendants," but were largely adopted without these defendants' input and certainly without their consensus.

In January 2014, the PSC asked the Court to enter a bellwether schedule designed to select representative cases, further discover and develop those cases, and ultimately select bellwether cases for initial trials.[6] In the PSC's Bellwether Proposal, it represented:

> To be effective, a bellwether trial selection process must be informed by an understanding of the basic facts of the relevant cases within the MDL and the important variables associated with the universe of included cases. Otherwise, the parties risk trying an anomalous case that, although it would yield some valuable information, would not necessarily yield to the type and magnitude of information most globally useful to the parties.

---

[5] "Case Specific" discovery, defined as "an issue that pertains to a single case or a small number of cases," has been "stayed pending issuance of a bellwether trial protocol and selection of the initial bellwether pool." MDL Order 9 at 1 n.1.

[6] *Memorandum In Support Of Plaintiffs' Steering Committee's Motion for Entry of Bellwether Trial and Pre-Trial Scheduling Order* (Docket #838) ("PSC's Bellwether Proposal").

PSC's Bellwether Proposal at 13-14 (citing Fallon, *Bellwether Trials*, 82 TUL. L. REV. at 2344-45).[7]

Other parties, including the Saint Thomas Entities, filed competing proposals as to the timing of key events and certain aspects of the selection process,[8] but all of the parties that filed competing proposals agreed with the quoted principle and relied on Judge Fallon's article. These motions were referred to Judge Boal, who carefully vetted the various proposals and entered MDL Order 9. Although the PSC's Bellwether Proposal was not adopted in full by the Court, the overall process of selecting representative cases contained in MDL Order 9 is consistent with the PSC's Bellwether Proposal.

Case Specific discovery has been "stayed pending issuance of a bellwether trial protocol and selection of the initial bellwether pool." MDL Order 9 at 3 n.5. Common Issue discovery has progressed in accordance with MDL Order 9, and is to be completed by June 15, 2015. MDL Order 9 also requires the parties to meet and confer regarding "[a bellwether proposal]" by April 15, 2016. *Id.* at 4. The Order then provides that, if the parties are unable to agree, the Court will entertain bellwether proposals and enter an order confirming the selection process and further case-development for the initial trials on May 15, 2015. *Id.*

At a recent status conference, the PSC, without advance warning to the other parties, notified the Court of its intention to seek an "expedited trial" by December 2015. Then, in an email of March 3, 2015, the PSC notified the other parties that the expedited trial it planned to request would include six cases it had unilaterally chosen; the PSC "assumed" the defendants

---

[7] The citation is to Judge Fallon's article on best practices for structuring bellwether trials based on his experience handling the Vioxx and Propulsid MDLs.

[8] *E.g.*, Docket #965 (UniFirst); Docket #1249 (Saint Thomas Entities' consolidated brief); Docket #1258 (Tennessee Clinic Defendants).

would object, so did not invite further discussion.[9] Although the PSC suggested that the parties had vetted their positions during prior meet and confers, they have never discussed a scenario involving a unilaterally selected and expedited trial—much less a combined trial of six cases single-handedly selected by the PSC. Such a proposal is entirely unworkable and unfair and will inevitably lead to a trial that would provide no predictive information regarding individual cases. Even more damaging, the PSC's proposal will divert the Court's and parties' attention away from global development and resolution.

## ARGUMENT AND AUTHORITIES

### I. Initial Trials Are Only Useful if They Are Truly Representative of the Universe of Cases in the MDL

In appropriate circumstances, bellwether trials (also referred to as test cases) can be used to glean important information about the claims of the litigation as a whole. *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.315 ("[T]o produce reliable information about other mass tort cases, the specific plaintiffs and their claims should be representative of the range of cases."). Bellwether procedures have been used in an increasing number of mass tort MDLs. *See* Fallon, *Bellwether Trials*, 82 TUL. L. REV. at 2324-25. As the Fifth Circuit has aptly summarized:

> A bellwether trial designed to achieve its value ascertainment function for settlement purposes or to answer troubling causation or liability issues common to the universe of claimants has as a core element representativeness -- that is, the sample must be a randomly selected one of sufficient size so as to achieve statistical significance to the desired level of confidence in the result obtained. Such samples are selected by the application of the science of inferential statistics. The essence of the science of inferential statistics is that one may confidently draw inferences about the whole from a representative sample of the whole.

*In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019-20 (5th Cir. 1997). As a result, "[i]t is critical to a successful bellwether plan that an honest representative sampling of cases be achieved." *In re*

---

[9] Email from B. Gastel to counsel dtd. Mar. 3, 2015 (Exhibit 1).

*Yasmin and Yaz (Drospirenone) Mktg., Sales Practices and Prods. Liab. Litig.*, No. 3:09-md-02100-DRH-PMF, 2010 WL 4024778, at *1 (S.D. Ill. Oct. 13, 2010).  According to the Federal Judicial Center's Manual for Complex Litigation:

> Test cases should produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis, and what range of values the cases may have if resolution is attempted on a group basis.  The more representative the test cases, the more reliable the information about similar cases will be.

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.315.  If bellwether trials are to serve their twin goals as informative indicators of future trends and catalysts for an ultimate resolution, the transferee court and the attorneys must carefully construct the trial-selection process. . . .  Any trial-selection process that strays from this path will likely resolve only a few independent cases and have a limited global impact."  Fallon, *Bellwether Trials*, 82 TUL. L. REV. at 2343.

## A. A Properly Designed, Bilateral Bellwether Selection Process Is Necessary to Determine Representative Cases

Based on his extensive experience in some of the largest and most successfully resolved MDLs, Judge Fallon has set out important principles for selecting bellwether trials.  He suggests that although there is no "one-size-fits-all" procedure, there are certain sequential steps that should be followed in crafting the protocols and processes.  First, the MDL court must be in a position to catalogue the "Entire Universe of Cases," meaning that it "conduct[s] a census of the entire litigation and identif[ies] all the major variables."  *Id.* at 2344.  The next step is for the court and the attorneys for both sides to "creat[e] a pool of cases that accurately represents the different divisions within the MDL from which the bellwether cases will be selected."  *Id.* at 2346.  Important to this step is deciding the size of the pool—"[i]f the pool is too small, then there is a risk that too few of the major variables will be properly represented."  *Id.* at 2347.  To fill the pool,

7

there are different methods—random selection, selection by the MDL court, and selection by the attorneys. *Id.* at 2348-49. And there are many variables within each strategy for filling the pool, all of which need to be geared to finding a truly representative, and therefore, credible sampling. *Id.* at 2348-60. After the trial-selection pool has been determined, the parties conduct case-specific discovery. *Id.* at 2360. Then the third step is to select individual cases from the pool, which also can be done in a variety of ways depending on the facts and circumstances. *Id.* at 2360-65. The PSC's latest proposal has strayed far from this considered process.

**B.     The PSC's Reversal of Course Is Ill-Advised**

The PSC has offered nothing but its one-sided opinion to justify abandonment of the bellwether process it previously advocated. *See* PSC Memo at 11.[10] It states only its unilateral belief that "[t]he parties can better use the months that would otherwise go to developing a bellwether plan and selecting cases on preparing cases for trial." *Id.* Such a position is entirely contrary to the authorities cited above—many of whom have also been relied on by the PSC.

Further, the PSC's argument that too much time has passed without a trial provides no basis for ordering a trial that is both unnecessarily expedited and inclusive of multiple unrelated plaintiffs. At the same time the PSC asserts that the MDL is taking too long, it has advised the Court that numerous additional plaintiffs and defendants will be brought into the MDL—in states that have a longer statute of limitations than Tennessee. This circumstance is important for several reasons. First and foremost, it means that the universe of cases in the MDL is still unknown— contrary to Judge Fallon's admonition that the Court have an understanding of all the potential

---

[10] At the March 25, 2015, status conference, PSC Federal-State Liaison, Mark Chalos, indicated that the PSC might still consider a bellwether process, but the PSC has not amended or withdrawn its written request to abandon that process or the argument of PSC Lead Attorney, Tom Sobol, from the March 25 status conference.

cases before making bellwether selections.  Second, it seems unnecessarily punitive to the Saint Thomas Entities, who have been complying with their discovery obligations on Common Issue discovery, but have been unable to take any depositions of the PSC's witnesses due to the stay of Case Specific Discovery.  And, as the Court is aware from the last status conference, the Saint Thomas Entities have served discovery on their co-defendants for comparative fault purposes, but are being met with resistance—despite prior assurances in the bankruptcy court (and this one) that the requested stays did not impact comparative-fault discovery.  There is still a great deal of discovery left to do as necessary to prepare *any* of these cases for trial, and that discovery has been complicated by the bankruptcy and criminal proceedings that parallel this MDL.

The PSC's new proposal is also fraught with a number of additional problems.  The settlement status of many defendants is still uncertain—especially with the recent objections raised to the channeling injunction that is a key predicate of those settlements.[11]  And the numerous, additional cases, with both known and unknown plaintiffs and defendants, expected be filed before October of this year further clouds the landscape.

Further the PSC has made no attempt to identify "all the major variables."  Fallon, *Bellwether Trials*, 82 TUL. L. REV. at 2344; *see also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. 1:00-1898, MDL 1358(SAS), 2007 WL 1791258, at *3 (S.D.N.Y. June 15, 2007) (approving plan developed after investigation and discovery of particular variables in litigation census).  Although the PSC lists some common features of the six proposed cases, it never attempts to identify the variables that will undoubtedly have impact on the selection of representative trials.

---

[11] *See, e.g.*, *United States Trustee's Objection and Reservation of Rights With Respect to Corrected Disclosed Statement for Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. Dated December 3, 2014*, Docket #1119, filed in *In re: New England Compounding Pharmacy, Inc.,* No. 12-19882 (D. Bankr. Mass.) (Feb. 2, 2015).

In *Vioxx*, for example, the "major variables ultimately decided upon . . . were (1) the type of injury (heart attack, stroke, or other), (2) period of ingestion (short-term versus long-term), (3) age group (older or younger than sixty-five), (4) prior health history (previous cardiovascular injuries or not), and (5) date of injury (before or after a certain label change)." Fallon, *Bellwether Trials*, 82 TUL. L. REV. at 2345. Although, in this case, more discovery—and especially the expert phase—will be necessary to reveal the full panoply of variables, factors relating to acuity and co-morbid conditions will be significant litigation variables, as there were many individuals who were exposed to contaminated NECC products who did not develop disease. These are matters for expert opinion, yet, to the Saint Thomas Entities' knowledge, not a single expert witness has been designated by any party in the MDL, and the deadline for doing so is many months away, as Common Issue fact discovery is still underway.

No bellwether selection procedure has been established. The Court has previously entertained multiple proposals from the PSC that the defendants claimed unduly precipitated the bellwether selection process, and the Court has thus far rejected that approach and instead ordered that the parties attempt to agree on the selection criteria and procedures and, if necessary, present competing proposals to the Court. *See* MDL Order 9 at 6-7. The Fallon article demonstrates the complexity and importance of that process, which should not be rushed, much less disregarded altogether. *See, e.g.*, *Methyl Tertiary Butyl Ether Prods.*, 2007 WL 1791258, at *3. The PSC's Motion indicates that the PSC no longer shares the goal of seeking representative trials—just immediate trial settings.

The PSC provides only its say-so that the six cases it has chosen—again without input from any defendant—are representative of the pending cases, much less that they are "clear choices" to proceed. PSC Memo at 12. Remarkably, it urges the *Granuflo* MDL in support of its suggestion

10

that the Court's bellwether order will "open the door to months of haggling and delay," *id.*, while at the same time quoting the *Granuflo* court's statement that it is doing everything in its power "to seek a fair cross-section," *id.* at 12 n.40.  The *Granuflo* MDL supports, rather than counsels against, adherence to the current course of bellwether selection under MDL Order 9.

The extent to which the parties will agree to a *Lexecon* waiver for cases transferred into the MDL[12] is another important variable that must be addressed before selecting initial trials.  In *In re Yasmin*, the court found "such a waiver to be critical to the success of th[e bellwether] endeavor." 2010 WL 4024778, at *1.  In fact, it ordered that if even one plaintiff chosen as a bellwether refused to execute such a waiver, it would void the entire bellwether plan because that venue objection would be tantamount to a "veto" right that would undermine the carefully drawn plan.  *Id.*  The PSC's latest proposal identifies the need for determining whether all the parties will execute *Lexecon* waivers as a line item, but only as to the six cases it proposes for trial.  There is no plan for determining whether any other cases will be tried in Boston or in their place of origin.  Other variables include the status of the bankruptcy, criminal proceedings, and/or settlement for many parties, the effect of the stays as to other defendants on the development of the bellwether claims, the necessity of vetoes or strikes, and other matters that will undoubtedly impact the Court's ultimate decision on whether and how to craft a bellwether procedure.  A great deal more work needs to be done—and many more parties should be heard—before the Court is positioned to make those decisions.

Finally, the PSC's proposal of trying six different individual cases together in a single trial destroys any conceivable chance that the initial trial will provide useful information.  It will be

---

[12] In *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34 (1998), the U.S. Supreme Court held that the MDL transfer statute, 28 U.S.C. § 1407, does not permit the transferee court to try cases that were not originated under its jurisdiction absent agreement by the parties.

impossible to attribute the aggregate result to one or more of the individual plaintiffs in any meaningful way. And the opportunity to apply lessons learned from that first trial would be wasted, as five other cases would already be impacted by prior rulings in the aggregate case. In light of the teachings of the authorities above, it is clear that this plan has no potential for serving the twin goals of bellwether trials. And there is a great cost attached to the PSC's proposed experiment—if the Court were to entertain even a single expedited trial, the parties' resources would be consumed in getting the individual case ready for a trial that is less than nine months away and diverted from moving the ultimate group of cases toward global development and resolution. There is a reason the PSC cannot cite authority for its extraordinary proposal.

## II.  The PSC's Time-Frame Is Unachievable

The PSC is incorrect when it asserts that "the individual discovery needed for defendants to prepare a case for trial has largely been completed." PSC Memo at 13. MDL Order 9 has stayed Case Specific Discovery, and the defendants only recently received completed Plaintiff Profile Forms and releases. In fact, as noted, there has been additional dispute over some of the required releases, and the Court entered another order on the PSC's motion for clarification on February 24, 2015.

The PSC misleadingly suggests that the Saint Thomas Entities have had access to the individual Plaintiffs' medical records for quite some time, but that is not true. Although the Court prescribed the form of the Plaintiffs' Profile Forms and authorizations for the release of records on February 14, 2014, the deadline for completion of the PPFs and authorizations was November 17, 2014, and a large number of these documents were served shortly before that deadline.[13] And

---

[13] The PSC references pre-suit releases, PSC Memo at 14, but those were limited to plaintiffs' providers at the time of the claimed injuries.

the PSC withheld a number of releases, claiming that the Court's prior order needed "clarification." And once the authorizations are received, it takes approximately 60-90 days to actually obtain the records from the third-party health care providers.

Further, the Saint Thomas Entities have served discovery on a number of the National Defendants, some of whom who have preliminarily objected to this discovery and none of whom has produced documents in response to the Saint Thomas Entities' discovery requests at this time. As a result, the suggestion that the Saint Thomas Entities already have the information *they need* to prepare these individual cases for trial is illusory.

The timing of the bankruptcy proceedings also impacts consideration of any trial in the MDL, as it is still quite unclear how the settling parties would be involved. UniFirst, for example, is continuing to defend the tort claims against it while its settlement is pending. And the parties can only speculate as to when and how the bankruptcy proceedings will finally conclude.

As noted above, under the current schedule, Common Issue expert discovery is to begin after the completion of Common Issue fact discovery in mid-June of this year, and Case Specific discovery is to be conducted after that point as part of the bellwether selection process. This is a logical sequencing of events that should be continued, and the Saint Thomas Entities propose a case management order to address bellwether selection and Case Specific discovery for individual cases. *See* Exhibit A.

**III.    Consolidation of Individual Cases Would Be Unworkable and Unfairly Prejudicial**

Even if the Court and the parties were in a position to entertain individual trials at this time—despite all of the issues outlined above—the PSC's proposal of consolidating individual cases for a single trial should be rejected. The PSC has not filed a motion to consolidate under Rule 42, presumably because it is unable to shoulder the burden of showing that the consolidation

"would promote judicial convenience and economy."  *Powell v. Nat'l Football League*, 764 F. Supp. 1351, 1359 (D. Minn.1991).  And simple assurances will not suffice:  "Considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1285 (2d Cir. 1990) (citations omitted).  It is noteworthy that the PSC has offered not a single opinion supporting its remarkable consolidation proposal.[14]

Combining six unrelated plaintiffs together in a single trial is transparently designed to stack the decks in favor of the PSC.  It would be unfairly prejudicial to the defendants for the PSC to put on the individual facts of so many different plaintiffs into a single trial, and the jury will be hopelessly confused in attempting to sort out the facts attributable to each.

Consolidation of more than one unrelated plaintiff in a single trial presents a real risk of both prejudice to the defendants and jury confusion.  As noted above, the risk is magnified in an initial trial where numerous other cases are also pending.  In situations like this one where no cases have ever been tried on a particular tort theory, the Federal Judicial Center advises caution on consolidation:

> If the injuries allegedly arise from new products or substances, or liability is predicated on novel legal claims, causation may be disputed or scientific evidence may be conflicting.  ***If there are few prior verdicts, judgments, or settlements, additional information may be needed to determine whether aggregation is appropriate.  The need for such information may lead a judge to require a***

---

[14] In its reply brief as to a proposed CMO on dispositive motions (Docket #1733), the PSC cited a few cases in support of its proposed language referencing Federal Rule of Civil Procedure 42. Notably, the cases it cites involve:  (i) consolidation for purposes of dispositive motions and appeal, *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1326 (N.D. Ga. 2007), *Scofield v. Telecable of Overland Park, Inc.*, 751 F. Supp. 1499, 1502 (D. Kan. 1990), *rev'd on other grounds*, 973 F.2d 874 (10th Cir. 1992), and *Nichols v. Rysavy*, 610 F. Supp. 1245, 1246-47 (D.S.D. 1985) *aff'd*, 809 F.2d 1317 (8th Cir. 1987); and (ii) consolidation of multiple suits involving the same parties and relating to the same transaction, *Miller v. U.S. Postal Serv.*, 729 F.2d 1033, 1036 (5th Cir.1984), and *Am. Home Assur. Co. v. Roxco, Ltd.*, 81 F.Supp.2d 674, 684 (S.D.Miss.1999).  *See* Docket #1733 at 5 n.21 & 6 nn.22 & 23 (collecting cases).  None of these opinions involves consolidating multiple wrongful death and personal injury cases—much less bellwether cases—for trial.

> ***number of single-plaintiff, single-defendant trials, or other small trials.*** These trials would test the claims of causation and damages and whether the evidence applies across groups, in order to provide the necessary information as to whether aggregation is appropriate, the form and extent of aggregation, and the likely range of values of the various claim

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.314 at 359 (emphasis added). Heeding that advice, another MDL court presented with a request to consolidate three personal injury cases for an initial bellwether trial refused to do so, reasoning that:

> this is a large-and still growing-MDL, the exact factual and legal contours of which are still undefined. The parties continue to conduct critical discovery, including deposing plaintiffs' prescribing physicians. The merits of the parties' arguments have not been tested at trial, in dispositive motions, or through some out-of-court resolution. Further, the stakes are high: the initial bellwether trials in this MDL may serve as the basis for the parties' resolution of remaining, pending cases. Thus, although plaintiffs appear to have demonstrated significant commonalities in fact and law among the three individual plaintiffs' cases, this motion is premature. In these circumstances, the parties should conclude case-specific discovery in the bellwether cases and should fully develop the legal and factual bases for their claims and defenses before the Court ultimately rules on plaintiffs' motion to consolidate.

*In re Levaquin Prods. Liab. Litig.*, MDL No. 08-1943(JRT), 2009 WL 5030772, at *4 (D. Minn. Dec. 14, 2009). These same factors are implicated here, and the Court should follow a similar course.

## CONCLUSION AND PRAYER

For these reasons, the Saint Thomas Entities request that the Court deny the PSC's Motion in its entirety and grant such other and further relief to which the Saint Thomas Entities are entitled.

15

        SAINT THOMAS WEST HOSPITAL,
        FORMERLY KNOWN AS ST. THOMAS
        HOSPITAL, SAINT THOMAS NETWORK,
        AND SAINT THOMAS HEALTH

        By its attorneys,
        */s/ Marcy Hogan Greer*
        Sarah P. Kelly (BBO #664267)
        skelly@nutter.com
        NUTTER McCLENNEN & FISH LLP
        Seaport West
        155 Seaport Boulevard
        Boston, Massachusetts  02210
        (617) 439-2000
        (617) 310-9461 (FAX)


Dated:  March 30, 2015

OF COUNSEL:

Yvonne K. Puig*
Texas State Bar No. 16385400
yvonne.puig@nortonrosefulbright.com
Adam T. Schramek*
Texas State Bar No. 24033045
adam.schramek@nortonrosefulbright.com
Eric J. Hoffman*
Texas State Bar No. 24074427
eric.hoffman@nortonrosefulbright.com

NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
(512) 536-2450
(512) 536-4598 (FAX)

Marcy Hogan Greer*
Texas State Bar No. 08417650
mgreer@adjtlaw.com

ALEXANDER DUBOSE JEFFERSON & TOWNSEND LLP
515 Congress, Suite 2350
Austin, Texas 78701
(512) 482-9300
(512) 482-9303

*Appearing Pro Hac Vice

## CERTIFICATE OF SERVICE

This certifies that a true and accurate copy of the foregoing was served on all parties of record by virtue of the Court's electronic filing system this 30th day of March, 2015.

*/s/ Marcy Hogan Greer*
MARCY HOGAN GREER