```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2


 3


 4   IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
     PHARMACY CASES LITIGATION          )
 5                                      )
                                        )
 6                                      )
                                        )
 7                                      )
                                        )
 8
             BEFORE:  THE HONORABLE RYA W. ZOBEL AND
 9                    THE HONORABLE JENNIFER C. BOAL


10


11


12                       STATUS CONFERENCE


13


14


15


                John Joseph Moakley United States Courthouse
16                       Courtroom No. 12
                        One Courthouse Way
17                       Boston, MA 02210


18
                         March 25, 2015
19                         2:00 p.m.


20


21


22              Catherine A. Handel, RPR-CM, CRR
                    Official Court Reporter
23        John Joseph Moakley United States Courthouse
                 One Courthouse Way, Room 5205
24                    Boston, MA 02210
                 E-mail: hhcatherine2@yahoo.com
25
```

```
1    APPEARANCES:

2    For The Plaintiffs:

3        Hagens, Berman, Sobol, Shapiro LLP, by KRISTEN JOHNSON,
     ESQ., and THOMAS M. SOBOL, ESQ., 55 Cambridge Parkway, Suite 301,
4    Cambridge, Massachusetts 02142;

5        Janet, Jenner & Suggs, LLC, KIMBERLY A. DOUGHERTY, ESQ., 75
     Arlington Street, Suite 500, Boston, Massachusetts 02116;
6
         Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ., 366 Elm
7    Avenue, SW, Roanoke, Virginia 24016;

8        Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
     Street, Suite 500, Boston, Massachusetts 02114;
9
         Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K.
10   MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, New York
     10013-1413;
11
         Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
12   ESQ., 150 Fourth Avenue North, Suite 1650, Nashville, Tennessee
     37219;
13

14

15    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

16       Brown & Rudnick, by KIERSTEN A. TAYLOR, ESQ., One Financial
     Center, Boston, Massachusetts 02111;
17

18
      FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
19   NECP, INC.:

20       Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
     Street, Suite 2400, Boston, Massachusetts 02110-1724;
21
      Harris Beach PLLC, by FREDERICK H. FERN, ESQ., 100 Wall Street,
22   New York, New York 10005;

23

24    (Appearances continue on the next page.)

25
```

APPEARANCES (Cont'd):


FOR THE DEFENDANTS:

     Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ., 1150 Huntington Building, 925 Euclid Avenue, Cleveland, Ohio 44115-1414;

     Michaels, Ward & Rabinovitz LLP, by DAN RABINOVITZ, ESQ., One Beacon Street, Boston, Massachusetts 02108;

     Todd & Weld LLP, by CORRINA L. HALE, ESQ., 28 State Street, 31st Floor, Boston, Massachusetts 02109;

     Ulmer & Berne LLP, by JOSHUA A. KLARFELD, ESQ., 1660 West 2nd Street, Suite 1100, Cleveland, Ohio 44113-1448;

     Alexander Dubose Jefferson & Townsend LLP, by MARCY H. GREER, ESQ., 515 Congress Avenue, Suite 2350, Austin, Texas 78701;

     Fulbright & Jaworski, LLP, by ADAM T. SCHRAMEK, ESQ., 98 San Jacinto Boulevard, Suite 1100, Austin, Texas;

     Donovan & Hatem, LLP, by COURTNEY LONGO, ESQ., Two Seaport Lane, Boston, Massachusetts 02210;

     Goodwin Procter LLP, by JAMES REHNQUIST, ESQ., and ROBERTO M. BRACERAS, ESQ., Exchange Place, 53 State Street, Boston, Massachusetts 02109;

     Pessin Katz Law, P.A., by GREGORY K. KIRBY, ESQ., 901 Dulaney Valley Road, Suite 400, Towson, MD 21204.

```
1                    P R O C E E D I N G S

2        (The following proceedings were held in open court before

3   the Honorable Rya W. Zobel, United States District Court Judge,

4   and the Honorable Jennifer C. Boal, Magistrate Judge, United

5   States District Court, District of Massachusetts, at the John J.

6   Moakley United States Courthouse, One Courthouse Way, Boston,

7   Massachusetts, on March 25, 2015.)

8            THE COURT:  Good afternoon.  Please be seated.

9            Call the case, but I believe we don't need to have

10  counsel identified.

11           COURTROOM DEPUTY CLERK URSO:  So, this is In Re:  New

12  England Compounding, MDL-13-2419.

13           THE COURT:  Ms. Johnson.

14           MS. JOHNSON:  Good afternoon, your Honor.  Kristen

15  Johnson for the Plaintiffs' Steering Committee.

16           We have identified the motions for which oral

17  argument is requested today.  The first is the PSC's motion

18  for entry of a case management order and Mr. Fennell from

19  Virginia will be addressing that.

20           THE COURT:  I gather that there's been a serious

21  problem among the parties for coming up with some kind of a

22  solution to the initial problem that I identified.  I'm happy

23  to hear you, but I wonder whether maybe this is a task I gave

24  that's impossible to have a solution.

25           MR. FENNELL:  Well, your Honor, we don't think so.
```

1    We filed a motion with proposed case management order attached

2    to it and there has been some opposition to it, but we feel as

3    though that proposed order, also attached to our response to

4    all of the defense pleadings, is a reasonable way of

5    addressing the Court's concerns about the multiple motions.

6          It simply requires people who want to file a

7    dispositive motion to contact counsel of record in the MDL and

8    address the issues that are going to be addressed in the

9    dispositive motions and identify those cases that have the

10   same issues and bring them into the process of briefing and

11   arguing those dispositive motions.  So that when the Court

12   reviews all of the -- reviews the briefing, hears the

13   arguments and issues a ruling, it addresses all of the cases

14   that have similar issues, similar types of related issues and

15   claims.  We think that's a very reasonable way of tackling it.

16         I know that the -- certain defendants have voiced

17   opposition to it for different reasons.  Those are addressed

18   in the PSC's reply, which was Docket No. 1733, but we think

19   we'll be able to address all those issues.

20         THE COURT:  Okay.  Is there anyone who will speak on

21   behalf of Saint Thomas and/or the Tennessee clinic defendants?

22         MS. GREER:  Your Honor -- is this on?

23         THE COURT:  If it's not, there is a button on it,

24   sort of near the base on the stem.

25         MS. GREER:  Is it on now?

```
1              THE COURT:  Yes.
2              MS. GREER:  Sorry about that.
3              Your Honor, Marcy Greer for the Saint Thomas
4    Entities.
5              THE COURT:  Marcy?
6              MS. GREER:  Greer for the Saint Thomas Entities.
7              The problem with the PSC's proposal is that it
8    essentially sets up an issue preclusion mechanism in advance
9    of ruling before the Court which makes it very difficult to
10   manage, and what it's going to do by having this objection
11   process set up is require defendants to have to file
12   objections to motions that they're not even prepared to
13   address or else risk having a dispositive consequence.
14             THE COURT:  Is there a solution to that problem?
15             MS. GREER:  Yes, your Honor, we believe there is.
16   Our proposal has a two-track to it.  One is you look at prior
17   rulings of this Court, which you should do in every case.
18   That should be the duty of every litigant before filing a
19   motion to dismiss, to look at this Court's prior orders and
20   determine whether the Court has ruled on it or ruled close
21   enough, and our proposal allows them -- those defendants who
22   conclude that, yes, a prior order does set forth the roadmap
23   here, to file a notice that says, I would have filed the same
24   motion and I agree that it would be covered by the Court's
25   ruling for purposes of preserving the appeal, which is another
```

1   problem with the PSC's order.

2          The PSC doesn't have any mechanism for a defendant to

3   file a motion or something of record that will allow it to

4   take a notice of appeal, and we're concerned that the way that

5   the PSC is proposing it is simply just to file a notice of

6   appeal.  Well, how do you have anything to appeal from at that

7   point?  By filing a notice that says, We agree that the Court

8   has already addressed this, we would have raised the same

9   motion.  Therefore, we want to take advantage of that.

10  There's no onus on the Court or the parties to do anything

11  after that point.  The party has preserved its rights and it

12  can take the appeal.

13         Conversely, if the party feels that this has not been

14  addressed by prior Court orders, then they can file a motion

15  to dismiss by the dispositive deadline.  At that point they

16  will know -- we will have a collection of briefing and we can

17  decide which issues should be considered together and we can

18  put them all together in a package for the Court and try to

19  work together to consolidate argument as much as possible so

20  that the Court can make the streamline rulings that it was

21  asking for.

22         Another place where I think the PSC's motion goes too

23  far is including summary judgments.  Summary judgments were

24  not on the table when the Court first asked the parties to

25  consider this, and summary judgments are a very different

1  animal.  Although there are some summary judgments that are

2  pure issues of law, like a motion to dismiss, some are real

3  evidence points, like the agency issues involving the Saint

4  Thomas Entities are very different from the agency issues

5  involving other healthcare providers in other jurisdictions.

6          THE COURT:  So, your solution to that is simply

7  limiting the case management order to motions to dismiss?

8          MS. GREER:  Yes, your Honor, at this point I think

9  that would be wise.  After a little bit of experience with

10  this -- because, frankly, we're writing on a clean slate here,

11  and after we've had a little bit of experience with it, we may

12  have more information and come up with a better way to do

13  summary judgments, but at this point it's premature to set up

14  a situation where there is a potential preclusion, because

15  what they are proposing -- and we've listed a number of issues

16  with the order, but I think the most fundamental problems are

17  the right of appeal and the preclusion issue, because you're

18  setting up preclusion in advance before a motion is even

19  filed.  You're basically having to give notice to all the

20  parties and they have to figure out, Wow, is the law of New

21  Mexico sufficiently similar to my law that I need to file an

22  objection here?

23          So, you're going to get a lot more briefing because

24  people are going to be prophylactic because they don't want to

25  risk the consequence of preclusion and can't afford to risk

1     the consequence of preclusion.  Typically, when preclusion is

2     in play, it's in a situation where the Court has ruled and

3     there's something to operate off of.

4          If you think about it, if you're looking at the

5     elements of negligence, for example -- I'm just going to use a

6     real simple example -- and the issue of duty, if the Court

7     rules -- and say that they move against duty and causation and

8     the Court rules on duty.  Well, then we know what the Court

9     has ruled and we can decide whether it affects our case or

10    not, but if you do it in advance of filing the motion and you

11    don't know what the Court is going to rule, then you have to

12    file a prophylactic objection to cover every element of every

13    cause of action that might be implicated by a motion that you

14    haven't even seen filed by defendants in other jurisdictions

15    under other states' laws.  So, it really is creating a

16    situation that's going to be unworkable.

17         THE COURT:  To what extent does your proposal make it

18    easier to deal with this proliferation of motions?

19         MS. GREER:  Well, again, it creates a situation where

20    people can choose to say the Court has already ruled and I am

21    protected in my position by filing a simple notice, which

22    requires no work from the Court and no work from the parties.

23         THE COURT:  You think that's likely to happen?

24         MS. GREER:  I do, your Honor, because no one wants to

25    file a motion that you've already ruled upon, especially when

1   you've indicated --

2           THE COURT:  They do it all the time.

3           MS. GREER:  I think -- I mean -- I'll be honest with

4   you.  I would take great care --

5           THE COURT:  Not you.  You, all of you do it all the

6   time.

7           The genesis of my suggestion was the fact that we

8   were getting motions to dismiss with lengthy briefs based on

9   state law, which are really very -- state laws which are very

10  similar to each other and there was not really an attempt to

11  distinguish the one -- the Tennessee law from the New Jersey

12  law, or whatever.  It was simply an entire new briefing on

13  substantially similar laws, without really understanding what

14  the differences are.

15          MS. GREER:  Well, your Honor --

16          THE COURT:  That's the problem.

17          MS. GREER:  But, your Honor, you hadn't ruled on

18  either Tennessee or New Jersey at that point.

19          THE COURT:  I just used that as an example.

20          MS. GREER:  Right, but I mean -- my point is that we

21  had to brief them and put them before you.  And there are

22  nuances, as the Court appreciated in its orders, between the

23  laws of those two states as to certain types of claims.  And

24  so -- but I think that if the defendants have the protection

25  of knowing that they can rely upon an order of this Court for

1    appellate purposes, then they can move on and will be more

2    judicious about filing motions.

3         And then the other side of it is if they do file a

4    motion, before it is argued to the Court we will collect it

5    and come up with a way to present the briefing and the

6    argument to the Court in a way that streamlines the issue and

7    say this is the same issue on causation for all of these

8    states, because it's a proximate cause standard.  I'm just

9    using, again, a simple negligence example.

10        THE COURT:  Whom do you represent?

11        MS. GREER:  Who do I represent?

12        THE COURT:  Yes.

13        MS. GREER:  The Saint Thomas Entities.

14        THE COURT:  And that's it?

15        MS. GREER:  Tennessee, your Honor.  Those are the

16   vicarious liability defendants.

17        THE COURT:  Okay.  I'm not sure that all the other

18   entities would necessarily go along with you.  That's part of

19   the problem we have.

20        MS. GREER:  Well, several of them have filed joinders

21   with our response and of the ones who have filed joinders, I

22   think all of them have agreed with our proposal in general

23   terms.

24        THE COURT:  Okay.  Anything else?  Anybody else?

25        MR. TARDIO:  Your Honor --

```
1            MR. FENNELL:  Your Honor, Patrick Fennell again for
2       the plaintiffs.  May I respond?
3            THE COURT:  Hold it one minute.
4            MR. TARDIO:  Very briefly, your Honor.  Chris Tardio
5       for the Tennessee clinic defendants.
6            We filed a joinder in Saint Thomas Entities' response
7       and we are fine with the proposed order that the Saint Thomas
8       Entities filed.  We have also filed with our joinder, in the
9       alternative, a proposed case management order that's even
10      simpler than the Saint Thomas Entities' proposal.
11           THE COURT:  Will Saint Thomas buy it?
12           MS. JOHNSON:  I don't know.  I don't know.
13           But it eliminates the pre-motion litigation over what
14      is and is not a related case and it simply puts the obligation
15      on the parties to meet and confer prior to filing a motion to
16      dismiss or a motion for summary judgment, to look -- it puts
17      the responsibility on the parties to look -- the attorneys to
18      look at the prior orders of the Court, and if the parties
19      still intend to file a motion on, for instance, a negligence
20      cause of action, to explain in the briefing why the prior
21      orders of the Court don't apply.
22           So, it, admittedly, does not solve the problem of
23      creating an issue with an order being binding on all cases
24      going forward.  It does address that, but it also avoids the
25      litigation over whether an order is binding on all issues
```

1   going forward.  So, we would submit that our simpler proposal,

2   in the alternative, is appropriate for the Court to enter.

3          THE COURT:  Okay.  Is there a third opposition?

4          MR. KIRBY:  Yes, your Honor.

5          For the record, your Honor, I'm Greg Kirby for Box

6   Hill Surgery Center, Dr. Bhambhani and her practice group.

7          I just want to point out that we have also --

8          THE COURT:  I'm sorry.  Tell me your name again,

9   please.

10          MR. KIRBY:  Greg Kirby.

11          THE COURT:  H-e-r-b --

12          MR. KIRBY:  K-i-r-b-y.

13          THE COURT:  Oh, Kirby, yes.

14          MR. KIRBY:  I just wanted to put on the record, we

15   also filed a response or an opposition to the plaintiffs'

16   motion to enter a CMO.

17          We agree -- and we had conferred with the Saint

18   Thomas Entities and the Tennessee clinic defendants.  We

19   agree, there needs to be a simpler and more efficient process.

20   We just don't believe that the PSC's proposed CMO does that.

21   It uses terms like "similar" and "same," but it doesn't

22   define, you know, what those are and, frankly, there's a lot

23   of what-if's that are just --

24          THE COURT:  You're trying to turn this into a patent

25   case.

1           MR. KIRBY:  That's true.  I did that for a little

2    while.  It's tough.

3           But the bottom line is we would adopt the arguments

4    made by much more intelligent counsel to my right, and we

5    would also ask that you enter the CMO that the Saint Thomas

6    Entity defendants sent in.  Thank you.

7           THE COURT:  Thank you.  Mr. Fennell.

8           MR. FENNELL:  Thank you, your Honor.

9           Just to kind of revisit the genesis of this whole

10   project.  As your Honor probably remembers -- and I'm just

11   citing as an example -- there have been five different motions

12   to dismiss in which the defendants --

13          THE COURT:  You don't have to remind me.

14          MR. FENNELL:  Pardon me?

15          -- in which the defendants raised issues regarding

16   claims of negligence and gross negligence.  In each of those

17   cases, the Court issued a ruling.  And, by the way, those

18   cases, those five different motions to dismiss, originated in

19   cases from five different states and the Court ruled

20   consistently in all five cases --

21          THE COURT:  That's a relief.

22          MR. FENNELL:  -- in five separate rulings, and it is

23   in that context that -- I think that the Court was concerned

24   about these multiple motions to dismiss.

25          And so, the PSC has proposed an order and, again, we

```
1    think that our order works.  We think that the defense
2    concerns about the order are overstated, and if I could just
3    walk through the process just briefly.
4            THE COURT:  Tell me, before you do that, do you agree
5    that there is a problem concerning issue preclusion with the
6    PSC's order?
7            MR. FENNELL:  No, I don't, and the reason I don't
8    agree with that is because the process -- our order is very
9    much process oriented.  The process that we have spelled out
10   in our proposed order addresses all of the objections that the
11   defendants have raised, including issue preclusion and due
12   process concerns and those kinds of things.
13           THE COURT:  And what about summary judgment?  Is
14   summary judgment appropriate for the proposed PSC order?
15           MR. FENNELL:  We think it is and --
16           THE COURT:  Even though it requires a looking at the
17   evidence in each case?
18           MR. FENNELL:  And that's absolutely true, but that's
19   the beauty of our order, is that it allows counsel the
20   opportunity -- once -- prior to filing a dispositive motion,
21   whether it's a motion to dismiss or a motion for summary
22   judgment, the -- counsel has to get together and identify the
23   related cases.  Once they've identified the related cases, if
24   somebody feels as though their particular case or their issue
25   is different from the ones that are being addressed in a
```

1    particular dispositive motion, then they can file an objection

2    to be included -- to being included in that motion.

3            THE COURT:  So, as a matter of course, then, anybody

4    who has a summary judgment motion or opposes a summary

5    judgment motion would rule out -- notify out the summary

6    judgment piece of it --

7            MR. FENNELL:  They would have --

8            THE COURT:  -- as opposed to the dismissed piece of

9    it?

10           MR. FENNELL:  Yes, your Honor.  They have an

11   opportunity to distinguish their case from all of -- from the

12   other issues that are being addressed in any particular motion

13   and -- by filing an objection, and those objections can be

14   consolidated amongst themselves and then be addressed by the

15   Court as well, but nobody is being denied due process in the

16   Plaintiffs' Steering Committee's proposed order because of

17   that process.

18           THE COURT:  Thank you.

19           MS. JOHNSON:  Your Honor --

20           THE COURT:  Do you wish to have a brief sur-reply?

21           MS. GREER:  Very brief, your Honor.

22           We're not suggesting that there's a lack of process.

23   We're suggesting that there's a lack of efficiency with their

24   proposal.  Their proposal requires you to identify whether or

25   not a motion -- a decision by this Court which is yet to be

1     made, because the Court has not decided which element or which

2     reason to grant the motion, whether or not that would be

3     preclusive on their case involving their laws, their facts, et

4     cetera, or they have to file an objection within 15 days,

5     which is accompanied by a full brief.  So, you're going to get

6     more briefs under their proposal than under ours.  Under our

7     proposal people will file motions and they will have the two

8     options.  They may choose to file a much slimmed-down motion

9     or not file one at all, and then once we have those motions,

10    we'll presumably have, you know, one for each state or at

11    least a representative for each state, and then you can say

12    this is the causation issue which is the same for these five

13    states and the Court can decide it once and for all, but with

14    the benefit of having done it correctly.

15          Where the PSC goes too far is in Paragraph 6 where it

16    says, "Any ruling of the Court arising from such motion shall

17    be dispositive as to any such noted party's related cause of

18    action," and there's going to be a lot of litigation about

19    that because no one can afford to risk losing a cause of

20    action that they haven't even had a chance to be heard on.

21          THE COURT:  Okay.  I thank you all for the effort and

22    we'll review the results of that effort and figure it out --

23    try to figure it out.

24          MR. FENNELL:  Thank you, your Honor.

25          THE COURT:  Thank you.

1           Ms. Johnson, what next?

2           MS. JOHNSON:  Next, your Honor, would be the Saint

3   Thomas' motion to enforce a court order permitting comparative

4   fault discovery against settling parties.

5           THE COURT:  That's not Ms. Greer.

6           MR. SCHRAMEK:  Correct.  Your Honor, it's Adam

7   Schramek for Saint Thomas Entities, Health Network and

8   Hospital.

9           THE COURT:  Okay.

10          MR. SCHRAMEK:  So, your Honor, you might recall a few

11  months ago as some of the parties were settling, there was an

12  effort as part of that settlement agreement to effectuate a

13  partial stay of the claims against them so that no one could

14  prosecute affirmative cases against them and some other terms

15  and conditions.

16          You had several parties, defendants, file objections

17  or motions to clarify that process because the concern was

18  that somehow those orders would be used in the future in order

19  to block comparative fault discovery.

20          THE COURT:  Is this an issue that concerns only

21  timing or is it a substantive issue as well?

22          MR. SCHRAMEK:  Well, your Honor, it's hard to say.  I

23  think it's a substantive issue because ARL, when we sent our

24  comparative fault discovery, attempted first to argue that

25  your prior order prohibited us from issuing any discovery to

1  them and allowed them to completely avoid any discovery

2  process.

3         I sent them the Court's order.  I sent them the memo

4  the Court had issued in which you specifically said this does

5  not prohibit comparative fault discovery, and they said, We

6  don't read it the same way, put it on the hearing for the next

7  status.

8         Now, when they filed their response, they took a

9  different position.  In their response they did not try to

10  argue that this Court's order somehow blocked this discovery.

11  Instead, they tried to argue that somehow they should be

12  entitled to additional relief and an additional stay because

13  of the facts and circumstances they argued, which was

14  essentially, We don't want to participate in discovery.

15         If we look at it from a timing point of view -- your

16  Honor, I believe the PSC is about to get up here and argue to

17  this Court that they want a trial as early as December of

18  2015.  We're going to have a lot to say about that, but from a

19  timing point of view, there is -- these issues, comparative

20  fault is key -- a key affirmative defense to all of my

21  clients' lawsuits in this MDL.

22         The June 15th deadline for fact discovery, common

23  fact discovery, is one that we've been taking seriously.  I've

24  issued -- we've issued discovery not only to multiple parties,

25  to Unifirst, to Barry Cadden, to the affiliated.  We've issued

1    all the discovery.  We've also sent letters asking for

2    depositions, because, your Honor, if we're going to move this

3    case along, as this Court has indicated it wants, we need that

4    discovery.  It is key to part of our defense and if ARL does

5    not participate in it or this Court protects them from it, we

6    don't see how any case can be tried in any reasonably

7    foreseeable future because to the -- we, of course, don't

8    believe we have any responsibility or liability for multiple

9    reasons, but to the extent we're wrong, your Honor, we

10   absolutely are going to be going to that jury and showing them

11   all the facts of all the other parties who bear substantially

12   larger responsibility for the contamination, including ARL who

13   tested the product that was actually injected into the

14   plaintiffs, into the patients, and gave it a clean bill of

15   health from their testing laboratory.

16          Your Honor, we believe we're entitled to comparative

17   discovery of that fact because we want to explain to the jury

18   how that's a much more responsible party from a comparative

19   fault point of view than someone who received the drug under

20   assurances it was safe.

21          THE COURT:  Okay.  Thank you.

22          Do the Tennessee clinic defendants want to talk about

23   this?

24          MR. TARDIO:  Your Honor, we've joined in the Saint

25   Thomas motion.  We sent a similar set of discovery.  So, we're

```
1    in the same position.  I won't bog the Court down with

2    argument because our position is exactly the same.

3              THE COURT:  Okay.  ARL.

4              MS. LONGO:  Good afternoon, your Honor.  My name is

5    Courtney Longo.

6              THE COURT:  You're all boxed in by the proposed

7    exhibits in the trial.  This is one fraud case.

8              MS. LONGO:  Good afternoon, your Honor.  My name is

9    Courtney Longo.  I'm standing in for Ken --

10             THE COURT:  Courtney?

11             MS. LONGO:  Courtney Longo.  I'm standing in for Ken

12   Walton today on behalf of ARL.

13             Your Honor, we're not asking for additional relief.

14   What we're asking for is the benefit of what we bargained for

15   in the settlement agreement; namely, to not have to be

16   defending lawsuits in the MDL right now.

17             THE COURT:  Well, when will you?

18             MS. LONGO:  Well -- so, this gets to your point --

19             THE COURT:  You say, "right now."

20             MS. LONGO:  And I'm going to get to -- I'll get to

21   that right now, as a matter of fact.

22             The bankruptcy court is set to confirm the plan

23   tentatively on May 19th.  Now, of course, we don't have an

24   absolute timeline on that.  We are at the mercy of the

25   bankruptcy court with that.
```

1          However, for us to have to engage in not only

2     interrogatories, admissions, document requests and depositions

3     at this point, it's crippling and that's a main part of what

4     we intended to do and what the stay was intended to do.

5          THE COURT:  Would you ever -- under your scenario,

6     are you ever amenable to discovery?

7          MS. LONGO:  So, your Honor, here is our -- what we

8     think is a fair compromise to that situation.  We have

9     produced to Mr. Ellis in the state matters over 28,000

10    documents on between five and six CDs.  It's my understanding

11    that those documents did not make it to the Plaintiffs'

12    Steering Committee depository at this point because we went

13    straight to mediation.  So, my understanding, the request was

14    made, but the documents did not make it to the depository.

15         We believe it's a fair compromise in this situation.

16    We're not trying to withhold documents.  We're not trying to

17    be uncooperative, but we are trying to come up with a solution

18    that is the least burdensome on ARL and we believe that would

19    be to produce the documents that were produced to Mr. Ellis

20    into the PSC depository so that we make one production of

21    documents to any comparative fault party that asks us for

22    discovery.

23         THE COURT:  Ms. Johnson.

24         MS. JOHNSON:  Thank you, your Honor.

25         We have not filed a pleading on this matter, but I

```
 1    will note that it was always contemplated as part of the

 2    settlement, with explicit language therein, that there would

 3    be some type of comparative fault discovery.  I think the way

 4    it's written is, "Discovery that's necessary to show the

 5    liability of other defendants," and I'll leave it at that.

 6              THE COURT:  Do you know anything about the 28,000

 7    documents that counsel is talking about?

 8              MS. JOHNSON:  Mr. Ellis could speak to that, your

 9    Honor.

10              MR. ELLIS:  Your Honor, those were produced very

11    early on in 2013 in connection with state court proceedings,

12    and then in the summer of 2013, ARL entered into mediation.

13    The depository at that point was just being set up.  They were

14    in mediation.  We did not turn those documents over to the

15    depository.

16              THE COURT:  But we do not know at the moment whether

17    those 28,000 documents addressed the issue of comparative

18    fault, do we?  Or do we?

19              MR. ELLIS:  Well, I have reviewed those documents

20    and, yes, they do.

21              THE COURT:  They do?

22              MR. ELLIS:  They do.

23              MS. LONGO:  Your Honor, if I may.

24              MR. ELLIS:  Alleged comparative fault.

25              MS. LONGO:  As you can imagine, such an extensive
```

```
 1    document production took an enormous amount of time and an
 2    enormous amount of resources on the part of ARL.
 3            An additional issue that we have with especially
 4    interrogatories, admissions at this point and depositions,
 5    we're in limbo.  We don't -- do we answer these as a
 6    defendant?  Do we answer these as a witness?  We don't know
 7    what the timing is in terms of that right now.  So, it puts us
 8    in a unique situation, I think.
 9            THE COURT:  Now, once the bankruptcy judge has
10    approved the agreement and the settlements take actual effect,
11    are you still resisting?  Will you still resist?
12            MS. LONGO:  In terms of document production?
13            THE COURT:  Well, instead of discovery on the issue
14    of comparative fault.
15            MS. LONGO:  Well, I think that --
16            THE COURT:  Whatever that may be.
17            MS. LONGO:  I'm sorry?
18            THE COURT:  Whatever that may be.
19            MS. LONGO:  Right.  I think that with that document
20    production, the 28,000 documents, I think that that -- I mean,
21    that's a substantial amount of material for comparative fault
22    parties.
23            THE COURT:  Well, it may or may not be.  I mean, just
24    because there are 28,000 documents doesn't mean that they
25    address the issue that the defendants -- the other defendants
```

1    are worried about.

2         MS. LONGO:  And I guess, you know -- at that point,

3    after the bankruptcy court has issued its injunction, I guess

4    we would be in a better position to know how to answer these

5    sort of questions.  Are we -- you know, the injunction is in

6    place.  Obviously, we -- our representatives are testifying as

7    a witness and a nonparty.

8         THE COURT:  So, it's an issue of timing initially?

9         MS. LONGO:  Yes, your Honor.

10        MR. SOBOL:  Your Honor, may I be heard?

11        THE COURT:  Yes.

12        MR. SOBOL:  I hear three different -- I hear three

13   different issues that are before the Court on this.

14        THE COURT:  This is Mr. Sobol speaking.

15        MR. SOBOL:  Yes.  The first and the simplest is that

16   to the extent that documents have previously been produced in

17   the state court case and ARL has no objection and the trustee

18   has no objection, documents like this should be put in the

19   depository and made available to everyone so that there can be

20   easy access to the appropriate parties under whatever the

21   terms are.  That just seems to be a no-brainer as long as

22   there's no substantive objection on the part of ARL or the

23   trustee.  And, frankly, I don't know whether there is or

24   isn't, and I'm not trying to tee that up right now.  That just

25   seems to be one straightforward issue.

```
 1              The second issue -- I should be very clear.  It was
 2     made clear before there were negotiations on the bankruptcy
 3     deal, during the negotiations of the bankruptcy deal and then
 4     once the bankruptcy deal was signed and was teed up, there was
 5     nothing that stops anyone from undertaking any form of
 6     discovery whatsoever by reason of the bankruptcy court
 7     proceedings that deals with anything in this MLD.  Meaning,
 8     you've got cases against clinics.  You've got cases against,
 9     you know -- we had cases against the national defendants until
10     they all have settled.  There is nothing that the bankruptcy
11     court order now is intended to do that in spirit or text stops
12     any of the process moving forward in this Court and that ought
13     not be a problem.
14              The third issue, then, is:  What is the appropriate
15     scope of ARL discovery?  I'm not going to comment on that
16     right now.  To the extent that documents should or shouldn't
17     be produced, whether they're privileged, whether depositions
18     should occur, that's the usual fodder, I think, of just the
19     case against ARL, and I haven't heard any issue concretely
20     teed up right now about that.  So, I'll just -- I'll leave it
21     like that and leave it.
22              THE COURT:  So, what do you want me to do?
23              MR. SOBOL:  In my view, if you were to enter an order
24     so long as the -- and I don't know whether the trustee or ARL
25     has an objection to the documents being put into the
```

1    depository and made available.  You know, we have to move this

2    case along.  That should be done, frankly.

3            And then, second, whatever discovery disputes there

4    are between ARL and Saint Thomas or some of the national

5    defendants, they should be dealt with on their merits

6    regardless of the fact that the bankruptcy proceeding is

7    ongoing, because there's nothing no longer that inhibits you

8    from doing that.

9            THE COURT:  Is there any reason why these 28,000

10   documents can't be put into the plaintiffs' whatever?

11           MS. LONGO:  I don't believe so, your Honor.

12           THE COURT:  Well, then why don't you do it?

13           MS. LONGO:  Well, I mean, I guess that's part of our

14   suggestion.  Like I said, we are looking for -- we're not

15   trying to be unreasonable or uncooperative, but --

16           THE COURT:  Well, I don't understand why you don't

17   just make these documents available.

18           MS. LONGO:  Well, your Honor, I mean, we were served

19   with interrogatories and admissions and requests for

20   production of documents and requested depositions, you know,

21   within the last couple of weeks.  So, we felt that we needed

22   to come to you and try and figure out what to do here.

23           THE COURT:  Okay.  Well, we're here and you offered

24   to submit all of these documents to the plaintiffs' registry

25   -- or what do you call -- repository.  So, why don't you just

1    do that now.  You've been heard.  I'll decide it.  I'll look

2    at it and see whether there should be additional relief, and

3    maybe those who want additional relief can have at least a

4    fast look at the documents and see whether there's -- whether

5    they need a whole lot more.

6            MS. LONGO:  I understand, your Honor.

7            THE COURT:  Okay?

8            MS. LONGO:  Yes.

9            MR. SCHRAMEK:  Your Honor, if I could just be heard

10   in a quick response, which is -- I'm not sure I thought I'd

11   ever be saying this, but I believe I would agree with Mr.

12   Sobol on this point because of the fact that the discovery

13   process should go forward as normal.  If we have a dispute --

14   if they think our objections -- our requests are

15   objectionable, they can file their responses in 30 days and

16   this Court has already referred everything to Judge Boal for

17   discovery disputes.

18           What can't happen, though, from our point of view, is

19   we get these 28,000 documents.  We have no idea how they

20   selected them.  There were no requests as what was being

21   requested.  We just have 28,000 documents, kind of like the

22   binders in front of us (indicating).

23           THE COURT:  But there is a bunch of stuff that is now

24   available to you.

25           MR. SCHRAMEK:  No.  It's very helpful, but I just

1    wanted to be clear that from our point of view, they need to

2    respond to our discovery requests, and if they're in the

3    28,000 documents, that's all they've got to say.  I asked for

4    all documents and correspondence with NECC on testing.  They

5    can say, See the 28,000 documents.  They've all been produced.

6    We just need a record to show we've asked for this and you've

7    told us they're in the 28,000.  And then, of course, we are

8    going to need a deposition of someone who we can then, you

9    know, talk to and present to the jury in admissible form.

10          I do want to address the timing because I also agree

11   about the timing, that we can't let the bankruptcy court stand

12   in the way.

13          Your Honor, yes, in May there's going to be this

14   proceeding where they're going to either approve or reject the

15   plan, et cetera.

16          We anticipate, based on the way everything is

17   currently proceeding, that there will also be an appeal from

18   that decision by somebody.  That's an appeal to the First

19   Circuit that is going to take many months to resolve.  That

20   will be the next excuse that you will hear as to why it's not

21   time yet for comparative fault discovery.

22          We agree those need to be separate tracks.  The order

23   currently in place allows full comparative fault discovery.

24   The order anticipated by the bankruptcy court, if approved,

25   allows full comparative fault discovery.  There's no reason to

1    stop it or to delay it from a timing point of view.

2            THE COURT:  Well, thank you all.  And I hereby refer

3    to Magistrate Judge Boal tasks of clarifying my earlier order.

4    So, that will be for her to do.

5            In the meantime, I would hope that Ms. Longo would

6    make the 28,000 documents available in the plaintiffs'

7    repository, in any event.

8            MS. LONGO:  Yes, your Honor.

9            THE COURT:  Thank you.

10           MS. LONGO:  Thank you.

11           THE COURT:  Okay.  What next, Ms. Johnson?

12           MS. JOHNSON:  That brings us to the report to the

13   Court portion of the agenda, your Honor, No. 3, status of

14   mediation efforts.

15           Liberty has reported a settlement in principle.  We

16   will have more information about that next time.

17           THE COURT:  I'm sorry, which part of that is settled

18   in principle?

19           MS. JOHNSON:  Liberty has reported a settlement in

20   principle, your Honor.

21           THE COURT:  Okay.

22           MR. GOTTFRIED:  The only thing the trustee would add

23   is they reported the settlement, period.  They filed a motion

24   seeking to stay the DJ case in Connecticut where they

25   represented to the Court and the Court granted a stay based on

1       their representation that the insurer and Liberty have agreed

2       to a settlement.

3                   THE COURT:  That takes care of 4(b), too, doesn't it?

4                   MS. JOHNSON:  Yes, your Honor, it does.

5                   So, to be clear, there is a settlement with what had

6       been the last-remaining national defendant in the MDL.

7                   That brings us to No. 5, the status of discovery.

8       5(a) really is just a reference to two orders issued by Judge

9       Boal dealing with discovery matters.

10                  As to the first, the PSC has distributed that order

11      to all plaintiffs' counsel and understand plaintiffs' counsel

12      to be in the process of complying with those clarifications.

13                  On the second, Saint Thomas has complied.  It has

14      provided the formulary that Judge Boal's order required them

15      to produce to plaintiffs.

16                  As to 5(b), this is really an administrative notice,

17      but the Plaintiffs' Steering Committee -- different members

18      have been copied on different discovery and discovery

19      responses.  So, we've asked that all parties in the MDL who

20      are serving discovery or responding to discovery, please be

21      sure to copy Mark Chalos, a member of the Plaintiffs' Steering

22      Committee, on those transmittals.

23                  THE COURT:  Any problem with that for anybody,

24      including those on the telephone?

25                  MR. SOBOL:  Well, maybe Mr. Chalos.

1          (No response.)

2          THE COURT:  Okay.

3          MS. JOHNSON:  As to 5(c), the parties have submitted

4    supplemental briefs on the issue of the motion to compel Saint

5    Thomas insurance agreements.  I believe Judge Boal now has the

6    briefing on that completed.

7          Turning to No. 6, the status of the litigation track.

8    In 6(a), the PSC has filed a second amended master complaint.

9    I won't get into the details of that, except to say that that

10   master complaint now removes certain counts based on the

11   Court's previous orders and rulings on motions to dismiss and

12   the Court's explanation for why certain counts have been

13   dismissed.

14         One procedural note is that in the PSC's proposed

15   case management order, we proposed in that order that the

16   amended master complaint would be binding as to all plaintiffs

17   who have filed short form complaints, but with an opportunity

18   for plaintiffs to opt out of that.

19         So, for example, if someone wanted to keep a count,

20   they would have the opportunity to file a notice with the

21   Court within 30 days to indicate that they are not adopting

22   the amended master complaint.

23         THE COURT:  Does that include the fair number of

24   complaints that are not, for some reason, part of the MDL?  I

25   mean, I have a bunch of cases that still have their old

1    numbers, not the MDL number.  I don't really know where they

2    are and why it is that way.

3              MS. JOHNSON:  I was not aware of that, your Honor.

4    They should -- all of the cases relating to New England

5    Compounding should be part of the MDL.

6              Is the Court aware of the universe of civil actions

7    that are not associated or that are not related to the MDL?

8              THE COURT:  Yes.  I think they are related, but they

9    somehow don't seem to be part of it.  They're still separate

10   cases.

11             MS. JOHNSON:  We can take that up with the Clerk's

12   Office.

13             THE COURT:  Maybe we can go over the docket at some

14   point and I'll show you and you can then tell me how we should

15   deal with it.

16             MS. JOHNSON:  Yes.

17             THE COURT:  Or ask the Clerk to do that.

18             MS. JOHNSON:  We're happy to -- we'll speak with the

19   Clerk, perhaps, as a starting point, your Honor, and speak

20   with the Court about it the next status conference.

21             THE COURT:  Good.

22             MS. JOHNSON:  That brings us to 6(b), the PSC's

23   motion for expedited trial.

24             MR. SOBOL:  If I may, your Honor.

25             That motion is not yet fully briefed, but if the

1    Court may indulge me for a few moments to talk about it so

2    that you'll know what is ahead of you.

3           My understanding is that the defendants have until

4    March 30th, sometime next week, to file a formal response.

5           I have addressed the Court now with respect to it and

6    I would ask that the Court rule on this before waiting for the

7    next status conference or even having any further argument on

8    it for the following reasons:

9           As this Court knows, this case -- the situation has

10   gone on now for two and a half years.  The MDL has been formed

11   for about two years.  We don't have a trial date set in any

12   particular case.

13          THE COURT:  When will the first case be ready for

14   trial?

15          MR. SOBOL:  We have filed motions that the first case

16   would be ready for trial in late November, early December of

17   this year for six people, six cases that are identified in our

18   motion --

19          THE COURT:  To be tried simultaneously?

20          MR. SOBOL:  To be tried simultaneously, your Honor.

21          Just to make sure that I outline that, the

22   Plaintiffs' Steering Committee is willing to go full board and

23   make sure that those six cases are appropriately and fairly

24   prepared with the appropriate -- the defendant is Saint Thomas

25   and that Saint Thomas had all the opportunity it needs to

1   prepare a defense to those cases.

2          The sensibility of doing that is the following:

3          First, let's just take a look at, you know, what are

4   some of the situations that face these people.  I'll only give

5   a couple of examples.  One of the cases would be on behalf of

6   the estate of a woman, a 56-year-old woman by the name of

7   Diane Reed, who has two sons and who is taking care of her

8   husband who is suffering from ALS.  She got injected and was

9   killed by Saint Thomas through injections into her body.  It

10  took her about a week or so to die as a result of it, eleven

11  days, but she was killed as a result of it, a 56-year-old

12  woman who was taking care of --

13          THE COURT:  Are all of the first six cases death

14  cases?

15          MR. SOBOL:  No.  There two death cases and four

16  non-death cases.  An example of a non-death case --

17          THE COURT:  What's the basis for combining these six

18  cases?

19          MR. SOBOL:  They're all Saint Thomas and they all

20  cover the roadmap of being both death cases and non-death

21  cases.

22          Now, one can say and one can pick, you know, are

23  these appropriate Bellwethers?  Well, they haven't gone

24  through a Bellwether process with the defendants and I don't

25  think that we're trying to suggest that you need to or we

1    should, but what we should do is start marking up cases for

2    trial and it can be done.  These are relatively simple single-

3    episode situations.

4            THE COURT:  How long would you anticipate the trial

5    to take?

6            MR. SOBOL:  Two and a half to three and a half weeks,

7    at the longest.

8            THE COURT:  Really?

9            MR. SOBOL:  There'll be a question about venue

10   because these cases are subject to lexicon and we would either

11   have to -- all six plaintiffs -- I understand from Mr. Chalos,

12   who will be lead trial counsel in connection with these cases,

13   all six plaintiffs are willing to waive lexicon and have the

14   case tried here.

15           If Saint Thomas wants to steadfastly enforce its

16   right to have the case tried down in Nashville, then there

17   needs to be a designation by the chief judge down there of

18   your Honor or the designation of a jurist down there or

19   elsewhere who would be able to sit on the case, but, again,

20   these are relatively simple single-episode kind of situations.

21           Now, one of the issues that Saint Thomas will raise

22   is that, apparently, the law of Tennessee is that if you buy

23   from a rogue company a drug product that has a fungus in it

24   and inject it into people and kill them or injure them

25   permanently, you can point the finger at everybody else you

1    can find to say, Well, we're not as bad as they are.  And so,

2    Saint Thomas will try to point the finger at the FDA, ARL,

3    Victory, Unifirst and everybody else that they can point the

4    finger at.

5            Fine, go ahead, point your fingers for the next six

6    months.  Do as much document requests as you want to do.  Take

7    as many depositions you want to do.  Hire your experts --

8            THE COURT:  We should probably get their opposition

9    and allow them full scope in responding to you.

10           MR. SOBOL:  And then maybe you'll get them on March

11   30th and then rather than waiting until the next conference in

12   April, or whenever, we would request that you issue an order

13   and the order I would hope you would issue would be that the

14   parties have ten days to provide a joint schedule leading to a

15   trial in late November, early December, and if they can't do a

16   joint one, to submit competing ones so that we can get going

17   with that, and that's our position with respect to this, your

18   Honor.  We need to get going.  We need to get cases on the

19   docket for trials.

20           THE COURT:  Ms. Greer.

21           MS. GREER:  Your Honor, since Mr. Zobel has been --

22   Sobol, excuse me, has been heard, at least in part, it seems

23   only fair that we can have a brief response.  The PSC's --

24           THE COURT:  That's why I called on you.

25           MS. GREER:  Thank you.

1          The PSC's position is a 180-degree reversal from

2     where it stood just a few months ago when it submitted a

3     Bellwether proposal and cited to Judge Fallon's article and

4     the -- all sorts of treatises and said, "To be effective, a

5     Bellwether trial selection process" -- this is a quote from

6     their pleading -- "must be informed by an understanding of the

7     basic facts of the relevant cases in the MDL and the important

8     variables associated with the universe of included cases."

9          The reason that we needed more time to respond to

10    this proposal is because it came out of the blue and was a

11    complete reversal, of course.

12         Judge Boal has entered MDL Order No. 9 that sets out

13    a process for common discovery that is to be completed by mid

14    June of this year, to be followed by expert common discovery

15    which is to be completed around October, to be then pursued by

16    individual case workup.

17         Now, the PSC says that we can be ready for a trial

18    this year by moving all of our resources away from the

19    Bellwether process that Judge Boal has designed for the

20    parties to follow to present the proposals to try to achieve

21    consensus by April 16th.  If not, to present proposals by May

22    15th, I believe.  And instead of pursuing that, let's turn all

23    of our attention to working up six cases of our unilateral

24    choosing in a consolidated trial.

25         Now, notably, the PSC has not moved for a

```
1    consolidation of these cases under Rule 42 and it hasn't cited
2    any caselaw to support doing so.  These cases involve very
3    different plaintiffs.  Some of them had different injectors.
4    So, it's not all the same injectors.  The facts are going to
5    be different.  As the Court has already noted, there are two
6    death cases, other personal injury cases.  Some were
7    infections of the cervical cavity.  Some were infections of
8    the spinal cavity.  Some were hip infections.  They're across
9    the board.  And what the manual on complex litigation tells us
10   is that you don't try the first few cases together in an
11   aggregate trial.  It destroys any predictive value, any
12   lessons learned from that case because you can't really
13   attribute the result to any one of those defendants.
14            THE COURT:  Well, assume for the moment that I agree
15   with you and that it should be one plaintiff who gets tried.
16   Is there any reason why that one plaintiff couldn't be tried
17   in November?
18            MS. GREER:  Well, again, I don't believe so, your
19   Honor, because we have so much left to do.
20            The PSC will be done with its discovery when common
21   discovery is done.  They have all the plaintiffs' records.
22   They have their side of the case.  We have --
23            THE COURT:  Yes, but if we determine one plaintiff
24   now, is there any reason why Saint Thomas can't be ready for a
25   trial in November on that one plaintiff?
```

1          MS. GREER:  I think it's going to be very difficult.

2     I mean, we don't have --

3          THE COURT:  When could you be ready, with less

4     difficulty?

5          MS. GREER:  Well, number one -- let me back up and

6     say, the Bellwether process needs to be followed.  That's what

7     we've been talking about for 18 months.

8          To be clear, we have only been in this MDL for 18

9     months and since the beginning of our participation in the

10    MDL, we've been saying the Bellwether process is important.

11    We've cited Judge Fallon's article because you have to decide

12    a representative case.  Trying any case that any party picks

13    is going to result in the same outlier problem that's been

14    identified by the judge in the *Granuflow* litigation, which is

15    the sole reason they're asking the Court to reverse course.

16    They're saying, Gosh, it's going to be time consuming and

17    annoying to have to go through -- "haggle" is the word they

18    used -- over the Bellwether process, but Judge Fallon, who

19    tried the *Vioxx* MLD and *Propulsid*, learned a lot through those

20    experiences and those have been very successful programs.

21          THE COURT:  So, what do you want me to do?

22          MS. GREER:  We want you to honor the Bellwether

23    process that Judge Boal had started.

24          THE COURT:  When will it get us a trial under that

25    process?

1          MS. GREER:  I think it would take -- it would

2     definitely be next year, and I can't tell you right now

3     because a lot of the things depend on the third-party

4     discovery.

5          The PSC is saying, you know, we're trying to blame

6     others parties for this.  They sued all those other parties.

7     Now that they've settled with them, all of a sudden, we're the

8     only the bad guys and we're left defenseless because they want

9     to have an immediate trial just so somebody can go to trial.

10         THE COURT:  You can settle, too.

11         MS. GREER:  Well, your Honor, at this point, frankly,

12    we don't believe we have liability and we're entitled for a

13    jury to find that, but it's also important that it be a fair

14    jury, and this is an MDL.  There are hundreds of cases in this

15    MDL, and the first case to be tried is important.  It's

16    important that it be representative, because that's how the

17    parties --

18         THE COURT:  I understand all that, but when can we

19    try this case that you are advocating be tried under a process

20    different from that which the plaintiffs advocate?

21         MS. GREER:  Well, again, I think it's going to depend

22    on when we get the discovery that we need.  We just found out

23    about 10,000 -- or how many thousands of documents just from

24    one national defendant, ARL.  We haven't gotten discovery from

25    the other defendants.  We've only gotten documents that

1    they've chosen to produce and --

2         THE COURT:  You know full well the approximate amount

3    of discovery that you will get from each of those.  I mean,

4    it's going to be the same as the one that you've already

5    gotten.  You got 28,000 from ARL.

6         MS. GREER:  But we need depositions as well.  We

7    can't just put documents in front of the jury with our

8    witnesses.  We have to have their witnesses.

9         THE COURT:  Give me an estimate of when you're going

10   to be ready for trial with this.

11        MS. GREER:  I would have to confer with my

12   co-defendants as well, but I can't see it happening before

13   next year, at the earliest.

14        THE COURT:  Next year is January.

15        MS. GREER:  January would be really no different from

16   December of this year.

17        I mean, the problem is that what we're talking about

18   is diverting all the attention to a single trial and taking it

19   away from trying to get a collective resolution.  The whole

20   point of the Bellwether process is to find cases that will

21   give us predictive values so that then we can make decisions.

22        THE COURT:  Okay.

23        MS. GREER:  And so, that's why this single trial is

24   so important and shouldn't be rushed because we've got to have

25   a vetting process, an adversarial vetting of the candidates to

1    figure out which case is really going to give us information

2    that we can believe in, that we can take back to our clients

3    and say, You know, if we try this case four more times, we're

4    going to get similar results.

5             THE COURT:  Okay.  I understand the position.  I will

6    receive your papers on the 30th and then decide it.  Thank

7    you.

8             MR. TARDIO:  Your Honor, very briefly, because we are

9    also impacted by this.  Chris Tardio for the Tennessee clinic

10   defendants.

11            I want to just very quickly make three points:

12            One, I won't rehash what's already been said, but the

13   six cases self selected by the plaintiffs are not

14   representative cases and they don't give us any predictive

15   value, particularly if you try them all in this consolidated

16   fashion, and we will brief this and explain why.

17            The second point is timing.  We don't believe that

18   December or January is realistic given the amount of discovery

19   that's going to need to be done.  I don't know that I can

20   commit to a time or date, but we do think it will be well into

21   2016 before a single case is ready to be tried.

22            The third point is, at least for my client, the

23   Tennessee clinic defendants, we do not waive lexicon.  We will

24   exercise our right to have the case tried --

25            THE COURT:  Just send it back.

1         MR. TARDIO:  Well, that -- and that gets to one issue

2    that will be addressed in our brief, which is at the end of

3    common discovery, whether -- if all of the national defendants

4    truly are settled and the bankruptcy plan is closed or the

5    bankruptcy is closed, whether the MDL process is still

6    appropriate or whether the Tennessee subset of cases should be

7    sent back for management in Tennessee, and that's something we

8    will address in our briefing, but our position is simply that

9    the timing proposed by the PSC is not realistic and that these

10   are not representative cases and we should select a -- or a

11   few representative cases.

12         THE COURT:  Okay.

13         MR. CHALOS:  Your Honor, may I respond briefly?  Very

14   briefly.  Mark Chalos on behalf of the Plaintiffs' Steering

15   Committee.

16         If there needs to be a Bellwether process, so be it.

17   We can do that.  They have every medical record on every

18   single plaintiff.  Part of the Tennessee process requires that

19   the plaintiffs execute HIPAA authorizations to all the

20   defendants so that they can gather medical records.  So --

21   there are patients who were treated at Saint Thomas.  So, they

22   have those records, anyway, but for the others who were not,

23   they've got every piece of information they need to evaluate

24   the cases.  In fact, I heard Mr. Tardio say affirmatively

25   these are not representative cases, which suggests that they

1    have undertaken to determine what a representative case is in

2    order to decide these are not.

3           So, if we need to do a Bellwether process between now

4    and November, December in some streamline basis, we can

5    certainly do that and each side can propose cases for trial,

6    but I think what we need, your Honor, most from the Court is a

7    firm trial date that we can work backward from and I think we

8    can probably then agree on most or at least some of the

9    deadlines between now and then.  Thank you.

10          THE COURT:  Thank you.

11          MS. GREER:  Your Honor, may I briefly address this

12   notion that we have all the records that we need?

13          Discovery in individual cases has been stayed, except

14   for what we are just now getting in.  We just got the releases

15   very recently.  They started coming in -- for the most part,

16   the deadline was mid November of last year to get the

17   releases.  Then you have to send them to the providers and get

18   the records, which takes 60 to 90 days.  We're still getting

19   records in, and we've never deposed any of them.  We haven't

20   done any case-specific discovery except for the plaintiff

21   profile sheets and the records that we're now getting in.

22          The affidavit release that he referred to that has to

23   be filed with the case is a very limited release.  We have had

24   those records, but those relate to the treatment at the time.

25   They do not relate to the plaintiff's whole medical history,

1    which is the point we've been making and we've been wrestling

2    with these discovery issues for many months now.

3          Judge Boal has set out a process and it sounds to me

4    like we should follow that process and, again, the Bellwether

5    selection is set up to have a meet-and-confer deadline of

6    April 16th, which is not that far away, and briefing by May

7    16th if we can't come to terms.

8          THE COURT:  Okay.  I will receive whatever you want

9    to file by whatever date you have to file it and consult with

10   Judge Boal.

11         MS. GREER:  Thank you.

12         THE COURT:  And then decide.

13         MR. SCHRAMEK:  Thank you.

14         MS. JOHNSON:  Turning to agenda Item 6(c), the

15   Plaintiffs' Steering Committee has filed a motion asking the

16   Court to appoint Annika Martin as the designated pro se

17   liaison.

18         THE COURT:  Assuming there's no objection.

19         MS. JOHNSON:  There has not been any objection filed,

20   your Honor.

21         THE COURT:  So, that's allowed.

22         MS. JOHNSON:  Thank you.

23         Related to that, we also -- I just draw the Court's

24   attention to the fact there is a pro se motion to intervene

25   that was sent to the Court that the Court referred to the

1    Plaintiffs' Steering Committee.  Ms. Martin went ahead and

2    filed that so that it at least appeared in the ECF system.

3            We suggest that the PSC -- I'm sorry, not the PSC.

4    Ms. Martin is happy to continue performing that role to the

5    extent that things make it to the Court that have not been

6    formally ECF'd.

7            In terms of Item 7, the status of the bankruptcy, I

8    turn to Mr. Gottfried.

9            MR. GOTTFRIED:  Good afternoon, your Honors.

10           As we indicated in our filing, which is Docket 1714

11   and 1715, on March 3rd, 2015 the bankruptcy court issued an

12   order approving the adequacy of the amended joint disclosure

13   statement, the solicitation and notice procedures with respect

14   to confirmation of the plan proponents' first amended joint

15   plan of reorganization, and the form of the various ballots

16   and notices in connection therewith.

17           The Court has set dates with respect to the following

18   matters:

19           Objections to the confirmation of the plan must be

20   filed by May 5.  The ballots, which were mailed out on March

21   6th, must be returned by March 5, and there's --

22           MR. ELLIS:  May.

23           MR. GOTTFRIED:  I'm sorry, May 5.  Mailed out on

24   March 6th.  They must be returned by May 5.  Thank you, Mr.

25   Ellis.  And the hearing to confirm the plan is scheduled for

1    May 19, at 10 a.m., before Judge Boroff.

2             THE COURT:  Okay.

3             MS. JOHNSON:  That brings us to No. 8, your Honor,

4    the status of appeals.  There has been an appeal pending in

5    the First Circuit.  Some of the Virginia plaintiffs appealed

6    from the order on bankruptcy jurisdiction and the transfer of

7    cases to this MDL stemming from that order.  The parties to

8    that appeal have submitted a joint stipulation asking that

9    that matter be stayed and the First Circuit has agreed to stay

10   that appeal.

11            THE COURT:  That brings us to the future.

12            MS. JOHNSON:  That brings us to the future, your

13   Honor.  I like that.

14            We currently have hearings scheduled -- I'm sorry --

15   status conferences scheduled for 2:00 p.m. before this Court

16   on April 29th.  That same day there's also an 11:30 hearing

17   before Judge Boal scheduled to address discovery matters.  We

18   next have a May 28th, 2 o'clock status conference before this

19   Court.

20            We'd ask that we schedule the June status conference

21   now.  I would suggest the last week in June, if that works for

22   the Court.

23            JUDGE BOAL:  I'll also put an 11:30 conference on May

24   28 just as a placeholder.  If there's nothing pending, then

25   I'll cancel it.

```
1              MS. JOHNSON:  Thank you, your Honor.

2              COURTROOM DEPUTY CLERK URSO:  Are we -- we're still

3    keeping the April 29th date, correct?

4              MS. JOHNSON:  Yes.

5              COURTROOM DEPUTY CLERK URSO:  Okay.  So, then May 28.

6    So, June --

7              THE COURT:  We also have May 28, right?

8              COURTROOM DEPUTY CLERK URSO:  Yes.  Yes.  So, the

9    week of the 22nd, is that what you're referring to for the --

10             MS. JOHNSON:  Yes.

11             COURTROOM DEPUTY CLERK URSO:  Okay.  So, we have the

12   Tuesday, Wednesday, Thursday open of that week with nothing

13   on.  Whatever day would be convenient for counsel.

14             MS. JOHNSON:  I would suggest Thursday, at 2:00.

15             COURTROOM DEPUTY CLERK URSO:  Yes, Thursday.  So,

16   June 25, at 2:00.

17             MR. GOTTFRIED:  Is it possible to do Wednesday

18   instead?

19             MS. JOHNSON:  That's fine.

20             COURTROOM DEPUTY CLERK URSO:  So, Wednesday, June

21   24th, at 2:00.

22             MS. JOHNSON:  That works for the plaintiffs.  Thank

23   you.

24             THE COURT:  Works for everybody.  And we'll have a --

25   we also have a placeholder 11:30 on that day with Judge Boal.
```

1          MS. JOHNSON:  That brings us, then, your Honor, there

2     are a list of fully-briefed motions here.  I don't believe any

3     of them need -- none have requested oral argument, but we're

4     happy to address those briefly if you would like.

5          THE COURT:  No. 13 is moot, right?

6          MS. JOHNSON:  I would like to think that it is moot,

7     but, technically, it's still a pending motion.  It is an

8     objection to the PSC's filing the --

9          THE COURT:  The declaration?

10          MS. JOHNSON:  -- the declaration with the words,

11     "under the pains and penalties."

12          THE COURT:  The case is settled.  It's effectively

13     moot.

14          MS. JOHNSON:  Oh, yes.  I'm sorry.  Yes, that is

15     moot, as is No. 11, your Honor.

16          THE COURT:  Right.

17          MS. JOHNSON:  On No. 10, Ms. Dougherty --

18          THE COURT:  Excuse me.  Well, No. 10 is a

19     stipulation.  So, that takes effect by stipulation, right?

20          MS. JOHNSON:  I believe the parties are requesting

21     your Honor's signature on that stipulation.

22          THE COURT:  Okay.  And then No. 12 is a motion to be

23     decided.

24          MS. JOHNSON:  That's correct.  And your Honor heard

25     oral argument on that previously.

1          THE COURT:  Right.  So, that's the only one to be

2     decided.

3          MS. JOHNSON:  Yes.  And then in terms of briefing in

4     progress, the only thing I would draw the Court's attention to

5     is that there is a motion to dismiss that's been filed by Box

6     Hill.  I understand that the parties are discussing what an

7     appropriate briefing schedule may be and may have something to

8     propose to the Court on that front before the next status

9     conference.

10          THE COURT:  Okay.  That's it.

11          MS. JOHNSON:  That's it.

12          THE COURT:  Does anyone have anything else?

13          (No response.)

14          THE COURT:  Thank you all very much, as usual.  Also

15     those on the telephone.

16          MR. SOBOL:  Thank you, your Honor.

17          MS. JOHNSON:  Thank you, your Honor.

18          (Adjourned, 3:04 p.m.)

19

20

21

22

23

24

25

```
1                      C E R T I F I C A T E

2            I, Catherine A. Handel, Official Court Reporter of the

3    United States District Court, do hereby certify that the

4    foregoing transcript, from Page 1 to Page 51, constitutes to the

5    best of my skill and ability a true and accurate transcription of

6    my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

7    Re: New England Compounding Pharmacy, Inc., Products Liability

8    Litigation.

9

10   March 29, 2015          /s/Catherine A. Handel
     Date                    Catherine A. Handel RPR-CM, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```