## EXHIBIT A

**Joint Motion of the Chapter 11 Trustee and the Official
Committee of Unsecured Creditors for an Order Approving Plan Support and Settlement
Agreement with Liberty Industries, Inc.**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) |
| | )   Chapter 11 |
| NEW ENGLAND COMPOUNDING | ) |
| PHARMACY, INC., | )   Case No. 12-19882 (HJB) |
| | ) |
| Debtor. | ) |
| | ) |

**JOINT MOTION OF THE CHAPTER 11 TRUSTEE AND**
**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN**
**ORDER APPROVING PLAN SUPPORT AND SETTLEMENT**
**AGREEMENT WITH LIBERTY INDUSTRIES, INC.**

Paul D. Moore, the Chapter 11 Trustee (the "Trustee") for the bankruptcy estate of New

England Compounding Pharmacy, Inc. ("NECC" or the "Debtor"), and the Official Committee

of Unsecured Creditors of NECC (the "Official Committee", and together with the Trustee, the

"Movants"), by and through their undersigned counsel, hereby move this Court (this "Motion")

for entry of an order approving a Settlement Agreement (the "Settlement Agreement") with

Liberty Industries, Inc. ("Liberty") and Great American E&S Insurance Company ("Great

American").[1]  In support of this Motion, the Movants respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      The Trustee, in consultation with the Official Committee and the Plaintiffs'

Steering Committee,[2] has entered into the Settlement Agreement to resolve the claims and

potential claims between and among Liberty, its insurer, Great American, and NECC's

---

[1]   An executed copy of the Settlement Agreement is attached as Exhibit A.  Capitalized terms used but not defined herein have the meaning ascribed to them in the Settlement Agreement, as applicable.

[2]   The Plaintiffs' Steering Committee is a seven-attorney committee appointed to organize, simplify, and streamline the handling of the MDL Action (as defined herein) on behalf of all plaintiffs to actions therein.

bankruptcy estate.  The Movants submit that the proposed settlement is fair and equitable and decidedly in the best interests of NECC, its creditors and its estate.

2.      As this Court is aware, thousands of individuals have asserted claims, whether through civil litigation or the proof of claim process in this Chapter 11 case, alleging that they or their family members were sickened, injured or killed by tainted medications compounded by NECC.  The settlement with Liberty and Great American resolves claims that Liberty, in connection with its design, manufacture, and installation of the "cleanrooms" in which NECC's products were compounded, caused those harms.

3.      The settlement embodied in the Settlement Agreement is, moreover, another step towards funding the Movants' joint Chapter 11 Plan, which, if confirmed by this Court, will furnish a mechanism to provide meaningful compensation to NECC's long-suffering tort creditors.  For this reason, as more fully set forth herein, the Movants respectfully request that this Court enter an order approving the Settlement Agreement.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are Bankruptcy Code Sections 105 and 363 and Federal Rule of Bankruptcy Procedure 9019.

## BACKGROUND

5.      On December 21, 2012 (the "Petition Date"), NECC filed a voluntary petition for relief pursuant to chapter 11 of the United States Bankruptcy Code.

6.      On January 18, 2013, the Office of the United States Trustee (the "UST"), pursuant to Bankruptcy Code Section 1102(a)(1), appointed a nine (9) member Official Committee, eight (8) of whom are tort claimants of the Debtor holding personal injury tort and/or

wrongful death cases against the Debtor and others.[3]

7.      On January 25, 2013, this Court granted the UST's *Certificate of Appointment* appointing Paul D. Moore as Chapter 11 Trustee for NECC's estate.  Since his appointment, the Trustee, working in cooperation with the Official Committee, has viewed settlement negotiations with those parties that contributed to the Outbreak (as defined herein) as among his highest priorities.

8.      On December 3, 2014, the Trustee and the Official Committee jointly filed the *Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1054] (as amended at Dkt. No. 1154, the "Plan") and the *Disclosure Statement for the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1053] (as amended at Dkt. No. 1162, the "Disclosure Statement").  On March 3, 2015, this Court entered an order approving the Disclosure Statement.  *See* Dkt. No. 1181.  This Court has scheduled a hearing to consider confirmation of the Plan for May 19, 2015.

9.      The Plan provides that, *inter alia*, holders of unsecured personal injury and wrongful death claims against NECC will receive, in exchange for their claims, shares in a "Tort Trust" funded by the proceeds of the Trustee's settlements with (i) NECC's shareholders, affiliates, and insurers, and (ii) non-NECC affiliates, including NECC's vendors and clinics and health care providers that administered preservative-free methylprednisolone acetate ("MPA") compounded by NECC.  In sum, the Movants anticipate that the Tort Trust will have an aggregate of more than $160 million to $190 million in cash available for distribution to holders of allowed tort claims (including, if the Settlement Agreement is approved, a $1 million settlement payment from Liberty and Great American).

---

3       The ninth member of the Committee is NStar Electric Company.

A.        **The Debtor's Prepetition Operations**

10.       Prior to the Petition Date, NECC operated as a compounding pharmacy. Beginning in September 2012, reports began to surface of several patients who contracted fungal meningitis (the "Outbreak") after receiving injections of MPA compounded by NECC.  An investigation was initiated by the Massachusetts Department of Public Health ("MDPH") and, two days later, on September 26, 2012, NECC issued a voluntary recall of three suspect lots, containing 17,646 doses of MPA that NECC had distributed to over 14,000 patients.  The Centers for Disease Control and Prevention ("CDC") reported that, as of October 23, 2013, 64 people had died and 751 individuals had fallen ill.[4]

11.       Upon information and belief, on October 1, 2012, the MDPH issued a formal quarantine notice pursuant to M.G.L. ch. 94C, §§ 13 & 189A, and M.G.L. ch. 112, §§ 30 & 42A, requiring NECC to preserve all products used to compound MPA, including products returned from pharmacies.

12.       Upon information and belief, in response to October 2, 2012 findings from the United States Food and Drug Administration ("FDA") and the MDPH, the Massachusetts Board of Registration in Pharmacy (the "Board") voted to request a voluntary surrender of NECC's pharmacy license.  NECC surrendered its license effective at noon on October 3, 2012 and further instituted a voluntary recall of all of its intrathecal medications, which are designed for injection near the spinal cord or brain.

13.       The FDA and the CDC recommended that all health care providers cease using, and remove from inventory, any NECC products.  At the behest of the MDPH, NECC issued an

---

[4]    Reported at http://www.cdc.gov/HAI/outbreaks/meningitis-map-large.html#casecount_table. The CDC has not updated the case counts since October 23, 2013 and indicates that further updates to the case counts are not anticipated.

immediate recall of all of its products, and Barry Cadden and Mr. Glenn Chin (a pharmacist and former employee of NECC) surrendered their pharmacist licenses pending the outcome of the investigation.

14.     The Outbreak has resulted in potentially tens of thousands of claims from personal injury claimants against NECC and others.  NECC claims it initiated this Chapter 11 case in response to the volume and wide geographic distribution of cases it confronted.  To date, over three hundred separate lawsuits have been joined in the multi-district litigation pending in the United States District Court for the District of Massachusetts (the "MDL Court"), and are pending before the Honorable Rya W. Zobel (the "MDL Action").[5]  In addition, some 3,300 claims asserting injury from injections of MPA have been submitted to the Trustee's claims and noticing agent, Donlin, Recano & Co.

15.     Shortly prior to the Petition Date, NECC suspended the operation of its business.  NECC also surrendered its Massachusetts pharmacy license and laid off most of its employees.  The MDPH also has temporarily barred former pharmacists for NECC from practicing pharmacology.   On December 16, 2014, a federal grand jury sitting in the District of Massachusetts returned a 131-count indictment against Messrs. Cadden and Chin, as well as twelve other NECC-affiliated individuals, relating to the Outbreak.

**B.     Claims and Proceedings Against Liberty by Third Parties**

16.     Liberty is a small, family-held corporation with approximately 24 current employees.   Liberty's business involves the construction of aseptic cleanrooms for the pharmaceutical industry.  Liberty's gross annual revenue is in the low seven figures, and Liberty has no significant tangible assets -- its value exists only as an operating business.

---

[5]     Case No. 1:13-md-02419-RWZ, *In re New England Compounding Pharmacy, Inc. Products Liability Litigation*.

17.     Liberty designed, manufactured, and installed the so-called "cleanrooms" NECC used to compound its products, including MPA.  Nearly 100 lawsuits naming Liberty as a defendant have been joined in the MDL Action, each of which alleges that Liberty, in connection with its construction of the NECC cleanrooms, is liable to plaintiffs for its acts and omissions that resulted in the alleged contamination of NECC's products, which contamination allegedly caused grievous personal injury and death.

18.     To the extent that Liberty caused or is responsible for the Outbreak, the Movants believe that the Trustee also has claims against Liberty for damage caused to NECC, including claims against NECC and its estate on account of death or personal injury, resulting from the Outbreak.

**C.      Settlement Negotiations with Liberty**

19.     On August 15, 2013, the MDL Court entered an Order on Mediation [MDL Dkt. No. 394] (the "Mediation Order") establishing mediation protocols (the "Mediation Program") for non-NECC affiliates, such as NECC's vendors (like Liberty) and pain clinics and medical care providers, that may be exposed to liability in connection with the Outbreak.  On November 18, 2014, Liberty filed a notice of participation in the Mediation Program.

20.     On May 28, 2014, the Trustee, representatives of Liberty, Great American, the Official Committee and the Plaintiffs' Steering Committee attended an in-person mediation session supervised by Carmen Reiss of Resolutions LLC (which firm was appointed mediator under the Mediation Program).  Although the parties were unable to reach settlement on that day (and indeed, on June 13, 2014, Liberty formally withdrew from the Mediation Program), negotiations continued by phone and email until a settlement in principle was reached in late March of 2015.  Additional negotiations resulted in the parties' agreement to the terms of the Settlement Agreement.

**D.**     **Great American's Declaratory Judgment Action**

21.     On April 4, 2014, while the parties were preparing for mediation under the Mediation Program, Great American, Liberty's primary insurer, and the issuer of the policy (the "Great American Policy") that is the source of over half of the settlement consideration, filed a Complaint for Declaratory Relief (a copy of which is attached hereto as Exhibit C) in the United States District Court for the District of Connecticut (commencing the "Declaratory Judgment Action").  The Great American Policy covers a policy period of January 20, 2012 to January 20, 2013 and has a $2 million aggregate limit and a $1 million per occurrence limit.[6]

22.     In the Declaratory Judgment Action, Great American makes several arguments, based on express exclusions contained in the Great American Policy, as to why it is not required to provide coverage to Liberty for the injuries and deaths that resulted from NECC's tainted products.   Of particular relevance is the Great American Policy endorsement entitled the "Organic Pathogen Exclusion," which provides as follows:

> A. The following exclusion is added to paragraph 2., Exclusions, of Section I. Coverages Bodily Injury and Property Damage Liability
>
> 2. Exclusions
>
>    This insurance does not apply to:
>
>    Organic Pathogens
>
>    a. Any "bodily injury" which would not have occurred, in whole or in part, but for the actual, alleged, threatened, or suspected inhalation of, exposure to, discharge, dispersal, seepage, migration, growth, release or escape, or contact with any "organic pathogen."
>
>                                         * * *

---

[6]     Great American also issued an excess liability policy to Liberty for the same policy period.  That excess policy is subject to the same definitions and exclusions as the Great American Policy, and has a $4 million aggregate and per occurrence limit.

This exclusion applies regardless of the circumstances of or leading to such actual, alleged, threatened, or suspected inhalation, ingestion, exposure, contact, existence, or presence.

\* \* \*

C. The following definition is added to the Definitions section: "Organic pathogen" means any bacteria including Escheria coli, Salmonella, Listerium, microbe, virus, fungi, mold, mildew, mycotoxins, spores, or their scent or byproducts.

23.     If Great American were successful in its argument that the Organic Pathogen Exclusion (among others) applies to the injuries suffered by NECC's tort creditors, these exclusions would result in no insurance being available to Liberty in connection with its liabilities with respect to the Outbreak.  Great American also seeks to limit its coverage based on the argument that the injuries and deaths that resulted from NECC's tainted products were not caused by an "occurrence" as defined by the applicable policy, and further, that if the injuries and deaths are found to be an "occurrence," then all fungal injury claims constitute a single "occurrence" (which is defined in the Great American Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful condition.").

24.     The Declaratory Judgment Action is currently stayed pending the ultimate outcome of Liberty's settlement negotiations with the Trustee (*i.e.*, pending this Court's consideration of the Settlement Agreement and confirmation of the Plan).

25.     For the reasons more fully described herein, the Movants and the Plaintiffs' Steering Committee all agree that the contemplated settlement, as set forth in the Settlement Agreement, is fair and reasonable and in the best interests of NECC's estate and creditors and, under the circumstances, will provide the certainty of Liberty's and its insurer's funds being presently available for distribution to NECC's creditors without the burden, expense, delay and

uncertainty of litigation.   Accordingly, the Movants respectfully request that this Court enter an

order approving the Settlement Agreement.

## PROPOSED COMPROMISE

26.     The essential terms of the Settlement Agreement, which is subject (except where

otherwise noted) to entry of an order approving this Motion, are summarized as follows:[7]

- **Settlement Payments:**  On or before five (5) days after entry of the Confirmation Order, Liberty and Great American will each direct a settlement payment to the Trustee, in trust, in the following amounts:  (i) in the case of Liberty, $450,000; and (ii) in the case of the Great American, $550,000.[8]  The settlement payments will be held in the IOLTA Attorney Trust Account of the Trustee's counsel, Duane Morris LLP, to be released to the Trustee on the Plan Effective Date. Upon the release of the settlement funds, the Trustee shall use those monies to make distributions under the Plan, including pursuant to the Tort Trust and to satisfy the costs and expenses of the administration of the Chapter 11 case.  *See* Settlement Agreement § II.

- **Plan Releases/Injunctions:**   Upon confirmation, the Plan shall provide for a release, on the Plan Effective date, of Liberty and Great American from any and all Claims asserted or that could be asserted by any Person against Liberty and/or Great American for personal injury, tort, wrongful death, medical monitoring, or any other economic or noneconomic injury or damage, based upon, arising out of or in any way related to the preparation of or administration to Persons of injectable methylprednisolone acetate, cardioplegia solutions or any other drugs or products compounded, produced, sold or distributed by NECC.  *See* Settlement Agreement § VI.

- **Amendment of the Plan:**  The Settlement Agreement requires the Trustee to move this Court (i) for leave to amend the Plan to effectuate the terms and provisions of the Settlement Agreement (in particular, to include Liberty and Great American as among the beneficiaries of the release and injunctions of the Plan) and (ii) for an order finding that such amendment is non-material and, therefore, does not require the Movants (as Plan Proponents) to resolicit

---

[7]   The description of the proposed settlement and the Settlement Agreement in this Motion is only a summary. The Settlement Agreement controls in all instances to the extent the summary is incomplete, inaccurate or conflicts with the Settlement Agreement.  Parties in interest should review the Settlement Agreement in its entirety as to all of its terms and conditions.

[8]   In the Declaratory Judgment Action, Great American represents that it has issued six policies to Liberty as named insured (including the Great American Policy and the excess policy described in note 6, *supra*). However, the nature and policy periods of those policies are such that only the Great American policies covering 2012 are applicable to the injuries suffered by individuals to whom NECC drugs were administered.

acceptances or rejections of the Plan and incur the related expense and delay.  *See* Settlement Agreement § IV.

- **Plan Support:**  Liberty and Great American agree to support and not oppose or object to the Plan.[9] Liberty and Great American's agreement to support the Plan is not conditioned on approval of this Motion, and indeed, Liberty and Great American are bound to support the Plan even if this Motion is not approved.  *See* Settlement Agreement § IV.[10]

- **Waiver and Assignment of Claims:**  Upon the Plan Effective Date, each of Liberty and Great American will either (a) irrevocably waive, relinquish and release (i) any and all Claims (whether or not a proof of claim is filed) of any kind or character it holds against the Debtor or its estate and (ii) any and all rights to distributions or recoveries, of any kind or character, on account of such Claims including, without limitation, pursuant to the Plan or (b) irrevocably assign such Claims to the NECC Trustee (at the NECC Trustee's discretion).  Such waiver or assignment shall be effective without regard to whether the Confirmation Order is or becomes a Final Order on the Plan Effective Date, and shall continue to remain in effect notwithstanding any appeal, modification, or reversal of the Confirmation Order.  *See* Settlement Agreement § V.

- **Adjournment of Claim Objection:**  The Settlement Agreement requires Liberty and the Trustee to jointly seek adjournment of the hearing on the Claim Objection, up to and including the date of the entry of an order of this Court on this Motion. *See* Settlement Agreement § IV(c).

- **Stay of MDL Proceeding:** As soon as reasonably practicable, Liberty will file a motion with the MDL Court (the "MDL Stay Motion") requesting entry of an order of the MDL Court staying the MDL Proceeding as to Liberty through the earlier of the Plan Effective Date or Termination of the Settlement Agreement (the "MDL Stay Order").  The stay requested in the MDL Stay Motion will include a prohibition against any party to the MDL Proceeding seeking dispositive relief, or any form of prejudgment security, including, but not limited to, and, attachments, injunctions, writs or orders of any nature with regard to Liberty, but will permit discovery against Liberty, only to the extent the discovery is relevant to the prosecution or defense of claims against defendants other than Liberty.  The effectiveness of the Settlement Agreement, and Liberty's and Great

---

[9]   Before signing the Settlement Agreement, Liberty objected to the approval of the Disclosure Statement, and indicated its intention to object to the Plan.  *See Objection of Liberty Industries, Inc. to the Corrected Disclosure Statement for Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1128]. The Settlement Agreement now forecloses any such objection.

[10]   Both the Official Committee and the Plaintiffs' Steering Committee have indicated their support of the Funding Agreement, including the Plan Support provisions.  *See* Addendum to Settlement Agreement (providing in pertinent part that "[e]ach of the Committee and the PSC is in favor of the [Settlement] Agreement and the compromise and settlement embodied" in the Settlement Agreement and that "[e]ach of the Committee and the PSC supports the Bankruptcy Court's approval of the [Settlement] Agreement in all respects.").

American's Plan support obligations thereunder (described *supra*), are not conditioned on entry of the MDL Stay Order. *See* Settlement Agreement § III(a).

## ARGUMENTS AND AUTHORITIES

### A.   Standard for Determining Motion

27.   Pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure, this Court has authority to approve a compromise or settlement. *See* Fed. R. Bankr. P. 9019(a).  The decision to approve a settlement or compromise lies within the discretion of the bankruptcy court, and is warranted when the settlement is found to be reasonable and fair in light of the particular circumstances of the case. *See Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968).  In evaluating whether a settlement is fair and reasonable, a bankruptcy court need not be convinced the settlement is the best possible compromise or that the estate has maximized its recovery.  Rather a settlement or compromise should be approved as fair and reasonable as long as it does not "fall below the lowest point in the range of reasonableness." *In re Healthco Int'l, Inc.*, 136 F.3d 45, 51 (1st Cir. 1998) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).  The Trustee is better situated than is any individual creditor to determine whether a settlement is in the best interests of the estate, and his informed judgment, after reasonable investigation, to settle and avoid the inherent risks, delays and expense of prolonged litigation is entitled to "wide latitude" from an inquiring court. *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 212 F.3d 632, 635 (1st Cir. 2000) (citing *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l., Inc.)*, 136 F.3d 45, 50 – 52 (1st Cir. 1998); *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1145 (1st Cir. 1992)).

28.   When evaluating a proposed compromise, a bankruptcy court must assess and balance the value of the claim that is being compromised against the value to the estate by virtue

of the compromise proposed.[11]   Bankruptcy courts consider the following factors in determining

whether the proposed settlement is in the best interest of the debtor's estate:  (1) the probability

of success in the litigation being compromised; (2) the difficulties to be encountered in the

matter of collection; (3) the complexity of the litigation involved and the expense, inconvenience

and delay in pursuing the litigation; and (4) the paramount interests of the creditors, and a proper

deference to their views.  *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc.*

*v. Anderson, supra; Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995); *see also In re Martin*,

91 F.3d 289 (3d Cir. 1996).

**B.**      **The Proposed Compromise is Fair and Reasonable and Should be Approved**

29.      The Movants submit that the proposed compromise embodied in the Settlement

Agreement is fair and reasonable and should be approved.  The Settlement Agreement is the

product of extended and intensive arm's-length negotiations that resolve complex and difficult

disputes and produce substantial cash to this estate for the benefit of its creditors.  Under the

circumstances, each of the relevant considerations for determining whether the settlement is in

the best interest of NECC's estate is satisfied.

>       i.      The Probability of Success in the Litigation Being Compromised
>               Weighs in Favor of Approving the Proposed Settlement

30.      The prospects for recovery in any litigation the Trustee or others may bring

against Liberty relating to the Outbreak are far from certain.  In evaluating the estate's and its

creditors' claims against Liberty for damages resulting from the contaminated MPA lots, it is

---

[11]      Although not directly on point, this Court's observations in a different case regarding the test for confirmation
of a chapter 11 plan where a chapter 11 debtor seeks to provide releases are instructive.  This Court observed
that "there are only two questions: and the first one is, is there some consideration for the release; and then the
second one is, does the release benefit the estate?"  *In re Northern Berkshire Healthcare, et. al.*, Case No. 11-
31114-HJB, Transcript of April 2, 2012 Hearing [Notice of Filing of Transcript at Docket No. 653] at 37::9-13).
The Movants submit that the releases the Trustee contemplates providing to Liberty and Great American
pursuant to the Settlement Agreement satisfy this standard.

necessary to examine not only Liberty's conduct in constructing NECC's clean rooms some years before the Outbreak, but also to consider Liberty's defense that, even if NECC could prove negligence, Liberty's negligence was not a proximate cause of the injuries suffered by any of the personal injury claimants.  To rebut Liberty's causation defense, experts would be required to engage in extensive forensic analyses of NECC's operations.  In order to prove that Liberty's negligence proximately caused the injuries to the victims, it would be necessary to retain experts who could testify as to what caused the adulteration of the MPA lots and when the contamination occurred.  Proving that Liberty acted negligently and that its negligence caused the injuries suffered by victims would not be simple, inexpensive, quick or convenient.  Moreover, the losing party could appeal, leading to further delay, complexity and expense.

31.     In addition, to prevail against Liberty, the NECC estate (and personal injury claimants) might be in the anomalous position of relying upon the testimony of some of NECC's own shareholders regarding NECC's course of dealing with Liberty.  This could pose difficulties as, upon information and belief, those individuals likely would assert their rights to withhold testimony under the Fifth Amendment to the United States Constitution, which could make obtaining a recovery against Liberty all the more challenging (and moreover, as described above, those individuals have now been indicted for crimes arising from, *inter* alia, their operation of NECC and/or their compounding of the tainted drugs).  As time passes, it will also likely become more difficult to obtain reliable testimony concerning when and how the contamination occurred.

32.     Finally, in any litigation the Trustee might bring against Liberty for its role in the Outbreak, Liberty could and likely would assert NECC's relative negligence in connection with the contamination of NECC's products.  Indeed, Liberty has asserted a substantial claim against the NECC estate for contribution and indemnity on just that basis.  *See* Claim Nos. 65, 65-2.

33. In sum, while the Movants believe that the NECC estate (and personal injury claimants) has substantial claims against Liberty, they are also mindful that litigation is inherently risky and that the difficulties summarized above make success in litigation far from certain. The Liberty settlement bypasses those difficulties, as well as the worst case scenario for NECC and its creditors: that litigation might result in a finding in favor of Liberty.

      ii. The Complexity of the Litigation Involved, the Expense, Inconvenience and Delay in Pursuing the Litigation, and the Difficulties to be Encountered in the Matter of Collection Weigh Heavily in <u>Favor of Approving the Settlement Agreement</u>

34. Even if the Trustee and the estate were to prevail in litigation against Liberty, it is unlikely the estate could collect more from Liberty and Great American than they have agreed to contribute, regardless of the nature of the claims the estate may assert against Liberty.

35. As described above, Great American has taken a hardline position with respect to its coverage obligations vis-à-vis Liberty: namely, that it has none. Liberty, a small, family-held corporation whose annual gross revenue is in the low seven figures, has also repeatedly and credibly represented that it is rapidly running out of available cash and may indeed be on the verge of bankruptcy itself. *See, e.g.,* Tr. of Proceedings Held June 19, 2014, Case No. 1:13-md-02419-RWZ, *In re New England Compounding Pharmacy, Inc. Products Liability Litigation*, at 28:16-19 (representing that "it may be that . . . [it] is headed straight for bankruptcy court."); Tr. of Proceedings Held Dec. 4, 2014 motion hearing and status conference, 24:8-17, 24:19-24 (informing the Court that "Liberty will not be filing an opposition" to its insurer's motion for summary judgment in the declaratory judgment action, and that "the motion will enter and we could have a lack of insurance coverage by the time that hearing [on Liberty's motion for summary judgment] comes around, your Honor. Liberty will be out of insurance. And at that point, due to its financials, it's going to have to file for bankruptcy. . . . We told the Plaintiffs'

Steering Committee that there's been bankruptcy counsel hired.  Schedules have been made.  We were trying to see – Liberty was trying to get as much as it could out of its insurers before then.  That's the urgency of deciding the motion [Liberty's motion for summary judgment] today, your Honor.").  And as described above, Liberty has been named in nearly 100 civil actions brought by victims of the Outbreak.  Even one judgment in favor of a plaintiff would likely exhaust Liberty's remaining assets (to the detriment of all other individuals with claims against Liberty).  It is thus far from clear that there would be anything left for the Trustee and the NECC estate to recover even if successful in a costly, protracted litigation.

36.    In any event, the alleged harm suffered by personal injury claimants dwarfs Liberty's available assets under any realistic analysis.  Thus, the measure of the settlement is not whether Liberty will have paid enough to satisfy all allowed claims in full – almost certainly it will have not – but rather, whether the settlement produces a greater recovery from Liberty for NECC's bankruptcy estate than is likely to be achieved absent a settlement.  The Movants respectfully submit that, given Liberty's rapidly-diminishing assets and the substantial risk to its insurance coverage posed by Great American's persuasive position on coverage in the Declaratory Judgment Action, it does.

iii.    The Paramount Interests of Creditors Are Best Served by the Settlement
       Contemplated by the Settlement Agreement

37.    In considering the specific *TMT* and *Jeffrey v. Desmond* factors, and the circumstances of this case, the Movants submit that the fourth factor – the "paramount" interests of creditors – weighs in support of the proposed settlement.  The Movants are mindful that the creditors' interests, two years after the Outbreak, have not yet been vindicated.  Personal injury claimants who have suffered grievous harm and have incurred and continue to incur substantial medical expenses cannot wait, and should not be required to wait the resolution of difficult,

15

costly and protracted litigation against Liberty if the contemplated settlement is not approved, particularly if Liberty's available funds are exhausted in the meantime and its insurance lost as a result of the insurer's potential success in its declaratory judgment action.

38.     Additionally, the contemplated settlement furthers the progress of NECC's bankruptcy case and provides additional support for, and removes a significant objection to, a Plan that will provide meaningful compensation to NECC's creditors (the vast majority of which are personal injury claimants).  Liberty has been an active participant in these proceedings and has made clear, at every turn, its intention to object to the Plan, to which the Movants (as Plan Proponents) will need to respond, utilizing estate resources and assets.  *See, e.g., Objection of Liberty Industries, Inc. to the Corrected Disclosure Statement for Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1128].  By contrast, the Settlement Agreement includes *irrevocable* plan support provisions, whereby Liberty and Great American agree to support and not object to the Plan *even if this Motion is not approved*.  The settlement thus eliminates a vigorous objection to the Plan (and the expense to the estate of the Plan Proponents in responding thereto) and provides another step towards confirmation thereof.  In this regard, the Movants firmly believe the proposed settlement is in the best interests of NECC's creditors.

39.     Moreover, as evidenced by paragraph 3 of the addendum to the Settlement Agreement (and by the Official Committee's joint making of this Motion), the Official Committee and the Plaintiffs' Steering Committee support the Court's approval of the Settlement Agreement "in all respects."   By definition, this includes the plan support provisions that contemplate a chapter 11 plan containing the necessary third party releases.  The support by the Official Committee and the Plaintiffs' Steering Committee for approval of the Agreement and the Plan evidences creditor support to accept the Plan (as does the Official Committee's role as

co-proponent of the Plan).  Indeed, none of the hypothetical alternatives to the Plan will produce more for creditors, including those who allegedly suffered personal injury as a result of the Outbreak and are struggling financially as a result of substantial, ongoing medical expenses and reduced or lost employment, than will the Plan.

40.     Under these circumstances, the Movants do not believe the "paramount" interests of creditors are served if the Trustee is compelled to pursue complex and difficult litigation that is likely to remain unresolved for the indefinite future and to: (a) forego a settlement that removes a significant obstacle to confirmation of the Plan; (b) risk loss or diminution of assets which the estate might recover from Liberty in any litigation (during which the limited available assets of Liberty would certainly be exhausted); and (c) risk loss of what is, under the circumstances and given Great American's strong insurance coverage defenses, a meaningful contribution from Great American.

41.     Finally, as noted above, the Official Committee and the Plaintiffs' Steering Committee support this Motion (indeed the Official Committee is one of the Movants) and assent to the requested relief.  Thus, the Trustee's "proper deference" to the views of the creditors further supports the determination that the contemplated settlement is fair and reasonable and that this Motion should be allowed.

**C.     The Plan Support Provisions of the Settlement Agreement are Fair and Reasonable, and Should be Approved**

42.     As noted above, the Settlement Agreement (in Section IV) contains extensive provisions that require Liberty to support the Plan.  These "plan support provisions" are a significant component of the settlement and a material term in the Settlement Agreement, and

should be approved.[12]

43.     The case law on the propriety of plan support agreements is evolving.  Most recently, the court in *In re Indianapolis Downs, LLC,* 486 B.R. 286 (Bankr. D. Del. 2013), denied a request by certain creditors to designate the votes of other creditors to a "Restructuring Support Agreement" and not count those votes pursuant to 11 U.S.C. §§ 1125(g) and 1126(e).  In denying the motion, the court relied upon *In re Century Glove,* 860 F.2d 94 (3rd Cir. 1988).  In *Century Glove*, which the *Indianapolis Downs* court characterized as the "seminal case [in the Third Circuit] construing solicitation and the designation of votes," the court affirmed the denial of a motion to designate votes of a creditor who had circulated an alternative plan to the creditors committee seeking to garner that body's support.  The Third Circuit ruled that "solicitation must be read narrowly" and that a broad reading "can seriously inhibit free creditor negotiations." *Id.* at 101.

44.     Although this Court has questioned the Third Circuit's reasoning in *Century Glove*, this Court's precedent is entirely consistent with *Indianapolis Downs* and its holding that creditors signing a plan support agreement have not violated the bankruptcy code.  In *In re Clamp-All Corp.*, 233 B.R. 198 (Bankr. D. Mass. 1999), a creditor filed an objection to a disclosure statement, attaching as an exhibit a full copy of a disclosure statement and alternative, competing reorganization plan.  This Court held that such conduct violated Sections 1121(b) and 1125(b) of the Bankruptcy Code as well as Federal Rule of Bankruptcy Procedure 3017(a).  Nevertheless, this Court emphasized that "open negotiation by creditors is imperative." *Id.* at

---

[12]     The Movants note that this Court has approved Settlement Agreements containing nearly identical plan support provisions in connection with the Trustee's settlements with NECC's shareholders and insurers.  *See Order Approving Plan Support, Funding Agreement and Related Escrow Agreement With Insiders of Debtor, and Granting Related Relief* [Dkt. No. 972]; *Order Pursuant to Fed. R. Bankr. P. 9019 Approving the Settlement Agreement and Mutual Release Between the Chapter 11 Trustee, Pharmacists Mutual Insurance Company, Maxum Indemnity Company and Individual Insureds* [Dkt. No. 970].

206.   This Court characterized the "difficult task" as "distinguishing between permissible negotiations and prohibited solicitations. . . ."  *Id.*  To pass muster as permissible negotiations, such "negotiations must be conducted in a manner consistent with the policy goals intended by Congress to be effectuated through sections 1121(b) and 1125(b) of the Bankruptcy Code."  *Id.*

45.   This Court's principal disagreement with *Century Glove* concerned the impairment of a chapter 11 debtor's exclusive right to solicit acceptances and rejections of a plan under 11 U.S.C. § 1121(d) arising from the disclosure by dissenting creditors of a potential, alternative plan.[13]  Exclusivity concerns do not exist here, as NECC's exclusive rights to solicit acceptances and rejections of a plan were terminated, pursuant to 11 U.S.C. § 1121(c)(1), on the day the Trustee was appointed.  Here, the parties entered into the plan support agreement to build support for, and not rejection of, the Movants' Plan.  Indeed, Section IV(f)(i) of the Settlement Agreement contemplates that solicitation of the Liberty's and Great American's votes will occur (and indeed already has occurred in accordance with Court's order approving the Disclosure Statement) separately, in accordance with 11 U.S.C. §§ 1125 and 1126, and expressly conditions the Liberty's and Great American's commitments to vote to accept the plan on the proper solicitation of their votes pursuant to those sections of the Bankruptcy Code.  The potential impairment of NECC's terminated exclusivity rights under 11 U.S.C. § 1121, so critical to this Court's *Clamp-All* opinion, simply is not at issue or relevant here.

46.   The remaining concern raised by *Clamp-All* is whether the negotiations and the plan support provisions of the Settlement Agreement "are consistent with the policy goals

---

[13]   This Court wrote: "This Court believes that the *Century Glove* analysis fails to sufficiently recognize Congress' intention to allow the debtor a reasonable time to obtain confirmation of a plan without the threat of a competing plan.  Therefore, whether a creditor's action during the exclusivity period violates § 1121(b) must be evaluated not only in terms of its effect on the ability of a debtor to delay reorganization, but also in terms of its interference with the debtor's efforts to propose and confirm a plan of reorganization."  *Clamp-All*, 233 B.R. at 207-08 (citation omitted).

intended by Congress to be effectuated through section[ ] . . . 1125(b) of the Bankruptcy Code."
*Id.* at 206.  Section 1125(b) requires a written disclosure statement, approved by the bankruptcy
court as containing adequate information, be transmitted to creditors, together with a plan or a
summary of the plan, prior to any post-petition solicitation of votes for or against the plan.  *Id.* at
208.  This Court noted that the requirement of advance court approval "was thought to
discourage the undesirable practice . . . of soliciting acceptance or rejection at a time when
creditors and stockholders were too ill-informed to act capably in their own interests."  *Clamp-
All Corp.*, 233 B.R. at 206 (citations and internal quotations omitted).

47.    Unlike with respect to the Section 1121 issues, *Indianapolis Downs* not only is
consistent with *Clamp-All* with respect to the Section 1125 issues, but, indeed, cites to *Clamp-All*
in finding that "the interests that § 1125 and the disclosure requirements are intended to protect
are not at material risk [from the plan support agreement] in this case."  *In re Indianapolis
Downs, LLC,* 486 B.R. at 295-96.  Here, as in *Indianapolis Downs*, Liberty and Great American
are "sophisticated. . . players and have been represented by able and experienced professionals
throughout these proceedings."  *Id.* at 296.  "[T]he entities whose votes are targeted [here,
Liberty and Great American] cannot seriously be characterized as too ill-informed to act capably
in their own interests."  *Id.* (quoting *In re Heritage Organization, LLC*, 376 B.R. 783, 794
(Bankr. N.D. Tex. 2007)).

48.    In sum, this Court acknowledged that "the *Century Glove* court's concern that a
broad reading of § 1125(b) could limit creditor communications and negotiations."  *Clamp-All*,
233 B.R. at 209.  Such an anomalous result, which *Indianapolis Downs* avoided partly in
reliance upon *Clamp-All*, would occur here if this Court does not approve the plan support
provisions of the Settlement Agreement.  The negotiations and the Settlement Agreement are all

"consistent with the policy goals intended by Congress to be effectuated through . . . the Bankruptcy Code." *Clamp-All*, 233 B.R. at 209.  There is no plan competing with or proposed as an alternative to the Movants' Plan that Liberty and Great American were solicited to accept. NECC's exclusivity period has terminated, and the Settlement Agreement contemplates, and is conditioned upon, subsequent, proper solicitation of all votes, including those of the Liberty and Great American, under Bankruptcy Code Sections 1125 and 1126 (and again, in accordance with Court's order approving the Disclosure Statement, that solicitation has already begun).  The plan support provisions operate to ensure Liberty and Great American do not seek to interfere with confirmation of the Movants' Plan or take any other action that may result in the escrowed settlement funds being returned to them rather than used to fund payments to holders of allowed claims under the Plan.  The plan support provisions operate to foster, rather than disrupt, the formulation and confirmation of the Movants' plan to maximize the recovery of creditors consensually, without a battle between competing plans.  Accordingly, the Movants submit that this Court can and should approve the Settlement Agreement in its entirety, including the plan support provisions in Section IV thereof.

## CONCLUSION

49.     In summary, the Movants submit that approval of the Settlement Agreement is both necessary to cause the expeditious administration of the Debtor's estate and payment to the Debtor's creditors, and appropriate as reflecting the paramount interest of the Debtor's creditors in receiving compensation for injuries allegedly caused by Liberty (among others).  The Movants have proposed a plan that provides for distribution of the proceeds of the Liberty settlement, as well as the significant proceeds of the Trustee's settlements with other third-parties, to the holders of allowed tort claims on a *pro rata* basis.  Approval of the Settlement Agreement represents another significant step towards confirmation of that plan and implementation of the

mechanism for liquidation and payment of tort claims upon plan confirmation.

       **WHEREFORE**, the Movants respectfully requests that this Court enter an order approving the Settlement Agreement attached hereto as <u>Exhibit A</u>, and grant the Trustee such other and further relief as this Court deems just and proper.

Dated:        April 20, 2015        Respectfully submitted,
                Boston, Massachusetts

                                   **DUANE MORRIS LLP**

                                   By:  <u>/s/ Michael R. Lastowski</u>
                                   Michael R. Lastowski (admitted *pro hac vice*)
                                   Duane Morris LLP
                                   222 Delaware Avenue, Suite 1600
                                   Wilmington, DE 19801
                                   Tel: (302) 657-4900
                                   Fax: (302) 657-4901
                                   mlastowski@duanemorris.com

                                   *Counsel for Paul D. Moore, Chapter 11*
                                   *Trustee of New England Compounding*
                                   *Pharmacy, Inc. d/b/a New England*
                                   *Compounding Center*

                                   -and-

**BROWN RUDNICK LLP**

By: */s/ William R. Baldiga*
William R. Baldiga, Esq.
Kiersten A. Taylor, Esq.
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201
wbaldiga@brownrudnick.com
ktaylor@brownrudnick.com

-and-

David J. Molton, Esq.
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801
dmolton@brownrudnick.com

*Counsel to the Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc.*

**<u>EXHIBIT A</u>**

## LIBERTY SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement (the "Agreement") is made and entered by, between and among the NECC Trustee (as defined below), Liberty (as defined below) and Great American (as defined below).

## RECITALS

WHEREAS, on December 21, 2012, NECC (as defined below) filed a voluntary petition under the Bankruptcy Code in the Bankruptcy Court, thereby commencing the Bankruptcy Case (each as defined below);

WHEREAS, on January 18, 2013, the UST (as defined below) appointed the Creditors' Committee (as defined below);

WHEREAS, upon application by the UST, Paul D. Moore was appointed to serve as chapter 11 trustee for NECC's estate on or about January 25, 2013, with the approval of the Bankruptcy Court (as defined below);

WHEREAS, on February 12, 2013, the Judicial Panel on Multidistrict Litigation entered an order transferring certain litigation actions against NECC and other third-parties to the MDL Court (as defined below) for consolidated pretrial proceedings;

WHEREAS, on April 9, 2013, the MDL Court entered an order establishing the seven-attorney Plaintiffs' Steering Committee (as defined below) to organize, simplify, and streamline the handling of the MDL Proceeding on behalf of all plaintiffs to actions therein, and appointed Thomas Sobol of Hagens Berman Sobol Shapiro LLP as lead counsel for the Plaintiffs' Steering Committee;

WHEREAS, NECC and Liberty have been named as defendants in numerous lawsuits asserting Claims (as defined below), and may have additional Claims made against them, seeking damages for injuries arising from the alleged contamination of certain lots of injectable methylprednisolone acetate compounded at and distributed by NECC (as more fully defined herein, the "NECC Claims");

WHEREAS, Great American (as defined below) issued the Policies (as defined below) to Liberty as named insured;

WHEREAS, the NECC Trustee, Liberty, and Great American may have Claims against each other and others as a result of the NECC Claims and based upon subrogation or contractual or equitable indemnification or contribution or other theories;

WHEREAS, on January 14, 2014 and March 27, 2014, Liberty filed proofs of claim in the Bankruptcy Case (Claim Nos. 65 and 65-2), asserting a contingent and unliquidated Claim against NECC arising from NECC's alleged obligations to Liberty as a result of the NECC Claims, including, without limitation, NECC's alleged contribution and/or indemnity obligations to Liberty (the "Indemnity Claim");

WHEREAS, Liberty and Great American have engaged in good faith settlement discussions among themselves and with the NECC Trustee, the Creditors' Committee (as defined below) and the Plaintiffs' Steering Committee (as defined below) in an effort to fully and finally compromise and resolve Liberty's potential liability and Great American's coverage obligations for the NECC Claims;

WHEREAS, Liberty, Great American and the NECC Trustee believe that, if their disputes and other remaining issues are not resolved now, future proceedings would be protracted and expensive, involve complex issues of liability and/or damages, and involve substantial expense and the uncertainties and risks inherent in litigation; and

WHEREAS, the Creditors' Committee and the Plaintiffs' Steering Committee (each as defined below) support this Agreement and the compromise and settlement embodied herein, as reflected in the *Addendum No. 1 to Settlement and Release Agreement* attached hereto.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the adequacy and sufficiency of which are hereby acknowledged by the Parties, and intending to be legally bound hereby, the Parties agree as follows:

I.      **Definitions**.  The following definitions shall apply to the capitalized terms used in this Agreement:

a.   **"Agreement"** has the meaning set forth above in the preamble.

b.   **"Alternative Plan"** has the meaning ascribed to it in Section IV.f.iii.5 hereof.

c.   **"Bankruptcy Case"** means the Chapter 11 case filed by NECC in the Bankruptcy Court captioned as *In Re: New England Compounding Pharmacy, Inc.,* Case No. 12-19882 (HJB).

d.   **"Bankruptcy Code"** means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as it may be amended.

e.   **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Massachusetts, Eastern Division.

f.   **"Bankruptcy Rules"** means collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court.

g.   **"Claim"** means any past, present or future claim, demand, action, cause of action, suit or liability of any kind or nature whatsoever (including claims for equitable or contractual indemnification or contribution), whether at law or in equity, pursuant to a statute, rule or regulation, known or unknown, asserted or unasserted, anticipated or unanticipated, accrued or unaccrued, fixed or contingent, which has been asserted, could have been asserted, or that may in the future be asserted, by or on behalf of any Person, whether seeking damages (including compensatory, punitive or exemplary damages) or equitable, mandatory, injunctive or any other type of relief, including cross-claims, counter-claims, third-party claims, suits, lawsuits, administrative proceedings, notices of liability or potential liability

2

(including Potentially Responsible Party or "PRP" notices), arbitrations, actions, rights, requests, demands for payment, causes of action, orders, or judgments, including without limitation, any "claim" as that term is defined in the Bankruptcy Code, 11 U. S. C. § 101(5).

h. **"Claimants"** mean any Person asserting an NECC Claim against NECC, Liberty and/or Great American.

i. **"Claim Objection"** means the NECC Trustee's *Objection to Liberty Industries, Inc. Proofs of Claim Nos. 65 and 65-2* [Bankruptcy Case Docket No. 1190].

j. **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan.

k. **"Confirmation Order"** means the order confirming the Plan.

l. **"Creditors' Committee"** means the official committee of unsecured creditors appointed in the Bankruptcy Case and any of its retained legal counsel or other professionals.

m. **"Execution Date"** means the first date upon which the NECC Trustee, Liberty, and Great American all have executed this Agreement.

n. **"Final Order"** means an order or judgment of the Bankruptcy Court (or the District Court, if applicable) that has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending; or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought, and  (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

o. **"Great American"** means Great American E&S Insurance Company and all of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting in their respective capacity as such.

p. **"Indemnity Claim"** has the meaning set forth in the Recitals.

q. **"Liberty"** means Liberty Industries, Inc. and all of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting in their respective capacity as such.

r. **"MDL Court"** means the United States District Court for the District of Massachusetts (at Boston) presiding over the MDL Proceeding.

3

s. **"MDL Proceeding"** means the matter entitled *In Re: New England Compounding Pharmacy, Inc. Product Liability Litigation*, MDL Docket No. 2419, Master File No. 1: 13-MD-2419.

t. **"MDL Stay Motion"** has the meaning ascribed to it in Section III(a) hereof.

u. **"MDL Stay Order"** has the meaning ascribed to it in Section III(a) hereof.

v. **"NECC"** or **"Debtor"** means the debtor New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, and any of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting in their respective capacity as such.

w. **"NECC Claims"** means any and all Claims asserted or that could be asserted by any Person against Liberty and/or Great American for personal injury, tort, wrongful death, medical monitoring, or any other economic or noneconomic injury or damage, based upon, arising out of or in any way related to the preparation of or administration to Persons of injectable methylprednisolone acetate, cardioplegia solutions or any other drugs or products compounded, produced, sold or distributed by NECC.

x. **"NECC Tort Trust"** means the trust created by the Plan which will be funded by assets of the NECC estate, including, *inter alia*, portions of the Settlement Amount from Liberty and/or Great American and which establishes procedures for the resolution and payment of all NECC Claims, including NECC Claims against Liberty and/or Great American.

y. **"NECC Tort Trustee"** means the trustee of the NECC Tort Trust.

z. **"NECC Tort Trust Agreement"** means the agreement governing the NECC Tort Trust.

aa. **"NECC Trustee"** means Paul D. Moore solely in his capacity as the Chapter 11 Trustee for debtor New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center and not individually, and any retained attorneys or other professionals acting on his behalf.

bb. **"Parties"** means, collectively, the NECC Trustee, Liberty and Great American.

cc. **"Person"** means an individual, including, but not limited to, Claimants, a corporation, a partnership, an association, a limited liability company, a proprietorship, a joint venture, a trust, an estate, trustee, executor, administrator, legal representative, or any other entity or organization.

dd. **"Plaintiffs' Steering Committee"** means the attorneys identified in MDL Order No. 2: Order Appointing Lead Counsel, Federal-State Liaison Counsel and Plaintiffs' Steering Committee and such committee's designated counsel.

ee. **"Plan"** means the proposed Chapter 11 plan of reorganization that was filed with the Bankruptcy Court on December 3, 2014 as Docket No. 1052-1, as amended at Docket No. 1154, and as may be further amended, supplemented or replaced, which is consistent with, incorporates and effectuates the terms and provisions of this Agreement without any material

4

changes or modifications with respect to the rights of the Parties hereto, and which includes, incorporates and implements the NECC Tort Trust, the Plan Release and the Plan Injunction.

ff. **"Plan Effective Date"** means the later of (i) the first business day following fourteen (14) days after the Bankruptcy Court's entry of the Confirmation Order, provided that the Confirmation Order is not subject to a stay by any court of competent jurisdiction as of such date, and (ii) the first business day on which all other conditions to the effective date of the Plan as set forth therein, and to the effective date of this Agreement as set forth in Section VII hereof, have been satisfied or waived.

gg. **"Plan Injunction"** means the permanent injunction forever barring and enjoining all Persons from commencing, continuing or prosecuting any NECC Claims against Liberty and/or Great American, as incorporated in the Plan and Confirmation Order.

hh. **"Plan Proponents"** means the NECC Trustee and the Creditors' Committee, collectively.

ii. **"Plan Release"** means a release to be included in the Plan and Confirmation Order pursuant to which the NECC Claims are deemed to have been waived and/or released by any and all Claimants.

jj. **"Policies"** means, collectively, those certain six Great American excess and primary policies of insurance identified as follows: (a) primary policies identified as (i) policy number PL 2387754 00 with effective dates of 1/20/11 to 1/20/12, (ii) policy number PL 2387754 01 with effective dates of 1/20/12 to 1/20/13, and (iii) policy number PL 2387754 02 with effective dates of 1/20/13 to 1/20/14, together with (b) excess policies identified as (i) policy number XS 2388167 00 with effective dates of 4/18/11 to 1/20/12, (ii) policy number XS 2388167 01 with effective dates 1/20/12 to 1/20/13, and (iii) policy number XS 2388167 02 with effective dates 1/20/13 to 1/20/14.

kk. **"Rule 9019 Motion"** means the motion to be filed by the NECC Trustee in accordance with Section IV(a) herein, in a form acceptable to Liberty and Great American in all material respects as to the matters relating to this Agreement, requesting that the Bankruptcy Court: (i) approve in all material respects, pursuant to Rule 9019 of the Bankruptcy Rules and the salient provisions of the Bankruptcy Code, the terms of this Agreement and any and all terms of the compromise and settlement memorialized in this Agreement; (ii) determine that notice of the hearing on the Rule 9019 Motion was duly served or otherwise provided to pursuant to the Bankruptcy Court's or MDL Court's ECF filing system, was appropriate, and that no further notice is required; and (iii) enter an order approving the Rule 9019 Motion and authorizing and directing the NECC Trustee to consummate all aspects of the Settlement in accordance with this Agreement.

ll. **"Rule 9019 Order"** means an order of the Bankruptcy Court granting the relief requested in the Rule 9019 Motion and approving the terms of this Agreement in all material respects.

mm. **"Settlement Amount"** means the sum of $1,000,000 (USD) to be paid by Liberty and Great American as follows:

    a.  Liberty:  $450,000

    b.  Great American:  $550,000

nn.    **"Termination Date"** has the meaning set forth in Section VIII hereof.

oo.    **"UST"** means the Office of the United States Trustee.

## II.    Payment of Settlement Amount

On or before five (5) days after entry of the Confirmation Order, Liberty and Great American shall each pay (or cause to be paid) their respective portions of the Settlement Amount in immediately available funds to the NECC Trustee and the NECC estate in accordance with the wire transfer instructions to be supplied by the NECC Trustee to Liberty and Great American.  Until the earlier to occur of the Plan Effective Date or the Termination Date, the NECC Trustee shall hold the Settlement Amount in the Duane Morris LLP IOLTA Attorney Trust Account.  On the Plan Effective Date, the Settlement Amount, together with all accrued interest thereon, shall be, and shall be deemed, irrevocably and indefeasibly paid to the NECC Trustee, and the Settlement Amount shall be used by the NECC Trustee for payment of the costs and expenses of administration of the Bankruptcy Case and for distribution to creditors under the Plan (including, but not limited to, pursuant to the NECC Tort Trust Agreement).  The Parties intend and agree that the Settlement Amount shall constitute a material part of a fund to be ultimately distributed to Claimants and other creditors of the Debtor under the Plan and, accordingly, shall be protected from collateral attack and reach by the Debtor's creditors or any other Persons whatsoever; and that such funds shall be therefore held in a legal manner that protects such funds from the reach of others to the full extent permitted by law.

## III.    Stay of MDL Proceeding

a.    As soon as reasonably practicable after the Execution Date, Liberty shall file and prosecute in good faith a motion with the MDL Court (the "MDL Stay Motion") requesting entry of an order of the MDL Court staying the MDL Proceeding as to Liberty through the earlier of the Plan Effective Date or the Termination Date ("MDL Stay Order").  The terms of the MDL Stay Order, as requested by the MDL Stay Motion, shall include, but not be limited to, the following terms:

    i)    A prohibition against any party to the MDL Proceeding seeking dispositive relief;

    ii)    A prohibition against any party to the MDL Proceeding seeking any form of prejudgment security, including, but not limited to, any attachments, injunctions, writs or orders of any nature with regard to Liberty; and

iii)   the permissibility of discovery against Liberty, but only to the extent the discovery is relevant to the prosecution, or defense, of claims against defendants other than Liberty.

b.   Liberty is hereby authorized to recite in the MDL Stay Motion that the NECC Trustee, the Plaintiffs' Steering Committee and the Creditors' Committee each support entry of the MDL Stay Order and, if requested by Liberty, the NECC Trustee, the Plaintiffs' Steering Committee, and the Creditors' Committee shall each appear in support of entry of the MDL Stay Order.

c.   Nothing in this Agreement, the MDL Stay Motion, or the MDL Stay Order, shall prevent or prohibit a party from objecting to a discovery request based on any grounds ordinarily available under the Federal Rules of Civil Procedure, with all such rights being expressly reserved.  It is further agreed that so long as the MDL Stay Order contains language consistent with sub-paragraphs (a)(i)-(a)(iii) above, nothing in this Agreement shall provide a basis for Liberty to claim that by virtue of entering into this Agreement, there is a general prohibition as to all discovery in the MDL Proceeding.

d.   Following entry of the MDL Stay Order, Liberty may (i) seek to enforce the MDL Stay Order in all courts of competent jurisdiction; and/or (ii) if those enforcement efforts are unsuccessful, seek entry of an order from the Bankruptcy Court or such other court of competent jurisdiction, enjoining any person or entity from taking such action or seeking such relief as to Liberty that is proscribed by the MDL Stay Order.  Upon request by Liberty, the NECC Trustee, the Plaintiffs' Steering Committee, and the Creditors' Committee shall each appear in the Bankruptcy Court and/or the MDL Court (as applicable) in support of any effort by Liberty to enforce the MDL Stay Order in those courts.

## IV.   Bankruptcy Related Obligations

a.   As soon as practicable after the Execution Date, the NECC Trustee shall prepare and file with the Bankruptcy Court a motion pursuant to Bankruptcy Rule 9019 seeking entry of the Rule 9019 Order authorizing him to enter into and be bound by the terms of this Agreement.

b.   Notice of the Rule 9019 Motion shall be provided solely through (i) the Bankruptcy Court's electronic case filing system and (ii) the NECC Trustee's filing of a notice of such motion, together with the motion itself, on the docket of the MDL Proceeding.  The NECC Trustee shall not be obligated to provide any other or further notice of the Rule 9019 Motion whatsoever.  If the Bankruptcy Court orders any other or further notice of the Rule 9019 Motion, Liberty, and not the NECC Trustee, shall bear any and all costs thereof.  If and when the Rule 9019 Motion is granted by the Bankruptcy Court, the NECC Trustee shall move the Bankruptcy Court for leave to amend the Plan to effectuate the terms and provisions of this Agreement and for an order finding that such amendment is non-material and, therefore, does not require the Plan Proponents to resolicit

acceptances or rejections of the Plan. In the event that the Bankruptcy Court finds that such amendment is material and requires the Plan Proponents to resolicit acceptances or rejections of the Plan, this Agreement shall terminate and be of no further force or effect; provided, however, that each of the rights, obligations and waivers by Liberty and Great American described in Section IV.f hereof shall survive any such termination of this Agreement and shall remain in effect.

c.   As soon as reasonably practicable after the Execution Date, Liberty and the NECC Trustee shall jointly seek adjournment of the hearing on the Claim Objection, up to and including, if the Rule 9019 Motion is denied prior to the date of the Confirmation Hearing, the date of such denial, otherwise, the date of the Confirmation Hearing.

d.   The NECC Trustee shall undertake commercially reasonable efforts to defend the Confirmation Order in the event of a direct appeal of that order.

e.   If any Claimant files a lawsuit or initiates an alternative dispute resolution proceeding asserting an NECC Claim or an Indemnity Claim against Liberty and/or Great American between the Execution Date and the Plan Effective Date, the NECC Trustee consents to Liberty and/or Great American taking all steps necessary to obtain from the Bankruptcy Court an order staying or enjoining such lawsuit or alternative dispute resolution proceeding until the date of the Confirmation Hearing. The failure of Liberty and/or Great American to obtain such an order from the Bankruptcy Court shall not affect in any way any rights or obligations of any Party under this Agreement.

f.   On the Execution Date, each of Liberty and Great American shall, and shall be deemed to, irrevocably waive any right to, directly or indirectly, either oppose or object to the Plan or the confirmation of the Plan and the transactions contemplated by the Plan. Each of Liberty and Great American hereby further agrees with respect to any Plan to:

   i.   so long as its vote has been properly solicited pursuant to sections 1125 and 1126 of the Bankruptcy Code, timely vote any and all Claims (to the extent filed) that it is entitled to vote, now or hereafter beneficially owned by such Party (subject to Section V hereof), to accept the Plan in accordance with the applicable procedures set forth in the solicitation materials accompanying the Plan, and timely return a duly executed ballot in connection therewith. A copy of the vote solicitation package shall be sent to the notice addresses in Section IX(o);

   ii.  not withdraw or revoke its tender, consent or vote with respect to the Plan, except as otherwise expressly permitted pursuant to this Agreement; and

   iii. not:

1. oppose or object to the Plan or the solicitation or consummation of the Plan and the transactions contemplated by the Plan, whether directly or indirectly;

2. join in or support any objection to the Plan or to the solicitation of the Plan;

3. initiate any legal proceedings that are inconsistent with or that would delay, prevent, frustrate or impede the approval, confirmation or consummation of the Plan, or otherwise commence any proceedings to oppose the Plan, or take any other action that is barred by or likely to frustrate this Agreement;

4. vote for, consent to, support or participate in the formulation of any other restructuring or settlement of Claims, any other transaction involving any plan of reorganization or liquidation (with the exception of the Plan) under applicable bankruptcy or insolvency laws, whether domestic or foreign, in respect of the Debtor or its affiliates, except as otherwise expressly contemplated pursuant to this Agreement;

5. directly or indirectly seek, solicit, or enter into any agreements relating to, any restructuring, plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, transaction, sale, disposition or restructuring of the Debtor or its affiliates (or substantially all of their assets or stock) other than the Plan or as otherwise set forth in this Agreement (any such plan or other action as described in clauses (4) and (5) immediately above, an "Alternative Plan"); or

6. enter into any letter of intent, memorandum of understanding or agreement in principle relating to any Alternative Plan.

The waiver and obligations described in this Section IV.f shall remain effective and continue regardless of whether (i) this Settlement is approved by the Bankruptcy Court, (ii) Liberty becomes the beneficiary of the releases and injunctions set forth in Section 10.05 and 10.06 of the Plan, or (iii) this Agreement terminates as provided in Section VIII hereof.  For the avoidance of doubt, nothing herein shall constitute a waiver by either Liberty or Great American of any objections to any subsequent amendments to the Plan to the extent those amendments materially and adversely affect the rights of Liberty or Great American or have a material and adverse impact on the settlement memorialized by this Agreement.

9

V.    **Waiver and Release of Bankruptcy Claims**

Upon the Plan Effective Date, without any further action by Liberty or Great American, each of Liberty and Great American shall, and shall be deemed to, either (a) irrevocably waive, relinquish and release (i) any and all Claims (whether or not a proof of claim is filed) of any kind or character it holds against the Debtor or its estate and (ii) any and all rights to distributions or recoveries, of any kind or character, on account of such Claims including, without limitation, pursuant to the Plan or (b) irrevocably assign such Claims to the NECC Trustee (at the NECC Trustee's discretion).  Such waiver or assignment shall be effective without regard to whether the Confirmation Order is or becomes a Final Order on the Plan Effective Date, and shall continue to remain in effect notwithstanding any appeal, modification, or reversal of the Confirmation Order.

VI.    **Releases**

a.    Subject only to the conditions set forth in Section VIII hereof, and without any further action by the Parties, Liberty, the NECC Trustee, the Debtor and its estate each hereby fully, finally and completely releases, remises, acquits and forever discharges Great American of and from the NECC Claims; provided, however, that Great American shall be so released, remised, acquitted and discharged of and from the NECC Claims solely in its capacity as issuer of, or in any other capacity that may arise from or be connected with, the Policies and not in its capacity as issuer of any other policies of insurance, or in any other capacity (unless provided in a separate Settlement and Release Agreement).

b.    Subject only to the conditions set forth in Section VIII hereof, and without any further action by the Parties, the NECC Trustee, the Debtor and its estate each hereby fully, finally and completely releases, remises, acquits and forever discharges Liberty of and from the NECC Claims.

c.    Subject only to the conditions set forth in Section VIII hereof, and without any further action by the Parties, Great American hereby fully, finally and completely releases, remises, acquits and forever discharges Liberty, the NECC Trustee, the Debtor, its estate, the Plaintiffs' Steering Committee and the Creditors' Committee of and from the NECC Claims.

d.    Subject only to the conditions set forth in Section VIII hereof, and without any further action by the Parties, each of Liberty and Great American hereby fully, finally and completely releases, remises, acquits and forever discharges all Claims against Claimants, the NECC Trustee, the Debtor, its estate, the Plaintiffs' Steering Committee and the Creditors' Committee that are based upon or that arise out of the NECC Claims.

e.    Upon the Plan Effective Date, Liberty and Great American shall, and shall be deemed to have, unconditionally assigned to the NECC Trustee any and all Claims that they may have between them (to the extent not otherwise released under this Agreement, the Plan and/or the Confirmation Order) and against any

Persons not a Party to this Agreement (including any claims for indemnification, contribution or subrogation) that are based upon or arise out of the NECC Claims.

f.      Nothing in this Section VI or any other provision of this Agreement is intended to, nor shall it be construed to, have any effect on, or constitute a release, waiver, assignment or discharge of, Great American's rights or Claims for reinsurance in connection with the Policies and/or the NECC Claims, all of which are expressly reserved by Great American.

g.      Nothing in this Section VI or any other provision of this Agreement is intended to, nor shall it be construed to, have any effect on, or constitute a release, waiver or discharge of, the Parties' respective rights, obligations, remedies or Claims created under this Agreement.

h.      The Parties hereto acknowledge that they are aware that they may hereafter discover facts different from or in addition to those they now know or believe to be true with respect to the NECC Claims, causes of action, rights, obligations, and liabilities herein released, and each agrees that the within release shall be and remain in effect in all respects as a complete release as to all matters released herein, notwithstanding any such different or additional facts.

## VII.   Representations and Warranties of the Parties

Each of the Parties separately represents and warrants to each of the other Parties as follows:

a.      It has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to the entry of the Rule 9019 Order, the amendment of the Plan consistent with the terms of this Agreement, and the entry of the Confirmation Order;

b.      The execution and delivery of this Agreement, and the performance of the obligations contemplated by this Agreement, have been approved by duly authorized representatives of the Party, and by all other necessary actions of the Party, subject only to the entry of the Rule 9019 Order, the amendment of the Plan consistent with the terms of this Agreement, and the entry of the Confirmation Order;

c.      It has expressly authorized its undersigned representative to execute this Agreement on the Party's behalf as its duly authorized agent;

d.      The making and performance of this Agreement will not violate any provision of the Party's respective articles of incorporation, membership agreement, charter or bylaws, where applicable;

e.      It has read the entire Agreement and knows the contents hereof; it understands that the terms hereof are contractual and not merely recitals; it has signed this

Agreement of its own free act and will; and in making this Agreement, it has obtained the advice of its own legal counsel;

f.  It has not previously assigned or transferred, or purported to assign or transfer to any other Person, any right or Claim that is the subject matter of this Agreement;

g.  This Agreement has been negotiated, executed and delivered in good faith, with the assistance of its own legal counsel, pursuant to good faith arm's-length negotiations, and for good and valuable consideration; and

h.  As to Liberty and Great American, each has conducted diligent good faith searches for any insurance policies that may have been issued by Great American that provide insurance coverage and/or other benefits to Liberty for the NECC Claims, and that they are unaware of any such insurance policies other than the Policies specifically identified herein.

## VIII.  Conditions to Effectiveness of this Agreement.

Upon the Execution Date, this Agreement shall be binding upon the Parties in accordance with its terms, including, but not limited to, the terms of Section IV.f hereof; provided, however, that the obligations of the NECC Trustee and the Debtor's estate under this Agreement are expressly subject to and conditioned upon entry of the Rule 9019 Order, the amendment of the Plan consistent with the terms of this Agreement and entry of the Confirmation Order; and provided, further, that the effectiveness and finality of the provisions of this Agreement concerning the Releases (Section VI) are expressly conditioned upon and subject to the following:

a.  The payment of the Settlement Amount to the NECC Trustee and the NECC estate by Liberty and Great American; and

b.  The occurrence of the Plan Effective Date.

For the avoidance of doubt, and without diminishing any other condition to the effectiveness of this Agreement or the Plan, it is expressly understood and agreed by the Parties that the Plan Release and the Plan Injunction are material, non-waivable conditions to the payment of the Settlement Amount and the effectiveness of this Agreement, and that they will also be made material, non-waivable conditions to the effectiveness of the Plan.

In the event that: (a) the Plan Effective Date does not occur within one (1) year from the Execution Date; (b) the Bankruptcy Court finds that any amendment to the Plan to effectuate the terms and provisions of this Agreement is material and thus requires the Plan Proponents to resolicit acceptances or rejections of the Plan; (c) the Bankruptcy Court denies confirmation of the Plan and such denial cannot be cured by amending the Plan in a manner that is either (i) not materially inconsistent with this Agreement or (ii) otherwise agreed to by the Parties; or (d) the Plan is withdrawn, then this Agreement shall immediately terminate and be of no further force or effect (the date of such termination,

the "Termination Date"); provided, however, that such termination may be waived by unanimous written consent of the Parties; and further provided, however, that each of the obligations and waivers by Liberty and Great American described in Section IV.f hereof shall survive the termination of this Agreement and shall remain in effect.  Upon the Termination Date, the Parties shall be restored to the same position they were in immediately prior to the Execution Date without waiver of any rights, claims, defenses or remedies that the Parties may have against each other, subject to the obligations and waivers by Liberty and Great American described in Section IV.f hereof which shall survive the termination of this Agreement and shall remain in effect. Within fifteen (15) days of the Termination Date, the Settlement Amount shall be refunded to Liberty and Great American.

## IX.   Other Provisions.

a.   **Informed Consent and Knowledge**. The Parties expressly warrant and represent that they have had the benefit of the professional advice of attorneys of their own choosing, that they are fully satisfied with that advice, and that they have not relied on any statement or representation of other Parties to this Agreement regarding the specific matters in dispute. The Parties also represent and acknowledge that, in executing this Agreement, they do not rely and have not relied upon any representation or statement made by any other Party or any of their agents, representatives, or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as specifically stated in this Agreement.

b.   **No Precedent.** The Parties stipulate that they have entered into this Agreement only for their own business reasons based on the unique circumstances presented by the NECC Claims, and that this Agreement creates no binding legal or factual precedent for themselves or others in any future case.  This Agreement does not constitute an admission of coverage or noncoverage, and is not based upon language in the Policies.

c.   **Confidentiality.** The Parties agree, subject to any disclosure obligations imposed by law, to hold this Agreement confidential and not to disclose the terms of this Agreement to any Person, other than the Creditors' Committee and the Plaintiffs' Steering Committee, until the NECC Trustee files this Agreement with the Bankruptcy Court; provided, however, that after the Execution Date, the Parties may inform the Bankruptcy Court and/or the MDL Court that they have entered into this Agreement; provided, further, that the Plan Proponents may disclose the fact that they have reached a settlement, the settlement amount, and such other terms of this Agreement as may be reasonably necessary or appropriate to implement the Agreement and in order to obtain entry of the Rule 9019 Order.

d.   **Cooperation.** Each Party agrees to take such steps and to execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by

13

any Person not a Party hereto to invalidate, interpret or prevent the validation, enforcement or carrying out of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant and covenant to cooperate in opposing such action or proceeding.

e.      **Nondisparagement**.  The Parties shall not disparage each other and shall support this Settlement Agreement and the Plan, consistent with Section IV.f hereof, and shall undertake commercially reasonable efforts to secure confirmation of the Plan.

f.      **Entire Agreement.**  This Agreement sets forth the entire agreement between the Parties and fully supersedes any and all prior agreements and understandings, written or oral, between and among the Parties pertaining to the subject matter hereof.   Except as explicitly set forth in this Agreement, there are no representations, warranties, promises or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Agreement or alter or supplement its terms.   Any statements, promises or inducements, whether made by any Party or the agent of any Party, that are not contained in this Agreement shall not be valid or binding.  This Agreement shall have perpetual existence, except as otherwise provided herein.

g.      **Amendment/Modification.**  No amendment or modification of this Agreement shall be binding or enforceable unless in writing and signed by the Parties and, if required, approved by the Bankruptcy Court.

h.      **Construction.**  This Agreement is the jointly-drafted product of good faith arm's length negotiations between the Parties with the benefit of advice from their own respective legal counsel and each of them has had sufficient opportunities to propose and negotiate changes to this Agreement prior to its execution.  As such, no Party will claim that any ambiguity in this Agreement shall be construed against any other Party by reason of their identity as a drafter or insurer.  The following rules of construction shall also apply to this Agreement:

1.  The Recitals and Definitions to this Agreement are a material part of this Agreement having the same force and effect as a mutual representation, warranty and covenant of the Parties;

2.  Unless the context of this Agreement otherwise requires, (a) words of any gender include each other gender, and the word "it" may refer to a Person as the context requires; (b) words used in the singular or plural also include the plural or singular number, respectively; (c) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (d) the words "include,' "includes" or "including" shall be deemed to be followed by the words "without limitation;" (e) the word "or" shall be disjunctive but not exclusive; (f) the words "any" or "all" shall mean "any and all";

3.  References to the Policies, agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto; and

4.  References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating or amending or replacing the statute or regulation.

i.  **Applicable Law.** This Agreement shall be interpreted and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the conflict of laws of the Commonwealth of Massachusetts, except to the extent that any particular provision hereof may be governed by the Bankruptcy Code and Rules. Each of the Parties hereby irrevocably consents to the exclusive jurisdiction of the Bankruptcy Court with respect to any action to enforce the terms and provisions of this Agreement, and expressly waives any right to commence any such action in any other forum (unless the Bankruptcy Court does not have or refuses to exercise such jurisdiction). In any dispute arising from this Agreement, the Parties hereby waive any right to a jury trial. This Agreement is intended to be and shall have the effect of a document executed under seal in accordance with the laws of the Commonwealth of Massachusetts.

j.  **No Admissions/Not Evidentiary.** This Agreement is not and shall not be construed as an admission or concession of coverage, responsibility, liability, non-liability or wrongdoing by any Party to this Agreement. No part of this Agreement may be used in any action or proceeding as evidence of the rights, duties or obligations of any Insurer under the Policies or otherwise.

k.  **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto, and their respective successors, permissible assigns, agents, employees and legal representatives, including, without limitation, NECC and its bankruptcy estate, any trust or trustee, responsible Person, estate administrator, representative or similar Person appointed for NECC in connection with the Bankruptcy Case, the Plan or any subsequent Chapter 7 case. Except as expressly provided in this Agreement, neither this Agreement nor any of the rights and obligations set forth herein shall be assigned by any Party without the prior written consent of the other Parties, which consent shall not be unreasonably withheld.

l.  **No Rights of Third Parties.** All Persons expressly included within the definitions of "Liberty", "Great American" and "NECC Trustee," are intended beneficiaries of this Agreement. The Parties agree that, except as set forth in the prior sentence or otherwise expressly set forth in this Agreement, there are no intended third party beneficiaries to this Agreement.

m.  **Enforcement of Agreement.** The Parties hereby acknowledge that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by any Party and that such breach shall cause the non-breaching

15

Parties irreparable harm. Accordingly, the Parties agree that in the event of any breach or threatened breach of this Agreement by any of the Parties, the Parties, in addition to any other remedies at law or in equity that they may have, shall be entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance.

n.   **Captions and Headings.** Captions and headings to paragraphs or sections in this Agreement are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof.

o.   **Notice.** Unless another Person is designated in writing for receipt of notices hereunder, notices to the respective Parties shall be sent to the following Persons to the extent so designated below. All notices shall be sent via email _and_ by either (i) overnight courier or (ii) fax, and shall be deemed effective upon receipt.

<u>As to the NECC Trustee:</u>

Paul D. Moore
Duane Morris LLP
100 High Street Suite 2400
Boston, MA 02110
Tel: 857-488-4200
Fax: 857-401-3057
Email: pdmoore@duanemorris.com

<u>With Copy To:</u>

Michael R. Gottfried
Duane Morris LLP
100 High Street Ste 2400
Boston, MA 02110
Tel: 857-488-4200
Fax: 857-401-3030
Email: mrgottfried@duanemorris.com

<u>As to Liberty:</u>

James J. Tancredi
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103
Tel: 860-275-0331
Fax: 860-881-2471

16

With Copy To:

Nicole Dorman
Law Office Nicole D. Dorman, LLC
P.O. Box 1142
Glastonbury, CT 06033
Tel: 860-463-6873
Fax: 860-760-6715

As to Great American:

Harry Veldhuis
Divisional Assistant Vice President
Great American Specialty E&S Division

With Copy To:
Peter Hermes
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, Seventh Floor
Boston, MA 02110
Tel: 617.728.0050
Fax: 617.728.0052

p.    **Execution and Delivery.**  This Agreement may be executed in one or more counterparts, all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by email and facsimile, which shall be deemed the same as originals.

q.    **Statutes of Limitations**.  The Parties agree and consent that all statutes of limitations, statutes of repose, time limited laches or estoppel defenses or any other state law pre-suit requirements, as to any and all Claims and causes of action among the Parties or against any of the Parties by a person who has a NECC Claim and who filed a timely proof of claim in the Bankruptcy Case pertaining to, concerning or related to NECC and/or its products, that had not expired by operation of applicable local, state, or federal law prior to the Execution Date shall be tolled through and including the earlier of (i) the Plan Effective Date or (ii) sixty (60) days following the Termination Date.


**[Signature Page Follows]**


17

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

Paul D. Moore, as Chapter 11 Trustee for
New England Compounding Pharmacy, Inc.
d/b/a New England Compounding Center
and not individually

Dated: 4/16/15

Liberty Industries, Inc.

By:
Dated:

Great American E&S Insurance Company

By:
Dated:

18

IN WITNESS WHEREOF, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

**Paul D. Moore, as Chapter 11 Trustee for
New England Compounding Pharmacy, Inc.
d/b/a New England Compounding Center
and not individually**

_____

Dated:

**Liberty Industries, Inc.**

By: Chief Executive Officer
Dated: 04/16/2015

**Great American E&S Insurance Company**

_____

By:
Dated:

18

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

**Paul D. Moore, as Chapter 11 Trustee for**
**New England Compounding Pharmacy, Inc.**
 **d/b/a New England Compounding Center**
**and not individually**

_____

Dated:

**Liberty Industries, Inc.**

_____

By:
Dated:

**Great American E&S Insurance Company**

_____
By: Harry J. Veldhuis
Dated: 4/20/15

19

## ADDENDUM NO. 1 TO SETTLEMENT AND RELEASE AGREEMENT

This Addendum No. 1 (the "Addendum No. 1") to the *Settlement and Release Agreement* dated as of April *16* (the "Agreement") is made as of April *16* by:

(i)     the Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 case of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center, Case No. 12-19882, pending in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"); and

(ii)    the Plaintiffs' Steering Committee (the "PSC") appointed in the multi-district litigation captioned *In re New England Compounding Pharmacy Cases Litigation*, MDL No. 2419, Case No. 13-cv-02419 (D. Mass.).

Capitalized terms not defined herein shall have the meanings assigned to them in Section 1 of the Agreement.

1.     Each of the Committee and the PSC acknowledges that it has had a sufficient opportunity to discuss and review the Agreement with its counsel, has in fact done so, and fully understands the terms, conditions, and agreements set forth therein.

2.     Each of the Committee and the PSC supports the Agreement and the compromise and settlement embodied therein and memorialized thereby.

3.     Each of the Committee and the PSC (i) agrees to support approval of the Agreement pursuant to Bankruptcy Rule 9019, and (ii) supports, agrees to take reasonable steps to secure, and agrees not to oppose or object to the Bankruptcy Court's confirmation of a Plan that incorporates and effectuates the terms and provisions of the Agreement in all material respects. Notwithstanding the foregoing, each of the Committee, the PSC, and their members reserve all rights in connection with any aspect of the Plan that is not the subject of the Agreement, including, without limitation, the right to object to and/or negotiate provisions of the Plan that are not the subject of the Agreement.

4.     Nothing in this Addendum No. 1 is intended to or does modify the Agreement in any respect.

*Signature Page to Addendum No. 1 to Settlement and Release Agreement*

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NEW ENGLAND COMPOUNDING PHARMACY, INC., BY AND THROUGH ITS COUNSEL AND CO-CHAIRS**

**BROWN RUDNICK LLP**

By: _____

David J. Molton, Esq. (admitted *pro hac vice*)
Daniel J. Saval, Esq. (BBO #653906)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com
dsaval@brownrudnick.com

and

William R. Baldiga, Esq. (BBO #542125)
Kiersten A. Taylor, Esq. (BBO #681906)
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
wbaldiga@brownrudnick.com
ktaylor@brownrudnick.com

*Counsel to the Official Committee of Unsecured Creditors of New England Compounding Pharmacy, Inc.*

2

*Signature Page to Addendum No. 1 to Settlement and Release Agreement*

ANDREWS & THORNTON

By: _____

Anne Andrews, Esq.
John C. Thornton, Esq.
Karren Schaeffer, Esq.
2 Corporate Park, Ste. 110
Irvine, CA 92606
Telephone: 949 748-1000
aa@andrewsthornton.com
jct@andrewsthornton.com
kschaeffer@andrewsthornton.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair, Katrina
Eldreth, obo Ari Gomez*

COHEN PLACITELLA & ROTH P.C.

By: _____

Michael Coren, Esq.
Harry Roth, Esq.
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: 215 567-3500
mcoren@cprlaw.com
hroth@cprlaw.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair,
Meghan Handy*

3

*Signature Page to Addendum No. 1 to Settlement and Release Agreement*

**ANDREWS & THORNTON**

By: _____

Anne Andrews, Esq.
John C. Thornton, Esq.
Karren Schaeffer, Esq.
2 Corporate Park, Ste. 110
Irvine, CA 92606
Telephone: 949 748-1000
aa@andrewsthornton.com
jct@andrewsthornton.com
kschaeffer@andrewsthornton.com

*Counsel for Official Committee of Unsecured*
*Creditors of New England Compounding*
*Pharmacy, Inc. Member and Co-Chair, Katrina*
*Eldreth, obo Ari Gomez*

**COHEN PLACITELLA & ROTH P.C.**

By: _____

Michael Coren, Esq.
Harry Roth, Esq.
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: 215 567-3500
mcoren@cprlaw.com
hroth@cprlaw.com

*Counsel for Official Committee of Unsecured*
*Creditors of New England Compounding*
*Pharmacy, Inc. Member and Co-Chair,*
*Meghan Handy*

3

*Signature Page to Addendum No. 1 to Settlement and Release Agreement*

**THE PLAINTIFF STEERING COMMITTEE,
BY AND THROUGH ITS LEAD COUNSEL**

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By:

Thomas M. Sobol, Esq.
Kristen Johnson, Esq.
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
(617) 482-3700
tom@hbsslaw.com
kristenj@hbsslaw.com

*Plaintiffs' Lead Counsel, for the PSC*

4

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(EASTERN DIVISION)**

| | |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>                    Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

<u>**CERTIFICATE OF SERVICE**</u>

I, Michael R. Lastowski, hereby certify that I caused a copy of the *Joint Motion of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors for an Order Approving Plan Support and Settlement Agreement with Liberty Industries, Inc.* to be served by electronic service via this Court's ECF service to those parties registered to receive electronic notice, on April 20, 2015.

Dated April 20, 2015

                                        /s/ Michael R. Lastowski
                                        Michael R. Lastowski (*Admitted Pro Hac Vice*)
                                        Duane Morris LLP
                                        222 Delaware Avenue, Suite 1600
                                        Wilmington, DE  19801
                                        Tel:  (302) 657-4900
                                        Fax:  (302) 657-4901
                                        mlastowski@duanemorris.com