# EXHIBIT A

**BROWN**RUDNICK

DAVID J. MOLTON
direct dial: (212) 209-4822
fax: (212) 938-2822
dmolton@brownrudnick.com

Seven
Times
Square
New York
New York
10036
tel 212.209.4800
fax 212.209.4801

November 18, 2014

**VIA HAND DELIVERY**

Mr. Mike Barker
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

**RE:   Response to Request for Proposal for Trustee of Tort Settlement Trust**
      **In re: New England Compounding Pharmacy, Inc.**

Dear Mr. Barker:

  Thank you for the opportunity to submit a proposal to serve as the Trustee of the Tort Settlement Trust to be established in the above-mentioned matter.  I am excited for the opportunity to take on this role.

**Background & Experience**

  As you know, the Trustee will be charged with, among other things, making distributions to holders of personal injury and wrongful death claims arising resulting from the 2012 meningitis outbreak caused by NECC and its operations and pursuing the resolution of the claims of those entities that actually administered tainted drugs to patients.  With over a decade of hands-on experience in this area, I have developed a wide range of expertise dealing with precisely this type of mass tort bankruptcy and restructuring issues and solutions.

  Of particular relevance, and as you know, I represent the Official Committee of Unsecured Creditors (principally tort victims) in NECC's Chapter 11 case.  The Creditors' Committee is charged with representing and protecting the interests of all unsecured creditors, including holders of personal injury and wrongful death claims as well as purported holders of reimbursement and contribution claims against NECC arising from the outbreak.  Along with the Creditors' Committee and other bankruptcy parties, I have worked tirelessly to achieve significant settlements with allegedly culpable parties for sums exceeding $100 million - these, as you know, are the sums which will be distributed through the Tort Settlement Trust to injured victims of the outbreak.

  Moreover, as a co-proponent of the Plan (together with Mr. Paul D. Moore, Esq., the Chapter 11 Trustee), I both conceptualized the structure of the Tort Settlement Trust (a model based on my experience in other national mass tort cases, as described below) and drafted the documents that will govern the establishment and operation of the Tort Settlement Trust (specifically, the Plan and the Tort Trust Agreement).  Additionally, of special importance in this case, I have significant knowledge of and experience

with the core bankruptcy issues the Tort Settlement Trustee will be charged with developing a strategy to address: specifically, resolution of the purported claims under the Bankruptcy Code for contribution and indemnity asserted by clinics and medical care providers that are allegedly co-liable with NECC to tort claimants for the outbreak (or these claimants' possible election of subrogation rights in connection with the tort claims).

In addition to my experience in this case, I have a significant track record of success involving other national mass torts cases, including:

▪ Representing (i) the Ad Hoc Committee of Tort Claimants in connection with the Muscletech CCAA proceeding in Canada (the foreign ephedra bankruptcy) and Muscletech's Chapter 15 case and related litigation in the Southern District of New York (one of the first Chapter 15 cases), (ii) the Official Committees of Creditors (consisting principally of tort claimants) in the Chapter 11 cases of Twinlab, Metabolife and NVE (the domestic ephedra bankruptcies) and (iii) all of these Committees in the ephedra MDL in the Southern District of New York presided over by Judge Jed Rakoff. In each of the ephedra bankruptcy cases, I helped create the architecture for global resolution of all tort claims and negotiated multi-million dollar global settlements for the benefit of the tort claimants.

▪ Representing dozens of clergy abuse victims in the Chapter 11 case of the Diocese of San Diego in Bankruptcy Court in California and participating in the negotiation of a significant global settlement with the Diocese and its insurers for the benefit of victims.

▪ Representing diacetyl tort claimants in the Chapter 11 case of Chemtura Corporation in Bankruptcy Court in New York.

▪ Representing Lead Counsel in the GM Ignition Switch Defect MDL Litigation (S.D.N.Y) as Plaintiffs' Designated Counsel in the Bankruptcy Court (Bankr. S.D.N.Y.) opposing GM's motion to enjoin plaintiffs' economic injury claims based on the injunction contained in the bankruptcy Sale Order by which the assets of Old GM were transferred to New GM in the GM bankruptcy in 2009. As Plaintiff's Designated Counsel, my colleagues and I are charged by MDL Lead Counsel with defeating New GM's efforts to use the GM Sale Order injunction to shield New GM from liability for billions of dollars of economic loss damages to plaintiffs.

▪ Representing the American Association for Justice and the New Jersey Association for Justice in submitting an Amici Curiae brief to the US Supreme Court in support of the Petition for a Writ of Certiorari, filed by Dean Erwin Chemerinsky of the University of California Irvine Law School, on behalf of injured diacetyl plaintiffs in connection with the Third Circuit's decision in *Diacetyl Plaintiffs v. Aaroma Holdings (In re Emoral), LLC*, 740 F.3d 845 (3d Cir. 2014), where the Third Circuit held that the injured plaintiffs' claims against a successor to the debtor were property of the estate which could be settled by the bankruptcy trustee.

My full biography, attached, includes additional details of my representative matters, publications and speaking engagements, and other professional affiliations. Also attached is a collection of articles and other press regarding my involvement both in NECC's Chapter 11 case and in other high-profile engagements.

Given my extensive experience with and deep personal knowledge of the matter at hand, and my years of experience in other national mass tort cases, I believe I am uniquely well-qualified to serve as Trustee of the Tort Settlement Trust.

**BR** Mr. Mike Barker
November 18, 2014
Page 3

## Fee Proposal

As an international law firm employing over approximately 200 staff members (including a full accounting department), my firm is well-positioned to provide any and all necessary administrative services to the Trustee in the performance of the tort Trustee's duties under the Tort Trust Agreement, in-house and with a minimum of expense. Mindful that any funds outlaid for the administrative services necessary to the Tort Settlement Trust's function are funds that will not be distributed to injured parties, I propose to charge a modest fixed fee of $5,000 as the compensation to which the Trustee and his staff are entitled in connection with administering and distributing the assets of the Tort Settlement Trust. (If I retain counsel (my firm or others) to represent me as Trustee in this matter (for example, to resolve legal claims asserted against the Tort Settlement Trust), counsel's fees will not be included in that fixed fee). I propose to seek reimbursement for any necessary out-of-pocket expenses in accordance with the Tort Trust Agreement. Given my firm's position in the marketplace, to the extent the retention of additional third-party professionals (for example, tax preparers or attorneys) becomes necessary from time to time, I expect to be able to negotiate competitive rates for those services, again resulting in the maximum possible distribution to injured parties.

Thank you again for the opportunity to submit this proposal and to be of service. If you have any questions, please do not hesitate to contact me.

Sincerely,

**BROWN RUDNICK LLP**

David J. Molton

61806404 v2





**Partner**

Litigation

+1.212.209.4822

dmolton@brownrudnick.com

**Practice Areas**

Cross Border Insolvencies

Financial Fraud Litigation

Mass Tort Bankruptcies

Mass Tort MDL Litigation

Commercial Litigation

Intellectual Property Litigation

Financial Institutions

Securities

**Education**

New York University School
of Law – J. D., *cum laude*,
1982

- Order of the Coif

Brandeis University – B.A.,
*summa cum laude*, 1979

- Phi Beta Kappa

## David J. Molton

David Molton specializes in complex financial and commercial litigation matters in federal, state and bankruptcy courts in the United States, and he represents foreign liquidators, official committees of creditors, unofficial ad hoc committees of creditors and interested parties in financial fraud and mass tort related litigations and bankruptcies in the United States and in foreign jurisdictions.  In the 2015 edition of *Benchmark Litigation*, David is commended as *"a true trial lawyer"* and *"a strategic thinker who plays the long game and doesn't get bogged down in the short-game issues."*

David was recently made a Fellow of INSOL International, a world-wide federation of national associations for lawyers, accountants and other professionals who specialize in turnaround and insolvency in domestic and cross-border cases.

After graduating from New York University School of Law, David clerked for the Honorable J. Edward Lumbard of the United States Court of Appeals for the Second Circuit. Earlier in his career, David served as an Assistant District Attorney in and for the Office of the District Attorney for New York County, where he was assigned to the Special Narcotics Prosecutor for the City of New York under the Honorable Sterling Johnson, Jr.  As a prosecutor, David supervised joint federal/state law enforcement task force teams and investigations for the New York Drug Enforcement Task Force and the Organized Crime Drug Enforcement Task Force and prosecuted cases involving (i) organized crime related narcotics conspiracies and distribution networks, and (ii) efforts to locate, seize and effectuate the forfeiture of proceeds and assets connected to those criminal activities.

### SIGNIFICANT REPRESENTATIVE MATTERS

David's more recent engagements include:

- Representing Lead Counsel in the GM Ignition Switch Defect MDL Litigation (S.D.N.Y) as Plaintiffs' Designated Counsel in the Bankruptcy Court (Bankr.



*D. Molton / p. 2*

S.D.N.Y.) opposing GM's motion to enjoin plaintiffs' economic injury claims based on the injunction contained in the bankruptcy Sale Order by which the assets of Old GM were transferred to New GM in the GM bankruptcy in 2009. As Plaintiff's Designated Counsel, David and his colleagues are charged by MDL Lead Counsel with defeating New GM's efforts to use the GM Sale Order injunction to shield New GM from liability for billions of dollars of economic loss damages to plaintiffs.

▪ Representing the American Association for Justice and the New Jersey Association for Justice in submitting an Amici Curiae brief to the US Supreme Court in support of the Petition for a Writ of Certiorari, filed by Dean Erwin Chemerinsky of the University of California Irvine Law School, on behalf of injured diacetyl plaintiffs in connection with the Third Circuit's decision in *Diacetyl Plaintiffs v.Aaroma Holdings (In re Emoral), LLC*, 740 F.3d 845 (3d Cir. 2014), where the Third Circuit held that the injured plaintiffs' claims against a successor to the debtor were property of the estate which could be settled by the bankruptcy trustee.

▪ Representing the Japanese Bankruptcy Trustee of the failed global Bitcoin exchange Mt. Gox, which had been the world's largest exchange for this digital currency, in connection with the company's Chapter 15 case in Bankruptcy Court in Texas and related litigation in the United States. David and his team obtained Chapter 15 recognition of the Japanese bankruptcy proceeding as a foreign main proceeding, thereby staying all US litigation against Mt. Gox for the benefit of its foreign insolvency proceeding.

▪ Representing the BVI Liquidator of the Fairfield Funds (the largest feeder funds into the Madoff Ponzi scheme) in the Funds' Chapter 15 case in Bankruptcy Court in New York and related litigation in the United States and elsewhere in the world. Among the achievements achieved by David and his team to date are (i) obtaining recognition from the Bankruptcy Court of the BVI liquidation proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code and obtaining affirmance of that judgment in a seminal and first impression decision of the United States Court of Appeals for the Second Circuit



*D. Molton / p. 3*

(*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.*), 714 F.3d 127 (2d Cir. 2013)), and (ii) obtaining another seminal and first impression Second Circuit decision making Bankruptcy Code Section 363 applicable to the foreign liquidator's sale of the Funds' claim against the Madoff SIPA estate, thereby giving the foreign liquidator an opportunity to seek to undo that deal for the benefit of the Funds' creditors and stakeholders based on changed circumstances (*Krys v. Farnum Place, LLC (In re Fairfield Sentry Ltd.*), 763 F.3d 239 (2d Cir. 2014)).  David and his team are also prosecuting over 300 clawback actions commenced by the foreign liquidator and the Funds against certain of the Funds' redeemers.  The clawback actions, which are presently pending in the Bankruptcy Court in New York, seek the return to the Funds of over $6 billion in overpaid redemptions.

▪ Representing the Official Committee of Unsecured Creditors (principally tort victims) in the New England Compounding Center Chapter 11 case pending in Bankruptcy Court in Boston, the objective of which is the resolution of injury and wrongful death cases resulting from the meningitis outbreak caused by the debtor and its operations in 2012.  David and his team, together with the Creditors' Committee and other bankruptcy parties, have achieved settlements with allegedly culpable parties exceeding $100 million which will be distributed through a bankruptcy Chapter 11 plan to injured victims of the outbreak.

▪ Representing the External Administrator of Awal Bank, BSC (a Bahraini bank implicated in the Al Gosaibi Group/Saad Group global dispute) in the bank's Chapter 15 case in Bankruptcy Court in New York and related litigation in the United States.  Awal Bank was destroyed by a major fraud in the Mideast, and, in a matter of first impression, David and his team successfully used the Chapter 15 case to assert Bankruptcy Code statutory avoidance claims against a global bank to recover assets taken from the Awal Bank overseas and transferred into the United States.

▪ Representing the Cayman Island liquidator of the SPhinX Funds (destroyed by the Refco fraud) in the Funds' Chapter 15 case and related litigation in the United States.  David and his team prosecuted the Funds' claims in the Refco



*D. Molton / p. 4*

MDL presided over by Judge Jed Rakoff in the Southern District of New York. The Funds' claims are against aiders and abettors of the Refco fraud (including auditors, law firms and service providers).  David was appointed by Judge Rakoff as Plaintiffs' Liaison Counsel for the Refco MDL.

- Representing the Central Bank of Bahrain in connection with the Chapter 11 case of Arcapita Bank, BSC (a Bahraini financial institution) in Bankruptcy Court in New York.

- Representing (i) the Ad Hoc Committee of Tort Claimants in connection with the Muscletech CCAA proceeding in Canada (the foreign ephedra bankruptcy) and Muscletech's Chapter 15 case and related litigation in the Southern District of New York (one of the first Chapter 15 cases), (ii) the Official Committees of Creditors (consisting principally of tort claimants) in the Chapter 11 cases of Twinlab, Metabolife and NVE (the domestic ephedra bankruptcies) and (iii) all of these Committees in the ephedra MDL in the Southern District of New York presided over by Judge Jed Rakoff.  In each of the ephedra bankruptcy cases, David helped create the architecture for global resolution of all tort claims and negotiated multi-million dollar global settlements for the benefit of the tort claimants.

- Representing dozens of clergy abuse victims in the Chapter 11 case of the Diocese of San Diego in Bankruptcy Court in California and participating in the negotiation of a significant global settlement with the Diocese and its insurers for the benefit of victims.

- Representing diacetyl tort claimants in the Chapter 11 case of Chemtura Corporation in Bankruptcy Court in New York.

## PUBLICATIONS

- Author, "Bankruptcies in Mass Tort Cases" and annual supplements, *Litigating Mass Tort Cases*, Vol. 1, Chapter 12, 2006 to 2014 (P. Rheingold, ed.).

- Interviewee, "A Look Inside the $100 Million Tainted-Drug Settlement," *National Law Journal*, December 24, 2013 (interviewer, Sheri Qualters).



*D. Molton / p. 5*

- Co-author, "2nd Cir. Raises a Drawbridge to Chapter 15," *Law 360*, December 2013.

- Co-author, "The Ephedra Bankruptcy Cases and the Twinlab Global Settlement Model," *The Bankruptcy Strategist*, January 2008.

**SPEAKING ENGAGEMENTS**

- Panelist, "Recent Developments in Knowing Assistance and Accessory Liability in Fraud Cases," C-5 Conference on Fraud, Asset Tracing and Recovery, Miami, September 2014.

- Presenter, "The Impact of the GM Bankruptcy," HarrisMartin's MDL Conference: General Motors Ignition Switch Recall Litigation Agenda, Chicago, May 2014.

- Panelist, "Chapter 15 Update with Judges and Practitioners," ABI Caribbean Insolvency Symposium, San Juan, February 2014.

- Panelist, "The Use and Recognition of Standalone Injunctions in Cross-Border Insolvencies to Freeze and Recover Assets," C-5 Conference on Fraud, Asset Tracing and Recovery, Miami, November 2013.

- Panelist, "Cross-Border Restructuring Proceedings: A Global Up-Date," Commercial List Users' Committee/OBA Insolvency Law Section/OAIRP Educational Program, Toronto, Canada, June 2013.

- Presenter, "Case Study: *TCT Rubin v. Eurofinance SA*," C-5 Conference on Fraud, Asset Tracing and Recovery, Miami, October 2012.

- Panelist, "*Stern v. Marshall*: The Sky is Not Falling – A Reasoned Analysis of the Decision and Case Law to Date," ABI Caribbean Insolvency Symposium, San Juan, February 2012.

- Presenter, "Madoff Case-Study: Developing US Remedies for Failed Offshore Funds to Assist in Asset Recovery," C-5 Conference on Fraud, Asset Tracing and Recovery, Dubai, January 2012.



*D. Molton / p. 6*

- Panelist, "Ephedra / PPA Bankruptcies and Insurance Coverage - Dexatrim and TL Bankruptcy Plans - The Wave of the Future," Mealey's Ephedra & PPA Litigation Conference, New Orleans, June 2005.

**BAR ADMISSIONS**

- New York
- New Jersey
- California
- Supreme Court of the United States
- US Courts of Appeals for the Second, Third and Ninth Circuits
- US District Courts for the Southern, Eastern and Northern Districts of New York, the District of New Jersey and the Northern District of Illinois
- Dubai International Financial Centre Courts

**AWARDS & HONORS**

- Named as 2014 ILO Client Choice Award Recipient for Insolvency and Restructuring
- Benchmark Litigation – Local Litigation Star, New York, 2013-2015
- Received highest peer review rating by Martindale-Hubbell (AV)

GRANT is free subscriber benefit, find out how to submit your voucher here.

The Boston Globe

# Metro

# $100m settlement reached over meningitis cases

## Deal struck with insurers, owners of firm that made tainted prescription drugs

**By Todd Wallack** | GLOBE STAFF  MAY 06, 2014

Bankruptcy lawyers have reached a settlement worth more than $100 million with insurers and the family that owns the defunct Framingham pharmacy that manufactured tainted drugs blamed for killing 64 people and sickening hundreds more in 2012, a deal that paves the way to eventually providing compensation for victims.

Under the proposed settlement filed in US Bankruptcy Court in Boston on Tuesday, New England Compounding Center owners Barry Cadden and his wife, Lisa Conigliaro Cadden, will contribute $21 million to a fund for creditors. Lisa's sister-in-law and co-owner Carla Conigliaro will add $24 million, and Lisa's brother and co-owner Greg Conigliaro will contribute $2.75 million.

CONTINUE READING BELOW ▼

Barry Cadden, who married into the Conigliaro family, was also the pharmacist who helped oversee the firm's operations.

The court had already frozen about $21 million in family bank accounts.

In addition, insurers for New England Compounding and its landlord are expected to contribute $29 million. And $20 million is expected to come from tax refunds New

### Related

- **12/24: $100 million agreement close in meningitis outbreak case**
- **11/13: US nears new curbs on compounding pharmacies**
- **9/8: Pain, questions linger, a year after meningitis**

England Compounding will receive as a result of its losses. Lawyers hope to raise up to $10 million more by selling Ameridose, a defunct sister company that manufactured and repackaged drugs for hospitals and medical centers.

Lawyers announced late last year that they were close to reaching the $100 million deal, but it took months to finalize the details. A judge must still approve the deal and a system for allocating the settlement to people who are owed money by the firm.

The vast majority of the $100 million is expected to go to victims, because the company had few other creditors when it shut down in 2012 after federal regulators traced a national fungal meningitis outbreak to contaminated steroids made at the compounding pharmacy.

CONTINUE READING BELOW ▼

More than 3,000 creditors have filed claims with the bankruptcy court, mostly victims and their family members. Though the US Centers for Disease Control and Prevention estimated that about 750 people contracted fungal meningitis or related diseases from the tainted drugs, many additional patients have since reported headaches, fatigue, and other symptoms, and may qualify for compensation, diluting the pool of money available to each person.

Still, lawyers are hoping to raise additional money from clinics that administered the drugs and from other companies that could potentially share liability for the contamination — from the company that designed the clean room where the drugs were produced to the firm hired to regularly clean portions of that room.

Paul D. Moore, the bankruptcy trustee who helped lead the negotiations, said he hopes the plan can be approved by the end of the year, with payments to begin soon afterward. He said it is difficult to forecast how much victims will receive, but said the settlement filed Tuesday "represents an excellent first step."

David Molton, a Brown Rudnick lawyer advising the committee of unsecured creditors, including victims, said he expects the first payments could come early next year.

Lawyers cautioned that the final total — even after raising money from additional parties — is still likely to fall short of fully compensating victims for their losses, but said it is significant given that New England Compounding is bankrupt.

The owners, who have declined interview requests in the past, released a joint statement Tuesday that said their thoughts and prayers are with the victims. "We know that no amount of money can adequately compensate the bereaved families for their loss of loved ones, nor those who are suffering today from the terrible effects of this tragedy."

Federal investigators are continuing to consider bringing criminal charges against anyone responsible for selling the tainted drugs. A spokeswoman for the US attorney's office in Boston said Tuesday that the investigation was ongoing.

The government has pressed charges in past cases in which people died from tainted food or medicine, so an indictment would not be unprecedented. In January, two Colorado cantaloupe farmers were given probation and home detention after their farm was blamed for a listeria outbreak that killed 33 people three years ago. The farmers in that case provided $4 million for victims.

*Todd Wallack can be reached at [twallack@globe.com](mailto:twallack@globe.com). Follow him on Twitter [@twallack](https://twitter.com/twallack).*

© 2014 BOSTON GLOBE MEDIA PARTNERS, LLC

## Judge asked to OK $100 million settlement for fungal meningitis victims

*By Robin Erb Detroit Free Press Medical Writer Filed Under Local News Michigan news*
*6:55 PM, May 6, 2014 |*

freep.com

Attorneys have asked a federal judge in New England to approve a settlement with owners of a Massachusetts compounding pharmacy that distributed steroid shots tainted with deadly fungal meningitis.

The settlement, a tentative version of which was reached in the waning days of 2013, sets up a fund of $100 million or more for victims of the tainted injections.

Under the terms, New England Compounding Center owners Barry Cadden, Lisa Cadden, Carla Conigliaro and Greg Conigliaro will personally contribute nearly $50 million, according to David Molton, a lawyer representing victims.

The tentative settlement was filed with U.S. Bankruptcy Judge Henry Boroff in Boston.

The tainted steroid shots were administered for back pain, but instead set off a deadly outbreak of fungal meningitis. At least 64 people died in 20 states. Michigan was among the hardest hit after injections were administered in clinics in Macomb, Livingston, Genesee and Grand Traverse counties.

The 264 Michigan cases included 19 deaths, according to the U.S. Centers for Disease Control and Prevention.

Molton said he believes the pact could be approved this year, making payments to victims possible "as early as early 2015."

He called Tuesday's development "no small matter," given the complexity of multiple investigations and lawsuits.

Additional complaints against other entities — medical providers, pain clinics and others — could lead to other compensation.

*Contact Robin Erb at rerb@freepress.com or 313-222-2708. Follow her on Twitter https://twitter.com/FreepHealth.*





1) Click the download button
2) This will take you to our web page
3) Download the FREE product
from DOCtoPDF

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

• See a sample reprint in PDF format. • Order a reprint of this article now

# THE WALL STREET JOURNAL.

BUSINESS

# GM Engineer Talks to Investigators

*Suspended Employee Met With Congressional Probers on His Role in Deadly Ignition-Switch Design*

By JEFF BENNETT And SIOBHAN HUGHES

Updated May 28, 2014 11:47 p.m. ET



General Motors Co. has recalled nearly 12.8 million cars world-wide this year. *Reuters*

CHICAGO—One of the General Motors Co. engineers at the center of the controversy over the company's handling of a deadly ignition switch defect has met with congressional investigators, indicating lawmakers are accelerating their probe, according to people familiar with the matter.

Raymond DeGiorgio, who was suspended last month with pay, traveled to Capitol Hill to talk about his role in a design change to ignition switches installed in 2.6 million GM compact cars that the company recalled earlier this year, two people who know of the meetings said Wednesday. The ignition switches can slip out of the run position, causing the cars to stall, and lose power to steering and airbags. GM has linked 13 fatalities to the defect. Plaintiffs' lawyers say the death toll is higher.

In 2006, about two years after cars containing the defective switches were launched, Mr. DeGiorgio signed

off on a change to the ignition switches that improved their performance, according to company documents. But company documents show that the design change wasn't accompanied by a change to the part number. That action made it difficult to track the change. It wasn't until 2013 that GM officials realized that the change had been made, after evidence was uncovered in litigation.

Mr. DeGiorgio later denied making the change in a 2013 deposition in a case brought by attorney Lance Cooper for the family of Brooke Melton, who died when her 2005 Cobalt crashed. GM has suspended Mr. DeGiorgio with pay. He hasn't made a public comment about the case. In his meetings on Capitol Hill he denied lying in the deposition, according to people familiar with the discussions.

The meeting with Mr. DeGiorgio suggests congressional leaders are intensifying efforts to nail down details of key events in GM's handling of the ignition switch matter. Lawmakers, in a hearing in early April, pressed GM Chief Executive Mary Barra to explain why the company delayed nearly a decade after employees first learned that the switches were defective before recalling vehicles to replace them. GM is expected to release its internal report on the recall next week, according to people familiar with the matter.

Lawmakers are also investigating why the National Highway Traffic Safety Administration didn't push GM to recall the vehicles sooner, when evidence of problems with the ignition switches and airbags surfaced in 2007.

Ms. Barra met with some lawmakers earlier this month, and she is expected to be called back to testify at a public hearing, possibly in July.

Meanwhile, plaintiffs' lawyers suing GM met in Chicago on Wednesday to map out a strategy for winning federal court approval for consolidating nearly 60 product liability suits under a single judge, a move that would allow them to quickly bring cases to trial.

The attorneys have cases claiming economic losses for owners of about 2.6 million small cars with a defective ignition switch. They are seeking class action status, arguing GM misled consumers who purchased Chevrolet Cobalt and other older cars about defects.

A key issue is whether a U.S. Bankruptcy Court would allow claims that predate the company's July 2009 bankruptcy to be brought against GM. That issue won't be considered until July, leaving the attorneys largely to share information on cases and urge agreement on a court locale.

A GM spokesman said the company "has taken responsibility for its actions and will keep doing so. We also have acknowledged that we have civic and legal obligations relating to injuries that may relate to recalled vehicles."

**GM's Recall Roster**

See a list of recalled models and the number of vehicles affected.

A seven-judge federal panel is expected to decide on Thursday whether to name a single judge and which court would be assigned to try the product-liability cases.

"All of the lessons we have learned from earlier cases are converging here. Never had we had a perfect storm for a class action," said San Francisco attorney Elizabeth Cabraser. "There has never been so many vehicles infected with an easily corrected defect. This is old school product liability, maybe the last of its kind."

| Vehicle Models | Problems |
|---|---|
| Buick LaCrosse, Chevy Malibu | Brakes |
| Saturn Auras | Transmission cable |
| Buick Enclave, Chevy Traverse | Fuel-gauge software |
| Cadillac SRX | Lag in acceleration |
| GMC Sierra, Chevy Silverado | Potential fuel leak |
| Chevy Malibu, Cobalt, others | Electric-power steering |
| Full-sized utility trucks | Oil cooler fitting |
| Chevy Cruze | Half shaft |
| Chevy Cobalt, others | Ignition switch |
| Cadillac ELR | Brake control module |
| Buick Enclave, others | Air bag connector |
| Chevy Express, GMC Savana | Air bag performance |

Georgia attorney Lance Cooper, who brought a wrongful-death suit that helped persuade GM to recall 2.6 million vehicles equipped with faulty ignition switches, told those assembled to closely examine crash evidence and police accident reports. It may show their clients were victims of the stalling and power failure associated with the faulty ignition switch, he said. The switch could move from the run position while in operation, restricting power steering and brakes and deactivating air bags.

"We have to continue working until we get to the truth," Mr. Cooper said.

### GM's Road to a Recall



The bankruptcy court decision will influence the product liability cases. Under the terms of its government-backed restructuring, GM emerged from bankruptcy free of prebankruptcy liabilities for product defects. Those liabilities were transferred to what is commonly called "Old GM," which has about $1 billion to cover all pending claims. If the agreement is upheld, bringing the product cases would be more difficult.

GM is expected to counter that the cases should be heard in New York, where it feels it would have best chance of maintaining a bankruptcy shield. The auto maker previously hired compensation expert Kenneth Feinberg to advise it how to deal with prebankruptcy victims. Details of how that fund would work haven't been released.

Mark Robinson, a Newport Beach, Calif., attorney who co-chaired the meeting and has led class-action suits against Toyota Motor Corp. over unintended acceleration, wants to have the GM cases heard in California where the Toyota case was settled favorably for plaintiffs.

A key issue is whether they can agree to name one or a handful of firms to manage the cases, allowing a trial to move quickly. Mr. Robinson declined to comment on whether he wanted to be appointed lead trial lawyer.

### Related

- **Bankruptcy Beat:** Mark Roe on GM's Liability
- **Bankruptcy Beat:** 'Old GM' Trust Has More Than $1 Billion
- **U.S. Pressures GM to Disclose More on Recall-Linked 13 Deaths**

"This is one case where we need to come together," he said. "This has gone national, it has gone international and everyone is watching. In my 40 years, I have never seen a set of facts at the start of a case, before the first deposition is taken, that points in a clear direction."

Mr. Robinson said he would move quickly to depose GM Chief Executive Mary Barra and General Counsel Mike Millikin. Other attorneys said they plan to attack GM's bankruptcy shield by arguing its terms were improperly reached.

"GM had the ability to find out who owned these cars, and they had the ability to do a recall but they didn't do it," said New York attorney David Molton who is representing plaintiffs seeking to reopen GM's bankruptcy case. "Whether it was intentional, deliberate or inadvertent we contend makes no difference."

The lawyers cited a May 15, 2009, meeting between GM and air-bag supplier Continental AG . At that time, according to GM documents, several GM engineers knew the ignition key was in the "accessory" position in seven of 14 frontal crashes where the air bags didn't deploy. Sixteen days later, GM filed for bankruptcy protection. The switch issue was never discussed in the reorganization.

"They are doing everything they can to hide behind the bankruptcy court," Mr. Robinson said.

Separately, GM product chief Mark Reuss in Detroit on Wednesday said the auto maker completed restructuring its engineering operations into two units and finished hiring additional defect investigators. He declined to answer questions about the recall or the company's internal investigation of its handling of the ignition-switch defect.

—Mike Ramsey
contributed to this article.

**Write to** Jeff Bennett at jeff.bennett@wsj.com

Copyright 2013 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com



**Portfolio Media. Inc.** | 860 Broadway, 6th Floor | New York, NY 10003 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# How They Won It: Brown Rudnick Widens Ch. 15 Courts' Reach

By **Andrew Scurria**

Law360, New York (October 28, 2014, 8:46 PM ET) -- Even after losing three times in lower courts, bankruptcy lawyers from Brown Rudnick LLP never lost faith that they could undo a questionable asset sale tied to the Bernard L. Madoff fraud and were rewarded with a seminal decision that made Chapter 15 a friendlier place for creditors of foreign debtors.

The Second Circuit's Sept. 26 **ruling** in Krys v. Farnum Place was the culmination of three years of Brown Rudnick's efforts on behalf of the foreign liquidator for Fairfield Sentry Ltd., the largest of the so-called feeder funds that funneled offshore money into Madoff's now-defunct firm and lost everything when the infamous Ponzi scheme collapsed.

The case concerned the liquidator's imprudent sale of a $230 million Securities Investor Protection Act claim against the Madoff estate days before it skyrocketed in value. Brown Rudnick went about undoing that transaction in search of a better one that would deliver more to Fairfield investors victimized by the fraud.

It would have been forgivable if the firm had lost faith along the way, as one court after another refused to intercede. But it remained convinced that its reading of a key provision in Chapter 15 of the U.S. Bankruptcy Code gave it a way to undo the deal, even though no court had explicitly said so before.

"Whenever those dark clouds arose, we just opened up [the statute] and read the language," said David Molton, one of the lead lawyers on the case.

Brown Rudnick is known for the breadth of its bankruptcy and restructuring work, representing large corporate debtors, bondholders, unsecured creditors and other claimants. The firm has been representing the Fairfield liquidator since shortly after the feeder fund was forced to begin an insolvency proceeding in its home court in the British Virgin Islands.

In 2010, the firm sought recognition of that case as Fairfield's foreign main proceeding under Chapter 15, which allows foreign debtors to enforce rulings from their home courts in the U.S. The case traveled to the Second Circuit, which upheld the recognition of the BVI case in a landmark April 2013 ruling.

The Fairfield fund may not have had much to work with in terms of assets, but it did have a claim north of $900 million against the Madoff estate. Its chances of returning money to investors was complicated by the trustee charged with winding down the Madoff estate, Irving Picard, who sued Fairfield for $3 billion in clawbacks and tried to disallow its SIPA claim.

Picard has been known for reaching aggressively to tap into any funds that Madoff feeder

funds recover, and the Fairfield liquidator chose to settle rather than pick a costly fight with the trustee. The subsequent deal, reached in May 2011, let the liquidator go after its redeemers without interference from Picard. It also handed the fund a $230 million claim against the Madoff estate, which the liquidator then put on the auction block to raise cash.

A hedge fund called The Baupost Group snapped it up for 32 cents on the dollar. Baked into that price, Molton said, was an anticipated settlement between the trustee and one of the largest beneficiaries of the Madoff fraud, Jeffry Picower.

When Picard did settle with Picower — three days after Baupost signed the dotted line — it brought in $7 billion to the Madoff estate, far exceeding what the market had thought was possible. Claims against the estate trade openly in the distressed debt market.

"That was a surprise, I believe, to everybody that was operating in the market, and it pushed the price from the low 30s to more than double that overnight," Molton said.

The liquidator's obvious course was to back out of the deal and sell the claim again, at the higher price. But Brown Rudnick faced a problem: Under BVI insolvency law, like most legal systems that follow the English tradition, there is no requirement that an asset sale be the best possible deal for creditors in order to win court approval.

Section 363 of the U.S. Bankruptcy Code requires more, typically a showing that an asset sale is in the best interests of creditors. Brown Rudnick petitioned the BVI court to reject the proposed sale, which required both U.S. and BVI court approval before it would go live.

The question was whether the U.S. court would conduct a so-called 363 review as a precondition to effectuating the deal.

"Based on not only the contractual terms but also the provisions of Chapter 15, it was our position that this required U.S. bankruptcy court approval under Section 363," said Daniel Saval, another Brown Rudnick lawyer on the case.

Brown Rudnick called in two heavy hitters to testify that it was so: New York Court of Appeals Judge Joseph W. Bellacosa and former U.S. Bankruptcy Judge Melanie Cyganowski.

Although Judge Edward Bannister of the BVI court declined to question the sale after conducting a three-day evidentiary hearing, he acknowledged that the U.S. court had the final say on whether a 363 review was appropriate.

"It was important to show the judge ... from the statutory overlay of Chapter 15 that if he approved it, that was only the first step, and that the approval of the bankruptcy court had to be the second step," Molton said. "What he did was say, I've done my job, I've looked at it under BVI law, but boys and girls, you now have to go to the U.S. and do the same thing there, and the U.S. court will decide how which and why Section 363 will affect approval of the agreement."

Developing that record before the BVI court would later prove critical.

"From that perspective, getting Judge Bannister to agree that this should be reviewed by a U.S. court was important, and that's why we focused significant attention on it," Saval said.

From there, Brown Rudnick tried to convince two U.S. judges, the late U.S. Bankruptcy Judge Burton R. Lifland and U.S. District Judge Alvin Hellerstein, to step in and conduct a 363 review — and it failed.

That brought the firm to the Second Circuit with a significant losing streak behind it. For appellate counsel, Fairfield tapped former U.S. Solicitor General Paul Bancroft to argue

against Baupost, represented by Kathleen Sullivan of Quinn Emanuel Urquhart & Sullivan LLP. The audience for the battle royal spilled outside the Second Circuit's main courtroom.

The appeals court adopted Brown Rudnick's position wholesale, finding that the sale of the SIPA claim fell within the territorial ambit of the U.S. and that the bankruptcy court handling Madoff's estate was required under Chapter 15 to conduct a 363 review.

The panel also held that there was no reason to defer to the BVI court's decision to uphold the sale because Congress didn't mean for international comity to apply in such an instance.

"Notwithstanding that we did not have the success that we wanted below ... we still remained convinced that we were reading the law correctly," Molton said. "The circuit gave us comfort that after three long years, we were reading the statute correctly."

The decision was the first in that jurisdiction to conclude that the protections of Section 363 apply as forcefully to sales of U.S. assets in Chapter 15 as in a Chapter 11 or a Chapter 7 case. The Second Circuit concluded that while Chapter 15 does encourage uniformity between different jurisdictions, there is some room for the protection of local creditors' interests under U.S. law when it comes to asset sales.

On remand, the bankruptcy court handling Fairfield's case will examine whether the sale generates the best possible recovery for creditors. If not, it will return to the liquidator.

Molton said that although the case has sent waves through the international insolvency community, it does not upend Chapter 15 law but simply puts sophisticated investors on notice that their dealings in foreign jurisdictions are subject to the same scrutiny that U.S. bankruptcy courts apply in other cases.

"All it means is that folks that enter into asset sales with foreign debtors whose foreign proceedings have been recognized under Chapter 15 have to realize that they're in a Chapter 11 or Chapter 7 world with respect to those asset sales," Molton said.

--Editing by Kat Laskowski.

All Content © 2003-2014, Portfolio Media, Inc.



**Portfolio Media. Inc.** | 860 Broadway, 6th Floor | New York, NY 10003 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Mt. Gox's Chapter 15 Bid Wins Texas Judge's Approval

By **Beth Winegarner**

Law360, San Francisco (June 17, 2014, 8:04 PM ET) -- A Texas federal bankruptcy judge on Tuesday approved Japan-based bitcoin exchange Mt. Gox's petition for Chapter 15 bankruptcy, a decision that will provide the exchange some protection in United States court while it continues its primary insolvency proceedings in Tokyo court.

U.S. District Court Bankruptcy Judge Stacey G. Jernigan granted recognition to Mt. Gox's petition for Chapter 15 bankruptcy after an evidentiary hearing Tuesday, noting in the court record that the Japanese court would have the authority to examine witnesses, take evidence and handle at least some of the exchange's United States assets.

David Molton of Brown Rudnick LLP, representing Mt. Gox's bankruptcy trustee and foreign representative Nobuaki Kobayashi, told Law360 he's pleased with the decision.

"Chapter 15 recognition provides [Kobayashi] with full and unfettered access to U.S. courts, including discovery rights, to assist and facilitate his ongoing efforts to identify and recover the debtor's property for the benefit of its customers, including the approximately 650,000 bitcoins that are still missing and led to Mt. Gox's bankruptcy," Molton said.

Mt. Gox filed its U.S. **bankruptcy petition** in March, saying it needed to halt two pending lawsuits in the U.S. while it sorts out its financial affairs through its main bankruptcy proceeding in Tokyo.

One of those cases, brought by CoinLab Inc. last May, sought $75 million over a license agreement the company said Mt. Gox had abandoned. The companies **entered a joint agreement** earlier this month outlining protections for CoinLab if Judge Jernigan recognized the Japanese bankruptcy case as the main foreign proceeding.

CoinLab recently said it would not oppose Mt. Gox's bid for Chapter 15 recognition, as long as its claims, rights and defenses were preserved — including its objections to a proposed reorganization plan that would turn control of Mt. Gox over to investor group Sunlot Holdings Ltd. and hand customers of the old exchange a 16.5 percent stake in Mt. Gox's renewed operations.

That plan would also give certain creditors a prorated disbursement of 200,000 bitcoins — worth about $116 million — and other currency still held by Mt. Gox, which shut down after filing for bankruptcy in Tokyo court in late February.

The SunLab deal came as the result of a pair of **proposed class actions** filed by Mt. Gox's creditors in Illinois federal court. In late April, the groups of American and Canadian creditors said they had spent a week developing the deal to turn over control of Mt. Gox to Sunlot Holdings.

Created in 2009, the bitcoin is the world's first — but not only — decentralized digital currency. A bitcoin's encrypted code is stored locally on a hard disk or flash drive, allowing for verifiable yet semi-anonymous transactions without the fees charged by banks or credit cards. New bitcoins are minted through a computer-driven algorithmic process called mining, and the currency exists in a finite number.

Karpeles announced that he was placing Mt. Gox in bankruptcy in late February after it lost around 750,000 of its customers' bitcoins and around 100,000 of its own, which amounted to about $473 million at the time, according to court papers. The company said it had been the target of numerous hacking attempts.

Mt. Gox's foreign representative is represented by Marcus Alan Helt and Thomas C. Scannell of Gardere Wynne Sewell LLP and by David J. Molton, Daniel J. Saval of Brown Rudnick LLP.

The case is In re: MtGox Co. Ltd., case number 14-31229, in the U.S. Bankruptcy Court for the Northern District of Texas.

--Additional reporting by Stewart Bishop, Maria Chutchian and Dan Ivers. Editing by Rebecca Flanagan.

All Content © 2003-2014, Portfolio Media, Inc.