# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>　　　　　　　　　Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

**DECLARATION OF KIMBERLY A. DOUGHERTY IN SUPPORT OF
CONFIRMATION OF FIRST AMENDED JOINT CHAPTER 11 PLAN OF NEW
ENGLAND COMPOUNDING PHARMACY, INC. AND FOR APPROVAL OF THE
HIGH POINT SETTLEMENT**

## INTRODUCTION

　　　　1.　　My name is Kimberly A. Dougherty. I have personal knowledge of all matters set forth in this Declaration, except for those matters stated to be upon information and belief, and I believe all such matters to be true and correct. I am competent to testify under oath to the matters set forth in the Declaration if called to do so. I submit this Declaration in support of confirmation of the Joint Chapter 11 Plan of the New England Compounding Pharmacy, Inc. [Docket No. 1054] (as amended at Docket No. 1154 and thereafter, from time to time, and including all exhibits and supplements thereto, the "Plan") and, more specifically, as it relates to the settlement of claims against High Point Surgery Center ("High Point") and associated physicians relating to its purchase and administration of contaminated injections.

　　　　2.　　I am an attorney at the law firm Janet, Jenner & Suggs, LLC, in Boston, Massachusetts, and I have been an attorney in good standing in Massachusetts for over ten years. I have over ten years of experience representing consumers nationally against the manufacturers of dangerous pharmaceuticals and defective medical devices. I have tried multiple cases to verdict and I have resolved numerous mass tort litigations resulting in multi-million dollar settlements for our injured clients.

　　　　3.　　I have personal experience serving in leadership roles in other mass tort litigations. Currently, I serve in a leadership capacity in several litigations, including as court appointed co-Liaison Counsel for *In re: Tyco/Covidien Transvaginal Mesh Litigation*, Master Docket 12-03700-N (Middlesex Superior Court, Massachusetts) and *In re: Repliform Only Implant Cases*, Master Docket 13-5100-M (Middlesex Superior Court, Massachusetts). I also serve in a leadership capacity for *In re Specially Assigned Mesh Implant Cases*, Master Docket 11-3750M (Middlesex Superior Court, Massachusetts). In 2010, I was appointed by the court as

1

one of three Plaintiffs' Liaison/Lead Counsel for In re Reglan/Metoclopramide, Master Docket No. 1997 (Court of Common Pleas of Philadelphia County, Pennsylvania) as liaison for Plaintiffs' involved in litigation against the Patient Education Monograph Defendants. The cases are currently stayed pending appeal.

4. I am also the President of the Massachusetts Women's Bar Association and have been a Board member since 2009 and served on the Executive Committee since 2012. I am an Executive Board member and have been a Board of Governor of Massachusetts Academy of Trial Attorneys for several years and I was the Co-Chair of its Women's Caucus for the past eight years.

5. My firm has been involved in this litigation since its inception, filing our first case just 4 weeks after the nationwide recall. I attended hearings at the Massachusetts State Housing and read the testimony of several representatives from the Department of Public Health. I also represent approximately 100 individual personal injury and wrongful death claimants in this bankruptcy proceeding for claims arising from injections of contaminated methylprednisolone acetate ("MPA") compounded by New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center ("NECC"). My clients include individuals who have died as a result of being administered contaminated MPA, as well as those who have developed fungal meningitis, other spinal fungal infections, arachnoiditis and complications from antifungal treatment.

6. From the beginning, I have taken a very active role in the In Re: New England Compounding Pharmacy ("NECP") litigation, including drafting pleadings and arguing multiple issues related to preservation orders and inspection of NECP's facility. Specifically, I briefed and argued in Massachusetts federal court on November 28, 2012, the adoption of the Honorable Judge Dennis Curran's Massachusetts state court preservation order and order of inspection of NECP's facility. I argued the issue of inspection on December 6, 2012 in front of Magistrate Boal and was successful in obtaining an order for a four day inspection of NECP's facility.

7. After the inspection was granted, I along with co-counsel Mark Zamora, took a lead role in drafting a protocol for the inspection with assistance from our experts. Concurrently, Attorney Zamora and I researched, interviewed and engaged multiple nationally recognized experts, including a forensic building expert, two clean room experts, a field hygienist and two laboratory hygienists, three HVAC specialists, and other assisting team members. We also took the lead negotiating with NECP, the government and GDC properties (the building owner) regarding the protocol for the inspection. Throughout this process we conferred with other plaintiffs lawyers regarding the selection of experts and the protocol.

8. During the four days of the inspection, I personally managed the inspection on three of the four days. This entailed being the point person for the dozens of plaintiffs visiting the facility and for all defense counsel and the government. It also involved negotiating sampling, destructive testing, removal of bulk samples, and other issues as they arose with the government, NECP and GDC Properties. I was also involved, along with other plaintiffs' lawyers, with providing NECP and GDC Properties notice of destructive testing and daily proposed plans for the next day's action items.

9.      In April 2013, I was appointed to the Plaintiffs' Steering Committee ("PSC") for the *In re:, New England Compounding Pharmacy, Inc. Products Liability Litigation*, MDL No. 1:13-md-2419, pending in the United States District Court for the District of Massachusetts ("MDL").[1]

10.     Since the time of my appointment, I have continued to be heavily involved in the day to day litigation of the MDL cases. I have taken active roles in spearheading litigation against healthcare providers and on the matrix and science committee, liens committee, as well as serving as the PSC member mediating and negotiating with High Point and Victory Mechanical Services, Inc. and Victory Heating & Air Conditioning Co., Inc.

11.     I have also appeared in front of this honorable court on behalf of the PSC to argue for fair and clear notice of the Bankruptcy and required Claim Form and PITWD addendum to victims.

## HIGH POINT SETTLEMENT

12.     High Point is a North Carolina health care provider that purchased and administered NECC's products to its patients, including contaminated MPA lots that were compounded by NECC during 2012. High Point was insured by Ironshore Specialty Insurance Company ("Ironshore") during the relevant time period. During the second half of 2014, High Point and Ironshore agreed to enter into the Mediation Program established by the MDL Court.

13.     There are 22 individual claimants who filed proofs of claim against NECC in the Bankruptcy Court on the basis that they were administered one or more injections of NECC MPA at High Point. One claimant has already independently resolved claims against High Point. Of the remaining 21 claimants, 12 are represented by seven law firms (this number includes three claimants represented by my firm) and nine are unrepresented. This mediation did not involve or include separate claims the claimants have made against NECC in the Bankruptcy Court by virtue of having filed Proofs of Claims.

14.     In preparing for the mediation with High Point, I obtained and reviewed numerous High Point documents and NECC documents concerning High Point. I also researched and analyzed complex issues and theories related to High Point's potential liability. I drafted a mediation brief that addressed the liability and causation issues relevant to the cases against High Point. Other High Point Claimants' attorneys contributed to this drafting. Additionally, all High Point Claimants' attorneys gathered and shared detailed information regarding the types of injuries suffered and the expenses incurred by their clients with their consent. Redacted information regarding the injuries suffered by the unrepresented claimants was provided by Counsel for the OCC. Thus, counsel for the High Point Claimants had a detailed understanding of both High Point's potential liability and the scope of the injuries that were sustained by all High Point Claimants.

15.     Prior to the mediation session, the parties exchanged among themselves confidential mediation statements outlining each side's positions on legal claims, injuries and

---

[1] MDL Doc. 82.

3

defenses. Each side accordingly was enabled to proceed into mediation fully aware of each parties' position and the basis for same.

16. Also briefed by the parties and considered throughout the mediation process, was the range of injuries suffered by the 21 High Point Claimants. There was a substantial variance in degree of harm and duration of injury among the High Point Claimants. While there was some dispute over the diagnoses, Plaintiffs' took the position that out of the 21 High Point Claimants, five claimants suffered from fungal meningitis,[2] seven claimants suffered from epidural abscesses, steroid site infections or paraspinal infections and two claimants suffered a stroke.[3] Eight of the claimants received potent anti-fungal medication that had terrible side effects and risks such as disturbing hallucinations, liver or kidney function impairment, rashes and skin eruptions, very painful light sensitivity and long-lasting cognitive impairment. Five claimants were required to undergo one or more painful lumbar puncture diagnostic/monitoring procedures as well as repeated MRI/CT's and blood tests.

17. On September 16, 2014, a mediation session was held in Boston, Massachusetts among myself and other High Point Claimants' attorneys, High Point and Ironshore. Carmen Reiss of Resolutions LLC was the mediator. The mediation was conducted pursuant to the MDL Court's Mediation Order dated August 15, 2013. The mediation began with presentations on liability and damages by myself and other High Point Claimants' attorneys to High Point and the mediator.

18. Under the mediator's auspices, the parties discussed at length the strengths and weaknesses of the liability case against High Point, with High Point and Ironshore strongly contesting that High Point Claimants would be able to prove that High Point breached the standard of care owed to individual claimants. It was recognized by all parties that 95% of the medical malpractice cases tried in North Carolina end in defense verdicts. The parties also discussed the likelihood of North Carolina's medical malpractice noneconomic damages statutory cap applying to claimants and as well as the effect it would have on potential verdicts. Specifically, High Point asserted that under North Carolina law the noneconomic damages component of a judgment could not exceed $500,000 against all defendants and that the statutory cap would apply to all claims brought by all parties arising out of the same professional services. The mediator, at all times, was actively involved in the process, ably encouraging the parties to logically and rationally consider their positions, authorities and facts to facilitate movement and realistic bargaining on each side.

19. The mediation session concluded late in the evening on September 16, 2014, with the parties having reached an agreement on the essential financial terms of the High Point Settlement. While High Point maintains it was not legally liable, together with Ironshore, it nonetheless agreed to contribute $3.5 million to the settlement fund in exchange for a non-debtor release and injunction providing protection against any claims and liability relating to NECC's compounded drugs. The High Point settlement is conditioned upon confirmation of a Plan that provides non-debtor or third party releases, both to contributors as well as certain parties who are not direct contributors. The scope of these releases is limited to claims arising from

---

[2] One of the five who claimants suffered from fungal meningitis resolved her claim prior to the mediation.
[3] One of the two claimants suffering a stroke was the same claimant who resolved her claim prior to mediation.

4

contaminated NECC products. These releases will have to be approved by the Court at confirmation (the settlement agreements, by their terms, only become wholly effective upon confirmation of a plan containing such releases). These non-party third party releases are a critical component of the High Point settlement, particularly with respect to persons and entities who are not directly contributing funds as part of this settlement.

20. While the financial terms of the settlement had been agreed upon, negotiations continued between myself and other High Point Plaintiffs' attorneys, the Trustee, counsel for the Creditors' Committee, High Point and Ironshore for many months over the terms and wording of the High Point Settlement Agreement. Detailed information was provided to our clients regarding the issues and obstacles. On information and belief, my colleagues did the same with regard to their respective clients. The agreement was finalized and executed on December 3, 2014.

21. Following the mediation and while the High Point Settlement Agreement was being prepared and finalized, I along with other High Point Plaintiffs' attorneys, the Trustee, counsel for the Creditors' Committee and the PSC met and conferred on numerous occasions to develop and agree upon a claims resolution process and distribution matrix for the portion of the High Point Settlement specifically earmarked for allocation to claimants administered contaminated NECC drugs at High Point. After much thought and deliberation, we all agreed that the Plan's matrix should serve as the base for distribution with a supplemental matrix to provide compensation reflecting the experience and situation of the High Point Claimants sharing this allocated fund. Therefore, the High Point supplemental claims resolution process and distribution matrix was developed to be used in combination with the proposed Chapter Plan's Tort Trust's claims resolution facility and Distribution Matrix. The process of reaching agreement was consensus driven and reflects the input and efforts of numerous High Point Plaintiffs' attorneys, counsel for the Creditors' Committee and members of the PSC.

22. As part of developing the proposed High Point supplemental claims resolution process and distribution matrix, claims administrators submitted proposals and were interviewed on their knowledge, experience and ability to serve as the High Point Claims Administrator. On the basis of these interviews and proposals, Edgar C. Gentle, III, Esq. of the firm Gentle, Turner, Sexton & Harbison, was selected to serve as the High Point Claims Administrator. The High Point supplemental claims resolution process includes a Facilitator to assist the pro se claimants with the process and submission of their claim forms. All of the decisions relating to the High Point supplemental claims resolution process and distribution matrix and the claim administrator were made by consensus, after thoughtful consideration and analysis. I believe they are all fair, reasonable, adequate and equable measures and should be approved by the Court as part of the Plan.

## CONCLUSION

23. The High Point settlement of $3.5 million provides for a fair and reasonable outcome for the creditors, NECC's estate and High Point, with the vast majority of the High Point settlement amount properly benefiting the High Point Claimants. I believe that the High Point settlement provides a greater recovery to NECC's bankruptcy estate and its creditors than what is likely through litigation, and without the costs, complexity, delay and ultimate

uncertainty of litigation. In reaching this conclusion, I have taken into account the variance in degree of harm and duration of injuries of all the High Point Claimants as well as the likelihood that North Carolina medical malpractice statutory law would apply. In my opinion, under the foregoing circumstances, along with other facts and circumstances that I anticipate will be presented to the Court, the High Point Settlement Agreement is a fair reasonable outcome for the High Point Claimants.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 28, 2015

By: _____
Kimberly A. Dougherty
Janet, Jenner & Suggs, LLC
31 St. James Ave., Suite 365
Boston, MA 02116
kdougherty@myadvocates.com
(617) 933-1265

6