# EXHIBIT C

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING PHARMACY, INC.,<br><br>      Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

## DECLARATION OF KIMBERLY A. DOUGHERTY IN SUPPORT OF CONFIRMATION OF FIRST AMENDED JOINT CHAPTER 11 PLAN OF NEW ENGLAND COMPOUNDING PHARMACY, INC. AND FOR APPROVAL OF THE VICTORY SETTLEMENT

## INTRODUCTION

1. My name is Kimberly A. Dougherty.  I have personal knowledge of all matters set forth in this Declaration, except for those matters stated to be upon information and belief, and I believe all such matters to be true and correct.  I am competent to testify under oath to the matters set forth in the Declaration if called to do so.  I submit this Declaration in support of confirmation of the Joint Chapter 11 Plan of the New England Compounding Pharmacy, Inc. [Docket No. 1054] (as amended at Docket No. 1154 and thereafter, from time to time, and including all exhibits and supplements thereto, the "Plan") and, more specifically, in support of approval of the Victory Settlement.

2. I am a partner at the law firm Janet, Jenner & Suggs, LLC, and managing attorney of the Boston, Massachusetts office. I have been an attorney in good standing in Massachusetts since 2003.  I have over 10 years of experience representing consumers nationally against the manufacturers of dangerous pharmaceuticals and defective medical devices.  I have tried multiple cases to verdict and I have resolved numerous mass tort litigations resulting in multi-million dollar settlements for our injured clients.

3.     I have personal experience serving in leadership roles in other mass tort litigations. Currently, I serve in a leadership capacity in several litigations, including as court appointed co-Liaison Counsel for *In re: Tyco/Covidien Transvaginal Mesh Litigation*, Master Docket 12-03700-N (Middlesex Superior Court, Massachusetts) and *In re: Repliform Only Implant Cases*, Master Docket 13-5100-M (Middlesex Superior Court, Massachusetts). I also serve in a leadership capacity for *In re Specially Assigned Mesh Implant Cases*, Master Docket 11-3750M (Middlesex Superior Court, Massachusetts). In 2010, I was appointed by the court as one of three Plaintiffs' Liaison/Lead Counsel for In re Reglan/Metoclopramide, Master Docket No. 1997 (Court of Common Pleas of Philadelphia County, Pennsylvania) as liaison for Plaintiffs' involved in litigation against the Patient Education Monograph Defendants.

4.     I am also the President of the Massachusetts Women's Bar Association (WBA) and have been a Board member since 2009 and served on the Executive Committee since 2012. I am an Executive Board member and have been a Board of Governor of Massachusetts Academy of Trial Attorneys (MATA) for several years and I was the Co-Chair of its Women's Caucus for the past eight years.

5.     My firm has been involved in this litigation since its inception, filing our first case just 4 weeks after the nationwide recall. I attended hearings at the Massachusetts State House and read the testimony of several representatives from the Department of Public Health. I also represent approximately 100 individual personal injury and wrongful death claimants in this bankruptcy proceeding for claims arising from injections of contaminated methylprednisolone acetate ("MPA") compounded by New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center ("NECC"). My clients include individuals who have died as a result of being administered contaminated MPA, as well as those who have developed fungal meningitis, other spinal fungal infections, arachnoiditis and complications from antifungal treatment.

6.     From the beginning, I have taken a very active role in the In Re: New England Compounding Pharmacy ("NECP") litigation, including drafting pleadings and arguing multiple issues related to preservation orders and inspection of NECP's facility. Specifically, I briefed and argued in Massachusetts federal court on November 28, 2012, the adoption of the Honorable Judge Dennis Curran's Massachusetts state court preservation order and order of inspection of

NECP's facility. I argued the issue of inspection on December 6, 2012 in front of Magistrate Boal and was successful in obtaining an order for a four day inspection of NECP's facility.

7.      After the inspection was granted, I along with co-counsel Mark Zamora, took a lead role in drafting a protocol for the inspection with assistance from our experts. Concurrently, Attorney Zamora and I researched, interviewed and engaged multiple nationally recognized experts, including a forensic building expert, two clean room experts, a field hygienist and two laboratory hygienists, three HVAC specialists, and other assisting team members. We also took the lead negotiating with NECP, the government and GDC properties (the building owner) regarding the protocol for the inspection. Throughout this process we conferred with other plaintiffs lawyers regarding the selection of experts and the protocol.

8.      During the four days of the inspection, I personally managed the inspection on three of the four days. This entailed being the point person for the dozens of plaintiffs visiting the facility and for all defense counsel and the government. It also involved negotiating sampling, destructive testing, removal of bulk samples, and other issues as they arose with the government, NECP and GDC Properties. I was also involved, along with other plaintiffs' lawyers, with providing NECP and GDC Properties notice of destructive testing and daily proposed plans for the next day's action items.

9.      In April 2013, I was appointed to the Plaintiffs' Steering Committee ("PSC") for the *In re:, New England Compounding Pharmacy, Inc. Products Liability Litigation*, MDL No. 1:13-md-2419, pending in the United States District Court for the District of Massachusetts ("MDL").[1]

10.     Since the time of my appointment, I have continued to be heavily involved in the day to day litigation of the MDL cases. I have taken active roles in spearheading litigation against healthcare providers and on the matrix and science committee, liens committee, as well as serving as the PSC member mediating and negotiating with Victory and a clinic and hospital in North Carolina.

---

[1] MDL Doc. 82.

11.     I have also appeared in front of this honorable court on behalf of the PSC to argue for fair and clear notice of the Bankruptcy and required Claim Form and PITWD addendum to victims.

## VICTORY SETTLEMENT

12.     Victory Mechanical Services, Inc. and Victory Heating & Air Conditioning Co., Inc. (collectively "Victory") is a Massachusetts corporation with its principal place of business in Bellingham, Massachusetts. Victory designed and installed the HVAC systems for the cleanrooms at NECC's facility, in which the three contaminated MPA lots were compounded. Also, Victory serviced and maintained the HVAC system at NECC, including years prior to and continuing through and after the outbreak.

13.     At all relevant times, Victory was insured by The Netherlands Insurance Company and Peerless Insurance (collectively "Insurers").

14.     The PSC intended to set forth allegations against Victory in the Master Complaint; however, Victory entered into the MDL Court's mediation program, pursuant to the MDL Court's Mediation Order dated August 15, 2013, prior to being named in claims by hundreds of plaintiffs.

15.     In preparation for the Victory mediation, I reviewed numerous documents produced by Victory and NECC documents obtained from the Trustee that pertain to Victory. On behalf of the PSC, and for the mutual benefit of the PSC, the OCC and the Trustee, I retained several consultants with expertise in the areas of engineering, HVAC engineering and cleanroom design. I drafted a mediation brief that addressed the liability and causation issues relevant to the case against Victory. Victory also drafted a mediation brief, addressing their defenses. Each party had the opportunity to review the mediation briefs in advance of the mediation, providing opportunity to prepare for it.

16.     The mediation sessions with Victory were held on July 21 and July 23, 2014 in Boston, Massachusetts. Participants of the mediation included myself (as Designated Counsel representing the PSC), the Trustee, Counsel for the Creditors' Committee, Victory, and Insurers. Carmen Reiss of Resolutions LLC acted as mediator.

17.    Victory strongly contested that Plaintiffs contentions, claiming the PSC would be unable to prove that Victory negligently designed and/or installed the HVAC system and that it had a duty to maintain and service NECC's HVAC system for years prior to and during the time relevant to the outbreak. More specifically, Victory asserted, among other things, it did not: (a) design, install or maintain the fan filter boxes and HEPA filters in the ceiling of the cleanrooms where openings were found that would allow contaminants to fall into the cleanroom;[2] and (b) have a maintenance agreement with NECC to service the HVAC system of the cleanrooms during the time the contaminated products were compounded.[3]

18.    Of great contention was the finding of exserohilum rostratum and aspergillus fumigatus[4] within the HVAC system. The Plaintiffs contended that the negligent design of the HVAC system pulling outside air from a location directly adjacent to a recycling factory lead to these fungi entering the cleanroom through the HVAC system. Victory claimed that the finding of the fungi in the HVAC system showed that it was working and collecting the contaminants before they entered the cleanroom, insisting that the contaminants entered on NECC personnel or others' bodies that entered the cleanroom.

19.    Victory also vehemently argued that the PSC could not prove that its actions caused the victims injuries. Victory contended that even if it had been negligent in some way, ultimately, the negligence of others broke the causal chain between its negligence and the injuries of the Plaintiffs.

20.    There was also a dispute over whether Victory's insurance policy limit under Insurers totaled $7 million for the relevant policy period.

21.    On July 23, 2014, the mediation concluded and the parties reached an agreement on the essential financial terms, pursuant to which Victory and Insurers would contribute $5.5

---

[2] Victory contends that because it was not responsible for the fan filter boxes and HEPA filters for the cleanrooms its employees never conducted any work or inspected above the cleanrooms after the initial installation of the HVAC system. Therefore, Victory claims that it could not have been responsible for or aware of the gaps between the fan filter boxes and ceiling tiles of the cleanrooms, the debris above the cleanrooms and the holes in the ductwork that supplied air to the cleanrooms, contending those events occurred after its installation.

[3] Victory contends that it only had a maintenance agreement with NECC for one of the cleanrooms from 2007 to 2009, and that even if they did have an obligation to service the HVAC system thereafter, that NECC would not cooperate to allow servicing and entrance into the facility.

[4] Exserohilum rostratum and aspergillus fumigates were the fungi found in the contaminated recalled vials of NECC's MPA and the spines of many victims who contracted fungal meningitis.

5

million to the settlement fund.

22.    While the financial terms of the settlement had been agreed upon, negotiations continued between myself, the Trustee, counsel for the Creditors' Committee, Victory and Insurers for many months over the terms and wording of the Victory Settlement Agreement. The agreement was finalized and executed on November 11, 2014.

## THE REASONABLENESS OF THE VICTORY SETTLEMENT

23.    The plan of reorganization (the "Plan") involves numerous settlements of various disputes between and among the NECC estate, certain of NECC's contractors and their insurance companies, various clinics/ hospitals that administered contaminated MPA and personal injury claimants. If approved by the Court, the Plan will provide the NECC bankruptcy estate with approximately $200 million - $5.5 million of this amount will be contributed by Victory and its Insurers. Upon approval of the Plan, and after payment of allowed administrative expenses, assets of the NECC estate will satisfy the claims held by creditors, the majority of which are comprised of personal injury claimants.

24.    I believe the Victory settlement is fair and provides for greater recovery to NECC's bankruptcy estate and its creditors than would be likely after litigation, without the corresponding delay, expense and risks associated with such litigation. After weighing the value of the claims being compromised against the value of the Victory settlement to the NECC bankruptcy estate and its creditors I have determined that the Victory settlement is reasonable for the following reasons:

### The Risks of Litigation

25.    An important factor in evaluating whether the proposed Victory settlement is in the best interests of the NECC bankruptcy estate and its creditors is the probability of success in litigation. While I and members of the PSC believe that Victory's negligence could ultimately be proven, success against Victory in litigation is far from certain.

26.    Although I believe Victory's contentions that it did not have a duty to design, install and service the cleanroom HVAC system, and, even if it did, that it did not negligently

perform such duties were surmountable, Victory presented credible arguments and defenses as to causation that were briefly addressed above and will be more fully explored here.

27.    Victory asserted that if exserohilum rostratum and aspergillus fumigates were found on the air intake filters it would show that the filters were functioning appropriately and capturing the fungi from the outside air before it could circulate through the HVAC system. Moreover, Victory claimed that the filter the PSC's expert did find spores of the fungi on was not an air intake filter but a mixed air filter. According to Victory, fresh air and return air from the cleanroom is funneled through the mixed air filter making the cleanroom itself a potential source of the fungal spores found in the mixed air filter. Victory also asserted that it did not install the HEPA filters adjacent to the areas where the aspergillus fumigates was located and that another party was responsible for the gap between the HEPA filter and the cleanroom ceiling.

28.    During the four day inspection of NECC, the PSC and their experts' ability to take samples were negotiated with NECC, GDC and specifically, and strictly, curtailed by the Federal Bureau of Investigation ("FBI") who were present during the investigation. The PSC's experts were only permitted to take limited samples due to time constraints to complete a facility wide inspection and were also limited in their ability to remove samples from filters, ceiling tiles, walls and other locations given the strict oversight by the FBI. In order to prove that Victory's negligence proximately caused the injuries to the victims with more than somewhat circumstantial evidence, it would be necessary to have an expert thoroughly examine and test multiple samples from NECC's entire cleanroom HVAC system. However, it has been approximately two and one-half years since NECC has ceased operations, making the probative value of any evidence found in the HVAC system uncertain at best.

29.    Furthermore, discovery of Liberty, NECC and its employees would also be necessary to establish the negligence claimed by the PSC, including which entity designed the air intake, which actually installed the HEPA filters, and which controlled the pressurization in the cleanroom (potentially responsible for putting holes in the HVAC system), etc. – all of which Victory vehemently claimed it did not do – and that discovery was not available at the time of mediation and would have been extremely costly to perform, if able to at all given NECC is likely to plead the 5th because of the criminal actions pending against them.

30.     Another challenge the Plaintiffs faced was establishing that the casual chain between any potential negligence claimed of Victory was not broken later by acts of negligence by other parties, including Liberty, NECC, Unifirst and the hospitals and healthcare providers that performed the injections.

31.     While I recognize that the creditors that hold claims, including the personal injury claimants, for the NECC bankruptcy estate have meaningful claims against Victory, I also appreciate that litigation is inherently risky and after evaluating all liability factors, I believe that the Victory settlement is reasonable, fair and adequate.

### Complexity, Expense, Inconvenience and Delay in Pursuing Litigation

32.     I reasonably anticipate that litigation of the claims against Victory would be lengthy, complex and expensive. Likely, Victory would vigorously deny liability, reducing the amount of available insurance coverage, and protracting any resolution of the claims against them. Moreover, costly discovery would have been required of other entities, including NECC, Liberty and Unifirst to establish certain theories of liability. Many of the personal injury claimants have already waited over two and one-half years for compensation and are suffering substantial financial hardship as a result of the injuries caused by the contaminated MPA. I believe that that the Victory settlement is in the best interest of the NECC bankruptcy estate.

### Issues with Collectability

33.     Victory is a Massachusetts, privately held company with minimal assets as it relates to the claims held by the plaintiffs. While a declaratory judgement action seeking to decline insurance coverage was not filed by its insurer, the reality of such was real given the claims made by the PSC. If such an action was filed and successful, Victory has limited assets to cover the claims of the Plaintiffs.

### Third Party Releases are a Necessary Requirement for the Victory Settlement

34.     The Plan, if approved by the Court, will provide third party releases to contributors of the NECC bankruptcy estate as well as certain parties who are not direct contributors. The scope of these releases is limited to claims arising from contaminated NECC products. Upon the Court's confirmation of the Plan and the releases, the settlement agreements, including the Victory settlement, will become wholly effective. Based on my personal

involvement in the mediation with Victory and their Insurers and my participation in the settlement negotiations that followed, I understand that the third party releases were a crucial requirement of the Victory settlement, and that absent the releases, Victory would not have offered the $5.5 million.

35.    As previously noted, it is anticipated that the majority of the claims against the NECC bankruptcy estate are held by personal injury claimants. Therefore, under the terms of the Bankruptcy Code and the contemplated Chapter 11 plan, after the payment of allowed administrative expenses the net proceeds of the NECC bankruptcy estate, including Victory's contribution, would be distributed to the tort claimants. Indeed, I believe that distribution under the Plan will provide the most equitable outcome for the all claimants, including the personal injury claimants, when considering that the alternative of litigation would likely only allow few, if any, of the victims to recover for their injuries.

## CONCLUSION

36.    The Victory settlement of $5.5 million provides for a fair and reasonable outcome for creditors, NECC's estate and Victory. I believe that the Victory settlement provides a greater recovery to NECC's bankruptcy estate and its creditors than what is likely through litigation, and without the costs, complexity, delay and ultimate uncertainty of litigation. In my opinion, under the foregoing circumstances, along with other facts and circumstances that I anticipate will be presented to the Court, the Victory Settlement agreement is a fair reasonable outcome for the NECC bankruptcy estate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 28, 2015

By: _____
Kimberly A. Dougherty
Janet, Jenner & Suggs, LLC
31 St. James Ave., Suite 365
Boston, MA 02116
kdougherty@myadvocates.com
(617) 933-1265