# EXHIBIT D

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

## DECLARATION OF FREDRIC L. ELLIS IN SUPPORT OF CONFIRMATION OF FIRST AMENDED JOINT CHAPTER 11 PLAN OF NEW ENGLAND COMPOUNDING PHARMACY, INC. AND FOR APPROVAL OF ARL SETTLEMENT

### INTRODUCTION

1. My name is Fredric L. Ellis. I have personal knowledge of all matters set forth in this Declaration, except for those matters stated to be upon information and belief, and I believe all such matters to be true and correct. I am competent to testify under oath to the matters set forth in the Declaration if called to do so. I submit this Declaration in support of confirmation of the Joint Chapter 11 Plan of the New England Compounding Pharmacy, Inc. [Docket No. 1054] (as amended at Docket No. 1154 and thereafter, from time to time, and including all exhibits and supplements thereto, the "Plan") and, more specifically, in support of approval of the ARL Settlement.

2. I have been an attorney in good standing in Massachusetts for over thirty years. I graduated with honors from Harvard Law School in 1983. From 1983 to 1984, I was a law clerk to Justice Raya S. Dreben of the Massachusetts Appeals Court. From 1984 to 1986, I served as an Assistant District Attorney in the Middlesex County District Attorney's Office, trying cases in the District and Superior Courts and briefing and arguing cases in the Massachusetts appellate courts, including first-degree murder cases in the Massachusetts Supreme Judicial Court. In 1986, I was appointed Deputy-Chief of the Appeals and Training Bureau for the Middlesex District Attorney's Office, supervising eleven attorneys in all aspects of appellate litigation.

3. From 1988 to 1996, I was in private practice at the Boston law firm of Gilman, McLaughlin & Hanrahan, where I was made a partner in 1991. I handled a variety of civil and criminal cases, including business litigation, products liability and class actions. In 1992, I was appointed to several plaintiffs' counsel committees in the Silicone Gel Breast Implant Product Liability Litigation, MDL-926, and was later appointed by Judge Sam Pointer of the Federal District Court in the Northern District of Alabama to serve on the MDL-926 Common Fund Disbursement Advisory Committee, which recommended appropriate attorney fee payments to

1

attorneys for common benefit work in that litigation. The silicone gel breast implant litigation involved hundreds of thousands of claimants and over twenty defendants, with tens of thousands of individual cases filed in state and federal courts throughout the country. Several of the defendants filed for bankruptcy and there were also a number of limited fund settlements, all coordinated with the MDL proceedings. I had substantial involvement with all of these various proceedings for many years, including oversight of the claims processes established to distribute several settlement funds.

4. In 1995, I was co-counsel for plaintiffs in the trial of Toole v. Baxter Healthcare, a breast implant case tried in Birmingham, Alabama, which resulted in a plaintiff's verdict of $6 million, later reduced to $1 million on remittitur. See Toole v. Baxter Healthcare Corp., 235 F. 3d 1307 (11th Cir. 2000). I was also lead trial counsel and lead appellate counsel in Mahlum v. Dow Chemical Co., in Reno, Nevada, which resulted in a $14.15 million dollar plaintiff's verdict in October 1995, which verdict was partially affirmed on appeal. See Mahlum v. Dow Chemical Company, 114 Nev. 1468 (1998) reh'g denied, 115 Nev. 13 (1999). I was also lead trial counsel and lead appellate counsel in a breast implant case in Massachusetts, which resulted in a $1.1 million plaintiff's verdict in 1996, which verdict was upheld on appeal. Vassallo v. Baxter Healthcare Corp., 428 Mass. 1 (1998). In May 1996, I founded the firm of Ellis & Rapacki LLP. In the late 1990s, I settled over one hundred individual breast implant cases with breast implant manufacturers. I also negotiated a settlement with the U.S. Department of Health and Human Services to resolve the government's Medicare and Medicaid reimbursement claims against breast implant manufacturers and claimants.

5. I also served as lead counsel of the Plaintiffs' Steering Committee in several bankruptcy debtor reaffirmation class actions, including In re: GECC Bankruptcy Reaffirmation Agreements Litigation, MDL-1192. I was also co-lead class counsel in Roberts v. Bausch & Lomb, in the Northern District of Alabama, a nationwide consumer class action, and Mohan v. Dell, Inc., in the San Francisco Superior Court, a California class action.

6. I have also served as lead class counsel in numerous other class actions, including Feiss v. MediaOne Group, U.S.D.C. N.D. Ga., Ciardi v. F. Hoffmann LaRoche, Mass. Sup. Ct., Sweeney v. BASF Corp., Mass. Sup. Ct., Providence Steel v. Union Central Life Insurance Co., U.S.D.C. D. Mass, and Shabshelowitz v. Royal Maccabees Life Insurance Co., U.S.D.C. D. Mass.

7. I have obtained numerous other jury verdicts and million dollar settlements in a wide range of other individual personal injury and wrongful death cases.

8. In 2005, I was appointed by Judge Denise Page Hood of the Federal District Court in the Eastern District of Michigan as Liaison Counsel for over 600 breast implant plaintiffs who opted-out of the Dow Corning Settlement Program in the Dow Corning Bankruptcy. I continue to serve in that role in coordinating the remainder of these cases in the Dow Corning Bankruptcy proceedings. More information concerning me and the Ellis & Rapacki LLP law firm may be found at www.ellisrapacki.com.

9. Since October of 2012, I have represented a number of clients with personal injury claims arising from injections of contaminated methylprednisolone acetate ("MPA)

2

compounded by New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center ("NECC"), and I filed one of the first cases involving NECC's products in Massachusetts state court in mid-October 2012. My clients include George Cary, individually and as the personal representative of the Estate of his wife, Lilian Cary, who died as a result of being administered contaminated MPA. Mr. Cary, who also received MPA injections, was diagnosed with fungal meningitis. Other clients of mine include those who developed fungal meningitis and other spinal fungal infections.

10. I was among the attorneys who coordinated the inspection of NECC's premises in December 2012, and was responsible for administering the fund established by plaintiffs' firms to conduct the inspection. I assisted in drafting the protocol for the inspection and I also coordinated the scheduling of plaintiffs' firms from around the country to visit the site during the four-day inspection.

11. I was the first attorney to name NECC's outside testing laboratory, ARL Bio Parma, Inc. ("ARL"), as a defendant in any case in the country. The complaint against ARL alleged that ARL was negligent in allowing NECC to submit an inadequate number of samples for sterility testing[1], which practice did not comply with the United States Pharmacopeia ("USP").[2] Specifically, USP chapter <71> ("USP 71"), which governs sterility testing, requires a certain number of samples to be tested in order to ensure valid sterility test results. For example, in a batch of parenteral preparation[3] of more than 500 articles, the minimum number of articles that must be tested is twenty. The complaint alleged that ARL was negligent in certifying as sterile three lots of contaminated MPA produced by NECC, each of which consists of more than 5,000 vials, based on testing of only two (2) vials from each lot, and that the negligence of ARL was a proximate cause of the plaintiff's injuries.

12. In February 2012, I assisted the Creditors' Committee's counsel in the preliminary injunction hearing before this Court, which resulted in the issuance of injunctions, attachments and trustee process over the assets of several NECC's officers and directors (the "NECC Insiders").

13. In 2013, as a result of discovery requests propounded by my firm in state court cases, I obtained and reviewed over 28,000 pages of ARL documents. I have worked hand-in-hand with the Plaintiffs' Steering Committee ("PSC") since the nascent stages of the MDL. I am the PSC's designated counsel responsible for a number of areas, including litigating against and ultimately negotiating the settlement with ARL on the PSC's behalf. On September 20, 2013, ARL elected to participate in the MDL Court's mediation program.

14. I am familiar with the requirements for approval of settlements in bankruptcy proceedings as prescribed in Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-45 (1968), and Jeffrey v. Desmond, 70 F. 3d 183 (1st

---

[1] Sterility testing is used to screen drugs for the presence of bacteria, fungi, and other microorganisms.

[2] The United States Pharmacopeia ("USP") is a scientific non-profit organization that sets standards for the identity, strength, quality, and purity of medicines, food ingredients, and dietary supplements.

[3] A "parenteral preparation" refers to an injectable medication, such as MPA.

Cir. 1995). I submit this Declaration to set forth the facts demonstrating that consideration of the factors in those cases (the "TMT/Jeffrey Factors") weighs heavily in favor of approval of the ARL Settlement.

## BACKGROUND MATTERS

### A. ARL and Its Insurer

15. ARL is an Oklahoma corporation with a principal place of business in Oklahoma City, Oklahoma. For a number of years prior to and including 2012, ARL conducted sterility testing on NECC's products, including the three contaminated MPA lots that were compounded by NECC during 2012.

16. Upon information and belief, by the fall of 2013, hundreds of lawsuits in federal and state courts throughout the country named ARL as a defendant. Many of those cases were later transferred to the MDL Court – whether by the Judicial Panel on Multidistrict Litigation or operation of transfer orders entered by the MDL court.

17. Absent a prompt, global resolution of those numerous competing claims, any amounts available to compensate personal injury claimants likely would have been exhausted in a race to the courthouse. In contrast, a prompt global resolution with ARL through the NECC estate would ensure that available proceeds were equitably distributed among those who were injured or died as a result of the contaminated MPA lots.

18. On May 31, 2013, ARL's insurance company, Landmark American Insurance Company ("Landmark") filed a petition Oklahoma state court seeking a declaratory judgment concerning the scope of an insurance policy issued by it to ARL for the period from October 1, 2011 through October 1, 2012. A copy of the Landmark Petition is attached hereto as Exhibit 1. The petition sought a declaration that (i) "the claims asserted in the underlying lawsuits, and all other claims asserted against ARL for injuries, arise out of a series of related, allegedly negligent acts, errors, or omissions and are therefore treated as a single claim," and (ii) because [the claims] are treated as a single claim, [the] $3,000,000 claim limit, and not the $6,000,000 aggregate limit applies to satisfy all claims or asserted claims against ARL arising from the underlying event[.]" Id., Ex. 1 at § 13. On January 23, 2014, after ARL filed an answer to the Landmark Petition, the court granted the PSC's motion to intervene in the declaratory judgment action and the PSC filed an Answer to the Landmark Petition.

### B. Settlement Negotiations with ARL

19. In preparing for the mediation with ARL, I also obtained from the Trustee and reviewed numerous NECC documents concerning ARL.

20. My preparation for the ARL mediation spanned many months and focused on many complex issues and theories. On behalf of the PSC, and for the mutual benefit of the PSC, the OCC, and the Trustee, I retained a consultant who has extensive expertise in microbiology to review some of the relevant documents and to assist in preparing a mediation brief outlining

4

ARL's potential liability. I also devoted substantial time and effort in my investigation of the financial condition of ARL and its available assets.

21. In March 2014, I drafted a mediation brief that addressed the liability and causation issues relevant to the cases against ARL, as well as a separate brief addressing the insurance coverage issue raised by the Landmark Petition. The OCC and the Trustee contributed to this drafting.

22. On April 1 and 2, 2014, mediation sessions were held in Boston among myself (as Designated Counsel representing the PSC), the Trustee, Counsel for the Creditors' Committee, one of the attorneys representing one of the members of the Creditors' Committee, ARL, and Landmark. Carmen Reiss, Esq. of Resolutions LLC was the mediator. The mediation was conducted pursuant to the MDL Court's Mediation Order dated August 15, 2013.

23. ARL's and Landmark's primary defenses were that Plaintiffs would not be able to prove that: (i) ARL tested any final product[4] from any of the three contaminated lots of MPA; (ii) any testing conducted by ARL yielded an inaccurate result; and (iii) that any act or omission by ARL caused damage to any individual claimant. As for insurance coverage, Landmark's position was that the $3 million claim limit applied, and that, pursuant to the policy, the claim limit was reduced by defense costs that had been incurred by Landmark between October 2012 and March 2014.

24. The settlement negotiations were at all times contentious, hard fought and conducted on an arms-length basis.

25. The mediation session concluded during the evening of April 2, 2014, with the parties having reached an agreement on the essential financial terms pursuant to which ARL and Landmark would contribute $6.4 million to the settlement fund.

26. While the financial terms of the settlement had been agreed upon, negotiations continued among myself, the Trustee, counsel for the Creditors' Committee, ARL, and Landmark for many months over the terms and wording of the ARL Settlement Agreement. The agreement was finalized and executed on December 4, 2014.

### THE REASONABLENESS OF THE ARL SETTLEMENT

27. The proposed Plan[5] contemplates court approval of numerous settlements of various disputes between and among the NECC estate, certain of NECC's contractors and their insurance companies, various clinics/ hospitals that administered contaminated MPA and personal injury claimants. If allowed, the plan of reorganization (the "Plan") will provide the

---

[4] ARL contended that the 5 mL vials of MPA submitted to it for testing from the three contaminated lots of MPA were taken from each respective batch before the filling of vials for release and it was likely that any contamination occurred during the fill process. Thus, according to ARL, even if it was negligent in conducting the sterility testing, which ARL disputed, it would not have discovered any contamination as the vials sent for testing were not contaminated.

[5] Terms used herein have the same definitions as defined in the Plan and/or the Tort Trust Agreement.

5

NECC estate with an amount projected to be approximately $200 million. Of this amount, $6.4 million will be contributed by ARL and its insurer.

28. The ARL settlement proceeds, which have been placed into an escrow account, will become property of the NECC bankruptcy estate pursuant to a Chapter 11 plan. Personal injury claimants by far hold the majority of claims in NECC's bankruptcy case, and the Plan provides for payment of allowed claims from the assets of the NECC estate after payment of allowed administrative expenses. As the largest block of creditors anticipated to hold allowed claims, personal injury claimants (through the Tort Trust created by and set forth in the plan) will receive the largest portion of NECC's assets, including the proceeds of the ARL settlement.

29. I believe that the ARL settlement is reasonable for at least the following reasons:

    a. **Result**: In assessing and balancing the value of the claims being compromised against the value to the estate and its creditors by virtue of the proposed settlements, I believe the funds available from the settlement provide a greater recovery to NECC's bankruptcy estate and its creditors than would be likely after litigation, without the corresponding delay, expense and risks associated with any such litigation. Both ARL and ARL's insurer (who raised a serious coverage defense) are making a substantial contribution to the ARL settlement;

    b. **Collectability**: ARL was founded in 1999 and is a small, privately held company with few assets. There is a serious question whether $3 million or $6 million in insurance coverage is available for all claims against ARL. The ARL insurance policy is also a wasting policy (i.e., defense costs are deducted from the policy limit), and I believe that, if there was no settlement, the policy limit would be eroded by defense costs. In such a situation, collecting judgments against ARL would be difficult. The ARL settlement results in significantly enhanced prospects for collection. A fixed sum of $6.4 million has been deposited into an escrow account, which I believe is an amount that is more than could be secured were the NECC estate and personal injury claimants to succeed in litigation.

    c. **Disputed Liability**: I believe the prospects for recovery against ARL in litigation are far from certain. While I believe that ARL's negligence would be proven, the issue of causation is more difficult. An inability to prove causation would raise serious issues that may defeat liability entirely. With respect to ARL's insurer, there exists a serious issue as to whether $3 million of $6 million of insurance coverage is available under the Landmark policy, creating significant doubts as to whether, when and to what extent insurance proceeds would be available for recovery by the NECC estate (or, indeed, any personal injury claimant) in litigation; and

    d. **Plan Progress/Interests of Creditors**: Approval of the ARL Settlement is essential to the approval of the Chapter 11 plan, and, I believe, is in the best interest of the estate's creditors. The victims of the outbreak have already waited

6

for over two and one half years for compensation, and confirmation of the Plan will allow distributions from the Tort Trust to begin to be made to them.

### A.  The Probability of Success in Litigation

30. The first TMT/Jeffrey Factor to consider in evaluating whether the proposed ARL settlement is in the best interests of the estate and its creditors is the probability of success in litigation. This evaluation is necessary to assess and balance the value of the claims that are being compromised against the value to the estate by virtue of the proposed compromises.

31. In evaluating the estate's and its creditors' claims against ARL for damages resulting from the contaminated MPA lots, it is necessary to examine not only ARL's conduct in testing NECC's products, but also to consider ARL's defense that, even if NECC could prove negligence, ARL's negligence was not a proximate cause of the injuries suffered by any of the personal injury claimants. Because the samples of MPA that were sent to ARL for sterility testing were apparently not taken from the final product after the fill procedure, it is possible that the vials tested were, in fact, sterile, and that the contaminated vials of MPA distributed to clinics and hospitals were actually contaminated during the fill procedure. To rebut ARLs causation defense, experts would be required to engage in extensive forensic analyses of NECC's operations. In order to prove that ARL's negligence proximately caused the injuries to the victims, it would be necessary to retain experts who could testify as to what caused the adulteration of the MPA lots and when the contamination occurred. Proving that ARL acted negligently and that its negligence caused the injuries suffered by victims would not be simple, inexpensive, quick or convenient. Moreover, the losing party could appeal, leading to further delay, complexity and expense.

32. Moreover, to prevail against ARL, the NECC estate (and the personal injury claimants) might be in the anomalous position of relying upon the testimony of some of the NECC Insiders regarding NECC's course of dealing with ARL. This could pose difficulties as, upon information and belief, the NECC Insiders likely would assert their rights to withhold testimony under the Fifth Amendment to the United States Constitution, which could make obtaining a recovery against ARL all the more challenging. As time passes, it will also likely become more difficult to obtain reliable testimony concerning when and how the contamination occurred.

33. In sum, while I believe that the NECC estate (and personal injury claimants) have substantial claims against ARL, I am also mindful that litigation is inherently risky and that the difficulties summarized above make success in litigation far from certain. The ARL settlement essentially bypasses the liability concerns described above. Under the ARL settlement, ARL and its insurer are making a substantial contribution without regard to their potential defenses and without regard to the strength or weakness of the factors described above that, in the worst case for NECC and the personal injury claimants, might result in a finding in favor of ARL.

### B.  Difficulties Encountered in the Matter of Collection

34. Based on my investigations to date, ARL is a small, closely held business with few assets. As for ARL's insurance policy, it is by no means certain that it provides more than

7

$3 million for all of the claims of the NECC estate and the personal injury claimants. Moreover, as the ARL insurance policy is a "wasting policy" (*i.e.*, defense costs are deducted from the policy limits) it is highly likely that the policy limits (whether $3 million or $6 million) would be eroded by defense costs in the ensuing litigation if a settlement is not approved. I believe that if the insurance policy were to be exhausted, collecting judgments against ARL's assets would be extremely difficult. Additionally, any coverage litigation with ARL's insurer would also be costly, difficult, complex and time consuming.

### C. Complexity, Expense, Inconvenience and Delay in Pursuing Litigation

35. Upon information and belief, the litigation that would be required to be pursued if the ARL settlement is not approved would be complex and expensive. Moreover, any such litigation likely would be protracted, such that any recovery for the benefit of creditors would be significantly delayed. Absent settlement, ARL likely will vigorously contest liability until its insurance coverage is exhausted by defense costs, and it will then likely file for bankruptcy protection or simply cease to operate as a going concern.

36. I do not believe that it is in the best interest of the NECC estate or the personal injury claimants to pursue the complex, lengthy, and costly litigation that would be required if the ARL settlement is not approved. Many of the personal injury claimants are suffering substantial financial hardship as a result of the injuries caused by the contaminated MPA and they have a compelling need to secure a recovery as soon as possible. The proposed settlement will greatly enhance the likelihood of achieving that goal.

### D. The Third Party Releases Were Necessary to Bring About the ARL Settlement

37. The contemplated ARL settlement is conditioned upon confirmation of a Plan that provides third party releases, both to contributors as well as certain parties who are not direct contributors. The scope of these releases is limited to claims arising from contaminated NECC products. These releases will have to be approved by the Court at confirmation (the settlement agreements, by their terms, become wholly effective only upon confirmation of a plan containing such releases). Upon information and belief, the third party releases are a critical component of the ARL settlement, particularly with respect to persons and entities who are not directly contributing funds as part of this settlement.

38. As a direct participant in the settlement negotiations, I understood that a channeling injunction and third party releases were the *sine qua non* for ARL's and its insurer's agreement to settle.

39. The benefits to the NECC estate from the ARL settlement ($6.4 million), the majority of which will flow to the tort claimants, is a principal reason why the third party releases are reasonable. The proceeds of these settlements are not "earmarked" to any particular group or constituency. Rather, the proceeds will be paid to the NECC estate, and are property of the estate, to be distributed on account of allowed administrative expenses and allowed claims in accordance with the Bankruptcy Code and the terms of the contemplated Chapter 11 plan. Since it is anticipated that personal injury claimants will hold the vast majority of allowed claims, the vast majority of the net proceeds of the ARL settlement (after payment of allowed administrative

expenses and priority claims, if any) will be distributed to personal injury claimants. Moreover, the settlement funds will be distributed in a fair and equitable manner, rather than as a result of a race to the courthouse.

### E. Paramount Interests of Creditors and a Proper Deference to Their Views

40. Personal injury claimants have suffered severe medical and financial harm, regardless of whether ARL is liable for damages. The ARL settlement, if allowed, will accelerate the progress of this case and provide a mechanism for prompt and meaningful payment to personal injury claimants holding allowed claims. Personal injury claimants have already waited too long for this case to be resolved. Approval of the ARL settlement will accelerate the pace of events necessary to occur to enable payment to such claimants and ameliorate the severe financial hardship some claimants are suffering from.

41. Perhaps the strongest indicator of creditor support for approval of the ARL settlement is that all of the Creditors' Committee, the PSC, and the Trustee support approval. The PSC and the Creditors' Committee have among them members and/or counsel who are sophisticated plaintiffs' personal injury counsel and both committees actively participated in the settlement negotiations with ARL and Landmark. That both representative bodies strongly support approval of the ARL settlement provides further validation and proof that the ARL settlement serves the paramount interests of creditors. A proper deference to their views weighs heavily in favor of approval of the ARL settlement.

### CONCLUSION

42. The ARL settlement is an exceptional outcome for creditors and NECC's estate. The ARL settlement provides $6.4 million, without the costs, complexity, delay and ultimate uncertainty of litigation. The vast majority of the ARL settlement amount will inure to the benefit of personal injury claimants holding allowed claims. In my opinion, the ARL settlement is fair and reasonable and the interests of personal injury claimants is best served by approval of the ARL settlement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 27, 2015

By: _/s/ Fredric L. Ellis_
Fredric L. Ellis

# EXHIBIT 1



CJ 2013-3193
Swinton

# IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

MAY 31 2013

TIM RHODES
COURT CLERK

| | |
|---|---|
| LANDMARK AMERICAN INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) Case No. 2013-3193 |
| ARL BIO PHARMA, INC. D/B/A ANALYTICAL RESEARCH LABORATORIES, | ) ) ) ) |
| Defendant. | ) |

## PETITION FOR DECLARATORY JUDGMENT

COMES NOW Landmark American Insurance Company ("Landmark") and pursuant to 12 O.S. §1651, files this Petition for Declaratory Judgment and respectfully shows:

### I.

### THE PARTIES

1. Plaintiff Landmark is an insurer organized under the laws of the State of Oklahoma and having its principal place of business in Atlanta, Georgia.

2. Defendant ARL Bio Pharma, Inc. d/b/a Analytical Research Laboratories ("ARL") is an Oklahoma corporation with its principal place of business at 840 Research Parkway, Suite 546, Oklahoma City, Oklahoma.

### II.

### JURISDICTION AND VENUE

3. Jurisdiction and venue are proper in that Defendant ARL is an Oklahoma corporation located in Oklahoma County, and ARL may be served by serving the registered

agent for ARL, Thomas Kupiec, with service of process at 840 Research Parkway, Suite 546, Oklahoma City, Oklahoma.

4. Further, this action concerns the interpretation of an insurance policy issued to ARL in Oklahoma.

### III.

### FACTUAL BACKGROUND

5. ARL provides laboratory testing services to compounding pharmacies, including the New England Compounding Pharmacy, Inc. ("NECP"). Between May and August 2012, NECP sent samples from three lots of methylpredisolone acetate ("the steroid") to ARL for sterility testing. The steroid is used to treat back pain and is received by patients through an epidural injection. Following testing of the samples from the first two lots, ARL reported the samples were "sterile." A vial from the third lot, however, showed heavy fungal growth after an incubation period. NECP recalled the third lot in September 2012.

6. Hundreds of individuals have reportedly contracted fungal meningitis after being injected with the steroid ("the underlying event"). As a result, several lawsuits were filed nationwide naming NECP and ARL as defendants, among others (the "underlying lawsuits"). The United States Judicial Panel on Multi-District Litigation issued an order on February of 2013 transferring the underlying lawsuits to the United States District Court in the District of Massachusetts.

7. Plaintiffs in the underlying lawsuits generally allege that ARL was negligent in the manner in which it conducted sterility testing on the steroid samples provided by NECP.

8. Landmark issued a professional liability policy to ARL, policy number LHM731509, effective October 1, 2011 to October 1, 2012. The policy has a $3,000,000 each claim limit, a $6,000,000 aggregate limit, and a $5,000 each claim deductible.

9. The policy provides medical professional liability coverage on a claims-made basis, and contains the following relevant provisions:

### Part I. Insuring Agreements

#### A. Covered Services

The Company will pay on behalf of the Insured, as shown in the Declarations, all sums that the Insured becomes legally obligated to pay as **Damages** and associated **Claim Expenses** arising out of a negligent act, error or omission, even if such **Claim** is groundless, false or fraudulent, in the rendering of or failure to render professional services as described in the Declarations, provided that the:

1. **Claim** is first made against the Insured during the **Policy Period**, and reported to the Company no later than thirty (30) days after the end of the **Policy Period**;
2. Negligent act, error or omission took place in a covered territory;
3. Negligent act, error or omission took place after the **Retroactive Date** as shown in the Declarations.

\* \* \*

#### C. Policy Limits

Regardless of the number of persons or entities insured or included in **Part I. E. Covered Persons and Entities**, or the number of claimants or **Claims** made against the Insured:

1. The maximum liability of the Company for **Damages** and **Claim Expenses** resulting from each **Claim** first made against the Insured during the **Policy Period** and the Extended Reporting Period, if purchased, shall not exceed the amount shown in the Declarations as each **Claim**;
2. The maximum liability of the Company for all **Damages** and **Claim Expenses** as a result of all **Claims** first made against the Insured during the **Policy Period** and the Extended Reporting Period, if purchased, shall not exceed the amount shown in the Declarations as Aggregate.

The Company shall not be obligated to pay any **Claim** for **Damages** or defend any **Claim** after the applicable Limit of Liability has been exhausted by payment of judgments, settlements, **Claim Expenses** or any combination thereof. **Claim Expenses** are part of and not in addition to the applicable Limits of Liability. Payment of **Claim Expenses** by the Company reduces the applicable Limits of Liability.

PETITION FOR DECLARATORY JUDGMENT – Page 3
1854776.v1
08011-358

> The inclusion of more than one Insured, or the making of **Claims** by more than one person or organization, does not increase the Company's Limit of Liability. In the event two or more **Claims** arise out of a single negligent act, error or omission, or a series of related negligent acts, errors or omissions, all such **Claims** shall be treated as a single **Claim**. Whenever made, all such **Claims** shall be considered first made and reported to the Company during the **Policy Period** in which the earliest **Claim** arising out of such negligent act error or omission was first made and reported to the Company, and all such **Claims** shall be subject to the same Limit of Liability.

\* \* \*

Part III. Definitions

\* \* \*

> C. **Claim** means a written or verbal demand, including any incident, occurrence or offense which may reasonably be expected to result in a claim, received by the Insured for money or services, including service of suit or institution of arbitration proceeding against the Insured.

10. Landmark is currently defending ARL in the underlying lawsuits under a reservation of rights.

## IV.

## REQUEST FOR DECLARATORY RELIEF

11. The claims for injuries associated with use of the steroid asserted against ARL arise out of a series of related negligent acts, errors, or ommisions—the alleged negligent testing of the steroid samples provided by NECP. Thus, under the Landmark policy's language, the claims are treated as a single claim and the $3,000,000 per claim limit applies.

12. Accordingly, Landmark seeks a declaration from this Court that only the $3,000,000 per claim limit, and not the $6,000,000 aggregate limit applies to satisfy all claims or suits asserted against ARL arising from the underlying event.

## V.

## PRAYER

13. Wherefore, premises considered, Landmark requests that the Court issue an Order:

   a. finding that the claims asserted in the underlying lawsuits, and all other claims asserted against ARL for injuries, arise out of a series of related, allegedly negligent acts, errors, or omissions and are therefore treated as a single claim; and,

   b. holding that because they are treated as a single claim, $3,000,000 per claim limit, and not the $6,000,000 aggregate limit applies to satisfy all claims or suits asserted against ARL arising from the underlying event; and,

   c. granting any and all further relief this Court deems just and to which Plaintiffs are entitled.

Respectfully Submitted,

*/s/ Douglas A. Terry*

Douglas A. Terry, OBA #15855
Melanie K. Christians, OBA #30846
**NELSON TERRY MORTON DEWITT PARUOLO & WOOD**
Attorneys at Law
3540 South Boulevard, Suite 300
Edmond, Oklahoma
T: (405) 705-3600
F: (405) 705-2573
Email: terry@ntmdlaw.com
       mchristians@ntmdlaw.com

and

Linda M. Szuhy, OBA # 17905
THOMPSON COE COUSINS & IRONS, LLP
700 N. Pearl Street, 25th Floor
Dallas, TX 75201
T: (214)871-8227
F: (214)871-8209
Email: rharmon@thompsoncoe.com
Email: lszuhy@thompsoncoe.com

**COUNSEL FOR PLAINTIFF
LANDMARK AMERICAN
INSURANCE COMPANY**