# EXHIBIT F

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

**DECLARATION OF J. SCOTT SEXTON IN SUPPORT OF CONFIRMATION OF FIRST AMENDED JOINT CHAPTER 11 PLAN OF NEW ENGLAND COMPOUNDING PHARMACY, INC. (RELATING TO SETTLEMENT WITH INSIGHT HEALTH CORP., AND OTHERS – VIRGINIA)**

### A. Introduction and Description of the Participation of Virginia Plaintiffs:

1. My name is J. Scott Sexton. I have personal knowledge of all matters set forth in this Declaration, except for those matters stated to be upon information and belief, and I believe all such matters to be true and correct. I am competent to testify under oath to the matters set forth in the Declaration if called to do so. I submit this Declaration in support of confirmation of the Joint Chapter 11 Plan of the New England Compounding Pharmacy, Inc. [Docket No. 1054] (as amended at Docket No. 1154 and thereafter, from time to time, and including all exhibits and supplements thereto, the "Plan") and, more specifically, as it relates to the settlement of claims against Insight Health Corp. ("Insight") and associated physicians, Dr. John Mathis and Dr. Robert O'Brien and their practice group, Image Guided Pain Management (collectively "IGPM") relating to injections of NECC MPA provided in Roanoke, Virginia.

2. I am an experienced trial attorney in good standing in Virginia. Since 1988, I have practiced with the Gentry Locke law firm in Virginia.

3. Beginning in October of 2012, our firm has represented 16 seriously injured individuals and 3 decedents' estates for personal injury and wrongful death claims arising from injections of contaminated methylprednisolone acetate ("MPA) compounded by New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center ("NECC"), at the Insight clinic in Roanoke, Virginia.

4. Our representation of these plaintiffs focused primarily on the liability of Insight and IGPM. After NECC filed for bankruptcy protection, we aggressively filed and pursued state law claims against Insight and IGPM in the Circuit Court for Roanoke City, Virginia. The wrongful death case of *Wingate v. Insight Health Corp.*, was the first case that was worked up

1

for trial. In the course of preparing this case, we obtained thousands of pages of documents from the defendant, conducted 19 depositions, and obtained detailed expert reports. A trial date for the *Wingate case* was set to start on April 21, 2014, in the Roanoke City Circuit Court in Virginia.

5. The *Wingate* case was resolved by agreement in late January 2014, and the settlement was later approved by the Circuit Court.

6. While the *Wingate* case was pending, the Judicial Panel for Multidistrict Litigation entered an order designating the U.S. District Court for Massachusetts as the MDL Court for all claims against NECC and other related third-parties entitled *In re New England Compounding Pharmacy, Inc. Product Liability Litigation,* MDL Docket No. 2419, Master File No. 1:13-MD-02419-RWZ ("MDL Court").

7. Before the *Wingate* case was resolved, the Chapter 11 Trustee for the NECC Bankruptcy ("NECC Trustee") filed a motion with the MDL Court to enter an order that would remove all of the cases against Insight and IGPM which were then pending in Virginia state court arising out of the NECC MPA injections to federal court and transfer them to the MDL Court. In June, 2014, the MDL Court entered the requested Order. Cases that were subsequently filed were transferred or removed to the MDL based upon this ruling. Ultimately, all the 153 claims of former patients who had sued Insight and IGPM in Virginia state courts as a result of injuries and deaths caused by having received one or more injections of NECC MPA administered by IGPM at Insight's Roanoke clinic (the "Virginia Plaintiffs") (this number includes the remaining 18 plaintiffs represented by our firm), were transferred to the MDL Court in Boston. The Virginia Plaintiffs are represented by nine law firms.

8. On August 22, 2014, the Virginia Plaintiffs agreed to submit their claims against Insight and IGPM to a mediation that involved Insight, IGPM, the NECC Trustee, Official Unsecured Creditors Committee from the NECC Bankruptcy, and the Plaintiffs Steering Committee from MDL 2419. This mediation did not involve or include separate claims the Virginia Plaintiffs have made against NECC in the Bankruptcy Court by virtue of having filed Proofs of Claims.

9. The Virginia Plaintiffs represent all of the 153 persons or their estates known to have filed a claim against Insight and/or IGPM arising out of injections of NECC MPA at the Roanoke, Virginia clinic (which is the only clinic at which Insight injected the NECC MPA).

10. As a result of the extensive discovery and expert witness development conducted in the lead *Wingate* case, the Virginia Plaintiffs entered the mediation with a fully-developed factual record and with confidence in the underlying legal merits of their claims. Additionally, the law firms representing the Virginia Plaintiffs gathered, and with the clients' consent, shared detailed information regarding the types of injuries suffered and the expenses incurred by each plaintiff. Thus, counsel for the Virginia Plaintiffs not only had detailed knowledge regarding the alleged liability of the defendants, but also the injuries that the 153 plaintiffs had sustained.

11.     Among the 153 cases there are eight death cases, and the majority of the remaining 145 surviving Virginia Plaintiffs are elderly. This demographic factor along with circumstances related to each plaintiff, caused the Virginia Plaintiffs to strongly encourage their counsel to seek an agreed settlement if a fair resolution could be achieved.

12.     In connection with and prior to the start of the mediation, Insight provided confidential financial statements to counsel for the Virginia Plaintiffs in order provide the Virginia Plaintiffs with a factual basis on which to determine Insight's ability (if any) to fund a settlement beyond its available insurance coverage.

13.     The mediation of these claims formally began on September 11, 2014, when the Virginia Plaintiffs presented the merits of their cases to the two mediators selected by the parties. These detailed presentations on liability and damages to the mediators provided a solid basis for the ultimate success of the mediation. At the end of the formal presentations, all 153 plaintiffs were invited to attend a meeting with the mediators in a hotel ballroom, which was well attended. This process included a vigorous question and answer session.

14.     The mediation process took place over nearly six (6) months, covering the period August 22, 2014 to February 12, 2015. There were multiple face-to-face sessions including five days in Roanoke, one day in Northern Virginia, and 3 days in Boston. At each significant step of the mediation, we provided detailed information to our clients regarding the issues and obstacles. On information and belief, the other counsel representing the Virginia Plaintiffs did the same with regard to their respective clients.

15.     Ultimately, each and every one of the 153 Virginia Plaintiffs overwhelmingly supported the settlement that was achieved and unanimously voted to accept the Settlement Agreement with Insight and IGPM that is reflected in the Plan; and each of the 153 Virginia Plaintiffs signed the Settlement Agreement.

**B.     Insight, IGPM, their Insurers, their respective disputes, and the key terms of the settlement:**

16.     Insight is a Delaware corporation with a principal place of business in Minneapolis, Minnesota. Insight purchased the clinic at issue in Roanoke, Virginia in 2010. At that time, the Roanoke clinic was already using MPA from NECC.

17.     In connection with the purchase of the Roanoke clinic, Insight entered into a contractual agreement with the local physicians, Dr. John Mathis and Dr. Robert O'Brien, who were already practicing at the Roanoke clinic. Those doctors continued to work at the Insight clinic through their practice group, Image Guided Pain Management ("IGPM").

18.     Lexington Insurance Company ("Lexington") issued two liability policies to Insight that provided coverage for claims made by the Virginia Plaintiffs. Insight also maintained an excess or umbrella policy with Darwin Select Insurance Company ("Darwin") that provided secondary coverage for these claims.

19. Based upon the resolution of state court litigation before the claims of the 153 Virginia Plaintiffs were transferred to the MDL, the remaining uncontested insurance coverage between the Lexington and Darwin policies totaled $31.5 million for purposes of the mediation.

20. IGPM's insurance coverage proved to be challenging. IGPM and its member doctors (also defendants) held a policy issued by Medical Mutual of North Carolina ("Medical Mutual"). In response to the lawsuits filed by the Virginia Plaintiffs, Medical Mutual defended under a reservation of rights and filed a federal lawsuit challenging its duty to defend IGPM and the doctors, as well as it coverage of the claims. After losing on its request for declaratory judgment that it had no duty to defend the claims, Medical Mutual appealed the district court decision to the U.S Court of Appeals for the Fourth Circuit, where the case remained as of the date of settlement. Medical Mutual never relented in its aggressive position on a lack of coverage, and this proved to be a major challenge in the efforts to settle the claims.

21. The amount of coverage for IGPM was also a disputed issue. Responses to discovery by IGPM revealed $6 million in total combined coverage for the practice group and the two doctors. However, a theory developed during the course of the mediation that the Medical Mutual policy could be read to provide $6 million per insured (which meant that the policy could provide a potential total of $18 million in coverage, assuming that the plaintiffs prevailed against each of the three insureds).

22. Another significant complication to settlement was the fact that Insight and IGPM had asserted cross claims against each other based on contractual indemnity in all of the cases filed by the Virginia Plaintiffs. Insight had contracted to provide management services to the practice, and IGPM had contracted to provide professional services to patients at the Roanoke clinic. Each claimed that if liability were to be found against them, then the other should be responsible based upon their contractual obligations. As the negotiations progressed it became clear that no settlement with Insight could be reached without including IGPM and the doctors because the joint tortfeasor settlement statute in Virginia could only extinguish claims for contribution and not for indemnity. Insight refused to settle without simultaneous resolution of its potential risk for indemnity claims by IGPM. This risk could only be eliminated by a joint settlement with mutual releases between Insight and IGPM.

23. Given these complications, Judge Zobel ordered the decision-makers for the parties and their counsel her courtroom in Boston with the express purpose of expediting a conclusion to the mediation. This mediation occurred on December 18, 2014, with Judge Zobel and Magistrate Judge Boal actively participating in the mediation meetings with parties. Notwithstanding the direct efforts of Judge Zobel, the parties remained unable to resolve significant details, including reaching a "global settlement" with both Insight and IGPM.

24. The nine firms representing the Virginia Plaintiffs are all experienced trial attorneys in Virginia who have substantial experience in handling complicated personal injury and medical practice claims. Despite the lack of success of the court-facilitated Boston mediation on December 18, 2014, with assistance from the NECC Trustee, the Creditors' Committee, and Plaintiffs Steering Committee, counsel for the Virginia Plaintiffs persuaded the mediators to continue work to overcome the obstacles to settlement.

5002/684/7085164v1

25.     Through continued work in January and February 2015, and an agreement among the NECC Trustee, Plaintiffs Steering Committee and the Virginia Plaintiffs, the parties ultimately reached agreement effective February 12, 2015 on the elusive global settlement, with Insight and IGPM agreeing to mutual releases of each other as a condition of settlement. All mediators, the counsel for the Virginia Plaintiffs, the NECC Trustee, the Official Unsecured Creditors Committee, and the Plaintiffs' Steering Committee endorsed the terms of the settlement as a great achievement for the injured parties.

### C.      The key terms of the settlement:

26.     As noted in the Plan, under the Settlement Agreement, the defendants and their insurers agreed to pay a total of $40 million, including a substantial contribution by Insight above and beyond its available insurance coverage. The $40 million has been deposited into an interim escrow account, and is subject to refund only as provided in the Settlement Agreement, including but not limited to the failure to confirm the chapter 11 plan with the plan releases and injunction. Nearly 90% of this settlement amount is payable upon the Plan Effective Date, with the remainder being held back in escrow in the event of an appeal of an order confirming the Plan. This allows prompt payment to the NECC Estate and the injured parties, regardless of appeals that might be filed. The parties to the settlement believe that ultimately all of the holdback funds will go to the benefit of the NECC Estate and the injured parties, subject only to payments that might be required to satisfy a small subset of theoretically possible claims against Insight that have not and are not practically expected to be filed.

### D.      The reasonableness of the Insight Settlement:

27.     In my opinion, there is no doubt that the settlement reached on the claims against Insight and IGPM is an exceptional result and is a very reasonable outcome for our clients and all of the Virginia Plaintiffs given a number of factors, including the following:

a) <u>Delay and expense associated with litigating 153 cases</u>: Without doubt the trial of these cases would have been extraordinarily expensive and there was likely to be substantial delay in getting these cases ready to be tried against these defendants. While an effort to consolidate the cases for a trial on liability was a possibility, the outcome of such a motion was an uncertain, and even if granted would have been a difficult undertaking, and would not have solved the practical problems associated with trying and proving damages associated with so many claims. With 8 death cases and another 40-50 very serious injury claims, there was a legitimate concern that the range of potential recoveries was well above the insurance coverage available even if all coverage issues were resolved in favor of the plaintiffs (and insureds). The expenses of litigation and the delay of an extended trial schedule were thus factored into this ultimate potential recovery (assuming all wins and all coverage), and the small incremental potential gains were not sufficient to offset the extraordinary associated expense of trial(s), even without factoring in the risk of defense rulings and the potential for loss on the coverage disputes (addressed below).

b) <u>Contested liability</u>: Both Insight and IGPM contested liability and promised to present a vigorous defense. Insight had developed a number of nationally-recognized experts to bolster its defense, and either or both might have convinced juries that the true fault rested with NECC, which produced the contaminated steroids without their knowledge, and through possible criminal acts.

c) <u>Insurance coverage disputes</u>: IGPM's insurance carrier was unrelenting in its challenge to any coverage, and was vigorously pursuing litigation to that end. During the six months of negotiations, no progress was made in gaining any concession from Medical Mutual on the extent of its coverage obligation.

d) <u>Limited resources (collectability and more delay)</u>: IGPM had no known assets of significance apart from its insurance coverage. The information provided by Insight provided no objective basis for the Virginia Plaintiffs, the Trustee, the Creditor's Committee or the PSC to believe that a substantial verdict in excess of insurance coverage could be collected. There was also substantial concern that Insight might file for bankruptcy protection, especially if one of the first cases tried resulted in a substantial verdict. Since Insight had been purchased out of bankruptcy in 2010 by the current owner, there was heightened concern that the owner's familiarity with the reorganization process might make it more willing to seek this protection. Counsel for the Virginia Plaintiffs were concerned that a successful series of trials against Insight would likely only open a new chapter of bankruptcy, further delaying recovery to the injured parties and depleting the recovery of the injured parties through administrative expenses.

e) <u>Injured party demographics and desires</u>: The majority of the parties asserting claims against Insight and IGPM are elderly and many are in poor health. They expressed an overwhelming desire to resolve the cases as quickly as possible by settlement. Many of our more elderly clients expressed a desire to bring closure to this dispute rather than passing it on to their heirs and estates as an additional burden to pursue on their behalf. Ultimately, <u>all</u> of the injured parties who had asserted claims against Insight and IGPM agreed to the settlement and signed the settlement agreement.

f) <u>Potential decline in "value" of numerous cases</u>: It is an unpleasant reality that the monetary "value"[1] of a substantial personal injury claim will often decline when the plaintiff dies. This is particularly true when the plaintiff is elderly and death is not caused by the underlying personal injuries that lead to the claim. Given the demographics of the Virginia Plaintiffs, counsel for these parties recognized the substantial likelihood that a number of the Virginia Plaintiffs would die prior to any trial date. As a result, delay (by default) favored the defense in almost all cases and particularly in cases where the plaintiff was ill and might die before the trial date. This fact was not lost on these defendants. Thus, the value of many of the cases used in the mediation to establish significant damage exposure might have declined with

---

[1] By this I mean only the likely range of jury verdict, not the measure of real harm experienced by the injured party.

6

the passage of time over the next several years. Thus, these defendants had every incentive to prolong and delay the ultimate trial of these cases for as long as possible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 28, 2015

By: _____
J. Scott Sexton (VSB No. 29284)
GENTRY LOCKE
10 Franklin Road, SE
Suite 900
Roanoke, Virginia 24011
540.983.9300
540.983.9400 fax
sexton@gentrylocke.com

7

5002/684/7085164v1