# EXHIBIT G

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>                        Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

**DECLARATION OF THOMAS M. SOBOL IN SUPPORT OF
APPROVAL OF THE UNIFIRST SETTLEMENT AND IN SUPPORT OF
APPROVAL OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF NEW
ENGLAND COMPOUNDING PHARMACY, INC.**

I, THOMAS M. SOBOL, declare and state as follows:

1.  I am a partner with the law firm Hagens Berman Sobol Shapiro LLP and member of the bar of the Supreme Judicial Court of the Commonwealth of Massachusetts. I have been practicing law for over 30 years and have been admitted *pro hac vice* in numerous jurisdictions and district courts across the country. I make this declaration in support of the proposed settlement with the UniFirst Corporation as incorporated into the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. (the "Plan").

2.  Unless otherwise stated, I have personal knowledge of the matters stated herein and, if called upon, I would competently testify thereto. I attest to all other matters upon information and belief, based on investigation conducted by myself, members of my firm or members of the PSC.

**MY BACKGROUND**

3.  I have been the managing partner of the Boston office of Hagens Berman Sobol Shapiro LLP ("HBSS") for fourteen years, and before that a partner in the Boston office of Leif Cabrasser Heiman and Bernstein for two years, where I represented plaintiffs exclusively. I

spent the previous seventeen years with the Boston-based law firm of Brown Rudnick LLP, representing large and small institutions, partnerships, and individual persons in complex criminal and civil matters.

4. I have significant bankruptcy and financial institution experience. As a plaintiffs' litigation attorney, I have handled matters against large institutions in both distressed and non-distressed situations. I have also defended large and small debtors and creditors. I have tried cases in bankruptcy and financial matters while a partner at Brown Rudnick LLP. I also worked in conjunction with the creditors' committee in the W.R. Grace Bankruptcy for Zonolite asbestos claims.[1]

5. I have written an article addressing the practical aspects and benefits of limited fund classes in situations where the defendant does not have adequate assets to fully compensate all tort claimants.[2]

6. My firm specializes in the representation of plaintiffs in class actions and multi-party, large-scale complex litigation and is regularly listed in the National Law Journal's Plaintiffs' Hot 100 List. I personally have significant experience representing plaintiffs in complex pharmaceutical class actions.

## COURT-APPOINTED POSITIONS

7. I am Court-appointed Lead Counsel and a member of the seven person Plaintiffs' Steering Committee ("PSC") in this associated MDL, *In re New England Compounding Pharmacy, Inc. Products Liability Litigation*, 1:13-md-2419-RWZ (D. Mass.) (the "MDL") pending before the Honorable Rya W. Zobel (the "MDL Court"). As Lead Counsel, I have been

---

[1] *In re W.R. Grace*, 01-cv-1139 (Bankr. D. Del. 2001).

[2] Elizabeth J. Cabraser and Thomas M. Sobol, *Equity for the Victims, Equity for the Transgressor: The Classwide Treatment of Punitive Damages Claims*, 74 Tul. L. Rev. 2005.

2

charged by the MDL Court with comprehensively coordinating pretrial strategy, discovery, mediation, and authorizing settlement of claims on behalf of all tort victims in the MDL.[3]

8.  I serve as a member of the Official Committee of Unsecured Creditors ("OCC"), through a proxy from my client Mr. Robert Cole.[4]

9.  I have been involved in this litigation from its inception in the fall of 2012. Very early in the proceedings and before the MDL was formed, I sought and obtained pre-judgement attachment of the tangible assets of NECC.[5] My firm also participated in and helped to coordinate the early inspection of the NECC facility in December 2012.

## EARLY LITIGATION AGAINST UNIFIRST

10. UniFirst Corporation ("UniFirst") is a Massachusetts corporation with its principal place of business at 68 Jonspin Road, Wilmington, Massachusetts.[6] UniFirst contracted with NECC to provide cleaning services that included the cleaning of the "cleanrooms" used to manufacture and/or compound drugs, including the NECC drugs responsible for this tragedy. UniFirst's corporate mission is to be recognized as the "quality leader" in the cleaning and garment industry and, upon information and belief, it represents to its customers that hiring UniFirst will "improve the safety and cleanliness" of their business facility.

11. Among other cleaning duties, NECC paid UniFirst to mop and sanitize the floors, walls and ceilings of each NECC cleanroom, and each pass-through leading to each cleanroom, on a monthly basis. UniFirst was responsible for vacuuming all floors with a HEPA filtered vacuum system. The company's workers were then required to first clean pass-through areas, including walls and ceilings, and then separately sanitize them with isopropyl alcohol. The

---

[3] Order Appointing Lead Counsel and Plaintiffs' Steering Committee, MDL Dkt. 82.

[4] Dkt. 67.

[5] *Erkan* Dkt. 38, 12-cv-12052.

[6] UniFirst may also do business as UniClean Cleanroom Services ("UniClean"), and shall be referred to herein as "UniFirst." UniClean is a division of UniFirst.

3

company was supposed to mop all floors, and then sanitize all floors using UniFirst's proprietary cleanroom mopping systems with materials provided by UniFirst. UniFirst was also responsible for cleaning and sanitizing all exterior hoods in each NECC cleanroom. In accordance with its contractual obligations and industry standards for good cleanroom procedures the two-step process of cleaning and then sanitizing was mandatory for each task.

12. Industry standards require that each action take due time, diligence, and attention to detail, since many particles and contaminants are not visible to the human eye. UniFirst was required to perform these services at NECC and use these products on a monthly basis for two years prior to the outbreak in the fall of 2012.

13. The Master Complaint filed on November 5, 2013[7] named UniFirst as a defendant. The Master Complaint states:

> Defendant UniFirst Corporation ("UniFirst") was hired by NECC to clean the NECC and Ameridose clean rooms, including the clean rooms where the contaminated products were manufactured. . . . NECC's internal records report numerous instances of reported mold and bacterial contamination in the months leading up to the outbreak. UniFirst failed to provide adequate cleaning services that would have prevented contamination of the drugs made in those clean rooms."

14. UniFirst's negligence was reasonably clear even at the pre-discovery stage. Conditions leading to fungal and other contamination were rife at the NECC facilities during 2012. UniFirst was the only outside, industrial cleaner responsible for assuring industrial sanitary conditions for a pharmacy compounding "clean room" facility. Upon information and belief, UniFirst repeatedly departed from both industry standards and contractual requirements, not only failing to accomplish rudimentary clean health standards, but at times exacerbating the unsanitary conditions at NECC.

---

[7] Amended Master Complaint, MDL Dkt. 545.

4

15.     I believe that UniFirst failed to undertake its duties in accordance with industry and contractual standards. However, as UniFirst only visited NECC one time a month, I also recognize that it may be difficult to prove that UniFirst's negligence was a substantial contributing factor that caused the contamination of the three compounded batches of methylprednisolone acetate ("MPA") from the NECC cleanrooms.

## MEDIATION EFFORTS

### A.    Demand letter and mediation briefs.

16.     I and other members of the PSC, along with the Chapter 11 Trustee, the OCC, and UniFirst began discussing the possibility of resolving claims against UniFirst through mediation in early 2014.

17.     On May 15, 2014, the PSC served UniFirst with a comprehensive demand that set out the substantive basis for plaintiffs' claims against UniFirst. The PSC's demand consisted of 40 pages and dozens of exhibits detailing UniFirst's failure to meet industry standards related to proper clean-room cleaning and sanitization procedures, as well as their own standard operating procedures and those of NECC.

18.     In June and July of 2014, the PSC and UniFirst, with involvement of the Trustee and the OCC, agreed to mediate privately, outside of the court-ordered mediation program, with David Geronemus of JAMS Arbitration, Mediation, and ADR Services. The parties exchanged mediation briefs in late summer and early fall of 2014.

### B.    October 17, 2014 Mediation

19.     Due to scheduling conflicts, the first in-person mediation did not take place until October 17, 2014. The PSC, counsel for and representatives of the OCC, and the Trustee attended the mediation for the MDL plaintiffs and bankruptcy creditors. UniFirst's MDL counsel and insurers attended for UniFirst.

5

20. The mediation occurred in the context of attempting to resolve UniFirst's claims for indemnification against the debtor in addition to resolving the tort victim's claims against UniFirst. Despite a day-long effort by all parties and some limited progress, no resolution was reached, although the parties' positions at that time showed the obvious middle point at which an agreement might be reached.

21. During the October in-person mediation, the following issues were in dispute:

   a. Whether UniFirst was responsible for sanitizing the floors, walls, and pass-throughs pursuant to its contract with NECC;

   b. Whether certain independent cleaning and sanitizing pharmaceutical compounding guidelines applied to cleaning companies like UniFirst;

   c. Whether UniFirst was required to use sporicidal cleaners on the cleanroom surfaces;

   d. Whether NECC could have reasonably expected UniFirst to adequately sanitize the cleanroom when UniFirst only visited the NECC facility for 90-120 minutes a month;

   e. Whether there were ongoing problems with the gowning procedures employed by UniFirst;

   f. Whether UniFirst's own written standard operating procedures for the sanitization of pharmaceutical cleanrooms applied to work done in the NECC cleanrooms;

   g. Whether NECC provided UniFirst with NECC's own internal cleanroom standard operating procedures; and

   h. Whether there was a correlation between UniFirst's visits and bacterial and/or fungal contamination in the NECC cleanrooms.

6

### C.    Further mediation efforts

22.     Following the October in-person mediation session, the parties continued discussing a possible resolution of claims against UniFirst. On December 3, 2014, the date the Plan was originally filed, the parties had not yet reached an agreement in principle. The parties continued through discussions with the mediator, both separately and together, to seek resolution (*i.e.*, basically the parties inched toward that mid-point).

23.     On February 22, 2015, the parties signed a settlement agreement. UniFirst agreed to contribute $30.5 million to the NECC bankruptcy estate in exchange for, among other things, a non-debtor release.

24.     On February 23, 2015, the Trustee filed the Plan Supplement, which incorporated the UniFirst Settlement.

### REASONABLENESS OF THE SETTLEMENT

25.     I believe that the proposed settlement with UniFirst is fair and reasonable and in the best interest of all tort victims in the MDL for the following reasons:

### A.    **Establishing liability against UniFirst at trial would be difficult, costly, and take years of continued litigation.**

26.     The PSC was prepared to litigate against Unifirst, but the outcome of such efforts was far from certain. Overcoming UniFirst's asserted defenses, particularly as they relate to the issue of causation, would be an uphill battle and require a tremendous expenditure of resources over a long period of time.

27.     UniFirst vigorously maintained that it bore no responsibility for the outbreak (see *supra* para 21). While the PSC had a basis for contesting UniFirst's defenses, there were serious questions about the ability to prove that UniFirst directly caused the fungal contamination in the batches of MPA.

7

28. Establishing liability and damages as to UniFirst was further hampered by UniFirst's document retention policies, the questionable record keeping at NECC, and an anticipated lack of deposition testimony from the NECC insiders. While none of these should permit UniFirst to escape liability, all had the practical effect of making the case against UniFirst harder to prove.

29. Given my extensive litigation experience with such matters, I harbored serious concerns that Plaintiffs would be able to recover significantly more than $30.5 million in the aggregate for tort victims within a reasonable period of time through multiple, individual trials.

### B. The settlement with UniFirst represents a substantial contribution to the bankruptcy estate.

30. UniFirst's $30.5 million contribution is the largest contribution from a national defendant. For comparison, the other national defendants, ARL and Victory, contributed $6.4 million and $4.5 million respectively.

### C. The proposed Plan and non-debtor releases provided an incentive to UniFirst to settle.

31. The approach chosen long ago for resolving the NECC catastrophe – non-debtor releases in exchange for significant contributions to the bankruptcy estate – provided a vehicle for the resolution of creditors' claims against UniFirst that would not have otherwise been available in a non-bankruptcy context. From the early stages of litigation UniFirst stated that it was only interested in settling if it could resolve all tort victims' claims against it. Without the settlement, significant compensation from UniFirst to the victims of this tragedy would be in doubt. Without the settlement, if financial compensation from UniFirst for the victims ever came, it would only be after years of continued litigation and a significant delay in justice for the victims of this tragedy.

8

## CONCLUSION

32.     It is my belief the settlement with UniFirst as incorporated in the proposed Plan is fair, reasonable, and serves the best interests of tort victims in the MDL.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: April 27, 2015

Respectfully submitted,

_____
Thomas M. Sobol
*Lead Counsel for Plaintiffs' Steering Committee in MDL 2419*