# EXHIBIT N

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| NEW ENGLAND COMPOUNDING | ) | |
| PHARMACY, INC., | ) | Case No. 12-19882 (HJB) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## JOINT DECLARATION OF ANNE ANDREWS AND MICHAEL COREN, AS REPRESENTATIVES OF THE CO-CHAIRS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, IN CONNECTION WITH THE OFFICIAL COMMITTEE'S SUPPORT FOR CONFIRMATION OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF NEW ENGLAND COMPOUNDING PHARMACY, INC. AND APPROVAL OF THE SETTLEMENTS CONTAINED THEREIN

Anne Andrews, Esq. and Michael Coren, Esq., as representatives of the co-chairs of the Official Committee of Unsecured Creditors (the "Official Committee") of New England Compounding Pharmacy, Inc. ("NECC"), make this joint declaration in support of the *First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* (the "Plan"). The undersigned have personal knowledge of all matters set forth in this Declaration, except for those matters stated to be upon information and belief, and the undersigned believe all such matters to be true and correct. The undersigned are each competent to testify under oath to the matters set forth in this Declaration if called to do so. The undersigned declare as follows:

## I.    Introduction

1.    This case began with an administratively insolvent Debtor with limited and inadequate assets careening into bankruptcy in the face of staggering tort liabilities and will end, if the Plan is confirmed by the Court, by distributing the net proceeds of over $200 million in settlements that will provide much needed and material compensation to the victims of NECC

Outbreak who comprise the overwhelming majority of NECC's creditors. Those funds represent the product of settlements, now embodied in the Plan, that were reached with the material participation of the Official Committee. For the reasons further described herein, the Official Committee supports those settlements in all respects.

2.      The consummation of these settlements and the subsequent distribution of their proceeds to NECC's creditors is contingent on this Court's confirmation of the Plan. The undersigned, on behalf of the Official Committee, accordingly submit that under these circumstances, there can be no question that confirmation of the Plan is in the best interests of NECC's creditors, and that the releases and injunctions that will then be provided to those who contributed to the fund to be distributed under the Plan are appropriate and proper. For these reasons, and as more fully set forth herein, the Official Committee fully supports the Plan and recommends its confirmation.

## II.      __The Outbreak__

2.      NECC was a Massachusetts corporation with its principal place of business at 697 Waverly Street, Framingham, MA 01702. Prior to the Petition Date (as defined herein), NECC operated as a compounding pharmacy which combined and mixed active and inactive ingredients to create formulations of compounded pharmaceutical products. Beginning in September 2012, reports began to surface of several patients diagnosed with a rare strain of fungal meningitis (the "Outbreak") after receiving injections of preservative-free methylprednisolone acetate ("MPA") compounded by NECC.[1]

3.      On October 1, 2012, the Massachusetts Department of Public Health (the "MDPH") issued a formal quarantine order pursuant to M.G.L. ch. 94C, §§ 13 & 189A, and

---

[1]      MPA is used to treat swelling and pain in the spine and joints associated with arthritis and other orthopedic disorders. Healthcare professionals administer MPA by injecting it into the affected location, often epidurally.

M.G.L. ch. 112, §§ 30 & 42A, requiring NECC to preserve all products used to compound MPA, including products returned from pharmacies. After an initial recall of the three suspect MPA lots on September 26, 2012, NECC undertook further recalls on October 3, 2012 of all intrathecal products (for injection into the spinal cord or brain); on October 4, 2012 of all injectable medications; and on October 6, 2012 of all NECC-compounded medications dispensed since January 1, 2012. In response to October 2, 2012 findings from the United States Food and Drug Administration and the MDPH, the Massachusetts Board of Registration in Pharmacy requested a voluntary surrender of NECC's pharmacy license. NECC surrendered its license on October 3, 2012. The Department of Justice since then has brought criminal charges against NECC's managers and lead pharmacists.

4. The Outbreak has resulted in hundreds of personal injury and wrongful death claims against NECC and others. The Centers for Disease Control and Prevention ("CDC") reports that, as of October 23, 2013, 64 people had died and 751 individuals had fallen ill.[2] NECC has surrendered its pharmacy license, suspended operations, and terminated its employees. The MDPH also has temporarily barred three former NECC pharmacists from practicing pharmacy.

## III.     The Formation and Membership of the Committee

5. On January 18, 2013, the Office of the United States Trustee (the "UST"), pursuant to Bankruptcy Code Section 1102(a)(1), appointed a nine (9) member Official Committee. Of the nine members of the Official Committee, eight are tort creditors, and accordingly, each of their attorneys serve on the Official Committee as their representative (as is routine and customary where tort claimants sit on Chapter 11 committees) (in this Declaration,

---

[2]     Reported at http://www.cdc.gov/HAI/outbreaks/meningitis-map-large.html#casecount_table (last visited on February 24, 2014). The CDC has not updated the case counts since October 23, 2013 and indicates that further updates to the case counts are not anticipated.

the attorney representatives of the individual tort creditor members of the Committee are collectively referred to as the "Members' Representatives").[3] The Members' Representatives likewise each represent a number of individuals in connection with the administration of NECC products either to those individuals or to their family members.

6.     Ms. Katrina Eldreth (obo Ari Gomez) is a member and co-chair of the Official Committee.   Ms. Eldreth is represented on the Official Committee by her attorneys Anne Andrews and John Thornton.

7.     Ms. Andrews and Mr. Thornton are the name partners at the law firm Andrews & Thornton in Irvine, California.   Collectively, Ms. Andrews and Mr. Thornton have been practicing personal injury and products liability law for over 50 years.  In that time, Andrews & Thornton has represented tens of thousands of clients nationwide in mass torts products liability litigation, and currently specializes in advocating for consumers and advancing the claims of those harmed by dietary supplements, pharmaceutical products, and compounded drugs.   Of particular relevance, Ms. Andrews was appointed by the Honorable Jed Rakoff, District Judge, Southern District of New York, to the Plaintiffs' Steering Committee in the Ephedra Multidistrict Litigation in Southern District of New York.  Ms. Andrews also served as member representative to co-chairs of Official Creditors' or Official Tort Claimants' Committees in Twinlab, Metabilife, NVE and Muscletech bankruptcy cases in United States, and the latter in Canada and the Southern District of New York.  In addition to Ms. Eldreth, Ms. Andrews and Mr. Thornton also represent 208 other personal injury and wrongful death claimants in connection with the administration of NECC products either to their clients or to their clients' family member(s).

---

[3]     The ninth member of the Committee is NStar Electric Company (n/k/a Eversource Energy), represented on the Official Committee by its counsel, Honor Heath.

Ms. Andrews and Mr. Thornton client's (or their clients' family member's) injuries range from spinal/paraspinal abscess to fungal meningitis to death.

8.      The other co-chair of the Official Committee is Meghan Handy.  Ms. Handy is represented on the Official Committee by attorneys Harry M. Roth and Michael Coren of Cohen Placitella & Roth P.C.

9.      Mr. Roth and Mr. Coren are well-known Philadelphia attorneys who, collectively, have been practicing personal injury and products liability law for over 65 years.  Mr. Coren, who also is member of the New Jersey bar, has handled groundbreaking cases in the areas of pharmaceutical/medical devices, consumer abuse, environmental injury and employee workplace safety.  He has considerable expertise in administering mass tort litigant and mass tort resolution programs.  Mr. Roth is highly regarded for his superior handling of complex civil litigation including medical negligence, medical malpractice, product liability, catastrophic personal injury, wrongful death, and pharmaceutical cases.  Mr. Roth has been appointed as Special Litigation counsel to represent the Commonwealth of Pennsylvania in its cost recovery claims against Merck, Sharp & Dohme in the Vioxx litigation.  In addition to Ms. Handy, Mr. Coren and Mr. Roth also represent sixteen (16) other personal injury claimants in connection with the administration of NECC products either to their clients or to their clients' family member(s).  Mr. Coren and Mr. Roth's clients' (or their clients' family member's) injuries range from mild symptoms and emotional distress post administration, to requiring treatment (including surgical intervention) to death (in Ms. Handy's mother's case).

10.      As this Court is aware, the Official Committee has fiduciary duties to all of NECC's unsecured creditors (the vast majority of whom are tort claimants).  Because the Plan

maximizes recoveries to those creditors, the undersigned, on behalf of the Official Committee as a whole, support the Plan and recommend its confirmation.

**IV.     The Members' Representatives and Official
         Committee's Involvement in These Proceedings**

**A.     The Receivership Action and the Adversary Proceeding**

11.     The Members' Representatives involvement in these proceedings pre-dates their clients' appointment to the Official Committee.  In November of 2012, less than a month after NECC undertook its final recall of all NECC-compounded medications dispensed since January 1, 2012, a group of other attorneys (many of whom are now Members' Representatives) contacted Brown Rudnick LLP (which firm now serves as counsel to the Official Committee) with their concern that NECC was dissipating its assets in the face of litigation brought by victims who had filed suits against the company in Massachusetts and across the country.  On November 19, 2012, that group filed in Middlesex Superior Court a petition for receivership, as well as a motion for expedited discovery, which included a request for the taking of sworn depositions of certain NECC's principals and managers (Barry Cadden, Gregory Conigliaro and Lisa Conigliaro-Cadden), and the production of material documents.  The receivership action was thus the precursor to the adversary proceeding the Official Committee would, not three months later, commence against NECC's shareholders and affiliated entities.

12.     Six days after its appointment on January 18, 2013, the Official Committee, on January 24, 2013, on behalf of NECC's bankruptcy estate, commenced Adversary Proceeding No. 13-01040 in this Court (the "Adversary Proceeding") against Barry J. Cadden, Lisa Conigliaro Cadden, Gregory Conigliaro, Carla Conigliaro, Amidose, LLC, GDC Properties Management, LLC, and Medical Sales Management, Inc. (collectively, the "NECC Affiliated Defendants").  In its Complaint, the Official Committee sought to avoid as preferential and

constructively fraudulent transfers over $20 million in pre-petition transfers made to or for the benefit of the NECC Affiliated Defendants during the twelve months prior to NECC's bankruptcy filing. The Official Committee also sought to disallow claims that the NECC Affiliated Defendants may assert against NECC, and to recover damages due to alleged breaches by the Caddens and Conigliaros of fiduciary duties of loyalty and care owed to NECC in their capacity as directors of NECC.

13. On the same day – *i.e.*, January 24, 2013 – the Official Committee filed in the Adversary Proceeding an *Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief* [Adv. Pro. Dkt. No. 3] (the "TRO/PI Motion"), *Emergency Motion for Attachment on Trustee Process* [Adv. Pro. Dkt. No. 5] (the "Trustee Process Motion"), *Emergency Motion for Reach and Apply Injunction* [Adv. Pro. Dkt. No. 6] (the "Reach and Apply Motion"), and *Emergency Motion for Approval of Real Estate Attachment* [Adv. Pro. Dkt. No. 9] (the "Real Estate Attachment Motion").

14. After a hearing on January 25, 2013, this Court issued, on January 28, 2013, the following orders with respect to the Official Committee's motions:

   a. an order granting the Reach and Apply Motion, and restraining and enjoining Ameridose LLC, GDC Properties Management, LLC, and Medical Sales Management, Inc. from paying, transferring, distributing, disbursing, or in any way alienating any amounts due or to become due to Barry Cadden, Lisa Conigliaro Cadden, Gregory Conigliaro, and Carla Conigliaro (the "NECC Shareholder Defendants") up to $21,110,344.30 [Adv. Pro. Dkt. No. 19] (the "Reach and Apply Order");

   b. an order granting the Trustee Process Motion, and ordering the attachment of up to $21,110,344.30 on each of six bank accounts held for the benefit of the NECC Shareholder Defendants [Adv. Pro. Dkt. No. 20] (the "Trustee Process Order");

   c. an order granting the Real Estate Attachment Motion, and ordering the attachment of up to $21,110,344.30 on each piece of real property standing in the name of the NECC Shareholder Defendants in the Commonwealth of Massachusetts [Adv. Pro. Dkt. No. 21] (the "Attachment Order"); and

      d. an order partially granting the TRO/PI Motion, and temporarily restraining and enjoining the NECC Shareholder Defendants from transferring, encumbering, assigning, pledging, mortgaging, or spending any asset other than as necessary for ordinary living or legal-representation expenses, except by leave of this Court [Adv. Pro. Dkt. No. 22] (the "<u>TRO Order</u>", and together with the Reach and Apply Order, the Trustee Process Order, and the Attachment Order, the "<u>Security Orders</u>").

15. Following the entry of the Security Orders, on January 29, 2013 writs of attachment entered attaching all of the Massachusetts real estate of each of Barry Cadden, Carla Conigliaro, Gregory Conigliaro and Lisa Cadden in the amount of $21,110,344.30 [Adv. Pro. Dkt. Nos. 31, 32, 33, 34].

16. Following the appointment of the Chapter 11 Trustee (the "<u>Trustee</u>") on January 25, 2013, on February 12, 2013, this Court entered a Stipulated Order, agreed to by the Trustee, the Official Committee and the NECC Affiliated Defendants, whereby the TRO Order matured into a preliminary injunction and the Trustee was substituted for the Official Committee as the plaintiff in the Adversary Proceeding.

**B. Settlement Negotiations with NECC's Insiders, Affiliates, and Others**

17. Once this Court's orders ensured that NECC's assets, and the significant assets of its shareholders, were protected from dissipation, the Official Committee, in full partnership with the Trustee and together with the MDL Plaintiffs' Steering Committee, turned its focus to maximizing estate value through negotiated settlements with the NECC Shareholder Defendants and other affiliates of NECC (collectively, the "<u>Insiders</u>") as well as with the third parties that allegedly bore responsibility for the Outbreak (such as NECC's vendors as well as clinics and health care providers that actually administered tainted MPA) (the "<u>Non-Affiliated Defendants</u>").

18. As this Court is aware, the Adversary Proceeding was resolved through the Trustee's settlements with the Insiders and NECC's insurers. The Official Committee, at the Trustee's invitation, took an active role in negotiating, evaluating and approving those

settlements, including devoting a considerable amount of time to analyzing tax issues (an anticipated tax refund makes up nearly a third of the Insiders' settlement consideration) as well as retaining special insurance counsel to analyze complicated insurance issues (including the coverage available and Insiders' abilities to defend themselves in litigation).  As this Court is aware, those negotiations ended in settlements totaling nearly $100 million for the benefit of NECC's estate and creditors.

19.     This Court approved the Insider settlement under Bankruptcy Rule 9019 by order dated July 31, 2014.  Upon entry of that order, the Security Orders were lifted, solely to the extent necessary to permit the Insiders to make initial payments into escrow as required by the settlement agreement.  On or about October 23, 2014, pursuant to the approved terms of the settlement, the Insiders made initial cash payments of $47.5 million to an escrow account, to be released to the NECC estate after confirmation of the Plan, and, pursuant to Section 3.4 of the settlement agreement, the illiquid and non-cash security that the Trustee had obtained pursuant to the Security Orders (*i.e.*, the attachments on the Massachusetts real estate of each of Barry Cadden, Carla Conigliaro, Gregory Conigliaro and Lisa Cadden attached in the amount of $21,110,344.30) was replaced with new, liquid security in the form of a lien on the escrowed payments (among other assets that the Insiders are to contribute to the estate).

20.     The Official Committee likewise was actively involved both in developing the mediation protocols for the MDL Court-supervised mediations (the "Mediation Program") (as well as substantially identical protocols for private mediations) and in participating in each of the mediations themselves.  Those mediations led to the over $100 million in settlements with Non-Affiliated Defendants for the benefit of NECC's estate and creditors that are embodied in the Plan.

21.     Once the Mediation Program and other mediation protocols were in place and potentially liable parties began to express their interest in consensually resolving their alleged NECC-related liability, one or more Members' Representatives, including the undersigned, personally assisted in formulating the strategy for each negotiation, including investigating the potential liability of those allegedly responsible for the NECC outbreak, recruiting and consulting with experts, investigating each of their ability to fund a settlement, reviewing the informal discovery produced by the allegedly liable parties, and drafting the confidential mediation briefs for submission to the experienced mediators (Professor Eric D. Green and Carmin Reiss, Esq. of Resolutions LLC, David Geronemous of JAMS, and Hon. Stanley P. Klein (Ret.) of the McCammon Group) supervising the mediations.   One or more Members' Representative likewise actively and materially participated in the in-person and telephonic mediation sessions conducted between the establishment of the Mediation Program in 2013 and early 2015, as well in the follow-up negotiations conducted over telephone and email.   The settlements with non-NECC affiliates are thus, collectively, the result of years of hard work and months of painstaking negotiations on the part of the Trustee, the Official Committee, and the MDL Plaintiffs' Steering Committee.

22.     Each settlement was hard-fought.   As others have competently testified, each potentially liable entity contested its liability to NECC's tort creditors on a number of grounds, including by taking the position, which created difficult challenges from the estate's perspective, that NECC's own comparative fault defeated any liability on their own part.   The settling parties' insurers likewise raised substantial, complicated and potentially dispositive coverage defenses that could, in the Members' Representatives' considered experience and judgment, pose a serious danger of eliminating coverage altogether.   The particular issues presented by each Non-

Affiliated Defendant settlement, and the reasons for the Official Committee's conclusion that each was in the best interest of NECC's estate and creditors, were as follows:

- **UniFirst Settlement**: UniFirst Corporation and UniClean, a division of UniFirst (collectively, "UniFirst"), provided cleaning and sanitation services to NECC. The UniFirst negotiations presented significant causation challenges. In particular, the correlation between UniFirst's visits and bacterial and/or fungal contamination found in the NECC cleanrooms was unclear and highly contested by UniFirst and its experts. It was also hotly contested whether despite UniFirst's contractual obligations, that NECC could have reasonably expected UniFirst to adequately sanitize the cleanroom when UniFirst only visited the NECC facility for 90-120 minutes a month. Under these circumstances, the Official Committee agreed that the settlement consideration of $30 million was fair and reasonable and, under the circumstances, constituted a substantial contribution to the estate.

- **ARL Settlement**: ARL BioPharma ("ARL") provided sterility testing services to NECC. As with UniFirst, the Official Committee believed there could be significant difficulties in proving that ARL's negligence (which the Official Committee did believe could be proved) caused victim's injuries. In particular, the Official Committee believed that there were significant litigation risks associated with proving that ARL tested any final product from any of the three contaminated lots of MPA, that any testing conducted by ARL yielded an inaccurate result, and that any act or omission by ARL caused damage to any individual claimant. The samples of MPA sent to ARL for sterility testing were apparently not taken from the final product after the fill procedure; it is possible that the vials tested were, in fact, sterile and the contaminated vials of MPA distributed to clinics and hospitals were contaminated during the fill procedure. Under these circumstances, the Official Committee agreed that the settlement consideration of $6.4 million was fair and reasonable and, under the circumstances, constituted a substantial contribution to the estate.

- **Victory Settlement**: Victory Mechanical Services, Inc. and the related entity Victory Heating & Air Conditioning Co., Inc. (collectively, "Victory") installed ventilation systems at NECC. Victory contested that anyone would ever be able to prove that Victory negligently designed or installed NECC's ventilation system, and argued that Victory did not design, install, or maintain the fan filter boxes or HEPA filters in the ceiling of the relevant "cleanroom" (where openings were found that would permit contaminants to enter the cleanroom). Victory also maintained that it did not have an ongoing responsibility to service the HVAC system. Finally, although the Official Committee believed Victory's insurance coverage totaled $7 million for the relevant time period, Victory's insurer strongly contested that conclusion. Accordingly, under these circumstances, the Official Committee agreed that the settlement consideration of $5.5 million was fair and reasonable and, under the circumstances, constituted a substantial contribution to the estate.

- **Liberty Settlement**: Liberty Industries, Inc. ("<u>Liberty</u>") designed, manufactured, and installed the so-called "cleanrooms" NECC used to compound its products, including MPA.  In considering what an appropriate settlement amount might be, the Official Committee had to consider Liberty's defense that, even if Liberty's negligence in designing, manufacturing, and installing the cleanrooms could be proven, Liberty's negligence was not a proximate cause of the injuries suffered by any of the personal injury claimants.  Liberty's insurer also maintained that it had and has no coverage obligations whatsoever vis-à-vis Liberty and based that position one or more potentially dispositive coverage exclusions and defenses. Finally, the Official Committee recognized that Liberty had limited tangible assets, and that its annual revenue barely reached seven figures in a good year. Accordingly, under these circumstances, the Official Committee agreed that the settlement consideration of $1 million was fair and reasonable and, under the circumstances, constituted a substantial contribution to the estate.

- **Insight/IGPM Settlement**: Insight Health Corp. ("<u>Insight</u>") and the related entity Image Guided Pain Management ("<u>IGPM</u>"), Virginia health care providers, administered a substantial number of tainted MPA injections.  Insight's and IGPM's defenses to liability mirrored that of the other defendants -- in particular, that NECC, and not Insight/IGPM, bore the brunt (or all) of the responsibility for the Outbreak.  There was also substantial concern that, if any one plaintiff obtained a substantial verdict against it, Insight might file for bankruptcy protection before a settlement could be reached (Insight's management having purchased the company out of bankruptcy in 2010 and accordingly, having familiarity with the process).  Finally, Insight's uncontested insurance totaled only $31.5 million, and IGPM's insurer was adamant that it had no coverage obligations whatsoever.  Under these circumstances, the Official Committee agreed that the settlement consideration of $40 million (including a $7 million contribution from Insight over and above its stated available insurance coverage) was fair and reasonable, and, under the circumstances, constituted a substantial contribution to the estate.

- **High Point Settlement**:  High Point Surgery Center ("<u>High Point</u>") is a North Carolina clinic that administered a large number of tainted MPA shots.  In addition to the causation defenses raised by all non-NECC affiliates, the parties to the High Point mediation had to contend with the fact that 95% of the medical malpractice cases tried in North Carolina end in defense verdicts, as well as the possibility that the North Carolina medical malpractice noneconomic damages statutory cap of $500,000 would apply to claimants (perforce limiting what NECC's tort creditors may be able to recover from High Point absent a settlement).  Accordingly, under these circumstances, the Official Committee agreed that the settlement consideration of $3.5 million was fair and reasonable, and, under the circumstances, constituted a substantial contribution to the estate.

- **Inspira Settlement**: Inspira Health Network, Inc. ("<u>Inspira</u>") is a New Jersey clinic that, like Insight/IGPM and High Point administered a large number of tainted MPA injections.  As did the other non-Insider settling defendants, Inspira

raised significant causation defenses. Those issues were of particular relevance in the Inspira negotiations because of New Jersey's laws on allocation of fault -- under New Jersey law, if a party is found to be less than 60% responsible for total damages, it can be held responsible only for payment of that percentage of damages directly attributable to its negligence. Moreover, Inspira's insurers, as did every other insurer involved in settlement negotiations, disputed their coverage obligations. Accordingly, under these circumstances, the Official Committee agreed that the settlement consideration of $16 million (which represents a substantial portion of Inspira's entire available insurance coverage) was fair and reasonable and, under the circumstances, constituted a substantial contribution to the estate.

23. At the end of the day, in short, each negotiation ended in a settlement that is, in the Official Committee's judgment, a "best-case" scenario for NECC's creditors (indeed, as reflected in the settlement agreements themselves, copies of which have been filed with this Court, each of the Official Committee co-chairs, executed statements in support of each and every settlement). And as this Court is aware, the consummation of the settlements and the subsequent distribution of the net proceeds of over $200 million in settlement payments to NECC's creditors are contingent on this Court's confirmation of the Plan.[4] Without Plan confirmation -- without the releases and injunctions in the Plan that are conditions precedent to the effectiveness of all the settlements -- it is almost certain that the NECC's liquidation will result in *de minimis*, if any, distributions to tort claimants and other general unsecured creditors, and that the resulting free-fall litigation against non-Debtor defendants will lead to a race to the courthouse for the limited funds and insurance available (if such insurance even survives the policies' exclusions), a result that can only benefit a few victims of the Outbreak. For these reasons, the Official Committee wholeheartedly supports the Plan, supports the approval of the settlements contained therein, and recommends confirmation of the Plan.

---

[4] In the case of Liberty, consummation of the settlement is also conditioned on approval of the pending motion for approval of that settlement under Bankruptcy Rule 9019.

Pursuant to 28 U.S.C. § 1746, the undersigned declare under penalty of perjury that the foregoing is true and correct.

Dated: April 15, 2015

Anne Andrews, Esq.
John C. Thornton, Esq.
Karren Schaeffer, Esq.
2 Corporate Park, Ste. 110
Irvine, CA 92606
Telephone: 949 748-1000
aa@andrewsthornton.com
jct@andrewsthornton.com
kschaeffer@andrewsthornton.com

*Counsel for Official Committee of Unsecured Creditors of New England Compounding Pharmacy, Inc. Member and Co-Chair, Katrina Eldreth, obo Ari Gomez*

Michael Coren, Esq.
Harry Roth, Esq.
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: 215 567-3500
mcoren@cprlaw.com
hroth@cprlaw.com

*Counsel for Official Committee of Unsecured Creditors of New England Compounding Pharmacy, Inc. Member and Co-Chair, Meghan Handy*

61930761 v1-WorkSiteUS-030764/0001

14