UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| IN RE: NEW ENGLAND COMPOUNDING | ) | |
| PHARMACY, INC. PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | MDL No. 1:13-md-2419-FDS |
| | ) | |
| This Document Relates to: | ) | |
|     All Cases | ) | |
| | ) | |

**NOTICE OF FILING OF PLAN PROPONENTS' PRE-CONFIRMATION HEARING
MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN
OF NEW ENGLAND COMPOUNDING PHARMACY, INC.**

**PLEASE TAKE NOTICE** that, on April 29, 2015, Paul D. Moore, the Chapter 11

Trustee (the "Trustee") for the bankruptcy Estate of New England Compounding Pharmacy, Inc.

("NECC" or the "Debtor") and the Official Committee of Unsecured Creditors of NECC (the

"Official Committee", and together with the Trustee, the "Plan Proponents"), filed the following

document with the United States Bankruptcy Court, a copy of which is attached hereto as Exhibit

A:

> Plan Proponents' Pre-Confirmation Hearing Memorandum of Law in Support of
> Confirmation of the First Amended Joint Chapter 11 Plan of New England
> Compounding Pharmacy, Inc.

*[The remainder of this page is intentionally blank.]*

Dated:  April 29, 2015

Respectfully submitted,

**DUANE MORRIS LLP**

/s/ Paul D. Moore
Paul D. Moore, Esq.
100 High Street
Suite 2400
Boston, MA 02110
Telephone:  (857) 488-4200
Facsimile:  (857) 401-3057

*Chapter 11 Trustee*

**BROWN RUDNICK LLP**

/s/ David J. Molton
David J. Molton, Esq.
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

William R. Baldiga, Esq.
Kiersten A. Taylor, Esq.
One Financial Center
Boston, MA 02111
Telephone:  (617) 856-8200
Facsimile:  (617) 856-8201

*Counsel to the Official Committee
of Unsecured Creditors*

61940998

## CERTIFICATE OF SERVICE

I, Carol S. Ennis, hereby certify that on April 29, 2015, I caused a copy of the foregoing Notice to be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants, by first class mail, postage prepaid.

Dated: April 29, 2015
       Boston, Massachusetts

/s/ Carol S. Ennis
Carol S. Ennis

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re:<br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

**PLAN PROPONENTS' PRE-CONFIRMATION HEARING**
**MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION**
**OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF**
**NEW ENGLAND COMPOUNDING PHARMACY, INC.**

**DUANE MORRIS LLP**

Paul D. Moore, Esq.
100 High Street
Suite 2400
Boston, MA 02110
Telephone: (857) 488-4200
Facsimile: (857) 401-3057

*Chapter 11 Trustee*

**BROWN RUDNICK LLP**

William R. Baldiga, Esq.
Kiersten A. Taylor, Esq.
One Financial Center
Boston, MA 02111
Telephone:  (617) 856-8200
Facsimile:  (617) 856-8201

David J. Molton, Esq.
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

*Counsel to the Official Committee*
*of Unsecured Creditors*

Dated:  April 29, 2015

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................... 2

**RELEVANT FACTUAL BACKGROUND** ............................................ 4

  A.  NECC's Prepetition Operations ......................................................... 4

  B.  Commencement of the Chapter 11 Case and the MDL Proceedings ................... 5

  C.  The Settlements With NECC's Insiders ............................................ 6

  D.  The MDL Mediation Program Settlements and Other Mediated Settlements ................ 7

  E.  The Plan ........................................................................ 8

**BASIS FOR RELIEF REQUESTED** ................................................. 10

  A.  The Plan Complies, or Will Comply, with
All Relevant Provisions of the Bankruptcy Code ................................... 10

      i.    The Plan Complies with Bankruptcy Code Section 1129(a)(1) ................. 10

      ii.   The Plan Complies with Bankruptcy Code Section 1129(a)(2) ................. 30

      iii.  The Plan Complies with Bankruptcy Code Section 1129(a)(3) Because it Has Been
Proposed in Good Faith and Not by Any Means Forbidden by Law ......................... 31

      iv.  The Plan Properly Provides for Bankruptcy Court Approval of Certain Payments for
Services or Costs and Expenses Pursuant to Bankruptcy Code Section 1129(a)(4). 33

      v.    The Plan Satisfies Bankruptcy Code Section 1129(a)(5). ......................... 34

      vi.  The Plan Does Not Require Governmental Approval Pursuant to Bankruptcy Code
Section 1129(a)(6). ................................................................ 34

      vii.  The Plan Complies with Statutorily-Mandated Treatment of Administrative and
Priority Tax Claims, as Required by Bankruptcy Code Section 1129(a)(9) .............. 35

      viii. The Plan is Feasible, as Required by Bankruptcy Code Section 1129(a)(11). .......... 35

      ix.  The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930, as Required
by Bankruptcy Code Section 1129(a)(12). ................................................ 36

      x.    The Plan Does Not Modify Retiree Benefits and Does Not Implicate Bankruptcy
Code Section 1129(a)(13). ............................................................. 36

      xi.  The Plan Does Not Implicate Bankruptcy Code Sections 1129(a)(14)-(16). ........... 36

      xii.  Bankruptcy Code Section 1129(c) – Only One Plan. .................................. 37

      xiii. Bankruptcy Code Section 1129(d) – Principal Purpose of the Plan is Not Avoidance
of Taxes. ............................................................................. 37

      xiv. At or Before the Confirmation Hearing, the Plan Proponents Will Demonstrate that
the Remaining Relevant Provisions of the Bankruptcy Code are Satisfied. .............. 37

  B.  The Settlements Embodied in the Plan Are
Fair and Reasonable and Should be Approved ....................................... 38

CONCLUSION .................................................................................................................. 42

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<small>CASES</small>

Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns Inc.),
   519 F.3d 640 (7th Cir. 2008) ............................................................................17, 18

Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.),
   885 F.2d 621 (9th Cir. 1989) ......................................................................................17

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,
   526 U.S. 434 (1999) .....................................................................................................3

Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),
   280 F.3d 648 (6th Cir. 2002) ................................................................17, 18, 20, 26

Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re
   Metromedia Fiber Network, Inc.),
   416 F.3d 136 (2d Cir. 2005) .................................................................17, 18, 21, 29

Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd.
   P'ship),
   116 F.3d 790 (5th Cir. 1997) .....................................................................................32

Gillman v. Continental Airlines (In re Continental Airlines),
   203 F.3d 203 (3rd Cir. 2000) ...............................................................................17, 25

Granada Wines, Inc., v. New England Teamsters and Trucking Industry Pension Fund,
   748 F.2d 42 (1st Cir. 1984) ..................................................................................11, 12

In re Am. Family Enters.,
   256 B.R. 377 (D.N.J. 2000) .......................................................................................25

In re Blitz U.S.A.,
   Case No. 11-13603 (PJW), 2014 Bankr. Lexis 2461 (Bankr. D. Del. Jan. 30, 2014) ............27

In re Century Glove, Inc.,
   Nos. 90-400, 90-401, 1993 U.S. Dist. LEXIS 2286 (D. Del. Feb. 10, 1993) .........................32

In re Charles St. African Methodist Episcopal Church of Boston,
   499 B.R. 66 (Bankr. D. Mass. 2013) ....................................................................20, 21

In re Clamp-All Corp.,
   233 B.R. 198 (Bankr. D. Mass. 1999) .......................................................................30

In re Combustion Eng'g, Inc.,
   391 F.3d 190 (3d Cir. 2004) ......................................................................................32

In re Drexel Burnham Lambert Grp.,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ..................................................................33

In re Drexel Burnham Lambert Grp., Inc.,
    960 F.2d 285 (2d Cir. 1992)..................................................................................17

In re Healthco Int'l, Inc.,
    136 F.3d 45 (1st Cir. 1998)...........................................................................38, 39

In re Indianapolis Downs, LLC,
    486 B.R. 286 (Bankr. D. Del. 2013) .....................................................................19

In re Ionosphere Clubs, Inc.,
    184 B.R. 648 (S.D.N.Y. 1995)...............................................................................26

In re Johns-Manville Corp.,
    837 F.2d 89 (2d Cir. 1988)....................................................................................29

In re Leroux,
    No. 92-20403, 1997 Bankr. LEXIS 971 (Bankr. E.D. Mass. June 30, 1997)..........10

In re Mahoney Hawkes, LLP,
    289 B.R. 285 (Bankr. D. Mass. 2002) ..................................................11, 12, 19, 20

In re Martin,
    91 F.3d 289 (3d Cir. 1996)....................................................................................39

In re Master Mortgage Inv. Fund,
    168 B.R. 930 (Bankr. W.D. Mo. 1994)........................................................... passim

In re New Eng. Compounding Pharm. Prods. Liab. Litig.,
    496 B.R. 256 ........................................................................................................22

In re Oscient Pharms. Corp.,
    No. 09-16576, 2010 Bankr. LEXIS 5567 (Bankr. E.D. Mass. June 29, 2010)........33

In re Quincy Med. Ctr., Inc.,
    No. 11-16394, 2011 Bankr. LEXIS 4405 (Bankr. D. Mass. Nov. 16, 2011)...........19

In re River Village Assocs.,
    161 B.R. 127 (Bankr. E.D. Pa. 1993), aff'd, 181 B.R. 795 (E.D. Pa. 1995) ...........32

In re S&W Enter.,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) ....................................................................10

In re Salem Suede, Inc.,
    219 B.R. 922 (Bankr. D. Mass. 1998) .............................................................19, 20

In re Spiegel Inc.,
    Case No. 03-11540 (BRL), 2006 Bankr. LEXIS 2158 (Bankr. S.D.N.Y. Aug. 16,
    2006) ........................................................................................................................25

In re SW Boston Hotel Venture, LLC,
    460 B.R. 38 (Bankr. D. Mass. 2011) (Feeney, J.).........................................9, 31, 33

In re Thompson,
    965 F.2d 1136 (1st Cir. 1992) ....................................................................................39

In re TL Administration Corp.,
    Case No. 03-15564 [Dkt. No. 1845] (Bankr. S.D.N.Y. July 27, 2005) ...................26

In re U.S. Fidelis, Inc.,
    481 B.R. 503 (Bankr. E.D. Mo. 2012).......................................................................26

In re UTGR, Inc.,
    No. 09-12418, 2010 Bankr. LEXIS 5699 (Bankr. D.R.I. June 24, 2010)..........10, 32

In re Washington Mut., Inc.,
    442 B.R. 314 (Bankr. D. Del. 2011) ..........................................................................18

In re Weber,
    209 B.R. 793 (Bankr. D. Mass. 1997) .................................................................31, 32

In re WorldCom, Inc.,
    No. 02-13533, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003) ...........33

In re W.T. Grant Co.,
    699 F.2d 599 (2d Cir. 1983).......................................................................................38

Jeffrey v. Desmond,
    70 F.3d 183 (1st Cir. 1995).........................................................................................39

Koehler v. Grant,
    213 B.R. 567 (B.A.P. 8th Cir. 1997)..........................................................................16

LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.),
    212 F.3d 632 (1st Cir. 2000).......................................................................................39

Lisanti v. Lubetkin (In re Lisanti Foods, Inc.),
    329 B.R. 491 (D.N.J. 2005) ........................................................................................33

Menard-Sanford v. Mabey (In re A.H. Robins Co.),
    880 F.2d 694 (4th Cir. 1989) ..........................................................................17, 18, 21

Monarch Life Ins. Co. v. Ropes & Gray,
    65 F.3d 973 (1st Cir. 1995).................................................................................19, 25

Nat'l Heritage Found., Inc. v. Highbourne Found.,
    Case No. 13-1608, 2014 U.S. App. LEXIS 12144 (4th Cir. June 27, 2014)....................18, 29

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,
    390 U.S. 414 (1968)........................................................................................................38, 39

Resorts Int'l v. Lowenschuss (In re Lowenschuss),
    67 F.3d 1394 (9th Cir. 1995) .................................................................................................17

Rieckborn v. Velti PLC,
    Case No. 13-cv-03889-WHO, 2015 U.S. Dist. LEXIS 13542 (N.D. Cal. Feb. 3, 2015) ........24

SE Prop. Holdings, LLC v. Seaside Eng'g & Surveying (In re Seaside Eng'g &
    Surveying),
    No. 14-11590, 2015 U.S. App. LEXIS 3831 (11th Cir. Mar. 12, 2015) .................................17

Tringali v. Hathaway Machinery Co.,
    796 F.2d 553 (1st Cir. 1986)..................................................................................................12

United States v. Mourad,
    289 F.3d 174 (1st Cir. 2002)..................................................................................................16

STATUTES

11 U.S.C. § 507(a) .....................................................................................................................35

11 U.S.C. § 507(a)(2)..................................................................................................................36

11 U.S.C. § 1102(a)(1)..................................................................................................................5

11 U.S.C. § 1122 ...........................................................................................................10, 11, 13

11 U.S.C. §s 1122 and 1123 .................................................................................................10, 29

11 U.S.C. § 1122(a) ....................................................................................................................13

11 U.S.C. § 1123 ........................................................................................................................10

11 U.S.C. § 1123(a) ..............................................................................................................13, 14

11 U.S.C. § 1123(a)(1)..........................................................................................................13, 14

11 U.S.C. § 1123(a)(2)................................................................................................................13

11 U.S.C. § 1123(a)(3)..........................................................................................................13, 14

11 U.S.C. § 1123(a)(4)..........................................................................................................13, 14

11 U.S.C. § 1123(a)(5)..........................................................................................................14, 15

11 U.S.C. § 1123(a)(6)................................................................................................14

11 U.S.C. § 1123(a)(7)..........................................................................................14, 15

11 U.S.C. § 1123(a)(8)................................................................................................14

11 U.S.C. § 1123(b)....................................................................................................15

11 U.S.C. § 1123(b)(1)...............................................................................................15

11 U.S.C. § 1123(b)(2)...............................................................................................15

11 U.S.C. § 1123(b)(3)...............................................................................................15

11 U.S.C. § 1125.........................................................................................................30

11 U.S.C. § 1125(a).....................................................................................................31

11 U.S.C. § 1125(b).....................................................................................................30

11 U.S.C. § 1125(e).....................................................................................................31

11 U.S.C. § 1125.........................................................................................................30

11 U.S.C. § 1126...................................................................................................30, 31

11 U.S.C. § 1123(b)(6)..........................................................................................15, 16

11 U.S.C. § 1129......................................................................................................9, 1

11 U.S.C. § 1129(a)(1).........................................................................................10, 29

11 U.S.C. § 1129(a)(2).........................................................................................30, 31

11 U.S.C. § 1129(a)(3).........................................................................................31, 32

11 U.S.C. § 1129(a)(4).........................................................................................33, 34

11 U.S.C. § 1129(a)(5).................................................................................................35

11 U.S.C. § 1129(a)(6).................................................................................................35

11 U.S.C. § 1129(a)(9).........................................................................................35, 36

11 U.S.C. § 1129(a)(11)...............................................................................................36

11 U.S.C. § 1129(a)(12)...............................................................................................37

11 U.S.C. § 1129(a)(13)...............................................................................................37

11 U.S.C. §§ 1129(a)(14) ....................................................................................................37

11 U.S.C. §§ 1129(a)(15) ....................................................................................................37

11 U.S.C. §§ 1129(a)(16) ....................................................................................................37

11 U.S.C. § 1129(c) ............................................................................................................37

11 U.S.C. § 1129(d) ...........................................................................................................38

28 U.S.C. § 1930 ...............................................................................................................36

M.G.L. ch. 94C, §§ 13 & 189A ...........................................................................................4

M.G.L. ch. 112, §§ 30 & 42A .............................................................................................4

**OTHER AUTHORITIES**

Fed. R. Bankr. P.  9019 ...................................................................................................7, 9

Fed. R. Bankr. P. 9019(a) ................................................................................................39

H.R. Rep. No. 95-595 ..................................................................................................10, 30

S. Rep. No. 95-989 ......................................................................................................10, 30

*Findings of Fact, Conclusions of Law, and Order Confirming First Amended Joint Plan
of Liquidation Proposed by the Debtors and the Official Committee of Unsecured
Creditors*, In re North Texas Bancshares Inc. ...................................................................26

*Order on Confirmation of Joint Amended Plan of Liquidation Dated May 14, 2007*, In re
MII Liquidation, Inc. ......................................................................................................18, 26

http://www.cdc.gov/HAI/outbreaks/meningitis-map-large.html#casecount_table (last
visited on February 24, 2014) ...........................................................................................4

Pursuant to Section 1129 of the United States Bankruptcy Code,[1] Paul D. Moore, the Chapter 11 Trustee (the "Trustee") for the chapter 11 estate of New England Compounding Pharmacy, Inc. ("NECC" or the "Debtor"), and the Official Committee of Unsecured Creditors of NECC (the "Official Committee," and together with the Trustee, the "Plan Proponents"), by and through their undersigned counsel, respectfully submit this Pre-Confirmation Hearing Memorandum of Law (the "Memorandum") in support of confirmation of the *First Amended Joint Chapter 11 Plan Of New England Compounding Pharmacy, Inc.* (together with all exhibits, supplements or other documents related thereto filed with this Court, and as may be amended supplemented, or modified, the "Plan"),[2] dated February 22, 2015.

In support of confirmation of the Plan, the Plan Proponents have filed the following declarations contemporaneously herewith:

- the *Declaration of Michael F. Barrett, Esq. in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and for Approval of Inspira Settlement*; the *Declaration of Kimberly A. Dougherty in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and for Approval of the High Point Settlement*; the *Declaration of Kimberly A. Dougherty in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and for Approval of the Victory Settlement*; the *Declaration of Frederic L. Ellis in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and for Approval of ARL Settlement*; the *Declaration of Patrick T. Fennell in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and for Approval of Insight Settlement*; the *Declaration of J. Scott Sexton in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. (Relating to Settlement with Insight Health Corp., and Others - Virginia)*; and the *Declaration of Thomas M. Sobol in Support of Approval of the Unifirst Settlement and in Support of Approval of the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* (collectively, the "Plaintiffs' Declarations");

---

[1]  Unless otherwise indicated, chapter, section and code references are to title 11 of the United States Code (the "Bankruptcy Code") and rule references are to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

[2]  Terms not otherwise defined herein have the meaning ascribed to them in the Plan.  All descriptions in this Memorandum with respect to the Plan are qualified in their entirety by the Plan as filed, which governs in the event of any inconsistency and should be read in its entirety.

- the *Declaration of Matthew K. Doonan, Esq. in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.*; the *Declaration of Henri G. Minette in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.*; the *Declaration of Gregory Earl Thomas in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.*; and the *Declaration of Mark G. Ledwin on Behalf of Preferred Mutual Insurance Company in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* (collectively, the "Defendants' Declarations");

- the *Declaration of Frederic L. Ellis Concerning the National Compensation Program Established by the Proposed Amended Plan of Reorganization* (the "National Compensation Program Declaration");

- the *Plaintiffs' Steering Committee's Declaration in Support of Approval of the First Amended Joint Chapter 11 Plan* (the "PSC Declaration");

- the *Joint Declaration of Anne Andrews and Michael Coren, as Representatives of the Co-Chairs of the Official Committee of Unsecured Creditors, in Connection With The Official Committee's Support for Confirmation of the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and Approval of the Settlements Contained Therein* (the "Official Committee Declaration", and, together with the Plaintiffs' Declarations, the Defendants' Declarations, the National Compensation Program Declaration, and the PSC Declaration, the "Declarations").[3]

In further support of confirmation of the Plan, the Plan Proponents respectfully represent as follows:

## PRELIMINARY STATEMENT

This is a case of national import which began with an administratively insolvent Debtor with limited and inadequate assets and will end, if the Plan is confirmed by the Court, with aggregate funds approaching or exceeding $200 million that will provide much needed and material compensation to the victims of the NECC Outbreak who comprise the overwhelming majority of NECC's creditors.

In September of 2012, NECC, a compounder of drugs, went careening into bankruptcy after a nationwide outbreak of fungal meningitis which quickly traced back to NECC's

---

[3]   The Plan Proponents reserve all rights to submit further declarations in support of confirmation of the Plan in advance of the Confirmation Hearing.

Framingham, MA facility.  As of October 2013, when the Centers for Disease Control stopped tracking cases, at least 64 people had been killed and no fewer than 751 individuals had fallen ill. Since then, over three thousand people have filed claims and approximately 686 have filed suits against NECC on the basis that they or their family members were harmed, died or were otherwise affected by NECC's products.  NECC's creditors are thus overwhelmingly holders of personal injury and wrongful death claims.  The Plan's primary goal, therefore, is to compensate those individuals.  If this Court confirms the Plan, funds in excess of $200 million likely will be available from the Debtor's estate for distribution to them and NECC's other creditors.

Of course, the Plan Proponents recognize that monetary distributions provide limited relief to the victims of the Outbreak and their families.  Plan distributions cannot bring back the people killed by NECC's products.  They cannot heal the injuries that, to this day, plague many of the survivors or undo the physical and emotional suffering of hundreds of individuals across this country.  Financial relief can, however, relieve the burden of continuing medical bills.  It can replace the income from lost employment.   Settlement payments are some measure of compensation extracted from those that were allegedly responsible for this calamity for the benefit of those they harmed.  In short, the settlements embodied in the Plan do simple justice.

The Plan Proponents respectfully submit that under these circumstances, there can be no question that confirmation of the Plan is in the best interests of NECC's creditors.  The alternative of liquidation would effectively deliver nothing.  Although the Plan seeks extraordinary relief (in the form of releases and injunctions for the benefit of certain non-Debtors) in favor of those who contributed to the fund to be distributed thereunder, the evidence to be submitted to this Court establishes beyond cavil that this is an extraordinary case with the extraordinary circumstances that make this relief appropriate and proper as a matter of law.

Courts across the country have recognized the need for this kind of relief in similar mass tort situations, under circumstances, such as those plainly present here, where such relief is absolutely essential to maximize the recoveries -- or to provide any recovery at all -- to tort creditors of an insolvent debtor.

"Confirmation of a plan . . . is the statutory goal of every chapter 11 case." Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 466 n.4 (1999). That is especially so here, where confirmation will provide crucial monetary assistance to those most in need of it, after a delay now counted in years. The Plan Proponents are thus pleased as well as honored to present the Plan to Your Honor for confirmation.

## RELEVANT FACTUAL BACKGROUND

### A.     NECC's Prepetition Operations

1.      NECC was a Massachusetts corporation with its principal place of business at 697 Waverly Street, Framingham, MA 01702. Prior to the Chapter 11 Case's Petition Date (as defined herein), NECC operated as a compounding pharmacy which combined and mixed active and inactive ingredients to create formulations of compounded pharmaceutical products. Beginning in September 2012, reports began to surface of several patients diagnosed with a rare strain of fungal meningitis (the "Outbreak") after receiving injections of preservative-free methylprednisolone acetate ("MPA") compounded by NECC.[4]

2.      On October 1, 2012, the Massachusetts Department of Public Health (the "MDPH") issued a formal quarantine order pursuant to M.G.L. ch. 94C, §§ 13 & 189A, and M.G.L. ch. 112, §§ 30 & 42A, requiring NECC to preserve all products used to compound MPA, including products returned from pharmacies. After an initial recall of the three suspect MPA

---

[4]      MPA is used to treat swelling and pain in the spine and joints associated with arthritis and other orthopedic disorders. Healthcare professionals administer MPA by injecting it into the affected location, often epidurally.

lots on September 26, 2012, NECC undertook further recalls on October 3, 2012 of all intrathecal products (for injection into the spinal cord or brain); on October 4, 2012 of all injectable medications; and on October 6, 2012 of all NECC-compounded medications dispensed since January 1, 2012.  In response to October 2, 2012 inspection findings from the United States Food and Drug Administration and the MDPH, the Massachusetts Board of Registration in Pharmacy requested a voluntary surrender of NECC's pharmacy license.  NECC surrendered its license on October 3, 2012.

3.    The Outbreak has resulted in hundreds of personal injury and wrongful death claims against NECC and others.  The Centers for Disease Control and Prevention ("CDC") reports that, as of October 23, 2013, 64 people had died and 751 individuals had fallen ill.[5] NECC has surrendered its pharmacy license, suspended operations, and terminated its employees.  The MDPH also has temporarily barred three former NECC pharmacists from practicing pharmacy.

## B.    Commencement of the Chapter 11 Case and the MDL Proceedings

4.    On January 18, 2013, the Office of the United States Trustee (the "UST"), pursuant to Bankruptcy Code Section 1102(a)(1), appointed a nine (9) member Official Committee, eight (8) of whom are tort claimants of the Debtor holding personal injury tort and/or wrongful death cases against the Debtor and others.

5.    On January 25, 2013, this Court granted the UST's Certificate of Appointment appointing Paul D. Moore as Chapter 11 Trustee for NECC's estate.

6.    On February 12, 2013, the Judicial Panel on Multidistrict Litigation entered an order establishing a multidistrict litigation and transferring actions against NECC involving the

---

[5]    Reported at http://www.cdc.gov/HAI/outbreaks/meningitis-map-large.html#casecount_table (last visited on February 24, 2014).  The CDC has not updated the case counts since October 23, 2013 and indicates that further updates to the case counts are not anticipated.

contaminated MPA (which were commenced prior to the filing of NECC's bankruptcy petition), as well as all actions against its affiliates, to the United States District Court for the District of Massachusetts (the "MDL Court") for consolidated pretrial proceedings.  As of April 27, 2015, 686 (six hundred and eighty-six) separate lawsuits have been joined before the MDL Court in these MDL Proceedings.

7.    On April 9, 2013, the MDL Court entered an order establishing a seven-attorney Plaintiffs' Steering Committee to organize, simplify, and streamline the handling of the MDL Proceeding on behalf of all plaintiffs to actions therein.  Since its appointment, the Plaintiffs' Steering Committee has worked hand in hand with the Plan Proponents to maximize, through mediated settlements, the funds available to NECC's tort creditors.

## C.    The Settlements With NECC's Insiders

8.    The Trustee, the Official Committee and the Plaintiffs' Steering Committee at all times viewed settlements with NECC's shareholders and related parties (collectively, the "Insiders") as among their highest priorities.   To establish protocols to maintain the confidentiality of information disclosed in the context of settlement negotiations with the Insiders, on April 18, 2013, this Court entered an *Agreed-Upon Order Establishing Protocol for Settlement Negotiations and Communication* [Adv. Pro. Dkt. No. 96, as amended by Adv. Pro. Dkt. No. 99] (the "Protocol Order").  In aid of the Protocol Order and the Trustee's settlement negotiations, the MDL Court stayed all formal discovery against the Insiders that were consolidated into the MDL Proceeding, and ordered that the discovery stay continue pending a further order.  See Clerk's Notes for Mar. 12, 2013 Status Conference (extending discovery stay to Apr. 10, 2013); Tr. of Apr. 10, 2013 Status Conference at 28:17-24 (extending discovery stay to May 14, 2013); *MDL Order No. 6* [MDL Dkt. No. 209] ("Formal discovery of NECC and the affiliated defendants shall remain temporarily stayed as set forth in this order and the previous

6

orders of the Court."); *MDL Order No. 7* [MDL Dkt. No. 438] (staying fact discovery of NECC and the NECC Affiliated Defendants "until further order of the Court").

9.     As a result of the Trustee's settlement negotiations with the Insiders (undertaken with the participation of counsel to the Official Committee and Lead Counsel to the Plaintiffs' Steering Committee), and aided by the discovery stay, the Trustee and the Official Committee announced on December 23, 2013, that settlements in principle had been reached with the Insiders, as well as with NECC's primary and excess insurers (collectively, the "<u>Insider and Insurer Settlements</u>"). This Court approved the Insider and Insurer Settlements on July 31, 2014. <u>See</u> Dkt Nos. 712, 713, 714. It is anticipated that those settlements will contribute over $100 million to the NECC estate in the form of cash contributions from the Insiders, as well as proceeds from, among other things, NECC's related company's and individuals' professional liability insurance, tax refunds which will be due to the Insiders as a result of their cash settlement payments, and the sale of a related business.

**D.     <u>The MDL Mediation Program Settlements and Other Mediated Settlements</u>**

10.     The Plan Proponents also developed a strategy for facilitating and obtaining substantial settlement contributions for distribution through the Plan from mediations with non-NECC affiliates, such as NECC's commercial vendors and pain clinics and medical care providers that may be exposed to liability to NECC and tort victims in connection with the Outbreak. To facilitate the Trustee's securing those settlements, on August 15, 2013, the MDL Court entered an Order on Mediation [MDL Dkt. No. 394] (the "<u>Mediation Order</u>") establishing mediation protocols (the "<u>Mediation Program</u>") for non-NECC affiliates.

11.     The Mediation Program, as well as private mediations conducted under substantially the same protocols, was an unqualified success. Through the following year and a half, the Trustee (with the material assistance and full support of the Official Committee and the

7

Plaintiffs' Steering Committee) secured over $100 million dollars in additional settlements from, among others, (i) vendors of NECC itself (*e.g.*, ARL BioPharma, the company that provided testing services to NECC, Liberty Industries, the company that built the so-called "cleanrooms" where MPA was compounded; Victory Mechanical Services, the company that installed ventilation systems at NECC; and Unifirst Corporation, the company that provided cleaning services to NECC), and (ii) health care providers in some of the states affected by the Outbreak (Virginia, New Jersey, and North Carolina).  As further described below, those settlements are embodied in, and their consummation is dependent upon confirmation of, the Plan.[6]

## E.     __The Plan__

12.     On December 3, 2014, the Plan Proponents filed the *Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1054] and the *Disclosure Statement for the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1053] (as amended at Docket No. 1162, the "__Disclosure Statement__").   On February 22, 2015, the Plan Proponents filed the *First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1154].  On March 3, 2015, this Court entered the *Order (I) Approving the Adequacy of the Amended Joint Disclosure Statement; (II) Approving Solicitation and Notice Procedures with Respect to Confirmation of the Plan Proponents' First Amended Joint Plan of Reorganization; (III) Approving the Form of Various Ballots and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Dkt. No. 1181] (the "__Disclosure Statement Order__").

13.     The Plan provides that, *inter alia*, holders of unsecured personal injury and wrongful death claims against NECC will receive, in exchange for their claims, shares in a "Tort

---

[6]     As the Liberty settlement was not yet consummated at the time of filing of the Plan, the settlement with Liberty Industries is also conditioned on approval of the Plan Proponents' pending joint motion to approve that settlement under Bankruptcy Rule 9019 [Dkt. No. 1219].

Trust" funded by the proceeds of the Trustee's mediated settlements with NECC's Insiders and non-NECC affiliates (as well as their respective insurers). In sum, if the Plan is confirmed, the Plan Proponents anticipate that the Tort Trust itself will have net proceeds of more than $160 million to $190 million in cash available for distribution to holders of allowed tort claims.

14.     The Plan also provides that NECC's other general unsecured creditors (who the Plan Proponents estimate will, after the resolution of claims the Plan Proponents believe are subject to disallowance in whole or substantial part, hold claims totaling approximately $1.025 million) will receive cash in the amount of ninety percent (90%) of their allowed claims, and that Priority Non-Tax Claims and Miscellaneous Secured Claims will be paid in full.

15.     Finally, among other things, confirmation of the Plan will constitute this Court's approval (to the extent not previously approved) of the settlements described above and therein (the "Plan Settlements").[7] Plan § 5.01. Confirmation will also constitute this Court's finding that the Plan Settlements "are in the best interest of the Debtor, the Estate and all holders of Claims in the Chapter 11 Case, are fair, equitable and reasonable, and have been entered into in good faith by all parties thereto." Plan § 5.01. The payment of the proceeds of those settlements, as well as those of the settlements already approved by this Court (or pending for approval by this Court) under Bankruptcy Rule 9019, are in each case conditioned on confirmation of the Plan.

---

[7]     The Plan Settlements are the settlements described in each of (in each case, as defined in the Plan): (i) the Ameridose Settlement Agreement; (ii) the ARL Settlement Agreement; (iii) the High Point Settlement Agreement; (iv) the Insight Settlement Agreement; (v) the Inspira Settlement Agreement; (vi) the Unifirst Settlement Agreement; and (vii) the Victory Settlement Agreement (collectively, the "Plan Settlement Agreements"). Each of the Plan Settlement Agreements are, in turn, described in the Plan, and were filed on this Court's docket as part of the Plan Supplement or supplements thereto. See Notice of Filing of Plan Supplement to the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. [Dkt. No. 1123]; Supplement to Plan Supplement - Unifirst Settlement and Release Agreement [Dkt. No. 1168]. As described in note 5, supra, the Liberty Settlement Agreement is subject to a separate approval process under Bankruptcy Rule 9019.

## BASIS FOR RELIEF REQUESTED

16.     To confirm a Chapter 11 plan, the plan proponent must show by a preponderance of evidence that the Plan satisfies requirements of Bankruptcy Code Section 1129.  See In re SW Boston Hotel Venture, LLC, 460 B.R. 38, 51 (Bankr. D. Mass. 2011) (Feeney, J.).  As set forth herein, in the Declarations, and in the preliminary voting report the Trustee's claims and noticing agent has provided to the Plan Proponents (the "Preliminary Voting Report", attached hereto as Exhibit A),[8] and as will be demonstrated by a final voting report and at the Confirmation Hearing, the Plan Proponents have carried, or will soon carry, this burden with respect to each relevant requirement.

## A.     The Plan Complies, or Will Comply, with All Relevant Provisions of the Bankruptcy Code

i.           The Plan Complies with Bankruptcy Code Section 1129(a)(1).

17.     Bankruptcy Code Section 1129(a)(1) provides that a plan must comply with the "applicable provisions" of the Bankruptcy Code.  See, e.g., In re Leroux, No. 92-20403, 1997 Bankr. LEXIS 971, at *1, *30-31 (Bankr. E.D. Mass. June 30, 1997).  Therefore, Bankruptcy Code Section 1129(a)(1) requires an analysis of both Bankruptcy Code Section 1122, which governs the classification of claims, and Bankruptcy Code Section 1123, which sets forth certain elements that a plan must contain or may contain.  See In re S&W Enter., 37 B.R. 153, 158 & n.15 (Bankr. N.D. Ill. 1984) (determining that the provisions of Bankruptcy Code Section 1129(a)(1) are directly aimed at Bankruptcy Code Sections 1122 and 1123); see also In re UTGR, Inc., No. 09-12418, 2010 Bankr. LEXIS 5699, at *1, *17-27 (Bankr. D.R.I. June 24, 2010) (finding that the plan "complie[d] with all applicable provisions of the Bankruptcy Code

---

[8]     As described in detail in Section A(xiv), infra, the satisfaction of certain requirements of the Bankruptcy Code can only be demonstrated after the passage of the May 5, 2015 voting deadline.  The Plan Proponents will file a final voting report in advance of the Confirmation Hearing.

as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123.");

S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No.

95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368.   As explained below, the

Plan complies with these provisions in all respects.

> *a.   The Plan Satisfies the Classification Requirements of*
> *Bankruptcy Code Section 1122.*

18.   The Plan satisfies the requirements of Bankruptcy Code Section 1122 regarding

classification.  Bankruptcy Code Section 1122 provides:

> (a)   Except as provided in subsection (b) of this section, a plan
> may place a claim or an interest in a particular class only if such
> claim or interest is substantially similar to the other claims or
> interests in such class.

> (b)   A plan may designate a separate class of claims consisting
> only of every unsecured claim that is less than or reduced to an
> amount that the court approves as reasonable and necessary for
> administrative convenience.

11 U.S.C. § 1122.

19.   The Plan classifies the various Claims against, and Interests in, the Debtor as:

Priority Non-Tax Claims (Class A), Miscellaneous Secured Claims (Class B), General

Unsecured Claims (Class C), Tort Claims (Class D), Subordinated Claims (Class E) and Equity

Interests (Class F).  See Plan, Article III.

20.   This Court has previously raised the issue whether it is permissible, under the

First Circuit's decision in Granada Wines, to separately classify tort claimants (Class D) from

general unsecured claimants (Class C) under the specific circumstances present here (*i.e.*, where

tort claimants will receive shares in a trust funded in large part by the proceeds of the

Contributing Parties' insurance policies).  See Tr. of Proceedings held Feb. 24, 2015 at 45:4-

46:22.  The Plan Proponents respectfully submit that it is.

21.  In <u>Granada Wines, Inc., v. New England Teamsters and Trucking Industry</u> <u>Pension Fund</u>, 748 F.2d 42, 46 (1st Cir. 1984), the First Circuit noted that the "general rule regarding classification is that 'all creditors of equal rank with claims against the same property should be placed in the same class.'"  It ruled that "separate classifications for unsecured creditors are only justified '***where the legal character of their claims is such as to accord them a status different from the other unsecured creditors*** . . . .'"  <u>Id.</u> (emphasis supplied).  The Plan Proponents respectfully submit, however, that for the reasons articulated in Judge Hillman's decision in <u>In re Mahoney Hawkes, LLP</u>, 289 B.R. 285 (Bankr. D. Mass. 2002), separately classifying claimants with rights against the debtor's insurance policy proceeds from other general unsecured claimants is appropriate here and does not violate of <u>Granada Wines</u>.

22.  In the <u>Mahoney Hawkes</u> case, the debtor carried malpractice insurance.  In its disclosure statement and plan, the debtor and the unsecured creditors' committee (as joint proponents) sought to classify malpractice claimants separately from other unsecured creditors. A creditor objected to the confirmation, arguing that because: (1) the proceeds of the malpractice insurance policy were property of the debtor's estate, <u>see</u> <u>Tringali v. Hathaway Machinery Co.</u>, 796 F.2d 553 (1st Cir. 1986) (holding that a Chapter 11 debtor's right to proceeds of a liability insurance policy were property of the estate); and (2) the claims of the general unsecured creditors were no different from the claims of the malpractice creditors, both sets of unsecured creditors must accordingly have been placed in the same class.  <u>Mahoney Hawkes</u>, 289 B.R. at 294.

23.  Judge Hillman rejected the official committee's counter-argument that the policy proceeds were not property of the estate, conceding that he was "constrained to follow <u>Tringali</u>

and hold that the proceeds of the Policy are property of the estate." Id. at 295.  However, he

noted that this holding

> is not dispositive of the issue of separate classification.  After holding that the
> proceeds of a liability policy were property of the estate, the First Circuit went on
> to state that what comes into the estate from such a policy is a 'debtor's right to
> have the insurance company pay money to satisfy one kind of debt - debts accrued
> through, for example, the insured's negligent behavior.'  796 F.2d at 560.  *It was
> not suggesting that the proceeds of a liability policy become part of the general
> fund available for distribution to all creditors*.
>
> The Debtor's interest in the proceeds of the Policy is precisely that identified in
> Tringali.  The malpractice claimants have the right to receive some property of the
> estate that general unsecured creditors cannot receive.  *They are, in effect,
> multiple secured creditors having claims against a single fund.  Separately
> classifying their claims does not violate Granada Wines*.

Id. (emphasis supplied).

24.    On the basis of these authorities, the Plan Proponents respectfully submit that,

under the facts of this case and the prevailing law in this Circuit, the Plan's separate

classification of Class C general unsecured claims and Class D tort claims is appropriate and

justified.

25.    The remaining Plan classifications are likewise factually and legally reasonable.

Each classification is based upon good business reasons and the legal nature and/or priority of

the Claim or Interest pursuant to Bankruptcy Code Section 1122(a).   First, Administrative

Expense Claims, and Priority Tax Claims are not classified and are separately treated in Sections

2.01, and 2.03 of the Plan, respectively.  Consistent with Section 1122, all secured claims are

classed together in Class B.  Similarly, the Plan classifies the only unsecured Claims other than

those in Classes C and D, Class E Subordinated Claims, together, on the basis of their identical

priority and legal nature.  The Plan also separately classifies Equity Interests (Class F) because of

their differing rights.  Thus, the Plan's classification scheme satisfies Bankruptcy Code Section

1122.

b. *The Plan Satisfies the Eight Plan Requirements of Bankruptcy Code Section 1123(a).*

26.     The Plan meets all of the applicable mandatory requirements of Bankruptcy Code Section 1123(a).   Specifically, Bankruptcy Code Section 1123(a) requires that a plan: (1) designate classes of claims and interests (Bankruptcy Code Section 1123(a)(1); (2) identify any class of claims or interests that is not impaired under the plan (Bankruptcy Code Section 1123(a)(2)); (3) specify treatment of impaired classes of claims and interests (Bankruptcy Code Section 1123(a)(3)); (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest (Bankruptcy Code Section 1123(a)(4)); (5) provide adequate means for implementation of the plan (Bankruptcy Code Section 1123(a)(5)); and (6) contain only provisions that are consistent with the interests of the creditors and equity holders and with public policy with respect to the manner of selection of any trustee and any successors under the plan (Bankruptcy Code Section 1123(a)(7)).  The other requirements of Section 1123(a) are not applicable, as (1) there will be no issuance of any type of equity securities (Bankruptcy Code Section 1123(a)(6)); and (2) the Debtor is not an individual (Bankruptcy Code Section 1123(a)(8)).

27.     Article III of the Plan satisfies the first and third requirements of Bankruptcy Code Section 1123(a) by (i) designating five (5) Classes of Claims and one (1) Class of Interests in compliance with Bankruptcy Code Section 1123(a)(1); and (ii) specifying the treatment of impaired Classes C, D and E and unimpaired Classes A,  B and F in compliance with Bankruptcy Code Section 1123(a)(3).  Article IV of the Plan satisfies the second requirement of Bankruptcy Code Section 1123(a), by identifying Classes A, B and F as classes of claims unimpaired under

14

the Plan.  Article IV of the Plan also satisfies Bankruptcy Code Section 1123(a)(4) by providing the same treatment for each Claim or Interest within a particular Class.

28.     The Plan satisfies Bankruptcy Code Section 1123(a)(5), as both (i) the Tort Trust Assets, and (ii) after payment of claims in Classes A, B, and C, and the making of appropriate reserves for, *inter alia*, payment of the costs of administration of the bankruptcy case, the Debtor's remaining assets, or the proceeds of their sale, will flow to the Tort Trust for the benefit of and distribution to NECC's tort creditors (as more specifically described in the Plan and Tort Trust Agreement).  Moreover, Articles V, VI and VII and various other provisions of the Plan specifically provide the means for implementing the Plan (including, without limitation, the mechanics of the transfer of the Tort Trust Assets to the Tort Trust).  Thus, the Plan satisfies Bankruptcy Code Section 1123(a)(5).

29.     Finally, Section 1.196 and Article VI of the Plan, together with the Tort Trust Agreement, satisfy Bankruptcy Code Section 1123(a)(7) by providing for the selection of the Post-Confirmation Officer, the Tort Trustee and any successors thereto in a manner consistent with applicable law, public policy and the interests of creditors and equity holders.

> *c.   The Discretionary Portions of the Plan are Appropriate.*

30.     Section 1123(b)(6) of the Bankruptcy Code sets forth the permissive provisions that may be incorporated into a Chapter 11 plan, including "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1123(b)(6). The following provisions of the Plan are consistent with Section 1123(b) of the Bankruptcy Code:

> a.   In compliance with Bankruptcy Code Section 1123(b)(1), pursuant to Articles III and IV of the Plan, Classes C, D and E are impaired.  See 11 U.S.C. § 1123(b)(1) ("[A] plan may . . . impair or leave unimpaired any class of claims, secured or unsecured, or of interests . . . .").

15

b. In compliance with Bankruptcy Code Section 1123(b)(2), Article VII of the Plan specifies which of the Debtor's executory contracts and unexpired leases are to be accepted or rejected as of the Effective Date and further specifies the treatment to be provided to assumed or rejected executory contracts and unexpired leases, including resolution of claims for damages arising from the rejection of any unexpired contract or unexpired lease. See 11 U.S.C. § 1123(b)(2) ("[A] plan may . . . subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected . . . .").

c. In compliance with Bankruptcy Code Section 1123(b)(3), pursuant to Article V of the Plan, all Estate Causes of Action will be transferred to and vested in the Tort Trust as part of the Initial Tort Trust Assets. See 11 U.S.C. § 1123(b)(3) ("[A] plan may . . . provide for . . . the settlement . . . of any claim or interest belonging to the debtor or to the estate; or . . . the retention . . . of any such claim or interest . . . .").

d. Bankruptcy Code Section 1123(b)(6) is a catch-all provision that permits the inclusion of any appropriate provision so long as it is consistent with other provisions of the Bankruptcy Code. Article XI of the Plan provides that, among other things, except as otherwise explicitly set forth in the Plan or the Tort Trust Documents as to those matters which are to be considered and determined by the District Court, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Case and any of the proceedings arising from or relating to the Chapter 11 Case to the fullest extent permitted under the Bankruptcy Code and applicable law. These provisions are in accordance with case law establishing that a bankruptcy court may retain jurisdiction over the debtor or property of the estate following confirmation. See United States v. Mourad, 289 F.3d 174, 180 (1st Cir. 2002) (citing Koehler v. Grant, 213 B.R. 567, 569-70 (B.A.P. 8th Cir. 1997) (stating that "'it is well-established that courts retain jurisdiction to enforce their own orders,' even after the bankruptcy court has closed the case")). Accordingly, the continuing jurisdiction of the Bankruptcy Court is permissible under Section 1123(b)(6) of the Bankruptcy Code.

e. The Plan also contains other various provisions that may be construed as discretionary but are not required for confirmation under the Bankruptcy Code. These Plan provisions are appropriate, in the best interests of the Debtors and the Estate, and not inconsistent with the applicable provisions of the Bankruptcy Code including, without limitation, provisions for (i) exculpation of various Persons and entities with respect to actions related to or taken in furtherance of this Chapter 11 Case, and injunctions against certain actions against the Debtor; (ii) the resolution of Claims and the treatment of Disputed Claims; (iii) the implementation of the Tort Trust, and the procedures for making distributions pursuant to the Plan; and (iv) indemnification obligations. The Plan also contains provisions for releases and injunctions in favor of the so-called "Contributing Parties", whose settlement contributions will make up the bulk of the Tort Trust

Assets, with respect to actions in any way relating to the Debtor or to the Debtor's products.

31.    This Court has previously raised the question of the propriety of the last discretionary provision above, *i.e.*, the inclusion in a plan of third party (or non-debtor) releases and injunctions in aid thereof.  See Tr. of Proceedings Held Feb. 24, 2015 at 36:8-39:6; Tr. of Proceedings Held July 14, 2014 at 65:19-66:2.  The Plan Proponents respectfully submit that, in the exceptional circumstances of this case, this Court has the authority to confirm a plan that contains such relief.

32.    As this Court is aware, although the circuit courts are split on the permissibility of third-party releases in plans of reorganization or liquidation, the substantial majority of circuit courts that have ruled on the issue have found them to be permissible in certain exceptional circumstances where the relief is "essential" to the success and viability of the plan, primarily, as in the case here, in the mass tort context.  See SE Prop. Holdings, LLC v. Seaside Eng'g & Surveying (In re Seaside Eng'g & Surveying), No. 14-11590, 2015 U.S. App. LEXIS 3831 at **13-14 (11th Cir. Mar. 12, 2015) (bankruptcy courts have the power under Section 105(a) to issue permanent injunctions or third-party releases where appropriate for the plan);  Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns Inc.), 519 F.3d 640, 655 (7th Cir. 2008); Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136 (2d Cir. 2005) (same); Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002) (same); Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203 (3rd Cir. 2000) (same); In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285 (2d Cir. 1992) (same); Menard-Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694 (4th Cir. 1989).

17

33.     Even in Circuits, like the Ninth, that maintain a narrow view of when non-debtor

releases are appropriate, see, e.g., Resorts Int'l v. Lowenschuss (In re Lowenschuss), 67 F.3d

1394, 1401 (9th Cir. 1995) (sections 105(a) and 524(e) specifically prohibit the permanent

release, discharge, or injunction of non-debtors); Am. Hardwoods, Inc. v. Deutsche Credit Corp.

(In re Am. Hardwoods, Inc.), 885 F.2d 621, 623-624 (9th Cir. 1989) (section 105(a), which

permits courts to "issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of this title," cannot be used to authorize relief inconsistent with the more

specific provision, section 524(e)), courts have authorized non-debtor releases.  For example,  in

the Metabolife ephedra bankruptcy, the Bankruptcy Court for the Southern District of California

approved a plan that permanently enjoined claims against shareholders, debtors, and liable

insurers and released fiduciaries and other debtor representatives from third-party claims.  See

*Order on Confirmation of Joint Amended Plan of Liquidation*, In re MII Liquidation, Inc., Case

No. 05-06040 (Bankr. S.D. Cal. May 14, 2007) [Dkt. No. 1740].

34.     In considering whether to approve third-party releases and injunctions, courts

typically apply a multi-factor test, considering such factors as whether there is an identity of

interests between the debtor and a third party (usually an indemnity relationship), whether the

non-debtor has contributed substantial assets to the reorganization, and whether the injunction is

essential to the reorganization;.  See, e.g., Dow Corning, 280 F.3d at 658 (applying a seven-

factor test); A.H. Robins Co., 880 F.2d at 702 (4th Cir. 1989) (applying a three-factor test);

Metromedia Fiber Network, 416 F.3d at 142 (applying a four-factor test).  A recent decision

from the Fourth Circuit Court of Appeals emphasizes that these factors are typically considered

*disjunctive*, *and that no one factor is dispositive*.  See Nat'l Heritage Found., Inc. v. Highbourne

Found., Case No. 13-1608, 2014 U.S. App. LEXIS 12144, at *19 (4th Cir.  June 27, 2014)

(applying the <u>Dow Corning</u> test and noting that "[a] debtor need not demonstrate that every <u>Dow</u> <u>Corning</u> factor weighs in its favor to obtain approval of a non-debtor release. But . . . a debtor must provide adequate factual support to show that the circumstances warrant such exceptional relief"); <u>see also</u> <u>Airadigm Comm'cns.</u>, 519 F.3d at 657 ("Ultimately, whether a release is 'appropriate' for the reorganization is fact intensive and depends on the nature of the reorganization"); <u>Metromedia Fiber Network</u>, 416 F.3d at 142 (2d Cir. 2005) (analyzing non-debtor releases is not "a matter of factors and prongs" but rather requires a finding of unique circumstances); <u>In re Washington Mut., Inc.</u>, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (the factors relevant to determining whether a debtor's release of a non-debtor is appropriate "are neither exclusive nor conjunctive requirements") (citing <u>Master Mortgage</u>, 168 B.R. 930 at 935 (finding that there is no "rigid test" to be applied in every circumstance and that the five factors enunciated therein are neither exclusive, nor conjunctive)); <u>In re Indianapolis Downs, LLC</u>, 486 B.R. 286, 303- 04 (Bankr. D. Del. 2013) (approving debtor releases where broad creditor support existed despite finding that two of the factors cited in <u>Dow Corning</u> were not met under the circumstances).

35.     The Court of Appeals for the First Circuit has recognized, but not weighed in on, the split in authority over whether non-debtor releases are permissible in a plan of reorganization.  <u>See</u> <u>Monarch Life Ins. Co. v. Ropes & Gray</u>, 65 F.3d 973, 979-80 (1st Cir. 1995) ("In extraordinary circumstances, it has been held that a bankruptcy court can grant permanent injunctive relief essential to enable the formulation and confirmation of a reorganization plan if, for example, nondebtors who would otherwise contribute to funding the plan will not settle their mutual claims absent 'protection' from potential post-confirmation lawsuits arising from their prepetition relationship with the Chapter 11 debtor."); <u>In re Quincy Med. Ctr., Inc.</u>, No. 11-

16394, 2011 Bankr. LEXIS 4405, at**4-5 (Bankr. D. Mass. Nov. 16, 2011) (noting that "the

First Circuit has thus far remained above the fray").  The lower courts in this District which have

considered the issue have followed the majority rule.  See, e.g., Quincy Med. Ctr., 2011 Bankr.

LEXIS 4405, at*6  ("I agree with the majority position that in the appropriate circumstances a

Chapter 11 plan may provide for the kinds of releases, exculpation and injunctions contained in

the debtors' joint plan in these cases."); In re Mahoney Hawkes, LLP, 289 B.R. at 300 (Bankr. D.

Mass. 2002) ("injunctive relief protecting non-debtor third parties may be appropriate depending

upon the circumstances of the case"); In re Salem Suede, Inc., 219 B.R. 922, 930–31 (Bankr. D.

Mass. 1998) (finding that "under the circumstances of this case," channeling injunction was not

warranted).

36.     In keeping with this trend, Judge Bailey recently wrote that he agreed "with

[Judge Hoffman in Quincy Medical Center], with the circuit-level majority, and with Judge

Hillman of this district [in Mahoney Hawkes], that a chapter 11 plan may, in appropriate

circumstances, include a third-party release . . . ."  In re Charles St. African Methodist Episcopal

Church of Boston, 499 B.R. 66, 83 (Bankr. D. Mass. 2013).

37.     In determining whether a non-debtor release is appropriate, bankruptcy courts in

this District, including Judge Hillman in Mahoney Hawkes and Judge Feeney in Salem Suede,

have adopted and considered the five-factor test set forth in  In re Master Mortgage Inv. Fund,

168 B.R. 930 (Bankr. W.D. Mo. 1994).  Under that test, courts consider the following criteria to

determine whether to allow a given non-debtor release:

     i.    There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.
    ii.    The non-debtor has contributed substantial assets to the reorganization.
   iii.    The injunction is essential to reorganization.  Without it, there is little likelihood of success.

iv.  A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.

v.  The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

See Master Mortgage, 168 B.R. at 934-35; Charles St., 499 B.R. at 83 (noting that "the Master Mortgage factors are useful considerations in assessing the propriety of a proposed release").[9]

38.  Recognizing, as did Judge Bailey in his Charles Street decision and as did the Fourth Circuit in National Heritage Foundation, that the Master Mortgage factors are not conjunctive requirements,  Charles St., 499 B.R. at 83 (quoting In re Washington Mut, 442 B.R. at 346), the Plan Proponents nonetheless respectfully submit that the Plan satisfies each of the Master Mortgage factors.

39.  Identity of Interest Between NECC and the Contributing Parties:  There is an identity of interest between the Contributing Parties and NECC.  Those parties have, collectively, been made the subject of hundreds of lawsuits in both state and federal courts, including those consolidated in the MDL Proceeding, alleging personal injury or wrongful death due to the administration of NECC products.  Accordingly, to the extent any of the Contributing Parties is or becomes liable to any patient who received an injection of a contaminated NECC product,

---

[9]  Other Circuits have set forth substantially similar criteria for evaluating the propriety of non-debtor releases. See Dow Corning, 280 F.3d at 658 (factors include whether (i) there is an identity of interests between debtor and third party, usually an indemnity relationship; (ii) the non-debtor has contributed substantial assets to the reorganization; (iii) the injunction is essential to the reorganization; (iv) the impacted classes have overwhelmingly voted to accept the plan; (v) the plan provides a mechanism to pay for all, or substantially all, of the classes affected by the injunction; (vi) the plan provides an opportunity for claimants who choose not to settle to recover in full; and (vii) the bankruptcy court has made a record of specific factual findings that support conclusions); A.H. Robins Co., 880 F.2d at 702 (factors include whether (i) the plan was overwhelmingly approved; (ii) the plan provided for certain claimants who nevertheless chose to opt out of settlement; and (iii) the entire reorganization hinged on the debtor's being free from indirect claims such as indemnity or contribution claims.); Metromedia Fiber Network, 416 F.3d at 142 (factors include whether (i) the estate received substantial consideration; (ii) enjoined claims were "channeled" to a settlement fund rather than extinguished; (iii) enjoined claims would indirectly impact the reorganization (indemnity or contribution); and (iv) the plan provided for the full payment of enjoined claims.).

those parties will have claims against NECC for, *inter alia*, contribution and indemnity. Indeed, all settling vendors and clinics have filed proofs of claim against the NECC estate on those grounds.

40. Absent confirmation of the Plan and the effectiveness of the releases and injunctions contained therein in favor of the Contributing Parties (which is a material condition to each of the settlement agreements), the Plan Proponents expect the Contributing Parties (who, pursuant to their settlement agreements, waive, release and/or assign to the estate their claims against the estate) to pursue their asserted claims against the NECC estate. As Judge Saylor noted in his decision on the Trustee's motion to transfer actions against NECC to the MDL Proceedings:

> Even in the absence of contractual indemnity agreements, the third-party defendants in the pending state-court actions may have claims for contribution or common-law indemnity from NECC in the event that they are found liable in state court. Those potential state-court verdicts pose the type of threat Congress had in mind when it crafted the exception to § 1334(c)(2)—*they can be "unpredictable and substantial" and even being required to contribute to their satisfaction "could have potentially deleterious effects on a debtor's estate."* This is particularly true in circumstances such as this, where the cause of action arises out of an allegedly defective product manufactured by the debtor. In many, if not all, jurisdictions, under ordinary circumstances, the debtor would be strictly liable for the harm caused by the defective product, even if there may have been a third-party interposed between the debtor and the tort claimant in the supply chain.

In re New Eng. Compounding Pharm. Prods. Liab. Litig., 496 B.R. 256, 272 (quoting Beck v. Victor Equipment Co., Inc., 277 B.R. 179, 180-181 (S.D.N.Y. 2002) (Rakoff, J.)) (emphasis supplied). Because "a suit against the [Contributing Parties] is, in essence, a suit against the debtor or will deplete assets of the estate," Master Mortgage, 168 B.R. at 934, there is plainly an identity of interest between NECC and the Contributing Parties.

41. <u>The Parties Receiving Releases Have Committed Substantial Assets to the</u>

<u>Reorganization</u>: The Contributing Parties have, without question, contributed "substantial" assets

to the reorganization, specifically as follows:

| Contributing Party | | Amount |
|---|---|---|
| Shareholders | Cash payment | **$47,500,000** |
| | Potential anticipated tax refunds | **$21,800,000** |
| Insight Settling Parties and Insurers | | **$40,000,000** |
| UniFirst and Insurers | | **$30,500,000** |
| NECC Insurers | | **$25,200,000** |
| Inspira and Insurers | | **$16,000,000** |
| Ameridose Insurer | | **$10,000,000** |
| ARL and Insurer | | **$6,400,000** |
| Victory and Insurers | | **$5,500,000** |
| GDC and Insurer | | **$3,750,000** |
| High Point and Insurer | | **$3,500,000** |
| Liberty and Insurer | | **$1,000,000** |
| **Total** | | **$211,150,000** |

42. As set forth in more detail in the Declarations, it is by no means certain that

NECC's tort creditors would be able to realize through litigation the significant sum that the

Contributing Parties have contributed to the NECC estate. They certainly would not be able to

realize any recovery whatsoever from the Contributing Parties without incurring the delay,

expense and risks of litigation (including the risk that one significant judgment in favor of a tort

claimant would significantly deplete the amounts available to pay others). Under these

circumstances, the Contributing Parties' contributions are each "substantial."

43.     <u>The Releases, and Injunctions in Aid Thereof, Are Essential to the Success of the</u> <u>Plan</u>:  As is also set forth in the Declarations, each and every settling Contributing Party demanded global releases and an injunction protecting them and their identified affiliates (and, in the case of NECC's shareholders, their spouses) from any and all claims that were related in any way to NECC or the drugs it compounded as a non-negotiable pre-condition to even agreeing to mediate their claims (let alone settling them).  It was only upon the acceptance of these conditions by the Plan Proponents and the Plaintiffs' Steering Committee that the Contributing Parties agreed to make their significant contributions to the NECC estate.  As such, the releases in favor of the settling parties themselves were a precondition to those parties' agreement to make their substantial contribution for the benefit of NECC's estate and creditors. <u>Cf.</u> <u>Monarch</u> <u>Life</u>, 65 F.3d at 979-80 (noting that permanent injunctive relief has been held appropriate where "non-debtors who would otherwise contribute to funding the plan ***will not settle their mutual*** ***claims absent 'protection' from potential post-confirmation lawsuits arising from their*** ***prepetition relationship with the chapter 11 debtor.***") (emphasis supplied),

44.     The Plan's "affiliate and spousal" releases and injunctions were likewise essential components of the settlement agreements reached by the Trustee with the Contributing Parties.  Simply put, NECC's shareholders and the other Contributing Parties would not have agreed to make their substantial contributions for the benefit of NECC's estate and creditors if their directors, officers, employees and other agents, and spouses, would have remained vulnerable to NECC-related litigation and liability after Plan confirmation.  Among other things, the affiliated parties benefitting from the releases and injunctions also: may have had indemnification or contribution rights as against NECC's shareholders and the other Contributing Parties; be named "insureds" whose express consent and release of their "policy

24

rights" were required for the insurers to consummate their settlements with the Chapter 11

Trustee;[10] or otherwise have an identify of interest with NECC's shareholders or other

Contributing Parties such that settlement would otherwise prove impossible. In addition,

NECC's shareholders agreed to contribute a share of their equity interests in certain affiliated

entities, as well as their spouses' interests in certain federal, state and local tax refunds, to the

global settlement fund for the benefit of creditors, but only if those entities and individuals

received the benefits of the Plan releases and injunctions.

45.     Accordingly, the Plan Proponents believe that the releases and injunctions in

favor of *all* of the Contributing Parties, including the affiliates/agents and spouses of NECC's

shareholders and the other settling defendants, were and are essential to the successful

consummation of the Settlement Agreements and the Plan. See In re Am. Family Enters., 256

B.R. 377, 407 (D.N.J. 2000) (approving a release that provided for a permanent injunction

against the pursuit of any creditor's claims against funding parties and numerous other released

third parties); In re Spiegel Inc., Case No. 03-11540 (BRL), 2006 Bankr. LEXIS 2158, at *49

(Bankr. S.D.N.Y. Aug. 16, 2006) (noting that "the making of a single contribution on behalf of

multiple beneficiaries of a third party plan release is both customary and acceptable").

46.     Absent these contributions, NECC would have no choice but to liquidate, with

little -- if anything -- left over for creditors. See Gillman v. Continental Airlines (In re

Continental Airlines), 203 F.3d 203, 212-13 (3d Cir. 2000) ("A central focus of these . . .

reorganizations was the global settlement of massive liabilities against the debtors and co-liable

---

[10]     See Rieckborn v. Velti PLC, Case No. 13-cv-03889-WHO, 2015 U.S. Dist. LEXIS 13542, at *48 (N.D. Cal. Feb. 3, 2015) (in the context of a proposed settlement agreement including a bar order, noting that bar order was appropriate where "it is undisputed that the settlement fund will be financed by insurance providers on behalf of [defendants]. These insurers would have little incentive to settle if they could not get a complete release of each of their insureds - otherwise, they would face the likelihood of more litigation. Further, while the [defendants] have not personally contributed to the fund, the insurers have contributed on their behalf . . .").

parties.    Substantial financial contributions from non-debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible.").    It is thus indisputable that the Plan's release and injunction provisions are essential to the successful implementation of the Plan and subsequent distributions to NECC's creditors (including tort victims), and that without them, there is little likelihood of success.

47.    Although some courts, including the Court in <u>Master Mortgage</u>, discuss the "essentiality to the plan" factor in terms of the essentiality of the releases to a plan of *reorganization* (as opposed to a liquidating plan), <u>see, e.g.</u>, <u>Dow Corning</u>, 280 F.3d at 658, a number of courts have approved liquidating plans containing third party releases and channeling injunctions.[11]    As this Court explained in <u>In re U.S. Fidelis, Inc.</u>, 481 B.R. 503 (Bankr. E.D. Mo. 2012) (applying <u>Master Mortgage</u>),

> A few courts suggest that compelled releases may not be appropriate in a liquidating 11 because the debtor necessarily does not need such extraordinary relief for the purpose of reorganizing.  The Court recognizes this concern and the possible abuse that could occur if the releases of non-debtors are commonly included in a plan of liquidation.  However, an orderly liquidation is a valid use of chapter 11 and one of its chief purposes—to ensure the best return for the unsecured creditors—should be promoted.  If the plan of liquidation ensures the best possible outcome for unsecured creditors and the releases therein are critical to confirmation of the plan, then the fact that the case is not a reorganization should not per se prohibit confirmation of the plan.

<u>Id.</u> at 520.

---

[11]    The Plan Proponents also note that liquidating plans were confirmed with non-debtor releases and a channeling injunction in the <u>Metabolife</u> and <u>TwinLabs</u> bankruptcies.  <u>See</u> *Order on Confirmation of Joint Amended Plan of Liquidation Dated May 14, 2007*, <u>In re MII Liquidation, Inc.</u>, Case No. 05-06040 [Dkt. No. 1740] (Bankr. S.D.Cal. Sept. 25, 2007); *Order Confirming First Amended Joint Plan of Liquidation of TL Administration Corporation (f/k/a Twinlab Corporation), TL Administration, Inc. (f/k/a Twin Laboratories Inc.), and TL Administration (Uk) Ltd. (f/k/a Twin Laboratories (Uk) Ltd.) Under Chapter 11 Of The Bankruptcy Code*, <u>In re TL Administration Corp.</u>, Case No. 03-15564 [Dkt. No. 1845] (Bankr. S.D.N.Y. July 27, 2005).

48.     For example, in <u>In re Ionosphere Clubs, Inc.</u>, 184 B.R. 648, 656 (S.D.N.Y. 1995), the Southern District of New York approved a non-debtor release in a liquidating plan.[12] Recently, Judge Gross of the United States Bankruptcy Court for the District of Delaware confirmed a joint plan of liquidation over the objections of the Office of the United States Trustee that the plan's releases and injunctions were impermissible in a liquidating plan.  *See* *Findings of Fact, Conclusions of Law, and Order Confirming First Amended Joint Plan of Liquidation Proposed by the Debtors and the Official Committee of Unsecured Creditors*, <u>In re North Texas Bancshares Inc.</u>, Case No. 13-12699 [Dkt. No. 366] (Bankr. D. Del. June 4, 2014). Judge Walsh, also of the United States Bankruptcy Court for the District of Delaware, also recently confirmed a joint plan of liquidation containing both releases and channeling injunctions to protect both non-debtors and insurers.  *See* <u>In re Blitz U.S.A.</u>, Case No. 11-13603 (PJW), 2014 Bankr. Lexis 2461 (Bankr. D. Del. Jan. 30, 2014).  A court may thus confirm a liquidating plan (like the Plan) that contains third party injunctions and releases.

49.     <u>The Impacted Classes Have, to Date, Overwhelmingly Voted to Accept the Plan</u>: The Tentative Voting Report, which will be supplemented after the May 5, 2015 voting deadline, shows that the holders of a majority of claims (in amount) in the classes impacted by the Plan's release and injunction provisions (Class D tort claimants and holders of Class E Subordinated Claims) have already voted to accept the Plan.  As this Court is aware, under the approved Solicitation Procedures, Class D's votes are weighted for voting purposes based on the severity of the claimant's injury.  The schedule below demonstrates that to date, claimants whose family members were killed or who themselves suffered grievous injuries have overwhelmingly voted to accept the Plan.

---

[12]     The Plan Proponents note that the <u>Ionosphere Clubs</u> court was not confronted with any arguments that third-party releases were inappropriate specifically in instances of liquidation plans.

| Injury | Weight of Claim for Voting Purposes[13] | Percentage Voting to Accept |
|---|---|---|
| Meningitis, stroke, and/or infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess, and/or arachnoiditis), after exposure to a contaminated NECC product resulting in the death of the claimant whose estate or other representative is submitting a vote | 120 points | 100.00% |
| Meningitis, stroke, and/or infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess, and/or arachnoiditis), after exposure to a contaminated NECC product not resulting in the death of the claimant | 80 points | 99.55% |
| Symptoms of headache, word-finding difficulty, nausea/vomiting, fever, neck stiffness or pain, back pain, photophobia, lack of appetite, urine retention, slurred speech, limb weakness, numbness, and/or pain at injection site and a lumbar puncture, MRI, or CT guided biopsy after exposure to a contaminated NECC product. | 10 points | 99.01% |
| Exposure to a contaminated NECC product and other injury or loss | 2 points | 99.55% |
| No exposure to a contaminated NECC product but other loss (*i.e.*, a spouse's loss of consortium) | 1 point | 99.05% |

50.    Moreover, the Official Committee (an estate fiduciary charged with representing the interests of creditors) and the Plaintiffs' Steering Committee (appointed in the MDL Proceeding to represent the interests of all plaintiffs) have each expressed their strong support for the Plan.  See Official Committee Declaration ¶ 23; PSC Declaration ¶ 25.  Indeed, the Official

---

[13]    For tabulation purposes, each point is worth $1.

Committee is a co-proponent of the Plan. In light of these facts and factors, the Plan Proponents fully expect the final voting report to demonstrate tort claimants' "overwhelming" support of the Plan.

51. <u>The Plan Provides a Mechanism for the Resolution of Tort Claims</u>: The establishment of the Tort Trust, which will be funded by the net proceeds of the Trustee's settlements with the Contributing Parties, also satisfies the fifth <u>Master Mortgage</u> factor. Courts analyzing this factor (whether a plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction) have not read that requirement to mean that claims of the affected class must be "paid in full" (a requirement very difficult to meet where, as here, the relevant claims are tort claims). Rather, courts, including circuit courts, have held that releases are appropriate where there is a *mechanism* for payment of all the affected claims - for example, a trust or settlement fund, like the Tort Trust, into which the affected claims are channeled. See, e.g., <u>Nat'l Heritage Found., Inc. v. Highbourne Found.</u>, 2014 U.S. App. LEXIS 12144, at **15-16 (noting that "[t]his consideration has typically been used to justify release provisions where the reorganization plan includes a mechanism ***such as a dedicated settlement fund to pay the claims of those affected by an injunction***" and finding that the absence of such a mechanism to pay claims in the subject plan weighed against the validity of a non-debtor release) (quoting <u>Nat'l Heritage Found. Inc. v. Behrmann</u>, 2013 U.S. Dist. LEXIS 49081, *8 (E.D. Va., Apr. 3, 2013)); <u>Metromedia Fiber Network</u>, 416 F.3d at 142 ("Courts have approved nondebtor releases when . . . the enjoined claims were 'channeled' to a settlement fund rather than extinguished . . . .") (citing <u>MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 837 F.2d 89, 93-94 (2d Cir. 1988)).

52.     Based upon the foregoing, the Plan fully complies with the requirements of Bankruptcy Code Sections 1122 and 1123 and all other provisions of the Bankruptcy Code, and therefore satisfies the requirements of Section 1129(a)(1) of the Bankruptcy Code.

    ii.    The Plan Complies with Bankruptcy Code Section 1129(a)(2).

53.     The Plan Proponents have satisfied Bankruptcy Code Section 1129(a)(2), which incorporates the disclosure and solicitation requirements of Bankruptcy Code Sections 1125 and 1126, because the disclosure and solicitation process was entirely consistent with the relevant provisions of the Bankruptcy Code.  See S. Rep. No. 95-989, at 126 (stating that Bankruptcy Code Section 1129(a)(2) "requires that the proponent of the plan comply with the applicable provisions of Chapter 11, such as section 1125 regarding disclosure"); H.R. Rep. No. 95-595, at 412.

54.     Bankruptcy Code Section 1125(b) prohibits the solicitation of acceptances or rejections of a plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the Court as containing adequate information."  See 11 U.S.C. § 1125(b).  The purpose of Bankruptcy Code Section 1125 is to ensure that parties in interest are fully informed regarding the condition of the debtor and the mechanics of the plan so that they have the ability to make an informed decision whether to approve or reject the plan.  See In re Clamp-All Corp., 233 B.R. 198, 208 (Bankr. D. Mass. 1999).

55.     Pursuant to the Disclosure Statement Order, entered after notice and a hearing, this Court approved the Disclosure Statement and held it contained "adequate information" pursuant to Bankruptcy Code Section 1125.  See Disclosure Statement Order ¶ 3.  The Plan Proponents submit that they have satisfied Section 1125 of the Bankruptcy Code, as their solicitation of acceptances or rejections of the Plan: (i) complied with the Disclosure Statement

Order; (ii) complied with all applicable laws, rules and regulations governing the adequacy of disclosure in connection with such solicitation; and (iii) solicited votes to accept or reject the Plan only after disclosing "adequate information" to holders of Claims or Interests, as Section 1125(a) of the Bankruptcy Code defines that term. Accordingly, the Plan Proponents and their employees, agents, affiliates, representatives and professionals have acted in "good faith" within the meaning of Section 1125(e) of the Bankruptcy Code.

56.     Section 1126 of the Bankruptcy Code provides that only holders of allowed claims, in impaired classes of claims that will receive or retain property under a plan on account of such claims, may vote to accept or reject the Plan. In accordance with Section 1126 of the Bankruptcy Code, the Plan Proponents solicited acceptances of the Plan from the holders of all Claims in each Class of impaired claims that are to receive distributions under the Plan and entitled to vote on the Plan. The impaired Classes entitled to vote under the Plan are Classes C, D and E. See Plan, Article III. The Plan also reflects that Classes A, B, and F have accepted the Plan in its entirety and the treatment thereunder for all purposes, without need for any further action. See id. Accordingly, the Plan Proponents did not solicit acceptances from the holders of Claims and Interests in the non-voting Classes A, B, and F. Based upon the foregoing, the requirements of Section 1129(a)(2) of the Bankruptcy Code have been satisfied.

> iii.     The Plan Complies with Bankruptcy Code Section 1129(a)(3)
> Because it Has Been Proposed in Good Faith
> and Not by Any Means Forbidden by Law.

57.     Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." See 11 U.S.C. § 1129(a)(3). The term "good faith" has been construed to mean "honesty in purpose and full disclosure of relevant facts." In re SW Boston Hotel, 460 B.R. at 66 (citing J. Feeney & N. Dreher, Bankruptcy Law Manual § 11:63 (West 2011)); see also In re Weber, 209 B.R. 793, 797 (Bankr. D. Mass. 1997)

("[T]he term is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objective and purposes of the Bankruptcy Code.") (internal quotations and citations omitted). Courts generally view the good faith requirement in light of the totality of the circumstances surrounding the establishment of the Chapter 11 plan. See In re Weber, 209 B.R. at 797; see also Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 802 (5th Cir. 1997) (citation omitted).

58.     In assessing good faith, courts should look to a Chapter 11 plan itself to determine whether it seeks relief in good faith and is otherwise consistent with the objectives and purposes of the Bankruptcy Code. See In re UTGR, Inc., 2010 Bankr. LEXIS 5699, at *29; see also In re Combustion Eng'g, Inc., 391 F.3d 190, 247 (3d Cir. 2004). Accordingly, where the plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of Bankruptcy Code Section 1129(a)(3) is deemed to be satisfied. See In re Century Glove, Inc., Nos. 90-400, 90-401, 1993 U.S. Dist. LEXIS 2286, at *1, *15 (D. Del. Feb. 10, 1993). A failure to satisfy Bankruptcy Code Section 1129(a)(3), on the other hand, requires a finding akin to "misconduct in the bankruptcy proceedings, such as fraudulent misrepresentations or serious nondisclosures of material facts to the court," which are wholly absent here. In re River Village Assocs., 161 B.R. 127, 140 (Bankr. E.D. Pa. 1993), aff'd, 181 B.R. 795 (E.D. Pa. 1995).

59.     Here, there can be no credible objection as to Plan Proponents' good faith. The record convincingly illustrates that the Plan is the product of arms-length negotiations and extensive efforts by the Plan Proponents, their professionals, the Plaintiffs' Steering Committee, and a number of other individuals to achieve consensus. The Plan Proponents proposed their Plan for the legitimate purpose of distributing the Debtor's assets (primarily the proceeds of the

32

Trustee's settlements with potentially liable third parties) for the benefit of NECC's creditors, including tort creditors. Accordingly, the Plan was proposed in good faith.

> iv.    The Plan Properly Provides for Bankruptcy Court Approval of Certain Payments for Services or Costs and Expenses Pursuant to Bankruptcy Code Section 1129(a)(4).

60.    Section 1129(a)(4) of the Bankruptcy Code requires court approval of certain professional fees and expenses paid by the plan proponent, by the debtor or by a person issuing securities or acquiring property under a plan. This section of the Bankruptcy Code has been construed to require that all payments of pre-confirmation professional fees that are made from estate assets be subject to review and approval by this Court to determine their reasonableness. See, e.g., In re SW Boston Hotel, 460 B.R. at 67; Lisanti v. Lubetkin (In re Lisanti Foods, Inc.), 329 B.R. 491, 503 (D.N.J. 2005); In re WorldCom, Inc., No. 02-13533, 2003 Bankr. LEXIS 1401, at *1, *158 (Bankr. S.D.N.Y. Oct. 31, 2003); In re Drexel Burnham Lambert Grp., 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992).

61.    All professional fee payments made or to be made by the Plan Proponents for services rendered and expenses incurred in connection with the Chapter 11 Case have been approved by, or are subject to approval of, this Court as reasonable.[14]  In particular, Article II of the Plan provides for the payment of only *Allowed* Administrative Expense Claims. See In re Oscient Pharms. Corp., No. 09-16576, 2010 Bankr. LEXIS 5567, at *1, *13 (Bankr. E.D. Mass. June 29, 2010) (holding that requirements of Bankruptcy Code Section 1129(a)(4) were satisfied

---

[14]    Pursuant to Section 2.02(i) of the Plan, except for applications by professionals under section 330 of the Bankruptcy Code and fees payable pursuant to 28 U.S.C. § 1930, all requests for payment of Administrative Expense Claims for which an earlier deadline has not been previously set or imposed by Local Rule 3002-1 must be filed and served on each of the Plan Proponents no later than thirty (30) days after entry of the Confirmation Order. All applications by professionals retained pursuant to sections 327, 328 and 1103 of the Bankruptcy Code for allowance and payment of fees and reimbursement of expenses pursuant to section 330 of the Bankruptcy Code for final compensation for services rendered and reimbursement of expenses incurred in connection with the Chapter 11 Case must be filed no later than sixty (60) days after the Effective Date. See Plan § 2.02(ii).

where the plan provided for payment of only approved administrative expenses). In addition, this Court will retain jurisdiction after the Effective Date to grant or deny applications for allowance of pre-confirmation compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan. See Plan, Section 11.01(iii). Thus, the Plan complies fully with the requirements of Bankruptcy Code Section 1129(a)(4).

> v. The Plan Satisfies Bankruptcy Code Section 1129(a)(5).

62. Section 1129(a)(5) of the Bankruptcy Code requires certain disclosures of the identity and nature of the compensation of proposed officers, directors and insiders in connection with reorganized debtors. The Plan identifies Paul D. Moore, Esq. as the sole post-confirmation officer of the Post-Effective Date Debtor. See Plan § 1.153. The Plan also provides that the Post-Confirmation Officer will be entitled to "reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings." See Plan § 6.01(ii). The Plan thus satisfies Bankruptcy Code Section 1129(a)(5).[15]

> vi. The Plan Does Not Require Governmental Approval Pursuant to Bankruptcy Code Section 1129(a)(6).

63. Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor approve any rate change provided for in a plan of reorganization. Here, Bankruptcy Code Section 1129(a)(6) is not implicated as the Debtor will not have a reorganized business upon the Effective Date and

---

[15] Although the Tort Trustee will not serve as a "director, officer, or voting trustee" or a "successor to the Debtor", out of an abundance of caution the Plan Proponents note that the matter of the identity of the Tort Trustee has been submitted to Judge Zobel. See Motion of the Official Committee of Unsecured Creditors to Appoint David J. Molton as Trustee of the New England Compounding Center Tort Trust [MDL Docket No. 1791]; see also Plan § 1.196 (providing that, under the circumstances, the selection of the Tort Trustee is to be made by the District Court). The Plan also discloses that the Tort Trustee shall be entitled to "reasonable compensation in an amount consistent with that of similar functionaries." See Plan § 5.90(ii).

the Plan does not provide for any change in rates over which a governmental regulatory commission has jurisdiction.

       vii.        The Plan Complies with Statutorily-Mandated Treatment of Administrative and Priority Tax Claims, as Required by Bankruptcy Code Section 1129(a)(9).

64.     Section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims entitled to priority under various provisions of Section 507(a) of the Bankruptcy Code receive payment in full in Cash unless the holder of a particular claim agrees to a different treatment with respect to such claims. Article II of the Plan provides that all Allowed Administrative Expense Claims and Priority Tax Claims shall receive, on the later of the Effective Date and the date such Administrative Expense Claim or Priority Tax Claim becomes an Allowed Administrative Expense Claim or Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable, an amount in Cash equal to the Allowed amount of such Claim. As such, the Plan satisfies the requirements of Bankruptcy Code Section 1129(a)(9).

       viii.       The Plan is Feasible, as Required by Bankruptcy Code Section 1129(a)(11).

65.     Section 1129(a)(11) of the Bankruptcy Code requires that a bankruptcy court find that a plan is feasible. In making a determination of feasibility, a court must consider whether confirmation of the plan is likely to be followed by the liquidation or further financial reorganization of the debtor or any successor to the debtor, unless "such liquidation is proposed in the plan." See 11 U.S.C. § 1129(a)(11). Under the Plan, claims in Classes A, B, and C will be satisfied from the Debtor's cash on hand. See Plan, Article IV. After making appropriate reserves for, *inter alia*, payment of the costs of administration of the bankruptcy case, the Debtor's remaining assets, or the proceeds of their sale, will flow to the Tort Trust. See Plan, Article V. In turn, the Tort Trust will make distributions pursuant to the Plan as a liquidating

35

trust, will not carry on a business or trade, and will only survive for the duration of time required

to liquidate or otherwise administer the Debtor's remaining assets.  See id.  This demonstrates

that the Plan is feasible, as the Plan establishes the procedures for the liquidation of NECC's

remaining assets for the benefit of its creditors.  Thus, Bankruptcy Code Section 1129(a)(11) is

satisfied.

> ix.      The Plan Provides for the Payment of All Fees
> Under 28 U.S.C. § 1930, as Required by
> Bankruptcy Code Section 1129(a)(12).

66.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees

payable under section 1930 of title 28, as determined by this Court at the hearing on

confirmation of the plan."  11 U.S.C. § 1129(a)(12).  Section 507(a)(2) of the Bankruptcy Code

further provides that "any fees and charges assessed against the estate under chapter 123 of title

28" are afforded priority as administrative expenses.  In accordance with Section 1129(a)(12) of

the Bankruptcy Code, the Plan provides for the payment of all fees payable under 28 U.S.C. §

1930.  See Plan §§ 2.02(ii), 12.07.

> x.      The Plan Does Not Modify Retiree
> Benefits and Does Not Implicate
> Bankruptcy Code Section 1129(a)(13).

67.    The Plan does not provide for unfunded retiree benefits; accordingly, Bankruptcy

Code Section 1129(a)(13) is not applicable.

> xi.      The Plan Does Not Implicate
> Bankruptcy Code Sections 1129(a)(14)-(16).

68.    Because Sections 1129(a)(14) and (15) of the Bankruptcy Code apply only to

individuals, these Sections are not implicated by the Plan.  Similarly, Section 1129(a)(16) of the

Bankruptcy Code only applies to nonprofit organizations; thus, this Section is not applicable to

the Plan.  Accordingly, Sections 1129(a)(14)-(16) of the Bankruptcy Code are not implicated by the Plan.

> xii.  Bankruptcy Code Section 1129(c) – Only One Plan.

69.  Section 1129(c) provides that this Court may confirm only one plan.  11 U.S.C. § 1129(c).  The Plan is the only Plan proposed for confirmation.  Section 1129(c) is thus satisfied.

> xiii.  Bankruptcy Code Section 1129(d) –
> Principal Purpose of the Plan is
> Not Avoidance of Taxes.

70.  No governmental unit has requested that this Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.  As evidenced by its terms and the record of this Chapter 11 Case, the principal purpose of the Plan is not such avoidance. Accordingly, the Plan satisfies the requirements of Section 1129(d) of the Bankruptcy Code.

> xiv.  At or Before the Confirmation Hearing, the Plan Proponents Will
> Demonstrate that the Remaining Relevant Provisions
> of the Bankruptcy Code are Satisfied.

71.  A demonstration that the remaining requirements of the Bankruptcy Code are satisfied is dependent on the completion of the voting process, in particular:

- Whether the Plan satisfies the "best interests" test, requiring that, with respect to each impaired class, each holder of a claim or an equity interest in such class either: (i) has accepted the plan or (ii) will receive or retain under the plan on account of its claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code, 11 U.S.C. §1129(a)(7);

- Whether each class of claims or interests has either accepted the plan or is unimpaired under a plan, 11 U.SC. §§ 1129(a)(8), 1126(c); and

- Whether one (1) impaired class of claims, not counting insiders, has accepted the plan, 11 U.S.C. § 1129(a)(10).

72.     The voting deadline is May 5, 2015.     The Preliminary Voting Report demonstrates strong creditor support for the Plan.  The Plan Proponents thus fully expect that each impaired Class entitled to vote (Classes C, D, and E) will vote to accept the Plan by sufficient amount and number.  Accordingly, the Plan Proponents submit that, by the time of the hearing to consider confirmation of the Plan, the requirements of Sections 1129(a)(7), (8), and (10) will be fully satisfied.

**B.      The Settlements Embodied in the Plan Are**
**        Fair and Reasonable and Should be Approved**

73.     As set forth above, confirmation of the Plan will constitute this Court's finding that, as required under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, the Plan Settlements "are in the best interest of the Debtor, the Estate and all holders of Claims in the Chapter 11 Case, are fair, equitable and reasonable, and have been entered into in good faith by all parties thereto."  Plan § 5.10.

74.     Pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure, this Court has authority to approve a compromise or settlement.  See Fed. R. Bankr. P. 9019(a).  The decision to approve a settlement or compromise lies within the discretion of the bankruptcy court, and is warranted when the settlement is found to be reasonable and fair in light of the particular circumstances of the case.  See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968).  In evaluating whether a settlement is fair and reasonable, a bankruptcy court need not be convinced the settlement is the best possible compromise or that the estate has maximized its recovery.  Rather a settlement or compromise should be approved as fair and reasonable as long as it does not "fall below the lowest point in the range of reasonableness."  In re Healthco Int'l, Inc., 136 F.3d 45, 51 (1st Cir. 1998) (quoting In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983)).  The trustee is better

38

situated than is any individual creditor to determine whether a settlement is in the best interests

of the estate, and his informed judgment, after reasonable investigation, to settle and avoid the

inherent risks, delays and expense of prolonged litigation is entitled to "wide latitude" from an

inquiring court.  LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 212 F.3d 632,

635 (1st Cir. 2000) (citing Hicks, Muse & Co. v. Brandt (In re Healthco Int'l., Inc.), 136 F.3d 45,

50-52 (1st Cir. 1998); Kowal v. Malkemus (In re Thompson), 965 F.2d 1136, 1145 (1st Cir.

1992)).

75.    When evaluating a proposed compromise, a bankruptcy court must assess and

balance the value of the claim that is being compromised against the value to the estate by virtue

of the compromise proposed.  Bankruptcy courts consider the following factors in determining

whether the proposed settlement is in the best interest of the debtor's estate:  (1) the probability

of success in the litigation being compromised; (2) the difficulties to be encountered in the

matter of collection; (3) the complexity of the litigation involved and the expense, inconvenience

and delay in pursuing the litigation; and (4) the paramount interests of the creditors, and a proper

deference to their views.  TMT Trailer Ferry, 390 U.S. at 424-25; Jeffrey v. Desmond, 70 F.3d

183, 185 (1st Cir. 1995); see also In re Martin, 91 F.3d 289 (3d Cir. 1996).

76.    For the reasons more fully set forth in the various Declarations, particularly those

of parties representing the plaintiffs' interests, the Plan Proponents respectfully submit that each

of the settlements described in the Plan Settlement Agreements is fair, equitable and reasonable,

and that, under the circumstances each of the relevant considerations for determining whether the

settlement is in the best interest of NECC's estate is satisfied and should be approved.

77.    The Probability of Success in the Litigation Being Compromised:  The prospects

for recovery against the relevant Contributing Parties in litigation were and are far from certain.

39

While the Plan Proponents believe that the Contributing Parties' negligence could be proven, the issues of causation and allocation of fault are more difficult issues. An inability to prove proximate causation between the relevant Contributing Parties' culpable conduct and NECC's tort creditors' injuries could raise serious issues that defeat liability entirely. Each relevant Contributing Party has maintained that it and its employees, agents and affiliates acted reasonably and within applicable standards of care, did not know of NECC's shortcomings, and indeed viewed itself a victim of NECC and the NECC insider's criminal conduct. And, even if the Trustee were successful in proving causative contribution to tort creditors' injuries, NECC's vendors, as well as clinics and health providers, could, and likely would, assert other parties' (likely NECC itself, and the so-called "national defendants" (entities like Unifirst, Liberty and ARL against whom all tort victims might have a claim)) relative negligence in connection with the contamination of NECC's products. Indeed, each of the Contributing Parties has asserted a claim against the NECC estate for contribution and indemnity on just that basis. In short, while the Plan Proponents believe that the NECC estate (and personal injury claimants) has substantial claims against each relevant Contributing Party, they are also mindful that litigation is inherently risky and that the difficulties summarized above make success in litigation far from certain. The Plan Settlements bypass those difficulties.

78.     The complexity of the litigation involved, the expense, inconvenience and delay in pursuing the litigation, and the difficulties to be encountered in the matter of collection: The litigation that would be required to be pursued if the Plan Settlements are not approved would be complex and expensive. Moreover, any such litigation likely would be protracted, and even further delayed by inevitable appeals, such that any recovery for the benefit of creditors would be significantly delayed. Absent confirmation of the Plan and approval of the Plan Settlements, the

relevant Contributing Parties likely will vigorously contest liability, all the while reducing the amount of available insurance coverage (indeed, many of the insurers of the Contributing Parties have taken aggressive positions on coverage, in some cases contending that there is none). The Plan Proponents do not believe that it is in the best interest of the NECC estate or its creditors (including tort claimants) to pursue the complex, lengthy, and costly litigation that would be required if the Plan Settlements are not approved. To the contrary, such litigation inevitably will significantly reduce, if not exhaust, the available sources of recovery as a result of judgments or settlements of the numerous competing claims and the costs of defending them, thus depleting available insurance coverage and the assets of the respective defendants. Many of the personal injury claimants are suffering substantial financial hardship as a result of the injuries caused by the contaminated NECC products, and they have a compelling need to secure a recovery as soon as possible. The Plan Settlements will achieve that goal, as well as ensure that the recoveries are distributed on an equitable basis.

79.    <u>The paramount interests of creditors</u>:    For those same reasons, the Plan Proponents submit that the Plan Settlements serve the interests of NECC's creditors, especially those holding tort claims. Those claimants, who have suffered grievous harm and have incurred and continue to incur substantial medical expenses, cannot await, and should not be required to await, the resolution of difficult, costly and protracted litigation against the Contributing Parties if the Plan Settlements are not approved, particularly if, as is a risk in many cases, the relevant Contributing Party's available funds are exhausted in the meantime and its insurance coverage precipitously reduced or lost. The support by the Official Committee and the Plaintiffs' Steering Committee for approval of the Plan Settlements evidences creditor support to approve the Plan Settlements (as does the Official Committee's role as co-proponent of the Plan). Indeed, none of

the hypothetical alternatives to the Plan and Plan Settlements will produce a better outcome for creditors.

80.     In summary, the Plan Proponents submit that approval of the Plan Settlement Agreements is both necessary to cause the expeditious administration of the Debtor's estate and payment to the Debtor's creditors, and appropriate as reflecting the paramount interest of the Debtor's creditors in receiving compensation for injuries allegedly caused by the relevant Contributing Parties.

## **CONCLUSION**

81.     For the foregoing reasons, the Plan Proponents respectfully request that the Plan be confirmed.

*[Remainder of page intentionally left blank.]*

Dated: April 29, 2015
       Boston, Massachusetts

Respectfully submitted,

**DUANE MORRIS LLP**

By:  /s/ Michael Lastowski
Michael R. Lastowski (admitted *pro hac vice*)
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
mlastowski@duanemorris.com

*Counsel to the Chapter 11 Trustee*

-and-

**BROWN RUDNICK LLP**

By:  /s/ William R. Baldiga
William R. Baldiga, Esq. (BBO #542125)
Kiersten A. Taylor, Esq. (BBO #681906)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
wbaldiga@brownrudnick.com
ktaylor@brownrudnick.com

and

David J. Molton, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com

*Counsel to the Official Committee of Unsecured Creditors of New England Compounding Pharmacy, Inc.*

61919091