```
 1                  UNITED STATES DISTRICT COURT
 2                   DISTRICT OF MASSACHUSETTS
 3


 4
     IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
 5   PHARMACY CASES LITIGATION          )
                                        )
 6                                      )
                                        )
 7                                      )
                                        )
 8                                      )

 9          BEFORE:  THE HONORABLE RYA W. ZOBEL AND
                     THE HONORABLE JENNIFER C. BOAL
10

11

12
                      STATUS CONFERENCE
13                    MOTION HEARING

14

15

16          John Joseph Moakley United States Courthouse
                       Courtroom No. 12
17                    One Courthouse Way
                      Boston, MA 02210
18

19                      April 29, 2015
                         2:00 p.m.
20

21

22
               Catherine A. Handel, RPR-CM, CRR
23                   Official Court Reporter
            John Joseph Moakley United States Courthouse
24               One Courthouse Way, Room 5205
                      Boston, MA 02210
25              E-mail: hhcatherine2@yahoo.com
```

1    APPEARANCES:

2    For The Plaintiffs:

3
     Hagens, Berman, Sobol, Shapiro LLP, by KIRSTEN JOHNSON,
4    ESQ., and THOMAS M. SOBOL, ESQ., 55 Cambridge Parkway, Suite 301,
     Cambridge, Massachusetts 02142;
5
     Janet, Jenner & Suggs, LLC, KIMBERLY A. DOUGHERTY, ESQ., 75
6    Arlington Street, Suite 500, Boston, Massachusetts  02116;

7    Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,
     ESQ., 227 Second Avenue North, Nashville, Tennessee 37201-1631;
8
     Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
9    Street, Suite 500, Boston, Massachusetts 02114;

10   Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
     ESQ., 150 Fourth Avenue North, Suite 1650, Nashville, Tennessee
11   37219;

12   LaFollette Johnson DeHaas Fesler & Ames, by ROBERT J.
     IACOPINO, ESQ., 2677 N. Main Street, Suite 901, Santa Ana,
13   California 92705 (Appearing telephonically);

14
     FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
15
     Brown Rudnick, by DAVID J. MOLTON, ESQ., Seven Times Square,
16   New York, New York 10036;

17   Andrews & Thornton, by ANNE ANDREWS, ESQ., 2 Corporate Park,
     Suite 100, Irvine, California 92606 (Appearing telephonically);
18
     HONOR HEATH, ESQ. (Appearing telephonically);
19

20   FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
     NECP, INC.:
21
     Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
22   Street, Suite 2400, Boston, Massachusetts 02110-1724;

23


24


25   (Appearances continued on the next page.)

```
 1     APPEARANCES (Cont'd):

 2
       FOR THE DEFENDANTS:
 3
            Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ., 1150
 4     Huntington Building, 925 Euclid Avenue, Cleveland, Ohio
       44115-1414;
 5
            Michaels, Ward & Rabinovitz LLP, by DANIEL M. RABINOVITZ,
 6     ESQ., One Beacon Street, Boston, Massachusetts 02108;

 7          Todd & Weld LLP, by CHRISTOPHER R. O'HARA, ESQ., and
       CORRINA L. HALE, ESQ., 28 State Street, 31st Floor, Boston,
 8     Massachusetts 02109;

 9          Ulmer & Berne LLP, by JOSHUA A. KLARFELD, ESQ., 1660 West
       2nd Street, Suite 1100, Cleveland, Ohio 44113-1448;
10
            Fulbright & Jaworski, LLP, by MARCY H. GREER, ESQ., 98 San
11     Jacinto Boulevard, Suite 1100, Austin, Texas 78701;

12          Goodwin Procter LLP, by JAMES REHNQUIST, ESQ., and ROBERTO
       M. BRACERAS, ESQ., Exchange Place, 53 State Street, Boston,
13     Massachusetts 02109;

14          McGuire Woods LLP, by CHRISTOPHER TRIBLE, ESQ., One James
       Center, 901 East Cary Street, Richmond, Virginia 23219-4030;
15
            Sloane & Walsh LLP, by ROBERT H. GAYNOR, ESQ., Three Center
16     Plaza, Boston, Massachusetts 02108;

17          Hermes, Netburn, O'Connor & Spearing, P.C., by KARA A.
       LORIDAS, ESQ., 265 Franklin Street, 7th Floor, Boston,
18     Massachusetts 02110-3113;

19          Brewer, Krause, Brooks, Chastain & Burrow, PLLC, by JASON
       A. LEE, ESQ., 611 Commerce Street, Suite 2600, Nashville,
20     Tennessee 37203;

21          Blumberg & Wolk LLC, by JAY J. BLUMBERG, ESQ., 158 Delaware
       Street, Woodbury, New Jersey 08096;
22

23

24

25
```

```
1                    P R O C E E D I N G S
2        (The following proceedings were held in open court before
3    the Honorable Rya W. Zobel, United States District Court Judge,
4    and the Honorable Jennifer C. Boal, Magistrate Judge, United
5    States District Court, District of Massachusetts, at the John J.
6    Moakley United States Courthouse, One Courthouse Way, Boston,
7    Massachusetts, on April 29, 2015.)
8              THE COURT:  Good afternoon.
9              MR. MORIARTY:  Good afternoon, your Honor.
10             MR. STRANCH:  Good afternoon.
11             THE COURT:  Please be seated.
12             I'm sorry, I was trying to find the name of the pro
13   se, whatever you call her.
14             MS. JOHNSON:  Ms. Annika Martin.
15             THE COURT:  Is she here?
16             MS. JOHNSON:  She was not able to attend this month,
17   your Honor.
18             THE COURT:  The reason I ask is because we still have
19   a pro se letter.  I think I had sent this to you at some
20   point, a motion to intervene and newly discovered evidence
21   signed by a bunch of people.
22             MS. JOHNSON:  Yes, your Honor, you have.
23             THE COURT:  That's taken care of.
24             MS. JOHNSON:  It is taken -- I can report from Ms.
25   Martin what has happened with that.  Ms. Martin has sent a
```

1    letter in response to that motion to each of the potential

2    intervenors asking them to speak with the PSC about what

3    information they actually believe that they have in their

4    possession.

5              THE COURT:  Okay.  So, I can stop worrying about it?

6              MS. JOHNSON:  I believe that's true, yes, your Honor.

7              THE COURT:  We'll just file it with the papers.

8    Thank you.

9              COURTROOM DEPUTY CLERK URSO:  Okay.

10             THE COURT:  All right.  Now, we start with Ms.

11   Johnson, and I think the first issue is whether -- is to hear

12   argument on the motion for the case management order, which I

13   think is an order that derived from the request by the Court

14   to streamline the many motions to dismiss, right?

15             MS. JOHNSON:  There's actually -- there are two

16   motions in front of you seeking case management order, your

17   Honor.  The first for which the Plaintiffs' Steering Committee

18   and the defendants have requested oral argument actually

19   relates to the motion to set a trial date, an expedited trial

20   date; the second of which is the motion for a case management

21   order that your Honor referred to which deals with some

22   procedures proposed by the Plaintiffs' Steering Committee to

23   coordinate filing of motions to dismiss, and the like.

24             We had not asked for oral argument on the second,

25   your Honor, but, of course, if the Court would wish to discuss

1    it, we're prepared to do that.

2         THE COURT:  Given that Magistrate Judge Boal is

3    working on the *Bellwether* issue in conjunction with discovery,

4    why should I now enter an order that expedites the trial date,

5    separate and apart from the *Bellwether* trials?  Mr. Sobol.

6         MR. SOBOL:  Yes, your Honor.

7         For the following reason, and also to make clear what

8    it is that we were suggesting at the outset and what it is

9    that I think we still press forward with is this:

10        MDL cases can get bogged down significantly by trying

11   to figure out what kind of case is a so-called, quote,

12   *"Bellwether*."  The fact of the matter is that there is no

13   perfect *Bellwether* caselaw.  All cases are going to be

14   different.  You're always going to be able to find one kind of

15   distinction after another after another.

16        The Court is in the process of undertaking an inquiry

17   regarding *Bellwether* cases, but, in the meantime, there's no

18   reason to wait to just get going with some cases, and it was,

19   frankly, an insight I think that the Court raised in which we,

20   frankly, didn't -- which is these are real people who have

21   real claims, regardless of whether or not you're going to call

22   it an example of something or not.  If you got somebody who --

23   you know, if there's a family of the deceased person or if

24   there is a person who is critically ill as a result of this,

25   you know, and we can expedite a trial, why not?  And that's

1    really the incentive for it.  Because, otherwise, as you can

2    see from the papers that are now before you, people are going

3    to be talking for the next two months or three months about

4    which kind of case is a good example and you're never going to

5    achieve that.  You're just not.

6              (Discussion off the record.)

7              MR. SOBOL:  Maybe as an example --

8              THE COURT:  Let me just explain to you where I think

9    we are.

10              Judge Boal has set certain dates for discovery to be

11    completed by April 16th, which was the parties were supposed

12    to confer regarding whether *Bellwether* trials are appropriate

13    and if so, the category of cases that should adequately be

14    represented in the *Bellwether* pool, and then *Bellwether*

15    proposals were to be due from the parties on May 18th.

16              So, it seems to me that by the next -- at the next

17    conference, we should be in a position to say whether it's the

18    *Bellwether* list or it's the expedited list that you want and

19    then just set the trial date for whichever one it is.

20              MR. SOBOL:  Which is perfectly fine, your Honor.

21              THE COURT:  Okay.

22              MR. SOBOL:  But let me also say this.  It doesn't

23    address the point that I'm trying to make, which is this:

24              As an example, the parties agree that there is a

25    potentially meritorious important case by the family of Diane

```
1    Reed.  The defendants say that the Reed case is an outlier,

2    that it doesn't represent anything, that it's -- and, so --

3         THE COURT:  There's going to be disagreement about

4    them down the line and we have to decide that.

5         MR. SOBOL:  Well, I understand, but my point is, if

6    the Reed case is going to be an outlier and it's not going to,

7    therefore, be resolved by any kind of Bellwether case, let's

8    set the Reed case for trial, too.

9         Any other case that the defendants think is an

10   outlier is never going to be resolved by a process -- the

11   defendants haven't committed is going to result in a

12   settlement, in any event.  That's simply my point.  So, we

13   can't --

14        THE COURT:  Whether we call it Bellwether or we call

15   it something else, we will set a schedule of cases to be tried

16   by a particular date, hopefully, within this year.

17        MR. SOBOL:  Thank you.

18        THE COURT:  That's really all you want, right?

19        MR. SOBOL:  That's all I want.

20        THE COURT:  And the defendants certainly don't

21   object, do you?  No.  You do?

22        (Pause.)

23        THE COURT:  I'm now talking about the process, not

24   the choice of any particular case.

25        MS. GREER:  Well, your Honor -- and I'm not sure this
```

```
 1    is connected.  Can you hear me if I --
 2              THE COURT:  Well, the problem is the people on the
 3    phone can't hear you.  So, we need to connect you.
 4              MS. GREER:  This came apart.
 5              THE COURT:  It's a question simply of turning on the
 6    switch.
 7              MS. GREER:  It's not plugged in, your Honor.
 8              MR. MOLTON:  Why don't you use this one over here?
 9              (Discussion off the record.)
10              MS. GREER:  Your Honor, the question is the timing.
11    The process I think we can all agree to, but the timing --
12    it's going to be impossible to try a case by the end of this
13    year.  At this point, discovery is incomplete.  We're still
14    waiting to get documents from all the plaintiffs.  We've been
15    amassing medical records.  It's a lengthy process.
16              THE COURT:  We are talking about a fairly small
17    number of cases and the discovery as to that small number of
18    cases should not be impossible to accomplish before the end of
19    the year.  So, we can have a trial at the end of the year.
20              MS. GREER:  Your Honor, we haven't even done expert
21    work at all.  There is not a single expert that's been
22    designated in this litigation.  There are going to be expert
23    challenges.  There are going to be motions for summary
24    judgment.  The Court has put aside the motions to dismiss in
25    specific cases, which, by agreement of the parties, we agreed
```

1    to do at the *Bellwether* workout process.

2          And one thing that -- this is Marcy Greer

3    representing St. Thomas Entities.

4          One thing that our clients have to deal with, in

5    particular, is the fact that *Bellwether* is going to have a

6    component both of the medical issues and the physical issues

7    that our co-defendants, the Tennessee clinics, will have, but

8    we also are in it just on vicarious liability.  So, our

9    liability is going to turn on both the primary liability and

10   whether or not we can be liable through an accused agency

11   relationship or not, and we've got to get some information and

12   discovery from these plaintiffs to figure out what that looks

13   like.  We have no information on that.  The plaintiffs'

14   profile sheets did not address that.  We were focused on

15   medical issues, getting releases and medical records.

16         So, we need to develop some of these cases further

17   and figure out what cases are going to be most representative,

18   because the *Bellwether* process is important.

19         The reason it takes time to pick the *Bellwether* is

20   because there is a process that, although not perfect, is

21   designed to get information that is useful, because, as Judge

22   Fallon --

23         THE COURT:  Excuse me for interrupting, but I'm not

24   prepared to talk about this now.

25         I think the first issue is to find out how we go

1    forward, which I intend to do at the next meeting, because by

2    that time, Judge Boal's work is done with respect to the

3    discovery and the setting of some dates for choosing who the

4    plaintiffs will be who will go forward first, and then after

5    that, we will have to set a schedule getting ready for trial

6    and for trying and it may be a very tight schedule, but we'll

7    try -- we'll try to have your anxieties in consideration as

8    much as the plaintiffs'.  So, hold your horses on the problems

9    because we're not there yet.

10           MS. GREER:  Appreciate that, your Honor.

11           THE COURT:  It will be easier if we can do it in the

12   context of particular cases as well.

13           MS. GREER:  I agree with that.

14           We just want to make sure that we're not rushing to

15   get a trial date and losing our ability to develop our

16   defenses in the process.  At this point we have almost no

17   records from our co-defendants as necessary to develop a

18   comparative fault decision.

19           THE COURT:  At the moment, I don't see that we have

20   ever rushed in this case, to my great chagrin, and I've been

21   as much responsible as anybody and I apologize for that, but

22   we haven't been rushing, and I don't think that, in fairness,

23   I can catch up by making counsel and the parties rush more

24   than they are able to rush.

25           MS. GREER:  Your Honor, I just want to just say, we

```
1    have been diligent.  I think we've demonstrated that to you,
2    and if you have any concerns about our side of it, you know, I
3    would like to put those to rest, because we've been pursuing
4    discovery.  We've been pursuing all of the necessary things.
5    We haven't been dragging our feet.  We just want to make sure
6    it's fair.
7              THE COURT:  Okay.  I agree it should be fair.  Of
8    course, our definition of fairness may differ, but not much.
9    So, I think that takes care of one part of this issue.
10             The other is the second one of the motions having to
11   do with the case management order that the parties tried to
12   evolve in response to my request, and I have looked at that
13   backwards and forwards, and I thank counsel for the efforts
14   they have made, but I don't think it's possible to reach the
15   kind of result that I hoped we could reach.  There is too much
16   difference between the parties, and I regret that I made you
17   do work that, in the end, turned out to be not capable of
18   being used.  I just -- I think the objections to the
19   management order are valid objections.  I appreciate the
20   effort that went into it, but I think we will drop that at the
21   moment and just -- I'll just proceed with the motions to
22   dismiss as they're being filed.  So, thank you very much.
23             That takes care of Dockets No. 1716 -- that is, 1716
24   is denied and 1717 -- I don't know what that is.  Is that the
25   *Bellwether* one that we just talked about?  This is Item A(1).
```

```
1              MR. CHALOS:  Yes.

2              (Discussion off the record at the Bench.)

3              MAGISTRATE JUDGE BOAL:  1711 is the one with regard

4    to dispositive motions.

5              MS. JOHNSON:  Yes.

6              THE COURT:  So, 1711 is denied, with regret, and

7    appreciation for counsel's efforts in that regard.

8              Ms. Johnson, the floor is yours.

9              MS. JOHNSON:  Thank you, your Honor.

10             I believe that brings us to the second item for which

11   the parties requested oral argument, which relates to the

12   selection of tort trustee, and on that I will turn to Mr.

13   Sobol.

14             THE COURT:  I regret to let you all know how

15   incredibly incompetent I am.  What is a tort trustee?

16             MR. MOLTON:  Your Honor, it's David Molton from the

17   Creditor's Committee.

18             Pursuant to the plan, to the extent the plan is

19   confirmed -- and, as your Honor knows, the confirmation

20   hearing will be held by Judge Boroff, I believe, on May 19th.

21             MR. GOTTFRIED:  That's correct.

22             MR. MOLTON:  There are going to be two post

23   confirmation funds set up pursuant to the plan, the first of

24   which is going to be the fund that handles ordinary general

25   unsecured creditors, and the like, and we can put that on the
```

1    side, and Paul Moore, who is presently the trustee of -- in

2    the Chapter 11 case, will continue and put on a new hat and he

3    will become what we call the post confirmation officer, and he

4    will be responsible with his firm, Duane Morris, for the

5    operation of the post confirmation debtor and the resolution

6    and payment of general unsecured claims.

7            The predominant amount of the money that has been

8    raised pursuant to the settlements -- and your Honor knows

9    that that figure is approaching or in excess of $200

10   million -- will be -- the net proceeds of that, after payment

11   of certain expenses and payment of reserve to pay the general

12   unsecured creditors, the typical unsecured creditor, widget

13   makers, telephone vendors, whatever, will then be channeled

14   and funded into what we call, "The NECC tort trust," which

15   will have a separate tort trust agreement, that is a plan

16   document and it's already been filed and there's -- the

17   disclosure statement in the Chapter 11 case discusses it and

18   explains it.

19           That trust will hold a general fund that will pay out

20   the claims of all tort claims of any NECC victim to the extent

21   that they meet the criteria for allowance of those claims as

22   established in the claims resolution facility, which is also a

23   document to the tort trust that was drafted, in predominant

24   part, by my friend Rick Ellis and others in this room.

25           There will also be several segregated funds in the

1   tort trust agreement that will represent a certain amount of

2   the settlement proceeds of the various clinic settlements,

3   such as the North Carolina settlement, the New Jersey

4   settlement, the Virginia settlement.

5          And the reasoning of that, your Honor, is because

6   Virginia injectees, tort claimants who were injured by

7   injections at a Virginia clinic, would only have -- only they

8   would have a claim for -- against that Virginia clinic.  It

9   was only fair that there be funds allocated from that

10  settlement for them.

11         So that there are separate sub-accounts, segregated

12  accounts, that are set up in the tort trust agreement that are

13  administered by separate claims facilities for the payment of

14  those folks as well.

15         The tort trust agreement, your Honor, is a liquidated

16  trust under -- pursuant to various IRS provisions that will

17  provide the best possible benefit to the tort victims.

18         The tort trustee, your Honor, is the person who

19  doesn't decide what value the claims are or how people can be

20  paid.  Those are the claims administrators under the various

21  resolution authorities that are in the tort's trust agreement,

22  but it's basically the fiduciary that is entrusted with the

23  funds is responsible for their administration and also has

24  within his or her authority various other responsibilities,

25  including, among others, prosecution of estate causes of

1    action that are assigned to the tort trust pursuant to the

2    plan, as well as resolution of what we call the

3    indemnification or contribution claims of clinics, and

4    otherwise.

5            That's a lot -- that's a mouthful, your Honor, but

6    that's, in sum or substance, what the tort trust is and how it

7    functions.

8            THE COURT:  So, the tort trust does not exist in

9    general in bankruptcy law.  It is specifically for this case

10   and similar rare cases like this one?

11           MR. MOLTON:  Yes.  I would say, your Honor, that post

12   confirmation liquidating trusts are not remarkable in Chapter

13   11 plans and they fulfill a whole lot of functions, but

14   especially in mass tort cases, it's very customary to have

15   this sort of post confirmation trust set up for tort victims

16   that channel all the tort claims to the trust and in that way,

17   also we are able to benefit from the circuit caselaw that is

18   -- the majority circuit caselaw in this country that says if

19   you set up a procedure like this and channel the claims and

20   meet certain other criteria, you can give the settling

21   defendants the releases and injunctions that they need in

22   order to have given over their substantial contributions to

23   the estate.  So, that's how the architecture has been set up

24   to work.

25           THE COURT:  Now, Ms. Johnson, do you wish to talk

1    about this in general or Mr. Sobol or shall we go on to the

2    motion to appoint a particular tort trustee?

3         MR. SOBOL:  If I may, your Honor.  I think that Mr.

4    Molton describes generally what the situation is.  I think it

5    would be helpful also to simply identify what the role is of

6    this Court, then, in connection with this process, and also

7    provide an analogy to make it a little bit more familiar.

8         If you can imagine, in any kind of class actions, for

9    instance, a fund, a settlement pot is created.  Someone has to

10   verify the money goes into an escrow account somewhere and

11   there has to be someone who is in charge of administering that

12   money, basically, sitting on the money, until such time as

13   it's ready for distribution.

14        And, in large part -- not in total part, but in large

15   part, that is the role of the tort trustee here.  A settlement

16   pot is being created.  There has to be someone who is in

17   charge of the settlement pot to make sure that it's invested

18   somewhere and that it's held appropriately until such time for

19   distribution.

20        There are some other functions, which we'll -- some

21   other potential functions that we'll get into later, but

22   that's, from my perspective, a reasonable analogy.

23        The role of this Court is -- to the extent that there

24   is a need for any court to supervise something that happens,

25   it's been contemplated by the plan that this Court will

1   supervise -- or will be the Court that needs to address in

2   some kind of manner some kind of issue.

3        So, if you look, then, at the broader picture about,

4   essentially, what's going on at this stage, the bankruptcy

5   situation, there'll be a confirmation hearing.  If the

6   confirmation goes the way that the vast majority, the super

7   majority, 90 percent or 95 percent more people want to see

8   happen, the plan will be confirmed.

9        It's likely, I would think, that there's not going to

10  be an appeal or if there is an appeal, there'll be no stay of

11  the operation of the plan.

12       At that point, therefore, there's the so-called

13  effective date, which happens relatively close to the heels of

14  the time that the confirmation order enters.

15       At that point in time, the trustee of NECC, Mr.

16  Moore, becomes -- wears a different hat, as Mr. Molton

17  indicated, and shortly after that, after the attorney's fees

18  and consultant fees and the bankruptcy have been either paid

19  or identified and the trade creditors, which are relatively

20  nominal in this situation, about a million dollars, roughly

21  speaking, are done, almost all -- all the other money pours

22  over into this tort trust, the settlement pot, for somebody to

23  -- the tort trustee to sit on and then be handled.

24       And at that point, frankly, you take over to the

25  extent there's ever any court that needs to be involved, and

1   we hope, frankly, that there wouldn't be, if there's some

2   issue that happens there as the settlement money is being

3   allocated by people other than the tort trustee and is being

4   identified so that the identification of checks can be issued.

5   So, that's the overview we're at.

6           So, the question, then, is -- there's a difference of

7   opinion between these two committees -- is what kind of person

8   should be playing that role as tort trustee and who would best

9   fit that role.

10          MR. MOLTON:  Your Honor, if I can --

11          THE COURT:  I, frankly, don't understand that there's

12   so much difference between counsel as to the role of the tort

13   trustee.

14          MR. SOBOL:  I think in one regard there may be, but,

15   by in large, I don't think there is.

16          THE COURT:  In that case, there shouldn't be such a

17   difference about the role and the qualifications of the tort

18   trustee.  Or are there differences between a particular

19   person?

20          MR. SOBOL:  Yes.

21          THE COURT:  Ah.

22          MR. MOLTON:  Judge, if I -- because it was our motion

23   at first.

24          First of all, what Mr. Sobol says is true.  And what

25   he didn't mention, but I will mention, is, just for the sake

1    of procedural propriety, the plan contemplates that soon after

2    confirmation, there'll be a withdrawal reference motion in the

3    bankruptcy court to bring to your Honor the jurisdiction to

4    have the supervisory role your Honor requires in order to make

5    the decisions or have the powers that the plan gives to your

6    Honor in connection with the tort trust.  So, I just wanted to

7    say that, because if there's a question of jurisdiction, I

8    just wanted to lay that out and we think that --

9              THE COURT:  So, you want to make sure that I know

10   that I'm going to work with this person?

11             MR. MOLTON:  Yes, your Honor.

12             And, Judge, I am here not to advocate for the motion,

13   because the motion by the committee nominates me to be the

14   tort trustee.  So, I find myself in a very peculiar position

15   sitting here introducing this.

16             But what I do want to say, because I've been

17   authorized to, is before I introduce the folks on the phone

18   who are going to talk to this for the committee, is that one

19   of the issues that Mr. Sobol wrote in his opposition was that

20   he was concerned about the hiring by the tort trustee of the

21   tort trustee's own firm, which, as we say in ours, is an

22   unremarkable thing in bankruptcy.  It happens all the time.

23   The trustee in this case has done it and will continue to do

24   it in his post confirmation role.

25             We have no problem with your Honor, as one of the

1    duties, basically approving any retention and supervising that

2    retention in order to eliminate any of the concerns raised by

3    Mr. Sobol.  So, I just wanted to --

4            THE COURT:  So, if I were to approve your firm, then

5    it's okay?

6            MR. MOLTON:  Well, we would think that would

7    alleviate Mr. Sobol's concerns.  And if you didn't, it would

8    be okay as well.

9            In any event, I do want to introduce your Honor to

10   two members of the committee who have worked very hard, by the

11   way, and what you've seen -- you seen the MDL portion and, as

12   your Honor knows, there's a whole other world going on out

13   there that has put together a whole lot of things and very

14   good things for the benefit of the victims here and we're very

15   proud of what we've done.

16           And if your Honor -- what we filed in the last two

17   days on this docket is notice of filing of what's been filed

18   in the bankruptcy court, including our post confirmation brief

19   that was filed today, as well as all the proof that we're

20   filing for Judge Boroff to approve the plan.

21           But two of the members who have worked very hard and

22   who are going to talk to this issue are Honor Heath -- Honor

23   is -- Ms. Heath is a member of the bar of this Court --

24           THE COURT:  I'm sorry.  What is the name of --

25           MR. MOLTON:  Honor, as in "your Honor."

```
 1              THE COURT:  Okay.
 2              MR. MOLTON:  H-o-n-o-r.  Heath, as in H-e-a-t-h.
 3              Ms. Heath is a member of the bar of this Court, your
 4    Honor, is counsel for Ever Source, who is --
 5              THE COURT:  I'm sorry.  The last name is what?
 6              MR. MOLTON:  Heath, H-e-a-t-h.
 7              THE COURT:  Like in Scotland?
 8              MR. MOLTON:  Yes.
 9              THE COURT:  Okay.
10              MR. MOLTON:  And she is counsel for Ever Source, who
11    is our only member who is not a tort claimant.  She is very
12    experienced in Chapter 11 work and insolvency work in general,
13    representing creditors and others, and she'll explain that,
14    and she's on the line.  She's got a hearing at 3 o'clock in
15    Springfield.  So, I promised her that I would get her on
16    first, but -- if your Honor lets me.
17              And also on this the line, your Honor, is Anne
18    Andrews, who is representative counsel to one of our co-chairs
19    on the committee.  Ms. Andrews is of Andrews & Thornton, and
20    among representing the co-chair of our committee, she
21    represents numerous other claimants in this MDL and in the
22    bankruptcy, and she will be speaking as well.  So, I'm going
23    to stop talking and turn the --
24              THE COURT:  Now, the entity -- from what entity do
25    these two people come?
```

```
1              MR. MOLTON:  They are both --

2              THE COURT:  The plaintiffs' committee?

3              MR. MOLTON:  Yes.  Ms. Heath is a counsel to Ever

4    Source, one of our committee members and the only committee

5    member who is not a tort claimant, and Ms. Andrews is counsel

6    to Ms. Eldridge, who is our -- one of our co-chairs, and she

7    is a member -- Ms. Eldridge is a member of -- and a co-chair

8    of the Creditor's Committee.  So, they're speaking for the

9    motion on behalf of the Creditor's Committee, your Honor.

10             THE COURT:  Okay.  Ms. Heath, are you there?

11             MS. HEATH:  Yes, your Honor.

12             THE COURT:  Can we keep everybody's comments to about

13   five, six minutes?

14             MS. HEATH:  Yes, your Honor.

15             THE COURT:  Thank you.

16             MS. HEATH:  My name is Honor Heath.  I am a member of

17   the Bar of the United States District Court of Massachusetts

18   and I am actually sitting in the Clerk's Office in

19   Springfield.

20             COURT REPORTER:  I'm having trouble hearing you.

21             THE COURT:  Ms. Heath, something doesn't work quite

22   right.  We have trouble understanding what you're saying.  I

23   don't know why that is.  It has something to do with the

24   microphone.

25             MS. HEATH:  I was graciously given this phone by the
```

```
 1    Clerk.  It is a --
 2              THE COURT:  Well, now it's better.  Just speak
 3    slowly, then, please.
 4              MS. HEATH:  I will talk and be right next to the
 5    unit.
 6              I'm going to tell you that I was a bankruptcy court
 7    law clerk and I served in the United States Trustee for six
 8    years in 1982 in Connecticut.
 9              They offered my services up to review the record.
10    That may be moot at this point.  I think the committee is very
11    much interested in seeing David Molton as the tort trustee
12    because he has a unique combination of talent and knowledge of
13    this case and of the type of things that might come before us.
14              The goal, in my opinion, as the tort trustee is to
15    resolve issues without litigation.  If litigation is required
16    and he has to hire his own firm, there is -- I see no problem
17    with that.  It is done as a matter of course in bankruptcy
18    matters.
19              But, additionally, I think he can make sure the
20    litigation is efficient as possible.  So -- because he is so,
21    obviously, the most qualified person, I really don't think any
22    issue of whether or not he hires his own law firm is a
23    difficult one.
24              THE COURT:  Thank you.
25              MS. HEATH:  Thank you.
```

```
1              THE COURT:  Is that it?

2              MS. ANDREWS:  Good afternoon, your Honor.  This is

3    Anne Andrews.  I think I've been designated to address the

4    Court, and let me thank you by allowing me to attend by

5    telephone from California, where I have another matter this

6    afternoon in federal court here.

7              But I'm addressing you today, your Honor, as the

8    co-chair of the Official Creditors' Committee.  It's a

9    committee made up of many attorneys who represent numerous --

10   we represent all the creditors in our fiduciary duty to the

11   committee and to the Court, but also in our capacity as mass

12   tort lawyers we represent a very large number of victims.

13             This committee has a great deal of experience.  A

14   number of the committee members have worked on other large

15   mass tort cases and in many of those cases, Brown Rudnick and

16   David Molton was acting on behalf of the creditors.

17             So, what we want to bring to the Court's attention

18   and our reasons for bringing forward Mr. Molton by motion to

19   be appointed as trustee for the case is, first of all, his

20   experience.  I think that it's very well laid out in the

21   papers that it would be very difficult to find anyone more

22   experienced and dedicated to mass tort victims than Mr. Molton

23   and his firm and, in fact, I think it's of note that he's been

24   very recently hired by Hagens, Berman and other firms to

25   handle the GM ignition switch cases that are before Judge
```

1    Gerber in the Southern District of New York.  He's dedicated

2    to this type of case and he has a proven track record in all

3    aspects of it, including the very important and not to be

4    taken lightly matter of the contribution and indemnity claim

5    that will be his responsibility in making very important

6    decisions.  As Honor Heath very well pointed out to the Court,

7    that it is the experience of this counsel and the experience

8    in bankruptcy law that this case not ought to be litigated

9    over those claims, but those matters would be vested in him if

10   you -- if your Honor chooses to appoint him.

11          I don't think there's any challenge to the

12   qualifications.  I think that he is -- this is a very

13   complicated case, but the second point I would point out to

14   the Court is that he has been in the case from the beginning,

15   from before there was a bankruptcy, when a number of mass tort

16   lawyers reached out to him through a receivership proceeding

17   and that the efforts of his aggressiveness, his tirelessness

18   and his work in ceasing funds immediately when the bankruptcy

19   did occur, tied up assets that were turned into -- that turned

20   into settlement and along with the work of Paul Moore and

21   others in this case, he has carefully watched after every

22   detail of it.

23          Aside from Mr. Moore and perhaps Mr. Sobol, I don't

24   think there's anyone more knowledgeable of every moving piece

25   that will come into play as his role of trustee of the

1    settlement and litigation issues.

2           What I also want to say is that, you know, results

3    are very important to this committee, and we know that

4    dedication results and efforts on behalf of other tort victims

5    have meant a lot in their selection, that without going into

6    detail because of the confidentiality aspects of the

7    committee's deliberation, let me just say on behalf of the

8    committee, that other candidates were considered and

9    discussed, but there was no one but a very distant second to

10   the qualifications that Mr. Molton brought forward.

11          And, lastly, your Honor, what I would say on behalf

12   of the committee is that, one of the things that we would like

13   to avoid, since this is an asset -- this is a case of -- let's

14   just say, even though it's a tremendous result achieved by all

15   here that we hope will be confirmed, the cost-saving effect

16   and the need for an economy of efficiency in this case can't

17   be underscored or taken lightly, can't be underscored enough,

18   and when I say that, I'm saying that to bring on a new person,

19   a new face to this case, when we think that we already have

20   the person in place to step into this role, hit the ground

21   running, with zero learning curve, all of which can be very

22   expensive and perhaps causing time delays, would not occur

23   with the selection of Mr. Molton.

24          So, with that, your Honor, if you don't have any

25   further questions, I just want you to know that the committee

1    feels that Mr. Molton is the best choice for this role, that

2    it's a very obvious choice to us and we're very grateful, in

3    fact, that he is willing to serve, because his job will be to

4    carry out to the letter the word of this trust and to answer

5    to your Honor, and in all respects, and we feel confident and

6    grateful that he is willing to undertake this huge task, to

7    see to it that these victims are well served and that the

8    payments are timely and that all matters of this case can be

9    well placed in his hands in a fiduciary capacity.

10           I thank you for the opportunity to address you, your

11   Honor.

12           THE COURT:  Thank you.

13           Is this deemed to be a full-time job?

14           MR. MOLTON:  No, your Honor.

15           THE COURT:  Half time?

16           MR. MOLTON:  No, your Honor.

17           THE COURT:  One-fifth?

18           MR. MOLTON:  Likely not.  My understanding, if I can

19   answer that question, it's going to be a job -- from the point

20   of view of the tort trustee, it's going to be a job whereby he

21   will be utilizing or she will be utilizing administrative

22   support staff in connection with the -- what Mr. Sobol has

23   described in his and what we've described in our pleading as

24   the ministerial requirements of the job, which will mean

25   receiving the schedule of payments that are determined by the

1    claims administrators and getting that paid out and making

2    sure the funds are properly cared for, deposited and accounted

3    for.

4            THE COURT:  This is your administrative staff?

5            MR. MOLTON:  Yes, this will be mine.

6            And from our position, we get a flat fee of $5,000

7    for the entire -- my entire fee.

8            But to the extent that there are litigation or legal

9    issues that arise in connection with the indemnification

10   claims or the prosecution of estate causes of action -- and

11   that's one thing that I think was conflated in Mr. Sobol's

12   pleading.  They're different issues.  The tort trustee will be

13   receiving from Mr. Moore an assignment of whatever claims NECC

14   still has that it can assert for the benefit of victims.

15           I don't know -- at this point, you know, it's

16   preliminary to talk about that, but certainly to the extent

17   that there are viable claims, it will increase the amount in

18   the tort trust for the benefit of the victims.  That's

19   something that is given to the tort trustee to develop a

20   strategy for and to implement a legal process in order to

21   realize on those assets.

22           In connection with the tricky issues of

23   indemnification and contribution claimants, that is -- when

24   and if it arises, it could -- you know, as in any case, it

25   could require a good amount of time for the tort trustee, a

1    decent amount of time for the tort trustee, his or her

2    counsel, in order to resolve that, including litigation.

3           So, at this point, looking forward, Judge, until we

4    see exactly how those issues play, those two issues, which I

5    call realization of estate assets to be assigned to the tort

6    trust and resolution of indemnification and contribution

7    claims, the scope of the work -- of the legal work, what I

8    would call the legal -- the legal work, the litigation work,

9    is yet to be determined.  It could be more expansive or -- I

10   know Mr. Moore and myself work day and night to preliminary --

11   before confirmation to resolve the indemnification claims, and

12   what we've been doing -- and when we get to the agenda item on

13   Liberty, we're going to be able to talk about a success on

14   that.

15          So, to the extent that Mr. Moore's team and my team

16   are able to resolve those preconfirmation, that reduces,

17   actually, the amount of work or risk of work that the tort

18   trustee will have to look at and it actually benefits the

19   victims tremendously.

20          So, I hope that answers the question.  It was a --

21   it's a question that I can't give a hard answer to.

22          THE COURT:  Thank you.  Mr. Sobol.

23          MR. SOBOL:  Thank you, your Honor.

24          I think I probably want to first address issues of

25   process and then the substance of the application and why it

1    is that the Plaintiffs' Steering Committee, appointed by this

2    Court, has unanimously concluded that it is supporting Ms.

3    Lynne Riley and not Mr. Molton for this position.

4            The way that this should have come to you, your

5    Honor, was by an agreement of both the committees as to who

6    the trustee would be.

7            THE COURT:  Who is this Lynne Riley?

8            MR. SOBOL:  She is in our proposal.  She is a

9    bankruptcy lawyer who has 20 years of experience of doing

10   precisely this kind of work, being a trustee over funds and

11   dealing with this kind of a matter, and she is a highly

12   respected member of the bankruptcy bar here in Boston and,

13   again, she's outlined -- I'll get to the specifics in a bit.

14           But, in any event, both committees should have come

15   to you with a joint proposal.  I mean, why not just have both

16   committees find somebody who can do this job relatively

17   straightforwardly, since it is a relatively straightforward

18   job.

19           And, frankly, from my perspective, most of the

20   members of the Creditor's Committee, not all of them, but

21   most, were unwilling to consider any other possibility other

22   than Molton.  And so, as a result, because the Plaintiffs'

23   Steering Committee was unanimously against that and because

24   the Creditor's Committee refused, as a practical matter, to

25   consider any other possibility, so that we could come in with

1    a joint proposal here, we're at loggerheads.

2              THE COURT:  The documents I have here, the agenda for

3    today, says that the PSC motion for appointment of tort

4    trustee in opposition is forthcoming.  Has it been filed?

5              MR. SOBOL:  It has been -- Ms. Johnson.

6              MS. JOHNSON:  It has been filed, your Honor.  It's

7    ECF No. 1798, and I have copies for the Court, if I may hand

8    them --

9              THE COURT:  It's okay.  I can get the copies once I

10   know it's filed.  I think I need to look at that before I can

11   decide anything.

12             MR. SOBOL:  Yes, of course.  Yes.

13             THE COURT:  And, presumably, the Document No. 1791,

14   the Creditor's Committee has some similar information with

15   respect to Mr. Molton.

16             MR. SOBOL:  It does.

17             THE COURT:  In addition to what was said about him

18   today exactly.

19             MR. SOBOL:  Exactly, yes.

20             MAGISTRATE JUDGE BOAL:  And I would just say, we had

21   asked for courtesy copies.  For some reason, the filing was

22   corrupted.  So, you can't actually print a copy.  I don't know

23   why that is, but that's why we had asked for it.

24             MR. SOBOL:  My office will make sure that --

25             MAGISTRATE JUDGE BOAL:  Not yours.  Brown Rudnick.

1           MR. SOBOL:  Yes.  I was going to make sure both

2    filings came to both of you, your Honors, by way of courtesy.

3           THE COURT:  Thank you.

4           MR. SOBOL:  So, let me turn, then, to the substance

5    of our objection to Mr. Molton, which I make that with all

6    respect.  He and I are colleagues and we know each other very

7    well.

8           Turn to the substance of the objection and why it is

9    that we vastly prefer unanimously Ms. Riley.  First, I think

10   it's important to understand that the tort trustee is

11   essentially doing that which, by in large, should be

12   ministerial.  It should be -- the tort trustee, by in large,

13   will be on his or her own being the fiduciary for roughly, you

14   know, well over $100 million to be held for victims.

15          However, there is some possibility that that tort

16   trustee will have to exercise some discretion, although it's a

17   remote one, and I'll get into that, but -- and I think, as Mr.

18   Molton I think candidly acknowledged, the scope of the legal

19   work, as he says, is yet to be determined and how much time

20   and energy the legal work of that has to be undertaken on

21   behalf of the tort trustee we don't know yet, but the tort

22   trustee might have to hire somebody.

23          The Creditor's Committee's proposal is that Mr.

24   Molton, a partner at Brown Rudnick, be made the tort trustee

25   and then Mr. Molton then be able to hire his own law firm to

1    be able to do whatever legal work, in his own judgment, he

2    thinks is necessary and appropriate.

3         Now, it's one thing to be able to monitor the fees

4    and expenses that Mr. Molton's firm incurs in connection with

5    doing that, but it's a different matter to first exercise the

6    judgment as to whether or not you should be doing it in the

7    first place.

8         Now, this Court is not going to be able to second-

9    guess its judgment for that of the tort trustee as to whether

10   or not a particular legal matter should have been gotten

11   involved in, in the first place to begin with, and, therefore,

12   there's going to be, therefore, no other practical control

13   over what it is that's going to be incurred by the tort

14   trustee in connection with this matter.

15        Now, by my saying that, I am not talking about how

16   Mr. Molton is going to go off on some frolic and start doing

17   legal work that doesn't need to be done, but, by the same

18   token, that is a possibility, that there are going to be

19   things that reasonable people could have differed in their

20   judgment as to whether or not it was appropriate activity to

21   get involved in or not, and you're not going to be able to

22   substitute your judgment.

23        Therefore, the position of the Plaintiffs' Steering

24   Committee unanimously -- and I'm not going to go through the

25   résumé of each of the members as opposed to what the

1    Creditor's Committee has done, but our unanimous feeling is

2    that the tort trustee must, must, absolutely must, be

3    independent from any law firm who is going to be hired to do

4    the legal work for the tort trust, so that there is no -- not

5    only the appearance of impropriety in terms of the selection,

6    which there would be, but then there's the actual conflict if

7    the tort trustee is, in fact, picking his or her firm.

8            Now, just so that you know I'm not picking on Mr.

9    Molton here, I actually believe personally that the best law

10   firm to do the legal work, if the legal work needs to be done,

11   is Brown Rudnick.  I worked there for 17 years.  I was a

12   partner for ten.  My law firm, as Ms. Andrews just indicated,

13   hired them in one of the most major bankruptcies in the

14   country recently.  We think they're excellent bankruptcy court

15   lawyers, and that's what we think their role should be, as

16   bankruptcy court lawyers, and not also as the tort trustee.

17           Now, this is exacerbated by the fact that Mr.

18   Molton's application indicates that it would compensate Brown

19   Rudnick, if Brown Rudnick were to get involved, at the rate of

20   $625 an hour on a blended basis.  That $625 is an increase

21   over the $410 -- $415, excuse me, their charge at a blended

22   rate to the bankruptcy estate.

23           Well, why is it that Brown Rudnick is now getting a

24   50 percent increase in its hourly rate, blended hourly rate,

25   once Mr. Molton becomes the tort trustee?

1        So, then another one of our duties is to try to show

2   that there is a balance and that there is some kind of check

3   on what the fees are.  That's another part of our objection.

4        The third part of the objection, frankly, is that Ms.

5   Riley has for 20 years been acting as a trustee of assets in

6   the bankruptcy context.

7        With all due respect, Mr. Molton, who is a very good

8   bankruptcy lawyer, has not made any submission before you that

9   indicates that he's performed this particular role as the tort

10  trustee before or as any other kind of trustee.

11       Now, next, I think it's important to understand that

12  -- the following issue.  I'm going to just take a two- or

13  three-sentence background so you can understand what it is.

14       In connection with this bankruptcy, there's always

15  been the possibility that some other entities, like clinics,

16  might raise a claim against the -- NECC for contribution or

17  indemnification because that clinic is facing a tort claim by

18  victims and the clinic doesn't think that it's responsible or

19  that if it is, NECC should really be blamed and should have to

20  pay for contribution or indemnification.  And so -- and there

21  are some, therefore, contribution or indemnification claims,

22  literally claims, that have been filed in the bankruptcy so

23  far, and the question is what happens with them.  Okay.

24       Now, there is some effort in this application by the

25  Creditor's Committee on behalf of Mr. Molton to sort of throw

1   some mystical thing that may -- that's complicated and might

2   need to be addressed and you need a tort trustee to address

3   these contribution or indemnification claims, but the fact is

4   that under this plan, this plan contemplates that claims for

5   contribution or indemnification get zero dollars.  It's

6   literally that in the plan.  The plan says explicitly it is

7   not anticipated that holders of these claims will receive any

8   cash as part of this plan.

9          Now, since we know that's the case -- and, candidly,

10  I know I'm getting a little bit too emotional, but I do get

11  emotional on these kinds of things.  It is a -- it is not the

12  way to further an application for the tort trustee by the

13  Creditor's Committee to suggest that there is this mystical

14  issue of contribution or indemnification claims that might in

15  some big way need to be addressed, but that at the same time

16  pointing out to you that, wait a second, this is probably a

17  non-issue because we intentionally designed the plan to make

18  these things go away.

19         So, in any event, whether that issue ultimately needs

20  to be addressed in any way, Ms. Riley, who does bankruptcy, is

21  more than capable of dealing with this.  This is a kind of

22  routine kind of contribution or indemnification issue.

23         Similarly, regarding the potential assignment of

24  claims by NECC.  This, again, is one of those sort of -- by

25  that I mean, Mr. Molton indicated one of technically the tort

1   trustee holds -- after the effective date, the tort trustee

2   holds these claims that New England Compounding used to have

3   against somebody.

4          Well, it's been two years.  Mr. Molton -- Mr. Moore,

5   the trustee, and NECC have done an excellent job trying to

6   marshal all of the assets that exist for this pot.  There are

7   no claims.  It's there because it needs to be there.  The

8   assignment needs to be there.  But no one has identified any

9   lawsuit that's going to need to be filed, and why.

10          And, again, if that's going to be an exercise of

11   discretion, great, let's have somebody exercise that

12   discretion who is not going to be a partner at the law firm

13   that's going to be hired to do the legal work, which is our

14   objection.

15          So, again, if it turns out that there is this issue

16   of having to chase a claim that Mr. Moore for some reason has

17   forgotten to do over the past two years, let's let an

18   independent trustee make that decision and if it does make

19   sense to do it, then have it pursued by Brown -- probably by

20   Brown Rudnick.

21          Ms. Riley has indicated to us that she, in all

22   likelihood, would be seeking to hire Brown Rudnick as the

23   lawyer -- lawyers on the matter, but she, of course, has

24   indicated that she's going to negotiate a rate that's more --

25   that's more consummate with the rates that so far have been

1    proposed by Brown Rudnick and others in connection with this

2    case.

3           Now, the -- one more process thing and then I'll -- I

4    have a final remark.  It is the case that in this Court, the

5    interests of the victims are represented by the Plaintiffs'

6    Steering Committee.  There are seven members of the

7    Plaintiffs' Steering Committee who have spent two years making

8    sure that the -- not only that the amount of moneys that are

9    received are appropriate, but also that the claims that aren't

10   going to be addressed in this bankruptcy go forward correctly.

11          All seven of those Plaintiffs' Steering Committee

12   members object to the hiring of Mr. Molton because it would be

13   a conflict of interest, real and apparent, on behalf of the

14   victims and that we do not, therefore, forsake any role of Mr.

15   Molton going forward, but rather think that needs to be an

16   independent trustee.

17          The final thing I want to say is this.  Because I do

18   in some respects feel uncomfortable having to make this pitch

19   to you.  Me and Mr. Molton have had very significant

20   disagreements over the past two years.  Some of them have not

21   even -- some of the time they've been not pleasant

22   disagreements.  But, by in large, we see eye to eye on things

23   and, by in large, he and I, and working with many others, have

24   done an extraordinary job.  I don't like having to say no to

25   Mr. Molton on this, but the fact of the matter is, is that we

```
 1    have to make a judgment call, the PSC, and we want there to be
 2    separation between the trustee and the need, if there ends up
 3    being one, for the professionals for work for the trustee.
 4              THE COURT:  Thank you.
 5              MR. MOLTON:  Judge, if I could just add a few words.
 6              THE COURT:  Go right ahead.
 7              MR. MOLTON:  Mr. Sobol is right, we've had some
 8    disagreements.  I won't call them heated.  They were always
 9    resolved by him coming around to my side, but, in any event --
10    with the success.
11              But, in any event, I would just differ with my friend
12    Tom on a number of things.  I know he's wearing his advocacy
13    hat.
14              The issue of possible indemnification and
15    contribution claims is not easy.  If your Honor reads 502 of
16    the Code and 509 of the Code, I think my -- anybody who reads
17    it needs to do it eight times and possibly with a translator
18    before one understands how those work and how they work
19    particularly in this case.
20              With respect to the causes of action that are
21    assigned, Mr. Moore and I have worked very hard to make sure
22    that all and every opportunity for the tort trust to realize
23    on viable claims which have been -- there's been a toll for
24    two years pursuant to the bankruptcy code.  So, I wouldn't put
25    much in Mr. Sobol's argument that nothing has happened.  It's
```

1    not all that unremarkable that that's exactly what happens, in

2    that the post confirmation trusts go to liquidate the claims,

3    and that's it, your Honor.

4          Again, as I started out, I said we would agree to

5    invest your Honor with the authority of the retention issue,

6    including fees, and I think that resolves 99 percent of what

7    my friend Tom, Mr. Sobol, said.

8          In any event, that's it for today, and we're looking

9    forward to getting on with the agenda.

10         THE COURT:  Thank you.

11         That, I think, takes us to the next agenda item,

12   which I think is Liberty.

13         MS. JOHNSON:  Yes.  Thank you, your Honor.

14         The trustee filed a notice with the MDL court to

15   formally inform this Court that the settlement with Liberty

16   has been papered now and has been submitted to the bankruptcy

17   court for approval under Rule 9019.  The terms of that

18   settlement, in broad strokes, are a total of $1 million

19   contribution.  It is to be paid $450,000 from Liberty and

20   $550,000 from Liberty's insurer, for a total of a million

21   dollars.

22         MR. MOLTON:  Ms. Johnson, if I can add to that.

23         Your Honor, the motion for approval of that

24   settlement was filed by the Committee and by the trustee in

25   the bankruptcy court.  We anticipate -- we have not yet gotten

1    a hearing date from Judge Boroff on that, but we anticipate --

2    I think it's a fair bet that that's going to be conflated with

3    the confirmation hearing.  And what that does, your Honor, is

4    it does resolve Liberty's objection, and it's important to say

5    that they have agreed not to object to the plan, whether or

6    not Judge Boroff agrees with the settlement or not, which was

7    a very important concession that we obtained from them.

8         And, number two, their claim is going to be

9    withdrawn, the indemnification claim, which makes the job of

10   the tort trustee easier with respect to Liberty.

11        THE COURT:  Thank you.

12        MR. MOLTON:  Thank you.

13        MS. JOHNSON:  In terms of No. 4, your Honor, the

14   status of the insurance declaratory judgment actions.  We have

15   removed the Liberty Insurance declaratory judgment action from

16   the agenda, now that Liberty has settled, which leaves two

17   that are pending in front of Judge Saylor dealing with the

18   Ameridose insurance proceeds.

19        Turning to No. 5, the status of discovery.  There is

20   a hearing scheduled for the May status conference in the

21   morning before Judge Boal that will address, we expect, a

22   number of issues there.

23        One issue to preview for the Court is that the

24   Tennessee clinic defendants have issued a subpoena to the FDA

25   requesting both documents and the 30(b)(6) witness deposition.

1    Briefing on that matter is ongoing according to the schedule

2    set by Judge Boal.  The briefing is set out in No. 20 below in

3    the agenda.

4           Counsel for the FDA, Mr. Glass, I believe, is

5    appearing by phone and indicated he may wish to briefly

6    address the Court on this issue.

7           THE COURT:  Mr. Glass, are you there?

8           (No response.)

9           THE COURT:  Can't see him.  Can't see through him.

10          MS. JOHNSON:  Moving on, then, to other discovery

11   topics.  To give the Court a brief overview of where we are on

12   discovery, there are 26 noticed depositions calendared for

13   between now and the close of common discovery on June 15th.

14   14 of those -- I'm sorry -- 16 of those depositions have been

15   noticed by St. Thomas and the Tennessee clinic defendants.  A

16   number have also been noticed by the PSC and other entities.

17   Those depositions include a proposed deposition of the FDA,

18   the Board of Pharmacy, Barry and Lisa Cadden, a 30(b)(6) of

19   St. Thomas --

20          THE COURT:  Excuse me.  Which board of pharmacy?

21          MS. JOHNSON:  The Massachusetts board of pharmacy,

22   your Honor.

23          -- Barry and Lisa Cadden as well as Doug and Carla

24   Conigliaro and also Ameridose and MSM.

25          THE COURT:  Well, the Caddens and NECC won't take

1    place, will they?

2          MS. JOHNSON:  The PSC anticipates that there may be

3    motion practice as to those notices of deposition.

4          In terms of written discovery, the written discovery

5    is going full steam ahead.  St. Thomas, as an example, has

6    served written discovery in the form of interrogatories and

7    requests for production on at least twelve entities, including

8    many of the settling national defendants, as well as the

9    Insiders and other entities.

10         The Tennessee defendants -- Tennessee clinic

11   defendants, excuse me, have served written discovery on 14

12   entities.  There is some overlap, not entirely, and the PSC

13   has a number of depositions and written discovery to process

14   outstanding, including those to Premier and Box Hill, who

15   we've not otherwise talked about so far in discovery.

16         Turning back to the agenda, Item 5(b) was a request

17   to defer or abstain filed by MSM.  I believe that's

18   functionally mooted by Judge Boal's recent order.  So, we need

19   not address that, which brings us back to the status of the

20   litigation track, Agenda Item No. 6.

21         The Court has already heard argument on the motion

22   for expedited trial and indicated what should be done there.

23   I don't think there's anything further to address there.

24         In terms of the report from the pro se liaison, Ms.

25   Martin apologizes.  She was not able to attend in person due

1    to another conflict at the status conference, but we do intend

2    for her to give periodic reports to the Court on her activity.

3    She asked me to inform the Court that she has responded by

4    letter to the motion to intervene that your Honor referred to

5    earlier, and she will apprise the Court as appropriate,

6    depending on the response that she receives from those

7    would-be intervenors.

8         THE COURT:  Does she have any other things to do as

9    pro se liaison?

10        MS. JOHNSON:  She does.  I can describe a few things

11   that she has undertaken this month.

12        There have been a few inquiries that were received by

13   my offices and other plaintiffs' offices from pro se

14   plaintiffs in the MDL asking questions about proceedings in

15   the MDL, sometimes touching on the bankruptcy settlement.

16   She's responded to all of the inquiries that we've received.

17   We now direct those to her.  I believe that's the scope of

18   what she's undertaken since appointed by the Court.

19        In terms of the status of the bankruptcy, I would

20   turn to Mr. Gottfried to see if he has any additional reports.

21        MR. GOTTFRIED:  Good afternoon, your Honor.

22        THE COURT:  Same to you.

23        MR. GOTTFRIED:  Thank you.

24        I don't have anything to add on the Liberty

25   settlement.  We're very pleased about that, obviously.

```
1              I did want to report that voting on the plan is
2     ongoing.  The deadline to vote is May 5th.  So far, the
3     support for the plan is overwhelming.  I'm very excited about
4     that.  And the confirmation hearing is scheduled for May 19th.
5              THE COURT:  Great.
6              MR. MOLTON:  If I can, your Honor -- and this is more
7     directed to the folks listening and the plaintiffs' lawyers.
8     With respect to voting, it's imperative that they remember
9     that the ballots have to be received by May 5th, not
10    postmarked.  They've got to be received by the service by May
11    5th.
12             MS. JOHNSON:  And, actually, it's 4:00 p.m. Eastern
13    on May 5th.
14             MR. MOLTON:  Thank you.
15             THE COURT:  Thank you.
16             MR. GOTTFRIED:  So, please vote.
17             MR. STRANCH:  Early and often.
18             MS. JOHNSON:  Only in Chicago.
19             Turning to No. 9 on the agenda, status of appeals.
20    The appeal before the First Circuit has been stayed pending
21    confirmation of the plan in light of the Virginia settlement.
22             And to Agenda Item 10, the schedule for future status
23    conferences.  We have status conferences set for both the
24    mornings and afternoons of May 28th and June 24th.  We would
25    like to request that the Court set argument for July.  I would
```

```
 1    suggest the last week in July, at the Court's discretion.
 2              THE COURT:  That would be the week of the 27th?
 3              MS. JOHNSON:  I apologize, your Honor.  I did say the
 4    last week, but I think the 20th to the 24th would work better,
 5    the previous week.
 6              THE COURT:  I was planning to be away that week.
 7              MS. JOHNSON:  Well, then let's go back to the last
 8    week, your Honor.  We can make that work, certainly.
 9              THE COURT:  All right.  Would Tuesday, the 28th,
10    work?
11              MS. JOHNSON:  That works for the Plaintiffs' Steering
12    Committee, your Honor.
13              THE COURT:  Everybody?
14              MS. GREER:  Your Honor...
15              (Discussion off the record at the Bench.)
16              THE COURT:  Is Monday, the 27th, good for counsel as
17    well?  I normally don't sit Monday afternoons, but if you
18    would prefer that, I can do that.
19              MS. JOHNSON:  That works for the Plaintiffs' Steering
20    Committee, your Honor.
21              THE COURT:  Okay.  So, why don't we do Monday, the
22    27th.
23              MS. GREER:  Your Honor, if I may be heard.  Marcy
24    Greer.
25              If there's going to be substantial motion practice
```

1   involving the St. Thomas Entities, I'm planning to be out of

2   the country during that time period.

3           THE COURT:  Do you want to do it by telephone from

4   wherever?

5           MS. GREER:  South Africa.  I'm a little nervous about

6   that.

7           THE COURT:  I recently called my carpenter to tell

8   him something that was happening at my house and he should be

9   aware of it, and he told me that he was sitting in a café in

10  Paris talking on a cell phone.

11          MR. STRANCH:  You overpay him.

12          THE COURT:  So, I don't know why it won't in South

13  Africa, too, unless you get caught up in England.

14          MS. GREER:  I can look and see where we'll be.

15          THE COURT:  When are you coming and going?

16          MS. GREER:  I would be coming back on August 3rd, and

17  if we can do something the following week, August 4th or 5th,

18  that would be very helpful.

19          THE COURT:  Does it matter to the plaintiffs?

20          MS. JOHNSON:  I think we would prefer, your Honor, if

21  we need to push it, that we push it earlier in time as opposed

22  to let it slip into August.

23          THE COURT:  I'm sorry.  When are you leaving?

24          MS. GREER:  July 10th.  It's kind of once-in-a-

25  lifetime trip.  Otherwise, I wouldn't ask.

1          MS. JOHNSON:  Given that, your Honor, the first week

2    in August would be fine.

3          MS. GREER:  I promise not to do this again.

4          THE COURT:  No.  You're entitled to have a vacation,

5    too.

6          So, you're suggesting when in August if it has to be

7    August, Ms. Johnson?

8          MS. JOHNSON:  The first week, if we could.  I

9    understand Ms. Greer comes back on the 3rd.  So, perhaps, the

10   5th or 6th.

11         THE COURT:  That will work for me, I think, yes.

12         COURTROOM DEPUTY CLERK URSO:  We have a conference

13   hearing on the 5th and the 6th, but I obviously can switch it.

14         THE COURT:  Yes.

15         COURTROOM DEPUTY CLERK URSO:  Okay.

16         MR. GOTTFRIED:  5th would be better for me.

17         THE COURT:  The 5th it is.

18         COURTROOM DEPUTY CLERK URSO:  So, the 5th, at 2:00.

19   Okay.

20         MS. GREER:  I appreciate it, your Honor.

21         THE COURT:  Well, I hope you have a great trip.

22         MS. GREER:  Well, thank you.

23         THE COURT:  I trust you will take the papers with you

24   and get ready.

25         MS. GREER:  Absolutely.

```
 1              THE COURT:  And do you also want on that day to have

 2    a hearing with Judge Boal?

 3              MS. JOHNSON:  Yes, please, your Honor.

 4              THE COURT:  Will that work for you?

 5              MAGISTRATE JUDGE BOAL:  I think so.

 6              THE COURT:  If not, you'll make whatever changes you

 7    have to make.

 8              MS. JOHNSON:  Thank you, your Honor.

 9              MS. GREER:  Thank you.

10              MS. JOHNSON:  I don't think there's any need for...

11              (Discussion off the record.)

12              MS. JOHNSON:  Turning to the fully-briefed motions.

13    I don't think there's any need to address any of those in

14    particular.  Several of those have already been argued or are

15    pending before Judge Boal.

16              I will point out that we have listed here still a

17    number of motions filed by Insight and Liberty.  I expect

18    those will drop off of next month's agenda.  So, this list

19    will continue to get shorter over time.

20              In terms of the briefing --

21              THE COURT:  Which ones do I absolutely need to decide

22    right now?

23              MS. JOHNSON:  I believe No. 12.  I'm not sure if

24    counsel for Ascension is here, but I don't believe the Court

25    has issued an order dealing with the Ascension parties' motion
```

```
1    to certify dismissal.

2            THE COURT:  Okay.  I'll decide that.  I have already

3    noted to decide it.

4            MS. JOHNSON:  And I believe that's all, your Honor.

5            MR. TRIBLE:  Your Honor, this is Chris Trible.  I'm

6    counsel for Insight Health Corp.

7            No. 16 on the agenda is a joint motion to stay filed

8    on behalf of the defendants and the Virginia plaintiffs in the

9    litigation.  We would ask for a ruling on that motion, your

10   Honor.

11           THE COURT:  In view of the settlement?

12           MR. TRIBLE:  Yes, your Honor.

13           THE COURT:  Is there any objection to that?

14           MR. TRIBLE:  None has been filed, your Honor.

15           THE COURT:  It's allowed.

16           MR. TRIBLE:  Thank you.

17           MS. JOHNSON:  And then one last request, your Honor,

18   which is in light of the Court's comments on the motion for

19   expedited trial and the proposed *Bellwether* submissions, just

20   to clarify for counsel's own scheduling purposes, we would ask

21   that the Court set that for argument in the afternoon before

22   both Judges, if appropriate, but, in any event, to tell us

23   which time it would be argued so that counsel can plan

24   accordingly.

25           THE COURT:  You want to have it in -- another
```

```
1    argument or an argument on the schedule for trial?
2         MS. JOHNSON:  Yes, for the May status conference, if
3    we could agree to address that.
4         THE COURT:  We already did that, didn't we?
5         MS. JOHNSON:  Well, let me start over, your Honor.
6         To the extent that there are issues that the Court
7    would like to address at the next status conference relating
8    to Bellwether proposals or the idea of setting a trial
9    schedule, whether it's this year or next, that sort of
10   straddles, perhaps, a bit between areas that your Honor has
11   dealt with and areas that Judge Boal has dealt with.
12        THE COURT:  Talk to each other.
13        MS. JOHNSON:  Well, for counsel's scheduling purposes
14   -- and we think that's wonderful and please keep talking to
15   each other.  For scheduling purposes, it would be helpful to
16   have clarity on whether that will be heard in the afternoon
17   argument in front of both Judges or in the morning argument
18   before Judge Boal.
19        THE COURT:  Let me understand.  I think the issue in
20   that dispute, such as it is, is, first, who gets to pick what
21   cases are going to be tried first; and, second, when do those
22   trials take place.  Those are the two issues, right?
23        MR. SOBOL:  Yes.
24        MS. JOHNSON:  Correct, yes.
25        THE COURT:  Do I need to hear more argument on that?
```

```
1                MS. JOHNSON:  Not necessarily, your Honor, no, not if
2      you don't wish to.
3                THE COURT:  So, it is possible for me to decide it
4      even before we next meet?
5                MR. STRANCH:  Yes.
6                MS. JOHNSON:  Correct, your Honor, yes.  Thank you.
7                THE COURT:  What else?
8                MS. JOHNSON:  That's it.
9                THE COURT:  Does anybody else have any issues,
10     questions, comments, suggestions?
11               MR. IACOPINO:  Yes, your Honor.  I'm not sure if I'm
12     being heard in the courtroom.
13               THE COURT:  I can hear you, but you need to identify
14     yourself.
15               MR. IACOPINO:  I will, your Honor.  This is Robert
16     Iacopino.  I'm calling in from California on No. 11 on the
17     agenda, Jeffries vs. Ameridose, the joint stipulation --
18               COURT REPORTER:  I'm sorry, I can't hear you.
19               MR. IACOPINO:  -- submit that particular action to
20     arbitration.
21               The parties have signed the stipulation, but I think
22     we need a court order to actually effectuate it, and a
23     proposed order was submitted with stipulation.  So, if your
24     Honor would be able to sign that at some point.
25               THE COURT:  I'll sign it today, assuming I can find
```

1    it, but I will find it.

2            MR. IACOPINO:  It's Docket 1672.

3            THE COURT:  Okay.

4            MR. IACOPINO:  Thank you very much.

5            THE COURT:  Thank you very much.  Anybody else?

6            (No response.)

7            THE COURT:  Thank you all, as usual.  And go about

8    and continue your good work.

9            MS. JOHNSON:  Thank you, your Honor.

10           (Adjourned, 3:13 p.m.)

11

12                  C E R T I F I C A T E

13           I, Catherine A. Handel, Official Court Reporter of

14   the United States District Court, do hereby certify that the

15   foregoing transcript, from Page 1 to Page 54, constitutes to the

16   best of my skill and ability a true and accurate transcription

17   of my stenotype notes taken in the matter of No. 13-md-2419-RWZ,

18   In Re: New England Compounding Pharmacy, Inc., Products

19   Liability Litigation.

20

21    May 3, 2015          /s/Catherine A. Handel
      Date                 Catherine A. Handel RPR-CM, CRR
22

23

24

25