# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>               Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

## NOTICE OF FILING OF SUPPLEMENTS TO THE PLAN SUPPLEMENT TO THE JOINT CHAPTER 11 PLAN OF NEW ENGLAND COMPOUNDING PHARMACY, INC.

**PLEASE TAKE NOTICE** that, on December 3, 2014, Paul D. Moore, as chapter 11 trustee (the "**Chapter 11 Trustee**") of New England Compounding Pharmacy, Inc., the above-captioned debtor (the "**Debtor**"), and the Official Committee of Unsecured Creditors (the "**Official Committee**" and together with the Chapter 11 Trustee, the "**Plan Proponents**") filed the *Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* (as may be amended, modified and/or supplemented from time to time, the "**Plan**").

**PLEASE TAKE FURTHER NOTICE** that, on February 13, 2015, the Plan Proponents filed the Plan Supplement [Docket No. 1123].[1]

**PLEASE TAKE FURTHER NOTICE** that, on February 19, 2015, the Plan Proponents filed Exhibit 6 to the Plan Supplement [Docket No. 1141].

**PLEASE TAKE FURTHER NOTICE** that, on February 22, 2015, the Plan Proponents filed the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. [Docket No. 1154].

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan Supplement.

PLEASE TAKE FURTHER NOTICE that, on February 23, 2015, the Plan Proponents filed a Supplement to the Plan Supplement (the Unifirst Settlement and Release Agreement) [Docket No. 1141].

PLEASE TAKE FURTHER NOTICE that, the Plan Proponents file herewith additional supplements to the Plan Supplement as described below:

1) the Liberty Settlement and Release Agreement, attached hereto as Exhibit A; and

2) redline and clean versions of the First Amended Insight Claims Resolution Facility Procedures (the first version of which was part of Exhibit 1-B to the Plan Supplement) attached hereto as Exhibit B.

PLEASE TAKE FURTHER NOTICE that any party in interest who would like to receive copies of any of the exhibits contained in the Plan Supplement may receive a copy by (a) accessing the website for the Claims and Noticing Agent at http://www.drcdrx.com/cases/caseinfo/necp; (b) writing to the Claims and Noticing Agent by First Class Mail at P.O. Box 2034, Murray Hill Station, New York, NY 10156-0701, Re: New England Compounding Pharmacy, Inc., Attn: Voting Department; (c) writing to the Claims and Noticing Agent by Hand Delivery or Overnight Mail at 6201 15th Ave, Brooklyn, NY 11219, Re: New England Compounding Pharmacy, Inc., Attn: Voting Department; or (d) calling the Claims and Noticing Agent at (212) 771-1128.  You may also obtain copies of any pleadings filed in the Chapter 11 case for a fee via PACER at: http://www.mab.uscourts.gov.

May 7, 2015

**DUANE MORRIS LLP**

/s/ Michael R. Lastowski
Michael R. Lastowski, Esq.
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Phone: (302) 657-4942
Facsimile: (302) 397-2138

*Counsel to the Chapter 11 Trustee*

**BROWN RUDNICK LLP**

/s/ David J. Molton
William R. Baldiga, Esq.
Kiersten A. Taylor, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201


David J. Molton, Esq.
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

*Counsel to the Official Committee
of Unsecured Creditors*

Case 1:12-md-02419-RWZ   Document 1831-1   Filed 05/08/15   Page 5 of 158

## CERTIFICATE OF SERVICE

I, Carol S. Ennis, hereby certify that on the 7th day of May, 2015, I caused a true and accurate copy of the foregoing Supplement to be served by electronic service via the Court's ECF service to those parties registered to receive electronic service.

In addition, a true and accurate copy was sent by first class mail to the following parties:

Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Darrel Cummings
1871 N.W. 8th Street
Pompano Beach, FL  33069

/s/ Carol S. Ennis
Carol S. Ennis, Paralegal
BROWN RUDNICK LLP
One Financial Center
Boston, MA  02111

# EXHIBIT A

## LIBERTY SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement (the "Agreement") is made and entered by, between and among the NECC Trustee (as defined below), Liberty (as defined below) and Great American (as defined below).

## RECITALS

WHEREAS, on December 21, 2012, NECC (as defined below) filed a voluntary petition under the Bankruptcy Code in the Bankruptcy Court, thereby commencing the Bankruptcy Case (each as defined below);

WHEREAS, on January 18, 2013, the UST (as defined below) appointed the Creditors' Committee (as defined below);

WHEREAS, upon application by the UST, Paul D. Moore was appointed to serve as chapter 11 trustee for NECC's estate on or about January 25, 2013, with the approval of the Bankruptcy Court (as defined below);

WHEREAS, on February 12, 2013, the Judicial Panel on Multidistrict Litigation entered an order transferring certain litigation actions against NECC and other third-parties to the MDL Court (as defined below) for consolidated pretrial proceedings;

WHEREAS, on April 9, 2013, the MDL Court entered an order establishing the seven-attorney Plaintiffs' Steering Committee (as defined below) to organize, simplify, and streamline the handling of the MDL Proceeding on behalf of all plaintiffs to actions therein, and appointed Thomas Sobol of Hagens Berman Sobol Shapiro LLP as lead counsel for the Plaintiffs' Steering Committee;

WHEREAS, NECC and Liberty have been named as defendants in numerous lawsuits asserting Claims (as defined below), and may have additional Claims made against them, seeking damages for injuries arising from the alleged contamination of certain lots of injectable methylprednisolone acetate compounded at and distributed by NECC (as more fully defined herein, the "NECC Claims");

WHEREAS, Great American (as defined below) issued the Policies (as defined below) to Liberty as named insured;

WHEREAS, the NECC Trustee, Liberty, and Great American may have Claims against each other and others as a result of the NECC Claims and based upon subrogation or contractual or equitable indemnification or contribution or other theories;

WHEREAS, on January 14, 2014 and March 27, 2014, Liberty filed proofs of claim in the Bankruptcy Case (Claim Nos. 65 and 65-2), asserting a contingent and unliquidated Claim against NECC arising from NECC's alleged obligations to Liberty as a result of the NECC Claims, including, without limitation, NECC's alleged contribution and/or indemnity obligations to Liberty (the "Indemnity Claim");

WHEREAS, Liberty and Great American have engaged in good faith settlement discussions among themselves and with the NECC Trustee, the Creditors' Committee (as defined below) and the Plaintiffs' Steering Committee (as defined below) in an effort to fully and finally compromise and resolve Liberty's potential liability and Great American's coverage obligations for the NECC Claims;

WHEREAS, Liberty, Great American and the NECC Trustee believe that, if their disputes and other remaining issues are not resolved now, future proceedings would be protracted and expensive, involve complex issues of liability and/or damages, and involve substantial expense and the uncertainties and risks inherent in litigation; and

WHEREAS, the Creditors' Committee and the Plaintiffs' Steering Committee (each as defined below) support this Agreement and the compromise and settlement embodied herein, as reflected in the *Addendum No. 1 to Settlement and Release Agreement* attached hereto.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the adequacy and sufficiency of which are hereby acknowledged by the Parties, and intending to be legally bound hereby, the Parties agree as follows:

I.  **Definitions**.  The following definitions shall apply to the capitalized terms used in this Agreement:

a.  **"Agreement"** has the meaning set forth above in the preamble.

b.  **"Alternative Plan"** has the meaning ascribed to it in Section IV.f.iii.5 hereof.

c.  **"Bankruptcy Case"** means the Chapter 11 case filed by NECC in the Bankruptcy Court captioned as *In Re: New England Compounding Pharmacy, Inc.,* Case No. 12-19882 (HJB).

d.  **"Bankruptcy Code"** means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as it may be amended.

e.  **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Massachusetts, Eastern Division.

f.  **"Bankruptcy Rules"** means collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court.

g.  **"Claim"** means any past, present or future claim, demand, action, cause of action, suit or liability of any kind or nature whatsoever (including claims for equitable or contractual indemnification or contribution), whether at law or in equity, pursuant to a statute, rule or regulation, known or unknown, asserted or unasserted, anticipated or unanticipated, accrued or unaccrued, fixed or contingent, which has been asserted, could have been asserted, or that may in the future be asserted, by or on behalf of any Person, whether seeking damages (including compensatory, punitive or exemplary damages) or equitable, mandatory, injunctive or any other type of relief, including cross-claims, counter-claims, third-party claims, suits, lawsuits, administrative proceedings, notices of liability or potential liability

2

(including Potentially Responsible Party or "PRP" notices), arbitrations, actions, rights, requests, demands for payment, causes of action, orders, or judgments, including without limitation, any "claim" as that term is defined in the Bankruptcy Code, 11 U. S. C. § 101(5).

h.  **"Claimants"** mean any Person asserting an NECC Claim against NECC, Liberty and/or Great American.

i.  **"Claim Objection"** means the NECC Trustee's *Objection to Liberty Industries, Inc. Proofs of Claim Nos. 65 and 65-2* [Bankruptcy Case Docket No. 1190].

j.  **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan.

k.  **"Confirmation Order"** means the order confirming the Plan.

l.  **"Creditors' Committee"** means the official committee of unsecured creditors appointed in the Bankruptcy Case and any of its retained legal counsel or other professionals.

m.  **"Execution Date"** means the first date upon which the NECC Trustee, Liberty, and Great American all have executed this Agreement.

n.  **"Final Order"** means an order or judgment of the Bankruptcy Court (or the District Court, if applicable) that has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending; or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought, and  (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

o.  **"Great American"** means Great American E&S Insurance Company and all of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting in their respective capacity as such.

p.  **"Indemnity Claim"** has the meaning set forth in the Recitals.

q.  **"Liberty"** means Liberty Industries, Inc. and all of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting in their respective capacity as such.

r.  **"MDL Court"** means the United States District Court for the District of Massachusetts (at Boston) presiding over the MDL Proceeding.

s.  **"MDL Proceeding"** means the matter entitled *In Re: New England Compounding Pharmacy, Inc. Product Liability Litigation*, MDL Docket No. 2419, Master File No. 1: 13-MD-2419.

t.  **"MDL Stay Motion"** has the meaning ascribed to it in Section III(a) hereof.

u.  **"MDL Stay Order"** has the meaning ascribed to it in Section III(a) hereof.

v.  **"NECC"** or **"Debtor"** means the debtor New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center, and any of its directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns, each acting in their respective capacity as such.

w.  **"NECC Claims"** means any and all Claims asserted or that could be asserted by any Person against Liberty and/or Great American for personal injury, tort, wrongful death, medical monitoring, or any other economic or noneconomic injury or damage, based upon, arising out of or in any way related to the preparation of or administration to Persons of injectable methylprednisolone acetate, cardioplegia solutions or any other drugs or products compounded, produced, sold or distributed by NECC.

x.  **"NECC Tort Trust"** means the trust created by the Plan which will be funded by assets of the NECC estate, including, *inter alia*, portions of the Settlement Amount from Liberty and/or Great American and which establishes procedures for the resolution and payment of all NECC Claims, including NECC Claims against Liberty and/or Great American.

y.  **"NECC Tort Trustee"** means the trustee of the NECC Tort Trust.

z.  **"NECC Tort Trust Agreement"** means the agreement governing the NECC Tort Trust.

aa. **"NECC Trustee"** means Paul D. Moore solely in his capacity as the Chapter 11 Trustee for debtor New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center and not individually, and any retained attorneys or other professionals acting on his behalf.

bb. **"Parties"** means, collectively, the NECC Trustee, Liberty and Great American.

cc. **"Person"** means an individual, including, but not limited to, Claimants, a corporation, a partnership, an association, a limited liability company, a proprietorship, a joint venture, a trust, an estate, trustee, executor, administrator, legal representative, or any other entity or organization.

dd. **"Plaintiffs' Steering Committee"** means the attorneys identified in MDL Order No. 2: Order Appointing Lead Counsel, Federal-State Liaison Counsel and Plaintiffs' Steering Committee and such committee's designated counsel.

ee. **"Plan"** means the proposed Chapter 11 plan of reorganization that was filed with the Bankruptcy Court on December 3, 2014 as Docket No. 1052-1, as amended at Docket No. 1154, and as may be further amended, supplemented or replaced, which is consistent with, incorporates and effectuates the terms and provisions of this Agreement without any material

changes or modifications with respect to the rights of the Parties hereto, and which includes, incorporates and implements the NECC Tort Trust, the Plan Release and the Plan Injunction.

ff. **"Plan Effective Date"** means the later of (i) the first business day following fourteen (14) days after the Bankruptcy Court's entry of the Confirmation Order, provided that the Confirmation Order is not subject to a stay by any court of competent jurisdiction as of such date, and (ii) the first business day on which all other conditions to the effective date of the Plan as set forth therein, and to the effective date of this Agreement as set forth in Section VII hereof, have been satisfied or waived.

gg. **"Plan Injunction"** means the permanent injunction forever barring and enjoining all Persons from commencing, continuing or prosecuting any NECC Claims against Liberty and/or Great American, as incorporated in the Plan and Confirmation Order.

hh. **"Plan Proponents"** means the NECC Trustee and the Creditors' Committee, collectively.

ii. **"Plan Release"** means a release to be included in the Plan and Confirmation Order pursuant to which the NECC Claims are deemed to have been waived and/or released by any and all Claimants.

jj. **"Policies"** means, collectively, those certain six Great American excess and primary policies of insurance identified as follows: (a) primary policies identified as (i) policy number PL 2387754 00 with effective dates of 1/20/11 to 1/20/12, (ii) policy number PL 2387754 01 with effective dates of 1/20/12 to 1/20/13, and (iii) policy number PL 2387754 02 with effective dates of 1/20/13 to 1/20/14, together with (b) excess policies identified as (i) policy number XS 2388167 00 with effective dates of 4/18/11 to 1/20/12, (ii) policy number XS 2388167 01 with effective dates 1/20/12 to 1/20/13, and (iii) policy number XS 2388167 02 with effective dates 1/20/13 to 1/20/14.

kk. **"Rule 9019 Motion"** means the motion to be filed by the NECC Trustee in accordance with Section IV(a) herein, in a form acceptable to Liberty and Great American in all material respects as to the matters relating to this Agreement, requesting that the Bankruptcy Court: (i) approve in all material respects, pursuant to Rule 9019 of the Bankruptcy Rules and the salient provisions of the Bankruptcy Code, the terms of this Agreement and any and all terms of the compromise and settlement memorialized in this Agreement; (ii) determine that notice of the hearing on the Rule 9019 Motion was duly served or otherwise provided to pursuant to the Bankruptcy Court's or MDL Court's ECF filing system, was appropriate, and that no further notice is required; and (iii) enter an order approving the Rule 9019 Motion and authorizing and directing the NECC Trustee to consummate all aspects of the Settlement in accordance with this Agreement.

ll. **"Rule 9019 Order"** means an order of the Bankruptcy Court granting the relief requested in the Rule 9019 Motion and approving the terms of this Agreement in all material respects.

mm. **"Settlement Amount"** means the sum of $1,000,000 (USD) to be paid by Liberty and Great American as follows:

       a.  Liberty: $450,000

       b.  Great American: $550,000

nn.   **"Termination Date"** has the meaning set forth in Section VIII hereof.

oo.   **"UST"** means the Office of the United States Trustee.

## II.   Payment of Settlement Amount

On or before five (5) days after entry of the Confirmation Order, Liberty and Great American shall each pay (or cause to be paid) their respective portions of the Settlement Amount in immediately available funds to the NECC Trustee and the NECC estate in accordance with the wire transfer instructions to be supplied by the NECC Trustee to Liberty and Great American. Until the earlier to occur of the Plan Effective Date or the Termination Date, the NECC Trustee shall hold the Settlement Amount in the Duane Morris LLP IOLTA Attorney Trust Account. On the Plan Effective Date, the Settlement Amount, together with all accrued interest thereon, shall be, and shall be deemed, irrevocably and indefeasibly paid to the NECC Trustee, and the Settlement Amount shall be used by the NECC Trustee for payment of the costs and expenses of administration of the Bankruptcy Case and for distribution to creditors under the Plan (including, but not limited to, pursuant to the NECC Tort Trust Agreement). The Parties intend and agree that the Settlement Amount shall constitute a material part of a fund to be ultimately distributed to Claimants and other creditors of the Debtor under the Plan and, accordingly, shall be protected from collateral attack and reach by the Debtor's creditors or any other Persons whatsoever; and that such funds shall be therefore held in a legal manner that protects such funds from the reach of others to the full extent permitted by law.

## III.   Stay of MDL Proceeding

a.   As soon as reasonably practicable after the Execution Date, Liberty shall file and prosecute in good faith a motion with the MDL Court (the "MDL Stay Motion") requesting entry of an order of the MDL Court staying the MDL Proceeding as to Liberty through the earlier of the Plan Effective Date or the Termination Date ("MDL Stay Order"). The terms of the MDL Stay Order, as requested by the MDL Stay Motion, shall include, but not be limited to, the following terms:

     i)    A prohibition against any party to the MDL Proceeding seeking dispositive relief;

    ii)    A prohibition against any party to the MDL Proceeding seeking any form of prejudgment security, including, but not limited to, any attachments, injunctions, writs or orders of any nature with regard to Liberty; and

iii) the permissibility of discovery against Liberty, but only to the extent the discovery is relevant to the prosecution, or defense, of claims against defendants other than Liberty.

b. Liberty is hereby authorized to recite in the MDL Stay Motion that the NECC Trustee, the Plaintiffs' Steering Committee and the Creditors' Committee each support entry of the MDL Stay Order and, if requested by Liberty, the NECC Trustee, the Plaintiffs' Steering Committee, and the Creditors' Committee shall each appear in support of entry of the MDL Stay Order.

c. Nothing in this Agreement, the MDL Stay Motion, or the MDL Stay Order, shall prevent or prohibit a party from objecting to a discovery request based on any grounds ordinarily available under the Federal Rules of Civil Procedure, with all such rights being expressly reserved. It is further agreed that so long as the MDL Stay Order contains language consistent with sub-paragraphs (a)(i)-(a)(iii) above, nothing in this Agreement shall provide a basis for Liberty to claim that by virtue of entering into this Agreement, there is a general prohibition as to all discovery in the MDL Proceeding.

d. Following entry of the MDL Stay Order, Liberty may (i) seek to enforce the MDL Stay Order in all courts of competent jurisdiction; and/or (ii) if those enforcement efforts are unsuccessful, seek entry of an order from the Bankruptcy Court or such other court of competent jurisdiction, enjoining any person or entity from taking such action or seeking such relief as to Liberty that is proscribed by the MDL Stay Order. Upon request by Liberty, the NECC Trustee, the Plaintiffs' Steering Committee, and the Creditors' Committee shall each appear in the Bankruptcy Court and/or the MDL Court (as applicable) in support of any effort by Liberty to enforce the MDL Stay Order in those courts.

## IV. Bankruptcy Related Obligations

a. As soon as practicable after the Execution Date, the NECC Trustee shall prepare and file with the Bankruptcy Court a motion pursuant to Bankruptcy Rule 9019 seeking entry of the Rule 9019 Order authorizing him to enter into and be bound by the terms of this Agreement.

b. Notice of the Rule 9019 Motion shall be provided solely through (i) the Bankruptcy Court's electronic case filing system and (ii) the NECC Trustee's filing of a notice of such motion, together with the motion itself, on the docket of the MDL Proceeding. The NECC Trustee shall not be obligated to provide any other or further notice of the Rule 9019 Motion whatsoever. If the Bankruptcy Court orders any other or further notice of the Rule 9019 Motion, Liberty, and not the NECC Trustee, shall bear any and all costs thereof. If and when the Rule 9019 Motion is granted by the Bankruptcy Court, the NECC Trustee shall move the Bankruptcy Court for leave to amend the Plan to effectuate the terms and provisions of this Agreement and for an order finding that such amendment is non-material and, therefore, does not require the Plan Proponents to resolicit

acceptances or rejections of the Plan. In the event that the Bankruptcy Court finds that such amendment is material and requires the Plan Proponents to resolicit acceptances or rejections of the Plan, this Agreement shall terminate and be of no further force or effect; provided, however, that each of the rights, obligations and waivers by Liberty and Great American described in Section IV.f hereof shall survive any such termination of this Agreement and shall remain in effect.

c.  As soon as reasonably practicable after the Execution Date, Liberty and the NECC Trustee shall jointly seek adjournment of the hearing on the Claim Objection, up to and including, if the Rule 9019 Motion is denied prior to the date of the Confirmation Hearing, the date of such denial, otherwise, the date of the Confirmation Hearing.

d.  The NECC Trustee shall undertake commercially reasonable efforts to defend the Confirmation Order in the event of a direct appeal of that order.

e.  If any Claimant files a lawsuit or initiates an alternative dispute resolution proceeding asserting an NECC Claim or an Indemnity Claim against Liberty and/or Great American between the Execution Date and the Plan Effective Date, the NECC Trustee consents to Liberty and/or Great American taking all steps necessary to obtain from the Bankruptcy Court an order staying or enjoining such lawsuit or alternative dispute resolution proceeding until the date of the Confirmation Hearing. The failure of Liberty and/or Great American to obtain such an order from the Bankruptcy Court shall not affect in any way any rights or obligations of any Party under this Agreement.

f.  On the Execution Date, each of Liberty and Great American shall, and shall be deemed to, irrevocably waive any right to, directly or indirectly, either oppose or object to the Plan or the confirmation of the Plan and the transactions contemplated by the Plan. Each of Liberty and Great American hereby further agrees with respect to any Plan to:

i.  so long as its vote has been properly solicited pursuant to sections 1125 and 1126 of the Bankruptcy Code, timely vote any and all Claims (to the extent filed) that it is entitled to vote, now or hereafter beneficially owned by such Party (subject to Section V hereof), to accept the Plan in accordance with the applicable procedures set forth in the solicitation materials accompanying the Plan, and timely return a duly executed ballot in connection therewith. A copy of the vote solicitation package shall be sent to the notice addresses in Section IX(o);

ii.  not withdraw or revoke its tender, consent or vote with respect to the Plan, except as otherwise expressly permitted pursuant to this Agreement; and

iii.  not:

8

1. oppose or object to the Plan or the solicitation or consummation of the Plan and the transactions contemplated by the Plan, whether directly or indirectly;

2. join in or support any objection to the Plan or to the solicitation of the Plan;

3. initiate any legal proceedings that are inconsistent with or that would delay, prevent, frustrate or impede the approval, confirmation or consummation of the Plan, or otherwise commence any proceedings to oppose the Plan, or take any other action that is barred by or likely to frustrate this Agreement;

4. vote for, consent to, support or participate in the formulation of any other restructuring or settlement of Claims, any other transaction involving any plan of reorganization or liquidation (with the exception of the Plan) under applicable bankruptcy or insolvency laws, whether domestic or foreign, in respect of the Debtor or its affiliates, except as otherwise expressly contemplated pursuant to this Agreement;

5. directly or indirectly seek, solicit, or enter into any agreements relating to, any restructuring, plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, transaction, sale, disposition or restructuring of the Debtor or its affiliates (or substantially all of their assets or stock) other than the Plan or as otherwise set forth in this Agreement (any such plan or other action as described in clauses (4) and (5) immediately above, an "Alternative Plan"); or

6. enter into any letter of intent, memorandum of understanding or agreement in principle relating to any Alternative Plan.

The waiver and obligations described in this Section IV.f shall remain effective and continue regardless of whether (i) this Settlement is approved by the Bankruptcy Court, (ii) Liberty becomes the beneficiary of the releases and injunctions set forth in Section 10.05 and 10.06 of the Plan, or (iii) this Agreement terminates as provided in Section VIII hereof. For the avoidance of doubt, nothing herein shall constitute a waiver by either Liberty or Great American of any objections to any subsequent amendments to the Plan to the extent those amendments materially and adversely affect the rights of Liberty or Great American or have a material and adverse impact on the settlement memorialized by this Agreement.

9

## V. Waiver and Release of Bankruptcy Claims

Upon the Plan Effective Date, without any further action by Liberty or Great American, each of Liberty and Great American shall, and shall be deemed to, either (a) irrevocably waive, relinquish and release (i) any and all Claims (whether or not a proof of claim is filed) of any kind or character it holds against the Debtor or its estate and (ii) any and all rights to distributions or recoveries, of any kind or character, on account of such Claims including, without limitation, pursuant to the Plan or (b) irrevocably assign such Claims to the NECC Trustee (at the NECC Trustee's discretion). Such waiver or assignment shall be effective without regard to whether the Confirmation Order is or becomes a Final Order on the Plan Effective Date, and shall continue to remain in effect notwithstanding any appeal, modification, or reversal of the Confirmation Order.

## VI. Releases

a. Subject only to the conditions set forth in Section VIII hereof, and without any further action by the Parties, Liberty, the NECC Trustee, the Debtor and its estate each hereby fully, finally and completely releases, remises, acquits and forever discharges Great American of and from the NECC Claims; provided, however, that Great American shall be so released, remised, acquitted and discharged of and from the NECC Claims solely in its capacity as issuer of, or in any other capacity that may arise from or be connected with, the Policies and not in its capacity as issuer of any other policies of insurance, or in any other capacity (unless provided in a separate Settlement and Release Agreement).

b. Subject only to the conditions set forth in Section VIII hereof, and without any further action by the Parties, the NECC Trustee, the Debtor and its estate each hereby fully, finally and completely releases, remises, acquits and forever discharges Liberty of and from the NECC Claims.

c. Subject only to the conditions set forth in Section VIII hereof, and without any further action by the Parties, Great American hereby fully, finally and completely releases, remises, acquits and forever discharges Liberty, the NECC Trustee, the Debtor, its estate, the Plaintiffs' Steering Committee and the Creditors' Committee of and from the NECC Claims.

d. Subject only to the conditions set forth in Section VIII hereof, and without any further action by the Parties, each of Liberty and Great American hereby fully, finally and completely releases, remises, acquits and forever discharges all Claims against Claimants, the NECC Trustee, the Debtor, its estate, the Plaintiffs' Steering Committee and the Creditors' Committee that are based upon or that arise out of the NECC Claims.

e. Upon the Plan Effective Date, Liberty and Great American shall, and shall be deemed to have, unconditionally assigned to the NECC Trustee any and all Claims that they may have between them (to the extent not otherwise released under this Agreement, the Plan and/or the Confirmation Order) and against any

10

Persons not a Party to this Agreement (including any claims for indemnification, contribution or subrogation) that are based upon or arise out of the NECC Claims.

f.  Nothing in this Section VI or any other provision of this Agreement is intended to, nor shall it be construed to, have any effect on, or constitute a release, waiver, assignment or discharge of, Great American's rights or Claims for reinsurance in connection with the Policies and/or the NECC Claims, all of which are expressly reserved by Great American.

g.  Nothing in this Section VI or any other provision of this Agreement is intended to, nor shall it be construed to, have any effect on, or constitute a release, waiver or discharge of, the Parties' respective rights, obligations, remedies or Claims created under this Agreement.

h.  The Parties hereto acknowledge that they are aware that they may hereafter discover facts different from or in addition to those they now know or believe to be true with respect to the NECC Claims, causes of action, rights, obligations, and liabilities herein released, and each agrees that the within release shall be and remain in effect in all respects as a complete release as to all matters released herein, notwithstanding any such different or additional facts.

## VII.  Representations and Warranties of the Parties

Each of the Parties separately represents and warrants to each of the other Parties as follows:

a.  It has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to the entry of the Rule 9019 Order, the amendment of the Plan consistent with the terms of this Agreement, and the entry of the Confirmation Order;

b.  The execution and delivery of this Agreement, and the performance of the obligations contemplated by this Agreement, have been approved by duly authorized representatives of the Party, and by all other necessary actions of the Party, subject only to the entry of the Rule 9019 Order, the amendment of the Plan consistent with the terms of this Agreement, and the entry of the Confirmation Order;

c.  It has expressly authorized its undersigned representative to execute this Agreement on the Party's behalf as its duly authorized agent;

d.  The making and performance of this Agreement will not violate any provision of the Party's respective articles of incorporation, membership agreement, charter or bylaws, where applicable;

e.  It has read the entire Agreement and knows the contents hereof; it understands that the terms hereof are contractual and not merely recitals; it has signed this

Agreement of its own free act and will; and in making this Agreement, it has obtained the advice of its own legal counsel;

f.   It has not previously assigned or transferred, or purported to assign or transfer to any other Person, any right or Claim that is the subject matter of this Agreement;

g.   This Agreement has been negotiated, executed and delivered in good faith, with the assistance of its own legal counsel, pursuant to good faith arm's-length negotiations, and for good and valuable consideration; and

h.   As to Liberty and Great American, each has conducted diligent good faith searches for any insurance policies that may have been issued by Great American that provide insurance coverage and/or other benefits to Liberty for the NECC Claims, and that they are unaware of any such insurance policies other than the Policies specifically identified herein.

## VIII.  Conditions to Effectiveness of this Agreement.

Upon the Execution Date, this Agreement shall be binding upon the Parties in accordance with its terms, including, but not limited to, the terms of Section IV.f hereof; provided, however, that the obligations of the NECC Trustee and the Debtor's estate under this Agreement are expressly subject to and conditioned upon entry of the Rule 9019 Order, the amendment of the Plan consistent with the terms of this Agreement and entry of the Confirmation Order; and provided, further, that the effectiveness and finality of the provisions of this Agreement concerning the Releases (Section VI) are expressly conditioned upon and subject to the following:

a.   The payment of the Settlement Amount to the NECC Trustee and the NECC estate by Liberty and Great American; and

b.   The occurrence of the Plan Effective Date.

For the avoidance of doubt, and without diminishing any other condition to the effectiveness of this Agreement or the Plan, it is expressly understood and agreed by the Parties that the Plan Release and the Plan Injunction are material, non-waivable conditions to the payment of the Settlement Amount and the effectiveness of this Agreement, and that they will also be made material, non-waivable conditions to the effectiveness of the Plan.

In the event that: (a) the Plan Effective Date does not occur within one (1) year from the Execution Date; (b) the Bankruptcy Court finds that any amendment to the Plan to effectuate the terms and provisions of this Agreement is material and thus requires the Plan Proponents to resolicit acceptances or rejections of the Plan; (c) the Bankruptcy Court denies confirmation of the Plan and such denial cannot be cured by amending the Plan in a manner that is either (i) not materially inconsistent with this Agreement or (ii) otherwise agreed to by the Parties; or (d) the Plan is withdrawn, then this Agreement shall immediately terminate and be of no further force or effect (the date of such termination,

12

the "Termination Date"); provided, however, that such termination may be waived by unanimous written consent of the Parties; and further provided, however, that each of the obligations and waivers by Liberty and Great American described in Section IV.f hereof shall survive the termination of this Agreement and shall remain in effect. Upon the Termination Date, the Parties shall be restored to the same position they were in immediately prior to the Execution Date without waiver of any rights, claims, defenses or remedies that the Parties may have against each other, subject to the obligations and waivers by Liberty and Great American described in Section IV.f hereof which shall survive the termination of this Agreement and shall remain in effect. Within fifteen (15) days of the Termination Date, the Settlement Amount shall be refunded to Liberty and Great American.

## IX.    Other Provisions.

a.    **Informed Consent and Knowledge**. The Parties expressly warrant and represent that they have had the benefit of the professional advice of attorneys of their own choosing, that they are fully satisfied with that advice, and that they have not relied on any statement or representation of other Parties to this Agreement regarding the specific matters in dispute. The Parties also represent and acknowledge that, in executing this Agreement, they do not rely and have not relied upon any representation or statement made by any other Party or any of their agents, representatives, or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as specifically stated in this Agreement.

b.    **No Precedent.** The Parties stipulate that they have entered into this Agreement only for their own business reasons based on the unique circumstances presented by the NECC Claims, and that this Agreement creates no binding legal or factual precedent for themselves or others in any future case. This Agreement does not constitute an admission of coverage or noncoverage, and is not based upon language in the Policies.

c.    **Confidentiality.** The Parties agree, subject to any disclosure obligations imposed by law, to hold this Agreement confidential and not to disclose the terms of this Agreement to any Person, other than the Creditors' Committee and the Plaintiffs' Steering Committee, until the NECC Trustee files this Agreement with the Bankruptcy Court; provided, however, that after the Execution Date, the Parties may inform the Bankruptcy Court and/or the MDL Court that they have entered into this Agreement; provided, further, that the Plan Proponents may disclose the fact that they have reached a settlement, the settlement amount, and such other terms of this Agreement as may be reasonably necessary or appropriate to implement the Agreement and in order to obtain entry of the Rule 9019 Order.

d.    **Cooperation.** Each Party agrees to take such steps and to execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by

13

any Person not a Party hereto to invalidate, interpret or prevent the validation, enforcement or carrying out of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant and covenant to cooperate in opposing such action or proceeding.

e.  **Nondisparagement.**  The Parties shall not disparage each other and shall support this Settlement Agreement and the Plan, consistent with Section IV.f hereof, and shall undertake commercially reasonable efforts to secure confirmation of the Plan.

f.  **Entire Agreement.**  This Agreement sets forth the entire agreement between the Parties and fully supersedes any and all prior agreements and understandings, written or oral, between and among the Parties pertaining to the subject matter hereof.   Except as explicitly set forth in this Agreement, there are no representations, warranties, promises or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Agreement or alter or supplement its terms.   Any statements, promises or inducements, whether made by any Party or the agent of any Party, that are not contained in this Agreement shall not be valid or binding.  This Agreement shall have perpetual existence, except as otherwise provided herein.

g.  **Amendment/Modification.**  No amendment or modification of this Agreement shall be binding or enforceable unless in writing and signed by the Parties and, if required, approved by the Bankruptcy Court.

h.  **Construction.**  This Agreement is the jointly-drafted product of good faith arm's length negotiations between the Parties with the benefit of advice from their own respective legal counsel and each of them has had sufficient opportunities to propose and negotiate changes to this Agreement prior to its execution.  As such, no Party will claim that any ambiguity in this Agreement shall be construed against any other Party by reason of their identity as a drafter or insurer.  The following rules of construction shall also apply to this Agreement:

1.  The Recitals and Definitions to this Agreement are a material part of this Agreement having the same force and effect as a mutual representation, warranty and covenant of the Parties;

2.  Unless the context of this Agreement otherwise requires, (a) words of any gender include each other gender, and the word "it" may refer to a Person as the context requires; (b) words used in the singular or plural also include the plural or singular number, respectively; (c) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (d) the words "include,' "includes" or "including" shall be deemed to be followed by the words "without limitation;" (e) the word "or" shall be disjunctive but not exclusive; (f) the words "any" or "all" shall mean "any and all";

14

3. References to the Policies, agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto; and

4. References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating or amending or replacing the statute or regulation.

i.    **Applicable Law.**  This Agreement shall be interpreted and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the conflict of laws of the Commonwealth of Massachusetts, except to the extent that any particular provision hereof may be governed by the Bankruptcy Code and Rules.  Each of the Parties hereby irrevocably consents to the exclusive jurisdiction of the Bankruptcy Court with respect to any action to enforce the terms and provisions of this Agreement, and expressly waives any right to commence any such action in any other forum (unless the Bankruptcy Court does not have or refuses to exercise such jurisdiction).  In any dispute arising from this Agreement, the Parties hereby waive any right to a jury trial.  This Agreement is intended to be and shall have the effect of a document executed under seal in accordance with the laws of the Commonwealth of Massachusetts.

j.    **No Admissions/Not Evidentiary.**  This Agreement is not and shall not be construed as an admission or concession of coverage, responsibility, liability, non-liability or wrongdoing by any Party to this Agreement.  No part of this Agreement may be used in any action or proceeding as evidence of the rights, duties or obligations of any Insurer under the Policies or otherwise.

k.    **Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto, and their respective successors, permissible assigns, agents, employees and legal representatives, including, without limitation, NECC and its bankruptcy estate, any trust or trustee, responsible Person, estate administrator, representative or similar Person appointed for NECC in connection with the Bankruptcy Case, the Plan or any subsequent Chapter 7 case.  Except as expressly provided in this Agreement, neither this Agreement nor any of the rights and obligations set forth herein shall be assigned by any Party without the prior written consent of the other Parties, which consent shall not be unreasonably withheld.

l.    **No Rights of Third Parties.**  All Persons expressly included within the definitions of "Liberty", "Great American" and "NECC Trustee," are intended beneficiaries of this Agreement.  The Parties agree that, except as set forth in the prior sentence or otherwise expressly set forth in this Agreement, there are no intended third party beneficiaries to this Agreement.

m.    **Enforcement of Agreement**.  The Parties hereby acknowledge that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by any Party and that such breach shall cause the non-breaching

15

Parties irreparable harm. Accordingly, the Parties agree that in the event of any breach or threatened breach of this Agreement by any of the Parties, the Parties, in addition to any other remedies at law or in equity that they may have, shall be entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance.

n.     **Captions and Headings**. Captions and headings to paragraphs or sections in this Agreement are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof.

o.     **Notice.** Unless another Person is designated in writing for receipt of notices hereunder, notices to the respective Parties shall be sent to the following Persons to the extent so designated below. All notices shall be sent via email <u>and</u> by either (i) overnight courier or (ii) fax, and shall be deemed effective upon receipt.

<u>As to the NECC Trustee</u>:

Paul D. Moore
Duane Morris LLP
100 High Street Suite 2400
Boston, MA 02110
Tel: 857-488-4200 ·
Fax: 857-401-3057
Email: pdmoore@duanemorris.com

<u>With Copy To</u>:

Michael R. Gottfried
Duane Morris LLP
100 High Street Ste 2400
Boston, MA 02110
Tel: 857-488-4200
Fax: 857-401-3030
Email: mrgottfried@duanemorris.com

<u>As to Liberty</u>:

James J. Tancredi
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103
Tel: 860-275-0331
Fax: 860-881-2471

16

With Copy To:

Nicole Dorman
Law Office Nicole D. Dorman, LLC
P.O. Box 1142
Glastonbury, CT 06033
Tel: 860-463-6873
Fax: 860-760-6715

As to Great American:

Harry Veldhuis
Divisional Assistant Vice President
Great American Specialty E&S Division

With Copy To:
Peter Hermes
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, Seventh Floor
Boston, MA 02110
Tel: 617.728.0050
Fax: 617.728.0052

p.    **Execution and Delivery.**  This Agreement may be executed in one or more counterparts, all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by email and facsimile, which shall be deemed the same as originals.

q.    **Statutes of Limitations**.  The Parties agree and consent that all statutes of limitations, statutes of repose, time limited laches or estoppel defenses or any other state law pre-suit requirements, as to any and all Claims and causes of action among the Parties or against any of the Parties by a person who has a NECC Claim and who filed a timely proof of claim in the Bankruptcy Case pertaining to, concerning or related to NECC and/or its products, that had not expired by operation of applicable local, state, or federal law prior to the Execution Date shall be tolled through and including the earlier of (i) the Plan Effective Date or (ii) sixty (60) days following the Termination Date.

**[Signature Page Follows]**

17

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

**Paul D. Moore, as Chapter 11 Trustee for**
**New England Compounding Pharmacy, Inc.**
**d/b/a New England Compounding Center**
**and not individually**

Dated: 4/16/15

**Liberty Industries, Inc.**

_____
By:
Dated:

**Great American E&S Insurance Company**

_____
By:
Dated:

18

IN WITNESS WHEREOF, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

**Paul D. Moore, as Chapter 11 Trustee for**
**New England Compounding Pharmacy, Inc.**
 **d/b/a New England Compounding Center**
**and not individually**

_____
Dated:

**Liberty Industries, Inc.**

By: Chief Executive Officer
Dated: 04/16/2015

**Great American E&S Insurance Company**

_____
By:
Dated:

18

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the undersigned Parties have each approved and executed this Agreement.

**Paul D. Moore, as Chapter 11 Trustee for**
**New England Compounding Pharmacy, Inc.**
** d/b/a New England Compounding Center**
**and not individually**

_____

Dated:

**Liberty Industries, Inc.**

_____

By:
Dated:

**Great American E&S Insurance Company**

_____
By: Harry J. Veldhuis
Dated: 4/20/15

19

## ADDENDUM NO. 1 TO SETTLEMENT AND RELEASE AGREEMENT

This Addendum No. 1 (the "Addendum No. 1") to the *Settlement and Release Agreement* dated as of April *16* (the "Agreement") is made as of April *16* by:

(i)      the Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 case of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center, Case No. 12-19882, pending in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"); and

(ii)     the Plaintiffs' Steering Committee (the "PSC") appointed in the multi-district litigation captioned *In re New England Compounding Pharmacy Cases Litigation*, MDL No. 2419, Case No. 13-cv-02419 (D. Mass.).

Capitalized terms not defined herein shall have the meanings assigned to them in Section 1 of the Agreement.

1.     Each of the Committee and the PSC acknowledges that it has had a sufficient opportunity to discuss and review the Agreement with its counsel, has in fact done so, and fully understands the terms, conditions, and agreements set forth therein.

2.     Each of the Committee and the PSC supports the Agreement and the compromise and settlement embodied therein and memorialized thereby.

3.     Each of the Committee and the PSC (i) agrees to support approval of the Agreement pursuant to Bankruptcy Rule 9019, and (ii) supports, agrees to take reasonable steps to secure, and agrees not to oppose or object to the Bankruptcy Court's confirmation of a Plan that incorporates and effectuates the terms and provisions of the Agreement in all material respects. Notwithstanding the foregoing, each of the Committee, the PSC, and their members reserve all rights in connection with any aspect of the Plan that is not the subject of the Agreement, including, without limitation, the right to object to and/or negotiate provisions of the Plan that are not the subject of the Agreement.

4.     Nothing in this Addendum No. 1 is intended to or does modify the Agreement in any respect.

*Signature Page to Addendum No. 1 to Settlement and Release Agreement*

> **THE OFFICIAL COMMITTEE OF**
> **UNSECURED CREDITORS OF NEW**
> **ENGLAND COMPOUNDING PHARMACY,**
> **INC., BY AND THROUGH ITS COUNSEL**
> **AND CO-CHAIRS**
>
> **BROWN RUDNICK LLP**
>
> By: _____
> David J. Molton, Esq. (admitted *pro hac vice*)
> Daniel J. Saval, Esq. (BBO #653906)
> Seven Times Square
> New York, New York 10036
> Telephone: (212) 209-4800
> Facsimile: (212) 209-4801
> dmolton@brownrudnick.com
> dsaval@brownrudnick.com
>
> and
>
> William R. Baldiga, Esq. (BBO #542125)
> Kiersten A. Taylor, Esq. (BBO #681906)
> One Financial Center
> Boston, Massachusetts 02111
> Telephone: (617) 856-8200
> Facsimile: (617) 856-8201
> wbaldiga@brownrudnick.com
> ktaylor@brownrudnick.com
>
> *Counsel to the Official Committee of Unsecured*
> *Creditors of New England Compounding*
> *Pharmacy, Inc.*

2

*Signature Page to Addendum No. 1 to Settlement and Release Agreement*

ANDREWS & THORNTON

By: _____

Anne Andrews, Esq.
John C. Thornton, Esq.
Karren Schaeffer, Esq.
2 Corporate Park, Ste. 110
Irvine, CA 92606
Telephone: 949 748-1000
aa@andrewsthornton.com
jct@andrewsthornton.com
kschaeffer@andrewsthornton.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair, Katrina
Eldreth, obo Ari Gomez*

COHEN PLACITELLA & ROTH P.C.

By: _____

Michael Coren, Esq.
Harry Roth, Esq.
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: 215 567-3500
mcoren@cprlaw.com
hroth@cprlaw.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair,
Meghan Handy*

3

*Signature Page to Addendum No. 1 to Settlement and Release Agreement*

### ANDREWS & THORNTON

By: _____

Anne Andrews, Esq.
John C. Thornton, Esq.
Karren Schaeffer, Esq.
2 Corporate Park, Ste. 110
Irvine, CA 92606
Telephone: 949 748-1000
aa@andrewsthornton.com
jct@andrewsthornton.com
kschaeffer@andrewsthornton.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair, Katrina
Eldreth, obo Ari Gomez*

### COHEN PLACITELLA & ROTH P.C.

By: _____

Michael Coren, Esq.
Harry Roth, Esq.
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: 215 567-3500
mcoren@cprlaw.com
hroth@cprlaw.com

*Counsel for Official Committee of Unsecured
Creditors of New England Compounding
Pharmacy, Inc. Member and Co-Chair,
Meghan Handy*

3

*Signature Page to Addendum No. 1 to Settlement and Release Agreement*

**THE PLAINTIFF STEERING COMMITTEE,
BY AND THROUGH ITS LEAD COUNSEL**

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By:

Thomas M. Sobol, Esq.
Kristen Johnson, Esq.
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700
tom@hbsslaw.com
kristenj@hbsslaw.com

*Plaintiffs' Lead Counsel, for the PSC*

4

# EXHIBIT B

## FIRST AMENDED INSIGHT CLAIMS RESOLUTION FACILITY PROCEDURES ("ICRFP")

### INTRODUCTION AND GENERAL PROVISIONS

An INSIGHT CLAIMS RESOLUTION FACILITY FOR PERSONAL INJURY AND WRONGFUL DEATH CLAIMS (the "ICRF") is hereby established in accordance with the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. (the "Plan"), the Tort Trust Agreement (the "Tort Trust Agreement"), the latter of which establishes the Tort Trust (the "Tort Trust"), and the Provider Settlement Agreement dated February __, 2015 (the "Settlement Agreement") by and between Insight Health Corp. ("Insight"), its insurers Lexington Insurance Company ("Lexington") and Darwin Select Insurance Company ("Darwin") (collectively, the "Insight Insurers"), Image Guided Pain Management, PC ("IGPM"), Dr. John M. Mathis, ("Mathis"), Dr. Robert F. O'Brien ("O'Brien") (collectively, the "Doctors"), their common insurer, Medical Mutual Insurance Company of North Carolina ("Medical Mutual"), Virginia Plaintiffs,[1] and Paul D. Moore, in his capacity as Trustee for the NECC Chapter 11 bankruptcy

---

[1] Virginia Plaintiffs and their counsel are identified in Attachment A. These Virginia Plaintiffs filed timely lawsuits against the Virginia Insight Providers and participated directly in lengthy mediation process that resulted in the Settlement Amount as defined in the Settlement Agreement.

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

estate (the "NECC Trustee").[2] Collectively, Insight, IGPM, and the Doctors are referenced herein as "Virginia Insight Providers." The Settlement Agreement resulted from a lengthy mediation process that formally began on August 22, 2014 and continued until the date of the Settlement Agreement (the "Virginia Mediation"). Counsel for the Virginia Plaintiffs participated in the Virginia Mediation and are referred to herein as "Virginia Counsel."

A.    Virginia Claimants.

Pursuant to the Settlement Agreement, "Claimant(s)" mean the Virginia Plaintiffs and all other persons who have filed timely proofs of claim or PITWD Addenda in the NECC Chapter 11 Case, or who have been granted leave to file a late claim,  and have NECC Claims[3]  against Insight, IGPM and/or the Doctors for personal injury or wrongful death arising out of the injection(s) of methylprednisolone acetate ("MPA") obtained from New England Compounding Pharmacy, Inc. ("NECC"), lot ##s 05212012@68, 06292012@26, or 08102012@51, (the "Three Contaminated MPA Lots") at the Insight Imaging clinic in Roanoke, Virginia. Claimant(s)

---

[2]    Unless otherwise defined herein, all capitalized terms used in these ICRFP and not otherwise defined herein shall have the meanings assigned to them in the Settlement Agreement, the Plan, and/or the Tort Trust Agreement.

[3] **"NECC Claims"** means any and all Claims asserted or that could be asserted by any Person against Insight, IGPM, the Doctors and/or any of the Insurers for personal injury, tort, wrongful death, medical monitoring, or any other economic or noneconomic injury or damage, based upon, arising out of or in any way related to the purchase or administration by or on behalf of Insight, IGPM and/or the Doctors of injectable methylprednisolone acetate or any other drugs or products compounded, produced, sold or distributed by or on behalf of NECC.

2

demonstrating the eligibility requirements set forth herein are "Eligible Virginia Claimants." "Claimants" include decedents and estate administrators or executors and any person meeting the eligibility requirements of Section III.   Any person whose only claim is one for loss of consortium damages associated with another person or relative's injection is not an Eligible Virginia Claimant and cannot recover under this ICRFP.   If the loss of consortium claim is only a part of an otherwise Eligible Claim, then the Claimant shall not be deemed ineligible, but there shall be no award of points under the Matrix for such a claim of loss.   Similarly, other than the estate of a decedent, any person whose only claim is one for loss of economic damages associated with another person or relative's injection is not an Eligible Virginia Claimant and cannot recover under this ICRFP. The filing of a Virginia Claimant Compensation Claim Form (as defined below) constitutes participation by the  Virginia Claimant's family members in the primary Claim, or the Class D Estate Claim,, and the Class D Consortium Claims of such family members shall be deemed released by the treatment afforded to the Virginia Claimant pursuant to these ICRFP.

      B.    <u>Virginia Provider Fund</u>.

      As defined and provided in the Settlement Agreement, certain portions of the Settlement Amount are to be segregated and held for the benefit of the Claimants. This segregated fund is defined as the "ICRFP Segregated Amount" (which, under the Tort Trust, is a Provider Fund). The funds comprising the ICRFP Segregated Amount are referred to herein as the "Virginia

3

Provider Fund." The Settlement Agreement and the payments to be made to the Claimants under these ICRFP do not and will not result in "payment in full" to any of the Claimants for their NECC-related claims as that term is defined under 11 U.S.C. §§ 509(c) and 502(c).

        C.        <u>Discrete Virginia Provider Fund</u>.

The ICRF is established in addition to and separate from the Claims Resolution Facility provided in the Plan (1) to evaluate claims by the Claimants according to the procedures established herein, with the least practicable cost, (2) to determine a fair and equitable compensation amount to be distributed from the Virginia Provider Fund for each Qualified Virginia Claim (as defined herein), and (3) to effectuate such distributions to Qualified Virginia Claimants (as defined herein) as expeditiously as possible.

        D.        <u>Appointment of the Insight Provider Settlement Administrator</u>.

To facilitate, effectuate and implement the purposes of these ICRFP, ~~Hon~~Edgar C. ~~Diane M. Strickland (Ret. Circuit Court)~~ <u>Gentle, III</u> is hereby retained and appointed as Insight Provider Settlement Administrator ("IPSA") to execute the functions described herein in accordance with the terms of these ICRFP, the Tort Trust Agreement and any applicable order of the MDL Court. The IPSA shall oversee all aspects of the ICRF and shall distribute to the Tort Trustee written instructions for the distribution of Virginia Provider Funds to Qualified Claimants. In the event that the IPSA resigns or is removed from office or is otherwise unable to perform the functions of the IPSA, a successor IPSA shall be recommended by Virginia Counsel

4

subject to confirmation by the MDL Court and opportunity to be heard.  The IPSA shall receive reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings and shall be reimbursed by the Virginia Provider Fund for ~~her~~ his reasonable expenses, including travel expenses, reasonably required and incurred in the performance of ~~her~~ his duties in accordance with the provisions of these ICRFP and the provisions of any retention agreement between the Tort Trustee and the IPSA. The IPSA and those engaged ~~by her~~ with him hereunder shall be afforded the rights and privileges of Provider Settlement Administrators under the Tort Trust Agreement, including indemnification as set forth therein.

E.    Additional specific authority of the IPSA.

The IPSA shall be delegated and assigned full authority to act as follows or in any other manner reasonably required in performance of ~~her~~ his tasks and responsibilities:

1. The IPSA ~~may engage Edgar C. Gentle, III, his firm, or another qualified third party consultant with experience in the administration of mass tort settlements (the "Delegated Consultant"), to provide the administrative assistance required to~~ shall communicate with Claimants as required, ~~to~~ receive and process claims, ~~to~~ provide advice on forms, procedures and awards under these ICRFP, ~~to~~ negotiate and resolve liens if requested to do so (consistent with these ICRFP, the Plan and the Tort Trust

5

Agreement), ~~and~~ undertake any other administrative or clerical tasks ~~assigned by the IPSA in the performance of her duties; and the expenses of such shall be paid by the Virginia Provider Fund in the same manner as if such costs and expenses were incurred directly by the IPSA.~~ necessary in the performance of his duties, and, as necessary and/or requested in connection with Special Circumstances Petitions (*see* Section V(G) *infra*) or otherwise, consult with, provide information and/or support to, and/or be a resource for the IPSCA being appointed under these ICRFP.

2. ~~In connection with the Delegated Consultant, the~~ The IPSA may alter the claims procedures set forth in these ICRFP in such a way as ~~she and the Delegated Consultant~~ he shall deem expeditious and fair; provided however, that no procedural modifications shall substantively alter the point allocation amounts, the eligibility requirements, the grounds for appeal, or the substantive rights and penalties as set forth in these ICRFP (including those within the Points Matrix (Attachment B), and the Standards of Proof (Attachment C)).

3. The IPSA may receive and maintain the confidentiality of copies of PITWD Addenda and other confidential information for Claimants under the Virginia Provider Fund.

4. The IPSA may adopt a Virginia Claimant Compensation Claim Form that shall be the required means for making a claim for a distribution from the Virginia Provider Fund.

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

Case 1:13-md-02419-RWZ   Document 1683-1   Filed 05/08/15   Page 39 of 159

5. To the extent not set forth in this ICRFP, the IPSA may establish the standards of proof that will be permitted to establish eligibility to make a claim and the existence of each element of damages, claims or point calculations under these ICRFP.

6. To the extent not otherwise set forth herein, the IPSA may set deadlines relating to claims against the Virginia Provider Fund.

7. ~~The~~ Consistent with these ICRFP (including those within the Points Matrix (Attachment B), and the Standards of Proof (Attachment C)), the IPSA may make determinations on eligibility of Claimants to make claims against, or receive compensation from the Virginia Provider Fund, including determinations as to whether such Claimants are Eligible Virginia Claimants and whether such Claimants hold Qualified Virginia Claim(s) (as defined below).

8. The IPSA may make awards, deny claims and assess costs under these ICRFP, all of which will become final if not appealed to the Appeals IPSA (defined below).

9. The IPSA may entertain petitions to correct errors or mistakes in connection with claims, awards or denials under these ICRFP.

10. The IPSA may perform such other duties as are required under these ICRFP or as the MDL Court may direct or assign.


F.    Appointment of the Insight Provider Special Circumstances Administrator.

7

Case 1:13-md-02419-RWZ   Document 1831-1   Filed 05/08/15   Page 40 of 159

To facilitate, effectuate and implement the purposes of these ICRFP, Hon. Diane M. Strickland (Ret. Virginia Circuit Court) is hereby retained and appointed as Insight Provider Special Circumstances Administrator ("IPSCA") to execute the functions described herein in accordance with the terms of these ICRFP, the Tort Trust and any applicable order of the MDL Court.  The IPSCA shall hear and decide all Petitions for Special Circumstances (Section V(G)) under these ICRFP. In the event that the IPSCA resigns or is removed from office or is otherwise unable to perform the functions of the IPSCA, the Virginia Counsel shall recommend a successor, subject to confirmation by the MDL Court, after notice and opportunity to be heard. The IPSCA shall receive reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings and shall be reimbursed by the Virginia Provider Fund for her reasonable expenses, including travel expenses, reasonably required and incurred in the performance of her duties in accordance with the provisions of these ICRFP and the provisions of the  retention agreement between the Tort Trustee and the IPSCA.  To the extent required in the execution of her duties, the IPSCA may receive confidential Claimant information in the same manner as provided for the IPSA. Under no circumstances shall the IPSCA be considered to be or held responsible for the actions of the IPSA, whose responsibilities are separate and apart from those of the IPSCA.

G.     Authority of the IPSCA.

The IPSCA shall be delegated and assigned full authority to act as follows:

8

1. The IPSCA may consult with the IPSA in any way expedient in connection with her duties and responsibilities;

2. The IPSCA may, in her discretion, establish the forms, documents, and procedures to be used for a Special Circumstances Petition, which forms may include terms customary with the engagement of arbitrators in binding arbitration.

3. The IPSCA may receive any and all information necessary from the IPSA or the Qualified Virginia Claimants in connection with her duties and responsibilities;

4. The IPSCA may hear, conduct proceedings related to, and make decisions on Petitions for Special Circumstances as deemed appropriate, which may involve denying relief or providing some or all of the relief requested;

5. The IPSCA shall report all decisions made on Petitions for Special Circumstances to the IPSA, who shall distribute the same pursuant to Section V(G)(3);

6. In coordination with the MDL Court, and subject to confirmation and approval by the MDL Court, the IPSA IPSCA may conduct hearings and make recommendations for approval of wrongful death settlements and distributions; and propose distribution to the statutory beneficiaries if required. Any petition for approval may be filed within the MDL Court without initiating a separate proceeding. These ICRFP anticipate that statutory approval of wrongful death settlements and settlements for persons under disability may be sought and obtained after the Claimant submits a timely Virginia

9

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

Compensation Claim Form, and such approval shall not be dependent upon quantifying the specific dollar amount to which the Claimant (or beneficiaries) shall be entitled to receive. To the extent that any associated procedure shall require the convening of parties before the MDL Court, these ICRFP anticipate that such proceedings shall be conducted telephonically if at all possible. These ICRFP further anticipate that multiple applications for approval may be joined in collective motions.;

7. 11. To the extent required for approval of settlements for the Virginia Plaintiffs or other Claimants, the IPSA IPSCA may appoint guardians *ad litem,* conduct hearings and make recommendations for approval of settlements and distributions involving minors or other persons under disability, subject to confirmation and approval by the MDL Court. Any petition for approval under § 8.01-424 may be filed within the case or matter file under which the IPSA IPSCA is appointed within the MDL Court without initiating a separate proceeding.;

8. 12. The IPSA IPSCA may make recommendations on the reduction or waiver of liens, if any, that may be asserted by private insurers or workers compensation carriers as may deemed appropriate. Subject to confirmation and approval by the MDL Court, the IPSA IPSCA may conduct hearings associated therewith, and make associated reports and recommendations.;

10

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

9. 13.The IPSA IPSCA may perform such other duties as are required under these ICRFP or as the MDL Court may direct or assign.

10. F.Appeals Insight The IPSCA shall be deemed to be a Provider Settlement Administrator under the Tort Trust and shall have quasi-judicial immunity for all actions taken pursuant to her appointment hereunder, and shall be indemnified in the same manner as a Provider Settlement Administrator. pursuant to the Tort Trust; and

11. The IPSCA may take such other acts as the MDL Court may direct or assign.

H.      Appeals Insight Provider Settlement Administrator.

To facilitate, effectuate and implement the purposes of these ICRFP, Hon. Lawrence G. Koontz (Ret. Virginia Supreme Court) is hereby retained and appointed as Appeals Insight Provider Settlement Administrator ("Appeals IPSA") to execute the appeals functions described herein in accordance with the terms of these ICRFP, the Tort Trust and any applicable order of the MDL Court.  The Appeals IPSA shall hear and decide all appeals from decisions of the IPSA and/or the IPSCA, as specified in these ICRFP. In the event that the Appeals IPSA resigns or is removed from office or is otherwise unable to perform the functions of the Appeals IPSA, the Virginia Counsel shall recommend a successor, subject to confirmation by the MDL Court, after notice and opportunity to be heard. The Appeals IPSA shall receive reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings and shall

11

be reimbursed by the Virginia Provider Fund for his reasonable expenses, including travel expenses, reasonably required and incurred in the performance of his duties in accordance with the provisions of these ICRFP and the provisions of any retention agreement between the Tort Trustee and the Appeals IPSA.  To the extent required in the execution of his duties, the Appeals IPSA may receive confidential Claimant information in the same manner as provided for the IPSA. The Appeals IPSA shall be deemed to be a Provider Settlement Administrator under the Tort Trust, shall have quasi-judicial immunity for all actions taken pursuant to his appointment hereunder, and shall be indemnified in the same manner as a Provider Settlement Administrator pursuant to the Tort Trust.

    I.       G.Authority of the Appeals IPSA.

The IPSA shall be delegated and assigned full authority to act as follows:

1.  consult with the IPSA in the development of Appeals Forms to be used if a Claimant elects to contest a proposed Award and files an appeal;

2.  in his discretion, establish the documents and procedures to be used for appeals, which documents may include terms customary with the engagement of arbitrators in binding arbitration;

3.  2.receive and decide all appeals filed and dismiss any appeal that is not filed in a timely manner;

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

4. 3. make final and binding decisions on appeals as deemed appropriate, which may involve denying relief or providing some or all of the relief requested;

5. 4. report all decisions made on appeals to all Qualified Virginia Claimants, including by providing such notice to Virginia Counsel; and

6. 5. take such other acts as the MDL Court may direct or assign.

J. H. Notice under ICRFP.

If the Claimant is represented by an attorney as indicated on such Claimant's Virginia Compensation Claim Form, then "notice" as required in these ICRFP  shall be provided to the attorney at the addresses (electronic or otherwise) listed on the Claimant's Virginia Compensation Claim Form unless updated by the Claimant. Notice to Claimants, including Eligible or Qualified Virginia Claimants, not represented by counsel shall be made to the Claimant's address on the Claimant's Virginia Compensation Claim Form. Distributions of funds awarded from the Virginia Provider Fund to Eligible or Qualified Virginia Claimants who are represented by attorneys shall be made payable jointly to the Qualified Virginia Claimant and the attorney (or law firm).  If an Eligible or Qualified Virginia Claimant is not represented by an attorney, distributions shall be made payable to the Qualified Virginia Claimant.

K. I. Change of Address.

All Claimants and/or his or her attorney shall be solely responsible for notifying the IPSA (and/or her Delegated Consultant) of address changes for the Claimant or the attorney and any

13

other changes with respect to the information provided by the Claimant on a completed W-9 form.

## PROCEDURES OF THE INSIGHT CLAIMS RESOLUTION FACILITY

Pursuant to the Plan, the Tort Trust Agreement, and the Settlement Agreement, the Tort Trustee shall make distributions as per the terms of the Tort Trust Agreement and these ICRFP. Each Eligible Virginia Claimant shall receive his or her individually allocated distribution of the Virginia Provider Fund Net Proceeds as directed under these ICRFP, the Tort Trust Agreement and the awards granted hereunder. Matrix Awards shall be determined by the IPSA, based upon the factors, methodologies and procedures set forth herein. Special Circumstances Petition Awards shall be determined by the IPSCA, based upon the factors, methodologies and procedures set forth herein. Appeals shall be based solely upon the factors, methodologies and procedures set forth herein.

I.      **Distribution of Virginia Compensation Claim Forms**

Immediately following the Effective Date, the IPSA or her Delegated Consultant shall request information ("Claim Criteria Data") from the Estate Representative (as defined in the

14

Plan) under Section 5.15 of the Plan, including information sufficient to provide the IPSA ~~or her Delegated Consultant~~ with the names and addresses of any persons who claims to have received treatment at the Insight Imaging clinic in Roanoke, Virginia and previously have filed in the NECC Chapter 11 Case a timely Proof of Claim ("POC") or Personal Injury Tort and Wrongful Death Claim Information Form ("PITWD Addendum"). POC's and PITWD Addenda that were not filed before the Bar Date (January 15, 2014 at 4:00 PM, EST) or as ordered and allowed by the Bankruptcy Court thereafter, will be conclusively deemed to be un-timely. Within 30 days after receiving such Claim Criteria Data the IPSA ~~(or her Delegated Consultant)~~ shall mail the Claimants a Virginia Fund Compensation Program Claim Form ("Virginia Compensation Claim Form"), together with instructions, a Base Point Category and Adjustment Calculation Worksheet, and a W-9 Form. As to the Claimants who are Virginia Plaintiffs, notice and delivery may be accomplished by providing the same documents to counsel for the Virginia Plaintiffs. To the extent orders are entered allowing individuals to file a POC after the Effective Date and such individuals claim to have an NECC Claim arising out of treatment at the Insight Imaging clinic in Roanoke, Virginia (referred to herein as "Late Allowed POC Claimants"), the IPSA ~~(or her Delegated Consultant)~~ shall mail the Late Allowed POC Claimant the Virginia Compensation Form within 60 days of such order. The Virginia Compensation Claim Form shall be structured so as to first establish whether the Claimant or Late Allowed POC Claimant holds an Eligible

15

and/or Qualified Virginia Claim; and, if not, to instruct the Claimant or Late Allowed POC Claimant to submit only the minimum information necessary.

**II.     Procedures for timely filing Virginia Compensation Claim Forms**

   A.     <u>Claimants must submit timely Virginia Compensation Claim Forms on or before the Virginia Claim Due Date</u>.

To be eligible to receive compensation from the Virginia Provider Fund, Claimants must submit a completed and signed Virginia Compensation Claim Form as directed by the IPSA, together will all supporting documentation required, on or before 90 days from the date on which the Virginia Compensation Claim Form was mailed ("Virginia Claim Due Date").  All Virginia Compensation Claim Forms must be postmarked or received by the IPSA ~~or her Delegated Consultant~~ by the Virginia Claim Due Date.  A Virginia Compensation Claim Form that is not received by Virginia Claim Due Date, or not placed in the U.S. mail with a postmarked date no later than such date, shall be denied, unless the IPSA finds excusable neglect. The IPSA ~~and/or her Delegated Consultant~~ shall have no further obligation to review or calculate points, categories or damages for any Claim found to be untimely, and absent a successful appeal to the Appeals VSPA, then that Claimant shall be barred from making any recovery from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

16

The IPSA or her Designated Consultant shall make a final determination of late filing and shall promptly notify the Claimant of such final decision and the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a final determination of late filing may file an appeal with the Appeals IPSA within 30 days of such ruling. The sole ground for reversal on appeal of any such final determination of late filing shall be proof that the Claimant's Virginia Compensation Claim Form was timely postmarked or timely received contrary to the finding of the IPSA and/or the Delegated Consultant.

B.     No Delay or Retention for Potential Late Allowed POC Claimants.

The IPSA shall not specially retain any funds for the purpose of compensating Late Allowed POC Claimants, nor shall the IPSA or Delegated Consultant delay or alter Tentative Matrix Awards or Final Matrix Awards based upon the filing of such claims. If such claim is not received in sufficient time and form to be competed and included in the Tentative Matrix Award without delaying or disrupting that process, then any recovery for such Late Allowed POC Claimant shall be based solely upon such Claimant's point share of the Retention Pool (if any) in comparison with all other Claimants' point shares for such pool. Any award to Late Allowed POC Claimants shall be made without regard to funds already distributed under these ICRFP.

C.     Certification Requirements.

17

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

All claims must be signed by the Claimant under the penalties of perjury. The submission of a fraudulent claim will violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and subject those responsible to criminal prosecution in the federal courts. If the IPSA determines that a claim is fraudulent, the claim shall be denied and the IPSA shall so inform the Claimant, and, if the Claimant does not appeal or after all appeals have been resolved against the Claimant, the Tort Trustee.

Each Claimant must also certify that he/she has not transferred his or her right to recover from the Virginia Insight Providers with respect to his or her Claim such that the Claim can be asserted by another person or entity.  The fact that a Claimant has executed a "subrogation" agreement with a health insurer or that a statutory provision grants to any governmental entity or workers compensation provider rights of subrogation shall not of itself be construed as a transfer of the Claimant's right to recover.

D.     Certification of Counsel.

Where any Claimant is represented by counsel in submitting a Virginia Compensation Claim Form and associated documentation for recovery under the Virginia Provider Fund, such counsel's submission of the Claim Form on such Claimant's behalf shall constitute a certification that the Claim Form is filed  consistent with the same standards that apply under Rule 1:4(a) of the Rules of the Supreme Court of Virginia and/or Rule 11 of the Federal Rules of Civil Procedure when a pleading is filed in state or federal courts.

18

## III.     Eligibility and Qualification Threshold Requirements

Each Virginia Compensation Claim Form received in a timely manner shall be subject to an initial limited review by the IPSA ~~and/or her Delegated Consultant~~ to make a threshold decision on whether the eligibility and classification requirements set forth in this Section III(A) and (B) are satisfied.

A.     **Claim Eligibility Criteria and Requirements.**

1.  Virginia Plaintiffs.  In order to be eligible to receive compensation from the Virginia Provider Fund, a Claimant must be one of the Virginia Plaintiffs or meet one of the other criteria for eligibility noted in Sections III(A)(2) or (3), below.

2.  Timely POC/PITWD Filing Requirement. Except as permitted and set forth in Sections III(A)(1) and III(A)(3), Claimants must demonstrate that s/he has (a) timely filed a POC or PITWD Addendum in the NECC Chapter 11 Case, (b) had a timely POC or PITWD Addendum filed on his or her behalf, or (c) received permission by Bankruptcy Court order allowing late filing of the POC and PITWD Addendum, and filed such POC or PITWD Addendum in a timely manner.

3.  Alternative: Claim against Virginia Insight Providers is not time-barred. An exception to the requirement in Section III(A)(2) may be applied for person(s) demonstrating

19

Case 1:13-md-02419-RWZ   Document 1831-1   Filed 05/08/15   Page 52 of 159

that his/her NECC Claims against the Virginia Insight Providers are not barred by the applicable statute of limitations. In this regard, if the person did not file a civil action against one or more of the Virginia Insight Providers on or before September 25, 2014 <u>and</u> if the asserted claim does not involve a person who died within the two years following injection from the Three Contaminated MPA Lots at the Insight Imaging Clinic in Roanoke, then such claim shall be deemed barred by the applicable statute of limitations.

4. The NECC Estate Representative shall provide the IPSA with information requested pursuant to Section 5.15 of the Plan, sufficient to provide the IPSA ~~or her Delegated Consultant~~ with POC's and PITWD Addenda submitted on behalf of Claimants and access to information sufficient to determine if a Claimant meets the Timely POC/PITWD filing requirement set forth in III(A)(2) above. If no timely POC or PITWD Addendum was filed by or on behalf of a given Claimant who does not meet the exceptions of Sections III(A)(1) or III(A)(3), then the IPSA shall deny that Claimant's claim and shall notify the Claimant that such determination is final, unless appealed and shall provide the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a denial determination may file a written appeal with the Appeals IPSA within 30

20

days of the date the determination was issued. The sole ground for reversal of any such final denial on appeal shall be proof that the Claimant filed a timely POC or PITWD Addendum contrary to the finding of the IPSA ~~and/or the Delegated Consultant~~. Absent a timely appeal and subsequent reversal, the determination is final, and the Claimant will not be entitled to a payment from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

5. All Claimants must submit a completed W-9 form with his or her Virginia Compensation Claim Form.  If a completed W-9 form is not submitted by a Claimant, the IPSA shall notify the Claimant that one must be submitted (postmarked or received) within 30 days of the date of such deficiency notice or the claim shall be denied unless otherwise excused by the IPSA.  In the event of such a denial, the IPSA shall notify the Claimant of the denial and the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a denial notice may file a written appeal with the Appeals IPSA within 30 days of the date of mailing of such ruling. The sole ground for reversal of any such final denial on appeal shall be proof that the Claimant's completed W-9 form was

21

timely postmarked or received contrary to the finding of the IPSA and/or the Delegated Consultant. Absent a timely appeal and subsequent reversal, the determination is final, and the Claimant will not be entitled to a payment from the Virginia Provider Fund. Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

6. All claims asserted by a timely Virginia Compensation Claim Form and not denied for failure to comply with the requirements of this Section shall be deemed to be "Eligible Claims" and persons holding such Eligible Claims shall be deemed "Eligible Virginia Claimant(s)."

B.    **Additional Requirements for Qualified Virginia Claim: proof of exposure through injection from one or more of the Three Contaminated MPA Lots at Insight Imaging in Roanoke, VA and viability of claims against Virginia Insight Providers.**

After the threshold determination that a Claimant is an Eligible Virginia Claimant, the IPSA or her Delegated Consultant shall further confirm two additional facts in order for the person to be a Qualified Virginia Claimant entitled to participate in substantive points analysis and special circumstances petitions under these ICRFP.

22

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

1.   <u>Injection Proof</u>. First, the medical or other records submitted by or on behalf of such Eligible Virginia Claimant must establish that the Claimant received injection(s) at the Insight Imaging clinic in Roanoke, Virginia, from one or more of the Three Contaminated MPA Lots or, alternatively, that such injection is established either by the Claim Criteria Data for such Claimant or because such Claimant's name appears on the "Insight List" [as that term is defined in ¶II of Attachment C] ("Injection Proof").

2.   <u>Viability Proof</u>. Next, The Eligible Virginia Claimant must demonstrate that s/he filed a timely lawsuit in federal or state court against one or more of the Virginia Insight Providers alleging injury or death as a result of such injection(s) or is otherwise not time-barred from doing so under the applicable Virginia statute of limitations due to death ("Viability Proof"). Lawsuits shall be deemed untimely if they were not filed against one or more of the Virginia Insight Providers on or before September 25, 2014. A date-stamped copy of a filed Complaint, showing filing on or before September 25, 2014, shall be sufficient Viability Proof.  If no such lawsuit has been filed and the statute of limitations has not been tolled or extended by death, then the claim is barred. For those persons who received injection(s) from one of the Three Contaminated MPA Lots at Insight Imaging in

23

Roanoke and then died before September 25, 2014, the IPSA shall calculate the appropriate statute of limitations for determining whether such claims are viable or barred.

3. <u>Qualified Virginia Claim(s)</u>. Eligible Virginia Claimants who meet the requirements for Injection Proof and Viability Proof, qualify for all distributions under the Virginia Provider Fund for recovery under the Points Matrix (**Attachment B**), and qualify for the Special Circumstances Petition process set forth herein (Section V(G)). Such claims are designated as "Qualified Virginia Claim(s)" and such Claimants are designated hereafter as "Qualified Virginia Claimants."

4. <u>Release of Virginia Providers</u>. In order to receive an award under these ICRFP, all Qualified Virginia Claimants must execute a release of all NECC Claims against the Virginia Providers.

C. **Summary rulings on Injection Proof and Viability Proof.**

1. <u>Injection Proof Rulings</u>. If an Eligible Virginia Claimant fails to present Injection Proof  (See Attachment C, §II), the IPSA shall promptly make a ruling denying that Claimant's claim and shall notify the Claimant of such denial and the procedure to

24

appeal to the Appeals IPSA.   Notwithstanding anything contained herein to the
contrary, a Claimant receiving such a final ruling may file a written appeal with the
Appeals IPSA within 30 days of the date of such ruling. The sole ground for reversal
of any such denial on appeal shall be proof (in any form allowed by Attachment C, §
II) that the Claimant received injection(s) from the one or more of the Three
Contaminated MPA Lots at Insight Imaging in Roanoke contrary to the finding of the
IPSA ~~and/or the Delegated Consultant~~. Absent a timely appeal and subsequent
reversal, the determination is final and the Claimant shall receive no award from the
Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from
receiving a recovery through the Claims Resolution Facility established by the
National Settlement Administrator.

2.  <u>Viability Proof Rulings</u>. If an Eligible Virginia Claimant fails to present Viability
Proof, the IPSA ~~and/or her Delegated Consultant~~ shall promptly issue a ruling
notifying the Claimant that his/her claim does not satisfy the Viability Proof
requirements and awarding such Claimant one-half (1/2) point, which shall be the
sole award provided under this ICRFP and the Virginia Provider Fund. Any Eligible
Virginia Claimant who fails to satisfy Viability Proof shall not be eligible to
participate under Section V(G) (Special Circumstances Petition procedures). The

25

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

IPSA ~~and/or her Delegated Consultant~~ shall have no further obligation to assess or consider factors that would qualify such Claimant(s) for additional points if such Eligible Claims were otherwise viable (i.e., not time barred). The IPSA ~~and/or her Delegated Consultant~~ shall promptly notify the Claimant of such ruling and the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a ruling may file a written appeal with the Appeals IPSA within 30 days of such ruling. The sole ground for reversal of any such Viability Proof ruling on appeal shall be proof that the Claimant has a viable claim against one or more of the Virginia Insight Providers arising from injection of one or more of the Three Contaminated MPA Lots at the Roanoke Insight Imaging clinic (i.e., that such claim(s) is/are not barred by the statute of limitations), contrary to the finding of the IPSA ~~and/or the Delegated Consultant~~. Absent a timely appeal and subsequent reversal, the determination is final and the Claimant shall receive a final award of ½ point and shall participate in distributions based solely upon such point assignment. Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

D.    **Administrative Review of forms and documentation submitted by Qualified Virginia Claimants and opportunity to correct errors.**

26

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

1.  Review by ~~Delegated Consultant~~IPSA. The claims handling and processing aspects of this ICRFP shall be handled ~~primarily~~ by the ~~Delegated Consultant. The Delegated Consultant~~ IPSA who shall review all Virginia Compensation Claim Forms and associated documentation submitted by Qualified Virginia Claimants. The primary purpose of this review is to identify clerical errors, to identify missing documents required to support assertion(s) made by the Qualified Virginia Claimant, and to ensure that Qualified Virginia Claims are properly classified.

2.  Errors or Deficiencies in Claim Submissions. If the ~~Delegated Consultant~~ IPSA detects errors in the forms, documents and/or information submitted by a Qualified Virginia Claimant, he may elect to do any of the following:

   a)    If the error or deficiency  can be cured or corrected without additional information from the Qualified Virginia Claimant, then the ~~Delegated Consultant~~ IPSA may cure or correct the error or deficiency using information supplied in the initial filings by the Qualified Virginia Claimant, and shall notify the Claimant's counsel (the Claimant, if unrepresented) of the error or deficiency, and of the cure or correction; or, alternatively, he may notify the Claimant's counsel (the Claimant, if unrepresented) of the error or

27

deficiency and allow opportunity for cure according to the process in subparagraph (b);

b)      If the error or deficiency is deemed one that cannot be cured or corrected without additional information from the Qualified Virginia Claimant, the ~~Delegated Consultant~~ IPSA shall send notice of the deficiency to such Claimant's counsel (the Claimant, if unrepresented), allowing a <u>minimum of 45 days</u> within which to correct the deficiency and file a Corrected Virginia Compensation Claim Form and any supplemental or corrected information in the manner requested by the ~~Delegated Consultant~~IPSA. If the Claimant fails to submit sufficient corrections or additional information within the time specified (or an extended time period as allowed by the IPSA ~~or the Delegated Consultant)~~, then the ~~Delegated Consultant~~ IPSA shall do one of the following:

(i)     Award points under the Points Matrix for only such portions of the Qualified Virginia Claim as are adequately supported by required documentation and issue a denial as

28

such portions of the Claim that are not supported by the submitted materials; or

(ii)    If the procedure outlined in the previous subparagraph is not feasible, the ~~Delegated Consultant~~ IPSA may treat the claim as a Base Category VII claim under the Points Matrix, allowing only such additional points (if any) as are supported by the submitted materials.

## IV.    The Points Matrix for assessing points for Qualified Virginia Claims (summary).

Qualified Virginia Claims shall be assigned points based on the criteria set forth in the Matrix attached hereto as **Attachment B** (the "Points Matrix"). The Points Matrix establishes seven base point categories in the same manner as the Claims Resolution Facility Procedures administered by the National Settlement Administrator (the "Base Point Categories"). The Matrix provides for additional points for death case adjustments, past medical bills and lost wages, total number of lumbar punctures, days of antifungal treatment, stroke/renal failure, all as more specifically described in the Points Matrix. The standards of proof required for the award of points are set out in **Attachment C** hereto. Calculations of points attributable to any Qualified

29

Virginia Claim under the Points Matrix shall not be reduced, limited or barred in the event that

an otherwise Qualified Virginia Claimant happens to die after January 1, 2015.

**V.      Determination of points and payments under the Points Matrix**

      A.      <u>Confirmation of Points for Qualified Virginia Claimants</u>.

As soon as practicable after the Virginia Claim Due Date, ~~the Delegated Consultant~~

~~and/or~~ the IPSA shall segregate the Qualified Virginia Claims for points analysis and

confirmation under the Points Matrix. The ~~Delegated Consultant~~ IPSA shall either (i) accept the

points calculations submitted with the Virginia Compensation Claim Form as verified; or (ii)

make a revised point calculation based on the Points Matrix or the other terms of these ICRFP.

The ~~Delegated Consultant~~ IPSA shall then total the resulting points awards for all Qualified

Virginia Claimants, together with points awarded to Claimants under Sections III(C)(2) (non-

viable claims), to determine the "Tentative Total Points".

      B.      <u>Calculation of Tentative Point Value</u>.

The IPSA ~~or her Delegated Consultant~~ shall consult with the Tort Trustee to determine

the amount of Virginia Provider Fund available for disbursement to Claimants (the "Virginia

Provider Fund Net Trust Proceeds"). The Virginia Provider Fund Net Trust Proceeds shall then

30

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

be reduced by 20%. This subtotal shall then be increased by an amount equal to the funds applied to the Expense Trust under Section VII (initially $700,000), in order to reach a total first distribution amount (the "First Distribution Net Proceeds"). The remaining 20% of the Virginia Provider Fund Net Trust Proceeds, less the amounts applied to the Expense Trust under Section VII, shall be held separately and retained as the "Special Circumstances Pool."

The ~~Delegated Consultant~~ IPSA shall divide the First Distribution Net Proceeds by the Tentative Total Points in order to obtain a calculated "Tentative Point Value":

[**(Virginia Provider Fund Net Trust Proceeds x .80) plus an amount equal to funds applied to the Expense Trust (e.g. $700,000) = First Distribution Net Proceeds]**

[**First Distribution Net Proceeds ÷ Tentative Total Points = Tentative Point Value]**

C.    Tentative Matrix Award.

The ~~Delegated Consultant~~ IPSA shall issue a written ~~a~~ Matrix Award Form to each Qualified Virginia Claimant informing such person of the total number of points awarded to him/her under the Points Matrix and the tentative award amount obtained by multiplying the Qualified Virginia Claimant's total points by the Tentative Point Value ("Tentative Matrix Award"). The ~~Delegated Consultant~~ IPSA shall also provide each Qualified Virginia Claimant with a disclosure of the tentative points and awards proposed to be made to all other Eligible and Qualified Virginia Claimants, but without disclosing the names of the other individuals. For the

31

Virginia Plaintiffs or other represented Qualified Virginia Claimants, the Tentative Matrix
Award listing shall identify the individual recipients by reference to Claimant's counsel.
Notwithstanding the appeals process noted below, mathematical and other such errors which
require no substantive analysis may be submitted promptly to the ~~Delegated Consultant or~~ IPSA
for modification within the 30 days following the date of the Tentative Matrix Award.
Appropriate modifications or corrections may be made accordingly.

     D.    <u>Acceptance or Appeal of Tentative Matrix Award</u>.

In order to contest a Tentative Matrix Award, within 30 days of the date of the Matrix
Award Form, each Qualified Virginia Claimant must file a written appeal. Absent extraordinary
circumstances (as determined solely by the IPSA), if no appeal as provided for in the next
paragraph is postmarked or received within the 30-day period, then the IPSA ~~and/or her~~
~~Delegated Consultant~~ shall be authorized to declare that the point allocation for such Qualified
Virginia Claimant has been accepted, and that person will be paid based upon the points set forth
in his/her Matrix Award Form.

The Tentative Matrix Award Form shall notify the Qualified Virginia Claimant of the
procedure to appeal the Tentative Matrix Award to the Appeals IPSA.  Notwithstanding anything
contained herein to the contrary, a Qualified Virginia Claimant receiving such a Tentative Matrix
Award may file a written appeal with the Appeals IPSA within 30 days of the date of such

32

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

Award. The sole ground for reversal or modification of a Tentative Matrix Award on appeal shall be proof that a factual or mathematical error was made in the number of points originally awarded. Absent a timely appeal and subsequent reversal, a Tentative Matrix Award will be final and binding.

If no timely appeal is filed by any of the Qualified Virginia Claimants regarding their respective Tentative Matrix Awards, then such awards shall be deemed final in all respects and the IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to each of the respective Qualified Virginia Claimants and their counsel (or, if unrepresented to the Qualified Virginia Claimant only) in the amounts indicated on the Tentative Matrix Award Forms based upon the Tentative Point Value. If a timely appeal is filed to any Tentative Matrix Award asserting that an incorrect number of points were assigned, then all Tentative Matrix Awards shall be suspended until a final decision is made on all appeals, allowing confirmation or recalculation of the Tentative Point Value. If any such appeals alter the Tentative Total Points, then the calculation set forth in Section V(B) shall be recalculated based upon the Final Total Points following appeals:

**[First Distribution Net Proceeds ÷ Final Total Points after appeal = Final Point Value]**

    E.    <u>Reissuance of Final Matrix Award notifications following appeal period</u>.

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

If appeals are filed regarding the Tentative Matrix Awards, resulting in recalculation of Final Total Points as set forth in Section V(D), the ~~Delegated Consultant~~ IPSA shall re-issue Final Matrix Award Forms to each Qualified Virginia Claimant informing each such person of the new total number of points awarded under the Points Matrix and the Final Point Value, the new dollar value of each point based on that new point total.  Such  Final Matrix Award Form shall set forth the amount of Final Matrix Award, which shall be the dollar amount obtained by multiplying that person's final number of    Matrix Points  by the Final Point Value. The ~~Delegated Consultant~~ IPSA shall also provide each Claimant and counsel with a disclosure of the final points and Matrix Awards being made to all other Claimants in the same manner as specified in Section V(C). The IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to the respective Claimants and their counsel (or, if unrepresented to the Claimant only) in the amounts indicated on the Final Matrix Award Forms. These and any other awards in this VPCRF shall be subject to satisfying the lien requirements reflected in the Settlement Agreement and in §§ 5.10 and 5.11 of the Plan.

      F.    <u>Assessments of Special Costs</u>.

Some Claimants' awards may require additional administrative steps and attention, resulting in costs associated only with such awards. For claims where (i) approval of the settlement or distribution must be separately made (e.g., wrongful death claims, persons under

34

disability, etc.), and (ii) such approval steps require evidentiary hearings with the IPSA beyond mere presentation of the settlement and agreement by the beneficiaries thereto, then the costs of such proceedings shall be assessed against such Claimant's award. For claims where a guardian ad litem is required for any proceeding associated with a Claimant's award, such costs shall be assessed solely against the Claimant's award. Similar assessments shall be allowed for other cases that require specific attention or hearing by the IPSA as part of the claim or award process, apart from Appeals and Special Circumstances Petitions which are addressed separately. For claims where lien resolution services are provided by the ~~Delegated Consultant~~ IPSA (or similar third party service provider), the costs of such lien resolution services shall be assessed against the Claimants' award.

G.     Petitions for Special Circumstances

In addition to the Matrix Award, if a Qualified Virginia Claimant, who did not include as part of his/her Claim a request for 10 additional points for "Other Factors," and desires to seek a supplemental award from the Special Circumstances Pool, then within the same 30 day period for appealing the Tentative Matrix Award notifications, the Qualified Virginia Claimant must also file a Special Circumstances Petition with the IPSA, who shall forward such Petitions to the IPSCA for review and decision. The IPSCA may, in her discretion, establish the forms, documents, and procedures to be used for a Special Circumstances Petition. Each Special

35

Circumstances Petition shall not exceed 5 pages, and shall be deemed filed by postmark date or, if not mailed, by date received.

Any Qualified Virginia Claimant who files a Special Circumstances Petition must directly pay, or agree to have his/her Matrix Award reduced by $2,000, which will serve as a filing and processing fee. Qualified Virginia Claimants filing a Special Circumstances Petition will otherwise retain the Matrix Award, and any Award for Special Circumstances shall be in addition thereto and shall be made in the reasonable discretion of the ~~IPSA~~ IPSCA based on unique factors and circumstances relating to the Claimant's case. If a Special Circumstances Petition is not filed in a timely manner, it shall be denied and no special award from the Special Circumstances Pool shall be made to that individual.  On timely filed petitions, it is anticipated that the ~~IPSA~~ IPSCA may meet with such Claimants if requested.

      1.    <u>Purpose and Standards</u>.

The purpose of the Special Circumstances Petition is to address those situations where the Points Matrix structure is inadequate to fairly account for all harm and loss suffered by some individuals whose unique circumstances make their situation different from others in the same Claims Category.  Those who filed a request for an award of additional points for "Other Circumstances" as part of their initial Claim submitted to the IPSA are not eligible to submit a Special Circumstances Petition.  Merely filing a Special Circumstances Petition will not entitle

36

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

the Qualified Virginia Claimant to an award from the Special Circumstances Pool as the ~~IPSA~~ IPSCA has the discretion to act on each Petition as deemed appropriate.

In making decisions on Special Circumstances Petitions, the ~~IPSA~~ IPSCA will be making a discretionary decision guided and informed by the same criteria listed in the Points Matrix, such as Claims Category, Death Case adjustments based on statutory beneficiaries, past medical expenses, future medical expenses, past lost wages, future lost wages, number of lumbar punctures, days of Anti-Fungal Treatment, as well as medical complications, permanent impairments, the impact of third party liens, and other appropriate circumstances which may not be fully reflected in the Points Matrix.

Just as there is no requirement that the ~~IPSA make a~~ IPSCA award funds from the Special Circumstances ~~Award~~ Pool to each person who files a Special Circumstances Petition, there is no expectation or requirement that the ~~IPSA~~ IPSCA will use or distribute the full Special Circumstances Pool to those who may file petitions when making Special Circumstances Awards.  The goal and purpose of this process is to ensure that persons who are similarly situated be treated the same to the extent possible, understanding there can be unique cases that deserve separate treatment.

        2.        <u>No Special Circumstances Awards until all petitions are considered</u>.

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

The ~~IPSA~~ IPSCA shall consider all timely filed Special Circumstances Petitions before making any awards on any Special Circumstance Petitions in order to avoid any possible preference for early filers.  ~~The IPSA~~ Once all Special Circumstances Petitions have been filed, the IPSCA shall provide the IPSA with a list of all Qualified Virginia Claimants who have filed Special Circumstances Petitions and the IPSA shall distribute the same to all such Claimants.

        3.      <u>Special Circumstances Award Notifications</u>.

Once the ~~IPSA~~ IPSCA has considered all of the Special Circumstances Petitions, she shall calculate Special Circumstances Awards (including such Awards in which no funds from the Special Circumstances Pool are awarded) in her discretion and provide such information to the ~~Delegated Consultant~~IPSA.  The ~~Delegated  Consultant~~ IPSA shall then prepare Special Circumstances Award Forms notifying each of the Qualified Virginia Claimants (and his/her counsel if represented) who filed Special Circumstances Petitions. The Special Circumstances Award Form shall notify the Qualified Virginia Claimant of the procedure to appeal the Special Circumstances Award (including any Award in which no funds from the Special Circumstances Pool were awarded) to the Appeals IPSA.  A copy of the Special Circumstances Award Forms shall be sent simultaneously by the ~~Delegated Consultant~~ IPSA to Virginia Counsel and to all other Qualified Virginia Claimants, protecting the personally-identifying information of each such person if they have not given consent to disclose his/her identity.  Notwithstanding anything

38

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

contained herein to the contrary, any Qualified Virginia Claimant receiving such a Special Circumstances Award may file a written appeal with the Appeals IPSA within 30 days of such award. The sole ground for reversal or modification of a Special Circumstances Award on appeal shall be abuse of discretion by the ~~IPSA~~IPSCA. "Abuse of discretion" for such appeal(s) may be demonstrated, among other ways, by establishing that the appealing person's Special Circumstances Award is grossly unfair to that person based on a comparison of the Matrix and Special Circumstances Awards for other similar Qualified Virginia Claimants in the same Claims Category. To the extent necessary, the Appeals IPSA may review the Special Circumstances petitions of other similar Qualified Virginia Claimants in making such an assessment.

4.  Acceptance or Appeal of Special Circumstances Award.

In order to contest a Special Circumstances Award, within 30 days of the date of the Special Circumstances Award, each such Qualified Virginia Claimant must file a written appeal. Absent extraordinary circumstances (as determined solely by the IPSA), if no appeal as provided for in the preceding paragraph is postmarked or received within the 30-day period, then the IPSA ~~and/or her Delegated Consultant~~ shall be authorized to declare that the Special Circumstances Award for such Qualified Virginia Claimant has been accepted. The only person who may file an appeal to a Special Circumstances Award is a Qualified Virginia Claimant who filed a Special Circumstances Petition.  If no timely appeal is filed by any of the Qualified Virginia Claimants

39

regarding their respective Special Circumstances Awards, then all such awards shall be deemed final in all respects. If a timely appeal is noted regarding any Special Circumstances Award, then all other Special Circumstances Awards shall be held in abeyance pending resolution of such appeal.

5.    <u>Final Special Circumstances Calculation</u>.

When all appeals (if any) have been completed and any corresponding modifications of Special Circumstances Awards have been made, the IPSA shall compile a final list of all Awards for Special Circumstances, providing a total amount to be distributed from the Special Circumstances Pool (the "Total Final Special Circumstances Distribution Amount"). Such information shall be submitted to each Claimant and counsel in the same manner as specified in section V(c). The IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to the respective Qualified Virginia Claimants and their counsel (or, if unrepresented to the Qualified Virginia Claimant only) in the amounts indicated on the final Special Circumstances Award forms. Such distributions may or may not be included with final distributions (if any) from the Remaining Retention Pool, provided that no substantial delay shall be required in order to combine such distributions.

6.    <u>Calculation of Remaining Retention Pool</u>.

40

The IPSA ~~and Delegated Consultant~~ shall calculate the amount remaining (if any) in the Special Circumstances Pool after deducting the Total Final Special Circumstances Distribution Amount. In consultation with the Tort Trustee, the IPSA shall then determine what (if any) funds remain to be distributed from the Virginia Provider Fund. This may include any funds remaining in the Special Circumstances Pool after all such awards, funds available in the Expense Trust, all interest accumulated but not previously distributed, as well as funds distributable to the Eligible and Qualified Virginia Claimants from the Insight Holdback. The total of all such sums, less any amounts necessary for remaining estimated expenses of the ICRFP, shall be the "Remaining Retention Pool."

H.    Final Distributions from Remaining Retention Pool.

Once the amount of the Remaining Retention Pool (if any) has been calculated, then a Remaining Retention Pool Point Value shall be calculated by the ~~Delegated Consultant~~ IPSA by dividing the funds held in the Remaining Retention Pool by the total amount of Final Matrix Award points awarded to all Qualified Virginia Claimants (plus points awards for any Late Allowed POC Claimant Claim Forms have been filed in the intervening period, if any), obtaining a Remaining Retention Pool Point Value. Distributions to each such Eligible and Qualified Virginia Claimant shall then be calculated by multiplying such person's Total Matrix Points by the Remaining Retention Pool Point Value, which amounts shall be reflected in notices provided

41

to each such person.   The IPSA shall provide written notice to the Tort Trustee directing that payments be made to the respective Qualified Virginia Claimants and their counsel (or, if unrepresented to the Eligible and/or Qualified Virginia Claimant only) in the amounts indicated on the Final Distribution Award notices. Such distributions may, if practical, be combined with Special Circumstances Distributions.

I.      <u>Subsequent distributions of any remaining Virginia Provider Fund amounts to be made in the same manner as distributions from the Remaining Retention Pool</u>.

Should any additional funds become available for distribution from the Virginia Provider Fund, (including any funds payable to the Eligible and/or Qualified Virginia Claimants under the Insight Holdback), the procedures and distributions noted for the distributions from the Remaining Retention Pool shall be applied; and such calculations and awards shall be made as promptly as practicable. No appeals shall be allowed from any such subsequent awards.

**VI.**    **Appeals Procedures**

A.      <u>Confirmation of Points for Qualified Virginia Claimants</u>.

Appeals shall be made to the Appeals IPSA in the following manner:

42

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

1. <u>Forms</u>. Appeals forms shall be supplied with any notice <u>from the IPSA</u> of an appealable decision <del>from the IPSA or Delegated Consultant</del>. Such appeals must be filed (postmarked or received) within 30 days of the date of notice of an appealable decision. Petitions for appeal shall not exceed 10 pages, and must set forth the basis for the appeal, contain a statement of requested relief, and attach any documents relating to the appeal.

2. <u>Fees</u>. Any appeal shall require a filing fee of $750, payable to the <del>Delegated Consultant</del>IPSA. The <del>Delegated Consultant</del> IPSA shall hold such fees in trust in order offset the costs of appeal to the Virginia Provider Fund. An appealing Qualified Virginia Claimant may satisfy the appeal fee by agreeing to have his/her Matrix Award reduced by the amount of the appeal fee, but only in circumstances where a Matrix Award is reasonably anticipated in at least the amount of $750.

    a. If the appealing Qualified Virginia Claimant prevails on his/her appeal, then $500 of the $750 appeal fee shall be refunded to the prevailing appellant, reducing the appeal fee to $250.

    b. Before the final distribution from the Virginia Provider Fund, the <del>Delegated Consultant or</del> IPSA shall disburse all appeal fees collected

43

under this Section (if any) to the Tort Trustee to be deposited into the Virginia Provider Fund and distributed to Qualifying Virginia Claimants or paid to reimburse costs and expenses incurred in connection with or reimbursable under these ICRFP.

3. <u>Hearings</u>.  Appeals may be decided with or without hearings, as determined in the sole discretion of the Appeals IPSA.

4. <u>Content of record on appeal</u>.  The record on appeal is limited to the record in the proceedings resulting in the appeal. Unless otherwise specified in these ICRFP, the appealing Claimant may not submit, nor may the Appeals IPSA consider, any facts or evidence not previously presented by the Qualified Virginia Claimant to the IPSA ~~or Delegated Consultant~~ as part of the claims process that resulted in the notice or decision being appealed.

5. <u>Basis for reversal or modification of rulings on appeal</u>. The grounds for appeal are specified within applicable sections of these ICRFP that give rise to appeals. To the extent that such grounds are not specified and an appeal is otherwise authorized or allowed, the basis for reversal or modification shall only be factual error.

44

**VII.    Liens, attorneys' fees, and engagement of ~~Delegated Consultant~~ IPSA for lien resolution.**

Any awards in this VPCRF shall be subject to satisfying the lien requirements reflected in the Settlement Agreement Addendum 2 and the Plan (§§ 5.10 and 5.11). Liens that are subject to court adjustment may be heard and decided by the ~~IPSA~~IPSCA, subject to MDL Court approval. Settlements that require lien holder approval unless approved by a court may also be heard and decided by the IPSA, subject to MDL Court approval.

All notices of award to Eligible and Qualified Virginia Claimants under these ICRFP shall disclose  that the award amount is subject to payment of liens and (if applicable) attorneys' fees and expenses pursuant to engagement agreements between the Qualified Virginia Claimant and his/her counsel. Payment of such liens shall be made by the Tort Trustee, unless after the amount of the lien has been negotiated and agreed upon, the Qualified Virginia Claimant is represented by counsel and such counsel agrees to make such payments to the lienholder to the satisfaction of the Tort Trustee and the IPSA.

To the extent that liens are not resolved by the Tort Trustee globally as indicated in §§ 5.10 and 5.11 of the Plan or by Virginia Claimants or their counsel, the ~~Delegated Consultant~~ IPSA shall be deemed engaged by the affected Claimants for the purposes of resolving any liens in connection with distributions to such Claimants, provided, however, that, for those Qualified

45

Virginia Claimants represented by counsel, the ~~Delegated Consultant~~ IPSA shall be engaged for purposes of resolving liens only upon written instruction by such counsel.  Notwithstanding the foregoing, if the distribution due an Eligible Claimant under these ICRFP is less than the amount owed on the lien, the ~~Delegated Consultant~~ IPSA shall discuss the circumstances with the Eligible Claimant prior to any engagement.

## VIII.   Payments of Administrative Expenses

The IPSA shall request from the Tort Trustee an initial expense distribution from the Virginia Provider Fund in the amount of $700,000. It is anticipated that such funds shall be held by the ~~Delegated Consultant~~ IPSA in trust (the "Expense Trust") for the payment of "Allowed Expenses," as defined below. Allowed Expenses shall include the fees and costs incurred by the ~~Delegated Consultant, the~~ IPSA, the IPSCA and the Appeals IPSA, all in accordance with agreements that shall be executed in connection therewith. Additional expense distributions may be requested from the Tort Trustee as authorized by the IPSA and shall be deposited in the Expense Trust with the ~~Delegated Consultant~~ IPSA in the same manner.

Any fees collected (as opposed to deductions from Awards) in connection with appeals or Special Circumstances petitions, shall be deposited with the ~~Delegated Consultant~~ IPSA to be held in the same manner. If any such funds are remaining and will not be used for expenses, they shall be forwarded to the Tort Trustee for the Virginia Provider Fund prior to the final

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

distribution to the Eligible and/or Qualified Virginia Claimants and included within such funds for distribution to such individuals.

## IX.    Final Accounting

Following the final distributions from the Remaining Retention Pool and /or Special Circumstances Pool, the IPSA and/or Delegated Consultant shall furnish a statement reflecting all payments to each Eligible and Qualifying Virginia Claimant as well as the costs distributed from the Virginia Provider Fund. Such statement shall be made available to all Eligible and Qualified Virginia Claimants and their counsel, and distributed as further required by the IPSA or the MDL Court.

## X.    Claims Assistance

The IPSA and Delegated Consultant are is authorized to establish a claims assistance procedure for providing information and claims assistance to Claimants and their counsel. Such assistance shall be staffed by employees of the Delegated Consultant IPSA in a manner to provide assistance regarding ICRFP procedures, eligibility requirements, submission requirements (including the documentation required), denials, deficiencies, the process for curing deficiencies, and other procedural and substantive issues.

47

## ATTACHMENT B

# Points Matrix

**The point assignments made within this Matrix and the Standards of Proof applicable thereto are used solely as tools for proportioning the funds available for distribution to the Claimants under these ICRFP. Such points are in no way to be used for earmarking particular portions of any Claimant's award.**

> I.       Seven Claim Base Categories.

This Matrix adopts seven categories of claims which are based on the criteria used in the NECC Claims Resolution Facility Procedures. Eligibility for classification within each category shall be governed by the standards of proof in Attachment C. The terms used in this Matrix assume eligibility requirements set forth in these ICRFP. No Claimant failing to establish the criteria for one of the following Base Categories shall be allowed to participate in the ICRFP distributions.

> CATEGORY I:       Death after injection from one of the Three Contaminated MPA Lots at Insight Imaging in Roanoke, Virginia ("MPA injection") and fungal meningitis and/or spinal or paraspinal fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis).

> CATEGORY II:       Fungal meningitis with a secondary or related spinal or paraspinal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis) after MPA injection.

48

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

CATEGORY III:    Fungal meningitis without secondary infection after a MPA injection.

CATEGORY IV:    Spinal or paraspinal (non-meningitis) fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis) after MPA injection.

CATEGORY V:    Fungal Peripheral joint infection (e.g., hip, knee, shoulder, elbow and/or ankle) after MPA injection.

CATEGORY VI:    MPA injection followed by documented symptoms associated with fungal meningitis or other fungal infection, i.e. headache, word-finding difficulty, fever, photophobia, nausea/vomiting, neck stiffness or pain, back pain, urine retention, slurred speech, limb weakness, numbness and/or pain at the injection site, resulting in medical treatment that includes at least one lumbar puncture.

CATEGORY VII:    MPA injection.

II.    <u>Point Allocations</u>.

A.  <u>Base Points by Category</u>.  Claimants proving that they qualify for these respective Base Categories shall be awarded the following base points:

i.  CATEGORY I:    60 points

ii.  CATEGORY II:    50 points

iii. CATEGORY III:    40 points

49

    iv.  CATEGORY IV:     20 points

    v.  CATEGORY V:     20 points

    vi.  CATEGORY VI:     5 points

    vii. CATEGORY VII:     2 points

B.  <u>Death Case Adjustments</u>

In Category I cases, the Claimant will be entitled to the following additional points based upon the surviving beneficiaries as defined by Virginia law (Va. Code § 8.01-50, et. seq.): Specifically:

If decedent was survived by a spouse or child, who was under the age of 21 at the time of death, who was a student and still dependent on parent for support, then the Claimant will receive an additional 100 points for each.

If decedent was survived by an adult child, then the Claimant will receive an additional 30 points per child.

If decedent was not survived by a spouse or child, but was survived by a parent, sibling, or a grandchild where the parent was a deceased child of the decedent, then the Claimant will receive 10 points for each of these surviving family members.

C.  <u>Past Medical Bills and Wage Loss</u>

As part of each claim, and subject the standards of proof requirements set forth in <u>Attachment C</u>, a Claimant shall be awarded points for documented medical expenses incurred and for lost wages caused as a

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA Lots. The cut-off date for claims for past medical bills and lost wages shall be February 28, 2015.

For each $1000 of either past medical bills related to medical treatment or lost wages caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA Lots, the Claimant will receive 1 pt. per $1000, or a pro rata portion thereof, of all documented medical bills or lost wages incurred through February 28, 2015. For example, if a Claimant incurred $112,346 in past medical expenses, and $13,500 in lost wages as of February 28, 2015, then the Claimant would receive 112.346 points for past medicals, and 13.5 points for lost wages for a total of 125.846 points under this Criteria II.C.

D. <u>Future Medical Bills and Future Wage Loss</u>

As part of each claim, and subject to the specific standard proof set forth in <u>Attachment C</u>, a Claimant may be awarded points for properly established claims for future medical treatment and expenses and for lost future wages that will be incurred after February 28, 2015 where such damages are a result of illness and/or complications arising from the injection with the Contaminated Lots. For each $1000 of either future medical bills or future lost wages resulting from Claimant's injuries related to the medical condition(s) caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA Lots, the Claimant will receive 1/3 pt. per $1000, or a pro rata portion thereof, of all future economic

51

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

damages. Claims for future non-medical economic damages shall be treated uniformly with a 4.0% discount rate (less than 10 years) and 4.5% discount rate (if greater than 10 years) and a 2% growth rate (if less than 10 years) and 2.5% growth rate (if greater than 10 years). For future medical expenses extending into the future for more than two years, the same discount rates shall apply, but the growth rate shall be 5.25%.

E. <u>Total Number of Lumbar Punctures</u>

As part of each claim, other than Category VII claims, and subject to the specific standard proof set forth in <u>Attachment C</u>, for each lumbar puncture the Claimant received, the Claimant will be awarded 2 pts.

F. <u>Anti-Fungal Treatment</u>

As part of each claim, and subject to the specific standard proof set forth in <u>Attachment C</u>, for each day the Claimant was administered or took anti-fungal medication (IV or orally), the Claimant will receive ¼ pt.

G. <u>Stroke</u>

As part of each claim, and subject to the specific standard of proof set forth in <u>Attachment C</u>, if the Claimant suffered a documented stroke which is linked to a fungal meningitis diagnosis, then that Claimant will receive 30 additional points.

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

## H.  Renal Failure

As part of each claim, and subject to the specific standard of proof set
forth in <u>Attachment C</u>, if the Claimant has suffered from Stage 3, 4, or 5
renal failure which is linked to a fungal infection or to a diagnosis of
fungal meningitis, then the Claimant shall receive 30 additional points.

## I.  Other Factors

As part of any claim, any Claimant may, as part of the initial Claim
submission, include a two page written request to the IPSA for an
award of up to an additional 10 points based on what the Claimant
considers to be the unusual circumstances of his/her situation, which
the Claimant feels are not adequately addressed by the points
otherwise assigned by the Matrix.  Any Claimant who files a request
for an award of "Other Factors" points as part of his/her Claim, shall
be disqualified from making a Special Circumstances Petition, and
receiving a Special Circumstances Award.

Simply filing an "Other Factors" request with a Claim does not mean
the IPSA will automatically award extra points, and the maximum
number of points that may be awarded to any Claimant under this
provision shall be 10 additional points.

The IPSA shall consider the written requests that are submitted, and
may in her sole discretion,  determine the correct number of additional
points  to  be  awarded  in  connection  with  each  Claimant's  "other

53

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

factors" request. In doing so, the IPSA may consider the other awards being made to similarly situated Claimants in the same Claim Category, and the nature of unusual circumstances presented in an effort to assess whether the Claimant's Matrix Award based on points otherwise awarded treat the Claimant fairly.

J. <u>Time-Barred Claims</u>

Any Claimant who submits a claim, but who is found not to have filed a timely civil claim in state or federal court alleging a tort claim against Insight relating to or arising from that individual or his/her decedent having received an injection from one or more of the Three Contaminated MPA Lots at the Insight Imaging clinic in Roanoke, Virginia, will receive an award of only one-half (1/2) point to reflect the fact that the claim is not viable because it is time barred. Time-barred Claimants are excluded from participation in the Special Circumstances petition process.

III.   <u>Examples of Application of Matrix</u>.

Once the "point value" is determined by the IPSA or Delegated Consultant, the Matrix Award is a simple mathematical calculation of multiplying the number of points assigned by the "point value" for the "Matrix Award."

Points in non-death cases would be determined under the Matrix as follows:

Category +

1 pt. per $1000 of past economic damage +

54

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

1/3 pt. per $1000 of future economic damage +

2 pts. for each lumbar puncture +

1/4 pt. per day on antifungal medications +

30 points for a stroke or chronic stage 3, 4 or 5 renal failure +

Extra points (up to 10 pts.) for "other factors" =

TOTAL POINTS

NOTE: Category I cases will receive additional points set forth above if decedent was survived by statutory beneficiaries.

Example: A Category II case with $150,000.00 of past medical bills and past wage loss with $45,000.00 of future medicals where Claimant had 5 lumbar punctures and 100 days of antifungal treatment would receive:

| | | |
|---|---|---|
| Category II | = | 50 points |
| $150,000 past economics | = | 150 points |
| $45,000 future economics | = | 15 points |
| 5 lumbar punctures | = | 10 points |
| 100 days of antifungals | = | 25 points |
| TOTAL | = | 250 points |

If the "point value" determined by the IPSA is $700.00, then the Matrix Award in this example would be $175,000.00.

55

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

IV.    <u>Special Circumstances Petition</u>.

The Claims Process includes an opportunity for those with exceptional and/or unique circumstances which make the Matrix Award inadequate to file a petition with the IPSA for a potential supplemental discretionary award from the Retention Pool.  There is a $2,000 fee required of anyone who desires to file a Special Circumstances Petition, and there is no guarantee of a Special Circumstances Award simply because the petition is filed.  For details, see Section V(G) of these ICRFP.

V.    <u>Appeal Rights</u>.

There is a limited right of appeal of a Matrix Award and/or a Special Circumstances Award as set forth in these ICRFP.

56

## ATTACHMENT C

### Standards of Proof

The following standards of proof will be used to evaluate claims submitted under these
ICRFP.

I.    Claims Forms.  Each Claimant must submit a completed Claims Form signed
under oath by the Claimant or an authorized representative.

II.    MPA Injection.  Medical or other records documenting an injection from one or
more of Lots 05212012@68, 06292012@26 or 08102012@51 of preservative-free
Methylprednisolone Acetate ("MPA") compounded by New England Compounding
Pharmacy ("NECC") (the "Three Contaminated MPA Lots "), including, e.g.: a letter
from Insight informing the Claimant or (where a representative is filing a claim on
behalf of another person), the person that s/he received an injection from one or more of
the Three Contaminated MPA Lots.  Alternatively the Claimant may request that the
~~Delegated Consultant or~~ IPSA review the list of patients who received an injection from
one or more of the Three Contaminated MPA Lots that Insight submitted to the Trustee
in 2013 in order to establish the necessary proof of injection (the "Insight List").

III.    Claim Categories.  The seven Base Categories (I – VII) may be established by
submitting the following documents, in addition to evidence of a MPA injection
(Section II above):

A.    Category I (Death After MPA Injection).  (a) A certified death certificate
documenting death as occurring after injection from one of the Three Contaminated
MPA Lots  with the immediate or underlying cause of death containing one of the
following words or phrases: meningitis, meningoencephalitis, encephalitis, epidural
injection, methylprednisolone injection, steroid injection, exserohilum, aspergillus,

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

abscess, or arachnoiditis; or (b) (i) a certified death certificate and medical documentation of a diagnosis of fungal meningitis, meningoencephalitis, encephalitis after injection from one or more of the Three Contaminated MPA Lots , and (ii) documentation that the Claimant received Anti-Fungal Treatment; or (c) a certified death certificate and medical documentation of a diagnosis of spinal or paraspinal fungal infection (vertebral osteomyelitis, discitis, sacroiliitis or epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of epidural clumping or unevenness of nerve routes after an MRI) after a spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , plus documentation that the Claimant received Anti-Fungal Treatments; or (d) a death certificate and medical documentation that the Claimant suffered cerebrovascular accident/stroke occurring (but not a transient ischemic attack only) on or before December 31, 2012, after injection from one or more of the Three Contaminated MPA Lots ; or (e) a certified death certificate and proof that the Claimant was listed on the Virginia NECC List of death cases.  If such proof is presented for deaths occurring before September 30, 2013, the IPSA shall presume that the death was the result of the MPA injection or complications arising therefrom unless there is cause to believe that the death was a result of an unrelated event (i.e., auto accident, unrelated illness).  For deaths occurring after September 30, 2013, where there is reason to believe that the death resulted from an unrelated event, a certified death certificate and other such proof deemed sufficient by the IPSA to establish the death was the result of a MPA injection or complications arising therefrom.

B.  <u>Category II (Fungal Meningitis Plus Secondary Fungal Infection)</u>.  Medical documentation of (a) (i) a diagnosis of fungal meningitis, meningoencephalitis, encephalitis after injection from one or more of the Three Contaminated MPA Lots , and (ii) a diagnosis of spinal or paraspinal fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, epidural or paraspinal phlegmon, epidural or

58

paraspinal abscess, arachnoiditis and/or documentation of abnormal thickening, intradural clumping or unevenness of nerve roots after MRI) after spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , plus documentation that the Claimant received Anti-Fungal Treatment; or (b) proof that the Claimant was listed on both the Virginia NECC List of NECC's fungal meningitis or stroke cases and was listed on the Virginia NECC List of NECC's spinal or paraspinal fungal infection cases, or was listed on the Virginia NECC List of NECC's fungal meningitis and spinal or paraspinal injection cases.

C. <u>Category III (Fungal Meningitis)</u>. May be established by presenting medical documentation of (a) (i) diagnosis of fungal meningitis, meningoencephalitis or encephalitis after injection from one or more of the Three Contaminated MPA Lots, and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia NECC List of NECC stroke or fungal meningitis cases.

D. <u>Category IV (Spinal or Paraspinal Fungal Infection (But Not Meningitis))</u>. May be proved by medical documentation of (a) (i) a diagnosis of spinal or paraspinal fungal injection (including vertebral osteomyelitis, discitis, sacroiliitis, epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of abnormal thickening, intradural clumping or unevenness of nerve roots after MRI, after a spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia List of spinal or paraspinal fungal infection cases.

E. <u>Category V (Fungal Peripheral joint infection (But Not Meningitis))</u>. May be proved by medical documentation of (a) (i) a diagnosis of fungal peripheral joint infections after joint injection from one or more of the Three Contaminated MPA Lots,

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia NECC List of peripheral joint infection cases.

F.     Category VI (Symptoms and at Least One Lumbar Puncture).  May be established by presenting contemporaneous medical records documenting that the Claimant suffered on or before March 31, 2013 from one or more of the symptoms listed in the definition of Category VI in §I of Attachment B, after an injection from one or more of the Three Contaminated MPA Lots, and medical records documenting at least one lumbar puncture prior to April 30, 2013.

G.     Category VII (Symptoms and Lumbar Puncture not required).  Only requires injection from one or more of the Three Contaminated MPA Lots.

IV.     Medical Conditions.

A.     Arachnoiditis may be established by medical records that document (a) the diagnosis of an arachnoiditis, or there must be documentation of intradural clumping or unevenness of nerve roots after MRI after an injection from one or more of the Three Contaminated MPA Lots, and (b) antifungal treatment.

B.     "Anti-Fungal Treatment" as used in these standards of proof requires presentation of medical records documenting the length of treatment with Amphotericin B, Voriconazole, Posaconazole, Itraconazole and/or Isavuconazole after injection from one or more of the Three Contaminated MPA Lots.

C.     Lumbar puncture adjustment will require medical records documenting one or more lumbar punctures after injection from one or more of the Three Contaminated MPA Lots and before December 31, 2014.

60

D.      Stroke adjustment requires medical documentation of a diagnosis of cerebrovascular accident/stroke (but not a transient ischemic attack only) after injection from one or more of the Three Contaminated MPA Lots and a diagnosis of fungal meningitis.  If the cerebrovascular accident/stroke occurred on or before December 31, 2012, the IPSA may presume that the stroke was the result of the MPA injection or complications arising therefrom unless there is reason to believe that the stroke was the result of an unrelated event (i.e., the Claimant has a past history of strokes).  For strokes where there is a reason to believe that it is unrelated to the MPA injection or complications arising therefrom, or for strokes occurring after December 31, 2012, proof deemed sufficient by the IPSA that the stroke was the result of the MPA injection or complications therefrom is required.

E.      Renal Failure adjustment may be established by any of the following records that show that the kidney disease is linked to an injection of one or more of the Three Contaminated MPA lots, or complications arising therefrom either by: (i)  medical records or a treating physician statement that state that the Claimant or decedent suffers or suffered  from Stage 3, 4, or 5 kidney disease which began within 12 months after injection from one or more of the Three Contaminated MPA Lots or the kidney disease is linked to an injection of one or more of the Three Contaminated MPA lots, or complications arising therefrom or (ii) medical records documenting acute renal insufficiency within 30 days of the first treatment with amphotericin B.   Proof of acute renal insufficiency shall consist of medical records documenting a glomerular filtration rate ("GFR") of <60 within 30 days following treatment with amphotericin B.  The applicable GFR score is the GFR score listed for the patient's race (non-African American or African American).  If GFR scores are not available, medical records documenting a Creatinine Clearance ("CrCl") level within 30 days after the first treatment with amphotericin B, where such CrCl level is commensurate with a GFR of less <60 is sufficient.

61

F.      Vertebral osteomyelitis may be established by medical records that document (a) a diagnosis of vertebral osteomyelitis after injection from one or more of one or more of the Three Contaminated MPA Lots, and (b) antifungal treatment.

V.      Death Adjustments.  Any administrator or executor making a claim on behalf of a decedent who seeks an award of additional points based upon surviving beneficiaries shall provide documentary evidence of dependent and/or adult children as of the date of death.

A.      Dependent Child.  For Dependent Children Adjustment:

(1)      A child is considered to have been dependent on the decedent if he or she is: (a) under the age of 21 as of the date of death and listed as a qualifying dependent child on the decedent's 2011 or 2012 federal income tax return; or (b) a natural or legitimate child under the age of 21 as of the date of death; or (c) an adopted child under the age of 21 as of the date of death; or (d) a stepchild under the age of 21 as of the date of death who lived with the decedent in a regular parent-child relationship at the time of the decedent's death or there are reasons why the stepchild did not live with the decedent (i.e., medical reasons, to attend school or other similar reasons); or (e) under the age of 21 as of the date of death who lived with the decedent in a regular parent-child relationship at the time of the decedent's death or did not live with the decedent because of medical reasons, to attend school or other similar reasons, and to whose support the decedent made regular and substantial contributions.

(2)      Proof that a child was under 21 as of the date of death may be provided by submitting the decedent's 2011 or 2012 federal tax return listing the child as a dependent and listing the child's date of birth, or by submitting a certified birth certificate of the child.

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

(3)     Proof of dependency may be provided as follows: (a) a copy of the decedent's federal tax return for 2011 or 2012, listing the child (ren) as a qualifying dependent child and listing his or her date of birth; (b) a certified birth certificate that indicates that a child was a natural or legitimate child of the decedent. In the event that decedent's name does not appear on the birth certificate, proof may be provided by documentation evidencing a judicial determination of support; (c) for domestic adoptions, a copy of a revised birth certificate showing the decedent as a parent. For foreign adoptions, proof may be provided by submitting a copy of the adoption decree and, if applicable, documentation showing the child's change of name.  Since rules for foreign adoptions vary by country, alternative and/or additional documentation may be required by the Settlement Administrator; (d) for a child that was a stepchild, a certificate of marriage, evidencing the marriage of the child's biological parent and the decedent, and a certified birth certificate or documentation evidencing a judicial determination of support and a signed statement from a person with direct knowledge that verifies that the stepchild lived with the decedent in a regular parent-child relationship at the time of decedent's death or describing the reasons why the stepchild did not live with the decedent (i.e., for medical reasons, to attend school, or for other similar reasons); (e) if dependency is claimed on the basis of the decedent having made regular and substantial contributions to the support of the child, a signed statement from a person with direct knowledge that verifies that the child (or children) lived with the decedent in a regular parent-child relationship at the time of the decedent's death or describing the reasons why the child did not live with the decedent (i.e., for medical reasons, to attend school, or for other similar reasons) and one or more of the following proofs: (1) evidence of eligibility as a dependent child for benefits under State or Federal programs; (2) cancelled checks, money orders, or receipts for periodic payments received from the decedent for or on behalf of the child; (3) evidence of goods or services that show regular contributions of considerable value from the decedent for or

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

on behalf of the child; or (4) proof of coverage of the child as a family member under the decedent's Federal Employees Health Benefits enrollment or private health insurance.

B.   Spouse.  For Spousal Adjustment, the decedent's certified death certificate.

C.   Adult Children.  For Adult Children Adjustment, listing of name, date of birth, and current address of each surviving natural or adopted adult child as of decedent's date of death on the Claims Form and a copy of the decedent's obituary identifying the surviving natural or adopted adult child(ren), or a signed statement from a person with direct knowledge that the decedent was survived by a natural or adopted adult child(ren) and identifies the surviving adult child(ren).

D.   Siblings.  For Siblings Adjustment, listing of name, date of birth, and current address of each surviving sibling as of decedent's date of death on the Claims Form and a copy of the decedent's obituary identifying the surviving sibling, or a signed statement from a person with direct knowledge that the decedent was survived by a sibling and identifies the surviving sibling.

VI.   Past Medical Bills.  For Claimants seeking an award based on past medical bills, the Claimant will need to supply a statement from either the treating physician or a physician qualified to offer the opinion that the medical treatment and the expenses presented are related to the care and treatment provided to the Claimant after receiving an injection from one or more of the Three Contaminated MPA Lots , and that the treatment, care and medical expenses are connected to the medical conditions that are causally connected to the injection from one or more of the Three Contaminated MPA Lots .

VII.   Claim for Past Lost Wages.  Any Claimant who is making a claim for lost wages of less than $2,000.00 may do so by providing a signed statement from his or her employer stating the time missed from work (which the Claimant attributes to the

64

complications resulting from having received an injection of MPA from one or more of the Three Contaminated MPA Lots) and the rate(s) of pay during such period(s) of missed work, or by producing employment records of the same.

For lost wages claims in excess of $2,000.00, the Claimant may provide either a federal tax return for 2011 (filed either jointly or individually) or the Claimant's 2011 W-2s, 1099s and/or 10-Ks, and the same documentation for each of the years 2012, 2013 and 2014, plus a statement from the Claimant's current or past employer (if self-employed, a statement by the Claimant) that the Claimant missed time from work during the time periods or by producing employment records of same; Claimant shall also produce documentation from either his/her treating physician or a qualified physician that the reason for termination or the inability to work was due to medical complications related to the MPA injection.

VIII.    <u>Future Medical Expenses</u>.  Any Claimant who makes a claim for Future Medical Expenses must provide a letter or statement from a treating physician or other qualified physician supporting such claim. In addition, if a Claimant seeks Future Medical Expenses in excess of $50,000 and for a period of greater than two (2) years into the future, then the Claimant must provide a life care plan prepared by an individual who has been previously qualified to provide opinion testimony on this topic in a Virginia state court. In addition, any claim for Future Medical Expenses to be incurred over a period greater than two (2) years must include a growth rate of 5.25% and a discount rate of 4% (if less than 10 years) and a discount rate of 4.5% (if greater than 10 years). Otherwise, such proof may be established with statements from treating physicians.

IX.    <u>Future Lost Wages</u>.  Any Claimant who makes a claim for Future Lost Wages must provide a letter or statement from a treating physician or other qualified physician supporting such claim.  Any Claimant seeking an award for future lost wages and/or other employment benefits in excess of $50,000 and for a period greater than two (2)

65

Case 1:13-md-02419-RWZ   Document 1831-1   Filed 05/08/15   Page 98 of 150

years and involves projected growth of wages and/or employment benefits must apply a wage/benefits growth rate of 2% (if less than 10 years) and 2.5% (if greater than 10 years) or provide a report from a qualified economist or other expert who has previously been qualified to provide such opinion testimony in a Virginia state court justifying application of any other rate. Claims greater than two (2) years must also apply a discount rate of 4% (if less than 10 years) and a discount rate of 4.5% (if greater than 10 years).  If more than five years of Future Lost Wages are sought, the Claimant must submit the opinion of a vocational rehabilitation expert or other qualified expert addressing any mitigating employment factors such as the ability to obtain other employment in another field.

66

5002/684/6986214v1

5002/684/7072676v1

5002/684/7042905v2

| Comparison Details | |
|---|---|
| Title | **pdfDocs compareDocs Comparison Results** |
| Date & Time | 4/13/2015 12:16:01 PM |
| Comparison Time | 1.78 seconds |
| compareDocs version | v3.4.11.2 |

| Sources | |
|---|---|
| Original Document | [#7072676] [v1] Insight Claims Resolution Facility Procedures - Final Version (same as ECF 1694-4).docDMS Information |
| Modified Document | [#7042905] [v2] First Amended Insight Claims Resolution Facility Procedures 3.30.14.docDMS information |

| Comparison Statistics | |
|---|---|
| Insertions | 34 |
| Deletions | 45 |
| Changes | 72 |
| Moves | 0 |
| TOTAL CHANGES | 151 |
| | |
| | |
| | |
| | |
| | |

| Word Rendering Set Markup Options | |
|---|---|
| Name | Standard |
| Insertions | |
| Deletions | |
| Moves / Moves | |
| Inserted cells | |
| Deleted cells | |
| Merged cells | |
| Formatting | Color only. |
| Changed lines | Mark left border. |
| Comments color | ByAuthorcolor options] |
| Balloons | False |

| compareDocs Settings Used | Category | Option Selected |
|---|---|---|
| Open Comparison Report after Saving | General | Always |
| Report Type | Word | Track Changes |
| Character Level | Word | False |
| Include Headers / Footers | Word | True |
| Include Footnotes / Endnotes | Word | True |
| Include List Numbers | Word | True |
| Include Tables | Word | True |
| Include Field Codes | Word | True |
| Include Moves | Word | False |
| Show Track Changes Toolbar | Word | True |
| Show Reviewing Pane | Word | True |
| Update Automatic Links at Open | Word | False |
| Summary Report | Word | End |
| Include Change Detail Report | Word | Separate |
| Document View | Word | Print |
| Remove Personal Information | Word | False |

## FIRST AMENDED INSIGHT CLAIMS RESOLUTION FACILITY PROCEDURES ("ICRFP")

## INTRODUCTION AND GENERAL PROVISIONS

An INSIGHT CLAIMS RESOLUTION FACILITY FOR PERSONAL INJURY AND WRONGFUL DEATH CLAIMS (the "ICRF") is hereby established in accordance with the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. (the "Plan"), the Tort Trust Agreement (the "Tort Trust Agreement"), the latter of which establishes the Tort Trust (the "Tort Trust"), and the Provider Settlement Agreement dated February __, 2015 (the "Settlement Agreement") by and between Insight Health Corp. ("Insight"), its insurers Lexington Insurance Company ("Lexington") and Darwin Select Insurance Company ("Darwin") (collectively, the "Insight Insurers"), Image Guided Pain Management, PC ("IGPM"), Dr. John M. Mathis, ("Mathis"), Dr. Robert F. O'Brien ("O'Brien") (collectively, the "Doctors"), their common insurer, Medical Mutual Insurance Company of North Carolina ("Medical Mutual"), Virginia Plaintiffs,[1] and Paul D. Moore, in his capacity as Trustee for the NECC Chapter 11 bankruptcy estate (the "NECC Trustee").[2] Collectively, Insight, IGPM, and the Doctors are referenced herein as "Virginia Insight Providers." The Settlement Agreement resulted from a lengthy mediation

---

[1] Virginia Plaintiffs and their counsel are identified in Attachment A. These Virginia Plaintiffs filed timely lawsuits against the Virginia Insight Providers and participated directly in lengthy mediation process that resulted in the Settlement Amount as defined in the Settlement Agreement.

[2] Unless otherwise defined herein, all capitalized terms used in these ICRFP and not otherwise defined herein shall have the meanings assigned to them in the Settlement Agreement, the Plan, and/or the Tort Trust Agreement.

5002/684/7042905v2

process that formally began on August 22, 2014 and continued until the date of the Settlement Agreement (the "Virginia Mediation"). Counsel for the Virginia Plaintiffs participated in the Virginia Mediation and are referred to herein as "Virginia Counsel."

    A.    <u>Virginia Claimants</u>.

Pursuant to the Settlement Agreement, "Claimant(s)" mean the Virginia Plaintiffs and all other persons who have filed timely proofs of claim or PITWD Addenda in the NECC Chapter 11 Case, or who have been granted leave to file a late claim,  and have NECC Claims[3]  against Insight, IGPM and/or the Doctors for personal injury or wrongful death arising out of the injection(s) of methylprednisolone acetate ("MPA") obtained from New England Compounding Pharmacy, Inc. ("NECC"), lot ##s 05212012@68, 06292012@26, or 08102012@51, (the "Three Contaminated MPA Lots") at the Insight Imaging clinic in Roanoke, Virginia. Claimant(s) demonstrating the eligibility requirements set forth herein are "Eligible Virginia Claimants." "Claimants" include decedents and estate administrators or executors and any person meeting the eligibility requirements of Section III.   Any person whose only claim is one for loss of consortium damages associated with another person or relative's injection is not an Eligible Virginia Claimant and cannot recover under this ICRFP.   If the loss of consortium claim is only a part of an otherwise Eligible Claim, then the Claimant shall not be deemed ineligible, but there

---

[3] **"NECC Claims"** means any and all Claims asserted or that could be asserted by any Person against Insight, IGPM, the Doctors and/or any of the Insurers for personal injury, tort, wrongful death, medical monitoring, or any other economic or noneconomic injury or damage, based upon, arising out of or in any way related to the purchase or administration by or on behalf of Insight, IGPM and/or the Doctors of injectable methylprednisolone acetate or any other drugs or products compounded, produced, sold or distributed by or on behalf of NECC.

2

shall be no award of points under the Matrix for such a claim of loss. Similarly, other than the estate of a decedent, any person whose only claim is one for loss of economic damages associated with another person or relative's injection is not an Eligible Virginia Claimant and cannot recover under this ICRFP. The filing of a Virginia Claimant Compensation Claim Form (as defined below) constitutes participation by the Virginia Claimant's family members in the primary Claim, or the Class D Estate Claim,, and the Class D Consortium Claims of such family members shall be deemed released by the treatment afforded to the Virginia Claimant pursuant to these ICRFP.

      B.    <u>Virginia Provider Fund</u>.

As defined and provided in the Settlement Agreement, certain portions of the Settlement Amount are to be segregated and held for the benefit of the Claimants. This segregated fund is defined as the "ICRFP Segregated Amount" (which, under the Tort Trust, is a Provider Fund). The funds comprising the ICRFP Segregated Amount are referred to herein as the "Virginia Provider Fund." The Settlement Agreement and the payments to be made to the Claimants under these ICRFP do not and will not result in "payment in full" to any of the Claimants for their NECC-related claims as that term is defined under 11 U.S.C. §§ 509(c) and 502(c).

      C.    <u>Discrete Virginia Provider Fund</u>.

The ICRF is established in addition to and separate from the Claims Resolution Facility provided in the Plan (1) to evaluate claims by the Claimants according to the procedures established herein, with the least practicable cost, (2) to determine a fair and equitable

3

compensation amount to be distributed from the Virginia Provider Fund for each Qualified Virginia Claim (as defined herein), and (3) to effectuate such distributions to Qualified Virginia Claimants (as defined herein) as expeditiously as possible.

D.    Appointment of the Insight Provider Settlement Administrator.

To facilitate, effectuate and implement the purposes of these ICRFP, Edgar C. Gentle, III is hereby retained and appointed as Insight Provider Settlement Administrator ("IPSA") to execute the functions described herein in accordance with the terms of these ICRFP, the Tort Trust Agreement and any applicable order of the MDL Court.  The IPSA shall oversee all aspects of the ICRF and shall distribute to the Tort Trustee written instructions for the distribution of Virginia Provider Funds to Qualified Claimants. In the event that the IPSA resigns or is removed from office or is otherwise unable to perform the functions of the IPSA, a successor IPSA shall be recommended by Virginia Counsel subject to confirmation by the MDL Court and opportunity to be heard.  The IPSA shall receive reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings and shall be reimbursed by the Virginia Provider Fund for his reasonable expenses, including travel expenses, reasonably required and incurred in the performance of his duties in accordance with the provisions of these ICRFP and the provisions of any retention agreement between the Tort Trustee and the IPSA. The IPSA and those engaged with him hereunder shall be afforded the rights and privileges of Provider Settlement Administrators under the Tort Trust Agreement, including indemnification as set forth therein.

4

E.     Additional specific authority of the IPSA.

The IPSA shall be delegated and assigned full authority to act as follows or in any other
manner reasonably required in performance of his tasks and responsibilities:

1.   The IPSA shall  communicate with Claimants as required,  receive and process
     claims,  provide advice on forms, procedures and awards under these ICRFP,
     negotiate and resolve liens if requested to do so (consistent with these ICRFP, the
     Plan and the Tort Trust Agreement), undertake any other administrative or clerical
     tasks necessary in the performance of his duties, and, as necessary and/or requested in
     connection with Special Circumstances Petitions (*see* Section V(G) *infra*) or
     otherwise, consult with, provide information and/or support to, and/or be a resource
     for the IPSCA being appointed under these ICRFP.

2.   The IPSA may alter the claims procedures set forth in these ICRFP in such a way as
     he shall deem expeditious and fair; provided however, that no procedural
     modifications shall substantively alter the point allocation amounts, the eligibility
     requirements, the grounds for appeal, or the substantive rights and penalties as set
     forth in these ICRFP (including those within the Points Matrix (Attachment B), and
     the Standards of Proof (Attachment C)).

3.   The IPSA may receive and maintain the confidentiality of copies of PITWD Addenda
     and other confidential information for Claimants under the Virginia Provider Fund.

5

4. The IPSA may adopt a Virginia Claimant Compensation Claim Form that shall be the required means for making a claim for a distribution from the Virginia Provider Fund.

5. To the extent not set forth in this ICRFP, the IPSA may establish the standards of proof that will be permitted to establish eligibility to make a claim and the existence of each element of damages, claims or point calculations under these ICRFP.

6. To the extent not otherwise set forth herein, the IPSA may set deadlines relating to claims against the Virginia Provider Fund.

7. Consistent with these ICRFP (including those within the Points Matrix (Attachment B), and the Standards of Proof (Attachment C)), the IPSA may make determinations on eligibility of Claimants to make claims against, or receive compensation from the Virginia Provider Fund, including determinations as to whether such Claimants are Eligible Virginia Claimants and whether such Claimants hold Qualified Virginia Claim(s) (as defined below).

8. The IPSA may make awards, deny claims and assess costs under these ICRFP, all of which will become final if not appealed to the Appeals IPSA (defined below).

9. The IPSA may entertain petitions to correct errors or mistakes in connection with claims, awards or denials under these ICRFP.

10. The IPSA may perform such other duties as are required under these ICRFP or as the MDL Court may direct or assign.

6

F.    <u>Appointment of the Insight Provider Special Circumstances Administrator</u>.

To facilitate, effectuate and implement the purposes of these ICRFP, Hon. Diane M. Strickland (Ret. Virginia Circuit Court) is hereby retained and appointed as Insight Provider Special Circumstances Administrator ("IPSCA") to execute the functions described herein in accordance with the terms of these ICRFP, the Tort Trust and any applicable order of the MDL Court.  The IPSCA shall hear and decide all Petitions for Special Circumstances (Section V(G)) under these ICRFP. In the event that the IPSCA resigns or is removed from office or is otherwise unable to perform the functions of the IPSCA, the Virginia Counsel shall recommend a successor, subject to confirmation by the MDL Court, after notice and opportunity to be heard. The IPSCA shall receive reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings and shall be reimbursed by the Virginia Provider Fund for her reasonable expenses, including travel expenses, reasonably required and incurred in the performance of her duties in accordance with the provisions of these ICRFP and the provisions of the  retention agreement between the Tort Trustee and the IPSCA.  To the extent required in the execution of her duties, the IPSCA may receive confidential Claimant information in the same manner as provided for the IPSA. Under no circumstances shall the IPSCA be considered to be or held responsible for the actions of the IPSA, whose responsibilities are separate and apart from those of the IPSCA.

G.    <u>Authority of the IPSCA</u>.

The IPSCA shall be delegated and assigned full authority to act as follows:

7

1. The IPSCA may consult with the IPSA in any way expedient in connection with her duties and responsibilities;

2. The IPSCA may, in her discretion, establish the forms, documents, and procedures to be used for a Special Circumstances Petition, which forms may include terms customary with the engagement of arbitrators in binding arbitration.

3. The IPSCA may receive any and all information necessary from the IPSA or the Qualified Virginia Claimants in connection with her duties and responsibilities;

4. The IPSCA may hear, conduct proceedings related to, and make decisions on Petitions for Special Circumstances as deemed appropriate, which may involve denying relief or providing some or all of the relief requested;

5. The IPSCA shall report all decisions made on Petitions for Special Circumstances to the IPSA, who shall distribute the same pursuant to Section V(G)(3);

6. In coordination with the MDL Court, and subject to confirmation and approval by the MDL Court, the IPSCA may conduct hearings and make recommendations for approval of wrongful death settlements and distributions; and propose distribution to the statutory beneficiaries if required. Any petition for approval may be filed within the MDL Court without initiating a separate proceeding. These ICRFP anticipate that statutory approval of wrongful death settlements and settlements for persons under disability may be sought and obtained after the Claimant submits a timely Virginia Compensation Claim Form, and such approval shall not be dependent upon

8

quantifying the specific dollar amount to which the Claimant (or beneficiaries) shall be entitled to receive. To the extent that any associated procedure shall require the convening of parties before the MDL Court, these ICRFP anticipate that such proceedings shall be conducted telephonically if at all possible. These ICRFP further anticipate that multiple applications for approval may be joined in collective motions;

7. To the extent required for approval of settlements for the Virginia Plaintiffs or other Claimants, the IPSCA may appoint guardians *ad litem,* conduct hearings and make recommendations for approval of settlements and distributions involving minors or other persons under disability, subject to confirmation and approval by the MDL Court. Any petition for approval under § 8.01-424 may be filed within the case or matter file under which the IPSCA is appointed within the MDL Court without initiating a separate proceeding;

8. The IPSCA may make recommendations on the reduction or waiver of liens, if any, that may be asserted by private insurers or workers compensation carriers as may deemed appropriate. Subject to confirmation and approval by the MDL Court, the IPSCA may conduct hearings associated therewith, and make associated reports and recommendations;

9. The IPSCA may perform such other duties as are required under these ICRFP or as the MDL Court may direct or assign.

9

10. The IPSCA shall be deemed to be a Provider Settlement Administrator under the Tort Trust and shall have quasi-judicial immunity for all actions taken pursuant to her appointment hereunder, and shall be indemnified in the same manner as a Provider Settlement Administrator pursuant to the Tort Trust; and

11. The IPSCA may take such other acts as the MDL Court may direct or assign.

H.    <u>Appeals Insight Provider Settlement Administrator</u>.

To facilitate, effectuate and implement the purposes of these ICRFP, Hon. Lawrence G. Koontz (Ret. Virginia Supreme Court) is hereby retained and appointed as Appeals Insight Provider Settlement Administrator ("Appeals IPSA") to execute the appeals functions described herein in accordance with the terms of these ICRFP, the Tort Trust and any applicable order of the MDL Court.  The Appeals IPSA shall hear and decide all appeals from decisions of the IPSA and/or the IPSCA, as specified in these ICRFP. In the event that the Appeals IPSA resigns or is removed from office or is otherwise unable to perform the functions of the Appeals IPSA, the Virginia Counsel shall recommend a successor, subject to confirmation by the MDL Court, after notice and opportunity to be heard. The Appeals IPSA shall receive reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings and shall be reimbursed by the Virginia Provider Fund for his reasonable expenses, including travel expenses, reasonably required and incurred in the performance of his duties in accordance with the provisions of these ICRFP and the provisions of any retention agreement between the Tort

10

Trustee and the Appeals IPSA. To the extent required in the execution of his duties, the Appeals IPSA may receive confidential Claimant information in the same manner as provided for the IPSA. The Appeals IPSA shall be deemed to be a Provider Settlement Administrator under the Tort Trust, shall have quasi-judicial immunity for all actions taken pursuant to his appointment hereunder, and shall be indemnified in the same manner as a Provider Settlement Administrator pursuant to the Tort Trust.

I.      Authority of the Appeals IPSA.

The IPSA shall be delegated and assigned full authority to act as follows:

1.  consult with the IPSA in the development of Appeals Forms to be used if a Claimant elects to contest a proposed Award and files an appeal;

2.  in his discretion, establish the documents and procedures to be used for appeals, which documents may include terms customary with the engagement of arbitrators in binding arbitration;

3.  receive and decide all appeals filed and dismiss any appeal that is not filed in a timely manner;

4.  make final and binding decisions on appeals as deemed appropriate, which may involve denying relief or providing some or all of the relief requested;

5.  report all decisions made on appeals to all Qualified Virginia Claimants, including by providing such notice to Virginia Counsel; and

6.  take such other acts as the MDL Court may direct or assign.

11

J.     Notice under ICRFP.

If the Claimant is represented by an attorney as indicated on such Claimant's Virginia Compensation Claim Form, then "notice" as required in these ICRFP  shall be provided to the attorney at the addresses (electronic or otherwise) listed on the Claimant's Virginia Compensation Claim Form unless updated by the Claimant. Notice to Claimants, including Eligible or Qualified Virginia Claimants, not represented by counsel shall be made to the Claimant's address on the Claimant's Virginia Compensation Claim Form. Distributions of funds awarded from the Virginia Provider Fund to Eligible or Qualified Virginia Claimants who are represented by attorneys shall be made payable jointly to the Qualified Virginia Claimant and the attorney (or law firm).  If an Eligible or Qualified Virginia Claimant is not represented by an attorney, distributions shall be made payable to the Qualified Virginia Claimant.

K.     Change of Address.

All Claimants and/or his or her attorney shall be solely responsible for notifying the IPSA of address changes for the Claimant or the attorney and any other changes with respect to the information provided by the Claimant on a completed W-9 form.

**PROCEDURES OF THE INSIGHT CLAIMS RESOLUTION FACILITY**

Pursuant to the Plan, the Tort Trust Agreement, and the Settlement Agreement, the Tort Trustee shall make distributions as per the terms of the Tort Trust Agreement and these ICRFP. Each Eligible Virginia Claimant shall receive his or her individually allocated distribution of the

12

Virginia Provider Fund Net Proceeds as directed under these ICRFP, the Tort Trust Agreement and the awards granted hereunder. Matrix Awards shall be determined by the IPSA, based upon the factors, methodologies and procedures set forth herein. Special Circumstances Petition Awards shall be determined by the IPSCA, based upon the factors, methodologies and procedures set forth herein. Appeals shall be based solely upon the factors, methodologies and procedures set forth herein.

I.       **Distribution of Virginia Compensation Claim Forms**

Immediately following the Effective Date, the IPSA shall request information ("Claim Criteria Data") from the Estate Representative (as defined in the Plan) under Section 5.15 of the Plan, including information sufficient to provide the IPSA with the names and addresses of any persons who claims to have received treatment at the Insight Imaging clinic in Roanoke, Virginia and previously have filed in the NECC Chapter 11 Case a timely Proof of Claim ("POC") or Personal Injury Tort and Wrongful Death Claim Information Form ("PITWD Addendum"). POC's and PITWD Addenda that were not filed before the Bar Date (January 15, 2014 at 4:00 PM, EST) or as ordered and allowed by the Bankruptcy Court thereafter, will be conclusively deemed to be un-timely. Within 30 days after receiving such Claim Criteria Data the IPSA shall mail the Claimants a Virginia Fund Compensation Program Claim Form ("Virginia Compensation Claim Form"), together with instructions, a Base Point Category and Adjustment

13

Calculation Worksheet, and a W-9 Form. As to the Claimants who are Virginia Plaintiffs, notice

and delivery may be accomplished by providing the same documents to counsel for the Virginia

Plaintiffs. To the extent orders are entered allowing individuals to file a POC after the Effective

Date and such individuals claim to have an NECC Claim arising out of treatment at the Insight

Imaging clinic in Roanoke, Virginia (referred to herein as "Late Allowed POC Claimants"), the

IPSA shall mail the Late Allowed POC Claimant the Virginia Compensation Form within 60

days of such order. The Virginia Compensation Claim Form shall be structured so as to first

establish whether the Claimant or Late Allowed POC Claimant holds an Eligible and/or

Qualified Virginia Claim; and, if not, to instruct the Claimant or Late Allowed POC Claimant to

submit only the minimum information necessary.

## II.   Procedures for timely filing Virginia Compensation Claim Forms

   A.   <u>Claimants must submit timely Virginia Compensation Claim Forms on or before
        the Virginia Claim Due Date</u>.

To be eligible to receive compensation from the Virginia Provider Fund, Claimants must

submit a completed and signed Virginia Compensation Claim Form as directed by the IPSA,

together will all supporting documentation required, on or before 90 days from the date on which

the Virginia Compensation Claim Form was mailed ("Virginia Claim Due Date").  All Virginia

Compensation Claim Forms must be postmarked or received by the IPSA by the Virginia Claim

Due Date.  A Virginia Compensation Claim Form that is not received by Virginia Claim Due

Date, or not placed in the U.S. mail with a postmarked date no later than such date, shall be

denied, unless the IPSA finds excusable neglect. The IPSA shall have no further obligation to

14

review or calculate points, categories or damages for any Claim found to be untimely, and absent a successful appeal to the Appeals VSPA, then that Claimant shall be barred from making any recovery from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

The IPSA shall make a final determination of late filing and shall promptly notify the Claimant of such final decision and the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a final determination of late filing may file an appeal with the Appeals IPSA within 30 days of such ruling. The sole ground for reversal on appeal of any such final determination of late filing shall be proof that the Claimant's Virginia Compensation Claim Form was timely postmarked or timely received contrary to the finding of the IPSA.

B.    No Delay or Retention for Potential Late Allowed POC Claimants.

The IPSA shall not specially retain any funds for the purpose of compensating Late Allowed POC Claimants, nor shall the IPSA delay or alter Tentative Matrix Awards or Final Matrix Awards based upon the filing of such claims. If such claim is not received in sufficient time and form to be competed and included in the Tentative Matrix Award without delaying or disrupting that process, then any recovery for such Late Allowed POC Claimant shall be based solely upon such Claimant's point share of the Retention Pool (if any) in comparison with all

15

other Claimants' point shares for such pool. Any award to Late Allowed POC Claimants shall be made without regard to funds already distributed under these ICRFP.

C.    Certification Requirements.

All claims must be signed by the Claimant under the penalties of perjury. The submission of a fraudulent claim will violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and subject those responsible to criminal prosecution in the federal courts. If the IPSA determines that a claim is fraudulent, the claim shall be denied and the IPSA shall so inform the Claimant, and, if the Claimant does not appeal or after all appeals have been resolved against the Claimant, the Tort Trustee.

Each Claimant must also certify that he/she has not transferred his or her right to recover from the Virginia Insight Providers with respect to his or her Claim such that the Claim can be asserted by another person or entity.  The fact that a Claimant has executed a "subrogation" agreement with a health insurer or that a statutory provision grants to any governmental entity or workers compensation provider rights of subrogation shall not of itself be construed as a transfer of the Claimant's right to recover.

D.    Certification of Counsel.

Where any Claimant is represented by counsel in submitting a Virginia Compensation Claim Form and associated documentation for recovery under the Virginia Provider Fund, such counsel's submission of the Claim Form on such Claimant's behalf shall constitute a certification that the Claim Form is filed  consistent with the same standards that apply under Rule 1:4(a) of

16

the Rules of the Supreme Court of Virginia and/or Rule 11 of the Federal Rules of Civil

Procedure when a pleading is filed in state or federal courts.

## III.    Eligibility and Qualification Threshold Requirements

Each Virginia Compensation Claim Form received in a timely manner shall be subject to

an initial limited review by the IPSA to make a threshold decision on whether the eligibility and

classification requirements set forth in this Section III(A) and (B) are satisfied.

A.    **Claim Eligibility Criteria and Requirements.**

1. <u>Virginia Plaintiffs</u>.  In order to be eligible to receive compensation from the Virginia

   Provider Fund, a Claimant must be one of the Virginia Plaintiffs <u>or</u> meet one of the

   other criteria for eligibility noted in Sections III(A)(2) or (3), below.

2. <u>Timely POC/PITWD Filing Requirement</u>. Except as permitted and set forth in

   Sections III(A)(1) and III(A)(3), Claimants must demonstrate that s/he has (a) timely

   filed a POC or PITWD Addendum in the NECC Chapter 11 Case, (b) had a timely

   POC or PITWD Addendum filed on his or her behalf, or (c) received permission by

   Bankruptcy Court order allowing late filing of the POC and PITWD Addendum, and

   filed such POC or PITWD Addendum in a timely manner.

3. <u>Alternative: Claim against Virginia Insight Providers is not time-barred</u>. An exception

   to the requirement in Section III(A)(2) may be applied for person(s) demonstrating

17

that his/her NECC Claims against the Virginia Insight Providers are not barred by the applicable statute of limitations. In this regard, if the person did not file a civil action against one or more of the Virginia Insight Providers on or before September 25, 2014 <u>and</u> if the asserted claim does not involve a person who died within the two years following injection from the Three Contaminated MPA Lots at the Insight Imaging Clinic in Roanoke, then such claim shall be deemed barred by the applicable statute of limitations.

4.  The NECC Estate Representative shall provide the IPSA with information requested pursuant to Section 5.15 of the Plan, sufficient to provide the IPSA with POC's and PITWD Addenda submitted on behalf of Claimants and access to information sufficient to determine if a Claimant meets the Timely POC/PITWD filing requirement set forth in III(A)(2) above. If no timely POC or PITWD Addendum was filed by or on behalf of a given Claimant who does not meet the exceptions of Sections III(A)(1) or III(A)(3), then the IPSA shall deny that Claimant's claim and shall notify the Claimant that such determination is final, unless appealed and shall provide the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a denial determination may file a written appeal with the Appeals IPSA within 30 days of the date the determination was issued. The sole ground for reversal of any such final denial on appeal shall be proof that the Claimant filed a timely POC or PITWD Addendum

18

contrary to the finding of the IPSA. Absent a timely appeal and subsequent reversal, the determination is final, and the Claimant will not be entitled to a payment from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

5.  All Claimants must submit a completed W-9 form with his or her Virginia Compensation Claim Form.  If a completed W-9 form is not submitted by a Claimant, the IPSA shall notify the Claimant that one must be submitted (postmarked or received) within 30 days of the date of such deficiency notice or the claim shall be denied unless otherwise excused by the IPSA.  In the event of such a denial, the IPSA shall notify the Claimant of the denial and the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a denial notice may file a written appeal with the Appeals IPSA within 30 days of the date of mailing of such ruling. The sole ground for reversal of any such final denial on appeal shall be proof that the Claimant's completed W-9 form was timely postmarked or received contrary to the finding of the IPSA. Absent a timely appeal and subsequent reversal, the determination is final, and the Claimant will not be entitled to a payment from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

19

6. All claims asserted by a timely Virginia Compensation Claim Form and not denied for failure to comply with the requirements of this Section shall be deemed to be "Eligible Claims" and persons holding such Eligible Claims shall be deemed "Eligible Virginia Claimant(s)."

B. **Additional Requirements for Qualified Virginia Claim: proof of exposure through injection from one or more of the Three Contaminated MPA Lots at Insight Imaging in Roanoke, VA and viability of claims against Virginia Insight Providers.**

After the threshold determination that a Claimant is an Eligible Virginia Claimant, the IPSA shall further confirm two additional facts in order for the person to be a Qualified Virginia Claimant entitled to participate in substantive points analysis and special circumstances petitions under these ICRFP.

1. Injection Proof. First, the medical or other records submitted by or on behalf of such Eligible Virginia Claimant must establish that the Claimant received injection(s) at the Insight Imaging clinic in Roanoke, Virginia, from one or more of the Three Contaminated MPA Lots or, alternatively, that such injection is established either by the Claim Criteria Data for such Claimant or because such Claimant's name appears on the "Insight List" [as that term is defined in ¶II of Attachment C] ("Injection Proof").

2. Viability Proof. Next, The Eligible Virginia Claimant must demonstrate that s/he filed a timely lawsuit in federal or state court against one or more of the Virginia

20

Insight Providers alleging injury or death as a result of such injection(s) or is otherwise not time-barred from doing so under the applicable Virginia statute of limitations due to death ("Viability Proof"). Lawsuits shall be deemed untimely if they were not filed against one or more of the Virginia Insight Providers on or before September 25, 2014. A date-stamped copy of a filed Complaint, showing filing on or before September 25, 2014, shall be sufficient Viability Proof.  If no such lawsuit has been filed and the statute of limitations has not been tolled or extended by death, then the claim is barred. For those persons who received injection(s) from one of the Three Contaminated MPA Lots at Insight Imaging in Roanoke and then died before September 25, 2014, the IPSA shall calculate the appropriate statute of limitations for determining whether such claims are viable or barred.

3.  <u>Qualified Virginia Claim(s)</u>.  Eligible Virginia Claimants who meet the requirements for Injection Proof and Viability Proof, qualify for all distributions under the Virginia Provider Fund for recovery under the Points Matrix (**Attachment B**), and qualify for the Special Circumstances Petition process set forth herein (Section V(G)). Such claims are designated as "Qualified Virginia Claim(s)" and such Claimants are designated hereafter as "Qualified Virginia Claimants."

21

4. <u>Release of Virginia Providers</u>. In order to receive an award under these ICRFP, all Qualified Virginia Claimants must execute a release of all NECC Claims against the Virginia Providers.

**C.** **Summary rulings on Injection Proof and Viability Proof.**

1. <u>Injection Proof Rulings</u>. If an Eligible Virginia Claimant fails to present Injection Proof  (See Attachment C, §II), the IPSA shall promptly make a ruling denying that Claimant's claim and shall notify the Claimant of such denial and the procedure to appeal to the Appeals IPSA.  Notwithstanding anything contained herein to the contrary, a Claimant receiving such a final ruling may file a written appeal with the Appeals IPSA within 30 days of the date of such ruling. The sole ground for reversal of any such denial on appeal shall be proof (in any form allowed by Attachment C, § II) that the Claimant received injection(s) from the one or more of the Three Contaminated MPA Lots at Insight Imaging in Roanoke contrary to the finding of the IPSA. Absent a timely appeal and subsequent reversal, the determination is final and the Claimant shall receive no award from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

2. <u>Viability Proof Rulings</u>. If an Eligible Virginia Claimant fails to present Viability Proof, the IPSA shall promptly issue a ruling notifying the Claimant that his/her claim

22

does not satisfy the Viability Proof requirements and awarding such Claimant one-half (1/2) point, which shall be the sole award provided under this ICRFP and the Virginia Provider Fund. Any Eligible Virginia Claimant who fails to satisfy Viability Proof shall not be eligible to participate under Section V(G) (Special Circumstances Petition procedures). The IPSA shall have no further obligation to assess or consider factors that would qualify such Claimant(s) for additional points if such Eligible Claims were otherwise viable (i.e., not time barred). The IPSA shall promptly notify the Claimant of such ruling and the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a ruling may file a written appeal with the Appeals IPSA within 30 days of such ruling. The sole ground for reversal of any such Viability Proof ruling on appeal shall be proof that the Claimant has a viable claim against one or more of the Virginia Insight Providers arising from injection of one or more of the Three Contaminated MPA Lots at the Roanoke Insight Imaging clinic (i.e., that such claim(s) is/are not barred by the statute of limitations), contrary to the finding of the IPSA. Absent a timely appeal and subsequent reversal, the determination is final and the Claimant shall receive a final award of ½ point and shall participate in distributions based solely upon such point assignment.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

23

D.      **Administrative Review of forms and documentation submitted by Qualified Virginia Claimants and opportunity to correct errors.**

1.   Review by IPSA. The claims handling and processing aspects of this ICRFP shall be handled by the IPSA who shall review all Virginia Compensation Claim Forms and associated documentation submitted by Qualified Virginia Claimants. The primary purpose of this review is to identify clerical errors, to identify missing documents required to support assertion(s) made by the Qualified Virginia Claimant, and to ensure that Qualified Virginia Claims are properly classified.

2.   Errors or Deficiencies in Claim Submissions. If the IPSA detects errors in the forms, documents and/or information submitted by a Qualified Virginia Claimant, he may elect to do any of the following:

   a)      If the error or deficiency  can be cured or corrected without additional information from the Qualified Virginia Claimant, then the IPSA may cure or correct the error or deficiency using information supplied in the initial filings by the Qualified Virginia Claimant, and shall notify the Claimant's counsel (the Claimant, if unrepresented) of the error or deficiency, and of the cure or correction; or, alternatively, he may notify the Claimant's counsel (the Claimant, if unrepresented) of the error or deficiency and

24

allow opportunity for cure according to the process in subparagraph (b);

b) If the error or deficiency is deemed one that cannot be cured or corrected without additional information from the Qualified Virginia Claimant, the IPSA shall send notice of the deficiency to such Claimant's counsel (the Claimant, if unrepresented), allowing a minimum of 45 days within which to correct the deficiency and file a Corrected Virginia Compensation Claim Form and any supplemental or corrected information in the manner requested by the IPSA. If the Claimant fails to submit sufficient corrections or additional information within the time specified (or an extended time period as allowed by the IPSA, then the IPSA shall do one of the following:

(i) Award points under the Points Matrix for only such portions of the Qualified Virginia Claim as are adequately supported by required documentation and issue a denial as such portions of the Claim that are not supported by the submitted materials; or

25

       (ii)     If the procedure outlined in the previous subparagraph is not feasible, the IPSA may treat the claim as a Base Category VII claim under the Points Matrix, allowing only such additional points (if any) as are supported by the submitted materials.

## IV.    The Points Matrix for assessing points for Qualified Virginia Claims (summary).

Qualified Virginia Claims shall be assigned points based on the criteria set forth in the Matrix attached hereto as **Attachment B** (the "Points Matrix"). The Points Matrix establishes seven base point categories in the same manner as the Claims Resolution Facility Procedures administered by the National Settlement Administrator (the "Base Point Categories"). The Matrix provides for additional points for death case adjustments, past medical bills and lost wages, total number of lumbar punctures, days of antifungal treatment, stroke/renal failure, all as more specifically described in the Points Matrix. The standards of proof required for the award of points are set out in **Attachment C** hereto. Calculations of points attributable to any Qualified Virginia Claim under the Points Matrix shall not be reduced, limited or barred in the event that an otherwise Qualified Virginia Claimant happens to die after January 1, 2015.

26

## V.       Determination of points and payments under the Points Matrix

### A.       Confirmation of Points for Qualified Virginia Claimants.

As soon as practicable after the Virginia Claim Due Date, the IPSA shall segregate the Qualified Virginia Claims for points analysis and confirmation under the Points Matrix. The IPSA shall either (i) accept the points calculations submitted with the Virginia Compensation Claim Form as verified; or (ii) make a revised point calculation based on the Points Matrix or the other terms of these ICRFP. The IPSA shall then total the resulting points awards for all Qualified Virginia Claimants, together with points awarded to Claimants under Sections III(C)(2) (non-viable claims), to determine the "Tentative Total Points".

### B.       Calculation of Tentative Point Value.

The IPSA shall consult with the Tort Trustee to determine the amount of Virginia Provider Fund available for disbursement to Claimants (the "Virginia Provider Fund Net Trust Proceeds"). The Virginia Provider Fund Net Trust Proceeds shall then be reduced by 20%. This subtotal shall then be increased by an amount equal to the funds applied to the Expense Trust under Section VII (initially $700,000), in order to reach a total first distribution amount (the "First Distribution Net Proceeds"). The remaining 20% of the Virginia Provider Fund Net Trust Proceeds, less the amounts applied to the Expense Trust under Section VII, shall be held separately and retained as the "Special Circumstances Pool."

The IPSA shall divide the First Distribution Net Proceeds by the Tentative Total Points in order to obtain a calculated "Tentative Point Value":

27

[(**Virginia Provider Fund Net Trust Proceeds x .80) plus an amount equal to funds applied to the Expense Trust (e.g. $700,000) = First Distribution Net Proceeds**]

[**First Distribution Net Proceeds ÷ Tentative Total Points = Tentative Point Value**]

   C. <u>Tentative Matrix Award</u>.

   The IPSA shall issue a written Matrix Award Form to each Qualified Virginia Claimant informing such person of the total number of points awarded to him/her under the Points Matrix and the tentative award amount obtained by multiplying the Qualified Virginia Claimant's total points by the Tentative Point Value ("Tentative Matrix Award"). The IPSA shall also provide each Qualified Virginia Claimant with a disclosure of the tentative points and awards proposed to be made to all other Eligible and Qualified Virginia Claimants, but without disclosing the names of the other individuals. For the Virginia Plaintiffs or other represented Qualified Virginia Claimants, the Tentative Matrix Award listing shall identify the individual recipients by reference to Claimant's counsel. Notwithstanding the appeals process noted below, mathematical and other such errors which require no substantive analysis may be submitted promptly to the IPSA for modification within the 30 days following the date of the Tentative Matrix Award. Appropriate modifications or corrections may be made accordingly.

   D. <u>Acceptance or Appeal of Tentative Matrix Award</u>.

   In order to contest a Tentative Matrix Award, within 30 days of the date of the Matrix Award Form, each Qualified Virginia Claimant must file a written appeal. Absent extraordinary circumstances (as determined solely by the IPSA), if no appeal as provided for in the next

28

paragraph is postmarked or received within the 30-day period, then the IPSA shall be authorized to declare that the point allocation for such Qualified Virginia Claimant has been accepted, and that person will be paid based upon the points set forth in his/her Matrix Award Form.

The Tentative Matrix Award Form shall notify the Qualified Virginia Claimant of the procedure to appeal the Tentative Matrix Award to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Qualified Virginia Claimant receiving such a Tentative Matrix Award may file a written appeal with the Appeals IPSA within 30 days of the date of such Award. The sole ground for reversal or modification of a Tentative Matrix Award on appeal shall be proof that a factual or mathematical error was made in the number of points originally awarded. Absent a timely appeal and subsequent reversal, a Tentative Matrix Award will be final and binding.

If no timely appeal is filed by any of the Qualified Virginia Claimants regarding their respective Tentative Matrix Awards, then such awards shall be deemed final in all respects and the IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to each of the respective Qualified Virginia Claimants and their counsel (or, if unrepresented to the Qualified Virginia Claimant only) in the amounts indicated on the Tentative Matrix Award Forms based upon the Tentative Point Value. If a timely appeal is filed to any Tentative Matrix Award asserting that an incorrect number of points were assigned, then all Tentative Matrix Awards shall be suspended until a final decision is made on all appeals, allowing confirmation or recalculation of the Tentative Point Value. If any such appeals alter the

29

Tentative Total Points, then the calculation set forth in Section V(B) shall be recalculated based upon the Final Total Points following appeals:

**[First Distribution Net Proceeds ÷ Final Total Points after appeal = Final Point Value]**

    E.    <u>Reissuance of Final Matrix Award notifications following appeal period</u>.

If appeals are filed regarding the Tentative Matrix Awards, resulting in recalculation of Final Total Points as set forth in Section V(D), the IPSA shall re-issue Final Matrix Award Forms to each Qualified Virginia Claimant informing each such person of the new total number of points awarded under the Points Matrix and the Final Point Value, the new dollar value of each point based on that new point total.  Such  Final Matrix Award Form shall set forth the amount of Final Matrix Award, which shall be the dollar amount obtained by multiplying that person's final number of   Matrix Points  by the Final Point Value. The IPSA shall also provide each Claimant and counsel with a disclosure of the final points and Matrix Awards being made to all other Claimants in the same manner as specified in Section V(C). The IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to the respective Claimants and their counsel (or, if unrepresented to the Claimant only) in the amounts indicated on the Final Matrix Award Forms. These and any other awards in this VPCRF shall be subject to satisfying the lien requirements reflected in the Settlement Agreement and in §§ 5.10 and 5.11 of the Plan.

    F.    <u>Assessments of Special Costs</u>.

30

Some Claimants' awards may require additional administrative steps and attention, resulting in costs associated only with such awards. For claims where (i) approval of the settlement or distribution must be separately made (e.g., wrongful death claims, persons under disability, etc.), and (ii) such approval steps require evidentiary hearings with the IPSA beyond mere presentation of the settlement and agreement by the beneficiaries thereto, then the costs of such proceedings shall be assessed against such Claimant's award. For claims where a guardian ad litem is required for any proceeding associated with a Claimant's award, such costs shall be assessed solely against the Claimant's award. Similar assessments shall be allowed for other cases that require specific attention or hearing by the IPSA as part of the claim or award process, apart from Appeals and Special Circumstances Petitions which are addressed separately. For claims where lien resolution services are provided by the IPSA (or similar third party service provider), the costs of such lien resolution services shall be assessed against the Claimants' award.

       G.      <u>Petitions for Special Circumstances</u>

In addition to the Matrix Award, if a Qualified Virginia Claimant, who did not include as part of his/her Claim a request for 10 additional points for "Other Factors," and desires to seek a supplemental award from the Special Circumstances Pool, then within the same 30 day period for appealing the Tentative Matrix Award notifications, the Qualified Virginia Claimant must also file a Special Circumstances Petition with the IPSA, who shall forward such Petitions to the IPSCA for review and decision. The IPSCA may, in her discretion, establish the forms,

31

documents, and procedures to be used for a Special Circumstances Petition. Each Special Circumstances Petition shall not exceed 5 pages, and shall be deemed filed by postmark date or, if not mailed, by date received.

Any Qualified Virginia Claimant who files a Special Circumstances Petition must directly pay, or agree to have his/her Matrix Award reduced by $2,000, which will serve as a filing and processing fee. Qualified Virginia Claimants filing a Special Circumstances Petition will otherwise retain the Matrix Award, and any Award for Special Circumstances shall be in addition thereto and shall be made in the reasonable discretion of the IPSCA based on unique factors and circumstances relating to the Claimant's case. If a Special Circumstances Petition is not filed in a timely manner, it shall be denied and no special award from the Special Circumstances Pool shall be made to that individual.  On timely filed petitions, it is anticipated that the IPSCA may meet with such Claimants if requested.

       1.    <u>Purpose and Standards</u>.

The purpose of the Special Circumstances Petition is to address those situations where the Points Matrix structure is inadequate to fairly account for all harm and loss suffered by some individuals whose unique circumstances make their situation different from others in the same Claims Category.  Those who filed a request for an award of additional points for "Other Circumstances" as part of their initial Claim submitted to the IPSA are not eligible to submit a Special Circumstances Petition.  Merely filing a Special Circumstances Petition will not entitle

32

the Qualified Virginia Claimant to an award from the Special Circumstances Pool as the IPSCA has the discretion to act on each Petition as deemed appropriate.

In making decisions on Special Circumstances Petitions, the IPSCA will be making a discretionary decision guided and informed by the same criteria listed in the Points Matrix, such as Claims Category, Death Case adjustments based on statutory beneficiaries, past medical expenses, future medical expenses, past lost wages, future lost wages, number of lumbar punctures, days of Anti-Fungal Treatment, as well as medical complications, permanent impairments, the impact of third party liens, and other appropriate circumstances which may not be fully reflected in the Points Matrix.

Just as there is no requirement that the IPSCA award funds from the  Special Circumstances Pool to each person who files a Special Circumstances Petition, there is no expectation or requirement that the IPSCA will use or distribute the full Special Circumstances Pool to those who may file petitions when making Special Circumstances Awards.  The goal and purpose of this process is to ensure that persons who are similarly situated be treated the same to the extent possible, understanding there can be unique cases that deserve separate treatment.

2.      No Special Circumstances Awards until all petitions are considered.

The IPSCA shall consider all timely filed Special Circumstances Petitions before making any awards on any Special Circumstance Petitions in order to avoid any possible preference for early filers.  Once all Special Circumstances Petitions have been filed, the IPSCA shall provide

33

the IPSA with a list of all Qualified Virginia Claimants who have filed Special Circumstances
Petitions and the IPSA shall distribute the same to all such Claimants.

### 3. Special Circumstances Award Notifications.

Once the IPSCA has considered all of the Special Circumstances Petitions, she shall
calculate Special Circumstances Awards (including such Awards in which no funds from the
Special Circumstances Pool are awarded) in her discretion and provide such information to the
IPSA. The IPSA shall then prepare Special Circumstances Award Forms notifying each of the
Qualified Virginia Claimants (and his/her counsel if represented) who filed Special
Circumstances Petitions. The Special Circumstances Award Form shall notify the Qualified
Virginia Claimant of the procedure to appeal the Special Circumstances Award (including any
Award in which no funds from the Special Circumstances Pool were awarded) to the Appeals
IPSA. A copy of the Special Circumstances Award Forms shall be sent simultaneously by the
IPSA to Virginia Counsel and to all other Qualified Virginia Claimants, protecting the
personally-identifying information of each such person if they have not given consent to disclose
his/her identity. Notwithstanding anything contained herein to the contrary, any Qualified
Virginia Claimant receiving such a Special Circumstances Award may file a written appeal with
the Appeals IPSA within 30 days of such award. The sole ground for reversal or modification of
a Special Circumstances Award on appeal shall be abuse of discretion by the IPSCA. "Abuse of
discretion" for such appeal(s) may be demonstrated, among other ways, by establishing that the
appealing person's Special Circumstances Award is grossly unfair to that person based on a

34

comparison of the Matrix and Special Circumstances Awards for other similar Qualified Virginia Claimants in the same Claims Category. To the extent necessary, the Appeals IPSA may review the Special Circumstances petitions of other similar Qualified Virginia Claimants in making such an assessment.

4.     Acceptance or Appeal of Special Circumstances Award.

In order to contest a Special Circumstances Award, within 30 days of the date of the Special Circumstances Award, each such Qualified Virginia Claimant must file a written appeal. Absent extraordinary circumstances (as determined solely by the IPSA), if no appeal as provided for in the preceding paragraph is postmarked or received within the 30-day period, then the IPSA shall be authorized to declare that the Special Circumstances Award for such Qualified Virginia Claimant has been accepted. The only person who may file an appeal to a Special Circumstances Award is a Qualified Virginia Claimant who filed a Special Circumstances Petition.  If no timely appeal is filed by any of the Qualified Virginia Claimants regarding their respective Special Circumstances Awards, then all such awards shall be deemed final in all respects. If a timely appeal is noted regarding any Special Circumstances Award, then all other Special Circumstances Awards shall be held in abeyance pending resolution of such appeal.

5.     Final Special Circumstances Calculation.

When all appeals (if any) have been completed and any corresponding modifications of Special Circumstances Awards have been made, the IPSA shall compile a final list of all Awards for Special Circumstances, providing a total amount to be distributed from the Special

35

Circumstances Pool (the "Total Final Special Circumstances Distribution Amount"). Such
information shall be submitted to each Claimant and counsel in the same manner as specified in
section V(c). The IPSA shall forward the appropriate W-9s and provide written notice to the Tort
Trustee directing that payments be made to the respective Qualified Virginia Claimants and their
counsel (or, if unrepresented to the Qualified Virginia Claimant only) in the amounts indicated
on the final Special Circumstances Award forms. Such distributions may or may not be included
with final distributions (if any) from the Remaining Retention Pool, provided that no substantial
delay shall be required in order to combine such distributions.

      6.      <u>Calculation of Remaining Retention Pool</u>.

The IPSA shall calculate the amount remaining (if any) in the Special Circumstances
Pool after deducting the Total Final Special Circumstances Distribution Amount. In consultation
with the Tort Trustee, the IPSA shall then determine what (if any) funds remain to be distributed
from the Virginia Provider Fund. This may include any funds remaining in the Special
Circumstances Pool after all such awards, funds available in the Expense Trust, all interest
accumulated but not previously distributed, as well as funds distributable to the Eligible and
Qualified Virginia Claimants from the Insight Holdback. The total of all such sums, less any
amounts necessary for remaining estimated expenses of the ICRFP, shall be the "Remaining
Retention Pool."

      H.      <u>Final Distributions from Remaining Retention Pool</u>.

36

Once the amount of the Remaining Retention Pool (if any) has been calculated, then a Remaining Retention Pool Point Value shall be calculated by the IPSA by dividing the funds held in the Remaining Retention Pool by the total amount of Final Matrix Award points awarded to all Qualified Virginia Claimants (plus points awards for any Late Allowed POC Claimant Claim Forms have been filed in the intervening period, if any), obtaining a Remaining Retention Pool Point Value. Distributions to each such Eligible and Qualified Virginia Claimant shall then be calculated by multiplying such person's Total Matrix Points by the Remaining Retention Pool Point Value, which amounts shall be reflected in notices provided to each such person.   The IPSA shall provide written notice to the Tort Trustee directing that payments be made to the respective Qualified Virginia Claimants and their counsel (or, if unrepresented to the Eligible and/or Qualified Virginia Claimant only) in the amounts indicated on the Final Distribution Award notices. Such distributions may, if practical, be combined with Special Circumstances Distributions.

I.    Subsequent distributions of any remaining Virginia Provider Fund amounts to be made in the same manner as distributions from the Remaining Retention Pool.

Should any additional funds become available for distribution from the Virginia Provider Fund, (including any funds payable to the Eligible and/or Qualified Virginia Claimants under the Insight Holdback), the procedures and distributions noted for the distributions from the Remaining Retention Pool shall be applied; and such calculations and awards shall be made as promptly as practicable. No appeals shall be allowed from any such subsequent awards.

37

## VI.    Appeals Procedures

A.    <u>Confirmation of Points for Qualified Virginia Claimants</u>.

Appeals shall be made to the Appeals IPSA in the following manner:

1.  <u>Forms</u>. Appeals forms shall be supplied with any notice from the IPSA of an appealable decision. Such appeals must be filed (postmarked or received) within 30 days of the date of notice of an appealable decision. Petitions for appeal shall not exceed 10 pages, and must set forth the basis for the appeal, contain a statement of requested relief, and attach any documents relating to the appeal.

2.  <u>Fees</u>. Any appeal shall require a filing fee of $750, payable to the IPSA. The IPSA shall hold such fees in trust in order offset the costs of appeal to the Virginia Provider Fund. An appealing Qualified Virginia Claimant may satisfy the appeal fee by  agreeing to have his/her Matrix Award reduced by the amount of the appeal fee, but only in circumstances where a Matrix Award is reasonably anticipated in at least the amount of $750.

    a.  If the appealing Qualified Virginia Claimant prevails on his/her appeal, then $500 of the $750 appeal fee shall be refunded to the prevailing appellant, reducing the appeal fee to $250.

38

b.  Before the final distribution from the Virginia Provider Fund, the IPSA shall disburse all appeal fees collected under this Section (if any) to the Tort Trustee to be deposited into the Virginia Provider Fund and distributed to Qualifying Virginia Claimants or paid to reimburse costs and expenses incurred in connection with or reimbursable under these ICRFP.

3.  Hearings.  Appeals may be decided with or without hearings, as determined in the sole discretion of the Appeals IPSA.

4.  Content of record on appeal.  The record on appeal is limited to the record in the proceedings resulting the appeal. Unless otherwise specified in these ICRFP, the appealing Claimant may not submit, nor may the Appeals IPSA consider, any facts or evidence not previously presented by the Qualified Virginia Claimant to the IPSA as part of the claims process that resulted in the notice or decision being appealed.

5.  Basis for reversal or modification of rulings on appeal. The grounds for appeal are specified within applicable sections of these ICRFP that give rise to appeals. To the extent that such grounds are not specified and an appeal is otherwise authorized or allowed, the basis for reversal or modification shall only be factual error.

39

### VII.    Liens, attorneys' fees, and engagement of IPSA for lien resolution.

Any awards in this VPCRF shall be subject to satisfying the lien requirements reflected in the Settlement Agreement Addendum 2 and the Plan (§§ 5.10 and 5.11). Liens that are subject to court adjustment may be heard and decided by the IPSCA, subject to MDL Court approval. Settlements that require lien holder approval unless approved by a court may also be heard and decided by the IPSA, subject to MDL Court approval.

All notices of award to Eligible and Qualified Virginia Claimants under these ICRFP shall disclose  that the award amount is subject to payment of liens and (if applicable) attorneys' fees and expenses pursuant to engagement agreements between the Qualified Virginia Claimant and his/her counsel. Payment of such liens shall be made by the Tort Trustee, unless after the amount of the lien has been negotiated and agreed upon, the Qualified Virginia Claimant is represented by counsel and such counsel agrees to make such payments to the lienholder to the satisfaction of the Tort Trustee and the IPSA.

To the extent that liens are not resolved by the Tort Trustee globally as indicated in §§ 5.10 and 5.11 of the Plan or by Virginia Claimants or their counsel, the IPSA shall be deemed engaged by the affected Claimants for the purposes of resolving any liens in connection with distributions to such Claimants, provided, however, that, for those Qualified Virginia Claimants represented by counsel, the IPSA shall be engaged for purposes of resolving liens only upon written instruction by such counsel.  Notwithstanding the foregoing, if the distribution due an

40

Eligible Claimant under these ICRFP is less than the amount owed on the lien, the IPSA shall discuss the circumstances with the Eligible Claimant prior to any engagement.

## VIII.   Payments of Administrative Expenses

The IPSA shall request from the Tort Trustee an initial expense distribution from the Virginia Provider Fund in the amount of $700,000. It is anticipated that such funds shall be held by the IPSA in trust (the "Expense Trust") for the payment of "Allowed Expenses," as defined below. Allowed Expenses shall include the fees and costs incurred by the IPSA, the IPSCA and the Appeals IPSA, all in accordance with agreements that shall be executed in connection therewith. Additional expense distributions may be requested from the Tort Trustee as authorized by the IPSA and shall be deposited in the Expense Trust with the IPSA in the same manner.

Any fees collected (as opposed to deductions from Awards) in connection with appeals or Special Circumstances petitions, shall be deposited with the IPSA to be held in the same manner. If any such funds are remaining and will not be used for expenses, they shall be forwarded to the Tort Trustee for the Virginia Provider Fund prior to the final distribution to the Eligible and/or Qualified Virginia Claimants and included within such funds for distribution to such individuals.

## IX.    Final Accounting

Following the final distributions from the Remaining Retention Pool and /or Special Circumstances Pool, the IPSA shall furnish a statement reflecting all payments to each Eligible and Qualifying Virginia Claimant as well as the costs distributed from the Virginia Provider

41

Fund. Such statement shall be made available to all Eligible and Qualified Virginia Claimants and their counsel, and distributed as further required by the IPSA or the MDL Court.

## X.    Claims Assistance

The IPSA is authorized to establish a claims assistance procedure for providing information and claims assistance to Claimants and their counsel. Such assistance shall be staffed by employees of the IPSA in a manner to provide assistance regarding ICRFP procedures, eligibility requirements, submission requirements (including the documentation required), denials, deficiencies, the process for curing deficiencies, and other procedural and substantive issues.

42

## ATTACHMENT B

# Points Matrix

**The point assignments made within this Matrix and the Standards of Proof applicable thereto are used solely as tools for proportioning the funds available for distribution to the Claimants under these ICRFP. Such points are in no way to be used for earmarking particular portions of any Claimant's award.**

I.     Seven Claim Base Categories.

This Matrix adopts seven categories of claims which are based on the criteria used in the NECC Claims Resolution Facility Procedures. Eligibility for classification within each category shall be governed by the standards of proof in Attachment C. The terms used in this Matrix assume eligibility requirements set forth in these ICRFP. No Claimant failing to establish the criteria for one of the following Base Categories shall be allowed to participate in the ICRFP distributions.

CATEGORY I:     Death after injection from one of the Three Contaminated MPA Lots at Insight Imaging in Roanoke, Virginia ("MPA injection") and fungal meningitis and/or spinal or paraspinal fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis).

CATEGORY II:     Fungal meningitis with a secondary or related spinal or paraspinal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis) after MPA injection.

CATEGORY III:     Fungal meningitis without secondary infection after a MPA injection.

43

CATEGORY IV:    Spinal or paraspinal (non-meningitis) fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis) after MPA injection.

CATEGORY V:     Fungal Peripheral joint infection (e.g., hip, knee, shoulder, elbow and/or ankle) after MPA injection.

CATEGORY VI:    MPA injection followed by documented symptoms associated with fungal meningitis or other fungal infection, i.e. headache, word-finding difficulty, fever, photophobia, nausea/vomiting, neck stiffness or pain, back pain, urine retention, slurred speech, limb weakness, numbness and/or pain at the injection site, resulting in medical treatment that includes at least one lumbar puncture.

CATEGORY VII:   MPA injection.


II.    <u>Point Allocations</u>.

    A.  <u>Base Points by Category</u>.  Claimants proving that they qualify for these respective Base Categories shall be awarded the following base points:

        i.   CATEGORY I:      60 points

        ii.  CATEGORY II:     50 points

        iii. CATEGORY III:    40 points

        iv.  CATEGORY IV:     20 points

        v.   CATEGORY V:      20 points

        vi.  CATEGORY VI:     5 points

44

vii. CATEGORY VII:     2 points

B. <u>Death Case Adjustments</u>

In Category I cases, the Claimant will be entitled to the following additional points based upon the surviving beneficiaries as defined by Virginia law (Va. Code § 8.01-50, et. seq.): Specifically:

If decedent was survived by a spouse or child, who was under the age of 21 at the time of death, who was a student and still dependent on parent for support, then the Claimant will receive an additional 100 points for each.

If decedent was survived by an adult child, then the Claimant will receive an additional 30 points per child.

If decedent was not survived by a spouse or child, but was survived by a parent, sibling, or a grandchild where the parent was a deceased child of the decedent, then the Claimant will receive 10 points for each of these surviving family members.

C. <u>Past Medical Bills and Wage Loss</u>

As part of each claim, and subject the standards of proof requirements set forth in <u>Attachment C</u>, a Claimant shall be awarded points for documented medical expenses incurred and for lost wages caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA Lots.  The cut-off date for claims for past medical bills and lost wages shall be February 28, 2015.

For each $1000 of either past medical bills related to medical treatment or lost wages caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA

45

Lots, the Claimant will receive 1 pt. per $1000, or a pro rata portion thereof, of all documented medical bills or lost wages incurred through February 28, 2015.  For example, if a Claimant incurred $112,346 in past medical expenses, and $13,500 in lost wages as of February 28, 2015, then the Claimant would receive 112.346 points for past medicals, and 13.5 points for lost wages for a total of 125.846 points under this Criteria II.C.

D.  <u>Future Medical Bills and Future Wage Loss</u>

As part of each claim, and subject to the specific standard proof set forth in <u>Attachment C</u>, a Claimant may be awarded points for properly established claims for future medical treatment and expenses and for lost future wages that will be incurred after February 28, 2015 where such damages are a result of illness and/or complications arising from the injection with the Contaminated Lots.  For each $1000 of either future medical bills or future lost wages resulting from Claimant's injuries related to the medical condition(s) caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA Lots, the Claimant will receive 1/3 pt. per $1000, or a pro rata portion thereof, of all future economic damages.  Claims for future non-medical economic damages shall be treated uniformly with a 4.0% discount rate (less than 10 years) and 4.5% discount rate (if greater than 10 years) and a 2% growth rate (if less than 10 years) and 2.5% growth rate (if greater than 10 years).  For future medical expenses extending into the future for more than two years, the same discount rates shall apply, but the growth rate shall be 5.25%.

46

E.  Total Number of Lumbar Punctures

As part of each claim, other than Category VII claims, and subject to the specific standard proof set forth in <u>Attachment C</u>, for each lumbar puncture the Claimant received, the Claimant will be awarded 2 pts.

F.  Anti-Fungal Treatment

As part of each claim, and subject to the specific standard proof set forth in <u>Attachment C</u>, for each day the Claimant was administered or took anti-fungal medication (IV or orally), the Claimant will receive ¼ pt.

G.  Stroke

As part of each claim, and subject to the specific standard of proof set forth in <u>Attachment C</u>, if the Claimant suffered a documented stroke which is linked to a fungal meningitis diagnosis, then that Claimant will receive 30 additional points.

H.  Renal Failure

As part of each claim, and subject to the specific standard of proof set forth in <u>Attachment C</u>, if the Claimant has suffered from Stage 3, 4, or 5 renal failure which is linked to a fungal infection or to a diagnosis of fungal meningitis, then the Claimant shall receive 30 additional points.

I.  Other Factors

As part of any claim, any Claimant may, as part of the initial Claim submission, include a two page written request to the IPSA for an

47

award of up to an additional 10 points based on what the Claimant considers to be the unusual circumstances of his/her situation, which the Claimant feels are not adequately addressed by the points otherwise assigned by the Matrix.  Any Claimant who files a request for an award of "Other Factors" points as part of his/her Claim, shall be disqualified from making a Special Circumstances Petition, and receiving a Special Circumstances Award.

Simply filing an "Other Factors" request with a Claim does not mean the IPSA will automatically award extra points, and the maximum number of points that may be awarded to any Claimant under this provision shall be 10 additional points.

The IPSA shall consider the written requests that are submitted, and may in her sole discretion,  determine the correct number of additional points to be awarded in connection with each Claimant's "other factors" request.  In doing so, the IPSA may consider the other awards being made to similarly situated Claimants in the same Claim Category, and the nature of unusual circumstances presented in an effort to assess whether the Claimant's Matrix Award based on points otherwise awarded treat the Claimant fairly.

J.  Time-Barred Claims

Any Claimant who submits a claim, but who is found not to have filed a timely civil claim in state or federal court alleging a tort claim against Insight relating to or arising from that individual or his/her decedent having received an injection from one or more of the Three Contaminated MPA Lots at the Insight Imaging clinic in Roanoke, Virginia, will receive an award of only one-half (1/2) point to reflect the fact that the claim is not viable because it is time barred. Time-barred

48

Claimants are excluded from participation in the Special
Circumstances petition process.

III.    <u>Examples of Application of Matrix</u>.

Once the "point value" is determined by the IPSA, the Matrix Award is a
simple mathematical calculation of multiplying the number of points
assigned by the "point value" for the "Matrix Award."

Points in non-death cases would be determined under the Matrix as
follows:

Category +

1 pt. per $1000 of past economic damage +

1/3 pt. per $1000 of future economic damage +

2 pts. for each lumbar puncture +

1/4 pt. per day on antifungal medications +

30 points for a stroke or chronic stage 3, 4 or 5 renal failure +

Extra points (up to 10 pts.) for "other factors" =

TOTAL POINTS

NOTE: Category I cases will receive additional points set forth above if
decedent was survived by statutory beneficiaries.

Example: A Category II case with $150,000.00 of past medical bills and
past wage loss with $45,000.00 of future medicals where Claimant had 5
lumbar punctures and 100 days of antifungal treatment would receive:

Category II                          =         50 points

49

| $150,000 past economics | = | 150 points |
| $45,000 future economics | = | 15 points |
| 5 lumbar punctures | = | 10 points |
| 100 days of antifungals | = | 25 points |
| TOTAL | = | 250 points |

If the "point value" determined by the IPSA is $700.00, then the Matrix Award in this example would be $175,000.00.

IV.   <u>Special Circumstances Petition</u>.

The Claims Process includes an opportunity for those with exceptional and/or unique circumstances which make the Matrix Award inadequate to file a petition with the IPSA for a potential supplemental discretionary award from the Retention Pool.  There is a $2,000 fee required of anyone who desires to file a Special Circumstances Petition, and there is no guarantee of a Special Circumstances Award simply because the petition is filed.  For details, see Section V(G) of these ICRFP.

V.   <u>Appeal Rights</u>.

There is a limited right of appeal of a Matrix Award and/or a Special Circumstances Award as set forth in these ICRFP.

50

# ATTACHMENT C

## Standards of Proof

The following standards of proof will be used to evaluate claims submitted under these ICRFP.

I.   <u>Claims Forms</u>.  Each Claimant must submit a completed Claims Form signed under oath by the Claimant or an authorized representative.

II.   <u>MPA Injection</u>.  Medical or other records documenting an injection from one or more of Lots 05212012@68, 06292012@26 or 08102012@51 of preservative-free Methylprednisolone Acetate ("MPA") compounded by New England Compounding Pharmacy ("NECC") (the "Three Contaminated MPA Lots "), including, e.g.: a letter from Insight informing the Claimant or (where a representative is filing a claim on behalf of another person), the person that s/he received an injection from one or more of the Three Contaminated MPA Lots.  Alternatively the Claimant may request that the IPSA review the list of patients who received an injection from one or more of the Three Contaminated MPA Lots that Insight submitted to the Trustee in 2013 in order to establish the necessary proof of injection (the "Insight List").

III.   <u>Claim Categories</u>.  The seven Base Categories (I – VII) may be established by submitting the following documents, in addition to evidence of a MPA injection (Section II above):

A.   <u>Category I (Death After MPA Injection)</u>.  (a) A certified death certificate documenting death as occurring after injection from one of the Three Contaminated MPA Lots  with the immediate or underlying cause of death containing one of the following words or phrases: meningitis, meningoencephalitis, encephalitis, epidural injection, methylprednisolone injection, steroid injection, exserohilum, aspergillus, abscess, or arachnoiditis; or (b) (i) a certified death certificate and medical documentation of a diagnosis of fungal meningitis, meningoencephalitis, encephalitis after injection from one or more of the Three Contaminated MPA Lots , and (ii)

51

documentation that the Claimant received Anti-Fungal Treatment; or (c) a certified death certificate and medical documentation of a diagnosis of spinal or paraspinal fungal infection (vertebral osteomyelitis, discitis, sacroiliitis or epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of epidural clumping or unevenness of nerve routes after an MRI) after a spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , plus documentation that the Claimant received Anti-Fungal Treatments; or (d) a death certificate and medical documentation that the Claimant suffered cerebrovascular accident/stroke occurring (but not a transient ischemic attack only) on or before December 31, 2012, after injection from one or more of the Three Contaminated MPA Lots ; or (e) a certified death certificate and proof that the Claimant was listed on the Virginia NECC List of death cases.  If such proof is presented for deaths occurring before September 30, 2013, the IPSA shall presume that the death was the result of the MPA injection or complications arising therefrom unless there is cause to believe that the death was a result of an unrelated event (i.e., auto accident, unrelated illness).  For deaths occurring after September 30, 2013, where there is reason to believe that the death resulted from an unrelated event, a certified death certificate and other such proof deemed sufficient by the IPSA to establish the death was the result of a MPA injection or complications arising therefrom.

   B.    <u>Category II (Fungal Meningitis Plus Secondary Fungal Infection)</u>.  Medical documentation of (a) (i) a diagnosis of fungal meningitis, meningoencephalitis, encephalitis after injection from one or more of the Three Contaminated MPA Lots , and (ii) a diagnosis of spinal or paraspinal fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of abnormal thickening, intradural clumping or unevenness of nerve roots after MRI) after spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , <u>plus</u> documentation that the Claimant received Anti-Fungal Treatment; or (b) proof that the Claimant was listed on both the Virginia NECC List of NECC's fungal meningitis or stroke cases and

52

was listed on the Virginia NECC List of NECC's spinal or paraspinal fungal infection cases, or was listed on the Virginia NECC List of NECC's fungal meningitis and spinal or paraspinal injection cases.

C.     <u>Category III (Fungal Meningitis)</u>.   May be established by presenting medical documentation of (a) (i) diagnosis of fungal meningitis, meningoencephalitis or encephalitis after injection from one or more of the Three Contaminated MPA Lots, and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia NECC List of NECC stroke or fungal meningitis cases.

D.     <u>Category IV (Spinal or Paraspinal Fungal Infection (But Not Meningitis))</u>. May be proved by medical documentation of (a) (i) a diagnosis of spinal or paraspinal fungal injection (including vertebral osteomyelitis, discitis, sacroiliitis, epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of abnormal thickening, intradural clumping or unevenness of nerve roots after MRI, after a spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia List of spinal or paraspinal fungal infection cases.

E.     <u>Category V (Fungal Peripheral joint infection (But Not Meningitis))</u>.   May be proved by medical documentation of (a) (i) a diagnosis of fungal peripheral joint infections after joint injection from one or more of the Three Contaminated MPA Lots, and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia NECC List of peripheral joint infection cases.

F.     <u>Category VI (Symptoms and at Least One Lumbar Puncture)</u>.   May be established by presenting contemporaneous medical records documenting that the Claimant suffered on or before March 31, 2013 from one or more of the symptoms listed in the definition of Category VI in §I of Attachment B, after an injection from one or

53

more of the Three Contaminated MPA Lots, and medical records documenting at least one lumbar puncture prior to April 30, 2013.

G.  <u>Category VII (Symptoms and Lumbar Puncture not required)</u>.  Only requires injection from one or more of the Three Contaminated MPA Lots.

IV.  <u>Medical Conditions</u>.

A.  Arachnoiditis may be established by medical records that document (a) the diagnosis of an arachnoiditis, or there must be documentation of intradural clumping or unevenness of nerve roots after MRI after an injection from one or more of the Three Contaminated MPA Lots, and (b) antifungal treatment.

B.  "Anti-Fungal Treatment" as used in these standards of proof requires presentation of medical records documenting the length of treatment with Amphotericin B, Voriconazole, Posaconazole, Itraconazole and/or Isavuconazole after injection from one or more of the Three Contaminated MPA Lots.

C.  Lumbar puncture adjustment will require medical records documenting one or more lumbar punctures after injection from one or more of the Three Contaminated MPA Lots and before December 31, 2014.

D.  Stroke adjustment requires medical documentation of a diagnosis of cerebrovascular accident/stroke (but not a transient ischemic attack only) after injection from one or more of the Three Contaminated MPA Lots and a diagnosis of fungal meningitis.  If the cerebrovascular accident/stroke occurred on or before December 31, 2012, the IPSA may presume that the stroke was the result of the MPA injection or complications arising therefrom unless there is reason to believe that the stroke was the result of an unrelated event (i.e., the Claimant has a past history of strokes).  For strokes where there is a reason to believe that it is unrelated to the MPA injection or complications arising therefrom, or for strokes occurring after December 31, 2012, proof deemed sufficient by the IPSA that the stroke was the result of the MPA injection or complications therefrom is required.

54

E.     Renal Failure adjustment may be established by any of the following records that show that the kidney disease is linked to an injection of one or more of the Three Contaminated MPA lots, or complications arising therefrom either by: (i) medical records or a treating physician statement that state that the Claimant or decedent suffers or suffered  from Stage 3, 4, or 5 kidney disease which began within 12 months after injection from one or more of the Three Contaminated MPA Lots or the kidney disease is linked to an injection of one or more of the Three Contaminated MPA lots, or complications arising therefrom or (ii) medical records documenting acute renal insufficiency within 30 days of the first treatment with amphotericin B.   Proof of acute renal insufficiency shall consist of medical records documenting a glomerular filtration rate ("GFR") of <60 within 30 days following treatment with amphotericin B.  The applicable GFR score is the GFR score listed for the patient's race (non-African American or African American).  If GFR scores are not available, medical records documenting a Creatinine Clearance ("CrCl") level within 30 days after the first treatment with amphotericin B, where such CrCl level is commensurate with a GFR of less <60 is sufficient.

F.     Vertebral osteomyelitis may be established by medical records that document (a) a diagnosis of vertebral osteomyelitis after injection from one or more of one or more of the Three Contaminated MPA Lots, and (b) antifungal treatment.

V.     Death Adjustments.  Any administrator or executor making a claim on behalf of a decedent who seeks an award of additional points based upon surviving beneficiaries shall provide documentary evidence of dependent and/or adult children as of the date of death.

A.     Dependent Child.  For Dependent Children Adjustment:

(1)     A child is considered to have been dependent on the decedent if he or she is: (a) under the age of 21 as of the date of death and listed as a qualifying dependent child on the decedent's 2011 or 2012 federal income tax return; or (b) a natural or legitimate child under the age of 21 as of the date of death; or (c) an adopted

55

child under the age of 21 as of the date of death; or (d) a stepchild under the age of 21 as of the date of death who lived with the decedent in a regular parent-child relationship at the time of the decedent's death or there are reasons why the stepchild did not live with the decedent (i.e., medical reasons, to attend school or other similar reasons); or (e) under the age of 21 as of the date of death who lived with the decedent in a regular parent-child relationship at the time of the decedent's death or did not live with the decedent because of medical reasons, to attend school or other similar reasons, and to whose support the decedent made regular and substantial contributions.

(2)     Proof that a child was under 21 as of the date of death may be provided by submitting the decedent's 2011 or 2012 federal tax return listing the child as a dependent and listing the child's date of birth, or by submitting a certified birth certificate of the child.

(3)     Proof of dependency may be provided as follows: (a) a copy of the decedent's federal tax return for 2011 or 2012, listing the child (ren) as a qualifying dependent child and listing his or her date of birth; (b) a certified birth certificate that indicates that a child was a natural or legitimate child of the decedent. In the event that decedent's name does not appear on the birth certificate, proof may be provided by documentation evidencing a judicial determination of support; (c) for domestic adoptions, a copy of a revised birth certificate showing the decedent as a parent. For foreign adoptions, proof may be provided by submitting a copy of the adoption decree and, if applicable, documentation showing the child's change of name.  Since rules for foreign adoptions vary by country, alternative and/or additional documentation may be required by the Settlement Administrator; (d) for a child that was a stepchild, a certificate of marriage, evidencing the marriage of the child's biological parent and the decedent, and a certified birth certificate or documentation evidencing a judicial determination of support and a signed statement from a person with direct knowledge that verifies that the stepchild lived with the decedent in a regular parent-child relationship at the time of decedent's death or describing the reasons why the stepchild did not live with the decedent (i.e., for medical reasons, to attend school, or for other

56

similar reasons); (e) if dependency is claimed on the basis of the decedent having made regular and substantial contributions to the support of the child, a signed statement from a person with direct knowledge that verifies that the child (or children) lived with the decedent in a regular parent-child relationship at the time of the decedent's death or describing the reasons why the child did not live with the decedent (i.e., for medical reasons, to attend school, or for other similar reasons) and one or more of the following proofs: (1) evidence of eligibility as a dependent child for benefits under State or Federal programs; (2) cancelled checks, money orders, or receipts for periodic payments received from the decedent for or on behalf of the child; (3) evidence of goods or services that show regular contributions of considerable value from the decedent for or on behalf of the child; or (4) proof of coverage of the child as a family member under the decedent's Federal Employees Health Benefits enrollment or private health insurance.

      B.     <u>Spouse</u>.  For Spousal Adjustment, the decedent's certified death certificate.

      C.     <u>Adult Children</u>.  For Adult Children Adjustment, listing of name, date of birth, and current address of each surviving natural or adopted adult child as of decedent's date of death on the Claims Form and a copy of the decedent's obituary identifying the surviving natural or adopted adult child(ren), or a signed statement from a person with direct knowledge that the decedent was survived by a natural or adopted adult child(ren) and identifies the surviving adult child(ren).

      D.     <u>Siblings</u>.  For Siblings Adjustment, listing of name, date of birth, and current address of each surviving sibling as of decedent's date of death on the Claims Form and a copy of the decedent's obituary identifying the surviving sibling, or a signed statement from a person with direct knowledge that the decedent was survived by a sibling and identifies the surviving sibling.

VI.     <u>Past Medical Bills</u>.  For Claimants seeking an award based on past medical bills, the Claimant will need to supply a statement from either the treating physician or a physician qualified to offer the opinion that the medical treatment and the expenses presented are related to the care and treatment provided to the Claimant after receiving

57

an injection from one or more of the Three Contaminated MPA Lots , and that the treatment, care and medical expenses are connected to the medical conditions that are causally connected to the injection from one or more of the Three Contaminated MPA Lots .

VII.     Claim for Past Lost Wages.  Any Claimant who is making a claim for lost wages of less than $2,000.00 may do so by providing a signed statement from his or her employer stating the time missed from work (which the Claimant attributes to the complications resulting from having received an injection of MPA from one or more of the Three Contaminated MPA Lots) and the rate(s) of pay during such period(s) of missed work, or by producing employment records of the same.

For lost wages claims in excess of $2,000.00, the Claimant may provide either a federal tax return for 2011 (filed either jointly or individually) or the Claimant's 2011 W-2s, 1099s and/or 10-Ks, and the same documentation for each of the years 2012, 2013 and 2014, plus a statement from the Claimant's current or past employer (if self-employed, a statement by the Claimant) that the Claimant missed time from work during the time periods or by producing employment records of same; Claimant shall also produce documentation from either his/her treating physician or a qualified physician that the reason for termination or the inability to work was due to medical complications related to the MPA injection.

VIII.     Future Medical Expenses.  Any Claimant who makes a claim for Future Medical Expenses must provide a letter or statement from a treating physician or other qualified physician supporting such claim. In addition, if a Claimant seeks Future Medical Expenses in excess of $50,000 and for a period of greater than two (2) years into the future, then the Claimant must provide a life care plan prepared by an individual who has been previously qualified to provide opinion testimony on this topic in a Virginia state court. In addition, any claim for Future Medical Expenses to be incurred over a period greater than two (2) years must include a growth rate of 5.25% and a discount

58

rate of 4% (if less than 10 years) and a discount rate of 4.5% (if greater than 10 years). Otherwise, such proof may be established with statements from treating physicians.

IX.     <u>Future Lost Wages</u>.  Any Claimant who makes a claim for Future Lost Wages must provide a letter or statement from a treating physician or other qualified physician supporting such claim.  Any Claimant seeking an award for future lost wages and/or other employment benefits in excess of $50,000 and for a period greater than two (2) years and involves projected growth of wages and/or employment benefits must apply a wage/benefits growth rate of 2% (if less than 10 years) and 2.5% (if greater than 10 years) <u>or</u> provide a report from a qualified economist or other expert who has previously been qualified to provide such opinion testimony in a Virginia state court justifying application of any other rate. Claims greater than two (2) years must also apply a discount rate of 4% (if less than 10 years) and a discount rate of 4.5% (if greater than 10 years).  If more than five years of Future Lost Wages are sought, the Claimant must submit the opinion of a vocational rehabilitation expert or other qualified expert addressing any mitigating employment factors such as the ability to obtain other employment in another field.

59