UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| IN RE: NEW ENGLAND COMPOUNDING | ) | |
| PHARMACY, INC. PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | MDL No. 1:13-md-2419-FDS |
| | ) | |
| This Document Relates to: | ) | |
|     All Cases | ) | |
| | ) | |

**NOTICE OF FILING OF PLAN PROPONENTS' REPLY MEMORANDUM OF LAW
(I) IN RESPONSE TO "OBJECTION" TO CONFIRMATION
OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF
DEBTOR NEW ENGLAND COMPOUNDING PHARMACY, INC.,
AND (II) IN FURTHER SUPPORT OF CONFIRMATION THEREOF**

**PLEASE TAKE NOTICE** that, on May 12, 2015, Paul D. Moore, the Chapter 11

Trustee (the "Trustee") for the bankruptcy Estate of New England Compounding Pharmacy, Inc.

("NECC" or the "Debtor") and the Official Committee of Unsecured Creditors of NECC (the

"Official Committee", and together with the Trustee, the "Plan Proponents"), filed the following

document with the United States Bankruptcy Court, a copy of which is attached hereto as Exhibit

A:

> Plan Proponents' Reply Memorandum of Law (i) in Response to "Objection" to
> Confirmation of the First Amended Joint Chapter 11 Plan of Debtor New England
> Compounding Pharmacy, Inc., and (ii) in Further Support of Confirmation Thereof

*[The remainder of this page is intentionally blank.]*

Dated: May 13, 2015

Respectfully submitted,

**DUANE MORRIS LLP**

/s/ Michael R. Lastowski
Michael R. Lastowski, Esq.
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Phone:  (302) 657-4942
Facsimile:  (302) 397-2138

*Counsel to the Chapter 11 Trustee*

**BROWN RUDNICK LLP**

/s/ David J. Molton
William R. Baldiga, Esq.
Kiersten A. Taylor, Esq.
One Financial Center
Boston, MA 02111
Telephone:  (617) 856-8200
Facsimile:  (617) 856-8201


David J. Molton, Esq.
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

*Counsel to the Official Committee*
*of Unsecured Creditors*

61949742

## CERTIFICATE OF SERVICE

I, Carol S. Ennis, hereby certify that on May 13, 2015, I caused a copy of the foregoing Notice to be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants, by first class mail, postage prepaid.


Dated: May 13, 2015
        Boston, Massachusetts                                   /s/ Carol S. Ennis
                                                                  Carol S. Ennis

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| In re:<br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

## PLAN PROPONENTS' REPLY MEMORANDUM OF LAW
## (I) IN RESPONSE TO "OBJECTION" TO CONFIRMATION
## OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF
## DEBTOR NEW ENGLAND COMPOUNDING PHARMACY, INC.,
## AND (II) IN FURTHER SUPPORT OF CONFIRMATION THEREOF

Pursuant to Section 1129 of the United States Bankruptcy Code,[1] Paul D. Moore, the Chapter 11 Trustee (the "Trustee") for the chapter 11 estate of New England Compounding Pharmacy, Inc. ("NECC" or the "Debtor"), and the Official Committee of Unsecured Creditors of NECC (the "Official Committee," and together with the Trustee, the "Plan Proponents"), by and through their undersigned counsel, respectfully submit this Reply Memorandum of Law (the "Reply Memorandum") (1) in reply to the sole pending objection (the "UST Objection")[2] to confirmation of the *First Amended Joint Chapter 11 Plan Of New England Compounding Pharmacy, Inc.* (together with all exhibits, supplements or other documents related thereto filed with this Court, and as may be amended supplemented, or modified, including at Docket No. 1308, the "Plan"),[3] dated February 22, 2015, and (2) in further support of Plan confirmation.

---

[1] Unless otherwise indicated, chapter, section and code references are to title 11 of the United States Code (the "Bankruptcy Code") and rule references are to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

[2] The UST Objection is the *United States Trustee's Objection to Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1272].

[3] Terms not otherwise defined herein have the meaning ascribed to them in the Plan. All descriptions in this Memorandum with respect to the Plan are qualified in their entirety by the Plan as filed, which governs in the event of any inconsistency and should be read in its entirety.

In support of confirmation of the Plan, the Plan Proponents refer to and incorporate by reference the following materials submitted in support of confirmation:

- the *Declaration of Michael F. Barrett, Esq. in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and for Approval of Inspira Settlement* [Dkt. No. 1225]; the *Declaration of Kimberly A. Dougherty in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and for Approval of the High Point Settlement* [Dkt. No. 1226]; the *Declaration of Kimberly A. Dougherty in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and for Approval of the Victory Settlement* [Dkt. No. 1227]; the *Declaration of Frederic L. Ellis in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and for Approval of ARL Settlement* [Dkt. No. 1228]; the *Declaration of Patrick T. Fennell in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and for Approval of Insight Settlement* [Dkt. No. 1229]; the *Declaration of J. Scott Sexton in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. (Relating to Settlement with Insight Health Corp., and Others - Virginia)* [Dkt. No. 1230]; and the *Declaration of Thomas M. Sobol in Support of Approval of the Unifirst Settlement and in Support of Approval of the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1231] (collectively, the "Plaintiffs' Declarations");

- the *Declaration of Henri G. Minette in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1233] (the "Minette Declaration"); the *Declaration of Matthew K. Doonan, Esq. in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1232] (the "Doonan Declaration"); the *Declaration of Gregory Earl Thomas in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1234] (the "Thomas Declaration"); the *Declaration of Mark G. Ledwin on Behalf of Preferred Mutual Insurance Company in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1235] (the "Ledwin Declaration"); the *Declaration of Rita A. Bunch in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1261] (the "Bunch Declaration"); the *Declaration of Joseph A. Ziemianski In Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1284] (the "Ziemianski Declaration"); the *Declaration of Liberty Industries, Inc. in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1293] (the "Liberty Declaration"); the *Declaration of Amanda J. Cox, Esq. in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1296] (the "Cox Declaration"); the *Affidavit of Michael T. Ryan on Behalf of Pharmacists Mutual Insurance Company in Support of the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1300] (the "Ryan Affidavit"); and the

*Declaration Of Brian Robischeau In Support Of Confirmation Of First Amended Joint Chapter 11 Plan Of New England Compounding Pharmacy, Inc.* [Dkt. No 1306] (the "Robischeau Declaration", and collectively, the "Defendants' Declarations");

- the *Declaration of Frederic L. Ellis Concerning the National Compensation Program Established by the Proposed Amended Plan of Reorganization* [Dkt. No. 1236] (the "National Compensation Program Declaration");

- the *Plaintiffs' Steering Committee's Declaration in Support of Approval of the First Amended Joint Chapter 11 Plan* [Dkt. No. 1237] (the "PSC Declaration");

- the *Joint Declaration of Anne Andrews and Michael Coren, as Representatives of the Co-Chairs of the Official Committee of Unsecured Creditors, in Connection With The Official Committee's Support for Confirmation of the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and Approval of the Settlements Contained Therein* [Dkt. No. 1238] (the "Official Committee Declaration");

- the *Plan Proponents' Pre-Confirmation Hearing Memorandum of Law in Support of Confirmation of the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1240] (the "Pre-Confirmation Memorandum"); *Claimant UniFirst Corporation's Statement in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1282] (the "UniFirst Statement"); *Pharmacists Mutual Insurance Company's Memorandum of Law in Support of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1300] (the "PMIC Memorandum", and together with the Pre-Confirmation Memorandum and the UniFirst Statement, the "Memoranda");

- the *Declaration of David J. Molton in Support of the Joint Motion of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors for an Order Approving Plan Support and Settlement Agreement with Liberty Industries, Inc.* [Dkt. No. 1260] (the "Molton Declaration", and, together with the Plaintiffs' Declarations, the Defendants' Declarations, the National Compensation Program Declaration, the PSC Declaration, the Official Committee Declaration, and the Memoranda, the "Declarations and Memoranda");

- the *Declaration of Jung W. Song on Behalf of Donlin, Recano & Company, Inc. Regarding Voting And Tabulation of Ballots Accepting and Rejecting the First Amended Joint Chapter 11 Plan Of New England Compounding Pharmacy, Inc.* (the "Voting Declaration") [Dkt. No. 1294]; and

- the *Declaration of Stephen B. Darr in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.*, and the analysis attached as Exhibit A thereto (the "Liquidation Analysis") [Dkt. No. 1309].[4]

---

[4]     The Plan Proponents reserve all rights to submit further declarations, statements or other materials in support of confirmation of the Plan in advance of the Confirmation Hearing.

In further support of confirmation of the Plan, the Plan Proponents respectfully represent as follows:

### PRELIMINARY STATEMENT

The Plan Proponents are pleased to report to the Court that NECC's creditors have overwhelmingly voted to accept the Plan. Of the 3,558 creditors entitled to vote, 2,673, or over 75%, submitted a ballot. Over **98%** of creditors that voted, including over **99%** of tort claimants and trade creditors, voted to accept the Plan.[5] Both the Official Committee, charged with representing the interests of all of NECC's unsecured creditors, and the Plaintiffs' Steering Committee, charged with representing the interests of all plaintiffs to actions consolidated in the MDL Proceeding, have submitted declarations in support of confirmation. This is an unqualified, and indeed, remarkable demonstration of creditor support (across a broad and diverse creditor body comprised of tort claimants, trade creditors and reimbursement/indemnification claimants) for confirmation of the Plan. Only one step now remains to bring much needed compensation – in the form of a more than $200 million pot built through the coordinated and unrelenting efforts of the Plan Proponents, the Plaintiffs' Steering Committee and others – to the victims of the Outbreak, *i.e.*, this Court's confirmation of the Plan. The Plan Proponents respectfully submit that, upon the substantial proof submitted, the Plan should be confirmed by this Court and the Confirmation Order entered.

---

[5]    The exact number and percentage of each Class that voted to accept the Plan is reflected in the following table:

| Class | Votes | | % Accepted | |
|---|---|---|---|---|
| | **Accept** | **Reject** | **Number** | **Amount** |
| C (General Unsecured Claims) | 23 | 1 | 95.83% | 99.69% |
| D (Tort Claims) | 2591 | 25 | 99.04% | 99.22% |
| E (Subordinated Claims) | 26 | 7 | 78.79% | 94.04% |

There is not before the Court a single pending objection to confirmation from a tort claimant.  In fact, no other general unsecured creditor has objected to the Plan.  Even holders of Class E subordinated claims, who will likely receive no distributions under the Plan, have not objected and have voted for the Plan in both substantial numbers and percentages.  This broad consensus in support of the Plan is made more compelling by the extensive notice of the Plan, and the releases and injunctions contained therein, that the Plan Proponents provided not only to the 3,558 parties who filed proofs of claims against NECC or were otherwise entitled to vote on the Plan, but also to the nearly 20,000 other persons and entities who either received a shipment of the three lots of contaminated MPA produced by NECC or may have been administered MPA that came, or likely came, from one of the contaminated lots.

None of those approximately 23,600 parties objected to the Plan or the third-party releases proposed in the Plan.  Indeed, only the "objection" of the United States Trustee (the "UST") stands in the way of a completely consensual confirmation.  Significantly, although labeled an "Objection", the UST ***does not request that this Court deny confirmation of the Plan, nor does he controvert the substantial evidence provided to this Court in support of the Plan***.  Rather, the UST requests that this Court condition confirmation on findings that the Plan Proponents have demonstrated that the Plan's third-party releases and injunctions comply with applicable law.  As set forth herein and in the Pre-Confirmation Memorandum, and as evidenced by the Declarations and Memoranda, under the undisputed factual circumstances of this case, the Plan releases and injunctions comply with applicable law.  The Plan Proponents therefore respectfully submit that the UST's "Objection" should be overruled, and the Plan should be confirmed.

## REPLY TO UST OBJECTION

1.      The record before this Court, including the Declarations and Memoranda, provides ample (if not overwhelming and undisputed), credible evidence and reasons supporting (1) the propriety of granting third-party non-debtor releases and injunctions in aid thereof granted to <u>each</u> of the beneficiaries of those releases, and (2) how these non-debtor releases and injunctions in aid thereof are necessary and appropriate and comply in all respects with applicable law.  <u>See</u> UST Objection ¶ 14 (arguing that the Plan Proponents must produce such evidence and reasons).

2.      The UST raises two specific concerns with the Plan's releases and injunctions. First, the UST notes that certain beneficiaries thereof may have made no direct contribution to the Plan (but does not go so far as to suggest that this is fatal to Plan confirmation).  Second, the UST points out that the releases are non-consensual (but again, does not claim that a plan containing non-consensual releases is *per se* unconfirmable in this Circuit).  The Plan Proponents address each concern in turn.

**A.    The "Affiliate and Spousal" Releases Are Appropriate**
**Since the Evidence Shows that they are Essential to Consummation**
**<u>of the Plan Settlements and Hence Essential to the Viability of the Plan.</u>**

3.      The "affiliate and spousal" releases in the Plan are unremarkable, as it is customary for parties who have made no direct financial contribution to receive releases when contributions are made by others *on their behalf*.  <u>In re Am. Family Enters.</u>, 256 B.R. 377, 407 (D.N.J. 2000) (approving a release that provided for a permanent injunction against the pursuit of any creditor's claims against funding parties and numerous other released third parties); <u>In re Spiegel Inc.</u>, Case No. 03-11540 (BRL), 2006 Bankr. LEXIS 2158, at *49 (Bankr. S.D.N.Y. Aug. 16, 2006) (noting that "the making of a single contribution on behalf of multiple beneficiaries of a third party plan release is both customary and acceptable").

6

4.      Moreover, here, as set forth in the Declarations and Memoranda, Plan releases and injunctions in favor of each and every one of the Contributing Parties (including those making no direct financial contribution) were ***essential*** components of the settlement agreements reached by the Trustee with the Contributing Parties.[6]  Simply put, NECC's shareholders and the other Contributing Parties ***would not have agreed*** to make their substantial contributions for the benefit of NECC's estate and creditors if their directors, officers, employees and other agents, and spouses, would have remained vulnerable to NECC-related litigation and liability after Plan confirmation.   Among other things, the affiliated parties benefitting from the releases and injunctions also may (1) have had indemnification or contribution rights as against NECC's shareholders and the other Contributing Parties, (2) be named "insureds" whose express consent and release of their "policy rights" were required for the insurers to consummate their settlements with the Chapter 11 Trustee,[7] or (3) otherwise have an identify of interest with NECC's shareholders or other Contributing Parties such that settlement would otherwise prove impossible.[8]  Moreover, with respect to each of those spousal or affiliated party releases and injunctions, the settlements expressly include them solely in such capacities, and not on account of any direct and independent liabilities they otherwise might have with respect to their dealings with NECC.  Where, as is the case with the affiliates of NECC's insiders, such as GDC and Ameridose and their insurers, there was such alleged direct and independent liability, the releases

---

[6]   These "affiliate and spousal" releases were also plainly disclosed in the Disclosure Statement, see Disclosure Statement § 12.5, which itself was sent to every holder of a claim entitled to vote.  As reflected in the Voting Declaration, those claimants overwhelmingly voted to support the Plan.  See Voting Declaration; supra n.5.

[7]   See Rieckborn v. Velti PLC, Case No. 13-cv-03889-WHO, 2015 U.S. Dist. LEXIS 13542, at *48 (N.D. Cal. Feb. 3, 2015) (in the context of a proposed settlement agreement including a bar order, noting that bar order was appropriate where "it is undisputed that the settlement fund will be financed by insurance providers on behalf of [defendants].  These insurers would have little incentive to settle if they could not get a complete release of each of their insureds - otherwise, they would face the likelihood of more litigation.  Further, while the [defendants] have not personally contributed to the fund, the insurers have contributed on their behalf . . .").

[8]   For example, the settlement amounts paid to the NECC estate by certain of NECC's shareholders includes joint monies in which both the relevant shareholder and his or her spouse had an interest.

and injunctions were the subject of entirely separate and independent settlements whereby these affiliates contributed substantial additional amounts.

5.    Accordingly, and as set forth in the Defendant Declarations and the UniFirst Statement as follows, each and every one of the settlements was expressly conditioned on obtaining the "spousal and affiliate" releases now contained in the Plan:

- "UniFirst's insurers have agreed to pay $30.5 million into the NECC estate, if and when—and *only* if and when—certain conditions are met. . . . Specifically, before payment of $30 million is required to be made under the Agreement: (1) this Court must (a) confirm a bankruptcy plan that contains a global release of all claims against UniFirst arising out of its dealings with NECC, and (b) issue an injunction prohibiting any and all such claims going forward . . . the Plan releases and injunctions, including the release and injunction of claims against UniFirst (and its affiliates, agents, and insurers) is . . . essential to consummation of the proposed Plan." UniFirst Statement ¶¶ 4, 16 (emphasis in original);

- "Inspira would not have settled with the Trustee on terms that did not provided for Inspira and its identified employees, affiliates, and agents to be protected from any and all claims arising from our related to the drugs that NECC compounded, including without lamination (i) claims brought or asserted at present or in the future by the tort claimants, who are to be the principal beneficiaries of Inpsira's contributions through the Plan, and (ii) any and all claims for contribution or indemnity.  In that same vein, Juno, Lexington and Ironshore would not have agreed to any settlement if there was any risk that any person or entity who was an insured under the applicable insurance policies would seek coverage for any claim related to NECC.  Inspira, Juno, Lexington and Ironshore would not have contributed the sums each agreed to contribute without the third party releases and injunctions.  As such, the third party releases are critical to the settlement." Doonan Declaration ¶ 13;

- "Insight, Lexington and Darwin would not have settled with the Trustee if Insight and its direct and indirect affiliates and their officers, directors, agents and employees were not protected from further third party claims brought by the tort claimants who are to be the principal beneficiaries of their substantial contributions through the Plan, and protected from all contribution, indemnity and other claims.  A settlement that did not include corporate affiliates, officers, directors, agents and employees would leave Insight-related entities and individuals at risk for future suits, because there is a subset of possible claims as to which the statute of limitations has not run.  This would make Insight vulnerable to future claims for indemnity, because the joint tortfeasor settlement statute in Virginia only extinguishes claims for contribution, and not for indemnity.  The need to protect affiliates through the plan releases and injection is not a theoretical 'belts and suspenders' protection as two of Insight's corporate

8

affiliates, Insight Health Services Corp. and Insight Health Services Holdings Corp., were sued along with Insight by three of the settling Virginia Plaintiffs (*Baker*, *Johnston* and *Wertz*). Thus, a settlement without protection for affiliates through the plan releases and injunction would mean that at the same time Insight would have exhausted its uncontested insurance coverage of $31.5 million with Lexington and Darwin (which also covers Insight's affiliates), and paid out an additional seven million dollars ($7,000,000) of Insight corporate funds, it and its affiliates would continue to have exposure for future claims. There is no way that Insight would settle under such circumstances." Minette Declaration ¶ 14;

- "ARL would not have settled with the Trustee or have waived its rights to defense under the applicable insurance policies if ARL and its employees, affiliates, and agents were not protected from further third party claims brought by the tort claimants who are to be the principal beneficiaries of ARL's contributions through the Plan, and protected from all contribution, indemnity and other claims related to NECC and drugs compounded by it. In that same vein, Landmark would not have agreed to any settlement if there was any risk that any person or entity who was an insured under the applicable insurance policy would seek reimbursement of defense costs to defend any claims against any of them. The only way to eliminate the risk of further defense costs to these insureds was to provide third party releases and an injunction to eliminate the need for them to defend themselves from any claims, and in exchange to secure from the insureds the 'policy releases' Landmark required as a condition to settlement. Effectively, all of the beneficiaries of the third party releases and injunction are contributors in that Landmark could not have contributed what it intends to contribute without the third party releases of all putative insureds, including those not directly contributing funds towards the settlement. Thus, the third party releases and injunction were critical to the settlement." Thomas Declaration ¶ 12;

- "Preferred Mutual is included in the definition of 'Other Contributing Parties' in the Plan and accordingly will, if the Plan is confirmed, be the beneficiary of certain releases and injunctions in aid thereof contained in the Plan. GDC and the various individual insured persons under the insurance policies issued by Preferred Mutual to GDC are also beneficiaries of the Plan's injunction and release provisions. As noted, without the benefit of the Plan release and injunction protections, Preferred Mutual's settlement with the NECC Trustee will fail since these provisions are a material and non-waiveable condition to the Preferred Mutual/GDC Settlement Agreement." Ledwin Declaration ¶ 11;

- "High Point would not have settled with the Trustee if High Point and its employees, affiliates, insurer, and agents were not protected from further third party claims brought by the tort claimants who are to be the principal beneficiaries of High Point's contributions through the Plan. In that same vein, it is my understanding that Ironshore would not have agreed to any settlement if there was any risk that any person or entity who was an insured under the applicable insurance policy would seek reimbursement of defense costs to defend any claims against any of them. The only way to eliminate the risk of further

defense costs to these insureds was to provide third party releases to eliminate the need for them to defend themselves from any claims.  In this fashion, **all** of the beneficiaries of the third party releases are contributors, in that it is my understanding that Ironshore would not have contributed what it intends to contribute without the third party releases, including those not directly contributing funds towards the settlement.  Thus, the third party releases were critical to the settlement."  Bunch Declaration ¶ 9 (emphasis in original);

- "The Plan releases and injunctions apply to Maxum and any insured under the Maxum Policies.  Maxum would not have agreed to any settlement if there was any risk that any person or entity who was an insured under the Maxum Policies would seek indemnity or reimbursement of defense costs to defend any claims against any of them.  The only way to eliminate the risk of further defense costs to these insureds is to provide third party releases to eliminate the need for them to defend themselves from any claims, and in exchange to secure from the insureds the 'policy releases' Maxum required as a condition to settlement.  In this fashion, **all** of the beneficiaries of the third party releases are contributors, in that Maxum could not have contributed what it intends to contribute without the third party releases of all putative insureds, including those not directly contributing funds towards the settlement.   Thus, the third party releases were critical to the settlement."  Ziemianski Declaration ¶ 10 (emphasis in original);

- "Liberty (and its Insurer GAIC) would not have settled with the Trustee or have waived its rights to defense under the applicable insurance policies if Liberty, GAIC and its employees, affiliates, and agents were not protected from further third party claims brought by the tort claimants who are to be the principal beneficiaries of Liberty's contributions through the Plan.  In that same vein, GAIC would not have agreed to any settlement if there was any risk that any person or entity who was an insured under the applicable insurance policy would continue to seek reimbursement of defense costs to defend any claims against any of them.  The only way to eliminate the risk of further defense costs to the Liberty and GAIC  was to provide third party releases to eliminate the need for them to defend themselves from any claims, and in exchange to secure from the insured the "policy releases" GAIC required as a condition to settlement.  In this fashion, **all** of the beneficiaries of the third party releases are contributors, in that Liberty and GAES could not have contributed what they intend to contribute without the third party releases of all putative insureds, including those not directly contributing funds towards the settlement.  Thus, the third party releases were critical to the settlement."  Liberty Declaration ¶ 11 (emphasis in original).

- "Victory would not have participated in the MDL mediation or settled with the Trustee if Victory and its employees, affiliates, and agents were not protected from further third party claims brought by the tort claimants who are to be the principal beneficiaries of Victory's contributions through the Plan.  These third party releases were critical to Victory's ultimate settlement."  Cox Declaration ¶ 15.

- "These releases and injunction are an integral part of the Plan and essential to its implementation, as PMIC has no incentive to provide funding to the Plan if claimants or other insureds are permitted to continue to assert claims against the Insureds or PMIC, who will, in turn, seek insurance coverage from PMIC. Thus, the agreement to make these substantial contributions was expressly conditioned upon PMIC being protected from such claims . . . . . PMIC could not agree to enter into these settlements absent the releases and injunctions contained in the Plan."  Ryan Declaration ¶¶ 19-20.

- "In the absence of the non-debtor releases and injunction provided in the Plan, Victory, Netherlands, and Peerless could face hundreds of individual claims from patients injured by NECC's contaminated vaccine, as well as multiple cross-claims by co-defendants for indemnity. Without the Plan's non-debtor releases and injunctive protection from those claims, Netherlands and Peerless would not have agreed to contribute to the Trustee's fund."  Robischeau Declaration ¶ 18.

6.       In addition, NECC's shareholders agreed to contribute a share of their equity interests in certain affiliated entities, as well as their spouses' interests in certain federal, state and local tax refunds, to the global settlement fund for the benefit of creditors, only if those entities and individuals received the benefits of the Plan releases and injunctions.  _See Declaration of Chapter 11 Trustee in Support of Pending Settlement Motion_s [Dkt. No. 905] ("[T]he contemplated settlements [with NECC's shareholders and insurers] are conditioned upon confirmation of a chapter 11 plan that provides third party releases, both to contributors as well as certain parties who are not direct contributors. . .  [T]he Contributors would not enter into the Insider settlement or waive their rights to defense under the applicable insurance policies if they were not protected from further third party claims from the plaintiffs who are likely to be the principal beneficiaries of their contributions through my chapter 11 plan.").

7.       For these reasons, and as set forth in the Pre-Confirmation Memorandum, the Plan Proponents respectfully submit that the releases and injunctions in favor of _all_ of the Contributing Parties, including the affiliates/agents and spouses of NECC's shareholders and the other settling defendants, were and are absolutely essential to the successful consummation of

the Settlement Agreements and the Plan. Without them, the Settlement Agreements come
undone, as does the Plan.

**B.     That There is No "Opt-Out" Provision
        is, Under Applicable Law, Irrelevant.**

8.      That the Plan releases and injunctions are non-consensual under the present
undisputed, exceptional factual circumstances is unremarkable. The large majority of circuit
courts to have considered the issue have found that non-consensual third-party releases are
permissible in certain exceptional circumstances where the relief is "essential" to the success and
viability of the plan, primarily, as is the case here, in the mass tort context. See Pre-
Confirmation Memorandum ¶ 32 (collecting cases). This was most recently demonstrated by the
Court of Appeals for the Eleventh Circuit in SE Prop. Holdings, LLC v. Seaside Eng'g &
Surveying (In re Seaside Eng'g & Surveying), 780 F.3d 1070 (11th Cir. 2015), in which that
Court explained that its case law is consistent with the "majority" view that a bankruptcy court
may grant non-consensual releases under section 105(a) of the Bankruptcy Code.

9.      Indeed, whether claimants have an ability to "opt out" of plan releases is not
included among the relevant criteria articulated in In re Master Mortgage Inv. Fund, 168 B.R.
930, 934-35 (Bankr. W.D. Mo. 1994), which courts in this District have consulted and adopted in
evaluating the propriety of non-debtor releases. See, e.g., In re Mahoney  Hawkes, LLP, 289
B.R. 285 (Bankr. D. Mass. 2002); In re Salem Suede, Inc., 219 B.R. 922, 930-31 (Bankr. D.
Mass. 1998). And of the circuit-level cases discussing the issue, the majority either do not
articulate an "opt-out" requirement or hold that the presence or absence of an "opt-out provision"
is not dispositive in and of itself. See Nat'l Heritage Found., 2014 U.S. App. LEXIS 12144, at
*19 (noting that "[a] debtor need not demonstrate that every Dow Corning factor weighs in its
favor to obtain approval of a non-debtor release."); Deutsche Bank AG, London Branch v.

12

Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 142 (2d Cir. 2005) (analyzing non-debtor releases is not "a matter of factors and prongs" but rather requires a finding of unique circumstances); Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002) (including, *as among other considerations*, whether the plan provides an opportunity for those claimants who choose not to settle to recover in full) (citing Menard-Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694 (4th Cir. 1989)); In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285 (2d Cir. 1992) (no mention of opt out as a factor in considering the propriety of non-debtor releases).

10.     By contrast, a crucial factor for *all* Circuit-level courts considering the propriety of non-consensual third-party releases is creditor support for the Plan.  See Master Mortgage (relevant considerations include whether a substantial majority of the creditors agree to such injunction, specifically, whether the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment); Dow Corning, 280 F.3d 648 (6th Cir. 2002) (non-debtor or third party releases and injunctions are appropriate where, among other things, the impacted classes have overwhelmingly voted to accept the plan); A.H. Robins Co., 880 F.2d at 702 (overwhelming approval of plan weighed in favor of confirming plan containing non-debtor injunction); Metromedia, 416 F.3d at 142 (same).  Here, tort creditors and other general unsecured creditors have ***overwhelmingly*** voted to accept the Plan (indeed, of the 2,616 tort creditors to have voted on the Plan, only 25, or less than 1%, did not vote to accept).  See supra n.5.  Likewise, over ***90%*** in amount of Class E subordinated claims have voted to accept the Plan.  See id.

11.     Particularly with respect to the op-out issue, the voting results are telling.  An extraordinary percentage of those entitled to vote did in fact vote.  Of the approximately 3,558

parties entitled to vote, 2,591 tort creditors voted in favor of the Plan and only 25 voted against it.[9]  Another 26 of the creditors holding Class E subordinated claims voted in favor of the Plan, with only seven (7) votes against it.  As such, the Plan and the releases and injunctions incorporated therein are overwhelmingly supported by the very parties who might be adversely affected by the releases and injunctions that prevent them from pursuing those who instead are prepared to contribute over $200 million to the NECC estate.

12.    For these reasons, and for the reasons more fully set forth in the Pre-Confirmation Memorandum, there can be no question that the Plan releases and injunctions comply with applicable law.

## ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED

13.    In the Pre-Confirmation Memorandum, the Plan Proponents noted that a demonstration that certain requirements of the Bankruptcy Code were satisfied was dependent on the completion of the voting process.  See Pre-Confirmation Memorandum ¶ 71.  The Voting Declaration demonstrates that those factors are satisfied.

**A.    The Plan is in the Best Interests of Creditors and Interest Holders as Required by Bankruptcy Code Section 1129(a)(7).**

14.    The Bankruptcy Code requires that a Chapter 11 plan be in the best interests of creditors and equity holders.  See 11 U.S.C. § 1129(a)(7).  The "best interests" test requires that, with respect to each impaired class, each holder of a claim or an equity interest in such class either: (i) has accepted the plan or (ii) will receive or retain under the plan on account of its claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors were liquidated under chapter 7 of the

---

[9]    Another 73 tort creditors cast "defective ballots."  Of those 73 tort creditors, 66 voted in favor and 8 abstained from voting.

Bankruptcy Code.  <u>See id.</u>  As demonstrated by the Voting Declaration and the exhibits thereto, each impaired Class entitled to vote (Classes C, D and E) has indeed accepted the Plan.[10]

15.     Thus, the Plan unquestionably satisfies the "best interests" test under Bankruptcy Code Section 1129(a)(7).

**B.      The Plan Complies with Bankruptcy Code Section 1129(a)(8).**

16.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept the plan or be unimpaired under a plan.  Pursuant to Bankruptcy Code Section 1126(c), a class of impaired claims accepts a plan if holders of at least two-thirds in amount and more than one-half in number of the claims in that class actually vote to accept the plan.  <u>See</u> 11 U.S.C. § 1126(c).  A class that is not impaired under a plan, and each holder of a claim or interest in such class, is conclusively presumed to have accepted the plan.  <u>See</u> 11 U.S.C. § 1126(f).  Conversely, a class is deemed to have rejected a plan if the plan provides that the claims or interests of such class do not receive or retain any property under the plan on account of such claims or interests.  <u>See</u> 11 U.S.C. § 1126(g).  Classes C, D and E are impaired under the Plan but have accepted the Plan by sufficient amount and number as required by Bankruptcy Code Section 1126(c).  <u>See</u> Voting Declaration.  Accordingly, the requirements of Section 1129(a)(8) are fully satisfied with respect to Classes C, D and E.

**C.      At Least One Non-Insider Impaired Class of Claims Has Accepted the
Plan, as Required by Bankruptcy Code Section 1129(a)(10).**

17.     Section 1129(a)(10) of the Bankruptcy Code requires that at least one (1) impaired class of claims, not counting insiders, accept a plan before a bankruptcy court can

---

[10]     As made clear in Section 1129(a)(7), the liquidation analysis applies only to non-accepting impaired claims or interests.  Here, all impaired classes have voted to accept the Plan.  <u>See</u> Voting Declaration.  However, the Plan Proponents note that even had one or more of Classes C, D and E rejected the Plan, a Chapter 7 liquidation of the Debtor's estate would result in a distribution that is the same as or lower than the distributions described for those Classes in the Plan, and thus the best interests test would be satisfied even in that event.  <u>See</u> Liquidation Analysis.

confirm a plan impairing one or more classes of claims.  See, e.g., In re P.J. Keating Co., 168

B.R. 464, 470 (Bankr. D. Mass. 1994).  Here, Classes C, D and E have voted to accept the Plan.

See Voting Declaration.  Because such Classes are impaired and do not consist of insiders, the

Plan satisfies the requirements of Bankruptcy Code Section 1129(a)(10).

## **CONCLUSION**

18.    For the foregoing reasons, the Plan Proponents respectfully request that the UST

Objection be overruled and that the Plan be confirmed.

*[Remainder of page intentionally left blank.]*

16

Dated: May 12, 2015
Boston, Massachusetts

Respectfully submitted,

**DUANE MORRIS LLP**

By: /s/ Michael R. Lastowski
Michael R. Lastowski (admitted *pro hac vice*)
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
mlastowski@duanemorris.com

*Counsel to the Chapter 11 Trustee*

-and-

**BROWN RUDNICK LLP**

By: /s/ William R. Baldiga
William R. Baldiga, Esq. (BBO #542125)
Kiersten A. Taylor, Esq. (BBO #681906)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
wbaldiga@brownrudnick.com
ktaylor@brownrudnick.com

and

David J. Molton, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com

*Counsel to the Official Committee of Unsecured Creditors of New England Compounding Pharmacy, Inc.*

17

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

In re:

NEW ENGLAND COMPOUNDING
PHARMACY, INC.,

                        Debtor.

Chapter 11

Case No. 12-19882-HJB

## CERTIFICATE OF SERVICE

I, Carol S. Ennis, hereby certify that on the 12th day of May, 2015, I caused a true and accurate copy of the foregoing Plan Proponents' Reply Memorandum of Law to be served by electronic service via the Court's ECF service to those parties registered to receive electronic service:

In addition, a true and accurate copy was sent by first class mail to the following parties:

Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Darrel Cummings
1871 N.W. 8th Street
Pompano Beach, FL  33069

/s/ Carol S. Ennis
Carol S. Ennis, Paralegal
BROWN RUDNICK LLP
One Financial Center
Boston, MA  02111
Tel.: (617) 856-8200

61947401