**<u>EXHIBIT A</u>**

**Notice**

PART 4

DM3\3296811.1

# PLAN PROPONENTS' EXHIBIT 20

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>               Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

## DECLARATION OF AMANDA J. COX, ESQ. IN SUPPORT OF CONFIRMATION OF FIRST AMENDED JOINT CHAPTER 11 PLAN OF NEW ENGLAND COMPOUNDING PHARMACY, INC.

I, Amanda J. Cox, Esq. submit this declaration in support of confirmation of the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. [Docket No. 1054] (as amended at Docket No. 1154 and thereafter from time to time, and including all exhibits and supplements thereto, the "Plan"), and respectfully state as follows:

1.      Along with Michael P. Sams of Kenney & Sams, P.C., I represent Victory Heating & Air Conditioning Co., Inc. and Victory Mechanical Services, Inc. ("Victory"), and I am authorized to make this declaration on Victory's behalf. The Plaintiff Steering Committee ("PSC") identified Victory as a potentially responsible party in the Multi-District Litigation styled as *In re: New England Compounding Pharmacy, Inc. Products Liability Litigation*, MDL No. 2419, Docket No. 1:13-md-2419 (RWZ) ("MDL"). The MDL consists of approximately 555 separate lawsuits brought by individuals affected by tainted pharmaceuticals New England Compounding Pharmacy, Inc. ("NECC") compounded at its Framingham facility in 2012. Victory installed HVAC systems at NECC's Framingham facility.

2.      To date over three thousand people have filed claims and approximately 686 have filed suits against NECC on the basis that they or their family members were harmed, died or

were otherwise affected by NECC's products.   Apparently due to the volume and wide geographic distribution of the lawsuits confronting it, NECC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  On January 15, 2014, and having been identified as a potentially responsible party, Victory filed proofs of claim in the bankruptcy proceedings against NECC for contribution and indemnification.  Victory subsequently participated in the voluntary mediation program established by the MDL and on November 11, 2014, Victory entered into a settlement agreement with the Chapter 11 Trustee, in consultation and cooperation with the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to § 1102 of the Bankruptcy Code ("Official Committee") and the PSC (the "Victory Settlement Agreement").  Consequently, the definition of "Other Contributing Parties" in the Plan includes Victory.  If the Plan is confirmed, Victory will be the beneficiary of certain releases and injunctions contained in the Plan.

3.     I understand that when evaluating third-party releases and injunctions (such as the Plan releases and injunctions in favor of Victory and others), courts in this Circuit consider the factors set forth in *In re Master Mortgage Invest. Fund, Inc.,* 168 B.R. 930 (Bankr. W.D. Mo. 1994).  The *Master Mortgage* factors relevant to my declaration include: (i) whether there is an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (ii) whether the non-debtor has contributed substantial assets to the estate; and (iii) whether the releases and injunction provided in the Plan are essential to the success and viability thereof and whether, without them, there is little likelihood of success.

4.     I respectfully submit that, concerning the Plan releases and injunctions in favor of Victory, its affiliates, and its insurers, those factors are satisfied.

2

## There Is an Identity of Interest Between NECC and Victory

5.     The PSC identified Victory as a potentially responsible party in the MDL Proceeding, alleging personal injury or wrongful death due to the administration of NECC products at its Framingham facility.  Accordingly, to the extent Victory is or becomes liable to any patient, family or estate thereof, who received an injection of an NECC product, or to that patient's family, estate, or to anyone else related to or arising from the use or injection of NECC's product, Victory has strong and significant claims against NECC for, *inter alia*, contribution and indemnity.  Pursuant to MDL Order Docket #394, Victory filed proofs of claim on January 15, 2014 (Claim Nos. 69 and 71) against the NECC estate on those grounds.  A suit against Victory, then, could be viewed as a suit against NECC.  Such suits, if permitted to continue, would deplete the estates' resources by increasing claims and administrative costs. Absent confirmation of the Plan and the effectiveness of the releases and injunctions contained therein in favor of Victory and its affiliates, Victory intends to pursue its claims against the NECC estate.  As such, there is an identity of interest between NECC and Victory.

## Victory Has Contributed Substantial Assets to the Estate Where It Has No Liability

6.     In an effort to resolve Victory's claims against the NECC estate and the alleged tort claims against Victory, Attorney Michael P. Sams and I participated in 2 days of mediation on July 21 and July 23, 2014 and extensive additional negotiation with the Trustee, his counsel, and representatives of both the Official Committee and the PSC, on behalf of Victory.  Carmen Reiss mediated the matter and related negotiations.  After four months of good faith, arm's-length negotiation, Victory and its insurers, Peerless Insurance and Netherlands Insurance, agreed to contribute $5,500,00.00 to the NECC estate.  The Victory Settlement Agreement was finalized and executed on November 11, 2014.

3

7.    Victory agreed to participate in mediation and ultimately to resolve the claim to avoid the expense and delay of protracted litigation relating to Victory's alleged liability for the harm caused by NECC's products.  Victory has strong legal and factual defenses to liability concerning its alleged role in the meningitis outbreak.

8.    According to all the evidence and two (2) expert opinions, Victory properly installed NECC's HVAC systems four to six years before NECC produced the tainted pharmaceuticals.  The evidence confirms that Victory's installation of the HVAC systems conformed to standard industry practices and the specifications and plans provided to Victory by Liberty Industries, Inc. ("Liberty").  Consistently, third party vendors tested and approved NECC's HVAC systems for proper temperature, pressurization, humidification and filtration in 2006, 2008, and 2011.  According to these licensed third party vendors, NECC's HVAC systems operated properly when tested.

9.    An engineer with expertise in HVAC design and installation analyzed Victory's HVAC installation and the HVAC operation from 2006 to 2012 and concluded to a reasonable degree of professional certainty that: (i) Victory's HVAC installation met and surpassed industry standards; (ii) the systems met all applicable codes and standards; and (iii) Victory provided certified clean room environments confirmed by independent third party testing.

10.    Victory initially provided limited HVAC service to NECC's clean rooms.  NECC, however, discontinued all service agreements with Victory in 2009, more than three years before NECC produced the tainted pharmaceuticals.  State and federal investigators concluded that NECC's poor hygiene practice produced the tainted pharmaceuticals in 2012. An industrial hygienist with experience analyzing the origin, type, and proliferation of biological organisms analyzed the organisms identified at NECC's facilities and in the tainted pharmaceuticals.  He

4

concluded that the HVAC system did not cause or contribute to the contamination. Specifically, he determined that the finding of fungi on the outside of filters in the HVAC system showed that the system was working and collecting contaminants before they entered the cleanrooms. Moreover, he determined that the fungi in the tainted vials did not match any samples found in the HVAC system. Like state and federal investigations, this expert concluded that NECC's poor hygiene practice - not the HVAC systems - provided the source for the contamination.

11. Finally, even if the plaintiffs could show that Victory was somehow negligent in its design, installation, or maintenance of the HVAC system, which it was not, any potential negligence by Victory was broken by later acts of negligence by other parties, including Liberty, NECC, Unifirst Corporation, and the hospitals and healthcare providers that performed the injections.

12. It is highly unlikely that NECC's tort creditors would be able to realize through litigation the significant sum that Victory has contributed to the NECC estate, and certainly would not be able to realize any recovery whatsoever from Victory without incurring the delay, expense and risks of litigation (including the risk that one significant judgment in favor of a tort claimant would significantly deplete the amounts available to pay any others).

13. Victory, Peerless Insurance, and Netherlands Insurance agreed to contribute $5,500.000 to the Trustee's fund to compensate the victims of the contaminated NECC pharmaceuticals. Victory is a Massachusetts, privately held company with minimal assets as it relates to the claims held by the plaintiffs. The only substantial asset available to Victory for contribution to the Trustee's fund is this insurance coverage. More than 90% of Victory's triggered insurance coverage will go to the Trustee's fund as a result of the Victory Settlement Agreement. Additionally, through the Victory Settlement Agreement, Victory will abandon its

two proofs of claim, thus reducing the claims against NECC's estate. Under these circumstances, Victory's contribution is "substantial."

**The Plan Releases and Injunction Are Essential to the Success of the Plan**

14.     In consideration for the Victory Settlement Agreement, the Plan provides Victory with general releases and an injunction permanently barring and enjoining any person or entity from suing Victory for any alleged involvement with NECC or the tainted pharmaceuticals it produced. The Plan releases and injunctions apply to Victory Mechanical Services, Inc., Victory Heating & Air Conditioning Co., Inc., Victory LLC, Victory Heating and Air Conditioning Business Trust, Victory Mechanical Services Business Trust, and all of their respective directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors, successors and assigns. The Plan releases and injunctions also apply to Peerless Insurance and Netherlands Insurance, as insurers of Victory, and all of their respective directors, officers, members, shareholders, owners, principals, employees, attorneys, predecessors successor and assigns.

15.     Victory would not have participated in the MDL mediation or settled with the Trustee if Victory and its employees, affiliates, and agents were not protected from further third party claims brought by the tort claimants who are to be the principal beneficiaries of Victory's contributions through the Plan. These third party releases were critical to Victory's ultimate settlement.

16.     As such, throughout the mediation process, the mutual understanding among Victory, Peerless Insurance, Netherlands Insurance, the mediator, the Trustee, his counsel, and representatives of both the Official Committee and the PSC was that Victory, Peerless Insurance, and Netherlands Insurance would settle only if it represented a final settlement of *all* NECC-related liability; not only that of Victory, Peerless Insurance and Netherlands Insurance, but any

potential liability of Victory Mechanical Services, Inc., Victory Heating & Air Conditioning Co.,
Inc., Victory LLC, Victory Heating and Air Conditioning Business Trust, Victory Mechanical
Services Business Trust, and all of their respective directors, officers, members, shareholders,
owners, principals, employees, attorneys, predecessors, successors and assigns. It was with this
understanding that Victory agreed to make its significant contribution to the NECC estate.

17.     Additionally, the Settlement Agreement negotiated and ultimately entered into by
Victory is a final settlement of ***all*** NECC-related liability; not only that of Victory, Peerless
Insurance and Netherlands Insurance, but any potential liability of Victory Mechanical Services,
Inc., Victory Heating & Air Conditioning Co., Inc., Victory LLC, Victory Heating and Air
Conditioning Business Trust, Victory Mechanical Services Business Trust, and all of their
respective directors, officers, members, shareholders, owners, principals, employees, attorneys,
predecessors, successors and assigns. Specifically, the releases and injunctions permanently bar
and enjoin all persons and entities from pursuing the settled claims against Victory.

18.     As aptly noted in the Disclosure Statement, the releases and injunctions constitute
"major component[s] of the consideration given to the counterparties to the Settlement
Agreements in exchange for their financial contributions to the estate, which shall fund
distributions to Claimants."

19.     I understand that Victory's significant contribution will be an important addition
to a fund to be distributed to NECC's creditors, and that absent Victory's contribution, and those
of similarly-situated parties, NECC's estate would have limited, if any, assets available for
distribution. Moreover, as described above, because of Victory's strong liability defenses, it is
unlikely that NECC's tort creditors would be able to recover any amounts whatsoever from
Victory if the Plan is not confirmed and the releases and injunctions contained therein are not

7

made effective. Despite this, Victory could face a flood of litigation for which NECC would owe it indemnity and contribution obligations. Further, in that scenario, each judgment awarded to an NECC tort creditor would reduce the amount available to pay other tort creditors, as each claim paid under Victory's insurance policies would reduce the amount available to satisfy other claims.

20.     For these reasons, I believe that the Plan releases and injunctions in favor of Victory, its insurers, and agents and affiliates of each not only are appropriate, but are in the best interests of NECC's creditors and are essential to consummating the proposed Plan.

21.     In sum, on behalf of Victory, I respectfully submit that: (i) under the circumstances, the relevant *Master Mortgage* factors are satisfied; (ii) that the Plan releases and injunctions are in the best interest of the NECC estate and its creditors; and (iii) that the Victory Settlement, as embodied in the Plan, best provides for the equitable distribution of Victory's substantial contribution to NECC's creditors. On behalf of Victory, I fully support confirmation of the Plan.

Case 1:18-cv-02419-RWZ Document 125-4 Filed 05/14/15 Page 11 of 146
Case 1:18-cv-02419-RWZ Document 125-4 Filed 05/14/15 Page 11 of 146
Exhibit 20    Page 9 of 12

I certify and declare under the laws of the United States of America and under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed on the 11 day of May, 2015.

Amanda J. Cox, Esq.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### (EASTERN DIVISION)

In re:

NEW ENGLAND COMPOUNDING
PHARMACY, INC.,

         Debtor

Chapter 11

Case No. 12-19882-HJB

## DECLARATION RE: ELECTRONIC FILING

    I, Amanda J. Cox, hereby declare under penalty of perjury that all of the information contained in the Declaration of Amanda J. Cox, Esq. in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc, filed electronically, is true and correct. I understand that this *DECLARATION* is to be filed with the Clerk of Court electronically concurrently with the electronic filing of the Document. I understand that failure to file this *DECLARATION* may cause the Document to be struck and any request contained or relying thereon to be denied, without further notice.

    I further understand that pursuant to the Massachusetts Electronic Filing Local Rule (MEFLR)-7(a) all paper documents containing original signatures executed under the penalties of perjury and filed electronically with the Court are the property of the bankruptcy estate and shall be maintained by the authorized CM/ECF Registered User for a period of five (5) years after the closing of this case.

Dated: May 11, 2015

Signed: _Amanda J. Cox_ _____
                  Amanda J. Cox

61940872

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

|  |  |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>         Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

<u>**CERTIFICATE OF SERVICE**</u>

     I, Carol S. Ennis, hereby certify that on the 11th day of May, 2015, I caused a true and accurate copy of the foregoing Declaration to be served by electronic service via the Court's ECF service to those parties registered to receive electronic service:

<u>/s/ Carol S. Ennis</u>
Carol S. Ennis, Paralegal
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
Tel.: (617) 856-8200

61948725

# PLAN PROPONENTS' EXHIBIT 21

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| NEW ENGLAND COMPOUNDING | ) | |
| PHARMACY, INC., | ) | Case No. 12-19882 (HJB) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF MICHAEL T. RYAN, ESQ.**
**ON BEHALF OF**
**PHARMACISTS MUTUAL INSURANCE COMPANY,**
**IN SUPPORT OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN**
**OF NEW ENGLAND COMPOUNDING PHARMACY, INC.**

I, Michael T. Ryan, submit this declaration (the "Declaration") in support of the confirmation of the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc., dated December 3, 2014 [Docket No. 1054] (as amended at Docket No. 1154 and thereafter from time to time, and including all exhibits and supplements thereto, the "Plan"),[1] and respectfully state, pursuant to 28 U.S.C. §1746, as follows:

1.  I am a partner with the law firm of Merry, Faren & Ryan, P.C. and act as outside counsel and advisor to Pharmacists Mutual Insurance Company ("PMIC") in connection with insurance related matters.  I have acted in that capacity with respect to various insurance issues regarding New England Compounding Pharmacy, Inc. ("NECC" or "Debtor"), including the related settlement negotiations with Paul D. Moore, the duly appointed chapter 11 trustee (the "Trustee") for the NECC estate.  As such, I have personal knowledge of, and am familiar with, the matters stated herein.  I am authorized to submit this Declaration on behalf of PMIC.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan.

2.      PMIC issued to NECC a Special Businessowners Policy, policy number BOP 0068490 07, with a policy period of January 1, 2011 to January 1, 2012, and a Special Businessowners Policy, policy number BOP 0068490 08, with a policy period of January 1, 2012 to January 1, 2013 (collectively, the "Primary NECC Policies").

3.      PMIC issued to NECC a Commercial Umbrella/Excess Coverage Policy, policy number UCL 0068490 07, with a policy period of January 1, 2011 to January 1, 2012 and a Commercial Umbrella/Excess Coverage Policy, policy number UCL 0068490 08, with a policy period of January 1, 2012 to January 1, 2013 (collectively, the "First Excess NECC Policies").

4.      PMIC issued Individual Pharmacist Professional Liability Insurance Policies to certain individuals (the "Individual Policies"); namely, Barry and Lisa Cadden, Glenn and Kathy Chin, Christopher Leary, Gene Svirsiy and Jill Keough (collectively, the "Individual Insureds").

5.      PMIC issued to Ameridose, LLC ("Ameridose") a Businessowners Special Policy, policy number BOP 0083404 05, with a policy period of March 1, 2011 to March 1, 2012; and a Businessowners Special Policy, policy number BOP 0083404 06, with a policy period of March 1, 2012 to March 1, 2013 (collectively, the "Primary Ameridose Policies").

6.      PMIC issued to Ameridose a Commercial Excess/Umbrella Liability Policy, policy number UCL 0083404 04, with a policy period of March 1, 2011 to March 1, 2012 and  a Commercial Excess/Umbrella Liability Policy, policy number UCL 0083404 05, with a policy period of March 1, 2012 to March 1, 2013 (collectively, the "First Excess Ameridose Policies").

7.       Copies of the policies are described more fully in, and attached to, the Affidavit of Nancy D. Adams dated July 11, 2014 [Docket No. 939] (the "Adams Affidavit").

8.      Ameridose together with NECC and the Individual Insureds are collectively hereinafter referred to as the "Insureds".  The Primary NECC Policies, First Excess NECC Policies, the Individual Policies, the Primary Ameridose Policies and the First Excess Ameridose Policies are collectively hereinafter referred to as the "PMIC Policies".

9.      PMIC is included in the definition of "Other Contributing Parties" in the Plan and accordingly will, if the Plan is confirmed, be the beneficiary of certain releases and injunctions in aid thereof contained in the Plan.

10.     Prior to the Petition Date, NECC allegedly compounded and distributed injectable methylpredinisolone acetate ("MPA") and other drugs (collectively, the "Drugs").  In September 2012, certain of the Drugs were alleged to have been contaminated and hundreds of patients who were injected with the Drugs allegedly developed injuries or died, such injuries or deaths allegedly giving rise to claims and causes of action against, *inter alia*, NECC, Ameridose and individuals affiliated with NECC or otherwise involved with the Drugs (the "Outbreak").   As described below, PMIC maintains that the PMIC Policies do not provide coverage to the Insureds for claims arising out of the Outbreak.  Nevertheless, in an effort to avoid the costs and risks of lengthy, expensive and unpredictable coverage litigation, PMIC and the Trustee settled the parties' coverage dispute.   Pursuant to these settlements described below, PMIC is contributing $25 million to the Plan for the benefit of the NECC estate's creditors.   PMIC's agreement to make these substantial contributions to NECC's estate was expressly conditioned upon the releases and injunctions included in the Plan.  Absent such releases and injunctions, PMIC would likely continue to be subject to claims for coverage under the PMIC Policies and, therefore, it would not make business sense for PMIC to provide funding for the Plan only to continue to litigate the existence, or not, of coverage under the PMIC Policies.

3

I. *PMIC's Provision of Insurance Coverage*

    a.  The NECC and Individual Policies

    11.    Broadly stated and subject to the policies' terms, conditions and exclusions, the Primary NECC Policies and First Excess NECC Policies bar coverage for bodily injury arising out of the rendering or failure to render a professional service (the "Professional Services Exclusion"). The Professional Services Exclusion does not, however, apply to bodily injury arising out of an insured's rendering or failure to render "pharmacy services" as that term is defined by the policies.

    12.    NECC, as well as certain employees and individual pharmacists, have sought insurance coverage under the Primary NECC Policies, First Excess NECC Policies and the Individual Policies in connection with various claims arising from the Drugs and the Outbreak (the "Tort Cases"). PMIC, however, contends that the Professional Services Exclusion, among other applicable policy exclusions, bars coverage for the Tort Cases. For this reason, although PMIC is presently defending NECC and the Insiders[2] against the Tort Cases, it is doing so subject to a full and complete reservation of rights to disclaim coverage and withdraw the defense. Further details regarding these coverage disputes can be found in *Pharmacists Mutual Insurance Company's Memorandum of Law in Support of Chapter 11 Trustee's Motion to Approve Compromise of Controversies and Settlements with Pharmacists Mutual Insurance Company and Maxum Indemnity Company,* dated July 11, 2014 [Docket No. 938] at 5-12.

    b.  The Ameridose Policies

    13.    Similar to the policies issued to NECC, subject to the policies' terms, conditions and exclusions, the Primary Ameridose Policies and the First Excess Ameridose Policies

---

[2] The "Insiders" are Barry and Lisa Cadden, Carla Conigliaro and Gregory Conigliaro.

contain a Professional Services Exclusion barring coverage for bodily injury arising out of the rendering or failure to render a professional service the alleged bodily injury arises out of an insured's rendering or failure to render "pharmacy services" as that term is defined by the policies.

14.     Ameridose has sought coverage under the Primary Ameridose Policies and the First Excess Ameridose Policies in connection with the Tort Cases.  The policies that PMIC issued to Ameridose are similar to those issued to NECC and, as such, PMIC maintains that the policies' Professional Services Exclusion, among other exclusions, bars coverage for the Tort Cases.

II.  The Settlement Agreements

15.     Although the availability of coverage for NECC under the PMIC issued insurance policies for the Tort Cases is speculative at best, PMIC negotiated and entered into settlement agreements with NECC and Ameridose.  Pursuant to the settlement agreements, PMIC is making significant contributions to the Plan, which funds will be made available to provide distributions to unsecured creditors in this Chapter 11 Case.  In exchange for these significant contributions, as described herein, the Plan will release PMIC, along with certain other parties, from any and all liability relating to the Drugs, the Outbreak and the Tort Cases.

a.  The PMIC/Maxum Settlement Agreement

16.     On May 2, 2014, the Trustee entered into the PMIC/Maxum Settlement Agreement with PMIC, Maxum Indemnity Company ("Maxum") and the Individual Insureds issued by PMIC and/or Maxum, NECC's second level excess liability insurance carrier.  The PMIC/Maxum Settlement agreement resolved a dispute regarding the coverage liability of PMIC, the Individual Insureds and Maxum.  This Court approved the PMIC/Maxum Settlement

5

Agreement by order dated July 31, 2014 [Docket No. 970].  Pursuant to the terms of the
PMIC/Maxum Settlement Agreement, on August 21, 2014, PMIC made payments to the
Trustee in the amount of $15 million and, on September 2, 2014, Maxum made a payment to the
Trustee in the amount of $10.2 million (collectively, the "PMIC/Maxum Settlement
Payments.")   The PMIC/Maxum Settlement Agreement requires that the PMIC/Maxum
Settlement Payments be held in a separate, interest-bearing account until the Effective Date of
the Plan and, on such date, the PMIC/Maxum Settlement Payments will be deemed irrevocably
and indefeasibly paid to the Trustee for distribution to creditors and other permitted uses under
the Plan.  On the Effective Date, the limits of liability under the Primary NECC Policies and the
First Excess NECC Policies will be exhausted and paid in full.  The PMIC/Settlement
Agreement also provides, among other things, that PMIC and Maxum will receive the benefit of
the Plan's release and injunction provisions.

17.    As evidenced from the terms of the PMIC/Maxum Settlement Agreement, among
other things, the PMIC/Maxum Settlement Agreement is conditioned upon the Insureds
providing PMIC with policy releases.  As a condition to providing such releases, the Insureds
have required that certain of their affiliates be included among the parties who will be released
from Tort Cases and beneficiaries of injunctions against such claims.  As such, the releases and
injunctions for the benefit of such affiliates are a critical part of the PMIC/Maxum Settlement
Agreement.

b.    The Ameridose Settlement Agreement

18.    On November 24, 2014, the Trustee entered into the Ameridose Settlement
Agreement with Ameridose and PMIC.  Pursuant to the Ameridose Settlement Agreement

6

PMIC will make a $10 million payment to the Trustee for eventual distribution to creditors and for other permitted uses under the Plan. On the Effective Date, the limits of liability under the Primary Ameridose Policies and First Excess Ameridose Policies will be exhausted and paid in full. The Ameridose Settlement Agreement also provides, among other things, that the Plan will provide the settling parties with general releases on the Plan Effective Date and an injunction permanently barring and enjoining any person or entity from pursuing claims based on NECC's or Ameridose's operations against the settling parties.

III. The Releases and Injunction

19.     These releases and injunction are an integral part of the Plan and essential to its implementation, as PMIC has no incentive to provide funding to the Plan if claimants or other insureds are permitted to continue to assert claims against the Insureds or PMIC, who will, in turn, seek insurance coverage from PMIC. Thus, the agreement to make these substantial contributions was expressly conditioned upon PMIC being protected from such claims. As set forth above, there are significant coverage defenses to the Insureds' claim for coverage for the Tort Cases and, absent the settlement agreements, PMIC would commence litigation against the Insureds to obtain a declaration that the PMIC Policies do not provide coverage – defense or indemnity – to the Insureds for the Tort Cases.

20.     These settlements have obviated the need for any such coverage litigation, and have ensured that significant contributions will be made to the NECC estate for the benefit of creditors, without the costs and risks of protracted coverage litigation. For the reasons stated, PMIC could not agree to enter into these settlements absent the releases and injunctions contained in the Plan.

21.     I understand that PMIC's significant contribution will be an important addition to a fund to be distributed to NECC's creditors, and that absent PMIC's contribution, and those of similarly-situated parties, NECC's estate would have limited, if any, assets available for distributions.  Moreover, as described above, in light of PMIC's strong defenses to liability, it is by no means certain that NECC's tort creditors would be able to recover any amounts whatsoever from PMIC and those similarly situated if the Plan were not confirmed and the releases and injunctions contained therein were not made effective.  And in that scenario, each judgment awarded to an NECC tort creditor would reduce the amount available to pay to other tort creditors, as each claim paid under the applicable insurance policy would reduce the amount available to satisfy other claims.

22.     For these reasons, I believe that the Plan releases and injunctions in favor of PMIC – which are essential to the confirmation of the proposed Plan – are appropriate and in the best interests of NECC's creditors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 11th day of May 2015

/s/ Michael T. Ryan
Michael T. Ryan

40084171v.6

8

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

In re:

NEW ENGLAND COMPOUNDING
PHARMACY, INC.,
        Debtor.

Chapter 11
Case No. 12-19882 (HJB)

## DECLARATION RE: ELECTRONIC FILING

PART I – DECLARATION OF PETITIONER

    I, Michael T. Ryan, *hereby declare under penalty of perjury* that all of the information contained in my Affidavit (the "Document"), filed electronically, is true and correct.  I understand that this *DECLARATION* is to be filed with the Clerk of Court electronically concurrently with the electronic filing of the Document.  I understand that failure to file this *DECLARATION* may cause the Document to be struck and any request contained or relying thereon to be denied, without further notice.

    I further understand that pursuant to the Massachusetts Electronic Filing Local Rule (MEFLR)-7(a) all paper documents containing original signatures executed under the penalties of perjury and filed electronically with the Court are the property of the bankruptcy estate and shall be maintained by the authorized CM/ECF Registered User for a period of five (5) years after the closing of this case.

Dated: May 11, 2015                 Signed: */s/ Michael T. Ryan*
                                        Michael T. Ryan

PART II – DECLARATION OF ATTORNEY (IF AFFIANT IS REPRESENTED BY COUNSEL)

    I certify that the affiant(s) signed this form before I submitted the Document, I gave the affiant(s) a copy of the Document and this DECLARATION, and I have followed all other electronic filing requirements currently established by local rule and standing order.  This DECLARATION is based on all information of which I have knowledge and my signature below constitutes my certification of the foregoing under Fed. R. Bankr. P. 9011.  I have reviewed and will comply with the provisions of MEFR 7.

Dated: May 11, 2015                 Signed: */s/Richard E. Mikels*
                                        Richard E. Mikels

# PLAN PROPONENTS' EXHIBIT 22

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>Debtor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Chapter 11<br><br>Case No. 12-19882-HJB |

DECLARATION OF BRIAN ROBISCHEAU IN SUPPORT OF
CONFIRMATION OF FIRST AMENDED JOINT
CHAPTER 11 PLAN OF NEW ENGLAND COMPOUNDING PHARMACY, INC.

I, Brian Robischeau, submit this declaration in support of confirmation of the Joint

Chapter 11 Plan Of New England Compounding Pharmacy, Inc. [Docket No. 1054] (as amended

at Docket No. 1154 and thereafter from time to time, and including all exhibits and supplements

thereto, the "Plan"), and respectfully state as follows:

1.     I am a Senior Technical Claims Specialist in Complex Construction Liability at

Liberty Mutual Insurance, and I am authorized to make this declaration on behalf of Liberty

Mutual's affiliates The Netherlands Insurance Company ("Netherlands") and Peerless Insurance

Company ("Peerless").

2.     Netherlands and Peerless issued certain insurance policies to Victory Heating and

Air Conditioning Co., Inc. ("Victory") and are included, along with Victory, in the definition of

"Other Contributing Parties" in the Plan and accordingly will, if the Plan is confirmed, be the

beneficiaries of certain non-debtor releases and injunctions in aid thereof provided in the Plan.  I

submit this declaration on behalf of Netherlands and Peerless in support of the grant of that relief.

## Background Facts

3.     Victory is a full service plumbing, heating, and air conditioning company in Massachusetts. From approximately 2006 to 2008, Victory installed HVAC systems to service two clean rooms at the New England Compounding Pharmacy, Inc. ("NECC") facility in Framingham. Thereafter, Victory provided HVAC services to NECC and performed certain preventative maintenance and inspection work at NECC's facility. NECC allegedly compounded contaminated vaccine in the two clean rooms serviced by the HVAC systems Victory installed.

4.     After NECC was shut down by government authorities in the fall of 2012 as a result of its manufacture and shipment of contaminated vaccine, Victory was identified as a potentially responsible party in the NECC Products Liability Multidistrict Litigation (the "MDL").

5.     Netherlands and Peerless issued, respectively, a Commercial General Liability policy and a Commercial Umbrella Liability policy (the "Policies") to Victory for 2012-2013. The Policies, subject to their terms, limits, conditions, and exclusions, provided coverage for bodily injury (including death) claims against Victory. As the primary level insurer, Netherlands provided Victory with a defense for the allegations against Victory in the MDL.

6.     As the facts were developed, Netherlands and Peerless concluded that Victory had strong factual and legal defenses to liability.

-     Two experts concluded that Victory properly installed the HVAC systems four to six years before NECC produced the contaminated vaccine.

- Third parties consistently tested and approved NECC's HVAC systems, finding that the HVAC systems operated properly.

- An engineer with expertise in HVAC design and installation analyzed Victory's installation and the HVAC operation from 2006 to 2012 and concluded that Victory's HVAC installation met and surpassed industry standards, and that Victory provided certified clean room environments confirmed by independent testing by a third party.

- NECC discontinued all service agreements with Victory in 2009, more than three years before NECC produced the contaminated vaccine.

- State and federal investigators concluded that the contaminated vaccine was caused by NECC's poor hygiene practices.

- An industrial hygienist with experience in analyzing the origin, type, and proliferation of biological organisms analyzed the organisms identified at NECC's facilities and in the contaminated vaccine and concluded that the HVAC systems did not cause or contribute to the contamination in any way; rather, NECC's poor hygiene practices were the source of the contamination.

7.     Notwithstanding Victory's strong defenses, Victory and its insurers faced the likelihood of presenting their defenses in dozens -- if not hundreds -- of individual lawsuits in the MDL.

8.     Thus, when NECC's Chapter 11 Trustee raised the possibility of Victory and its insurers participating in the bankruptcy by making a substantial contribution to the fund being established to compensate NECC's victims, in exchange for protection from individual third-party claims, they decided to explore this avenue.

- 3 -

9.      After two days of mediation and extensive additional negotiations with the
Trustee, the Official Creditors' Committee, and the MDL Plaintiffs' Steering Committee (the
"PSC"), Netherlands and Peerless agreed to pay $5,500,000 to the Trustee's fund as Victory's
insurers on the condition that they and Victory would be beneficiaries of the releases and
injunctive protection provided to them in the Plan.  This amount exceeded 90 % of the triggered
policy limits of the Policies.

### The Legal Standard

10.     I am told that when evaluating non-debtor releases and injunctions (such as the
Plan releases and injunction in favor of Netherlands, Peerless, Victory, and others) courts in the
First Circuit consider the factors set forth in *In re Master Mortgage Invest. Fund, Inc.*, 168 B.R.
930 (Bankr. W.D. Mo. 1994).  The *Master Mortgage* factors relevant to my declaration are:
(i) whether there is an identity of interest, usually an indemnity relationship, between the debtor
and the third-party being released, such that a suit against the third-party is, in essence, a suit
against the debtor or will deplete the assets of the estate; (ii) whether the third-party has
contributed substantial assets to the estate; and (iii) whether the releases and injunctions are
essential to the viability of the Plan and whether, without them, there is little likelihood of
success.  Netherlands and Peerless respectfully submit that, concerning the Plan releases and
injunction in favor of Netherlands and Peerless, these factors are satisfied.

### (i)  A Strong Identity Of Interest Exists Between NECC, On The One Hand, And Netherlands, Peerless, And Victory, On The Other Hand.

11.     Victory faces possible third-party claims from two sources:  (i) from the patients
who were victims of the contaminated NECC vaccine; and (ii) from other defendants who assert
cross-claims for indemnification.  NECC, Victory, Netherlands, and Peerless all share a strong
common interest in protecting Victory from these third-party claims for two reasons:  (i) third-

- 4 -

party claimants who successfully pursue their claims against Victory will give Victory an

indemnity claim against NECC which will be pursued by Netherlands and Peerless as subrogees,

and will deplete the NECC funds available for distribution by the Trustee to the tort victims; and

(ii) third-party claimants who successfully pursue their claims against Victory will deplete the

insurance that Victory has from Netherlands and Peerless which would otherwise be available to

satisfy any successful indemnification claim of NECC against Victory, and will cause

Netherlands and Peerless to incur additional defense costs.

      12.    *Protection of NECC from indemnification claims by Victory, Netherlands, and*

*Peerless.*  To the extent that third-parties successfully make claims against Victory, Victory will

have an indemnification claim against NECC for that liability.  To the extent that Netherlands

and Peerless pay those third-party claims against Victory, Netherlands and Peerless will be

subrogated to Victory's indemnification claim against NECC.  Victory has preserved its

indemnification claim against NECC by filing proofs of claim (Claim Nos. 69 and 71) in the

NECC bankruptcy on January 15, 2014.  If Victory (or Netherlands and Peerless as Victory's

subrogee) prevail in their claim seeking indemnification from NECC for the third-party liability

incurred by Victory, the assets of the NECC estate available to compensate the victims will be

diminished.  If the Plan is not confirmed and the non-debtor releases and injunctions are not

granted, Netherlands and Peerless will pursue against NECC any subrogated indemnification

claims they have arising from third-party claims against Victory.  NECC, Victory, Netherlands,

and Peerless plainly share a common interest in protecting Victory from third-party claims.

      13.    *Preservation of insurance assets for NECC.*  Since NECC has theoretical

indemnity claims against Victory, NECC has a strong interest -- shared with Victory,

Netherlands, and Peerless -- in protecting Victory's insurance from being attacked and dissipated

- 5 -

by third parties. The PSC has identified multiple theories of liability of Victory related to the

condition of the HVAC systems in NECC's clean rooms. As indicated above, Victory has strong

defenses against such liability. However, if NECC nevertheless were to prevail on an

indemnification claim against Victory, NECC would plainly have an interest in protecting

Victory's insurance coverage under the Netherlands and Peerless policies from being dissipated

by payment of third-party claims against Victory. Victory also has an interest in the most

efficient use of its limited insurance assets by settling with the Trustee. Netherlands and Peerless

have an interest in avoiding the defense costs of numerous third-party claims. Under the Plan,

the non-debtor releases and injunction will preclude third-party claims against Victory, and will

ensure that more than 90 % of Victory's triggered insurance coverage will go to the Trustee's

fund for compensation of victims. The releases and injunction will also protect Netherlands and

Peerless from defense costs for the third-party claims.

**(ii) Netherlands And Peerless Have Contributed Substantial Assets To The Estate.**

14.     As a result of extensive arms-length negotiation at and following the mediation

mentioned above, Netherlands and Peerless have agreed to contribute $5,500,000 as Victory's

insurers to the fund being created by the Trustee to compensate those with claims against NECC.

This constitutes over 90 % of the triggered limits of the primary and umbrella policies issued by

Netherlands and Peerless.

15.     Viewed in a vacuum, $5,500,000 is a substantial sum of money. Viewed in the

context of a case where Victory has strong defenses to liability, the payment by Victory's

insurers of more than 90 % of the triggered limits of Victory's insurance, resulting in the

recovery for the Trustee's fund of $5,500,000, is an exceptionally favorable result for the NECC

estate. The Trustee drove a hard bargain with Netherlands, Peerless, and Victory.

- 6 -

16.    It is highly unlikely that NECC's tort creditors would be able to recover through litigation with Victory the significant sum that Netherlands and Peerless have agreed to contribute to the Trustee's fund.  Certainly, the tort creditors would not be able to realize any recovery whatsoever from Victory or its insurers without the delay, expense, and risk of protracted litigation (in particular, the risk that one substantial judgment in favor of a single tort claimant would significantly deplete Victory's insurance assets).  Under these circumstances, the $5,500,000 contribution to the NECC estate by Netherlands and Peerless is "substantial."

**(iii)  The Plan Releases And Injunctions Are Essential To The Success Of The Plan.**

17.    A key part of the Plan is the creation of a fund to compensate NECC's victims. Payments to the fund by debtor-related parties, who will receive the protection of NECC's bankruptcy discharge, will provide substantial money for the fund.  However, the aggregate damages of NECC's victims far exceed the amount of the debtor-related contributions.  Thus, it is essential for the success of the Plan to increase the size of the fund through payments from non-debtor parties who have an interest in the matter, such as Netherlands, Peerless, and Victory. Those parties will obviously not receive the protection of NECC's bankruptcy discharge.  The only way those parties can receive protection -- and will thus have an incentive to contribute to the fund -- is by the grant of the non-debtor releases and injunctive protection under Bankruptcy Code § 105 that the Plan provides to non-debtor contributors.

18.    In the absence of the non-debtor releases and injunction provided in the Plan, Victory, Netherlands, and Peerless could face hundreds of individual claims from patients injured by NECC's contaminated vaccine, as well as multiple cross-claims by co-defendants for indemnity.  Without the Plan's non-debtor releases and injunctive protection from these claims, Netherlands and Peerless would not have agreed to contribute to the Trustee's fund.

19.     Schedule 1.103 to the Plan indicates that, in addition to Victory, Netherlands, and Peerless, there are six other non-debtors who will be making payments to the Trustee's fund and receiving non-debtor releases and injunctive relief.  It is reasonable to assume that -- like Victory, Netherlands, and Peerless -- none of those other six contributors would have agreed to make a payment to the fund without receiving those non-debtor protections.  Thus, the provisions of the Plan for non-debtor releases and injunctions are essential to the success of the Plan.

### Conclusion

20.     For these reasons, on behalf of Netherlands and Peerless, I submit that (i) under the present circumstances, the relevant *Master Mortgage* factors are satisfied, (ii) the Plan releases and injunctions are in the best interest of the NECC estate and its creditors, and (iii) the settlement, as embodied in the Plan, best provides for the equitable distribution to NECC's creditors of the substantial contribution to be made by Netherlands and Peerless.  On behalf of Netherlands and Peerless, I fully support confirmation of the Plan.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the $\underline{12}$ day of May 2015.

_____
Brian Robischeau

6641047

- 8 -

# PLAN PROPONENTS' EXHIBIT 23

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

### DECLARATION OF STEPHEN B. DARR IN SUPPORT OF CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN
### OF NEW ENGLAND COMPOUNDING PHARMACY, INC.

### INTRODUCTION

1.      My name is Stephen B. Darr.  As of April 13, 2015, I am a managing director of Huron Consulting Services LLC.  Prior to that date, I was a Senior Managing Director of Mesirow Financial Consulting, LLC ("MFC"), which has been employed as financial advisor to Paul D. Moore, the duly appointed trustee ("Trustee") of the chapter 11 estate of New England Compounding Pharmacy, Inc. ("NECC") or the "Debtor") in the above-captioned bankruptcy case.  I had overall responsibilities for all services provided by MFC in connection with these proceedings, and I have personal knowledge of all matters averred in this Declaration, except for those matters stated to be upon information and belief, which I believe to be true and correct.  I am competent to testify under oath to the matters set forth in this Declaration if called to do so.  I submit this Declaration in support of confirmation of the *Second Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. 1308] (the "Plan") in the above-referenced chapter 11 proceeding.

2.      A copy of my resume is attached.  In summary, I have over 35 years of extensive experience in providing financial advisory services related to complex restructuring matters.  I have served, and continue to serve, as a bankruptcy trustee in numerous cases, and I have served

as a financial advisor to numerous chapter 11 creditors' committees and chapter 11 debtors in possession. Accordingly, I have specialized experience in fiduciary roles, such as trustee, examiner, assignee for benefit of creditors and liquidating agent. I also have significant experience providing litigation support and expert testimony in matters involving, *inter alia*, professional liability claims and business tort claims. I have provided valuation services in a number of roles for a variety of industries. I am a Certified Insolvency and Restructuring Advisor (CIRA), and I hold a Certification in Distressed Business Valuation (CDBV). I am a Certified Public Accountant (CPA) in the Commonwealth of Massachusetts and the State of New Hampshire. I hold a Certification in Financial Forensics (CFF), and I hold FINRA Series 7, 24 and 79 licenses. I am a Fellow of the American College of Bankruptcy.

## LIQUIDATION ANALYSIS

**The "Best Interests" of the Creditors Test**

3.      As a condition to confirmation, Section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find that each Holder of a Claim or Interest in each Impaired Class: (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. Satisfaction of these criteria is often referred to as the "best interests" test.

4.      Attached hereto as Exhibit "A" is an analysis (the "Liquidation Analysis") which I prepared and which demonstrates that the Plan satisfies the "best interests" test. This analysis demonstrates the Plan's satisfaction of the "best interests" test through the following hypothetical three-part process: (1) estimating the amounts that would be recovered by a chapter 7 trustee if this case were converted to a case under chapter 7 of the Bankruptcy Code (the "Liquidation Proceeds"); (2) determining the amounts that would be available for distributions to creditors in a

2

chapter 7 case; and (3) comparing the amounts available for distribution under a hypothetical chapter 7 case as opposed to the amount available for distribution under the Plan. The Liquidation Analysis is based upon certain assumptions discussed herein and in the Disclosure Statement.

**General Liquidation Analysis Assumptions**

5.        The Liquidation Analysis begins with the Debtor's projected cash balance and assets as of May 19, 2015 (the hypothetical "Conversion Date") and estimates the amount of potential litigation recoveries in a chapter 7 case and the net costs to execute the administration of the wind-down of the estate. The Liquidation Analysis assumes that the Debtor would commence a chapter 7 liquidation on or about the Conversion Date under the supervision of a chapter 7 trustee. The Liquidation Analysis reflects the wind-down and liquidation of substantially all of the Debtor's remaining assets and the settlement or prosecution of remaining litigation.

6.        If this Court confirms the Plan, in addition to existing cash and estimated proceeds from the realization of accounts receivable and furniture and equipment, the proceeds from the following settlements will be available for payment of administrative priority claims and distribution to creditors:

| Contributing Party | | Amount |
|---|---|---|
| Shareholders | Cash payment | **$47,500,000** |
| | Potential anticipated tax refunds | **$21,800,000** |
| Insight Settling Parties and Insurers | | **$40,000,000** |
| UniFirst and Insurers | | **$30,500,000** |
| NECC Insurers | | **$25,200,000** |

3

| Contributing Party | Amount |
|---|---|
| Inspira and Insurers | **$16,000,000** |
| Ameridose Insurer | **$10,000,000** |
| ARL and Insurer | **$6,400,000** |
| Victory and Insurers | **$5,500,000** |
| GDC and Insurer | **$3,750,000** |
| High Point and Insurer | **$3,500,000** |
| Liberty and Insurer | **$1,000,000** |
| **Total** | **$211,150,000** |

7.      In my opinion, a chapter 7 trustee would not be able to realize *any* amounts from the Contributing Parties in settlements due to the fact that a condition to any settlement with these parties is the  third-party releases of these parties provided in the Plan.  Such releases are not available in a chapter 7 case.  Further, the Contributing Parties (with the exception of the Shareholders) paid these settlement amounts principally, if not exclusively, to satisfy claims of tort claimants.  A chapter 7 trustee would not have standing to pursue such claims.  In sum, with the exception of the pursuit of avoidance actions against the Shareholder discussed in Paragraph 10 below, a chapter 7 trustee would not recover any amounts from the Contributing Parties through settlement or litigation.

8.      The settlements with the Shareholders provide the Debtor's estate with certain tax-related payments that would not otherwise be available to the estate through traditional litigation.  *See Declaration of Stephen B. Darr in Support of Pending Settlement Motions* [Dkt. 906] at ¶ ¶ 25-28.

9.      Additionally, the settlements provide for payments to the estate from NECC's insurers, which, outside of the Plan, would likely contest or deny coverage under the applicable

4

Policies, as a result of which the Debtor's estate would like realize no recovery from these insurers. Moreover, they would not be willing to settle without policy releases for the various NECC insured parties, who would be unwilling to provide them without third party releases and assurances that they would no longer require coverage for related defense costs.

10. I have assumed that a chapter 7 Trustee would pursue successfully an action to avoid and recover certain transfers from the Shareholders and their affiliates (the "Insiders") under 11 U.S.C. § § 544, 548 & 550. I have assumed that the recovery in this action (the "Fraudulent Conveyance Action") would be limited to a maximum amount of $10,927,801, which is the total amount of transfers to the Insiders on or after May 21, 2012 (the "Earliest Compounding Date"), the date on which a contaminated lot appears to have been compounded. See Declaration of Chapter 11 Trustee in Support of Pending Settlement Motions [Dkt. 905] at ¶ 18. Prior to the Earliest Compounding Date, NECC was highly profitable. It is reasonable to assume that a chapter 7 trustee would not be able to prove that NECC was insolvent prior to that date.

11. The costs of liquidation under Chapter 7 of the Bankruptcy Code would include the fees payable to a Chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. The foregoing types of claims and other claims that might arise in a Chapter 7 liquidation case or result from the pending Chapter 11 Case, including any unpaid expenses incurred by the Chapter 11 Trustee and the Official Committee during this case, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available for distribution to holders of allowed general unsecured claims.

12.     After considering the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to the holders of Claims and interests in this Chapter 11 Case, including the increases in Claims which could be satisfied on a priority basis or on parity with creditors in this Chapter 11 Case, I believe that confirmation of the Plan will provide each holder of an allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to a liquidation under Chapter 7 of the Bankruptcy Code.

13.     The statements in the Liquidation Analysis, including estimates of Allowed Claims, were prepared solely to assist the Bankruptcy Court in making the findings required under section 1129(a)(7) for the Plan, and they should not be used or relied upon for any other purpose.

[*Signature Page Follows*]

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 12, 2015

Stephen B. Darr, C.P.A.
Huron Consulting Services LLC.
125 Summer Street
18th Floor
Boston, MA 02110

# EXHIBIT A

## LIQUIDATION ANALYSIS[1]

---

[1] THE CHAPTER 11 TRUSTEE BELIEVES THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE CHAPTER 11 TRUSTEE OR A CHAPTER 7 TRUSTEE. NEITHER THE ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

Case 1:13-cv-02419-RWZ Document 256-4 Filed 05/14/15 Page 42 of 146
Case 12-19882 Doc 1860-23 Filed 05/14/15 Entered 05/14/15 20:03:29 Desc
Exhibit 23 Page 12 of 14

Page 1

New England Compounding Pharmacy, Inc.
Liquidation Analysis
United States Bankruptcy Court for the District of Massachusetts
Chapter 11 Case No. 12-19882-HJB

| | Book Value | | Projected Proceeds Available Under Chapter 11 Plan | Projected Proceeds Under Hypothetical Chapter 7 |
|---|---|---|---|---|
| **Estimated Cash on Hand as of May 19, 2015** | | | $ 800,000 | $ 800,000 |
| **Settlements with National Defendants:** | | | | |
| Amerisouce Settlement | | Note 2 | 10,000,000 | - |
| GDC Settlement | | Note 1 | 3,750,000 | - |
| PMIC/Maxum Settlement | | Note 1 | 25,200,000 | - |
| NECC Owners/Shareholder Settlement | | Note 1 | 47,500,000 | 10,927,801 |
| Victory Settlement | | Note 2 | 5,500,000 | - |
| ARL Settlement | | Note 2 | 6,400,000 | - |
| Liberty Settlement | | Note 2 | 1,000,000 | - |
| UniFirst Settlement | | Note 2 | 30,500,000 | - |
| Total Estimated Amount | | | 129,850,000 | 10,927,801 |
| **Settlements with Clinic-Related Defendants:** | | | | |
| High Point Settlement | | Note 2 | 3,500,000 | - |
| Inspira Settlement | | Note 2 | 16,000,000 | - |
| Insight Settlement | | Note 2 | 40,000,000 | - |
| Total Estimated Amount | | | 59,500,000 | - |
| **Shareholder Settlement** | | | | |
| 75% of the net funds realized from the sale or other disposition of | | | | |
| the equity interests in or assets of the Pharmaceutical Entities | | Note 1 | - | - |
| Interests in Insurance Policies | | Note 1 | - | - |
| 90 % of Estimated Federal, State and Local Tax Refunds | | Notes 1 & 3 | 21,800,000 | - |
| 100% of Non-Disclosed Assets | | Note 1 | - | - |
| | | | 21,800,000 | - |
| **Other Assets** | Book Value | | | |
| Accounts Receivable | 1,070,342 | Note 4 | 107,034 | 107,034 |
| Furniture and Equipment | 3,168,037 | Note 4 | 316,804 | 316,804 |
| **Total recoveries** | | | 212,373,838 | 12,151,639 |
| **Administrative expenses** | | | | |
| Chapter 11/7 Trustee fees | | Note 5 | (6,434,643) | (387,799) |
| Chapter 7 professional Fees | 40% | Note 6 | - | (4,371,120) |
| Estimated Chapter 11 Administrative Expenses (Professional Fees) | | | (11,020,000) | (11,020,000) |
| **Estimated amount available to pay claims after administrative claims/ (deficiency)** b | | | 194,919,195 | (3,627,280) |
| **Estimated Priority Tax Claims** | | | - | - |
| Class A - Estimated Priority Non-Tax Claims | | | - | - |
| | | | - | - |
| **Available for Class C - General Unsecured Claims and Class D - Tort Claims (deficiency)** | | | $ 194,919,195 | (3,627,280) |

New England Compounding Pharmacy, Inc.
Liquidation Analysis
United States Bankruptcy Court for the District of Massachusetts
Chapter 11 Case No. 12-19882-HJB

Note 1-Each of these settlements provides that the settling counterparty will receive a third-party release under the Plan.  In a Chapter 7 case, none of the recoveries (other than the insider settlements) would be possible since (a) such a release would not be available; and (b) the settlement amounts could not be recovered by a Chapter 7 Trustee through litigation because the underlying claims are the claims of the tort claimants and not claims of the estate.  It is projected that a maximum of $10,927,802 would be recovered in Chapter 7 litigation against NECC's insiders pursuant to 11 U.S.C.  Sections 544, 548 and 550.

Note 2-Each of these pending settlements is anticipated to provide that the settling counterparty receive a third-party release under the Plan.  In a Chapter 7 case, none of the  recoveries (other than the insider settlements) would be possible since (a) such a release would not be available; and (b) the settlement amounts could not be recovered by a Chapter 7 Trustee through litigation because the underlying claims are the claims of the tort claimants and not claims of the estate.

Note 3-Estimated amount of tax refunds arising from the carry-back of expenses incurred in connection with the administration of the estate and/or  in the investigation and settlement of the liability claims which will be available under  the terms of the Chapter 11 Plan.  No such tax refunds would be available or recovered in a Chapter 7 liquidation.

Note 4-Calculated at
*10% of remaining accounts receivable (a significant portion has been collected postpetition)
*10% of original cost of furniture and equipment

Note 5-Calculated at the rates provided by Section 326 of the U.S. Bankruptcy Code.

Note 6-Assumed contingency fee required to pursue litigation seeking recoveries from the insiders; estate has insufficient funds to pursue these claims on a fee basis.



## STEPHEN B. DARR
**SENIOR MANAGING DIRECTOR**
**MESIROW FINANCIAL CONSULTING, LLC**

Mr. Darr is a Managing Director in the Boston office of Huron Consulting Group, Inc. ("Huron") Huron provides financial advisory services, interim management and fiduciary services to financially distressed business organizations, as well as litigation support and valuation services involving both distressed and non-distressed business organizations.  Mr. Darr has led advisory engagements involving several significant reorganization cases, has provided interim management services in a variety of "C-level" positions, has served as Examiner, Chapter 7and Chapter 11 trustee in Massachusetts, Rhode Island, Maine and New Hampshire.  He has testified frequently in both bankruptcy and non-bankruptcy matters.

**Education and Qualifications:**

University of Chicago, Master of Business Administration (Accounting and Finance)

Boston College, Bachelor's in Business Administration (Accounting)

Certified Public Accountant - Massachusetts and New Hampshire

Certified Insolvency and Reorganization Advisor

Certification in Distressed Business Valuation

Certification in Financial Forensics

Securities registrations

- Series 7–Registered Securities Representative
- Series 24-General Securities Principal
- Series 79-Investment Banking Representative

**STEPHEN B. DARR**
Page 2

## Associations and Memberships:

Member-American Institute of Certified Public Accountants

Member-Massachusetts Society of Certified Public Accountants

Member-American Bankruptcy Institute

Director, member and President (*emeritus*) of the Association of Insolvency and Restructuring Advisors

Fellow-American College of Bankruptcy

## Certificate of Service

I, Michael R. Lastowski, hereby certify that on this day, May 12, 2015, I caused a copy of the *Declaration of Stephen B. Darr in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.*, which was filed using this Court's ECF system, to be served electronically upon those parties registered to receive ECF service.

/s/ Michael R. Lastowski
Michael R. Lastowski

# PLAN PROPONENTS' EXHIBIT 24

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>                Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

## DECLARATION OF CHAPTER 11 TRUSTEE
## IN SUPPORT OF CONFIRMATION OF SECOND AMENDED JOINT CHAPTER 11
## PLAN OF NEW ENGLAND COMPOUNDING PHARMACY, INC.

Dated: May 13, 2015
      Boston, Massachusetts

**DUANE MORRIS LLP**

Paul D. Moore, Esq.
100 High Street
Suite 2400
Boston, MA 02110
Telephone: (857) 488-4200
Facsimile: (857) 401-3057

*Chapter 11 Trustee*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................1

II.  HISTORICAL BACKGROUND MATTERS ....................................................2

    A.   My Appointment as Chapter 11 Trustee ................................................ 2

    B.   Events Precipitating the Chapter 11 Case ............................................. 3

    C.   The Plan and Disclosure Statement Process ......................................... 4

III. SUMMARY OF PLAN SETTLEMENTS ........................................................7

    A.   National Settlement Agreements ........................................................... 9

    B.   Provider Settlement Agreements ......................................................... 11

    C.   Settlement Proceeds ............................................................................. 11

IV.  THE REASONABLENESS OF THE PLAN SETTLEMENTS .....................13

    A.   The Approved National Settlements .................................................... 13

        1.   The Shareholder Settlement, PMIC/Maxum Settlement and the GDC Settlement ...............................................................13

    B.   The Proposed National Settlements .................................................... 15

        1.   The Ameridose Settlement ......................................................15

            a.   Factual Background ......................................................15

            b.   The Ameridose Settlement Agreement.........................16

            c.   The Ameridose Settlement is in the best interests of NECC's estate. ...............................................................17

                i.   The probability of success ................................17

                ii.   Difficulty of collection.....................................19

                iii.   Complexity of the litigation involved and the expense, inconvenience and delay in pursuing litigation .................19

                iv.   The paramount interest of creditors ..................20

i

Case 1:19-md-02419-RWZ Document 1856-4 Filed 05/14/15 Page 50 of 146
Case 1:19-md-02419-RWZ Document 1856-4 Filed 05/14/15 Page 50 of 146
Case 1:19-md-02419-RWZ Document 1856-4 Filed 05/14/15 Page 50 of 146
Exhibit 24    Page 43 of 75

|       |    | v.   | The third party releases were necessary to achieve the Ameridose Settlement .......................................................21 |

| 2.    |    | The ARL Settlement ...............................................................22 |
|       | a. | Factual Background ...................................................22 |
|       | b. | The ARL Settlement Agreement ...............................................24 |
|       | c. | The ARL Settlement is in the best interests of NECC's estate ................................................................24 |
|       |    | i.   | The probability of success ...............................................25 |
|       |    | ii.  | Difficulties in collection ..................................................26 |
|       |    | iii. | Complexity of the litigation involved and the expense, inconvenience and delay in pursuing litigation ................26 |
|       |    | iv.  | The paramount interest of creditors ..................................27 |
|       |    | v.   | The third party releases were necessary to achieve the ARL Settlement ................................................................28 |

| 3.    |    | The Victory Settlement ..............................................................28 |
|       | a. | Factual Background ...................................................28 |
|       | b. | The Victory Settlement Agreement ...............................................30 |
|       | c. | The Victory Settlement is in the best interests of NECC's estate ................................................................31 |
|       |    | i.   | The probability of success ...............................................31 |
|       |    | ii.  | Difficulties in collection ..................................................33 |
|       |    | iii. | Complexity of the litigation involved and the expense, inconvenience and delay in pursuing litigation ................33 |
|       |    | iv.  | The paramount interest of creditors ..................................34 |
|       |    | v.   | The third party releases were necessary to achieve the Victory Settlement ...........................................................35 |

| 4.    |    | The UniFirst Settlement ..............................................................35 |
|       | a. | Factual Background ...................................................35 |

Case 1:19-md-02419-RWZ Document 1250-1 Filed 06/14/15 Page 51 of 146
Case 1:19-md-02419-RWZ Document 1250-1 Filed 06/14/15 Page 51 of 146 Desc Main
Document 24   Page 54 of 75
Exhibit 24   Page 54 of 75

        b.      The UniFirst Settlement Agreement .............................................38

        c.      The UniFirst Settlement is in the best interests of NECC's
               estate ....................................................................................................38

               i.      The probability of success ...............................................39

               ii.     Difficulties in collection ..................................................39

               iii.    Complexity of the litigation involved and the expense,
                       inconvenience and delay in pursuing litigation ................40

               iv.    The paramount interest of creditors ..................................40

               v.     The third party releases were necessary to achieve the
                       UniFirst Settlement ............................................................41

C.     The Provider Settlement Agreements .................................................... 42

    1.     The High Point Settlement ........................................................42

        a.      Factual Background ........................................................42

        b.      The High Point Settlement Agreement .........................................44

        c.      The High Point Settlement is in the best interests of
               NECC's estate .................................................................................44

               i.      The probability of success ...............................................44

                ii.     Difficulties in collection ..................................................45

                iii.    Complexity of the litigation involved and the expense,
                       inconvenience and delay in pursuing litigation ................45

               iv.    The paramount interest of creditors ..................................46

               v.     The third party releases were necessary to achieve the
                       High Point Settlement ........................................................46

    2.     The Insight Settlement Agreement ..........................................................47

        a.      Factual Background ........................................................47

        b.      The Insight Settlement Agreement .................................................48

        c.      The Insight Settlement is in the best interests of NECC's
               estate ....................................................................................................49

|   |   | i. | The probability of success | ...................................................49 |
|---|---|----|---------------------------|---|
|   |   | ii. | Difficulties in collection | ...................................................50 |
|   |   | iii. | Complexity of the litigation involved and the expense, inconvenience and delay in pursuing litigation | ................50 |
|   |   | iv. | The paramount interest of creditors | ...................................51 |
|   |   | v. | The third party releases were necessary to achieve the Insight Settlement | ................................51 |
|   | 3. | | The Inspira Settlement Agreement | ..........................................52 |
|   |   | a. | Factual Background | ....................................................52 |
|   |   | b. | The Inspira Settlement Agreement | .................................52 |
|   |   | c. | The Inspira Settlement is in the best interests of NECC's estate | .........................................................53 |
|   |   | i. | The probability of success | ...................................................53 |
|   |   | ii. | Difficulties in collection | ...................................................54 |
|   |   | iii. | Complexity of the litigation involved and the expense, inconvenience and delay in pursuing litigation | ................54 |
|   |   | iv. | The paramount interest of creditors | ...................................54 |
|   |   | v. | The third party releases were necessary to achieve the Inspira Settlement | ................................55 |
| V. | PLAN CONFIRMATION ISSUES | | | .................................................................56 |
|   | A. | The Plan Meets All Statutory Requirements to Confirmation | | ...........................56 |
|   | B. | The Third Party Releases are Appropriate and Necessary | | ...................................61 |
|   | 1. | There is an identity of interest between the debtor and the third parties such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate | | ....................................................61 |
|   | 2. | The non-debtors have contributed substantial assets to the reorganization | | ............................................................63 |
|   | 3. | The third party releases and injunctions are essential to the reorganization, and without them, there is little likelihood of success | | ......64 |

4.     A substantial majority of the creditors agree to such injunction, and the impacted class or classes have "overwhelmingly" voted to accept the proposed Plan treatment..................................................................................65

5.     The Plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction ..........67

VI.    CONCLUSION......................................................................................................68

Case 1:13-md-02419-RWZ Document 1856-1 Filed 05/14/15 Page 54 of 146
Case 1:13-cv-02882 Doc 13520-4 entered 06/06/15 14:51:49 desc Main
Document 24 Page 87 of 75

## I.    <u>INTRODUCTION</u>

1.      I, Paul D. Moore, am the duly-appointed chapter 11 trustee in the above-captioned bankruptcy case. I have personal knowledge of all matters set forth in this Declaration, except for those matters stated to be upon information and belief, and I believe all such matters to be true and correct. I am competent to testify under oath to the matters set forth in this Declaration if called to do so. I submit this Declaration in support of confirmation of the Second Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. [Docket No. 1308] (as amended and including all exhibits thereto, the "<u>Plan</u>").[1] In addition, facts and statements of law set forth in the Plan Proponents' Pre-Confirmation Hearing Memorandum of Law in Support of Confirmation of the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. [Docket No. 1240] (the "<u>Confirmation Brief</u>") and the Plan Proponents' Reply Memorandum of Law (i) in Response to "Objection" to Confirmation of the First Amended Joint Chapter 11 Plan of Debtor New England Compounding Pharmacy, Inc., and (ii) in Further Support of Confirmation Thereof [Docket No. 1310] (the "<u>Confirmation Reply Brief</u>") are incorporated as if more fully set forth herein.

2.      I am an attorney at law licensed by and practicing in the Commonwealth of Massachusetts since 1976. I have extensive experience in complex chapter 11 cases. In the course and scope of my bankruptcy practice, I have frequently encountered and been involved with proceedings regarding the confirmation of plans of reorganization, including plans of reorganization which incorporated third party releases and related plan injunctions. I am familiar with the requirements for confirmation of such plans as prescribed by section 1129 of the

---

[1] Unless otherwise set forth herein, capitalized terms shall have the meaning ascribed to in the Plan.

Bankruptcy Code and applicable law. I submit this Declaration in order to set forth the facts that demonstrate that the Plan meets those requirements and thus support confirmation of the Plan.

3.      Part II of this Declaration describes the historical background of the Debtor's business and the circumstances surrounding the filing of its chapter 11 petition. Part III of this Declaration provides a summary of the numerous settlements I have negotiated on behalf of the Debtor's estate and the efforts I have taken to obtain Court approval of the same in connection with confirmation of the Plan. Part IV of this Declaration sets forth the details of each of these settlements and discusses the reasons I believe each settlement to be fair and reasonable. Finally, Part V of this Declaration sets for the relevant facts in support of the confirmation of the Plan.

## II.      HISTORICAL BACKGROUND MATTERS

### A.      My Appointment as Chapter 11 Trustee

4.      On December 21, 2012 (the "Petition Date"), the above-captioned debtor, New England Compounding Pharmacy, Inc., d/b/a/ New England Compounding Company ("NECC" or the "Debtor"), filed a voluntary petition for relief pursuant to chapter 11 of the United States Bankruptcy Code.

5.      On January 24, 2013, this Court entered an order [Docket No. 92] ordering the appointment of a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.

6.      On January 25, 2013 (the "Appointment Date"), the United States Trustee (the "UST") filed an Application for and Certificate of Appointment of Chapter 11 Trustee [Docket No. 98] (the "UST Application") requesting this Court's approval of my appointment as Chapter 11 Trustee. The UST Application was granted by order of this Court [Docket No. 99] entered the same day. Thereafter, on February 1, 2013, I filed the Verified Statement Pursuant to Rule 2007.1 of Paul D. Moore in Support of Application for and Certificate of Chapter 11 Trustee [Docket No. 111] (the "Statement").

7.      An Official Committee of Unsecured Creditors (the "Official Committee") was also appointed on January 18, 2013 [Docket No. 67].

**B.      Events Precipitating the Chapter 11 Case**

8.      Prior to the Petition Date, NECC operated as a compounding pharmacy. Beginning in September 2012, reports began to surface of several patients who contracted fungal meningitis (the "Outbreak") after receiving injections of preservative-free methylprednisolone acetate ("MPA") compounded by NECC.  An investigation was initiated by the Massachusetts Department of Public Health ("MDPH") and, two days later, on September 26, 2012, NECC issued a voluntary recall of three suspect lots, containing approximately 18,000 doses of MPA that NECC had distributed to hospitals, clinics, and doctor's offices, and were administered to approximately 14,000 patients.  The Centers for Disease Control and Prevention ("CDC") reported that, as of October 23, 2013, 64 people had died and 751 individuals had fallen ill.[2]

9.      In response to October 2, 2012 findings from the United States Food and Drug Administration ("FDA") and the MDPH, the Massachusetts Board of Registration in Pharmacy (the "Board") voted to request a voluntary surrender of NECC's pharmacy license.  NECC surrendered its license effective at noon on October 3, 2012, and further instituted a voluntary recall of all of its intrathecal medications, which are designed for injection near the spinal cord or brain.  The FDA and the CDC recommended that all health care providers cease using, and remove from inventory, any NECC products.  At the behest of the MDPH, NECC issued an immediate recall of all of its products.  There remain ongoing proceedings to revoke or otherwise take action against the licenses of NECC's pharmacists.  Approximately three months prior to the Petition Date, NECC suspended the operation of its business.  NECC also surrendered its

---

[2] The CDC has not updated the case counts since October 23, 2013 and has stated that further updates to the case counts are not anticipated.

Massachusetts pharmacy license and laid off most of its employees. The MDPH has temporarily barred former pharmacists for NECC from practicing pharmacology.

10. On the Petition Date, NECC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. NECC stated that it initiated this Chapter 11 Case in response to the volume and wide geographic distribution of the lawsuits with which it was confronted. The Outbreak has resulted in thousands of claims from personal injury claimants against NECC and others. As of April 27, 2015, approximately 686 separate lawsuits (the "Tort Cases") have been joined in the MDL Proceeding pending before the Honorable Rya W. Zobel, United States District Court Judge, in the MDL Court. Approximately 3,770 proofs of claims have been filed in NECC's Chapter 11 Case, approximately 3,500 of which are for damages for death or personal injuries resulting from the Outbreak.

### C. The Plan and Disclosure Statement Process

11. The Plan is a plan of liquidation. The primary objective of the Plan is to compensate those victims that have suffered personal injury and/or death due to allegedly contaminated drugs compounded by NECC.

12. The Plan has been funded in substantial part by contributions from NECC's shareholders, affiliated entities, clinics and healthcare providers and National Contributing Parties that provided goods and services to NECC and various of their respective insurers and other parties in interest, as described in Section 3.4 of the Disclosure Statement and identified in Schedules 1.127 and 1.173 to the Plan (collectively referred to as the "Contributing Parties"). In exchange for such funding contributions, claims against the Contributing Parties shall be released, and future claims enjoined, pursuant to the Plan and in accordance with the terms of the settlement agreements previously entered into by me, in my capacity as Chapter 11 Trustee

4

(more fully described below).[3] The amount of each distribution to a holder of an Allowed Claim will depend on which Class the Allowed Claim is in and the treatment afforded to that Class under the Plan.

13.     Pursuant to the Plan, assets of the Debtor will be converted into Cash.   The monetized assets of the Debtor will be used to satisfy in full all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims (Class A) and Miscellaneous Secured Claims (Class B).  Because holders of such Claims shall be paid in full, their Claims are deemed Unimpaired, and they are presumed to accept the Plan.  Thus, they will not be solicited to vote to accept or reject the Plan.

14.     I estimate that claims in Class C (General Unsecured Claims) aggregate approximately $900,000 and that holders of Class C Claims will receive distributions equal to approximately 90% of the amount of their Allowed General Unsecured Claims.  In its Schedules and Statement of Financial Affairs, the Debtor scheduled such Class C Claims in the amount of $885,514.19, some $200,000 of which was allegedly payable to an affiliate of the Debtor, Medical Sales Management.  Class C Proofs of Claim thereafter filed by NECC creditors significantly increased that amount to an aggregate of $7.85 million.  The increase, however, is largely the result of two claims, aggregating $6.83 million, which I believe are subject to disallowance, in whole or substantial part.  If that proves to be the case, and those claims are disallowed, the scheduled and filed Class C Claims would aggregate $1,025,500.

15.     Holders of claims in Class D (Tort Claims) will receive shares of a beneficial interest in the Tort Trust.  All claims that holders of Class D Claims have against the Contributing Parties are being channeled into the Tort Trust, where they will be satisfied from

[3] These settlements are outlined in Section 3.4 of the Disclosure Statement and are discussed more fully below.

the net proceeds of the settlements (the "Settlement Proceeds") reached between me, in my capacity as Chapter 11 Trustee, and the Contributing Parties in accordance with the terms of the Plan, the Tort Trust Documents, and the "Claims Resolution Facility Procedure" and, if applicable, the "Provider Claims Resolution Facility Procedures." I estimate that, in total, the Tort Trust will have an aggregate of more than $160 million to $190 million available for distribution to Tort Claimants who timely filed proofs of claim or other documents supporting their claim, or were deemed to have done so by this Court. In exchange for a share of the beneficial interest in the Tort Trust, all claims the Tort Trust Beneficiaries may hold against any and all of the Contributing Parties (other than Ameridose) will be released, and Tort Trust Beneficiaries will be forever barred, estopped and enjoined from asserting those claims against the Contributing Parties.

16. Because holders of General Unsecured Claims (Class C) will receive distributions anticipated to be less than the full value of their Claims, and holders of Tort Claims (Class D) will receive distributions that may or may not satisfy their Claims in full, Claims in Classes C and D are Impaired, and the holders of those Claims are entitled to vote to accept or reject the Plan.

17. Holders of Subordinated Claims (Class E) are not expected to receive a meaningful distribution, if any, under the Plan. Their Claims are therefore Impaired, and the holders of Class E Claims are entitled to vote to accept or reject the Plan.

18. Holders of Equity Interests (Class F) will not receive any distribution under the Plan. However, they will be permitted to retain their Equity Interests pursuant to the Shareholder Settlement Agreement (but without any rights of control over the Debtor or the Estate). Because that treatment is consistent with the terms of the Shareholder Settlement Agreement, their

6

Case 1:13-md-02419-RWZ Document 1850-1 Filed 05/04/15 Page 60 of 146
Case 1:13-md-02419-RWZ Document 1850-1 Filed 05/04/15 Page 60 of 146 Main
Document 24    Page 143 of 75

Interests are not deemed to be impaired, and they are deemed to accept the Plan and will not solicited to vote to accept or reject the Plan.

19.     On February 22, 2015, I, in my capacity as Chapter 11 Trustee, along with the Official Committee, filed the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. [Docket No. 1154] and an accompanying Disclosure Statement [Docket No. 1155]. On March 3, 2015, this Court entered an Order (i) Approving the Adequacy of the Amended Joint Disclosure Statement; (ii) Approving Solicitation and Notice Procedures with Respect to Confirmation of the Plan Proponents' First Amended Joint Plan of Reorganization; (iii) Approving the Form of Various Ballots and Notices in Connection Therewith; (iv) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief [Docket No. 1181] that, among other things, approved the adequacy of the Disclosure Statement and authorized the Plan Proponents to solicit acceptances or rejections of the plan from holders of Impaired Claims who are or may be entitled to received distributions under the plan.

## III.    <u>SUMMARY OF PLAN SETTLEMENTS</u>

20.     Since the Appointment Date, I have viewed settlement negotiations as among my highest priorities.   Numerous lawsuits had been commenced against the Insiders[4] and their affiliates in federal and state courts throughout the country, hundreds of which were subsequently joined in the MDL Proceedings.   Absent a prompt, global resolution of those numerous competing claims, any amounts available to compensate those who suffered the

---

[4] The term "Insiders", as used throughout this Declaration, generally refers to Barry Cadden, Lisa Cadden, Carla Conigliaro, and Gregory Conigliaro, collectively with their respective spouses, children, parents, and other nuclear family members, all trusts under which such persons are settlers, trustees, or beneficiaries, all Affiliated Entities, and any other entities in which such persons hold a controlling interest, and those entities' successors, assigns, and predecessors. These persons and entities are sometimes collectively referred to in the Plan as the Shareholder and Affiliate Released Parties.

consequences of the Outbreak likely would have been exhausted in a race to the courthouse by those competing claimants. In contrast, a prompt global resolution through the NECC estate would ensure that available proceeds were equitably distributed among those who were injured or died as a result of the Outbreak.

21. The Plan is built upon numerous settlements with various entities, including settlements with the Insiders, insurers, vendors, and health care providers. As described more fully below, some of these settlements have already been approved by this Court pursuant to Federal Rule of Bankruptcy 9019 ("Rule 9019"). Approval of the remaining Proposed Plan Settlements (as defined below) is being sought as part of confirmation of the Plan. I am familiar with the requirements for approval of settlements presented to the Court pursuant to Rule 9019, as prescribed in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968), and *Jeffrey v. Desmond*, 70 F.3d 183 (1st Cir. 1995). I personally participated in all of the settlement negotiations with respect to each and every settlement, attended all or substantially all of the related mediations and meetings and participated in the related calls and reviewed the various briefs submitted by all of the parties. Based upon that, and taking into consideration of the factors identified in those cases (the "TMT/Jeffrey Factors"),[5] I firmly believe that the facts set forth herein weigh heavily in favor of allowance and approval of the Proposed Plan Settlements.

---

[5] These factors include: (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise. *Jeffrey*, 70 F.3d at 184.

### A.     National Settlement Agreements

22.     In my capacity as Chapter 11 Trustee, I have entered into settlement agreements with certain "National Defendants" (*i.e.*, individuals or entities against whom every Tort Claimant may have a claim, such as NECC's owners or the company that provided sterility testing services for NECC products). This Court has already approved the following settlements with National Defendants by orders dated July 31, 2014 [Docket Nos. 970, 971 and 972], respectively:

> a.     that certain Plan Support and Funding Agreement (the "<u>Shareholder Settlement Agreement</u>") by and among me, in my capacity as Chapter 11 Trustee, and the Shareholders;

> b.     that certain Plan Support and Settlement Agreement (the "<u>PMIC/Maxum Settlement Agreement</u>") by and among me, in my capacity as Chapter 11 Trustee, and NECC's primary and excess liability insurance carriers, PMIC and Maxum, and the Individual NECC Insureds covered under the PMIC/Maxum Policies; and

> c.     that certain GDC Insurance Settlement and Release Agreement (the "<u>GDC Settlement Agreement</u>") by and among me, in my capacity as Chapter 11 Trustee, and GDC, Preferred Mutual, and the Individual GDC Insureds.

23.     The following settlements with National Defendants (generally, the "<u>Proposed National Settlements</u>") are pending this Court's approval through confirmation of the proposed Plan:

> a.     that certain Ameridose, LLC Insurance Settlement, Release and Injunction Agreement (the "<u>Ameridose Settlement Agreement</u>") by and among me, in

my capacity as Chapter 11 Trustee, Ameridose, and Ameridose's primary and first excess liability insurance carrier, PMIC;

b.     that certain Settlement and Release Agreement (the "<u>ARL Settlement Agreement</u>") by and among me, in my capacity as Chapter 11 Trustee, ARL and Landmark;

c.     that certain Settlement and Release Agreement (the "<u>Victory Settlement Agreement</u>") by and among me, in my capacity as Chapter 11 Trustee, Victory, Netherlands Insurance, and Peerless Insurance; and

d.     that certain Settlement and Release Agreement (the "<u>UniFirst Settlement Agreement</u>") by and among me, in my capacity as Chapter 11 Trustee, UniFirst, National Union and North American Elite.

e.     That certain Settlement and Release Agreement (the "<u>Liberty Settlement Agreement</u>")[6] by and among me, in my capacity as Chapter 11 Trustee, Liberty Industries, Inc. ("<u>Liberty</u>") and Great American E&S Insurance Company ("<u>Great American</u>").

---

[6] I entered into the Liberty Settlement Agreement in consultation with the Official Committee and the Plaintiffs' Steering Committee. On April 20, 2015, the Official Committee and I filed a joint motion pursuant to Rule 9019 seeking approval of the Liberty Settlement Agreement [Docket No. 1219] (the "<u>Liberty Settlement Motion</u>"). On April 30, 2015, the Official Committee filed the Declaration of David J. Molton in Support of the Joint Motion of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors for an Order Approving Plan Support and Settlement Agreement with Liberty Industries, Inc. [Docket No. 1260] (the "<u>Molton Declaration</u>") which discussed in detail the reasonableness of the Liberty Settlement Agreement. The Molton Declaration is incorporated herein by reference. On May 8, 2015, Liberty filed the Declaration of Liberty Industries, Inc. in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. [Docket No. 1293]. This Court established May 12, 2015 at 4:30 p.m. as the deadline for the filing of any objections to the Liberty Settlement Motion. No timely objections have been filed. A hearing to approve the Liberty Settlement Agreement is scheduled concurrent with the Confirmation Hearing.

**B.     Provider Settlement Agreements**

24.     In addition to the settlements with National Defendants, in my capacity as the Chapter 11 Trustee, I have entered into settlement agreements with certain clinics and other healthcare providers that allegedly administered tainted NECC drugs (the so-called "<u>Provider Defendants</u>"), which are pending this Court's approval:

> a.     that certain Settlement and Release Agreement (the "<u>High Point Settlement Agreement</u>") by and among the Chapter 11 Trustee, High Point, and Ironshore;
>
> b.     that certain Settlement and Release Agreement (the "<u>Insight Settlement Agreement</u>") by and among the Chapter 11 Trustee, Insight, Lexington, Darwin, IGPM, the Doctors (as defined therein), the Virginia Plaintiffs (as defined therein), and Medical Mutual; and
>
> c.     that certain Settlement and Release Agreement (the "<u>Inspira Settlement Agreement</u>") by and among the Chapter 11 Trustee, Inspira, Lexington, and Ironshore.

**C.     Settlement Proceeds**

25.     The Plan seeks the approval of the settlements with the Provider Defendants (generally, and together with the Proposed National Settlements, the "<u>Proposed Plan Settlements</u>") at the Confirmation Hearing.

26.     If approved, the Proposed Plan Settlements will provide the estate with almost $113 million.[7]  Specifically, the Proposed Plan Settlements will result in at least the following

---

[7] As set forth more fully herein, the proceeds of the Proposed Plan Settlements, when combined with proceeds of the previously approved settlements will total over $211 million.

additional recoveries, over and above those to be realized from settlements previously approved

by this Court:

| Proposed Plan Settlement | Settlement Amount |
|---|---|
| Insight Settlement Agreement | $40,000,000 |
| UniFirst Settlement Agreement | $30,500,000 |
| Inspira Settlement Agreement | $16,000,000 |
| Ameridose Settlement Agreement | $10,000,000 |
| ARL Settlement Agreement | $6,400,000 |
| Victory Settlement Agreement | $5,500,000 |
| High Point Settlement Agreement | $3,500,000 |
| Liberty Settlement Agreement | $1,000,000 |
| **TOTAL** | $112,900,000.00 |

27.     Pursuant to the Plan: (a) the bulk of these settlement proceeds will be delivered

and paid into the Tort Trust, where such proceeds will be segregated in separate accounts; (b) all

NECC related tort claims against each Provider Defendant shall be channeled into that Provider

Defendant's respective account; and (c) all Tort Claimants who received injections of NECC

product from the settling provider and who have filed a timely-filed proof of claim (or a late-

filed proof of claim that this Court has determined should be excused from the Bar Date Order),

will have a right and opportunity under the Plan to seek distribution and payment from such

segregated and separate funds.  The remainder of those settlement funds will be released to the

Estate for distribution to other creditors under the Plan and for payment of the costs and expenses

of administration of the Chapter 11 Case.

28.     The settlement proceeds will become property of the Estate pursuant to the Plan.

Personal injury claimants by far hold the majority of claims in NECC's bankruptcy case.  As the

largest block of creditors anticipated to hold Allowed Claims, personal injury claimants (through

the Tort Trust) will receive the largest portion of NECC's assets, including the bulk of the

proceeds of the settlements that are the subject of the Proposed Plan Settlements.

## IV.      THE REASONABLENESS OF THE PLAN SETTLEMENTS

29.      For the reasons set forth below, I believe that each of the Proposed Plan Settlements is fair and reasonable.

### A.      The Approved National Settlements

#### 1.      The Shareholder Settlement, PMIC/Maxum Settlement and the GDC Settlement

30.      On May 6, 2014, I filed (a) the Chapter 11 Trustee's Motion to Compromise Controversies and to Approve Plan Support and Funding Agreement, with certain Insiders of the Debtor [Docket No. 712] (the "Shareholder Settlement Motion"), which sought approval of the Shareholder Settlement; (b) the Chapter 11 Trustee's Motion to Approve Compromise of Controversies and Settlements with Pharmacists Mutual Insurance Company and Maxum Indemnity Company [Docket No. 713] (the "PMIC/Maxum Settlement Motion"), which sought approval of the PMIC/Maxum Settlement; and (c) the Chapter 11 Trustee's Motion to Approve Compromise of Controversies and Insurance Settlement and Release Agreement with GDC Properties Management, LLC its Insurer and Certain of its Insiders (the "GDC Settlement Motion") [Docket No. 714], which sought approval of the GDC Settlement.   This Court approved the Shareholder Settlement Motion, the PMIC/Maxum Settlement Motion and the GDC Settlement Motion by Orders dated July 31, 2014 [Docket Nos. 970, 971 and 972 ], but expressly reserved until confirmation ruling on the third party releases and injunctions contemplated in those settlements.

31.      In support of the Shareholder Settlement Motion, the PMIC/Maxum Settlement Motion and the GDC Settlement Motion, I submitted the Declaration of Chapter 11 Trustee in Support of Pending Settlement Motions [Docket No. 905] (the "Trustee's Settlement Declaration").  I hereby adopt and incorporate the Trustee's Settlement Declaration.

13

32.     As set forth in the Trustee's Settlement Declaration, with respect to such third

party releases and injunctions:

> I believe that the Insurers would not have agreed to settle without
> the third party releases.  It quickly became clear to me that the
> Insurers would not agree to any settlement if there was any risk
> that any person or entity who arguably was an insured under any of
> the applicable insurance policies would seek reimbursement of
> defense costs to defend any claim against any of them.  Upon
> information and belief, the Insurers intend that the settlements
> terminate their obligations to pay either for defense costs of their
> putative insureds and their indemnity obligations under the various
> policies.  The most effective, indeed as a practical matter, the only,
> way to eliminate the risk of further defense costs to the insureds is
> to provide third party releases to eliminate the need for these
> insureds to defend themselves from any claims and therefore
> secure from the Insiders the "policy releases" the Insurers require
> as a condition to the Insurers' settlements.  Thus, the third party
> releases are *critical* to the settlements with the Insurers.  I do not
> believe the Insurers would have settled and contributed as much, if
> they would have settled and contributed any amounts whatsoever,
> absent the condition in the contemplated settlements for third party
> releases to be included in a confirmed chapter 11 plan.  In this
> fashion, all of the beneficiaries of the third party releases are
> contributors, in that the Insurers would not have contributed what
> they intend to contribute without the third party releases of all
> putative insureds, including those not directly contributing funds
> towards the settlement, in exchange for which the Insurers will
> secure "policy releases" from the insureds.   Similarly, the
> Contributors[8] would not enter into the [Shareholder Settlement
> Agreement] or waive their rights to defense under the applicable
> insurance policies if they were not protected from further third
> party claims from the plaintiffs who are likely to be to the principal
> beneficiaries of their contributions through my chapter 11 plan.

Trustee's Settlement Declaration at ¶ 36.

33.     Under the Shareholder Settlement Agreement, the released parties include the

Insiders, who are specifically identified as the "Contributors, and the respective spouses,

children, parents, and other nuclear family members of each Contributor, all trusts under which

---

[8] The Contributors are Barry Cadden, Lisa Cadden, Carla Conigliaro and Gregory Conigliarao.

the Contributors or their spouses or family members are settlors, trustees, or beneficiaries, the

Affiliated Entities,[9] and any other entities in which the Contributors' spouses, children or other

nuclear family members hold a controlling interest, and those entities' successors, assigns, and

predecessors." Shareholder Settlement Agreement at 4.

34. The Insiders would not have entered into the Shareholder Settlement Agreement

absent the release set forth therein. The Insiders were only willing to make their settlement

contributions and to waive their rights against certain insurance policies on the condition that any

settlement include a global release of the Insiders, their family members and affiliates entities.

**B.    The Proposed National Settlements**

**1.    The Ameridose Settlement**

**a.    Factual Background**

35. Ameridose is an affiliate of the Debtor, whose membership interests are all owned

by certain of the Debtor's Insiders. In 2006, Gregory Conigliaro and Barry Cadden launched

Ameridose. Ameridose sought to fill a niche market – pre-filling syringes and breaking down

vats of liquid medications into small intravenous bags for individual treatments. New federal

regulations rendered these procedures very costly for hospitals to perform themselves.

Ameridose was originally located in the same building in Framingham, Massachusetts as NECC.

In contrast to NECC, Ameridose had an FDA manufacturing license, under which Ameridose

could ship medications in bulk without obtaining individual prescriptions.

---

[9] The Affiliated Entities are 203 Flanders Road, LLC; 205 Flanders Road, LLC; Alaunus
Pharmaceutical, LLC; Ameridose, LLC; Cadden Family-2012, LLC; Cardo Properties, LLC;
Conigliaro Block, Inc.; Conigliaro Family Investments, LLC; Conigliaro Industries, Inc.; GDC
Holdings, Inc.; GDC Properties Management, LLC; Hunter Holdings, LLC; L & S Creations,
Inc.; Medical Sales Management, Inc.; Medical Sales Management, SW, Inc.; Nationwide Foam,
Inc.; Nationwide Recycling Sales Management, Inc.; Physicians Choice Medical Marketing,
LLC; and Stone House Realty Group, LLC. *See* Shareholder Settlement Motion at Exhibit 1.

36.     Ameridose did not compound MPA.  Products distributed by Ameridose did not contribute to the Outbreak.

37.     PMIC issued to Ameridose a Businessowners Special Policy, policy number BOP 0083404 05, with a policy period of March 1, 2011 to March 1, 2012; and a Businessowners Special Policy, policy number BOP 0083404 06, with a policy period of March 1, 2012 to March 1, 2013 (collectively, the "Primary Ameridose Policies").

38.     PMIC also issued to Ameridose a Commercial Excess/Umbrella Liability Policy, policy number UCL 0083404 04, with a policy period of March 1, 2011 to March 1, 2012 and a Commercial Excess/Umbrella Liability Policy, policy number UCL 0083404 05, with a policy period of March 1, 2012 to March 1, 2013.

39.     Subject to the policies' terms, conditions and exclusions, the PMIC policies contain a Professional Services Exclusion barring coverage for bodily injury arising out of the rendering or failure to render a professional service including instances where the alleged bodily injury arises out of an insured's rendering or failure to render "pharmacy services" as that term is defined by the policies.

40.     Ameridose sought coverage under the PMIC policies in connection with the Tort Cases.  The policies that PMIC issued to Ameridose are similar to those issued to NECC and, as such, PMIC maintained that the policies' Professional Services Exclusion, among other exclusions, barred coverage for the Tort Cases.  For that reason, while PMIC is presently defending Ameridose against the Tort Cases, it is doing so subject to a full and complete reservation of rights to disclaim coverage and withdraw the defense.

### b.     The Ameridose Settlement Agreement

41.     On November 24, 2014, in consultation and cooperation with the Official Committee and the Plaintiffs' Steering Committee, I entered into a the Ameridose Settlement

Agreement.  Under the Ameridose Settlement Agreement, PMIC will make payment of $10 million to me, in my capacity as Chapter 11 Trustee, for eventual distribution to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 Case.[10]

**c.      The Ameridose Settlement is in the best interests of NECC's estate.**

42.      The proposed compromise in the Ameridose Settlement Agreement is fair and reasonable and should be approved.  The Ameridose Settlement Agreement is the product of extended and intensive good faith, arm's-length negotiations that resolve complex and difficult disputes and provides substantial cash to this estate for the benefit of its creditors.  In considering the specific *TMT/Jeffrey* Factors and the circumstances of this case, all four weigh particularly strongly in support of the proposed settlement.  In addition, the proposed third party releases were necessary conditions to the Ameridose Settlement Agreement.

**i.      The probability of success**

43.      The first *TMT/Jeffrey* Factor (likelihood of success) must be measured both with regard to the Trustee's claims against Ameridose and with regard to the coverage dispute with PMIC.  The difficulty and complexity of the litigation involved and the expense, inconvenience and delay in pursuing the litigation both virtually mandate approval of the proposed compromise. It is unclear what claims I or the Estate have against Ameridose, in light of the fact that Ameridose did not compound or distribute the MPA which gave rise to the Outbreak.   The facts underlying any case would be based in part upon testimony of some of the Insiders, which may be unavailable to me if the Insiders assert their rights to withhold testimony under the Fifth Amendment of the United States Constitution.  Even if the Insiders waive their Fifth Amendment

---

[10] A further summary of the Ameridose Settlement Agreement is set forth at pages 7-8 of the Disclosure Statement.  A true and correct copy of the Ameridose Settlement Agreement is included in the Plan Supplement as Exhibit "2."

17

rights and testify, I would be in the position of relying upon the credibility of the testimony of the Insiders.

44.     Similar issues exist with respect to the coverage disputes with PMIC.  At bottom, the coverage dispute is a contract dispute.   Under Massachusetts law, "insurance contracts must be interpreted to reflect the intention of the parties as manifested by the policy language." *Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am.,* 338 F.3d 42, 47 (1st Cir. 2003)(citations omitted).   The interpretation of an insurance policy begins "with the actual language of the policies," and a court is to consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered."  *GRE Ins. Group v. Metropolitan Boston Hous. Ptnership.*, 61 F.3d 79, 81 (1st Cir. 1995)(*citing Trustees of Tufts Univ. v. Comm. Union Ins. Co.*, 415 Mass. 844, 849, 616 N.E.2d 576, 583 (1990)).

45.     "Contract interpretation presents, in the first instance, a question of law, and is therefore the court's responsibility.  If, however, a contract is thought ambiguous, the court may receive extrinsic evidence, even parol evidence, to determine whether uncertainty exists."  *In re Access Cardiosystems, Inc.,* 361 B.R. 626, 641 (Bankr. D. Mass. 2007)(*quoting, Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989) (citations omitted)). Thus, if this Court determines that the PMIC policies are unambiguous, then, without a trial, the parties would have to brief, and this Court would have to examine, multiple provisions of the various PMIC policies to discern the parties' intentions.  Policy terms would be the subject to painstaking analysis and argument.  If this Court determines that the PMIC policies are ambiguous, then a trial may be required.  I may have to rely in part upon the testimony of NECC's former principals for these coverage disputes as well.  Many of the coverage issues are heavily fact-intensive and will turn on facts that may not be determined until the outcome of the underlying litigation, including any

appeals, regardless of which party prevails in the coverage action. This significant delay in recovery, even in the best of circumstances, weighs heavily in favor of approval of the proposed settlement. Regardless of whether this Court determines that a trial is required, I anticipate that costly, expensive and time-consuming discovery will be required.

### ii.     Difficulty of collection

46.     The second *TMT/Jeffrey* Factor (difficulty of collection) is likewise avoided by the Ameridose Settlement Agreement. Upon information and belief, Ameridose has ceased operating and has no assets to satisfy a judgment. Any recovery against Ameridose would be limited to amounts available under PMIC's policies. As set forth above, recovery under those policies is far from certain.

### iii.    Complexity of the litigation involved and the expense, inconvenience and delay in pursuing litigation

47.     The third *TMT/Jeffrey* Factor (complexity, expense, inconvenience and delay in pursuing litigation) is also addressed by the Ameridose Settlement Agreement. As set forth above, PMIC has raised coverage issues. Litigating those issues would be expensive and any ultimate recovery would be subject to considerable delay.

48.     I believe that the settlement amount of $10 million is an amount that is more than could be secured were the NECC estate and personal injury claimants to succeed in litigation, especially when taking into account the costs and expenses of any such litigation and inevitable appeals. The settlement ensures prompt recovery without the risk of depleting, through years of litigation, and judgments and settlements in favor of competing claimants that otherwise might exhaust amounts available for recovery by the NECC estate.

### iv. The paramount interest of creditors

49.     Perhaps the most compelling factor supporting approval of the Ameridose Settlement is the fourth *TMT/Jeffrey* Factor (the best interests of the creditors).  Personal injury claimants have suffered severe medical and financial harm, regardless of whether Ameridose is liable for damages. The Ameridose Settlement Agreement, if allowed, will accelerate the progress of this case and provide a mechanism for prompt and meaningful payment to personal injury claimants holding Allowed Claims.  Personal injury claimants have already waited too long for this case to be resolved. Approval of the Ameridose Settlement Agreement will accelerate the pace of events necessary to occur to enable payment to such claimants and ameliorate the severe financial hardship from which many claimants are suffering.[11]

50.     Perhaps the strongest indicator of creditor support for approval of the Ameridose Settlement Agreement is that I, all of the members of the Official Committee, and the Plaintiffs' Steering Committee, support approval. The Plaintiffs' Steering Committee and the Official Committee have among them members and/or counsel who are sophisticated plaintiffs' personal injury counsel and both committees actively participated in the settlement negotiations with the numerous Contributing Parties. That both representative bodies strongly support approval of the Ameridose Settlement Agreement provides further validation and proof that the Ameridose Settlement Agreement serves the paramount interests of creditors.  A proper deference to their views weighs heavily in favor of approval of the Ameridose Settlement Agreement, through which claimants will obtain the benefit of payment from PMIC, without the risk, expense, and delay of protracted litigation and related appeals.  Indeed, the personal injury claimants themselves have overwhelmingly expressed their approval.  Of the approximately 3461 personal

---

[11] These statements apply equally to each of the Proposed Plan Settlements discussed throughout this Declaration.

injury claimants in Class D, 2,591 cast timely ballots in favor of the Plan, and only 25 voted to reject it. Moreover, another 74 tort claimants cast "defective ballots", all in favor of the Plan, other than eight who abstained from voting.

v.     **The third party releases were necessary to achieve the Ameridose Settlement**

51.     PMIC is funding the Ameridose Settlement Agreement. Ameridose and PMIC would only agree to contribute to a settlement of claims against Ameridose on the condition that PMIC, Ameridose and their affiliates be released parties under the Plan's third party release provisions and that Ameridose, PMIC and their affiliates be beneficiaries of the related plan injunctions.

52.     Ameridose and PMIC would not have entered into the Ameridose Settlement Agreement absent the third party releases set forth in the Plan. Ameridose and PMIC were only willing to enter into negotiations on the condition that any settlement result in a final settlement of all NECC related liability. The third party releases release Ameridose, PMIC, as well as related parties, including direct and indirect affiliates and present officers, directors, agents and employees, all of whom would potentially seek indemnity and contribution from Ameridose and PMIC in connection with any litigation against these related parties relating to NECC. The scope of these releases is limited to claims arising from NECC contaminated products. Further, to the extent individuals are released as officers, directors, agents and employees, those individuals are only released in such capacity. The third party releases are a necessary condition to Ameridose and PMIC's final settlement of all NECC related liability.

## 2.    The ARL Settlement

### a.    Factual Background

53.     ARL is an Oklahoma corporation with a principal place of business in Oklahoma City, Oklahoma.  For a number of years prior to and including 2012, ARL conducted sterility testing on NECC's products, including the allegedly three contaminated MPA lots that were compounded by NECC during 2012.

54.     Upon information and belief, by the fall of 2013, hundreds of lawsuits in federal and state courts throughout the country named ARL as a defendant. Many of those cases were later transferred to the MDL Court – whether by the Judicial Panel on Multidistrict Litigation or operation of transfer orders entered by the MDL Court.  To date, more than 680 state and federal lawsuits have been joined in the MDL Court.

55.     Absent a prompt, global resolution of those numerous competing claims, any amounts available to compensate personal injury claimants likely would have been exhausted in a race to the courthouse. In contrast, a prompt global resolution with ARL through the NECC estate would ensure that available proceeds were equitably distributed among those who were injured or died as a result of the contaminated MPA lots.

56.     On May 31, 2013, ARL's insurance company, Landmark filed a petition (the "Landmark Petition") in Oklahoma state court seeking a declaratory judgment concerning the scope of an insurance policy issued by it to ARL for the period from October 1, 2011 through October 1, 2012.  The petition sought a declaration that (i) "the claims asserted in the underlying lawsuits, and all other claims asserted against ARL for injuries, arise out of a series of related, allegedly negligent acts, errors, or omissions and are therefore treated as a single claim," and (ii) "because [the claims] are treated as a single claim, [the] $3,000,000 claim limit, and not the $6,000,000 aggregate limit applies to satisfy all claims or asserted claims against ARL arising

22

Case 1:13-md-02419-RWZ Document 1258-1 Filed 06/14/15 Page 76 of 146
Case 1:13-md-02419-RWZ Document 3528 Entered on FLSD Docket 05/14/15 Page 329 of 775
Exhibit 24     Page 329 of 775

from the underlying event[.]" On January 23, 2014, after ARL filed an answer to the Landmark Petition, the court granted the Plaintiffs' Steering Committee's motion to intervene in the declaratory judgment action and the Plaintiffs' Steering Committee filed an answer to the Landmark Petition.

57.     Settlement discussions with ARL spanned many months.

58.     On April 1 and 2, 2014, mediation sessions were held in Boston, Massachusetts, among myself, the Plaintiffs' Steering Committee, counsel for the Official Committee, one of the members of the Official Committee, ARL and Landmark.  Carmen Reiss, Esq. of Resolutions LLC was the mediator.  The mediation was conducted pursuant to the MDL Court's Mediation Order dated August 15, 2013.

59.     ARL's and Landmark's primary defenses were that plaintiffs would not be able to prove that: (i) ARL tested any final product[12] from any of the three contaminated lots of MPA; (ii) any testing conducted by ARL yielded an inaccurate result; and (iii) that any act or omission by ARL caused damage to any individual claimant.  As for insurance coverage, Landmark's position was that the $3 million claim limit applied, and that, pursuant to the policy, the claim limit was reduced by defense costs that had been incurred by Landmark between October 2012 and March 2014.

60.     The settlement negotiations were at all times contentious, hard fought and conducted on an arms-length basis.

---

[12] ARL contended that the 5 mL vials of MPA submitted to it for testing from the three contaminated lots of MPA were taken from each respective batch before the filling of vials for release and it was likely that any contamination occurred during the fill process.  Thus, according to ARL, even if it were negligent in conducting the sterility testing, which ARL disputed, it would not have discovered any contamination as the vials sent for testing were not contaminated.

61.     The mediation session concluded during the evening of April 2, 2014, with the parties having reached an agreement on the essential financial terms pursuant to which ARL and Landmark would contribute $6.4 million to the settlement fund.

62.     While the financial terms of the settlement had been agreed upon, negotiations continued among myself, the Plaintiffs' Steering Committee, counsel for the Official Committee, ARL, and Landmark for many months over the terms and wording of the ARL Settlement Agreement.  The agreement was finalized and executed on December 4, 2014.

### b.     The ARL Settlement Agreement

63.     On November 24, 2014, in consultation and cooperation with the Official Committee and the Plaintiffs' Steering Committee, I entered into the ARL Settlement Agreement.  Under the ARL Settlement Agreement, Landmark will make payment to me, in my capacity as Chapter 11 Trustee, the amount of $6.4 million for eventual distribution to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 Case.[13]

### c.     The ARL Settlement is in the best interests of NECC's estate

64.     The proposed compromise embodied in the ARL Settlement Agreement is fair and reasonable and should be approved.  The ARL Settlement Agreement is the product of extended and intensive good faith, arm's-length negotiations that resolve complex and difficult disputes and provides substantial cash to this estate for the benefit of its creditors.  In considering the specific *TMT/Jeffrey* Factors and the circumstances of this case, all four weigh particularly strongly in support of the proposed settlement.  In addition, the proposed third party releases were necessary conditions to the ARL Settlement Agreement.

---

[13]  A true and correct copy of the ARL Settlement Agreement is included in the Plan Supplement as Exhibit "3."

### i.    The probability of success

65.    In evaluating the Estate's and its creditors' claims against ARL for damages resulting from the contaminated MPA lots, it is necessary to examine not only ARL's conduct in testing NECC's products, but also to consider ARL's defense that, even if NECC could prove negligence, ARL's negligence was not a proximate cause of the injuries suffered by any of the personal injury claimants.  Because the samples of MPA that were sent to ARL for sterility testing were apparently not taken from the final product after the fill procedure, it is possible that the vials tested were, in fact, sterile, and that the contaminated vials of MPA distributed to clinics and hospitals were actually contaminated during the fill procedure. To rebut ARL's causation defense, experts would be required to engage in extensive forensic analyses of NECC's operations. In order to prove that ARL's negligence proximately caused the injuries to the victims, it would be necessary to retain experts who could testify as to what caused the adulteration of the MPA lots and when the contamination occurred.  Proving that ARL acted negligently and that its negligence caused the injuries suffered by victims would be complex and expensive. Moreover, the losing party could appeal, leading to further delay, complexity and expense.

66.    Moreover, to prevail against ARL, the NECC estate (and the personal injury claimants) might be in the position of relying upon the testimony of some of the Insiders regarding NECC's course of dealing with ARL.  This could pose difficulties as, upon information and belief, the Insiders likely would assert their rights to withhold testimony under the Fifth Amendment to the United States Constitution, which could make obtaining a recovery against ARL all the more challenging.  As time passes, it will also likely become more difficult to obtain reliable testimony concerning when and how the contamination occurred.

Case 1:19-md-02819-NG Document 1258-4 Filed 06/04/15 Page 79 of 146
Case 1:13-cv-03494-RWZ Document 585-4 Entered 06/04/15 Page 332 of 765 Desc Main
Document 24 Page 332 of 765

67. The NECC estate has claims for indemnity and contribution against ARL. The personal injury claimants have direct claims. I am mindful that litigation is inherently risky and that the difficulties summarized above make success in litigation far from certain. The ARL Settlement Agreement essentially bypasses the liability concerns described above. Under the ARL Settlement Agreement, ARL and its insurer are making a substantial contribution without regard to their potential defenses and without regard to the strength or weakness of the factors described above that, in the worst case for NECC and the personal injury claimants, might result in a finding in favor of ARL.

### ii. Difficulties in collection

68. ARL is a small, closely held business with few assets. As for ARL's insurance policy, it is by no means certain that it provides more than $3 million for all of the claims of the NECC estate and the personal injury claimants. Moreover, as the ARL insurance policy is a "wasting policy" (*i.e.*, defense costs are deducted from the policy limits) it is highly likely that the policy limits (whether $3 million or $6 million) would be eroded by defense costs in the ensuing litigation if a settlement is not approved. I believe that if the insurance policy were to be exhausted, collecting judgments against ARL's assets would be extremely difficult. Additionally, any coverage litigation with ARL's insurer would also be costly, difficult, complex and time consuming.

### iii. Complexity of the litigation involved and the expense, inconvenience and delay in pursuing litigation

69. Upon information and belief, the litigation that would be required to be pursued if the ARL Settlement Agreement is not approved would be complex and expensive. Moreover, any such litigation likely would be protracted, such that any recovery for the benefit of creditors would be significantly delayed. Absent settlement, ARL likely will vigorously contest liability

until its insurance coverage is exhausted by defense costs, and it will then likely file for bankruptcy protection or simply cease to operate as a going concern.

70.     I believe that the settlement amount of $6.4 million is an amount that is more than could be secured were the NECC estate and personal injury claimants to succeed in litigation, especially when taking into account the costs and expenses of any such litigation and inevitable appeals.  The settlement ensures prompt recovery without the risk of depleting, through years of litigation, judgments among competing claimants that otherwise might exhaust amounts available for competing claimants.

### iv.     The paramount interest of creditors

71.     The ARL Settlement Agreement, if approved and consummated, will accelerate the progress of this case and provide a mechanism for prompt and meaningful payment to personal injury claimants holding Allowed Claims.  Approval of the ARL Settlement Agreement will accelerate the pace of events necessary to occur to enable payment to such claimants and ameliorate the severe financial hardship from which some claimants are suffering.

72.     As with the other Proposed Plan Settlements, all of the members of the Official Committee, and the Plaintiffs' Steering Committee, support approval of the ARL Settlement Agreement. That both representative bodies strongly support approval of the ARL Settlement Agreement provides further validation and proof that the ARL Settlement Agreement serves the paramount interests of creditors.  A proper deference to their views weighs heavily in favor of approval of the ARL Settlement Agreement.

        v.      **The third party releases were necessary to achieve the ARL Settlement**

73.    As a direct participant in the settlement negotiations, I understood that a channeling injunction and third party releases were the *sine qua non* for ARL's and its insurer's agreement to settle.

74.    ARL and Landmark would not have entered into the ARL Settlement Agreement absent the third party releases set forth in the Plan. ARL and Landmark were only willing to enter into negotiations on the condition that any settlement result in a final settlement of all NECC related liability. The third party releases release ARL and Landmark, as well as related parties, including direct and indirect affiliates and present officers, directors, agents and employees, all of whom would potentially seek indemnity and contribution from ARL or Landmark in connection with any litigation against these related parties relating to NECC. The scope of these releases is limited to claims arising from NECC contaminated products. Further, to the extent individuals are released as officers, directors, agents and employees, those individuals are only released in such capacity. The third party releases are a necessary condition to ARL's and Landmark's final settlement of all NECC related liability.

        **3.**    **The Victory Settlement**

           **a.**    **Factual Background**

75.    Victory is a Massachusetts corporation with its principal place of business in Bellingham, Massachusetts. For years prior to and continuing through and after the Outbreak Victory designed, installed and maintained NECC's HVAC systems, including the HVAC systems for the cleanrooms at NECC's facility, in which the three contaminated MPA lots were compounded. At all relevant times, Victory was insured by Netherlands Insurance and Peerless Insurance (collectively "<u>Victory Insurers</u>").

76.     Victory entered into the MDL Court's mediation program, pursuant to the MDL Court's Mediation Order dated August 15, 2013, prior to being named in suits by hundreds of plaintiffs.  The mediation sessions with Victory were held on July 21 and July 23, 2014 in Boston, Massachusetts.  Participants of the mediation included me, representatives of the Plaintiffs' Steering Committee, counsel for the Official Committee, Victory, and the Victory Insurers.  Carmen Reiss of Resolutions LLC acted as mediator.

77.     Victory strongly contested liability, claiming that the Plaintiffs' Steering Committee would be unable to prove that Victory negligently designed and/or installed the HVAC system or that it had a duty to maintain and service NECC's HVAC system for years prior to and during the time relevant to the outbreak.  More specifically, Victory asserted, among other things, it did not:  (a) design, install or maintain the fan filter boxes and HEPA filters in the ceiling of the cleanrooms where openings were found that would allow contaminants to fall into the cleanroom;[14] and (b) have a maintenance agreement with NECC to service the HVAC system of the cleanrooms during the time the contaminated products were compounded.[15]

---

[14] Victory contends that because it was not responsible for the fan filter boxes and HEPA filters for the cleanrooms its employees never conducted any work or inspected above the cleanrooms after the initial installation of the HVAC system.  Therefore, Victory claims that it could not have been responsible for or aware of the gaps between the fan filter boxes and ceiling tiles of the cleanrooms, the debris above the cleanrooms and the holes in the ductwork that supplied air to the cleanrooms, contending those events occurred after its installation.

[15] Victory contends that it only had a maintenance agreement with NECC for one of the cleanrooms from 2007 to 2009, and that even if they did have an obligation to service the HVAC system thereafter, that NECC would not cooperate to allow servicing and entrance into the facility.

78. A point of great contention was the presence of exserohilum rostratum and aspergillus fumigatus[16] within the HVAC system. The plaintiffs contended that the negligent design of the HVAC system pulling outside air from a location directly adjacent to a recycling factory lead to these fungi entering the cleanroom through the HVAC system. Victory claimed that the presence of the fungi in the HVAC system demonstrated that the HVAC system was working and collecting the contaminants before they entered the cleanroom, insisting that the contaminants entered on NECC personnel or others' bodies that entered the cleanroom.

79. Victory also vehemently argued that the Plaintiffs' Steering Committee could not prove that its actions caused the victims injuries. Victory contended that even if it had been negligent in some way, ultimately, the negligence of others broke the causal chain between its negligence and the injuries of the plaintiffs.

80. There was also a dispute over whether Victory's insurance policy limit under the Victory Policies totaled $7 million for the relevant policy period.

81. On July 23, 2014, the mediation concluded and the parties reached an agreement on the essential financial terms, pursuant to which Victory and the Victory Insurers would contribute $5.5 million to the settlement fund.

### b. The Victory Settlement Agreement

82. While the financial terms of the settlement had been agreed upon, negotiations continued among me, the Plaintiffs' Steering Committee, counsel for the Official Committee, Victory and the Victory Insurers for many months over the terms and wording of the Victory Settlement Agreement. The agreement was finalized and executed on November 11, 2014.

---

[16] Exserohilum rostratum and aspergillus fumigates were the fungi found in the contaminated recalled vials of NECC's MPA and the spines of many victims who contracted fungal meningitis.

83.    Under the Victory Settlement Agreement, Peerless Insurance and Netherlands Insurance will make payments to me, in my capacity as Chapter 11 Trustee, in the amount of $5.5 million for eventual distributions to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 Case.[17]

### c.    The Victory Settlement is in the best interests of NECC's estate

84.    The proposed compromise in the Victory Settlement Agreement is fair and reasonable and should be approved.  The Victory Settlement Agreement is the product of extended and intensive good faith, arm's-length negotiations that resolve complex and difficult disputes and provides substantial cash to this estate for the benefit of its creditors.  In considering the specific *TMT/Jeffrey* Factors and the circumstances of this case, all four weigh particularly strongly in support of the proposed settlement.  In addition, the proposed third party releases were necessary conditions to the Victory Settlement Agreement.

### i.    The probability of success

85.    While I believe Victory's negligence could ultimately be proven, success against Victory in litigation is far from certain.  Although Victory's contentions that it did not have a duty to design, install and service the cleanroom HVAC system, and, even if it did, that it did not negligently perform such duties were surmountable, Victory presented credible arguments and defenses as to causation.

86.    Victory asserted that if exserohilum rostratum and aspergillus fumigates were found on the air intake filters it would show that the filters were functioning appropriately and capturing the fungi from the outside air before it could circulate through the HVAC system.

---

[17] A further summary of the Victory Settlement Agreement is set forth at pages 13-14 of the Disclosure Statement.  A true and correct copy of the Victory Settlement Agreement is included in the Plan Supplement as Exhibit "7."

Moreover, Victory claimed that the filter the Plaintiffs' Steering Committee's expert did find spores of the fungi on was not an air intake filter but a mixed air filter. According to Victory, fresh air and return air from the cleanroom is funneled through the mixed air filter making the cleanroom itself a potential source of the fungal spores found in the mixed air filter. Victory also asserted that it did not install the HEPA filters adjacent to the areas where the aspergillus fumigates was located and that another party was responsible for the gap between the HEPA filter and the cleanroom ceiling.

87.     During the four day inspection of NECC, the Plaintiffs' Steering Committee and their experts' ability to take samples were negotiated with NECC, GDC and specifically, and strictly, curtailed by the Federal Bureau of Investigation ("FBI") who were present during the investigation. The Plaintiffs' Steering Committee's experts were only permitted to take limited samples due to time constraints to complete a facility wide inspection and were also limited in their ability to remove samples from filters, ceiling tiles, walls and other locations given the strict oversight by the FBI. In order to prove that Victory's negligence proximately caused the injuries to the victims with more than somewhat circumstantial evidence, it would be necessary to have an expert thoroughly examine and test multiple samples from NECC's entire cleanroom HVAC system. However, it has been approximately two and one-half years since NECC has ceased operations, making the probative value of any evidence found in the HVAC system uncertain at best.

88.     Furthermore, in order to establish the negligence claims asserted by the Plaintiffs' Steering Committee, discovery directed toward Liberty, NECC and its employees would also be necessary. Such discovery would likely investigate which entity designed the air intake, which actually installed the HEPA filters, and which controlled the pressurization in the cleanroom

(potentially responsible for putting holes in the HVAC system), *etc.* – all of which Victory vehemently claimed it did not do. Such discovery was not available at the time of mediation and would have been extremely costly to perform and unlikely to be obtained given that knowledgeable Insiders would likely assert their rights to withhold testimony under the Fifth Amendment to the United States Constitution.

89.    Another challenge was establishing that the casual chain between any potential negligence claimed of Victory was not broken later by acts of negligence by other parties, including Liberty, NECC, UniFirst (the company that provided sanitation services to NECC, my settlement with which is described below) and the hospitals and healthcare providers that performed the injections.

90.    Litigation is inherently risky and after evaluating all liability factors, I believe that the Victory settlement is reasonable, fair and adequate.

### ii.    Difficulties in collection

91.    Victory is a privately held Massachusetts company with minimal assets as it relates to the claims held by the plaintiffs.  While a declaratory judgment action seeking to decline insurance coverage was not filed by the Victory Insurers, the reality of such was real given the claims made by the Plaintiffs' Steering Committee.  If such an action was filed and successful, Victory has limited assets to cover the claims of the plaintiffs.

### iii.    Complexity of the litigation involved and the expense, inconvenience and delay in pursuing litigation

92.    I reasonably anticipate that litigation of the claims against Victory would be lengthy, complex and expensive.  Likely, Victory would vigorously deny liability, reducing the amount of available insurance coverage, and protracting any resolution of the claims against them.  Moreover, costly discovery would have been required of other entities, including NECC,

Liberty and UniFirst to establish certain theories of liability. Many of the personal injury claimants have already waited over two and one-half years for compensation and are suffering substantial financial hardship as a result of the injuries caused by the contaminated MPA.

93. I believe that the settlement amount of $5.5 million is an amount that is more than could be secured were the NECC estate and personal injury claimants to succeed in litigation, especially when taking into account the costs and expenses of any such litigation and inevitable appeals. The settlement ensures prompt recovery without the risk of depleting, through years of litigation, judgments among competing claimants that otherwise might exhaust amounts available for competing claimants.

### iv. The paramount interest of creditors

94. The Victory settlement of $5.5 million provides for a fair and reasonable outcome for creditors, NECC's estate and Victory. I believe that the Victory settlement provides a greater recovery to NECC's estate and its creditors than what is likely through litigation, and without the costs, complexity, delay and ultimate uncertainty of litigation.

95. The Victory Settlement Agreement, if allowed, will accelerate the progress of this case and provide a mechanism for prompt and meaningful payment to personal injury claimants holding Allowed Claims. Approval of the Victory Settlement Agreement will accelerate the pace of events necessary to occur to enable payment to such claimants and ameliorate the severe financial hardship from which some claimants are suffering.

96. As with the other Proposed Plan Settlements, all of the members of the Official Committee, and the Plaintiffs' Steering Committee, support approval of the Victory Settlement Agreement. That both representative bodies strongly support approval of the Victory Settlement Agreement provides further validation and proof that the Victory Settlement Agreement serves

the paramount interests of creditors. A proper deference to their views weighs heavily in favor of approval of the Victory Settlement Agreement.

**v.    The third party releases were necessary to achieve the Victory Settlement**

97.    Victory and the Victory Insurers would not have entered into the Victory Settlement Agreement absent the third party releases set forth in the Plan. Victory and the Victory Insurers were only willing to enter into negotiations on the condition that any settlement result in a final settlement of all NECC related liability. The third party releases release Victory and the Victory Insurers, as well as related parties, including direct and indirect affiliates and present officers, directors, agents and employees, all of whom would potentially seek indemnity and contribution from Victory or the Victory Insurers in connection with any litigation against these related parties relating to NECC. The scope of these releases is limited to claims arising from NECC contaminated products. Further, to the extent individuals are released as officers, directors, agents and employees, those individuals are only released in such capacity. The third party releases are a necessary condition to Victory's and the Victory Insurers' final settlement of all NECC related liability.

**4.    The UniFirst Settlement**

**a.    Factual Background**

98.    UniFirst is a Massachusetts corporation with its principal place of business at 68 Jonspin Road, Wilmington, Massachusetts.[18]    UniFirst contracted with NECC to provide cleaning services that included the cleaning of the "cleanrooms" used to manufacture and/or compound drugs, including the NECC drugs responsible for this tragedy. UniFirst's corporate mission is to be recognized as the "quality leader" in the cleaning and garment industry and,

---

[18]  UniFirst may also do business as UniClean Cleanroom Services, a division of UniFirst.

upon information and belief, it represents to its customers that hiring UniFirst will "improve the safety and cleanliness" of their business facility.

99.     Among other cleaning duties, NECC paid UniFirst to mop and sanitize the floors, walls and ceilings of each NECC cleanroom, and each pass-through leading to each cleanroom, on a monthly basis.  UniFirst was responsible for vacuuming all floors with a HEPA filtered vacuum system.  The company's workers were then required to first clean pass-through areas, including walls and ceilings, and then separately sanitize them with isopropyl alcohol.  The company was supposed to mop all floors, and then sanitize all floors using UniFirst's proprietary cleanroom mopping systems with materials provided by UniFirst.  UniFirst was also responsible for cleaning and sanitizing all exterior hoods in each NECC cleanroom.  In accordance with its contractual obligations and industry standards for good cleanroom procedures the two-step process of cleaning and then sanitizing was mandatory for each task.

100.    Upon information and belief, industry standards require that each action take due time, diligence, and attention to detail, since many particles and contaminants are not visible to the human eye.  UniFirst was required to perform these services at NECC's facility and use these products on a monthly basis for two years prior to the Outbreak.

101.    The master complaint filed on November 5, 2013 in the MDL Proceedings (the "Master Complaint")[19] named UniFirst as a defendant.  The Master Complaint states:

> Defendant UniFirst Corporation ("UniFirst") was hired by NECC to clean the NECC and Ameridose clean rooms, including the clean rooms where the contaminated products were manufactured. . . . NECC's internal records report numerous instances of reported mold and bacterial contamination in the months leading up to the outbreak.  UniFirst failed to provide adequate cleaning services that would have prevented contamination of the drugs made in those clean rooms.

---

[19]   Amended Master Complaint, MDL Proceeding Docket No. 545.

102.    UniFirst's negligence was reasonably clear even at the pre-discovery stage. Conditions leading to fungal and other contamination were rife at the NECC facilities during 2012.   UniFirst was the only outside, industrial cleaner responsible for assuring industrial sanitary conditions for a pharmacy compounding "clean room" facility.  Upon information and belief, UniFirst repeatedly departed from both industry standards and contractual requirements, not only failing to accomplish rudimentary clean health standards, but at times exacerbating the unsanitary conditions at NECC.

103.    Although UniFirst failed to undertake its duties in accordance with industry and contractual standards, as UniFirst only visited NECC one time a month, it would be difficult to prove that UniFirst's negligence was a substantial contributing factor that caused contamination of MPA from the NECC cleanrooms.

104.    Along with the Plaintiffs' Steering Committee and the Official Committee, UniFirst and I began discussing the possibility of resolving claims against UniFirst through mediation in early 2014.

105.    In June and July of 2014, the Plaintiffs' Steering Committee and UniFirst, with the involvement of the myself and the Official Committee, agreed to mediate privately, outside of the court-ordered mediation program, with David Geronemus of JAMS Arbitration, Mediation, and ADR Services.  The parties exchanged mediation briefs in late summer and early fall of 2014.

106.    Due to scheduling conflicts, the first in-person mediation did not take place until October 17, 2014.

107.    The mediation occurred in the context of attempting to resolve UniFirst's claims for indemnification against NECC in addition to resolving the tort victim's claims against

UniFirst.  Despite a day-long effort by all parties and some limited progress, no resolution was reached, although the parties' positions at that time showed the obvious middle point at which an agreement might be reached.

108.    Following the October in-person mediation session, the parties continued discussing a possible resolution of claims against UniFirst.  On December 3, 2014, the date the Plan was originally filed, the parties had not yet reached an agreement in principle.  The parties continued through discussions with the mediator, both separately and together, to seek resolution.

### b.    The UniFirst Settlement Agreement

109.    On February 22, 2015, the parties signed the UniFirst Settlement Agreement.  Under the UniFirst Settlement Agreement, UniFirst agreed to contribute $30.5 million to the NECC estate in exchange for, among other things, a third-party release.[20]

### c.    The UniFirst Settlement is in the best interests of NECC's estate

110.    The proposed compromise in the UniFirst Settlement Agreement is fair and reasonable and should be approved.  The UniFirst Settlement Agreement is the product of extended and intensive good faith, arm's-length negotiations that resolve complex and difficult disputes and provides substantial cash to this estate for the benefit of its creditors.  In considering the specific *TMT/Jeffrey* Factors and the circumstances of this case, all four weigh particularly strongly in support of the proposed settlement.  In addition, the proposed third party releases were necessary conditions to the UniFirst Settlement Agreement.

---

[20] The UniFirst Settlement was completed after the Plan Supplement was filed. However, a copy of the UniFirst Settlement Agreement is included in the version of the Plan Supplement provided to solicited parties as Exhibit "10."

### i.     The probability of success

111.     The Plaintiffs' Steering Committee was prepared to litigate against UniFirst, but the outcome of such efforts was far from certain.  Overcoming UniFirst's asserted defenses, particularly as they relate to the issue of causation, would be an uphill battle and require a tremendous expenditure of resources over a long period of time.

112.     UniFirst has vigorously maintained that it bore no responsibility for the Outbreak. While the Plaintiffs' Steering Committee had a basis for contesting UniFirst's defenses, there were serious questions about the ability to prove that UniFirst directly caused the fungal contamination in the batches of MPA.

113.     Establishing liability and damages as to UniFirst was further hampered by UniFirst's document retention policies, the questionable record keeping at NECC, and an anticipated lack of deposition testimony from the NECC Insiders.  While none of these should permit UniFirst to escape liability, all had the practical effect of making the case against UniFirst harder to prove.

114.     Given my extensive litigation experience with such matters, I harbored serious concerns that Plaintiffs would be able to recover significantly more than $30.5 million in the aggregate for tort victims within a reasonable period of time through multiple, individual trials.

### ii.     Difficulties in collection

115.     UniFirst is contributing substantial amounts as part of the UniFirst Settlement Agreement. If such amounts were awarded through litigation, I believe that collecting such judgments against UniFirst's assets would be extremely difficult.   Additionally, any such litigation or collection efforts would also be costly, difficult, complex and time consuming.

### iii. Complexity of the litigation involved and the expense, inconvenience and delay in pursuing litigation

116.     NECC hired UniFirst to clean the NECC facility, including the cleanrooms where MPA was compounded. The prospects of proving Unifirst's liability were challenging.  Even if negligence could be proven, there would remain difficult issues as to whether Unifirst's negligence was a proximate cause of the victims' injuries.  UniFirst only visited the NECC facility once a month for 90-120 minutes.  It was unclear whether NECC could have reasonably expected UniFirst to sanitize adequately the cleanroom during these brief, monthly visits. It would be difficult to prove a correlation between Unifirst's visits and any bacterial or fungal contamination.

117.     I believe that the settlement amount of $30.5 million is an amount that is more than could be secured were the NECC estate and personal injury claimants to succeed in litigation, especially when taking into account the costs and expenses of any such litigation and inevitable appeals.  The settlement ensures prompt recovery without the risk of depleting, through years of litigation, judgments among competing claimants that otherwise might exhaust amounts available for competing claimants.

### iv. The paramount interest of creditors

118.     The UniFirst Settlement Agreement, if allowed, will accelerate the progress of this case and provide a mechanism for prompt and meaningful payment to personal injury claimants holding Allowed Claims.  Approval of the UniFirst Settlement Agreement will accelerate the pace of events necessary to occur to enable payment to such claimants and ameliorate the severe financial hardship from which some claimants are suffering.

119.     As with the other Proposed Plan Settlements, all of the members of the Official Committee, and the Plaintiffs' Steering Committee, support approval of the UniFirst Settlement

Agreement. That both representative bodies strongly support approval of the UniFirst Settlement

Agreement provides further validation and proof that the UniFirst Settlement Agreement serves

the paramount interests of creditors.  A proper deference to their views weighs heavily in favor

of approval of the UniFirst Settlement Agreement.

**v.  The third party releases were necessary to achieve the UniFirst Settlement**

120.    The approach chosen long ago for resolving the NECC catastrophe – non-debtor

releases in exchange for significant contributions to the bankruptcy estate – provided a vehicle

for the resolution of creditors' claims against UniFirst that would not have otherwise been

available in a non-bankruptcy context.  From the early stages of litigation, UniFirst stated that it

was only interested in settling if it could resolve all tort victims' claims against it.  Without the

settlement, significant compensation from UniFirst to the victims of this tragedy would be in

doubt.  Without the settlement, if financial compensation from UniFirst for the victims ever

came, it would only be after years of continued litigation and a significant delay in justice for the

victims of this tragedy. UniFirst's $30.5 million contribution is the largest contribution from a

National Defendant.   For comparison, the other National Defendants, ARL and Victory,

contributed $6.4 million and $4.5 million respectively.

121.    UniFirst not have entered into the UniFirst Settlement Agreement absent the third

party releases set forth in the Plan.  UniFirst was only willing to enter into negotiations on the

condition that any settlement result in a final settlement of all NECC related liability.  The third

party releases release UniFirst, as well as related parties, including direct and indirect affiliates

and present officers, directors, agents and employees, all of whom would potentially seek

indemnity and contribution from UniFirst in connection with any litigation against these related

parties relating to NECC. The scope of these releases is limited to claims arising from NECC

41

Case 1:13-md-02419-RWZ Document 1425-1 Filed 06/04/15 Page 95 of 146
Case 1:13-md-02419-RWZ Document 1325-4 Filed 05/10/15 Page 93 of 75
Exhibit 24 Page 493 of 755

contaminated products. Further, to the extent individuals are released as officers, directors, agents and employees, those individuals are only released in such capacity. The third party releases are a necessary condition to UniFirst's final settlement of all NECC related liability.

**C. The Provider Settlement Agreements**

**1. The High Point Settlement**

**a. Factual Background**

122.   High Point is an ambulatory surgery center located in High Point, North Carolina High Point purchased MPA from NECC.  At High Point's facilities, a total of seventy-four patients received injections from contaminated MPA lots that were compounded by NECC during 2012.  High Point was insured by Ironshore during the relevant time period.

123.   During the second half of 2014, High Point and Ironshore agreed to enter into the Mediation Program established by the MDL Court.

124.   There was a substantial variance in degree of harm and duration of injury among parties pursuing claims against High Point (the "High Point Claimants").  While there was some dispute over the diagnoses, High Point Claimants took the position that out of the twenty-one High Point Claimants, five claimants suffered from fungal meningitis;[21] seven claimants suffered from epidural abscesses, steroid site infections or paraspinal infections; and two claimants suffered a stroke.[22]  Eight of the claimants received potent anti-fungal medication that had terrible side effects and risks such as disturbing hallucinations, liver or kidney function impairment, rashes and skin eruptions, very painful light sensitivity and long-lasting cognitive

---

[21]  One of the five High Point Claimants who suffered from fungal meningitis resolved her claim prior to the mediation.

[22]  One of the two claimants suffering a stroke was the same claimant who resolved her claim prior to mediation.

impairment.  Five claimants were required to undergo one or more painful lumbar puncture diagnostic/monitoring procedures as well as repeated MRI/CT's and blood tests.

125.    On September 16, 2014, a mediation session was held in Boston, Massachusetts among myself, High Point Claimants' attorneys, High Point and Ironshore.  Carmen Reiss of Resolutions LLC was the mediator.  The mediation was conducted pursuant to the MDL Court's Mediation Order dated August 15, 2013.

126.    Under the mediator's auspices, the parties discussed at length the strengths and weaknesses of the liability case against High Point, with High Point and Ironshore strongly contesting that High Point Claimants would be able to prove that High Point breached the standard of care owed to individual claimants.  It was recognized by all parties that 95% of the medical malpractice cases tried in North Carolina end in defense verdicts.  The parties also discussed the likelihood of North Carolina's medical malpractice noneconomic damages statutory cap applying to claimants and as well as the effect it would have on potential verdicts.  Specifically, High Point asserted that under North Carolina law, the noneconomic damages component of a judgment could not exceed $500,000 against all defendants and that the statutory cap would apply to all claims brought by all parties arising out of the same professional services.  The mediator, at all times, was actively involved in the process, ably encouraging the parties to logically and rationally consider their positions, authorities and facts to facilitate movement and realistic bargaining on each side.

127.    The mediation session concluded late in the evening on September 16, 2014, with the parties having reached an agreement on the essential financial terms of the High Point Settlement Agreement.  While High Point maintains it was not legally liable, together with Ironshore, it nonetheless agreed to contribute $3.5 million to the settlement fund in exchange for

a non-debtor release and injunction providing protection against any claims and liability relating to NECC's compounded drugs.

### b. The High Point Settlement Agreement

128.    On December 3, 2014, in consultation and cooperation with the Official Committee and the Plaintiffs' Steering Committee, I entered into the High Point Settlement Agreement.  Under the High Point Settlement Agreement, High Point and Ironshore will make payment to me, in my capacity as Chapter 11 Trustee, the amount of $3.5 million for eventual distribution to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 Case.[23]

### c. The High Point Settlement is in the best interests of NECC's estate

129.    The proposed compromise in the High Point Settlement Agreement is fair and reasonable and should be approved.  The High Point Settlement Agreement is the product of extended and intensive good faith, arm's-length negotiations that resolve complex and difficult disputes and provides substantial cash to this estate for the benefit of its creditors.  In considering the specific *TMT/Jeffrey* Factors and the circumstances of this case, all four weigh particularly strongly in support of the proposed settlement.  In addition, the proposed third party releases were necessary conditions to the High Point Settlement Agreement.

### i.    The probability of success

130.    High Point asserted legal and factual defenses to liability in connection with its alleged role in the Outbreak.  Only sixteen of High Point's seventy-four patients were considered "cases" by the CDC.  Of the sixteen, only two were definitively diagnosed with meningitis.  One

---

[23]    A further summary of the High Point Settlement Agreement is included in the Disclosure Statement at pages 14-15.  A true and correct copy of the High Point Settlement Agreement is included in the Plan Supplement as Exhibit "4."

of these two patients recovered, and one passed away. High Point settled the death case separately months before the September 16, 2014 mediation. All of the remaining patients have seen their symptoms resolve. With regard to the remaining claims, High Point asserted defenses which included the lack of causation between its actions and alleged injuries and damages; the so-called "sealed container defense", and the assertion that High Point's care of patients was consistent with the applicable standard of care. All of the patients whom High Point treated had severe pre-existing back pain before the injections, and many had other significant co-morbidities. Under North Carolina law, which High Point contends would apply to these cases, non-economic damages are capped at $500,000 for the applicable time period. Furthermore, none of the High Point patients has significant economic damages.

### ii. Difficulties in collection

131. Given the scope of potential claims against High Point and Ironshore, and the legal and factual issues discussed throughout this Declaration, I believe that obtaining and/or collecting any judgments against High Point's or Ironshore's assets would be extremely costly, complex, and time consuming. Moreover, the potential state law cap on non-economic damages may further negatively affect the collectability of any judgment.

### iii. Complexity of the litigation involved and the expense, inconvenience and delay in pursuing litigation

132. Litigation against High Point would have been complex and inconvenient and would have resulted in considerable delay in recoveries for the benefit of personal injury claimants. Further, it is by no means certain that NECC's tort creditors would be able to realize through litigation the significant sum that High Point and its insurer have contributed to the NECC estate. I believe that the settlement amount of $3.5 million is an amount that is more than could be secured were the NECC estate and personal injury claimants to succeed in litigation,

especially when taking into account the costs and expenses of any such litigation and inevitable appeals. The settlement ensures prompt recovery without the risk of depleting, through years of litigation, judgments among competing claimants that otherwise might exhaust amounts available for competing claimants.

### iv. The paramount interest of creditors

133. The High Point Settlement Agreement, if allowed, will accelerate the progress of this case and provide a mechanism for prompt and meaningful payment to personal injury claimants holding Allowed Claims. Approval of the High Point Settlement Agreement will accelerate the pace of events necessary to occur to enable payment to such claimants and ameliorate the severe financial hardship from which some claimants are suffering

134. As with the other Proposed Plan Settlements, all of the members of the Official Committee, and the Plaintiffs' Steering Committee, support approval of the High Point Settlement Agreement. That both representative bodies strongly support approval of the High Point Settlement Agreement provides further validation and proof that the High Point Settlement Agreement serves the paramount interests of creditors. A proper deference to their views weighs heavily in favor of approval of the High Point Settlement Agreement.

### v. The third party releases were necessary to achieve the High Point Settlement

135. The High Point settlement is conditioned upon confirmation of a Plan that provides third party releases. In fact, during settlement negotiations it was understood that neither High Point nor Ironshore would enter into a settlement agreement unless such an agreement included third party releases.

136. High Point and Ironshore would not have entered into the High Point Settlement Agreement absent the third party releases set forth in the Plan. High Point and Ironshore were

46

only willing to enter into negotiations on the condition that any settlement result in a final settlement of all NECC related liability. The third party releases release High Point and Ironshore, as well as related parties, including direct and indirect affiliates and present officers, directors, agents and employees, all of whom would potentially seek indemnity and contribution from High Point and Ironshore in connection with any litigation against these related parties relating to NECC. The scope of these releases is limited to claims arising from NECC contaminated products. Further, to the extent individuals are released as officers, directors, agents and employees, those individuals are only released in such capacity. The third party releases are a necessary condition to High Point's and Ironshore's final settlement of all NECC related liability.

### 2. The Insight Settlement Agreement

#### a. Factual Background

137. Insight is a Delaware corporation with a principal place of business in Minneapolis, Minnesota. Insight purchased the clinic at issue (the "Roanoke Clinic") in Roanoke, Virginia in 2010. At that time, the Roanoke Clinic was already using MPA from NECC.

138. In connection with the purchase of the Roanoke Clinic, Insight entered into a contractual agreement with the local physicians, Dr. John Mathis and Dr. Robert O'Brien, who were already practicing at the Roanoke Clinic. Those doctors continued to work at the Roanoke Clinic through their practice group, Image Guided Pain Management ("IGPM").

139. One hundred fifty-three persons or their estates have filed claims against Insight and/or IGPM arising out of injections of MPA at the Roanoke Clinic (generally, the "Virginia Plaintiffs"). These 153 cases include eight wrongful death cases. The majority of the surviving plaintiffs are elderly.

140.    Lexington Insurance issued two liability policies to Insight that provided coverage for claims made by the Virginia Plaintiffs.  Insight also maintained an excess or umbrella policy with Darwin that provided secondary coverage for these claims.

141.    Mediation of the Virginia Plaintiffs' claims formally began on September 11, 2014, when the Virginia Plaintiffs presented the merits of their cases to the two mediators selected by the parties.

142.    The mediation process took place over nearly six months, covering the period August 22, 2014 to February 12, 2015.  There were multiple face-to-face sessions including five days in Roanoke, one day in Northern Virginia, and 3 days in Boston.  Ultimately, the mediations resulted in a settlement.  Each and every one of the Virginia Plaintiffs overwhelmingly supported the settlement and signed the Insight Settlement Agreement.

### b.    The Insight Settlement Agreement

143.    On February 12, 2015, in consultation and cooperation with the Official Committee and the Plaintiffs' Steering Committee, I entered into the Insight Settlement Agreement with Insight, Lexington Insurance and Darwin, IGPM, two affiliated doctors, and their insurer Medical Mutual.[24]

144.    Under the Insight Settlement Agreement, Insight, Lexington, Darwin and Medical Mutual will make payments to me, in my capacity as Chapter 11 Trustee, in the aggregate amount of $40 million.[25]

---

[24]  These parties are hereinafter referred to as the "Insight Settling Parties".

[25]  A further summary of the Insight Settlement Agreement is set forth in the Disclosure Statement at pages 21-23.  A copy of the Insight Settlement Agreement is included in the Plan Supplement as Exhibit "5."

### c.     The Insight Settlement is in the best interests of NECC's estate

145.     The proposed compromise in the Insight Settlement Agreement is fair and reasonable and should be approved.   The Insight Settlement Agreement is the product of extended and intensive good faith, arm's-length negotiations that resolve complex and difficult disputes and provides substantial cash to this estate for the benefit of its creditors.   In considering the specific *TMT/Jeffrey* Factors and the circumstances of this case, all four weigh particularly strongly in support of the proposed settlement.   In addition, the proposed third party releases were necessary conditions to the Insight Settlement Agreement.

#### i.     The probability of success

146.     Both Insight and IGPM contested liability and promised to present a vigorous defense.  Insight had retained nationally-recognized experts to bolster its defense that Insight and IGPM were not at fault for any of the damages suffered by the Virginia Plaintiffs.   Instead, Insight and IGPM were likely to assert that NECC was solely at fault due to NECC's having distributed contaminated MPA without the knowledge of Insight or IGPM.

147.     IGPM's insurance coverage proved to be challenging.   IGPM and its member doctors (also defendants) held a policy issued by Medical Mutual.  Medical Mutual defended the actions filed by the Virginia Plaintiffs under a reservation of rights.   Medical Mutual filed a federal declaratory judgment action challenging its duty to defend IGPM and the doctors, as well as its coverage of the claims.   After the district court held that Medical Mutual had a duty to defend the Virginia Plaintiffs' claims, Medical Mutual appealed the district court decision to the United States Court of Appeals for the Fourth Circuit, where the case remained as of the date of Insight Settlement Agreement.   Medical Mutual never relented in its aggressive position on a lack of coverage.

148.     In addition, the amount of coverage for IGPM was also a disputed.   While
discovery responses revealed that IGPM had $6 million in total combined coverage for the
practice group and the two doctors, Medical Mutual argued that the Medical Mutual policy only
provided $6 million in coverage *per insured* (*i.e.*, Medical Mutual policy provides a potential
total of $18 million in coverage for the three insured parties under that policy).

### ii.     Difficulties in collection

149.     Aside from insurance coverage, IGPM has no known significant assets.   The
information provided by Insight provided no objective basis for me, the Virginia Plaintiffs, the
Official Committee or the Plaintiffs' Steering Committee to believe that a substantial verdict in
excess of insurance coverage could be collected.   There was also a concern that Insight might file
for bankruptcy protection after suffering from a substantial adverse verdict.   Insight had been
purchased out of bankruptcy in 2010 by the current owner.   There was therefore a heightened
concern that the owner's familiarity with the reorganization process might make it more willing
to seek this protection.   An Insight chapter 11 proceeding would delay and diminish recoveries.

### iii.     Complexity of the litigation involved and the expense, inconvenience and delay in pursuing litigation

150.     Any trial against Insight or IGPM would have been extraordinarily expensive and
would have led to considerable delay.   Recoveries might also have to await the outcome of
insurance coverage litigation. I believe that the settlement amount of $40 million is an amount
that is more than could be secured were the NECC estate and personal injury claimants to
succeed in litigation, especially when taking into account the costs and expenses of any such
litigation and inevitable appeals.   The settlement ensures prompt recovery without the risk of
depleting, through years of litigation, judgments among competing claimants that otherwise
might exhaust amounts available for competing claimants.

#### iv.      The paramount interest of creditors

151.     The Insight Settlement Agreement, if approved and consummated, will accelerate the progress of this case and provide a mechanism for prompt and meaningful payment to personal injury claimants holding Allowed Claims.   Approval of the Insight Settlement Agreement will accelerate the pace of events necessary to occur to enable payment to such claimants and ameliorate the severe financial hardship from which some claimants are suffering.

152.     As with the other Proposed Plan Settlements, all of the members of the Official Committee, and the Plaintiffs' Steering Committee, support approval of the Insight Settlement Agreement. That both representative bodies strongly support approval of the Insight Settlement Agreement provides further validation and proof that the Insight Settlement Agreement serves the paramount interests of creditors.  A proper deference to their views weighs heavily in favor of approval of the Insight Settlement Agreement.

#### v.      The third party releases were necessary to achieve the Insight Settlement

153.     The Insight Settling Parties would not have entered into the Insight Settlement Agreement absent the third party releases set forth in the Plan.  The Insight Settling Parties were only willing to enter into negotiations on the condition that any settlement result in a final settlement of all NECC related liability.   The third party releases release the Insight Settling Parties, as well as related parties, including direct and indirect affiliates and present officers, directors, agents and employees, all of whom would potentially seek indemnity and contribution from the Insight Settling Parties in connection with any litigation against these related parties relating to NECC. The scope of these releases is limited to claims arising from NECC contaminated products. Further, to the extent individuals are released as officers, directors, agents and employees, those individuals are only released in such capacity. The third party

51

releases are a necessary condition to the Insight Settling Parties' final settlement of all NECC related liability.

### 3. The Inspira Settlement Agreement

#### a. Factual Background

154.    Inspira is incorporated in the State of New Jersey as a nonprofit, non-stock, 501(c)(3) charitable organization. Inspira operates health care facilities in New Jersey. Physicians at those facilities injected patients with contaminated MPA which had been compounded and distributed by NECC.

155.    During the second half of 2013, Inspira agreed to participate in a mediation program offered by me, the Official Committee and the Plaintiffs' Steering Committee.  While Inspira chose not to enter into the mediation program established by the MDL Court, it nonetheless agreed to mediate privately before Professor Eric Green, who was designated by Judge Zobel as the lead mediator in the MDL Court's mediation program.  Judge Zobel was apprised of the Inspira private mediation and was periodically provided status reports on its progress.

156.    Under the auspices of Professor Green, Inspira continued to negotiate during numerous conference calls starting in the fall of 2013 and continuing until June, 2014.  On July 2, 2014 and July 24, 2014, lengthy mediation sessions were held in New York, New York.

157.    The mediation sessions concluded during the evening of July 24, 2014, with the parties reaching a settlement.

#### b. The Inspira Settlement Agreement

158.    On December 3, 2014, in consultation and cooperation with the Official Committee and the Plaintiffs' Steering Committee, I entered into the Inspira Settlement Agreement with Inspira and its insurers, Lexington and Ironshore (the "Inspira Settling Parties").

Under the Inspira Settlement Agreement, the Inspira Settling Parties will make payments to me, in my capacity as Chapter 11 Trustee, in the amount of $16 million for eventual distribution to creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 Case.

### c. The Inspira Settlement is in the best interests of NECC's estate

159.    The proposed compromise in the Inspira Settlement Agreement is fair and reasonable and should be approved.   The Inspira Settlement Agreement is the product of extended and intensive good faith, arm's-length negotiations that resolve complex and difficult disputes and provides substantial cash to this estate for the benefit of its creditors.  In considering the specific *TMT/Jeffrey* Factors and the circumstances of this case, all four weigh particularly strongly in support of the proposed settlement.   In addition, the proposed third party releases were necessary conditions to the Inspira Settlement Agreement.

### i. The probability of success

160.    In any litigation against Inspira, recovery would be subject to difficult issues involving causation and comparative fault. Inspira maintained that it acted reasonably and within applicable standards of care, did not know of NECC's shortcomings and indeed viewed itself a victim of NECC and the NECC insider's criminal conduct.

161.    Further, there is the issue of comparative fault under New Jersey law.  More particularly, NECC claimants would need to establish that Inspira was at least sixty percent (60%) at fault in order to have Inspira held jointly and severally liable for any claimant's entire judgment.[26]  Inspira would seek to diminish its own liability by presenting proof of the liability

---

[26]  Under New Jersey law, if a party is found to be less than 60% responsible for total damages, it can be held responsible only for payment of that percentage of damages directly attributable to

Case 1:13-md-02419-RWZ Document 4257-4 Filed 05/04/15 Page 107 of 146
Case 1:13-cv-23082 Document 26-4 Entered on FLSD 05/14/15 Page 61 of 75
Exhibit 24    Page 60 of 75

of others (*e.g.* NECC, NECC's employees and officers, certain healthcare providers, ARL, Liberty, Victory and Unifirst).

### ii.    Difficulties in collection

162.    Given the scope of potential claims against the Inspira Settling Parties, and the legal and factual issues discussed throughout this Declaration, I believe that obtaining and/or collecting any judgments against the Inspira Settling Parties' assets would be extremely costly, complex, and time consuming. Moreover, state law comparative fault principles may further negatively affect the collectability of any judgment.

### iii.    Complexity of the litigation involved and the expense, inconvenience and delay in pursuing litigation

163.    The Inspira settlement of $16 million is a substantial portion of Inspira's entire available insurance coverage.  I believe that the settlement amount of $16 million is an amount that is more than could be secured were the NECC estate and personal injury claimants to succeed in litigation, especially when taking into account the costs and expenses of any such litigation and inevitable appeals.  The settlement ensures prompt recovery without the risk of depleting, through years of litigation, judgments among competing claimants that otherwise might exhaust amounts available for competing claimants.

### iv.    The paramount interest of creditors

164.    The Inspira Settlement Agreement, if allowed, will accelerate the progress of this case and provide a mechanism for prompt and meaningful payment to personal injury claimants holding Allowed Claims.  Approval of the Inspira Settlement Agreement will accelerate the pace

---

its negligence.  N.J.S.A. 2A:15-5.3.  Of course there, is also the remote risk that a jury would ascribe no liability against Inspira.

of events necessary to occur to enable payment to such claimants and ameliorate the severe financial hardship from which some claimants are suffering.

165. As with the other Proposed Plan Settlements, all of the members of the Official Committee, and the Plaintiffs' Steering Committee, support approval of the Inspira Settlement Agreement. That both representative bodies strongly support approval of the Inspira Settlement Agreement provides further validation and proof that the Inspira Settlement Agreement serves the paramount interests of creditors. A proper deference to their views weighs heavily in favor of approval of the Inspira Settlement Agreement.

### v. The third party releases were necessary to achieve the Inspira Settlement

166. The Inspira Settling Parties would not have entered into the Inspira Settlement Agreement absent the third party releases set forth in the Plan. The Inspira Settling Parties were only willing to enter into negotiations on the condition that any settlement result in a final settlement of all NECC related liability. The third party releases release the Inspira Settling Parties, as well as related parties, including direct and indirect affiliates and present officers, directors, agents and employees, all of whom would potentially seek indemnity and contribution from the Inspira Settling Parties in connection with any litigation against these related parties relating to NECC. The scope of these releases is limited to claims arising from NECC contaminated products. Further, to the extent individuals are released as officers, directors, agents and employees, those individuals are only released in such capacity. The third party releases are a necessary condition to the Inspira Settling Parties' final settlement of all NECC related liability.

## V.    PLAN CONFIRMATION ISSUES[27]

### A.    The Plan Meets All Statutory Requirements to Confirmation

167.    The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) thereof, including, without limitation, sections 1122, 1123 and 1129.  Consistent with section 1122 of the Bankruptcy Code, each Class of Claims and Equity Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within that Class.

168.    Pursuant to section 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Classes of Claims and Equity Interests.  Pursuant to sections 1123(a)(2) and (3) of the Bankruptcy Code, Article III of the Plan also specifies all Classes that are unimpaired under the Plan and the treatment of each impaired Class of Claims and Equity Interests.

169.    Unless otherwise agreed to by particular holders, all of the holders of Claims or Equity Interests within each of the Classes are provided the same treatment under the Plan as required by section 1123(a)(4) of the Bankruptcy Code.

170.    Pursuant to section 1123(a)(5) of the Bankruptcy Code, Article VI and various other provisions of the Plan, including but not limited to Article V, specifically provide adequate means for the Plan's implementation, including, without limitation: (a) settlement and compromise of claims against the Debtor; (b) exhaustion of insurance policies; (c) restructuring the Debtor's estate to provide for, among other things, the settlement of tort claims through the establishment of the Tort Trust; (d) the continuation of the corporate existence and the vesting of assets in the Post-Effective Date Debtor (e) the cancellation of existing of existing agreements; and (f) appointment of the Post-Confirmation Officer.

---

[27] The following points and authorities are set forth at length in the Confirmation Brief and the Confirmation Reply Brief, which I have incorporated herein.

171.     In accordance with section 1123(a)(6) of the Bankruptcy Code and the Plan, the Post-Effective Date Debtor's certificate of incorporation and bylaws shall be deemed amended to include a provision  prohibiting the issuance of non-voting equity securities.

172.     Pursuant to section 1123(a)(7) of the Bankruptcy Code, the terms and conditions of the Plan contain provisions consistent with the interests of the Debtor's creditors and with public policy as to the manner and selection of any officer, director or trustee and any successor thereto.  As more fully described in the Plan, I shall be appointed as the sole officer and director of NECC to serve in accordance with the certificate of incorporation and the bylaws of NECC, as such may be amended to carry out the provisions of the Plan. The Insiders shall not have the power or ability to remove me as the Post-Confirmation officer or to affect any of my decisions in that capacity.

173.     The Plan complies with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Massachusetts, thus satisfying the requirements of section 1129(a)(1) of the Bankruptcy Code.

174.     I, along with the Official Committee, as co-proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 and Bankruptcy Rules 3017, 3018 and 3019. As evidenced by the Affidavit of Donlin, Recano and Company, Inc. Regarding Service of Solicitation Packages with Respect to Disclosure Statement for First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. Dated February 22, 2015 executed by John Burlacu and filed on March 13, 2015 [Docket No. 1193]; the Affidavits of Service executed by Maribeth D. Mills and filed on April 15, 2015 [Docket No.

212]; the Supplemental Affidavit of Donlin, Recano and Company, Inc. Regarding Service of Solicitation Packages with Respect to Disclosure Statement for First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. Dated February 22, 2015 executed by John Burlacu and filed on May 7, 2015 [Docket No. 1287]; the Affidavit of Publication of Notice of Confirmation Hearing [Docket No. 1211]; and other relevant documents, the solicitation of, acceptances of, and consent to the Plan were (a) in compliance with all applicable laws, rules, and regulations governing the adequacy of disclosure in connection with such solicitation, and (b) solicited after disclosure to the holders of Claims or Equity Interests of adequate information as defined in section 1125(a) of the Bankruptcy Code.

175.    Pursuant to section 1129(a)(3) of the Bankruptcy Code, I, along with the Official Committee, proposed the Plan in good faith and not by any means forbidden by law.  The filing of the Plan and all of its terms were properly approved and authorized by me, in my capacity as Chapter 11 Trustee.  Further, consistent with the overriding purpose of chapter 11 of the Bankruptcy Code, I, along with the Official Committee, assert that the Plan enables holders of Claims to realize the highest possible and most certain recoveries under the circumstances.  The Plan is the result of extensive and transparent arms-length negotiations among the Debtor, the Official Committee, the Plaintiffs' Steering Committee, and other major constituents.

176.    In accordance with section 1129(a)(4) of the Bankruptcy Code, all fees and expenses of professionals through the Effective Date are subject to final review for reasonableness by the Court under section 330 of the Bankruptcy Code.  In addition, pursuant to sections 503(b)(3) and (4), this Court must review any applications for substantial contribution to ensure compliance with the statutory requirements and that the fees requested are reasonable.

Finally, all other payments required to be disclosed under section 1129(a)(4) of the Bankruptcy Code have, in fact, been disclosed.

177.    Pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, I shall be appointed as the sole officer and director of NECC to serve in accordance with the certificate of incorporation and the bylaws of NECC, as such may be amended to carry out the provisions of the Plan. In addition, as of the Effective Date, the authority, power and incumbency of the persons then acting as directors and officers of the Debtor, and my own authority, power and incumbency as Chapter 11 Trustee, shall be terminated, and such directors and officers, as well as my appointment as Chapter 11 Trustee, shall be deemed to have been discharged pursuant to Bankruptcy Code section 350(a).

178.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan.  The foregoing provision is inapplicable in this Chapter 11 Case because the Plan does not provide for, or contemplate, any rate changes with respect to the current businesses.

179.    Pursuant to section 1129(a)(7) of the Bankruptcy Code, each holder of a Claim or Equity Interest in an impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Class would receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code.  Indeed, it is clear from the Liquidation Analysis, which is attached as Exhibit "A" to the Declaration of Stephen B. Darr in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. [Docket No. 1309], that the Plan provides for a recovery at least in equal value to, and in most cases much greater than, the recovery such creditors would receive pursuant to a chapter 7 liquidation.  A

chapter 7 liquidation of the Debtor's estate would result in a substantial reduction in the ultimate proceeds available for distribution to all Creditors and Equity Holders in this Chapter 11 Case.

180.    Pursuant to sections 1126 and 1129(a)(8) of the Bankruptcy Code, as indicated in the Declaration of Jung W. Song on Behalf of Donlin, Recano & Company, Inc. Regarding Voting and Tabulation of Ballots Accepting and Rejecting the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. [Docket No. 1294] (the "Ballot Report"), holders of Claims in Classes C, D, and E have overwhelmingly accepted the Plan. Classes A, B, and F are unimpaired under the Plan and are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

181.    In accordance with sections 1129(a)(9)(A), Article II of the Plan provides that all Allowed Administrative Expense Claims under sections 503(b) or 507(a)(1) or (2) of the Bankruptcy Code will be paid, in Cash, on the later of the Effective Date and the date such Administrative Expense Claim becomes and Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable.

182.    Pursuant to Article II of the Plan, except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable, the Post-Confirmation Officer shall pay to each holder of an Allowed Priority Tax Claim, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.

183.    Pursuant to section 1129(a)(10) of the Bankruptcy Code, and as evidenced by the Ballot Report, all three non-insider impaired Classes entitled to vote accepted the Plan; specifically Classes C, D, and E accepted the Plan.

184.     Pursuant to section 1129(a)(11) of the Bankruptcy Code, I have thoroughly
analyzed the Debtor's ability to meet its obligations under the Plan post-confirmation. Moreover,
I believe that the Estate will be able to satisfy its obligations under the Plan and that confirmation
of the Plan will not be followed by the need for liquidation or further financial reorganization,
other than as described in the Plan.  The Debtor will emerge from chapter 11 and continue to
exist as the Post-Effective Date Debtor.  Except as otherwise provided in the Plan, all property of
the Debtor's Estate, will vest in and become property of Post-Effective Date Debtor or in such
other Entity as provided in the Plan, principally the Tort Trust.  Further, the Debtor will be able
to satisfy the conditions precedent to the Effective Date and otherwise will have sufficient funds
to meet its post-confirmation obligations to pay for the costs of administering and fully
consummating the Plan and closing the Chapter 11 Case.

185.     As required by section 1129(a)(12) of the Bankruptcy Code, the Plan provides
that fees listed in 28 U.S.C. § 1930 will be paid on the Effective Date, and thereafter as may be
required with respect to any such fees payable after the Effective Date.

186.     The Debtor has no retirement benefit obligations.

**B.      The Third Party Releases are Appropriate and Necessary**

187.     In determining whether a non-debtor release is appropriate, courts in the District
of Massachusetts consider the five-factor test set forth in *In re Master Mortgage Investment
Fund*, 168 B.R. 930 (Bankr. W.D. Mo. 1994) (the "Master Mortgage Factors"). I am familiar
with the *Master Mortgage* Factors and believe that the Plan releases are appropriate.

**1.      There is an identity of interest between the debtor and the third
          parties such that a suit against the non-debtor is, in essence, a suit
          against the debtor or will deplete assets of the estate**

188.     There is an identity of interest between the Contributing Parties and NECC.
Those parties have, collectively, been made the subject of hundreds of lawsuits in both state and

federal courts, including those consolidated in the MDL Proceeding, alleging personal injury or
wrongful death due to the administration of NECC products. Accordingly, to the extent any of
the Contributing Parties is or becomes liable to any patient who received an injection of a
contaminated NECC product, those parties will have claims against NECC for, *inter alia*,
contribution and indemnity. Indeed, all settling vendors and clinics have filed proofs of claim
against the NECC estate on those grounds.

189.     Absent confirmation of the Plan and the effectiveness of the releases and
injunctions contained therein in favor of the Contributing Parties (which is a material condition
to each of the settlement agreements), I expect the Contributing Parties (who, pursuant to their
settlement agreements, waive, release and/or assign to the estate their claims against the estate)
to pursue their asserted claims against the NECC estate. As Judge Saylor noted in his decision
on my motion to transfer actions against NECC to the MDL Proceedings:

> Even in the absence of contractual indemnity agreements, the third-party
> defendants in the pending state-court actions may have claims for contribution or
> common-law indemnity from NECC in the event that they are found liable in state
> court. Those potential state-court verdicts pose the type of threat Congress had in
> mind when it crafted the exception to § 1334(c)(2)—*they can be "unpredictable
> and substantial" and even being required to contribute to their satisfaction
> "could have potentially deleterious effects on a debtor's estate."* This is
> particularly true in circumstances such as this, where the cause of action arises out
> of an allegedly defective product manufactured by the debtor. In many, if not all,
> jurisdictions, under ordinary circumstances, the debtor would be strictly liable for
> the harm caused by the defective product, even if there may have been a third-
> party interposed between the debtor and the tort claimant in the supply chain.

*In re New Eng. Compounding Pharm. Prods. Liab. Litig.,* 496 B.R. 256, 272 (quoting *Beck v.
Victor Equipment Co., Inc.,* 277 B.R. 179, 180-181 (S.D.N.Y. 2002) (Rakoff, J.)) (emphasis
supplied). Because "a suit against the [Contributing Parties] is, in essence, a suit against the
debtor or will deplete assets of the estate," *Master Mortgage*, 168 B.R. at 934, there is plainly an
identity of interest between NECC and the Contributing Parties.

### 2. The non-debtors have contributed substantial assets to the reorganization

190.    The Contributing Parties have, without question, contributed "substantial" assets to the reorganization, specifically as follows:

| Contributing Party | | Amount |
|---|---|---|
| Shareholders | Cash payment | **$47,500,000** |
| | Potential anticipated tax refunds | **$21,800,000** |
| Insight Settling Parties and Insurers | | **$40,000,000** |
| UniFirst and Insurers | | **$30,500,000** |
| NECC Insurers | | **$25,200,000** |
| Inspira and Insurers | | **$16,000,000** |
| Ameridose Insurer | | **$10,000,000** |
| ARL and Insurer | | **$6,400,000** |
| Victory and Insurers | | **$5,500,000** |
| GDC and Insurer | | **$3,750,000** |
| High Point and Insurer | | **$3,500,000** |
| Liberty and Insurer | | **$1,000,000** |
| **Total** | | **$211,150,000** |

191.    As set forth in more detail above, it is by no means certain that NECC's tort creditors would be able to realize through litigation the significant sum that the Contributing Parties have contributed to the NECC estate.  They certainly would not be able to realize any recovery whatsoever from the Contributing Parties without incurring the delay, expense and risks of litigation (including the risk that one significant judgment in favor of a tort claimant would significantly deplete the amounts available to pay others).  Under these circumstances, the Contributing Parties' contributions are each "substantial."

63

### 3.    The third party releases and injunctions are essential to the reorganization, and without them, there is little likelihood of success

192.    As is also set forth above, each and every settling Contributing Party demanded global releases and an injunction protecting them and their identified affiliates (and, in the case of NECC's shareholders, their spouses) from any and all claims that were related in any way to NECC or the drugs it compounded as a non-negotiable pre-condition to even agreeing to mediate their claims (let alone settling them). It was only upon the acceptance of these conditions by the Plan Proponents and the Plaintiffs' Steering Committee that the Contributing Parties agreed to make their significant contributions to the NECC estate. As such, the releases in favor of the settling parties themselves were a precondition to those parties' agreement to make their substantial contribution for the benefit of NECC's estate and creditors.

193.    The Plan's "affiliate and spousal" releases and injunctions were likewise essential components of the settlement agreements reached between me and the Contributing Parties. Simply put, NECC's shareholders and the other Contributing Parties would not have agreed to make their substantial contributions for the benefit of NECC's estate and creditors if their directors, officers, employees and other agents, and spouses, would have remained vulnerable to NECC-related litigation and liability after Plan confirmation. Among other things, the affiliated parties benefitting from the releases and injunctions also: may have had indemnification or contribution rights as against NECC's shareholders and the other Contributing Parties; be named "insureds" whose express consent and release of their "policy rights" were required for the insurers to consummate their settlements with me; or otherwise have an identify of interest with NECC's shareholders or other Contributing Parties such that settlement would otherwise prove impossible. In addition, NECC's shareholders agreed to contribute a share of their equity interests in certain affiliated entities, as well as their spouses'

64

interests in certain federal, state and local tax refunds, to the global settlement fund for the benefit of creditors, but only if those entities and individuals received the benefits of the Plan releases and injunctions. Finally, such "affiliate and spousal" releases were expressly limited and apply only "in their capacity as such." They afford no protection for any person or entity who has any independent liability for any reason under applicable law, including any culpable actions on their part.

194.    Accordingly, I believe that the releases and injunctions in favor of *all* of the Contributing Parties, including the affiliates/agents and spouses of NECC's shareholders and the other settling defendants, were and are essential to the successful consummation of the Settlement Agreements and the Plan.

195.    Absent these contributions, NECC would have no choice but to liquidate, with little -- if anything -- left over for creditors. It is thus indisputable that the Plan's release and injunction provisions are essential to the successful implementation of the Plan and subsequent distributions to NECC's creditors (including tort victims), and that without them, there is little likelihood of success.

**4.    A substantial majority of the creditors agree to such injunction, and the impacted class or classes have "overwhelmingly" voted to accept the proposed Plan treatment**

196.    The Ballot Report shows that the holders of a majority of claims (in amount) in the classes impacted by the Plan's release and injunction provisions (Class D tort claimants and holders of Class E Subordinated Claims) have already voted to accept the Plan. As this Court is aware, under the approved Solicitation Procedures, Class D's votes are weighted for voting purposes based on the severity of the claimant's injury. The schedule below demonstrates that to date, claimants whose family members were killed or who themselves suffered grievous injuries have overwhelmingly voted to accept the Plan.

| Injury | Weight of Claim for Voting Purposes[28] | Percentage Voting to Accept |
|---|---|---|
| Meningitis, stroke, and/or infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess, and/or arachnoiditis), after exposure to a contaminated NECC product resulting in the death of the claimant whose estate or other representative is submitting a vote | 120 points | 100.00% |
| Meningitis, stroke, and/or infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess, and/or arachnoiditis), after exposure to a contaminated NECC product not resulting in the death of the claimant | 80 points | 99.55% |
| Symptoms of headache, word-finding difficulty, nausea/vomiting, fever, neck stiffness or pain, back pain, photophobia, lack of appetite, urine retention, slurred speech, limb weakness, numbness, and/or pain at injection site and a lumbar puncture, MRI, or CT guided biopsy after exposure to a contaminated NECC product. | 10 points | 99.01% |
| Exposure to a contaminated NECC product and other injury or loss | 2 points | 99.55% |
| No exposure to a contaminated NECC product but other loss (i.e., a spouse's loss of consortium) | 1 point | 99.05% |

Of the 3461 personal injury claimants in Class D, 2,591 cast timely ballots in favor of the Plan, and only 25 voted to reject it. Moreover, another 74 tort claimants cast "defective ballots", all in favor of the Plan, other than eight who abstained from voting.

---

[28] For tabulation purposes, each point is worth $1.

Case 2:18-cv-02419-RM2-Document 128-5-Filed-05/14/15-Page 120 of 146
Case 2:18-md-02419-RM2-Document 128-5-Filed-05/14/15-Page 120 of 146
Exhibit 24     Page 743 of 765

197.    Moreover, the Official Committee and the Plaintiffs' Steering Committee have each expressed their strong support for the Plan - indeed, the Official Committee is a co-proponent of the Plan – and the Ballot Report demonstrates, as well, the tort claimants' "overwhelming" support of the Plan.

### 5.    The Plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction

198.    The establishment of the Tort Trust, which will be funded by the net proceeds of the Trustee's settlements with the Contributing Parties, also satisfies the fifth *Master Mortgage* Factor.  Courts analyzing this factor (whether a plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction) have not read that requirement to mean that claims of the affected class must be "paid in full" (a requirement very difficult to meet where, as here, the relevant claims are tort claims).  Rather, courts, including circuit courts, have held that releases are appropriate where there is a *mechanism* for payment of all the affected claims - for example, a trust or settlement fund, like the Tort Trust, into which the affected claims are channeled.  *See, e.g., Nat'l Heritage Found., Inc. v. Highbourne Found.*, 2014 U.S. App. LEXIS 12144, at **15-16

199.    Based upon the foregoing, the Plan fully complies with the requirements of Bankruptcy Code Sections 1122 and 1123 and all other provisions of the Bankruptcy Code, and therefore satisfies the requirements of Section 1129(a)(1) of the Bankruptcy Code.

## VI.    CONCLUSION

200.    I believe that confirmation of the Plan, including approval of the Proposed Plan Settlements and the third-party releases, provide for an exceptional outcome for creditors and NECC's estate.  The Plan provides a pot that could exceed $200 million, without the costs, complexity and delay of litigation, none of which NECC's estate easily can afford, if at all.  The vast majority of the NECC assets, including the proceeds of the settlements set forth in the Plan, will inure to the benefit of personal injury claimants holding allowed claims.  I believe that our collective efforts to accumulate such a large sum of money largely for personal injury claimants in this time frame in such a large and difficult nationally-significant mass tort case is unprecedented.  As such, and for all of the foregoing reasons, I believe that confirmation of the Plan is appropriate given that the Plan meets all statutory requirements necessary for confirmation under the Bankruptcy Code, that the settlements included therein are fair and reasonable, and that the interests of personal injury claimants is best served by confirmation of the Plan forthwith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 13, 2015

By: _____

Paul D. Moore

**Certificate of Service**

I, Michael R. Lastowski, hereby certify that on May 13, 2015, I caused a copy of the foregoing *Declaration of the Chapter 11 Trustee in Support of Confirmation of Second Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.*, which was filed using this Court's ECF system, to be served electronically upon those parties registered to receive ECF service.

/s/ *Michael R. Lastowski*
Michael R. Lastowski

# PLAN PROPONENTS' EXHIBIT 25

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

In re:

NEW ENGLAND COMPOUNDING
PHARMACY, INC.,

                                    Debtor.

Chapter 11

Case No. 12-19882-HJB

SUPPLEMENTAL DECLARATION OF THOMAS M. SOBOL
CONCERNING THE NATIONAL COMPENSATION PROGRAM
ESTABLISHED BY THE PROPOSED AMENDED PLAN OF REORGANIZATION

I, THOMAS M. SOBOL, declare and state as follows:

1.      I am a partner with the law firm Hagens Berman Sobol Shapiro LLP and member
of the bar of the Supreme Judicial Court of the Commonwealth of Massachusetts. I have been
practicing law for over 30 years and have been admitted *pro hac vice* in numerous jurisdictions
and district courts across the country. I make this declaration in response to the filing of the
"Limited Objection" [Dkt. No. 1280] and, less than 24 hours later, the "Withdrawal" [Dkt. No.
1286] of "Conditional Support of Katrina Eldreth to Confirmation of the Debtor's Joint Chapter
11 Plan."

A.      **Background**

2.      I am Court-appointed Lead Counsel and a member of the seven person Plaintiffs'
Steering Committee ("PSC") in this associated MDL, *In re New England Compounding
Pharmacy, Inc. Products Liability Litigation*, 1:13-md-2419-RWZ (D. Mass.) (the "MDL")
pending before the Honorable Rya W. Zobel (the "MDL Court"). As Lead Counsel, I have been
charged by the MDL Court with comprehensively coordinating pretrial strategy, discovery,

mediation, and authorizing settlement of claims on behalf of all tort victims in the MDL.[1]  I have

been fully engaged in all settlement matters including the drafting, review, and coordination of

the currently proposed Joint Amended Chapter 11 Plan of NECC (the "Plan").

3.    I also serve as a member of the Official Committee of Unsecured Creditors

("OCC"), through a proxy from my client Mr. Robert Cole.[2]

4.    I previously submitted an affidavit for consideration by the Court in relation to the

proposed settlement with UniFirst [Dkt. No. 1231] and in support of the Plan generally in my

capacity as a member of the PSC [Dkt. No. 1237].

**B.    Objection to the National Compensation Program**

5.    On May 5, 2015, at approximately 4:00 p.m. EDT, Ms. Anne Andrews, on behalf

of one of her clients, filed an objection with this Court indicating concerns over the proposed

National Compensation Program established by the Tort Trust Agreement[3] and the Claims

Resolution Facility Procedures (Exhibit A to the Tort Trust Agreement) which set forth the

procedures for, and proof required to be submitted to, the Court-appointed Settlement

Administrator who will, in the first instance, allocate monies held in the Tort Trust to victims and

families of victims of the NECC tragedy (the "Claims Procedures").

6.    Early on in this case, the PSC and OCC both determined that it was critically

important that an exhaustive and inclusive process be used to create and vet any proposed Claims

Procedures.  All agreed that the process must be substantively and procedurally fair to the

victims and families of victims.  The goal was to create a process for determining allocation of

the Tort Trust funds that was fair and efficient while also being thorough and inclusive.

---

[1] Order Appointing Lead Counsel and Plaintiffs' Steering Committee, MDL Dkt. No. 82.

[2] Dkt. No. 67.

[3] Dkt. No. 1123.

7.      Accordingly during 2013, various approaches to the allocation process were discussed by the PSC and OCC along with others outside of those committees.

8.      In the spring of 2014, as Lead Counsel for the PSC, I formed a committee of experienced attorneys to formalize proposals for the Claims Procedures.  This committee was not limited in membership to the PSC and OCC.  Mr. Rick Ellis was its functional leader along with PSC members Kim Dougherty, Marc Lipton, and Mark Zamora and, OCC member Harry Roth.

9.      I have personally known Mr. Ellis for over 30 years and know him to be an accomplished complex civil litigator who has significant experience with mass tort and bankruptcy matters such as this one, including experience with mass tort settlement matrices.  Ms. Dougherty, Mr. Lipton, and Mr. Zamora are all experienced litigators and members of the MDL Court-appointed PSC.  Mr. Roth I know to have an exceptional reputation as well as being a co-chair of the OCC.

10.     During the spring and summer 2014, this committee prepared and reviewed various proposals for allocation of funds.  The committee also retained expert treating physicians to advise and consult, as described in Mr. Ellis's declaration.

11.     The committee's process included outreach to plaintiff lawyers representing tort victims, both on and outside of the PSC and OCC, including multiple "open forum" phone calls that gave all plaintiffs' lawyers an opportunity to ask questions or raise concerns.  These calls were very well attended and many questions were asked that helped shape the ultimate Claims Procedures.

12.     On or about July 2014, a national meeting of lawyers for the NECC matter sponsored by the American Association of Justice was held.  During that meeting, Ms. Anne Andrews and Mr. Michael Coren, co-chairs of the OCC, were present and actively participated in discussion.  During that meeting, a detailed presentation of the proposed allocation mechanism

3

was made. I recall reporting at that time that it was critically important to achieve broad support and acceptance of the Claims Procedures as among all victims. I have a vivid recollection that no complaints to the allocation process were made with the exception of two minor concerns.

13.     As far as I recall, there were no major objections or issues regarding the Claims Procedures raised at that time. I do recall one matter that was left to further discussion as to the weighting of claims of relatives of deceased victims compared to injured victims, which was later resolved and was not the subject of the now withdrawn partial objection. At the time, my understanding was that both the PSC and OCC were content with the allocation process.

14.     At some point in the fall of 2014, the proposed Claims Procedures were brought up by the OCC. I was surprised to learn of outstanding concerns regarding the allocation process because of the hands-on approach and active participation from both committees. Nevertheless, the OCC formed a subcommittee to further review the proposed Claims Procedures.

15.     For about several weeks thereafter, the sub-committee reviewed the process with Rick Ellis and others and settled on further refinements. The sub-committee identified some concerns in a "white paper," and addressed those concerns with Mr. Ellis and others on the committee. My understanding is that the OCC subcommittee was satisfied with Mr. Ellis's responses and some small tweaks made to the Claims Procedures.

16.     Also by this time, numerous plaintiff attorneys tested a variety of client cases through the proposed settlement matrix to ensure that it worked, not only in theory but also in practice.

17.     Drafting of the Plan was a collaborative, critical process that underwent numerous drafts and was reviewed by the Chapter 11 Trustee, members of the PSC, members of the OCC, including the co-chairs of the OCC, as well as counsel for the OCC.

4

18.     During the many weeks that the parties reviewed the Plan, neither committee raised a substantive issue regarding the Claims Procedures. There was no indication that any objection remained to the Claims Procedures.

19.     The Plan Supplement, including the Tort Trust Agreement and Claims Procedures, was finalized and filed with the Court on February 13, 2015,[4] and soon followed on February 23, 2015, the Amended Disclosure Statement,[5] with no objections raised to me by the PSC, OCC, or any of the individual members of those committees. Following the filing of the Plan and the Claims Procedures, there were joint efforts by the PSC and OCC to "get the vote out" (*i.e.*, encourage claimants to vote on the plan and otherwise exercise their rights).

20.     As part of the Court-approved package sent to all victims receiving a Class D ballot, both the PSC and OCC penned separate letters endorsing the Plan, of which the Claims Procedures was a critical part. The PSC also included a plain English summary of the Disclosure Statement to further ensure recipients understood the Plan and the way the Claims Procedures would work.

21.     The OCC's March 6, 2015 letter of Plan endorsement sent to all claim holders states that "[t]he Plan is proposed jointly by the Committee and the Chapter 11 Trustee," and "[a]ccordingly, the Committee strongly supports acceptance of the Plan and urges all Unsecured Creditors to vote to accept it."[6] Ms. Andrews and her firm is the signatory of that letter as the committee co-chair. Neither during the drafting of this letter nor after, did Ms. Andrews inform the OCC or the PSC that she or her clients had any objections to the Claims Procedures.

---

[4] Dkt. No. 1123.

[5] Dkt. No. 1162.

[6] https://www.drcdrx.com/dr201/necp/NECC%20-
%20Committee%20Letter%20to%20Creditors%20Recommending%20Plan%20Acceptance.pdf

22.     After sending the letters of support, both committees undertook real efforts to support the Plan.

23.     On or about Tuesday, April 14, 2015, members of the PSC and the OCC participated in a joint call with all Plaintiffs' counsel to discuss the proposed Plan and to answer any questions concerning the Plan or Claims Procedures.  Members of the OCC participated in that call.  Ms. Andrews urged counsel on that call to encourage their clients to vote in favor of the Plan and offered up her assistance in answering questions about how the Plan and Claims Procedures would work.

24.     During the April 29, 2015 MDL hearing before Judge Zobel, Ms. Andrews expressed support of the Plan stating that "it's a tremendous result achieved by all here and we hope will be confirmed."[7]  Again, she did not indicate any issue that she or her clients had before the objection deadline of May 5, 2015.

25.     The first time that I learned that Ms. Andrews had an objection to the Claims Procedures was at about noon on May 5, 2015, the day which was the deadline to object, when I was advised that she may file an objection to the Plan.

26.     With respect to proof of exposure to other NECC products, the provisions of the Claims Procedures are clear.  If a party has evidence of exposure to other NECC products that were contaminated, he or she may provide that evidence to, and it may be considered by, the Settlement Administrator.  It is my understanding and memory that this provision has been in the Claims Procedures since the beginning of the process.  The Claims Procedures even provide a list of *examples* of the kind of evidence that may be provided that is meant to be illustrative, but *not* exhaustive:

---

[7] Transcript of MDL Status Conference Hearing (J. Zobel and M.J. Boal), April 29, 2015, p. 27, lines 14-15.

A. Proof of Exposure to a Contaminated Product Compounded by NECC After January
1, 2006 Apart From One of the Three Contaminated MPA Lots

In order for an Eligible Claim that does not involve an injection or injections from
one of the Three Contaminated MPA Lots to be deemed a Qualified Claim, the
Eligible Tort Trust Beneficiary must submit to the National Settlement
Administrator medical records or other records documenting that the Tort Trust
Beneficiary was administered a specified lot of NECC product that was
compounded by NECC after January 1, 2006 (*i.e.,* **a letter from a clinic, hospital
or doctor's office informing the Tort Trust Beneficiary that he/she was
administered a specified lot of NECC product)**. The Tort Trust Beneficiary
must also submit proof deemed sufficient by the National Settlement
Administrator that the administered lot of NECC product was contaminated.
**Examples of such satisfactory proof are the nine lots of non-MPA NECC
products which have been determined by the CDC to have been
contaminated (see attached Addendum A), and NECC's outside testing
laboratory's determination that some lots of NECC's products were
contaminated during the summer and fall of 2012 (see attached Addendum
B)**. If the requirements listed above are satisfied, the Tort Trust Beneficiary shall
be entitled to make a claim for one of the seven Base Point Categories designed
for the Three Contaminated MPA Lots described in Section IV.B herein. The Tort
Trust Beneficiary must satisfy the proof requirements for one of the seven Base
Point Categories and adjustments applied for, except the Tort Trust Beneficiary
need not provide proof of an injection from one of the Three Contaminated MPA
Lots and references to an "injection from one of the Three Contaminated MPA
Lots" in the seven Base Categories proof requirements will be read as
"administration from a contaminated lot of NECC product."[8]

27.     It is my understanding that after a phone call with Mr. Ellis and Mr. Roth, Ms.

Andrews, without *quid pro quo*, withdrew the objection; and it is my understanding that the FAQ

which will be sent to tort claimants will state what I thought had always been obvious:

circumstantial evidence may be considered by the Settlement Administrator in weighing claims.


I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

---

[8] Dkt. No. 1123-2, Section V.A. Proof of Exposure to a Contaminated Product Compounded by NECC After
January 1, 2006 Apart From One of the Three Contaminated MPA Lots, pp 36-37 (bold emphasis added).

Dated: May 14, 2015

Respectfully submitted,

_____
Thomas M. Sobol
*Lead Counsel for Plaintiffs' Steering Committee in MDL 2419*

# PLAN PROPONENTS' EXHIBIT 26

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

In re:

NEW ENGLAND COMPOUNDING
PHARMACY, INC.,

            Debtor.

Chapter 11

Case No. 12-19882-HJB

## SUPPLEMENTAL DECLARATION OF FREDRIC L. ELLIS CONCERNING THE NATIONAL COMPENSATION PROGRAM ESTABLISHED BY THE PROPOSED AMENDED PLAN OF REORGANIZATION

### I.    INTRODUCTION

1.    My name is Fredric L. Ellis. I have personal knowledge of all matters set forth in this Declaration, except for those matters stated to be upon information and belief, and I believe all such matters to be true and correct. I am competent to testify under oath to the matters set forth in the Declaration if called to do so.

2.    On April 28, 2015, I submitted a Declaration Concerning the National Compensation Program Established by the Proposed Amended Plan of Reorganization and in support of the Proposed Plan.  (Document No. 1236)  I file this supplemental declaration to clarify how claims involving "Other Products" (those not involving the Three Contaminated MPA Lots) and claims involving bacterial infections are treated in the National Compensation Program (the "Compensation Program").  A suggestion that the Compensation Program somehow treats claims involving Other Products unfairly was raised by the May 5, 2015 filing of the Limited Objection by Katrina Eldreth regarding the Proposed Plan (Document No. 1280) (hereafter, the "Limited Objection").  Although the Limited Objection was subsequently

1

withdrawn by Ms. Eldreth on May 6, 2015 (see Document No. 1286), the contentions in the

Limited Objection may cause some tort claimants to question how claims involving Other

Products and/or bacterial infections are treated under the Compensation Program. As those

concerns are unfounded, I submit this Supplemental Declaration.

## II.    THE PROCESS OF DEVELOPING THE COMPENSATION PROGRAM AND SUPPORT FOR THE PROGRAM

3.    As I set forth in my April 28, 2015 Declaration, the Compensation Program was

developed over a one-year period with the assistance of consulting physicians. In July of 2014, a

draft of the settlement matrix was distributed to all known plaintiffs' counsel who represent

victims of the outbreak and many of those counsel provided further input concerning the

Compensation Program. As a result of this input, appropriate adjustments were made to the

program. With the help of attorneys representing victims from different states, the settlement

matrix was tested by taking over 100 cases and comparing the results. All involved in this

testing process believed that the settlement matrix was fair and equitable, as applied.

4.    Members of the PSC were consulted during the process of developing the

Compensation Program, and the PSC has endorsed the Compensation Program, as has the

Creditors' Committee (of which Ms. Eldreth is a member). In fact, the Creditors' Committee

appointed its own matrix subcommittee to review the Compensation Program in September 2014

and, after their review, fully endorsed the Plan, of which the Compensation Program is an

integral part. Ms. Eldreth's own counsel "have been carefully following the developments of the

Plan allocation procedures under the matrix and fully support its aims and the precision with

which it has been tailored." Decl. of John C. Thornton, Document No. 1280-1, ¶ 4.) The Plan

has garnered support from more than 99% of the tort claimants who voted.

## III.   OTHER PRODUCTS AND HOW THEY ARE TREATED UNDER THE COMPENSATION PROGRAM

5.      As the Court is aware, this case primarily involves the claims of approximately 65

persons who died, and over 750 others who developed fungal meningitis and/or fungal

infections, after receiving injections from one of the Three Contaminated MPA Lots (Lots

05212012@68, 06292012@26, and 08102012@51).  However, it is estimated that there are also

between 25 and 50 claims involving Other Products (products other than the 3 contaminated lots

of MPA) compounded by NECC, many of which are alleged to have caused bacterial, not fungal,

infections.  After the outbreak, the CDC and FDA tested hundreds of NECC lots of Other

Products and found that only nine lots of Other Products were contaminated: six with bacteria

and three with fungus.  The contaminated lots and testing results were as follows:

### CDC and FDA Laboratory-confirmed Organisms from Product Samples
### Laboratory-Confirmed Organisms from Product Samples Associated with
### NECC Recalled Lots of  Betamethasone, Cardioplegia, and Triamcinolone Solutions

| Medication | Lot Number | Bacterial Contamination |
| --- | --- | --- |
| Betamethasone 6 mg/ml injectable -5 ml per vial | 08202012@141 | *Paenibaciilus pabuli/amolyticus, Bacillus idriensis, Bacillus flexus, Bacillus simplex, Lysinibacillus* sp., *Bacillus niacini, Kocuria rosea, Bacillus lentus* |
| Betamethasone 6 mg/ml injectable -5 ml per vial | 07032012@22 | *Bacillus niabensis, Bacillus circulans* |
| Betamethasone 12 mg/ml injectable - 5 ml per vial | 07302012@52 | *Bacillus lentus, Bacillus circulans, Bacillus niabensis, Paenibacillus barenqoltzii/timonensis* |

| | | |
|---|---|---|
| Betamethasone 6mg/ml injectable - 5 ml per vial | 08202012@44 | *Bacillus lentus, Bacillus firmus, Bacillus pumilus* |
| Triamcinolone 40mg/ml injectable - 1 ml per vial | 06062012@6 | *Bacillus lentus, Bacillus circulans, Bacillus niabensis, Bacillus nealsonil, Bacillus subtilis group, Bacillus firmus* |
| Cardioplegia solution 265.5 ml per bag | 09242012@55 | *Bacillus halmapalus/horikoshii, Brevibacillus choshinensis* |

| Medication | Lot Number | Fungal Contamination |
|---|---|---|
| Betamethasone 6 mg/ml injectable - 5 ml per vial | 08152012@84 | *Penicillium* sp., *Cladosporium* sp. |
| Triamcinolone 40 mg/ml injectable - 2 ml per vial | 08172012@60 | *Aspergillus tubingensis, Penicillium* sp. |
| Triamcinolone 40mg/ml injectable- 10 ml per vial | 08242012@2 | *Aspergillus fumigatus* |

6. Upon information and belief, the CDC has not linked <u>any</u> NECC product, other than the Three Contaminated MPA Lots, to any illness or injury. Moreover, the Plaintiffs Steering Committee ("PSC") retained consulting physicians who treated hundreds of patients after the outbreak. These consulting physicians – retained for purposes of designing the matrix – also never identified a case involving an "Other Product" causing injury or illness.

4

7.       Nevertheless, the Compensation Program provides claimants who were exposed

to Other Products the same opportunity to recover as claimants who received an injection of

MPA from one of the Three Contaminated MPA Lots. All claimants, whether they received an

injection from one of the Three Contaminated MPA Lots or were administered an Other Product,

must establish that they were administered a compound from a contaminated lot.  If a claimant

was administered an Other Product that was contaminated with fungus, and thereafter developed

fungal meningitis or a fungal infection, such claimant is eligible to recover the same

compensation as a claimant who developed fungal meningitis or a fungal infection after being

administered MPA from one of the Three Contaminated MPA Lots.[1]

8.       Whether the alleged cause is an Other Product or one of the Three Contaminated

MPA Lots, a claimant would face the same hurdles in a court proceeding.  Under the laws of

every state of which I am aware of, a plaintiff in a product liability action must establish that his

or her injury was caused by the product at issue.  See e.g. Allison v. Merek & Co., 110 Nev. 762,

766-767 (1994).  Proof of exposure to the product and causation are necessary to maintain a

cause of action.  Indeed, in every mass tort settlement that I am aware of, proof of exposure to

the defective drug or product at issue was required.  Without such a proof requirement, claims

would be allowed for injuries that were not caused by the drug or product and the funds available

to the true victims of a defective drug or product would be reduced.

9.       The Claims Procedures here allow any claimant who received any NECC product

that was compounded after January 1, 2006 to prove that they were exposed to a contaminated

lot and that the contamination caused their injury.  Circumstantial evidence is admissible to

prove both exposure and causation, Wilson v. Circus Circus Hotels, Inc., 101 Nev. 751, 754

---

[1] If a claimant did not suffer from fungal meningitis or a fungal infection, they may recover smaller amounts under
Base Point Category VI (symptoms and a diagnostic procedure) or under Base Point Category VII (exposure to a
contaminated lot with no injury).

5

(1985), and the Claims Procedures here do not foreclose proof of exposure by circumstantial evidence. Claims Procedures at p. 36 (requiring only "proof deemed sufficient by the National Settlement Administrator"). And, under the Claims Procedures, if a claim is denied by the Settlement Administrator, she is afforded the right to a *de novo* appeal of that denial by the Appeals Administrator.

## IV. **CLAIMS INVOLVING BACTERIAL INFECTION**

10.     Upon information and belief, the CDC has not linked any case of bacterial meningitis or bacterial infection to any NECC product compounded after January 1, 2006. Moreover, the consulting physicians retained by the PSC to develop the matrix, and who treated hundreds of patients after the outbreak, also never identified a case where a person suffered from bacterial meningitis or a bacterial infection as a result of receiving an NECC product. Nevertheless, the Compensation Program provides claimants who received a NECC product that was contaminated with bacteria the ability to file a claim for compensation.

11.     However, as opposed to fungal meningitis and infections, bacterial infections are quite common. For example, it is common for a hospitalized patient to develop a staph infection, which staph infection was unrelated to any product that was administered to a patient. Thus, even if a patient was administered an NECC product that was found to be contaminated with Bacillus niabensis or Bacillus circulans, it is entirely possible that the patient could develop an unrelated staph infection from being hospitalized (a "nocosomial" or hospital acquired infection). For this reason, the Compensation Program requires that, for bacterial infections, the claimant (as he or she would have to do in a court proceeding) must prove that the type of bacteria that caused the infection is the same type of bacteria that was found in the contaminated lot. The Claims Procedures allow the presentation of circumstantial evidence to prove this element. See Claims

6

Procedures at p. 38. As with all other claims, if the Settlement Administrator denies the claim for lack of such proof, the claimant may appeal to the Appeals Administrator who will employ a *de novo* standard of review.

## V.  THE LIMITED OBJECTION

12.     The Limited Objection contended (1) that the son of Ms. Eldreth "died as a result of contaminated NECC cardioplegia solution" and (2) that the Proposed Plan "forecloses Katrina Eldreth from recovery and, as written, results in manifest injustice." Limited Objection, p. 1. As set forth in more detail below, the first contention is by no means clear, and the second contention is simply incorrect.

13.     The Limited Objection alleges that Ms. Eldreth' son was administered NECC cardioplegia solution compounded by NECC on August 14, 2012, that the boy subsequently died on September 24, 2012, and that no autopsy was ever conducted. The expert report submitted with the Limited Objection states that the child had a sputum culture on August 17, 2012, which "showed scant growth or [sic] *Staphylococcus aureus* and *Pseudomonas aeruginosa*" but all subsequent cultures were negative. [See Exhibit A in Support of Limited Objection (Document 1280-2).] Both Staphylococcus Aureus (commonly known as "staph") and Pseudomonas aeruginosa are bacteria quite commonly found in a hospital setting.[2] Upon information and belief, neither of the two types of bacteria that were found in the child were ever found in any NECC product or premises during the year 2012.[3]

---

[2] Upon information and belief, there are over 500,000 staph infections in the U.S. each year and over 50,000 infections involving Pseudomonas aeruginosa, some of which lead to deaths.

[3] There also appears to be a serious question concerning whether the child even had a bacterial infection. As Ms. Eldreth's expert notes in his report, only "scant growth" of Staphylococcus aureus and Pseudomonas aeruginosa was found in the August 17, 2012 culture and all cultures taken between August 18, 2012 and the child's death on

14.     As for the contention in the Limited Objection that the Plan "forecloses" Ms. Eldreth from recovery, it does no such thing. The Compensation Program allows Ms. Eldreth, like any other claimant, to present the evidence that she has, including her expert's report, to the National Settlement Administrator.[4] It is up to the Settlement Administrator to determine if she has established that her son was exposed to a contaminated lot of NECC product and whether his bacterial infection was caused by the contaminated product. The burden of proof under the Compensation Program is no different than the burden of proof upon Ms. Eldreth if she pursued a civil cause of action.

15.     Immediately after Ms. Eldreth filed her Limited Objection, the PSC had discussions with Ms. Eldreth's counsel and explained that her expert report could be submitted in support of her claim. The Limited Objection was then withdrawn.

16.     I express no opinion on how the Settlement Administrator or Appeals Administrator should rule on Ms. Eldreth's claim or on other claims involving Other Products or bacterial infections. I would expect that, just as with claims involving one of the Three Contaminated MPA Lots, some of these claims will be allowed and some will be denied. But I believe that the claims process that has been established here is a fair one – not just for those claims involving one of the Three Contaminated MPA Lots – but for all claims.

Dated: May 13, 2015

By: Fredric L. Ellis

September 24, 2012 were negative. (See Document No. 1280-2, p.3) There is no mention in the Limited Objection or the expert's report of what cause of death was listed on the child's death certificate.

[4] Ms. Eldreth's contention that, apart from the September 24, 2012 lot of cardioplegia that was found to be contaminated with Bacillus hamapalus/horikoshii and Bacillus coshinensis, "counsel for NECC has confirmed that there were no other samples [of other lots of cardioplegia] tested" (Limited Objection, p. 4), adds nothing to the analysis. The FDA or CDC may well have tested many different lots of cardioplegia solution compounded by NECC, like they did for many other of NECC's products, but the CDC only published the test results that were positive.

# PLAN PROPONENTS' EXHIBIT 27

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

In re:

NEW ENGLAND COMPOUNDING
PHARMACY, INC.,

                     Debtor.

Chapter 11

Case No. 12-19882-HJB

## DECLARATION OF HARRY M. ROTH CONCERNING THE NATIONAL COMPENSATION PROGRAM ESTABLISHED BY THE PROPOSED AMENDED PLAN OF REORGANIZATION

1.     My name is Harry M. Roth. I am an attorney in good standing before the bar of the Commonwealth of Pennsylvania. I have personal knowledge of all matters set forth in this declaration, except for those matters stated to be upon information and belief, and I believe all such matters to be true and correct. I am competent to testify under oath to the matters set forth in the Declaration if called to do so. I represent Meghan Handy on behalf of the Estate of Brenda Rozek. Ms. Handy serves as a co-chair of the Official Committee of Unsecured Creditors (the "Official Committee") in this bankruptcy.

2.     In the spring of 2014, I was asked to join a small committee of attorneys to work on the development of a Settlement Matrix that would be incorporated in, and would form the means of calculating damages to be awarded to tort claimants under, the Joint Chapter 11 Plan of the New England Compounding Pharmacy, Inc. (the "Plan") The Settlement Matrix is incorporated in the Plan and indeed, because the Settlement Matrix governs the distribution of the proceeds of the Trustee's settlements (described elsewhere) to tort creditors, is an integral part of the Plan. The Settlement Matrix and the process by which it was created, vetted and

approved by all relevant parties are accurately described in the declaration of Frederic L. Ellis, Esquire dated April 28, 2015 (Document No. 1236), including the involvement of representatives of other members of the Official Committee (specifically, Melvin Wright, Mike Galligan, and Anne Andrews) tasked with reviewing the Matrix in September of 2014.

     3.     In late 2014, the Official Committee voted to endorse the Plan, including the Settlement Matrix. To that end, the Official Committee sent a letter (after this Court's approval of the form of that letter) to the holders of all unsecured claims, urging those holders to vote to accept the Plan.

     4.     On May 5, 2015, Ms. Katrina Eldreth, through her counsel, filed a Limited Objection to the Plan, based upon her apparent belief that the Settlement Matrix foreclosed the submission of circumstantial evidence in support of claims, and, because Ms. Eldreth's claim is, upon information and belief, supported solely by such evidence, that the Settlement Matrix therefore foreclosed any recovery whatsoever on account of her claim. That claim seeks compensation for the death of the Ms. Eldreth's son, which is alleged to have resulted from a bacterial infection caused by contaminated NECC cardioplegia solution.

     5.     Immediately following the submission of the Limited Objection, I, along with counsel for the Creditors' Committee, Mr. Michael Coren, Esquire (a member of my firm who also represents Ms. Handy in her role as OCC Co-chair) and Mr. Ellis, spoke with counsel for Ms. Eldreth to review the objection and the basis for Ms. Eldreth's counsel's assertion that the Settlement Matrix foreclosed consideration of Ms. Eldreth's claim. Counsel for the Creditors' Committee, Mr. Ellis, and I informed Ms. Eldreth's counsel that circumstantial evidence (such as the expert opinion submitted as an attachment to Ms. Eldreth's objection) is in fact a permissible means of proof under the terms of the Settlement Matrix for claims (like Ms. Eldreth's) related to

bacterial objections caused by non-MPA products.    After I, counsel for the Creditors'
Committee, and Mr. Ellis made clear that there is therefore no bar or *per se* preclusion of the
Eldreth or other similar claim under the Settlement Matrix, the Limited Objection was
withdrawn.

Dated: May ___, 2015

By: _____
     Harry M. Roth

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### (EASTERN DIVISION)

| | |
|---|---|
| In re: | Chapter 11 |
| NEW ENGLAND COMPOUNDING PHARMACY, INC., | Case No. 12-19882-HJB |
| Debtor | |

## DECLARATION RE: ELECTRONIC FILING

I, Harry M. Roth, hereby declare under penalty of perjury that all of the information contained in the *Declaration of Harry M. Roth Concerning the National Compensation Program Established by the Proposed Amended Plan of Reorganization*, filed electronically, is true and correct. I understand that this *DECLARATION* is to be filed with the Clerk of Court electronically concurrently with the electronic filing of the Document. I understand that failure to file this *DECLARATION* may cause the Document to be struck and any request contained or relying thereon to be denied, without further notice.

I further understand that pursuant to the Massachusetts Electronic Filing Local Rule (MEFLR)-7(a) all paper documents containing original signatures executed under the penalties of perjury and filed electronically with the Court are the property of the bankruptcy estate and shall be maintained by the authorized CM/ECF Registered User for a period of five (5) years after the closing of this case.

Dated: May 14, 2015

Signed: _____
Harry M. Roth

61940872

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

In re:

NEW ENGLAND COMPOUNDING
PHARMACY, INC.,

                Debtor.

Chapter 11

Case No. 12-19882-HJB

## CERTIFICATE OF SERVICE

      I, Carol S. Ennis, hereby certify that on the 14th day of May, 2015, I caused a true and accurate copy of the following document to be served by electronic service via the Court's ECF service to those parties registered to receive electronic service.

      Declaration of Harry M. Roth Concerning the National Compensation Program Established by the Proposed Amended Plan of Reorganization

      /s/ Carol S. Ennis
      Carol S. Ennis, Paralegal
      BROWN RUDNICK LLP
      One Financial Center
      Boston, MA  02111
      Tel.: (617) 856-8200

61950186