UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | ) ) ) | |
| _____ | ) | MDL No. 2419 |
| | ) | Dkt. No 1:13-md-2419 (RWZ) |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
|    ALL CASES | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**SAINT THOMAS ENTITIES' PROPOSAL FOR BELLWETHER TRIALS**

In accordance with MDL Order No. 9,[1] Saint Thomas West Hospital, formerly known as St. Thomas Hospital, Saint Thomas Network, and Saint Thomas Health (collectively referred to as the "Saint Thomas Entities") file this Proposal for Bellwether Trials to show the Court as follows:

**PRELIMINARY STATEMENT**

For the past nineteen months, the Saint Thomas Entities have been pursuing a bilateral and reasonable process for discovering and developing cases for initial bellwether trials and have been frustrated at every turn by the Plaintiffs' Steering Committee ("PSC") in its attempts to truncate discovery, pretrial development, and trial preparation.  Although it originally espoused a bellwether procedure, the PSC now seeks to jettison this process entirely, stating as its primary reason for pushing for a quick trial the fact that the injuries happened almost three years ago.  It is ironic for the PSC to criticize the Saint Thomas Entities for pursuing a fair and balanced process that necessarily takes time when the PSC has not even filed lawsuits to protect the rights of so many other plaintiffs who happen to reside in states with a longer statute of limitations.  Notably,

_____

[1] MDL Order No. 9, entered September 18, 2014 (Docket #1425) ("MDL Order 9").

there is no allegation or evidence of undue delay by these Defendants, and a docket of this size and complexity warrants careful consideration of the bellwether selection process.

The Saint Thomas Entities have previously responded to the proposal of the PSC for expediting a trial[2] and explained why the PSC's counterproposal to a carefully designed and considered bellwether process—for an expedited trial of six outlier cases of its sole choosing—should be rejected.[3]  This brief incorporates that Opposition by reference and assumes that the Court will continue with the process developed under MDL Order 9.

Fulfilling the expectations of MDL Order 9 and following the teachings of Judge Eldon Fallon,[4] the Saint Thomas Entities have developed a bellwether proposal, which is attached as Exhibit A.  This plan has been crafted and honed with the benefit of case developments and the comments of the Court at the last status conference.  The Saint Thomas Entities respectfully suggest that their proposal best balances the competing interests of the PSC in advancing cases to initial trials and of the defendants who will be participating at trial in adequately developing their defenses—especially the comparative fault issues that implicate their co-defendants and non-parties.  The Saint Thomas Entities therefore respectfully request that the Court adopt their proposal.

---

[2] *Plaintiffs' Steering Committee's Motion for Entry of Case Management Order Setting Selected Cases for Expedited Trials* and memorandum in support (Docket ## 1716 & 1717) ("Motion to Expedite").

[3] *See Saint Thomas Entities' Opposition to Plaintiffs' Steering Committee's Motion for Entry of Case Management Order Setting Selected Cases for Expedited Trials* (Docket # 1753) ("Opposition").

[4] Eldon E. Fallon, Jeremy T. Grabill & Robert Pitard Wynne, *The Problem of Multidistrict Litigation: Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323 (June 2008).

## ARGUMENT AND AUTHORITIES

### I.     The Initial Trials Must Be Truly Representative

The Saint Thomas Entities have briefed the importance of representative selection in prior briefs, most recently in their Opposition to the PSC's Motion to Expedite and will not restate those arguments here.  And of course, there is no one-size-fits-all case selection method.  But the federal courts have a great deal of experience with bringing MDLs to successful resolution, and they have shared their experiences.   Judge Fallon's article, based on his successful management of two massive MDLs, has suggested a sequencing that bears consideration.  *See generally* Eldon E. Fallon, Jeremy T. Grabill & Robert Pitard Wynne, *The Problem of Multidistrict Litigation: Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323 (June 2008) [hereinafter *Bellwether Trials*].  His recommended process and strategic questions to be asked and answered are all designed to achieve the goal of choosing truly representative cases:  "If bellwether trials are to serve their twin goals as informative indicators of future trends and catalysts for an ultimate resolution, the transferee court and the attorneys must carefully construct the trial-selection process. . . .  Any trial-selection process that strays from this path will likely resolve only a few independent cases and have a limited global impact."  *Id.* at 2343; *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.315 ("[T]o produce reliable information about other mass tort cases, the specific plaintiffs and their claims should be representative of the range of cases.").  The risk of rushing the process, as the PSC is urging, is significant and unacceptable by any standard:  "[l]ittle credibility will be attached to this process, and it will be a waste of everyone's time and resources."  *In re Yasmin and Yaz (Drospirenone) Mktg., Sales Practices and Prods. Liab. Litig.*, No. 3:09-md-02100-DRH-PMF, 2010 WL 4024778, at *2 (S.D. Ill. Oct. 13, 2010).

## II.     The Process Takes Careful and Deliberate Consideration

Based on his extensive experience in some of the largest and most successfully resolved MDLs, Judge Fallon has set out important principles for selecting bellwether trials.  He suggests certain sequential steps that should be followed in crafting the protocols and processes.  First, the MDL court must be in a position to catalogue the "entire universe of cases."  *Bellwether Trials*, 82 TUL. L. REV. at 2344.  The next step is for the court and the attorneys for both sides to "creat[e] a pool of cases that accurately represents the different divisions within the MDL from which the bellwether cases will be selected."  *Id.* at 2346.  Important to this step is deciding the size of the pool—"[i]f the pool is too small, then there is a risk that too few of the major variables will be properly represented."  *Id.* at 2347.  To fill the pool, there are different methods—random selection, selection by the MDL court, and selection by the attorneys.  *Id.* at 2348-49.  And there are many variables within each strategy for filling the pool, all of which need to be geared to finding a truly representative, and therefore, credible sampling.  *Id.* at 2348-60.  After the trial-selection pool has been determined, the parties conduct case-specific discovery.  *Id.* at 2360.  Then the third step is to select individual cases from the pool, which also can be done in a variety of ways depending on the facts and circumstances.  *Id.* at 2360-65.

### A.     Any Census of MDL Claims Will Be Incomplete

Judge Fallon's first step in the bellwether selection process is to catalog the universe of cases.  By that, he means that the MDL court should "conduct a census of the entire litigation and identify all the major variables."  *Id.* at 2344.  The Court is not in a position to evaluate the entire universe of cases in this MDL because the PSC has indicated that numerous more cases will be filed, coming from jurisdictions that have a three-year statute of limitations.

Further, there is very little information available as the MDL Plaintiffs who are outside of Tennessee.  To the Saint Thomas Entities' knowledge, no party, including the PSC, has undertaken any sort of analysis of the current universe of claimants except in terms of pure headcounts.  It has been the Saint Thomas Entities' position that the census should include a deeper analysis of all the cases in the MDL to try and understand the full panoply of litigation variables.  Even though Plaintiffs from other states and clinics are not proposed to be included in the Tennessee bellwether process, it is nonetheless important to review their individual factual circumstances to understand the universe of litigation variables.  Without information as to all patient plaintiffs in the MDL, there is no basis for comparing the Tennessee Plaintiffs to the larger cohort to determine whether they share common characteristics or reveal different trends.

At this time, the universe cannot be known.  Very few Plaintiffs outside of Tennessee have provided Plaintiff Profile Forms and records releases.  And there is no information available for the cases that have yet to be filed.  Consequently, even a preliminary census analysis is not possible as to the greater MDL.  But the Saint Thomas Entities also appreciate that the Court desires to move the Tennessee cases toward trial and so will focus on the data that is available to assist that effort.

**B.     The Bellwether Pool Must Be Carefully Designed**

**1.     The Litigation Variables Should Be Defined Before Creating the Bellwether Pool**

Judge Fallon indicated that the next critical step in the process is to identify the litigation variables that need to guide the process of choosing bellwethers.  In *Vioxx*, for example, the "major variables ultimately decided upon . . .  were (1) [the] type of injury (heart attack, stroke, or other), (2) period of ingestion (short-term versus long-term), (3) age group (older or younger than sixty-

five), (4) prior health history (previous cardiovascular injuries or not), and (5) date of injury (before or after a certain label change)." *Bellwether Trials*, 82 Tul. L. Rev. at 2345.

The PSC has never attempted to identify all the variables that will undoubtedly have impact on the selection of representative trials.  Instead, it has taken the position that it cannot discuss these matters until after the Court decides whether it will accept the PSC's alternative path of expedited and self-selected trials.  In this case, more discovery—and especially within the expert phase—is necessary to reveal the full panoply of variables, and factors relating to acuity and co-morbid conditions will likely be significant litigation variables, as there were many individuals who were exposed to contaminated NECC products who did not develop disease.  These are matters for expert opinion, yet, to the Saint Thomas Entities' knowledge, not a single expert witness has been designated by any party in the MDL, and the deadline for doing so is months away, as Common Issue fact discovery is still underway.

Further, absent a summary judgment, the ultimate issue of the Saint Thomas Entities' liability will hinge on questions of actual and apparent authority and necessarily require discovery into the individual experiences and perceptions of the Tennessee Plaintiffs.  That discovery has been stayed pending conclusion of Common Issue discovery.  And the Plaintiff Profile Forms that have been received focus on medical and other personal information relevant to all parties, not the agency issues particular to the Saint Thomas Entities.

Finally, the Saint Thomas Entities are encountering extensive resistance to any discovery from their co-defendants and from non-parties on the critical comparative fault defenses that will be necessary to present their case at trial.  Now that these other defendants have agreed to settle, the PSC lacks any motive to seek discovery from them, so the entirety of that burden has shifted

to the healthcare defendants to conduct it.  That discovery may well yield additional litigation variables, but there is no way to know until it is finally received.

With these important caveats and mindful of the Court's directive to move forward on the bellwether process, the Saint Thomas Entities respectfully request that the Court consider the following litigation variables.

### a.    There Are Five Key Injury Categories

The first category is and should be injury.  The PSC and Trustee agreed to seven different categories of injuries in the Tort Trust Agreement that is part of the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. ("Plan") for the purpose of determining "a fair and equitable compensation amount" for the tort victims from the settlement fund:

1. Death and (1) Spinal or Paraspinal Fungal Infection and/or (2) Fungal Meningitis

2. Non-Death Fungal Meningitis and Spinal or Paraspinal Fungal Infection

3. Non-Death Fungal Meningitis

4. Non-Death Spinal or Paraspinal Fungal Infection

5. Peripheral Joint Fungal Infection

6.   Certain defined symptoms (including headache, word-finding difficulty, nausea/vomiting, fever, neck stiffness, back pain, etc.) and/or pain at the injection site and a lumbar puncture, MRI, or CT guided biopsy

7. No symptoms or no lumbar puncture, MRI, or CT guided biopsy

*See Exhibit A to Tort Trust Agreement:  Claims Resolution Facility Procedures In re New England Compounding Pharmacy, Inc.*, No. 12-19882 (Bankr. D. Mass.) (Docket #1123-2) at 8 (attached as Exhibit B).  For each category, the claimant who proved he or she had received an injection from one of the contaminated batches of methyl-prednisolone acetate manufactured by NECC would be presumptively entitled to a defined number of "Base Points" from which to calculate his or her recovery.  *Id.* at 8-15, 41-42, 47-49.

Although an argument can be made that true bellwether selection requires consideration of cases from each of the seven injury categories in the Tort Trust Agreement, the Saint Thomas Entities respectfully suggest that the Court collapse some of those categories to facilitate bellwether selection.  As the Tennessee Clinic Defendants have pointed out, the 117 patient Plaintiffs with claims against Saint Thomas Outpatient Neurosurgical Center ("STOPNC")[5] generally fall into 5 different injury categories:

| Injury Category | Number of STOPNC Patients | Percentage |
|---|---|---|
| Death | 14 | 12% |
| Meningitis + Infection | 45 | 38% |
| Meningitis only | 17 | 15% |
| Local infection only (no meningitis) | 13 | 11% |
| No disease | 28 | 24% |

These injury categories make the most sense for considering bellwether trials, and cases from each category should be included in the bellwether pool.  The census information strongly suggests that the first cases be selected from the two largest categories—Meningitis + Infection (38%) and No Disease (24%).  By contrast, the PSC's current proposal includes two death cases—which represent only 12% of the total Tennessee Plaintiff census—only one Meningitis + Infection (38%

---

[5] The Saint Thomas Entities are claimed to be vicariously liable for these STOPNC patients based on the fact that Saint Thomas Network owns 50% of STOPNC.  Although the Tennessee Clinic Defendants also analyze patient information for a different clinic that is entirely unrelated to the Saint Thomas Entities and request a similar bellwether process be put in place for those Plaintiffs, the Saint Thomas Entities respectfully suggest that judicial economy is best served by having the STOPNC patients' bellwether trials go first.

of that population), zero in the local infection (11%), and zero in the no-disease (24%) categories. The PSC's six proposed cases also include four reported stroke patients, although only 10% of the STOPNC patients were characterized as having stroke complications. This disproportionate aspect of its selection additionally skews the process, as stroke victims typically have more permanent and residual injuries, often requiring longer hospitalization and long-term treatment.

The available scientific literature also suggests that litigation variables should include gender (females nearly twice as vulnerable), age (older than 60 four times more likely to become patients), lot exposure (risk significantly greater with those exposed to lot 08102012@51), and timing of exposure (patients receiving injections from older vials more likely to develop infection). *See* Kainer *et al*., Fungal Infections Associated with Contaminated Methylprednisolone in Tennessee, N. Engl. J. Med. 367:23 2194, at 2199-2201 (Dec. 2012) (attached as Exhibit C). Here again, the PSC's proposed selection is out of line with the patient data: it includes equal numbers of men and women, and three of the patients (Reed, Rybinski, and Ziegler) were younger than 60, with one (Ziegler) being only 32 at the time of the exposure. The parties are in the process of obtaining records as to the individual patients' lot exposures so that they can analyze the interval between production of MPA and injection for each of these plaintiffs, but do not currently have the necessary records to complete this analysis.

### b.       Damages-Enhancing Factors Should Be Considered

In the Tort Trust Agreement's Claims Procedure, in addition to the Seven Base Point (Injury) Categories, Plaintiffs who can demonstrate particular aggravating factors can receive additional points for more compensation. In the category of "Upward Adjustments," are circumstances like the age of the Plaintiff (more points awarded to younger patients) and whether he or she has a spouse and/or dependent and adult children. Exhibit B at 15-18. Additional points

are available to Plaintiffs having post-infection complications and procedures, like surgical debridement, irrigation surgery, laminectomy, discectomy, or hemilaminectomy, lengthy antifungal treatment and complications, lumbar punctures, and CT-guided biopsies. *Id.* at 18-24, 35-36. Other enhancement factors include the length of the hospital stay and drops in personal income. *Id.* at 22-24, 25-26, 34. Stroke, sacroiliac joint infection, arachnoiditis, neurogenic bowel and bladder complications, vertebral osteomyelitis, and peripheral joint infection are other enhancement factors. *Id.* at 26-32. These and other defined factors were evidently considered important by the settling parties after a significant adversarial process, presumably involving medical experts, and should be considered as possible litigation variables.

### c.      Preexisting Conditions Must Be Taken Into Account

Preexisting auto-immune disorders appear to play a role in the acuity of these patients, and 14% of the Tennessee Plaintiffs reported such a preexisting condition. Notwithstanding this significant potentially confounding factor, the PSC does not propose trying a single case with this variable.

### 2.      The Pool Should Be Sufficiently Large

As noted, the size of the bellwether pool is critical: "[i]f the pool is too small, then there is a risk that too few of the major variables will be properly represented." Fallon, *Bellwether Trials*, 82 TUL. L. REV. at 2347. The Saint Thomas Entities have proposed a pool of 20—10 selected by the PSC and 10 selected by the defendants. There are several factors here that support this proposal.

### a.      The Pool Needs to Include all of the Injury Categories

As discussed in part II.B.1.a, there are at least five injury categories, and the bellwether pool should include representative cases from each. The PSC's proposed six cases do not include

all of these categories and demonstrate the dangers of too small a pool in terms of over-representing certain categories while under-representing others.

> **b.     The Agency Theories Need to Be Developed and Tested Through Discovery and Summary Judgment**

For the Saint Thomas Entities, the facts surrounding the individual Plaintiffs' claims of agency[6] will be developed through individual discovery that has not yet been allowed.  This circumstance bears on three important procedural aspects of the bellwether proposal:  (i) the Saint Thomas Entities need to have, at a minimum, limited Case-Specific discovery that includes the depositions of the patient plaintiff and any consortium plaintiffs as to all bellwether candidates before being required to make binding elections; (ii) the bellwether pool needs to be sufficiently large to account for cases that may be summarily adjudicated; and (iii) these defendants should also be entitled to have at least two strikes as to the PSC's selections to account for the fact that cases that will be included in the bellwether pool before information as to the agency facts and expert and third-party discovery are available.

> **c.     Provision Must Be Made for Cases That May Be Dismissed or Summarily Adjudicated**

As the Court may recall, the Saint Thomas Entities moved to dismiss the complaints against them in a motion limited to only "global" issues.  The parties agreed to hold off on case-specific motions to dismiss regarding compliance with the Tennessee Health Care Liability Act ("THCLA") until a later date, meaning that some of the cases in the pool from which bellwether cases will be selected include ones where the plaintiffs have failed to comply with the THCLA,

---

[6] The Court has previously dismissed the alter ego claims against these defendants on the pleadings, so all that remains are Plaintiffs' agency and failure-to-supervise theories.  The Saint Thomas Entities will file appropriate motions for summary judgment to demonstrate the lack of merit to these claims.

and are subject to dismissal on that basis.  In pertinent part, the Court's Order on the global motions to dismiss states as follows:

> If I find that a plaintiff did in fact fail to comply (substantially or otherwise) with the THCLA's requirements, I must then evaluate whether extraordinary cause exists to excuse the violation. This may, as plaintiffs suggest, require case-specific inquiry. In any event, there are no allegations of noncompliance as to specific complaints currently before the court. As agreed to by the parties, such case-specific issues have been held in abeyance to be resolved at some later point in this litigation.

Memorandum of Decision (Docket #1360) at 23-24 (Aug. 29, 2014).  As indicated on the list of reserved cases, at least two of the PSC's proposed cases (Wray and Ziegler) fall into that category. *See, e.g.*, Exhibit D.

Further, the Saint Thomas Entities believe that none of the Plaintiffs has viable agency or failure-to-supervise claims against them and are entitled to test the legal sufficiency of those claims through summary judgment, which should occur before final bellwether selections are made. These defendants anticipate that the bellwether pool of cases against them may be greatly reduced or eliminated altogether after summary judgment.

### C.     The Selection of Bellwether Plaintiffs Should Follow a Deliberate, Not Random, Process

#### 1.     The Saint Thomas Entities' Selection Process Follows Judge Fallon's Suggested Protocol

The Saint Thomas Entities' bellwether proposal was originally submitted with the *Saint Thomas Entities' Opposition to Plaintiffs' Steering Committee's Motion for Entry of Case Management Order Setting Selected Cases for Expedited Trials* (Docket #1753), but has been revised, as explained below, based on the Court's comments at the April 28, 2015, status conference.  It sets out a procedure for creating the pool by considering the litigation variables and simultaneous exchange of lists of potential bellwether plaintiffs by the two sides—a process that

affords the parties an opportunity to independently consider the cases and the potential for agreement on particular cases to be included—as well as a procedure for adding cases to the pool if the two sides select the same case or cases.

The Saint Thomas Entities originally proposed a full work-up of each of the cases in the bellwether pool,[7] but in the interest of moving forward, as the Court has requested, alternatively propose that the Court allow at least limited discovery before bellwether plaintiffs are chosen for trial.  In this regard, they differ with the Tennessee Clinic Defendants' proposal, but for a very important reason—the Saint Thomas Entities cannot adequately assess the agency claims against them for purposes of selecting bellwethers and exercising strikes without individual discovery. The Tennessee Clinic Defendants have very different agency issues to develop and defend.

After this initial limited discovery, each side would be permitted two strikes so that the outliers can be eliminated.  This is the procedure used by Judge Fallon, and it makes eminent sense in this MDL as well.  Then the parties would attempt to agree on four cases for initial trials and submit the matter to the Court, with the benefit of briefing as to the key litigation variables as applied to their selections, if they cannot agree.

### 2.    The Issue of *Lexecon* Waivers Must Be Factored into the Analysis

The extent to which the parties will agree to a *Lexecon* waiver for cases transferred into the MDL[8] is another important procedural variable that must be addressed.  In *In re Yasmin*, the court found "such a waiver to be critical to the success of th[e bellwether] endeavor."  2010 WL

---

[7] *See [Proposed] MDL Order No. [12] Order on Bellwether Plan and Case Specific Discovery And Scheduling* (Docket 1753-1).

[8] In *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34 (1998), the U.S. Supreme Court held that the MDL transfer statute, 28 U.S.C. § 1407, does not permit the transferee court to try cases that were not originated under its jurisdiction absent agreement by the parties.

4024778, at *1.  In fact, it ordered that if even one plaintiff chosen as a bellwether refused to execute such a waiver, it would void the entire bellwether plan because that venue objection would be tantamount to a "veto" right that would undermine the carefully drawn plan.  *Id.*  The PSC's latest proposal identifies the need for determining whether all the parties will execute *Lexecon* waivers as a line item, but only as to the six cases it proposes for trial.  There is no plan for determining whether any other cases will be tried in Boston or in their place of origin.  The Saint Thomas Entities suggest that this question be determined for all cases at the outset of the selection process.

### 3. Comparative Fault Discovery Must Be Available Before any Trial Can Be Conducted

Finally, as to timing, no cases should proceed to trial until the Saint Thomas Entities have had a full and fair opportunity to discover and develop the facts necessary to show the comparative fault of their co-defendants and certain non-parties.  The Court is familiar with the Saint Thomas Entities' position on this matter, so they will not re-brief the issues here.

### III. Alternatively, the Saint Thomas Entities Propose a Method for Accelerating the Selection of Representative Cases for the Bellwether Pool

In *Plaintiffs' Steering Committee's Reply in Support of Motion for Expedited Trial* (Docket #1771) ("Reply") at 4, the PSC suggested that because it had already identified its six best bellwether choices and the Tennessee Clinic Defendants had identified nine cases involving STOPNC that a pool could be created from these selections by either adding or subtracting cases so that there is equal input from both sides.  Contrary to the PSC's misleading suggestions to the Court in its Reply,[9] the Saint Thomas Entities had no prior say in either of these lists, but to the

---

[9] *See Plaintiffs' Steering Committee's Reply in Support of Motion for Expedited Trial* ("Reply") (Docket # 1771) (stating that "defendants have proposed nine cases as initial trial candidates" without distinguishing between the Tennessee Clinic Defendants and the Saint Thomas Entities;

extent the Court has interest in starting with these identified cases in forming a pool, it should permit the parties to add to the list such that each side has identified 10 cases.  As explained above, the PSC's six cases are not representative ones—an additional reason to permit strikes—but with four additional selections and guidance as to the proper litigation variables, its contribution to the pool may become more representative.  The Tennessee Clinic Defendants' list of nine cases is much more representative, and the Saint Thomas Entities propose adding Phillip Tyree to complete the list of ten for the defendants.

If the Court elects to pursue this route, it should then order the limited Case Specific discovery and final selection process outlined in paragraphs II.C-G of the Saint Thomas Entities' proposed bellwether Case Management Order for the reasons discussed above.

## CONCLUSION AND PRAYER

For these reasons, the Saint Thomas Entities request that the Court enter their bellwether proposal and grant such other and further relief to which the Saint Thomas Entities are entitled.

---

the Saint Thomas Entities have not proposed any bellwether cases until the date of this proposal's filing).

SAINT THOMAS WEST HOSPITAL,
FORMERLY KNOWN AS ST. THOMAS
HOSPITAL, SAINT THOMAS NETWORK,
AND SAINT THOMAS HEALTH

By their attorneys,
*/s/ Sarah P. Kelly*
Sarah P. Kelly (BBO #664267)
skelly@nutter.com
NUTTER McCLENNEN & FISH LLP
Seaport West
155 Seaport Boulevard
Boston, Massachusetts  02210
(617) 439-2000
(617) 310-9461 (FAX)


Dated:  May 18, 2015


OF COUNSEL:

Yvonne K. Puig*
Texas State Bar No. 16385400
yvonne.puig@nortonrosefulbright.com
Adam T. Schramek*
Texas State Bar No. 24033045
adam.schramek@nortonrosefulbright.com
Eric J. Hoffman*
Texas State Bar No. 24074427
eric.hoffman@nortonrosefulbright.com

FULBRIGHT & JAWORSKI L.L.P.NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Blvd. Suite 1100
Austin, Texas 78701
(512) 536-2450
(512) 536-4598 (FAX)

Marcy Hogan Greer*
Texas State Bar No. 08417650
mgreer@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON & TOWNSEND LLP

515 Congress, Suite 2350
Austin, Texas 78701
(512) 482-9300

*Appearing *Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

This certifies that a true and accurate copy of the foregoing was served on all parties of record by virtue of the Court's electronic filing system this 18th day of May, 2015.

*/s/ Sarah P. Kelly*
SARAH P. KELLY

17