```
1                    UNITED STATES DISTRICT COURT
2                     DISTRICT OF MASSACHUSETTS

3

4
   IN RE:  NEW ENGLAND COMPOUNDING   )  MDL NO. 13-02419-RWZ
5  PHARMACY CASES LITIGATION         )
                                     )
6                                    )
                                     )
7                                    )
                                     )
8                                    )

9

10
        BEFORE:  THE HONORABLE JENNIFER C. BOAL
11

12

13
                    MOTION HEARING
14

15
      John Joseph Moakley United States Courthouse
16                   Courtroom No. 12
                     One Courthouse Way
17                   Boston, MA 02210

18
                     May 28, 2015
19                   11:30 a.m.

20

21          Catherine A. Handel, RPR-CM, CRR
                  Official Court Reporter
22    John Joseph Moakley United States Courthouse
               One Courthouse Way, Room 5205
23                 Boston, MA 02210
             E-mail: hhcatherine2@yahoo.com
24

25
```

1    APPEARANCES:

2

     For The Plaintiffs:

3

        Hagens, Berman, Sobol, Shapiro LLP, by KRISTEN JOHNSON,
4    ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, MA 02142;

5        Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
     ESQ., One Nashville Place, 150 Fourth Avenue, North, Suite 1650,
6    Nashville, TN 37219-2423;

7        Janet, Jenner & Suggs, LLC, KIMBERLY A. DOUGHERTY, ESQ., 75
     Arlington Street, Suite 500, Boston, MA 02116;
8
         Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,
9    IV, ESQ., and BEN GASTEL, ESQ., ESQ., 227 Second Avenue North,
     Nashville, TN 37201-1631;
10
         Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
11   Street, Suite 500, Boston, MA 02114;

12

13

     For the Defendants:
14
         Harris Beach PLLC, by FREDERICK H. FERN, ESQ., 100 Wall
15   Street, New York, NY 10005;

16       Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ.,
     1150 Huntington Building, 925 Euclid Avenue, Cleveland, OH
17   44115-1414;

18       Todd & Weld LLP, by CHRISTOPHER R. O'HARA, ESQ., and
     CORRINA L. HALE, ESQ., 28 State Street, 31st Floor, Boston, MA
19   02109;

20       Ulmer & Berne LLP, by JOSHUA A. KLARFELD, ESQ., 1660 West
     2nd Street, Suite 1100, Cleveland, OH 44113-1448;
21
         Hermes, Netburn, O'Connor & Spearing, P.C., by KARA A.
22   LORIDAS, ESQ., 265 Franklin Street, 7th Floor, Boston, MA
     02110-3113;
23
         Nutter, McClennen & Fish LLP, by SARAH P. KELLY, ESQ.,
24   World Trade Center West, 155 Seaport Boulevard, Boston, MA
     02210-2604;
25
      (Appearances continued on the next page.)

1    APPEARANCES (Cont'd):

2

3    FOR THE DEFENDANTS (Cont'd):

4

5        Alexander Dubose Jefferson & Townsend LLP, by MARCY HOGAN
     GREER, ESQ., 515 Congress Avenue, Suite 2350, Austin, TX
     78701-3562;

6

7        Norton Rose Fulbright US LLP, by YVONNE K. PUIG, ESQ., 98
     San Jacinto Boulevard, Suite 1100, Austin, TX 78701-4255;

8        Michaels, Ward & Rabinovitz LLP, by DANIEL M. RABINOVITZ,
     ESQ., One Beacon Street, Second Floor, Boston, MA 02108;

9

10       Blumberg & Wolk LLC, by CHRISTOPHER M. WOLK, ESQ., 158
     Delaware Street, Woodbury, NJ 08096;

11       Goodwin Procter LLP, by JAMES REHNQUIST, ESQ., and ROBERTO
     M. BRACERAS, ESQ., Exchange Place, 53 State Street, Boston, MA
12   02109;

13       Gideon, Cooper & Essary, PLLC, by C.J. GIDEON, JR., ESQ.,
     and CHRIS J. TARDIO, ESQ., 315 Deaderick Street, Suite 1100,
14   Nashville, TN 37238;

15       Brewer, Krause, Brooks, Chastain & Burrow, PPLC, by PARKS
     T. CHASTAIN, ESQ., 611 Commerce Street, suite 2600, Nashville,
16   TN, 37202-3890;

17       Donoghue Barrett & Singal, PC, by MICHELLE R. PEIRCE, ESQ.,
     One Beacon Street, Suite 1320, Boston, MA 02108-3106;

18       Sloane & Walsh, by HARRY A. PIERCE, ESQ., 3 Center Plaza,
19   8th Floor, Boston, MA 02108;

20

21   FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
     NECP, INC.:

22       Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
     Street, Suite 2400, Boston, MA 02110-1724;

23

24
     (Appearances continue on the next page.)
25

```
 1      APPEARANCES (Cont'd):

 2
        ALSO PRESENT:
 3
            U.S. Department of Justice, Civil Division, by DAVID M.
 4      GLASS, Senior Trial Counsel, 20 Massachusetts Avenue, N.W., Room
        7200, Washington, DC 20530;
 5

 6

 7      APPEARING TELEPHONICALLY:

 8
        For the Defendants:
 9

10          Pessin Katz Law, P.A., by GREGORY K. KIRBY, ESQ., 901
        Dulaney Valley Road, Suite 400, Towson, MD 21204
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2         (The following proceedings were held in open court before
3    the Honorable Jennifer C. Boal, United States Magistrate Judge,
4    United States District Court, District of Massachusetts, at the
5    John J. Moakley United States Courthouse, One Courthouse Way,
6    Boston, Massachusetts, on May 28, 2015.)
7              COURTROOM DEPUTY CLERK YORK:  You may be seated.
8              Today is May 28, 2015.  We're on the record in the
9    matter of In Re:  New England Compounding Pharmacy
10   Incorporated, et al., Case No. 13-CV-2419.
11             Will counsel please identify themselves for the
12   record, starting with the Plaintiffs' Steering Committee.
13             MS. JOHNSON:  Good morning, your Honor.  Kristen
14   Johnson for the PSC.
15             MR. GASTEL:  Good morning, your Honor.  Ben Gastel
16   for the PSC.
17             MS. DOUGHERTY:  Good morning, your Honor.  Kim
18   Dougherty for the PSC.
19             MR. CHALOS:  Mark Chalos for the plaintiffs.
20             MR. ELLIS:  Good morning, your Honor.  Rick Ellis for
21   the plaintiffs.
22             MR. GOTTFRIED:  Good morning.  Michael Gottfried for
23   the trustee, Paul Moore.
24             MR. GLASS:  Your Honor, I'm David Glass.  I'm here on
25   behalf of the FDA.
```

```
 1            MR. TARDIO:  Chris Tardio for the Tennessee clinic
 2    defendants.
 3            THE COURT:  Mr. Glass, I should make no associations
 4    by the fact of where you're sitting; is that correct?
 5            MR. GLASS:  No, your Honor.
 6            THE COURT:  All right.
 7            MR. GLASS:  The last --
 8            THE COURT:  We have assigned seats for these things.
 9            MR. GLASS:  I had no idea that there were place
10    cards.
11            THE COURT:  That's fine.
12            MR. GIDEON:  C.J. Gideon on behalf of the Tennessee
13    clinic defendants.
14            MR. WOLK:  Christopher Wolk, your Honor, on behalf of
15    the Premier defendants.
16            MR. FERN:  Frederick Fern, special counsel to the
17    bankruptcy trustee, Judge.
18            MR. PIERCE:  Harry Pierce, Sloane & Walsh, on behalf
19    of Glenn Chin, your Honor.
20            MS. PEIRCE:  Michelle Peirce from Donoghue Barrett &
21    Singal on behalf of Barry and Lisa Cadden.
22            MR. RABINOVITZ:  Your Honor, Dan Rabinovitz.  I
23    represent Gregory Conigliaro in the criminal matter and I
24    represent Medical Sales Management, Inc. in the MDL.
25            MR. O'HARA:  Good morning, your Honor.  Christopher
```

```
1    O'Hara from Todd & Weld on behalf of Carla and Doug

2    Conigliaro.  With me is my colleague.

3              MS. HALE:  Good morning, your Honor.  Corrina Hale.

4              MR. KLARFELD:  Good morning, your Honor.  Joshua

5    Klarfeld on behalf of GDC.

6              MS. PUIG:  Your Honor, Yvonne Puig for the St. Thomas

7    Entities, along with Sarah Kelly and Marcy Greer.

8              MS. KELLY:  Good morning.

9              MR. MORIARTY:  Your Honor, Matthew Moriarty for

10   Ameridose.

11             THE COURT:  And I believe we had a couple of people

12   on the phone who thought they might be arguing as well.  If

13   you could introduce yourselves.

14             MR. KIRBY:  Yes, your Honor.  This is Greg Kirby on

15   behalf of the Box Hill defendants.  Can you hear me okay?

16             THE COURT:  Yes.

17             MR. KIRBY:  I'm not actually sure if my issue will be

18   in front of you or in front of Judge Zobel later this

19   afternoon, but it was listed on both agendas.  So, I thought I

20   would make sure to be included, if necessary.  So, thank you

21   for letting me appear by telephone.

22             THE COURT:  Anyone else on the phone?

23             (No response.)

24             THE COURT:  No.  So, for -- and I think it's the

25   usual procedure in this case for the benefit of the people who
```

1    are on the phone, if those arguing could stay seated and move

2    the microphone as close as possible to them, if they could.

3              (Attorney Stranch enters courtroom.)

4              THE COURT:  So, Ms. Johnson or -- I don't know if

5    it's Mr. Gastel, given that it's not Judge Zobel here.  Are

6    you going to be running us through the agenda or did you want

7    me to do so?

8              MS. JOHNSON:  We're happy to do that.  Mr. Gastel and

9    I are tag teaming this morning, your Honor, if that's okay.

10             THE COURT:  Otherwise, I would have to call him

11   "Gastel-Johnson."

12             MS. JOHNSON:  That's right.

13             So, the PSC, your Honor -- we have not done this

14   before for hearings before you, but we took the liberty of

15   putting together a proposed agenda.  We tried to do this

16   jointly.  We did circulate it to other parties in advance, but

17   given the timing of it, I am not sure everyone signed off.

18   So, this is our best effort to list all of the discovery-

19   related motions that are fully briefed and ready for argument

20   before your Honor today.

21             With that caveat, the first motion that I believe is

22   ready to go is the Tennessee Clinic Defendants' motions to

23   compel the FDA's compliance with its subpoena, which is No. 1

24   on the agenda.

25             THE COURT:  All right.  So, who is going to speak on

1    behalf of that?

2            MR. GIDEON:  It's actually up to your preference,

3    your Honor.  We have in response to our motion to compel a

4    motion for protective order by the United States represented

5    by Mr. Glass.  So, it's entirely up to you which of us you

6    hear first.

7            THE COURT:  Well, since you filed first, we'll go

8    with you first.

9            MR. GIDEON:  All right.  We on behalf of the

10   Tennessee Clinic Defendants respectfully submit that the

11   motion filed by the FDA and the United States should be

12   denied.

13           At present, if I've read all the pleadings correctly,

14   the only real issue is timing.  If you look at Document 1881,

15   that's expressly stated in Mr. Glass' response.

16           At the outset of my presentation, I want you to know

17   that our assertion of comparative fault and our need to obtain

18   information from the FDA is not something we just stumbled

19   into.  There's an implication in one of the pleadings filed by

20   one of the parties here that this was our effort to delay the

21   resolution of these issues and delay a trial.  That couldn't

22   be further from the truth.

23           We made our initial assertion of comparative fault as

24   to the FDA on March 1st, 2013, in the state court litigation

25   in a very, very detailed rendition of what we thought at the

1    time they had done that contributed to the outcome.  We need

2    to obtain discovery from the FDA to cover their duty; their

3    failure to make a trove of information that they had publicly

4    available; their multiple complaints that they received, not

5    just from insiders at NECC and Ameridose, but from other

6    regulators around the country, including Colorado; their

7    failure to follow up on the December 4, 2006 warning letter;

8    and their failure to comply -- their inexplicable failure to

9    comply with their own 2002 compliance policy guidelines.

10           The bottom line is, most of the information that we

11   wish to obtain deals with the conduct or misconduct of the FDA

12   that precedes September of 2012.  So, in that respect, I'll

13   anticipate the argument being made by Mr. Glass and that is

14   that's really going to impair our prosecution of these people.

15           I don't think so.  It's going to deal with the

16   conduct of the FDA, the information they had, and what they

17   didn't do about it.

18           Taking a look at the seven-factor test from *Micro

19   Financial*, First Circuit, in terms of whether you should

20   postpone this deposition or not, we respectfully submit you

21   should not, and that all the factors favor -- granted, there's

22   a balancing and there's not a perfect answer to this issue,

23   but all the factors favor allowing us to proceed, and those

24   factors that I would like to address are:

25           First, the interest of my client in proceeding

1    expeditiously to defend the claims that are pending against

2    them as well as the interests of all the plaintiffs whose

3    cases are currently joined here to have an expeditious

4    resolution of this case.

5            Secondly, hardship on the criminal defendants and the

6    FDA, I respectfully submit, is minimal.  In large respect,

7    we're going to be dealing with the conduct of the FDA before

8    September 2012, which I can't see impairing the criminal

9    prosecution of the defendants.

10           The third factor, convenience to the courts.  That

11   would permit not only the Tennessee Clinic Defendants and the

12   St. Thomas Entities, but the folks in New Jersey, Michigan and

13   elsewhere to obtain this common discovery in an expedited

14   fashion.

15           Fourth, public interest does not favor a stay and I

16   respectfully submit the Court should look at *SEC vs. K2*

17   *Unlimited*, 15 F.Supp 3d, District of Massachusetts (2014),

18   which specifically points to the risk of fading memories, loss

19   of documents and death of witnesses.  Our principal

20   accusations against the FDA begin in 2002 and continue for a

21   period of eleven years.  So that risk is very real here.

22           And, finally, with respect to that, the United States

23   waited until September 16th, 2014 to indict, over two years

24   after this controversy occurred.  I respectfully submit, we

25   should not have to wait until the criminal proceeding is

1    concluded.

2            The other reason why this is so important to us is

3    that in a federal court proceeding under §803(8), we can

4    utilize the data obtained by the FDA after the inspections

5    finally occurred to establish liability as to NECC.

6            So, for those reasons, we respectfully request that

7    you deny the motion for protective order and allow us to

8    proceed.  Any questions?

9            THE COURT:  Yes.  So, I'm not quite as familiar with

10   the defense as I should be of comparative fault.

11           MR. GIDEON:  All right.

12           THE COURT:  So, my limited understanding is that the

13   entity to which you're trying to ascribe comparative fault is

14   not actually a party to the lawsuit, but rather someone you

15   could point to and say you should diminish my liability

16   because of the other entity's culpability.

17           MR. GIDEON:  That is correct.

18           THE COURT:  Okay.  And perhaps you could just expand

19   on that a little bit, what you would try to show with respect

20   to the FDA, and I think that actually applies to the other

21   defendants as well.

22           MR. GIDEON:  Sure.  A little background.

23           Tennessee adopted comparative fault in a modified

24   comparative fault fashion when the Supreme Court decided the

25   *McIntyre vs. Balentine* case in 1992.  We have the right to

```
1    assert comparative fault and then the jury is permitted to
2    ascribe fault to that nonparty entity based on the evidence
3    that's presented.  The fault has to cause or contribute to the
4    outcome and when you assert comparative fault, the defendant
5    asserting comparative fault has the burden of proof on that
6    point.
7              It's been through a number of iterations since 1992,
8    but one point that's probably quite material to your Honor's
9    determination is there is a specific Supreme Court decision
10   that holds that even an immune entity may be identified as a
11   comparatively-at-fault party, with the purpose being to make
12   sure that allocation of responsibility follows the degree of
13   fault that that entity is guilty of.
14             THE COURT:  Meaning, that in this case -- and I
15   express no opinion on it, but the United States has a lot of
16   sovereign immunity defenses.  Perhaps they would not be
17   subject to suit as a defendant.
18             MR. GIDEON:  Correct.
19             THE COURT:  But they could be named in a comparative
20   fault defense.
21             MR. GIDEON:  That's explicitly correct.
22             THE COURT:  Okay.  And I believe the government brief
23   had alluded to an agreement to produce documents.
24             MR. GIDEON:  Yes.
25             THE COURT:  And I just wondered what your position
```

1   was on that.  Have you received documents or what is the

2   agreement and the timetable from your perspective?

3            MR. GIDEON:  The agreement is they are coming, but we

4   have not received the documents.  We have outstanding FOIA

5   requests to the FDA as well from quite some time ago, but we

6   haven't received the material data that we have been seeking

7   for some time.

8            THE COURT:  I had taken this as a settlement, to the

9   extent you might call that, with respect to what I would call

10  your *Twomey* requests.  And then the FOIA requests, while being

11  overlapping, might be a separate issue.

12           MR. GIDEON:  That's correct.

13           THE COURT:  All right.  That's all the questions that

14  I had for you.  Mr. Glass.

15           MR. GLASS:  Thank you, your Honor.

16           Let me first speak to the documents.  What happened

17  immediately after this meningitis outbreak was that Congress

18  hauled the Commissioner of Food and Drugs before it and in

19  connection with that, there were document requests from

20  several committees and subcommittees of Congress for documents

21  from FDA.

22           In response to those requests, FDA produced a total

23  of approximately 52,000 pages of documents.  There may be

24  duplication in there because there were multiple requests.

25           What we have agreed with the Tennessee Clinic

1    Defendants is that we will review those documents for

2    responsiveness to the subpoena and also for privilege and we

3    will produce all of the -- all of the non-privileged

4    responsive material.

5           This is a new venture for FDA.  We have been using an

6    ediscovery platform now.  Their current timetable is that they

7    are hopeful that they can have an initial release of these

8    documents in a week or two and to be finished by the end of

9    July.  So, those documents are on their way, and we are fairly

10   confident that much, if not all, of what the Tennessee Clinic

11   Defendants are looking for is going to be in those documents,

12   but they are on their way.  Mr. Gideon is correct that they

13   haven't arrived yet, but that process is working.

14          THE COURT:  So, this would include materials prior to

15   2012?

16          MR. GLASS:  Correct.  Correct.  I think that

17   basically -- I'm trying to think, but I think that's basically

18   correct.

19          If I may speak to the rest of what Mr. Gideon had to

20   say.  Of course, we disagree.  We are not here to interfere

21   with the civil cases, but this is an important criminal

22   prosecution.  64 or 65 people died here.  People are charged

23   with murder, and we think on the basis of that, that criminal

24   case should be entitled to a certain amount of precedence here.

25          We think that there are going to be problems if these

depositions take place before the criminal trial.  We are
fairly confident that the transcripts of the depositions will
become public, regardless of whether they are covered by a
protective order.  We think that's inevitable.  You have 680
separate civil actions and a lot of people are going to have
access to those transcripts and we, therefore, are concerned
that the criminal defendants are going to get access to these
transcripts and when that happens, they can try and tailor
their defenses to the testimony.  They can also try and use
those transcripts for the purpose of trying to impeach the
government's trial witnesses because FDA personnel are going
to be called in the trial.

          We are not concerned that anybody is going to say
anything of substance different at his or her deposition than
what he or she would say at trial, but nobody ever answers the
same question exactly the same way twice.  It's going to be a
fertile field for impeachment challenges.  So, we're concerned
about that.

          We're also concerned that once these transcripts
become public -- and, as I say, we're sure they will become
public -- they will hit the media and there's likely to be
another media flurry about this case and that could make it
more difficult to pick a fair and impartial jury.

          Another problem we see is that since the FDA
personnel are likely to be called at trial, that the

1   prosecution team is going to have to become involved in

2   witness preparation.  That's going to take them away from all

3   of the other things that they need to be doing to prepare this

4   case for trial and that process is going to be exacerbated if,

5   as we think possible, that these depositions lead to other

6   depositions of potential government witnesses.

7          We're aware that there's a tension in what we are

8   suggesting here between early dates in the civil trials and

9   the stay that we are seeking.

10         There are a couple of consolations that we see here.

11  First, it's my understanding that there is now a $200 million

12  settlement fund for the plaintiffs.  So, perhaps, the early

13  trial dates are not as important as they were.

14         Second, once the trial is held, the trial transcripts

15  will be available for everybody to use in the civil trials and

16  that may, in the long run, make it less necessary for anybody

17  to take any depositions of FDA personnel.

18         And, finally, it's documents that we're producing.

19  Those, too, may make it unnecessary for there to be any

20  depositions here.

21         So, Mr. Gideon alluded to the First Circuit case,

22  *Micro Financial*.  That makes it clear that all of these cases

23  are sui generis when a stay of civil proceedings are sought in

24  parallel criminal proceedings.  We think this is the ideal

25  case for that because there is pretty much complete overlap in

1    the issues between the two cases.  Both the criminal case and

2    the civil cases arose out of the same conduct on behalf of

3    NECC and the people who were running it.  So, we think this is

4    an appropriate case for a stay of the FDA depositions pending

5    the criminal trial and we ask that that be entered.

6            THE COURT:  So, Mr. Glass, it seemed as if the FDA

7    has dealt with all the categories of information that were

8    sought in equal manner, and it seems to me that, actually, the

9    information has different levels of sensitivity.

10           So, for example, at the high end of sensitivity, I

11   would imagine from the government's perspective, is the actual

12   investigation after 2012.

13           MR. GLASS:  That's correct.

14           THE COURT:  And then of perhaps less sensitivity is

15   the activity that preceded 2012 and, perhaps, FDA's authority

16   to investigate, those sorts of categories.  So -- and then I

17   think there was also a suggestion about authentication of

18   documents.

19           So, why shouldn't I allow a deposition on the less

20   sensitive topics, but stay any questioning of the more

21   sensitive topics?

22           MR. GLASS:  Your Honor, it's -- all of the concerns

23   that I outlined are going to attach to that if these

24   transcripts become available.  And on top of that, you're

25   still going to have the issue of having the prosecutors get

1    involved with witness preparation and all of the disruption

2    that that would entail.

3            THE COURT:  And what about authentication of

4    documents, do you think there's some procedure that could be

5    worked out for that purpose?

6            MR. GLASS:  It's a while since I looked at the

7    authentication rule, but I believe the government documents

8    are self-authenticating, I suppose, except for any corporate

9    documents that are in there.

10           THE COURT:  All right.  Now, I believed the PSC had

11   filed a response to these motions as well.

12           MS. JOHNSON:  We did, your Honor, and I would make

13   two points to the Court.

14           The first is that the PSC's position is that the

15   production of documents by the FDA is the logical starting

16   point and possibly the ending point.  It is those documents

17   that will reveal what knowledge the FDA had before 2012, which

18   seems to be one of the reasons, at least, the St. Thomas

19   Clinics are requesting this information, deposition.

20           St. Thomas -- or I'm sorry -- Tennessee Clinics have

21   put forward three reasons that they're entitled to discovery

22   here.  Those reasons may be enough to get them documents.

23   It's not clear to the PSC that those reasons require

24   depositions.

25           To that end, there is much publicly-available

1    information already about the FDA's knowledge and the FDA's

2    position that has already been available for quite some time

3    attendant to the congressional investigation and other ongoing

4    discussions.

5         Given all of that, the PSC would strongly encourage

6    the Court to consider not deciding the deposition issue until

7    the documents have been produced and the Tennessee clinics

8    have had an opportunity to review those documents and

9    determine whether a deposition is really necessary.

10         The second point I would make, your Honor, is a

11    larger overall issue, which is this:  The discovery disputes

12    that are before your Honor today, including this dispute with

13    the FDA's deposition, should not derail this MDL to the point

14    where the victims are required to wait until after resolution

15    of the criminal matters.

16         Now, I don't hear Mr. Glass saying that.  I hear him

17    saying the opposite, that this is a logical situation to have

18    these cases running in parallel, and so far that has been done

19    and I think done effectively, but we would ask that this Court

20    strongly consider that parallel approach and, therefore, when

21    making these decisions, we would hope that the Court would

22    encourage this MDL to continue running apace.

23         And, finally, if the Court is to consider the option

24    of ordering a deposition of FDA that is somewhat tailored --

25    you mentioned the possibility of perhaps less sensitive topics

```
1    would go forward -- I would just note as to Mr. Glass'
2    concern, that there are many different ways that we could
3    craft a protective order to restrict access to those
4    documents.  I don't say that to suggest that access to those
5    depositions should be very tightly controlled.  I don't mean
6    to be taking a position, but there are certainly lots of
7    opportunities for us to -- and for the Court to decide what
8    the appropriate level of access would be.  Thank you.
9              THE COURT:  All right.  Does anyone else wish to
10   speak to this motion?
11             MR. GIDEON:  May I be heard one more time, your
12   Honor?
13             THE COURT:  Yes.
14             MR. GIDEON:  It seems that the FDA, NECC and several
15   of the other parties in this, participants in this, suggest
16   that we should defend our client simply by walking into a
17   courtroom with boxes of documents and just presenting the
18   documents.  That's not going to work.
19             We need to have witnesses to carry out discharging
20   our burden of proving that the FDA was complicit in this
21   calamity, and we need to have people who have been informed so
22   that they can answer specific questions.
23             Secondly, while I understand what Mr. Glass is
24   talking about, he doesn't want to divert the attention of an
25   AUSA who is preparing for trial to get someone ready for
```

22

1   deposition, it's not all a waste of time.  They're going to be

2   preparing the same witness to present to obtain direct

3   testimony.  I think while there may be some waste, it won't be

4   significant.

5           Third, at least with respect to the Tennessee

6   litigation and certainly from our standpoint and from the

7   standpoint of St. Thomas, there have been no leaks to the

8   media and there won't be any leaks to the media about

9   deposition testimony, and the cases will be tried in Nashville

10  or perhaps in Cookeville.  So, it's very unlikely that

11  anything that comes out of that is going to affect a trial

12  here of the Caddens, Conigliaros, and others.

13          So, I respectfully request that you permit us the

14  option to do what we've been working on since February, and

15  that is have that FDA representative answer specific questions

16  we've been seeking to have answers to since March of 2013.

17          THE COURT:  And I believe Judge Zobel may be asking

18  about this as well, but in terms of the comparative fault

19  defense, that would seem to me to be the gravamen of the

20  allegations here, right, the negligence?  But are there other

21  claims against your client that do not have a comparative

22  fault defense?

23          MR. GIDEON:  No.

24          THE COURT:  Okay.

25          MR. GIDEON:  And it is -- as I said in the second

1   half of this, we're encountering difficulties finding anyone

2   who will be supplied by NECC to answer questions about NECC.

3          One of the nice things about being in federal court

4   is §803(8) will allow us to take the testimony from the FDA to

5   establish why these three lots were contaminated, what they

6   were contaminated with, what caused the contamination, which

7   will certainly aid in the presentation of our comparative

8   fault claims against these individual defendants and NECC.

9   So, it has two major reasons for occurring.

10          THE COURT:  All right.  Does anyone else wish to

11  speak to this?

12          MR. GLASS:  Your Honor, may I just address very

13  briefly here?

14          THE COURT:  Yes, absolutely.

15          MR. GLASS:  First, Ms. Johnson referred to the

16  availability of documents.  I should point out -- and this is

17  an attachment, actually, to Tennessee Clinic Defendants'

18  papers.  After the Commissioner of Food and Drugs was hauled

19  before Congress, there was a scathing congressional report

20  that came out accusing FDA of all kinds of misconduct, citing

21  the documents that we produced.  So, that's all on the record,

22  what we did or what we didn't do or what we should have done.

23  So, that's all available.

24          Mr. Gideon referred earlier to fading memories and

25  death of witnesses and why it was important for depositions to

1   be taken.  Now, these are 30(b)(6) depositions.  So, somebody

2   will show up on behalf of FDA.  The FDA is not going any

3   place.

4           The last thing that Mr. Gideon talked about was the

5   two years that it took for the government to indict anybody.

6   Well, the government needs to take its time when it's going to

7   accuse people of murder and defrauding the government.  So,

8   there's nothing improper about that.

9           And we do think these transcripts are going to become

10  public and we do think there's a good chance that they could

11  reach the defendants.  So, we ask that this protective order

12  be entered.

13          THE COURT:  All right.  Thank you.

14          MR. GASTEL:  Can I just address one quick thing?

15          THE COURT:  Yes.

16          MR. GASTEL:  And correct from the plaintiffs'

17  perspective an answer that Mr. Gideon gave regarding Tennessee

18  law on comparative fault.

19          The plaintiffs very much disagree with Mr. Gideon's

20  claims that there's not claims pending against his clients in

21  which comparative fault does not attach.  Plaintiffs have

22  claims under the Tennessee Products Liability Act and I think

23  that Tennessee law is crystal clear on this issue, that joint

24  and several liability continues to apply to claims under the

25  Tennessee Products Liability Act, and I would direct the Court

1    to the *Owens vs. Truck Stop of America* case from the Tennessee

2    Supreme Court, which I think does a very good job of

3    explaining how claims under the Tennessee Product Liability

4    Act survive the change to the comparative fault regime in

5    Tennessee.

6         THE COURT:  Thank you.

7         So, Ms. Johnson, will you be moving us along or --

8         MS. JOHNSON:  Yes, your Honor.  That brings us to the

9    second item on our agenda, which is -- it's a litany.  The

10   heading is, "Motions to Quash and for Protective Order."  I

11   will speak generally and say that these are motions filed by

12   the affiliated defendants, the insiders, and related entities,

13   seeking relief from this Court in response to discovery

14   requests.

15        THE COURT:  All right.  And it looks like you have

16   teed up Mr. Moore's motion, yes.

17        MR. GOTTFRIED:  Thank you, your Honor.  Michael

18   Gottfried from the trustee, Paul Moore.

19        First of all, on the agenda, Item 2-a. and -- well,

20   there is no motion with respect to 2-b., which was our

21   objection to the subpoena duces tecum, I think that's where I

22   would like to start, which is to tell the Court that the

23   motion for protective order pertains only to the request for

24   the 30(b)(6) deposition.

25        The trustee on May 1st filed a response and an

1    objection to the document request, and in connection with that

2    response, the trustee identified the documents in the

3    repository that had previously been produced that would be

4    responsive to Requests 2, 5, 6, 9, 12, 17, 18, and 19.

5         The trustee also agreed and did conduct additional

6    searches of documents that were not in the repository and made

7    an additional supplemental production in response to Requests

8    10, 11, 15, and 16.  The trustee conducted searches with

9    respect to Requests 2, 3, 17, 18, and 19, and determined there

10   were no additional responsive documents.

11        The trustee objected, but offered to meet and confer

12   because the requests were too broad to conduct a reasonable

13   search with respect to 4, 5, 6, 7, 9, and 12, and although

14   that was served on May 1st and filed in the MDL, here we are

15   on May 29th and no one has contacted our special counsel

16   Harris Beach, Mr. Fern, to have a meet-and-confer with respect

17   to those documents.

18        So, I think the point -- I'm going to try to outline

19   six specific points that I think you should be considering in

20   deciding prudentially whether this deposition should go

21   forward, but the point I want to make with respect to (b.) is

22   that the trustee has been fully responsive with respect to the

23   document requests, has conducted additional searches and

24   produced documents that were not in the repository, has

25   specifically identified documents in the repository and has

1  offered to meet and confer with respect to additional requests

2  and, in fact, has only objected to four requests in their

3  entirety, which, again, there's been no motion to compel, no

4  meet-and-confer at all almost a month later with respect to

5  any of those.

6          So, what are the six reasons why the trustee thinks

7  the Court should grant his motion for protective order?  I

8  think it starts with the question that you asked in connection

9  with the FDA, which is we're a nonparty.  This is not a

10 request to take a 30(b)(6) deposition of a party defendant.

11 In fact, the Tennessee Clinics have agreed not to name Mr.

12 Moore as a party in any case other than for comparative fault

13 purposes.

14         The plan, as the Court knows, has been approved and

15 goes effective June 4th.  The automatic stay, all it provides,

16 that there are no direct claims against NECC that are going to

17 be brought here.  So, this is a nonparty situation which

18 requires the Court, I believe, to carefully balance the

19 various factors that I'm hoping to lay out for you to decide

20 whether for a nonparty this makes sense and we would submit

21 that it doesn't.

22         The first reason it doesn't make sense is that there

23 has been, as I just laid out for the Court, an extensive

24 document production and a continuing offer to meet and confer

25 with respect to additional documents.  So, there's been no

1    stonewall with respect to document production at all.

2         Second, I don't believe that the Tennessee defendants

3    have been diligent in pursuing the documents.  As I've just

4    pointed out, it's been almost a month and we've had no meet-

5    and-confer.  I think, as the PSC pointed out in its papers to

6    the Court, the discovery has been open in this case since

7    September of last year and here we are, essentially, in June

8    and we're first dealing with this now.  I don't think they've

9    been diligent in pursuing it.

10        I think, third, is really the very strong and

11   practical considerations that I think are right in accordance

12   with the rule, which is that NECC has no employees.  It has no

13   officers and directors, except for Mr. Moore, who under the

14   plan is the sole officer and director and post-confirmation

15   officer.  So, therefore, the only people it could approach to

16   testify on its behalf with respect to these matters are these

17   former employees, who, as you'll find out very shortly in

18   connection with all these motions, do not consent to testify.

19   So, the trustee literally has no one who will consent to

20   testify -- they're all taking the Fifth Amendment -- on his

21   behalf.

22        Now, let's look at the trustee.  He was appointed

23   four months after this facility was shut down.  So, he has no

24   personal knowledge of anything that they want to ask about.

25        Now, they have made quite clear in their papers, they

1    don't want to take his deposition.  They want to take somebody

2    else's deposition.  And our point, very simply, is there isn't

3    anybody else.  The people who could testify will not consent

4    to testify.  There really is no witness.  And so, that's a

5    practical matter for a nonparty that you really need to think

6    about, I think.

7           But, more importantly, what are the alternatives?

8    What alternative means are there to try to force this

9    deposition where there is no witness?  And I would submit

10   there's at least three that should be considered here:

11          One is, what stipulations can they reach with the

12   plaintiffs regarding issues, such as NECC supplied the

13   medicine.  My understanding is the plaintiffs are prepared to

14   agree to that.  There are other stipulations that they could

15   agree to that might obviate the need for NECC to be deposed

16   and, again, the practical problem is there's no one to depose.

17   So, stipulations need to be considered.

18          Expert testimony.  You know, there's a complaint that

19   documents are not sufficient, but if you look at the

20   Tennessee's objection, they say the Tennessee Clinic

21   Defendants need testimony and documents to prove NECC's

22   deviation from the standard of practice in manufacturing and

23   distributing the medication that caused the plaintiffs'

24   injuries.

25          To me that's classic expert testimony.  Experts can

1    look at documents.  They can read all the reports that Mr.

2    Glass referred to.  They can read all the documents that we

3    specifically identified in our response and objection and they

4    can provide the testimony that they say they need for

5    comparative fault purposes, it seems to me.

6          And then, finally, they're going to have the benefit

7    of an adverse inference, presumably, if, as I understand it,

8    the various former employees of and officers and directors of

9    NECC take the Fifth Amendment.

10         So, the question as you're making this balance is

11   given all of those available alternative means, do they really

12   need to push forward with a deposition where, as a practical

13   matter, there is no witness who could be deposed and we're

14   being fully cooperative with respect to document production,

15   and they have not diligently pursued it.

16         And last and I think maybe importantly is cost.  As

17   the Court may know and as I think I said just a minute ago,

18   the plan is effective June 4th, and one of the realities of

19   the plan being effective June 4th is that part of the

20   agreement with the insurers in this case is that their

21   requirement to provide defense costs stops on June 4th.  So,

22   anything that happens after June 4th is coming directly out of

23   the victims' pockets because that's the only source for

24   payment, and I think when you're balancing this --

25         THE COURT:  When you say that, Mr. Gottfried, you

1    mean it's coming out of the trust fund?

2              MR. GOTTFRIED:  Yes.

3              THE COURT:  Okay.

4              MR. GOTTFRIED:  Exactly.  Exactly, your Honor.

5         So, given that they have not been diligent, given

6    that that is going to happen, the burden and expense here

7    should not be shifted to the victims to prove this where

8    there's alternatives, where there's no real witness, where

9    we're a nonparty.  It just seems to me that the protective

10   order here under the facts of this case makes sense.

11             They cited some cases to the Court.  Some don't even

12   involve 30(b)(6) depositions.  Some don't involve nonparties.

13   This is a unique case.  I agree, it's a sui generis case, but

14   under the facts of this case, to make the trustee somehow go

15   in and maybe look at documents and then testify based on his

16   review of documents at the expense of the victims, where they

17   and their experts could look at the very same documents,

18   doesn't seem correct.

19             In addition, obviously, Mr. Moore has the issue where

20   some of the information he has is attorney/client privilege

21   and it is work product which he used to achieve the $200

22   million in settlements that were achieved in this case.

23             So, we would urge based on those six factors that the

24   Court grant the motion for protective order.

25             THE COURT:  So -- and, as you say -- obviously, you

```
1    cited cases that were supportive of your view and the other
2    side cited cases that were supportive of their view of it.
3    And as is typical with 30(b)(6), sometimes you have people
4    with knowledge, sometimes you have people not with knowledge
5    and you have to feed them the knowledge, so to speak, which is
6    specifically allowed by the 30(b)(6) procedures.
7            So, you're saying I should reconcile the two
8    competing views in accordance with what you're saying or
9    through the alternative methods?
10           MR. GOTTFRIED:  Correct.  I think -- again, I think
11   you have to balance the interests, okay?  And I think where
12   there are alternative means, where the expense in this case
13   because of their lack of diligence, in particular, is going to
14   fall on the victims, where the trustee has no personal
15   knowledge, where they are going to get, in particular, the
16   benefit of the adverse inferences because the people who you
17   would ask do not consent to testify, which is what 30(b)(6)
18   requires, they don't need this deposition.  I think the
19   reality here is they don't need this deposition.  It's
20   unnecessary.  It's an unfair burden on the estate.  And I
21   think for all those reasons, you should find that the balance
22   here favors the protective order in this case.
23           Again, we're making the documents available.  We're
24   not saying they don't get discovery, but the question I would
25   ask them is, Where have you been for 30 days on the meet-and-
```

1    confer?

2              THE COURT:  All right.

3              MR. GOTTFRIED:  It makes it seem like this is more of

4    a tactic, quite frankly, than a good-faith effort that they

5    really need this.

6              THE COURT:  Yes.

7              MR. GIDEON:  C.J. Gideon on behalf of the party that

8    opposes this motion for protective order, and I'm going to

9    refrain from the hyperbole.

10             I thought that at the outset that the gentlemen who

11   was just speaking was saying this isn't about document

12   production and then he spent two-thirds of his presentation

13   faulting us for not challenging the document production.

14             What I'm here to address with the Court today is our

15   request that we have somebody or several people designated by

16   NECC under Rule 30(b)(6).

17             As the Court knows quite well from all the papers

18   that have been submitted, there is no exception in 30(b)(6)

19   for a bankrupt entity.  There's also no exception in 30(b)(6)

20   for a company that says this is just, frankly, inconvenient or

21   it's going to cost something.  It's a policy choice that's

22   been made to utilize and permit the utilization of this method

23   for the collection of information.

24             We wish to use it principally because it provides us

25   with an excellent means to put questions to an entity that

1    cannot assert the Fifth Amendment and require a response by
2    the entity that everybody in this room knows is responsible
3    for unleashing at least three lots of toxic pharmaceuticals
4    throughout the country.
5            Now, looking at the high watermark of all the
6    briefing that's been done and submitted to you, I would take
7    the brief that was submitted on the 27th by the invoking
8    defendants, the response brief this Court permitted, and
9    there's one case in there that just fits this like a glove,
10   and it's *City of Chicago vs. Reliable Auto Parts*, same set of
11   circumstances.  The City of Chicago was proceeding against
12   Reliable Auto Parts for defrauding the city on maintenance and
13   repair for a number of years.  All the owners and operators
14   all were facing criminal liability.  All said they were going
15   to take the Fifth.  The Court, the senior U.S. district judge,
16   still required the NECC in that case to designate an
17   individual to answer the questions and disposed of all of
18   those arguments quite quickly.
19           The second substantive point I would like to make is
20   the inadequacy of the submissions to you to support the
21   argument that was just made.  The declaration of the trustee
22   is approximately three pages long.  It is incorporated word
23   for word in the first four pages of the memorandum.  Even the
24   tense is the same.
25           Not one time in the declaration or the brief do they

1   ever say that they have contacted a former employee or made

2   any effort to speak to anybody in particular.  They simply

3   state that these former officers and directors will not be

4   available, but there is no reflection that they had made any

5   effort at all to contact anyone who has not been indicted by

6   the United States.

7       14 people were indicted December 16th, 2014.  At the

8   time Brigham & Women's Hospital did an inspection of NECC in

9   2012, NECC reported it had 75 employees.  There is no

10  indication that the trustee or trustee's counsel has made any

11  effort to contact any of these people to say that you're

12  compensated reasonably for your time, which I suspect would be

13  less than the charges by trustee's counsel.  Will you take the

14  time to be prepared to answer these specific questions?

15      Linda Pineau is a former employee of NECC.  She was

16  deposed in Virginia in the Virginia litigation.  We've tried

17  our best, those of us who are accused of being non-diligent,

18  to get that transcript, but we can't get it.  We tried our

19  best to find other individuals who used to work for NECC, but

20  they're much more clearly available to them.

21      So, when you look at the rule, when you look at the

22  text of the rule, when you look at a recent case submitted to

23  the Court for consideration by the invoking defendants, the

24  answer, I respectfully submit, is rather clear.  They should

25  be required to designate someone to answer those specific

```
1    questions, not just for us, but for everybody else in this

2    litigation.

3              THE COURT:  Anyone else wish to speak to this issue?

4              MS. JOHNSON:  Yes, your Honor.

5              THE COURT:  Yes.

6              MS. JOHNSON:  A few things.

7         I start, again, with the observation from the PSC's

8    perspective, this really is all about the documents.  There is

9    a wealth of documents that have been produced.  We understand

10   the trustee is making additional production of documents or

11   has made additional production of documents in response to

12   this.  There is a wealth of information available about NECC

13   that's available to the Tennessee defendants and that is,

14   again, a logical starting point.

15        I will make a couple of observations moving from that

16   point:

17        First, given the PSC's hand-to-hand involvement with

18   the trustee, the PSC's own efforts to develop cases against

19   NECC, all of which led, by the way, to a significant

20   settlement where NECC paid money into a pot for victims, it is

21   unclear from the PSC's perspective that there really is a

22   logical person that could do this depo.  So, when Mr.

23   Gottfried says he's not sure who it would be, we agree with him.

24        Now, sure, 30(b)(6), you could take the time to

25   educate people.  You can put documents in front of your own
```

1    former employee and educate that person.  You could do a depo

2    that way, I suppose, but let's talk about costs for a minute.

3         Insurance defense coverage for NECC ends on June 4th

4    and I'm looking at the letter that the trustee sent me last

5    night from its own insurer informing the trustee very loudly

6    of that fact.

7         If a deposition goes forward -- and we don't think

8    that it should -- if it goes forward, the St. Thomas Clinics

9    should have to pay the costs associated with that deposition.

10   That would include, perhaps, Mr. Fern's time, special counsel

11   to the trustee, to the extent he would need to be involved in

12   preparing a witness for 30(b)(6).  It would include things

13   like a court reporter, the cost of lunch, reserving the

14   conference room.  It should include Tennessee Clinics having

15   to pay for any time incurred by the trustee, who I suppose at

16   that point, technically, his title changes.  He would be the

17   post-confirmation officer, but Mr. Moore's time should be paid

18   for.  It is not a small thing to talk about having the tort

19   trust pay these costs.  It is a real hit to victims, and both

20   Mr. Moore and the PSC feel very strongly those costs need to

21   be minimized.

22        Finally, I can't help but note that all of the

23   defendants here before you that are seeking to -- seeking

24   motions to quash or protective orders have all contributed to

25   the bankruptcy settlement, and as part of the negotiation for

```
 1   that settlement and the releases that have now been confirmed
 2   by Judge Boroff, there was an agreement that the discovery
 3   that would need to be done was only the discovery that was
 4   necessary to establish comparative fault defenses or the
 5   defenses and liability of other entities.
 6          Now, I do think that much of what's being fought
 7   about here fits into that bucket.  So, I'm not suggesting they
 8   shouldn't have to do anything, but I do think that the
 9   structure that was contemplated there and very carefully
10   negotiated always had at its root the thought that these
11   entities should have to produce information sufficient for
12   discovery, but should not have to do more than was necessary
13   to adequately provide the information necessary for
14   comparative fault defenses.
15          So, that brings me back, your Honor, to where I
16   started, which we really do think the documents here are the
17   logical starting point and, hopefully, the ending point,
18   particularly as to NECC.
19          THE COURT:  Does anyone else wish to speak to it?
20   Yes.
21          MR. GIDEON:  One last -- couple points.
22          Our notice of deposition went out in April, set the
23   date for May 13th.  Today is the first time there's been any
24   emphasis placed in this response on when the insurance
25   carriers would quit paying for defense costs.  That's
```

1     particularly one point that could have been resolved very

2     quickly if they had said, Let's go ahead and do this

3     deposition before June 14th.

4              The offer of lots of documents, we addressed that.

5     It is specifically and squarely rejected in the *In Re:*

6     *Vitamins Antitrust Litigation* case, cited at Note 46 in our

7     response.

8              And in terms of what it is that we're trying to

9     establish, let me just give you a vignette that shows how

10    clearly this deals with the comparative fault issue.

11             Medical Sales Management, which we're told is a

12    separate entity, separate and apart from NECC, had salespeople

13    who came to Tennessee and with the Tennessee physicians and

14    nurses made a representation that all the product they sold

15    was compliant with USP 797, the gold standard for safety, and

16    that all of their processes here were compliant with USP 71.

17             We want to have someone from NECC confirm that those

18    were the representations that were being made, that under

19    their contract with NECC and Medical Sales Management, the

20    director of pharmacy for NECC had the final right to approve

21    the contact -- the content of the representations; that Mr.

22    Barry Cadden was the one who set the pricing and established

23    that if they had followed -- if they had followed the rather

24    clear requirements of USP 797 and 71, this never would have

25    happened.  It could not have occurred.  That's an example why

1   we want to have somebody who cannot assert the Fifth Amendment

2   answer those very, very important questions.

3           THE COURT:  All right.  Thank you.

4           And, yes -- and, actually, Mr. Gottfried, I had a

5   question for you.  This may sound uninformed because it's a

6   long time since I was involved in bankruptcy litigation.

7           MR. GOTTFRIED:  Okay.

8           THE COURT:  But I thought sometimes there was money

9   set aside to pay for expenses after the confirmation of the

10  plan, and if there are no such --

11          MR. GOTTFRIED:  There is.

12          THE COURT:  Okay.

13          MR. GOTTFRIED:  There is, your Honor, but the point

14  on that is quite clear, that any money that's not used goes to

15  the tort trust.

16          THE COURT:  I see.  So, there's a reserve, but you

17  would like that reserve to go to --

18          MR. GOTTFRIED:  We would like as much money to go to

19  the victims as possible after all of the legitimate

20  administrative expenses are paid.

21          THE COURT:  But right now it's not in the trust fund.

22  It's in a reserve to pay for whatever expenses, additional

23  legal costs or things like that?

24          MR. GOTTFRIED:  I'm not sure that's --

25          THE COURT:  Yes.

```
1              MS. JOHNSON:  So, just to -- I knew nothing about
2     bankruptcy law coming into this case, your Honor.  So, I have
3     forced myself to distil it into plain English.  So, the way I
4     think about it, if it's helpful, is there have been
5     contributions made to a pot.  The trustee will then from that
6     pot pay fees and expenses off the top.  That includes payments
7     of nontort creditors, as described in the plan.  Not all of
8     those are paid, but those that are paid get paid first.  The
9     money then pours over into the tort trust and victims are then
10    paid out of the -- tort victims are then paid out of that tort
11    trust.  So, there's no reserve, as I think your Honor may be
12    contemplating where a designated amount of money is set aside
13    specifically to pay expenses, but it is the case that fees and
14    expenses are dealt with first and anything remaining is then
15    poured over into the tort trust.
16              THE COURT:  Thank you.
17              MR. GOTTFRIED:  It's certainly the trustee's goal for
18    a lot of tax advantages for the tort victims to get this done
19    this year.  So, a couple of -- if that answers your question,
20    a couple of quick points.
21              THE COURT:  Yes.
22              MR. GOTTFRIED:  One, again, this is a balance test,
23    and the rhetorical questions that were asked are, you know, we
24    want a witness to say this.  Well, they're going to have the
25    Fifth Amendment inference with respect to those questions.
```

1    And so, the question is under these circumstances, do they get

2    something else in addition to that Fifth Amendment inference?

3          And what I'm trying to ask the Court to also consider

4    is, there is nobody else to give that testimony.  There is no

5    witness who is going to testify who is knowledgeable of those

6    facts who can answer those questions about what representation

7    was made.  The answer is going to be, "I don't know," and then

8    they have the Fifth Amendment inference.

9          So, the question is, under these circumstances, given

10   the costs, are they entitled to the perfect in proving

11   comparative fault against a nonparty or are they entitled to a

12   balance?  And I'm suggesting that the balance here is clear,

13   that they can enter into stipulations.  Their expert witness

14   can review the documents and testify to conclusions.  They

15   have the Fifth Amendment inference.

16         There is no serious question that the jury is going

17   to understand that the medicine here was sold by NECC.  And

18   the real question is:  What more do they need for comparative

19   fault than to tell the jury for the jury to understand that

20   they bought tainted medicine?

21         At the end of the day, that's going to be an

22   established fact and there are multiple ways they can get that

23   fact.  How it was tainted, why it was tainted, who

24   particularly tainted it, is all irrelevant.  It's that they

25   got that medicine.

```
 1            So, I think when you really drill down here -- sure,
 2    in the ideal world, they would like one of these folks to
 3    waive their Fifth Amendment and talk about all that stuff, but
 4    that's not going to happen and the trustee can't make that
 5    happen, but what they do have is sufficient for proving
 6    comparative fault.  That's all they're entitled to.  This is a
 7    nonparty and the money is coming out of the victims' pockets.
 8    I urge you to grant the protective order.
 9            MS. JOHNSON:  I have one point that I think I owe Mr.
10    Gideon a response on something, because I heard him say that
11    he tried to get his hands on the Linda Pineau deposition that
12    was taken in Virginia.  The PSC has never been asked for that
13    deposition.
14            I don't know sitting here today whether I would be
15    allowed to produce it, given the protective orders that may be
16    in place in Virginia and in the agreements in the Virginia
17    settlement, but, in any event, we've not been asked for that
18    before.  So, we will certainly look into whether or not we're
19    in a position to produce that.
20            THE COURT:  All right.  So, moving on to the next
21    batch.  We have quite a few motions.
22            MS. JOHNSON:  I think the next one on our agenda
23    would be (c), which would be the motion for protective order
24    and motion to quash deposition notices by what -- the group
25    that's calling itself, "the invoking defendants."
```

1          MR. RABINOVITZ:  Your Honor, I'm going to start the

2    argument, if it please the Court.

3          There are a few things that I want to highlight for

4    you that are in our briefs that we filed.

5          The first is, let us not forget that the discovery

6    stay which was, as the PSC just pointed out, an integral part

7    of the negotiations.  The discovery stay says that the only

8    thing that's permissible in discovery are things that are

9    relevant to the prosecution or defense of third-party claims,

10   and in this context, what that means is questions that are

11   designed to discover fault, and when you start to talk about

12   questions that relate to fault, that automatically triggers

13   legitimate Fifth Amendment concerns.  What could be more

14   triggering than that, questions about fault to people who have

15   been --

16         THE COURT:  I didn't understand that anyone was

17   questioning the individual defendants' right to assert the

18   Fifth Amendment.  Or am I missing something?

19         MR. RABINOVITZ:  You are missing a nuisance, I think,

20   your Honor, which is that they are absolutely -- the Tennessee

21   parties are absolutely trying to force the invoking parties,

22   as they're called in our brief, to show up for a deposition

23   and be videotaped and they have --

24         THE COURT:  Invoking their Fifth Amendment?

25         MR. RABINOVITZ:  Well, that's their first starting

1     point.  Under their theory of what should happen is first they

2     want to videotape them invoking and then they want to come

3     back to the Court and argue about whether the invocation was

4     proper question by question.

5           And what we did in our meet-and-confer is we said,

6     Why don't you give us the questions in writing?  That is

7     permissible under the Rules.  And then we can take it question

8     by question and we can hash that all out before the Court and

9     there will be no videotaping if it's not necessary.

10          But the point I'm trying to make is that the

11    discovery stay means that the only questions that can be asked

12    are questions that the invocation is absolutely legitimate and

13    must be upheld and if that's the case, your Honor, then

14    videotaping defendants taking -- invoking their constitutional

15    rights is oppressive.  It's burdensome.  It's wasteful in

16    terms of cost.  Quite frankly, it's outrageous.

17          And when you factor in this blanket approach that

18    they're talking about that they've argued in their

19    pleadings -- we're not asking for a blanket approach.  The

20    fact of the matter is that the stay says these are the only

21    relevant questions that can be asked, and the fact of the

22    matter is that means, by definition, those questions trigger

23    legitimate Fifth Amendment concerns.

24          And, with all due respect to everybody who has argued

25    otherwise, that's the end of the ball game right there, your

1    Honor.  It's not that we're asking for a blanket approach.

2    It's that the stay says what it says and, by definition, those

3    questions are legitimate Fifth-Amendment-invoking questions.

4           And said another way, all you have to do is read the

5    affidavit that was filed by the U.S. Attorney for the District

6    of Massachusetts in connection with the FDA motions that you

7    just heard and it is full of examples of how this Fifth

8    Amendment concern as to all these invoking parties are

9    extremely real.

10          And let's not forget that we are talking about the

11   most valued principle in American jurisprudence, is the Fifth

12   Amendment.

13          And I must comment on something that Mr. Gideon said

14   because it was very telling.  What Mr. Gideon said was that he

15   wants to aid in his presentation, trial presentation, and

16   that's the issue, as Mr. Gottfried was commenting on as well.

17   The issue for your Honor is to balance the most important

18   right an individual in the United States of America has under

19   the Constitution versus the preference of other parties in a

20   civil matter to present their case in the most prejudicial way

21   that they can, and when you view the issue that way, your

22   Honor, again, it should be absolutely clear that there's only

23   one decision here, which is to say to these parties who want

24   to force these individuals, many of whom, if not all, have

25   contributed millions and millions of dollars to this fund that

1    is going to be available to the victims, prevent them from

2    being videotaped for the strictly harassing purpose that this is.

3          I also, your Honor, wanted to draw to your attention

4    a particular line from -- a quote from the United States

5    Supreme Court, the *Hoffmann* case, that was quoted in our

6    papers, and in that case the Court said that, "The immediate

7    and potential evils of compulsory self disclosure transcend

8    difficulties the exercise of privilege may impose on society,"

9    and the quote, to quote it completely, says, "in the detection

10   of prosecution of crime," but that principle is just as

11   applicable in this civil context as well, and that's the

12   reality of the situation, is that the Fifth Amendment concerns

13   and the Fifth Amendment rights trump often -- trump concerns

14   in a civil case, and this is -- if this case doesn't do it,

15   what case does?

16         Again, the facts in the U.S. Attorney's affidavit

17   make it clear that this is a very real concern and there's

18   absolutely no legitimate reason for the Tennessee parties to

19   be able to film people invoking the Fifth Amendment when they

20   can get that evidence and they can get that adverse inference

21   in almost identical form.  The only difference is that they

22   don't have the videotape, but it will be stipulated to at

23   trial, I'm sure.  There'll be an adverse inference drawn at

24   trial and they don't need that, and it's telling that they

25   wouldn't give us the questions by questions, because they know

1   that there are no questions permitted by the discovery stay

2   that don't trigger legitimate Fifth Amendment concerns and

3   they wouldn't agree to that and that's why, I submit to this

4   Court.

5           And if the Court has any questions, I'd be happy to

6   -- I'm sorry.  My colleague wants to makes a point.

7           THE COURT:  Okay.

8           MR. O'HARA:  If you will, Chris O'Hara.

9           I wanted to circle back with a point that Mr. Glass

10  made earlier, that there is a complete overlap, not

11  questionable, but a complete overlap between the criminal

12  action and the civil matter here.  So, there isn't any

13  question about whether the Fifth Amendment invocation is

14  proper.

15          Second, the adverse inference, which is the sole

16  basis upon which they seek to have discovery from the invoking

17  defendants is already amply provided to them in all of the

18  discovery responses that we've given in writing already

19  invoking in great detail in requests for admission, in

20  interrogatories and in document requests, all of which are

21  available to the Tennessee Clinic Defendants, to the St.

22  Thomas Entities and to the Premier defendants in order to get

23  the adverse inference that they are seeking for purposes of

24  comparative fault, and the depositions add nothing because the

25  -- they already know and have been told that the invoking

1    defendants will invoke given the clear existing criminal

2    proceeding that completely overlaps any possible area of

3    inquiry.

4            So, I think under those circumstances, when you

5    balance those factors, where they have the adverse inference

6    already from us, the depositions are not only unnecessary,

7    they are -- indeed, appear to be for a different purpose, from

8    our perspective.

9            THE COURT:  And you gentlemen have been speaking

10   about all the defendants as one group, but Ms. Conigliaro-

11   Cadden is slightly different in that she hasn't been indicted.

12           MS. PEIRCE:  Your Honor, Michelle Peirce.  I

13   represent Ms. Cadden.

14           You're right that she is fortunate not to be in that

15   group arising out of this terrible tragedy, but in terms of

16   the principles that apply, she falls squarely within the same

17   principles.  The indictment -- I'm sure your Honor has had a

18   chance to read it -- is a sweeping indictment.  The government

19   in a recent affidavit provided by the U.S. Attorney has made

20   clear that they're still investigating.

21           So, the point for Ms. Cadden is that it is for

22   reasonable for her for all of the same reasons to protect

23   herself and invoke, as she has in written discovery.

24           If I could add one point that applies to her and to

25   my colleagues who have spoken well to the fact that at a

1    deposition, they would be required to invoke and I believe the

2    Judge, were you forced to go through this process, which I

3    think is unnecessary, of looking question by question, for all

4    the reasons my colleagues said, you would agree that given the

5    broad right to invoke, whether it's a direct admission or

6    could be a steppingstone in someone proving a case against

7    them, I think you would agree for the reasons my colleague

8    said that the invocation would be proper question by question,

9    not because it's blanket, but because of the unique

10   circumstances here.

11          What I wanted to add is that that's balanced against

12   their right to a fair trial.  I also represent Mr. Cadden, and

13   I do want to emphasis.  It's not just the important right to

14   invoke the Fifth Amendment.  The point is every time something

15   like that happens in this case, at the arrests, there is a ton

16   of publicity and there is a very real risk and, in fact, I am

17   concerned that we've already crossed the line of that risk

18   with the publicity at the arrests, that they will not be able

19   to get a fair trial, and to allow each of them to be put in an

20   unnecessary situation where they have to invoke, as we all

21   know they will, and as I believe your Honor would uphold

22   question after question, as others have said, there is a real

23   risk that those transcripts could become public, doesn't even

24   matter.  Those trials are going forward ahead of the criminal

25   trial.  And so, what you will have is another media storm of

```
 1    each of these individuals, whether on paper or on video,
 2    invoking.  And the balance of the need or preference for an
 3    attractive piece of evidence -- which I understand.  I
 4    understand why the clinics would prefer that, but it is so
 5    wildly outweighed by my clients' need and right to a fair
 6    trial, and they can get everything they need on paper, that to
 7    me it's a balance that drops quickly in the invoking
 8    defendants' favor.
 9              THE COURT:  All right.
10              MR. GIDEON:  We respectfully disagree.  Let me --
11              MR. RABINOVITZ:  I'm sorry.  I apologize.  We have
12    one more counsel who would like to speak.
13              THE COURT:  All right.  It makes sense to hear from
14    all the invoking defendants.
15              MR. KLARFELD:  Your Honor, can you hear me okay?
16              THE COURT:  Yes.
17              MR. KLARFELD:  I represent GDC, which is one of the
18    affiliated defendants, the so-called affiliated defendants.
19    I'm not sure if your Honor wants to hear our piece of this
20    argument now or --
21              THE COURT:  That's fine.
22              MR. KLARFELD:  Okay.  I'm actually here to speak on
23    behalf of GDC and the other so-called affiliated defendants,
24    MSN and Ameridose.
25              Our position -- and briefly at the end Steve Higgins,
```

1      who has also filed a motion --

2              THE COURT:  I'm sure Mr. Higgins doesn't want you to

3      speak briefly.

4              MR. KLARFELD:  Fair enough.

5              The affiliated defendants find themselves in a

6      slightly different position and their position is actually

7      quite similar to what Mr. Gottfried outlined.

8              There are really two categories of a potential

9      witnesses who could speak on behalf of the affiliated

10     defendants in a 30(b)(6) context and those are the owners, the

11     individuals who already invoked who will invoke if ordered to

12     testify in a 30(b)(6) capacity as well because it's the same

13     Fifth Amendment concerns that they would have in that context.

14     Not that the company has a Fifth Amendment right, but the

15     individuals who would be called upon to testify would.

16             The other group of potential witnesses are other

17     employees or former employees and we have, in fact, reached

18     out to them.  We have, in fact, tried to get -- tried to see

19     if they would consent and by the plain terms of Rule 30(b)(6),

20     as the requesting defendants themselves recognize, that

21     requires consent, and those individuals have refused their

22     consent and they've refused their consent for any number of

23     reasons, not the least of which -- and this ties into Mr.

24     Higgins -- not the least of which is that they, too, have

25     Fifth Amendment concerns and their Fifth Amendment concerns in

1    the case of Mr. Higgins has led him to tell us that he will

2    invoke his Fifth Amendment right, and the other potential

3    prospective individuals who could otherwise testify on behalf

4    of the company who have refused to do so for the same reasons.

5    We have made an effort to do that and we have actually put in

6    our papers that we made that effort.

7            There simply is no one to testify on behalf of the

8    affiliated defendants, either because they have already

9    invoked their Fifth Amendment or because they are refusing to

10   consent, which is their right to do.

11           With respect to Mr. Higgins specifically, he in many

12   ways is in the same boat as Ms. Cadden.  He's a nonparty,

13   which is unlike her, but he has not been indicted, but that --

14   you know, that said, he still has legitimate concerns that he

15   could be indicted.  As the U.S. Attorney's affidavit makes

16   clear, there is still ongoing investigations and there is no

17   reason to believe that he could not be the target of those

18   investigations.  As a result, he has the same Fifth Amendment

19   concerns that the other invoking defendants have, with the

20   added piece that he is a nonparty.

21           If you have no questions for me, I think that covers

22   where the affiliated defendants --

23           THE COURT:  I think there are also -- besides the

24   substantive issues, there's a motion for joinder at (d.) by

25   Ameridose and (e.) by GDC.  I assume there's no opposition to

1    those.

2         My only question about them is that they're

3    corporations and they're seeking to join the motions that were

4    filed by individuals and the rights are, obviously, slightly

5    different in terms of invoking the Fifth Amendment, how you go

6    about invoking the Fifth Amendment.

7         MR. KLARFELD:  Right, I agree with your Honor.  As a

8    corporation, the companies -- they can't invoke Fifth

9    Amendment and we're not suggesting that they can.  What we're

10   suggesting is there are only two categories of people who

11   could testify on their behalf as a 30(b)(6) representative.

12        If one of the invoking defendants were called upon to

13   testify, that person would still have his or her individual

14   right to invoke the Fifth Amendment and would be forced to

15   invoke the Fifth Amendment whether testifying in an individual

16   capacity or on behalf of the company because it's still going

17   to fall back to them.  So, yes, the company standing by itself

18   cannot invoke the Fifth Amendment and we're not suggesting

19   otherwise.

20        The one other piece that I think is important here,

21   Mr. Gideon referenced the case of *City of Chicago vs.*

22   *Reliable* and I think that is a very important case.  One of

23   the rules of law that comes out of that case is that a person

24   who would otherwise invoke the Fifth Amendment cannot be

25   forced to give his or her information to educate another

1    person so that that other person could testify as a 30(b)(6)

2    witness.  So, even if they were correct that we should go out

3    and scour the earth to find someone who could testify and

4    educate that person, there's no one to do that because that

5    person, presumably, could only be educated by someone who will

6    otherwise invoke the Fifth Amendment and that person can't be

7    forced to waive his or her Fifth Amendment rights to educate

8    someone else to testify on behalf of the company, which really

9    just takes us back to there's no one to testify on behalf of

10   the various companies.

11        THE COURT:  And with respect to Mr. Higgins, because

12   he's in a slightly different posture than the other potential

13   deponents, if I understood correctly, they're also seeking

14   documents from him; is that correct?

15        MR. KLARFELD:  Yes, your Honor.  And I want to be

16   clear, your Honor.  I'll let you ask your question, but I

17   think --

18        THE COURT:  No.  No.  Go ahead.

19        MR. KLARFELD:  We have not moved to quash that

20   component.

21        THE COURT:  Okay.

22        MR. KLARFELD:  But to be clear, what they have --

23   what they have requested are his own personal documents.  So,

24   something like his driver's license, I suspect we'll be able

25   to come forward with.  Whether he has other documents in his

1    individual capacity that he could produce, I don't know that

2    he does, and we have already produced the responsive documents

3    that we have on behalf of GDC, which is his employer.  So, I'm

4    not sure that there's --

5              THE COURT:  But you need to look.

6              MR. KLARFELD:  Of course, we need to look, but I just

7    -- we haven't moved on that --

8              THE COURT:  You haven't, okay.  All right.

9              Do you want -- we'll go to the PSC and then you'll

10   get to respond to everybody.

11             MS. JOHNSON:  Mr. Moriarty for Ameridose wishes to --

12             THE COURT:  Okay.

13             MR. MORIARTY:  Sorry, your Honor.  I was forced to

14   the back of the bleachers today.

15             THE COURT:  Well, you can actually sit in the witness

16   box.

17             MR. MORIARTY:  No, I think I'm fine right here.  You

18   don't want to do the Tennessee Clinic lawyer's job for me.

19             Our joinder, which was Docket No. 1824, had to do

20   with the Fifth Amendment issues and the other objections that

21   were made by the invoking defendants at the time.  We have

22   subsequently filed a separate motion that isn't ripe and ready

23   to be argued today.  So, on the issues that have already been

24   argued, I don't have anything to add to what Mr. Gottfried,

25   Rabinovitz, O'Hara and Klarfeld have already said, except for

1    one thing, and I think this is an issue under the scope of the

2    motion that's pending.

3            The notion that someone following the settlement of

4    this case and everything that that entails and all these Fifth

5    Amendment issues can educate nonmanagerial employees, former

6    employees of these companies, find them, get them to consent

7    and educate them, is, to put it mildly, very unreasonable.

8            To follow up on Mr. Klarfeld's point, you just can't

9    educate non-managerial employees about these kinds of topics

10   with the documents available, the Fifth Amendment issues, and

11   all the other issues that are going to be coming up in the

12   next few weeks.  So, it's not so easy.  And the law requires

13   that any 30(b)(6) witness who is educated because they can't

14   meet all the requirements, you have to really educate them.

15   You can't just put somebody in the box anymore and have them

16   say, I don't know, I wasn't there, I don't understand these

17   documents, I don't have these documents available.  You can't

18   do that anymore.

19           So, the entities, like MSN, GDC and Ameridose, are in

20   a real bind with their ability to find and get consent and

21   identify witnesses who are not going to invoke the Fifth

22   Amendment.  Thank you, your Honor.

23           THE COURT:  So, I have read the motion that was filed

24   on May 22nd.  Obviously, the time to respond has not gone by

25   yet, but what I would suggest is that if there's something

1    else you would like to address, since we're all here.  I,

2    obviously, won't rule on it until I get a written opposition

3    or if anyone does oppose it, they're welcome to do it orally

4    here today.  So, is there anything else that you would like to

5    say in support of that motion?

6            MR. MORIARTY:  Well, sure.  We must have said 20

7    times in those pages that Ameridose did not manufacture,

8    compound, dispense, disseminate this drug and I'm --

9            THE COURT:  And as opposed to the other movants, you

10   were raising quite a strong relevance objection?

11           MR. MORIARTY:  Well, yes, it's relevance, it's

12   liability, it's causation.  And as I understand Tennessee

13   products liability and comparative fault law, under the *Owens*

14   case that somebody mentioned earlier, Ameridose can't be

15   carved out separately anyway on a Tennessee jury form for a

16   Tennessee jury to say Ameridose was at fault.  And so, there's

17   another 20 percent off the St. Thomas Entities or the

18   Tennessee Clinic Defendants.  It's one single share.

19           As Mr. Gottfried and others have already pointed

20   out -- as a matter of fact, as Mr. Gideon pointed out, and I

21   quote, "There is an entity that everyone in this room knows

22   unleashed three toxic lots of methylprednisolone acetate."

23   It's pretty clear that NECC made this product.

24           There have been a bunch of depositions taken in the

25   Tennessee cases.  Ameridose isn't implicated in any of them.

1   The St. Thomas Entities didn't buy this drug at all from

2   anyone and the Tennessee Clinic Defendants didn't buy it from

3   Ameridose.

4           So, the farther afield you get from the true relevant

5   inquiry for the purposes that they need it in Tennessee, the

6   more costly, the more difficult, and the more hurdles are

7   thrown up.  All for what?  When you have no causations for an

8   entity that didn't make the product and you have no liability

9   beyond this one single share theory.  It's just too expensive.

10  It's too much digging and it isn't warranted, and I think Mr.

11  Gottfried pointed out -- and I left these other notes in the

12  back -- that, you know, you get all these people who are going

13  to have a right to be at these depositions that cost money.

14  People are going to be applying to the tort trust for we need

15  fees for this and fees for that, because the insurance

16  companies aren't going to be paying for it anymore.  So, it's

17  just too problematic and it isn't necessary.

18          And until I have something in writing or something

19  that these Tennessee defendants want to talk about today to

20  reply to, that's about all I can say.

21          THE COURT:  Okay.  Thank you.  All right.  PSC.

22          MS. JOHNSON:  Thank you, your Honor.

23          What's good for the goose is good for the gander, and

24  if this Court determines that Mr. Gideon is entitled to have

25  Barry Cadden, as an example, invoke his Fifth Amendment rights

1   in response to questions that are helpful for Mr. Gideon's

2   client, then the PSC intends to have Mr. Cadden invoke his

3   Fifth Amendment privilege on questions that are helpful to the

4   plaintiffs, and I make that point only to be very clear with

5   everyone in this courtroom that that is the PSC's position.

6   If these go forward, then we will need some of that time as

7   well to protect the plaintiffs' interests.

8       Second, a word on timing.  And I don't mean to be

9   jumping ahead to the scheduling motions, but I think it's

10  important to hear.

11      The PSC acknowledges that there are a plethora of

12  discovery-related motions before this Court and no matter how

13  efficient this Court is, it will, by definition, take some

14  time to resolve those.  So, in recognition of that fact and

15  also the fact that multiple defendants have filed motions to

16  extend certain discovery, the PSC agreed in filings last night

17  that the PSC is not opposed to a 45-day extension of the

18  deadlines currently set in MDL Order 9.

19      And I mention that at this point, your Honor, because

20  it is our hope that these matters could all be resolved such

21  that that new compromised deadline could hold.

22      The PSC's primary goal now in this MDL is to collect

23  all of the discovery -- the common discovery from the settling

24  defendants and any other defendants from whom there can truly

25  be common discovery and put that into a single repository for

1    the benefit of all plaintiffs, and it is our hope that that

2    can be done expediently.  As this Court knows, we've been

3    aggressive on scheduling.  It is our hope that this additional

4    45-day extension can stick.

5               THE COURT:  All right.  Mr. Gideon.

6               MR. GIDEON:  Yes, your Honor.  Thank you.

7               This must be hyperbole day.  I've now directly in

8    front of you been advised that what we're trying to do is

9    nothing but harassing and outrageous, and it's quite short of

10   that.

11              The first point that I think everybody has to agree

12   on is that we all recognize the importance of the Fifth

13   Amendment to the United States Constitution.  We're not

14   suggesting that it's unimportant.

15              We're also not suggesting that the Caddens or

16   Conigliaros should get anything less than a full and fair

17   trial in the forum.

18              But at the same time, we want to adequately defend

19   our clients, who we believe have been victimized by the

20   conduct of those very same people, and we look at the rules

21   that have already been established in this jurisdiction.  We

22   don't write de novo.  And, as I said earlier, if we look at

23   the brief that was submitted on the 27th by the invoking

24   defendants and read the cases, it is clear that first you may

25   not make a blanket assertion of the Fifth Amendment.  That is

1    not the prerogative of a litigant in this proceeding.

2            That is precisely what they've done.  They've told us

3    that no matter what we ask, the witness will not respond.  For

4    example, one of the questions that I would ask is:  Is this,

5    in fact, a document you approved as director of pharmacy,

6    talking about compliance with USP 797 and 71?

7            Another question I would ask that doesn't reasonably

8    implicate any Fifth Amendment concerns is:  Did anyone other

9    than Brigham & Women's Hospital ever inspect NECC before

10   electing to purchase product from them?

11           The law provides that it's not up to them to decide

12   in advance that they're going to assert the Fifth as to every

13   question, but instead for the Court to do a particularized

14   inquiry, *U.S. vs. Castro*, a First Circuit case, and then to

15   decide whether the invocation is appropriate.

16           Second thing, you would think from the presentation

17   in the papers that there has been a very, very careful

18   application of the Fifth Amendment to the discovery in this

19   case, and that's simply not true.

20           I will respectfully direct your attention to the

21   Cadden response to request for production No. 42, which asks

22   them to turn over to us the 8.7 million documents that the

23   affidavit of the United States Attorney for this district that

24   was filed as part of the FDA's papers said had been turned

25   over to these invoking defendants.

1          The response when we're asking for documents that

2     have been given to them by the United States is to assert the

3     Fifth Amendment.  It simply doesn't apply.

4          It is true that I want to present this evidence in

5     the most efficient and at the same time effective manner in

6     order to adequately defend my clients and that's why I want to

7     have them invoke the Fifth Amendment on videotape.  It is, I

8     respectfully submit --

9          THE COURT:  Are other defendants being -- other

10    witnesses being videotaped?

11         MR. GIDEON:  Yes, we have consistently videotaped

12    everybody in our cases.  Everybody has been videotaped.  We're

13    not selecting out Ms. Conigliaro or Mr. Cadden.  All of our

14    clients were deposed at length by video.

15         And, finally, I point out that it's not just my

16    suggestion.  That suggestion has met with favor in the very

17    case that was cited with approval by the invoking defendants,

18    the one I've mentioned twice already today, *The City of*

19    *Chicago vs. Reliable Auto Parts*, where the United States

20    district judge recommended to the parties in that case that

21    they take the depositions and, quote, "make full use of the

22    negative inference from their silence at trial."

23         The last point I would like to make is I -- I say

24    this with confidence.  It is unlikely that videotaped

25    depositions of any of these individuals invoking the Fifth

```
1    Amendment will be leaked or released in the Tennessee
2    litigation; and, secondly, if they are utilized at trial, it
3    will be in Nashville, Tennessee and/or Cookeville, Tennessee.
4    The middle district also hears cases.  And I think there's
5    little likelihood it will be impactful here.
6              THE COURT:  You still have time to respond to
7    Ameridose's motion, but do you want to address the relevance
8    arguments now or would you prefer to wait?
9              MR. GIDEON:  I do not wish to speak on that because I
10   don't want to undercut the argument by the St. Thomas Entities
11   who had the discussions with Mr. Moriarty and I've not.
12             THE COURT:  All right.  So, I'll wait to get the
13   brief on that.
14             And the relevance of Mr. Higgins individually?
15             MR. GIDEON:  The same thing.  St. Thomas Hospital --
16   the St. Thomas Entities are the ones leading that particular
17   issue and I don't want to undercut them.
18             THE COURT:  Does someone want to --
19             MR. GIDEON:  I'll yield to one of them.
20             THE COURT:  Yes.
21             MS. KELLY:  To start with, Mr. Higgins, your Honor --
22   this is Sarah Kelly for the St. Thomas Entities.
23             To begin with, Mr. Higgins, he's in a slightly
24   different position, but it is laid out in our papers.  We're
25   still entitled to take his deposition.  He has a lot of
```

1    relevant knowledge.  He was, as I understand it, the day-to-
2    day sort of property manager and he was maintenance at NECC --
3    or GDC, the property manager, and for him to say ahead of
4    time, I do not have to show up, I'm going to invoke my Fifth
5    no matter what you ask me, and for us not to have the
6    opportunity to depose him and ask the questions we want to ask
7    and explain to a jury, likely in Tennessee, who this person
8    is, what he did, and why he can't tell them about it is going
9    to be important when we put on our case.  I mean, it's easy to
10   say everybody knows here what happened.  It's going to be
11   really easy to explain to the jury who is at fault, but it's
12   not.  It's hard to put hundreds of documents in front of a
13   jury or read a deposition transcript or say there's going to
14   be an adverse inference instruction and we all know what it's
15   going to say, but we don't know what the Plaintiffs' Steering
16   Committee is going to say about an adverse inference
17   instruction.  We don't know what a trial court judge is going
18   to say about that, and to sort of cut all that off right now
19   and say, All you need is written questions, we'll answer them,
20   we'll invoke our Fifth, no discovery for you, deal with the
21   documents, cuts us off in discovery and puts us at an unfair
22   disadvantage.
23           As for Mr. Moriarty's motion, I would have to address
24   the relevance questions at a later hearing.
25           THE COURT:  That's fine.

1        MS. KELLY:  I don't have all of the answers and

2    responses.

3        I would say that I disagree -- a lot of the people

4    here talking about Tennessee law who practice in Boston.  My

5    understanding is there is not one extra line on the verdict

6    form for everybody else.  There will be individual lines for

7    other defendants for which we've shown our case for

8    comparative fault.  So, Ameridose would be on that form.  We

9    could make that case.  It wouldn't just get rolled up into one

10   additional line.  So, if we were able to make that case, that

11   would matter for the fault of the St. Thomas Entities.

12       THE COURT:  So, obviously, there are a lot of

13   competing interests here and we're trying to balance them.

14   Obviously, I'm considering alternatives.

15       The invoking defendants have mentioned their offer to

16   give answers to written interrogatory questions.  So, why is

17   that -- I mean, obviously, it's -- you prefer to have a

18   deposition, but, as an alternative, why is that not

19   satisfactory for you?

20       MS. KELLY:  Well, I would want to say two things in

21   response to that:

22       The first is -- I think Mr. Rabinovitz made the point

23   that, you know, the only questions we're allowed to ask have

24   to do with comparative fault.  So -- like, there's one

25   question out there:  Were you at fault?  And the answer is:

1    Yes.  And that's the end of it.

2          I mean, there is going to be a lot of questions that

3    in the ordinary course we would want to put to a deponent,

4    sort of the background, your education, your training, where

5    you worked, leading up to the actual events at issue.

6          So, those background questions, we'll call them, I

7    don't think there is any Fifth Amendment privilege.  There two

8    cases cited in our papers, the *Moll* case and the *McIntrye's*

9    *Mini Computers Sales Group*, which came from Judge Saris,

10   listing out those kinds of topics, general employment

11   background, present employment, educational background,

12   general contacts with the plaintiff, those are the kinds of

13   questions we would want to put to a witness.

14         And your question is:  Well, okay.  There might be

15   some of those, but why don't you do it by written question?

16   And I would answer by saying what we want to do is be able to

17   tell a jury these -- just call it five people are responsible

18   and we are going to prove our case to you.  And instead of

19   being able to say to them, And here's what that person said at

20   their deposition, I'll read you their background.

21         It's clear and it's widely recognized that a video of

22   that person explaining -- saying his name, where he grew up,

23   what he did, is going to stick with the jury.  They're going

24   to see who that person is and that person is going to say on

25   videotape, I can't answer your question because I have a Fifth

1    Amendment right.  And I think -- and I feel strongly that that

2    would stay with the jury and when they are assessing fault,

3    actually apportioning blame to a particular individual, having

4    seen that person and having seen those words come from that

5    person's mouth, they're more likely to do it.  They're able to

6    understand who that person is and why that person is not there

7    testifying.

8         We're not arguing that there is not a valid Fifth

9    Amendment right here.  I don't want to come back next month

10   and argue over 50 questions and whether the right should have

11   been asserted or shouldn't, but that videotape, to be able to

12   play it for the jury and explain who each of these individual

13   defendants is, I think is going to be very important at trial.

14        THE COURT:  And, again, in balancing, obviously, you

15   would like the depositions to take place now and there's no

16   trial set in the criminal case, but often courts say you can

17   do this after the criminal case is over, take a deposition.

18        MS. KELLY:  Are you asking whether I would agree to --

19        THE COURT:  I'm not asking you to agree, but,

20   obviously, the timing isn't perfect.

21        MS. KELLY:  I agree that the timing isn't perfect.  I

22   think it's what we're faced with right now.  I know that the

23   PSC is looking for a short trial date.

24        The deposition can be taken now.  That can certainly

25   be covered by a protective order right now.  I don't think it

```
 1   raises the same concerns as, for example, the FDA's motion.
 2   That's a different issue.
 3          And as far as the videotapes being played at trial, I
 4   think a trial about the STOPNC and St. Thomas Hospital in
 5   Nashville, a videotape being played at a trial of a defendant
 6   might be on trial in Boston, you know, six months or a year.
 7   I don't know how much long later.  I just think it's unlikely
 8   to make a big splash.
 9          THE COURT:  All right.  Thank you.
10          Mr. Gideon, did you want to respond to any of my --
11          MR. GIDEON:  Two additional points.
12          THE COURT:  Yes, of course.
13          MS. KELLY:  Could I make one more point on the
14   30(b)(6) depositions that we've talked about?
15          THE COURT:  Yes.
16          MS. KELLY:  I heard a lot of it's very hard.  We
17   don't have a current employer.  We don't have a former
18   employee.
19          The law is clear that somebody has to be designated.
20   They've got to find somebody, a consultant, a lawyer.  There's
21   somebody who has to read these documents and come in and
22   testify.
23          This comes up -- I was looking at the caselaw -- I
24   think frequently in litigation where the events, like asbestos
25   litigation, happened four years ago and there is no nobody.
```

```
1     This happens.  There's no one who knows anything because the

2     event happened so long ago.  They find somebody and they

3     educate them and they come in and answer.  And, again, this is

4     important to us.  The St. Thomas Entities are all going to be

5     subjected to a 30(b)(6) deposition.  No one is saying the

6     documents are sufficient.  We want a deposition and we think

7     the same true is for the other affiliated defendants.

8                 THE COURT:  Thank you.

9                 MR. GIDEON:  Thank you.

10                I just have a couple of additional points.  One of

11    those is that the depositions of the invoking defendants won't

12    just be limited to their fault.  It will deal with the fault

13    of other people as well and the personal knowledge or

14    information they have on that point.

15                The second thing I would like to point out is that

16    early on today, the counsel for the trustee suggested that we

17    should, frankly, just be satisfied with the documents that

18    we've been given and convince the jury just by giving them a

19    lot of documents.

20                Mr. Klarfeld who spoke just a few minutes ago

21    articulated the difficulty of designating someone to speak for

22    the entity representative because he said there wasn't anybody

23    who wasn't facing Fifth Amendment issues who could talk to

24    someone and bring them up to speed, which is a recognition --

25    a candid recognition by that gentleman and the others that the
```

1    documents are not sufficient, not sufficient even to prepare

2    someone for a deposition, let alone to conduct a trial with.

3              That's why we should be given the opportunity to

4    identify these people, as Sarah just said, to allow a jury to

5    know who Barry Cadden is, to recognize who Barry Cadden is,

6    and then to be able to convince the jurors of the importance

7    of that negative inference based on the substance of the

8    questions that have been asked.

9              And keep in mind, too, that these cases will be

10   tried, not all together, but one after another, over and over

11   again.  It's far more efficient to take that videotaped

12   deposition just one time.

13             THE COURT:  And do you have similar views about the

14   written interrogatories -- deposition by written questions?

15             MR. GIDEON:  Yes.  It is incredibly ineffective in

16   terms of persuasion.  And I'll be candid with you.  I think

17   that it is inadequate because it is ineffective in terms of

18   persuasion.

19             THE COURT:  All right.

20             MR. GIDEON:  Thank you.

21             MR. GOTTFRIED:  Your Honor, briefly, since --

22             THE COURT:  Yes.

23             MR. GOTTFRIED:  Referring back to the trustee, I just

24   want to make three very quick points.

25             The Johns Manville case, Johns Manville was the

1    party.  This is a nonparty.  There are alternatives.  I'm not

2    just simply saying give them all the documents.  That's all

3    they get.  I've given alternatives.  Their expert can review

4    those documents and testify.

5         And the question is:  What do they need for

6    comparative fault?  Do they need to simply show that these

7    people bought tainted medicine or do they need more?

8         Stipulations.  One way or another, there's going to

9    be an adverse inference, whether it's going to be the adverse

10   inference in a way that the affiliated and invoking defendants

11   suggest or it's going to be the way that the Tennessee folks

12   suggest.  Either way, that's sufficient to prove comparative

13   fault against NECC, given all the alternatives, and putting

14   that burden on the trustee and on the estate and on the

15   victims on a balancing situation for a nonparty is something

16   that should not happen.

17        THE COURT:  Yes, Mr. O'Hara.

18        MR. O'HARA:  Thank you.

19        MR. WOLK:  Your Honor, I don't mean to interrupt, but

20   Christopher Wolk, the Premier defendants.

21        THE COURT:  Yes.

22        MR. WOLK:  Before the invoking defendants have an

23   opportunity to respond, I would like to --

24        THE COURT:  Yes, I think that makes sense.

25        MR. WOLK:  Thank you, your Honor.

1          As I represented, we represent the Premier defendants

2     who are located in Vineland, New Jersey.  Currently there's

3     about 50 cases pending against five individual doctors

4     performed injections in this case as well as our clinic.

5          Most, if not all, of the arguments you've heard

6     already in opposition to this motion for a protective order to

7     quash apply to us.  I would like to add the following:

8          A comment was made that the inference that we're

9     going to get from the Fifth Amendment invocation in this case

10    is an attractive piece of evidence, and I would like to

11    respectfully disagree.  In fact, it's not all that attractive.

12         It's no secret that in this case, the claims against

13    our clinics is that we had a duty to perform some reasonable

14    investigation, some due diligence to find out just exactly who

15    we were buying these compounding drugs from.  For us to have

16    an inference that NECC did it all wrong is just as much

17    telling the jury that they did it all wrong from the very

18    beginning and that my clinic, what fools they were to order

19    from them from the beginning.

20         I have to have the opportunity to explain to a jury

21    that they weren't all wrong.  They didn't do it all wrong from

22    the beginning and, in fact, there was a reputation coming out

23    of NECC that was respectable and one that we could rely on,

24    and that goes back to the points that were made earlier, which

25    is some of the questions that we're going to ask at these

1    depositions, such as background, education, pharmacy

2    licensure, their good standing with boards of pharmacy, not

3    only in Massachusetts, but in other states, the reputation

4    with other hospitals and clinics, is important information

5    that we need to get at a deposition, which I do not believe

6    that can -- they can assert a Fifth Amendment privilege when

7    answering those questions, and it's important evidence to help

8    my client fight their way out of this corner that we're being

9    painted into where everyone is throwing their hands up in the

10   air and saying, We don't have a witness.  We have a lot of

11   documents and, in fact, we can look at all those documents.

12   We know what they are, but we couldn't even educate a former

13   employee on what they mean.  How am I supposed to educate

14   myself about what they mean in preparation to try this case

15   and then educate a jury on what they mean?

16          We need someone who can come and educate the jury,

17   not only that, yes, we're going to invoke our Fifth and we're

18   going to get the inference, but also so that I can educate the

19   jury it wasn't all bad from the beginning.

20          The *Hoffmann* case was cited.  I would like to address

21   that.  In the *Hoffmann* case, as I'm sure your Honor is aware,

22   the courts -- it states that the courts cannot effectively

23   determine whether a responsive answer to a question or an

24   explanation of why it cannot be answered, except in the

25   context of a proposed question.  We don't have that yet.

1          Your Honor asked about written questions in this

2     case, and I would join in the arguments that they are wholly

3     ineffective and that they are -- they're not even close to

4     being persuasive in front of a jury.

5          Your Honor, I would also like to add -- address the

6     publicity point, which is these cases, again, would be tried

7     in New Jersey, maybe Camden County, New Jersey or Cumberland

8     County, New Jersey, far far away from where these criminal

9     trials would be held, and I think a protective order could

10    absolutely help to protect from any of these videos being

11    disseminated.

12         So, the arguments apply to the New Jersey cases as

13    well, your Honor, and not only because we need information

14    about an inference, but we need information to defend our

15    cases.  It does go to the comparative fault, which we also

16    have in New Jersey and we are asserting it, but it also goes

17    to our own defense and it's relevant to proximate cause as

18    well.  What was the cause of the contamination here?  We're

19    going to argue it wasn't anything the Premier defendants did

20    to cause the contamination, but it had to do with what they

21    did.

22         Now, one last point, your Honor.  A lot has been said

23    about expert witnesses.  We can rely on our experts to review

24    the documents, come in and testify.

25         It's not always the case that an expert can come into

1    court and rely on hearsay testimony, and I need to protect

2    myself and my client later on from having an objection that if

3    my expert relied on a piece of paper and I get a hearsay

4    objection because I didn't have someone testify about what was

5    in that document, then, again, I'm back in the corner where I

6    started from.  So, those are all the reasons why the motion

7    should be denied from our perspective.

8          THE COURT:  And before we go back to Mr. O'Hara, two

9    suggestions that have percolated up, one from Mr. Gottfried

10   about stipulations and trying to work out stipulations before

11   taking at least the trustee's 30(b)(6) deposition, and then

12   also Ms. Johnson's suggestion that if, in fact, it ends up

13   that I order a 30(b)(6) deposition of the trustee, that you

14   all should pay for it.

15         (No response.)

16         THE COURT:  You don't have any reactions to that?

17         MR. GIDEON:  Yes, we do.  I just heard Ms. Johnson's

18   suggestion.  The response has to be based on the fact that it

19   was for the first time today that we've heard that the cutoff

20   for the insurance carriers would occur on June 4th.

21         Now, I'm confident I'm going to hear that that data

22   is buried somewhere in Footnote 68 on Page 198 of this plan.

23   Maybe it is.  And I'm sure we'll be accused of negligence in

24   not finding that, but if that's the central point with respect

25   to opposing a 30(b)(6) deposition, that it's going to cost

1    some money and the insurance carriers aren't going to pay for

2    it from June 4th forward, a far better solution is let's get

3    it done before June 4th rather than have us pay for it, and

4    I'm here to say I'm ready to do that before June 4th.  Whether

5    it's a Saturday or a Sunday makes no difference.  We'll do it

6    before June 4th.

7              THE COURT:  Is that Wednesday?  Yes, Wednesday.

8              MR. O'HARA:  Thursday.

9              THE COURT:  Thursday.

10             MR. FERN:  Your Honor, Frederick Fern.

11             Mr. Gideon is totally correct.  On May 2nd, 2014, in

12   the plan and the settlement agreement with PMIC that was filed

13   in this court and the bankruptcy court, it said within 14 days

14   after the Chapter 11 plan was confirmed, that the PMIC policy

15   would be exhausted and extinguished, in those exact words.

16             Last week on May 20th, when Judge Boroff confirmed

17   the third amended Chapter 11 plan, that kicked in that

18   exhaustion of the PMIC policy.

19             Just one other point, Judge.  Though Mr. Gottfried

20   spoke about the post-confirmation officer being Paul Moore,

21   the trustee, changing hats from the trustee to the post-

22   confirmation officer, also within that plan in Section 6.01 of

23   the third amended Chapter 11 plan that was confirmed last week

24   by Judge Boroff, therein it says that any officer -- director

25   or officer is terminated and is deemed discharged.

```
1            So, there is no officer pursuant to 30(b)(6) --

2     officer, director or managing agent pursuant to 30(b)(6) which

3     can be tagged to testify on behalf of NECC, and any other

4     person must consent, which has been spoken about before, and

5     there hasn't been anybody who is willing to testify, who is

6     willing to consent to provide their testimony as a 30(b)(6)

7     witness on behalf of NECC.

8            THE COURT:  All right.  Mr. O'Hara.

9            MR. O'HARA:  Your Honor, I would just make a couple

10    of quick points:

11           One, to the extent that Mr. Gideon suggests that

12    they're entitled to ask questions of the invoking defendants

13    relating to the activities of others, I would simply note that

14    the -- there are conspiracy allegations in the criminal

15    indictments which clearly would cover any conceivable question

16    that Mr. Gideon or his colleagues could come up with.

17           So, the issue is not something that permits them to

18    get testimony in that area where there are allegations in the

19    indictments of a conspiracy here.

20           Second, I think Mr. Gideon doth protested much when

21    they already have in their responses the -- more than

22    sufficient ways of proving the adverse inference from the

23    responses and requests for admission and interrogatories, and

24    with due respect to Mr. Gideon, there is no law that says that

25    the balancing of these factors compels this Court to order
```

1    videotaped depositions where adverse inference responses

2    already exist in the written responses and, respectfully, they

3    declined the opportunity to submit their written questions to

4    us.

5            So, with -- on the basis of that and the *Pratt* and

6    *Cowens* decision, which I think your Honor has in our brief,

7    which says that where there is this incredible overlap, we are

8    -- the protective order is appropriate.

9            I think what we would respectfully suggest is that

10   the protective order be allowed as to the videotaped

11   depositions and that they be left with their discovery, which

12   they already have in the adverse inference, availability to

13   prove their comparative fault issues.

14           THE COURT:  All right.  Does anyone wish to speak

15   about this who is on the phone?

16           (No response.)

17           THE COURT:  No.  So, we are now at 1:20.  I do want

18   to let everyone get some lunch because, otherwise, I'm doing a

19   disservice to Judge Zobel, since many of us will be back here

20   at 2 o'clock.

21           What I would suggest, because the Tennessee Clinic

22   Defendants' motion to compel at No. 3, I believe the response

23   was just filed yesterday.  So, I'm prepared to either hear

24   that at the next scheduled conference, which is June 28th or

25   something like that, or if the parties to that motion feel

1   that I should hear it sooner, I am available on June 15th, at

2   3 o'clock, if that would work.

3          MS. JOHNSON:  The PSC was actually going to suggest,

4   your Honor, that we would waive oral argument on that motion

5   if the Tennessee defendants would agree to the same.

6          MR. TARDIO:  Yes, your Honor, we would be comfortable

7   with the Court ruling on the papers.

8          THE COURT:  All right.  So, I will not schedule a

9   separate oral argument on that.

10         And I think, actually, Item No. 4 kind of dovetails

11  into some of our discussion in front of Judge Zobel.  So, I

12  would table that until this afternoon or we can take it up at

13  a later time.

14         MR. RABINOVITZ:  Your Honor, could I make two

15  comments before you close this session?

16         THE COURT:  Yes.

17         MR. RABINOVITZ:  Very, very briefly.

18         I want to say that all the argument about the trials

19  happening in New Jersey or the trials happening in Tennessee

20  and, therefore, it's far away, you know, we've all seen videos

21  on the Internet that you can be anywhere in the world and post

22  things on the Internet.  So, I would say that those arguments

23  are not persuasive.

24         I also wanted to point out that these questions about

25  background and things like that, I would submit to the Court

 1    that the discovery stay doesn't permit that.  Those kinds of

 2    questions aren't relevant to the defense and prosecution of

 3    these third-party claims, and now we're going to say that they

 4    want to buttress their adverse inference by being able to get

 5    into somebody's background.  That's as attenuated as I've

 6    heard in this entire argument.  That's all I wanted to say.

 7    Thank you.

 8            THE COURT:  All right.  Briefly, because I think

 9    we're going over some of the ground that's already been

10    covered.

11            MR. KLARFELD:  I would like to make one point with

12    respect to Mr. Higgins.

13            THE COURT:  Yes.

14            MR. KLARFELD:  The Tennessee defendants have not

15    identified Mr. Higgins as a comparative fault party in their

16    answer.  So, they can't list him on the verdict form.  So, for

17    all the other reasons --

18            THE COURT:  I can't hear you.  Can you speak up?

19            MR. KLARFELD:  Better?  Sorry.

20            The Tennessee defendants did not identify Mr. Higgins

21    as a comparative fault party in their answer.  So, they can't

22    list him on the verdict form.  So, for all the reasons we said

23    previously as well as that one, his deposition really ought

24    not occur and if it were to occur, we've offered a Rule 31

25    deposition.

1          THE COURT:  All right.  Thank you very much.

2          MS. JOHNSON:  Thank you, your Honor.

3          COURTROOM DEPUTY CLERK YORK:  All rise.  This Court

4     is in recess.

5          (Adjourned, 1:25 p.m.)

6

7

8

9

10               C E R T I F I C A T E

11          I, Catherine A. Handel, Official Court Reporter of the

12    United States District Court, do hereby certify that the

13    foregoing transcript, from Page 1 to Page 81, constitutes to the

14    best of my skill and ability a true and accurate transcription of

15    my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

16    Re: New England Compounding Pharmacy, Inc., Products Liability

17    Litigation.

18

19    June 3, 2015          /s/Catherine A. Handel
20    Date                  Catherine A. Handel RPR-CM, CRR

21

22

23

24

25