UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | ) | MDL No. 2419<br>Dkt. No 1:13-md-2419 (RWZ) |
| THIS DOCUMENT RELATES TO:<br><br>All Cases | ) | |

**TENNESSEE CLINIC DEFENDANTS' RESPONSE TO PLAINTIFFS' STEERING COMMITTEE'S MOTION TO AMEND CASE MANAGEMENT ORDER NO. 9 [1867]**

Defendants Saint Thomas Outpatient Neurosurgical Center, LLC; Howell Allen Clinic, A Professional Corporation; John Culclasure, MD; Debra Schamberg, RN, CNOR; Vaughan Allen, MD; Specialty Surgery Center, PLLC; Kenneth R. Lister, MD; Kenneth Lister, MD, PC, and Donald Jones, MD (collectively "Tennessee Clinic Defendants")[1] hereby file this Response to the PSC's Motion to Amend Case Management Order No. 9.

**1. Procedural posture**

At Dkt. 1867, the PSC moves to modify CMO No. 9 to (1) enter deadlines governing the remainder of common discovery and case-specific discovery, and (2) set a process and deadlines for selection of the first trial cases. The PSC attaches a proposed order at Dkt. 1868-1,[2] which, if entered, would govern these cases through the first trial. Subsequently, the PSC filed an amended proposed order at Dkt. 1900-1.

[1] The PSC's Motion primarily addresses the "St. Thomas cases" (cases against the St. Thomas Entities and the Tennessee Clinic Defendants). To the extent the PSC's proposed order is intended to impact other Tennessee Clinic Defendants, it is filed on all their behalf.
[2] "MDL Order No. 9B, Order Regarding Common Issue Discovery."

The title of the Memorandum of Law that accompanies the Motion[3] says the motion is "unopposed." It is opposed. The Tennessee Clinic Defendants have repeatedly set out their position on (1) a timetable for the remainder of discovery and first trials, and (2) the process for selecting the first trial cases. The PSC's proposed CMO 9B (1868-1) does not reflect an agreed-to process, nor is it reasonable or consistent with established precedent.

Here, the Tennessee Clinic Defendants again set out their position on (1) a reasonable timetable for the remainder of discovery and (2) a process to select cases for trial. The Tennessee Clinic Defendants try not to rehash the same arguments they have already put forth.[4] Instead, the Tennessee Clinic Defendants summarize below their position and answer the questions that the Court must consider before establishing the timetable for the remaining discovery and a process for selecting cases for trial.

**2. Timing**

**a. Role of MDL court**

These Defendants agree with the PSC's general statement at the last status conference that the role of the MDL now is to manage the remaining common discovery of NECC, NECC's affiliates and employees, and the national defendants.[5] This requires the MDL court to continue efficiently managing this common discovery, with the immediate MDL goal to finish the common discovery phase.[6]

---

[3] Dkt. 1868.

[4] *See, e.g.,* Dkt. 1754 ("Tennessee Clinic Defendants' Response to the PSC's Motion for Entry of Case Management Order Setting an Expedited Trial Date"); Dkt. 1871 ("Tennessee Clinic Defendants' Brief Setting forth Position regarding Bellwether Selection").

[5] May 28, 2015, Status Conference, Tr., p. 14.

[6] Depending on whether there are truly any "common" experts, the MDL's function may end as early as the conclusion of common *fact* discovery.

At the conclusion of common discovery, the Tennessee cases will be at a fork in the road. The logical path after common discovery is transfer back to Tennessee for case-specific discovery and trial.[7]

**b. What is left in the common discovery phase?**

First, the Court must consider what common discovery remains.

**i. Common fact discovery**

While common fact discovery continues unobstructed on certain tracks, it has encountered major resistance on other tracks. The remaining tracks:

<u>Remaining depositions of the Tennessee witnesses common to all cases:</u> The PSC plans to take the depositions of some remaining Tennessee Clinic Defendant witnesses and St. Thomas Entities witnesses. These should be done in advance of the new July 30, 2015, common fact discovery deadline.[8]

<u>Discovery of national defendants:</u> Discovery of ARL, Victory, UniFirst, and Liberty is underway. Some depositions have been taken; some remain.

<u>Discovery of the FDA and Massachusetts Board of Pharmacy:</u> The FDA and Massachusetts Board of Pharmacy both refuse to present a witness. Neither have produced documents pursuant the pending subpoenas. The FDA's Motion for Protective Order is pending before the Court. The Massachusetts Board of Pharmacy – based on correspondence recently – may file its own motion for protective order.

<u>Discovery of NECC, its affiliates, and its insiders</u>: Virtually all NECC witnesses have refused to participate in discovery. Discovery motions are pending before the Court.

[7] This could theoretically occur after the conclusion of common fact discovery or after the conclusion of common expert discovery. Both are logical points for transfer back to Tennessee. It is unclear at this point whether "common" experts will include experts common to cases across the country, or just common for all of a particular state's cases. If the latter, *i.e.*, there are no truly "common" experts, it may be logical for transfer after common *fact* discovery. If there are truly *common*, *national* experts, it may benefit to keep common expert discovery under the MDL umbrella.

[8] On May 28, 2015, a 45-day extension of the June 15, 2015, deadline for common discovery was agreed to in principle. (Tr., p. 27).

Considering the above, the remaining common fact discovery includes (1) document production from multiple parties and non-parties and (2) approximately 20-25 depositions, recognizing that the numbers could change if the Court limits the ability to examine certain witnesses in response to the pending discovery motions.

The PSC says at Dkt. 1868, page 1, that "[b]oth the affiliated defendants and the national defendants have produced significant written discovery, and the national defendants have agreed, in some instances, to depositions." The PSC later says that "[t]he individual insiders, GDC, and Ameridose, have responded to written discovery requests" and that "NECC has produced approximately 30,000 pages of documents."[9]

This misleadingly suggests to the Court that NECC and NECC's affiliates are actively engaging in discovery. That is obviously not the case, as illustrated by the numerous pending discovery motions. NECC has self-selected 30,000 of its millions of documents to dump onto a repository and steadfastly refuses to produce a corporate witness. The individual defendants have all taken the position – even where not indicted – that they will not respond to any interrogatory, request for production, or request for admission on Fifth Amendment grounds.[10] The affiliated entities – not having a Fifth Amendment right – refuse to produce witnesses because it would be burdensome. To the extent this is unclear, obtaining any discovery from NECC and its insiders has been a challenge, and it will continue to require motion practice for at least the near future.

[9] Dkt. 1868, p. 7.

[10] Several former employees of NECC and affiliates have also refused to give depositions, citing their Fifth Amendment right.

Put simply, the suggestion that the common discovery of the governmental agencies, NECC, and NECC's affiliates and employees will swiftly wrap up in the next 45 days or so does not reflect reality. The Court must resolve numerous threshold legal issues. Once the Court makes rulings on the various pending discovery motions, document discovery and 20-25 depositions must occur. Significant work has been done; but, significant work remains.

**ii. Common expert discovery**

Following common fact discovery, the parties (for the Tennessee cases, the "parties" being the PSC, the Tennessee Clinic Defendants, and the St. Thomas Entities) will disclose and then depose common experts. Assuming each of the three "parties" discloses 6-8 experts, this will require ~20 depositions, not a short process.

**c. How long will it take to conclude common discovery?**

This is not an easy question to answer. The time to finish the above-described common discovery depends, in part, on how and when the Court resolves the pending motions for protection filed by the various parties resisting depositions.[11] It also depends on how quickly documents can be produced and depositions scheduled should the Court allow discovery of these parties in some form or fashion.

With the 45-day extension, the deadline for common fact discovery is presently July 30, 2015, and the deadline for common expert discovery is November 27, 2015.

[11] The Court is also sorting out choice-of-law issues that may impact the scope and extent of common discovery.

The Tennessee Clinic Defendants previously proposed deadlines of August 18, 2015 (common fact discovery to conclude) and January 18, 2016 (common expert discovery to conclude).[12] [13] Given the pending issues, even these are ambitious. The Tennessee Clinic Defendants anticipate at least 90 more days of common fact discovery (probably through August, at minimum). The Tennessee Clinic Defendants anticipate that common expert discovery (disclosure of reports + depositions) will take at least 150 days.

Put simply, the Tennessee Clinic Defendants suggest a common fact discovery deadline of *at least* August 18, 2015, and a common expert discovery deadline of *at least* January 18, 2016. These deadlines may need to be extended, depending on how and when the numerous pending discovery disputes resolve.[14]

* * * * * * *

One point is certain: The PSC's proposed deadlines for completion of discovery defy logic. Some telling examples:

- The PSC's proposal simply omits any mention of common dispositive motions filed at the end of common discovery. It should be no secret given the extensive motion to dismiss briefing that the defendants will file motions for summary judgment on common issues. This will take time.

- The PSC's proposal calls for case-specific fact discovery in the eight possible trial selections to conclude in about 45 days.[15] How many single-plaintiff, single-defendant cases can complete even abbreviated written discovery and depositions of fact witnesses in 45 days, much less *eight* cases with multiple parties?

[12] Dkt. 1754, p. 9.

[13] For the Court's convenience, attached as exhibit 1 is the Tennessee Clinic Defendants' proposed discovery timeline that they submitted in Dkt. 1754.

[14] For instance, if the Court waits until after the conclusion of the choice-of-law briefing and argument to rule on the discovery disputes, it may be August or later before discovery of the parties who moved for protection – to the extent allowed – begins. If this is the case, the deadline for common discovery will need extending.

[15] Dkt. 1900-1, p. 3.

- After the conclusion of fact discovery, the PSC calls for simultaneous exchange of case-specific expert reports in the two trial cases in seven business days.[16] It is beyond unreasonable to expect lawyers to review and digest transcripts from fact witnesses, relay them to experts, meet with the experts, memorialize the experts' opinions, and have the reports signed in seven business days.

- Following the completion of expert discovery, the parties have four business days to file *Daubert* motions and dispositive motions on case-specific issues.[17] First, it is impossible to do so without even having the deposition transcripts back. Second, this is insufficient time to brief issues with huge potential impact on the trials.[18]

* * * * * * *

Delaying the trials helps the Tennessee Clinics none. It drives up cost and lengthens the emotional toll on the individual defendants. They seek timely, efficient resolution. *However*, the Tennessee Clinic Defendants, foremost, seek a *fair trial* of the cases.

Truncated discovery, hurried expert disclosures, depositions conducted on unreasonable schedules, omitted steps necessary for pretrial preparation, and rushed presentation of important motions inevitably would result in an unfair, unproductive trial. Whatever deadlines the Court chooses in setting the timeline for the remaining discovery, they should reflect the realities of the litigation and allow time to fairly prepare these cases for trial. The PSC's timing proposal does neither.

[16] Dkt. 1900-1, p. 4.
[17] Dkt. 1900-1, p. 4.
[18] Interestingly, the PSC gives the Plaintiffs twice the time to respond to the defense dispositive motions as the defendants get to actually draft the motions.

**d. What happens after common discovery concludes?**

After common discovery concludes, the centralized portion of the MDL will have concluded, and the Tennessee cases chosen for trial[19] will stand ready for case-specific discovery. At that point, the MDL's purpose (at least for the Tennessee trial cases) has been served, and the cases should be transferred to Tennessee for trial.[20] [21]

It seems logical for the MDL Court to continue in its role of centrally managing common discovery that affects cases across the country, and for the Tennessee court to pick up the management of the case when the trial cases are ready for case-specific discovery and trial. On the other hand, it seems illogical for a Massachusetts court to manage case-specific discovery and immediate pre-trial proceedings (*e.g.*, motions *in limine*) in a case between a Tennessee plaintiff and Tennessee health care provider defendants, governed by Tennessee law, and tried in a Tennessee court.

Thus, the Tennessee Clinic Defendants envision, at the conclusion of common fact discovery or at the conclusion of common expert discovery, the cases being transferred back to Tennessee for case-specific discovery and trial.[22] [23]

---

[19] Depending on the selection process the Court puts in place, this could be a single case or, more likely, some small subset of 2-4 cases identified as first in line for trials.

[20] The Tennessee Clinic Defendants do not intend to waive *Lexecon.*

[21] Again, this could occur at the end of common fact discovery or at the end of common expert discovery. If there are no truly "common" experts to be deposed, it may be just as logical to transfer the cases back to Tennessee after the conclusion of common *fact* discovery.

[22] *See, e.g., In re A.H. Robins Co., Inc.*, 453 F. Supp. 108, 109 (J.P.M.L. 1978) ("[w]e find that remand of the actions on Schedule A is appropriate at this time and, accordingly, we order the actions remanded to their respective transferor courts….The actions that Judge Theis has recommended for remand are actions that name Robins as the sole defendant. Judge Theis states that while all pretrial proceedings have not been completed in these actions, all pretrial proceedings of a general nature have been concluded. Judge Theis considers remand of these actions appropriate at this time because the objectives of centralized pretrial proceedings under Section 1407 have been achieved, and because completion of the remaining discovery and resolution of the remaining issues can most expeditiously be effectuated by the transferor courts").

[23] At 1754 (also attached as exhibit 1 to this pleading), the Tennessee Clinic Defendants proposed about nine months to complete case-specific discovery in the four cases selected for trial.

**3. Case selection**

The second component of the Court's analysis of the pending issues is how the first trial cases should be selected.

The PSC has been all over the board on this. Initially, the PSC advocated wholeheartedly for a bellwether selection process to identify representative cases.[24] Then, it jettisoned that idea for a single trial of six PSC-selected cases in a consolidated proceeding.[25] The PSC scrapped the six-plaintiff-trial proposal and now proposes in one pleading a selection process that arrives at two cases for trial.[26] But, at the same time, the Plaintiffs advocate in a separate pleading for the expedited trial of the *Reed* case first.[27]

The Tennessee Clinic Defendants will respond to the motion to send *Reed* to the front of the line in a forthcoming response, due June 15. For now, the Tennessee Clinic Defendants respond to the PSC's proposal at Dkt. 1900-1:

The PSC at 1900-1 proposes that (1) each side select four cases (for a total of eight cases in the initial trial pool); (2) the parties conduct case-specific discovery in the eight cases[28]; and (3) the Court then designates the first two for trial.

This process is not far from the Tennessee Clinic Defendants' proposal, but it lacks a key component – safeguards to ensure that the trial cases are actually valuable bellwethers.

---

[24] Dkt. 868.
[25] Dkt. 1716.
[26] Dkt. 1866-2.
[27] Dkt. 1882.
[28] Over the course of about 30 days.

What the PSC proposes is not a bellwether process aimed at selecting representative cases.[29] The process instead invites each side to propose its four best cases, creating a pool of eight cases from separate ends of the spectrum, and asks the Court to pick the most representative *of the eight outliers* for trial.[30] Because the pool from which the first two trial cases are selected consists of eight outlier cases, the process inevitably will result in the trial of an outlier case.

The Tennessee Clinic Defendants' proposal – by sheer numbers – is not much different than the PSC's.[31] The Tennessee Clinic Defendants propose that each side select eight cases to populate the pool of possible trial picks (for 16 total). From that pool of 16, after strikes, eight will be left as possible trial picks. The parties and Court will then collaborate to pick the four trial picks from the eight possibilities.[32]

[29] *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997) ("[w]hatever may be said about the trial contemplated by the district court's December 19, 1996 order, one thing is clear. It is not a bellwether trial. It is simply a trial of fifteen (15) of the "best" and fifteen (15) of the "worst" cases contained in the universe of claims involved in this litigation. There is no pretense that the thirty (30) cases selected are representative of the 3,000 member group of plaintiffs").

[30] Interestingly, the PSC cites at Dkt. 1868, p. 22, n. 32, Brown, *et al.*, *Bellwether Trial Selection in Multi-District Litigation: Empirical Evidence in Favor of Random Selection*, 47 AKRON L. REV. 663, 668 (2014). Brown argues for *random selection* of cases for trial from the entire pool, theorizing based on data that this results in the trial of representative cases and removes the bias inherent in the parties selecting the cases. Brown writes, when discussing the downside of party-selection: "Permitting both sides to take part in selection ensures that the trial pool is not entirely biased in favor of a single party, as each side has a stake in having its best cases included in the bellwether trial pool. However, this method frequently results in a pool of outlier cases, which do not represent the vast majority of unchosen cases. In other words, while the sample may include cases on each end of the spectrum, it typically does not include cases that are most common in the larger docket."

[31] For the convenience of the Court, the Tennessee Clinic Defendants' bellwether selection proposal (originally filed at 1871-1) is attached as exhibit 2.

[32] Then, those four picks will proceed to case-specific discovery.

The Tennessee Clinic Defendants' proposal – unlike the PSC's – has two simple procedural mechanisms to ensure that representative cases are selected:

1. The parties are required to pick potential trial cases from each of five injury categories. This ensures that the pool of potential trial cases includes a cross-section of injuries (which seems to be the most important variable).[33]

2. Each side can strike four of the other side's first round of picks. This gives each side the ability to eliminate cases it believes are outliers, and should result in a more representative pool from which the trial cases are picked.

No process is perfect. However, by adding these two safeguards, the process is much more likely to result in representative cases selected for trial. The PSC's proposal guarantees the opposite – that outliers will be chosen.

**3. Conclusion**

The Court has in front of it several motions and briefs that advocate for various approaches to move these cases from their present status (midway through common fact discovery) to trial of the first subset of case. This requires the Court to decide the timing of the remaining discovery and how the first trial cases will be selected. The Tennessee Clinic Defendants have been consistent in their position on both points:

1. Timing: The timetable for common discovery cannot be so condensed at the request of the PSC that it makes the completion of necessary document discovery and depositions impossible. Common discovery should continue on a steady, but fair, pace, allowing the discovery necessary to defend the cases.

2. Selection process: The trial selection process should not favor either side's "best" cases, but instead should aim to select a subset of representative cases for the first few trials.

---

[33] Additionally, under the Tennessee Clinic Defendants' proposal, the Court's bellwether order would set out the factors the parties should consider in making their selections, *e.g.*, age; gender; preexisting conditions; lost wages; lost earning capacity; length of hospitalization.

The Tennessee Clinic Defendants have set out herein a reasonable timeline to move the Tennessee cases through common discovery to a point that they can be transferred to Tennessee for case-specific discovery and trial.[34] The Tennessee Clinic Defendants have set out a reasonable process for selecting the first trial cases.[35] The Court should not heed the PSC's wishes to rush a non-representative case to trial. That will only result in a waste of time and resources. It will also severely prejudice the defendants wishing to fairly defend the cases through trial.

Respectfully submitted,

**GIDEON, COOPER & ESSARY, PLC**

/s/ Chris J. Tardio
**C.J. Gideon, Jr.***
**Chris J. Tardio***
**Alan S. Bean****
**Matthew H. Cline***
315 Deaderick Street, Suite 1100
Nashville, TN 37238
Ph: (615) 254-0400
Fax: (615) 254-0459
chris@gideoncooper.com

***Attorneys for the Tennessee Clinic Defendants***

* Admitted pursuant to MDL Order No. 1.
** Admitted *pro hac vice*.

[34] *See* exhibit 1. Although, again, this timeline may need to be adjusted depending on how the remainder of common fact discovery proceeds, including how the Court handles the pending discovery disputes.
[35] *See* exhibit 2.

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be served electronically to the registered participants identified on the Notice of Electronic Filing and copies will be e-mailed or mailed via regular U.S. mail to those participants identified as unregistered this 10th day of June, 2015.

/s/ Chris J. Tardio
**Chris J. Tardio**