UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION _____ THIS DOCUMENT RELATES TO: *Reed v. Ameridose, et al.* Case No. 1:13-cv-12565 | ) ) ) ) ) ) ) ) ) ) ) |

MDL No. 2419
Dkt. No 1:13-md-2419 (RWZ)

**OPPOSITION TO THE *REED* MOTION TO SET
AND
SUGGESTION OF REMAND UNDER MDL RULE OF PROCEDURE 10.3(a)(i)**

Defendants Saint Thomas Outpatient Neurosurgical Center, LLC; Howell Allen Clinic, a Professional Corporation; John Culclasure, MD; Debra Schamberg, RN, CNOR; Vaughan Allen, MD; Specialty Surgery Center, Crossville, PLLC; Kenneth R. Lister, MD; Kenneth Lister, MD, PC; and Donald E. Jones, MD (collectively "Tennessee Clinic Defendants"[1]) hereby oppose *Plaintiff Wayne Reed's Motion to Set Case for Trial.*[2]

---

[1] The Tennessee Clinic Defendants include, in addition to those involved in the *Reed* case, Vaughan Allen, MD; Kenneth Lister, MD; Kenneth Lister, MD, PC; Specialty Surgery Center, Crossville, PLLC; and Donald Jones, MD. None of these parties are named in the *Reed* case. However, the relief sought in the *Reed* Motion to Set impacts these remaining Tennessee Clinic Defendants in that it would set aside the bellwether process that all the Tennessee Clinic Defendants (not just those named in *Reed*) rely upon. Thus, the Tennessee Clinic Defendants oppose the *Reed* Motion to Set on behalf of STOPNC, Howell Allen, Dr. Culclasure, and Debra Schamberg, RN, CNOR (those defendants named specifically in the *Reed* case) and request additional relief on behalf of all the Tennessee Clinic Defendants, *i.e.*, that the Court maintain the bellwether process and, in the alternative, if the Court sets aside the bellwether process and orders *Reed* to trial, remand the cases to Tennessee for trials of *Reed*, *Alexander*, and *Parman.*
[2] Main MDL Dkt. 1882; Case No. 1:13-1265, Dkt. 45.

In opposition, the Tennessee Clinic Defendants state, as explained below:

1. The Court should continue the bellwether process.

2. Alternatively, if the Court grants the *Reed* motion, the Court should (a) work to conclude common discovery on a reasonable timeline, (b) suggest remand of the Tennessee cases to the transferor courts, and (c) follow the *Reed* case with the trials of *Alexander* and *Parman*.

## INTRODUCTION

In order to assure an opportunity to be heard, and to respectfully direct the Court's attention to issues that should be squarely addressed at this stage in the proceedings, the Tennessee Clinic Defendants (1) oppose the *Reed* motion to set, (2) suggest remand of the Tennessee cases at the conclusion of common discovery[3], and, (3) if the Court is inclined to grant the *Reed* motion to set, move to set the *Alexander*[4] and *Parman*[5] cases for trial.

Perhaps not immediately apparent, the *Reed* motion to set[6] requires more of this Court than selecting or directing a date for the trial of a single case. The Court must address:

- The apparent lack of authority of individual counsel for Mr. Reed to submit the pending motion given the terms of MDL Order 2.[7] The *Reed* case is not the first case filed, nor the first case arising from a patient's death. Other, more representative cases, earlier filed, warrant consideration as the index case for trial.[8]

---

[3] The cases will be ready for remand at the end of common fact discovery (if there is no truly "common" expert discovery) or at the end of common expert discovery (if there is truly "common" expert discovery to be done).

[4] Case No. 1:13-cv-12428, filed September 9, 2013.

[5] Case No. 1:13-cv-12433, filed September 6, 2013.

[6] Dtk. 1882, filed May 22, 2015, by individual counsel for Mr. Reed.

[7] Dkt. 82, entered April 9, 2013.

[8] Attached as Exhibit 1 to this Response is a chart listing the cases filed in the United States District Court, Middle District of Tennessee, naming the "Tennessee Clinic Defendants" before the *Reed* case was filed.

- The *Reed* motion to set painfully emphasizes unique hardships faced by Wayne Reed, the surviving spouse of Diana Reed. Accordingly, the motion and supporting memorandum[9] prove the *Reed* case is *not* representative[10] of the cases currently in the MDL. If *Reed* is set based on its uniqueness, it is time to end discussion of the bellwether process altogether.

- No reasonable party would suggest that an individual case in this MDL should be set for trial before common discovery is completed. Common discovery should be completed. If it is time for individual cases to be set, it is also time to carry out the directives of 28 U.S.C. 1407(a)[11] and remand the Tennessee cases to the Middle and Eastern Districts of Tennessee.

---

[9] Dkt. 1883.

[10] *See* Dkt. 838, pages 9-14, where the PSC waxed at length on the overriding importance of selecting a small number of "carefully selected" and truly "representative" cases for trial that include each of the "important variables associated with the universe of included cases." *See also* Dkt. 1868, at page 22, where the PSC, on *May 18, 2015*, advocated for a process to select "St. Thomas cases" that "serve their bellwether purpose – which is to evaluate the 'strength and value of the larger pool of cases' thereby providing 'litigants with reference points or benchmarks that serve as a basis to discuss resolution of the litigation as a whole.'" In that same pleading, the PSC cites to Fallon for the proposition that, "If a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the cases as reflected by the jury verdicts." (Dkt. 1868, n. 33). The instant *Reed* motion apparently seeks, now, to set aside the bellwether process that the PSC has at times said was imperative to resolving these cases.

[11] "Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred[.]"

## LAW AND ARGUMENT

### I. Authority for the Pending Motion

#### A. The Motion is not allowed under prior MDL orders.

First, the Court must consider that the *Reed* motion is filed contrary to previous orders entered to ensure the efficient conduct of this multi-district litigation.

MDL Order No. 2 directed the PSC to initiate and carry out all pre-trial proceedings in a "coordinated and consolidated" manner,[12] including the duty to "coordinate the selection" of "any common issue, bellwether or test case trials."[13]

The pending motion is filed by individual counsel for Mr. Reed, with no claim of authorization from the PSC. The pending motion is not allowed under the literal terms of MDL Order No. 2, and counsel for Mr. Reed has no authority to unilaterally leap ahead of cases filed earlier in the United States District Court for the Middle District of Tennessee, certainly not ahead of more representative cases involving patient death.[14]

#### B. The Motion to Set should be denied.

Setting aside the lack of authority to request the relief, Mr. Reed cites no authority that would justify setting for trial a non-representative case out-of-order, in contravention of the bellwether process, and before discovery is completed.

---

[12] Dkt. 82, page 6.

[13] Dkt. 82, page 7.

[14] *See* Exhibit 1. The cases filed on behalf of Marie Hester, deceased, Case No. 1:13-cv-12315, filed August 30, 2013; Dallas Nealon, deceased, Case No. 1:13-cv-12491, filed September 9, 2013; Earline Williams, deceased, Case No. 1:13-cv-12434, filed September 10, 2013; and Mary Martin, deceased, Case No. 1:13-cv-12624, filed September 11, 2013, were all filed before the *Reed* case.

The Plaintiff only cites to a "concern" of Mr. Reed and his lawyer that Mr. Reed will lose his ability to testify because of "health problems" "[a]t some point."[15] This may be a legitimate concern; but, it is a concern that has an easy, built-in fix. MDL Order No. 10 (the Deposition Protocol) specifically tells the parties what to do in this circumstance:

**Early Depositions**

If the parties become aware of any person who possess[es] relevant information but, who, by reason of age, ill health, or termination of employment with defendants may become unavailable for deposition, the deposition may be taken as soon as possible, using the procedures outlined in Fed. R. Civ. P. 27.[16]

The solution provided by MDL Order No. 10 is to take Mr. Reed's deposition to preserve his testimony for use at trial[17], *not* abandon the bellwether process altogether and skip necessary discovery in order to try the case by an arbitrary date, as Mr. Reed asks the Court to do.

## II. The *Reed* Case Is Not Representative

Presuming, as we should, coordination among capable professionals, the pending motion must be viewed as implicitly authorized and approved, if not formally embraced, by the PSC, thus permitting the PSC to avoid overt abandonment of the "bellwether" process to which much time, effort, and expense has been invested thus far.[18] [19]

---

[15] Absent from the motion is any specific, or even estimated, timeframe when Mr. Reed will lose his ability to testify, or any affidavit from a treating physician to support the affidavits of Mr. Reed and his attorney.

[16] Dkt. 1426, page 9.

[17] This option could have been discussed had the Plaintiff complied with the "meet and confer" requirement of Local Rule 7.1.

[18] *See, e.g.,* Dkts. 431, 837, 838, 1754, 1866, 1870, 1871 (examples of briefs previously filed on bellwether issues).

[19] It should be noted that Mr. Reed originally filed suit against the clinic-related defendants in January 2013 in state court in Davidson County, Tennessee. Mr. Reed then made the *strategic* decision to voluntarily dismiss that case (while the defendants' motion to dismiss was pending) and refile the case in the MDL. The *Reed* case would have continued in state court on a likely straighter path toward trial had the Plaintiff not made this strategic decision to dismiss the case and refile.

Even if the PSC has, in truth, abandoned the MDL bellwether process (as the *Reed* motion suggests), *the Court* has not yet done so. <u>The PSC itself</u> has repeatedly extolled the virtues of choosing bellwethers and described the bellwether process as the experience-tested method to maximize efficiencies in a MDL,[20] cautioning that success will never be achieved unless truly "representative" cases are chosen for trial.[21] Only "representative" cases, those which incorporate the "important – major – variables associated with the universe of included cases" that fall into "easily ascertainable groupings" warrant selection as a "bellwether" trial.[22] Cases that do not fit those descriptions are "anomalous,"[23] and not predictive of likely outcomes for the universe of cases.

*Reed* is, <u>by the PSC's own criteria</u>, unquestionably anomalous. The Trustee, PSC, and Creditors Committee worked for months setting a process to decide how to allocate money from the "Tort Trust" to each claimant. They identified factors used to decide how much each "victim" receives from the "Tort Trust," set out in the "Claims Resolution Facility."[24] Applying <u>the PSC's own criteria</u> for valuing cases to the *Reed* case illustrates that the PSC would be hard pressed to find a "better" and more anomalous case to press for trial.[25]

---

[20] Dtk. 838, pages 2, 8.
[21] *Id.* at 9-10; 13-14.
[22] *Id.* at 14.
[23] *Id.* at 13.
[24] Dkt. 1694-3.
[25] This anticipated distribution by year's end, from the true wrongdoers here, should alleviate the financial hardship described in Mr. Reed's motion to set. *See* Dkt. 1883, pages 3-4.

*Reed* is a "category 1" case (the most serious, most valuable category).[26] That alone makes it an outlier, as only 14 of the 117 patient-plaintiffs died (the second-smallest injury category).[27] Plus, *Reed* qualifies for virtually all of the upward adjustments that the PSC has pegged as making a case most valuable:

- Ms. Reed was significantly below the average age.[28]
- She was married at the time of her death.[29]
- She had children.[30]
- Her treatment included lumbar puncture and anti-fungal medication.[31]
- She was earning $40,000.00 per year at the time of her death.[32]

Further, Diana Reed is an outlier in terms of the unique loss of consortium claim due to Mr. Reed's illness. The PSC would have a difficult time finding a more sympathetic consortium case.

The *Reed* lawsuit, while undeniably tragic, is not representative, whether one applies the PSC's own valuation criteria, analyzes the data, or takes a passing look at the case's basic underlying facts.

If the demonstrably unrepresentative *Reed* matter is set for trial, then surely it is time to end discussion of the bellwether process.[33]

---

[26] Dkt. 1694-3, page 13.

[27] Below is the breakdown of the injuries for the 117 STOPNC cases

| *Injury* | *Number* | *Percentage of all cases* |
|---|---|---|
| Death | 14 | 12% |
| Meningitis + infection or stroke | 45 | 38% |
| Meningitis | 17 | 15% |
| Infection only (no meningitis) | 13 | 11% |
| No disease | 28 | 24% |

[28] Dkt. 1694-3, page 20 (adding points to the base point total under category 1 for each year the decedent was under the age of 65; Ms. Reed was 56 at the time of her death).

[29] Dkt. 1694-3, page 22 (adding points to the base point total if the decedent was married at the time of the death).

[30] Dkt. 1694-3, page 22-23 (adding points to the base point total if the decedent had adult children).

[31] Dkt. 1694-3, page 26-30 (adding points to the base point total if the decedent underwent lumbar punctures and anti-fungal therapy).

[32] Dkt. 1694-3, page 30-31 (adding points to the base point total for lost earnings).

### III. **Defendants' Trial Choices**

If the Court is inclined to grant Mr. Reed's motion, abandoning the bellwether process and setting the PSC's unilaterally-chosen, outlier case for trial first, then the Defendants should be permitted to choose the next two cases to be tried.

Accordingly, the Defendants will file motions to set the *Alexander*[34] and *Parman*[35] cases for trial, both of which were filed *before* the *Reed* case and both of which are much more representative of the entire universe of cases from Tennessee in the MDL.[36]

### IV. **Timing of Trial and Suggestion of Remand of the Tennessee Cases**

#### A. **Timeline for first trial**

If the Court is inclined to set a specific case for trial now, the Court cannot simply ignore the discovery left to be done and the calendar of the court that will try the case.[37]

Mr. Reed's case obviously cannot be tried in 2015, as he requests. There remain at least a dozen common fact depositions, disclosure and depositions of numerous common experts, common dispositive motions, case-specific written discovery,

---

[33] *See In Re Chevron USA, Inc.*, 109 F.3d 1016, 1019-21 (5th Cir. 1997) (recognizing that the sample cases chosen must be representative in order to maintain the parties' due process rights and that selecting the best, and worst, of the cases, from the adverse parties' perspective, is not a "bellwether" process).

[34] Case No. 1:13-cv-12428, filed September 9, 2013.

[35] Case No. 1:13-cv-12433, filed September 6, 2013.

[36] To the extent the Court is not concerned with order of filing, the Tennessee Clinic Defendants also suggest setting *Kinsey*, Case No. 1:13-cv-12571, filed September 17, 2013; *Besaw*, Case No. 1:13-cv-12604, filed September 17, 2013; or *Pierce*, Case No. 1:13-cv-12733, filed September 20, 2013.

[37] It is interesting how the PSC's "facts" change depending on what the PSC is asking for. In its previous request for the six-plaintiff expedited trial, the PSC told the Court that these Defendants "largely refused to participate in discovery" prior to Judge Boal's initial discovery order. (Dkt. 1717, page 9). Now, in the request to set *Reed*, the Plaintiff states that "Wayne Reed's case can easily be ready for trial in late 2015" because, in part, "[a]fter Plaintiff filed the State Court Action, Plaintiff and Defendants exchanged extensive written discovery." (Dkt. 1883, page 5) emphasis added). Obviously, one cannot refuse to participate in discovery yet, at the same time, provide extensive discovery. This bending of the facts only further frustrates compromise and, ultimately, moving these cases efficiently through discovery toward trial.

depositions of case-specific fact witnesses, disclosure and depositions of case-specific expert witnesses, and pre-trial motions.[38] [39]

With the agreed-to 45-day extension, *common issue* dispositive motion briefing does not even begin until *January 2016* and does not conclude until *March 2016*. Is the PSC suggesting trying *Reed* prior to having any dispositive motion briefing and without even engaging in case-specific discovery?

To say that "[s]etting Mr. Reed's case for trial in late 2015 will result in zero unfair prejudice to any party"[40] is absurd. Putting aside the cost and time wasted by trying, first, a non-representative case (resulting in virtually no predictive value), setting the *Reed* case for trial in 2015 would require the Defendants to skip necessary discovery, abandon defenses that they do not have time to develop, omit viable dispositive motions, and eliminate important experts, all because of an artificially compressed schedule.[41]

---

[38] *See* Dkt. 1958, page 3-6, where the Tennessee Clinic Defendants set out the remaining discovery necessary before the first case – no matter which case – can be tried.

[39] It is also interesting how the PSC's position changes depending on which cases they wish to push to the forefront. No matter the state, the same *common* discovery of national parties and non-parties has to be taken to prepare any case for trial. At 1900-1, the PSC posits that it will take until *August 2016* to have a Premier (NJ) case ready for trial, and until *October 2016* to have a Box Hill (MD) case ready for trial. But, without further explanation, the Plaintiff says *Reed* can be ready by *December 2015*. Further, at 1900-1, the PSC tells the Court that it will take *~9 months* to do the pre-trial discovery for the Premier cases and about the same for the Box Hill cases. Here, the PSC is telling the Court that *Reed* can complete the pre-trial discovery in about *90-120 days*. Again, bending the timeframe to suit the case the Plaintiffs wish to push to the front of the line only frustrates reasonable discussion about this process.

[40] Dkt. 1883, page 5.

[41] As a practical matter, the Court must consider the calendar of the Tennessee court that will actually try the *Reed* case in determining a trial date.

## B.  Remand to Tennessee

Abbreviated as pertinent to this discussion, 28 U.S.C. 1407(a) directs that "each action [transferred to an MDL] shall be remanded by the panel at or before the conclusion of…pre-trial proceedings to the district from which it was transferred…."[42] Rule 10.3(a) of the Judicial Panel on Multidistrict Litigation makes clear the Panel's reluctance to order remand "absent the suggestion of the transferee judge."[43]

Guided by these provisions, the Tennessee Clinic Defendants respectfully move the Court to (a) direct the completion of common discovery[44], consistent with Local Rule 26.3, and, once it is completed, (b) suggest remand of the Tennessee cases to the Judicial Panel on Multidistrict Litigation.

Unless this Court intends to go through the complicated procedure necessary for Intercircuit Assignment to the United States District Court for the Middle District of Tennessee for a multi-week trial (or trials), the trial date will ultimately depend on the availability of the judge to whom the cases are assigned when they return to Tennessee.[45]

---

[42] *See also Lexecon, Inc. v. Milberg, Weiss, Bershad, Hynes & Lerach*, 523 U.S. 26, 34 (1998).

[43] In *Delaventura v. Columbia AcornTrust*, 417 F. Supp. 2d 147, 152 (D. Mass. 2006), the District Court commented that reluctance to return the cases to the transferor district is not limited to the Panel on Multidistrict Litigation: "Thus it is almost a point of honor among transferee judges acting pursuant to 1407(a) that cases so transferred should be settled rather than sent back to their home courts for trial. This, in turn, reinforces the unfortunate tendency to hang on to transferred cases to enhance the likelihood of settlement."

[44] The MDL Court's function could conclude after common fact discovery, if there are no truly *common* experts. Or, if there is discovery of truly national, common experts, the MDL could manage that portion of the case, and then remand.

[45] *See In re Motor Fuel Temperature Sales Practices Litigation*, 711 F.3d 1050 (9th Cir. 2013) (describing the process and appropriate circumstances for Intercircuit Assignment in MDL context).

## CONCLUSION

If the bellwether process is to continue, the *Reed* motion to set must be denied. Alternatively, if the *Reed* motion is allowed, the Tennessee Clinic Defendants' respectfully submit that common discovery should be completed, the Court should suggest remand of the Tennessee cases to the United States District Court for Tennessee, Middle and Eastern Districts, and the *Reed* trial should be followed by trials of the *Alexander*[46] and *Parman*[47] cases.

Respectfully submitted,

**GIDEON, COOPER & ESSARY, PLC**

/s/ Chris J. Tardio
**C.J. Gideon, Jr.***
**Chris J. Tardio***
**Alan S. Bean****
**Matthew H. Cline***
315 Deaderick Street, Suite 100
Nashville, TN 37238
Ph: (615) 254-0400
Fax: (515) 254-0459
chris@gideoncooper.com

***Attorneys for the Tennessee Clinic Defendants***

* Admitted pursuant to MDL Order No. 1.
** Admitted *pro hac vice*.

---

[46] Case No. 1:13-cv-12428, filed September 9, 2013.
[47] Case No. 1:13-cv-12433, filed September 6, 2013.

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through the CM/ECF system will be served electronically to the registered participants identified on the Notice of Electronic Filing and copies will be e-mailed or mailed via regular U.S. mail to those participants identified as unregistered this 15th day of June, 2015.


/s/ Chris J. Tardio
**Chris J. Tardio**