UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Wayne Reed v. Ameridose, et al.*,<br>Docket No. 1:13-cv-12565 | MDL No. 2419<br>Dkt. No 1:13-md-2419 (RWZ) |

**SAINT THOMAS ENTITIES' RESPONSE TO PLAINTIFF WAYNE REED'S MOTION TO SET CASE FOR TRIAL**

Saint Thomas West Hospital, formerly known as St. Thomas Hospital, Saint Thomas Network, and Saint Thomas Health (collectively referred to as the "Saint Thomas Entities") file this response to *Plaintiff Wayne Reed's Motion to Set Case for Trial* (Docket #1882) ("Motion") to show the Court as follows:

**PRELIMINARY STATEMENT**

As the Court is aware, the Saint Thomas Entities have been made parties to the cases against them in this MDL because Saint Thomas Network is a 50% investor in Saint Thomas Outpatient Neurosurgical Center ("STOPNC")—an ambulatory surgery center located in a medical office building on the Saint Thomas West Hospital campus. STOPNC administered methylprednisolone acetate ("MPA") that was later discovered to be contaminated. Neither the Saint Thomas Entities nor STOPNC had any role in causing the contamination. Nor did they have any knowledge of any contamination by the New England Compounding Center ("NECC"). The parties responsible for the contamination have settled and funded a substantial tort trust to compensate their victims. The PSC has laudably pursued these wrongdoers. But the PSC's claims

1

against the Saint Thomas Entities have no basis in either law or fact.  The Saint Thomas Entities, who are neither vicariously, much less directly, liable for these injuries, are entitled to the opportunity to defend themselves on the merits.

Like all of the plaintiffs in the MDL, the Saint Thomas Entities are anxious to have their day in court.  But they also recognize this is not an ordinary litigation.  It is one of the most complicated MDLs in the country, with ongoing and parallel bankruptcy and criminal proceedings involving the responsible parties where the defendants common to all the lawsuits have settled out, leaving only the Healthcare Defendants,[1] who are scattered across the country.  And these defendants are now in the position of having to discover and develop the facts behind the wrongdoing of their co-defendants in order to defend themselves, as the PSC has lost interest in doing so.  These circumstances present unique challenges in addressing and resolving the remaining claims.

Since they were brought into the MDL, the Saint Thomas Entities have been pursuing a legitimate goal—a fair and balanced bellwether process designed to try representative cases to facilitate the ultimate resolution of *all* of the pending cases.  They have submitted a great deal of briefing on the importance of a carefully designed and considered bellwether plan.  The PSC, by contrast, has repeatedly demonstrated that it simply wants expedited trials and—despite many months and reams of briefing on these issues—has never attempted to demonstrate that any of the proposed cases is in fact representative of the whole.  Nor does Mr. Reed.  His situation is surely sympathetic, but the requested relief of a single, unrepresentative trial—that will effectively

---

[1] "Healthcare Defendants" are the clinics/hospitals and their employees, physicians, nurses, and staff, that injected their patients with NECC-manufactured MPA, and the organizations and individuals alleged to be liable to the Plaintiffs based upon their alleged relationship to the injecting individuals and entities.

2

become the "bellwether" regardless of the circumstances—is not warranted and poses a significant threat of derailing the MDL. All of the Court's and parties' time and energies will be focused on bringing this single case to trial and the ultimate resolution of all of the other cases, involving plaintiffs who likewise desire their day in court, will fall behind. This result is especially unwarranted when there is a clear alternative of preserving his testimony by videotaped deposition—as was contemplated and provided for by the Court's case management orders on discovery.

Nor does Mr. Reed's financial condition warrant expediting a trial setting. Even if he were successful at trial, any prospect of payment from the Saint Thomas Entities is at best far down the road. By contrast, Mr. Reed is expected to receive an initial payment from the tort trust—created by the bankruptcy proceeding as part of the settlements with NECC, the Affiliated Defendants, and the National Defendants[2]—that is intended to approximate his ultimate recovery from the wrongdoers who caused this tragedy. And that payment is expected by year-end.[3] Mr. Reed does not require an expedited trial to obtain significant compensation from the proper parties. Accordingly, the Court is requested to deny the Motion and any request for a trial setting outside of the bellwether process.

---

[2] National Defendants" are the Unaffiliated Defendants who had service agreements or arrangements with NECC or its Affiliated Defendants, but who did not purchase compounded product from NECC.

[3] *See* Transcript of Status Conference of May 28, 2015, at 12 (attached as Exhibit A) ("[I]nterim payments, we are hopeful, will be mailed by year-end.").

**ARGUMENT AND AUTHORITIES**

I.  **Expediting a Single, Unrepresentative Case Will Derail the Entire Bellwether Process**

The proposal of taking a single case that is not representative of the other 116 plaintiffs with claims against the Saint Thomas Entities is unworkable and inevitably will lead to a trial that would provide no predictive information regarding other individual cases. Even more damaging, doing so will divert the Court's and parties' attention away from global development and resolution. *See* Eldon E. Fallon, Jeremy T. Grabill & Robert Pitard Wynne, *The Problem of Multidistrict Litigation: Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2343 (June 2008) [hereafter *Bellwether Trials*] ("If bellwether trials are to serve their twin goals as informative indicators of future trends and catalysts for an ultimate resolution, the transferee court and the attorneys must carefully construct the trial-selection process. . . . Any trial-selection process that strays from this path will likely resolve only a few independent cases and have a limited global impact."); *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.315 ("[T]o produce reliable information about other mass tort cases, the specific plaintiffs and their claims should be representative of the range of cases."). The risk of rushing the process is significant: "[l]ittle credibility will be attached to this process, and it will be a waste of everyone's time and resources*." In re Yasmin and Yaz (Drospirenone) Mktg., Sales Practices and Prods. Liab. Litig*., No. 3:09-md-02100-DRH-PMF, 2010 WL 4024778, at *2 (S.D. Ill. Oct. 13, 2010).

While Mr. Reed's situation is clearly sympathetic, the reality is that it is also part of a large number of cases pending in an MDL, many of which also involve serious injuries and deaths. That was also the case in the Vioxx and Propulsid MDLs, where Judge Fallon likewise took seriously the need to move the cases along expeditiously, but also observed that justice is best served by spending the time necessary to select truly representative bellwether cases. The objective of an

MDL—as opposed to a single-plaintiff case—is not to get one or more cases to trial as quickly as possible. Instead, the principal goal is to identify and work up representative cases for initial trials:

> Bellwether trials thus assist in the maturation of any given dispute by providing an opportunity for coordinating counsel to organize the products of pretrial common discovery, evaluate the strengths and weaknesses of their arguments and evidence, and understand the risks and costs associated with the litigation. Indeed, the utilization of bellwether jury trials can enhance and accelerate the MDL process in two key respects. First, bellwether trials allow coordinating counsel to hone their presentation for subsequent trials and can lead to the development of "trial packages" for use by local counsel upon the dissolution of MDLs. Second, and perhaps more importantly, bellwether trials can precipitate and inform settlement negotiations by indicating future trends, that is, by providing guidance on how similar claims may fare before subsequent juries.

Fallon, *Bellwether Trials*, 82 TUL. L. REV. at 2338. Taking Mr. Reed's case first and without any consideration of its relationship to all of the other pending cases is entirely inconsistent with these important objectives.

## II. Circumstances Like Mr. Reed's Were Both Anticipated and Addressed in Previous Orders

Although Plaintiff's counsel offer him for deposition, they suggest it as an afterthought. But in fact, that is the appropriate relief under the circumstances. A videotaped deposition will preserve the necessary testimony in the event that Mr. Reed is unable to testify if and when his case is tried. Indeed, the Deposition Order previously entered by the Court contemplates as much:

> If the parties become aware of any person who possess relevant information but, who, by reason of age, ill health, or termination of employment with defendants may become unavailable for deposition, the deposition may be taken as soon as possible, using the procedures outlined in FED. R. CIV. P. 27.

MDL Order No. 10, § II(F).

## III. Mr. Reed Will Be Receiving an Interim Payment from the Tort Trust in the Near Future

According to the PSC, interim payments from the tort trust that is being established as part of the bankruptcy plan will be made in the next few months. *See* Transcript of Status Conference

of May 28, 2015, at 12 (attached as Exhibit A) ("[I]nterim payments, we are hopeful, will be mailed by year-end."). These "Initial Payments" are intended to estimate the full recovery for each tort plaintiff, based on an elaborate point system designed to compensate them as to the level of severity of injury and exacerbating factors. *See* Exhibit A to Tort Trust Agreement: Claims Resolution Facility Procedures *In re New England Compounding Pharmacy, Inc.*, No. 12-19882 (Bankr. D. Mass.) (Docket #1123-2) at 41-42 (attached as Exhibit B). And additional payments may be made after final resolution of all the claims. *Id.* at 42, 48-49.

The Saint Thomas Entities have done everything possible to pave the way for the tort trust funds committed by the responsible parties to be provided to the MDL plaintiffs, including Mr. Reed, as soon as possible. They did not object to or appeal the bankruptcy plan (despite significant reservations over its legality) primarily because an appeal could have significantly delayed payments to plaintiffs like Mr. Reed. Now that the bankruptcy plan has been confirmed, including the Tort Trust Agreement, those funds should be available to Mr. Reed much sooner than any judgment would possibly be paid. In particular, given the Saint Thomas Entities' unwavering belief that they bear no responsibility for the contaminated steroid, any adverse judgment would almost certainly be appealed and judgment superseded pending appeal.

**IV.     The Saint Thomas Entities and the Entire MDL Process Will Be Significantly Prejudiced by the Proposed Divergence From a Legitimate Bellwether Process to a Single-Plaintiff Trial**

Plaintiff asserts without either argument or authority that "[n]o unfair prejudice will occur to any party if Mr. Reed's claims are set for trial." Motion at 2. But that is simply not true. Not only will the Saint Thomas Entities and their remaining co-defendants be prejudiced, but all of the other pending plaintiffs' cases will also be adversely affected because a disproportionate amount of time and resources will be necessarily dedicated to a trial that will have little if any predictive

6

value and will not necessarily provide the type and magnitude of information most useful to the parties.  Fallon, *Bellwether Trials*, 82 TUL. L. REV. at 2344-45.  All of the parties desire and need to have their day in court.  But considering the magnitude and complexity of this litigation, that process needs to be managed fairly and appropriately for all.

**V.     A Trial in 2015 Is Extremely Unrealistic**

Mr. Reed also seeks a trial setting "in late 2015."  Motion at 1.  The amount of discovery left to be completed and the other pretrial matters that must be resolved have been thoroughly briefed in prior submissions from the Saint Thomas Entities, which are incorporated by reference. *See* Docket #1753, #1870, #1850.  And those briefs did not have the benefit of the PSC's newest proposal for *[Amended Proposed] MDL Order 9B: Order Regarding Common Issue Discovery* (Docket #1900-1) ("Proposed Order 9B"), which was further addressed in the *Saint Thomas Entities' Response to PSC's Memorandum in Support of its Proposal for Initial Trial Setting and Pretrial Deadlines and Cross-Motion to Amend Case MDL Order No. 9* (Docket #1957), also incorporated by reference.  Even the PSC's latest overly optimistic proposal does not propose a "trial-ready" date before February 2016.  There is a significant amount of time needed for expert discovery, dispositive motion briefing, and case-specific discovery before any case will be "trial ready"—much less ready to start jury selection.[4]

---

[4] Any suggestion that case-specific discovery was completed in the *Reed* case when it was in state court is wrong.  The medical records authorizations that Mr. Reed served in 2012 only pertained to Mrs. Reed and were only for those health care providers to whom his counsel chose to send a notice.  As detailed above and in the briefs incorporated by reference, there are large gaps in the discovery and other information the Healthcare Defendants have sought from the settling defendants and third parties that will be necessary to defend themselves at trial.  Moreover, case-specific discovery in the *Reed* case remains stayed in the MDL pending completion of common fact discovery and will occur in earnest once case-specific discovery commences.

7

## VI. The Temporary Assignment Authority Invoked by Mr. Reed Further Complicates, Not Simplifies, the Logistical Challenges

Finally, considering the Nashville Clinic Defendants' representations that they will not execute a *Lexecon* waiver such that these cases could be tried in Boston, Mr. Reed further suggests that this Court be appointed temporarily to sit in the Middle District of Tennessee and preside over the trial under 28 U.S.C. § 1407(b).  *See* Motion at 2-3.[5]  Such process is time-consuming and is not necessarily guaranteed, particularly since the inter-circuit transfer is based on necessity:

> This procedure [28 U.S.C. § 292] has the benefit of allowing the transferee judge to hear the actions that he has become familiar with throughout the course of pretrial proceedings.  Intercircuit and intracircuit transfer, however, is a "cumbersome and inefficient procedure."  This process is much more complicated and time-consuming than simply transferring the cases directly to the transferee judge's trial docket.

*See* Courtney E. Silver, Note, *Procedural Hassles in Multidistrict Litigation: A Call for Reform of 28 U.S.C. § 1407 and the Lexecon Result*, 70 OHIO ST. L.J. 455, 474 (2009) (quoting William J. Martin, *Reducing Delays in Hatch-Waxman Multidistrict Litigation*, 71 U. Chi. L. Rev. 1173, 1193 (2004)).

## CONCLUSION AND PRAYER

For these reasons, the Saint Thomas Entities request that the Court deny Plaintiff Wayne Reed's Motion to Set Case for Trial and grant such other and further relief to which the Saint Thomas Entities are entitled.

---

[5] The Saint Thomas Entities presume that Mr. Reed meant instead to refer to 28 U.S.C. § 292.

SAINT THOMAS WEST HOSPITAL, FORMERLY KNOWN AS ST. THOMAS HOSPITAL, SAINT THOMAS NETWORK, AND SAINT THOMAS HEALTH

By their attorneys,
*/s/ Marcy Hogan Greer*
Sarah P. Kelly (BBO #664267)
skelly@nutter.com
NUTTER McCLENNEN & FISH LLP
Seaport West
155 Seaport Boulevard
Boston, Massachusetts  02210
(617) 439-2000
(617) 310-9461 (FAX)

Dated: June 15, 2015

OF COUNSEL:

Yvonne K. Puig*
Texas State Bar No. 16385400
yvonne.puig@nortonrosefulbright.com
Adam T. Schramek*
Texas State Bar No. 24033045
adam.schramek@nortonrosefulbright.com
Eric J. Hoffman*
Texas State Bar No. 24074427
eric.hoffman@nortonrosefulbright.com

NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Blvd. Suite 1100
Austin, Texas 78701
(512) 536-2450
(512) 536-4598 (FAX)

Marcy Hogan Greer*
Texas State Bar No. 08417650
mgreer@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON & TOWNSEND LLP
515 Congress, Suite 2350
Austin, Texas 78701
(512) 482-9300

*Appearing *Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

      This certifies that a true and accurate copy of the foregoing was served on all parties of record by virtue of the Court's electronic filing system this 15th day of June, 2015.

                                          */s/ Marcy Hogan Greer*
                                          MARCY HOGAN GREER