**MONTGOMERY McCRACKEN WALKER & RHOADS LLP**
(A Limited Liability Partnership Formed in Pennsylvania)
LibertyView, Suite 600
457 Haddonfield Road
Cherry Hill, New Jersey 08002
(856) 488-7700
*Counsel for Defendants Inspira Health Network, Inc.,*
*Inspira Medical Centers, Inc., Joseph Alessandrini and*
*Paul Abrams*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **IN RE: NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION** _____ THIS DOCUMENT RELATES TO: *All New Jersey Cases* | **Document Electronically Filed** MDL No. 1:13-md-2419-RWZ MDL No. 02419 |

### DECLARATION OF STEPHEN A. GROSSMAN IN SUPPORT OF INSPIRA HEALTH NETWORK, INC. AND INSPIRA MEDICAL CENTERS, INC.'S MOTION FOR A PROTECTIVE ORDER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(C)

**STEPHEN A. GROSSMAN, ESQ.**, of full age, hereby declares as follows:

1.      I am a partner in the firm Montgomery, McCracken, Walker & Rhoads, LLP, located at LibertyView, Suite 600, 457 Haddonfield Road, Cherry Hill, New Jersey 08002, and counsel to Defendants Inspira Health Network, Inc. and Inspira Medical Centers, Inc. (formerly known as South Jersey Health System, Inc. and South Jersey Hospital, Inc.) and Joseph Alessandrini and Paul Abrams (collectively, "Inspira").

2.      I am authorized to and make this Declaration in support of Inspira's Motion for a Protective Order Pursuant to Fed. R. Civ. P. 26(c).

3.     On May 15, 2015, the Premier Defendants[1] served by email a Fed. R. Civ. P. 30(b)(6) deposition notice on Inspira seeking fifteen separate categories of information.  The same day, Premier also served by email a deposition notice to depose Inspira employee Joseph Alessandrini, R.Ph. ("Deposition Notices").

4.     On May 19, 2015, I had preliminary conversations with Christopher Wolk, Esq., counsel for the Premier Defendants, in person at the bankruptcy courthouse in Springfield, Massachusetts concerning the Deposition Notices.

5.     On June 10, 2015 I, along with my colleague, Louis R. Moffa, Jr., Esq., met and conferred by telephone with Jay Blumberg, Esq. and Christopher Wolk, Esq., counsel for the Premier Defendants.

6.     I advised counsel for the Premier Defendants that Inspira objected to the Deposition Notices for a number of reasons: (i) that the Premier Defendants were not entitled to the discovery in the 35 cases in which Inspira is not a defendant; (ii) that the bellwether cases almost certainly will include only those involving only the Premier Defendants, so discovery from Inspira would not be necessary at this time; and (iii) that discovery from Inspira was case specific and barred under MDL. Order No. 9.

7.     For these reasons, Inspira objected to the Deposition Notices at this time, although I made clear that these depositions may be appropriate at some future date once the bellwether protocol and selection was completed.

---

[1]     The Premier Defendants, represented by the same law firm, include Premier Orthopaedic and Sports Medicine Associates of Southern New Jersey, LLC, trading as Premier Orthopaedic Associates, Premier Orthopaedic Associates Surgical Center, LLC, and Kimberley Yvette Smith, M.D., a/k/a Kimberley Yvette Smith-Martin, M.D., Thomas Dwyer, M.D., Richard C. DiVerniero, M.D., and Richard Strauss, M.D.

8.      Counsel for the Premier Defendants advised that they were entitled to depose Inspira *now* in all cases based on the deposition testimony of Premier employee Michelle Cassidy.  Ms. Cassidy allegedly testified that she obtained NECC's contact information from Inspira.  She did not obtain any other information relating to NECC from Inspira.

9.      Counsel for the Premier Defendants rejected Inspira's offer to revisit the Deposition Notices until the bellwether protocol and selection process was completed, which likely will be sometime in December 2015, and insisted on moving forward now with the Inspira depositions.

10.     Based on the communications between counsel to date, because the parties are at an impasse, Inspira is forced file the within Motion for a Protective Order to protect Inspira from unnecessary discovery, cost, and expense.

11.     Attached at **Exhibit A** is a true and correct copy of the relevant pages of Michelle Renee Cassidy's March 27, 2015 Deposition Transcript.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

                              s/ Stephen A. Grossman_____

Dated:  June 22, 2015

-3-

<u>**CERTIFICATE OF SERVICE**</u>

I, **STEPHEN A. GROSSMAN**, hereby certify that I caused a true and correct copy of

Inspira Health Network, Inc. and Inspira Medical Centers, Inc.'s Motion For A Protective Order

Pursuant To Federal Rule Of Civil Procedure 26(c), accompanying Memorandum, Declaration of

Stephen A. Grossman, Esq., and proposed form of Order, to be filed electronically via the

Court's electronic filing system.  Those attorneys who are registered with the Court's electronic

filing system may access these filings through the Court's system, and notice of these filings will

be sent to these parties by operation of the Court's electronic filing system.

Dated:  June 22, 2015                              _s/ Stephen A. Grossman_____
                                                   Stephen A. Grossman

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2

 3

 4
      IN RE: NEW ENGLAND
 5    COMPOUNDING PHARMACY,
      INC. PRODUCTS LIABILITY      MDL No. 2419
 6    LITIGATION
                                   Master Dkt:
 7                                 1:13-md-02419-RWZ
      ~~~~~~~~~~~~~~~~~~~~~~
 8    THIS DOCUMENT RELATES
      TO:
 9

10    All Actions

11
      ~~~~~~~~~~~~~~~~~~~~~~~
12

13
              VIDEOTAPED DEPOSITION OF
14              MICHELLE RENEE CASSIDY

15
                    8:56 a.m.
16              March 27, 2015

17

18                  Suite 300
              9000 Midlantic Drive
19          Mount Laurel, New Jersey

20

21      Blanche J. Dugas, RPR, CCR No. B-2290

22

23

24

25
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q.      And do you understand -- strike that.
 2                What, if any, is your understanding of the
 3    reasons for the use of both?
 4        A.      Well, I'm not a doctor, but my
 5    understanding as to why they use MPA preservative-free
 6    is because it was safer for the patient and if it has
 7    preservatives in it and you use it for spine
 8    procedures, the patient could have a chance of having
 9    a stroke.
10        Q.      Okay.  And what is the basis or source of
11    that understanding that you just communicated to me?
12        A.      That's what the physicians have told me.
13        Q.      And which physicians told you that?
14        A.      Dr. Smith.
15        Q.      Now, you used the word "compounding
16    pharmacy."  What is your understanding of what a
17    compounding pharmacy is?
18        A.      A compounding pharmacy mixes drugs to make
19    medications that physicians aren't able to purchase
20    from the drug distributor.
21        Q.      Now, when was it that you commenced your
22    employment with your present employer?
23        A.      September of 2009.
24        Q.      And what -- when you were hired in
25    September of 2009, for what job or position were you
```



1   hired?

2       A.      As the administrator of nursing for Premier

3   Orthopaedic Associates Surgical Center.

4       Q.      And do I understand that you've held that

5   position throughout your tenure?

6       A.      That's correct.

7       Q.      And have you received raises during that

8   time?

9       A.      Yes.

10      Q.      And have you received bonuses?

11      A.      Yes.

12      Q.      Are you -- do you have a contract of

13  employment?

14      A.      I signed a contract with Dr. Dwyer, yes.

15      Q.      And when was that?

16      A.      In September of 2009?

17      Q.      And for -- was there a term for that

18  contract?

19      A.      I don't recall.  I'd have to look at it.

20      Q.      Have you signed any additional contracts?

21      A.      I have not.

22      Q.      Do you have any current plans or intentions

23  of you leaving your employment?

24      A.      I do not.

25      Q.      From the time that you commenced your



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1  became a nurse in 2002.
 2       Q.     And when you worked -- strike that.
 3              What did you do at Inspira prior to your
 4  becoming a nurse?
 5       A.     I was a surgical tech in the operating
 6  room.
 7       Q.     During the time that you worked for what we
 8  know --we now reference -- refer to as Inspira, did
 9  you have any contact or communications with anyone
10  whom you understood to be employed by NECC?
11       A.     Can you repeat that.
12       Q.     Sure.  What I want to know is during the
13  time that you worked at what we now called Inspira --
14       A.     Yeah.
15       Q.     -- did you have any contacts or
16  communications with anyone at NECC?
17       A.     I did not.
18       Q.     Do you know whether or not anyone from NECC
19  ever came to Inspira?
20       A.     I'm not aware of that.
21       Q.     Do you know if -- strike that.
22              When you commenced your employment in
23  September of 2009 at Premier, was Premier using MPA
24  preservative-free purchased from NECC?
25       A.     Can you repeat that.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q.     Yes.  Upon your arriving at your current

 2    employment, did you find that your current employer

 3    was already using NECC MPA preservative-free?

 4              MR. BLUMBERG:  Objection to form.

 5         You can answer.

 6              THE WITNESS:  Our facility did not

 7         open until January 2010, so there was no

 8         Premier Orthopaedic Associates Surgical

 9         Center at that time.

10        Q.     (By Mr. Barrett)  All right.  The entity

11    that you were working for in September of 2009, what

12    was that?

13        A.     Premier Orthopaedic Associates Surgical

14    Center.

15        Q.     Okay.  When you arrived there, were they

16    using NECC MPA preservative-free?

17              MR. BLUMBERG:  Mike, it wasn't open

18         yet.

19              MR. BARRETT:  I understand.

20              THE WITNESS:  No.  My answer is no.

21        Q.     (By Mr. Barrett)  When was the first time

22    that you learned that your current employer was using

23    NECC's MPA preservative-free?

24        A.     At Inspira Healthcare.  I worked there.  I

25    worked in the operating rooms with the physicians and
```



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    they were using New England Compounding MPA at the

2    hospital.

3         Q.     Do you know whether any of the

4    physicians -- specifically Dr. Dwyer, Dr. Smith or Dr.

5    Perkins -- had any communications with anyone at NECC

6    prior to the recall?

7         A.     Can you restate that.

8         Q.     Yeah.  I want to know if whether Dr. Dwyer,

9    Dr. Smith or Dr. Perkins had any communications with

10   anyone at NECC prior to the recall.

11        A.     Not that I'm aware of.

12        Q.     Who was it who decided to use the NECC MPA

13   preservative-free at Premier?

14        A.     Medical advisory committee recommended it

15   and the managers approved it.

16        Q.     And when was this?

17        A.     Around about November 2009.

18        Q.     And would you please explain for me that

19   process, as best you can recall.

20        A.     So when I was working at the hospital, at

21   Inspira Healthcare, I worked with many physicians

22   there.  I worked with Dr. Mitros who was an

23   anesthesiologist, pharmacist, pain management

24   physician, at the hospital.  I asked him where they

25   were ordering the preservative-free MPA because we



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    were, you know, in the process of opening the new
 2    facility.  He said they used New England Compounding.
 3    He said I should call the hospital pharmacy to get the
 4    information on where to place an order from.  I called
 5    the hospital pharmacy at Inspira Healthcare.  They
 6    recommended NECC, and so that's where they had been
 7    ordering the preservative-free MPA for many years.
 8             The physicians on the medical advisory
 9    committee were submitting their preferences for the
10    facility.  They wanted to continue using everything
11    they had been using at Inspira.
12        Q.    Was there any attempt or effort to
13    investigate any other sources for the purchase of MPA
14    preservative-free?
15        A.    At that time, no.  The physicians were
16    comfortable using everything they had been using at
17    Inspira and wanted to continue to order from where
18    they were ordering from at the hospital.
19        Q.    At any point in time between that time and
20    the recall, was there ever any consideration of using
21    any other facility to purchase MPA preservative-free?
22        A.    There was not.
23        Q.    Besides what you've told me, are you aware
24    of any investigation which was performed by you or
25    anyone else associated or affiliated with Premier
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1    Q.    And what about Dr. Perkins?  When did you
2  first meet her?
3    A.    I met Dr. Perkins in 2012.
4    Q.    Was there anyone who trained you in
5  connection with your current employment?
6    A.    Yes.
7    Q.    Who was that?
8    A.    We have a management company, Murphy
9  Healthcare.
10   Q.    When did that training occur?
11   A.    Well, I met them in 2009.  My official
12  start date was September of 2009.  That's when I
13  started working with the clinical director at Murphy
14  Healthcare.
15   Q.    And who was that?
16   A.    Darlene DeCataldo.
17   Q.    Are you aware of any relationship between
18  Murphy Healthcare and either of the Premier entities?
19   A.    I don't understand your question.
20   Q.    Are you aware if there is any financial
21  relationship between Murphy Healthcare and either of
22  the Premier entities?
23   A.    Well, Murphy Healthcare is the management
24  company for Premier Orthopaedics Surgery Center.
25   Q.    Who owns Murphy Healthcare?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q.      And what does she do?
 2        A.      She -- well, in the beginning, she helped
 3   get me set up, trained me how to do everything at the
 4   facility.  On the clinical aspect, she comes maybe
 5   once or twice a week to the facility to make sure
 6   everything's going smoothly and if we have any issues,
 7   she'll address them.
 8        Q.      Does she work with anyone else at Premier
 9   besides you?
10        A.      Yes.
11        Q.      Who else?
12        A.      The physicians there, the staff at the
13   facility.
14        Q.      What does she do with the physicians?
15        A.      Well, if they have any issues or concerns
16   or have any questions, she can help them.
17        Q.      Was Murphy in any way involved with the
18   purchase of medications by Premier?
19        A.      Yes.
20        Q.      How so?
21        A.      Well, when we were starting up the
22   facility, they had contracts with different drug
23   distributors, they referenced to us places where we
24   could place orders from, where the other centers had
25   been ordering from.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1     Q.      Were they involved with the decision to

2  purchase MPA preservative-free from NECC?

3     A.      Yes.

4     Q.      How so?

5     A.      Well, they met at the medical advisory

6  committees with us.  They were aware we were ordering

7  from a compounding company.

8     Q.      Were you present during any of those

9  meetings when that was discussed?

10    A.      I was, yes.

11    Q.      What is your recollection regarding that

12 discussion?

13    A.      Well, in November 2009 before we opened, we

14 had to approve our drug formulary.  So that was a list

15 of medications that the physicians and

16 anesthesiologists had been using or were requesting to

17 use at the facility along with the medications we

18 needed to start our open date, which was in January of

19 2010.

20    Q.      Did they make any suggestions or

21 recommendations to order MPA preservative-free from

22 anyone other than NECC?

23            MR. BLUMBERG:  "They" being --

24            MR. BARRETT:  Murphy.

25            MR. BLUMBERG:  -- Murphy Healthcare?



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Nationwide Coverage

1      Okay.

2              THE WITNESS:  They did not.  They

3       were comfortable using what the physicians

4       were comfortable using at the hospital.

5      Q.    (By Mr. Barrett)  Why do you say that?

6      A.    Because the physicians at our facility

7  wanted to continue using the items that they had been

8  using at the hospital.  They had been using items

9  there for a long time.  They asked me to contact

10 whoever did the ordering at the hospital to continue

11 ordering the same products.  So since the physicians

12 were comfortable using the same medications, the

13 management company was comfortable with that as well.

14     Q.    Did you undertake any independent

15 investigation of NECC?

16             MR. BLUMBERG:  Objection, asked and

17      answered.  You can answer it.

18             THE WITNESS:  I don't understand the

19      question.

20     Q.    (By Mr. Barrett)  Did you perform any

21 investigation of NECC in connection with the decision

22 to continue to purchase MPA preservative-free from

23 NECC?

24     A.    I did, yes.  I spoke Dr. Mitros, who is the

25 pharmacist, anesthesiologist and pain management



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    physician who has been using it for many years.  He
 2    had no nothing -- no issues or concerns or negative
 3    things to say.  He recommended the facility.  I also
 4    spoke to Inspira Healthcare pharmacy.  I asked them
 5    where they were ordering the MPA preservative-free
 6    from.  They were comfortable giving me the
 7    recommendation of NECC and we continued to order it
 8    from there.
 9        Q.    Did you ever speak with anyone at NECC?
10              MR. BLUMBERG:  Wait a minute.  Before
11         the decision was made or ever?
12        Q.    (By Mr. Barrett)  Let me put a time frame
13    on it.  In connection with the decision to continue to
14    use NECC for the MPA preservative-free, did you ever
15    speak with anyone there?
16        A.    Yes.
17        Q.    Who did you speak with?
18        A.    Well, after I obtained their contact
19    information from Inspira Healthcare pharmacy, I called
20    New England Compounding and I spoke to a drug
21    representative named Linda Pino.
22              MR. COREN:  Can you say that a little
23         louder.
24              THE WITNESS:  Yes.  Linda Pino at New
25         England Compounding.  She's a drug rep
```



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1       hospital?
 2       Q.      (By Mr. Rehnquist)  Yes.  If that's -- yes.
 3       A.      I'm not aware.  There was more than one
 4  hospital.  I don't know how many surgeons were there.
 5       Q.      You mentioned -- was the hospital called
 6  South Jersey Healthcare or were there multiple
 7  hospitals?
 8       A.      There was South Jersey Healthcare - Elmer.
 9  South Jersey Healthcare Regional Medical Center.  Two
10  of them.
11       Q.      Two separate hospitals at that time?
12       A.      At that time, yeah.
13       Q.      And you mentioned a Dr. Mitros, I believe?
14       A.      Dr. Mitros.
15       Q.      Dr. Mitros.  How do you spell that?
16       A.      M-I-T-R-O-S.
17       Q.      And what was his position within the South
18  Jersey Healthcare network?
19       A.      He was chief of anesthesia.  At that time
20  he was an anesthesiologist at the hospital.
21       Q.      And I believe you said that he was one of
22  the people that you consulted about a source for
23  preservative-free MPA; correct?
24       A.      Yes.
25       Q.      And what did he tell you?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              MR. BLUMBERG:  Objection, asked and
 2        answered, but you can answer it again.
 3              THE WITNESS:  He told me that the
 4        hospital was ordering it from New England
 5        Compounding, that it was preservative-free
 6        MPA, to call the pharmacy to get the
 7        contact information.
 8        Q.    (By Mr. Rehnquist)  Okay.  And you went
 9   ahead and you did call the pharmacy; correct?
10        A.    I did, yes.
11        Q.    And was this an in-house pharmacy at one of
12   the hospitals that you mentioned?
13        A.    Yes.
14        Q.    Which hospital?
15        A.    South Jersey Healthcare Regional Medical
16   Center.
17        Q.    And did you understand that that hospital
18   had its own in-house pharmacy that it used for drugs
19   for the patients at the hospital?
20        A.    Yes.
21        Q.    And who did you talk to at the hospital
22   pharmacy?
23        A.    I don't recall the specific name.
24   Typically when I called the pharmacy, it would be a
25   pharmacy tech on the phone.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q.      And all you remember is just asking this

2  person for a name and address?

3      A.      I asked them where they ordered their

4  preservative-free compounding medications from.

5      Q.      Did the in-house pharmacy at the hospital

6  do any of its own compounding, to your knowledge?

7      A.      That, I'm not aware of.

8      Q.      Before you came to the Premier surgery

9  center, did you have any experience with compounding

10  pharmacies yourself?

11      A.      Well, while I worked at the hospital, we

12  used New England Compounding medication.

13      Q.      Putting aside -- let me try a better

14  question.

15      A.      Okay.

16      Q.      Before you had dealings with New England

17  Compounding Company, did you have any experience

18  dealing with any other compounding pharmacies?

19      A.      I did not.

20      Q.      Did all the doctors who formed the Premier

21  physicians group come from South Jersey Healthcare?

22          MR. BLUMBERG:   Now we're talking

23      about the orthopaedic group as opposed to

24      the surgery center?

25          MR. REHNQUIST:   That's right.   I



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com