```
 1                    UNITED STATES DISTRICT COURT
 2                    DISTRICT OF MASSACHUSETTS
 3

 4
    IN RE:  NEW ENGLAND COMPOUNDING   )  MDL NO. 13-02419-RWZ
 5  PHARMACY CASES LITIGATION         )
                                      )
 6                                    )
                                      )
 7                                    )
                                      )
 8                                    )

 9          BEFORE:  THE HONORABLE RYA W. ZOBEL AND
                     THE HONORABLE JENNIFER C. BOAL
10

11

12
                       STATUS CONFERENCE
13

14

15

16         John Joseph Moakley United States Courthouse
                        Courtroom No. 12
17                      One Courthouse Way
                        Boston, MA 02210
18

19                        June 24, 2015
                           2:00 p.m.
20

21

22
                Catherine A. Handel, RPR-CM, CRR
23                   Official Court Reporter
           John Joseph Moakley United States Courthouse
24              One Courthouse Way, Room 5205
                        Boston, MA 02210
25             E-mail: hhcatherine2@yahoo.com
```

```
1     APPEARANCES:

2     FOR THE PLAINTIFFS:

3
          Hagens, Berman, Sobol, Shapiro LLP, KRISTEN A. JOHNSON,
4     ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts
      02142;
5
          Janet, Jenner & Suggs, LLC, KIMBERLY A. DOUGHERTY, ESQ., 75
6     Arlington Street, Suite 500, Boston, Massachusetts  02116;

7         Crandall & Katt, by PATRICK THOMAS FENNELL, ESQ., 366 Elm
      Avenue, SW, Roanoke, Virginia 24016;
8
          Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,
9     ESQ., 227 Second Avenue North, Nashville, Tennessee 37201-1631;

10        Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
      Street, Suite 500, Boston, Massachusetts 02114;
11
          Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
12    ESQ., 150 Fourth Avenue North, Suite 1650, Nashville, Tennessee
      37219;
13
          Leader, Bulso, Nolan & Burnstein, PLC, by GEORGE NOLAN,
14    ESQ., 414 Union Street, Suite 1740, Nashville, Tennessee
      37219-1734;
15

16
      FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
17    NECP, INC.:

18        Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
      Street, Suite 2400, Boston, Massachusetts 02110-1724;
19

20
      FOR THE DEFENDANTS:
21
          Tucker & Ellis LLP, by MATTHEW P. MORIARTY, ESQ., 1150
22    Huntington Building, 925 Euclid Avenue, Cleveland, Ohio
      44115-1414;
23

24
      (Appearances continued on the next page.)
25
```

```
 1      APPEARANCES (Cont'd):

 2
        FOR THE DEFENDANTS:
 3
            Gideon, Cooper & Essary, PLLC, by C.J. GIDEON, JR., ESQ.,
 4     315 Deaderick Street, Suite 1100, Nashville, Tennessee 31238;

 5          Blumberg & Wolk LLC, by JAY J. BLUMBERG, ESQ., 158 Delaware
       Street, Woodbury, New Jersey 08096;
 6
            Tucker, Saltzman & Dyer, LLP, by SCOTT J. TUCKER, ESQ., 50
 7     Congress Street, Boston, Massachusetts 02109;

 8          Michaels, Ward & Rabinovitz LLP, by DAN RABINOVITZ, ESQ.,
       One Beacon Street, Boston, Massachusetts 02108;
 9
            Ulmer & Berne LLP, by JOSHUA A. KLARFELD, ESQ., 1660 West
10     2nd Street, Suite 1100, Cleveland, Ohio 44113-1448;

11          Fulbright & Jaworski, LLP, by MARCY H. GREER, ESQ., 98 San
       Jacinto Blvd, Suite 1100, Austin, Texas 78701;
12
            Sloane & Walsh LLP, by ROBERT H. GAYNOR, ESQ., Three Center
13     Plaza, Boston, Massachusetts 02108;

14          Brewer, Krause, Brooks, Chastain & Burrow, PLLC by KENT E.
       KRAUSE, ESQ., 611 Commerce Street, Suite 2600, Nashville,
15     Tennessee 37203;

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S

 2        (The following proceedings were held in open court before

 3   the Honorable Rya W. Zobel, United States District Court Judge,

 4   and the Honorable Jennifer C. Boal, Magistrate Judge, United

 5   States District Court, District of Massachusetts, at the John J.

 6   Moakley United States Courthouse, One Courthouse Way, Boston,

 7   Massachusetts, on June 24, 2015.)

 8             THE COURT:  Good afternoon.  Please be seated.

 9             COURTROOM DEPUTY CLERK URSO:  This is In Re:  New

10   England Compounding, MD-13-2419.

11             THE COURT:  Good afternoon all.

12             MS. JOHNSON:  Good afternoon, your Honor.

13             THE COURT:  Let's see.  We have Ms. Johnson, Mr.

14   Stranch, not Mr. Sobol, Mr. Chalos -- no.

15             MR. CHALOS:  I'm here, your Honor.

16             THE COURT:  Yes, Mr. Chalos is here.  Mr. Fennell.

17             MR. FENNELL:  Right here, your Honor.  Good

18   afternoon.

19             THE COURT:  Who is that, Lisa?

20             COURTROOM DEPUTY CLERK URSO:  Someone must have

21   called in that just got on.

22             THE COURT:  And then for the trustee, Mr. Gottlieb.

23             MR. GOTTFRIED:  Yes.

24             THE COURT:  Okay.  And Mr. --

25             MR. ELLIS:  Mr. Ellis, your Honor.
```

```
 1              THE COURT:  Are you speaking?

 2              MS. DOUGHERTY:  It's possible, your Honor.  Kim

 3   Dougherty on behalf of the Plaintiffs' Steering Committee.

 4              THE COURT:  Okay.  And then we come over here to the

 5   creditors.  Tell me your name, please.  The list is so long, I

 6   cannot get through it.

 7              MS. GREER:  Your Honor, Marcy Greer for the St.

 8   Thomas Entities.

 9              THE COURT:  For?

10              MS. GREER:  The St. Thomas Entities.

11              THE COURT:  Right.

12              MR. BLUMBERG:  Jay Blumberg from Blumberg & Wolk on

13   behalf of the Premier defendants.

14              MS. GIDEON:  C.J. Gideon on behalf of the Tennessee

15   Clinic Defendants, your Honor.

16              THE COURT:  Okay.  And then in the front row?

17              MR. KLARFELD:  Joshua Klarfeld on behalf of GDC.

18              MR. RABINOVITZ:  Dan Rabinovitz on behalf of Medical

19   Sales Management.

20              MR. GAYNOR:  Robert Gaynor on behalf of the

21   individual defendants.

22              MR. TUCKER:  Scott Tucker, your Honor, for Ameridose.

23              MR. MORIARTY:  Matt Moriarty.

24              THE COURT:  I promise you before this case ends, I

25   will remember each and every one of you and your names, maybe.
```

1          I will start with your agenda, Ms. Johnson, but at

2   some point I propose to take off on my own, but you'll know it.

3          MS. JOHNSON:  Thank you, your Honor.

4          THE COURT:  So, the motion for approval of the

5   Virginia wrongful death settlements, I assume that's up to

6   you.  No?  Who is speaking?

7          MS. JOHNSON:  No, your Honor.  Mr. Fennell will be

8   addressing that for the Plaintiffs' Steering Committee.

9          THE COURT:  Okay.  I assume it's not going to take an

10  hour.

11         MR. FENNELL:  No, your Honor, not today.

12         I'm Patrick Fennell.  I represent a number of

13  Virginia plaintiffs and, as you are already aware, Virginia

14  requires approval of all settlements involving allegations of

15  wrongful death.

16         There is a specific notice requirement under Virginia

17  law which requires every statutory beneficiary in each death

18  case to be given notice and an opportunity to be heard.  In

19  order to do that properly, we need to have a hearing date

20  sufficiently in advance so that we can issue notice to all of

21  the statutory beneficiaries.

22         THE COURT:  My trying to short circuit that by having

23  a hearing today won't work?

24         MR. FENNELL:  Yes, ma'am.

25         So, what we are requesting is about an hour of the

1    Court's time sometime on July 9th or 10th, if it suits the

2    Court.  All the counsel for plaintiffs and defense counsel

3    have gotten together and those two dates work for all of us.

4    If it is acceptable to the Court, we would like to try and

5    schedule something for one of those two days for an hour so

6    that we can get notice out to all the beneficiaries.

7              THE COURT:  Why do we need an hour?

8              MR. FENNELL:  Well, there are eight cases, your

9    Honor, eight wrongful death cases, and each one of them,

10   frankly, would probably have to be presented to some extent on

11   an individual basis.  So, we're just -- I'm being, I guess,

12   maybe cautious about it taking an hour.  It might take 45

13   minutes.  If we're really lucky, maybe half an hour.

14             THE COURT:  Is there any reason -- first of all,

15   there's no opposition to it, right?  It's a joint motion by

16   plaintiffs and defendants?

17             MR. FENNELL:  That's correct.

18             THE COURT:  Is there any reason why the parties can't

19   give me an outline of what the settlement is and how each of

20   the -- how the settlement satisfies each of the requirements

21   and then you can talk about it?

22             MR. FENNELL:  Yes, ma'am.  We're planning on filing

23   petitions, individual petitions in each case.  Those are going

24   to be filed -- many of them might be filed today, but some

25   might be filed tomorrow or Friday, and each of the petitions

1    will outline who the statutory beneficiaries are.

2          The one thing that we won't know in each case until

3    later this year, probably sometime in October or November, is

4    what the actual payout will be in each case and the breakdown

5    in terms of attorney's fees and that sort of thing.

6          What we're asking the Court for now is an approval of

7    the process by which each case -- each of the wrongful death

8    cases will be evaluated so that we can move forward with the

9    other conditions of our settlement.  This was one of the steps

10   that was identified in our settlement agreement with the

11   Virginia defendants.  And so, we're asking the Court to

12   basically review that process and give us an approval on that

13   basis.

14         THE COURT:  Well, that process is presumably the same

15   for each of the parties.

16         MR. FENNELL:  That's true.

17         THE COURT:  So, we can deal with it as one.

18         MR. FENNELL:  Yes.

19         THE COURT:  And then we come back in October, or

20   whenever.  We review the individual verdict or the settlement

21   amounts.

22         MR. FENNELL:  What we will be asking the Court to

23   do -- when we come back in October, what we will be asking the

24   Court to approve -- and, again, this is a requirement under

25   Virginia law -- to approve the dispersement, a proposed

1    dispersement in each of the cases.

2         THE COURT:  Our next hearing here is to be in August.

3    Do you want to do it before then?

4         MR. FENNELL:  Yes, ma'am.  And the reason for that is

5    because of the structure of the Virginia settlements, we --

6    there's a particular deadline or -- July 10th is a significant

7    date in the settlement because that is the date after which we

8    can transfer the settlement funds into escrow and that would

9    allow -- if we have the Court's preliminary approval of the

10   process by that date, that would allow things to move forward

11   more quickly.

12        THE COURT:  Lisa, what are we doing on the --

13        COURTROOM DEPUTY CLERK URSO:  We could do the morning

14   of the 8th or 9th, Judge.  We have afternoon court.

15        (Discussion off the record at the Bench.)

16        MR. FENNELL:  If I said July 8th or 9th, I was

17   mistaken.  I meant --

18        THE COURT:  You said 9th or 10th.

19        MR. FENNELL:  Nine or ten, yes, ma'am.

20        (Discussion off the record at the Bench.)

21        THE COURT:  How about 9 o'clock in the morning on the

22   9th?

23        MR. FENNELL:  That would be fine, your Honor.

24        THE COURT:  Okay.  But I don't anticipate it will

25   take an hour.

1          MR. FENNELL:  Yes, ma'am.  We will do our best to

2     keep it to a half an hour or so.

3          THE COURT:  How about 25 minutes?

4          MR. FENNELL:  24 minutes, your Honor.

5          THE COURT:  Don't worry about it.  Okay.

6          MS. JOHNSON:  The second item on the agenda, your

7     Honor, is the Wayne Reed motion to set case for trial.  George

8     Nolan to my right will be addressing that motion.  Because

9     there was a question asked in one of the responses, I did want

10     to state from the start that the PSC fully supports Mr. Reed's

11     motion.

12          MR. NOLAN:  Good afternoon, your Honor.

13          THE COURT:  There arrived today -- no.  That came to

14     me -- this is an old motion.  Go ahead.  I'm sorry, I'm

15     looking at an old motion.

16          MR. NOLAN:  Your Honor, I'm George Nolan from

17     Nashville.  I represent a gentleman named Wayne Reed.

18          THE COURT:  Where do you anticipate this trial that

19     you're asking for is going to take place?

20          MR. NOLAN:  Your Honor, unless the defendants are

21     willing to waive lexicon, we would anticipate it would take

22     place in Nashville, in the Middle District of Tennessee.

23          THE COURT:  Well, how can I set a trial in Nashville?

24          MR. NOLAN:  I think that would have to be done, your

25     Honor, in coordination with the Chief Judge of the Middle

1   District of Tennessee.  So, there would have to be some

2   coordination in that regard.

3          Our concern, your Honor, is that Mr. Reed's wife died

4   more than two and a half years ago and they've been married

5   for 36 years and, unfortunately, Mr. Reed suffers from ALS,

6   also known as Lou Gehrig's Disease.

7          THE COURT:  I read the papers.  I understand what a

8   sad case it is.

9          Can I just pass it?  Because I have some suggestions

10  to deal with it in the big picture.  So, forgive me, but I

11  would like to come back to it.

12         MR. NOLAN:  Certainly, your Honor.

13         THE COURT:  So, the next item, the motions to

14  withdraw.

15         MS. JOHNSON:  Yes, your Honor.  There have been a

16  series of motions filed by the affiliated defendants to

17  withdraw.

18         THE COURT:  Do you have any objections to the

19  Tennessee Clinics' suggestion as to how this be done?

20         MS. JOHNSON:  I think, if what the Court is referring

21  to, that there needs to be successor counsel identified, we

22  agree with that.

23         THE COURT:  Well, people that they can talk to, that

24  people can talk to, so that they don't just disappear.

25         MS. JOHNSON:  Yes, but, your Honor, I think if you

```
1    look at Local Rule 83.5.2, there's actually a requirement that
2    counsel be identified.  That rule provides that the Court will
3    not recognize the appearance of a firm or professional
4    corporation unless it is accompanied by the appearance of at
5    least one attorney.
6           So, we would suggest that under the local rules,
7    there needs to be at least one attorney that is identified as
8    counsel of record, particularly because these -- there are
9    pending motions filed by these entities.
10          THE COURT:  In this case?
11          MS. JOHNSON:  Correct, your Honor.
12          THE COURT:  So, you're saying they cannot withdraw?
13          MS. JOHNSON:  Correct, your Honor.
14          THE COURT:  Okay.  Anybody wish to be heard?
15          MR. MORIARTY:  Matthew Moriarty for Ameridose.
16          First of all, Mr. Tucker, who is our local counsel,
17   and our firm complied with the Massachusetts Rules of
18   Professional Conduct, specifically, 1.16.
19          THE COURT:  But that's not what she's talking about.
20          MR. MORIARTY:  I'll get to what Ms. Johnson said.
21          There's no opposition to this by the clients or
22   otherwise.
23          THE COURT:  Could you please keep your voice up.
24          MR. MORIARTY:  There's no opposition to this by the
25   clients or otherwise.
```

1          What Mr. Tardio and Mr. Schramek suggested in a

2    response, not an opposition, was that this -- that there be

3    identification of counsel if there was going to be counsel.

4          Settlement has effectively taken Ameridose and GDC

5    and MSM out of this case because of the channeling

6    injunctions.  So, in essence, they're over already.  Once the

7    cases are actually dismissed pursuant to the PSC's motion to

8    show cause, that will be formalized.  They will not be

9    defendants anymore.  They do not need to make appearances.

10   So, the Rule that Ms. Johnson is referring to does not apply.

11   They will be third parties and any orders against them as

12   third parties, any discovery directed to them as third parties

13   will take their natural course at that point.  There is no

14   obligation for non-parties to have lawyers identified.  So, we

15   don't believe that the provision she's citing even applies.

16   Those motions should be granted.

17          THE COURT:  Anything else, Ms. Johnson?

18          MS. JOHNSON:  No, your Honor.  Although I did think

19   that the Tennessee Clinic Defendants and St. Thomas filed

20   responses.  I don't know if they wish to be heard on this

21   point.

22          THE COURT:  I'm sorry?

23          MS. JOHNSON:  I don't know whether the Tennessee

24   defendants may wish to be heard on this point.

25          MR. GIDEON:  We would, your Honor, for just a moment.

```
 1              THE COURT:  I'll hear you.

 2              MR. GIDEON:  We ask in the response to the motion to

 3    withdraw that they simply designate someone that we may

 4    contact with respect to these entities.  It doesn't have to be

 5    a lawyer, but we don't want to be in a position where we

 6    cannot contact these entities, and we just ask that they be

 7    required to do that as part and parcel of your order

 8    permitting withdrawal.  Thank you.

 9              MR. MORIARTY:  Yesterday I had email correspondence

10    with both Mr. Schramek and with Mr. Tardio, who is Mr.

11    Gideon's partner, and I thought we had this resolved.  I

12    identified that --

13              THE COURT:  Do you want to talk to him?

14              MR. MORIARTY:  -- to the best of our knowledge, there

15    is no successor counsel and, to the best of our knowledge, the

16    information on the Massachusetts Secretary of State's Website

17    is still accurate, and that's what I told them and they seemed

18    satisfied with the response.

19              MR. GIDEON:  Well, unfortunately, in terms of the

20    communications, the email I got from Mr. Tardio last night at

21    11 o'clock was still make sure that there is somebody we can

22    contact at each of these entities.  So, there must have been

23    some misunderstanding, but that's all we ask, is somebody we

24    can speak to and somebody we can contact at each of these

25    entities.
```

```
 1              THE COURT:  Who else wishes to be heard?
 2              MR. GAYNOR:  Just briefly, your Honor.  My name is
 3   Robert Gaynor.  I represent the individuals.  So, I'm not in
 4   the status of --
 5              THE COURT:  You represent whom?
 6              MR. GAYNOR:  The individuals.
 7              THE COURT:  The individual defendants?
 8              MR. GAYNOR:  That's correct.  We have a motion
 9   pending to withdraw.  We're not in the same category as
10   entities and I believe all of my clients are individually
11   represented with the exception of Mr. Chin, who has criminal
12   counsel who is well aware of this situation and well aware of
13   the motion, and no one has raised any objection --
14              THE COURT:  So, what do you want me to do?
15              MR. GAYNOR:  I would like you to allow my motion to
16   withdraw on behalf of the individuals.
17              THE COURT:  You don't object to that?
18              MS. JOHNSON:  We have no objection to that, your
19   Honor.
20              THE COURT:  Okay.  So, your motion to withdraw on
21   behalf of the individuals is allowed without objection.
22              MR. GAYNOR:  Thank you.
23              THE COURT:  Anybody else?
24              (No response.)
25              THE COURT:  And with respect to the Tennessee
```

1    defendants and -- I guess it's primarily the Tennessee

2    defendants, I will think about it and try to reconcile your

3    various positions and then rule on the motion.

4            All right.  That takes us to Item B.

5            MS. JOHNSON:  Yes, your Honor, the report to the

6    Court.  No. 4, the status of bankruptcy, we have two items to

7    bring to the Court's attention.  The first is that the PSC has

8    filed a motion to appoint Judge Neiman as the appeals

9    administrator.  It's a topic that we have addressed with the

10   Court before.

11           THE COURT:  I have allowed that.

12           MS. JOHNSON:  Excellent.  Thank you, your Honor.

13           The second, then, is the post confirmation officer's

14   motion for partial withdrawal of the reference, and I believe

15   Mr. Gottfried would like to address that.

16           THE COURT:  Hold on one minute.

17           Here, Lisa, is the motion, ruling on the motion.

18   Okay.

19           COURTROOM DEPUTY CLERK URSO:  Okay.

20           MR. GOTTFRIED:  Good afternoon, your Honor.  Michael

21   Gottfried for the post confirmation officer, Paul Moore.

22           This is really in sort of the nature of a report, in

23   that Mr. Moore's motion to withdraw the reference partially to

24   effectuate the settlement and give life to the tort trust was

25   just referred to you, I believe, on June 22nd.  We filed it

1    with the bankruptcy court on June 12th in accordance with the

2    statute.  The matter was referred to the District Court for

3    decision and then the matter was assigned to you on the 22nd.

4            So, the period for people to file any responses to it

5    has not yet expired.  I'm not anticipating that anybody will

6    oppose this because this is part of the plan and, obviously,

7    there still remains to be several things to be done in the

8    bankruptcy.  So, this is only a partial withdrawal of the

9    reference.

10           When the Court has an opportunity to look at the

11   motion, you will see that the specific items that are -- that

12   the Court is going to overseeing are laid out in Paragraphs

13   13(a) through (j) of the motion, which appear beginning at

14   Page 4 of the motion and then move on, you know, through Page

15   10.  It's basically -- because under the statutory scheme tort

16   claims must be resolved by the District Court, it basically

17   gives you the power to oversee that process, to appoint

18   Magistrate Judge Neiman non pro tunc, to appoint Ms. Riley non

19   pro tunc, et cetera.

20           So, I just wanted to call that to your attention.

21   Hopefully, there will be no objection in the time period.  I

22   would think that it's something that you might be able to rule

23   on without the need for it to pass the --

24           THE COURT:  When does the time for objection run out?

25           MR. GOTTFRIED:  I believe it's 14 days from June

1    22nd.  So -- I haven't quite calculated that out.  July 6th,

2    maybe, I'm hearing.

3             THE COURT:  Which is it?  July what, 4th?

4             COURTROOM DEPUTY CLERK URSO:  6th.  6th, Judge.  July

5    6th.

6             THE COURT:  July 2nd?

7             MR. GOTTFRIED:  6th.

8             MS. JOHNSON:  6th.

9             THE COURT:  6th.

10            MR. GOTTFRIED:  So, we would ask that you act on

11   that, assuming there's no objection, without a further

12   hearing, if that suits the Court.

13            THE COURT:  Okay.

14            MR. GOTTFRIED:  The only other thing -- and I know

15   this is the bankruptcy portion of the report.  The only thing

16   I wanted to make the Court aware of is that, you know, as you

17   know, as a result of the settlement, Mr. Fern is no longer

18   having his services paid for by the insurer and I just wanted

19   to make the Court aware that prior to that occurring, he did

20   perform searches and identified additional documents that

21   relate to the defendants who are actively still defending

22   these cases and placed them into two repositories.

23            Specifically, he identified documents with respect to

24   St. Thomas, St. Thomas Out-Patient Neurological Center,

25   Specialty Surgery, Premier Orthopedic, and Box Hill Surgery

1    Center, and we placed into the repository an additional 68,500

2    pages to U.S. Legal and another 1,375 pages to Russ Omni in an

3    effort to facilitate, hopefully, the proper resolution of

4    those plans.

5            THE COURT:  Thank you.

6            MR. GOTTFRIED:  Thank you, your Honor.

7            THE COURT:  Okay.  Insurance actions.

8            MS. JOHNSON:  There are two brief reports, your

9    Honor, as to the insurance declaratory judgment actions

10   involving Ameridose that are before Judge Saylor in this

11   district.  The status conference for those actions is set for

12   late July.  At the last status conference the plan

13   confirmation date had either just passed or was about to pass,

14   so there was an agreement to let things play out for a bit

15   before revisiting.

16           On the second, as to Specialty Surgery Center, I

17   believe Mr. Chalos will address that.

18           THE COURT:  Okay.  Then State Farm.

19           MR. CHALOS:  Yes, your Honor.

20           State Farm is an insurer for one of the Tennessee

21   clinics, not St. Thomas, but a separate clinic.  State Farm

22   has filed a declaratory judgment action and as part of that

23   named both the clinic and its -- one of its physicians as well

24   as other parties, including the individual plaintiffs, our

25   clients, as defendants in the declaratory judgment action.

1          So, with the agreement of the plaintiff, State Farm,

2    we went to the District Court, Judge Sharp in Nashville, and

3    asked him to appoint Mr. Stranch and me to serve as lead

4    counsel for the individual defendants, meaning our clients,

5    the victims of the meningitis catastrophe, and the Court -- I

6    don't know if the Court has entered that yet.  I don't think

7    so, but it was submitted by agreement.  We had notified the

8    Court in a telephone conference that we intended to do that.

9    So, we expect that he'll sign that order.

10         THE COURT:  The individual defendants are who?

11         MR. CHALOS:  Are the victims and their families.  The

12   -- in other words, the plaintiffs in the MDL case are now

13   procedurally defendants in the insurance declaratory judgment

14   action.

15         THE COURT:  And has the case made any progress beyond

16   that?

17         MR. CHALOS:  No.  They just filed it a month or so

18   ago.

19         THE COURT:  Okay.  All right.  Thank you.

20         MS. JOHNSON:  That brings us to No. 6, the status of

21   discovery.  To bring to the Court's attention, there has been

22   a motion to quash filed by the Massachusetts Board of

23   Registration of Pharmacy.  That motion is not --

24         THE COURT:  That will go to Judge Boal?

25         MS. JOHNSON:  I expected so.  That motion is not

1    ripe, but we did want to inform the Court.

2              MAGISTRATE JUDGE BOAL:  Yes.  And I'm going to

3    schedule it for oral argument on August 5th.

4              THE COURT:  Now, the next item I want to skip for the

5    moment and come back to.

6              MS. JOHNSON:  Understood, your Honor.

7              I also had one other report that's not the agenda,

8    that I learned this morning that the FDA has produced

9    documents to the U.S. Legal repository.  I do not know yet

10   whether U.S. Legal has processed them such that they're

11   available to the other entities, but at least they have made

12   their way to U.S. Legal at this point.

13             THE COURT:  Terrific.

14             MS. JOHNSON:  That brings us to 6(c), which is just a

15   recognition that the Court has entered an order denying

16   Cumberland Medical's motion to quash.  Because that had never

17   showed up on an agenda, I thought we should acknowledge it

18   here.

19             And then that brings us to No. 7, the status of the

20   litigation track, and as to 7(a), I will ask Mr. Fennell to

21   address that with the Court.

22             MR. FENNELL:  Your Honor, this is -- is this on?

23             THE COURT:  There's a button at the back.

24             MR. FENNELL:  This is pursuant to the Court's May

25   28th order listing -- a long list of pending motions that are

1    pending in individual cases within the MDL.

2            The PSC filed its report on Monday.  That's Docket --

3    or Document No. 1999, and I would just like to summarize for

4    the Court real quickly, the majority of those motions that

5    were identified in the May 28th order involve cases with

6    allegations against Insight Health Corporation and the other

7    Virginia defendants.

8            Now, since we are now working our way through our

9    settlement process, all of the conditions that have to play

10   out in our settlements, we anticipate that those motions will

11   go away when those cases are dismissed, which should be

12   comparatively soon.  So, that will take care of the --

13           THE COURT:  Many of them appear to be, more or less,

14   done already by virtue of the settlement.

15           MR. FENNELL:  Yes, ma'am.  And we're approaching the

16   date where we can dismiss those cases and those will all go

17   away, and that will take care of the majority of the pending

18   motions in the Court's May 28th order.

19           As for the remaining motions, many of them are mooted

20   for several reasons, including settlements and prior orders of

21   this Court addressing motions to dismiss, and the like.

22           The PSC will be contacting counsel for the parties in

23   those cases and asking them to make appropriate filings in

24   their individual dockets to clean up those motions.

25           THE COURT:  Okay.  Thank you.

1        MR. FENNELL:  If it pleases the Court, it would be

2   the PSC's proposal moving forward to review the current case

3   management orders and, if necessary, propose an amendment to

4   the case management orders directing that motions going

5   forward be filed in the central MDL docket.  So, it would be

6   easier for the Court to track all of those.

7        THE COURT:  I assume for counsel, too.

8        MR. FENNELL:  Yes, ma'am.

9        THE COURT:  Okay.  Thanks.

10        MS. JOHNSON:  The Court has issued an order granting

11   the PSC's motion for order to show cause.  Thank you for that,

12   your Honor.  I think everyone thanks you for that.  It

13   resolves a majority of cases in this MDL, we think -- or,

14   rather, will once the dismissals become effective.

15        THE COURT:  So, that takes care of Ameridose's motion

16   and PSC's motion as well.

17        MS. JOHNSON:  I believe so, yes.  Does Mr. Moriarty

18   agree?

19        MR. MORIARTY:  We do.

20        THE COURT:  Okay.

21        MS. JOHNSON:  One thing I did want to point out to

22   the Court there.  I think Mr. Fennell has alluded to it, but

23   just to say it expressly.  The PSC's proposed order seeking

24   the motions to show cause did not cover the Virginia

25   defendants' settlement for reasons that are particular to the

```
 1    Virginia settlement, but there will be in appropriate time
 2    motions filed with this Court to address the remaining cases
 3    involving Insight.
 4              THE COURT:  Okay.  Pro se liaison.
 5              MS. JOHNSON:  Ms. Martin asked me to report to the
 6    Court that she has no activity to report this month.
 7              THE COURT:  Imagine, all the pro se's went away.
 8              MS. JOHNSON:  Finally, that brings us to No. 9, the
 9    status of appeals.  There is technically an appeal still
10    pending in the First Circuit, although that has been
11    functionally, if not officially, stayed pending the resolution
12    of the settlements.
13              THE COURT:  And the next dates we have already
14    previously agreed to, yes?
15              MS. JOHNSON:  Yes, we have, your Honor.  If possible,
16    we would like to set the schedule for the October conference.
17              THE COURT:  Sure.
18              MS. JOHNSON:  I would suggest sometime the second
19    week of October, if that works for the Court.
20              COURTROOM DEPUTY CLERK URSO:  Yes, it does.  Would
21    Tuesday, Wednesday or Thursday...
22              MS. JOHNSON:  I think Wednesday usually works well.
23              COURTROOM DEPUTY CLERK URSO:  Wednesday, October
24    14th, at 2:00.
25              THE COURT:  Does that work for you?
```

1           MAGISTRATE JUDGE BOAL:  Yes.

2           MS. JOHNSON:  That works for the Plaintiffs' Steering

3    Committee.

4           THE COURT:  And you will, as usual, let me know

5    whether there are motions to be heard either before or after

6    the status conference?

7           MS. JOHNSON:  Yes, your Honor.

8           THE COURT:  On that day.

9           Okay.  Now, that brings me to (C), when I really

10   wanted to talk to you about some issues.

11          Judge Boal and I sat down together for a lengthy

12   conference to try to figure out, really, how we should manage

13   the cases from here on in, and as we were talking, it occurred

14   to us that there really only -- it seemed to me that there are

15   really only two possibilities:

16          One is that the cases are tried here with lexicon

17   waivers or that the cases go back if there are no waivers, and

18   that our trying to set up a trial schedule without

19   understanding what the defendants are planning to do with

20   respect to those waivers doesn't seem to make a lot of sense

21   and it makes a lot of anxiety, not only for counsel, but also

22   for the Court.  We don't know where we're going to go.

23          And so, what I propose is that the defendants, within

24   a very short time, make a choice as to whether they want to --

25   whether they're going to waive or not.  If they don't waive,

we will proceed with the common discovery, fact discovery and
expert discovery and get it done as quickly as we can, which I
think should be early next year, at the latest, and then the
cases would be sent back for trial to their original
jurisdictions.

        If there are waivers, then we will proceed, perhaps
in a slightly faster fashion, with the common discovery, move
on to individual discovery of the individual cases in the
order in which they are set up, having in mind both the
desires of the defendants and the plaintiffs as to the order
in which they should be done, and then I think we're in a
somewhat sort of Bellwether situation, but to talk about
Bellwether trials now, without knowing who is going to try
them, just doesn't seem to make a lot of sense.

        So, I propose to enter an order that spells out the
details of what I have only very broadly sketched now and
would like your -- it is an order, but I, nonetheless, request
any input from all parties so that we can fine tune the order,
if necessary, and that is why I wanted to skip over some of
the other things that you were talking about, including Mr.
Reed.  I do not know where that case is going to be tried now.
So, to say it's going to be tried on a particular day is
really not a very useful exercise.

        MR. NOLAN:  Your Honor, George Nolan.

        I would like to point out one thing.  Your Honor,

1   there is a third alternative I don't think that the Court has

2   considered, which is that the Court does have statutory

3   authority to try cases here against these defendants pursuant

4   to 28 U.S.C. Section 157(b)(5).  Your Honor, that is the

5   statute that authorizes courts in -- district courts in cases

6   where a bankruptcy proceeding is pending to hear the tort

7   claims that affect that particular bankruptcy proceeding.  So,

8   I guess I would, very respectfully, on Mr. Reed's behalf,

9   encourage the Court to take a look at that particular statute.

10           THE COURT:  Do you prefer to be here?

11           MR. NOLAN:  Your Honor, we would be happy to try the

12   cases here and we would prefer to try the case here if that

13   results in a more swift trial schedule.

14           THE COURT:  Well, that is one thing.  The other thing

15   is that there were a number of cases that were originally

16   filed here, not only the bankruptcy court, but here, and those

17   need to be considered as well.

18           MR. NOLAN:  Certainly.

19           And another very respectful suggestion, your Honor,

20   is that we think the best way for the Court to posture this

21   case to move forward more efficiently is to address soon the

22   legal issue that is bogging down the case, and that is the

23   issue of whether joint and several liability will apply to the

24   claims against these defendants.

25           Now, two days ago --

1          THE COURT:  Joint and several liability among whom?

2          MR. NOLAN:  Among the tort-feasors that are presently

3     in the case, and here's --

4          THE COURT:  But not including -- I mean, as I

5     understand it, either -- yes, Tennessee defendants have some

6     kind of what they call comparative fault, but isn't really

7     comparative fault.

8          MR. NOLAN:  That's right.  What the Tennessee

9     defendants want to do at trial is blame empty chairs.  They

10    want to ask the jury to attribute fault to parties that have

11    already settled or parties who are immune from suit, such as

12    the FDA and the Massachusetts Board of Pharmacy.

13         Now, two days ago the PSC filed a brief on the choice

14    of law question at the Court's request and has explained in

15    that brief, under the applicable cases and choice of law

16    rules, Massachusetts law should apply to the issue of whether

17    the clinics who chose NECC as their supplier of steroids and

18    sold and distributed those products to their patients, whether

19    they can be held jointly and severally liable for the harm

20    caused by the product.

21         So, the PSC in that brief explains that under the

22    applicable choice of law rules, Massachusetts law of joint and

23    several liability should govern that particular issue.

24         Now, if the Court agrees with the PSC's position,

25    then this onslaught of comparative fault discovery in which

1   we're becoming mired becomes unnecessary.

2           THE COURT:  Now, you have -- you're relying on your

3   motion concerning choice of law to resolve this issue?

4           MR. NOLAN:  In part, yes, your Honor.  Under the

5   Court's present briefing schedule, the briefing will be

6   thoroughly complete next month on that particular issue.

7           Now, it's also important for the Court to understand

8   that if the Court does not agree with the PSC and does not

9   apply Massachusetts law of joint and several liability to

10  these claims, then the Court will need to make another

11  decision, and that is that in Tennessee, although that state

12  has generally abolished the doctrine of joint and several

13  liability, it has retained it in certain contexts.  In

14  particular, under the Tennessee product-liability statute.

15          So, it's the plaintiffs' position that the doctrine

16  of joint and several liability does apply to the plaintiffs'

17  product-liability claims and that these defendants are not

18  allowed to reduce their degree of responsibility by trying to

19  attribute fault to parties associated with NECC, because under

20  Tennessee law, because these defendants sold and distributed

21  this product in Tennessee, they are required to stand behind

22  the product and be responsible for all harm caused by the

23  product.

24          Now, obviously, the Tennessee defendants disagree

25  with the plaintiffs on this particular issue, but that is an

1    issue, your Honor, that if it -- depending upon how it comes

2    out, it may make this onslaught of comparative fault discovery

3    unnecessary.  So, we encourage the Court to resolve that issue

4    as soon as possible.

5         So, I think it could be a one-step process, depending

6    on where the Court comes down on the choice of law question,

7    or it could be a two-step process if the Court determines it

8    needs to dig a little bit more deeply into Tennessee law, but

9    that's something that the parties can help the Court with, and

10   the outcome will be very important to how much of this current

11   discovery is necessary.

12        MR. GIDEON:  Your Honor --

13        THE COURT:  What about the cases filed in this

14   district, not the bankruptcy cases, but there were a bunch

15   that were filed directly in the District Court.

16        MS. JOHNSON:  Yes, your Honor.  There are a number

17   that I can think of.  It's unclear to me right now how many

18   that will be once all the settling defendants are dismissed,

19   but I know I have at least one.  So, I know there will be

20   something here that would require this Court to try if it is

21   not otherwise settled.

22        I would point out also, I think, your Honor, you

23   identified two possibilities:  Lexicon waiver and trial here

24   or no waivers and trial in Tennessee.

25        Mr. Nolan raised a third possibility that I think is

```
1    important for us to explore and if the Court would like a
2    short brief on it, we're happy to submit that, which is
3    whether --
4              THE COURT:  This is the bankruptcy issue.
5              MS. JOHNSON:  -- because these cases were transferred
6    here under 157(b), there may be jurisdiction under 157(b).
7    It's an issue the PSC has been looking at.  I wouldn't want to
8    give you a position today, but I think Mr. Nolan is on point
9    to suggest that we look at that issue.  There is then a fourth
10   possibility --
11             THE COURT:  Well, I would appreciate a memorandum on
12   that, and then any opposition by Tennessee, I assume.
13             MS. JOHNSON:  Should we say ten pages, your Honor?
14             THE COURT:  Fine.
15             MS. JOHNSON:  Okay.  There is a fourth possibility
16   and I hate to add to the mix, but I want to make sure all of
17   those options are on the table as we plot a course forward.
18   The fourth is that this Court could actually sit by
19   designation in Tennessee to preside over these cases.
20             THE COURT:  I have considered and rejected that.
21             MS. JOHNSON:  Okay.  Well, then there are only three
22   options.
23             I will also say, I think that the Court's suggestion
24   that we decide this issue is a good one and I think it will
25   help us move things forward, but I also --
```

1          THE COURT:  It will help Judge Boal, too, because now

2    it's such a mishmash, it's very difficult and she's done an

3    extraordinary job of keeping you going, but until we get

4    clarity as to trials, to run a schedule is really quite

5    impossible, and we can't even begin to talk about Bellwether

6    trials until we have some understanding of the question that

7    we have just been talking about now.

8          MS. JOHNSON:  Yes, your Honor.

9          I would say two quick things also.  We agree with Mr.

10   Nolan that the choice of law issue is very determinative of

11   what the future path of this litigation looks like as well.

12         And, finally, that the PSC had injected a concept in

13   earlier briefing of the notion of cases being pretrial ready

14   by a certain date.

15         If we do wind up in a situation where cases are going

16   to wind up being sent back to Tennessee, for example, it may

17   still be appropriate for the Court to set deadlines by which

18   the case should be fully worked up and ready to go and trial

19   ready.

20         THE COURT:  Well, it seems to me the only thing left

21   to do when they go back is the individual, essentially,

22   medical discovery with respect to the plaintiffs.  Is there

23   more than that?

24         MR. STRANCH:  No, your Honor.  The PSC's position

25   would be that when the case -- if the cases do get sent back,

1    they are sent back trial ready.  So that when the case arrives

2    back in Tennessee, there would just be the -- all that would

3    need to be done is a trial date picked and the case would go

4    to trial.  So --

5          THE COURT:  No discovery of the individual

6    plaintiffs' causation?

7          MR. STRANCH:  That would go forward here as part of

8    the larger issue, because if the Court -- if there's 88

9    plaintiffs that want to raise causation issues on summary

10   judgment, defendants want to raise causation issues on summary

11   judgment, there is still the benefit of having this Court to

12   set down and look at it as a whole, because your ruling on one

13   summary judgment motion, just like on the motion to dismiss at

14   the beginning, will inform what happens with all the other

15   cases.  And so, that should all be done as part of this and

16   when the cases are sent back, they're sent back trial ready.

17         THE COURT:  But how can I rule on summary judgment

18   with respect to causation?

19         MR. STRANCH:  The individual discovery would all go

20   forward here in the MDL as well.

21         THE COURT:  Is that agreed by all parties?

22         MR. GIDEON:  Absolutely not.  We respectfully

23   disagree with the last 17 minutes, 20 minutes.

24         THE COURT:  Well, even if you do disagree, I think it

25   is the individuals -- the additional individual discovery

1    concerning causation that should be done with great speed.

2              MR. GIDEON:  Absolutely, I concur with that.

3              THE COURT:  I mean, like maybe two weeks.

4              MR. GIDEON:  Well, with 130-some cases, two

5    weeks might be ambitious.

6              THE COURT:  Well, they're not all going to go to

7    trial at the same time.

8              MR. GIDEON:  Right.

9              But with respect to what you have heard thus far

10   today, we've also looked at the issue of whether Section

11   157(b)(5) has any application now that the bankruptcy is

12   largely completed.  It's closed as of June 4th.  And this

13   Court's decision in *Quincy Medical Center*, January 5th, 2015,

14   tells me that it has precious little application to continue

15   jurisdiction here.

16             The scenario Mr. Nolan talks about, Mr. Stranch talks

17   about is principally Tennessee plaintiffs suing Tennessee

18   healthcare providers for injuries that occurred in Tennessee,

19   and we respectfully submit that while common discovery should

20   be completed here, truly common discovery, the rest of the

21   cases should be remanded to Tennessee, and we question whether

22   there is continuing federal jurisdiction.  There is no

23   diversity.  There's no federal question.

24             THE COURT:  Well, let me suggest --

25             MR. GIDEON:  That's an open issue.

1          THE COURT:  -- that the plaintiffs file a brief on

2     this question by -- ten days from now and then the defendants

3     who wish to respond can have ten days to respond after that,

4     and then maybe what we can do is have oral argument on it at

5     the next conference in August, I think.

6          MR. GIDEON:  Okay.

7          THE COURT:  I've forgotten now when it is.

8          MAGISTRATE JUDGE BOAL:  August 5th.

9          THE COURT:  August 5th.  So, we can stretch out the

10    schedule in such a way that we're ready to have argument.  I

11    think it's an important issue.  I welcome your input.  And I

12    think it may still be a good idea to try to go forward with

13    the suggestion I had made or think about it and we'll make a

14    final decision after I have considered the 157 whatever

15    argument that you make.

16          And, also, please add to this what should happen if

17    there are any Massachusetts-filed cases in any number.  If

18    there's just one, then we obviously don't worry too much about

19    it, but it will help in structuring the discovery and the

20    disposition of these cases if we can get this resolved.  So, I

21    thank you all for that.

22          MS. GREER:  Your Honor, if I may.  Marcy Greer for

23    the St. Thomas Entities.  And just a couple of quick points:

24          One is that I believe there are very, very few cases

25    from Tennessee that have been filed in federal court

1   originally in Massachusetts.  I think there are only --

2           THE COURT:  Well, you can mention that in your brief

3   and tell me that they are still in a different place from all

4   the others.

5           MS. GREER:  Okay.

6           THE COURT:  But there's no sense in having argument

7   on it now because we haven't really -- I, frankly, haven't

8   thought about this particular question that was raised at the

9   bankruptcy and the reference to bankruptcy.

10          MS. GREER:  Sure.  And we would appreciate the

11   opportunity to be heard on that.

12          We would also appreciate that the Court give us the

13   opportunity to be heard on the choice of law issues.  They've

14   gotten a chance to now go in and make all their arguments --

15          THE COURT:  Appreciate being heard on what?

16          MS. GREER:  The choice of law issues.

17          THE COURT:  Well, that's the issue.  That is what

18   gives rise to a lot of this now.

19          MS. GREER:  But they're suggesting --

20          THE COURT:  The bankruptcy and the choice of law

21   issues are the ones that we're now talking about now, I think.

22          MS. GREER:  Yes, your Honor, that's true, but they're

23   suggesting that the choice of law issues go -- well, if they

24   are ripe and Massachusetts applies, joint and several

25   liability applies, that there's no need for this comparative

1   fault discovery.  That's not true.  As we briefed in our

2   three-page brief that we filed earlier --

3          THE COURT:  That Judge Boal will take care as it

4   arises.

5          MS. GREER:  Okay.  But they have represented that it

6   will make it go away and we wish to be heard on that.

7          THE COURT:  Oh, I know.  What's next, Ms. Johnson?

8          MS. GREER:  Thank you, your Honor.

9          MS. JOHNSON:  Well, your Honor, I had one question I

10  think for the Court.  I think you had suggested earlier that

11  you may file an order or a proposed order on lexicon.

12         THE COURT:  Well, I wonder whether I should do that.

13  It may be helpful if I do something like that simply to tell

14  you where I am, having not thought about the bankruptcy fillip

15  that you just raised.  So, I'll call it something.

16         MS. JOHNSON:  I just wanted to tell the Court, I do

17  think that would be helpful --

18         THE COURT:  Yes.

19         MS. JOHNSON:  -- to have that, if that's possible.

20         THE COURT:  Okay.  Really, the object of this is to

21  get a framework for Judge Boal to deal with the discovery.

22  It's very difficult now.  And to get some final date when the

23  trials can begin as soon as possible.

24         MR. STRANCH:  Your Honor, I apologize.  I'll be very

25  brief.

```
1              I just wanted to ask you a clarification question to
2     make sure we're addressing exactly what you want.  You would
3     like a ten-page brief from us in ten days that addresses --
4              THE COURT:  Ask Mr. Nolan.  He suggested it.
5              MR. STRANCH:  Okay.
6              MR. NOLAN:  I understand, your Honor.
7              MR. STRANCH:  Okay.  We're good.
8              THE COURT:  You'll tell him, right?
9              MR. NOLAN:  I'll fill him in.
10             THE COURT:  Maybe you can tell all of us exactly what
11    you have in mind and --
12             MR. NOLAN:  What I understand is you've asked for a
13    brief within ten days addressing the issue on whether under 28
14    U.S.C. Section 157(b)(5), this Court could try the cases in
15    this courtroom.
16             THE COURT:  Regardless of lexicon?
17             MR. STRANCH:  Right.
18             MR. NOLAN:  That's right, regardless of lexicon.
19             THE COURT:  Okay.  That's the essential issue.
20             And I think with that and lexicon and -- or sending
21    the cases back and then also resolving the choice of law issue
22    having to do with what they erroneously called comparative
23    fault should clear the decks, right?  Clear the air.
24             Okay.  Now we continue with your suggestion under
25    Part C.
```

1          MS. JOHNSON:  Thank you, your Honor.

2          I think that brings us -- that functionally addresses

3    everything that we listed in No. 11, the motions for pretrial

4    schedules.  So, I think that brings us to No. 12, which is

5    Ameridose's motion for protective order and to quash a

6    deposition notice.

7          THE COURT:  Is this something that we're hearing

8    today?

9          MAGISTRATE JUDGE BOAL:  I guess I'm not quite sure

10   why we're having additional argument.  It seems as if the

11   issues are all the same as what was discussed at the hearing

12   before me last month.

13         MR. MORIARTY:  In all fairness to the St. Thomas

14   Entities, you allowed me to argue --

15         THE COURT:  Excuse me.  Why don't you sit down and

16   pull the thing down.  It's much easier.

17         MR. MORIARTY:  -- you allowed me to argue, even

18   though their brief in opposition had not been filed.  So,

19   actually, to be efficient, the ball would be in their court to

20   decide if they want to talk about this today before both of

21   your Honors and then I would get a brief opportunity to reply.

22         MAGISTRATE JUDGE BOAL:  But I think your motion

23   raised -- it's, obviously, a different movant, but the same

24   issues that were raised by other entities, and I understand

25   St. Thomas and the Tennessee Clinics' position on it.  I just

```
1    have to decide which side I agree with.

2           MR. MORIARTY:  Well, actually -- and I don't mean to

3    cut you off, Marcy, but we originally joined the individuals'

4    motions on the Fifth Amendment issue.  We filed a separate

5    motion for protective order because there are other issues

6    regarding Ameridose and what we consider to be the law of

7    Tennessee.

8           MAGISTRATE JUDGE BOAL:  In fact, I read your motion

9    and the opposition before I got here today and I don't think I

10   need any further argument.

11          MR. MORIARTY:  Okay.  And then we filed a reply -- a

12   motion for leave to file a reply brief.

13          MAGISTRATE JUDGE BOAL:  And it was granted this

14   morning.

15          MR. MORIARTY:  Yes.  Do you need us to refile --

16          MAGISTRATE JUDGE BOAL:  No.

17          MR. MORIARTY:  -- what we already filed as Exhibit A?

18          MAGISTRATE JUDGE BOAL:  That is the custom in this

19   courthouse.

20          MS. JOHNSON:  I think, your Honor, then, we have

21   heard argument -- Judge Boal has heard argument on all of the

22   remaining motions listed under (C).  So, that brings us all

23   the way to (D) on Page 5.

24          There are just a few things that I would bring to the

25   Court's attention there in anticipation of next time.  We've
```

1  mentioned the Massachusetts Board of Pharmacy's motion.  There

2  is also a motion by Ameridose to destroy 100 pallets of paper

3  records.  That is not yet fully briefed, but will be next

4  time.

5          And, finally, there are two substantive motions to --

6  every motion to dismiss is substantive.  I don't know why I

7  said that.  There are two motions to dismiss that I believe,

8  although counsel still -- and one of them still addresses the

9  schedule.  I believe those will be ready for next time.  So,

10  there may be substantive motions to be heard next time around.

11          THE COURT:  Okay.

12          MS. JOHNSON:  And that's it.

13          THE COURT:  Is that it for the PSC?

14          MS. JOHNSON:  That's it, your Honor.

15          THE COURT:  Does anybody else have any issues to

16  discuss that we have not already discussed?

17          Somebody on the telephone?  It was a bird.

18          Thank you all.  And I will see you in July.

19          MS. JOHNSON:  August, your Honor.

20          THE COURT:  August.  August.

21          MS. JOHNSON:  Thank you, your Honor.

22          MR. STRANCH:  Thank you, your Honor.

23          THE COURT:  And I thank you for your assistance and

24  also for the briefing that I look forward to.  Court is in

25  recess.

```
 1              (Adjourned, 2:51 p.m.)

 2

 3

 4                    C E R T I F I C A T E

 5         I, Catherine A. Handel, Official Court Reporter of the

 6   United States District Court, do hereby certify that the

 7   foregoing transcript, from Page 1 to Page 41, constitutes to the

 8   best of my skill and ability a true and accurate transcription of

 9   my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

10   Re: New England Compounding Pharmacy, Inc., Products Liability

11   Litigation.

12

13   June 28, 2015          /s/Catherine A. Handel
     Date                   Catherine A. Handel, RPR-CM, CRR
14

15

16

17

18

19

20

21

22

23

24

25
```