## FIRST AMENDED INSIGHT CLAIMS RESOLUTION FACILITY PROCEDURES ("ICRFP")

## INTRODUCTION AND GENERAL PROVISIONS

An INSIGHT CLAIMS RESOLUTION FACILITY FOR PERSONAL INJURY AND WRONGFUL DEATH CLAIMS (the "ICRF") is hereby established in accordance with the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. (the "Plan"), the Tort Trust Agreement (the "Tort Trust Agreement"), the latter of which establishes the Tort Trust (the "Tort Trust"), and the Provider Settlement Agreement dated February __, 2015 (the "Settlement Agreement") by and between Insight Health Corp. ("Insight"), its insurers Lexington Insurance Company ("Lexington") and Darwin Select Insurance Company ("Darwin") (collectively, the "Insight Insurers"), Image Guided Pain Management, PC ("IGPM"), Dr. John M. Mathis, ("Mathis"), Dr. Robert F. O'Brien ("O'Brien") (collectively, the "Doctors"), their common insurer, Medical Mutual Insurance Company of North Carolina ("Medical Mutual"), Virginia Plaintiffs,[1] and Paul D. Moore, in his capacity as Trustee for the NECC Chapter 11 bankruptcy estate (the "NECC Trustee").[2] Collectively, Insight, IGPM, and the Doctors are referenced herein as "Virginia Insight Providers." The Settlement Agreement resulted from a lengthy mediation

---

[1]  Virginia Plaintiffs and their counsel are identified in Attachment A. These Virginia Plaintiffs filed timely lawsuits against the Virginia Insight Providers and participated directly in lengthy mediation process that resulted in the Settlement Amount as defined in the Settlement Agreement.

[2]  Unless otherwise defined herein, all capitalized terms used in these ICRFP and not otherwise defined herein shall have the meanings assigned to them in the Settlement Agreement, the Plan, and/or the Tort Trust Agreement.

process that formally began on August 22, 2014 and continued until the date of the Settlement

Agreement (the "Virginia Mediation"). Counsel for the Virginia Plaintiffs participated in the

Virginia Mediation and are referred to herein as "Virginia Counsel."

    A.   <u>Virginia Claimants.</u>

    Pursuant to the Settlement Agreement, "Claimant(s)" mean the Virginia Plaintiffs and all

other persons who have filed timely proofs of claim or PITWD Addenda in the NECC Chapter

11 Case, or who have been granted leave to file a late claim,  and have NECC Claims[3]  against

Insight, IGPM and/or the Doctors for personal injury or wrongful death arising out of the

injection(s) of methylprednisolone acetate ("MPA") obtained from New England Compounding

Pharmacy, Inc. ("NECC"), lot ##s 05212012@68, 06292012@26, or 08102012@51, (the "Three

Contaminated MPA Lots") at the Insight Imaging clinic in Roanoke, Virginia. Claimant(s)

demonstrating the eligibility requirements set forth herein are "Eligible Virginia Claimants."

"Claimants" include decedents and estate administrators or executors and any person meeting the

eligibility requirements of Section III.   Any person whose only claim is one for loss of

consortium damages associated with another person or relative's injection is not an Eligible

Virginia Claimant and cannot recover under this ICRFP.   If the loss of consortium claim is only

a part of an otherwise Eligible Claim, then the Claimant shall not be deemed ineligible, but there

---

[3] **"NECC Claims"** means any and all Claims asserted or that could be asserted by any Person against Insight, IGPM, the Doctors and/or any of the Insurers for personal injury, tort, wrongful death, medical monitoring, or any other economic or noneconomic injury or damage, based upon, arising out of or in any way related to the purchase or administration by or on behalf of Insight, IGPM and/or the Doctors of injectable methylprednisolone acetate or any other drugs or products compounded, produced, sold or distributed by or on behalf of NECC.

و

shall be no award of points under the Matrix for such a claim of loss. Similarly, other than the estate of a decedent, any person whose only claim is one for loss of economic damages associated with another person or relative's injection is not an Eligible Virginia Claimant and cannot recover under this ICRFP. The filing of a Virginia Claimant Compensation Claim Form (as defined below) constitutes participation by the Virginia Claimant's family members in the primary Claim, or the Class D Estate Claim,, and the Class D Consortium Claims of such family members shall be deemed released by the treatment afforded to the Virginia Claimant pursuant to these ICRFP.

B.    Virginia Provider Fund.

As defined and provided in the Settlement Agreement, certain portions of the Settlement Amount are to be segregated and held for the benefit of the Claimants. This segregated fund is defined as the "ICRFP Segregated Amount" (which, under the Tort Trust, is a Provider Fund). The funds comprising the ICRFP Segregated Amount are referred to herein as the "Virginia Provider Fund." The Settlement Agreement and the payments to be made to the Claimants under these ICRFP do not and will not result in "payment in full" to any of the Claimants for their NECC-related claims as that term is defined under 11 U.S.C. §§ 509(c) and 502(c).

C.    Discrete Virginia Provider Fund.

The ICRF is established in addition to and separate from the Claims Resolution Facility provided in the Plan (1) to evaluate claims by the Claimants according to the procedures established herein, with the least practicable cost, (2) to determine a fair and equitable

ی

compensation amount to be distributed from the Virginia Provider Fund for each Qualified Virginia Claim (as defined herein), and (3) to effectuate such distributions to Qualified Virginia Claimants (as defined herein) as expeditiously as possible.

D.   <u>Appointment of the Insight Provider Settlement Administrator.</u>

To facilitate, effectuate and implement the purposes of these ICRFP, Edgar C. Gentle, III is hereby retained and appointed as Insight Provider Settlement Administrator ("IPSA") to execute the functions described herein in accordance with the terms of these ICRFP, the Tort Trust Agreement and any applicable order of the MDL Court.  The IPSA shall oversee all aspects of the ICRF and shall distribute to the Tort Trustee written instructions for the distribution of Virginia Provider Funds to Qualified Claimants. In the event that the IPSA resigns or is removed from office or is otherwise unable to perform the functions of the IPSA, a successor IPSA shall be recommended by Virginia Counsel subject to confirmation by the MDL Court and opportunity to be heard.  The IPSA shall receive reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings and shall be reimbursed by the Virginia Provider Fund for his reasonable expenses, including travel expenses, reasonably required and incurred in the performance of his duties in accordance with the provisions of these ICRFP and the provisions of any retention agreement between the Tort Trustee and the IPSA. The IPSA and those engaged with him hereunder shall be afforded the rights and privileges of Provider Settlement Administrators under the Tort Trust Agreement, including indemnification as set forth therein.

E.      <u>Additional specific authority of the IPSA.</u>

The IPSA shall be delegated and assigned full authority to act as follows or in any other manner reasonably required in performance of his tasks and responsibilities:

1. The IPSA shall  communicate with Claimants as required,  receive and process claims,  provide advice on forms, procedures and awards under these ICRFP, negotiate and resolve liens if requested to do so (consistent with these ICRFP, the Plan and the Tort Trust Agreement), undertake any other administrative or clerical tasks necessary in the performance of his duties, and, as necessary and/or requested in connection with Special Circumstances Petitions (*see* Section V(G) *infra*) or otherwise, consult with, provide information and/or support to, and/or be a resource for the IPSCA being appointed under these ICRFP.

2. The IPSA may alter the claims procedures set forth in these ICRFP in such a way as he shall deem expeditious and fair; provided however, that no procedural modifications shall substantively alter the point allocation amounts, the eligibility requirements, the grounds for appeal, or the substantive rights and penalties as set forth in these ICRFP (including those within the Points Matrix (Attachment B), and the Standards of Proof (Attachment C)).

3. The IPSA may receive and maintain the confidentiality of copies of PITWD Addenda and other confidential information for Claimants under the Virginia Provider Fund.

4.  The IPSA may adopt a Virginia Claimant Compensation Claim Form that shall be the required means for making a claim for a distribution from the Virginia Provider Fund.

5.  To the extent not set forth in this ICRFP, the IPSA may establish the standards of proof that will be permitted to establish eligibility to make a claim and the existence of each element of damages, claims or point calculations under these ICRFP.

6.  To the extent not otherwise set forth herein, the IPSA may set deadlines relating to claims against the Virginia Provider Fund.

7.  Consistent with these ICRFP (including those within the Points Matrix (Attachment B), and the Standards of Proof (Attachment C)), the IPSA may make determinations on eligibility of Claimants to make claims against, or receive compensation from the Virginia Provider Fund, including determinations as to whether such Claimants are Eligible Virginia Claimants and whether such Claimants hold Qualified Virginia Claim(s) (as defined below).

8.  The IPSA may make awards, deny claims and assess costs under these ICRFP, all of which will become final if not appealed to the Appeals IPSA (defined below).

9.  The IPSA may entertain petitions to correct errors or mistakes in connection with claims, awards or denials under these ICRFP.

10. The IPSA may perform such other duties as are required under these ICRFP or as the MDL Court may direct or assign.

F.      <u>Appointment of the Insight Provider Special Circumstances Administrator</u>.

To facilitate, effectuate and implement the purposes of these ICRFP, Hon. Diane M. Strickland (Ret. Virginia Circuit Court) is hereby retained and appointed as Insight Provider Special Circumstances Administrator ("IPSCA") to execute the functions described herein in accordance with the terms of these ICRFP, the Tort Trust and any applicable order of the MDL Court. The IPSCA shall hear and decide all Petitions for Special Circumstances (Section V(G)) under these ICRFP. In the event that the IPSCA resigns or is removed from office or is otherwise unable to perform the functions of the IPSCA, the Virginia Counsel shall recommend a successor, subject to confirmation by the MDL Court, after notice and opportunity to be heard. The IPSCA shall receive reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings and shall be reimbursed by the Virginia Provider Fund for her reasonable expenses, including travel expenses, reasonably required and incurred in the performance of her duties in accordance with the provisions of these ICRFP and the provisions of the  retention agreement between the Tort Trustee and the IPSCA.  To the extent required in the execution of her duties, the IPSCA may receive confidential Claimant information in the same manner as provided for the IPSA. Under no circumstances shall the IPSCA be considered to be or held responsible for the actions of the IPSA, whose responsibilities are separate and apart from those of the IPSCA.

G.      <u>Authority of the IPSCA</u>.

The IPSCA shall be delegated and assigned full authority to act as follows:

1. The IPSCA may consult with the IPSA in any way expedient in connection with her duties and responsibilities;

2. The IPSCA may, in her discretion, establish the forms, documents, and procedures to be used for a Special Circumstances Petition, which forms may include terms customary with the engagement of arbitrators in binding arbitration.

3. The IPSCA may receive any and all information necessary from the IPSA or the Qualified Virginia Claimants in connection with her duties and responsibilities;

4. The IPSCA may hear, conduct proceedings related to, and make decisions on Petitions for Special Circumstances as deemed appropriate, which may involve denying relief or providing some or all of the relief requested;

5. The IPSCA shall report all decisions made on Petitions for Special Circumstances to the IPSA, who shall distribute the same pursuant to Section V(G)(3);

6. In coordination with the MDL Court, and subject to confirmation and approval by the MDL Court, the IPSCA may conduct hearings and make recommendations for approval of wrongful death settlements and distributions; and propose distribution to the statutory beneficiaries if required. Any petition for approval may be filed within the MDL Court without initiating a separate proceeding. These ICRFP anticipate that statutory approval of wrongful death settlements and settlements for persons under disability may be sought and obtained after the Claimant submits a timely Virginia Compensation Claim Form, and such approval shall not be dependent upon

quantifying the specific dollar amount to which the Claimant (or beneficiaries) shall be entitled to receive. To the extent that any associated procedure shall require the convening of parties before the MDL Court, these ICRFP anticipate that such proceedings shall be conducted telephonically if at all possible. These ICRFP further anticipate that multiple applications for approval may be joined in collective motions;

7. To the extent required for approval of settlements for the Virginia Plaintiffs or other Claimants, the IPSCA may appoint guardians *ad litem,* conduct hearings and make recommendations for approval of settlements and distributions involving minors or other persons under disability, subject to confirmation and approval by the MDL Court. Any petition for approval under § 8.01-424 may be filed within the case or matter file under which the IPSCA is appointed within the MDL Court without initiating a separate proceeding;

8. The IPSCA may make recommendations on the reduction or waiver of liens, if any, that may be asserted by private insurers or workers compensation carriers as may deemed appropriate. Subject to confirmation and approval by the MDL Court, the IPSCA may conduct hearings associated therewith, and make associated reports and recommendations;

9. The IPSCA may perform such other duties as are required under these ICRFP or as the MDL Court may direct or assign.

10. The IPSCA shall be deemed to be a Provider Settlement Administrator under the Tort Trust and shall have quasi-judicial immunity for all actions taken pursuant to her appointment hereunder, and shall be indemnified in the same manner as a Provider Settlement Administrator pursuant to the Tort Trust; and

11. The IPSCA may take such other acts as the MDL Court may direct or assign.

H.     Appeals Insight Provider Settlement Administrator.

To facilitate, effectuate and implement the purposes of these ICRFP, Hon. Lawrence G. Koontz (Ret. Virginia Supreme Court) is hereby retained and appointed as Appeals Insight Provider Settlement Administrator ("Appeals IPSA") to execute the appeals functions described herein in accordance with the terms of these ICRFP, the Tort Trust and any applicable order of the MDL Court.  The Appeals IPSA shall hear and decide all appeals from decisions of the IPSA and/or the IPSCA, as specified in these ICRFP. In the event that the Appeals IPSA resigns or is removed from office or is otherwise unable to perform the functions of the Appeals IPSA, the Virginia Counsel shall recommend a successor, subject to confirmation by the MDL Court, after notice and opportunity to be heard. The Appeals IPSA shall receive reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings and shall be reimbursed by the Virginia Provider Fund for his reasonable expenses, including travel expenses, reasonably required and incurred in the performance of his duties in accordance with the provisions of these ICRFP and the provisions of any retention agreement between the Tort

Trustee and the Appeals IPSA.  To the extent required in the execution of his duties, the Appeals IPSA may receive confidential Claimant information in the same manner as provided for the IPSA. The Appeals IPSA shall be deemed to be a Provider Settlement Administrator under the Tort Trust, shall have quasi-judicial immunity for all actions taken pursuant to his appointment hereunder, and shall be indemnified in the same manner as a Provider Settlement Administrator pursuant to the Tort Trust.

      I.      <u>Authority of the Appeals IPSA</u>.

The IPSA shall be delegated and assigned full authority to act as follows:

1. consult with the IPSA in the development of Appeals Forms to be used if a Claimant elects to contest a proposed Award and files an appeal;

2. in his discretion, establish the documents and procedures to be used for appeals, which documents may include terms customary with the engagement of arbitrators in binding arbitration;

3. receive and decide all appeals filed and dismiss any appeal that is not filed in a timely manner;

4. make final and binding decisions on appeals as deemed appropriate, which may involve denying relief or providing some or all of the relief requested;

5. report all decisions made on appeals to all Qualified Virginia Claimants, including by providing such notice to Virginia Counsel; and

6. take such other acts as the MDL Court may direct or assign.

J.      Notice under ICRFP.

If the Claimant is represented by an attorney as indicated on such Claimant's Virginia Compensation Claim Form, then "notice" as required in these ICRFP  shall be provided to the attorney at the addresses (electronic or otherwise) listed on the Claimant's Virginia Compensation Claim Form unless updated by the Claimant. Notice to Claimants, including Eligible or Qualified Virginia Claimants, not represented by counsel shall be made to the Claimant's address on the Claimant's Virginia Compensation Claim Form. Distributions of funds awarded from the Virginia Provider Fund to Eligible or Qualified Virginia Claimants who are represented by attorneys shall be made payable jointly to the Qualified Virginia Claimant and the attorney (or law firm).  If an Eligible or Qualified Virginia Claimant is not represented by an attorney, distributions shall be made payable to the Qualified Virginia Claimant.

K.      Change of Address.

All Claimants and/or his or her attorney shall be solely responsible for notifying the IPSA of address changes for the Claimant or the attorney and any other changes with respect to the information provided by the Claimant on a completed W-9 form.


**PROCEDURES OF THE INSIGHT CLAIMS RESOLUTION FACILITY**


Pursuant to the Plan, the Tort Trust Agreement, and the Settlement Agreement, the Tort Trustee shall make distributions as per the terms of the Tort Trust Agreement and these ICRFP. Each Eligible Virginia Claimant shall receive his or her individually allocated distribution of the

Virginia Provider Fund Net Proceeds as directed under these ICRFP, the Tort Trust Agreement and the awards granted hereunder. Matrix Awards shall be determined by the IPSA, based upon the factors, methodologies and procedures set forth herein. Special Circumstances Petition Awards shall be determined by the IPSCA, based upon the factors, methodologies and procedures set forth herein. Appeals shall be based solely upon the factors, methodologies and procedures set forth herein.

I.     **Distribution of Virginia Compensation Claim Forms**

Immediately following the Effective Date, the IPSA shall request information ("Claim Criteria Data") from the Estate Representative (as defined in the Plan) under Section 5.15 of the Plan, including information sufficient to provide the IPSA with the names and addresses of any persons who claims to have received treatment at the Insight Imaging clinic in Roanoke, Virginia and previously have filed in the NECC Chapter 11 Case a timely Proof of Claim ("POC") or Personal Injury Tort and Wrongful Death Claim Information Form ("PITWD Addendum"). POC's and PITWD Addenda that were not filed before the Bar Date (January 15, 2014 at 4:00 PM, EST) or as ordered and allowed by the Bankruptcy Court thereafter, will be conclusively deemed to be un-timely. Within 30 days after receiving such Claim Criteria Data the IPSA shall mail the Claimants a Virginia Fund Compensation Program Claim Form ("Virginia Compensation Claim Form"), together with instructions, a Base Point Category and Adjustment

Calculation Worksheet, and a W-9 Form. As to the Claimants who are Virginia Plaintiffs, notice and delivery may be accomplished by providing the same documents to counsel for the Virginia Plaintiffs. To the extent orders are entered allowing individuals to file a POC after the Effective Date and such individuals claim to have an NECC Claim arising out of treatment at the Insight Imaging clinic in Roanoke, Virginia (referred to herein as "Late Allowed POC Claimants"), the IPSA shall mail the Late Allowed POC Claimant the Virginia Compensation Form within 60 days of such order. The Virginia Compensation Claim Form shall be structured so as to first establish whether the Claimant or Late Allowed POC Claimant holds an Eligible and/or Qualified Virginia Claim; and, if not, to instruct the Claimant or Late Allowed POC Claimant to submit only the minimum information necessary.

II.     **Procedures for timely filing Virginia Compensation Claim Forms**

      A.     Claimants must submit timely Virginia Compensation Claim Forms on or before the Virginia Claim Due Date.

To be eligible to receive compensation from the Virginia Provider Fund, Claimants must submit a completed and signed Virginia Compensation Claim Form as directed by the IPSA, together will all supporting documentation required, on or before 90 days from the date on which the Virginia Compensation Claim Form was mailed ("Virginia Claim Due Date"). All Virginia Compensation Claim Forms must be postmarked or received by the IPSA by the Virginia Claim Due Date. A Virginia Compensation Claim Form that is not received by Virginia Claim Due Date, or not placed in the U.S. mail with a postmarked date no later than such date, shall be denied, unless the IPSA finds excusable neglect. The IPSA shall have no further obligation to

review or calculate points, categories or damages for any Claim found to be untimely, and absent a successful appeal to the Appeals VSPA, then that Claimant shall be barred from making any recovery from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

The IPSA shall make a final determination of late filing and shall promptly notify the Claimant of such final decision and the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a final determination of late filing may file an appeal with the Appeals IPSA within 30 days of such ruling. The sole ground for reversal on appeal of any such final determination of late filing shall be proof that the Claimant's Virginia Compensation Claim Form was timely postmarked or timely received contrary to the finding of the IPSA.

B.     No Delay or Retention for Potential Late Allowed POC Claimants.

The IPSA shall not specially retain any funds for the purpose of compensating Late Allowed POC Claimants, nor shall the IPSA delay or alter Tentative Matrix Awards or Final Matrix Awards based upon the filing of such claims. If such claim is not received in sufficient time and form to be competed and included in the Tentative Matrix Award without delaying or disrupting that process, then any recovery for such Late Allowed POC Claimant shall be based solely upon such Claimant's point share of the Retention Pool (if any) in comparison with all

other Claimants' point shares for such pool. Any award to Late Allowed POC Claimants shall be made without regard to funds already distributed under these ICRFP.

C.      Certification Requirements.

All claims must be signed by the Claimant under the penalties of perjury. The submission of a fraudulent claim will violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and subject those responsible to criminal prosecution in the federal courts. If the IPSA determines that a claim is fraudulent, the claim shall be denied and the IPSA shall so inform the Claimant, and, if the Claimant does not appeal or after all appeals have been resolved against the Claimant, the Tort Trustee.

Each Claimant must also certify that he/she has not transferred his or her right to recover from the Virginia Insight Providers with respect to his or her Claim such that the Claim can be asserted by another person or entity.  The fact that a Claimant has executed a "subrogation" agreement with a health insurer or that a statutory provision grants to any governmental entity or workers compensation provider rights of subrogation shall not of itself be construed as a transfer of the Claimant's right to recover.

D.      Certification of Counsel.

Where any Claimant is represented by counsel in submitting a Virginia Compensation Claim Form and associated documentation for recovery under the Virginia Provider Fund, such counsel's submission of the Claim Form on such Claimant's behalf shall constitute a certification that the Claim Form is filed  consistent with the same standards that apply under Rule 1:4(a) of

the Rules of the Supreme Court of Virginia and/or Rule 11 of the Federal Rules of Civil
Procedure when a pleading is filed in state or federal courts.

### III.     Eligibility and Qualification Threshold Requirements

Each Virginia Compensation Claim Form received in a timely manner shall be subject to
an initial limited review by the IPSA to make a threshold decision on whether the eligibility and
classification requirements set forth in this Section III(A) and (B) are satisfied.

A.     <u>**Claim Eligibility Criteria and Requirements**</u>.

1.  <u>Virginia Plaintiffs</u>.  In order to be eligible to receive compensation from the Virginia
Provider Fund, a Claimant must be one of the Virginia Plaintiffs <u>or</u> meet one of the
other criteria for eligibility noted in Sections III(A)(2) or (3), below.

2.  <u>Timely POC/PITWD Filing Requirement</u>. Except as permitted and set forth in
Sections III(A)(1) and III(A)(3), Claimants must demonstrate that s/he has (a) timely
filed a POC or PITWD Addendum in the NECC Chapter 11 Case, (b) had a timely
POC or PITWD Addendum filed on his or her behalf, or (c) received permission by
Bankruptcy Court order allowing late filing of the POC and PITWD Addendum, and
filed such POC or PITWD Addendum in a timely manner.

3.  <u>Alternative: Claim against Virginia Insight Providers is not time-barred</u>. An exception
to the requirement in Section III(A)(2) may be applied for person(s) demonstrating

that his/her NECC Claims against the Virginia Insight Providers are not barred by the applicable statute of limitations. In this regard, if the person did not file a civil action against one or more of the Virginia Insight Providers on or before September 25, 2014 and if the asserted claim does not involve a person who died within the two years following injection from the Three Contaminated MPA Lots at the Insight Imaging Clinic in Roanoke, then such claim shall be deemed barred by the applicable statute of limitations.

4. The NECC Estate Representative shall provide the IPSA with information requested pursuant to Section 5.15 of the Plan, sufficient to provide the IPSA with POC's and PITWD Addenda submitted on behalf of Claimants and access to information sufficient to determine if a Claimant meets the Timely POC/PITWD filing requirement set forth in III(A)(2) above. If no timely POC or PITWD Addendum was filed by or on behalf of a given Claimant who does not meet the exceptions of Sections III(A)(1) or III(A)(3), then the IPSA shall deny that Claimant's claim and shall notify the Claimant that such determination is final, unless appealed and shall provide the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a denial determination may file a written appeal with the Appeals IPSA within 30 days of the date the determination was issued. The sole ground for reversal of any such final denial on appeal shall be proof that the Claimant filed a timely POC or PITWD Addendum

contrary to the finding of the IPSA. Absent a timely appeal and subsequent reversal, the determination is final, and the Claimant will not be entitled to a payment from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

5. All Claimants must submit a completed W-9 form with his or her Virginia Compensation Claim Form.  If a completed W-9 form is not submitted by a Claimant, the IPSA shall notify the Claimant that one must be submitted (postmarked or received) within 30 days of the date of such deficiency notice or the claim shall be denied unless otherwise excused by the IPSA.  In the event of such a denial, the IPSA shall notify the Claimant of the denial and the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a denial notice may file a written appeal with the Appeals IPSA within 30 days of the date of mailing of such ruling. The sole ground for reversal of any such final denial on appeal shall be proof that the Claimant's completed W-9 form was timely postmarked or received contrary to the finding of the IPSA. Absent a timely appeal and subsequent reversal, the determination is final, and the Claimant will not be entitled to a payment from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

6.  All claims asserted by a timely Virginia Compensation Claim Form and not denied for failure to comply with the requirements of this Section shall be deemed to be "Eligible Claims" and persons holding such Eligible Claims shall be deemed "Eligible Virginia Claimant(s)."

B.  **Additional Requirements for Qualified Virginia Claim: proof of exposure through injection from one or more of the Three Contaminated MPA Lots at Insight Imaging in Roanoke, VA and viability of claims against Virginia Insight Providers.**

After the threshold determination that a Claimant is an Eligible Virginia Claimant, the IPSA shall further confirm two additional facts in order for the person to be a Qualified Virginia Claimant entitled to participate in substantive points analysis and special circumstances petitions under these ICRFP.

1.  Injection Proof. First, the medical or other records submitted by or on behalf of such Eligible Virginia Claimant must establish that the Claimant received injection(s) at the Insight Imaging clinic in Roanoke, Virginia, from one or more of the Three Contaminated MPA Lots or, alternatively, that such injection is established either by the Claim Criteria Data for such Claimant or because such Claimant's name appears on the "Insight List" [as that term is defined in ¶II of Attachment C] ("Injection Proof").

2.  Viability Proof. Next, The Eligible Virginia Claimant must demonstrate that s/he filed a timely lawsuit in federal or state court against one or more of the Virginia

Insight Providers alleging injury or death as a result of such injection(s) or is otherwise not time-barred from doing so under the applicable Virginia statute of limitations due to death ("Viability Proof"). Lawsuits shall be deemed untimely if they were not filed against one or more of the Virginia Insight Providers on or before September 25, 2014. A date-stamped copy of a filed Complaint, showing filing on or before September 25, 2014, shall be sufficient Viability Proof.  If no such lawsuit has been filed and the statute of limitations has not been tolled or extended by death, then the claim is barred. For those persons who received injection(s) from one of the Three Contaminated MPA Lots at Insight Imaging in Roanoke and then died before September 25, 2014, the IPSA shall calculate the appropriate statute of limitations for determining whether such claims are viable or barred.

3.   <u>Qualified Virginia Claim(s)</u>.   Eligible Virginia Claimants who meet the requirements for Injection Proof and Viability Proof, qualify for all distributions under the Virginia Provider Fund for recovery under the Points Matrix (**Attachment B**), and qualify for the Special Circumstances Petition process set forth herein (Section V(G)). Such claims are designated as "Qualified Virginia Claim(s)" and such Claimants are designated hereafter as "Qualified Virginia Claimants."

4. <u>Release of Virginia Providers</u>. In order to receive an award under these ICRFP, all Qualified Virginia Claimants must execute a release of all NECC Claims against the Virginia Providers.

C.   **Summary rulings on Injection Proof and Viability Proof.**

1. <u>Injection Proof Rulings</u>. If an Eligible Virginia Claimant fails to present Injection Proof  (See Attachment C, §II), the IPSA shall promptly make a ruling denying that Claimant's claim and shall notify the Claimant of such denial and the procedure to appeal to the Appeals IPSA.   Notwithstanding anything contained herein to the contrary, a Claimant receiving such a final ruling may file a written appeal with the Appeals IPSA within 30 days of the date of such ruling. The sole ground for reversal of any such denial on appeal shall be proof (in any form allowed by Attachment C, § II) that the Claimant received injection(s) from the one or more of the Three Contaminated MPA Lots at Insight Imaging in Roanoke contrary to the finding of the IPSA. Absent a timely appeal and subsequent reversal, the determination is final and the Claimant shall receive no award from the Virginia Provider Fund.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

2. <u>Viability Proof Rulings</u>. If an Eligible Virginia Claimant fails to present Viability Proof, the IPSA shall promptly issue a ruling notifying the Claimant that his/her claim

does not satisfy the Viability Proof requirements and awarding such Claimant one-half (1/2) point, which shall be the sole award provided under this ICRFP and the Virginia Provider Fund. Any Eligible Virginia Claimant who fails to satisfy Viability Proof shall not be eligible to participate under Section V(G) (Special Circumstances Petition procedures). The IPSA shall have no further obligation to assess or consider factors that would qualify such Claimant(s) for additional points if such Eligible Claims were otherwise viable (i.e., not time barred). The IPSA shall promptly notify the Claimant of such ruling and the procedure to appeal to the Appeals IPSA. Notwithstanding anything contained herein to the contrary, a Claimant receiving such a ruling may file a written appeal with the Appeals IPSA within 30 days of such ruling. The sole ground for reversal of any such Viability Proof ruling on appeal shall be proof that the Claimant has a viable claim against one or more of the Virginia Insight Providers arising from injection of one or more of the Three Contaminated MPA Lots at the Roanoke Insight Imaging clinic (i.e., that such claim(s) is/are not barred by the statute of limitations), contrary to the finding of the IPSA. Absent a timely appeal and subsequent reversal, the determination is final and the Claimant shall receive a final award of ½ point and shall participate in distributions based solely upon such point assignment.  Such rulings shall in no way preclude such Claimant from receiving a recovery through the Claims Resolution Facility established by the National Settlement Administrator.

D. **Administrative Review of forms and documentation submitted by Qualified Virginia Claimants and opportunity to correct errors.**

1.  Review by IPSA. The claims handling and processing aspects of this ICRFP shall be handled by the IPSA who shall review all Virginia Compensation Claim Forms and associated documentation submitted by Qualified Virginia Claimants. The primary purpose of this review is to identify clerical errors, to identify missing documents required to support assertion(s) made by the Qualified Virginia Claimant, and to ensure that Qualified Virginia Claims are properly classified.

2.  Errors or Deficiencies in Claim Submissions. If the IPSA detects errors in the forms, documents and/or information submitted by a Qualified Virginia Claimant, he may elect to do any of the following:

    a)    If the error or deficiency  can be cured or corrected without additional information from the Qualified Virginia Claimant, then the IPSA may cure or correct the error or deficiency using information supplied in the initial filings by the Qualified Virginia Claimant, and shall notify the Claimant's counsel (the Claimant, if unrepresented) of the error or deficiency, and of the cure or correction; or, alternatively, he may notify the Claimant's counsel (the Claimant, if unrepresented) of the error or deficiency and

allow opportunity for cure according to the process in subparagraph (b);

b)   If the error or deficiency is deemed one that cannot be cured or corrected without additional information from the Qualified Virginia Claimant, the IPSA shall send notice of the deficiency to such Claimant's counsel (the Claimant, if unrepresented), allowing a minimum of 45 days within which to correct the deficiency and file a Corrected Virginia Compensation Claim Form and any supplemental or corrected information in the manner requested by the IPSA. If the Claimant fails to submit sufficient corrections or additional information within the time specified (or an extended time period as allowed by the IPSA, then the IPSA shall do one of the following:

(i)   Award points under the Points Matrix for only such portions of the Qualified Virginia Claim as are adequately supported by required documentation and issue a denial as such portions of the Claim that are not supported by the submitted materials; or

   (ii)  If the procedure outlined in the previous subparagraph is not feasible, the IPSA may treat the claim as a Base Category VII claim under the Points Matrix, allowing only such additional points (if any) as are supported by the submitted materials.

IV.  **The Points Matrix for assessing points for Qualified Virginia Claims (summary).**

  Qualified Virginia Claims shall be assigned points based on the criteria set forth in the Matrix attached hereto as **Attachment B** (the "Points Matrix"). The Points Matrix establishes seven base point categories in the same manner as the Claims Resolution Facility Procedures administered by the National Settlement Administrator (the "Base Point Categories"). The Matrix provides for additional points for death case adjustments, past medical bills and lost wages, total number of lumbar punctures, days of antifungal treatment, stroke/renal failure, all as more specifically described in the Points Matrix. The standards of proof required for the award of points are set out in **Attachment C** hereto. Calculations of points attributable to any Qualified Virginia Claim under the Points Matrix shall not be reduced, limited or barred in the event that an otherwise Qualified Virginia Claimant happens to die after January 1, 2015.

## V.   Determination of points and payments under the Points Matrix

### A.   Confirmation of Points for Qualified Virginia Claimants.

As soon as practicable after the Virginia Claim Due Date, the IPSA shall segregate the Qualified Virginia Claims for points analysis and confirmation under the Points Matrix. The IPSA shall either (i) accept the points calculations submitted with the Virginia Compensation Claim Form as verified; or (ii) make a revised point calculation based on the Points Matrix or the other terms of these ICRFP. The IPSA shall then total the resulting points awards for all Qualified Virginia Claimants, together with points awarded to Claimants under Sections III(C)(2) (non-viable claims), to determine the "Tentative Total Points".

### B.   Calculation of Tentative Point Value.

The IPSA shall consult with the Tort Trustee to determine the amount of Virginia Provider Fund available for disbursement to Claimants (the "Virginia Provider Fund Net Trust Proceeds"). The Virginia Provider Fund Net Trust Proceeds shall then be reduced by 20%. This subtotal shall then be increased by an amount equal to the funds applied to the Expense Trust under Section VII (initially $700,000), in order to reach a total first distribution amount (the "First Distribution Net Proceeds"). The remaining 20% of the Virginia Provider Fund Net Trust Proceeds, less the amounts applied to the Expense Trust under Section VII, shall be held separately and retained as the "Special Circumstances Pool."

The IPSA shall divide the First Distribution Net Proceeds by the Tentative Total Points in order to obtain a calculated "Tentative Point Value":

[(Virginia Provider Fund Net Trust Proceeds x .80) plus an amount equal to funds applied to the Expense Trust (e.g. $700,000) = First Distribution Net Proceeds]

[First Distribution Net Proceeds ÷ Tentative Total Points = Tentative Point Value]

C.    <u>Tentative Matrix Award</u>.

The IPSA shall issue a written Matrix Award Form to each Qualified Virginia Claimant informing such person of the total number of points awarded to him/her under the Points Matrix and the tentative award amount obtained by multiplying the Qualified Virginia Claimant's total points by the Tentative Point Value ("Tentative Matrix Award"). The IPSA shall also provide each Qualified Virginia Claimant with a disclosure of the tentative points and awards proposed to be made to all other Eligible and Qualified Virginia Claimants, but without disclosing the names of the other individuals. For the Virginia Plaintiffs or other represented Qualified Virginia Claimants, the Tentative Matrix Award listing shall identify the individual recipients by reference to Claimant's counsel. Notwithstanding the appeals process noted below, mathematical and other such errors which require no substantive analysis may be submitted promptly to the IPSA for modification within the 30 days following the date of the Tentative Matrix Award. Appropriate modifications or corrections may be made accordingly.

D.    <u>Acceptance or Appeal of Tentative Matrix Award</u>.

In order to contest a Tentative Matrix Award, within 30 days of the date of the Matrix Award Form, each Qualified Virginia Claimant must file a written appeal. Absent extraordinary circumstances (as determined solely by the IPSA), if no appeal as provided for in the next

paragraph is postmarked or received within the 30-day period, then the IPSA shall be authorized to declare that the point allocation for such Qualified Virginia Claimant has been accepted, and that person will be paid based upon the points set forth in his/her Matrix Award Form.

The Tentative Matrix Award Form shall notify the Qualified Virginia Claimant of the procedure to appeal the Tentative Matrix Award to the Appeals IPSA.  Notwithstanding anything contained herein to the contrary, a Qualified Virginia Claimant receiving such a Tentative Matrix Award may file a written appeal with the Appeals IPSA within 30 days of the date of such Award. The sole ground for reversal or modification of a Tentative Matrix Award on appeal shall be proof that a factual or mathematical error was made in the number of points originally awarded. Absent a timely appeal and subsequent reversal, a Tentative Matrix Award will be final and binding.

If no timely appeal is filed by any of the Qualified Virginia Claimants regarding their respective Tentative Matrix Awards, then such awards shall be deemed final in all respects and the IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to each of the respective Qualified Virginia Claimants and their counsel (or, if unrepresented to the Qualified Virginia Claimant only) in the amounts indicated on the Tentative Matrix Award Forms based upon the Tentative Point Value. If a timely appeal is filed to any Tentative Matrix Award asserting that an incorrect number of points were assigned, then all Tentative Matrix Awards shall be suspended until a final decision is made on all appeals, allowing confirmation or recalculation of the Tentative Point Value. If any such appeals alter the

لآو

وﻧﮕﻰﭼﻼوﻰ٭ﻞﺋﻰ ﺑﯩﯖٲو ٭ﭼﻰ

Tentative Total Points, then the calculation set forth in Section V(B) shall be recalculated based upon the Final Total Points following appeals:

**[First Distribution Net Proceeds ÷ Final Total Points after appeal = Final Point Value]**

    E.    <u>Reissuance of Final Matrix Award notifications following appeal period</u>.

If appeals are filed regarding the Tentative Matrix Awards, resulting in recalculation of Final Total Points as set forth in Section V(D), the IPSA shall re-issue Final Matrix Award Forms to each Qualified Virginia Claimant informing each such person of the new total number of points awarded under the Points Matrix and the Final Point Value, the new dollar value of each point based on that new point total. Such Final Matrix Award Form shall set forth the amount of Final Matrix Award, which shall be the dollar amount obtained by multiplying that person's final number of Matrix Points by the Final Point Value. The IPSA shall also provide each Claimant and counsel with a disclosure of the final points and Matrix Awards being made to all other Claimants in the same manner as specified in Section V(C). The IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to the respective Claimants and their counsel (or, if unrepresented to the Claimant only) in the amounts indicated on the Final Matrix Award Forms. These and any other awards in this VPCRF shall be subject to satisfying the lien requirements reflected in the Settlement Agreement and in §§ 5.10 and 5.11 of the Plan.

    F.    <u>Assessments of Special Costs</u>.

Some Claimants' awards may require additional administrative steps and attention, resulting in costs associated only with such awards. For claims where (i) approval of the settlement or distribution must be separately made (e.g., wrongful death claims, persons under disability, etc.), and (ii) such approval steps require evidentiary hearings with the IPSA beyond mere presentation of the settlement and agreement by the beneficiaries thereto, then the costs of such proceedings shall be assessed against such Claimant's award. For claims where a guardian ad litem is required for any proceeding associated with a Claimant's award, such costs shall be assessed solely against the Claimant's award. Similar assessments shall be allowed for other cases that require specific attention or hearing by the IPSA as part of the claim or award process, apart from Appeals and Special Circumstances Petitions which are addressed separately. For claims where lien resolution services are provided by the IPSA (or similar third party service provider), the costs of such lien resolution services shall be assessed against the Claimants' award.

G.    Petitions for Special Circumstances

In addition to the Matrix Award, if a Qualified Virginia Claimant, who did not include as part of his/her Claim a request for 10 additional points for "Other Factors," and desires to seek a supplemental award from the Special Circumstances Pool, then within the same 30 day period for appealing the Tentative Matrix Award notifications, the Qualified Virginia Claimant must also file a Special Circumstances Petition with the IPSA, who shall forward such Petitions to the IPSCA for review and decision. The IPSCA may, in her discretion, establish the forms,

وی

وتيٍ‌ولأوىٍ‌ولٍ‌نى‌بلٍٓاوٍ‌وٍ‌بٍ‌ٍ‌ٍ‌ي

documents, and procedures to be used for a Special Circumstances Petition. Each Special Circumstances Petition shall not exceed 5 pages, and shall be deemed filed by postmark date or, if not mailed, by date received.

Any Qualified Virginia Claimant who files a Special Circumstances Petition must directly pay, or agree to have his/her Matrix Award reduced by $2,000, which will serve as a filing and processing fee. Qualified Virginia Claimants filing a Special Circumstances Petition will otherwise retain the Matrix Award, and any Award for Special Circumstances shall be in addition thereto and shall be made in the reasonable discretion of the IPSCA based on unique factors and circumstances relating to the Claimant's case. If a Special Circumstances Petition is not filed in a timely manner, it shall be denied and no special award from the Special Circumstances Pool shall be made to that individual.  On timely filed petitions, it is anticipated that the IPSCA may meet with such Claimants if requested.

1.     <u>Purpose and Standards</u>.

The purpose of the Special Circumstances Petition is to address those situations where the Points Matrix structure is inadequate to fairly account for all harm and loss suffered by some individuals whose unique circumstances make their situation different from others in the same Claims Category.  Those who filed a request for an award of additional points for "Other Circumstances" as part of their initial Claim submitted to the IPSA are not eligible to submit a Special Circumstances Petition.  Merely filing a Special Circumstances Petition will not entitle

وی

the Qualified Virginia Claimant to an award from the Special Circumstances Pool as the IPSCA has the discretion to act on each Petition as deemed appropriate.

In making decisions on Special Circumstances Petitions, the IPSCA will be making a discretionary decision guided and informed by the same criteria listed in the Points Matrix, such as Claims Category, Death Case adjustments based on statutory beneficiaries, past medical expenses, future medical expenses, past lost wages, future lost wages, number of lumbar punctures, days of Anti-Fungal Treatment, as well as medical complications, permanent impairments, the impact of third party liens, and other appropriate circumstances which may not be fully reflected in the Points Matrix.

Just as there is no requirement that the IPSCA award funds from the   Special Circumstances Pool to each person who files a Special Circumstances Petition, there is no expectation or requirement that the IPSCA will use or distribute the full Special Circumstances Pool to those who may file petitions when making Special Circumstances Awards.  The goal and purpose of this process is to ensure that persons who are similarly situated be treated the same to the extent possible, understanding there can be unique cases that deserve separate treatment.

2. <u>No Special Circumstances Awards until all petitions are considered</u>.

The IPSCA shall consider all timely filed Special Circumstances Petitions before making any awards on any Special Circumstance Petitions in order to avoid any possible preference for early filers.  Once all Special Circumstances Petitions have been filed, the IPSCA shall provide

ﯨﻔﯩ

the IPSA with a list of all Qualified Virginia Claimants who have filed Special Circumstances Petitions and the IPSA shall distribute the same to all such Claimants.

      3.    <u>Special Circumstances Award Notifications.</u>

Once the IPSCA has considered all of the Special Circumstances Petitions, she shall calculate Special Circumstances Awards (including such Awards in which no funds from the Special Circumstances Pool are awarded) in her discretion and provide such information to the IPSA.  The IPSA shall then prepare Special Circumstances Award Forms notifying each of the Qualified Virginia Claimants (and his/her counsel if represented) who filed Special Circumstances Petitions. The Special Circumstances Award Form shall notify the Qualified Virginia Claimant of the procedure to appeal the Special Circumstances Award (including any Award in which no funds from the Special Circumstances Pool were awarded) to the Appeals IPSA.  A copy of the Special Circumstances Award Forms shall be sent simultaneously by the IPSA to Virginia Counsel and to all other Qualified Virginia Claimants, protecting the personally-identifying information of each such person if they have not given consent to disclose his/her identity.   Notwithstanding anything contained herein to the contrary, any Qualified Virginia Claimant receiving such a Special Circumstances Award may file a written appeal with the Appeals IPSA within 30 days of such award. The sole ground for reversal or modification of a Special Circumstances Award on appeal shall be abuse of discretion by the IPSCA. "Abuse of discretion" for such appeal(s) may be demonstrated, among other ways, by establishing that the appealing person's Special Circumstances Award is grossly unfair to that person based on a

comparison of the Matrix and Special Circumstances Awards for other similar Qualified Virginia Claimants in the same Claims Category. To the extent necessary, the Appeals IPSA may review the Special Circumstances petitions of other similar Qualified Virginia Claimants in making such an assessment.

4.     Acceptance or Appeal of Special Circumstances Award.

In order to contest a Special Circumstances Award, within 30 days of the date of the Special Circumstances Award, each such Qualified Virginia Claimant must file a written appeal. Absent extraordinary circumstances (as determined solely by the IPSA), if no appeal as provided for in the preceding paragraph is postmarked or received within the 30-day period, then the IPSA shall be authorized to declare that the Special Circumstances Award for such Qualified Virginia Claimant has been accepted. The only person who may file an appeal to a Special Circumstances Award is a Qualified Virginia Claimant who filed a Special Circumstances Petition. If no timely appeal is filed by any of the Qualified Virginia Claimants regarding their respective Special Circumstances Awards, then all such awards shall be deemed final in all respects. If a timely appeal is noted regarding any Special Circumstances Award, then all other Special Circumstances Awards shall be held in abeyance pending resolution of such appeal.

5.     Final Special Circumstances Calculation.

When all appeals (if any) have been completed and any corresponding modifications of Special Circumstances Awards have been made, the IPSA shall compile a final list of all Awards for Special Circumstances, providing a total amount to be distributed from the Special

Circumstances Pool (the "Total Final Special Circumstances Distribution Amount"). Such information shall be submitted to each Claimant and counsel in the same manner as specified in section V(c). The IPSA shall forward the appropriate W-9s and provide written notice to the Tort Trustee directing that payments be made to the respective Qualified Virginia Claimants and their counsel (or, if unrepresented to the Qualified Virginia Claimant only) in the amounts indicated on the final Special Circumstances Award forms. Such distributions may or may not be included with final distributions (if any) from the Remaining Retention Pool, provided that no substantial delay shall be required in order to combine such distributions.

6.     Calculation of Remaining Retention Pool.

The IPSA shall calculate the amount remaining (if any) in the Special Circumstances Pool after deducting the Total Final Special Circumstances Distribution Amount. In consultation with the Tort Trustee, the IPSA shall then determine what (if any) funds remain to be distributed from the Virginia Provider Fund. This may include any funds remaining in the Special Circumstances Pool after all such awards, funds available in the Expense Trust, all interest accumulated but not previously distributed, as well as funds distributable to the Eligible and Qualified Virginia Claimants from the Insight Holdback. The total of all such sums, less any amounts necessary for remaining estimated expenses of the ICRFP, shall be the "Remaining Retention Pool."

H.     Final Distributions from Remaining Retention Pool.

Once the amount of the Remaining Retention Pool (if any) has been calculated, then a Remaining Retention Pool Point Value shall be calculated by the IPSA by dividing the funds held in the Remaining Retention Pool by the total amount of Final Matrix Award points awarded to all Qualified Virginia Claimants (plus points awards for any Late Allowed POC Claimant Claim Forms have been filed in the intervening period, if any), obtaining a Remaining Retention Pool Point Value. Distributions to each such Eligible and Qualified Virginia Claimant shall then be calculated by multiplying such person's Total Matrix Points by the Remaining Retention Pool Point Value, which amounts shall be reflected in notices provided to each such person.   The IPSA shall provide written notice to the Tort Trustee directing that payments be made to the respective Qualified Virginia Claimants and their counsel (or, if unrepresented to the Eligible and/or Qualified Virginia Claimant only) in the amounts indicated on the Final Distribution Award notices. Such distributions may, if practical, be combined with Special Circumstances Distributions.

I.     Subsequent distributions of any remaining Virginia Provider Fund amounts to be made in the same manner as distributions from the Remaining Retention Pool.

Should any additional funds become available for distribution from the Virginia Provider Fund, (including any funds payable to the Eligible and/or Qualified Virginia Claimants under the Insight Holdback), the procedures and distributions noted for the distributions from the Remaining Retention Pool shall be applied; and such calculations and awards shall be made as promptly as practicable. No appeals shall be allowed from any such subsequent awards.

**VI.**    **Appeals Procedures**

A.    <u>Confirmation of Points for Qualified Virginia Claimants</u>.

Appeals shall be made to the Appeals IPSA in the following manner:

1. <u>Forms</u>. Appeals forms shall be supplied with any notice from the IPSA of an appealable decision. Such appeals must be filed (postmarked or received) within 30 days of the date of notice of an appealable decision. Petitions for appeal shall not exceed 10 pages, and must set forth the basis for the appeal, contain a statement of requested relief, and attach any documents relating to the appeal.

2. <u>Fees</u>. Any appeal shall require a filing fee of $750, payable to the IPSA. The IPSA shall hold such fees in trust in order offset the costs of appeal to the Virginia Provider Fund. An appealing Qualified Virginia Claimant may satisfy the appeal fee by  agreeing to have his/her Matrix Award reduced by the amount of the appeal fee, but only in circumstances where a Matrix Award is reasonably anticipated in at least the amount of $750.

   a. If the appealing Qualified Virginia Claimant prevails on his/her appeal, then $500 of the $750 appeal fee shall be refunded to the prevailing appellant, reducing the appeal fee to $250.

b. Before the final distribution from the Virginia Provider Fund, the IPSA shall disburse all appeal fees collected under this Section (if any) to the Tort Trustee to be deposited into the Virginia Provider Fund and distributed to Qualifying Virginia Claimants or paid to reimburse costs and expenses incurred in connection with or reimbursable under these ICRFP.

3. <u>Hearings</u>.  Appeals may be decided with or without hearings, as determined in the sole discretion of the Appeals IPSA.

4. <u>Content of record on appeal</u>.  The record on appeal is limited to the record in the proceedings resulting in the appeal. Unless otherwise specified in these ICRFP, the appealing Claimant may not submit, nor may the Appeals IPSA consider, any facts or evidence not previously presented by the Qualified Virginia Claimant to the IPSA as part of the claims process that resulted in the notice or decision being appealed.

5. <u>Basis for reversal or modification of rulings on appeal</u>. The grounds for appeal are specified within applicable sections of these ICRFP that give rise to appeals. To the extent that such grounds are not specified and an appeal is otherwise authorized or allowed, the basis for reversal or modification shall only be factual error.

لأى

وتيءلأوىءلـ ى ليٰـ ٱ و ٠ءجي

**VII.   Liens, attorneys' fees, and engagement of IPSA for lien resolution.**

Any awards in this VPCRF shall be subject to satisfying the lien requirements reflected in the Settlement Agreement Addendum 2 and the Plan (§§ 5.10 and 5.11). Liens that are subject to court adjustment may be heard and decided by the IPSCA, subject to MDL Court approval. Settlements that require lien holder approval unless approved by a court may also be heard and decided by the IPSA, subject to MDL Court approval.

All notices of award to Eligible and Qualified Virginia Claimants under these ICRFP shall disclose  that the award amount is subject to payment of liens and (if applicable) attorneys' fees and expenses pursuant to engagement agreements between the Qualified Virginia Claimant and his/her counsel. Payment of such liens shall be made by the Tort Trustee, unless after the amount of the lien has been negotiated and agreed upon, the Qualified Virginia Claimant is represented by counsel and such counsel agrees to make such payments to the lienholder to the satisfaction of the Tort Trustee and the IPSA.

To the extent that liens are not resolved by the Tort Trustee globally as indicated in §§ 5.10 and 5.11 of the Plan or by Virginia Claimants or their counsel, the IPSA shall be deemed engaged by the affected Claimants for the purposes of resolving any liens in connection with distributions to such Claimants, provided, however, that, for those Qualified Virginia Claimants represented by counsel, the IPSA shall be engaged for purposes of resolving liens only upon written instruction by such counsel.  Notwithstanding the foregoing, if the distribution due an

Eligible Claimant under these ICRFP is less than the amount owed on the lien, the IPSA shall discuss the circumstances with the Eligible Claimant prior to any engagement.

## VIII.   Payments of Administrative Expenses

The IPSA shall request from the Tort Trustee an initial expense distribution from the Virginia Provider Fund in the amount of $700,000. It is anticipated that such funds shall be held by the IPSA in trust (the "Expense Trust") for the payment of "Allowed Expenses," as defined below. Allowed Expenses shall include the fees and costs incurred by the IPSA, the IPSCA and the Appeals IPSA, all in accordance with agreements that shall be executed in connection therewith. Additional expense distributions may be requested from the Tort Trustee as authorized by the IPSA and shall be deposited in the Expense Trust with the IPSA in the same manner.

Any fees collected (as opposed to deductions from Awards) in connection with appeals or Special Circumstances petitions, shall be deposited with the IPSA to be held in the same manner. If any such funds are remaining and will not be used for expenses, they shall be forwarded to the Tort Trustee for the Virginia Provider Fund prior to the final distribution to the Eligible and/or Qualified Virginia Claimants and included within such funds for distribution to such individuals.

## IX.    Final Accounting

Following the final distributions from the Remaining Retention Pool and /or Special Circumstances Pool, the IPSA shall furnish a statement reflecting all payments to each Eligible and Qualifying Virginia Claimant as well as the costs distributed from the Virginia Provider

Fund. Such statement shall be made available to all Eligible and Qualified Virginia Claimants and their counsel, and distributed as further required by the IPSA or the MDL Court.

## X.    Claims Assistance

The IPSA is authorized to establish a claims assistance procedure for providing information and claims assistance to Claimants and their counsel. Such assistance shall be staffed by employees of the IPSA in a manner to provide assistance regarding ICRFP procedures, eligibility requirements, submission requirements (including the documentation required), denials, deficiencies, the process for curing deficiencies, and other procedural and substantive issues.

ATTACHMENT B

# Points Matrix

**The point assignments made within this Matrix and the Standards of Proof applicable thereto are used solely as tools for proportioning the funds available for distribution to the Claimants under these ICRFP. Such points are in no way to be used for earmarking particular portions of any Claimant's award.**

     I.     <u>Seven Claim Base Categories</u>.

This Matrix adopts seven categories of claims which are based on the criteria used in the NECC Claims Resolution Facility Procedures. Eligibility for classification within each category shall be governed by the standards of proof in <u>Attachment C</u>. The terms used in this Matrix assume eligibility requirements set forth in these ICRFP. No Claimant failing to establish the criteria for one of the following Base Categories shall be allowed to participate in the ICRFP distributions.

CATEGORY I:     Death after injection from one of the Three Contaminated MPA Lots at Insight Imaging in Roanoke, Virginia ("MPA injection") and fungal meningitis and/or spinal or paraspinal fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis).

CATEGORY II:     Fungal meningitis with a secondary or related spinal or paraspinal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis) after MPA injection.

CATEGORY III:     Fungal meningitis without secondary infection after a MPA injection.

یی

وگئی ﺒﻼﻭی ﻪ ﺗ۪ﺑی ﺑﯿ۪ﺎٗ ﺭ ﻪ ﭼﯥ

CATEGORY IV:      Spinal or paraspinal (non-meningitis) fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, phlegmon, abscess and/or arachnoiditis) after MPA injection.

CATEGORY V:      Fungal Peripheral joint infection (e.g., hip, knee, shoulder, elbow and/or ankle) after MPA injection.

CATEGORY VI:      MPA injection followed by documented symptoms associated with fungal meningitis or other fungal infection, i.e. headache, word-finding difficulty, fever, photophobia, nausea/vomiting, neck stiffness or pain, back pain, urine retention, slurred speech, limb weakness, numbness and/or pain at the injection site, resulting in medical treatment that includes at least one lumbar puncture.

CATEGORY VII:      MPA injection.

II.      <u>Point Allocations</u>.

    A.  <u>Base Points by Category</u>.  Claimants proving that they qualify for these respective Base Categories shall be awarded the following base points:

        i.  CATEGORY I:      60 points

        ii.  CATEGORY II:      50 points

        iii.  CATEGORY III:      40 points

        iv.  CATEGORY IV:      20 points

        v.  CATEGORY V:      20 points

        vi.  CATEGORY VI:      5 points

vii. CATEGORY VII:     2 points

B.  Death Case Adjustments

In Category I cases, the Claimant will be entitled to the following additional points based upon the surviving beneficiaries as defined by Virginia law (Va. Code § 8.01-50, et. seq.): Specifically:

If decedent was survived by a spouse or child, who was under the age of 21 at the time of death, who was a student and still dependent on parent for support, then the Claimant will receive an additional 100 points for each.

If decedent was survived by an adult child, then the Claimant will receive an additional 30 points per child.

If decedent was not survived by a spouse or child, but was survived by a parent, sibling, or a grandchild where the parent was a deceased child of the decedent, then the Claimant will receive 10 points for each of these surviving family members.

C.  Past Medical Bills and Wage Loss

As part of each claim, and subject the standards of proof requirements set forth in Attachment C, a Claimant shall be awarded points for documented medical expenses incurred and for lost wages caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA Lots.  The cut-off date for claims for past medical bills and lost wages shall be February 28, 2015.

For each $1000 of either past medical bills related to medical treatment or lost wages caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA

Lots, the Claimant will receive 1 pt. per $1000, or a pro rata portion thereof, of all documented medical bills or lost wages incurred through February 28, 2015. For example, if a Claimant incurred $112,346 in past medical expenses, and $13,500 in lost wages as of February 28, 2015, then the Claimant would receive 112.346 points for past medicals, and 13.5 points for lost wages for a total of 125.846 points under this Criteria II.C.

D. Future Medical Bills and Future Wage Loss

As part of each claim, and subject to the specific standard proof set forth in Attachment C, a Claimant may be awarded points for properly established claims for future medical treatment and expenses and for lost future wages that will be incurred after February 28, 2015 where such damages are a result of illness and/or complications arising from the injection with the Contaminated Lots. For each $1000 of either future medical bills or future lost wages resulting from Claimant's injuries related to the medical condition(s) caused as a result of illness and/or complications arising from the injection from one or more of the Three Contaminated MPA Lots, the Claimant will receive 1/3 pt. per $1000, or a pro rata portion thereof, of all future economic damages. Claims for future non-medical economic damages shall be treated uniformly with a 4.0% discount rate (less than 10 years) and 4.5% discount rate (if greater than 10 years) and a 2% growth rate (if less than 10 years) and 2.5% growth rate (if greater than 10 years). For future medical expenses extending into the future for more than two years, the same discount rates shall apply, but the growth rate shall be 5.25%.

E.   Total Number of Lumbar Punctures

As part of each claim, other than Category VII claims, and subject to the specific standard proof set forth in Attachment C, for each lumbar puncture the Claimant received, the Claimant will be awarded 2 pts.

F.   Anti-Fungal Treatment

As part of each claim, and subject to the specific standard proof set forth in Attachment C, for each day the Claimant was administered or took anti-fungal medication (IV or orally), the Claimant will receive ¼ pt.

G.   Stroke

As part of each claim, and subject to the specific standard of proof set forth in Attachment C, if the Claimant suffered a documented stroke which is linked to a fungal meningitis diagnosis, then that Claimant will receive 30 additional points.

H.   Renal Failure

As part of each claim, and subject to the specific standard of proof set forth in Attachment C, if the Claimant has suffered from Stage 3, 4, or 5 renal failure which is linked to a fungal infection or to a diagnosis of fungal meningitis, then the Claimant shall receive 30 additional points.

I.   Other Factors

As part of any claim, any Claimant may, as part of the initial Claim submission, include a two page written request to the IPSA for an

award of up to an additional 10 points based on what the Claimant considers to be the unusual circumstances of his/her situation, which the Claimant feels are not adequately addressed by the points otherwise assigned by the Matrix.  Any Claimant who files a request for an award of "Other Factors" points as part of his/her Claim, shall be disqualified from making a Special Circumstances Petition, and receiving a Special Circumstances Award.

Simply filing an "Other Factors" request with a Claim does not mean the IPSA will automatically award extra points, and the maximum number of points that may be awarded to any Claimant under this provision shall be 10 additional points.

The IPSA shall consider the written requests that are submitted, and may in her sole discretion,  determine the correct number of additional points to be awarded in connection with each Claimant's "other factors" request.  In doing so, the IPSA may consider the other awards being made to similarly situated Claimants in the same Claim Category, and the nature of unusual circumstances presented in an effort to assess whether the Claimant's Matrix Award based on points otherwise awarded treat the Claimant fairly.

J.   Time-Barred Claims

Any Claimant who submits a claim, but who is found not to have filed a timely civil claim in state or federal court alleging a tort claim against Insight relating to or arising from that individual or his/her decedent having received an injection from one or more of the Three Contaminated MPA Lots at the Insight Imaging clinic in Roanoke, Virginia, will receive an award of only one-half (1/2) point to reflect the fact that the claim is not viable because it is time barred. Time-barred

Claimants are excluded from participation in the Special Circumstances petition process.

III.   <u>Examples of Application of Matrix</u>.

Once the "point value" is determined by the IPSA, the Matrix Award is a simple mathematical calculation of multiplying the number of points assigned by the "point value" for the "Matrix Award."

Points in non-death cases would be determined under the Matrix as follows:

Category +

1 pt. per $1000 of past economic damage +

1/3 pt. per $1000 of future economic damage +

2 pts. for each lumbar puncture +

1/4 pt. per day on antifungal medications +

30 points for a stroke or chronic stage 3, 4 or 5 renal failure +

Extra points (up to 10 pts.) for "other factors" =

TOTAL POINTS

NOTE: Category I cases will receive additional points set forth above if decedent was survived by statutory beneficiaries.

Example: A Category II case with $150,000.00 of past medical bills and past wage loss with $45,000.00 of future medicals where Claimant had 5 lumbar punctures and 100 days of antifungal treatment would receive:

Category II                    =        50 points

لآی

وقتی‌بلاری + ایکی پیآر و چی

| | | |
|---|---|---|
| $150,000 past economics | = | 150 points |
| $45,000 future economics | = | 15 points |
| 5 lumbar punctures | = | 10 points |
| 100 days of antifungals | = | 25 points |
| TOTAL | = | 250 points |

If the "point value" determined by the IPSA is $700.00, then the Matrix Award in this example would be $175,000.00.

IV.    Special Circumstances Petition.

The Claims Process includes an opportunity for those with exceptional and/or unique circumstances which make the Matrix Award inadequate to file a petition with the IPSA for a potential supplemental discretionary award from the Retention Pool.  There is a $2,000 fee required of anyone who desires to file a Special Circumstances Petition, and there is no guarantee of a Special Circumstances Award simply because the petition is filed.  For details, see Section V(G) of these ICRFP.

V.    Appeal Rights.

There is a limited right of appeal of a Matrix Award and/or a Special Circumstances Award as set forth in these ICRFP.

## ATTACHMENT C

### Standards of Proof

The following standards of proof will be used to evaluate claims submitted under these ICRFP.

I.    <u>Claims Forms</u>.  Each Claimant must submit a completed Claims Form signed under oath by the Claimant or an authorized representative.

II.    <u>MPA Injection</u>.  Medical or other records documenting an injection from one or more of Lots 05212012@68, 06292012@26 or 08102012@51 of preservative-free Methylprednisolone Acetate ("MPA") compounded by New England Compounding Pharmacy ("NECC") (the "Three Contaminated MPA Lots "), including, e.g.: a letter from Insight informing the Claimant or (where a representative is filing a claim on behalf of another person), the person that s/he received an injection from one or more of the Three Contaminated MPA Lots.  Alternatively the Claimant may request that the IPSA review the list of patients who received an injection from one or more of the Three Contaminated MPA Lots that Insight submitted to the Trustee in 2013 in order to establish the necessary proof of injection (the "Insight List").

III.    <u>Claim Categories</u>.  The seven Base Categories (I – VII) may be established by submitting the following documents, in addition to evidence of a MPA injection (Section II above):

    A.    <u>Category I (Death After MPA Injection)</u>.  (a) A certified death certificate documenting death as occurring after injection from one of the Three Contaminated MPA Lots  with the immediate or underlying cause of death containing one of the following words or phrases: meningitis, meningoencephalitis, encephalitis, epidural injection, methylprednisolone injection, steroid injection, exserohilum, aspergillus, abscess, or arachnoiditis; or (b) (i) a certified death certificate and medical documentation of a diagnosis of fungal meningitis, meningoencephalitis, encephalitis after injection from one or more of the Three Contaminated MPA Lots , and (ii)

وي

documentation that the Claimant received Anti-Fungal Treatment; or (c) a certified death certificate and medical documentation of a diagnosis of spinal or paraspinal fungal infection (vertebral osteomyelitis, discitis, sacroiliitis or epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of epidural clumping or unevenness of nerve routes after an MRI) after a spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , plus documentation that the Claimant received Anti-Fungal Treatments; or (d) a death certificate and medical documentation that the Claimant suffered cerebrovascular accident/stroke occurring (but not a transient ischemic attack only) on or before December 31, 2012, after injection from one or more of the Three Contaminated MPA Lots ; or (e) a certified death certificate and proof that the Claimant was listed on the Virginia NECC List of death cases.  If such proof is presented for deaths occurring before September 30, 2013, the IPSA shall presume that the death was the result of the MPA injection or complications arising therefrom unless there is cause to believe that the death was a result of an unrelated event (i.e., auto accident, unrelated illness).  For deaths occurring after September 30, 2013, where there is reason to believe that the death resulted from an unrelated event, a certified death certificate and other such proof deemed sufficient by the IPSA to establish the death was the result of a MPA injection or complications arising therefrom.

B.      Category II (Fungal Meningitis Plus Secondary Fungal Infection).  Medical documentation of (a) (i) a diagnosis of fungal meningitis, meningoencephalitis, encephalitis after injection from one or more of the Three Contaminated MPA Lots , and (ii) a diagnosis of spinal or paraspinal fungal infection (including vertebral osteomyelitis, discitis, sacroiliitis, epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of abnormal thickening, intradural clumping or unevenness of nerve roots after MRI) after spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , plus documentation that the Claimant received Anti-Fungal Treatment; or (b) proof that the Claimant was listed on both the Virginia NECC List of NECC's fungal meningitis or stroke cases and

was listed on the Virginia NECC List of NECC's spinal or paraspinal fungal infection cases, or was listed on the Virginia NECC List of NECC's fungal meningitis and spinal or paraspinal injection cases.

C.    Category III (Fungal Meningitis).   May be established by presenting medical documentation of (a) (i) diagnosis of fungal meningitis, meningoencephalitis or encephalitis after injection from one or more of the Three Contaminated MPA Lots, and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia NECC List of NECC stroke or fungal meningitis cases.

D.    Category IV (Spinal or Paraspinal Fungal Infection (But Not Meningitis)). May be proved by medical documentation of (a) (i) a diagnosis of spinal or paraspinal fungal injection (including vertebral osteomyelitis, discitis, sacroiliitis, epidural or paraspinal phlegmon, epidural or paraspinal abscess, arachnoiditis and/or documentation of abnormal thickening, intradural clumping or unevenness of nerve roots after MRI, after a spinal or paraspinal injection from one or more of the Three Contaminated MPA Lots , and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia List of spinal or paraspinal fungal infection cases.

E.    Category V (Fungal Peripheral joint infection (But Not Meningitis)).   May be proved by medical documentation of (a) (i) a diagnosis of fungal peripheral joint infections after joint injection from one or more of the Three Contaminated MPA Lots, and (ii) documentation that the Claimant received antifungal treatment; or (b) proof that the Claimant was listed on the Virginia NECC List of peripheral joint infection cases.

F.    Category VI (Symptoms and at Least One Lumbar Puncture).   May be established by presenting contemporaneous medical records documenting that the Claimant suffered on or before March 31, 2013 from one or more of the symptoms listed in the definition of Category VI in §I of Attachment B, after an injection from one or

more of the Three Contaminated MPA Lots, and medical records documenting at least one lumbar puncture prior to April 30, 2013.

G.      Category VII (Symptoms and Lumbar Puncture not required).     Only requires injection from one or more of the Three Contaminated MPA Lots.

IV.     Medical Conditions.

A.      Arachnoiditis may be established by medical records that document (a) the diagnosis of an arachnoiditis, or there must be documentation of intradural clumping or unevenness of nerve roots after MRI after an injection from one or more of the Three Contaminated MPA Lots, and (b) antifungal treatment.

B.      "Anti-Fungal Treatment" as used in these standards of proof requires presentation of medical records documenting the length of treatment with Amphotericin B, Voriconazole, Posaconazole, Itraconazole and/or Isavuconazole after injection from one or more of the Three Contaminated MPA Lots.

C.      Lumbar puncture adjustment will require medical records documenting one or more lumbar punctures after injection from one or more of the Three Contaminated MPA Lots and before December 31, 2014.

D.      Stroke adjustment requires medical documentation of a diagnosis of cerebrovascular accident/stroke (but not a transient ischemic attack only) after injection from one or more of the Three Contaminated MPA Lots and a diagnosis of fungal meningitis.  If the cerebrovascular accident/stroke occurred on or before December 31, 2012, the IPSA may presume that the stroke was the result of the MPA injection or complications arising therefrom unless there is reason to believe that the stroke was the result of an unrelated event (i.e., the Claimant has a past history of strokes).  For strokes where there is a reason to believe that it is unrelated to the MPA injection or complications arising therefrom, or for strokes occurring after December 31, 2012, proof deemed sufficient by the IPSA that the stroke was the result of the MPA injection or complications therefrom is required.

E.      Renal Failure adjustment may be established by any of the following records that show that the kidney disease is linked to an injection of one or more of the Three Contaminated MPA lots, or complications arising therefrom either by: (i) medical records or a treating physician statement that state that the Claimant or decedent suffers or suffered  from Stage 3, 4, or 5 kidney disease which began within 12 months after injection from one or more of the Three Contaminated MPA Lots or the kidney disease is linked to an injection of one or more of the Three Contaminated MPA lots, or complications arising therefrom or (ii) medical records documenting acute renal insufficiency within 30 days of the first treatment with amphotericin B.   Proof of acute renal insufficiency shall consist of medical records documenting a glomerular filtration rate ("GFR") of <60 within 30 days following treatment with amphotericin B.   The applicable GFR score is the GFR score listed for the patient's race (non-African American or African American).   If GFR scores are not available, medical records documenting a Creatinine Clearance ("CrCl") level within 30 days after the first treatment with amphotericin B, where such CrCl level is commensurate with a GFR of less <60 is sufficient.

F.      Vertebral osteomyelitis may be established by medical records that document (a) a diagnosis of vertebral osteomyelitis after injection from one or more of one or more of the Three Contaminated MPA Lots, and (b) antifungal treatment.

V.      <u>Death Adjustments</u>.  Any administrator or executor making a claim on behalf of a decedent who seeks an award of additional points based upon surviving beneficiaries shall provide documentary evidence of dependent and/or adult children as of the date of death.

A.      <u>Dependent Child</u>.  For Dependent Children Adjustment:

(1)      A child is considered to have been dependent on the decedent if he or she is: (a) under the age of 21 as of the date of death and listed as a qualifying dependent child on the decedent's 2011 or 2012 federal income tax return; or (b) a natural or legitimate child under the age of 21 as of the date of death; or (c) an adopted

child under the age of 21 as of the date of death; or (d) a stepchild under the age of 21 as of the date of death who lived with the decedent in a regular parent-child relationship at the time of the decedent's death or there are reasons why the stepchild did not live with the decedent (i.e., medical reasons, to attend school or other similar reasons); or (e) under the age of 21 as of the date of death who lived with the decedent in a regular parent-child relationship at the time of the decedent's death or did not live with the decedent because of medical reasons, to attend school or other similar reasons, and to whose support the decedent made regular and substantial contributions.

(2)     Proof that a child was under 21 as of the date of death may be provided by submitting the decedent's 2011 or 2012 federal tax return listing the child as a dependent and listing the child's date of birth, or by submitting a certified birth certificate of the child.

(3)     Proof of dependency may be provided as follows: (a) a copy of the decedent's federal tax return for 2011 or 2012, listing the child (ren) as a qualifying dependent child and listing his or her date of birth; (b) a certified birth certificate that indicates that a child was a natural or legitimate child of the decedent. In the event that decedent's name does not appear on the birth certificate, proof may be provided by documentation evidencing a judicial determination of support; (c) for domestic adoptions, a copy of a revised birth certificate showing the decedent as a parent. For foreign adoptions, proof may be provided by submitting a copy of the adoption decree and, if applicable, documentation showing the child's change of name.  Since rules for foreign adoptions vary by country, alternative and/or additional documentation may be required by the Settlement Administrator; (d) for a child that was a stepchild, a certificate of marriage, evidencing the marriage of the child's biological parent and the decedent, and a certified birth certificate or documentation evidencing a judicial determination of support and a signed statement from a person with direct knowledge that verifies that the stepchild lived with the decedent in a regular parent-child relationship at the time of decedent's death or describing the reasons why the stepchild did not live with the decedent (i.e., for medical reasons, to attend school, or for other

similar reasons); (e) if dependency is claimed on the basis of the decedent having made regular and substantial contributions to the support of the child, a signed statement from a person with direct knowledge that verifies that the child (or children) lived with the decedent in a regular parent-child relationship at the time of the decedent's death or describing the reasons why the child did not live with the decedent (i.e., for medical reasons, to attend school, or for other similar reasons) and one or more of the following proofs: (1) evidence of eligibility as a dependent child for benefits under State or Federal programs; (2) cancelled checks, money orders, or receipts for periodic payments received from the decedent for or on behalf of the child; (3) evidence of goods or services that show regular contributions of considerable value from the decedent for or on behalf of the child; or (4) proof of coverage of the child as a family member under the decedent's Federal Employees Health Benefits enrollment or private health insurance.

B. <u>Spouse</u>. For Spousal Adjustment, the decedent's certified death certificate.

C. <u>Adult Children</u>. For Adult Children Adjustment, listing of name, date of birth, and current address of each surviving natural or adopted adult child as of decedent's date of death on the Claims Form and a copy of the decedent's obituary identifying the surviving natural or adopted adult child(ren), or a signed statement from a person with direct knowledge that the decedent was survived by a natural or adopted adult child(ren) and identifies the surviving adult child(ren).

D. <u>Siblings</u>. For Siblings Adjustment, listing of name, date of birth, and current address of each surviving sibling as of decedent's date of death on the Claims Form and a copy of the decedent's obituary identifying the surviving sibling, or a signed statement from a person with direct knowledge that the decedent was survived by a sibling and identifies the surviving sibling.

VI. <u>Past Medical Bills</u>. For Claimants seeking an award based on past medical bills, the Claimant will need to supply a statement from either the treating physician or a physician qualified to offer the opinion that the medical treatment and the expenses presented are related to the care and treatment provided to the Claimant after receiving

an injection from one or more of the Three Contaminated MPA Lots , and that the treatment, care and medical expenses are connected to the medical conditions that are causally connected to the injection from one or more of the Three Contaminated MPA Lots .

VII.   <u>Claim for Past Lost Wages</u>.  Any Claimant who is making a claim for lost wages of less than $2,000.00 may do so by providing a signed statement from his or her employer stating the time missed from work (which the Claimant attributes to the complications resulting from having received an injection of MPA from one or more of the Three Contaminated MPA Lots) and the rate(s) of pay during such period(s) of missed work, or by producing employment records of the same.

For lost wages claims in excess of $2,000.00, the Claimant may provide either a federal tax return for 2011 (filed either jointly or individually) or the Claimant's 2011 W-2s, 1099s and/or 10-Ks, and the same documentation for each of the years 2012, 2013 and 2014, <u>plus</u> a statement from the Claimant's current or past employer (if self-employed, a statement by the Claimant) that the Claimant missed time from work during the time periods or by producing employment records of same; Claimant shall also produce documentation from either his/her treating physician or a qualified physician that the reason for termination or the inability to work was due to medical complications related to the MPA injection.

VIII.   <u>Future Medical Expenses</u>.  Any Claimant who makes a claim for Future Medical Expenses must provide a letter or statement from a treating physician or other qualified physician supporting such claim. In addition, if a Claimant seeks Future Medical Expenses in excess of $50,000 and for a period of greater than two (2) years into the future, then the Claimant must provide a life care plan prepared by an individual who has been previously qualified to provide opinion testimony on this topic in a Virginia state court. In addition, any claim for Future Medical Expenses to be incurred over a period greater than two (2) years must include a growth rate of 5.25% and a discount

rate of 4% (if less than 10 years) and a discount rate of 4.5% (if greater than 10 years). Otherwise, such proof may be established with statements from treating physicians.

IX.     Future Lost Wages.  Any Claimant who makes a claim for Future Lost Wages must provide a letter or statement from a treating physician or other qualified physician supporting such claim.  Any Claimant seeking an award for future lost wages and/or other employment benefits in excess of $50,000 and for a period greater than two (2) years and involves projected growth of wages and/or employment benefits must apply a wage/benefits growth rate of 2% (if less than 10 years) and 2.5% (if greater than 10 years) or provide a report from a qualified economist or other expert who has previously been qualified to provide such opinion testimony in a Virginia state court justifying application of any other rate. Claims greater than two (2) years must also apply a discount rate of 4% (if less than 10 years) and a discount rate of 4.5% (if greater than 10 years).  If more than five years of Future Lost Wages are sought, the Claimant must submit the opinion of a vocational rehabilitation expert or other qualified expert addressing any mitigating employment factors such as the ability to obtain other employment in another field.

لأني

وڨي ۋلأوى ۼ لى لى ني أو ۼ ۼي