**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

All Suits Against the Saint Thomas Entities

MDL No. 2419
Dkt. No 1:13-md-2419 (RWZ)

**SAINT THOMAS ENTITIES' RESPONSE IN OPPOSITION TO MOTION TO QUASH SUBPOENA TO DR. PHILIP J. AUSTIN, PH.D.**

Pursuant to Federal Rules of Civil Procedure 45 and 26, the Saint Thomas Entities[1] hereby ask the Court to deny the Plaintiffs' Steering Committee's ("PSC") motion to quash the Saint Thomas Entities' subpoena, deposition notice, and document requests to Dr. Philip J. Austin, Ph.D and compel him to produce the documents requested and submit to a deposition. The Saint Thomas Entities further ask that the Court deny the PSC's alternative request for a protective order.

## I. SUMMARY OF ARGUMENT

The discovery process is supposed to be a search for the truth. Here, numerous health care providers are searching for answers as to how and why the methylprednisolone acetate ("MPA") at issue in this litigation was contaminated, now that the Plaintiffs have lost interest in doing so. The PSC filed photos and sworn testimony in this MDL showing that Liberty Industries, Inc. ("Liberty") defectively designed and installed a New England Compounding Center ("NECC") cleanroom, and that those defects caused the contamination. Through Dr. Austin's sworn testimony about his December 2012 inspection at NECC, the PSC was able to

[1] Saint Thomas West Hospital f/k/a St. Thomas Hospital; Saint Thomas Health; and Saint Thomas Network.

defeat Liberty's attempt to obtain a summary judgment from this Court. Having obtained affirmative relief based on Dr. Austin's sworn testimony, the PSC should not be allowed to now hide that evidence merely because Liberty has settled with them, and this Court should reject any attempts by the PSC to now conceal the truth behind the sworn testimony that it submitted to this Court merely nine months ago.

## II. BACKGROUND

Plaintiffs allege injuries and death based on contaminated epidural injections of MPA compounded and sold by NECC.[2] Plaintiffs have made claims against numerous parties other than NECC, including the Saint Thomas Entities and Saint Thomas Outpatient Neurosurgical Center ("STOPNC").[3] STOPNC, like thousands of health care providers across the country, did nothing more than purchase medication from NECC to administer to patients.[4] The Saint Thomas Entities have been sued for little more than the fact one of them (Saint Thomas Network) owns half of STOPNC.

The Saint Thomas Entities have asserted the affirmative defenses of comparative fault and sole intervening cause in this litigation.[5] Quite simply, the Saint Thomas Entities assert that the parties who actually caused or contributed to the contamination are solely responsible for injuries suffered by patients.[6] One such responsible party, according to the PSC, is Liberty.[7] Liberty designed, manufactured, and installed the cleanroom used to compound, mix, prepare, and assemble the contaminated products.[8] Plaintiffs allege that Liberty's cleanrooms contained defects that made them unsuitable for their intended use and vulnerable to the manufacture of

---

[2] *See* Mem. of Decision [re: Motions to Dismiss] (August 29, 2014) [Dkt. No. 1360].
[3] *Id.* at 2.
[4] *Id.* at 3.
[5] *See* Saint Thomas Entities' Master Answer and Affirmative Defenses to Plaintiffs' Amended Master Complaint at 51-120 [Dkt. No. 1464].
[6] *Id.*
[7] *See* Second Amended Master Complaint at ¶ 4[Dkt. No. 1719].
[8] *See id.*

contaminated products.[9] They allege that without Liberty, there would have been no cleanrooms for NECC to compound medicine in, and that without the alleged defects in Liberty's cleanrooms, the contamination may well have been avoided.[10]

In December of 2012, shortly after the NECC facility was shut down, Dr. Philip J. Austin and his father, Dr. Philip R. Austin—both leading consultants in the cleanroom industry—conducted a three-day inspection of the NECC facility and the cleanrooms therein under the supervision of federal agents.[11] The purpose of the investigation was to document the conditions of the facility and attempt to identify the likely causes of the contamination of the MPA at issue.[12] Dr. Austin concluded that "to a reasonable degree of scientific certainty cleanroom one designed and constructed by Liberty Industries was improperly designed and installed to ensure its intended use for the compounding of sterile injectable drugs."[13] In July of 2014—over a year and a half later—certain parties were permitted to briefly tour the premises for about three hours each.[14]

In December of 2014, the PSC filed a response to Liberty's motion for summary judgment, and filed with it the declaration of Dr. Phillip J. Austin.[15] The declaration included lengthy testimony about the various defects in the design, construction, and installation of the NECC cleanroom in which the contaminated MPA was manufactured.[16] Dr. Austin's sworn declaration detailed some of his observations from the 2012 inspection, including large gaps he

---

[9] *See id.*
[10] *See id.*
[11] *See* Declaration of Dr. Philip J. Austin (hereinafter "Austin Dec.") at ¶ 33 [Dkt. No. 1651-1], attached hereto as Ex. A. Note that the initial Declaration of Dr. Philip J. Austin is located at Dkt. 1610-1, and an amended declaration was filed on January 15, 2015 [Dkt. No. 1651].
[12] *See id*. at ¶ 33.
[13] *Id.* at ¶ 4.
[14] *See* Aug. 7, 2014 Status Conference Transcript at 20:14-21, attached hereto as Ex. B.
[15] *See* Liberty's Motion for Summary Judgment [Dkt. No. 1471]; PSC's Opposition to Liberty's Motion for Summary Judgment [Dkt. No. 1610] and [initial] Austin Dec. [Dkt. 1610-1]; and amended Austin Dec. [Dkt. No. 1651].
[16] *See generally* Austin Dec.

observed in the cleanroom ceiling grid.[17] The PSC likewise filed some of the pictures from Dr. Austin's inspection, pictures taken from above the ceiling of the cleanroom.[18] Based largely on the testimony from Dr. Austin regarding his 2012 inspection shortly after NECC closed, the Court denied Liberty's motion for summary judgment, stating "in light of the declaration of plaintiff's expert highlighting substantial alleged design flaws and testimony given by Liberty's witnesses at their deposition, genuine issues of fact remain for a jury to decide."[19]

After its summary judgment was denied, Liberty settled with the PSC for $1,000,000.00.[20] As a result, the PSC is in the process of dismissing its claims against Liberty.

On June 22, 2015, the Saint Thomas Entities served a subpoena, deposition notice, and requests for production on the PSC, in which the Saint Thomas Entities requested the deposition of Dr. Austin, as well as highly relevant documents such as all photographs taken during Dr. Austin's 2012 inspection.[21]

Having settled with Liberty and no longer interested in providing juries with evidence of Liberty's fault, the PSC filed a motion to quash the Saint Thomas Entities' Subpoena, Deposition Notice, and Document Requests.[22]

Because Dr. Austin possesses firsthand, highly relevant evidence of the condition of the NECC cleanroom ceilings shortly after the facility was shut down that cannot be obtained by

---

[17] *See* Austin Dec. at ¶¶ 39-46.

[18] *See* Ex. 6. to the Declaration of Marc Lipton [Dkt. No. 1519-6], attached hereto as Ex. C.

[19] Memorandum of Decision Denying Liberty's Motion for Summary Judgment [Dkt. No 1613].

[20] *See* Ex. A (Settlement Agreement) to the Joint Motion of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors for an Order Approving Plan Support and Settlement Agreement with Liberty Industries, Inc. at pp. 5-6, Case No. 12-19882 [Bankr. Dkt. No. 1219-1] ("'Settlement Amount' means the sum of $1,000,000 (USD) to be paid by Liberty and [Liberty's Insurer] . . . .").

[21] *See* Saint Thomas Entities' Notice of Filing Discovery Subpoena and Subpoena [Dkt. No. 2003], attached hereto as Ex. D.

[22] *See* PSC's Motion to Quash the Saint Thomas Entities' Subpoena, Deposition Notice, and Document Requests [Dkt. No. 2069] (hereinafter "Motion to Quash").

other means, the Saint Thomas Entities ask the Court to deny the PSC's motion to quash and order Dr. Austin to submit to a deposition.

## III. ARGUMENT AND AUTHORITIES

### A. The PSC opened the door to discovery from Dr. Austin by filing his sworn testimony and some of his evidence in this MDL.

While Dr. Austin has provided some expert opinions to this Court (resulting in an order denying Liberty's motion for summary judgment), he is also a key fact witness regarding the misalignment of the cleanroom grid, which caused or contributed to the contamination at issue in this litigation. His knowledge includes the precise location of the observed ceiling gaps and the compounding equipment that was located below such gaps. The PSC contends that the Saint Thomas Entities are not permitted to depose Dr. Austin because he is a "non-testifying consultant."[23] However, that is simply not true. By utilizing Dr. Austin to obtain affirmative relief in this Court, the PSC alone made him a testifying expert.

Under FED. R. CIV. P. 26(b)(4), experts are separated into two categories with different discovery limitations. Rule 26(b)(4)(A) addresses "testifying experts," and permits an opponent to discover the facts and opinions of such experts. Rule 26(b)(4)(D), on the other hand, addresses "consulting experts," and governs discoverability of information possessed by such experts (who have not, and are not expected, to testify in the litigation).

"Ordinarily, a party may not . . . discover facts known or opinions held" by a consulting expert.[24] However, a party may seek discovery as to even a consulting expert "on showing exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means."[25]

---

[23] *See* Motion to Quash at p. 3.
[24] FED. R. CIV. P. 26(b)(4)(D)(ii).
[25] *Id.*

Many courts have held that discovery regarding an expert's statements is allowed when a party submits that expert's declaration in support of their own summary judgment motion, or in opposition to an opponent's motion. In effect, the act of submitting such a sworn declaration re-designates a consulting expert as a testifying expert, and opens the door to discovery.[26]

For example, in *Morningware, Inc. v. Hearthware Home Products*, the court found that "although [defendant] initially may have intended [its expert] to serve only as a consulting expert, when [the expert] submitted a sworn affidavit (i.e., testimony) to the Court in connection with its opposition to summary judgment and its cross-motion for summary judgment, [the expert] became a testifying expert."[27] The court found it immaterial that the defendant submitted the testimony in connection with summary judgment and not trial, "given that the purpose of summary judgment is to determine, based on all of the evidence gleaned in discovery, whether any disputed issues of material fact exist for trial."[28]

Similarly, in *Worley v. Avanquest North America, Inc.*, the court held that when plaintiffs "put their experts' investigation into play" by including in their amended complaint certain factual allegations resulting from the expert's examination of defendant's software, the defendant had a right to discover information relating to those factual allegations.[29] There, the court permitted the deposition of the plaintiff's expert as to information related to the expert's statements, findings, or opinions that were put at issue.[30] In particular, the court permitted the deposition of the expert regarding the factual allegations in the plaintiff's petition that were supported by the expert's investigation.[31]

---

[26] *See Sims v. Metro. Life Ins. Co.*, No. C-05-02980, 2006 U.S. Dist. LEXIS 100677, at *9-10 (N.D. Cal. Dec. 27, 2006).
[27] No. 09 C 4348, 2012 U.S. Dist. LEXIS 121333, at *21 (N.D. Ill. Aug. 27, 2012).
[28] *Id.* (citing *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)).
[29] No. C 12-04391, 2013 U.S. Dist. LEXIS 175305, at *13-14 (N.D. Cal. Dec. 13, 2013).
[30] *Id.* at *17-19.
[31] *Id.* at *19.

Many other courts have held similarly. *See, e.g.*, *Positive Techs., Inc. v. Sony Elecs., Inc.*, No. 11-cv-2226 SI, 2013 U.S. Dist. LEXIS 49738, at *7-8 (N.D. Cal. Apr. 5, 2013) ("Because Plaintiff filed [its expert's] declaration during summary judgment proceedings, and the declaration is sworn testimony similar to testimony at trial, Plaintiff cannot now claim that [the expert] is merely a consulting expert with respect to the subjects raised in his declaration."); *SEC v. Reyes*, No. C 06-04435, 2007 U.S. Dist. LEXIS 27767, at *9-12 (N.D. Cal. Mar. 30, 2007) (requiring production of materials experts relied upon in relation to those experts' declaration in support of a summary judgment motion); *Sims*, 2006 U.S. Dist. LEXIS 100677, at *9-10 (holding that "[s]ubmitting sworn testimony is incompatible with retaining the . . . status of a mere consulting expert immune from discovery" and holding that when a party opened the door to expert testimony by submitting the testimony of its expert in summary judgment proceedings, the opposing party was entitled to depose the expert about the subject of the testimony); *Lugue v. Hercules, Inc.*, 12 F. Supp. 2d 1351, 1358 (S.D. Ga. 1997) ("[A]ffidavits and depositions which support the motion [for summary judgment] are a substitute for live testimony at trial."); *U.S. v. Hooker Chems. & Plastics Corp.*, 112 F.R.D. 333, 339-41 (W.D.N.Y. 1987) (allowing deposition of expert whose declaration defendant submitted in support of a motion for summary judgment); *Cox v. Commonwealth Oil Co.*, 31 F.R.D. 583, 584 (S.D. Tex. 1962) ("[W]hen a party offers the affidavit of an expert witness in opposition to, or in support of, a motion for summary judgment, it waives its right not to have the deposition of said expert taken.").

The reasoning behind such opinions is that "if a party uses a consulting expert's ***statements, findings, or opinions in a filing***, that party has put the expert's statements, findings,

or opinions into the judicial arena and the opposing side may take discovery about those statements, findings, or opinions."[32]

Here, the PSC voluntarily submitted Dr. Austin's declaration, thereby disclosing his investigation and opinions, at summary judgment proceedings in the MDL in an attempt to keep Liberty as a defendant. The PSC's efforts succeeded, leading to Liberty paying significant sums in settlement. As such, Dr. Austin is no longer a consulting expert and the details of his 2012 inspection and resulting conclusions are now subject to discovery.

### B. The Saint Thomas Entities' subpoena, deposition notice, and document requests are not premature.

The Saint Thomas Entities' subpoena, deposition notice, and document requests are not premature. Despite the current scheduling order entered by the Court as to the Tennessee cases—which does not require the disclosure of common experts until October 16, 2015, with common expert depositions to be completed by December 11, 2015—Dr. Austin is not merely an expert witness.[33] He is also an important fact witness. Indeed, he and his father are the only fact witnesses who can testify about the state and condition of the NECC ceiling in 2012, the same year in which the tainted MPA was compounded and shortly after NECC closed. As such, the Saint Thomas Entities are entitled to depose Dr. Austin about his observations and obtain all photographs, notes and samples taken during his inspection.

### C. Even if Dr. Austin were a consulting expert, his observations and opinions would be discoverable under the exceptional circumstances that exist here.

Even if Dr. Austin were a consulting expert, his observations and opinions remain discoverable because exceptional circumstances exist. A party may seek discovery as to a consulting expert under federal law upon "showing exceptional circumstances under which it is

---

[32] *Worley*, 2013 U.S. Dist. LEXIS 175305, at *15 (emphasis added).
[33] *See* July 9, 2015 Order at p. 3 [Dkt. No. 2075].

impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means."[34] The PSC alleges that Saint Thomas Entities cannot make such a showing because they have "already been given access to the documents [they] request[] and preformed [their] own inspection of the NECC facility and its cleanrooms."[35] The PSC's argument has no merit once Dr. Austin's 3-day inspection with federal authorities in 2012—before the Saint Thomas Entities were even sued—is compared to the limited tour of NECC's premises they were allowed to take more than a year and a half later.

Indeed, the NECC bankruptcy trustee and Unsecured Creditors' Committee both opposed the summer 2014 tour of the NECC facility by these and other defendants primarily because of the limited evidentiary value of such a tour. They explained that the condition of the cleanrooms in July 2014 had no bearing on what they looked like in 2012, the year in which the cleanrooms were operational and in which Dr. Austin completed his inspection.[36] Counsel for the bankruptcy trustee stated, "at this point where we're more than two years after the fact, our view was that there literally is ***no evidentiary value*** to anything that was left in the premises."[37] Frederick Fern echoed these sentiments, stating:

> "[G]oing in and looking at the equipment, Judge, ***there is nothing in the same condition as it was in October of 2012.*** There's been no air conditioning. There's been no vent. There's been no negative air pressure. No one has been working in there. So, it's fair to say that ***there's nothing in the same condition*** [as] . . . when the PSC wanted to do their inspection and the Magistrate, in her infinite wisdom, gave them a four-day inspection with videos, experts, drilling, and the PSC took whatever they wanted to do at the time."[38]

---

[34] FED. R. CIV. P. 26(b)(4)(D)(ii).
[35] Motion to Quash at p. 4.
[36] *See generally* Aug. 7, 2014 Status Conference Transcript.
[37] *Id.* at 19:15-22 (emphasis added).
[38] *Id.* at 37:10-20 (emphasis added).

He went on to say, "[i]t's fair to say that ***the evidence they collected back then is a much fairer representation of what the clean room looked like at the time of the alleged negligence than it does 20 months later***, with no one being in there."[39]

Indeed, the PSC's inspection in 2012 was a hard-fought win. Just one month after NECC closed its doors, some plaintiffs began demanding an immediate inspection of the facility. In *Green v. New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center*, prior to the creation of this MDL, Kimberly Dougherty (who was subsequently appointed to the PSC) explained that the facility was "crucially important to this case" and sought an expedited opportunity to inspect it.[40] She expressed concerns that "the premises will be altered and evidence destroyed if [the inspection] does not take place promptly," that "evidence has already likely been spoliated," and that the plaintiffs would suffer "severe prejudice" if further spoliation were allowed.[41] And this was in November of 2012, just one month after the facility closed down. For the PSC to now suggest that the brief tours which occurred 18 months later are somehow sufficient is disingenuous at best.

In a hearing on the issue in November of 2012, Ms. Dougherty stressed "there is physical evidence at the facility that we are very concerned is going to be further compromised. . . ."[42] She explained the evidentiary value of an immediate inspection.[43] She also expressed concerns about potential challenges to the reliability of evidence if the inspection was delayed, explaining:

> The defendants are going to suggest that you do this sometime after an MDL is formed. Your Honor, that's talking March [of 2013] at the earliest, and we simply cannot wait that long. Not only would the evidence be compromised, but

---

[39] *Id*. at 37:21-24 (emphasis added).

[40] No. 1:12-cv-12121, Pl.'s Mot. to Adopt State Court orders Granting Motion to Preserve Evidence and to Permit Inspection of Premises of Defendant at p. 2 [Dkt. No. 7], attached hereto as Ex. E.

[41] *See id.* at 2, 5.

[42] *See* Nov. 28, 2012 Transcript of Motion Hearing at 18:19-19:8, No. 1:12-cv-12121 [Dkt. No. 18], attached hereto as Ex. F. Dougherty further stated, "I might just mention, your Honor, that time is of the essence. The further we go along that we go and we wait to get the sampling, the further that it could be compromised . . . ." *Id.* at 20:12-15.

[43] *Id.* at 20:22-21:9.

> ***that will give the defendants a clear opportunity to attempt to challenge our experts on Daubert as finding that all of our evidence is completely unreliable,*** and we just cannot allow the plaintiffs to be prejudiced in that way.[44]

In other words, counsel for the plaintiffs previously argued that no "later" inspection could ever substitute for an inspection in December 2012, shortly after NECC was shut down. The Saint Thomas Entities agree, and for the same reasons as Ms. Dougherty expressed in 2012, are seeking the deposition of Dr. Austin.

Finally, Ms. Dougherty stated, "what we are looking for is to preserve not just documents and equipment but also not allow alteration of things to occur in this facility so that when we do in fact have an opportunity to inspect that ***it is as close as possible to the condition that it was in at the time of the misconduct in this case***."[45] Over a year-and-a-half passed between the time that Ms. Dougherty expressed these concerns and the time that other parties were permitted brief site visits to the facility. During that timeframe, the air conditioning was turned off and the facility was allowed to fall into disrepair. Clearly, the Saint Thomas Entities are entitled to question Dr. Austin about his inspection, which was made just a few weeks after Ms. Dougherty voiced these very concerns.

Robert Kaiser is president of Liberty, and he too participated in a tour of NECC in July 2014. At his deposition, Mr. Kaiser testified that Dr. Austin had better information regarding the condition of the facility in 2012 than would those who toured it in July of 2014.[46] He also explained that without Dr. Austin's testimony, there was no way to know how any of the observations made in July 2014 compared to the way the facility actually existed in 2012.[47]

---

[44] *Id.* at 21:22-22:4 (emphasis added).
[45] *Id.* at 23:15-24:1 (emphasis added).
[46] Transcript from the Deposition of Robert Kaiser (hereinafter "Kaiser Dep.") at 105:9-13, attached hereto as Ex. G.
[47] Kaiser Dep. at 105:25-106:5.

Dr. Austin conducted a three-day inspection under the supervision of federal agents in December of 2012, just two months after the NECC facility's operations were shut down.[48] The July 2014 tours were limited to three or four hours per defendant.[49] As Mr. Kaiser explained, this limited the extent of what could be observed.[50]

Dr. Austin was also permitted virtually unfettered access to the cleanrooms, and was able to closely inspect the ceiling grids from the walkable ceiling above the cleanroom.[51] It is still unknown how Dr. Austin got up to the cleanroom roof, as the parties touring the facility in July of 2014 were not provided such access. As Mr. Kaiser explained under oath, he was not provided access to the area above the ceiling in July 2014, nor was he aware of anyone who was provided such access.[52] In fact, despite the fact he and his company built the cleanrooms at issue, he did not see any access to the ceiling grid system during his inspection.[53]

It was also "oppressively hot and humid" in the NECC facility during the brief tours defendants received during the summer of 2014, as, consistent with the NECC trustee's representations to the Court, there was no air conditioning.[54] Such conditions are a breeding ground for contamination. As Mr. Kaiser explained, he has no idea whether the rust and contamination he saw in July 2014 was there a year and a half before, or whether it came to be during the interim.[55]

In addition, the handful of pictures apparently taken by Dr. Austin and filed of record in the MDL lack the context needed that only Dr. Austin can provide, such as where they were

[48] *See* Austin Dec. at ¶ 33.
[49] *See* Aug. 7, 2014 Status Conference Transcript at 20:14-21; Kaiser Dep. at 108:6-16.
[50] Kaiser Dep. at 110:4-7.
[51] *See* Austin Dec. at ¶¶ 40-46.
[52] Kaiser Dep. at 109:12-21; 110:1-3.
[53] *Id.* at 109:22-25.
[54] *Id.* at 79:23-80:12.
[55] *Id.* at 85:21-96:23.

taken, what they purport to show, and what is outside of the camera frame.[56] Indeed, when the Saint Thomas Entities have tried to obtain evidence from other witnesses regarding what Dr. Austin's photographs reflect, the PSC has objected, ***asserting that witnesses asked to testify about the photographs could not identify where the photographs came from***.[57]

Although Dr. Austin does not qualify as a non-testifying expert, even if he did, there are clearly exceptional circumstances here. It is impossible to obtain the details of Dr. Austin's observations by any means other than questioning him directly.

The exceptional circumstances here are similar to those at issue in *MacDonald Sprague Roofing Co. v. USM Weather-Shield Systems Company*. There, plaintiff was permitted to depose defendant's non-testifying expert upon the court's finding that the plaintiff made the requisite showing.[58] The case concerned the condition of an old roof, which had been covered by a new one (meaning the plaintiff's own expert could no longer inspect it).[59] The court stated that such circumstance made it "'impractical' for the plaintiff to obtain facts and opinions from any expert the plaintiff can now retain."[60] While the defendant argued that the plaintiff had the non-testifying expert's report and could hire its own expert, the court stated that "***from a reading of [the expert's] report***, it is quite apparent that ***his opinions are based primarily on what he observed*** of the roof which is the subject of this litigation after the problems arose but before the new roof was put on over it, and while it is possible for the plaintiff to hire an expert to express opinions only on the basis of [the expert's] observations at the time, it is surely not practical."[61] Similarly here, the only way the Saint Thomas Entities can obtain evidence of the condition of

[56] *See* Ex. 6. to the Declaration of Marc Lipton.
[57] *See* Transcript from the Deposition of George Pollick (hereinafter "Pollick Dep.") at 220:14-221:5 (emphasis added), attached hereto as Ex. H.
[58] *See* C.A. No. 81-1329-N, 1983 U.S. Dist. LEXIS 12839, at *1-2 (D. Mass. Oct. 12, 1983).
[59] *Id.*
[60] *Id.* at *2.
[61] *Id.* (emphasis added).

the NECC cleanrooms' ceiling grids shortly after NECC closed is by questioning Dr. Austin. The brief tours in the summer 2014 – taken before Dr. Austin's observations and opinions were revealed and without access to the space above the ceiling – were not an adequate substitute. Only Dr. Austin can testify about the photographs taken in 2012 and his observations made at that critical time.

**D. The Saint Thomas Entities will pay for Dr. Austin's time.**

In accordance with the Federal Rules of Civil Procedure, the Saint Thomas Entities are willing to pay for Dr. Austin's time in order to obtain his testimony.[62] Furthermore, to the extent the PSC complains of their cost to prepare and present Dr. Austin, the Saint Thomas Entities are willing to avoid that expense and the need for any deposition whatsoever by simply retaining Dr. Austin directly.[63] The PSC no longer has any need for Dr. Austin's assistance since they have settled with Liberty and are in the process of dismissing their claims against the company. If the PSC refuses to permit such common sense resolution of this matter, the Court should compel the discovery.

**E. This Court should deny the PSC's alternative request for a protective order.**

This Court should deny the PSC's alternative motion for a protective order because the PSC has not met its burden of showing good cause.[64] The PSC has not shown that it will suffer serious injury if the requested information is disclosed. Indeed, the discovery of Dr. Austin's investigation is only being sought because the information was already partially disclosed by the

---

[62] *See* FED. R. CIV. P 26(b)(4)(E) ("Unless manifest injustice would result, the court must require that the party seeking discovery (i) pay the expert a reasonable fee for time spent in responding to discovery under Rule 26(b)(4)(A) or (D); and (ii) for discovery under (D), also pay the other party a fair portion of the fees incurred in obtaining the expert's facts and opinions.")

[63] Prior to filing its opposition brief, the Saint Thomas Entities attempted to obtain the PSC's permission to retain Dr. Austin directly and thereby avoid this dispute. The PSC refused.

[64] *See* FED. R. CIV. P. 26(c)(1); *Serrano v. Cintas Corp.*, 699 F.3d 884, 901-02 (6th Cir. 2012).

PSC itself in order to convince this Court that Liberty's negligence in causing the contamination at NECC should be submitted to a jury.

This Court should also deny the PSC's request for a protective order because, as explained above, the Saint Thomas Entities' request to depose and obtain documents from Dr. Austin is not unreasonably cumulative or duplicative, nor can it be obtained from some other source that is more convenient, less burdensome, or less expensive.[65] Only Dr. Austin can provide an accurate depiction of the facility as it existed in 2012 when, under the supervision of federal agents, he performed a 3-day "investigation . . . to document the conditions of the [NECC] facility" and "identify the likely causes of the contamination of the MPA at issue." [66]

Furthermore, any burden placed on the PSC by the Saint Thomas Entities' request for deposition and documents does not outweigh the likely benefit of the discovery, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the proposed deposition and document requests in resolving the issues.[67] The health care providers who have been sued, and the juries that will decide the claims against them, are entitled to answers as to how and why the MPA at NECC was contaminated. In addition, the Saint Thomas Entities have mitigated any concerns about any expenses related to deposing Dr. Austin by offering to shoulder the burden of paying for his time or retaining him directly.

For these reasons, the Saint Thomas Entities request that this Court deny the PSC's alternative request for a protective order.

---

[65] *See* FED. R. CIV. P. 26(b)(2)(C)(i).
[66] *See* Austin Dec. at ¶ 33.
[67] *See* FED. R. CIV. P. 26(b)(2)(C)(iii).

## IV. CONCLUSION

WHEREFORE, the Saint Thomas Entities respectfully request the Court deny the PSC's motion to quash the Saint Thomas Entities' Subpoena, Deposition Notice, and Document Requests to Dr. Austin. The Saint Thomas Entities further ask that the Court deny the PSC's alternative request for a protective order, and seek any further relief for which they are entitled.

Dated: July 24, 2015

By their attorneys,

*/s/ Sarah P. Kelly*

Sarah P. Kelly (BBO #664267)
skelly@nutter.com

NUTTER McCLENNEN & FISH LLP
Seaport West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 439-2000
(617) 310-9461 (FAX)

OF COUNSEL:

Yvonne K. Puig*
Texas State Bar No. 16385400
yvonne.puig@nortonrosefulbright.com
Adam T. Schramek*
Texas State Bar No. 24033045
adam.schramek@nortonrosefulbright.com
Eric J. Hoffman*
Texas State Bar No. 24074427
eric.hoffman@nortonrosefulbright.com

NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
(512) 536-2450
(512) 536-4598 (FAX)

Marcy Hogan Greer*
Texas State Bar No. 08417650
mgreer@adjtlaw.com

ALEXANDER DUBOSE JEFFERSON & TOWNSEND LLP
515 Congress, Suite 2350
Austin, Texas 78701
(512) 482-9300
(512) 482-9303

*Appearing Pro Hac Vice

**CERTIFICATE OF SERVICE**

I certify that this document filed through the CM/ECF system will be served electronically to the registered participants identified on the Notice of Electronic Filing this 24th day of July, 2015.

*/s/ Sarah P. Kelly*
Sarah P. Kelly

2847852.1