```
1                     UNITED STATES DISTRICT COURT
2                      DISTRICT OF MASSACHUSETTS

3

4
    IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
5   PHARMACY CASES LITIGATION          )
                                       )
6                                      )
                                       )
7                                      )
                                       )
8                                      )

9         BEFORE:  THE HONORABLE RYA W. ZOBEL AND
                   THE HONORABLE JENNIFER C. BOAL
10

11

12
                      STATUS CONFERENCE
13                          AND
                      MOTION HEARING
14

15

16

17      John Joseph Moakley United States Courthouse
                    Courtroom No. 12
18                  One Courthouse Way
                    Boston, MA 02210
19

20                    August 5, 2015
                        2:00 p.m.
21

22
                Catherine A. Handel, RPR-CM, CRR
23                  Official Court Reporter
         John Joseph Moakley United States Courthouse
24            One Courthouse Way, Room 5205
                    Boston, MA 02210
25              E-mail: hhcatherine2@yahoo.com
```

APPEARANCES:

For The Plaintiffs:

    Hagens, Berman, Sobol, Shapiro LLP, by EDWARD NOTARGIACOMO, ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts 02142;

    Janet, Jenner & Suggs, LLC, by KIMBERLY A. DOUGHERTY, ESQ., 75 Arlington Street, Suite 500, Boston, Massachusetts  02116;

    Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH, ESQ., and BENJAMIN GASTEL, ESQ., 227 Second Avenue North, Nashville, Tennessee 37201-1631;

    Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac Street, Suite 500, Boston, Massachusetts 02114;

    Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K. MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, New York 10013-1413;

    Leader, Bulso & Nolan, PLC, by GEORGE NOLAN, ESQ., 414 Union Street, Suite 1740, Nashville, Tennessee 37219;


FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF NECP, INC.:

    Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High Street, Suite 2400, Boston, Massachusetts 02110-1724;


FOR THE DEFENDANTS:

    Gideon, Cooper & Essary, PLC, by CHRISTOPHER J. TARDIO, ESQ., 315 Deaderick Street, Suite 1100, Nashville Tennessee 37238;

    Michaels, Ward & Rabinovitz LLP, by DAN RABINOVITZ, ESQ., One Beacon Street, Boston, Massachusetts 02108;

    Todd & Weld LLP, by CORRINA L. HALE, ESQ., 28 State Street, 31st Floor, Boston, Massachusetts 02109;

(Appearances continued on the next page.)

1    APPEARANCES (Cont'd):

2

     FOR THE DEFENDANTS:
3

         Alexander Dubose Jefferson & Townsend LLP, by MARCY HOGAN
4    GREER, ESQ., 515 Congress Avenue, Suite 2350, Austin, Texas
     78701-3562;
5

         Montgomery McCracken Walker & Rhoads LLP, by STEPHEN A.
6    GROSSMAN, ESQ., Liberty View, Suite 600, 457 Haddonfield Road,
     Cherry Hill, New Jersey 08002;
7

         Nutter McClennen & Fish LLP, by SARAH P. KELLY, ESQ.,
8    Seaport West, 155 Seaport Boulevard, Boston, Massachusetts
     02210-2604;
9

         Fulbright & Jaworski LLP, by YVONNE K. PUIG, ESQ., 98 San
10   Jacinto Boulevard, Suite 1100, Austin, Texas 78701-4255;

11       Brewer, Krause, Brooks & Chastain, PLLC, by PARKS T.
     CHASTAIN, ESQ., and ASHLEY E. GENO, ESQ., 611 Commerce Street,
12   Suite 2600, Nashville, Tennessee 37203;

13       Tucker, Saltzman & Dyer, LLP, by PAUL SALTZMAN, ESQ., 50
     Congress Street, Boston, Massachusetts 02109;
14
         Pessin Katz Law, P.A., by GREGORY K. KIRBY, ESQ., 901
15   Dulaney Valley Road, Suite 400, Towson, Maryland 21204;

16       Blumberg & Wolk, LLC, by CHRISTOPHER M. WOLK, ESQ., 158
     Delaware Street, Woodbury, New Jersey 08096;
17

18
     VIA PHONE FOR THE PLAINTIFFS:
19
     Anthony V. Agudelo
20   Erin M. Amos
     Anne Andrews
21   Evan D. Baker
     Erin E. Bantz
22   Bailor B. Bell
     Rebecca C. Blair
23   Bryan Bleichner
     Robert W. Briley
24   Daniel L. Clayton

25
     (Appearances continued on the next page.)

```
 1     APPEARANCES (Cont'd):

 2
       VIA PHONE FOR THE PLAINTIFFS:
 3
       Michael Coren
 4     Ryan F. Curran
       Mark Dancer
 5     Lauren Davis
       Michael G. Derrick
 6     Patrick Fennell
       Mary Gidaro
 7     James E. Girards
       Sharon Houston
 8     Michael R. Hugo
       Edward A. Jazlowiecki
 9     Douglas E. Jones
       James Stephen King
10     Nicole L. Kreklau
       Jonathan R. Krohnfeldt
11     Garren R. Laymon
       Bill Leader
12     John Lyons
       Thomas Martin
13     Ned Mulligan
       Leslie Muse
14     Daniel Myers
       Nolan Nicely
15     Alyson Oliver
       Elliot Olsen
16     Emily Peacock
       James J. Pettit
17     Laura Pittner
       Robert Randall
18     Harry Roth
       Karren Schaeffer
19     Brian Schuette
       Bridget Stratton
20     John C. Thornton

21

22

23

24

25
```

<pre>
 1                    P R O C E E D I N G S

 2        (The following proceedings were held in open court before

 3   the Honorable Rya W. Zobel, United States District Court Judge,

 4   and the Honorable Jennifer C. Boal, Magistrate Judge, United

 5   States District Court, District of Massachusetts, at the John J.

 6   Moakley United States Courthouse, One Courthouse Way, Boston,

 7   Massachusetts, on August 5, 2015.)

 8             THE COURT:  Good afternoon.  Please be seated.

 9             All right.  We have some new faces today, designed

10   unquestionably to confuse me.

11             I think maybe we should just go into the agenda for

12   today's meeting.  Ms. Johnson has been most helpful.

13             MR. NOTARGIACOMO:  Your Honor, my name is Ed

14   Notargiacomo from Hagens, Berman, Sobol, Shapiro.  Ms. Johnson

15   is on vacation.  So, for all intents and purposes today, I am

16   Ms. Johnson.  I am the master of ceremony for the Plaintiffs'

17   Steering Committee.

18             THE COURT:  I don't believe it.

19             MR. NOTARGIACOMO:  She's the brains.  I'm the beauty,

20   your Honor.

21             THE COURT:  So, you are Mr. Notargiacomo?

22             MR. NOTARGIACOMO:  *Notargiacomo*, your Honor.

23             THE COURT:  Let me suggest that we start the agenda

24   in a slightly different order.  That is, with respect to the

25   choice of law briefing, I do not believe I need to hear
</pre>

1    argument at all.

2            With respect to the §157(b)(5) motion or issue, I

3    would like to do that at the end of the agenda because Judge

4    Boal -- I guess you're not going to leave because we're going

5    to do it here.  We'll do it at the end, anyhow.  So, we will

6    proceed now with Item C of the agenda.

7            MR. NOTARGIACOMO:  That's fine, your Honor.

8            THE COURT:  And then come back to the hearing on the

9    §157(b) motions.

10           MR. NOTARGIACOMO:  Thank you, your Honor.

11           So, the first item on the agenda, C(1), is the status

12   of the bankruptcy, and Mr. -- Attorney Gottfried from the

13   trustee will address the issue of the post confirmation

14   officer's motion for partial withdrawal, which, as noted on

15   the agenda, has not been opposed by anyone.

16           MR. GOTTFRIED:  Thank you.  Your Honor, Michael

17   Gottfried for the post confirmation officer, Paul Moore.

18           In terms of the status of the bankruptcy, the first

19   issue I do want to address is our motion for withdrawal of the

20   reference.  As the Court may recall, we discussed this at the

21   last status conference.  There has been no opposition.  As a

22   result, we did file a notice of no opposition, both in the

23   case where the withdrawal of the reference was filed as well

24   as in the MDL, and because that motion is necessary for the

25   implementation of the plan -- as the Court may recall from our

1    last argument, on Page 4 of our motion to withdraw the

2    reference, Paragraph 13, and continuing on, we went through in

3    some detail of all the reasons why it's necessary for the

4    implementation of the plan.  So, we would ask the Court to

5    enter that order so we can implement the plan.

6           THE COURT:  Okay.  If there's no opposition to the

7    motion, the motion is allowed and I will sign the order as

8    soon as I can find it.

9           MR. GOTTFRIED:  Great.  Thank you, your Honor.

10          Just in terms of the rest of the bankruptcy report --

11          THE COURT:  Excuse me.

12          Last time I allowed the motion which turned out to

13   have several copies.  That is, several different identical

14   motions.  This is one motion, right, that takes care of the

15   whole thing?

16          MR. GOTTFRIED:  Yes, your Honor.

17          THE COURT:  Okay.

18          MR. GOTTFRIED:  In terms of a bankruptcy status

19   report, I wanted to make the Court aware of a couple of

20   different things.

21          Pursuant to your order modifying the preservation

22   order, the post confirmation officer is making very good

23   progress in preparing to vacate the premises in Framingham.

24   He's in the process of identifying liquidators to try to

25   obtain value from the assets and is hopeful that at the

1  conclusion of that process, there will be additional moneys

2  available for victims.

3          Second, he is continuing to review and analyze the

4  non-tort claims in the case and preparing to address those.

5  Obviously, we may have some discovery responses that we're

6  continuing to deal with depending on some of the rulings of

7  this Court.

8          And, finally, he's just generally fulfilling his

9  duties under the plan.  So, the bankruptcy report is moving

10  along.  Thank you.

11          THE COURT:  Well, thank you and thank him.

12          MR. GOTTFRIED:  Thank you, your Honor.

13          MR. NOTARGIACOMO:  Next on the agenda is the status

14  of the insurance declaratory actions in which there are two.

15  The first was filed by *Lloyd's of London vs. Ameridose*.

16  Annika Martin from the PSC will brief the Court on the status

17  of that.

18          MS. MARTIN:  Good afternoon, your Honor.

19          I'll actually give a combined report on both the

20  *Lloyd's* and the *Ironshore* actions.

21          There was a status conference on July 22nd.  Both of

22  those actions are in the process of being settled.  That was

23  reported to Judge Saylor at that conference, and the parties

24  asked for some more time from him so that they could get

25  everything ironed out.

1          So, he set the next conference for September 3rd, and

2     that conference -- obviously, if the settlements are reached

3     and the dismissal notices are filed, then that conference will

4     not go forward, but that's the next thing on the agenda.

5          MR. GOTTFRIED:  Your Honor, if I might just clarify.

6          The action with Lloyd's is absolutely an agreement in

7     principle and we're exchanging documents.  I am sure we're

8     still negotiating and we're hopeful, but we do not have an

9     agreement yet.

10         THE COURT:  Okay.

11         MR. NOTARGIACOMO:  And the second -- last declaratory

12    action is the *State Farm Fire vs. Specialty Surgery* and Ben

13    Gastel of the PSC will report on the status of that.

14         MR. GASTEL:  Good afternoon, Judge.

15         On Monday the parties in that case, which included

16    the individual tort victims plaintiffs who have filed cases

17    pending in this Court, had a -- the formal case management

18    conference in front of Judge Sharp in the Middle District of

19    Tennessee.  He entered your standard case management order,

20    opening discovery and setting dispositive motions deadline and

21    also set the case for trial in November of next year.

22         It became rather apparent during that status

23    conference that both State Farm, the insurer, and Specialty

24    Surgery Center, one of the defendants, were using that case as

25    a sort of vehicle to try to make an end-run, if you will,

1    around this Court's previous order related to the ability of

2    plaintiffs to bring claims against Specialty Surgery Center

3    under the Tennessee Products Liability Act and as a result,

4    the individual tort victims who are parties to that case will

5    likely be filing either a motion to strike or a motion to stay

6    that proceeding, pending, essentially, the outcome of those

7    claims in this proceeding.

8            We hope to get that on file relatively soon and we'll

9    see whether or not that adjusts the schedule that was set by

10   the Judge at Monday's case management conference.

11           THE COURT:  How will they go around our order?

12           MR. GASTEL:  They essentially asked the Court for a

13   declaration that plaintiffs, as a matter of law, are not

14   allowed to bring a claim against the clinics as sellers of the

15   MPA.  This Court, as you will recall, had previously set an

16   order denying that motion to dismiss in this case and ordering

17   that those claims go forward.  And so, you know, seeking a

18   declaration from another court on that issue, we think, is

19   really an end-run around this Court's order from last year on

20   this motion to dismiss.

21           THE COURT:  Does that court understand that to be the

22   case?

23           MR. GASTEL:  We made that clear at the case

24   management conference, your Honor, and that is why we will be

25   filing some motion practice to make that abundantly clear to

1    Judge Sharp in the Middle District.

2             THE COURT:  He's pretty sharp.

3             MR. GASTEL:  He is the Chief Judge and he is, in

4    fact, very sharp, yes, your Honor.

5             THE COURT:  Okay.  Now, status of discovery.  This is

6    all addressed to Judge Boal.

7             MR. NOTARGIACOMO:  That's true, your Honor.  The

8    first three motions listed there are all referred to Judge

9    Boal and I believe she's hearing argument on all three of

10   those motions directly after this status.

11            The third -- I'm sorry.  The fourth one, 3(d), is

12   there just so the Court knows that it's happening.  That

13   motion is not ripe.  It was just filed I think a week or so

14   ago.  The time for opposition to that motion is not yet upon

15   us.  So, that remains pending.

16            If there are no questions with respect to those, we

17   can move to four, the status of the litigation track.

18            THE COURT:  Okay.

19            MR. NOTARGIACOMO:  4(a), the PSC filed on Friday

20   their report to the Court regarding *Lexecon* election forms.

21   Your Honor may recall that your order of July 9th, 2015, you

22   asked that all parties in the MDL file an election form,

23   either waiving *Lexecon* or not waiving *Lexecon*, and to submit

24   those to the PSC and you ordered the PSC to file a report.

25            THE COURT:  Well, I suppose, since nobody has waived,

1    there is no need to file a paper, is there?

2            MR. NOTARGIACOMO:  Well, we did file a paper, but

3    you'll notice from the -- from the notice filed with the

4    paper, that we didn't fully complete the analysis of that,

5    partially because of the volume of responses --

6            THE COURT:  Well, what analysis is there?  They all

7    declined.

8            MR. NOTARGIACOMO:  We just haven't been able to

9    figure out whether there's anyone out there who didn't follow

10   your Honor's order and file a response, but to do that we

11   would have to go through every party in every case in the MDL

12   to decide whether or not they're amongst the 1200 entities

13   that filed, but you're right, your Honor, that --

14           THE COURT:  Under the circumstances, is that worth it?

15           MR. NOTARGIACOMO:  We don't think so, your Honor.

16           THE COURT:  Then don't do it.

17           MR. NOTARGIACOMO:  Okay.

18           THE COURT:  I now countermand my earlier order.

19           MR. NOTARGIACOMO:  I've been asked to clarify that.

20           A number of plaintiffs have waived *Lexecon*, your

21   Honor.  It's just on the defense side --

22           THE COURT:  Right.

23           MR. NOTARGIACOMO:  -- most have not.  The vast

24   majority --

25           THE COURT:  Well, I assume that it's pretty much one

1    side waiving and the other side not.

2            MR. NOTARGIACOMO:  Right.  That is correct.

3            4(b), proposed stipulation and order discussing --

4    dismissing all product liability claims against the Premier

5    defendants.  This is something that the counsel for Premier

6    had asked be put on the agenda and I assume he will be either

7    on the phone or is here today to discuss it.

8            MR. WOLK:  Yes.  Good afternoon, your Honor.

9    Christopher Wolk from Blumberg & Wolk on behalf of the Premier

10   defendants.

11           THE COURT:  I'm sorry, say that again.

12           MR. WOLK:  Christopher Wolk from Blumberg & Wolk.

13           THE COURT:  Do sit down because the microphone works

14   much better if it's not --

15           MR. WOLK:  I'll just pull it closer to me, Judge.

16   Christopher Wolk.  I represent the Premier defendants, Judge.

17           We had this item placed on the agenda because we have

18   circulated a proposed stipulation to the Plaintiffs' Steering

19   Committee dismissing all product-liability claims.  There are

20   product-liability claims still pending against the Premier

21   defendants.  Some plaintiffs have pled product liability.

22   Other plaintiffs have not.

23           It's my understanding that in my discussions with

24   some members of the PSC, they've agreed to execute this

25   proposed stipulation dismissing those claims.

1          There is, however, still some plaintiffs that need to

2     respond to indicate whether they're willing to sign it or not.

3     So, this is currently a draft and it's been sent to the PSC

4     for their consideration, and I'm hoping at the next status

5     conference, I can report back that either it's been executed

6     or that it has not.

7          THE COURT:  I look forward to the form.

8          MR. WOLK:  Thank you very much.

9          THE COURT:  Thank you.

10         MR. NOTARGIACOMO:  Next on the agenda, your Honor,

11    4(c), relates to the Court's order to show cause regarding the

12    dismissals against the settling parties.

13         Your Honor on June 8th asked any party with an

14    objection to dismissing the claims in the MDL against the

15    settling parties to file an objection by July 2nd.  There was

16    one objector.  Box Hill filed an objection, and your Honor

17    shortly thereafter overruled the objection.

18         But having gone back and looked at your Honor's

19    original order, which said that if no one objected, the claims

20    would be dismissed, it's a little unclear to us that, in fact,

21    that operation of what -- that what actually occurred clearly

22    dismisses those --

23         THE COURT:  You mean if one objected, then it doesn't

24    say --

25         MR. NOTARGIACOMO:  It doesn't say what would happen

1    if there is an objection and it's overruled.

2              THE COURT:  So, I need to amend that order as well.

3              MR. NOTARGIACOMO:  Well, I have for your Honor a

4    proposed order that would clear the whole thing up.  If we put

5    that on the record, then --

6              THE COURT:  That's fine.

7              MR. NOTARGIACOMO:  May I approach and provide that?

8              THE COURT:  Yes.

9              (Attorney Notargiacomo hands document to the Court.)

10             MR. NOTARGIACOMO:  I have copies.  It's a very simple

11   order, your Honor.

12             COURTROOM DEPUTY CLERK URSO:  I don't know if it's a

13   question...

14             (Discussion off the record at the Bench.)

15             THE COURT:  I have a jury that has just announced a

16   verdict.  Would there be objection if we quickly took the

17   verdict?

18             MR. NOTARGIACOMO:  No objection.

19             THE COURT:  I think since this table is already free,

20   I just need you to slide over a little bit.  There are two

21   lawyers.  Just make room for two lawyers, that's all.

22             UNIDENTIFIED SPEAKER:  Your Honor, do you want us to

23   call back in on the phone or just --

24             THE COURT:  No.  You're welcome to listen, too,

25   unless you're desperate to leave, which you're also welcome to

```
 1   do.
 2              (Recess taken.)
 3              THE COURT:  Okay.  We continue.  And I apologize.
 4   Are you still all there on the telephone?
 5              (No response.)
 6              THE COURT:  They gave up.
 7              So, we're now at No. 4.
 8              MR. NOTARGIACOMO:  We are, your Honor.  We discussed
 9   four --
10              THE COURT:  Oh, yes.  We don't need to -- I've
11   countermanded that order.
12              MR. NOTARGIACOMO:  Right.  Then we talked about 4(c).
13              I'm sorry, I couldn't hear your Honor.
14              THE COURT:  Part B of 4, when I get whatever you've
15   going to give me, I'll take care of it, right?
16              MR. NOTARGIACOMO:  Correct.  That's right.
17              We were discussing 4(c), your Honor, and the entry of
18   a final order dismissing those claims, and I've handed up a
19   proposed order to your Honor, to your Honor and your Honor's
20   clerks.
21              THE COURT:  As soon as that is ready, if you give me
22   an order, I will sign it, but we're not there yet, right?
23              MR. NOTARGIACOMO:  No.  I believe we are, your Honor,
24   in that there was --
25              THE COURT:  Box Hill --
```

1          MR. NOTARGIACOMO:  There was one objection, but your

2    Honor already overruled that objection.

3          THE COURT:  So, do I need any other order to take

4    care of the rest of the -- all of the dismissals?

5          MR. NOTARGIACOMO:  We believe it would be cleaner if

6    your Honor entered a second order clearly dismissing all of

7    those cases against all of those defendants.

8          THE COURT:  Okay.

9          MR. NOTARGIACOMO:  And I've handed that --

10         THE COURT:  You'll send me one, right, or is it here

11   already?

12         MR. NOTARGIACOMO:  We have handed one up.  We're

13   happy to also file it.

14         THE COURT:  As soon as Ms. Urso gets back, I'll do it

15   and I'll sign it.

16         MR. NOTARGIACOMO:  Thank you, your Honor.

17         MR. WOLK:  Your Honor, we have an objection to the

18   order that was handed up just now and if I could just place

19   that on the record briefly.

20         I'm just seeing this for the first time today, but it

21   states that all claims of any type -- these help -- against

22   the following settling defendants in all cases currently

23   pending is dismissed with prejudice.

24         One could read that order and understand it to mean

25   that any comparative fault claims or cross claims, which we've

1    worked very hard to preserve, are also dismissed.

2          And so, I would suggest that we could go back and

3    speak to the PSC and perhaps add language in here that would

4    preserve those claims against these dismissed entities so

5    there's no confusion later on.

6          MR. NOTARGIACOMO:  Your Honor, I believe that was the

7    very basis for Box Hill's objection filed after your order and

8    you overruled those objections.  So, I don't believe that that

9    makes much sense in this context.

10         MR. WOLK:  Well, I can't imagine that the intent here

11   based on the dismissal of these cases is to dismiss those

12   comparative fault claims out of hand with -- you know, and

13   there's no reason to dismiss them.  They survive under various

14   rules of law in New Jersey and we've been pursuing them

15   throughout.  It doesn't change the dismissal against those

16   defendants that are listed here.  All of the substantive

17   claims are dismissed.

18         THE COURT:  I'll tell you what.  You submit an order

19   that you want me to sign and I'll look at it and I'll decide

20   which order to sign.  How is that?

21         MR. WOLK:  Thank you, your Honor.

22         MR. NOTARGIACOMO:  Moving down the list to No. 5,

23   your Honor.  Annika Martin, who is the pro se liaison, will

24   give a short report.

25         THE COURT:  We're on Ameridose, right?

```
1              MR. NOTARGIACOMO:  No, your Honor.

2              THE COURT:  Where are we?

3              MR. NOTARGIACOMO:  We're on No. 5.

4              THE COURT:  Okay.

5              MR. NOTARGIACOMO:  I'm sorry.  You're confused by (d)

6      and (e).  Those are there simply -- both Ameridose and GDC had

7      filed their own motions for an order dismissing the claims

8      against them.  Those are subsumed by your Honor's order and

9      will be subsumed by the proposed order that I've provided.

10             THE COURT:  Okay.

11             MS. MARTIN:  So, since the last status conference

12     update on the pro se's, I've had three new pro se's contact

13     me.  One of them is actually looking for a lawyer.  So,

14     pursuant to the duties that were outlined in the order that

15     you issued when you appointed me, I put together a list of

16     plaintiff's counsel that volunteered to be on the list to be

17     provided to pro se claimants who requested attorney contacts.

18             So, I put together that list and I have that now to

19     use should another pro se contact me looking for an attorney.

20     And so, I did provide that to that particular caller and he

21     was satisfied with that.  So, that's the short report.

22             THE COURT:  Thank you.

23             MR. RABINOVITZ:  Excuse me, your Honor.  Dan

24     Rabinovitz from Medical Sales Management.

25             Would it be possible to go back just for a second to
```

1  the issue of the order of dismissal that was just raised that

2  you just went on to?  Can I add one quick thing, if you don't

3  mind?  Again, Dan Rabinovitz on behalf of Medical Sales

4  Management.

5          THE COURT:  Excuse me one moment.

6          Are there any counsel still on the telephone?

7          UNIDENTIFIED SPEAKER:  Yes, your Honor.

8          UNIDENTIFIED SPEAKER:  Yes, your Honor.

9          UNIDENTIFIED SPEAKER:  Yes, your Honor.

10          THE COURT:  Oh, yes, there are.  Okay.  Thanks.

11          Thank you for your patience, too.

12          MR. RABINOVITZ:  What I just wanted to add for the

13  record, two things.  Number one, we would like -- as one of

14  the defendants who has settled, we would like a chance to see

15  the order that you just asked to be filed and have a chance to

16  object to that or comment on it before you make your ruling,

17  and what we will say, I'm sure, when we see it is it's one

18  thing to talk about affirmative defenses that are still

19  preserved, comparative fault, and the like.  It's another

20  thing to call those claims, and those claims have been

21  dismissed.  And so, we would urge you to sign the order that

22  was just --

23          THE COURT:  Why don't you work together and come up

24  with an order that satisfies you both?

25          MR. RABINOVITZ:  I'm happy to try and do --

```
 1              THE COURT:  And, hopefully, also the plaintiffs.

 2              MR. RABINOVITZ:  I'm happy to try to do that.  I just

 3      wanted to put on the record that was our position and that we

 4      would like a chance to comment on it before you rule.

 5              THE COURT:  When you submit it, tell me whether it is

 6      fully agreed or not, whatever the order is that you send me.

 7              MR. RABINOVITZ:  Thank you.

 8              THE COURT:  Thank you.

 9              MR. NOTARGIACOMO:  Moving quickly through the agenda,

10      your Honor, No. 6, status of appeals.  There was a joint

11      status report to the appeals court in mid July whereby the

12      parties asked this Court to stay any further action of any

13      appeals pending resolution of the eight wrongful death claims

14      in Virginia and, as your Honor knows, those -- the settlements

15      with respect to those eight death claims will not be finalized

16      until an amount has been reached to pay to those plaintiffs

17      and that has been approved by this Court.  So, the appeals

18      court then asked to stay the appeal pending resolution of

19      those cases.

20              THE COURT:  But there's nothing before me with

21      respect -- there's nothing I have to do now?

22              MR. NOTARGIACOMO:  Not right now.

23              THE COURT:  Okay.

24              MR. NOTARGIACOMO:  That brings us to the schedule for

25      future status conferences.  We have one scheduled next month,
```

1    September 10th, and another one on October 14th.  If your

2    Honor is so inclined, I would suggest, perhaps, we set another

3    one for November 11th or the 18th, which is a month after the

4    October 14th conference.

5          THE COURT:  November 11th is Veteran's Day, which I

6    think is a holiday.

7          MR. NOTARGIACOMO:  It is, your Honor.  I apologize.

8          THE COURT:  Do you want to do it on the 10th or the

9    following week?

10         MR. NOTARGIACOMO:  Whatever your Honor -- the 10th

11   would be fine with us.

12         THE COURT:  Have we had a habit of having it on a

13   particular day of the week?

14         MR. NOTARGIACOMO:  We have.  Usually it's on a

15   Wednesday.

16         THE COURT:  Well, what is preferable to you, move it

17   back one day or to the next?

18         MR. NOTARGIACOMO:  So, I've been told that it's

19   usually on a Thursday, which I guess would be November 12th.

20         THE COURT:  Okay.

21         MR. NOTARGIACOMO:  That brings us to fully-briefed --

22         THE COURT:  So, the same drill with Judge Boal in the

23   morning and this one in the afternoon.

24         MR. NOTARGIACOMO:  Yes, if that's --

25         THE COURT:  Or the other way around.

1          MR. NOTARGIACOMO:  -- amenable to both of your

2     Honors.

3          THE COURT:  November 12th.

4          MS. PUIG:  Your Honor, could I receive clarification?

5          I think you said November 12th; is that right?

6          THE COURT:  I did, because the 11th is a holiday.

7          MS. PUIG:  All right.  Thank you.

8          COURTROOM DEPUTY CLERK URSO:  I'm sorry.  So, the

9     11th --

10          THE COURT:  Will that not work for you?

11          MS. PUIG:  It doesn't, your Honor, on behalf of Saint

12     Thomas Entities.  I'm in arbitration the entire week of

13     November 9th through the 16th.  I would ask the Court to

14     consider the week of November 2nd.

15          THE COURT:  Anybody have an objection to that?

16          MR. NOTARGIACOMO:  Your Honor, that's only two weeks

17     after the October 14th status conference.

18          THE COURT:  That's true.  Then why don't we go over

19     to the 19th.  Will that work for you?

20          MS. PUIG:  It does not, your Honor.  What about the

21     week of the 23rd?  The only problem is that's --

22          COURTROOM DEPUTY CLERK URSO:  That's the Thanksgiving

23     week.

24          THE COURT:  That's Thanksgiving.  We do not want to

25     be here on Thanksgiving Day.

```
1              MS. PUIG:  No, I wasn't suggesting it, your Honor.

2              COURTROOM DEPUTY CLERK URSO:  Judge, on the 19th we

3    have a Markman hearing from 9:00 to 1:00.

4              THE COURT:  So, the 19th doesn't work for us either.

5              COURTROOM DEPUTY CLERK URSO:  No, but it didn't work

6    for counsel.

7              THE COURT:  Are all of these weeks in November no

8    good for you?

9              MS. PUIG:  All the weeks except the week of November

10   9th and the week of November 16th.  Just two weeks are out.

11   The rest is in play.

12             THE COURT:  But those are exactly the weeks that we

13   -- we can't do it the week of Thanksgiving.

14             COURTROOM DEPUTY CLERK URSO:  I'm sorry.  You said

15   yes, you're going to do it the week of Thanksgiving?

16             THE COURT:  No, we cannot.

17             COURTROOM DEPUTY CLERK URSO:  No --

18             THE COURT:  I mean, the following week would then be

19   December 3rd.

20             COURTROOM DEPUTY CLERK URSO:  Maybe we could do the

21   3rd.

22             THE COURT:  Is that too distant?

23             MR. NOTARGIACOMO:  Your Honor, I believe it's too far

24   from the October 14th.

25             THE COURT:  Well, let's do it on November 12th and
```

1    maybe you can find somebody to substitute for you.

2              MS. PUIG:  All right, your Honor.

3              THE COURT:  There doesn't seem to be another

4    reasonable day.

5              MS. PUIG:  Thank you for your consideration.

6              COURTROOM DEPUTY CLERK URSO:  Judge, is that at

7    2 o'clock on November 12th?

8              THE COURT:  Yes.  And the same as before.  To the

9    extent that Judge Boal needs to have a hearing, she'll do it

10   in the morning and we'll do this in the afternoon, unless she

11   decides to do it in the afternoon.

12             COURTROOM DEPUTY CLERK URSO:  Okay.

13             MR. NOTARGIACOMO:  That brings us to Section D, the

14   fully-briefed motions.  There are a number of motions listed

15   that either -- for which either oral argument has been waived

16   or oral argument has already been held by your Honor, and a

17   number of motions that are to be heard in front of Judge Boal

18   this afternoon.

19             THE COURT:  I think eight I still have to decide and

20   I will do so.

21             MR. NOTARGIACOMO:  Correct, your Honor.

22             THE COURT:  Nine, is there any reason not to allow

23   that?

24             MR. NOTARGIACOMO:  We see none.  No opposition was

25   filed, your Honor.

```
 1              THE COURT:  I'm sorry?

 2              MR. NOTARGIACOMO:  No opposition was filed by any

 3     party.

 4              THE COURT:  So, that is allowed.  That is the motion

 5     to destroy 100 pallets of paper, Docket No. 1980, is allowed

 6     without opposition.

 7          The PSC's motion for entry of qualified protective

 8     order.  I think that's one of yours, isn't it?

 9              MAGISTRATE JUDGE BOAL:  Yes.

10              THE COURT:  Yes.  It's unopposed, I gather.

11              MR. GASTEL:  Your Honor, Ben Gastel on behalf of the

12     PSC.

13          This is just a motion that I helped negotiate with

14     the Tennessee Department of Health, whereby they will submit

15     as part of the bankruptcy claims settlement process to the

16     settlement administrator and the appeals administrator the

17     list that they maintained during the outbreak of affected

18     individuals.

19          The order is very limited to just simply requesting

20     access to that information by the settlement administrator and

21     the appeals administrator in the bankruptcy claims process.

22          I can't imagine that any party would want to oppose

23     that.  It doesn't give access to any party to that

24     information.  It just provides access to the settlement

25     administrator and appeals administrator, and given the timing
```

1    of that, we would like that to be entered relatively soon so

2    that it does not delay the claims process that's ongoing with

3    the bankruptcy.

4                    MAGISTRATE JUDGE BOAL:  Has the two-week period

5    expired yet?

6                    MR. GASTEL:  No.  We just filed that last Friday.

7                    MAGISTRATE JUDGE BOAL:  All right.  So, I'll wait and

8    if there's no opposition --

9                    MR. GASTEL:  Thank you.

10                   UNIDENTIFIED SPEAKER:  Sorry to barge in, your Honor,

11   but there are a lot of people speaking --

12                   COURT REPORTER:  I'm sorry, I didn't hear that.

13                   THE COURT:  Counsel on the telephone has trouble

14   hearing counsel in the courtroom.  So, would counsel in the

15   courtroom please be sure to talk into the microphone.

16                   We were discussing No. 10, unopposed motion for entry

17   of qualified protective order, and I think it is agreed that

18   it will be filed and Judge Boal will deal with it.  Okay.

19                   Then we come to motions to withdraw as counsel, which

20   I think is also Judge Boal's, right?

21                   MR. NOTARGIACOMO:  I believe this was argued in front

22   of your Honor at the last status conference.

23                   THE COURT:  Then I'll decide it.  That's right.  I

24   will decide it, but I need to check some of the orders.  So, I

25   will do that.

1          MR. NOTARGIACOMO:  The next three motions, 12, 13 and

2     14, are all in front of Judge Boal this afternoon.

3          THE COURT:  Right.  15 as well.

4          MR. NOTARGIACOMO:  Correct, 15 as well.

5          16, actually, probably should have been taken off the

6     agenda.  I think it was dealt with and resolved by the Court's

7     order of July 9th related to pretrial schedules.

8          And that leaves us with 17, choice of law briefing,

9     which your Honor indicated she did not need to hear oral

10    argument regarding.

11         And, finally, No. 18, PSC's memo regarding the

12    Court's authority under §157(b), which your Honor said she

13    wanted to hear oral argument on.

14         THE COURT:  Okay.  Let me go back for a moment to the

15    Bellwether business.

16         I think -- I assumed in the order that I entered in

17    July that there would be trials with respect to the Tennessee

18    cases, at least for purposes of keeping the discovery going.

19    Until there is some other order, that's what I'm assuming will

20    happen, and that the discovery activity should continue based

21    on that July 9th order.

22         MR. NOTARGIACOMO:  That was our assumption as well,

23    your Honor.

24         THE COURT:  Okay.  That's No. 18.

25         The Part E, the Ohio medical defendants' motion to

1    dismiss.  The question I have is whether the issues raised in

2    that motion I haven't decided in the case of Dr. Chowdhury, or

3    whatever his name was.

4         MR. NOTARGIACOMO:  There was one issue in that motion

5    that the Court has not decided and it's a statute of

6    limitations issue.  There are other issues in that motion that

7    are identical to the previous motion that your Honor already

8    decided.

9         THE COURT:  Well, I'm unlikely to decide it

10   differently in the case of the rest of the defendants, but

11   then what you're saying is the only thing still to be decided

12   is the statute of limitations issue?

13        MR. NOTARGIACOMO:  I believe so.  Not having the

14   motion in front of me, but having reviewed it, I believe

15   that's the case.

16        THE COURT:  What about the New Hampshire cases?  I

17   guess nothing yet because we haven't heard from them yet.

18        MR. NOTARGIACOMO:  That's right, your Honor.  I

19   believe you ordered a response --

20        THE COURT:  Are we going to hear anything from them?

21        MR. NOTARGIACOMO:  There's been some discussion.

22   Counsel, Kim Dougherty, who has one or two of those cases, is

23   here and can discuss that, if the Court wishes.

24        MS. DOUGHERTY:  Good afternoon, your Honor.  Kim

25   Dougherty.  I represent two of the plaintiffs.

1          There are four cases that are currently pending in

2     front of you.  We have until August 17th to file our order to

3     show cause as to whether or not the cases should remain here

4     and whether or not there's jurisdiction --

5          THE COURT:  Whether or not there's jurisdiction?

6          MS. DOUGHERTY:  Yes, absolutely, your Honor.

7          So, there's a distinction, I think, within the facts

8     that we will be making the Court aware of in terms of the

9     timing of filings versus timing of transfer into the Court.

10         The timing of the filings in New Hampshire was during

11    the appeal period, but prior to the confirmation order and

12    then the cases were transferred into the Court after the

13    confirmation order.

14         We are still looking into our legal arguments as to

15    whether or not that would support jurisdiction here, and we'll

16    be filing something with the Court on the 17th per your order.

17         THE COURT:  Okay.  And, finally, the Saint Thomas

18    Entities' motion to compel.  That is, again, for Judge Boal,

19    right?

20         MR. NOTARGIACOMO:  Yes, your Honor, but that case --

21    and that is just a motion that we just filed.  So, I don't

22    believe there's been a full briefing on that issue.

23         THE COURT:  All right.  So, does anybody have

24    anything else that we need to talk about other than the

25    §157(b)(5) argument?

```
 1              (No response.)

 2         THE COURT:  So, that's what we're doing now.

 3         MR. NOTARGIACOMO:  And, your Honor, George Nolan,

 4    Tennessee plaintiff counsel, will be addressing the §157(b)(5)

 5    issue on behalf of the PSC.

 6         MR. NOLAN:  Your Honor, I'm George Nolan from

 7    Nashville.

 8              This issue has been fully briefed and I'd like to

 9    begin by asking the Court whether it has any particular areas

10    or questions that it would -- it's curious to have oral

11    argument on.

12         THE COURT:  I do not.  I would like to hear whatever

13    you have to say in, hopefully, no more than 15 minutes.

14         MR. NOLAN:  Certainly, your Honor.

15         THE COURT:  The other side will also have 15 minutes.

16         MR. NOLAN:  Your Honor, I'm first going to discuss

17    what this Court has the legal authority to do as far as this

18    issue is concerned, and then what would be the best thing for

19    this Court to do, given the interest of all the parties and

20    under basic precepts of justice.

21              What we ask the Court to do, your Honor, is to

22    exercise its power and responsibility under 28 U.S.C.

23    157(b)(5) to determine what the appropriate trial venue should

24    be for the personal injury actions that are pending in this

25    Court, and that statute, your Honor, requires the Court in
```

1    bankruptcy cases to determine whether personal injury claims

2    should be tried in this Court or whether they should be tried

3    in their home districts, and we ask this Court to make the

4    decision to select at least some of the Tennessee cases and

5    set them for trial in this Court pursuant to that statute.

6            Now, your Honor, we recognize in our brief that there

7    is a tension between Section 157(b)(5) and also Section 1407

8    of Title 28 and, as the Court knows, cases reach this forum

9    via two different mechanisms.  Some cases were transferred to

10   this Court by the judicial panel multi-district litigation

11   pursuant to Section 1407, and other cases this Court

12   transferred to itself pursuant to Section 157(b)(5).  So, this

13   Court actually sits in supervision of a bankruptcy as well as

14   an MDL court.

15           Well, there's some tension between Section 157(b)(5)

16   and the Supreme Court's interpretation of Section 1407 in the

17   *Lexecon* case, and in *Lexecon* the Supreme Court found that

18   §1407 requires the judicial panel to remand cases for trial

19   back to their home districts.

20           However, your Honor, *Lexecon* was not a bankruptcy

21   proceeding and Section 157(b)(5) was not mentioned in that

22   particular case.  So, we have an issue that's a matter of

23   first impression in the First Circuit.

24           What we're asking this Court to do, your Honor, is to

25   select certain Tennessee cases, set them for trial in this

1    Court in early fall of 2016, but also certify --

2          THE COURT:  In the fall of 2016?  I thought we were

3    talking about the spring.

4          MR. NOLAN:  Spring of 2016, but also build in enough

5    time, your Honor, for the Court to certify an interlocutory

6    appeal of this venue issue to the First Circuit.

7          We don't want to try a case in the wrong court.  That

8    would be terribly inefficient, but we do think that the best

9    way for the Court to keep these cases on track and be fair to

10   the plaintiffs, understanding the fact that it's now been

11   three years since they were injured, is to set the cases for

12   trial in this Court, and here's why we suggest that that is

13   the appropriate thing to do.

14         Your Honor, this Court, because of its background in

15   the case, can get cases to trial more quickly than any other

16   venue.  If cases were remanded at this stage or some future

17   stage after certain discovery is concluded, then there are

18   going to be other judges in other districts who are going to

19   have to climb the same learning curve that this Court has

20   already climbed in ruling on several important issues.

21         I think it's fair to say, your Honor, based on Mr.

22   Gastel's description of the insurance declaratory judgment

23   actions that are pending in Tennessee, that there is genuine

24   concern on the plaintiffs' side of the case that the

25   defendants want to leave this Court and have a redo of the

1    issues that were decided by this Court at the motion to

2    dismiss phase, particularly plaintiffs' right to proceed with

3    claims under the Tennessee Product Liability Act.

4         So, your Honor, it's our very respectful position

5    that if this Court selects a handful of Tennessee cases, sets

6    them for trial in 2016, moves forward, continues to supervise

7    those cases, that is the best and the most efficient way to

8    get the cases to trial on the merits, which is what the

9    plaintiffs wish to do, and that is basically our position.

10        Your Honor, there's been argument in our --

11        THE COURT:  Let me ask you about the mechanics.  Are

12   you suggesting that we finish with the discovery, the cases

13   sort of sit here then, and I exercise jurisdiction under the

14   bankruptcy statute or under §157(b)(5) to try certain of these

15   cases regardless of what happens with multi-district?

16        MR. NOLAN:  That's right, your Honor.  We ask you to

17   exercise your authority under that statute to set cases for

18   trial in this Court.

19        THE COURT:  And let the MDL cases -- let the cases as

20   MDL cases sit here?

21        MR. NOLAN:  Let them remain here pending the outcome

22   of those cases.  In other words, we're not asking this Court

23   to tie its hands, so to speak, with respect to every case

24   that's pending in this MDL, but we think it would be

25   appropriate for the Court to select certain cases and set them

1    for trial pursuant to §157(b)(5).

2         THE COURT:  Okay.

3         MR. NOLAN:  Now, I would like to add, your Honor,

4    that there's been a lot of pushback in opposing parties'

5    briefs under whether this Court continues to maintain subject

6    matter jurisdiction, and we have submitted the Court with

7    ample authority supporting the proposition that for purposes

8    of determining subject matter jurisdiction under §1334(b),

9    that determination is made at the time litigation is filed.

10        This Court has previously ruled twice that this Court

11   does have subject matter jurisdiction over these proceedings,

12   and we've submitted the Court with authority from four

13   circuits, the Fourth, Fifth, Sixth and Eleventh Circuits, as

14   well as six district courts, supporting the proposition that

15   subsequent events cannot undo the Court's subject matter

16   jurisdiction.  That jurisdiction is fixed at the time of

17   filing and this Court continues to enjoy jurisdiction.

18        We've also pointed out, your Honor, that because of

19   the nature of the comparative fault defenses that these

20   particular defendants are asserting, it will require the

21   trustee as the post confirmation officer to spend money in the

22   future dealing with those and under the terms of the

23   bankruptcy plan, that will erode funds that would otherwise go

24   into the tort trust and be available to injured plaintiffs.

25        And so, this Court does continue to have a stake in

1    the outcome of these claims, your Honor, and does have subject

2    matter jurisdiction.

3           THE COURT:  Thank you.  Who will be heard in

4    opposition?

5           MR. TARDIO:  Good afternoon, your Honor.

6           THE COURT:  Is there a green light?

7           MR. TARDIO:  No.

8           (Discussion off the record.)

9           MR. TARDIO:  Good afternoon, your Honor.  Chris

10   Tardio on behalf of the Tennessee clinic defendants.

11          We have filed, obviously, a brief in response to the

12   plaintiffs' brief that covers many of the arguments that I

13   will set forth here today.  So, I'll try to be brief and I'll

14   try to hit the high points.

15          First and foremost, this Court has these cases in

16   front of it under MDL Statute 28 U.S.C. 1407.  That's how they

17   were transferred to this Court, and, from our perspective,

18   respectfully, the analysis of what to do with these cases at

19   the conclusion of the pretrial proceedings is fairly simple.

20          §1407 says that the Court shall, "shall," send them

21   back at the conclusion of pretrial proceedings.  That's the

22   statutory language, and we have on top of the statutory

23   language an unambiguous interpretation of the statutory

24   language in *Lexecon* which says that the Court, when hearing

25   cases under §1407, does not have any discretion to self assign

1    them under any transfer statute, and we assume that the U.S.

2    Supreme Court chose that word "any" carefully.  That would

3    mean any transfer statute.  And *Lexecon* is clear that the

4    Court cannot self assign cases under any transfer statute.

5    So, from our perspective, that is where the analysis of this

6    issue should end.

7            THE COURT:  What happens to the Court's bankruptcy

8    jurisdiction while the cases go back to multi-district?

9            MR. TARDIO:  This Court?  I think that we're

10   conflating jurisdiction and venue.  §157 is not a

11   jurisdictional statute.  It's strictly a venue statute.  The

12   federal court -- our position, frankly, your Honor, is that

13   this Court at this point has lost related-to jurisdiction.

14           And I recognize that the plaintiffs have filed a

15   brief and they cite cases that say once related-to

16   jurisdiction attaches, it can't be lost.  We filed cases that

17   say the opposite.  So, I would respectfully disagree that that

18   law is settled, particularly in the First Circuit and Sixth

19   Circuit, but I don't think that has -- §1407 -- the federal

20   court can still have jurisdiction, but still under §1407 have

21   the responsibility to remand the venue back to the transfer

22   court.  So, I don't know that §157 has anything to do with

23   jurisdiction.  It's strictly a venue statute.  So, under

24   §1407, we think that the analysis ends -- begins and ends with

25   the statutory language and *Lexecon*.

1        Now, the Court -- back to the issue that the Court

2   just raised.  This Court has already recognized in previous

3   orders that changes in circumstances can change whether or not

4   the Court has related-to jurisdiction.  Judge Saylor in the

5   2013 order that addressed the jurisdiction over the Virginia

6   cases, the state law cases, he doesn't decide whether he had

7   related-to jurisdiction, but he -- assuming that the Court did

8   have related-to jurisdiction, Judge Saylor's 2013 order said

9   I'm not going to exercise it over cases where there's no claim

10  against the debtor or no potential claim against the debtor,

11  but what Judge Saylor said was, quote, "If the balance of

12  factors shifts over time, the Court can revisit the issue and,

13  if necessary and appropriate, can issue further orders

14  concerning the exercise of related-to jurisdictions."

15        And that's what happened.  That's what happened later

16  when Insight filed a proof of claim.  Your Honor ruled that

17  there was related-to jurisdiction.  So, this Court has already

18  recognized that circumstances can change to bring a case

19  either within or outside of related-to jurisdiction, and our

20  position, as we lay out in the briefing, is that this Court --

21  with the confirmation of the plan, Tennessee-plaintiff-versus-

22  Tennessee-defendant cases do not have any relation to the

23  bankruptcy anymore and related-to jurisdiction has gone.

24        But, again, that's separate from the venue argument.

25  Even if the Court has -- federal court has jurisdiction under

1    related-to, that does not, in our view, relieve the Court of

2    the obligation under §1407 and *Lexecon* to transfer them back

3    to the transfer court, in this case Tennessee.

4         One more important point.  If the Court is going to

5    do a §157(b)(5) analysis -- if the Court disagrees with us and

6    the Court believes that §157(b)(5) applies, the caselaw says

7    that the first step in doing a §157(b)(5) analysis is to do

8    the permissive abstention analysis, the twelve factors.

9         So, before transferring any -- or self transferring a

10   case to be heard under §157(b)(5), the Court has to apply the

11   twelve factors of permissive abstention and decide that the

12   proper place to hear the case is Massachusetts, and this Court

13   has already done that permissive abstention analysis for this

14   category of cases, state only party cases where there's no

15   claim against the bankruptcy in the context of the Virginia

16   cases and said based on those permissive abstention factors,

17   the Court is not going to exercise jurisdiction.

18        We don't have a claim against NECC, the debtor,

19   anymore.  We can't have a claim against NECC.  It's

20   extinguished in -- by the court of -- the bankruptcy court.

21   So, these cases, if you apply the twelve abstention factors,

22   which §157 requires, Massachusetts is not the appropriate

23   place to hear the cases.

24        Lastly, if we assume that we are wrong and the Court

25   finds that we are wrong on §1407, on the application of

1    *Lexecon*, on the permissive abstention factors, and the Court

2    finds that under §157(b)(5), the Court is going to analyze

3    what is the appropriate forum to hear the case, we would

4    respectfully submit that the logical forum to hear these cases

5    is Tennessee.  We are now left with Tennessee plaintiffs

6    versus Tennessee defendants, Tennessee law claims, state law

7    claims, based on a relationship -- physician/patient

8    relationship that was developed and only in Tennessee.  The

9    injury occurred in Tennessee.  The lawyers are in Tennessee.

10   Most of the witnesses will be in Tennessee.

11          So, even if the Court at bottom does the traditional

12   forum analysis and weighs the traditional factors, the logical

13   conclusion is Tennessee is the appropriate venue, which leads

14   me to the conclusion which is whichever track we go down, we

15   end up with these cases, respectfully, should be transferred

16   back to Tennessee for trial.  Thank you, your Honor.

17          THE COURT:  Thank you.

18          MS. GREER:  Your Honor, Marcy Greer for the Saint

19   Thomas Entities, and I'll just touch on a few additional

20   points.

21          We, of course, agree with Mr. Tardio's position on

22   those, as demonstrated in our brief on those points.

23          The suggestion that federal jurisdiction of any type

24   attaches at the time of removal or filing the complaint and

25   then can never be divested is not a concept that the First

1    Circuit has adopted.  This is not even an unsettled question.

2    The First Circuit takes a different position, and in the

3    *Zuckerberg* case, the Facebook case that we cited in our

4    papers, they made it clear that this motion of time-of-filing

5    jurisdiction and it fixes then and nothing else can divest it

6    is a concept that is limited to diversity jurisdiction, as the

7    Supreme Court made clear in the *Grupo Dataflex* case.  That's

8    the seminal case on that point.  The First Circuit's opinion

9    in *Zuckerberg* said that that's premised on diversity of

10   citizenship.  It would be unwise for us to extend it to

11   federal question type cases, of which this bankruptcy

12   jurisdiction statute is a member.

13          So, the First Circuit has basically said that rule

14   doesn't apply.  They've cited a number of cases from other

15   circuits, but this Court sits in the First Circuit and that

16   decision has been made, that this is something that can ebb

17   and flow as circumstances change, because the purposes of the

18   time-of-filing rule are to protect diversity defendants who

19   want to stay in federal court from manipulation of the

20   parties' place of business, things like that, that might

21   divest diversity.  You don't have those problems with subject

22   matter jurisdiction, as the First Circuit recognized.  So, you

23   don't need a rule like this.

24          And so, the reality is that related-to jurisdiction

25   is a very, very special species of jurisdiction.  It swells

1    when a bankruptcy proceeding is pending to allow the court to

2    have as much flexibility to deal with all of the issues,

3    whether they be state court tort proceedings, personal injury

4    cases, like we have here, or contract claims, like was the

5    case in *Quincy*.  It swells so that the Court can deal with

6    those claims and have a basis for jurisdiction, but once the

7    plan is confirmed, once that happens, there is no more

8    bankruptcy that needs to be protected.  There is no more

9    debtor.

10          The order in this case could not be clearer that

11   there are no more claims against NECC, the debtor, in this

12   case, ever.  Nothing that happens in these cases can impact

13   NECC.  They are not paying any judgment.  They are not going

14   to be profiting from any judgment.  They are completely out of

15   the equation.  That was the entire design of the bankruptcy

16   claim in this case.

17          So, with the confirmation of the plan, the courts

18   want to be -- you know, bankruptcy jurisdiction is really

19   gone.  And so, there's really no basis for invoking the

20   jurisdictional statute and venue statute of §157(b)(5).

21          Now, they've proposed a procedure that's very

22   interesting.  This is the first time we've heard about the

23   §1292(b) interlocutory certification suggestion.  A few

24   thoughts on that.

25          First of all, as the Court well knows, interlocutory

1    certification requires a double certification, one from this

2    Court and one from the First Circuit.  So, even if this Court

3    were to certify it for an interlocutory appeal -- let me back

4    up and mention, one of the facts you consider in §1292(d) is

5    whether or not this is an issue of law that can be debatable

6    among reasonable jurists.  They're admitting this is an open

7    question as to whether or not the Court continues to have

8    jurisdiction, such that it even has the power to set the venue

9    here.  Okay.

10           So, if we then take it up and we have to go through

11   the double certification process, the First Circuit may or may

12   not take it.  They don't have to.  And if they don't take it,

13   it's game over.  If they do take it, it's going to take time

14   to get those cases resolved.  So, I would submit to you that

15   is not a very efficient process.

16           We have an ulterior -- an alternative path here.  One

17   is that the Court can find that it no longer has jurisdiction

18   because the bankruptcy plan has been confirmed, so it's game

19   over, and then send the cases back, because I think it's

20   interesting that a third of Tennessee plaintiffs refuse to

21   waive *Lexecon*, including Mr. Reed, who had tried to get an

22   early trial in this case.  He's refusing to waive his *Lexecon*

23   rights to go back to Tennessee.

24           So, there's a lot -- you know, even a lot of the

25   Tennessee plaintiffs don't want to try the cases here.  So, if

1    you flip then into the one -- I'm sorry -- the §157(b)(5)

2    factors that Mr. Tardio has talked about, those are

3    discretionary flexible factors.  It's kind of supplemental

4    jurisdiction.  Okay.  The federal question is gone.  Now let's

5    look at whether we retain jurisdiction over these purely state

6    law claims, and all of those factors point to Tennessee,

7    including, I think notably, the fact that the Tennessee

8    plaintiffs -- a large majority of them -- or a large minority,

9    excuse me, want to go back to Tennessee as well, and the

10   Court's conclusion is -- all the factors, frankly, counsel in

11   favor of going to Tennessee.

12         So, under either analysis, the straightforward path

13   to get to a trial that -- because we agree.  We don't want to

14   retry these cases after finding out they were tried in the

15   wrong venue.  Nobody wants that, but the straightest path to

16   get there is to go back to Tennessee, because the Court has

17   the discretion to do that, even if they're right on whether or

18   not there's bankruptcy jurisdiction to do it here.

19         And I just -- under the complete analysis of the

20   circumstances, you know, with Tennessee plaintiffs, Tennessee

21   claims, everything else, there are no possible -- there's no

22   possibility that there will be liability findings against any

23   of the comparative fault defendants.  That's been taken care

24   of.  The comparative fault verdict will only be taken into

25   account the policies of Tennessee as to whether or not the

```
 1    responsibility for the defendants who are in the case should

 2    be reduced by virtue of Tennessee law.  All of those issues

 3    point towards Tennessee, not trying the cases here, and I

 4    think that trying to set a construct where some of the cases

 5    are considered as being under the Court's bankruptcy

 6    jurisdiction and some of the cases are considered in the MDL

 7    doesn't make a lot of sense.  They're all in the MDL and they

 8    all ought to be treated the same, and I think the easiest,

 9    cleanest and most efficient way to do that is to either find

10    the bankruptcy jurisdiction has expired and so §157(b)(5) is

11    not available, or to exercise your discretion under that

12    statute and say they belong in Tennessee.

13            The only arguments that they've offered in favor of

14    keeping them here are that they think they can get to a faster

15    trial, but the procedure with the §1292 they ask that -- is

16    not going to get it there.

17            So, I'm happy to answer any further questions or I'll

18    turn to the next.

19            THE COURT:  Thank you.  Anybody else?

20            MR. WOLK:  Your Honor, this is Christopher Wolk again

21    for the Premier defendants.

22            We submitted a brief also in opposition and I will be

23    brief in my comments because I believe that Mr. Tardio and Ms.

24    Greer have covered most of the arguments that also apply to

25    New Jersey cases.
```

1          I don't -- it's unclear to me at this time whether or

2     not this issue is directed exclusively at the Tennessee

3     defendants or if whatever order your Honor enters in this case

4     will be so far-reaching that it could impact New Jersey.  So,

5     that's why I decided that we should also submit a brief on the

6     issue.

7          And, your Honor, we're in the same position that the

8     Tennessee defendants are in in this particular case and feel

9     that regardless of the analysis, as Ms. Greer has put forth

10    before your Honor, either under §1334 or under §157(b)(5),

11    that these cases should be sent back to New Jersey for their

12    trials.  This is particularly a venue issue.

13         We, too, have no claims against NECC.  They have been

14    extinguished with the approval of the plan.  There will be no

15    indemnification payment by NECC under our comparative fault

16    defenses.  That is what we've been working towards as we've

17    been working on these cases.  It's simply to have a credit for

18    their negligence at the time of trial.  There will be no

19    payment from NECC.  It will not deplete any tort trust that

20    may be out there.

21         And speaking to that point, the tort trust -- it's my

22    understanding that there is -- and I'm going to get the term

23    wrong because I know very little about bankruptcy, but there's

24    an expense account.  There's an expense trust where money has

25    been put aside in order to pay for the professionals that may

1    need to interfere or may need to get involved in this

2    litigation for discovery, comparative fault discovery

3    purposes, whatever the case may be.  That was fully understood

4    at the time that the Chapter 11 plan was approved and that was

5    fully understood when all of the -- when all the parties voted

6    in favor of the plan.

7            So, to say that it is depleting resources from the

8    tort trust and that that's how it somehow continues to be

9    related to the bankruptcy in this case, I think, is not the

10   case.

11           Again, all of the cases that are pending now against

12   Premier will continue to have New Jersey plaintiffs and New

13   Jersey defendants, with New Jersey claims and injuries and

14   actions that occurred in New Jersey.  It makes sense to have

15   these cases sent back to New Jersey under either analysis that

16   the Court may decide.

17           It's been my experience and I've seen it written more

18   than once, that swift justice is not just swiftness.  So, any

19   argument that one may advance that it would be a way to get

20   these cases to trial faster may just, in fact, have us in a

21   position where we have to try them again because they were

22   tried in the wrong place, as has been pointed out.  So, that's

23   the conclusion of my comments.

24           THE COURT:  It's highly unlikely that one could

25   accuse this Court of swift justice given it's been around for

1    a while and -- so, I'm not sure.

2              Is there someone else who wishes to speak?

3              MR. NOLAN:  Your Honor, I would like to make a couple

4    of points in rebuttal, unless someone else --

5              THE COURT:  Did you want to --

6              MR. KIRBY:  Yes, your Honor, just briefly.  Very,

7    very briefly.  Greg Kirby on behalf of the Box Hill defendants

8    in Maryland.

9              We didn't file a brief in this and that was because

10   the focus was on the Tennessee defendants.  As Mr. Wolk said,

11   we're not sure if this just applies to Tennessee defendants or

12   not, but it seems like it would have the same effect on us.

13   We also didn't want to burden the Court and file an identical

14   brief.  I think that the briefing is already very thorough.

15             That said, the very last sentence or thereabout of

16   the reply brief from the plaintiffs mentioned the Box Hill

17   defendants and having trials here.  So, I just wanted to stand

18   up and make my point that we join the arguments of the

19   Tennessee defendants and the New Jersey defendants, adopt

20   their arguments in the briefs and what they've argued here

21   today.  We were brought here as well into the MDL based on

22   §1407.

23             THE COURT:  Thank you.  Mr. Nolan.

24             MR. NOLAN:  Your Honor, I'd first like to correct the

25   factual misstatement by Ms. Greer.  I'm not suggesting it was

1    intentional, but she told the Court that my client, Wayne

2    Reed, has not waived *Lexecon*, and that is simply incorrect.

3    All the clients of our firm, including Mr. Reed, did waive

4    *Lexecon* and sent the appropriate form to the PSC by the

5    deadline required by this Court.  So, I wanted to be very

6    clear about that.

7            As far as the issue of subject matter jurisdiction is

8    concerned, I'd like to read to the Court a direct quote from

9    the First Circuit as far as how that court views §1334(b)

10   jurisdiction.  I'm quoting from the case of *In Re:  Boston*

11   *Regional Medical Center*.  §1334 jurisdiction exists when

12   litigation, quote, "could potentially have some effect," close

13   quote, on the bankruptcy estate.  And certainly that

14   circumstance is present in this particular case.

15           As I previously explained, your Honor, Mr. Moore, now

16   that the bankruptcy plan has been confirmed, he puts on a post

17   confirmation officer hat.  Money has been set aside for him to

18   deal will additional expenses that may be incurred.  Now that

19   the plan has been confirmed, NECC's insurers have turned off

20   the money spigot, so to speak, as far as paying for Mr.

21   Moore's law firm's expenses.

22           So, any other time that his firm incurs in dealing

23   with the comparative fault defenses asserted against NECC and

24   the Insiders will come from the expense fund, your Honor, and

25   whatever is not spent in that fund goes into the tort trust

1    and will be distributed to tort victims.

2         So, clearly, these continued proceedings and the

3    comparative fault defenses which the defendants are choosing

4    to assert, quote, "could potentially have some effect," close

5    quote, on the bankruptcy estate, which is the test in the

6    First Circuit.

7         Your Honor, I'd also like to point the Court to a

8    case we cited in Footnote 9 of our brief.  It's the *Ching vs.*

9    *Mitre Corporation* case, which stands for the proposition that

10   in federal question jurisdiction cases, jurisdiction is fixed

11   at the time of filing.

12        Now, your Honor, because this Court does have

13   jurisdiction -- and we are supposed to be here today.

14   Otherwise, if there was no jurisdiction, we would not be

15   having this conversation.  Because the Court does have

16   jurisdiction over these proceedings, it's important for the

17   Court to know that under Section 157(b)(5), the Court can

18   select venue in this Court.

19        Now, Mr. Tardio indicated that Section 1407 says that

20   the Court "shall" remand.  That's not exactly what it says.

21   What it says is that the judicial panel shall remand at

22   conclusion of pretrial proceedings.

23        So, typically, the way it works is once pretrial

24   proceedings are concluded, the Court suggests a remand and

25   then the panel performs the remand.

1          So, there's no question that if the Court wanted to,

2    the Court could conclude all pretrial proceedings, suggest a

3    remand.  The cases would be remanded by the panel and, yet,

4    this Court would, nevertheless, have the authority under

5    Section 157(b)(5) to transfer those courts back to this --

6    those cases back to this Court for trial.  That would be a

7    silly procedural exercise, your Honor, and it's for that

8    reason we suggest that what we propose makes sense.

9          Your Honor, the defendants chose to import products

10   from Massachusetts into Tennessee and distribute those in

11   Tennessee, and these defendants are now choosing to assert

12   defenses which are centered in Massachusetts and which focus

13   on Massachusetts parties, and for that reason, there's nothing

14   unjust about having a trial in this courtroom.  Thank you.

15          THE COURT:  Thank you.

16          MS. GREER:  Your Honor, if I may address the *Lexecon*

17   waiver issue.  We did not --

18          THE COURT:  You mean the one with respect to Mr. Reed

19   only?

20          MS. GREER:  Yes, and the other plaintiffs.  We did

21   not actually --

22          THE COURT:  Mr. Reed was the particular one.

23          MS. GREER:  Correct, but the information that I'm

24   basing that on is the document filed with the Court.  We did

25   not actually receive the waivers.  They went to the PSC, but

1   the chart filed with the Court indicates that about a third of

2   the plaintiffs did not execute the *Lexecon* waiver and Mr.

3   Reed's case was listed in that.  There may be an error in that

4   chart, but that's where I got it from.

5           THE COURT:  Okay.

6           MR. NOLAN:  There may be more than one person named

7   Reed, your Honor.  That's a possibility.

8           THE COURT:  All right.  Thank you all for your good

9   arguments and good briefs.  I will take the papers and will

10  decide it.  I will see you again in September on the -- what

11  happened to the date?

12          MR. NOTARGIACOMO:  The 10th, your Honor.  September

13  10th.

14          THE COURT:  September 10th.

15          Those of you who have business before Judge Boal,

16  please remain.  Those of you who are done with the business

17  may also leave and I'm leaving.

18          (Adjourned, 3:15 p.m.)

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2              I, Catherine A. Handel, Official Court Reporter of the

3    United States District Court, do hereby certify that the

4    foregoing transcript, from Page 1 to Page 52, constitutes to the

5    best of my skill and ability a true and accurate transcription of

6    my stenotype notes taken in the matter of Multidistrict

7    Litigation No. 13-02419-RWZ, In Re: New England Compounding

8    Pharmacy Cases Litigation.

9

10

     August 9, 2015        /s/Catherine A. Handel
11   Date                  Catherine A. Handel, RPR-CM, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```