1
2                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
3

4
   IN RE:  NEW ENGLAND COMPOUNDING   )  MDL NO. 13-02419-RWZ
5  PHARMACY CASES LITIGATION         )
                                     )
6                                    )
                                     )
7                                    )
                                     )
8                                    )

9

10        BEFORE:  THE HONORABLE JENNIFER C. BOAL

11

12

13                    **MOTIONS HEARING**

14

15

16
             John Joseph Moakley United States Courthouse
17                       Courtroom No. 12
                        One Courthouse Way
18                      Boston, MA 02210

19
                        August 5, 2015
20                        3:00 p.m.

21

22
                 Catherine A. Handel, RPR-CM, CRR
23                   Official Court Reporter
             John Joseph Moakley United States Courthouse
24             One Courthouse Way, Room 5205
                      Boston, MA 02210
25             E-mail: hhcatherine2@yahoo.com

```
1      APPEARANCES:

2      FOR THE PLAINTIFFS:

3          Hagens, Berman, Sobol, Shapiro LLP, by EDWARD NOTARGIACOMO,
4      ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts
       02142;
5
           Janet, Jenner & Suggs, LLC, by KIMBERLY A. DOUGHERTY, ESQ.,
6      and ANDREW LEE, ESQ., 75 Arlington Street, Suite 500, Boston,
       Massachusetts  02116;
7
           Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,
8      ESQ., and BENJAMIN GASTEL, ESQ., 227 Second Avenue North,
       Nashville, Tennessee 37201-1631;
9
           Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
10     Street, Suite 500, Boston, Massachusetts 02114;

11         Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K.
       MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, New York
12     10013-1413;

13

14     FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
       NECP, INC.:
15
           Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
16     Street, Suite 2400, Boston, Massachusetts 02110-1724;

17

       FOR THE DEFENDANTS:
18

19         Michaels, Ward & Rabinovitz LLP, by DAN RABINOVITZ, ESQ.,
       One Beacon Street, Boston, Massachusetts 02108;
20
           Todd & Weld LLP, by CORRINA L. HALE, ESQ., 28 State Street,
21     31st Floor, Boston, Massachusetts 02109;

22         Alexander Dubose Jefferson & Townsend LLP, by MARCY HOGAN
       GREER, ESQ., 515 Congress Avenue, Suite 2350, Austin, Texas
23     78701-3562;

24

25     (Appearances continued on the next page.)
```

```
1     APPEARANCES (Cont'd):

2     FOR THE DEFENDANTS:

3        Gideon, Cooper & Essary, PLC, by CHRISTOPHER J. TARDIO,
      ESQ., 315 Deaderick Street, Suite 1100, Nashville, Tennessee
4     37238;

5        Nutter McClennen & Fish LLP, by SARAH P. KELLY, ESQ.,
      Seaport West, 155 Seaport Boulevard, Boston, Massachusetts
6     02210-2604;

7        Montgomery McCracken Walker & Rhoads LLP, by STEPHEN A.
      GROSSMAN, ESQ., Liberty View, Suite 600, 457 Haddonfield Road,
8     Cherry Hill, New Jersey 08002;

9        Fulbright & Jaworski LLP, by YVONNE K. PUIG, ESQ., 98 San
      Jacinto Boulevard, Suite 1100, Austin, Texas 78701-4255;
10
         Brewer, Krause, Brooks & Chastain, PLLC, by PARKS T.
11    CHASTAIN, ESQ., and ASHLEY E. GENO, ESQ., 611 Commerce Street,
      Suite 2600, Nashville, Tennessee 37203;
12
         Tucker, Saltzman & Dyer, LLP, by PAUL SALTZMAN, ESQ., 50
13    Congress Street, Boston, Massachusetts 02109;

14       Pessin Katz Law, P.A., by GREGORY K. KIRBY, ESQ., 901
      Dulaney Valley Road, Suite 400, Towson, Maryland 21204;
15
         Blumberg & Wolk, LLC, by CHRISTOPHER M. WOLK, ESQ., 158
16    Delaware Street, Woodbury, New Jersey 08096;

17

18    FOR INTERESTED PARTY, COMMONWEALTH OF MASSACHUSETTS,
      BOARD OF REGISTRATION OF PHARMACY:

19       Office of the Attorney General, by J. DAVID HAMPTON, AAG,
      One Ashburton Place, 18th Floor, Boston, Massachusetts 02108;
20

21    VIA PHONE FOR THE PLAINTIFFS:

22    Anthony V. Agudelo
      Erin M. Amos
23    Anne Andrews
      Evan D. Baker
24    Erin E. Bantz
      Bailor B. Bell

25
      (Appearances continued on the next page.)
```

APPEARANCES (Cont'd):


<u>VIA PHONE FOR THE PLAINTIFFS</u>:

Rebecca C. Blair
Bryan Bleichner
Robert W. Briley
Daniel L. Clayton
Michael Coren
Ryan F. Curran
Mark Dancer
Lauren Davis
Michael G. Derrick
Patrick Fennell
Mary Gidaro
James E. Girards
Sharon Houston
Michael R. Hugo
Edward A. Jazlowiecki
Douglas E. Jones
James Stephen King
Nicole L. Kreklau
Jonathan R. Krohnfeldt
Garren R. Laymon
Bill Leader
John Lyons
Thomas Martin
Ned Mulligan
Leslie Muse
Daniel Myers
Nolan Nicely
Alyson Oliver
Elliot Olsen
Emily Peacock
James J. Pettit
Laura Pittner
Robert Randall
Harry Roth
Karren Schaeffer
Brian Schuette
Bridget Stratton
John C. Thornton

```
 1                    P R O C E E D I N G S

 2        (The following proceedings were held in open court before

 3    the Honorable Jennifer C. Boal, Magistrate Judge, United States

 4    District Court, District of Massachusetts, at the John J. Moakley

 5    United States Courthouse, One Courthouse Way, Boston,

 6    Massachusetts, on August 5, 2015.)

 7        COURTROOM DEPUTY YORK:  Today is August 5th, 2015.

 8    We're on the record in the matter of In Re: New England

 9    Compounding Pharmacy, Case No. is 13-MD-02419.  Will counsel

10    please identify themselves for the record.

11        MR. NOTARGIACOMO:  Ed Notargiacomo from Hagens,

12    Berman, Sobol, Shapiro for the Plaintiffs' Steering Committee.

13        MS. DOUGHERTY:  Good afternoon, your Honor.  Kim

14    Dougherty from Janet, Jenner & Suggs on behalf of the

15    Plaintiffs' Steering Committee.

16        MR. GASTEL:  Good afternoon, your Honor.  Ben Gastel

17    from Branstetter, Stranch & Jennings on behalf of the

18    Plaintiffs' Steering Committee.

19        MR. LEE:  Good afternoon, your Honor.  Andrew Lee

20    from Janet, Jenner & Suggs on behalf of the Plaintiffs'

21    Steering Committee.

22        MR. ELLIS:  Good afternoon, your Honor.  Rick Ellis

23    for the plaintiffs.

24        MR. GROSSMAN:  Good afternoon, your Honor.  Steve

25    Grossman from Montgomery McCracken Walker & Rhoads on behalf
```

1    of the Inspira defendants.

2           MR. WOLK:  Good afternoon, your Honor.  Christopher

3    Wolk from Blumberg & Wolk on behalf of the Premier defendants.

4           MS. PUIG:  Good afternoon, your Honor.  Yvonne Puig

5    on behalf of Saint Thomas Entities.

6           MR. TARDIO:  Good afternoon, your Honor.  Chris

7    Tardio for the Tennessee clinic defendants.

8           MR. HAMPTON:  Good afternoon, your Honor.  Assistant

9    Attorney General David Hampton on behalf of the Massachusetts

10   Board of Registration of Pharmacy.

11          MR. KIRBY:  Good afternoon, your Honor.  Greg Kirby

12   on behalf of the Box Hill defendants.

13          MR. CHASTAIN:  Good afternoon, your Honor.  Parks

14   Chastain and Ashley Geno for Specialty Surgery and Dr. Lister.

15          THE COURT:  Anyone else?  I think we have people on

16   the phone as well.  My understanding from Mr. York is there's

17   no one on the phone that wishes to speak, but if an issue does

18   come, hopefully, I will remember at the end and I will ask you

19   at that time.

20          I appreciate everyone's indulgence in the change of

21   schedule.  I, unfortunately, had to attend a funeral this

22   morning and those were, obviously, outside of my control, but

23   I appreciate everyone's flexibility in appearing here this

24   afternoon.

25          Judge Zobel did ask me to remind everyone that in her

1    order dated July 9th of 2015, that on Page 5 of that order, it

2    does require the parties to select 16 potential Bellwether

3    trial cases by August 14th in light of the §157(b) briefing

4    and until the Court orders otherwise, she would like that

5    process to continue.

6            I also did want to mention on September 10th, I have

7    a couple of moving pieces.  So, I'm not sure yet whether I'm

8    going to be able to go forward at 11:30 with the conference

9    and I did just want to get the parties' input whether you

10   would prefer, if I can, if I could do it the day before,

11   whether you would rather me to do that or, if possible, to do

12   what we did today and tag it on after Judge Zobel's hearing.

13   I'm going to try to keep 11:30, but if I can't, does the PSC

14   have a preference?

15           MR. NOTARGIACOMO:  I think the PSC would prefer to

16   tag it on like we did today.

17           THE COURT:  All right.  And the Tennessee defendants?

18           MS. PUIG:  Same, your Honor.

19           THE COURT:  All right.  And how about on the back

20   table?

21           MR. WOLK:  That's fine, your Honor.  Tag it on

22   afterwards is fine.

23           THE COURT:  All right.  Well, that's what I will try

24   to do.  I think that's it for the scheduling matters, and I'm

25   going to move on to the motion with respect to DPH.

```
1              So, would you like to have a seat at the table?

2              MR. GROSSMAN:  Your Honor, this is Steve Grossman on

3    behalf of the Inspira motion.

4              THE COURT:  Yes.

5              MR. GROSSMAN:  I have a 5:20 train.

6              THE COURT:  Well, we can take that --

7              MR. GROSSMAN:  Would you mind?  Otherwise, I'm here

8    the rest of the night.

9              THE COURT:  No.  I'm happy to.  And since I believe

10   the attorney for the Commonwealth of Massachusetts is local, I

11   think that we can do that.

12             MR. GROSSMAN:  If that's okay with the rest of the

13   parties.

14             THE COURT:  That's fine.  And I assume that's all

15   right with everybody else.

16             MS. PUIG:  That's fine, your Honor.

17             MR. GROSSMAN:  Thank you.

18             THE COURT:  All right.  And I appreciate your

19   changing your schedule to modify -- to accommodate my

20   schedule.  All right.

21             So, I will hear the Inspira motion, and that was

22   filed by Inspira.

23             MR. GROSSMAN:  Correct, your Honor.  And thank you

24   for the opportunity to be heard today.

25             My intention today is not to rehash the arguments
```

1    that we have submitted and set forth in our moving papers.

2    Instead, I thought I would address, you know, the impact of

3    the ever-changing procedural landscape that I think has

4    occurred and continues to occur since the time that we did

5    file the motion.

6           First, however, I do want to make sure that the

7    distinction between the cases against Premier only, the cases

8    in which Inspira is a named defendant, that that remains a

9    critically important distinction.

10          THE COURT:  Why is that critical?  Because we're not

11   at the case-specific fact discovery.

12          MR. GROSSMAN:  So, it's been our position since the

13   beginning that, indeed, this is case specific.

14          THE COURT:  But they're not asking for statements

15   about the plaintiffs or things like that.  It's more about

16   policies and procedures.

17          MR. GROSSMAN:  Right.  So, our position with that --

18   when the Court entered the MDL order addressing common

19   discovery, for example, it was our intention, I think most of

20   the parties here that time, that was really directed towards

21   the national defendants.  It was directed towards the

22   Insiders, NECC, and the affiliated defendants.  I don't think

23   the intention at that point in time was really the clinic-

24   related defendants since it wasn't common to all cases in the

25   MDL, which is what we set forth in our brief.  Really, the

1  percentage of cases that we are named as a defendant is

2  miniscule.

3       Now, I recognize that the landscape has changed

4  somewhat with respect to the ability of the defendants or the

5  co-defendants, Premier at this point, to do any discovery

6  considering your recent order on their invoking of the Fifth

7  Amendment, but at this point I think we've always taken the

8  position that this is case specific.  This should be handled

9  at some point later in the process.

10       As I've explained in our brief, and I can certainly

11  set forth today, really from a practical standpoint, Inspira

12  may never really be part of the Bellwether process.  It's our

13  view at this point in time, now that no one, essentially,

14  consented to trial in this venue -- and I understand there was

15  argument on other reasons it should stay here.  To the extent

16  that that does not occur, all these cases are going to be --

17  at least the New Jersey cases, are going to be remanded

18  sometime -- or sent back sometime in February of 2016 for

19  case-specific discovery.

20       Through that Bellwether process, it's our position

21  it's very unlikely at any time that the plaintiffs are going

22  to choose -- or that a Bellwether trial is going to include a

23  case that involves Inspira.  Those cases that will

24  proceed will proceed against Premier only, and because of

25  that -- I mean, that's going to be a representative case for a

1    Bellwether trial.  Because of that, we don't see why we need

2    to partake in discovery as a settling defendant, to pay a

3    significant sum to resolve the claims against us at this point

4    in time.  We're not saying it can't happen.  We're saying that

5    there's really no urgency, and we explain this to the Premier

6    defendants.  The discovery needs to take place now.

7         To the extent that Inspira is ever part of a trial, a

8    Bellwether trial process, which we don't believe will ever

9    happen -- for example, if Premier goes to trial and wins its

10   cases at trial, then, really, the value of the remaining cases

11   becomes less significant.  We would expect the remaining cases

12   to settle.

13        To the extent that Premier loses at trial, the value

14   of those 35 cases becomes significantly more and it's

15   likely -- given what we understand their insurance to be, that

16   it's likely they'll be well above their policy limits and,

17   again, those cases are going to settle, including the 21 cases

18   against Inspira.

19        So, from our perspective, we're going down a path of

20   discovery that's never going to be necessary, and why the

21   distinction is important is because in those 35 cases that

22   involve Premier only, it's very clear that Inspira had nothing

23   to do with the way in which Premier vetted, ordered,

24   administered the NECC MPA to its patients by its doctors at

25   its facilities.  There's nothing from Inspira that's going to

1    add or change that.  So, they're not entitled, in our view, to

2    the discovery of those 35 cases, which impacts, again, as I

3    just mentioned, how we see the Bellwether process unfolding.

4         And so, for those reasons -- and I won't belabor some

5    of the other points -- we don't think at this time that

6    Inspira should be subject to the depositions that they are

7    seeking.  At some point in the future, to the extent that that

8    discovery becomes necessary or critical in a case that would

9    involve Inspira, certainly, as I explained to both Chris and

10   his partner, Jay, we would work that out.  That's what we

11   anticipated we would do from the date that we spoke and tried

12   to resolve this.  Instead, we're here hoping that the Court

13   will hear our plight and certainly just wait for the

14   appropriate time.

15        THE COURT:  And I believe you made an argument about

16   privileged materials.  Is that limited to the materials

17   submitted during the settlement process or --

18        MR. GROSSMAN:  So, it would be -- we responded

19   primarily in our reply brief to bolster the position that the

20   mediation materials, which can be the only thing that they're

21   asking for with respect to that particular category, that

22   they're not entitled to that information.

23        Rule 408, the cases that we cited -- I mean, to allow

24   them -- to the extent that even materials were exchanged in

25   the process -- I'm not going to say one way or the other if

```
1    they have a mediation privilege or an agreement not to
2    disclose that.  To the extent that even occurs, they're not
3    entitled to that.  They can find out the underlying facts in
4    any other reasonable way other than seeking what settlement
5    negotiations and discussions took place over almost a year and
6    a half of negotiations.
7              THE COURT:  Thank you.
8              MR. GROSSMAN:  Thank you, your Honor.
9              MR. WOLK:  Thank you, your Honor.
10             I'm having difficulty understanding the objections --
11   I've read the papers and I've heard Mr. Grossman's argument --
12   to the point that this is case-specific discovery.  It is not.
13   This is common to 100 percent of Premier's cases.
14             There is evidence in this case through the deposition
15   testimony of Michelle Cassidy, which was attached to our
16   motion -- to Mr. Grossman's motion, actually, regarding her
17   and Premier's interaction with Inspira in the 2009-2010
18   timeframe when they were to open their surgery center.
19             Unequivocally, Ms. Cassidy testified that there was a
20   recommendation that -- she used that word -- by Inspira to use
21   New England Compounding as the source for their preserving
22   free MPA.  She testified unequivocally that she had a
23   conversation with the pharmacy at Inspira and Dr. Metros who
24   was an Inspira employee at the time, who was not only the
25   chief of anesthesia, but is also a pharmacist, and this
```

1     conversation occurred in the process of investigating and

2     determining whether -- who to use to fill these orders and

3     whether to use New England Compounding.  We're entitled to

4     know what the substance of those conversations were from

5     Inspira's perspective between the individuals that she spoke

6     with, but to a different point besides just Ms. Cassidy's

7     testimony about her interactions with Inspira, which make all

8     of the requests we've made to date highly relevant to our

9     defenses in this case, is that 21 of the 35 cases pending

10    currently against Premier and its doctors occurred at Inspira,

11    where they ordered the medication.

12         Now, Mr. Grossman tries to draw the distinction that

13    21 out of 35 isn't enough cases to make it that common

14    discovery.  So that it should be distinguished in some way so

15    that we can wait until later when it becomes appropriate

16    during case-specific discovery.

17         I submit to your Honor that it makes no difference

18    whether there was one case, whether there were 35 cases where

19    Inspira was a defendant.  The conversations -- the interaction

20    that Ms. Cassidy and Premier had with Inspira is relevant to

21    our defenses in this case, as I've pointed out in my papers,

22    and I won't go through all of the particular reasons why it's

23    relevant, but to hit some of the high notes, it's relevant

24    towards standard of care and the proof of what the standard of

25    care was at the time.

1          Most importantly, it's relevant to show what due

2     diligence we did, what Premier did, and the basis upon which

3     we relied on Inspira's recommendations coming straight from

4     Inspira's knowledge, and that's why we need the depositions

5     and that's why they're relevant.

6          Mr. Grossman has the burden here.  He has the burden

7     in this motion for protective order to show that this

8     information should somehow not be sought, and I don't think

9     Mr. Grossman has met his burden in that capacity.

10         Rule 26 should be read broadly, as we have pointed

11    out in our papers, and even if it was not to be read broadly,

12    your Honor, it was to be given the strictest interpretation in

13    this case.  We feel that the information Inspira has about New

14    England Compounding and, most importantly, about its

15    interactions with Premier, my client, a defendant in this

16    case, is highly relevant.

17         THE COURT:  Is Premier in all of the New Jersey

18    cases?

19         MR. WOLK:  Yes.  In this case, just to address some

20    of the other points that were made, there was a comment made

21    that it's just not practical to do it now or have the

22    discovery done now.

23         Well, I submit to your Honor that it's not practical

24    to wait.  We're under a deadline in this case, one of which

25    has already passed.  That is, the discovery against the

1    settling defendants, which one could argue that Inspira is

2    part of it because they have, in fact, settled.  The other is

3    a common discovery deadline of November 15.  I'm not so sure

4    that we can wait much longer.

5            Your Honor was correct.  I did not see in the papers

6    an assertion of any privileged material in this case aside

7    from what may have been inferred from the arguments about the

8    information from the settlement.  We did ask for that.

9            Mr. Grossman admits in his own papers in his reply

10   brief that the facts underlying the settlement in this case is

11   discoverable, is relevant.  I'm not exactly sure how it was

12   phrased in the papers, but concedes that that would be the

13   only information we would be entitled to.  Well, certainly,

14   that is the information we're looking for.

15           So, if Inspira disclosed to the PSC during their

16   negotiations some information that they had about NECC, we

17   would want to know that.  If they disclosed and handed over

18   information about their contacts and their relationship with

19   Premier, we would want to know that and would be entitled to

20   it.

21           Another issue that is impacted here is our

22   comparative fault defenses and we're not going to shy away

23   from that.  In these cases where Inspira is a defendant, we

24   can show this jury that it wasn't Premier's responsibility to

25   order this medication.

```
 1              And to the point that we need to wait until the

 2     Bellwether process, I don't know how we can determine now

 3     whether or not an Inspira case -- and I use that term -- a

 4     case where Inspira was a defendant will be chosen as a

 5     Bellwether case or not.  Certainly, if they're not going to be

 6     chosen as Bellwether cases, I'm prepared to take a dismissal

 7     on those cases right now from my clients.  Why would we be

 8     here otherwise if they weren't part of the potential cases

 9     that could be chosen.

10              THE COURT:  If I read your discovery requests

11     correctly, there was no date limitation.  Is there a permanent

12     date limitation that's been used in discovery requests?

13              MR. WOLK:  I did see that in there, and that -- I

14     think we have -- at some point in some discovery that's been

15     going back and forth between the plaintiffs and the

16     defendants, we have agreed on a date range and I can clarify

17     that.

18              THE COURT:  Do the plaintiffs know what the date

19     range is for discovery?

20              MS. DOUGHERTY:  It's unlimited in these discovery

21     requests.

22              MR. GASTEL:  Your Honor, I believe the plaintiffs

23     have been using for the vast majority of our requests -- and

24     if I recall correctly, it's been a while since I reviewed

25     those -- we've been using the period with regard to sort of
```

1    NECC-related materials from January 1, 2011 until, I believe,

2    the end of calendar year 2012.

3           MR. WOLK:  Now that I'm reminded of that timeline,

4    that wouldn't work for our discovery requests because we're

5    dealing with information that occurred back in 2009, when we

6    were formed, but -- when Premier was formed, but, also, I

7    would request that we can discuss and have disclosed by

8    Inspira information beginning with their relationship with

9    NECC going forward, because I think that's what's relevant

10   here.

11          THE COURT:  All right.  Anything else, Mr. Grossman?

12          MR. GROSSMAN:  Let me just briefly respond to, I

13   think, generally all the comments that Premier has made here

14   today.

15          THE COURT:  And, actually, Mr. Grossman, I'll give

16   you the last word.  Does the PSC -- I didn't have any briefing

17   from you.  Are you taking a position on --

18          MR. GASTEL:  No, we have no position on this, your

19   Honor.

20          THE COURT:  All right.  Is there anyone on the phone

21   that wants to speak to this motion?

22          (No response.)

23          THE COURT:  All right.  Mr. Grossman.

24          MR. GROSSMAN:  So, real quickly, Premier argues this

25   is necessary for the standard of care and due diligence, but

1    all of these arguments are premised, essentially, on Premier's

2    fiction of what their own witness testified about.

3           All she testified to was that she asked this

4    recommendation -- all this is, is that she asked Inspira's

5    pharmacy for contact information.  It's not a recommendation.

6    I don't know what "recommendation" means, but to Ms. Cassidy,

7    their own witness, they asked for contact information, the

8    name of the manufacturer, which she knew, and the contact

9    information, which she then took upon herself to move forward

10   and contact because Premier's doctors had familiarity with the

11   product.  They used it for years at Inspira and they were to

12   continue to use it, regardless of what we would say, but we

13   didn't say anything and their witness said that.  All they got

14   was contact information.

15          So, this whole position that they're taking of

16   relevancy in 100 percent of the cases is premised on fiction

17   that's not on the record.  And I'll end with that, your Honor.

18   Thank you for indulging me.

19          MR. WOLK:  Your Honor, may I just briefly --

20          THE COURT:  Briefly.

21          MR. WOLK:  Very briefly, I will.

22          Perhaps maybe Ms. Cassidy is mistaken.  I don't know.

23   How do we know unless we get the deposition?  It's the risk we

24   take every time we swear someone in.

25          And just one more point, your Honor.  Inspira set up

1    a clinic to treat these patients when the outbreak came up.

2    They treated each and every one of the patients that were

3    injected at Premier and also at Inspira, which is another area

4    of information I did not include in the deposition notice, but

5    I can amend it or I'll move to amend it.

6           And, finally, your Honor, I'll end with this.  There

7    was comment in the brief papers about the order, the mediation

8    order barring or staying discovery against the defendants, and

9    I would submit to your Honor that we would request that that

10   order be lifted.

11          THE COURT:  All right.  Thank you.

12          Mr. Grossman, I think you have plenty of time to make

13   your train and you're welcome to leave if you would like to do

14   so.

15          MR. GROSSMAN:  Thank you, your Honor.  I appreciate it.

16          THE COURT:  All right.  Should we go to the DPH

17   motion or does someone want to have something else heard

18   first?

19          (No response.)

20          THE COURT:  All right.  So, we'll do go to the DPH

21   motion.

22          MR. HAMPTON:  Thank you, your Honor.  Again, I am

23   David Hampton, Assistant Attorney General on behalf of the

24   Massachusetts Board of Registration of Pharmacy, and to the

25   extent there's overlap, the Department of Public Health.

1     We're here on the board's motion for protective order.

2          As your Honor is no doubt aware, we are moving for a

3     protective order to the same extent and for the same reasons

4     as the Food and Drug Administration recently moved for a

5     protective order against the Rule 30(b)(6) testimony as

6     requested by the Tennessee --

7          THE COURT:  Isn't the DPH in a different position?

8     It is not part of the criminal investigative team.  It

9     certainly was not one of the listed agencies in the U.S.

10    Attorney's Office's press release as participating in the

11    criminal investigation as distinct from the FDA.

12         MR. HAMPTON:  To the extent that you say, it is in a

13    different posture, but, as I understand it, witnesses who were

14    inspectors for the board and for DPH who had firsthand

15    information about --

16         THE COURT:  But how is that different?  I assume some

17    of the plaintiffs will be witnesses.

18         MR. HAMPTON:  Because, as I understand it, it's going

19    to be a critical part of the case in chief as presented by the

20    Department of Justice in its criminal prosecution.

21         To some extent we have to take the Department of

22    Justice at its word.  I assume that the seven-page affidavit

23    from the U.S. Attorney is not sworn out idly in support of our

24    motion for a protective order, and perhaps by explaining kind

25    of the evolution of this motion for a protective order, your

1   Honor can better appreciate the posture that we are in.

2          We first received the subpoena from the Tennessee

3   defendants in March and entered negotiations and discussions

4   with the Tennessee defendants over the scope of Rule 30(b)(6)

5   testimony and over the scope of our document production in

6   response to the duces tecum.

7          As we were contemplating a particular production, I

8   reached out to the Department of Justice and said, I

9   understand there is a criminal prosecution proceeding.  We

10  intend to make a document production.  Do you have any

11  concerns about that and its potential prejudicial effect on

12  the criminal prosecution?  To which the response was no.

13  However, has Rule 30(b)(6) testimony been requested from the

14  board?  We're aware that such testimony had been requested

15  from the FDA in response to a very similar subpoena.

16          I informed them that it had.  And they said, Well, we

17  do have grave concerns about the Rule 30(b)(6) testimony

18  moving forward and, therefore, we would ask you to raise a

19  motion for protective order to protect the same kind of

20  considerations, the same considerations that are at issue in

21  the FDA's motion; namely, the fear of pretrial publicity, the

22  requirement that one or more AUSA's would have to essentially

23  ride herd on the civil -- on this MDL, participate in the

24  preparation of witnesses and otherwise participate in this

25  case to make sure that it's not having undue prejudicial

1    effect on the criminal action and unnecessarily prematurely

2    require the Department of Justice to formulate and then

3    disclose its case in chief before such time as is appropriate,

4    and for those reasons --

5             THE COURT:  So, do you have -- are there particular

6    concerns in the 30(b)(6) of any of the topics more than others

7    or are you just making a blanket assertion?

8             MR. HAMPTON:  We are making a blanket assertion

9    because, good lawyers that they are, the topics that --

10            THE COURT:  Well, good lawyers would probably make

11   alternative arguments.

12            MR. HAMPTON:  It's a very comprehensive list of

13   topics.

14            THE COURT:  Right, but are there ones on here that

15   are more concern than others?

16            MR. HAMPTON:  Ten of the topics are, although

17   verbatim counterparts of those that are -- were the subject of

18   the FDA subpoena for which this Court previously allowed the--

19            THE COURT:  Right.  I'm asking from the DPH's

20   perspective.

21            MR. HAMPTON:  Yes.  From DPH's perspective, for our

22   own sakes, our concerns are only coextensive with those of the

23   Department of Justice.

24            My understanding is there's particular sensitivity

25   around 2012, particularly September 2012 and afterward, but

1    because our concerns are really just those of the DOJ, I'm not

2    in a particularly good position to speculate as to which ones

3    would give more --

4            THE COURT:  So, you've been put in a difficult

5    position.

6            MR. HAMPTON:  To some extent, your Honor.

7            I'd like to clarify that, just like the FDA's own

8    motion, this is not consider -- concern the document

9    production that's been requested.

10           THE COURT:  Had the documents been produced?

11           MR. HAMPTON:  The 15,000 pages of documents are

12   currently at our vendor and are -- will be available for

13   pickup by the plaintiffs' counsel as soon as they pay their

14   share.  We've entered into a cost-sharing arrangement.  What I

15   understand to be a little less than a thousand documents, the

16   remainder of our production, will be finalized within two

17   weeks and will then be available for --

18           THE COURT:  I believe it was the Tennessee defendants

19   that wanted the documents.

20           MR. HAMPTON:  Oh, I apologize.  The Tennessee

21   defendants.

22           THE COURT:  So, they don't have them yet, but they're

23   going to be available in the next week or so?

24           MR. HAMPTON:  All will be available by the end of

25   next week.  I believe the vast majority will be available

1    tomorrow.

2            THE COURT:  All right.

3            MR. HAMPTON:  And unless other issues arise in the

4    course of these arguments, we're happy to rest on our motion,

5    on the arguments raised in the FDA's motion and the reasoning

6    in this Court's allowance of the FDA's motion.

7            THE COURT:  All right.  Yes, Mr. Tardio.

8            MR. TARDIO:  Thank you, your Honor.

9            The Court's reasoning in denying us the opportunity

10   to depose the FDA, as I read the order, was because the

11   deposition of the FDA would directly impact the FDA's

12   investigation and prosecution of the criminal Insiders.

13           I don't think there's really anything unclear about

14   this Court's order on that point, and the Massachusetts Board

15   of Pharmacy is not in that position, and the Court, I think in

16   questions earlier, obviously recognizes that distinction, but

17   that is a key, key distinction, and I think that distinction

18   permeates the papers filed by the Massachusetts Board of

19   Pharmacy.

20           It seems to me that if anybody should be moving for a

21   protective order on this deposition notice, it should be the

22   U.S. Attorney.  Again, the Massachusetts Board of Pharmacy has

23   not demonstrated any burden on it that I can see in the papers

24   or have heard here today in producing a witness for a

25   deposition.  It sounds to me like the Massachusetts Board of

```
1    Pharmacy is simply reciting what they have been told by the

2    U.S. Attorney.  The U.S. Attorney can move for a protective

3    order on this motion.  The papers filed by the Massachusetts

4    Board of Pharmacy, with all due respect to the board, do not

5    come anywhere close to meeting the heavy burden that is

6    required to grant a blanket protective order like they have

7    asked for.

8            I can address any specific questions, but this is

9    clearly a discretionary matter, and the caselaw is clear that

10   this is not something that should be granted without

11   sufficient evidence in the record of a heavy burden.  It's

12   their burden.  They haven't met it.  The deposition notice

13   should stand and the Massachusetts Board of Pharmacy should be

14   required to comply.  Thank you.

15           THE COURT:  All right.  Thank you.

16           I'm going to take it under advisement.  You're

17   welcome to stay or you're welcome to leave, whatever you want.

18           MR. HAMPTON:  Thank you, your Honor.

19           MR. LEE:  Your Honor?

20           THE COURT:  Yes.

21           MR. LEE:  The PSC had actually submitted a response.

22           THE COURT:  Yes.  Did you want to speak to it?

23           MR. LEE:  Yes, very briefly, just for the record.

24           We had made arguments that our -- actually, not

25   related to the criminal proceeding, but were for other
```

1     considerations, some that are related to the choice of law

2     issues that are implicated in some discovery requests.

3          However, considering the recent order -- I'm not

4     going to delve too far into that.  However, I would like to

5     state that the PSC still maintains that the 16,000 documents

6     that the board is going to be producing within a week are

7     sufficient for any discovery required by the Tennessee clinic

8     defendants if there is comparative fault allowed or even if

9     there isn't.

10          THE COURT:  Thank you.  All right.

11          So, the next motion is the PSC's motion to quash the

12    subpoena to Dr. Austin.

13          MS. DOUGHERTY:  Yes, your Honor.  Thank you.  Once

14    again, Kim Dougherty on behalf of the Plaintiffs' Steering

15    Committee.

16          The Plaintiffs' Steering Committee has moved to quash

17    the deposition subpoena of Dr. Austin for primarily three

18    reasons.  The first being that to allow that deposition would

19    be directly in violation of Federal Rules of Civil Procedure

20    Rule 26(4)(d), which protects discovery of non-testifying

21    consulting experts.

22          The second is that the information sought through

23    this deposition has already been provided to the defendants by

24    the PSC and is also available through other means and would

25    make this entirely duplicative, including the means of the

1    deposition that was just recently ordered by your Honor last

2    week of Steve Higgins, and I'll get to more detail on why he

3    is the more appropriate person to gather the discovery that

4    they are seeking.

5          And, third, it's also premature even if the Court

6    were to decide to allow expert depositions.  The disclosure of

7    experts under the current schedule is not for several months

8    from now and the expert depositions are months after that, but

9    we can tell you today that we are not planning to put forth or

10   disclose Dr. Austin.  The Plaintiffs' Steering Committee will

11   not be doing so in the Tennessee cases or likely ever.

12         The defendants seek primarily three areas of

13   information.  The first is pictures from the inspection.  Over

14   4,000 photographs have already been produced to the Tennessee

15   defendants, along with four days of video footage, and those

16   were already produced in our initial disclosures to the

17   defendant.  So, we believe that argument there is moot.

18         Dr. Austin actually did not take any photographs,

19   it's our understanding.  It was another consulting expert that

20   took over 4,000 photos which were provided to the defendants.

21         They were also provided all the testing results.  We

22   provided them, I believe, six or seven different categories of

23   testing results.  All of the test results were also produced

24   with our initial disclosures and, again, Dr. Austin did not

25   perform any testing of any kind.  He didn't do any sampling of

1    any kind.  So, he has absolutely no information to provide

2    with respect to testing or test results which have already

3    been provided.  So, we believe that issue is also moot.

4          What is the current issue, probably most likely,

5    before the Court that you're interested in hearing about are

6    the observations and the requests to seek the observations of

7    Dr. Austin, and we believe, as I previously stated, that Rule

8    26(4)(d) is clear.  As the Court is well aware, the Rule

9    states that ordinarily a party may not, by interrogatories or

10   a deposition, discover facts known or opinions held by an

11   expert who has been retained or specifically employed by

12   another party in anticipation of litigation or to prepare for

13   trial and who is not expected to be called as a witness at

14   trial.

15         Dr. Austin falls precisely within this rule.  He has

16   not been disclosed as a testifying expert by the Plaintiffs'

17   Steering Committee and he will not be disclosed by the

18   steering committee in any cases against the Tennessee

19   defendants or ever, likely.

20         He's only served in a limited capacity as a

21   consultant.  The fact that he filed an affidavit in response

22   to a summary judgment motion involving a small number of

23   Indiana clinics involving an entirely different defendant

24   where Tennessee defendants were not named does not suddenly do

25   away with the rules.

1          THE COURT:  And this may have been a typographical

2     error, but you know in the caption there's a sub-heading and

3     it says what case the documents are filed in, and for Dr.

4     Austin's declaration it says, "This document relates to all

5     actions."

6          MR. GASTEL:  Yes.  I think that that's probably a

7     hold-over caption.  I think if you look at the PSC's response

8     to the actual motion, we triggered that over to the original

9     Liberty motion for summary judgment, which actually lists the

10    Indiana cases in which it applied.  So, that's probably a

11    drafting error on behalf of somebody who went into and just

12    grabbed the previous case caption and wasn't aware that

13    Liberty simply filed that motion on very limited Indiana

14    cases.

15         MS. DOUGHERTY:  So, yes, your Honor, I believe you're

16    right that it was a typographical error.

17         I would like to point out with respect to that

18    briefing related to the Indiana clinics, the Saint Thomas

19    Entities specifically stated as non-parties to those

20    proceedings the Saint Thomas Entities lack standing to

21    participate in that briefing.

22         So, they clearly took the position when it was going

23    on at that time that they had no interest whatsoever in those

24    cases, no interest in the briefing that was going on and that

25    they had absolutely no standing in order to respond to any of

1     that briefing, and that does not change today.

2          So, there's caselaw on point as well, your Honor,

3     that supports the PSC's position, and we hadn't cited this in

4     any of our briefing, but we're happy to provide the Court with

5     a copy of it and supplement if you would like.

6          There's a case called *In Re: Brussels Lambert vs.*

7     *Chase Manhattan Bank*, 175 F.R.D. 34, Southern District of New

8     York, 1997.  In that case the plaintiff sued two defendants.

9     An expert was identified in one of the cases against the EY

10    defendants, but not in the other cases that were against the

11    CLS defendants.  The cases were consolidated, like here, for

12    pretrial proceedings, but not for trial.

13         And so, just like in that case, the Tennessee

14    defendants here are like the CLS defendants there, where they

15    sought to depose the expert that was identified by the

16    plaintiffs in the EY case, and even though the plaintiffs had

17    not identified the experts in the CLS case, the Court ruled

18    and held, "Not all parties are entitled to depose a given

19    witness simply because the parties in one case demonstrate

20    that they are entitled to depose that witness.  The parties in

21    the CLS case must independently demonstrate their entitlement

22    to depose a witness."

23         The Court went on to allow the deposition in the EY

24    case, but in ruling in the CLS matter, the Court held, "The

25    CLS parties have no interest in preparing to cross-examine

1   Anderson, the testifying expert, at trial.  Accordingly, there

2   is no basis to permit CLS parties the right to depose Anderson

3   as a testifying witness.  Thus, Anderson qualifies as a non-

4   testifying expert for the purpose of protecting under the Rule

5   26(b)(4)(D).

6           THE COURT:  So, the wrinkle here is, obviously, the

7   December 2012 inspection was ordered under sort of unusual

8   circumstances.

9           MS. DOUGHERTY:  Yep.

10          THE COURT:  And as part of that order -- and I think

11  this is what you were telling me the PSC has complied with,

12  that they had to share all the results with the defendants.

13          The evidence that was gathered there and Dr. Austin's

14  observations in some ways now are unique.  He's almost a fact

15  witness in many ways.  So that's what strikes me as a little

16  bit different from the cases that typically rely on

17  26(b)(4)(D).

18          MS. DOUGHERTY:  Yes, your Honor.  He may be a fact

19  witness, but so are many people, and the fact witness that is

20  the most appropriate to get the observations that the

21  defendants are looking for is the fact witness you just

22  allowed last week, Steve Higgins.  Mr. Higgins managed the

23  entire facility.  He was there the four days of that

24  inspection.  He was there again during the Tennessee

25  inspection.  He's been there throughout the entire time

1    managing the facility and the property.  He's the person to be

2    asking the questions about the observations.  He has the most

3    information that's available.

4           THE COURT:  And when is Mr. Higgins' deposition -- I

5    mean, he's -- his lawyer had said he would assert the Fifth,

6    but --

7           MS. PUIG:  It's not set yet, your Honor.

8           MS. DOUGHERTY:  We also have provided the four-day

9    inspection, which provides the information that was -- could

10   be directly gathered, because these experts were -- literally

11   had video cameras over their shoulders.  So, four days of the

12   entire day-long is video footage showing exactly what was

13   observed by Dr. Austin.  And so, too, were all of the

14   photographs that were available to him.

15          And we also have agreed in terms of authentication

16   and whether that's a potential issue, that we will stipulate

17   and we'll work out some language to stipulate to the

18   authentication of both the photographs and the video footage.

19   So that shouldn't be an issue when their experts would like to

20   look at those and rely upon those at trial.

21          None of the cases that the defendants have cited show

22   that they are entitled to Dr. Austin's testimony.  The two

23   cases that they cited, *Morning Ware* and *Morley*, and, frankly,

24   all the other cases, are entirely distinguishable because,

25   unlike in those cases, the PSC has never filed a sworn

1   affidavit of Dr. Austin in cases involving the Tennessee

2   defendants.  In every single case that they've cited to, the

3   expert had filed a sworn affidavit previously.  And so, we

4   think that's entirely different here, and even Tennessee has

5   admitted and admitted at the time, that they lack standing to

6   brief in those matters.

7          The other case that has been cited to and an issue

8   that has been raised by the Tennessee defendants is some

9   alleged alteration of evidence and they spent a lot of time

10  quoting my argument here in front of you and in front of Judge

11  Saylor in the past with respect to the evidence, but what they

12  don't note is that at that time when I was making those

13  arguments to the Court, no preservation orders were in place.

14         We had a very grave concern that the evidence could

15  change or be altered because no preservation order was in

16  place.  And so, quickly after a preservation order was put

17  into place, which has been respected completely by the

18  trustee -- as we heard just even today, the trustee and

19  Ameridose were in front of Judge Zobel asking whether they

20  could destroy 100 pallets of paper from Ameridose.  Every time

21  they've sought to do anything to alter the facility or to

22  change anything in any way, and including Ameridose's

23  facility, they've come to this Court and said, Please, may I,

24  your Honor, do this or do that.

25         So, what the Tennessee defendants saw when they saw

1   the inspection in 2014 was nothing different than Dr. Austin

2   observed himself. There has been no change or alteration to

3   the facility, and I think the trustee would also support that

4   position. So that does not entitle them to deposition

5   testimony from a consulting expert who's not the only person

6   available and not the only source of evidence.

7        Clearly, what we're looking at, what we're really

8   seeing here is that they don't want facts. They don't want

9   observations. They want opinions, and that is not what

10   they're entitled to.

11        So, your Honor, we also looked at their case *McDonald*

12   *Sprayed Roofing*. This is a case that they cited to support

13   that the expert was the only one able to provide the

14   testimony.

15        Well, in that case there had been significant

16   alterations to the roof between the time that the defendant

17   expert observed it and the time that the plaintiff's expert

18   observed it. The entire roof had actually been covered and

19   replaced with another roof, which made it impractical for the

20   plaintiff to obtain the facts that they needed at that time.

21        We don't have that scenario here, your Honor. We

22   have a situation where nothing has changed. Nothing has been

23   altered, and the defendants have been given the opportunity to

24   get the evidence and the inspection that they need, along with

25   4,000 photos, four days of video, now other depositions of

```
 1    other key potential witnesses, and they've got all the
 2    evidence they need available to them, and Mr. -- Dr. Austin's
 3    testimony should be quashed, any deposition.  Thank you.
 4              THE COURT:  Thank you.
 5              MS. PUIG:  Your Honor, Yvonne Puig for the Saint
 6    Thomas Entities.  Thank you for the Court's careful attention
 7    to detail and picking up on the notation as to all actions
 8    with respect to Dr. Austin's declaration.
 9              The Court is right in suggesting that Dr. Austin is
10    unique among any one in this case.  He is unique in that the
11    PSC will have you believe he's not an expert.  He's only a
12    consultant.  If he's a consultant, we don't satisfy Federal
13    Rule 26(b)(4)'s exceptional circumstance exception or
14    standard, and we do, and I'll take each of those arguments in
15    turn.
16              Dr. Austin's declaration is filed as Exhibit A to
17    Document No. 2100, our opposition to the motion to quash.  The
18    depth and breadth of his observations is nothing less than
19    breathtaking.  It is stunning.  He is a fact witness.  And for
20    the PSC to argue, go get Mr. Higgins who worked there, it will
21    not be the same.
22              He had extraordinary access.  He's one of the only
23    people we've heard who walked on the catwalk above the grid
24    system that held 77 HEPA filters, some of which were not even
25    connected, some of which you could see light through, some of
```

which you could put a pencil through, and it was Dr. Austin's belief that it was this area directly above the clean room where the compounding occurred that was a proximate cause of the contamination. While he didn't give it a sole cause, he did say in his declaration it was a proximate cause of the contamination.

They opened the door. By filing the declaration, they were able to secure a large settlement from Liberty, and this Court denied summary judgment, possibly in large measure, as a result of Dr. Austin's declaration.

On the issue of whether he's an expert, we think that they did put him forward as an expert. They filed his declaration. They opened the door. If he's only a consultant, we clearly meet the exceptional standard. We clearly believe he's virtually a sole source, and to argue go get Mr. Higgins or go get somebody who did the walk-through -- the walk-through was attended by officials from federal agencies and the PSC. We can't turn anybody into a fact witness on the PSC or their lawyers. We can't turn federal agents into witnesses. We can't even get witnesses now with knowledge of relevant facts, including the Insiders. So, clearly, it is not practical, as the rule anticipates. So, we are --

THE COURT: So, you're seeking both his factual observations and also his expert opinion?

1          MS. PUIG:  To the extent he has any expert opinions,

2    but what is key to us are his factual observations, what he

3    saw over those days, what he saw from the catwalk, what he saw

4    on the clean room walls, what he saw regarding Liberty's

5    defective design, and that's key to us.

6          The next argument is he's only a consultant and you

7    don't satisfy the exceptional standard.  We think we do.  We

8    think that's amply demonstrated, if by no other document, his

9    own declaration.

10          Then they argue you've already been provided this

11   information.  You have a videotape.  You know, you can go out

12   and hire an expert and they can express opinions on the

13   videotape.

14          In this instance, Dr. Austin and his father saw it in

15   December 2012.  I won't recite what is contained in our brief

16   or what Ms. Dougherty.  Let's go to what Frederick Fern said

17   in this courtroom years later in describing why we shouldn't

18   have access for a walk-through in the summer of 2014.  This is

19   contained at Page 9 of our opposition:

20          "Going in there and looking at the equipment, Judge,

21   there is nothing in the same condition as it was in October of

22   2012.  There's no air conditioning.  There's no vent."  And he

23   goes on and on.

24          So, it's disingenuous to argue it was critically

25   important to the PSC to get in there quickly in the fall of

1    2012, and then by the time we saw it in a three-hour walk-

2    through last summer, that nothing had changed.  I think the

3    Court can see clearly through that argument.

4         With respect to having an expert rely solely on the

5    video, you can imagine that cross-examination, that we're

6    expressing opinions solely on the video and not the factual

7    observations of a trained expert, one of the premiere experts

8    in clean room design, Dr. Austin and his father, Dr. Austin,

9    in December of 2012.

10        With respect to we've been provided with every single

11   thing that's possible, we don't know that until we depose Dr.

12   Austin to test the authenticity of that statement.

13        With respect to the sweeping request for protective

14   order, my arguments are almost like Mr. Tardio's.  They have

15   failed to satisfy that burden.  It's a steep burden.  They

16   haven't satisfied it.  What's the serious injury?  What's the

17   harm?  What's the burden?

18        With respect to the challenge that it is premature

19   and I will have my time, if they were to name Dr. Austin by

20   October 25th and I would have to depose him by December

21   15th -- that's what I thought you were going to hear today,

22   your Honor.  Today we hear they're not going to name him as an

23   expert.  So, my chance, even on the prematurity argument, has

24   just sailed away by the admission in the courtroom today.

25        I need his testimony now.  That's why we requested it

1    when we did, and I certainly would need his testimony either

2    at or near the time or before Mr. Higgins to put that into

3    context.  We have had to take these depositions without these

4    observations and it has been an uphill climb.

5            So, your Honor, I would ask that under Rule --

6    Federal Rule 26(b)(4), that if you find him to be an expert,

7    you will allow us to depose him right away.  If you find that

8    he's not, he's merely a consultant, that you find that we have

9    satisfied our burden to prove that it is an exceptional

10   circumstance.

11           Last, but not least, that it is not premature and

12   that I must wait my turn, and now I hear today he will not be

13   identified.

14           Last, but not least, they have wholly failed to

15   satisfy their burden for a protective order.

16           I want the Court to be aware, and I have outlined it

17   in my briefing, that we offered to pay the reasonable expenses

18   of Dr. Austin.  And so, this will not be an expense to the PSC

19   other than for them to show up and present him, your Honor.

20   It is not an unreasonable burden.  It is manifestly fair, and

21   any burden is outweighed by our demonstrated necessity to have

22   this witness.  Thank you, your Honor.

23           THE COURT:  And I understand the comparative fault

24   arguments, but is Liberty -- was Liberty a defendant in any

25   case in which the Saint Thomas Entities were a defendant?

1      MS. PUIG:  I don't think they were in the case with

2 the Tennessee defendants.  With respect to the Indiana

3 defendants -- and, your Honor, I would ask the Court to take

4 notice of pleading No. 2112, which is the joinder of the

5 anonymous clinic defendants, the Indiana defendants, and our

6 joinder exists, and that we represent some of those anonymous

7 clinics, which are required to be identified as anonymous

8 under Indiana medical malpractice statute.  Thank you, your

9 Honor.

10      THE COURT:  Anything further from the PSC?

11      MS. DOUGHERTY:  Just a few points of clarification,

12 your Honor.

13      Attorney Fern made these same exact representations

14 when the Plaintiffs' Steering Committee was seeking to have

15 the inspection of the facility back in November of 2012.

16      THE COURT:  I well remember the arguments.

17      MS. DOUGHERTY:  Okay.  So, that's nothing new.

18 That's just a rehash of what was already sent to us.

19      So, with respect to the arguments about the air

20 conditioning being off, clearly that's not going to affect the

21 design of the clean room, which is what Dr. Austin was

22 observing.  The Tennessee experts have gone there themselves.

23 They have looked at the facility themselves.  If they want to

24 seek to get on top of that catwalk, the Plaintiffs' Steering

25 Committee is not going to object to them seeking to go and

1    observe the top of the catwalk, if that's what they're looking

2    for.  They've got their own experts who can take a look at it.

3    They don't need to try -- to come and violate Rule 26 where

4    they have absolutely no standing and seek that sort of

5    information from a consulting expert who is not testifying.

6           And to question our good-faith representations with

7    respect to what we've produced in terms of documentation,

8    that's not sufficient to allow this deposition.  Dr. Austin is

9    not going to have the answers to those sort of questions.

10          So, we just ask, your Honor, that under these

11   circumstances, where all of this vast other information is

12   available, that you again not allow this deposition to move

13   forward.  Thank you.

14          THE COURT:  Thank you.  Does anyone have anything

15   else?

16          (No response.)

17          THE COURT:  Okay.  Does anyone have anything on the

18   phone?

19          (No response.)

20          THE COURT:  All right.  I will see you all in

21   September.

22          MS. DOUGHERTY:  Thank you, your Honor.

23          COURTROOM DEPUTY CLERK YORK:  All rise.  This Court

24   is in recess.

25          (Adjourned, 4:20 p.m.)

1              C E R T I F I C A T E

2          I, Catherine A. Handel, Official Court Reporter of the

3    United States District Court, do hereby certify that the

4    foregoing transcript, from Page 1 to Page 42, constitutes to the

5    best of my skill and ability a true and accurate transcription of

6    my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

7    Re: New England Compounding Pharmacy, Inc., Products Liability

8    Litigation.

9

10   August 9, 2015            /s/Catherine A. Handel
     Date                      Catherine A. Handel RPR-CM, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25