UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


                                    )
IN RE:  NEW ENGLAND COMPOUNDING  )   MDL NO. 13-02419-RWZ
PHARMACY CASES LITIGATION        )
                                    )
                                    )


BEFORE:  THE HONORABLE JENNIFER C. BOAL


MOTION HEARING


September 9, 2015


3:22 p.m.


John J. Moakley United States Courthouse
Courtroom No. 14
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    For the Plaintiffs:

3    On behalf of Plaintiffs' Steering Committee:
     Kristen A. Johnson, Esq.
4    Edward Notargiacomo, Esq.
     Hagens Berman Sobol Shapiro LLP
5    55 Cambridge Pkwy
     Suite 301
6    Cambridge, MA 02142
     617-482-3700
7    kristenj@hbsslaw.com

8    Benjamin A. Gastel, Esq.
     Branstetter, Stranch & Jennings, PLLC
9    227 Second Avenue, N
     4th Floor
10   Nashville, TN 37201
     615-254-8801
11   beng@branstetterlaw.com

12

     For the Defendants:
13
     On Behalf of Barry J. Cadden:
14   Michelle Peirce, Esq.
     Donoghue Barrett & Singal
15   One Beacon Street
     Suite 1320
16   Boston, MA 02108
     617.720.5090
17   mpeirce@dbslawfirm.com

18   On behalf of Douglas Conigliaro:
     Christopher R. O'Hara, Esq.
19   Todd & Weld LLP
     27th Floor
20   One Federal Street
     Boston, MA 02110
21   617-720-2626
     cohara@toddweld.com

22


23


24


25   (Continued on next page)

```
 1    APPEARANCES:  (Continued)

 2    On behalf of Medical Sales Management:
      Daniel M. Rabinovitz, Esq.
 3    Greenberg Traurig LLP
      One International Place
 4    Boston, MA 02110
      617-310-6000
 5    rabinovitzd@gtlaw.com

 6    On behalf of the Saint Thomas Entities:
      Chris J. Tardio, Esq.
 7    Matthew H. Cline, Esq.
      Gideon, Cooper & Essary, PLC
 8    315 Deaderick St
      Suite 1100
 9    Nashville, TN 37238
      615-254-0400
10    chris@gideoncooper.com
      matt@gideoncooper.com
11
      On behalf of Pain Medicine Specialists P.A.:
12    Gregory K. Kirby, Esq.
      Pessin Katz Law, P.A.
13    901 Dulaney Valley Rd
      Suite 400
14    Towson, MD 21204
      410-938-8800
15    gkirby@pklaw.com

16    On behalf of Saint Thomas West Hospital:
      Adam T. Schramek, Esq.
17    Marcy Greer, Esq.
      Fulbright & Jaworski LLP
18    98 San Jacinto Boulevard
      Suite 1100
19    Austin, TX
      (512) 536-5232
20    adam.schramek@nortonrosefulbright.com
      mgreer@adjtlaw.com
21

22

23

24

25    (Continued on next page)
```

```
 1    APPEARANCES:   (Continued)

 2    George P. Varghese, AUSA
      Amanda Strachan, AUSA
 3    United States Attorney's Office
      John Joseph Moakley Federal Courthouse
 4    1 Courthouse Way
      Suite 9200
 5    Boston, MA 02210
      617-748-3237
 6    george.varghese@usdoj.gov
      amanda.strachan@usdoj.gov
 7


 8
      Via teleconference:
 9
      On behalf of Tim I. Chowdhury, M.D.:
10    Bartholomew T. Freeze, Esq.
      Freund, Freeze & Arnold
11    65 East State Street
      Capitol Square Office Building
12    Suite 800
      Columbus, OH 43215
13    (614) 827-7300
      bfreeze@ffalaw.com
14
      On behalf of Saint Thomas West Hospital:
15    Eric J. Hoffman, Esq.
      Fulbright & Jaworski, LLP
16    98 San Jacinto Blvd
      Suite 1100
17    Austin, TX 78701
      512-536-2450
18    eric.hoffman@nortonrosefulbright.com

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2            (The following proceedings were held in open court

 3    before The Honorable Jennifer C. Boal, United States

 4    Magistrate Judge, United States District Court, District of

 5    Massachusetts, at the John J. Moakley United States Courthouse,

 6    One Courthouse Way, Courtroom 14, Boston, Massachusetts, on

 7    Wednesday, September 9, 2015.)

 8            THE CLERK:  This is Steve York, Judge Boal's clerk.

 9    Before we get started, I'd ask the parties on the phone to

10    please identify themselves.

11            MR. HOFFMAN:  Eric Hoffman for Saint Thomas Entities.

12            THE CLERK:  Anyone else?  Can counsel on the phone

13    please identify themselves for the record.

14            MR. FREEZE:  Bartholomew Freeze for Dr. Tim Chowdhury.

15            THE CLERK:  Anyone else?  All right.  If you guys

16    don't mind holding on, we'll get started in a few minutes.

17        (Judge Boal enters)

18            THE CLERK:  Today is September 9, 2015.  We're on the

19    record in the matter of New England Compounding Pharmacy,

20    Incorporated, Case Number 13-MD-02419.

21            Will counsel in the courtroom please identify

22    themselves for the record, followed by counsel on the phone.

23            MR. O'HARA:  Good afternoon, your Honor.  Christopher

24    O'Hara on behalf of Doug and Carla Conigliaro, and I'm from

25    Todd & Weld.
```

```
 1              MR. RABINOVITZ:  Dan Rabinovitz on behalf of Greg
 2    Conigliaro.  Good afternoon, your Honor.
 3              MS. PEIRCE:  Good afternoon, your Honor.  Michelle
 4    Peirce on behalf of Barry and Lisa Cadden.
 5              MR. SCHRAMEK:  Good afternoon, your Honor.  Adam
 6    Schramek and Marcy Greer on behalf of the Saint Thomas
 7    Entities, Saint Thomas Hospital, Saint Thomas Health and Saint
 8    Thomas Network.
 9              MR. TARDIO:  Good afternoon, your Honor.  Chris Tardio
10    for the Tennessee clinic defendants.
11              MR. CLINE:  Good afternoon, your Honor.  Matt Cline
12    for Tennessee clinic defendants.
13              MR. VARGHESE:  Good afternoon, your Honor.  George
14    Varghese for the United States.
15              MS. STRACHAN:  Good afternoon, your Honor.  Amanda
16    Stachan for the United States.
17              MS. JOHNSON:  Good afternoon, your Honor.  Kristen
18    Johnson for the Plaintiffs' Steering Committee.
19              THE COURT:  And you have a new seat.
20              MS. JOHNSON:  Yes.
21              MR. NOTARGIACOMO:  Edward Notargiacomo for the
22    Plaintiffs' Steering Committee.
23              MR. GASTEL:  Ben Gastel on behalf of the plaintiffs,
24    your Honor.
25              THE COURT:  I understand there are people on the
```

            phone.  If you could stay seated and speak into the microphone
            so the folks on the phone can hear us.  Mr. York, is the
            microphone set up at the stand in case anyone else --

                    THE CLERK:  It should be.  I'll double-check.

                    THE COURT:  Thank you.  And my apologies to the
            parties.  I know everyone had expressed a preference, if I had
            to move this conference, to have it moved to tomorrow afternoon
            after Judge Zobel's session, but I was unable to accommodate
            that.  And I did want to go forward sometime around the
            conference tomorrow because I know everyone's under a tight
            time deadline.

                    So this is the Tennessee defendants' motion, so I'll
            hear from you first.

                    MR. SCHRAMEK:  Your Honor, Adam Schramek for the Saint
            Thomas Entities.  Your Honor, I want to give the Court a little
            bit of context of how we got here today because I think it is
            very important, which is the Saint Thomas Entities did what
            normally a defendant would do in a case, which is send
            discovery to the various parties, to the entities and to the
            individuals.

                    In response to our discovery requests, we had 39 that
            went to the individuals, we of course got a pleading of the
            Fifth Amendment privilege against self-incrimination and no
            documents.  In response to other parties' requests, such as MSN
            and Ameridose, we got a host of objections, including the

1    objection that the materials had been seized by the government

2    and had only been returned to them in the context of criminal

3    discovery, therefore, they couldn't produce them to us because

4    it was outside the scope of civil discovery.

5         The problem we have, your Honor, is that we are on the

6    cusp of expert disclosures, and we are in the position of

7    having to put forward our defense, which will be that NECC, the

8    insiders and the affiliates were the sole proximate cause of

9    the damage to all of the patients.  And in order to establish

03:49 10    that, either under Massachusetts law, sole proximate cause,

11    unforeseeable criminal conduct that breaks the chain of

12    causation, or under Tennessee law, which of course we believe

13    will apply and should apply, under the concept of comparative

14    fault.

15         And under comparative fault, I think it's very

16    important we put into our papers this time the specific jury

17    instruction for that instruction.  And what it says is the jury

18    determines from all of the facts and circumstances what it

19    decides is important for the allocation of fault, who was the

03:50 20    more direct cause of the injury to the plaintiffs, whose

21    conduct was more reasonable under all the facts and

22    circumstances.  And there's even a statement to the jury that

23    nobody can tell you what factor matters more than the other.

24         Under that sort of an analysis, your Honor, we believe

25    that the scope of discovery as to NECC as to how this

1    contamination occurred, as to where it occurred, in which clean

2    room did it occur, your Honor, we are at this point without one

3    witness on record who can provide that sworn testimony.  We

4    tried to get it through a corporate rep.  We thought, well,

5    maybe we could have the NECC trustee do it.  That was denied by

6    the Court.  We said, well, MSN is a company.  It doesn't have a

7    right to a Fifth Amendment.  Let's get a corporate rep to get

8    some of this basic information out.  That was denied by the

9    Court because they say the only people they have capable will

03:51 10   invoke the Fifth.  We've tried to go to the individuals now,

11   and of course there was a motion to stay on Friday for some of

12   the pharmacy techs we were trying to depose.

13           At every step of the way we have been cut off from the

14   discovery that is key and integral to our defense at trial,

15   that it's NECC, Ameridose, MSN and the insiders who solely

16   proximately caused the injury to the patients.

17           So facing all of that, we find the order, your Honor,

18   in the criminal trial, your order with respect to some of the

19   briefing that occurred there, and we find the letters that

03:51 20   essentially list all the evidence we've been looking for.  I

21   just want to give the Court a couple of examples.  One training

22   disc seized from NECC labeled, "FDAC's Documents Baxa ExactaMix

23   Compounder Training," our expert has told us that the Baxa pump

24   is what would have been used to compound MPA.  So the question

25   is how were the NECC employees trained on that Baxa pump.

1    Right here, it's been here all along, and they're
2  refusing, the individuals refuse to produce it under the Fifth
3  Amendment, and yet we know they have it and we know that the
4  government has it, which, under the *eBay* case, if the
5  government has it, it can't incriminate you by giving it,
6  turning it over to someone who requests it because the
7  government already possesses it and it will not in any way
8  incriminate you.

9    Your Honor, there's a long list of things, including
03:52 10  compact discs labeled "Barry Cadden Sales Education."  What was
11  it Mr. Cadden, the manager of NECC, the man who stood before
12  Congress and pled the Fifth Amendment, who refuses to testify
13  this proceeding and has been given that protection by this
14  Court, what has Mr. Cadden -- what was he taught about how to
15  sell his products, about how to misrepresent to customers like
16  my clients -- well, not my clients, but the solvency that I'm
17  trying to be held responsible for, to them and to other health
18  care providers.  And even though we brought this motion, your
19  Honor, all the other health care providers support it because
03:53 20  they're looking for the same information.  What was he taught;
21  what was he teaching his sales representatives as to how to go
22  out and to sell the quality of these preparations, the fact
23  that they were USP compliant; what were these training
24  materials?

25    The government has listed I believe 20 -- sorry, five

1    compact discs of Mr. Barry Cadden's training materials and an

2    additional training disc on other materials.  It has different

3    training materials on how to sell to hospitals versus an ASC,

4    an ambulatory surgery center.  It has different training

5    materials on generic training binders.  They have things like a

6    handwritten note from ARL, which is the testing lab that said

7    that this MPA was not contaminated; it was a clean batch that

8    was going out to the health care providers.  They have

9    handwritten thank-you notes from the head of ARL saying thank

03:54 10  you to Barry and his team for all their support over the years.

11        I went up and took ARL's deposition -- I guess down --

12    in Oklahoma City.  That would have been a great document to ask

13    ARL about their relationship and why it was that ARL wasn't

14    requiring NECC to submit the number of samples they were

15    supposed to under the guidelines.  ARL is another party that we

16    would point to as, if there's fault to be shared, if the jury

17    is going to look at all the facts and circumstances, ARL, which

18    as this Court knows is one of the settling parties, is one of

19    those parties.  And here is documentary evidence that is in the

03:54 20  possession of the individuals that's highly relevant to that

21    long-term relationship and other ARL testing results, ARL

22    testing protocols.  We actually have testimony listed in here

23    from ARL that's been provided, sworn testimony, and that's been

24    provided to the individuals who review in connection with the

25    criminal proceeding.

1          Your Honor, NECC and its pharmacists and its owners,

2     its directors, they are before this particular District Court

3     for two reasons.  One is because they've been alleged to have

4     committed a crime.  The second is because the patients who were

5     injured are asking for compensation.  The same material, the

6     same facts, the same factual predicate that is driving the

7     criminal case is the basis for the defense in the civil case by

8     the Saint Thomas Entities and the other health providers.

9          So the question becomes, you know, in our view, well,

03:55 10   relevance.  Clearly, we've broken it down into four categories

11     of documents.  We think, one, we have the actual business

12     records that were seized that would have been subject to

13     discovery like normal business records but for the seizure.

14     The act of seizing them can't have changed their

15     discoverability.  Those, as well as the photos that were taken

16     during the seizure, these are pictures of the facility.

17     There's nothing secret or protective against those.

18          Second is third-party records.  As I mentioned, ARL,

19     there are some from the FDA.  There are various third parties

03:56 20   that participated to provide their communications with the

21     sales agents and NECC.  The third is witness statements and

22     investigatory notes.  And the fourth are the grand jury

23     materials.

24          And your Honor, I believe the reason we attached all

25     the letters to A, B, C and D to our first motion is because

1       it's hard to imagine anyone reading those letters and not

2       going, "That is the treasure trove of evidence that the

3       defendants have been fighting for the past year to try to get

4       and so far has been blocked at every stop."  So when we saw

5       these letters, we absolutely sent a new request to the

6       individuals and said, "Under the *eBay* case, you have no Fifth

7       Amendment privilege to not produce what the government already

8       has.  Give us the documents we've been asking for."

9            And I filed today, just because I realized the record

03:56 10      wasn't complete, the document request for the individuals that

11      we had previously sent so that the Court can see we sent 39

12      categories of documents and got zilch.  I think a great example

13      of what we're up against is the fact that we've been trying to

14      seek the training videos.  These are, you know, how to sell

15      NECC product that have been produced and given to their sales

16      force.  And we tried to get it, and the response is, "Well,

17      some of those were seized by the government and may not be

18      subject to the protective order, therefore, we can't produce

19      it."  There's always an excuse.  If there's one thing that is

03:57 20      consistent from the individuals and the affiliated companies is

21      they will produce nothing absent a court order.

22            We literally have gotten almost zero from them.  This

23      morning, your Honor, I took the deposition before this hearing

24      of Steve Higgins.  He's with GDC Properties, the management

25      company.  He pled the Fifth to every question.  So if I don't

1    have a document, I don't have evidence in this case.  And these

2    are the documents, the key documents that we absolutely,

3    absolutely need.

4         I would like to address a couple of the legal issues

5    that were raised.  One of course -- and I'd like to put in the

6    context of the U.S. has filed its motion to intervene.  We're

7    here today to respond to their arguments as to the

8    discoverability of these documents.

9         THE COURT:  And that's all I'm considering at this

03:58 10    time.

11         MR. SCHRAMEK:  Okay.  So we'll file our response to

12    the other.  But with respect to that argument, one case they

13    pointed to and relied heavily on to this Court was the *U.S. v.*

14    *Moussaoui* case, which of course was the 9/11 bomber case.  I

15    think it is very telling that -- what that case had to do with

16    was which court was going to make the decision.  And the

17    criminal court, which I believe was in Virginia, was saying,

18    "Well, the Southern District of New York, it's the civil court

19    where the civil cases are pending.  I'm going to let it make

03:58 20    the decision."  And it went up on appeal on a very strange kind

21    of procedural basis.  And ultimately, at the end of the opinion

22    what the Court said in *Moussaoui* was what you've got to do is

23    you first have to go to the criminal court, ask the criminal

24    court to turn this grand jury -- these are grand jury

25    materials -- over to the Southern District of New York under

1    6(e), I believe it is, of the federal criminal rules, and then

2    the civil court can determine the appropriate discoverability

3    of those documents.

4         In other words, *Moussaoui* had to do with something we

5    don't have to worry about today because this court, the

6    District of Massachusetts, is sitting in both the civil and

7    criminal trail.  So *Moussaoui* is just about irrelevant for the

8    purposes of why we're here because the Court ended by saying,

9    "Get the documents in the right place and then come back to us

03:59 10   later."  Your Honor, what *Moussaoui* did do -- and also the case

11   of *U.S. v. Bulger* did, was lay out the Supreme Court standard

12   for being able to get grand jury materials.

13        And the standard is a three-prong test.  One is you

14   have to show that there's a need for the materials to avoid

15   injustice in another proceeding.  Your Honor, my clients are

16   trying to be -- the PSC is seeking millions of dollars from my

17   clients in a civil judgment.  Your Honor, it would be unjust

18   and we believe would violate basic tenets of due process to try

19   to send us to trial without the documents we need to defend

04:00 20   ourselves.  So we think one is clearly easily met here.

21        The second is the need for disclosure is greater than

22   the need for continued secrecy.  Now, as the Court is aware,

23   sometimes the defendants, criminal defendants, don't even get

24   grand jury materials, right?  There are certain circumstances

25   they do or they don't, *Brady,* all these other issues.  But

1    here, the government has decided to give them everything,

2    and/or whatever is on the hard drive, they got.  So oftentimes

3    the grand jury, secrecy of the grand jury process is -- as the

4    grand jury determines who to indict, what to do.  Here, the

5    indictments issued months ago.  There's no indication any more

6    are coming, and the grand jury materials are in the hands of

7    the criminal defendants.

8            So it's not, are they secret from the public.  It's,

9    is there a need for disclosure in the litigation proceeding

04:01 10   that's greater than the need for secrecy from the defendants.

11   There's a protective order in place in the MDL.  There's zero

12   evidence that anyone has ever violated it.  Almost every

13   document produced by the defendants that has to do with patient

14   medical information, financial information, internal, it's all

15   been marked confidential.  Has it ever come out in the news?

16   Are there news stories about the internal ARL operating

17   procedures?  Of course not.  Because, your Honor, we have --

18   all the parties have lived up to that protective order and will

19   into the future.

04:01 20           So the question on the second prong of *Moussaoui* is,

21   is there a need for disclosure greater than the need for

22   continued secrecy.  And we believe in a partial disclosure of

23   civil defendants, under a protective order issued by the same

24   court in which the criminal court is pending, subject to the

25   same enforcement procedures as the criminal and civil court,

1    the answer we believe is clearly yes in this circumstance.

2         And three, the request has to be limited to the needed

3    materials.  Your Honor, when we saw these letters, we had no

4    doubt we needed them.  We have yet to see any argument of --

5    any sort of meaningful argument that we don't need them.  All

6    we keep hearing is, "Well, it's irrelevant," and you know,

7    "Let's wait until later," and this, that and the other.  Your

8    Honor, we can't imagine more relevant information, and we have

9    limited our request to the needed materials because at the end

04:02 10   of the day, as I mentioned in the beginning, the same facts at

11   issue as to whether Mr. Cadden is going to go to jail for a

12   year, ten years or the rest of his life, are the facts that

13   will determine whether NECC should have one percent of fault,

14   10 percent of fault or 100 percent of the fault.  It's the same

15   facts and circumstances that the civil juries get to hear in

16   the context of determining money damages as the criminal jury

17   gets to hear in the context of liberty.

18         Your Honor, I guess the final point that I would like

19   to make is that we have been willing to work with the

04:03 20   individuals, with the government.  If there is some particular

21   category the government is really concerned about, "There is an

22   ongoing investigation of some matter, and we would give you all

23   the grand jury materials but these.  We're going to hold these

24   back because we're letting you know" -- we would work with them

25   and we'd be happy to limit it in some way.  But as of today,

         1    it's been the same light switch approach that we've had from
         2    day one.  It's all or nothing.  And they're giving us nothing.
         3         We would ask the Court to help us here to provide
         4    meaningful evidence for us to develop our defenses on and
         5    certainly not to force us to trial or expert disclosure without
         6    the documents we need for a meaningful defense.  Thank you.
         7         THE COURT:  Thank you.  Who is going to speak on
         8    behalf of the invoking defendants?
         9         MR. O'HARA:  There are actually two of us that need to
04:04   10    speak, your Honor.
        11         THE COURT:  So who is going to go first?
        12         MS. PEIRCE:  Did you want to hear from us, your Honor?
        13         THE COURT:  Actually, I know it's unusual, but if you
        14    would sit --
        15         MS. PEIRCE:  Sitting.  Sorry.  Please know it's out of
        16    respect.
        17         In reality, your Honor, we're simply the wrong people
        18    to be asking this from.  We are temporarily allowed to look at
        19    certain material.  As your Honor knows from the criminal case,
04:04   20    it took months and months to even get the stuff downloaded.  We
        21    haven't even gotten through it.  But the bottom line is it is
        22    not ours.  It's not in our custody, possession and control.
        23    This is not a fight -- it's one of the few fights that
        24    Mr. Cadden doesn't need to be in because he does not possess or
        25    control these documents.

1          As your Honor is aware, in the old days, we used to go
2     over to the U.S. Attorney's Office when a client was indicted,
3     and we were given discovery.  You go over there under the
4     watchful eye of FBI agents.  You look at what you want under
5     their care.  These aren't our documents.  These aren't our
6     documents in the way it would typically be in the civil case.
7     We are allowed under very confined circumstances to bring these
8     to our office because they are too voluminous to have us go
9     over and sit as we did in the old days and pore through boxes
04:05 10     of materials.
11          So the bottom line is, we shouldn't be part of this
12     debate.  We shouldn't be in the middle of an analysis that the
13     Supreme Court has said goes on between the requesting party and
14     the government, which, here, the clinic's completely
15     circumvented by going directly to us because the analysis is
16     between the government.  So that's the first thing, your Honor,
17     is that we would like to be removed from this because they're
18     not ours to give.
19          Mr. Cadden and the other defendants may feel
04:05 20     similarly.  We are under a tremendous burden to be sure we
21     don't inadvertently violate your protective order or do
22     anything else with the materials that we're allowed to look at
23     but not own or possess.  To be in a position to have to begin
24     turning over things to clinics, et cetera, puts them at further
25     peril.  Are they going to violate the protective order?  We

1    just shouldn't be in this position when really what we should

2    be doing is showing why our clients are not guilty of the

3    crimes they're charged with, your Honor.

4         So, you know, the main point is I think this isn't --

5    it shouldn't be our battle and we shouldn't be in the middle of

6    it.  At the end of the case, we're required to either return or

7    destroy the documents that we're allowed to look at.  It is no

8    different right now than if we were sitting in a basement in

9    this building somewhere flipping through documents.  We don't

04:06 10   have custody and control.  It's not our decision or job to do

11   the balancing the Supreme Court had asked to balance the

12   secrecy interests versus their interest in having it.

13        The particularized need here I think is -- maybe I am

14   beginning to have the battle that I said isn't mine, but I do

15   want to speak to that.  Mr. Schramek has gone through a host of

16   things they say are critical and they don't have access to.  I

17   can't answer that completely.  But most of the list he went

18   through, the documents from NECC, all of those documents, as I

19   understand it, have been put in a repository in this case, and

04:07 20   the trustee has been very forthcoming about providing them what

21   they need.  So I do believe that's overstated a little bit.

22        And regardless, one thing I also want to clarify, and

23   it really gets back to this point, that these are simply not

24   our documents.  Mr. Cadden hasn't had anything returned to him

25   in the criminal process.  He didn't have anything to begin

1    with.  What happened was, NECC was raided.  As you know, the

2    government has gone to clinics, to ARL, to all these third

3    party entities and others that we may not even know, gotten

4    their documents and given us to review, not to keep or own,

5    certain selected pieces.  So it's simply not the case as in the

6    *eBay* case, for example, that they cite that Mr. Cadden made a

7    document production and now he's simply being asked to give a

8    copy to somebody else.  These aren't his to begin with, your

9    Honor.

04:08 10    I believe at that point, you know, the last piece of

11    the balancing as far as I see it again -- and then I defer to

12    the government because this is not our battle.  As I've said a

13    couple of times, these aren't our documents.  That point that I

14    was going to make and then I just distracted myself -- I

15    apologize, your Honor.

16    You know, in terms of the need -- there's another

17    motion kicking around now relating to the civil depositions.

18    These are the individuals who have the possibility of answering

19    some of these questions without the tremendous burden of asking

04:08 20    our clients to turn over the government's discovery in the

21    criminal case.  And I think it's a much more balanced approach,

22    your Honor, to at least see if those people inside the clean

23    rooms that they want to know about who can say where the meth

24    pred was compounded, get that information from them before we

25    or the government is put in that position of turning over grand

1    jury information, financial information that is intertwined in

2    all of this material, including the e-mails, personal

3    information that they would never been entitled to, your Honor.

4    Thank you.

5            THE COURT:  Thank you.

6            MR. O'HARA:  Your Honor, I want to start with the

7    place where the discovery order that Judge Zobel issued

8    confines the remaining defendants to discovery that is

9    necessary only to the extent it's relevant to the prosecution,

04:09 10   defense of claims against defendants other than the estate

11   parties and the individual settling parties.  That starting

12   point has been used to I think create a much broader swath of

13   discovery as we've seen from motion after motion after motion

14   from Saint Thomas.  And I would respectfully suggest that that

15   has to be kept in mind in relation to what they are now seeking

16   in this particular go-round.

17           The particularized need is something which Michelle

18   has already touched upon.  I want to speak specifically to the

19   overbreadth issue, if it's not structured to cover material as

04:10 20   to which a particular need for disclosure has been shown, and

21   that's from obviously the *Douglas Oil* case cited in our brief

22   with *Liberty Mutual* and the *Diamante* case.

23           In this instance, Saint Thomas Entities have lumped

24   together all of the entities and the individuals which I think

25   in this instance, number one, it's not ALR -- excuse me --

1    NECC, Ameridose, ARL, GDC, they're not here before you today.

2    This is solely about the individuals.  And the reason they're

3    casting a broad net, I respectfully suggest, is when you look

4    and shine a sharper light on and focus on the requests being

5    made, it doesn't come out as the Saint Thomas Entities would

6    have it.  In my case with regard to Doug and Carla Conigliaro,

7    it is unequivocally clear that the charges and indictments that

8    were brought against our clients in the criminal proceeding

9    were financial crimes.

04:11 10          There is no set of circumstances that Saint Thomas

11   Entities can articulate that suggests there's a particularized

12   need for the discovery that has been produced in this -- and

13   it's not discovery, it's Rule 6(e) disclosures -- to our

14   clients, Doug and Carla Conigliaro in the financial crimes and

15   indictments for which they have been charged.  You see nowhere

16   in their response in both the main brief or in the reply brief

17   any comment that directs to why they need these materials.  I

18   look at that and then I put in context the timing of when

19   they've brought this motion, which comes on the eve of yet

04:12 20   another trial deadline.  The materials that they attached were

21   on record in May of 2015.  They filed their motion of the

22   urgent need in August of 2015, when they know yet another trial

23   deadline is coming up.

24          I respectfully suggest the lag in time tells me that,

25   first -- I draw by way of inference that this is a delay

1    tactic, an attempt to stall these proceedings so that the

2    claims that the PSC would like to make on behalf of the victims

3    do not go forward now.  It's been tactic after tactic after

4    tactic directed towards the individuals.

5         Now, I say that purposefully, and I say it for this

6    reason.  When Mr. Schramek says that he has received nothing in

7    the discovery process, I respectfully disagree with him.  The

8    discovery -- they have subjected the settling parties, before

9    they settled, to interrogatories, document requests and

04:13 10   requests for admissions.  In each of those instances, the

11   settling parties have invoked their Fifth Amendment privilege

12   against self-incrimination, as is their right, given the

13   pending criminal charges that exist.

14        In the civil context, the Tennessee defendants and the

15   Saint Thomas Entities have more than they need in order to be

16   able to advance their cause to say that all of this is the

17   responsibility of the finger-pointing that they will do to the

18   parties that settled, and they have the advantage of being able

19   to do so only because we're not at liberty to respond to that

04:14 20   because of the criminal indictments.

21        So when they suggest to you they have no evidence,

22   they're simply not correct, and they will use every device they

23   can to put as much of that evidence in as they can.  I

24   respectfully come back to Judge Zobel's order that there has to

25   be a particularized need.  And when I look at Doug and Carla

1    Conigliaro and particularly requests for discovery about

2    structuring, about financial accounts, about things that are

3    all within your protective order that exists in the criminal

4    case, there is no reason that they have any particularized need

5    to access financial accounts, information that relates to the

6    charges that were brought against Doug and Carla Conigliaro.

7        I also want to point out that their attempts to raise

8    *eBay* overlooks the distinguishing circumstances between the

9    *eBay* case and these circumstances here.  In the *eBay* case,

04:15 10  there were -- not all of the parties for whom discovery was

11   sought were under indictment.  In this instance, the ones that

12   have received, been on the receiving end of the discovery are

13   all under indictment.  That's one distinguishing

14   characteristic.

15       Second, as Michelle I think alluded to, these were

16   documents that were seized from the corporate entity NECC and

17   other corporate entities.  These are not individual documents

18   that were produced by the individuals, and there's a material

19   distinction between that in terms of both the Fifth Amendment

04:15 20  privilege and with respect to other arguments about whether

21   it's in possession, custody or control.  And respectfully, I

22   think they're conflating the fact that individual defendants

23   have a right to receive certain disclosures under Federal

24   Criminal Rule 6(e) with their attempt to suggest that Judge

25   Zobel's order permits them to get the same documents that the

1    criminal defendants have been given, and they're not the same.

2         So I would -- and when we point to the *Diamante* case

3    and others, it is crystal clear that there is not a

4    particularized need in this instance that justifies the

5    production of all of these records.  Interspersed without

6    them -- and by the way, the government can speak more to this,

7    but the government has already indicated to folks that are on

8    our side of the ledger that they're still reviewing documents

9    that have been produced as to whether they're covered or not

04:16 10    covered within this, and it's not quite so easy to simply say

11   we'll just be subject to the same confidentiality order and

12   leave it at that.

13        There is very strong case law that financial documents

14   should not be subject to discovery prejudgment.  It doesn't

15   relate to their asset -- excuse me -- their comparative fault

16   disclosures.  It doesn't relate to their expert disclosures.

17   And respectfully, when they sought documents from us from Carla

18   and Doug Conigliaro, it made abundantly clear to us this is a

19   delay tactic to try to avoid the trial date with the PSC.

04:17 20        THE COURT:  Thank you.  Mr. Rabinovitz, did you want

21   to speak to this?

22        MR. RABINOVITZ:  I do, your Honor, very briefly.

23        One thing I think that we can all agree on is that the

24   Tennessee parties are not entitled to the financial information

25   and not entitled to information relating to patient

1    information.  And I want the Court to appreciate -- we pled

2    this in our brief, but I want to make sure that you appreciate

3    how intertwined that material is within approximately four

4    million pages of e-mails.

5         And so while the index that the Tennessee parties

6    point to may have some categories of folders that the

7    government segregated out that, for example, relate to

8    financial information, I can tell you that -- and we said this

9    again in our brief -- that that's not the only places that that

04:18 10   information is found.

11        And so literally, if this order was granted, if the

12   order was that you shall produce everything other than the

13   financial information and the patient information, it would be

14   impossible for us to do that.  And it would be manually looking

15   at four million pages of documents and trying to parse out the

16   protected material, and that, in the context of defendants

17   trying to get ready for a criminal trial, not only is it

18   impossible but it's unreasonable to ask them to try.  I just

19   wanted to highlight that for the Court.

04:18 20        THE COURT:  Thank you.  Who is going to speak on

21   behalf of the government?

22        MS. STRACHAN:  I will, your Honor.  Thank you.

23        Your Honor, as you know, on Friday the government

24   filed a motion to intervene with respect to two issues in this

25   litigation.  I don't know if your Honor would like to hear us

1    on the motion to intervene or if you'd like --

2         THE COURT:  Not at this point.  I think I'll allow the

3    other parties in this civil case -- I know you had attached a

4    7.1 certificate -- just give everyone else an opportunity to

5    object on the motion to intervene issue, but I can certainly

6    hear you on the issue that is being discussed today.

7         MS. STRACHAN:  Thank you.  Your Honor, as many people

8    in this courtroom here today know, my colleague AUSA Varghese

9    and I have sat on the sidelines in the civil litigation.  We

04:19 10   sat in the back of the courtroom for many, many months now

11   observing these proceedings, and we have not to date moved to

12   intervene.  And that's been for what we view to be a very

13   important reason.

14        First of all -- and yet we came to observe because we

15   also felt that it was important for us to really follow two

16   things.  Number one, the victims in our case, their pursuit of

17   compensation for the injuries that they have suffered.  They're

18   victims in our criminal case, and we view their litigation here

19   and the process they all have been following here to be very

04:20 20   important.  We haven't wanted to get involved.

21        Secondly, and equally importantly, we have observed

22   these proceedings in order to ensure that there is not harm to

23   the criminal case, which is obviously the foremost

24   responsibility of the U.S. Attorney's Office, and it has been

25   our hope that this parallel proceeding would not do that.  We

1    realize that fact discovery is set to close just a mere three

2    weeks from when we filed our brief, and yet, we felt that we

3    were not given a choice because we now see two clear harms to

4    the criminal case, one of which will be addressed at another

5    time, and that's the depositions of potential government

6    witnesses and then the issue that we're here to address today,

7    which is the potential production of criminal discovery to

8    civil litigants.

9         Your Honor, you have our brief, which I know we just

04:21 10   filed a few days ago.  There are a few points that I would like

11   to address.  I'd like to highlight from the brief and also to

12   address the response that was filed earlier this week.

13        Saint Thomas Entities correctly states that the

14   government does not cite a lot of case law on this topic, and

15   that's because, your Honor, there simply is none.  There is not

16   a lot of case law on this subject other than the Fourth and

17   Eleventh Circuit decisions that we cite in our brief.  And I

18   submit, your Honor, that that speaks volumes in and of itself,

19   and that is because it is an extraordinary and largely

04:21 20   unprecedented request.

21        We cite a number of cases in our brief that there's no

22   First Amendment right to criminal discovery, and there are

23   plenty of cases that say that.  And even in those cases, the

24   newspapers that are seeking criminal discovery are seeking

25   documents -- they're not seeking all criminal discovery.

1    They're seeking documents that were filed under seal or were

2    filed and were used when the Court exercised its Article III

3    authority to make decisions.  Saint Thomas Entities refer in

4    their reply brief to this presumption of access.  And yet the

5    presumption of access that they cite again are documents that

6    were submitted to the Court for the Court's use in making

7    decisions, not documents that are submitted to parties in

8    criminal litigation.

9           As the invoking defendants have said, your Honor, in

04:22 10   their brief and as we have as well, we believe they have not

11   made a showing of need for the discovery.  They say they want

12   it.  We understand why they want it.  I think there are a lot

13   of people that would probably be interested in reading the

14   government's memoranda of interview of the witnesses that we

15   interviewed in connection with our criminal investigation.  But

16   I would submit, your Honor, that this is a completely improper

17   basis for them to seek the criminal discovery.  They simply

18   don't have a right to it.

19          They also say in the reply brief that was filed

04:22 20   earlier this week that they are asking simply for documents

21   that were seized by the government and then returned to NECC.

22   Your Honor, the amount of documents -- as you know, the

23   discovery of 8.8 million pages, that number has been thrown

24   around a lot both in this litigation and the criminal

25   litigation.  The volume of materials that were seized from NECC

1    and has since been returned to NECC, that's about 12.5 percent

2    of the criminal discovery produced.  So there are vast amounts

3    of information that were not seized from NECC and now, quote,

4    unquote, "returned" to the criminal defendants in the criminal

5    discovery.

6            THE COURT:  I'm sorry.  You're saying that only 12

7    percent of the material at NECC was seized, or did I

8    misunderstand you?

9            MS. STRACHAN:  No.  I'm sorry, your Honor.  Of the 8.8

04:23 10   million pages of documents in criminal discovery, only about

11   1.8 million of those documents were documents that were seized

12   from NECC servers or in paper form.

13           THE COURT:  I see.

14           MS. STRACHAN:  Your Honor, the Saint Thomas

15   defendants, we submit, also misunderstands the nature of what's

16   in some of the discovery and also the nature of grand jury

17   secrecy protection.  They say in their papers they're not

18   seeking grand jury materials.  It sounds today like perhaps

19   they are.  I think that they clearly have looked at the

04:24 20   exhibits that were filed in response to the discovery brief,

21   but the discovery brief written in the criminal case makes very

22   clear, as does your Court's order, that the criminal defendants

23   don't even have all of the grand jury materials.  With respect

24   to grand jury secrecy that is afforded grand jury materials,

25   that secrecy lives on after a case is charged.  We as

1    prosecutors are still required to adhere to the rule, Federal

2    Rule of Criminal Procedure 6(e).  The grand jury secrecy

3    protection lives on for those documents.

4         Any documents that we received in response to grand

5    jury subpoenas are also protected by Rule 6(e), also may be

6    included within that production.  So I think that it's

7    important for us to note the grand jury secrecy is alive and

8    well in that criminal discovery, and there's a very good reason

9    for that.

04:25 10        As your Honor knows, this case began with an outbreak.

11   It began with a national tragedy.  Two years later we had a

12   131-count indictment.  Without disclosing what happened between

13   Point A and Point B, I think everyone probably understands that

14   a lot happened.  A lot of evidence was collected.  There's 8.8

15   million pages of discovery.  And what happened before the grand

16   jury that returned that indictment is secret for a very good

17   reason.  It protects people who are charged.  It protects

18   people who are not charged.  And we submit, your Honor, that

19   the policy reasons behind that grand jury secrecy are still

04:25 20   very much in effect today.

21        Again, I know the parties have talked about *Douglas*

22   *Oil* and the standard that Saint Thomas needs to meet.  We

23   respectfully submit, your Honor, that they have not met that,

24   and they haven't come close to meeting their burden to show

25   either an injustice in their proceeding, a need for the

1    disclosure or any -- clearly, they've made no request to

2    structure -- their request is only government materials that

3    they're looking for.  And we submit, your Honor, that the

4    reason they don't do that is because they can't.  They don't

5    exactly know what they're looking for.  That's why we say in

6    our brief we believe that this is a fishing expedition.  We

7    understand that they'd like to review our memoranda of

8    interviews to decide who they should call at trial, but we

9    submit that is not making a particularized need for the

04:26 10   information.

11         They also talk about needing equal access to the

12   discovery.  We point out that they're not parties to the

13   criminal case, obviously.  So again, their view that they have

14   some sort of right of access to criminal discovery as to the

15   litigants, I submit, is just not persuasive.  In an attempt to

16   understand this request, as I said when I began, it was not our

17   desire to intervene in this case.  I've had conversations with

18   multiple counsel for the Saint Thomas Entities.  And frankly,

19   we struggle at the U.S. Attorney's Office to understand why

04:27 20   they need all of this information in order to assert their

21   comparative fault claims.

22         I don't think anybody in this litigation is going to

23   dispute that NECC made contaminated drugs.  And as to how that

24   drug was made or what the process was, what processes were or

25   were not followed, I don't know how much of that, if this case

1    goes to trial, is going to be allowed to come in or how much

2    the Saint Thomas Entities will decide they even want to put in,

3    but I submit, your Honor, that the relevance of a lot of this

4    material is highly in question.  And we've done our best to

5    understand the request, and we struggle, too, frankly, and I've

6    let them all know that.

7            It, again, has led us to the conclusion similar to

8    what Mr. O'Hara said, that perhaps this is some sort of tactic

9    to stall their litigation.

04:27 10         Finally, a couple of other points I just wanted to

11   highlight from our brief, your Honor.  Again, the threat of the

12   documents becoming public, I know Ms. Peirce says she feels

13   this is the government's battle.  In many ways we feel like

14   this is the defendants' battle.  14 criminal defendants have a

15   right to a fair trial.  If these documents become public --

16   there's a great national interest in this case, and if these

17   documents become public, if testimony or witness interviews

18   become public, there's no way to take that back, and there's no

19   way to rectify the harm in some ways.  And so we really see a

04:28 20   very real threat to the criminal case and the integrity of the

21   criminal process which, as you know, your Honor, is set to go

22   to trial in April.

23           Again, vast amounts of the discovery material are not

24   relevant, even assuming that they were to be allowed to

25   introduce evidence in their trial about how the methyl pred was

1   made.  A lot happened in this investigation between Point A and

2   Point B, and 8.8 million pages are not relevant to their

3   comparative fault claims.

4          Finally, your Honor, we just ask that you read the

5   *Moussaoui* case.  We obviously have a very different view of it

6   than the Saint Thomas Entities do, particularly Part D of that

7   decision.  The discovery issue in this case was not about

8   turning over non-classified, non-sensitive security information

9   as they suggest in that brief.  It was about the policy reasons

04:29 10   behind not allowing criminal discovery to go to civil litigants

11   before criminal cases are tried.  There's very strong policy

12   argument against it as set forth in the brief, and it's the

13   very same situation we're facing here, your Honor.

14          So for those reasons, unless you have any questions,

15   we'd ask that you oppose their -- deny their motion to compel.

16          THE COURT:  Thank you.  Does anyone from the PSC wish

17   to speak?

18          MS. JOHNSON:  Thank you, your Honor.

19          Briefly, your Honor, the PSC did not initially take a

04:29 20   position on this matter, feeling it was adequately briefed by

21   both sides and that the Court would ultimately decide.  After

22   the U.S. Attorney's Office moved to intervene, we looked at

23   this issue again, and I do want to share with the Court PSC's

24   viewpoint.

25          We think that these materials are not needed by the

1    Tennessee defendants for two different reasons.  First, as this

2    Court is well aware, there's a choice of law decision pending

3    before -- I believe formally before Judge Zobel but before this

4    Court.  Depending on how that choice of law decision comes out,

5    if the court, in fact, chooses to apply Massachusetts law in

6    this context, there would be no need for comparative fault

7    discovery.  And despite the Tennessee defendants' efforts to

8    articulate reasons that these documents -- these and other

9    documents, it's actually better articulated I think in the

04:30 10   motion to compel documents from NECC, but there have been

11   efforts by the Tennessee defendants to articulate other

12   allegedly non-comparative fault reasons that materials may be

13   needed, we think those fall flat here.  It really does

14   ultimately come back to finger-pointing, which under Tennessee

15   law, the Tennessee defendants may have a right to do but they

16   do not under Massachusetts law.  So it may be that that choice

17   of law decision functionally moots this particular area of

18   discovery.

19        Separate from that, your Honor, much discovery has

04:31 20   been produced in this case to date both by NECC as well as

21   copious documents from the various other settling defendants.

22   So when we consider the request here, we should remember the

23   materials that are available to the Tennessee defendants, which

24   include materials produced by Unifirst, Liberty, ARL, all of

25   those other entities that relate to their dealings with NECC.

1          On top of that, there are roughly, I believe, 30 or

2    40,000 pages that were produced by NECC.  And while I am sure

3    that it's not surprising to have the PSC say that the opposing

4    party doesn't need more discovery, to put some teeth to that.

5    Those documents produced by NECC and the other parties were

6    sufficient for the PSC to draft an amended master complaint

7    that articulated in detail the causes of action against NECC

8    and the insiders.  Those documents and other discovery

9    materials produced to date were also sufficient for the PSC

04:32 10   with the trustee and many others to cobble together a $200

11   million settlement.

12         Finally, your Honor, I hear Mr. Schramek say

13   repeatedly that one of the key issues in this case is they have

14   to know where the MPA was compounded.  It's unclear that

15   there's any issue on that.  Frankly, from the PSC's

16   perspective -- excuse me -- the documents are very, very clear

17   on where the contaminated batches of MPA were compounded.  And

18   to the extent that there's any question about that in the civil

19   case, I am certain that the PSC and Tennessee defendants can

04:32 20   work out that particular issue.  Thank you.

21         THE COURT:  Thank you.  Does anyone else wish to speak

22   on this?

23         All right.  I will take it under advisement.  Thank

24   you very much.

25         (Proceedings adjourned at 4:32 p.m.)

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Kelly Mortellite, Registered Merit Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that pursuant to Section 753, Title 28, United States

 7    Code that the foregoing is a true and correct transcript of the

 8    stenographically reported proceedings held in the

 9    above-entitled matter and that the transcript page format is in

10    conformance with the regulations of the Judicial Conference of

11    the United States.

12                        Dated this 15h day of September, 2015.

13

14                        /s/ Kelly Mortellite

15                        _____

16                        Kelly Mortellite, RMR, CRR

17                        Official Court Reporter

18

19

20

21

22

23

24

25
```