UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | |
| | MDL No. 2419<br>Master Docket No.: 1:13-md-2419-RWZ |
| THIS DOCUMENT RELATES TO:<br>All Tennessee Actions Against The<br>St. Thomas Entities | Honorable Rya W. Zobel<br><br>DEMAND FOR JURY TRIAL |

<u>MEMORANDUM IN SUPPORT OF PSC'S MOTION TO COMPEL THE ST. THOMAS ENTITIES TO RESPOND TO PRODUCE CERTAIN DOCUMENTS</u>

The Plaintiffs' Steering Committee (the "PSC") moves this Honorable Court, pursuant to Fed. Rule Civ. Pro. 37 and Local Rule 37.1, for an order compelling the St. Thomas Entities[1] to respond to certain document requests. After receiving responses to the PSC's second set of common discovery requests from the St. Thomas Entities and exchanging letters and conducting one separate telephonic conference with the St. Thomas Entities to narrow any dispute over their responses, the PSC now seeks the Court's intervention concerning those issues still in dispute. As grounds for this motion, the PSC respectfully states as follows:

I.      **Local Rule 37.1 Discovery Conference**

This current Motion to Compel relates to two different sets of discovery served by PSC. The PSC originally served its initial common discovery requests on the St. Thomas Entities on October 9, 2013.[2] The St. Thomas Entities provided initial responses on

---

[1] The Defendants Saint Thomas West Hospital, formerly known as St. Thomas Hospital ("St. Thomas Hospital"), St. Thomas Health ("St. Thomas Health"), and St. Thomas Network ("St. Thomas Network") are collectively referred to as the "St. Thomas Entities".

[2] *See* Declaration of Benjamin A. Gastel filed contemporaneously herewith at ¶ 2 (hereinafter the "Gastel Decl.").

December 11, 2013, largely objecting to these requests.[3]   Eventually, the Saint Thomas Entities provided initial substantive responses to discovery on November 10, 2014 and completed its initial document production on or around April 7, 2015.[4]

Thereafter, the PSC took its first round of depositions based largely on this initial document set.  The PSC, based on information that came to light during these depositions, then served a second set of requests for production on May 6, 2015.[5]  The Saint Thomas Entities then served their responses on June 15, 2015.[6]

After another round of depositions, the PSC served a meet and confer letter on August 7, 2015 addressing deficiencies in the most recent round of discovery responses and a handful of hold over issues that came to light during depositions.[7]   On August 21, 2015, the Saint Thomas Entities responded to this meet and confer letter.[8]

The parties held a telephonic meet and confer conference on these issues on September 4, 2015, where Benjamin Gastel appeared on behalf of the PSC and Adam Schramek and Marcy Greer appeared, amongst other counsel, on behalf of the St. Thomas Entities.[9]

During these meet and confer sessions, the parties were able to reach agreement on certain items, and the St. Thomas Entities agreed to supplement some additional documents and conduct some additional searches of material.[10]  This motion is therefore limited to the three remaining outstanding issues still in dispute: 1) whether the Saint Thomas Entities need to produce marketing surveys and documents related to focus groups conducted as part

---

[3] *Id*. at ¶ 2 and Ex. 1.
[4] *Id*.
[5] *Id*. at ¶ 3.
[6] *Id*. at ¶ 3 and Ex. 2.
[7] *Id*. at ¶ 4 and Ex. 3.
[8] *Id*. at ¶ 4 and Ex. 4.
[9] *Id*. at ¶ 4.
[10] *Id*.

of the development of Saint Thomas's strategy to create a "unifying brand"; 2) whether the Saint Thomas Entities need to produce all managed care contracts governing reimbursements the Saint Thomas Outpatient Neurosurgical Center (the "Saint Thomas Clinic") receives for the goods and services it provides and 3) whether the Saint Thomas Entities need to produce documents related to whether its five hospitals it owns and operates purchased MPA during 2011 and 2012.

## II.    Factual and Procedural Background

As the Court knows, this litigation arises from a widespread outbreak of fungal meningitis affecting victims in at least 20 states caused by contaminated pharmaceuticals compounded by the New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center ("NECC") located in Framingham, Massachusetts.

The defendant, St. Thomas Outpatient Neurosurgical Center ("St. Thomas Clinic"), is a pain clinic located on the St. Thomas Hospital campus in Nashville, Tennessee.  Plaintiffs allege that St. Thomas Clinic and its employees and agents knew or should have known of the dangers of using compounded drugs generally, and specifically products compounded by NECC.[11] Nevertheless, they decided to purchase injectable steroids from NECC after undertaking zero due diligence.[12]  They did nothing to ascertain the safety and quality of NECC's products.[13]  Instead, they decided to purchase the cheapest steroid available.[14]  Rather than purchasing purportedly sterile injectable steroids from an under-regulated, out-of-state compounding pharmacy that

---

[11] *See* Master Complaint, Dkt. No. 545 ¶¶ 152-158, 180.
[12] *Id.* at ¶ 192.
[13] *Id.*
[14] *Id.*

lacked the license to sell in bulk, St. Thomas Clinic should have purchased medications made by an FDA-approved drug manufacturer such as Pfizer or another properly licensed manufacturer.[15]

Plaintiffs allege that St. Thomas Clinic is the actual or apparent agent of St. Thomas Hospital, St. Thomas Health and St. Thomas Network.  Plaintiffs assert that all of the St. Thomas Entities use a common name, share common officers, share a common location, and are otherwise so inextricably intertwined as to create an agency relationship with St. Thomas Clinic.[16]

St. Thomas Clinic is co-owned by St. Thomas Network and defendant, Howell Allen Clinic.[17] St. Thomas Network has zero employees and appears to be an empty shell.  It, in turn, is owned by St. Thomas Health, the same entity that owns St. Thomas Hospital.[18]  St. Thomas Clinic operates on the 9th floor of the Medical Plaza East on the St. Thomas Hospital campus.[19] In other words, patients who visit St. Thomas Clinic must go to St. Thomas Hospital in order to do so.

When patients entered the St. Thomas Clinic, they were greeted by a receptionist wearing a nametag bearing the name:  "Saint Thomas Hospital".  Specifically, below is a copy of a nametag worn by Sherri DeZwaan, the clinic's receptionist[20]:

---

[15] *Id*. at ¶ 180.
[16] The Saint Thomas Entities are not named in the Master Complaint.  For allegations related to the Saint Thomas Entities, the PSC will use the complaint filed in *Reed v. Ameridose*, Case No. 1:13-cv-12565-RWZ, Dkt. No. 1 as a representative complaint containing allegations against the St. Thomas Entities.  This complaint will hereinafter be referred to as the *Reed* Complaint.  The St. Thomas Entities filed an answer to this complaint on October 1, 2014 (*Reed*, Case No. Dkt. 1:13-cv-12565-RWZ No. 42).
[17] Saint Thomas Clinic's Answer to Short Form Complaint, Dkt. No 1459-1 at ¶ 261.
[18] *See* Dkt. No. 1552-5.
[19] Saint Thomas Clinic Answer to Short Form Complaint, Dkt. No 1459-1 at ¶ 275.
[20] Dkt. No. 1552-6.



Ms. DeZwaan was a Howell Allen employee who worked at the St. Thomas Clinic while wearing a Saint Thomas Hospital nametag.[21]  The employees and leadership of the St. Thomas Entities, Howell Allen, and St. Thomas Clinic are likewise intertwined.[22]

Moreover, the St. Thomas Entities and St. Thomas Clinic hold themselves out to the public as one singular entity, further blurring any distinctions between or among them. The St. Thomas Entities and St. Thomas Clinic share the St. Thomas name and the same location on the St. Hospital Thomas campus. They intentionally foster the public perception that they are one united entity through a large scale marketing campaign highlighting the tag line:  "*St. Thomas Health:  One Name, One Healing Community*." An example of that marketing campaign is as follows:

---

[21] *Id.*.
[22] *See Reed* Complaint ¶¶ 275-277.



Presenting a united face to the public, the St. Thomas Entities – as one, or at least as an indistinguishable tangle – Plaintiffs allege creates an actual or apparent agency relationship with St. Thomas Clinic.[23]

The Plaintiffs allege that the St. Thomas Entities permitted their agent to procure injectable steroids from NECC without conducting basic due diligence and without using patient-specific prescriptions and injected those steroids into patients.[24]

Based upon the above allegations, and pertinent to the pending motion, Plaintiffs assert, amongst others, claims for agency, apparent agency, and *respondeat superior*.[25]   Additionally, Plaintiffs' substantive claims against the St. Thomas Clinic allege that it is liable as a seller of drugs under the Tennessee Products Liability Act (the "TPLA") and that the St. Thomas Clinic failed to follow the American Society of Health-System Pharmacists' guidelines, which establish due diligence standards healthcare providers should follow when purchasing

---

[23] *Reed* Complaint ¶¶ 274-286.
[24] *Id*. ¶281.
[25] *Id*. at ¶¶ 274-286.

compounded pharmaceuticals.[26] The Saint Thomas Clinic appears to defend these allegations, in part, on the claim that there was a national shortage of drugs requiring them to purchase compounding product and that they satisfied the standard of care in the procurement of compounded pharmaceuticals and well-known industry regulations do not create a duty upon the Saint Thomas Clinic to satisfy those regulations (principally because Saint Thomas Clinic admits that it did not follow ASHP guidelines).[27]

## III.   LEGAL STANDARD

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party's claim or defense."[28] Relevance is broadly construed to encompass "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."[29]  This very court has previously noted that "[t]he scope of discovery is very broad, and information is discoverable if there is any possibility it might be relevant to the subject matter of the action."[30]  "Relevant information includes any matter that is or may become an issue in the litigation."[31]  Because Rule 26(b) sets a "very low threshold for relevancy," courts should "err in favor of

---

[26] *Reed* Complaint ¶ 120; *see also* Master Complaint, Dkt. No. 545 ¶¶ 152-158, 180, 192.

[27] Saint Thomas Clinic Answer to Master Complaint, Dkt. No. 1455, ¶¶ 46, 54, 152-158; Saint Thomas Clinic Answer to Short Form Complaint, Dkt. No. 1459-1 at ¶ 120.  *see also* Tenn. Code Ann. § § 29-26-115*; Mabon v. Jackson-Madison County Gen. Hosp.,* 968 S.W.2d 826 (Tenn. Ct. App. 1997) (holding that Plaintiff's tendered expert must be familiar with the standard of care in the community in which the defendant practices or a similar community, and without such threshold evidence of the locality's standard of practice, plaintiff cannot demonstrate a breach of duty.).

[28] Fed. R. Civ. P 26(b)(1).

[29] *Oppenheimer Fund v. Sanders* 437 U.S. 340, 351 (1978); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 244 F.3d 189, 192 (1st Cir. 2001) ("The Supreme Court has long recognized that the Federal Rules of Civil Procedure are to be construed liberally in favor of discovery.")

[30] *Gulbankian v. MW Mfrs., Inc.*, Case No. 10-10392-RWZ, 2013 U.S. Dist. LEXIS 69773 (D. Mass. 2013, Judge Zobel) (internal quotations omitted); *see also In re Heparin Prods. Liab. Litig.* 273 F.R.D. 399, 406 (N.D. Ohio 2011) ("If there is any possibility that the information may be relevant to the general subject matter of the action.") citing *Oppenheimer,* 437 U.S. at 351.

[31] *Multi-Core, Inc. v. Southern Water Treatment Co.*, 139 F.R.D. 262, 264 n.2 (D. Mass. 1991); s*ee also Chubb Integrated Systems Limited v. National Bank of Washington*, 103 F.R.D. 52, 59 (D.D.C. 1984)("The concept of relevancy is broadly construed at the discovery stage of an action, and discovery rules are to be accorded liberal treatment.").

discovery rather than against it."[32]

## IV.   The PSC's Position as to Each Contested Document

The PSC seeks an order compelling the St. Thomas Entities to produce the following documents: 1) the internal branding and marketing surveys performed annually by Saint Thomas Health and documents related to focus groups conducted for the purpose of helping Saint Thomas develop a "unified brand"; 2) all managed care contracts for which the St. Thomas Entities negotiated on behalf of Saint Thomas Clinic; and 3) documents sufficient to identify the availability of MPA at the five hospitals operated by Saint Thomas Health. The number of the documents requests below corresponds to the numbers in the interrogatories posed to St. Thomas Health, unless otherwise indicated.[33]

### 1.   Saint Thomas Health Should Produce Its Marketing And Branding Surveys

The PSC propounded the following document requests related to these documents and the Saint Thomas Entities responded as follows:

> **REQUEST NO. 51:**  Produce the results of all "brand attribute surveys" conducted by St. Thomas Hospital and/or Saint Thomas Health referenced in Rebecca Climer's deposition at page 23, line 11.

> OBJECTION: STHe objects to this request as it seeks information that is irrelevant, beyond the scope of permissible discovery under Fed. R. Civ. P. 26, and is not reasonably calculated to lead to the discovery of relevant or admissible evidence regarding any allegation in the Complaints.  STHe also objects to this request as overly broad and unduly burdensome because it is not appropriately limited in time or scope.  STHe further objects to this request as seeking information that is not in STHe's possession, custody, or control.

> RESPONSE: Subject to and without waiving the foregoing objections, no specific "brand attribute surveys" were conducted and STHe has no documents responsive to this request.

---

[32] *Kipperman v. Onex Corp.* (N.D. Ga. Apr. 25, 2008) 2008 U.S. Dist. LEXIS 34519, *28.
[33] In some instances related to the disputed discovery requests, the PSC propounded identical requests to each of the St. Thomas Entities, and the St. Thomas Entities propounded the same responses to the overlapping document requests.

**REQUEST NO. 52:**  Produce the results of all "annual surveys" conducted by St. Thomas Hospital and/or Saint Thomas Health referenced in Rebecca Climer's deposition at page 23, line 23.

OBJECTION:   STHe objects to this request as it seeks information that is irrelevant, beyond the scope of permissible discovery under Fed. R. Civ. P. 26, and is not reasonably calculated to lead to the discovery of relevant or admissible evidence regarding any allegation in the Complaints.  STHe also objects to this request as overly broad and unduly burdensome because it is not appropriately limited in time or scope.   STHe further objects to this request as seeking information that is not in STHe's possession, custody, or control.

**REQUEST NO. 53:**  Produce all transcripts of any focus groups referenced in Rebecca Climer's deposition at page 23, line 20 and page 142, lines 1 – 7.

OBJECTION:   STHe objects to this request as it seeks information that is irrelevant, beyond the scope of permissible discovery under Fed. R. Civ. P. 26, and not reasonably calculated to lead to the discovery of relevant or admissible evidence regarding any allegation in the Complaints.  STHe further objects to this request as seeking confidential, proprietary, and trade-secret information.

**REQUEST NO. 54:**  Produce the focus group summaries prepared by Tombras referenced in Rebecca Climer's deposition at page 142, lines 14 – 15.

OBJECTION:   STHe objects to this request as it seeks information that is irrelevant, beyond the scope of permissible discovery under Fed. R. Civ. P. 26, and not reasonably calculated to lead to the discovery of relevant or admissible evidence regarding any allegation in the Complaints.  STHe further objects to this request as seeking confidential, proprietary, and trade-secret information.

**REQUEST NO. 57:**   Produce a copy of all documents relied upon by Saint Thomas Health and/or Saint Thomas in development of the "One Name One Healing Community" advertising campaign.

OBJECTION:   STHe objects to this request as it seeks information that is irrelevant, beyond the scope of permissible discovery under Fed. R. Civ. P. 26, and is not reasonably calculated to lead to the discovery of relevant or admissible evidence regarding any allegation in the Complaints.  STHe further objects to the phrase "and/or Saint Thomas" as vague and ambiguous.  STHe objects to this request as seeking confidential, proprietary, and trade-secret information.  STHe further objects to this request as seeking electronically stored information, without appropriately limited time constraints, that is not reasonably accessible due to undue burden or cost, and this burden and expense outweighs any likely benefit of the requested information.

**REQUEST NO. 58:**   Produce all documents related to any focus group conducted by Saint Thomas Health and/or Saint Thomas Hospital.

OBJECTION:   STHe objects to this request as it seeks information that is irrelevant, beyond the scope of permissible discovery under Fed. R. Civ. P. 26, and is not reasonably calculated to lead to the discovery of relevant or admissible evidence regarding any allegation in the Complaints.  STHe also objects to this request as overly broad and unduly burdensome because it is not appropriately limited in time or scope.   STHe further objects to this request as seeking confidential, proprietary, and trade-secret information.  STHe further objects to this request as seeking information that is not in STHe's possession, custody, or control.

Importantly for the issue at hand, Saint Thomas Health's Communications Director, Rebecca Climer, testified that Saint Thomas Health in or around 2010 had a goal of implementing a unified brand across Saint Thomas Health's healthcare facilities and as a part of that marketing campaign conducted several surveys and focus groups related to "mind awareness" and "preferences for service lines."[34]  Ms. Climer readily admitted that Saint Thomas Health conducts robust annual surveys and conducted several focus groups in the development of the "unified brand" strategy that the CEO of Saint Thomas Health sought to implement as early as 2010 – two years before the current outbreak.[35]

Here, Plaintiffs have brought a variety of claims against the Saint Thomas Entities including apparent agency claims.  In Tennessee it has been the law for over 100 years that apparent agency claims depend, in part, on how a principal holds itself out to the public.[36]  This rule has been specifically applied to the healthcare industry and largely adopted in determining whether a patient who walks into a healthcare facility has a reasonable belief that it is receiving care from the hospital or some other entity or person (since some

---

[34] Climer Tr., Pg. 21-23.  Relevant portions of this transcript are attached hereto as Exhibit B.
[35] *Id*. at Pg. 23-25.
[36] *Southern R. Co. v. Pickle*, 138 Tenn. 238, 246 (Tenn. 1917) (" It is essential to the application of [apparent agency] that two important facts be clearly established: (1) That the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority; and (2) that the person dealing with the agent knew of the facts, and, acting in good faith, had reason to believe, and did believe, that the agent possessed the necessary authority.")

hospitals employ independent contractor physicians to work within the hospital).[37]

Saint Thomas Health refuses to produce its own marketing studies and focus groups, the very data that Saint Thomas Health relied upon in developing a unified "Saint Thomas" brand across its entire system, on the specious grounds that these documents are not relevant to Plaintiffs' agency claims.   Documents showing specifically the public's perceptions of Saint Thomas' brand are exactly the type of evidence that can demonstrate whether the Plaintiffs' reasonably relied upon the fact that Saint Thomas appeared on the building where they received their injection and the very door of the clinic in which they were injected. These documents should be produced.

### 2. Saint Thomas Health Should Produce All Managed Care Contracts For Which They Negotiated On Saint Thomas Clinic's Behalf

**REQUEST NO. 32:**   Produce a copy of all contracts, agreements, and documents related to Saint Thomas Health's relationship with Saint Thomas Neurosurgical.

OBJECTION:  STHe objects to this request as vague and ambiguous, as the word "relationship" is undefined.

RESPONSE:   Subject to and without waiving the foregoing objection, documents responsive to this request have been produced previously in related Tennessee state court litigation, and will be produced in this litigation.

Saint Thomas Health negotiates the Saint Thomas Clinic's managed care contracts, which are the contracts governing payment for goods and services Saint Thomas Clinic provides to its patients but are paid for by third party payors (normally insurance

---

[37] *Boren ex rel. Boren v. Weeks,* 251 S.W.3d 426, 436 (Tenn. 2008) ("To hold a hospital vicariously liable for the negligent or wrongful acts of an independent contractor physician, a plaintiff must show that (1) ***the hospital held itself out to the public as providing medical services***; (2) the plaintiff looked to the hospital rather than to the individual physician to perform those services; and (3) the patient accepted those services in the reasonable belief that the services were provided by the hospital or a hospital employee.") (emphasis added).

companies).[38]   Plaintiffs requested production of all such agreements, but Saint Thomas Health produced only the agreement with Blue Cross Blue Shield ("BCBS").   Given the scope of this tragedy it simply defies belief that only BCBS patients were affected by this tragedy.

Plaintiffs' claims against Saint Thomas Clinic relate, in part, to claims that Saint Thomas Clinic put profit over patient safety.  Evidence uncovered to date reveals that Saint Thomas Clinic could have easily continued to purchase branded Depo-Medrol in lieu of purchases from the far more dangerous compounded product manufactured by NECC.[39] They did not do so because it would have cost more than $2.50 per vial.[40]  The BCBS agreement produced to date shows that any added cost in the procurement of the drug could not be passed onto to these third party payors, providing the profit motive for Saint Thomas Clinic to buy the cheaper but far more dangerous product.[41]  Plaintiffs should be entitled to know whether other Managed Care Contracts negotiated by Saint Thomas Health for Saint Thomas Clinic had similar arrangements.

Moreover, the BCBS managed care contract specifically states that as part of the payment received by Saint Thomas Clinic included a sale of "drugs" and specifically provided for different procedures for certain types of high-cost drugs.[42]  Plaintiffs here have made claims that Saint Thomas Clinic was a "seller" of the MPA it sold to patients, and the BCBS agreement demonstrates that it was specifically reimbursed (i.e. paid) for the drugs used in treatment of patients at Saint Thomas Clinic.

As a result, all managed care agreements should be produced to shed light on

---

[38] Williams Tr. Pg. 12-15, relevant portions of this transcript are attached hereto as Exhibit C.
[39] Ebel Tr. Pg. 27-28, relevant portions of this deposition are attached as Exhibit D.
[40] *Id*. at P. 29.
[41] Williams Tr. at Ex. 517.
[42] *Id*.

whether they too provided the incentive to put profit over patient safety and to help shed light specifically on how Saint Thomas Clinic receives payment for the drugs it sells to patients.

Accordingly, the managed care contract clearly meets the low threshold of relevancy requiring its production in this case.

### 3. Saint Thomas Health Should Produce Documents Showing Supplies of MPA At Its Five Hospitals

> **REQUEST NO. 64:** Produce all documents showing any purchases of methylprednisolone acetate or Depo-Medrol that were made by Saint Thomas Health (and its affiliates, subsidiaries, joint ventures, and/or related entities) and/or Saint Thomas Hospital from January 2011- December 2012.
>
> **OBJECTION:** STH objects to this request as it seeks information that is irrelevant, beyond the scope of permissible discovery under FED. R. CIV. P. 26, and not reasonably calculated to lead to the discovery of relevant or admissible evidence regarding any allegation in the Complaints. STH also objects to this request as seeking information that is not in STH's possession, custody, or control. STH further objects to this request as seeking electronically stored information, without appropriately limited time constraints, that is not reasonably accessible due to undue burden or cost, and this burden and expense outweighs any likely benefit of the requested information.
>
> **RESPONSE:** Subject to and without waiving the foregoing objections, no responsive documents were located.

Saint Thomas Health owns and operates five major hospitals throughout middle Tennessee, including Saint Thomas Hospital, the specific entity that is a defendant in this lawsuit.[43] The Saint Thomas Clinic defends its actions of procuring the cheapest drug available for use in its patients based on a claim that a drug shortage existed at the time requiring procurement from a compounding pharmacy.  Although plaintiffs do not believe

---

[43] The other five hospitals are Saint Thomas Midtown, Saint Thomas Hickman Hospital, Saint Thomas Rutherford Hospital, and the Saint Thomas Hospital for Specialty Surgery.

there is any foundation for this drug shortage argument, they should be able to investigate whether other healthcare facilities in Tennessee had a problem with MPA inventories during the relevant period.  As a result, the PSC propounded the above-identified request to determine what, if any, problem Saint Thomas Health's other healthcare facilities had in procuring MPA during the relevant time period.

Although Saint Thomas Health argued this would be unreasonably burdensome, the PSC agreed, given the scope of Saint Thomas Health's operations, to limit the scope of the request to the five major hospitals within the Saint Thomas Health system.  Saint Thomas Health refused even this limited request.

Given that the Saint Thomas Clinic alleges that a drug shortage existed at the time it started doing business with NECC, the PSC should be entitled to know whether its part owner had any problem with procuring MPA.

## V.    Conclusion

For the foregoing reasons, the PSC respectfully requests that the Court compel the Saint Thomas Entities to produce:

- The marketing studies and focus group documents identified in RFPs 51-54 and 57-58;

- The managed care contracts negotiated by Saint Thomas Health on behalf of Saint Thomas Clinic requested in RFP 32; and

- Documents responsive to the MPA inventory levels of the hospitals owned and operated on behalf of Saint Thomas Health as requested in RFP 64.

September 17, 2015

Respectfully submitted,

s/ Benjamin A. Gastel
J. Gerard Stranch, IV
Benjamin A. Gastel
BRANSTETTER, STRANCH & JENNINGS
PLLC
227 Second Avenue North
Nashville, TN  37201
Telephone:  (615) 254-8801
Facsimile:  (615) 255-5419
gerards@branstetterlaw.com
beng@branstetterlaw.com

*Plaintiffs' Steering Committee and Tennessee State Chair*

Thomas M. Sobol
Kristen Johnson Parker
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Telephone:  (617) 482-3700
Facsimile:  (617) 482-3003
tom@hbsslaw.com
kristenjp@hbsslaw.com

*Plaintiffs' Lead Counsel*

Elizabeth J. Cabraser
Mark P. Chalos
Annika K. Martin
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219-2417
Telephone:  615.313.9000
Facsimile:  615.313.9965
ecabraser@lchb.com
mchalos@lchb.com
akmartin@lchb.com

*Federal/State Liaison*

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI  48075
Telephone:  (248) 557-1688
Facsimile:  (248) 557-6344
marc@liptonlawcenter.com

Kim Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue, Suite 365
Boston, MA  02116
Telephone:  (617) 933-1265
kdougherty@myadvocates.com

Patrick T. Fennell
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, VA  24016
Telephone:  (540) 342-2000
pfennel@crandalllaw.com

Mark Zamora
ZAMORA FIRM
6 Concourse Way, 22nd Floor
Atlanta, GA  30328
Telephone:  (404) 451-7781
Facsimile:  (404) 506-9223
marc@markzamora.com

*Plaintiffs' Steering Committee*

## **CERTIFICATE OF SERVICE**

I, Benjamin A. Gastel, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system.  Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Date:  September 17, 2015                                 /s Benjamin A. Gastel
                                                          Benjamin A. Gastel