August 21, 2015

**NORTON ROSE FULBRIGHT**

Norton Rose Fulbright US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
United States

**By E-mail**

Benjamin A. Gastel
Branstetter, Stranch & Jennings, PLLC
227 Second Avenue North
Nashville, Tennessee 37201

**Adam T. Schramek**
Partner
Direct line +1 512 536 5232
adam.schramek@nortonrosefulbright.com

Tel +1 512 474 5201
Fax +1 512 536 4598
nortonrosefulbright.com

Re:   New England Compounding Center MDL No. 2419

Dear Mr. Gastel:

    I write on behalf of the Saint Thomas Entities in response to your letter dated August 7, 2015.

    At the outset, I note that the Saint Thomas Entities have participated in a lengthy, expensive e-discovery process pursuant to the Court's ESI order. As you know, that order was carefully crafted to balance the interests of the parties in light of the Federal Rules' protection against fishing expeditions and undue burden. To date, the Court has not expanded the scope of discovery beyond matters relevant to any claim or defense in the litigation (as opposed to relevant to the subject matter of the litigation, which requires a court order and showing of "good cause" under FRCP 26(b)(1)). With most depositions of witnesses from Saint Thomas Health and Saint Thomas West Hospital having taken place, we believe any further e-discovery searches must overcome a heightened showing of relevance, not be merely cumulative, and, if permitted, be very narrowly tailored.

    With respect to your first request in your letter relating to "all correspondence with NECC and the Affiliated Defendants," we do not think the circumstances warrant any further e-discovery expense. First, the e-mail you point to is largely between Ameridose and an MSM employee inquiring into the ordering history of St. Thomas Hospital. None of these communications were possessed by any of my clients, so they were produced by the party from whom they should have been, MSM. The MSM employee identifies "one order of LET" that was made in January 2011. This is the same single order St. Thomas Hospital previously identified in its discovery responses. Indeed, it previously explained:

> STH did not purchase from NECC after the one-time purchase of LET solution in 2011. Martin Kelvas, Director of Pharmacy Services, decided not to use the product from NECC and decided not to purchase from NECC in the future. He did not believe supplies could be ordered from NECC, which he believed could only fulfill patient prescriptions.

54101036.3

NORTON ROSE FULBRIGHT

August 21, 2015
Page 2

*See* Saint Thomas West Hospital's Third Supplemental Objections and Answers to Plaintiffs' Steering Committee's First Set of Interrogatories, Answer to Interrogatory No. 4.

We have repeatedly objected to requests for "all correspondence" with a party as overly broad and unduly burdensome. Accordingly, there is no basis for conducting more e-discovery searches into "all members of the pharmacy department." There is nothing about this e-mail to suggest relevant documents have not been produced. However, to avoid further motion practice, we are willing to do a limited search of Mr. Roberts's e-mails from 1/1/12 to 9/30/12 using the terms "neccrx.com," "Ameridose.com," and "medicalsalesmgmt.com." Chris Roberts is the only person that St. Thomas Hospital has identified as ever having purchased from NECC (the LET solution previously discussed). This narrow search should capture any correspondence Mr. Roberts (who had a procurement role and placed the LET solution order previously disclosed) had with anyone at NECC, Ameridose or MSM during 2012.

As to managed care contracts, it is undisputed that STOPNC had a services agreement with Saint Thomas Health pursuant to which, for a fee, Saint Thomas Health negotiated managed care agreements. While we objected to your request for such agreements, we did produce exemplar agreements for Blue Cross Blue Shield. We do not believe producing all of these managed care agreements, which are highly confidential, is warranted under the circumstances. Not only have we provided written discovery requests regarding this topic, we have produced the managed care negotiator for Saint Thomas Health's joint ventures for deposition. The relevance of this issue is razor thin, and at this point, the horse is long dead. To avoid burdening the Court with this matter, we would be willing to produce a listing of all managed care agreements to which STOPNC was included via exhibit or attachment. Please let me know if this is acceptable.

With respect to STE MDL 356714-16, the spreadsheet attached to this e-mail was not produced because, as explained in the e-mail, STOPNC rates were not at issue in the rate negotiation at issue. Accordingly, the "rate comparisons for negotiations" spreadsheet does not involve or concern STOPNC and is irrelevant. However, since we produced the e-mail and in a good faith attempt to resolve as many discovery matters as possible, we are enclosing a pdf of the spreadsheet with the rates redacted. We have Bates labeled the 2-page pdf STE_MDL_034516a and STE_MDL_034516b to reflect that it follows page STE_MDL_034516 of our production.

Finally, as to the most recent round of discovery, our responses below are listed per document request, as you did in your letter.

**RFPs 51-54 and 57-58**. With respect to "brand attribute surveys," "annual surveys," "focus groups," and the "One Healing Community" advertising campaign, we have objected to producing them on multiple grounds, including relevance. Our position on this issue should be well known by now, particularly given our objections on the same issues for the recent 30(b)(6) deposition topics.

The decision to name STOPNC the Saint Thomas Outpatient Neurosurgical Center was made in the year 2000 when the entity was founded. Any brand surveys conducted in 2012 or the years leading up to 2012 are irrelevant. Moreover, several witnesses have testified regarding STOPNC's name, and we expect current and former STOPNC Board members to

August 21, 2015
Page 3

NORTON ROSE FULBRIGHT

likewise address the issue in upcoming depositions. We have located no documents prior to the formation of STOPNC that are responsive to your request.

We believe your case cite to a decision on apparent agency proves the point that these requests seek irrelevant information. At the outset, we note that the decision you cited—issued in 1917—is of questionable viability to the Plaintiffs' claims in this litigation. But even if *Pickle* were applicable to these cases, the first requirement for apparent agency that you cite is that a "principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question." None of the document requests you have made have anything to do with this issue. Stated simply, neither Saint Thomas Health nor St. Thomas Hospital has ever advertised the services offered at STOPNC. The documents sought are irrelevant to the heavy burden the PSC bears on this issue under Tennessee law. Likewise, the second element concerns what each patient knew, an issue for case-specific discovery. Curiously, you did not cite to any of the more recent cases on apparent agency in a healthcare context, which require as a third factor that the patient "relied on [the alleged] apparent authority to his or her detriment." *Boren v. Boren ex. rel Weeks*, 251 S.W.3d 426, 433 (Tenn. 2008). This issue is also one for case-specific discovery and one in which brand surveys or an after-the-fact advertising campaign could not possibly have any relevance.

**RFP 55.**

While we continue to dispute the relevancy of the information sought in this category, Howell Allen Clinic has produced the call coverage agreement between STH and Howell Allen Clinic (*see* HAC - 0000048-0000069). To the extent that you seek the same production from us for authentication purposes, we are willing to stipulate that the document produced by HAC is a true and correct copy of the on-call agreement between STH and HAC effective July 1, 2012.

**RFP 60.** We have produced to you all of the St. Thomas Hospital policies and procedures that we could locate relating to the use of compounding pharmacies. We do not believe there are any that are applicable, but for example, we produced the policies for adding drugs to the hospital's formulary. We also disagree that hospital procedures have anything to do with the standard of care at an Ambulatory Surgical Center performing limited procedures like those performed at STOPNC. As you know, ASCs are subject to vastly different regulatory requirements than hospitals. Regardless, the T-14 forms you identify have nothing to do with compounding pharmacies as they concern a drug that is needed, not the source from which it will be obtained. In an attempt to avoid an unnecessary discovery dispute, we will produce early next week examples of the T-14 forms so you can see why they have no relevance to this matter.

**RFP 61.** The employment separation agreement for Mr. Kelvas is irrelevant to this matter. You now have not only sworn interrogatory responses establishing it is not relevant, but two depositions of Dawn Rudolph (individually and as a corporate representative) detailing the reasons Mr. Kelvas was terminated and how it had nothing to do with compounding pharmacies. Accordingly, I am at a loss as to what "circumstances of his termination" you are referencing. As mentioned above, we have worked to produce all St. Thomas Hospital policies that relate to compounding pharmacies. With respect to any belief or practice Mr. Kelvas may have had regarding compounding pharmacies, we have disclosed it in interrogatory responses (for

NORTON ROSE FULBRIGHT

August 21, 2015
Page 4

example, see above) and you will be deposing him shortly on those facts. His severance agreement is irrelevant to that discussion.

**RFPs 63 and 64.**

We do not believe we provided inconsistent answers to RFPs 63 and 64. The reason Saint Thomas Health provided no answer to RFP 64 is not because it has any documents, but because the request purported to cover "affiliates, subsidiaries, joint ventures, and/or related entities." As you know, Saint Thomas Health wholly owns more than one hospital. Accordingly, we objected since we are not, for example, going to go look for MPA purchase documents at rural Tennessee hospitals. With respect to Saint Thomas Health alone, please note that we can confirm "no responsive documents were located."

I hope this resolves these matters, but please do not hesitate to contact me to further discuss.

Very truly yours,

Adam T. Schramek

cc:   Mark P. Chalos
      J. Gerard Stranch, IV

54101036.3

## Aetna rates for Current Surgery Centers

**Baptist Ambulatory Surgery Center**
**Middle TN Ambulatory Surgery Center**
**Northridge Surgery Center**
**Physicians Pavilion**



|  | 9/1/2008 | 9/1/2009<br>3% increase | 7/1/2010<br>3 % increase | 7/1/2011<br>3 % increase |
|---|---|---|---|---|
| **Effective** | | | | |
| Group 1 | $ ▮ | ▮ | ▮ | ▮ |
| Group 2 | $ ▮ | ▮ | ▮ | ▮ |
| Group 3 | $ ▮ | ▮ | ▮ | ▮ |
| Group 4 | $ ▮ | ▮ | ▮ | ▮ |
| Group 5 | $ ▮ | ▮ | ▮ | ▮ |
| Group 6 | $ ▮ | ▮ | ▮ | ▮ |
| Group 7 | $ ▮ | ▮ | ▮ | ▮ |
| Group 8 | $ ▮ | ▮ | ▮ | ▮ |
| Group 9 | $ ▮ | ▮ | ▮ | ▮ |
| Default | ▮ % of billed Charges | | | |
| Implants | ▮ % billed charges for rev codes 274, 276, 278 -> ▮ | | | |

Carve outs using asc methodology

| Code | | | | |
|---|---|---|---|---|
| 41899 | $ ▮ | ▮ | ▮ | ▮ |
| 64475 | $ ▮ | ▮ | ▮ | ▮ |
| 64476 | $ ▮ | ▮ | ▮ | ▮ |
| 64483 | $ ▮ | ▮ | ▮ | ▮ |
| 64721 | $ ▮ | ▮ | ▮ | ▮ |
| 29805-29827 | $ ▮ | ▮ | ▮ | ▮ |
| 23412 | $ ▮ | ▮ | ▮ | ▮ |
| 28285 | $ ▮ | ▮ | ▮ | ▮ |
| 28296 | $ ▮ | ▮ | ▮ | ▮ |
| 29870-29999 | $ ▮ | ▮ | ▮ | ▮ |
| 30140 | $ ▮ | ▮ | ▮ | ▮ |
| 30520 | $ ▮ | ▮ | ▮ | ▮ |
| 31255 | $ ▮ | ▮ | ▮ | ▮ |
| 31267 | $ ▮ | ▮ | ▮ | ▮ |

This is what we would like to see moved to the rates for the other centers

**Saint Thomas Surgicare**
**Baptist Plaza Surgery Center**



| Effective 1-1-2006 - no increases since contract was written | |
|---|---|
| Group 1 | $ ▮ |
| Group 2 | $ ▮ |
| Group 3 | $ ▮ |
| Group 4 | $ ▮ |
| Group 5 | $ ▮ |
| Group 6 | $ ▮ |
| Group 7 | $ ▮ |
| Group 8 | $ ▮ |
| Group 9 | $ ▮ |
| Default | $ ▮ |
| Implants/ high dollar drugs | ▮ % billed charges for rev codes 274, 276, 278 ,636 |



All CPT codes pd at 100/50/25/25 etc.