Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: NEW ENGLAND
COMPOUNDING PHARMACY,
INC. PRODUCTS LIABILITY   MDL No. 2419
LITIGATION
        Master Dkt:
        1:13-md-02419-RWZ
~~~~~~~~~~~~~~~~~~~~~
THIS DOCUMENT RELATES
TO:

All Actions

~~~~~~~~~~~~~~~~~~~~~


VIDEOTAPED DEPOSITION OF
DEBRA SCHAMBERG, R.N.

9:06 a.m.
February 4, 2015

Suite 1100
315 Deaderick Street
Nashville, Tennessee

Blanche J. Dugas, RPR, CCR No. B-2290

---

Page 2

```
 1        APPEARANCES OF COUNSEL
 2
    On Behalf of the Plaintiffs:
 3    GEORGE NOLAN, Esquire
      WILLIAM LEADER, Esquire
 4    Leader, Bulso & Nolan, PLC
      Suite 1740
 5    414 Union Street
      Nashville, Tennessee  37219-1734
 6    (615) 780-4114
      (615) 780-4122 (facsimile)
 7    gnolan@leaderbulso.com
      bleader@leaderbulso.com
 8
      J. GERARD STRANCH, IV, Esquire
 9    Branstetter, Stranch & Jennings, PLLC
      227 Second Avenue North
10    Nashville, Tennessee  37201
      (615)254-8801
11    gerards@branstetterlaw.com
12    MARK P. CHALOS, Esquire
      Lieff, Cabraser, Heimann & Bernstein, LLP
13    Suite 1650, One Nashville Place
      150 Fourth Avenue
14    Nashville, Tennessee  37219-2423
      (615) 313-9000
15    (615) 313-9965 (facsimile)
      mchalos@lchb.com
16
      DANIEL L. CLAYTON, Esquire
17    Kinnard, Clayton & Beveridge
      127 Woodmont Boulevard
18    Nashville, Tennessee  37205
      (615) 686-2501
19    (615) 297-1505 (facsimile)
      dclayton@kcbattys.com
20
21
22
23
24
25
```

---

Page 3

```
 1        ~~ APPEARANCES CONTINUED ~~
 2  On Behalf of Saint Thomas Outpatient Neurosurgical
      Center, LLC; Howell Allen, a Professional Corporation;
 3    John W. Culclasure, M.D.; Debra V. Schamberg, RN:
      CLARENCE J. "C.J." GIDEON, JR., Esquire
 4    MATTHEW CLINE, Esquire
      CHRISTOPHER TARDIO, Esquire
 5    Gideon, Cooper & Essary, PLC
      Suite 1100
 6    315 Deaderick Street
      Nashville, Tennessee 37238
 7    (615) 254-0400
      cj@gideoncooper.com
 8    matt@gideoncooper.com
      chris@gideoncooper.com
 9
      On Behalf of St. Thomas Health; St. Thomas Network;
10  St. Thomas West Hospital f/k/a St. Thomas Hospital:
      ERIC J. HOFFMAN, Esquire
11    ADAM T. SCHRAMEK, Esquire
      Norton, Rose, Fulbright
12    Suite 1100
      98 San Jacinto Boulevard
13    Austin, Texas 78701
      (512) 536-5232
14    adam.schramek@nortonrosefulbright.com
      eric.hoffman@nortonrosefulbright.com
15
      AMY D. HAMPTON, Esquire
16    Bradley, Arant, Boult & Cummings, LLP
      Suite 700, Roundabout Plaza
17    1600 Division Street
      Nashville, Tennessee  37203
18    (615) 244-2582
      (615) 252-6379 (facsimile)
19    ahampton@babc.com
20  On Behalf of Premier Orthopaedic & Sports Medicine
      Associates of Southern New Jersey, LLC d/b/a Premier
21  Orthopaedic & Sports Associates, LLC; Premier
      Orthopaedic Associates Surgical Center, LLC:
22    JAY J. BLUMBERG, Esquire
      Blumberg & Wolk, LLC
23    158 Delaware Street
      Woodbury, New Jersey 08096
24    (856) 848-7472
      (856) 848-8012 (facsimile)
25    jjblumberg@blumberglawoffices.com
```

---

Page 4

```
 1        ~~ APPEARANCES CONTINUED ~~
 2  On Behalf of UniFirst Corporation:
      JIM REHNQUIST, Esquire
 3    KATE E. MACLEMAN, Esquire
      Goodwin Procter, LLP
 4    53 State Street, Exchange Place
      Boston, Massachusetts 02109
 5    (617) 570-1000
      (617) 523-1231 (facsimile)
 6    jrehnquist@goodwinprocter.com
      kmacleman@goodwinprocter.com
 7
 8  On Behalf of Specialty Surgery Center - Crossville,
      PLLC; Kenneth R. Lister, M.D.; Kenneth R. Lister,
 9  M.D., PC:
      MEGAN A. CARRICK, Esquire
10    Brewer, Krause, Brooks, Chastain & Burrow, PLLC
      Suite 2600
11    611 Commerce Street
      Nashville, Tennessee  37203
12    (615)256-8787
      (615)256-8985 (facsimile)
13    mcarrick@bkblaw.com
14  *The following attorneys appeared via video stream*
15    CHRISTOPHER T. CAIN, Esquire
      Scott & Cain
16    Suite 601
      550 West Main Street
17    Knoxville, Tennessee  37902
      (865) 525-2150
18    (865) 525-2120 (facsimile)
19    CLARE CARROLL, Esquire
      McCarthy, Bouley & Barry, PC
20    47 Thorndike Street
      Cambridge, Massachusetts 02141
21    (617) 225-2211
      (617) 225-7711 (facsimile)
22    cfc@mbblaw.com
23
24
25
```

## Page 5

```
 1        ~~ APPEARANCES CONTINUED ~~
 2    TRACY CONTE, Esquire
      The Blair Law Firm
 3    Suite 207
      5214 Maryland Way
 4    Brentwood, Tennessee  37027
      (615) 515-4492
 5    tconte@blair-law.com
 6    DUSTIN CLINT DANIEL, Esquire
      Schulman, LeRoy & Bennett, PC
 7    7th Floor
      501 Union Street
 8    Nashville, Tennessee  37219-0676
      (615) 244-6670
 9    (615) 254-5407 (facsimile)
      ddaniel@slblawfirm.com
10
      KATHERINE DENNIS, Esquire
11    Capplis, Connors & Carroll, PC
      Suite 220
12    18 Tremont Street
      Boston, Massachusetts 02108
13    (617) 227-0722
14    ROBERT H. GAYNOR, Esquire
      Sloane & Walsh, LLP
15    Suite 850
      Three Center Plaza
16    Boston, Massachusetts 02108
      (617) 523-6010
17    (617) 227-0927 (facsimile)
      rgaynor@sloanewalsh.com
18
      BRANDON KULWICKI, Esquire
19    Stewart, Courington, Dugger & Dean
      Suite 200
20    1701 N. Market Street
      Dallas, Texas 75202
21    (214) 615-2025
      (214) 615-2001 (facsimile)
22    brandon@scddlaw.com
23
24
25
```

## Page 6

```
 1        ~~ APPEARANCES CONTINUED ~~
 2    JESSICA H. MEDDER, Esquire
      Janet, Jenner & Suggs, LLC
 3    Suite 165
      1777 Reisterstown Road
 4    Baltimore, Maryland  21208
      (410) 653-3200
 5    (410) 653-9030 (facsimile)
      jmedder@myadvocates.com
 6
      ROBERT YOUNG, Esquire
 7    English, Lucas, Priest & Owsley, LLP
      1101 College Street
 8    Bowling Green, Kentucky  42102-0770
      (270) 782-6500
 9    (270) 782-7782
      byoung@elpolaw.com
10
      LOUIS W. VOELKER, Esquire
11    Eichhorn & Eichhorn, LLP
      200 Russell Street
12    Hammond, Indiana 46320
      (219) 931-0560
13    lvoelker@eichhorn-law.com
14    ASHLEE A. WEBSTER, Esquire
      LeClairRyan
15    Drawer 1200
      1800 Wells Fargo Tower
16    Roanoke, Virginia 24006
      (540) 510-3000
17
      MARK ZAMORA, Esquire
18    The Orlando Firm, PC
      Suite 2600
19    5 Concourse Parkway
      Atlanta, Georgia 30328
20    (404) 373-1800
      mark@markzamora.com
21
22
23
24
25
```

## Page 7

```
 1        ~~ APPEARANCES CONTINUED ~~
 2    CHRISTOPHER WOLK, Esquire
      MELISSA BUTERBAUGH, Esquire
 3    Blumberg & Wolk, LLC
      158 Delaware Street
 4    Woodbury, New Jersey 08096
      (856) 848-7472
 5    (856) 848-8012 (facsimile)
      cwolk@blumberglawoffices.com
 6    mbuterbaugh@blumberglawoffices.com
 7    JEREMY CAIN, Esquire
      Gideon, Cooper & Essary, PLC
 8    Suite 1100
      315 Deaderick Street
 9    Nashville, Tennessee 37238
      (615) 254-0400
10    jeremy@gideoncooper.com
11    NICHOLAS DREW, Esquire
      Goodwin Procter, LLP
12    53 State Street, Exchange Place
      Boston, Massachusetts 02109
13    (617) 570-1000
      (617) 523-1231 (facsimile)
14    ndrew@goodwinprocter.com
15    BEN GASTEL, Esquire
      Branstetter, Stranch & Jennings, PLLC
16    227 Second Avenue North
      Nashville, Tennessee  37201
17    (615)254-8801
      beng@bsjfirm.com
18
      Also Present:
19    Daniel Makowski, Videographer
      Scott Butler
20
21
22
23
24
25
```

## Page 8

```
 1           INDEX OF EXAMINATION
 2    EXAMINATION                 PAGE
 3    EXAMINATION                  17
      BY MR. NOLAN
 4
      EXAMINATION                 220
 5    BY MR. SCHRAMEK
 6    EXAMINATION                 246
      BY MR. REHNQUIST
 7
      EXAMINATION                 287
 8    BY MS. CARRICK
 9           - - -
10
11        INDEX TO EXHIBITS
12    EXHIBIT   DESCRIPTION       PAGE
13
      23   Photograph           41
14
      24   Black and white photographs  43
15         of employee name tags
      25   Curriculum vitae of Debra  50
16         Schamberg, RN, CNOR
17    26   Letter from the State of  51
           Tennessee Department of
18         Health dated February 7,
           2007 to Tom Hall,
19         Administrator of the St.
           Thomas Outpatient
20         Neurosurgical Center, LLC
21    27   E-mail string RE:  New   53
           order
22    28   Excel/CSV file provided   59
           natively, Bates numbered
23         STOPNC-0003774
24    29   Spreadsheet titled STOPNC  72
           MPA Purchases 2008-2010
25
```

Page 9

1   30   Spreadsheet with invoices   73
         attached
2
3   31   E-mail from Jason Salvucci   74
         to Debra Schamberg dated
         Monday, September 27, 2010
4        RE quote with attachments
5   32   FDA document titled "The   80
         Special Risks of Pharmacy
6        Compounding"
7   33   Document titled "Drugs -   80
         2006 Limited FDA Survey of
8        Compounded Drug Products"
9   34   Google Earth photograph   88
10  35   CDC document titled "MMWR -   91
         Morbidity and Mortality
11       Weekly Report"
12  36   Clint Pharmaceuticals   98
         document Bates numbered
13       STOPNC000849 through
         STOPNC000868
14
15  37   NECC invoices Bates   104
         numbered STOPNC_0030
16       through STOPNC_0020
17  38   PSS World Medical, Inc.   106
         Invoices Bates numbered
18       STOPNC_0211 through
         STOPNC_0208
19  39   Packet of e-mail string   112
         regarding vendors
20
21  40   St. Thomas Outpatient   178
         Neurosurgical Center
22       formulary policy Bates
         numbered STOPNC_0533
23       through STOPNC_0538
24  41   St. Thomas Outpatient   181
         Neurosurgical Center, LLC
25       rules and regulations

Page 10

1   42   Saint Thomas Outpatient   185
         Neurosurgical Center
2        medication substitution,
         shortage or outage policy
3
4   43   St. Thomas Outpatient   187
         Neurosurgical Center
5        formulary drug evaluation
         request
6   44   E-mail string Bates   194
         numbered STOPNC-0003501
7
8   45   Document titled "Script   197
         STOPNC Used when Calling
9        Patients before the TN DoH
         Permitted STOPNC to Mention
10       Fungal Meningitis and the
         NECC Recall"
11  46   Photograph Bates numbered   201
         STOPNC_0770
12
13  47   Photograph Bates numbered   202
         STOPNC_0773
14  48   Photograph Bates numbered   203
         STOPNC_0784
15
16  49   Photograph Bates numbered   204
         STOPNC_0785
17  50   Photograph Bates numbered   204
         STOPNC_0775
18
19  51   E-mail from Clint   205
         Pharmaceuticals to Debra
20       Schamberg dated Thursday,
         October 4, 2012 regarding
21       Clint Pharmaceuticals NOT
         linked to Fatal Meningitis
22       Outbreak
23  52   Affidavit   207
24  53   St. Thomas Outpatient   229
         Neurosurgical Center
25       medication errors policy

Page 11

1   54   St. Thomas Outpatient   233
         Neurosurgical Center
2        infection prevention and
         control plan CY 2012
3
4   55   E-mail string regarding   267
         correction action plan and
         protocols Bates numbered
5        STE_MDL_014343
6   56   St. Thomas Outpatient   269
         Neurosurgical Center
7        injection practice
         guidelines
8
9   57   E-mail from Debra Schamberg   283
         dated Thursday, September
         6, 2012 regarding Aug stats
10
11       (Original Exhibits 23 through 57 have
         been attached to the original transcript.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 12

1        Videotaped Deposition of Debra Schamberg, R.N.
2              February 4, 2015
3            VIDEOGRAPHER:  Here begins Tape No. 1
4    in the videotaped deposition of Debra
5    Schamberg, RN, taken in the matter of New
6    England Compounding Pharmacy, Inc. product
7    liability litigation.  This deposition is
8    being held at 315 Deaderick Street,
9    Nashville, Tennessee 37238 on February 4th
10   of 2015 and the time is 9:06 a.m.
11           My name is Daniel Makowski.  I'm the
12   video technician.  The court reporter today
13   is B.J. Dugas.  Would counsel please
14   introduce yourselves for the record and
15   state whom they represent and the court
16   reporter will then swear in the witness.
17           MR. NOLAN:  George Nolan asking
18   questions on behalf of the PSC.
19           MR. STRANCH:  I'm Gerard Stranch
20   asking questions on behalf of the PSC.
21           MR. CHALOS:  I'm Mark Chalos on
22   behalf of the plaintiffs.
23           MR. LEADER:  Bill Leader on behalf of
24   the plaintiffs.
25           MR. CLAYTON:  Daniel Clayton on

Page 13

1  behalf of the plaintiffs.
2      MR. SCHRAMEK:  Adam Schramek on
3  behalf of the St. Thomas entities.
4      MR. HOFFMAN:  Eric Hoffman on behalf
5  of the St. Thomas entities.
6      MS. HAMPTON:  Amy Hampton on behalf
7  of the St. Thomas entities.
8      MR. BLUMBERG:  Jay Blumberg on behalf
9  of the Premier defendants.
10     MS. CARRICK:  Megan Carrick on behalf
11 of Dr. Lester.
12     MR. REHNQUIST:  Jim Rhenquist,
13 UniFirst.
14     MS. MACLEMAN:  Kate MacLeman,
15 UniFirst.
16     MR. TARDIO:  Chris Tardio for the
17 Tennessee clinic defendants.
18     MR. CLINE:  Matt Cline for the
19 Tennessee clinic defendants.
20     MR. GIDEON:  C.J. Gideon for Debbie
21 Schamberg and all the other Tennessee
22 clinic defendants.
23     MR. NOLAN:  Could the lawyers on the
24 phone please introduce themselves.
25     MR. GAYOR:  Robert Gaynor on behalf

Page 14

1  of the individual defendants and FCC
2  related.
3      MS. MEDDER:  This is Jessica Medder
4  on behalf of the plaintiffs.
5      MR. NOLAN:  Could the last person
6  please repeat that.
7      MS. WEBSTER:  Ashley Webster.
8      MR. YOUNG:  This is Bob Young. I
9  represent several of the Tennessee
10 plaintiffs.
11     MS. MEDDER:  This is Jessica. Did
12 you hear me? I wasn't sure.
13     MR. NOLAN:  We did not.
14     MS. MEDDER:  Okay. Jessica Medder on
15 behalf of the plaintiffs.
16     MR. GIDEON:  George, before you get
17 started, who was it that entered an
18 appearance on behalf of the NECC
19 defendants?
20     MR. NOLAN:  I don't know. Could the
21 lawyer for the --
22     MR. GAYNOR:  Robert Gaynor on behalf
23 of the individual defendants for NECC.
24     VIDEOGRAPHER:  Just a moment before
25 we get started.

Page 15

1      MS. CRAIG:  Yvonne Craig, St. Thomas
2  entities.
3      VIDEOGRAPHER:  I'm getting some
4  unpleasant audio artifacts. That's usually
5  caused by cell phones on or near wires. If
6  you would please remove those devices from
7  those areas. Thank you.
8      MR. NOLAN:  I'd like the record to
9  also reflect that Scott Butler is present.
10     Is there anybody else who has not yet
11 introduced themselves?
12     MS. CRAIG:  Matt, is that you?
13     MR. CLINE:  That's George Nolan.
14     MS. CRAIG:  Hello? I want to be sure
15 that you can hear me. This is Yvonne
16 Craig.
17     MR. NOLAN:  Yvonne, this is George
18 Nolan. We can hear you loud and clear.
19 Thank you.
20     MS. KWAIG:  Thank you, George.
21     MR. NOLAN:  You're welcome.
22     MS. MEDDER:  It's actually a little
23 difficult to hear you. Maybe it will
24 become easier once everyone starts talking.
25 I don't know if there's a way to increase

Page 16

1  your volume for people in the room.
2      MS. CRAIG:  Okay. I won't have much
3  to say. I wanted to know is there any
4  other numbers to dial in? This is a 615
5  number.
6      MR. CLINE:  No, that's the only
7  number.
8      VIDEOGRAPHER:  Please turn the volume
9  off on your phones.
10     MR. NOLAN:  If everyone on the phone
11 could mute your line unless you need to say
12 something, that would be appreciated.
13 We're going to go ahead and get started.
14     MR. GIDEON:  Let's go ahead. Let's
15 go ahead. Let's have an agreement on the
16 caption. All objections except to the form
17 are reserved. Agreed?
18     MR. NOLAN:  That's standard. That's
19 fine.
20     MR. GIDEON:  Okay. And the witness
21 has not waived signature.
22     MR. NOLAN:  That would be our
23 preference as well.
24     Let's go ahead and swear the witness.
25     DEBRA SCHAMBERG,

Page 17

```
 1    having been first duly sworn, was examined and
 2    testified as follows:
 3    EXAMINATION
 4    BY MR. NOLAN:
 5        Q.    Ms. Schamberg, my name is George Nolan.  We
 6    are here to take your deposition today.  I understand
 7    this is not the first time you've ever been deposed.
 8    Is that true?
 9        A.    That is true.
10        Q.    In this litigation, I am required to
11    provide you with a copy of what's called the third
12    amended protective order of confidentiality.  I'm
13    going to give that to you now.  I'm giving that to you
14    because during the course of this proceeding, you may
15    be asked to look at documents that have been marked
16    confidential during our discovery process, and I'd
17    like to know if you're willing at your convenience to
18    review that document and be sure to treat its
19    requirements of confidentiality seriously.  Is that
20    fair enough?
21        A.    Yes, sir.
22        Q.    Okay.  Thank you.  We're going to --  you
23    understand you're under oath today; correct?
24        A.    Yes, sir.
25        Q.    And you have the same obligation to tell
```

Page 18

```
 1    the truth in response to each of my questions as you
 2    would have if we were in a courtroom and the judge was
 3    sitting next to the witness stand.  You understand
 4    that?
 5        A.    Yes, sir.
 6        Q.    And will you agree to make sure that all of
 7    your answers today are full, truthful and complete?
 8        A.    Yes, I will.
 9        Q.    If I ask you any question that you don't
10    understand, will you let me know and I'll be happy to
11    try to clear up any confusion?
12        A.    Yes, sir.
13        Q.    If I ask a question and you give me an
14    answer, I'm going to assume that you understood my
15    question.  Is that fair enough?
16        A.    Yes, sir.
17        Q.    So if you're confused about something, the
18    obligation is on you to let us know.  Fair enough?
19        A.    Fair.
20        Q.    Now, if I ask you a question and you know
21    the answer, will you promise to tell us the answer
22    that you're aware of?  In other words, you will not
23    feign a lack of memory when, in fact, you know the
24    answer.  Is that fair enough?
25        A.    Correct.
```

Page 19

```
 1        Q.    And if you don't know the answer, tell us
 2    that as well.  Fair?
 3        A.    Fair.
 4        Q.    I'd like to start with a few questions
 5    about your background.  Where are you from originally?
 6        A.    I grew up in Hendersonville, Tennessee.
 7        Q.    Okay.  And can you give us a thumbnail
 8    sketch of your education, please.
 9        A.    After graduating from high school, I
10    attended Middle Tennessee State University for two
11    years.  I married and started a family and I returned
12    to school in 1982.  I went to nursing school at
13    Tennessee State University.
14        Q.    And what professional licensures do you
15    hold?
16        A.    I'm a registered nurse.
17        Q.    You've been a registered nurse for how
18    long?
19        A.    Since 1984.
20        Q.    And when you became a registered nurse in
21    1984, where did you begin working?
22        A.    Westside Hospital.
23        Q.    How long did you work there?
24        A.    Until 1987.
25        Q.    What did you do next?
```

Page 20

```
 1        A.    I had a child.
 2        Q.    Did you take some time off in connection
 3    with that?
 4        A.    A few months.
 5        Q.    All right.  And where did you work after
 6    Westside Hospital?
 7        A.    It was a surgery -- Parkside Surgery
 8    Center.
 9        Q.    Okay.  How long did you work there?
10        A.    A few months.
11        Q.    What did you do next?
12        A.    I went to work for CNA Insurance.
13        Q.    What did you do for that insurance company?
14        A.    Obtained medical information for clients
15    applying for disability and life insurance.
16        Q.    How long did you do that?
17        A.    Until 1990, I believe.
18        Q.    And what did you begin doing in 1990?
19        A.    I went to work for Parkview Hospital.
20        Q.    What did you do for Parkview?
21        A.    I was an OR nurse.
22        Q.    Have you ever worked in a pharmacy?
23        A.    Not a true pharmacy.
24        Q.    Well, what other type of pharmacy is there?
25        A.    Well, working with the pharmacist in the
```

Page 21

```
 1   OR.
 2       Q.   Okay.  Well, was there a pharmacy in the
 3   OR?
 4       A.   Yes.
 5       Q.   Okay.  So have you worked in a pharmacy?
 6       A.   Not inside the pharmacy.
 7       Q.   Okay.  So you have never worked in a
 8   pharmacy; is that true?
 9       A.   That is -- not inside the pharmacy.  No,
10   sir, I have not.
11       Q.   All right.  So after working as an OR nurse
12   at Parkview, what did you do next?
13       A.   I worked with them until 2000.
14       Q.   Then what did you do?
15       A.   I went to work for Howell Allen Clinic.
16       Q.   I understand that the name of the Howell
17   Allen Clinic was different at that point in time; is
18   that correct?
19       A.   That is correct.
20       Q.   What was the name of that company at that
21   time?
22       A.   Neurological Surgeons.
23       Q.   And so when you went to work with the
24   entity which is now the Howell Allen Clinic in 2000,
25   what was your job?
```

Page 22

```
 1       A.   I went to work as a staff nurse at the St.
 2   Thomas Outpatient Neurosurgical Center.
 3       Q.   And what were your duties as a staff nurse
 4   with that organization?
 5       A.   I worked as a circulator and as a scrub
 6   nurse.
 7       Q.   How long did you do that?
 8       A.   Until 2005.
 9       Q.   What changed in 2005?
10       A.   We moved the surgery portion to the north
11   tower at Baptist.
12       Q.   So am I correct in understanding that from
13   2000 to 2005, at the St. Thomas Outpatient
14   Neurosurgical Center, there were actual neuro --
15   neurosurgery actually occurred at that facility; is
16   that true?
17       A.   That is true.
18       Q.   Okay.  And were epidural steroid injections
19   also given at the St. Thomas Outpatient Neurosurgical
20   Center during that period of time?
21       A.   Yes, they were.
22       Q.   All right.  Now, the name of that entity is
23   somewhat of a mouthful, and during the course of the
24   deposition, I'm likely to refer to it as St. Thomas
25   Neurosurgical.  So if I say St. Thomas Neurosurgical,
```

Page 23

```
 1   will you understand that I'm referring to the St.
 2   Thomas Outpatient Neurosurgical Center?  Fair enough?
 3       A.   Okay.
 4       Q.   And so if I understand your testimony, it
 5   was in 2005 that St. Thomas Neurosurgical began to
 6   focus on pain management as opposed to neurosurgery
 7   and specifically began to focus on providing patients
 8   with epidural steroid injections; is that correct?
 9           MR. GIDEON:  Objection to the form.
10           THE WITNESS:  We were doing pain
11      management at St. Thomas Outpatient
12      Neurosurgical Center prior to 2005.
13       Q.   (By Mr. Nolan)  All right.  So would it be
14   fair for me to say that St. Thomas Neurosurgical has
15   been in the pain management business since 2000?
16       A.   I believe that's correct.
17       Q.   But in 2005, it began to focus almost
18   exclusively on epidural steroid injections; is that
19   correct?
20       A.   That is correct.
21       Q.   And do you know why St. Thomas
22   Neurosurgical made that change?
23       A.   The physicians wanted to be able to do
24   their inpatient procedures so we moved to the
25   hospital.
```

Page 24

```
 1       Q.   And so in 2005, did your job title change?
 2       A.   Not -- not immediately.
 3       Q.   All right.  So what was your job title in
 4   2005 when St. Thomas Neurosurgical began to focus on
 5   providing epidural steroid injections?
 6       A.   I missed part of that.
 7       Q.   In 2005 when the change occurred such that
 8   surgery wasn't being done at this facility and rather
 9   epidural steroid injections comprised that facility's
10   business, when that change occurred, were you still a
11   staff nurse?
12       A.   Yes.
13       Q.   All right.  And what was the next job that
14   you assumed for the company?
15       A.   I became their clinical educator and
16   employee health and infection control nurse.
17       Q.   All right.  So I have clinical educator,
18   employee health and infection control nurse?
19       A.   That is correct.
20       Q.   What were your duties as a clinical
21   educator?
22       A.   To orient, help new employees, and I was in
23   charge of doing monthly in-service, any type of
24   education that was required.
25       Q.   All right.  And what about your employee
```

Page 25

1  health duties?  What were those?
2      A.   Keeping current on employees TB skin tests
3  and any type of -- if there were any needle sticks or
4  that type of thing, where to refer them to.
5      Q.   Okay.  And what about your duties as the
6  infection control nurse?
7      A.   Infection control, doing followup if there
8  were any infections, touring the facility to see if we
9  were -- just surveying the facility.
10     Q.   Okay.  Did you receive any special training
11 in order to assume responsibilities for infection
12 control?
13     A.   Yes, I did.
14     Q.   And tell us about that.
15     A.   I attended and I believe it was put on by
16 APIC, a course in St. Louis.
17     Q.   What is APIC?
18     A.   Association prevention [sic] of infection
19 control.
20     Q.   Okay.  And when did you go to that course?
21     A.   I'm not sure of the dates.
22     Q.   What would be your best estimate?
23     A.   2006, 2007.
24     Q.   Other than that particular course, did you
25 have any other special training to assume

Page 26

1  responsibilities for infection control?
2      A.   No.
3      Q.   Does infection control include infection
4  prevention?
5      A.   Yes.
6      Q.   Did any of the training that you had in the
7  course in St. Louis involve special education
8  regarding compounding pharmacies?
9      A.   Not that I recall.
10     Q.   Did you ever have any particular training
11 that focused on compounding pharmacies?
12     A.   No.
13     Q.   All right.  So how long did you serve the
14 three functions that you've mentioned:  clinical
15 education, employee health and infection control
16 nurse?
17     A.   Until I took the position as the facility
18 director at -- back at St. Thomas Outpatient
19 Neurosurgical Center.
20     Q.   Now, let me make sure I understand.  I may
21 have missed something.  When you were doing the
22 infection control nurse responsibilities, was that at
23 St. Thomas Neurosurgical or was that at another part
24 of Howell Allen Clinic?
25     A.   That was at the Center for Spinal Surgery.

Page 27

1      Q.   I see.  Okay.  And so you left St. Thomas
2  Neurosurgical for a while and went over to work at The
3  Center for Spinal Surgery; correct?
4      A.   That is correct.
5      Q.   And how long did you work at The Center for
6  Spinal Surgery?
7      A.   In 2009 I took the position at the St.
8  Thomas Outpatient Neurosurgical Center.
9      Q.   All right.  And so when did you start at
10 The Center for Spinal Surgery?
11     A.   When we moved there in 2005.
12     Q.   Okay.  Gotcha.  So just so the record is
13 clear, from 2000 to 2005, you were at St. Thomas
14 Neurosurgical, then from 2005 to 2009, you went over
15 to The Center for Spinal Surgery, and then in 2009,
16 you went back to St. Thomas Neurosurgical.  Do I have
17 that straight, so to speak?
18     A.   That is correct.
19     Q.   And so when you went back to St. Thomas
20 Neurosurgical in 2009, what was your position?
21     A.   I became the facility director.
22     Q.   Okay.  And who decided to appoint you the
23 facility director?  Who made that decision?
24     A.   Scott Butler and I assume the physicians.
25 I'm...

Page 28

1      Q.   And so have you continued to serve as the
2  facility director for St. Thomas Neurosurgical since
3  2009?
4      A.   Yes, I have.
5      Q.   And describe your duties as the facility's
6  director.
7      A.   I oversee the day-to-day operations of the
8  facility.
9      Q.   And what does that include?
10     A.   I oversee the whole -- the staff and the
11 running of the facility, anything that's a part of the
12 clinical side.
13     Q.   Are you an employee of Howell Allen Clinic?
14     A.   Yes, I am.
15     Q.   And are all the people who work at St.
16 Thomas Neurosurgical employees of Howell Allen Clinic?
17     A.   Yes, they are.
18     Q.   And how many people do you supervise?
19     A.   Probably -- I do have some part time so --
20 and PRN.  On a basis, usually 13.
21     Q.   And those 13 people, what types of jobs do
22 they comprise?
23     A.   I have registered nurses, LPN, medical
24 assistants and secretaries and x-ray technician.
25     Q.   Okay.  So would it be fair for me to

Page 29

1  understand that your responsibility to supervise the
2  day-to-day operations includes making sure that the
3  doctors who give epidural steroid injections have
4  everything they need in order to do their jobs; is
5  that correct?
6      A.   I rely on the staff to make sure we have
7  what is needed for the physicians.
8      Q.   But is it ultimately your responsibility to
9  make sure the staff does what they're supposed to do
10 so that the physicians have what they need to do
11 their -- do their jobs?
12     A.   Yes.
13     Q.   So you are ultimately responsibility for
14 procuring supplies, including medications; is that
15 true?
16     A.   Yes.
17     Q.   And did you receive any special training in
18 order to become a facilities director of an ambulatory
19 surgical center?
20     A.   I worked as -- in the facility since 2000
21 and have learned what is required.
22     Q.   So your training consisted of on-the-job
23 experience.  Is that what I'm hearing you say?
24     A.   Yes.
25     Q.   Would I be correct in understanding that

Page 30

1  St. Thomas Neurosurgical and Howell Allen Clinic did
2  not provide you with any special training other than
3  the on-the-job experience that you mentioned for you
4  to fulfill the role as facility director; is that
5  true?
6      A.   I -- it wasn't necessary.
7      Q.   All right.  And did you provide -- did
8  anyone provide you with any special training about how
9  to go about evaluating drug suppliers or pharmacies?
10     A.   In my 30 years of nursing, we're -- and
11 working in the OR, you're constantly doing that.
12     Q.   So I understand that your testimony is that
13 you have experience in that regard, but I guess my
14 question to you is:  Did Howell Allen Clinic or St.
15 Thomas Neurosurgical or St. Thomas Hospital or St.
16 Thomas Health ever provide you with any particular
17 training about how to evaluate a compounding pharmacy
18 or any other type of drug supplier?
19     A.   St. Thomas Hospital had nothing to do with
20 my job, first of all.  My training is ongoing.  I'm
21 not sure how to -- what you're looking for on this,
22 sir.
23     Q.   All right.  So am I correct in
24 understanding that Howell Allen Clinic and St. Thomas
25 Neurosurgical never provided you with any specialty

Page 31

1  training about how to evaluate a compounding pharmacy
2  or any other supplier of medicines; is that true?
3      A.   That was not necessary.
4      Q.   All right.  You say it wasn't necessary.  I
5  guess there may be a dispute about that in this case.
6  But I take it from your answer that it wasn't
7  necessary, but the answer is no, there was no special
8  training on that subject that was provided to you; is
9  that correct?
10     A.   There was no special training on how to do
11 an order.  That is -- just comes with the experience
12 and the supplier you're dealing with.
13     Q.   All right.  So to make sure I'm clear,
14 whether it was necessary or unnecessary, no one ever
15 sat down with you and said, "Ms. Schamberg, we want
16 you to attend a course, we want you to watch a video,
17 we want you to read a book about how to evaluate
18 compounding pharmacies or any other type of medication
19 supplier"; is that correct?
20     A.   That's correct.
21     Q.   Has your medical license ever been the
22 subject of any type of disciplinary procedure?
23         MR. GIDEON:  Objection to the form.
24         THE WITNESS:  No.
25     Q.   (By Mr. Nolan)  Who do you report to?

Page 32

1      A.   I report to my medical executive committee
2  and my governing board.
3      Q.   Who is on the medical executive committee?
4      A.   Dr. Hubbard, Jason Hubbard, Scott Butler,
5  Dr. John Culclasure, Shreka Rogers, Christy Ebert.
6      Q.   Who is Dr. Hubbard?  Did you say Jason
7  Hubbard?
8      A.   Yes.
9      Q.   Jason Hubbard.  Is he a doctor?  Is he a
10 physician?
11     A.   He is one of the neurosurgeons.
12     Q.   Okay.  And we know who Dr. Culclasure is.
13 We know who Mr. Butler is.  Shreka Rogers?
14     A.   Shreka Rogers is the business manager.
15     Q.   Does she have any type of medical license
16 or healthcare license?
17     A.   I -- I do not know.
18     Q.   And who is the last person you mentioned?
19     A.   Christy Ebert.
20     Q.   Who is she?
21     A.   She is manager of the imaging center for
22 Howell Allen.
23     Q.   What is the function of the medical
24 executive committee?
25     A.   To report the clinical operations of the

Page 33

1    facility.
2       Q.    And to report those clinical operations to
3    who?
4       A.    I report it to the committee.
5       Q.    Okay. How often do you do that?
6       A.    At least quarterly, sometimes more often.
7       Q.    And how do you do that? E-mail, face to
8    face, board meeting? How does it go?
9       A.    It's a face-to-face meeting.
10      Q.    And where do the meetings happen?
11      A.    Most of the time on the 8th floor of the --
12   in the Howell Allen office.
13      Q.    Where is that located?
14      A.    St. Thomas Medical Plaza.
15      Q.    So the meetings of -- are you saying that
16   the meetings of the St. Thomas Neurosurgical medical
17   executive committee occur on the 8th floor of the St.
18   Thomas Medical Plaza?
19      A.    Yes.
20      Q.    Okay. All right. Have you ever been the
21   subject of any type of internal disciplinary action by
22   either Howell Allen or St. Thomas Neurosurgical?
23            MR. GIDEON: That information would
24      be privileged under TCA 68-11-272 and
25      63-1-150. So if there's been any kind of

Page 34

1       internal quality improvement review, you're
2       not to discuss that.
3            THE WITNESS: Okay.
4       Q.    (By Mr. Nolan) Well -- and I'm -- at least
5    at present, I'm not asking you what was said in any
6    sort of a quality improvement meeting. My question
7    is: Have you ever been disciplined by either Howell
8    Allen Clinic or St. Thomas Neurosurgical?
9            MR. GIDEON: If there was any
10      discipline as a result of a quality
11      improvement evaluation, then that's not
12      something you should discuss. It is
13      privileged.
14           THE WITNESS: Okay.
15      Q.    (By Mr. Nolan) All right. So I think I
16   understand your lawyer's objection. If you've been
17   disciplined as a result of something having to do with
18   the quality of care, I guess you shouldn't answer the
19   question. But if you've been disciplined for any
20   other reason, I'd like you to answer the question.
21           So can you answer my question?
22      A.    I have not been disciplined.
23      Q.    At any point and for any reason; is that
24   true?
25      A.    None that I can recall.

Page 35

1       Q.    Okay. So, for example, you haven't been
2    disciplined in connection with the fungal meningitis
3    outbreak; is that true?
4       A.    That is true.
5       Q.    Have you been subjected to any sort of
6    corrective action or specialty training as a result of
7    the fungal meningitis outbreak?
8       A.    I'm not following you on this.
9       Q.    Well, have your bosses at St. Thomas
10   Neurosurgical and Howell Allen Clinic required you to
11   change anything as a result of the fungal meningitis
12   outbreak?
13           MR. GIDEON: Debbie, anything that
14      may have been done as a result of an
15      evaluation of the claims made by these
16      people that comes from a quality
17      improvement committee is not discoverable.
18      It is privileged by law. So I instruct you
19      not to share with him information that may
20      have come from a quality improvement
21      committee. All right?
22           THE WITNESS: Okay.
23           MR. GIDEON: Do you understand the
24   distinction?
25           THE WITNESS: I think.

Page 36

1            MR. GIDEON: Okay.
2       Q.    (By Mr. Nolan) Are you able to answer the
3    question?
4       A.    We did not change any procedure after the
5    meningitis outbreak.
6       Q.    Does St. Thomas Neurosurgical have a
7    quality improvement committee?
8       A.    It's part of my MEC committee.
9       Q.    Who is on the governing board of St. Thomas
10   Neurosurgical?
11      A.    Dr. Greg Lanford, Scott Butler, Bernie
12   Sherry, Craig Polkow.
13      Q.    All right. And who is Mr. Sherry?
14      A.    I believe he's CEO of St. Thomas Health
15   Services.
16      Q.    All right. In 2011 and 2012, who were the
17   members of the St. Thomas Neurosurgical board?
18      A.    Greg Lanford, Scott Butler, Dr. Dale
19   Batchelor and Alan Strauss.
20      Q.    Okay. All right. So Greg Lanford is the
21   president of Howell Allen Clinic; is that correct?
22      A.    That is correct.
23      Q.    And Scott Butler, is he the CFO of Howell
24   Allen Clinic?
25      A.    Yes.

Page 37

1    Q.    And Dale Batchelor is the chief medical
2  officer for St. Thomas Hospital; true?
3    A.    At that time, he was.
4    Q.    Okay.  At that time.  And then Alan
5  Strauss?  What was his position?  Who is he?
6    A.    He was the CFO for St. Thomas Health.
7    Q.    All right.  And so then I take it at some
8  point Mr. Polkow became the CFO of St. Thomas Health
9  and took Mr. Strauss's place; is that correct?
10   A.    That is correct.
11   Q.    Are your duties today at St. Thomas
12 Neurosurgical basically the same as they were in 2011
13 and 2012?
14   A.    Yes, they are.
15   Q.    As the facility director for St. Thomas
16 Neurosurgical, were you in part responsible for
17 helping that entity function within a particular
18 financial budget?
19   A.    I did not have to deal with the budget.
20   Q.    Were you responsible in part for paying
21 attention to the cost of the supplies you used by that
22 facility?
23   A.    Yes.
24   Q.    All right.  And who first explained to you
25 that that was part of your responsibility, to pay

Page 38

1  attention to the cost of supplies?
2    A.    That is just part of a director or
3  manager's role.
4    Q.    And were you encouraged to control cost
5  when possible?
6    A.    No.
7    Q.    So the -- your supervisors, your bosses,
8  the board and so forth, they never encouraged you to
9  control costs?
10   A.    They trusted my judgment.
11   Q.    Did you endeavor to control costs?
12   A.    Yes.
13   Q.    How were you -- how were you evaluated by
14 your superiors?
15   A.    If there was an issue, I was contacted.
16 That was...
17   Q.    Well, did you have annual evaluations, for
18 example?
19   A.    No.
20   Q.    All right.  So there was never any process
21 whereby you would be periodically evaluated by your
22 superiors and they would tell you what you're doing
23 well, how you can improve, what your pay raise might
24 be, anything like that?
25   A.    If there was an issue, we would discuss it

Page 39

1  at the MEC meeting or at the board meeting if there
2  were questions.
3    Q.    And would you typically attend meetings of
4  the St. Thomas Neurosurgical board?
5    A.    Yes.
6    Q.    All right.  And how often would you attend
7  those meetings?
8    A.    We had the meetings quarterly.
9    Q.    And where would the meetings occur?
10   A.    The meetings occurred in the board room of
11 St. Thomas Hospital.
12   Q.    All right.  And who would keep the minutes
13 for those meetings?
14   A.    I would keep the minutes.
15   Q.    Could you give us an example of when any of
16 your superiors contacted you about some sort of a
17 problem?
18   A.    There's none that I recall at the moment.
19   Q.    So you never recall ever experiencing a
20 problem in the workplace; is that your testimony?
21   A.    I cannot recall specific ones.
22   Q.    Have you ever received any accolades from
23 your superiors about the fact that you had
24 successfully been able to contain costs or save either
25 Howell Allen or St. Thomas money at some point?

Page 40

1    A.    I'm not sure what -- rephrase for me,
2  please.
3    Q.    Sure.  Have you ever gotten a pat on the
4  back or a compliment from any of your superiors
5  because you were successful in saving money for Howell
6  Allen Clinic or St. Thomas Neurosurgical?
7    A.    No.
8    Q.    Now, as I understand your testimony, St.
9  Thomas Neurosurgical is located on the St. Thomas
10 Hospital campus; is that true?
11   A.    That is true.
12   Q.    And it's on the 9th floor of one of the
13 buildings there on the campus; is that true?
14   A.    That is true.
15   Q.    And when people come to that facility to
16 receive an epidural steroid injection, I assume they
17 usually park somewhere on the campus; is that true?
18   A.    That is true.
19   Q.    All right.  And so then when they -- when
20 they come in the front door of the -- of the facility,
21 they see a sign that says St. Thomas Outpatient
22 Neurosurgical Center; is that correct?
23   A.    On the 9th floor.
24   Q.    On the 9th floor; is that correct?
25   A.    That is correct.

Page 41

1    Q.    All right.  And would I be correct that as
2  patients enter the building, they see the words "St.
3  Thomas" in a lot of different places; is that true?
4    A.    I -- yes, sir.
5    Q.    All right.  Let me make a photograph which
6  we'll make Exhibit No. 23, and ask you to tell us what
7  it is.
8          (Exhibit 23 was marked for
9  identification.)
10         MR. GIDEON:  Is this already Bates
11  stamped?
12         MR. NOLAN:  Yes.
13         MR. GIDEON:  What's the Bates number?
14         MR. NOLAN:  This is Bates No. 750,
15  STOPNC_750.
16         MR. REHNQUIST:  What's the exhibit
17  number, please?
18         MR. NOLAN:  750.
19         MR. GIDEON:  No, he asked the exhibit
20  number, not the Bates number.
21         MR. NOLAN:  This is 23.
22         MR. GIDEON:  I'm fine.  There's so
23  many people, you can just pass those down.
24  If you give us the Bates number, I'll pull
25  it up on the screen.

Page 42

1          MR. NOLAN:  That's fair enough.
2  Thank you.  That makes it easier.
3    Q.    (By Mr. Nolan)  Tell us about this exhibit.
4  What is this?
5    A.    This is the sign on the door leading into
6  the center, into the -- where they enter the waiting
7  room.
8    Q.    Okay.  And is there a reception area?
9    A.    After you go through the door into another
10  door, there is a reception area.
11   Q.    Okay.  And was there a woman named Sherri
12  DeZwaan who worked as a receptionist for a while at
13  St. Thomas Neurosurgical?
14   A.    There was a -- one of my secretaries or
15  administrative assistants, Sherri DeZwaan, was
16  employed there with me.
17   Q.    And did she work as a receptionist?
18   A.    Occasionally.
19   Q.    All right.  So she would sit at the front
20  desk and greet patients when they came in for their
21  epidural steroid injections; is that true?
22   A.    Only if she was relieving.
23   Q.    Okay.  Well, did you know that St. Thomas
24  Neurosurgical, in a sworn interrogatory response in
25  connection with this litigation, referred to Ms.

Page 43

1  DeZwaan as a receptionist?
2    A.    She did reception work.  She did
3  secretarial work.  She did front desk work.
4    Q.    All right.  So do you know why St. Thomas
5  Neurosurgical attached the label receptionist to Ms.
6  DeZwaan?
7    A.    I think some of that is just a graphic of
8  words.  It's not -- she did play receptionist at some
9  times and she had multiple duties.  That was just one
10  of the words we use to describe her.
11   Q.    Okay.  Let me give you a group of documents
12  that we're going to make Exhibit No. 24.  And the one
13  on top is Bates numbered STOPNC_940.  I'm going to
14  hand that to you now.  And I'm going to ask you if
15  this appears to be a photocopy of the name tags of the
16  people who worked in St. Thomas Neurosurgical, with
17  Ms. DeZwaan's name tag on top?
18         (Exhibit 24 was marked for
19  identification.)
20         MR. GIDEON:  You need to listen to
21  his question before you start looking at
22  the documents.  Did you understand what he
23  said?
24         THE WITNESS:  Yes, this is Sherri
25  DeZwaan.

Page 44

1          MR. GIDEON:  There's more to it than
2  that.  Ask the question again.
3          MR. NOLAN:  Sure.  I'll be happy to.
4    Q.    (By Mr. Nolan)  And to make sure we
5  understand what you just said, Sherri DeZwaan's name
6  tag is on top of the stack I've handed you as
7  Exhibit 24; is that correct?
8    A.    That is correct.
9    Q.    All right.  And look through the remainder
10  of that and tell us whether this appears to be the
11  name tags of people who worked at St. Thomas
12  Neurosurgical.
13         Let's just take it one at a time if we
14  could.  Sherri DeZwaan is on top and then a man named
15  Art Arcinas is the second?
16   A.    Arcinas.
17   Q.    Did he work there?
18   A.    Yes, he did.
19   Q.    And then Royal Barrow, did he work there?
20   A.    Yes, he did.
21   Q.    All right.  And then Julie Coleman, did she
22  work there?
23   A.    Yes, she did.
24   Q.    All right.  And then Bobbi Doty, did she
25  work there?

Page 45

```
1    A.    Yes.
2    Q.    What's her job?
3    A.    During that time period or at the present?
4    Q.    During that time period, 2011 and 2012.
5    A.    She worked in the -- with pain -- in the
6  pain clinic and she was also a scheduler.
7    Q.    All right.  And Renae Ferguson, did she
8  work there?
9    A.    Yes.
10    Q.    What about Linda Forrest apparently?
11    A.    Yes.
12    Q.    Okay.  And Dawn Hall, did she work there?
13    A.    Yes.
14    Q.    Okay.  Greta Hallman, did she work there?
15    A.    Yes.
16    Q.    And Sandy Littleton, did she work there?
17    A.    Yes.
18    Q.    What was her job?
19    A.    She was a staff nurse.
20    Q.    All right.  Christine Mayhew, did she work
21  there?
22    A.    Yes.
23    Q.    Cindy McLendon, did she work there?
24    A.    Yes.
25    Q.    What was her job?
```

Page 46

```
1    A.    She's a staff nurse.
2    Q.    Rhonda McNally?
3    A.    Yes.
4    Q.    Dot Pemerton?
5    A.    Yes.
6    Q.    Dawn Woodard?
7    A.    Yes.
8    Q.    There's you, Ms. Schamberg; correct?
9    A.    Correct.
10    Q.    All right.  And then we have Dr.
11  Culclasure; is that correct?
12    A.    That is correct.
13    Q.    And, now, Ms. DeZwaan's name tag on top
14  says at the top of the name tag St. Thomas Hospital.
15  Do you see that?
16    A.    Yes.
17    Q.    All right.  Why is that?  Why does it say
18  St. Thomas Hospital above St. Thomas Outpatient
19  Surgery Center?
20    A.    I am assuming because she's at the St.
21  Thomas office for the Howell Allen Clinic.
22    Q.    Okay.  So am I correct that if a patient
23  walked into the St. Thomas Outpatient Neurosurgical
24  Center, they may have been greeted by Ms. DeZwaan as a
25  receptionist at the front desk and they would have
```

Page 47

```
1  been able to see this name tag that she would have
2  affixed to her shirt or blouse in some way; is that
3  true?
4    A.    That is true.
5         MR. SCHRAMEK:  Objection to form.
6    Q.    (By Mr. Nolan)  And did the Howell Allen
7  Clinic ask Ms. DeZwaan to wear a name tag like this so
8  that patients would understand that St. Thomas
9  Neurosurgical was actually a part of St. Thomas
10  Hospital?
11         MR. SCHRAMEK:  Objection to form.
12         THE WITNESS:  No.
13    Q.    (By Mr. Nolan)  Was there any signage
14  posted in St. Thomas Neurosurgical designed to inform
15  patients that St. Thomas Neurosurgical was somehow
16  separate from St. Thomas Hospital and St. Thomas
17  Health?
18    A.    I -- not necessary.  Our name says who we
19  are.
20    Q.    There may be a dispute about whether it's
21  necessary, but my question is:  Was there any signage
22  designed to inform patients that St. Thomas
23  Neurosurgical was somehow separate from St. Thomas
24  Hospital and St. Thomas Health?
25    A.    No.
```

Page 48

```
1    Q.    And why does Ms. DeZwaan's name tag not
2  include Howell Allen if it was supposed to designate
3  that she worked at Howell Allen Clinic St. Thomas
4  office?
5    A.    I cannot answer that.
6    Q.    Who would know that?
7    A.    That would be -- the name tags come from
8  human resources.
9    Q.    All right.  And who in human resources
10  should we contact?
11    A.    Marlese Allen.
12    Q.    Marlese Allen?
13    A.    Correct.
14    Q.    Who does she work for?
15    A.    She works for Howell Allen Clinic.
16    Q.    And Ms. DeZwaan, was her employer -- who
17  was her employer?  Who did she get her paycheck from?
18    A.    Howell Allen Clinic.
19    Q.    Was that true for everyone who worked in
20  the facility?
21    A.    That is true.
22    Q.    What is your understanding of how many
23  people died after receiving epidural steroid
24  injections at St. Thomas Neurosurgical?
25    A.    There were 13.
```

Page 49

1    Q.    What's your understanding of how many
2  people suffered fungal meningitis infections in
3  addition to the ones who died after receive -- after
4  receiving those injections -- epidural steroid
5  injections at that particular clinic?
6    A.    I don't have the exact number.
7    Q.    Are there any neurosurgeons who currently
8  work at St. Thomas Neurosurgical?
9    A.    All of the neurosurgeons have consulting
10  privileges.
11    Q.    Right, I understand that.  But are there
12  any of them that actually provide treatment to
13  patients at St. Thomas Neurosurgical now?
14    A.    No.
15    Q.    All right.  And so why is it that that
16  entity is licensed as an ambulatory surgery center,
17  but there are no neurosurgeons who actually treat
18  patients there?
19    A.    We operate as an ambulatory surgery center.
20  We follow all of the regulations for an ambulatory
21  surgery center.
22    Q.    Even though neurosurgeons don't perform
23  surgery there; is that correct?
24    A.    That is correct.
25    Q.    In addition to epidural steroid injections,

Page 50

1  are there any other types of procedures that were
2  performed at St. Thomas Neurosurgical in 2011 and
3  2012?
4    A.    Denervations and stem trial.
5    Q.    Stem what?
6    A.    Stem trials.
7    Q.    Denervations and stem trials?
8    A.    Correct.
9    Q.    What's a stem trial?
10    A.    Patients that are being evaluated for a
11  spinal cord stimulator.
12    Q.    And what is a denervation?
13    A.    It's a burning of the ancillary nerve
14  that's causing the pain.
15    Q.    And I take it -- well, let me do this,
16  before we move to a different area, let me hand you a
17  document which we'll make Exhibit No. 25, which is
18  Bates number STOPNC_408.  And let me just ask you if
19  this is a copy of your resumé?
20            (Exhibit 25 was marked for
21        identification.)
22            THE WITNESS:  Yes, it is.
23    Q.    (By Mr. Nolan)  And has St. Thomas
24  Neurosurgical ever been found by the Department of
25  Health to have any particular deficiencies or

Page 51

1  problems?
2    A.    We have been surveyed by the Department of
3  Health.  Yes, there are -- there were minor issues.
4    Q.    All right.  Let me -- let me hand you a
5  document that we'll make Exhibit No. 26, which is
6  actually St. Thomas entities 3668.  Let me hand this
7  to you and let you tell us what that is.
8            (Exhibit 26 was marked for
9        identification.)
10            MR. CLINE:  George, do you have
11        another copy of that?
12            MR. NOLAN:  Yes.
13            MR. GIDEON:  Let me see the date.
14  2007?
15            THE WITNESS:  Uh-huh (affirmative).
16            MR. REHNQUIST:  Sorry, George, what
17        was this exhibit number?
18            MR. NOLAN:  This would be 26.
19            THE WITNESS:  Now, what was your
20  question again, sir?
21    Q.    (By Mr. Nolan)  What is this?
22    A.    This is a letter from the State Department
23  of Health and Regulations.
24    Q.    Okay.  Do you recall this letter?
25    A.    No, sir.

Page 52

1    Q.    It talks about an enclosed statement of
2  deficiencies.  Do you see that?
3    A.    Yes.
4    Q.    Do you know where that document is?
5    A.    No.
6    Q.    Is that something that you would expect to
7  be maintained in the files of St. Thomas
8  Neurosurgical?
9    A.    I don't know.  I was not director there at
10  that time.
11    Q.    Okay.  I understand.  Okay.  You didn't go
12  there until 2009 as director; is that correct?
13    A.    That is correct.
14    Q.    Okay.  Fair enough.
15            Would I be correct in understanding that
16  St. Thomas Neurosurgical does track the volume of
17  epidural steroid injections and other procedures that
18  it performs?
19    A.    That is correct.
20    Q.    And am I correct in understanding that in
21  the 2011 and 2012 time frame, St. Thomas Neurosurgical
22  averaged in the neighborhood of 450 to 500 epidural
23  steroid injections a month?
24    A.    I'd have to see the spreadsheet to answer
25  correctly.

Page 53

1     Q.   Well, let me -- let me hand you a document
2  that we'll make Exhibit No. 27, and this is STOPNC_889
3  and the subsequent pages.  I'll hand that to you.
4         (Exhibit 27 was marked for
5         identification.)
6         THE WITNESS:  Okay.
7     Q.   (By Mr. Nolan)  Can you tell us what that
8  is.
9     A.   This is an e-mail that I exchanged with
10  Bruce Stock of Henry Schein.
11     Q.   Okay.  And what is Henry Schein?
12     A.   It's a supplier of medical supplies.
13     Q.   Okay.  And this is an e-mail dated in
14  July 2011; is that correct?
15     A.   Correct.
16     Q.   And at that time, you tell Mr. Stock that
17  "We average 450 to 500 procedures a month."  Do you
18  see that?
19     A.   Yes.
20     Q.   And are those procedures epidural steroid
21  injections?
22     A.   Yes.
23     Q.   And then you give him a list of medications
24  about which you are apparently making pricing
25  inquiries; is that right?

Page 54

1     A.   That is correct.
2     Q.   And is inquiring about price one of the
3  ways that you would help Howell Allen Clinic control
4  the costs at St. Thomas Neurosurgical?
5     A.   Well, yes.
6     Q.   Okay.  And so -- and you indicate that
7  you-all used 500 to 700 vials of either Depo-Medrol or
8  methylprednisolone, 80 milligrams a month; is that
9  correct?
10     A.   That is correct.
11     Q.   So does that refresh your memory about
12  generally how many procedures that you were doing at
13  that period of time?
14     A.   Yes, that seems correct.
15     Q.   What -- would I be correct in understanding
16  that epidural steroid injections comprises the
17  overwhelming majority of revenues generated at St.
18  Thomas Neurosurgical?
19     A.   Yes, I believe it does.
20     Q.   And what percentage of revenues would you
21  estimate are attributable to epidural steroid
22  injections as opposed to some other procedure?
23     A.   Now, I don't -- I don't have the
24  percentages.  To what other procedures are we...
25     Q.   Well, you mentioned the stem trials and the

Page 55

1  denervations.
2     A.   Okay.
3     Q.   And I understand -- I'm not asking you for
4  an exact number.
5     A.   Okay.
6     Q.   And if you don't know, just say that.  But
7  my question is what's your estimate of the percentage
8  of revenues that are attributable to epidural steroid
9  injections?
10     A.   I probably -- I can't answer that for sure.
11     Q.   And St. Thomas Neurosurgical provides
12  epidural steroids to patients in exchange for money;
13  correct?
14     A.   That is correct.
15     Q.   And it's a for-profit entity, St. Thomas
16  Neurosurgical; is that correct?
17     A.   That is correct.
18     Q.   Now, you understand that a steroid, which
19  is at issue in this litigation is known as -- I might
20  mispronounce it and if I do, I apologize.  But I say
21  methylprednisolone acetate.  Have I said it correctly?
22     A.   Yes.
23     Q.   And it's abbreviated MPA; is that correct?
24     A.   That is correct.
25     Q.   Who is it that decided that St. Thomas

Page 56

1  Neurosurgical would purchase MPA from New England
2  Compounding Center, what we call NECC?
3     A.   That was -- after conferring with Dr.
4  Culclasure, it was his decision and my decision.
5     Q.   So other than you and Dr. Culclasure, were
6  there any other persons employed by Howell Allen
7  Clinic or St. Thomas Neurosurgical or any of the
8  other -- well, any other persons other than you and
9  Dr. Culclasure who made that decision?
10     A.   No.
11     Q.   Why did you and Dr. Culclasure decide that
12  St. Thomas Neurosurgical would buy MPA from NECC?
13     A.   There was a shortage of MPA.  MPA also from
14  NECC offered a true preservative-free in their
15  steroid.
16     Q.   All right.  Any other reasons?
17     A.   Those are the main reasons.
18     Q.   Price was not a primary factor; is that
19  true?
20     A.   That's true.
21     Q.   Tell us about the shortage.
22     A.   We had ordered from our other vendor and
23  were unable to get the quantity that we needed.
24     Q.   Okay.  Who was your other vendor?
25     A.   We were using Clint.

Page 57

1    Q.   Clint Pharmaceuticals?
2    A.   Clint Pharmaceuticals.
3    Q.   What is Clint Pharmaceuticals?
4    A.   It's a supplier of medication.
5    Q.   Okay. It's not a pharmacy, is it?
6    A.   No.
7    Q.   All right. Any other vendors you were
8  using?
9        MR. GIDEON: Objection to form. Just
10   for MPA or anything?
11       THE WITNESS: Yeah.
12       MR. NOLAN: MPA.
13       THE WITNESS: We previously ordered
14   from CuraScript. That's it.
15   Q.   (By Mr. Nolan) All right. At any point in
16  time before switching from Clint Pharmaceuticals to
17  NECC, did St. Thomas Neurosurgical have to close or
18  decline to schedule patients because it could not
19  obtain an adequate supply of either Depo-Medrol or
20  MPA?
21   A.   No.
22   Q.   And am I correct in understanding that
23  because of the fungal meningitis outbreak, St. Thomas
24  Neurosurgical closed for business on September 20th,
25  2012?

Page 58

1    A.   That is true.
2    Q.   All right. And am I correct in
3  understanding that immediately St. Thomas
4  Neurosurgical ordered replacement steroids; is that
5  true?
6    A.   That is true.
7    Q.   And did they order replacement steroids
8  from a supplier known as PSS; is that true?
9    A.   That's true, yes.
10   Q.   And you were in charge of that; correct?
11   A.   I do not -- I did not do the ordering of
12  that.
13   Q.   But were you ultimately in charge of
14  finding a replacement supplier of appropriate
15  steroids?
16   A.   I was not there the day they ordered the
17  replacements.
18   Q.   Okay. Did you become aware of it after
19  they did?
20   A.   Yes.
21   Q.   All right. And how long did it take the
22  replacement steroids from PSS to arrive?
23   A.   I do not know.
24   Q.   Were they there in time for you to reopen
25  on November the 1st, 2012?

Page 59

1    A.   Yes, they were.
2    Q.   Okay. And did you-all then, over the month
3  of November, begin ramping back up on your volumes of
4  epidural steroid injections, so to speak?
5    A.   It was a gradual increase.
6    Q.   All right. By the time December of 2012
7  rolled around, were you back at full force performing
8  approximately 484 epidural steroid injections that
9  month?
10   A.   No.
11   Q.   You were not?
12   A.   We were not.
13       (Exhibit 28 was marked for
14   identification.)
15   Q.   (By Mr. Nolan) Okay. Let me hand you a
16  document, Ms. Schamberg, and we're going to make this
17  Exhibit No. 28. And this is found at STOPNC_3774.
18  And can you tell us what this is.
19       Ms. Schamberg, I've asked you what --
20   A.   This is the monthly stats for the facility,
21  but I don't know the year.
22   Q.   Okay. May I see that exhibit for a moment?
23   A.   (The witness complies.)
24   Q.   Ms. Schamberg, I intended to hand you the
25  spreadsheet of the monthly stats, but our copy service

Page 60

1  has attached three pages that are not included. So
2  I'm going to remove that now and I'm going to hand it
3  back to you.
4        All right. So this appears to be monthly
5  statistics; correct?
6    A.   That is correct.
7    Q.   All right. So let's look at the months of
8  September. The outbreak first became known to you in
9  September of 2012; correct?
10   A.   That is correct.
11   Q.   And this monthly spreadsheet, this is an
12  Excel spreadsheet; is that right?
13   A.   That is correct.
14   Q.   All right. And is this a spreadsheet
15  that's maintained by St. Thomas Neurosurgical?
16   A.   Yes.
17   Q.   Who's in charge of maintaining these types
18  of spreadsheets?
19   A.   At that time, Sherri DeZwaan.
20   Q.   Okay. And did she report to you?
21   A.   Yes.
22   Q.   All right. And does she no longer work for
23  St. Thomas Neurosurgical?
24   A.   No.
25   Q.   Why did she leave?

Page 61

1    A.    She went back to work at the Howell Allen
2  Clinic.
3    Q.    Okay.
4    A.    This is not right.
5    Q.    If we look here for the September page, you
6  see it reflects that the clinic was closed it looks
7  like beginning actually September 21st.  Do you see
8  that?
9    A.    Yes.
10   Q.    And it remained closed for the rest of that
11 month; correct?
12   A.    Correct.
13   Q.    So does that indicate to you that this is
14 apparently for the year 2011?
15   A.    No.
16   Q.    All right.  Well, then look at the next --
17 I mean, excuse me.  2012.
18   A.    That would be correct.
19   Q.    All right.  And then the next page,
20 October, shows that the clinic was closed that entire
21 month; is that correct?
22   A.    That is correct.
23   Q.    And then the next page for November
24 indicates that the clinic began to open somewhat on an
25 intermittent basis in November of 2012; correct?

Page 62

1    A.    Correct.
2    Q.    And then this spreadsheet indicates that in
3  December of 2012, a total of 482 procedures were
4  performed; correct?
5    A.    This is not the spreadsheet for December of
6  2012.  This is, I'm thinking, the spreadsheet for
7  2011.
8    Q.    All right.  Well, why would -- why would
9  your company produce to us a 12-month spreadsheet that
10 appears to include September, October and November of
11 2012 and then tack on to the end of it December of
12 2011?
13   A.    The secretary many times would keep the
14 same spreadsheet, and then when the month started she
15 would just clear the entry and use the same date.
16   Q.    Do you know that's the truth -- the true
17 explanation or are you speculating?
18   A.    I know that's how she did it, but I do not
19 know on this particular document -- I -- I don't -- I
20 do not feel this is December 2012.
21   Q.    All right.  Okay.  But do you agree that to
22 someone who didn't have that type of inside knowledge,
23 it would appear that in December of 2012 482
24 procedures were performed at St. Thomas Neurosurgical?
25   A.    But it doesn't say 2012 on here, so...

Page 63

1    Q.    Right.  It's the last page of a group -- a
2  12-month spreadsheet that does include 2012 numbers;
3  is that true?
4    A.    The other dates appear to be correct.
5    Q.    All right.
6    A.    All but the December.
7    Q.    Okay.  So you're saying that every month in
8  this spreadsheet is 2012 except the last month?  Is
9  that what your testimony is?
10   A.    I would have to look at the -- it appears
11 to be that, but I can't guarantee.  But I do not --
12 I -- I do not feel the last page is 2012.
13   Q.    Are you certain about that?
14   A.    Yes.
15   Q.    All right.  Well, how many epidural steroid
16 injections were performed in December of 2012?
17   A.    I do not know.
18   Q.    What would be your best estimate?
19   A.    Maybe 200, if that many.  I don't -- I
20 don't recall.
21   Q.    All right.  And what about for January of
22 2013?
23   A.    I do not -- I don't know how many we did.
24   Q.    All right.  What about last month?
25   A.    I don't know the exact number.  It was

Page 64

1  under 400, if that's what you're asking.
2    Q.    Well, in 2013, what was -- I mean, what
3  would be your estimate of St. Thomas Neurosurgical's
4  monthly average for epidural steroid injections?
5    A.    Guesstimation would be around 300.
6    Q.    Why the difference?
7    A.    Not as many on our schedule.
8    Q.    Okay.  Would I be correct in understanding
9  that most of St. Thomas Neurosurgical's epidural
10 steroid injection patients are referred by Howell
11 Allen Clinic neurosurgeons?
12   A.    That is correct.
13   Q.    And would that be the overwhelming majority
14 of St. Thomas Neurosurgical epidural steroid
15 recipients?
16   A.    That is correct.
17   Q.    Do you know whether patients of those
18 Howell Allen Clinic neurosurgeons are ever informed
19 that Howell Allen Clinic owns part of St. Thomas
20 Neurosurgical when doctors send patients there?
21   A.    We inform the patient when they come.
22   Q.    All right.  What are you referring to?
23   A.    That Howell Allen has part ownership into
24 the St. Thomas Outpatient Neurosurgical Center.
25   Q.    And how do you do that?

Page 65

1      A.    It's on their consent when they do their
2    consent.
3      Q.    Any other method other than the consent
4    form that you convey that information to the patients?
5      A.    When we send them information regarding
6    their appointment, it is in a Howell Allen envelope.
7      Q.    Okay.  And do you also tell the patients
8    that St. Thomas has a part ownership of St. Thomas
9    Neurosurgical?
10     A.    No, not normally.
11     Q.    Any particular reason why not?
12     A.    We feel that the -- they need to know that
13   their surgeon has sent them there and has ownership
14   interest in it.
15     Q.    All right.  Now, you mentioned that you and
16   Dr. Culclasure made the decision for your clinic to
17   buy MPA from NECC, and I believe that the two reasons
18   you gave when I asked you why you made that decision
19   were shortage and the fact that NECC offered a
20   preservative-free -- offered preservative-free MPA; is
21   that correct?
22     A.    That is correct.
23     Q.    And what is the function of having
24   preservative in that particular steroid?
25     A.    I -- I can't answer.

Page 66

1      Q.    All right.  Well, did you understand that
2    the purpose of having a preservative in MPA was to
3    preserve the sterility and safety of the solution?
4      A.    You put -- there are multiple medications
5    that are preservative-free on the market.
6      Q.    That wasn't my question.  My question was:
7    Did you understand that the function of having a
8    preservative in MPA was to preserve the sterility and
9    safety of the solution?
10     A.    Yes, especially on a multidose vial.
11     Q.    And that's -- the same would be true on a
12   single-dose vial; correct?
13     A.    I cannot answer on that.  But you -- I know
14   you have preservatives for a multidose vial.
15     Q.    Well, as I understand it, your clinic was
16   providing either Depo-Medrol or generic MPA to
17   patients before you and Dr. Culclasure decided to
18   switch to NECC as your supplier of MPA in June of
19   2011; is that correct?
20     A.    We had other suppliers.
21     Q.    Right.
22     A.    Correct, we did.
23     Q.    And those other suppliers, CuraScript and
24   Clint Pharmaceutical, they were supplying at times
25   brand name Depo-Medrol which is a drug made by Pfizer;

Page 67

1    is that correct?
2      A.    Some of -- of our -- was by Pfizer, not all
3    of it.
4      Q.    Right.  Some of it was made by Pfizer;
5    correct?
6      A.    Some was made by Pfizer.
7      Q.    And where did you get the Depo-Medrol that
8    was made by Pfizer?
9      A.    CuraScript, I believe.
10     Q.    Okay.  And then in addition to the -- well,
11   the Depo-Medrol made by Pfizer had preservatives in
12   it; correct?
13     A.    It's considered preservative-free, but
14   there is a preservative in it.
15     Q.    There is a preservative in it?
16     A.    Yes.
17     Q.    And that would include single-dose vials of
18   Depo-Medrol; correct?
19     A.    That is correct.
20     Q.    And did you understand that the purpose of
21   having some preservative in those single-dose vials
22   was to preserve the sterility and safety of the
23   solution?
24     A.    I have no -- I can't answer that with
25   knowledge if that's why they put that in there.

Page 68

1      Q.    Okay.  Did you understand that when
2    preservatives are not included in the solution, that
3    germs have an increased opportunity to grow and thrive
4    in the solution?
5      A.    No.
6      Q.    Did anyone provide you any training
7    whatsoever about the purpose of having a preservative
8    in a vial of Depo-Medrol?
9      A.    No.
10     Q.    Did you and Dr. Culclasure discuss the
11   risks of switching to a preservative-free solution
12   when you decided to start buying from NECC?
13     A.    By not having the preservative in there,
14   which is an alcohol, that's better for the patient not
15   to have a true preservative-free.
16     Q.    Am I correct in understanding that when you
17   started buying these drugs from NECC, it was the first
18   time that your clinic began using preservative-free
19   MPA; is that correct?
20     A.    No.  Depo-Medrol and the other -- well, the
21   Depo-Medrol is considered preservative-free.
22     Q.    But it contains preservatives; correct?
23     A.    It says it contains alcohol.
24     Q.    Okay.  And was the same true from the
25   generic -- for the generic MPA that you were receiving

Page 69

1   from Clint Pharmaceuticals?
2     A.   Yes.
3     Q.   Okay. And who made that product?
4     A.   I don't know. Right off the top of my
5   head, I do not know.
6     Q.   Was it made by a company called TEVA?
7     A.   I know we've got -- we received some from
8   TEVA.
9     Q.   And did you receive some from TEVA from
10   Clint Pharmaceuticals?
11     A.   I do not recall.
12     Q.   Okay. Do you recall receiving some from
13   any other -- receiving generic MPA from any other
14   pharmaceutical companies in addition to TEVA?
15     A.   I don't remember.
16     Q.   But you do remember that that generic MPA
17   likewise did contain a small amount of alcohol?
18     A.   Yes.
19     Q.   Okay. And so when you decided to buy
20   medicines from NECC, that was the first time that your
21   clinic decided to purchase MPA that had zero alcohol
22   in it as a preservative; is that correct?
23     A.   That is true.
24     Q.   Okay. And did you and Dr. Culclasure
25   discuss the risk that would be posed by procuring this

Page 70

1   particular solution, this MPA from a compounding
2   pharmacy that uses zero alcohol in the solution? Did
3   you talk about those risks?
4     A.   No.
5     Q.   Did you make any effort to learn about
6   those risks?
7     A.   By not putting the alcohol in it?
8     Q.   Yes.
9     A.   No. That was not in my...
10     Q.   And so when you made this switch in June of
11   2011, would it be correct for me to understand that
12   your clinic by that point in time had given thousands
13   of epidural steroid injections using either
14   Depo-Medrol by Pfizer or generic MPA made by a
15   pharmaceutical company all of which contained small
16   amounts of alcohol as a preservative?
17     A.   That is correct.
18     Q.   Any problems?
19     A.   None that I'm aware of.
20     Q.   All right. So you've told us that you and
21   Dr. Culclasure made the decision to buy truly
22   preservative-free MPA from the compounding pharmacy
23   known as NECC. Walk us through that decision. Tell
24   us exactly how it unfolded.
25     A.   There was a shortage of steroid,

Page 71

1   Depo-Medrol. We were having trouble obtaining it. I
2   had met NECC at a seminar that I had gone to and we
3   had discussed them.
4     Q.   How did you learn about the shortage?
5     A.   When an order was placed, they -- they
6   didn't send all of it. I don't remember exactly, but
7   I did speak with them regarding this.
8     Q.   Who are you talking about?
9     A.   I spoke to Clint Pharmaceuticals.
10     Q.   Who did you talk to?
11     A.   I don't remember the person.
12     Q.   When did you talk to them?
13     A.   I don't know exactly. It was May, June. I
14   don't know. I don't know the exact date.
15     Q.   Did you talk with anybody else about this
16   purported shortage?
17     A.   I spoke with NECC.
18     Q.   Okay. Who at NECC?
19     A.   John --
20         MR. GIDEON: Try your best to
21     pronounce the last name.
22         THE WITNESS: Let's see. Notarianni.
23     Notarianni.
24     Q.   (By Mr. Nolan) All right. So other than
25   someone whose name you don't recall at Clint

Page 72

1   Pharmaceuticals and a sales representative at NECC,
2   you did not talk with anybody else about the so-called
3   shortage before you started ordering from NECC; is
4   that true?
5     A.   Not that I recall.
6     Q.   How many conversations with Clint
7   Pharmaceuticals about shortage did you have?
8     A.   I don't know.
9     Q.   Let me hand you a document we'll make
10   Exhibit No. 29. I'm going to hand you a document
11   we'll make Exhibit No. 29.
12     A.   Okay.
13     Q.   But before I do, I want to make sure we're
14   clear on one point. As I understand it, the only two
15   people who ever said anything to you about a shortage
16   were someone with Clint Pharmaceutical and the
17   gentleman, John that you mentioned with NECC; is that
18   correct?
19     A.   That's all I recall at the moment.
20         (Exhibit 29 was marked for
21     identification.)
22     Q.   (By Mr. Nolan) Let me hand you this
23   document, which is STOPNC_526, and can you tell me
24   what this is.
25     A.   It's showing the purchases from 2008 to

Page 73

1    2010 of MPA.
2        Q.   All right.  Who prepared this document?
3        A.   I do not know.
4        Q.   Okay.  And do you know why it is that St.
5    Thomas Neurosurgical produced a spreadsheet that
6    stopped at the end of 2010?
7        A.   I do not know.
8        Q.   Does that spreadsheet appear to accurately
9    reflect the quantities and the source of either
10   Depo-Medrol or generic MPA that your clinic used
11   during the 2008 through 2010 time frame?
12       A.   I -- I assume so.
13            (Exhibit 30 was marked for
14       identification.)
15       Q.   (By Mr. Nolan)  All right.  Let me hand you
16   a document that we're going to make Exhibit No. 30,
17   and this is a spreadsheet that we've prepared, and --
18            MR. GIDEON:  Is there a Bates stamp
19       number on it?
20            MR. NOLAN:  No, there's not.
21       Q.   (By Mr. Nolan)  This is --
22            MR. NOLAN:  Although --
23            MR. GIDEON:  It's never been
24       produced.
25       Q.   (By Mr. Nolan)  The first page, this is

Page 74

1    what lawyers call a data compilation.  It's our effort
2    to put on a spreadsheet information about the volume
3    and source of steroids for your clinic as reflected by
4    the invoices that were produced.  So the invoices are
5    attached and they do have Bates numbers on them.
6            And I'm not going to ask you to vouch for
7    the accuracy of the front page spreadsheet, but
8    assuming as you look at the spreadsheet that the
9    amounts reflected are true, am I right in
10   understanding that although you heard about a shortage
11   from Clint Pharmaceuticals, you did have a steady
12   supply of either Depo-Medrol or generic MPA before you
13   made the switch to NECC in June of 2011?
14       A.   I had -- yes, I did have a steady supply.
15       Q.   Fair enough.  Now, I would assume and I
16   understand that NECC provided you with some -- that
17   NECC provided you with some promotional materials
18   about their -- about the drugs that they wanted to
19   sell to you; is that correct?
20       A.   They provided me with literature regarding
21   their...
22            (Exhibit 31 was marked for
23       identification.)
24       Q.   (By Mr. Nolan)  All right.  Let me hand you
25   as the next exhibit what we're going to make Exhibit

Page 75

1    No. 31.  Let me explain what we've tried to do with
2    this exhibit.  What I've tried to do, Ms. Schamberg,
3    is to assemble all of the literature and information
4    that you-all have produced to us that apparently
5    you-all obtained from NECC and put it in one package.
6    And I'm not going to ask you to confirm that I've
7    gotten it all, but that's what we've tried to do.  And
8    I'd like to talk with you about this exhibit for a
9    minute.
10            Now, the first -- we've numbered at the
11   bottom of the pages -- we put our own numbers on there
12   so we can kind of refer to the same pages.  And the
13   first 13 pages of this exhibit, which start at
14   STOPNC_513, and go through STOPNC_525 appear to me to
15   be information which you received from a Mr. Jason
16   Salvucci of medical sales management, at least that's
17   what his e-mail address is from.  But he says he's the
18   account manager of NECC.
19            Do you see that?
20       A.   Yes.
21       Q.   And do you recall receiving that
22   information?
23       A.   No, not right off.
24       Q.   All right.  But when you received it, did
25   you review it?

Page 76

1        A.   Yes.
2        Q.   Okay.  And then if we look on the 14th
3    page, we have an e-mail from Mr. John Notarianni who
4    is indicated as the regional sales manager for medical
5    sales management representing NECC.  And it looks like
6    he sent you an e-mail on March the 25th, 2011; is that
7    correct?
8        A.   That is correct.
9        Q.   All right.  And he attached some literature
10   that goes through Page 17.  Do you see that?
11       A.   Yes.
12       Q.   All right.  And then if we look at the 18th
13   page, we have another e-mail from Mr. Notarianni
14   attaching some more information that appears to go
15   through Page 19.  Do you see that?
16       A.   Yes.
17       Q.   All right.  And then beginning at Page 20
18   through the end is a brochure from NECC that you
19   produced to us, and that document starts at
20   STOPNC_835.  Do you see that?
21       A.   Yes.
22       Q.   All right.  And so am I correct in
23   understanding that this collective exhibit that I've
24   handed you does consist of information that you
25   received from NECC at various points in time?

Page 77

```
1      A.    That would be correct.
2      Q.    And you reviewed this information before
3   you started ordering from NECC; is that true?
4      A.    That is true.
5      Q.    How many conversations did you have with
6   Dr. Culclasure regarding whether it was a good idea to
7   start ordering the truly preservative-free MPA from
8   this New England Compounding Center?
9      A.    I have no idea.
10     Q.    What would be your best estimate?
11     A.    I don't know.  I would say several.
12     Q.    Well, are you able to give us a number of
13  how many conversations or even estimate a number?
14     A.    I would say probably four, five.
15     Q.    Over what period of time?
16     A.    Probably several weeks.
17     Q.    Why did you talk to him four or five times?
18     A.    The shortage that we were having.
19     Q.    Were you concerned about the shortage?
20     A.    Yes, I was.
21     Q.    Were you concerned that if -- if you didn't
22  have enough MPA to inject into patients it could hurt
23  the company's revenues?
24     A.    Not the company's revenue.  We would not be
25  able to treat the patients for their pain.
```

Page 78

```
1      Q.    So revenue was not a concern in the least
2   when you learned about this so-called shortage; is
3   that true?
4      A.    If we can't do procedures, then I have to
5   lay off staff.  We can't take care of our patients.
6      Q.    So does that mean, yes, you were concerned
7   about revenues?
8      A.    Well, then, yes, from that aspect of it.
9      Q.    Other than Dr. Culclasure, did you speak
10  with anyone else about whether it would be wise to
11  purchase materials from NECC?
12     A.    Not that I recall.
13     Q.    Did you have any conversations with anybody
14  at St. Thomas Hospital?
15     A.    No.
16     Q.    Did you have any conversations with anyone
17  on the board of St. Thomas Neurosurgical?
18     A.    Regarding?
19     Q.    Regarding switching to NECC.
20     A.    No.
21     Q.    Did you have any conversations with any of
22  the neurosurgeons at Howell Allen Clinic?
23     A.    No.
24     Q.    And at the time you and Dr. Culclasure made
25  the decision to start purchasing this material from
```

Page 79

```
1   NECC, what was your understanding of what a
2   compounding pharmacy is?
3      A.    They just provided medication.
4      Q.    So at the time you and Dr. Culclasure made
5   that joint decision, did you know that, according to
6   the FDA, "Consumers need to be aware that compounded
7   drugs are not FDA approved.  This means that FDA has
8   not verified their safety and effectiveness."
9            Did you know that?
10     A.    I had no -- no.
11     Q.    You didn't know that.  Okay.  Did you --
12  did you do any research regarding what the FDA had to
13  say about compounding pharmacies?
14     A.    There -- no.  There was no need.
15     Q.    Okay.  Now, there may be a dispute about
16  whether there was a need to do research in that
17  regard, but the answer is you didn't do any research
18  about what the FDA had to say about compounding
19  pharmacies before you started buying this stuff from a
20  compounding pharmacy; is that true?
21     A.    That is true.  Yes, sir.
22     Q.    And so if I hand you this document that
23  we're going to make Exhibit No. 32, this is a document
24  that you did not see before you and Dr. Culclasure
25  began or authorized your clinic to purchase this
```

Page 80

```
1   material from a compounding pharmacy; is that true?
2            (Exhibit 32 was marked for
3      identification.)
4            THE WITNESS:  That is true.
5      Q.    (By Mr. Nolan)  Okay.  Did you even know
6   that information like this was available on the
7   Internet?
8      A.    There's all information available on the
9   Internet.
10     Q.    Okay.  So I take it you did not do any
11  Internet research regarding the safety or risks
12  associated with compounding pharmacies; is that true?
13     A.    That's true.  Didn't see that need.
14     Q.    All right.  And so did you talk with
15  Dr. Culclasure about whether he did any research
16  regarding the risks associated with purchasing from
17  compounding pharmacies?
18     A.    Not in regard to this.
19     Q.    All right.  Let me hand you a document that
20  we're going to make Exhibit No. 33.  And I'm going to
21  ask you if you had ever seen this document before your
22  clinic started buying this truly preservative-free MPA
23  from NECC?
24            (Exhibit 33 was marked for
25      identification.)
```

Page 81

1          THE WITNESS:  What are you asking me
2     again, sir?
3          Q.   (By Mr. Nolan)  Did you ever see this
4     document before you and Dr. Culclasure decided your
5     clinic should purchase material from NECC?
6          A.   Not that I recall.
7          Q.   Okay.  Does this appear to be a report
8     published by the FDA?
9          A.   It says it's an FDA survey.
10         Q.   Could you read the first sentence into the
11    record, please, under the executive summary.
12         A.   "Several studies including a survey
13    conducted by FDA in 2001 have reported quality
14    problems with various pharmacy compounded drugs
15    including subpotency, sub -- superpotency and
16    contamination."
17         Q.   So at the time that you and Dr. Culclasure
18    decided to start purchasing material from NECC, did
19    you understand that if these steroids were
20    contaminated, if there were germs growing in the
21    solutions and that solution was injected into the
22    epidural space of a patient's spinal column, the
23    patient could become infected and die?  Did you
24    understand that?
25         A.   Patients can die from any medication that's

Page 82

1     injected.  I'm not following you.
2          Q.   Did you understand that if you're injecting
3     a solution into the epidural space, it is particularly
4     important that that solution be safe and sterile?
5          A.   Yes.
6          Q.   And did you understand that if the solution
7     was not safe and sterile, the patient could contract a
8     disease such as meningitis and die?
9          A.   That would be true.
10         Q.   And so what did you and Dr. Culclasure do
11    in order to make sure that the solution that you were
12    ordering from NECC would be safe and sterile before
13    your clinic began injecting it into the spinal columns
14    of patients?
15         A.   NECC provided us literature showing that
16    they had met the regulations.
17         Q.   Okay.  So other than reading NECC's
18    literature and accepting it all as true, all at face
19    value, did you do anything to verify the accuracy of
20    any of NECC's statements?
21         A.   I don't do that on any of the products.
22         Q.   So is the answer no, you did nothing to
23    verify the accuracy of any of the literature provided
24    to you by NECC?
25         A.   No, I did not.  Did not feel it was

Page 83

1     necessary.
2          Q.   Did you check with any references provided
3     to you by NECC?
4          A.   No.
5          Q.   Did you check with any other customers of
6     NECC?
7          A.   No.
8          Q.   At the time you decided to purchase from
9     NECC, were you even aware of the identity of any of
10    NECC's other customers?
11         A.   I don't recall.
12         Q.   Did you contact the Tennessee Board of
13    Pharmacy to see what they had to say about NECC?
14         A.   I -- no, but I don't contact them on any
15    medicines.
16         Q.   All right.  Did you contact the
17    Massachusetts Board of Pharmacy at any time regarding
18    NECC?
19         A.   No.
20         Q.   All right.  Did you ever try to call the
21    FDA to find out information about NECC?
22         A.   No.
23         Q.   Did you ask the sales representative
24    whether NECC had ever been disciplined by either the
25    FDA or the Massachusetts Board of Pharmacy?

Page 84

1          A.   Not that I recall.
2          Q.   All right.  What questions do you recall
3     asking the NECC sales representative?
4          A.   I don't remember specific questions that I
5     asked him.  I don't remember specific questions that I
6     asked him.
7          Q.   Do you remember asking about price?
8          A.   Yes, I do.
9          Q.   Okay.  And that's the only question you
10    recall; is that correct?
11         A.   Well, no, I would have asked the
12    availability and the cost and we would have discussed
13    the preservative-free.
14         MR. NOLAN:  Why don't we take a short
15    break.
16         THE WITNESS:  Okay.
17         VIDEOGRAPHER:  We're off the record.
18    The time is 11:02 a.m. and this is the end
19    of Tape No. 1.
20         (A recess was taken.)
21         VIDEOGRAPHER:  Here begins Tape No. 2
22    in the deposition of Debra Schamberg.
23    We're back on the record and the time is
24    11:18 a.m.
25         Q.   (By Mr. Nolan)  Ms. Schamberg, before we

Page 85

1    took our break, I believe you testified that the
2    primary reasons that you and -- or that St. Thomas
3    Neurosurgical switched from Clint Pharmaceuticals to
4    NECC were the shortage that you talked about and the
5    fact that NECC offered a truly preservative-free
6    version of MPA.
7            Now I'd like to talk about all the factors.
8    What were all the factors that influenced St. Thomas
9    Neurosurgical's decision to start buying from NECC?
10       A.   There was a factor of price.  Clint
11   Pharmaceuticals increased their price drastically and
12   told me they would continue to increase it due to
13   supply and demand.
14       Q.   So as I understand your testimony, before
15   you decided to start buying from NECC, you knew that
16   Clint Pharmaceuticals was increasing its price for
17   generic MPA; is that correct?
18       A.   That's correct.
19       Q.   And it increased its price by an amount of
20   $2.49 a vial; is that true?
21       A.   I'm not sure of the exact amount, but it
22   was a substantial increase.
23       Q.   And I think when we look at some documents,
24   we'll be able to pin that down.  But am I correct in
25   understanding that the day after you learned of Clint

Page 86

1    Pharmaceuticals' price increase, you placed your first
2    order with NECC?
3        A.   I don't know for sure.  I'd have to look at
4    the dates.  I'm not...
5        Q.   But in any event, was it shortly after you
6    learned of Clint Pharmaceuticals' price increase that
7    you placed your first order with NECC?
8        A.   It wasn't mainly on the price increase.  It
9    was they did not -- couldn't guarantee me the supply
10   that I needed.
11       Q.   The question was: Did you place your first
12   order with NECC shortly after learning of Clint
13   Pharmaceuticals' price increase?
14       A.   Yes.
15       Q.   And if Clint Pharmaceuticals had told you
16   "We're going to increase our price by $2.49 a vial,"
17   but we'll have enough for you, we'll meet your need,"
18   what would you have done?
19       A.   I don't know because that wasn't the --
20   that wasn't the...
21       Q.   All right.  So we've talked about shortage,
22   preservative-free, price.  Any other factors that
23   influenced the decision?
24       A.   Nothing that's coming to mind at the
25   moment.

Page 87

1        Q.   Did you ever call the St. Thomas pharmacy
2    department to talk about whether it would be smart to
3    purchase this particular preservative-free solution
4    from NECC?
5        A.   No.
6        Q.   Did you ever ask the sales representative
7    whether NECC carried any sort of liability insurance?
8        A.   I did not.
9        Q.   Did you ask the sales representative
10   anything about whether NECC had the financial strength
11   to stand behind its products?
12       A.   No, but I don't ask any pharmaceutical that
13   question.
14       Q.   Did you investigate whether NECC had been
15   sued before?
16       A.   No.
17       Q.   Did you do any Internet research about NECC
18   specifically?
19       A.   No.
20       Q.   So you didn't Google NECC?
21       A.   Not that I recall.
22       Q.   Let me hand you a photograph that we're
23   going to make Exhibit No. 34.  And I'm going to
24   represent to you, ma'am, this is a -- a photograph
25   from Google Earth of the NECC facility at 701 Waverly

Page 88

1    Street in Framingham, Massachusetts.  It's dated
2    June 18th of 2010.  Have you ever seen any photograph
3    like this before?
4            (Exhibit 34 was marked for
5        identification.)
6            THE WITNESS:  No.
7        Q.   (By Mr. Nolan)  So you see here how there
8    appears to be a bunch of trash behind this facility?
9    Do you see that?
10       A.   Yes.
11       Q.   Okay.  So did you know when you decided to
12   purchase these sterile solutions from New England
13   Compounding Pharmacy that it actually shared a site
14   with a garbage compacting operation?
15       A.   No.
16       Q.   You did not know that.  And so I take it,
17   then, that you never endeavored to get on Google Earth
18   and check out this new vendor that you were switching
19   to; is that correct?
20       A.   That is correct.  But neither do I go on
21   and Google any other.
22       Q.   Did NECC come recommended to you by anyone?
23       A.   The freestanding ambulatory surgery center.
24       Q.   Say that again.
25       A.   FASCA.

Page 89

1      Q.    FASCA.  You're saying they recommended --
2  who at FASCA recommended you go with NECC?
3      A.    They had them at their trade show.
4      Q.    Okay.  So they were present at a trade
5  show; correct?
6      A.    Correct.
7      Q.    And they were giving out brochures like
8  some we've already exhibited here to your deposition;
9  is that correct?
10     A.    That is correct.
11     Q.    And did you understand that those brochures
12 were advertising, they were advertising their wares?
13     A.    They were providing me with the information
14 of their wares, what they have available.
15     Q.    And did you understand that those brochures
16 were advertisements?
17     A.    I don't know if I'd consider them, like, an
18 advertisement, like -- I just considered them
19 literature telling me about their products.
20     Q.    Did you understand they were advertising
21 their wares by giving you these brochures at their
22 trade shows?
23     A.    Yes.  Everyone was advertising, I guess, in
24 that sense, their wares.
25     Q.    And do you typically believe everything

Page 90

1  that is printed in an advertisement?
2      A.    It depends on the...
3      Q.    Depends on?
4      A.    The advertise -- whoever is providing me
5  the information, where I'm...
6      Q.    And you did believe everything that was
7  printed in NECC's brochures; is that correct?
8      A.    I -- correct.  I had no reason to doubt it.
9      Q.    Did you -- did you review any medical
10 literature regarding compounding pharmacies in general
11 before making the decision to purchase from NECC?
12     A.    Not that I recall.
13     Q.    Did you ever contact the CDC, Centers for
14 Disease Control and Prevention?
15     A.    Regarding?
16     Q.    Regarding compounding pharmacies.
17     A.    No.
18     Q.    And you're doing a very good job, but I
19 neglected to mention during our break, I had one
20 request by one of the defense lawyers at the end of
21 the table to ask you to speak up a little bit more.
22 So if you could do that, that would be appreciated.
23          Let me hand you a document we will mark
24 Exhibit No. 35.  And let me ask you if this appears to
25 be a publication from the CDC entitled "Morbidity and

Page 91

1  Mortality Weekly Report"?
2          (Exhibit 35 was marked for
3  identification.)
4          THE WITNESS:  That is what it says.
5      Q.    (By Mr. Nolan)  All right.  Are you
6  familiar with the Morbidity and Mortality Weekly
7  Report as a registered nurse?
8      A.    I do not read this.
9      Q.    Do you know whether anyone at -- at St.
10 Thomas Neurosurgical receives this report?
11     A.    Not that I'm aware.  I don't know.
12     Q.    Okay.  Do you know whether anyone at Howell
13 Allen Clinic receives this report?
14     A.    I have no idea.
15     Q.    In any event, did you discover the
16 existence of this report before you ordered from NECC?
17     A.    No, I did not.
18     Q.    Now, let's look at the first paragraph
19 about halfway through, you see the sentence that says,
20 "This report describes"?  Do you see the sentence that
21 starts that?
22     A.    Yes.
23     Q.    It says, "This report describes five cases
24 of fungal infection associated with contaminated drugs
25 prepared at a compounding pharmacy.  Clinicians should

Page 92

1  consider the possibility of improperly compounded
2  medications as a source of infection in patients after
3  epidural or intraarticular injections."
4          Did I read that correctly?
5      A.    Yes, you did.
6      Q.    Did you know about that phenomenon before
7  you decided to purchase from NECC?
8      A.    No.
9      Q.    So once you learned about that
10 phenomenon -- it was new information to you after the
11 outbreak for you to hear that the CDC had been
12 reporting on problems in compounding pharmacies for
13 approximately -- or approximately ten years before you
14 first ordered; is that true?
15     A.    True.
16     Q.    All right.  Were you aware that before you
17 made the decision to buy from NECC, the United States
18 Congress had conducted hearings about risks associated
19 with compounding pharmacies?
20     A.    No.
21     Q.    Before you decided to go with NECC, did you
22 talk with anybody at CuraScript?
23     A.    No.
24     Q.    Any other suppliers other than Clint
25 Pharmaceutical?

Page 93

1    A.   Not that I'm aware.  I don't remember.
2    Q.   Did you happen to see the educational
3  videos that the FDA had posted on YouTube about the
4  risks associated with compounded pharmacies before you
5  made the decision to switch?
6    A.   No.  I don't normally pull up YouTube.
7    Q.   Am I correct in understanding that the
8  clinic's decision to buy from NECC was the first time
9  that it ever ordered medications from a compounding
10  pharmacy?
11    A.   That's not correct.
12    Q.   All right.  What else had it previously
13  ordered from a compounded pharmacy?
14    A.   We had ordered ethyl -- an injection for a
15  celiac plexus block for patients.
16    Q.   An injection for a celiac plexus block?
17    A.   Uh-huh (affirmative).
18    Q.   All right.  And who did you order that
19  from?
20    A.   We've ordered from Health and Wellness
21  Compounding in Nashville, also St. Thomas Plaza
22  Pharmacy.
23    Q.   Okay.  And when you ordered those, was an
24  individual prescription used in order to acquire those
25  medicines from the compounding pharmacy?

Page 94

1    A.   I believe it was.
2    Q.   Okay.  And when you began purchasing from
3  NECC, did you understand that drugs from that
4  compounding pharmacy should only be dispensed pursuant
5  to an individual patient-specific prescription?
6    A.   No.
7    Q.   You didn't understand that?
8    A.   No.
9    Q.   You didn't understand that it should be
10  dispensed pursuant to an individual patient-specific
11  prescription, and the prescription is kind of a
12  three-party thing.  It's a relationship between a
13  physician, patient and the pharmacy.  You didn't
14  understand that?
15    A.   If NECC had needed individual prescriptions
16  or prescriptions for these, that was not discussed at
17  the time.
18    Q.   All right.  So --
19    A.   That I recall.
20    Q.   All right.  So you didn't realize that an
21  individual prescription was needed for NECC's products
22  that you were purchasing from that pharmacy; is that
23  true?
24    A.   Not at that time, did I did not.
25    Q.   All right.  Let me ask you to refer back to

Page 95

1  Exhibit No. 31.  Turn to the 10th page, if you would.
2  Now, you see Paragraph G in this information from NECC
3  that you received that reads as follows:  "The product
4  is dispensed by patient-specific prescription only.
5  There must be a specific
6  practitioner/patient/pharmacist relationship to
7  dispense to an individual patient or facility."
8        Did I read that correctly?
9    A.   Yes, you did.
10    Q.   All right.  Did you even bother to read
11  this stuff that NECC gave you before you decided to
12  purchase from NECC?
13        MR. GIDEON:  Objection to the form.
14    Q.   (By Mr. Nolan)  You can answer.
15    A.   Yes, I did.
16    Q.   All right.  Did you read Paragraph G?
17    A.   I'm sure I did.
18    Q.   So would you agree that you either knew or
19  should have known that the products that you were
20  purchasing from NECC should be dispensed by
21  patient-specific prescription only?
22    A.   If the rep told me -- did not -- we did not
23  need this, I would not have -- if he didn't require
24  it, then I did not have to supply it.
25    Q.   Okay.  So you just -- you decided to

Page 96

1  disregard Paragraph G?
2    A.   No, I did not disregard it.  He did not
3  require me to do that for him.
4    Q.   And you weren't going to do anything that
5  was not required of you by the sales rep; is that what
6  your testimony is?
7    A.   If the sales rep and the company didn't ask
8  it of me, then I did not.
9    Q.   After you made the switch to NECC, did your
10  clinic continue using Depo-Medrol made by Pfizer?
11    A.   If there -- if we had any in the facility,
12  we continued -- we used what we had.
13    Q.   Okay.  And so did some of your doctors
14  prefer using Depo-Medrol?
15    A.   None that expressed that to me.
16    Q.   Specifically did a doctor named Rachel Rome
17  frequently inject Depo-Medrol rather than the material
18  from NECC?
19    A.   She used whatever we had at the facility.
20  Sometimes she would use the words "Depo-Medrol"
21  instead of -- it was easier to type instead of
22  methylprednisolone acetate.
23    Q.   So are you saying that there were times
24  when records would be created by your facility
25  reflecting that the patient received Depo-Medrol and

Page 97

1    those records were not accurate, they, in fact, got
2    preservative-free MPA made by NECC?
3              MR. GIDEON:  Objection to the form.
4        Q.    (By Mr. Nolan)  Is that what you're
5    suggesting?
6        A.    No.
7        Q.    All right.  Well, what are you suggesting?
8        A.    I am telling you that sometimes the doctor
9    will -- it's easier, like, on a lot of things to write
10   the -- instead of writing the generic -- long generic
11   name.  They will just use the most common name that
12   something is known by.  If we didn't have Depo in
13   there, she would still dictate it as a Depo -- as an
14   interchange for methylprednisolone acetate.
15       Q.    Well, I guess my question is:  Did -- did
16   your clinic continue to have Depo-Medrol on hand while
17   it was using the material from NECC?
18       A.    No.  Like I said, if we had it in there, we
19   used all that product but did not order more
20   Depo-Medrol.
21       Q.    I understand that this MPA is part of a
22   class of drugs known as corticosteroids; is that
23   right?
24       A.    I think so.
25       Q.    And were there any FDA approved

Page 98

1    corticosteroids that were preservative-free?
2        A.    Depo-Medrol was considered
3    preservative-free.
4        Q.    But it had some alcohol in it; correct?
5        A.    It is labeled preservative-free.
6        Q.    All right.  Well, let me hand you a
7    document that we're going to make Exhibit No. 36.  And
8    I'm going to ask you -- this is a -- what appears
9    to be a Clint Pharmaceuticals brochure that begins at
10   STOPNC_849.
11             Am I right about how I characterized that
12   document, it's a Clint Pharmaceuticals brochure?
13             (Exhibit 36 was marked for
14             identification.)
15             THE WITNESS:  Yes, it is.
16       Q.    (By Mr. Nolan)  All right.  And look
17   on the -- let's see -- I think it's the third page of
18   the document.  You see -- you see the information
19   about a drug known as dexamethasone?
20       A.    Yes.
21       Q.    All right.  Is that also a corticosteroid?
22       A.    To my understanding, it is.
23       Q.    All right.  Is that one that your clinic
24   used?
25       A.    We used a dexamethasone.  I don't remember

Page 99

1    if it was from here.
2        Q.    All right.  So how long has your clinic
3    been using dexamethasone?
4        A.    That, I don't know.
5        Q.    Okay.  Was it using dexamethasone when you
6    started working there in 2009?
7        A.    I believe so.
8        Q.    Okay.  And has it continued to use it since
9    then?
10       A.    I think, yes.
11       Q.    Okay.
12       A.    I don't know who is using.
13       Q.    And so who -- does it use dexamethasone for
14   epidural steroid injections?
15       A.    Some doctors, depending on the procedures,
16   would prefer it.
17       Q.    Okay.  Who prefers it?
18       A.    I believe Dr. Rome.  I don't remember right
19   offhand.  I don't know who all used it.
20       Q.    All right.  And you see where it says under
21   dexamethasone, "The only FDA approved corticosteroid
22   that is preservative-free and particulate-free"?  You
23   see that?
24       A.    Yes.
25       Q.    Were you aware of that characteristic of

Page 100

1    dexamethasone?
2        A.    They all say preservative-free.
3        Q.    What about particulate-free?
4        A.    I -- that is --
5        Q.    What is your understanding about why some
6    doctors who give shots at St. Thomas Neurosurgical
7    prefer dethamethasone -- or dexamethasone I guess is
8    the proper way to pronounce it?
9        A.    Some of that is just physician preference.
10       Q.    Okay.  Did you ever do any price
11   comparisons between MPA from NECC and dexamethasone?
12       A.    Comparing the two prices?
13       Q.    Correct.
14       A.    No, not that I recall.
15       Q.    What is your understanding of the
16   difference between a compounding pharmacy and a
17   pharmaceutical company such as Pfizer?
18       A.    Pfizer makes all kinds of medicine and the
19   compounding is more specialized.  It's not like they
20   make thousands of medications such as Pfizer would do.
21       Q.    Do you understand that compounding
22   pharmacies are not regulated by the FDA to the same
23   degree as pharmaceutical companies such as Pfizer?
24             MR. GIDEON:  Objection to the form.
25             THE WITNESS:  No.

Page 101

1    Q.   (By Mr. Nolan)  You can answer.
2    A.   No.
3    Q.   What is your understanding of the
4  difference between how compounding pharmacies are
5  regulated and how pharmaceutical companies are
6  regulated?
7    A.   During that time period, I did not know.
8  It did not -- is wasn't necessary for me to know all
9  of that.
10   Q.   And tell me every reason why it was not
11 necessary.
12   A.   I don't -- when I order any medication or
13 any medication that comes in there, I don't do an
14 extensive research on any of it.  It's a drug that we
15 are using or -- or in need of.  It's --
16   Q.   Okay.  So during the four or five
17 conversations that you had with Dr. Culclasure, he
18 never pointed out to you, "Now, Debra, compounding
19 pharmacies are different than companies like Pfizer so
20 we need to be careful here"?  He never said anything
21 to you along those lines; is that true?
22   A.   Not that I recall.
23   Q.   Okay.  Tell me everything that you can
24 remember about those four or five conversations with
25 Dr. Culclasure.

Page 102

1    A.   I remember that we discussed the shortage
2  that we were -- of the availability of the Depo-Medrol
3  and that I had spoken with NECC.  I had met them at
4  the FASCA conference and had spoken with them on a
5  couple of occasions and this is what they had to offer
6  and can provide us with what we need.  And he looked
7  at the literature and was comfortable with it and the
8  decision was made.
9    Q.   Tell me everything that you recall
10 Dr. Culclasure saying during those four or five
11 conversations.
12   A.   Basically what we talked about.  He was
13 pleased that it was true preservative-free.
14   Q.   Did you two discuss price?
15   A.   I'm sure we did.
16   Q.   Did you talk about how much you'd save a
17 month if you went with NECC?
18   A.   I -- that doesn't -- I don't know.
19   Q.   Did you think about that fact in your mind?
20   A.   We wouldn't be -- we weren't paying any
21 cheaper than what we had been getting the -- from
22 Clint until they --
23   Q.   Increased their price?
24   A.   -- increased their price drastically.
25   Q.   All right.  What is your memory of the

Page 103

1  amount of the price increase?
2    A.   I know it went to over $8 and he said it
3  would probably go up into the $11 range per vial.
4    Q.   Did he tell you that he wouldn't be able to
5  get you enough of it?
6    A.   If I wanted to buy 2,000 vials at once.
7    Q.   Okay.  So he -- he, being the
8  representative from Clint Pharmaceuticals, told you
9  that if you want -- if you would buy 2,000 vials at a
10 time, he could meet your need; is that correct?
11   A.   He thought he could.
12   Q.   All right.  And -- but that would be at an
13 increased price?
14   A.   At a drastically increased price.
15   Q.   Well, what does drastically mean?
16   A.   I don't remember what all he had quoted me,
17 but it was supply and demand and if I would -- they
18 would supply it as long as I would buy large
19 quantities.
20   Q.   All right.  So to make sure I understand
21 your testimony, it was your information from Clint
22 Pharmaceuticals that they could meet your need, but --
23 in terms of supply if you bought 2,000 vials at which
24 you've described as a drastically increased price;
25 true?

Page 104

1    A.   For the time being, he could meet my needs.
2  I don't know for how long because there was a
3  shortage.
4    Q.   Did he give any sort of time parameters
5  when you talked to him?
6    A.   I don't remember.
7    Q.   And the fact that he indicated that you
8  could buy 2,000 vials of that stuff at one time, did
9  that not cause you to maybe ask questions about
10 whether the shortage was as real or critical as he was
11 representing?
12   A.   I had to go by what he was telling me.  We
13 order, it's back ordered, and then it's we can get it
14 and here's the crease -- increase.
15   Q.   All right.  Now, in terms of your purchases
16 from NECC, I'm going to hand you a group of documents
17 that we're going to make Exhibit No. 37, and --
18        (Exhibit 37 was marked for
19   identification.)
20        MR. GIDEON:  Give me the Bates number
21   down at the bottom.
22        MR. NOLAN:  Bates number STOPNC_30.
23   Q.   (By Mr. Nolan)  -- and let me ask you if
24 this appears to be a group of four invoices from NECC
25 to your clinic during the months of June, July and

Page 105

1 August of 2012?
2 MR. CLINE: What are the Bates
3 numbers?
4 THE WITNESS: That is correct.
5 MR. NOLAN: STOPNC_30, 27, 25 and 20.
6 Q. (By Mr. Nolan) Okay. And so these
7 invoices reflect that your clinic purchased 500 vials
8 of MPA from NECC during that three-month period; is
9 that correct? Excuse me. I've misspoke.
10 These invoices reflect that your clinic
11 purchased 2,000 vials of MPA from NECC during that
12 particular three-month period; is that true?
13 A. That is true.
14 Q. All right. Did you know that your clinic
15 was NECC's largest customer for that particular
16 product during that three-month period of time?
17 A. No, I did not.
18 Q. All right. Let's talk for a minute
19 about -- a minute more about who you purchased from
20 after the outbreak and after you discovered the
21 problem with the NECC medications. And I'm going to
22 hand you a document that we're going to make -- a
23 group of documents that we're going to make
24 Exhibit 38. And it's a group of invoices that include
25 STOPNC_209 -- excuse me -- 208 through 211.

Page 106

1 And are these invoices reflecting purchases
2 of Depo-Medrol that your clinic made after the
3 outbreak?
4 (Exhibit 38 was marked for
5 identification.)
6 THE WITNESS: Yes.
7 Q. (By Mr. Nolan) Okay. And it shows that in
8 September -- on September 24th, which I guess was four
9 days after your clinic learned of the outbreak --
10 well, let me back up.
11 Do you remember the date that your clinic
12 learned about a problem surrounding its epidural
13 steroid injections?
14 A. Yes.
15 Q. Okay. What was the date?
16 A. I was notified on the 18th of an issue with
17 a patient.
18 Q. All right. Okay. Fair enough. And so
19 this first invoice is, I guess, six days after you
20 were notified that there was a problem?
21 A. Four days after we decided to close the
22 facility because we knew something was going on.
23 Q. Okay. So -- so four days later, you
24 order it looks like 200 vials of Depo-Medrol from that
25 particular facility. Do you see that?

Page 107

1 A. Yes.
2 Q. And then if we look at the next invoice,
3 November the 19th, it appears to me that you were
4 ordering boxes of Depo-Medrol 80 milligrams that would
5 contain 25 bottles per box. Do you see that?
6 A. Yes.
7 Q. So it looks like you ordered ten boxes. So
8 you ordered another 250 vials on that particular day;
9 is that correct?
10 A. It would be 25 in a -- oh, I'm sorry. Yes.
11 Q. Okay. And then on the next page, you
12 ordered ten more 25 box vials of Depo-Medrol on
13 November the 29th for a total of 250 more; is that
14 correct?
15 A. Correct.
16 Q. All right. And then on the last invoice in
17 this stack, December the 20th, you ordered 250 more
18 vials of Depo-Medrol from the same company; is that
19 correct?
20 A. That is correct.
21 Q. All right. And did the company deliver
22 these vials of Depo-Medrol reflected in these invoices
23 as requested?
24 A. I would have to see the packing slip, but
25 I'm assuming so.

Page 108

1 Q. Okay. So you don't remember anything about
2 PSS telling you, "Oh, I'm sorry, we can't send this
3 stuff to you because there's a shortage"?
4 A. PSS was not a supplier of medication at the
5 time we were ordering in 2011.
6 Q. All right. So the question is: You do not
7 recall that PSS ever told you that they would be
8 unable to meet the orders reflected in these invoices,
9 Exhibit 38, because of a shortage, they never said
10 that to you; is that true?
11 A. No, because the shortage was over, I'm
12 assuming.
13 Q. Okay. All right.
14 MR. NOLAN: C.J., it's almost noon.
15 How about a lunch break?
16 MR. GIDEON: Stop now, come back at
17 five till 1:00. Good enough?
18 MR. NOLAN: Sounds good.
19 MR. GIDEON: Yes.
20 MR. NOLAN: Yes.
21 VIDEOGRAPHER: We're off the record.
22 This is the end of Tape No. 2 and the time
23 is 11:56 a.m.
24 (A lunch recess was taken at 11:56
25 a.m. and the deposition reconvened at 1:02

Page 109

```
1      p.m.)
2           VIDEOGRAPHER:  Here begins Tape No. 3
3      in the deposition of Debra Schamberg.
4      We're back on the record and the time is
5      11:02 p.m. -- I'm sorry -- 1:02 p.m.
6      Q.   (By Mr. Nolan) Ms. Schamberg, other than
7      Howell Allen Clinic, who refers patients to St. Thomas
8      Neurosurgical for epidural steroid injections?
9      A.   We have done probably less than five
10     procedures on patients that were not Howell Allen.
11     Q.   Over what period of time?
12     A.   Since 2009.  Since I have been there.
13     Q.   All right.  So I take it, then, in almost
14     100 percent of the patients that are seen at St.
15     Thomas Neurosurgical are Howell Allen Clinic referrals
16     except for the five that you've mentioned?
17     A.   True.  Yes.
18     Q.   Okay.  Now, you said that -- I thought I
19     heard you say that NECC was endorsed by someone at
20     some point in your deposition.  Do you recall what I'm
21     referring to?
22     A.   Yes.  At the Freestanding Ambulatory
23     Surgery Center conference.
24     Q.   How were they endorsed by that
25     organization?
```

Page 110

```
1      A.   They're allowed to come and be at the
2      vendor show.
3      Q.   Okay.  So did they have to pay -- did NECC
4      have to pay for a booth --
5      A.   That, I don't know.
6      Q.   -- at that vendor show?
7      A.   Huh-uh (negative).
8      Q.   Okay.  But you never received any sort of
9      literature or correspondence from that trade
10     organization saying "We hereby endorse NECC as an
11     approved compounding pharmacy"; is that true?
12     A.   I do not know if that was on the
13     literature, the info they sent to me or not for these
14     meetings.
15     Q.   Okay.  You don't -- certainly don't recall
16     anything like that, do you?
17     A.   Not right offhand.
18     Q.   And you never received any sort of written
19     endorsements from that trade group that you relied on
20     when you decided to purchase from NECC; is that true?
21     A.   If FASCA felt like that they weren't a
22     reputable company, they would not have allowed them to
23     be there.
24     Q.   Right.  But what I'm saying is if -- is it
25     FASFA?
```

Page 111

```
1      A.   FASCA.
2      Q.   FASCA.  Okay.
3           You never relied on any sort of written
4      endorsement from FASCA regarding NECC at the time you
5      decided your clinic should purchase from NECC; is that
6      true?
7      A.   That is true.
8      Q.   Okay.  And for all you know, the reason
9      that FASCA allowed NECC to appear at the trade show is
10     because NECC was wanting to pay for a booth at the
11     trade show?
12          MR. GIDEON:  Objection to the form.
13     Q.   (By Mr. Nolan) You can go ahead and
14     answer.
15     A.   I do not know if they charge them or what
16     they charge them.
17     Q.   But you didn't talk with anyone associated
18     with FASCA about NECC; is that true?
19     A.   That is true.
20     Q.   Ms. Schamberg, I'm going to hand you a
21     group of documents we're going to make a collective
22     exhibit, which will be Exhibit No. 47, and it's a
23     group of documents that have been produced in this
24     litigation.
25          COURT REPORTER:  You skipped some
```

Page 112

```
1      numbers.
2           MR. NOLAN:  Oh, I did?
3           COURT REPORTER:  The last one was 38.
4           MR. NOLAN:  Let's try that again.
5           COURT REPORTER:  39.
6           MR. NOLAN:  39?  Okay.  We'll make
7      that Exhibit No. 39.
8           (Exhibit 39 was marked for
9      identification.)
10     Q.   (By Mr. Nolan)  Now, Exhibit 39, what I've
11     endeavored to do is place a series of documents in
12     chronological order that have been produced.  We're
13     going to go through, we're going to talk about them.
14     We can also refer to the Bates number down at the
15     bottom of the page so that folks can know what we're
16     talking about.
17          And the first page is an e-mail from you to
18     Marlese Allen in June of 2009, and it's STOPNC Bates
19     No. 2386.  Do you see that?
20     A.   Yes, sir.
21     Q.   It says -- you're asking, "Do I have to use
22     certain vendors for ordering, question mark.  I would
23     like to do some price comparison with other vendors
24     other than Cardinal.  I'm not pleased with our
25     Cardinal rep and I know there are some hungry vendor s
```

Page 113

1    that would love our business."
2         Have I read those sentences correctly?
3    A.   Correct.
4    Q.   Okay.  And so I take it that this is you
5    trying to shop for the best price possible from
6    various vendors.  Is that a fair way for me to
7    understand this e-mail?
8    A.   I wasn't pleased with the Cardinal rep so I
9    was wanting to look at other vendors and see who could
10   meet our needs better.
11   Q.   Okay.  All right.  And you mentioned price
12   there.  Now, I take it when you were thinking about
13   switching from Cardinal, that didn't have anything to
14   do with the shortage, did it?
15   A.   No.
16   Q.   Okay.  And didn't have anything to do with
17   the desire to procure a truly preservative-free MPA,
18   did it?
19   A.   Cardinal did not supply us with MPA.
20   Q.   Okay.  All right.  What did you buy from
21   Cardinal?
22   A.   All of our -- I think all of our -- most of
23   our supplies came from them.  They were our vendor for
24   medical supplies.
25   Q.   Did you buy any medicines from Cardinal?

Page 114

1    A.   I don't remember.
2    Q.   Okay.  So you may have or you may not have,
3    you just have no recollection?
4    A.   I don't -- I don't have a recollection on
5    that, sir.
6    Q.   All right.  Would you characterize NECC as
7    a hungry vendor?
8    A.   I think any vendor is a hungry vendor.
9    Q.   All right.  If we go to the next page,
10   STOPNC_224, it's a page of handwritten notes.  You see
11   that?
12   A.   Yes, I do.
13   Q.   Whose handwriting is that?
14   A.   That is my handwriting.
15   Q.   All right.  And are those notes made during
16   the year 2010?
17   A.   It appears that way.
18   Q.   Okay.  So it looks like the first note --
19   does it appear to be dated March 10th of that year?
20   A.   Yes.
21   Q.   Okay.  And so tell us what that note means.
22   A.   Methylprednisolone, $6.66 for an 80
23   milligram bottle.
24   Q.   Okay.  Do you know who you were procuring
25   that material from at that time?

Page 115

1    A.   Not by looking at this, I do not.
2    Q.   Could you find in front of you the
3    spreadsheet that your clinic produced to us that would
4    include that time frame.  It should be one of the
5    exhibits there in front of you.  Exhibit 29.  Does
6    that price appear to correspond with Exhibit 29?
7    A.   Yes.
8    Q.   Okay.  So is this note apparently a note
9    that you made in reference to some information that
10   you gathered from CuraScript?
11   A.   I don't know if I took it from the invoice
12   or if I called them.  I don't know.
13   Q.   Okay.  Fair enough.  And why did you find
14   it necessary to make a note about that -- about the
15   price of MPA at that time?
16   A.   I try to keep notes on various things so
17   that I could remember.
18   Q.   Okay.  All right.  Was it common for to you
19   make written notes about price?
20   A.   Yes.
21   Q.   The next note is April 13th, 2010.  Could
22   you read us that note.
23   A.   "Changed account name for pain
24   management" -- PM is for pain management -- "to JWC
25   from GBL."

Page 116

1    Q.   And what's GBL mean?
2    A.   That's Dr. Lambert's.
3    Q.   I see.  When it says changed account name,
4    what does that mean?
5    A.   The name I believe was under -- was listing
6    Dr. Lanford as the -- as the person using the
7    medication, ordering the medication or may have been
8    even his DEA.  I don't know.  I don't remember.
9    Q.   Okay.  All right.  And then what's the next
10   sentence say?
11   A.   "Will give us MedAssets pricing."
12   Q.   What does that mean?
13   A.   MedAssets was the buying group that we were
14   using.
15   Q.   Okay.  And what price were you getting from
16   MedAssets?
17   A.   MedAssets is the -- is a group that you
18   belong to or a buying group.  It's not a company per
19   se.
20   Q.   Okay.  So am I correct if we look at our
21   spreadsheet that you were procuring either Depo-Medrol
22   or generic MPA from CuraScript in April of 2010?
23   A.   Correct.
24   Q.   Okay.  Do you know specifically which it
25   was?  Was it Depo-Medrol or was it generic MPA?

Page 117

1    A.    I don't -- I don't remember.
2    Q.    All right.  But is the price reflected on
3  your clinic's spreadsheet the MedAssets price?
4    A.    I'm assuming so.
5    Q.    Okay.  No reason to think otherwise;
6  correct?
7    A.    Correct.
8    Q.    All right.  The next note, May 25th of
9  2010.  What does that mean?
10   A.    It's for a minimum order fee.
11   Q.    What is that?
12   A.    If you did not order a certain amount, you
13  would be charged a minimum order fee.
14   Q.    I see.  Were you getting charged a minimum
15  order fee at that time?
16   A.    I don't know for sure.  The person ordering
17  sometimes would not order but a small quantity instead
18  of a...
19   Q.    Okay.  So the next note is dated June
20  the 10th.  Is that June the 10th of 2010?
21   A.    I'm assuming.
22   Q.    Okay.
23   A.    And it may have been just June of '10.
24   Q.    June of '10.  Okay.  Fair enough.  And read
25  us what that says.

Page 118

1    A.    "Methylprednisolone acetate backorder.
2  Using Depo-Medrol.  $7.02.  Question about when we'll
3  be off backorder."
4    Q.    So I take it from that note that the
5  generic MPA was on backorder; is that correct?
6    A.    From this note, it appears that.
7    Q.    And it -- for that reason, you were using
8  the brand name Depo-Medrol at a price of $7.02 a vial;
9  is that true?
10   A.    That's true.
11   Q.    So you were able to get Depo-Medrol even
12  though the generic MPA was on backorder; correct?
13   A.    It appears so.
14   Q.    All right.  Was there ever a period of time
15  where you were not able to procure the brand name
16  Depo-Medrol?
17   A.    Not that I recall, but I don't remember.
18   Q.    Fair enough.  Who would know?  Is there
19  anybody who would have more information about that
20  than you?
21   A.    Not necessarily, no.  Probably not.
22   Q.    All right.  The next note, what's the date
23  of the next note?
24   A.    I believe it's 10/26/10.  The -- the month
25  is kind of --

Page 119

1    Q.    It's difficult to read?
2    A.    -- difficult on that.
3    Q.    And I'll say you have nice handwriting so
4  that's a good thing.  Tell us what that note says.
5    A.    "Spoke with Sandra several times for
6  pricing for pain management.  Account is under
7  MedAssets.  Correct price for Depo-Medrol 80
8  milligrams five mL is 30 point -- $30.66.  Will send
9  credit for 7/21 order and 9/18 order."
10   Q.    So when it says "Depo-Medrol 80 milligrams
11  five milliliters," what does that mean?
12   A.    This was for pain management.  This was not
13  for STOPNC.
14   Q.    Okay.  So this was for a different Howell
15  Allen facility; is that correct?  Is that what you're
16  telling us?
17   A.    It's a different -- it's not part of the
18  neurosurgical center.  It was the pain management
19  center that's not part of STOPNC.
20   Q.    Well, what is the pain management center?
21   A.    That would be where we -- pain management
22  center covered the chronic pain patients that had
23  pumps, pain pumps in, and they took care of taking --
24  managing the pain pumps and they would do trigger
25  point injections and various injections.

Page 120

1    Q.    So was that a separate clinic from St.
2  Thomas Neurosurgical?
3    A.    Yes.
4    Q.    And where is it located?
5    A.    It was on the 8th floor.  We're on the 9th
6  floor.  It's on the 8th floor.
7    Q.    On the 8th floor of the St. Thomas Hospital
8  campus?
9    A.    Of the medical building.
10   Q.    All right.  Fair enough.  And what is the
11  name of that clinic -- pain management clinic?
12   A.    It was part of the Howell Allen.
13   Q.    So what is the full name of that -- of that
14  particular facility, the place on the 8th floor?  If
15  someone walked up to that place, what sign would they
16  see on the door?
17   A.    Howell Allen Clinic.
18   Q.    Okay.  All right.  Read us the note dated
19  12/1 of '10.
20   A.    "Spoke with Sandra.  She is checking with
21  the account department.  Has to get back with me.  Not
22  sure of delay in processing.  Return call.  Contract
23  department needs vendor approval.  Sandra feels we
24  will get contracting price on this, but they must have
25  vendor approval.  Will get back to me tomorrow or next

Page 121

```
 1   day."
 2      Q.   Who is Sandra?
 3      A.   I believe she's with CuraScript.
 4      Q.   All right.  And what contract department is
 5   she referring to?
 6      A.   I don't know.
 7      Q.   Okay.  Was that a contract department
 8   associated with St. Thomas Hospital?
 9      A.   No.  I --
10      Q.   What vendor was she referring to?
11      A.   I don't remember.
12      Q.   All right.  Let's go to the next page,
13   which is STOPNC_222.  This looks like a Clint
14   Pharmaceuticals invoice dated June the 22nd, 2010 and
15   it has some handwritten notes on it; is that correct
16   that?
17      A.   That is correct.
18      Q.   Are those your written notes?
19      A.   Yes.
20      Q.   Okay.  It looks like you're doing some more
21   price comparison; is that true?
22      A.   Yes.
23      Q.   That was a fairly common part of your job,
24   wasn't it?
25      A.   Price comparing is always important on
```

Page 122

```
 1   everything we do.
 2      Q.   Yeah.  And so we see here that there's a
 3   price for Depo-Medrol of $11.95 a vial for a 25 box
 4   shipment.  Do you see that?
 5      A.   Yes.
 6      Q.   And is that an 80 milligram vial, one
 7   milliliter?
 8      A.   80 milligrams per one CC.
 9      Q.   Okay.  And then the generic price that's
10   listed there is $6.49.  Is that the way I should
11   interpret that?
12      A.   I'm trying to figure out the difference in
13   that and the -- but I do see the 6.49.
14      Q.   Do you know when you made this note?
15      A.   No.
16      Q.   So whenever you made this note, am I
17   correct in thinking that you could buy the generic for
18   6.49 a vial presumably from Clint Pharmaceuticals, or
19   you could buy Depo-Medrol, the brand name for 11.95 a
20   vial?  Is that the way you interpret your note?
21      A.   Yes, it is.
22      Q.   Okay.  Do you think this reflects
23   information you gathered from Clint Pharmaceuticals?
24      A.   I feel like it is.  If it was stuck on a
25   Clint thing that would have been where I put -- would
```

Page 123

```
 1   have put a note.
 2      Q.   Now, you mentioned earlier that you were
 3   pricing medicines for the Howell Allen pain management
 4   clinic.  Why were you doing that?
 5      A.   I submitted the invoices for the pain
 6   management clinic for -- to accounts payable.
 7      Q.   Okay.  So did you hold any positions with
 8   the Howell Allen pain management clinic?
 9      A.   I was, in essence, the manager over that
10   also.
11      Q.   So were you considered the facilities
12   director of that pain management clinic?
13      A.   Yes.
14      Q.   Okay.  And how many folks worked in that
15   pain management clinic on the 8th floor of that
16   particular building in the St. Thomas Hospital campus?
17      A.   Two.
18      Q.   Who were they?
19      A.   It was -- it was Anna Marie Anderson was
20   the nurse practitioner.  When she left, Michelle Doud
21   took the spot, and then Bobbi Doty was -- helped
22   the -- did secretarial work and scheduling for that as
23   well as at STOPNC.
24      Q.   And could you explain why that particular
25   clinic was organized separately from St. Thomas
```

Page 124

```
 1   Neurosurgical.
 2      A.   Because they were not part of an ambulatory
 3   surgery center.
 4      Q.   Okay.  All right.  Let's go to the next
 5   page, the fourth page, which is STOPNC_5409.  And is
 6   this an e-mail from you to Bobbi Doty that occurred in
 7   December of 2010?
 8      A.   Yes, it is.
 9      Q.   All right.  And remind me what Ms. Doty's
10   job was.
11      A.   She helped in the pain management with the
12   pain management and she was also the scheduling for
13   the surgery center.
14      Q.   All right.  So she worked both in the pain
15   management clinic and also in St. Thomas
16   Neurosurgical.
17      A.   That's correct.
18      Q.   Did St. Thomas Neurosurgical do pain
19   management in the form of epidural steroid injections?
20      A.   The outpatient neurosurgery center?
21      Q.   Yes.
22      A.   Yes.
23      Q.   Okay.  So would it be fair for me to refer
24   to St. Thomas Neurosurgical as a pain management
25   clinic?
```

Page 125

1    A.    We're an ambulatory surgery center.
2    Q.    All right.
3    A.    The pain management portion did not do
4  epidural steroid injections.
5    Q.    Okay.  All right.  Well, in any event, on
6  December the 9th of 2010, you say to Ms. Doty, "We may
7  start ordering from Clint Pharma.  They are local and
8  I think they will give us better" -- money.  I assume
9  you mean price; correct?
10   A.    Correct.
11   Q.    And so did you then switch from CuraScript
12 to Clint Pharmaceuticals because Clint would give you
13 a better price?
14   A.    I don't know the reason at the moment why
15 we switched.  It may have been.
16   Q.    All right.  Well, did you --
17   A.    I don't know.
18   Q.    Your e-mail to Ms. Noty -- Doty refresh
19 your memory?  It says, "We may start ordering from
20 Clint Pharma.  They are local and I think they will
21 give us better" -- price.
22         Does that refresh your memory about why you
23 changed from CuraScript to Clint Pharmaceuticals?
24   A.    No, because I don't know if we were having
25 any problems at that time with CuraScript.

Page 126

1    Q.    Well, if we look at our spreadsheet, it
2  shows that lo and behold on December the 9th, you did
3  make the switch and you did get a better price.  Do
4  you see that?
5    A.    Yes.
6    Q.    So it appears that at that point, you
7  started buying MPA for $6.49 for a one milliliter
8  vial; is that correct?
9    A.    Correct.
10   Q.    Was that generic MPA?
11   A.    I do not know.
12   Q.    Did you ever buy brand named Depo-Medrol
13 from Clint Pharmaceuticals?
14   A.    I don't remember.
15   Q.    Okay.  Let's go to the next page, which is
16 a page of notes.  It's STOPNC document 223.  Are these
17 your notes?
18   A.    Yes.
19   Q.    Read us the first one dated 12/9 of '10.
20   A.    "Not getting MedAssets" -- pricing.  That's
21 the dollar sign -- "on pain management account because
22 address or suite number is different.  We changed
23 their pain management suite number to 9 -- changed
24 pain management suite number to 901.  Sandra will
25 process request and send us credit on invoices that

Page 127

1  overcharged.  To get MedAssets pricing on suite 10,
2  have to submit request to MedAssets for approval.
3  Sandra to give us credit once paperwork completed."
4    Q.    All right.  So I take it, then, that Sandra
5  with CuraScript was indicating that you could not get
6  your special MedAssets price, the price that you were
7  entitled to receive because you were part of this
8  MedAssets purchasing group for the pain management
9  clinic because it had a different suite address than
10 St. Thomas Neurosurgical; is that correct?
11   A.    At one time the pain management was in
12 suite 901 and I do not remember when I moved it to the
13 8th floor.
14   Q.    Okay.
15   A.    So -- but to -- I had to have that suite
16 number to get the pricing.
17   Q.    All right.  So did you then change the
18 suite number from the 8th floor to the 9th floor so
19 you could get the MedAssets pricing?
20   A.    That's what it says I did.
21   Q.    Okay.  And so -- but -- but -- but in
22 truth, the pain management clinic was on the 8th
23 floor, not on the 9th floor; right?
24   A.    At one time it was on the eighth -- on the
25 9th floor.

Page 128

1    Q.    All right.  Where is it now?
2    A.    It's now on the 8th floor.
3    Q.    All right.  What's your best estimate of
4  when it moved down to the 8th floor?
5    A.    It was during -- it was probably in 2010 or
6  2011.  I don't know the exact date.
7    Q.    Does it appear to you from this note that
8  by December of 2010 it had already moved down to the
9  8th floor?
10   A.    I don't remember.
11   Q.    Okay.  Do you currently buy medicine for
12 the pain clinic on the 8th floor?
13   A.    We no longer have a pain clinic.
14   Q.    Was there a period of time when you bought
15 medicine for the pain clinic on the 8th floor, but you
16 used the 9th floor suite address so you could get a
17 better price?
18   A.    No.  No.
19   Q.    That never happened?
20   A.    This is -- no.
21   Q.    Okay.  All right.  What's the next note,
22 February 14th of '11?
23   A.    "Depo-Medrol 80 milligrams per mL 25
24 Box 6.88 a vial.  172.92 for 25 box.  Spoke with" --
25 I'm not sure if that's -- I think that's Ruth.  I

1    think that's my writing.
2        Q.   Okay.
3        A.   "New rep.  Phone, 888-875-8062.  She's in
4    central Florida.  Check on past order for PM" -- pain
5    management -- "July for a refund.  Not sure when
6    contract began."  A star beside "Celestone on
7    long-term backorder.  Pentothal," star with that --
8    Pentothal no longer available in the U.S."
9            And I have PM circled and a star.
10   "Bupivacaine always order in box of 25.  Not
11   individual."  Because it's cheaper.  Again, PM, star,
12   "Depo-Medrol order individual.  Cheaper.  Five mL per
13   80 -- 80 milligrams, $30.02."
14       Q.   Okay.
15       A.   "$30.50 if out -- if out box -- if" -- I
16   believe that probably says "if order box."
17       Q.   Okay.  So this note does include pricing
18   information about Depo-Medrol; correct?
19       A.   Correct, for pain management.
20       Q.   All right.  So you not only would try to
21   get the best price for St. Thomas Neurosurgical
22   whenever you were ordering for that entity, but you
23   would also try to get the best price when you would
24   order for Howell Allen's pain management clinic ; is
25   that true?

1        A.   Correct.
2        Q.   All right.  The next series of notes I see
3    references to Depo-Medrol.  Are those in reference to
4    St. Thomas Neurosurgical or to the pain management
5    clinic?
6        A.   If it has a "PM" in front of it, it would
7    be pain management.
8        Q.   All right.  Read the one dated 9/27.
9        A.   "Per CuraScript, Mary" -- I can't pronounce
10   the last name -- I don't know the -- I can't read my
11   writing on that.  "877-703-8266 outstanding balance of
12   $118.20.  Paid on 7/20.  Cleared bank on 7/25.
13   CuraScript has no record of payment being received.
14   Marlese says address correct.  They check -- correct.
15   Check probably went to incorrect lockbox at their
16   facility.  CuraScript saying our responsibility to
17   find out where it went.  Marlese says no."
18       Q.   Okay.  Fair enough.  Thank you.  Let's turn
19   to the next page, if we could.  This is STOPNC_147.
20   It appears to be an e-mail from John Nor -- I can't
21   say it any better than you can.  Notarianni?
22       A.   I believe that's correct.
23       Q.   The subject of which is NECC pricing,
24   question mark.  Do you see that?
25       A.   Yes.

1        Q.   All right.  And he says, "Debra, after our
2    conversation, I went back to my manager and he said he
3    really would like to offer you better to earn your
4    business.  What price would we need to give you to
5    gain your business on methylprednisolone 80 milligrams
6    one milliliter and two milliliter vials?  Can you
7    please let me know what price would allow us to work
8    together.  Thank you for your patience."
9            Have I read that correctly?
10       A.   You're asking --
11       Q.   Have I read that correctly?
12       A.   Yes, you have.
13       Q.   And so is -- is -- let's call him John.  Is
14   John the person that you saw at the trade show that
15   you mentioned?
16       A.   I did meet him at the trade show.
17       Q.   Did you meet anybody else from NECC at the
18   trade show?
19       A.   I did from the past e-mails you showed me
20   that Josh or Jay, whomever -- I don't remember him.
21       Q.   You don't remember Mr. Salvucci?
22       A.   No, I do not.
23       Q.   Okay.  Do you remember having any
24   conversations with anyone associated with NECC other
25   than John?

1        A.   I have spoken with Mario Giovanni, and I
2    knew I had spoken with someone at the trade show, but
3    I did not know -- could not remember the name.
4        Q.   Okay.  All right.  So tell us everything
5    you remember talking about with the NECC
6    representatives at the trade show.
7        A.   First time I spoke with them, I was
8    inquiring about Omnipaque.  You can only buy Omnipaque
9    in large quantities and we didn't need large
10   quantities.  I was trying to see if they sold the --
11   that product in a five, ten or -- cc vial versus the
12   30 and 50 that I was purchasing.
13       Q.   Okay.  Do you remember discussing
14   anything else in particular other than your desire to
15   procure that medicine?
16       A.   Not -- not at the moment, no.  That was in
17   2010, the first time I met them.
18       Q.   Okay.  And why did you go to that trade
19   show?
20       A.   It's an ambulatory surgery -- I go to
21   the -- they have various seminars that -- educational
22   seminars.
23       Q.   Where was it?
24       A.   In 2010 , it was in Franklin.
25       Q.   So before you actually ordered from NECC,

Page 133

1  how many conversations either by telephone or in
2  person did you have with a representative of NECC?
3      A.   I do not know.
4      Q.   What would be your best estimate?
5      A.   I have -- they would call me periodically.
6      Q.   Okay.
7      A.   Not daily, not weekly.  Just -- I can't
8  give you a -- but he would call, see how we were
9  doing, if we were interested, having any issues,
10  delivery issues.
11     Q.   All right.  And tell me everything that you
12  can remember an NECC person telling you before you
13  decided to select them as a vendor.
14     A.   They assured me they could meet our needs.
15     Q.   All right.  Any other information that they
16  provided you orally about NECC?
17     A.   I reviewed some of the literature that they
18  had, going over the -- that Massachusetts Board of
19  Pharmacy was -- oversaw them, they were licensed in
20  all 50 states and that various people were using their
21  product.  I don't remember exact conversations, but
22  that was in some of the conversations we had.
23     Q.   But you don't remember any other specifics
24  other than what you've already told us?
25     A.   I -- I'm sure we talked about price and

Page 134

1  they would get pricing to me, but not at this moment,
2  I -- I'm not recalling anything else.
3      Q.   All right.  So do you recall any other
4  specifics that you've not already shared with us?
5      A.   Not at this time.
6      Q.   All right.  Do you -- can you tell us any
7  questions that you asked of NECC?
8      A.   Generalized questions, but a specific
9  question, no.  Not at this time.
10     Q.   All right.  All right.  Returning back to
11  our e-mails here, after Mr. -- after John, we'll call
12  him, asks you about price, what price do you need to
13  meet, this is on May the 17th, you respond the same
14  day, if we look on the next page, and you say, "John,
15  if you can get your price under $6.50 for one
16  milligram vial, then we can talk."
17          Do you see that?
18     A.   Yes.
19     Q.   All right.  Why did you pick that number?
20     A.   That was in a range for what we had been
21  paying.
22     Q.   All right.  You were paying at that point
23  in time $6.49 a vial when you got the MPA or
24  Depo-Medrol from Clint Pharmaceuticals; is that
25  correct?

Page 135

1      A.   That is correct.
2      Q.   And then --
3      A.   I take that back.  I don't know what we
4  were paying in May.  Your spreadsheet ends on 12/10 --
5  12 of '10.  So I --
6      Q.   I see.
7      A.   Pricing may have been different at that
8  time.  I'm not sure.
9      Q.   Okay.  That's fair enough.  All right.
10  What's the next page?
11         MR. REHNQUIST:  What's the Bates
12  number, George?
13         MR. NOLAN:  It's Bates number
14  STOPNC_'97.
15         MR. REHNQUIST:  Thanks.
16     Q.   (By Mr. Nolan)  This looks like an NECC
17  price list.  Is that what this is?
18     A.   That's what it appears to be.
19     Q.   Is this your handwriting there?
20     A.   I'm not sure.
21     Q.   Okay.  Fair enough.  All right.  Let's look
22  at Page No. 9, which is STOPNC_0164.  This is an
23  invoice for Clint Pharmaceuticals dated June 9th of
24  2011; is that correct?
25     A.   That is correct.

Page 136

1      Q.   All right.  And this is the invoice that
2  reflects a price increase by Clint Pharmaceuticals; is
3  that correct?
4      A.   That is correct.
5      Q.   And they increased their price to $8.95 for
6  a vial of MPA, one milliliter, 80 milligrams; correct?
7      A.   Correct.
8      Q.   All right.  You didn't expect that price
9  increase, did you?
10     A.   No, I did not.
11     Q.   All right.  You had become accustomed to
12  paying $6.49 a vial; correct?
13     A.   That is correct.
14     Q.   All right.  And it -- it says -- it
15  seems to indicate at the top that this invoice was
16  faxed to you-all on the date of the invoice, June
17  the 9th, 2011.  Do you see that?
18     A.   Yes, I do.
19     Q.   And then if we look two more pages over,
20  STOPNC_511, there's an e-mail from you the following
21  day on June the 10th to our friend John at NECC, and
22  you say, "John, happy Friday, John.  If pricing is
23  still 6.50 for one milliliter and 12 for two
24  milliliters for methylprednisolone 80 milligrams one
25  milliliter, I'm willing to do business with you.  Let

Page 137

1    me know what is needed."
2         Did I read that paragraph correctly?
3    A.   Yes, you did.
4    Q.   All right.  So does it appear to you that
5    the day after you became aware of Clint
6    Pharmaceuticals' increasing its price from $6.49 a
7    vial to $8.95 a vial, you told NECC that you would be
8    willing to do business with them if they could give it
9    to you for $6.50 a vial?
10   A.   Yes.
11   Q.   Okay.  Now, that is not what we would call
12   a coincidence.  You would agree that price was a
13   primary factor in your decision to place your first
14   order with NECC the very day that follows Clint
15   Pharmaceuticals raising its price from 6.45 -- $6.49
16   to $8.95?
17   A.   No.  Demand, supply and demand.  They had
18   backordered some.  Clint Pharmaceuticals had -- there
19   was a backorder, and NECC had told me that they could
20   keep us in supply.  That was the main reason.
21   Q.   Price was not the main reason?
22   A.   It was not the main reason.
23   Q.   Okay.  Was it -- and was it any reason?
24   A.   Sure.
25   Q.   All right.  Now, if we look at this invoice

Page 138

1    on the ninth page, STOPNC_164, what does it say about
2    back orders for MPA?  There's a column for backorder;
3    right?
4    A.   Oh, correct.
5    Q.   Zero backorder?
6    A.   Zero.
7    Q.   So at the time they increased their price,
8    their invoice reflected zero backorder?
9         MR. GIDEON:  Objection to the form.
10   Q.   (By Mr. Nolan)  Is that correct?
11   A.   It does say that.
12   Q.   All right.  Do you know why it says that?
13   A.   Because they sent us 400 vials.
14   Q.   Okay.  So they were willing to sell you 400
15   vials at $8.95 a vial without a backorder?  Is that
16   the way that invoice was interpreted by you?
17   A.   When I talked to them about the $8.95
18   increase, I was told -- and it may not reflect it, but
19   I was told the reason for the increase was due to the
20   backorder and that the price would continue to rise.
21   Q.   But they didn't tell you that you couldn't
22   get it from them, they just told you that you would
23   pay a higher price?
24   A.   No, they did not -- at first they did not
25   know if they could even supply it.  They said it's

Page 139

1    a -- there is a shortage.  Therefore, it's kind of
2    like supply and demand.  If somebody needs it, we're
3    just going to go up on our price.  I didn't appreciate
4    that type of business.
5    Q.   Why didn't you appreciate it?
6    A.   It's kind of like gouging your loyal
7    customers.
8    Q.   Okay.  Well, I guess the question is:  Was
9    it your understanding that Clint Pharmaceuticals was
10   willing to sell and promptly deliver 400 vials of that
11   particular medicine at a price of $8.95 a vial?
12   A.   They did deliver that to us.
13   Q.   Okay.  And they -- all right.  That's fine.
14        And so read your note to us, your
15   handwritten note.
16   A.   "E-mail Clint Ebel about the $2.49 increase
17   per vial."  And then on 6/21, "Spoke with Clint Ebel.
18   Will give us $6.29 pricing on this invoice.  Future
19   invoices will be $8.95."
20   Q.   Okay.  Now, those two particular notes, I
21   don't see anything about a shortage reflected in those
22   notes.
23   A.   These are just my little handwritten notes
24   so I can remember.
25   Q.   All right.  The first note is dated 6/15

Page 140

1    and the next is dated 6/21; is that right?
2    A.   Yes.
3    Q.   Okay.  And then if we turn to the next
4    page, it's a copy of the same invoice but there are
5    different notes on it.  Do you see that?
6    A.   Yes.
7    Q.   How did that happen?
8    A.   It -- I don't know who faxed this copy to
9    me.  I don't know if after our conversation or what if
10   they faxed to me.  But the increase -- it says price
11   increase was due to the shortage.
12   Q.   Okay.  Whose handwriting is that?
13   A.   That is mine.
14   Q.   All right.  Is your note about the price
15   increase due to the shortage dated --
16   A.   6/21/11 is the date that it's written on
17   this.
18   Q.   All right.  But you --
19   A.   The date -- the 6/21/11 is the date I would
20   have submitted this to -- with my initials under it,
21   the date I submitted this for payment to accounts
22   payable.
23   Q.   Do you have any note or e-mail dated before
24   June the 10th when you first decided to do business
25   with NECC when you sent that e-mail to John that says

Page 141

1  anything about a shortage?
2      A.   I -- I don't know.
3      Q.   Okay.  All right.  And the next page is the
4  page we've already referenced.  That's -- that's when
5  you first told John that you were willing to do
6  business with NECC; is that correct?
7      A.   That is correct.
8      Q.   All right.  And then if we go two more
9  pages, it looks like John responded at some point.
10  Oh, yeah.  If we go two more pages, STOPNC_95, do you
11  see the note, the handwritten note at the top of that
12  e-mail?
13      A.   Yes.
14      Q.   "Call on Monday, order"?
15      A.   Yes.
16      Q.   Okay.  So your note -- your e-mail to John,
17  the happy Friday e-mail was sent on the Friday, and
18  then what is this note, call on Monday, order, what
19  does that mean?
20      A.   I -- I do not know.
21      Q.   Can we look back at Page -- the tenth page,
22  STOPNC_165.  You see how we see Tennessee sales at the
23  bottom, bottom right-hand corner, Tennessee sales, and
24  then part of the X in tax appears to be missing.  Do
25  you see that?

Page 142

1      A.   Yes.
2      Q.   Was anything redacted from this invoice?
3      A.   I have no way of knowing.
4      Q.   And are the originals of these documents
5  still available --
6      A.   Yes.
7      Q.   -- somewhere?
8           And where are those?
9      A.   I believe they're -- I have them in my
10  office, I believe.
11      Q.   Okay.  And you'll agree to hang on to them
12  and not let anything happen to them.  Fair enough?
13      A.   Yes.
14      Q.   All right.  And then let's go to the
15  next -- the 14th page, which is STOPNC_95.  This looks
16  like more notes that you made on an e-mail string.  Do
17  you see that?
18      A.   95 or 94 you're talking about?
19      Q.   094.  That's what I mean to say.
20      A.   There -- yes, those are my notes.
21      Q.   Okay.  Tell us what these notes mean.
22      A.   CuraScript, $6.66.  Clint, $6.49.  And I
23  can't read what is written after that.  First order 48
24  to 72 hours.  500 - 1 mL, 6.50.  200 - 2 mLs at 12.
25  Then I have John Notarianni's name plus shipping, 24

Page 143

1  to 48 hours.  500 - 1 mLs.  200 - 2 mLs.  Order at one
2  time.  I don't know if all those are the same note or
3  different Post-it notes on there.
4      Q.   Okay.  So they could have been -- could be
5  different Post-it notes made on different days;
6  correct?
7      A.   Yes.  Yes.
8      Q.   So just because they're attached to an
9  e-mail string dated May 20th doesn't mean that's when
10  the notes were written; is that true?
11      A.   That would be correct.
12      Q.   And so read us the bottom Post-it note, if
13  you would.
14      A.   "Need 140 names from roster.  Pharmacy
15  requires state of Massachusetts can submit last name,
16  initial."
17      Q.   Okay.  What's that about?
18      A.   Mario -- well, I don't know.  I was told we
19  needed 140 names from the roster because of the board
20  of -- Massachusetts Board of Pharmacy.
21      Q.   Who told you that?
22      A.   I'm thinking Mario.
23      Q.   Okay.
24      A.   I do remember talking to Mario about that.
25      Q.   All right.  Is that your handwriting on

Page 144

1  that Post-it note?
2      A.   Yes, it is.
3      Q.   And so approximately when did Mario tell
4  you that?
5      A.   When we started sending the patient list
6  with the order.
7      Q.   All right.  And specifically, what did
8  Mario say?
9      A.   He -- not to quote.  I don't know the exact
10  words, but he told me that -- basically what this is.
11  The Massachusetts Board of Pharmacy required names
12  for -- required names for the MPA to be sent to us.
13      Q.   Did he explain why?
14      A.   He just said it was their rules of the
15  Massachusetts Board of Pharmacy.
16      Q.   Did you ask him what rules?
17      A.   I -- no.
18      Q.   Did you ask him to --
19      A.   I don't --
20      Q.   -- explain where you could get a copy of
21  those rules?
22      A.   I did not ask.
23      Q.   Okay.  Did it sound strange to you that he
24  was asking you to send names from your patient roster
25  to NECC?

Page 145

1    A.    I did question him on that.
2    Q.    All right.  And what questions did you ask?
3    A.    I asked him why now were we having to do
4    this.
5    Q.    What do you mean why now?
6    A.    We had been ordering for quite a while for
7    almost a year before that was required.
8    Q.    I thought you -- and maybe I misheard you.
9    I thought you said that Mario told you this when you
10   first started ordering from NECC.
11   A.    No.
12   Q.    I see.  When -- approximately when did
13   Mario tell you this?
14   A.    Prior -- right at the time we started
15   sending it.
16   Q.    Okay.  I see.
17   A.    That was about a year after.
18   Q.    So you thought -- didn't you think it was
19   strange that he was asking you to do this when you
20   hadn't been doing it for the previous year?
21   A.    That's why I questioned him on this.
22   Q.    All right.  And specifically, what question
23   did you pose to him?
24   A.    Why were we having to do this now and did
25   not have to do it in the beginning.

Page 146

1    Q.    And what was his response?
2    A.    It is being required by the Massachusetts
3    Board of Pharmacy.
4    Q.    At any point did you go back and reference
5    Paragraph G from the NECC brochure that explained to
6    you that these drugs could only be dispensed through a
7    patient-specific prescription?
8    A.    I don't recall doing that.
9    Q.    Okay.  Why did you not do that?
10   A.    Why was it -- I didn't know it would be
11   necessary.
12   Q.    You understood that New England Compounding
13   Center was a compounding pharmacy, didn't you?
14   A.    Yes.
15   Q.    But you thought it was all right just to
16   buy purportedly sterile solutions that would be
17   injected into patients' spinal columns from a
18   compounding pharmacy sometimes at 500 vials per order
19   without any sort of individual prescriptions?
20   A.    I didn't give -- do prescriptions for
21   anyone that I ordered from.
22   Q.    But you didn't -- when you started buying
23   MPA from NECC, that was the first time you had bought
24   epidural steroids from -- or that particular epidural
25   steroid from a compounding pharmacy; is that correct?

Page 147

1    A.    That is correct.
2    Q.    And the only other time that you had
3    purchased anything from a compounding pharmacy is when
4    you ordered the injections celiac plexus blue from
5    Health and Wellness as well as the St. Thomas Plaza
6    Pharmacy, and you did use prescriptions for those two
7    purchases; correct?
8    A.    That is correct.
9    Q.    All right.
10   A.    They were a specific amount, a specific
11   mixture for that one patient.  It was not a...
12   Q.    So did you comply with this -- I mean,
13   would it be fair for me to characterize -- to think
14   that you thought Mario's request that you send patient
15   lists up to NECC was strange?
16   A.    Yes, when I questioned him, his
17   explanation, I understood his explanation.
18   Q.    All right.  In your packet go to the 47th
19   page, if you would, which is STOPNC_60.
20   A.    Uh-huh (affirmative).
21   Q.    Am I correct that you actually complied
22   with Mario's request and began sending patient lists?
23   A.    Yes.
24   Q.    Okay.  And how were those patient lists
25   prepared?

Page 148

1    A.    They printed a copy of a schedule.
2    Q.    And just because a patient was on the list
3    did not necessarily mean that that patient would
4    receive NECC compounded MPA; is that correct?
5    A.    That is correct.
6    Q.    So you sent a list -- or you began sending
7    lists to NECC that did not actually correspond with
8    who would receive the medicine that you were
9    purchasing from NECC; is that true?
10   A.    That is true, but I had discussed that with
11   Mario.
12   Q.    And so Mario said it was okay so you did
13   it; correct?
14   A.    That is correct.
15   Q.    All right.  And so did it strike you as
16   strange that Mario was asking you to send lists of
17   patients with patient names to NECC even though some
18   of the patients on the list would not get NECC
19   medication?
20   A.    I did question him on it, but if my rep
21   says this is okay because I only have to have names
22   because the Massachusetts Board of Pharmacy requires a
23   name, this -- I made it clear to him, I do not --
24   cannot guarantee these are patients are going to get
25   this medicine, and that was substantial for him.

Page 149

1  Q. Did it strike you as strange that he was
2 asking for a list of patients that did not correspond
3 with who would receive the medicine?
4  A. Yes, that's what I was explaining.
5  Q. All right. And did he ever explain to your
6 satisfaction why he was making that strange request?
7  A. Yes. His explanation that the
8 Massachusetts Board of Pharmacy needed this.
9  Q. Needed random names of patients?
10  A. They just needed names that --
11  Q. And did that explanation make sense to you?
12  A. I had dealt with pharmacies, state
13 officials, a lot of things don't make sense that they
14 request.
15  Q. Did you make any effort to investigate
16 that? Did you call the Massachusetts Board of
17 Pharmacy and say, "What is this about"?
18  A. No.
19  Q. Did call them and say, "Hey, we -- our
20 patient names are confidential. There's a HIPAA
21 statute. It's a federal law that makes it illegal to
22 send" --
23  MR. GIDEON: Objection to the wind
24  up. Ask her a question instead of giving
25  her a speech, George, for Pete's sakes.

Page 150

1  Q. (By Mr. Nolan) Did you know -- are you
2 familiar with HIPAA?
3  A. Yes.
4  Q. All right. What's your understanding of
5 that law's requirements?
6  A. It is to protect the patient's information.
7  Q. Okay. And did you get consent from any of
8 the patients who weren't going to get NECC's medicine
9 to send their names to this compounding pharmacy that
10 they had no relationship with?
11  A. Patients know that we can give their names
12 to people -- to who -- what is needed for their care.
13 Same with doing insurance or anything else I'm
14 supplying, I have to supply a name.
15  Q. Well, my question is: For the patients who
16 did not get NECC drugs, it wasn't needed for their
17 care for you to send their name up to NECC, was it?
18  MR. GIDEON: Wait for him to ask a
19  question. Make sure you understand the
20  question.
21  Q. (By Mr. Nolan) Was it?
22  A. Repeat, I'm sorry.
23  Q. Sure. For patients who did not receive
24 NECC drugs but who's name was -- were on the list, it
25 wasn't necessary for their care that you send their

Page 151

1 name to NECC, was it?
2  A. No, but I did not know who would see the...
3  Q. So is it true that you did know that you
4 and your clinic were sending names of patients to NECC
5 even though some of those patients would not receive
6 NECC drugs and sending their names to NECC was not
7 necessary for their care? Did you know that?
8  A. That's correct, but I wasn't sending any
9 other pertinent information with that.
10  Q. All right. And so back to my earlier
11 question. For those patients that didn't get NECC
12 drugs --
13  A. Uh-huh (affirmative).
14  Q. -- did you get their permission to send
15 their names to a compounding pharmacy that they had no
16 involvement with?
17  A. No.
18  Q. Do you think that that conduct violated
19 HIPAA?
20  A. No.
21  Q. Do you think it was appropriate under
22 HIPAA?
23  A. Yes.
24  Q. All right. What gives you that impression?
25  A. I needed names to -- let's see how -- I did

Page 152

1 not violate any patient confidentiality in sending
2 these names.
3  Q. Well, I mean, this document, STOPNC_60, all
4 the names except for one is redacted. Do you know why
5 someone redacted all the names?
6  A. There's -- I'm not sure I'm following you.
7  Q. Well, is it your understanding that before
8 this document was given to us, someone -- presuming
9 your legal team -- redacted the names for the purpose
10 of protecting the patient confidentiality?
11  A. I assume so.
12  Q. Yeah. But when you sent these lists to
13 NECC, you didn't redact the names, did you?
14  A. No.
15  Q. Well, why did you redact the names when you
16 sent it to us but you didn't redact the names when you
17 sent it to NECC given that --
18  MR. GIDEON: Objection to the form.
19  She didn't redact the names. You just said
20  we did. You want to ask her about what we
21  did?
22  Q. (By Mr. Nolan) Why are the names redacted
23 when it was given to us when you did not redact the
24 names before sending the lists that you provided to
25 NECC?

Page 153

1    A.   You will have to speak with my attorney on
2  that.
3    Q.   And so if we look at this list, it includes
4  not only the names, but it also includes the specific
5  reason for their visit to the clinic; is that correct?
6    A.   That is correct.
7    Q.   Okay.  So not only did you provide NECC
8  with the names of people who did not receive their
9  medicines, but you also provided NECC with information
10  about why they were visiting the clinic?
11   A.   I'm providing information for the procedure
12  that was -- they needed the -- there's no diagnosis on
13  this.
14   Q.   So you gave NECC the names and the
15  procedure; is that correct?
16   A.   On this one, yes, it is.
17   Q.   All right.  And for example, if we look
18  down the list, I see about 11 patients down someone
19  came in for a diagnostic lumbar facet block No. 2.  Do
20  you see that?
21   A.   Yes.
22   Q.   W/J.  What does that mean?
23   A.   My -- it's probably -- I'm thinking it may
24  be with Dr. Culclasure.
25   Q.   That is not --

Page 154

1    A.   I don't know.
2    Q.   -- an epidural steroid injection, is it?
3    A.   No.
4    Q.   That did not use NECC MPA, did it?
5    A.   I don't know for sure.
6    Q.   But we do know that that patient's
7  procedure and name was submitted to NECC; correct?
8    A.   I'm assuming so.
9    Q.   And in your view, was there anything wrong
10  with providing NECC with the names of patients who did
11  not receive their medicines as well as information
12  about the procedure that your clinic performed on that
13  patient?
14   A.   I believe we've answered that.  I don't
15  mean to --
16        MR. GIDEON:  I believe we have.
17   Q.   (By Mr. Nolan)  Now.  At the bottom we see
18  Mickey Mouse's name is on the list.  Do you see that?
19   A.   Yes.
20   Q.   Tell me about that.  Why is Mickey Mouse's
21  name on the list?
22   A.   Mickey Mouse is a -- is to hold a spot.  If
23  you will look over, it says a consult that we would have
24  been in the pain clinic.  That way we would not have
25  scheduled a procedure in the surgery center.  It's to

Page 155

1  hold a spot.
2    Q.   What's redacted on Mickey Mouse's line?  Is
3  there something -- are we concerned about Mickey
4  Mouse's privacy or what's redacted there?
5    A.   Probably a patient's name that was the
6  consult.  I don't know.
7    Q.   Did you tell Dr. Culclasure that NECC was
8  requesting these patient lists that didn't correspond
9  with the drugs they provided?
10   A.   He knew of this, yes.
11   Q.   He did know about it?
12   A.   Yes.
13   Q.   And how did he find out about it?
14   A.   I told him.
15   Q.   All right.
16   A.   It was discussed with him.
17   Q.   And when did you tell him?
18   A.   Whenever I was asked, Mario asked for it.
19   Q.   And what did he say?
20   A.   He was like -- he didn't see the issue with
21  it.
22   Q.   So he approved it?
23   A.   Yes.
24   Q.   And who would have prepared these lists?
25   A.   Sandy Littleton would send them with the

Page 156

1  order.
2    Q.   Did it concern you at all that -- that NECC
3  was apparently attempting to paper over some sort of
4  requirement of the Massachusetts Board of Pharmacy?
5    A.   No.
6    Q.   Did it raise any red flags in your mind?
7    A.   No.
8    Q.   Did you ever -- did you discuss that
9  request by NECC with anyone other than Dr. Culclasure?
10   A.   Not that I recall.  I retract.  Sandy
11  Littleton was the nurse that would be doing the
12  ordering.
13   Q.   Anyone other than Nurse Littleton and
14  Dr. Culclasure?
15   A.   Unless there was someone that heard our
16  conversation.  And the secretary.  I take that back.
17  The secretary because she would print the schedule off
18  for her.
19   Q.   Okay.  How would you -- how would you
20  transmit these lists to NECC?
21   A.   I think she faxed it.
22   Q.   Okay.
23   A.   I'm not sure.  I believe she would fax the
24  order.
25   Q.   And so do you know who on the other end

Page 157

1   received the fax?
2       A.   I do not.
3       Q.   Do you know what NECC did with those lists?
4       A.   I do not.
5       Q.   But you were comfortable just sending lists
6   of your clinic's patients' names up to NECC without
7   knowing what would happen to the list --
8            MR. GIDEON:  Objection to the
9   repetition.
10      Q.   (By Mr. Nolan)  -- after they arrived?
11      A.   I did what they asked me to do.
12      Q.   All right.  Let's go back to Page No. 15,
13  which is STOPNC_093.  Now, this is a fax cover sheet
14  that appears to be dated June the 10th, and then
15  somebody's also written in June the 14th.  Do you see
16  that?
17      A.   Yes, I do.
18      Q.   And it's a fax to John with NECC.  Do you
19  see that?
20      A.   Yes, I do.
21      Q.   If we go to the next page, which is STOPNC_
22  82, there's a prescription order form.  It appears to
23  be dated June the 10th of 2011.  Do you see that?
24      A.   Yes.
25      Q.   Does that appear to be the first order that

Page 158

1   your clinic placed with NECC?
2       A.   I believe it is.
3       Q.   All right.  Now, you see as we -- as we --
4   as we look at this prescription order form, first of
5   all, there's a place for the patient's name/signature
6   at the bottom and it says Dr. John -- John Culclasure,
7   M.D.  Is that his signature?
8       A.   No, it is not.
9       Q.   Whose handwriting is that?
10      A.   That is mine.
11      Q.   Okay.  And did Dr. Culclasure authorize you
12  to sign his name to this prescription order form?
13      A.   That's not a signature.
14      Q.   Did Dr. Culclasure ever see this form at
15  the time it was used?
16      A.   I do not know.
17      Q.   All right.  Do you see how it's got a place
18  for you to put the name of the patient on the form --
19      A.   Yes.
20      Q.   -- the column for that?
21           And why was that not completed?
22      A.   It was not required.
23      Q.   Did NECC did not require that column to be completed?
24  that NECC did not require that column to be completed?
25      A.   No.

Page 159

1       Q.   Did you view this order form to be a
2   prescription?
3       A.   I viewed it as an order form.
4       Q.   Had you ever seen a form like this from any
5   of your other suppliers?
6       A.   No.
7       Q.   So this -- using this method of purchasing
8   these steroids, that was a new thing for you; correct?
9       A.   No, we purchased -- usually I could do it
10  online or just do a call, phone call.
11      Q.   But using a form like this was a new thing
12  for you; correct?
13      A.   I can't -- I'm not sure because I have
14  used -- I have filled out other forms, order forms and
15  all.
16      Q.   Do you recall ever using a form like this
17  before?
18      A.   From NECC, no, but I have used forms to
19  order various other supplies through my years.
20      Q.   Do you ever recall using a form like this
21  one where it says prescription order form and there's
22  a list for patient names that's left blank?
23      A.   Not that I recall.
24      Q.   Would I be correct in thinking that no
25  other supplier of medicines has ever asked you to send

Page 160

1   a patient list to them when you bought the medicines;
2   is that true?
3       A.   Not that I can ever recall.
4       Q.   All right.  It looks like the next page is
5   an account application -- account information credit
6   application.  Do you see that?
7       A.   Yes.
8       Q.   All right.  And so if we go back to our fax
9   cover page, two pages earlier, it says -- it looks
10  like there's three pages in the fax including the
11  cover.  Do you see that?
12      A.   Yes.
13      Q.   Then we have the order form and then we
14  have the credit application.  Do you see that?
15      A.   Yes.
16      Q.   So does that appear to be the fax that
17  you-all sent that day on June the 10th?
18      A.   It does.
19      Q.   All right.  Let's go to the 18th page,
20  which is STOPNC_309.  This is an e-mail from you to
21  Clinton Ebel of Clint Pharmaceuticals dated June the
22  15th of 2011; is that correct?
23      A.   Correct.
24      Q.   All right.  And then you say, "Good
25  morning, Clint.  Have a question about our most recent

Page 161

1   drug order from your company. We ordered
2   methylprednisolone 80 milligram/milliliter, 400 vials
3   and were told pricing had increased to $8.98 per vial.
4   This is 2.49 percent -- $2.49 increase per vial. When
5   asked about the reason for this sudden jump, we were
6   told it was due to supply and demand. This" --
7            MR. GIDEON:  No.  Objection.  Read it
8     correctly.
9        Q.   (By Mr. Nolan)  "Is this -- is this to be
10  expected anytime we place an order with your company?
11  Pricing depends on supply and demand?"
12           Have I read that paragraph basically
13  correctly?
14       A.   Yes, you have.
15       Q.   So the price increase that motivated you to
16  switch to NECC was $2.49 per vial; is that correct?
17       A.   That along with the shortage.  The shortage
18  was the main reason.
19       Q.   All right.  The next page, STOPNC_17, does
20  this appear to be the -- the invoice for your first
21  order from NECC?
22       A.   Yes.
23       Q.   All right.  And then the next page,
24  STOPNC_310, we have Mr. Ebel's response to your e-mail
25  about the price increase and he responded it looks

Page 162

1   like five days later on June the 20th.  Do you see
2   that?
3        A.   Yes.
4        Q.   And he mentions the shortage there in his
5   e-mail.  Do you see that?
6        A.   Yes.
7        Q.   Okay.  And then at the top, you respond by
8   saying, "You can control inventory and stockpiling by
9   limiting the amount of product you sell to your
10  customers at one time, especially when your product
11  cost did not change."
12           Do you see that paragraph that you wrote to
13  him?
14       A.   Yes, I do.
15       Q.   So you were not satisfied with Mr. Ebel's
16  response; is that correct?
17       A.   That is correct.  I think you would have
18  been -- anyone would have been disgusted with that
19  one.
20       Q.   All right.  Let's go to the 22nd page,
21  which is STOPNC_12.  Then we have Mr. Ebel's response
22  back to you; is that correct?
23       A.   Correct.
24       Q.   When is the last time you talked with
25  Mr. Ebel?

Page 163

1        A.   That -- I don't know.
2        Q.   Well, what would be your best estimate of
3   when you last talked to him?
4        A.   I don't know if I talked to them after
5   that.  I don't know.
6        Q.   Have you talked to him since the fungal
7   meningitis outbreak?
8        A.   Not that I recall.  I don't know.  I don't
9   remember.
10       Q.   Do you know if he still works for Clint
11  Pharmaceuticals?
12       A.   I do not know.
13       Q.   Has Clint Pharmaceuticals solicited your
14  clinic's business since the fungal meningitis
15  outbreak?
16       A.   They have not called -- they have not
17  called to get my business.  They send me, you know,
18  periodical things through the mail.
19       Q.   All right.  Let's go to the 24th page,
20  which is STOPNC_5349.  And this appears to be an
21  e-mail exchange between you and Maurice -- Marlese
22  Allen; is that correct?
23       A.   Correct.
24       Q.   Who does she work for?
25       A.   She works for Howell Allen.

Page 164

1        Q.   And what is her job?
2        A.   She is human resource and accounts payable.
3        Q.   Okay.  All right.  And so who actually paid
4   for the drugs that were purchased from NECC?
5        A.   The outpatient surgery center pays for
6   them.
7        Q.   All right.  Okay.  Is Ms. Marlese Allen
8   involved in that?
9        A.   Yes.
10       Q.   Okay.  And is her office at St. Thomas
11  Neurosurgical or is it over at the Howell Allen
12  Clinic?
13       A.   It's at the Howell Allen Clinic.
14       Q.   Okay.  So the check -- would I be correct
15  in understanding that the checks that were used to pay
16  for these drugs actually came from the Howell Allen
17  Clinic?
18       A.   I would assume.  I don't see the checks
19  so...
20       Q.   Okay.  But the -- whoever was in charge of
21  writing the checks, they worked over at the Howell
22  Allen Clinic and did not work inside St. Thomas
23  Neurosurgical; is that true?
24       A.   They did not work in our building.
25       Q.   Right.  They worked -- what building did

Page 165

```
 1    they work in, the person who would be in charge of
 2    writing the checks for NECC.
 3        A.   They're at the -- at the Baptist north
 4    tower in the office -- in the Howell Allen office.
 5        Q.   I see.  Okay.  And your e-mail to Marlese
 6    Allen says, "I sent invoice from Clint Pharmaceuticals
 7    to you today.  Hold this."
 8             Now, let me stop there.  Are you referring
 9    to the June 9th of 2011 invoice from Clint that
10    contained the price increase?
11        A.   Well, the next sentence says, "I'll be
12    sending a new invoice for this order."
13        Q.   Okay.  So what does that mean to you?
14        A.   That means they're sending a new invoice
15    for the order I assume with the correct pricing.  I
16    don't know.
17        Q.   Okay.  Well, take a minute to read that
18    e-mail if you would.
19        A.   You want me to read it aloud?
20        Q.   Yeah, read it aloud.
21        A.   "I sent invoice from Clint Pharmaceuticals
22    to you today.  Hold this.  They will be sending a new
23    invoice for this order.  Since there is a shortage on
24    steroids, they decided to up their price $2.49 a vial.
25    Stated this was for inventory control.  I e-mailed
```

Page 166

```
 1    them and told them I thought this was not fair.  They
 2    didn't pay extra for this drug.  If they want to do
 3    inventory control, limit the amount you can order at
 4    one time.  Anyway, they're going to let us have this
 5    invoice at $6.49 a vial instead of the $8.95 listed on
 6    invoice.  Of course next order will be at $8.95, but I
 7    may not be ordering from them again.  Just saved us
 8    $996 by sending an e-mail.  I think we should
 9    celebrate."
10        Q.   Okay.  Fair enough.  And then if we look at
11    the next page, does this appear to be the replacement
12    invoice that was sent by Clint Pharmaceuticals also
13    dated June the 9th, 2011, but containing the price
14    that you had originally expected, the $6.49 a vial?
15        A.   That's the date.  It appears that way.
16        Q.   Okay.
17        A.   It says this replaces.
18        Q.   All right.  So that we understand the
19    sequence of events, after you challenged Mr. Ebel
20    about the price increase, he -- his company agreed to
21    redo the invoice and knock the price for that
22    particular order back down to $6.49; correct?
23        A.   That is correct.
24        Q.   But as indicated by your previous invoice,
25    you understood that going forward it would be $8.95 a
```

Page 167

```
 1    vial?
 2        A.   That's what he told me.
 3        Q.   Okay.  Well, let's look at your notes.
 4    Your first note -- that is your handwriting on this
 5    invoice; correct?
 6        A.   Correct.
 7        Q.   All right.  And let's first start over on
 8    the left-hand part of the page.  Read that top note to
 9    us.
10        A.   6/23/11?
11        Q.   Yes, ma'am.
12        A.   "This invoice replaces previous invoice on
13    methylprednisolone 80 per mL.  This has correct
14    pricing of $6.49.  Other invoice $8.95."
15        Q.   Okay.  Now, then beside that, we have
16    another note.  Is it dated August the 9th?
17        A.   That's what it appears.
18        Q.   All right.  And that's your handwriting?
19        A.   Correct.
20        Q.   Okay.  Read that one to us.
21        A.   "Spoke with -- spoke with Clint.  He called
22    me.  Stated we could order 2,000 vials at $7.49 or
23    seven" -- I don't know if that's a nine or a -- 7.95.
24    I don't -- I can't read my writing.  "Stated national
25    shortage.  Told him we were okay at the moment and did
```

Page 168

```
 1    not wish to order.  Asked him to issue Marlese the
 2    credit of $980."
 3        Q.   So I take it from this note that on August
 4    the 9th you spoke with Clint of Clint Pharmaceuticals
 5    and he told you that you could order 2,000 vials from
 6    his company at either $7.49 or $7.90 something per
 7    vial; correct?
 8        A.   Correct.
 9        Q.   All right.  Vials of what?
10        A.   Well, we're dealing with the
11    methylprednisolone.
12        Q.   Okay.  And that would have been -- if you
13    had bought it from Clint, would that have been generic
14    methylprednisolone made by a pharmaceutical company
15    containing at least some alcohol as a preservative?
16        A.   I'm assuming.  I can't even remember
17    what's -- what brand they sent us at the moment.  But
18    if it was generic, it would have been.
19        Q.   All right.  Did you consider -- when you
20    got that information from Clint Pharmaceuticals, did
21    you consider buying the 2,000 vials from that supplier
22    at the somewhat higher price so as to avoid the risks
23    associated with buying from a compounding pharmacy?
24             MR. GIDEON:  Objection to the form.
25             THE WITNESS:  I didn't want to buy
```

Page 169

1     from Clint Pharmaceuticals again because
2     they had just told me that they were
3     inventoried and to prevent people from
4     stockpiling.
5         Q.   (By Mr. Nolan)  Turn to the 28th page, if
6  you would, please, ma'am, STOPNC_6161.  This is an
7  e-mail exchange between you and Shreka Rogers where
8  she asks, "Depo-Medrol 80 milligrams, how much do we
9  pay for it," and you answered, "Methylprednisolone
10 acetate 80 milligrams, $6.50, 80 milligrams."  Do you
11 see that?
12        A.   Yes.
13        Q.   Why was she asking that question?
14        A.   That, I don't know from this.
15        Q.   Well, do you have any memory of why she was
16 asking the question?
17        A.   No.
18        Q.   Can you remind me what her job -- what was
19 her job at that time?
20        A.   She's business manager.
21        Q.   Of?
22        A.   The Howell Allen Clinic.
23        Q.   Was it common for Ms. Rogers to make
24 inquiries about what St. Thomas Neurosurgical was
25 spending on steroids?

Page 170

1         A.    She handled the business office portion of
2  it.  I don't -- for our facility.  I don't...
3         Q.    And in terms of your efforts to control
4  price and control costs, who -- who supervised that
5  aspect of your work, if anyone?
6         A.    No one on that aspect of it.
7         Q.    All right.  Go to the 31st page, Page 31,
8  STOPNC_1574.  What is this about?
9         A.    I have no idea.  I don't remember.
10        Q.    Well, look at the next page.  It looks to
11 me like a package of NECC product was apparently
12 delivered over to the hospital pharmacy.  Is that what
13 happened?  Is that -- do these e-mails refresh your
14 memory as to that event?
15        A.    Well, in reading my reply, it -- I'm just
16 going by what the reply says.  I don't remember this
17 incident.
18        Q.    All right.  Let me ask you to turn to Page
19 44, which is STOPNC_5497.  Now, this is an e-mail
20 exchange between you and Scott Butler; correct?
21        A.    Correct.
22        Q.    And let's start with Mr. Butler's e-mail to
23 you, which is down at the bottom of that page.  It
24 looks like the subject of the e-mail was "Complaints
25 about scheduling at STOPNC from secretaries."

Page 171

1         Do you see that?
2         A.   Yes.
3         Q.   And then it looks like his fourth bullet
4  point at the top of the next page is "Medication
5  differences between the competition and STOPNC."
6         Do you see that?
7         A.   I see that.
8         Q.   All right.  So Mr. Butler was one of your
9  supervisors.  You would have considered him, I guess,
10 one of your bosses; correct?
11        A.   Correct.
12        Q.   All right.  And so who was that about?  Why
13 was your boss e-mailing you about medication
14 differences between the competition and STOPNC?
15        A.   I'm -- I'm not sure, but I will take a
16 guess at this one.  The medication they're talking
17 about is the anticoagulants.  Our policy on the -- how
18 long a patient must be off the anticoagulants prior to
19 scheduling an ESI.  That would be the only --
20        MR. GIDEON:  You've answered it.
21        Q.   (By Mr. Nolan)  Let me ask you to refer to
22 Page 54, if you would.  And it's STOPNC_2472.  Now,
23 this is an e-mail from Dr. Culclasure to you; correct?
24        A.   Yes.
25        Q.   All right.  And Dr. Culclasure was the

Page 172

1  medical director at St. Thomas Neurosurgical and he
2  was also someone you reported to; is that correct?
3         A.    That is correct.
4         Q.    Okay.  And so he would be one of your
5  bosses.  Is that fair?
6         A.    That is correct.
7         Q.    And Dr. Culclasure is forwarding to you an
8  e-mail that he received from a Dr. Manchikanti in
9  Paducah, Kentucky who is apparently the chairman of
10 the board and chief executive officer of the ASIPP,
11 which I think is the American Society of
12 Interventional Pain Physicians.  Did you read this
13 e-mail that your boss had forwarded to you?
14        A.    I'm sure I did at the time.
15        Q.    Okay.  All right.  All right.  Well, then
16 let's look at this, if we could.  The first paragraph,
17 last sentence says, "While this is not only very
18 expensive, tedious and unnecessary, there are more
19 cases of infections and increased risk with
20 compounding rather than dividing the single doses into
21 multiple doses in an office itself."
22        Do you see that sentence?
23        A.    I see it.
24        Q.    What is that about?
25        A.    I -- I don't know.  I'd have to read.

Page 173

1    Q.   All right.  Go ahead.
2    A.   This article is speaking -- or this thing
3  is speaking to -- it's regarding Omnipaque.
4    Q.   Okay.  You see on the second page, the
5  paragraph that's underneath the column of numbers
6  where it says, "Thus even if a compounding pharmacy,
7  which we consider not to be very safe, revised it, it
8  would be double or triple the price we would be paying
9  when we used a single-dose vial on multiple patients."
10      You see that paragraph?
11    A.   Yes.
12    Q.   Do you know why -- first of all, do you
13  know who "we" is in that sentence?
14    A.   No, I don't know.
15    Q.   When you read it, did you take it to mean
16  that it was the American Society of Interventional
17  Pain Physicians?
18    A.   I don't know that I gave it thought on
19  that.
20    Q.   Okay.  And so what was your reaction when
21  you read it, to the statement that even if a
22  compounding pharmacy, which we consider not to be very
23  safe, what was your reaction to that sentence when you
24  read it?
25    A.   I don't remember because it was referring

Page 174

1  to the Omnipaque.
2    Q.   Okay.  So did that statement by Dr.
3  Manchikanti raise any red flags in your mind about the
4  safety of purchasing from NECC?
5    A.   Not that I recall.
6    Q.   Did you discuss this e-mail with
7  Dr. Culclasure?
8    A.   I don't remember.
9      MR. NOLAN:  Why don't we take a short
10  break.
11      THE WITNESS:  Okay.
12      VIDEOGRAPHER:  We're off the record.
13  This is the end of Tape No. 3.  The time is
14  2:42 p.m.
15      (A recess was taken.)
16      VIDEOGRAPHER:  Here begins Tape No. 4
17  in the deposition of Debra Schamberg.
18  We're back on the record and the time is
19  2:57 p.m.
20    Q.   (By Mr. Nolan)  Ms. Schamberg, during the
21  shortage that you've mentioned, did you ever approach
22  the St. Thomas Plaza Pharmacy about whether they could
23  supply MPA to your facility?
24    A.   Not that I recall.
25    Q.   Is there any particular reason why you

Page 175

1  didn't approach the St. Thomas Plaza Pharmacy?
2    A.   They're -- that's not something I would
3  order from.
4    Q.   Now, I want to get back to the two reasons
5  that you initially mentioned as to why you -- what you
6  call the primary reasons for going with NECC, the
7  shortage, and I think you said that having a truly
8  preservative-free MPA product was better for the
9  patients.  Have I characterized that fairly?
10    A.   Yes, those are the main reasons.
11    Q.   Okay.  So who told that you it was better
12  for the patients?
13    A.   I went on Dr. Culclasure's recommendation.
14    Q.   Okay.  Did you do any independent research
15  on that particular issue?
16    A.   No.
17    Q.   Did you ever inquire as to whether
18  CuraScript or Clint Pharmaceuticals could provide a
19  truly preservative-free steroid?
20    A.   They provided me what they said was a
21  preservative-free, but we know that it did have
22  alcohol in it, but they considered it
23  preservative-free.
24    Q.   Did -- so if I understand it, there are
25  some differences between Depo-Medrol -- brand name

Page 176

1  Depo-Medrol and the MPA that you were acquiring from
2  NECC.  One difference is that the brand name
3  Depo-Medrol is made by a company called Pfizer as
4  opposed to New England Compounding Center.  You would
5  agree that's a difference between those two products?
6    A.   Okay.
7    Q.   You agree?
8    A.   Yes.
9    Q.   And another difference is the ingredients
10  are different to a certain degree because Depo-Medrol
11  by Pfizer contains a small amount of alcohol whereas
12  the material that you received from NECC did not; is
13  that correct?
14    A.   That is correct.
15    Q.   Okay.  Did St. Thomas Neurosurgical at the
16  time you started buying from NECC have a written
17  formulary?
18    A.   Yes.
19    Q.   And what is a formulary?
20    A.   It's the drugs that you can carry in
21  your -- that can be used at your facility.
22    Q.   Okay.  And how was the written formulary
23  developed?
24    A.   It was in place when I took over.
25    Q.   And was it in place when you originally

Page 177

1    started working there in 2000 -- in the year 2000?
2        A.    Yes.
3        Q.    Okay.  And it was in place when you came
4    back to be facility director in 2009; is that correct?
5        A.    That is correct.
6        Q.    And is the formulary a written policy that
7    St. Thomas Neurosurgical expected its employees to
8    follow?
9        A.    Formularies says drugs that can be used in
10   the facility.
11       Q.    And so what is your understanding of who
12   established the formulary?
13       A.    It was originally established, I'm
14   assuming, by the anesthesiologist.
15       Q.    And so what is the purpose of having a
16   written formulary that lists what drugs can be used in
17   the facility?  Why take the trouble to write that down
18   on a list?
19       A.    There's certain drugs that are on the
20   market that would not be needed in an ambulatory
21   surgery center.  It's to control.
22       Q.    So I take it, then, that the people who
23   worked at St. Thomas Neurosurgical were not allowed
24   just to haul off and give any old drug to a patient.
25   If a drug was given to a patient it had to be on the

Page 178

1    formulary; is that correct?
2        A.    We -- correct.
3              (Exhibit 40 was marked for
4              identification.)
5        Q.    (By Mr. Nolan)  And let me hand you what we
6    will make Exhibit No. 40, which is STOPNC_ -- which
7    begins at STOPNC_533.  And let me ask you whether this
8    is a copy of the formulary that was in place at St.
9    Thomas Neurosurgical at the time you started ordering
10   drugs from NECC.
11       A.    Yes.
12       Q.    And if we look at the fifth page of the
13   document, it lists the corticosteroids for use at the
14   facility.  Do you see that?
15       A.    Yes.
16       Q.    All right.  It lists four different
17   corticosteroids; correct?
18       A.    Yes.
19       Q.    Including Depo-Medrol; correct?
20       A.    That is correct.
21       Q.    It does not list truly preservative-free
22   MPA, does it?
23       A.    Not that -- not as -- does it list MPA.  It
24   lists the brand name.
25       Q.    It lists Depo-Medrol?

Page 179

1        A.    Yes.
2        Q.    Okay.  And so when you decided to purchase
3    a truly preservative-free MPA from NECC, you went off
4    formulary because that -- the ingredients of that
5    medicine are different from Depo-Medrol?
6        A.    Depo-Medrol is considered a
7    preservative-free corticosteroid.  So it was
8    methylprednisolone.
9        Q.    Well, but as we've discussed, Depo-Medrol
10   does contain some alcohol; correct?
11       A.    But it's listed as preservative-free.
12       Q.    All right.  But it does contain some
13   alcohol; true?
14       A.    Yes.
15       Q.    All right.  And so that's different than
16   the stuff that you bought from NECC; correct?
17       A.    With the alcohol, yes.
18       Q.    All right.  So when you started buying from
19   NECC, you went off formulary; correct?
20       A.    I don't consider that going off formulary,
21   what you're implying, sir.
22       Q.    Can you explain why this formulary doesn't
23   list truly preservative-free MPA.
24       A.    It doesn't list preservative-free on the
25   others either.  I -- you know, I do not know.  I can't

Page 180

1    answer why it did not specify that particular --
2        Q.    Do you know whether the shelf life for
3    Depo-Medrol that does contain some alcohol is longer
4    than the shelf life of truly preservative-free MPA
5    like you're getting from NECC?
6        A.    I don't -- I don't -- I do not know the
7    shelf life.
8        Q.    Okay.  How long did you keep the material
9    that you purchased from NECC on the shelf or in the
10   drawer, however you store it, before you gave it to
11   patients?
12       A.    I mean, I -- I have no way of knowing --
13   I'm not sure I follow your question.
14       Q.    Well, do you know when you order from NECC
15   what would be the longest period of time that you
16   would keep vials in the drawer before injecting the
17   solution in the patients?
18       A.    There's -- again, there's no way of
19   knowing.  We would use the medication, if you're
20   asking, prior to the expiration date.
21       Q.    Do you know whether buying this material
22   from NECC with zero alcohol with it in bulk, 500 vials
23   a shot --
24             MR. GIDEON:  Objection to the form.
25       Q.    (By Mr. Nolan)  Do you know whether and

Page 181

1   when keeping it that way involved any increased risk
2   that germs would grow in the solution and cause
3   infections with the patients as compared to buying
4   Depo-Medrol that does have some alcohol in it?
5       A.   No.
6           (Exhibit 41 was marked for
7       identification.)
8       Q.   (By Mr. Nolan)  Let me hand you a document
9   which we will make Exhibit 40, which begins at
10  STOPNC_6758.
11          MR. GIDEON:  That's not right.  We
12      just did Exhibit 43, according to you.
13          MR. NOLAN:  That's my mistake.  Let
14      me have that back.  I need to pay more
15      attention.
16      Q.   (By Mr. Nolan)  I'm going to put the
17  correct label on it.  So the next exhibit will be
18  Exhibit 41.
19          MR. CLINE:  What's the Bates number
20      on it?
21      Q.   (By Mr. Nolan)  Let's try that again.
22  Exhibit 41 at Bates number STOPNC_6758, can you tell
23  us what this is.
24      A.   This is the medical staff rules and
25  regulations for the St. Thomas Outpatient

Page 182

1   Neurosurgical Center.
2       Q.   All right.  Have you seen this document
3   before?
4       A.   In the past, I have, I'm sure.
5       Q.   All right.  And what's the purpose of
6   having rules and regulations like this?
7       A.   It's a guideline to go by.
8       Q.   And is following the guidelines like this
9   important to patient safety?
10      A.   Yes.
11      Q.   And is following written formularies, in
12  your view, important to patient safety?
13      A.   Yes.
14      Q.   And why is following formularies important
15  to patient safety?  How does that enhance patient
16  safety?
17      A.   I'm not sure how to answer.  I'm getting a
18  roadblock on this.
19      Q.   Okay.  Let's look at Page 4 of the rules
20  and regulations, and the subheading "Drugs."  Do you
21  see that?
22      A.   Yes.
23      Q.   You see where it says, in Paragraph 1,
24  "Patients shall be given only medications dispensed by
25  qualified staff of the center pharmacy."

Page 183

1           Do you see that?
2       A.   Yes.
3       Q.   What does that mean?
4       A.   We will only give medications that we have
5   at the facility.  The next sentence explains that the
6   medication -- if the patient brings their medication
7   from home, we do not dispense that unless the
8   practitioner or doctor approves you can use their
9   medication.
10      Q.   Okay.  And so is there a pharmacy at St.
11  Thomas Neurosurgical?
12      A.   There's a pharmacy room, but, no, there's
13  not a pharmacy.
14      Q.   All right.  Pharmacy room?
15      A.   There's an area.
16      Q.   And on the next page, Paragraph 2 says,
17  "All drugs and medications administered to patients
18  shall be those listed in the center formulary as
19  approved by the center's medical staff."
20          Did I read that correctly?
21      A.   Yes, sir.
22      Q.   Were you aware that there was a specific
23  rule that required folks in your clinic to follow the
24  formulary?
25      A.   We do follow the formularies.

Page 184

1       Q.   And do you agree that it would be
2   substandard medical care to give patients drugs at
3   your clinic that are not on the formulary?
4           MR. GIDEON:  Objection to the form.
5       Q.   (By Mr. Nolan)  You can go ahead and
6   answer.
7       A.   No, I don't -- you're saying that what we
8   used was not on the formulary.  We considered that it
9   was.
10      Q.   Is it -- was there any documentation of
11  that?
12      A.   That --
13      Q.   In other words, were there any e-mails
14  written, any notes taken, any forms filled out to
15  document your position that this material that was
16  being ordered from NECC, which was not Depo-Medrol,
17  was on the formulary?
18          MR. GIDEON:  Objection to the form.
19      Q.   (By Mr. Nolan)  Is that documented
20  anywhere, to your knowledge?
21      A.   I don't know that it is.  I know when I --
22  I can order anywhere.  It's the brand name.  Like you
23  can order Motrin, but you're going to get ibuprofen.
24      Q.   All right.  Did -- did St. Thomas
25  Neurosurgical have any sort of written policies or

Page 185

1    procedures as to what to do in the event of a
2    medication shortage.
3        A.    Yes, we do.
4        Q.    And tell us -- tell us what you're supposed
5    to do when confronted with a medication's shortage.
6        A.    Not without reading.
7        Q.    So as we sit here today, am I correct that
8    you do not have an independent memory as to what is
9    required from a policy standpoint if you're confronted
10   with a medication shortage?
11       A.    I'm going to consult with my medical
12   director and we'd go from there.
13       Q.    All right.  Let me hand you a document
14   we're going to make Exhibit No. 42.  It's STOPNC_308.
15   And ask you if this is, in fact, a copy of the policy
16   that you mentioned.
17            (Exhibit 42 was marked for
18        identification.)
19            THE WITNESS:  Yes, it is.
20       Q.    (By Mr. Nolan)  You see where the policy
21   requires that you communicate the shortage and
22   practice changes to all personnel?
23       A.    Yes.
24       Q.    Okay.  And was that done as far as this
25   shortage that motivated you to start buying from NECC?

Page 186

1        A.    The staff knew that there was a shortage,
2    yes.
3        Q.    All right.  And how was it communicated to
4    the staff?
5        A.    Verbally.
6        Q.    Is there anything in writing that shows
7    that a shortage was communicated to the staff?
8        A.    I -- not that I -- I don't know.  I don't
9    remember.
10       Q.    Is there anything in writing indicating
11   that the shortage was communicated to the board or the
12   medical executive committee?
13       A.    Not that I recall.
14       Q.    Did -- did the clinic have any procedure
15   for making changes on the formulary, adding a drug to
16   the formulary, for example?
17       A.    If a drug needed to be added to the
18   formulary, we would submit a -- the medical director
19   would sign off on a -- for the request and it would be
20   submitted to the board.
21       Q.    Okay.  Submitted to the board?
22       A.    Well, the MEC and I guess the board, both.
23       Q.    And so was it your understanding that both
24   the medical executive committee and the board had to
25   approve any changes to the formulary?

Page 187

1        A.    If we were adding or deleting medication to
2    the formulary, it went to the --
3        Q.    All right.  And so is that level of review
4    by those two different committees also a matter of
5    patient safety?
6        A.    I would assume so.
7        Q.    Let me hand you a document we'll make
8    Exhibit No. 43, which is STOPNC_307 and I'm going to
9    ask you to tell us what this is.
10            (Exhibit 43 was marked for
11       identification.)
12            THE WITNESS:  It's the -- or
13   formulary drug evaluation request.
14       Q.    (By Mr. Nolan)  So is this a form that
15   would be completed if someone wanted to add a drug to
16   the formulary?
17       A.    Yes.
18       Q.    Okay.  And so this -- this form would be
19   filled out and then it would be approved by the
20   medical director, the medical executive committee, as
21   well as the board of St. Thomas Neurosurgical; is that
22   correct?
23       A.    That is correct.
24       Q.    All right.  That process was never
25   undertaken with respect to your decision and

Page 188

1    Dr. Culclasure's decision to begin purchasing from
2    NECC; is that true?
3        A.    We did not use this for NECC.
4        Q.    Do you know why changes to the formulary
5    require, I guess, three levels of review, the medical
6    director, the medical executive committee and
7    ultimately the board?
8        A.    It just goes through the chain of command
9    to make sure everyone knows.
10       Q.    And would you agree that adding drugs for
11   use in the clinic without appropriately amending the
12   formulary and going through that review could be
13   dangerous for patients?
14            MR. GIDEON:  Objection to the form.
15            THE WITNESS:  Not necessarily, I
16       don't.
17       Q.    (By Mr. Nolan)  Did you ever talk with a
18   pharmacist named Martin Kelvas at St. Thomas Hospital?
19       A.    Not that I recall.
20       Q.    What about Carmen Leffler?
21       A.    Not that I recall.
22       Q.    How did you first learn that there was a
23   problem in September -- I think you said on September
24   the 18th, 2012?  How did you first become aware that
25   there was a problem with a potential meningitis issue?

Page 189

1      A.   I received a call from Candace Smith, who
2  is the infection prevention nurse at St. Thomas
3  Hospital.
4      Q.   All right.  And now that you bring up Ms.
5  Smith, you knew Ms. Smith before she called you that
6  day; is that correct?
7      A.   That is correct.
8      Q.   In fact, she would actually help St. Thomas
9  Neurosurgical with some of its infection control
10 measures; is that true?
11     A.   That is correct.
12     Q.   Okay.  And she is an employee of whom?
13     A.   St. Thomas Hospital.
14     Q.   Okay.  And so why is it that a St. Thomas
15 Hospital employee would help St. Thomas Neurosurgical
16 with its infection control procedures?
17     A.   That's not uncommon.  I could talk to
18 someone at Baptist or Skyline, anywhere.
19     Q.   All right.  But did anyone other than Ms.
20 Smith from St. Thomas Hospital come in and assist St.
21 Thomas Neurosurgical with infection control issues
22 before the outbreak?
23     A.   Just there may have been somebody in her
24 department, but, no, I -- there was no need for it.
25     Q.   Okay.  What sort of infection control

Page 190

1  measures were used at St. Thomas Neurosurgical?
2      A.   Rephrase that.  What are you --
3      Q.   Tell us what types of infection control
4  measures were used at St. Thomas Neurosurgical.
5      A.   I mean, you -- you're always monitoring
6  your infection control on a day-to-day procedural
7  basis.
8      Q.   And explain those procedures to us.
9      A.   You make sure sterile technique is used,
10 that rooms are being cleaned and that protocol is
11 being followed as best could -- that it can be.
12     Q.   And what sterile techniques are you
13 referring to?
14     A.   For the procedures.  When the physician is
15 doing the procedure.
16     Q.   So does the physician wear sterile masks?
17     A.   Not sterile masks.
18     Q.   Do they wear gloves?
19     A.   They wear sterile gloves.
20     Q.   And a gown?
21     A.   Not for an epidural, a gown is not needed.
22     Q.   All right.  So what sterile materials are
23 used for an epidural steroid injection?
24     A.   An epidural tray, the needles, supplies in
25 the tray, sterile gloves, you're cleaning the patient.

Page 191

1  You cannot sterilize the skin, but you can cleanse the
2  skin.
3      Q.   And so all of those essential procedures
4  were set out in writing, I assume; is that correct?
5      A.   The guideline, they have a guideline to...
6      Q.   And Ms. Smith, would she come over and
7  periodically inspect your procedures and sterility
8  protocols and help you --
9      A.   No.
10     Q.   All right.  Well, what exactly was her role
11 as far as infection prevention at St. Thomas
12 Neurosurgical?
13     A.   She had no role.  She -- if I had a
14 question, I could call her and ask her.
15     Q.   But did she ever get paid to come over and
16 help you-all with infection control?
17     A.   No.
18     Q.   That never happened?
19     A.   Not that I'm aware of.
20     Q.   All right.  So we took a sidetrack.  You
21 indicated that you first received a call from Ms.
22 Smith on September 18th.  Tell us the story.  What
23 happened next?
24     A.   Ms. Smith called, told me that there was a
25 patient that had been -- she had been notified that

Page 192

1  the patient had Aspergillus fungal infection and that
2  she was checking to see if that patient was treated --
3  had an epidural at St. Thomas Outpatient Neurosurgical
4  Center.
5      Q.   And what happened next?
6      A.   I was on vacation so I notified -- sent an
7  e-mail to Dr. Culclasure to please check the following
8  day to see if that is a patient of ours, if he was a
9  patient of ours.
10     Q.   Did he do that?
11     A.   Yes, he did.
12     Q.   And what happened next?
13     A.   He responded to me that he had -- that,
14 yes, this gentleman was a patient of ours, but he
15 had -- in reading his record, his office record note,
16 that he had -- this patient had been seen in the ER at
17 St. Thomas Hospital to rule out Rocky Mountain spotted
18 fever.
19     Q.   All right.  And what happened next?
20     A.   That was on Wednesday.  On -- there again,
21 I'm on vacation.  I'm going by what I was told.  But
22 on Thursday, they were informed that two more patients
23 had become ill.  So we voluntarily stopped procedures
24 until we could figure out what's going on.
25     Q.   All right.  And so was that September 20th?

Page 193

1    A.   Yes.
2    Q.   And so when did you learn that the first
3 person had died of fungal meningitis?
4    A.   I don't know the exact day.  It was the
5 following week, I think.  I don't know the exact day.
6    Q.   Do you remember where you were when you
7 learned that fact that someone had died?
8        MR. GIDEON:  That's somebody on the
9    phone.  Don't worry about that.
10       THE WITNESS:  I don't remember.  I
11   don't remember if I was at -- was at home
12   or if I had come back to work.
13   Q.   (By Mr. Nolan)  Okay.  And so talk with us
14 about your involvement and any interactions with the
15 Tennessee Department of Health.
16   A.   Tennessee Department of Health contacted me
17 on -- I'm not sure.  They may have contacted me at
18 home on Sunday regarding this -- some type of
19 outbreak, they weren't sure, and then they -- my next
20 conversation with them was on Monday.
21   Q.   How did St. Thomas Neurosurgical go about
22 notifying patients that they may have -- they should
23 get checked, they may be infected with a
24 life-threatening disease?
25   A.   We called the patients.

Page 194

1    Q.   All right.  And so tell us about that
2 process.
3    A.   About which process?
4    Q.   Calling the patients.
5    A.   Our -- the staff began calling patients on
6 Monday, 24th, and -- to see if there was any problems
7 and how they were doing.
8    Q.   Okay.
9    A.   If there were issues, they were having any
10 problems, they spoke with the -- one of the nurses or
11 the doctor.
12   Q.   All right.  And so eventually was a script
13 prepared for people working at St. Thomas
14 Neurosurgical to use when calling patients?
15   A.   Yes, there was.
16   Q.   And is it true that St. Thomas
17 Neurosurgical collaborated heavily with St. Thomas
18 Health and St. Thomas Hospital in preparing that
19 script?
20       MR. SCHRAMEK:  Objection to the form.
21   Q.   (By Mr. Nolan)  You may answer.
22   A.   My understanding, they did.
23       (Exhibit 44 was marked for
24   identification.)
25   Q.   (By Mr. Nolan)  Let me hand you an e-mail

Page 195

1 string that we'll make Exhibit 44, which is the
2 STOPNC_3501, and you've seen this before, have you
3 not?
4    A.   Yes.
5    Q.   All right.  So this is an e-mail string
6 that eventually -- well, it originally starts with
7 Rebecca Climer, the chief communications and marketing
8 officer with St. Thomas Health.  Do you see that?
9    A.   Yes, I do.
10   Q.   Okay.  And she is sending a script or a
11 partial script to Scott Butler regarding anticipated
12 phone calls; is that correct?
13   A.   Yes.
14   Q.   Okay.  And then the next e-mail says --
15 from Ms. Climer to Scott Butler and there's a copy to
16 Dale Batchelor, who is the chief medical officer for
17 St. Thomas Hospital.  Do you see that?
18   A.   Yes, I do.
19   Q.   And then it says, "Had Berry review
20 script."  Is Berry a physician?
21   A.   I'm -- no, I don't --
22       MR. GIDEON:  Simple question.
23       THE WITNESS:  I don't know.
24       MR. GIDEON:  Is he a physician?
25       THE WITNESS:  No, not a physician I

Page 196

1    deal with.
2    Q.   (By Mr. Nolan)  Okay.  Do you know who
3 Berry is?
4    A.   No, not right at this moment.
5    Q.   Okay.  And so do you have any idea why the
6 chief communications and marketing officer would be
7 collaborating with Mr. Butler and someone named Berry
8 on the script that should be used when calling
9 patients?
10       MR. SCHRAMEK:  Objection to the form
11   to the extent it calls for speculation.
12       THE WITNESS:  Mr. Butler was handling
13   communications with the hospital and other
14   entities while I handled the clinical
15   portion with the Tennessee Department of
16   Health.
17   Q.   (By Mr. Nolan)  Okay.  Well, apparently
18 Berry made a suggestion.  He said, "He would like to
19 add the statement in case they" -- I assume referring
20 to a patient -- "asks 'why are you calling,' it's okay
21 to say there had been some reactions to the procedure
22 and we're calling to check and see if you've had any
23 reaction."
24       Do you see that?
25   A.   Yes.

1    Q.    Okay.  And did your clinic actually use
2  this script that apparently was influenced by Berry?
3    A.    Yes, we did.
4    Q.    And so let me give you a document which
5  we'll make Exhibit No. 45, which begins at STOPNC_990
6  and ask you if this appears to be the script that was
7  used after this e-mail exchange between Ms. Climer and
8  Mr. Butler.
9        (Exhibit 45 was marked for
10        identification.)
11        THE WITNESS:  This was the script we
12        used.
13    Q.    (By Mr. Nolan)  Okay.  All right.  Do you
14  know how many people had died by the time that you
15  started using this script to call patients?
16    A.    No, I do not, not right offhand.
17    Q.    Do you know whether it was more than one?
18    A.    I believe it was, but I cannot give you an
19  answer -- I mean, a number.
20    Q.    All right.  And so when Mr. Butler
21  forwarded this script to you and Dr. Culclasure, did
22  you give him any pushback?
23    A.    Pushback?
24    Q.    Well, did you say, "Now, wait a minute.
25  People have died of meningitis.  If a patient asks us

1  why are you calling, we should tell them the truth, we
2  shouldn't tell them that some people have had a
3  reaction.  We should tell them the truth.  They may
4  have a life-threatening infection."
5        Did you say that to Mr. Butler when he
6  forwarded this script to you?
7    A.    We followed the guidelines that the
8  Tennessee Department of Health set.  They did not want
9  us to go any further.
10    Q.    Well, did you and Dr. Culclasure have any
11  discussions along the lines of, "Look, I don't care
12  what Berry thinks or the Tennessee Department of
13  Health thinks.  If a patient asks us a question, we're
14  going to tell them the truth"?
15    A.    We didn't know what was causing their
16  infection.
17    Q.    Did anyone at the Tennessee Department of
18  Health tell you that if a patient asks why you are
19  calling, you should tell them that there had been some
20  reactions to the procedure?
21    A.    I don't remember exactly what they -- if
22  they said reactions to procedure or if that is from
23  Ms. Climer.  They just told us not to mention
24  meningitis.
25    Q.    Did anybody with the Tennessee Department

1  of Health specifically say that to you?
2    A.    Yes, they did.
3    Q.    And who said that?
4    A.    I believe it was Dr. Kainer.
5    Q.    All right.  When did she say it?
6    A.    I can't give you the date.  It was before
7  they went to the -- before they did their
8  announcement.
9    Q.    Okay.  How many times did she say that to
10  you?
11    A.    I don't recall.
12    Q.    In what context did she say that to you?
13    A.    We're not to tell the patients that there
14  is meningitis until we know what it is and where it's
15  coming from until we have more answers.
16    Q.    Was this during a face-to-face meeting, a
17  phone call, e-mail?
18    A.    I think all.
19    Q.    Say that again.
20    A.    I think all of the above.
21    Q.    All right.
22    A.    All that you mentioned.
23    Q.    So you're saying there's an e-mail from Dr.
24  Kainer saying don't mention meningitis?
25    A.    I don't know.  I'd have to go -- I don't

1  know.
2    Q.    Okay.  Now, does Berry work for Dr. Kainer?
3    A.    I don't know who Berry is.
4    Q.    At the time that you began using this
5  script, were you at all uncomfortable with the
6  suggestion made by Berry and incorporated into the
7  script that was used?
8    A.    This was a very difficult time.  We were
9  uncomfortable with everything going on.
10    Q.    So does that mean you were uncomfortable
11  with responding to a question from a patient, why are
12  you calling, with saying there had been some reactions
13  to the procedure?
14    A.    I wasn't uncomfortable with that because
15  that was all we knew at this time.
16    Q.    Did you make any of these calls yourself?
17    A.    I'm sure I did.
18    Q.    And did you have any patients ask why you
19  were calling?
20    A.    I don't remember.
21    Q.    Let me hand you a photograph, if I could.
22  I'm going to hand you a photograph we'll make Exhibit
23  No. 56, which is STOPNC --
24        MR. GIDEON:  Don't do that again,
25        George, please.  This is 45.  So it should

Page 201

1    be 46, not 56.
2         MR. NOLAN:  I'm sorry, I misspoke.
3         MR. GIDEON:  Oh, okay.
4         MR. NOLAN:  Thank you C.J.  I
5    appreciate that.  46.
6         MR. GIDEON:  Sure.  You know the
7    first sign of senile dementia is getting
8    the numbers confused.
9         MR. NOLAN:  I've been demented for a
10   long time now.
11        MR. GIDEON:  I know.
12        (Exhibit 46 was marked for
13   identification.)
14        Q.    (By Mr. Nolan)  All right.  46.
15   STOPNC_770.  Tell us what's in this picture.
16        A.    This is our medication room where we store
17   our medications.
18        Q.    Okay.  That basically look the same as it
19   was before the outbreak?
20        A.    Probably we -- when was this picture made?
21        Q.    I don't know.  I was going to ask you the
22   same question.
23        A.    I don't know.
24        Q.    All right.  Is that basically what it
25   looked like before the outbreak?

Page 202

1         MR. SCHRAMEK:  Do we get a picture
2    down here?
3         THE WITNESS:  Normally we don't have
4    the medications stacked like that.
5         Q.    (By Mr. Nolan)  All right.
6         A.    I mean...
7         Q.    If we look at this picture, does it -- it
8    looks like there's some drawers where medications are
9    stored; is that correct?
10        A.    That is correct.
11        Q.    And I think if we look down in the lower
12   right-hand corner, we see the drawer for
13   methylprednisolone.  Do you see that?
14        A.    Yes, sir.
15        Q.    Okay.  All right.  And let me hand you a
16   picture we'll make Exhibit No. 47 and ask you -- and
17   this is at STOPNC_773, and ask you if this is a
18   close-up of the drawer with a -- where you, your
19   clinic stored methylprednisolone?
20        (Exhibit 47 was marked for
21   identification.)
22        THE WITNESS:  Yes, it is.
23        Q.    (By Mr. Nolan)  Okay.  All right.  And it
24   looks like in the drawer above it, although it's
25   somewhat cut off, that's where you kept some of the

Page 203

1    dexamethasone; correct?
2         A.    Correct.
3         Q.    All right.  Let me hand you a picture we'll
4    make Exhibit No. 48 and ask you to tell me what this
5    is.
6         MR. CLINE:  What's the Bates, George?
7         MR. NOLAN:  784.
8         (Exhibit 48 was marked for
9    identification.)
10        THE WITNESS:  This is in one of the
11   procedure rooms.  It's the cabinet where
12   medication is stored in the procedure room.
13        Q.    (By Mr. Nolan)  Okay.  And so there's a --
14   there's a sign that says "Please use all of the Depo
15   in this container before you open any more.  Thanks."
16        Do you know who wrote that?
17        A.    I believe Greta did, one of the -- my LPN.
18        Q.    Okay.  Do you know why she put that there?
19        A.    This area -- this room only -- they would
20   just stock it for a short period of time, and she was
21   making sure that they -- to rotate our stock that they
22   used what was in there before you brought more in.
23        Q.    All right.  Let me hand you a photograph
24   we'll make Exhibit No. 49, which is Document 785, and
25   ask you if this is a close-up of the same sign?

Page 204

1         (Exhibit 49 was marked for
2    identification.)
3         THE WITNESS:  Yes.
4         Q.    (By Mr. Nolan)  All right.  Now let me hand
5    you a picture we'll make Exhibit No. 50, which is
6    Document No. 775 and this was produced by your
7    lawyers.  Tell us what this is.
8         (Exhibit 50 was marked for
9    identification.)
10        THE WITNESS:  It is a picture of -- I
11   believe it's the drawer that hold -- that
12   we store the medication in, the
13   Depo-Medrol.
14        Q.    (By Mr. Nolan)  Okay.  So that -- would
15   that appear to be a picture of the contents of the
16   drawer that we see in Exhibit No. 47?
17        A.    I can only assume that it is.
18        MR. GIDEON:  No, look at Exhibit 47.
19        THE WITNESS:  Yeah.
20        MR. GIDEON:  Make sure you
21   understand.
22        THE WITNESS:  He's asking that -- is
23   it -- and I assume.  I don't know.
24        MR. GIDEON:  You just tell him you
25   don't know then.

Page 205

1     (Exhibit 51 was marked for
2  identification.)
3     Q.   (By Mr. Nolan)  Let me hand you an e-mail
4  that I'm going to make Exhibit No. 51.  And it is
5  found -- I believe it's STOPNC_809 or 807.  It's
6  unclear from this copy.  And I'm going to ask you if
7  this is an e-mail that you received from Clint
8  Pharmaceuticals on October the 4th, 2012?
9     A.   That's what -- yes, that's what it says
10  here.
11     Q.   All right.  And so after you received this
12  e-mail from Clint Pharmaceuticals, did you read it?
13     A.   At the time, I'm sure I did.
14     Q.   Now, do you see here about halfway down the
15  first paragraph beginning in the bold where it says,
16  "Compounded corticosteroids do not have FDA approval.
17  We have historically recommended that all
18  practitioners do not use unapproved compounded
19  steroids, especially when FDA-approved products are
20  commercially available.  All products distributed by
21  Clint Pharmaceuticals are FDA approved and are not --
22  are not implicated in this outbreak.  FDA approved
23  corticosteroids have been and are still available
24  through Clint Pharmaceuticals."
25     Have I read that correctly?

Page 206

1     A.   Yes.
2     Q.   Is there anything about what I've read that
3  you believe to be false or inaccurate?
4     MR. GIDEON:  Objection to the form.
5     THE WITNESS:  This is October of '12
6  and June of '11.  They did not have the
7  supply.
8     Q.   (By Mr. Nolan)  Well, we know in August
9  they were willing to send you 2,000 vials; right?
10     A.   But they had already -- they had told me
11  that there was a shortage.
12     Q.   Right.  I understand that.
13     A.   Which means I couldn't guarantee that two
14  months down the line that they would not be out of
15  product.
16     Q.   At the time you found out about the
17  shortage, did you check with Henry Schein to see
18  whether they could supply MPA or Depo-Medrol to you?
19     A.   I checked with them at some point.  I don't
20  know the exact date, but they were not a supplier for
21  us.
22     Q.   What does that mean?
23     A.   We were not on their the -- part of their
24  buying group or however that works.
25     Q.   And so would I be correct in understanding

Page 207

1  that Henry Schein would have sold it to you, but you
2  wouldn't have gotten a favorable price because you
3  were not part of a buying group that included that
4  vendor?
5     A.   That's correct, and I didn't have an
6  account with them.
7     Q.   So that is correct?
8     A.   I -- I'm assuming so.
9     Q.   And would the same be true for PSS?
10     A.   At the time, PSS was not sell -- did not
11  sell medications.
12     Q.   Okay.
13     A.   That came in later.
14     Q.   All right.  And do you know when PSS began
15  selling medication?
16     A.   No, I do not.
17     MR. HOFFMAN:  If everyone on the
18  phone could mute their phones.
19     MR. NOLAN:  If everyone on the phone
20  could mute their phones, that would be
21  appreciated.
22     MR. GIDEON:  They're not listening at
23  all.
24     (Exhibit 52 was marked for
25  identification.)

Page 208

1     Q.   (By Mr. Nolan)  Ms. Schamberg, let me hand
2  you an affidavit that you signed.  We're going to make
3  it Exhibit No. 52.  It's STOPNC_797.  Do you remember
4  signing this affidavit?
5     A.   Yes.
6     Q.   Okay.  And why did you sign this affidavit?
7     A.   Somebody told me to.  I don't know why.  I
8  don't remember why I was told to sign it.
9     Q.   Okay.  Do you know who prepared it?
10     A.   Looks like the State of Tennessee.
11     Q.   The State of Tennessee prepared it?
12     A.   This says State of Tennessee, County of
13  Davidson.
14     Q.   Well, that might have to do with the
15  notary, but maybe not.  I don't know.
16     A.   I don't -- I don't remember.
17     MR. NOLAN:  Why don't we take a short
18  break.
19     MR. GIDEON:  How long?
20     MR. NOLAN:  Ten minutes.
21     MR. GIDEON:  Okay.  We'll be back at
22  4:00, then.
23     VIDEOGRAPHER:  This is the end of
24  Tape No. 4.  We're off the record and the
25  time is 3:52 p.m.

Page 209

1          (A recess was taken.)
2          VIDEOGRAPHER:  Here begins Tape No. 5
3    in the deposition of Debra Schamberg.
4    We're back on the record and the time is
5    4:04 p.m.
6          Q.    (By Mr. Nolan)  Ms. Schamberg, before you
7    became the facilities director of St. Thomas
8    Neurosurgical in 2009, how often were you involved in
9    ordering medications?
10         A.    Rare.
11         Q.    Rarely?
12         A.    Rare.
13         Q.    All right.  Did you have any experience
14   with ordering medications before that?
15         A.    If medication was needed in the OR room, I
16   would go and order medications for that.
17         Q.    So would I be correct in thinking that when
18   you became facilities director, that was the first
19   time you had ever held a job that required you to
20   regularly order medications for any particular
21   facility?
22         A.    No, when I was -- prior to nursing school,
23   I worked for a group of orthopaedic surgeons and I
24   ordered their medications.
25         Q.    And what group was that?

Page 210

1          A.    It was called Suburban Orthopaedics.
2          Q.    Is that here in Nashville?
3          A.    It was in Donaldson.
4          Q.    Were you the one who approved which vendors
5    would be used?
6          A.    I don't recall at that time.  I don't know.
7          Q.    Okay.  So when you worked for that group in
8    Donaldson, did you actually evaluate medication
9    suppliers?
10         A.    I don't recall.
11         Q.    Would it be fair for me to say that your
12   job as facilities director at St. Thomas
13   Neurosurgical, which started in 2009, is the first
14   time you recall having a job that required you to
15   select and order from medication suppliers?
16         A.    Order from suppliers that carried
17   medications before.
18         Q.    I'm talking about ordering medications.
19         A.    Yes.
20         Q.    And just so we're clear, it's when you
21   became facilities director in '09, that was the first
22   time that you became one of the deciders, if we can
23   use that -- that term -- as to from where medications
24   would be purchased; is that correct?
25         A.    Correct.

Page 211

1          Q.    All right.  Can I get you to find
2    Exhibit 30, which is the spreadsheet that our office
3    prepared showing the 2011 purchases.
4          Now, that's --
5          MR. GIDEON:  She doesn't have it yet.
6          Q.    (By Mr. Nolan)  Do you have that exhibit in
7    front of you?
8          A.    I do.
9          Q.    All right.  Now, that -- that exhibit
10   indicates that when you started buying from NECC, you
11   started buying two milliliter vials on occasion from
12   NECC; is that correct?
13         A.    That is correct.
14         Q.    And was that a new thing?
15         A.    Yes.
16         Q.    All right.  And why -- why did you start
17   doing that?
18         A.    Many times the doctor uses 120 to 180 on
19   the injection.  So instead of opening up two vials,
20   you can use one.
21         Q.    Okay.  Had that never happened before you
22   started with NECC?
23         A.    It had never been offered.
24         Q.    Okay.  So if a two milliliter vial was
25   used, does that mean that that vial would be stuck

Page 212

1    more than once when treating a patient?
2          A.    No.
3          Q.    It does not mean that?
4          A.    No.
5          Q.    Okay.  At any point did anyone at St.
6    Thomas Neurosurgical ever stick a vial more than once
7    when administering epidural steroid injections to
8    patients?
9          A.    Yes.
10         Q.    And how often would that occur?
11         A.    For a short period of time, we were using
12   the Omnipaque more than -- more than once.
13         Q.    Did you ever stick MPA vials more than
14   once?
15         A.    Not that I'm aware of.
16         Q.    So is it your testimony that with the two
17   milliliter vials of MPA, they would only be used on a
18   single patient?
19         A.    That is correct.
20         Q.    Does St. Thomas Neurosurgical have any
21   systems in place designed to monitor its patients for
22   infections or problems?
23         A.    Yes.  I send a -- I check with the doctors.
24   And when I had more than one doctor there, I would
25   send them monthly e-mails asking if there was any --

Page 213

1    if they had any issues, infections for the patients.
2       Q.    And so in other words, you would kind of
3    take a census among the doctors who gave injections at
4    St. Thomas Neurosurgical on a monthly basis to find
5    out whether there were any problems being experienced
6    by patients?
7       A.    Yes.
8       Q.    And was that a Joint Commission requirement
9    or did you do that for some other reason?
10      A.    It -- I don't know if it's Joint Commission
11   or a state requirement, but it is a...
12      Q.    And so would those statistics be kept then
13   by St. Thomas Neurosurgical either in some sort of
14   file?
15      A.    Yes.
16      Q.    And was there any uptick in -- in problems
17   in, say, August of 2012?
18      A.    No.
19      Q.    So you didn't notice any sort of uptick in
20   problems associated by -- experienced by patients
21   before you got the call from Ms. Smith on September
22   the 18th of 2012?
23      A.    No.
24      Q.    I think I asked you earlier about whether
25   St. Thomas Neurosurgical had a quality improvement

Page 214

1    committee, and I believe you made reference to the
2    medical executive committee.
3       A.    That is correct.
4       Q.    Is the quality improvement committee a
5    subset of the medical executive committee or is it --
6    are the members the same?
7       A.    We're a very small entity so we just kind
8    of incorporate it all in together.
9       Q.    All right.  So the same people -- the
10   quality improvement committee and the medical
11   executive committee have the same members; is that
12   correct?
13      A.    Correct.  Well, I take that back.
14   Basically Dr. Culclasure and I are the quality
15   improvement committee.  If there's issues, we -- but
16   we're a small spot facility, so it's...
17      Q.    Is -- I'm going to ask about your
18   compensation.  I'm not going to ask you how much
19   you're paid, but is your compensation at all linked to
20   how the clinic performs?
21      A.    No.
22      Q.    Is it all -- at all linked to the amount of
23   profit or revenue generated by the clinic?
24      A.    No.
25      Q.    Is there any bonus component to your

Page 215

1    compensation?
2       A.    The same bonus as all other employees
3    receive.
4       Q.    And what is your understanding of what
5    factors determine the size of the bonus?
6       A.    That is determined by the physicians.
7       Q.    The fact that St. Thomas Neurosurgical had
8    a written formulary, is that a -- that a Joint
9    Commission requirement?
10      A.    Yes.
11      Q.    Do you know why the Joint Commission
12   requires a formulary?
13      A.    That -- why do they require anything that
14   they say?
15      Q.    And who is in charge of making sure that
16   St. Thomas Neurosurgical met Joint Commission
17   requirements?
18      A.    That's my responsibility.
19      Q.    Did you ever talk with a pharmacist before
20   sending the lists of names to NECC?
21           MR. GIDEON:  I can tell you now that
22       as I instructed her earlier, any discussion
23       you had as part of a quality improvement
24       committee is privileged under Tennessee
25       law.  You're instructed not to share any of

Page 216

1        that information if in answering the
2        question you would do so.
3       Q.    (By Mr. Nolan)  And so in light of that
4    objection, will you answer the question?
5       A.    No.
6       Q.    When was the first time that you
7    participated in a Joint Commission survey?
8       A.    Since I have been in a hospital there's
9    been Joint Commission.
10      Q.    Well, since -- let me limit the question.
11   Since you've been working at St. Thomas Neurosurgical.
12      A.    There again, since -- I think we had our
13   first one in 2001 or so.  It's...
14      Q.    And so how many Joint Commission surveys
15   have you participated in?
16      A.    In 2009 was the first one I led.
17      Q.    Okay.  And then when was the next one?
18      A.    2012.
19      Q.    And do you know specifically what the Joint
20   Commission requirements are for a written formulary?
21      A.    Not off the top of my head.
22      Q.    And do you keep a copy of the rules and
23   requirements of the Joint Commission for formularies?
24      A.    I have a Joint Commission standard book
25   with their requirement.  I do have a copy of that.

Page 217

1    Q.   Do you keep that in your office?
2    A.   Yes, I do.
3    Q.   All right. I think when I was asking you
4  about the -- Mario's explanation for the reason he
5  needed the patient list, that being a Massachusetts
6  Board of Pharmacy requirement, I think you said that
7  you've run into other pharmacy laws which were unusual
8  or something along those lines. Do you remember that
9  part of your testimony? I'm not trying to
10  mischaracterize it.
11        MR. GIDEON: Objection to the form.
12    Q.   (By Mr. Nolan) You can answer it.
13        MR. GIDEON: What was the question?
14        THE WITNESS: I don't know were there
15      other pharmacy laws. Other requirements
16      that the state and all require that I --
17      that don't make sense sometimes.
18    Q.   (By Mr. Nolan) Since 2009, can you give us
19  any other examples of pharmacy laws that you've run
20  into that didn't make sense?
21    A.   My response on the other one were there
22  were other laws I said did not make sense, not
23  necessarily pharmacy laws.
24    Q.   All right. Well, let's make the question
25  broader, then, to include the other laws. Since 2009,

Page 218

1  what other laws have you run into in your job that
2  didn't make sense to you?
3    A.   I -- my facility St. Thomas Outpatient
4  could not share a waiting room with the practice.
5  Now, it had to be a separate waiting room or it could
6  be the same waiting room with a firewall in between
7  it.
8    Q.   Okay. All right. That's one example. Any
9  others?
10    A.   That one sticks out the most at this
11  moment.
12    Q.   The Joint Commission survey that happened
13  in 2012, when in 2012 did that occur?
14    A.   I don't know the exact date. It was in the
15  late spring, early summer.
16    Q.   And does the Joint Commission provide you
17  or the clinic with results of its survey?
18    A.   Yes, they do.
19    Q.   And obviously that's a document you keep on
20  file?
21    A.   Yes, it is.
22    Q.   In terms of your decisions regarding and
23  interactions with NECC, is there anything that you
24  wish you had done differently?
25        MR. GIDEON: Objection to the form.

Page 219

1        THE WITNESS: No, not at that time
2      period.
3    Q.   (By Mr. Nolan) So as we sit here today, is
4  there anything that you wish you had done differently?
5        MR. GIDEON: Didn't you just answer
6      that?
7        THE WITNESS: I did. Not for that
8      time period.
9    Q.   (By Mr. Nolan) Which time period are you
10  referring to?
11    A.   Up until September the 20th, 2012.
12        MR. NOLAN: That's all I have.
13        MR. GIDEON: Mr. Stranch said he was
14      going to ask questions on behalf of the PSC
15      when we did the introductions. Is that not
16      correct?
17        MR. STRANCH: I did say that, but
18      I've been feeding mine to George and he's
19      already covered all of it.
20        MR. GIDEON: So you're not going to
21      ask questions?
22        MR. STRANCH: I'm not going to ask
23      them at this point.
24        MR. GIDEON: Just two have been
25      identified for the PSC. I think the next

Page 220

1  person to speak is the attorney for the St.
2  Thomas entities. It may be -- I don't know
3  how loud you are. You want to move down
4  here?
5        MR. SCHRAMEK: I need a microphone
6      and to be by the witness.
7        MR. NOLAN: I'm happy to trade places
8      with you.
9        MR. GIDEON: If it's not too
10      inconvenient for you, it might be easier
11      for him.
12        How much time have we actually been
13      involved in the deposition of this lady
14      today?
15        VIDEOGRAPHER: Five hours and 29
16      minutes.
17        MR. GIDEON: Okay. As of right now?
18        VIDEOGRAPHER: It's still running, so
19      that is an approximation.
20        MR. GIDEON: I understand. But as of
21      now, five hours and 29 minutes?
22        VIDEOGRAPHER: Yes, sir.
23  EXAMINATION
24  BY MR. SCHRAMEK:
25    Q.   Good almost evening, Ms. Schamberg. How

Page 221

1    are you?  Is it Schomberg or Schamberg?
2        A.   Schamberg.  Depends on what part of the
3    country you're from.
4        Q.   I hear you.  As a Schramek, I can
5    understand that.  I represent, you may have heard
6    earlier this morning, St. Thomas Hospital, St. Thomas
7    Health and the St. Thomas network.  Do you understand
8    that?
9        A.   Yes, I do.
10       Q.   And I refer to them as the St. Thomas
11   entities because that's how we've been doing all of
12   our briefing in the MDL, the judge is familiar with
13   that terminology.  And so if I use that terminology,
14   will you understand I'm talking about those three
15   entities?
16       A.   Yes.
17       Q.   Could you take a quick look back at
18   Exhibit 24, which was the name tag exhibit.
19           MR. GIDEON:  It's back here, Debbie.
20   It's right here.
21       Q.   (By Mr. Schramek)  And I want to start at
22   what's been Bates labeled 501, which is your name tag.
23   Now, throughout this deposition, the plaintiffs'
24   counsel was asking you to -- he's been using the term
25   "St. Thomas Neurosurgical" and asked you that whenever

Page 222

1    he talked about that, you would understand that meant
2    St. Thomas -- St. Thomas outpatient neurological
3    center; right?
4        A.   Neurosurgical Center.
5        Q.   Neurosurgical Center.  Can you tell me what
6    it actually says on your name tag with respect to the
7    name of your facility you were working at.
8        A.   It says Howell Allen Clinic.
9        Q.   All right.  And then as far as your
10   director position, how is that explained on your name
11   tag?
12       A.   It's STOPNC is the -- but that's St. Thomas
13   Outpatient Neurosurgical Center.
14       Q.   Sure.  It's an acronym; right?
15       A.   Correct.
16       Q.   STOPNC.  And that's the acronym we've been
17   using for the Court in all of our filings and it's an
18   acronym that's, in fact, on your name tag as the
19   director of STOPNC; right?
20       A.   That's correct.
21       Q.   And is that an acronym that's used during
22   the practice?
23       A.   Yes.
24       Q.   So it's not something that was created by
25   lawyers today.  It was actually something you used in

Page 223

1    your daily business; right?
2        A.   Correct.
3        Q.   So I want to talk a little bit about STOPNC
4    and Howell Allen Clinic and the St. Thomas entities;
5    all right?
6        A.   Okay.
7        Q.   I'd like to start, you mentioned earlier
8    that the physicians determined your bonus; right?
9        A.   Correct.
10       Q.   The physicians, who are the physicians
11   you're talking about?
12       A.   The Howell Allen Clinic physicians.
13       Q.   And Howell Allen Clinic, how did that get
14   its name, do you know?
15       A.   From Dr. Howell and Dr. Allen.
16       Q.   Okay.  So Dr. Howell, Dr. Allen got
17   together and formed a clinic of doctors or an
18   association of doctors known as the Howell Allen
19   Clinic?
20           MR. REHNQUIST:  Objection.
21       Q.   (By Mr. Schramek)  Is that right?
22           MR. REHNQUIST:  Objection.
23           THE WITNESS:  They were neurological
24   surgeons and they changed their name to
25   Howell Allen Clinic.

Page 224

1        Q.   (By Mr. Schramek)  All right.  And with
2    respect to the other name tags we looked at, if you
3    want to start and you flip through those, other
4    than -- how do you said her name, DeZwaan?
5        A.   DeZwaan.
6        Q.   Other than Ms. DeZwaan, can you look
7    through these and tell me what does the top of
8    everyone else's name tag at STOPNC say.
9        A.   The top line on all say Howell Allen
10   Clinic.
11       Q.   And I believe earlier we were talking about
12   how Ms. DeZwaan, she would substitute sometimes, sit
13   in for the receptionist.  Is that what you said?
14       A.   Yes.
15       Q.   Who, in fact, is the normal receptionist at
16   STOPNC?
17       A.   Dot Pemberton.
18       Q.   And the Dot Pemberton that's on Page
19   STOPNC_499, is that who you're referring to?
20       A.   Yes.
21       Q.   And what does the top of her name tag say?
22       A.   Howell Allen Clinic.
23       Q.   And what does it say on the second line of
24   her name tag?
25       A.   The Center for Spinal Surgery.

1      Q.    So the normal receptionist at STOPNC does
2   not even have St. Thomas anywhere on her name tag;
3   right?
4           MR. REHNQUIST: Objection, leading.
5      Q.    (By Mr. Schramek) You can answer.
6      A.    No, she does not have it. I will say
7   that's an old name tag.
8      Q.    That's right, because that was -- the old
9   name was STOPNC; right?
10          MR. REHNQUIST: Objection.
11          THE WITNESS: No.
12     Q.    (By Mr. Schramek) Okay. Then what does
13   that refer to, do you know, The Center for?
14     A.    Center for Spinal Surgery, CSS, that's
15   their -- the hospital portion.
16     Q.    Okay. Gotcha. And then on the -- some of
17   the others, Howell Allen Clinic, it lists their titles
18   at the bottom of what they do; right?
19     A.    Correct.
20     Q.    And who actually did the injections at
21   STOPNC of MPA? Was it an anesthesiologist?
22     A.    Yes.
23     Q.    And can you just give me the names.
24     A.    Dr. John Culclasure, Dr. Rachel Rome, Dr.
25   Steve Dickerson, Dr. Tito Carrero, Dr. Tim Arney was

1   there for -- I don't know when his last -- when he
2   last was there. He -- he stopped coming quite a while
3   before the others -- before the incident.
4      Q.    For the record, Dr. Culclasure's name tag
5   is STOPNC_502; correct?
6      A.    Correct.
7      Q.    And his also says at the top Howell Allen
8   Clinic; right?
9      A.    Correct.
10     Q.    And all the doctors who actually were doing
11   injections that you just told me about, they're all
12   Howell Allen employees; correct?
13     A.    No.
14     Q.    Or they work for Howell Allen?
15     A.    No.
16     Q.    What is their relationship to Howell Allen?
17     A.    No relationship to Howell Allen.
18     Q.    Okay. And you said Dr. Culclasure, he was
19   the -- he sits on the medical committee?
20     A.    Yes, he does.
21     Q.    Executive committee. I believe you said
22   almost all of the Howell Allen Clinic's -- all of the
23   patients that end up at STOPNC, nearly all of them are
24   referred by Howell Allen Clinic; is that correct?
25     A.    That is correct.

1      Q.    So is it fair to say that almost
2   100 percent -- I think you said there were five;
3   right?
4      A.    Well, I did not have a number. I don't --
5   very few. So we're in the 99 percentile.
6      Q.    So 99 percent of the patients, before they
7   ever get to STOPNC, they've started at Howell Allen;
8   correct?
9      A.    That is correct.
10     Q.    They've gone to Howell Allen to get
11   treatment; right?
12          MR. REHNQUIST: Objection.
13     Q.    (By Mr. Schramek) Correct?
14     A.    Correct.
15     Q.    Howell Allen Clinic refers them to go get
16   their injections at STOPNC?
17          MR. REHNQUIST: Objection.
18          THE WITNESS: They refer them to go
19    get injections. We do a large portion of
20    those for them.
21     Q.    (By Mr. Schramek) And when they get to
22   STOPNC, they're injected by a doctor who has Howell
23   Allen Clinic at the top of their name tag; right?
24     A.    Not necessarily.
25     Q.    Well, like Dr. Culclasure could do it?

1      A.    Dr. Culclasure would have Howell Allen
2   Clinic on it.
3      Q.    But they started and it was their intent to
4   go to Howell Allen Clinic for their medical issues;
5   correct?
6           MR. REHNQUIST: Objection.
7      Q.    (By Mr. Schramek) Patients.
8           MR. STRANCH: Object to the form.
9           THE WITNESS: You'll have to
10    rephrase. I'm --
11     Q.    (By Mr. Schramek) Sure. They started
12   their --
13          MR. GIDEON: Just a second. When
14    these other people object, just let them
15    finish, but you'll still answer the
16    question unless you get some instructions
17    not to. If the objections make you forget
18    the question, it's okay to say, "I'm sorry,
19    I've forgotten the question."
20          THE WITNESS: Well, I did.
21          MR. GIDEON: Yeah. Go ahead.
22     Q.    (By Mr. Schramek) I was just saying that
23   99 percent of the patients that end up at STOPNC
24   started their search for medical services at a Howell
25   Allen Clinic. Is that fair?

1    MR. STRANCH: Objection.
2    THE WITNESS: That is fair to say.
3    Q.    (By Mr. Schramek) And I'd like to refer
4  you to what I'm going to mark as Exhibit 53.
5    MR. GIDEON: Let me see the Bates
6  numbers.
7    Q.    (By Mr. Schramek) They are Bates
8  STOPNC_298 and 300.
9    MR. REHNQUIST: I'm sorry, what was
10  the exhibit number?
11    MR. SCHRAMEK: It's 53 according to
12  the -- the tags. That was the next one.
13    MR. REHNQUIST: Thank you.
14    Q.    (By Mr. Schramek) Ms. Schamberg, do you
15  recognize this policy?
16    A.    Yes, I do.
17    Q.    First of all, we've looked at a couple of
18  documents today that bear a similar resemblance with
19  respect to policies; isn't that right?
20    A.    Yes, we have.
21    Q.    And this -- this format, what we see as
22  Exhibit 53, this is the format that was used by STOPNC
23  with respect to promulgating their formal policies; is
24  that fair?
25    (Exhibit 53 was marked for

1    identification.)
2    MR. REHNQUIST: Objection.
3    THE WITNESS: Yes.
4    Q.    (By Mr. Schramek) And these -- the one
5  we're looking at here is called medication errors.
6    A.    That is correct.
7    Q.    And you're familiar with this policy?
8    A.    Sort of at the moment.
9    Q.    Yeah. And it says at the top its purpose
10  is to prevent, detect and resolve drug-related
11  problems that can result in patient harm; correct?
12    A.    Correct.
13    Q.    And when we look at the definition of a
14  medication error, it talks about medication errors
15  being preventable. Any preventable event that could
16  lead or cause to inappropriate patient use or
17  medication -- or patient harm; right?
18    MR. GIDEON: I object to the form.
19  That's not an accurate rendition of the
20  sentence you just referred to.
21    MR. SCHRAMEK: Sure. Let me re-read
22  it.
23    Q.    (By Mr. Schramek) The first sentence says,
24  "A medication error is any preventable event that may
25  cause or lead to any inappropriate medication use or

1  patient harm while the medication is in the control of
2  the healthcare professional, patient or consumer."
3    A.    That is what it says.
4    Q.    Did I read that correctly?
5    So that's what this policy is talking
6  about; right?
7    A.    Correct.
8    MR. REHNQUIST: Objection.
9    Q.    (By Mr. Schramek) And if we go to the last
10  page on reporting, it says that nursing and pharmacy
11  will report medication errors to the MEC for their
12  review; correct?
13    A.    Correct.
14    Q.    And the MEC we talked about earlier; right?
15  The MEC is the medical executive committee; right?
16    A.    That is correct.
17    Q.    The medical executive committee is -- who
18  are the four persons on it?
19    A.    Dr. Jason Hubbard, Scott Butler, Shreka
20  Rogers and Christy Ebert.
21    Q.    And no one on the medical executive
22  committee is employed by any of the St. Thomas
23  entities; correct?
24    MR. REHNQUIST: Objection.
25    THE WITNESS: That is correct.

1    Q.    (By Mr. Schramek) And you as the
2  director -- facilities director, this is one of the
3  policies that you also are in charge of overseeing;
4  right?
5    MR. REHNQUIST: Objection.
6    THE WITNESS: Correct.
7    Q.    (By Mr. Schramek) And, in fact, if we look
8  at the top of Page STOPNC_300, it says, "The medical
9  staff, in collaboration with the nursing and other
10  staff as appropriate, shall periodically assess its
11  definition of a significant medication error and the
12  mechanism's effectiveness to detect significant
13  medication errors."
14    Did I read that correctly?
15    A.    You did.
16    Q.    And with respect to this policy, this is a
17  policy through you and the MEC that is aimed at
18  resolving, addressing medication errors; fair?
19    MR. REHNQUIST: Objection.
20    MR. STRANCH: Objection to the form.
21    THE WITNESS: Yes.
22    Q.    (By Mr. Schramek) And is this a policy
23  that you followed during your work at STOPNC as the
24  facility's director?
25    A.    This is the policy we would follow.

Page 233

1    Q.   And I'd like to next point you to another
2  policy, Exhibit 54, which has a Bates label STOPNC_256
3  to 257.  Just two pages.  Do you recognize this
4  document?
5        (Exhibit 54 was marked for
6        identification.)
7        THE WITNESS:  Yes, I do.
8    Q.   (By Mr. Schramek)  And what is it?
9    A.   It's the St. Thomas Outpatient
10 Neurosurgical Center infection prevention and control
11 plan for the year 2012.
12   Q.   Could you read into the record the first
13 sentence of the overview of this control plan.
14   A.   "St. Thomas Outpatient Neurosurgical Center
15 is an ambulatory care center that is part of the
16 Howell Allen Clinic, a specialty clinic treating
17 disorders of the brain and spine."
18   Q.   And is that a true statement?
19   A.   Yes.
20   Q.   And in this overview, it next says -- in
21 the middle, it says, "The medical executive committee
22 oversees and serves as an advisory board to the
23 center," and it lists four people.  I believe those
24 are the people you just mentioned a minute ago;
25 correct?

Page 234

1    A.   No.  The -- the president has changed.
2    Q.   Okay.  But at the time that this policy was
3  put in place, the president was Steven Abram?
4    A.   Yes.
5    Q.   And at the time of the outbreak, was the
6  president Steven Abram?
7    A.   Yes.
8    Q.   So at the time of the outbreak in 2012,
9  leading up to it, this accurately reflects --
10 STOPNC_256 accurately reflects the composition of the
11 MEC?
12   A.   Yes.  Christy Ebert was -- she attended the
13 meetings, but really had no -- that was to give her
14 report for the imaging office.
15   Q.   Okay.  And if we look at infection
16 prevention control plan evaluation, I'm going to --
17 I'm sure you're tired by now, so I'm going to read it
18 and you can tell me if it's accurate.
19   A.   Okay.
20   Q.   "Infection prevention surveillance and
21 daily management of infection prevention activities is
22 the responsibility of the facility director."
23        Right?
24   A.   That is correct.
25   Q.   And that would be you; correct?

Page 235

1    A.   Correct.
2    Q.   Towards the beginning of this deposition,
3  you made a statement, "St. Thomas Hospital had nothing
4  to do with my job."
5        Do you remember that?
6    A.   Yes.
7    Q.   All right.  And can you just explain that,
8  what you meant by that.
9    A.   I'm not employed by St. Thomas Hospital.
10   Q.   You're employed by Howell Allen Clinic?
11   A.   That is correct.
12   Q.   They're the ones that pay your bonuses;
13 right?  If you get one.  I hear you.
14   A.   If I get one.
15   Q.   We all always are hoping for the best;
16 right?
17        And Howell Allen Clinic, again, is the one
18 that is referring 99 percent of the patients to
19 STOPNC; correct?
20   A.   That is correct.
21   Q.   And if we turn to Exhibit 43, which you
22 actually -- we don't -- you don't have to look at it
23 probably.  It's simply the formulary change approval
24 sheet.  Do you remember that exhibit, 43?
25   A.   Yes.

Page 236

1    Q.   That document reflects that when there is a
2  change to the formulary, it goes all the way up to the
3  board of directors; right?
4    A.   That is correct.
5    Q.   Now, plaintiffs' counsel earlier today was
6  discussing this issue with you about whether or not
7  the use of a compounded form of MPA was a change to
8  the formulary.  Remember that back and forth exchange?
9    A.   Yes.
10   Q.   Putting that issue aside, regardless of
11 that fight, is it true that, in fact, the use of NECC,
12 the use of the compounded MPA, that never was raised
13 to the board of directors pursuant to this Exhibit 43
14 process?
15   A.   Re --
16   Q.   Let me rephrase.
17   A.   Please.
18   Q.   It's your position there was no change to
19 the formulary when you ordered from NECC; right?
20   A.   That is correct.
21   Q.   And because there was no change to the
22 formulary, there was never a formulary change raised
23 to the board of directors?
24   A.   That is correct.
25   Q.   And that was a decision that was made by

Page 237

1    you as facilities director in consultation with
2    Dr. Culclasure?
3         A.    That is correct.
4         Q.    And I think you've said this a few parts
5    throughout the day, but I want to be clear.  None of
6    the St. Thomas entities had anything to do with the
7    decision of STOPNC to begin acquiring product from
8    NECC?
9         A.    That is correct.
10             MR. STRANCH:  Objection to form.
11        Q.    (By Mr. Schramek)  If we could go to
12   Exhibit 39 real quickly.  It's that -- that kind of
13   big exhibit full of e-mails and invoices.  Do you have
14   it in front of you?
15        A.    Yes.
16             MR. REHNQUIST:  I'm sorry, can you
17   say that number again.
18             MR. SCHRAMEK:  Exhibit 39, Bates
19   STOPNC_2386 is the cover.
20        Q.    (By Mr. Schramek)  The top e-mail of that
21   packet was from a -- from you to Marlesa Allen --
22   Marlese Allen; correct?
23        A.    Marlese, yes, sir.
24        Q.    And I think later in the -- in the
25   deposition, we learned that she's the director of HR

Page 238

1    at Howell Allen Clinic; right?
2         A.    That is correct.
3         Q.    And so she's also employed by Howell Allen;
4    correct?
5         A.    That is correct.
6         Q.    And I want to read that first sentence to
7    you.  It says, quote, Do I have to use certain vendors
8    for ordering?  I would like to do some price
9    comparisons with other vendors other than Cardinal,
10   period, closed quote.
11             Did I read those first two sentences
12   correctly?
13        A.    Yes, sir, you did.
14        Q.    And is it fair to say this e-mail reflects
15   the fact that you, as facilities director, was
16   e-mailing the Howell Allen HR director asking her if
17   you had any sort of restrictions on which vendor to
18   order from?
19             MR. REHNQUIST:  Objection to the
20   form, leading.
21             MR. STRANCH:  Objection.
22             THE WITNESS:  I was not e-mailing her
23   as the HR person.  She's also the accounts
24   payable.
25        Q.    (By Mr. Schramek)  All right.

Page 239

1         A.    That is why that question was directed at
2    her.
3         Q.    "In other words, is there some limitation I
4    need to know about that would prevent me from ordering
5    from certain vendors?"
6         A.    Correct.
7         Q.    And I don't think we saw a response to
8    this.  Did Ms. Allen provide any limitations to you?
9         A.    Not that I know -- that I'm aware of.
10        Q.    And you reached out to your employer,
11   Howell Allen Clinic, as the person who you believe
12   would make the decision as to whether or not there
13   were any restrictions on which vendors you could use
14   or not use; correct?
15        A.    That is correct.
16        Q.    And if we turn to -- in that packet, I'm
17   just going to go through a couple more pages.  It's
18   Page 4 of the packet, Bates STOPNC_5409.  That e-mail
19   at the top from Debra -- from you to -- is her name
20   Bobbi Doty?
21        A.    Correct.
22        Q.    You e-mailed her to say, "We may start
23   ordering from Clint Pharma.  They are local and I
24   think will give us better money" -- a better deal;
25   right?

Page 240

1         A.    Yes.
2         Q.    Ms. Doty is also with Howell Allen Clinic;
3    right?
4         A.    That is correct.
5         Q.    And employed by Howell Allen Clinic;
6    correct?
7         A.    Yes.
8         Q.    In fact, if we look at the bottom of that
9    e-mail at 5409, you notice a lot of times it just says
10   the name of the person and doesn't give their e-mail
11   address?  That's a normal thing Outlook does when you
12   print it; right?
13             But at the bottom there, we have your
14   e-mail signature, and could you, for the record, tell
15   us, what is your e-mail address?
16        A.    dschamberg@howellallen.com.
17        Q.    I think you can put that aside.  If you
18   would just look back at Exhibit 41 next, which is the
19   formulary for STOPNC.
20        A.    41 is not formulary.  40.
21        Q.    Oh, all right.  Then I have 41 written on
22   mine.  So STOPNC_533?
23        A.    Yes.
24        Q.    STOPNC_533, Exhibit 40, I think you earlier
25   said, quote, We're a very small entity, closed quote.

Page 241

1  Do you remember saying that?
2      A.   Yes.
3      Q.   And that's reflected by the fact that you
4  have a very small formulary; right?
5      A.   Correct.
6          MR. REHNQUIST:  Objection.
7      Q.   (By Mr. Schramek)  Is it fair to say
8  that -- can you tell me what is the relationship, if
9  any, between the STOPNC formulary on Exhibit 40 and,
10 for example, St. Thomas Hospital's formulary.
11         MR. STRANCH:  Objection, foundation.
12         THE WITNESS:  That I couldn't -- you
13         know, I don't think that would even be
14         close, but I can't -- I don't know what's
15         all on St. Thomas's formulary.
16     Q.   (By Mr. Schramek)  Have you ever seen the
17 formulary?
18     A.   No.
19     Q.   In connection with your work in STOPNC, did
20 you ever have any interaction with the formulary?
21     A.   For St. Thomas Hospital?
22         MR. STRANCH:  Objection.
23     Q.   (By Mr. Schramek)  Hospital.
24     A.   No.
25     Q.   Do you personally -- do you believe that

Page 242

1  the St. Thomas Hospital formulary has anything to do
2  with STOPNC?
3          MR. STRANCH:  Objection.
4          MR. NOLAN:  Objection to the form.
5          THE WITNESS:  No.
6      Q.   (By Mr. Schramek)  And it doesn't appear
7  that your formulary, in fact, changed since 2007; is
8  that right?
9      A.   At that time.
10     Q.   And just so the record's clear, at the
11 bottom of these policies, it says what the date
12 written was, the dates they were reviewed, and then
13 the dates they were revised; correct?
14     A.   Correct.
15     Q.   When you want to determine whether a policy
16 has changed, that's what you look at; right?
17     A.   Yes.
18     Q.   We had some talk about what's referred to
19 as the St. Thomas -- I believe the Medical Plaza.  Is
20 that the right term for it?
21     A.   Yes.
22     Q.   And that's the office building essentially
23 in which STOPNC rents space?
24     A.   Correct.
25         MR. NOLAN:  Objection to the form.

Page 243

1      Q.   (By Mr. Schramek)  The St. Thomas Medical
2  Plaza like most office buildings rents to tenants;
3  right?
4      A.   Correct.
5          MR. REHNQUIST:  Objection.
6      Q.   (By Mr. Schramek)  Can you tell me just for
7  the record -- I mean, you work there every day.  Can
8  you tell me some of the other sorts of health-related
9  doctors' office clinics.  What else is in that medical
10 plaza?
11     A.   TOA, Tennessee Orthopaedic Alliance is in
12 that plaza.
13     Q.   Let's stop there.  Tennessee Orthopaedic
14 Alliance, what is that?
15     A.   Orthopaedics.
16     Q.   It's --
17     A.   It's a doctors' office.  I mean, it's...
18     Q.   An orthopaedic doctors' office?
19     A.   Yes.
20     Q.   All right.  What else?
21     A.   Let's see.  Southern Joint, which recently
22 left the -- that building, but they were -- they were
23 a big orthopaedic clinic.
24     Q.   Ortho clinic.  Some other things?
25     A.   I know there's Dr. Schwaber who does ENT

Page 244

1  and is in that facility.  There's multiple doctors and
2  also the SurgiCare.
3      Q.   And what is SurgiCare?
4      A.   It's an outpatient surgery center.
5      Q.   All right.  And in your about -- what was
6  it, 30 years' experience as a nurse?
7      A.   Yes.
8      Q.   You used to work in an OR; right?
9      A.   Yes.
10     Q.   Which one?
11     A.   I worked at West Side, Parkview, which
12 became Centennial.
13     Q.   All right.  In your 30 years of experience
14 as an RN, as someone who's worked in hospital ORs, is
15 it fairly common to have an office building next to a
16 hospital in which other health service providers can
17 rent space?
18         MR. NOLAN:  Objection to the form.
19         THE WITNESS:  Yes.
20     Q.   (By Mr. Schramek)  And that's because
21 doctors and other clinics and providers, it's good to
22 be near the hospital because a lot of times when
23 people are discharged, they need to continue getting
24 services.  That's one example; right?
25         MR. REHNQUIST:  Objection, leading,

Page 245

```
 1       foundation.
 2           MR. STRANCH:  Objection.
 3           THE WITNESS:  Yes.
 4       Q.   (By Mr. Schramek)  What other reasons in
 5   your 30 years' experience have you noticed why it is
 6   there are medical centers near hospitals?
 7           MR. REHNQUIST:  Objection,
 8       foundation.
 9           THE WITNESS:  For the physician to
10       come to the OR or to the hospital, a short
11       distance from his clinic.
12       Q.   (By Mr. Schramek)  You want the best
13   doctors to have privileges at the hospital to help
14   people --
15           MR. NOLAN:  Objection.
16           MR. STRANCH:  Objection.
17       Q.   (By Mr. Schramek)  -- in emergencies;
18   right?
19       A.   Yes.
20       Q.   And you want them to be able to do their
21   own businesses nearby so they'll be near the hospital
22   if need be; right?
23           MR. REHNQUIST:  Objection.
24           MR. STRANCH:  Objection.
25           THE WITNESS:  Yes.
```

Page 246

```
 1       Q.   (By Mr. Schramek)  Is there anything at all
 2   uncommon about the St. Thomas Plaza -- Medical Center
 3   Plaza and the other office buildings next to
 4   hospitals, in your experience?
 5           MR. REHNQUIST:  Objection to form.
 6           MR. STRANCH:  Objection to form.
 7           MR. NOLAN:  Objection to form.
 8           THE WITNESS:  No.
 9           MR. SCHRAMEK:  Thank you for your
10       time.
11           MR. GIDEON:  Hey, Daniel, are you
12       going to ask any questions.
13           MR. CLAYTON:  No.
14           MR. GIDEON:  You look like you're
15       right on the edge there.
16           MR. CLAYTON:  I'm too nervous here.
17       I can't.
18   EXAMINATION
19   BY MR. REHNQUIST:
20       Q.   Good afternoon, Ms. Schamberg.  My name is
21   Jim Rehnquist.  We haven't met before, have we?
22       A.   Not that I recall, sir.
23       Q.   I represent a company in this case called
24   UniFirst Corporation.  Have you ever heard of
25   UniFirst?
```

Page 247

```
 1       A.   No.
 2       Q.   I just have a few questions and I hope to
 3   get through this as quick as I can.
 4       A.   Okay.
 5       Q.   To what other clinics does Howell Allen
 6   refer patients for steroid injections besides STOPNC?
 7       A.   Depending on the location of where the
 8   patient lives, they will refer them to -- to Bowling
 9   Green or Crossville.  There's several places that they
10   will -- especially if the patient lives out of town.
11   And then they also can refer to Premier Radiology.  I
12   do not know all of the places that they refer them to,
13   but they do refer to other places.
14       Q.   Do you know if the majority of Howell Allen
15   referrals for steroid injections go to STOPNC?
16       A.   I believe they do, sir.
17       Q.   Do you know if 75 percent of them do?
18       A.   Probably within that range.
19       Q.   75 percent is a reasonable ballpark
20   estimate?
21       A.   Yes.
22       Q.   You were asked questions by Mr. Volan [sic]
23   about certain FDA and CDC reports.  Do you remember
24   those questions?
25       A.   Not right off the -- no.  It was a long
```

Page 248

```
 1   time ago.
 2       Q.   You testified -- I believe you testified
 3   that there were certain reports about compounding
 4   pharmacies that were issued by the FDA and the CDC,
 5   and you testified that you -- that you were not
 6   familiar with those.  Do you remember that?
 7       A.   That was earlier today, but I -- I was not
 8   familiar with some of the things on the compounding.
 9       Q.   What publications does STOPNC receive
10   regarding its business?  Newspapers, magazines,
11   periodicals.  What does STOPNC receive to keep up to
12   date?
13       A.   We receive a quarterly journal on new
14   medications or medications.  It's the physicians
15   assistant medication guide.
16       Q.   Your best recall of the name is that it's
17   the physicians assistant medication guide?
18       A.   MP -- it's -- physicians -- I do not know.
19   I don't remember the exact name of this publication.
20       Q.   Do you know who publishes it?
21       A.   No.
22       Q.   It comes quarterly?
23       A.   Yes, sir.
24       Q.   What other publications does STOPNC
25   receive?
```

Page 249

1      A.   Are you talking just general magazines?
2      Q.   No, putting aside Highlights and Newsweek
3   and stuff like that.
4      A.   Okay.
5      Q.   What other trade publications or
6   periodicals does STOPNC receive?
7      A.   I receive Infection Control Magazine.
8      Q.   That's the name of it, Infection Control
9   Magazine?
10     A.   Infection Control.
11     Q.   Who publishes that?
12     A.   That's a -- an infection -- I do not know
13  the publisher, but it's an infection control, OR -- I
14  get an outpatient OR magazine.  Dr. Culclasure
15  receives -- I think it's called clinical advisor or
16  something.  It's another publication.  It's a medical
17  publication.  And then I personally get the AORN
18  journal.
19     Q.   So the AORN?
20     A.   Association of Perioperative Room Nurses.
21     Q.   Do you know of any other publications that
22  Dr. Culclasure receives besides the one you spoke
23  about?
24     A.   No, I don't.  I don't know what he
25  receives.

Page 250

1      Q.   Apart from the ones that you've testified
2   about so far, are you aware of any other publications
3   that the office receives?
4      A.   Now, I get -- and I get e-mails from
5   instead of -- instead of written copies, I will get
6   e-mail -- receive the literature through the e-mail.
7      Q.   Just sort of regular e-mails
8   notifications --
9      A.   Yes.
10     Q.   -- whether you ask for them or not?
11     A.   Yes.
12     Q.   And who do you get those from?
13     A.   The FDA on drug recalls, infection control.
14     Q.   Is that from the FDA as well, infection
15  control?
16     A.   No, it's from a different -- I can't -- top
17  of my head, can't think of them right now.  There's
18  several that I get through the --
19          MR. GIDEON:  Through the e-mail.
20          THE WITNESS:  Through the e-mail.
21     Q.   (By Mr. Rehnquist) Are you on certain
22  lists as far as you understand on the computer where
23  you get these things automatically?
24     A.   Yes.
25     Q.   And did you choose to be on those lists?

Page 251

1   Did you make a decision as to what you were going to
2   receive?
3      A.   Yes.
4      Q.   You get anything from the CDC on a regular
5   basis?
6      A.   Yes.
7      Q.   Do you know what type -- how often do you
8   get e-mail notifications from the CDC?
9      A.   At this time period, just about daily.
10     Q.   Well, let's go back before the outbreak.
11     A.   Okay.  No, I was not on the CDC, but I did
12  receive all the others as well as -- let's see --
13  updates from the state of Tennessee for -- I guess for
14  TOSHA.  I received updates on TOSHA.
15     Q.   Is that T-O-S-H-A?
16     A.   Correct.
17     Q.   Do you know what that stands for?
18     A.   Tennessee Occupational -- it's OSHA.
19          MR. GIDEON:  Tennessee Occupational
20  Safety.
21          THE WITNESS:  Yes.
22     Q.   (By Mr. Rehnquist)  And do you read these
23  e-mail notifications when you get them?
24     A.   I skim them.
25     Q.   Are there sometimes documents attached to

Page 252

1   these e-mail notifications?
2      A.   Yes.
3      Q.   And do you open the attachments as a
4   general matter?
5      A.   It depends on the topic.
6      Q.   Are there certain topics that you would be
7   more likely to open an attachment on than others?
8      A.   If it was a topic that's pertaining to a
9   facility that -- something that would pertain to a
10  facility such as our surgery center.
11     Q.   Do you recall ever receiving any e-mail or
12  an attachment to an e-mail that had anything to do at
13  all with compounding pharmacies?
14     A.   No, sir.
15     Q.   Can you -- do you still have the exhibits
16  in front of you?
17     A.   Yes, sir.
18     Q.   Can you look at Exhibit 39.  I'd like to
19  ask you first, you see the Exhibit 39 has individual
20  page numbers that are different than the Bates
21  numbers?
22     A.   Yes.
23     Q.   Just take a look at Page 1 first.  You send
24  an e-mail to Marlese Allen saying, "Do I have to use
25  certain vendors for ordering"; correct?

Page 253

```
 1      A.    Correct.
 2      Q.    You were seeking her permission to switch
 3   from Cardinal to other vendors; is that right?
 4      A.    I was asking can I do -- can I use other
 5   vendors or is there a set vendor that I have to use.
 6      Q.    Right.  And you were looking for her
 7   approval to choose vendors; correct?
 8      A.    I just need to know if I could do that.
 9      Q.    You were asking --
10      A.    I had recently taken this position so I had
11   to -- I was getting clarification on what I could use.
12      Q.    Okay.  I'm sorry.  Turn to Page 39 of that
13   same exhibit, please.  I'm sorry, Page 47.  This is
14   the patient list that Mr. Volan asked you about
15   earlier?
16      A.    Uh-huh (affirmative).
17      Q.    And I'm just drawing your attention -- if
18   you look at the fourth and fifth entries in that
19   patient list, you'll see that -- who is ASA on that
20   patient list?  That's an anesthesiologist?
21      A.    Yes.
22      Q.    Who is that?
23      A.    That would be Dr. Dickerson, Carrero, Arney
24   and Rome's group.
25      Q.    And if you look down to JWC, do you see
```

Page 254

```
 1   that there's an entry for an 8:00 ESI 2 with JWC?
 2      A.    Yes.
 3      Q.    That means it's a second steroid injection
 4   in a series?
 5      A.    Correct.  It says two of three.
 6      Q.    And then the next entry is at 8:15 entry
 7   for a three of three ESI with JWC?
 8      A.    That's correct.
 9      Q.    And that's Mr. -- Dr. Culclasure as well?
10      A.    Correct.
11      Q.    So he's scheduled to do ESIs -- two ESIs 15
12   minutes apart?
13      A.    Yes.
14      Q.    And is that the standard scheduling that
15   was used in the clinic, that ESIs could be scheduled
16   by the same anesthesiologist 15 minutes apart?
17      A.    Yes.
18      Q.    Are you aware if that's industry standard
19   as well as your clinic standard?
20      A.    I don't know what the industry standard
21   does.
22      Q.    If you look at Page 54 of that same
23   exhibit, please.  I believe you were asked about this
24   by Mr. Volan, and I don't intend to be repetitive, but
25   I just had a couple of followup questions.
```

Page 255

```
 1           If you look at the top of Page 54, this
 2   is -- Dr. Culclasure is -- is forwarding you an e-mail
 3   that he received from a Laxmaiah Manchikanti; is that
 4   correct?
 5      A.    Yes.
 6      Q.    Do you know who Laxmaiah Manchikanti is?
 7      A.    No, I do not.
 8      Q.    But if you -- and then the thing that is
 9   forwarded is actually a long e-mail or a letter to
10   Dr. Culclasure; correct?
11      A.    That is correct.
12      Q.    And in the last sentence in the first
13   paragraph, there's some discussion of multidose vials,
14   but then there's the statement in the last sentence of
15   the paragraph that "There are more cases of infections
16   and increased risk with compounding."  Do you see
17   that?
18      A.    Yes, sir.
19      Q.    Do you recall learning in July of 2012 that
20   a doctor named Laxmaiah Manchikanti told
21   Dr. Culclasure that there were cases of infections and
22   increased risk with compounding?
23      A.    But I don't think -- this is not what he's
24   referring to as far as -- that's not the basis for
25   this e-mail.
```

Page 256

```
 1      Q.    Well, let me try this question.  There is a
 2   reference in this e-mail to cases of infections at
 3   increased risk with compounding; correct?
 4      A.    That is what this says, yes, sir.
 5      Q.    And you read that around the time that you
 6   received it in July of 2012; correct?
 7      A.    I -- you know, I -- I received it.  I can't
 8   tell you how extensive I read it.
 9      Q.    Well, you would normally read an e-mail
10   that Dr. Culclasure forwards to you, wouldn't you?
11      A.    Sometimes.
12      Q.    After receiving this e-mail and seeing the
13   reference to cases of infections and increased risk
14   with compounding, did you do anything about your
15   ongoing relationship with NECC?
16      A.    I was having no problems with NECC so there
17   was -- I had no reason to.
18      Q.    And this reference here to cases of
19   infections and increased risk with compounding did not
20   cause you in any way to ask any questions or do any
21   further research or investigation of compounding
22   pharmacies, did it?
23      A.    I did not -- this -- one reason was because
24   this is dealing with a different medication and a
25   different scenario than...
```

Page 257

1    Q.    So you didn't do anything?
2    A.    Apparently not.
3         MR. GIDEON:  It's okay.
4    Q.    (By Mr. Rehnquist)  You testified in
5  response to Mr. Volan's question, Ms. Schamberg, that
6  you believe that Depo-Medrol is considered to be
7  preservative-free; correct?
8    A.    Not all Depo-Medrol is preservative-free.
9  There is Depo-Medrol that is not preservative-free
10  that states it is -- has preservatives in it.
11    Q.    But you testified, I believe, that at least
12  some of the Depo-Medrol made by Pfizer is
13  preservative-free; correct?
14    A.    That is what their literature says.
15    Q.    And that was literature that you had
16  received from Pfizer about Depo-Medrol stating that
17  some of it was --
18    A.    That's what's on the --
19    Q.    -- preservative-free?
20    A.    That's what's on the bottle.
21    Q.    And you believe that the Depo-Medrol label
22  on the vial itself states that it's preservative-free?
23    A.    Yes, sir.
24    Q.    Turn to Exhibit 36, please.
25    A.    Okay.  Exhibit, wrong one.

Page 258

1         MR. REHNQUIST:  Do you need a copy,
2  C.J.?
3         MR. GIDEON:  No.  It's here.  Let me
4  have that.  Let me put this back in order.
5    Q.    (By Mr. Rehnquist)  Can you look at -- on
6  Page 4, Ms. Schamberg, and do you see the top of Page
7  4 those are photographic depictions of vials of
8  Depo-Medrol.  Do you see that?
9    A.    Yes, I do.
10    Q.    And the -- the lettering on the vial is the
11  label that you were talking about before; correct?
12    A.    Yeah, the single dose vials.
13    Q.    Correct.  Do you see anything on the label
14  of any of those four vials of Depo-Medrol that states
15  that they are preservative-free?
16    A.    I can only see the front.
17    Q.    Is there language on the back as well?
18    A.    There's additional information on this.
19    Q.    And do you recall that the label
20  information that you recall about Depo-Medrol being
21  preservative-free was on the back of the label?
22    A.    I don't remember where it is.  It is -- it
23  states somewhere on the container, the box, somewhere,
24  it says preservative-free.
25    Q.    So you're not sure it's on the label.  It

Page 259

1  might be on the box?
2    A.    I'd have to see to, you know...
3    Q.    But anyway, you'll agree with me that as
4  far as the photographic depictions on Page 4 are
5  concerned, there is nothing on the front of those
6  labels that indicates this is preservative-free;
7  correct?
8    A.    I don't see that word written.
9    Q.    Ms. Schamberg, I would assume that you
10  learned a lot about compounded pharmaceuticals since
11  the outbreak?
12    A.    Yes.
13    Q.    And do you know now that Massachusetts
14  Board of Pharmacy regulations in 2000 -- 2010, 2011,
15  2012 did require patient-specific prescriptions in
16  order for drugs to be compounded by a compounding
17  pharmacy?
18    A.    Since that -- at the present, I know that
19  now.
20    Q.    You know that now.  If you had known that
21  at the time, would you have still gone into business
22  with NECC and given them those patient names that you
23  did?
24         MR. GIDEON:  Objection.
25         THE WITNESS:  I don't know.

Page 260

1    Q.    (By Mr. Rehnquist)  Did you also know that
2  during 2010, 2011, 2012 that Tennessee also had a
3  statute requiring a patient-specific prescription?
4         MR. GIDEON:  Objection to the form.
5  That is absolutely wrong.  I object to your
6  misrepresentation as to the law in this
7  state.
8         MR. REHNQUIST:  Okay.  Let me finish
9  the question --
10         MR. GIDEON:  Objection.
11         MR. REHNQUIST:  -- and then state the
12  objection.
13         And if I'm misstating the law, I'm
14  misinformed.  Okay?
15    Q.    (By Mr. Rehnquist)  Did you know before the
16  outbreak that Tennessee, in the 2011-2012 time period,
17  had a statute that required that a drug be compounded
18  only based on a specific patient prescription?
19         MR. GIDEON:  Objection to the form
20  and that is an absolute misstatement of the
21  law of the state of Tennessee then and
22  today.
23    Q.    (By Mr. Rehnquist)  Did you know that?
24    A.    No.
25         MR. REHNQUIST:  Do you have

1      Exhibit 51, C.J.?
2      Q.    (By Mr. Rehnquist)  You were asked about
3  this document before.  And do you see that in this,
4  the first paragraph of the publication from Clint
5  Pharmaceuticals, he states that compounded
6  corticosteroids do not have FDA approval.  Do you see
7  that?
8      A.    Yes, I do.
9      Q.    And MPA is a com -- MPA from a compounding
10  pharmacy is a compounded corticosteroid; correct?
11      A.    Are you reading that from here, sir?
12      Q.    I just want -- I just want to make sure
13  we're on the same page, that MPA is a corticosteroid.
14      A.    Yes.
15      Q.    Was this the first time that you realized
16  that compounded MPA did not have FDA approval?
17      A.    Not from there.  I didn't learn that from
18  Clint Pharmaceuticals, I don't believe.
19      Q.    When did you learn that?
20      A.    I -- that, I do not know.
21      Q.    At some point, at any rate, you learned
22  that compounded MPA was not FDA approved; correct?
23      A.    After the fact.
24      Q.    Okay.  So in other words, the first time
25  you learned that, that it wasn't approved was after

1  the outbreak?
2      A.    Yes.
3      Q.    If you had known in 2011 that compounded
4  MPA was not FDA approved, would you have done business
5  with NECC?
6          MR. GIDEON:  Objection to the form.
7          THE WITNESS:  I don't know.
8      Q.    (By Mr. Rehnquist)  When you were first
9  having discussions with NECC in the 2000 -- let me
10  say -- putting a date aside, between the period of
11  time when you first ran into NECC at the FASCA
12  conference and the time that you actually ordered MPA
13  from NECC, did you have any conversations with any
14  other compounding pharmacies about buying MPA from
15  them?
16      A.    No.
17      Q.    Did you look for any other compounding
18  pharmacies during that time period that might be able
19  to sell you MPA?
20      A.    No.
21      Q.    Are you aware of any compounding pharmacies
22  in Tennessee?
23      A.    Yes.
24      Q.    Did you inquire of them about their
25  willingness to make MPA for you?

1      A.    No.
2      Q.    Why not?
3      A.    The compounding pharmacies that I've dealt
4  with are small facilities that deal with -- they're
5  small little places, facilities.
6      Q.    These are the types of compounding
7  pharmacies that you went to in your testimony before
8  for a procedure that had to be done pursuant to a
9  patient prescription; correct?
10      A.    That is correct.
11      Q.    And is your understanding that all of the
12  compounding pharmacies that you know of in Tennessee
13  wouldn't have the capacity to produce the kind of --
14  the quantity of drugs that you needed for your
15  practice?
16      A.    Those are the only two compounding
17  pharmacies I know of, the two I had dealt with.  I
18  don't know of -- I don't know about any others in
19  Tennessee.
20      Q.    And neither of them had the capacity to
21  meet your needs; correct?
22      A.    I did not ask them.
23      Q.    But -- and you did not ask them because
24  they were small; correct?
25      A.    Correct.

1      Q.    And you did not ask them as well because
2  you knew that they would only give you a compounded
3  drug with a prescription; correct?
4      A.    No, sir.  I -- these compounding pharmacies
5  that I had used were, like, your little local
6  pharmacy.  So they made something very specific that
7  would require a prescription.
8      Q.    And experience with those kind of small
9  pharmacies that would compound a drug pursuant to a
10  prescription, that's the only kind of compounding
11  pharmacy you were aware of before you began talking to
12  people from NECC; correct?
13      A.    That is correct.
14      Q.    So basically nothing in the on-the-job
15  training that you described earlier in the day
16  prepared you for dealing with a large quantity
17  compounding pharmacy; correct?
18      A.    I've never had the need for that type of --
19      Q.    You testified in response to Mr. Volan's
20  question that as far as you know a single vial of MPA
21  was never used for more than one patient?
22      A.    That is correct.
23      Q.    Were there any policies in place prior to
24  the outbreak at STOPNC about multiple uses of
25  single-dose vials?

Page 265

```
1       A.   I don't know.
2       Q.   Nothing -- you don't recall anything as we
3   sit here?
4       A.   No. No.
5       Q.   Can you look at Exhibit 31, please.  And
6   can you look at -- it's hand marked Page 2 of
7   Exhibit 31.  And you see the third line on that
8   document -- this is an NECC marketing material;
9   correct?
10      A.   It's the literature they gave.
11      Q.   Page 3.
12      A.   Yes.
13      Q.   This is one of the documents that you
14  remember seeing?
15      A.   Yes.
16      Q.   And the third line -- this page is about
17  MPA; correct?
18      A.   Correct.
19      Q.   And the third line of that says that,
20  "Preservative-free is available in one mL, two mL and
21  five mL vials."  Do you see that?
22      A.   Yes, sir.
23      Q.   And I believe you testified that there are
24  some patients who actually need sufficient MPA for an
25  injection that you have to open two vials; correct?
```

Page 266

```
1       A.   That is correct.
2       Q.   Why would anyone have a need for five mL
3   vials of MPA, based on your experience?
4       A.   I -- that, I -- I don't know.  We don't use
5   five.
6       Q.   Well, is there any patient that's big
7   enough or needs that amount of MPA for a steroid
8   injection?
9       A.   You wouldn't put that much in an epidural
10  space.
11      Q.   Did you read this when you saw it as
12  indicating that these five milliliter vials were being
13  marketed for use on multiple patients?
14      A.   No, I didn't read it as that.
15      Q.   That wasn't a red flag to you about New
16  England Compounding Company that they were selling
17  five mL vials of MPA?
18      A.   No.
19      Q.   Have you heard of anyone else selling five
20  mL vials of MPA?
21      A.   I -- I haven't looked.  It doesn't meet my
22  needs, so I would not know.
23      Q.   And this was the first time, in fact, you
24  heard of anybody selling two mL vials of MPA; correct?
25      A.   It's the first time I ever checked on it.
```

Page 267

```
1       (Exhibit 55 was marked for
2   identification.)
3       Q.   (By Mr. Rehnquist)  I'm showing you a new
4   exhibit, Ms. Schamberg, that's marked as 55.
5       MR. GIDEON:  What's the Bates number?
6   This is a duplicate.
7       MR. REHNQUIST:  Is that a
8   different --
9       MR. GIDEON:  Duplicate. 14343, St.
10  Thomas.
11      Q.   (By Mr. Rehnquist)  Let's start from the
12  bottom of this document on the back.  This is an
13  e-mail from a Marion Kainer at the Tennessee
14  Department of Health?
15      A.   Correct.
16      Q.   And do you know who she is?
17      A.   Yes, I do.
18      Q.   Who is she?
19      A.   She's the -- she's an epidemiologist or
20  whatever with the Department of -- Tennessee
21  Department of Health.
22      Q.   And the -- the e-mail at the bottom of the
23  page from Marion Kainer was either sent to you or
24  forwarded to you; is that correct?  If you read the
25  whole thread, start from the bottom up.
```

Page 268

```
1       MR. GIDEON:  I think he means from
2   the back -- backside up.
3       Q.   (By Mr. Rehnquist)  I'm sorry.  From the
4   bottom of the back.
5       MR. GIDEON:  Yeah, read it from there
6   and then flip the page.
7       THE WITNESS:  It appears this is from
8   Dr. Culclasure to Dr. Kainer, or...
9       Q.   (By Mr. Rehnquist)  I'll ask you a
10  question.
11      A.   I'm trying to follow it.
12      Q.   It appears as though Dr. Culclasure
13  responds to the e-mail from Marion Kainer and he
14  copies you and some other people on that including
15  Scott Butler; correct?
16      A.   That is correct.
17      Q.   And what Dr. Culclasure tells Marion
18  Kainer, among other things, in his response is that
19  "Debra will write action plan and new policies and
20  procedures.  Will get copies to you ASAP."
21      Do you see that?  What I just read, Ms.
22  Schamberg, is on the back of the exhibit.  It's the
23  second line from the top.
24      A.   Oh, okay.  I do see that.  Yes.
25      Q.   And did you do that?  Did you write an
```

Page 269

1    action plan and draft new policies and procedures in
2    response to Ms. Kainer?
3        A.    We wrote a guide, a -- it was a procedure
4    guide covering everything that she asked for.  It's a
5    guideline for the staff and put it into place.
6        Q.    Okay.  And you did it really fast, didn't
7    you?  I'm going to show it to you in a minute.
8        A.    Yeah, after she had requested it, we did.
9        Q.    Okay.  And two of the concerns that Ms.
10   Kainer expressed in her e-mail were single-dose vials
11   being used on multiple patients; correct?
12       A.    Correct.
13       Q.    And this was the issue that you talked
14   about before with -- and I may not pronounce it
15   right -- Omnipaque?
16       A.    Omnipaque.
17       Q.    Omnipaque.  And the other concerns she
18   raised was that the tops of the vials need to be wiped
19   down before being opened; correct?
20       A.    Correct.
21            (Exhibit 56 was marked for
22       identification.)
23       Q.    (By Mr. Rehnquist)  This is Exhibit 56.
24   It's a document entitled "St. Thomas Outpatient
25   Neurological Center injection practice guidelines."

Page 270

1            Have you had a chance to take a look at the
2    document, Ms. Schamberg, and see if you're familiar
3    with it or not?
4        A.    Yes, I am.
5        Q.    And is this the corrective action plan that
6    was written in response to the e-mail from Marion
7    Kainer?
8        A.    Yes, it is.
9        Q.    Was a person named Candace Smith involved
10   in developing this corrective action plan?
11       A.    I reviewed it with Candace.
12       Q.    And who is Candace Smith?
13       A.    She's infection prevention nurse for St.
14   Thomas Hospital.
15       Q.    Is she an employee of Howell Allen?
16       A.    No, she is not.
17       Q.    And why did you review it with her?
18       A.    Because she's an infection control nurse
19   and she had been working with us on -- with -- since
20   the outbreak.
21       Q.    Were working with you on responses to the
22   outbreak, to just describe it generally?
23       A.    And providing me with information.
24       Q.    And at the very bottom of Exhibit 56 -- is
25   that 56, Ms. Schamberg?

Page 271

1        A.    Yes, it is.
2        Q.    At the very bottom of that document, it
3    indicates in bold type, "Note:  All medications
4    needles and syringes are single-use patient items and
5    are disposed of at the end of each procedure."
6            Do you see that?
7        A.    Yes, I do.
8        Q.    And that was drafted in this policy to
9    specifically respond to the concerns that Ms. Kainer
10   had raised; correct?
11       A.    Correct.
12       Q.    Was this the first time that STOPNC had any
13   kind of a policy regarding injection practice
14   guidelines?
15       A.    It's the first time we had anything that
16   went through all of these steps listed.
17       Q.    What did you have that didn't go through
18   all these steps?
19       A.    Now, that, I don't recall.
20       Q.    Did you have -- do you recall having a
21   policy that was -- that had specific guidelines for
22   injection practices?
23       A.    I don't remember what we had in place.  A
24   lot of this is -- is, you know -- it's a guideline.
25   It's not a policy.  It's a guideline to use just --

Page 272

1    most of everything --
2        Q.    Some of it's optional?
3        A.    Everything on here is -- most everything on
4    here is things that are just a -- it's -- what's the
5    word I'm looking for?
6            MR. GIDEON:  Take your time.
7            THE WITNESS:  This is just giving
8        someone a step by step on how to set up and
9        do the procedure.  Normally your policies
10       do not do a little step by step by step by
11       step.
12       Q.    (By Mr. Rehnquist)  This was something new,
13   kind of a checklist?
14       A.    Something very similar.
15       Q.    Was this checklist something that was
16   supposed to be followed in every injection that was
17   done at STOPNC?
18       A.    It was followed with every injection.  We
19   didn't make any changes.  This is how we did things.
20   It just was not written down.
21       Q.    Does a patient have to have a consulting
22   appointment with a STOPNC anesthesiologist before he
23   has a steroid injection?
24       A.    The anesthesiologist speaks with the
25   patient before and obtains their history before

Page 273

1    they -- he does the injection.
2        Q.    Maybe that was a bad question.  My question
3    is let's suppose someone is referred from Howell Allen
4    and they come over to STOPNC.  Can they get an
5    injection the very first time they walk in the door or
6    do they have to discuss the procedure with an
7    anesthesiologist and then come back again later?
8        A.    They get the procedure that day after
9    talking with the anesthesiologist.
10       Q.    And sometimes the first steroid injection
11   doesn't work; correct?
12       A.    Correct.
13       Q.    It's not uncommon for a patient to have two
14   or even three injections; correct?
15       A.    That is correct.
16       Q.    Do patients ever have more than three
17   injections?
18       A.    Occasionally the doctor -- physician will
19   order four.
20       Q.    And is there a certain amount of time
21   period that is supposed to elapse between the first
22   injection and the second injection?
23       A.    No sooner than ten days apart.  They can be
24   two to three weeks or longer apart.
25       Q.    And what is the source of that guideline or

Page 274

1    rule or practice that you just referred to that they
2    have to be at least ten days apart?
3        A.    That, you'd have to ask the surgeon or the
4    medical -- the doctor.  There's a rationale that I
5    can't give that to you that would come from the doctor
6    to tell you.
7        Q.    Are you aware of any limit on the number of
8    steroid injections a patient can get in a year?
9        A.    They do not like for them to have more than
10   three or four in a six-month period.
11       Q.    Are you aware of any insurance or other
12   payor restrictions on number of steroid injections you
13   can get in a year?
14       A.    Yes.
15       Q.    What generally are those restrictions, if
16   you know them?
17       A.    Now or then?
18       Q.    Let's talk about then.
19       A.    Then, I -- there was -- I don't know.
20   Medicare, I believe, had a restriction on the number,
21   but I do not remember -- I do not remember the
22   numbers.
23       Q.    Did any patient ever request a particular
24   type or source of steroid for an injection?
25       A.    Not that I'm aware.

Page 275

1        Q.    For example, did any patient ever request
2    being given the brand drug rather than the generic
3    equivalent?
4        A.    Not that I'm aware.
5        Q.    Before May 2011 -- I'm sorry.  Before the
6    outbreak, as a matter of practice were patients
7    informed -- withdrawn.
8              During the -- during the period that you
9    were buying MPA from NECC, were patients informed
10   during that time period that they were being given a
11   non-FDA approved drug from a compounding pharmacy?
12       A.    No.
13       Q.    Do you participate in the -- do you
14   occasionally participate in the meetings that
15   Dr. Culclasure or another anesthesiologist would have
16   with patients when they inform them of the risks of
17   the injection?
18       A.    I have heard Dr. Culclasure explain the
19   procedure to them -- to the patients.
20       Q.    Have you heard other doctors explain the
21   procedures to the patients?
22       A.    I don't know if I've been in the room when
23   the other doctors were explaining or not.
24       Q.    What risks did Dr. Culclasure inform the
25   patients of when you've overheard him?

Page 276

1        A.    I don't recall.  They're on the form.  He
2    would go through and explain the risks that are listed
3    on his -- when he does his history with them.
4        Q.    Has any patient ever requested specifically
5    that he wants Depo-Medrol from Pfizer, to your
6    knowledge?
7        A.    Not to my knowledge.
8        Q.    Ms. Schamberg, you testified that
9    Dr. Culclasure had a preference for using
10   preservative-free MPA?
11       A.    Yes.
12       Q.    Did he tell you why he had that preference?
13       A.    They don't like to put alcohol in the
14   epidural space.
15       Q.    Why not?  Did he tell you why not?
16       A.    He did, but I don't -- I can't -- I don't
17   remember exactly why.  There's a reason for it.
18       Q.    Did he ever tell you there was a risk of a
19   complication called arachnoiditis?
20       A.    That sounds familiar.
21       Q.    Did he ever talk to you at all about the
22   literature on the subject that there was some
23   controversy about using drugs with a preservative in
24   them in steroid injections?
25       A.    I remember having conversations of that,

Page 277

1    but I don't remember the content of it.
2        Q.    Do you remember having those conversations
3    with Dr. Culclasure in 2010, let's say, six months
4    before you started doing business with NECC?
5        A.    I don't recall.
6        Q.    Do you recall for how long prior to doing
7    business with NECC that Dr. Culclasure had expressed
8    to you concerns about using a steroid with
9    preservative in it for ESIs?
10       A.    No.
11       Q.    Now, Mr. Volan asked you -- asked you
12   questions today about everybody that you talked to in
13   connection with making the decision to buy drugs from
14   NECC. Do you remember that?
15       A.    Yes.
16       Q.    And you never mentioned in those -- you
17   never mentioned in response to those questions that
18   you had any communications with your pharmacy
19   consultant, Mr. O'Neil, about the decision to buy
20   drugs from NECC; correct?
21       A.    I did not respond to that.
22       Q.    Right. You didn't talk to Mr. O'Neil about
23   the decision to buy drugs from NECC, did you?
24            MR. GIDEON: If it -- if -- if you
25       had any discussions with Mr. O'Neil in

Page 278

1        connection with a quality improvement
2        committee, then that is privileged in
3        Tennessee.
4            THE WITNESS: Okay.
5            MR. GIDEON: And you can't answer it.
6        If it wasn't in connection with quality
7        improvement, then you can; okay?
8            THE WITNESS: Okay.
9        Q.    (By Mr. Rehnquist) Did you have any
10   conversations with Mr. O'Neil about the decision to
11   buy drugs from NECC?
12       A.    It's -- that's quality.
13       Q.    So is the -- is the answer that you did
14   have communications with him?
15            MR. GIDEON: She's not going to
16       answer the question.
17            THE WITNESS: The answer is I'm not
18       going to answer.
19            MR. REHNQUIST: She's not going to
20       tell me whether or not she had
21       communications with Mr. O'Neil on the
22       subject?
23            MR. GIDEON: Right.
24       Q.    (By Mr. Rehnquist) And you're not going to
25   tell me whether or not you had communications with

Page 279

1    Mr. O'Neil on the subject of NEC's patient name
2    request; correct?
3            MR. GIDEON: Same.
4        Q.    (By Mr. Rehnquist) You're not going to
5    tell me whether or not?
6        A.    No, sir.
7        Q.    And that's on the basis of this privilege
8    that your lawyer has advised you about?
9        A.    That is correct.
10       Q.    Now, you don't have a pharmacist in-house
11   do you --
12       A.    No, sir.
13       Q.    -- at STOPNC?
14            And you're not a pharmacist?
15       A.    No, I'm not.
16       Q.    And that's why you have a pharmacy
17   consultant; correct?
18       A.    That is correct.
19       Q.    Mr. O'Neil is STOPNC's source of pharmacy
20   expertise; correct?
21       A.    Yes.
22       Q.    And you filed an affidavit in court under
23   oath about that relationship with Mr. O'Neil, didn't
24   you?
25       A.    I don't remember. I --

Page 280

1        Q.    You probably filed a lot of things.
2        A.    I have filed a lot of things. I can't tell
3    you that's what it is.
4        Q.    I'm sorry. Can you look at what's
5    previously been marked as Exhibit 52. And I believe
6    you said you wrote this affidavit at the request of
7    the board of health?
8        A.    That's what it said. I do not know who I
9    wrote this affidavit for.
10       Q.    But this -- this is an affidavit that you
11   signed under oath on January 11th, '19 -- sorry --
12   2013?
13       A.    January 11th, '13. Yes, sir.
14       Q.    And can you just take a look at Paragraph 5
15   and read that one to yourself, please.
16       A.    (The witness complies.)
17       Q.    In that last paragraph, you state that, "Of
18   the three lots that were subject to a voluntary
19   recall," those were all lots from which you purchased
20   MPA from NECC; correct?
21       A.    These lots -- we did purchase -- that were
22   these three lots.
23       Q.    Okay. Do you have any records that
24   indicate for a particular patient injection which of
25   those three lots the steroids came from?

Page 281

1    A.   No.
2    Q.   Did the Tennessee Board of Health ask you
3  about that?  In other words -- let me withdraw the
4  question.
5        Did the Tennessee Board of Health ask you
6  if you could connect one of those three lots to a
7  specific injection?
8    A.   I'm not sure I understand exactly what
9  you're -- I mean, I can't tell you that this
10  particular patient got that particular lot number.
11    Q.   Ms. Schamberg, you've been interviewed by
12  many people from different government agencies since
13  the outbreak; correct?
14    A.   That is correct.
15    Q.   And have you, in all of -- can you just
16  identify as best you can which government agencies
17  have interviewed you.
18    A.   Since the outbreak?
19    Q.   Since the outbreak.  We talked about the
20  Tennessee Board of Health.  Is that one?
21    A.   The Tennessee Board of Health.  The
22  Tennessee board for licensure regulations.  They do --
23  they surveyed us.  They came in.  The DEA came in as a
24  random -- it had nothing to do with the outbreak.  We
25  did have a survey by them.

Page 282

1    Q.   I just want to focus on the outbreak.
2    A.   Okay.
3    Q.   Any other government bodies interview you
4  in connection with the meningitis outbreak?
5    A.   Joint Commission.
6    Q.   Joint Commission.  What else?
7    A.   Tennessee --
8    Q.   Any federal bodies?  Did you talk to the
9  U.S. Attorney's Office in Boston?
10    A.   Oh, yes.  Yes.
11    Q.   You talked to the CDC?
12    A.   I believe I did.
13    Q.   And in all those -- in all those
14  interviews, have you had counsel with you?  In other
15  words, lawyers that represent STOPNC.
16    A.   No.
17    Q.   Did you have lawyers with you when you
18  talked to the CDC?
19    A.   No, because some of the CDC was conference
20  calls.
21    Q.   Did you have lawyers with you when you
22  talked to the U.S. Attorney's Office in Boston?
23    A.   I -- I don't remember.
24        THE WITNESS:  I don't think y'all
25  were there.

Page 283

1        Yes, they were.
2    Q.   (By Mr. Rehnquist)  Pardon me?
3    A.   I was trying to remember.  Yes, they were
4  there.  I remember him sitting there.
5    Q.   And did they take notes of those
6  interviews?
7    A.   I assume they did.  I don't know.
8    Q.   Did you observe them taking notes?
9    A.   My focus was on the gentleman talking with
10  me.
11    Q.   What was the general subject matter of the
12  interview with the U.S. Attorney's Office?  I mean, I
13  understand it was about the outbreak, but do you
14  recall any of the questions that they asked?
15    A.   I do not.
16        (Exhibit 57 was marked for
17        identification.)
18    Q.   (By Mr. Rehnquist)  This is Exhibit 57.
19  It's a document and an attachment, which I understand
20  were produced back to back.
21        MR. REHNQUIST:  C.J., I've got...
22        MR. GIDEON:  There's a -- what's the
23  Bates stamp number?
24        MS. MACLEMAN:  The Bates stamp is
25  STOPNC_004245.

Page 284

1        MR. REHNQUIST:  It's not on this
2  particular copy.
3        MR. GIDEON:  Number again, please,
4  00?
5        MS. MACLEMAN:  4245.
6        MR. GIDEON:  It's Exhibit No. 57.
7    Q.   (By Mr. Rehnquist)  Have you had a chance
8  to look at this exhibit, Ms. Schamberg?
9    A.   Yes, I have.
10    Q.   So there was questioning earlier about the
11  average number of steroids injections that STOPNC
12  would give in a period -- in a particular month.  Do
13  you recall that testimony?
14    A.   Yes.
15    Q.   And is it fair to say that, like, 500
16  procedures would be a good month?
17    A.   500 would be a good month.
18    Q.   And can you look at the spreadsheet that
19  is -- and I apologize.  There aren't -- there aren't
20  Bates stamp numbers on the spreadsheet, but I'm going
21  to try to ask you just a couple of questions about it
22  anyway and then I'm done.
23        If you look at the -- can you hold it so
24  the staple is in the upper right-hand corner?
25    A.   Yes.

Page 285

1    Q.    Okay.  If you look at that page, do you see
2    that for August 2012 it lists 504; correct?
3    A.    That is correct.
4    Q.    And that's the same number that is in the
5    e-mail that is the first page of Exhibit 57; correct?
6    A.    Correct.
7    Q.    And then if you turn to the -- if you hold
8    the document so the staple is in the lower right-hand
9    corner on what I'm going to call the back page.
10   A.    Uh-huh (affirmative).
11   Q.    This is a list of all of STOPNC's
12   procedures for 2012, correct, up through August?
13   A.    Correct.
14   Q.    And you mentioned that STOPNC -- you
15   mentioned this morning that STOPNC did two other
16   procedures, one was called a denervation and one was
17   called a stem trial.
18   A.    Yes.
19   Q.    And this document has a row for stem trial
20   about halfway down the left-hand side of the page I've
21   been asking about.  Do you see that?
22   A.    Yes.
23   Q.    This indicates that STOPNC did zero stem
24   trials in 2012?
25   A.    That is correct.

Page 286

1    Q.    And do any of the other items in the column
2    under the heading procedures refer to denervations?
3    A.    Yes.  The LRFA is a radiofrequency ablation
4    that is also a denervation.  Same answer.
5    Q.    That's a denervation?
6    A.    Yes, sir.
7    Q.    And so if you add those numbers up for
8    2012, just going across from the right LRFA, it looks
9    like there was a total of 25 denervations done in
10   2000 -- in this period of 2012, approximately 25?
11   A.    16.  Huh-uh (negative).  First quarter and
12   second quarter is four, plus seven, 11, 12, 13, 14,
13   15.  15 of lumbar.
14   Q.    Are you -- I'm sorry.  Just looking at the
15   LRFA row.
16   A.    Correct.  But if you'll look it's --
17   there's a first, second, third, fourth quarter that
18   gives you the total for the quarter.
19   Q.    Okay.  Gotcha.  But in any event, LRFA is
20   the denervation procedure that you testified about
21   this morning?
22   A.    That is correct.
23          MR. REHNQUIST:  Ms. Schamberg, thanks
24   very much for staying late and I have
25   nothing further.

Page 287

1          MS. CARRICK:  I have just a few
2    questions.
3          MR. GIDEON:  Switch with him.  Who do
4    you represent?
5          MS. CARRICK:  Dr. Lister and SCC,
6    Surgery Center - Crossville.
7          MR. REHNQUIST:  I didn't catch that.
8    Can you repeat it on the record.
9          MS. CARRICK:  Yes.
10   EXAMINATION
11   BY MS. CARRICK:
12   Q.    Ms. Schamberg, my name is Megan Carrick.  I
13   represent Dr. Lister, who is out in Crossville, and
14   Specialty Surgery Center, which is in Crossville as
15   well, and I just have a few questions and you've been
16   quite the trooper today.
17          You testified that you learned that there
18   was an issue on September 18th when you received an
19   e-mail from Candace Smith; is that correct?
20   A.    That is correct.
21   Q.    And at that time, did you alert any
22   authorities such as a State Board of Health or a
23   federal agency that there was some sort of issue going
24   on?
25   A.    No, I did not.

Page 288

1    Q.    Did you instruct any of your staff or
2    anyone at STOPNC to do so?
3    A.    I was on vacation.  She was -- the patient
4    was in Vanderbilt Hospital.  They were the ones that
5    were doing the conducting of what was going on.
6    Q.    Candace Smith at St. Thomas was dealing
7    with the issue at that time; is that correct?
8    A.    The patient was at Vanderbilt Hospital.
9    They had contacted Candace Smith because the patient
10   had said they had an epidural steroid injection at St.
11   Thomas.  She knew they did not do the injection and
12   called me to see if it was at our facility.
13   Q.    All right.  And I believe you testified
14   that you were first contacted by the Tennessee
15   Department of Health the following Sunday.
16   A.    I believe --
17   Q.    Is that correct?
18   A.    I believe that's correct.
19   Q.    Do you know how they became aware that
20   there was an issue at that time?
21   A.    They knew prior to.  They knew on Thursday
22   that there was an issue.
23   Q.    So they became aware that there was an
24   issue on Thursday, which would be September 19th; is
25   that correct?

Page 289

```
 1    A.   The 20th.
 2    Q.   The 20th?
 3    A.   No, the 20th.
 4    Q.   So in that interim, between September 18th
 5   and September 20th, do you know how the Tennessee
 6   Department of Health became aware that there was an
 7   issue?
 8    A.   They were notified by the hospitals.
 9    Q.   Was that Vanderbilt Hospital or St. Thomas
10   Hospital?
11    A.   I do not know.  I'm assuming both.
12         MS. CARRICK:  That's all of my
13   questions.
14         MR. GIDEON:  All right.  That's it.
15   We do not waive signature.  We'll see you
16   tomorrow morning at 9:00.
17         VIDEOGRAPHER:  This concludes?
18         This concludes the deposition.  We're
19   off the record.  This is the end of Tape
20   No. 5.  The time is 5:55 p.m.
21         (Deposition concluded at 5:55 p.m.)
22
23
24
25
```

Page 290

```
 1         DISCLOSURE
 2
 3     Pursuant to Article 10.B of the Rules
   and Regulations of the Board of Court
   Reporting of the Judicial Council of
 4   Georgia which states:  "Each court reporter
   shall tender a disclosure form at the time
 5   of the taking of the deposition stating the
   arrangements made for the reporting
 6   services of the certified court reporter,
   by the certified court reporter, the court
 7   reporter's employer or the referral source
   for the deposition, with any party to the
 8   litigation, counsel to the parties, or
   other entity.  Such form shall be attached
 9   to the deposition transcript," I make the
   following disclosure:
10
     I am a Georgia Certified Court
11   Reporter.  I am here as a representative of
   Discovery Litigation Services, LLC.
12   Discovery Litigation Services, LLC was
   contacted to provide court reporting
13   services for the deposition.  Discovery
   Litigation Services, LLC will not be taking
14   this deposition under any contract that is
   prohibited by O.C.G.A. 9-11-28(c).
15
     Discovery Litigation Services, LLC
16   has no contract/agreement to provide
   reporting services with any party to the
17   case, any counsel in the case, or any
   reporter or reporting agency from whom a
18   referral might have been made to cover this
   deposition.
19
     Discovery Litigation Services, LLC
20   will charge its usual and customary rates
   to all parties in the case, and a financial
21   discount will not be given to any party to
   this litigation.
22
23
        Blanche J. Dugas
24        CCR No. B-2290
25
```

Page 291

```
 1   STATE OF GEORGIA:
 2   COUNTY OF FULTON:
 3
 4       I hereby certify that the foregoing
 5   transcript was reported, as stated in the
 6   caption, and the questions and answers
 7   thereto were reduced to typewriting under
 8   my direction; that the foregoing pages
 9   represent a true, complete, and correct
10   transcript of the evidence given upon said
11   hearing, and I further certify that I am
12   not of kin or counsel to the parties in the
13   case; am not in the employ of counsel for
14   any of said parties; nor am I in any way
15   interested in the result of said case.
16
17   February 10, 2015
18
19
20       BLANCHE J. DUGAS, CCR-B-2290
21
22
23
24
25
```

Page 292

```
 1         CAPTION
 2
 3       The Deposition of DEBRA SCHAMBERG, RN,
 4   taken in the matter, on the date, and at the time and
 5   place set out on the title page hereof.
 6       It was requested that the deposition be
 7   taken by the reporter and that same be reduced to
 8   typewritten form.
 9       It was agreed by and between counsel and
10   the parties that the Deponent will read and sign the
11   transcript of said deposition.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 293

```
1              DEPOSITION ERRATA SHEET
2     DLS Assignment No.  20638
3     Case Caption:  In Re:  New England Compounding
4     Pharmacy, Inc., et al
5
6     Witness:  DEBRA SCHAMBERG, R.N. - 02/04/2015
7
8          DECLARATION UNDER PENALTY OF PERJURY
9
10    I declare under penalty of perjury that I have read
11    the entire transcript of my deposition taken in the
12    captioned matter or the same has been read to me, and
13    The same is true and accurate, save and except for
14    changes and/or corrections, if any, as indicated by me
15    on the DEPOSITION ERRATA SHEET hereof, with the
16    understanding that I offer these changes as if still
17    under oath.
18
19    Signed on the _____ day of
20
21    _____, 20___.
22
23    _____
24    DEBRA SCHAMBERG, RN
25
```

Page 294

```
1                  CERTIFICATE
2     STATE OF GEORGIA
3     COUNTY OF FULTON
4          Before me, this day, personally appeared,
5     DEBRA SCHAMBERG, R.N., who, being duly sworn, states
6     that the foregoing transcript of her deposition, taken
7     in the matter, on the date, and at the time and place
8     set out on the title page hereof, constitutes a true
9     and accurate transcript of said deposition.
10
11    _____
12    DEBRA SCHAMBERG, R.N.
13
14         SUBSCRIBED and SWORN to before me this
15    _____day of_____, 20___ in the
16    jurisdiction aforesaid.
17
18    _____    _____
19    My Commission Expires     Notary Public
20
21    *If no changes need to be made on the following two
22    pages, place a check here ____, and return only this
23    signed page.*
24
25
```

Page 295

```
1              DEPOSITION ERRATA SHEET
2     Page No.____Line No.____Change to:_____
3     _____
4     Reason for change:_____
5     Page No.____Line No.____Change to:_____
6     _____
7     Reason for change:_____
8     Page No.____Line No.____Change to:_____
9     _____
10    Reason for change:_____
11    Page No.____Line No.____Change to:_____
12    _____
13    Reason for change:_____
14    Page No.____Line No.____Change to:_____
15    _____
16    Reason for change:_____
17    Page No.____Line No.____Change to:_____
18    _____
19    Reason for change:_____
20    Page No.____Line No.____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
25          DEBRA SCHAMBERG, R.N.
```

Page 296

```
1              DEPOSITION ERRATA SHEET
2     Page No.____Line No.____Change to:_____
3     _____
4     Reason for change:_____
5     Page No.____Line No.____Change to:_____
6     _____
7     Reason for change:_____
8     Page No.____Line No.____Change to:_____
9     _____
10    Reason for change:_____
11    Page No.____Line No.____Change to:_____
12    _____
13    Reason for change:_____
14    Page No.____Line No.____Change to:_____
15    _____
16    Reason for change:_____
17    Page No.____Line No.____Change to:_____
18    _____
19    Reason for change:_____
20    Page No.____Line No.____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
25          DEBRA SCHAMBERG, R.N.
```