Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: NEW ENGLAND
COMPOUNDING PHARMACY,
INC. PRODUCTS LIABILITY    MDL No. 2419
LITIGATION
                    Master Dkt:
                    1:13-md-02419-RWZ
~~~~~~~~~~~~~~~~~~~~~~~
THIS DOCUMENT RELATES
TO:

All Actions

~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF
JOHN W. CULCLASURE, M.D.

9:05 a.m.
March 23, 2015

Suite 1100
315 Deaderick Street
Nashville, Tennessee

Blanche J. Dugas, RPR, CCR No. B-2290

---

Page 2

1          APPEARANCES OF COUNSEL
2   On Behalf of the Plaintiffs:
        RANDALL L. KINNARD, Esquire
3       DANIEL L. CLAYTON, Esquire
        Kinnard, Clayton & Beveridge
4       127 Woodmont Boulevard
        Nashville, Tennessee 37205
5       (615) 686-2501
        (615) 297-1505 (facsimile)
6       rkinnard@kcbattys.com
        dclayton@kcbattys.com
7
        J. GERARD STRANCH, IV, Esquire
8       BENJAMIN A. GASTEL, Esquire
        Branstetter, Stranch & Jennings, PLLC
9       227 Second Avenue North, Fourth Floor
        Nashville, Tennessee 37201
10      (615) 254-8801
        (615) 250-3937 (facsimile)
11      gerards@bsjfirm.com
12      GEORGE NOLAN, Esquire
        WILLIAM LEADER, Esquire
13      Leader, Bulso & Nolan, PLC
        414 Union Street - Suite 1740
14      Nashville, Tennessee 37219-1734
        (615) 780-4114
15      (615) 780-4122 (facsimile)
        gnolan@leaderbulso.com
16      bleader@leaderbulso.com
17  On Behalf of St. Thomas Outpatient Neurosurgical
    Center, LLC; Howell Allen, a Professional Corporation;
18  John W. Culclasure, M.D.; Debra V. Schamberg, RN:
        CLARENCE J. "C.J." GIDEON, JR., Esquire
19      MATTHEW CLINE, Esquire
        Gideon, Cooper & Essary, PLC
20      315 Deaderick Street - Suite 1100
        Nashville, Tennessee 37238
21      (615) 254-0400
        (615) 254-0459 (facsimile)
22      cj@gideoncooper.com
        matt@gideoncooper.com
23      chris@gideoncooper.com
24
25

---

Page 3

1       ~~ APPEARANCES CONTINUED ~~
2   On Behalf of Saint Thomas Health, Saint Thomas
    Network, Saint Thomas West Hospital f/k/a St. Thomas
3   Hospital:
        ADAM T. SCHRAMEK, Esquire
4       Norton, Rose, Fulbright
        Suite 1100
5       98 San Jacinto Boulevard, Suite 1100
        Austin, Texas 78701
6       (512) 536-5232
        adam.schramek@nortonrosefulbright.com
7
        LELA M. HOLLABAUGH, Esquire
8       Bradley, Arant, Boult & Cummings, LLP
        Suite 700, Roundabout Plaza
9       1600 Division Street, Suite 700
        Nashville, Tennessee 37203
10      (615) 252-2348
        (615) 252-6348 (facsimile)
11      lhollabaugh@babc.com
12  On Behalf of UniFirst Corporation:
        JIM REHNQUIST, Esquire
13      NICHOLAS DREW, Esquire
        Goodwin Procter, LLP
14      53 State Street, Exchange Place
        Boston, Massachusetts 02109
15      (617) 570-1000
        (617) 523-1231 (facsimile)
16      ndrew@goodwinprocter.com
        jrehnquist@goodwinprocter.com
17
        On Behalf of Specialty Surgery Center - Crossville,
18      PLLC; Kenneth R. Lister, M.D.; Kenneth R. Lister,
        M.D., PC:
19      MEGAN A. CARRICK, Esquire
        Brewer, Krause, Brooks, Chastain & Burrow, PLLC
20      Suite 2600
        611 Commerce Street, Suite 2600
21      Nashville, Tennessee 37203
        (615) 256-8787
22      (615) 256-8985 (facsimile)
        mcarrick@bkblaw.com
23
24
25

---

Page 4

1       ~~ ATTORNEYS APPEARING VIA VIDEO STREAM ~~
2   On Behalf of the Plaintiffs:
        DANIEL MILLER, Esquire
3       Janet, Jenner & Suggs, LLC
        Suite 165
4       1777 Reisterstown Road
        Baltimore, Maryland 21208
5       (410) 653-3200
        (410) 653-9030 (facsimile)
6       dkm@myadvocates.com
7   On Behalf of the Plaintiffs Jocelyn Norris and James
    and Michelle Palmer:
8       CHRISTOPHER T. CAIN, Esquire
        Scott & Cain
9       Suite 601
        550 West Main Street
10      Knoxville, Tennessee 37902
        (865) 525-2150
11      (865) 525-2120 (facsimile)
        cain@scottandcain.com
12
13  On Behalf of St. Thomas Outpatient Neurosurgical
    Center, LLC; Howell Allen, a Professional Corporation;
    John W. Culclasure, M.D.; Debra V. Schamberg, RN:
14      JEREMY CAIN, Esquire
        Gideon, Cooper & Essary, PLC
15      315 Deaderick Street - Suite 1100
        Nashville, Tennessee 37238
16      (615) 254-0400
        (615) 254-0459 (facsimile)
17      jeremy@gideoncooper.com
18  On Behalf of Dallas Back Pain Management/Momentum Pain
    Management and Abbeselom Ghermay, M.D.:
19      COURTNEY BOES, Esquire
        Fraley & Fraley, LLP
20      Suite 6300, Bank of America Plaza
        901 Main Street
21      Dallas, Texas 75202
        (214) 761-6460
22      (214) 761-6469 (facsimile)
        cboes@fraley-law.com
23
24
25

## Page 5

```
 1       ~~ VIDEO STREAM APPEARANCES CONTINUED ~~
 2  On Behalf of Premier Orthopaedic & Sports Medicine
         Associates of Southern New Jersey, LLC d/b/a Premier
 3  Orthopaedic & Sports Associates, LLC and Premier
         Orthopaedic Associates Surgical Center, LLC:
 4       JAY J. BLUMBERG, Esquire
           Blumberg & Wolk, LLC
 5       158 Delaware Street
           Woodbury, New Jersey 08096
 6       (856) 848-7472
           (856) 848-8012 (facsimile)
 7       jjblumberg@blumberglawoffices.com
 8  On Behalf of Barry Cadden, Lisa Conigliaro Cadden,
         Carla Conigliaro, Gregory Conigliaro, Douglas
 9  Conigliaro and Glenn Chin:
           ROBERT H. GAYNOR, Esquire
10       Sloane & Walsh, LLP
           Suite 850
11       Three Center Plaza
           Boston, Massachusetts  02108
12       (617) 523-6010
           (617) 227-0927 (facsimile)
13       rgaynor@sloanewalsh.com
14  On Behalf of Medical Advanced Pain Specialists, PA and
         David M. Schultz, M.D.:
15       CLARE CARROLL, Esquire
           McCarthy, Bouley & Barry, PC
16       47 Thorndike Street
           Cambridge, Massachusetts  02141
17       (617) 225-2211
           (617) 225-7711 (facsimile)
18       cfc@mbblaw.com
19  On Behalf of Ocean State Pain Management, Inc. and
         Abdul Barakat, M.D.:
20       THOMAS M. DOLAN, III, Esquire
           Capplis, Connors & Carroll, PC
21       Suite 220
           18 Tremont Street
22       Boston, Massachusetts  02108
           (617) 227-0722
23       (617) 227-0772 (facsimile)
           tdolan@ccclaw.org
24
25
```

## Page 6

```
 1       ~~ VIDEO STREAM APPEARANCES CONTINUED ~~
 2  On Behalf of Harris Methodist Hospital Southlake:
           ROBERT YOUNG, Esquire
 3       English, Lucas, Priest & Owsley, LLP
           1101 College Street
 4       Bowling Green, Kentucky  42102-0770
           (270) 782-6500
 5       (270) 782-7782 (facsimile)
           byoung@elpolaw.com
 6
       On Behalf of Medical Advanced Pain Specialists, PA and
 7  David M. Schultz, M.D.:
           TRACY CONTE, Esquire
 8       The Blair Law Firm
           Suite 207
 9       5214 Maryland Way
           Brentwood, Tennessee  37027
10       (615) 515-4492
           (615) 515-4491 (facsimile)
11       tconte@blair-law.com
12
       Also Present:
13  Daniel Makowski, Videographer
       Melissa Howard, paralegal
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 7

```
 1                INDEX OF EXAMINATION
 2  EXAMINATION                    PAGE
 3  EXAMINATION             12
       BY MR. KINNARD
 4
       EXAMINATION                  168
 5  BY MR. CLAYTON
 6  EXAMINATION                  187
       BY MR. REHNQUIST
 7
       FURTHER EXAMINATION          222
 8  BY MR. CLAYTON
 9
                     - - -
10
               INDEX TO EXHIBITS
11
       EXHIBIT   DESCRIPTION          PAGE
12
       122   Document titled Exhibit "A"   67
13         floor plan of premises,
           Bates labeled STOPNC_0727,
14         PSC-EX_000035 and 36
15     123   St. Thomas Outpatient   73
           Neurosurgical Center -
16         Nashville Tennessee consent
           to operation,
17         administration of
           anesthetics and rendering
18         of other medical service,
           including consent for
19         transfusion(s) and release,
           Bates labeled PSC-EX_000031
20         and 32
21     124   Disc titled "Epidural   86
           injection computer
22         animations"
23     125   Anesthesia record - St.   91
           Thomas Outpatient
24         Neurosurgical Center, Bates
           labeled PSC-EX_000033 and
25         34
```

## Page 8

```
 1     126   Busse Hospital Disposables   94
           letter dated April 1, 2011
 2         to Howell Allen - St.
           Thomas/PM/901, Attention
 3         Debra Schamberg, RN, Bates
           labeled PSC-EX_000041
 4
       127   St. Thomas Outpatient   97
 5         Neurosurgical Center -
           Nashville, Tennessee Policy
 6         Title:  Mission and Goals,
           Policy #: LD-02, Bates
 7         labeled STOPNC_0629
 8     128   St. Thomas Outpatient   100
           Neurosurgical Center -
 9         Nashville, Tennessee Policy
           Title:  Philosophy and
10         objectives, Policy #:
           LD-01, Bates labeled
11         STOPNC_0628
12     131   St. Thomas Outpatient   127
           Neurosurgical Center -
13         Nashville, Tennessee Policy
           Title:  Ethical Business
14         Behavior, Policy #:  RI-10,
           Bates labeled STOPNC_0696
15         through 0705
16     133   Curriculum vitae, Bates   20
           labeled STOPNC_0400 through
17         0407
18     134   Sketch prepared by Dr.   90
           Culclasure
19
       135   NECC prescription order   135
20         form, Bates labeled
           STOPNC_0056 through 65
21
22
23
24
25
```

Page 9

1    136   Letter dated October 3,       153
2          2012 to "Dear Medical
          Provider" from Son D. Le,
3          M.D., FAAPMR from the
          Center for Spine, Joint and
4          Neuromuscular
          Rehabilitation, Bates
5          labeled STOPNC_0001597 and
          1594
6    137   E-mail from Clint             155
          Pharmaceuticals dated
7          Thursday, October 4, 2012
          regarding Clint
8          Pharmaceuticals NOT linked
          to Fatal Meningitis
9          Outbreak, Bates labeled
          STOPNC_00807 and 808
10
     138   E-mail from John W.           158
11        Cluclasure, Dr. To Shreka
          Rogers dated 10/17/2012
12        regarding STOPNC Balances,
          Bates labeled
13        STOPNC_0004565
14   139   E-mail string dated October   162
          4, 2012 regarding
15        inquiries, Bates labeled
          STOPNC_0004422
16
     140   Photograph Bates labeled      163
17        STOPNC_0775
18   141   St. Thomas Outpatient         208
          Neurosurgical Center, LLC's
19        responses to plaintiff's
          first set of
20        interrogatories in the case
          of Reed vs. STOPNC
21
     142   E-mail string regarding       218
22        Opposing the Clarksville
          Chiropractor CON for Pain
23        Management Surgery Center,
          Bates labeled STOPNC_0352
24        and 0353
25

Page 11

1        Videotaped Deposition of John W. Culclasure, M.D.
              March 23, 2015

2

3        VIDEOGRAPHER:  Here begins Tape No. 1

4    to the videotaped deposition of John W.

5    Culclasure, M.D., taken in the matter of

6    New England Compounding Pharmacy, Inc.

7    Products Liability Litigation.  This

8    deposition is being held at 315 Deaderick

9    Street, Nashville, Tennessee 37238, on

10   March 23 of 2015.  The time is 9:05 a.m.

11   My name is Daniel Makowski and I'm the

12   video technician.  The reporter today is

13   B.J. Dugas.  Would counsel please introduce

14   yourselves for the record and state whom

15   you represent.  Then the court reporter

16   will swear in the witness.

17       MR. KINNARD:  I'm Randy Kinnard and I

18   represent the PSC.

19       MR. CLAYTON:  Daniel Clayton, on

20   behalf of the PSC.

21       MR. NOLAN:  George Nolan for the

22   plaintiffs.

23       MR. REHNQUIST:  Jim Rehnquist,

24   UniFirst.

25       MR. LEADER:  Bill Leader, for

Page 10

1            (Original Exhibits 122 through 142
         have been attached to the original
2        transcript.  Exhibit Nos. 129, 130 132 were
         not marked.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 12

1    plaintiffs.

2        MR. SCHRAMEK:  Adam Schramek, Saint

3    Thomas entities.

4        MR. DREW:  Nicholas Drew, UniFirst.

5        MR. GASTEL:  Ben Gastel, plaintiffs.

6        MR. STRANCH:  Gerard Stranch,

7    plaintiffs.

8        MS. CARRICK:  Megan Carrick, Dr.

9    Lister and Speciality Surgery Center.

10       MS. HOLLABAUGH:  Lela Hollabaugh,

11   Saint Thomas Hospital, Saint Thomas Health,

12   Saint Thomas Network.

13       MR. TARDIO:  Chris Tardio, for the

14   Tennessee clinic defendants.

15       MR. CLINE:  Matt Cline, for the

16   Tennessee clinic defendants.

17       MR. GIDEON:  C.J. Gideon, for the

18   witness and Howell Allen Clinic, as well as

19   St. Thomas Outpatient Neurosurgery Center.

20       JOHN W. CULCLASURE, M.D.,

21   having been first duly sworn, was examined and

22   testified as follows:

23   EXAMINATION

24   BY MR. KINNARD:

25       Q.    Sir, would you tell us your name, please.

Page 13

1    A.    John Culclasure.
2    Q.    Dr. Culclasure -- is that how you say it?
3    A.    Culclasure, yes.
4    Q.    Doctor, I haven't met you yet.  My name is
5    Randy Kinnard.  And you've just took an oath.  You
6    understand that?
7    A.    Yes.
8    Q.    You've testified before, haven't you?
9    A.    Yes.
10   Q.    And you understand that the oath you just
11   took is as important as the one you could take in
12   court?
13   A.    Yes.
14   Q.    If anyone including myself asks you a
15   question today that you don't understand, will you ask
16   for clarification?
17   A.    I will.
18   Q.    I don't want to talk over you when you give
19   an answer.  And try to let me finish a question.
20   Okay?
21   A.    (Witness nods head affirmatively.)
22   Q.    And try to say "yes" or "no" when an
23   appropriate yes or no is the answer.  Okay?
24   A.    I will.
25   Q.    During the deposition, if you realize

Page 14

1    you've made a mistake, will you agree to try to fix it
2    during the deposition?
3    A.    Yes.
4    Q.    We're going to take breaks.  I'm going to
5    shoot for about every 50 minutes.  If you need one
6    before that, you're welcome to take it.  Okay?
7    A.    Yes.
8    Q.    How many patients of St. Thomas Outpatient
9    neurological --
10         MR. GIDEON:  Neurosurgical.
11   Q.    (By Mr. Kinnard) -- Neurosurgical Center
12   died from meningitis?
13   A.    13, I believe.
14   Q.    How many were injured?
15   A.    I think 113 got sick.
16   Q.    Do you agree that this was a catastrophe?
17   A.    Yes.
18   Q.    You understand the importance of your
19   testimony today, don't you?
20   A.    Yes.
21   Q.    Were you the medical director of this
22   center?
23   A.    Yes.
24   Q.    Were you overall in charge of it?
25   A.    I'm -- I don't understand the question.

Page 15

1    Q.    Of the center.  Were you overall in charge
2    of it?
3    A.    Well, there's a manager, a nurse manager,
4    and so she was in charge of the day-to-day operations,
5    and I was -- I'm the medical director.
6    Q.    Did she answer to you as the medical
7    director?
8    A.    For clinical issues, not for -- not for
9    personnel matters or other things along those lines.
10   Q.    Okay.
11   A.    We would collaborate, I guess, if there was
12   an issue like that.
13   Q.    Let's go over your background, Doctor.
14   Where were you born?
15   A.    Orangeburg, South Carolina.
16   Q.    When?
17   A.    1957, January 23rd.
18   Q.    And where were you raised?
19   A.    About ten miles away in a smaller town.
20   St. Matthews.
21   Q.    Where did you go to high school?
22   A.    In Orangeburg.  Wade Hampton Academy.
23   Q.    What year did you graduate from high
24   school?
25   A.    1975.

Page 16

1    Q.    Then what did you do?
2    A.    College.
3    Q.    Where did you go?
4    A.    Wofford College.
5    Q.    Where is that?
6    A.    Spartanburg, South Carolina.
7    Q.    Was that a four-year program?
8    A.    Yes.
9    Q.    What kind of degree did you get?
10   A.    A BS in biology.
11   Q.    And when did you graduate?
12   A.    In 1979.
13   Q.    Then what did you do?
14   A.    Went to medical school.
15   Q.    Why did you want to go to medical school?
16   A.    My grandmother's brother was a big
17   influence on me.  He was the town doctor.
18   St. Matthews is about 2000 people, then and now.  It
19   hasn't really grown.  But he -- he went to Wofford.
20   He graduated medical school in the 19 -- around 1914
21   or '15 or '16, somewhere in that range.  And came back
22   and practiced in St. Matthews until -- until his death
23   when he was about 92.
24   Q.    So that man's influence caused you to want
25   to go to medical school?

Page 17

1    A.    Yes.  My grandfather -- my maternal
2  grandfather died before I was born, so he was like a
3  grandfather to me.  He encouraged me to go to Wofford.
4    Q.    When you went to medical school, first, did
5  you have a goal to become a particular specialist or
6  not?
7    A.    No.  No goal.
8    Q.    And how long was medical school?
9    A.    Four years.
10    Q.    When did you graduate from medical school,
11  Doctor?
12    A.    1983.
13    Q.    Medical and University of South Carolina?
14    A.    Yes, sir.
15    Q.    Then what did you do?
16    A.    Started my internship in the Army.
17    Q.    Now, what sort of -- did you have an
18  arrangement with the Army of some type?
19    A.    I had an obligation from undergraduate
20  school, from ROTC, an academic scholarship.
21    Q.    So in undergrad, you were in ROTC?
22    A.    Yes.
23    Q.    So they -- the government gave you money, I
24  guess?
25    A.    Yes, tuition.

Page 18

1    Q.    Now, were you on active duty, and if so,
2  what year were you on active duty?
3    A.    I was not on active duty until starting
4  internship in 1983.  Well, I was not considered to be
5  on active duty while I was in medical school.
6    Q.    Now after you finished medical school, did
7  you have in mind a particular specialty?
8    A.    I didn't until -- yes.  Once I finished I
9  did, yes.
10    Q.    Okay.  What was that speciality you wanted
11  to be in?
12    A.    Anesthesiology.
13    Q.    Why did you want to be in anesthesiology?
14    A.    During our junior year of medical school,
15  we rotate -- we rotated through some of the major
16  specialties -- three months of general surgery, three
17  months of internal medicine, and then two months each
18  of pediatrics, OB/GYN and psychiatry.  And at the end
19  of that period of time, I just was still undecided
20  about what I wanted to do.  And so I was assisting --
21  I was at the naval hospital that was just north of
22  Charleston, and I was performing the function that
23  most medical students have done at one time or
24  another, I was holding a retractor.  But the way they
25  position the medical students, the students can rarely

Page 19

1  see what's going on.  So I had one person standing on
2  one side of my arm that was holding the retractor and
3  another on the other side -- on the other side of my
4  arm.
5        And the way I was positioned, I was facing
6  the anesthesiologist and I couldn't see the field.  So
7  I started asking him what he was doing.  So that's
8  when I first started thinking about anesthesiology.
9  My two favorite subjects in medical school were
10  physiology and pharmacology.  And so each anesthetic
11  is really all about that person's physiology and how
12  they respond to the medications administered.  So it
13  seemed like a good -- it piqued my interest at that
14  point.
15    Q.    So you say you began an internship.  Where
16  was it?
17    A.    San Antonio, Texas.  Fort Sam Houston.
18    Q.    What was the date you began that?
19    A.    July 1, 1983.
20    Q.    Did you complete a year in that internship?
21    A.    Yes.
22    Q.    So does that bring us to July 1 in '84?
23    A.    Yes.
24    Q.    Then what did you do?
25    A.    Started the anesthesiology residency.

Page 20

1    Q.    Whereabouts?
2    A.    The same place.  Brooke Army Medical
3  Center, Fort Sam.
4    Q.    Now, we have a CD.  This is Exhibit 133.
5  STOPNC_0400.  Would you look at that, please, Doctor.
6  And look through that and tell us if that's accurate,
7  please.
8        (Exhibit 133 was marked for
9    identification.)
10        THE WITNESS:  The continuing medical
11    education stops in 2012, so that's not
12    updated.  But other than that it appears to
13    be accurate.
14    Q.    (By Mr. Kinnard)  So you've had some
15  continuing education that's not on this form?
16    A.    Yes.
17    Q.    Other than that, it's accurate?
18    A.    Yes, sir.
19    Q.    Well, look at Page 2, please.  And let's
20  look at your -- under -- you state things about your
21  education.  Look at 1983 to 1984.  This is what you
22  call an anesthesiology categorical internship.  Is
23  this what you're talking about a moment ago?
24    A.    The -- yes.  The internship that started in
25  July 1, 1983.

Page 21

1    Q.    Now, looking up above that line, I see 1984
2  to 1987 an anesthesiology residency program; correct?
3    A.    Yes.
4    Q.    Above that, I see 1988 through 1989,
5  anesthesiology residency program; correct?
6    A.    Yes.
7    Q.    Was this a five-year residency, Doctor?
8    A.    No, sir.
9    Q.    What's missing in there?
10   A.    I worked in the Troop Medical Clinic at
11 Fort Sam in the intervening time.
12   Q.    Now tell me that again.  You worked where?
13 In the troop what?
14   A.    It's called the TMC, the Troop Medical
15 Clinic.  Had a general practice.
16   Q.    What were the dates of that?
17   A.    Roughly -- let's see -- probably February
18 of '87 until fall of '88.
19   Q.    At least a year and a half?
20   A.    Yes, sir.
21   Q.    Why is that not on your CV?
22   A.    That was not part of my education.
23   Q.    I'm sorry?
24   A.    That wasn't -- that wasn't part of my
25 training or education.

Page 22

1    Q.    So you stopped your residency in
2  anesthesiology at that point; is that correct?
3    A.    Yes.
4    Q.    Why did you stop?
5    A.    I went to treatment for substance abuse.
6    Q.    Substance abuse?
7    A.    Yes, sir.
8    Q.    What was the substance?
9    A.    Fentanyl.
10   Q.    So during your residency program, you
11 abused fentanyl?
12   A.    Yes, sir.
13   Q.    How?  IV, muscular, both, what?
14   A.    Both.
15   Q.    Would you inject yourself in a hospital?
16   A.    I did.
17   Q.    Did you steal drugs to do that?
18   A.    I diverted drugs, yes, sir.
19   Q.    Sir?  I'm sorry?
20   A.    Yes.  I diverted drugs.
21   Q.    You diverted them.  You stole them;
22 correct?
23   A.    Yes, sir.
24   Q.    Why did you start doing that?
25   A.    My ex-wife had a substance abuse problem.

Page 23

1  She was going around San Antonio seeing multiple
2  physicians, intending to get medication, and was not
3  able to take care of our children at home because of
4  her pursuit.  And so in order to try to wean her off,
5  I initially brought some medication home to try to
6  wean her off so she wouldn't go to the -- all the
7  physicians in town.  And that -- I clearly was not
8  able to do that and it just made things worse.  And it
9  was just a -- it was -- it was just a very difficult,
10 bad time.
11         And my -- my -- and in all of that, my --
12 I -- to relieve stress and get away from what was
13 going on, and trying to manage her and take care of
14 the kids, I tried some of the fentanyl myself, and
15 that's how I started.
16   Q.    When you first tried it, was it IV or
17 intramuscular?
18   A.    Actually, just subcutaneous.
19   Q.    Subcu?
20   A.    Uh-huh (affirmative).
21   Q.    When did you start doing that?
22   A.    Sometime in 1986.  I don't remember
23 exactly.  Probably that fall.
24   Q.    And there would be times when you were on
25 duty as a resident that you would be under the

Page 24

1  influence of fentanyl?
2    A.    Yes, sir.
3    Q.    Looking after patients?
4    A.    Yes, sir.
5    Q.    How long did you use fentanyl like this?
6    A.    Until December of '86.
7    Q.    Then did you get caught using it or what?
8    A.    They -- the staff suspected that something
9  was going on because of mood and personality changes,
10 and so they confronted me.
11   Q.    Somebody challenged you and said, What are
12 you doing?
13   A.    Yes.  I think I was called to meet with the
14 program director.  And at that point they had arranged
15 for me to go to treatment.
16   Q.    Where did you go to treatment?
17   A.    The residential treatment facility.  They
18 called it the RTF at William Beaumont Army Medical
19 Center in El Paso Texas.
20   Q.    How long were you there?
21   A.    Six weeks, I believe.  No more than eight.
22 Six to eight weeks.
23   Q.    When you finished that, did you consider
24 yourself clean?
25   A.    Yes, I was at that time.

Page 25

1    Q.    Then did the Army let you continue your
2    residency program?
3    A.    I went back to Fort Sam and started working
4    at the Troop Medical Center. I resigned my -- I
5    resigned from the residency.
6    Q.    You did resign?
7    A.    (Witness nods head affirmatively.)
8    Q.    Okay. How much of an obligation did you
9    have left for the Army?
10    A.    I think I had a four-year obligation.
11    Q.    So that was not up yet?
12    A.    No.
13    Q.    So you went to the Troop Medical Clinic
14    kind of as a general practitioner?
15    A.    Yes.
16    Q.    How long did you do that?
17    A.    Until I think December of '88, when I went
18    to Walter Reed.
19    Q.    Now, did you have to start your residency
20    over?
21    A.    No, sir.
22    Q.    They gave you credit for what you had done?
23    A.    Yes.
24    Q.    Okay. Then when your duty in this Troop
25    Medical Clinic was over, what did you do?

Page 26

1    A.    I went to Walter Reed to finish my
2    residency.
3    Q.    And how much more time did that take? I
4    see 1988 to 1989 at Walter Reed Army Medical Center.
5    A.    When I went to treatment, I had I guess
6    seven months left in my residency. So they had me do
7    a full year at Walter Reed. So I started I think
8    December 1st of '88, and finished November 30th of
9    '89.
10    Q.    During this time that you were abusing
11    fentanyl, did you abuse anything else?
12    A.    No, sir.
13    Q.    After you finished your residency at Walter
14    Reed in 1989, what did you do next?
15    A.    I stayed at Walter Reed for about a month
16    on staff, and during that time, I had a decision to
17    make about -- they offered me a promotion and I could
18    stay in or I had the option of getting out. I had
19    been passed over for a promotion three times and so I
20    was scheduled to leave the Army. But the -- my staff
21    guys in the residency program sort of petitioned the
22    promotion board to let -- to reconsider and let me
23    stay in.
24    And so they did offer me the promotion, but
25    I chose not to take it. I didn't think I could stay

Page 27

1    in the Army for a career, and so rather than stay in
2    for four more years, I just -- I opted to get out.
3    Q.    Doctor, there's been a request down at the
4    other end of the table. Could you please speak a
5    little louder. I hear you fine.
6    A.    Okay.
7    Q.    But it's a distance down there.
8    A.    Okay.
9    Q.    What was your rank when you got out of the
10    Army?
11    A.    Captain.
12    Q.    Then what did you do?
13    A.    I took a job in Bowling Green, Kentucky.
14    Q.    What was that job?
15    A.    Anesthesiologist with a group there.
16    Q.    Who were the doctors in that group?
17    A.    Robert Watson, John Villarreal, Ken -- and
18    I'm blanking on his last name now. He retired not too
19    long after I got there. And one other guy from West
20    Virginia who came and left after a few months. I
21    think that's -- I think that's everybody.
22    Q.    What type of work did you do in Bowling
23    Green?
24    A.    General anesthesiology and some pain clinic
25    work, chronic pain, with patients.

Page 28

1    Q.    When is the first time you ever performed
2    an epidural steroid injection?
3    A.    That would have been during my residency,
4    but I couldn't tell you the year.
5    Q.    Can you approximate the number of epidural
6    steroid injections you personally were responsible for
7    in residency training?
8    A.    I couldn't. It would be just a very rough
9    guess. I don't have a total.
10    Q.    What's your rough guess?
11    A.    I'm sorry, could you repeat the question.
12    Q.    Okay. How many were you personally
13    responsible for in residency training?
14    A.    Of what procedure?
15    Q.    Epidural steroid injections?
16    A.    Steroid. Okay. I didn't know whether you
17    wanted me to include OB epidurals and things like
18    that. To the best of my recollection, I probably
19    spent two months or maybe three in the pain clinic at
20    Brooke Army Medical Center. So while there, I would
21    have done epidural steroid injections. Usually there
22    was just one resident there, so I would have done all
23    of the injections under supervision from the staff
24    guys. It wasn't a high volume. Probably five or six
25    a day for two to three months, because we did other

Page 29

1   procedures too.
2       Q.   When you did them in your residency was
3   somebody watching you, or were you allowed to do it
4   alone?
5       A.   Someone was always with us as residents.
6       Q.   Under the supervision of somebody else?
7       A.   Yes.
8       Q.   Is that where you learned to do epidural
9   steroid injections?
10      A.   Yes, sir.
11      Q.   Has your technique over the years changed
12  any, in the way you actually perform the procedure?
13      A.   Yes.
14      Q.   Well, we'll get do that eventually.  Did
15  you do some pain management shot in Bowling Green?
16      A.   Yes.
17      Q.   What percentage of your practice in Bowling
18  Green was pain management?
19      A.   Probably about 20 percent.  15 to 20.
20      Q.   And of that 15 to 20 percent of your
21  practice, what did epidural steroid injections
22  represent?
23      A.   The majority of that 15 to 20 percent.
24  Excuse me.
25      Q.   How long did you work in Bowling Green?

Page 30

1       A.   A couple of years, I think.  I took a job
2   in Washington D.C. at the Washington Hospital Center.
3   My ex-wife had moved from western North Carolina near
4   Asheville to Myrtle Beach.  And so that made my drive
5   to see my kids really long and difficult to do on a
6   weekend.  And so there was a -- in the early '90s
7   there was an oversupply of anesthesiologists, so I
8   tried to find work in South Carolina closer to them.
9   But the best I could do was D.C. on I-95, so I could
10  at least have a straighter shot to get down there.
11      So I took a job in D.C.
12      Q.   Back to Bowling Green.  Can you estimate
13  for us, please, the approximate number of epidural
14  steroid injections you did?
15      A.   It would be very difficult.  I guess on an
16  afternoon -- morning and afternoon, probably 12 to 15
17  in an afternoon.  We'd usually go down in the
18  afternoon after the OR schedule slowed down a little
19  bit.  And one of us would have a -- would go down and
20  see patients in the pain clinic.
21      Q.   Was there a clinic devoted to pain
22  management?
23      A.   Yes.
24      Q.   What was it called?
25      A.   You know, I don't think it had a specific

Page 31

1   name.  It was just in the outpatient department of the
2   hospital, sort of adjacent to the outpatient surgery
3   center.  So we just utilized some of the rooms there.
4       Q.   And were they anesthesiologists like you?
5       A.   Yes.
6       Q.   Performing these procedures?  All right.
7       Then who did you go to work for in
8   Washington D.C.?
9       A.   The anesthesia group at Washington Hospital
10  Center.
11      Q.   Were there more doctors there than there
12  were in Bowling Green that you worked with?
13      A.   Yes.
14      Q.   And what kinds of practice did you have
15  there?
16      A.   Just OR anesthesia.
17      Q.   Did you do pain management?
18      A.   No.
19      Q.   Why not?
20      A.   It wasn't an option.  That group didn't do
21  pain management.
22      Q.   How long did you work there?
23      A.   Somewhere between four and six months.
24  After I got there, the call schedule was not --
25  several things -- a couple of things happened.  The

Page 32

1   people that I met when I interviewed had all
2   decided -- the younger guys that I had met and liked
3   had decided to leave.  They had a lot of internal
4   problems within the group.
5       A couple of the guys were actually just a
6   couple months away from partnership and they chose to
7   leave anyway.  And they put me on a call schedule such
8   that I would be on call on Friday one weekend,
9   Saturday the next, Sunday the next, and then a backup
10  weekend somewhere also in that mix -- or after that.
11  So that meant I couldn't drive down to Myrtle Beach to
12  see my kids if I was on call any of those days of the
13  weekend.
14      So I turned in my resignation because they
15  would not -- I asked them to modify the call schedule
16  for me and they wouldn't.  So I resigned, so I -- the
17  people in Bowling Green said if I ever -- if I wanted
18  to come back, I was welcome to do that.  So I
19  contacted them and told them I didn't think it was
20  going to work out for me in D.C. and I wanted to come
21  back.
22      Q.   So you went back to Bowling Green?
23      A.   (Witness nods head affirmatively.)
24      Q.   Did you resume the same type practice you
25  described earlier for us?

Page 33

1    A.    Yes.
2    Q.    Okay.  Then how long did you stay there?
3    A.    Until '95.
4    Q.    Then where did you go?
5    A.    I moved to Asheville, North Carolina and
6  started a pain practice there.  My kids were with my
7  ex-wife.  Then she'd moved back to the mountains and
8  they were living in Hendersonville.
9    Q.    Hendersonville, North Carolina?
10   A.    Yes.
11   Q.    Now, you started a practice there?
12   A.    Yes.
13   Q.    Is that correct?
14         Now, the practice you left in Bowling
15  Green, you were doing general anesthesia and pain
16  management?
17   A.    Yes.
18   Q.    Now what did you start in North Carolina,
19  in 1995?
20   A.    A full-time pain practice.
21   Q.    Did you do other anesthesia work?
22   A.    No.
23   Q.    Why did you switch to full-time pain
24  management?
25   A.    It was -- the best opportunity for me to be

Page 34

1  able to move closer to the kids.
2    Q.    But why didn't you start practicing
3  anesthesiology there also, in like the OR?
4    A.    Well, they had closed -- the medical staff
5  was closed, so I couldn't just go in and offer to do
6  OR anesthesia.  I would have had to have been a member
7  of the group -- one of the groups that was at the two
8  hospitals.
9    Q.    How many hospitals were there?
10   A.    Two in Asheville proper.  Another one
11  slightly south, between Asheville and Hendersonville.
12   Q.    Now, did you have privileges to admit
13  patients to either of those hospitals?
14   A.    Only St. Joseph's.
15   Q.    You did have privileges there?
16   A.    Yes.
17   Q.    The whole time you were in Asheville, did
18  you run this Carolina Pain Management Center?
19   A.    Yes.
20   Q.    You called it Carolina Pain Management
21  Center; is that correct?
22   A.    Yes.
23   Q.    Did you have other doctors working with
24  you?
25   A.    No.

Page 35

1    Q.    Well, describe your practice for us,
2  please.  How many employees did you have?
3    A.    One nurse who helped me schedule.  And then
4  all the administrative things, I had a contract with a
5  management company.  They did the billing and taxes
6  and all -- and all of those other things.
7    Q.    Tell us what you did in this pain
8  management.
9    A.    A combination of procedures and medical
10  management of the patients.
11   Q.    Tell us what those were.
12   A.    What -- which were?
13   Q.    Well, the pain management procedures.
14   A.    Procedures.
15   Q.    What did you do?
16   A.    Epidural steroid injections, facet
17  injections, implantable morphine pumps or pain pumps,
18  some spinal cord stimulation.
19   Q.    What percentage of the total pain
20  management that you did was epidural steroid
21  injections?
22   A.    Probably 60 or 70 percent of the
23  procedures.
24   Q.    How many could do you in a day over there?
25   A.    I never booked an entire day, probably

Page 36

1  because I would see office visits in the morning or
2  the afternoon.  It just sort of -- I think it varied
3  from day to day.  And whether I had to go to the
4  hospital to do procedures.
5         We'd probably do seven or eight in an
6  afternoon.  Probably in between some followup visits.
7    Q.    To shorten things up, is it all right with
8  you if I say ESI sometimes for epidural steroid
9  injections?
10   A.    That's fine.
11   Q.    You'll know what I'm talking about; right?
12   A.    Yes, I will.
13   Q.    The way you've described your practice for
14  everybody here, did it stay the same the whole time
15  you were there at Carolina's pain management center?
16   A.    Yes.
17   Q.    It stayed the same.  Then when did you stop
18  doing that practice?
19   A.    '98, I believe.
20   Q.    You're welcome to look at your CV.
21   A.    Okay.  There we go.  Thank you, appreciate
22  it.
23         Yeah, at that point, I took a -- I had been
24  in solo practice for that time in Asheville and I had
25  not been able to, you know, get busy enough to bring

Page 37

1  on another person, another physician.  And so I had
2  met some of the people in Johnson City at a meeting,
3  and so we talked about me coming over there.  So I
4  visited with them, interviewed, and they offered me a
5  position.
6      Q.   Correct me if I'm wrong.  It sounds like
7  you couldn't make enough money at pain management --
8  excuse me, Carolina's pain management center to keep
9  it going?
10     A.   Oh, I could keep it going, but I
11  couldn't -- to bring on another person, I would need
12  to be able to do, you know, about enough work for one
13  and a half people to then bring on another person, let
14  that new person take over part of -- you know, part of
15  the work.  And I was busy, but I couldn't make -- I
16  couldn't get to the point where I could comfortably
17  bring on another person, so...
18     Q.   So you felt uncomfortable having to cover
19  all these things?
20     A.   Right.  I was on call all the time.  It was
21  very hard to leave town or do anything else, so...
22     Q.   And you'd met these doctors in Johnson
23  City?
24     A.   I don't -- I did go to meet them there, you
25  know, but I'd met them I think at a medical

Page 38

1  conference.  I think that was our first contact.
2      Q.   And when did you start working with them?
3      A.   I don't remember the -- you know, the
4  month, offhand.  But it was in 1998.
5      Q.   Your CV looks like --
6      A.   Oh, there it is.  May of '98.  Okay.
7      Q.   Started in May of '98 through February '99;
8  correct?
9      A.   Yes.
10     Q.   Well, describe for us, please, the practice
11  of anesthesia and pain consultants in Johnson City
12  when you were there.
13     A.   They covered several hospitals and so --
14  and Turney Williams, one of the partners in the group,
15  did pain management primarily, some OR anesthesia.
16  And so I worked primarily with him and I did some
17  weekend or night coverage for the -- you know, in the
18  hospital for anesthesia.  But primarily spent my days
19  doing pain management.
20     Q.   You did some work in the OR, though?
21     A.   Yes.
22     Q.   As a regular anesthesiologist?
23     A.   Yes.
24     Q.   What percentage of your practice was pain
25  management in Johnson City?

Page 39

1      A.   90 or 95 percent.
2      Q.   Were the percentage of your ESIs going up
3  compared to prior practice or staying about the same?
4      A.   I -- I was doing other additional
5  procedures at that time.  But I was -- a rough guess
6  probably still 75 percent of the procedures were
7  epidurals.
8      Q.   Why did you leave that practice?
9      A.   I relapsed and went to treatment here in
10  Nashville.
11     Q.   Now what was the problem this time?
12     A.   Same thing.
13     Q.   What?
14     A.   Fentanyl.
15     Q.   What caused you to use fentanyl again?
16     A.   I wasn't -- I wasn't going to meetings and
17  hit some rough spots in the road with my access to my
18  kids and with my ex-wife, and -- and so I relapsed.
19     Q.   What meetings were you not making?
20     A.   AA and NA meetings.
21     Q.   What do those initials stand for?
22     A.   Alcoholics Anonymous and Narcotics
23  Anonymous.
24     Q.   Are those meetings held, you know, for
25  people who were addicted to alcohol and narcotics, in

Page 40

1  the same place, or were they different meetings?  AA
2  and NA, are they different meetings or the same?
3      A.   Different meetings.  They're more AA
4  meetings, so a lot of people who have a substance
5  abuse issue will still go to AA just because there are
6  more options.  NA meetings are a bit more limited
7  and -- as far as location and frequency.
8      Q.   Do you remember when you took your first
9  fentanyl drug in this time period?
10     A.   No.  It -- let's see.  I believe probably
11  December.  It was after some issues at Thanksgiving of
12  that year.  So probably December.
13     Q.   Of what year?
14     A.   Of 1998.
15     Q.   Again, did you steal drugs from a hospital?
16     A.   Yes.
17     Q.   That was the source of your drugs?
18     A.   Yes.
19     Q.   How long were you abusing fentanyl before
20  something happened that caused you to seek treatment?
21     A.   January of '99.  So about a month and a
22  half, I guess.
23     Q.   What happened?
24     A.   One of the nurses who worked in the pain
25  clinic saw me divert some of the medication.

Page 41

1    Q.    Some nurse saw you take?
2    A.    Yes.
3    Q.    What was it -- what form was it?  A syringe
4    or what was it?
5    A.    A syringe.
6    Q.    And where did you put it that she saw you
7    doing this?
8    A.    Most likely in my pocket.
9    Q.    So she turned you in?
10   A.    He did, yes.
11   Q.    Oh, he did.  This nurse turned you in.
12   Then what happened?
13   A.    I was -- the Tennessee Medical Foundation,
14   who at that time -- at that time it was headed by Gary
15   Olbrich.  And so he came and paid me a visit and
16   the -- the group stopped my clinical duties at that
17   point.  And so he recommended that I go to treatment
18   here in Nashville.
19   Q.    So you left that group practice; right?
20   A.    Yes.
21   Q.    And came to Nashville.  Where did you go?
22   A.    CPE.  The Center for Professional
23   Excellence is what it's called.
24   Q.    Where did you live while you were there?
25   A.    In an apartment.  They had -- it was a --

Page 42

1    they put us up in apartments in Bellevue.
2    Q.    Is this the campus of this treatment center
3    or not?
4    A.    No, the treatment center itself is near the
5    zoo, would be the best description.
6    Q.    How many months were you in that program?
7    A.    Four.
8    Q.    Did you ever inform any Tennessee board of
9    your being treated over there?
10   A.    Yes.  The -- they were -- yes.  The board
11   was aware.  The TMF communicates with the board.
12   Q.    And when did they find that out?
13   A.    Probably in January.  I don't remember.
14   But it's not a -- it wouldn't have been a delayed
15   process.  They would have notified them immediately.
16   Q.    Did you inform them or what?
17   A.    I don't remember, but probably the -- it
18   was Dr. Olbrich who informed them.
19   Q.    Did they contact you in January -- anybody
20   with the board?
21   A.    I don't remember.  It probably occurred
22   later, once I was in treatment here in Nashville.
23   Q.    Do you remember somebody from the board
24   talking to you?
25   A.    Not in person, but probably by phone.  But

Page 43

1    I don't -- I don't have a specific memory of that.
2    Q.    You don't have a memory of a phone call
3    either or --
4    A.    I don't remember how the contact was done.
5    It could have been by letter.  It could have been a
6    phone call.  I just don't remember.  And at that point
7    the TMF and Dr. Olbrich were sort of the method of the
8    communication between me and the board at that point,
9    so...
10   Q.    Has your addiction -- excuse me.  Do you
11   consider yourself today addicted?  Or maybe that's not
12   the right question.
13         Are you an addictive person?
14   A.    I would say that I'm an addict, but I'm in
15   recovery.
16   Q.    You're a recovering addict.  Is that a fair
17   statement?
18   A.    Yes, sir.
19   Q.    Has the fact that you're a recovering
20   addict impacted your practice of medicine and what you
21   do?
22   A.    I chose not to return to the OR where there
23   was, you know, so much access to the medication.
24   Q.    When did you make that decision, that
25   you're not going to work in the OR anymore?

Page 44

1    A.    During my treatment here at the -- at CPE.
2    And it was just based on the process there, in
3    consultation with the staff there.  And that was their
4    recommendation.
5    Q.    Have you relapsed any since then?
6    A.    No, sir.  I'm happy to say I have not.
7    Q.    You've what, I'm sorry?
8    A.    I'm happy to say I have not.
9    Q.    Okay.  You need a break yet?
10   A.    No, sir.
11   Q.    When you completed your treatment in
12   Nashville, what did you do next?
13   A.    I started a job here in Nashville.
14   Q.    All right.  Who was that job with?
15   A.    Neurosurgical Associates.
16   Q.    Who was in that group, please?
17   A.    Ray Hester, Paul McCombs, William Schooley.
18   Q.    I'm sorry, last name?
19   A.    William Schooley.
20   Q.    Stooley.
21   A.    Schooley, S-C-H-O-O-L-E-Y.
22   Q.    Schooley?
23   A.    Doug Mathews, Richard Berkman.
24         MR. GIDEON:  Arendall.
25         THE WITNESS:  Oh, and Rex Arendall.

Page 45

1           Thank you.
2     Q.   (By Mr. Kinnard)  Arendall?
3     A.   Yes.  Rex Arendall.
4     Q.   Anybody else?
5     A.   That's it.
6     Q.   What did that group do?
7     A.   Those are all neurosurgeons.  So they do
8  neurosurgery.
9     Q.   Did you know any of these gentlemen before?
10    A.   Yes.  I had seen some patients or had some
11 contact with Doug Mathews, and so apparently the group
12 had some internal discussions about adding a pain
13 management physician.  So he contacted me while I was
14 still in treatment at CPE.
15    Q.   So when they first talked to you, they did
16 not have a pain management practice; is that fair or
17 not?
18    A.   That's correct.  They did not have one.
19    Q.   They wanted to start one?
20    A.   Yes.
21    Q.   And did you start it for them?
22    A.   Yes.
23    Q.   Tell us about that.  What was -- what was
24 it like?
25    A.   Well, at first I started seeing patients in

Page 46

1  their -- in the main office at Centennial.  And it --
2  and the volume just grew from there, as they got -- as
3  they got comfortable with me and saw what I could do,
4  then we moved over to -- we needed more dedicated
5  space, so we moved over to Doctor's Pavilion.  The
6  group had a CT scanner over there.  So -- and so we
7  got some space adjacent to the CT scanner area, and
8  started seeing patients there.
9     Q.   What was the clinic called, or whatever it
10 was?
11    A.   It didn't have a separate name.  It was
12 just still Neurosurgical Associates.
13    Q.   But there was a site dedicated to pain
14 management.  Is that right; yes?
15    A.   A location, yes.
16    Q.   How long did you work with this group?
17    A.   Until they split up in 2005.
18    Q.   When did you start working for them?
19    A.   In '99.  July, I believe.  Yeah.
20    Q.   I know it varied, it had to have.  But give
21 us an estimate, as you moved towards the end of your
22 time with this group, working in the pain management
23 area, about how many ESIs you did a year?
24    A.   Let's say -- I probably did 15 a day plus
25 some other procedures.  But let's -- that's probably

Page 47

1  conservative.  15 epidurals a day, five days a week,
2  75 times -- I probably worked 46 weeks a year.  So 75
3  times 46 would probably be a reasonable estimate.
4     Q.   Now, in 2005 something happened to this
5  group.  I think you said it split up.
6     A.   Yes.
7     Q.   Tell us about that split.
8     A.   McCombs and Mathews and Arendall joined
9  Neurological Surgeons, and they asked me to come along
10 with them.
11    Q.   So Hester, Schooley and Berkman did
12 something else?
13    A.   Yes, they just remained as Neurosurgical
14 Associates.
15    Q.   And where did you go?  What was the name of
16 the new group?
17    A.   Neurological Surgeons.
18    Q.   Who all was in that when you joined?
19    A.   It's the same group I'm with now.  It's --
20 they've just changed the name to Howell Allen Clinic.
21 So Everett Howell, Vaughan Allen, Tim Schoette, Greg
22 Lanford, Jason Hubbard, Arendall, McCombs and Mathews.
23 Although Arendall and Mathews eventually left for
24 other reasons.
25         Let's see.  Carl Hampf, Scott Standard, and

Page 48

1  now Adam Reig and Richard Lebow and Brian
2  O'Shaughnessy.  If I missed one, don't tell them.
3     Q.   When you went over to Neurological
4  Surgeons, did they have a pain management location?
5     A.   Yes.  Ben Johnson was doing pain management
6  with them, but it was mostly he ran more of a headache
7  clinic, I believe.  It was located at Skyline, but
8  some of the anesthesiologists at St. Thomas Outpatient
9  Neurosurgical Center were doing ESIs there.  So when I
10 came over, when we joined the group, at that point
11 they were about to open what's now called Hospital For
12 Specialty Surgery, behind Baptist.  And so those three
13 anesthesiologists went over there to provide
14 anesthesia services, and I took over the pain
15 management at St. Thomas Outpatient Neurosurgical
16 Center.
17    Q.   Did it already exist by that name when you
18 went over there?
19    A.   Yes.  And if it's okay with you, we'll call
20 it STOPNC.
21    Q.   Yes.
22    A.   Okay.
23    Q.   All right.  STOPNC already existed; right?
24    A.   Yes.
25    Q.   Ben Johnson was a doctor?

Page 49

1    A.   Yes.  He still is, yes.
2    Q.   He's not with the group anymore?
3    A.   No.
4    Q.   You took his place?
5    A.   No, we worked together.
6    Q.   Okay.  Well tell us about how long you
7  worked together?
8    A.   He left maybe five years ago -- I don't
9  remember exactly when -- and started working with -- I
10  believe it was with Dr. Le, out at Summit.  Then he
11  went down to maybe Columbia.  I think they asked him
12  to run a pain management center down there.
13    Q.   When did you become the medical director of
14  STOPNC?
15    A.   About the same time that I joined the
16  group.  As the other anesthesiologists were leaving
17  and I moved -- and I moved in there to do the pain
18  management stuff, and I became the medical director.
19  Brad Worthington had been the medical director, but
20  since he was no longer going to be over there, they
21  needed someone else to do that, to fill that role.
22    MR. KINNARD:  Well, I think this would be a
23  good time to take a break.  I promised every 50
24  minutes.  I might have run a little too long there.
25  So we'll take a few minutes.

Page 50

1    VIDEOGRAPHER:  This is the end of
2  Tape No. 1 --
3    MR. GIDEON:  We've got a lot of
4  people on the phone, Randy.  How long do
5  you want to take this break.  Five minutes,
6  seven minutes --
7    MR. KINNARD:  Seven minutes sounds
8  good.  Thank you.
9    VIDEOGRAPHER:  This is the end of
10  Tape No. 1.  We're off the record and the
11  time is 9:58 a.m.
12    (A recess was taken.)
13    VIDEOGRAPHER:  Here begins Tape No. 2
14  in the deposition of John W. Culclasure,
15  M.D.  We're back on the record, and the
16  time is 10:09 a.m.
17    Q.   (By Mr. Kinnard)  Ready, Doctor?
18    A.   Yes, sir.
19    Q.   Look at the front page of your curriculum
20  vitae again, please.
21    A.   Yes, sir.
22    Q.   I don't know how we managed to do this, but
23  we've skipped something in here.  The -- look under
24  pain management, next item to the last.  You've got
25  Carolina's Pain Management Center.  June '95 through

Page 51

1  May '97.  Above that is The Pain Management Group, PC
2  in Hermitage, Tennessee.  Tell us about that group,
3  please.
4    A.   Yes.  And in fact, just as I sat down I
5  looked down at the CV and saw that.  I did not go
6  from -- and I hadn't thought about the sequence in a
7  long time, so I apologize.  I joined -- from North
8  Carolina I joined The Pain Management Group here in
9  Nashville and worked with -- the doctor's name was
10  Steve Long there.  Steve later -- he was difficult to
11  work with.  He eventually had his license summarily
12  suspended.  He was carrying a weapon with him to work
13  and probably -- and getting some medication --
14  diverting medication.
15    So it was a difficult to work with him and
16  so that's actually when I met the folks in Johnson
17  City and took a job there.  So...
18    Q.   That -- while working there is when you
19  first met doctors from Johnson City?
20    A.   Yeah, at a meeting, I guess.  I don't
21  remember the exact -- that'll be about the only way I
22  would have met them, I think, was at a pain management
23  meeting of some sort.
24    Q.   You're not taking any drugs today, are you?
25    A.   No, sir.

Page 52

1    Q.   You're not under the influence of anything
2  today except perhaps coffee or water?
3    A.   Both, yes.
4    Q.   All right.  So what did you do at The Pain
5  Management Group?
6    A.   Full-time pain management.
7    Q.   Did you go into the OR at all?
8    A.   Only to do stimulator implants or pump
9  implants.
10    Q.   Now look back at Page 2, the second item
11  down, staff anesthesiologist in Hendersonville, North
12  Carolina.  Is that information correct there?
13    A.   Yes.
14    Q.   All right.  Now, why did you go from
15  Nashville here at The Pain Management Group to Johnson
16  City?
17    A.   Because I found it extremely difficult to
18  work with Dr. Long.
19    Q.   And so there was a work opportunity in
20  Johnson City, is that it?
21    A.   Yes.
22    Q.   And you've told us about that work over
23  there already, haven't you?
24    A.   Yes, sir.
25    Q.   Have we gone over your work history

Page 53

1   accurately now?
2       A.   Yes, sir.  I believe we have.
3       Q.   Is there anything about your education that
4   we haven't covered?
5       A.   Oh I -- you know, I will just say that when
6   I went back to finish my residency at Walter Reed that
7   they were just -- they were great guys and they
8   supported me and I appreciated that.  And they gave me
9   the award for the outstanding resident that year at
10  Walter Reed.  So that was part of my education, I
11  guess.
12      Q.   Anything else you want to tell us about
13  your education?
14      A.   I think that covers it.
15      Q.   So now we're up to St. Thomas Outpatient
16  Neurosurgical Center, also known as STOPNC; right?
17      A.   Yes, sir.
18      Q.   In 2011, what percentage of your practice
19  was epidural steroid injections?
20      A.   Generally, at STOPNC, four days a week.  On
21  Wednesdays I go to our imaging center.  And at the
22  imaging center I do other procedures:  Discography,
23  kyphoplasties, spinal cord stimulator trials.  So
24  about 80 percent of my time, roughly, would be done --
25  would be spent doing epidurals when I'm at STOPNC.

Page 54

1   Although there are some other procedures I do at
2   STOPNC, but 90 percent or so would be epidurals.
3       Q.   90 percent?
4       A.   Yes, sir.
5       Q.   Has that increased over the years or always
6   been about the same?
7       A.   I don't -- I'd have to -- I'd have to look
8   at something.  I don't know.  I don't have those
9   numbers handy.  But...
10      Q.   But in 2011, your practice was about
11  90 percent ESI at STOPNC?
12      A.   At STOPNC, yes, sir.
13      Q.   Of your overall practice, what did ESIs
14  represent?
15      A.   Well, that one day a week I don't do
16  them -- you're asking me to do math on the fly.  So I
17  would just guess probably 75 percent, 80.
18      Q.   Was the same thing true about your
19  percentages in 2012?
20      A.   Yes, sir.
21      Q.   And is it the same today?
22      A.   Percentages, yes.
23      Q.   Who owns STOPNC?
24      A.   I believe it's owned equally by Howell
25  Allen Clinic and Saint Thomas Hospital.

Page 55

1       Q.   What's -- in 2012, what was done in STOPNC
2   for patients?
3       A.   Procedures, epidural steroid injections,
4   facet joint injections, facet joint denervations, some
5   sacroiliac joint injections.  That would be -- that
6   would be the -- that would be most of it, 99 percent
7   of it.  Occasionally some other unusual -- less common
8   procedure.
9       Q.   This is all pain management?
10      A.   Yes, sir.
11      Q.   If it's pain management, why is it called a
12  neurosurgical center?
13      A.   Well, it was originally used for outpatient
14  surgery that was neurosurgical in nature.
15      Q.   When was that?
16      A.   Up until 2005.
17      Q.   Why didn't the name change after 2005?
18      A.   Sir, I have no idea.
19      Q.   But in 2011 and 2012, St. Thomas Outpatient
20  Neurosurgical Center was a pain management center; is
21  that fair?
22      A.   Yes.  Procedure only, no medication
23  management.
24      Q.   Can we call it a pain management clinic?
25  Is that fair or not?

Page 56

1       A.   That would not be accurate.
2       Q.   Okay.  What's the accurate kind of generic
3   description of this center?
4       A.   It's a surgery center; an ambulatory
5   surgery center where pain management procedures are
6   performed.
7       Q.   Is any surgery done in there?
8       A.   No, sir.
9       Q.   Did any surgeons work in there in 2012?
10      A.   No.
11      Q.   You're not a surgeon?
12      A.   No, sir.
13      Q.   Do you know what Tennessee authority
14  regulates this center?
15      A.   The Department of Health, I guess.  I think
16  some occupational and safety health people come in
17  too.
18      Q.   Is it licensed as some facility?
19      A.   Yes, sir.
20      Q.   What is it licensed as?
21      A.   As an ambulatory surgery center.
22      Q.   Let's talk about your compensation for a
23  moment.  Are you an employee or a member of Howell
24  Allen Clinic?
25      A.   I'm an employee.

Page 57

```
 1      Q.   Are you paid a salary?
 2      A.   No, sir.
 3      Q.   So how do you get paid?
 4      A.   I get paid based on what I do, a percentage
 5   of that.
 6      Q.   Now is that percentage based on some
 7   formula, or is it just a set like you get half of
 8   whatever you generate or what?
 9      A.   It's set.
10      Q.   It's set.  All right.  What's the
11   percentage you get for whatever you generate for
12   Howell Allen?
13      A.   60 percent.
14      Q.   Was that the case in 2012?
15      A.   Yes, sir.
16      Q.   Now, in 2012, what were the sources of your
17   income?
18      A.   I don't understand the question.
19      Q.   How did you make money in 2012?
20      A.   By doing the procedure that's we've been
21   discussing.
22      Q.   Did you make money any other way in your
23   life?
24      A.   Oh, I do some expert witness work
25   sometimes.  That would be -- that would be my job and
```

Page 58

```
 1   then sometimes that.
 2      Q.   So you've testified as an expert witness
 3   before?
 4      A.   I was just trying to remember during break.
 5   I don't -- I don't -- I may have been deposed.  Most
 6   of the time I reviewed medical records and worked with
 7   the attorney.  And you know, things rarely -- I'm not
 8   even sure I was ever deposed during that work.
 9      Q.   You're not sure what?
10      A.   That I was ever deposed because of the
11   expert witness work that I did.  The cases just almost
12   never went to -- they all settled.  So I never even
13   got deposed, I don't think.  I don't remember being
14   deposed for that.
15      Q.   You have no memory of ever giving a lawyer
16   a deposition as an expert witness before; is that
17   true?
18      A.   I believe so, yeah.  I mean, that's true
19   about my memory, but yeah.
20      Q.   Have you ever testified in court before as
21   an expert?
22      A.   Once.
23      Q.   And was it for a medical care provider?
24      A.   I don't understand the question.
25      Q.   Was it on behalf of a medical care provider
```

Page 59

```
 1   or on behalf of a patient?
 2      A.   A patient.
 3      Q.   Where was that?
 4      A.   Hendersonville, North Carolina.
 5      Q.   When was that?
 6      A.   Probably '98.
 7      Q.   Did you testify that some medical care
 8   provider had violated standards of care?
 9      A.   Yes, I did.
10      Q.   Do you remember any of the names of the
11   people involved in that case?
12      A.   I do not remember the name of the
13   anesthes -- no.  None of the names.
14      Q.   What year did you go to court?
15      A.   I think '98.
16      Q.   And you went in Hendersonville, North
17   Carolina?
18      A.   Yes, sir.
19      Q.   Where were you practicing at the time?
20      A.   At The Pain Management Group.
21      Q.   Where was that located?
22      A.   Out at Summit.
23      Q.   Here in Nashville?
24      A.   Yes, sir.
25      Q.   Do you remember the lawyer who employed
```

Page 60

```
 1   you?
 2      A.   I do not.
 3      Q.   What had happened to the patient?
 4      A.   She died.
 5      Q.   What caused her death?
 6      A.   Lack of oxygen to the brain.
 7      Q.   All right.  And caused that?
 8      A.   The anesthesiologist failed to properly
 9   intubate her.
10      Q.   Did you testify during that trial that
11   there was a national standard of care pertaining to
12   the provision of anesthesia during that procedure?
13      A.   I don't have a specific memory of my -- of
14   that testimony.  I'm sure they probably asked, but I
15   don't have a specific memory of it.
16      Q.   If they asked, would you have had knowledge
17   of a national standard of care?
18      A.   Regarding intubation, yes.
19      Q.   The more ESIs you do, the more money you
20   make; true?
21      A.   Yes.
22      Q.   And ESIs are your bread and butter; true?
23      A.   Yes.
24      Q.   Can we call this STOPNC a center?  Is
25   that -- how should we call this in one word?  I'm
```

Page 61

1  looking for something like center, clinic, something
2  like that.
3      A.    ASC, ambulatory surgery center.
4      Q.    Okay. It's an ASC. But can you and I call
5  it center and we'll know what we're talking about?
6      A.    Sure I can do that.
7      Q.    All right. In 2012, what days of the week
8  was the center open?
9      A.    I believe Monday, Tuesday, Thursday,
10 Friday. We've had that pattern for a while.
11     Q.    So it was not even open on Wednesday; is
12 that right?
13     A.    Correct. The staff worked ten-hour days on
14 those four days, so they make their 40 hours.
15     Q.    How many weeks where you were open four
16 days a week a year was the center open?
17         MR. GIDEON: Excuse me, object to the
18     form.
19         THE WITNESS: Could you --
20     Q.    (By Mr. Kinnard) Okay. Sure. How many
21 weeks per year was the center open?
22     A.    I don't remember if we had to -- if I'm --
23 at that time I had some people coming in to help,
24 because I couldn't get all of the -- all of the work
25 done. And so if I went out of town they would

Page 62

1  generally be able to fill in. But sometimes if they
2  couldn't fill in and I was out of town, then the
3  center would close on those days. So generally it was
4  open four days a week. But there would be times, I
5  believe, that we -- it might have closed because of no
6  physician being available to staff it.
7      Q.    Would the clinic -- excuse me, the center,
8  be closed for Thanksgiving?
9      A.    Yes.
10     Q.    Other holidays it would be closed?
11     A.    Yes.
12     Q.    When ESIs were being done Monday, Tuesday,
13 Thursday, Friday, on average how many were being done
14 a day at the center in 2012?
15     A.    I believe I was probably doing 20 to 22 or
16 '3. And then if there was another physician there,
17 then they would have a similar schedule. I think at
18 that point, we had help two days a week and I was
19 there the other days by myself.
20     Q.    Who would come in to help?
21     A.    Dr. Arney -- Tim Arney, Dr. Steve
22 Dickerson, Dr. Gilberto Carrero, Dr. Rachel Rome.
23     Q.    Would they come in because you physically
24 weren't able to do all the ESIs that were needed?
25     A.    Yes.

Page 63

1      Q.    If you were able to do all the ESIs on one
2  day, you'd just do them without any help?
3      A.    Yes.
4      Q.    For your involvement with an ESI procedure,
5  how much time of your time does it take?
6      A.    It depends on if it's a -- if it's the
7  patient's first time at the center, or if they're --
8  you know, if they're coming in for maybe a second or
9  third injection out of a series. The first time takes
10 longer because I'm -- they usually have more questions
11 when I'm talking to them prior to the procedure.
12         So a new patient, I would review the chart,
13 talk to the patient, explain the procedure, cover
14 the -- go over the risks, and then -- and then do the
15 procedure. At a followup visit it was a bit quicker.
16 Check on how they were doing, how they were responding
17 to the previous injection, counseled them again if
18 they wanted to hear it again, and then do the
19 procedure.
20     Q.    Okay. For a new patient, how much of your
21 total time would be required?
22     A.    Including the procedure time?
23     Q.    Yes.
24     A.    20 to 30 minutes.
25     Q.    For a followup how much of your total time?

Page 64

1      A.    15 to 20.
2      Q.    How long did it take you to perform an ESI?
3      A.    Ten minutes.
4      Q.    Did over 99 percent of the patients who
5  came to this center get there from Howell Allen?
6      A.    Yes, sir.
7      Q.    If efforts to help the patient with pain
8  didn't work through ESI, would that sort of patient
9  get referred back to the doctor at Howell Allen?
10     A.    They would always follow up with their
11 referring surgeon, whether they got better or not.
12     Q.    And would many of these people be operated
13 on?
14     A.    Some certainly would. I don't know the
15 percentage.
16     Q.    They'd get operated on by doctors at the
17 Howell Allen Clinic?
18     A.    Yes, sir.
19     Q.    And where would they be operated on?
20     A.    They could have surgery at any number of
21 locations, from Saint Thomas West to Saint Thomas
22 Midtown, the Hospital For Spine Surgery, Summit -- I
23 mean excuse me, Skyline. The surgeons operated at all
24 of those locations.
25     Q.    Where did they perform most of their

Page 65

1   surgical procedures on these sorts of patients when
2   they needed that?
3       A.    Probably the Hospital For Spine Surgery,
4   HHS.
5       Q.    Where is that?
6       A.    Behind Baptist.  Behind Saint Thomas
7   Midtown.
8       Q.    And what's that facility called?
9       A.    I think it's now called the Hospital for
10  Speciality Surgery.
11      Q.    Does Saint Thomas have some sort of
12  interest in that facility?
13      A.    Yes, sir, I believe they do.
14          MR. SCHRAMEK:  Objection to form.
15      Q.    (By Mr. Kinnard)  What's their interest
16  there?
17      A.    They're part owner.
18      Q.    The state of Tennessee -- I want you to
19  assume this is true -- reflects that in 2011, 548
20  patients of this center came from Kentucky.  What do
21  you know about Kentucky people coming down here?
22      A.    Could you be more specific?  I don't
23  understand.
24      Q.    I don't know.  I just -- is there some
25  reference, referable service -- excuse me, a referral

Page 66

1   clinic or something service in Kentucky that sends
2   patients to Howell Allen in Kentucky?
3       A.    No, sir.  Howell Allen's been around for a
4   long time.  Dr. Allen and Dr. Howell are well known.
5   Patients come from Alabama as well as -- and Kentucky
6   as well as Tennessee.
7       Q.    Is this center accredited by anybody?
8       A.    Yes.
9       Q.    Who is it accredited by?
10      A.    A Joint Commission.
11      Q.    Does this center, and did it in 2011 and
12  2012, maintain a policy and procedure manual?
13      A.    Yes, sir.
14      Q.    Is this center a member of the Freestanding
15  Ambulatory Surgery Center Association of Tennessee?
16      A.    I don't know.  I don't know if the centers
17  join that or individuals join that organization.
18      Q.    Are you a member of it?
19      A.    No, sir.
20      Q.    Did you have some idea in 2012 how much
21  money you would actually make per ESI?
22      A.    No, sir.
23      Q.    Is it fair that it would be 60 percent of
24  whatever the amount was paid to Howell Allen; is that
25  right?

Page 67

1       A.    Yes, sir.
2       Q.    Did Howell Allen pay you for the ESIs done
3   at this center?
4       A.    Howell Allen collected the money from the
5   insurance companies and the patients for the work that
6   I did, they retained 40 percent of that to cover my
7   overhead and expenses, and then paid me the remaining
8   60 percent.
9       Q.    But they would collect money -- Howell
10  Allen would collect money for ESIs done at this
11  center; correct?
12      A.    For the ones that I did, yes.
13      Q.    All right.  Did this center pay you some
14  money as medical director?
15      A.    No.
16      Q.    Did the center pay you anything for
17  anything?
18      A.    No, sir.
19      Q.    So the way you got your money for your work
20  over there was through Howell Allen; true?
21      A.    Yes.
22      Q.    You didn't charge the patients personally?
23      A.    No.  They got a bill from Howell Allen
24  Clinic.
25          (Exhibit 122 was marked for

Page 68

1   identification.)
2       Q.    (By Mr. Kinnard)  Doctor, we've marked as
3   Exhibit 122, diagrams of the floors at St. Thomas
4   neurosurgical clinic and Neurological Surgeons PC.
5   This is also STOPNC Document 0727.
6          MR. GIDEON:  Is this supposed to be a
7   sequential exhibit number?  This last one
8   was 133.
9          MR. CLAYTON:  It's not sequential,
10  no.  But we have it filled up from 122.
11          MR. GIDEON:  Okay.
12      Q.    (By Mr. Kinnard)  This is a three-page
13  document.  What we've done is enlarged one floor on
14  Page 35 of this document and on Page 36 enlarged
15  another floor.  Do you have the document in front of
16  you, Doctor?
17      A.    Yes, sir.
18      Q.    Let me give you the one that's marked as an
19  exhibit.  Page 2 is an enlargement of Neurological
20  Surgeons PC.  Are you familiar with this layout?
21      A.    Yes, sir.
22      Q.    What does this represent?
23      A.    That's the office on the 8th floor.
24      Q.    When a patient in 2012 would come to this
25  building for an ESI, would they report to the 8th

Page 69

1  floor or not?
2     A.   I don't remember.
3     Q.   What all is done on the 8th floor?
4     A.   Office visits.
5     Q.   For pain management or what?
6     A.   No, generally with the neurosurgeons.
7     Q.   So neurosurgeons work in that clinic?
8     A.   Yes, sir.
9     Q.   On that floor?
10          Look at the next page, please.  Tell us
11  what this is.
12    A.   That's the center.
13    Q.   All right.  This is the STOPNC center;
14  right?
15    A.   Yes, sir.
16    Q.   Okay.  Would you mark on there where the
17  door is a patient would come through?
18    A.   Probably here.  Oh okay, they come in
19  the -- well, they could come in one of two ways.  I
20  see the nurses bring them in different ways.  So
21  sometimes they'll -- they could come in either.  It
22  just depends on the nurses preference, really.  They
23  pick them up from the waiting room.
24    Q.   Okay.  If you would write "waiting room" on
25  there, that'll help us -- just the word "waiting

Page 70

1  room."  And then draw an arrow to it.
2     A.   (The witness complies.)
3     Q.   And now draw -- well, write "entrance" to
4  one entrance and "entrance" to another one, and draw
5  an arrow to those.
6     A.   (The witness complies.)
7     Q.   Did you do that?
8     A.   Yes, sir.
9     Q.   Okay.  Thank you.  I want you to highlight
10  in blue where the patients would wait.
11    A.   You mean the waiting room?
12    Q.   Yes.
13    A.   I'm just going to highlight that side.  I
14  mean, I guess those are the -- it's slightly different
15  than this.  I don't quite -- that's not quite
16  accurate.  But that's the waiting area as it stands.
17    Q.   Obviously, a patient would go in and wait
18  in the waiting area until something would happen;
19  either somebody would come out or a name would be
20  called.  What usually would happen?
21    A.   I'm not over there when -- when all that
22  happens.  There's a receptionist and she checks them
23  in, and then one of the nurses -- I guess she notifies
24  the nurses at the center, which is just across the
25  hall, and one of the nurses would go and get the

Page 71

1  patient, and escort them back into the center.
2     Q.   All right.  Then when they escort the
3  patient in, where does the patient go?
4     A.   There are six holding rooms or patient
5  rooms, and they would be placed in one of those.
6     Q.   Is that room where a procedure like an ESI
7  will occur?
8     A.   No, sir.
9     Q.   So there are six rooms that are what --
10  what do you call them?
11    A.   Well, the -- it's a patients' -- kind of
12  like a holding room.  The nurses take their --
13  complete their nursing history with the patient in
14  that room.  I'd go in and talk to the patient while
15  they're in that room, counsel them, answer their
16  questions, mark them.  We have to mark them with a
17  marker, based on the procedure that's going to be
18  done.  So all of that happens in that -- in those
19  rooms.
20    Q.   Could you outline those rooms in red,
21  please.
22    A.   (The witness complies.)
23    Q.   And off to the side, write something?
24    A.   Patient rooms.  How about that?
25    Q.   That's fine.

Page 72

1     A.   And oftentimes the family member is in
2  there with them, and the family member waits in that
3  room until they come back, usually.
4     Q.   Do you get the patient to sign the informed
5  consent document or does somebody else do that?
6     A.   It could be either.
7     Q.   What percentage of time do you actually get
8  the patient to sign a consent form?
9     A.   Actually, up until late 2014 I did -- I
10  actually witnessed all the consent forms.  And then
11  after discussing it with the nurse manager, it
12  wasn't -- it's not really necessary for me to witness
13  it.  Anyone can witness the signature.  So now it
14  could be me or it could be one of the nurses.
15    Q.   Well, when you would witness the signature,
16  does that mean you saw every patient sign the consent
17  form?
18    A.   Yes.
19    Q.   Now, there are procedure rooms in here,
20  obviously.  Will you highlight those in yellow?
21    A.   (The witness complies.)
22    Q.   How many did you highlight, Doctor?
23    A.   Three.
24    Q.   Are ESIs done in all three of those rooms?
25    A.   Yes, sir.

Page 73

1    Q.    Is that where the majority of the
2    procedures are, in those rooms?
3        A.    100 percent of the procedures are in those
4    rooms.
5        Q.    Does anything else happen in those rooms?
6    Any other procedures besides ESI?
7        A.    Oh, yes.
8        Q.    Like what?
9        A.    Facet injections, facet denervations, SI
10   joint injections, spinal cord stimulator trials,
11   sometimes pain pump trials.  That would be the
12   majority of things.
13            (Exhibit 123 was marked for
14        identification.)
15       Q.    (By Mr. Kinnard)  I'm going to hand you
16   Exhibit 123, which is also PSC Exhibit 31, and ask you
17   to look at that, please.  Do you recognize this
18   document?
19       A.    Yes, sir.
20       Q.    What is this?
21       A.    It's part of the consent form.  It looks
22   like the first and last pages of the consent form.
23       Q.    Are some pages missing from it?
24       A.    Yes, sir.
25       Q.    What's missing?

Page 74

1        A.    Two pages.
2        Q.    Now, what's on the other two pages?
3        A.    I couldn't tell you exactly.  It's a lot of
4    small type.
5        Q.    Well, you're familiar with the two pages
6    you see here?
7        A.    Yes, sir.
8        Q.    Well, let's go over this first page.
9    First, at the top we see St. Thomas Outpatient
10   Neurosurgical Center; right?
11       A.    Yes, sir.
12       Q.    So is it fair that the first time the
13   patient is seeing this form is at the center?
14       A.    Yes, sir.
15       Q.    Look at the big letters underneath the
16   patient's name: "This paragraph authorizes the surgeon
17   to operate."  Is that what it says?
18       A.    Yes, sir.
19       Q.    You're not a surgeon?
20       A.    No, sir.
21       Q.    Paragraph 1, "I hereby authorize and direct
22   John Culclasure, M.D., and associates or assistants of
23   his choice, to perform the following operation."  This
24   is not an operation, is it?
25       A.    It's a procedure.

Page 75

1        Q.    Why don't you use the word procedure
2    instead of operation?
3        A.    The form was created before I started
4    working at the center.
5        Q.    Look at Paragraph 6.  "I/We hereby
6    authorize all doctors, pharmacists" -- what is that
7    referring to "pharmacists"?
8        A.    I don't know.
9        Q.    Paragraph 12, what is that about?
10       A.    Could you be more specific?
11       Q.    What's the intent of Paragraph 12?
12       A.    I think if a referring physician has an
13   ownership interest in a facility, that has to be
14   disclosed to the patient.
15       Q.    And this Paragraph 12 has that "I am aware
16   that my physician or his practice does/does not have
17   ownership interest in the St. Thomas Outpatient
18   Neurosurgical Center."
19            So what's circled here?
20       A.    It would be does.
21       Q.    And that's referring to who?
22       A.    Dr. Shetley, who referred the patient.
23       Q.    Look at the next page, please, Doctor.
24   This is the last page, you say, of the consent form?
25       A.    Yes, sir.

Page 76

1        Q.    And for some reason we're missing two pages
2    of it.  But this is the last page; right?
3        A.    Yes, sir.
4        Q.    There's a place for the patient's
5    signature, time and date, witness to signature.  Is
6    that your signature?
7        A.    Yes, sir.
8        Q.    All right.  Let's go -- you can put that
9    down, Doctor.  Let's go to, say, a new patient coming
10   to the center.  Is this the first time you meet this
11   person?
12       A.    If it's a new patient almost always, yes.
13       Q.    If you had met them before it just would
14   have been an accident someplace; you bumped into them
15   or something?
16       A.    No, not necessarily.
17       Q.    You could have had something to do with
18   them?
19       A.    Yes.
20       Q.    But the majority of the time you meet them
21   for the first time in this center; right?
22       A.    Yes.
23       Q.    And you meet them in one of the rooms you
24   highlighted, in the patient room?
25       A.    Yes.

Page 77

1    Q.   Typically for an average patient who is
2  going to get an ESI, take us through the moment you
3  enter that room to the moment you step back out again.
4  What happens?  What do you say and what happens to
5  them?
6    A.   Excuse me.  I walk in and introduce myself
7  and then I tell the patient that I need to see their
8  blue wristband, and I make sure that the chart I
9  picked up -- that the name tag on the chart matches
10  their wristband.  And so I usually try to -- usually
11  they're nervous, so I try to be a little bit funny and
12  say, Well, I'm glad I got the right patient to do the
13  right procedure."  Something like that.
14        And so then I look at the medical
15  information that's already in the chart about the
16  patient.  I look at what surgeon has ordered for
17  that patient.  I review their medical history with
18  them, confirm their allergies, confirm -- find out --
19  confirm whether or not they're taking a blood thinner
20  and other -- and go over other -- any other coexisting
21  medical problems that they might have.  I find out
22  where their pain is -- where they're hurting, what other
23  treatment they may have had.  And then I explain the
24  procedure to them and then I counsel them.  And then I
25  have them sign the consent form, once I've counseled

Page 78

1  them.  And then I mark their back or neck or wherever
2  the procedure is going to be carried out.
3        And sometimes they'll ask why I'm writing
4  on them and I tell them so I won't cut off the wrong
5  leg.  So again, just trying to make them laugh a
6  little bit, because they're all a little bit nervous
7  about getting an injection.  I'm not a good comedian.
8    Q.   I'm just waiting for you to finish your
9  answer.  I don't --
10    A.   At that moment we're done in the room.
11    Q.   Now, when you first come in that room you
12  told us about, where the patient is, what's the
13  patient dressed like?
14    A.   Street clothes.
15    Q.   I'm sorry?
16    A.   Usually.
17    Q.   Street clothes?
18    A.   Yes, sir.
19    Q.   Okay.  Then do they have to change later or
20  what?
21    A.   If we're doing a neck -- a cervical
22  epidural steroid injection or a cervical procedure of
23  some type, then we have them put on a gown.  Because I
24  can't prep them and maintain a sterile field if
25  they've got a shirt on.  But if it's just their lower

Page 79

1  back, we don't make them change into a gown.  Once
2  they get on the table they just move their shirt up
3  and their trousers or slacks down and we just prep the
4  area.
5    Q.   When you say you explain the procedure,
6  tell us typically what you tell the patient.
7    A.   Let's see.  Well, I go through the sequence
8  that I'm going to follow once they get back to the
9  room.  I'll tell them, you know, when you get to the
10  room -- well, let me back up.
11        I tell them the x-ray person is going to
12  come get them in a few minutes and take them to the
13  room and get them ready.  They'll be lying on their
14  stomach on the table and the x-ray person will -- the
15  x-ray person will clean them off with the antiseptic.
16  And I'll come in, I'll look at their back or neck with
17  the x-ray and identify the level for the injection.
18        At that point, once that's done, I'll numb
19  the skin with a very skinny needle.  I tell them
20  they'll feel a bee sting as the numbing medicine goes
21  in.  And then I'll tell them after that I'll put the
22  next needle, the epidural needle, through that numb
23  spot, and using the x-ray I will guide the needle into
24  the epidural space or spinal canal.
25        I'll inject some x-ray dye at that point

Page 80

1  when I think I'm in the right place, and the x-ray dye
2  will tell me whether I am indeed in the epidural space
3  or not.  If the dye pattern is consistent with the
4  needle tip being in the epidural space, then at that
5  point I'll inject the steroid and take the needle out.
6    Q.   Now, is that your standard procedure, as
7  you do it?
8    A.   That's the description of the procedure and
9  then I counsel -- go over the risks with them.
10    Q.   Okay.  Well, what are the risks?
11    A.   Sure.  I tell them that the risks include
12  infection, internal bleeding, nerve damage, paralysis,
13  allergic reaction to the medicines used and headache
14  if the needle goes into the spinal fluid sac.  And
15  then I ask them if they have any other questions, or
16  if they would like me to elaborate on any of those
17  things I mentioned.
18    Q.   I didn't hear the word "death," Doctor.
19  You don't mention death?
20    A.   That's not -- that would be an exceptional
21  event for an epidural steroid injection and so that's
22  not -- I don't discuss death as part of the counseling
23  process.
24    Q.   And have you told us about everything that
25  happens in there while you're with the patient?

Page 81

1    A.    I believe I have, yes, sir.
2    Q.    Well, in the deposition, if something
3  occurs to you -- Hey, I left this out -- will you tell
4  us?
5    A.    Yes, sir.
6    Q.    Now, typically, after you leave the room,
7  what happens next, as far as you're concerned?
8    A.    I may have a patient -- excuse me, another
9  patient waiting for their injection in one of the
10  treatment -- one of the procedure rooms.  So if that's
11  the case then I would leave that patient and go to the
12  procedure room and perform that injection.  If
13  nobody's ready and there's not another patient waiting
14  to be seen, then I would just go sit at my desk or
15  wait outside until the x-ray person picked the patient
16  up.
17    Q.    So if you leave Patient A and there's
18  Patient B in a procedure room waiting for you to come
19  in and do the procedure, you could go there, do the
20  procedure; right?
21    A.    Yes.
22    Q.    And you could go to Patient C, who is on a
23  table waiting for an ESI, that you've already talked
24  to; right?
25    A.    Yes.

Page 82

1    Q.    And do that procedure?
2    A.    Yes.
3    Q.    And then Patient A could have been taken
4  into a procedure room, and you come in and do the
5  procedure on patient A?
6    A.    Yes.
7    Q.    So the cycle continues while you perform
8  ESIs for that day?
9    A.    Yes.
10    Q.    What time of the day typically does the
11  center open?
12    A.    7:00 for bringing patients in, I believe,
13  over to the -- to the -- 7:00 for bringing a patient
14  to the patient room.
15    Q.    And what time does your work actually
16  start, normally?
17    A.    7:30.
18    Q.    And what time does your day normally end,
19  looking after the patients?
20    A.    It varies somewhat, but 4:30 to 5:30.
21    Q.    Doctor, we're going to show you a video now
22  of a lumbar ESI; okay?  The first time I show it to
23  you, I don't want you to say anything.  I just want to
24  you watch it.  It lasts about two minutes.  After
25  you've looked at it, we'll play it again and stop it

Page 83

1  as we need to, to explain.
2    Q.    You ready to do that?
3    A.    Yes, sir.
4        MR. KINNARD:  All right.  We'll have
5    to set this up.  This is going to take a
6    moment for the people on the telephone.
7        (Video was played.)
8    Q.    (By Mr. Kinnard)  First of all, have you
9  had a chance watch it?
10    A.    Yes, sir.
11    Q.    Is it a fair representation of what it
12  showed -- attempted to show?
13    A.    Yes, sir.
14    Q.    And when you do this procedure yourself, do
15  you do it like that?
16    A.    Yes.
17    Q.    Is this what it's called?
18    A.    Yes.
19    Q.    Let me know, as you look at it the second
20  time, if any of the words are improper or inaccurate.
21        (Video was played.)
22    Q.    (By Mr. Kinnard)  Is all that accurate
23  there, Doctor?
24    A.    Yes, sir.
25    Q.    Is that how you do the needle placement?

Page 84

1    A.    Not exactly.
2    Q.    How do you do it differently?
3    A.    Well, I would never advance it that much
4  without stopping and checking the x-ray.  That was a
5  large -- a pretty long distance to push the needle in
6  without taking a look.
7    Q.    Do you check your location of the needle
8  with fluoroscopy?
9    A.    Yes, sir.
10    Q.    Does the dye enter something like this?
11    A.    Yes, sir.
12    Q.    What is this here, Doctor?
13    A.    It's a cross-section through the lumbar
14  spine.
15    Q.    Now tell us what this is showing, Doctor,
16  as it goes along.
17    A.    At this point the animation is showing the
18  needle being advanced into the intervertebral foramen.
19    Q.    Now what's happening?
20    A.    It's -- the animation is showing the
21  injection of the contrast.
22    Q.    Did you mean the steroid?
23    A.    Could you go back?  I thought that was
24  the --
25    Q.    Sure.

Page 85

1      A.    Just to the end.  If you can get to just
2  end, when the blue substance was showing up in the
3  animation.
4      Q.    We'll just have to watch and stop it,
5  because I can't make it go faster.
6      A.    Okay.
7      Q.    This is for the fluoroscopy, correct, that
8  solution, the contrast?
9      A.    Yes, it shows up on fluoro.
10     Q.    Now this is the steroid; correct?
11     A.    Okay, yeah.  They titled that "medication
12  administered."  Okay.  So that would be the steroid, I
13  assume.
14     Q.    Now, this represents the steroid; is that
15  fair?
16     A.    We could -- yes.  Because they titled it
17  "medication."  The reason I thought it was the
18  contrast was because in the animation, that's the
19  first thing that's being injected after the needle was
20  placed.  So that would really normally be the
21  contrast.  And the animation and the actual fluoro
22  images don't match.  In the fluoro image the contrast
23  is in the ventral epidural space, and in the animation
24  it's in the dorsal epidural space.
25     Q.    Any way else it's not consistent with what

Page 86

1  you do?
2      A.    No, not that I'm aware of.
3      Q.    Okay.  Well we'll mark this as -- or we had
4  marked it as Exhibit 124?
5           (Exhibit 124 was marked for
6            identification.)
7           THE WITNESS:  That is only one type
8      of epidural.  That's not the one that I
9      used the most often.
10     Q.    (By Mr. Kinnard)  What do you use most
11  often?
12     A.    Translaminar.
13     Q.    And what is translaminar?
14     A.    It's the needle placed -- the needle is not
15  directed into the intervertebral foramen.  Instead
16  it's inserted between the laminae, which is the bone
17  that forms sort of the -- like a house.  It's like the
18  roof over the spinal cord and spinal canal.  And
19  there's a ligament that connects one laminae to the --
20  to the one below.  And the epidural space, that's the
21  boundary of the epidural space.  And so when the
22  needle passes through that ligament, the tip of the
23  needle is then in the epidural space.  And that's
24  really the more common way to do it.
25     Q.    If you would, can you draw us an anatomical

Page 87

1  rough sketch of what you're talking about.  Why don't
2  you use blue for that and you can use colors as you
3  need to explain.
4      A.    (The witness complies.)
5      Q.    Okay.  If you would hold up what you've
6  drawn for the camera and explain what you've drawn.
7  Let him get it focused first, though?
8           VIDEOGRAPHER:  Zoom in?
9           MR. KINNARD:  Yeah, you should zoom
10     in and pick it up.
11     Q.    (By Mr. Kinnard)  He's going to zoom in.
12     A.    Okay.
13     Q.    Okay.  That's good.
14          MR. GIDEON:  Can you see it, John?
15          THE WITNESS:  Yeah.
16     Q.    (By Mr. Kinnard)  Go ahead.
17     A.    If I can get my glasses to focus on the
18  right spot.  Okay, this is the skin.  The patient's
19  skin.  And in this instance the patient would be lying
20  on his or her stomach.  And that's the syringe and
21  needle.  This is one vertebra, in blue.  So that
22  little -- that bone that sticks up is called the
23  spinous process.  If you see someone without a shirt
24  on and they bend forward, you will see little bumps
25  under the skin and that bone is what's making that

Page 88

1  bump.
2           This is the vertebral body.  That's the
3  bone that is in the front of the spine and it supports
4  our -- the weight of the upper body.  And this -- this
5  bone and this bone going out to the side, those are
6  transverse processes.  This bone, both of these on
7  each side, that's the laminae.  And this bone and that
8  bone that come up, those are pedicles.  And what I
9  was -- when I show this to patients, if I'm explaining
10  in a little more detail to them, I just tell them
11  that's kind of like a house, and so they can see,
12  there's the roof and there are the walls and inside
13  that is the spinal fluid sac with the spinal cord
14  inside.
15          Usually, if I'm showing this to a patient
16  they've asked me something about a previous surgery,
17  and they had a laminectomy and they don't understand
18  what that meant.  And so I draw this and I tell them,
19  you know, this is the laminae.  So if the surgeon did
20  a laminectomy, he has removed that bone to relieve
21  pressure that's on the -- on the nerves in the spinal
22  cord.
23          So let me go back to the procedure.  This
24  is the needle.  It crosses the laminae, and that's why
25  it's called translaminar, because it's crossing the

Page 89

1   laminae.  Usually when it gets to about -- just before
2   it enters the epidural space, which I've labeled here,
3   the needle engages the ligamentum flavum, or yellow
4   ligament.  And at that point, if I'm trying to inject
5   sterile saline through that needle with that syringe,
6   I can't inject, it's because the needle is embedded in
7   the ligamentum flavum.  So while maintaining pressure
8   on the plunger of the syringe, I slowly advance the
9   needle forward.  And as soon as it passes through that
10  ligament, I can inject -- the syringe will -- it'll,
11  you know, it will let me inject because the resistance
12  is no longer there.  The epidural space generally
13  takes -- allows the -- it will accept the liquid
14  easily.
15          So that is called loss of resistance
16  technique, and that's the technique that's used when
17  we do translaminar epidural steroid injections.  Or
18  for that matter, labor epidurals, that's the same
19  technique that's used for that.
20          So at that point then I would -- to confirm
21  that I really am in the epidural space, I would inject
22  a contrast and look at that with the fluoro.
23  Sometimes there are false losses of resistance.
24  Sometimes you can inject into the ligaments and there
25  may be a plain in that ligament that will -- that

Page 90

1   accepts some contrast.  And sometimes if you're not
2   all the way in, in the muscle you'll get a loss of
3   resistance.  So the contrast pattern helps -- help me
4   confirm that I'm in the epidural space and not in one
5   of the -- you know not outside of the spinal canal.
6   It also tells me if I'm in the spinal fluid sac,
7   because the pattern then is different than when it's
8   in the epidural space.  I think that's pretty much
9   everything.
10      Q.   Then you inject the steroid?
11      A.   Correct.  Once I've ascertained that the
12  needle tip is in the epidural space.
13      Q.   And does that complete the procedure?
14      A.   Once I remove the needle; yes.
15      Q.   Okay.  I need to mark this drawing as
16  Exhibit 134.
17          (Exhibit 134 was marked for
18  identification.)
19      Q.   (By Mr. Kinnard)  Can I have that blue pen
20  back, Doctor.  The other one.
21      A.   Uh-huh (affirmative).
22      Q.   Now, the way you performed this procedure
23  as you've explained it, using Exhibit --
24      A.   134?
25      Q.   -- 134 , is that within nationally

Page 91

1   recognized standards of acceptable professional
2   practice for this procedure?
3       A.   Yes, sir.
4       Q.   And is it within nationally recognized
5   standards of acceptable practice for this procedure,
6   regardless of whether it's being done in Nashville,
7   Tennessee, Louisville, Atlanta, or Boston?
8       A.   Is it still the acceptable standard of
9   care?
10      Q.   Yes.
11      A.   Yes.
12      Q.   I'm going to pass you Exhibit 125 now.
13  This is a PSC Exhibit 33.
14          (Exhibit 125 was marked for
15  identification.)
16      Q.   (By Mr. Kinnard)  You recognize this?
17      A.   Yes, sir.
18      Q.   What is it?
19      A.   This is our procedure note form.
20      Q.   How is this note generated?
21      A.   The computer system generates -- or we have
22  a template in it for each procedure and then we modify
23  it with the dose or the level that we did the
24  procedure at.
25      Q.   So what -- somebody has to type in

Page 92

1   something -- some information for this to be
2   generated?
3       A.   Yes.
4       Q.   But is it a pretty standard form and this
5   is the way it goes in each procedure?
6       A.   Yes, sir, pretty much, unless we note a
7   deviation or something.
8       Q.   So how does the computer know when things
9   are started?  It says, "started," "printed,"
10  "anesthesia record"?  How does the computer know that?
11      A.   The x-ray person starts it when we -- as we
12  start the procedure.  In fact, that made me a bit
13  uncomfortable when I started working there.  That's
14  why the third comment that comes up is "Times assigned
15  to the procedure, sequence or an artifact of the
16  software."  So it just simply shows the sequence and
17  the times are not necessarily accurate.
18      Q.   So for this procedure 2:52 may not be the
19  time it actually started?
20      A.   It's most likely about the time that it
21  started.  I mean you know, start time can vary
22  depending on what's -- what we want to determine is
23  the start time.  It could be when I walked into the
24  room.  It could be when I numb the patient's skin.  So
25  the start time, I mean, is a little bit variable.  But

Page 93

1    the sequence of events would be accurate.  You know,
2    the second one follows the first.  The third follows
3    the second.  The sixth following the fifth.
4        Q.    Is the time, 2:52 to 3:08 -- is that
5    accurate in terms of how long it takes to do these
6    things?
7        A.    That's pretty accurate.  It varies.
8    Sometimes they're more difficult than others.
9    Sometimes they're easier.  It just depends on the
10   patient's anatomy.
11       Q.    Now, is the O2 sat monitor already on the
12   patient's finger when you come in the procedure room?
13       A.    Usually, or the patient -- or the x-ray
14   person might be attaching it when I come in.  It just
15   depends.  They'll call me to try to hurry me up, and
16   so sometimes I might surprise them and get in while
17   they're still putting the blood pressure cup on the
18   patient and the pulse oximeter.
19       Q.    And are the words that are used on this
20   form accurate in describing the procedure from start
21   to end?
22       A.    Let me read through it to be sure.
23          Yes.
24       Q.    Now look at the second page of this exhibit
25   and tell us why it's in a different format.

Page 94

1        A.    It's just the way the software prints it
2    out.  It's not necessary to have both.  The
3    software -- that's just how it does it.  It's the same
4    text.
5        Q.    When you do ESIs, do you use some sort of
6    an ESI tray?
7        A.    Yes.
8        Q.    Is it a B-U-S-S-E tray?
9        A.    I don't know.
10          (Exhibit 126 was marked for
11          identification.)
12       Q.    (By Mr. Kinnard)  Let me pass you what we
13   marked as Exhibit 126, PSC Exhibit 41.  Have you seen
14   this before?
15       A.    I don't remember.  It's not something I
16   would normally see.
17       Q.    Look at the list of things that are in the
18   tray and tell us if these are the same type things you
19   had in your tray.
20       A.    Yes.
21       Q.    Doctor, do you believe that the way you
22   performed ESIs on your patients in 2012 was within
23   recognized and acceptable professional standards for
24   this type procedure?
25       A.    Yes.  Excuse me.  Yes.

Page 95

1        Q.    And you're familiar with recognized
2    national acceptable standards of care for this type of
3    procedure, aren't you?
4        A.    Yes.
5        Q.    I want to talk with you now about the
6    center, its responsibilities.  You've made statements
7    to other people that this center observes high
8    standards, haven't you?
9        A.    I don't remember a specific conversation,
10   but I would say that we do; yes.
11       Q.    As the medical director, you're familiar
12   with the recognized standards of acceptable
13   professional practice for centers such as this,
14   providing ESI care to patients in 2012, aren't you?
15       A.    Yes, sir.
16       Q.    For short, from now on, can we call that
17   the standard of care for the center?  Is that fair?
18       A.    Yes, sir.
19       Q.    And you're also familiar with national
20   recognized standards of acceptable professional
21   practice for a medical director of a center such as
22   this providing services in 2012; is that true?
23       A.    Yes, sir.
24       Q.    And we can call that the medical director
25   standard of care; okay?

Page 96

1        A.    Yes, sir.
2        Q.    We may call these standards of care
3    "standard," "standard practice" or whatever, but when
4    we use the word "standard," that's what we're going to
5    be talking about; okay?
6        A.    Yes, sir.
7        Q.    Now, in your opinion, did the standard of
8    care for this center in the performance of ESIs in
9    2012 differ from the standards expected of a clinic if
10   it was called a pain management clinic?
11       A.    Could you -- could you elaborate on that?
12       Q.    All right.  This -- some places where ESIs
13   are performed are called pain management clinics;
14   right?
15       A.    Yes, sir.
16       Q.    You-all have chosen to call yourself a
17   surgery -- an ambulatory surgery center; right?
18       A.    We didn't choose to call ourselves that.
19   It is, yes.
20       Q.    Well, that's what it is.  But the name is
21   St. Thomas Outpatient Neurosurgical Center.
22       A.    Yes.
23       Q.    STOPNC; right?
24       A.    Yes, sir.
25       Q.    This center in 2012 performed ESIs; right?

Page 97

1    A.    Yes, sir.
2    Q.    You're aware that there were other places
3  who performed ESIs like you-all did, but they called
4  themselves different names; true?
5    A.    Yes, sir.
6    Q.    And some call themselves "pain management
7  clinics"; right?
8    A.    Yes, sir.  They may be office space, which
9  means they're not a surgery center, and that they
10  don't have accreditation, so it makes it -- it's sort
11  of -- it's a bit different.
12    Q.    But for the performance of providing ESI
13  care to a patient in 2012, whether it was being done
14  at a center like yours or in a pain management clinic,
15  the standards were the same; you agree?
16    A.    For the procedure itself, yes.
17          (Exhibit 127 was marked for
18     identification.)
19    Q.    (By Mr. Kinnard)  Now I'll hand you
20  Exhibit 127, Doctor.  This is STOPNC_629.  Just read
21  to yourself the mission first, please, Doctor.
22          Have you read it?
23    A.    Yes, sir.
24    Q.    Now, this STOPNC policy is titled "Mission
25  and Goals."  Mission -- would you read to us what it

Page 98

1  says, please.
2    A.    "The mission of St. Thomas Outpatient
3  Neurosurgical Center is to provide safe, timely and
4  effective care to the patients we serve.  We strive to
5  implement innovative, cost-effective techniques that
6  will ensure optimal patient outcomes in pain
7  management."
8    Q.    Do you agree with that mission?
9    A.    Yes, sir.
10    Q.    Did the standard of care for this center
11  require it to provide safe and timely and effective
12  care to the patients it serves?
13    A.    Yes.
14    Q.    Is it fair that the standard of care for
15  the center required that the center must provide safe,
16  timely and effective care to the patients it serves?
17    A.    Say that -- I'm sorry.  Repeat the
18  question.
19          MR. KINNARD:  If the court reporter
20     will read it back, please.
21          (The record was read by the reporter
22     as requested.)
23          THE WITNESS:  Yes.
24    Q.    (By Mr. Kinnard)  Okay.  Doctor, you can
25  put that down.

Page 99

1          Doctor, did you take the Hippocratic oath?
2    A.    Yes.
3    Q.    First do no harm?
4    A.    Yes.
5    Q.    Do you agree that the standard of care for
6  a center requires that the center not needlessly
7  endanger its patients?
8    A.    Yes.
9    Q.    Do you agree that the standard of care for
10  a center is that it must put patient safety first?
11    A.    Yes.
12    Q.    Do you agree that the standard of care for
13  a center requires that it must act in the best
14  interest of the patient?
15    A.    Yes.
16    Q.    Do you agree that the standard of care for
17  the center is that it must take all steps necessary to
18  ensure that the product being injected into the
19  patient's spine is safe?
20    A.    I would say that it take all reasonable
21  steps that are part of the standard of care.
22    Q.    So you would say that the surgery center
23  standard of care -- strike that -- that the center
24  standard of care is that it must take all reasonable
25  steps to ensure that the product that is being

Page 100

1  injected into a patient's spine is safe?
2    A.    That are part of the standard of care.  All
3  reasonable steps that are part of the standard of
4  care.
5    Q.    Now, you're familiar also with the
6  recognized standards of acceptable professional
7  practice for an anesthesiologist caring for patients
8  by means of epidural steroid injections in 2012, are
9  you not?
10    A.    I am.
11    Q.    Those standards are national in nature,
12  aren't they?
13    A.    Generally.  I guess there may be some
14  regional variation, but there's a pretty consistent
15  national standard.
16          (Exhibit 128 was marked for
17     identification.)
18    Q.    (By Mr. Kinnard)  Now I'm going to pass you
19  Exhibit 128, STOPNC_628, and ask you to look at that.
20  Read the philosophy part, please, Doctor.
21    A.    "St. Thomas Outpatient Neurosurgical Center
22  will provide and facilitate care to those patients
23  who, because of their general physical condition and
24  the nature of the procedure to be performed, do not
25  require acute hospitalization.  Patients using this

Page 101

1    service shall receive the same quality of care as
2    those who are inpatients."
3        Q.    Now, first, do you agree with that?
4        A.    Yes.
5        Q.    And when it says "inpatients," that means
6    if they are in the hospital; true?
7        A.    Yes.
8        Q.    And so the center standard of care requires
9    that patients at that service must receive the same
10   quality of care as they would as if they were in a
11   hospital?
12       A.    Well, I'm not sure that it requires that.
13   That's a philosophy statement.  But in -- and the
14   standard of care for a surgery center is not the same
15   as for an inpatient facility.
16       Q.    Well, you do agree that patients at the
17   center should receive the same quality of care as they
18   would if they were in a hospital.  You agree with
19   that?
20       A.    They should have good quality care.  But
21   in -- but there are other -- other standards that
22   apply to a hospitalized patient and the services
23   provided at a full hospital compared to those at a
24   surgery center.
25       Q.    Do you agree that the standard of care for

Page 102

1    the center includes that the center must not allow
2    center profits to jeopardize patient safety?
3        A.    Yes.
4        Q.    Do you agree that the standard of care for
5    the medical director is that he must make and keep
6    safety of the patients as his top priority?
7        A.    Yes.
8        Q.    Are you familiar in general with the
9    facility director's job?
10       A.    Yes.
11       Q.    And who was the facility director in 2011
12   and 2012?
13       A.    Debra Schamberg.
14       Q.    Now, why do -- why does the center have
15   policies and procedures?
16       A.    To provide a framework for our operations.
17   It gives us something to refer to if we have a
18   question about how to proceed in a given situation.
19       Q.    And do you know if people over there are
20   required to look through and read the policy and
21   procedures?
22       A.    I don't know.  I don't know if the staff
23   members when they're hired have to read the entire
24   policy and procedure manual or just parts they might
25   be responsible for.  I don't know.

Page 103

1        Q.    Have you ever bought a home, Doctor?
2        A.    Yes, sir.
3        Q.    How many homes have you bought?
4        A.    Three.  Yes.
5        Q.    Three?
6        A.    (Witness nods head affirmatively.)
7              No, four, excuse me.
8        Q.    Have you had the experience that the seller
9    likes to brag about the quality of the home he or she
10   wants to sell?
11       A.    Well, I've never met the seller prior to
12   the sale, so I don't know.
13       Q.    Have you ever had a home inspection done of
14   a home before you bought it?
15       A.    Yes, sir.
16       Q.    Why did you do that?
17       A.    To make sure that there were no hidden
18   problems or unrecognized problems in the -- in the
19   home.
20             MR. KINNARD:  We'll take a lunch
21   break.
22             THE WITNESS:  Okay.
23             VIDEOGRAPHER:  This is the end of
24   Tape No. 2.  We're off the record.  And the
25   time is 11:41 a.m.

Page 104

1              (A lunch recess was taken at 11:41
2    a.m. and the deposition reconvened at 12:41
3    p.m.)
4              VIDEOGRAPHER:  Here begins Tape No. 3
5    in the deposition of John Culclasure, M.D.
6    We're back on the record and the time is
7    12:41 p.m.
8        Q.    (By Mr. Kinnard)  You ready, Doctor?
9        A.    Yes, sir.
10       Q.    What is your understanding of what a
11   deposition is?
12       A.    It's a chance for you to, I guess, question
13   me about events that you're interested in, under oath.
14       Q.    Okay.  Do you understand that a deposition
15   is where you take an oath to tell the truth, and then
16   one or more lawyers may ask you questions?
17       A.    Yeah.
18       Q.    And that at the deposition there's a court
19   reporter?
20       A.    And I'm sorry, I didn't --
21       Q.    There's a court reporter like this lady at
22   the end of the table --
23       A.    Uh-huh (affirmative).
24       Q.    -- taking down your answers to questions;
25   right?

1    A.   Yes.
2    Q.   So you do understand what a deposition is?
3    A.   Yes, sir.
4    Q.   Now, earlier in your testimony, you said
5    you had no memory of giving a deposition as an expert
6    witness before; is that right?
7    A.   (Witness nods head affirmatively.)
8    Q.   True?
9    A.   Yes, sir.
10   Q.   You have to say yes or no.
11   A.   Oh, yes, sir.
12   Q.   Are you John W. Culclasure, M.D.?
13   A.   Yes, sir.  I am.
14   Q.   Can you see that all right, Doctor?
15   A.   Yes.
16   Q.   This document appears to be -- it says the
17   deposition of John W. Culclasure, M.D.  Is that you?
18   A.   Yes, sir.
19   Q.   Taken on December 12, 2012.  Do you see
20   that?
21   A.   Yes, sir.
22   Q.   And in the First Circuit Court of Davidson
23   County Tennessee -- and there's the style of the case
24   up there.  Humphrey versus Mack Wilson Griffith, M.D.
25   Do you see that?

1    A.   Yes, sir.
2    Q.   It looks like a malpractice case, doesn't
3    it?
4    A.   Yes, sir.
5    Q.   Do you remember now serving as an expert
6    witness in that case?
7    A.   Yes, sir.  I remember reviewing that.  I
8    didn't remember whether we did a deposition or not,
9    so...
10   Q.   There's a stipulation on the Page 4 that
11   the deposition of John W. Culclasure was taken by the
12   plaintiff at the law offices of Miller & Martin.  Do
13   you see that?
14   A.   Yes, sir.
15   Q.   This ring a bell now?
16   A.   I don't remember the questions or the
17   exact -- the deposition.  But I -- I certainly
18   reviewed the case.  I know Dr. Wilson -- I mean Dr.
19   Griffith.
20   Q.   Well --
21   A.   I remember the details of the case.
22   Q.   The question is not whether you remember
23   the questions.  It's whether you remember giving the
24   deposition.  Do you remember it?
25   A.   I remember now.  It's just -- yes, sir.  I

1    remember.
2    Q.   Mr. Beveridge is my law partner.  And one
3    of the first questions he asked you is "Have you given
4    a deposition before?"  What did you say?
5    A.   20 or so, 25 maybe.  Mostly workers'
6    compensation.
7    Q.   But you said fewer for malpractice cases.
8    A.   Yes, sir.  I don't remember how many I've
9    done for malpractice.  Most of the ones that -- excuse
10   me -- most of the time when I served as an expert for
11   the case, they don't -- they generally didn't go to
12   even a deposition, I don't think.  I don't remember
13   doing a lot of depositions for malpractice cases.
14   Q.   The point is, you've testified in more than
15   one medical malpractice deposition, haven't you?
16   A.   I mean, I see this one.  I don't know how
17   many, sir.
18   Q.   But you did do it; right?
19   A.   Yes, sir.  I guess so.
20   Q.   Now, is there something wrong with your
21   memory?
22   A.   Not generally, no.
23   Q.   Okay.  Let's talk --
24        MR. KINNARD:  Let's shut this Elmo
25   down.  Thank you.

1    Q.   (By Mr. Kinnard)  About how many total ESIs
2    have you done in your career?
3    A.   A rough guess would be probably be 40,000,
4    somewhere around that.  Just based on the average
5    number and the number of years I've been doing it.
6    Q.   Before this catastrophe we've referred to
7    in the first couple of minutes of your testimony
8    happened, did you ever have a patient develop
9    arachnoiditis as a result of your injecting epidural
10   steroid injection steroids into the patient?
11   A.   Not that I'm aware of.
12   Q.   Since the catastrophe happened, have any of
13   your patients that you injected epidural steroids into
14   developed arachnoiditis?
15   A.   I don't know.
16   Q.   You don't know of any?
17   A.   Correct.
18   Q.   Whatever steroid products you used before
19   2011, you were satisfied and content that they were
20   safe; is that true?
21   A.   Yes, sir.
22   Q.   After the catastrophe occurred, whatever
23   steroid product you used for epidural steroid
24   injections, you are content and satisfied with as
25   being safe; true?

Page 109

1     A.   Yes. True.
2     Q.   What were you using before you switched to
3  a product made by NECC?
4     A.   Methylprednisolone acetate.
5     Q.   MPA? Can we -- MPA?
6     A.   Yes. We can call it MPA.
7     Q.   Okay. Did it have preservative in it?
8     A.   Yes, sir.
9     Q.   What was the preservative?
10    A.   Picolinium.
11    Q.   And what is that?
12    A.   I couldn't tell you exactly, but it's used
13  as a preservative in some injectable medications.
14    Q.   But to your knowledge, none of your
15  patients that you used that with ever developed
16  arachnoiditis; is that right?
17    A.   Correct.
18    Q.   After the catastrophe --
19    A.   Well, none developed it as a result of that
20  injection, as far as I know. There are other causes
21  of arachnoiditis.
22    Q.   Yeah. But not connected to the ESI?
23    A.   Correct.
24    Q.   After the catastrophe, what did you use for
25  the steroid?

Page 110

1     A.   Methylpredni -- MPA.
2     Q.   Manufactured by whom?
3     A.   Pfizer.
4     Q.   Did Pfizer manufacture the steroid you used
5  before the catastrophe?
6     A.   I believe they did.
7     Q.   Were you able to get all the steroids you
8  needed after the catastrophe?
9     A.   Yes, I believe we have been.
10    Q.   Now, somebody came to you at some point in
11  time and said, We're having some trouble with the
12  supplier of our MPA. True?
13    A.   Yes.
14    Q.   Was that person Ms. Schamberg?
15    A.   No.
16    Q.   Who was it?
17    A.   I think it was either Cindy McLendon or
18  Sandra Littleton.
19    Q.   What is Cindy's last name?
20    A.   McLendon, M-C-L-E-N-D-O-N --
21    Q.   Or?
22    A.   Sandra or Sandy Littleton.
23    Q.   Do you know which one it was?
24    A.   No, sir, I don't. It was just mentioned --
25  I think -- I think both of them may have ordered

Page 111

1  medications for us at different times. But one or
2  both of them informed me that we were running low on
3  that medication.
4     Q.   Did they tell you why?
5     A.   Not that I remember, other than it was back
6  ordered.
7     Q.   What does "back ordered" mean?
8     A.   It means they put in the order and there's
9  none available, and they'll fill the order as soon as
10  they get more -- more in.
11    Q.   Did you ever have to not do an ESI because
12  of a short shortage of MPA shortage?
13    A.   No.
14    Q.   In other words, you always had enough MPA
15  to perform the ESIs?
16    A.   Yes, but we came down to I think a one- or
17  two-day supply a couple of times.
18    Q.   But you never ran out? With no --
19    A.   With no -- correct. With no guarantee of
20  when the next order might be shipped.
21    Q.   So was that your first knowledge by Ms.
22  McLendon or Ms. Littleton about some sort of issue?
23    A.   I believe so, yes.
24    Q.   What did you tell them to do?
25    A.   I don't remember specifically. I probably

Page 112

1  asked them if there were other sources that we could
2  get it from.
3     Q.   Probably or do you remember?
4     A.   I don't remember that specifically. This
5  would have been a conversation when I'm -- when I
6  probably left a patient room after talking to them and
7  counseling them for the procedure. And they would
8  have just stopped me as I was headed to the procedure
9  room to take care of another patient, and just say,
10  you know, Dr. Culclasure, we're running really low on
11  the steroid and we're having trouble getting it. And
12  so it would not have been a sit-down meeting, it just
13  would have been mentioned to me in passing.
14    Q.   What did you do as a result of that
15  conversation in the hallway?
16    A.   I probably either -- well, asked them to --
17  or if they knew why or was there a way around that,
18  could we -- is there a way to procure the medication?
19  I probably went to Debra Schamberg and just asked her
20  what our options were.
21    Q.   I'm not fussing with you, Doctor. I want
22  to know, though, the difference between what you
23  remember and what your memory tells you, and what
24  think you probably would have done. Do you understand
25  there's a difference?

Page 113

1    A.   I certainly do.
2    Q.   Okay. What do you remember -- what do you
3  actually remember telling either Ms. McLendon or Ms.
4  Littleton?
5    A.   I don't remember anything verbatim.
6    Q.   But in your mind, as a result of one of
7  those people or both of them talking to you, what were
8  you thinking at the time? Do you remember that?
9    A.   I was thinking that I didn't want to run
10  out of the supply of that medication.
11    Q.   And how short was this picture that they
12  painted for you?
13    A.   I thought that -- I think they said a few
14  days or one to two days' supply. I thought that we
15  got down to that low on a couple of occasions where we
16  were about to run out.
17    Q.   But you don't remember whether it was one
18  or two days or a few days?
19    A.   That's right. It just didn't -- that was
20  not a big distinction at that point.
21    Q.   And then what happened, according to your
22  memory, next?
23    A.   I don't remember how many times we got
24  close. But I discussed the situation with Debra
25  Schamberg and she said that she had met a

Page 114

1  representative from a company called NECC at the FASCA
2  meeting that she attended.
3    Q.   At what meeting?
4    A.   The Freestanding Ambulatory Surgery Center
5  Association. I think that may not be exactly it, but
6  something along those lines.
7    Q.   And?
8    A.   And so she asked if it was worthwhile to
9  check with them and see if they could supply the
10  medication. I said that would be fine. Check with
11  them and see what they can do.
12    Q.   Anything else about that conversation?
13    A.   I don't know whether at that same time or
14  later that day or the next day, she told me that she
15  had seen them at that meeting for at least two years,
16  maybe that was all. But they had been there -- she
17  had seen them there exhibiting for a couple of times,
18  that they supplied all kinds of medications including
19  steroid. And she thought they might be an answer to
20  our -- our threatened supply shortage.
21    Q.   Anything else you remember about -- up to
22  this point in time, about speaking with anybody about
23  this issue?
24    A.   I never spoke to anyone from NECC. The
25  only people I discussed this with would have been

Page 115

1  staff, probably, as I said, Cindy or Sandy and then
2  Debra.
3    Q.   Are the only people you would have talked
4  with about this supply of steroids been Cindy, Sandy
5  and Debra?
6    A.   Yes, sir.
7    Q.   It's true you never talked to anybody else
8  about this situation at that point?
9    A.   I think to the best of my recollection
10  that's true. It wasn't a -- it wasn't a crisis. It
11  wasn't something that stood out dramatically. It was
12  just something to deal with in the course of taking
13  care of the patients.
14    Q.   Is there anything else about these
15  conversations up to this point in time you haven't
16  told us about yet? Anything?
17    A.   Well, somewhere in the sequence, Debra
18  showed me some of the information from NECC. I don't
19  know whether that was the first time I talked to her
20  about it or when she told me that she thought about
21  reaching out to them. But she did have some -- I
22  don't remember whether it was a folder or whether it
23  was a one-page -- I mean a one-sheet on back and
24  front, but it just -- it was some advertising material
25  from NECC. So I saw that at some point during the

Page 116

1  process.
2    Q.   Were you leaving it up to Debra Schamberg
3  to decide where to purchase these steroids?
4    A.   She -- it was, I guess, more of a
5  collaboration. She just asked me if I thought that
6  was reasonable, and I said, Yeah that's very
7  reasonable, that they -- it looks like they do
8  everything correctly. They've got -- they follow, you
9  know -- it looks like they maintain high standards,
10  everything looks like it's state of the art. So I
11  said, That's fine.
12    Q.   Was this in the hallway also?
13    A.   It could have been in her office. Probably
14  in her office.
15    Q.   Now, did she ever let you know anything
16  about price?
17    A.   I think -- you know, she may have mentioned
18  some things about price. That just wasn't something
19  that concerned me, so I didn't really -- I didn't care
20  whether it was 50 cents more or less or a dollar more
21  or less. That wasn't a large sum of money. I mean if
22  we're talking about four or five hundred vials a
23  month, a dollar a vial wasn't going to -- it wasn't a
24  huge change in whether the center made money or not.
25    Q.   Well, what if it had been $3 more? Would

Page 117

1    that have made a difference to you?
2    A.   Well, I don't know what the cut-off point
3    would have been.  It wasn't -- that's not my issue.
4    I'm not the -- I'm not managing the surgery center.
5    Q.   Well, do you know whether the patient would
6    have had to pay more -- if the switch occurred in
7    steroids, that a few dollars more were charged to the
8    center; do you know that?
9    A.   That wouldn't change anything that the
10   patient -- anything in the patient's bill.  So no.
11   Q.   But what it would change is the profit of
12   the center?
13   A.   Yes, it would.
14   Q.   And we've already established that the
15   standard of care for a center is never let profit
16   take priority over patient safety; true?
17   A.   True.  And it never did.
18   Q.   Are you telling us and the jury that money
19   had nothing to do with this decision, Doctor?
20   A.   I said that profit did not affect the
21   patient care.
22   Q.   Did money have anything to do with the
23   decision to switch?
24   A.   Not with my decision, no.
25   Q.   Did it have anything to do with the

Page 118

1    center's decision to switch?
2    A.   The center was just looking for a reliable,
3    safe source of the medication.  And I think Debra as
4    part of her job tried to negotiate the best price --
5    which is what her job would require of her.
6    Q.   Do you know what supplier was supplying the
7    MPA to you-all before this catastrophe occurred?
8    A.   No, sir.
9    Q.   You don't really care about that, do you?
10   A.   I don't care what wholesaler sends the
11   medication over.
12   Q.   Did you have a discussion with Ms.
13   Schamberg, Find me steroid that's preservative-free?
14   A.   I don't think we -- I think it was more
15   that she said, One other advantage for NECC is they
16   provide preservative-free steroid.  We weren't
17   actually -- we weren't actively searching for a
18   preservative-free steroid at that time.  It's always
19   desirable -- it's desirable to have a
20   preservative-free formulation if we're going to inject
21   it into the spine.  But it's very hard to get that for
22   a lot of the medications.  So that wasn't what really
23   drove the decision to go with NECC.  But the fact that
24   they offered preservative-free I thought was a bonus.
25   Q.   Have you ever used a steroid for ESI, other

Page 119

1    than NECC, that was preservative-free?
2    A.   I don't know.  I think there might have
3    been a betamethasone formulation that was
4    preservative-free, but I just don't remember exactly.
5    I didn't use betamethasone routinely, so -- or ever,
6    really, probably.
7    Q.   But the MPA that you're familiar with does
8    have a preservative in it?
9    A.   Yes.
10   Q.   Right?
11        And that's what -- how many thousands of
12   injections of that MPA, which has a -- of the
13   preservative in it have you done?
14   A.   Well, probably close to 40,000.  It would
15   be -- I use that almost -- I use the MPA almost all
16   the time.
17   Q.   If Cindy, Sandy and Debra had never had a
18   conversation with you about some potential shortage of
19   MPA and there had not been any sort of shortage of
20   MPA, you would have kept on using it, wouldn't you?
21        MR. GIDEON:  Object to the form.
22        THE WITNESS:  Yes.  If I had -- as
23   long as the -- it was supplied to us, then
24   I would have continued to use it.
25   Q.   (By Mr. Kinnard)  In other words, as long

Page 120

1    as you could have gotten MPA like you were getting it
2    from Pfizer, you would have kept using it?
3    A.   Yes.
4        MR. GIDEON:  Objection.
5    Q.   (By Mr. Kinnard)  I want to be certain
6    about some things in respect to what you did about
7    this switch to NECC.  Is it true you never called a
8    pharmacist about this potential switch?
9    A.   Yes, that's true.
10   Q.   Is it true you never consulted with any
11   doctors in your group?
12   A.   Yes, that's true.
13   Q.   Is it true, other than some brochures that
14   Ms. Schamberg showed you from NECC, that that's the
15   only documents you ever saw about this proposed
16   switch?
17   A.   Yes, that's true.
18   Q.   You never went to a computer and Googled
19   NECC, did you?
20   A.   I never Googled the name of any
21   manufacturer or supplier that we got supplies from.
22   Q.   The question is did you ever go to a
23   computer and Google anything about NECC?
24   A.   No, sir.
25   Q.   Other than these three ladies you told us

Page 121

1    about, did you ever talk to anybody about NECC before
2    the catastrophe?
3         A.   No, sir.
4         Q.   How much trouble would it have been,
5    Doctor, to consult with a qualified pharmacist about
6    the question of whether what NECC does is safe?
7         A.   I don't know.
8         Q.   Is there anything in writing about the
9    decision that was made to switch to NECC?
10        A.   If there is something in writing, it would
11   be from Debra, since she was doing the ordering or
12   initiating the contact.  I would not have made any
13   notes that I'm aware of.
14        Q.   If it there were any questions about the
15   quality of steroids at NECC, did you expect Ms.
16   Schamberg to find that out?
17        A.   No, I expected the FDA and the Tennessee
18   department of pharmacy and the Massachusetts Board of
19   Pharmacy to be on top of that.
20        Q.   Did you know, when Ms. Schamberg talked to
21   you, that NECC was a compounding pharmacy?
22        A.   Yes, sir.
23        Q.   What did you know a compounding pharmacy
24   was?
25        A.   Compounding pharmacies take raw material

Page 122

1    and package it for an injectable drug in a sterile
2    form.
3         Q.   Did you know whether or not it was
4    FDA-regulated?
5         A.   I did not.
6         Q.   Did you assume it was?
7         A.   I did.
8         Q.   That was a mistake, wasn't it?
9         A.   I don't know.
10             The FDA did go in in early 2013 and inspect
11   and shut down some compounding pharmacies.  So that
12   makes it appear that they did have the power to do
13   that at that time.
14        Q.   Do you know why?
15        A.   I don't know it offhand, but I remember
16   seeing some news reports about that.
17        Q.   Do you know the difference between a
18   compounding pharmacy and a manufacturer of drugs?
19        A.   I -- not exactly.
20        Q.   Do you know what triggers FDA involvement
21   when a compounder starts manufacturing drugs?
22        A.   I don't.
23        Q.   Did you ever go to the Framingham facility?
24        A.   No, sir.
25        Q.   Never been.

Page 123

1         Q.   Did you call any doctors or colleagues and
2    ask them, Do you use NECC?
3         A.   No, sir.
4         Q.   Do I understand that what Ms. Schamberg --
5             MR. GIDEON:  Schamberg.
6         Q.   (By Mr. Kinnard) -- showed you from NECC
7    was their sales promotional materials?
8         A.   I believe that's correct.
9         Q.   Did it ever cross your mind to ask whether
10   this compounder was -- that their drugs were
11   FDA-approved or not?
12        A.   No, it did not.  I didn't know that a drug
13   could be sold in the United States and not be
14   FDA-approved.
15        Q.   Anything else you want to add to that?
16        A.   I think that's sufficient.
17        Q.   Okay.  Saint Thomas Health Services was a
18   50-percent owner of this center; is that right?
19        A.   I've never seen the documents about that,
20   but I think that's true.
21        Q.   Assume it is, that according to the
22   documents they've supplied, they're 50-percent owner;
23   okay?
24        A.   Yes.
25        Q.   You did know that they had an ownership

Page 124

1    interest, didn't you?
2         A.   Yes.
3         Q.   You could have called a Saint Thomas
4    Hospital pharmacist and asked for some help if you
5    thought you needed it?
6         A.   Yes.
7         Q.   Tell us every step, Doctor, that you
8    haven't mentioned already, to perform due diligence to
9    ensure that NECC was a safe supplier of these
10   steroids.
11        A.   Those were all the steps.
12        Q.   There's nothing else, is there?
13        A.   No, sir.
14        Q.   Did anybody ever come to you and say,
15   Doctor, we're getting the steroids from NECC, and now
16   they want a patient-specific prescription?  Did
17   anybody ever do that?
18        A.   No.
19        Q.   Did you ever learn, before the catastrophe,
20   that NECC wanted from the center, patient-specific
21   prescriptions, by name?
22        A.   No.  They never asked for a prescriptions,
23   that I'm aware of.
24        Q.   Did they ever want a list of names of
25   patients before they would supply the steroids?

Page 125

```
 1    A.   Yes, they did.
 2    Q.   Were you aware of that?
 3    A.   Yes.
 4    Q.   How did you become aware of that?
 5    A.   Debra Schamberg informed me.
 6    Q.   When did she tell you?
 7    A.   I don't remember.
 8    Q.   What did she tell you?
 9    A.   That NECC wanted a list of patients because
10  the -- they told her that it was a requirement from
11  the Massachusetts Board of Pharmacy.
12    Q.   What did you tell her?
13    A.   I said that was fine.  See what they need
14  and supply them with the information.
15    Q.   What did you think was going to be supplied
16  to NECC?
17    A.   Debra and I discussed it.  She was
18  concerned about relaying too much information about
19  the patients.  And so I think she negotiated with them
20  a little bit about what they needed.  So I think they
21  got basically just a list of patient names.
22    Q.   Okay.  We're using words that worry me a
23  little bit, "think."  I want to know your memory,
24  Doctor.  Let's start over.  So what did she tell you
25  NECC wanted?
```

Page 126

```
 1    A.   Well, sir, that's the best I can do.  These
 2  were events that at the time were not -- were not that
 3  dramatic or unusual, and so I don't remember the day
 4  of the week or the time of the day or anything like
 5  that.  I don't remember the month.
 6         So she just stopped me while -- you know,
 7  at work or got my attention, and just said, Now they
 8  want patient names.  And she was concerned about
 9  protected health information.  So I just said, Find
10  out what they need and, you know, we can -- if they're
11  a supplier then we can provide them with that kind of
12  information, if necessary.
13    Q.   Did you understand that they wanted the
14  names of patients who were to receive these
15  injections?
16    A.   I don't know.  There was some -- Debra
17  informed them that we wouldn't know at the time the
18  list was sent, which ones got which medications.  You
19  know because they were -- other people used different
20  steroids.  Not every patient got MPA.  And so -- but
21  they were satisfied with having the list that way.  I
22  just -- I assumed that it meant that if for some
23  reason something came up or the Massachusetts Board of
24  Pharmacy wanted information from them, they could
25  always backtrack from that list and see who got what.
```

Page 127

```
 1  They could call us and we could look up the patient
 2  and tell them, Ms. Smith got MPA and Mrs. Jones got
 3  betamethasone.
 4    Q.   So the list, as far as you thought, was not
 5  designed to tell NECC who is going to get epidural
 6  steroid product, but any product from NECC?
 7    A.   I'm -- I don't --
 8    Q.   You're going to have to explain, please,
 9  for all of us, what you mean, about the list of the
10  patients' names could be for what?
11    A.   I'm not understanding your question
12  exactly.  But almost all the patients got epidural
13  steroid injections, so...
14    Q.   Is it your understanding that each
15  patient's name that went to NECC was injected with
16  something later?
17    A.   Yes, or they wouldn't have been a patient
18  at the center.
19    Q.   And the something they were injected with,
20  may not have been an epidural steroid, but something
21  else?
22    A.   It could have been, yes.
23         (Exhibit 131 was marked for
24    identification.)
25    Q.   (By Mr. Kinnard)  Let me hand you what we
```

Page 128

```
 1  marked as Exhibit 131.  It's a collective exhibit,
 2  STOPNC_696.  What is this, Doctor?
 3    A.   It's the policy, the title is Ethical
 4  Business Behavior.
 5    Q.   Part of STOPNC's policy manual?
 6    A.   Yes, it appears so.
 7    Q.   Looking at Page 3, do you see Principle
 8  One, Legal Compliance?
 9    A.   Yes.
10    Q.   Would you read that for us all, please,
11  Doctor.
12    A.   "STOPNC is committed to conduct its
13  activities in compliance with applicable laws and
14  regulations.  The following standards are meant to
15  guide employees in compliance.  These standards do not
16  completely cover all applicable laws and regulations.
17  Regardless, employees are expected to comply with all
18  applicable laws, regulations and guidelines, use good
19  judgment, and consult with their supervisor."
20    Q.   You agree with that?
21    A.   Yes.
22    Q.   Now, look at Page 4, please, Principle Two,
23  Business Practices.  Read that first paragraph,
24  please.
25    A.   "STOPNC is committed to the highest
```

1    standards of business ethics and integrity.  Employees
2    are charged with representing STOPNC accurately and
3    honestly, refraining from any activity intended to
4    defraud anyone of money, property or services, and at
5    all times act in good faith and in the best interest
6    of STOPNC."
7        Q.    Do you agree with that?
8        A.    Yes, sir.
9        Q.    And will you please read the next
10   paragraph.
11       A.    "The following standards provide guidance
12   to help ensure STOPNC's business activities reflect
13   high standards of business ethics and integrity.
14   Employee conduct not specifically addressed by these
15   standards must still be consistent with this
16   principle.  Questions regarding the interpretation or
17   application of this principle should be directed to
18   the supervisor."
19       Q.    You agree with that?
20       A.    Yes.
21       Q.    Then the Page 10 -- you on Page 10?
22       A.    I'm on Page 5.
23       Q.    Well go to 10, please, sir.  Read the
24   second question, and then the answer, please.
25       A.    "Who is responsible for understanding and

1    complying with the laws and regulations that apply to
2    my work area?  All employees are responsible for
3    complying with laws and regulations as well as STOPNC
4    policies and procedures that relate to their jobs and
5    apply to their respective work areas.  Familiarize
6    yourself with this document for expectations regarding
7    your business conduct.  If you have questions, ask
8    your supervisor for clarification."
9        Q.    You agree with that, don't you?
10       A.    Yes, sir.
11       Q.    Did Ms. Schamberg ever come to you and say
12   to you, I need to put the name Mickey Mouse on this
13   document that lists the patients to NECC?
14       A.    No.
15       Q.    You didn't know anything about the use of
16   Mickey Mouse's name to NECC, did you?
17       A.    No.
18       Q.    If she had come to you and said, Doctor, I
19   want to use the name Mickey Mouse on this list of
20   patients with NECC, would you have told her, Don't do
21   that?
22       A.    I would have asked her to redact that from
23   the document, because there's no patient named Mickey
24   Mouse.  That's a placeholder that we would use to let
25   the staff upstairs know that I was going to be

1    downstairs at a certain time on the 8th floor, after
2    seeing a patient downstairs.  So they would -- the
3    system, to my understanding, doesn't allow a
4    placeholder.  So they would just use Mickey Mouse or
5    Minnie Mouse, I think, as a -- as placeholders.  Those
6    names are clearly not real people, and so it just
7    let's the staff know that -- not to book something in
8    that slot because I was going to be elsewhere.
9           I think they also used those -- attached to
10   those names are a full set of made-up demographics in
11   the system, and when new employees come on board they
12   train -- they learn how to put data in, do charges and
13   things like that, using Mickey Mouse and Minnie Mouse,
14   because those are clearly not real patients, whereas
15   Joe Smith or John Doe could be a real patient.
16       Q.    Have you finished?
17       A.    Yes, sir.
18       Q.    That is an internal arrangement the center
19   has?
20       A.    Yes.
21       Q.    It's not -- the use of Mickey Mouse is not
22   intended to go out of the center, is it?
23       A.    No.  It wasn't intended to.
24       Q.    Do you know why she used the name Mickey
25   Mouse?

1        A.    I have no idea.  I think that was set up
2    long before I came.  But it was explained to me that
3    it was chosen partly because everyone would know that
4    that was not a real patient.
5        Q.    You mean NECC would know it was not a
6    real --
7        A.    No, no, no.  That other employees at the --
8    at STOPNC would know that -- it was -- if that showed
9    up, they knew not to book something in that slot at
10   the center, because I was going to be elsewhere.  I
11   would be maybe downstairs on the 8th floor seeing a
12   consult, would be the most common reason.  So
13   otherwise I would -- I could get double-booked.
14          The -- because the office -- the scheduling
15   system is different for the center and for the
16   practice.  And so the -- so it would have been
17   possible for someone to book me to see a consult as
18   part of me being -- me being a part of Howell Allen
19   Clinic on the 8th floor, and at the same time the
20   center staff could have booked me to do injections on
21   the 9th floor.
22          And so by having those filler names in, it
23   was apparent to the center staff that I was not going
24   to be there, not to book anyone in those slots.
25          They tended to be the first slots after

Page 133

1    lunch, because I would eat lunch and then go
2    downstairs and see consults, if I had consults to see
3    downstairs.
4        Q.    But that was never intended to communicate
5    with NECC or anybody like NECC?
6        A.    Correct.  Those were just placeholder
7    names.
8        Q.    Did Ms. Schamberg tell you that the Board
9    of Pharmacy in Massachusetts wanted NECC to get a list
10   of names of patients?
11       A.    No, sir.
12       Q.    Do you get a flu shot each year?
13       A.    I have for the last several.
14       Q.    Do you know how much a flu shot is?
15       A.    I have no idea.
16       Q.    Do you have good insurance?
17       A.    I have --
18       Q.    Health insurance?
19       A.    Yes, sir.
20       Q.    Where do you get your flu shot?
21       A.    Debra administers it to center staff.
22       Q.    Well, if you didn't have that advantage,
23   Doctor, and you were like the rest of us who have to
24   go to places sometimes like Walgreens, to get a -- you
25   ever get a flu shot at Walgreens?

Page 134

1        A.    No, sir.
2        Q.    You don't have any idea how much a flu shot
3    cost at Walgreens, do you?
4        A.    Not at all.
5        Q.    Well, if you went to Walgreens to get your
6    flu shot, and they said, You're going to have to copay
7    $10 instead of $5, would you do it?
8        A.    Yes.
9        MR. KINNARD:  Okay.  We'll take a
10   five- to seven-minute break.
11       VIDEOGRAPHER:  This is the end of
12   Tape No. 3.  We're off the record.  The
13   time is 1:25 p.m.
14       (A recess was taken.)
15       VIDEOGRAPHER:  Here begins Tape No. 4
16   to the videotaped deposition of John
17   Culclasure.  We're back on the record and
18   the time is 1:40 p.m.
19       Q.    (By Mr. Kinnard)  Ready, Doctor?
20       A.    Yes, sir.
21       Q.    Other than with NECC, which asked
22   Ms. Schamberg to send a list of patient names, was
23   there ever any other manufacturer or provider of
24   steroids that asked for such a list?
25       A.    No, sir.

Page 135

1        (Exhibit 135 was marked for
2    identification.)
3        Q.    (By Mr. Kinnard)  Doctor, we've marked as
4    Exhibit 135, STOPNC 65, 59, 58, 57, 56, as this
5    exhibit.  Do you see down here where it says physician
6    name, signature?  Do you see that, Doctor?
7        A.    Yes.  Yes.  Yes.
8        Q.    Is that your signature?
9        A.    No, sir.
10       Q.    Who signed your name there?
11       MR. GIDEON:  Object to the form.
12       THE WITNESS:  I don't know.
13       Q.    (By Mr. Kinnard)  You don't know who signed
14   your name?
15       A.    Well, that doesn't look like --
16       MR. GIDEON:  Object to the form.
17       THE WITNESS:  That doesn't look like
18   an attempt at a signature.  It looks like
19   they were putting my name down as requested
20   by the form.
21       Q.    (By Mr. Kinnard)  Oh, did you write your
22   name there?
23       A.    No, sir.  I didn't.  But it's -- I'm saying
24   it doesn't look like someone tried to fake my
25   signature.

Page 136

1        Q.    What did you say?
2        A.    It looks like someone printed my name.  It
3    says -- the form says "physician's name/signature."
4    So I would assume that meant the first thing to do
5    would be to write the physician's name out, and then a
6    signature.  And that looks like my name written out,
7    not a signature.
8        Q.    So you never signed this, obviously?
9        A.    No, sir.
10       Q.    All right.  Do you know what the shelf life
11   for MPA manufactured by Pfizer was?
12       A.    No, sir.
13       Q.    All right.  Did the procedure that you told
14   us about, when you went in to meet with the patient
15   for the first time, who is going to undergo an ESI,
16   change any when you were using this product from NECC?
17       A.    No, sir.
18       Q.    I'm going to put up on the Elmo now, STOPNC
19   2386, which is Exhibit 39 from Ms. Schamberg's
20   testimony at her deposition.  Please read that,
21   Doctor.
22       A.    "Do I have to use certain vendors for
23   ordering?  I would like to do some price comparison
24   with other vendors other than Cardinal.  I'm not
25   pleased with our Cardinal rep, and I know there are

Page 137

1  some hungry vendors that would love our business.
2  Also, I have Solar Tinting coming next week to frost
3  the two windows looking into the ORs.  Cost will be
4  $175."
5       Q.   Have you ever seen this document?
6       A.   No, that -- if I did, it would have been
7  just looking through materials that I was provided to
8  review.  But, I mean, that was hundreds of pages.  I
9  don't remember that specifically.
10      Q.   Okay.  You're talking about after
11 litigation started in this matter, somebody sent you
12 documents to look at?
13      A.   Yes, sir.
14      Q.   Who sent you the document?
15      A.   My attorneys.
16      Q.   I'm going to put up there now on the Elmo,
17 STOPNC 2472, 2473 and 2474.  This is from you to Debra
18 Schamberg on July 26, 2012; right?  Apparently you
19 sent her this letter you got; is that right?
20      A.   Yes, sir.
21      Q.   Now, do you remember getting this letter?
22      A.   Yes, sir.  We were concerned about the --
23 about the contrast.  The contrast came in very large
24 vials and I don't remember now how many, 50 cc vials,
25 and we were only using two or three ccs from each one.

Page 138

1  It just seemed awfully wasteful, and plus we were
2  dumping them back into the environment if we threw
3  them away immediately.  So we wanted to -- and so we
4  had been using them multiple times on the same day,
5  cleaning each one -- cleaning in between times and
6  never it with -- only entering it with new needles.
7       And so there -- and then that became
8  controversial and the organization ASIP, which is up
9  there, next to Dr. Manchikanti's name, they were
10 concerned about that too, and they thought there
11 should be a way for practices to split up the contrast
12 into smaller aliquots or have a compounding pharmacy
13 do it under a sterile hood and then ship it.
14      And so that was why I sent that to her.
15      Q.   Well, here's the doctor's name.  Do you
16 recognize that name now?
17      A.   Yes, sir.
18      Q.   Do you know him?
19      A.   Yes, sir.  I've met him.
20      Q.   How do you say his name?
21      A.   Manchikanti.
22      Q.   All right.  He says, "Thus even if a
23 compounding pharmacy, which we consider not to be very
24 safe, revised it, it would be doable" -- excuse me,
25 "double or triple the price we would be paying when we

Page 139

1  used a single dose vial on multiple patients."
2       Now, what did you take it to mean he was
3  saying, "Thus even if a compounding pharmacy which we
4  consider to be not very safe."  What does he mean?
5       A.   That didn't really concern me at the time.
6  I wasn't -- that was not my focus about the letter.
7  It was the fact that he was supporting our position
8  that we should have some alternative to wasting so
9  much contrast on multiple patients.
10      My experience by that time with NECC had
11 been a year of being a client of theirs with no
12 problems with their medication.  So that -- my
13 experience was not that.  And over the years, we've
14 used compounding pharmacies to make pump medications,
15 to compound pump medications for patients that have
16 implanted pumps.  And those are complicated mixtures
17 of drugs and they only come from compounding
18 pharmacies.
19      So -- and throughout that time, with many,
20 many years of using compounding pharmacies, I'd never
21 had a problem with a compounding pharmacy.  So my
22 experience -- because of that experience I was not
23 very concerned about his -- that one line in that
24 letter.  And that wasn't the focus of the letter.  The
25 focus of the letter was about having CMS allow us to

Page 140

1  split the vials of contrast.
2       Q.   Here's a memo from -- excuse me, an e-mail
3  from Debra Schamberg to Bobbi Doty.  Who is Bobbi
4  Doty?
5       A.   She's a clerical person in the practice.
6  She's my secretary and she schedules procedures for
7  me.
8       Q.   Dated 12/9/2010.  Ms. Schamberg said, "We
9  may start ordering from Clint Pharma.  They are local
10 and I think they will give us better $$."  What do you
11 interpret that to mean?
12      A.   I assume that's just her shorthand for a
13 better price.
14      Q.   I'm going to show you now STOPNC 4231, an
15 e-mail.  What does it mean, "from John W. Culclasure,
16 Doctor, to John Culclasure, Senior."  What does that
17 mean?
18      A.   She -- let me see.  That means I forwarded
19 that from my work e-mail to my personal e-mail.
20      Q.   Okay.  Why did you do that?
21      A.   I'm not sure.  Let me...
22      Q.   Let's see what this said.  Maybe it'll help
23 you.
24      A.   To ASA 13.  Oh, that's the other guys that
25 came in, and that was in October.  I guess I must have

Page 141

1   been -- I don't know, I guess I was obviously out of
2   town. Sometimes -- usually what I save is when she
3   sends me just, like, totals of what we've done, I
4   usually save that in a folder on my personal e-mail.
5   But I'm not sure why I saved that.
6       Q.   Well, she told you, "We have an increase of
7   50 procedures over the last year." Right?
8       A.   Yeah. But that doesn't seem worth saving.
9   So I just don't remember why I would have saved that.
10      Q.   She says "You have done 37 more procedures
11  to ASA 13." What does that mean?
12      A.   That's the group's -- the abbreviation of
13  the group's name for the guys who came over to help
14  me. Dr. Dickerson, Carrero, Arney, Rome.
15      Q.   They were all combined?
16      A.   Yes, they were all within that group.
17      Q.   And who is Dr. A she gave a flu shot to?
18      A.   That would be Dr. Arney.
19      Q.   And is there any sort of animosity with her
20  or him? Is it a woman or man?
21      A.   It's a man. He was a very nice man. He
22  passed away because of multiple myeloma and we were
23  all very close to him, so there was no animosity.
24      Q.   Now, when was the first time -- strike
25  that.

Page 142

1       Before somebody told you there's a possible
2   connection to ESIs performed in the center during that
3   summer before, were you getting any sense of there are
4   more patients returning to Howell Allen with problems
5   after the ESIs than usual?
6       A.   No, sir.
7       Q.   Nobody at Howell Allen alerted you to, "Hey
8   we're getting more people in here for more tests after
9   ESIs," anything like that?
10      A.   No, sir.
11      Q.   So you -- you were oblivious to any problem
12  with the ESIs until somebody told you something; is
13  that right?
14      A.   I was unaware of any problems with the ESIs
15  until I was informed that there was a patient at
16  Vanderbilt who had a fungal meningitis.
17      Q.   Who told you that?
18      A.   I think I got a call from Debra, who'd
19  gotten a call from the infection control nurse at
20  Saint Thomas.
21      Q.   Did you know the patient?
22      A.   I didn't know him. I had done his
23  injections. I don't think he was -- he was not a --
24  someone that I had seen for years like some of the
25  patients.

Page 143

1       Q.   What was the date of that information?
2       A.   It was September 18th. My dad's birthday
3   is the 19th, so that's why I remember that.
4       Q.   And what did you do about that information?
5       A.   Debra told me -- Debra called me. I was
6   already home and she told me that Candace wanted to
7   know if a -- just said there was a patient at
8   Vanderbilt who was sick and he had been diagnosed with
9   an Aspergillus meningitis and wanted to know if he had
10  received injections at STOPNC. And I asked her if she
11  wanted me to go back in and find out then and she
12  said, no, it's not -- that's not urgent. Candace just
13  wanted to know tomorrow if he had been a patient.
14      So when I went in the next day to the
15  imaging center where I am on Wednesdays, I pulled up
16  his information and he -- there was a telephone note
17  in the chart. He told -- he was calling to let Dr.
18  McCombs know that he was doing better after his
19  injections, but that he had been diagnosed at
20  Vanderbilt with Rocky Mountain spotted fever
21  meningitis . And -- but since that note was made, he
22  had been re-admitted and they made the diagnosis of
23  Aspergillus meningitis.
24      So I guess I contacted both -- I think I
25  probably just talked to Debra. I don't know if I

Page 144

1   called Candace at that point, but I told her what I
2   saw in the record and I said, you know, I don't see
3   how this could come from us. If someone had -- if we
4   had had a contaminated injection, I would expect it to
5   be, one, bacterial, and, two, an abscess, not a
6   meningitis because that's what would happen after an
7   epidural injection.
8       And so I said this seems very unusual, and
9   I said apparently they diagnosed him with Rocky
10  Mountain spotted fever, I said, and he had a spinal
11  tap in July at Vanderbilt. And I said, you know,
12  that's when the new residents and interns are there.
13  It almost seems more likely to me that they could
14  have, you know, con -- gotten -- you know, broken
15  sterile technique and in the process of doing the
16  spinal tap, they could have maybe gotten -- you know,
17  put some aspergillus spores into him and maybe that's
18  how this happened. But I was -- that was -- the
19  possibility of a fungal meningitis occurring so long
20  after this man's procedures, it just -- at that point
21  it seemed like the more likely explanation was
22  something else. But I reported that back. And so --
23  and so that's what happened on the 19th.
24      Q.   And then what happened next as far as
25  you're concerned?

Page 145

1    A.   I went in to work on Thursday sometime in
2  the morning. We were -- Candace got in touch and said
3  there might be two more patients in the hospital who
4  have -- who have symptoms of meningitis. And so we
5  checked to see what -- see if they had been patients
6  at the center and they had.
7       I think at that point, I asked Cindy to
8  call our suppliers and see if any of them had had any
9  reports of unusual infections following use of their
10 supplies or medication. I think she -- I think she
11 called -- got in touch with GE because they supplied
12 the contrast. We called the people who put the trays
13 together. We called NECC so -- to try to see if
14 anything -- if they had any reports of anything
15 unusual, and they all said no.
16      But -- but so that afternoon, after sort of
17 digesting all of this even though it just -- I could
18 not in my mind connect the dots, I called Scott
19 Butler, the practice manager, and I told him that I
20 didn't know what was going on, that there were three
21 patients who had appeared to have meningitis, and I
22 thought that we should close the center until we knew
23 what was going on.
24 Q.   Would you like to take a break?
25 A.   I'm all right. Let's go.

Page 146

1  Q.   All right. Then what happened?
2  A.   We -- I told the staff that they needed to
3  call the patients and just -- and tell them that, you
4  know, we -- that we had an equipment problem that we
5  were having to reschedule their cases for the next
6  day. I think also that -- no, on Friday morning, I
7  think Dr. Latham, the infectious disease specialist at
8  Saint Thomas West, came up to -- and Candace, they
9  came up and sort of walked around, they looked at the
10 facility. And the Department of Health may have
11 gotten some people out that Friday too.
12      From that point on, we really just became
13 an arm of the Tennessee Department of Health. We
14 just -- you know, they came in and told us what they
15 needed, what we should do. And so from that point on
16 we were basically, you know, just following their
17 instructions on everything. I had no experience with
18 anything like this, and so we just did whatever they
19 said. Dr. Marion Kainer was involved. She's an
20 epidemiologist. So she thought that if we went
21 through the records and got lots of patient
22 demographic data when they had their injections, what
23 they were injected with, that we should be able to
24 figure out what was going on.
25      So for a -- for quite a while we had no

Page 147

1  diagnosis. But for -- but every day, we would get,
2  you know -- there would be two or three more people
3  being admitted to the hospital. And at one point Dr.
4  Latham even thought that it wasn't infectious. That
5  instead it was -- might have been a chemical
6  contaminant in some of the stuff because he gave some
7  of the patients steroids and they got better
8  temporarily, but then they all got worse about 24 to
9  36 hours later.
10      And so that -- that next week it was --
11 Debra set up a process to try to call all the
12 patients. At first they just wanted to ask -- they
13 being the department of health -- they just wanted to
14 us ask the patients if they were -- how they were
15 doing and if they had any unusual symptoms, and if
16 they did, then we were going to -- we were going to
17 instruct them to come back to Saint Thomas and be
18 evaluated. We did not mention the word meningitis
19 because the department of health told us not to.
20      Apparently they had an outbreak of
21 meningococcal meningitis at MTSU sometime prior to
22 that and before they got that assessed and under
23 control word got out, I think I was told on Twitter or
24 something about men -- meningococcal meningitis at
25 MTSU. That's very infectious and it tends to infect

Page 148

1  young people, college age, people in the military
2  living in close quarters. And so that got out ahead
3  of them being prepared to deal with it. So they
4  didn't want the word meningitis mentioned until they
5  knew it really was meningitis.
6       So we weren't even clear on the diagnosis
7  for probably for another week after that. One patient
8  instead of developing meningitis had an abscess, and
9  Dr. Standard opened her up to clean it out and then
10 that was the first time we had tissue and it was -- I
11 talked to the pathologist and he said it was -- it
12 looked like fungus. It was black. And so then they
13 tested it and it came back Exserohilum, which is not
14 the same fungus that the first patient was growing.
15 In fact, I think he was the only patient who ever grew
16 Aspergillus.
17      I'm sorry. I don't remember the question.
18 I probably --
19 Q.   What we're going to do is take a break.
20 I'm going to take -- just a brief five-minute break.
21 We'll pick up right there when we come back; all
22 right?
23 A.   (Witness nods head affirmatively.)
24      VIDEOGRAPHER: We're off the record.
25      The time is 2:06 p.m.

Page 149

1    (A recess was taken.)
2    VIDEOGRAPHER:  We're back on the
3  record and the time is 2:17 p.m.
4    Q.   (By Mr. Kinnard)  You ready, Doctor?
5    A.   Yes, sir.
6    Q.   Okay.  You want to continue the answer that
7  you were giving us?
8    A.   Could you repeat the question.  I want to
9  make sure whether I --
10    MR. KINNARD:  What was the last
11  subject matter he was talking about?  Give
12  us a hint of the last few lines.
13    THE WITNESS:  And I'd also like to
14  hear the question.
15    MR. GIDEON:  I think the question
16  was, "And then what happened?"
17    THE WITNESS:  Oh, okay.
18    (The record was read by the reporter
19  as requested.)
20    THE WITNESS:  Yeah.  Prior to the
21  biopsy of the abscess, we -- everybody
22  thought it was Aspergillus because of the
23  first patient who went to Vanderbilt.  And
24  so they -- the infectious disease guy sent
25  off a special -- sent off CSF, cerebral

Page 150

1  spinal fluid, for a special test.  I'm
2  blanking on the name of it.  But anyway,
3  it's an antigen test that should be
4  positive if the patient is infected with
5  Aspergillus.
6    So we all just thought that it would
7  confirm that the patients in the hospital
8  had Aspergillus, and that came back
9  negative.  So then that was -- that was
10  very confusing because then we had really
11  no idea what was going on.  We didn't know,
12  well, maybe -- maybe what the patients had
13  that are at Saint Thomas have is different
14  from what Mr. R. had at Vanderbilt.  And so
15  it wasn't until Dr. Standard got the biopsy
16  that we were able to actually get a
17  diagnosis.
18    The problem -- and for a lot of the
19  patients the problem of the -- of it being
20  a fungal infection was that the fungal
21  medications are hard on people,
22  particularly older folks.  It's hard on
23  their livers and kidneys and so that made
24  treating them -- for the infectious disease
25  guy, that made it very difficult for them

Page 151

1  to treat these infections for a lot of the
2  folks because they would have problems with
3  the medication that they needed to take.
4    So I think I've sort of run out of anything
5  else to say at this point.
6    Q.   (By Mr. Kinnard)  What was the date that you
7  started doing ESI injections again?
8    A.   I think November 1st.  I remember seeing
9  that on a document.  Oh, that's when the center opened
10  back up, I think November 1st.  I did some ESIs at the
11  imaging center.
12    Q.   And that was where, the imaging center?
13    A.   Yes, sir.
14    Q.   Where was that located?
15    A.   On Ellison Place near Saint Thomas Midtown.
16    Q.   A Howell Allen facility; right?
17    A.   Yes.
18    Q.   Or --
19    A.   Not a facility, but owned by Howell Allen.
20    Q.   Okay.  STOPNC 2718 is an e-mail from you to
21  Scott Butler.  Would you please read the first
22  paragraph.
23    A.   "Debra and I talked yesterday evening.
24  We're going to have the staff write down everything
25  they remember.  Debra and I will do the same.  We will

Page 152

1  create memorandum and sign and date it.  In the future
2  we can refer to this statement, not rely on our memory
3  a year from now."
4    Q.   Okay.  Do you know if that was done?
5    A.   I didn't because I think about that time we
6  started compiling everything from all the notes that
7  the staff had made and we put all of the information
8  on patient phone calls and everything into an Excel
9  spreadsheet.  And so I think -- so once that
10  started -- once that was done, that sort of had all
11  the -- all that kind of information.
12    Q.   Well, what happened to the notes, do you
13  know?
14    A.   I didn't maybe -- I don't know.  I mean, I
15  didn't make -- I didn't make a separate note myself.
16  But initially when the staff was calling people, they
17  would -- I think they printed out the logs from each
18  day and they would call the patients and make -- just
19  write next to each name, you know, patient answered,
20  doing okay, no answer, call back, just notes like that
21  so they would know what to do.
22    Q.   So have you seen any of those document s in
23  preparation for your deposition today?
24    A.   I have not seen the spreadsheet
25  information, no.

Page 153

1    Q.   Have you seen any of the notes, any
2 handwritten notes or anything like that?
3    A.   I saw them while they were -- I mean, I saw
4 them at that time. I've not seen them in any of the
5 materials I've reviewed for the deposition.
6    Q.   Do you know if they were kept or destroyed?
7    A.   I don't know. I would be surprised if
8 Debra -- anything would be destroyed. She's pretty
9 careful about documents.
10        (Exhibit 136 was marked for
11     identification.)
12    Q.   (By Mr. Kinnard) I'm going to mark as
13 Exhibit 136 STOPNC_1597, which is a two-page document.
14 It also includes 1594. It's dated October 3rd, 2012.
15 You familiar with this letter?
16    A.   Yes, I believe so. I think I saw it.
17    Q.   Is this a competitor of STOPNC?
18    A.   He has another pain practice in town. I --
19 I don't usually think of it as a competitor. We're
20 closed. I mean, I'm not -- he's not -- so I don't
21 compete with him for patients. I mean, we're a closed
22 center. We don't take outside referrals.
23    Q.   Okay. There's a sentence in the first
24 paragraph where he says, "The medications utilized by
25 the physicians at Center for Spine, Joint and

Page 154

1 Neuromuscular Rehabilitation are FDA approved
2 medications from manufacturers and not" -- not being
3 in all caps -- "from compounding pharmacies."
4        Did you see that sentence at the time?
5    A.   I believe I did, yes.
6    Q.   Now, as a result of -- did you see this
7 letter at or about the time he sent it?
8    A.   Yes. I think -- I don't really -- I think
9 he might have come -- come to us because we were
10 probably on the mailing list, or came to me.
11    Q.   Were you upset seeing this?
12    A.   Yeah, I was upset.
13    Q.   Were you angry about it?
14    A.   Possibly. Yeah, because that was -- at
15 that point things were still -- we still didn't really
16 even know -- I imagine by then we had the biopsy
17 diagnosis, but, yeah, yeah, I was angry.
18    Q.   Why were you angry?
19    A.   It just made it sound like we had done
20 something wrong.
21    Q.   Okay. And what did you do about that
22 letter?
23    A.   I think I showed it to Debra probably.
24    Q.   Did you show it or send it to any of the
25 members of Howell Allen?

Page 155

1    A.   I may have. I don't remember. It sounds
2 like I -- I might have forwarded it -- could have
3 forwarded it to Scott to let him know that this was
4 going around.
5    Q.   Do you know whether Scott Butler took some
6 action about the letter?
7    A.   I don't know.
8    Q.   Did you ever call this gentleman who sent
9 the letter?
10    A.   I don't think so. Don't remember.
11        (Exhibit 137 was marked for
12     identification.)
13    Q.   (By Mr. Kinnard) Exhibit 51 to Ms.
14 Schamberg's deposition we've marked as Exhibit 137
15 here, and I want to show you a copy of that. Do you
16 recognize this?
17    A.   I don't think so.
18    Q.   Are you saying you've never seen this
19 before?
20    A.   I don't remember seeing a lot of things
21 from Clint so I don't know.
22    Q.   Clint makes the representation in this,
23 "All products distributed by Clint Pharmaceuticals are
24 FDA approved and are not implicated in this outbreak.
25 FDA approved corticosteroids have been and are still

Page 156

1 readily available through Clint Pharmaceuticals."
2        Now, do you agree or disagree with that
3 statement?
4    A.   That FDA approved corticosteroids have been
5 and are still readily available through Clint
6 Pharmaceuticals?
7    Q.   Right.
8    A.   If they say that they were, then I guess
9 they had a supply.
10    Q.   So you can't say this is incorrect; right?
11    A.   If they had it on their shelves, I guess
12 that's accurate.
13    Q.   Before this catastrophe occurred, you did
14 not know how many states NECC was licensed in, did
15 you?
16    A.   It's hard to say when Debra told me, you
17 know, what about NECC some of those kind of details.
18 I thought she told me early on in the process that
19 they were licensed in every state in the country when
20 we started to order from them, but, I mean, that
21 wasn't -- that -- I couldn't put a date on that or
22 even a rough time, but I thought that that was
23 mentioned to me early on.
24    Q.   Well, you didn't mention that when I asked
25 you to tell us everything Ms. Schamberg told you

Page 157

1   before y'all placed the orders.
2       A.   Well, that's true.  I can't think of a long
3   list of things always, but I gave you the best answer
4   I could at the time.
5       Q.   Well, did you know before switching to NECC
6   anything about whether hospitals used NECC?
7       A.   I don't know when I became aware of that.
8   Probably more after this occurred -- after the
9   outbreak occurred.
10      Q.   People told you things about NECC after the
11  catastrophe; correct?
12      A.   Yes.
13      Q.   People fed you information about NECC, what
14  it did, who all used it; correct?
15      A.   I guess -- yes.  They -- I got other
16  information provided to me about NECC.
17      Q.   Where did you get that information?
18      A.   Probably mainly from Debra.
19      Q.   Anybody else?
20      A.   I don't remember.  Most of the discussions
21  about NECC were from Debra because she had a contact
22  with the company and I didn't.
23      Q.   You also did not tell us earlier when I
24  asked you about your conversation with Ms. Schamberg
25  that an NECC rep had told her that Vanderbilt was an

Page 158

1   NECC customer.  You didn't tell us that part.  Did she
2   tell you that before the switch?
3       A.   I don't remember.
4       Q.   Likely after?
5       A.   I don't remember.
6            (Exhibit 138 was marked for
7            identification.)
8       Q.   (By Mr. Kinnard)  We've marked as
9   Exhibit 138 STOPNC_4565.  What does this appear to be,
10  Doctor?
11      A.   Okay.  I'm sorry, what was the question
12  about the document?
13      Q.   What is this?
14      A.   This looks like a letter from our business
15  manager to -- well, I'm replying to her.  She must
16  have -- she sent it to me and then I wrote back saying
17  thanks.
18      Q.   This is dated 10/17/2012; right?
19      A.   Yes.
20      Q.   You were aware of the catastrophe by then?
21      A.   Yes.
22      Q.   And she's -- please read the fourth full
23  paragraph that she sent you.
24      A.   The one that starts off with --
25      Q.   "When you have."

Page 159

1       A.   Oh.  "When you have a patient stating they
2   will not pay for care rendered at STOPNC during the
3   affected time period, make sure you kindly advise them
4   of their responsibility.  I will seek direction from
5   Mr. Butler regarding how to handle these accounts and
6   future appointments if patients elect not to pay.  I
7   would assume standard collection protocol would be
8   followed, but I will keep you abreast of the decision
9   as soon as I speak with Mr. Butler."
10      Q.   Now, what's standard collection protocol?
11  What is that?
12      A.   I don't know.  I don't work in the billing
13  office.
14      Q.   Were you aware that the center would sue
15  patients for money?
16      A.   I know that this probably came because
17  either the patients -- the patients were complaining
18  or I reached out to Shreka just asking if we could not
19  charge them considering what all happened.  So it
20  could have been either one of those things.  But we
21  also -- and, I mean, I'm not a business person, but it
22  is my understanding that with the insurance company we
23  were not able to waive a fee or, I mean, it was a
24  contractual obligation to, you know, balance bill the
25  patient for their part of the service and stuff like

Page 160

1   that.  It's considered an illegal inducement if we
2   waive the copay or the deductible.
3       Q.   Here's another e-mail dated 10/4/2012.  Do
4   you recognize this now?
5       A.   Yeah, I see it.
6       Q.   Okay.  You sent it to Greg Lanford and
7   copied several people; right?
8       A.   Yes, looks like it.
9       Q.   Who is bholt@babc.com?
10      A.   I have no idea.  It could have also been a
11  list of people who -- I wouldn't have had Dr.
12  Batchelor's e-mail or Dr. Latham's.  It's probably
13  people that I had an e-mail that included those and I
14  thought -- and I probably just copied them because I
15  thought they all should have seen that.  But I don't
16  know who bholt is.
17      Q.   Did you author, that is, type this e-mail
18  where it starts saying, "We started using NECC"?
19      A.   It's sent through my iPhone, so yes.
20      Q.   Were these statements true when you made
21  them?
22      A.   Yes.
23      Q.   Down below, there's an e-mail from somebody
24  named Rebecca Cline.  You see that?
25      A.   Yes.

Page 161

1    Q.   Who is she?
2    A.   She's at St. Thomas.
3    Q.   What does she do?
4    A.   You know, right now, I couldn't tell you.
5    Q.   The title there says chief communications
6  and marketing officer.  Do you see that?  You can't
7  see that?
8    A.   Oh, okay.
9    Q.   Does that help you identify who she is?
10   A.   Yes.  Okay.
11   Q.   Okay.  Would you read to us, please, the
12 sentence she wrote, "We are starting to get."
13   A.   Sure.  "We are starting to get inquiries
14 regarding the use of materials from the NECC and from
15 compounding pharmacies in general.  Given that
16 hospitals don't use compounding pharmacies, this is
17 going to be best answered by a representative from the
18 center.  They're going to ask why centers use
19 compounding pharmacies" -- something -- "previous
20 problems."  I can't see the rest.
21   Q.   Well --
22   A.   "That have -- pharmacies that have -- there
23 have been previous problems," et cetera.
24   Q.   Did you know whether or not hospitals used
25 compounding pharmacies?

Page 162

1    A.   I don't think I did at the time know one
2  way or the other.
3        (Exhibit 139 was marked for
4        identification.)
5    Q.   (By Mr. Kinnard)  I'm going to mark that
6  e-mail we just discussed as Exhibit 139, STOPNC-4422.
7        Here's an e-mail from you to Debra
8  Schamberg, copying Scott Butler, 11/21/2012.
9        MR. SCHRAMEK:  If there aren't copies
10       of the exhibits, could you read out the
11       Bates number.
12       MR. KINNARD:  I'm sorry.  Yes.
13 STOPNC_3097.  I'm sorry.
14       MR. SCHRAMEK:  Okay.
15   Q.   (By Mr. Kinnard)  In that -- down here, you
16 say, "I do not want to be responsible for ordering the
17 imaging studies and having to follow up on those."
18 What do you mean by that?
19   A.   If I ordered the tests, then it's my
20 responsibility to the patient to then make sure I get
21 the results and then get in touch with them about
22 those results.  At that point, there was so much going
23 on, I didn't have the --
24   Q.   You want the date?
25   A.   I see.  It's the 12th of November -- 21st

Page 163

1  of November.  But that was not what -- I was not their
2  primary care physician.  I'm not an infectious disease
3  specialist.  And so that was just me saying that the
4  most efficient way for them to get studies done and
5  make sure that they got proper followup was to have it
6  done with the emergency room or with -- with their own
7  physician.
8    Q.   We're going to mark Exhibit 140
9  STOPNC_0775.  It's a photograph.  What would this
10 appear to be a photograph of?
11       (Exhibit 140 was marked for
12       identification.)
13       THE WITNESS:  Depo-Medrol.
14   Q.   (By Mr. Kinnard)  Do you know when this
15 photograph was made?
16   A.   No, sir.
17   Q.   I see an expiration date of 05/2013.  Do
18 you see that?
19   A.   Yes.
20   Q.   Is it fair to assume that that was the
21 expiration date for this product?
22   A.   I assume so given that the only information
23 I have is the picture again.
24   Q.   When this catastrophe occurred -- excuse
25 me -- before the switch to NECC, do you know if this

Page 164

1  drug was around, Depo-Medrol?
2    A.   It's been around for years.
3    Q.   Did you have it on your premises at the
4  center?
5    A.   I have no idea.
6    Q.   Have you ever been sued before, Doctor?
7    A.   Once.
8    Q.   Was it dismissed?
9    A.   Yes.
10   Q.   You didn't go to trial?
11   A.   No, sir.
12   Q.   Are you married now?
13   A.   Yes, sir.
14   Q.   This is the second time?
15   A.   Yes, sir.
16   Q.   How many children do you have?
17   A.   Three.
18   Q.   Where do they live?
19   A.   My oldest son lives in western North
20 Carolina, Franklin, North Carolina.  My next son
21 lives -- well, I'm not sure where he lives.  He and
22 his wife travel all over southeast Asia.  They have no
23 kids at this point so they just travel.  And my
24 daughter lives in Seattle.  She got married this
25 summer and she's a principal at a grammar school.

Page 165

1    Q.    Now, what county and state did you get your
2  divorce in?
3    A.    Bexar, Texas.
4    Q.    How do you spell Bexar?
5    A.    B-E-X-A-R.
6    Q.    B-E what?
7    A.    X-A-R.
8    Q.    Pronounced Bexar?
9    A.    Yes, sir.
10   Q.    Who filed for the divorce, you or your
11  wife?
12   A.    I don't remember. We didn't -- it
13  wasn't -- we didn't contest it. So it was -- it was
14  pretty amicable.
15   Q.    These patients who developed meningitis
16  after receiving the steroid injections were not guilty
17  of any fault, were they?
18   A.    No, sir.
19   Q.    Would you inspect a vial of steroids before
20  you injected them into the patient?
21   A.    Not formally, but the way we do it, the
22  x-ray person holds the vial up for me. So I check the
23  vial for the expiration date, confirm it's the steroid
24  that I want, and then I draw it up. So the vial is
25  about 6 to 8 inches from my face. So I see what I'm

Page 166

1  drawing up and then I also see the contents in the
2  syringe. So it's -- while it's not a formal
3  inspection process of the vial, I do clearly see the
4  contents of the vial.
5    Q.    Now, did you take a vacation starting
6  about -- well, actually starting October 4th, 2012?
7    A.    I think I went to Chicago.
8    Q.    On October 4th?
9    A.    I don't remember exactly.
10   Q.    Why did you go to Chicago?
11   A.    Just to get out of town for a little bit.
12  It had just been a very intense time period. I wasn't
13  being utilized for any patient care so I just went up
14  for the weekend.
15   Q.    How long were you gone?
16   A.    I think just the weekend.
17   Q.    A weekend.
18   A.    The center wasn't open on the weekend so it
19  wasn't really --
20   Q.    Did you take a vacation in October of 2012
21  other than this weekend off?
22   A.    I don't -- I don't remember.
23   Q.    But you wanted to get out of town?
24   A.    Yes, sir.
25   Q.    Did you call any patients while you were up

Page 167

1  there in Chicago?
2    A.    I don't remember. If I got a message from
3  Debra or someone that a patient had a question, I
4  could have called them, but I just don't -- I don't
5  remember.
6    Q.    Are your parents alive?
7    A.    Yes, sir.
8    Q.    Both of them are?
9    A.    Yes, sir.
10   Q.    Do you feel that you have an addiction gene
11  of any type?
12   A.    I don't know. I think there's evidence
13  that there's a genetic component to addiction.
14   Q.    You've probably thought about this; right?
15   A.    Yeah.
16   Q.    Do you think you do or not?
17   A.    Well, the data suggests that that's --
18  that's possible. So I think if that's true, then -- I
19  don't think it's proven, but I think there's strong
20  evidence that there is that component. It's the --
21  like many things, it's -- the outcome is a mix of
22  genetics and environment.
23   Q.    What does your current wife do?
24   A.    Well, my current wife is a husband, and
25  he's a real estate agent.

Page 168

1    Q.    I'm sorry.
2    A.    That's okay.
3    Q.    I beg your pardon.
4        A real estate agent?
5    A.    Yes, sir.
6    Q.    Okay.
7    A.    22 years together. We got married in the
8  fall of 2013.
9        MR. KINNARD: Okay, Doctor. What
10  we're going to do is take just a quick
11  break. You can take as long as you want.
12  I'm not sure how long we'll be, but we're
13  going to talk amongst ourselves --
14       THE WITNESS: All right.
15       MR. KINNARD: -- and resume.
16  I don't think it'll be much longer.
17       THE WITNESS: Okay.
18       MR. KINNARD: Thank you.
19       VIDEOGRAPHER: We're off the record
20  and the time is 2:47 p.m.
21       (A recess was taken.)
22       VIDEOGRAPHER: Back on the record and
23  the time 3:05 p.m.
24  EXAMINATION
25  BY MR. CLAYTON:

1    Q.    Dr. Culclasure, Daniel Clayton.  I have a
2  few questions for you.
3    A.    Okay.
4    Q.    You mentioned previously that you have used
5  compounding pharmacies in the past.  You recall that
6  testimony?
7    A.    Yes.
8    Q.    What sort of products have you ordered from
9  those compounding products -- compounding pharmacies?
10   A.    Combinations of medications used to fill
11  implanted pain pumps, those generally pump medication
12  into the spinal canal, the spinal fluid sac, and
13  usually those involve two and sometimes three
14  different medications all combined into that, you
15  know, one refill when we do it.  And then -- so that's
16  multiple drugs combined.  And then a couple --
17  sometimes we would order alcohol, absolute alcohol
18  when I had a neurolytic procedure to perform.
19   Q.    Explain for me, please.  What do you
20  mean a neurolytic procedure?
21   A.    Alcohol destroys nerves.  So there's some
22  nerves that are amenable to destruction.  Some nerves
23  can't be destroyed because they provide motor function
24  to an arm or a leg.  But some nerves only provide
25  sensory function, and those nerves can be destroyed

1  without causing a problem for the patient.
2         An example would be something called a
3  celiac plexus, and it's a collection of nerves that
4  supply sensation to the part of the abdomen.  And so
5  if someone has pancreatic cancer, I can do an
6  injection with the absolute alcohol and destroy that
7  collection of nerves and give them some pain relief.
8    Q.    So had you done that type of procedure
9  using the absolute alcohol at STOPNC?
10   A.    Yes, I believe so.  Yes.  Because we had to
11  order it -- I don't think I did it in the operating
12  room at St. Thomas.  I think it was at STOPNC.
13   Q.    On how many different patients?
14   A.    Probably two or three.  It's not a common
15  procedure.
16   Q.    So how many times have you done that at
17  STOPNC using the absolute alcohol?
18   A.    Two or three probably.  Not a lot.
19   Q.    When was the last time you did that
20  procedure?
21   A.    Gee, probably at least two, three years
22  ago.
23   Q.    And where did you get the absolute alcohol
24  from?
25   A.    There's a pharmacy near Saint Thomas

1  Midtown.  I don't remember the name of the pharmacy.
2  I mean, I can drive you there, but I don't remember
3  the name.
4    Q.    Near the old Baptist --
5    A.    Yes.
6    Q.    -- Health and Wellness Pharmacy?
7    A.    I think it is that, yes.
8    Q.    Mark Binkley?
9    A.    I don't know the name of the pharmacist.
10   Q.    Did the -- in order to obtain the absolute
11  alcohol, was a patient-specific prescription required?
12   A.    I believe it was, yes.
13   Q.    And did you sign that prescription?
14   A.    I don't have a rec -- specific
15  recollection, but if that was what was required, then
16  we probably -- I probably signed it.
17   Q.    In other words, the absolute alcohol had to
18  be used on a patient that you were obtaining it for
19  through the Health and Wellness Pharmacy; correct?
20   A.    Yes.
21   Q.    With regard to the medications used to fill
22  the implanted pain pumps, have you done that at
23  STOPNC?
24   A.    No, that's done in an office setting, not
25  in a facility.

1    Q.    So would that be done at the Howell Allen
2  imaging clinic where you go on Wednesdays?
3    A.    No.  It would generally be done in the
4  office on the 8th floor below STOPNC.
5    Q.    Did -- were any ESIs ever performed on the
6  8th floor?
7    A.    No.
8    Q.    They would not be allowed to be performed
9  on the 8th floor; correct?
10   A.    Well, they could be.
11   Q.    Do you know if any physicians performed
12  ESIs on the 8th floor?
13   A.    Not that I'm -- none that I'm aware of.
14   Q.    Okay.  So how often would you need
15  medications used to fill implanted pain pumps at
16  the -- is it the Howell Allen Clinic on the 8th floor?
17   A.    Yes.
18   Q.    Okay.
19   A.    There could have been -- oh, gosh.  It
20  would depend on when.  But because at times we might
21  have had a hundred -- a hundred pump patients.  So
22  there could have been six to ten to 15 pump refills on
23  a given week.  It just depends on when they're due to
24  run out or if we -- if -- because of side effects or
25  lack of efficacy, we would have to remix the --

Page 173

1    rebalance the drugs that we ordered.
2        Q.    Would each patient be different or would it
3    be something that you could use the same on any
4    patient?
5        A.    Generally -- generally different.  It might
6    be the same medication but in different concentrations
7    because a patient who had been on that a long time
8    would have a higher tolerance and would need a higher
9    dose.  Someone who had not been on it very long would
10   have less tolerance and would be on a lower dose.
11       Q.    And when was the last time that you have
12   used medications to fill implanted pain pumps?
13       A.    Oh, gosh, probably a year and a half or two
14   years ago.  We just referred all the pain pumps out to
15   other providers in Nashville.  It was just -- it was
16   hard for me to provide the supervision for those
17   patients with my other duties.  It's sort of a lot to
18   keep up with.  We had trouble keeping a nurse
19   practitioner who was trained.  And so some practices
20   have four or five nurse practitioners because they're
21   bigger and they -- and so if one nurse practitioner
22   takes another job, then there's still others who can
23   help do the pump refills.  But if there's just one and
24   that person leaves, then I have no one else to do
25   that, so it would be hard for me to do that and take

Page 174

1    care of STOPNC.
2        Q.    Did -- or when did you start referring
3    those patients out?
4        A.    I don't remember exactly.  One and a half
5    to two years ago would be my best guess.
6        Q.    Would it have been after this catastrophe
7    happened at STOPNC?
8        A.    I don't -- I don't remember the sequence of
9    events.
10       Q.    Where would you obtain the medications used
11   to fill the implanted pain pumps?
12       A.    That varied.  And sometimes it depended on
13   the insurance company.  I think Blue Cross/Blue Shield
14   of Tennessee designated a specific pharmacy --
15   compounding pharmacy in Tennessee.  Other patients we
16   would use a different -- a different place.  I don't
17   remember all the different ones that we used over
18   time.
19       Q.    Tell me the names of any of them that you
20   used over time?
21       A.    I couldn't.  I don't know.
22       Q.    Any of them out of state?
23       A.    I don't -- I just don't know.  I didn't do
24   the actual ordering.  The nurse practitioner did.  So
25   I don't know the -- I just don't know the name of the

Page 175

1    company.
2        Q.    Who was the nurse practitioner?
3        A.    There were several.  Keri Weber, Allison --
4    I'll think of her last name in a minute, but there
5    were three or four that -- that did that for me.
6        Q.    Did they work at the Howell Allen Clinic
7    there on the 8th floor?
8        A.    Yes.
9        Q.    Do they still work at the Howell Allen
10   Clinic?
11       A.    No.
12       Q.    None of the four do?
13       A.    Correct.
14       Q.    Do you have something that you can look at
15   to help refresh your memory of the names of those four
16   people?
17       A.    Nothing handy.
18       Q.    But back at the office you think you have
19   it?
20       A.    I wouldn't have a list of them.
21       Q.    For the medications used to fill the
22   implanted pain pumps, were those patient-specific
23   prescriptions?
24       A.    I think they were ordered on a different
25   DEA form, and I don't know that they -- on that form

Page 176

1    it includes any information about the patient.  I
2    think it's just numbering, the drugs and
3    concentrations.  So it's not actually like a
4    prescription that we normally would give to a patient
5    to take to a pharmacy.
6        Q.    Was the prescription for the absolute
7    alcohol something that you would give to the patient
8    to take to the pharmacy?
9        A.    No.  We would probably -- probably have
10   faxed it to the pharmacy or somebody would -- I would
11   have had the secretary drop it by if they couldn't
12   take it by fax.  So the patient didn't pick up that
13   drug.  They -- we either then picked it up or they
14   delivered it.  I don't remember.
15       Q.    For the medications used to fill the
16   implanted pain pumps, then, you're saying there may
17   have been some form that was signed that would not be
18   patient specific?
19       A.    I think that's correct.  I haven't seen
20   that form in a while, so I'd have look at it to
21   refresh my memory.
22       Q.    Would you even sign any of those forms,
23   because nurse practitioners are allowed to sign them,
24   aren't they?
25       A.    I did at one time, but -- earlier in my

1   career when I was ordering them myself, I did fill
2   that form out, but the nurses -- the nurse
3   practitioners did do most of that afterwards, yes.
4       Q.   When you said earlier in your career, would
5   that have been at the Howell Allen Clinic or somewhere
6   else?
7       A.   No, somewhere else.  Primarily when I was
8   in North Carolina I know I did it myself then.  And at
9   times if somebody was on -- if the nurse practitioner
10  was on vacation, if someone needed to be refilled
11  early, then I would -- then I would have to order it.
12      Q.   So as you're saying while you have been
13  practicing medicine in Tennessee that you have written
14  orders for medications used to fill implanted pain
15  pumps that have been sent to compounding pharmacies
16  that were not patient-specific prescriptions?
17      A.   I think that's the case.  I'd have to see
18  the form.  It's been a long time since I filled a form
19  out myself.
20      Q.   I'm talking about in Tennessee whether or
21  not you have done that.
22      A.   Oh, I understand your question.  I'm saying
23  I just don't remember.
24      Q.   Was there any prescription written for the
25  compounding products that were received from NECC?

1       A.   Not that I'm aware of, no.
2       Q.   You saw earlier that prescription order
3   that had your name printed or written on it, but you
4   said that was not your signature or you had not -- you
5   did not write your name on that.
6       A.   Correct.
7       Q.   Is that not considered under Tennessee law
8   a prescription order?
9       A.   I don't know.
10          MR. GIDEON:  Objection.
11      Q.   (By Mr. Clayton)  You don't know?
12      A.   I don't know if that's considered a
13  prescription or not, no.
14      Q.   And was that the only type of order that
15  was used to obtain the products from NECC?
16      A.   I don't know.
17      Q.   Have you ever allowed anyone to sign your
18  name to a prescription for a medication?
19      A.   No.
20      Q.   That would not be allowed, would it?
21      A.   No.
22      Q.   Did you review all of the brochures that
23  Debra Schamberg gave you regarding NECC?
24      A.   If she gave them to me, I -- I would have
25  looked at them, yes.

1       Q.   Well, what is it that you recall she gave
2   to you?
3       A.   I've seen some of the things -- some of the
4   materials from NECC since that time.  So I don't
5   really -- it's a little bit hard to say what I saw at
6   the time.  I -- earlier today, I said I thought
7   what -- one thing that I saw was a two -- a glossy
8   two-sided sheet of paper with information on the
9   processes that they use, the standards that they met.
10  It could have also been a four-page foldout.  I just
11  don't remember.
12      Q.   Your ex-wife -- what was your ex-wife's
13  name?
14      A.   Maiden name?
15      Q.   Her name, please.
16      A.   Elizabeth Penny, P-E-N-N-Y.
17      Q.   And where does she currently live?
18      A.   Chicago.
19      Q.   And when were the two of you divorced?
20      A.   Probably 1987.
21      Q.   And are your children a result of the
22  marriage from her?
23      A.   Yes.
24      Q.   You were subpoenaed to give testimony to
25  the grand jury in Boston?

1       A.   Yes.
2       Q.   Did you go?
3       A.   Yes.
4       Q.   Did you ever invoke the Fifth Amendment?
5       A.   Never.
6       Q.   With regard to the fentanyl abuse, how did
7   you account for the missing fentanyl that you stole?
8       A.   Usually by saying that I gave two vials --
9   two vials instead of one.  So the patient always got
10  an adequate amount.  I just -- I just wrote on the
11  record that I gave, you know, more as if the patient
12  had a high tolerance.  So the record would balance
13  out, but...
14      Q.   So you would falsify patient records in
15  order for you to cover up your fentanyl use?
16      A.   Yes.
17      Q.   And did you do that during both occasions
18  whenever you were abusing the fentanyl?
19      A.   I don't remember -- I don't remember in
20  Johnson City whether I had access to the records there
21  or not.  So I don't know, but definitely the first
22  time in the Army, yes.
23      Q.   Well, if you didn't have access to the
24  records in Johnson City, then how did you account for
25  the missing fentanyl there?

Page 181

1    A.    Well, there was waste.  And so if the nurse
2    set the syringe down, I could pick up the syringe.
3    Q.    Any other way?
4    A.    No, sir, not that I remember.
5    Q.    You had sent an e-mail asking How -- asking
6    if Howell Allen was going to pursue a claim on your
7    behalf for lost wages.  Do you remember sending that
8    e-mail?
9    A.    Vaguely, yes.
10   Q.    Okay.  Tell me the reasons why you sent
11   that e-mail.
12   A.    I think someone told me that that was --
13   that that was possible.  And so I just asked if that
14   was -- if that was part of the -- if that was the
15   plan.
16   Q.    Who told you?
17   A.    I don't remember.
18   Q.    What were you told when you sent that
19   e-mail?
20   A.    Probably there were -- it was possible to
21   collect damages because of lost income.
22   Q.    I'm sorry, I did not hear what you --
23   A.    It was possible -- someone -- I guess
24   someone told me it was possible to collect damages
25   because of lost income and so I guess I was just

Page 182

1    inquiring if that was a possibility.
2    Q.    And what was the response that you
3    received?
4    A.    I don't remember.
5    Q.    Well, you're aware that -- or are you aware
6    whether or not Howell Allen has filed a claim in the
7    bankruptcy for its losses?
8    A.    I'll not sure.
9    Q.    Or lost money?
10   A.    I don't know.
11   Q.    Is it --
12   A.    I'm not a partner so I don't attend
13   business meetings and things like that.  So I don't
14   know what's been filed.
15   Q.    Whenever these other physicians from ASA
16   would perform the ESIs at STOPNC, if I understand
17   correctly, Howell Allen would not pay them directly;
18   is that correct?
19   A.    Correct.  They did their own billing.
20   Q.    Would you receive any sort of compensation
21   for ESIs that were performed by the ASA folks at
22   STOPNC?
23   A.    No.
24   Q.    Did you receive any type of separate
25   compensation for being the medical director of STOPNC

Page 183

1    other than the 60 percent that you would receive from
2    Howell Allen for performing the ESIs?
3    A.    No.
4    Q.    So there was no separate stipend from
5    anybody to be the medical director?
6    A.    Correct.
7    Q.    Do you personally know any compounding
8    pharmacists who live in the Nashville area?
9    A.    Yes.  First name, though.  I don't
10   remember -- his name is John.
11   Q.    That's a -- you don't know his last name?
12   A.    No.
13   Q.    Do you know the name of the company he
14   works for?
15   A.    No.
16   Q.    How long have you known him?
17   A.    Three or four years.
18   Q.    You were aware back in 2011 and 2012 that
19   there were compounding pharmacies in Tennessee;
20   correct?
21   A.    Yes.
22   Q.    And compounding pharmacists in Tennessee;
23   correct?
24   A.    Yes.
25   Q.    For the fentanyl -- you're -- for your

Page 184

1    fentanyl use, was there ever any -- or were there ever
2    any criminal charges that were brought against you?
3    A.    No.
4    Q.    Were you ever threatened with any criminal
5    charges?
6    A.    No.
7    Q.    Did you go straight from being a
8    non-illegal drug user to starting to use fentanyl?
9    A.    Yes.
10   Q.    Had you abused any other drugs of any kind,
11   whether they were prescription or illegal drugs, prior
12   to using fentanyl?
13   A.    I smoked some marijuana in college.
14   Q.    Were any of the -- were you familiar with
15   any of the other physicians' preference, whether they
16   preferred using Depo-Medrol versus MPA over at STOPNC?
17   A.    A preference between Depo-Medrol over MPA?
18   Q.    Yes.
19   A.    No.
20   Q.    Or Depo-Medrol over a compounded
21   pharmaceutical like the one that NECC provided.
22   A.    No.
23   MR. CLAYTON:  Short break.
24   VIDEOGRAPHER:  This is the end of
25   Tape No. 3.  We're off the record and the

Page 185

1    time is 3:25 p.m. I'm sorry. That was
2    Tape No. 4.
3        (A recess was taken.)
4        VIDEOGRAPHER: Here begins Tape No. 5
5    in the deposition of John Culclasure, M.D.
6    We're back on the record and the time is
7    3:31 p.m.
8    Q.    (By Mr. Clayton) Dr. Culclasure, have you
9    ever attended any CMEs regarding being a medical
10   director?
11   A.    No.
12   Q.    Have you ever had any training to be a
13   medical director?
14   A.    No.
15   Q.    So while you were in your treatment program
16   in Nashville, the folks who ultimately formed the
17   Howell Allen Clinic, one of the people there came to
18   you and asked you to be a medical director --
19       MR. GIDEON: Objection.
20   Q.    (By Mr. Clayton) -- of the pain clinic?
21   A.    He called me and then asked me to come --
22   if I could come interview. So I -- yes. So that's
23   how that happened.
24   Q.    Is your position as the medical director
25   of STOPNC that STOPNC obtained the MPA from New

Page 186

1    England Compounding Company without ever writing a
2    prescription?
3    A.    Would you repeat that.
4    Q.    Is it your position as the medical director
5    of STOPNC that STOPNC obtained the MPA from New
6    England Compounding Center without ever writing a
7    prescription?
8    A.    I'm not sure if that form is considered a
9    prescription. So if it's considered a prescription,
10   then we submitted a prescription. If it's not a
11   prescription, then we didn't. I can't answer the
12   question any better than that.
13   Q.    And if it's considered a prescription, then
14   it's a prescription that's being submitted without
15   your signature on it; right?
16   A.    Yes, in that example that you showed me.
17   Q.    And how does that comply with Tennessee
18   law, do you know?
19   A.    I don't know.
20       MR. CLAYTON: That's all I have.
21   Thank you.
22       MR. GIDEON: Next. That's two for
23   the PSC. Is there anybody else who is not
24   with the PSC that wants to ask any
25   questions?

Page 187

1        MR. REHNQUIST: Go over a little bit,
2    yes.
3        MR. GIDEON: Besides Jim who always
4    has some more questions. Anybody else?
5        Okay.
6    EXAMINATION
7    BY MR. REHNQUIST:
8    Q.    Good afternoon, Dr. Culclasure. My name is
9    Jim Rehnquist. I'm a lawyer for a company in this
10   case called UniFirst. I'm just going to ask you a few
11   followup questions.
12       As I recall, your first job after your
13   relapse was with neurological associates?
14   A.    Neurosurgical Associates.
15   Q.    I'm sorry. Neurosurgical Associates. And
16   you fully informed them of your substance abuse
17   issues?
18   A.    Yes. That was -- when the treatment center
19   let me go interview, that was a requirement. They
20   said the first thing I had to do is tell them I was in
21   treatment and discuss that with them.
22   Q.    And then you informed them of both the
23   original incident and then your subsequent relapse?
24   A.    I don't remember that -- exactly what we
25   discussed in that. That was in 1999.

Page 188

1    Q.    Well, what do you remember of what you
2    informed them about your substance abuse issues?
3    A.    I told them -- I don't remember clearly. I
4    probably told them -- well, I told them I was in
5    treatment at that time, that it was -- it was -- I
6    abused opioids. And the main thing I remember from
7    the meeting was when -- because I was really nervous
8    about having to tell them that because I needed to get
9    a job after I got out.
10       And so I said, "So I'm an addict and I'm in
11   treatment," and they all started laughing and one of
12   them said, well, we're all addicts. And so they --
13   they just made me feel -- I don't know what he meant
14   by that exactly because they're not all addicts, but
15   it may have been just him trying to make me feel
16   better or at least have their own unique issues or
17   something. So that's the thing I remember mostly from
18   that interview, was that they all started laughing and
19   I was not quite sure what they were laughing about at
20   first.
21   Q.    Did you tell them the substance you abused
22   was fentanyl?
23   A.    Probably.
24   Q.    I mean, fentanyl is used with the
25   administration of anesthesiology; correct?

Page 189

1    A.    Correct.
2    Q.    And you think you probably told them that
3  or you're positive?
4    A.    Well, I don't remember the details of the
5  discussion.  It's likely that I did since that was my
6  drug of choice.  If I told you today that I remembered
7  specifically saying that, that would not be true
8  because I don't.
9    Q.    And did they put any -- did the people at
10  Neurosurgical Associates put any sort of conditions or
11  restrictions on your work because of the substance
12  abuse issues?
13    A.    I don't.  The Tennessee Medical Foundation
14  did initially, and I don't remember the -- exactly --
15  the exact number of hours, but they -- they make us
16  restrict our work hours for three months or some
17  period of time after treatment, but I think that was
18  from the TMF, not from the practice.
19    Q.    Did the practice put any conditions or
20  restrictions on your work with them as you recall
21  because of your past?
22    A.    I don't remember any specific restrictions.
23    Q.    Did they require you to continue going to
24  AA and NA meetings?
25    A.    Well, the TMF did and the board, the

Page 190

1  Tennessee Medical Board did.
2    Q.    And have you done that since you left
3  treatment?
4    A.    Yes.
5    Q.    And I believe you testified that you left
6  Neurosurgical Associates when that group sort of split
7  up and you eventually ended up working at STOPNC --
8  I'm sorry, you ended up with the Howell Allen Clinic?
9    A.    Yes, it was like a -- an immediate job
10  change.  It wasn't a -- it wasn't eventually.  It was
11  just a transfer.
12    Q.    Okay.
13    A.    So my employment date with Howell Allen
14  actually goes back to when I joined Neurosurgical
15  Associates because it was somehow they -- I don't know
16  all the reasons for that, but it was as if I had been
17  with Neuro -- with Howell Allen for the whole time.
18    Q.    So when the -- with the name change and the
19  change in that practice, the people you were working
20  with after the name change and the change in the
21  practice were the same people you had been working
22  with before?
23    A.    Well, Neurosurgical Associates had six
24  members and three of them joined Howell Allen and they
25  wanted me to come along.  So then I joined -- and then

Page 191

1  they were -- I don't remember however many there were
2  with Howell Allen at the time, eight or nine.  And so
3  the three guys that I had worked with and I joined
4  Howell Allen.
5    Q.    And the -- I'm sorry.
6    A.    So there were eight or nine guys I had not
7  worked with before.
8    Q.    And what steps did you take to fully inform
9  the eight or nine members of Howell Allen that you
10  hadn't worked with before about your substance abuse
11  issues?
12    A.    I don't remember.  I've always been pretty
13  open about it.  It's not anything that's hidden.  The
14  board knows.  I don't remember any specific document
15  that I gave them.  But it was not a -- it was not a
16  secret, but I don't remember a formal notification
17  process.
18    Q.    Do you remember doing anything to inform
19  these new members or the eight or nine that you hadn't
20  worked with before about your past?
21    A.    I don't remember.
22    Q.    You were asked questions about the name
23  STOPNC and why the name Neurosurgical is in that name
24  even though there's no neurosurgery being performed
25  there.  Remember that question?

Page 192

1    A.    Yes.
2    Q.    Were there any -- were there ever any
3  discussions within Howell Allen about the disconnect
4  between the name of STOPNC and the functions that
5  STOPNC was performing?
6    A.    Because I'm not a partner, if they
7  discussed that at a business meeting, I wouldn't be
8  aware of it.
9    Q.    So you weren't aware -- regardless of
10  whether they discussed it at a business meeting or
11  otherwise, you weren't aware of any such discussions?
12    A.    Correct.
13    Q.    Was there ever any confusion among
14  patients, to your knowledge, about being referred to a
15  facility with the word "neurosurgical" in the title
16  when they weren't getting neurosurgery?
17    A.    I never had a patient ask me about that.
18    Q.    Did you ever hear about a patient asking
19  anyone at STOPNC that?
20    A.    Not that I recall.
21    Q.    You testified that your payment terms are
22  that you receive 60 percent of what Howell Allen is
23  able to collect from the procedures that you perform?
24    A.    Yes.
25    Q.    What happens if Howell Allen can't collect

1    from a procedure that you performed from an insurer or
2    a third-party payor?
3        A.    Then there's just no money collected for
4    that particular procedure.
5        Q.    If the money is collected from the patient
6    directly, do you receive the same 60 percent of that
7    if it's collected?
8        A.    I would assume so.  I've never had that
9    discussion with anybody.
10       Q.    Are you aware of any situations where any
11   insurance or other third-party payors have not
12   provided reimbursement to Howell Allen for an ESI
13   procedure that you performed?
14       A.    Not specifically.  I mean, there are a lot
15   of reasons that -- that can cause a problem.  If
16   it's -- if a procedure is approved for a certain date
17   or a range of dates, sometimes it's just one day, some
18   of them are really difficult, and then the patient
19   reschedules and the staff doesn't catch that, then
20   they won't reimburse.  So if they're supposed to come
21   in on Tuesday but we had an ice storm and they came in
22   on Friday, then some insurance companies will not
23   reimburse that.  So...
24       Q.    But you don't recall any issues other than
25   those kind of administrative issues coming up?

1        A.    That's primarily it.  I mean, if they -- if
2    the patient got scheduled and they're with a
3    particular -- and their diagnoses didn't establish
4    medical necessity with their insurance company, then
5    we can do the procedure and not be reimbursed.  I
6    mean, if that's -- I generally ask the billing not to
7    balance bill patients if there are errors that
8    occurred because of something that we missed.  If I'm
9    aware of it, I don't want the patients billed.
10       Q.    Do you remember any ESI patients not being
11   reimbursed for medical necessity reasons?
12       A.    Not specifically.  I don't get a report
13   from the business office about how many are not being
14   reimbursed because of a problem.  That's just not the
15   data that I get.
16       Q.    So if there were medical necessity issues
17   that came up, you wouldn't have known about them?
18       A.    Probably.  I've asked the billing office if
19   there is a problem, you know, to let me know if they
20   need, you know, help with diagnosis codes or anything
21   like that or that I can help with, but I don't know of
22   any -- they don't -- I haven't gotten a call about any
23   specific patients that didn't -- you know, insurance
24   denied payment for.
25       Q.    What entity handles the billing for STOPNC?

1        A.    It's internal to the practice -- or Howell
2    Allen.  Excuse me.  The Howell Allen billing office, I
3    believe, handles them.
4        Q.    A patient who's considering getting an
5    epidural steroid injection presumably like most
6    procedures has other options; correct?
7        A.    Yes.
8        Q.    What are the other options that a patient
9    has in lieu of getting an ESI?
10       A.    Time, analgesics, physical therapy.  Those
11   would be the main ones.
12       Q.    Who do you mean by time?
13       A.    Just waiting, see if it gets better.
14       Q.    You described the sort of initial consult
15   you -- that you do with the new patients earlier
16   today.  And I believe you said, you know, you walk
17   into the room and the patient's got the blue wristband
18   and they're in street clothes and you go over things
19   with them for a few minutes, and then you might leave
20   that room to go and do a procedure, for example.
21             When you walk into the room the first time
22   to meet the new patient, what do you know about that
23   patient as you walk into their room?
24       A.    Well, I've already picked up the chart and
25   I look at the chart.  So I see some basic demographic

1    data like their age, sex.  And the nurses have the
2    nursing history filled out so I look at that.  I look
3    at allergies, make sure they're not on a blood
4    thinner.  It lists their medications.  I review those.
5    It lists medical illnesses that they've told the
6    nurses about.  It lists their surgical history.  So I
7    look through that and also their imaging.  The nurses
8    print out their last imaging reports.  So I have that
9    available too.  So I'm aware of all that when I walk
10   into the room.
11       Q.    And when do you become aware of that with
12   respect to the moment that you walk into the room?
13       A.    Immediately before because I would be at
14   the -- at the nursing station there's a rack that they
15   put charts in that belong to patients that I have not
16   seen yet.  So I pick up the next one, open it up, look
17   at that information that I just described and then I
18   walk into the room.
19       Q.    How much time do you spend looking at that
20   information before you walk in the room?
21       A.    It could be anywhere -- if they're young
22   and healthy, there's very little there.  It could be a
23   couple of minutes.  A lot of that is spent on the
24   imaging probably.  Because if there's nothing filled
25   out, it's easy to scan.  Not allergic to anything, no

Page 197

1   significant past medication history, no surgeries.
2       If it's an older patient or a patient who
3   has other medical illnesses, then there's more to read
4   so that takes a little bit longer.  It's hard to say.
5   I mean, it just depends on how much I have to go over.
6   And then I go into the room and I verify what they've
7   got.  "You're not allergic to any medicines; is that
8   correct?"
9           "Yes."  Because I just want to make sure
10  that -- you know, that what the nurses have recorded
11  is accurate, so...
12      Q.   Now, these new patients, they are already
13  scheduled for both the consult with you and the
14  procedure on the same day; correct?
15      A.   Yes.  I wouldn't characterize it as a
16  consult.  It's not --
17      Q.   How would you characterize that, that 10-
18  or 15-minute part of that?
19      A.   Well, consult has a specific meaning
20  about -- that it's a separate billable event and, you
21  know, and all that.  This is just -- I just -- it's
22  just me reviewing -- it's integral to the procedure.
23  So there's no additional billing or anything.  It's
24  just me answering their questions, describing the
25  procedure, counseling on the risks.

Page 198

1       Q.   Okay.  And when you counsel them on the
2   risks and verify their information and so forth, do
3   you explain to them the other options they have
4   instead of actually getting an ESI?
5       A.   Yes.  Well, I may say, "Well, I see from
6   the history that you've already had physical therapy,
7   you're taking some pain medication and this has been
8   bothering you for three months."  In that case, there
9   really is not -- the other alternative then is just
10  not to have it, and I always tell people you don't
11  ever have to have this injection.
12      Q.   Do you ever recommend to patients that they
13  try other options or try other options for a longer
14  period of time and not have the ESI that day?
15      A.   Some -- sometimes.  The more common reason
16  I cancel a procedure is if -- if they come back and
17  they're doing well, and I'll go, "Well, your pain's --
18  you're rating your pain as a one or two.  I can't make
19  you any better than that probably.  Why don't we
20  cancel today's procedure and you just save it until
21  you need it down the road."  So that's more common
22  than what you described.
23      Q.   What percentage of the time do you
24  recommend to a new patient that they not have an ESI
25  that day?

Page 199

1       A.   It happens but it's not real common.  I'm
2   trying to think about what those circumstances --
3   well, sometimes they'll come in and they've just
4   gotten better since the surgeon made the referral and
5   so I'll say, "Well, you know, you might stay -- you
6   might stay good for a long time.  There's no reason to
7   do an injection since you're really doing well.  Let
8   just see how long this lasts.  Maybe you won't need
9   this."
10      Q.   Would you say it's less than ten percent of
11  the time?
12      A.   Oh, yeah.  Oh, yeah.  It's certainly less
13  than ten percent.
14          MR. GIDEON:  Let him finish his
15  question before you start to answer.
16          THE WITNESS:  Oh, I'm sorry.
17      Q.   (By Mr. Rehnquist) Less than five percent
18  of the time?
19      A.   For a new patient?  Probably two to three
20  percent as a very rough guess.
21      Q.   Do patients ever decide, apart from a
22  recommendation that you made, not to have an ESI that
23  day for any reasons?
24      A.   I'm not sure that I understand the question
25  or how I would know if they didn't.

Page 200

1       Q.   I'm sorry.  I think we just established
2   that you might recommend a patient of your own
3   volition not to have the ESI that day that's already
4   been scheduled in a rough guess of two to three
5   percent of the time; correct?
6       A.   Yes.
7       Q.   And are there patients that ever, even if
8   you don't make that recommendation, decide not to go
9   through with the ESI?
10      A.   That would be extremely rare.
11      Q.   It's already scheduled; right?
12      A.   Yes.
13      Q.   Now, with patients who are receiving a
14  second or a third injection, have you or anyone in
15  your office spoken to them between the first injection
16  and the day they show up for the second injection?
17      A.   Generally not unless it's about scheduling.
18  But there -- they're informed by the nurses that if
19  they're doing well they can cancel -- they should just
20  call and cancel it and then reschedule it when they --
21  if and when their pain returns.
22      Q.   They're told of that -- they're told that
23  by the nurses when they check out of the -- from the
24  first appointment?
25      A.   Yes.  Yes.

Page 201

1    Q.    How often -- I'm sorry -- in your
2  experience, how long does it generally take -- after
3  receiving an ESI of MPA or Depo-Medrol does it take
4  for the patient to know if the first injection has
5  worked?
6    A.    I usually tell them that it may take
7  anywhere from a few days to a week to see what it's
8  going to do.  I explain to them that it's a slow
9  release preparation and so it may -- you know, not to
10  expect a change in the first day or two, although some
11  people will experience that.
12    Q.    You know that Debra Schamberg had her
13  deposition taken in this case?
14    A.    Yes.
15    Q.    Did you talk to her about her deposition
16  either before or after it?
17    A.    When she came back I asked her how it went,
18  and she said, "I'm sorry, I can't tell you anything
19  about my deposition."
20    Q.    Did you talk to her about it before she
21  went?
22    A.    Some.  Not real specific.  I mean, I -- I
23  know she met with someone to do some preparation
24  before the -- before the deposition and she was really
25  pleased.  She said it made her feel a lot better, more

Page 202

1  relaxed.
2    Q.    Did you feel the same way after your
3  preparation?
4    A.    Yes.
5    Q.    And did you talk to Debra Schamberg about
6  your deposition --
7    A.    No.
8    Q.    -- in the couple of weeks before it?
9    A.    No, other than just, you know, that it was
10  coming up because she's aware of the scheduling, I had
11  to be out today.
12    Q.    Did you read the transcript of her
13  deposition?
14    A.    No.
15    Q.    Do you know who the Saint Thomas Hospital
16  pharmacist is or was?
17    A.    No.
18    Q.    Does the name Martin Kelvas mean anything
19  to you?
20    A.    That does -- Marty, I think.  That does
21  sound familiar, Marty Kelvas, I believe.
22    Q.    Do you know who he is?
23    A.    I wouldn't know him if he walked in here.
24    Q.    Do you -- do you have a memory of how the
25  name come up or how you became familiar with the name?

Page 203

1    A.    Probably from Debra mentioning his name,
2  but other than that, I don't remember the context.
3    Q.    Now, you aren't a pharmacist; correct?
4    A.    Correct.
5    Q.    You don't have any pharmacy expertise?
6    A.    None.
7    Q.    Debra Schamberg is not a pharmacist and she
8  has no pharmacy expertise?
9    A.    That's true.
10    Q.    STOPNC has a pharmacy consultant named
11  Michael O'Neil; correct?
12    A.    Yes.
13    Q.    And Mr. O'Neil is retained by STOPNC for
14  the specific purpose of advising STOPNC on pharmacy
15  matters?
16    A.    Yes.
17    Q.    But neither you nor Ms. Schamberg ever
18  reached out to him regarding the initial decision to
19  purchase NECC?
20        MR. GIDEON:  Objection, peer-review,
21  68-11-272.  You're instructed not answer.
22        MR. REHNQUIST:  I think he already
23  answered that question, C.J.
24        MR. GIDEON:  Huh?
25        MR. REHNQUIST:  I think he already

Page 204

1  answered that question that he never
2  reached out to them.
3        MR. GIDEON:  If he did, then he just
4  ignored what I said.  Immaterial, isn't it?
5    Q.    (By Mr. Rehnquist) Did you have any
6  discussions with Ms. Schamberg about whether you
7  should reach out to Michael O'Neil to ask him about
8  the decision to purchase product from NECC?
9    A.    No, not that I remember.
10    Q.    Why not?
11    A.    Why don't I remember?
12    Q.    Why didn't you reach out to him?  Why
13  didn't you have discussions on that subject with
14  Ms. Schamberg?
15    A.    I've never asked for any pharmacist
16  feedback on us purchasing, ordering medications from
17  any supplier.  It's never become -- it's never been an
18  issue.  Today it's different, but in -- in 2011 when
19  we decided to place that order, it was not.  As I said
20  earlier, the FDA, the Department of Pharmacy in
21  Massachusetts, the Department of Pharmacy here in
22  Tennessee, all of those institutions are in place to
23  protect patients and make sure that the drugs are
24  prepared correctly.  It never -- if never crossed our
25  minds that there would be -- that these -- that this

1    entity NECC would not be regulated.
2       Q.   Doctor, do you still have Exhibit 135 in
3    your stack there?
4       A.   I do.
5       Q.   And you were asked about this document and
6    I believe you said that you -- that's not your
7    signature?
8       A.   Correct, that's not my signature.
9       Q.   Do you recall seeing this document or
10   documents like this document prior to September of
11   2012?
12      A.   I don't recall one way or the other.  I was
13   not involved in the ordering so I -- I wouldn't have
14   seen it unless it just happened to be left out on the
15   desk and I just glanced at it or something, but I
16   don't remember -- I never filled one out.  I don't
17   remember -- I never remember signing one.
18      Q.   Is it -- I believe your testimony was that
19   you believe you heard about the MPA supply issues from
20   either Cindy -- Cindy McLendon or Sandy Littleton?
21      A.   Yes.
22      Q.   Is it possible you might have first heard
23   about those issues from Debra Schamberg?
24      A.   It's possible, but to the best of my
25   recollection, it seems like I was at work, walking by

1    the desk where they sit, and I think one of them told
2    me -- that was when they would catch me because it was
3    very informal and they just -- I think at that point
4    they said -- because they're the ones who were
5    ordering, so they knew the status of the orders.  So I
6    think it probably came from them rather than from
7    Debra, but if could have.  I mean, it could have come
8    from Debra.  I just don't remember.
9       Q.   And I think you testified that the context
10   in which you were facing this, I think, you know,
11   one-day or two-day or a couple of days' supply, and
12   that was it, you said that wasn't a crisis; correct?
13      A.   I think I did use that term.  It wasn't
14   something that -- just being short was a concern, but
15   it wasn't at that point a crisis.
16      Q.   Well, if -- if -- if you had run out of MPA
17   in two days, that would have been a crisis, wouldn't
18   it have been?
19      A.   Well, I would substitute a different
20   steroid, but that was the one I started using in
21   training.  That's one that I prefer because of its
22   long acting nature.  So I would rather use that and
23   that's just what I'm used to using, but, I mean, I
24   could -- we could over the short term make altered --
25   change and use a different one.

1       Q.   What other -- what other steroid options
2    would you have considered or what other -- I'm sorry?
3       A.   Triamcinolone, betamethasone.
4       Q.   So if the supply of MPA had literally run
5    out or it appeared to be on the verge of running out,
6    you could have ordered an alternative steroid?
7       A.   Yes, or we had some on hand because some of
8    the other anesthesiologists who work there used other
9    steroids.
10      Q.   But your preferred choice was to find a
11   source of MPA?
12      A.   Yes.
13      Q.   And approximately how much time elapsed
14   between the time that you first heard about the
15   shortage and the time that STOPNC began ordering from
16   NECC?
17      A.   I don't know.
18      Q.   Less than a week?
19      A.   No.  I think it would be longer than that
20   because it happened -- I think that they informed me
21   of shortages or supply problems at least twice or
22   maybe three times.  So I think it was over they would
23   tell me we're about out and we would get a shipment
24   in.  So it happened several times, so it wasn't -- it
25   wasn't a week after the very first time we encountered

1    a problem.
2               (Exhibit 141 was marked for
3            identification.)
4       Q.   (By Mr. Rehnquist)  Dr. Culclasure, I'm
5    handing you a document that's marked Exhibit 141.
6    This is STOPNC's response to plaintiff's first set of
7    interrogatories in the case of Reed v. STOPNC.  Can
8    you just look at that.
9       A.   Sure.  The entire thing or part of it?
10      Q.   Well, I'm going to focus you on something
11   in a moment.
12           MR. GIDEON:  Is there a particular
13   question you want him to look at?
14           MR. REHNQUIST:  Yeah.
15      Q.   (By Mr. Rehnquist)  Can you look at Page
16   16.  Can you read the question and answer to No. 8,
17   top of Page 16, please, Doctor.
18      A.   Yes.  "Describe each and every action St.
19   Thomas" --
20      Q.   I'm sorry.  You can read it to yourself.
21      A.   Oh.  Okay.
22      Q.   In the third paragraph of the response it
23   states "Ms. Schamberg complied with the acceptable
24   standard of professional practices for drug
25   procurement practices by speaking to Mr. Notarianni

Page 209

1   regarding NECC, consulting with Dr. Culclasure, and
2   reviewing materials provided by NECC regarding the
3   sterility of its compounded processes."
4           Do you see that?
5       A.   Yes.
6       Q.   What acceptable standard of professional
7   practice is being referred to there?
8       A.   Well, I don't -- I don't know that there
9   was a -- the standard would -- at that time was to
10  order the medication from a licensed pharmacy.  So
11  there was no -- there were no procedures in place.
12  I've gone to CME, I mean, classes for years.  I've
13  never -- or conventions or meetings.  I've never heard
14  anyone address anything about ordering from a
15  compounding pharmacy or any other source for that
16  matter.
17          So, again, as I mentioned earlier,
18  that's -- that's why, you know, we thought at the time
19  that the FDA was there, why the Massachusetts Board of
20  Pharmacy was there and why the Tennessee Board of
21  Pharmacy was there.  It was their job to ensure that
22  the medication supply was safe.
23      Q.   So are you now saying that there was no
24  acceptable standard of professional practice for drug
25  procurement at that time?

Page 210

1       A.   Well, the standard was to order the drug
2   from a licensed pharmacy.
3       Q.   And where is that standard -- where was
4   that standard contained?
5       A.   From my experience.
6       Q.   It wasn't written down anywhere?
7       A.   Not that I'm aware of.
8       Q.   Is STOPNC accredited?
9       A.   Yes.
10      Q.   And by what body?
11      A.   Joint Commission.
12      Q.   And what is the significance to STOPNC of
13  being accredited?
14      A.   I'm not sure exactly -- I mean, probably --
15  well, in order to have contracts with insurance
16  companies, I imagine that we have to show that we're
17  certified by one -- I think there's another certifying
18  body that also specifically credentials surgery
19  centers.  So I don't remember the name of that one,
20  but that body and the Joint Commission both
21  credentialed ASCs.
22      Q.   And being accredited as a healthcare
23  provider means that you are in compliance with the
24  accreditation body's standards?
25      A.   Yes.

Page 211

1       Q.   Did you at any point ask Ms. Schamberg to
2   determine whether NECC was accredited by anybody?
3       A.   No.
4       Q.   This has been previously marked in this
5   case as Exhibit 31.  It's STOPNC -- begins at
6   STOPNC_513, but it doesn't appear to be consecutive
7   thread.  It's Exhibit 31 to Schamberg.
8           Can you just look through Exhibit 31,
9   Doctor, and tell me if these are -- or appear to be
10  the materials that you received from Ms. Schamberg
11  regarding NECC.
12      A.   It's hard for me to say that.  I
13  remember -- I don't remember this many different
14  pages.  So I just -- I don't remember the details of
15  the documents that I saw.  But I don't think it was
16  this many individual documents.
17      Q.   Did you read the materials that
18  Ms. Schamberg showed you?
19      A.   The one that she showed me, yes.
20      Q.   How long did you take reading it?
21      A.   Gosh, I think it was -- as I said, it was
22  as few as two pages and maybe as many as four.  So it
23  didn't take long to look at it.  They were bullet
24  pointed items.  It wasn't like there was paragraphs to
25  read.

Page 212

1       Q.   Can you look at document that has the Bates
2   stamp 522.  It's probably about five, six pages in.
3       A.   The date stamp five -- STOPNC_0522?  Okay.
4       Q.   Yeah.  On Bates stamp Page 522, do you see
5   the heading GE dispensing?
6       A.   Yes.
7       Q.   And it said "Product is dispensed by
8   patient-specific prescriptions only.  There must be a
9   specific practitioner/patient/pharmacist relationship
10  to dispense to an individual patient or facility."
11          Do you see that?
12      A.   Yes.
13      Q.   Do you recall seeing that language in the
14  materials that Ms. Schamberg showed you?
15      A.   No.
16      Q.   If you had seen that language in the
17  materials Ms. Schamberg showed you, would you have
18  done some followup?
19      A.   If -- I don't know.  I don't know.
20      Q.   I mean, ultimately, you didn't write
21  prescriptions for individual patients for the MPA that
22  was ordered from NECC, did you?
23      A.   Correct.
24      Q.   Dr. Culclasure, you had previous experience
25  with compounding pharmacies before you bought MPA from

Page 213

1    NECC?
2        A.    Yes.
3        Q.    And were you aware of any of the published
4    literature about risks of using compounded drugs at
5    that time prior to ordering from NECC?
6        A.    No.
7        Q.    I'm showing you what's marked as Schamberg
8    32.  It's a May 31st, 2007 FDA consumer health
9    information publication.  Do you see that?
10       A.    Yes.
11       Q.    And do you see at the top of the middle
12   column on the first page, going back to the bottom
13   line on the previous column, but "Consumers need to be
14   aware that compounded drugs are not FDA approved,
15   Anderson says.  This means that FDA has not verified
16   their safety and effectiveness."
17             Do you see that?
18       A.    I do.
19       Q.    And at the time you made the decision to
20   order from NECC, you did not know that compounded
21   drugs are not FDA approved either, did you?
22       A.    That's correct.
23       Q.    Would you have ordered those drugs from
24   NECC if you had known they were not FDA approved?
25       A.    I don't know.

Page 214

1        Q.    If you turn to the second page of this
2    exhibit, under the heading "What can you do," in the
3    third column on the right, the first say bullet point
4    says, "Ask your doctor if an FDA approved drug is
5    available and appropriate for your treatment."  Do you
6    see that?
7        A.    I do.
8        Q.    None of the patients that you treated were
9    aware they were being injected with the drug from a
10   compounding pharmacy, were they?
11       A.    That's correct.  Also on that document
12   under enforcement on the second page, it says that
13   "The FDA historically hasn't directed enforcement
14   against pharmacies engaged in traditional compounding,
15   says Anderson, rather we focus on establishments as
16   activities raise the kinds of concerns normally
17   associated with the drug manufacturer and whose
18   compounding practices result in significant violations
19   of the new drug adulteration of misbranding provisions
20   of the Federal Food, Drug and Cosmetic Act."
21             So it sounds like even in 2007 the FDA was
22   saying that a pharmacy like NECC would fall under
23   their scrutiny.
24       Q.    And why did you chose to add that onto your
25   answer -- why did you choose to add that passage onto

Page 215

1    your answer?
2        A.    Because I think it shows that even in
3    2000 -- that as far back as 2007, the FDA in this
4    communication is recognizing the fact -- is telling
5    people that they would be looking for problems with
6    entities like NECC.  She also says that the FDA
7    recognizes that states have a central role in
8    regulating pharmacy compounding.  That's just a point
9    that I made earlier.  They were located in
10   Massachusetts.  They were inspected by the
11   Massachusetts Board of Pharmacy and they had to get
12   permission to sell their drugs -- their medications
13   here in Tennessee.  So that's why we have these
14   governmental regulating bodies, to ensure the safety
15   of our medication supply.
16             And so those two things right there point
17   out -- point to the fact that, one, the FDA says that
18   NECC was the type of facility they should be looking
19   at, they would be looking at, and that there's also a
20   significant state role.  So both the FDA and the
21   states fell down or didn't live up to their
22   responsibilities in this situation.
23       Q.    So you think this catastrophe was the
24   government's fault?
25       A.    I said the regulating agencies.  So they're

Page 216

1    part of the government, yes, sir.
2        Q.    And you think -- you think it was their
3    fault this catastrophe happened?
4        A.    Well, I think that it could have -- it may
5    have been preventable had they done their job with the
6    checking on NECC.
7        Q.    Did STOPNC do anything wrong?
8        A.    We ordered in good faith from NECC.  I
9    don't -- at that time, I was unaware of any particular
10   issues involving compounding pharmacies.  I don't
11   think we did anything wrong.
12       Q.    You ordered in good faith based on a review
13   of their self-promotional materials?
14       A.    We didn't order -- we didn't go and
15   purchase it from the back of a -- the trunk of a car
16   in a dark alley.
17       Q.    Do you think you should have done more due
18   diligence with respect to NECC before you made the
19   decision to purchase from them?
20       A.    I think we did what was appropriate at the
21   time.  In ret -- now with all of this -- all of the
22   information and lots of other compounding pharmacies
23   having products recalled.  In fact, big companies,
24   pharmacy companies like Johnson & Johnson have
25   frequent recalls of their medications.  So now things

Page 217

1    are different, but at that time, this issue was not on
2    the radar of most practitioners and providers.
3        Q.    Prior to 2012, had you ever heard of ESI
4    patients getting fungal meningitis from an injection?
5        A.    I think I saw one report.  I don't remember
6    when I saw that.  I don't remember how the -- how the
7    contamination occurred.  I don't remember whether I
8    saw that prior to our event or after.
9        Q.    This has been marked as Schamberg 35.
10       A.    Okay.
11       Q.    I'm showing you Schamberg 35, which is a --
12    the CDC morbidity and mortality weekly report for
13    December 13th, 2002.  Do you see that?
14       A.    I do.
15       Q.    Is this the report that you were referring
16    to?
17       A.    I don't know.
18       Q.    If you look at the first paragraph, it
19    references two cases of meningitis in North Carolina.
20    Do you see that?
21       A.    Yes.
22       Q.    And do you see that this refers to five
23    cases of fungal infection associated with contaminated
24    drugs prepared at the compounding pharmacy?
25       A.    Yes.

Page 218

1        Q.    And you think you might have seen this at
2    some point, but you don't recall whether it was before
3    or after our situation?
4        A.    I probably would not have seen the MMWR.  I
5    don't get copies of that.  I don't subscribe to it.  I
6    might have -- might have seen this referred to in --
7    online or something after -- after the outbreak
8    occurred with us.
9        Q.    Do you think you might have seen it before
10    the outbreak occurred?
11       A.    I've never gotten copies of MMWR.  I never
12    got that prior to the outbreak.
13            (Exhibit 142 was marked for
14            identification.)
15       Q.    (By Mr. Rehnquist)  This is Exhibit 62,
16    Dr. Culclasure -- I'm sorry.  No.  It is --
17            MR. GIDEON:  142.
18            MR. REHNQUIST:  141?
19            MR. GIDEON:  142 is what the number
20    is that you put on there.
21            MR. REHNQUIST:  Yeah, 142.
22       Q.    (By Mr. Rehnquist)  Do you recognize
23    Exhibit 142?
24            MR. GIDEON:  STOPNC_352.
25            THE WITNESS:  Yes.

Page 219

1            MR. REHNQUIST:  I'm sorry.
2        Q.    (By Mr. Rehnquist)  And what is this?  This
3    is an e-mail exchange that you're on?
4        A.    Yes.
5        Q.    And this is after the outbreak?
6        A.    Yes, it appears to be.
7        Q.    Who is Damon Dozier?
8        A.    A pain management physician in Clarksville,
9    Tennessee.
10       Q.    And do you recall why you were
11    communicating with him on this subject?
12       A.    I got a lot of e-mails about that -- about
13    the issue of midlevel providers doing spine injections
14    because for several years I was the president of the
15    Tennessee Society of Interventional Pain Physicians so
16    a lot of people would contact me if they had issues or
17    they wanted me to be aware of something.
18       Q.    Lax is the Laxmaiah Manchikanti whose name
19    came up earlier.
20       A.    Yes.
21       Q.    And he's a pretty big deal in this field?
22       A.    Yes.
23       Q.    You say in the e-mail to Mr. Dozier, Dr.
24    Dozier in No. 2, referring to what Lax said, you said
25    that 60 percent of ESIs are unnecessary.  Do you see

Page 220

1    that?
2        A.    Yes.
3        Q.    And then you add parenthetically, "That is
4    okay for discussion among us because ESIs are abused,
5    but I think not appropriate for discussion with the
6    general public especially at this time."
7            You see that?
8        A.    Yes.
9        Q.    In what ways do you believe ESIs are
10    abused?
11       A.    A lot of providers will -- they choose
12    patients who are inappropriate for ESIs.  They
13    always -- they require the patients to have three ESIs
14    no matter whether they're doing better or not.  I've
15    seen images from other providers where the contrast is
16    not in the epidural space.  So there are a lot of
17    poorly trained or untrained people -- I don't know
18    a lot, but there are a number who can -- they can do
19    these injections in their office, there's no
20    peer-review, there's no quality improvement process
21    that's in place.
22            And so it was a way for them to, you know,
23    submit charges to insurance companies and get
24    reimbursed for these procedures when they're not being
25    applied appropriately or correctly .  And the -- I

Page 221

1   said the discussion is good -- it's okay for
2   discussion among us at this time, but not the general
3   public because it was in the midst of the -- or right
4   after the meningitis outbreak and I just didn't think
5   it was appropriate to -- it was a different issue
6   about what people were doing and the issue of
7   contaminated medicine.
8       Q.   What is the -- what were STOPNC's
9   procedures about the number of injections that -- the
10  number of ESI injections that a patient could receive
11  and the time frame within which a patient could
12  receive those injections?
13      A.   Generally -- generally we tried to not
14  space them any closer than two weeks.  If somebody was
15  going out of town and they said, "I'd like to get my
16  second one in ten days," then we would probably do
17  that.  And then generally a maximum of three in a
18  series.  Three within a six-month period is my rule of
19  thumb.
20      Q.   And was there -- was there any kind of a
21  spacing requirement between the second -- the second
22  and third?  Was it the same?
23      A.   Same, ten to 14 days.
24           MR. REHNQUIST:  I have no further
25      questions.  Thank you, Doctor.

Page 222

1           THE WITNESS:  You're welcome.
2           MR. GIDEON:  Anyone else?
3           MR. CLAYTON:  I have a couple
4       followup.
5   FURTHER EXAMINATION
6   BY MR. CLAYTON:
7       Q.   Dr. Culclasure, you mentioned a few times
8   during your testimony about the Tennessee Department
9   of Health, the Massachusetts Board of Pharmacy and the
10  FDA, that you believe that they are somehow at fault
11  for this catastrophe; is that right?
12      A.   Yes.
13      Q.   And explain to me how you think they are at
14  fault.
15      A.   They are the agencies that should have been
16  regulating NECC.
17      Q.   So back in 2011 and 2012 were you of the
18  mindset that you thought that they would be the
19  agencies that were relegating or watching over a
20  company like NECC?
21      A.   Yes.
22      Q.   So when did you contact the Massachusetts
23  Board of Pharmacy to find out whether or not they had
24  any investigations going on regarding NECC?
25      A.   I did not contact them because we assumed

Page 223

1   that if they were in business, that they were good.
2   If there was a significant problem, I assumed that the
3   Massachusetts Board of Pharmacy or the FDA would have
4   prevented them from selling their medications or that
5   the Tennessee Board of Pharmacy would have stopped
6   them from shipping medications to Tennessee.
7       Q.   And so you mentioned the FDA.  When did you
8   contact the FDA or do any search on the FDA's website
9   prior to purchasing from NECC to see what sort of
10  investigations or what sort of warnings they had?
11      A.   I didn't because as long as they were doing
12  business, I assumed that they had clearance from the
13  FDA.
14      Q.   So your assumption -- you're assuming that
15  as long as they're doing business, they must okay
16  with the Massachusetts Board of Health and the FDA and
17  the Tennessee Board of Pharmacy?
18      A.   Absolutely.
19      Q.   In making that assumption, do you believe
20  that that is consistent with the policies and
21  procedures of STOPNC with regard to providing optimal
22  care --
23      A.   Yes.
24      Q.   -- for its patients?
25      A.   Yes.

Page 224

1       Q.   And providing safe care for its patients?
2       A.   Yes.
3       Q.   What are you-all doing now at STOPNC to
4   make sure that companies or compounding pharmacies
5   like NECC are okay to deal with?
6       A.   We're not ordering from any compounding
7   pharmacies at this time.
8       Q.   Have you ordered from any compounding
9   pharmacies at all after this catastrophe?
10      A.   I don't think so.
11      Q.   So what are you doing in order to make sure
12  that the -- the MPA that you're ordering from a
13  manufacturer is safe?
14      A.   Nothing different.  We're ordering from
15  Pfizer.
16      Q.   So the only change that STOPNC has made
17  after this catastrophe is to stop ordering from
18  compounding pharmacies; correct?
19      A.   Correct.
20      Q.   And you would agree with me that prior to
21  2011 and 2012, there were warnings from the FDA and
22  warnings in the medical literature regarding the
23  dangers of ordering from compounding pharmacies, you
24  would agree with me, wouldn't you?
25      A.   There were, yes.

Page 225

```
 1       Q.   And you just didn't know about it?
 2       A.   I didn't know about it.
 3       Q.   And you think that's acceptable, being a
 4  medical director of a STOP -- of STOPNC to not know
 5  about the warnings that were out there available
 6  against ordering from compounding pharmacies?
 7       A.   I've never been instructed, I've never
 8  attended a lecture, I've not read materials that said
 9  that anything else needed to be done when you're
10  ordering from those pharmacies at that time.  It's not
11  possible for me to review every -- everything that is
12  put out on the Internet or -- or studies.  I -- I
13  depend on our professional societies to help with that
14  and I depend on the regulatory agencies to ensure that
15  the drug supply is safe.
16       Q.   So are you blaming the professional society
17  too along with the government for this catastrophe?
18       A.   Well, they don't have any power to do
19  anything about NECC.
20       Q.   Well, are you blaming your professional
21  society for not putting out warnings about dealing
22  with compounding pharmacies?
23       A.   I don't think the risk was clear then as it
24  is now.
25       Q.   Why do you say that?
```

Page 226

```
 1       A.   Well, there's never been an outbreak to
 2  this prior to that.
 3       Q.   Have there been deaths associated with
 4  compounds pharmacies before regarding ESIs?
 5       A.   Yes, I just -- we just reviewed one
 6  document.
 7       Q.   And you weren't aware of that before --
 8       A.   No.
 9       Q.   -- y'all started ordering from NECC?
10       A.   I was not.
11       Q.   And you never even contacted a compounding
12  pharmacist who was in your back yard prior to ordering
13  from NECC, did you?
14       A.   That's correct.  I doubt that he would have
15  had any knowledge of NECC.
16       Q.   He would have had knowledge about the
17  regulations regarding compounding pharmacies, wouldn't
18  he?
19       A.   I don't know.
20       Q.   Didn't you see the e-mail that was sent out
21  by the Health and Wellness Pharmacy, Dr. Mark,
22  Binkley, shortly after this catastrophe occurred that
23  went to your office?
24       A.   I don't know.  You'd have to show it to me.
25       Q.   Doesn't it say specifically about
```

Page 227

```
 1  patient-specific prescriptions?  You don't recall
 2  seeing that e-mail?
 3       A.   I don't know.
 4       Q.   When did you first learn about the need for
 5  patient prescription -- patient-specific prescriptions
 6  when you were ordering from a compounding pharmacy?
 7            MR. GIDEON:  Objection, form.
 8       Q.   (By Mr. Clayton)  You can go ahead, Doctor.
 9       A.   Are you asking when we were told that by
10  NECC that they needed patient names?
11       Q.   No.  I want to know when did you learn that
12  a patient-specific prescription was necessary in order
13  to obtain MPA from a compounding pharmacy?
14            MR. GIDEON:  Objection.
15            THE WITNESS:  I didn't know that
16       until after the outbreak when -- when
17       all -- when more information came out.
18       Q.   (By Mr. Clayton)  How far after the
19  outbreak did you learn that?
20       A.   I don't recall.
21       Q.   How did you learn that?
22       A.   When it came up in discussions.  I don't
23  remember exactly, but it was brought -- it was brought
24  up about the -- Board of Pharmacy and
25  Massachusetts required patient-specific prescriptions,
```

Page 228

```
 1  but that was a requirement on NECC to obtain those.
 2  I'm not sure that it applied to me to provide them
 3  unless they asked me for those.
 4       Q.   Doesn't the Board of Pharmacy in Tennessee
 5  also require back in 2011 and 2012 patient-specific
 6  prescriptions?
 7            MR. GIDEON:  Objection.
 8            THE WITNESS:  I'm not sure.
 9       Q.   (By Mr. Clayton)  Have you ever asked
10  anybody about that?
11       A.   I don't think so.
12       Q.   Would you agree with me that the name
13  Mickey Mouse was used to obtain MPA from NECC?
14       A.   No.
15       Q.   Have you not seen that list that went to
16  NECC in order to obtain MPA?
17       A.   That was a clerical error on the part of a
18  clerical person who copied that log sheet and sent it
19  in.
20       Q.   They sent it in to NECC; correct?
21       A.   Yes.
22       Q.   So the name Mickey Mouse was used in order
23  to obtain MPA from NECC; correct?
24       A.   If they didn't understand that that was an
25  error, then I guess it could have, yes.
```

Page 229

1    Q.    So that was an error on STOPNC's part for
2  submitting that name along with the names of other
3  patients who may or may not even be receiving the MPA.
4  Is that what you're saying?
5    A.    I said those were placeholder names and
6  should not have been included in what was sent out.
7    Q.    Were patients -- do you feel like patients
8  of STOPNC were looking to STOPNC to make sure that
9  whatever is being injected into their spine was safe?
10    A.    I'm sorry, would you repeat that.
11    Q.    Do you think the patients of STOPNC were
12  looking to STOPNC to make sure that the -- whatever
13  was being injected into their spine was safe?
14    A.    Yes, just like I expected that what NECC
15  was providing me was safe.
16    MR. CLAYTON:  That's all I have.
17  Thank you.
18    MR. GIDEON:  Anybody else?  Hearing
19  none, that's it.  We will read and sign.
20    VIDEOGRAPHER:  This concludes the
21  deposition.  This is the end of Tape No. 5.
22  We're off the record and the time is
23  4:31 p.m.
24    (Deposition concluded at 4:31 p.m.)
25

Page 230

1             DISCLOSURE
2
3    Pursuant to Article 10.B of the Rules
and Regulations of the Board of Court
Reporting of the Judicial Council of
4  Georgia which states:  "Each court reporter
shall tender a disclosure form at the time
5  of the taking of the deposition stating the
arrangements made for the reporting
6  services of the certified court reporter,
by the certified court reporter, the court
7  reporter's employer or the referral source
for the deposition, with any party to the
8  litigation, counsel to the parties, or
other entity.  Such form shall be attached
9  to the deposition transcript," I make the
following disclosure:
10
11    I am a Georgia Certified Court
Reporter.  I am here as a representative of
Discovery Litigation Services, LLC.
12  Discovery Litigation Services, LLC was
contacted to provide court reporting
13  services for the deposition.  Discovery
Litigation Services, LLC will not be taking
14  this deposition under any contract that is
prohibited by O.C.G.A. 9-11-28(c).
15
16    Discovery Litigation Services, LLC
has no contract/agreement to provide
17  reporting services with any party to the
case, any counsel in the case, or any
18  reporter or reporting agency from whom a
referral might have been made to cover this
deposition.
19
20    Discovery Litigation Services, LLC
will charge its usual and customary rates
21  to all parties in the case, and a financial
discount will not be given to any party to
this litigation.
22
23
       Blanche J. Dugas
24     CCR No. B-2290
25

Page 231

1  STATE OF GEORGIA:
2  COUNTY OF FULTON:
3
4    I hereby certify that the foregoing
5  transcript was reported, as stated in the
6  caption, and the questions and answers
7  thereto were reduced to typewriting under
8  my direction; that the foregoing pages
9  represent a true, complete, and correct
10  transcript of the evidence given upon said
11  hearing, and I further certify that I am
12  not of kin or counsel to the parties in the
13  case; am not in the employ of counsel for
14  any of said parties; nor am I in any way
15  interested in the result of said case.
16
17  March 31, 2015
18
19
20
21    BLANCHE J. DUGAS, CCR-B-2290
22
23
24
25

Page 232

1             CAPTION
2
3    The Deposition of JOHN W. CULCLASURE, M.D.,
4  taken in the matter, on the date, and at the time and
5  place set out on the title page hereof.
6    It was requested that the deposition be
7  taken by the reporter and that same be reduced to
8  typewritten form.
9    It was agreed by and between counsel and
10  the parties that the Deponent will read and sign the
11  transcript of said deposition.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 233

```
 1              DEPOSITION ERRATA SHEET
 2   DLS Assignment No.  21012
 3   Case Caption:  In Re:  New England Compounding
 4          Pharmacy, Inc. Products Liability
 5          Litigation
 6   Witness:  JOHN W. CULCLASURE, M.D. - 03/23/2015
 7
 8        DECLARATION UNDER PENALTY OF PERJURY
 9
10   I declare under penalty of perjury that I have read
11   the entire transcript of my deposition taken in the
12   captioned matter or the same has been read to me, and
13   The same is true and accurate, save and except for
14   changes and/or corrections, if any, as indicated by me
15   on the DEPOSITION ERRATA SHEET hereof, with the
16   understanding that I offer these changes as if still
17   under oath.
18
19   Signed on the _____ day of
20
21   _____, 20___.
22
23   _____
24   JOHN W. CULCLASURE, M.D.
25
```

Page 234

```
 1              CERTIFICATE
 2   STATE OF GEORGIA
 3   COUNTY OF FULTON
 4         Before me, this day, personally appeared,
 5   JOHN W. CULCLASURE, M.D., who, being duly sworn,
 6   states that the foregoing transcript of his
 7   deposition, taken in the matter, on the date, and at
 8   the time and place set out on the title page hereof,
 9   constitutes a true and accurate transcript of said
10   deposition.
11
12   _____
13   JOHN W. CULCLASURE, M.D.
14
15         SUBSCRIBED and SWORN to before me this
16   _____day of_____, 20___ in the
17   jurisdiction aforesaid.
18
19   _____   _____
20   My Commission Expires    Notary Public
21
22   *If no changes need to be made on the following two
23   pages, place a check here _____, and return only this
24   signed page.*
25
```

Page 235

```
 1           DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3
 4   _____
 5   Reason for change:_____
 6   Page No._____Line No._____Change to:_____
 7
 8   _____
 9   Reason for change:_____
10   Page No._____Line No._____Change to:_____
11
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19
20   _____
21   Reason for change:_____
22   Page No._____Line No._____Change to:_____
23
24   SIGNATURE:_____DATE:_____
25         JOHN W. CULCLASURE, M.D.
```

Page 236

```
 1           DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3
 4   _____
 5   Reason for change:_____
 6   Page No._____Line No._____Change to:_____
 7
 8   _____
 9   Reason for change:_____
10   Page No._____Line No._____Change to:_____
11
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19
20   _____
21   Reason for change:_____
22   Page No._____Line No._____Change to:_____
23
24   SIGNATURE:_____DATE:_____
25         JOHN W. CULCLASURE, M.D.
```