Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE: NEW ENGLAND
COMPOUNDING PHARMACY,
INC. PRODUCTS LIABILITY    MDL No. 2419
LITIGATION
            Master Dkt:
            1:13-md-02419-RWZ
~~~~~~~~~~~~~~~~~~~~~~
THIS DOCUMENT RELATES
TO:

All Actions

~~~~~~~~~~~~~~~~~~~~~~~


30(b)(6) VIDEOTAPED DEPOSITION OF
JEFFERY EBEL

9:05 a.m.
May 29, 2015

Suite 1740
414 Union Street
Nashville, Tennessee

Blanche J. Dugas, RPR, CCR No. B-2290

---

Page 2

1        APPEARANCES OF COUNSEL
2
   On Behalf of the Plaintiffs:
3      BILL LEADER, Esquire
       GEORGE NOLAN, Esquire
4      Leader, Bulso & Nolan, PLC
       Suite 1740
5      414 Union Street
       Nashville, Tennessee  37219
6      (615) 780-4114
       (615) 780-4122 (facsimile)
7      gnolan@leaderbulso.com
       bleader@leaderbulso.com
8
       DANIEL L. CLAYTON
9      Kinnard, Clayton & Beveridge
       127 Woodmont Boulevard
10     Nashville, Tennessee  37205-2240
       (615) 297-1007
11     (615) 297-1505 (facsimile)
       dclayton@kcbattys.com
12
   On Behalf of Saint Thomas Outpatient Neurosurgical
13 Center, LLC; Howell Allen, a Professional Corporation;
   John W. Culclasure, M.D.; Debra V. Schamberg, RN:
14     MATTHEW CLINE, Esquire
       CHRISTOPHER TARDIO, Esquire
15     Gideon, Cooper & Essary, PLC
       Suite 1100
16     315 Deaderick Street
       Nashville, Tennessee 37238
17     (615) 254-0400
       (615) 254-0459 (facsimile)
18     matt@gideoncooper.com
       chris@gideoncooper.com
19
20
21
22
23
24
25

---

Page 3

1      ~~ Attorneys Appearing Via Video Stream ~~
2  On Behalf of Dallas Back Pain Management/Momentum
   Pain Management and Abbeselom Ghermay, M.D.:
3      HEATHER A. KANNY, Esquire
       Fraley & Fraley, LLP
4      Suite 6300
       901 Main Street
5      Dallas, Texas 75202-3773
       (214) 761-6468
6      hkanny@fraley-law.com
7  On Behalf of Tim I. Chowdhury, M.D.:
       BARTHOLOMEW T. FREEZE, Esquire
8      FREUND, FREEZE & ARNOLD
       Suite 800
9      65 E. State Street
       Columbus, Ohio 43215-4247
10     (614) 255-7567
       (614) 827-7303 (facsimile)
11     bfreeze@ffalaw.com
12 On Behalf of Specialty Surgery Center - Crossville,
   PLLC; Kenneth R. Lister, M.D.; Kenneth R. Lister,
13 M.D., PC:
       KENT E. KRAUSE, Esquire
14     Brewer, Krause, Brooks, Chastain & Burrow, PLLC
       Suite 2600
15     611 Commerce Street
       Nashville, Tennessee 37203
16     (615) 256-8787
       (615) 256-8985 (facsimile)
17     kkrause@bkblaw.com
18 Also Present:
       Daniel Makowski, videographer
19
20
21
22
23
24
25

---

Page 4

1         INDEX OF EXAMINATION
2  EXAMINATION             PAGE
3  EXAMINATION                8
   BY MR. NOLAN
4
   EXAMINATION               38
5  BY MR. TARDIO
6  FURTHER EXAMINATION      165
   BY MR. NOLAN
7
   FURTHER EXAMINATION      178
8  BY MR. TARDIO
9  FURTHER EXAMINATION      189
   BY MR. NOLAN
10
11            - - -
12       INDEX TO EXHIBITS
13 EXHIBIT   DESCRIPTION      PAGE
14 278  Fourth page of the fall of    17
        2011 Clint Pharmaceuticals
15      catalog citing fungal
        meningitis linked to
16      compounding
17 279  Clint Pharmaceuticals July    18
        2009 catalog
18
19 280  Copy of the Clint             23
        Pharmaceuticals,
20      Incorporated website, Bates
        labeled PSC-EX-0065 through
        68
21
22 281A Clint Pharmaceuticals fall    42
        of 2012 catalog
23 281B Copy of the Clint             42
        Pharmaceuticals website
24      About Clint page
25

---

Page 5

```
 1    282   Copy of the Clint          43
            Pharmaceuticals Spring 2012
 2          catalog, Bates labeled
            STOPNC000849 and 850
 3
      283   Page 20 and 21 of Clint     49
 4          Pharmaceuticals' fall 2013
            catalog, Bates labeled
 5          STOPNC000879
 6    284   Clint Pharmaceuticals, Inc.  89
            Invoice # 207958, Bates
 7          labeled STOPNC_0165
 8    285   Clint Pharmaceuticals, Inc.  90
            Invoice # 206412, Bates
 9          labeled STOPNC_0173
10    286   E-mail string regarding      94
            Drug order 6-9-11, Bates
11          labeled STOPNC_0312 and 313
12    287   Clint Pharmaceuticals, Inc.  107
            Invoice # 207958, Bates
13          labeled STOPNC_0164
14    288   Clint Pharmaceuticals, Inc.  110
            Invoice # 207958, Bates
15          labeled STOPNC_0163
16    289   Page from the 2011 spring    124
            catalog, Bates stamped
17          STOPNC000852
18    290   Printout of Clint            126
            Pharmaceuticals, Inc.
19          Website now
20    291   Copy of Clint                134
            Pharmaceuticals, Inc.'s
21          website from 2011
22    292   Copy of the Clint            134
            Pharmaceuticals, Inc.'s
23          website as of May 2015
24
25
```

Page 6

```
 1    293   National drug code          161
            availability of
 2          methylprednisolone acetate
            and Depo-Medrol
 3
      294   Printout from Clint         175
 4          Pharmaceuticals, Inc.'s
            website titled "Comparison
 5          of Parenteral
            Corticosteroids", Bates
 6          labeled PSC-EX-0069 through
            71
 7
 8          (Original Exhibits 278 through 294
            have been attached to the original
 9          transcript.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1          30(b)(6) Videotaped Deposition of Jeffery Ebel
                  May 29, 2015
 2
 3          VIDEOGRAPHER:  Here begins Tape No. 1
 4    to the videotaped deposition of Jeff Ebel.
 5    Today is Friday, the 29th day of May of
 6    2015.  The time is 9:05 a.m.  We are at 414
 7    Union Street, Nashville, Tennessee 37219.
 8    The court reporter today is B.J. Dugas.  I
 9    am the videographer, Daniel Makowski.
10          Would counsel please state your
11    appearance for the record and state whom
12    you represent, then the reporter will swear
13    in the witness.
14          MR. NOLAN:  George Nolan for the
15    plaintiffs.
16          MR. LEADER:  Bill Leader for
17    plaintiffs.
18          MR. TARDIO:  Chris Tardio and Matt
19    Cline for the Tennessee clinic defendants.
20              JEFFERY EBEL,
21    having been first duly sworn, was examined and
22    testified as follows:
23          MR. NOLAN:  And before we start the
24    questioning, I'd like to make sure that
25    we're clear on kind of the caption in terms
```

Page 8

```
 1    of objections.  And my understanding is
 2    that all objections except as to the form
 3    of the question are reserved.  Is that your
 4    understanding, Mr. Tardio?
 5          MR. TARDIO:  Yes.
 6    EXAMINATION
 7    BY MR. NOLAN:
 8      Q.   Sir, would you state your full name.
 9      A.   Jeffery Ebel.
10      Q.   Mr. Ebel, my name is George Nolan, and we
11    are here to take the deposition of actually of the
12    company called Clint Pharmaceuticals, Incorporated.
13    Are you affiliated with that company?
14      A.   Yes.
15      Q.   And how are affiliated with that company?
16      A.   I am co-owner and I am an officer.
17      Q.   All right.  And who is the other owner of
18    that company?
19      A.   Sally Ebel.
20      Q.   Okay.  And is she related to you?
21      A.   Yes.
22      Q.   And how is she related to you?
23      A.   She's my wife.
24      Q.   All right.  And so were you the founder of
25    that company?
```

Page 9

1   A.   Yes.
2   Q.   As we have our conversation today, the most
3   important thing is that we communicate with each other
4   clearly.  So if I ask you a question that you don't
5   understand, will you point that out to me and I'll do
6   my best to ask a question that's more clear.  Fair
7   enough?
8   A.   Yes.
9   Q.   And if I or anybody asks you a question
10  today that you know the answer to, you understand we
11  want you to tell us; correct?
12  A.   Correct.
13  Q.   And if you don't know the answer to the
14  question, you should tell us that you don't know.  Is
15  that --
16  A.   Correct.
17  Q.   -- fair enough?  All right.
18       And you are here today under subpoena; is
19  that correct?
20  A.   Yes.
21  Q.   And am I correct in understanding that
22  originally when the fungal meningitis catastrophe
23  that's occurred here in Nashville hit the press, you
24  were reluctant to get involved as a witness or any
25  other way; is that true?

Page 10

1   A.   Yes.
2   Q.   All right.  And so originally you did not
3   want to talk with lawyers.  Is that also true?
4   A.   Yes.
5   Q.   Okay.  But you have talked to me on one
6   occasion before today; is that true?
7   A.   Yes.
8   Q.   Have you also talked with some other lawyer
9   involved in the litigation?
10  A.   I have had a couple attorneys that I don't
11  recall their name, they have called --
12  Q.   Okay.
13  A.   -- in the past.
14  Q.   And do you remember whether they were
15  representing healthcare providers in this litigation,
16  maybe the Saint -- one of the St. Thomas entities?
17  A.   I don't think so.  I don't know.
18  Q.   Okay.  Fair enough.  I'd like to start with
19  a few questions about your background if I could.
20  Where are you from originally?
21  A.   Illinois.
22  Q.   All right.  And what brought you to
23  Tennessee?
24  A.   My wife got a degree in the music business.
25  Q.   And how long have you lived in Tennessee?

Page 11

1   A.   Since 1979.
2   Q.   All right.  And could you give us just a
3   thumbnail sketch of your educational background.
4   A.   Yes.  I've got a bachelor's degree in
5   psychology from Southern Illinois University.  And I
6   don't have a master's degree in anything.  That was as
7   far -- that's as high as I went.
8   Q.   Okay.  And so when did you start the
9   company known as Clint Pharmaceuticals, Incorporated?
10  A.   June of 1987.
11  Q.   And what prompted you to start the company?
12  A.   The company that I was with was getting out
13  of the corticosteroid market.
14  Q.   I see.
15  A.   And they were going with oral solid
16  products and I liked the injectable market and so I
17  started the company.
18  Q.   I see.  And so how would you describe your
19  company to someone who is not familiar with it?
20  A.   We have always been an injectable company.
21  We've always specialized in corticosteroids and we --
22  the products -- we have a vast array of products.  A
23  lot of them kind of center around corticosteroids and
24  are kind of offshoots of corticosteroids.
25  Q.   And what are corticosteroids?

Page 12

1   A.   They are anti-inflammatory preparations.
2   Q.   Now, does the -- does the category of drugs
3   known as corticosteroids include a particular medicine
4   known as methylprednisolone acetate, what we call MPA?
5   A.   Yes.
6   Q.   And over what geographic region does your
7   company sell corticosteroids?
8   A.   We're in the United States in all 50
9   states.  We go into some of the territories as well.
10  Q.   And where is your company headquartered?
11  A.   Nash -- Old Hickory, Tennessee.
12  Q.   And how long has it been headquartered in
13  Old Hickory?
14  A.   Since September of 1999.
15  Q.   And approximately how many employees does
16  your company have?
17  A.   We currently have about 22.
18  Q.   And what type of customers does your
19  company sell corticosteroids to?
20  A.   We market to the outpatient market.  So a
21  physician office, a clinic or a surgery center, we
22  would market to those people.  We do not go into
23  hospitals generally.
24  Q.   Okay.  And how long has your company sold
25  corticosteroids that could be used in epidural steroid

Page 13

1  injections?
2      A.   We've sold corticosteroids since the
3  inception of the company.  And how they're used, we
4  don't -- we don't actually -- are able to see that.
5  That's usually up to the physician, how they use it.
6      Q.   Okay.  Now, are you a -- is your company a
7  pharmacy?
8      A.   It's considered a wholesale -- we're
9  considered a wholesale drug distributor.
10     Q.   All right.  And what does that mean?
11     A.   That means that we have a license to
12 distribute drugs in the state of Tennessee and any
13 state that we're licensed in.
14     Q.   And in Tennessee, who issues that license?
15     A.   I'm -- the Board of Pharmacy.
16     Q.   Okay.  So what is the difference between a
17 wholesale drug distributor and a pharmacy?
18     A.   A pharmacy typically we think of as like
19 either a hospital pharmacy where the pharmacist is --
20 is dispensing to patients in the hospital or if you
21 think of a retail pharmacy where the pharmacist is
22 dispensing to the general public.  We only sell to
23 licensed physicians in the facilities that we -- that
24 have a license to carry and use these type of
25 products.

Page 14

1      Q.   All right.  Let's talk for a minute about
2  compounding pharmacies.  Does your company sell
3  steroids made by compounding pharmacies?
4      A.   Absolutely not.
5      Q.   And why not?
6      A.   Because we feel that in general they're
7  dangerous, they're not FDA approved.
8      Q.   Okay.
9      A.   We only sell FDA approved products.
10     Q.   And how long has it been your company's
11 policy to only sell FDA approved products?
12     A.   Since its inception.
13     Q.   And what gave you the impression that it
14 would be dangerous to sell products from compounding
15 pharmacies?
16     A.   Well, I believe it would be dangerous to
17 sell products that would be illegally compounded.
18     Q.   Okay.
19     A.   And so -- and whenever something is done
20 illegally, we feel like it's a danger to the health of
21 our community.
22     Q.   And when you use the term "illegally
23 compounded," what do you mean by that?
24     A.   Well, different states have different rules
25 and regulations, but in general, pharmacies are not

Page 15

1  supposed to be compounding anything that's
2  commercially available or without a prescription for
3  an individual patient.
4      Q.   Okay.  So under kind of your concept of
5  illegal compounding, if a -- if a pharmacy was
6  producing a corticosteroid, mass producing a
7  corticosteroid and shipping it across state lines into
8  Tennessee to a clinic in Tennessee without patient
9  specific prescriptions, would that fit the category of
10 illegal compounding as you're using it?
11         MR. TARDIO:  Object to the form.
12     Q.   (By Mr. Nolan)  You can go ahead and
13 answer.
14     A.   That raises a lot of red flags and, yes, I
15 would think that -- I would be very concerned about
16 anybody using a product like that.
17     Q.   And so what sort of red flags are you
18 referring to?
19     A.   Well, if it's commercially available and --
20 and are there individual prescriptions for it.
21     Q.   Does your company do anything to warn its
22 customers about the dangers associated with dispensing
23 illegally compounded steroids?
24     A.   Absolutely.
25     Q.   And tell us what your company does.

Page 16

1      A.   Well, in 2001, there were 13 cases of fatal
2  meningitis from compounded corticosteroids, and since
3  that time, we have put in our catalogs, which is our
4  main marketing mechanism, we've put -- referred to
5  that article where patients died during that -- the
6  consumption of that product.
7      Q.   Okay.
8      A.   So we've been doing that since 2001.
9      Q.   All right.  And I understand that you
10 brought with you today several of your company's
11 catalogs that show --
12     A.   Uh-huh (affirmative).
13     Q.   -- its various products.
14     A.   Yeah.
15     Q.   And I'd like to kind of focus your
16 attention on the June of 2011 time frame because
17 that's an important time frame in this case.
18     A.   Okay.
19     Q.   Do you have a catalog that preceded that
20 month in time that would contain the warning that you
21 are making reference to?
22     A.   Well, I have the fall of 2011, and it's
23 right on the fourth page where we cite the fatal
24 meningitis linked to compounding there.
25     Q.   Okay.  If I could have that.

Page 17

1    A.   Okay.
2    Q.   And at a break, we're going to make a copy
3  of this document and we're going to make it Exhibit
4  No. 278.
5        All right.  Do you have anything earlier
6  than the fall of 2011?
7        (Exhibit 278 was marked for
8   identification.)
9        THE WITNESS:  Yes.  Let's see here.
10  On July of 2009 -- I believe it was in 2007
11  when we began printing about the warning
12  against illegal drug compounding and
13  counterfeiting.  And I believe that we
14  started that in 2008 and 2000 -- or 2007.
15   Q.   (By Mr. Nolan)  Okay.  And so -- and that
16  is which catalog that you're referring to?
17   A.   This one is the July of 2009 --
18   Q.   Okay.
19   A.   -- catalog.
20   Q.   All right.  I'm going to make a copy of --
21  for all of these we're going to make at least the
22  front page as well as the warning page that you're
23  indicating.  And that will be Exhibit No. 279.
24        So in addition to these warnings which you
25  publish in your catalog, do you do anything else to

Page 18

1  alert clinics as to the dangers associated with
2  compounding?
3        (Exhibit 279 was marked for
4   identification.)
5        THE WITNESS:  Well, whenever we would
6   be in a trade show or whenever we would
7   speak to a physician, if compounding came
8   up, we would alert them.
9    Q.   (By Mr. Nolan)  All right.  And so as far
10  as trade shows are concerned, what trade shows would
11  you discuss issues about the dangers of compounding
12  pharmacies?
13   A.   It would mainly be -- the trade shows that
14  we would attend would mainly be pain management trade
15  shows.
16   Q.   Okay.  Would you attend trade shows of
17  ambulatory surgery centers?
18   A.   We have in the past, yes.
19   Q.   Are you familiar with an organization
20  called FASCA?
21   A.   I am not.  What does it stand for?
22   Q.   Freestanding ambulatory surgery centers.
23   A.   No, I'm not familiar with that.  We would
24  mail these catalogs to every ambulatory surgery center
25  in the United States.

Page 19

1    Q.   I see.  And so that would include the St.
2  Thomas Outpatient Neurosurgical Center?
3    A.   It might and it might not.  We would
4  normally flag -- we would try to flag the outpatient
5  surgery centers that were privately held.
6    Q.   Okay.
7    A.   And -- because a lot of times if they're
8  owned by a hospital, they may be restricted on what
9  they could purchase.  And so sometimes we would only
10  flag the ones that were privately held.
11   Q.   And can you -- and tell us about -- about
12  your experience of hospitals restricting what clinics
13  can purchase.  Explain what you mean by that.
14   A.   Well, often they will have a contract, and
15  they will have to go through a formulary committee on
16  what can be used and where they can purchase from.
17   Q.   I see.
18   A.   So let's say you were a representative of
19  XYZ pharmaceutical company.  You would negotiate for a
20  contract for let's say two or three years or something
21  like that and then that hospital agrees to purchase
22  your product for that length of time.  So if they
23  were -- if we felt like they were under contract, we
24  might try to avoid going in there or at least wasting
25  a mailing on it.

Page 20

1    Q.   Do you know any of the specifics about how
2  the St. Thomas Outpatient Neurosurgical Center is
3  owned?
4    A.   I do not.
5    Q.   Okay.  And if that particular entity wanted
6  to buy corticosteroids from your company, would it be
7  standard for your company to provide that entity with
8  the brochures that you've mentioned?
9    A.   Oh, absolutely.  Once they become a
10  customer --
11   Q.   Okay.
12   A.   -- then they continue to receive these --
13  our catalogs.
14   Q.   All right.  So if we assume that the St.
15  Thomas Outpatient Neurosurgical Center was, in fact,
16  at one point in time a customer of your company, am I
17  correct in understanding that they would have received
18  brochures from your company?
19   A.   Absolutely.
20        MR. TARDIO:  Object to the form.
21   Q.   (By Mr. Nolan)  And so does your company
22  employ sales representatives?
23   A.   Yes.
24   Q.   And how many sales representatives do you
25  employ?

1    A.    About four.  About four.
2    Q.    And what -- what are your sales
3  representatives trained to do, if anything, with
4  regard to informing customers or prospective customers
5  about the dangers associated with illegal compounding?
6    A.    Well, they were instructed to warn people
7  about the meningitis and about, you know, to try to
8  look for an NBC number on a product, which is the
9  national drug code, to just let the physicians know
10  that, you know, there's some illegally compounded
11  products out there and to be very cautious.  And the
12  depth of discussion would be depending upon the
13  physician.
14    Q.    Okay.  And when I first asked you about
15  whether you automatically sent brochures to the St.
16  Thomas Outpatient Neurosurgical Center and then you
17  explained that sometimes you try to avoid hospital
18  owned --
19    A.    Uh-huh (affirmative).
20    Q.    -- entities, what hospital did you assume
21  the St. Thomas Outpatient Neurosurgical Center was
22  affiliated with, if any?
23    A.    Well, you know, I don't know -- I have no
24  idea who owned -- owns it.  By the name it indicates
25  they would be affiliated with St. Thomas.

1    Q.    Okay.  And in addition to the brochures,
2  does your company do anything on its website in order
3  to inform customers of the dangers associated with
4  illegal compounding?
5    A.    Yes.
6    Q.    And tell us about that.
7    A.    We would refer them to the FDA orange book
8  where they could look up and see if a product was FDA
9  approved on the website.  We would refer them to the
10  FDA MedWatch so that they could look up and see a
11  particular compounding pharmacy, get some information
12  about that.
13    Q.    Okay.  So I take it then that through your
14  website, your company encourages its customers to do
15  research before it decides to buy steroids from
16  compounding pharmacies?
17          MR. TARDIO:  Object to the form.
18    Q.    (By Mr. Nolan)  You can go ahead and
19  answer.
20    A.    Yes, we think it's good that you know who
21  you're getting your products from.
22    Q.    Okay.  And do you have in front of you an
23  example of information from your website that dates
24  back to 2008?
25    A.    I do not see the date on here, but it looks

1  like it would.
2    Q.    Okay.  You see down at the bottom in the
3  web address you see where 2008 is at the beginning of
4  the string of numbers there right after the word web?
5    A.    Yes, I do.
6    Q.    But that does appear to be from your
7  company's website?
8    A.    Yes, it is.
9    Q.    And let me mark that as Exhibit No. 280.
10  And can you explain what this exhibit informs
11  prospective customers of, as far as the dangers of
12  compounding pharmacies are concerned.
13          (Exhibit 280 was marked for
14          identification.)
15          THE WITNESS:  Well, it refers to the
16  incident that happened in 2001 in San
17  Francisco at Walnut Creek.  I believe there
18  was 13 people that died of fatal meningitis
19  from injectable corticosteroid compounding.
20  It refers them to drugtopics.com relating
21  to the dangers of compounding.  And it kind
22  of talks about the story that happened in
23  Walnut Creek and how that transpired.
24    Q.    (By Mr. Nolan)  I see.
25    A.    There's also a notice from one of the

1  leading pain management societies that they posted FDA
2  to take action against pharmacies that compounded
3  drugs as if they were manufacturers.
4    Q.    I see.  Now, when you say pharmacies that
5  compound drugs as if they're drug manufacturers, what
6  do you mean?
7    A.    The mass production of compounded medicine.
8  In other words, instead of compounding it, it becomes
9  manufacturing.
10    Q.    I see.  And is that phenomenon something
11  that you consider to be illegal compounding?
12          MR. TARDIO:  Object to the form.
13    Q.    (By Mr. Nolan)  You can go ahead and
14  answer.
15    A.    I believe that our government considers it
16  to be illegal and that's my understanding is that it's
17  illegal.
18    Q.    And so what -- what physician society does
19  your website make reference to in terms of the
20  discussion of that particular issue?
21    A.    This is American -- on this, this is
22  American Society of Interventional Pain Physicians.
23    Q.    Okay.  And in your work for your company,
24  do you have occasion to talk with doctors who give
25  epidural steroid injections about the dangers of

Page 25

1    illegally compounded drugs?
2        A.    Yes.
3        Q.    And how many doctors have you talked with
4    about that over the years?
5        A.    I don't know.  I would say hundreds.
6        Q.    Now, do you have a sales representative who
7    works for your company named Clinton Ebel?
8        A.    Yes.
9        Q.    And is he related to you?
10       A.    Yes.
11       Q.    And how is he related to you?
12       A.    He's my son.
13       Q.    Okay.  And is mentioning the added safety
14   benefits of using FDA approved injectable
15   corticosteroids as well as the dangers of using
16   illegally compounded drugs something that you would
17   expect Clinton as well as your other sales
18   representatives to discuss with customers like St.
19   Thomas Outpatient Neurosurgical Center?
20       A.    Yes.
21       Q.    And do you know whether your son Clinton
22   actually discussed those issues with the St. Thomas
23   Outpatient Neurosurgical Center?
24       A.    I am not sure.
25       Q.    Is it -- if -- if a customer asks your

Page 26

1    company about the source of the drugs that your
2    company sells, what does your company do?
3        A.    We provide them with whatever information
4    that they would want, but that we have documents of
5    where we buy our product and where our product comes
6    from and it always goes to the manufacturer of the
7    product that is FDA approved.
8        Q.    All right.  So --
9        A.    They can get as detailed as they want with
10   that.
11       Q.    All right.  So would I be correct in
12   understanding that your company only sells
13   corticosteroids that are made by FDA regulated
14   pharmaceutical companies?
15       A.    That is correct.
16             MR. TARDIO:  Object to the form.
17       Q.    (By Mr. Nolan)  And have you serviced
18   customers who have inquired about the source of the
19   drugs?
20       A.    Yes.
21       Q.    Now, I'd like to talk with you for a minute
22   about the supply of methylprednisolone acetate back in
23   2011 and 2012.
24       A.    Uh-huh (affirmative).
25       Q.    And whether your company could have

Page 27

1    supplied that particular medicine.  Could your company
2    have supplied that particular medicine,
3    methylprednisolone acetate, to the St. Thomas
4    Outpatient Neurosurgical Center throughout 2011 and
5    2012?
6        A.    Yes.
7        Q.    All right.  And is there any doubt in your
8    answer in that regard?
9        A.    Well, your question was could we supply
10   methylprednisolone acetate.
11       Q.    Yes.
12       A.    And, yes, we could.
13       Q.    Okay.  Were there any shortages of that
14   medicine during that time frame?
15       A.    During that time frame in 2011, there was
16   an FDA approved manufacturer by the name of Sandoz
17   that made methylprednisolone acetate, and there also
18   was an FDA approved manufacturer by the name of Pfizer
19   who made Depo-Medrol, which is methylprednisolone
20   acetate.  And during 2011, 2012, we always had one of
21   those two in stock.
22       Q.    Okay.  All right.  And so if it -- if St.
23   Thomas Outpatient Neurosurgical Center had wanted to
24   procure let's say 500 vials of methylprednisolone
25   acetate each and every month during the 2011-2012 time

Page 28

1    frame, would your company have been able to supply
2    them with that medicine?
3        A.    Yes.
4        Q.    Now, did the price of that medicine
5    fluctuate during that time period?
6        A.    During -- during 2011, Sandoz informed us
7    that they were going to be exiting the market.  Sandoz
8    is the company that made the generic to Depo-Medrol,
9    and so we had a limited inventory and so we weren't
10   discounting the product as much as if we had a lot of
11   supply.
12       Q.    Okay.  And so I would like for you to
13   assume that there's been testimony in this case that
14   in June of 2011 your company increased the price of
15   MPA from $6.49 for an 80-milligram vial to $8.95,
16   which is an increase of $2.46 cents a vial, I believe.
17             Does that sound correct to you?
18       A.    That may have been correct.  I'm not
19   positive about that.
20       Q.    All right.  Well, let me show you an
21   exhibit that we've already marked in this case, which
22   is Exhibit No. 30.  And this contains several invoices
23   to the St. Thomas Outpatient Neurosurgical Center and
24   let me first -- if you look in the bottom right-hand
25   corner, the exhibits are numbered, and look at Page

1  No. 10, the tenth page, which is STOPNC0173 is how
2  it's labeled.
3      A.   Okay. It's an invoice here.
4      Q.   Okay. And do you see there for
5  methylprednisolone acetate a price of $6.49?
6      A.   Yes.
7      Q.   Okay. And then let's look at the twelfth
8  page. Is that another invoice for your company?
9      A.   It is.
10     Q.   All right. And that's an invoice in June,
11  June the 9th of 2011. Do you see that?
12     A.   Yes.
13     Q.   And so what's the price of that particular
14  invoice?
15     A.   $8.95.
16     Q.   So the previous invoice was from May 13th
17  of '11 where you charged $6.49, but then in June of
18  2011, the price went up to $8.95. Do you see that?
19     A.   Yes.
20     Q.   Okay. So what was the reason for that
21  price increase?
22     A.   The reason for that price increase was
23  because there was a limited supply of
24  methylprednisolone acetate from Sandoz. They were
25  exiting the market. There was, however, plenty of

1  methylprednisolone acetate by Pfizer.
2      Q.   Okay. And so --
3      A.   And I can --
4      Q.   -- to make sure I understand your
5  testimony, the limited supply referred to the generic
6  MPA manufactured by Sandoz; is that correct?
7      A.   Right.
8      Q.   But the brand name MPA, Depo-Medrol, made
9  by Pfizer was not in limited supply; is that true?
10     A.   Correct.
11     Q.   And is there any difference between the
12  generic and the brand name as far as you know other
13  than price?
14     A.   I don't know of any difference between the
15  two products as far as patient benefits. I only know
16  that the price might be a difference.
17     Q.   Okay. And so when your company realized
18  there might be a restriction on the supply of the
19  generic but not the brand name MPA, what did your
20  company do?
21     A.   Would you repeat that, please.
22     Q.   When your company recognized that there
23  would be a restriction in the supply of the generic
24  but not the brand name MPA --
25     A.   Uh-huh (affirmative).

1      Q.   -- what did your company do?
2      A.   We were not -- we did not really give
3  discounts as much --
4      Q.   I see.
5      A.   -- as we did in the past. Because we knew
6  we were going to run out of the product.
7      Q.   And so did your company ever run out of
8  Depo-Medrol?
9      A.   No.
10     Q.   So were there any customers that your
11  company had to turn away because it did not have an
12  adequate supply of Depo-Medrol?
13     A.   I do not -- I am not aware of one customer.
14     Q.   So am I correct in understanding that if
15  St. Thomas Outpatient Neurosurgical Center had chosen
16  to continue doing business with your company, you
17  could have supplied them with plenty of Depo-Medrol,
18  but the price would have been a little bit higher than
19  what that entity had been previously paying for the
20  generic version?
21     A.   Yes.
22         MR. TARDIO: Object to the form.
23         THE WITNESS: I think that I have the
24     price here, and it looks like it would be
25     $9.95 a vial.

1      Q.   (By Mr. Nolan) Okay. And what are you
2  referring to?
3      A.   I'm referring to our catalog price in the
4  fall of 2012.
5      Q.   And I'd like to make that particular
6  catalog -- we'll make the catalog -- the entire
7  catalog Exhibit No. 281. We'll copy that during a
8  break.
9         Now, what about after the fungal meningitis
10  catastrophe became public in October of 2012? When
11  that news hit the press, did your company experience
12  an upsurge in demand for FDA approved corticosteroids?
13     A.   Yes.
14     Q.   Okay.
15     A.   Our -- our phones were ringing off the
16  hook.
17     Q.   Okay.
18     A.   People were wondering, okay, where they
19  could get FDA approved product. They were calling
20  with all sorts of questions.
21     Q.   And --
22     A.   That was kind of like 2001 and the World
23  Trade Center for us.
24     Q.   Okay.
25     A.   I mean, you remember where you were at.

Page 33

1    Q.    And so was there an increased demand for
2  Depo-Medrol?
3    A.    Absolutely.
4    Q.    All right.  Did your company ever run out
5  of Depo-Medrol during that busy time?
6    A.    No, we did not.
7    Q.    In addition to Depo-Medrol, are there other
8  injectable corticosteroids appropriate for use in
9  epidural steroid injections that you sell?
10    A.    Let me give a little bit more information
11  to the last question --
12    Q.    Okay.
13    A.    -- if I could, which was did we ever let
14  anybody run out.
15         If -- let's say during that time there's a
16  good possibility -- let's say somebody ordered 2,000
17  vials of Depo-Medrol single dose vials, we might have
18  said, well, okay, how many do you use in a month.
19  They say they use 200 in a month.  We might have given
20  them a partial order so that other people could get
21  the product, but we did not let anybody run out.
22    Q.    I see.  Okay.  Fair enough.
23         And in addition to Depo-Medrol, are there
24  other injectable corticosteroids that your company
25  sells?

Page 34

1    A.    Yes.
2    Q.    Are there other corticosteroids appropriate
3  for use in epidural steroid injections that your
4  company sells?
5    A.    None of the products are indicated for
6  epidural steroid injections so we don't promote it for
7  that.
8    Q.    I see.
9    A.    But there are other steroids that people
10  could have used.
11    Q.    All right.  And so what other steroids does
12  your company sell that customers could have used for
13  epidural steroid injections?
14    A.    We sell all FDA approved corticosteroids.
15  So it would be Kenalog, it would be Celestone,
16  Celestone is a generic, betamethasone.  There was
17  Aristospan at that time.  There was dexamethasone at
18  that time.  So whatever other steroid there was that
19  had FDA approval, we would have.
20    Q.    Okay.  And none of those other steroids
21  that your company sold were made by compounded
22  pharmacies; is that true?
23    A.    No.  Every product that's ever been in our
24  company, a requirement to go through our doors and for
25  us to order for them to get checked into inventory is

Page 35

1  that it has to be FDA approved.
2    Q.    Okay.  And now, the single dose vials of
3  Depo-Medrol that your company had on hand in 2011 and
4  2012 --
5    A.    Uh-huh (affirmative).
6    Q.    -- were those what are known as
7  preservative-free?
8    A.    Yes.
9    Q.    Okay.  So if St. Thomas Outpatient
10  Neurosurgical Center had come to your company during
11  either of those two years and said we want single dose
12  preservative-free methylprednisolone, you could have
13  supplied it to St. Thomas Outpatient Neurosurgical
14  Center?
15    A.    Yes.
16         MR. TARDIO:  Object to the form.
17         THE WITNESS:  Now, the formulation --
18    let me add to that a bit.
19    Q.    (By Mr. Nolan)  Sure.
20    A.    In the formulation of the preservative-free
21  methylprednisolone acetate, there's also polyethylene
22  glycol and myristyl-gamma-picolinium chloride.
23    Q.    Okay.
24    A.    Some people consider that a preservative,
25  but it's not considered a preservative to my

Page 36

1  understanding in what the pain management physicians
2  were using as far as a danger, a neurotoxin.
3    Q.    Okay.  So --
4    A.    It was benzyl alcohol that people were
5  afraid of as being a neurotoxin.
6    Q.    Okay.  So -- so to be more clear, then, if
7  St. Thomas Outpatient Neurosurgical Center had said we
8  want methylprednisolone acetate that is free from
9  benzyl alcohol in a single dose vial, could your
10  company have supplied to them?
11    A.    Yes.  It may have had to be Depo-Medrol and
12  not a generic, but we would supply them.
13    Q.    All right.  And so the Depo-Medrol that you
14  could have supplied to them was made by what company?
15    A.    Pfizer.
16    Q.    And so how many years has your company sold
17  corticosteroids that -- some of which were used in
18  epidural steroid injections?
19    A.    We have sold corticosteroids since 1987.
20    Q.    And so that would be for the last
21  how many years?
22    A.    About 28 years, yeah.
23    Q.    And so what would be your best estimate of
24  how many vials of injectable corticosteroids your
25  company has sold over the years?

Page 37

1      A.   Millions.
2      Q.   And were all of those steroids made by FDA
3  approved or regulated drug manufacturers?
4      A.   Absolutely.
5      Q.   And were all of those steroids FDA
6  approved?
7      A.   Absolutely.
8      Q.   Were any of them from compounding
9  pharmacies?
10     A.   Never.
11     Q.   And how many times have you learned that
12 corticosteroids that you sold caused patients to
13 contract fungal meningitis?
14     A.   Never.
15     Q.   And how many times have you learned that
16 corticosteroids that you sold were contaminated with
17 lethal germs?
18     A.   Never.  We report all adverse reactions to
19 the FDA and we didn't get any reports of anything like
20 that.
21          MR. NOLAN:  Let's take a short break.
22          VIDEOGRAPHER:  We're off the record
23 and the time is -- the time is 9:51 a.m.
24          (A recess was taken.)
25          VIDEOGRAPHER:  We're back on the

Page 38

1          record and the time is 10:02 a.m.
2  EXAMINATION
3  BY MR. TARDIO:
4      Q.   Mr. Ebel, my name is Chris Tardio.  I
5  represent a group of Tennessee clinic defendants
6  including STOPNC and also represent Dr. Culclasure and
7  Nurse Schamberg.  I represent some other clinics in
8  Tennessee, but for purposes of this deposition, I
9  think most of my questions will focus on STOPNC and
10 Ms. Schamberg.  Do you understand who I am --
11     A.   Yeah, I do.
12     Q.   -- and who I represent?
13     A.   I don't know -- I've never heard of STOPNC.
14     Q.   Well, how did they refer to it when you
15 dealt with them, St. Thomas outpatient Neurosurgical
16 Clinic?
17     A.   As St. Thomas -- St. Thomas Outpatient
18 Neurosurgery.
19     Q.   Okay.  So you just never heard of the
20 acronym or the shortened version STOPNC; is that
21 right?
22     A.   Correct.
23     Q.   Okay.  Well, that's who I represent and
24 when I say STOPNC, I mean St. Thomas Outpatient
25 Neurosurgical Clinic; okay?

Page 39

1      A.   Okay.
2      Q.   Now, have we ever met before?
3      A.   No.
4      Q.   Before today?
5          Have we ever discussed this case or these
6  issues?
7      A.   No, not that I'm aware of.
8      Q.   Have you met face to face with either
9  Mr. Nolan or somebody from his office?
10     A.   Yes.
11     Q.   How many times?
12     A.   Once.
13     Q.   When was that?
14     A.   A week ago.
15     Q.   How did that come about?  Did he call you?
16 Did you call him?  Was it after you got the subpoena?
17 How did it come about?
18     A.   I was being deposed and he asked if I could
19 come down and talk with him.  In fact, I sat right
20 here.
21     Q.   And did you meet face to face with
22 Mr. Nolan to talk --
23     A.   Yes.
24     Q.   -- about the issues that we've talked about
25 today?

Page 40

1      A.   Yes.
2      Q.   How long did that meeting last?
3      A.   About -- a little over an hour.
4      Q.   Okay.
5      A.   Probably maybe about two hours.
6      Q.   Is there anything that you discussed in
7  that meeting that we haven't discussed here today?
8      A.   Not that I'm aware of.
9      Q.   Anybody else involved in the meeting?
10     A.   There was his assistant.
11     Q.   Okay.  Any other lawyers that you know of?
12     A.   No.
13     Q.   Do you recall when we requested several
14 years ago -- it may have been less than several years
15 ago -- to meet with you face to face?
16     A.   No.  I recall someone, an attorney calling
17 our office and I returned a call, but I don't recall.
18 I never met with anybody.
19     Q.   Would it surprise you if our recollection
20 is that we requested to meet with you face to face and
21 you weren't willing to do it?
22     A.   No, that wouldn't surprise me at all.
23     Q.   Okay.  Is that because -- why?  Why would
24 that not surprise me?
25     A.   Because I really wasn't wanting to get

Page 41

1    involved in the case.
2        Q.   Why were you willing to meet with Mr. Nolan
3    and his assistant a week ago?
4        A.   I was subpoenaed.
5        Q.   Well, you understand that the subpoena is
6    to come for the deposition today, right, not
7    necessarily to come for a meeting?  Do you understand
8    that?
9        A.   Yes.
10       Q.   Okay.  So my question is:  Why were you
11   willing to informally meet with Mr. Nolan and his
12   assistant a week before the deposition?
13       A.   He asked.  He talked with my attorney and
14   my attorney said he thought it would be okay.
15       Q.   Okay.  Who represents you?
16       A.   My attorney name is Robert Pautienus.
17       Q.   How do you spell that?
18       A.   P-A-U -- you would have to ask that,
19   wouldn't you?
20       Q.   This is coming the day after the spelling
21   bee.
22       A.   P-A-U-T-I-E-N-U-S.
23       Q.   And where is Mr. Pautienus?
24       A.   He is at 216 Centerview Drive, Suite 317.
25       Q.   In?

Page 42

1        A.   Brentwood, 37027.
2        Q.   And he is not with you here today; right?
3        A.   Correct.
4        Q.   Okay.  I want to start by talking a little
5    bit about your -- some of this -- let me back up and
6    give you some context.  I'm going second in my
7    questions, so I'm going to be jumping around a little
8    bit, trying to fill in some gaps, asking you about
9    some new areas.  So if you don't understand my
10   question or if I've gone from one topic to another and
11   it's just too confusing or I've asked a bad question,
12   can I rely on you to stop me and have me ask it again
13   or ask it a different way?
14       A.   Yes, absolutely, feel free.
15       Q.   If you do answer my question, I'm going to
16   assume that you understood it and I'm going to rely on
17   that answer; is that fair?
18       A.   Yeah.
19       Q.   Let me show you something that we printed
20   off your website that is -- we'll mark it as the next
21   exhibit.  So this will be Exhibit 281 to the
22   deposition.  This is either the front page or one of
23   the front pages of your website, the "about us" page.
24   You recognize that?
25           (Exhibits 281A and 281B were marked

Page 43

1        for identification.)
2           THE WITNESS:  Yes.
3        Q.   (By Mr. Tardio)  And does this come from
4    your website?
5        A.   Yes.
6        Q.   And let me just go ahead and mark the next
7    numbered exhibit, 282, which is STOPNC849 and 850.
8    And these kind of go together or at least will for
9    purposes of my questions.
10          Do you recognize Exhibit 282 as the first
11   two pages of your spring 2012 catalog?
12          (Exhibit 282 was marked for
13       identification.)
14          THE WITNESS:  Yes.
15       Q.   (By Mr. Tardio)  Are these the types of
16   materials both on the web and in the catalog that you
17   provide to customers to educate them on your company?
18       A.   Yes.
19       Q.   And if we look at -- for instance, if we
20   look at the page from the website, you tell customers
21   "Clint Pharmaceuticals is one of the most reliable
22   sources of injectable pharmaceuticals in the United
23   States."
24          That's kind of the first sentence of the
25   intro sentence; right?

Page 44

1        A.   Yes.
2        Q.   You talk about your manufactures meet or
3    exceed all applicable state and federal regulations;
4    right?
5        A.   Yes.
6        Q.   And utilize state of the art manufacturing
7    techniques; true?
8        A.   Yes.
9        Q.   And that your suppliers or your
10   manufacturers employ highly experienced and qualified
11   scientists and technicians; is that right?
12       A.   Yes.
13       Q.   Is one of the goals of providing this
14   information to prospective customers that they will
15   buy from you and think you're a reliable supplier?
16       A.   We are a reliable supplier.
17       Q.   Right.  And that's what you're trying to
18   convey to both customers and potential customers
19   through these types of materials; right?
20       A.   Yeah.
21       Q.   Do you expect that your customers will rely
22   on those things?
23       A.   They do.
24       Q.   And when you put this stuff in your website
25   and in your catalog, you expect that they will; right?

Page 45

1     A.   Yes.
2     Q.   And it's reasonable for them in your view
3  to assume that you're telling the truth and making
4  fair representations; true?
5     A.   Yes.
6     Q.   Let me ask you -- actually, it may be part
7  of what I just gave you.  Let me see that.  On
8  STOPNC850, which is the second page of the catalog I
9  just passed you, there's a section titled value.  It's
10  the next page.
11     A.   Uh-huh (affirmative).
12     Q.   You see what I'm talking about?  You talk
13  about or you state in the catalog, "At Clint
14  Pharmaceuticals, we understand and are very much aware
15  of the current price-conscious atmosphere in the
16  medical arena."
17          Do you see that?
18     A.   Yes.
19     Q.   What does that mean?
20     A.   The value.
21     Q.   Yeah, what does that statement mean, the
22  statement, "At Clint Pharmaceuticals, we understand
23  and are very much aware of the current price-conscious
24  atmosphere in the medical arena"?  What does that
25  mean?

Page 46

1     A.   That means that there is a current
2  price-conscious atmosphere in the medical arena.
3     Q.   What does that mean?  What's a
4  price-conscious atmosphere in the medical arena?
5     A.   That means a lot of people are -- look at
6  the prices and are aware of what things cost.
7     Q.   And when you say a lot of people, what are
8  you referring to?  You're referring to healthcare
9  providers?
10     A.   Yes.
11     Q.   Has that always been the case -- let me ask
12  a better question.
13          You started in I think you said '86 or '87;
14  right?
15     A.   Yes.
16     Q.   So you've been doing this for almost
17  30 years; true?
18     A.   We've been in business for almost 30 years.
19     Q.   Has that changed over the 30 years, that
20  price or cost of medications for your customers has
21  become a more important consideration?
22     A.   I think it has become more and more
23  important as the years go by, yes.
24     Q.   Why is that?
25     A.   It's my understanding that there is less

Page 47

1  and less reimbursement by insurance companies, by
2  government providers.
3     Q.   And is that what you're referring to
4  generally when you talk about the current
5  price-conscious atmosphere in the medical arena, that
6  there's less reimbursement so over the course of the
7  last 30 years in your experience providers have become
8  more and more price conscious?
9     A.   Yeah, you could assume that.
10     Q.   Okay.  Is it standard for your customers
11  when you interact with them and sell them drugs for
12  them to consider price in whether or not they're going
13  to buy from you?
14          MR. NOLAN:  Object to the form.  Go
15     ahead.
16          THE WITNESS:  Is it standard for
17     customers to look at the price?
18     Q.   (By Mr. Tardio)  Uh-huh (affirmative).
19     A.   Yes.
20     Q.   And has that been the way that the
21  customers that you do business with have operated
22  since you started in 1986 up through today, that when
23  they're dealing with you and deciding whether to buy,
24  price is a consideration?
25     A.   That's one aspect.

Page 48

1     Q.   Okay.  Do you have any customers that don't
2  care about price at all that you know of?
3     A.   Yes.
4     Q.   What's the percentage?
5     A.   Not very much.
6     Q.   So fair to say that the vast majority of
7  your -- of your customers when they purchase
8  medication from you, part of the dynamic in deciding
9  whether or not to buy from you is price; right?
10     A.   Part of the dynamic of buying from me I
11  believe would be price.
12     Q.   Okay.  And that is the reason or one of the
13  reasons why in your marketing materials and the
14  catalog you say, hey, we're aware that price is a
15  consideration or we're very much aware of the current
16  price-conscious atmosphere and that's something we're
17  going to work with you on, value; right?
18     A.   Uh-huh (affirmative).  Yes.
19     Q.   Now, this is a different page of a
20  different catalog, so let me mark it as a separate
21  Exhibit 283.  It's STOPNC879.  It's a page out of the
22  fall/winter 2013 catalog.  Another part of going
23  second is you're probably not going to use all the
24  documents you came with, so you have to kind of
25  shuffle through.

Page 49

1    So this is STOPNC879.  It's marked
2    Exhibit 283 and it is Page 20 and 21 of your fall 2013
3    catalog.  So I'll pass it to you and just ask first
4    whether you -- while Matt passes it out, I'll just ask
5    you whether you recognize it?
6        (Exhibit 283 was marked for
7        identification.)
8        THE WITNESS:  Fall of 2013, yes.
9    Q.    (By Mr. Tardio)  And on Page 20, do you
10   talk about some of the conferences that Clint is going
11   to be at?
12   A.    Yes.
13   Q.    Why is that part of the marketing materials
14   that you send to customers?  Why do you say, hey,
15   we're Clint, we're going to be at these various
16   conferences in 2013-2014?
17   A.    If they want to see us in person.
18   Q.    Do you interact with healthcare providers
19   at these conferences?
20   A.    Yes.
21   Q.    What is the goal or the reason that Clint
22   decides to go to these different conferences?
23   A.    They get to meet us.
24   Q.    So the reason that Clint goes to these
25   various conferences is so that you can interact with

Page 50

1    healthcare providers, tell them about your business;
2    right?
3    A.    Yes.
4    Q.    Explain some of these things that we see on
5    the website and in the catalog, value, your
6    background, who you buy from, what you do, things like
7    that?
8    A.    Yeah.
9    Q.    And do you expect in interacting with these
10   customers and potential customers that at these
11   conferences that they will rely on what you tell them?
12   A.    Yes.
13   Q.    Let me ask it a better way.  Do you expect
14   that these customers and potential customers at these
15   conferences will assume you're telling them the truth?
16   A.    Yes.
17   Q.    And that's important to you as both a
18   business person and a supplier of a product, that you
19   want to make sure when you make representations to
20   people you're telling them the truth; right?
21   A.    Yes.
22   Q.    What -- and is there -- we talked about or
23   there was a question or two about the FASCA,
24   freestanding ambulatory surgery center conference.  I
25   didn't see it on this list and I don't think you

Page 51

1    recognized the name or the acronym.  So tell me how
2    does Clint decide which -- which conferences it's
3    going to attend?
4    A.    We have a meeting and we get the year's
5    conferences that we know of --
6    Q.    But what --
7    A.    -- together and we decide which ones we're
8    going to attend.
9    Q.    What are the criteria you use?  In other
10   words, are you going to go to ones that involve just
11   pain physicians, are you going to go to ones that
12   involve just ambulatory surgery centers, ones that
13   involve just hospitals?  What's the criteria?
14   A.    The criteria would be do we think it would
15   be an effective conference for us.
16   Q.    Based on your experience, why do healthcare
17   providers attend these conferences?
18   A.    They get credits.
19   Q.    They --
20   A.    They get educational credits.
21   Q.    Okay.  Any other reasons?
22   A.    They get to see other physicians.
23   Q.    Any other reasons?  What about the vendors?
24   Do they get to see the vendors?
25   A.    They get to see the vendors.

Page 52

1    Q.    Based on your experience at these various
2    conferences, do healthcare providers interact with
3    you?
4    A.    Yes.
5    Q.    Who goes from Clint?  Is it actually you?
6    A.    I've gone to many of them.
7    Q.    Okay.  Do healthcare providers interact
8    with you and ask questions about your business?
9    A.    Yes.
10   Q.    Ask questions about your business
11   practices, how you do business, things like that?
12   A.    Yes.
13   Q.    Do you hand out materials at these
14   conferences?
15   A.    We would hand out these catalogs.
16   Q.    But as far as the FASCA or freestanding
17   ambulatory surgery center conference, you don't know
18   whether you've ever displayed there or you're pretty
19   certain you haven't?
20   A.    That particular one that you just named,
21   I'm not familiar with them.
22   Q.    Okay.  And the reason we ask is there's
23   been some testimony about that conference in these
24   cases.  So I'm not pulling it out of thin air.  But as
25   far as FASCA is concerned, that's not an acronym or

Page 53

1    entity that you're familiar with; right?
2        A.   No.  Who runs it?
3        Q.   I'm not sure.  I'm not sure.  I think it's
4    an association of ambulatory surgery centers.
5        A.   Okay.
6        Q.   Let me shift gears a little bit and ask you
7    about something that you talked about earlier.  Well,
8    let me ask you first about the catalog.  We talked a
9    little bit about the catalog.  Do you know when STOPNC
10   or St. Thomas Outpatient began buying from Clint?
11       A.   Well, according to these invoices on
12   Exhibit 30, I think the earliest is in 2011.
13       Q.   Do you have any independent recollection of
14   your business having a relationship with STOPNC prior
15   to 2011?
16       A.   They could have purchased from us.  I
17   don't -- I don't know.  I don't have that record in
18   front of me.
19       Q.   What would that record be?  How would
20   you -- do you have a computer system?  Do you have
21   paper invoices?  If we had to determine when your
22   relationship with STOPNC began, what would we do or
23   what would you do?
24       A.   I'd go to our system and see when they
25   started doing business with us.

Page 54

1        Q.   But for purposes of our discussion,
2    whenever they began -- well, let me back up.
3        What I think you told us earlier, tell me
4    if this is wrong, that you send out catalogs to
5    surgery centers that you consider to be privately held
6    as kind of a marketing tool; right?
7        A.   Yes.
8        Q.   And whether that included STOPNC prior to
9    the time they were a customer, don't know, right,
10   whether they were on your distribution list?
11       A.   I don't know.  Let's say there was a
12   physician who purchased from us in the past and
13   happened to go to St. Thomas and do the procedures,
14   they would get our catalogs.
15       Q.   Do you have a list or do you keep a list?
16       A.   Of?
17       Q.   Your distribution list for the catalogs.
18       A.   No.  We don't keep a list of everybody we
19   dispute to, no.  We rent a list, so we can't keep it.
20       Q.   Okay.  So as we sit here today, tell me if
21   I have this right, generally speaking, Clint
22   Pharmaceuticals distributes catalogs to ambulatory
23   surgery centers that it believes are privately held
24   and not hospital affiliated; right?
25       A.   Yes, and unless a customer in the past, if

Page 55

1    there's somebody in there that's been a customer in
2    the past, they would automatically get our catalog.
3    When we produce these catalogs, a lot of times we'll
4    produce a couple hundred thousand of them, okay, so
5    there's a lot of catalogs that go out --
6        Q.   Right.
7        A.   -- and could get in the hands of a lot of
8    different people.
9        Q.   But as for specifically STOPNC, as we sit
10   here today, prior to the time they became a customer,
11   you can't say one way or the other whether they would
12   have received a catalog; right?
13       A.   Yes, I don't know that.
14       Q.   From the time they became a customer,
15   whenever that was, they would have received a
16   catalog --
17       A.   Yes.
18       Q.   -- is that right?
19       Would they receive -- do you know from
20   either independent recollection or any documents you
21   you've reviewed how Clint came to be a supplier for
22   STOPNC, how the relationship began?
23       A.   I do not know.
24       Q.   Who did the dealing with STOPNC?  Was it
25   your son?

Page 56

1        A.   Clint, yes.
2        Q.   Okay.
3        A.   I believe he set the account up.
4        Q.   Okay.  We'll look at some e-mails.  He's on
5    some e-mails which made me think he was the contact
6    person.
7        A.   Yeah.
8        Q.   How is that -- how does that work at your
9    business?  Is one person designated to deal with a
10   particular customer?  How does that work?
11       A.   At that time, he was designated to deal
12   with St. Thomas.
13       Q.   Okay.  Was he designated to deal with St.
14   Thomas Outpatient Neurosurgical Center?
15       A.   I believe that's correct.
16       Q.   So if STOPNC had a question about a Clint
17   order or ordering from Clint, he would be their point
18   of contact?
19       A.   Correct.  They may have called customer
20   service and if they had something -- a problem or
21   something, the customer service may have worked it
22   out, but then if it was anything significant, it would
23   go to Clint.
24       Q.   Okay.  And that -- and again, I'm not --
25   it's not a -- I promise it's not a trick question.

Page 57

1    But generally speaking, he would have been their point
2    of contact?
3        A.   Yeah.
4        Q.   You mentioned a few other corticosteroids
5    that Clint supplies:  Betamethasone, Aristospan,
6    dexamethasone.  Do you remember that testimony?
7        A.   Yes.
8        Q.   Just for purposes of clarification, these
9    are not the same drugs as methylprednisolone acetate,
10   right, they're different drugs; true?
11       A.   They're different drugs, but they're
12   considered to do the same thing.
13       Q.   They're different drugs, but they are used
14   for the same purpose; is that right?
15       A.   Often.  We don't determine how they use it,
16   but it has -- they have the same mechanism of action.
17       Q.   And that's basically what I'm getting at.
18   From your perspective, you don't make the decision for
19   the physician which medication they're going to use;
20   right?
21       A.   No, that's a call that only a physician can
22   make.
23       Q.   Sure.  And if the physician for whatever
24   clinical reason prefers to use methylprednisolone
25   acetate instead of betamethasone or dexamethasone,

Page 58

1    that's their call; right?
2        A.   He has the license --
3        Q.   And --
4        A.   -- to practice medicine.
5        Q.   And he may have good reason for that;
6    right?
7        A.   Yes.
8        Q.   These drugs, in your experience, even
9    though they're used for the same purpose, in this case
10   epidural steroid injections, they have different
11   active ingredients in cases; right?
12       A.   Uh-huh (affirmative).
13       Q.   Yes?
14       A.   Yes.
15       Q.   You just gotta give us yes and no.
16       A.   I'm sorry.  Yes.
17       Q.   That's fine.  They may have different
18   properties, some may be longer acting, shorter acting;
19   right?
20       A.   It could be, yes.
21       Q.   In other words, there could be reasons why
22   a physician would choose to use methylprednisolone
23   acetate versus one of these other corticosteroids that
24   you described; true?
25       A.   Yes, they have their reasons.

Page 59

1        Q.   And that wouldn't be something you would
2    interfere with based on his training versus -- his
3    training and role in this transaction --
4        A.   Right.
5        Q.   -- versus yours.
6        A.   It's not up to us to tell them, you know,
7    this is what you must use.
8        Q.   And in fact, I'm sure over the course of
9    your career, you've dealt with physicians or clinics
10   that prefer a certain drug versus another drug that
11   may do the same thing; right?
12       A.   That could be the case, yes.
13       Q.   I mean, that -- am I correct in saying that
14   has happened --
15       A.   Yeah.
16       Q.   -- over the course of your career --
17       A.   Uh-huh (affirmative).
18       Q.   -- that a physician will call and say, I
19   want methylprednisolone acetate or I want whatever,
20   and you or your sales rep says, well, we don't have
21   that or this is the price for that, but we can get you
22   these other three that are in the same class and he
23   says, no, I want to use the former?
24           MR. LEADER:  Object to the form of
25       the question.

Page 60

1        Q.   (By Mr. Tardio)  Does that happen?
2        A.   We try to work with our physicians.
3        Q.   Right, but my question is simply:  Does it
4    happen that sometimes the physician prefers one drug
5    over the other?
6        A.   Yeah, certainly.
7        Q.   Let me see if I can circle back and
8    understand what you were telling us about, the
9    preservative in Pfizer methylprednisolone, Pfizer
10   Depo-Medrol.
11           Is Pfizer Depo-Medrol preservative-free?
12       A.   It's benzyl alcohol free.  Benzyl alcohol
13   is the preservative that, generally speaking, in pain
14   management physicians would like to avoid, not all
15   physicians, but some.
16       Q.   What is the preservative that is in Pfizer
17   Depo-Medrol, whether or not you think that physicians
18   are or should be worried about it?  What is the
19   preservative that's actually in there?
20           MR. CLAYTON:  Objection to the form.
21           THE WITNESS:  Which Pfizer
22       Depo-Medrol are you talking about?
23       Q.   (By Mr. Tardio)  What do you mean?  Which
24   size?
25       A.   Yeah.  For both the name brand and the

Page 61

1  generic product, you have different formulations and
2  there is five different --
3      Q.   Okay. Let's talk about the 80-milligram.
4  The one that -- the MPA that you were supplying to
5  STOPNC.
6      A.   Yes.
7      Q.   What is the preservative that is in the
8  Pfizer version?
9          MR. NOLAN: Object to the form.
10     Q.   (By Mr. Tardio) Single dose vial.
11     A.   The Pfizer version is the same as the
12  generic FDA approved version.
13     Q.   Okay. Does it have a preservative in it?
14     A.   There is possibly a preservative, not a
15  preservative that's known to be a neurotoxin, but
16  myristyl gamma picolinium chloride.
17     Q.   And so it has a preservative in it, but
18  based on your understanding, physicians aren't worried
19  about the preservative that's in it?
20         MR. LEADER: Objection to form.
21         MR. CLAYTON: Objection to form.
22     Q.   (By Mr. Tardio) You can answer if
23  understand the question.
24     A.   It's not something that is -- comes to us
25  as a concern of physicians.

Page 62

1      Q.   Would you defer to pain physicians on
2  whether or not it's appropriate to be concerned about
3  the picolinium in MPA or Pfizer Depo-Medrol?
4          MR. NOLAN: Object to the form.
5          THE WITNESS: I don't understand the
6      question.
7      Q.   (By Mr. Tardio) Sure. I mean, is it
8  within your training and expertise to know whether or
9  not the preservative that's actually in MPA in Pfizer
10  Depo-Medrol, the picolinium is neurotoxin?
11         MR. LEADER: Object to the form.
12         THE WITNESS: I don't know.
13     Q.   (By Mr. Tardio) Do you feel that you're
14  trained, based on education, training and experience,
15  to render an opinion on whether picolinium is a
16  neurotoxin or would you defer to a pain management
17  physician on that?
18     A.   I always refer to -- the physician has more
19  training than I do, so I always refer to them.
20     Q.   Okay.
21     A.   It's up to them to do what they want to do.
22     Q.   Do you know whether Teva or Sandoz could
23  provide a -- could provide MPA without the picolinium
24  in it?
25     A.   They could if they want to get -- they

Page 63

1  would have to get FDA approval. They're an FDA
2  approved manufacturer. So if they -- if they were
3  wanting to get the product without particular -- or
4  change a formulation, they would have to get approval
5  for that.
6      Q.   And I probably asked a bad question. Do
7  you know whether generic MPA without picolinium in it,
8  with no benzyl alcohol, no picolinium was available
9  from Teva or Sandoz in 2011 or 2012?
10     A.   My understanding is that some of these
11  preparations in here that you're referring to is more
12  of an emulsifier and allows a product to go into
13  suspension.
14     Q.   Okay.
15     A.   And so if you took something out like that,
16  you would really endanger the properties of the
17  product.
18     Q.   Well, setting aside why the preservative is
19  in there, my question is simply whether Teva and
20  Sandoz supplied a true picolinium-free benzyl
21  alcohol-free product in 2011 and 2012 that you know
22  of?
23     A.   Not that I'm aware of, no. It would have
24  to be FDA approved if they were to do that.
25     Q.   Same with Pfizer? Do you know whether they

Page 64

1  had a benzyl alcohol-free, picolinium-free version of
2  Depo-Medrol available in 2011, 2012?
3      A.   I -- no. It would have to be FDA approved
4  and there was nothing FDA approved like that.
5      Q.   Okay. So as far as you know, in 2011,
6  2012, if a physician or pain management clinic came to
7  you and said, we know you can provide us MPA or
8  Depo-Medrol with -- without benzyl alcohol but it has
9  picolinium in it, and they asked, can you get us MPA
10  or Depo-Medrol without the picolinium in it, without
11  any preservative at all, could Clint have done that?
12         MR. NOLAN: Object to the form.
13         MR. LEADER: Object to the form of
14     the question.
15         THE WITNESS: No one ever did that
16     because no one ever had a problem with that
17     that I'm aware of.
18     Q.   (By Mr. Tardio) My question is not whether
19  anybody did it. My question is whether Clint could do
20  that, whether that was something you could go out and
21  get for them.
22     A.   It had FDA approval, we could, but it
23  didn't have FDA approval so we would not.
24     Q.   Okay. What do you do to get the Tennessee
25  Board of Pharmacy license that you have? Do you have

1    to -- does the Board of Pharmacy come inspect?
2        A.    Yes.
3        Q.    Did they come inspect when you first became
4    licensed?
5        A.    Yes.
6        Q.    Do you remember that?
7        A.    Yes.
8        Q.    What -- what did it entail?
9        A.    Well, this was, like, 28 years ago.
10       Q.    Well, that's why I asked you whether you
11   remembered it.
12       A.    Well, I met the inspector and introduced
13   myself to him.  He -- you know --
14       Q.    Looked around?
15       A.    He looked around, yeah.
16       Q.    Asked you some questions?
17       A.    Yeah.
18       Q.    Are there inspections after that?
19       A.    Yes.
20       Q.    How frequently does the board inspect you?
21       A.    Usually about once a year, sometimes it's
22   gone a little bit over a year.  If -- you know, I
23   think they probably would come out if they ever
24   suspected anything.  I would hope that they would.
25       Q.    Sure.  Is your expectation that if a

1    problem arises with Clint, the board will come check
2    it out?
3        A.    I believe that the board is there to work
4    with the industry and, yes, I would want them to do
5    that.
6        Q.    Sure.  Is your expectation that if Clint is
7    doing something it shouldn't be doing, the board will
8    take some action?
9        A.    I would hope so.
10       Q.    And do you consider that part of the
11   licensure process, that the board has authority over
12   you to do something to your business if you're doing
13   something --
14       A.    Yes.
15       Q.    -- you shouldn't be doing?
16       A.    Yeah, they have authority over me.
17       Q.    Do you, in -- so just explain it to me.  Is
18   it a license that was granted in 2000 -- or in 1986 or
19   '87, whatever it was, is it automatically renewed or
20   do you have to go through the process each year?
21       A.    They inspect you all the time and you need
22   to be able to pass your inspection.
23       Q.    Do you have to submit any written materials
24   on a yearly basis, reapply or fill out forms or how
25   does it work?

1        A.    I don't -- I don't --
2        Q.    Somebody else --
3        A.    I'm not sure because I have somebody else
4    doing that.
5        Q.    Who handles that in your office?
6        A.    We have a company that is in charge of our
7    licensing that gets the renewals.
8        Q.    Okay.  Who is that?  Is that like a
9    contract --
10       A.    License Logic.
11       Q.    Okay.  Do you know if New England
12   Compounding Company was licensed in Tennessee?
13       A.    As?
14       Q.    As anything.
15       A.    I don't know.
16       Q.    Would it surprise you to know they were
17   licensed by the Board of Pharmacy?
18             MR. NOLAN:  Object to the form.
19       Q.    (By Mr. Tardio)  The Tennessee Board of
20   Pharmacy.
21       A.    No.
22       Q.    Why not?  Why would that not be surprising
23   to you?
24       A.    Because in order to come into this state,
25   you need to be licensed.

1        Q.    Did you know anything about New England
2    Compounding Pharmacy or New England Compounding Center
3    before this outbreak?
4        A.    Yes.
5        Q.    What did you know about them?
6        A.    They would go to some of the trade shows we
7    were at.
8        Q.    What trade shows did you see them at or did
9    you know they were there?
10       A.    Well, let's see here.  I think they went to
11   all of the ones that are listed in this Exhibit 283,
12   and there could have been some that they didn't go to.
13   I don't keep track of their schedule.
14       Q.    I didn't ask whether you kept track of
15   their schedule.  I just asked you whether you knew
16   anything about it.
17       A.    We would frequently see them at the trade
18   shows.
19       Q.    What would they be doing at the trade
20   shows?  Displaying -- did they have a booth?
21       A.    Yes.
22       Q.    Same -- same type of setup you had?
23       A.    Yes.
24       Q.    Did they hand out materials or do you know?
25       A.    I don't know.

Page 69

1    Q.    Did you ever interact with any of their
2 salespeople or reps or anybody who was at any of these
3 trade shows?
4    A.    Yes.
5    Q.    Tell me about that, what you remember about
6 it.
7    A.    Well, we would typically tell them or
8 companies like them or physicians is that if their
9 product was as good as the FDA approval product, why
10 don't they get FDA approval.
11    Q.    So you -- did you have that discussion with
12 the NECC salesperson?
13    A.    I don't recall having that particular
14 discussion, but that's basically what we would tell
15 physicians.
16    Q.    My question isn't necessarily --
17    A.    And if we had interaction with them, we
18 would -- that would be a typical thing we would say.
19    Q.    Okay.  Well, let me ask a better question
20 then.  Do you remember having any interactions with
21 anybody associated with NECC?
22    A.    Nothing specific.
23    Q.    Do you remember generally having
24 interactions with them?
25    A.    Yeah.

Page 70

1    Q.    Tell --
2    A.    There might be a, you know, down the hall
3 with the -- you know, with their booth.
4    Q.    Is the extent of your general recollection
5 of interactions with NECC the fact that they were at
6 these trade shows?  Is that kind of the extent of --
7    A.    Yeah, I knew that they were there.
8    Q.    Were they in a special section for
9 compounding pharmacies at the trade shows, or were
10 they --
11    A.    No.
12    Q.    -- mixed in with everybody else?
13    A.    They were mixed in with everybody else.
14    Q.    Did you ever go to the organizers of these
15 conferences and say, hey, I don't think these people
16 are safe, you need to look at them before you give
17 them a booth next year?
18    A.    Not specifically like that.
19    Q.    Okay.  Well, did you ever go generally to
20 any of the organizers of these conferences and voice
21 your concerns about compounding pharmacies?
22    A.    I don't know.
23    Q.    Let me -- I should have said this at the
24 beginning of the deposition.  We're taking the
25 deposition of Clint Pharmaceuticals.  Some of these

Page 71

1 questions, you're the -- you're the president or
2 whatever -- the co-owner, I guess you told us.  So
3 some of these questions are probably directed at Clint
4 Pharmaceuticals.  So did anybody at Clint that you
5 know of interact with NECC other than the general
6 recollection of interactions you just told us about?
7    A.    Not that I'm aware of.
8        MR. LEADER:  Object to the question
9    to the extent it's outside the scope of the
10    notice.
11    Q.    (By Mr. Tardio)  Did you have any specific
12 concerns about New England Compounding Company based
13 on what you saw at these trade shows?
14    A.    I had concerns about all the illegally
15 compounding companies.
16    Q.    Did you have any specific concerns about
17 New England Compounding Center other than the general
18 concern we've talked about today about compounding
19 pharmacies and not being FDA approved?
20    A.    There were a lot of compounding companies
21 doing similar things as New England and I had concerns
22 about all of them.
23    Q.    Were there a lot of compounding companies
24 at these trade shows?
25    A.    Yes.

Page 72

1    Q.    Did you see physicians and representatives
2 from clinics interacting with these compounding
3 pharmacies at the trade shows?
4    A.    I saw physicians interacting with the
5 compounding companies, yes.
6    Q.    Okay.  Did you consider them to be a
7 competitor of yours?
8    A.    Yes, in some -- in some respects they
9 were -- they were -- they were portraying the -- their
10 product to compete with our products.
11    Q.    In some instances, you would be competing
12 with them for business; right?
13    A.    Uh-huh (affirmative).  Yes.
14    Q.    Including New England Compounding Center;
15 true?
16    A.    Yes.
17    Q.    And other compounding companies that were
18 doing the same thing that New England Compounding was
19 doing; right?
20    A.    Right.
21    Q.    What are some of the other compounding
22 companies that were doing the same thing that New
23 England was doing, 2011, 2012 time frame that you were
24 aware of?
25        MR. NOLAN:  Object to the form.  Go

Page 73

1    ahead.
2         THE WITNESS:  There were a lot of
3    compounding companies across the United
4    States that were doing similar things as
5    New England.
6         Q.    (By Mr. Tardio)  Okay.  What are some of
7    them?
8         A.    You'd have to pull the records of these
9    societies and see who they were renting booths to to
10   get exactly who they were.
11        Q.    Okay.  And I'm not talking about specific
12   to these conferences.  I'm just talking about your
13   recollection, what were some of the other compounding
14   companies that were --
15        A.    I think --
16        Q.    Let me get the question out so it's on the
17   transcript.
18        -- that were, to use your phrase, doing the
19   same thing that New England Compounding was doing?
20        MR. LEADER:  Object to the form.
21        THE WITNESS:  I don't recall exactly
22   their names, but there were a lot of them.
23        Q.    (By Mr. Tardio)  Do you know of any
24   compounding company other New England Compounding
25   Center by name?

Page 74

1         A.    There were, like, Custom Compounding.  If I
2    were you, I'd get the records from the societies who
3    they were renting booths to.
4         Q.    Well, what society here listed is the -- is
5    there a leading society that is in your field that
6    you're going to every year?
7         A.    They're all about the same.  But you
8    could -- there's ISIS.  There's SPPM.  There's ASRA.
9    There's NANS.  There's quite a few in there.  I would
10   say if you were to get the records on those who they
11   rented booths to, you'd probably find out a lot of
12   different compounding pharmacies in there.
13        Q.    Okay.  My question is simply if you know of
14   any or knew of any.
15        A.    I knew it was a problem.
16        Q.    Did you know of any other compounding
17   companies, compounding pharmacies?
18        A.    I can't recall the names right now.
19        Q.    Is Clint licensed by the DEA?
20        A.    We do not carry controlled substances.
21        Q.    So is that no, you don't have to have it?
22        A.    No, we do not.
23        Q.    Do you know if NECC was licensed by the
24   DEA?
25        A.    I do not know.

Page 75

1         Q.    I want to look at -- well, we're going to
2    look at some e-mails in a minute from your company to
3    my clients, but let me talk first about shortages in
4    general.  In 2011-2012, were shortages of drugs a
5    problem in the -- I think you called it the medical
6    arena, for lack of a better word?
7         MR. NOLAN:  Object to the form.
8         THE WITNESS:  I'd have to know
9    specifically what drugs you're talking
10   about.
11        Q.    (By Mr. Tardio)  Were shortages of
12   corticosteroids a problem?
13        A.    We had -- Sandoz was -- told us that they
14   were going to exit the market in 2011 and they had the
15   generic to Pfizer's Depo-Medrol and so we were going
16   to run out of that product --
17        Q.    Okay.
18        A.    -- at some point.
19        Q.    And even speaking more generally, were
20   shortages of corticosteroids a problem, not
21   necessarily just methylprednisolone acetate, but were
22   shortages of this class of drugs --
23        A.    No.
24        Q.    -- a particular problem?
25        A.    Not for us.

Page 76

1         Q.    What about across the country, do you know?
2         A.    I can't speak for them, for other...
3         Q.    Do you think shortages of pharmaceutical
4    drugs are a serious problem in the public health?
5         MR. NOLAN:  Object to the form.
6         THE WITNESS:  I don't feel like I'm
7    in a position to answer that.
8         Q.    (By Mr. Tardio)  Why not?
9         A.    Because I deal with a very narrow range of
10   injectable products and there's a lot of
11   pharmaceuticals that are out there that could have or
12   could not have shortages that I wouldn't be aware of.
13        Q.    Do you believe that shortages of sterile
14   injectable drugs are a serious problem for public
15   health?
16        MR. NOLAN:  Object to the form.
17        THE WITNESS:  It could be.
18        Q.    (By Mr. Tardio)  Well, based -- based on
19   your experience dealing with sterile injectables over
20   the years, have you had discussions with physicians
21   about shortages of those drugs?
22        A.    Yes.  Yes.
23        Q.    Is that a topic that comes up on a regular
24   basis?
25        A.    No.

Page 77

1    Q.    Who's -- can you name me the physicians
2  that you've talked to about shortages of sterile
3  injectable drugs, let's say in the last -- since 2011?
4    A.    If a physician asked us about, like, a
5  shortage, we usually report to them whether or not we
6  have product in stock and what they could expect from
7  us.
8    Q.    How frequently does that happen that a
9  physician or clinic will ask you about a shortage of a
10 particular drug?  Is that something that happens once
11 a year, once a decade, or is that something that
12 happens almost every day?
13   A.    They ask us a lot.  We're more known -- we
14 are known to have products when other people do not.
15 We're known to keep large inventory.
16   Q.    Has the issue of shortages in sterile
17 injectables become more prevalent over the course of
18 your 30-year career -- 30 years or so?
19   A.    Yeah, it's off and on.
20   Q.    In 2011-2012, was it more on or more off?
21   A.    It was fairly normal for us in that we did
22 not run out of the corticosteroids.
23   Q.    Based on your narrow experience or your
24 narrow niche in the drug supply business -- you may
25 not know the answer, so just tell me if you don't --

Page 78

1  but are sterile injectable drugs more often affected
2  by shortages than other drugs?
3        MR. CLAYTON:  Objection to the form.
4        THE WITNESS:  I don't know.
5    Q.  (By Mr. Tardio)  What causes shortages?
6        MR. NOLAN:  Object to the form.
7        THE WITNESS:  A lot of what causes
8    shortages is increased regulations, I
9    believe.
10   Q.  (By Mr. Tardio)  Tell me what you mean by
11 that.  Increased regulations by whom, of whom?
12   A.    If, like, let's say an FDA inspector sees
13 something that is of concern to them, they raise a bar
14 by which the product can be manufactured.  So the
15 manufacturing company has to increase the standards by
16 which the product is made and it can create a
17 shortage.
18   Q.    Okay.
19   A.    If the manufacturer is unable to -- to meet
20 the FDA specifications, they can't produce the
21 product.
22   Q.    It's supply and demand issue; right?  If it
23 supply goes down, you could potentially have a
24 shortage; true?
25   A.    Right.

Page 79

1    Q.    Or presumably if demand goes up and supply
2  can't meet the demand, you can have a shortage; true?
3    A.    You could.
4    Q.    Or if both act in concert, supply goes
5  down, demand goes up you could have a shortage; true?
6    A.    Yes.
7    Q.    And like you said, regulators could impact
8  a supplier's ability to put a drug into the market;
9  right?
10   A.    Yes.
11   Q.    And that could cause the supply, generally
12 speaking, to go down; true?
13   A.    Yes.
14   Q.    Could lead to a shortage; true?
15   A.    Uh-huh (affirmative).
16   Q.    A drug maker could stop making the drugs
17 for financial reasons, for whatever, and that could
18 lead to a supply problem; true?
19   A.    Yeah.  It effectively stops them if they
20 can't meet the new regulation, they can't make -- meet
21 it, then the product doesn't go out in the market.
22   Q.    In some cases -- and in some cases if the
23 drug is not profitable for whatever reason, the drug
24 maker will just stop making or make less of it and
25 that --

Page 80

1    A.    Right.
2    Q.    -- could impact the supply --
3        MR. LEADER:  Object to the form of
4    the question.
5    Q.  (By Mr. Tardio)  That could impact the
6  supply; true?
7    A.    Correct.
8        MR. LEADER:  Lack of foundation
9    objection.
10   Q.  (By Mr. Tardio)  Can we agree that
11 generally when there is a shortage of a drug, the
12 price will go up?
13   A.    By supply and demand, yes, that could
14 happen.
15   Q.    And that's in part because the supply of
16 the drug cannot be guaranteed; right?
17       MR. NOLAN:  Object to the form.
18       THE WITNESS:  I don't know of anybody
19   who can guarantee supplies of drugs.
20   Q.  (By Mr. Tardio)  Well, and that's
21 particular -- particularly true when there's less
22 supply out there; right?
23       MR. NOLAN:  Object to the form.
24       THE WITNESS:  It makes sense.
25   Q.  (By Mr. Tardio)  And I -- these questions

Page 81

1    are general. I'm sure there are exceptions to every
2    rule. But what I'm trying to do is talk a little bit
3    about generally how the market works. And you'll
4    agree that when the supply goes down, generally the
5    price will go up; true?
6        A.    It can happen.
7        Q.    And so generally speaking, when there's a
8    shortage, the price of the drug is probably going to
9    go up; true?
10           MR. CLAYTON: Objection to the form.
11           THE WITNESS: In the case that we're
12       talking about, the generic -- the supply --
13       the generic manufacturer was exiting the
14       market.
15       Q.    (By Mr. Tardio) Uh-huh (affirmative).
16       A.    And so the alternative would be the name
17   brand product and that was a more expensive product by
18   about $2.
19       Q.    Okay. That's not my question. My question
20   is, generally speaking, when we're talking about the
21   market that we're describing, when the supply goes
22   down of not necessarily MPA, but any drug, generally
23   speaking, the price is going to go up; true?
24       A.    Yeah, and the reverse is true too.
25       Q.    If you have an oversupply of the drug in

Page 82

1    the market --
2        A.    Yeah.
3        Q.    -- people are going to be able to get it
4    cheaper; true?
5        A.    Yes.
6           MR. NOLAN: Object to form.
7        Q.    (By Mr. Tardio) Have you ever had a
8    situation in your -- with your business where you
9    couldn't supply a drug at all because of a shortage, a
10   supply problem?
11       A.    We had a case in about 2004 of Celestone
12   Soluspan, not being able to supply that product --
13       Q.    Is that --
14       A.    -- during those years.
15       Q.    Is that an injectable steroid?
16       A.    Yes.
17       Q.    When was that?
18       A.    It was around the -- 2003 to about 2005.
19       Q.    Have you had instances over the years where
20   because of a supply problem you had to increase the
21   price of a drug for a customer?
22       A.    Yes.
23       Q.    Does that happen on a fairly regular basis
24   that the price will go up or down depending on the
25   supply?

Page 83

1        A.    Not -- not dramatic. It hasn't recently
2    dramatically, no.
3        Q.    Okay. Well, over the course of your
4    career, have there been instances where the price has
5    gone up and down --
6        A.    Sure.
7        Q.    -- based on --
8        A.    Manufacturers take price increases.
9    There's a -- I mean, yes.
10       Q.    Have you had instances over the years in
11   the course of your career where the -- where the
12   supply affected the price of the drug and the customer
13   couldn't buy it anymore from you at that price?
14       A.    I don't understand the question.
15       Q.    Have you had customers over the years
16   switch from you because of a price issue or say, we --
17   I'm sorry, Mr. Ebel, we just can't buy that at that
18   price?
19           MR. CLAYTON: Objection to the form.
20           THE WITNESS: Yes.
21       Q.    (By Mr. Tardio) I mean, that happens in
22   business; right?
23       A.    Yeah. I mean, these are basic economic
24   questions you're asking me.
25       Q.    Sure. And that's -- that's -- that's a

Page 84

1    basic economic principle, basic business principle
2    that over the years you've had customers who couldn't
3    pay the price that you were charging for the drug,
4    right, or unwilling to?
5        A.    Yeah.
6        Q.    Is shortage or a shortage different than
7    backorder?
8        A.    They're almost one and the same.
9        Q.    And in your experience, when you hear those
10   terms, do you use them interchangeably when -- a drug
11   on shortage or a drug on backorder?
12       A.    Well, I can give you a scenario.
13       Q.    Sure.
14       A.    Let's say there was an injectable drug that
15   a manufacturer came to us and said, listen, we won't
16   have any more -- we won't be able to supply you any
17   more product until September 1st, and you get a
18   customer that wants to order and they want to order a
19   six-month supply. We would try to ask the customer to
20   get enough to last until the manufacturer can resupply
21   us.
22           And so we would backorder let's say half
23   the product or a certain amount of the product so that
24   they can get through the shortage and yet we could
25   conserve the product. So we would have methods in

1    place to make sure that people got product.
2         Q.    So if I'm understanding this correctly, a
3    backorder situation can occur when there is a
4    shortage?
5         A.    Yes.
6         Q.    Again, we've been talking about some of
7    these general market principles, general business
8    principles, but is it reasonable for your customers to
9    think that when there is a shortage the price is going
10   to go up?
11             MR. NOLAN: Object to the form.
12             THE WITNESS: No, it's not -- not
13        necessarily.  I mean, we don't just raise a
14        price because there's a shortage.
15        Q.    (By Mr. Tardio)  Okay.
16        A.    We don't do that.
17        Q.    What are the other factors that go into
18   raising a price?
19        A.    The manufacturers go up in price.
20        Q.    So the price you're paying for the product
21   is going up?
22        A.    Right.
23        Q.    Generally speaking, is it -- do you raise
24   the price of all drugs when there is a shortage,
25   not -- that's a bad question.

1         Do you raise the price of the drug every
2    time it's short?
3         A.    No.
4         Q.    What factors go into whether or not you're
5    going to raise the price?
6         A.    What the product costs us.  That's one of
7    the factors.
8         Q.    Okay.
9         A.    I mean, what the competition is charging,
10   that's a factor, supply and demand.
11        Q.    Is it reasonable for customers -- your
12   customers to think that when there is a shortage that
13   there's a supply issue?
14             MR. LEADER:  Object to the form.
15             MR. NOLAN:  Object to the form.
16             THE WITNESS:  Usually if there's a
17        shortage, there is a supply issue.
18        Q.    (By Mr. Tardio)  And that's something you
19   would expect your customers to assume when they hear
20   there's a shortage of the drug or a drug, that there's
21   a supply issue out there; right?
22             MR. LEADER:  Object to the form.
23             THE WITNESS:  Yeah.
24             MR. NOLAN:  Object to the form.
25        Q.    (By Mr. Tardio)  Let's look at some e-mails

1    that have been produced in this litigation.  I should
2    have asked you earlier.  Other than the catalogs you
3    brought and the inventory sheet that you brought, did
4    you bring any other materials with you today?
5         A.    I did not.
6         Q.    Have you reviewed any other materials to
7    prepare for the deposition?
8         A.    Such as?
9         Q.    Anything.  Any e-mails, internal Clint
10   documents.  Did Mr. Nolan supply you with any
11   documents?
12        A.    I think I've seen an e-mail with Clint and
13   somebody at St. Thomas Neurosurgery Center.
14        Q.    When did you see that?
15        A.    About a week ago.
16        Q.    Did you see it during your meeting?
17        A.    I saw the same e-mail probably a few weeks
18   ago.
19        Q.    Okay.  What was the -- was the context
20   about a week ago when you were meeting with --
21        A.    Yeah.
22        Q.    -- Mr. Nolan?
23        A.    I think I reviewed it then.
24        Q.    Did he show you just one e-mail and y'all
25   talked about it?

1         A.    It was an e-mail thread, yeah.
2         Q.    Do you remember what it was and what the
3    date was?  We'll look at a few and you may recognize
4    it.  Do you remember what it was about?
5         A.    It was something about the price.  I think
6    there was someone where they objected to us raising
7    the price and we gave them a refund or something of
8    that nature.
9         Q.    Did you look at any other document with
10   Mr. Nolan during that meeting or at any other time?
11        A.    I don't think so.
12        Q.    Then you said you looked at the e-mails a
13   few weeks ago.  What was the context of that?
14        A.    When I got the deposition -- when I was
15   subpoenaed.
16        Q.    Okay.  Did you go back and do a search of
17   your e-mails to look -- look to see what
18   communications your company had had with STOPNC?
19        A.    Yeah.  With St. Thomas, yes.
20        Q.    Well, do you understand that St. Thomas
21   Hospital and St. Thomas Outpatient Neurosurgical
22   Clinic are two separate entities?
23             MR. NOLAN:  Object to the form.
24             THE WITNESS:  I'm sorry?
25        Q.    (By Mr. Tardio)  That they're two separate

Page 89

1    entities, the hospital and the outpatient
2    neurosurgical center?
3        A.   No.  I don't know who owns them.
4        Q.   Okay.  Well, do you consider them to be the
5    same thing or do you consider them two separate
6    entities?
7        A.   The hospital and the neurosurgery center, I
8    consider them to be separate.  I mean, we have them as
9    a separate account.
10       Q.   Okay.  When you say you went back and
11   looked at e-mails with St. Thomas, I was just not sure
12   whether when you were saying you went back and looked at
13   e-mails with the hospital or e-mails with STOPNC.
14       A.   The surgery center.
15       Q.   Did Clint sell to St. Thomas Hospital?
16       A.   I don't think so.
17           (Exhibit 284 was marked for
18        identification.)
19       Q.   (By Mr. Tardio)  I'm going to hand you what
20   we've marked as Exhibit 284.  And I'm sure you'll --
21   you may not recognize this specifically, but you'll
22   know obviously what it is.  So just tell us what this
23   document is.
24       A.   It's an invoice.
25       Q.   And what's the date of it?

Page 90

1        A.   6/9/11.
2           (Exhibit 285 was marked for
3        identification.)
4        Q.   (By Mr. Tardio)  Let me mark as the next
5    numbered exhibit Exhibit 285, and we'll look at these
6    together.  Tell me what that is and what the date is.
7        A.   5/13/11.  It's an invoice.
8        Q.   Okay.  What is it an invoice for, what
9    drug?
10       A.   On the 11 -- 5/13/11, Celestone Soluspan
11   and methylprednisolone acetate.
12       Q.   And then what about the 6/9/11 invoice?
13       A.   It was methylprednisolone acetate and the
14   generic to Celestone Soluspan, betamethasone acetate
15   75.
16       Q.   If we look at the 5/13/11 invoice, St.
17   Thomas Outpatient Neurosurgical Center ordered 300
18   units of methylprednisolone acetate; right?
19       A.   Yes.
20       Q.   At $6.49 a unit?
21       A.   Yes.
22       Q.   $6.49; is that right?
23       A.   Yes.
24       Q.   And then if we look at the 6/9/11 invoice
25   marked Exhibit 285, STOPNC ordered 400 units of the

Page 91

1    same drug and the price is $8.95; right?
2        A.   Yes.
3        Q.   Do you consider that to be a significant
4    price increase?
5        A.   Yes.
6        Q.   Look at the writing on Exhibit 285.  You
7    see on the left -- lower left there's some handwritten
8    notes?  Let me ask this:  Have you ever seen these
9    documents before?
10       A.   I think they're here.
11       Q.   Okay.  So they may be in the package you
12   were already shown?
13       A.   Yeah.  Yeah.
14       Q.   Okay.  Before that, had you --
15       A.   It's a duplication of this.
16       Q.   Okay.  Before that, did you look at these
17   documents to prepare for the deposition?
18       A.   Well, both of these are our invoices, so I
19   could have seen these before.
20       Q.   Well, the difference being that they have
21   some notes from the client on them; right?
22       A.   Yes, I see those notes.
23       Q.   Okay.  Have you ever seen the invoices with
24   the notes on them before -- before today?
25       A.   I may have seen it last Friday when I came

Page 92

1    here.
2        Q.   If we look at Exhibit 285, the 6/9/11
3    invoice, you'll see where somebody has noted -- I'll
4    represent to you to Debra Schamberg -- price increase,
5    dash, looks like $2.47 or $2.49 vial due to shortage,
6    exclamation point; right?
7        A.   Yes.
8        Q.   Is that based on -- looking at these two
9    invoices, does that describe the increase from 5/13/11
10   to 6/9/11?
11       A.   Yes.
12           MR. CLAYTON:  Objection to the form.
13       Q.   (By Mr. Tardio)  Was it common that in --
14   when ordering a medication, the customer will have a
15   conversation with somebody at Clint?
16       A.   Was it common?
17       Q.   Yeah.
18       A.   Yeah.
19       Q.   To have a --
20       A.   They usually would call on the phone, yeah,
21   absolutely.
22       Q.   So let's assume hypothetically that --
23   well, let me ask this:  I'll represent to you that Ms.
24   Schamberg testified that she had a conversation with
25   somebody at Clint around this time and she was told

Page 93

1  that the price increase was due to a shortage.  Do you
2  have anything to dispute that testimony?
3          MR. LEADER:  Object to the form.
4          MR. NOLAN:  Object to the form.  Go
5   ahead and answer.
6          MR. LEADER:  It's outside the scope
7   of this notice.  Objection.
8     Q.   (By Mr. Tardio)  They're just objecting --
9  making objections for the record.  If you understand
10  the question, you can answer.
11     A.   I believe that during this -- in between
12  these two time periods, the manufacturer told us they
13  were going to cease manufacturing.  They were going to
14  exit the market.
15     Q.   Okay.
16     A.   Okay?
17     Q.   And my question is simply:  If Debra
18  Schamberg testified that around this time she had a
19  conversation with somebody at Clint and they said,
20  yes, the price did go up --
21     A.   Yes.
22     Q.   -- and that's due to a shortage, would --
23     A.   Yeah.
24     Q.   -- does that -- would that be inconsistent
25  with anything you know about how your business runs or

Page 94

1  anything you know specifically about that?
2          MR. CLAYTON:  Objection to the form.
3          THE WITNESS:  That sounds right.
4          MR. TARDIO:  I tell you what, we'll
5   take a quick break.  He's going to change
6   the tape.  We can take a five-minute
7   bathroom break and then walk through a few
8   of these e-mails.
9          THE WITNESS:  Okay.
10          VIDEOGRAPHER:  This is the end of
11   Tape No. 1.  We're off the record and the
12   time is 11:10 a.m.
13          (A recess was taken.)
14          VIDEOGRAPHER:  Here begins Tape No. 2
15   in the deposition of Jeff Ebel.  We're back
16   on the record and the time is 11:22 a.m.
17          (Exhibit 286 was marked for
18   identification.)
19     Q.   (By Mr. Tardio)  I passed you during the
20  break what I marked as Exhibit 286, and now I'm
21  thinking that we may be -- we may have two 286s.  What
22  were the last two numbered exhibits you have?  Those
23  two.
24     A.   284, 285.
25     Q.   Okay.  So we're good.  The next numbered

Page 95

1  exhibit is 286, which I handed to you during the
2  break.  It's Bates stamped STOPNC312 and 313, and it's
3  an e-mail chain that starts June 15th, 2011, 8:42 a.m.
4  and it goes through June 20th, 2011, 1:27 p.m.; right?
5     A.   Yes.
6     Q.   And did you have a chance to look through
7  it?
8     A.   I did.
9     Q.   Have you seen this before?
10     A.   I believe I have, yes, sir.
11     Q.   Is this probably the e-mail chain you
12  looked at last week --
13     A.   Yeah.
14     Q.   -- with Mr. Nolan?
15     A.   Yes, sir.
16     Q.   Okay.  And Clinton Ebel is your son, we've
17  mentioned earlier; right?
18     A.   Yes.
19     Q.   It says medical sales specialist.  What
20  does that mean?  What's his position?
21     A.   That's his title.
22     Q.   What's he do?  What's his job duty?
23     A.   He was a salesperson.
24     Q.   Does he still work there?
25     A.   Yes.

Page 96

1     Q.   Same position?
2     A.   No.
3     Q.   What does he do now?
4     A.   He's in charge of our IT.
5     Q.   So at this time, he was essentially a
6  salesperson for your company?
7     A.   Yes.
8     Q.   And in interacting with Debra Schamberg at
9  STOPNC, he would have been doing so as an employee and
10  representative of Clint Pharmaceuticals; true?
11     A.   Yes.
12     Q.   Let's just see if we can walk through this
13  e-mail exchange and understand what was going on.
14  First e-mail, June 15th, 2011, at 8:42 a.m. Debra
15  writes asking a question about essentially why is the
16  price going up?
17     A.   Why the price increase, yeah.
18     Q.   And is that -- if we look at the time frame
19  and the numbers in the -- that she cites in her
20  e-mail, is that referring to the increase that we
21  looked at from 5/13 to 6/9?
22     A.   Yes.
23     Q.   And then she says, "When asked about the
24  reason for this sudden jump, we were told it was due
25  to supply and demand."  Does that -- is that

Page 97

1   consistent with what you would expect --
2       A.   Yes.
3       Q.   -- somebody from your company to say?
4          Something to that effect?
5       A.   Yes.
6       Q.   And I'm doing it just as much as you are.
7   We need to try not to talk over each other so she can
8   type it up; okay?
9          And then she asks, "Is this something -- or
10  is this to be expected anytime we place an order with
11  your company?  Pricing depends on supply and demand,
12  question mark"; correct?  That's kind of her last
13  question in the e-mail.
14      A.   Yes.
15      Q.   And then Clint -- is it Clint or Clinton?
16  What does he go by?
17      A.   Clint.
18      Q.   Clint Ebel, your son, responds.  Took him a
19  little bit of delay to get back, but he apologizes and
20  then says, "We are currently experiencing a shortage
21  as you probably know."
22          Do you know why he would say "as you
23  probably know"?
24      A.   I do not.
25      Q.   But he clearly relays to Ms. Schamberg that

Page 98

1   "we," being Clint Pharmaceuticals, is currently
2   experiencing a shortage; true?
3       A.   Yes.
4       Q.   And then the next sentence, "The reason for
5   the price increase is to somewhat control our
6   inventory."
7          What does that mean?
8       A.   Well, like, for example, we were told that
9   Sandoz was going to be exiting the market.  So you
10  have -- there's not going to be any more inventory of
11  that product.  So there's a potential for someone to
12  come in and buy up all your inventory and then you
13  can't supply anybody --
14      Q.   Okay.
15      A.   -- because your inventory is gone.
16      Q.   Did you inventory MPA from Teva too?
17      A.   They were not in the market at that time.
18      Q.   So based on your recollection, Teva was not
19  producing generic MPA around June 2011; right?
20      A.   That is correct.
21      Q.   And then his -- after he says, "The reason
22  for the price increase is to somewhat control our
23  inventory," he says, "In a way we are trying to
24  discourage other customers from stockpiling product,"
25  which is basically what you just told me; right?

Page 99

1       A.   Yeah, you could get a customer that let's
2   say never did business before with you that would take
3   all your inventory away from you.
4       Q.   Is that a problem or that happens?
5       A.   It could be.
6       Q.   I mean, have you seen that happen in your
7   experience?
8       A.   Yeah.  If somebody knows that there's a
9   shortage, they go and take your inventory then you
10  don't -- you can't supply your other customers.
11      Q.   And if that is happening across the
12  spectrum of drug purchases for a particular drug, that
13  can affect supply too; right?
14      A.   Uh-huh (affirmative).  Yeah.
15      Q.   And it could -- it could cause situations
16  where you have shortages in one area of the country
17  and maybe not in another area of the country; true?
18      A.   Perhaps, yeah.  That's feasible.
19      Q.   Does that happen that drugs are short in
20  one area of the country and maybe another area of the
21  country they -- they're -- the supply has not been
22  affected?
23      A.   I don't know.  Our job is to make sure our
24  customers have inventory.
25      Q.   Okay.  Fair enough.  Then his next

Page 100

1   statement or the next paragraph in this e-mail is, "I
2   assure you I can hold to the price we agreed upon
3   before once the shortage is over."
4          So is he saying effectively that we can go
5   back to the $6.49 price or somewhere around $6.49 once
6   the shortage ends?
7       A.   Yeah.
8       Q.   "As of right now, I'm not allowed to give
9   any special pricing for the M-Pred for any customers."
10  He's saying because of the shortage he can't give the
11  $6.49 price?
12      A.   At that time.
13      Q.   And was the $6.49 price a special price for
14  STOPNC?
15      A.   I believe that normally they would have to
16  get 2,000 vials or 1,000, a lot more quantity to get
17  the $6.49 price.
18      Q.   So why were they given the $6.49 price?
19      A.   They were a good customer.
20      Q.   They'd have to buy 2,000 over -- in one
21  order?
22      A.   In one order, yeah.  I'm not sure about
23  that exact quantity --
24      Q.   Sure.
25      A.   -- but it may have been 1,000.  I think it

1   was 2,000, though.
2       Q.   So basically if we read Debra's e-mail and
3   the Clint Pharmaceuticals' response, Debra asks why is
4   the price going up, you're telling me it's because of
5   supply and demand and your sales representative
6   apologizes and says, it's a shortage and we can go
7   back to the old price after the shortage is over?
8           MR. CLAYTON:  Objection to the form.
9       Q.   (By Mr. Tardio)  Is that a fair summary of
10  kind of how we read the first e-mail in the response?
11          MR. CLAYTON:  Objection to the form.
12          THE WITNESS:  I think what happened
13      was that she answered you can control the
14      inventory by -- and stockpile by limiting
15      the amount of product you sell to your
16      customers.  Clint went to myself and said,
17      hey, listen, you know, St. Thomas
18      Neurosurgery is objecting to this price.
19          And so we lowered or -- we gave them
20      a refund or a credit or something to get
21      down to the $6.49 price as active goodwill
22      towards them.  They were a very good
23      customer of ours.  And in case, you know,
24      this price increase caught them by surprise
25      or something like that, that they were

1       unaware of, you know, just to make sure
2       there were no hard feelings.
3       Q.   (By Mr. Tardio)  Well, based on Debra's
4   e-mail, it does appear it caught her by surprise;
5   right?
6           MR. CLAYTON:  Objection to the form.
7           THE WITNESS:  I don't know that it
8       did catch her by surprise, but she -- she
9       did not like the price increase.
10      Q.   (By Mr. Tardio)  She was concerned about
11  the price going up?
12      A.   Yeah.  Yeah.  I mean, what I'm saying is I
13  don't know that she was -- was not told when she
14  ordered that it went up, but -- because we tried to
15  tell people.  It is possible that maybe she did order
16  it, she wasn't told.  Regardless of that, when she
17  objected we gave her the credit.
18      Q.   The -- you'll agree with me that at least
19  the first inquiry to Clint Pharmaceuticals, the
20  response is, sorry, you know, I apologize for the
21  price increase, but we're facing a shortage and the
22  reason for the increase is we're trying to control our
23  inventory; right?
24          MR. NOLAN:  Objection to the form.
25          MR. CLAYTON:  Objection to the form.

1           MR. LEADER:  Object to form.
2           THE WITNESS:  We were trying to get
3       them through this situation here.
4       Q.   (By Mr. Tardio)  Sure.  And then she
5   responds on June 20th, I guess the same day, "Thanks
6   for getting back to me.  You can control inventory and
7   stockpiling by limiting the amount of product you sell
8   your customers at one time."
9           Let me ask this question:  Was there any
10  belief on part of Clint Pharmaceuticals that STOPNC
11  was stockpiling product?
12          MR. CLAYTON:  Objection to the form.
13          THE WITNESS:  No.  Our objective
14      during a situation like this is to get the
15      customer through the shortage.
16      Q.   (By Mr. Tardio)  I understand that.  My
17  question is --
18          MR. CLAYTON:  I'm going to object to
19      you interrupting him.  He's answering the
20      question.
21      Q.   (By Mr. Tardio)  Go ahead.
22      A.   And so what this e-mail thread is doing is
23  it was an effort going to get the customer so that
24  they can get through the shortage.
25      Q.   Okay.  My question is simply:  Did Clint

1   Pharmaceuticals have any evidence that STOPNC was
2   stockpiling?
3       A.   We would not know that unless it was
4   revealed to us.  And to my knowledge, it wasn't
5   revealed to us.  So I don't think she -- you know, I
6   don't particularly think they were trying to do that.
7   There's some other invoices here where they were
8   ordering from other people, but we didn't know that at
9   the time.
10      Q.   So as we sit here today, you have no
11  evidence that STOPNC was stockpiling the product;
12  true?
13      A.   No, we don't have any evidence on that.
14      Q.   And her question to -- to -- to Clint is --
15  it's not really a question.  I guess it's a statement.
16  "You can control inventory and stockpiling by limiting
17  the amount of product you sell to your customers at
18  one time."
19          Can Clint Pharmaceuticals do that?
20      A.   That was her statement.  Our goal -- and
21  I'll repeat it again -- is to get the customer through
22  the situation of supplying them, okay, to make sure
23  that every time they need product, they have product.
24  That's -- that's what this e-mail thread is about.
25      Q.   I understand that.  And my question is --

Page 105

1    A.    And keep them in business.  They can't --
2  you can't run practice if you don't have product.
3    Q.    Can Clint limit the amount -- let me ask it
4  a different way.
5          Does Clint limit the amount of product
6  certain customers can buy when there is a shortage to
7  control inventory?
8    A.    Well, a common practice we would do in a
9  situation like this is, okay, Debra, how many vials do
10  you use in a month?  Let's say Debra says 100 or 300
11  or 500, whatever it is, we would try to limit them to
12  500 vials in a month.
13    Q.    Okay.
14    A.    Okay?
15    Q.    To eliminate the chance that they're
16  stockpiling; right?
17    A.    We have no control whether they're
18  stockpiling or not.  To make sure they have product
19  when their patients come through the door.  They can
20  buy from 50 different suppliers and do the same thing.
21  We're not acting as police agents as far as
22  stockpiling.  We have no control over that nor do we
23  try to have control on them stockpiling.  We're trying
24  to get them through the shortage.
25    Q.    And that's why you try to determine how

Page 106

1  many units they're actually using?
2    A.    Right.  Right.  So if they see 200 patients
3  a month, we try to get them to 200 vials or 200 doses
4  in that month to make sure that they're taken care of.
5    Q.    And that -- that helps you control your
6  inventory too; right?
7    A.    Yeah, that helps us be able to get other
8  people, you know -- if they're -- if they're using
9  200, we send them 200, whereas in a normal
10  circumstance if there wasn't a shortage, they might
11  order 1,000.
12    Q.    Right.
13    A.    Well, that's 800 that's out of inventory
14  that somebody else could be using on their patients.
15    Q.    Okay.  And then Clint Ebel responds,
16  "Debra, I definitely understand your point.  I'm going
17  to talk to my boss" -- is that a reference to you?
18    A.    Yes.
19    Q.    -- "and let him know your concerns.  Like I
20  said before, myself and the company as a whole values
21  your business.  If there's anything I can do, I'll let
22  you know."
23          Do you remember having a conversation with
24  your son around this time about this issue?
25    A.    I'm not sure.

Page 107

1    Q.    Okay.  Is that something that you and your
2  son would typically discuss, an issue like this?
3    A.    Yeah, and typically what we would want in a
4  situation like this is that Debra would not walk away
5  from the situation feeling like she was being taken
6  advantage of, that there was a surprise price
7  increase.  I mean, because her job is to, you know,
8  supply their clinic and do the best thing that she can
9  for her clinic and we want to assist her with that.
10    Q.    Okay.  Let's -- hopefully we're working in
11  chronological order.  So let's now look at STOPNC164,
12  which we'll mark as Exhibit 287.
13          MR. TARDIO:  Just for the record,
14    this is an invoice dated 6/9/11 that
15    reflects the -- it reflects a price of
16    $8.95 and it's got some notes on it.
17          (Exhibit 287 was marked for
18    identification.)
19    Q.    (By Mr. Tardio)  I want to ask you about
20  the notes.
21    A.    You're saying --
22    Q.    I've got it here.  It's the same invoice.
23  It's different handwritten notes by Debra.
24    A.    Oh, okay.
25    Q.    So you see where she has written -- or I'll

Page 108

1  represent to you it's Debra Schamberg's handwriting.
2    A.    Yes.
3    Q.    "6/15 e-mail Clint Ebel about 2.49 increase
4  per vial."  She writes that; right?
5    A.    Yes.
6    Q.    "6/21 spoke with Clint Ebel.  Will give
7  $6.49 pricing on this invoice.  Future invoices will
8  be $8.95."  You see that?
9    A.    Yeah.
10    Q.    Do you know whether she had a followup
11  phone conversation after that e-mail exchange with
12  Clint?
13    A.    You know, I do not know, sir.
14    Q.    Would that be inconsistent with the
15  business practices that she -- they would have a
16  conversation --
17    A.    Oh, yeah.
18    Q.    -- on the phone?
19    A.    Very easily.
20    Q.    And would it be inconsistent with the
21  business practices -- and I think we'll see it in the
22  next -- in the next changed order or invoice.  Would
23  it be inconsistent with Clint's business practices to
24  give the $6.49 pricing on this invoice, but say in the
25  future we're going to have to go up to the new price?

1      A.   Yes.  The reason why we want to do that is
2  so that that way Debra is not caught by surprise.  It
3  gives her a fair chance to try to find other products
4  somewhere else if she needs to or prepare herself that
5  now it's going to be $8.95.
6      Q.   So I think you said earlier it's almost an
7  act of goodwill.  I think that's the word you used?
8      A.   Yeah.
9      Q.   Business -- to help the business
10  relationship and to ensure she has product; right?
11     A.   Yeah.  Because, you know, you talk to these
12  people, you don't know if they -- what kind of
13  thinking they're -- going on in their mind.  They
14  think, well, gee, this company came and gave us this
15  price increase, you know.  You know, we're not really
16  trying to hurt them at all.  And so it's an act of
17  goodwill, yeah.
18     Q.   And that's the reason that Clint -- your
19  son, Clint, was willing to explain to Debra why the
20  price increase happened, right, so that she didn't
21  think you were just doing it for no reason?
22     A.   Yeah.
23          MR. CLAYTON:  Objection to the form.
24     Q.   (By Mr. Tardio)  You can answer.
25     A.   Yes.

1      Q.   The next exhibit we'll mark as 288, it is
2  an invoice dated 6/9/11.  The difference you'll see
3  is -- at least the difference in the typewritten part
4  is that the price is $6.49.  It's the last item in the
5  invoice.  You see that?
6          (Exhibit 288 was marked for
7          identification.)
8          THE WITNESS:  Yes.
9      Q.   (By Mr. Tardio)  And if you look at Debra's
10  handwriting, 6/23/11, which is kind of continuing in
11  chronological order, this invoice replaces previous
12  invoice on M-Pred 80 milligram per milliliter.  This
13  has correct pricing of $6.49, other invoice $8.95;
14  correct?
15     A.   Correct.
16     Q.   This is the next step in this act of
17  goodwill in saying, hey, we'll charge you $6.49 on
18  this one, but it's going to be $8.95 going forward;
19  right?
20     A.   Uh-huh (affirmative).
21     Q.   Yes?
22     A.   Yes.
23     Q.   Do you dispute that that is what happened?
24     A.   I don't dispute that.
25     Q.   That would be consistent with how Clint

1  does business; right?
2      A.   Yes.
3      Q.   Now, one thing I did want to ask you on
4  this, you see in the middle of the 6/9/11 invoice,
5  the -- I'll call it the replacement invoice,
6  there's -- and I don't know how your invoicing system
7  works, but it looks like you can maybe enter comments
8  in there.  "Ordered by Sandy by -- ordered by Sandy
9  with Rachel.  Your backorder will ship Friday."
10         Is that from Clint?  You see what I'm --
11  right in the very middle.
12     A.   On 288?
13     Q.   Yeah.
14     A.   Yeah, I see that there.
15     Q.   Okay.  Where does that come from?  Is that
16  something that's typed in?
17     A.   It would be manually typed in.
18     Q.   So is that a -- I don't know what to call
19  it -- a comment box or a box to put comments on the
20  invoice?
21     A.   Yes.
22     Q.   And who enters those -- the typewritten
23  comments?
24     A.   It says ordered by Sandy with Rachel.  So
25  somebody by the name of Sandy from St. Thomas ordered

1  it from our employee Rachel.
2      Q.   Okay.  What's Rachel's last name?
3      A.   Tyler.
4      Q.   She still there?
5      A.   No.
6      Q.   Do you know where she is or where she works
7  now?
8      A.   I don't know.
9      Q.   What was her role?  Simply to enter --
10     A.   Customer service.
11     Q.   Did she do anything other than process
12  these orders?
13     A.   No.
14     Q.   Did she have any decision-making authority
15  on price, inventory, anything like that?
16     A.   No, I'm -- it says "Pricing per Jeff/one
17  time only."  So I'm the one who authorized that price.
18     Q.   Okay.  "Pricing per Jeff, forward slash,
19  one time only, regular pricing until shortage is
20  over"?
21     A.   Right.
22     Q.   Jeff is referring to you; right?
23     A.   Yes.
24     Q.   So am I reading this correctly that you
25  approved the one time $6.49 price for this invoice and

1 then it would go to the $8.95 price until the shortage
2 is over?
3    A.   Right, but if you notice there, they were
4 ordering 400 vials.  I think our 2000 vial price was
5 $6.49.  I think we gave them a special price.
6    Q.   Okay.  And my question is simply:  Was --
7 does that reflect the decision by Clint to replace the
8 invoice and invoice them at $6.49 --
9    A.   Yes.
10    Q.   -- for this shipment, and it would go to
11 $8.95 until the shortage is over?
12    A.   Right.  Now, it looks like there's a note
13 here that says something about 2,000 vials at 7.49 or
14 something.  So Clint may have been trying to get them
15 to get through this situation and said, well, if you
16 want, you know, we still have so many vials, you want
17 to get 2,000 vials, if that would help you, you could
18 buy it at that price.
19    Q.   I did want to ask you about this.  It looks
20 like it's dated -- her note at least is dated 8/9/11,
21 which would have been --
22    A.   Yeah.
23    Q.   -- six weeks or so after this price change.
24 And I'll just read it so it's in the record.  "Spoke
25 with Clint.  He called me, stated we could order 2,000

1 vials at 7.49 or -- I think that's 7.98, but seven
2 something -- "stated, dash, national shortage, dash,
3 told him we were okay at moment and did not wish to
4 order.  Asked him to issue Marlese the credit, equals
5 $980."
6       Do you have any independent recollection of
7 this conversation with looks like probably with Clint
8 Ebel?
9    A.   No, I mean, it would have been Clint Ebel
10 that would have had the conversation.
11    Q.   Right.  But did he discuss it with you or
12 did you participate in the discussion?
13    A.   No, I don't have any recollection of that.
14    Q.   Would it be inconsistent with the way Clint
15 does business -- Clint Pharmaceuticals does business
16 for its sales rep to follow up with the customer after
17 four or six weeks and talk about pricing again?
18    A.   Well, his job was sales so he would be
19 doing his job by calling her or her calling him.
20    Q.   So this is not atypical for --
21    A.   No.
22    Q.   -- Clint Pharmaceuticals?
23    A.   From that note, it sounds like what Clint
24 was looking at, hey, look, I've got so many vials.  If
25 this would help you out, we can do this.

1    Q.   Okay.  Now, I did have a question about
2 this.  As I read it, tell me if I'm -- if you read it
3 differently.  She's saying that Clint stated we could
4 order 2,000 vials at seven whatever a vial; right?
5       MR. LEADER:  Object to the form.
6    Q.   (By Mr. Tardio)  You can answer.
7    A.   That's what it looks like to me.
8    Q.   Would that be a reference to 2,000 vials in
9 one order or is that 2,000 vials over a period of
10 time?
11    A.   The way I take this is that Clint was
12 looking at the problem that St. Thomas Outpatient
13 Neurosurgery was having with inventory knowing that we
14 were -- we ran out in October of this inventory
15 knowing we were going to run out and instead of
16 leaving St. Thomas without any product at all, he was
17 offering them 2,000 vials at 7.49 or 7.98.
18    Q.   Okay.
19    A.   Okay?  And it was an effort -- because if
20 she were to order let's say 200 vials or 400 vials,
21 they might last her until November and we probably
22 knew that we were going to be out then and then we
23 still had the problem.
24    Q.   To get the 7.49 price, would it have to be
25 a single order of 2,000 vials?

1    A.   Probably.  Now, often when people object to
2 that because that's a lot of money, that's $15,000,
3 the customer might say, well, that's -- that's going
4 to last me a year or that's going to last me six
5 months or that's going to last me eight months or
6 whatever.  So we would defer the payments out at no
7 interest so that it's not -- even though they got all
8 the product in at once, they're not paying for it but
9 over a period of time.
10    Q.   Okay.  So it would require an order of
11 2,000 vials to get that price, but Clint would
12 generally be willing to work with the customer on how
13 that --
14    A.   Yeah.
15    Q.   -- payment is made?
16    A.   Yes.
17    Q.   Was the national shortage of MPA still
18 going on 8/9/11?
19    A.   Yes.  We were hoping that maybe Teva, which
20 is another generic manufacturer that had been in the
21 market, might come back to market.  They didn't get
22 back for a few years later.
23    Q.   What was the -- if we -- bound by time
24 frame, what was the beginning and ending of, in your
25 opinion, the national shortage of MPA?

Page 117

1    MR. NOLAN:  Object to the form.
2    THE WITNESS:  Well, of the
3  methylprednisolone, we were out of product.
4  I think I already testified to that -- in
5  October of 2011, but we did have the name
6  brand of methylprednisolone made by Pfizer
7  and never did run out of that.
8    Q.    (By Mr. Tardio)  So when did the national
9  shortage begin, national shortage of
10  methylprednisolone acetate?
11    MR. NOLAN:  Object to the form.
12    THE WITNESS:  Well, Pfizer's
13  Depo-Medrol is methylprednisolone acetate.
14  So the shortage in some ways never
15  occurred.  There was a shortage of the MPA
16  at this price, okay.  If a customer were to
17  want to get Pfizer's product, they could
18  get that.
19    Q.    (By Mr. Tardio)  Okay.  Let me ask it --
20    A.    That would be MPA.
21    Q.    Let me ask it a different way and see if we
22  can ask it this way:  When did the national shortage
23  that Clint Pharmaceuticals was referring to in these
24  e-mails and this invoice, when did that begin?
25    MR. NOLAN:  Object to the form.

Page 118

1    THE WITNESS:  When did it begin?
2    Q.    (By Mr. Tardio)  Yeah.
3    A.    I think it was the spring of 2011.
4    Q.    Okay.  Can you be any more specific or is
5  spring 2011 your general recollection?
6    A.    I do not know.
7    Q.    And then when did it end?
8    A.    Teva entered the market with a generic MPA
9  I believe around June of 2013.  It may have been
10  February of 2013.
11    Q.    And that would have, in your opinion, been
12  the end time of the national shortage that's referred
13  to in these e-mails?
14    A.    That -- that would be probably the end of
15  the national shortage of generic -- the generic to
16  Depo-Medrol.
17    Q.    We've talked about this a little bit in
18  going through some of these issues, but as I
19  understand it, Teva shut down a plant in 2010 that
20  made MPA, is that right, or do you know?
21    A.    I'm not sure exactly the year, but that
22  sounds -- they did shut down their plant in Irvine,
23  California.
24    Q.    Was that -- was that based on what you knew
25  at the time what created the supply issue or

Page 119

1  contributed to the supply issue?
2    A.    It -- yeah.  They were the generic, the
3  competition for Depo-Medrol.
4    Q.    Okay.  I'm just trying to understand based
5  on your recollection why the shortage of generic
6  Depo-Medrol occurred, and one of the reasons, I
7  think -- tell me if I'm wrong -- is because Teva shut
8  down a plant that made it?
9    A.    Yeah, that's -- that would contribute to
10  that.
11    Q.    And then didn't Sandoz stop making its
12  version sometime in 2011?
13    A.    Correct.
14    Q.    And both of those caused a shortage or
15  contributed to cause a shortage of generic
16  Depo-Medrol; right?
17    A.    Correct.
18    MR. CLAYTON:  Objection to the form.
19    Q.    (By Mr. Tardio)  Now, did that impact the
20  supply of brand Depo-Medrol at all?
21    A.    Not for us.
22    Q.    Do you know whether it impacted -- impacted
23  that for any other suppliers?
24    A.    I do not know.
25    Q.    When the shortage of generic MPA occurred,

Page 120

1  did that cause the demand for brand MPA to go up?
2    A.    For the Depo-Medrol?  Yes.  I would say it
3  would.
4    Q.    Let me ask a better question.  I'm sorry
5  for using those imprecisely.
6    When the -- when the shortage of generic
7  methylprednisolone acetate occurred, did that cause
8  the demand for brand Depo-Medrol to go up?
9    A.    I'm sure it probably did.
10    Q.    Do you know whether Pfizer ramped up their
11  production to meet the increased -- probable increased
12  demand?
13    A.    I don't know that factual, but they were
14  aware of what was going on in the market.
15    Q.    Was the brand Depo-Medrol always more
16  expensive than the generic version?
17    A.    A little bit, yes.
18    Q.    Shifting topics.  The -- I don't want to
19  mark something that's already been marked, so let
20  me --
21    MR. TARDIO:  Do you remember which
22  versions of the catalog you marked or what
23  numbers they were?
24    MR. NOLAN:  Not exactly, but they're
25  down there.

1      MR. CLINE: It's 278 and 279.
2      MR. NOLAN: 278 and 279.
3      MR. TARDIO: I've got them all.
4      MR. CLINE: You may have
5  double-marked 281.
6      MR. TARDIO: Yeah, we double-marked
7  281. I think your first exhibit was 281
8  and my last exhibit was 281. We need to
9  fix that.
10      MR. NOLAN: For the sake of clarity,
11  why don't we say that 281-A is the catalog.
12      MR. TARDIO: Fall of 2012.
13      MR. NOLAN: Okay. And then 281-B
14  will be this document that you marked from
15  Clint's website.
16      MR. TARDIO: The "about us" page, I
17  think it's called.
18      Q.  (By Mr. Tardio) Is there a second page to
19  this? I'm looking for STOPNC849. There's a Bates
20  stamp in the lower right corner.
21      A.  There's a what?
22      Q.  You see the page numbers in the lower right
23  corner?
24      A.  Okay. Is that it?
25      Q.  Yeah. I'm going to clip these together so

1  we don't lose them. Okay. So Bates stamped STOPNC849
2  and 850, which we marked previously as Exhibit 282,
3  is -- it's really the first four pages -- I guess it's
4  the cover and the first three pages of the Clint --
5  okay. I'm sorry.
6      It's the front and back of the Clint
7  catalog, spring 2012 and then at least Page 3. Let me
8  hand that to you and ask you a few questions about it.
9      Flip to the -- to the next page where
10  the -- so that is the catalog from spring 2012; right?
11      A.  Yes.
12      Q.  When would that be printed? When would it
13  be sent to the -- to the people who actually produced
14  it and sent it back to you?
15      A.  In the spring of 2012.
16      Q.  How long did it take to get it back?
17      A.  You mean to get it to the physicians?
18      Q.  No, no. I want to know -- just take me
19  through the process to get the -- get the catalog
20  printed for you to send to the physicians.
21      A.  I don't have that much time.
22      Q.  Is it a -- is it a -- really involved?
23      A.  It is an involved process, yes.
24      Q.  How long does it take to put the catalog
25  together on your end?

1      A.  Couple months.
2      Q.  Is there somebody who is in charge of that
3  at Clint?
4      A.  I am.
5      Q.  And have you been in charge of it for at
6  least the last four or five years?
7      A.  Yes.
8      Q.  So it takes a couple of months for you to
9  get together the information that's going to go into
10  the catalog; right?
11      A.  Yes.
12      Q.  And then what do you provide to the
13  printer? Do you provide a draft of the catalog? How
14  does that work?
15      A.  We provide the image that goes on their --
16  into their system. We called them files. They're on
17  CD.
18      Q.  How long does it take to get back the
19  catalog like we marked 281-A that you actually stick
20  in the mail?
21      A.  It probably takes -- it depends on how the
22  printer is running. If they have a lot of business at
23  the time, it may be a wait. And when I say a wait,
24  usually it's not over four days. If -- it may be
25  right away they can start printing, but usually it

1  takes one to two weeks before we get the catalog to
2  the mailing company and to be mailed, and then it will
3  take the catalog -- the mailing company let's say
4  another five days.
5      Q.  And how many -- I know you told me a minute
6  ago, but I didn't write it down. How many catalogs do
7  you print? Did you say it's in the hundred thousands?
8      A.  Yeah. We usually -- in other words, we
9  usually would print a spring catalog to last the
10  spring.
11      (Exhibit 289 was marked for
12  identification.)
13      Q.  (By Mr. Tardio) What I'm going to hand you
14  is a page from the 2011 spring catalog that's Bates
15  stamped STOPNC852. We'll mark it Exhibit 289.
16      Do you have the actual catalog in front of
17  you?
18      A.  Yeah.
19      Q.  Great.
20      A.  I think I do.
21      Q.  It's Page 7 of the spring 2012 catalog.
22      A.  Yes.
23      Q.  There's a statement -- and we've marked it
24  Exhibit 289. There's a statement on the right side
25  "Notice: Production of FDA approved generic

1    Depo-Medrol, methylprednisolone acetate has been
2    discontinued by the manufacturer."  Then in some looks
3    like smaller type, "Clint Pharmaceuticals will resume
4    distribution of methylprednisolone acetate when it
5    becomes available."
6         What --
7    A.    Maybe I don't have that, sir.
8    Q.    Okay.  Here you go.
9    A.    Oh, okay.  All right.
10   Q.    Just read that and tell me what that means.
11   A.    It means that FDA approved generic to
12   Depo-Medrol does not exist any longer and when it does
13   exist, we will have it.
14   Q.    Okay.  So essentially what we've been
15   talking about, Teva and Sandoz weren't producing the
16   generic, therefore you couldn't supply it to your
17   customers; right?
18   A.    Right.  Not the generic.
19   Q.    Right.  And you're telling your customers
20   in spring of 2012 that's what's going on; right?
21   A.    Yeah.
22   Q.    This has also been marked so I don't want
23   to re-mark it, but do you remember looking at the 2008
24   version of your website?
25   A.    Yes.

1    Q.    I think it may be that.  There is now on
2    your website a -- there is a -- well, let me ask.  Is
3    there a warning on your website about the use of
4    compounding pharmacies now?
5    A.    About the using of illegally compounded
6    drugs.
7    Q.    Different than what we see on the 2008
8    version; right?
9    A.    What are you referring to on the 2008
10   version?
11   Q.    Let me see if I can find -- we'll just mark
12   for identification purposes 290 is a printout of your
13   website now.  You might want to hold it next to the
14   2008 version.
15        (Exhibit 290 was marked for
16        identification.)
17        THE WITNESS:  Okay.
18   Q.    (By Mr. Tardio)  On the left side of the
19   2014 version there's a tab for illegal compounding;
20   right?
21   A.    Would you repeat that, please.
22   Q.    I'm sorry.  I know this is a lot of
23   documents.  But on the left side of the 2014 version
24   of your website --
25   A.    There's a tab for illegal -- yes.  I see

1    that.
2    Q.    When did that tab go up on the website?
3    A.    I don't know.
4    Q.    Do you know whether it was before or after
5    the fungal meningitis outbreak September 2012?
6    A.    I don't know.
7    Q.    Who would --
8    A.    I know after the outbreak, you know, I --
9    we increased the -- what we said about illegal
10   compounding.  I mean, we didn't change what we said,
11   but we published it more.  Let me be specific.  In
12   2011, in 2012, we did not have this in our catalogs.
13   Q.    Okay.
14   A.    Okay?  We had taken it out because it
15   didn't seem like anybody was really paying attention
16   to it.  We put it back in after the fatal meningitis
17   outbreak.
18   Q.    So --
19   A.    Did I make that clear?
20   Q.    Yeah, it is clear to me, but let's make
21   sure it's clear in the record so when we read this in
22   two years or six months or however long it is, you're
23   pointing at which version of your catalog?
24   A.    Well, this is -- this -- this is winter
25   2012-2013.

1    Q.    So winter 2012, that catalog would have
2    been created after the meningitis outbreak; true?
3    A.    Yes.
4    Q.    And after the meningitis outbreak, you
5    added an explicit Clint Pharmaceuticals corporate
6    position regarding illegal drug compounding and
7    counterfeiting box or whatever you want to call it,
8    warning to your catalog; true?
9    A.    Yeah, we didn't --
10        MR. CLAYTON:  Objection to the form.
11   You can go ahead.
12        THE WITNESS:  We didn't actually add
13   to it.  We just put this back in there, in
14   our catalog.  We had taken it out
15   previously for -- I'm not sure how long,
16   but we put it back in.  So it was adopted.
17   We have it down here adopted 2009.  I think
18   it actually may have been 2008, 2007 we
19   originally were doing this.
20   Q.    (By Mr. Tardio)  So when was that warning
21   not in the catalog?
22   A.    I don't believe it was in the 2011 and 2012
23   catalog.
24   Q.    Well, it was in the winter 2012 catalog
25   because that's the one you're holding; right?

1     A.    Yeah.  Yeah.  No, I meant about -- around
2  the time of the fatal meningitis, I don't think this
3  warning was in there.  Now, there was a warning about
4  the fatal meningitis in Walnut, California -- Walnut
5  Creek, California.  That's been there since 2001.
6     Q.    The -- so am I correct in understanding
7  that the warning that is on -- what page is that?
8     A.    This is Page 4.
9     Q.    The warning that is on Page 4 of the winter
10 2012 catalog was not specifically -- that specific
11 warning was not in the spring 2012 or any of the 2011
12 versions?
13          MR. NOLAN:  Object to the form.  Go
14    ahead.
15          THE WITNESS:  I believe that that's
16    correct.
17     Q.    (By Mr. Tardio)  Do you know whether it was
18 in the 2010 versions or do you have them to look at?
19     A.    I might.  2009, it was in there.
20     Q.    Let me see that.
21     A.    I know it was in 2009, but I don't believe
22 it was in 2011.  Somewhere we've got a 2011 here.  We
23 can check it.
24          MR. NOLAN:  I think we have one here.
25          THE WITNESS:  Is that 2011?  Okay.

1       2011, fall of 2011, it was not in
2     there.
3     Q.    (By Mr. Tardio)  Okay.
4     A.    But the -- the warning about the fatal
5  meningitis linked to compounding from drugtopics.com
6  was in there.
7     Q.    And that's the reference to the 20 -- 2001
8  event?
9     A.    Yes, sir.
10    Q.    So let me see if I can just recap this so
11 it's clear.  Winter 2012, the warning about illegal
12 compounding was put back in the catalog; right?
13    A.    Yeah, the bigger warning, yes.
14    Q.    The bigger warning?
15    A.    Yeah.
16    Q.    Not the 2001 reference; right?
17    A.    Right.
18    Q.    2011, you don't believe it was in those
19 catalogs; true?
20    A.    Correct.
21    Q.    And we have one of them?
22    A.    We have -- yeah.
23    Q.    2010?
24    A.    It was in there.
25    Q.    No.  We haven't looked --

1     A.    No, 2009 it was in there.  Sorry.
2     Q.    2010, we don't know?
3     A.    Don't know.
4     Q.    And 2009 we've looked at one.  It was in
5  there?
6     A.    Yes.
7     Q.    Tell me again why it was taken out sometime
8  after 2009 and sometime before 2012.
9     A.    No, I don't know.
10    Q.    Who would have made that decision?
11    A.    Myself.
12    Q.    Would anybody else have been involved in
13 making the decision?
14    A.    No.
15    Q.    The -- how many times a year do you put out
16 the catalog?
17    A.    About twice.
18    Q.    This one that we looked at, the 2009
19 version with warning in there, it says January 2009.
20 Is that a different catalog?  I mean, the other ones
21 are labeled spring or winter, fall.
22    A.    No, it's not.  It's -- it may have been
23 labeled winter, spring.  Sometimes we label it January
24 or put the exact month in there sometimes.
25    Q.    So even in 2009, you were just doing two a

1  year?
2     A.    I believe so.
3     Q.    One in the winter and one in the spring?
4     A.    Yeah, we would -- normally we print enough
5  up so that a customer would get several mailings.
6     Q.    When was the -- not the reference to the
7  2001 event, but the warning that we see in the 2012
8  catalog, when was that put up on the website?
9     A.    I don't know.
10    Q.    Do you know whether it was put up before
11 the meningitis outbreak?
12    A.    I don't know.
13    Q.    Who would know that, if anybody?
14    A.    I don't know that anybody would know that.
15    Q.    Who would be responsible for actually
16 putting it up on the website?
17    A.    I would tell the person in charge to put it
18 up.
19    Q.    Okay.  Who is the -- who is the person in
20 charge?
21    A.    Our graphic designer.
22    Q.    Which is?  Is that an outside company?
23    A.    Outside company.
24    Q.    Who is it?
25    A.    Bill Carl.

Page 133

1    Q.    Is that C-A-R-L or K?
2    A.    C-A-R-L.
3    Q.    Is he in Nashville or Brentwood?
4    A.    No, he's in Minnesota.
5    Q.    Does he have a business name?
6    A.    Carl Design.
7    Q.    Is it fair to say that after the fungal
8  meningitis outbreak, Clint Pharmaceuticals more
9  prominently displayed its warnings about compounding
10 pharmacies?
11   A.    Yes.  We were wanting to make sure that
12 there was a distance between what the perception of
13 what we do was different than the -- what the
14 compounding pharmacies do.
15   Q.    One thing you said way back was that after
16 the meningitis outbreak, you got a deluge -- that may
17 be my word, but a lot of calls; right?
18   A.    Yes.
19   Q.    I think you said your phones were ringing
20 off the hook; right?
21   A.    Yes.
22   Q.    With all sorts of questions.
23   A.    Yes.
24   Q.    What -- what were some of the questions you
25 were getting?

Page 134

1    A.    Well, the physicians were scared.  They
2  didn't know what was going on exactly and they were
3  wanting information.  They were wanting to be assured
4  of the integrity of the products that they were using.
5  So they would call us.
6         (Exhibit 291 was marked for
7    identification.)
8    Q.    (By Mr. Tardio)  Let me mark as the next
9  Exhibit 291.  This is from the same Internet archiving
10 site that you saw earlier.  It's marked 291.  And what
11 I want you to do is look at that.  Does that look like
12 your website in 2011?
13   A.    Yes.
14   Q.    Can we agree at least that in November of
15 2011, based on this archiving of your website, there
16 was no illegal compounding tab on the left side?
17   A.    Correct.
18   Q.    Does that make you think that it's probable
19 that the illegal compounding tab was added after the
20 fungal meningitis outbreak as part of Clint's effort
21 to more prominently display its warning about
22 compounding?
23   A.    That's possible.
24        (Exhibit 292 was marked for
25    identification.)

Page 135

1    Q.    (By Mr. Tardio)  The next website page
2  we'll mark 292, this is a printout from your website
3  now.  There's a news section right on your website.
4    A.    Okay.
5    Q.    Is there a news section on your website?
6    A.    Oh, yeah.
7    Q.    And it's an article about the -- it's a
8  letter or whatever you want to call it, something
9  written, dear customer from Clint Pharmaceuticals;
10 right?
11   A.    Yes.
12   Q.    And it's talking about or at least the
13 title is "Products distributed by Clint
14 Pharmaceuticals not linked to fatal meningitis
15 outbreak"; true?
16   A.    Correct.
17   Q.    And this is dated November 4th, 2012?
18   A.    Correct.
19   Q.    Was this part of Clint's efforts to make
20 sure its customers and the public knew that it was --
21 knew that there was a distinction between what Clint
22 was doing and what the compounding pharmacies were
23 doing?
24   A.    At least illegally compounding pharmacies,
25 yes.

Page 136

1    Q.    Well, tell me -- do you believe that there
2  are compounding pharmacies that act within the bounds
3  of the law?
4    A.    If they follow the law, they are.
5    Q.    Okay.  Well, do you believe that there are
6  compounding pharmacies that do follow the law?
7    A.    There could be.  I don't go around
8  interviewing compounding pharmacies.  I don't know all
9  the laws to know.
10   Q.    Well --
11   A.    So I don't feel qualified to answer that.
12   Q.    Well, you made a distinction between when I
13 said something about compounding pharmacies, you said
14 compounding pharmacies that are operating illegally.
15 My question is simply:  Are there -- in your
16 experience, are there compounding pharmacies that --
17 that operate legally?
18        MR. NOLAN:  Objection, asked and
19    answered.
20        THE WITNESS:  I don't know.
21   Q.    (By Mr. Tardio)  Do you think that
22 compounding pharmacies have a viable role in the
23 production of drugs?
24   A.    I don't know.
25   Q.    Do you have an opinion on it whether they

Page 137

1   play a role in this whole market that we've been
2   talking about?
3       MR. NOLAN:  Object to the form.
4       THE WITNESS:  I have an opinion on
5   it, yeah.
6       Q.   (By Mr. Tardio)  Okay.  Well, tell me and
7   tell us what the opinion is.
8       A.   Well, when you distribute drugs into our
9   country, you're entrusted with a certain amount of
10  responsibilities and it's kind of a sacred position
11  and you don't -- you want to first do no harm if at
12  all possible, and that's my opinion on it.
13      I think a person should obey the laws --
14      Q.   Sure.
15      A.   -- to the best of their abilities.
16      Q.   Do you represent to your customers that
17  Clint obeys the laws?
18      A.   To the best of our abilities.
19      Q.   Sure.
20      A.   Yeah.
21      Q.   Is -- and is that part of your marketing to
22  potential customers, that we at Clint follow the law?
23      A.   It's our values.  It's not our marketing.
24  It's our values.
25      Q.   And that's something that you want to make

Page 138

1   sure customers know when they're deciding whether or
2   not to buy from you; right?
3       A.   Yeah.
4       Q.   And you expect them to rely on that
5   representation in deciding whether or not to choose
6   Clint as their supplier; true?
7       MR. NOLAN:  Object to the form.
8       Q.   (By Mr. Tardio)  Do you expect customers to
9   rely on that representation?
10      A.   If they want to.  I mean, it's up to them
11  how they make their decisions.  I mean, whether
12  they -- whether or not they choose us because we try
13  to obey the law or not, we're still going to obey the
14  law.
15      Q.   The -- the -- it's in the 2009.  It's
16  probably the easiest place to see it.  The Clint --
17  I'll hand this to you.  The Clint Pharmaceuticals
18  corporate position regarding illegal drug compounding
19  and counterfeiting.  Do you know whether that was ever
20  verbally or in writing relayed to Debra Schamberg?
21      A.   I do not know, sir.
22      Q.   Do you know whether that was ever verbally
23  or in writing relayed to anybody at St. Thomas
24  Outpatient Neurosurgical Center?
25      A.   I do not know.

Page 139

1       MR. CLAYTON:  Objection to the form.
2       Q.   (By Mr. Tardio)  Do you know whether that
3   was -- that the Clint Pharmaceuticals -- well, strike
4   that.
5       Did Clint ever send an e-mail to all its
6   customers before the fungal meningitis outbreak where
7   Clint relayed to its customers its position on illegal
8   compounding?
9       A.   An e-mail?
10      Q.   Yes, sir.
11      A.   No.  As far as I know, all we did as far as
12  a mass thing was with the catalog here or on the
13  website.  At least a mass production.  There may have
14  been somebody who e-mailed somewhere.
15      Q.   Do you know whether or not the FDA has the
16  authority to inspect pharmacies to determine if
17  they're acting as if they are drug manufacturers?
18      A.   I do not know.
19      Q.   And look at Exhibit 2 -- that one right
20  there.
21      A.   This one?
22      Q.   Uh-huh (affirmative).
23      A.   Okay.
24      Q.   Flip to the third page, I think.  It's the
25  article from Dr. Manchikanti.

Page 140

1       A.   Yes.
2       Q.   So just -- I provide that simply as
3   context.  Do you know whether the FDA has the
4   authority to inspect pharmacies to determine whether
5   or not they're acting as a manufacturer and not as a
6   traditional pharmacy?
7       MR. NOLAN:  Objection, asked and
8   answered.
9       THE WITNESS:  Yeah, I think that they
10  had that authority, but whether or not the
11  compounding pharmacy listened to that
12  authority, I don't know.  I do know that
13  they inspected compounding pharmacies.  I
14  don't think that they were very effective
15  as evidenced by the fatal meningitis
16  outbreak.
17      Q.   (By Mr. Tardio)  Is it your understanding
18  that prior to the meningitis outbreak the FDA had the
19  authority to inspect compounding pharmacies that were
20  acting as drug manufacturers?
21      A.   Yes.
22      MR. LEADER:  Object to the form, lack
23  of foundation.
24      Q.   (By Mr. Tardio)  Do you know whether the
25  FDA ever was in to inspect New England Compounding?

Page 141

1    A.   I do not know.
2    Q.   Do you know whether the FDA took any
3   regulatory action against New England Compounding
4   prior to September of 2012?
5    A.   I do not know.  The only thing I would have
6   would be something that I read in a newspaper and I
7   don't know how factual it would be.
8    Q.   Okay.  Do you know whether the FDA ever
9   investigated any complaints about New England
10  Compounding?
11   A.   I don't know.
12   Q.   Other than what you've read in the
13  newspaper?
14   A.   Yeah, I don't know anything about that.
15   Q.   Okay.  Did Clint Pharmaceuticals ever make
16  any complaints about New England Compounding to the
17  FDA?
18   A.   Not that I'm aware of.
19   Q.   Or to the Tennessee Board of Pharmacy or
20  any other state board of pharmacy?
21   A.   No.
22    Can you repeat that last question?
23   A.   Sure.  Did Clint Pharmaceuticals ever make
24  any complaints about New England Compounding Center to
25  any state board of pharmacy?

Page 142

1    A.   No.
2    Q.   Did it make any complaints to any
3   governmental regulators?
4    A.   About?
5    Q.   About New England Compounding.
6    A.   I don't believe so.
7    Q.   Do you know how many customers Clint has
8   roughly?
9    A.   Yes.
10   Q.   What's the -- just rough estimate?
11  Thousands, hundreds, tens of thousands?
12   A.   It's proprietary information.
13   Q.   The number of customers that Clint has?
14   A.   Yeah.
15   Q.   So you're not willing to disclose that?
16   A.   I mean, if I have to, I guess I will.
17   Q.   Well, can you give us at least a range?  Is
18  it in the thousands?
19   A.   It's in the thousands.
20    MR. CLAYTON:  I'm going to -- I'm
21    going to -- I will object and just let you
22    decide whether or not you wish to answer
23    that in any way.
24   Q.   (By Mr. Tardio) How many of those
25  customers, if you know, order drugs from compounding

Page 143

1   pharmacies?
2    MR. NOLAN:  Object to the form.
3    THE WITNESS:  I would not know.
4    Q.   (By Mr. Tardio)  Have you ever had any
5   discussions with them about them ordering from
6   compounding pharmacies?
7    A.   Yes.  Yeah.
8    Q.   But as far as what percentage of your
9   customers order from compounding pharmacies, you don't
10  know; right?
11   A.   I don't know what percentage.  I know that
12  it was a problem, because -- you know, we'd go in and
13  we would find ourselves losing business over price and
14  we go into price and we'd find out that they were
15  using a compounded product.
16   Q.   Did that frustrate you?
17   A.   It frustrated me, yes, because it was not
18  FDA approved.
19   Q.   Affected your business?
20   A.   Yes.
21   Q.   Who made the decision to make it the
22  corporate policy of Clint Pharmaceuticals that's
23  reflected on Page 4, I think, of the 2009 catalog?
24   A.   I did.
25   Q.   What went into that decision?  Did you have

Page 144

1   meetings?  Did you consult people?  Did you just sit
2   down one day and say this is what the policy is going
3   to be?  How did you come up with this corporate
4   policy?
5    A.   Well, the corporate policy is -- we are
6   warning people against illegally compounded products;
7   okay?  And there -- we felt like there was a
8   lot of illegally compounded products in the market and
9   so we felt like it would be good to let people know
10  that there's illegally compounded products.
11   Q.   What prompted Clint to adopt that -- that
12  policy?
13   A.   Seeing the amount of business we were
14  losing, going -- seeing these products in physician
15  offices, knowing that they were producing product and
16  that was not FDA approved, not on a level playing
17  field with the competition, they were able to produce
18  product without oversight.
19   Q.   Prior to September of 2012, did you have
20  any personal experience with -- through your business,
21  with compounded drugs causing injury?
22   A.   Compounded products, for one thing if --
23  since we didn't sell them, if there was injury, the
24  physician would report it to whoever they bought it
25  from.  So in that respect, we didn't have any --

1    anybody reporting that.  But on the other hand,
2    compounded products, because the compounding companies
3    did not feel like they were regulated by FDA, often
4    would not have to report to FDA if they had an adverse
5    reaction.
6            So I don't know if you would get any real
7    records regarding adverse events with compounded
8    products if they didn't recognize FDA oversight.
9        Q.    And my question is aimed at the statement
10   in this policy or position -- I've called it a policy.
11   It's actually titled "Corporate position."
12           "The use of such products is very dangerous
13   to the health of your patients."
14           Other than the 2001 one link that you've --
15   that we've talked about, do you have any other
16   knowledge of compounded products causing injury to
17   patients prior to the fungal meningitis outbreak?
18       A.    There's -- there are -- when the adverse
19   reactions occur, to my knowledge, there's no study
20   that says these adverse reactions have occurred with
21   this group of patients and this came from compounded
22   products and this came from FDA approved products.  I
23   don't know of any study like that.
24       Q.    Okay.  Or what about anecdotally?
25       A.    What do you mean?

1        Q.    Well, has -- putting aside whether you read
2    a study that says compounding products are more
3    dangerous than non-compounded products, did anybody
4    ever come to you and say, yeah, we had five patients
5    who got a compounded product, they all got sick.  Did
6    you hear anecdotally any --
7        A.    I would hear things, but it wasn't like it
8    was reported to me.
9        Q.    Who did you hear those things from?
10       A.    Just different, you know, physicians.
11       Q.    Who told you?  Who told you that they had a
12   problem?  Do you remember specific conversations?
13       A.    Well, there's -- no, I don't remember
14   specific, but there's been adverse reactions with
15   corticosteroids in the past and there's no study
16   saying this came from compounded and this came from
17   non-compounded.
18           You know, what our objection was was with
19   illegally compounded products.  If you have a company
20   that is willing to do one thing that's illegal, then
21   we feel like they might be willing to do two things or
22   three things or four things and it keeps going.
23       Q.    Fair to say that --
24       A.    Okay?  So it's illegally compounded
25   products is what we have the objection to, not the

1    legally compounded products.
2        Q.    Okay.  Did you -- strike that.
3            So fair to say that Clint's recommendation
4    to its customers at least as of July 2009 was that it
5    should not buy from compounders who were compounding
6    drugs illegally; right?
7        A.    Correct.  Correct.
8        Q.    Clint Pharmaceuticals' position was not
9    that its customers should not buy from any compounders
10   ever; true?
11       A.    Correct.
12       Q.    Does Clint employ any physicians?
13       A.    No.
14       Q.    Or pharmacists?
15       A.    No.
16       Q.    Pharmacologists?
17       A.    No.
18       Q.    Do you know how methylprednisolone
19   acetate -- preservative-free methylprednisolone
20   acetate is compounded?
21       A.    I have no idea.  I think that depends on
22   the compounder.
23       Q.    But that wouldn't be something that your
24   training and expertise would be familiar with, the
25   actual process of compounding the drug; right?

1        A.    No, we don't compound.
2        Q.    Do you know how Pfizer with Depo-Medrol or
3    Sandoz or Teva with generic methylprednisolone
4    acetate, how they manufacture the drug?
5        A.    I have toured manufacturing facilities, FDA
6    approved manufacturing facilities, but I'm not an
7    expert in that.
8        Q.    When was the last time you toured a
9    manufacturing facility?
10       A.    It's been some years ago.
11       Q.    Has it been more than five years?
12       A.    Probably.
13       Q.    Have you toured every -- the facility of
14   every supplier that Clint Pharmaceuticals has?
15       A.    Pretty much, you know.  I mean, not
16   necessarily their manufacturing plant but we went to
17   see them.
18       Q.    Does Clint -- this is probably a question
19   that stems from my ignorance of the process, but do
20   you house the medications at a facility before you
21   deliver them to the customers, or are you truly a,
22   quote, middleman where you don't -- don't get the
23   product in your possession before it goes to the
24   customer?
25           MR. CLAYTON:  Objection to the form.

Page 149

1       THE WITNESS: We -- we are an
2 authorized distributor for the
3 manufacturers. We order from the
4 manufacturers. It comes into our facility.
5 We check it in, we inspect it.
6     Q. (By Mr. Tardio) Okay.
7     A. It stays under strict governmental laws,
8 how we store it, licensed physicians, clinics order
9 the product from us.
10     Q. So you house the drugs --
11     A. Yes.
12     Q. -- until it's actually delivered to the
13 clinic --
14     A. Yes.
15     Q. -- or physician?
16     A. Yes.
17     Q. Are you or is Clint Pharmaceuticals
18 registered with the FDA?
19     A. Yes.
20     Q. How -- as what? As what -- as?
21     A. As a wholesale distributor.
22     Q. What does that entail? Do you have to
23 submit an application to the FDA?
24     A. We're a VAWD approved, accredited wholesale
25 distributor.

Page 150

1     Q. What does VAWD stand for?
2     A. That's the highest accreditation that
3 wholesale distributors can obtain, and you get an
4 independent inspection, and what the inspection
5 involves is making sure that the drug supply you have
6 is secure, making sure that you don't get in impure
7 products, making sure that you've got -- that who you
8 ship to, that you're shipping to people who have
9 licenses, that you're obeying the law.
10     Q. Is VAWD -- is that an acronym for
11 something?
12     A. It's vendor authorized wholesale
13 distributor.
14     Q. And did you have to get inspected by the
15 FDA to get that certification?
16     A. No. That's an independent -- it's an
17 independent -- it's put on by the National Association
18 of Boards of Pharmacy.
19     Q. So is Clint Pharmaceuticals registered with
20 the FDA?
21     A. Yes.
22     Q. What -- is that separate from this VAWD?
23     A. Yeah.
24     Q. Okay. Well, what does the FDA registration
25 entail?

Page 151

1     A. Well, you know, I don't know because I
2 didn't register it, fill out all the forms. It's a
3 lot of forms.
4     Q. Who did it? At your office, who would have
5 been responsible for that?
6     A. We had -- I think we had License Logic do
7 that.
8     Q. Do you know what the FDA registration is?
9 Is that what you were telling me a minute ago?
10     A. Yeah. Prior to this happening, the fatal
11 meningitis or after the fatal meningitis, the FDA
12 wants everybody to register with them, so we're
13 registered.
14     Q. Okay. That was going to be my next
15 question. Were you registered with the FDA prior to
16 September 2012?
17     A. I believe we were.
18     Q. How --
19     A. We used to have products manufactured for
20 us. So we had our own FDA labeler code, and they
21 issued that to us back in 2007 -- I mean 1987.
22     Q. What do you have to do to maintain that FDA
23 registration?
24     A. You make sure that you have FDA approved
25 products and that you abide by the FDA rules.

Page 152

1     Q. Were you registered with the FDA in 2011?
2     A. Yes, I'm sure we were.
3     Q. Is there a database of FDA registration
4 where you can look up the FDA registered wholesalers
5 or do you know?
6     A. I think there recently was created one.
7     Q. Has the FDA come and inspected you?
8     A. They've come in, yeah, they have. They
9 come in on different manufacturers having recalls to
10 make sure that we were conducting recalls accordingly.
11     Q. When -- go ahead. I'm sorry.
12     A. So that type of thing.
13     Q. Did they come --
14     A. It's been a while since they inspected us.
15     Q. When was the last time?
16     A. I don't know.
17     Q. Was it before the outbreak or do you know?
18     A. It probably was.
19     Q. Did the FDA come in and do an inspection --
20     A. They've been there since that time, though.
21 I mean...
22     Q. Did they come in and do an inspection
23 before you got the initial registration?
24     A. I don't think so.
25     Q. Have you had recalls of medications

Page 153

1    produced by FDA registered manufacturers?
2        A.   Yes.
3        Q.   How often does that happen?
4        A.   Recently we've had quite a rash of recalls.
5        Q.   What does that mean?  I mean, I know you
6    said -- I want to make sure I understand what you're
7    saying.  You say recently we've had quite a rash of
8    recalls.  Does that mean you're getting one a day, one
9    a week, one a month?
10       A.   Oh, recently it's been, like, once every
11   two weeks.  Seems like FDA is, you know, stepping up
12   their standards by which medications can be produced.
13   And so the manufacturer is unable to meet those
14   standards, they issue a voluntary recall and we go and
15   notify the customers and let them know that this
16   product is recalled and give them instructions how to
17   send it back and give them credit for their product.
18       Q.   Have you had recalls of Pfizer medications?
19       A.   We have had one, but it wasn't Depo-Medrol.
20   And I don't know what it was.
21       Q.   Have you had recalls of Teva medications?
22       A.   No.
23       Q.   Sandoz?
24       A.   No.
25       Q.   So you've never -- Clint Pharmaceuticals

Page 154

1    has never had a recall of Teva and Sandoz medication?
2        A.   Not that I -- I don't believe.  To the best
3    of my knowledge, no.
4        Q.   Sure.  And I understand that.  Who keeps up
5    with that at your business?
6        A.   April Branscombe.
7        Q.   Does she keep records of all the recalls
8    that come in?
9        A.   Yeah.
10       Q.   How far back are they go?
11       A.   I think they go three years.  We may have
12   extended it a little bit longer.
13       Q.   Are they kept in a binder or folder or are
14   they kept electronically?
15       A.   I think they're in a binder.  I don't know.
16       Q.   How do they come in?  By fax or e-mail?
17       A.   The manufacturer sends it to you usually by
18   e-mail and by a letter.
19       Q.   Do you remember what the Pfizer recall was
20   for?
21       A.   I don't.  I just remember seeing -- you
22   know, going through the warehouse and seeing, you
23   know, recalled Pfizer.  It wasn't -- it wasn't
24   anything significant.
25       Q.   Fair to say that even FDA registered

Page 155

1    manufacturers like Pfizer have issues that lead to
2    recalls?
3        A.   Yeah.
4        MR. NOLAN:  Object to the form.
5        Q.   (By Mr. Tardio)  Do you agree that FDA
6    registration of a drug manufacturer does not guarantee
7    the drug safety?
8        A.   Would you repeat that question.
9        Q.   Sure.  Do you agree that the fact that a
10   manufacturer is FDA registered does not guarantee the
11   drug's safety?
12       A.   Well, let me put it a different way.  I
13   wouldn't want to live in a society where the FDA did
14   not require the products to be registered especially
15   in the sterile field.
16       Q.   Let me ask my question again.  Do you agree
17   that the fact that a manufacturer is FDA registered
18   doesn't guarantee that the drug is going to be safe?
19       MR. NOLAN:  Object to the form.  Go
20   ahead and answer.
21       THE WITNESS:  There are no
22   guarantees.  So I agree.
23       Q.   (By Mr. Tardio)  Let me go back to a few
24   things you talked about earlier this morning.
25       MR. NOLAN:  Chris, do you have any

Page 156

1    feel for how much longer you're going to
2    be?
3        MR. TARDIO:  15, 20 minutes at most.
4        MR. NOLAN:  Okay.
5        Q.   (By Mr. Tardio)  You do not have any
6    clinical healthcare training; right?
7        A.   No.
8        Q.   Is that true?
9        A.   You mean, like, formal?
10       Q.   Yes, sir.
11       A.   No.
12       Q.   Is that true?  Just so it's clear on the
13   record.
14       A.   Yes, that's true.
15       Q.   And you say you mean formal.  Do you have
16   some informal healthcare training?
17       A.   I've been in -- I've run a pharmaceutical
18   company since 1987.
19       Q.   So it would be through the -- through the
20   experience with your business you've gained an
21   understanding of the pharmaceutical industry; right?
22       A.   Yes.
23       Q.   Do you have any special training on how to
24   purchase drugs?  In other words, did you take a class?
25   Did you get a certification for it?  Anything like

Page 157

1   that?
2     A.  No certification in how to purchase drugs.
3     Q.  Was it on-the-job training?
4     A.  Yes.
5     Q.  You mentioned MedWatch earlier. Do you
6   know whether MedWatch has information on compounding
7   pharmacies?
8     A.  I'm -- I believe that they do.
9     Q.  Did any customers of Clint Pharmaceuticals
10  come inspect Clint Pharmaceuticals' facility last
11  year?
12     A.  Not that I'm aware of.
13     Q.  Has that happened in the past five years
14  that you can remember a customer of yours came to
15  inspect the facility?
16     A.  No, I don't remember any kind of formal
17  inspection like that from a customer.
18     Q.  Even informal where the customers come and
19  said, hey, I'd like to look around, we're getting
20  drugs from you?
21     A.  I don't even remember that.
22     Q.  Have any customers of yours in the last
23  year conducted an audit of your business asking
24  questions about, for instance, your licensure,
25  lawsuits against you, your regulatory history, things

Page 158

1   of that nature?
2     A.  From customers?
3     Q.  Yes, sir.
4     A.  Not that I'm aware of.
5     Q.  Have you ever remembered that happening
6  where a customer before buying from you or sometime
7  during the -- during the course of your relationship
8  with the customer audited your business on issues like
9  licensure, regulatory history, lawsuits, things of
10  that nature?
11     A.  It's -- it's common practice for a customer
12  to say, okay, are you licensed in the state that we're
13  in or are you licensed in Tennessee. So it's common
14  that we would send them a photocopy of whatever
15  license that they were requesting. So as far as
16  saying, okay, are you abiding by the law, are you
17  licensed in the state, that type of thing, that's a
18  frequent question.
19     Q.  Generally --
20     A.  As far as saying I'm going to fly out here
21  and see you and want to go through your facility, no,
22  that's -- I don't remember anybody doing that.
23     Q.  And as far as you're aware -- strike that.
24     So generally speaking, the practice with
25  Clint Pharmaceuticals when a customer is going to buy

Page 159

1   drugs from Clint Pharmaceuticals is that they will ask
2   for a copy of your license; right?
3     A.  Yes.
4     Q.  Which you provide?
5     A.  Yes.
6     Q.  True.
7     And they may have questions about your
8   business; true?
9     A.  They could, yeah.
10     Q.  And if they do, you'll answer them
11  truthfully; right?
12     A.  Oh, yeah. Absolutely.
13     Q.  Before you purchased from a manufacturer,
14  do you do any check on the manufacturer to make sure
15  they're FDA approved?
16     A.  Yeah, you -- there's a book called the
17  Orange Book.
18     Q.  Okay.
19     A.  And you can, you know, just Google Orange
20  Book and you can see if a manufacturer has approval
21  for the drug that you're wanting to buy. So -- and
22  you can do that whether you're a distributor like
23  ourselves or whether -- whoever you are as long as you
24  got access to a computer.
25     Q.  Have you ever performed an unannounced

Page 160

1   visit to a manufacturing plant to make sure that the
2   manufacturing plant is operating to Clint's standards?
3     A.  An unannounced?
4     Q.  Yes, sir.
5     A.  No.
6     Q.  Have you ever hired a consultant to go with
7  you to a manufacturing plant to look around and
8  inspect their manufacturing processes before you
9  bought from it them?
10     A.  I have relied on the FDA to do their
11  inspections.
12     Q.  When you buy from a manufacturer, is it
13  your expectation that the FDA has done its job in
14  certifying that manufacturer is safe?
15     A.  Yeah.
16     MR. CLAYTON: I object to the form.
17     Q.  (By Mr. Tardio) Lastly --
18     A.  Usually they've done way more than their
19  job.
20     Q.  Do you know whether they did their job in
21  this case with New England Compounding company?
22     MR. LEADER: Object to the form.
23     MR. CLAYTON: Object to the form.
24     MR. NOLAN: Object to the form.
25     Q.  (By Mr. Tardio) Or do you have an opinion

Page 161

1    on it?
2         MR. LEADER:  Object to the form.
3         THE WITNESS:  I think history has
4    told us on that one.
5    Q.    (By Mr. Tardio)  What does that mean?
6         MR. CLAYTON:  Objection to the form.
7         THE WITNESS:  Well, I think there
8    were 63 counts of second-degree murder
9    filed.
10        (Exhibit 293 was marked for
11        identification.)
12   Q.    (By Mr. Tardio)  Let me pass you the last
13   exhibit I want to cover, which is something you
14   brought with you, and we'll mark it as --
15        MR. TARDIO:  You didn't mark this,
16        did you?
17        MR. NOLAN:  No.
18   Q.    (By Mr. Tardio)  It's Exhibit 293 and I
19   want you to explain kind of what it is.
20   A.    Okay.  Exhibit 293 shows by NDC number --
21   it stands for national drug code -- the availability
22   of methylprednisolone acetate manufactured by Sandoz.
23   Q.    Okay.
24   A.    And the side-by-side with the availability
25   of Depo-Medrol, methylprednisolone acetate,

Page 162

1    manufactured by Pfizer, and it shows the dates on
2    which the inventories were performed and it shows
3    whether or not we had inventory or not.
4    Q.    And tell me when you did not have -- so
5    that -- let me make sure I understand it.  That
6    doesn't tell us how much inventory you had.  That just
7    tells us yes or no, right, yes, you had it, no, you
8    didn't?
9    A.    Basically it tells you if we can supply
10   some of it.
11   Q.    And tell me when you did not have inventory
12   of generic methylprednisolone acetate.
13   A.    October.
14   Q.    Of?
15   A.    Of 2011.
16   Q.    And there are yeses in all the other boxes?
17   A.    Yes.
18   Q.    And that -- again, that doesn't tell us
19   whether you had -- that doesn't tell us the amount of
20   inventory you had, it just tells us yes or no, you
21   could or couldn't supply somebody; right?
22        MR. CLAYTON:  Objection to the form.
23        THE WITNESS:  We had plenty of
24        inventory of methylprednisolone acetate to
25        supply our customers when the fatal

Page 163

1    meningitis broke out, our customer -- we
2    took on tremendous influx of customers that
3    were fleeing compounded -- illegally
4    compounded corticosteroids and coming to us
5    and they were supplied.
6    Q.    (By Mr. Tardio)  And I understand that.  My
7    question is simply about the document.  The document
8    doesn't tell us numbers?
9    A.    The exact inventory, no.
10   Q.    It just tells us yes or no, you could have
11   supply?
12   A.    Yes.
13   Q.    You mentioned that -- these are just a few
14   clean-up questions I need to cover.  You mentioned in
15   some earlier testimony that Clint Ebel is now in IT,
16   not doing sales anymore.  Why is that?  Did it have
17   anything to do with job performance?
18   A.    Nothing to do with job performance.  I wish
19   he was back in sales.
20   Q.    Okay.  Who wrote the policy, the corporate
21   position?  Who actually put pen to paper and drafted
22   it?
23   A.    This policy?
24   Q.    This in June or July of 2009 or January.
25   A.    I formulated it, but I have people, you

Page 164

1    know, look it over before I publish it.
2    Q.    Did you draft it though?
3    A.    Yeah.
4    Q.    Okay.
5    A.    I'm not the best of writers, so I have a
6    lot of people edit my writing.
7    Q.    You -- I think at the very beginning of
8    your deposition, you said you worked at a -- at a
9    wholesaler or drug pharmaceutical company prior to
10   starting Clint; is that right?
11   A.    Uh-huh (affirmative).
12   Q.    What was that?  Where did you start your
13   career?
14   A.    I started my career with -- I was with
15   Forest Laboratories prior to Clint Pharmaceuticals.
16   And Forest Laboratories was getting out of the
17   injectable business and I was wanting to get in.
18   Q.    Forest Laboratories is where?
19   A.    They're out of New York.
20   Q.    Is that where you worked, in New York?
21   A.    Well, that's where our company was based.
22   I was still in Tennessee at the time, but they --
23   that's typical for a pharmaceutical company to have
24   people out of state that they employ.
25   Q.    Were you a salesperson?

Page 165

1      A.    I was a salesperson.  I also was a district
2  manager and I was a product specialist in
3  corticosteroids.
4      Q.    Did you sell compounded drugs for Forest?
5      A.    No.
6      Q.    Did Forest sell compounded drugs?
7      A.    No.
8      Q.    Are you being paid to be here today?
9      A.    No.
10      Q.    Unfortunately, right.
11          MR. TARDIO:  Let me take about a
12  five-minute break and I don't think I have
13  any more; okay?
14          THE WITNESS:  Okay.
15          VIDEOGRAPHER:  We're off the record
16  and the time is 12:58 p.m.
17          (A recess was taken.)
18          VIDEOGRAPHER:  We're back on the
19  record and the time is 1:09 p.m.
20  FURTHER EXAMINATION
21  BY MR. NOLAN:
22      Q.    Mr. Ebel, this is George Nolan.  I have
23  just a few followup questions to make sure the record
24  is clear on a few points.  I think you mentioned that
25  you started your company in 1987; correct?

Page 166

1      A.    Yes.
2      Q.    And you've never sold products from
3  compounding pharmacies for -- based on concerns for
4  safety; is that true?
5      A.    Yes.
6          MR. TARDIO:  Objection.  Leading.
7      Q.    (By Mr. Nolan)  And in what year was it
8  that this incident occurred out in California where 13
9  people died of meningitis after receiving contaminated
10  injections of corticosteroids?
11      A.    It was in 2001.
12      Q.    In 2001.  And since that particular event
13  occurred, has your company made efforts to bring that
14  event to the attention of its customers?
15      A.    Yes.
16      Q.    And did that event, when it happened,
17  result in media coverage within the medical community
18  and pharmaceutical distribution community?  Were there
19  newspaper articles written about it and that sort of
20  thing?
21      A.    Yes.
22      Q.    And was it talked about at some of the
23  various trade shows and organizational meetings that
24  you attended?
25      A.    Yes.  The person who compounded the product

Page 167

1  committed suicide.
2      Q.    Now, in terms of how you went about
3  bringing that -- that particular event to the
4  attention of customers, I think you indicated that you
5  put something in your company's catalogs or brochures
6  about it; is that correct?
7      A.    Yes.
8      Q.    And did that particular warning stay in
9  your brochures over time?
10      A.    Yes.
11      Q.    Okay.  So that --
12      A.    It's still in there.
13      Q.    Still in there.  And it's always been in
14  there; is that correct?
15      A.    Yes.
16      Q.    And in addition to that particular warning,
17  as I understand it, you created what we might call a
18  bigger box warning that appears in your 2009 catalog
19  for example; is that true?
20          MR. TARDIO:  Objection to the form.
21          THE WITNESS:  Yes.
22      Q.    (By Mr. Nolan)  Okay.  And an example of
23  that bigger box warning is what we've exhibited here
24  as Exhibit 279; is that correct?
25      A.    Yes.

Page 168

1      Q.    Now, I notice that you did not bring with
2  you a 2010 catalog.
3      A.    Correct.
4      Q.    Why is that?
5      A.    Nobody asked me for it.
6      Q.    Okay.  All right.  Do you think that you
7  have one somewhere in your files --
8      A.    Maybe.
9      Q.    -- for that particular year?
10      A.    I can check.
11      Q.    Or is it possible that you maybe skipped a
12  publication that year?
13      A.    No, we did not skip a publication for that
14  year.
15      Q.    So if we needed to make what we call a late
16  filed exhibit, a copy of the brochures your company
17  published in 2010, could you do that?  In other
18  words --
19      A.    If it's available, you will have it.
20      Q.    Okay.  All right.  I appreciate that.  Now,
21  let me -- let me show you or let me just ask you to
22  assume that according to the St. Thomas Outpatient
23  Neurosurgical Center, they started purchasing material
24  from your company in December of 2010.
25      A.    Okay.

1    Q.   If they started -- and specifically I'm
2  going to hand you what has already been marked as
3  Exhibit No. 29, which is a spreadsheet for that
4  particular clinic's purchases of MPA.  And if you look
5  on the last page, it appears that it was December 9th
6  of 2010 when they placed their first order through
7  your particular company.
8    A.   Yes.
9    Q.   So when that -- when you started doing
10  business with St. Thomas Outpatient Neurosurgical
11  Center, I think you indicated it would have been your
12  standard procedure to give that new customer a copy of
13  your catalogs?
14    A.   Yes.
15    Q.   And that -- we know that would have
16  included the warning about the fatal incident that
17  occurred in California in 2001; correct?
18    A.   Yes.
19    Q.   Okay.  And do you know whether that 2010
20  version of the catalog would have in addition included
21  what we might call the big box warning that we see in
22  the 2009 catalog?
23    A.   It may have.  I would have to produce a
24  catalog for you to verify that.
25    Q.   Okay.  And would it be fair to say that

1  over the years it's been frustrating for you to watch
2  clinics purchase drugs from compounding pharmacies
3  given the difference between the degree of regulation
4  that compounding pharmacies operate under as opposed
5  to FDA regulated pharmaceutical manufacturers?
6    MR. TARDIO:  Object to the form.
7    THE WITNESS:  Well, it's frustrating
8    because I like to see people get good
9    results and be out of pain.
10    Q.   (By Mr. Nolan)  Right.
11    A.   That's why I'm in the business.
12    Q.   Now, we -- Mr. Tardio asked you questions
13  about a shortage of MPA, and I believe you made it
14  clear that there was never a shortage of the brand
15  name Depo-Medrol made by the company called Pfizer;
16  correct?
17    A.   Not with our company.
18    Q.   Okay.  And -- and I believe you explained
19  that when Sandoz, the maker of generic MPA, announced
20  that it was going to pull out of the market, that was
21  one of the reasons for the increase in price in June
22  of 2011; correct?
23    A.   Yes.
24    Q.   But it was your company's way of doing
25  business to let its customers know that you were not

1  going to leave them in the lurch; correct?
2    MR. TARDIO:  Object to the form.
3    THE WITNESS:  We would be defeating
4    our objectives for being in business if we
5    left them in the lurch.
6    Q.   (By Mr. Nolan)  Okay.  So was it your
7  company's policy and procedure to let customers know
8  very clearly that if they wanted to buy MPA from your
9  company, the brand name Depo-Medrol was, in fact,
10  available?
11    A.   Oh, absolutely.
12    Q.   And if you look at Exhibit No. 288 that
13  Mr. Tardio introduced.
14    A.   288?
15    Q.   Actually, I think it's 289.  Excuse me.
16  It's Exhibit 289.
17    A.   Yes.
18    Q.   You got it right there.
19    A.   Uh-huh (affirmative).
20    Q.   Okay.  And you see on this particular
21  document on the right-hand page, there's the notice
22  regarding the fact that the maker of FDA approved
23  generic Depo-Medrol had discontinued production.  You
24  see that?
25    A.   Yes.

1    Q.   Then on the left hand page, your company is
2  advertising the sale of the brand name Depo-Medrol;
3  correct?
4    A.   Correct.
5    Q.   All right.  So in the same brochure, your
6  company clearly communicated two things.  No. 1, that
7  generic MPA was being discontinued, but that brand
8  name MPA was, in fact, available to the customers; is
9  that true?
10    A.   Yes.
11    MR. TARDIO:  Object to the form.
12    Q.   (By Mr. Nolan)  And in addition to stating
13  that on paper in the brochures, were your sales
14  agents, including your son Clinton, trained to
15  communicate that clearly to customers when they talked
16  with customers?
17    A.   Yes.  Absolutely.
18    Q.   Now, we talked about the fact that in your
19  experience price is one factor that customers consider
20  when making purchasing decisions; correct?
21    A.   Yes.
22    Q.   Is that the only factor?
23    A.   No.
24    Q.   What are some of the other factors, in your
25  experience?

1    A.   A physician -- and I believe really all
2  physicians want to get good results when they do their
3  procedures.  And so they look at quality of the
4  products or they should and, in general, I believe
5  that they all want to get, you know -- we're in the
6  business of fighting pain or whatever their procedure
7  is doing, they want to get good results.  They want to
8  get dependable service, they -- you cannot run a
9  business if you go in in the morning and do your
10  procedures, you can't tell a patient, hey, I'm sorry,
11  but such and such a company is out of product so come
12  back tomorrow the next day because we didn't -- you
13  know, there's a shortage.
14    Q.   Is safety a factor that's appropriate?
15    A.   It should be.  It is.  I think it is.  I
16  think it is with most physicians, the vast majority of
17  them.
18    Q.   And is that why your company includes the
19  warnings about the fatal incident in California in its
20  brochures, for example?
21    A.   Yes.  Yeah.  Because that's important to
22  them.
23    Q.   All right.  And so in your experience, if
24  there's a choice between price and safety, what do
25  good physicians choose?  Do they go with safety or

1  price?
2        MR. TARDIO:  Object to form.
3        THE WITNESS:  Well, that depends on
4    the physician and how they go about
5    thinking through a product.  Their backs
6    have been up against the wall for a long
7    time as far as the insurance companies
8    reimbursing less, Medicare reimbursing
9    less.  So in order for them to do the
10    procedure, they need to be able to make
11    some money or they won't be able to do the
12    procedures.
13       So there is an economic component
14    that takes place, but -- so it depends on
15    the physician, but, yeah, most of them want
16    to get good results.
17    Q.   (By Mr. Nolan)  Sure.  But in your view,
18  would it ever be appropriate for a physician to
19  compromise safety for the sake of economics?
20        MR. TARDIO:  Object to the form.
21        THE WITNESS:  It's -- most physicians
22    is first do no harm.
23    Q.   (By Mr. Nolan)  Right.
24    A.   And that's the general rule.  So I think
25  that they should -- they abide by that, you know.

1    Q.   Do you know whether in this -- in this
2  field where patients give -- or clinics give epidural
3  steroid injections, do you know whether it's common
4  for clinics to pay their medical directors based on
5  the volume of revenues?
6       In other words, if a -- if a particular
7  doctor gives shots, the clinic pays the doctor more
8  money?  Have you run into that compensation structure
9  in your industry before?
10    A.   No, I don't really get involved in that.
11    Q.   And so another way of informing customers
12  about dangers of illegal pharmacy compounding is the
13  notice on your website that was discussed; is that
14  correct?
15    A.   Yes.
16    Q.   All right.  And let me hand you a document
17  that we'll make the next exhibit, and this will be
18  Exhibit 294.  Let me ask you if this appears to be
19  something that came off of your company's current --
20  current website?
21       (Exhibit 294 was marked for
22    identification.)
23       THE WITNESS:  What's your question?
24    Q.   (By Mr. Nolan)  Does this appear to be a
25  printout from portions of your company's current

1  website?
2    A.   Yes.
3    Q.   Okay.  And if we look over on the second
4  page of that exhibit, you see we have a notice about
5  illegal drug compounding and counterfeiting.  You see
6  that?
7    A.   Yes.
8    Q.   And it says adopted and published
9  July 2009.  You see that?
10    A.   Yes.
11    Q.   And so what does that mean?
12    A.   Well, that means we adopted it and
13  published it first time in 2009.
14    Q.   Okay.  And so is that -- would that be when
15  it began appearing on your website?
16       MR. TARDIO:  Object to the form.
17       THE WITNESS:  It may not -- actually,
18    I think it began appearing in 2008 --
19    Q.   (By Mr. Nolan)  Okay.
20    A.   -- in our catalog.
21    Q.   Okay.  I see.
22    A.   I think.
23    Q.   And so now we've talked about the fact that
24  your company is not a pharmacy; correct?
25    A.   Yes.

1    Q.    And so you -- you don't actually make
2    medications yourself; is that true?
3    A.    We don't -- yes.  We don't touch or do
4    anything with the product.
5    Q.    Okay.  So when you purchase the product
6    from pharmaceutical companies, it comes in -- in
7    sealed vials?
8    A.    Yes.
9    Q.    Okay.  And you don't tamper with those
10   packages?
11   A.    Absolutely not.
12   Q.    Okay.  And -- and customers who do business
13   with you, they do not come inspect your facility;
14   correct?
15   A.    They could if they wanted to.  They just --
16   no one has asked.
17   Q.    They don't?
18   A.    Yeah.
19   Q.    Are you familiar with an organization
20   called the American Society of Health-System
21   Pharmacists?
22   A.    Yes.
23   Q.    All right.  Were you aware that that
24   particular organization recommended that health
25   systems before buying anything from a compounding

1    pharmacy should take certain steps to carefully vet
2    that particular pharmacy as to whether it would be a
3    safe supplier of drugs?  Did you know that?
4        MR. TARDIO:  Object to form.
5        THE WITNESS:  I was aware of that,
6    but -- yeah, I read that.
7    Q.    (By Mr. Nolan)  And from your perspective
8    and giving your knowledge of the industry, do you
9    think it would be wise for any medical organization
10   who is considering buying material from a compounding
11   pharmacy to carefully check that organization out
12   before doing so?
13       MR. TARDIO:  Object to the form.
14       THE WITNESS:  Yes.
15   Q.    (By Mr. Nolan)  And why is that your
16   thought?
17   A.    So that they don't have anything bad happen
18   to their patients for the health hazard.  They want to
19   avoid anything -- side effects, any adverse reactions.
20   That's the whole purpose of doing that.
21       MR. NOLAN:  That's all I have.
22       MR. TARDIO:  I've got a handful of
23   followup.
24   FURTHER EXAMINATION
25   BY MR. TARDIO:

1    Q.    Sir, I just have a handful of followup
2    questions.  One is something that I don't know if we
3    ever -- I want to make sure we covered this.  What was
4    the price of Depo-Medrol, brand name Depo-Medrol from
5    Clint in 2011?  Is that something we can get from the
6    catalog?
7    A.    Yeah.  You have a 2011 catalog?
8    Q.    Fall of 2011.
9    A.    $9.95.  Got as low as 9.95.
10   Q.    Okay.  After the 2001 or after you learned
11   of the 2001 fungal meningitis outbreak that you have
12   talked about at various points in your deposition
13   today, did you make any complaint to the FDA about
14   compounding pharmacies and how they were operating?
15   A.    Yes.
16   Q.    What was that?  Was there a -- I mean, how
17   did you do it?  Did you call them?  Did you write them
18   a letter?  Did you write them an e-mail?
19   A.    I went and visited them.
20   Q.    And when was that?
21   A.    I don't know the exact month.
22   Q.    Do you know the year?
23   A.    I think it was about 2008, 2007.
24   Q.    Did you just show up or did you --
25   A.    I had an appointment.  Made an appointment.

1    Q.    Who did you meet with, do you remember?
2    A.    I don't remember.
3    Q.    Is there any documentation from that?
4    A.    I don't.  I've looked for that.
5    Q.    Well, what was there?  Was there a formal
6    complaint you filed?
7    A.    I just was wanting to see if they were
8    aware of the massive amounts of compounding going on.
9    Q.    Did you meet with somebody from the FDA?
10   A.    Yes.
11   Q.    And is that what you told them, that
12   there's a lot of compounding going on out there, I've
13   seen it?
14   A.    Yes.
15   Q.    And I'm worried about it?
16   A.    Yeah.
17   Q.    What was their response?
18   A.    They would look into it.
19   Q.    Do you know the position of the person or
20   the title of the person?
21   A.    I don't.  You know, I looked through that
22   quite a bit and I cannot find any documentation on
23   that.
24   Q.    What happened after that as it relates to
25   that complaint?

1    A.   I don't know.
2    Q.   Did you follow up to say what's going on
3  here, I met with you like a month ago or a year ago?
4    A.   No.
5    Q.   When you left the meeting, did you get the
6  sense that something was going to be done or was it
7  just an, okay, we'll look into it?
8    A.   I think they were limited as to what they
9  could tell me.
10   Q.   What gave you that sense?
11   A.   Because when I asked questions I didn't get
12 the answers.
13   Q.   How did you go about setting up the
14 appointment?
15   A.   I called.
16   Q.   Since that time, have you followed the
17 FDA's regulatory actions as they relate to compounding
18 pharmacies?  I mean, have you paid attention to it?
19   A.   To some degree.
20   Q.   Have you paid attention to what the FDA did
21 and didn't do in these cases with NECC?
22   A.   No, I don't think I can comment on that
23 because I haven't really paid that much attention to
24 it.
25   Q.   So you don't have an opinion on whether or

1  not the FDA discharged their regulatory duty in this
2  case?
3         MR. NOLAN:  Object to the form.
4         THE WITNESS:  I have no opinion on
5    that.  I don't know.
6    Q.   (By Mr. Tardio)  We talked a lot about
7  e-mails between Clint -- Clint Pharmaceuticals and
8  STOPNC.  Have you had any conversations with Debra
9  Schamberg that you can remember?
10   A.   I don't remember any.
11   Q.   Or with anybody at STOPNC?
12   A.   I don't remember any.  I may have called on
13 them, but I don't remember calling on them.
14   Q.   Have you seen any e-mails where Clint
15 Pharmaceuticals represented to STOPNC that they had
16 the brand Depo-Medrol still available?
17   A.   No, I haven't.
18   Q.   Or any phone slips or anything that
19 would -- would -- would illustrate that that was
20 relayed to STOPNC?
21   A.   I don't have anything.  I'd have to go back
22 and look, but I don't have anything.
23   Q.   Did you ever -- you talked about with
24 Mr. Nolan a minute or two ago about how physicians and
25 healthcare providers generally at least in your

1  experience want to do good for their patients; right?
2    A.   Yeah.
3    Q.   You ever get the sense with your business
4  dealing with STOPNC that they were not in that
5  category of trying to do or wanting to do good for
6  their patients?
7         MR. NOLAN:  Object to the form.
8         THE WITNESS:  I have -- repeat the
9    question, please.
10   Q.   (By Mr. Tardio)  Sure.  Did you ever have
11 any information that suggested to you STOPNC and the
12 doctors and nurses there didn't fall in that category
13 of healthcare providers that you talked about earlier
14 who wanted to do good for their patients?
15   A.   I've always thought highly of St. Thomas
16 Neurosurgery Center and the physicians there and I
17 think that they have very good intentions.
18   Q.   The -- let me ask you this question so it's
19 on the video.  The 2011 and 2012 catalogs, I don't --
20 I don't know if I understand where this 2000 --
21 warning about 2001 is.  Can you just show me where it
22 is?
23   A.   Here's a catalog from 2001.
24   Q.   Well, I'm talking about '11 and '12.  Is it
25 in those catalogs?

1    A.   Yeah.
2    Q.   Can you just show me what you're talking
3  about.
4    A.   It would be the 2012 catalog.
5         MR. TARDIO:  I tell you what, he's
6    going to change it real quick while you
7    look.
8         VIDEOGRAPHER:  This is the end of
9    Tape No. 2.  The time -- we're off the
10   record and the time is 1:34 p.m.
11        (A recess was taken.)
12        VIDEOGRAPHER:  We're back on the
13   record and the time is 1:36 p.m.
14   Q.   (By Mr. Tardio)  Okay.  I just asked before
15 we switched the tape if you could point me to in the
16 2011 and 20 -- the '11 and '12 catalogs before the
17 outbreak --
18   A.   Okay.
19   Q.   -- where the warning about 2001 and the
20 fungal meningitis.
21        So we'll start with -- when is this one?
22   A.   That's fall of 2011.
23   Q.   Fall of 2011 and you pointed me to what
24 page?
25   A.   Right here.

1    Q.    Tell me what page.
2    A.    That's Page 4.
3    Q.    Okay.  So Page 4 underneath the chart of
4  corticosteroids that you make available, there's a
5  link for more information on relating to the dangers
6  of compounding, see our website under what's new or
7  see July 2nd, 2001, fatal meningitis link to
8  compounding and then it gives a website; right?
9    A.    Yes.
10   Q.    So that's the 2000 -- that's the warning
11 about 2001 that we've been talking about?
12   A.    Yes.
13   Q.    Then the next catalog would have been?
14   A.    Spring of 2012 --
15   Q.    Okay.
16   A.    -- probably, which I do not have that here.
17 But I do have the winter 2012.
18   Q.    Winter of 2012, I think we've talked about.
19 I think we've covered the warnings in that one.
20   A.    Okay.
21   Q.    Let me see if I can hand you spring of
22 2012.
23   A.    I have the fall of 2012 and it does not
24 appear to be in the fall of 2012, so I stand corrected
25 on that.

1    Q.    Okay.  So the reference is in the spring of
2  2011; right?
3    A.    Yes.  It should be anyway.
4    Q.    The next catalog would be fall of 2011?
5    A.    Which you have right here.
6    Q.    Okay.  I'm sorry.  Do we have the spring of
7  2011 here?
8    A.    I don't believe we do, sir.  No, we do not.
9        THE WITNESS:  Unless you've got one.
10   Q.    (By Mr. Tardio)  Is it the one under your
11 right -- this one?
12   A.    This is July of 2009.
13   Q.    Okay.  So we've got fall of 2011; right?
14   A.    Yeah.
15   Q.    It's in there.  The 2001 reference?
16   A.    Yes.
17   Q.    Then I'm going to hand you -- we don't have
18 fall of 2011 here; right?
19   A.    It doesn't appear.
20       MR. CLINE:  That's fall.  We don't
21 have spring of '11.
22       MR. TARDIO:  I'm sorry.
23   Q.    (By Mr. Tardio)  Start over.  We have fall
24 of 2011.  It's been marked exhibit?
25       MR. NOLAN:  278.

1    Q.    (By Mr. Tardio)  278.  It has the 2001
2  reference in it; true?
3    A.    Yes.
4    Q.    We don't have the next catalog; right?
5    A.    Spring of 2012.  I do not believe we have
6  that one.
7    Q.    I don't think it's been marked yet.  I have
8  a copy.  I think portions of it have been marked -- if
9  we have the catalog we can confirm it for ourselves,
10 but do you know if it was in the spring of 2012
11 catalog?
12   A.    Well, I'd like to confirm it with you.  If
13 this is it.
14   Q.    That's missing the pages that we marked?
15   A.    Oh, it is?
16   Q.    Here's a full copy.
17   A.    Okay.  Okay.  Spring of 2012.
18   Q.    Yes, sir.
19   A.    Okay.
20   Q.    Is it in there?
21   A.    I do not see it in here.
22   Q.    And then the next one would be fall of
23 2012.  Is it in there?
24   A.    I have the winter of 2012.
25   Q.    Would that be the next catalog?

1    A.    That probably is, sir.  And I don't see it
2  in -- oh, yes.  Yeah, it is in here.
3    Q.    That would be the post-outbreak catalog;
4  right?
5    A.    Yes.  That would be post-outbreak.
6    Q.    And then Exhibit 281-A is fall of 2012?  Is
7  it in there?
8    A.    Fall of 2012, it is not in there.
9    Q.    Okay.  It's admittedly partly my fault that
10 some of these are marked and some of them aren't.  Can
11 you agree or will you agree to -- well, let me ask it
12 this way:  Do you have copies of all these catalogs at
13 your office?  Do y'all maintain them?
14   A.    I'd have to look.  If it's available, I can
15 get it to you if that's what you're asking.
16   Q.    It is.  And the second part of my question
17 is simply will you agree not to destroy or get rid of
18 any of these catalogs?
19   A.    Oh, I -- I don't want to get rid of them at
20 all.  So yes.
21   Q.    Same question for the recall binder, that
22 is something that we may consider asking for either
23 formally or informally.  Do you keep that as a matter
24 of your business back at least three years?
25   A.    Yeah.

Page 189

1    Q.    Is that something you would be willing to
2  at least maintain?
3    A.    We maintain that.
4    Q.    But will you agree not to destroy it?
5    A.    Yeah, we don't destroy things.
6    Q.    Fair enough.
7         MR. TARDIO:  That's all I have.  I
8  really appreciate your time.
9  FURTHER EXAMINATION
10 BY MR. NOLAN:
11   Q.    Two housekeeping measures.  We don't have
12 the 2010 catalogs with us.  Will you agree to send us
13 copies of the 2010 catalogs?
14   A.    Yeah, just -- if you would just send me an
15 e-mail what you want --
16   Q.    Okay.
17   A.    -- and I'll be glad to send it to you.
18        THE WITNESS:  And you as well.
19        MR. TARDIO:  Thank you, sir.
20   Q.    (By Mr. Nolan)  And then also, Mr. Ebel,
21 you as a witness, sir, are entitled if you want to to
22 read and sign your deposition transcript and that's
23 for the purpose of making sure the court reporter got
24 everything down correctly, or you can waive that.  You
25 don't have to do it.  But I just want to let you know

Page 190

1  you have that option if that's something you choose.
2    A.    I'm certainly not going to do it now.
3    Q.    Okay.  All right.  Fair enough.  So I'll
4  take it, then, you're waiving your opportunity to do
5  that which is perfectly fine.
6         MR. TARDIO:  I don't have anything
7  else.
8         MR. NOLAN:  That's it.
9         VIDEOGRAPHER:  This concludes?
10        MR. TARDIO:  Yes, sir.
11        VIDEOGRAPHER:  This concludes the
12 deposition.  This is the end of Tape No. 3.
13 We're off the record and the time is
14 1:44 p.m.
15        (Deposition concluded at 1:44 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 191

1               CAPTION
2
3        The Deposition of JEFFERY EBEL, taken in
4  the matter, on the date, and at the time and place set
5  out on the title page hereof.
6        It was requested that the deposition be
7  taken by the reporter and that same be reduced to
8  typewritten form.
9        It was agreed by and between counsel and
10 the parties that the Deponent will waive reading and
11 signing of the transcript of said deposition.

Page 192

1        DISCLOSURE
2
3        Pursuant to Article 10.B of the Rules
   and Regulations of the Board of Court
4  Reporting of the Judicial Council of
   Georgia which states:  "Each court reporter
5  shall tender a disclosure form at the time
   of the taking of the deposition stating the
6  arrangements made for the reporting
   services of the certified court reporter,
7  by the certified court reporter, the court
   reporter's employer or the referral source
8  for the deposition, with any party to the
   litigation, counsel to the parties, or
9  other entity.  Such form shall be attached
   to the deposition transcript," I make the
10 following disclosure:
11      I am a Georgia Certified Court
   Reporter.  I am here as a representative of
12 Discovery Litigation Services, LLC.
   Discovery Litigation Services, LLC was
13 contacted to provide court reporting
   services for the deposition.  Discovery
14 Litigation Services, LLC will not be taking
   this deposition under any contract that is
15 prohibited by O.C.G.A. 9-11-28(c).
16      Discovery Litigation Services, LLC
   has no contract/agreement to provide
17 reporting services with any party to the
   case, any counsel in the case, or any
18 reporter or reporting agency from whom a
   referral might have been made to cover this
19 deposition.
20      Discovery Litigation Services, LLC
   will charge its usual and customary rates
21 to all parties in the case, and a financial
   discount will not be given to any party to
   this litigation.
22
23
24           Blanche J. Dugas
             CCR No. B-2290
25

Page 193

```
 1    STATE OF GEORGIA:
 2    COUNTY OF FULTON:
 3
 4          I hereby certify that the foregoing
 5    transcript was reported, as stated in the
 6    caption, and the questions and answers
 7    thereto were reduced to typewriting under
 8    my direction; that the foregoing pages
 9    represent a true, complete, and correct
10    transcript of the evidence given upon said
11    hearing, and I further certify that I am
12    not of kin or counsel to the parties in the
13    case; am not in the employ of counsel for
14    any of said parties; nor am I in any way
15    interested in the result of said case.
16
17
18
19
20          BLANCHE J. DUGAS, CCR-B-2290
21
22
23
24
25
```