Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: NEW ENGLAND
COMPOUNDING PHARMACY,
INC. PRODUCTS LIABILITY   MDL No. 2419
LITIGATION
                    Master Dkt:
                    1:13-md-02419-RWZ
~~~~~~~~~~~~~~~~~~~~~~
THIS DOCUMENT RELATES
TO:

All Actions

~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF
SCOTT BUTLER

9:03 a.m.
February 5, 2015

Suite 1100
315 Deaderick Street
Nashville, Tennessee

Blanche J. Dugas, RPR, CCR No. B-2290

---

Page 2

1              APPEARANCES OF COUNSEL
2
    On Behalf of the Plaintiffs:
3      GEORGE NOLAN, Esquire
       WILLIAM LEADER, Esquire
4      Leader, Bulso & Nolan, PLC
       Suite 1740
5      414 Union Street
       Nashville, Tennessee  37219-1734
6      (615) 780-4114
       (615) 780-4122 (facsimile)
7      gnolan@leaderbulso.com
       bleader@leaderbulso.com
8
       J. GERARD STRANCH, IV, Esquire
9      Branstetter, Stranch & Jennnings, PLLC
       227 Second Avenue North
10     Nashville, Tennessee  37201
       (615)254-8801
11     gerards@branstetterlaw.com
       MARK P. CHALOS, Esquire
12     Lieff, Cabraser, Heimann & Bernstein, LLP
       Suite 1650, One Nashville Place
13     150 Fourth Avenue
       Nashville, Tennessee  37219-2423
14     (615) 313-9000
       (615) 313-9965 (facsimile)
15     mchalos@lchb.com
16
       DANIEL L. CLAYTON, Esquire
17     Kinnard, Clayton & Beveridge
       127 Woodmont Boulevard
18     Nashville, Tennessee  37205
       (615) 686-2501
19     (615) 297-1505 (facsimile)
       dclayton@kcbattys.com
20
21
22
23
24
25

---

Page 3

1            ~~ APPEARANCES CONTINUED ~~
2   On Behalf of Saint Thomas Outpatient Neurosurgical
    Center, LLC; Howell Allen, a Professional Corporation;
3   John W. Culclasure, M.D.; Debra V. Schamberg, RN:
       CLARENCE J. "C.J." GIDEON, JR., Esquire
4      MATTHEW CLINE, Esquire
       CHRISTOPHER TARDIO, Esquire
5      Gideon, Cooper & Essary, PLC
       Suite 1100
6      315 Deaderick Street
       Nashville, Tennessee 37238
7      (615) 254-0400
       cj@gideoncooper.com
8      matt@gideoncooper.com
       chris@gideoncooper.com
9
    On Behalf of St. Thomas Health; St. Thomas Network;
10  St. Thomas West Hospital f/k/a St. Thomas Hospital:
       ERIC J. HOFFMAN, Esquire
11     ADAM T. SCHRAMEK, Esquire
       Norton, Rose, Fulbright
12     Suite 1100
       98 San Jacinto Boulevard
13     Austin, Texas 78701
       (512) 536-5232
14     adam.schramek@nortonrosefulbright.com
       eric.hoffman@nortonrosefulbright.com
15
       AMY D. HAMPTON, Esquire
16     Bradley, Arant, Boult & Cummings, LLP
       Suite 700, Roundabout Plaza
17     1600 Division Street
       Nashville, Tennessee  37203
18     (615) 244-2582
       (615) 252-6379 (facsimile)
19     ahampton@babc.com
20  On Behalf of Premier Orthopaedic & Sports Medicine
    Associates of Southern New Jersey, LLC d/b/a Premier
21  Orthopaedic & Sports Associates, LLC; Premier
    Orthopaedic Associates Surgical Center, LLC:
22     JAY J. BLUMBERG, Esquire
       Blumberg & Wolk, LLC
23     158 Delaware Street
       Woodbury, New Jersey 08096
24     (856) 848-7472
       (856) 848-8012 (facsimile)
25     jjblumberg@blumberglawoffices.com

---

Page 4

1            ~~ APPEARANCES CONTINUED ~~
2   On Behalf of UniFirst Corporation:
       JIM REHNQUIST, Esquire
3      KATE E. MACLEMAN, Esquire
       Goodwin Procter, LLP
4      53 State Street, Exchange Place
       Boston, Massachusetts 02109
5      (617) 570-1000
       (617) 523-1231 (facsimile)
6      jrehnquist@goodwinprocter.com
       kmacleman@goodwinprocter.com
7
8   On Behalf of Specialty Surgery Center - Crossville,
    PLLC; Kenneth R. Lister, M.D.; Kenneth R. Lister,
9   M.D., PC:
       MEGAN A. CARRICK, Esquire
10     Brewer, Krause, Brooks, Chastain & Burrow, PLLC
       Suite 2600
11     611 Commerce Street
       Nashville, Tennessee  37203
12     (615)256-8787
       (615)256-8985 (facsimile)
13     mcarrick@bkblaw.com
14
15     * The Following Attorneys Appeared Via Video Stream *
15     CLARE CARROLL, Esquire
16     McCarthy, Bouley & Barry, PC
       47 Thorndike Street
17     Cambridge, Massachusetts  02141
       (617) 225-2211
18     (617) 225-7711 (facsimile)
       cfc@mbblaw.com
19
       REBECCA BLAIR, Esquire
20     The Blair Law Firm
       Suite 207
21     5214 Maryland Way
       Brentwood, Tennessee  37027
22     (615) 515-4492
       rblair@blair-law.com
23
24
25

---

1 (Pages 1 to 4)

Page 5

```
 1            ~~ APPEARANCES CONTINUED ~~
 2     DUSTIN CLINT DANIEL, Esquire
       Schulman, LeRoy & Bennett, PC
 3     7th Floor
       501 Union Street
 4     Nashville, Tennessee 37219-0676
       (615) 244-6670
 5     (615) 254-5407 (facsimile)
       ddaniel@slblawfirm.com
 6
       KATHERINE DENNIS, Esquire
 7     Capplis, Connors & Carroll, PC
       Suite 220
 8     18 Tremont Street
       Boston, Massachusetts  02108
 9     (617) 227-0722
10     MELISSA HOWARD, Esquire
       Leader, Bulso & Nolan, PLC
11     Suite 1740
       414 Union Street
12     Nashville, Tennessee 37219-1734
       (615) 780-4114
13     (615) 780-4122 (facsimile)
       mhoward@leaderbulso.com
14
       BRANDON KULWICKI, Esquire
15     Stewart, Courington, Dugger & Dean
       Suite 200
16     1701 N. Market Street
       Dallas, Texas  75202
17     (214) 615-2025
       (214) 615-2001 (facsimile)
18     brandon@scddlaw.com
19     J. KYLE ROBY, Esquire
       English, Lucas, Priest & Owsley, LLP
20     1101 College Street
       Bowling Green, Kentucky  42102-0770
21     (270) 782-6500
       (270) 782-7782 (facsimile)
22     kroby@elpolaw.com
23
24
25
```

Page 6

```
 1            ~~ APPEARANCES CONTINUED ~~
 2     LOUIS W. VOELKER, Esquire
       Eichhorn & Eichhorn, LLP
 3     200 Russell Street
       Hammond, Indiana  46320
 4     (219) 931-0560
       lvoelker@eichhorn.com
 5
       MARK ZAMORA, Esquire
 6     The Orlando Firm, PC
       Suite 2600
 7     5 Concourse Parkway
       Atlanta, Georgia  30328
 8     (404) 373-1800
       mark@markzamora.com
 9
       JEREMY CAIN, Esquire
10     Gideon, Cooper & Essary, PLC
       Suite 1100
11     315 Deaderick Street
       Nashville, Tennessee  37238
12     (615) 254-0400
       jeremy@gideoncooper.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1        Videotaped Deposition of Scott Butler
              February 5, 2015
 2
 3         VIDEOGRAPHER:  Here begins Tape No. 1
 4    to the videotaped deposition of Scott
 5    Butler taken in matter of New England
 6    Compounding Pharmacy, Inc. product
 7    liability litigation.  This deposition is
 8    being held at 315 Deaderick Street,
 9    Nashville, Tennessee 37238 on February 5th
10    of 2015.  The time is 9:03 a.m.
11         My name is Daniel Makowski.  I'm the
12    video technician.  The court reporter today
13    is B.J. Dugas.  Would counsel please
14    introduce yourselves for the record and
15    state whom you represent, then the reporter
16    will swear in the witness.
17         MR. NOLAN:  George Nolan for the
18    plaintiffs.
19         MR. CHALOS:  Mark Chalos for the
20    plaintiffs.
21         MR. STRANCH:  Gerard Stranch for the
22    plaintiffs.
23         MR. LEADER:  Bill Leader for the
24    plaintiffs.
25         MR. CLAYTON:  Daniel Clayton for the
```

Page 8

```
 1    plaintiffs.
 2         MR. HOFFMAN:  Eric Hoffman for the
 3    St. Thomas entities.
 4         MS. HAMPTON:  Amy Hampton for the St.
 5    Thomas entities.
 6         MR. BLUMBERG:  Jay Blumberg for the
 7    Premier defendants.
 8         MS. CARRICK:  Megan Carrick for Dr.
 9    Lister and Specialty Surgery Center.
10         MR. REHNQUIST:  Jim Rehnquist,
11    UniFirst.
12         MS. MACLEMAN:  Kate MacLeman also for
13    UniFirst.
14         MR. TARDIO:  Christopher Tardio for
15    the Tennessee clinic defendants.
16         MR. CLINE:  Matt Cline for the
17    Tennessee clinic defendants.
18         MR. GIDEON:  And C.J. Gideon for
19    Howell Allen, STOPNC and the witness, Scott
20    Butler.
21         SCOTT ALEXANDER BUTLER,
22    having been first duly sworn, was examined and
23    testified as follows:
24    EXAMINATION
25    BY MR. NOLAN:
```

Page 9

1    Q.    Sir, would you please state your full name.
2    A.    My name is Scott Alexander Butler.
3    Q.    Mr. Butler, we're here to take your
4    deposition today.  You understand that you're under
5    oath?
6    A.    Yes.
7    Q.    And that you have an obligation to tell the
8    truth in response to all questions posed to you today,
9    and that's the same obligation that you would have if
10   you were sitting in a federal courtroom and the
11   federal judge was sitting next to the witness stand.
12   Do you understand that?
13   A.    Yes.
14   Q.    With that obligation in mind, would you be
15   sure to make all of your answers full, truthful and
16   complete?
17   A.    Yes.
18   Q.    If I ask you a question that you do not
19   understand, will you let me know and I will try to ask
20   a question that is more clear.  Fair enough?
21   A.    Yes.
22   Q.    If I ask you a question and you give me an
23   answer, I'm going to assume that you understood the
24   question.  Is that also fair?
25   A.    Yes.

Page 10

1    Q.    I'm going to start by a few -- with a few
2    questions about your background.  I understand you're
3    originally from Atlanta; is that correct?
4    A.    Correct.
5    Q.    And how long have you worked for the Howell
6    Allen Clinic?
7    A.    Since 2005.  Spring of 2005.
8    Q.    All right.  Where did you go to college?
9    A.    I went to undergraduate at Samford
10   University and graduate school at Auburn University.
11   Q.    And what degree did you obtain from
12   Samford?
13   A.    A bachelor of science in business
14   administration and then an MBA from Auburn.
15   Q.    Do you have any medical training?
16   A.    No.
17   Q.    When you began working for Howell Allen
18   Clinic in 2005, what was your job?
19   A.    I was the controller, CFO.
20   Q.    What is your job now?
21   A.    Chief administrative officer.  Really just
22   the administrator for the practice.
23   Q.    When did you become the chief -- chief
24   administrative officer for Howell Allen Clinic?
25   A.    2007.

Page 11

1    Q.    And what are your responsibilities as the
2    chief administrative officer of the Howell Allen
3    Clinic?
4    A.    Mainly just manage the business side of the
5    practice.
6    Q.    What's included in that?
7    A.    Accounting, payroll, accounts payable,
8    billing and collection and the overall -- the
9    operations of the practice.
10   Q.    Do your responsibilities include public
11   relations?
12   A.    Yes, they do.
13   Q.    Who do you report to?
14   A.    The board of Howell Allen Clinic.
15   Q.    And how would you describe the Howell Allen
16   Clinic for someone who is unfamiliar with that entity?
17   A.    A group of neurosurgeons.
18   Q.    How many?
19   A.    Twelve.
20   Q.    How many employees does Howell Allen Clinic
21   have?
22   A.    Approximately 125.
23   Q.    How many locations?
24   A.    Three main locations and about six
25   satellite locations.

Page 12

1    Q.    Where are the three main locations?
2    A.    St. Thomas Midtown, St. Thomas West and
3    Skyline Hospital.
4    Q.    Now, it was on the campus of St. Thomas
5    West where the epidural and ster -- epidural steroid
6    injections were given that's the subject of this
7    lawsuit; is that correct?
8    A.    Yes.
9    Q.    Where are the six satellite locations that
10   you mentioned?
11   A.    Clarksville, Hopkinsville, Bowling Green,
12   Summit, Columbia.  How many is that?  Is that six?
13   Q.    I wrote down five.
14   A.    Okay.  And then Franklin.
15   Q.    Okay.
16   A.    And then one more, Columbia.
17   Q.    Thank you.  Who is the president of Howell
18   Allen Clinic?
19   A.    Greg Lanford.
20   Q.    He was the president back in 2011 and 2012;
21   is that correct?
22   A.    Yes.
23   Q.    Do you hold any official titles with St.
24   Thomas Outpatient Neurosurgical Center?
25   A.    I'm a board member.

Page 13

1    Q.    How long have you been a board member?
2    A.    I think 2007.
3    Q.    Now, St. Thomas Outpatient Neurosurgical
4  Center is somewhat of a mouthful, and here in the
5  deposition today, I'm likely to refer to that entity
6  as St. Thomas Neurosurgical.  So if I do that, will
7  you understand that I'm referring to St. Thomas
8  Outpatient Neurosurgical Center?
9    A.    Okay.
10   Q.    Fair enough?
11        And I also want to -- I meant to give you
12  this earlier.  This is a copy of a protective order
13  that's been entered by the judge in this litigation.
14  And the reason I'm giving it to you is because it's
15  likely that you may be shown some information during
16  the course of today's proceeding that was stamped
17  "confidential" by the parties that are producing it.
18        So you don't have to do it now, but at your
19  convenience, I want you to read that and then I ask
20  you to make sure you take it -- its requirements of
21  confidentiality seriously.  Fair enough?
22   A.    So you're just telling me the documents
23  that I receive today that have "confidential" on them,
24  I need to keep them confidential?
25   Q.    Right.  You need to read the order and

Page 14

1  follow the order, but the primary purpose of the order
2  is that you have to keep those confidential and can't
3  use them beyond the confines of this litigation.  Fair
4  enough?
5    A.    Okay.
6    Q.    All right.  Tell us what you know about the
7  history of St. Thomas Neurosurgical.
8    A.    I know it was started in 2000 doing spine
9  surgery and epidural steroid injections, and then in
10  early 2005, all the spine surgery moved out of there
11  and since 2005, it's been doing epidural steroid
12  injection, pain blocks, various other procedures.
13   Q.    And approximately how many epidural steroid
14  injections does St. Thomas Neurosurgical do in a year?
15   A.    Over the course of the last ten years, just
16  an approximate?
17   Q.    Sure.
18   A.    I'd say between three and 4,000 would be my
19  guess.
20   Q.    What about in 2012 and 2000 -- or rather
21  let's say 2011?  Do you have any idea as to
22  approximately how many procedures -- epidural steroid
23  injections were done that year?
24   A.    I think around 5,000.
25   Q.    And before the fungal meningitis outbreak,

Page 15

1  was St. Thomas Neurosurgical generally on pace to do a
2  similar number of procedures in 2012?
3    A.    I'm not sure.
4    Q.    And is it true that St. Thomas
5  Neurosurgical is a joint venture between Howell Allen
6  Clinic and St. Thomas Hospital?
7        MR. HOFFMAN:  Objection to form.
8        THE WITNESS:  I'm not sure if it's
9    St. Thomas Hospital or St. Thomas Health
10   Services.  I'm not sure how the -- I know
11   that our side is Howell Allen Clinic, but
12   I'm not sure who the official owner is on
13   the -- on their side.
14   Q.    (By Mr. Nolan)  All right.  So you're not
15  sure exactly which St. Thomas entity is the official
16  owner of half of St. Thomas Neurosurgical; is that
17  correct?
18   A.    Correct.
19   Q.    But is it true that St. Thomas
20  Neurosurgical is a joint venture between Howell Allen
21  Clinic and some St. Thomas entity?
22   A.    Yes.
23   Q.    All right.  And generally, that joint
24  venture functioned as a partnership between Howell
25  Allen Clinic and St. Thomas for the 12 or 13 years

Page 16

1  before the fungal meningitis outbreak?
2        MR. GIDEON:  Objection to the form.
3    Q.    (By Mr. Nolan)  You may answer.
4    A.    I'm not sure what you're asking.
5    Q.    Let me -- let me repeat the question.
6        Am I correct in understanding that St.
7  Thomas Neurosurgical is a joint venture between Howell
8  Allen Clinic and St. Thomas, and that that joint
9  venture functioned as a partnership between --
10       MR. HOFFMAN:  Objection to form.
11   Q.    (By Mr. Nolan)  -- the two venturers for
12  several years before the fungal meningitis outbreak?
13       MR. GIDEON:  And I repeat my
14   objection to your characterization of it as
15   a partnership.
16       MR. NOLAN:  Okay.  Fair enough.
17   Q.    (By Mr. Nolan)  You can go ahead and
18  answer.
19   A.    I don't know that I would characterize it
20  as a partnership.  I'm not...
21   Q.    Isn't it true that --
22       MR. GIDEON:  Was he finished?
23   Were you finished?
24       THE WITNESS:  Yes.
25   Q.    (By Mr. Nolan)  Okay.  Isn't it true,

Page 17

1    however, that at the time of the fungal meningitis
2    outbreak, you viewed it as functioning as a
3    partnership?
4        A.    I'm not sure I would -- I would view it as
5    a joint venture between our group and St. Thomas.
6        Q.    All right.  And I appreciate that, but my
7    question was:  Did you view that joint venture as
8    functioning as a partnership?
9        A.    I'm not sure.  I don't -- I don't remember.
10       Q.    All right.  So you have no memory of
11   whether -- as someone who is both an officer for
12   Howell Allen Clinic and on the board of St. Thomas
13   Neurosurgical, you don't remember whether you actually
14   viewed it as functioning as a partnership?
15       A.    I'm saying I don't remember myself viewing
16   it as a partnership.
17       Q.    All right.  Do you know whether Dr. Lanford
18   viewed it as a partnership?
19           MR. GIDEON:  Objection to the form.
20           THE WITNESS:  I'm not sure.
21       Q.    (By Mr. Nolan)  Okay.  Did you ever have
22   any reason to believe that Dr. Lanford viewed it as
23   functioning as a partnership?
24       A.    I'm not sure.
25           MR. GIDEON:  You can save copies for

Page 18

1        us.  Just give us the Bates number.  Pass
2        the rest of them down.
3            (Exhibit 58 was marked for
4        identification.)
5        Q.    (By Mr. Nolan)  Let me hand you a document
6    which we'll make Exhibit No. 58.  It's STOPNC number
7    6043.  And I'm going to ask you if this is an e-mail
8    that you authored?
9        A.    Yes.
10       Q.    Okay.  All right.  And you sent it to Dr.
11   Lanford, the president of Howell Allen Clinic, as well
12   as several other physician owners of that clinic; is
13   that true?
14       A.    Yes.
15       Q.    All right.  And why did you send this
16   e-mail to Dr. Lanford?
17       A.    It appears that our group was concerned
18   that St. Thomas was separating themselves from us.
19       Q.    And who is "us"?
20       A.    From Howell Allen Clinic.
21       Q.    Okay.  Well, let's read this e-mail
22   together.  First of all, this is an e-mail that
23   Dr. Lanford asked you to draft; is that correct?
24       A.    Correct.
25       Q.    All right.  And so you wrote this e-mail

Page 19

1    for Dr. Lanford understanding that Dr. Lanford would
2    then send a version of this e-mail to St. Thomas; is
3    that correct?
4        A.    Correct.
5        Q.    All right.  And did you know who at St.
6    Thomas he planned to send the e-mail that you were
7    ghostwriting for him, so to speak?
8        A.    Looks like Dawn Rudolph.
9        Q.    All right.  And she was the CEO of St.
10   Thomas Hospital; is that correct?
11       A.    Yes.
12       Q.    Okay.  All right.  And so here's what the
13   e-mail says.  It says, "When this issue with tainted
14   steroids started back in September, our physicians and
15   staff at St. Thomas Hospital worked very closely to
16   coordinate patient care and communication.  It was an
17   outstanding example of teamwork between partners."
18           All right.  Now, what partners are you
19   referring to there?
20       A.    I would assume my physicians and St.
21   Thomas.
22       Q.    Okay.  Would that include St. Thomas
23   Hospital and St. Thomas Health?
24       A.    Yes.
25       Q.    Okay.  And then it says, "In our STOPNC

Page 20

1    emergency board meeting at St. Thomas, you made it
2    very clear that you wanted to be the buffalo in this
3    event and brave the storms ahead together.  Our group
4    felt like we were on the same page in making sure that
5    the patients were the top priority for all of us in
6    the joint venture at STOPNC."
7            Did I read those sentences correctly?
8        A.    Yes.
9        Q.    All right.  Then it says, "However, over
10   the last couple of weeks, it has become evident that
11   your goal is to separate yourself from our group and
12   the joint venture by informing all media that this
13   surgery center was independent and unaffiliated with
14   St. Thomas Hospital.  In the Tennessean, writer Josh
15   Rogers e-mailed us and said, 'St. Thomas is trying to
16   distance themselves from you even though their name is
17   on the corporation documents saying that you are
18   independent, end quote.  In Health Leaders magazine,
19   it was stated that STOPNC was, quote, not affiliated
20   with the hospital, close quote, and, quote,
21   unaffiliated clinic, close quote, and, quote,
22   similarly named, but unaffiliated clinic, close quote.
23           Our group has never considered this joint
24   venture to be anything other than a partnership
25   between St. Thomas Hospital and Howell Allen Clinic.

Page 21

1    That's how it began and that's how it has functioned
2    over the last 13 years."
3         Have I read those sentences correctly?
4    A.    Yes.
5    Q.    Is the material and the words that you
6    wrote for Dr. Lanford, are those words true?
7    A.    I'm not sure what you mean by are they
8    true.
9    Q.    Are you unfamiliar with that term?
10   A.    I'm just not sure what -- are you -- if
11   you're saying that the document is -- how you read it
12   is how I typed it, then, yes. I'm not sure what
13   you're asking me --
14   Q.    Well --
15   A.    -- is true or not.
16   Q.    When you were writing this at Dr. Lanford's
17   request, did you endeavor to make sure that the
18   verbiage you selected was truthful?
19   A.    I guess I would say I'm not -- I'm not sure
20   that I would say truthful. I would say that this is
21   my opinion on the situation.
22   Q.    All right. That was your honest opinion at
23   the time; correct?
24   A.    Correct.
25   Q.    All right. Now, the sentence that begins,

Page 22

1    "Our group," which we've already read. "Our group had
2    never considered this joint venture to be anything
3    other than a partnership between St. Thomas Hospital
4    and Howell Allen Clinic," who is "our group"?
5    A.    Howell Allen Clinic.
6    Q.    All right. And then when you say, "That's
7    how it began." Are you referring to -- is "it" St.
8    Thomas Neurosurgical?
9    A.    Yes.
10   Q.    Okay. And it says, "That's how it began
11   and that's how it has functioned over the last
12   13 years." "It" is still St. Thomas Neurosurgical;
13   correct?
14   A.    Yes.
15   Q.    All right. And then continuing on, it
16   says, "The management of the facility has shared
17   responsibilities between our group and your hospital.
18   Until your arrival, the administrator at St. Thomas
19   Hospital has always been on the board at STOPNC."
20        Did I read that correctly?
21   A.    Yes.
22   Q.    All right. And then it says, "The Howell
23   Allen Clinic has had a long -- a very long and
24   successful partnership with St. Thomas Hospital."
25        Did I read that correctly?

Page 23

1    A.    Yes.
2    Q.    What partnership are you referring to?
3    A.    I think if I was -- going back and looking
4    at it, I think I would say that that partnership to me
5    could probably be replaced with relationship, really
6    referring to our relationship with St. Thomas
7    Hospital. That our physicians had been at St. Thomas
8    Hospital for roughly 40 years in some form or fashion.
9    Q.    Did Dr. Lanford eventually send this e-mail
10   to Dawn Rudolph?
11   A.    I believe so, but I'm not sure.
12   Q.    Can you tell me how the name St. Thomas
13   Neurosurgical was selected?
14   A.    I don't know.
15   Q.    Do you know who chose that name?
16   A.    I don't know.
17   Q.    Do you know why that entity has continued
18   to use that name since you've been there?
19   A.    I think that was the name that it was
20   started with and there's just never been any
21   initiative to change it.
22   Q.    Do you think that St. Thomas Surgical, by
23   using the St. Thomas name, has benefited from that?
24   A.    No, I don't think so.
25   Q.    All right. And if we look at the e-mail,

Page 24

1    at the bottom is Dr. Lanford's e-mail to you asking
2    you to draft an e-mail for Dawn. Dawn Rudolph;
3    correct?
4    A.    Correct.
5    Q.    And he suggested that you send a copy -- or
6    he intended to send a copy of the e-mail apparently to
7    MS. Does that stand for Mike Schatzlein?
8    A.    I would think so.
9    Q.    And Mike Schatzlein at that point in time
10   was the president and CEO of St. Thomas Health?
11   A.    I think so.
12   Q.    All right. But is Mr. Schatzlein a
13   physician?
14   A.    Yes.
15   Q.    Okay. So Dr. Schatzlein was not on the
16   board of St. Thomas Neurosurgical; is that correct?
17   A.    Correct.
18   Q.    Was Ms. Rudolph on the board?
19   A.    I believe at that time she was on the
20   board.
21   Q.    And for what purpose did Howell Allen and
22   St. Thomas come together and form St. Thomas
23   Neurosurgical?
24   A.    I'm not sure. I wasn't -- I wasn't there
25   at the time.

Page 25

1  Q.  Well, what is your understanding of the
2  purpose that St. Thomas and Howell Allen Clinic had
3  operated St. Thomas Surgical since you were involved
4  beginning in 2007?
5  A.  Since I've been involved, it's been
6  operating as a surgery center that does epidural
7  steroid injections, blocks.
8  Q.  Okay.  And as I understand it, the
9  ownership of that entity is shared equally between St.
10  Thomas and Howell Allen Clinic; is that correct?
11  A.  Yes.
12  Q.  But the profits from that entity are
13  distributed equally; is that correct?
14  A.  Yes.
15  Q.  And it is a for-profit entity?
16  A.  Yes.
17  Q.  And the profits are calculated after
18  expenses are paid; is that correct?
19  A.  Yes.
20  Q.  So that expenses are likewise shared
21  between the venturers; is that true?
22  A.  Yes.
23  Q.  And at the time of the meningitis outbreak,
24  who were the St. Thomas Neurosurgical board members?
25  A.  Myself, Greg Lanford, Dale Batchelor and

Page 26

1  Dawn Rudolph.
2  Q.  All right.
3  A.  I'm not sure if Dawn or Alan Strauss was
4  the -- we didn't -- we don't have any control over the
5  St. Thomas board side, and their side changed -- has
6  changed over the last seven and a half years since
7  I've been there.  So I'm not sure who --
8  Q.  All right.
9  A.  -- the -- it was two of those three I'm --
10  I'm pretty sure of that.
11  Q.  Okay.  All right.  And so you -- Howell
12  Allen didn't have any control over who St. Thomas
13  selected to be its representatives on the board;
14  correct?
15  A.  Correct.
16  Q.  All right.  And so we know who you are.  We
17  know who Dr. Lanford is.  Dale Batchelor was the chief
18  medical officer for St. Thomas Hospital; is that
19  correct?
20  A.  Yes.
21  Q.  And Dawn Rudolph was the CEO of St. Thomas
22  Hospital; correct?
23  A.  Yes.
24  Q.  And what position did Alan Strauss hold?
25  A.  I believe he was the CFO of -- he was the

Page 27

1  CFO.
2  Q.  Do you know whether that was a -- either
3  St. Thomas Hospital or St. Thomas Health?
4  A.  I'm not sure if that was -- I'm not sure.
5  Q.  And you were here during Ms. Schamberg's
6  deposition yesterday?
7  A.  Yes.
8  Q.  And you heard her indicate that she reports
9  to the board; correct?
10  A.  Correct.
11  Q.  Okay.  And would I be correct in
12  understanding that if you as a board member gave a
13  directive to Ms. Schamberg, you would expect her to
14  follow that directive?
15  A.  Yes.
16  Q.  Would I be correct in understanding that if
17  Dr. Bachelor gave Ms. Schamberg a directive as a board
18  member of St. Thomas Neurosurgical, you would expect
19  her to follow that directive?
20  A.  Yes.
21  Q.  And would the same be true for Dr.
22  Culclasure?
23  A.  If he gave her a directive, would she be
24  responsible for following it?
25  Q.  Yes.

Page 28

1  A.  I think depending on what -- what it is,
2  yes.
3  Q.  And what was the purpose for having
4  representatives of St. Thomas on the St. Thomas
5  Neurosurgical board?
6  A.  Because they own 50 percent of the -- of
7  the surgery center.
8  Q.  Okay.  Would I be correct in understanding
9  that both Howell Allen Clinic and St. Thomas -- and
10  St. Thomas had an equal right to control St. Thomas
11  Neurosurgical because their representation on the
12  board was equal?
13  MR. HOFFMAN:  Objection to form.
14  THE WITNESS:  I'm not sure what
15  you're asking.
16  Q.  (By Mr. Nolan)  Sure.  The board
17  representation for Howell Allen and St. Thomas was
18  equal, each side had two members on the board for a
19  total of four; is that correct?
20  A.  Yes.
21  Q.  All right.  So both members of the joint
22  venture had equal control as far as the venture itself
23  was concerned.  You'll agree with that?
24  A.  Yes.
25  Q.  Let's look back at the e-mail, which is

Page 29

1    Exhibit 58. And in the last paragraph of your e-mail,
2    you see the sentence that begins, "We hope that your
3    decision to remain, quote, unaffiliated during this
4    crisis is not a sign of the decline of our
5    partnership."
6          Do you see that?
7    A.    Yes.
8    Q.    And then it says, "At the Howell Allen
9    Clinic, we remain fiercely loyal to St. Thomas
10   Hospital and our affiliation and dependence on you is
11   reflected in our excellence in patient care that
12   hasn't changed over -- in over 30 years."
13         Did I read that correctly?
14   A.    Yes.
15   Q.    And what does "affiliation and dependence
16   on you" mean?
17   A.    On the affiliation side, obviously our
18   ownership of a surgery center and then our physicians
19   that covered all the neurosurgery for St. Thomas
20   Hospital would be what I would be referring to.
21   Q.    All right. So that's the affiliation side.
22   What about dependence? What does that mean?
23   A.    I think the dependence would be that we
24   depend on St. Thomas Hospital. That's where we take
25   care of patients for our group and in their hospital.

Page 30

1          (Exhibit 59 was marked for
2          identification.)
3    Q.    (By Mr. Nolan) Let me hand you a document that
4    we're going to make Exhibit No. 59. And it is
5    a -- it's a newspaper article that you were quoted in
6    from the Tennessean. And I want to ask you if you
7    read this article when it was published.
8    A.    I'm sure I did read it when it was
9    published.
10   Q.    Okay. Do you recall giving an interview to
11   the Tennessean, a writer named Josh Brown?
12   A.    Yes.
13   Q.    And at the bottom of the first page, you
14   talk about the center. Is that St. Thomas
15   Neurosurgical?
16   A.    Yes.
17   Q.    All right. And you say, "The center
18   started 12 years ago as a joint venture between St.
19   Thomas network, the parent corporation of St. Thomas
20   Hospital, and Howell Allen Clinic, a local group of
21   neurosurgeons."
22         Did you tell Mr. Brown that?
23   A.    Yes.
24   Q.    Okay. Now, is it your understanding that
25   ownership of half of the clinic is re -- resides in

Page 31

1    St. Thomas network?
2    A.    I think that goes back to the question you
3    asked earlier. I'm not sure who the official owner
4    is.
5    Q.    Okay. Let me ask you to assume that the
6    operating agreement for St. Thomas Neurosurgical is,
7    in fact, set up that way, it shows St. Thomas network
8    is owning half of the company. But I'd also like you
9    to assume that that -- that entity, St. Thomas
10   network, has zero employees. Do you know why it is
11   that it was set up such that at least on paper, half
12   of the ownership of St. Thomas Neurosurgical would
13   reside in an entity with zero employees?
14         MR. HOFFMAN: Objection to form.
15         THE WITNESS: No.
16   Q.    (By Mr. Nolan) Okay. And I take it, then,
17   that the people who actually served on the board of
18   St. Thomas -- St. Thomas Neurosurgical since you've
19   been there have been either employees of St. Thomas
20   Hospital or employees of St. Thomas Health; is that
21   correct?
22   A.    Yes.
23   Q.    All right. And then the next paragraph of
24   our article says, "Originally the center handling both
25   spinal surgery and epidural steroid injections" --

Page 32

1    excuse me. I messed that up. Let me start over.
2          "Originally, the center handled both spinal
3    surgery and epidural steroid injections. Since 2005,
4    it has focused exclusively on pain management and
5    gives roughly 500 -- 5,000 epidural steroid injections
6    a year, Butler said."
7          Did you -- did you represent that to
8    Mr. Brown?
9    A.    Yes.
10   Q.    And did you give your interview to
11   Mr. Brown in your capacity as a board member of St.
12   Thomas Neurosurgical?
13   A.    I'm not sure if I -- I'm not sure if I did
14   it as a board member or as a -- as the administrator
15   of Howell Allen Clinic. I mean, I guess it's one and
16   the same, but --
17   Q.    Okay. Fair enough. And what is the date
18   of -- that this article was published?
19   A.    October 17th, 2012.
20   Q.    Okay. Let me hand you a document that was
21   produced to us that we're going to make Exhibit
22   No. 60, and it is STOPNC_11563. Now, this is a letter
23   on St. Thomas Health letterhead dated the same date as
24   the -- as the article that was published in the
25   Tennessean?

Page 33

1      (Exhibit 60 was marked for
2   identification.)
3      MR. GIDEON:  That must be the wrong
4   document, 11563, 011563.
5      Q.   (By Mr. Nolan)  So this appears to be a
6   letter on St. Thomas Health letterhead that was
7   actually apparently sent the same day as the
8   Tennessean article; correct?
9      A.   Yes.
10     Q.   Okay.  And it's a letter from someone named
11  Cynthia Figaro, who identifies herself as vice
12  president of corporate responsibility program.  Do you
13  see that?
14     A.   Yes.
15     Q.   And it's to a woman named Shreka Rogers.
16  Do you know Ms. Rogers?
17     A.   Yes.
18     Q.   And who does she work for?
19     A.   She's the billing manager for Howell Allen.
20     Q.   Okay.  And the letter indicates that she's
21  the coding and compliance manager for St. Thomas
22  Neurosurgical.  Do you see that?
23     A.   Yes.
24     Q.   Does she also serve that function?
25     A.   No.  She's the -- she's our billing manager

Page 34

1   and since we manage the facility, she manages the
2   billing.
3      Q.   Okay.
4      A.   I don't -- I've never seen her referred to
5   as the coding and compliance manager.
6      Q.   Okay.  And this is what she says in the
7   first sentence.  "St. Thomas Health is a partner with
8   your company in the St. Thomas Outpatient Neurological
9   Center, LLC joint venture."
10        Did I read that correctly?
11     A.   Yes.
12     Q.   Is that referring to what you call STOPNC
13  and I call St. Thomas Neurosurgical?
14     A.   Yes.
15     Q.   Okay.  Were you aware that St. Thomas
16  Health was referring to itself as a partner with your
17  company?
18     A.   No.  I've never seen this letter.
19     Q.   Do you know -- I mean, how do you interpret
20  the phrase "your company"?  Who is "your company"?
21     A.   I would assume Howell Allen.
22     Q.   Is it true that because Howell Allen and
23  St. Thomas were so bound together in this joint
24  venture that functioned as a partnership that you took
25  it upon yourself after the outbreak to influence the

Page 35

1   hospital's PR moves?
2      MR. HOFFMAN:  Objection to form.
3      MR. GIDEON:  Objection to the form.
4      THE WITNESS:  No.
5      Q.   (By Mr. Nolan)  Did you take it upon
6   yourself to influence the hospital's PR moves?
7      A.   No.
8      Q.   Why not?
9      A.   Why did I not try to influence their PR
10  moves?
11     Q.   Yeah.  Why not?
12     A.   I think because I feel like I don't have
13  any control over their PR department.
14        (Exhibit 61 was marked for
15  identification.)
16     Q.   (By Mr. Nolan)  Let me hand you an e-mail
17  that we'll make Exhibit No. 61.  And this is at St.
18  Thomas entities 014181.  And let me ask you if you've
19  seen this before?
20        MR. GIDEON:  Let me see the document
21  number -- the Bates number again.
22     Q.   (By Mr. Nolan)  You've seen this before.
23  This is an e-mail from you to Dawn Rudolph; is that
24  correct?
25     A.   Yes.

Page 36

1      Q.   And it's an e-mail that you sent on October
2   the 9th, 2012; is that right?
3      A.   Yes.
4      Q.   And the subject is "Two things"; is that
5   correct?
6      A.   Yes.
7      Q.   Could you read into the record the two
8   things that you e-mailed to Ms. Rudolph.
9      A.   "No. 1, our group would like to buy lunch
10  for the ER staff tomorrow.  Who can I talk to about
11  coordinating this effort?  No. 2, Standard has a great
12  idea.  He would like for St. Thomas to have a day of
13  prayer for the patients and families affected by the
14  meningitis outbreak.  Good PR move."
15     Q.   Now, Standard refers to Dr. Standard; is
16  that correct?
17     A.   Yes.
18     Q.   And is he one of the owners of Howell Allen
19  Clinic?
20     A.   Yes.
21     Q.   And when did you decide that having St.
22  Thomas organize a day of prayer for the patients and
23  families affected by the meningitis outbreak would be
24  a good PR move?
25     A.   I assume when I sent the e-mail.

Page 37

1    Q.   Okay.  And so did you talk with Dr.
2  Standard about the fact that that would be a good PR
3  move?
4    A.   No, I think me and Dr. Standard talked
5  about it as a way to come together as a family, as a
6  Christian and pray for the families affected by the
7  outbreak.
8    Q.   Okay.  And so the notion that it would be a
9  good PR move originated with you; is that correct?
10   A.   Correct.
11   Q.   All right.  And how did Ms. Rudolph react
12 to your suggestion?
13   A.   I'm not sure.
14   Q.   All right.  Let's look at the next page and
15 let me ask you if that contains Ms. Rudolph's initial
16 response?
17   A.   Yes.
18   Q.   Okay.  And so suggestion No. 1 about buying
19 lunch for the ER staff, she apparently gave you the
20 phone number of someone you could talk to about that;
21 correct?
22   A.   Correct.
23   Q.   And she indicated that she was working on
24 your second suggestion about the day of prayer;
25 correct?

Page 38

1    A.   Correct.
2    Q.   And did it happen?  Was there a day of
3  prayer organized?
4    A.   I don't remember.
5    Q.   Okay.  Do you know whether St. Thomas
6  Health or St. Thomas Hospital began collaborating with
7  an outside PR firm about organizing a day of prayer?
8    A.   I don't know.
9    Q.   Okay.  Do you have any recollection of any
10 of the surgeons at Howell Allen Clinic, such as Dr.
11 Standard, for example, attending a day of prayer?
12   A.   I don't know.
13   Q.   So you made no effort to follow up on this
14 suggestion that -- that you and Dr. Standard had made;
15 is that correct?
16   A.   I don't remember if I followed up on it.
17   Q.   If there had been a day of prayer, is that
18 something that you would likely have attended?
19   A.   Yes.
20   Q.   And if you had attended a day of prayer for
21 the families and their victims, wouldn't you expect to
22 remember that?
23   A.   I said that I didn't attend a day of
24 prayer.
25   Q.   And who did you anticipate the day of

Page 39

1  prayer would be a good PR move for?
2    A.   I think for everybody involved.
3    Q.   And is that because -- because you
4  recognize that St. Thomas Neurosurgical's problem was
5  both Howell Allen Clinic's problem as well as St.
6  Thomas Hospital and St. Thomas Health's problem?
7    A.   No, I think -- I think I saw it as an
8  emotional time for a lot of different people.  I had
9  friends of mine that were affected by this, employees
10 affected by this, physicians affected by this and it
11 was an emotional time that I felt like it would -- it
12 seemed like everything was disconnected at the time
13 and I wanted everybody to get together and focus on
14 taking care of these people that were affected.  It
15 was an emotional whirlwind at that time.
16   Q.   At any point did anyone indicate to any of
17 the patients or families that -- that Howell Allen
18 Clinic and St. Thomas Hospital were collaborating on a
19 day of prayer for PR purposes?
20       MR. HOFFMAN:  Objection to form.
21       THE WITNESS:  I don't think so, no.
22   Q.   (By Mr. Nolan)  And after this outbreak
23 occurred, did you recognize that because Howell Allen
24 Clinic and St. Thomas were in a joint venture and
25 because St. Thomas Surgical -- Neurosurgical was an

Page 40

1  agent of those venturers, that Howell Allen and St.
2  Thomas were in this thing together and needed to stick
3  together during the aftermath of the outbreak?
4        MR. HOFFMAN:  Objection.
5    Q.   (By Mr. Nolan)  Is that true?
6        MR. GIDEON:  I object -- object to
7    the form to all four or five of the
8    component parts of that question.
9    Q.   (By Mr. Nolan)  You can answer.
10   A.   If you could, I guess, consolidate that
11 down to the question.
12   Q.   Sure.  I'll try to rephrase it.
13       MR. GIDEON:  Without the long wind
14   up.
15       MR. NOLAN:  I'll do the best I can.
16   Q.   (By Mr. Nolan)  Is it true that -- that
17 after the outbreak, you decided that Howell Allen
18 Clinic and St. Thomas should stick together in the
19 aftermath of the outbreak?
20   A.   Yes.
21   Q.   And you made that decision because you knew
22 that Howell Allen and St. Thomas were in this joint
23 venture together that you described in the e-mail as
24 being a partnership and that's why you needed to stick
25 together; is that true?

Page 41

1      A.    I think it was less about the partnership
2  and the joint venture than it was about taking care of
3  everybody that was involved with it because it was --
4  affected a lot of people and was important for all --
5  all of us to be together.
6      Q.    Did you collaborate with St. Thomas
7  regarding efforts to protect the collective
8  reputations of Howell Allen and St. Thomas in the
9  aftermath of the outbreak?
10         MR. HOFFMAN:  Form.
11         THE WITNESS:  I think I was focused
12     on Howell Allen.
13     Q.    (By Mr. Nolan)  And did you recognize that
14  Howell Allen's -- I mean that St. Thomas
15  Neurosurgical's problem was Howell Allen's problem in
16  the aftermath of the outbreak?
17     A.    Yes.
18     Q.    And why did you view St. Thomas
19  Neurosurgical's problem to be Howell Allen's problem?
20     A.    I think mainly because all those patients
21  were our patients that we took care of and that was
22  why I felt like it was our problem.
23     Q.    Okay.  Did you likewise recognize that St.
24  Thomas Neurosurgical's problem was St. Thomas's
25  problem regardless of whether we're talking about

Page 42

1  Hospital or Health or network?
2      A.    Yes.
3      Q.    All right.  And why did you feel that St.
4  Thomas Neurosurgical's problem was also the problem of
5  the St. Thomas entities?
6      A.    I think mainly because the way we try to
7  take care of patients was to direct all of them to St.
8  Thomas Hospital for our group to take care of, and I
9  think that was -- I mean, you saw from the e-mail
10  about sending lunch to the ER staff where the ER was
11  seeing -- I believe they saw over 300 patients in a
12  week and it was overwhelming a lot of different people
13  at St. Thomas.
14     Q.    Okay.  And why did St. Thomas -- was it St.
15  Thomas Neurosurgical that directed the patients to go
16  to St. Thomas Hospital if they had any problems?
17     A.    Yes.
18     Q.    And why did St. Thomas Neurosurgical do
19  that?
20     A.    Because we didn't have an ER staff to take
21  care of the patients.
22     Q.    And why did St. Thomas Neurosurgical not
23  send the patients to Centennial Medical Center or
24  Vanderbilt University Medical Center, for example?
25     A.    I mean, I think our idea was for the

Page 43

1  patient to go to the closest ER, but we just wanted
2  them to get to an ER as soon as possible, and I think
3  St. Thomas was staffingwise preparing for it.  I think
4  one of the issues -- this is just me -- I don't recall
5  any facts on this, I just remember that it was a time
6  where you had to have enough people because it was
7  basically sending potentially a thousand people to an
8  ER and most ERs aren't prepared for that.
9          So we were trying to direct everybody to
10  one location if we could.  I mean, we wanted them to
11  go to the closest ER they could get to.  If they could
12  get to St. Thomas that was better because we were
13  ready for it.
14     Q.    Would I be correct in thinking that the
15  only emergency room that St. Thomas Neurosurgical
16  referred patients by name was St. Thomas Hospital's
17  ER?
18     A.    Yes.
19     Q.    Now, if we look back at the -- your e-mail
20  which is Exhibit 58, the one you wrote for
21  Dr. Lanford, I believe you indicated that Howell Allen
22  was frustrated by the way it perceived St. Thomas
23  Hospital to be attempting to distance itself from
24  Howell Allen; is that fair?
25     A.    Yes.

Page 44

1      Q.    And you also indicated that St. Thomas
2  Hospital was attempting to distance itself from St.
3  Thomas Neurosurgical; correct?
4      A.    Yes.
5      Q.    Okay.  And it was frustrating that St.
6  Thomas Hospital was attempting to distance itself from
7  St. Thomas Neurosurgical; correct?
8      A.    Yes.
9      Q.    And why was it frustrating?
10     A.    I think because, you know, our relationship
11  with them that we were -- we both owned 50 percent of
12  the facility and that was the frustration with it.
13     Q.    Okay.  Would it be fair for me to think
14  that you and Dr. Lanford did not think it was very
15  fair for the hospital to be trying to distance itself
16  from St. Thomas Neurosurgical?
17     A.    For myself, yes.
18     Q.    Okay.  Now, did Howell Allen Clinic do
19  anything to try and distance itself from St. Thomas
20  Neurosurgical?
21     A.    No.
22     Q.    At any point, did Howell Allen Clinic
23  remove references to St. Thomas Neurosurgical from its
24  website?
25     A.    Yes.

Page 45

1  Q.  Was that before or after the outbreak?
2  A.  After.
3  Q.  And why did that happen?
4  A.  The main reason we did that was that we
5  were running into a problem where I believe some
6  attorneys had put our e-mail address -- our web
7  address on the Internet and we had patients calling
8  our staff wanting information about STOPNC.  And so my
9  plan was to try to make it easier for the patients to
10 get the information.  Because they're calling our
11 physician secretaries who didn't know a lot of details
12 about how to treat it or what to do with it other than
13 to send them to an ER.
14      And so what I was trying to do was to -- I
15 instructed our staff, our IT people to put a big red
16 bullet on the top of our website to say "If you've had
17 an injection, go to this site," and it went to a
18 STOPNC site that had all of the information that I
19 felt the patients needed to see.  I was really worried
20 about the patient getting lost in our website that has
21 all of our physician bios, all of our spine surgery
22 information, all that kind of information on there.
23 Q.  All right.  So to make sure I'm clear about
24 what specifically happened, am I correct in
25 understanding that on Howell Allen's website, there

Page 46

1  was a list of the various locations that Howell Allen
2  had; correct?
3  A.  Correct.
4  Q.  And before the outbreak, that list did
5  specifically mention St. Thomas Outpatient
6  Neurosurgical Center located at the St. Thomas
7  Hospital campus; correct?
8  A.  Correct.
9  Q.  All right.  And then after the outbreak,
10 that location reference was removed from Howell
11 Allen's website; is that true?
12 A.  Right.  Correct.
13 Q.  And that was done at your direction; is
14 that correct?
15 A.  Yes.
16 Q.  And did you confer with Dr. Lanford or
17 anyone else before you had that removed from the
18 website?
19 A.  I don't remember.
20 Q.  Okay.  And then am I also correct that
21 Howell Allen's website before the outbreak said,
22 quote, Howell Allen's -- with an apostrophe S -- St.
23 Thomas Outpatient Neurosurgical Center provides
24 efficient and professional ambulatory care to have you
25 in, out and on your way to recovery in no time.

Page 47

1      Do you recognize that as being something
2  from Howell Allen's website before the outbreak?
3  A.  I don't, but it sounds like you're reading
4  it from the site, so...
5  Q.  Okay.  And is that the type of thing that
6  was -- would have also been removed at your direction?
7  A.  Yes.
8  Q.  Okay.  And so then after the outbreak --
9  and let me just hand you as Exhibit No. 62 and ask you
10 if there's -- this appears to be a page from -- from
11 Howell Allen's website before the outbreak.
12      (Exhibit 62 was marked for
13      identification.)
14      THE WITNESS:  Appears to be, yes.
15 Q.  (By Mr. Nolan)  All right.  And let me hand
16 you as Exhibit No. 63 something that I'll ask you if
17 this appears to be another page from Howell Allen's
18 website as it would have existed before the outbreak.
19      (Exhibit 63 was marked for
20      identification.)
21      THE WITNESS:  Yes.
22 Q.  (By Mr. Nolan)  Okay.  Let me hand you as
23 Exhibit No. 64 something that I'll ask you if it
24 appears to be a list of Howell Allen's locations after
25 the outbreak, and this list does not include St.

Page 48

1  Thomas Neurosurgical; is that correct?
2      (Exhibit 64 was marked for
3      identification.)
4      THE WITNESS:  Correct.
5  Q.  (By Mr. Nolan)  Is St. Thomas Neurosurgical
6  currently listed as St. Thomas -- on Howell Allen's
7  website?
8  A.  No.
9  Q.  And why not?
10 A.  It's funny you should ask that because Matt
11 asked me the same question yesterday and I didn't
12 realize.  What happened was when we took it off the
13 website, we took it off the website when it was
14 closed, when STOPNC was closed, you know.  We closed
15 for a long time.  And then when it opened back up, I
16 guess we never -- like, Matt asked me if it was on the
17 website and I said, yeah, it's on the website and we
18 looked it up and the location wasn't on there.
19      So, yeah, I told Matt yesterday, I said,
20 I've got to get our guys back on that because it's --
21 it's -- it was never changed.  I don't think it was
22 ever changed from when we took it off, you know, two
23 years ago.
24 Q.  Okay.  And who is your IT person?  Who did
25 Howell Allen use to make these changes on its website?

Page 49

1    A.    Nathan Anderson.
2    Q.    Okay.  And did you ever direct Mr. Anderson
3  to set up a separate website for St. Thomas
4  Neurosurgical?
5    A.    Yes.  That's what I said a minute ago.
6    Q.    Okay.  And does St. Thomas Neurosurgical
7  currently maintain a separate website?
8    A.    I don't think so.
9    Q.    All right.
10   A.    I thought we had shut that down.
11   Q.    All right.  And approximately when did you
12  shut that website down?
13   A.    I'm not sure.
14   Q.    Why did you shut it down?
15   A.    Because I think I felt that we were out of
16  the window of patients being sick and having
17  questions.
18   Q.    And where is the website that was -- that
19  previously existed for St. Thomas Neurosurgical?
20   A.    The new one that we -- the new one that we
21  started that had the meningitis information on it?
22   Q.    Right.
23   A.    Where is it?
24   Q.    Yes, where is it?  Is there a copy of it
25  somewhere if we wanted to look at it?

Page 50

1    A.    I don't --
2    Q.    Was that preserved?
3    A.    I have a I have -- I have no earthly -- I
4  really don't have any idea.
5          MR. GIDEON:  You need to let him
6    finish his question before you --
7          THE WITNESS:  Okay.
8          MR. GIDEON:  -- begin answering it.
9          THE WITNESS:  Okay.
10   Q.    (By Mr. Nolan)  Do you think it's
11  reasonable for patients to expect that if they go to a
12  facility bearing the St. Thomas name that any drugs
13  that they would receive at that facility would be
14  safe?
15   A.    Yes.
16   Q.    And why do you think it would be reasonable
17  for patients to expect that?
18   A.    To come to our facility and expect things
19  to be safe?
20   Q.    Yeah.  If a patient goes to a facility with
21  the St. Thomas name, why do you think it would be
22  reasonable for those patients to expect any drugs that
23  they receive there to be safe?
24   A.    I don't know that I can answer based on the
25  St. Thomas name.  I think I can answer based on

Page 51

1  STOPNC, that -- is that the same question?
2    Q.    Well, why don't you answer it for St.
3  Thomas Neurosurgical, then.
4    A.    Because I think our staff would make their
5  best efforts to make sure that whatever we provide for
6  the patient would be safe.
7    Q.    All right.  And so you were here yesterday
8  during Debra Schamberg's deposition; correct?
9    A.    Correct.
10   Q.    So you listened to her testify about her
11  role in St. Thomas Neurosurgical's decision to
12  purchase medicines from New England Compounding
13  Center; correct?
14   A.    Correct.
15   Q.    And as a board member of St. Thomas
16  Neurosurgical, were you satisfied with the information
17  she shared with us yesterday?
18   A.    Yes.
19   Q.    Was there anything that you thought to
20  yourself, I wish Ms. Schamberg had done that
21  differently?
22   A.    In the deposition?
23   Q.    Yeah.
24   A.    No.
25   Q.    So as you listened to her testify, there

Page 52

1  were -- there was at no point when she described her
2  actions that you thought, I wish she had done that
3  differently; is that correct?
4    A.    There was never a point that I thought she
5  should have done anything differently.
6    Q.    And what was the URL of the St. Thomas
7  Neurosurgical website that was set up immediately
8  after the outbreak?
9    A.    I have no idea.
10   Q.    Do you agree that St. Thomas Neurosurgical
11  is both part of Howell Allen Clinic and part of St.
12  Thomas?
13         MR. GIDEON:  Objection to the form.
14         MR. HOFFMAN:  Objection to form.
15   Q.    (By Mr. Nolan)  You can answer.
16   A.    No.
17   Q.    Do you agree that St. Thomas Neurosurgical
18  is part of Howell Allen Clinic?
19   A.    I think STOPNC is a joint venture of Howell
20  Allen's.
21   Q.    And who else?
22   A.    One of the St. Thomas entities.  I've heard
23  several different names today, so I'll just say that.
24  I think that's the easiest answer.
25         (Exhibit 65 was marked for

Page 53

1          identification.)
2     Q.   (By Mr. Nolan)  Let me hand you a document
3   we'll make Exhibit No. 65, and it's found at
4   STOPNC_0256 it's titled "St. Thomas Outpatient
5   Neurosurgical Center infection prevention and control
6   plan."  Does this appear to be part of St. Thomas
7   Neurosurgical's policies and procedures?
8     A.   Appears to be.
9     Q.   Okay.
10         MR. GIDEON:  May I see the document?
11    Q.   (By Mr. Nolan)  And the first sentence
12  reads, "St. Thomas Outpatient Neurosurgical Center is
13  an ambulatory care center that is part of the Howell
14  Allen Clinic specialty clinic treating disorders of
15  the brain and spine."
16         Have I read that correctly?
17    A.   Yes.
18    Q.   Is that a true statement?
19    A.   No.
20    Q.   And why do you say no?
21    A.   Because I think that anything that's part
22  of the Howell Allen Clinic is something that we would
23  own exclusively, not something that would be a joint
24  venture between two parties.
25    Q.   All right.  Now, I understand that Dr. John

Page 54

1   Culclasure is the medical director of St. Thomas
2   Neurosurgical; correct?
3     A.   Correct.
4     Q.   He was at the time of the outbreak; true?
5     A.   True.
6     Q.   He also was an employee of Howell Allen
7   Clinic; is that correct?
8     A.   Yes.
9     Q.   And what were his responsibilities as an
10  employee of Howell Allen Clinic?
11    A.   To take care of patients referred to him
12  from within our group for pain management, epidural
13  steroid injections, kyphoplasty, several different
14  interventional pain procedures that he does to take
15  care of our patients.
16    Q.   Okay.  But in doing that, did he report to
17  the St. Thomas Neurosurgical board?
18    A.   You mean, like, who is his supervisor?
19    Q.   Right.
20    A.   I would say Greg Lanford would be his -- I
21  would -- I would think -- if there's a problem with
22  John, it would have -- it would be directed to Greg
23  before it would be to the St. Thomas board.
24    Q.   Okay.  All right.  But ultimately would the
25  St. Thomas board have supervisory authority over Dr.

Page 55

1   Culclasure?
2          MR. HOFFMAN:  Objection to form.
3          THE WITNESS:  I don't think so.  I
4    think as an employee of Howell Allen,
5    Howell Allen has supervisory -- is the
6    supervisor of Dr. Culclasure.
7     Q.   (By Mr. Nolan)  But you would agree that if
8   the St. Thomas board wanted to make a change in the
9   medical director of St. Thomas Neurosurgical, the
10  board had the power to do that?
11         MR. HOFFMAN:  Objection to form.
12    Q.   (By Mr. Nolan)  Would you agree?
13    A.   I'm not sure how that is written in the
14  operating agreement.  I'm not sure if Howell Allen
15  appoints the medical director.  I'm not sure how
16  that's legally decided.
17    Q.   Okay.
18    A.   It's never been an issue since I've been
19  there.
20    Q.   All right.  Fair enough.
21         MR. GIDEON:  George, when you get to
22    a point that you're comfortable stopping, I
23    want to take a bathroom break for about
24    five to ten minutes.
25         MR. NOLAN:  Let's go ahead and do it.

Page 56

1          MR. GIDEON:  Should we do it --
2   suspend make it short, five minutes --
3          MR. NOLAN:  That sounds good.
4          MR. GIDEON:  -- in that time frame?
5          VIDEOGRAPHER:  This is the end of
6   Tape No. 1.  We're off the record and the
7   time is 10:15 a.m.
8          (A recess was taken.)
9          VIDEOGRAPHER:  Here begins Tape No. 2
10  in the deposition of Scott Butler.  We're
11  back on the record and the time is
12  10:24 a.m.
13    Q.   (By Mr. Nolan)  Mr. Butler, can you explain
14  to us how Dr. Culclasure -- how his performance is
15  evaluated.
16    A.   I think mainly just based on outcomes and
17  patient satisfaction.
18    Q.   Okay.  And I'm not going to ask you what
19  he's paid, but can you tell us how his compensation is
20  determined.
21    A.   He gets paid a percentage of collections.
22    Q.   Okay.  So the more -- the more epidural
23  steroid injections that are performed at St. Thomas
24  Neurosurgical, the more Dr. Culclasure gets paid; is
25  that correct?

Page 57

1     A.    The more work he does, the more he gets
2     paid.
3     Q.    Okay.  And would that be a percentage of
4     his collections or St. Thomas Neurosurgical's
5     collections?  In other words --
6     A.    His collections.
7     Q.    His collections.  Okay.  So the more shots
8     that he gives and the surgical -- St. Thomas
9     Neurosurgical is paid for, then the more money he
10    makes; is that correct?
11    A.    Yes.
12    Q.    Okay.  So would you agree that
13    Dr. Culclasure has a financial incentive to give as
14    many epidural steroid injections as possible in as
15    short a period of time as possible?
16          MR. GIDEON:  Objection to the form.
17    Q.    (By Mr. Nolan) You may answer.
18    A.    No.
19    Q.    All right.  Why would you not agree with
20    that?
21    A.    Because I think that he doesn't self-refer
22    the patients.  So if he's only sent 50, he can only do
23    50.
24    Q.    Before this outbreak, has there ever been a
25    problem with Dr. Culclasure being unable to keep his

Page 58

1     plate full, so to speak, with epidural steroid
2     injections work that was being referred by Howell
3     Allen Clinic?
4     A.    You're asking if he was busy enough?
5     Q.    Right.
6     A.    If there was ever a time where he wasn't
7     busy?
8     Q.    Correct.
9     A.    Not that I remember.
10    Q.    All right.
11    A.    But he -- he's done a lot of different pain
12    management stuff too through the years that has come
13    and gone so...
14    Q.    Okay.
15    A.    Not that I remember.
16    Q.    So am I correct in understanding that, in
17    fact, Howell Allen was sending so many folks over to
18    St. Thomas Neurosurgical for epidural steroid
19    injections before the outbreak that Dr. Culclasure
20    could not give shots to all of those people, there had
21    to be other anesthesiologists to come in and basically
22    take up overflow?
23          MR. GIDEON:  Objection to the form.
24          Which of the three questions you want him
25          to answer?

Page 59

1           MR. NOLAN:  I want --
2           MR. GIDEON:  All three?
3     Q.    (By Mr. Nolan) It's one question that I'd
4     like you to answer.
5           MR. GIDEON:  It's three questions all
6           rolled together.  I object to it.
7           MR. NOLAN:  Okay.
8     Q.    (By Mr. Nolan) You can go ahead and
9     answer.
10    A.    I've forgotten it now.  What's the...
11    Q.    Before the outbreak, was Dr. Culclasure the
12    only anesthesiologist -- anesthesiologist giving shots
13    at St. Thomas Neurosurgical?
14    A.    No.
15    Q.    All right.  But Dr. Culclasure gave most of
16    the shots; is that true?
17    A.    Yes.
18    Q.    All right.  And how many other doctors gave
19    some shots in addition to Dr. Culclasure?
20    A.    I'm guessing, but I think in addition to
21    Culclasure, around five.
22    Q.    Okay.  And why -- why was it set up that
23    way?
24    A.    I think it was mainly set up that way so
25    that the patient wait wasn't as long.  We can only do

Page 60

1     so many in a day.  And so the patients didn't have to
2     wait a long time to get the injection.
3     Q.    All right.  And so would I be correct in
4     understanding that Howell Allen Clinic was referring
5     more patients -- more patients to St. Thomas
6     Neurosurgical than Dr. Culclasure could treat
7     single-handedly?
8     A.    Yes.
9     Q.    But under Dr. Culclasure's compensation
10    system, if he averaged ten shots a day as compared to
11    20 shots a day, he would make more money if he was
12    giving 20 shots a day as opposed to ten shots a day;
13    is that correct?
14    A.    Yes.
15    Q.    Now, the collections that -- let me ask you
16    this:  You heard Ms. Schamberg explain yesterday that
17    when she decided and Dr. Culclasure decided that St.
18    Thomas Neurosurgical would begin buying MPA from NECC,
19    that occurred immediately after the previous supplier,
20    Clint Pharmaceuticals, increased its price from $6.49
21    a vial to $8.95 a vial.
22          Do you recall that line of her testimony?
23    A.    Yes.
24    Q.    And so you would agree that when St. Thomas
25    Neurosurgical opted for that less expensive source of

Page 61

1    MPA -- and I'm comparing Clint Pharmaceuticals' price
2    with NECC's price -- that saved the clinic, St. Thomas
3    Neurosurgical, money; is that true?
4        A.   When Clint went up on the price with the
5    supply --
6        Q.   Right.
7        A.   -- issue?  Yes.
8        Q.   Right.  Now, was that cost savings passed
9    on to the patients or did it increase the
10   profitability of the -- of the clinic for its owners?
11       A.   It was not passed on to the patients.
12       Q.   All right.  So that means that that cost
13   savings caused the clinic to be more profitable for
14   its owners; correct?
15       A.   Yes.
16       Q.   The owners being Howell Allen Clinic and
17   St. Thomas; correct?
18       A.   Yes.
19       Q.   Now, we know now that patients received
20   epidural steroid injections that included tainted
21   steroids or contaminated steroids that were procured
22   from NECC; correct?
23       A.   Yes.
24       Q.   All right.  And did St. Thomas
25   Neurosurgical charge the patients or their

Page 62

1    representative payors such as the government through
2    Medicare or insurance companies, for example -- did
3    St. Thomas Neurosurgical charge for those epidural
4    steroid injections when they were given?
5        A.   Did we submit a bill for the service when
6    it was given?
7        Q.   Yeah.
8        A.   Yes.
9        Q.   And was St. Thomas Neurosurgical paid for
10   that?
11       A.   I would assume just like anything else in
12   healthcare, I would hope so, but doesn't necessarily
13   mean always get paid.
14       Q.   Well, after the outbreak, did St. Thomas
15   Neurosurgical make any effort to refund any payments
16   that it had received for contaminated shots that were
17   administered?
18       A.   I don't think so.  I don't remember.
19       Q.   And I picked up from looking through
20   e-mails that were produced that there was apparently
21   some discussion after the outbreak about who was going
22   to pay for the care that the patients received in
23   contending with meningitis infections.  Were you
24   involved in any of that discussion?
25       A.   I believe so.

Page 63

1        Q.   All right.  Tell us about that, what you
2    remember about that.
3        A.   I mean, I think there were several
4    different discussions.  I'm not sure which ones you're
5    referring to.  There was discussion about patients
6    calling, complaining that they shouldn't have to pay
7    any copay or anything for the procedure at the surgery
8    center.  There was discussion about patients that went
9    in through the ER and had to have procedures done.
10   There was discussion about that.
11           We ended up putting two of our nurses at
12   STOPNC to see patients, there were questions about
13   that.  So there were several different discussions
14   about payment.
15       Q.   Okay.  All right.  Let's break that down.
16   What was the first discussion you mentioned?
17       A.   I believe there was some discussion from
18   patients asking about whether or not they owed their
19   copay for the injections during the tainted period.
20       Q.   All right.  And so was that issue ever
21   resolved?
22       A.   To the best of my knowledge, it was.  I
23   don't remember.  I just remember it happening.  I
24   don't remember the details.
25       Q.   Do you remember how it was resolved?

Page 64

1        A.   No.  I think we contacted the insurance
2    companies and they said to bill it like normal.  I
3    mean, there were -- there were various different ways
4    to -- I don't remember the details.
5        Q.   So as far as you know, were patients
6    required to pay their copays for the contaminated
7    shots that they had received?
8        A.   As far as I know.
9        Q.   Okay.  Was any effort made to refund those
10   monies to the patients?
11       A.   There was discussion about it, but I don't
12   know that we ever made a decision on -- I think a lot
13   of that was based on conversations with the insurance
14   companies, how they wanted us to handle it.
15       Q.   Okay.  And when patients went to the
16   emergency room at St. Thomas at St. Thomas
17   Neurosurgical's suggestion, who paid for the care that
18   they received there?
19       A.   I don't know how that was handled.
20       Q.   All right.  Well, do you know whether
21   Howell Allen Clinic surgeons had to treat any patients
22   who went to the St. Thomas emergency room?
23       A.   I think some of our physicians saw patients
24   in the ER, but I'm not sure.
25       Q.   Okay.  Do you know whether any of your

Page 65

1    physicians had to perform surgical procedures such as
2    irrigating an epidural abscess as a result of the
3    patient having received an epidural steroid injection
4    at St. Thomas Neurosurgical?
5         A.    I believe so.
6         Q.    And did Howell Allen charge for that?
7         A.    I think so.
8         Q.    As far as you know, were they -- was Howell
9    Allen paid for doing those procedures?
10        A.    I don't know.
11        Q.    And why did Howell Allen --
12        A.    I don't know -- I don't know if we billed
13   for those or not.  I can't remember if we billed for
14   those or not.
15        Q.    The epidural steroid injections that are at
16   issue in this case, what is your understanding of what
17   the active ingredient was in those injections?
18        A.    The active ingredient in MPA?
19        Q.    So it's your understanding that the
20   injection was MPA; correct?
21        A.    Yes.
22        Q.    All right.  Now, am I correct in
23   understanding that St. Thomas Neurosurgical's
24   registered agent for service of process is
25   Dr. Lanford; is that right?

Page 66

1         A.    Yes.
2         Q.    And that's the same person who's the
3    registered agent for service of process for Howell
4    Allen Clinic; is that correct?
5         A.    Yes.
6         Q.    And why was it set up so the same guy would
7    be the registered agent for those two entities?
8         A.    I don't know.
9              (Exhibit 66 was marked for
10   identification.)
11        Q.    (By Mr. Nolan)  Let me hand you a group of
12   documents that we're going to make Exhibit No. 66, and
13   it starts at St. Thomas entities 001777.  Take a
14   moment to familiarize yourself with this and I'll ask
15   if you can tell us what it is.
16        A.    Just the first page?
17        Q.    The whole thing.
18             MR. GIDEON:  Can you make the print a
19   little smaller next time?
20             THE WITNESS:  Okay.
21        Q.    (By Mr. Nolan)  What is this?
22        A.    STOPNC financial reports.
23        Q.    Okay.  And let's look at the last page, if
24   we could, St. Thomas entities 001803.  Can you tell
25   what time period this financial report covers?

Page 67

1         A.    Looks like through August 2012.
2         Q.    Okay.  And beginning when?
3         A.    The bottom set of numbers would have been
4    the previous year, so that would have been '11.
5         Q.    Okay.
6         A.    And then the top set of numbers would have
7    been the current year.
8         Q.    All right.  So for the bottom set of
9    numbers, what was the -- what would the total net
10   receipts for 2011 for St. Thomas Neurosurgical?
11        A.    $2,477,495.
12        Q.    And how is net receipts calculated?
13        A.    After write offs, adjustments, refunds.
14        Q.    Okay.  And does this report indicate the
15   total profits for that entity for 2011?
16        A.    No.
17        Q.    Nor for 2012; is that correct?
18        A.    Correct.
19        Q.    So the net receipts, is that actually
20   dollars in the door, so to speak?
21        A.    That's just dollars in the door.
22        Q.    All right.  Let me hand you a group of
23   documents we're going to make Exhibit No. 67.  It
24   begins at STOPNC_0002425, and I'm going to ask you to
25   tell us what these are.

Page 68

1              (Exhibit 67 was marked for
2    identification.)
3              THE WITNESS:  Can I just ignore the
4    e-mail on the top?
5         Q.    (By Mr. Nolan)  No.  Let me -- let's talk
6    about the e-mail and then we'll start ignoring it
7    together, I guess.
8         A.    Okay.
9         Q.    It looks like the top e-mail is from a
10   woman named Jennifer Hendricks to Ms. Schamberg; is
11   that correct?
12        A.    Correct.
13        Q.    And who is Ms. Hendricks?
14        A.    She works for St. Thomas Health and she's
15   the one that reviews the financials for STOPNC.
16        Q.    Okay.  I got it.  And so it appears that
17   she attached the -- what's labeled as the St. Thomas
18   Neurosurgical board report and it's dated
19   December 31st of 2011.  Do you see that?
20        A.    Yes.
21        Q.    Okay.  And this is the type of document
22   that you would be familiar with because you'd get a
23   copy of it as a member of the board; is that correct?
24        A.    Correct.
25        Q.    And why does it say at the top St. Thomas

Page 69

1   Health?
2       A.   I don't know other than that might be on
3   everything that Jennifer -- I think Jennifer does a
4   lot of the joint ventures for St. Thomas, reviewing
5   the financials.
6       Q.   Okay.  All right.  Well, can you -- can you
7   direct us to the page of this report that would allow
8   us to discern what the profits were for St. Thomas
9   Neurosurgical for that particular year?
10      A.   It looks like Page 2 on the bottom.
11      Q.   All right.  So Page 2 on the bottom.  And
12  so what does it reflect as being the profit for that
13  entity for 2011?
14      A.   624,000.
15      Q.   Okay.  And that would have been divided
16  equally between the joint venturers; is that correct?
17      A.   No.
18      Q.   Why not?
19      A.   We typically try to keep roughly a hundred
20  to $150,000 in the bank.
21      Q.   I gotcha.
22      A.   And so that number wouldn't reflect the
23  amount of any kind of distribution.  That number would
24  be less than that.
25      Q.   I gotcha.  So some of the profits would

Page 70

1   have been retained by the entity, but any
2   distributions would have been equal to the two joint
3   venturers; is that correct?
4       A.   Correct.
5       Q.   All right.  I'm with you.  Okay.  And then
6   it indicates that there are various expenses that were
7   removed before the profits were calculated.  Do you
8   see that?
9       A.   Yes.
10      Q.   All right.  And under salaries and wages,
11  does that include the people who were Howell Allen
12  employees?
13      A.   That includes all of the STOPNC staff.
14      Q.   All right.
15      A.   That's what that includes.
16      Q.   And those are people who were getting their
17  paychecks from Howell Allen Clinic?
18      A.   Correct.
19      Q.   Okay.  So am I correct in understanding
20  that in addition to receiving any distribution of
21  profits from St. Thomas Neurosurgical, Howell Allen
22  also was reimbursed for the paychecks that were sent
23  to the folks who worked at St. Thomas Neurosurgical?
24      A.   Yes.
25      Q.   And then I guess employee benefits

Page 71

1   is the cost of the benefits for the same people we've
2   just been mentioning; correct?
3       A.   Yes.
4       Q.   Now, would Dr. Culclasure's compensation be
5   included in the salaries and wages line, the 611,000
6   and change?
7       A.   No.
8       Q.   Okay.  And is his -- his compensation
9   deducted as an expense anywhere in this report?
10      A.   No.
11      Q.   And is the reason for that that when
12  Dr. Culclasure gives a shot over at St. Thomas
13  Neurosurgical, Howell Allen Clinic sends a separate
14  bill to the payor for that service?
15      A.   He's a Howell Allen employee so none of his
16  costs would be included on this financial statement.
17      Q.   All right.  But the other people who work
18  there at -- at St. Thomas Neurosurgical, they are also
19  Howell Allen employees; correct?
20      A.   Correct.
21      Q.   Okay.  And so why is Dr. Culclasure treated
22  differently than those other employees?
23      A.   We included those employees under Howell
24  Allen for the simple reason that -- the ease of doing
25  payroll and it made it -- it made us -- it made us

Page 72

1   able to give them better benefits.  If it was just a
2   surgery center with 12 employees, it's a tough time
3   getting good benefits.  So that's the reason why we
4   include those as Howell Allen employees, is to be able
5   to provide benefits for them --
6       Q.   Okay.
7       A.   -- is the main reason.
8            Obviously there's some ease of doing
9   payroll as opposed to having to do two payrolls.  We
10  just do one payroll and then those employees for
11  STOPNC are isolated as a separate cost center and we
12  charge that cost back to the surgery center.
13      Q.   And so why not put Dr. Culclasure in that
14  group?
15      A.   Because he's not an employee of the surgery
16  center.
17      Q.   Okay.  Am I correct in understanding that
18  when Dr. Culclasure gives a shot, an epidural steroid
19  injection at St. Thomas Neurosurgical, Howell Allen
20  Clinic send a separate bill to the payor, the
21  government, Medicare or an insurance company like Blue
22  Cross/Blue Shield for Dr. Culclasure's service in
23  administering that shot; is that true?
24      A.   That's true.
25      Q.   All right.  So as we look back at the board

Page 73

1   report, you see the expense item of purchased
2   services --
3       A.   Yes.
4       Q.   -- 223,000 and change.
5            What does that include?
6       A.   I think that's the management fee that's
7   paid to us is included in that --
8       Q.   Okay.
9       A.   -- category.
10      Q.   All right.
11      A.   I believe that's what that is.
12      Q.   Okay.
13      A.   And then there might be some other services
14  included in there.  I'm not sure.
15      Q.   Okay.  How is it -- how does St. Thomas
16  Neurosurgical go about tracking the number of epidural
17  steroid injections that are given each month?
18      A.   I don't know.
19           (Exhibit 68 was marked for
20           identification.)
21      Q.   (By Mr. Nolan)  Let me hand you something
22  that we'll make Exhibit No. 68.  And let me just ask
23  you whether you're familiar with this document.  It
24  begins at STOPNC _0004219.  Are you familiar with that
25  document?

Page 74

1       A.   Okay.
2       Q.   Are you familiar with that document?
3       A.   I'm familiar with the first -- the first
4   two pages.  I'm not familiar with the third page.
5       Q.   Okay.  Well, let's talk about the first
6   two.  Tell us what you're -- tell us about those
7   pages.
8       A.   Just volume from STOPNC.
9       Q.   Okay.
10      A.   All the procedures done.
11      Q.   So STOPNC uses Excel spreadsheets to keep
12  up with the volume of procedures that are done at that
13  facility; is that correct?
14      A.   I don't know if -- this is a document Debra
15  just sends me that just tells me the information.  I
16  don't know if they use this for anything more than
17  just recordkeeping.
18      Q.   And how often does Ms. Schamberg send this
19  type of document to you?
20      A.   Usually on a quarterly basis.
21      Q.   And is that something that you require her
22  to do?
23      A.   It's just something we've always done, yes.
24      Q.   And what's the purpose of that?
25      A.   Just so I know what they're doing over

Page 75

1   there.
2            (Exhibit 69 was marked for
3            identification.)
4       Q.   (By Mr. Nolan)  Let me hand you a set of
5   documents we'll make Exhibit No. 69 beginning at St.
6   Thomas entities 012933.  And can you tell us generally
7   what this is.
8       A.   An e-mail between Jennifer and Debra about
9   the financial report for the board.
10      Q.   Okay.  So this basically contains the same
11  type of information as we find in Exhibit No. 67 from
12  the previous year; is that right?
13      A.   Yes.
14      Q.   Now, you mentioned that Dr. Culclasure --
15  his compensation is a percentage of his collections.
16  Why is it set up that way?
17      A.   I don't know.
18      Q.   Has it been that way since -- since you
19  were there?
20      A.   Yes.
21      Q.   Was Dr. Culclasure working for Howell Allen
22  Clinic when you started working for that company in
23  2007?
24      A.   Yes.
25      Q.   Since you've been working there in 2007,

Page 76

1   have you ever learned anything about why his
2   compensation is set up on a percentage basis?
3       A.   No.
4       Q.   Can I ask you to look back at Exhibit
5   No. 67, which is the board report for 2011.
6       A.   Okay.
7       Q.   You see the line item that is for supplies?
8       A.   Yes.
9       Q.   217,000 and change.  Do you see that?
10      A.   Yes.
11      Q.   What does that include?
12      A.   I believe that would be all supplies,
13  office supplies, medical supplies, imaging supplies.
14  I believe that would all go into that category.
15      Q.   Does that include medications?
16      A.   Probably, yes.  I think it's any medical
17  supplies that we use.
18      Q.   Now, the management -- the professional
19  services line item that you described as a management
20  fee that goes to Howell Allen, what are the components
21  of that?
22      A.   I'm not sure if that's under professional
23  fees or purchased services.  But that management fee
24  includes anything, payroll that our staff does,
25  billing and collection, information technology.

1    Anything that the Howell Allen Clinic staff has to do
2    for STOPNC.
3        Q.   Okay.
4        A.   That aren't STOPNC employees.
5        Q.   All right.  What is your understanding of
6    what professional fees includes?
7        A.   I'm not sure.  That's what I was saying,
8    I'm not sure if professional fees is the management
9    fee or purchased services.
10       Q.   I gotcha.  Okay.  Let me hand you a
11   collection of documents we'll make Exhibit No. 70.  It
12   begins at STOPNC_0712, and can you tell us what these
13   documents are.
14            (Exhibit 70 was marked for
15            identification.)
16            THE WITNESS:  A service agreement.
17       Q.   (By Mr. Nolan)  Okay.  So this document is
18   the various services that Howell Allen Clinic provides
19   for St. Thomas Neurosurgical; is that right?
20       A.   Yes.
21            (Exhibit 71 was marked for
22            identification.)
23       Q.   (By Mr. Nolan)  All right.  Let me hand you
24   a set of documents we're marking Exhibit 71.  It
25   starts at St. Thomas entities 003622, and ask you to

1    tell us what this is.
2        A.   Looks like it's part of a recredentialing
3    application for Amerigroup on disclosure of ownership.
4        Q.   Okay.  And so it's from Cindy Williams to
5    you, the e-mail is.  Who is Cindy Williams?
6        A.   She works for St. Thomas.
7        Q.   All right.  She's listed as being the
8    director of joint venture contract and managed care.
9    Do you see that?
10       A.   Uh-huh (affirmative).
11       Q.   Is that a yes?
12       A.   Yes.
13       Q.   Okay.  And the next page gives information
14   about the ownership of St. Thomas Neurosurgical;
15   correct?
16       A.   Yes.
17       Q.   And it seems to have information about how
18   the various St. Thomas entities are interrelated.  Do
19   you see that?
20       A.   Yes.
21       Q.   Okay.  And then it lists the -- the
22   officers of St. Thomas Neurosurgical.  Do you see
23   that?
24       A.   Yes.
25       Q.   Is that synonymous with the board?

1        A.   Yes, that's the same thing as the board.
2        Q.   Same thing as the board.  Okay.  And so
3    does this refresh your memory as to who the board
4    members were at the time of the outbreak?
5        A.   Yes.
6        Q.   All right.  So these four people listed as
7    official officers, those were the four board members
8    of St. Thomas Neurosurgical at the time of the
9    outbreak?
10       A.   Yes.
11            (Exhibit 72 was marked for
12            identification.)
13       Q.   (By Mr. Nolan)  Let me hand you an e-mail
14   which we'll make Exhibit No. 72, STOPNC_0002431, and
15   let me ask you if you recognize that?
16       A.   Okay.
17       Q.   So you sent this e-mail to Ms. Schamberg in
18   May of 2012; is that correct?
19       A.   Yes.
20       Q.   All right.  And what prompted you to send
21   this e-mail?
22       A.   Based on my memory, I had a meeting with
23   the secretaries who do the scheduling, and these were
24   the issues that they asked -- I asked them to e-mail
25   me the issues they were having and I e-mailed those to

1    Debra.
2        Q.   Okay.  And the fourth point that you list
3    is medication differences between the competition and
4    STOPNC.  Do you see that?
5        A.   Yes.
6        Q.   What is that about?
7        A.   I think that was about how other surgery
8    centers around town would not make patients wait after
9    being off a medication.  You know, a lot of times
10   they'll make a patient wait.  They'll quit taking a
11   blood pressure medicine or something and have a
12   procedure within X number of days.  And that was where
13   I believe we were making the patient wait longer than
14   the competition was after being off certain types of
15   medication.  Other facilities were doing it quicker
16   than we were.
17       Q.   How did you first learn that there was a
18   problem associated with St. Thomas Neurosurgical in
19   September of 2012?
20       A.   John Culclasure called me on Wednesday
21   night, September the 19th, about a patient, I believe,
22   that was at Vanderbilt.  And at the time, the patient
23   was a recent -- had received an injection at STOPNC, I
24   believe July 28th, 26th, 28th, something like that.
25       Q.   And did Dr. Culclasure indicate that it

Page 81

1    appeared that the Vanderbilt patient was suffering
2    from meningitis?
3        A.    No.  He didn't know what it was.  I think
4    he called it Aspergillus, and I don't know anything
5    about what that is, but it wasn't meningitis.
6        Q.    Did he indicate anything about Aspergillus
7    being a type of fungus?
8        A.    No.
9        Q.    And so how long did you talk with
10   Dr. Culclasure?
11       A.    Five to ten minutes.
12       Q.    All right.  And what was your takeaway from
13   that conversation?
14       A.    Really nothing other than that the patient
15   was a Howell Allen patient who had an injection at
16   STOPNC in July and was sick at Vanderbilt.
17       Q.    And then -- so what happened next?
18       A.    The next afternoon, John called me again
19   and I believe he said there was maybe two patients at
20   St. Thomas.  It was either two or -- it was either two
21   patients at St. Thomas and then two -- another one at
22   Vanderbilt, maybe four total that were sick and they
23   seemed to all have been given injections within the
24   past month or so.  So that was Thursday, September
25   the 20th.  And so me and John on the phone decided to

Page 82

1    close the facility until we figured out what was going
2    on.
3        Q.    Okay.  And so when Dr. Culclasure called
4    you on September the 19th, his first call, was that
5    out of the ordinary or did he typically call you if it
6    appeared that a patient was suffering some type of
7    post-procedure complication?
8        A.    We had never had an issue with any patient
9    since I had been there at STOPNC.  So it was out of
10   the ordinary for him to call me, but it was only
11   because we never had an issue previously.
12       Q.    All right.  And so at the time that you --
13   am I correct in understanding that the decision to
14   close the facility on September the 20th was made by
15   you and Dr. Culclasure?
16       A.    Correct.
17       Q.    Was anyone else involved in that decision?
18       A.    I believe I hung up the phone from him and
19   contacted Dr. Lanford and contacted Dr. Batchelor and
20   just told them what we were doing and they both agreed
21   with it so -- but me and John had already decided to
22   close prior to discussing with them.  It was really
23   just calling to inform them what we were doing.
24       Q.    And who -- who first suggested that the
25   clinic should be closed?

Page 83

1        A.    I -- I don't -- I don't remember.
2        Q.    Whether it was you or Dr. Culclasure?
3        A.    I don't remember if it was me or John.  I
4    don't remember.  We both agreed to close it, but I
5    don't remember who.
6        Q.    All right.  And at the time you decided to
7    close the facility, how many people were you aware of
8    who were apparently sick in the aftermath of receiving
9    one of these injections?
10       A.    I believe at the time it was four.
11       Q.    Okay.  All right.  And I think you
12   mentioned that two of those were at St. Thomas; is
13   that correct?
14       A.    I believe so.
15       Q.    And where were the other two?
16       A.    I believe at Vanderbilt.
17       Q.    All right.  And was the St. Thomas
18   Neurosurgical center closed at the beginning of the
19   day on the 20th or the end of the day on the 20th?  In
20   other words --
21       A.    End of day.  He called me around 4:00
22   or so.  It was in the afternoon.  But it was at the
23   end of September the 20th.
24       Q.    And why did you think the clinic should be
25   closed?

Page 84

1        A.    Care of the patients.  Scared to death.
2        Q.    And so what happened next?
3        A.    So I went -- I believe Debra was out of
4    town then.  So I went over there Friday and met with
5    John and at the time, there was no common theme as far
6    as who was in these rooms with these patients that
7    were sick.  It wasn't -- you know, there wasn't one
8    nurse that was in all four of them.  It was a
9    different kind of different team.
10             So we kind of thought that it was one of
11   the products we were using.  We didn't -- my first
12   thought was it's got to be the needles.  I'm diabetic
13   so I take shots and I know how needles get infected.
14   So immediately that's what I thought it was.  But it
15   was kind of spending time wondering which one -- one
16   of the products is infected, has something wrong with
17   it.
18       Q.    So your thought was it's got to be the
19   needles.  Did Dr. Culclasure indicate what he
20   suspected?
21       A.    No.  I think -- I think his was just kind
22   of it's got to be something.  We don't know what it
23   is.  It's got to be one of the products that we're
24   using because nothing else is the same.  I believe one
25   of the patients -- I think Culclasure was the only

Page 85

1    common person in all four of the rooms.
2        Q.   So he was the common link in those four
3    patients that you were aware of at that time?
4        A.   Correct.
5        Q.   All right.  And so what happened next?
6        A.   The state came by that Friday, and then
7    starting the next week was when we were meeting with
8    the state, phone calls with the state, still didn't
9    have any idea what was going on, and it just kind of
10   progressed from there to calling the patients,
11   checking on them, you know, asking if they were okay,
12   if they had a problem.  If so, send them to an ER and
13   then to sending letters.
14       Q.   All right.  Now, you said that there were
15   meetings with the state.  Who was included in those
16   meetings?
17       A.   I think those were more phone calls with
18   the state.
19       Q.   Okay.
20       A.   Conference calls.  Culclasure was on -- I
21   believe he was on all of them.  I believe Dr. Latham
22   was on -- from St. Thomas was on some of the calls.  I
23   may have called in to one or two of them, but
24   clinically, I didn't know what they were talking about
25   so I don't think I continued to call in to those phone

Page 86

1    calls.
2        Q.   Okay.
3        A.   I would wait on Culclasure to tell me, hey,
4    this is what is going on, this is what we need to do.
5        Q.   And in addition to meetings with the state,
6    were there any meetings with people at St. Thomas?
7        A.   The STOPNC board, we met, I believe that
8    first week.  I believe we had a conference call and a
9    meeting that week.  I think the scary thing for us was
10   that more patients continued to get sick.  So that was
11   the scary thing for us.
12       Q.   And so was Dawn Rudolph included in any of
13   these meetings?
14       A.   I believe so, yes.
15       Q.   And what about Dr. Schatzlein?
16       A.   I don't think so.
17       Q.   Okay.
18       A.   He might have been invited, but I don't
19   know if he was -- I don't remember him being on any
20   phone calls or any -- in any meeting.
21       Q.   All right.  And so we now know that at that
22   time Ms. Rudolph was not on the board of St. Thomas
23   Neurosurgical.  The board representatives for St.
24   Thomas consisted of Dale Batchelor and Craig Polkow;
25   correct?

Page 87

1        A.   Correct.
2        Q.   And so why was Dawn Rudolph being included
3    in these post-outbreak meetings?
4        A.   I think because the patients were going --
5    were -- there were patients at St. Thomas at the time
6    that were sick.  I'm not sure if we were directing
7    patients to St. Thomas yet, but I know there were
8    patients at St. Thomas.
9        Q.   All right.  And how many meetings do you
10   recall being involved in in which Ms. Rudolph
11   attended?
12       A.   Phone calls or face-to-face, sit down
13   meetings?
14       Q.   Let's break it down.  Let's talk about
15   face-to-face meetings first.
16       A.   I believe just one.
17       Q.   All right.  And was that the meeting that
18   you referred to in the e-mail that you drafted for
19   Dr. Lanford that we talked about earlier?
20       A.   I'm not sure.
21       Q.   Okay.  Was there a meeting where Ms.
22   Rudolph indicated that she wanted to be the buffalo?
23       A.   Right.  Yes.
24       Q.   Okay.  And what -- what did you take that
25   to mean, she wanted to be the buffalo?

Page 88

1        A.   That I think the idea was that we wanted to
2    stand up and take care of the patients and not act
3    like we didn't know what was going on.
4        Q.   So stand together and weather the storm, so
5    to speak?
6        A.   Yes.
7        Q.   All right.  In addition to Ms. Rudolph as
8    well as Dr. Batchelor and Mr. Polkow, were there any
9    other St. Thomas representatives who participated in
10   any face-to-face meetings?
11       A.   The only person I would think would have
12   been there would have been Dr. Latham.
13       Q.   Okay.
14       A.   I don't remember anybody else being there.
15       Q.   Okay.  And so what was the topic of these
16   meetings?
17       A.   I think the first meeting was we didn't
18   know what it was -- what was going on at the time,
19   what do we do.  Then I think later it was how are we
20   doing, how are we handling these phone calls, how are
21   we handling mailing these letters.  You know, after
22   discussions with the state, you know, to determine
23   what we needed to do next and just to keep everybody
24   informed as to what we were doing.
25       Q.   Okay.  All right.  Any other meetings that

Page 89

1  you recall?
2      A.  Not that I remember.
3      Q.  Tell us --
4      A.  I think we had a meeting with the ER
5  doctors before we started sending the patients in to
6  the ERs.  I think we met with Dr. Morrison.
7      Q.  Okay.  Tell us about the telephone
8  conferences.  I'm sure there were several of those; is
9  that correct?
10     A.  Uh-huh (affirmative).
11     Q.  Is that correct?
12     A.  Yes.
13     Q.  And, I'm sorry, you're doing a great job,
14  but uh-huhs (affirmatives) or huh-uhs (negative) don't
15  show up on the transcript.
16     A.  Correct.  Right.
17     Q.  Okay.  And who was included on these
18  telephone calls?
19     A.  The board.
20     Q.  Anyone else?
21     A.  I believe Dr. Culclasure, probably Debra.
22     Q.  Okay.  Anyone else?
23     A.  And I would think maybe Dr. Latham.  Dr.
24  Latham was very involved with all of this, so I'm
25  guessing, but that would be who I would think would be

Page 90

1  on the roster.
2      Q.  What about Rebecca Climer?
3      A.  I don't know if she -- she might have come
4  to one of the meetings.
5      Q.  Okay.  So she may have attended one of the
6  face-to-face meetings; is that correct?
7      A.  She might have.
8      Q.  All right.  And is she the chief
9  communications and marketing officer for St. Thomas
10  Health?
11     A.  I think so.
12     Q.  Is it your understanding that she was the
13  head PR person inside St. Thomas Health?
14     A.  Yes.
15     Q.  Okay.  And do you know why it is that she
16  came to one of the meetings?
17     A.  I think we asked for her to come to the
18  meeting because we needed help.
19     Q.  And you needed help with what specifically?
20     A.  I think getting the message out to
21  patients.  That was one of our biggest concerns at the
22  time was that we wanted to find every possible way.
23  You know, we had Internet, we had phone calls, we had
24  letters, we wanted to make sure there was -- that we
25  were getting to every one of the patients to make sure

Page 91

1  that they knew what was going on, to get help if they
2  needed it.
3      Q.  So would I be correct in understanding that
4  at this point, shortly after the outbreak, and the
5  days and weeks following the outbreak, Howell Allen
6  Clinic and St. Thomas Neurosurgical's chief concern
7  was getting the word out to patients so that patients
8  could receive treatment if necessary; is that true?
9      A.  Yes.
10     Q.  Okay.  And Howell Allen Clinic and St.
11  Thomas Neurosurgical, they were willing to do whatever
12  it took to get the word out to those patients so that
13  people could request or get treatment if necessary; is
14  that true?
15     A.  Yes.
16     Q.  Were there any other concerns that Howell
17  Allen Clinic and St. Thomas Neurosurgical were focused
18  on during these weeks immediately after the outbreak?
19     A.  I think I was -- I was concerned about the
20  media side of it just simply because I had never had
21  any -- I've never had to interact with the media in my
22  career.  And so I was getting phone calls every
23  30 minutes from newspapers, radio stations, news
24  channels and I've never, ever dealt with that before.
25  And so that was one of my questions to Rebecca Climer

Page 92

1  was, help, you know, I'm stuck here.  I don't really
2  know what to do.
3          You know, I felt guilty because part of me
4  wanted to get on the TV, you know, and say, "Hey, if
5  you got it and had an injection, you need to get into
6  the hospital immediately," but then there was another
7  part of me that wasn't sure what to do.
8      Q.  Okay.  All right.  And so in addition to
9  Ms. Climer and the other people that you've mentioned,
10  did anyone else associated with St. Thomas attend any
11  of these meetings?
12     A.  Not that I recall.  I think I gave you the
13  roster of the people that I would -- I think with
14  Rebecca Climer, she had a couple of employees that
15  worked in the marketing department that may have come
16  to a meeting, but I'm not sure.
17     Q.  Okay.  Did Berry Holt attend any of the
18  meetings?
19     A.  I don't think so.
20     Q.  What about conference calls?
21     A.  He might have been on a conference call.
22     Q.  Okay.  You say might have been on a
23  conference call.  Do you recall a conference call that
24  involved not only members of the STOPNC board, but
25  also Dr. Schatzlein and Mr. Holt?

Page 93

1      A.    I don't remember talking to Schatzlein at
2   all about it.  Berry may have been part of the
3   conference call.
4      Q.    Is it your recollection that he was?
5      A.    No.  I remember he was involved, but I'm
6   not sure if that was e-mail, phone, conference.  I
7   don't remember.
8      Q.    All right.  So tell us what St. Thomas
9   Neurosurgical and Howell Allen Clinic did to get the
10  word out to patients, so to speak.
11     A.    First we called all the patients.  We had a
12  date.  I believe initially it was August and
13  September.  And called them and just asked if they
14  were having any issues.  We didn't mention any --
15  anything else.  And then -- then we sent letters to
16  all the patients.  And then the state continued to
17  move the date back because I think we were just doing
18  maybe July 20th to September 20th, and I think the
19  state moved back to July the 1st.  So that required us
20  to call another, you know, couple hundred patients.
21         I think at one point I had -- I made a note
22  that we had contacted 835 patients, but I'm not sure
23  of the date.  Then they moved back to June and it went
24  to contacting patients who had any type of procedure
25  done, not only ESIs, but anything else.  So it just

Page 94

1   kind of was a moving target on what patients to
2   contact.  And so it was phone calls and letters were
3   the initial blitz, and then we went and did another
4   set of phone calls.  I believe we did three sets of
5   phone calls and a couple of letters over that month or
6   so after the -- after it came out.
7      Q.    Did St. Thomas Neurosurgical send the
8   letters?
9      A.    St. Thomas Neurosurgical sent the letters.
10  Howell Allen employees helped stuff the envelopes, get
11  them mailed.
12     Q.    Okay.  Did St. Thomas Hospital or St.
13  Thomas Health take charge of sending any letters?
14         MR. HOFFMAN:  Objection to form.
15         THE WITNESS:  I believe they helped
16   send the second round or maybe the third --
17   there was a -- there was a round of letters
18   that they sent out.
19     Q.    (By Mr. Nolan)  Okay.
20     A.    And that was when we were too overwhelmed
21  to be able to deal with us.  It was us asking for
22  their help because we just couldn't -- we couldn't do
23  it.
24     Q.    Okay.
25     A.    We needed help.

Page 95

1      Q.    So St. Thomas Neurosurgical did not send
2   the second round of letters, they were actually sent
3   by either St. Thomas Hospital or St. Thomas Health?
4      A.    Correct.  I can't remember if we sent two
5   rounds of letters and they sent the third round or if
6   we sent one, they sent one.  I can't remember the
7   exact number of letters that were mailed.
8      Q.    But in any event, the letters that were
9   sent reflected that they were actually coming from St.
10  Thomas Neurosurgical; correct?
11     A.    Correct.
12     Q.    Even though they were being sent or at
13  least one round of letters was being sent by either
14  St. Thomas Health or St. Thomas Hospital; correct?
15     A.    Correct.
16     Q.    And who made the phone calls?
17     A.    All of our -- I mean, we were closed at the
18  time so we had all of our STOPNC nurses and staff
19  making the phone calls.
20     Q.    Anything else that you can remember about
21  the aftermath of the discovery of the outbreak?
22     A.    No.
23         MR. NOLAN:  I suggest that we take a
24   lunch break, C.J.
25         MR. GIDEON:  Timingwise that's fine.

Page 96

1   I'm going to have Chris step in for me if
2   I'm not back when you guys are ready to get
3   started again.  I'm going to go see Noel
4   before his case.  I went over there this
5   morning and he wasn't checked in yet.
6         MR. NOLAN:  Okay.
7         MR. GIDEON:  So if you're ready to go
8   back again at say 25 till 1:00, Chris is
9   going to take my place.  Is that agreeable
10   with everybody until I get back?
11         MR. NOLAN:  Absolutely.  No problem.
12         MR. GIDEON:  All right.
13         VIDEOGRAPHER:  We're off the record.
14   This is the end of Tape No. 2 and the time
15   is 11:34 a.m.
16         (A lunch recess was taken at 11:34
17   a.m. and the deposition reconvened at 12:39
18   p.m.)
19         VIDEOGRAPHER:  Here begins Tape No. 3
20   in the deposition of Scott Butler.  We're
21   back on the record and the time is
22   12:39 p.m.
23         MR. TARDIO:  George, one thing we
24   didn't say at the beginning of the
25   depositions is all objections except as to

Page 97

1    form are reserved.
2        MR. NOLAN:  That's fine.
3        Q.    (By Mr. Nolan)  Mr. Butler, in your earlier
4    testimony, you mentioned that you had many friends
5    affected by this, I think referring to the meningitis
6    outbreak.  What friends were you referring to?
7        A.    A friend of my wife's that had an injection
8    in August and then my best friend's --
9        MR. TARDIO:  Don't say his name for
10    HIPAA purposes.
11        THE WITNESS:  No.  My best friend's
12    father had an injection last week in
13    July.
14        Q.    (By Mr. Nolan)  Did either of those two
15    friends contract fungal meningitis?
16        A.    No.
17        Q.    Now, you -- I assume that you would always
18    attend St. Thomas Neurosurgical's board meetings; is
19    that correct?
20        A.    Yes.
21        Q.    And how frequently did those meetings
22    occur?
23        A.    Usually quarterly.
24        Q.    Okay.  And at those quarterly board
25    meetings would you-all discuss the budget for that

Page 98

1    organization?
2        A.    No, only the board financial report that
3    you --
4        Q.    Okay.  So you --
5        A.    -- that you got.
6        Q.    -- would discuss the financial reports like
7    the ones that we've made exhibits already to your
8    deposition?
9        A.    Yes.
10        Q.    Then would you, in the context of those
11    discussions, talk about whether the clinic was on
12    budget, so to speak, or over-budget or under-budget?
13        A.    Yes.
14        Q.    Okay.  And in the context of whether the
15    clinic was performing in accordance with the budget,
16    would you also talk about the cost and expenses that
17    were being incurred by the clinic?
18        A.    We might have.  Though I don't remember any
19    specific time talking about it.
20        Q.    Well, what would you do if the clinic was
21    performed under-budget?
22        A.    We would talk about the reasons why it
23    might be under-budget.
24        Q.    Okay.  And do you recall the clinic
25    performing under-budget?

Page 99

1        A.    No.
2        Q.    If you look at the exhibit which is Exhibit
3    No. 72, you see the fourth point down where you say,
4    the medication differences between the competition and
5    STOPNC?
6        A.    Right.
7        Q.    Who is the competition?
8        A.    Just other doctors around Nashville that do
9    epidural steroid injections and any kind of other
10    procedures that physicians would want.
11        Q.    And who specifically do you consider to be
12    St. Thomas Neurosurgical's competition?
13        A.    Really all the other surgery centers in the
14    Nashville area.
15        Q.    Can you give us some examples?
16        A.    No.
17        Q.    So you don't know the names of any
18    healthcare entities that compete with St. Thomas
19    Neurosurgical?
20        A.    No.  I mean, I know -- I know of -- there's
21    a neuro -- there's an outpatient surgery center at the
22    base of our building, BASC, but that's all -- I don't
23    know -- I don't know who operates there or what they
24    do there.
25        Q.    Okay.  So as a board member of St. Thomas

Page 100

1    Neurosurgical, you're just not aware of other places
2    in Nashville that patients could go to receive an
3    epidural steroid injection?
4        A.    I think you have to understand that those
5    patients are referred from within Howell Allen.  So
6    you're not -- those patients are coming to our group.
7    You're not necessarily competing.  I don't consider
8    ourselves to be competing with other surgery centers.
9        Q.    Well, this e-mail that you sent to Ms.
10    Schamberg, is it fair for me to say that you were
11    concerned that some of the patients who needed
12    epidural steroid injections could wind up having their
13    shots at the competition if certain things didn't
14    change at St. Thomas Neurosurgical?
15        A.    This e-mail for me was a compilation of
16    e-mails that I received from the secretaries.  So
17    these were not my words that you're seeing on this.  I
18    simply got e-mails from all the secretaries, copied
19    and pasted it on this e-mail.
20        Q.    Well, at the bottom part, it talks about
21    Dawn.  Who is Dawn?
22        A.    She does scheduling.
23        Q.    For who?
24        A.    At the surgery center.
25        Q.    At St. Thomas Neurosurgical?

1   A.   Yes.
2   Q.   Okay.  And so it says, "If -- it would help
3   if Dawn would just schedule the patients instead of
4   going through the list of patients to see what they
5   don't have in the chart."
6        So someone was complaining that Dawn was
7   spending too much time making sure that the patients'
8   chart was complete before they received care at St.
9   Thomas Neurosurgical; correct?
10       MR. TARDIO:  Object to the form.
11       THE WITNESS:  I'm not sure I don't --
12       I'd have to read this to answer the
13       question.
14   Q.   (By Mr. Nolan)  Take your time.
15   A.   It appears that Dawn is not scheduling
16   without everything in the chart before she puts them
17   on the schedule.
18   Q.   Okay.  And so did you expect Ms. Schamberg
19   to speak with Dawn and tell her not to -- you know, to
20   get patients scheduled more quickly and not to waste
21   time making sure the chart was complete before they
22   were scheduled to have an epidural steroid injection?
23   A.   No.  I just wanted to make her aware of the
24   issues that I had -- that the secretaries had in the
25   meeting that I had with them for her to understand

1   what was going on.  I don't remember that we ever even
2   followed up on any of this.
3   Q.   Okay.  All right.  The first paragraph in
4   the e-mail says -- deals with scheduling issues.  You
5   see that?
6   A.   Yes.
7   Q.   It says, "Scheduling issues.  Not being
8   able to get patients scheduled when patients care --
9   patients are in the office when urgent.  Having to
10  send to the competition."
11       Did I read that correctly?
12  A.   Yes.
13  Q.   So am I correct in understanding that
14  apparently because of scheduling problems at St.
15  Thomas Neurosurgical, Howell Allen Clinic was having
16  to send ESI patients to the competition; is that true?
17  A.   From this e-mail, it appears to be true.
18  Q.   Okay.  And so who is the competition that
19  Howell Allen Clinic were sending ESI patients to?
20  A.   I don't know.
21  Q.   Who would know that?
22  A.   I assume whoever sent that to me would --
23  could tell me who they're sending those patients to.
24  I mean, there's not a list of competitors that
25  everybody sends to.

1   Q.   And who -- who voiced that concern to you?
2   A.   I don't know.
3   Q.   Do you know if any of your local
4   competition was caught up in the fungal meningitis
5   outbreak?
6   A.   I don't think so.
7   Q.   Do you know whether any of your local
8   competitors purchased MPA from NECC?
9   A.   I don't know.
10       (Exhibit 73 was marked for
11   identification.)
12  Q.   (By Mr. Nolan)  Let me hand you a group of
13  documents that we're going to make collective
14  Exhibit 73.  And this is a group of several e-mails
15  that I've tried to put in chronological order.  Now,
16  it also includes the newspaper article that we've
17  already discussed.  It's in there chronologically and
18  we probably won't spend any time on that.
19       But other than that, it's e-mails that I've
20  attempted to put in chronological order, but because
21  of the way string e-mails work, sometimes it might not
22  be in exact chronological order.
23       But that being said, what I'd like to do is
24  go through here and talk with you about some of these
25  e-mails, many of which you were privy to; okay?

1   A.   Okay.
2   Q.   And the first one is on the first page,
3   it's St. Thomas entities 005622, and this at the
4   bottom appears to be an e-mail from you to Dawn
5   Rudolph, Dale Batchelor and Dr. Lanford on September
6   the 24th; is that correct?
7   A.   Yes.
8   Q.   Okay.  And you are just -- I take it from
9   this e-mail that you are reporting to them about what
10  the current situation is.  Is that a fair way for me
11  to interpret this?
12  A.   Yes.
13  Q.   And did you make sure that all of the
14  information in this particular e-mail was truthful and
15  accurate?
16  A.   I think I based this e-mail from what I was
17  told.  I don't think I did any research on, like,
18  the number of patients that were at each facility.
19  That's just based on what I was told.
20  Q.   Okay.  What you were told.  Okay.  Well,
21  let me ask you this more specifically.  This e-mail
22  was sent four days after St. Thomas Neurosurgical was
23  closed by you and Dr. Culclasure; correct?
24  A.   Yes.
25  Q.   All right.  And then the second to last

1    paragraph, second to last sentence, you see where it
2    says, "We have new steroids, new steroid injection
3    kits and new Omnipaque contrast"?
4        A.    Yes.
5        Q.    All right.  And so who told you that St.
6    Thomas Neurosurgical had new steroids by October -- by
7    September the 24th?
8        A.    I would guess Debra.
9        Q.    Okay.  And did Debra indicate that she had
10   had any problems getting new steroids on an expedited
11   basis?
12       A.    I don't know.  I don't remember.
13       Q.    You don't recall her --
14       A.    I don't remember.
15       Q.    All right.  All right.  On the next page,
16   St. Thomas entity 014341, this is an e-mail from Dawn
17   Rudolph to you; is that correct?
18       A.    Looks like I sent the first e-mail and then
19   she sent one after that.
20       Q.    Okay.  And your e-mail says, "We need to
21   have a STOPNC board meeting to discuss the next steps.
22   Dr. Lanford can do a conference call at 7:00 a.m.
23   tomorrow or a meeting at St. Thomas at 4:00 p.m.
24   tomorrow.  Let me know what works best for both of
25   you."

1        And then Ms. Rudolph responds, "Please call
2    me directly," and she gives a number, "ASAP."  Did you
3    call her?
4        A.    I would imagine that I did.
5        Q.    And what happened after that?  Was there a
6    meeting?
7        A.    I don't remember.  I mean, I -- what's the
8    date?  9/24.  Yeah, I think we met the next day.
9        Q.    Okay.  And do you remember who was present
10   at that meeting?
11       A.    No.
12       Q.    Do you remember having any meetings that
13   occurred once it was determined that the source of the
14   fungal infection was the steroid that was used?
15       A.    I think we found out that following
16   weekend.  So I think we would have met after that, but
17   I'm not sure.
18       Q.    All right.  Well, did you participate in
19   any meetings in which the board of St. Thomas
20   Neurosurgical asked the question "Why did we order
21   this stuff from a compounding pharmacy"?
22       A.    No.
23       Q.    So that question never -- just never came
24   up in a St. Thomas Neurosurgical board meeting?
25       A.    I don't remember that being discussed.

1        Q.    Okay.  Did -- were you ever in any meetings
2    with anyone in which -- other than your -- your
3    company's lawyers -- with anyone in which the question
4    of who decided to buy this stuff from NECC was
5    discussed?
6        A.    No.
7        Q.    Did you ever make any endeavor to
8    investigate that issue?
9        A.    No.  Because I think I knew Debra is the
10   one that -- after we found out it was the tainted
11   steroid, that she's the one that said -- gave us the
12   details that she ordered them and the details behind
13   that.  So I don't think there was ever a -- when we
14   found out what it was that was going on, I think she
15   immediately gave the details on it.
16       Q.    Okay.  Now, if we go back to the first
17   page, this e-mail that you sent on September the 24th,
18   we see here that Dr. Batchelor forwarded that e-mail
19   to Rebecca Climer.  Do you see that?
20       A.    Yes.
21       Q.    Did Dr. Batchelor discuss that with you
22   before he forwarded it to Ms. Climer?
23       A.    Not that I remember.
24       Q.    So you don't know why he forwarded it to
25   Ms. Climer; is that true?

1        A.    Yes.  I don't know.
2        Q.    All right.  And Page 4 is STOPNC 003501.
3    And this appears to be an e-mail string in which you
4    were included which you ultimately forwarded to
5    Dr. Culclasure and Nurse Schamberg; correct?
6        A.    Yes.
7        Q.    All right.  Now, this is September
8    the 27th.  So seven days after you closed; correct?
9        A.    Yes.
10       Q.    You were aware that some patients had died
11   by that point in time, weren't you?
12       A.    Yes.
13       Q.    Okay.  And so the first e-mail at the
14   bottom is from Ms. Climer to you which apparently
15   contains language for a script to be used by St.
16   Thomas Neurosurgical when calling patients.  Do you
17   see that?
18       A.    Yes.
19       Q.    And who drafted that script?
20       A.    I don't know.
21       Q.    Okay.  Is it your understanding that Mr. --
22   Ms. Climer drafted the script?
23       A.    I -- she e-mailed it to me is all I know.
24   I'm not sure who drafted it.
25       Q.    All right.  And so why is it that the --

Page 109

1    the chief communications and marketing officer of St.
2    Thomas Health would be determining what St. Thomas
3    Neurosurgical says to patients --
4            MR. TARDIO: Object to the form.
5    Q.   (By Mr. Nolan) -- when calls are made?
6    A.   I asked for her help.
7    Q.   Okay.  And so why did you ask for the help
8    of the chief communications and marketing officer of
9    St. Thomas Health in determining what should be said
10   to patients by the neurosurgical center when calls
11   were made?
12   A.   I think because nobody in our -- in our
13   practice, in our management team had any experience
14   with an adverse situation and didn't really know how
15   to react to it.
16   Q.   And does Ms. Climer have any medical
17   training, to your knowledge?
18   A.   I don't know.
19   Q.   Okay.  And then after Ms. Climer sends this
20   first e-mail to you, did you give her any feedback on
21   the proposed script?
22   A.   I don't think so.
23   Q.   And did St. Thomas Neurosurgical ever pay
24   Ms. Climer for the work that she did in connection
25   with this e-mail and other PR efforts after the

Page 110

1    outbreak?
2    A.   No.
3    Q.   And then the next e-mail further up,
4    Ms. Climer says to you and Dr. Batchelor, "Have Berry
5    review the script.  He would like to add a statement
6    in case they ask, 'Why are you calling me,' say --
7    okay to say, 'There have been some reactions to the
8    procedure and we're calling to check and see if you
9    have had any reaction.'"
10           Did I read that correctly?
11   A.   Yes.
12   Q.   All right.  And who is "they" in case they
13   ask?  Who is "they"?
14   A.   The patients.
15   Q.   Okay.  Now, is Berry a physician?
16   A.   No.
17   Q.   Okay.  Is he a public health official?
18   A.   No.
19   Q.   Who is Berry?
20   A.   Berry Holt, an attorney for St. Thomas.
21   Q.   All right.  So he's a lawyer who represents
22   St. Thomas Hospital and St. Thomas Health; is that
23   right?
24   A.   To my knowledge, yes.
25   Q.   Did it strike you as strange that a chief

Page 111

1    communications officer for St. Thomas Health and a
2    lawyer for St. Thomas Health would be scripting what
3    this particular ambulatory surgery center would say to
4    patients who might be suffering from a
5    life-threatening infection?
6            MR. HOFFMAN:  Objection to form.
7            MR. TARDIO:  Objection to form.
8            THE WITNESS:  At the time, that was
9      the least of my worries, who was involved
10     with the script.
11   Q.   (By Mr. Nolan)  Okay.  Is it true that St.
12   Thomas was taking control of what St. Thomas
13   Neurosurgical would say because St. Thomas recognized
14   that St. Thomas Neurosurgical shared their name and
15   was their agent?
16           MR. HOFFMAN:  Objection to form.
17           MR. TARDIO:  Object to form.
18   Q.   (By Mr. Nolan)  You can go ahead and
19   answer.
20   A.   I think we got a script from St. Thomas
21   because the state asked us to call the patients back
22   and neither me or Debra had any idea what we needed to
23   say.  So we asked for their help because we really
24   didn't have any experience at all with any kind of
25   event like this.

Page 112

1    Q.   So in terms of what St. Thomas
2    Neurosurgical said to patients when it initially began
3    calling patients, it said -- it followed the script
4    that Ms. Climer provided through this e-mail; correct?
5    A.   To my knowledge, yes.  I didn't hear every
6    call, but this was what script they were supposed to
7    follow.
8    Q.   Did the state ever tell anyone to your
9    knowledge to say anything to patients that was false?
10   A.   Can you ask the question again?
11   Q.   Did the state ever tell anyone to your
12   knowledge to make false statements to the
13   neurosurgical center's patients?
14   A.   No, I don't know that I would characterize
15   them as false statements.  Maybe they would just be --
16   wouldn't contain the entire facts of the case.  But at
17   this point, you have to remember we didn't know it was
18   the tainted steroid.  We had no idea what it was.  We
19   just had sick people in the hospital and were trying
20   to figure out how to take care of them.
21   Q.   Do you think that it is important for St.
22   Thomas Neurosurgical to be truthful anytime a patient
23   poses a question to it?
24   A.   Yes.
25   Q.   And do you think it's important for St.

Page 113

1    Thomas Neurosurgical to be truthful with patients
2    regardless of what Berry says or what the state of
3    Tennessee says?
4         A.    Yes.
5         Q.    At any point did you give Ms. Climer any
6    pushback about the script that she was proposing in
7    this e-mail?
8         A.    I know I complained to her about some stuff
9    during this time, but I'm not sure if I complained
10   about the script.
11        Q.    Okay. Do you recall Dr. Culclasure or Ms.
12   Schamberg giving any pushback against this script that
13   was being suggested by St. Thomas Health?
14        A.    No.
15        Q.    Is part of the reason that St. Thomas
16   Health and you were collaborating on a script for
17   these phone calls to patients that you and St. Thomas
18   recognized that you were a joint venture functioning
19   as a partnership and you needed to have a unified
20   message, so to speak?
21             MR. HOFFMAN:  Objection to form.
22             MR. TARDIO:  Object to the form.
23        Q.    (By Mr. Nolan)  You may answer.
24        A.    No, I think I just needed help dealing with
25   an adverse event that I had never had a minute worth

Page 114

1    of experience handling.
2         Q.    And so why were you requesting direction
3    from St. Thomas Health about what to say to patients
4    as opposed to requesting that direction from the
5    state?
6         A.    I think we had received direction from the
7    state on what not to mention, but I think our -- our
8    interaction with the state was limited to that. I
9    don't think they had any desire to give us a script.
10        Q.    And so did you -- did the state ever tell
11   you or did you ever hear the state provide any
12   specific direction about what to say and what not to
13   say to patients?
14        A.    I believe I saw an e-mail from Dr. Kainer.
15   I'm not sure who it was directed to or if it was
16   forwarded to me about what or what not to mention.
17        Q.    What do you recall about that e-mail?
18        A.    I believe it just said not to mention
19   meningitis, and my understanding was that they were --
20   the state was concerned because they had an issue, I
21   think, in Murfreesboro with a student at MTSU getting
22   meningitis and apparently that blew up, and I think
23   that was the reasoning that I was told. But -- why they didn't
24   remember who said that to me. But -- why they didn't
25   want to broadcast meningitis at that time.

Page 115

1         Q.    Now, is that something that was said to you
2    in an e-mail or something the state told you?
3         A.    I think that was said to me. I don't know
4    if that was mentioned on a phone call or something. I
5    just remember that coming from an e-mail.
6         Q.    Do you remember who you heard it from?
7         A.    No.
8         Q.    All right. Let's go to the eighth page of
9    this stack, STOPNC_0004312. Now, this is an e-mail
10   string, and if we look at the top of that page, it's
11   from you to Rebecca Climer, we know who she is, and
12   Dale Batchelor. He was the chief medical officer for
13   the hospital; correct?
14        A.    Correct.
15        Q.    All right. And Dawn Rudolph was the CEO
16   for the hospital; correct?
17        A.    Correct.
18        Q.    And then Berry Holt was the hospital's
19   lawyer; is that correct?
20        A.    Correct.
21        Q.    And then Dr. Latham was an infectious
22   disease specialist at the hospital; correct?
23        A.    Yes.
24        Q.    And then Craig Polkow, he was the CFO for
25   St. Thomas Health; is that correct?

Page 116

1         A.    Yes.
2         Q.    And then Mike Schatzlein was the president
3    and CEO of St. Thomas Health; correct?
4         A.    Correct.
5         Q.    And then Amanda Anderson. Did she work in
6    Ms. Climer's department?
7         A.    I think so.
8         Q.    And then there's several -- there's two
9    people who are with Jarrard, Inc. What is Jarrard,
10   Inc.?
11        A.    I don't -- I don't know.
12        Q.    Okay. So you were sending this e-mail to
13   these people at Jarrard, Inc., but you were not aware
14   of who they were or what their role was?
15             MR. HOFFMAN:  Objection to form.
16             THE WITNESS:  No. We met with a --
17        sometime during that time, we met with a PR
18        firm and I can't remember who it was. We
19        ended up not using them. So I don't know
20        if that's who that is or not. I'm not
21        sure.
22        Q.    (By Mr. Nolan)  Now, who is "we"? We met
23   with them. Who is "we"?
24        A.    Me and Dr. Lanford.
25        Q.    All right. I think we're going to discover

1  that you met with a different PR firm.
2      A.   Then I don't know who Jarrard --
3      Q.   Do you know whether the hospital ever
4  involved an outside PR firm?
5      A.   I don't know.
6      Q.   Okay.  And then it also goes to all the
7  physician partners at Howell Allen Clinic.  Do you see
8  that?
9      A.   Yes.
10     Q.   Okay.  And so this is the 27th.  It's sent
11  within a week of when you closed the hospital -- I
12  mean closed the clinic; correct?
13     A.   Correct.
14     Q.   All right.  And so in the e-mail from
15  Ms. Climer to you, she says, "The Department of Health
16  wants to do a press conference at noon tomorrow.  We
17  have a conference call set up with Dr. Kainer, Dr.
18  Reagan and Woody McMillin with the health department
19  at 7:00 a.m. tomorrow.  I will send out a conference
20  call contact information."
21          And then you say, "Rebecca, after reviewing
22  the available options, our group would support the
23  state releasing a statement that has been reviewed and
24  approved by the board of STOPNC.  We feel that is the
25  best option and in the best interest of the patients

1  of our group."
2          Have I read that correctly?
3      A.   Yes.
4      Q.   Okay.  And so is it fair for me to say
5  that -- that within a week of this problem developing,
6  you are part of a group that involves all the people
7  that are listed in this e-mail and you're beginning to
8  collaborate about how to shape public perception of
9  this event?  Is that a fair way for me to understand
10  what's happening at that point in time?
11     A.   I think our group was just opposed to doing
12  a press conference without having any information.
13     Q.   Okay.  Well, did you understand that part
14  of the reason that the state wanted to have a press
15  conference was because the state was concerned about
16  public safety and wanted to get the word out about the
17  meningitis outbreak?
18     A.   I'm not sure what they were -- I'm not sure
19  what the press conference was for.
20     Q.   So you -- you didn't have any notion as to
21  why the state wanted to have the press conference?
22     A.   No.  Our group didn't want to be involved
23  in a press conference because we didn't feel like we
24  knew -- had any information that we could publicly
25  share --

1      Q.   Okay.
2      A.   -- with anybody.
3      Q.   Did your group nevertheless want patients
4  who may have been injected with a life-threatening
5  solution to come in and get checked as soon as
6  possible?
7      A.   Yes.
8      Q.   Okay.  And you and Howell Allen Clinic and
9  St. Thomas Neurosurgical wanted to get the word out to
10  those people as quickly and effectively as possible;
11  correct?
12     A.   Correct.
13     Q.   And that would include Dr. Lanford;
14  correct?
15     A.   Correct.
16     Q.   All right.  Let's -- let's go to Page 7.
17  Now, at the very bottom, Ms. Climer responds to you
18  and she says, "Understood.  Let's proceed with the
19  call in a.m. focusing on learning what we can about
20  all of the known facts and what would be included in a
21  potential announcement.  Just to be clear, the state
22  is proposing a press conference, not the release of a
23  statement.  Are you saying you would be okay with
24  representatives of the state releasing something on
25  behalf of STOPNC at a press conference," question

1  mark.
2          And then Dr. Lanford responds, "I would
3  advocate a press release by the health department if
4  they so choose, but still honoring the anonymous
5  nature of the proposed press conference."
6          Now, you got a copy of Dr. Lanford's
7  e-mail, didn't you?
8      A.   Yes.
9      Q.   Okay.  And what did you understand he was
10  saying about honoring the anonymous nature of the
11  proposed press conference?
12     A.   I'm not sure.
13     Q.   Well, was it your understanding that at
14  that point in time, Dr. Lanford did not want either
15  Howell Allen Clinic or St. Thomas Neurosurgical's name
16  to be released to the public?
17     A.   Yes.
18     Q.   That was your understanding?
19     A.   Yes.
20     Q.   And what was your understanding of why that
21  was Dr. Lanford's desire?
22     A.   I'm not sure, other than just not
23  getting -- having our name released without more
24  information.
25     Q.   Okay.

Page 121

1    A.    It was really a lack of information at the
2  time.
3    Q.    Well, wouldn't you agree it would be hard
4  to get the word out to STOPNC's patients without
5  using -- using the name of the clinic?
6    A.    But I think you need to understand that we
7  see roughly 40,000 patients a year, and if all 40,000
8  of those patients felt like there was something that
9  Howell Allen Clinic did, you know, bought a tainted
10  steroid and injected them with it, then that can
11  unleash a flood of patient calls that we couldn't ever
12  accommodate.
13    Q.    Yeah, but you would also agree, then, that
14  if there was a press release or press conference in
15  which it was conveyed, look, if you went to the St.
16  Thomas Outpatient Neurosurgical Center during this
17  window of time and received an epidural steroid
18  injection, then you should come in and get certain
19  tests performed?
20    A.    I would agree with that statement, but I
21  think at that point we didn't have any window of time.
22  I mean, this was in the first seven days of this. We
23  didn't have any window of time. We didn't have -- we
24  didn't know what was causing it. We didn't have any
25  idea what it was.

Page 122

1    Q.    All right.
2    A.    For all we knew it was something they
3  picked up in the elevator. So we didn't -- we didn't
4  know.
5    Q.    All right. So even though you didn't know
6  exactly what was causing this, do you think that
7  erring on the side of transparency and clear effective
8  communication would be the wisest course of action?
9       MR. TARDIO:  Objection to form.
10       THE WITNESS:  Not without the
11  details.
12    Q.    (By Mr. Nolan)  All right. And so would I
13  be correct in understanding, then, that although
14  you've indicated that the clinic and -- St. Thomas
15  Neurosurgical, that is, and Howell Allen Clinic was
16  concerned about getting the word out effectively to
17  patients, a countervailing concern was it didn't want
18  its name released to the public at that point in time?
19    A.    I think not without more information.
20    Q.    And what specifically was the information
21  it was lacking at that point?
22    A.    We didn't have any information. We didn't
23  know it was the tainted steroid at that point. We
24  didn't know what it was. We didn't know what the
25  window was . We didn't know how much patients we were

Page 123

1  talking about. We just didn't have enough information
2  to be able to share with people.
3    Q.    But you did know where the problem appeared
4  to be originating, meaning that it was coming from St.
5  Thomas Neurosurgical; correct?
6    A.    We didn't know at that point. Like I said,
7  it could have been on the elevator. We didn't have
8  any idea what it was until that weekend. I believe
9  that weekend was when it finally came out that it was
10  the NECC steroid. I believe it was the 20 -- the 28th
11  or the 29th.
12    Q.    All right. Well, see, this -- this e-mail
13  from Dr. Lanford about the anonymity is sent on the
14  27th and the script had already been developed by the
15  27th; right?
16    A.    Right.
17    Q.    You had already developed a script for
18  calling patients. So you knew enough to develop a
19  script and start calling patients; correct?
20    A.    Right.
21    Q.    But you didn't feel like you knew enough to
22  have your name released to the general public?
23    A.    No.
24    Q.    All right. And so then Ms. Climer responds
25  to Dr. Lanford's e-mail where he talks about wanting

Page 124

1  to keep things anonymous and she says, "If we can move
2  the state off a press conference in our 7:00 a.m.
3  call -- 7A call, that will be significant. We do need
4  to be realistic in understanding that whether it is a
5  press conference or a press release, anonymity is
6  going to be short lived given the calls that we have
7  made, the multiple facilities involved, et cetera.
8  What does SVMIC advise the STOPNC board in this
9  regard," question mark.
10       I have read that part correctly?
11    A.    Yes.
12    Q.    All right. Now, would I be correct in
13  thinking that certainly an insurance company is not a
14  public health agency? You would agree with that;
15  correct?
16    A.    Yes.
17    Q.    Okay. And that if decisions are going to
18  be made that would affect the health of St. Thomas
19  Neurosurgical's patients, those decisions should be
20  made by physicians and not an insurance company. You
21  would agree with that?
22    A.    Yes.
23    Q.    Okay. And you understood that getting the
24  word out quickly and effectively to those who may have
25  received these injections was an important public

Page 125

1   health issue.
2       A.   Yes.
3       Q.   You understood that.  Okay.
4            And then the next e-mail says -- and this
5   is from you back to Ms. Climer and several others.
6   "We have spoken with our attorneys who feel that we
7   have used the medication/supplies properly and handled
8   it appropriately."  And I'll just stop there.
9            So you would agree that the questions --
10  the question of whether medications or supplies had
11  been used properly is really a medical issue that
12  should be answered by physicians as opposed to
13  lawyers.  You would agree with that?
14      A.   Yes.
15      Q.   Okay.  And then it says, "SVMIC has advised
16  us to make no comment.  Too many unanswered
17  questions -- or questions unanswered."
18           Do you see that?  You see what I'm
19  referring to?
20      A.   Yes.
21      Q.   Okay.  And so what did you think of SVMIC's
22  advice to make no comment?
23      A.   I think SVMIC's advice was to make no
24  comment at a press conference.  At that point we had
25  already began calling the patients, so it wasn't --

Page 126

1   they weren't telling us to make no comment to anybody.
2   It was not to make a public comment.
3       Q.   Okay.  Do you know whether SVMIC ever
4   reviewed the script that was used from the phone calls
5   were made to patients?
6       A.   I don't know.
7       Q.   Let me ask you this:  I presume that when
8   St. Thomas Neurosurgical closed on September the 20th,
9   it already had patients scheduled to come in the
10  following week and receive epidural steroid
11  injections; correct?
12      A.   Yes.
13      Q.   So somehow it had to communicate to those
14  patients "You don't need to come in because we're
15  closed"; is that correct?
16      A.   Yes.
17      Q.   And so what did St. Thomas Neurosurgical
18  tell patients who might have been coming in, say, for
19  their second or third epidural steroid injection?
20      A.   I believe we told them that there was an
21  equipment problem and we were closed.
22      Q.   Okay.  And would you say that even if
23  someone was -- had already received an epidural
24  steroid injection at St. Thomas Neurosurgical and they
25  were scheduled the week of September the 24th to get

Page 127

1   Shot No. 2?
2       A.   Are you asking me if somebody had had an
3   injection within the previous couple of months --
4       Q.   Right?
5       A.   -- and was scheduled to come back?
6       Q.   Uh-huh (affirmative).
7       A.   I think we had already called those
8   patients and asked them questions about their -- if
9   they were having any issues at that point.
10      Q.   Right.  Let me --
11      A.   So they would have already been told, I
12  would guess, but I don't know.  I wasn't on the -- I
13  didn't make any of those phone calls.
14           (Exhibit 74 was marked for
15           identification.)
16      Q.   (By Mr. Nolan)  Let me hand you an e-mail
17  that we'll make Exhibit No. 74, and it's
18  STOPNC_0001970.  And let me ask you to take a minute
19  and take a look at it.
20      A.   Okay.
21      Q.   Okay.  This appears to be an e-mail that
22  was generated -- string that was generated in
23  connection with a patient who was coming in for either
24  a second or third ESI and was told, as you have
25  indicated, that the center was closed because it was

Page 128

1   having equipment issues.
2            Is that what this appears to be?
3       A.   Yes.
4       Q.   Okay.  So that's -- this is kind of an
5   example of what you were just talking about; is that
6   right?
7       A.   Yes.
8       Q.   Now, that -- that's a less than transparent
9   and honest thing to tell patients, wouldn't you say,
10  you're having equipment issues when in fact people had
11  already begun dying of fungal meningitis?
12           MR. TARDIO:  Object to the form.
13           THE WITNESS:  At that -- we were
14  canceling appointments.
15      Q.   (By Mr. Nolan)  Okay.  But the question was
16  not whether you were canceling appointments, but
17  telling people that you were having equipment issues
18  was less than an open and honest thing to say to them.
19  You would agree with that?
20      A.   I would disagree with that.
21      Q.   Okay.  And why would you disagree with
22  that?
23      A.   Because we were canceling appointments with
24  patients who had an epidural scheduled.
25      Q.   Patients who may have already received a

Page 129

1  contaminated shot; true?
2      A.   But I would think those patients would have
3  already have received a phone call from our staff.
4      Q.   Are you certain that all of the patients
5  who had a shot within the window of concern actually
6  received a phone call?
7      A.   To my knowledge, we called all the
8  patients.
9      Q.   All right.  Let's go to Page 9 of our stack
10 here.  This is an e-mail also dated the 27th of
11 September, and down at the bottom you're e-mailing
12 Dawn Rudolph and Dale Batchelor copying all of the
13 physicians, and it says, "After discussions with the
14 state and Culclasure, we will remain closed through
15 next Wednesday, October the 3rd."
16      And then Dr. Batchelor, the chief medical
17 officer for the hospital, says, "That's a good target
18 date.  I do think the board needs to okay the final
19 decision to reopen after we see what the situation is
20 closer to that date."
21      Have I read those two e-mails correctly?
22      A.   Yes.
23      Q.   Okay.  So by this point in time,
24 September 27th, there was already beginning to be
25 discussion about when St. Thomas Neurosurgical would

Page 130

1  reopen; correct?
2      A.   Yes.
3      Q.   And Dr. Batchelor was saying, well, that's
4  not really going to be Dr. Culclasure's decision.
5  That's going to be a decision that has to be made by
6  the St. Thomas Neurosurgical board.  Is that a fair
7  way for me to characterize this?
8      A.   Yes.
9      MR. HOFFMAN:  Objection to form.
10     Q.   (By Mr. Nolan) Okay.  Was Dr. Culclasure
11 eager to get the clinic open again?
12     MR. TARDIO:  Object to the form.
13     Q.   (By Mr. Nolan) Let me rephrase the
14 question.
15     Did you perceive that Dr. Culclasure was
16 eager to get the clinic open up again?
17     A.   No.
18     Q.   Were you eager to get it open again?
19     A.   Absolutely not.
20     Q.   Okay.  If we go to Page 10, we see at the
21 top an e-mail from Ms. Climer to -- one, two, three,
22 four, five, six, seven -- eight people -- eight to ten
23 people; correct?
24     A.   Yes.
25     Q.   All right.  And she's apparently forwarding

Page 131

1  to everyone an e-mail that she got from a chief
2  information officer or the communications and media
3  relations person with the Department of Health;
4  correct?
5      A.   Yes.
6      Q.   And this is Saturday, September 29th and
7  the last line of Mr. McMillin's e-mail says, "Let me
8  know when you hear from your folks about
9  identification and the release or being at the press
10 briefing."
11      Have I read that correctly?
12      A.   Yes.
13      Q.   So am I correct in understanding that by
14 that point in time, Howell Allen Clinic still did not
15 feel comfortable having either its name or St. Thomas
16 Neurosurgical's name released to the public?
17      A.   I don't see that in these e-mails, so it's
18 hard for me to make a conclusion on that.
19      Q.   Well, in the e-mail that's being forwarded,
20 it looks like she's attaching a revised draft of a
21 press release, is that correct, which I think is on
22 the next page?
23      A.   Yes.
24      Q.   And I don't see that St. Thomas's name or
25 Howell Allen Clinic's name is mentioned in the press

Page 132

1  release, the draft press release at that point.
2      MR. HOFFMAN:  Objection to form.
3      Q.   (By Mr. Nolan) Am I right about that?
4      A.   Yes.
5      Q.   All right.  So this is what Ms. Climer says
6  in her e-mail.  She says "All, attached is the latest
7  update of the holding statement proposed by the
8  state."
9      What does that mean, holding statement?
10     A.   I don't know.
11     Q.   Okay.  It says, "Their PIO" -- I assume
12 that means public information officer -- "Woody
13 McMillin is asking about whether the latest events in
14 North Carolina would change your opinion as to whether
15 to include the name of the facility either in the
16 holding statement or in an eventual press briefing."
17     Now, what are the events in North Carolina?
18     MR. TARDIO:  George, you misread
19 that.  You said "your" instead of "our."
20     MR. NOLAN:  I'm sorry.  Let me -- let
21 me go do it again.
22     Q.   (By Mr. Nolan) She says, "All, attached is
23 the latest update of the holding statement proposed by
24 the state.  Their PIO, Woody McMillin, is asking about
25 whether the latest events in North Carolina would

Page 133

1    change our opinion as to include -- as to whether to
2    include the name of the facility either in the holding
3    statement or an eventual -- in an eventual press
4    briefing."
5          So have I read that correctly so far?
6    A.    Yes.
7    Q.    All right.  And who is "our"?
8    A.    I don't know.
9    Q.    Okay.  Would "our" be the -- the -- the --
10   the collective group, this joint venture or
11   partnership that existed between Howell Allen Clinic
12   and St. Thomas?
13         MR. HOFFMAN:  Objection to form.
14         THE WITNESS:  I don't know.
15   Q.    (By Mr. Nolan) Would "our" be everybody
16   that's listed on this e-mail?
17   A.    I don't know.
18   Q.    Okay.  But nevertheless, we do see here
19   that there is a group of several people, several of
20   whom are not on the St. Thomas Neurosurgical board,
21   that are collaborating about what should be said to
22   the general public about this very unfortunate event.
23   Is that true?
24   A.    Their names are on the e-mail.
25   Q.    Okay.  And so you knew that all these

Page 134

1    people were collaborating together because your name
2    was in the mix also; correct?
3    A.    I don't know that I would say I knew that
4    because I don't even know who Kay Fox at Jarrard, Inc.
5    is.  So I would imagine I probably looked at it and
6    saw some of the names that I recognized, but others
7    that I didn't know who they were.
8    Q.    Okay.  Why was Dr. Culclasure the medical
9    director of St. Thomas Neurosurgical not included in
10   this e-mail chain?
11   A.    I don't know.
12   Q.    And why didn't St. Thomas Neurosurgical if,
13   in fact, it really is a separate entity -- why didn't
14   it take charge of trying to shape the public
15   perception and communicate with the public about what
16   had happened at its facility?
17         MR. HOFFMAN:  Objection to the form.
18         THE WITNESS:  Because I didn't have
19   any experience in dealing with the public.
20   I had to ask for help.
21   Q.    (By Mr. Nolan) Did you consider hiring a
22   PR firm from the coffers of St. Thomas Neurosurgical
23   rather than form this -- I don't know what we would
24   call it -- a crisis group that we see reflected in
25   this e-mail?

Page 135

1          MR. TARDIO:  Object to the form.
2          THE WITNESS:  We spoke with a PR firm
3    at some point during this process, but I'm
4    not sure when that idea came about or when
5    that meeting was.
6    Q.    (By Mr. Nolan) Now, I believe it's been
7    very clearly established that almost all of the
8    epidural steroid injection patients who received shots
9    at St. Thomas Neurosurgical were referred there from
10   Howell Allen Clinic; correct?
11   A.    Correct.
12   Q.    So Howell Allen Clinic had an ongoing
13   physician/patient relationship with those people that
14   it referred to St. Thomas Neurosurgical for those
15   shots; correct?
16   A.    Correct.
17   Q.    Did Howell Allen Clinic tell the nursing
18   staff, its own nursing staff about what was happening
19   over at St. Thomas Neurosurgical so that if patients
20   called Howell Allen Clinic because they felt sick,
21   those nurses would know to tell them to go to St.
22   Thomas or some other emergency room and get checked?
23   A.    No.  I think that was a mistake that I made
24   early on is I forgot to include them in an e-mail that
25   I sent about questions from patients.  It was just an

Page 136

1    oversight on my part that I failed to notify them.
2    Q.    Okay.  So if we look at the e-mail, which
3    is on Page 12, we see here that there's a woman named
4    Jaime Frazier.  What type of personnel is Ms. Frazier?
5    A.    She's a nurse practitioner for the group.
6    Q.    And she appears to be kind of fussing about
7    the fact -- or she's upset about the fact that she was
8    not told about the meningitis outbreak sooner; is that
9    correct?
10   A.    Correct.
11   Q.    During this period of time, were you
12   concerned about trying to keep a lid on this thing, so
13   to speak?
14         MR. TARDIO:  Object to the form.
15         THE WITNESS:  No.
16   Q.    (By Mr. Nolan) Okay.  Let me ask you to
17   turn to Page 14.  Okay.  Now, this appears to be an
18   e-mail from Amanda Anderson to Rebecca Climer with a
19   copy to Joe Hagan.  You see that?
20   A.    Yes.
21   Q.    And it appears to a attach a draft of a
22   STOPNC letter, which we find on the next page; is that
23   right?
24   A.    If this was attached to there, then yes.
25   Q.    Okay.  Do you know -- do you know why it

Page 137

1   is -- now -- now, Ms. Anderson is listed as a
2   communications coordinator with St. Thomas Health. We
3   know Ms. Climer is the chief communications and
4   marketing officer. Do you know why those folks would
5   be collaborating about what St. Thomas Neurosurgical
6   should say in a letter to its patients?
7       A.   I think it goes back to what I indicated
8   earlier, is that I had no experience at all in this
9   type of event and asked for their help in every aspect
10  of patient notification.
11      Q.   Well, why not let the medical director of
12  the clinic decide what should be said to patients
13  regarding this problem that was developing that could
14  impact their health greatly?
15      A.   I don't know if he reviewed this or not.
16      Q.   Okay. Well, why was it necessary for -- I
17  mean, this letter wasn't going to go to the media, was
18  it?
19      A.   No. I think this -- this was just going to
20  the patients.
21      Q.   Okay. So why -- why is it that these two
22  people in the St. Thomas Health communications
23  department are reviewing this letter that's supposed
24  to go to patients?
25      A.   I don't know. I would guess to make sure

Page 138

1   that whatever information that needs to be in there
2   was included, that we didn't leave anything out.
3       Q.   Okay. All right. Let's go to Page 16. So
4   on Page 16, we have an e-mail from Ms. Climer to
5   several people including you, copied to Berry Holt and
6   Dawn Rudolph. Do you see that in the middle of the
7   page?
8       A.   Yes.
9       Q.   And it appears that Ms. Climer wants to
10  know how St. Thomas Neurosurgical should be described.
11  Do you see that?
12      A.   Yes.
13      Q.   All right. And why was Ms. Climer
14  inquiring about how she should describe St. Thomas
15  Neurosurgical?
16          MR. GIDEON: Objection to form.
17          THE WITNESS: I don't know.
18      Q.   (By Mr. Nolan) Okay. And in response, you
19  say, "Our leadership wants to remove the statement not
20  germane to the discussions at this point in this
21  investigation."
22          Why did you say that to Ms. Climer?
23      A.   I'm not sure. I'm not sure what the
24  document was -- what document she was referring to.
25      Q.   Yeah, and that was my next question.

Page 139

1   What -- what statement are you asking this be removed
2   from?
3       A.   I don't know.
4       Q.   Was this some sort of a joint press release
5   that would be coming out?
6       A.   I don't know.
7       Q.   So at that point in time, was your
8   leadership -- referring to Howell Allen Clinic's
9   leadership -- continuing in its desire that it and St.
10  Thomas Neurosurgical remain anonymous?
11      A.   I'm not sure. I'm not sure if our
12  leadership is the STOPNC board or the Howell Allen --
13      Q.   Okay.
14      A.   -- physicians.
15      Q.   But one of the two was continuing in its
16  concern that that particular clinic remain anonymous;
17  is that correct?
18      A.   I think if I remember correctly, anonymous
19  to the public, but certainly well described in and
20  documented to the patients involved.
21      Q.   All right. And then on Page 17, it appears
22  a continuation of the e-mail string in which Berry
23  Holt weighs in and he says, "I assume the point was to
24  avoid the impression that the center is actually a
25  department or unit of St. Thomas Hospital. How about,

Page 140

1   quote, The center is an ambulatory neurosurgical
2   surgery center licensed by the state of Tennessee and
3   housed on the St. Thomas Hospital campus," closed
4   quote.
5          And then apparently after you received
6   that, you respond, "Our group supports this revised
7   statement from Berry."
8          Did I read that correctly?
9       A.   Yes.
10      Q.   Okay. And so why did your group support
11  that revised statement from Mr. Holt?
12      A.   I'm not sure what the document was
13  referring to, but I assume that we thought that it
14  described the center's location.
15      Q.   Okay. Let's look at Page 19. Here we have
16  an e-mail string dated October the 1st of 2012. Was
17  that the date of the press conference?
18      A.   That identified NECC?
19      Q.   I --
20      A.   That press conference, is that --
21      Q.   I'm talking the first press conference that
22  made the outbreak known to the public.
23      A.   I'm not -- I was thinking October the 1st
24  was when they had identified NECC as the provider of
25  the steroid.

Page 141

1    Q.    Well, how many press conferences do you
2  recall?
3    A.    That was the most important one because it
4  was when -- it really identified where the problem was
5  from.
6    Q.    All right.
7    A.    All the other ones really didn't --
8    Q.    Was there a --
9    A.    -- add up.
10    MR. GIDEON:  He wasn't finished.
11    Q.    (By Mr. Nolan)  Sorry about that.
12    A.    No, go ahead.
13    Q.    I apologize.  Go ahead.
14    A.    No, go ahead.
15    Q.    Was there a press conference in which the
16  fact of the meningitis outbreak was first revealed to
17  the public?
18    A.    I don't know if -- I don't know if the -- I
19  know that October the 1st was when they identified
20  that steroid is the problem, but I'm not sure if
21  that's the first press conference they had or if they
22  had one at the end of the previous week.
23    Q.    Well, in any event, Ms. Climer appears to
24  be reporting to this e-mail group that's formed about
25  what happened at the press conference.  You see that?

Page 142

1    A.    Yes.
2    MR. HOFFMAN:  Object to form.
3    Q.    (By Mr. Nolan)  And then she mentions in
4  the last sentence of the first paragraph of her e-mail
5  at the bottom, "The reporter from Channel 5, Heather
6  Graff, knows that she has to stay off the property."
7    Apparently she's going to go out and take
8  some pictures of the hospital.  Do you see that
9  sentence I'm referring to?
10    A.    "The reporter from Channel 5, Heather
11  Graff, knows that she has to stay off property."
12    Q.    Right.  And then you respond, "Channel 5's
13  reference that the state shut us down is not accurate
14  and it -- and was not presented that way at the press
15  conference."  Did I read that correctly?
16    A.    Yes.
17    Q.    Okay.  And then Ms. Climer responds, "I
18  know.  We've already contacted them about it, both the
19  news director and the reporter.  She has sent a tweet
20  and online message correcting it.  It is now corrected
21  online as well."
22    Did I read that correctly?
23    A.    Yes.
24    Q.    Okay.  And so when you sent an e-mail to
25  Ms. Climer about this problem with Channel 5, what did

Page 143

1  you expect her to do about that problem?
2    A.    I assume let Heather Graff know that it was
3  not accurate, that I didn't -- all I was telling her
4  is the way it was presented in the report was not
5  accurate.  I didn't ask her to do anything.
6    Q.    And when she says, "Channel 5's reference
7  to this -- that the state" -- excuse me.  When you
8  said, "Channel 5's reference that the state shut us
9  down," who is "us"?
10    A.    STOPNC.
11    Q.    Okay.  So is it correct that after this
12  outbreak, St. Thomas Neurosurgical relied upon St.
13  Thomas Health to manage the media and PR issues that
14  it was facing?
15    MR. HOFFMAN:  Object to the form.
16    THE WITNESS:  I think that I would --
17  I guess I would phrase it as I asked St.
18  Thomas to help us with the media, PR, any
19  type of report -- reporting that we had to
20  do just because I had absolutely no
21  experience dealing with this kind of event
22  at all.
23    Q.    (By Mr. Nolan)  And did you also think to
24  yourself, well, because St. Thomas Neurosurgical
25  shares a name with St. Thomas Health, we -- we could

Page 144

1  be construed as St. Thomas Health's agents, so we need
2  to let St. Thomas Health quarterback the public
3  perception stuff as opposed to us taking that role on
4  ourselves?
5    MR. GIDEON:  Object to the form.
6    MR. HOFFMAN:  Objection to form.
7    THE WITNESS:  No.
8    Q.    (By Mr. Nolan)  Did the patients, to your
9  knowledge, of St. Thomas Neurosurgical know where the
10  steroids that they had received came from?
11    A.    I don't know.
12    Q.    And so do you have any reason to believe
13  that they -- that they knew when they received the
14  shots that these steroids came from NECC?
15    A.    I don't know.
16    Q.    All right.  Let's turn to Page 20.  This is
17  an e-mail from Dr. Lanford to you with a copy to
18  Ms. Climer; correct?
19    A.    Yes.
20    Q.    What is this?
21    A.    I don't know.  Something that we released
22  to somebody, but I'm not sure who that went to.
23    Q.    All right.  Let's go to Page 21.  At the
24  bottom of that page, we have an e-mail from you to
25  several people dated October the 2nd; correct?

Page 145

```
1        A.   Correct.
2        Q.   All right.  And you say as follows:  "As
3    much as we try to be noble throughout this ordeal, I'm
4    concerned that our response when tempered with the
5    state's control has resulted in making our center look
6    like the bad guy."
7             What do you mean by "our center"?
8        A.   STOPNC.
9        Q.   Okay.  And so who is "our"?  I know who the
10   center is, but who is "our"?
11       A.   I mean STOPNC.  That's who I'm referring
12   to.
13       Q.   Okay.  And then you say, "Even though we
14   should be treated as the pharmacy who gave out bad
15   Tylenol" --
16            MR. GIDEON:  You didn't read the
17        whole sentence.
18            MR. NOLAN:  Right.  Let me start
19        again.
20       Q.   (By Mr. Nolan)  "Even though we should be
21   treated as the pharmacy who gave out the bad Tylenol,
22   these reports make us look guilty."
23            Did I read that sentence correctly?
24       A.   Yes.
25       Q.   What did you mean by that?
```

Page 146

```
1        A.   I think I was frustrated at that point and,
2    you know, we -- we provide excellent care to patients
3    and I felt like the media reports were portraying us
4    as being the guilty party.
5        Q.   And so did you feel like you should be
6    should be treated the same as a pharmacy that sold bad
7    Tylenol that was manufactured by someone else?
8        A.   No, I think that was just me being -- being
9    frustrated and upset and reacting to the situation.  I
10   think the next sentence is how I really felt about the
11   whole situation, that we had patients suffering and it
12   appeared to be something that we had done.
13       Q.   And then at the end, you say, "At what
14   point can we point the finger at the pharmacy,"
15   question mark.  Do you see that?
16       A.   Yes.
17       Q.   What did you mean by that?
18       A.   I guess they hadn't announced NECC yet.
19       Q.   So would it be fair to say that at this
20   point you were eager to shift the focus of the public
21   discussion away from St. Thomas Neurosurgical and
22   toward NECC?
23       A.   Yes.
24       Q.   Now, when you said in the first paragraph,
25   "Even though we should be treated as the pharmacy who
```

Page 147

```
1    gave out the bad Tylenol," why did you pick that
2    example, the bad Tylenol?
3        A.   I don't -- I don't know.  I guess because
4    we had received a bad product from somebody and that
5    was causing a lot of people a lot of pain and that was
6    clearly frustrating me and hurting me to deal with it.
7    I think that the last sentence in that fourth
8    paragraph kind of just will tell you how I feel about
9    the whole situation.
10            "The real truth is that STOPNC provides
11   great care to patients and when these patients are
12   hurting, it hurts all of us."  And I was referring to
13   our group, our patients, everybody that worked for us.
14   It was a painful experience.
15       Q.   Do you think it would be fair for St.
16   Thomas Neurosurgical to stand behind the product that
17   it delivered to patients if the manufacturer of that
18   product becomes insolvent?
19            MR. GIDEON:  Objection to the form.
20       Q.   (By Mr. Nolan)  You can answer.
21       A.   I don't know.
22       Q.   Okay.  Well, do you think that would be the
23   right thing to do, if NECC is unable to stand behind
24   that product, do you think it would be the right thing
25   to do for St. Thomas Neurosurgical to do so?
```

Page 148

```
1            MR. GIDEON:  Objection.
2        Q.   (By Mr. Nolan)  You can answer.
3        A.   You're asking me if I think we should stand
4    behind a company that produced a bad product that hurt
5    our patients, I'm supposed to support that?  Is that
6    what you're asking me?
7        Q.   No.  That's not what I'm asking you at all.
8            MR. GIDEON:  Yeah, it is.
9            THE WITNESS:  That's exactly what
10        you're asking me.
11       Q.   (By Mr. Nolan)  No, it's not.
12       A.   You're asking me if I would stand behind a
13   company that went insolvent that hurt our patients.
14       Q.   No, I'm asking you stand behind
15   the product that you injected into patients, that you
16   delivered to the patients if the manufacturer --
17       A.   I'm not going to answer that question.
18       Q.   Why not?
19       A.   Because it embarrasses me that you would
20   ask me that question.
21       Q.   So would I take it, then, that you don't
22   think that there should be any reason that St. Thomas
23   Neurosurgical should be required to stand behind the
24   product if the manufacturer of the product becomes
25   insolvent?
```

Page 149

1      MR. GIDEON:  Just a second.  That's
2  not a question to him about facts.  He's
3  not been qualified as an expert.  You're
4  asking him for a legal conclusion to share
5  his agreement or lack of agreement with one
6  of your closing arguments.  I don't think
7  it's proper discovery and I object to it.
8  He's already answered it so that's another
9  basis for the objection.
10      So do you have a new answer to the
11  same --
12      THE WITNESS:  No.
13      MR. GIDEON:  -- question that's been
14  asked four times?
15      THE WITNESS:  No.
16      MR. GIDEON:  Okay.
17      MR. TARDIO:  I just got an e-mail.  I
18  think that the phone may have cut out.
19  Can the people on the phone hear us?
20  May have dropped the line.
21      MR. NOLAN:  Why don't we go off the
22  record.
23      MR. GIDEON:  What's the time?
24      VIDEOGRAPHER:  We're off the record.
25  This is the end of Tape No. 3 and the time

Page 150

1  is 1:59 p.m.
2      (A recess was taken.)
3      VIDEOGRAPHER:  Here begins Tape No. 4
4  in the deposition of Scott Butler.  We're
5  back on the record and the time is
6  2:13 p.m.
7      Q.    (By Mr. Nolan)  Mr. Butler, let me ask you
8  to refer back to Exhibit No. 74, which was the e-mail
9  that was an example of a fact that St. Thomas
10  Neurosurgical told patients who were scheduled to have
11  procedures during the week of September the 24th that
12  the clinic was having equipment problems that was
13  causing the clinic to cancel patient appointments.
14      Do you remember that line of our
15  discussion?
16      A.    Yes.
17      Q.    All right.  And so what equipment issues
18  caused St. Thomas Neurosurgical to cancel patients?
19      A.    I think it was just a -- a line to tell
20  patients that we were closed.  I don't think there was
21  any -- I don't think there was any true equipment
22  issues.
23      Q.    Okay.  So that -- so you actually canceled
24  patients because you knew that some people apparently
25  had a life-threatening disease after receiving

Page 151

1  injections at that facility; correct?
2      A.    No.  We closed because there were sick
3  patients and then I think our answer to patients in
4  the beginning was that there were equipment issues
5  because we didn't have information to share with
6  anybody.
7      Q.    But you would acknowledge that the
8  statement that you were having equipment issues was
9  not a truthful statement; correct?
10      A.    I believe that's correct.  I don't think
11  there was any equipment issues.
12      Q.    At any point were you interviewed by the
13  FBI in connection with any of this?
14      A.    No.
15      Q.    What about the U.S. Attorney's Office in
16  Boston?
17      A.    No.
18      Q.    Let me ask you to refer back to Page 7 of
19  our group of e-mails, if you would.
20      MR. REHNQUIST:  What page, George?
21      MR. NOLAN:  Seven.  The seventh page.
22      Q.    (By Mr. Nolan)  And so this e-mail -- in
23  this e-mail you make, as we've discussed, reference to
24  the advise that you received from SVMIC about not
25  making a comment.  Do you see that?

Page 152

1      A.    Yes.
2      Q.    And so when did St. Thomas Neurosurgical
3  first contact SVMIC about this event?
4      A.    Sometime that week.  I'm not sure when.
5      Q.    All right.  So sometime before September
6  the 28th; correct?
7      A.    Correct.
8      Q.    Why did it do that?
9      A.    I think because we didn't know what was
10  going on and wanted to make sure that they were aware
11  that something was going on with our patients.
12      Q.    At that point in time were you concerned
13  about potential liability with St. Thomas
14  Neurosurgical?
15      A.    No.
16      Q.    Then why contact SVMIC?
17      MR. GIDEON:  He's already answered
18  the question.  Object to the form.
19      Q.    (By Mr. Nolan)  When was the decision made
20  that St. Thomas Neurosurgical's name should be
21  released?
22      A.    I don't remember.
23      Q.    Who made that decision?
24      A.    I don't remember.
25      Q.    How was the decision made?

Page 153

1    A.   I don't know.
2    Q.   All right.  Let me ask you to turn to Page
3  30, if you would, at STOPNC_005704.  Now, at the
4  bottom, there's an e-mail from Rebecca Climer to
5  several different people that appears to contain some
6  statistical information about the outbreak.  Do you
7  see that?
8    A.   Yes.
9    Q.   Okay.  And then in the middle we have an
10  e-mail from Dr. Schatzlein to several people where he
11  says, "I wonder if we need a news conference to
12  clarify that hospital has -- was never involved and
13  the ASC was immediately closed.  Local news keeps
14  referring to, quote, the meningitis scare at St.
15  Thomas, closed quote, and we should call them out on
16  this."
17       Have I read that correctly?
18    A.   Yes.
19    Q.   Okay.  And then you forwarded this e-mail
20  to Dr. Lanford with the one word that says,
21  "Crickets."  Do you see that?
22    A.   Yes.
23    Q.   And what did you mean by that?
24    A.   Just that nobody responded.  Quiet.
25    Q.   Let's go to Page 34, if we could.  Is this

Page 154

1  an e-mail exchange that involved you and Rebecca
2  Climer regarding a letter that would be sent to
3  patients?
4    A.   Okay.
5    Q.   Is that what this appears to be?
6    A.   Yes.
7    Q.   Okay.  And so it appears that Ms. Climer is
8  keeping several people in the loop about what's going
9  to be said in this letter including everybody that
10  she -- she ccs and sends her e-mail of October 10th at
11  12:10 p.m. to.  Do you see that?
12    A.   Yes.
13    Q.   All right.  Why were all those people
14  involved in reviewing the letter?
15    A.   The only ones that I know are the board
16  members that are on the e-mail and Dr. Culclasure.
17    Q.   All right.  So --
18    A.   I don't know who Dianne Conlee is.
19    Q.   Okay.
20    A.   I think we established that Amanda worked
21  for Rebecca.
22    Q.   All right.  You know who Berry Holt is;
23  right?
24    A.   Yes.
25    Q.   Why was St. Thomas Health's lawyer involved

Page 155

1  in the letter that St. Thomas Neurosurgical would be
2  sending to patients?
3       MR. HOFFMAN:  Object to form.
4       THE WITNESS:  I don't know.
5    Q.   (By Mr. Nolan)  And does it appear that the
6  next two pages are the two versions of the letter that
7  are -- is being discussed by Ms. Climer?
8    A.   Is this the same letter?
9    Q.   It's much the same.  The main difference I
10  see is that one on Page 36 has a paragraph at the
11  bottom that mentions the Tennessee Department of
12  Health, whereas the one on Page 35 does not contain
13  that paragraph.  And if you look back at Ms. Climer's
14  e-mail --
15    A.   I see that.
16    Q.   -- she's referring to two versions, one of
17  which references the Department of Health and one of
18  this doesn't.  Do you see that?
19    A.   Yes.
20    Q.   So it does appear that these two draft
21  letters are what is -- what Ms. Climer is discussing
22  in the previous e-mail; is that true?
23    A.   Yes.
24    Q.   Okay.  All right.  And then let's go to
25  Page 38 and 39.  What are those two pages?

Page 156

1    A.   Looks like a press statement.
2    Q.   So it's a press statement.  Was it drafted
3  by Mr. Cline?
4    A.   Yes.
5    Q.   Okay.  And he's one of the lawyers for
6  Howell Allen Clinic and St. Thomas Neurosurgical; is
7  that correct?
8    A.   Yes.
9    Q.   Okay.  And he was sending this proposed
10  press statement to several different people including
11  Ms. Climer as well as Berry Holt and Dawn Rudolph and
12  others; correct?
13    A.   Yes.
14    Q.   Do you know why he was sending that to
15  those different people?
16    A.   I don't know.
17    Q.   Okay.  And the press release appears to be
18  a release that would be put out on behalf of St.
19  Thomas Outpatient Neurosurgical Center; correct?
20    A.   Yes.
21    Q.   Okay.  And do you know why the lawyer for
22  that entity would be giving input from Berry Holt or
23  Dawn Rudolph, for example, on what should be contained
24  in that entity's press release?
25    A.   I don't know.

Page 157

1   Q.   Okay.  Okay.  Let's go to Page 42.  This is
2   an e-mail exchange between you and Amanda Anderson; is
3   that true?
4   A.   Yes.
5   Q.   Okay.  And she's apparently indicating that
6   a newspaper in Kentucky has requested contact
7   information for St. Thomas Neurosurgical and -- and
8   she referred that reporter to you.  Is that the gist
9   of this e-mail exchange or her --
10  A.   Yes.
11  Q.   -- e-mail to you, in any event?
12  A.   Yes.
13  Q.   And then you respond and you say, "Going
14  forward, just send them this statement.  That's all
15  I'm doing."  And then we have another copy of the
16  statement that Mr. Cline drafted.  Do you see that?
17  A.   Yes.
18  Q.   Okay.  So were you telling Ms. Anderson
19  simply to forward that particular statement to the
20  reporter in Kentucky?
21  A.   Correct.
22  Q.   All right.  And then on Page 44, we have
23  Ms. Anderson responding.  She says, "Hey, Scott, media
24  are finding it difficult to delineate the statements
25  from St. Thomas Hospital when I or Rebecca provide

Page 158

1   them.  It would be best if you continue to send out
2   these STOPNC statements specifically."
3   Did I read that correctly?
4   A.   Yes.
5   Q.   Did it appear to you at that time that St.
6   Thomas Health was beginning to try and distance itself
7   from STOPNC?
8   MR. HOFFMAN:  Objection to form.
9   THE WITNESS:  I don't know.
10  Q.   (By Mr. Nolan) Can you tell us what Page
11  46 is?
12  A.   It looks like it was something I e-mailed
13  myself.
14  Q.   Was this Internet research that you were
15  doing when you were trying to figure out what St.
16  Thomas Neurosurgical should say when questioned about
17  why it purchased material from a compounded pharmacy?
18  A.   No, I don't know if somebody sent that to
19  me.  I don't know where that came from.
20  Q.   Okay.
21  MR. NOLAN:  That's all the questions
22  I have at this time.
23  Who's next?
24  MR. GIDEON:  We didn't do this at the
25  beginning of the deposition today.  Are you

Page 159

1   the only person who is going to ask
2   questions on behalf of PSC?
3   MR. NOLAN:  Well, Mike Chalos was
4   also designated, but he had to leave.  So
5   my answer is currently, yes.
6   MR. GIDEON:  Okay.  Are you going to
7   ask some questions?
8   MR. CLAYTON:  I am not asking any
9   questions on behalf of PSC.
10  MR. GIDEON:  Anybody who intends to
11  speak on behalf of PSC today?
12  MR. NOLAN:  No.
13  MR. GIDEON:  Do you have any
14  questions?
15  MR. HOFFMAN:  I have no questions at
16  this time.
17  MS. CARRICK:  I have just a few.
18  MR. REHNQUIST:  We might have a few,
19  but we want to confer for a moment, if you
20  don't mind.  Not many.
21  MR. GIDEON:  All right.  Well,
22  whoever is next, if you just have a few.
23  Jim, do you need some time to decide what
24  you're going to do?
25  MR. REHNQUIST:  Yes, what and

Page 160

1   whether.
2   MR. GIDEON:  Okay.  You want to let
3   her go ahead?
4   MR. REHNQUIST:  Sure.  That's fine.
5   MR. GIDEON:  Would you come over here
6   where George is seated so the witness can
7   see you.
8   MS. CARRICK:  Yes.
9   EXAMINATION
10  BY MS. CARRICK:
11  Q.   Good afternoon.
12  A.   Hi.
13  Q.   My name is Megan Carrick.  I represent
14  Speciality Surgery Center and Dr. Lister, who are out
15  in Crossville.  As I indicated, I just have a few
16  questions.
17  You indicated during your testimony that
18  Dr. Culclasure called you on September 19th and
19  informed you that a patient who had an injection at
20  STOPNC was being treated at Vanderbilt with an
21  infection; is that correct?
22  A.   Yes.
23  Q.   And I understood that you-all met with the
24  state just two days later on the 21st, which was the
25  Friday of that week; is that correct?

Page 161

1    A.   Yes.
2    Q.   What is your understanding of how and when
3  the state became alerted to the fact that there was
4  some sort of issue going on?
5    A.   I'm not sure if the state was involved in
6  the phone call on Thursday with Dr. Culclasure.  I
7  don't know who he -- he heard there were more patients
8  who were sick on that Thursday, the 20th, and I'm not
9  sure if -- I think Vanderbilt, who was the first
10 patient communicated with the state.  And then I don't
11 know if the Thursday patient, whatever happened,
12 wherever that patient -- I think it was at St. Thomas
13 communicated with the state, and the state didn't come
14 meet with us on Friday.  They came and did an
15 inspection on Friday.
16   Q.   Okay.  So to your knowledge, it was either
17 Vanderbilt Hospital or St. Thomas Hospital that
18 initially made the alert to the state --
19   A.   Yes.
20   Q.   -- that there was an issue?
21   A.   Yes.
22   Q.   All right.
23        MS. CARRICK:  That's all of my
24   questions.
25        THE WITNESS:  Okay.

Page 162

1        MR. GIDEON:  Watch the clip.
2        MR. REHNQUIST:  Give me about less
3     than five minutes.
4  EXAMINATION
5  BY MR. REHNQUIST:
6    Q.   Good afternoon, Mr. Butler.  My name is Jim
7  Rehnquist.  I represent the defendant in this case
8  called UniFirst Corporation.  Yesterday Ms. Schamberg
9  mentioned several other anesthesiologists who did
10 injections at STOPNC.  Do you remember that?
11   A.   Yes.
12   Q.   I'm not sure we got the names right, but I
13 think one of them was Rachel Rome?
14   A.   Yes.
15   Q.   Was there a Steve Nichols?
16   A.   Dickerson.
17   Q.   Steve Dickerson.  Someone who's name is
18 Carrero?
19   A.   Yeah.  I think it's Arthur Carrero.
20   Q.   And I think she said for a time there might
21 have been someone named Tim Arney?
22   A.   Correct.
23   Q.   Are there any others that you can think of?
24   A.   No.  And Arney passed away within the last
25 year or so.  He had cancer and died.

Page 163

1    Q.   Okay.  Sorry to hear that.  Were those
2  other anesthesiologists also Howell Allen employees?
3    A.   No.
4    Q.   Do you know if they were employees of
5  someone else?
6    A.   I believe they were employees of
7  Comprehensive Pain Specialists.
8    Q.   Is that also an ambulatory surgery center?
9    A.   It's just a pain group.  They do anesthesia
10 and pain management.
11   Q.   How were those other anesthesiologists
12 compensated by Howell Allen for the services they
13 performed?
14   A.   They weren't.  They did all their own
15 billing for professional fees.
16   Q.   So if a patient comes into STOPNC and gets
17 an injection, they would receive a -- they would
18 either receive a bill or whatever claim they had would
19 be handled within with a payor by Comprehensive Pain
20 Specialists, as far as you know?
21   A.   Yes.
22   Q.   Were the intake procedures or recordkeeping
23 at STOPNC any different for the work that those
24 anesthesiologists did as opposed to Dr. Culclasure?
25   A.   Not to my knowledge.

Page 164

1    Q.   Did they pay fees to STOPNC for the
2  privileges of using the STOPNC facilities?
3    A.   No.
4    Q.   Did they make any payments at all to
5  STOPNC?
6    A.   No.
7    Q.   Did they make any payments to Howell Allen?
8    A.   No, they -- I think the only fee they would
9  have paid is just a simple -- might have been a
10 credentialing application fee of some kind, you know,
11 25 or $50, but I don't -- they didn't pay any fees to
12 STOPNC or Howell Allen.
13   Q.   Were they used by STOPNC on more or less an
14 overflow situation if Dr. Culclasure was backed up?
15   A.   No.  We tried to use them as often as we
16 could.  We didn't have enough work -- we didn't have
17 enough -- we had more than enough work for
18 Dr. Culclasure so we needed other physicians to come
19 in, and those were doctors that Dr. Culclasure had
20 worked with, was comfortable with, knew their work was
21 high quality.  So he asked them to apply for
22 privileges.
23   Q.   Okay.  And he -- okay.  And by privileges,
24 what do you mean?
25   A.   Just privileges at the surgery center to

Page 165

1    work there.
2        Q.    And Dr. Culclasure, as the medical director
3    of STOPNC, had the authority to make that decision?
4        A.    All he did was just ask them to get
5    privileges there.  So then they would fill out an
6    application and that would go through the -- the
7    board.
8        Q.    And Howell Allen -- Howell Allen is
9    organized as a professional corporation under
10   Tennessee law in -- I gather that structure continued
11   from the prior entity, Neurological Surgeons, PC, I
12   believe?
13       A.    Correct.
14       Q.    Is Tina Sullivan a current employee of
15   Howell Allen?
16       A.    No.
17       Q.    Do you know where she works?
18       A.    I don't know.  She's still in Nashville,
19   but I'm not sure where she works.
20       Q.    She was the facility -- she was Debra
21   Schamberg's predecessor as the STOPNC facility
22   director; correct?
23       A.    Correct.
24       Q.    And I believe Debra became the facility
25   director in May of 2009 or thereabouts?

Page 166

1        A.    Yes.
2        Q.    And when Debra came on as the facility
3    director, did Tina stay within the Howell Allen
4    family, so to speak, after that?
5        A.    No.  I think she stayed around maybe for a
6    little while to work with Debra, but I don't -- she
7    didn't stay.  She left for another job, so I don't
8    know if she did -- if Debra spent any time with her or
9    not.
10       Q.    So she left STOPNC for another job --
11       A.    Correct.
12       Q.    -- voluntarily?
13       A.    Yes.
14       Q.    Do you know what the immediate next job
15   that she went to after leaving STOPNC was?
16       A.    I don't know.  I -- I don't know.
17       Q.    Who owned or leased the office space at
18   which STOPNC operated?
19       A.    I think the lease was -- I'm not sure if --
20   it's either all under Howell Allen and we -- the cost,
21   you know, STOPNC pays for the 9th floor.  Howell Allen
22   pays for the 8th floor.  I don't think it's two
23   separate leases.  I think it's just one lease.
24       Q.    And the name of the tenant on the lease is
25   Howell Allen, PC?

Page 167

1        A.    Either Howell Allen or Neurological
2    Services because we've been in that office for --
3    prior -- before the name change and continue to be in
4    that office now.
5        Q.    And the financial report that you were
6    shown earlier has an expense for STOPNC of -- I
7    believe it was something like rentals and repairs.  Do
8    you remember that?
9        A.    Uh-huh (affirmative).
10       Q.    And that would have been what was allocated
11   to STOPNC for the -- their portion of the lease?
12       A.    Yes, if it went into that category.  Yes.
13             MR. REHNQUIST:  I've got nothing
14   else.  Thanks.
15             THE WITNESS:  Thank you.
16             MR. GIDEON:  George, do you have any
17   followup?
18             MR. NOLAN:  I do.
19   FURTHER EXAMINATION
20   BY MR. NOLAN:
21       Q.    If you look at the large collective exhibit
22   that we spent some time with on Page 41.  There's an
23   e-mail exchange between you and Mr. Polkow in which he
24   inquires about a report from the state that apparently
25   he was expecting and you were expecting.  Do you see

Page 168

1    that?
2        A.    Yes.
3        Q.    And did the state ever provide such a
4    report?
5        A.    I don't know.  They would have given that
6    to Debra.  I don't -- I don't remember if we got a
7    report or not.
8        Q.    Okay.
9             MR. NOLAN:  That's all I have.
10            MR. GIDEON:  Anybody else have any
11   followup?  Any questions by St. Thomas?
12            MR. HOFFMAN:  No.
13            MR. GIDEON:  Anybody have any
14   additional questions at all?  Jim, nothing?
15            MR. REHNQUIST:  No thanks.
16            MR. GIDEON:  That's it.
17            VIDEOGRAPHER:  This conclude?
18            MR. GIDEON:  Yes.  Read and sign.
19            VIDEOGRAPHER:  This concludes the
20   deposition.  This is the end of Tape No. 4.
21   We're off the record and the time is
22   2:44 p.m.
23            (Deposition concluded at 2:44 p.m.)
24
25

Page 169

1   DISCLOSURE
2
3       Pursuant to Article 10.B of the Rules
    and Regulations of the Board of Court
    Reporting of the Judicial Council of
4   Georgia which states: "Each court reporter
    shall tender a disclosure form at the time
5   of the taking of the deposition stating the
    arrangements made for the reporting
6   services of the certified court reporter,
    by the certified court reporter, the court
7   reporter's employer or the referral source
    for the deposition, with any party to the
8   litigation, counsel to the parties, or
    other entity.  Such form shall be attached
9   to the deposition transcript," I make the
    following disclosure:
10
11      I am a Georgia Certified Court
    Reporter.  I am here as a representative of
12  Discovery Litigation Services, LLC.
    Discovery Litigation Services, LLC was
13  contacted to provide court reporting
    services for the deposition.  Discovery
14  Litigation Services, LLC will not be taking
    this deposition under any contract that is
15  prohibited by O.C.G.A. 9-11-28(c).
16      Discovery Litigation Services, LLC
    has no contract/agreement to provide
17  reporting services with any party to the
    case, any counsel in the case, or any
18  reporter or reporting agency from whom a
    referral might have been made to cover this
19  deposition.
20      Discovery Litigation Services, LLC
    will charge its usual and customary rates
21  to all parties in the case, and a financial
    discount will not be given to any party to
22  this litigation.
23
            Blanche J. Dugas
24          CCR No. B-2290
25

---

Page 170

1   STATE OF GEORGIA:
2   COUNTY OF FULTON:
3
4       I hereby certify that the foregoing
5   transcript was reported, as stated in the
6   caption, and the questions and answers
7   thereto were reduced to typewriting under
8   my direction; that the foregoing pages
9   represent a true, complete, and correct
10  transcript of the evidence given upon said
11  hearing, and I further certify that I am
12  not of kin or counsel to the parties in the
13  case; am not in the employ of counsel for
14  any of said parties; nor am I in any way
15  interested in the result of said case.
16
17  February 10, 2015.
18
19
20      BLANCHE J. DUGAS, CCR-B-2290
21
22
23
24
25

---

Page 171

1                    CAPTION
2
3       The Deposition of SCOTT BUTLER, taken in
4   the matter, on the date, and at the time and place set
5   out on the title page hereof.
6       It was requested that the deposition be
7   taken by the reporter and that same be reduced to
8   typewritten form.
9       It was agreed by and between counsel and
10  the parties that the Deponent will read and sign the
11  transcript of said deposition.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 172

1           DEPOSITION ERRATA SHEET
2   DLS Assignment No.  20639
3   Case Caption:  In Re:  New England Compounding
4   Pharmacy, et al.
5
6   Witness:  SCOTT BUTLER - 02/05/2015
7
8       DECLARATION UNDER PENALTY OF PERJURY
9   I declare under penalty of perjury that I have read
10  the entire transcript of my deposition taken in the
11  captioned matter or the same has been read to me, and
12  The same is true and accurate, save and except for
13  changes and/or corrections, if any, as indicated by me
14  on the DEPOSITION ERRATA SHEET hereof, with the
15  understanding that I offer these changes as if still
16  under oath.
17
18  Signed on the _____ day of
19
20  _____, 20___.
21
22  _____
23  SCOTT BUTLER
24
25

Page 173

```
1              CERTIFICATE
2    STATE OF GEORGIA
3    COUNTY OF FULTON
4           Before me, this day, personally appeared,
5    SCOTT BUTLER, who, being duly sworn, states that the
6    foregoing transcript of his deposition, taken in the
7    matter, on the date, and at the time and place set out
8    on the title page hereof, constitutes a true and
9    accurate transcript of said deposition.
10
11   _____
12   SCOTT BUTLER
13
14           SUBSCRIBED and SWORN to before me this
15   _____day of_____, 20___ in the
16   jurisdiction aforesaid.
17
18   _____     _____
19   My Commission Expires     Notary Public
20
21   *If no changes need to be made on the following two
22   pages, place a check here _____, and return only this
23   signed page.*
24
25
```

Page 174

```
1              DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25              SCOTT BUTLER
```

Page 175

```
1              DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25              SCOTT BUTLER
```