UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


MDL NO. 13-02419-RWZ


IN RE: NEW ENGLAND COMPOUNDING PHARMACY, INC.
PRODUCTS LIABILITY LITIGATION


**THIS ORDER RELATES TO ALL ACTIONS.**


<u>MEMORANDUM OF DECISION</u>

October 7, 2015


ZOBEL, D.J.

Hanging over this multidistrict litigation ("MDL") litigation is the question of whether, and, if so, where, any bellwether trials will take place.  Plaintiffs want them to happen and want them to be in this district.  Most have waived their rights under <u>Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach</u>, 523 U.S. 26 (1998), to trials in the districts where their cases were originally filed, and many seek to have their cases transferred here under 28 U.S.C. § 157(b)(5), contending that their cases are personal injury tort or wrongful death actions related to <u>In re New England Compounding Pharmacy, Inc.</u>, No. 12-19882 (Bankr. D. Mass.).  Defendants vehemently disagree. Most contend that their cases should be remanded for trials in their home districts after pretrial proceedings are complete.  Nearly all of the defendants have refused to waive <u>Lexecon</u>, and they argue that § 157(b)(5) provides no authority for transfers now that the NECC bankruptcy plan has been confirmed.

This disagreement has made it virtually impossible for the parties to reach agreement on a schedule or case-specific trial preparation procedures.  The parties have filed many motions asking me to resolve the impasse,[1] and, although I have attempted to do so, see Docket # 2075, I fear that I have provided only a short-term solution.  The time has come to settle this question.  This order therefore considers whether bellwether trials are feasible and, if so, whether and how they can occur in this district.  After concluding that this court, sitting in bankruptcy, has the power to set venue for bellwether trials, I lay out the schedule and procedures for the first bellwether trials, which will involve cases originating in Tennessee and will occur in the early spring of 2016.

## I.      Background

The allegations giving rise to this MDL have been described at length elsewhere, see, e.g., In re New England Compounding Pharmacy, Inc. Products Liab. Litig., 496 B.R. 256, 262 (D. Mass. 2013), so I will repeat only the most pertinent facts here.

This dispute stems from an outbreak of fungal meningitis caused by contaminated methylprednisolone acetate ("MPA") manufactured and sold by the New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center ("NECC").  NECC operated a compounding pharmacy in Framingham, Massachusetts, that combined and mixed ingredients to create specific formulations of pharmaceutical

---

[1] In addition to the specific briefing on 28 U.S.C. § 157(b)(5), the following motions also seek a schedule for the MDL going forward: Docket ## 1716, 1849, 1852, 1867, 1889, 1935, 1964, and 1965.

products.  In the fall of 2012, health officials traced a number of cases of fungal meningitis to injections of MPA that had been manufactured by NECC.  NECC initiated a recall of several contaminated batches of MPA before eventually surrendering its pharmacy license and ceasing production of all pharmaceutical products.  NECC filed for bankruptcy in December 2012, and the bankruptcy court confirmed the Chapter 11 plan on May 20, 2015.  See Docket # 1890.

Beginning in November 2012, plaintiffs, alleging death or injury caused by NECC's contaminated MPA, filed lawsuits against NECC, affiliated entities and individuals, and health-care providers in multiple state and federal jurisdictions.  In February 2013, the Judicial Panel on Multidistrict Litigation ("MDL Panel") issued an order under 28 U.S.C. § 1407 transferring a number of cases pending in several federal courts to this court for coordinated and consolidated pretrial proceedings.  Several other transfer orders followed.  At last count, 754 individual cases have been associated, in some way, with this MDL.

All of the cases in the MDL raise only state law claims, like negligence, violation of consumer protection statutes, failure to warn, product liability, agency, wrongful death, loss of consortium, and punitive damages.[2]  Most of them were filed in federal court under "related to" bankruptcy jurisdiction, i.e., 28 U.S.C. § 1334(b), because they

---

[2] The master complaint in this MDL originally included claims for battery and civil conspiracy, but, after the court dismissed those claims under some states' laws, the remainder were dropped.  See Docket ## 1360 (dismissing some battery and civil conspiracy claims), 1719 (second amended master complaint dropping battery and civil conspiracy counts).

either named NECC (the debtor) or could affect the bankruptcy proceedings.[3]  See 28

U.S.C. § 1334.  A few others were filed in state court and transferred to the District of

Massachusetts (and the MDL) by this court under 28 U.S.C. § 157(b)(5).  See In re N.

Eng. Compounding Pharmacy, Inc. Prods. Liab. Litig., 496 B.R. 256, 275 (D. Mass.

2013) (Virginia state court cases); Docket # 1173 (additional Virginia state court

cases).

Broadly speaking, all of the cases name some combination of four groups of

defendants: NECC; its employees, directors, and affiliated companies[4] (the "Affiliated

Defendants"); vendors who provided services to NECC[5] (the "National Defendants");

and clinics, hospitals, and healthcare professionals who procured contaminated NECC

products and administered them to patients (the "Clinic-Related Defendants").  NECC

and the Affiliated and National Defendants reached settlements with all plaintiffs in the

course of NECC's bankruptcy and this MDL, so only claims against the Clinic-Related

Defendants remain.  Those claims, however, continue to implicate the Affiliated and

National Defendants in various ways.  The defendants in many of the Tennessee

cases, for example, seek to attribute fault to NECC and the Affiliated and National

Defendants, as well as state and federal regulators.  Those defendants continue to

---

[3] A small fraction of the cases were filed in federal court under diversity jurisdiction, 28 U.S.C. § 1332, as well as bankruptcy jurisdiction.

[4] The Affiliated Defendants include Barry and Lisa Cadden; Doug, Carla, and Greg Conigliaro; Glenn Chin; Alaunus Pharmaceutical, LLC; Ameridose, LLC; GDC Properties Management, Inc.; Medical Sales Management, Inc.; and Medical Sales Management, SW, Inc.

[5] The National Defendants include UniFirst Corporation, ARL BioPharma Inc., Liberty Industries, Inc., Victory Mechanical Services, Inc., and Victory Heating & Air Conditioning Co.

seek discovery from NECC and the Affiliated and National Defendants to support their comparative fault defenses, and they will likely seek to present the evidence they uncover in their trials.

The court was initially able to manage the MDL's cases on a more-or-less uniform discovery schedule. It appointed a Plaintiffs' Steering Committee to coordinate discovery, and it set a now-expired deadline for discovery from settling defendants. But the uniform case management approach has begun to groan under the weight of the constituent cases' idiosyncracies. Because cases arising from some states are more advanced than those arising from others, the court recently adopted a more nuanced approach and created several tracks for common fact discovery. For Tennessee cases, the most advanced cases in the MDL, common fact discovery closes on September 15, 2015. The court has also set deadlines for expert reports and depositions, with all common expert discovery set to finish on December 11, 2015. Similar deadlines for cases from other states lag shortly behind this schedule.[6] After common expert discovery is complete, there will be no more coordinated discovery for the MDL court to oversee. Only case-specific fact and expert discovery will remain.

Pretrial proceedings, of course, encompass more than just common discovery. "Settlement," for example, "is an important part of pretrial proceedings in the [MDL] transferee court." David F. Herr, Multidistrict Litigation Manual § 9:16 (2014). In multidistrict litigation involving collections of individual tort cases, a common

---

[6] For example, for certain New Jersey and Maryland cases, common fact discovery closes on November 15, 2015, and January 22, 2016, respectively.

5

mechanism to help the parties value claims—and ultimately help them settle their individual cases—is bellwether trials.  See, e.g., William B. Rubenstein, Newberg on Class Actions §§ 11:11-12 (5th ed. 2015) (discussing purposes of bellwether trials in multidistrict litigation).  The most common way to conduct bellwether trials in multidistrict litigation is for parties in the bellwether cases to waive their rights to trials in their original districts under Lexecon.[7]  The parties in this case overwhelmingly refused to consent to trial here, so, absent some means (other than the MDL statute) of transferring cases filed in other districts to this district for trial, effective bellwethers are not an option here.

The plaintiffs point to such a mechanism.  For "personal injury tort and wrongful death claims" related to a case under title 11, 28 U.S.C. § 157(b)(5) authorizes "the district court in which the bankruptcy case is pending" to try the claims, regardless of where they arose.  This power belongs to any district court overseeing a bankruptcy and is unrelated to the MDL statute.  In plaintiffs' view, effective bellwether trials are possible because § 157(b)(5) skirts the Lexecon problem entirely by letting this court try the bellwethers under its bankruptcy powers.  Defendants object, contending (1) that their cases are not related to the now-confirmed bankruptcy, so this court lacks jurisdiction under 28 U.S.C. § 1334 (a prerequisite to transfer under 28 U.S.C. § 157(b)(5)); (2) section 157(b)(5) does not authorize a change of venue because the bankruptcy plan has been confirmed; (3) section 157(b)(5) cannot create a loophole in

---

[7] As other MDL district judges have noted, "[t]he import of [Lexecon's] holding can be quite debilitating to the effectiveness of bellwether trials."  Eldon E. Fallon et al., Bellwether Trials in Multidistrict Litigation, 82 Tul. L. Rev. 2323, 2354 (2008).

the Lexecon rule; and (4) it would be improper to transfer their cases here under section 157(b)(5), even if the court formally has the power to do so.  I consider these arguments in turn and, after rejecting them, set a schedule and procedure for the first bellwether trials in this MDL.

## II.     Subject Matter Jurisdiction Under 28 U.S.C. § 1334

Defendants' first argument is jurisdictional—they contend that the federal courts no longer have "related to" jurisdiction under 28 U.S.C. § 1334(b).  Because "[i]t is hornbook law that a court cannot act in the absence of subject matter jurisdiction," United States v. Horn, 29 F.3d 754, 767 (1st Cir. 1994), I will address that argument before considering the venue and bellwether questions.

"The general grant of bankruptcy jurisdiction is contained in 28 U.S.C. § 1334." In re Bos. Regional Med. Ctr., Inc., 410 F.3d 100, 105 (1st Cir. 2005).  Section 1334 grants district courts jurisdiction over four types of matters: "(1) cases under title 11, (2) proceedings arising under title 11, (3) proceedings arising in a case under title 11, and (4) proceedings related to a case under title 11."  Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.), 372 F.3d 154, 162 (3d Cir. 2004).  Proceedings falling into the first three categories are called "core" proceedings, while those falling into the last category are "non-core" proceedings.  Stern v. Marshall, 131 S. Ct. 2594, 2605 (2011). The cases in the MDL are, indisputably, "non-core" proceedings, so it is the "related to" jurisdictional grant that may be the font of this court's power to hear them.

"The statutory grant of 'related to' jurisdiction is quite broad," extending to "the entire universe of matters connected with bankruptcy estates."  In re Bos. Regional

Med. Ctr., Inc., 410 F.3d at 105.  Yet, "related to" jurisdiction is not without limit.

"[B]ankruptcy courts ordinarily may exercise related to jurisdiction as long as the

outcome of the litigation 'potentially [could] have some effect on the bankruptcy estate,

such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise

have an impact upon the handling and administration of the bankrupt estate.'"  Id.

(quoting In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. 1991)) (emphasis added).

The critical limitation on "related to" jurisdiction is that "bankruptcy courts have no

jurisdiction over proceedings that have no effect on the estate of the debtor."  Celotex

Corp. v. Edwards, 514 U.S. 300, 308 n.6 (1995).

There are three variables that might affect whether a particular case in this MDL

is "related to" the NECC bankruptcy: the parties named in the case, the possible cross-

claims and defenses (including proofs of claim filed by the parties in NECC's

bankruptcy), and the timing of the complaints.  I will discuss the first two here; the third

is the subject of ongoing briefing.  See Docket # 2103 (requesting briefing on whether

cases filed post-confirmation are sufficiently "related to" the bankruptcy to support

subject matter jurisdiction under 28 U.S.C. § 1334(b)).

Fortunately, I do not need to paint on a blank canvas.  This court has already

decided that "related to" jurisdiction is appropriate over any "case in which any plaintiff

has asserted a claim, or any defendant has asserted a claim for contribution or

indemnity, against NECC or any affiliated entity or individual [i.e., an Affiliated

Defendant]."  In re N. Eng. Compounding Pharmacy, Inc. Prods. Liab. Litig., 496 B.R. at

269.  It has also concluded that 28 U.S.C. § 1334(c)(2) does not require it to abstain

8

from hearing these cases and that permissive abstention is not appropriate under 28

U.S.C. § 1334(c)(1).  Those decisions are now law of the case, and I will not revisit

them here.  See, e.g., Naser Jewelers, Inc. v. City of Concord, 538 F.3d 17, 20 (1st Cir.

2008).

Harder jurisdictional problems arise in cases where claims against NECC or the

Affiliated Defendants are possible but have not yet been asserted.  Earlier in this MDL,

the court "assume[d] the existence of subject-matter jurisdiction" over such cases, but it

"abstain[ed] from exercising any such jurisdiction" absent additional claims affecting the

NECC estate.  See 496 B.R. at 269.  That decision, however, was in the MDL's infancy.

Not surprisingly, some of those cases eventually became more entangled with the

estate, requiring the court to revisit the subject matter jurisdiction question.  In a group

of cases from Virginia that asserted claims against only physicians, their professional

corporation, and the clinic where the physicians worked, the court initially abstained

from exercising jurisdiction.  Id.  But, when the clinic and the plaintiffs in those cases

filed proofs of claim against the bankruptcy estate (i.e., in the clinic's case, contingent

contribution and indemnity claims against NECC), the court reversed course.  Docket #

1131 at 11-12.  It concluded that defendants' contribution and indemnity claims could

conceivably have an effect on NECC's bankruptcy estate, making them "related to" the

bankruptcy and conferring subject matter jurisdiction over the cases under 28 U.S.C. §

1334(b).  Id.  It also held that mandatory abstention under § 1334(c)(2) was not

implicated because of the exception in 28 U.S.C. § 157(b)(4), which takes "[n]on-core

proceedings under [28 U.S.C.] section 157(b)(2)(B)" out of the mandatory abstention

9

statute's reach.  Section 157(b)(2)(B) relates to "personal injury tort or wrongful death claims against the estate," which the court construed to include contribution and indemnity claims against the estate that derive from personal injury or wrongful death claims against third parties, like the Clinic Related Defendants.[8]  Docket # 1131 at 13. Finally, as before, the court concluded that permissive abstention would not be appropriate because it would unnecessarily deplete the limited funds available to satisfy any judgments that the victims might obtain.  Docket # 1131 at 14-15.

Now, a new breed of cases has cropped up, particularly in Tennessee and New Jersey.  See, e.g., Reed v. Ameridose, LLC, No. 13-cv-12565 (D. Mass.).  Like the Virginia cases discussed above, these cases involve claims against physicians or other care providers, their employers, and the healthcare facilities for which they worked. For the most part, they do not name NECC or any of the Affiliated Defendants as parties.  They do not involve cross-claims for contribution or indemnity against NECC, but they do involve comparative fault defenses that will require the defendants to present evidence of NECC's conduct at trial.  Although many (if not all) of the plaintiffs

---

[8] The court specifically relied on the following earlier reasoning from this case:

> Contribution or indemnity claims are simply procedural vehicles for asserting liability against the estate for some underlying harm.  If the underlying harm giving rise to the estate's potential liability involves personal injury or wrongful death, the claim against a third-party concerning that harm is, in substance, a "personal injury tort or wrongful death claim against the estate" and therefore covered by the exception in § 157(b)(2)(B).  This reading is more congruent with Congress's motivation in crafting the exception to mandatory abstention.  A narrower reading would create a potentially gaping loophole in the carefully crafted system for the orderly administration of bankruptcy estates.

In re New England Compounding Pharmacy, Inc. Products Liab. Litig., 496 B.R. at 272.

in these cases filed proofs of claim in the bankruptcy,[9] the defendants did not.  These differences raise two questions: whether these cases remain sufficiently "related to" the bankruptcy to support subject matter jurisdiction, and, if so, whether I must (or should) abstain from hearing them.

As to the first question, these cases are "related to" the bankruptcy under § 1334(b).  First, plaintiffs have submitted proofs of claim against NECC in the bankruptcy.  I previously found such claims sufficient to support jurisdiction under § 1334(b), and I do so again now.  See Docket # 1131 at 11.  Second, the comparative fault defenses that the defendants in these cases are pursuing have already caused the estate to incur substantial litigation costs, and there is no doubt that these costs will balloon as the defendants seek to present evidence and testimony about NECC's alleged wrongdoing at trial.  Because of the estate's structure, these costs will directly affect the administration of the bankruptcy and the supply of funds available to NECC's future judgment creditors.

Specifically, the now-confirmed bankruptcy plan creates two pots of funds that are relevant to this MDL: a Tort Trust, which will pay out any awards to prevailing plaintiffs (i.e., future judgment creditors); and an Expense Fund, which is a separate fund within the Tort Trust to pay the ongoing litigation needs of the estate.  See Third Am. Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc., Docket # 1890-1, at § 1.71 (defining "Expense Fund" as "[t]he fund that may be established

---

[9] For example, all plaintiffs in the 15 proposed bellwether cases appear to have filed proofs of claim.  See Docket ## 2174, 2175; Claims Filed Against New England Compounding Pharmacy, Inc., https://drcdrx.com/claims/necp/bynumber/1/7005.

within the Tort Trust under, and subject to the provisions of, Section 6.04 hereof"); see also id. § 6.04 ("The Expense Fund, and earnings thereon, may be used for, inter alia, payment of . . . post-confirmation fees and expenses . . . of the Post-Effective Date Debtor and the Estate Representative . . . and such other fees or expenses of the Debtor and the Estate as determined by the Estate Representative on or before the date he transfers the Expense Fund Amount to the Expense Fund Administrator.").  If any funds are left in the Expense Fund when all litigation is complete, they will flow into the Tort Trust and will be used to further satisfy any judgments against the estate.  See id. § 6.04 ("To the extent that a portion of the Expense Fund is not disbursed, or otherwise held in reserve to fund the costs and expenses described herein, in the sole judgment of the Expense Fund Administrator, such portion shall be transferred to the Tort Trust, and shall be subject to the terms thereof.").  If a case involves no direct claims against NECC but does raise issues that require discovery or participation from the estate—issues like comparative fault—that case will deplete the Expense Fund. That, in turn, will diminish the funds that are available to the estate's future judgment-creditors.  Such cases therefore clearly affect the estate in a manner that can support "related to" jurisdiction under § 1334(b).

As to the second question, abstention in these cases is neither required nor appropriate.  First, mandatory abstention is not required because these cases fall within the § 157(b)(2)(B) exception.  Although they do not involve direct claims against NECC or now the estate, they do implicate the estate in two ways: they seek to assign liability to it, which will deplete funds through litigation costs as explained above, and

they involve plaintiffs who have filed proofs of claim against NECC in the bankruptcy. As the court has explained twice now, § 157(b)(2)(B) includes such subsidiary or derivative claims within its scope, removing these cases from the ambit of § 1334(c)(2)'s mandatory abstention provision.  See 496 B.R. at 272; Docket # 1131 at 13.  And, for the same reasons that I explained with respect to the Virginia cases, permissive abstention under 28 U.S.C. § 1334(c)(1) is not appropriate.  See Docket # 1131 at 14-15.

In response, defendants contend that the court's subject matter jurisdiction over these cases is somehow contingent upon timing.  They contend that even if jurisdiction had been appropriate under 28 U.S.C. § 1334 at some point, it no longer is because the bankruptcy plan has been confirmed.  Of course, the consequences of the court adopting that position would be sweeping—and, for many plaintiffs, catastrophic.  In essence, defendants suggest that this court (and all other federal courts) no longer have subject matter jurisdiction over the vast majority of the cases that, until this May, were properly in this MDL.  Because most of the cases were originally filed in federal court, they cannot be remanded to any state courts.  And, because many of the limitations periods have run, plaintiffs would not be able to re-file their cases in state court.  That a single event in the bankruptcy could lead to this result—the near evisceration of the MDL and loss of many of the plaintiffs' claims—is absurd.

Fortunately, that outcome is not required or even suggested by the law. Although the scope of "related-to" jurisdiction may shrink after a bankruptcy plan is confirmed, see, e.g., In re Resorts Int'l, Inc., 372 F.3d 154, 164-69 (3d Cir. 2004), plan

13

confirmation cannot cause subject matter jurisdiction to disappear if it was properly vested before confirmation.  Defendants' argument is virtually identical to one made in the Enron securities multidistrict litigation and rejected by the Fifth Circuit.  In <u>Newby v. Enron Corp.</u>, 535 F.3d 325 (5th Cir. 2008), the plaintiffs filed several individual suits in state court alleging tort claims against parties associated with Enron, which was in bankruptcy.  The cases were filed before the Enron bankruptcy plan was confirmed.  They were removed to federal court under "related to" jurisdiction, and the individual federal cases were consolidated into an MDL for pretrial proceedings.  After the Enron bankruptcy plan was confirmed, the plaintiffs sought to have the cases remanded to state court for lack of subject matter jurisdiction, contending that plan confirmation shrank the scope of related-to jurisdiction and placed their cases outside its ambit.  The Fifth Circuit was not persuaded, holding that "if 'related to' jurisdiction actually existed at the time of removal subsequent events cannot divest the district court of that subject matter jurisdiction."  <u>Id.</u> at 335 (internal quotation marks and alterations omitted).  It noted that plaintiffs "[could ]not point to a single case in which we have held that plan confirmation divests a District Court of bankruptcy jurisdiction over pre-confirmation claims based on pre-confirmation activities that properly had been removed pursuant to 'related to' jurisdiction," and "likewise f[ou]nd none."  <u>Id.</u>  Like the Fifth Circuit, this court has not found a single case to that effect, either in defendants' submissions or on its own.  Indeed, the bulk of authority suggests the opposite result.[10]  <u>See, e.g.</u>, <u>Superior</u>

---

[10] The First Circuit has not squarely addressed when "related to" jurisdiction vests under 28 U.S.C. § 1334(b).

Bank, FSB v. Boyd (In re Lewis), 398 F.3d 735, 743 (6th Cir. 2005); Newby, 535 F.3d at

336; Continental Nat'l. Bank of Miami v. Sanchez (In re Toledo), 170 F.3d 1340, 1346

n.8 (11th Cir. 1999); Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.), 124

F.3d 619, 626 (4th Cir. 1997).  Accordingly, I conclude that the confirmation of NECC's

bankruptcy plan did not render subject matter jurisdiction that had properly vested

before confirmation deficient.

In light of the principles outlined above, a set of cases over which this court

indisputably has subject matter jurisdiction under its bankruptcy powers has emerged.[11]

That set—which I shall call the "Candidate Cases," since any of them may theoretically

function as a bellwether case for the MDL—consists of any case filed before May 20,

2015 that:[12]

- names NECC or an Affiliated Defendant as a defendant, regardless of whether the case was originally filed in state or federal court, 496 B.R. at 264;

- involves cross-claims against NECC or any Affiliated Defendant, including claims for contribution or indemnity, id.;

- does not involve claims of any kind against NECC or an Affiliated Defendant in the litigation, but does involve plaintiffs or defendants that filed timely proofs of claim in the bankruptcy, Docket # 1131 at 11-12;

- does not involve claims of any kind against NECC or an Affiliated Defendant in the litigation, but does involve defendants that may assert, and have expressed an intention to assert, comparative fault defenses

---

[11] To reiterate, I do not address cases that are properly in federal court under 28 U.S.C. §§ 1331 or 1332 here, unless those cases are also related to the NECC bankruptcy.

[12] As explained in further detail above, the bankruptcy court confirmed NECC's Chapter 11 plan on May 20, 2015.  Docket # 1890.  Briefing about the effect of plan confirmation on this court's "related to" jurisdiction over newly-filed cases is underway.  See Docket # 2103.

that seek to assign fault to NECC or an Affiliated Defendant.[13]

Mandatory abstention is not required by § 1334(c)(2) for any of the Candidate Cases,

and permissive abstention is not appropriate for these cases under § 1334(c)(1).

## III.   The Court's Powers Under 28 U.S.C. § 157(b)(5)

This leaves the question of venue—i.e., where the bellwether trials will take

place.  The PSC contends that this court, acting under its bankruptcy powers, may set

venue for any or all of the Candidate Cases under 28 U.S.C. § 157(b)(5).  That statute

provides:

> The district court shall order that personal injury tort and wrongful death
> claims shall be tried in the district court in which the bankruptcy case is
> pending, or in the district court in the district in which the claim arose, as
> determined by the district court in which the bankruptcy case is pending.

"§ 157(b)(5) simply specifies where a particular category of cases should be tried,"

Stern v. Marshall, 131 S. Court. 2594, 2607 (2011), and "is not jurisdictional," id. at

2606.  Its purpose is "to centralize the administration of the [bankruptcy] estate and to

eliminate the 'multiplicity of forums for the adjudication of parts of a bankruptcy case.'"

A.H. Robins Co. v. Piccinin, 788 F.2d 994, 1011 (4th Cir. 1986) (quoting House

Agreement to the Conference Report on H.R. 5174, 130 Cong. Rec. 20206, at 20228

(1984), as reprinted in 1984 U.S.C.C.A.N. 576, 579 (statement of Rep. Kastenmeier,

Member, H. Comm. on the Judiciary)).  But, despite conferring the power to effectuate

such centralization with the district court overseeing the bankruptcy, "section 157(b)(5)

does not prescribe any procedure" to guide its use.  A.H. Robins Co., 788 F.2d at 1011.

---

[13] To be clear, the last group of cases includes the Tennessee cases, including those against the
St. Thomas entities.

Courts confronted with motions to set venue under section 157(b)(5) have weighed the impact that claim centralization might have on the bankruptcy estate against the convenience to the parties and witnesses and the availability of evidence. For example, in A.H. Robins Co., the United States Court of Appeals for the Fourth Circuit approved the district court's order provisionally consolidating personal injury actions against the bankrupt maker of the Dalkon Shield intrauterine device in the bankruptcy district.  Id. at 1014.  At the time of the § 157(b)(5) motion, there were 5000 suits pending against the debtor and various non-debtor defendants (i.e., under claims of joint and several liability).  Id. at 1013.  The Fourth Circuit found that the prospect of trying these cases individually (i.e., in many different districts) would impose "stupendous costs" on the bankruptcy, reasoning that "[i]f all these claims were to be tried, the expense of discovery proceedings and trial would likely consume all the assets of the debtor and exhaust all the resources of its executives and employees." Id.  The Sixth Circuit, in a case involving thousands of individual claims against the bankrupt maker of silicone gel breast implants along with various non-debtor defendants, followed the Fourth Circuit's approach and allowed the claims to be consolidated in the district overseeing the maker's bankruptcy.  See In re Dow Corning Corp., 86 F.3d 482, 497 (6th Cir. 1996) ("We agree with the Fourth Circuit that Section 157(b)(5) should be read to allow a district court to fix venue for cases pending against nondebtor defendants which are 'related to' a debtor's bankruptcy proceedings pursuant to Section 1334(b).  This approach will further the prompt, fair, and complete resolution of all claims 'related to' bankruptcy proceedings, and harmonize Section

1334(b)'s broad jurisdictional grant with the oft-stated goal of centralizing the administration of a bankruptcy estate.") (internal footnote omitted).

Given the procedural similarities between this case and A.H. Robins and Dow, I find that authority persuasive.  Nonetheless, this cases's peculiarities merit discussion. Two differences in particular stand out: first, A.H. Robins and Dow involved motions to set venue that were filed before bankruptcy plan confirmation, but NECC's plan has been confirmed; and second, the individual actions in those cases involved causes of action against the debtor, while many of the Candidate Cases do not.  These differences, however, do not dictate a different outcome.  Having considered the arguments raised by all parties, I conclude that it is proper for this court, sitting in bankruptcy, to transfer any of the Candidate Cases to this district for trial.

Although the Candidate Cases' potential effects on the NECC bankruptcy are more circumscribed now than they may have been before confirmation, their litigation and resolution may affect the implementation of the plan, making consolidation for trial purposes appropriate.  As I explained above, the NECC bankruptcy plan contains two funds set up to satisfy personal injury or wrongful death judgments and to pay for ongoing litigation involving the estate (i.e., the Expense Fund and the Tort Trust). Depletion of the latter necessarily depletes the former, limiting the extent to which NECC's eventual judgment creditors can recover.  As in A.H. Robins, "[i]f the claimants as a whole are to realize reasonable compensation for their claims, it is obviously in the interest of the class of claimants as a whole to obviate the tremendous expense of trying these cases separately."  A.H. Robins Co., 788 F.2d at 1013; see also Dow, 86

18

F.3d at 496.  Therefore, even though the NECC bankruptcy plan has been confirmed, setting venue in this district for the bellwether cases (and possibly for others) better effectuates the plan and better serves the purpose of the bankruptcy proceeding.

Whether the Candidate Cases themselves name NECC as a defendant is of no consequence to this holding.  At least for the Tennessee and New Jersey cases, the defendants have expressed their intention to pursue a defense in which they will seek to attribute liability to NECC.[14]  That strategy will necessarily require plaintiffs to present evidence about NECC's actions, and the bankruptcy estate will incur costs as it defends itself (or, for that matter, as it merely complies with subpoenas).  This will result in litigation expenses that will drain the Expense Fund and, indirectly, the Tort Trust.  Refusing to transfer some cases based merely on pleading decisions would elevate form over function in a way that would frustrate the goals of the Chapter 11 plan and the bankruptcy more generally.

Because the Candidate Cases are related to a bankruptcy in this district and because they present personal injury tort or wrongful death claims, I have the authority and obligation, sitting in bankruptcy, to set the venue in which they will be tried.  That authority enables me to try bellwether cases for the MDL in this district.  The only remaining question is how to exercise that power in a way that complies with my obligations under the MDL statute.  I now address that problem.

--------

[14] To the extent that defendants in cases premised upon bankruptcy jurisdiction that do not name NECC as a party are unable, under applicable state law, to pursue such a strategy, this analysis may change.  But it is not clear to me that such cases even exist, so I will not address that possibility further here.

**IV.    The Court's Obligations Under 28 U.S.C. § 1407**

Many defendants contend that I may not set venue here under any circumstances because Lexecon generally prohibits an MDL court from transferring a case to itself.  Plaintiffs counter that Lexecon is entirely irrelevant in this case because it imposes no limits on the court's bankruptcy power.  Both parties misunderstand Lexecon's reach.  Lexecon does impose structural constraints on this court's power when it sits as the MDL court, but it imposes no constraints on the court when it sits in bankruptcy.  In other words, Lexecon prevents me from keeping the cases here through trial, but it does not prevent me from transferring bellwether cases back to this district under 28 U.S.C. § 157(b)(5) after the MDL Panel remands the cases to their home districts.

The parties' confusion likely arises because the court is wearing two hats.  First, the court is the MDL transferee court for all of the MDL's cases.  In that role, it is both empowered and constrained by 28 U.S.C. § 1407.  It may only preside over pretrial proceedings, and it must ensure that the cases are remanded by the MDL Panel when its job is complete.  Second, it is the district court overseeing NECC's bankruptcy, the proceeding to which many of the MDL's cases are related.  In that role, it assumes the full panoply of supervisory powers and responsibilities that district courts normally have over bankruptcies.  See, e.g., 28 U.S.C. § 157.  That includes the venue-setting power for personal injury tort or wrongful death cases under § 157(b)(5).  These two sets of powers and restrictions, though related, operate independently.

The Lexecon rule restricting venue transfers comes from 28 U.S.C. § 1407's

20

strictures that MDL courts may only preside over "coordinated or consolidated pretrial proceedings" and must remand cases to their original districts "at or before the conclusion of such pretrial proceedings."  See 523 U.S. at 28.  Lexecon involved an MDL transferee court ordering that one of the MDL's constituent cases, which had been filed in a different district from the MDL court, be transferred under 28 U.S.C. § 1404 (the general venue transfer statute) to the MDL court's district for trial.  The claims at issue in that MDL involved malicious prosecution, abuse of process, tortious interference, commercial disparagement, and defamation—there was no bankruptcy, let alone a bankruptcy in the district where the MDL court sat.  To determine whether transfer under § 1404 was allowed, the Supreme Court focused on the MDL's statute's remand provision, which says that "[e]ach action . . . transferred [to the MDL] shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated." 28 U.S.C. § 1407(a) (emphasis added).  In the Court's view, this provision means that MDL cases must be returned to their home districts if they proceed to trial.[15]

The Court did not, however, hold that MDL cases may never be transferred to the MDL district for trial—it merely held that the MDL court, sitting as such, lacks the power to effectuate that transfer.  Indeed, the Court explained that "on any view of § 1407(a), if an order may be [otherwise properly] made under § 1404(a), it may be

---

[15] The language of Lexecon, which suggest that remand is mandatory, is in tension with the practice of MDL transferee courts trying bellwether cases by obtaining Lexecon waivers.  See, e.g., David F. Herr, Multidistrict Litigation Manual § 9:24 (2014).  But, since the defendants in this MDL have taken that option off the table, I leave the problem of reconciling this tension to another court at another time.

made after remand of the case to the originating district court." Lexecon, 523 U.S. at 39 (internal footnote omitted). Lexecon therefore resolved only one issue: "that self-assignment is beyond the scope of the transferee court's authority." Id. It did not consider whether consolidation of a case into an MDL exhausts all venue-shifting statutes for the duration of the case's time in the federal courts.

For the bellwether trials selected by the court and the parties, pretrial proceedings will be complete after Daubert motions are fully briefed. For the first round of bellwether cases (i.e., Tennessee), that will be February 26, 2016.[16] See Docket # 2075. This court's MDL function for those cases will then be done, so it expects to file a suggestion of remand with the MDL Panel on February 29, 2016. See J.P.M.L. R. 10.1(b)(l). The Panel will likely remand the cases to their original districts shortly thereafter, clearing the way for me to hear a motion to set the venue in this district for trial under my bankruptcy powers.

## V.   Venue for the Bellwether Trials and the Bellwether Schedule

As other courts have noted, "due process requires some form of notice and opportunity for a hearing before there can be a change of venue and before trial of a personal injury tort cause of action against a debtor may be transferred finally from the court in which the cause was initially filed to the district where the bankruptcy proceedings are pending." A.H. Robins Co., 788 F.2d at 1014. I intend to follow that standard, so I will not set venue for the bellwether cases before the cases are

---

[16] The court reiterates its intention to strictly adhere to this deadline, as well as all other deadlines in its bellwether schedule for the Tennessee cases. Docket # 2075 at 4-5.

identified.  Yet, to set the schedule for the MDL, I must at least consider whether it is

likely that a motion to set venue in this district for the bellwether trials might succeed.

Having reviewed the parties' positions, I am of the opinion that such a motion

would be successful.  Counseling against transfer are the defendants' objections that

many key witnesses and evidence are located in the home districts.  But those

problems may be mitigated in several ways.  First, the court expects that nearly all of

the evidence presented to the jury will be documentary.  That evidence can readily be

moved around the country.  Second, the parties can plan their trial presentations

around the limits of this court's subpoena power.  They can (and should) inquire early

about witnesses' availability to appear for trial in Massachusetts.  They can take

videotaped depositions of witnesses whose availability is in doubt, and they can seek

leave to present key testimony live through video conferencing.[17]  <u>See</u> Fed. R. Civ. P.

43(a).

To the extent that any inconveniences to the parties might remain, they are more

than outweighed by the factors favoring trial in this district.  First, this court is intimately

familiar with the now 2200-plus filings in this multidistrict litigation.  Requiring another

court to develop that familiarity when this court is available as an alternative, statutorily

permissible forum and when the home court will hear few, if any, other cases from this

MDL would be asking it to undertake a salmon run to nowhere.  Second, this MDL is

based in Massachusetts, as are a plurality of the lawyers in it.  Bellwether trials will be

---

[17] To be clear, this court highly disfavors the use of deposition videos or teleconferencing at trial
if it can be avoided.  <u>See, e.g.</u>, <u>In re Prograf Antitrust Litig.</u>, No. 1:11-MD-02242-RWZ, 2014 WL
7641156, at *5 (D. Mass. Dec. 23, 2014).

more effective if the arguments presented in them are well developed, and it stands to reason that facilitating the participation of more lawyers in the MDL may further that goal.  Finally, much of the evidence that will likely be presented as part of the defendants' cases, like evidence of NECC and the Affiliated Defendants' wrongdoing in support of the comparative fault defenses, is located in Massachusetts, making any evidentiary inconveniences caused by moving the cases out of their original districts a wash.[18]

This, at last, brings us to the schedule going forward.  On July 9, 2015, the court issued an order setting forth a schedule for bellwether case selection and trials.  See Docket # 2075 at 4-5.  That schedule was conditioned upon the Tennessee defendants waiving their rights to trials in their home districts under Lexecon.  After all of the Tennessee defendants refused to do that, I ordered the parties at the last status conference to follow that schedule while I considered the § 157(b)(5) question.  The parties have now started the bellwether selection process in accordance with that order.

_____

[18] Some defendants, particularly St. Thomas, contend that something akin to an abstention analysis under 28 U.S.C. § 1334 is necessary before I use § 157(b)(5) to set venue here.  They point to cases holding that "[a] motion under section 157(b)(5) . . . requires an abstention analysis."  In re Pan Am. Corp., 950 F.3d 839, 844 (2d Cir. 1991); see also Arnold v. Garlock, Inc., 278 F.3d 426, 444 (5th Cir. 2001) ("A § 157(b)(5) motion ordinarily requires an abstention analysis.").  Although that statement is technically accurate, it conflates the subject matter jurisdiction and venue questions.  Any state law cause of action that is heard under the federal courts' bankruptcy jurisdiction powers, like state tort cases related to a bankruptcy, require an abstention analysis under 28 U.S.C. § 1334(c).  But that analysis is jurisdictional.  It has nothing to do with venue, which is all that 28 U.S.C. § 157(b)(5) addresses.  To the extent that a motion under § 157(b)(5) asks a federal court to set venue for a case that is pending in state court, it seeks two distinct forms of relief in one motion: removal of the state action to federal court, which does require a jurisdictional abstention analysis, and a determination of venue.  This was the case in both Pan American and Garlock.  Most of the Candidate Cases, however, were originally filed in federal court.  And, as I explained above, it is appropriate for the federal courts to exercise subject matter jurisdiction over those cases.  No further abstention analysis is required to transfer venue to this district under 28 U.S.C. § 157(b)(5).

The court intends to adhere to that schedule through the completion of <u>Daubert</u> motion briefing.[19]  As explained above, I will then send the four bellwether cases to the MDL Panel for remand to their original districts.  After the Panel does that, I will immediately entertain a motion from the NECC Post-Confirmation Officer to set venue for trials under 28 U.S.C. § 157(b)(5).[20]  Because the cases will no longer be part of the MDL, the motion should be filed in the same form as a motion to withdraw the reference in the bankruptcy court,[21] <u>see</u> Bankr. D. Mass. R. 5011-1, and a notice and copy of the bankruptcy court motion should be filed as a notice in the MDL docket.  I will then consider the motion and hold a hearing to assess whether it is ultimately appropriate to transfer the cases to this district for trial.[22]  If it is, I will issue an order to that effect and promptly schedule a pretrial conference.  At that conference, the court will set a schedule for the bellwether trials in which one will begin at the court's next available

---

[19] This includes the January 29, 2016 case-specific expert discovery cutoff and the January 15, 2016, deadline to seek leave to move for summary judgment.

[20] If the Post-Confirmation Officer declines to file such a motion, the PSC or any party to the bellwether cases may do so.  If the moving party is not the Post-Confirmation Officer, however, it should address whether it is authorized by the bankruptcy statutes or rules to invoke § 157(b)(5).  Authority expounding the mechanics of § 157(b)(5) is sparse, and the court has only been able to locate cases in which the transfer motion is filed on behalf of the debtor.  <u>See, e.g.</u>, <u>In re Pan Am Corp.</u>, 16 F.3d 513, 516 (2d Cir. 1994) ("A bankrupt debtor who is a defendant in a personal injury action may move under section 157(b)(5) to transfer the case to one of two venues . . . .").  But the statute does not appear to be so limited, and the court will not, at this point, prohibit other parties from moving to transfer.

[21] Under the rules of this district's bankruptcy court, the motion should be filed with the clerk of the bankruptcy court, who will docket the motion and transmit it to this court's clerk.  As prescribed by Local Bankruptcy Rule 5011-1, the motion should be accompanied by a district court cover sheet.  That cover sheet should indicate that the motion is related to the MDL case and the cases' former District of Massachusetts case numbers.

[22] Parties opposing the motion may, of course, file a response within 14 days of its docketing in the district court.

trial date[23] and any others will follow immediately thereafter.

## VI.  Conclusion and Next Steps

In the court's view, this order resolves the schedule and procedure for Tennessee bellwether trials.  Should any parties see value to setting a schedule for bellwether trials for cases from other jurisdictions, they may move to do so at any time. Any such motion should include a proposed schedule and procedure that is consistent with this order and my July 9, 2015, order (Docket # 2075).

The assented-to motion for a hearing on the issues discussed in this order (Docket # 2137) is ALLOWED, with the hearing having taken place at the August 5, 2015, status conference.


_____October 7, 2015_____                    _____/s/Rya W. Zobel_____
             DATE                                                RYA W. ZOBEL
                                                      UNITED STATES DISTRICT JUDGE

---

[23] I expect this would be late March or early April 2016.