UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
PHARMACY CASES LITIGATION          )
                                   )
                                   )
                                   )
                                   )
                                   )
                                   )


BEFORE:  THE HONORABLE JENNIFER C. BOAL




**<u>MOTIONS HEARING</u>**




John Joseph Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, MA 02210


October 14, 2015
11:30 a.m.



Catherine A. Handel, RPR-CM, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 5205
Boston, MA 02210
E-mail: hhcatherine2@yahoo.com

APPEARANCES:


For The Plaintiffs:

    Hagens, Berman, Sobol, Shapiro LLP, by KRISTEN JOHNSON, ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts 02142;


    Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH, ESQ., and BENJAMIN A. GASTEL, ESQ., 227 Second Avenue North, Nashville, Tennessee 37201-1631;


    Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac Street, Suite 500, Boston, Massachusetts 02114;


    Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K. MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, New York 10013-1413;


    Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS, ESQ., 150 Fourth Avenue North, Suite 1650, Nashville, Tennessee 37219;




FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF NECP, INC.:


    Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High Street, Suite 2400, Boston, Massachusetts 02110-1724;






(Appearances continued on the next page.)

```
 1     APPEARANCES (Cont'd):

 2
       FOR THE DEFENDANTS:
 3

 4        Fulbright & Jaworski LLP, by YVONNE K. PUIG, ESQ., and
       MARCY H. GREER, ESQ., 98 San Jacinto Boulevard, Suite 1100,
 5     Austin, Texas 78701-4255;

 6
          Gideon, Cooper & Essary, PLC, by CHRIS J. TARDIO, ESQ., and
 7     MATTHEW H. CLINE, ESQ., 315 Dearerick Street, Suite 1100,
       Nashville, Tennessee 37238;
 8

 9        Michaels, Ward & Rabinovitz LLP, by DAN RABINOVITZ, ESQ.,
       One Beacon Street, Second Floor, Boston, Massachusetts 02108;
10

11        Todd & Weld LLP, by CORRINA L. HALE, ESQ., 28 State Street,
       31st Floor, Boston, Massachusetts 02109;
12

13        Brewer, Krause, Brooks & Chastain, PLLC, by PARKS T.
       CHASTAIN, ESQ., 611 Commerce Street, Suite 2600, Nashville,
14     Tennessee 37203;

15
          Pessin Katz Law, P.A., by GREGORY K. KIRBY, ESQ., 901
16     Dulaney Valley Road, Suite 400, Towson, Maryland 21204;

17
          Nutter McClennen & Fish LLP, by SARAH P. KELLY, ESQ.,
18     Seaport West, 155 Seaport Boulevard, Boston, Massachusetts
       02210-2604;
19

20        Collora LLP, by INGRID S. MARTIN, ESQ., 100 High Street,
       20th Floor, Boston, Massachusetts 02110;
21

22

23

24     (Appearances continued on the next page.)

25
```

```
 1    APPEARANCES (Cont'd):

 2

 3     FOR THE MOVANTS:

 4
          Dennis R. Brown, P.C., by DENNIS R. BROWN, ESQ., 869 Concord
 5    Street, Framingham, Massachusetts 10701;

 6

 7     FOR THE GOVERNMENT:

 8         United States Attorney's Office, by AUSA AMANDA P.M.
      STRACHAN, AUSA GEORGE P. VARGHESE and AUSA JOHN CLAUD, John J.
 9    Moakley Courthouse, One Courthouse Way, Suite 9200, Boston,
      Massachusetts 02210.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2         (The following proceedings were held in open court before

 3    the Honorable Jennifer C. Boal, Magistrate Judge, United States

 4    District Court, District of Massachusetts, at the John J.

 5    Moakley United States Courthouse, One Courthouse Way, Boston,

 6    Massachusetts, on October 14, 2015.)

 7              COURTROOM DEPUTY CLERK YORK:  The Honorable Jennifer

 8    C. Boal presiding.  Please be seated.

 9              Today is October 14th, 2015.  We're on the record in

10    the matter of New England Compounding Pharmacy Incorporated.

11    The Case No. is 13-MDL-2419.  Will counsel please identify

12    themselves for the record, starting with counsel at that

13    table.

14              MR. TARDIO:  Chris Tardio and Matt Cline for the

15    Tennessee Clinic defendants.

16              MS. STRACHAN:  Good morning, your Honor.  Amanda

17    Strachan for the United States.

18              MR. VARGHESE:  Good morning, your Honor.  George

19    Varghese for the United States.

20              MR. CLAUD:  And John Claud for the United States.

21              MR. BROWN:  Good morning, your Honor.  Dennis Brown

22    for Owen Finnegan and Stephen Haynes.

23              THE COURT:  Good morning.

24              MR. GASTEL:  Good morning, your Honor.  Ben Gastel on

25    behalf of the plaintiffs.
```

```
1            MS. JOHNSON:  Kristen Johnson on behalf of the
2     Plaintiffs' Steering Committee.
3            MR. GOTTFRIED:  Michael Gottfried for the post
4     confirmation officer, Paul Moore.
5            THE COURT:  Good morning.
6            MS. PUIG:  Good morning, your Honor.  Yvonne Puig for
7     the Saint Thomas Entities.
8            MS. KELLY:  Good morning, your Honor.  Sarah Kelly
9     for the Saint Thomas Entities.
10            MR. RABINOVITZ:  Dan Rabinovitz, your Honor, on
11     behalf of Gregory Conigliaro and Medical Sales Management, Inc.
12            MS. MARTIN:  Good Morning, your Honor.  Ingrid Martin
13     on behalf of Ameridose.
14            THE COURT:  Anybody else?
15            (No response.)
16            THE COURT:  All right.  So, we have quite a few
17     motions to go through.
18            I thought -- I have read all the papers.  I do have a
19     few questions, but I would also ask, so we can get through
20     everything -- and I know Judge Zobel has another proceeding at
21     2:00 -- to try and limit your argument to about five minutes
22     or so.  So, really hit the highlights if you think there's
23     things in the motion papers that you haven't addressed.
24            So, I would like to start with the -- is the
25     Plaintiffs' Steering Committee running this like they usually
```

```
 1    do with Judge Zobel?

 2              MS. JOHNSON:  (Shaking head.)

 3              THE COURT:  I was going to go down through the agenda

 4    with some slight adjustments.  I thought I would first hear

 5    the U.S. motion to intervene as well as the motions brought by

 6    Messrs. Finnegan and Haynes because they seem to be related.

 7    I don't actually need to hear argument on the actual motion to

 8    intervene as to whether or not, essentially, the United States

 9    can participate, but, rather, the underlying substance of the

10    motions.  So, I'll hear from the government first.

11              MS. STRACHAN:  Thank you, your Honor.

12              Is there anyone on the phone?

13              THE COURT:  There are people on the phone.  So,

14    you'll need to stay seated and pull the microphone close to you.

15              MS. STRACHAN:  All right.  Thank you.

16              Your Honor, as was stated the last time we were

17    before you, the government's goal in this civil litigation has

18    been to be involved as little as possible and only to come

19    forward to you when we felt that the criminal case is at

20    stake, and that's why we're here today.

21              There are two issues before your Honor from the

22    government's perspective:

23              Number one is our request that the Court stay the

24    depositions of any government witnesses pending trial in the

25    criminal case, and the second are the Saint Thomas Entities'
```

```
1    motions to compel documents from both Gregory Conigliaro and

2    MSM now.  I'll just address -- does your Honor just want to

3    hear on the deposition argument first and I assume we will

4    address the documents later?

5             As your Honor knows from the filings to date, the

6    positions have changed slightly.  The government is asking

7    that the Court stay any depositions of government witnesses

8    until after the criminal case, the parties address the

9    Microfinancial factors and the TelexFree case in their briefs.

10   So, I won't do that here.

11            THE COURT:  I thought the government was also seeking

12   to stay any depositions of former employees of NECC and other

13   affiliated defendants.

14            MS. STRACHAN:  Your Honor, the government is -- the

15   request is that any deposition of a potential government

16   witness be stayed.  And so, former employees of NECC, in large

17   part, are potential government witnesses.  We spoke to a large

18   number of them in our investigation.

19            THE COURT:  How many former employees are there?

20            MR. VARGHESE:  I'm sorry, your Honor.  Are you asking

21   how many former employees are there --

22            THE COURT:  Yes.  You just said, essentially, that

23   any former employees are potential witnesses.  So, how many

24   people are we talking about?

25            MS. STRACHAN:  Your Honor, we can get you that exact
```

1     number.  We had focused our papers on the witnesses that they

2     have actually sought to depose by deposition notice.

3              THE COURT:  Right, but your request is broader.

4              MS. STRACHAN:  That's correct, your Honor, just in

5     the event that there are future requests of a similar like.

6     My assumption is that after they -- if they have a chance to

7     talk to these witnesses, there are others that they're going

8     to wish to speak to.

9              We can get your Honor the list of the former

10    employees and we can also address these on an ad hoc basis

11    going forward -- on an individual basis going forward if they

12    seek to -- if they have -- we already in the past -- the Saint

13    Thomas Entities have emailed me and said, Are all of these

14    people potential witnesses of yours?  I've written back and

15    said, Yes, they are, and we can address them on a piecemeal

16    basis going forward if that's what the Court chooses to do,

17    but so far, of the six or so former employees of MSM and NECC

18    that they've noticed depositions of, they are all our

19    potential witnesses, yes.

20             THE COURT:  What struck me was the breadth of the

21    government's request, both in terms of the Massachusetts Board

22    of Pharmacy and with respect to not just Mr. Haynes and

23    Finnegan, but the broader requests.

24             So, for example, it doesn't seem as if the government

25    is -- you're seeking a blanket ban on a deposition of the

1    Massachusetts Board of Pharmacy.  There's no topics, it seems,

2    that the government is willing to have a representative -- a

3    30(b)(6) witness answer, if I understand the government's

4    position correctly.

5         MS. STRACHAN:  Your Honor, counsel for the

6    Massachusetts Board of Pharmacy has indicated -- has let us

7    know that the two witnesses that they intend to designate as

8    their 30(b)(6) witnesses are, in fact, two very important

9    witnesses in the government investigation.  They are the two

10   individuals from the Mass Board of Pharmacy who were the first

11   people on the ground at NECC during the outbreak.

12        THE COURT:  Right, but the deposition notice requests

13   information from well before that as well.

14        MS. STRACHAN:  That's correct, your Honor.  And

15   that's why in our papers we discuss the fact that the

16   indictment has a client conspiracy alleged in it.  So, much of

17   the anticipated testimony from the Mass Board of Pharmacy will

18   be directly relevant to the government's -- Count 3 of the

19   indictment, which is our client conspiracy.

20        THE COURT:  Why shouldn't they consider this part of

21   the government's motion, essentially, a motion for

22   reconsideration?

23        MS. STRACHAN:  Your Honor, I did see that argument.

24   If your Honor wishes to view it that way, I think that would

25   be a fine way to go.  The reason we didn't address it and

1    didn't ask this Court to reconsider is because we hadn't

2    intervened at that point.  I --

3         THE COURT:  Right, but it was clear from the argument

4    presented by the Attorney General that they were doing this on

5    your behalf.

6         MS. STRACHAN:  Yes, I understand that.  And your

7    Honor found that they had not -- therefore, not made a showing

8    of harm and that they had not made a showing for protective

9    order.  I attended the oral argument on that motion.  I heard

10   Mr. Tardio say that if the government wishes to intervene and

11   speak on the issue, that they should do so.  And so --

12        THE COURT:  No.  I think his point was you should

13   have done so.  Clearly, you could have done that up-front,

14   right?  But you choose to go the route of asking the Attorney

15   General to make arguments on your behalf.

16        MS. STRACHAN:  Well, your Honor, just -- so that your

17   Honor knows what ended up happening, as I think counsel for

18   the Mass Board of Pharmacy indicated at the last hearing, they

19   -- we were not aware that these were -- there were ongoing

20   discussions about the 30(b)(6).  They called us and said, What

21   is your position?  We let them know that we had a great amount

22   of concern about the witnesses going forward with their

23   deposition and it's for that reason that they filed it.

24        The way that I started, your Honor, it has not been

25   our goal to intervene and to get involved in this litigation.

```
 1    It's the course we chose at the time because we thought it
 2    made the most sense.  It was what we had done with the FDA.
 3    In hindsight, perhaps, we should have intervened earlier, but,
 4    like I said, we were doing our best to stay out of the way of
 5    this litigation to the extent that we felt like we could
 6    without risking harm to the criminal case.
 7              THE COURT:  Thank you.
 8              So, it's the -- who wishes to speak on the -- Ms.
 9    Strachan.
10              MS. STRACHAN:  Sorry.  There are just a couple of
11    other things I wanted to make -- points I wanted to make on
12    the motion before we move on, if I could.
13              THE COURT:  Yes.
14              MS. STRACHAN:  And so, to the -- I don't know if the
15    Court is interested in hearing particularly as to the
16    witnesses who have already been noticed for depositions, but I
17    think the Court probably has seen from the papers several of
18    those witnesses are very important to the government's
19    investigation.
20              Stephen Haynes, Owen Finnegan, Joe Connolly all
21    worked in the clean room in which the methylpred was made.
22    Annette Robinson is the director or head of the QA, quality
23    assurance operation at NECC, to the extent there was one.
24    Belmira Carvalho was in charge of the data, the word
25    processing area.  MSM sales reps, obviously, were in the field
```

1   making representations about what NECC could provide to its

2   customers and, again, the Mass Board of Pharmacy witnesses

3   were there and they were first on the ground during the

4   outbreak, all very important to the government's

5   investigation.

6           I also just wanted to bring to the Court's attention

7   the fact that -- and this is probably something that has

8   already occurred to the Court given litigation that's happened

9   so far from Mr. Haynes and Mr. Finnegan, but it's our

10  understanding from the discussions that we've had with counsel

11  for the witnesses who so far have been deposed, that a large

12  number of them intend to take the Fifth Amendment right and

13  assert that right in these depositions.

14          THE COURT:  So, then what harm is there to the

15  government?  I believe Mr. Haynes -- Messrs. Haynes and

16  Finnegan have also said they will assert their Fifth Amendment

17  right.  So, what harm is there to the government's case from

18  such a deposition?

19          MS. STRACHAN:  Well, first of all, we don't believe

20  that all of the witnesses will assert a Fifth Amendment right

21  to those -- during those depositions.  It's our understanding

22  that not all of them will, your Honor.  So, to the extent that

23  any of them go forward, we have concerns.

24          And then to the extent that the Court deems that the

25  witnesses are improperly asserting the Fifth or don't have a

1    Fifth, I think this would take up a tremendous amount of the

2    Court's resources in order to determine every potential

3    witness and every potential witness' Fifth Amendment right.  I

4    think it would be a large waste of the Court's resources, and

5    I think there is an ongoing risk of harm to the government's

6    case if witnesses are allowed to be deposed.

7         I've asked the Saint Thomas Entities' counsel, What

8    are you going to do?  What happens if you win and you're

9    allowed to take these depositions and most of your witnesses

10   take the Fifth?  And they don't have an answer to that and,

11   your Honor --

12        THE COURT:  It can still be useful to civil litigants

13   to have a witness --

14        MS. STRACHAN:  That's true, your Honor.

15        THE COURT:  -- take the Fifth Amendment.

16        MS. STRACHAN:  But my guess is that more than that,

17   they would like to have the information and that they likely

18   will come back to your Honor, I think, ask your Honor for a

19   stay, and we may end up in the very same place.  If they truly

20   believe that this information is important for their defense

21   in the civil case, my guess is that they will not want to try

22   the civil case until they have it.

23        The best course and the best way for them to get what

24   they need is to wait until the criminal case, which is slated

25   to begin six months from now, and to hear the evidence, to get

1    the benefit of the government's investigation, benefit of the

2    evidence that we've amassed over two years in which we have

3    focused on what was the wrongdoing at NECC.  They'll have the

4    benefit of that.  The Court will have the benefit of that.

5    Everything will be more streamlined and both court proceedings

6    can focus on what they are intended to do, which is a search

7    for the truth.  Thank you.

8            THE COURT:  Thank you.

9            So, do the Tennessee Clinic defendants wish to add

10   anything?

11           MR. TARDIO:  Yes, your Honor.  Good morning.  Chris

12   Tardio for the Tennessee Clinic defendants.  Let me see if I

13   can address a few points, because I understand the Court's

14   time concerns.

15           First with the Massachusetts Board of Pharmacy.  I

16   agree with the suggestion of the Court's question that this

17   is, in essence, a motion to reconsider.  In fact, I think you

18   could even argue that the first motion, the motion brought by

19   the Massachusetts Board, had more substance behind it.  It had

20   an affidavit filed with it from Ms. Ortiz, and the Court

21   rejected the position of the Massachusetts Board of Pharmacy,

22   which was -- as I think the Court recognized and I think we

23   all know, was essentially acting as a proxy for the U.S.

24   Attorney, who are essentially making the same argument here

25   today.

1          I think the Court should deny that portion of the

2    motion simply because that argument has already been rejected.

3    No new information and no new law has been presented.

4          As for the depositions, I think that -- our position

5    is fairly simple and it's not that far away from what I think

6    the government is saying.  We need these depositions before we

7    can try these cases.  We don't oppose a stay so long as the

8    expert disclosure deadlines and the first civil trial are not

9    imposed on us before we get the chance to take these

10   depositions.  That is -- that's our position.

11         If the Court is inclined to require us to disclose

12   experts and to try the first Bellwether case, then we believe

13   the prejudice to us outweighs the need for the stay -- the

14   government's need for the stay, and that's our position.

15         I'm happy to answer any questions, but I don't

16   believe it's too far from what the government says.  We don't

17   disagree that the government is going to elicit information in

18   the criminal trial that will, hopefully, answer a lot of the

19   questions we have, but that doesn't help us if our civil trial

20   comes before the criminal trial.

21         THE COURT:  Thank you.

22         Anyone from the Saint Thomas --

23         MS. PUIG:  Yes, your Honor.  Yvonne Puig on behalf of

24   the Saint Thomas Entities.

25         Your Honor, we're in a very unique position.  When

1    the government reached out to us to ask if we would oppose the

2    motion to intervene, it really puts you in a box, because, as

3    the Court can recognize, it's almost like that old adage,

4    "Have you stopped beating your wife?"

5          If we agree, it will be on the front page of The

6    Tennessean saying that we are trying to delay justice to the

7    victims of this tragedy.  If we join -- you know, if we oppose

8    it, then we will be subject to having to go forward in the

9    selection of a Bellwether case and retain experts to express

10   opinions on matters that are not now known to all of us.

11         When I appeared before this Court to ask the Court to

12   deny the motion to quash the deposition of Dr. Austin and the

13   Court graciously granted that, we learned a lot in that

14   deposition.  One of the things that we still don't know is how

15   this contamination occurred precisely and in what room.

16         So, when looking at the government's pleading on the

17   motion to intervene -- or the motion to stop the discovery of

18   the wrongdoers from NECC, more unites Saint Thomas Entities

19   with the government than divides us.  In fact, I could adopt

20   nearly in whole cloth some of the pleadings and allegations

21   made by the government.

22         In the declaration of C.J. Gideon which is before

23   this Court, he references conversations with the government

24   where they suggest that the information to be gleaned as a

25   result of the criminal trial is so pervasive, so important, so

1    critical, that the suggestion was we don't even know how you

2    can go forward in depositions without knowing what we know.

3    We understand that.

4            Secondly, your Honor, the suggestion that we have

5    been resting over here, kicking back and eating Bonbons and

6    this discovery could have or should have been had earlier,

7    I'll remind this Court that when the bankruptcy was filed, all

8    discovery was halted.  When the special mediation program was

9    enacted in order to effect a channeling injunction, only those

10   who went into the mediation received some of this discovery.

11   So, now we're being told you can't have it because it's the

12   fruits of mediation.  And so, you can't have --

13           THE COURT:  We're on a different issue now.

14           MS. PUIG:  Your Honor, it's all together.

15           THE COURT:  Okay.

16           MS. PUIG:  We're now being told you can't have it

17   because you're going to trample through the government's

18   evidence garden.

19           Your Honor, you can't have it both ways.  Every

20   single person and entity in this courtroom has told us you

21   can't have it.  You don't need it.

22           We do need it.  It's critical to our defenses in this

23   case, your Honor.

24           So, with respect to the motion to intervene, I'll

25   point out and I'll draw the Court's attention to our pleading.

1    The government cited not a single case that the case should go

2    forward and we would continue case-specific discovery or

3    expert discovery, but just don't take the wrongdoer's

4    discovery, either documentary or the wrongdoers.

5         I need not remind this Court or anyone here of the

6    solemnity of these motions and the fact that people, in fact,

7    were injured and died at the hands of the NECC wrongdoers.

8    And so, to tell us you don't need it, it's frivolous, it's

9    tenuous, it's costly, it's some novel Tennessee theory, it's

10   law school 101.  They have the burden to put on their case,

11   your Honor.  I have the burden to put on our defenses, and I

12   am being precluded and prejudiced from doing so by getting

13   no's from every single person and entity in this room, your

14   Honor.

15        And so, we ask that if the Court were to grant the

16   motions -- the motion to intervene by the government and the

17   impact of that is that we are unable to take discovery of the

18   NECC wrongdoers or even pharmacy techs who can tell us what

19   hood, what room, how it happened, we cannot prepare a defense

20   in this case.  We cannot even retain experts to express

21   opinions to defend ourselves in this case, your Honor.

22        So, for that reason, our response is if the

23   government motion to intervene is granted, then in that case,

24   your Honor, all deadlines be extended and no civil case be

25   held before the criminal case in this Court in April of 2016.

1     Thank you, your Honor.

2              THE COURT:  All right.  Anyone from the PSC?

3              MS. JOHNSON:  Thank you, your Honor.

4              The PSC has no objection to the U.S. Attorney's

5     motions to intervene.  That speaks to both motions to

6     intervene.

7              We also take no position on the substantive relief

8     requested there, but we do recognize that Judge Zobel's

9     October 7th order confirmed that she will try Tennessee cases

10    in this district, starting in early spring of 2016, and with

11    that in mind, we think that a thoughtful but quick resolution

12    here will keep us on track with that schedule.  Thank you.

13             THE COURT:  Mr. Gottfried, anything on this topic?

14             MR. GOTTFRIED:  No, thank you, your Honor.

15             THE COURT:  Mr. Brown.  There is a podium over there

16    with a microphone.

17             MR. BROWN:  Thank you, Judge.

18             Judge, I'll try and keep my remarks brief, but just

19    for the record, Dennis R. Brown for Owen Finnegan and Stephen

20    Haynes.

21             Much of what I have to say standing here is simply

22    just an emphasis on some of what was written in the motion, in

23    the memo, but I would just point out to the Court, as you've

24    cited in your memorandum and order of July 31st, 2015, which

25    is Docket 2123, that there are circumstances in which a

1  blanket assertion of privilege can be granted and, clearly,

2  it's within the Court's authority to grant the relief which is

3  being requested by Mr. Finnegan and Mr. Haynes.

4         Now, I would point out to the Court that there is a

5  distinction between those individuals who are required to

6  attend the deposition based on your previous order.  For

7  example, Lisa Cadden and Steven Higgins were two that were not

8  permitted to be protected from a deposition notice.

9         Lisa Cadden is married -- is a spouse of one of the

10  indicted co-defendants, but it's clear that she had no role in

11  the pharmacy since 2000, and the tainted drugs were produced

12  long after 2000.  So, she never had an active role with regard

13  to production of any of the medicines.

14         Steven Higgins was simply a property manager at the

15  location.  So, there's a great distinction that my clients see

16  between themselves and between those two that were basically

17  required to go forward with the deposition.

18         These persons, as you've heard from previous comments

19  today, were pharmacy technicians.  They were in the particular

20  location where the drugs were produced.  So, they have a very,

21  very clear concern, a genuine concern and a real concern that

22  even being ordered to go to a deposition, that some,

23  apparently, innocuous question may be turned around and used

24  somehow against them later on.

25         So, I would ask the Court to look at Mr. Finnegan and

1    Mr. Haynes as unique in terms of their relationship to this

2    case and to those individuals that so far have been required

3    to attend the deposition.

4          The only thing that's going to be gained by this

5    thing, essentially, will be a record replete with an assertion

6    of a Fifth Amendment privilege.  There's going to be a

7    tremendous waste of resources.  There's going to be tremendous

8    expense.  There's going to be tremendous time that's going to

9    be expended in this case.

10          And I've heard for the first time today, there is

11   some suggestion that perhaps a stay would be an appropriate

12   response to this, and while that's not part of my motion, I

13   would certainly suggest, from my client's vantage point, that

14   makes eminent sense, and I would ask that you take a look at

15   them as unique individuals and afford them the protection that

16   they seek.  Thank you.

17          THE COURT:  Thank you.

18          Anything further from the government?  I'll let you

19   have the last word.

20          MS. STRACHAN:  No, thank you, your Honor.

21          THE COURT:  All right.  So, moving on to the Saint

22   Thomas' motion to compel Ameridose.

23          MS. KELLY:  Good morning, your Honor.  Sarah Kelly

24   for the Saint Thomas Entities, and I will keep this brief.

25          What I want to address in Ameridose's motion is the

1    argument that it's too expensive and burdensome to produce any

2    of the discovery and the affidavit of Mr. Moriarty, who has

3    withdrawn as counsel, but had submitted his affidavit.

4            The affidavit makes reference to a tremendous expense

5    to process a number of servers, to look for documents, and the

6    Saint Thomas Entities are requesting -- I think a number of

7    1.6 million is thrown out there.

8            I would note that Ameridose did not participate in

9    the ESI protocol discussions, unlike some of the other

10   affiliated defendants, not just those who were in litigation

11   for the long haul, and the numbers that they put forward now,

12   as I understand them, are to look at every possible source of

13   documents that Ameridose might have, and we can be realistic

14   here, and I understand that the email servers that Ameridose

15   has have already been downloaded and processed.  Ameridose has

16   not even searched them.

17           An easy solution and a very good first step would be

18   to allow the Saint Thomas Entities to search -- or give search

19   terms to Ameridose to look at those email servers and search

20   terms can be given to them.  The search can be done, I

21   understand, relatively quickly and easily.  This kind of

22   search should be allowed to be permitted to give us the

23   documents we need, and there's no reason to exact Ameridose

24   wholesale from discovery in this case.

25           THE COURT:  Is Saint Thomas willing to pay for part

1    of the discovery?

2         MS. KELLY:  As I understand it, yes, we would be

3    willing to pay for those search terms.  As I understand it,

4    the emails have already been downloaded and if that's correct,

5    which I believe it is, we would be able to pay to have those

6    searches run.

7         THE COURT:  And, as I understand it, there is a lot

8    of dispute back and forth as to I guess the defendant's theory

9    as to why they needed the discovery.

10        As I understand it, part of the reason why you want

11   this discovery is because you believe Ameridose was involved

12   in the construction of the clean room.

13        MS. KELLY:  That's correct.  I believe that the

14   contract between Liberty -- and these exhibits are attached to

15   our papers.  The contract for the construction of that clean

16   room where the MPA was compounded was between Liberty and

17   Ameridose at the time it was constructed.  Only later did it

18   become an NECC clean room.

19        So, those documents -- while we have Liberty's

20   documents, we don't have anything from Ameridose.

21        THE COURT:  All right.  Thank you.

22        So, is it Ms. Martin?  Did I get that correctly?

23        MS. MARTIN:  Yes, your Honor.  Good morning, your

24   Honor.  Ingrid Martin on behalf of Ameridose.

25        I just want to reiterate what I think has been said

1    to this Court many times, but I think it is important to

2    remember that this case is about plaintiffs who have brought

3    claims for damages arising out of the injection of

4    contaminated methylprednisolone acetate, MPA, that was

5    produced at NECC.

6           I think everyone in this room agrees that this,

7    what's been referred to as the fungal meningitis outbreak,

8    occurred in 2012 and that's been linked, at least by the CDC,

9    to specific and discrete batches of MPA that were produced by

10   NECC in 2012.

11          The plaintiffs have not and cannot contend that any

12   of that methylprednisolone acetate was produced by Ameridose.

13   It had nothing to do with purchasing the product.  It had

14   nothing to do with --

15          THE COURT:  Right.  I understand that Saint Thomas

16   wants these documents, in part, because of Ameridose's

17   involvement in the construction of the clean room.

18          MS. MARTIN:  Well, your Honor, that construction --

19   they have a handful of emails that they've provided to you,

20   and I would like to point out that they do actually have

21   access to a tremendous database of documents that NECC has

22   provided and, certainly, the PSC has combed through that.  I

23   assume that the Saint Thomas Entities have done the same.

24          THE COURT:  I'm sorry.  Are you saying they have

25   access to Ameridose documents or other company's documents

1    about the clean room?

2         MS. MARTIN:  Your Honor, the documents that they have

3    located are some email exchanges in 2006 relating to

4    construction in 2006, and we dispute that construction that

5    occurred in 2006 -- that they have created any sort of a link

6    that could -- if you step back and think about what this trial

7    is going to be about, that construction that took place in

8    that building in 2006, how does that tie -- they've made no

9    suggestion.  They've offered no testimony.  They've provided

10   no standards that they're going to measure this against.  It's

11   a fishing expedition where they're hoping to find something at

12   the end of that line, and it's a tremendously expensive one.

13   They --

14        THE COURT:  So, if they're willing to pay for the

15   searches, what is your objection, then?

16        MS. MARTIN:  Your Honor, it is -- first of all, it is

17   not that -- Ameridose is currently -- essentially, it's non-

18   operational and, for all intents and purposes, nonexistent.

19   So, their computers are not --

20        THE COURT:  Right, but the servers still exist.

21        MS. MARTIN:  The server still exists.  It is not as

22   easy as flicking a switch to put it back on.

23        And the proposal that's been outlined here, I was not

24   provided with that specifically, so I can't put a dollar

25   figure on it, but I do not believe that it is a de minimus

1   cost.  I believe it is still a substantial cost.  This is a

2   company that had dozens of employees and operated over many

3   years.  I've heard no suggestion of constraint regarding time,

4   people, anything like that.

5        And, your Honor, as you know, where the rubber really

6   meets the road in these kinds of things is the search terms,

7   and if you look, your Honor, they've provided you at Exhibit 6

8   to their opposition here with a letter that they sent to

9   Attorney Moriarty which included a list of search terms that,

10  your Honor, would, frankly, return every single document on

11  those -- that relates to the business of Ameridose.  It is not

12  at all a focused search.

13       There's also tremendous concern about privilege.

14  Obviously, attorneys consulted with Ameridose over time over

15  various regulatory matters.  It would be very difficult, I

16  believe, to figure out how to address that.

17       THE COURT:  Well, that happens all the time.  You

18  would give them a list of the attorneys, right?  So, they

19  could run the search and then you could run a search for

20  the -- I mean, they work that out all the time.

21       MS. MARTIN:  Your Honor, companies work it out when

22  they have funds with which to pay for those things.  We would

23  -- we could certainly provide them with a list of names of

24  attorneys, and then the way that typically happens is the

25  others -- somebody runs that search and then that -- all the

1    things that get hit by that, they would still need to get

2    reviewed by the party asserting the privilege, and when you

3    balance the cost of what they are proposing and what they're

4    looking for -- and, again, I hear what is being said in this

5    courtroom today, but if you look at the scope of the requests

6    and the scope that -- of the search terms -- for example, they

7    want the word "expired" as one of their search terms.  They

8    want the term "USP" as one of their search terms.  These are

9    things that are going to generate hundreds of thousands of hits.

10           I also -- so, I think for all of those reasons, it's

11   not going to be cheap, and I think that -- asking a company

12   that doesn't exist, that has no funds, that has no active

13   computer system, that has no staff, to undertake this for --

14   at the end of the day, I come back to I don't see the reward

15   at the end of this road.  They have not demonstrated that

16   there is going to be evidence that they will find through this

17   process that is going to be relevant and admissible or lead in

18   that direction.  They have not offered standards that were not

19   followed.  They have not explained how in 2006 people were

20   supposed to predict that in 2012 a new company would be in

21   that space producing a sterile injectable, a sterile

22   injectable that Ameridose itself never made and never

23   distributed.  There are a lot of dots on that chain that I

24   just don't see them being able to complete, your Honor.

25           THE COURT:  And I recognize, I believe, that much of

1    this information came from Mr. Moriarty rather than you, but,

2    as I read the submissions, it mostly talks about electronic

3    discovery.  So, I wasn't clear if there are still hard copies

4    of documents available or if all the hard copies were

5    downloaded into servers.  There was a little bit of an open

6    question about the hard copies of documents for me.

7            MS. MARTIN:  My understanding is that a small

8    universe of hard documents does continue to exist that

9    potentially might be relevant here.

10           There are also in addition to that -- and there's, in

11   fact, an unopposed pending motion to destroy several hundred

12   pallets worth of documents that were essentially shrink

13   wrapped that nobody has wanted to undertake the effort or

14   expense of trying to look at.  So, there is a giant warehouse

15   of documents that we've asked for permission to destroy.

16           I would also point out that in terms of drugs and all

17   of those other things, we have -- we let everyone know that we

18   were planning to destroy those.  They have been disposed of.

19   The government expressed no interest in preservation.  None of

20   the parties did.  So, there are -- there are still physical

21   servers with data on them, but they are in no way functional

22   or operational at the moment.

23           THE COURT:  All right.  Thank you.

24           Mr. Gottfried, I have a question for you.  Are there

25   any Ameridose documents -- or maybe it's the PSC.  Are there

1    Ameridose documents in the repository that's available for

2    everyone?

3            MR. GOTTFRIED:  They would not have been Ameridose

4    documents.  They may be documents between, I believe, NECC and

5    Ameridose.

6            THE COURT:  I see.  That makes sense.

7            MR. GOTTFRIED:  But we certainly didn't gather

8    Ameridose documents.

9            THE COURT:  All right.  Thank you.

10           MR. GOTTFRIED:  And, your Honor, as you may recall,

11   in connection with the preservation motions, Mr. Fern of

12   Harris Beach produced -- I think it was over 200-page index of

13   what we actually did preserve, which is available to all the

14   parties in the repository.

15           THE COURT:  All right.  Thank you.

16           MS. MARTIN:  Sorry, your Honor.  There's one more

17   point I wanted to make --

18           THE COURT:  Yes.

19           MS. MARTIN:  -- which is that Ameridose has actually

20   been dismissed from this case.  So, we are technically not a

21   party.  So, arguably, we aren't subject to document -- to

22   requests and interrogatories.  I believe at this point

23   technically the Tennessee defendants would need to proceed by

24   way of a Rule 45 subpoena, which we have not been served with.

25           THE COURT:  All right.

1          MS. KELLY:  Your Honor, may I just address a few

2    points just very briefly?

3          THE COURT:  Yes.

4          MS. KELLY:  As far as the clean room goes, it's not

5    our contention that somebody would have predicted in 2006

6    something.  It's that the actual construction of the clean

7    room is important and how it was done.  We don't have access

8    to those documents.  And as this Court is aware, documents are

9    going to be a big part of this case.  Ms. Martin mentioned

10   testimony.  Right now it's very difficult to get any such

11   testimony.  The documents are what we are looking for and how

12   largely we'll be putting on our defense.

13          And as a cost, I -- certainly, we would offer to pay

14   for the cost of these email searches.  There may be attorney

15   time, which I cannot offer to pay for for Ameridose, but the

16   ESI agreement does have good clawback provisions for any

17   privileged documents that Ameridose is concerned about.

18          And as for the search terms, we will talk to

19   Ameridose's counsel about those search terms if the search

20   terms are their concern.  We were just met with, when

21   Ameridose was a party, blanket resistance to these requests,

22   not a negotiation over the breadth of the search terms.

23          THE COURT:  Thank you.

24          MS. MARTIN:  Your Honor, I would disagree.  Ameridose

25   responded to the first set of discovery with written responses

1   within the 26-day window.  Did not ask for any extension.  Did

2   produce some very limited documents.  Provided written

3   responses to the second set of discovery.  And so -- and there

4   was a letter exchange between the parties.  So, I would just

5   object to the characterization that they've provided no

6   response.

7            THE COURT:  Thank you.

8            Moving on to the Tennessee Clinic defendants' motion

9   to compel -- sorry -- compel compliance with NECC.  So, the

10  Tennessee Clinic.

11           MR. TARDIO:  Thank you, your Honor.

12           Let me see if I can distil this to a few points and

13  not just recite the brief.

14           First, I think this is a very simple analysis for the

15  Court to make.  The first question, are the documents that

16  we've requested discoverable?  I have not heard any argument

17  from anyone, including the trustee, that these documents are

18  not relevant and discoverable, and in considering and weighing

19  the equities in a situation like this, as the Court

20  essentially has to do, they're highly important to us and

21  that's why we seek them and that's why we continue to come to

22  the Court and continue to ask for access to documents like

23  this.

24           The second part of the Court's analysis, I

25  respectfully suggest, is the question has the responding party

```
 1    sufficiently responded to the requests, and I encourage the

 2    Court to look at the responses.  They're simply not

 3    responsive.  Some are completely non-responsive and no

 4    documents are produced specific to the request, and some say

 5    here are a few documents we have identified in the past.  They

 6    don't say that's the entire universe of the documents, just

 7    that here are a few that we have produced.  So, we're --

 8            THE COURT:  So, I take it from your comments, that

 9    the supplemental productions were not sufficient.

10            MR. TARDIO:  Well, what's happened -- and this

11    permeates the brief and I'll address it now.  It permeates all

12    the briefing.

13            I think that the trustee's position, at least as I

14    understand it, is basically we've produced a lot of documents.

15    Go find what you're looking for.

16            THE COURT:  But they gave you Bates ranges.

17            MR. TARDIO:  They gave Bates ranges on a few of these

18    responses, but the Bates ranges -- for instance, we asked for

19    a specific category of documents, and the response, as I read

20    it, is objection, objection, objection, objection.  Here are a

21    few documents that we have already produced with some Bates

22    range -- with a Bates range.

23            That's fine if that Bates range is the entirety of

24    the responsive documents.  I don't read the responses to say

25    that these Bates ranges are the entirety of the responsive
```

1    documents.  I read the responses to say here are a few

2    documents that fit this category that we've already produced,

3    suggesting to me there are more out there.  We're not going to

4    go look for them.

5          But it is the burden of the responding party under

6    the rule, whether this is analyzed under Rule 34 or Rule 45.

7    It's the responding party's burden to serve responses specific

8    to the request, and we cited the *Mulero-Abreu* case, which is a

9    First Circuit case, and that's essentially what the Court

10   said.  You cannot discharge your duty in discovery by saying,

11   We've produced a lot of documents.  Go find what you're

12   looking for.

13         So, we would ask that the Court -- and I'm happy to

14   address any of the specific categories of documents, but --

15         THE COURT:  So, there are also categories where the

16   trustee has responded that there were no documents responsive.

17   So, I'm not quite sure what else you would want them to do.

18         MR. TARDIO:  I don't know that we have moved to

19   compel on those specific categories.  If we have and the

20   trustee has said there are no documents, that is fine.  We

21   don't have any exception to that response.  I think that's

22   entirely compliant with the rule.

23         THE COURT:  And then they have also, as I understand

24   it, given you an explanation as to the missing Bates range.

25   Are you satisfied with that?

```
 1              MR. TARDIO:  Yes, your Honor, we're satisfied with

 2      the explanation for the missing Bates range.  I think there

 3      were two -- or a missing Bates range and a missing

 4      explanation --

 5              THE COURT:  I should say so-called missing Bates

 6      range.

 7              MR. TARDIO:  Yes, your Honor.  We couldn't figure out

 8      what happened, and we're satisfied with the explanation, and

 9      that's fine.

10              So, what we've essentially come down to is six

11      categories of documents that we're moving to compel on, and we

12      would simply ask that the Court order the trustee to respond

13      to the specific requests.  If the documents have already been

14      produced, the answer can be, We've produced these.  They are

15      at Bates range X, Y and Z.  If they have not been produced or

16      they're being withheld on some privilege basis, then we need

17      that as a response, but we cannot go search for documents that

18      -- we don't know what we're looking for, number one, because

19      we're not the custodian of these documents.  We don't have

20      access to anybody to explain these documents, and we have no

21      way to certify when -- whether any of these responses are

22      complete.

23              So, we would respectfully request that the Court

24      order the trustee to respond on those specific categories of

25      documents that we've outlined in the motion.
```

 1          THE COURT:  And the specific requests -- the six

 2   categories you're referring to are outlined in your original

 3   memo?

 4          MR. TARDIO:  Yes, your Honor.  Just for the record,

 5   so that the Court knows what we are talking about, personnel

 6   file, requests for production one.  Documents specific to the

 7   Tennessee Clinic defendants, request for production four, five

 8   and six.  Documents related to the customers doing site visits

 9   or inspections, request for production seven.  Documents

10   related to whether NECC required customers to use patient-

11   specific prescriptions, request for production 9 and 14.

12   Documents related to due diligence that customers did, request

13   for production 12 and 13.  Documents related to cleaning,

14   testing and autoclaving, request for production 16, 17 and 18.

15          THE COURT:  All right.  Thank you.

16          And if I remember correctly, part of the trustee's

17   position was the expense.  Are the Tennessee Clinic defendants

18   willing to pay for some of the searches?

19          MR. TARDIO:  It depends on the cost, number one, but

20   at this point, no.  It's not our burden to do so, and we --

21   your Honor, I would understand the cost argument more if we

22   had sent incredibly broad requests, but I feel wholeheartedly

23   that these are narrow requests that can be complied with.

24          THE COURT:  All right.  Mr. Gottfried.

25          MR. GOTTFRIED:  Yes, several things I would like to

1    point to the Court.

2              I absolutely think that whatever the Court does

3    decide -- and we certainly hope that you'll find, as I believe

4    is the case, that the trustee actually has fully complied with

5    the subpoena, that any further work be at the expense of the

6    Tennessee Clinics.

7              As the Court may recall, we filed for relief from the

8    preservation order.  The Tennessee Clinics objected very

9    strenuously.  They needed us to preserve twelve pieces of

10   equipment, I believe it was.  As soon as the Court said they

11   would have to pay for the storage costs, that became one, the

12   autoclave.  That's it.

13             I think we're dealing with the same situation here.

14   This doesn't really fit their narrative because their

15   narrative is that people are refusing to give them documents.

16   Here they're not taking yes for an answer.

17             The plain fact is when you actually look at the

18   response that we provided these folks, that we did identify --

19   you know, take, for example, request number two.  They said

20   give us the testing results.  We asserted our objections, but

21   then we gave them -- for the three batches that are at issue,

22   we gave them the testing results.  We identified it by Bates

23   number.  We told them exactly where they could find it.

24             I think it's clear from our objection to the

25   subpoena -- which, by the way, your Honor, I think it's

1    important to note in terms of bona fides of this, we objected

2    on May 1st.  It took them seven weeks after the plan was

3    confirmed to ask to meet and confer.  That was after we lost

4    the ability to have insurance counsel help us do any further

5    responses, and I think that's important.

6          So, I think what you need to understand is we did

7    respond.  We did identify specific Bates ranges.  We did

8    additional searches based on their requests.

9          And I think the most important point is there were a

10   number of requests, several that he just identified that we

11   said, You know what?  These are so broad, when we do a search,

12   we come up with like 10,000 documents, and we want to meet and

13   confer with you and talk about how we can narrow that.  And

14   the first chance they got to meet and confer with us was seven

15   weeks after we filed the objection, and at that point our

16   position was, and remains today, by the way, your Honor, that

17   it's premature.

18         There's a choice of law issue before this Court.  If

19   the Court, in our view, decides that Massachusetts law

20   applies, none of this discovery is relevant.  We believe that

21   there was a broad injunction and release granted that had a

22   narrow carve-out for comparative fault discovery and if the

23   comparative fault falls by the wayside, based on Judge Zobel's

24   forthcoming decision, that none of this is relevant.  We said

25   we'll meet and confer with you after that's decided so we can

1    see what's relevant.

2         But I think even that argument, I'd say, in terms of

3    compliance is moot for this reason.  Because we knew we were

4    losing Harris Beach, we had them do that additional search,

5    which picked up 60 some odd thousand documents, and what we

6    believe, and what Harris Beach has confirmed to me, is any

7    documents they believe that would be responsive to these

8    particular categories that would have dealt with the Tennessee

9    Clinics, they believe would likely have been picked up at the

10   search that we did right at the plan effective date.

11        So, even the meet and confer -- I mean, yes, it was a

12   broad search.  It was designed to pick up anything that

13   related to those clinics, including these Tennessee Clinics,

14   but we gave that to them.  So, they now have those documents

15   that are fully searchable.

16        What you haven't heard anyone represent is that they

17   searched them and they can't find the documents.  That you

18   haven't heard.

19        So, I think the short answer here is, whether it be

20   the so-called gaps which weren't gaps, whether it be the

21   argument that we told them to go fish, where, in fact, we

22   identified specific documents by Bates range.  We did

23   additional searching and gave them through an FDP site

24   additional documents, where we ultimately produced another

25   60,000 documents based on a broad search, even when they

1    didn't want to meet and confer with us in a timely way.  We've

2    complied.  We've absolutely complied, and I think -- we can

3    talk about a couple of things where we did object.  We did

4    object to the personnel files.  We interposed an objection and

5    we stand on that objection.  We think they're irrelevant.  We

6    don't think that they're appropriate discovery in this case.

7            There are other objections, contrary to what my

8    brother said, that are in our subpoena.  We objected.  We said

9    that if it relates to the Tennessee Clinics, we'll give it to

10   you.  We'll search.  We'll find it, but when you want to start

11   going far afield, we think that's too much.

12           So, to the extent the Court, after looking at our

13   objections and looking at our response, which I think is very

14   fulsome and is compliant, not non-compliant, as they suggest,

15   if there's anything that's still open, it should be at their

16   nickel, 100 percent.  100 percent of their nickel.

17           THE COURT:  And do I understand correctly, Mr.

18   Gottfried, that you're not withholding any documents on the

19   basis of privilege?  I'm not quite sure how it was worded.

20           MR. GOTTFRIED:  That's not correct.

21           THE COURT:  Oh, you are?

22           MR. GOTTFRIED:  We have done -- every document pull

23   that we've done, we've done a privilege search, and the

24   trustee has not waived the privilege.

25           THE COURT:  And have you turned over a privilege log?

```
1          MR. GOTTFRIED:  Not at this point, not yet.

2          THE COURT:  And when do you plan to do so?

3          MR. GOTTFRIED:  We'll have to confer with Harris

4    Beach and report back to the Court.

5          THE COURT:  And there was an argument made as well

6    that some documents were only available to some parties.  Are

7    all of the documents that are in the repository available to

8    all parties?

9          MR. GOTTFRIED:  If the documents are in the

10   repository, I believe as long as they pay their fee, they're

11   available to them, is my understanding.  I don't control the

12   repository, but that is my understanding.

13         MS. JOHNSON:  That is correct, your Honor.

14         THE COURT:  All right.  Mr. Tardio, anything else?

15         MR. TARDIO:  Yes, I'm going to make a few points.

16         Our consideration -- or our concern isn't necessarily

17   the documents are in the repository that we don't have access

18   to.  We have access to the repository.  Our concern is the

19   documents have been produced to the plaintiffs that we don't

20   have access to, and that's --

21         THE COURT:  Are there any documents that have been

22   produced to the plaintiffs to which they don't have access?

23         MS. JOHNSON:  As far as I can think of, your Honor,

24   no.  I will make one observation, though.

25         There was a reference earlier to mediation documents.
```

1 I don't believe those documents come into play by any of these

2 motions before you today, but, to be clear, there are -- I can

3 think of a handful of really memos that were done in

4 preparation for mediation that the PSC has withheld.  Those

5 are not in the repository.

6     THE COURT:  But not any what I would call core

7 factual documents?

8     MS. JOHNSON:  Correct.

9     MR. TARDIO:  Request for production two, which the

10 trustee's counsel referred to, isn't one of the ones that's at

11 issue.  So, the answer to that --

12     THE COURT:  Thank you.  It seemed to be on and it

13 seemed to be off again, number two.  So, is it off?

14     MR. TARDIO:  It's off.

15     THE COURT:  Okay.

16     MR. TARDIO:  Let me make sure, because, you're right,

17 it has been on and off.  No, it's off.

18     But let me make one point.  One that is on is request

19 for production six, and let me read to the Court very briefly

20 what the response is, and let me explain the concern with this

21 response.

22     After a number of objections, it says, "Further, NECC

23 responds that it has produced a customer complaint record

24 pertaining to the Tennessee Clinic defendants as set forth at

25 Bates stamp 65 through 68."

1          So, that doesn't tell me whether there are other

2     documents that are responsive to this request for any

3     documents related to us.  That only tells me we have produced

4     a three-page customer complaint.  If that's the only document

5     that is responsive to that request, that's fine, but,

6     respectfully, that's what the answer has to say.

7          These requests are not far afield.  They are narrow.

8     They are aimed at obtaining discoverable, relevant

9     information.  This is not a fishing expedition.  And if there

10    are documents that are being withheld on the basis of

11    privilege, be it the mediation privilege, attorney/client

12    privilege, we do deserve a privilege log and the ability to

13    evaluate that.  Thank you, your Honor.

14         MR. GOTTFRIED:  Your Honor, I could just respond

15    briefly, because I think six is actually a pretty good example

16    of what I'm taking about, at least.

17         So, we conducted a search.  In that search we found a

18    document which we identified by Bates range and number.

19    That's in the repository, a specific response, but we also

20    noted that, you know, absent sort of finding a needle in a

21    haystack, this is a very difficult topic to respond to.  So,

22    we offered to meet and confer, which, as I've now said twice,

23    they didn't take us up on for seven weeks.

24         But in the interim -- and this is the key point -- on

25    our own, without them offering to meet and confer, without

1   them even reaching out to us, we had Harris Beach do

2   additional searches, which we believe, to the extent there are

3   any documents that would be responsive to this request, would

4   be among and between the 60,000 documents that we produced.

5   That's our belief, because we did a broad search for anything

6   that related to this clinic.

7        Now, I don't believe there's anything further we can

8   do.  They can search that all they want.  It's a searchable

9   database, and as between us and them, I think they should

10  search it.  That's our view.  And to the extent there's

11  anything you want us to do, it should be on their nickel.

12       THE COURT:  All right.  Thank you.

13       So, moving on to the Saint Thomas Entities' motion to

14  compel MSM, and I think this really goes together with the

15  Saint Thomas Entities' motion to compel Greg Conigliaro as

16  well.  So, I'll hear from Saint Thomas.

17       MS. KELLY:  Thank you, your Honor.

18       As you know, we are seeking to compel a very limited

19  subset of the criminal discovery sought in a prior motion.

20  This is training materials used by MSM and MSM's marketing and

21  advertising materials, and to try to keep this brief, I'll

22  just focus on briefly addressing the arguments that the

23  government set forth in their opposition on the Greg

24  Conigliaro front yesterday.  I don't want to rehash all of the

25  arguments.

 1          I think first the government sets forth that there's

 2    no caselaw in support of our position as a reason to deny the

 3    request.  I would submit that the *Rajaratnam* case does support

 4    our request.  Not only does it not say there's no bar on civil

 5    litigants receiving this kind of discovery, it makes clear

 6    that in some cases they would be entitled to it, and I would

 7    submit that this is one of those cases.

 8          The cases that the government has primarily relied

 9    on, the *Moussaoui* case, presents a totally different set of

10    issues than are present here.  The *Anderson* case where the

11    press was seeking documents, again, presents a different set

12    of issues than are here present.  They've cited no caselaw

13    saying our request is inappropriate.

14          The second concern that the government has is that

15    there will be a leak of these documents, these training

16    materials.  There have been, I would say, thousands of

17    documents produced in this litigation designated as

18    confidential, a lot of testimony designated as confidential.

19    I am not aware of any leaks that have taken place so far.  I

20    know this is a high-profile case.  I see no reason that these

21    documents would be treated differently or that there's any

22    special concern about leaks considering these training

23    materials.  I don't see that that's a real concern.

24          The third reason the government says is they may not

25    be relevant, the training materials.  First of all, I would

```
1    say they go to the heart of the defense, why we -- why STOPNC
2    purchased the MPA, what due diligence had been done, what they
3    were told about it, and I would submit that we offered to give
4    you -- give the Court Exhibit A under seal --
5          THE COURT:  I was going to ask about that.  So, that
6    goes simply to relevance, right?  If I viewed it, I would have
7    a better handle on why -- or understand your argument on --
8          MS. KELLY:  That's right.  I mean, I would say it's
9    extremely compelling evidence of -- that these documents are
10   relevant and helpful to our case.  So, yes, that's why we
11   wanted to show you -- it's a five-minute clip of a video, an
12   excerpt from some of the training materials that we have
13   received that weren't -- that the government didn't have in
14   its possession.  So, I do have a copy of that for the Court,
15   if you wish to view it.
16         THE COURT:  All right.  I'll think about it.
17         MS. KELLY:  The fourth reason the government sets
18   forth is the chilling effect that it would have on discovery.
19   Again, we see this as a unique case with a difficult set of
20   circumstances for the defendants seeking some discovery.  We
21   are seeking -- making a very limited request.  It's extremely
22   narrow.  These targeted materials are what we are looking for
23   and there's, in this circumstance, no other way for us to get
24   at it.  We're making the request of MSM because these
25   materials are in the possession of their officers and
```

```
 1    directors.  Mr. Conigliaro has them.  We're asking for a
 2    limited production.
 3          And, finally, about the argument about custody and
 4    control, as I just said, these documents are plainly in MSM's
 5    custody and control.  Its officers and directors, as stated on
 6    the Secretary of State's Website, have them in their
 7    possession.  I don't think there's any dispute about that, and
 8    I would point the Court to the Flagg and the Riddell cases, as
 9    cited in our papers.
10          If you have any other further questions, I'm happy to
11    answer them.
12          THE COURT:  Mr. Rabinovitz, I guess what I'm also
13    trying to understand is -- well, let me state what my
14    understanding is, but please correct me if I am wrong.
15          That MSM had documents.  It still has documents
16    because it's made some production of some documents, but some
17    of the documents were seized by the government.  Do I
18    understand that correctly?
19          MR. RABINOVITZ:  Yes, that's correct, your Honor, and
20    we've tried to comply with our obligations, as narrow as they
21    may be, under the broad release that Mr. Gottfried spoke of,
22    but the fact of the matter is, as I tried to say in my brief
23    brief, MSM does not have the documents that they are seeking.
24    These documents were produced by the government in the
25    criminal case to individuals and, as the government said in
```

1  their brief and as I reiterated in my brief, they did not

2  produce them to MSM.  So, it's just wrong that MSM possesses

3  those.

4          What MSM has tried to do is -- with respect to

5  documents that they did not receive from the government -- I'm

6  sorry -- that the individuals did not receive from the

7  government in the criminal case, we've tried to produce the

8  documents that we can and we've had objections to the various

9  subsets of those documents and those aren't really the focus

10  of this motion at this time.  It seems that the Saint Thomas

11  Entities are focusing the Court on the discovery that was

12  given to the -- or produced to the individual defendants, and

13  with respect to the motion as to MSM, MSM simply doesn't

14  possess those.

15          And, again, I would say that -- another point that

16  Mr. Gottfried made that I thought was very sound was that what

17  you haven't heard in this context of this motion is that they

18  have searched the repository and that they have come up empty

19  on any of these other categories of documents that they're

20  looking for, binders, things like that.

21          So, MSM doesn't have it because it wasn't produced to

22  them in the context of the criminal case that charged

23  defendants.  They haven't said that they searched the

24  repository.  And the last thing is, these are really NECC

25  documents.  They have to do with -- the binders have to do

1  with training binders of NECC related things.

2         So, either they're in the possession of the trustee

3  and they've been put in the repository or they're in the

4  possession of the trustee and they're not in the repository,

5  but MSM does not possess them.  That's the major point of my

6  argument.

7         THE COURT:  All right.  Anything you want to say on

8  behalf of Mr. Conigliaro?  I know you're wearing two hats.

9         MR. RABINOVITZ:  I am, your Honor, and I would like

10  to say something on behalf of Mr. Conigliaro, which is simply

11  that he's a criminal defendant and, as I said in my papers, he

12  doesn't possess anything other than what was given to me as

13  his lawyer in the criminal matter and, therefore, it's

14  completely an inappropriate motion to bring.

15         I understand why they brought it.  They're trying

16  everything and anything to get at the government discovery

17  and, unfortunately for them, I hope that they're not going to

18  be able to.

19         I guess the only other thing I would point out is I

20  think that those cases that they cited are actually not

21  applicable.  In the *Flagg* case the issue was that a third-

22  party provider possessed and controlled, I guess, texts that

23  were actually the property of the City of Detroit.  That's not

24  this case.  There's no third-party provider.  The facts are

25  completely inapposite.

1          And in the *Riddell* case, you had a situation where,

2     as the case explains, a corporate officer in his capacity as

3     the corporate officer apparently made some recordings, gave

4     those recordings to the corporate attorney and then said, Oh,

5     I don't have them.  You'll have to issue a different kind of

6     subpoena.  Again, nothing close to this case, your Honor.  So,

7     I would ask you to find that those are inapplicable.

8          THE COURT:  The government.

9          MS. STRACHAN:  Thank you, your Honor.

10         The government asserts, as you know from the briefs,

11    that both the motion to compel MSM and Greg Conigliaro should

12    be denied, both as a factual and as a legal matter.

13         I won't reiterate what Mr. Rabinovitz said, but I

14    will highlight, again, MSM does not have possession, custody

15    or control of these documents.  There's no caselaw to say that

16    when criminal discovery is produced to a criminal defendant,

17    that if they are an officer or a director of a company, the

18    company then has it.  I don't want to give them additional

19    ideas, but Barry Cadden and Doug Conigliaro are also officers

20    of Ameridose.  Does Ameridose have possession, custody and

21    control of our criminal discovery?  I would say that they do

22    not.  The government has not --

23         THE COURT:  Ms. Strachan, just on a practical matter,

24    right?  So, let's say I accept the government's argument that

25    because they turn over criminal discovery to an individual,

1   civil litigants can't get access to that, right?

2        And in other situations, right, business documents

3   are returned to the business, even though there's an ongoing

4   criminal case, even if the business itself isn't.  Then there

5   are some times when the business is a defendant and they need

6   those documents to operate.

7        Isn't there some way for the government to give these

8   training materials to Saint Thomas?  Isn't there a practical

9   way that we could -- I understand all the caselaw, but if we

10  remove ourselves from Saint Thomas or the Tennessee Clinics

11  trying to get it from the criminal defendant.  They were MSM

12  documents.  I understand the government has -- not all of

13  them, but at least some of them that they're looking for.

14  Isn't there a practical way that we could get those documents

15  to the civil litigants?

16        MS. STRACHAN:  I understand what the Court is asking.

17  Let me try to address it in a couple of ways.

18        First of all, as you just noted, the 26 disks

19  containing the training materials where Barry Cadden is

20  training the seller representatives on how to sell the drugs

21  were not seized.  Those were not taken from MSM.  We couldn't

22  possibly return them to MSM because that's not where we got

23  them.  I know -- I think that's what they really want, but

24  that's not how we got them.  We got them by other

25  investigative means.  They know this.  And so, we can't

1    provide those --

2         THE COURT:  It doesn't follow along with my

3    proposition that they came from MSM.  You're holding them.  So

4    -- okay.

5         MS. STRACHAN:  Yes, your Honor, that's correct.

6         And, as you know, many, if not all of cases they cite

7    on this proposition, go to Federal Rule of Criminal Procedure

8    41(g) where the company is claiming irreparable harm from

9    having its property denied.  Many of those cases there hasn't

10   been an indictment returned.  It's just not the situation that

11   we're faced with here.  MSM no longer exists -- or it's no

12   longer operating.  They haven't asked for these materials

13   back.  They don't need them and there's no irreparable harm.

14   So, I would say as an initial matter, MSM simply didn't have

15   them.

16        And then I would also say with respect to compelling

17   the documents to be produced by criminal defendants, your

18   Honor, again, sometimes in the course of these proceedings, I

19   find myself shaking my head.  As a criminal prosecutor, I

20   never imagined that we would be filing oppositions in civil

21   litigation opposing motions to compel or criminal defendants

22   to turn over evidence, but here we are and, again, I think

23   this is -- it's really an extraordinary request that's being

24   made.

25        We have a real disagreement with the Saint Thomas

1    Entities on the state of the law.  I don't understand how they

2    read that Rajaratnam case, your Honor.  I have it in front of

3    me.  It adds that this is the Second Circuit which makes the

4    additional argument that when discovery has been produced in a

5    criminal case to criminal defendants, but the legality of

6    taking that discovery has not yet been tested, that the courts

7    should -- doesn't even have discretion to turn the materials

8    over.

9         I'm not saying that I think that there is a valid

10   motion to suppress the evidence that we've seized in this

11   case, your Honor, but -- you know, the *Rajaratnam* case says,

12   and I'm quoting here, "At a minimum, however, ordering

13   discovery of the wiretap materials before any determination of

14   the legality of the surveillance involved exceeded the

15   district court's discretion.  The primary reason for the

16   pretrial disclosure of the material to appellants in the

17   criminal case in the first place was to enable them to make

18   motions addressing their legality before the judges presiding

19   over the related criminal cases."

20        I just think that when you have the *Moussaoui* case,

21   which we also read differently from Saint Thomas, we have the

22   *Anderson* case in the Eleventh Circuit, and we have *Rajaratnam*

23   in the Second Circuit, your Honor, I think all point to the

24   very important conclusion that turning over criminal discovery

25   before a criminal case has been tried to civil litigants is an

 1    unprecedented thing to do.

 2           As the Fourth Circuit said in *Moussaoui*, they could

 3    find no cases in which a district court had ordered it and,

 4    your Honor, I don't need to talk about the stakes of the

 5    criminal case to you.  I know that you're aware of them.  It's

 6    not to detract from what -- the stakes of the civil

 7    litigation, which are also very high, but where there is no

 8    caselaw in the country that supports doing something like

 9    this, I suggest to your Honor, that this is not the case in

10    which to do it.

11           THE COURT:  All right.  Thank you.

12           MS. KELLY:  Your Honor, could I just respond briefly

13    to a few of the points made by the government?

14           Your Honor, the Saint Thomas Entities understand the

15    importance of the government's case, the criminal case, as

16    well as the importance of the criminal defendants' rights, but

17    the suggestion that we could go elsewhere to get these

18    documents is untrue.  We have certainly looked on the

19    repository.  They aren't there.

20           These documents were obtained by grand jury subpoena

21    and they didn't originally come from MSM.  The Saint Thomas

22    Entities don't have any way to ask MSM who else might have had

23    these documents.  Where can we get them?

24           As you suggested, we are looking for a practical way

25    to obtain documents that we view -- I think there's very good

1    evidence for the proposition are critical to our defense.

2             THE COURT:  All right.  Thank you.

3             So, moving on to the PSC's motion to compel.

4             MR. GASTEL:  Thank you, your Honor.  Ben Gastel on

5    behalf of the plaintiffs.

6             That's our motion to compel three categories of

7    documents, your Honor.  There are the documents that I'll call

8    the focus group and marketing annual survey documents,

9    documents related to the managed care contracts that the Saint

10   Thomas Entities negotiated on behalf of the Saint Thomas

11   Clinic, and the third category of documents is documents

12   related to the inventories of MPA that the other hospitals in

13   the Saint Thomas Health System had during the period of 2011

14   through 2012.

15            Regarding the first group of documents, your Honor,

16   I'll take it back just very briefly.  If your Honor will

17   recall, the plaintiffs who have cases against Saint Thomas

18   received their epidural steroid injections at the Saint Thomas

19   Outpatient Neurosurgical Center, which I will refer to as the

20   Saint Thomas Clinic.

21            The Saint Thomas Clinic is owned -- there's joint

22   ownership of the Saint Thomas Clinic between the Howell Allen

23   Clinic and, essentially, Saint Thomas Health.  And so, in 2013

24   Saint Thomas Health embarked upon what would be considered a

25   strategy to unify its brand across the Middle Tennessee

1    healthcare community.

2           THE COURT:  I thought it was in 2010.

3           MR. GASTEL:  Well, they began contemplating doing it

4    in 2010.

5           THE COURT:  I see.  But they didn't start it until

6    2013, which is material to their arguments.

7           MR. GASTEL:  And that's correct, your Honor.  That's

8    when the one-name-one-healing-community marketing campaign

9    began, but that centered around, your Honor, rebranding the

10   health system around the Saint Thomas name, which Saint Thomas

11   Health believed had significant value in the Middle Tennessee

12   healthcare community, a point that was all but admitted by

13   Saint Thomas Health's communications director at her

14   deposition when she was asked why they chose to rebrand around

15   the Saint Thomas name, and I'll quote her response, your

16   Honor:

17          "Well, we're Catholic.  Saint Thomas is the legacy

18   name for the Catholic organization.  The original Saint Thomas

19   Hospital was established in, I believe, 1898 by the Daughters

20   of Charity here, meaning in Nashville.  So, it is the Catholic

21   name that is present in the community.  'It,' being Saint

22   Thomas, also has a strong recognition across a several-county

23   area."

24          And these, the documents that we're now trying to

25   compel, are the documents that Saint Thomas Health itself

1    relied upon in determining that the Saint Thomas brand had

2    meaning within the community and, specifically, that for

3    people seeking medical care in Middle Tennessee, that the

4    Saint Thomas name was a brand that it could trust to provide

5    quality medical care.

6         One of the questions in this litigation, your Honor,

7    is whether or not those individuals walking into a clinic on

8    the Saint Thomas Hospital campus, passing the Saint Thomas

9    Health branded signs and logos, walking into a clinic with

10   "Saint Thomas" on the door reasonably believed that they were

11   receiving healthcare from a Saint Thomas Health facility, and

12   these are the documents -- the documents we're seeking to

13   compel in this motion are the documents Saint Thomas itself

14   relied upon in determining that the Saint Thomas name, quote,

15   "had a strong recognition across a several-county area."

16        And certainly these documents can be used to show

17   that it was reasonable for those folks walking into the Saint

18   Thomas Clinic on those fateful days in the summer of 2012

19   trusted the Saint Thomas name to deliver the same high-quality

20   care promised to them by that name, a promise that the

21   plaintiffs maintain was broken in this instance because of the

22   Saint Thomas Clinic's decision to put profits before --

23             THE COURT:  All right.

24             MR. GASTEL:  -- before patient safety.

25             THE COURT:  That doesn't help me determine

```
1    materiality of this.
2            MR. GASTEL:  Well, it does, your Honor, lead me to
3    the second --
4            THE COURT:  Will you, please, streamline your -- I
5    feel like I'm getting an opening argument and I would like to
6    focus on the documents.
7            MR. GASTEL:  Sure.
8            The point is, your Honor, that leads to the second
9    group of documents that are at issue.
10           THE COURT:  So, there's no time limitation on this
11   request?
12           MR. GASTEL:  I'm sorry, your Honor?
13           THE COURT:  There's no time limitation.  There's no
14   from 2012 forward or some --
15           MR. GASTEL:  I believe that we had agreed probably in
16   the preliminary instructions to limit it, I believe, from the
17   period of 2008 through 2012.
18           THE COURT:  All right.  So, the second category.
19           MR. GASTEL:  Which is the managed care contracts.
20   There's no dispute that Saint Thomas Health negotiates the
21   managed care contracts with the Saint Thomas Clinic.  These
22   are the contracts that govern the reimbursement for the goods
23   and services provided by the Saint Thomas Clinic that are at
24   issue in this litigation.
25           One of the issues in this litigation, your Honor, is
```

1    whether or not there was a sale of the drug by the Saint

2    Thomas Clinic, and "seller" and "sale" have very specific

3    definitions under Tennessee law, and it includes -- and I'm

4    quoting from Tennessee Code Annotated 29-28-102, that, "A

5    seller includes a retailer, wholesaler or distributor.  That

6    means any individual or entity engaged in the business of

7    selling a product, whether such sale is for resale or for use

8    or consumption."

9              Your Honor, Saint Thomas Health did produce -- and we

10   included it in our papers with this motion -- one of the

11   managed care contracts at issue, specifically with Blue

12   Cross/Blue Shield of Tennessee.  I don't think that there's

13   any dispute, given the wide nature of this tragedy, that that

14   managed care contract does not cover all of the potential

15   plaintiffs in this lawsuit, but the document does specifically

16   speak to reimbursement; i.e., a sale of drugs.  The document

17   itself -- and I'll quote from the document -- says, that, "The

18   global fee also includes laser equipment, drugs and facility

19   charges."  In other words, there's specifically in the managed

20   care contract a contemplation of reimbursement for a drug.

21             Now, when we're going to prove these cases at trial,

22   your Honor, I can't simply for somebody who did not get

23   reimbursement through the Blue Cross/Blue Shield network say

24   that this document supports the sale of a drug in this

25   instance.  We need all of the managed care contracts to the

1    extent that they apply to the reimbursement for the services

2    for a specific patient.

3          So, we would say that these documents go -- and let

4    me also reiterate and bring it back to the profit issue, your

5    Honor.  Part of our theory is that the reason why Saint Thomas

6    Clinic chose to purchase from NECC was that the drugs were

7    cheaper there.  The managed care contract shows that there's

8    one fee.  So, every single dollar that the Saint Thomas Clinic

9    could save by going through NECC as opposed to purchasing the

10   slightly more expensive Pfeifer Depo Medrol was a dollar that

11   went directly to the Saint Thomas Clinic's bottom line.

12         So, the managed care contracts are relevant for those

13   two issues, to prove that the profit motive here was main

14   driving force and to help support plaintiffs' claims that

15   there was a sale of a drug.

16         The last category of documents, which is the supplies

17   of MPA at the five hospitals within the Saint Thomas Health

18   System.  The Saint Thomas Clinic defends its decision to go

19   with NECC, in part, on the idea of a drug shortage.  We don't

20   think that that's going to be supported by the record, but

21   certainly relevant evidence to that issue would be whether or

22   not the five other hospitals in the Saint Thomas Health System

23   had similar problems of purchasing MPA during the relevant

24   time period, and we think those documents should be produced,

25   your Honor.

```
 1          THE COURT:  You want those documents to show them as

 2     examples, not because of other entities that had shortages,

 3     not because you're saying that the clinic could get the drug

 4     from these other Saint Thomas Entities?

 5          MR. GASTEL:  Well, it's to -- that's certainly part

 6     of it, your Honor, but it also goes to show that other

 7     facilities were not having problems procuring MPA during the

 8     relevant time period and, certainly, if the Saint Thomas

 9     Clinic was having problems but its parent organization was

10     not, then it certainly could have gone to its parent

11     organization and procure the MPA through that mechanism.

12          MS. PUIG:  Your Honor, Yvonne Puig for the Saint

13     Thomas Entities.

14          I just want to remind the Court early and often, as

15     we have so many times, we are Saint Thomas Entities.  We are

16     not STOPNC.  The repeated attempts to blur those lines for the

17     Court, I think -- I want to make very clear who we are and who

18     we aren't.

19          We didn't make the MPA.  We didn't buy the MPA.  We

20     didn't inject the MPA.  I think that if the Court keeps those

21     three important elements in mind, it will inform the Court's

22     choices in regard to these requests.

23          I will take them in the same order in which they

24     appear in the briefing and as argued by Mr. Gastel.

25          First with respect to the branding campaign, the
```

1    focus group, all of that.  To suggest to this Court that the

2    branding campaign -- you know, they featured it prominently at

3    the motion to dismiss hearing, a bust with the, "one healing

4    community" on it occurred in 2013.  Unless the plaintiffs in

5    this case were time travelers, it could not have informed

6    their choices in the summer of 2012 to seek healthcare

7    services at the STOPNC clinic.  The STOPNC clinic was the

8    injector.  The entities were the physicians at Howell Allen

9    Clinic.  The idea that a person would just stumble on to our

10   campus seeking a steroid injection is preposterous.  These

11   patients were the patients of Howell Allen Clinic.  They

12   sought surgical procedures and these injections from the

13   Howell Allen Clinic doctors who performed these injections at

14   the STOPNC clinic.  There has not been one evidence, one shred

15   of a witness, one answer to an interrogatory that anybody did

16   the reverse.

17          So, the idea that a focused survey or branding

18   survey, which, oh, by the way, is aggregated data, would have

19   informed the choice of a plaintiff in the summer of 2012 is

20   just preposterous.

21          Secondly, your Honor, the MPA was not the subject of

22   any survey, neither was STOPNC.  STOPNC was not the focus of

23   the branding campaign, was not the reason why any of this data

24   was collected or suggested.

25          I want to remind the Court, this entity, STOPNC, was

1    named in the year 2000.  So, data that was garnered years

2    later and the branding campaign in 2013 is simply irrelevant.

3    It's a stretch.  It's a fishing expedition.  It defines a

4    fishing expedition.

5            Your Honor, let's move to the managed care contracts.

6    The PSC had the opportunity to depose the person who oversees

7    managed care contracting for Saint Thomas Health by a

8    contract, a specific purchase service agreement.  STOPNC

9    sought the services of Ms. Cindy Williams with respect to

10   managed care contracting.

11           The argument that somehow they're going to discern

12   from the other managed care contracts something different than

13   the Blue Cross/Blue Shield exemplar which we provided, is

14   simply not true.

15           THE COURT:  So, are you saying -- I know you produced

16   one as an exemplar.  I wasn't sure, but are you saying that

17   it's regulated by Medicare and so that there's only one

18   clause like that?

19           MS. PUIG:  It's the same, your Honor.  This is --

20           THE COURT:  So, are you willing to agree that that

21   clause applied to all the contracts?

22           MS. PUIG:  The pricing is different, your Honor, but

23   even the PSC has acknowledged in answers to interrogatories

24   for STOPNC, they understand the methodology.  It's very

25   simple.  STOPNC equals an ASC, equals a single fee.  That's

1    the statute under which the ASC, STOPNC, operated.  It's a

2    single fee.  Sometimes referred to as a global.  Sometimes

3    referred to as a bundled fee.

4         So, providing additional documentation has nothing to

5    do with the MPA or how the charges worked.  Whether the MPA --

6         THE COURT:  So, it sounds from what you're saying

7    that there might be a different -- even if it's one fee, but

8    that fee might be different in each contract.

9         MS. PUIG:  It's the same.  The managed care

10   providers, the Blue Crosses and the Blue Shields still charge

11   a fee -- a capitated fee and they're paid back.  Whether the

12   MPA cost STOPNC a dollar or cost them $10,000, STOPNC could

13   only charge a single capped fee, which is the Medicare rate,

14   which the PSC has acknowledged that methodology in response to

15   discovery in this case, your Honor.

16        So, it's a fishing expedition.  It's not relevant,

17   and we would ask that the Court deny their request for all

18   managed care contracts.

19        Your Honor, with respect to the MPA, this, again,

20   begs the question, the uncontradicted evidence in this case,

21   as testified to by the STOPNC entity witnesses, is that the

22   Saint Thomas Hospital, nor Saint Thomas Health ever provided

23   drugs to STOPNC.  STOPNC didn't buy them from the hospital or

24   Saint Thomas Health, never purchased it, never sought to

25   acquire MPA.

1          So, to ask Saint Thomas Health, which operates a

2    number of hospitals, including rural Tennessee hospitals, that

3    they focus on five hospitals, Hey, hospitals, what did you

4    have in stock in the summer of 2012 to prove or disprove

5    whether or not MPA was in short supply, whether or not Sando

6    had decided to exit the market, all of which is in evidence in

7    this case, including the deposition of a pharmaceutical

8    salesperson who talked about it, number one, it's irrelevant.

9    Number two, it's burdensome.  Number three, it is

10   uncontradicted that if we had it sitting on the shelf, never

11   once did we sell to STOPNC and never once did STOPNC ever

12   reach out to Saint Thomas Hospital or Saint Thomas Health to

13   purchase product.

14          So, it's irrelevant.  It's a fishing expedition and,

15   your Honor, they don't need to know whether we stocked it,

16   whether we had it, whether it was there.  It is uncontradicted

17   by every witness in this case who has testified under oath,

18   STOPNC never purchased MPA or any other product or drug from

19   Saint Thomas Hospital or Saint Thomas Health.  Thank you, your

20   Honor.

21          THE COURT:  Thank you.  Anything further?

22          MR. GASTEL:  Just going back to the branding

23   documents.  I think the key here is that the research that was

24   done to determine the unifying brand was done at the time

25   these injections were taking place and they show what the

1    community understood about Saint Thomas and its associated

2    entities with the same name.

3            So, Saint Thomas -- the Saint Thomas Entities'

4    argument here really has it backwards.  Because the name Saint

5    Thomas had value, they decided to use it.  And how did they

6    know that it had value?  Because it had earlier done the

7    internal testing and surveys to show what people in this

8    community understood about that name, and that's why they

9    should be produced.

10           THE COURT:  All right.  Thank you.

11           MS. PUIG:  Your Honor, briefly.

12           The entity was named in 2000.  There were no branding

13   surveys done in 2000.  So, to argue that something done that

14   was in early development in 2010 that came to fruition in 2013

15   would somehow be relevant to the claims in this lawsuit is

16   preposterous.  Thank you, your Honor.

17           THE COURT:  All right.  I will see many of you at 2

18   o'clock.

19           MS. STRACHAN:  Thank you.

20           COURTROOM DEPUTY CLERK YORK:  All rise.  This Court

21   is in recess.

22           (Adjourned, 1:03 p.m.)

23

24

25

```
 1                C E R T I F I C A T E

 2          I, Catherine A. Handel, Official Court Reporter of the

 3   United States District Court, do hereby certify that the

 4   foregoing transcript, from Page 1 to Page 66, constitutes to the

 5   best of my skill and ability a true and accurate transcription of

 6   my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

 7   Re: New England Compounding Pharmacy, Inc., Products Liability

 8   Litigation.

 9

10   October 27, 2015          /s/Catherine A. Handel
     Date                      Catherine A. Handel RPR-CM, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```