UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
PHARMACY CASES LITIGATION          )
                                   )
                                   )
                                   )
                                   )
                                   )
                                   )

BEFORE:   THE HONORABLE RYA W. ZOBEL AND
          THE HONORABLE JENNIFER C. BOAL




**MOTION HEARING**
AND
**STATUS CONFERENCE**




John Joseph Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, MA 02210


October 14, 2015
2:00 p.m.




Catherine A. Handel, RPR-CM, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 5205
Boston, MA 02210
E-mail: hhcatherine2@yahoo.com

1    APPEARANCES:

2

3    FOR THE PLAINTIFFS:

4

5        Hagens, Berman, Sobol, Shapiro LLP, by KRISTEN JOHNSON,
     ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts
     02142;

6

7        Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,
     ESQ., and BENJAMIN A. GASTEL, ESQ., 227 Second Avenue North,
8    Nashville, Tennessee 37201-1631;

9

10       Janet, Jenner & Suggs, LLC, by ANDREW LEE, ESQ., and
     JESSICA MEEDER, ESQ., 75 Arlington Street, Suite 500, Boston,
     Massachusetts 02116;

11

12       Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
     Street, Suite 500, Boston, Massachusetts 02114;

13

14       Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K.
     MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, New York
15   10013-1413;

16

17       Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
     ESQ., 150 Fourth Avenue North, Suite 1650, Nashville, Tennessee
     37219;

18

19       Leader, Bulso & Nolan, PLC, by GEORGE H. NOLAN, ESQ., 414
     Union Street, Suite 1740, Nashville, Tennessee 37219;

20

21       Magee Goldstein Lasky & Sayers, P.C., by GARREN R. LAYMON,
     ESQ. (appearing telephonically), 310 1st Street, S.W., Suite
22   1200, Roanoke, Virginia 24011;

23

24       Lyons Law Offices, P.A., by JOHN E. LYONS, ESQ. (appearing
     telephonically), One New Hampshire Avenue, Suite 235, Portsmouth,
     New Hampshire 03801;

25

     (Appearances continued on the next page.)

```
 1     APPEARANCES (Cont'd):

 2

 3    FOR THE PLAINTIFFS:

 4
          Dennis R. Brown, P.C., by DENNIS R. BROWN, ESQ., 869
 5    Concord Street, Framingham, Massachusetts 10701;

 6

 7    FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
      NECP, INC.:
 8

 9        Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
      Street, Suite 2400, Boston, Massachusetts 02110-1724;
10

11

12    FOR THE DEFENDANTS:

13
          Fulbright & Jaworski LLP, by YVONNE K. PUIG, ESQ., and
14    MARCY H. GREER, ESQ., 98 San Jacinto Boulevard, Suite 1100,
      Austin, Texas 78701-4255;
15

16        Gideon, Cooper & Essary, PLC, by CHRIS J. TARDIO, ESQ., and
      MATTHEW H. CLINE, ESQ., 315 Dearerick Street, Suite 1100,
17    Nashville, Tennessee 37238;

18
          Michaels, Ward & Rabinovitz LLP, by DAN RABINOVITZ, ESQ.,
19    One Beacon Street, Second Floor, Boston, Massachusetts 02108;

20
          Todd & Weld LLP, by CORRINA L. HALE, ESQ., 28 State Street,
21    31st Floor, Boston, Massachusetts 02109;

22
          Brewer, Krause, Brooks & Chastain, PLLC, by PARKS T.
23    CHASTAIN, ESQ., 611 Commerce Street, Suite 2600, Nashville,
      Tennessee 37203;
24

25     (Appearances continued on the next page.)
```

APPEARANCES (Cont'd):


FOR THE DEFENDANTS:


    Pessin Katz Law, P.A., by GREGORY K. KIRBY, ESQ., 901
Dulaney Valley Road, Suite 400, Towson, Maryland 21204;


    Nutter McClennen & Fish LLP, by SARAH P. KELLY, ESQ.,
Seaport West, 155 Seaport Boulevard, Boston, Massachusetts
02210-2604;


    Collora LLP, by INGRID S. MARTIN, ESQ., 100 High Street,
20th Floor, Boston, Massachusetts 02110;


    Morrison Mahoney LLP, by WILLIAM N. SMART, ESQ., 1001 Elm
Street, Suite 304, Manchester, New Hampshire 03101;




FOR THE GOVERNMENT:


    United States Attorney's Office, by AUSA AMANDA P.M.
STRACHAN, AUSA GEORGE P. VARGHESE and AUSA JOHN CLAUD, John J.
Moakley Courthouse, One Courthouse Way, Suite 9200, Boston,
Massachusetts 02210.

```
1                      P R O C E E D I N G S

2          (The following proceedings were held in open court before

3    the Honorable Rya W. Zobel, United States District Court Judge,

4    and the Honorable Jennifer C. Boal, Magistrate Judge, United

5    States District Court, District of Massachusetts, at the John J.

6    Moakley United States Courthouse, One Courthouse Way, Boston,

7    Massachusetts, on October 14, 2015.)

8              THE COURT:  Good afternoon.  Please be seated.

9              We seem to be stymied at the moment because the

10   telephone system isn't working.  So, we need to wait until the

11   technical people can come and help us, particularly for the

12   Virginia argument.

13             (Pause.)

14             THE COURT:  Does anyone know whether there are

15   counsel who are interested in the New Hampshire cases who

16   would want to listen to the argument with respect to them?

17             MR. LEE:  Yes, your Honor.

18             MR. SMART:  Yes, your Honor.  Myself, Bill Smart.

19             THE COURT:  I know.  Other than people who are here.

20             MR. SMART:  Oh, I'm sorry.  Yes, there is another

21   attorney from my firm who would be listening in.

22             MR. LEE:  And I believe there's a plaintiff's

23   attorney as well --

24             THE COURT:  I'm sorry?

25             MR. LEE:  I believe there's a plaintiff's attorney as
```

```
 1    well for Golden who is listening in, Attorney John Lyons.

 2              THE COURT:  Okay.

 3              (Discussion off the record at the Bench.)

 4              (Pause.)

 5              THE COURT:  We are desperate for your presence.

 6              (Discussion off the record.)

 7              THE COURT:  All right.  We can now start the status

 8    conference.  This is Judge Zobel for those on the telephone.

 9    I hope all 40 of you are now available.  I'm sorry, we had

10    problems with the system.

11              In any event, it was -- the agenda asks that we first

12    deal with two motions, one the Virginia motion to approve a

13    settlement -- or several settlements, I think.  Yes, I think

14    several -- no, wait a minute.  Only one.

15              MR. STRANCH:  Your Honor, I believe the gentleman

16    that filed that was on the phone and got off the phone to call

17    separately so that he could appear to handle that.  Ms.

18    Johnson has stepped out to call him and to ask him to return

19    back into the conference.

20              THE COURT:  Who is the person we're looking for in

21    Virginia?

22              MS. JOHNSON:  Mr. Laymon, your Honor.  I just stepped

23    out to let him know that we are using the conference call

24    number after all.

25              THE COURT:  Mr. Laymon, are you there?
```

```
 1              (No response.)
 2          THE COURT:  Not there.  He is calling in or
 3   connecting himself?
 4          MS. JOHNSON:  Yes, but it may take a minute, your
 5   Honor.  He was waiting for a call, but now he's dialing in.
 6              (Pause.)
 7          MS. JOHNSON:  Perhaps it makes sense, your Honor, to
 8   start with the New Hampshire motions that are set for oral
 9   argument.  I don't believe Mr. Laymon has an interest in
10   those.
11          THE COURT:  He does?
12          MS. JOHNSON:  I do not believe that he has an
13   interest in those, no.
14          THE COURT:  So, you're suggesting we should start
15   with them?
16          MS. JOHNSON:  Yes, your Honor.
17          THE COURT:  He'll have to listen for a while.
18          MS. JOHNSON:  That is true.
19          THE COURT:  Mr. Laymon, are you there yet?
20          MR. LAYMON:  I am here.  Can you hear me?
21          THE COURT:  Yes.  What is before us now is your
22   motion for -- or petition for approval of the compromised
23   settlement in a wrongful death claim, and I think that what
24   we're doing is a formality.  So, treating it as a formality, I
25   will hear you on that formality.
```

1          MR. LAYMON:  Thank you, your Honor.  I do believe

2     this is a formality.

3          I introduce myself.  I am Garren Laymon representing

4     Leona Corker, who is the executrix of the estate of Billy L.

5     Corker.

6          As you notice, this is a formality.  It comes from a

7     Virginia statute, Section 8.01-55 that requires court approval

8     of wrongful death settlements, even if no lawsuit has been

9     filed, and that's the situation we are in here.

10         Mr. Corker died after receiving tainted MPA

11     injections.  No lawsuit has been filed, but the statute of

12     limitations, we assert that hasn't expired yet.

13         So, it appears that Ms. Corker is allowed to

14     participate in the procedures negotiated with the other

15     Virginia plaintiffs, but what she's doing through those

16     procedures potentially amounts to settling a wrongful death

17     claim, which requires court approval.

18         So, with respect to Ms. Corker, her husband received

19     two MPA injections at the Insight Imaging Clinic about a month

20     apart.  From the records obtained from Insight, it appears

21     that both injections were from tainted MPA vials produced by

22     NECC.

23         Mr. Corker developed an infection at the injection

24     site.  He exhibited symptoms consistent with the effects of

25     tainted preservative-free MPA compounded by NECC.  His health

1    never recovered and he died on July 12th, 2014.  The

2    petitioner believes that Mr. Corker died as a result from one

3    or both injections.

4         Mrs. Corker now seeks an order authorizing her to

5    participate in the Insight claims resolution procedures to

6    settle the wrongful death claim, and that's why we're here

7    before the Court, your Honor.

8         THE COURT:  Is there any objection?

9         (No response.)

10        THE COURT:  All right.  I have signed the order.  So,

11   you're all set.  Thank you.

12        MR. LAYMON:  Thank you very much, your Honor.

13        THE COURT:  Now, we turn to New Hampshire, and I

14   would like to know before we hear arguments, who is going to

15   argue.  For the plaintiff?

16        MS. JOHNSON:  For the plaintiffs, your Honor, it will

17   be Andrew Lee.

18        MR LYONS:  And, Judge, Attorney Lyons is also on the

19   line.  I represent Lecia Golden, but our motions were simply

20   to join the very fine pleadings filed by Kim.  So, unless the

21   Court has some specific issue, I will likely not say anything.

22        THE COURT:  Okay.  And for the defendant?

23        MR. SMART:  William Smart, your Honor.

24        THE COURT:  I'm sorry?

25        MR. SMART:  William Smart.

```
 1            THE COURT:  Mark?

 2            MR. SMART:  Smart, S-m-a-r-t.

 3            THE COURT:  Okay.  I'm not exactly sure.  I guess

 4  maybe the defendant should argue first since the defendant has

 5  the motion.

 6            MR. SMART:  That's what I had in mind, absolutely.

 7            THE COURT:  Okay.  Go ahead.

 8            MR. SMART:  Thank you.

 9            THE COURT:  Try to do this in about ten minutes.

10            MR. SMART:  Okay.  Well --

11            THE COURT:  Yes, we'll need the microphone.  In fact,

12  if you want, you can just do it from your table and sit down

13  because otherwise -- the microphones don't have a very long

14  neck.

15            MR. SMART:  Sure.

16            Well, your Honor, we're here today on motions to

17  dismiss that have been filed in three -- in fact, four cases

18  that were initially filed in the federal district court in New

19  Hampshire and were then transferred to this Court for

20  participation in the MDL.  We feel that the Court lacks

21  subject matter jurisdiction over these cases.

22            We start with the proposition that these cases were

23  clearly filed after the confirmation of NECC's bankruptcy plan

24  on May 20th, and that, in general, the scope of bankruptcy

25  court jurisdiction under §1334(b) is going to be narrowed
```

1    following confirmation of that plan.

2           These cases should be dismissed because exercising

3    jurisdiction over them would not be consistent with *In Re:*

4    *Boston Regional Medical Center*, *In Re: Resorts*, or many of the

5    cases cited therein.

6           THE COURT:  Well, why should they be dismissed?  I

7    mean, it seems to me, at the very least, they should go back

8    to New Hampshire and be treated as New Hampshire cases or is

9    there no jurisdiction in New Hampshire either?

10          MR. SMART:  There is no basis for jurisdiction other

11   than §1334(b).

12          I would point out, though, that of these four cases,

13   two of them have been filed in New Hampshire state court, two

14   recently, at least one since the Court raised the issue of its

15   own jurisdiction.  We also have 22 cases which are proceeding

16   in state court.  Of the -- two of the four who have not filed

17   in state court yet, they've apparently chosen not to do so,

18   presumably because there is a one-year saving statute in New

19   Hampshire that would likely apply.  So, if this case is

20   dismissed not on the merits of the case, they would presumably

21   have another year to file suit.

22          So, we don't see the statute of limitations being a

23   significant issue here.  Were the Court to dismiss these

24   cases, as we feel it should, those that have been filed in the

25   state will proceed.  Those that have not will, presumably, be

1   filed in the near future.

2          In our view, you have really a commonality among

3   cases post confirmation that usually arise when you have the

4   litigation trust or the debtor in bankruptcy basically filing

5   a collections action for the purpose of accumulating funds to

6   be dispersed to the former claimants of the reorganized

7   debtor, which are then the trust beneficiaries.

8          THE COURT:  Is the basis of your argument that there

9   is no longer an estate?

10         MR. SMART:  That's one of the bases for the argument,

11  but I think -- well, maybe I'll just jump right to it.

12         The Court has articulated a potential basis for

13  related-to jurisdiction in a recent order and that's based on

14  the rolling over of expense funds.

15         THE COURT:  Now, why does that not apply here?

16         MR. SMART:  The nexus just isn't close enough, your

17  Honor.

18         THE COURT:  Because these were filed after

19  confirmation or they vested after confirmation?

20         MR. SMART:  Partly, yes, but, also, you know, if you

21  compare those cases, you have -- first of all, the idea that

22  this money is going to spill over and fund the trust is

23  speculative, I would suggest, because nobody knows how much,

24  if anything, is going to move into the trust, whether these

25  cases are litigated as part of the MDL or whether they're sent

1    back to state court.  Nobody knows that.  So, it's

2    speculative.

3         I would also argue that you have cases where a

4    litigation trust is a party and they're seeking a direct --

5    you know, they have a direct claim against some third party in

6    order to fund the trust, and the courts are finding that in

7    often cases, that's not a direct and close enough nexus.

8         This case is even more removed.  The plan in this

9    case specifically carved out the claims of these plaintiffs

10   against other entities, like Pain Care and the clinics who are

11   not part of the bankruptcy, and it was contemplated that those

12   cases were going to go forward.  There's a separate pool of

13   liability and potentially a recovery for those plaintiffs.

14        And so, the connection between those cases and the

15   tort trusts, let alone the bankruptcy, is so thin.  You're

16   talking about this possibility that they could be litigated

17   more efficiently here and that maybe there would be more

18   expenses left over that we roll over.  We don't know how much

19   that is.  So, it's an extraordinarily thin connection between

20   these cases as they're postured now and this bankruptcy, and

21   it would be, I think, unprecedented based on any of the cases

22   I've looked at.

23        THE COURT:  Does the multidistrict panel have

24   anything to say about jurisdiction?

25        MR. SMART:  Does the multidistrict panel have

1    anything to say -- no.  I mean, I think that jurisdiction is

2    derived from the federal statute and it is -- the onus is on

3    the Court.

4           THE COURT:  So, what I'm really deciding is that

5    there's no jurisdiction in New Hampshire?

6           MR. SMART:  Not in New Hampshire Federal District

7    Court, no.

8           THE COURT:  Yes.  Well, that's what we're talking

9    about.

10          MR. SMART:  Right.

11          THE COURT:  The four cases before me were all filed

12   in federal court, right?

13          MR. SMART:  That's right.  Right, they're all filed

14   in federal court.

15          So, you know, really -- and just to put this into a

16   test that the Court can apply, if you look at the *In Re: Haas*

17   case, which is a case that's discussed at some length in *In*

18   *Re: Resorts*, essentially, what you have there is you have a

19   liquidation trust created by a bankruptcy suing a former

20   partner of the bankrupt entity to recover money for the trust.

21   Presumably, that partner had something to do with the

22   financial difficulties that brought that company to bankruptcy

23   in the first place.

24          And what the Court concluded was that there was no

25   jurisdiction because the plaintiff had failed to demonstrate

1    how any damages recovered from the defendant in that case,

2    quote, "were necessary to effectuate the terms of the plan."

3    And what you end up with is the ruling *In Re: Resorts*, that

4    the potential to increase assets in the litigation trust alone

5    is not a sufficient basis to confer related-to jurisdiction

6    for cases post confirmation.

7         THE COURT:  We're not talking about that in this

8    context, in any event.  We're not adding to the litigation

9    trust.

10        MR. SMART:  Well, my understanding of at least one

11   theory of relatedness that's been articulated is that the

12   rollover from the expense fund could potentially increase it.

13        So, in comparison -- so, it's very thin.  So, I think

14   the test really would have to be, you know, is the rollover

15   excess expense funds necessary to effectuate the terms of the

16   plan in this case?  And I think the answer to that is clearly

17   no.  Whether there's no dollars or a million dollars that

18   rolls over, it doesn't affect this plan unfolding as written.

19   The Court is not being called upon to interpret any aspect of

20   the plan.  And so, it's clear -- it's just purely an issue of

21   how much money is in the trust, and it's very speculative at

22   that and it's very removed compared to these cases where the

23   trust itself is actually filing a collections action.

24        Even if the Court finds that it has jurisdiction or

25   that it may have jurisdiction, we've asked the Court to

```
 1    abstain.  We've asked the Court to carve out these cases and
 2    send them back.
 3            THE COURT:  That's not going to get you anywhere.  If
 4    there is jurisdiction, I think I would let it go forward.  I
 5    don't think I would voluntarily abstain, but I'll hear you.
 6            MR. SMART:  Okay.
 7            (Laughter.)
 8            MR. SMART:  What I've noted, looking back to some of
 9    the Court's rulings, it doesn't appear -- and it's sort of
10    consistent with what your Honor has just said -- that there
11    hasn't been a real detailed analysis of the abstention issue.
12    It seems to turn on, well -- at least initially, there was
13    abstention because the basis for jurisdiction seemed weak.
14    Then those cases were taken into the MDL.
15            So, the weakness in the jurisdictional argument that
16    I've just articulated, based on the rolling over of expense
17    funds, is so tenuous, so much more tenuous than in any other
18    reported case, that even if there is jurisdiction, there needs
19    to be abstention.
20            These are state law claims against entities of New
21    Hampshire, who treated patients in New Hampshire.  They want
22    the opportunity to try these cases, if necessary, to a New
23    Hampshire jury and, again, there is no statute of limitations
24    issue in the case.
25            THE COURT:  Thank you.  Mr. Lee.
```

1          MR. LEE:  Andrew Lee for plaintiffs Jojayra Garcia

2     and Cheryl Ann --

3          THE COURT:  Is that on?

4          MR. LEE:  Oh, I got it.

5          THE COURT:  Thank you.

6          MR. LEE:  Andrew Lee for the plaintiffs Jojayra

7     Garcia and Cheryl Ann McCarthy.

8          Your Honor, I'm going to be working a little bit

9     backwards from counsel and explaining why jurisdiction is,

10    first, appropriate and not address the timing issue until

11    after.

12         Many of the issues raised in the defendants' motion

13    to dismiss have already been resolved by the Court's recent

14    order related to the Tennessee defendants as well as the

15    jurisdiction issue as well as whether or not the Court has the

16    ability to hear -- or to set trial for the Tennessee defendant

17    cases.

18         THE COURT:  What is the basis for jurisdiction here?

19         MR. LEE:  The basis for jurisdiction is related-to

20    jurisdiction under $1334.

21         THE COURT:  How are the New Hampshire plaintiffs --

22    how do they have a case related to the bankruptcy?

23         MR. LEE:  Your Honor, they have a case related to

24    bankruptcy the same way that multiple cases that have been

25    filed prior to the confirmation date do, and the reason that

1   is --

2          THE COURT:  Does it matter that the case was filed

3   after confirmation?

4          MR. LEE:  It does not, your Honor.

5          THE COURT:  Why not?

6          MR. LEE:  The reason it does not matter is because,

7   as defendants have just said, they're basing their belief that

8   the Court does not have related-to jurisdiction over these

9   cases is because they were filed after confirmation, because

10  the NECC bankruptcy stay no longer existed.  Plaintiffs assert

11  that's simply incorrect.

12         THE COURT:  Why?

13         MR. LEE:  If we look at *In re: Resort*, which was

14  cited by defendants -- I believe defendants quote this

15  particular passage:  "It is impossible for the bankrupt

16  debtor's estate to be affected by post confirmation dispute

17  because the debtor's estate ceases to exist once confirmation

18  has occurred."

19         However, we believe that statement is taken out of

20  context.  If you look at the immediately-following sentence,

21  the Court *In Re: Resorts* cites 11 U.S.C. 1141(b) and

22  continues, "Unless otherwise provided by the plan or order

23  confirming the plan, the confirmation of the plan vests all of

24  the property of the estate into the reorganized debtor."

25         Your Honor, what that basically means is under

1   §1141(b), generally, confirmation of the plan vests all of the

2   -- all of the estate assets into the reorganized debtor.

3   However, there is an exception, and that exception is

4   highlighted in a case cited by the defendants -- I'm sorry --

5   by the plaintiffs in response to the defendants' reply to the

6   show cause order, *In Re: Roll Call*, and in that court -- I'm

7   sorry.  In that case, the court highlights the fact that there

8   is that exception that states that the bankruptcy plan itself

9   can provide for a different date that estate assets vest in

10  the reorganized debtor rather than confirmation date.

11          For example, in *In Re: Roll Call*, the plan itself had

12  a provision that stated, "Upon the effective date, pursuant to

13  Section 1141(b) and (c) all property of the estate of the

14  debtor shall vest in the reorganized debtor free and clear of

15  all claims."

16          THE COURT:  Is there such a provision in the NECC

17  plan?

18          MR. LEE:  Yes, your Honor.  Section 10.1 actually

19  states, "All property of the NECC bankruptcy estate does not

20  vest in post effective debtor until the effective date."

21          So, because of that, the estate continued to exist

22  until the effective date, which occurred after the filing of

23  the plaintiffs' complaints.

24          THE COURT:  Okay.  That's your argument?

25          MR. LEE:  Yes.

1        MR. SMART:  Your Honor, that's an argument that we

2   addressed at length in our briefing.  This is a form-over-

3   substance argument.

4        We had -- in this case the plan was confirmed on May

5   20th.  If everything unfolded as expected over 14 days, it

6   became effective.  These cases were filed perhaps hours before

7   the effective date of the plan.  And so, there's just no

8   meaningful distinction between plan confirmation and plan

9   effective date in this context.

10       THE COURT:  Well, why not?  I mean, if, in fact, the

11  plan itself says it is effective on another date other than

12  the date of the signing or whatever happened, why shouldn't

13  that be given credit?

14       MR. SMART:  Because by the point that these cases are

15  filed within hours of that effective date, it's a foregone

16  conclusion, number one; and, number two, it's really at the

17  point where an approved plan is approved, that the situation

18  fundamentally changes and the Court's focus shifts to post

19  confirmation issues.  And the question becomes, how does this

20  case relate to post confirmation issues?

21       So, the question is, how does this New Hampshire --

22  how do these New Hampshire cases affect the interpretation,

23  implementation, consummation, execution or administration of a

24  confirmed plan or incorporated litigation trust agreement?

25  And the only basis I've heard articulated is this, well, it's

1    possible that some expense funds could roll over.  We don't

2    know how much, but it's possible.  And to me that's not the

3    close nexus that is called for in *In Re: Resorts*.

4              THE COURT:  Okay.  Anything else, Mr. Lee?

5              MR. LEE:  Yes, your Honor.

6              We are asking -- or arguing that any sort of post

7    confirmation -- and I'm using that term in light of what was

8    written in *In Re: Resorts*, although we claim that confirmation

9    is not the date that any sort of related-to subject matter

10   jurisdiction changes or shrinks.

11             We are looking at the jurisdiction over our cases in

12   the context of whether it has any -- or it's possible that it

13   could affect the bankruptcy estate because the bankrupt estate

14   exists at the time.  This post confirmation evaluation, this

15   new analysis doesn't even play into our argument.

16             THE COURT:  So, you're saying what with respect to

17   the confirmation date?

18             MR. LEE:  That the confirmation date is irrelevant as

19   far as the jurisdiction of this Court under §1334.

20             THE COURT:  So, when does the jurisdiction of this

21   Court cease under this theory of relatedness?

22             MR. LEE:  Under the effective date, which was

23   provided by the plan itself.

24             THE COURT:  Because it was provided in the plan?

25             MR. LEE:  Yes, ma'am.

```
 1                THE COURT:  And only that?

 2           MR. LEE:  Yes.

 3                THE COURT:  Okay.

 4           I mean, you say otherwise and he says --

 5                MR. SMART:  Well, I do.  I mean, I don't understand

 6      how if the basis is -- if there's a genuine connection,

 7      substantive connection between this litigation and the trust

 8      based on the rolling over of expenses, that's not affected by

 9      the -- by the effective date.  So, there's an inconsistency

10      within the argument that's not logical.

11                THE COURT:  Well, if there's a case that says the

12      effective date is the one -- it's either confirmation or if

13      there's another date, the other date, if there is such law,

14      then why should I not go along with it?

15                MR. SMART:  I suppose if there is such law.  The only

16      law I've seen is this Global Crossings case where there's just

17      an extended -- and we've dealt with this in the brief.

18      There's an extended period between confirmation and

19      effectiveness and it was a unique situation.

20                THE COURT:  So is this.

21           MR. SMART:  True.  Very true.

22                THE COURT:  All right.  I will take the papers and I

23      thank you both.

24           MR. SMART:  Thank you.

25           MR. LEE:  Thank you, your Honor.
```

```
 1              THE COURT:  Now we go back to the agenda.  Is that
 2   you, Ms. Johnson?
 3              MS. JOHNSON:  It is, your Honor.  Thank you.
 4              In terms of status of the bankruptcy, I don't think
 5   we need a formal report on that, unless Mr. Gottfried feels
 6   otherwise.
 7              MR. GOTTFRIED:  Just to share briefly with the Court,
 8   the post confirmation officer is actively engaged in preparing
 9   to vacate the premises in Framingham.
10              THE COURT:  That's still going on?
11              MR. GOTTFRIED:  It's still going on.  It's been a
12   very lengthy process.  We're hoping to conclude it shortly,
13   to, hopefully, sell the salable equipment and furniture and
14   vacate the premises, but that is ongoing.  It's been ongoing
15   in a fairly intense way over the last several weeks.
16              In addition to that, the post confirmation officer
17   continues to deal with late claim motions that are being filed
18   in the bankruptcy, dealing with the claims that are filed and,
19   basically, is fully engaged in the analysis of those claims.
20   So, the work continues.
21              THE COURT:  Thank you.
22              MAGISTRATE JUDGE BOAL:  I just had a question.  I
23   don't know if it's more directed to the PSC or Mr. Gottfried,
24   really, from Judge Neiman who is anxious to be at work when
25   it's appropriate to do so.  Do you have any sort of timeframe
```

```
1    when you think that his services will be potentially required?

2            MS. JOHNSON:  Mr. Ellis will address that, your

3    Honor.

4            MR. ELLIS:  Your Honor, I think the first appeals, if

5    there are any, would probably be in, hopefully, 60 to 90 days.

6            MAGISTRATE JUDGE BOAL:  And those would be appeals to

7    Judge Neiman?

8            MR. ELLIS:  Correct, from the settlement

9    administrator's determination.

10           MAGISTRATE JUDGE BOAL:  Thank you.

11           THE COURT:  Well, has the beginning date been fixed

12   for the 30 to 90 days?

13           MR. ELLIS:  The claims deadline has now passed.

14           THE COURT:  So, now we're beginning to count?

15           MR. ELLIS:  That's correct, that's where we are.  And

16   we hope to have the first letters out between 60 to 90 days,

17   which would then trigger -- it, actually, may be another 30

18   days there because there's one more set.  So --

19           THE COURT:  So, sometime next summer?

20           (Laughter.)

21           MR. ELLIS:  Late fall, early spring.

22           MAGISTRATE JUDGE BOAL:  Thank you.

23           MS. JOHNSON:  I will suggest, your Honor, that the

24   claims administrator reach out to Judge Neiman to provide him

25   directly with some observations.
```

```
 1              MAGISTRATE JUDGE BOAL:  Yes, definitely.

 2         MS. JOHNSON:  That brings us to the status of the

 3    insurance declaratory judgment actions.  Mr. Gottfried will

 4    address where we are with the Ironshore action.

 5         MR. GOTTFRIED:  Yes, your Honor.

 6              I'm pleased to report that subject to working through

 7    the documentation of the settlement, that the post

 8    confirmation officer has reached a settlement with Ironshore.

 9         THE COURT:  Fabulous.

10         MS. JOHNSON:  That brings us to the declaratory

11    judgment action with Specialty Surgery Center that's ongoing

12    in Tennessee, and Mr. Gastel will address that.

13         MR. GASTEL:  Good afternoon, your Honor.

14              The Middle District of Tennessee has agreed that the

15    merits of the plaintiffs' claims are at issue in the dec

16    action, and in light of that and this Court's order of October

17    7th, the individual tort victim defendants in that case, the

18    plaintiffs here, anticipate requesting the JPML transfer that

19    case to this Court.  We hope to have those papers filed in the

20    coming days and we would anticipate a ruling from the JPML on

21    that within 30 to 45 days.

22         THE COURT:  Why is it coming here?

23         MR. GASTEL:  Again, in light of this Court's decision

24    to set venue for the initial Bellwether trials, we presume, of

25    some Tennessee cases here in this Court, we believe that there
```

```
1    needs to be consistency between all actions that involve the

2    merits of the plaintiffs' claims there -- I'm sorry -- the

3    plaintiffs' claims that are pending here.

4                THE COURT:  But what does that have to do with the

5    coverage case?

6                MR. GASTEL:  Well, in the coverage case, if you

7    recall, your Honor, and as I mentioned at the last two status

8    conferences, the insurance company has put into issue the

9    legal merits of some of the claims that the plaintiffs have

10   raised here.

11               THE COURT:  Okay.

12               MR. GASTEL:  And so, we believe that there needs to

13   be consistency between the rulings on plaintiffs' claims and

14   that's the whole purpose of the MDL, is to sort of streamline

15   and give consistency to those types of matters and as a

16   result, we believe the JPML should transfer them here.

17               THE COURT:  And who is applying for transfer, which

18   party?

19               MR. GASTEL:  It will be the plaintiffs -- the

20   Specialty Surgery plaintiffs who have cases pending in this

21   Court right now.

22               THE COURT:  Well, they're seeking to have the

23   coverage case come here as well?

24               MR. GASTEL:  Correct, your Honor.  And they happen to

25   be the defendants in the dec action.
```

```
 1              THE COURT:  Okay.  Well, we'll wait and see.

 2              MR. GASTEL:  And that's, I think, what we're asking

 3    the Court to do.

 4              THE COURT:  Is this request to the multidistrict

 5    panel a request by all parties or only some?

 6              MR. GASTEL:  We haven't conferred with the insurance

 7    company or counsel for Specialty Surgery on that yet, but we

 8    anticipate that there will be probably some adversary type of

 9    motions filed at the JPML.

10              THE COURT:  So, it would be useful to have this on

11    the agenda for the next meeting, too?

12              MR. GASTEL:  Most likely, your Honor, yes.

13              THE COURT:  Thank you.

14              Okay.  Status of discovery -- no -- yes.  That's it.

15              MS. JOHNSON:  Yes.

16              THE COURT:  And that's Judge Boal.

17              MS. JOHNSON:  That is Judge Boal, with one issue we

18    would like to bring to the Court's attention.

19              I'll acknowledge, first, that Judge Boal held a

20    hearing this morning that dealt with virtually all, if not

21    every single one, of the pending discovery motions.

22              There is one order that was entered since the last

23    status conference that is -- sort of blends discovery and

24    litigation, and we wanted to address that.  That's, of course,

25    this Court's order on the Bellwether trials related to the
```

1    National Healthcare Center, and Mr. Stranch wanted to address

2    where we go now that we have that order.

3              THE COURT:  Mr. Stranch.

4              MR. STRANCH:  Thank you, your Honor.  And good

5    afternoon.

6              After receiving the Court's order, we have pending

7    before the Court an assented-to motion that would change --

8    before we received your order, we assented with the defendants

9    to extend the deadlines that are currently in place for

10   disclosures -- expert disclosures and discovery about 30 days.

11             THE COURT:  Didn't Judge Boal deal with that already?

12             MR. STRANCH:  No.

13             MAGISTRATE JUDGE BOAL:  I'm planning to issue

14   something.  I don't know if you want to add anything or --

15             MR. STRANCH:  Well, the one thing I will say is our

16   expert reports are due this Friday and we are under an

17   incredible time crunch because of that and not all --

18             MAGISTRATE JUDGE BOAL:  I am planning to extend the

19   deadline.  So, you don't need to produce those this Friday.

20             MR. STRANCH:  Great.  Thank you, your Honor.

21             THE COURT:  That's it?

22             MR. STRANCH:  And the other thing that I was going to

23   raise with the Court is the Bellwether schedule that the Court

24   has put in its order is not a fully flushed-out schedule.

25   There's still some deadlines that need to be filled in, and we

```
 1    are going to propose, since we want to keep that early spring
 2    trial date that the Court has said the Court is aiming for, we
 3    propose that we meet and confer with the defendants and fully
 4    flush out the rest of that Bellwether process and those
 5    deadlines and get something --
 6              THE COURT:  We would both welcome that.
 7              MR. STRANCH:  Okay.  Good.  We'll do that and we'll
 8    get it to the Court by Monday, and we will do a three-page
 9    motion in support if we're unable to agree on everything, just
10    explaining the differences.  Hopefully, we can agree on
11    everything and fill it in.
12              THE COURT:  If you agree, then you can have more
13    pages.
14              (Laughter.)
15              MR. STRANCH:  We can have as many pages as we want if
16    we're in agreement?
17              MAGISTRATE JUDGE BOAL:  And just so we're not sort of
18    two ships passing in the night, I was planning to issue an
19    order in response to Docket Nos. 2245 and 2251, and these deal
20    with common discovery deadlines.
21              MR. STRANCH:  Right.
22              MAGISTRATE JUDGE BOAL:  And you're going to be giving
23    us a proposal with respect to the Bellwether trials?
24              MR. STRANCH:  To the Bellwether and case-specific
25    deadlines.
```

```
1              MS. PUIG:  Your Honor, if I could be heard.

2              MAGISTRATE JUDGE BOAL:  Yes.

3              MS. PUIG:  Yvonne Puig on behalf of Saint Thomas

4    Entities.

5              Responsive to Mr. Stranch's question --

6              THE COURT:  Excuse me.  There is a chair there for

7    you --

8              MS. PUIG:  Thank you.

9              THE COURT:  -- and a microphone.

10             MS. PUIG:  Thank you, your Honor.  Yvonne Puig on

11   behalf of Saint Thomas Entities.

12             One follow-on question to Mr. Stranch's point.  As

13   well, he cites the deadline for identification of experts for

14   the PSC.

15             A literal reading of the Court's order from October

16   7th would have the case-specific discovery closed by October

17   30th, which means all the plaintiffs -- or proposed plaintiffs

18   in the Bellwether would need to be deposed in the next two

19   weeks.  So, I would ask Judge Boal and you, Judge Zobel, will

20   that be extended as well?

21             MAGISTRATE JUDGE BOAL:  If I may.  I was planning to

22   issue an order with respect to the common discovery deadlines.

23   I did notice that there's --

24             MS. PUIG:  There's an overlap.

25             MAGISTRATE JUDGE BOAL:  Yes.  The way the orders have
```

```
 1    come down, there is overlap.  So, I think it makes sense to
 2    deal with -- if Judge Zobel agrees, with those specific
 3    deadlines.
 4              THE COURT:  I agree to anything you say.
 5              MAGISTRATE JUDGE BOAL:  I should wait and hear the
 6    proposals.
 7              MS. PUIG:  Okay.  Thank you.
 8              MAGISTRATE JUDGE BOAL:  But that deadline is not
 9    current.
10              MS. PUIG:  Thank you both.  I just wanted to be sure.
11    Thank you.
12              MR. STRANCH:  We'll discuss that with Tennessee
13    defendants.
14              MR. CHALOS:  Your Honor, Mark Chalos on behalf of the
15    plaintiffs.
16              This is particularly an issue of concern to me
17    because I'm dealing with some of the experts that we would
18    otherwise be disclosing on Friday.
19              When your Honor issues your order, will we have
20    sufficient time to -- I mean, in other words, the order is not
21    going to come to down and say you're producing tomorrow or a
22    few days from now?
23              THE COURT:  You'll have sufficient time as she's
24    defined "sufficient."
25              MR. CHALOS:  Good question.  Right.
```

```
 1              But I just want to be mindful.  If we're going to
 2    head off for Friday, that we, you know --
 3              MAGISTRATE JUDGE BOAL:  It's not going to be Monday.
 4              MR. CHALOS:  Okay.  That's great.  Thank you, your
 5    Honor.
 6              THE COURT:  Ms. Johnson.
 7              MS. JOHNSON:  I believe that covers No. 7(a) as well.
 8    That was the assented-to motion to extend deadlines.
 9              So, that brings us to 7(b), which is the PSC's
10    proposed qualified protective order for the production of
11    information from the Maryland Department of Health and Ms.
12    Meeder will address that briefly.
13              MS. MEEDER:  Good afternoon, your Honor.  Jessica
14    Meeder on behalf of the plaintiffs.
15              We have filed an amended proposed qualified
16    protective order to request -- or obtain a certain list the
17    Department of Health and Mental Hygiene Maryland has in its
18    possession.  The docket number for that amended motion is
19    2323, and the department has consented to that production once
20    this order is put in place.
21              There may potentially be another list in their
22    possession that we would need to discuss with them separately.
23    So, there may also be another request by the PSC for the
24    production of that list, but at this point we're just
25    requesting what's stated in 2323.
```

```
 1              MAGISTRATE JUDGE BOAL:  That's for me.

 2              MS. MEEDER:  Okay.  I have a copy of the motion, your

 3    Honor, if that would be helpful.

 4              MAGISTRATE JUDGE BOAL:  Yes, that would be great.

 5              MS. MEEDER:  May I approach?

 6              MAGISTRATE JUDGE BOAL:  Yes.  Thank you.

 7              (Attorney Meeder hands document to the Court.)

 8              THE COURT:  Is that it?

 9              (No response.)

10              THE COURT:  Now the pro se liaison.

11              MS. JOHNSON:  On to pro se liaison, which is Ms.

12    Martin.

13              MS. MARTIN:  Good afternoon, your Honor.

14              Short update.  We had some inquiries asking questions

15    about claim forms leading up to the deadline for claim forms

16    to be submitted, and since then we have not had any pro se

17    contacts.  So, that seems to be wrapping up in terms of

18    questions about the claims.

19              Judge Boroff -- in a hearing earlier this month, the

20    bankruptcy court did allow one late pro se claimant.  And so,

21    that was decided in that hearing, and I believe he's allowed

22    some other late claimants prior to that.

23              THE COURT:  You know, it just occurred to me.  When I

24    went senior, I had a right to decide what cases I did not wish

25    to hear and I had eliminated from my docket all pro se's.  So,
```

```
 1    what do I do?

 2            MS. JOHNSON:  Shall we ask Ms. Martin to leave the

 3    courtroom?

 4            (Laughter.)

 5            THE COURT:  All right.

 6            MS. JOHNSON:  That brings us to No. 9, the status of

 7    appeal.  We're pleased to report to the Court that the order

 8    dismissing and the mandate have issued on the appeal.  And so,

 9    that appeal is no longer.

10            And on to schedule for future status conferences.  We

11    have a conference --

12            THE COURT:  We have that set for November 12th,

13    hadn't we?

14            MS. JOHNSON:  Yes, your Honor, we have November 12th,

15    at 2:00, and December 17th, at 2:00, if those still work for

16    the Court.  We would ask that we set the January conference as

17    well.  I would suggest sometime the second week of January.

18            COURTROOM DEPUTY CLERK URSO:  What about the 13th?

19            MS. JOHNSON:  That works for the plaintiffs, your

20    Honor.

21            MR. KIRBY:  Your Honor, Greg Kirby for Box Hill

22    Surgery Center.

23            I can't do that date, if that means anything.

24            THE COURT:  Wait a minute.  We're now talking about

25    November 12th?
```

```
1              MS. JOHNSON:  January.

2              COURTROOM DEPUTY CLERK URSO:  I thought you said

3    January.

4              THE COURT:  November 12th is okay.  December 17th is

5    okay.  And the question is January what?

6              COURTROOM DEPUTY CLERK URSO:  Well, I was looking at

7    January 13th, but the gentleman in the back said that isn't a

8    good date.

9              THE COURT:  You can't do it by telephone either?

10             MR. KIRBY:  No.  I have an all-day commitment.

11             THE COURT:  So, we are going to have another date?

12             COURTROOM DEPUTY CLERK URSO:  Maybe the 14th, and I

13   can switch the hearings off on the 14th.

14             MR. KIRBY:  The 14th would be great.

15             THE COURT:  Is the 14th a problem?

16             MR. KIRBY:  The 14th is great.

17             MS. JOHNSON:  The 14th works for the plaintiffs.

18             THE COURT:  All right.  January 14th.

19             MAGISTRATE JUDGE BOAL:  I would just add that I have

20   scheduled a jury trial this week, which doesn't affect the

21   afternoon proceedings, but if we need to have any discovery

22   disputes, I'll have to do it the afternoon before.  So, that

23   would be the 13th.  Or I could do it the afternoon of the next

24   day, the Friday.

25             THE COURT:  I'm sorry.  You are Mr.?
```

1              MR. KIRBY:  Mr. Kirby, Greg Kirby from Box Hill

2    Surgery Center.

3              The 14th and the 15th would be great if you had to do

4    the discovery the next day.

5              THE COURT:  We try to please everyone.

6              MS. JOHNSON:  That works for the plaintiffs, your

7    Honor.

8              COURTROOM DEPUTY CLERK URSO:  So, the 14th, at 2

9    o'clock.  Then we would do the 15th, at 11:00?

10             MAGISTRATE JUDGE BOAL:  At 2:00.

11             COURTROOM DEPUTY CLERK URSO:  Oh, at 2:00?

12             THE COURT:  Because she's in trial.

13             COURTROOM DEPUTY CLERK URSO:  Right.  I'm sorry.

14    I'll type Steve.

15             THE COURT:  Now, unopposed motions.

16             MS. JOHNSON:  Yes, your Honor.  There are a number of

17    unopposed motions here.  These are all fully briefed and

18    pending before your Honor.

19             THE COURT:  Then I can allow them?

20             MS. JOHNSON:  We would request that you do, yes.

21             THE COURT:  I mean, since they're unopposed.

22             MS. JOHNSON:  Correct.  And all have been filed and

23    the time to respond has well elapsed.

24             THE COURT:  I thought we had dealt before with No.

25    13, the 100 pallets of paper.

```
1            MS. JOHNSON:  We may have, your Honor, and the

2   transcript from the last status conference to my reading was a

3   little bit unclear whether that was included.

4            THE COURT:  Okay.

5            MS. JOHNSON:  So, there may be overlap.

6            THE COURT:  So, it's allowed, either the first time

7   or second time.

8            And then there are a bunch that are Judge Boal's.

9            MAGISTRATE JUDGE BOAL:  Right.  No. 14 will be

10  included in the order that I'm issuing for scheduling.

11           MS. JOHNSON:  Thank you.

12           THE COURT:  New Hampshire, I think, is not unopposed,

13  but it's what we heard earlier, is it not?

14           MS. JOHNSON:  No.  This is different, your Honor.

15  This is actually counsel in New Hampshire --

16           THE COURT:  These are voluntary dismissals by certain

17  plaintiffs?

18           MS. JOHNSON:  They are.  They're styled a little

19  oddly, perhaps, but they are, essentially, voluntary

20  dismissals.

21           THE COURT:  Okay.  And Box Hill is stipulated?

22           MR. KIRBY:  I'm sorry.  What issue, your Honor?

23           THE COURT:  No. 16 on the agenda, Box Hill

24  stipulation on extension of time to answer complaints.

25           MR. KIRBY:  Yes.  Yes, your Honor.
```

```
 1                THE COURT:  Okay.  Done.

 2                MR. KIRBY:  And so the Court knows, we actually

 3      agreed to a further extension until the 20th of October.

 4                THE COURT:  Okay.  So long as it doesn't muck up our

 5      schedule, that's fine.

 6                MR. KIRBY:  Thank you, your Honor.

 7                MS. JOHNSON:  That brings us to discovery-related

 8      motions, and all of 17 through 22 were heard before Judge Boal

 9      this morning.

10                THE COURT:  Okay.  Then Ohio Medical defendant's

11      motion to dismiss.  That is -- I'm working on that.  I have a

12      draft.

13                MS. JOHNSON:  Thank you, your Honor.

14                THE COURT:  Choice of law briefing --

15                MS. JOHNSON:  Yes.

16                THE COURT:  -- is also in draft.

17                MS. JOHNSON:  Thank you.

18                That brings us to briefing in progress.  The Finnegan

19      and Haynes joint motion was heard before Judge Boal this

20      morning, which brings us to the PSC's motion for partial

21      summary judgment on the product-liability claims against Saint

22      Thomas, and I believe Mr. Nolan wishes to be heard on that

23      briefly in light of the Court's recent order addressing Saint

24      Thomas.

25                MR. NOLAN:  Your Honor, George Nolan from Nashville.
```

1          I just wanted to mention briefly that the plaintiffs

2     have filed a motion for partial summary judgment on a legal

3     issue that we think requires decision before these cases are

4     to be tried, and that issue is that we in that motion are

5     asking the Court to find that the Saint Thomas Outpatient

6     Neurosurgical Center meets the statutory definition of a

7     seller under the Tennessee Products Liability Act, and that as

8     such, under Tennessee law, is jointly and severally liable for

9     all harm caused by the product.  In other words, as far as our

10    strict product-liability claim is concerned, that entity would

11    not be able to attribute fault to NECC or any other party

12    within the chain of distribution.

13          It's not fully briefed.  It's not ripe.  It's really

14    in the coming attractions category.  We anticipate asking the

15    Court to entertain argument at the next status conference.

16          The reason I wanted to mention it is that we filed

17    that motion, your Honor, before we had the benefit of this

18    Court's ruling of last week on the trial venue issue, and in

19    that particular ruling, the Court indicated that we are --

20    will be governed by its order of July the 9th with regard to

21    deadlines, and so forth.

22          We talked about some of that today, but one sentence

23    in the Court's July 9th order says that, "The parties shall

24    seek leave of the Court to move for summary judgment," and I

25    just wanted to let the Court know, we were not in any way

1    intending to contravene that order when we filed this

2    particular motion for partial summary judgment, but now that

3    the Court has ruled on the venue issue and we see that phrase

4    in the July 9 order, I just wanted to let the Court know that

5    my family and I desperately hope that you don't find me in

6    contempt for filing that motion, but it's an issue that we

7    felt was important.

8              (Laughter.)

9              THE COURT:  I'll think about it.

10             MR. NOLAN:  Thank you.

11             THE COURT:  Yes.

12             MR. TARDIO:  Your Honor, Chris Tardio for the

13   Tennessee Clinic defendants.

14             We're on the other side of that motion, and Mr. Nolan

15   is right, that didn't seek leave, but, more importantly, it's

16   going to take more than 30 days to brief that motion.  We

17   looked back -- this is, essentially, the same issue that was

18   briefed in the motions to dismiss, except now we have mounds

19   of fact discovery that's going to be signed into.  We will

20   likely file a motion for partial summary judgment which will

21   result in cross-motions on the issue.

22             We agree with the plaintiffs on the motion to dismiss

23   to allow them almost -- more than two months, 70 something

24   days, to respond to our motion to dismiss.  The briefing is

25   going to be equally as involved.  So, we will file a formal

1   motion for extension of time to respond to that -- to the

2   motion for partial summary judgment, but it is not going to be

3   briefed by the next status conference, unless the Court orders

4   it.

5           THE COURT:  No, we don't need to do that, do we?

6           MR. STRANCH:  Your Honor, they've not approached us

7   about that.  We're happy to discuss it with them and see if we

8   can work --

9           THE COURT:  Yes.  Why don't you agree on a date and

10  I'll abide by your agreement.

11          MR. STRANCH:  We'll do that and we'll work with them.

12          MR. TARDIO:  Your Honor, let me add one more point,

13  and it was mentioned earlier, but these two issues intersect

14  in some way.

15          The declaratory judgment action involving Specialty

16  Surgery Center that is now pending in the Middle District of

17  Tennessee -- and it sounds like the plaintiffs here,

18  defendants there, will be moving to transfer that case -- or

19  have that case transferred here.

20          What the Court has done there is ordered that the

21  product-liability legal issue be certified to the Tennessee

22  Supreme Court for a decision on the issue.  So, unless the

23  case -- if the JPML transfers the case here, then we're all

24  going to be here in both -- the SSC product-liability issue

25  and the STOPNC product-liability issue will be pending before

```
 1    this Court.  If the JPML does not transfer the case here, then
 2    in the Middle District of Tennessee, the product-liability
 3    issue is going to be going up to the Tennessee Supreme Court
 4    and here we're going to have competing motions on the same
 5    issue.
 6            So, I suppose that once the JPML does what it does,
 7    we will have some more guidance, but I wanted to give the
 8    Court a little more context to what's happening in the
 9    declaratory judgment action.
10            THE COURT:  The issue of whether the case will be
11    here or there will be entirely in the hands of the JPML?
12            MR. TARDIO:  I haven't seen the motion, but that's
13    what I understand from the --
14            MR. STRANCH:  That is correct, your Honor.
15            THE COURT:  And what is the view of plaintiffs, that
16    this Court is in a better position than the Tennessee Supreme
17    Court to decide this all?
18            MR. STRANCH:  Your Honor, first of all, this is a
19    unique procedure that Tennessee has.  The magistrate judge has
20    suggested that we do a certification and ask the District
21    Court to certify to the Supreme Court.  So, first, the First
22    Federal District Court will have to --
23            THE COURT:  This is the magistrate judge in
24    Tennessee?
25            MR. STRANCH:  That is correct.
```

1           First, the Federal District Court would have to

2   accept the certification and send it to the Supreme Court and

3   then the Supreme Court would have to accept the certification

4   and rule upon it.

5           THE COURT:  Now, in Massachusetts that process would

6   take about three years.

7           MR. STRANCH:  That's about what it's going to take in

8   Tennessee, your Honor.

9           MR. TARDIO:  Well, I don't know that that's the case.

10          MR. STRANCH:  I've got one that's been pending

11  waiting for the Supreme Court to rule whether they're going to

12  take it or not for a couple of months, and we don't have a

13  full Tennessee Supreme Court right now.  It appears that

14  they're not issuing very many opinions until they get filled

15  back up with new judges.  So, it could very well be a very

16  long time before it's decided, and that doesn't even get into

17  the fact that there are factual issues that are not in front

18  of the judge in Tennessee that would need to be put into the

19  record so that it could go up to the Tennessee Supreme Court.

20  This will be a very long process, and that's one of the

21  reasons why we want it here, because the Court already has all

22  the facts --

23          THE COURT:  I thought you asked for certification.  I

24  thought the plaintiffs asked for certification.

25          MR. STRANCH:  We did not ask for certification.  We

1    asked that the Court strike it because it's inappropriate to

2    have a court sitting on an insurance coverage dispute case

3    determining what claims plaintiffs can bring not related to

4    the question of whether there's coverage or not.

5         THE COURT:  Well, I guess you'll duke it out for a

6    while and then it will come to me or not.

7         MR. STRANCH:  That's correct, your Honor.

8         THE COURT:  Thank you.

9         MR. TARDIO:  Thank you, your Honor.

10        THE COURT:  What else?

11        MR. STRANCH:  You Honor, we have one other thing.

12   It's under the briefing in process, but it's not been filed

13   yet.

14        We discovered recently in a deposition of Culclasure

15   that the drug formulary that had been provided to the

16   plaintiffs by the Specialty Surgery Center and Dr. Lister was

17   not actually the drug formulary in effect at the time the

18   shots were given to the plaintiffs and, in fact, Depo Medrol

19   and MPA were not on the drug formulary that was being used by

20   the clinic at the time the shots were given.

21        The changes to that formulary were made in April of

22   2013, long after this became aware of it, long after notice

23   letters had been sent.  And so, we've served some discovery to

24   try to figure out why plaintiffs didn't get this information

25   earlier, and to determine whether there is a problem with the

1    document collection and production that's taken place there or

2    what happened.

3            We're going to be filing a motion to ask to re-depose

4    two of the people now that we have this information that we

5    did not have when we deposed them the first time, and then

6    we're also going to be filing a motion asking that the

7    defendants shorten the period of time to respond to our

8    written discovery because it's narrow and laser targeted at

9    this one issue, and we've met and conferred with the

10   defendants about that and they're going to get back to us as

11   to where they stand, but as it sits today, we're going to have

12   to file a motion on it, and we wanted to let you know that

13   that was coming as well.

14           THE COURT:  Who are the defendants with respect to

15   this issue?

16           MR. STRANCH:  Specialty Surgery Center and Dr.

17   Lister.  They're in Tennessee.  They're the smaller clinic,

18   you know, in the Cookeville/Cumberland area of Tennessee.  Mr.

19   Tardio and his firm also represent that clinic defendant as

20   well.

21           THE COURT:  Okay.  We can't wait.

22           Is there anything else that anyone has, plaintiff or

23   defendant?

24           (No response.)

25           THE COURT:  Well, thank you all.  I will see you,

1    then, on November 12th, I think.

2              MS. JOHNSON:  Thank you, your Honors.

3              THE COURT:  Thank you.

4              (Adjourned, 2:59 p.m.)

5

6                    C E R T I F I C A T E

7         I, Catherine A. Handel, Official Court Reporter of the

8    United States District Court, do hereby certify that the

9    foregoing transcript, from Page 1 to Page 45, constitutes to the

10   best of my skill and ability a true and accurate transcription of

11   my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

12   Re: New England Compounding Pharmacy, Inc., Products Liability

13   Litigation.

14

15   October 28, 2015          /s/Catherine A. Handel
16   Date                      Catherine A. Handel RPR-CM, CRR

17

18

19

20

21

22

23

24

25