1
2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

3

4

IN RE:  NEW ENGLAND COMPOUNDING   )  MDL NO. 13-02419-RWZ
PHARMACY CASES LITIGATION         )
                                  )
                                  )
                                  )
                                  )
                                  )
                                  )

5

6

7

8

9        BEFORE:  THE HONORABLE RYA W. ZOBEL AND
                  THE HONORABLE JENNIFER C. BOAL

10

11

12

13        **MOTION HEARING**
          **AND**
          **STATUS CONFERENCE**

14

15

16

17        John Joseph Moakley United States Courthouse
          Courtroom No. 12
          One Courthouse Way
18        Boston, MA 02210

19

          November 12, 2015
20        2:00 p.m.

21

22        Catherine A. Handel, RPR-CM, CRR
          Official Court Reporter
23        John Joseph Moakley United States Courthouse
          One Courthouse Way, Room 5205
24        Boston, MA 02210
          E-mail: hhcatherine2@yahoo.com

25

```
 1     APPEARANCES:

 2
       For The Plaintiffs:

 3

 4        Hagens, Berman, Sobol, Shapiro LLP, by KRISTEN JOHNSON,
       ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts
 5     02142;

 6        Janet, Jenner & Suggs, LLC, KIMBERLY A. DOUGHERTY, ESQ., 75
       Arlington Street, Suite 500, Boston, Massachusetts 02116;
 7

 8        Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,
       ESQ., and BENJAMIN GASTEL, ESQ., 227 Second Avenue North,
 9     Nashville, Tennessee 37201-1631;

10

          Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
11     Street, Suite 500, Boston, Massachusetts 02114;

12

          Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K.
13     MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, New York
       10013-1413;
14
          Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
15     ESQ., 150 Fourth Avenue North, Suite 1650, Nashville, Tennessee
       37219;
16

17        Leader, Bulso & Nolan, PLC, by GEORGE H. NOLAN, ESQ., 414
       Union Street, Suite 1740, Nashville, Tennessee 37219;
18

19
        FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
20     NECP, INC.:

21
        Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
22     Street, Suite 2400, Boston, Massachusetts 02110-1724;

23

24

25     (Appearances continued on the next page.)
```

```
1      APPEARANCES (Cont'd):
2


3      FOR THE DEFENDANTS:
4

5          Gideon, Cooper & Essary, PLC, by CHRIS J. TARDIO, ESQ., 315
       Deaderick Street, Suite 1100, Nashville, Tennessee 37238;
6

7          Todd & Weld LLP, by CORRINA L. HALE, ESQ., 28 State Street,
       31st Floor, Boston, Massachusetts 02109;
8

9          Fulbright & Jaworski, LLP, by MARCY H. GREER, ESQ., and
       ADAM T. SCHRAMEK, ESQ., 98 San Jacinto Blvd, Suite 1100, Austin,
10     Texas 78701;

11
           Pessin Katz Law, P.A., by GREGORY K. KIRBY, ESQ., 901
12     Dulaney Valley Road, Suite 400, Towson, Maryland 21204;

13
           Law Offices of Jay Blumberg, by JAY J. BLUMBERG, ESQ., 158
14     Delaware Street, P.O. Box 68, Woodbury, New Jersey 08096;

15
           CAPPLIS, CONNORS & CARROLL, PC, by JESSICA L. CUMMINGS,
16     ESQ., 18 Tremont Street, Suite 220, Boston, Massachusetts 02108.

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2        (The following proceedings were held in open court before

 3   the Honorable Rya W. Zobel, United States District Court Judge,

 4   and the Honorable Jennifer C. Boal, Magistrate Judge, United

 5   States District Court, District of Massachusetts, at the John J.

 6   Moakley United States Courthouse, One Courthouse Way, Boston,

 7   Massachusetts, on November 12, 2015.)

 8             THE COURT:  Good afternoon.  Please be seated.

 9             COURTROOM DEPUTY CLERK URSO:  This is In Re:  New

10   England Compounding.  It's MD-13-2419.

11             THE COURT:  All right.  Any reason not to start with

12   your, as usual, fantastic agenda?

13             MS. JOHNSON:  Thank you, your Honor.  No, we would

14   suggest that we begin there.

15             THE COURT:  Okay.

16             MS. JOHNSON:  The only argument we have up for oral

17   argument today is the plaintiff Wayne Reed's motion to set the

18   case for trial and, if the Court would indulge me, I would

19   like to give a background of where we are in Bellwether and

20   trial schedules that I think may provide some context.

21             THE COURT:  Let me remember what the issue is.  As I

22   recall, he either was dying or had died and he wanted to have

23   an earlier trial, and we put it off until we decided whether

24   we had jurisdiction, which I've now decided we do.

25             So, the question, I gather, is whether he fits into
```

1    any kind of a schedule that is based on both parties

2    submitting cases to be tried in the early trials; is that

3    correct?

4           MS. JOHNSON:  I'll let Mr. Nolan speak to whether he

5    agrees with that, but in terms of the context, your Honor,

6    there are, you're correct, competing proposed Bellwether trial

7    schedules that have been filed by the plaintiffs and

8    defendants.  Those are ECF 2341 and 2342.  That's one issue

9    that's before the Court that would relate to this type of

10   scheduling matter.

11          Another issue is within those Bellwether trial

12   submissions, the parties propose different paths forward.  The

13   defendants propose a posture that includes strikes and the

14   ability to strike a certain number of the other side's cases.

15   Plaintiffs propose decreasing the size of the pool of cases,

16   but without formal strikes.

17          Thirdly, we also have -- the defendants have filed a

18   notice of strikes.  They have identified cases that they wish

19   to strike from that Bellwether pool.  I understand that those

20   strikes include Plaintiff Reed as one of the defendants'

21   strikes.  So, with that background, I would like to hand it to

22   Mr. Nolan.

23          THE COURT:  So, the essential issue is whether this

24   particular case should remain in whatever ultimately results

25   for the Bellwether trials, the list that ultimately will be

1    the Bellwether trials?

2         MS. JOHNSON:  I think that is certainly one issue,

3    your Honor.  I think a second issue that Mr. Nolan may wish to

4    speak to is whether independently of that Bellwether

5    framework, there would be a reason to mark out Mr. Reed's case

6    for trial.

7         THE COURT:  Mr. Nolan.

8         MR. NOLAN:  Thank you, your Honor.

9         Your Honor, Wayne Reed is a gentleman in Nashville

10   who, unfortunately, suffers from the disease known as ALS or

11   Lou Gehrig's disease.

12        THE COURT:  He has not yet died?

13        MR. NOLAN:  He has not yet died.

14        And his wife, Diana Reed, injured her neck helping

15   him as his primary caregiver.  He'll wheelchair bound.  And as

16   a result of that injury, she sought treatment at the Saint

17   Thomas Out-Patient Neurosurgical Center where she received the

18   contaminated epidural steroid injections.  So, his wife -- and

19   they had been married for 36 years -- died at age 56 and left

20   Mr. Reed wheelchair bound, living alone, and now attempting to

21   fend for himself, and not only did he depend on her as his

22   primary caregiver, but he also depended on her income to

23   supplement his very modest income.

24        So, now, this gentleman, your Honor, is struggling at

25   home, alone and running out of money, which is why we think

1    that justice requires that his case be set for trial as soon

2    as possible.

3           There's another problem, which is that the nature of

4    his neurological disorder affects his vocal chords.  So, he

5    does not speak normally now, and his vocal abilities are

6    continuing to deteriorate.  So, at some point he will be

7    unable to talk about his late wife in a courtroom, and it's

8    for that reason, your Honor, that we suggest that justice

9    requires that his case be one of the Bellwether cases that is

10   designated early for trial.

11          Now, the Court is correct in recalling that when we

12   were here in June, I attempted to bring this motion up and the

13   Court said that we really couldn't address this motion until

14   the Court decided where the cases were going to be tried.

15          Now they're going to be tried here, and the parties

16   disagree across the vee about whether allowing strikes is

17   appropriate under these particular circumstances.

18          Your Honor, another important point is that early on

19   in this litigation, all the parties agree that the Wayne Reed

20   case would be treated as the lead case from a pleading

21   standpoint, and by that I mean that as far as the answers that

22   these defendants had filed are concerned, they answered the

23   master complaint, which was a national complaint, and we all

24   agree that we would pick one Tennessee case and they would

25   file an answer to this Tennessee-specific allegations in that

1    complaint and we agreed that that would be Mr. Reed's case.

2          So, it should come as no surprise to my adversaries

3    that we want his case to proceed first.  There are enormous

4    equitable reasons for it to do so, and it's our very

5    respectful position, your Honor, that at some point the

6    process must yield to justice and this is one of those points.

7          Now, my adversaries have basically suggested that if

8    we're that concerned about Mr. Reed, we should simply take his

9    videotape deposition and be content to wait for whatever

10   indefinite period of time, but as this Court has observed in

11   one of its previous orders, the Court has a distaste for

12   videotape depositions, and we agree with that because there's

13   just no substitute for having live witnesses at trial.

14         THE COURT:  Well, let me ask you.  Even under the

15   best of circumstances, no trial is going to occur until

16   sometime maybe April, May, June, right?

17         MR. NOLAN:  That's correct.

18         THE COURT:  Would it not be prudent to have his

19   videotape deposition done, in any event?

20         MR. NOLAN:  That may be prudent, your Honor.  That

21   may be prudent.  I would agree with that, but --

22         THE COURT:  So, that's not an element that we really

23   need to consider.  It may have to be done regardless.

24         MR. NOLAN:  It might have to be done regardless and

25   we're not opposed to that, but we would suggest that having

1    his ability to testify live -- a videotape deposition would be

2    an insufficient substitute for that.

3         THE COURT:  When is it contemplated that the

4    bankruptcy pot is going to start distributing?  I mean, that

5    pot is independent of his claim against the Tennessee

6    defendants, is it not?

7         MR. ELLIS:  Your Honor, Rick Ellis.

8         We are hopeful that the first letters approving

9    claims are going to be able to go out, hopefully, prior to

10   Christmas.  If that's true, there are some lien issues

11   involved with Medicare, private liens.  We're working on

12   those.  If we can get those resolved quickly, there is a

13   possibility that the first payments could conceivably go out

14   maybe March of next year potentially, but I also want to add,

15   that's not going to be large sums.  It's not going to be large

16   sums from the national settlement.

17        THE COURT:  What is a "not large sum" for somebody

18   like Reed?  Just a broad estimate.

19        MR. ELLIS:  Well, those have not been finalized yet,

20   but we do have some estimates.  I'm not exactly sure what that

21   category -- so, potentially 175, 200, in that range, with some

22   flexibility.

23        THE COURT:  Okay.

24        MR. NOLAN:  Your Honor, it's been now more than three

25   years since Ms. Reed passed, and while I appreciate Mr. Ellis'

1  efforts to move along the bankruptcy pot distribution process

2  very much, I have not heard a firm date yet as to when those

3  funds would actually be released.  So, my job as an advocate

4  is to try to move his case along as quickly as I can.

5           THE COURT:  I understand.

6           MR. NOLAN:  I think it's also important to note that

7  part of the primary resistance that we received from the

8  defendants in setting his case for trial is the notion that

9  his circumstances are so sympathetic, that his case is an

10  outlier and would not have predictive value and, therefore, is

11  not appropriate for a Bellwether trial.  Here's why I disagree

12  with that:

13           The problem with this litigation --

14           THE COURT:  Why does one at the trial need to get

15  into this very sympathetic stuff?  I mean, it will be her

16  claim -- or now his claim as administrator, or whatever he is,

17  and she is like other people who were injured by the drug.  I

18  mean, why does the case have to be tried as super sympathetic

19  as you're giving it to me in order to get a trial date?

20           MR. NOLAN:  Well, your Honor, one of the elements of

21  damages that he would be entitled to recover is the value of

22  the lost services of his wife.  So, the jury would have to

23  know in order to quantify his compensatory damages about Mr.

24  Reed's circumstances and --

25           THE COURT:  Well, then he is an outlier.  That makes

```
1    him an outlier in comparison to other cases.
2              MR. NOLAN:  I suggest that that's not really the
3    fundamental problem, and here's why:
4              The parties in this case -- their disagreement is not
5    over how to value cases.  The problem is not what various
6    death cases might be worth or what fungal meningitis cases
7    might be worth.  The problem is that the parties have a
8    fundamental disagreement, different view, about how liability
9    should be allocated in this situation, and that question isn't
10   a function of compensatory damages.  It's a function of what
11   the proof is on the liability issues and it will also be a
12   function of certain rulings this Court may make on certain
13   dispositive motions.  So, the Wayne Reed case will have just
14   as much predictive value on issues of how legal responsibility
15   should be allocated as any other case.  Now, out of --
16             THE COURT:  The defendants don't agree with that?
17             MR. NOLAN:  The defendants do not agree with that.
18             THE COURT:  Okay.
19             MR. NOLAN:  And I would acknowledge that in terms of
20   severity of damages is concerned, the Wayne Reed case is at
21   the top end of the scale, but that's not what's holding up the
22   parties' ability to get a resolution.  What's holding that up
23   is the parties are -- they just view from completely different
24   prisms the basic liability issues and those issues can be
25   sorted out in Wayne Reed's case as well as any other.
```

```
 1              THE COURT:  Why does that apply to Wayne Reed's case
 2   more than to any other case?
 3              MR. NOLAN:  Why does that apply more to Wayne Reed's
 4   case than to any other case?
 5              THE COURT:  Yes.  Because of the higher damages, or
 6   what?
 7              MR. NOLAN:  Well, I think the liability issues in
 8   Wayne Reed's case are the same as any other case.  They're the
 9   same as any other case.  So, his case --
10              THE COURT:  So, the defendants have a substantial
11   disagreement concerning the responsibility, I guess, of the
12   defendants with -- amongst themselves -- or I'm not exactly
13   sure what you're saying, but from what you said before, it
14   doesn't sound to me as though Wayne Reed is any different from
15   anybody else --
16              MR. NOLAN:  You're exactly --
17              THE COURT:  -- as to the disagreement.
18              MR. NOLAN:  You're exactly right, your Honor.  Wayne
19   Reed's case is the same as to that disagreement.  So, his case
20   at trial would have the same degree of predictive value as any
21   other potential Bellwether case would have.
22              So, if the goal is try a case that isn't truly worth
23   trying so that the parties can see how a jury sorts out issues
24   such as comparative fault --
25              THE COURT:  Okay.
```

```
 1              MR. NOLAN:  -- Wayne Reed's case is good as any other.
 2              MR. STRANCH:  Your Honor, there's one thing I would
 3    like to say.  I'd be remiss if I didn't mention that the other
 4    plaintiffs throughout this litigation also have very sad
 5    stories.  There are also sympathetic plaintiffs well beyond
 6    Mr. Reed, families that were torn apart as a result of this,
 7    people that lost their homes.  And so, it's not an outlier
 8    because he's got a sad situation, as has been suggested to the
 9    Court, and I just wanted to make the point that all --
10              THE COURT:  Do the plaintiffs object to Reed going
11    first?
12              MR. STRANCH:  We do not object to the Reed case going
13    first.
14              THE COURT:  Okay.  Let me -- wait one second.  Lisa.
15              (Discussion off the record at the Bench.)
16              THE COURT:  I have a jury out, which has just
17    announced it has a verdict.  So, I think what we should do --
18    I told them that there would be a lot of lawyers here and that
19    we would have to vacate the jury box and -- but, in any event,
20    let us hear from Tennessee and then we'll...
21              MR. TARDIO:  Thank you, your Honor.  Chris --
22              THE COURT:  Who is going to speak?  I think there are
23    some --
24              MS. GREER:  Mr. Tardio can go first.
25              THE COURT:  Whom do you represent?
```

```
 1          MR. TARDIO:  I represent the Tennessee Clinic

 2   defendants, your Honor.

 3          THE COURT:  And you are?

 4          MR. TARDIO:  Chris Tardio, T-a-r-d-i-o.

 5          Let me just make a few points, because I know the

 6   Court has an another matter outside the door.

 7          But to address what Mr. Nolan said, first off, the

 8   Court has already put in place a process in an order issued in

 9   July.  The Court has already decided what the Bellwether

10   process is going to be.

11          So, I think, if I understand what the plaintiffs are

12   proposing, they're proposing that the Court set aside the

13   process was put in place and allow the Reed case to move to

14   the front of the line.

15          THE COURT:  I think what the plaintiffs are proposing

16   is to not eliminate Reed's case.  Reed would be in the mix, in

17   any event, subject to being eliminated by defendants, and I

18   think what they're asking is not to have him eliminated.

19          MR. TARDIO:  Well, that would require the Court to

20   set aside the process put in place in July that explicitly

21   allows strikes on either side.

22          To the extent that -- so, in our view, this issue has

23   already been decided.  The Court has already put in place a

24   process that allows each side to strike certain cases, and

25   there's good policy behind that, because it strikes cases at
```

1     the polar opposite ends of the spectrum and gives us a

2     representative case.

3            So, if the Court's goal -- and I believe it is, but

4     if the Court -- if the Court's goal is to put in place a

5     process that identifies a representative case to be tried in

6     early or mid 2016, the Reed case is not a representative case,

7     and there's no reason to depart from the process --

8            THE COURT:  Why is it not representative?

9            MR. TARDIO:  Well, Ms. Reed is younger than the

10    average plaintiff.  She was married.  The unique circumstances

11    that we've talked about here make it unique.  She was making

12    more money than the average plaintiff.  All of these elements

13    put her outside the middle of the spectrum and it makes her an

14    outlier.

15           THE COURT:  Why do we have to have a middle of the

16    spectrum?  Why can't we have an outlier for plaintiffs and an

17    outlier for defendants?

18           MR. TARDIO:  Because I don't think that achieves the

19    purpose behind trying a representative case, to realize a case

20    -- or to try a case and get a verdict that allows the parties

21    to predict what will happen in the next 150 cases or if you

22    want to apply it across the entire MDL to see what's going to

23    happen in the next 700 cases.  It doesn't -- trying an

24    unrepresentative or nonrepresentative case does not allow the

25    parties to take that verdict and predict what's going to

1    happen down the road.

2            THE COURT:  Okay.

3            MR. TARDIO:  Thank you, your Honor.

4            MS. GREER:  Your Honor, Marcy Greer for the Saint

5    Thomas Entities.  Just a couple of quick points to add to Mr.

6    Tardio's.

7            You asked how is this an outlier versus a

8    representative case.  It's an incredibly sympathetic case.  I

9    mean, these facts are going to get before the jury and Mr.

10   Reed's condition.  It's going to overpower the law in this

11   case and it's going to give a result, most likely, that is not

12   predictive.

13           In addition, she was injected with cervical

14   injections, which is very different from most of the

15   plaintiffs in these cases who had epidural injections.  So,

16   there are factors that we haven't even had a chance to go into

17   because we thought this motion had been decided and the Court

18   had set up strikes and we actually struck this case.  We

19   exercised our strikes before the deadline and struck this case

20   and another case.  So, they're basically asking you to

21   reconsider the process, the strikes, and everything, and put

22   this case to the front of the line and it's going to derail

23   all of the attention from all of the other cases.

24           As Mr. Stranch pointed out, there are a lot

25   sympathetic plaintiffs here and they're all having to wait,

1    and the fact that they've chosen to put one forward in favor

2    of another is not relevant to whether or not they're

3    representative, and that's the real goal here.  We've really

4    got to get representative cases to trial, and we're willing to

5    try cases.  You know, if that's what it has to be to get this

6    information, we're willing to do it.

7            We do see the allocation in the fault and the

8    liability issues very differently, but the only way to know

9    how those issues get tried and what juries will do with that

10   information and what the law is, is to have cases that are in

11   the middle of the road.  That's the whole reason that we've

12   laid out this process that Judge Fallen has put forward as

13   being the way to get to representative cases because we want

14   to avoid the situation where all the time has been wasted.  We

15   don't have a lot of time.

16           At this rate, you know, March does not seem realistic

17   for a single trial, and I think your Honor put your finger on

18   it.  I mean, we need to take a deposition of Mr. Reed to

19   preserve his testimony and then figure out what makes sense

20   for the entire litigation, all of the plaintiffs in this case.

21           THE COURT:  All right.  Let me take, I'm sorry, a

22   brief recess here so I think take this jury's verdict and then

23   we'll resume.

24           (Recess taken.)

25           THE COURT:  Thank you for your accommodation.  The

1   jury thanks you.

2          Are we done with Mr. Reed or does anyone wish to add

3   anything to the arguments for Mr. Reed?

4          MR. STRANCH:  Your Honor, if I may briefly.

5          THE COURT:  Yes.

6          MR. STRANCH:  This will tie into some issues that we

7   have kind of touched on now and will touch on later or we may

8   just want to deal with them now, which is the competing

9   proposals for the Bellwether process.

10         You heard from the defense lawyers a minute ago that,

11  you know, the goal is to get a perfectly average middle-of-

12  the-road case, and the problem with that, your Honor, is --

13  for example, the defendants' picks that they have put before

14  the Court as their Bellwether selections, pretty much all of

15  them, according to the defendants, have significant notice

16  problems under Tennessee law that would prohibit them if the

17  defendants are right from ever seeing a jury, which would --

18         THE COURT:  I thought this was for trials.

19         MR. STRANCH:  This --

20         THE COURT:  Why would we have cases that aren't going

21  to go trial?

22         MR. STRANCH:  Well, if the defendants are right about

23  the notice issues, then a bunch of those cases would never

24  make it to trial, and we would submit to the Court that that

25  would make those cases outliers, and that's one of the reasons

```
 1    why we've made our Bellwether proposal that we did to the
 2    Court, which takes out the strikes and it narrows the pool
 3    down to certain types of cases that will be most instructive
 4    for the parties.
 5              THE COURT:  Does that suggest that the protocol that
 6    we had originally put out is inadequate?
 7              MR. STRANCH:  The way the protocol is being used, it
 8    would be inadequate.  It would leave us with no death cases
 9    and no fungal infection cases being tried for a Bellwether
10    process, possibly.
11              THE COURT:  So, what do counsel suggest I should do?
12              MR. STRANCH:  We've proposed to the Court in our
13    Bellwether proposal that we narrow the cases to four from each
14    side and that there be no strikes and that those four cases
15    would be basically the death or serious fungal -- or fungal
16    infection cases, and then we would work up those cases, have
17    them trial ready on the same schedule that the Court has
18    already suggested, and the parties would then propose to the
19    Court of these eight cases, these are the ones that we think
20    should be tried and why we think they would be the most
21    helpful as a Bellwether, and then the Court would select who
22    goes to trial at that time, and then there would be a second
23    Bellwether pool following behind that that would be for the
24    non-fungal infection, the lesser damage cases, basically,
25    because what's really causing a problem here is the question
```

1    of, Is big Saint Thomas going to be vicariously liable or not?

2    Can we bring a products claim here or not?  And once those

3    questions are answered --

4              THE COURT:  But does it take a trial to answer those?

5              MR. STRANCH:  Well, we filed a partial motion for

6    summary judgment on a product seller issue which we think if

7    the Court grants that would help in valuing these cases

8    dramatically, but we may --

9              THE COURT:  That's not ripe for decision yet?

10             MR. STRANCH:  That is not yet ripe for decision, but

11   the position we are in, though, your Honor, is -- you know,

12   some of the issues can't be worked out pretrial, such as was

13   big Saint Thomas' conduct such that they're vicariously liable

14   for what happened at STOPNC.

15             THE COURT:  And that's a purely legal question raised

16   in the summary judgment motion?

17             MR. STRANCH:  No, your Honor.  That's something that

18   a jury is going to have to decide based upon the facts.

19             THE COURT:  Ms. Greer.

20             MS. GREER:  Your Honor, actually, the agency issues

21   are going to be raised on summary judgment by us and we

22   believe they are -- there are some -- a lot of issues that can

23   be narrowed down pretrial as well, but the real point here --

24   and I'd like to take a second to just context this as to where

25   we were.

1          On July 9th and then again in October, the Court has

2     issued orders deciding the Bellwether process.  At one of the

3     hearings we were asked to go back and come up with a schedule

4     based on the Bellwether, and what the PSC came back with was a

5     reconsideration of the entire process to move away from what

6     the Court has ordered in the two orders and to basically do

7     away with strikes, set the cases for trial, et cetera, in this

8     sequence.

9          We believe that the Court has spent a lot of time

10    looking at these issues and the process that was adopted in

11    those two orders makes sense and needs to be followed, and as

12    to --

13         THE COURT:  Excuse me.  I can't say that it was such

14    a -- I mean, if what I hear now is the case, that the

15    defendants are putting into the Bellwether process cases that

16    are either not going to go to trial or that are certainly not

17    representative of the cases, then that doesn't make sense, nor

18    does it make sense if the plaintiffs were to do the same.

19         MS. GREER:  Well, your Honor, I don't think that's a

20    fair characterization at all.  First of all, I'm not sure

21    where the statement that there would be no infection cases if

22    we're allowed to exercise our strikes would be.  That's not

23    the case.

24         The death cases are 12 percent of the census of

25    Tennessee plaintiffs.  They are a small minority.  There's a

1    huge percentage of fear cases that they don't want to see the

2    light of day in a courtroom where there's no physical injury,

3    but the fear that something could happen in the future.  So,

4    we are trying to get more towards the middle.

5         And as to the notice issues, those issues were

6    specifically put off at the plaintiffs' request until the

7    individual cases rather than trying to address them on a

8    global basis.  So, there are notice issues that we have

9    raised.  We don't know how they're going to come out.  The

10   Court has not ruled on those notice issues.

11        We did not put cases into the Bellwethers that we

12   think we're going to get out on notice issues.  We put cases

13   into the Bellwethers, the ones that we chose, and we spent a

14   lot of time looking at this, that we thought would be

15   representative and fair and be down the middle.  So that if

16   there are verdicts, we would be in a position to make some

17   values.  With every verdict you have to make adjustments.  You

18   have to look at it, because each case is somewhat different,

19   but we were looking for mainstream cases so that the parties

20   could get towards the middle, and that's the process that the

21   Court put into place and we are simply trying to follow.

22        THE COURT:  Okay.  So, the question before me today

23   is whether Mr. Reed goes on to the list by hook or crook, or

24   otherwise, right?

25        MR. STRANCH:  Fair enough, your Honor.

```
 1              THE COURT:  Apart from that, there appears to be some
 2      considerable difference between the parties as to what that
 3      process is all about and how it should be executed, right?
 4              As to the second, do counsel have a suggestion as to
 5      how I should do that other than, more or less, arbitrarily?
 6              MR. STRANCH:  Yes, your Honor.  We've proposed that
 7      in our scheduling --
 8              THE COURT:  Just four.
 9              MR. STRANCH:  -- that we filed, that each side would
10      pick four.  There would be no strikes.  We would work those
11      eight cases up.  We would present to the Court arguments as to
12      why we think which case should be tried, and the Court would
13      then select which ones go to trial, and that is a manageable
14      number of cases to get ready for the end of March, early April
15      trial date, and it would also let us focus on the cases that
16      we believe will be most instructive in setting a value and
17      valuing claims and also determining whether there is liability
18      or not.
19              THE COURT:  And you want to go forward with what you
20      perceive to be the existing protocol?
21              MS. GREER:  That's correct, your Honor, and we need
22      -- I mean, if you just look at what's happening now, we have
23      not had a single plaintiff's deposition yet.  We've been
24      trying to schedule those.  There's been delays with that.
25      Expert reports have not been designated on a common level,
```

1   much less a specific level.  I mean, March, April is going to

2   be very difficult to do.

3          Our proposal is to get to four Bellwethers and finish

4   working them up for trial, and I think that can be done more

5   efficiently, but the process is important because it should

6   get to those --

7          THE COURT:  Okay.  So, I need to pick whether the

8   process or amended process that the plaintiffs suggest, four

9   from each side, no strikes, and you say that we already have a

10  process and I should stick with that?

11         MS. GREER:  Yes, your Honor.

12         THE COURT:  Okay.  So, that's what I have to do.

13         Anybody want to submit anything else to me so as to

14  focus me further?

15         (No response.)

16         THE COURT:  So, I --

17         MS. JOHNSON:  Your Honor, the plaintiffs are content

18  with the submission that we have made so far.

19         THE COURT:  Okay.  And defendants as well?

20         MS. GREER:  Yes, your Honor.  We've responded to that.

21         MS. JOHNSON:  I will say this, your Honor, if I may.

22  I think everyone is in agreement that the goal here is to try

23  the cases that will help resolve the MDL.  From the PSC's

24  perspective, that means trying death cases and fungal

25  infection cases.  We don't see trying fear cases as driving

1    resolution of this MDL.  It may eliminate some swath of cases,

2    but it's not really going to bring us to where we need to be.

3           I also observed -- and I think having the jury come

4    in the middle of the hearing had me focus on this.  One of the

5    questions that I hear the Court asking is, how are we going to

6    make sure that the verdict is actually predictive and helpful

7    across the swath of cases, and I -- it occurs to me that one

8    conversation I expect that the parties and also the Court will

9    have, probably ongoing between now and the spring, is what the

10   verdict slip actually looks like and if there are ways to

11   structure that that make particular outcomes more clear or

12   have more bearing on certain types of cases.

13          So, it is not as though simply picking the cases is

14   determinative of the outcome.  There are also ways to

15   structure that verdict such that you can elicit information

16   that may be helpful across the board.

17          THE COURT:  I'm not exactly sure I follow the verdict

18   slip issue, but I gather you're concerned.

19          Okay.  Thank you very much.

20          So, now we go to Part B.

21          MS. JOHNSON:  Yes, your Honor.  Mr. Gottfried will

22   address the status of the bankruptcy.

23          MR. GOTTFRIED:  Good afternoon, your Honor.  I just

24   wanted to give you a brief status report.

25          The post confirmation officer has completed his

1  review of the non-tort unsecured claims.  He has filed with

2  the bankruptcy court notice of which claims are going to be

3  allowed, which claims are being disallowed pursuant to the

4  statute.

5           He has filed three omnibus objections to categories

6  of claims.  Those have all now been set for hearing by Judge

7  Boroff.  There'll be one group that will be heard on December

8  16th of this year, and the other two omnibus motions will be

9  heard on January 6th of next year.  Those involve things like

10  the indemnity and contribution claims, the medical liens

11  asserted against NECC, the late-filed claims, release claims

12  and sufficient document claims.  So, the process is moving

13  forward in an expeditious and appropriate manner.

14           THE COURT:  Good.  Thank you.

15           MS. JOHNSON:  No. 3, the status of the insurance

16  declaratory judgment actions.  Mr. Stranch will address what's

17  been going on in Tennessee.

18           MR. STRANCH:  Your Honor, the magistrate judge had

19  ruled last time that the question of whether a products claim

20  can be brought against a doctor or a clinic, to certify that

21  question to the Tennessee Supreme Court.  We appealed that

22  order to the district court judge who upheld the magistrate's

23  order.

24           So, the process going forward is in -- by December

25  we're going to have either an agreement on the certification

1    that's going to go up to the Court or competing proposals, and

2    then those will be filed with the Tennessee Supreme Court.

3          THE COURT:  Does that court take as long as our

4    Supreme Court Judicial Court to decide cases?

5          MR. STRANCH:  Your Honor, it may even take longer

6    because we don't even have a full court right now.

7          And one thing that is key, though, is they don't have

8    to take the question just because it's certified, and we just

9    had a question that was certified to the Tennessee Supreme

10   Court and we waited about six months to get a decline from the

11   Supreme Court.  They do not grant those as a normal course to

12   take them.  They're very selective.

13         And so, we may get six months down the road and the

14   Court may deny it.  We may get a year down the road and they

15   may deny it, and that's just where we stand.

16         Magistrate Brown indicated over the phone that if the

17   Supreme Court did deny the certification, he would be inclined

18   to stay the case until after the MDL has resolved itself, but

19   it's not -- but he was also very clear that he was just

20   thinking out loud about that.

21         THE COURT:  That's always a mistake.

22         (Laughter.)

23         MR. STRANCH:  So, that's the status of the

24   declaratory judgment action.

25         THE COURT:  Thank you.

1          MS. JOHNSON:  That brings us to No. 4, the status of

2     discovery.  We wanted to bring to the Court's attention that

3     we expect to have filed shortly an agreed-upon motion to

4     extend the common discovery deadlines in the Premier New

5     Jersey cases.  I understand that counsel has, I believe,

6     agreed to an extension of about 60 days of the common

7     discovery deadline.  That brings us to -- I think January 22nd

8     is the date they're considering.  That would bring the Premier

9     common discovery deadline in line with the Box Hill common

10    discovery deadline.  So, that would effectively shrink us from

11    three tracks to two tracks.  I expect that to be filed this

12    week, but, in any event, before the next status conference.

13         In terms of Court rulings, I think it's worth

14    mentioning -- I won't drag anyone through all eight orders

15    that have been issued.  We will all say thank you.  That was a

16    tremendous amount of work done by this Court in the last 30

17    days, primarily by Judge Boal, and we appreciate that.

18         I will mention one thing that happened this week, as

19    it is the most current, which is there were motions to prevent

20    the deposition of certain NECC employees from going forward,

21    and the short-term resolution of that is that the deposition

22    did not go forward.  Two depositions of both Connolly and

23    Notarianni have been -- I'm not sure they're formally stayed,

24    but have been put off, in any event, according to the Court's

25    order.

```
1              And we do understand -- the Court may find this
2    interesting.  We do understand from -- well, we understand
3    that both of those employees, one of whom is an NECC employee
4    and one of whom is a medical sales management sales trainer,
5    are not expected to take the Fifth Amendment, which I think
6    the government made clear in the papers briefing us.
7              THE COURT:  So, why were they -- the depositions
8    postponed?  You mean, they apparently have nothing to do with
9    the criminal case or do they?
10             MS. JOHNSON:  The U.S. Attorney's Office asked that
11   the deposition be stayed, I think was their formal term.
12             That brings us to the status of the litigation track,
13   your Honor, No. 5, and the Court entered yesterday or this
14   morning -- I've forgotten -- an order regarding the procedure
15   for --
16             THE COURT:  Day before yesterday.
17             MS. JOHNSON:  Day before yesterday.  Thank you, your
18   Honor.
19             (Discussion off the record at the Bench.)
20             THE COURT:  Well, I did it two days ago.
21             COURTROOM DEPUTY CLERK URSO:  Right.
22             THE COURT:  Ms. Urso just did it today.
23             MS. JOHNSON:  Yes.  Thanks to both of you.
24             We did have one question about that, your Honor.  The
25   Court had adjusted the dates in that schedule, but it appears
```

```
1    that there is a date in the second paragraph where the date
2    given is November 7th, which has passed.  So, we would ask
3    that the Court, likewise, adjust that November 7th date to the
4    November 19th, as the Court had done above.  I have a copy of --
5              THE COURT:  Where is it?
6              COURTROOM DEPUTY CLERK URSO:  I have it, too.  I have
7    the original, actually.  The Judge is looking at it.
8              THE COURT:  This looks like the original.
9              COURTROOM DEPUTY CLERK URSO:  It is.  She's asking
10   for --
11             THE COURT:  Oh, November 7th.
12             COURTROOM DEPUTY CLERK URSO:  To do it to the 19th,
13   like you did up here.
14             THE COURT:  Okay.  Done.
15             MS. JOHNSON:  Thank you, your Honor.  And the PSC
16   will be sure to circulate that to all plaintiffs' counsel
17   promptly.
18             COURTROOM DEPUTY CLERK URSO:  I'm not going to
19   re-enter the order again.
20             MS. JOHNSON:  I don't think that's -- I don't think
21   that's necessary.
22             COURTROOM DEPUTY CLERK URSO:  Okay.
23             MS. JOHNSON:  Thank you.
24             And then I think, your Honor, we've addressed Items
25   5-B, C and D in the context of addressing the Reed motion,
```

```
 1    unless counsel for either party feels differently.

 2              THE COURT:  No?  Okay.  Then we go to E, right?

 3              MS. JOHNSON:  Yes.  And this is...

 4              MR. STRANCH:  Your Honor --

 5              THE COURT:  What's the issue with respect to this?

 6              MR. STRANCH:  As a bit of quick background, there are

 7    two clinics -- or three clinics in Tennessee.  The majority of

 8    the cases are against the Saint Thomas Clinic.  There is a

 9    smaller clinic called Specialty Surgery Center that's in east

10    Tennessee that also has cases against them.  This relates only

11    to the Specialty Surgery Center, which is the other clinic in

12    Tennessee.

13              They had a business manager Calisher that we learned

14    about once depositions started this past fall -- I mean, this

15    past winter, and we've moved to add them as a defendant based

16    upon what discovery has shown.

17              Mr. Moran who is representing Calisher has -- is

18    speaking with his client about whether they're going to oppose

19    the motion to amend and file on that or whether they're going

20    to allow it and then just file a Rule 12 motion after that.

21    The time has not come to answer that, but that's what's going

22    on there, and we have done some discovery of Calisher itself

23    already.  So, it should not slow down the schedule that

24    Specialty Surgery is on.

25              THE COURT:  Okay.
```

1          MR. STRANCH:  And that's --

2          THE COURT:  So, at the moment, there's nothing to do.

3          MR. STRANCH:  At the moment, there's nothing to do,

4     but that is coming, your Honor.

5          THE COURT:  Well, it may be by agreement.

6          MR. STRANCH:  Hopefully so, your Honor.

7          MS. JOHNSON:  And No. 6, your Honor.  I wanted to

8     give the Court an update on proceedings in Michigan state

9     court.

10          We're pleased to announce that settlement has been

11     reached in the Michigan Pain -- MPS case, which is Michigan

12     Pain Specialists.  That is a class settlement for $10.5

13     million.  The Court has entered preliminary approval already.

14     The final approval hearing is set for March 26th, and we will

15     update the Court about that as it goes on.

16          The second update is that a northern Michigan jury in

17     Travers City, Michigan found a northern Michigan pain clinic

18     called Neuromuscular Rehabilitation Center, did not violate

19     the standard of care in their community on medical malpractice

20     claim.  That case and verdict did not address product

21     liability claims.  It also did not include allegations of fake

22     names, such as Mickey Mouse, and I understand there is either

23     an appeal in process or an expected appeal from that verdict.

24          THE COURT:  But that matter is not here?

25          MS. JOHNSON:  That matter is not, your Honor.  We

```
 1    only thought by -- as we were updating the Court on the MPS
 2    settlement -- and you may recall -- actually, forgive me, your
 3    Honor.  I forget whether that was when the case was still with
 4    Judge Saylor, but at a point in time MPS participated in a
 5    mediation program here and we were not able to resolve things
 6    here.  So, we wanted to inform the Court that that resolution
 7    has been reached elsewhere.
 8                THE COURT:  Thank you.  Pro se.
 9                MS. MARTIN:  Thank you, your Honor.
10                There is no news from the pro se world this month.
11    So, that is the entire report.
12                THE COURT:  Thank you.
13                MS. JOHNSON:  I do think Ms. Dougherty wanted to
14    speak about some pro se work in the clinic settlements.
15                MS. DOUGHERTY:  Good afternoon, your Honor.
16                I just wanted to update you with respect to the pro
17    se facilitators that were appointed to assist with the clinic
18    settlements.
19                We had the generosity of Professor Kevin Outterson
20    from Boston University and two students, Louis Osterman and
21    Christian Rogerson, who helped many of the victims of this
22    tragedy who had claims against High Point, Inspira and Insight
23    who settled, work through the claim forms, get those filed,
24    and ensure that they were able to make a valid claim.
25                So, we appreciate all the work that was done by
```

```
1   Boston University students and Professor Outterson.  It was

2   really -- they really did an excellent job and were really

3   helpful to a lot of pro se claimants out there.  So, we just

4   want to thank them publicly.

5               THE COURT:  And I bet they learned a lot.

6               MS. DOUGHERTY:  Yes, absolutely.

7               THE COURT:  Thank you.

8               MS. DOUGHERTY:  You're welcome.

9               THE COURT:  So, the next scheduled is December 17th

10  and January 14 and 15, and I think that's okay.

11              COURTROOM DEPUTY CLERK URSO:  December 17th.  And

12  then January 14?

13              THE COURT:  Yes.  January 14th For us.  January 15th

14  for Judge Boal.

15              COURTROOM DEPUTY CLERK URSO:  Yes.

16              THE COURT:  Okay.  So, those are the dates.

17              MAGISTRATE JUDGE BOAL:  I can also add on December

18  17th a morning session at 11:30.

19              MS. JOHNSON:  Thank you, your Honor.

20              Would it be possible to schedule the February

21  conference at this time?

22              COURTROOM DEPUTY CLERK URSO:  Yes.

23              MS. JOHNSON:  For the second week -- excuse me?

24              THE COURT:  Why do we need to go out that far?

25              MS. JOHNSON:  We certainly do not, your Honor.  It's
```

```
1     sort of our practice to add one as we go, but we do not need to.
2              THE COURT:  We can do it.
3              MS. GREER:  Your Honor, it helps for us for planning
4     purposes, those of us who have to travel, if we could go ahead
5     and get dates on the calendar.
6              THE COURT:  I haven't scheduled my spa vacation yet.
7              (Laughter.)
8              MS. GREER:  Oh, that comes first.
9              THE COURT:  Just kidding.
10             MR. STRANCH:  Will that place be warmer than Boston?
11    Can we meet there instead?
12             THE COURT:  It's interesting.  Off the record.
13             (Discussion off the record.)
14             COURTROOM DEPUTY CLERK URSO:  Did you say a date?
15    I'm sorry.
16             MS. JOHNSON:  The second week.  I apologize.
17             COURTROOM DEPUTY CLERK URSO:  Yes.
18             MS. JOHNSON:  Thursdays seems to have worked well
19    recently.
20             COURTROOM DEPUTY CLERK URSO:  Okay.
21             MS. GREER:  The first week is the ABA midyear
22    meeting, which may impact some people.
23             COURTROOM DEPUTY CLERK URSO:  It wouldn't, by any
24    chance, be a good day on the 18th for that, would it?  If
25    not -- if it's the 11th, I'll change the hearings that I
```

1    already have set there.

2         MS. JOHNSON:  I think the 18th would work for

3    plaintiffs.

4         COURTROOM DEPUTY CLERK URSO:  Would the 18th work

5    for --

6         THE COURT:  Is the 11th in conflict with the ABA?

7         MS. GREER:  No, your Honor.

8         THE COURT:  So, is the 11th possible?

9         COURTROOM DEPUTY CLERK URSO:  Well, we have three

10   hearings on that, Judge.  I was just seeing if we could do the

11   following week, but if it's not, I'll change the 11th date.

12        MS. JOHNSON:  Ms. Dougherty just reminded me that the

13   18th school vacation week.

14        COURTROOM DEPUTY CLERK URSO:  All right.  So, we'll

15   do the 11th at 2:00 and I'll change the other hearings.

16        MS. JOHNSON:  Thank you.

17        COURTROOM DEPUTY CLERK URSO:  Okay.

18        MAGISTRATE JUDGE BOAL:  And I'll schedule a session

19   in the morning at 11:30.

20        MS. JOHNSON:  Thank you, your Honor.

21        THE COURT:  Now, Item C, the discovery-related

22   motions are Judge Boal's.

23        MS. JOHNSON:  Yes, your Honor.

24        In terms of the "Other Motions" heading we have

25   there, 11 simply lists the choice of law briefing that has

1    previously been done.  There is no additional briefing.

2            THE COURT:  I have that and I will decide it soon.

3            MS. JOHNSON:  That brings us to briefing in progress,

4    and there is one issue that I would like to alert the Court

5    to.  There has been briefing on -- the PSC has filed a motion

6    seeking protective order to prevent defendants' efforts to

7    take deposition by written questions in both the Premier cases

8    and the Box Hill cases.  Those are on slightly different

9    briefing tracks and, technically, the Premier motion is ready

10   for a decision, but we thought it made sense to address that

11   issue because it is fairly cross-cutting once before the Court

12   and we were hoping to address that at argument next month, if

13   that works for the Court.

14           MAGISTRATE JUDGE BOAL:  Yes, I will put it on for the

15   11:30.

16           And I actually had a question on 14.  I know that

17   that was withdrawn.  I think it was yesterday or maybe this

18   morning.  But I guess it relates to the discovery-related

19   motions in nine and ten.  There were overlapping issues.

20           So, I was wondering if in any way -- I guess it's

21   really from Mr. Tardio's perspective whether -- I assume there

22   was some resolution, which is why the motion was withdrawn.  I

23   was wondering if NECC did produce materials and if so, what

24   effect that had on the motions on nine and ten.

25           MR. TARDIO:  I think that the motion that the Court

1  is referring to -- or the withdrawal of the motion was the

2  Saint Thomas Entities, I believe.

3          MAGISTRATE JUDGE BOAL:  All right.

4          MS. JOHNSON:  Yes, it was.

5          MR. SCHRAMEK:  Adam Schramek for the Saint Thomas

6  Entities.

7          Yesterday we received from the NECC trustee through

8  an agreement, we received some of the marketing materials we

9  were looking for, and I'm told that the videos are in the mail

10 and should be waiting for me when I get back to my office

11 hopefully tomorrow.  Yes, tomorrow.

12         Accordingly, we withdrew the motion against NECC

13 pursuant to that agreement, and we are currently -- when I

14 look at the videos tomorrow and see exactly what I have, we

15 may be filing some additional motions to -- with respect to

16 these two.  So, they are currently pending because we just

17 haven't had time --

18         MAGISTRATE JUDGE BOAL:  Because it seemed like they

19 were overlapping with the --

20         MR. SCHRAMEK:  That's right.

21         So, we hope to file something in the next day or so

22 advising the Court of whether or not the materials we got from

23 NECC, in fact, have satisfied nine and ten.  Again, I haven't

24 looked at the videos yet.  I was downloading them on the plane

25 last night for the deposition this morning.  So, I just need

```
 1    to look at it tomorrow and we're going to get something on
 2    file with the Court shortly.
 3              MAGISTRATE JUDGE BOAL:  All right.  Thank you.
 4              MR. GOTTFRIED:  But I do believe that all the issues
 5    with NECC have been resolved consensually and, once again, the
 6    trustee --
 7              MAGISTRATE JUDGE BOAL:  There's nothing pending
 8    before me.
 9              MR. GOTTFRIED:  That's correct.
10              MAGISTRATE JUDGE BOAL:  So, I would agree with you at
11    this point.
12              MR. GOTTFRIED:  Perfect.  Thank you.
13              MS. JOHNSON:  I believe that brings us, then, to No.
14    15, and that's just a reminder that the PSC has filed the
15    motion for partial summary judgment that was referred to
16    earlier today involving the product claims.
17              THE COURT:  Is there objection to the emergency
18    motion to extend time?
19              MS. JOHNSON:  We did not object to the extension
20    sought there, but I believe the time has elapsed and no
21    opposition has been filed.
22              MR. STRANCH:  Yes, your Honor.
23              What's at stake on this issue is we had offered when
24    the defendants asked for an extension of time to respond to
25    it, an extension that would give them an additional 15 days
```

1    basically to work on the motion that would allow us to then

2    have that motion heard in December, because it would simplify

3    the trial preparation significantly if that motion is granted.

4    And so, we felt that it was important to have that heard

5    earlier rather than later.

6            The defendants didn't want to have it heard until

7    January at the earliest or February, and we said that's just

8    too late for us because it will complicate things

9    unnecessarily.  It will impact experts that are disclosed and

10   other matters depending upon the --

11           THE COURT:  I can't imagine why anybody wants to work

12   on this motion over Christmas.

13           MR. TARDIO:  I don't know that we want to work on it

14   over Christmas.  We simply asked for an extra two weeks on top

15   of what the plaintiffs were willing to give us, which was

16   still less than we agreed earlier when deciding how long they

17   would have to respond to our motion.

18           THE COURT:  So, when do you want to respond?

19           MR. TARDIO:  I think the difference in opinion is

20   between November 20th and December 2nd or 3rd, somewhere

21   around then.

22           THE COURT:  If they respond on December 3rd, why

23   can't it be heard on December 17th or whatever the next date is?

24           MR. TARDIO:  Well, one issue is we -- our response

25   will include a cross-motion on the same issue, which if I

1   understand --

2           THE COURT:  Well, it will be effectively briefed

3   because they have filed a motion on an issue.  You have

4   responded and now you ask to have --

5           MR. TARDIO:  That's fine.  I just wanted to alert the

6   Court that that would be the procedural posture.

7           MR. STRANCH:  Your Honor, when could we get in our

8   response to their cross-motion?  When would the Court like --

9           THE COURT:  If they respond by December 3rd, then --

10  and the next meeting is December 17, if you can respond by

11  December 16th, we'll have a chance to look at it --

12          MR. STRANCH:  Okay.

13          THE COURT:  -- for the 17th.

14          MR. STRANCH:  Okay.

15          THE COURT:  So, 12/3 for defendant and 12/16 for

16  plaintiff's response, okay.

17          MR. STRANCH:  Thank you.

18          MR. TARDIO:  Your Honor, let me make one note,

19  please, the issue --

20          THE COURT:  Now that I decided, you're not going to

21  make it more complicated and make it all impossible?

22          MR. TARDIO:  It may make the Court's job easier.

23          THE COURT:  Really?

24          MR. TARDIO:  The motions -- or cross-motions will

25  address the product-liability issue, which, as we heard

1    earlier, is set at least to, hopefully -- that's a mistake

2    because Mr. Stranch has said the Supreme Court will take it in

3    Tennessee.  I think they will and I hope they do.

4         The Court in ruling on these cross-motions will be

5    asked to predict what the Tennessee Supreme Court will do.

6    So, I don't know if we'll file a formal motion to stay the

7    Court's ruling on our cross-motions for summary judgment, but

8    they do tie together and the issue the Court will be asked to

9    -- this Court will be asked to decide will, presumably,

10   hopefully, be on its way to the Tennessee Supreme Court.

11        THE COURT:  Well, if I decide not to wait for the

12   Court, then that Court will have some additional stuff to work

13   with.

14        MR. TARDIO:  Right.

15        THE COURT:  Okay.  That brings us to 16.

16        MS. JOHNSON:  16, 17 and 18 have been pending.  They

17   are not completed.  They're ongoing.  So, I think we can jump

18   to 19, and on 19, really, we wanted to alert the Court that we

19   expect that this motion will be argued at the next status --

20   rather, we would ask that this motion be argued at the next

21   status conference.

22        THE COURT:  That would be on the 17th, right?

23        MS. JOHNSON:  Yes.

24        THE COURT:  Is there anything else that anybody wants

25   to bring to the attention of either Judge Boal or me?

1          MR. STRANCH:  Yes, your Honor.

2          We're going to be bringing motions to compel against

3     Specialty Surgery Center and Dr. Lister.  I'm giving the Court

4     this information so that we can, hopefully, get this scheduled

5     quickly.  I can tell Judge Boal is excited.  We're going to be

6     asking to re-depose two of the individuals.  That's Dr. Lister

7     and Jean Atkinson.

8          As I previewed in the last hearing, we discovered

9     that the drug formulary that was provided to us as being the

10    drug formulary in effect in 2012 was not the drug formulary

11    that was actually in effect in 2012, and that the medication

12    that was used on the patients in this litigation was not on

13    the actual drug formulary that was in effect when the

14    injections were done, and we discovered that in April of 2013,

15    after the litigation process had started, after litigation

16    hold letters had gone out, that there had been a change made

17    to the drug formulary to add DepoMedrol, which is the brand

18    name for the drug at issue here, to the drug formulary saying

19    that it could then be used within their clinic, and we want to

20    depose Dr. Lister and Jean Atkinson, who is the head nurse,

21    over these changes that were made to the formulary after

22    litigation started.

23          And there will also be a motion to compel over what

24    to search, because the defendants are taking the position that

25    they don't have to add in searches from 2013.  They don't have

1    to go do another document search to try to find all the emails

2    and everything around this change that was made.

3         And this is an important issue that the Court is

4    going to have to consider because at the end of the day, we're

5    going to be saying our economic caps, our punitive damage caps

6    in Tennessee do not apply to this case because they altered

7    documents in this case, and that's one of the exceptions.  And

8    so, we're going to need full discovery over that, and so far

9    we're being told no, we're not going to give it.  And so, that

10   issue is coming and it's important and we're going to need to

11   get that heard by the Court quickly so that we can get that

12   done and get those cases ready for trial as well.

13        THE COURT:  But there is not yet a motion?

14        MR. STRANCH:  There is not yet a motion.  It's going

15   to be filed -- we have to wait until they formally respond and

16   say we're not doing this.  They've already told us that, but

17   we have to wait until then.  There will be very shortly filed

18   the motion on the re-depositions as well.

19        THE COURT:  All right.  So, we will patiently wait.

20        MR. STRANCH:  Thank you, your Honor.

21        MR. SCHRAMEK:  Your Honor, there is other thing I did

22   want to raise, which is when we submitted our kind of

23   competing Bellwether schedules, that was over 30 days now, and

24   in the interim, I think we've all realized with holiday

25   schedules and trying to get witnesses to come and the number

1      of depositions that are going to be required in the individual

2      cases -- it's not just the plaintiff.  It's often a spouse.

3      We're going to find out at those depositions who else they

4      intend to testify to.  We haven't gotten to treating

5      physicians either for each Bellwether case that is in place.

6      I think it's become pretty obvious to both parties, both

7      sides, that we're going to need more time in order to conduct

8      that individual discovery, and we were trying to fit it into

9      this Court's February 28th or so deadline to have all

10     discovery completed, but, your Honor, it's simply not

11     realistic.  I just don't see how we're physically going to get

12     it all done.

13            So, we will likely be asking the Court -- or filing a

14     supplemental calendar.  I think I've heard the Court mention

15     earlier, you know, spring, you know, or a little bit into

16     summer, maybe to June, pushing it out because there is simply

17     so much to be done in order to get it all done, and right now

18     we asked about two and a half weeks ago for, you know, a

19     deposition schedule for all the plaintiffs, for all the

20     spouses, and we haven't even gotten the treaters and it's been

21     about two weeks and we just yesterday got some dates for the

22     first time for a small part of that.

23            I understand with the holidays, it's hard to get

24     folks scheduled.  I understand they're working with a lot of

25     attorneys, but we are in a position of simply not having

1    enough time to get all the individual case discovery done.

2    We're still -- by agreement, we've extended common discovery.

3    We're doing common discovery by agreement now into early --

4              THE COURT:  So, at the moment there's no issue, right?

5              MR. SCHRAMEK:  I'm sorry?

6              THE COURT:  At the moment there is no issue.

7              MR. SCHRAMEK:  Well, I just wanted to advise the

8    Court, as Mr. Stranch did, that that is coming, yes, your

9    Honor.

10             THE COURT:  Well, Judge Boal can't wait.

11             MR. STRANCH:  Your Honor, we're happy to stay with

12   the current schedule and, of course, if the Court adopts our

13   Bellwether schedule, that will cut down on the number of cases

14   that need to be worked up that would allow us to keep to the

15   schedule that the Court has already put in place.

16             MR. SCHRAMEK:  And one of the issues we have, your

17   Honor, is until we take the plaintiff's deposition, you often

18   don't discover some of the things that make a case an outlier,

19   and that's why the original process was we take the

20   plaintiff's deposition, we take the spouse, you know, we issue

21   our strikes, and then we continue discovery on the remaining

22   cases.  So, that's where we have a little bit of a chicken and

23   egg issue going on here.

24             THE COURT:  Ms. Johnson, did you want to say

25   anything?

1          MS. JOHNSON:  No, your Honor.

2          THE COURT:  Just a precaution to get the microphone.

3          MR. STRANCH:  She apparently --

4          MS. JOHNSON:  I think we've said enough on this

5     topic.

6          THE COURT:  Thank you all.

7          MR. SCHRAMEK:  Thank you.

8          THE COURT:  See you in December.

9          (Adjourned 3:06 p.m.)

10

11                    C E R T I F I C A T E

12          I, Catherine A. Handel, Official Court Reporter of the

13    United States District Court, do hereby certify that the

14    foregoing transcript, from Page 1 to Page 47, constitutes to the

15    best of my skill and ability a true and accurate transcription of

16    my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

17    Re: New England Compounding Pharmacy, Inc., Products Liability

18    Litigation.

19

20    November 18, 2015          /s/Catherine A. Handel
      Date                       Catherine A. Handel RPR-CM, CRR
21

22

23

24

25