Case 1:13-md-02419-RWZ   Document 2439-2   Filed 11/24/15   Page 1 of 9

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION
VIDEOTAPED DEPOSITION OF DEBRA SCHAMBERG, R.N. on 02/04/2015          Page 55

```
 1   denervations.

 2        A.      Okay.

 3        Q.      And I understand -- I'm not asking you for

 4   an exact number.

 5        A.      Okay.

 6        Q.      And if you don't know, just say that.  But

 7   my question is what's your estimate of the percentage

 8   of revenues that are attributable to epidural steroid

 9   injections?

10        A.      I probably -- I can't answer that for sure.

11        Q.      And St. Thomas Neurosurgical provides

12   epidural steroids to patients in exchange for money;

13   correct?

14        A.      That is correct.

15        Q.      And it's a for-profit entity, St. Thomas

16   Neurosurgical; is that correct?

17        A.      That is correct.

18        Q.      Now, you understand that a steroid, which

19   is at issue in this litigation is known as -- I might

20   mispronounce it and if I do, I apologize.  But I say

21   methylprednisolone acetate.  Have I said it correctly?

22        A.      Yes.

23        Q.      And it's abbreviated MPA; is that correct?

24        A.      That is correct.

25        Q.      Who is it that decided that St. Thomas
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com
EXHIBIT 2

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION
VIDEOTAPED DEPOSITION OF DEBRA SCHAMBERG, R.N. on 02/04/2015                     Page 56

```
 1    Neurosurgical would purchase MPA from New England

 2    Compounding Center, what we call NECC?

 3         A.     That was -- after conferring with Dr.

 4    Culclasure, it was his decision and my decision.

 5         Q.     So other than you and Dr. Culclasure, were

 6    there any other persons employed by Howell Allen

 7    Clinic or St. Thomas Neurosurgical or any of the

 8    other -- well, any other persons other than you and

 9    Dr. Culclasure who made that decision?

10         A.     No.

11         Q.     Why did you and Dr. Culclasure decide that

12    St. Thomas Neurosurgical would buy MPA from NECC?

13         A.     There was a shortage of MPA.  MPA also from

14    NECC offered a true preservative-free in their

15    steroid.

16         Q.     All right.  Any other reasons?

17         A.     Those are the main reasons.

18         Q.     Price was not a primary factor; is that

19    true?

20         A.     That's true.

21         Q.     Tell us about the shortage.

22         A.     We had ordered from our other vendor and

23    were unable to get the quantity that we needed.

24         Q.     Okay.  Who was your other vendor?

25         A.     We were using Clint.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q.      All right.  Well, did you understand that

2   the purpose of having a preservative in MPA was to

3   preserve the sterility and safety of the solution?

4      A.      You put -- there are multiple medications

5   that are preservative-free on the market.

6      Q.      That wasn't my question.  My question was:

7   Did you understand that the function of having a

8   preservative in MPA was to preserve the sterility and

9   safety of the solution?

10      A.      Yes, especially on a multidose vial.

11      Q.      And that's -- the same would be true on a

12   single-dose vial; correct?

13      A.      I cannot answer on that.  But you -- I know

14   you have preservatives for a multidose vial.

15      Q.      Well, as I understand it, your clinic was

16   providing either Depo-Medrol or generic MPA to

17   patients before you and Dr. Culclasure decided to

18   switch to NECC as your supplier of MPA in June of

19   2011; is that correct?

20      A.      We had other suppliers.

21      Q.      Right.

22      A.      Correct, we did.

23      Q.      And those other suppliers, CuraScript and

24   Clint Pharmaceutical, they were supplying at times

25   brand name Depo-Medrol which is a drug made by Pfizer;



Case 1:13-md-02419-RWZ   Document 2439-2   Filed 11/24/15   Page 4 of 9

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION
VIDEOTAPED DEPOSITION OF DEBRA SCHAMBERG, R.N. on 02/04/2015          Page 77

1      A.      That would be correct.

2      Q.      And you reviewed this information before

3   you started ordering from NECC; is that true?

4      A.      That is true.

5      Q.      How many conversations did you have with

6   Dr. Culclasure regarding whether it was a good idea to

7   start ordering the truly preservative-free MPA from

8   this New England Compounding Center?

9      A.      I have no idea.

10      Q.      What would be your best estimate?

11      A.      I don't know.  I would say several.

12      Q.      Well, are you able to give us a number of

13   how many conversations or even estimate a number?

14      A.      I would say probably four, five.

15      Q.      Over what period of time?

16      A.      Probably several weeks.

17      Q.      Why did you talk to him four or five times?

18      A.      The shortage that we were having.

19      Q.      Were you concerned about the shortage?

20      A.      Yes, I was.

21      Q.      Were you concerned that if -- if you didn't

22   have enough MPA to inject into patients it could hurt

23   the company's revenues?

24      A.      Not the company's revenue.  We would not be

25   able to treat the patients for their pain.



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        Q.      So revenue was not a concern in the least

2    when you learned about this so-called shortage; is

3    that true?

4        A.      If we can't do procedures, then I have to

5    lay off staff.  We can't take care of our patients.

6        Q.      So does that mean, yes, you were concerned

7    about revenues?

8        A.      Well, then, yes, from that aspect of it.

9        Q.      Other than Dr. Culclasure, did you speak

10   with anyone else about whether it would be wise to

11   purchase materials from NECC?

12       A.      Not that I recall.

13       Q.      Did you have any conversations with anybody

14   at St. Thomas Hospital?

15       A.      No.

16       Q.      Did you have any conversations with anyone

17   on the board of St. Thomas Neurosurgical?

18       A.      Regarding?

19       Q.      Regarding switching to NECC.

20       A.      No.

21       Q.      Did you have any conversations with any of

22   the neurosurgeons at Howell Allen Clinic?

23       A.      No.

24       Q.      And at the time you and Dr. Culclasure made

25   the decision to start purchasing this material from



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    injected.  I'm not following you.

 2        Q.      Did you understand that if you're injecting

 3    a solution into the epidural space, it is particularly

 4    important that that solution be safe and sterile?

 5        A.      Yes.

 6        Q.      And did you understand that if the solution

 7    was not safe and sterile, the patient could contract a

 8    disease such as meningitis and die?

 9        A.      That would be true.

10        Q.      And so what did you and Dr. Culclasure do

11    in order to make sure that the solution that you were

12    ordering from NECC would be safe and sterile before

13    your clinic began injecting it into the spinal columns

14    of patients?

15        A.      NECC provided us literature showing that

16    they had met the regulations.

17        Q.      Okay.  So other than reading NECC's

18    literature and accepting it all as true, all at face

19    value, did you do anything to verify the accuracy of

20    any of NECC's statements?

21        A.      I don't do that on any of the products.

22        Q.      So is the answer no, you did nothing to

23    verify the accuracy of any of the literature provided

24    to you by NECC?

25        A.      No, I did not.  Did not feel it was
```



 1   but I don't remember the content of it.

 2       Q.     Do you remember having those conversations

 3   with Dr. Culclasure in 2010, let's say, six months

 4   before you started doing business with NECC?

 5       A.     I don't recall.

 6       Q.     Do you recall for how long prior to doing

 7   business with NECC that Dr. Culclasure had expressed

 8   to you concerns about using a steroid with

 9   preservative in it for ESIs?

10       A.     No.

11       Q.     Now, Mr. Volan asked you -- asked you

12   questions today about everybody that you talked to in

13   connection with making the decision to buy drugs from

14   NECC.  Do you remember that?

15       A.     Yes.

16       Q.     And you never mentioned in those -- you

17   never mentioned in response to those questions that

18   you had any communications with your pharmacy

19   consultant, Mr. O'Neil, about the decision to buy

20   drugs from NECC; correct?

21       A.     I did not respond to that.

22       Q.     Right.  You didn't talk to Mr. O'Neil about

23   the decision to buy drugs from NECC, did you?

24              MR. GIDEON:  If it -- if -- if you

25        had any discussions with Mr. O'Neil in



```
 1        connection with a quality improvement

 2        committee, then that is privileged in

 3        Tennessee.

 4               THE WITNESS:  Okay.

 5               MR. GIDEON:  And you can't answer it.

 6         If it wasn't in connection with quality

 7          improvement, then you can; okay?

 8               THE WITNESS:  Okay.

 9      Q.     (By Mr. Rehnquist)  Did you have any

10  conversations with Mr. O'Neil about the decision to

11  buy drugs from NECC?

12      A.     It's -- that's quality.

13      Q.     So is the -- is the answer that you did

14  have communications with him?

15               MR. GIDEON:  She's not going to

16        answer the question.

17               THE WITNESS:  The answer is I'm not

18        going to answer.

19               MR. REHNQUIST:  She's not going to

20        tell me whether or not she had

21        communications with Mr. O'Neil on the

22        subject?

23               MR. GIDEON:  Right.

24      Q.     (By Mr. Rehnquist)  And you're not going to

25  tell me whether or not you had communications with
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    Mr. O'Neil on the subject of NEC's patient name

 2    request; correct?

 3                 MR. GIDEON:   Same.

 4         Q.      (By Mr. Rehnquist)   You're not going to

 5    tell me whether or not?

 6         A.      No, sir.

 7         Q.      And that's on the basis of this privilege

 8    that your lawyer has advised you about?

 9         A.      That is correct.

10         Q.      Now, you don't have a pharmacist in-house

11    do you --

12         A.      No, sir.

13         Q.      -- at STOPNC?

14                 And you're not a pharmacist?

15         A.      No, I'm not.

16         Q.      And that's why you have a pharmacy

17    consultant; correct?

18         A.      That is correct.

19         Q.      Mr. O'Neil is STOPNC's source of pharmacy

20    expertise; correct?

21         A.      Yes.

22         Q.      And you filed an affidavit in court under

23    oath about that relationship with Mr. O'Neil, didn't

24    you?

25         A.      I don't remember.  I --
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com