UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING )<br>PHARMACY, INC. PRODUCTS LIABILITY )<br>LITIGATION )<br>                                                    )<br>                                                    )<br>THIS DOCUMENT RELATES TO: )<br>                                                    )<br>All Cases )| MDL No. 2419<br>Dkt. No 1:13-md-2419 (RWZ) |

**OPPOSITION TO GOVERNMENT'S MOTION TO STAY DEPOSITIONS OF
JOSEPH CONNOLLY AND JOHN NOTARIANNI [DOC. 2395]**

Defendants Saint Thomas Outpatient Neurosurgical Center, LLC; Howell Allen Clinic, a Professional Corporation; John Culclasure, MD; Debra Schamberg, RN, CNOR; Vaughan Allen, MD; Specialty Surgery Center, Crossville, PLLC; Kenneth R. Lister, MD; Kenneth Lister, MD, PC; and Donald E. Jones, MD (collectively "Tennessee Clinic Defendants"), oppose the *Motion of the United States to Stay the Depositions of Joseph Connolly and John Notarianni.*[1]

These issues have been briefed in detail.[2] Thus, extensive treatment is not necessary here. The Tennessee Clinic Defendants' position has not changed. The Court should (1) deny the Government's latest attempt to insert itself into the civil case's discovery process; or, (2) if the Court grants the Government's requested stay of these depositions, the Court must likewise stay the Tennessee Clinic Defendant's expert disclosure deadline and first civil trial pending the criminal trial.

---

[1] Doc. 2395.
[2] *See* Doc. 2209 (Government's original motion to stay all depositions of former NECC and MSM employees); Doc. 2274 (Tennessee Clinic Defendants' response opposing, in part, the Government's original motion); Doc. 2401 (Tennessee Clinic Defendants' opposition to Government's emergency motion to stay Mr. Connolly's deposition).

*<u>Relevant History</u>*

1.    The Tennessee Clinic Defendants are health care provider defendants in 100+ lawsuits consolidated into this MDL. Every lawsuit against them includes the claim that they should not have relied on the representations of NECC's salespeople (employed by a related entity, MSM) that NECC had a state-of-the-art drug manufacturing process that ensured sterility.[3] In defense of all 100+ lawsuits, the Tennessee Clinic Defendants state (1) that they reasonably relied upon NECC/MSM's representations about the sterility process[4], (2) that NECC is at fault for the injuries complained of[5], and (3) that NECC's contamination of the medications was a superseding cause of the injuries[6].

2.    To develop these defenses, the Tennessee Clinic Defendants, beginning in 2013, have done informal and formal discovery of NECC. From the outset, NECC, its affiliates, and the PSC have put up incredible resistance to the Tennessee Clinic Defendants' efforts at document discovery and depositions of NECC and its affiliates.[7]

3.    At this point, the Tennessee Clinic Defendants have obtained document discovery from NECC and MSM. They have finally taken the depositions of several former employees. However, *no* former NECC/MSM employee deposed in the MDL has provided substantive testimony; all have invoked the Fifth Amendment to substantive questions.

---

[3] *See* 2nd Am. Master Compl., ¶ 192 (alleging that the Defendants' due diligence prior to purchasing from NECC, which included talking with MSM salespeople and reviewing materials they provided, was insufficient).
[4] *See* Answer to Master Compl., p. 68 [Doc. 1455].
[5] *See id.*
[6] *See id.* at 62.
[7] *See*, *e.g.*, Docs. 1830, 1945, 2118, 2190, 2206.

4. In its most recent comprehensive order, the Court stated that it intends to try the first civil case in March or April 2016.[8] At the most recent status conference, this date slid a bit given the remaining discovery, to "April, May, June[.]"[9]

5. Thus, the Tennessee Clinic Defendants are left in a position of (1) having to disclose expert witnesses to support their defenses and (2) having to try the first civil case *without* substantive deposition testimony from NECC or MSM former employees.

6. The Government originally moved to stay the depositions of *any* former NECC or MSM employee pending the outcome of the criminal trial.[10] The first criminal trial of the NECC insiders is set to begin on April 4, 2016.[11]

7. The Court denied this request but said it would entertain motions to stay the depositions of specific individuals supported by particularized reasons.[12] The Government now moves to stay the depositions of two former NECC/MSM employees – Joseph Connolly and John Notarianni, rehashing the same arguments.[13]

---

[8] Doc. 2309, p. 26, n. 23.
[9] Hr'g Tr., p. 8 (Nov. 12, 2015 status conference).
[10] Doc. 2209.
[11] *See* Doc. 272, *U.S.A. v. Cadden, et al.*, 1:14-cr-10363-RGS (D. Mass.).
[12] Doc. 2354.
[13] Doc. 2395.

### *Roles of Mr. Connolly and Mr. Notarianni*

8.     Mr. Connolly is one of two "compounding" pharmacy technicians who worked in the cleanroom where the contaminated MPA was compounded. He worked side-by-side with the technician who compounded the three contaminated lots, Cory Fletcher.[14] Mr. Connolly's testimony will likely cover both (1) the condition of NECC's facility[15] and (2) the process used to compound the three contaminated lots of MPA, in addition to basic background about NECC. This information simply cannot be gleaned from the documents produced by NECC.[16]

9.     Mr. Notarianni is a former MSM employee whom Saint Thomas Outpatient Neurosurgical Center (one of the Tennessee Clinic Defendants) primarily dealt with when it was deciding whether to purchase MPA from NECC. Mr. Notarianni's testimony will likely cover (1) his interactions with Saint Thomas Outpatient Neurosurgical Center (including written and verbal representations regarding the quality of NECC's products) and (2) the training Barry Cadden provided to MSM's salesforce (including Mr. Notarianni), in addition to basic background about MSM.

---

[14] Mr. Fletcher was deposed but asserted the Fifth Amendment to every substantive question.
[15] The Plaintiffs allege that, if the clinic-defendants had traveled to NECC and toured the facility, the condition of the facility would have prompted the clinic defendants to purchase elsewhere. However, the testimony to-date has been that the facility was clean and the equipment state-of-the-art. Mr. Connolly can likely corroborate that.
[16] For example, one document produced by NECC lists the steps supposedly taken when the MPA was compounded, but it does not identify the *location* where each step took place (*i.e.*, whether in the main cleanroom or in the controlled environment of an isolator hood), a critical issue under USP 797. Less obvious, this information is necessary to allocate fault between the various settling defendants. The Plaintiffs seek to hold the Tennessee Clinic Defendants jointly and severally liable with NECC on various theories. If Mr. Connolly's testimony indicates that the contamination most likely occurred before the medication was sent to ARL for testing, a jury will likely assign fault to ARL, thereby reducing the amount of fault that can be attributed to NECC and the Tennessee Clinic Defendants if they are found to be jointly and severally liable.

### *Summary of Tennessee Clinic Defendants' Position*

10. The Government has not offered sufficient, particularized reasons to justify staying these depositions. Thus, the motion should be denied.

11. However, if the Court grants the Government's requested stay of these two depositions, the Court must likewise stay the Tennessee Clinic Defendants' expert disclosure deadlines and not schedule any civil trial to take place until after the criminal trial(s).

### *Law and Argument*

12. The Government must carry a "heavy burden" to justify staying a civil proceeding pending a parallel criminal proceeding. *Microfinancial, Inc. v. Premier Holidays Int'l*, 385 F.3d 72, 77 (1st Cir. 2004).

13. The Government has failed to carry its burden of showing a particularized reason the depositions of Mr. Connolly and Mr. Notarianni will negatively impact the criminal prosecution. The Government only states the testimony "could potentially harm it."[17] [18] Also, there are no "particularized reasons" set forth why Connolly's and Notarianni's testimony is so crucial to the criminal prosecution that the criminal prosecution will be forever compromised if they testify elsewhere. General statements of potential harm are insufficient to satisfy the Government's burden.

---

[17] *See* Doc. 2395, pp. 1, 2, 3.
[18] Notably, the Government does not even commit that it will call these witnesses in the criminal trial, calling them "potential witnesses." *See* Doc. 2395, p. 2.

14. The Government offers four specific arguments:

  a. First, the civil case deposition transcripts of Mr. Connolly and Mr. Notarianni will be available to impeach the witnesses during the criminal case.

  b. Second, there is "substantial overlap" in the issues for the civil depositions of Mr. Connolly and Mr. Notarianni and their potential testimony in the criminal case.

  c. Third, the deposition transcripts could "leak," causing pretrial publicity.

  d. Fourth, the civil case parties will achieve cost savings if the Notarianni depositions are stayed until the conclusion of the criminal case.

***Impeachment***

15. The Government offers no case law or concrete example to support its impeachment argument. True, former testimony could be used to impeach the witnesses. However, a witness can only be impeached if he testifies inconsistent with a prior statement. FED. R. EVID. 613. Nothing has been offered to establish any reasonable expectation that Mr. Connolly or Mr. Notarianni will testify differently from the civil case to the criminal case. One would presume they will testify truthfully in both. They have not been indicted and have no reason to do anything but testify truthfully. If they testify truthfully on relevant facts, there is no reason to believe this unspecified fear of impeachment will ever materialize.[19]

---

[19] Additionally, the Government's goal and the Tennessee Clinic Defendants' goal in taking this discovery align. Both seek to impart a finding of wrongdoing on NECC and MSM, just under different legal schemes. The Tennessee Clinic Defendants have no interest in developing testimony to *help* the criminal defendants. Further, the risk of impeachment is low considering the testimony sought by the Tennessee Clinic Defendants is basic fact testimony explaining NECC's process for making MPA (Connolly) and MSM's sales strategies, representations to customers, and conversations with the Tennessee Clinic

16. Besides, if potential for impeachment were sufficient to justify a stay of a civil case, courts would have to put on hold every civil case in America where a witness in the civil case could possibly be called to testify in a related criminal case. This comes nowhere close to carrying the "heavy burden" or particularized showing necessary to justify a stay.

17. Finally, a stay of these depositions does not solve the Government's problem. Whether these depositions go forward or not, the Tennessee Clinic Defendants will need to call these witnesses at the first trial, which the Court has indicated may proceed before the first criminal trial. Moreover, prosecutions of two of the criminal defendants have already been severed from the other criminal defendants, and no trial date has been set for the severed defendants.[20] Thus, the first civil trial will likely occur before at least one of the criminal trials, such that Mr. Connolly and Mr. Notarianni will be subject to impeachment in at least one of the criminal trials based on their testimony at the civil trial.

### *"Substantial overlap"*

18. Stays of civil proceedings in the face of parallel criminal proceedings often happen to protect a criminal defendant's right against self-incrimination by not exposing him to civil testimony where he may be asked to testify on subjects covered by the parallel criminal prosecution. *See Alcala v. Texas Webb County*, 625 F. Supp. 2d 391 (S.D. Tex. 2009) ("[o]ne primary goal of a stay, when a stay is indeed warranted, is to

---

Defendants (Notarianni). The Government has not explained why it believes Mr. Connolly or Mr. Notarianni will testify inconsistently from one proceeding to the next.

[20] *See* Order granting Douglas and Carla Conigliaro's motion to sever [Doc. 358], *U.S.A. v. Cadden, et al.*, 1:14-cr-10363-RGS (D. Mass.).

7

preserve a defendant's Fifth Amendment right against self-incrimination and to resolve the conflict he would face between asserting this right and defending the civil action").

19. The consideration of the "substantial overlap" of the criminal and civil proceedings in the stay analysis is most relevant when a *criminal defendant* will be required to testify during discovery of a civil case. *See Trustees of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1139 (S.D. N.Y. 1995) ("The first question to be resolved is the extent to which the issues in the criminal case overlap with those present in the civil case, since self-incrimination is more likely if there is a significant overlap. If there is no overlap, there would be no danger of self-incrimination and accordingly no need for a stay") (cites omitted).

20. The strongest case for deferring a civil proceeding while a parallel criminal case proceeds "is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter." *Secs. & Exch. Comm'n v. Dresser Indus.*, 628 F.2d 1368, 1375-76 (D.C. Cir. 1980).

21. This factor is not at issue here. The civil proceeding exists against third-parties whose only link to the criminal proceeding is that they seek oral testimony from former employees of companies co-owned by criminal defendants. If the witnesses had any fear of self-incrimination, they would be asserting their Fifth Amendment rights, but they have stated their intention not to do so. *See Trustees of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. at 1139. Thus, while the Government argues at length about the "substantial overlap," the overlap will not implicate any criminal defendant's Fifth Amendment rights. The "substantial overlap" factor should be discounted heavily, to the extent it has any bearing here.

### *"Leak" of Deposition Transcripts*

22.     The Government argues that the mechanism for making deposition testimony in the civil cases confidential is inadequate because the deponents may choose not to designate their testimony as confidential pursuant to the Third Amended Protective Order [Doc. 814].

23.     This concern is resolved easily: The Court can prospectively designate the testimony confidential.

### *Cost Savings*

24.     The Tennessee Clinic Defendants do not disagree that the criminal trial(s) will probably produce evidence and testimony that they seek now, and that staying the depositions of Mr. Connolly and Mr. Notarianni until after the criminal trial(s) may result in time and cost savings.

25.     *However*, the Government glosses over a key fact: The Court's proposed timetable may result in the civil case going to trial *before* (or at the same time) as the first criminal trial. Indeed, the Government's "cost savings" argument is moot so long as the Court remains intent on trying the first civil case in the spring.

### *Equities and Conclusion*

26.     Whether to impose a stay requires the Court to weigh the competing equities in the particular case. *See In re Braga*, 789 F. Supp. 2d 1294, 1310 (S.D. Fla. 2011) ("after considering all the evidence and weighing the equities, the Court finds that a limited stay of discovery relating to the Intervenors is warranted").

27. Requiring the Tennessee Clinic Defendants to disclose experts and try the first civil case before the depositions of Mr. Connolly and Mr. Notarianni will significantly prejudice the Tennessee Clinic Defendants because they will not have access to information critical to their defenses.[21] Further, going through expert discovery and the first civil trial without essential testimony is inefficient and will result in a trial on an incomplete record and an unrepresentative verdict.

28. Balancing these equities requires the Court to either (1) deny the Government's motion for a stay of Connolly's and Notarianni's depositions *or* (2) grant the stay but likewise stay the deadline for disclosure of the Tennessee Clinic Defendants' expert witnesses and the first trial date until after the criminal trial(s) is completed.

Respectfully submitted,

**GIDEON, COOPER & ESSARY, PLC**

/s/ Chris J. Tardio
**C.J. Gideon, Jr.***
**Chris J. Tardio***
**Alan S. Bean****
**Matthew H. Cline***
315 Deaderick Street, Suite
Nashville, TN 37238
Ph: (615) 254-0400
Fax: (615) 254-0459
chris@gideoncooper.com

***Attorneys for the Tennessee Clinic Defendants***

* Admitted pursuant to MDL Order No. 1.
** Admitted *pro hac vice*.

---

[21] This is explained, at length, at pp. 9-20 of Doc. 2274. Additionally, the affidavit filed at Doc. 2274-2 explains the reasons why this would be prejudicial to the Tennessee Clinic Defendants' defense of the cases. Notably, no party in the civil proceeding has ever disputed the importance of this testimony to the Tennessee Clinic Defendants' defense. The arguments at Doc. 2274 are incorporated as if stated fully herein.

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the CM/ECF system will be served electronically to the registered participants identified on the Notice of Electronic Filing and copies will be e-mailed or mailed via regular U.S. mail to those participants identified as unregistered this 24th day of November, 2015.

                                        /s/ Chris J. Tardio
                                        **Chris. J. Tardio**