# EXHIBIT 3

## Summary of Case Law on Health Care Provider Products Liability Nationally

**Summary of Case Law on Health Care Provider Products Liability Nationally**

For the Court's convenience, the STOPNC Defendants provide the following summary of cases addressing health care provider products liability nationally.

## 1. California

- *San Diego Hospital Ass'n. v. Superior Court*, 30 Cal.App.4th 8, 14-15 (Cal. App. 1994) ("Our Supreme Court has held that a pharmacy may not be strictly liable for dispensing a prescription drug. (*Murphy* v. *E.R. Squib b & Sons, Inc.* (1985) 40 Cal.3d 672 [221 Cal. Rptr. 447, 710 P.2d 247].) In doing so, the court in part relied upon cases rejecting strict liability for hospitals, doctors and dentists. (*Id.* at p. 677.) The court characterized hospitals, doctors and dentists as providers of medical services and not suppliers of products and stated they were not in the business of selling drugs or devices but rather used the product in a course of treatment to effect a cure. (*Id.* at p. 679.)

  It is clear from the foregoing authority that had Dr. Coombe's patient, rather than Dr. Coombe, been injured by a defective laser during the surgery, strict liability could not have been imposed against either the hospital or Dr. Coombe. . . .").

- *Pierson v. Sharp Memorial Hospital, Inc.*, 216 Cal.App.3d 340, 346 (Cal. App. 1989) ("Our conclusion Sharp may not be held strictly liable in tort is consistent with case law characterizing hospitals as providers of professional medical services rather than producers or marketers of products.").

- *Hector v. Cedars-Sinai Medical Center*, 180 Cal.App.3d 493, 504 (Cal. App. 1986) ("The essence of the relationship between hospital and patient is the provision of professional medical services necessary to effect the implantation of the pacemaker — the patient does not enter the hospital merely to purchase a pacemaker but to obtain a course of treatment which includes implantation of a pacemaker. (*Shepard* v. *Alexian Brothers Hosp., supra,* 33 Cal. App.3d at p. 611; *Silverhart* v. *Mount Zion Hospital, supra,* 20 Cal. App.3d at p. 1027.) As a provider of services rather than a seller of a product, the hospital is not subject to strict liability for a defective product provided to the patient during the course of his or her treatment. (*Murphy* v. *E.R. Squibb & Sons, Inc., supra,* 40 Cal.3d at p. 679; *Shepard, supra,* at p. 611; *Silverhart, supra,* at pp. 1027-1028; Rest.2d Torts, § 402A.

  Plaintiff argues Cedars-Sinai should not be exempt from the application of strict liability, in that its actions do not fall within any of the three previously recognized categories of exemption: blood and blood products, tools of the trade, and essential conduits. However, this argument presupposes Cedars-Sinai is in fact engaged in the business of selling pacemakers, thus otherwise subject to strict liability for selling a defective product; if the hospital is a provider of services, it is

not subject to strict liability and it is unnecessary to find an exemption to protect it from the application of the doctrine.").

- *Shepard v. Alexian Brothers Hospital*, 33 Cal.App.3d 606, 611 (Cal. App. 1973) ("Providing medicine or supplying blood is simply a chemical aid or instrument utilized to accomplish the objective of cure or treatment. The patient who enters a hospital goes there not to buy medicines or pills, not to purchase bandages, iodine, serum or blood, but to obtain a course of treatment (*Perlmutter* v. *Beth David Hospital, supra,* at pp. 795-796; *Silverhart* v. *Mount Zion Hospital* (1971) 20 Cal. App.3d 1022, 1027 [98 Cal. Rptr. 187]). It is also obvious that in the normal commercial transaction contemplated in the strict liability cases the essence of the transaction relates *solely* to the article sold, the seller is in the business of supplying the product to the consumer and it is that, and that alone for which he is paid (*Magrine* v. *Spector* (1968) 100 N.J. Super. 223 [241 A.2d 637]). (3) The foregoing marked distinctions compel the conclusion that *a hospital* is not engaged in the business of distributing blood to the public and *does not put the blood as a product on the market in order to profit therefrom.*").

- *Silverhart v. Mount Zion Hospital*, 20 Cal.App.3d 1022, 1027-1028 (Cal. App. 1971) ("A hospital is not ordinarily engaged in the business of selling any of the products or equipment its uses in providing such services. (2) The essence of the relationship between a hospital and its patients does not relate essentially to any product or piece of equipment it uses but to the professional services it provides.

  In the present case, the process of manufacturing and distribution ended with the person or firm that sold, leased or otherwise supplied the defective needle to defendant. The needle which was first placed on the market by the manufacturer left the stream of commerce when it came into defendant's possession. The needle then became a part of the surgical equipment of the hospital that was made available to surgeons for use in surgical procedures and as a part of the hospital's medical services. In sum, the hospital itself was a *user* of the needle since such needle was supplied to the hospital for its use in performing medical services incident to the normal and ordinary business of the hospital.").

## 2. Colorado

- *St. Luke's Hospital v. Schmaltz*, 534 P.2d 781, 784 (Col. 1975) ("Although respondent's complaint alleges that petitioner "sold" blood for the purposes of transfusion, such being essential to raise the issue of warranty, the totality of the allegations does not change the true character of the transaction from that of furnishing medical services to that of a simple sale. We simply do not view it as realistic to hold the transfusion of blood, in these circumstances, is a sale of a product. . . .

  The transaction between petitioner and respondent, in our view, was one for medical services and not the sale of a product.").

2

### 3. Connecticut

- *Zbras v. St. Vincent's Medical Center*, 880 A.2d 999, 1002 (Conn. App. 2005) ("On appeal, the plaintiffs explain for the first time in their reply brief the reasons for their assertion that statements contained in the affidavit were false. First, they claim that Varga's statement that "[a]t no time was St. Vincent's engaged in the business of selling" the devices used in the surgery was false because Peter Zbras' insurance company was billed for the devices. That claim evinces both a lack of understanding of the law and a mischaracterization of the facts. The defendant can bill for goods provided incidental to surgery without being in the business of selling goods. "Once a particular transaction is labeled a `service,' as opposed to a `sale' of a `product,' it is outside the purview of our product liability statute." *Zichichi v. Middlesex Memorial Hospital,* 204 Conn. 399, 403, 528 A.2d 805 (1987); see also General Statutes § 52-572m(a). The transaction in this case, a surgery, clearly was labeled a service rather than the sale of a product.").

- *Zelle v. Bayer Corp.*, 2012 WL 1435192, at *2-3 (Conn. Super. Feb. 2, 2012) ("The sole issue to be determined in this motion is whether Danbury Hospital as the provider of services to Ms. Zelle satisfies the legal criteria as a product seller of Magnevist and thus could be subjected to liability pursuant to C.G.S. § 52–572m(a).

  General Statute § 52–572m(a) defines "product seller" as "any person or entity, including a ... distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption." "To maintain a product liability action under 52–572m et seq., the plaintiff must establish and prove, inter alia, that the defendant was engaged in the business of selling the product ... [and that] the defect existed at the time of the sale ..." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Zichichi v. Middlesex Memorial Hospital,* 204 Conn. 399, 403, 528 A.2d 805 (1987). "Once a particular transaction is labeled a 'service,' as opposed to a 'sale' of a 'product,' it is outside the purview of our product liability statute." *Id.*

  The plaintiff argues that the hospital is a product seller because they have billed separately for the Magnevist. In other words, the MRI is billed as one item and the second item is the Magnevist. The plaintiff also contends that the filing of a motion to strike the non-product liability counts which was granted by the court is an admission that it is a product seller and thus the summary judgment should be denied.

  The defendant argues that the court in *Zkras* [sic] *v. St. Vincent's Medical Center,* Superior Court, J.D. Bridgeport at Fairfield, Docket No. CV 95323593 (March 20, 2002, Rush, J.), addressed this issue when it examined the separate billing of the TRSH hardware which was inserted during the operation and was billed separately from the procedure at the hospital. The *Zkras* [sic] court stated: "With respect to the fact that the equipment utilized in the operative procedure was

separately billed to the plaintiff, the court agrees with the statement contained in *Cafazzo v. Central Medical Health Services* 542 Pa. 526, 668 A.2d 521 (1995), where the court stated, "the thrust of the inquiry is thus not whether a separate consideration is charged for the physical material used in the exercise of medical skill but what service is performed to restore or maintain the patient's health." (Citations omitted.) *Id.* The plaintiff does not provide the court with any support for her position that the use of materials or supplies in providing an essential medical service in a hospital would create this theory of potential liability as a product seller. The defendants provide a vast number of Superior Court decisions where the courts have specifically distinguished from liability a service that would naturally require certain products to be utilized during the course of the procedure. . . .").

- *Lambert v. Charlotte Hungerford Hospital*, 2006 WL 3491275, at *2 (Conn. Super. Nov. 2, 2006) ("As to the plaintiff's first argument, the court finds that *Zbras* is controlling. The court finds that when a hospital provides the surgeon with hardware to perform a surgical procedure, it is performing a service and not selling a product. As to the second argument the court agrees with the reasoning of Silbert, J. in *Herrick v. Middlesex Hospital et al.,* CV 03-30100932, Superior Court, Judicial District of Middlesex, July 27, 2005, (39 Conn. L. Rptr. 624) that the mere fact that the hospital appears to have made a substantial profit on the hardware does not make it a product seller.").

- *Herrick v. Middlesex Hospital*, 2005 WL 1760785, at *5-*6 (Conn. Super. June 27, 2005) ("Recognizing that the weight of at least trial court authority was solidly against him, the plaintiff conducted extensive discovery in an effort to establish that the facts of his case were sufficiently different from those of the Superior Court cases previously cited such that there are issues in genuine dispute concerning the hospital's status as an alleged product seller. The court has reviewed the voluminous documentation provided by the plaintiff, including depositions of the Director of Surgical Services from Middlesex Hospital, the Director of Budget and Reimbursement from Middlesex Hospital, and the Purchasing Manager from Middlesex Hospital, the plaintiff's own affidavit, and various bills, invoices and photographs which reference the rod in question. Despite the plaintiff's exhaustive efforts to distinguish his case from those previous cited, however, the undisputed facts demonstrate that the hospital is in the business of providing a service and that its ancillary role in providing surgeons who use the hospital's facilities for medical operations with needed supplies, including the rod in question, does not undermine the hospital's primary role as a provider of services and not of products.

The plaintiff places great emphasis on the fact that the Hospital appears to have made a substantial profit when it billed the patient for the Russell-Taylor device, but he offers no authority for the proposition that the amount of profit should be a factor in determining whether a provider of a professional service should be deemed a product seller. Moreover, the undisputed evidence shows only that the

defendant charged the defendant [sic] a significantly higher price than it paid for the rod. The plaintiff offered no evidence concerning such issues as overhead and collectibility that could have a significant impact on the amount of "profit," if any. Thus, even if the issue of profit were relevant to the determination the court must make as to the defendant's status as a product seller, the plaintiff has submitted no convincing evidence that the defendant in fact profits from the sale of this or any other materials it furnishes to surgeons performing operations at its facilities.

Because the undisputed facts demonstrate that Middlesex Hospital is not a product seller within the meaning of the Connecticut Products Liability Act, the defendant hospital's motion for summary judgment as to the first count is granted.").

- *Ferguson v. EBI Medical Systems*, 1995 WL 462438, at *5 (Conn. Super. Aug. 1, 1995) ("Applying the law set forth herein to these particular facts, the court holds that Lawrence & Memorial was a provider of services of which the subject wrist fixators were an incidental part, rather than a "product seller" of such fixators under the PLA.).

## 4. District of Columbia
- *Iacangelo v. Georgetown University*, 2006 WL 4391359, at *5 (Mag. D.D.C. Oct. 11, 2006) ("[T]he weight of uncontradicted legal authority suggests that courts do not apply [strict liability] to a hospital or medical practitioner for injuries caused by medical instruments, drugs or other substances used in treatment."), adopted in pertinent part, 2007 WL 915224 (D.D.C. March 26, 2007).

## 5. Florida
- *NME Hospitals, Inc. v. Azzariti*, 573 So.2d 173, 173 (Fla. App. 1991) ("A hospital that utilizes an alleged defective product only in the course of its primary function of providing medical services is not subject to an action in strict liability where the professional services could not have been rendered without using the product. *North Miami General Hospital v. Goldberg,* 520 So.2d 650 (Fla. 3d DCA 1988).

  Accordingly, we find that the circuit court's order departed from the essential requirements of law. The petition for writ of certiorari is granted, and the case is remanded to the circuit court for proceedings consistent with this opinion.").

- *North Miami General Hospital, Inc. v. Goldberg*, 520 So.2d 650, 651 (Fla. App. 1988) ("The plaintiff recovered a money judgment against the North Miami General Hospital upon a jury's conclusion that she had sustained an injury caused by a manufacturing defect in a piece of equipment the hospital employed during an operation. We reverse on the ground that no strict liability claim lies against a hospital in these circumstances.").

6. **Georgia**
- *McCombs v. Southern Regional Medical Center*, Inc., 504 S.E.2d 747, 749 (Ga. App. 1998) ("In this case, McCombs did not go to Southern Regional to purchase a cervical plate but to have her spinal problem surgically repaired. Southern Regional furnished its facility for use by her surgeon, and it supplied the requisite underlying support services, including the recovery room, laboratory, pharmacy support, and nursing care, to help facilitate the surgery and her recovery from it. Thus, the transaction at issue was one involving "services and labor with an incidental furnishing of equipment and materials." (Punctuation omitted.) *J. Lee Gregory, Inc. v. Scandinavian House*, 209 Ga.App. 285, 288(1), 433 S.E.2d 687 (1993). As such, the Georgia UCC has no application. Id.; see *OMAC, Inc. v. Southwestern Machine, etc.,* 189 Ga.App. 42, 374 S.E.2d 829 (1988).

  In these circumstances the trial court did not err in dismissing these counts as a matter of law. OCGA § 9-11-12(b)(6). We will not reverse the correct ruling of a trial court regardless of the reason given therefore. See *Vaughan v. Vaughan,* 253 Ga. 76, 77, 317 S.E.2d 201 (1984); *Tony v. Pollard,* 248 Ga. 86, 88(1), 281 S.E.2d 557 (1981).").

7. **Illinois**
- *Brandt v. Boston Scientific Corp.*, 792 N.E.2d 296, 304 (Ill. 2003) ("In fact, the conclusion that the Health Center predominantly provided services in this case is in accord with the national trend on this issue. A majority of foreign jurisdictions hold that a hospital's provision of a defective surgical device is primarily a transaction for services rather than goods so that no implied warranty of merchantability claim is available. . . .

  Because we find that the transaction between Brandt and the Health Center was predominantly a transaction for services, article 2 of the UCC does not apply. Given this holding, we need not evaluate whether the Health Center is a merchant of medical devices.").

- *Greenberg v. Michael Reese Hospital*, 83 Ill.2d 282, 291 (Ill. 1980) ("For the reasons stated we conclude that public policy dictates against the imposition of strict liability in tort for injuries resulting from the administration of X-radiation treatments by a hospital.").

8. **Indiana**
- *St. Mary Medical Center, Inc. v. Casko*, 639 N.E.2d 312, 313-15 (Ind. App. 1994) ("The Indiana Products Liability Act provides that a seller who places any defective product unreasonably dangerous to any consumer into the stream of commerce is subject to liability if the consumer is in the class of persons that the seller should reasonably foresee as being subject to such harm, *the seller is engaged in the business of selling such a product,* and the product is expected to and does reach the consumer without substantial alteration of the condition in which it was sold. Ind. Code § 33-1-1.5-3(a). A "seller" is defined as "a person

6

engaged in business as a manufacturer, a wholesaler, a retail dealer, a lessor, or a distributor. I.C. § 33-1-1.5-2. The term "product" means "any item or good that is personalty at the time it is conveyed by the seller to another party. *It does not apply to a transaction that, by its nature, involves wholly or predominantly the sale of a service rather than a product." Id.* (emphasis added). St. Mary argues that it is not a seller which is engaged in the business of selling pacemakers, but that it is in the business of providing professional medical services to its patients, including facilities, skilled personnel, and equipment. St. Mary maintains that the sale of various items necessary for a patient's treatment are merely incidental to the overall purpose of providing health care. Casko counters that "[w]hile it is true St. Mary does employ nursing staffs and other medical personnel who provide treatment to patients, the predominate activity is to sell goods and products to patients." (Brief of Appellee at 9). Casko argues that the medical services provided by a hospital, consisting primarily of the nursing staff, should be treated under the Medical Malpractice Act, while the products sold by the hospital may properly be addressed by the Products Liability Act.

We cannot agree with Casko. . . .

. . . where the allegations of negligence were unrelated to a scheme of health care, the provision of a pacemaker is clearly a part of the overall medical services provided by the hospital. *See Methodist Hospital of Indiana, Inc. v. Ray* (1990), Ind. App., 551 N.E.2d 463, 466 (opinion adopted (1990), Ind., 558 N.E.2d 829). Samuel Casko entered St. Mary not merely to purchase a pacemaker, but to obtain a course of treatment which included the implantation of a pacemaker. This is supported by Casko's complaint, which alleged that the defendants, including St. Mary, "undertook to treat and provide health, medical, and surgical care, diagnosis and treatment to the Plaintiff, Samuel Casko." (R. 8). Casko attempts to argue two opposing contentions from the same set of facts: one, that St. Mary performed negligent medical services, and, two, that St. Mary is primarily a seller of goods and not a provider of medical services. Clearly, the essence of St. Mary's conduct in this case is not that of a seller of pacemakers but rather that of a provider of medical services. As such, it cannot be subject to strict liability for a defective product provided to a patient during the course of his or her treatment.").

## 9. Kansas

- Kan. Stat. Ann. § 60-3302(a) ("'Product seller' means any person or entity that is engaged in the business of selling products, whether the sale is for resale, or for use or consumption. The term includes a manufacturer, wholesaler, distributor or retailer of the relevant product, but does not include a health care provider, as defined in subsection (f) of K.S.A. 40-3401 and amendments thereto, who utilizes a product in the course of rendering professional services.").

7

10. **Louisiana**
   - *Huffaker v. ABC Ins. Co.*, 659 So.2d 544, 545-46 (La. Ct. App. 1995) (holding that claim against hospital for allegedly defective manufacture of prosthetic hip implanted at hospital was subject to Louisiana Medical Malpractice Act, La.Rev.Stat.Ann. 40:1299.41, which states: "Malpractice means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient.")

11. **Maryland**
   - *Roberts v. Suburban Hospital*, 532 A.2d 1081, 1088-89 (Md. App. 1987) ("We are persuaded to follow the *Perlmutter* theory and not to carve out a distinction, as we are urged to do, between the case of a plaintiff who receives a transfusion as part of some more general medical care, as in *Perlmutter,* and one who, like appellant, receives only the transfusion from the hospital. We adopt this view for four reasons.

     First, it appears to be the majority view throughout the country, even by judicial decision, and certainly comports with the actual law — now mostly statutory — in nearly every State. Second, notwithstanding the criticism of it, it appears to us to be a sounder rule than the alternatives proposed. A transfusion is not just a sale of blood which the patient takes home in a package. The transfusion of the blood — the injecting of it into the patient's bloodstream — is what he really needs and pays for, and that involves the application of medical skill. It would be artificial at best, and probably inaccurate, to conclude as a matter of law that the product predominates over the service. Third, although the 1971 statute applied only to hepatitis contamination, it would be anomalous to apply or not apply implied warranties or strict liability based upon the type of infection one gets. To draw from Gertrude Stein, a blood transfusion is a blood transfusion is a blood transfusion is a blood transfusion. If the blood is contaminated with an infectious virus, it is just as unmerchantable and unfit and unreasonably dangerous whether the virus produces hepatitis or AIDS; and, if the Legislature, as a matter of declared public policy, has decided to immunize hospitals and blood banks from implied warranty and strict liability in the one case, it makes little sense for the courts, given a choice, to impose liability in the other. Finally, and essentially for the same reason, it makes little sense to us to try to draw distinctions based on whether the patient has received some other service from the hospital. That too can be terribly artificial.

     For these reasons, we conclude that Counts I and II arose from the provision of a service — i.e., the rendering of health care — rather than the sale of a product. It

follows, then, that the complaint should have been dismissed for failure to follow the required administrative remedy.").

## 12. Michigan

- *Ayyash v. Henry Ford Health Systems*, 533 N.W.2d 353, (Mich. App. 1995) (summarized in the body of the brief).

- *Leith v. Henry Ford Hospital*, 2000 WL 33420641, at *2 (Mich. App. May 16, 2000) ("Our review of the record shows that plaintiff was involved in an accident and incurred serious, potentially life-threatening injuries as a result. Plaintiff argues, however, that defendant's only "involvement" was to provide him with a blood transfusion. The primary function of physicians and hospitals is to provide care, not to manufacture or distribute products, *id.,* and there is nothing in the record to refute our assumption that plaintiff was admitted to defendant hospital for the purpose of receiving medical care and treatment for his injuries. Because defendant's provision of a blood transfusion to plaintiff was merely incidental to its primary function of providing medical care and treatment, we conclude that the UCC is inapplicable to plaintiff's breach of warranty claim against defendant.") (unpublished).

## 13. Minnesota

- *Femrite v. Abbott Northwestern Hospital*, 568 N.W.2d 535, 543 (Minn. App. 1997) ("But Minnesota courts have never recognized the doctrine of strict liability for administrative services, and, in our primary role as an error-correcting court, we decline to recognize this cause of action here.").

## 14. Mississippi

- *Roell v. Stryker Corp.*, 2007 WL 2783357, at *3-4 (S.D. Miss. Sept. 21, 2007) ("Thus, defendants argue that SDH is not a "seller" within the scope of this statute, and therefore, say defendants, [Saint Dominic–Jackson Memorial Hospital ("SDH")] is not a proper defendant in this product liability lawsuit. *See Vergott v. Deseret Pharm. Co.,* 463 F.2d 12, 16 n. 5 (5th Cir.1972) (citing *Perlmutter v. Beth David Hospital,* 308 N.Y. 100, 123 N.E.2d 792 (N.Y.1954), for the proposition that "a hospital is not a seller engaged in the business of selling the product," but is instead a provider of services).

  Defendants' argument on the above point, that SDH is not a seller and thus not liable under the applicable statute, is not a common defense. In other words, this argument does not apply to the other defendants in this lawsuit. Further, even if successfully argued, this defense only applies to the product liability claim, and not to plaintiff's other claims.

  This court finds from the plain language of the statute and case authority cited above that SDH is not a "seller" within the scope of MPLA. Accordingly, this court dismisses this claim against SDH.

9

Next, this court examines whether SDH may be held liable as a "seller" under the Uniform Commercial Code (hereinafter "the U.C.C."). The court's focus here is on the U.C.C. whereas in the preceding paragraphs, the court focused upon the MPLA.

Roell asserts that SDH is liable for breach of implied and express warranties and warranty of fitness for a particular purpose under the U.C.C. In numerous jurisdictions which have adopted the U.C.C., courts have held that hospitals may not be held liable under the U.C.C. for the "sale" of an allegedly defective medical device. *See, e.g., Hoff v. Zimmer, Inc.,* 746 F.Supp. 872 (W.D.Wis.1990) (holding that a hospital could not be held liable for breach of warranty for an allegedly defective prosthetic hip device); *In re TMJ Implants Prod. Liab. Litig.,* 872 F.Supp. 1019 (D.Minn.1995), aff'd, 97 F.3d 1050 (8th Cir.1996) (holding a that a physician who installed a temporomandibular joint implant could not be liable under breach of warranty theories); *In re: Breast Implant Prod. Liab. Litig.,* 503 S.E.2d 445 (S.C.1998) ("[H]ealth care providers offer services, not products [.]"); *Pleasant v. Dow Corning Corp.,* 1993 U.S. Dist LEXIS 21488, at *1518 (D.S.C. January 7, 1993) (holding that a hospital's primary function in the sale of breast implants was the medical service supplied to the plaintiff); *Easterly v Hosp. of Tex., Inc.,* 772 S.W.2d 211 (Tex.App.1989) ("Texas follows the majority rule that the essence of the hospital stay is the furnishing of the institution's healing services. The services necessarily require certain goods or products, and these goods are usually incidental to the primary purpose of the hospital's function which is to heal."); *Fisher v. Sibley Mem'l Hosp.,* 403 A.2d 1130 (D.D.C.1979) ("To characterize as a sale the supplying of blood would mean that the hospital, no matter how careful, would be responsible, virtually as an insurer, if the patient were harmed as a result of impure blood.").

Roell has not identified, nor is this court aware of, any Mississippi authority that has recognized hospitals as "sellers" of medical devices or drugs used in the course of patient treatment services. Further, this court agrees with defendants that SDH may not be considered a "seller" of Roell's hip replacement device under the U.C.C. Therefore, this court dismisses the claim.").

## 15. Missouri
- *Budding v. SSM Healthcare System*, 19 S.W.3d 678, 681 (Mo. 2000) (malpractice statute "eliminate[d] liability of health care providers for strict products liability;" overruling prior cases that had allowed hospital strict liability).

## 16. New Hampshire
- *Royer v. Catholic Medical Center*, 144 N.H. 330, 335-36 (N.H. 1999) ("The plaintiffs do not allege in this case that the defendant altered the prosthesis in any way. Further, holding health care providers strictly liable for defects in prosthetic devices necessary to the provision of health care would likely result in higher health care costs borne ultimately by all patients, *see Ayyash v. Henry Ford Health Systems,* 533 N.W.2d 353, 355 (Mich. Ct. App. 1995); *Parker,* 919

P.2d at 1108; *Cafazzo,* 668 A.2d at 527, and "place an unrealistic burden on the physicians and hospitals of this state to test or guarantee the tens of thousands of products used in hospitals by doctors," *Ayyash,* 533 N.W.2d at 356; *see Parker,* 919 P.2d at 1110. Additionally, "research and innovation in medical equipment and treatment would be inhibited." *Cafazzo,* 668 A.2d at 527; *see Hoff,* 746 F. Supp. at 874-75. We find that the "peculiar characteristics of medical services[,]. . . [which] include the tendency to be experimental,... a dependence on factors beyond the control of the professional[,] and a lack of certainty or assurance of the desired result," *Cafazzo,* 668 A.2d at 527, outweigh any reasons that might support the imposition of strict liability in this context.

"In short, medical services are distinguished by factors which make them significantly different in kind from the retail marketing enterprise at which 402A is directed." *Id.* We conclude that where, as here, a health care provider in the course of rendering health care services supplies a prosthetic device to be implanted into a patient, the health care provider is not "engaged in the business of selling" prostheses for purposes of strict products liability. Accordingly, the trial court did not err in granting the defendant's motion to dismiss. . . ."

### 17. New Jersey

- *Snyder v Mekhjian*, 244 N.J. Super. 281, 291 (N.J. Super. App. Div. 1990) ("We appreciate the difference between having no test at all and having a test with a significant, if not perfect, degree of reliability. But even an 88% reliability factor is, in our view, insufficient to overcome the other policy reasons on which we relied in *Brody* in rejecting strict liability. In sum, considering the public health implications of blood collection and distribution and the non-profit status of that segment of the industry involved in *Brody,* we were there convinced that it would be inimical to the public interest to call upon the non-profit blood bank and those in its distributive chain to warrant a blood product whose safety was beyond their power to ensure. So here. In 1984, no matter how diligent and aggressive BCBC might have been in donor screening and laboratory testing, it would nevertheless necessarily have supplied some AIDS-contaminated blood. The unfortunate recipient of that blood would be in no different legal or equitable position than the plaintiff in *Brody,* nor would the blood bank. In short, product protection for the patient and legal protection for the blood bank remains the same — that is, that the blood bank is obliged to do everything it reasonably can do to ensure safety, but it cannot be responsible for what is not within its capacity to control. This rationale of *Brody* was forcefully reiterated by the Supreme Court in *Feldman v. Lederle Laboratories,* 97 *N.J.* 429, 442, 479 *A.*2d 374 (1984), the Court there holding that:

    > When the essential nature of the transaction involves a service rather than a product, public policy may dictate, in view of the status of the provider, that the general welfare is served better by inapplicability of the strict liability doctrine. Further, when the provider is a nonprofit institution that supplies a product and that

> product is vital to the public health, the doctrine may similarly be inapplicable. The common thread that runs through these cases is that in each of those situations there is a strong public policy rooted in the general welfare that justifies imposing responsibility only on the basis of a want of due care (negligence) rather than on the basis of a defective product (strict liability). . . .

Little need be said respecting the inapplicability of strict liability to defendants St. Joseph's, AABB, and the physicians. The physicians are clearly exempt under the holding and rationale of *Newmark v. Gimbel's, Inc.,* 54 *N.J.* 585, 258 *A.*2d 697 (1969). AABB is not itself a supplier or tester of blood. It itself does not deal in producing or distributing a product whether or not the blood bank itself does. As to St. Joseph's, we concur with the holding of *Johnson v. Mountainside Hosp.,* 239 *N.J. Super.* 312, 571 *A.*2d 318 (App.Div. 1990), that for purposes of product liability law, a hospital cannot be held strictly liable for a latently defective product supplied to it by another for its use in rendering treatment."), aff'd on opinion below, 593 A.2d 318 (N.J. 1991).").

- *Johnson v. Mountainside Hospital*, 571 A.2d 318, 320-321 (N.J. Super. App. Div. 1990) ("We also disagree with plaintiff's contention that his claim for relief against Mountainside Hospital was properly predicated upon a strict liability theory and, for that reason, the $10,000 limit on its liability was inapplicable. *Cf. Brody v. Overlook Hospital,* 121 *N.J. Super.* 299, 296 *A.*2d 668 (Law Div. 1972), rev'd on other grounds, 127 *N.J. Super.* 331, 317 *A.*2d 392 (App.Div. 1974), aff'd, 66 *N.J.* 448, 332 *A.*2d 596 (1975). Although there was evidence in the case showing that Mountainside Hospital charged a rental fee for the respirator, the trial judge held that the Hospital was in the business of providing health care to patients and therefore could not be treated as a lessor of equipment to whom strict legal liability applied. We agree. Our courts have refused to impose strict liability on health care providers. *Brody v. Overlook Hospital, supra,* 66 *N.J.* 448, 332 *A.*2d 596 (1975); *Baptista v. Saint Barnabas Medical Center,* 109 *N.J. Super.* 217, 262 *A.*2d 902 (App.Div. 1970), aff'd o.b. 57 *N.J.* 167, 270 *A.*2d 409; *Newmark v. Gimbel's, Inc.,* 54 *N.J.* 585, 258 *A.*2d 697 (1969); *Magrine v. Krasnica,* 94 *N.J. Super.* 228, 227 *A.*2d 539 (Cty.Ct. 1967), aff'd, 100 *N.J. Super.* 223, 241 *A.*2d 637 (App.Div. 1968), aff'd, 53 *N.J.* 259, 250 *A.*2d 129 (1969). . . .

The policy of these cases is applicable to the present case and supports the trial judge's decision that plaintiff cannot prevail against the hospital on the basis of a theory of strict liability.").

## 18. New Mexico

- *Parker v. St. Vincent Hospital*, 919 P.2d 1104, 1106-1107, 1110-11 (N.M. App. 1996) ("The claims regarding the TJRs present the most interesting and challenging issue raised by this appeal: whether a hospital should be strictly liable for supplying a defectively designed implant selected by the treating physician. We must address whether the Hospital should be treated as a

distributor of the implant and, if so, whether there are sound policy reasons not to treat a hospital the same as other distributors for purposes of strict products liability.

According to the weight of authority, a hospital is not a distributor of medical supplies, even though it may bill separately for the item and charge the patient a markup over the hospital's cost. *See Hoff v. Zimmer, Inc.,* 746 F.Supp. 872 (W.D.Wis.1990) (hip prosthesis); *Hector v. Cedars-Sinai Med. Ctr.,* 180 Cal.App.3d 493, 225 Cal.Rptr. 595 (1986) (pacemaker); *Fisher v. Sibley Memorial Hosp.,* 403 A.2d 1130 (D.C.1979) (blood for transfusion); *Roberts v. Suburban Hosp. Ass'n,* 73 Md.App. 1, 532 A.2d 1081 (1987) (same); *Baptista v. Saint Barnabas Med. Ctr.,* 109 N.J.Super. 217, 262 A.2d 902 (App. Div.) (same), *aff'd,* 57 N.J. 167, 270 A.2d 409 (1970); *Goldfarb v. Teitelbaum,* 149 A.D.2d *1107 566, 540 N.Y.S.2d 263 (1989) (mandibular prosthesis); *Ayyash v. Henry Ford Health Sys.,* 210 Mich.App. 142, 533 N.W.2d 353 (1995) (Vitek implant); *Cafazzo v. Central Med. Health Servs.,* 542 Pa. 526, 668 A.2d 521 (1995) (same); Tentative Draft No. 2, *supra,* § 5 cmt. c, at 165; *id.,* Reporters' Note c, at 168-69; *contra Cunningham v. MacNeal Memorial Hosp.,* 47 Ill.2d 443, 266 N.E.2d 897 (1970) (blood); *Bell v. Poplar Bluff Physicians Group,* 879 S.W.2d 618 (Mo.Ct.App.1994). The courts have generally held that the essence of the hospital's role is the provision of services, regardless of whether a product is involved. *See* Tentative Draft No. 2, *supra,* § 5 cmt. c, at 165; *id.,* Reporters' Note c, at 168-69.

Although we reject the view that hospitals are never engaged in the business of distributing medical products, we do not ignore the judicial authority in favor of relieving hospitals from exposure to strict products liability for such items. The results of those cases, if not the reasoning, appear to reflect a widely accepted view of public policy. Not only are we aware of no legislative action to overrule those decisions and impose strict products liability on hospitals, but also the few decisions that imposed such liability on hospitals with respect to blood products resulted in almost universal adoption of state laws removing such liability. *See* Tentative Draft No. 2, *supra,* § 4 cmt. c; *id.,* Reporters' Note to cmt. c; *cf. Hines v. St. Joseph's Hosp.,* 86 N.M. 763, 764-65, 527 P.2d 1075, 1076-77 (Ct.App.) (rejecting strict liability for blood), *cert. denied,* 87 N.M. 111, 529 P.2d 1232 (1974). . . .

Having analyzed the policies favoring strict products liability in the context of potential hospital liability for defectively designed medical products selected by treating physicians, we conclude that such liability is inappropriate. Although we have not followed other jurisdictions which have held that hospitals are not distributors of medical products, we find support for our conclusion in the results reached by the majority of courts that have considered strict-products liability claims against hospitals. In addition, we find support in Tentative Draft No. 2, *supra,* § 8(e), which states that retail sellers and other distributors of prescription

13

drugs and medical devices are subject to liability only for manufacturing defects or their own negligence.").

**19. New York**

- *Perlmutter v. Beth David Hospital*, 308 N.Y. 100, 104-105, 107-108 (N.Y. 1954) ("The answer to that question turns upon whether the transaction described in the complaint constitutes a sale under the Sales Act, whether, in other words, there was created a vendorvendee [sic] relationship between defendant and plaintiff.

  A hospital is devoted to the care and healing of the sick. Not only does it gather in its wards "a company of skilled physicians and trained nurses" and place their services "at the call of the afflicted" (*Schloendorff v. Society of N. Y. Hosp.*, 211 N.Y. 125, 135), but it also offers to patients resorting to the hospital "the benefit of facilities" and equipment, developed through medical science, "that would not otherwise be available." (*Hamburger v. Cornell Univ.*, 240 N.Y. 328, 336.) The essence of the contractual relationship between hospital and patient is readily apparent; the patient bargains for, and the hospital agrees to make available, the human skill and physical materiel of medical science to the end that the patient's health be restored. Such a contract is clearly one for services, and, just as clearly, it is not divisible. Concepts of purchase and sale cannot separately be attached to the healing materials — such as medicines, drugs or, indeed, blood — supplied by the hospital for a price as part of the medical services it offers. That the property or title to certain items of medical material may be transferred, so to speak, from the hospital to the patient during the course of medical treatment does not serve to make each such transaction a sale. "`Sale' and `transfer' are not synonymous", and not every transfer of personal property constitutes a sale. (*Halsted v. Globe Ind. Co.*, 258 N.Y. 176, 179.) It has long been recognized that, when service predominates, and transfer of personal property is but an incidental feature of the transaction, the transaction is not deemed a sale within the Sales Act. (See *Racklin-Fagin Constr. Corp. v. Villar*, 156 Misc. 220; *Saugus v. B. Perini & Sons, Inc.*, 305 Mass. 403; *Stevens Implement Co. v. Hintze*, 92 Utah 264; *Crystal Recreation, Inc., v. Seattle Assn. of Credit Men*, 34 Wn. 2d 553; see, also, 1 Williston on Sales [Rev. ed., 1948] §§ 54-55a, pp. 144-149; Benjamin on Sale [8th ed., 1950] p. 166; 77 C. J. S., Sales, § 2, p. 584; *105 cf. *Babcock v. Nudelman*, 367 Ill. 626.) As Benjamin put it in his work on Sale (*op. cit.*, p. 166), 'a contract of sale is not constituted merely by reason that the property in the materials is to be transferred * * *. If they are simply accessory to work and labour, the contract is for work, labour and materials. Such is the case of medicine supplied by a medical man to a patient, or by a farrier to a horse.' . . .

  It follows from the foregoing that the complaint should be dismissed, *unless*, as the court at Special Term believed, we are foreclosed by the allegation that the hospital "sold" the blood to plaintiff. To adopt such a view represents an oversimplification of the case. The sufficiency of the complaint cannot be made to

14

turn on the presence of any particular word or words. It is the totality of the facts themselves which must be examined to determine the complaint's validity, not plaintiff's characterization of them or the conclusion which she seeks to draw from them. (See, e.g., *Greeff v. Equitable Life Assur. Soc.*, 160 N.Y. 19, 29; *Red Robin Stores v. Rose*, 274 App. Div. 462, 465; cf. *Skinner Bros. Mfg. Co. v. Shevlin Eng. Co.*, 231 App. Div. 656, 659, affd. 257 N.Y. 562.) In this case, it is plain that what the complaint alleges and truly describes is not a purchase and sale of a given quantity of blood, but a furnishing of blood to plaintiff for transfusion at a stated sum, as part of, and incidental to, her medical treatment. . . .

Our conclusion that the complaint fails to state a cause of action for breach of implied warranty under the Sales Act leaves untouched the question of defendant's liability for negligence, if any.

- *Goldfarb v. Teitelbaum*, 149 A.D.2d 566, 567 (N.Y. App. Div. 1989) ("The record is clear that the plaintiff Miriam Goldfarb sought treatment from the defendant in order to have her teeth capped. As a part of the procedure, the mandibular prosthesis was required. The placing of the prosthesis in Mrs. Goldfarb's mouth did not constitute a "sale" of the device as required for a cause of action sounding in products liability and breach of warranty (*see*, *Milau Assocs. v North Ave. Dev. Corp.*, 42 N.Y.2d 482; *Perlmutter v Beth David Hosp.*, 308 N.Y. 100). The insertion of the prosthetic device was only a procedure incidental to medical treatment (*see*, *Perlmutter v Beth David Hosp.*, *supra*; *Probst v Einstein Med. Center*, 82 AD2d 739; *Osborn v Kelley*, 61 AD2d 367). Hence, the plaintiffs have failed to set forth a valid cause of action sounding in either breach of warranty or products liability.").

- *Probst v. Albert Einstein Medical Center*, 440 N.Y.S.2d 2, 3 (N.Y. App. Div. 1981) ("The insertion of the metal rod was incidental to the medical services provided by the Center and Hoppenfeld. Since they did not technically sell the metal rod to the plaintiff, there is no merit to the two new causes proposed against them in the amended complaint (*Perlmutter v Beth David Hosp.*, 308 N.Y. 100). Hence, the plaintiff's motion should have been denied.").

- *Simone v. Long Island Jewish Hillside Medical Center*, 81 Misc.2d 163, 165-166 (N.Y. Sup. 1975) ("Recently in *Shepard v Alexian Bros. Hosp.* (33 Cal App 3d 606) the Court of Appeal, Division 2, was called upon to decide the question of whether or not a blood transfusion, the alleged cause of the plaintiff's injury, constituted a cause of action under the doctrine of strict liability. At issue therein was a statute adopted by the State of California (Health and Safety Code, § 1606) which is not unlike subdivision 4 of section 580 of the Public Health Law. It is interesting to note that the rationale behind section 1606 was expressed in the *Perlmutter* case (*supra*). The court held (p 610) that "since section 1606 and its underlying rationale compel the conclusion that a blood transfusion must be regarded as a service, the doctrine of strict liability in tort is inapplicable as a

15

matter of law." The court further stated (p 611): "The patient who enters a hospital goes there not to buy medicines or pills, not to purchase bandages, iodine, serum or blood, but to obtain a course of treatment (*Perlmutter v Beth David Hospital*, *supra*, [123 NE2d at pp 795-796]; *Silverhart v Mount Zion Hospital* [1971], 20 Cal App 3d 1022, 1027 [98 Cal Rptr 187]). It is also obvious that in the normal commercial transaction contemplated in the strict liability cases the essence of the transaction relates *solely* to the article sold, the seller is in the business of supplying the product to the consumer and it is that, and that alone for which he is paid (*Magrine v Spector* [1968], 100 NJ Super. 223 [241 A2d 637]). The foregoing marked distinctions compel the conclusion that *a hospital* is not engaged in the business of distributing blood to the public and *does not put the blood as a product on the market in order to profit therefrom.*").

- *Tucker v. Kaleida Health*, 2011 WL 1260117, at *3-*4 (W.D.N.Y. March 31, 2011) ("In her first cause of action, Plaintiff alleges that Kaleida purchased from Howmedica a fractured femoral component which it resold to her, thereby passing on an implied warranty that the component was fit for its intended use. (Am.Compl.¶¶ 24–26.) This Court agrees that, as a matter of law, there are no set of facts Plaintiff can plead relative to the alleged failure of her right hip prosthesis, that would permit her to maintain a breach of warranty claim against Kaleida.

  More than a half-century ago, the Court of Appeals of New York held that the nature of the relationship between hospital and patient is that of a service, rather than a sale. *Perlmutter v. Beth David Hospital,* 308 N.Y. 100, 123 N.E.2d 792 (1954). Thus, a patient's receipt of tangible materials is merely an incidental adjunct to the services performed, and the service provider is not a seller for products liability purposes. *Id.; see also, Weissman v. Dow Corning Corp.,* 892 F.Supp. 510, 517 (S.D.N.Y.1995) (citing *Perlmutter,* 308 N.Y. at 123).

  In *Probst v. Albert Einstein Med. Ctr.,* a plaintiff sought to amend her complaint to add claims for breach of warranty and strict products liability against the medical center and a physician on the grounds that they had "sold" her the metal rod that had been inserted into her back, which rod later fractured. 82 A.D.2d 739 (1st Dep't 1981). Citing *Perlmutter,* the appellate court reversed the trial court's granting of the motion to amend on the ground that the proposed amendments did not state any valid claim for relief. *Id.*

  Since *Perlmutter* and *Probst,* courts applying New York law consistently have held that, as a matter of law, hospitals and medical professionals cannot be held liable for a purported "sale" of supplies or devices associated with treatment under a breach of warranty or strict products liability theory. *See, Weissman,* 892 F.Supp. 510 (holding defendant cannot be held liable for medical services incidental to treatment even if the procedure is "cosmetic" rather than health care related); *see also, Betro v. GAC Int'l, Inc.,* 158 A.D.2d 498, 551 N.Y.S.2d 72 (2nd Dept.1990) (third-party defendant physician or hospital was not liable under a

theory of breach of warranty and strict products liability since the prescription of a night brace is incidental to medical treatment rather than a "sale" of the device); *Goldfarb v. Teitelbaum,* 149 A.D.2d 566, 540 N.Y.S.2d 263 (2nd Dept.1989) (defendant dentist could not be held liable for placing the allegedly defective mandibular prosthesis into plaintiff's mouth since such a service does not constitute a "sale" as required for an action sounding in products liability and breach of warranty).

As in the foregoing cases, Plaintiff's breach of warranty claim is predicated on Kaleida's purported "sale" of the prosthetic components she received during her surgery at Buffalo General. It is clear there is no possibility that a right to relief exists under the governing law with respect to this claim.").

- *Pantano v. Telectronics Pacing Systems, Inc.*, 1996 WL 107099, at *1 (W.D.N.Y. Feb. 15, 1996) ("The plaintiffs cannot state a strict products liability claim against the Hospital  because, under New York law, a hospital is not considered a seller, designer or manufacturer of the medical supplies it provides incidental to its provision of medical services. *Perlmutter v. Beth David Hospital,* 308 N.Y. 100 (1954), *reargument denied,* 308 N.Y. 812 (1955); *Trevithick v. Abbott Laboratories,* 421 N.Y.S.2d 706 (3d Dep't 1979) (causes of action for breach of warranty and strict products liability are not available against defendant hospital); *Osborn v. Kelley,* 402 N.Y.S.2d 463, 464 (3d Dep't 1978). Thus, such causes of action will be dismissed as to the Hospital. . . .").

- *Weissman v. Dow Corning Corp.*, 892 F. Supp. 510, 517-518 (S.D.N.Y. 1995) ("Plaintiff attempts to distinguish *Perlmutter* by arguing that that case involved "health" care while the instant case involves a purely elective, cosmetic procedure not intended to improve plaintiff's health. Plaintiff's Memorandum of Law, at 10 n. 1. That argument is unpersuasive. *Perlmutter* turns on the standard of care applicable to the medical profession in general, not on the type of care provided. While *Perlmutter* cites the risks and dangers inherent in "the art of healing" as a reason for rejecting faultless liability in the medical services context, those risks and dangers were equally present in the procedure plaintiff underwent. The fact that plaintiff was or was not intended to be "healed" by the medical service has little, if any, legal significance. Moreover, the type of medical services provided does not transform what is primarily a service into the sale of a product. . . .

  . . . . Here, because Dr. Rish primarily provided plaintiff medical services, under *Perlmutter* plaintiff may not maintain her failure to warn, negligence, breach of warranty, and strict products liability causes of action against Dr. Rish on the basis that he was a seller or distributor of a defective product.").

- *Samuels v. Health & Hospital Corp.*, 432 F. Supp. 1283, 1284-85 (S.D.N.Y. 1977) ("The essence of the strict products liability doctrine as set forth by the Court of Appeals of the State of New York in *Codling v. Paglia,* 32 N.Y.2d 330,

345 N.Y. S.2d 461, 298 N.E.2d 622 (1973) is that a party injured by a defective product may recover damages from the manufacturer of that product without the requirement of proving that the manufacturer was negligent. No cases have held that the furnishing of services is encompassed by this doctrine. Specifically, the doctrine of strict liability in tort is inapplicable to the service by the hospital of providing blood transfusions. *Simone v. Long Island Jewish Hillside Medical Center,* 81 Misc.2d 163, 364 N.Y.S.2d 714 (Sup.Ct.Nassau Co.1975); *Shepard v. Alexian Brothers Hospital, Inc.,* 33 Cal.App.3d 606, 109 Cal.Rptr. 132 (Ct. App.2d Div.1974).").

## 20. North Carolina

- *Batiste v. American Home Products Corp*., 231 S.E.2d 269, 272-273 (N.C. Ct. App. 1977) ("The physician offers his professional services and skill. It is his professional services and his skill for which he is paid, and they are the essence of the relationship between him and his patient. To say that the issuance of a prescription for drugs, which prescription is to be filled by a pharmacist should the patient desire to follow the physician's suggestion, constitutes the transfer of title to the drugs in the formula in the prescription, is simply too unrealistic for serious consideration.

  The fact remains that one does not normally go to a physician to purchase medicines or drugs or bandages or other items incidental to medical treatment. Plaintiff alleged in her complaint that she 'employed and consulted with' defendant in his professional capacity '*for the purpose of securing medical services and advice.*' . . .

  We adhere to the general and majority rule that those who, for a fee, furnish their professional medical services for the guidance and assistance of others are not liable in the absence of negligence or intentional misconduct. We, therefore, hold that the court committed no error in dismissing the eleventh and twelfth claims for relief.").

## 21. Oklahoma (federal courts interpreting Oklahoma law)

- *Hollander v. Sandoz Pharmaceuticals Corp*., 289 F.3d 1193, 1217 n.22 (10th Cir. 2002) ("We do note, as Presbyterian Hospital observes in its response brief, that an overwhelming majority of jurisdictions have refused to apply strict liability principles to claims against hospitals and physicians involving the distribution of allegedly dangerous drugs or medical devices. *See, e.g, Royer v. Catholic Med. Ctr.,* 144 N.H. 330, 741 A.2d 74 (1999) (affirming the dismissal of a products liability claim based on an allegedly defective prosthesis and reasoning that where "a health care provider in the course of rendering health care services supplies a prosthetic device to be implanted into a patient, the health care provider is `not engaged in the business of selling' prostheses for purposes of strict products liability"); *Cafazzo v. Central Med. Health Servs., Inc.,* 542 Pa. 526, 668 A.2d 521, 525 (1995) (rejecting products liability claim based on a prosthesis and reasoning that "hospitals and physicians are not sellers,

18

providers, suppliers, or distributors of products such as to activate 402A" and that the policy reasons for strict liability are not present); *Ayyash v. Henry Ford Health Sys.,* 210 Mich.App. 142, 533 N.W.2d 353, 354 (1995) (rejecting products liability claim against a hospital based on an allegedly defective temporomandibular joint implant and reasoning that when "a putative defendant uses a defective product in the course of providing a service, the courts must decide whether the `transaction' is primarily a sale or a service" and concluding that "[i]n the case of a physician or hospital rendering medical care courts typically have characterized the `transaction' as a service" and adopting that characterization for policy reasons); *see generally* Linda A. Sharp, Annotation, *Liability of Hospital or Medical Practitioner under Doctrine of Strict Liability in Tort or Breach of Warranty, for Harm Caused by Drug, Medical Instrument, or Similar Device Used in Treating Patient,* 65 ALR 5th 357, 371 § 2(b) (1999) (noting "the continued reluctance by most courts to apply no-fault products liability principles in actions against medical defendants for injuries caused by medical products"). . . .

Although Oklahoma courts do not appear to have answered this particular question, we have no reason to believe that those courts would disagree with the majority rule and extend products liability to hospitals in circumstances like those in the case at bar. *Cf. Allenberg v. Bentley Hedges Travel Serv., Inc.,* 22 P.3d 223, 230-31 (Okla.2001) (holding that commercial sellers of used products may not be held strictly liable, "at least if the alleged defect was not created by the seller, and the product is sold in essentially the same condition as when it was acquired for resale"). For that reason, and because the Hollanders did not seek certification in the district court proceedings, we DENY their motion for certification to the Oklahoma Supreme Court. *See Boyd Rosene & Assocs., Inc. v. Kansas Municipal Gas Agency,* 178 F.3d 1363, 1365 (10th Cir.1999) (observing that "[c]ertification is never compelled, even when there is no state law governing an issue"); *Massengale v. Oklahoma Bd. of Examiners in Optometry,* 30 F.3d 1325, 1331 (10th Cir.1994) (stating that "[w]e generally will not certify questions to a state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court").").

- *Von Downum v. Synthes*, 2012 WL 5463900, at *5 (N.D. Okla. Nov. 8, 2012) ("*In [Brewer v. Acromed Corp.,* Case No. 96–C–311–K, 1996 WL 34586260 (N.D.Okla.) (unpublished). [Dkt. # 17, Ex. 1]]*, Judge Kern granted a motion to dismiss a claim for strict liability against St. John Hospital for an allegedly defective internal spinal fixation device implanted during surgery at the hospital. He found that "the overwhelming weight of authority" favored defendant and "[i]t is hornbook law that a health-care provider cannot be held strictly liable for a latent defect in a medical device manufactured by a third party." [*Id.* at 2]. The court concurs with *Hollander* and *Brewer*. The Hospital is primarily in the business of rendering health care services; it is not a member of the manufacturer's marketing chain, as contemplated under § 402A of the

Restatement (Second). Thus, Van Downum cannot state a cognizable claim for strict liability against the Hospital.").

## 22. Pennsylvania

- *Cafazzo v. Central Medical Health Service, Inc.*, 668 A.2d 521 (Pa. 1995) (summarized in the body of the brief).

- *Podrat v. Codman-Shurtleff, Inc.*, 384 Pa. Superior Ct. 404, 410 (Pa. Super. 1989) ("In support of their position Appellants rely upon a claim that the hospital charged the patient for the use of this instrument. First we note the the [sic] record does not support this claim. Although Mr. Podrat testified that he received a bill for "surgery and medical supplies," (N.T. 3/11/87), there is no evidence that a charge was made for the use of this particular piece of equipment. Further, even if a charge was made, the outcome of this case would not be affected. As stated in *Hector v. Cedars-Sinai Medical Center, supra* 180 Cal.App.3d at 506, 225 Cal.Rptr. at 600, a charge in and of itself does not place the hospital in the business of selling. We must concentrate not on how the hospital charges, or whether in fact it does charge, but rather what the hospital does. *Id. See also Francioni v. Gibsonia Truck Corporation,* 472 Pa. 362, 369-70 n. 3, 372 A.2d 736 (1977) (although strict liability is applied to conventional lease situation it is not applicable where the lessor is not marketing the product but merely financing its acquisition).

  In sum, we conclude that the trial court did not err in finding that the hospital could not be liable under a theory of strict liability because the hospital was not in the business of selling this instrument, its use was only incidental to the hospital's primary function of providing medical services and the medical services could not have been rendered without the use of this product.").

- *Eby v. Milton S. Hershey Medical Center*, 31 Pa. D. & C.4th 121, 127 (Pa. C.P. 1996) ("We find that the hyperalimentation solution administered to Joseph Eby was the treatment rendered by the hospital and that is was critical to the provision of medical services which is Medical Center's primary activity. Therefore, in accordance with the *Cafazzo* decision, we find that a cause of action for strict liability cannot be asserted against the Medical Center, that the entry of partial summary judgment is appropriate").

- *LaValla v. Parker*, 1991 WL 17757, at *4 (E.D. Pa. Feb. 12, 1991) ("In the present case the product at issue is Hespan. The University of Pennsylvania Hospital did not manufacture the Hespan, but provided it as required in the course of a surgical procedure. Just as in the *Podrat* case, the use of Hespan was incidental to the hospital's primary function of providing medical services. Accordingly, this Court finds that under Pennsylvania law, the hospital cannot be found liable under a theory of strict lability because the hospital was not in the business of selling Hespan. The Trustee's Motion for Summary Judgment as to count V of the complaint will be granted. An appropriate Order follows.").

- contra *Karibjanian v. Thomas Jefferson University Hospital*, 717 F. Supp. 1081 (E.D. Pa. 1989) (pre-Cafazzo).

## 23. South Carolina

- *In re Breast Implant Product Liability Litigation*, 331 S.C. 540 (S.C. 1998) (summarized in the body of the brief).

- *Pleasant v. Dow Corning Corp.*, 1993 WL 1156110, at *5 (D.S.C. Jan. 7, 1993) ("Because the Hospital was primarily engaged in providing medical services necessary to affect the implantation of the prosthetics, rather than the sale of goods, it cannot be liable under a theory of strict liability. *Hector,* 225 Cal.Rptr. at 599–600. *Doe v. American Red Cross Blood Services,* 297 S.C. 430, 377 S.E.2d 323 (1989) (describing the provision of a transfusion of blood as a service). To subject the Hospital to strict liability for providing a patient with an allegedly defective prosthetic device would be a dramatic departure from well-settled precedent from numerous jurisdictions. Accordingly, the court finds that the plaintiff cannot recover against the Hospital under a theory of strict liability in tort.").

## 24. Texas

- *Cobb v. Dallas Fort Worth Medical Center-Grand Prairie*, 48 S.W.3d 820, 826-27 (Tex. App. 2001) ("In this case, the Cobbs allege that the transpedicular hardware and screws installed in Mrs. Cobb are defective because they are the wrong size and non-FDA approved. They argue that the transpedicular "set" is separable from the services of DFWMC and thus DFWMC may be strictly liable.

  DFWMC is not in the business of independently selling "TSRH sets" to the public, nor is it in the business of providing them outside of its primary purpose of providing medical facilities. Also, Mrs. Cobb could not have provided her own "set" for use during her surgery. Accordingly, we hold that the allegedly defective pedicular hardware and screws installed in Mrs. Cobb's back are inseparable from the services rendered by the hospital. Therefore, DFWMC established its entitlement to judgment as a matter of law on the Cobbs's strict liability claim. This holding necessarily forecloses the Cobbs's claims of implied and express warranties under the DTPA as well. *See Walden v. Jeffery,* 907 S.W.2d 446, 448 (Tex.1995); *Easterly v. Hospital of Texas, Inc.*, 772 S.W.2d 211, 214 (Tex. App. 1989).").

- *Easterly v. Hospital of Texas, Inc.*, 772 S.W.2d 211, 213 (Tex. App. 1989) ("As a general proposition, a hospital cannot be held strictly liable for defective services as opposed to defective products. *Nevauex v. Park Place Hosp., Inc.,* 656 S.W.2d 923, 925 (Tex.App.—Beaumont 1983, writ ref'd n.r.e.). *See, e.g., Langford v. Kraft,* 551 S.W.2d 392, 396 (Tex.Civ.App.—Beaumont 1977), *aff'd,* 565 S.W.2d 223 (Tex.1978). *See generally* Sales, *Strict Tort Liability,* 11 Hous.L.Rev. 1043, 1066 (1974). Strict liability, however, has been applied to

hospitals where the court found that the hospital introduced into the stream of commerce a defective product unrelated to the essential professional relationship. *Thomas v. St. Joseph Hosp.,* 618 S.W.2d 791, 796-97 (Tex.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). Therefore, we must ascertain whether the epidural kit was intimately and inseparably connected to the professional service of providing Jennifer Easterly with anesthesia during the delivery of her child.

For strict liability to apply, the product must be released in some manner to the consuming public. *American Cyanamid Co. v. Frankson,* 732 S.W.2d 648 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.). An epidural kit is not an ordinary good offered to the general public in regular commercial transactions. *See Barbee v. Rogers,* 425 S.W.2d 342, *passim* (Tex.1968); *Vergott v. Deseret Pharmaceuticals Co.,* 463 F.2d 12, 16-17 (5th Cir.1972). The hospital is not in the business of selling epidural kits separate from the medical relationship between doctor and patient involving the furnishing of medical services.

The "sale" of the epidural kit was integrally related to the medical procedure—the kit was not a separate good sold in a commercial transaction. *See Shivers v. Good Shepherd Hosp. Inc.,* 427 S.W.2d 104, *passim* (Tex.Civ.App.—Tyler 1968, writ ref'd n.r.e.) (hospital not strictly liable because it was not a manufacturer or distributor of alleged defective drug); *Ethicon, Inc. v. Parten,* 520 S.W.2d 527, 533 (Tex.Civ.App.—Houston [1st Dist.] 1975, no writ) (hospital not strictly liable for a needle which broke off in patient's vaginal cuff). In other words, the epidural kit was so intimately connected to the service provided as to lose its separate character as a good. *Thomas v. St. Joseph Hospital,* 618 S.W.2d at 791, cited by the Easterlys, is distinguishable because, in that case, the patient could have provided his own pajamas; in this case, Jennifer Easterly could not have provided her own epidural kit nor her own anesthesia. Accordingly, summary judgment was proper on the Easterly's strict liability cause of action.").

- *Shivers v. Good Shepherd Hospital, Inc.*, 427 S.W.2d 104, 107 (Tex. Civ. App. 1968) (rejecting §402A strict liability against hospital for administration of prescription drug), writ ref'd n.r.e.

- *Vergott v. Deseret Pharmaceutical Co.*, 463 F.2d 12, 16 n.5 (5th Cir. 1972) ("Even if § 402A is applicable, a hospital is not a seller engaged in the business of selling the product. *Cf.* Perlmutter v. Beth David Hospital, 1954, 308 N.Y. 100, 123 N.E.2d 792.").

## 25. Washington

- *Howell v. Spokane & Inland Empire Blood Bank*, 114 Wn.2d 42, 51-52, 54 (Wash. 1990) ("we need next to determine if the transfusion of blood is considered a service or a sale by hospitals and blood banks under the common law. Although the origin of strict liability is in tort and breach of implied warranty arises from contract, both claims are based upon a sale of goods rather than a

service. *See Reilly v. King Cy. Cent. Blood Bank, Inc.,* 6 Wn. App. 172, 492 P.2d 246 (1971); RCW 62A.2-106. Whether the claim is of strict liability or implied warranty, it is actionable only as to defective products but not to defective services. *Roberts v. Suburban Hosp. Ass'n, Inc.,* 73 Md. App. 1, 8, 532 A.2d 1081 (1987); *Barbee v. Rogers,* 425 S.W.2d 342, 346 (Tex. 1968); Sales, *An Overview of Strict Tort Liability in Texas,* 11 Hous. L. Rev. 1043, 1066 (1974). While we recently held in *Washington Water Power Co. v. Graybar Elec. Co.,* 112 Wn.2d 847, 774 P.2d 1199, 779 P.2d 697 (1989) that the Washington product liability act, RCW 7.72, preempts previously existing common law product liability remedies, "human blood and its components" are expressly excluded from coverage under the act. *See* RCW 7.72.010(3)-(5). Thus, the common law governs the resolution of plaintiffs' strict liability and implied warranty claims. *See* RCW 7.72.020. Both claims may be analyzed together for purposes of determining if summary judgment was properly granted.

In *Gile v. Kennewick Pub. Hosp. Dist.,* 48 Wn.2d 774, 296 P.2d 662, 59 A.L.R.2d 761 (1956), we stated that a patient is not in the hospital to purchase goods, including blood, but rather to receive services. *Gile* relied on *Perlmutter v. Beth David Hosp.,* 308 N.Y. 100, 123 N.E.2d 792 (1954), which is the seminal case applying the service/sale distinction to cases involving the administration of blood by hospitals. In *Perlmutter,* the court reasoned that a blood transfusion, allegedly containing harmful impurities, was incidental and secondary to the hospital services and thus not within the provisions of sales law. *Perlmutter,* at 106. *Perlmutter* is the majority view with respect to transfusion cases against hospitals. *See generally Roberts v. Suburban Hosp. Ass'n, Inc., supra* at 12 n. 6 (listing cases following *Perlmutter*). *But see, contra, Cunningham v. MacNeal Mem. Hosp.,* 47 Ill.2d 443, 266 N.E.2d 897 (1970). (It should be noted that *Cunningham,* which rejected the service analysis, appears to be the only case refuting this view. *See Roberts v. Suburban Hosp. Ass'n, Inc., supra* at 13. Furthermore, the Illinois Legislature quickly overturned the *Cunningham* ruling. *See Glass v. Ingalls Mem. Hosp.,* 32 Ill. App.3d 237, 336 N.E.2d 495 (1975)).

In agreement with *Perlmutter, Gile* characterized the relationship between the hospital and patient as one of service, not sale. . . .

For the foregoing reasons we hold the trial court correctly dismissed plaintiffs' strict liability and implied warranty claims against defendants Deaconess and the SIEBB.").

- *McKenna v. Harrison Memorial Hospital*, 960 P.2d 486, 489 (Wash. App. 1998) ("McKenna entered Harrison Hospital, not to purchase the screw and rod device inserted in her spine, but to receive the surgery to which the device was incidental. And in providing ancillary surgical services, Harrison Hospital was not a seller of the device, but rather a provider of professional services. Harrison is, therefore, exempt from liability for the broken device under the Washington Product Liability Act.").

23

- *Doyle v. Planned Parenthood of Seattle-King County, Inc.*, 31 Wn. App. 126, 132 (Wash. App. 1982) ("We find no Washington authority for Doyle's proposed addition of a strict liability claim against Planned Parenthood. Given the granting of summary judgment, the untimely motion to amend the complaint, and the lack of legal support for the proposed theory of liability, we conclude that the trial court did not err in denying the motion to amend the complaint.").

## 26. West Virginia

- *Foster v. Memorial Hospital Ass'n*, 219 S.E.2d 916, 917 (W. Va. 1975) ("The Circuit Court of Kanawha County granted a summary judgment for the defendant hospital on the grounds that an exchange of blood is not a "sale" which would support an action in warranty, but rather is the performance of a "service." As the Circuit Court's decision is in harmony with the great weight of authority throughout the country, and as this Court holds that an action in warranty is improper, the judgment of the Circuit Court is affirmed.").

## 27. Wisconsin

- *Hoven v. Kelble*, 79 Wis.2d 444, 463-464, 471 (Wis. 1977) ("Where 'professional' services are in issue the cases uniformly require that negligence be shown. We have found no decision of any court applying strict liability to the rendition of professional medical services. . . . Moving from the malpractice concept even with its many problems to a strict liability system at the present time appears to be a dubious move").

- *Satorius v. Proassurance Wisconsin Insurance Co.*, ___ N.W.2d ___, 2012 WL 5319213 ¶¶20-22 (Wis. App. Oct. 30, 2012) *cert. denied,* 2013 W.I. 40 (Wis. 2013) (In essence, the Satoriuses contend they have placed Luther Hospital's negligence at issue by submitting evidence that a Luer-Lok syringe is less prone to failure than a tension syringe. To accept this argument would be to remove Luther Hospital's conduct from the negligence realm and elevate it to a form of strict liability.

  Our supreme court rejected a strict theory of liability in the medical services context in *Hoven.* There, the plaintiff argued that he would be entitled to recovery if he could show "that a hypothetical virtually perfectly informed doctor, working in a perfectly equipped hospital, could have avoided the untoward result,. . . notwithstanding that the defendant exercised reasonable care in all respects." *Id.* at 460. The court determined that adopting this theory of liability "would set the standard of performance for the entire medical profession at the zenith of that profession's achievement, a level at which by definition virtually no one could perform all the time." *Id.*

  Even if arguably sounding in negligence, the Satoriuses' claim does not pass muster. At the very least, such a claim would require some evidence that the applicable standard of care in the medical community is to use the safest

equipment available. The Satoriuses have supplied no evidence that this is the standard. Further, such a claim treads dangerously close to the line drawn in *Hoven.* Under the plaintiff's rejected theory there, "[t]hat which might possibly have been done would be required, or liability would result, and inevitably, the matter would be judged with the acuity of vision which hindsight provides." *Id."*).

- *Hoff v. Zimmer*, 746 F. Supp. 872, 874-875 (W.D. Wis. 1990) ("The doctrine of strict liability applied by Wisconsin courts is contained in the Restatement (Second) of Torts § 402A (1965). Section 402A provides that *manufacturers* or *sellers* of defective and unreasonably dangerous products are liable, without proof of negligence or other fault, for injuries caused by such products to the user or consumer. Generally, courts will not apply the doctrine of strict liability to a hospital or medical practitioner for injuries caused by medical instruments, drugs or other substances used in treatment. *See, e.g., Hoven v. Kelble,* 79 Wis.2d 444, 256 N.W.2d 379 (1977); *Vergott v. Deseret Pharmaceutical Co., Inc.,* 463 F.2d 12 (5th Cir.1972) (hospital cannot be held strictly liable for injuries caused by defective intercath needle because hospital is not a seller engaged in business of selling the product); *North Miami General Hosp., Inc. v. Goldberg,* 520 So.2d 650 (Fla.Dist.Ct.App. 1988) (overturning jury's verdict of strict liability against hospital for injuries suffered as a result of malfunction of electrosurgical grounding pad; holding that hospital is not a business within product's distributive chain but more like a consumer that employs a product in the course of providing medical services); *Nevauex v. Park Place Hosp., Inc.,* 656 S.W.2d 923 (Tex.Ct.App.1983) (hospital not liable for misapplication of cobalt radiation, because it is not a "merchant" dispensing radiation treatment).

In *Hoven v. Kelble,* 79 Wis.2d 444, 256 N.W.2d 379, for example, the Supreme Court of Wisconsin held that plaintiffs could not bring a claim of strict liability against a hospital for allegedly defective medical services rendered when a patient undergoing a lung biopsy suffered a cardiac arrest and consequent injury to his nervous system and brain tissue. The court recognized that while there are some justifications for holding the medical profession strictly liable for the products they use in the course of treatment, those justifications are outweighed by other factors. These include the peculiar characteristics of medical services, such as 1) a tendency to be experimental; 2) a dependence on factors beyond the control of the professional; and 3) a lack of certainty or assurance of results. In addition, any imposition of the theory of strict liability on medical providers would increase the cost of medical services beyond the means of consumers and hinder the development of new medicines and medical techniques. *Id.* at 467-472, 256 N.W.2d at 390-393.

Plaintiffs suggest that this court should read *Hoven* to permit a products liability claim against a hospital when the injury is caused by a defective product supplied by a hospital to a doctor who uses the product in rendering medical services at the hospital. Although such a holding is not precluded explicitly by *Hoven,* it would be inconsistent with the court's reasoning. Whether the injury results from

the treatment provided (or omitted) or from the product used in the treatment, the same public policy reasons support the denial of strict liability to a provider of medical services.").

- *contra Johnson v. Sears, Roebuck & Co.*, 355 F. Supp. 1065, 1067 (E.D. Wis. 1973) (pre-*Hoven*).

### *Contra* States

**28. Alabama**
- *Skelton v. Druid City Hosp. Bd.*, 459 So.2d 818 (Ala. 1984) (holding that summary judgment was inappropriate on plaintiff's claim against hospital for breach of implied warranty of fitness for a particular purpose for suturing needle that broke during surgery and was left in the plaintiff's body, and rejecting distinction between a service contract and a contract for sale)

**29. Ohio**
- *Saylor v. Providence Hosp.*, 680 N.E.2d 193, 113 Ohio App. 3d 1, 5-6, n. 7 (Ohio App. 1996) (affirming dismissal of the plaintiff's strict product liability claims against the defendant hospital for defective screw and plate surgically implanted into the plaintiff's back but holding that plaintiff properly pled a "product liability inadequate-warning claim" against the hospital, which requires proof of a supplier's failure to "exercise reasonable care [in giving] those who are to use the chattel the information which the supplier possesses, and which he should realize to be necessary to make its use safe for them and those in whose vicinity it is to be used") (quoting *Restatement (2d) Torts* § 388, Comment G).