UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | )<br>)  MDL No. 2419<br>)  Dkt. No. 1:13-md-2419-RWZ<br>) |
| _____ | ) |
| This Document Relates to Suits Naming: | )<br>) |
| Saint Thomas Outpatient Neurosurgical Center, LLC | )<br>)<br>) |

**AFFIDAVIT OF SCOTT BUTLER**

STATE OF TENNESSEE      )
COUNTY OF DAVIDSON      )

Comes Scott Butler, after first being duly sworn, and states as follows:

1.      I am over 18 years of age, have personal knowledge of the facts contained herein, and am competent to testify to same.

2.      In 2012, I was the Chief Administrative Officer of Howell Allen Clinic and a member of the Board of Governors of Saint Thomas Outpatient Neurosurgical Center ("STOPNC").

3.      In 2012, Howell Allen provided a variety of services and personnel to STOPNC pursuant to a management agreement, including providing staffing to STOPNC. The business office at Howell Allen also served as the business office for STOPNC, pursuant to the management agreement.

4.      In 2012, Howell Allen employees in Howell Allen's business office submitted bills on STOPNC's behalf to patients' and their insurers, including bills for the Plaintiffs' epidural steroid injection procedures.

5.      In 2012, Howell Allen business office personnel worked with an accounting firm to prepare STOPNC's federal income tax return.

6.      In 2012, Howell Allen business office personnel remitted payment to vendors who provided the medical supplies used at STOPNC during epidural steroid injections.

7.    In 2012, as Chief Administrative Officer of Howell Allen, I oversaw the activities of Howell Allen personnel providing services to STOPNC, including the business office personnel performing the activities described herein.

8.    In 2012, many of the Plaintiffs were Medicare beneficiaries.[1]

9.    In 2012, STOPNC billed Medicare beneficiaries and non-Medicare patients in the same manner (*i.e.*, using the same billing codes). The only difference was the fee received by STOPNC, which varied to some degree based on the payor.

10.    STOPNC did not submit a separate charge to the Plaintiffs or their insurers specifically for the MPA administered during their epidural steroid injection procedures.[2]

11.    In 2012, STOPNC was typically reimbursed approximately $370 for epidural steroid injections.

12.    STOPNC did not collect sales tax from the Plaintiffs or their insurers for the medications administered during their epidural steroid injection procedures.[3]

13.    In 2012, STOPNC did not deduct the cost of the medical supplies used during the Plaintiffs' procedures as "costs of goods sold" from its income for tax purposes.[4]

14.    The medical supplies used during an epidural steroid injection, including the MPA, typically cost less than $40 total.[5]

15.    STOPNC has contracts with BlueCross BlueShield of Tennessee, Cigna HealthCare of Tennessee, and MissionPoint Health Partners, among other insurers.[6]

---

[1] *See*, *e.g.*, excerpts from Plaintiff Mae Parman's STOPNC billing records attached as Exhibit 1 (Case No. 1:13-cv-12433).
[2] *See*, *e.g.*, excerpts from Plaintiff Mae Parman's billing records from STOPNC attached as Exhibit 1.
[3] *See*, *e.g.*, excerpts from Plaintiff Mae Parman's billing records from STOPNC attached as Exhibit 1.
[4] *See* redacted excerpt from STOPNC's 2012 income tax return showing no deduction for costs of goods sold, attached as Exhibit 2.
[5] *See*, *e.g.*, email with itemized list of medical supplies used during steroid injections at STOPNC, with their respective costs, attached as Exhibit 3.
[6] The contracts are attached as Exhibit 4 (BlueCross BlueShield contract), Exhibit 5 (Cigna contract), and Exhibit 6 (Mission Point contract).

_____
(Signature of Affiant)

STATE OF TENNESSEE          )
                            )
COUNTY OF Davidson          )

Sworn to and subscribed by me on this 1st day of December, 2015.

_____
(Notary Public)

My Commission Expires: 11/05/18

MARLESE T. ALLEN
STATE
OF
TENNESSEE
NOTARY
PUBLIC
DAVIDSON COUNTY

3

# EXHIBIT 1

Excerpts from Plaintiff Mae Parman's
STOPNC billing records
(Case No. 1:13-cv-12433)

MEDICARE OFFICE          1 800 821 9913
BUSINESS OFFICE          615-341-7579

ST THOMAS NEUROSURGICAL O/P CTR, LLC
P O BOX 305172 DEPT 16
NASHVILLE, TENNESSEE  37230-5172


LOCATION:    ST THOMAS OP NEUROSURGICA  PT-0066      PAGE:   1


MAE L PARMAN                          BILLING DATE: 11/19/12
P O BOX 273
FAIRVIEW TN 37062                     AMOUNT DUE :     0.00


BILL TO: PARMAN         MAE        CHART #: SC28239


| DATE | POS | PROC | DESCRIPTION | CHARGES | CREDITS | BALANCE |
|------|-----|------|-------------|---------|---------|---------|
|      |     |      | MAE |  |  |  |
|      |     |      | SAINT THOMAS OUTPT NEUROSURG |  |  |  |
| 07/30/12 | 62311 |  | INJECTION SINGLE DIAGNOSTIC OR | 1,034.00 |  | 1034.00 |
| 07/30/12 |  |  | ADDITIONAL DIAGNOSIS | 0.00 |  | 1034.00 |
| 08/02/12 |  |  | MEDICARE # 981591 Filed |  |  |  |
| 08/20/12 |  |  | AARP HEALTH CARE OPTIONS # 981592 Filed |  |  |  |
| 08/17/12 |  |  | PAYMENT MEDICARE OF TENNEc# 981591 |  | 233.59- | 800.41 |
| 08/17/12 |  |  | Co-ins       58.40 |  |  |  |
| 08/17/12 |  |  | WRITE-OFF MEDICARE OF TENNEc# 981591 |  | 742.01- | 58.40 |
|      |     |      | MAE |  |  |  |
|      |     |      | SAINT THOMAS OUTPT NEUROSURG |  |  |  |
| 08/20/12 | 62311 |  | INJECTION SINGLE DIAGNOSTIC OR | 1,034.00 |  | 1092.40 |
| 08/20/12 |  |  | ADDITIONAL DIAGNOSIS | 0.00 |  | 1092.40 |
| 08/21/12 |  |  | MEDICARE # 985921 Filed |  |  |  |
| 09/13/12 |  |  | AARP HEALTH CARE OPTIONS # 985922 Filed |  |  |  |
| 09/06/12 |  |  | PMT AARP HEALTH CARE OPTIONc# 981592 |  | 58.40- | 1034.00 |
| 09/12/12 |  |  | PAYMENT MEDICARE OF TENNEc# 985921 |  | 233.59- | 800.41 |
| 09/12/12 |  |  | Co-ins       58.40 |  |  |  |
| 09/12/12 |  |  | WRITE-OFF MEDICARE OF TENNEc# 985921 |  | 742.01- | 58.40 |
| 09/24/12 |  |  | PMT AARP HEALTH CARE OPTIONc# 985922 |  | 58.40- | 0.00 |


| CURRENT/ | 30-60 DAYS/ | 60-90 DAYS/ | )90 DAYS/ | TOTAL | TOTAL DUE |
|----------|-------------|-------------|-----------|-------|-----------|
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |


ST THOMAS OP NEUROLOGICAL CENT
P.O. BOX 305172 DEPT16
NASHVILLE TN 37230-5172

LOCATION :   ST THOMAS OP NEU

PHONE : 615 341 7579          REFERRING DOCTOR :   HOWELL JR MD

| | | | | | 4 TYPE: OF BILL |
|---|---|---|---|---|---|
| 1 ST THOMAS OF NEUROSURGIC 4230 HARDING RD STE901 NASHVILLE TN 372052149 6153279543 | ST THOMAS OF NEUROSURGIC PO BOX 305172 DEPT 16 NASHVILLE TN 37230 | b. MED. REC. # SC28239 621802891 | 6 STATEMENT COVERS PERIOD FROM 073012 THROUGH 073012 | 7 | 831 |

5 FED. TAX NO.

| 8 PATIENT NAME | a | 9 PATIENT ADDRESS | a P O BOX 273 | | | |
|---|---|---|---|---|---|---|
| b PARMAN MAE L | | b FAIRVIEW | | c TN | d 37062 | e |

| 10 BIRTHDATE | 11 SEX | 12 DATE | ADMISSION 13 HR 14 TYPE | 15 SRC | 16 DHR | 17 STAT | 18 | 19 | 20 | CONDITION CODES 21 22 23 24 25 | 26 | 27 | 28 | 29 ACDT STATE | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01221930 | F | | | | | 01 | | | | | | | | | |

| 31 OCCURRENCE CODE DATE | 32 OCCURRENCE CODE DATE | 33 OCCURRENCE CODE DATE | 34 OCCURRENCE CODE DATE | 35 CODE | OCCURRENCE SPAN FROM THROUGH | 36 CODE | OCCURRENCE SPAN FROM THROUGH | 37 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| 38 | | 39 VALUE CODES CODE AMOUNT | 40 VALUE CODES CODE AMOUNT | 41 VALUE CODES CODE AMOUNT |
|---|---|---|---|---|
| PARMAN MAE L P O BOX 273 FAIRVIEW TN 37062 | a b c d | | | |

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATE / HIPPS CODE | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
|---|---|---|---|---|---|---|---|
| 490 | INJECTION SINGLE DIAGNOS | 62311 | 073012 | 1 | 103400 | | |
| 0001 | PAGE 1 OF 1 | CREATION DATE 080212 | TOTALS ➡ | | 103400 | | |

| 50 PAYER NAME | 51 HEALTH PLAN ID | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST AMOUNT DUE | 56 NPI 1538139811 |
|---|---|---|---|---|---|---|
| A MEDICARE | | Y | Y | | | |
| B AARP HEALTH CARE OPTION | | Y | Y | | | 57 OTHER PRV ID |
| C | | | | | | |

| 58 INSURED'S NAME | 59 P.REL | 60 INSURED'S UNIQUE ID | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
|---|---|---|---|---|
| A PARMAN MAE L | 18 | 414129991D | | |
| B PARMAN MAE L | 18 | 32457329211 | | PLAN F |
| C | | | | |

| 63 TREATMENT AUTHORIZATION CODES | 64 DOCUMENT CONTROL NUMBER | 65 EMPLOYER NAME |
|---|---|---|
| A | | |
| B | | |
| C | | |

| 66 DX | 7244 | 72402 | | | | | 68 |
|---|---|---|---|---|---|---|---|
| 9 | | | | | | | |

| 69 ADMIT DX 7244 | 70 PATIENT REASON DX | | | 71 PPS CODE | 72 ECI | | 73 |
|---|---|---|---|---|---|---|---|

| 74 | PRINCIPAL PROCEDURE CODE DATE 03.92 073012 | a OTHER PROCEDURE CODE DATE | b OTHER PROCEDURE CODE DATE | 75 | 76 ATTENDING NPI 1538139811 QUAL LAST OUTPT NEUROSURG FIRST SAINT THOMAS |
|---|---|---|---|---|---|
| c | OTHER PROCEDURE CODE DATE | d OTHER PROCEDURE CODE DATE | e OTHER PROCEDURE CODE DATE | | 77 OPERATING NPI QUAL LAST FIRST |

| 80 REMARKS MEDICARE P O BOX 12086 BIRMINGHAM AL 35202 | 81CC a b c d | | 78 OTHER NPI QUAL LAST FIRST |
|---|---|---|---|
| | | | 79 OTHER NPI QUAL LAST FIRST |

UB-04 CMS-1450    APPROVED OMB NO. 0938-0997    ⊕ Printed on Recycled Paper    NUBC™ TFP24394589    THE CERTIFICATIONS ON THE REVERSE APPLY TO THIS BILL AND ARE MADE A PART HEREOF

| | | | | | 4 TYPE OF BILL |
|---|---|---|---|---|---|
| 1 ST THOMAS OP NEUROSURGIC ST THOMAS OP NEUROSURGIC | | 9000285921 | | | 831 |

ST THOMAS OP NEUROSURGIC ST THOMAS OP NEUROSURGIC
4230 HARDING RD STE901    PO BOX 305172 DEPT 16
NASHVILLE    TN 372052149 NASHVILLE    TN 37230
6153279543

23a PAT 9000285921
5 MED REC # SC28239
5 FED. TAX NO 621802891
6 STATEMENT COVERS PERIOD FROM 082012 THROUGH 082012
7

| 8 PATIENT NAME | | 9 PATIENT ADDRESS | a | P O BOX 273 | | | | |
|---|---|---|---|---|---|---|---|---|
| b PARMAN MAE L | | b FAIRVIEW | | | | c TN | d 37062 | e |

| 10 BIRTHDATE | 11 SEX | 12 DATE | ADMISSION 13 HR | 14 TYPE | 15 SRC | 16 DHR | 17 STAT | 18 | 19 | 20 | 21 | CONDITION CODES 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 ACDT STATE | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01221930 | F | | | | | | 01 | | | | | | | | | | | | | |

| 31 OCCURRENCE CODE DATE | 32 OCCURRENCE CODE DATE | 33 OCCURRENCE CODE DATE | 34 OCCURRENCE CODE DATE | 35 OCCURRENCE SPAN CODE FROM THROUGH | 36 OCCURRENCE SPAN CODE FROM THROUGH | 37 |
|---|---|---|---|---|---|---|
| | | | | | | |

38
PARMAN MAE L
P O BOX 273

FAIRVIEW    TN 37062

| 39 CODE | VALUE CODES AMOUNT | 40 CODE | VALUE CODES AMOUNT | 41 CODE | VALUE CODES AMOUNT |
|---|---|---|---|---|---|
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATE / HIPPS CODE | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
|---|---|---|---|---|---|---|---|
| 490 | INJECTION SINGLE DIAGNOS | 62311 | 082012 | 1 | 103400 | | 1 |
| | | | | | | | 2 |
| | | | | | | | 3 |
| | | | | | | | 4 |
| | | | | | | | 5 |
| | | | | | | | 6 |
| | | | | | | | 7 |
| | | | | | | | 8 |
| | | | | | | | 9 |
| | | | | | | | 10 |
| | | | | | | | 11 |
| | | | | | | | 12 |
| | | | | | | | 13 |
| | | | | | | | 14 |
| | | | | | | | 15 |
| | | | | | | | 16 |
| | | | | | | | 17 |
| | | | | | | | 18 |
| | | | | | | | 19 |
| | | | | | | | 20 |
| | | | | | | | 21 |
| | | | | | | | 22 |
| 0001 | PAGE 1 OF 1 | CREATION DATE 082112 | TOTALS | | 103400 | | |

| 50 PAYER NAME | 51 HEALTH PLAN ID | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 NPI 1538139811 | |
|---|---|---|---|---|---|---|---|
| <mark>MEDICARE</mark> | | Y | Y | | | | A |
| AARP HEALTH CARE OPTION | | Y | Y | | | 57 OTHER PRV ID | B |
| | | | | | | | C |

| 58 INSURED'S NAME | 59 P.REL | 60 INSURED'S UNIQUE ID | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
|---|---|---|---|---|
| PARMAN MAE L | 18 | 414129991D | | |
| PARMAN MAE L | 18 | 32457329211 | | PLAN F |
| | | | | |

| 63 TREATMENT AUTHORIZATION CODES | 64 DOCUMENT CONTROL NUMBER | 65 EMPLOYER NAME |
|---|---|---|
| | | A |
| | | B |
| | | C |

| 66 DX | 7244 | 72402 | | | | 68 |
|---|---|---|---|---|---|---|
| 9 | | | | | | |

| 69 ADMIT DX 7244 | 70 PATIENT REASON DX | 71 PPS CODE | 72 ECI | 73 |
|---|---|---|---|---|

| 74 | PRINCIPAL PROCEDURE CODE DATE | a. OTHER PROCEDURE CODE DATE | b. OTHER PROCEDURE CODE DATE | 75 | 76 ATTENDING NPI 1538139811 QUAL |
|---|---|---|---|---|---|
| | 03.92 082012 | | | | LAST OUTPT NEUROSURG FIRST SAINT THOMAS |
| | c. OTHER PROCEDURE CODE DATE | d. OTHER PROCEDURE CODE DATE | e. OTHER PROCEDURE CODE DATE | | 77 OPERATING NPI QUAL |
| | | | | | LAST FIRST |

| 80 REMARKS | MEDICARE | 81CC a | | 78 OTHER NPI QUAL |
|---|---|---|---|---|
| P O BOX 12086 | | b | | LAST FIRST |
| | | c | | 79 OTHER NPI QUAL |
| BIRMINGHAM AL 35202 | | d | | LAST FIRST |

UB-04 CMS-1450    APPROVED OMB NO. 0938-0997    Printed on Recycled Paper    NUBC    TFP24394689    THE CERTIFICATIONS ON THE REVERSE APPLY TO THIS BILL AND ARE MADE A PART HEREOF.

# EXHIBIT 2

Excerpt from STOPNC's 2012
federal income tax return

(with sensitive and irrelevant financial information redacted)

| Form **1065** | **U.S. Return of Partnership Income** | OMB No. 1545-0099 |
|---|---|---|
| Department of the Treasury / Internal Revenue Service | For calendar year 2012, or tax year beginning _____, ending _____ . ▶ Information about Form 1065 and its separate instructions is at www.irs.gov/form1065. | **2012** |

**A** Principal business activity
SURGERY CENTER

**B** Principal product or service
HEALTHCARE

**C** Business code number
621498

Print or type.

Name of partnership
ST THOMAS OUTPATIENT NEUROSURGICAL CENTER LLC

Number, street, and room or suite no. If a P.O. box, see the instructions.
2410 PATTERSON STREET, SUITE 500

City or town, state, and ZIP code
NASHVILLE, TN  37203

**D** Employer identification number
62-1802891

**E** Date business started
08/01/2000

**F** Total assets (see the instructions)
$

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return **(6)** ☐ Technical termination - also check (1) or (2)

**H** Check accounting method: **(1)** ☐ Cash **(2)** ☒ Accrual **(3)** ☐ Other (specify) ▶ _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ _____2_____

**J** Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐

**Caution.** Include **only** trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

**Income**

| | | | |
|---|---|---|---|
| 1 a | Gross receipts or sales . . . . . . . . . . . . . . | 1a | |
| b | Returns and allowances . . . . . . . . . . . . . . | 1b | |
| c | Balance. Subtract line 1b from line 1a . . . . . . . . . . . | 1c | |
| 2 | Cost of goods sold (attach Form 1125-A) . . . . . . . . . . | **2** | |
| 3 | Gross profit. Subtract line 2 from line 1c . . . . . . . . . . | 3 | |
| 4 | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) . . . . | 4 | |
| 5 | Net farm profit (loss) (attach Schedule F (Form 1040)) . . . . . . . | 5 | |
| 6 | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . | 6 | |
| 7 | Other income (loss) (attach statement) . . . . . . . . . . | 7 | |
| 8 | **Total income (loss).** Combine lines 3 through 7 . . . . . . . . . . | 8 | |

**Deductions** (see the instructions for limitations)

| | | | |
|---|---|---|---|
| 9 | Salaries and wages (other than to partners) (less employment credits) . . . . . . | 9 | |
| 10 | Guaranteed payments to partners . . . . . . . . . . . . . | 10 | |
| 11 | Repairs and maintenance . . . . . . . . . . . . . . . . | 11 | |
| 12 | Bad debts . . . . . . . . . . . . . . . . . . . . . | 12 | |
| 13 | Rent . . . . . . . . . . . . . . . . . . . . . . . | 13 | |
| 14 | Taxes and licenses . . . . . . . . . . . . . . . SEE STATEMENT 1 . | 14 | |
| 15 | Interest . . . . . . . . . . . . . . . . . . . . . | 15 | |
| 16 a | Depreciation (if required, attach Form 4562) . . . . . . . | 16a | |
| b | Less depreciation reported on Form 1125-A and elsewhere on return | 16b | 16c | |
| 17 | Depletion **(Do not deduct oil and gas depletion.)** . . . . . . . . . | 17 | |
| 18 | Retirement plans, etc. . . . . . . . . . . . . . . . . . | 18 | |
| 19 | Employee benefit programs . . . . . . . . . . . . . . . | 19 | |
| 20 | Other deductions (attach statement) . . . . . . . . . . SEE STATEMENT 1 . | 20 | |
| 21 | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 . . . | 21 | |
| 22 | **Ordinary business income (loss).** Subtract line 21 from line 8 . . . . . . . . . . | 22 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner or limited liability company member manager) is based on all information of which preparer has any knowledge.

▶ Signature of general partner or limited liability company member manager     ▶ Date

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| BRIEN DICKSON, CPA | Brien Dickson | 3/1/2013 | | P00856271 |

Firm's name ▶ DELOITTE TAX LLP
Firm's EIN ▶ 86-1065772

Firm's address ▶ 250 EAST FIFTH STREET, SUITE 1900
CINCINNATI, OH 45202
Phone no. 513-784-7100

For Paperwork Reduction Act Notice, see separate instructions.

Form **1065** (2012)

JSA
2P1010 3.000

9NI0RH   K518                    V12-2.2   ST THOMAS NEUROSURGE 8

CLIENT COPY

# EXHIBIT 3

Email with itemized costs of medical supplies used during steroid injections at STOPNC

**From:**        Debra Schamberg
**To:**          Shreka Rogers
**Sent:**        8/13/2010 10:54:40 AM
**Subject:**     cost


Approx cost for a SI joint injection
tray                $9.53
22x5 needle         $5.62
DepoMedrol 80mg   $7.00
Contrast Dye        $6.89
Gloves( X 2 sterile)  $4.03
skin marker             .25


total               $33.32


This may vary a dollar or two depending on needle opened.  This is just for supplies. Not sure how you factor in x-ray and facility charge.  Approximately the same for ESI's, again, depends on needle used.  Some are more expensive.  The needle listed here is the one used most often on SI joints.


Hope this is what you needed.

Debra Schamberg,RN,CNOR
Facility Director
StThomas Outpatient Neurosurgical Center
4230 Harding Road   Suite 901
Nashville, TN   37205
615-341-3425   fax 615-3413427

**CONFIDENTIAL DISCOVERY MATERIAL**

# EXHIBIT 4

STOPNC's contracts with (1) BlueCross BlueShield of Tennessee, (2) Cigna HealthCare of Tennessee, and (3) MissionPoint Health Partners

# Contract with BlueCross BlueShield of Tennessee

# Blue Cross and Blue Shield of Tennessee

# Institution Agreement



BlueCross BlueShield
of Tennessee

An Independent Licensee of the
Blue Cross and Blue Shield Association

STOPNC - 017941

BLUECROSS BLUESHIELD OF TENNESSEE

INSTITUTION AGREEMENT

This BlueCross BlueShield of Tennessee Institution Agreement (the "**Institution Agreement**") is entered into by and between  BlueCross BlueShield of Tennessee on behalf of its licensed Affiliates (collectively referred to herein as "**BCBST**"), and the Institution who has signed the Signature Page and Data Sheet attached hereto (the"**Institution**").

Under the terms and conditions of this Institution Agreement, Institution shall provide Covered Services to BCBST Members in accordance with the provisions of BCBST Health Benefit Plans issued by BCBST and in accordance with the provisions of any applicable Network Attachments attached hereto, as amended.  Institution acknowledges that BCBST does not promise, warrant, or guarantee, by way of this Institution Agreement, Institution's participation pursuant to any particular Network Attachment.  This Institution Agreement, the Signature Page and Data Sheet, and the applicable Network Attachments, as the same may be amended or modified, are collectively referred to herein as "**the Agreement**" or "**this Agreement.**"  The Agreement shall remain in full force and effect with respect to all BCBST Members, unless, otherwise expressly stated.  Each Network Attachment is enforceable under the terms and conditions contained therein and, in the event of a conflict between the language of this Institution Agreement and any Network Attachment, the language of the Network Attachment shall prevail with respect to the services rendered pursuant to the Network Attachment.

**1.**   **RECITALS**

Whereas, BCBST includes entities duly licensed by the State of Tennessee, which issue benefit agreements covering the provision of health care services; and

Whereas, the Institution is a Corporation, duly licensed by the Tennessee Department of Public Health to provide general acute inpatient and outpatient services, and is accredited by the Joint Commission on Accreditation of Healthcare Organizations ("**JCAHO**") or is Medicare-certified and intends to provide institutional health care services to BCBST Members; and

Whereas, the parties to this Agreement desire to enter into this Agreement to make available quality health care services to BCBST Members; and

Whereas, this Agreement shall remain in full force and effect with respect to all BCBST Members, unless otherwise expressly stated.

*NOW, THEREFORE,* in consideration of the mutual promises and covenants herein contained, the parties hereto agree as follows:

**2.**   **DEFINITIONS**

"**Affiliate**" means (i) an entity controlled by, controlling, or under common control with another entity including, but not limited to, through ownership of stock, membership interest, or a management contract; (ii) any  BlueCross BlueShield entity; or (iii) any  BlueCross BlueShield entity's joint venture arrangement.

"**BCBST Health Benefit Plan**" means a plan for the delivery of health services to BCBST Members.

"**BCBST Member(s)**" means a person (or persons) enrolled in a particular BCBST Health Benefit Plan.

STOPNC - 017942

"**BCBST Participating Institution**" means an institution that has entered into an Institution Agreement with BCBST to provide services to BCBST Members.

"**BCBST Participating Physician**" means a physician who has entered into a Physician Agreement with BCBST to provide services to BCBST Members.

"**BCBST Participating Provider**" means a BCBST Participating Institution, BCBST Participating Physician, BCBST Participating Health Care Professional, or BCBST Participating Medical Services Supplier who or which has entered into the applicable Provider Agreement with BCBST to provide services to BCBST Members.

" **BlueCross Plan**" means a plan for the delivery of health services, where such plan is insured or administered by any BlueCross BlueShield entity (and/or such entity's Affiliates) that is licensed by the BlueCross BlueShield Association to use the " BlueCross" and/or " BlueShield" symbols, trademarks, and service marks presently existing or hereafter established. Such plan shall include, but not be limited to any BlueCross BlueShield administrative services only ("ASO") product.

"**Complete Claim**" means an accurately completed claim that is submitted for payment for Covered Services provided to a BCBST Member by a BCBST Participating Provider. A claim is considered complete by BCBST when it requires no further information, documentation, adjustment, or alteration from a Provider in order to be processed by BCBST.

"**Coordination of Benefits**" means the act of determining primary/secondary carrier liability and paying under more than one health insurance program, policy or other form of coverage, including governmental and/or non-governmental coverage.

"**Covered Services**" means those Medically Necessary health care services and supplies delivered to or provided for BCBST Members for which benefits are available under the terms of a Member Benefit Agreement.

"**Emergency**" means the sudden onset of a medical and/or mental condition manifesting itself by acute symptoms of sufficient severity that in the absence of immediate attention could reasonably result in:

    (a)    permanently placing a BCBST Member's health in jeopardy;
    (b)    causing other serious medical and/or mental consequences;
    (c)    causing impairments to body functions;
    (d)    causing serious or permanent dysfunction of any body part; or
    (e)    causing serious emotional dysfunction.

"**Experimental and Investigational**" means a drug, treatment, device or procedure shall be considered to be Experimental and Investigational if any of the following conditions exists at the time of the request:

(a)    It cannot be lawfully marketed without the approval of the Food and Drug Administration ( "FDA") and such approval has not been granted at the time of use or proposed use.

(b)    It is the subject of a current investigational new drug or new device application on file with the FDA.

(c)    It is being provided pursuant to a Phase I or Phase II clinical trial or as the experimental or research arm of a Phase III clinical trial.

(d)    It is being provided pursuant to a written protocol which describes among its objectives, determinations of safety, toxicity, maximum tolerated dose, efficacy or efficacy in comparison to the standard means of treatment or diagnosis.

STOPNC - 017943

(e)     It is being delivered or should be delivered subject to the approval and supervision of an Institutional Review Board ("IRB") as required and defined by federal regulations, particularly those of the FDA or the Department of Health and Human Services ("HHS").

(f)     It is being provided or should be provided pursuant to a written informed consent form signed by the BCBST Member which describes the use of the drug, treatment, procedure or device as part of research or a study to determine the safety, toxicity, maximum tolerated dose, efficacy or efficacy in comparison to the standard means of treatment or diagnosis.

(g)     The predominant opinion among experts as expressed in the published authoritative medical and scientific literature is that usage should be substantially confined to research settings.

(h)     The predominant opinion among experts as expressed in the published authoritative medical and scientific literature is that further research is necessary in order to define safety, toxicity, maximum tolerated dose, effectiveness or effectiveness compared with the standard means of treatment or diagnosis.

(i)     There is a lack of any published authoritative medical and scientific literature addressing the efficacy of the treatment, drug, device or procedure.

(j)     Its delivery or provision is directly attributable to, or a result of, an Experimental and Investigational procedure.

(k)     It is otherwise reasonably determined by BCBST to be Experimental and Investigational in nature.

**"Health Care Professional"** means a podiatrist, dentist, chiropractor, midwife, nurse, optometrist, or other individual licensed or certified to practice a health care profession, other than medicine or osteopathy, by the state or states in which he/she practices.

**"Institution"** means a hospital, skilled nursing facility, or other duly licensed health care facility.

**"Institution Services"** means inpatient and outpatient services provided by a BCBST Participating Institution.

**"Medically Necessary"** or **"Medical Necessity"** shall mean services or supplies provided by an Institution, Physician, or other Provider that are required to identify or treat a BCBST Member's illness or injury and which, as determined by BCBST:

(a)     are consistent with the symptoms or diagnosis and treatment of the BCBST Member's condition, disease, ailment, or injury;

(b)     are appropriate with regard to standards of good medical practice;

(c)     are not solely for the convenience of a BCBST Member, Physician, Institution, or other Provider;

(d)     are the most appropriate supply or level of service that can safely be provided to the BCBST Member. When applied to the care of an inpatient, it further means that services for the BCBST Member's medical symptoms or condition require that the services cannot be safely provided to the BCBST Member as an outpatient; and

(e)     are not Experimental and Investigational, as defined above.

**"Member Benefit Agreement"** means the written contracts entered into by BCBST with groups and/or individuals under which BCBST, and/or any BlueCross Plan, specifically defines the benefit inclusions and exclusions on behalf of BCBST Members, and any amendment thereto.

**"Network"** means the particular group or collection of Providers that are available to render Covered Services to a BCBST Member.

3 corerevised.doc
4/15/99

STOPNC - 017944

"Network Provider" means a BCBST Participating Provider who is authorized to provide Covered Services to the BCBST Members enrolled in a benefit plan served by a particular Network.

"Physician" means a person licensed to practice medicine or osteopathy by the state or states in which he/she practices.

"Prior Authorization" means an authorization obtained from BCBST by a BCBST Participating Provider for the provision of services prior to the delivery of that service or period of confinement. A Prior Authorization may be retroactively denied by BCBST if BCBST subsequently determines that the health care services sought were (a) not included as Covered Services under the applicable BCBST Member's Benefit Agreement; (b) not Medically Necessary; or (c) Experimental and Investigational, as defined above.

"Provider" means a Physician, Institution, Health Care Professional, or Medical Service Supplier.

"Quality Improvement Program" means the BCBST program designed to monitor and enhance the quality of care rendered by BCBST Participating Providers.

"Utilization Review" or "Utilization Review Program" means that component of BCBST's Quality Improvement Program which focuses on review of services provided by Institution to BCBST's Members to determine whether such services were appropriate with respect to BCBST's criteria for Medical Necessity.

3.     RELATIONSHIP BETWEEN BCBST AND INSTITUTION

3.1     **Independence of Parties.**  BCBST and the Institution are independent legal entities contracting with each other solely to carry out the terms of this Agreement for the purposes stated herein. Nothing in this Agreement shall be construed or be deemed to create a relationship of employer and employee, principal and agent, partnership, joint venture, or any relationship other than that of independent parties.

3.2     **Status of Agreement.**  The Agreement is entered into by Institution with the understanding that the Agreement shall not constitute an agreement between Institution and other facilities that are parties to similar agreements or contracts. Neither shall the Agreement constitute an agreement that Institution may act as agent for any other institution that becomes party to a similar agreement or impose any liability upon any other institution by reason of any act or acts of omission or commission on its part.

3.3     **Change to Member Benefit Agreement.**  It is understood that BCBST retains the right to change, revise, modify, or alter the form and/or content of any BCBST Member's Benefit Agreement without prior approval and/or notice to the Institution.

3.4     **Status of BCBST.**  Institution hereby expressly acknowledges its understanding that the Agreement constitutes a legally binding agreement between the Institution and BCBST. BCBST is an independent corporation operating under a license from the BlueCross BlueShield Association, an association of independent BlueCross BlueShield Plans, (the "Association") permitting BCBST to use the BlueCross BlueShield Service Marks, and that BCBST is not contracting as the agent of the Association Institution further acknowledges and agrees that it has not entered into this Agreement based upon representations by any person other than BCBST and that no person, entity, or organization other than BCBST shall be held accountable or liable to Institution for any of BCBST's obligations to Institution created under this Agreement. This paragraph shall not create any additional obligations whatsoever on the part of BCBST other than those obligations created under other provisions of this Agreement.

STOPNC - 017945

4.    **INSTITUTION RESPONSIBILITIES AND SERVICES**

4.1    **Provision of Services.**  The Institution shall be responsible for providing the medical care and treatment and the maintenance of a patient relationship with each BCBST Member that the Institution treats.  Institution will provide only those services that it is duly licensed, authorized and qualified to provide, and will otherwise abide by the terms of this Agreement and the applicable Network Attachments.  Institution will use its best efforts to provide Covered Services in a competent and timely manner.  To the extent that any determination is made by BCBST regarding what is Medically Necessary for purposes of defining reimbursement under this Agreement, such determination is expressly recognized by the parties as not interfering with any determination by the Institution with respect to the provision of medical care to a BCBST Member.  In addition, the Institution shall only provide Covered Services that are; (i) Medically Necessary; and (ii) are ordered by a Physician or other Health Care Professional.

In addition, the Institution agrees to provide Covered Services in accordance with the terms of this Agreement to all persons identified by BCBST as being covered under the terms of any BCBST Health Benefit Plan and/or any  BlueCross Plan

4.2    **Quality of Care.**  Institution shall provide health care services to BCBST Members in accordance with recognized standards and within the same time frame as those services provided to Institution's other patients. Institution agrees not to differentiate or discriminate in the treatment of BCBST Members on the basis of race, sex, age, handicap, religion, national origin, state of health, and to observe, protect and promote the rights of BCBST Members as patients.  However, BCBST recognizes the Institution's right to refuse to treat any BCBST Member for appropriate medical and/or professional reasons, provided that the reason for such refusal is not that the patient is a BCBST Member in a participating BCBST Health Benefit Plan.

4.3    **Credentialing and Insurance Requirements.**  Institution shall ensure that all Physicians and Health Care Professionals with staff privileges are credentialed in accordance with Institution policies and shall routinely monitor said Physicians and Health Care Professionals to ensure adherence to applicable rules of the Institution.  The Institution shall also require that Physicians and Health Care Professionals shall maintain professional liability insurance in forms and amounts set by the Institution.

Institution shall immediately notify BCBST in writing by certified mail of any significant action against a BCBST Participating Provider, or any other Health Care Professional who renders services at the Institution pursuant to this Agreement, that may limit suspend, revoke or otherwise limit such professional's privileges at the Institution, provided that such BCBST Participating Provider or Health Care Professional has provided to BCBST such consent as may be lawfully required for such notification.

4.4    **Acceptance of Assignments.**  Institution shall accept assignments for the payment of Institution services provided to BCBST Members under the applicable Network Attachment.  Institution shall acquire and maintain all necessary evidence of assignments.

4.5    **Care Not Medically Necessary.**  Neither BCBST nor a BCBST Member shall be obligated to pay for care provided by the Institution to the BCBST Member after BCBST, the attending physician or the Institution, pursuant to its Utilization Review Program, determines that further care by the Institution is not Medically Necessary.  However, the parties recognize that BCBST Members might request services that are not covered or not Medically Necessary and are, therefore, payable by the BCBST Member.  In such cases, Institution agrees, prior to rendering any such services, to enter a written agreement with the BCBST Member advising him/her of such payment responsibilities.

**STOPNC - 017946**

4.6     Conditions of Participation.  As a condition of participation as a BCBST Participating Institution, the Institution shall maintain all certification and licenses as required by applicable state law and by BCBST, and possess general liability and professional insurance for the employed staff and the Institution in amounts acceptable to BCBST. Institution shall provide copies of such insurance coverage to BCBST upon request and shall inform BCBST immediately upon receiving notification of any change in such coverage.  Such insurance shall not be required, however, to the extent that an Institution demonstrates that such coverage is not necessary as a consequence of the applicability of the Tennessee Governmental Tort Liability Act or because the Institution is adequately self-insured.

4.7     Institution Application.  The Institution guarantees that the BCBST application for participation (the "Application") has been accurately completed. The Institution shall notify BCBST by certified mail within ten (10) days of any change of status with respect to information contained in the Application or any other action or occurrence that will impede the Institution in the performance of  its obligation under this Agreement. Institution shall provide copies of documentation as requested by BCBST to verify the ability of Institution to meet the requirements of the Application.

4.8     Quality Improvement Program/Monitoring of Care. Institution agrees to cooperate and participate with BCBST's, or a designated entity's, Quality Improvement Program to monitor and to evaluate the care delivered to BCBST Members according to predetermined standards, and to improve services as needed using decisions resulting from reviews or surveys and are subject to the rights of appeal.

4.9     Member Relations. Institution, its staff, personnel, and agents shall treat BCBST Members promptly, fairly and courteously, whether by phone, in person, or in writing. Institution and BCBST, and their respective employees, shall endeavor to maintain a high level of customer service and satisfaction.

4.10    Gifts by Institution.  The Institution warrants that no monies or gifts, beyond common business courtesy, have been or will be made directly or indirectly to any officer or employee of BCBST in connection with any work related to the Agreement. BCBST will terminate the Agreement if notice that this provision has been breached is received by BCBST.

4.11    Notification by Institution.  The Institution shall promptly notify BCBST of the following:

        4.11.1   being acquired by or merging with, or otherwise affiliating with, another entity;
        4.11.2   any legal or governmental action initiated against the Institution, including, but not limited to, an action:
                 (i)     for professional negligence;
                 (ii)    for a violation of law;
                 (iii)   which, if successful, would materially impair the ability of the Institution to carry out the duties and obligations of this Agreement; or
                 (iv)    resulting in a sanction or limitation upon any license or certificate issued pursuant to state or federal law or upon the Institution's right or ability to participate in any state or federal program; or
        4.11.3   any other problem or situation that would materially impair the ability of the Institution to carry out the duties and obligations of this Agreement.

4.12    Execution of Agreement. Institution warrants and represents that it may lawfully execute this Agreement and undertake to perform the services described herein, and that the execution of this Agreement and compliance with its provisions will not in any material respect conflict with or constitute a default on the part of the Institution (immediately, with due notice, with the passage of

STOPNC - 017947

time, or otherwise) under any agreement or instrument to which Institution is a party or is subject, or to the best knowledge of Institution, under any applicable law, rule, regulation, court order, or decree to which Institution is subject.

4.13    **Accessibility of Institution.**  The provision of care from the Institution shall be accessible to BCBST Members in accordance with applicable BCBST policies and procedures.

4.14    **Participation of Physicians.**  Institution shall guarantee that physicians who are (i) employed or (ii) otherwise have a contractual relationship with Institution pursuant to which such physicians are the exclusive providers of a particular medical service or treatment shall participate in the same Networks as the Institution.  Institution shall seek and actively promote affiliation by its medical staff with BCBST.

5.    BCBST SERVICES AND RESPONSIBILITIES

5.1    **Identification Cards.**  BCBST agrees to provide appropriate identification cards for BCBST Members.

5.2    **Compensation.**  BCBST agrees to pay Institution according to the provisions of this Agreement, including those set forth in the applicable Network Attachment, and will process all claims submitted to BCBST upon receipt of a Complete Claim.

5.3    **Quality Improvement Program.**  BCBST shall maintain a Quality Improvement Program that will incorporate Utilization Review, quality improvement, and care assessment components.

5.4    **General Liability Insurance.**  BCBST agrees to maintain adequate general liability insurance.

6.    COMPENSATION

6.1    **Reimbursement.**  Institution shall be reimbursed for the provision of Covered Services provided to BCBST Members in accordance with the terms set forth in this Institution Agreement and the applicable Network Attachment.  Institution agrees to accept ninety-eight percent (98%) of covered charges as payment in full for services rendered to BCBST Members not covered through a Network product.  Such reimbursement as is described in this section shall represent the maximum amount payable to Institution for Covered Services and Institution shall not bill any BCBST Member for any contractual difference between billed charges and such reimbursement. Institution agrees that in no event, including, but not limited to, non-payment by BCBST (including non-payment as a result of Institution's failure to submit charges in accordance with Section 6.8), rebundling or down coding of charges by BCBST (as described in Section 6.8), BCBST's insolvency, or breach of this Agreement, shall Institution bill, charge, collect a deposit from, seek compensation from, or have any recourse against BCBST Members or person, other than BCBST, acting on the behalf of BCBST Members, for Covered Services provided pursuant to this Agreement.

6.2    **Non-Covered Services, Deductibles, Copayments, and Coinsurance.** Institution agrees to bill a BCBST Member for any non-Covered Service, deductible, copayment, or coinsurance amounts and that the only charges for which a BCBST Member may be liable and billed for shall be those Institution services not covered under the applicable Member Benefit Agreement or for applicable deductibles, copayments, and/or coinsurance.

6.3    **Other Coverage.**  If the Institution is aware of the availability to a BCBST Member of other coverage, the Institution shall inform BCBST of such other known insurance coverage, including, but not limited to, Medicare and Workers' Compensation coverage for job-related injuries or illnesses.

STOPNC - 017948

**6.4**   **Liability Defined.**  In cases involving application of Coordination of Benefits or non-duplication of benefits for a BCBST Member and another health benefit plan or program, BCBST shall pay the liability as defined by the BCBST Member's Benefit Agreement.

**6.5**   **Deduction of Certain Payments.**  BCBST shall deduct any co-payment and/or deductible amounts from payments due Institution.  Deductions for the co-payment and/or deductible amounts shall be determined on the basis of the applicable contracted reimbursement amounts.

**6.6**   **Program Compliance.**  Disputes arising from denial of benefits from Medical Necessity, Utilization Review and/or Quality Improvement determinations shall be resolved as provided in such programs.

**6.7**   **Recovery of Payments.**  The Institution shall allow BCBST to recover any payments made to the Institution in error, including, but not limited to, under the circumstances set forth below:

   **6.7.1**   when two (2) or more payments have been made to Institution for the same service ("Duplicate Payments") ;
   **6.7.2**   when payments have been made to the Institution for services not rendered by the Institution;
   **6.7.3**   when BCBST is the secondary payer under the Coordination of Benefits provision of a BCBST Health Benefit Plan and has made a payment for services for which payment has been, or should have been made by a primary carrier;
   **6.7.4**   when payment has been made by BCBST for services for which benefits are available to the BCBST Member under the Workers' Compensation laws of any state or federal jurisdiction; or
   **6.7.5**   when payment has been made by BCBST for services denied as not being Medically Necessary.

   Such recoveries may be made, among other means, by BCBST through an offset from what is owed to the Institution under other claims.  If requested, BCBST will give Institution thirty (30) days notice of the amount and reason for any such recovery.  In addition, the Institution recognizes that BCBST shall be subrogated and shall succeed to any BCBST Member's rights of recovery from a third party for incurred services provided under this Agreement.

**6.8**   **Submission of Charges.**  The Institution warrants that all legitimate charges for all BCBST Members will be submitted to BCBST for payment. Institution shall bill BCBST on forms and in a manner acceptable to BCBST and shall submit such Complete Claims within one hundred and eighty (180) days from the date services have been rendered.  Failure to submit such claims within such period will result in denial of claims. Institution agrees that it will abide by recognized standards of coding, as determined by BCBST, and shall not engage in any unbundling, upcoding and/or any similar activities.  In addition, BCBST shall have the authority, where BCBST determines that such activity has occurred, to rebundle, down code and/or otherwise address and correct such activities.

**6.9**   **Contingency Fee Schedule.**  In the event Institution treats a BCBST Member who is enrolled in a product for which Institution is not Participating Provider, then Institution shall be compensated in accordance with Exhibit A, as attached hereto and incorporated by reference herein.  Payments made pursuant to the terms of this section shall be subject to all applicable terms and conditions of this Agreement, including, but not limited to, the reimbursement provisions of Section 6.1. Notwithstanding the foregoing, Institution shall be permitted to bill the BCBST Member for any contractual difference between billed charges and BCBST payment and BCBST Member obligations.

8

STOPNC - 017949

6.10 **Multiple Health Plans.** Institution may seek payment for the provision of services rendered by the Institution from multiple health benefit plans when a BCBST Member is eligible to receive benefits according to Coordination of Benefit provisions. If BCBST is the secondary payor, then any payment that is not paid by the primary payor will be calculated as set forth in the Member Benefit Agreement. When the Institution seeks payment from another health benefit plan, the Institution is not obligated to seek payment based on the rates in the applicable Network Attachment.

6.11 **Payment of Claims.** Claim payments made by BCBST are contingent upon the accuracy of diagnostic and other information provided by Institution to BCBST. If BCBST determines that it has accepted responsibility for payment based upon erroneous or incomplete information provided by Institution, or if benefits are misapplied by BCBST, and the BCBST Member is not entitled to benefits, the full refund shall be made in a manner that is acceptable to BCBST within thirty (30) days of notice from BCBST. Institution shall allow BCBST to recover through BCBST's remittance adjustment system any overpayments made to the Institution.

## 7. QUALITY IMPROVEMENT AND UTILIZATION REVIEW

7.1 **Quality Improvement and Utilization Review Programs.** BCBST, or an entity designated by BCBST, shall maintain Quality Improvement and Utilization Review Programs to monitor the delivery of health care services for BCBST Members, including a focus upon Utilization Review, clinical outcomes, and peer assessment. BCBST may monitor Institution's Quality Improvement activities and compliance with BCBST's Quality Improvement policies and procedures. BCBST shall also monitor Institution's credentialing compliance with its disciplinary policies and procedures. Institution agrees to cooperate with any corrective action plans requested by BCBST.

7.2 **Institution's Utilization Review Plan.** Institution shall develop and maintain a utilization review plan that is compatible with the provisions included in BCBST's Utilization Review Program. Institution agrees to submit its plan to BCBST upon request, and further agrees to submit any changes or modifications to its utilization review plan to BCBST upon request.

7.3 **Medical Review.** Institution agrees that BCBST may conduct medical reviews of all cases prior to payment and that BCBST reserves the right to deny payment for any services that BCBST determines to be not Medically Necessary. Therefore, the Institution agrees that services will be provided to prescribed consistent with criteria detailed in the Institution's and/or BCBST's Utilization Review and Quality Improvement Program.

7.4 **Scope of Programs.** The Quality Improvement and Utilization Review Programs will be administered according to the applicable BCBST Health Benefit Plan and will include the following:

7.4.1 **Prior Authorization and/or Certification** - to determine whether a scheduled inpatient admission or procedure is Medically Necessary and appropriate.

7.4.2 **Concurrent Review** - to determine whether continued inpatient acute care hospitalization, length of stay, outpatient care, ambulatory surgery, diagnostic ancillary services and/or determinations are appropriate.

7.4.3 **Retrospective Review** - to determine the appropriateness of institution and physician services after such services have been delivered.

## 8. RESOLUTION OF DISPUTES

3 corerevised.doc
4/15/99

STOPNC - 017950

8.1 **Meeting of Parties.** BCBST and the Institution agree to meet and confer in good faith to resolve any problem, dispute, or controversy that may arise under this Agreement.

8.2 **Arbitration.** If a dispute, other than a dispute for which the resolution is provided for in the Utilization Review Program, arises between the parties of this Agreement involving a contention by either party that the other has failed to perform its obligations and responsibilities under this Agreement, then the party making such contention shall promptly give written notice to the other. Such notice shall set forth in detail the basis for the party's contention, and shall be sent by certified mail, with a return receipt requested. The other party shall within thirty (30) calendar days after receipt of the notice provide a written response seeking to satisfy the party that gave notice regarding the matter as to which notice was given. Following such response, or the failure of the second party to respond to the complaint of the first party within thirty (30) calendar days, if the party that gave notice of dissatisfaction remains dissatisfied, then that party shall so notify the other party and the matter shall be promptly submitted to inexpensive
and binding arbitration in accordance with the Tennessee Uniform Arbitration Act at Tennessee Code Annotated Section 29-5-301 et seq.

8.3 **Notice and Resolution of Complaints.** If any formal complaints are received from BCBST Members by the Institution regarding the Institution, or any BCBST Participating Provider, the Institution agrees to promptly notify BCBST concerning all details of such complaint. The Institution agrees to cooperate fully with BCBST for the investigation and resolution of any complaint from a BCBST Member.

9. **MARKETING, ADVERTISING, AND PUBLICITY**

9.1 **Use of Institution's Name.** BCBST shall have the right to use the name of Institution for purposes of marketing and, informing BCBST Members of the identity of Institution through written (e.g., directories) or oral communication, and otherwise to carry out the terms of the Agreement.

9.2 **Reservation of Rights.** Except as provided in Section 9.1, BCBST and the Institution each reserves the right to control of the use of their respective names, symbols, trademarks, service marks, and product names presently existing or later established. In addition, except as provided in this Agreement, neither BCBST nor the Institution shall use the other party's name, symbols, trademarks, or service marks in advertising or promotional materials, or otherwise, without the prior written consent of that party, and shall cease any such usage immediately upon written notice of the party or on termination of this Agreement, whichever occurs first.

10. **RECORDS, ACCESS, INSPECTION, AND CONFIDENTIALITY**

10.1 **Processing of Claims.** The Institution will furnish to BCBST, without charge, all information reasonably required by BCBST for the proper processing and adjudication of claims, including complete and accurate descriptions of the services performed and charges made. Institution will use best efforts to furnish such data in an electronic format and to provide all encounter data as requested by BCBST.

10.2 **Maintenance of Records.** The Institution shall prepare and maintain all appropriate records on BCBST Members receiving services. The records shall be maintained in accordance with prudent record-keeping procedures, in a form and manner as determined by BCBST to be reasonably acceptable, and as required by law.

10.3 **Audits and Inspections.** The Institution agrees that BCBST, or a vendor designated by BCBST, is allowed to perform on-site audits and inspections of relevant financial and/or medical records, and Utilization Review procedures covering treatment of any BCBST Member. Such audits and

STOPNC - 017951

inspections shall be permitted without charge to BCBST or its designated vendor, who shall be provided copies of records involving the audit or inspection without charge. Each BCBST Member has waived any provision of law forbidding such disclosure as a condition of enrollment as a BCBST Member and to receive claims payment. Except in the event of suspected fraud or other illegal activity, such inspection, audit and duplication shall occur only after reasonable notice and during regular working hours at no charge.

10.4    **Requests for Reimbursement.** If it is determined that the Institution has overcharged BCBST for payment for services rendered, the Institution agrees to reimburse BCBST for such overpayment. With respect to overpayments made after December 31, 1998, BCBST's requests for reimbursement shall be made not later than two (2) years after the end of the year in which the overpayment occurred except in the case of overpayments resulting from the Institution's fraud or other illegal act(s), in which case no time limit shall apply. If an audit of the Institution is in progress at the end of the two (2) year time limit above, BCBST shall have an additional 120 days from the completion of the audit to request reimbursement. With respect to claims submitted after December 31, 1998, Institution agrees that any requests for reimbursement of unpaid or underpaid claims shall be made within two (2) years of the end of the year in which the claim was originally submitted.

10.5    **Record Ownership and Access.** Ownership and access to the records of BCBST Members shall be controlled by applicable law and this Agreement.

10.6    **Confidentiality.** The Institution and BCBST agree to maintain confidentiality and to take all reasonable precautions to prevent the unauthorized disclosure of any and all records prepared and/or maintained pursuant to this Agreement.

10.7    **Availability of Records.** Subject to all applicable privacy and confidentiality requirements, the medical records of BCBST Members shall be made available to each Physician and/or Health Care Professional treating BCBST Members and to BCBST, its agents, or representatives. In the event that a BCBST Member is transferred from the Institution, or disenrolls from BCBST, Institution shall, upon BCBST's request, provide a copy of such BCBST Member's medical records to BCBST and/or the attending physician in a timely manner, as appropriate to the efficient provision of care to such BCBST Member.

11.    **LIABILITY AND INDEMNIFICATION**

11.1    **Third Party Acts and Omissions.** None of BCBST, Institution, nor any of their respective agents or employees shall be liable to third parties for any act or omission of the other party.

11.2    **Indemnification.** Each party (the "Indemnitor") agrees to indemnify and hold the other party (the " Indemnitee") harmless from any and all liability, loss, damage, claim and expense of any kind, including costs and attorneys' fees which result from negligent or willful acts or omissions by the Indemnitor, its agents or employees, regarding the duties and obligations of the Indemnitor under the Agreement, including, as applicable, the duty to maintain the legal standard of care applicable to the Indemnitor. Such indemnification and holding harmless shall not apply to any matters resulting in whole or in part from the negligent or willful acts or omissions of the Indemnitee or its agents or employees.

The foregoing notwithstanding, if Institution is a state or municipally owned entity, the Institution agrees to indemnify and hold BCBST harmless from all claims which result from negligent acts or omissions of the Institution, its agents or employees, regarding the duties and obligations of Institution under the Agreement. However, such liability of Institution shall be strictly limited in accordance with the provisions of the Tennessee Claims Commission Act, as applicable. Such

STOPNC - 017952

indemnification and holding harmless shall not apply to any matters resulting in whole or in part from the negligent or willful acts or omissions of BCBST or its agents or employees.

12.     <u>TERM OF AGREEMENT; TERMINATION</u>

12.1     **Term.** When executed by both parties, this Agreement shall become effective as of the date indicated on the Agreement's Signature Page and shall continue in effect unless terminated in accordance with the terms of this Agreement. The Institution's participation in specific Networks shall become effective as of the date noted for on the Signature Page for the applicable Network Attachment, and shall remain in effect as noted on such Attachment. In the event this Agreement terminates, all Attachments shall also terminate.

12.2     **Without Cause Termination.** Either party may terminate this Agreement or the applicable Network Attachment by giving, via certified mail, written notice one hundred twenty (120) days prior to the anniversary of the effective date. Nothing contained herein, however, shall be construed to limit either party's lawful remedies in the event of a material breach of this Agreement.

12.3     **Immediate Termination.** BCBST may terminate this Agreement immediately in the event that:

12.3.1     Institution's license to provide health care services is suspended, revoked or limited, or Institution is placed on probation by the applicable licensing authority;

12.3.2     Institution in BCBST's sole determination, provides care in a manner that (i) jeopardizes the health or safety of BCBST Members; or (ii) fails to meet prevailing recognized professional community standards of practice, standards established under law, or standards as determined by BCBST;

12.3.3     Institution has included a material misrepresentation, in BCBST's determination, in an application or report submitted to BCBST, or any report filed with any person corporation, partnership, association, federal or state agency, or any other entity, relating to the provision of health services;

12.3.4     A judgment of civil liability or a criminal conviction (including a plea of nolo contendere) for Medicare or Medicaid fraud or similar offense involving health insurance fraud, revocation or suspension of participation in Medicare and/or Medicaid, or conviction (including a plea or nolo contendere) of a felony or of a misdemeanor involving fraud or moral turpitude is rendered against the Institution;

12.3.5     Failure to maintain insurance in accordance with the provisions of Section 4.6 hereof;

12.3.6     Judgment in malpractice actions and/or settlement of malpractice claims (whether or not such claims related to care of BCBST members) of sufficient number or seriousness to suggest deficiencies in patient care and to cause Institution to no longer meet BCBST's participation criteria and procedures;

12.3.7     Any other behavior or circumstance demonstrating deficiencies in Institution's professional competence or dedication to providing a level of care that meets prevailing recognized professional community standards of practice, standards established under law, or standards as determined by BCBST.

12.4     **Effects of Termination.** The termination of this Agreement shall not release Institution, except as otherwise determined by BCBST, from any obligation to provide Covered Services to a BCBST Member until the BCBST Member can be transferred to the care of another BCBST

STOPNC - 017953

Participating Institution or is otherwise discharged from the Institution's care. BCBST shall make payments to Institution for such Covered Services in accordance with the terms of this Agreement. Upon termination of this Agreement, the parties shall cooperate with each other to effect such orderly transfer as promptly as is medically practicable and appropriate. Notwithstanding termination, BCBST shall for five (5) years, and as otherwise required by law and as necessary to fulfill the terms of the Agreement and the applicable Network Attachment, continue to have access to records of BCBST Members. In addition, in cases of suspected fraud or abuse, BCBST shall continue to have access to records until all matters relating to such fraud and abuse have been resolved.

12.5    **Cooperation Upon Termination.** The parties agree to cooperate with each other to resolve promptly any outstanding financial, administrative, or patient care issues upon the termination of this Agreement. Institution agrees that it shall refrain in every instance from interfering with the contractual relationship between BCBST and BCBST Members, and shall promptly supply all records necessary for the settlement of outstanding claims for Covered Services upon the termination of the Agreement. The provisions of Section 12.6 shall survive the termination of this Agreement for any reason.

12.6    **Survival.** It is the express intention and agreement of the parties hereto that Sections 6.1 and 6.7, Section 10, and Sections 12.4 and 12.5, and all other sections which by their terms are intended to survive termination, or which are necessary for the resolution of all matters unresolved, shall survive the termination of this Agreement for any reason and the terminated party shall continue to be bound by the provision of such sections.

13.    **UNFORESEEN CIRCUMSTANCES**

13.1    **Unforeseen Circumstances.** In the event that the Institution's operations are interrupted by acts of war, fire, insurrection, labor disputes, riots, earthquakes, or other acts of nature beyond its control, Institution shall be relieved of its obligation to perform any functions that are affected such that it could not render quality health care to any BCBST Member in the Institution, but those portions of the Institution that are not affected by these unforeseen acts as heretofore set forth shall continue to operate during the term of such interruption in accordance with the terms and conditions of the Agreement.

13.2    **Right of Termination.** Notwithstanding the foregoing, in the event that the Covered Services to be provided by Institution are substantially interrupted so that it cannot adequately render quality health care due to the events described in Section 13.1, BCBST shall have the right to terminate this Agreement upon thirty (30) days written notice to Institution, without any other cause.

14.    **GENERAL PROVISIONS**

14.1    **Assignment.** This Agreement shall not in any manner be assigned, delegated, or transferred by Institution without the prior written consent of BCBST. BCBST, however, may assign this Agreement to any Affiliate, now or in the future, or to any entity which succeeds to its business through a sale, merger, or other corporate transaction. Any assignment, delegation, or transfer, or attempt to do the same, that is in violation of Section 14.1 shall be void and shall have no binding effect.

14.2    **Subcontracting.** The Institution shall not subcontract this Agreement, or any portion of this Agreement, without the prior written consent of BCBST. BCBST may subcontract any administrative function as it relates to this Agreement to any organization it so designates. In addition, in the absence of a separate agreement with any entity referenced in this section, the terms of this Agreement and/or any attachment shall be applicable to any services provided to individuals covered under health care plans insured or administered by any BlueCross BlueShield

STOPNC - 017954

entity and their Affiliates that are licensed by the BlueCross BlueShield Association to use the " BlueCross" and/or " BlueShield" symbols, trademarks, and service marks presently existing or hereafter established.

14.3   **Material Breach.** This Agreement or the applicable Network Attachment may be terminated by either party by giving, via certified mail, thirty (30) days' prior written notice to the other party if the party to whom notice is given is in material breach of any provisions of this Agreement. The party claiming the right to terminate will set forth in the notice of intended termination, the facts underlying the claim that the other is in breach of this Agreement. Remedy of the breach to the satisfaction of the party giving notice, within thirty (30) days of receipt of notice, will nullify the intended termination notice.

14.4   **Waiver of Breach.** Neither the waiver by either of the parties hereto of a breach of, or a default under, any of the provisions of this Agreement, nor the failure of either of the parties, on one or more occasions, to enforce any of the provisions of this Agreement, or to exercise any right or privilege hereunder, shall be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any such provisions, rights, or privileges hereunder.

14.5   **Notice.** Any notice required to be given pursuant to the terms and provisions of this Agreement shall be in writing and shall be hand delivered (including delivery by courier), mailed by first-class, registered, or certified mail, return receipt requested, or transmitted by facsimile transmission addressed as follows:

(i)  If to BCBST:

BlueCross BlueShield of Tennessee
Provider Contract Management
801 Pine Street
Chattanooga, Tennessee 37402

(ii)  If to Institution:

as designated on the attached Signature Page.

Either party may designate by notice in writing a new address to which any notice, demand, request, or communication may thereafter be so given, served, or sent.

14.6   **Severability.** In the event that any part of any provision of this Agreement is rendered invalid or unenforceable under applicable law, or is declared null and void by any court of competent jurisdiction, such part shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining parts of such provision or the remaining parts of the Agreement.

14.7   **Effect of Severable Provision.** In the event that a provision of this Agreement is rendered invalid or unenforceable or declared null and void as provided in Section 14.6, and its removal has the effect of materially altering the obligations of either party in such manner as (i) will cause serious financial hardship to such party; or (ii) will cause such party to act in violation of its corporate articles or bylaws, the party so affected shall have the right to terminate this Agreement upon thirty (30) days prior written notice to the other party.

14.8   **Entire Agreement.**   This Agreement, together with any Exhibits, applicable Network Attachments, manuals, and other attachments, constitutes the entire Agreement between the parties relating to the rights granted and the obligations assumed by the parties and supersedes any

14

STOPNC - 017955

prior written or oral agreements, promises, negotiations, or representations pertaining to the subject matter hereof.

**14.9    Amendment.** Except as otherwise provided below, this Agreement, or any part, article, section, exhibit, or Network Attachment hereto, may be amended, altered, or modified only in writing as duly executed by both parties. However, the removal of a Network Provider from a Network, or a change (i) to a Member Benefit Agreement, (ii) to BCBST policies or procedures, or (iii) as required by state or federal laws and regulations, shall be automatically incorporated herein to the extent the services rendered by the Institution pursuant to this Agreement are affected by such removal or change, and shall not be deemed an amendment to this Agreement, subject to the right of the Institution to terminate this Agreement without cause as provided in Section 12.2. In addition, and notwithstanding the foregoing, BCBST shall have the right to amend this Agreement in accordance with the following procedure:

14.9.1   BCBST shall furnish Institution with the proposed amendment in writing;

14.9.2   Institution shall have thirty (30) days after delivery of the proposed amendment in which to respond in writing to BCBST. If Institution either accepts such amendment or fails to respond in writing within such period, the proposed amendment shall be deemed accepted by Institution and shall become effective, and therefore binding on Institution, upon the earlier of the Institution 's written acceptance or the expiration of such thirty (30) day period; and

14.9.3   If Institution notifies BCBST in writing by certified mail within thirty (30) days after the delivery of the proposed amendment that Institution does not accept the proposed amendment, such amendment shall not take effect and BCBST shall have the right to elect either (i) to have this Agreement remain in effect in accordance with its terms without the proposed amendment or (ii) to terminate this Agreement by giving written notice fifteen (15) days prior to the effective date of termination.

**14.10   Attorney Fees.** In the event that either BCBST or the Institution initiates any action, suit, or arbitration proceeding to enforce the provisions of this Agreement, each party shall bear its own costs and attorney fees.

**14.11   Headings.** The headings of articles and sections contained in this Agreement are for reference purposes only, shall not be deemed to be a part of this Agreement for any purpose, and shall not in any way define or affect the meaning, interpretation, construction, or scope of this Agreement.

**14.12   Utilization of Services.** Institution hereby acknowledges that BCBST does not warrant that BCBST Members will choose to utilize the Institution's services.

**14.13   Governing Law.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Tennessee.

**14.14   Execution.** To facilitate execution, this Agreement may be executed in one or more counterparts, each of which shall be considered an original, and which collectively shall constitute the Agreement.

3 corerevised.doc
4/15/99

15

STOPNC - 017956

02/10/2001 15:20 FAX 615          BCCB                              ☒022/022

Insert 6

14.15    Ethical and Religious Directives. The parties acknowledge that
Institution is a member of the Ascension Health System and that the
operation of Institution in accordance with the Ethical and Religious
Directives and the principles and beliefs of the Roman Catholic Church is a
matter of conscience to the Institution. It is the intent and agreement of the
parties that neither this Agreement nor any part hereof shall be construed to
require Institution to violate said Ethical and Religious Directives in its
operation and all parts of this Agreement must be interpreted in a manner
that is consistent with said Ethical and Religious Directives. "Ethical and
Religious Directives" shall be defined as Ethical and Religious Directives for
Catholic Health Care Facilities as promulgated, from time to time, by the
National Conference of Catholic Bishops, Washington, D.C., of the Roman
Catholic Church and as adopted by the Bishop of the Catholic Diocese of
Nashville. In the event that the National Conference of Catholic Bishops
shall cease to exist, "Ethical and Religious Directives" shall mean such similar
directives promulgated by its successor organization or by such organization
then exercising its powers and duties, or by the Roman Catholic Church, and
in the event the Diocese of Nashville shall cease to exist so that there is not
then an individual bearing the title of Bishop of the Catholic Diocese of
Nashville, such "Ethical and Religious Directives" shall be as are adopted by
the individual or organization then exercising the power, duties and authority
of the Bishop of the Catholic Diocese of Nashville.

14.16    Compliance Plan. The Institution has in place a Corporate
Responsibility Plan (the "Plan") which has as a goal to insure that the
Institution complies with federal, state and local laws and regulations. The
Plan focuses on risk management, the promotion of good corporate
citizenship, including a commitment to uphold a high standard of ethical and
legal business practices, and the prevention of misconduct. The parties to
this Agreement acknowledge the Institution's commitment to corporate
responsibility and agree to conduct all business transactions which occur
pursuant to this Agreement in accordance with the Plan.



**SAINT THOMAS
HEALTH SERVICES**
Caring for you and those around you.

Attached is the last page which is the
Ethical and Religious Directives and
Compliance Plan Language for your review
and inclusion in the contract.

(615) 298-3200
(800) 298-3200  **STOPNC - 017957**

**BLUE CROSS AND BLUE SHIELD OF TENNESSEE**

INSTITUTION AGREEMENT
SIGNATURE PAGE AND DATA SHEET

In consideration of mutual covenants and promises stated herein and other good valuable consideration, the undersigned agree to be bound by the Blue Cross and Blue Shield of Tennessee ("BCBST") Institution Agreement (the "Institution Agreement"), as of the date set forth below by BCBST as the effective date (hereinafter "the Effective Date").

Saint Thomas Outpatient
Neurosurgical Center, L.L.C

(INSTITUTION NAME)

By: _Cheryl Sullivan_

Title: _Administrator_

Date: _2/28/01_

Blue Cross and Blue Shield of Tennessee

By: _____

Title: _Senior Vice President_

Date: _04/05/01_

Effective Date: _04/19/01_

Location Address:

_4230 Harding Rd, Suite 901_

_Nashville, TN 37205_

_615-327-9543_

Billing Address:

_(same)_

**Federal Tax Information:**

Tax Identification Number: _62-1802891_

Reporting Name: _Saint Thomas Outpatient Neurosugical Center, LLC_

Reporting Address: _4230 Harding Rd_

_Suite 901_

_Nashville, TN 37205_

| FOR BCBST OFFICE USE ONLY | |
|---|---|
| Provider Number: _____ | PIMS Number: _____ |
| PIMS Specialist: _____ | Date: _____ |

STOPNC - 017958

# BLUECLASSIC℠ NETWORK
# AMBULATORY SURGICAL FACILITY
# ATTACHMENT

### Saint Thomas Outpatient Neurosurgical Center, LLC

**WHEREAS,** this BlueClassic℠ Network Ambulatory Surgical Facility Attachment (the **"Network Ambulatory Surgical Facility Attachment"**) made by and between BlueCross BlueShield of Tennessee (**"BCBST"**) and Ambulatory Surgical Facility will be attached to and made a part of BlueCross and BlueShield of Tennessee Institution  Agreement, (the **"Institution Agreement"**) and,

**WHEREAS,** Ambulatory Surgical Facility desires to participate in the BlueClassic℠ Network for the purpose of providing health care services to BCBST Members whose health benefits are delivered through the BlueClassic℠ Network;

**THEREFORE, Ambulatory Surgical Facility** and BCBST agree to the following terms and conditions of participation in the BlueClassic℠ Network:

## Reimbursement

For Covered Services provided to BCBST Members whose health benefits are delivered through the BlueClassic℠ Network, Ambulatory Surgical Facility will be paid the lesser of billed charges or the established fee for the procedure performed, as indicated in the BlueClassic℠ Network Schedule 1 at the time of service, as attached hereto and incorporated by reference herein, less applicable member payments.  Such reimbursement from BCBST and the BCBST Members shall represent the maximum amount payable to Ambulatory Surgical Facility for Covered Services and Ambulatory Surgical Facility shall not bill any BCBST Member for any contractual difference between billed charges and BCBST payment and BCBST Member obligation.

## Previous Agreements

This BlueClassic℠ Network Ambulatory Surgical Facility Attachment is enforceable under the terms and conditions contained herein and, in the event of a conflict between the language of this BlueClassic℠ Network Ambulatory Surgical Facility Attachment and the Institution Agreement, the language of this BlueClassic℠ Network Ambulatory Surgical Facility Attachment shall prevail with respect to the services and benefits to be rendered.

## Credentialing/Recredentialing

References to credentialing and/or recredentialing in Sections 4.1, 4.3 and 7.1 of the Institution Agreement shall not be applicable to this BlueClassic℠ Network Ambulatory Surgical Facility Attachment.

## Term and Termination

When executed by both parties, this BlueClassic℠ Network Ambulatory Surgical Facility Attachment shall become effective as of the date noted below as the Effective Date and shall remain in effect until the

2/1/01

STOPNC - 017959

BlueClassic℠ Network Ambulatory Surgical Facility Attachment
Page 2

end of the calendar year, and shall automatically renew on an annual basis, unless terminated in accordance with the terms of the Institution Agreement. A party may elect to terminate this Ambulatory Surgical Facility Attachment, however, without terminating the Institution Agreement or other applicable Network Attachment(s) of that Institution Agreement. This BlueClassic℠ Network Ambulatory Surgical Facility Attachment shall immediately terminate upon the termination of the Institution Agreement.

**BlueCross BlueShield of Tennessee, Inc.**              **Saint Thomas Outpatient Neurosurgical Center, LLC**

By: Gary B. Simmons                                      By: _Tina Sullivan_

Title: Sr. VP, Provider Networks and Contracting         Title: _Administrator_

Signature: _____                               Signature: _Tina Sullivan_

Date: _04/05/01_                                         Date: _2/28/01_

Effective Date: _04/19/01_

2/1/01

**STOPNC - 017960**

BlueClassic Network
Schedule 1

Saint Thomas Outpatient Neurosurgical Center, LLC
BCBST Provider No.: 3157258

### Outpatient Surgery

Fee Schedule amounts are all inclusive and will fully compensate Institution for all facility services and supplies provided in association with surgery that is directly related to the procedure(s) performed.  Pre-admission testing that is provided up to five (5) days prior to the surgery are included in the global fee.  The global fee also includes laser, equipment, drugs and facility charges.  Reimbursement will be paid the lesser of approved charges or the rates listed below.

When two different covered procedures are performed on the same day, payment shall be made at 50% of the fee schedule amount for the second and subsequent procedures.  When a procedure is repeated on the same day, no additional amount will be paid for the second procedure.

### Ambulatory Surgery Global Fees*

| | |
|---|---|
| Group 0 | $     0.00 |
| Group 1 | $   785.00 |
| Group 2 | $ 1,055.00 |
| Group 3 | $ 1,205.00 |
| Group 4 | $ 1,487.50 |
| Group 5 | $ 1,695.00 |
| Group 6 | $ 1,972.50 |
| Group 7 | $ 2,352.50 |
| Group 8 | $ 2,320.00 |
| Group 9 | $ 4,807.50 |
| Group 10 | $ 3,360.00 |

(*Ambulatory Surgery Groupings Defined in Exhibit 2A)

*Rebundling of charges will occur if necessary
*Excludes modifier 22
*File claim with a bill type of 831 and Revenue Code 490

2/1/01

STOPNC - 017961

# BLUE PREFERRED NETWORK
## INSTITUTION ATTACHMENT

Saint Thomas Outpatient Neurosurgical Center, LLC

**WHEREAS,** this Blue Preferred Network Institution Attachment (the "**Blue Preferred Network Attachment**") made by and between BlueCross BlueShield of Tennessee ("**BCBST**") and Institution will be attached to and made a part of BlueCross BlueShield of Tennessee Institution Agreement, (the "**Institution Agreement**"); and,

**WHEREAS,** Institution desires to participate in the Blue Preferred Network for the purpose of providing health care services to BCBST Members whose health benefits are delivered through the Blue Preferred Network;

**THEREFORE,** Institution and BCBST agree to the following terms and conditions of participation in the Blue Preferred Network:

### Reimbursement

For Covered Services provided to BCBST Members whose health benefits are delivered through the Blue Preferred Network, Institution will be paid the lesser of billed charges or the established fee for the procedure performed, as indicated in the Blue Preferred Schedule 1, as attached hereto and incorporated by reference herein, less applicable coinsurance and/or deductibles. Such reimbursement from BCBST and the BCBST Members shall represent the maximum amount payable to Institution for Covered Services and Institution shall not bill any BCBST Member for any contractual difference between billed charges and BCBST payment and BCBST Member obligation.

### Previous Agreements

This Blue Preferred Network Attachment supersedes any previous Blue Preferred Network Attachment, as amended, and will be substituted and shall become part of the Institution Agreement. In addition, this Blue Preferred Network Attachment is enforceable under the terms and conditions contained herein and, in the event of a conflict between the language of this Blue Preferred Network Attachment and the Institution Agreement, the language of this Blue Preferred Network Attachment shall prevail with respect to the services and benefits to be rendered.

### Term and Termination

When executed by both parties, this Blue Preferred Network Attachment shall become effective as of the date noted below as the Effective Date and shall remain in effect and shall automatically renew as provided in the Institution Agreement, unless terminated in accordance with the terms therein. In the event, however, that the Institution Agreement terminates, then participation by the Institution pursuant to this Blue Preferred Network Attachment shall also terminate.

BlueCross BlueShield of Tennessee, Inc.

By: _____

Printed Name: Gary B. Simmons

Title: Sr. VP, Provider Networks and Contracting

Date: 04/05/01

Saint Thomas Outpatient Neurosurgical Center, LLC

By: _____

Printed Name: Tina Sullivan

Title: Administrator

Date: 2/28/01

**EFFECTIVE DATE:** 04/19/01

STOPNC - 017962

Blue Preferred Network
Schedule 1

Saint Thomas Outpatient Neurosurgical Center, LLC
BCBST Provider No.: 3157258

Effective Date: 04/19/01

## Outpatient Surgery

Fee Schedule amounts are all inclusive and will fully compensate Institution for all facility services and supplies provided in association with surgery that is directly related to the procedure(s) performed.  Pre-admission testing that is provided up to five (5) days prior to the surgery are included in the global fee.  The global fee also includes laser, equipment, drugs and facility charges.  Reimbursement will be paid the lesser of approved charges or the rates listed below.

When two different covered procedures are performed on the same day, payment shall be made at 50% of the fee schedule amount for the second and subsequent procedures.  When a procedure is repeated on the same day, no additional amount will be paid for the second procedure.

### Ambulatory Surgery Global Fees*

| | |
|---|---|
| Group 0 | $      0.00 |
| Group 1 | $    596.60 |
| Group 2 | $    801.80 |
| Group 3 | $    915.80 |
| Group 4 | $  1,130.50 |
| Group 5 | $  1,288.20 |
| Group 6 | $  1,499.10 |
| Group 7 | $  1,787.90 |
| Group 8 | $  1,763.20 |
| Group 9 | $  3,653.70 |
| Group 10 | $  2,553.60 |

(*Ambulatory Surgery Groupings Defined in Exhibit 2A)

*Rebundling of charges will occur if necessary
*Excludes modifier 22
*File claim with a bill type of 831 and Revenue Code 490

2/1/01

STOPNC - 017963

# BLUE SELECT NETWORK
## INSTITUTION ATTACHMENT

### Saint Thomas Outpatient Neurosurgical Center, LLC

**WHEREAS,** this Blue Select Network Institution Attachment (the "**Blue Select Network Attachment**") made by and between BlueCross BlueShield of Tennessee ("**BCBST**") and Institution will be attached to and made a part of BlueCross BlueShield of Tennessee Institution Agreement, (the "**Institution Agreement**"); and,

**WHEREAS,** Institution desires to participate in the Blue Select Network for the purpose of providing health care services to BCBST Members whose health benefits are delivered through the Blue Select Network;

**THEREFORE,** Institution and BCBST agree to the following terms and conditions of participation in the Blue Select Network:

#### Reimbursement

For Covered Services provided to BCBST Members whose health benefits are delivered through the Blue Select Network, Institution will be paid the lesser of billed charges or the established fee for the procedure performed, as indicated in the Blue Select Schedule 1, as attached hereto and incorporated by reference herein, less applicable coinsurance and/or deductibles. Such reimbursement from BCBST and the BCBST Members shall represent the maximum amount payable to Institution for Covered Services and Institution shall not bill any BCBST Member for any contractual difference between billed charges and BCBST payment and BCBST Member obligation.

#### Previous Agreements

This Blue Select Network Attachment supersedes any previous Blue Select Network Attachment, as amended, and will be substituted and shall become part of the Institution Agreement. In addition, this Blue Select Network Attachment is enforceable under the terms and conditions contained herein and, in the event of a conflict between the language of this Blue Select Network Attachment and the Institution Agreement, the language of this Blue Select Network Attachment shall prevail with respect to the services and benefits to be rendered.

#### Term and Termination

When executed by both parties, this Blue Select Network Attachment shall become effective as of the date noted below as the Effective Date and shall remain in effect and shall automatically renew as provided in the Institution Agreement, unless terminated in accordance with the terms therein. In the event, however, that the Institution Agreement terminates, then participation by the Institution pursuant to this Blue Select Network Attachment shall also terminate.

**BlueCross BlueShield of Tennessee, Inc.**     **Saint Thomas Outpatient Neurosurgical Center, LLC**

By: _____     By: _____

Printed Name: Gary B. Simmons     Printed Name: _Tina Sullivan_

Title: Sr. VP, Provider Networks and Contracting     Title: _Administrator_

Date: _04/05/01_     Date: _2/28/01_

**EFFECTIVE DATE:** _04/19/01_

STOPNC - 017964

**Blue Select Network**
**Schedule 1**

Saint Thomas Outpatient Neurosurgical Center, LLC
BCBST Provider No.: 3157258

Effective Date: 04|19|01

## Outpatient Surgery

Fee Schedule amounts are all inclusive and will fully compensate Institution for all facility services and supplies provided in association with surgery that is directly related to the procedure(s) performed.  Pre-admission testing that is provided up to five (5) days prior to the surgery are included in the global fee.  The global fee also includes laser, equipment, drugs and facility charges.  Reimbursement will be paid the lesser of approved charges or the rates listed below.

When two different covered procedures are performed on the same day, payment shall be made at 50% of the fee schedule amount for the second and subsequent procedures.  When a procedure is repeated on the same day, no additional amount will be paid for the second procedure.

**Ambulatory Surgery Global Fees***

| Group | Fee |
|---|---|
| Group 0 | $ 0.00 |
| Group 1 | $ 549.50 |
| Group 2 | $ 738.50 |
| Group 3 | $ 843.50 |
| Group 4 | $ 1,041.25 |
| Group 5 | $ 1,186.50 |
| Group 6 | $ 1,380.75 |
| Group 7 | $ 1,646.75 |
| Group 8 | $ 1,624.00 |
| Group 9 | $ 3,365.25 |
| Group 10 | $ 2,352.00 |

**(*Ambulatory Surgery Groupings Defined in Exhibit 2A)**

*Rebundling of charges will occur if necessary
*Excludes modifier 22
*File claim with a bill type of 831 and Revenue Code 490

2/1/01

STOPNC - 017965

AMENDMENT TO
BLUECLASSIC NETWORK
INSTITUTION ATTACHMENT

**Saint Thomas Health Services**
**For Facilities Identified in Exhibit 1A**

This Amendment modifies the BlueClassic Network Institution Attachment ("BlueClassic Network Attachment") by and between BlueCross BlueShield of Tennessee ("BCBST") and its designated affiliates and the "Institution" and has an Effective Date of _12/1/02_ .

NOW THEREFORE, the parties agree to amend the BlueClassic Network Institution Attachment as follows:

1. <u>Reimbursement</u>. The Reimbursement provision is replaced in its entirety with the following:

    For Covered Services provided to BCBST Members whose health benefits are delivered through the BlueClassic Network, BCBST or the applicable Payor will pay Institution the lesser of billed charges or the established fee for the procedure performed, as indicated in Schedule 1 at the time of service, as attached hereto and incorporated by reference herein, less applicable Member Payments.

2. To the extent this Amendment is inconsistent with the BlueClassic Network Institution Attachment, this Amendment shall govern. Otherwise, the Amendment remains in full force and effect.

IN WITNESS WHEREOF, the parties have accepted this Amendment intending to be bound on and after the Effective Date first written above.

BlueCross BlueShield of Tennessee, Inc.

By: _Gary B. Simmons_

Title: _Senior Vice President_

Signature: _____

Date: _10/28/02_

Saint Thomas Health Services

By: _Kenneth J. Kennuth_

Title: _CFO_

Signature: _Kenneth J. Kennuth_

Date: _10/22/02_

8/23/02

STOPNC - 017966

BlueClassic Network
Schedule 1

Saint Thomas Outpatient Neurosurgical Center, LLC
BCBST Provider No.: 3157258

Effective date: __12/1/02__

## Outpatient Surgery

Fee Schedule amounts are all inclusive and will fully compensate Institution for all facility services and supplies provided in association with surgery that is directly related to the procedure(s) performed.  Pre-admission testing that is provided up to five (5) days prior to the surgery are included in the global fee.  The global fee also includes laser, equipment, drugs and facility charges.  Reimbursement will be paid the lesser of approved charges or the rates listed below.

When two different covered procedures are performed on the same day, payment shall be made at 50% of the fee schedule amount for the second and subsequent procedures.  When a procedure is repeated on the same day, no additional amount will be paid for the second procedure.

### Ambulatory Surgery Global Fees*

| | |
|---|---|
| Group 0 | $      0.00 |
| Group 1 | $   825.82 |
| Group 2 | $ 1,109.86 |
| Group 3 | $ 1,267.66 |
| Group 4 | $ 1,564.85 |
| Group 5 | $ 1,783.14 |
| Group 6 | $ 2,075.07 |
| Group 7 | $ 2,474.83 |
| Group 8 | $ 2,440.64 |
| Group 9 | $ 5,057.49 |
| Group 10 | $ 3,534.72 |

(*Ambulatory Surgery Groupings Defined in Exhibit 2A)
*Rebundling of charges will occur if necessary
*Excludes modifier 22
*File claim with a bill type of 831 and Revenue Code 490

### High Cost Drugs

Revenue Code 636                    55% of Covered Charges
*(Revenue Code 636 is paid in addition to Ambulatory Surgery Global Rates, Observation Services, Outpatient Flat Fees, Laboratory and Radiology, Emergency Services, and Other Outpatient Services. The payment made will in no instance be greater than the total cost of the drug.)

### Implants*

| | | |
|---|---|---|
| Pacemaker | Revenue Code 275 | 55% of Covered Charges |
| Prosthetic/Orthotic Devices | Revenue Code 274 | 55% of Covered Charges |
| Other Implants | Revenue Code 278 | 55% of Covered Charges |

*Charges billed for Implants must meet the criteria of a Surgical Implant or Surgical Appliance as noted below and be no greater than the charge billed to any other third party payor. In addition the payment made will in no instance be greater than the total cost of an individual implant.  Periodic audits will be performed to ascertain adherence to this criteria and adjustments will be made accordingly.

> Surgical Implant: A device that is medically necessary and medically appropriate which is surgically placed internally for therapeutic or reconstructive purposes and not considered a prosthetic or orthotic device.
> Surgical Appliance: A surgical device that is medically necessary and medically appropriate which is externally paced as a part of a surgical procedure and is integral to the surgical procedure and not considered a prosthetic or orthotic device.

*(Revenue Codes 274, 275, & 278 are paid in addition to Ambulatory Surgery Global Rates.)

10/9/02

STOPNC - 017967

# EXHIBIT 1

Saint Thomas Health Services
For
Facilities Identified Below

A.   Institution Agreement, BlueClassic, BluePreferred, BlueSelect Facilities

| | |
|---|---|
| Saint Thomas Outpatient Neurosurgical Center, LLC | 3157258 |
| Middle Tennessee Ambulatory Surgery Center | 3122521 |
| Baptist Ambulatory Surgery Center | 3083845 |
| Baptist Physicians Pavilion Surgery Center | 1000923 |
| Saint Thomas Campus SurgiCare | 4042363 |

B.   HMO Blue Network H Facilities

| | |
|---|---|
| Middle Tennessee Ambulatory Surgery Center | 3122521 |
| Baptist Ambulatory Surgery Center | 3083845 |
| Baptist Physicians Pavilion Surgery Center | 1000923 |

STOPNC - 017968

BlueSelect Network
Schedule 1

Saint Thomas Outpatient Neurosurgical Center, LLC
BCBST Provider No.: 3157258

Effective date: _12/1/02_

## Outpatient Surgery

Fee Schedule amounts are all inclusive and will fully compensate Institution for all facility services and supplies provided in association with surgery that is directly related to the procedure(s) performed. Pre-admission testing that is provided up to five (5) days prior to the surgery are included in the global fee. The global fee also includes laser, equipment, drugs and facility charges. Reimbursement will be paid the lesser of approved charges or the rates listed below.

When two different covered procedures are performed on the same day, payment shall be made at 50% of the fee schedule amount for the second and subsequent procedures. When a procedure is repeated on the same day, no additional amount will be paid for the second procedure.

### Ambulatory Surgery Global Fees*

| | |
|---|---|
| Group 0 | $ 0.00 |
| Group 1 | $ 577.76 |
| Group 2 | $ 776.48 |
| Group 3 | $ 886.88 |
| Group 4 | $ 1,094.80 |
| Group 5 | $ 1,247.52 |
| Group 6 | $ 1,451.76 |
| Group 7 | $ 1,731.44 |
| Group 8 | $ 1,707.52 |
| Group 9 | $ 3,538.32 |
| Group 10 | $ 2,472.96 |

(*Ambulatory Surgery Groupings Defined in Exhibit 2A)
*Rebundling of charges will occur if necessary
*Excludes modifier 22
*File claim with a bill type of 831 and Revenue Code 490

### High Cost Drugs

Revenue Code 636        55% of Covered Charges

*(Revenue Code 636 is paid in addition to Ambulatory Surgery Global Rates, Observation Services, Outpatient Flat Fees, Laboratory and Radiology, Emergency Services, and Other Outpatient Services. The payment made will in no instance be greater than the total cost of the drug.)

### Implants*

| | | |
|---|---|---|
| Pacemaker | Revenue Code 275 | 55% of Covered Charges |
| Prosthetic/Orthotic Devices | Revenue Code 274 | 55% of Covered Charges |
| Other Implants | Revenue Code 278 | 55% of Covered Charges |

*Charges billed for Implants must meet the criteria of a Surgical Implant or Surgical Appliance as noted below and be no greater than the charge billed to any other third party payor. In addition the payment made will in no instance be greater than the total cost of an individual implant. Periodic audits will be performed to ascertain adherence to this criteria and adjustments will be made accordingly.

    Surgical Implant: A device that is medically necessary and medically appropriate which is surgically placed internally for therapeutic or reconstructive purposes and not considered a prosthetic or orthotic device.

    Surgical Appliance: A surgical device that is medically necessary and medically appropriate which is externally paced as a part of a surgical procedure and is integral to the surgical procedure and not considered a prosthetic or orthotic device.

*(Revenue Codes 274, 275, & 278 are paid in addition to Ambulatory Surgery Global Rates.)

10/9/02

STOPNC - 017969

# EXHIBIT 1

Saint Thomas Health Services
For
Facilities Identified Below

A.  Institution Agreement, BlueClassic, BluePreferred, BlueSelect Facilities

| | |
|---|---|
| Saint Thomas Outpatient Neurosurgical Center, LLC | 3157258 |
| Middle Tennessee Ambulatory Surgery Center | 3122521 |
| Baptist Ambulatory Surgery Center | 3083845 |
| Baptist Physicians Pavilion Surgery Center | 1000923 |
| Saint Thomas Campus SurgiCare | 4042363 |

B.  HMO Blue Network H Facilities

| | |
|---|---|
| Middle Tennessee Ambulatory Surgery Center | 3122521 |
| Baptist Ambulatory Surgery Center | 3083845 |
| Baptist Physicians Pavilion Surgery Center | 1000923 |

STOPNC - 017970

AMENDMENT TO
BLUE SELECT NETWORK
INSTITUTION ATTACHMENT

**Saint Thomas Health Services**
**For Facilities Identified in Exhibit 1A**

This Amendment modifies the Blue Select Network Institution Attachment ("Blue Select Network Attachment") by and between BlueCross BlueShield of Tennessee ("BCBST") and its designated affiliates and the "Institution" and has an Effective Date of _____12/1/02_____.

NOW THEREFORE, the parties agree to amend the Blue Select Network Institution Attachment as follows:

1. Reimbursement.  The Reimbursement provision is replaced in its entirety with the following:

    For Covered Services provided to BCBST Members whose health benefits are delivered through the Blue Select Network, BCBST or the applicable Payor will pay Institution the lesser of billed charges or the established fee for the procedure performed, as indicated in Schedule 1 at the time of service, as attached hereto and  incorporated by reference herein, less applicable Member Payments.

2. To the extent this Amendment is inconsistent with the Blue Select Network Institution Attachment, this Amendment shall govern.  Otherwise, the Amendment remains in full force and effect.

IN WITNESS WHEREOF, the parties have accepted this Amendment intending to be bound on and after the Effective Date first written above.

**BlueCross BlueShield of Tennessee, Inc.**    **Saint Thomas Health Services**

By: Gary B. Simmons_____    By: KENNETH J. VENUTO_____

Title: Senior Vice President                Title: CFO_____

Signature:_____              Signature: Kenneth J. Venuto_____

Date: 10/28/02_____            Date: 10/22/02_____

8/23/02

BluePreferred Network
Schedule 1

Saint Thomas Outpatient Neurosurgical Center, LLC
BCBST Provider No.: 3157258

Effective date: _12/1/02_

## Outpatient Surgery

Fee Schedule amounts are all inclusive and will fully compensate Institution for all facility services and supplies provided in association with surgery that is directly related to the procedure(s) performed. Pre-admission testing that is provided up to five (5) days prior to the surgery are included in the global fee. The global fee also includes laser, equipment, drugs and facility charges. Reimbursement will be paid the lesser of approved charges or the rates listed below.

When two different covered procedures are performed on the same day, payment shall be made at 50% of the fee schedule amount for the second and subsequent procedures. When a procedure is repeated on the same day, no additional amount will be paid for the second procedure.

### Ambulatory Surgery Global Fees*

| | |
|---|---|
| Group 0 | $     0.00 |
| Group 1 | $   628.00 |
| Group 2 | $   844.00 |
| Group 3 | $   964.00 |
| Group 4 | $ 1,190.00 |
| Group 5 | $ 1,356.00 |
| Group 6 | $ 1,578.00 |
| Group 7 | $ 1,882.00 |
| Group 8 | $ 1,856.00 |
| Group 9 | $ 3,846.00 |
| Group 10 | $ 2,688.00 |

(*Ambulatory Surgery Groupings Defined in Exhibit 2A)
*Rebundling of charges will occur if necessary
*Excludes modifier 22
*File claim with a bill type of 831 and Revenue Code 490

| High Cost Drugs | Revenue Code 636 | 55% of Covered Charges |
|---|---|---|

*(Revenue Code 636 is paid in addition to Ambulatory Surgery Global Rates, Observation Services, Outpatient Flat Fees, Laboratory and Radiology, Emergency Services, and Other Outpatient Services. The payment made will in no instance be greater than the total cost of the drug.)

### Implants*

| | | |
|---|---|---|
| Pacemaker | Revenue Code 275 | 55% of Covered Charges |
| Prosthetic/Orthotic Devices | Revenue Code 274 | 55% of Covered Charges |
| Other Implants | Revenue Code 278 | 55% of Covered Charges |

*Charges billed for Implants must meet the criteria of a Surgical Implant or Surgical Appliance as noted below and be no greater than the charge billed to any other third party payor. In addition the payment made will in no instance be greater than the total cost of an individual implant. Periodic audits will be performed to ascertain adherence to this criteria and adjustments will be made accordingly.

> Surgical Implant: A device that is medically necessary and medically appropriate which is surgically placed internally for therapeutic or reconstructive purposes and not considered a prosthetic or orthotic device.
> Surgical Appliance: A surgical device that is medically necessary and medically appropriate which is externally paced as a part of a surgical procedure and is integral to the surgical procedure and not considered a prosthetic or orthotic device.

*(Revenue Codes 274, 275, & 278 are paid in addition to Ambulatory Surgery Global Rates.)

10/9/02

**STOPNC - 017972**

AMENDMENT TO
BLUE PREFERRED NETWORK
INSTITUTION ATTACHMENT

**Saint Thomas Health Services**
**For Facilities Identified in Exhibit 1A**

This Amendment modifies the Blue Preferred Network Institution Attachment ("Blue Preferred Network Attachment") by and between BlueCross BlueShield of Tennessee ("BCBST") and its designated affiliates and the "Institution" and has an Effective Date of _____12/1/02_____.

NOW THEREFORE, the parties agree to amend the Blue Preferred Network Institution Attachment as follows:

1. <u>Reimbursement</u>.  The Reimbursement provision is replaced in its entirety with the following:

> For Covered Services provided to BCBST Members whose health benefits are delivered through the Blue Preferred Network, BCBST or the applicable Payor will pay Institution the lesser of billed charges or the established fee for the procedure performed, as indicated in Schedule 1 at the time of service, as attached hereto and incorporated by reference herein, less applicable Member Payments.

2. To the extent this Amendment is inconsistent with the Blue Preferred Network Institution Attachment, this Amendment shall govern.  Otherwise, the Amendment remains in full force and effect.

IN WITNESS WHEREOF, the parties have accepted this Amendment intending to be bound on and after the Effective Date first written above.

**BlueCross BlueShield of Tennessee, Inc.**          **Saint Thomas Health Services**

By: Gary B. Simmons                                   By: KENNETH J. VENUTO

Title: Senior Vice President                          Title: CFO

Signature: _____                            Signature: Kenneth J. Venuto

Date: 10/28/02                                        Date: 10/22/02

8/23/02

**STOPNC - 017973**

# EXHIBIT 1

Saint Thomas Health Services
For
Facilities Identified Below

A.   Institution Agreement, BlueClassic, BluePreferred, BlueSelect Facilities

| | |
|---|---|
| Saint Thomas Outpatient Neurosurgical Center, LLC | 3157258 |
| Middle Tennessee Ambulatory Surgery Center | 3122521 |
| Baptist Ambulatory Surgery Center | 3083845 |
| Baptist Physicians Pavilion Surgery Center | 1000923 |
| Saint Thomas Campus SurgiCare | 4042363 |

B.   HMO Blue Network H Facilities

| | |
|---|---|
| Middle Tennessee Ambulatory Surgery Center | 3122521 |
| Baptist Ambulatory Surgery Center | 3083845 |
| Baptist Physicians Pavilion Surgery Center | 1000923 |

STOPNC - 017974

# Contract with Cigna HealthCare of Tennessee

PROVIDER
FILE COPY

# ANCILLARY PROVIDER
# MANAGED CARE AGREEMENT

## PARTIES

THIS AGREEMENT is by and between CIGNA HealthCare of Tennessee, Inc. ("CIGNA") and Saint Thomas Outpatient Neurosurgical Center, LLC. ("Provider") and is entered into as of the Effective Date.

## PURPOSE

CIGNA contracts directly or indirectly with Payors, employers, individuals, insurers, sponsors and others, to provide, insure, arrange for or administer the provision of health care services;

CIGNA contracts with physicians, hospitals and other health care practitioners and entities, to provide, arrange for or administer, at predetermined rates, the delivery of such health care services;

CIGNA and Provider desire to enter into this Agreement relating to certain health care services for individuals;

In consideration of the mutual promises herein, the parties agree as follows:

## I.    DEFINITIONS

Defined terms are set forth herein and in the Program Attachments.

**CIGNA Affiliate** means any direct or indirect subsidiary of CIGNA Corporation, as designated by CIGNA.

**Coinsurance** means a payment that a Participant is required to make to a Participating Provider for Covered Services under a Service Agreement, which is calculated as a percentage of the contracted reimbursement rate of such services or, if reimbursement is on a basis other than a fee-for-service amount, as a percentage of a CIGNA determined fee schedule or as a CIGNA determined percentage of actual billed charges.

**Copayment or Deductible** means a payment that a Participant is required to make to a Participating Provider under a Service Agreement, which is calculated as a fixed dollar payment.

**Covered Services** means those health care services provided to a Participant in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                     STHe_JVMC000534

accordance with a Service Agreement.

**Emergency** means a condition for which Emergency Services are required.

**Emergency Services** are as defined in the applicable Service Agreement.

**Medically Necessary** means services and supplies which under the terms of the applicable Service Agreement are "Medically Necessary". No service is a Covered Service unless it is Medically Necessary.

**Participant** means any individual, or eligible dependent of such individual, whether referred to as "Insured," "Subscriber," "Member," "Participant," "Enrollee," "Dependent" or otherwise, who is eligible for Covered Services pursuant to a Service Agreement.

**Participating Provider** means a hospital, a physician or any other health care practitioner or entity that has a direct or indirect contractual arrangement with CIGNA to provide Covered Services with regard to the particular Program under which the Participant is covered.

**Payor** means the entity which, pursuant to a Service Agreement, funds, administers, offers or insures Covered Services and which has agreed to act as Payor in accordance with this Agreement. CIGNA or a CIGNA Affiliate is the responsible Payor for those services covered by plans that are fully insured by CIGNA or such CIGNA Affiliate. For plans that are self-funded, the employer, labor union or other organization or entity sponsoring the plan is the responsible Payor.

**Pre-Qualified Maternity Stay** means a maternity hospital stay of 48 hours for vaginal delivery birth, or 96 hours for caesarean section birth, that does not require prior authorization.

**Program** means the Managed Care, Preferred Provider Organization (PPO) or other types of health care or administrative services which are provided by or arranged by CIGNA or CIGNA Affiliates and which are specifically described in applicable Program Attachments and Program Requirements.

**Program Requirements** means the rules and procedures that establish conditions to be followed by Participating Providers with respect to Programs. Reference to Program Requirements includes the Summary of Program Requirements distributed by CIGNA.

**Quality Management** means the processes established and operated by CIGNA or its designee relating to the quality of Covered Services.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                      STHe_JVMC000535

**Service Agreement** means those agreements among CIGNA or a CIGNA Affiliate, and an employer, insurer, labor union, trust or other organization or entity, or an individual, that specifies services to be provided to or for the benefit of, or arranged for or reimbursed to or for the benefit of Participants, the terms and conditions under which those services are to be provided or reimbursed, and is consistent with applicable Program Requirements.

**Utilization Management** means the processes to review and determine whether certain health care services provided or to be provided to Participants are in accordance with Program Requirements.

## II.   PARTIES' OBLIGATIONS

### A.  Services

1.  Provider and CIGNA shall act in accordance with the terms of this Agreement and applicable Program Attachments and Program Requirements.  The rates set forth in this Agreement shall be payment in full for all services provided to Participants pursuant to this Agreement.

2.  Provider shall accept Participants as new patients, treat current patients should they become Participants, and shall otherwise render Covered Services in the same manner, in accordance with the same standards, and with the same availability, as offered to other patients.   Provider shall not differentiate or discriminate in the treatment of any Participant because of race, color, national origin, ancestry, religion, sex, marital status, sexual orientation, age, health status, veteran's status, handicap or source of payment.

3.  Provider shall provide Covered Services at locations approved by CIGNA. Locations shall not be eliminated or changed without thirty (30) days prior written notice to CIGNA.

4.  Provider shall refer Participants to or arrange for provision of Covered Services by Participating Providers, except in the case of an Emergency or as otherwise described in applicable Program Requirements or as otherwise required by law.

5.  Provider shall be bound by and comply with the provisions of applicable state and federal laws, regulations and Program Requirements.  Provider shall comply with the requirements of and shall participate in Quality Management and Utilization Management.

6.  CIGNA shall establish a system of Participant identification, communicate Program Requirements to Participating Providers and identify Participating Providers to Payors and Participants.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000536

7. CIGNA shall contract, directly or indirectly, with Payors who agree to pay in accordance with this Agreement for Covered Services rendered by Provider.

8. CIGNA shall, upon specific request by Provider, identify the Payor responsible for payment of Covered Services.

9. This Agreement shall specifically exclude those services rendered at Provider facilities other than those facilities agreed upon and utilized as of the Effective Date unless otherwise agreed by CIGNA.

## B. Compensation and Billing

1. Provider shall receive payments for Covered Services as set forth in this Agreement. Compensation arrangements and rates are set forth in applicable Program Attachments.

2. For any Covered Services which are reimbursed on a fee-for-service basis:

   a. Provider shall submit claims on the appropriate claim form for all Covered Services within one hundred and eighty (180) days of the date those services are rendered. Claims received after this one hundred and eighty (80) day period will be denied for payment, except as otherwise agreed by CIGNA. Provider shall submit claims to the location described in applicable Program Requirements.

   b. Amounts owing under this Agreement shall be paid in accordance with the timeframes required by Tennessee or applicable law.

3. Provider may bill an individual directly for any services provided following the date the individual ceases to be a Participant. Payor has no obligation under this Agreement to pay for services rendered to individuals who no longer are Participants.

4. The following provisions apply regarding coordination of benefits:

   a. CIGNA and Provider agree to cooperate to exchange information relating to coordination of benefits with regard to any Participant for whom Provider is providing services.

   b. With respect to those services reimbursed on a fee-for-service basis:

      1) Certain claims for services rendered to Participants are claims for which another payor may be primarily responsible under coordination of benefit rules. Provider may pursue and process any such coordination of benefits claims and, in so doing, shall comply with

ANC2000MCA.TN.2004                                  5                                    04/01/2004

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000537

the primary payor's billing rules, including, but not limited to, any of the primary payor's limitations on billing.

2) When Payor is other than primary under applicable coordination of benefits rules, Payor will pay no greater amount than that which, when added to amounts payable to Provider from other sources under the applicable coordination of benefit rules, equals one hundred percent of the Provider's reimbursement for Covered Services pursuant to this Agreement. The foregoing shall not prohibit Provider from collecting up to the full allowable or contracted rate under the primary payor or other payor's contract.

3) When Payor is primary under applicable coordination of benefit rules, Payor will pay amounts due pursuant to this Agreement without regard for the obligations of any secondary payors.

5.  Upon reasonable notice and during regular business hours, CIGNA or its designee shall have the right to inspect, review and make copies of, at CIGNA's expense, all records maintained by Provider with respect to all payments received by Provider from all sources for Covered Services rendered to Participants during the term of this Agreement. CIGNA or its designee shall have the right to conduct periodic audits of such records and may audit its own records to determine if amounts have been properly paid under this Agreement. CIGNA shall provide Provider with the results of any such audits, and any amounts determined to be due and owing as a result of such audits shall be promptly paid or, at the option of the party to whom such amounts are owed, offset against amounts due and owing by such party hereunder. This provision shall survive the termination of this Agreement.

6.  If Provider believes Provider is entitled to any payment for a Covered Service from a Payor, or for payment in excess of the amount the Payor has paid or indicated it will pay, then Provider shall not directly or indirectly bill for or seek to collect from Payor any such payment or additional payment except pursuant to a written request for an appeal or adjustment filed with CIGNA within one hundred eighty (180) days from the date of Payor's payment or explanation of benefits.

7.  Provider shall refund to CIGNA or the applicable CIGNA Affiliate any excess payment made by a Payor to Provider, as long as the Provider agrees to the excess payment, in the event Provider is paid for the same health care services or supplies more than once, is overpaid for particular health care services or otherwise receives incorrect or inadvertent payment. CIGNA or the appropriate CIGNA Affiliate may, at its option, deduct said excess payments from other payments to Provider. CIGNA will notify Provider of any such deduction.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000538

8. Only those charges for Covered Services billed in accordance with CIGNA's standard claim coding and bundling methodology reflected in the applicable claim payment system will be payable.

## C. Books and Records

1. CIGNA and Provider agree that clinical records of Participants and any other records containing individually identifiable information with respect to Participants shall be regarded as confidential and both shall comply with all applicable federal and state laws and regulations regarding such records. This provision shall survive the termination of this Agreement.

2. Provider shall maintain and furnish such records and documents as may be required by applicable laws, regulations and Program Requirements. All of such records shall be maintained for the period of time required by applicable law. Provider shall cooperate with CIGNA to facilitate the information and record exchanges necessary for Quality Management, Utilization Management, peer review, or other programs required for CIGNA's operations. Provider agrees to provide copies of such records requested by CIGNA within the timeframes requested by CIGNA and at no charge.

3. Upon reasonable notice and during regular business hours, CIGNA, its designee and duly authorized third parties, including, but not limited to, applicable governmental regulatory agencies, shall have the right to inspect, review and make copies of such records maintained by Provider related to Covered Services rendered to Participants under this Agreement.     Cigna agrees that copies of such records that are not to facilitate claims payment and/or medical review determinations shall be subject to a per copy cost not to exceed the amounts allowed by Section 68-11-304 of the Tennessee statues for each record provided. This provision shall survive the termination of this Agreement.

4. Provider shall cooperate with CIGNA in the development and maintenance of statistical data, records and procedures in support of Quality Management, Utilization Management and other applicable Program Requirements.

5. Provider agrees to cooperate in connection with any transfers of Participants' medical records required when Provider ceases rendering services to a Participant whether during the term of this Agreement or after termination of this Agreement. Provider agrees to provide copies of such records at no charge.

6. Provider shall be responsible for obtaining Participant's consent to the disclosure of private and medical record information in connection with any such disclosures required under this Agreement.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000539

**D. Participant Appeal**

Provider shall cooperate with CIGNA in the implementation of CIGNA's Participant appeal procedure and shall assist CIGNA in taking appropriate corrective action. Provider shall comply with all final determinations made by CIGNA pursuant to such appeal procedure.  In the event that a Participant Appeal is not resolved in a mutually satisfactory manner, the parties shall have the right under Section III, P to resolve the disputed portion of the Appeal.

**E. Insurance and Liability**

1. Throughout the term of this Agreement, Provider shall maintain at Provider's expense general and professional liability coverage of 1 million individual coverage and 5 million aggregate coverage, or such lesser amount and type as is acceptable to CIGNA.  Provider shall give CIGNA a certificate of insurance evidencing such coverage upon request.  Provider shall give CIGNA immediate written notice of cancellation, modification or termination of such insurance. Provider shall give CIGNA prompt written notice of any professional liability claims against Provider's liability coverage.

2. Provider shall notify CIGNA immediately of the initiation of any formal complaint, formal inquiry, formal investigation, or formal review with or by any licensing or regulatory authority, peer review organization, hospital committee, or other committee, organization or body which reviews quality of medical care which complaint, inquiry, investigation, or review directly or indirectly, evaluates or focuses on the quality of care provided by Provider either in any specific instance or in general.

**F. Site Review**

Upon reasonable notice and at reasonable hours, CIGNA or its agents may review Provider's premises and operations to ensure that they are adequate to meet Participants' needs.

**G. Representations**

1. Provider represents and warrants that the information supplied by Provider for consideration by CIGNA in Provider becoming a Participating Provider is true and correct.  Provider shall notify CIGNA of any material changes in such information within thirty (30) days of such change.

2. CIGNA makes no representations or guarantees concerning the number of Participants it can or will refer to Provider under this Agreement. CIGNA reserves the right to direct Participants to selected Participating Providers.

3. Provider fully understands this Agreement and its reimbursement

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000540

arrangement. Provider acknowledges and agrees that this Agreement does not contain any financial incentive or make any payment that acts directly or indirectly as an inducement to limit Medically Necessary services.

4. CIGNA acknowledges and agrees that:

    a. Utilization Management decision making for services rendered under this Agreement shall be based only on appropriateness of care and service;

    b. practitioners or other individuals conducting Utilization Management are not compensated for denials of Covered Services; and

    c. financial incentives for Utilization Management decision makers do not encourage denials of Covered Services.

## III.   MISCELLANEOUS OBLIGATIONS

### A. Independent Contractor Relationship

1. This Agreement is not intended to create nor shall be construed to create any relationship between CIGNA and Provider other than that of independent persons or entities contracting for the purpose of effecting provisions of this Agreement.  Neither party nor any of their representatives shall be construed to be the agent, employer, employee or representative of the other.

2. Provider represents that nothing in this Agreement, including Provider's participation in the Quality Management and Utilization Management process, or any coverage determination made by CIGNA or Payor, shall interfere with Provider's obligation to exercise independent medical judgment in rendering health care services to Participants.

### B. Term of Agreement

This Agreement shall begin on the Effective Date and shall continue from year to year thereafter, unless terminated as set forth below.

### C. Termination

1. For Cause.

    a. Provider may terminate this Agreement at any time for cause.  Cause for termination includes, but is not limited to, the following:

        i. Failure of CIGNA to maintain licenses or certifications required to operate in conformity with this Agreement.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000541

    ii.  Material failure of CIGNA, when acting as Payor, to make required compensation payments to Provider.

    iii.  Any material change or alteration by CIGNA of Program Requirements if such action is unacceptable to Provider, providing that (a) Provider gives CIGNA notice of rejection of such action within thirty (30) days of receipt by Provider of CIGNA's notice concerning the change or alteration; and (b) CIGNA does not withdraw the change or alteration to the Program Requirements or the parties do not reach an agreement with respect to a mutually acceptable change or alteration to the Program Requirements within thirty (30) days of receipt by CIGNA of Provider's notice of rejection.

    iv.  Material breach of this Agreement by CIGNA.

    v.  Insolvency of CIGNA.

b.  CIGNA may terminate this Agreement at any time for cause. Cause for termination includes but is not limited to the following:

    i.  Material breach of this Agreement by Provider.

    ii.  Provider's failure to comply with the provisions of this Agreement regarding the limitations on billing Participants.

    iii.  Provider's failure to comply or cooperate with CIGNA's Utilization Management or Quality Management programs.

    iv.  Insolvency of Provider.

    v.  Failure by Provider to maintain licenses required to perform Provider's duties under this Agreement, or to comply with applicable laws, regulations or Program Requirements.

    vi.  Any material misrepresentation or falsification of any information supplied by Provider to CIGNA for consideration by CIGNA in Provider's becoming a Participating Provider.

    vii.  Commission or omission of any act or any conduct or allegation of conduct for which Provider's license or certification may be subject to revocation or suspension, whether or not actually revoked or suspended, or if Provider is otherwise disciplined by any licensing, regulatory, professional entity or any professional organization with jurisdiction over Provider.

    viii.  Failure of Provider to maintain required liability coverage protection.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        STHe_JVMC000542

ix. Commission or omission of any act or conduct by Provider which is detrimental to Participant's health or safety.

x. Failure of Provider to comply with Section III. F., Confidentiality/Damaging Communications.

xi. Failure of Provider to comply with Section III. A. 2., regarding Provider's obligation to exercise independent medical judgment.

c. Any occurrence under paragraphs a) (i) or a) (v) above shall be grounds for immediate termination by Provider.  Any occurrence under paragraphs b) (iv) through (xi) above shall be grounds for immediate termination by CIGNA.  Termination for any other reason set forth above shall be upon thirty (30) days' prior written notice by the terminating party unless said reason for termination is cured to the satisfaction of the terminating party within said thirty (30) day period.

2. <u>With Notice</u>.  This Agreement or any individual Program Attachment to this Agreement may be terminated at any time upon sixty (60) days' prior written notice by either party.  Termination of any individual Program Attachment will not have the effect of terminating the entire Agreement and all remaining Sections and Program Attachments of the Agreement will remain in full force.

3. <u>Termination Effective Date</u>.  The effective date of the termination must be consistent with the notice period specified in Sections C.1. and C. 2.

## D. Services Upon Termination

Upon termination of this Agreement, Provider shall continue to provide Covered Services for specific conditions for which a Participant was under Provider's care at the time of such termination so long as Participant retains eligibility under a Service Agreement, until the earlier of completion of such services, CIGNA's provision for the assumption of such treatment by another provider, or the expiration of sixty (60) days.  Provider shall be compensated for Covered Services provided to any such Participant in accordance with the compensation arrangements under this Agreement until sixty (60) days following termination, and compensation thereafter for continued services authorized by CIGNA shall be as mutually agreed.  Provider has no obligation under this Agreement to provide services to individuals who cease to be Participants.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000543

### E. Rights and Obligations Upon Termination

Upon termination of this Agreement for any reason, the rights of each party hereunder shall terminate, except as provided in this Agreement, including any Program Attachment to this Agreement. Any such termination, however, shall not release Provider or CIGNA from obligations under this Agreement prior to the effective date of termination.

### F. Confidentiality/Damaging Communications

1. The parties acknowledge that, as a result of this Agreement, each may have access to certain trade secrets and other confidential and proprietary information of the other. Each party shall hold such trade secrets and other confidential and proprietary information, including the terms and conditions of this Agreement, in confidence and shall not use or disclose such information, either by publication or otherwise, to any person without the prior written consent of the other party except as may be required by law and except as may be required to fulfill the rights and obligations set forth in this Agreement. With respect to CIGNA, such confidential and proprietary information shall include, without limitation, the Program Attachments and Program Requirements. This provision shall not be construed to prohibit CIGNA from disclosing information to CIGNA Affiliates or the agents or subcontractors of CIGNA or CIGNA Affiliates or from disclosing the terms and conditions of this Agreement, including reimbursement rates, to existing or potential customers of CIGNA or CIGNA Affiliates or their representatives. This provision shall survive the termination of this Agreement.

2. Provider shall not issue any false or disparaging communications which would, or are likely to, interfere with or otherwise damage any of CIGNA's existing or potential contractual relationships.

3. Nothing in subsections 1. or 2. above shall be construed to prohibit:

   a. communications necessary or appropriate for the delivery of health care services;

   b. communications to Participants regarding treatment alternatives regardless of the provisions or limitations of the Participant's coverage;

   c. communications to Participants regarding applicable rights to appeal coverage determinations;

   d. communications to Participants identifying the type of reimbursement arrangement under which Provider is compensated for Covered Services under this Agreement (i.e. fee-for-service, capitation, etc.), excluding any communications with regard to the applicable rates of reimbursement; or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000544

e.  any other communications expressly protected under applicable state or federal statute or regulation.

## G.  Assignment and Delegation of Duties

Neither CIGNA nor Provider may assign duties, rights or interests under this Agreement unless the other party shall so approve by written consent, provided, however, that any reference to CIGNA herein shall include any successor in interest and that CIGNA may assign its duties, rights and interests under this Agreement in whole or in part to a CIGNA Affiliate or may delegate any and all of its duties in the ordinary course of business.

## H.  Use of Name

Provider agrees that CIGNA may include descriptive information relating to Provider in literature distributed to existing or potential Participants, Participating Providers and customers of CIGNA or a CIGNA Affiliate.  Such information shall include, but not be limited to, Provider's name, office telephone number, address, specialty, professional certification and hospital affiliation.  Provider's use of CIGNA's name or CIGNA Affiliate's name, or any other use of Provider's name by CIGNA shall be upon prior written approval or as the parties may agree.

## I.  Interpretation

The validity, enforceability and interpretation of this Agreement shall be governed by any applicable federal law and by the applicable laws of the state in which Provider is licensed and has rendered Covered Services.

## J.  Amendment

1.  CIGNA may amend this Agreement and Program Attachments except for applicable reimbursement by providing (60) days prior written notice to Provider.  Failure of Provider to object in writing to any such proposed amendment within sixty (60) days following receipt of notice shall constitute Provider's acceptance thereof.  Notification to CIGNA of rejection of any proposed amendment means that this Agreement shall remain in force without the proposed amendment.

2.  In the event that state or federal law or regulation, or an arbitration or judicial interpretation of same, should require that the terms, benefits and conditions of this Agreement must be changed accordingly, then upon notice from CIGNA, Provider shall continue to perform services under this Agreement as modified.  In this regard, the parties specifically acknowledge the importance of the financial arrangements described herein and,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000545

therefore, agree, in the event that the financial arrangements are deemed invalid or unenforceable, the parties shall use best efforts to preserve the underlying economic and financial arrangements to the maximum extent possible. In the event that the parties are unable to reach agreement, then the financial terms shall be set pursuant to the dispute resolution process, giving full effect to the intent of the parties as described in this subsection.

3. Except as provided above, amendments to this Agreement shall be agreed to in advance in writing by CIGNA and Provider.

## K. Program Attachments

The Program Attachments hereto are a part of this Agreement and their terms shall supersede those of other parts of this Agreement in the event of a conflict.

## L. Entire Contract

This Agreement, together with all Program Attachments, contains all the terms and conditions agreed upon by the parties, and supersedes all other agreements, express or implied regarding the subject matter.

## M. Notice

Any notice required hereunder shall be in writing and shall be sent by United States mail, postage prepaid, to CIGNA and Provider at the addresses set forth below.

## N. Enforceability and Waiver

The invalidity and unenforceability of any term or provision of this Agreement shall in no way affect the validity or enforceability of any other term or provision. The waiver by either party of a breach of any provision of this Agreement shall not operate as or be construed as a waiver of any subsequent breach thereof.

## O. Regulatory Approval

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000546

In the event that CIGNA has not been licensed or has not received any applicable regulatory approval for use of this Agreement prior to the execution of this Agreement, this Agreement shall be deemed to be a binding letter of intent. In such event, each party will cooperate to obtain regulatory approval of this Agreement, including, if necessary modifying the Agreement to obtain such approval as described in subsection III. J. 2. above. The Agreement shall become fully effective on the date that regulatory approval is obtained. If despite these efforts, CIGNA concludes that it is unable to obtain such licensure or approval, then CIGNA shall notify Provider and both parties shall be released from any further liability under this Agreement.

## P. Dispute Resolution

1. Any disputes between the parties arising with respect to the performance or interpretation of the Agreement shall first be resolved in accordance with the dispute resolution procedures outlined in the Program Requirements.

2. In the event that a dispute is not resolved through the aforementioned process, the parties shall attempt in good faith to resolve the dispute promptly by negotiation between designated representatives of the parties who have authority to settle the dispute.

   If the matter has not been resolved within 60 days of a party's request for negotiation, either party may initiate arbitration by providing written notice to the other party.

3. If a party initiates arbitration as provided above, the proceeding shall be governed by the Rules of the American Arbitration Association then in effect and shall be held in the jurisdiction of Provider's domicile. The parties will jointly appoint a mutually acceptable arbitrator. If the parties are unable to agree upon such an arbitrator within thirty (30) days after a party has given the other party written notice of its desire to submit a dispute for arbitration, then either party may apply to the American Arbitration Association for the appointment of an arbitrator or, if such Association is not then in existence or does not desire to act in the matter, each party shall appoint an arbitrator of its choice. The appointed arbitrators will select a third arbitrator, and the panel of three arbitrators will hear the parties and settle the dispute. Each party shall assume its own costs, but the compensation and expenses of the arbitrator(s) and any administrative fees or costs shall be borne equally by the parties. Arbitration shall be the exclusive remedy for the settlement of disputes arising under this Agreement. The decision of the arbitrator(s) shall be final, conclusive and binding, and no action at law or in equity may be instituted by either party other than to enforce the award of the arbitrator(s). Judgment upon the award rendered by the arbitrator(s) may be entered in any court of competent jurisdiction. The Agreement will remain in full force and effect during any such period of arbitration unless otherwise terminated

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000547

pursuant to the terms of this Agreement.

## Q. Participation with Provider Groups

To the extent that Provider is a participant with a provider group (such as a professional corporation, physician hospital organization, independent practitioner association, or any similar group) that has contracted with CIGNA for Provider's services to any or all Participants, Provider will accept compensation pursuant to that contract, and this Agreement will be held in abeyance regarding services to the affected Participants. In particular, to the extent the provider group is accepting Capitation or other payments from CIGNA or other Payor for Provider's services, and CIGNA is not paying Provider directly for such services, Provider acknowledges that the group is responsible for payment to Provider for rendering Covered Services to the affected Participants. For such services, Provider will not seek reimbursement from CIGNA, any other applicable Payor or the Participant. Also, if such a group negotiates direct payment terms on Provider 's behalf, then those payment terms shall supersede any rates specified in this Agreement. Notwithstanding any abeyance of this Agreement, as described above, Provider shall continue to comply with all of the provisions of this Agreement which are required by applicable law.

## R. Cooperation with CIGNA Affiliates

Provider agrees to cooperate with any CIGNA Affiliate which provides disability coverage for a disabled Participant in the management of the disabling event.

## S. Ethical and Religious Directives

The parties acknowledge that Hospital is a member of the Ascension Health System and that the operation of Hospital in accordance with the Ethical and Religious Directives and the principles and beliefs of the Roman Catholic Church is a matter of conscience to the Hospital. It is the intent and agreement of the parties that neither this Agreement nor any part hereof shall be construed to require Hospital to violate said Ethical and Religious Directives in its operation and all parts of this Agreement must be interpretated in a manner that is consistent with said Ethical and Religious Directives. "Ethical and Religious Directives" shall be defined as Ethical and Religious Directives for Catholic Health Care Facilities as promulgated, from time to time, by the National Conference of Catholic Bishops, Washington, D.C., of the Roman Catholic Church and as adopted by the Bishop of the Catholic Diocese of Nashville. In the event that the National Conference of Catholic Bishops shall cease to exist, "Ethical and Religious Directives" shall mean such similar directives promulgated by its successor organization or by such organization then exercising its powers and duties, or by the Roman Catholic Church, and in the event the Diocese of Nashville shall cease to exist so that there is not then an individual bearing the title of Bishop of the Catholic Diocese of Nashville, such "Ethical and Religious

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000548

Directives" shall be as are adopted by the individual or organization then exercising the power, duties and authority of the Bishop of the Catholic Diocese of Nashville.

## T. Compliance

In compliance with federal law, including provisions of Title IX of the Education Amendments of 1972, Section 503 and 504 of the Rehabilitation Act of 1973, and the Amercians with Disabilities Act of 1990, the parties hereto will not discriminate on the basis of race, sex, religion, color, national or ethnic origin, age, disability, or military service in its administration of its policies, programs, or activities, its admissions policies, other programs or employment.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000549

In WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the EFFECTIVE DATE.

**CIGNA**

**EFFECTIVE DATE:**

By: _John_

Title: _VP Contracts_

_u 1/05_

Address

Date Signed: _8/29/05_

**PROVIDER**

Please Print or Type Name _MACK MASON_

By: _____

Address: _4230 Harding Road, Su. 901 Nashville, TN 37205_

Federal Tax Identification Number: _62-180 2891_

Date Signed: _8-16-05_

Under penalties of perjury, by executing this Agreement above, Provider hereby certifies that 1) the taxpayer identification number set forth above is the correct taxpayer identification number; and 2) Provider is not subject to backup withholding because it a) is exempt from backup withholding; or b) has not been notified by the Internal Revenue Service that it is subject to backup withholding as a result of a failure to report all interest or dividends; or c) the IRS has notified Provider that it is no longer subject to backup withholding.

ANC2000MCA.TN.2004                     18                     04/01/2004

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                     STHe_JVMC000550

**Program Attachments:**

HMO Fee for Service      ☐

HMO Capitation      ☐

Managed Care Fee for Service      ☐

PPO      ☐

Open Access Plus Program Attachment      ☐

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER      STHe_JVMC000551

## HMO PROGRAM ATTACHMENT
## TO
## ANCILLARY PROVIDER MANAGED CARE AGREEMENT
### (Fee-For-Service)

**PURPOSE**

The terms and provisions of this HMO Program Attachment and the Agreement are applicable to services rendered by Provider to HMO Program Participants.

**I.    DEFINITIONS**

**CIGNA's Maximum Fee Schedule** means CIGNA's customary fee schedule in effect at the time of service and applicable to Provider with respect to this HMO Program.

**HMO Program Participant** means a Participant enrolled in a non-governmental, fully insured Standard HMO or Point of Service product and which product is underwritten based on a community rating methodology (i.e. community rating, community rating by class, adjusted community rating by class).

**Medical Director** means a physician designated by CIGNA to manage Quality Management and Utilization Management responsibilities, or that physician's designee.

**Point of Service** means a product offered pursuant to a Service Agreement which allows the Participant to choose, in addition to Closed Panel benefits, a lower level of benefits if the Participant receives Covered Services from (i) a Participating Provider without a necessary authorization or (ii) from a non-Participating Provider, at the time such services are sought.

**Primary Care Physician** means a physician duly licensed to practice medicine who is a Participating Provider with CIGNA to provide Covered Services in the fields of general medicine, internal medicine, family practice or pediatrics, and who has agreed to provide primary care physician services to Participants in accordance with HMO Program Requirements.

**Standard HMO** means a product offered pursuant to a Service Agreement where Covered Services are available to Participants only from Participating Providers, except in the case of an Emergency or with the prior authorization of CIGNA or CIGNA Affiliate where Covered Services are not available from Participating Providers.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000552

## II.   PARTIES' OBLIGATIONS

### A. Services

1. Except as set forth below, Provider shall provide all Covered Services within the scope of Provider's practice that are required by Participants in accordance with the terms of this Agreement, this HMO Program Attachment and HMO Program Requirements. Provider shall provide Covered Services to all Participants. The compensation set forth in this HMO Program Attachment shall be payment in full for such services.

2. Prior authorizations as prescribed by HMO Program Requirements are required for payment of certain Covered Services rendered to Participants. Referrals, if any, shall be to Participating Providers, except where an Emergency requires otherwise, in other cases where Medical Director specifically authorizes the referral or as otherwise required by law.

### B. Compensation and Billing

1. Provider shall be compensated for Covered Services at the lesser of billed charges or the rates set forth in Exhibit A, attached hereto, less applicable Copayments, Deductibles and Coinsurance.

2. The rates set forth herein shall apply to all services rendered to Participants in the HMO Program, including services covered under a Participant's in-network or opt out benefits, and whether the Payor or Participant is financially responsible for payment.

3. The applicable rate includes all Medically Necessary services that Provider customarily provides to outpatients and specifically excludes those services which, in accordance with community standards, are considered office-based procedures or services. Only those charges for Covered Services billed in accordance with CIGNA's standard claim coding and bundling methodology reflected in the applicable claim payment system will be payable.

4. This Agreement shall not relate to and shall specifically exclude those Covered Services which CIGNA has elected to obtain pursuant to an arrangement between CIGNA or a CIGNA Affiliate and a national vendor or provider, except as otherwise agreed by CIGNA.

### C. Limitations on Billing Participants

1. a. Provider hereby agrees that in no event, including, but not limited to non-payment by Payor, Payor's insolvency or breach of this Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against

ANC2000MCA.TN.2004                          PPO - 2                          04/01/2004

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                          STHe_JVMC000553

Participants or persons other than Payor for Covered Services. This provision shall not prohibit collection of any applicable Copayments, Deductibles or Coinsurance billed in accordance with the terms of a Service Agreement.

b.  Provider further agrees that this provision shall survive the termination of this Agreement regardless of the cause giving rise to such termination and shall be construed to be for the benefit of Participants, and that this provision supersedes any oral or written agreement to the contrary now existing or hereafter entered into between Provider and the Participant or persons acting on the Participant's behalf.

c.  Any modification, additions, or deletion to the provisions of this hold harmless clause shall become effective on a date no earlier than fifteen (15) days after the applicable state regulatory agency has received written notice of such proposed changes or the date permitted by applicable law, whichever is later.

2.  Provider shall not charge a Participant for a service which is not a Covered Service unless, in advance of the provision of such service, the Participant has been notified by Provider that the particular service will not be covered and the Participant acknowledges in writing that he or she shall be responsible for payment of charges for such service.

3.  a.  Should Provider collect, or cause to be collected, any payment from Participant or any representative of Participant in violation of Section II. C. Limitations on Billing Participants, then Provider shall repay the inappropriately collected amount within two (2) weeks of demand from CIGNA or Participant. If Provider fails to make the repayments, then CIGNA may (but is not obligated to) reimburse the Participant the amount inappropriately paid and then withhold such amount and costs from future payments otherwise due to Provider.

b.  These remedies are in addition to, and not in lieu of, any other remedies that CIGNA or Participant may have against Provider for breach of this section.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000554

### III.    RIGHTS AND OBLIGATIONS UPON TERMINATION

Upon termination of this Agreement, Provider shall continue to provide Covered Services for specific conditions for which a Participant was under Provider's care at the time of such termination so long as Participant retains eligibility under a Service Agreement, until the earlier of completion of such services, CIGNA's provision for the assumption of such treatment by another provider, or the expiration of sixty (60) days. Provider shall be compensated for Covered Services provided to any such Participant in accordance with the compensation arrangements under this Agreement until sixty (60) days following termination, and compensation thereafter for continued services authorized by CIGNA shall be as mutually agreed but will not exceed usual and customary charges for such services.  Provider has no obligation under this Agreement to provide services to individuals who cease to be Participants.


**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000555

**EXHIBIT A TO THE**
**HMO PROGRAM ATTACHMENT**
**TO ANCILLARY PROVIDER MANAGED CARE AGREEMENT**

Effective Date: _____

For Covered Services, CIGNA shall reimburse Provider at CIGNA's ASC grouper fee schedule. These rates are all-inclusive, including ancillary services such as anesthesia, radiology, laboratory, and pathology that are provided at the facility.  Professional services are excluded.

**ASC Group**

| | | |
|---|---|---|
| Group 1 | REDACTED    $436 | per case |
| | | per case |
| | | per case |
| | | per case |
| | | per case |
| | | per case |
| | | per case |
| | | per case |

**Exceptions**
**CPT Codes:**

| | | |
|---|---|---|
| 63030 | REDACTED | per case |
| 63020 | | per case |
| 63035 | | per case |
| 63045 | | per case |
| 63047 | | per case |
| 63048 | | per case |
| 63075 | | per case |
| 63076 | | per case |
| 22554 | | per case |
| 22585 | | per case |
| 20931 | | per case |

**Notes for Reimbursement:**

1. **Insertion of Lens Prosthesis (IOL)** is included in the reimbursement for groups 6 and 8.

2. **Ungrouped/Unassigned Procedures:** Ungrouped/unassigned procedures are those procedures that are performed by facility, but not included in the CIGNA ASC grouper logic.  Reimbursement for these procedures will be at the all-inclusive case rate for Group #2.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000556

3. **Multiple Procedures**. When multiple Covered procedures are performed in the same operative session, payment for the procedures is determined as follows:
   - One hundred percent (100%) reimbursement for the procedure classified in the highest ASC payment group or with the highest maximum allowable fee (pertains to exception codes)
   - Fifty percent (50%) reimbursement for the second highest procedure
   - Fifty percent (50%) reimbursement for the third and fourth procedures.
   - Clinical review required for fifth procedure and beyond (if performed in the same operative session)

   A procedure performed bilaterally in one operative session is reported as two procedures. Therefore, payment for a procedure performed bilaterally will be paid the same as payment for multiple procedures.

4. **New Procedures** Provider and CIGNA agree to negotiate reimbursement for new procedures and services that become available during the term of this Agreement.

5. **Implants (Rev code 278).** If Provider's total billed charges with respect to revenue code 278 for Covered Services rendered with respect to a single outpatient registration exceed $1,500, Provider shall be reimbursed for such revenue code for Covered Services at ᴿ % of billed charge. If such charges are less than $1,500, reimbursement is included in the case rate above, and the Provider shall not be reimbursed separately for these charges.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                STHe_JVMC000557

**MANAGED CARE PROGRAM ATTACHMENT**
**TO**
**ANCILLARY PROVIDER MANAGED CARE AGREEMENT**
**(Fee-For-Service)**

## PURPOSE

The terms and provisions of this Managed Care Program Attachment and the Agreement are applicable to services rendered by Provider to Managed Care Program Participants.

## I.   DEFINITIONS

**CIGNA's Maximum Fee Schedule** means CIGNA's customary fee schedule in effect at the time of service and applicable to Provider with respect to this Managed Care Program.

**Managed Care Program Participant** means a Participant enrolled in a Closed Panel or Point of Service product and who may be assigned to a Primary Care Physician.

**Medical Director** means a physician designated by CIGNA to manage Quality Management and Utilization Management responsibilities, or that physician's designee.

**Point of Service** means a product offered pursuant to a Service Agreement which allows the Participant to choose, in addition to Closed Panel benefits, a lower level of benefits if the Participant receives Covered Services from (i) a Participating Provider without a necessary authorization or (ii) from a non-Participating Provider, at the time such services are sought.

**Primary Care Physician** means a physician duly licensed to practice medicine who is a Participating Provider with CIGNA to provide Covered Services in the fields of general medicine, internal medicine, family practice or pediatrics, and who has agreed to provide primary care physician services to Participants in accordance with Managed Care Program Requirements.

**Closed Panel** means a product offered pursuant to a Service Agreement where Covered Services are available to Participants only from Participating Providers, except in the case of an Emergency or with the prior authorization of CIGNA or CIGNA Affiliate where Covered Services are not available from Participating Providers.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER              STHe_JVMC000558

## II.    PARTIES' OBLIGATIONS

### A. Services

1. Except as set forth below, Provider shall provide all Covered Services within the scope of Provider's practice that are required by Participants in accordance with the terms of this Agreement, this Managed Care Program Attachment and Managed Care Program Requirements. Provider shall provide Covered Services to all Participants. The compensation set forth in this Managed Care Program Attachment shall be payment in full for such services.

2. Prior authorizations as prescribed by Managed Care Program Requirements are required for payment of certain Covered Services rendered to Participants. Referrals, if any, shall be to Participating Providers, except where an Emergency requires otherwise, in other cases where Medical Director specifically authorizes the referral or as otherwise required by law.

### B. Compensation and Billing

1. Provider shall be compensated for Covered Services at the lesser of billed charges or the rates set forth in Exhibit A, attached hereto, less applicable Copayments, Deductibles and Coinsurance.

2. The rates set forth herein shall apply to all services rendered to Participants in the Managed Care Program, including services covered under a Participant's in-network or opt out benefits, and whether the Payor or Participant is financially responsible for payment.

3. The applicable rate includes all Medically Necessary services that Provider customarily provides to outpatients and specifically excludes those services which, in accordance with community standards, are considered office-based procedures or services. Only those charges for Covered Services billed in accordance with CIGNA's standard claim coding and bundling methodology reflected in the applicable claim payment system will be payable.

4. This Agreement shall not relate to and shall specifically exclude those Covered Services which CIGNA has elected to obtain pursuant to an arrangement between CIGNA or a CIGNA Affiliate and a national vendor or provider, except as otherwise agreed by CIGNA.

### C. Limitations on Billing Participants

1. a.  Provider hereby agrees that in no event, including, but not limited to non-payment by Payor, Payor's insolvency or breach of this Agreement, shall Provider bill, charge, collect a deposit from, seek compensation,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000559

remuneration or reimbursement from, or have any recourse against Participants or persons other than Payor for Covered Services.  This provision shall not prohibit collection of any applicable Copayments, Deductibles or Coinsurance billed in accordance with the terms of a Service Agreement.

    b.   Provider further agrees that this provision shall survive the termination of this Agreement regardless of the cause giving rise to such termination and shall be construed to be for the benefit of Participants, and that this provision supersedes any oral or written agreement to the contrary now existing or hereafter entered into between Provider and the Participant or persons acting on the Participant's behalf.

    c.   Any modification, additions, or deletion to the provisions of this hold harmless clause shall become effective on a date no earlier than fifteen (15) days after the applicable state regulatory agency has received written notice of such proposed changes or the date permitted by applicable law, whichever is later.

2.   Provider shall not charge a Participant for a service which is not a Covered Service unless, in advance of the provision of such service, the Participant has been notified by Provider that the particular service will not be covered and the Participant acknowledges in writing that he or she shall be responsible for payment of charges for such service.

3.   a.   Should Provider collect, or cause to be collected, any payment from Participant or any representative of Participant in violation of Section II. C. Limitations on Billing Participants, then Provider shall repay the inappropriately collected amount within two (2) weeks of demand from CIGNA or Participant.  If Provider fails to make the repayments, then CIGNA may (but is not obligated to) reimburse the Participant the amount inappropriately paid and then withhold such amount and costs from future payments otherwise due to Provider.

    b.   These remedies are in addition to, and not in lieu of, any other remedies that CIGNA or Participant may have against Provider for breach of this section.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          STHe_JVMC000560

## III.    RIGHTS AND OBLIGATIONS UPON TERMINATION

Upon termination of this Agreement, Provider shall continue to provide Covered Services for specific conditions for which a Participant was under Provider's care at the time of such termination so long as Participant retains eligibility under a Service Agreement, until the earlier of completion of such services, CIGNA's provision for the assumption of such treatment by another provider, or the expiration of sixty (60) days. Provider shall be compensated for Covered Services provided to any such Participant in accordance with the compensation arrangements under this Agreement until sixty (60) days following termination, and compensation thereafter for continued services authorized by CIGNA shall be as mutually agreed but will not exceed usual and customary charges for such services.  Provider has no obligation under this Agreement to provide services to individuals who cease to be Participants.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000561

**EXHIBIT A TO THE**
**MANAGED CARE PROGRAM ATTACHMENT**
**TO ANCILLARY PROVIDER MANAGED CARE AGREEMENT**

Effective Date: _____

For Covered Services, CIGNA shall reimburse Provider at CIGNA's ASC grouper fee schedule. These rates are all-inclusive, including ancillary services such as anesthesia, radiology, laboratory, and pathology that are provided at the facility.  Professional services are excluded.

**ASC Group**

| | | |
|---|---|---|
| Group 1 | $469 | per case |
| Group 2 | REDACTED | per case |
| Group 3 | | per case |
| Group 4 | | per case |
| Group 5 | | per case |
| Group 6 | | per case |
| Group 7 | | per case |
| Group 8 | | per case |
| Group 9 | | per case |

**Exceptions**
**CPT Codes**:

| | | |
|---|---|---|
| 63030 | REDACTED | per case |
| 63020 | | per case |
| 63035 | | per case |
| 63045 | | per case |
| 63047 | | per case |
| 63048 | | per case |
| 63075 | | per case |
| 63076 | | per case |
| 22554 | | per case |
| 22585 | | per case |
| 20931 | | per case |

**Notes for Reimbursement:**

1. **Insertion of Lens Prosthesis (IOL)** is included in the reimbursement for groups 6 and 8.

2. **Ungrouped/Unassigned Procedures:** Ungrouped/unassigned procedures are those procedures that are performed by facility, but not included in the CIGNA ASC grouper logic.  Reimbursement for these procedures will be at the all-inclusive case rate for Group #2.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                STHe_JVMC000562

**3. Multiple Procedures**. When multiple Covered procedures are performed in the same operative session, payment for the procedures is determined as follows:

- One hundred percent (100%) reimbursement for the procedure classified in the highest ASC payment group or with the highest maximum allowable fee (pertains to exception codes)
- Fifty percent (50%) reimbursement for the second highest procedure
- Fifty percent (50%) reimbursement for the third and fourth procedures.
- Clinical review required for fifth procedure and beyond (if performed in the same operative session)

A procedure performed bilaterally in one operative session is reported as two procedures. Therefore, payment for a procedure performed bilaterally will be paid the same as payment for multiple procedures.

6. **New Procedures** Provider and CIGNA agree to negotiate reimbursement for new procedures and services that become available during the term of this Agreement.

7. **Implants (Rev code 278).**  If Provider's total billed charges with respect to revenue code 278 for Covered Services rendered with respect to a single outpatient registration exceed $1,500, Provider shall be reimbursed for such revenue code for Covered Services at $^{RE}$% of billed charge.  If such charges are less than $1,500, reimbursement is included in the case rate above, and the Provider shall not be reimbursed separately for these charges.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000563

# PPO PROGRAM ATTACHMENT
## TO
## ANCILLARY PROVIDER MANAGED CARE AGREEMENT

**PURPOSE**

The terms and provisions of this PPO Program Attachment and the Agreement are applicable to services rendered by Provider to PPO Program Participants.

**I.    DEFINITION**

**CIGNA's Maximum Fee Schedule** means CIGNA's customary fee schedule in effect at the time of service and applicable to Provider with respect to this PPO Program.

**II.    PARTIES' OBLIGATIONS**

### A. Compensation and Billing

1. Provider's reimbursement for Covered Services shall be the lesser of Provider's billed charges for the service provided or the rates set forth in Exhibit A, herein, less applicable Copayments, Deductibles and Coinsurance. The rates set forth herein shall apply to all services rendered to Participants in the PPO Program, and whether the Payor or Participant is financially responsible for payment.

2. Payors shall agree to deduct any Copayments, Deductibles, or Coinsurance required by the Service Agreement from payment due to Provider. Deduction for the Copayment, Deductible or Coinsurance shall be determined on the basis of the contracted rate.

3. Provider shall not charge a Participant for a service which is not a Covered Service unless, in advance of the provision of such service, the Participant has been notified by Provider that the particular service will not be covered and the Participant acknowledges in writing that he or she shall be responsible for payment of charges for such service.

4. Provider will look solely to Payor for compensation for Covered Services except or Copayments, Deductibles or Coinsurance. Provider agrees that whether or not there is any unresolved dispute for payment, that under no circumstances will Provider directly or indirectly make any charges or claims, other than for Copayments, Deductibles or Coinsurance against any Participants or their representatives for Covered Services and that this provision survives termination of this Agreement for services rendered prior to such termination. Except for the collection of Copayments, Deductibles

ANC2000MCA.TN.2004                          PPO - 13                                      04/01/2004

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000564

or Coinsurance, only those services that are not Covered Services may be billed directly to Participants, subject to limitations listed above.  This paragraph is to be interpreted for the benefit of Participants and does not diminish the obligation of Payor to make payments to Provider according to the terms of this Agreement.

5.  a.  Should Provider collect, or cause to be collected, any payment from Participant or any representative of Participant in violation of Section II. A., then Provider shall repay the inappropriately collected amount within two (2) weeks of demand from CIGNA or Participant.   If Provider fails to make the repayments, then CIGNA may (but is not obligated to) reimburse the Participant the amount inappropriately paid and then withhold such amount and costs from future payments otherwise due to Provider.

   b.  These remedies are in addition to, and not in lieu of, any other remedies that CIGNA or Participant may have against Provider for breach of this section.

6.  The applicable rate includes all Medically Necessary services that Provider customarily provides to outpatients and specifically excludes those services which, in accordance with community standards, are considered office-based procedures or services.

7.  Only those charges for Covered Services billed in accordance with CIGNA's standard claim coding and bundling methodology reflected in the applicable claim payment system will be payable.

8.  This Agreement shall not relate to and shall specifically exclude those Covered Services which CIGNA has elected to obtain pursuant to an arrangement between CIGNA or a CIGNA Affiliate and a national vendor or provider, except as otherwise agreed by CIGNA.

## B. Utilization Management

1.  CIGNA shall establish or contract for Utilization Management which shall seek to assure that Covered Services compensated under the Service Agreement are Medically Necessary.

2.  Provider may appeal a Utilization Management decision in accordance with the dispute resolution procedures set forth in the Agreement and Program Requirements.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                     STHe_JVMC000565

### III.   RIGHTS AND OBLIGATIONS UPON TERMINATION

Upon termination of this Agreement, Provider shall continue to provide Covered Services for specific conditions for which a Participant was under Provider's care at the time of such termination so long as Participant retains eligibility under a Service Agreement, until the earlier of completion of such services, CIGNA's provision for the assumption of such treatment by another provider, or the expiration of sixty (60) days. Provider shall be compensated for Covered Services provided to any such Participant in accordance with the compensation arrangements under this Agreement until sixty (60) days following termination, and compensation thereafter for continued services authorized by CIGNA shall be as mutually agreed but will not exceed usual and customary charges for such services.  Provider has no obligation under this Agreement to provide services to individuals who cease to be Participants.

**[REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                STHe_JVMC000566

**EXHIBIT A TO THE**
**PPO PROGRAM ATTACHMENT**
**TO ANCILLARY PROVIDER MANAGED CARE AGREEMENT**

Effective Date: _____

For Covered Services, CIGNA shall reimburse Provider at CIGNA's ASC grouper fee schedule. These rates are all-inclusive, including ancillary services such as anesthesia, radiology, laboratory, and pathology that are provided at the facility.  Professional services are excluded.

**ASC Group**

| | | |
|---|---|---|
| Group 1 | $500 | per case |
| Group 2 | REDACTED | per case |
| Group 3 | | per case |
| Group 4 | | per case |
| Group 5 | | per case |
| Group 6 | | per case |
| Group 7 | | per case |
| Group 8 | | per case |

**Exceptions**
**CPT Codes:**

| | | |
|---|---|---|
| 63030 | REDACTED | per case |
| 63020 | | per case |
| 63035 | | per case |
| 63045 | | per case |
| 63047 | | per case |
| 63048 | | per case |
| 63075 | | per case |
| 63076 | | per case |
| 22554 | | per case |
| 22585 | | per case |
| 20931 | | per case |

**Notes for Reimbursement:**

1. **Insertion of Lens Prosthesis (IOL)** is included in the reimbursement for groups 6 and 8.

2. **Ungrouped/Unassigned Procedures:** Ungrouped/unassigned procedures are those procedures that are performed by facility, but not included in the CIGNA ASC grouper logic.  Reimbursement for these procedures will be at the all-inclusive case rate for Group #2.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000567

3. **Multiple Procedures**. When multiple Covered procedures are performed in the same operative session, payment for the procedures is determined as follows:

- One hundred percent (100%) reimbursement for the procedure classified in the highest ASC payment group or with the highest maximum allowable fee (pertains to exception codes)
- Fifty percent (50%) reimbursement for the second highest procedure
- Fifty percent (50%) reimbursement for the third and fourth procedures.
- Clinical review required for fifth procedure and beyond (if performed in the same operative session)

A procedure performed bilaterally in one operative session is reported as two procedures. Therefore, payment for a procedure performed bilaterally will be paid the same as payment for multiple procedures.

4. **New Procedures** Provider and CIGNA agree to negotiate reimbursement for new procedures and services that become available during the term of this Agreement.

5. **Implants (Rev code 278).** If Provider's total billed charges with respect to revenue code 278 for Covered Services rendered with respect to a single outpatient registration exceed $225, Provider shall be reimbursed for such revenue code for Covered Services at RE% of billed charge. If such charges are less than $225, reimbursement is included in the case rate above, and the Provider shall not be reimbursed separately for these charges.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000568

## AMENDMENT TO ANCILLARY PROVIDER MANAGED CARE AGREEMENT FOR THE STATE OF TENNESSEE

The provisions set forth in this Amendment comply with legislative and regulatory requirements of the State of Tennessee regarding provider contracts with providers rendering health care services in the State of Tennessee. To the extent that such Tennessee laws and regulations are applicable and/or not otherwise preempted by federal law, the provisions set forth in this Amendment supersede any provisions in the main body of the Agreement to the contrary.

With respect to Covered Services rendered to Participants covered under an HMO plan:

1.     The Agreement's recitals (under **Purpose**) are revised so that the first paragraph therein is amended to read as follows:

   CIGNA is a Tennessee health maintenance organization;

   CIGNA contracts with physicians, hospitals and other health care practitioners and entities, to provide, arrange for or administer, at predetermined rates, the delivery of health care services;

   CIGNA and Provider desire to enter into this Agreement relating to delivery of health care services to individuals enrolled with health maintenance organization and point of service plans;

   In consideration of the mutual promises herein, the parties agree as follows:

2.     Notwithstanding anything to the contrary set forth in the Agreement, the following definitions shall apply to the Agreement:

   (a)  **CIGNA Affiliate** means any corporation or entity that is directly or indirectly owned and/or managed or administered, in whole or in part, by CIGNA, or by its ultimate parent company, or by a corporation or entity that directly or indirectly controls CIGNA, as designated by CIGNA; and which is permitted to access this Agreement under Tennessee law and regulations.

   (b)  **Emergency Services** mean medical, surgical, hospital and related health care services and testing, including ambulance service, required to treat a sudden unexpected onset of bodily injury or serious illness that manifests itself by symptoms of sufficient severity or severe pain, that the absence of immediate medical attention could reasonably be expected by a prudent layperson, who possesses an average knowledge of health and medicine, to result in the placing of the Participant's health in serious jeopardy, serious impairment to bodily functions, serious dysfunction of any bodily organ or part, or, in the case of a pregnant woman, serious jeopardy to the health of the fetus. Included are conditions which produce loss of consciousness or excessive bleeding; or which may otherwise be determined by the CIGNA Medical Director in accordance with generally accepted medical standards, to have been a condition requiring immediate medical attention. Services shall include medical screening examinations which are necessary to determine whether an emergency medical condition exists and services necessary for the treatment and stabilization of an emergency medical condition.

   (c)  **Payor** means CIGNA.

ANC.AMD(A).HMO.TN                                    1                                    11/01/2003

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000569

3.  Notwithstanding anything to the contrary set forth in the Agreement, the following provisions shall apply to the **Compensation and Billing** section of the Agreement:

A.  For any Covered Services which are reimbursed on a fee-for-service basis, Provider shall bill for Covered Services according to the following:

(a)  Provider shall submit claims on the appropriate claim form for all Covered Services within one hundred eighty (180) days of the date those services are rendered.  Claims received after this one hundred eighty (180) day period may be denied for payment.  Provider shall submit claims to the location described in the applicable Program Requirements.

(b)  Within thirty (30) calendar days after Payor's receipt of Provider's claim, if submitted by the Provider in paper form, Payor shall: (i) if the claim is a clean claim as defined below, pay for any fee-for-service amounts owing under this Agreement for such health care services provided; (ii) pay the portion of the claim that is clean and not in dispute and notify Provider in writing of the reason or reasons why the remaining portion of the claim will not be paid; or (iii) notify Provider in writing of all reasons why the claim is not a clean claim and will not be paid and what substantiating documentation and information is required to adjudicate the claim as a clean claim.

(c)  Within twenty-one (21) calendar days after Payor's receipt of an electronic submission of Provider's claim Payor shall: (i) if the claim is a clean claim as defined below, pay for any fee-for-service amounts owing under this Agreement for such health care services provided; (ii) pay the portion of the claim that is clean and not in dispute and notify Provider in writing of the reason or reasons why the remaining portion of the claim will not be paid; or (iii) notify Provider in writing of all reasons why the claim is not a clean claim and will not be paid and what substantiating documentation and information is required to adjudicate the claim as a clean claim.

(d)  If Payor fails to comply with the requirements of subdivision (b) and (c) above, Payor shall pay one percent (1%) interest per month, accruing from the day after the day payment was due, on that amount of the claim that remains unpaid.

(e)  As used herein clean claim means a claim received by Payor which requires no further information, adjustment or alteration by the provider of services in order to be processed and paid by Payor.  A claim is clean if it has no defect or impropriety (including any lack of any required substantiating documentation) or particular circumstances requiring special treatment that prevents timely payment from being made on Provider's claim.  A clean claim does not include a duplicate claim.  A duplicate claim means an original claim and its duplicate when the duplicate is filed within thirty (30) days of the original claim.  A clean claim does not include any claim submitted more than one hundred and eighty (180) days after the date of service.  The definition of clean claim includes resubmitted paper form claims with previously identified deficiencies corrected.

B.  Pursuant to the requirements of Tennessee Code Annotated Section 56-7-110:

(a)  Payor shall not be required to correct a payment error to Provider, if Provider's request for a payment correction is filed more than eighteen (18) months after the date that Provider received payment for the claim from Payor.

(b)  Except in cases of fraud committed by Provider, Payor may only retroactively deny reimbursements to Provider during the eighteen (18) month period after the date that Payor paid the claim submitted by Provider.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000570

(c)  If Payor retroactively denies reimbursement to Provider under this section, Payor shall give Provider a written or electronic statement specifying the basis for the retroactive denial and the statement shall contain, at a minimum, the information required by subsection (f) of this section.

(d)  If Payor determines that payment was made for services not covered under Participant's health care plan, Payor shall give written notice to Provider of its intent to retroactively deny a previously paid claim and may:

(1)  Request a refund from Provider; or

(2)  Make a recoupment of the payment from Provider in accordance with subsection (f).

The notice required by this subsection may be included in the results of an audit submitted to Provider.

(e)  Notwithstanding subsection (b), if Payor or an agent contracted to provide eligibility verification, verifies that an individual is a Participant and if Provider provides health care services to the individual in reliance on such verification, Payor may not thereafter retroactively deny a claim on the basis that the individual is not a Participant unless such retroactive denial occurs within six (6) months of the date that Payor paid the claim; otherwise Payor is barred from making such recoupment unless there was fraud by Provider.

(f)  If Payor chooses to recoup from Provider amounts previously paid under a retroactively denied claim pursuant to subsections (b) or (d), Payor shall provide Provider written documentation that specifies:

(1)  The amount of the recoupment;

(2)  The person's name to whom the recoupment applies;

(3)  Patient identification number;

(4)  Date of service;

(5)  The health care service or services on which the recoupment is based; and

(6)  The pending claims being recouped or that future claims will be recouped.

4.  Notwithstanding anything to the contrary set forth in the Agreement, the **Participant Appeal** section of the Agreement is amended to read as follows:

Provider shall cooperate with CIGNA in the implementation of CIGNA's Participant appeal procedure and shall assist CIGNA in taking appropriate corrective action. Provider shall comply with all final determinations made by CIGNA pursuant to such appeal procedure, except to the extent required otherwise by Tennessee Code Annotated Sections 56-32-210, 56-32-213, and 56-32-227.

5.  The following provision concerning continued services and rights and obligations upon termination of the Agreement is a requirement of Tennessee law. However, to the extent that any requirements of any such current provision of the Agreement concerning continued services and rights and obligations upon termination of the Agreement exceeds the requirements of Tennessee law, such

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000571

requirements of the current provision of the Agreement shall continue to apply:

If Provider terminates this Agreement, or CIGNA terminates this Agreement without cause, then Provider and CIGNA shall allow Participant who is:

   (a)  Under active treatment for a particular injury or sickness, to continue to receive Covered Services from Provider for such injury or sickness for a period of sixty (60) days from the date of notice of termination,

   (b)  In the second trimester of pregnancy to continue care with Provider until completion of postpartum care,

   (c)  Being treated at an inpatient facility to remain at the facility until Participant is discharged.

The terms, conditions and reimbursement rates of this Agreement shall apply during the period of continued care.

6.    Notwithstanding anything to the contrary set forth in the Agreement, the following provision shall apply to the **Amendment** section of the Agreement:

Any change to the payment or fee schedules of this Agreement shall be made available and made effective upon mutual written consent by Provider at least thirty (30) days prior to the effective date of the amendment. However, this requirement shall not apply to changes in standard codes and guidelines developed by the American Medical Association or a similar organization.

7.    Notwithstanding anything to the contrary set forth in the Agreement, the following provisions shall apply to the **Limitations on Billing Participants** section in the HMO Program Attachment to the Agreement:

   (a)  The title of the **Limitations on Billing Participants** section is changed to read as follows:

     **Hold Harmless**

   (b)  Any modification, additions, or deletion to the provisions of this hold harmless clause shall become effective on a date no earlier than thirty (30) days after the applicable state regulatory agency has received written notice of such proposed changes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER         STHe_JVMC000572

## AMENDMENT TO ANCILLARY PROVIDER MANAGED CARE AGREEMENT FOR THE STATE OF TENNESSEE

The provisions set forth in this Amendment comply with legislative and regulatory requirements of the State of Tennessee regarding provider contracts with providers rendering health care services in the State of Tennessee. To the extent that such Tennessee laws and regulations are applicable and/or not otherwise preempted by federal law, the provisions set forth in this Amendment supersede any provisions in the main body of the Agreement to the contrary.

With respect to the Managed Care, PPO and Open Access Plus Programs under the Agreement:

1.      Notwithstanding anything to the contrary set forth in the Agreement, the following definition shall apply to the Agreement:

**Emergency Services** mean medical, surgical, hospital and related health care services and testing, including ambulance service, required to treat a sudden unexpected onset of bodily injury or serious illness that manifests itself by symptoms of sufficient severity or severe pain, that the absence of immediate medical attention could reasonably be expected by a prudent layperson, who possesses an average knowledge of health and medicine, to result in the placing of the Participant's health in serious jeopardy, serious impairment to bodily functions, serious dysfunction of any bodily organ or part, or, in the case of a pregnant woman, serious jeopardy to the health of the fetus. Included are conditions which produce loss of consciousness or excessive bleeding; or which may otherwise be determined by the CIGNA Medical Director in accordance with generally accepted medical standards, to have been a condition requiring immediate medical attention. Services shall include medical screening examinations which are necessary to determine whether an emergency medical condition exists and services necessary for the treatment and stabilization of an emergency medical condition.

2.      Notwithstanding anything to the contrary set forth in the Agreement, the following provisions shall apply to the **Compensation and Billing** section of the Agreement:

A.      For any Covered Services which are reimbursed on a fee-for-service basis, Provider shall bill for Covered Services according to the following:

(a)     Provider shall submit claims on the appropriate claim form for all Covered Services within one hundred eighty (180) days of the date those services are rendered. Claims received after this one hundred eighty (180) day period may be denied for payment. Provider shall submit claims to the location described in the applicable Program Requirements.

(b)     Within thirty (30) calendar days after Payor's receipt of Provider's claim, if submitted by the Provider in paper form, Payor shall: (i) if the claim is a clean claim as defined below, pay for any fee-for-service amounts owing under this Agreement for such health care services provided; (ii) pay the portion of the claim that is clean and not in dispute and notify Provider in writing of the reason or reasons why the remaining portion of the claim will not be paid; or (iii) notify Provider in writing of all reasons why the claim is not a clean claim and will not be paid and what substantiating documentation and information is required to adjudicate the claim as a clean claim.

(c)     Within twenty-one (21) calendar days after Payor's receipt of an electronic submission of Provider's claim Payor shall: (i) if the claim is a clean claim as defined below, pay for any fee-for-service amounts owing under this Agreement for such health care services provided; (ii)

ANC.AMD(A).PPO.TN                                               1                                               11/01/2003

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                               STHe_JVMC000573

pay the portion of the claim that is clean and not in dispute and notify Provider in writing of the reason or reasons why the remaining portion of the claim will not be paid; or (iii) notify Provider in writing of all reasons why the claim is not a clean claim and will not be paid and what substantiating documentation and information is required to adjudicate the claim as a clean claim.

(d) If Payor fails to comply with the requirements of subdivision (b) and (c) above, Payor shall pay one percent (1%) interest per month, accruing from the day after the day payment was due, on that amount of the claim that remains unpaid.

(e) As used herein clean claim means a claim received by Payor which requires no further information, adjustment or alteration by the provider of services in order to be processed and paid by Payor. A claim is clean if it has no defect or impropriety (including any lack of any required substantiating documentation) or particular circumstances requiring special treatment that prevents timely payment from being made on Provider's claim. A clean claim does not include a duplicate claim. A duplicate claim means an original claim and its duplicate when the duplicate is filed within thirty (30) days of the original claim. A clean claim does not include any claim submitted more than one hundred and eighty (180) days after the date of service. The definition of clean claim includes resubmitted paper form claims with previously identified deficiencies corrected.

B.  All references to capitation, capitated basis, or reimbursement under any periodic risk sharing settlements are hereby deleted and shall not apply to the Agreement.

C.  Pursuant to the requirements of Tennessee Code Annotated Section 56-7-110:

(a) Payor shall not be required to correct a payment error to Provider, if Provider's request for a payment correction is filed more than eighteen (18) months after the date that Provider received payment for the claim from Payor.

(b) Except in cases of fraud committed by Provider, Payor may only retroactively deny reimbursements to Provider during the eighteen (18) month period after the date that Payor paid the claim submitted by Provider.

(c) If Payor retroactively denies reimbursement to Provider under this section, Payor shall give Provider a written or electronic statement specifying the basis for the retroactive denial and the statement shall contain, at a minimum, the information required by subsection (f) of this section.

(d) If Payor determines that payment was made for services not covered under Participant's health care plan, Payor shall give written notice to Provider of its intent to retroactively deny a previously paid claim and may:

(1) Request a refund from Provider; or

(2) Make a recoupment of the payment from Provider in accordance with subsection (f).

The notice required by this subsection may be included in the results of an audit submitted to Provider.

(e) Notwithstanding subsection (b), if Payor or an agent contracted to provide eligibility

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                          STHe_JVMC000574

verification, verifies that an individual is a Participant and if Provider provides health care services to the individual in reliance on such verification, Payor may not thereafter retroactively deny a claim on the basis that the individual is not a Participant unless such retroactive denial occurs within six (6) months of the date that Payor paid the claim; otherwise Payor is barred from making such recoupment unless there was fraud by Provider.

(f)   If Payor chooses to recoup from Provider amounts previously paid under a retroactively denied claim pursuant to subsections (b) or (d), Payor shall provide Provider written documentation that specifies:

  (1)   The amount of the recoupment;

  (2)   The person's name to whom the recoupment applies;

  (3)   Patient identification number;

  (4)   Date of service;

  (5)   The health care service or services on which the recoupment is based; and

  (6)   The pending claims being recouped or that future claims will be recouped.

3.   The following provision concerning continued services and rights and obligations upon termination of the Agreement is a requirement of Tennessee law. However, to the extent that any requirements of any such current provision of the Agreement concerning continued services and rights and obligations upon termination of the Agreement exceeds the requirements of Tennessee law, such requirements of the current provision of the Agreement shall continue to apply:

If Provider terminates this Agreement, or CIGNA terminates this Agreement without cause, then Provider and CIGNA shall allow Participant who is:

(a)   Under active treatment for a particular injury or sickness, to continue to receive Covered Services from Provider for such injury or sickness for a period of sixty (60) days from the date of notice of termination,

(b)   In the second trimester of pregnancy to continue care with Provider until completion of postpartum care,

(c)   Being treated at an inpatient facility to remain at the facility until Participant is discharged.

The terms, conditions and reimbursement rates of this Agreement shall apply during the period of continued care.

4.   Notwithstanding anything to the contrary set forth in the Agreement, the following provision shall apply to the **Amendment** section of the Agreement:

Any change to the payment or fee schedules of this Agreement shall be made available and made effective upon mutual written consent by Provider at least thirty (30) days prior to the effective date of the amendment. However, this requirement shall not apply to changes in standard codes and guidelines developed by the American Medical Association or a similar organization.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                             STHe_JVMC000575

# Contract with MissionPoint Health Partners

*Agreement Revision Date 9/23/11*

**FACILITY PARTICIPATION AGREEMENT**

**BY AND BETWEEN**

**MISSIONPOINT HEALTH PARTNERS**

**AND**

**SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC**

# TABLE OF CONTENTS

1.0   DEFINITIONS ................................................................................................. 1
      Affiliate ..................................................................................................... 1
      Agreement ................................................................................................. 1
      Clinical Integration Standards .................................................................. 1
      Coinsurance ............................................................................................... 1
      Company .................................................................................................... 2
      Confidential Information ........................................................................... 2
      Copayment .................................................................................................. 2
      Covered Services ....................................................................................... 2
      Deductible .................................................................................................. 2
      Effective Date ............................................................................................ 2
      Facility ....................................................................................................... 2
      Facility Services ........................................................................................ 2
      Governing Body ........................................................................................ 2
      Information ................................................................................................. 2
      Material Change ......................................................................................... 2
      Member ...................................................................................................... 2
      MSSP .......................................................................................................... 2
      MSSP Attachment ...................................................................................... 2
      Participating Provider ............................................................................... 2
      Party ........................................................................................................... 2
      Plan ............................................................................................................ 3
      Plan Sponsor .............................................................................................. 3
      Plan Summary ............................................................................................ 3
      Policies ...................................................................................................... 3
      Product ....................................................................................................... 3
      Product Attachment ................................................................................... 3
      Proprietary Information ............................................................................. 3
      Provider Manual ........................................................................................ 4
      Records ...................................................................................................... 4

2.0   FACILITY SERVICES AND OBLIGATIONS ........................................... 4
      Provision of Services; Clinical Integration .............................................. 4
      Non-Discrimination ................................................................................... 4
      Policies ...................................................................................................... 4
      Facility Representations ............................................................................ 4
      Notice of Certain Events ........................................................................... 5
      Facility Locations ...................................................................................... 5
      Administrative Obligations ....................................................................... 6
      Collection of Member Payments .............................................................. 6
      Facility Insurance ...................................................................................... 6
      Participation .............................................................................................. 6
      Consents to Release Medical Information; HIPAA Compliance ............... 6
      Disclosure of Plan Information to Patients ............................................... 6
      Encounter Data and Claims ....................................................................... 7
      Change to Plan ........................................................................................... 7
      Information Systems; Electronic Connectivity .......................................... 7
      Quality, Accreditation and Review Activities ........................................... 7
      Fees ............................................................................................................ 7
      Non-Exclusivity ......................................................................................... 7

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER            STHe_JVMC000251

## TABLE OF CONTENTS (cont'd)

|  |  |  |
|---|---|---|
|  | Market Share Data | 7 |
| **3.0** | COMPANY OBLIGATIONS | 7 |
|  | Company's Covenants | 7 |
|  | Company's Insurance | 8 |
| **4.0** | CLAIMS SUBMISSIONS, COMPENSATION AND MEMBER BILLING | 8 |
|  | Submission and Payment of Claims | 8 |
|  | Member Hold Harmless | 8 |
| **5.0** | INFORMATION AND RECORDS | 8 |
|  | Information and Records | 8 |
|  | Proprietary Information | 9 |
|  | Facility Information | 9 |
|  | Audits | 9 |
| **6.0** | TERM AND TERMINATION | 10 |
|  | Term | 10 |
|  | Termination without Cause | 10 |
|  | Termination for Breach | 10 |
|  | Immediate Termination of Facility | 10 |
|  | Termination related to Tax-Exempt Status | 11 |
|  | Obligations Following Termination | 12 |
| **7.0** | RELATIONSHIP OF THE PARTIES | 12 |
|  | Independent Contractor Status | 12 |
|  | Use of Name | 12 |
|  | Interference with Contractual Relations | 12 |
| **8.0** | DISPUTE RESOLUTION | 13 |
|  | Grievance Dispute Resolution | 13 |
|  | Binding Arbitration | 13 |
|  | Arbitration Solely Between Parties: No Consolidation or Class Action | 13 |
| **9.0** | MISCELLANEOUS | 13 |
|  | Amendments | 13 |
|  | Waiver | 14 |
|  | Governing Law | 14 |
|  | Liability | 14 |
|  | Severability | 14 |
|  | Successors; Assignment | 15 |
|  | Third Party Beneficiaries | 15 |
|  | Subcontracting | 15 |
|  | Headings | 15 |
|  | Notices | 15 |
|  | Remedies | 16 |
|  | Force Majeure | 16 |
|  | Certain Legal Requirements | 16 |
|  | Survival | 16 |
|  | Entire Agreement | 16 |
|  | Conflicts Between Agreements | 16 |
|  | Corporate Compliance | 16 |
|  | Ethical and Religious Directives | 17 |
|  | Attorney Fees | 17 |
|  | Exclusion | 17 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000252

**TABLE OF CONTENTS (cont'd)**

Execution..................................................................................................................... 17

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000253

*Agreement Revision Date 9/23/11*

## FACILITY PARTICIPATION AGREEMENT

This Facility Participation Agreement ("Agreement") is made and entered into as of the Effective Date by and between **MISSIONPOINT HEALTH PARTNERS**, a Tennessee non-profit corporation (hereinafter "Company") and Saint Thomas Outpatient Neurosurgical Center, LLC on behalf of the licensed health care facility locations listed on **Exhibit A** attached hereto (collectively, the "Facility").

**WHEREAS**, Company is an affiliate of Saint Thomas Health, a Tennessee nonprofit corporation ("STH") and has been organized to serve as an accountable care organization in furtherance of STH's charitable purpose of providing health care to residents of its service area, especially to those persons who are poor;

**WHEREAS**, as an accountable care organization, Company will seek to engage health care providers and facilities for the purpose of improving the quality and reducing the costs of health care services provided to certain patient populations;

**WHEREAS**, in furtherance of this purpose, Company will be engaged by Plan Sponsors to arrange health care services for Members of Plans, and will contract with health care providers and facilities to provide such health care services to Members;

**WHEREAS**, Facility provides health care services to patients within the scope of its licensure; and

**WHEREAS**, Company and Facility mutually desire to enter into an arrangement whereby Facility will render health care services to Members as part of an accountable care organization, and be reimbursed for such services in accordance with the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual covenants, promises and undertakings herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

## 1.0   DEFINITIONS

When used in this Agreement, the following capitalized terms shall have the following meanings:

1.1    Affiliate.  With respect to any legal entity, any other legal entity that is directly or indirectly owned or controlled by, or which owns or controls, or which is under common ownership or control with, such entity.  When determining whether an entity is an Affiliate of Company, STH shall be deemed to "own" Company.

1.2    Agreement.  Defined in first paragraph of this Agreement.

1.3    Clinical Integration Standards.  Those standards set forth on the attached **Exhibit B**, or as otherwise adopted or modified from time to time by the Governing Body, relating to the integration of the operation of the Facility with Company and with other similarly situated health care providers and facilities participating with Company under an agreement similar to this Agreement.

1.4    Coinsurance.  The percentage of the lesser of: (a) the rates established under this Agreement; or (b) Facility's usual, customary and reasonable billed charges, which a Member is required to pay for Covered Services under a Plan.

1

*Agreement Revision Date 9/23/11*

1.5     Company.  Defined in first paragraph of this Agreement.

1.6     Confidential Information.  Any information that identifies a Member and is related to the Member's participation in a Plan, the Member's physical or mental health or condition, the provision of health care to the Member or payment for the provision of health care to the Member.  Confidential Information includes, without limitation, "individually identifiable health information," as defined in 45 C.F.R. § 160.103.

1.7     Copayment.  A charge required under a Plan that must be paid by a Member at the time of the provision of Covered Services, or at such other time as determined by Facility.

1.8     Covered Services.  Those health care services for which a Member is entitled to receive coverage under the terms and conditions of a Plan.

1.9     Deductible.  An amount that a Member must pay for Covered Services during a specified coverage period in accordance with the Member's Plan before benefits will be paid.

1.10    Effective Date.  The date set forth as the "Effective Date" under the signature of Company set forth on the signature pages to this Agreement.

1.11    Facility.  Defined in first paragraph of this Agreement.

1.12    Facility Services.  Defined in Section 2.1 of this Agreement.

1.13    Governing Body.  The body serving as the board of directors or "governing body" of the Company.

1.14    Information.  Defined in Section 5.1.2 of this Agreement.

1.15    Material Change.  Any change in Policies that could reasonably be expected to have a material adverse impact on (i) Facility's reimbursement for Facility Services or (ii) the operation of the Facility.

1.16    Member.  An individual covered by or enrolled in a Plan.

1.17    MSSP.  The Medicare Shared Savings Program established by the Centers for Medicare and Medicaid Services.

1.18    MSSP Attachment.  An Attachment to this Agreement governing Facility's participation in the MSSP.  The MSSP Attachment shall be considered a "Product Attachment" for purposes of this Agreement.

1.19    Participating Provider.  Any physician, hospital, skilled nursing facility, or other individual or entity involved in the delivery of health care or ancillary services who or which has entered into and continues to have a current valid contract with Company to provide Covered Services to Members, and, where applicable, has been credentialed by Company or its designee consistent with Company's credentialing policies.  Certain categories of Participating Providers may be referred to herein more specifically as, e.g., "Participating Physicians", "Participating Hospitals" or "Participating Facilities."

1.20    Party.  Company or Facility, as applicable.

2

1.21 <u>Plan</u>. A Member's health care benefits as set forth in the Member's Summary Plan Description, Certificate of Coverage or other applicable coverage document. Such benefits must be approved by the Company's Governing Body before such benefits become a Plan.

1.22 <u>Plan Sponsor</u>. An employer, insurer, health maintenance organization, governmental agency (including the Centers for Medicare and Medicaid Services), third party administrator, labor union, organization or other person or entity that offers, issues and/or administers a Plan and has agreed to be responsible for funding benefit payments for Covered Services provided to Members under the terms of a Plan.

1.23 <u>Plan Summary</u>. A document summarizing the terms of any Plan, which document has been provided to Facility by the Plan Sponsor.

1.24 <u>Policies</u>. The policies and procedures promulgated by Company with the approval of the Governing Body, including, but not limited to: (a) quality improvement/management; (b) utilization management; (c) claims payment review; (d) member grievances; (e) physician credentialing and participation requirements; (f) electronic submission of claims and other data required by Company; (g) general and professional liability requirements; and (h) data sharing and electronic medical records maintenance. Policies include those policies and procedures set forth in the Company's Provider Manual or its successors (as modified from time to time) and other policies and procedures, whether made available via a password-protected web site for Participating Providers (when available), by letter, newsletter, electronic mail or other media.

1.25 <u>Product</u>. A grouping of Plans having the same category of payers, such as employer-sponsored plans, commercially insured plans, etc. Each grouping must be approved by the Governing Body before such grouping becomes a Product.

1.26 <u>Product Attachment</u>. A description of a Product attached to this Agreement.

1.27 <u>Proprietary Information</u>. Any and all information, whether prepared by a Party, its advisors or otherwise, relating to such Party or the development, execution or performance of this Agreement whether furnished prior to or after the Effective Date. Proprietary Information includes but is not limited to, with respect to Company, the structure and organization of Company, compensation and financial models, financial information, rate schedules and financial terms that are developed by Company or otherwise furnished or disclosed to Facility by Company. Notwithstanding the foregoing, the following shall not constitute Proprietary Information:

    (a) information which was known to a receiving Party (a "Recipient") prior to receipt from the other Party (a "Disclosing Party") (as evidenced by the written records of a Recipient);

    (b) information which was previously available to the public prior to a Recipient's receipt thereof from a Disclosing Party;

    (c) information which subsequently became available to the public through no fault or omission on the part of a Recipient, including without limitation, the Recipient's officers, directors, trustees, employees, agents, contractors and other representatives;

    (d) information which is furnished to a Recipient by a third party which a Recipient confirms, after due inquiry, has no confidentiality obligation, directly or

3

*Agreement Revision Date 9/23/11*

indirectly, to a Disclosing Party; or

(e)     information which is approved in writing in advance for disclosure or other use by a Disclosing Party.

1.28     Provider Manual.  A Company-established manual setting forth certain processes, procedures, requirements and other policies of the Company, as amended by Company from time to time, which manual shall be established and amended by the Company only with the approval of the Governing Body.

1.29     Records.  Defined in Section 5.1.2 of this Agreement.

## 2.0     FACILITY SERVICES AND OBLIGATIONS

2.1     Provision of Services; Clinical Integration.

2.1.1     Facility shall provide to Members those Covered Services that are within the scope of the Facility's license to provide and are offered by Facility to other patients who are not Members ("Facility Services").  Facility will maintain, at a minimum, the hours of operation in effect as of the date of this Agreement.  Facility will remain solely responsible for the quality of health care services provided thereby to Members, and will provide such services in accordance with generally accepted standards of medical practice and applicable professional standards, legal requirements, and applicable accreditation standards.

2.1.2     Facility shall comply with the Clinical Integration Standards.

2.2     Non-Discrimination.  Facility agrees to provide Facility Services to Members with the same degree of promptness, service, availability (both in terms of hours and scope of services), care and skill as customarily provided to Facility's patients who are not Members.  Facility agrees that Members and non-Members will be treated equitably, and to that end, Facility shall not discriminate against Members on the basis of race, gender, creed, ancestry, lawful occupation, age, religion, marital status, sexual orientation, mental or physical disability, color, national origin, place of residence, health status, source of payment for services, cost or extent of Facility Services required, or any other grounds prohibited by law or this Agreement.  Company recognizes that Facility has the right to refuse to treat any Member for appropriate non-discriminatory reasons, provided that the reason for such refusal is not that the patient is a Member.

2.3     Policies.  Facility will comply with all Policies.  Company may at any time modify Policies.  Company will provide ninety (90) days prior notice by letter, newsletter, electronic mail or other media, of Material Changes to Policies.

2.4     Facility Representations.

2.4.1     General Representations and Covenants.  Facility represents, warrants and covenants, as applicable, on behalf of itself and each of the locations of Facility listed on **Exhibit A**, that: (a) it has, and shall maintain throughout the term of this Agreement all appropriate licenses, permits, approvals and certifications mandated by governmental regulatory agencies, and any certificates of needs, licenses and permits required for the services provided by Facility; (b) it is, and will remain throughout the term of this Agreement, accredited by The Joint Commission ("TJC") or another applicable accrediting agency recognized by Company; (c) it is, and will remain throughout the term of this Agreement, in compliance with all applicable Federal and state laws and regulations related to this

4

STHe_JVMC000257

Agreement and the services to be provided hereunder, including, without limitation, statutes and regulations related to fraud, abuse, discrimination, disabilities, confidentiality, self-referral, false claims and prohibition of kickbacks; (d) it is certified to participate in the Medicare program; (e) it has established an ongoing quality assurance/assessment program which includes, without limitation, appropriate credentialing of employees and subcontractors and shall supply to Company the relevant documentation, including, without limitation, internal quality assurance/assessment protocols, state licenses and certifications, Federal agency certifications and/or registrations upon request; (f) it is legally authorized to negotiate on behalf of the Facility locations listed on **Exhibit A** and to bind Facility locations to abide by the terms of this Agreement, as amended from time to time; (g) this Agreement has been executed by its duly authorized representative; and (h) executing this Agreement and performing its obligations hereunder shall not cause Facility to violate any term or covenant of any other agreement or arrangement now existing or hereinafter executed.

       2.4.2   Qualified Personnel.  Facility represents and covenants that all personnel employed by, or associated or contracted with, Facility who are involved in the provision of Facility Services for Members: (a) are and shall remain throughout the term of this Agreement appropriately licensed and/or certified and supervised in accordance with applicable federal and state law, and qualified by education, training and experience to perform their professional duties; and (b) shall act within the scope of their licensure or certification, as the case may be.  Company may audit Facility for compliance with this section upon prior written notice.

       2.4.3   Government Program Representations.  Company has or may seek a contract to serve Medicare and Medicaid beneficiaries ("Government Programs").  To the extent Company participates in such Government Programs, Facility agrees, on behalf of itself and any subcontractors thereof, to be bound by all rules and regulations of, and all requirements applicable to, such Government Programs.

       2.5   Notice of Certain Events.  Facility shall provide written notice to Company, and shall provide all information reasonably requested by Company regarding the nature, circumstances, and disposition, of: (a) any litigation brought against Facility or any of its employees or affiliated providers which is related to the provision of health care services to a Member or which could have a material impact on the Facility Services provided to Members; (b) the occurrence of any event or matter listed in Section 6.4 below; (c) any state or federal governmental investigation or action against Facility, including any investigation or claim regarding fraud, abuse, self-referral, false claims, or kickbacks, excluding any routine audits such as RAC audits; (d) any revocation, suspension, limitation or other adverse action with respect to any license, certification, permit or other similar approval required to be maintained by Facility to provide Facility Services, or any investigation, audit, review, survey or other evaluation by a governmental agency that could potentially result in any such adverse action, and (e) any other problem or situation that would materially impair the ability of Facility to carry out the duties and obligations of this Agreement. Facility agrees to use its best efforts to provide Company with prior notice of any of such events or matters, and in any event will provide notice as soon as reasonably practicable.

       2.6   Facility Locations.  Attached hereto as **Exhibit A** is a list of all Facility locations, including names, addresses, telephone numbers, and Tax-IDs and provider numbers.  Facility shall notify Company in writing within ten (10) business days of any change in this information, provided that Facility shall provide Company with at least sixty (60) days prior written notice of (a) Facility ceasing for any reason to operate any location listed in **Exhibit A**, (b) the relocation of any Facility location listed in **Exhibit A**, or (c) the addition of any new Facility location.  The addition of a new Facility location shall not require the approval of Company if the new location will provide only services already being provided by Facility under this Agreement at another location of Facility listed in **Exhibit A**.  The addition of a new Facility location under this Agreement that will provide services not currently being

5

STHe_JVMC000258

provided by Facility under this Agreement shall require the prior written approval of Company.  **Exhibit A** shall be updated as necessary to reflect any changes in Facility location information in accordance with this Section.

      2.7     Administrative Obligations.  Facility shall comply with the following:

      2.7.1     Compliance with Utilization Management and Other Terms of Product Attachments, Plan Summaries and Provider Manual.  Facility shall comply with the terms of any utilization management, referral requirements, service standards, quality improvement plans, billing, payment, refund and other aspects of the delivery of, billing for, or payment for care to Members set forth in any Product Attachment or Plan Summary or set forth in the Provider Manual or any other Policy.

      2.7.2     Acceptance of Members.  Facility and Company agree that a broad selection of health care providers is important to Members and that Members expect providers listed in Company's directories to be available to them.  Accordingly, during the term of this Agreement, Facility shall accept Members as patients on the same basis and availability as patients who are not Members.

      2.8     Collection of Member Payments.  Facility shall use its commercially reasonable efforts to collect all Coinsurance, Copayments and Deductibles owed to Facility by Members of the Plans.

      2.9     Facility Insurance.  During the term of this Agreement, Facility agrees to procure and maintain such policies of general and professional liability and other insurance, at minimum levels as required by Company's Policies.  Facility acknowledges that the Company's current policy requires insurance in at least the amount of $1,000,000 per occurrence or $3,000,000 in the annual aggregate.  Such insurance coverage shall cover the acts and omissions of Facility as well as those of Facility agents and employees.  Facility agrees to deliver certificates of insurance or other documentation as appropriate to show evidence of such coverage to Company upon request.  Facility agrees to make best efforts to provide to Company at least thirty (30) days advance notice, and in any event will provide notice as soon as reasonably practicable, of any cancellation or material modification of said policies.

      2.10     Participation.  Facility shall participate in each Plan associated with each Product described in the Product Attachments attached to this Agreement at execution for which Facility receives a Plan Summary.  Company reserves the right to introduce and designate Facility's participation in new Products and new Plans during the term of this Agreement by sending to Facility additional Product Attachments and Plan Summaries.  Facility shall participate in any additional Product, and all Plans associated with such additional Product, unless Facility rejects such additional Product in writing within thirty (30) days from the date of transmittal to Facility of the Product Attachment for such Product.

      2.11     Consents to Release Medical Information; HIPAA Compliance.  Facility will obtain from Members to whom Facility Services are provided, any necessary consents or authorizations to the release of Information and Records to Company, Plan Sponsors, their agents and representatives in accordance with any applicable Federal or state law or regulation or this Agreement.  In addition, in accordance with the Health Insurance Portability and Accountability Act ("HIPAA") and regulations promulgated thereunder (the "HIPAA Regulations"), Company shall ensure that any patient identifiable health information (as defined in the HIPAA Regulations) provided to it and its employees and agents by Facility in connection with this Agreement will be treated as confidential in accordance with the HIPAA Regulations, other applicable laws and the provisions of this Agreement.  Without limiting the generality of the foregoing, Company agrees to be bound by the terms and conditions set forth in the attached Health Information Privacy Addendum set forth on **Exhibit C** attached hereto and incorporated herein by this reference.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000259

*Agreement Revision Date 9/23/11*

2.12   <u>Disclosure of Plan Information to Patients</u>.  Company may provide written notice to Members regarding the methodology by which Facility is compensated and any incentive payments based on achievement of performance and/or quality measures.  To the extent that a Product Attachment, Plan Summary or applicable law requires such disclosures be made by Facility, the Company shall so notify Facility, and Facility shall be responsible for giving such notice.

2.13   <u>Encounter Data and Claims</u>.  Facility agrees to file claims for services rendered (even with respect to services compensated on a capitated basis, if applicable) in order that the Company and Plan Sponsors shall have adequate encounter data.

2.14   <u>Change to Plan</u>.  It is understood that the Plan Sponsor may retain the right to change, revise, modify, or alter the form and/or content of any Plan and such changes, revisions, modifications or alterations, if approved by the Governing Body, shall be binding on the Facility.

2.15   <u>Information Systems; Electronic Connectivity</u>.  Facility shall maintain and participate in the technical systems necessary in order to further the purposes of this Agreement as required by the Clinical Integration Standards.

2.16   <u>Quality, Accreditation and Review Activities</u>.  Facility shall cooperate with any Company quality activities and any review of Company conducted by any accrediting body or a Federal or state agency with authority over Company, as applicable.

2.17   <u>Fees</u>.  If the Governing Body of the Company determines that Participating Providers will be required to pay fees in order to continue participating in the Company, then Company shall give Facility at least ninety (90) days prior written notice of the imposition and amount of such fees (such notice, the "Fee Notice").  If Facility does not wish to pay such fees, Facility may terminate this Agreement by giving Company written notice of termination no later than thirty (30) days after the date the Fee Notice is given.  If Facility delivers a timely termination notice to Company in accordance with the preceding sentence, then (a) this Agreement will terminate exactly ninety (90) days after the date on which Facility delivers such timely termination notice to Company, and (b) Facility shall not be required to pay the fees set forth in the Fee Notice.  If Facility does not deliver a termination notice to Company in accordance with this Section, then Facility agrees to pay the fees assessed by the Governing Body of the Company, and such fees shall become due and payable in accordance with the terms established by the Governing Body.

2.18   <u>Non-Exclusivity</u>.  This Agreement is not exclusive, and nothing herein shall preclude either Party from contracting with any other person or entity for any purpose.  Company makes no representation or guarantee as to the number of Members who may select Facility.

2.19   <u>Market Share Data</u>.  If necessary to evaluate compliance with antitrust or similar laws governing anticompetitive behavior, either in response to an inquiry or request from a governmental agency or due to a concern raised by legal counsel to the Company, or in connection with an application for participation in the MSSP or any other Medicare program (if Facility will participate in such program), Facility shall provide market share data (such as numbers of patients by zip code or other data necessary to evaluate market share) for Facility.  Facility will only be required to provide market share information necessary for the limited purposes set forth in this Section, and Company will not make any other use of such information.

## 3.0   COMPANY OBLIGATIONS

3.1   <u>Company's Covenants</u>.  Company shall attach the Product Attachments to this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000260

Agreement before execution, and supplement this Agreement post-execution by sending supplemental Product Attachments to Facility. As Plans are added in each Product, Company shall send Plan Summaries to Facility.

      3.2    <u>Company's Insurance</u>. Company at its sole cost and expense agrees to procure and maintain such policies of general and/or professional liability and other insurance (or maintain a self-insurance program) as shall be necessary to insure Company and its employees against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by Company under this Agreement.

## 4.0    CLAIMS SUBMISSIONS, COMPENSATION AND MEMBER BILLING

      4.1    <u>Submission and Payment of Claims</u>. Facility shall submit claims to the applicable Plan Sponsor in accordance with the applicable Product Attachment, Plan Summary and the Provider Manual. Payments for Covered Services will be made by (or on behalf of) the applicable Plan Sponsor in accordance with the applicable Product Attachment, Plan Summary and the Provider Manual. Facility acknowledges that Facility shall not bill the Company and that Company will not be liable for any amounts owing to Facility from any Plan Sponsor or any Member.

      4.2    <u>Member Hold Harmless</u>. The reimbursement set forth in the applicable Product Attachment shall represent the maximum amount payable under this Agreement to Facility for Covered Services, and Facility shall not bill any Member for any contractual difference between billed charges and such reimbursement. Facility further agrees not to bill a Member for any service that would have been a Covered Service but was not reimbursed due to the failure of Facility to comply with any payment requirements for the applicable Plan. Except for Copayments, Coinsurance, Deductibles or other permitted supplemental charges made in accordance with the terms of the applicable Plan, Facility shall not bill, charge, collect a deposit from, seek remuneration or reimbursement from, or have any recourse against Members or persons acting on their behalf for Covered Services. This provision shall survive the expiration or termination of this Agreement regardless of the cause giving rise to termination and shall be construed for the benefit of Members. This provision also supersedes any oral or written contrary agreement or waiver now existing or hereafter entered into between Facility and Members or persons acting on their behalf. To protect Members, Facility shall not seek or accept or rely upon waivers of the Member protections provided by this Section 4.2.

## 5.0    INFORMATION AND RECORDS

      5.1    <u>Information and Records</u>.

      5.1.1    <u>Maintenance of Information and Records</u>. Facility agrees (a) to maintain Information and Records (as such terms are defined in Section 5.1.2) in a current, detailed, organized and comprehensive manner and in accordance with applicable Federal and state laws, and accreditation standards; (b) that all Member medical records and Confidential Information shall be treated as confidential and in accordance with applicable laws; (c) to maintain such Information and Records for the longer of seven (7) years after the last date Facility Services were provided to Member, or the period required by applicable law. This Section 5.1.1 shall survive the termination of this Agreement, regardless of the cause of the termination.

      5.1.2    <u>Access to Information and Records</u>. Facility agrees that (a) Company (including Company's authorized designee) and Plan Sponsors shall have access to all data and information obtained, created or collected by Facility related to Members and necessary for payment of claims, including without limitation Confidential Information ("Information"); (b) Company (including

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    STHe_JVMC000261

*Agreement Revision Date 9/23/11*

Company's authorized designee), Plan Sponsors and Federal, state, and local governmental authorities and their agents having jurisdiction, upon request, shall have access to all books, records and other papers (including, but not limited to, contracts, medical records and financial records and physician incentive plan information) and information relating to this Agreement and to the Facility Services rendered to Members ("Records"); (c) Company or its agents or designees shall have access to, and be provided with copies of (without charge), Information and Records for the purpose of assessing quality of care, conducting medical evaluations and audits, and performing utilization management functions; (d) applicable Federal and state authorities and their agents shall have access to, and be provided with copies of (without charge), medical records for assessing the quality of care or investigating Member grievances or complaints; and (e) Members shall have access to their health information as required by applicable law. Facility agrees to supply copies of Information and Records within fourteen (14) days of the receipt of a request, where practicable, and in no event later than the date required by any applicable law or regulatory authority. Subject to the provisions of this section as well as other provisions of this Agreement, Company confirms that, as between Company and Facility, Facility owns its medical records. Upon termination of this Agreement, Company shall for five (5) years (or for such longer period of time as required by law) continue to have access to records of Members as necessary in connection with any litigation or to fulfill the terms of this Agreement and the applicable Plan Summary. In addition, in cases of suspected fraud or abuse, Company shall continue to have access to records until all matters relating to such fraud and abuse have been resolved. This Section 5.1.2 shall survive the termination of this Agreement, regardless of the cause of termination.

5.2    Proprietary Information. Each Party agrees that the Proprietary Information of the other Party is the exclusive property of such Party and that each Party has no right, title or interest in the same. Each Party agrees to keep the Proprietary Information and this Agreement strictly confidential and agrees not to disclose any Proprietary Information or the contents of this Agreement to any third party without the other Party's consent, except (i) to governmental authorities having jurisdiction, (ii) in the case of Company's disclosure to Members, Plan Sponsors, consultants or vendors under contract with Company, and (iii) in the case of Facility's disclosure to Members for the purposes of advising Members of potential treatment options and costs. Except as otherwise required under applicable Federal or state law, each Party agrees to not use any Proprietary Information of the other Party, and at the request of the other Party hereto, return any Proprietary Information upon termination of this Agreement for whatever reason. Notwithstanding the foregoing, Facility is encouraged to discuss Company's provider payment methodology with patients, including descriptions of the methodology under which the Facility is paid. In addition, Facility may freely communicate with patients about their treatment options, regardless of benefit coverage limitations. This Section 5.2 shall survive the termination of this Agreement for one (1) year, regardless of the cause of termination.

5.3    Facility Information. Facility acknowledges and agrees that Company will compile data, statistics and information on the Facility Services provided by Facility pursuant to this Agreement (including, without limitation, utilization of certain services, outcomes of the provision of such services, compliance with applicable quality metrics, etc.). Facility hereby consents to the compilation and release of such information by Company to other Participating Providers, Plan Sponsors, prospective Plan Sponsors, and other providers. Facility shall have access to, and an opportunity to provide input with respect to, any information regarding Facility that is maintained by Company for the purposes described in this Section.

5.4    Audits. Facility agrees that Company or its designee may perform audits of Facility's records in connection with credentialing, quality improvement with utilization review functions. Such audits shall be permitted without charge to Company or its designee, who shall be provided copies of records involving the audit without charge and within a reasonable timeframe as requested by Company. On-site audits will also be permitted during regular business hours, and except in the event of suspected

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000262

*Agreement Revision Date 9/23/11*

fraud or other illegal activity, shall occur only following reasonable prior notice.

## 6.0    TERM AND TERMINATION

6.1    <u>Term</u>.  This Agreement shall commence on the Effective Date and shall continue until terminated as set forth below.  Any Plan may be terminated as set forth in the applicable Plan Summary. In the event that this Agreement terminates, the Facility's participation in all Plans shall terminate except to the extent otherwise set forth in the applicable Plan Summary.

6.2    <u>Termination without Cause</u>.  This Agreement may be terminated by either Party with at least ninety (90) days prior written notice to the other Party, subject to the terms of the MSSP Attachment if Facility has agreed to participate in such Product Attachment.  In addition, this Agreement may be terminated by Facility in accordance with Section 2.17 above.

6.3    <u>Termination for Breach</u>.

6.3.1    This Agreement may be terminated at any time by either Party upon at least thirty (30) days prior written notice of such termination to the other Party upon material default or substantial breach by such Party of one or more of its obligations hereunder (other than obligations set forth in Section 2.1.2, the default or breach of which shall be subject to Section 6.3.2 below), unless such material default or substantial breach is cured to the satisfaction of the non-breaching Party within such thirty (30) day period; provided, however, if such material default or substantial breach is incapable of being cured within such thirty (30) day period, then the breaching party shall have ninety (90) days after delivery of written notice to the breaching Party to cure such breach or default, but only if the breaching Party commences such cure within the initial thirty (30) day period and thereafter diligently prosecutes such cure to completion and to the satisfaction of the non-breaching Party within the remaining portion of the ninety (90) day period.

6.3.2    This Agreement may be terminated by Company upon Facility's failure to comply in all material respects with the Clinical Integration Standards, unless such failure is cured to the satisfaction of the Company within sixty (60) days after notice thereof has been delivered to Facility.

6.4    <u>Immediate Termination of Facility</u>.    Company may immediately terminate this Agreement at Company's discretion at any time, due to any of the following events:

   (a)    the suspension, withdrawal, expiration, revocation or non-renewal of any Federal, state or local license, permit, certification, approval or other legal credential necessary for Facility to perform its obligations under this Agreement;

   (b)    the indictment or conviction of Facility for any crime;

   (c)    the bankruptcy or receivership of Facility, or an assignment by Facility for the benefit of creditors;

   (d)    the loss or material limitation of Facility's insurance under Section 2.9 of this Agreement;

   (e)    the exclusion, debarment or suspension of Facility from participation in any governmental sponsored program, including, but not limited to, Medicare or Medicaid;

10

*Agreement Revision Date 9/23/11*

(f)    any Change of Control (as hereinafter defined) of Facility;

(g)    any false statement or material omission of Facility in the participation application and/or confidential information forms and all other requested information (including, without limitation, claims information), as determined by Company in its sole discretion;

(h)    Facility's provision of care in a manner (as determined by Company in its sole discretion) that (i) jeopardizes the health or safety of Members, or (ii) fails to meet prevailing recognized professional community standards of practice, standards established under law, or standards as determined by Company;

(i)    the revocation or suspension of Facility's accreditation by TJC or any other applicable accrediting agency recognized by Company;

(j)    any failure to maintain minimum standards for participation in a Plan or to comply with Company's credentialing and recredentialing Policies as established from time to time by Company;

(k)    any failure to comply with the requirements of a Product Attachment or a Plan Summary, or any failure to meet performance standards or goals established by Company, as determined by Company in its sole discretion, provided that in lieu of terminating the participation under this Agreement of Facility, Company may instead terminate only such participation in the applicable Product Attachment or Plan Summary;

(l)    any fraud or act of theft by Facility; or

(m)    any judgment in malpractice actions and/or settlement of malpractice claims (whether or not such claims related to care of Members) of sufficient number or seriousness to suggest deficiencies in patient care or to cause the Facility to no longer meet Company's participation criteria and procedures.

To protect the interests of patients, including Members, Facility will provide immediate notice to Company of any of the aforesaid events. For purposes hereof, the term "Change of Control" means, with respect to Facility, (1) a transfer (whether by sale, lease, transfer, assignment or otherwise) of all or a substantial portion of the business and/or assets of Facility to a Competing Hospital (as hereinafter defined), (2) the transfer of any stock, membership interests or ownership interests in Facility to a Competing Hospital, or (3) entering into an arrangement under which a Competing Hospital manages the operations of Facility or under which services provided at the Facility are billed by a Competing Hospital. The term "Competing Hospital" means any entity licensed to operate an acute care hospital located within Davidson County, Tennessee or Rutherford County, Tennessee or any Affiliate of such an entity, in each case, other than STH and its Affiliates.

6.5    <u>Termination related to Tax-Exempt Status</u>. In the event that, in the reasonable and good faith judgment of Company and its legal counsel, any term or provision of this Agreement could (a) jeopardize the classification of any tax-exempt Affiliate of Company as a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code of 1986 (as amended from time to time (or any corresponding provisions of succeeding law) (the "Code")), (b) result in any income of any tax-exempt Affiliate of Company being subject to federal income taxation as unrelated business income or otherwise, or (c) result in the imposition of intermediate sanctions on any tax-exempt Affiliate of the Company (or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000264

its members, officers, directors or trustees) pursuant to Section 4958 of the Code (a "Tax-Exempt Issue"), then the Company may terminate this Agreement on thirty (30) days written notice to Facility.  During such thirty day (30) period, this Agreement shall be performed in a manner that allows Company's tax-exempt Affiliates to maintain their respective tax exempt statuses.

     6.6    <u>Obligations Following Termination</u>.  Following the effective date of any termination of this Agreement or any Plan, Facility and Company will abide by the terms of this Section 6.6.  This Section 6.6 shall survive the termination of this Agreement, regardless of the cause of termination.

     6.6.1    <u>Upon Termination</u>.  Upon termination of this Agreement for any reason, Facility agrees to provide Facility Services at Company's discretion to any Member who is receiving an ongoing course of treatment from Facility until such Member can be transferred to the care of another provider; <u>provided</u>, that in no event shall Facility's obligation to provide such services continue for more than ninety (90) days after the termination of this Agreement.  The terms of this Agreement, including payment in accordance with the applicable Product Attachment and Plan Summary, shall apply to such services.

     6.6.2    <u>Obligation to Cooperate</u>.  Upon notice of termination of this Agreement or of a Plan, Facility shall cooperate with Company and comply with Policies, if any, in the transfer of the provision of services to Members to other providers.

     6.6.3    <u>Obligation to Notify Members</u>.  Upon notice of termination of this Agreement or of a Plan, Company or the applicable Plan Sponsor shall provide reasonable advance notice of the impending termination to Members of Plans currently receiving services from Facility, or in the event of immediate termination, as soon as practicable after termination.

## 7.0    RELATIONSHIP OF THE PARTIES

     7.1    <u>Independent Contractor Status</u>.  The relationship between Company and Facility, as well as their respective employees and agents, is that of independent contractors, and neither shall be considered an agent or representative of the other Party for any purpose, nor shall either hold itself out to be an agent or representative of the other for any purpose.  Company and Facility will each be solely liable for its own activities and those of its agents and employees, and neither Company nor Facility will be liable in any way for the activities of the other Party or the other Party's agents or employees arising out of or in connection with: (a) any failure to perform any of the agreements, terms, covenants or conditions of this Agreement; (b) any negligent act or omission or other misconduct; (c) the failure to comply with any applicable laws, rules or regulations; or (d) any accident, injury or damage.  Facility acknowledges that all Member care and related decisions are the responsibility of Facility and that neither Policies nor coverage determinations dictate or control Facility's decisions with respect to the care of Members.  Facility agrees to indemnify and hold harmless the Company, its directors, officers, owners, and agents from any and all claims, liabilities and third party causes of action arising out of Facility's provision of services to Members.  Company agrees to indemnify and hold harmless the Facility from any and all claims, liabilities and third party causes of action arising out of the Company's provision of services hereunder.  This provision shall survive the termination of this Agreement, regardless of the reason for termination.

     7.2    <u>Use of Name</u>.  Facility consents to the use of its name and other identifying and descriptive material in provider directories and in other materials and marketing literature of Company in all formats, including, but not limited to, electronic media.  Facility may not use Company's names, logos, trademarks or service marks in marketing materials or otherwise, unless such use is specifically approved or directed by Company in writing.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000265

7.3     Interference with Contractual Relations.  Facility shall not engage in activities that will cause Company to lose existing or potential Members, including but not limited to: (a) advising Company customers, Plan Sponsors or other entities currently under contract with Company to cancel, or not renew said contracts; (b) impeding or otherwise interfering with negotiations which Company is conducting for the provision of health benefits or Plans; or (c) using or disclosing to any third party membership lists acquired during the term of this Agreement for the purpose of soliciting individuals who were or are Members or otherwise to compete with Company.  Nothing in this Section 7.3 is intended or shall be deemed to restrict (i) any communication between Facility and a Member determined by Facility to be necessary or appropriate for the provision of Facility Services for the Member and otherwise in accordance with Section 5.2; or (ii) notification of participation status with other HMOs or insurers.  This section shall continue to be in effect for a period of one (1) year after the termination of this Agreement.

## 8.0     DISPUTE RESOLUTION

8.1     Grievance Dispute Resolution.  Facility agrees to (a) cooperate with and participate in Company's applicable appeal, grievance and external review procedures, (b) provide Company with the information necessary to resolve same, and (c) abide by decisions of the applicable appeals, grievance and review committees.

8.2     Binding Arbitration.  Any controversy or claim arising out of or related to this Agreement or the breach, termination, or validity thereof, except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, shall be settled by binding arbitration in accordance with this Section.  Any Party shall have the right, by delivery of written notice thereof to the other Party (the "Arbitration Notice") to submit the matter to the arbitration provisions of this Section 8.2.  Within fifteen (15) days of receipt of the Arbitration Notice, the Parties shall submit the dispute to binding arbitration to be held in Nashville, Tennessee in accordance with this Section, to be conducted under the Alternative Dispute Resolution Service offered by the American Health Lawyers Association (the "AHLA").  The arbitration will be conducted by three (3) arbitrators, one being selected by each Party and the third by the two arbitrators so named; provided that, if such arbitrators are unable to agree upon the third arbitrator within ten (10) days after their respective appointments, the third arbitrator shall be chosen by the AHLA.  If either Party shall not have selected their respective arbitrators within fifteen (15) days after receipt of the Arbitration Notice, an arbitrator representing such Party shall be chosen by the AHLA.  The decision of a majority of the arbitrators shall be final and binding upon all Parties and judgment may be entered on any award rendered by the arbitrators in any court having jurisdiction over the situs in which the principal office of such Party is located.  Each Party shall each pay the fees and expenses of the arbitrator each selected.  The fees and expenses of the third arbitrator, and any other expenses of the arbitration, shall be shared equally between both Parties.

8.3     Arbitration Solely Between Parties: No Consolidation or Class Action.  Company and Facility agree that any arbitration or other proceeding related to a dispute arising under this Agreement shall be conducted solely between them.  Neither Party shall request, nor consent to any request, that their dispute be joined or consolidated for any purpose, including without limitation any class action or similar procedural device, with any other proceeding between such Party and any third party.

## 9.0     MISCELLANEOUS

9.1     Amendments.

9.1.1   This Agreement, or any part, article, section or exhibit may be amended, altered, or modified only by (a) a written agreement executed by both Company and Facility, or (b) an amendment which has been approved in writing by Company and has been accepted by Facility (which

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    STHe_JVMC000266

*Agreement Revision Date 9/23/11*

acceptance shall be obtained or deemed obtained in the manner described below), or (c) as otherwise provided in Section 9.1.2 below. The acceptance of an amendment by Facility may be obtained in accordance with the following procedure:

(a)     Company shall furnish Facility with the proposed amendment in writing;

(b)     Facility shall have thirty (30) days after delivery of the proposed amendment in which to respond in writing to Company. If Facility either accepts such amendment or fails to respond in writing within such period, the proposed amendment shall be deemed accepted by Facility and shall become effective, and therefore binding on Facility, upon the earlier of Facility's written acceptance or the expiration of such thirty (30) day period; and

(c)     If Facility notifies Company in writing by certified mail within thirty (30) days after notice of the proposed amendment is given to Facility that Facility does not accept the proposed amendment, then such amendment shall not apply to this Agreement and shall not be binding on Facility, provided that Company shall have the right to terminate this Agreement on thirty (30) days written notice to Facility given no later than thirty (30) days after the date Company receives Facility's notice of rejection of the amendment.

9.1.2     Notwithstanding the terms of Section 9.1.1, the following shall not require the agreement or acceptance of Facility and shall automatically be effective and binding on the parties: (a) any amendment to a Product Attachment or the Clinical Integration Standards which has been approved by the Governing Body of the Company, provided Company shall have given Facility at least ninety (90) days prior notice of any such amendment, (b) any amendment to a Plan Summary adopted by the applicable Plan Sponsor and approved by the Company, provided that an amendment to a Plan Summary shall not change the reimbursement rates applicable to such Plan (which reimbursement rates may only be changed by an amendment to the applicable Product Attachment), (c) any amendment to a Policy or the Provider Manual, provided that Company shall have provided Facility with at least ninety (90) days prior notice by letter, newsletter, electronic mail or other media, of any Material Changes to Policies, or (d) any amendment reasonably determined by Company to be necessary (i) to comply with state or federal laws and regulations (or any decision of any court of competent jurisdiction related thereto) or (ii) to allow the Company to become or to remain an eligible accountable care organization under the MSSP.

9.2     Waiver. The waiver by either Party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach thereof. To be effective, all waivers must be in writing and signed by an authorized officer of the Party to be charged. Facility waives any claims or cause of action for fraud in the inducement or execution related hereto.

9.3     Governing Law. This Agreement shall be governed in all respects by the laws of the State of Tennessee.

9.4     Liability. Notwithstanding Section 9.3, either Party's liability, if any, for damages to the other Party for any cause whatsoever arising out of or related to this Agreement, and regardless of the form of the action, shall be limited to the damaged Party's actual damages. Neither Party shall be liable for any indirect, incidental, punitive, exemplary, special or consequential damages of any kind whatsoever sustained as a result of a breach of this Agreement or any action, inaction, alleged tortious conduct, or delay by the other Party.

9.5     Severability.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                STHe_JVMC000267

9.5.1    In the event that any part of any provision of this Agreement is rendered invalid or unenforceable under applicable laws, or is declared null and void by any court of competent jurisdiction, such part shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining parts of such provision or the remaining parts of the Agreement. Neither Party shall assert or claim that this Agreement or any provision hereof is void or voidable if such Party performs under this Agreement without prompt and timely written objection.

9.5.2    In the event that a provision of this Agreement is rendered invalid or unenforceable or declared null and void as provided in Section 9.5.1, and its removal has the effect of materially altering the obligations of either party in such manner as will cause serious financial hardship to such party, then the parties shall negotiate in good faith to amend this Agreement to preserve the underlying economic and financial arrangements to the maximum extent possible.  If, after good faith efforts, the parties are unable to reach agreement on a proper amendment to this Agreement, then the party so affected shall have the right to terminate this Agreement upon thirty (30) days prior written notice to the other party.

9.6    Successors; Assignment.  This Agreement may not be assigned by either Party without the prior written consent of the other Party, except that Company may assign its rights or delegate its duties and obligations to an Affiliate of Company or a successor in interest.

9.7    Third Party Beneficiaries.  The terms and provisions of this Agreement are intended solely for the benefit of Company, Facility and their respective successors or permitted assigns, and it is not the intention of the parties to confer, and this Agreement shall not confer, third-party beneficiary rights upon any other person (including any Member).

9.8    Subcontracting.  Facility shall not subcontract this Agreement, or any portion of this Agreement, without the prior written consent of Company.  Company may subcontract any of its obligations and functions to any organization it so designates.

9.9    Headings.  The headings contained in this Agreement are included for purposes of convenience only, and shall not affect in any way the meaning or interpretation of any of the terms or provisions of this Agreement.

9.10    Notices.  Any notice required to be given under this Agreement shall be in writing, except in cases in which this Agreement specifically permits Company to deliver electronic notice.  All written or electronic notices shall be deemed to have been given (a) when delivered in person, by electronic mail, or by facsimile, (b) when received by the addressee, if sent by a nationally-recognized overnight delivery service, or (c) if sent by first-class United States mail, then three (3) days following the date mailed, proper postage prepaid and properly address to the appropriate party at the address set forth below.  Notwithstanding the foregoing, all notices of termination of this Agreement by either Party must be sent by certified mail, return receipt requested.  Facility shall notify Company of any changes in the information provided by Facility below.

To Facility at the address set forth on the signature pages hereto;

and to Company at:

MissionPoint Health Partners
102 Woodmont Boulevard, Suite 700
Nashville, TN 37205
Attention: Chief Executive Officer

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                STHe_JVMC000268

9.11    Remedies.  Notwithstanding Sections 8.2 and 9.3, the Parties agree that each has the right to seek any and all remedies at law or equity in the event of breach or threatened breach of Section(s) 5.2 and 7.3.

9.12    Force Majeure.  If either Party shall be delayed or interrupted in the performance or completion of its obligations hereunder by any act, neglect or default of the other Party, or by an embargo, war, act of terror, riot, incendiary, fire, flood, earthquake, epidemic or other calamity, act of God or of the public enemy, governmental act (including, but not restricted to, any government priority, preference, requisition, allocation, interference, restraint or seizure, or the necessity of complying with any governmental order, directive, ruling or request) then the time of completion specified herein shall be extended for a period equivalent to the time lost as a result thereof.  This Section 9.12 shall not apply to either Party's obligations to pay any amounts owing to the other Party, nor to any strike or labor dispute involving such Party or the other Party.

9.13    Certain Legal Requirements.  To the extent applicable to Facility, Facility, on behalf of itself and any subcontractors, agree to comply with the following, as amended from time to time: Executive Order 11246, the Vietnam Era Veterans Readjustment Act of 1974, the Drug Free Workplace Act of 1988, Section 503 of the Rehabilitation Act of 1973, Title VI of the Civil Rights Act of 1964, the Age Discrimination Act of 1975, HIPAA administrative simplification rules at 45 CFR parts 160, 162, and 164, the Americans with Disabilities Act of 1990, Federal laws, rules and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. 3729 et seq.), and the anti-kickback statute (Section 1128B(b) of the Social Security Act), and any similar laws, regulations or other legal mandates applicable to recipients of federal funds and/or transactions under or otherwise subject to any government contract of Company.

9.14    Survival.  In addition to those provisions which by their terms survive termination of this Agreement (e.g., Sections 5.1.1 and 5.1.2), Sections 5.2, 6.6, 7.3 and 8 shall survive termination of this Agreement, regardless of the cause giving rise thereto.

9.15    Entire Agreement.  This Agreement (including any exhibits, the Product Attachments, the Plan Summaries (together with all schedules and exhibits thereto), the Provider Manuals and other attachments) constitutes the complete and sole contract between the Parties regarding the subject hereof and supersedes any and all prior or contemporaneous oral or written representations, communications, proposals or agreements not expressly included herein and may not be contradicted or varied by evidence of prior, contemporaneous or subsequent oral representations, communications, proposals, agreements, prior course of dealings or discussions of the Parties.  There are no oral agreements between the Parties. Facility represents that it has not relied on any data, financial analysis, reports, notes, proposals, conclusions or projections, whether made orally or in writing, made by Company or any of its representatives, agents, employees or advisors, in connection with negotiation, acceptance, execution or delivery of this Agreement by Facility.

9.16    Conflicts Between Agreements.  If there is any conflict or claimed conflict between this Agreement, the Provider Manual, any Product Attachment, or any Plan Summary, the following documents shall be controlling in descending order: this Agreement, Plan Summary, Product Attachment and Provider Manual.

9.17    Corporate Compliance.  Company has in place a Corporate Responsibility Plan, which has as its goal to ensure that Company complies with federal, state and local laws and regulations.  The plan focuses on risk management, the promotion of good corporate citizenship, including a commitment to uphold a high standard of ethical and legal business practices, and the prevention of misconduct.

16

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000269

Facility acknowledges Company's commitment to corporate responsibility. Facility agrees to conduct its business transactions with Company in accordance with the principles of good corporate citizenship and a high standard of ethical and legal business practices.

9.18    Ethical and Religious Directives. The parties acknowledge that Company is a member of Ascension Health and that the operation of Company in accordance with the Ethical and Religious Directives for Catholic Health Care Services, as promulgated by the United States Conference of Catholic Bishops, Washington, D.C. of the Roman Catholic Church or its successor ("Directives") and the principles and beliefs of the Roman Catholic Church is a matter of conscience to Company. It is the intent and agreement of the parties that neither this Agreement nor any part hereof shall be construed to require Company to violate said Directives in its operation.

9.19    Attorney Fees. In the event that either Company or Facility initiates any action, suit, or arbitration proceeding to enforce the provisions of this Agreement, each party shall bear its own costs and attorney fees.

9.20    Exclusion. Facility represents and warrants that neither Facility nor any employee or contractor of Facility involved in providing Facility Services ("Facility Personnel") has been, nor are any of them about to be, excluded from participation in any Federal Healthcare Programs (as hereinafter defined). Facility agrees to notify Company within one (1) business day of Facility's receipt of a notice of intent to exclude or actual notice of exclusion from any such program. The listing of Facility, any Facility-owned subsidiary, or any Facility Personnel on the Office of Inspector General's exclusion list (OIG website) or the General Services Administration's Lists of Parties Excluded from Federal Procurement and Nonprocurement Programs (GSA website) for excluded individuals and entities shall constitute "exclusion" for purposes of this Section. Facility shall immediately remove from providing Facility Services any Facility Personnel who is excluded from any Federal Healthcare Program. In the event that Facility is excluded from any Federal Healthcare Program, Company may terminate this Agreement in accordance with Section 6.4. The term "Federal Healthcare Program" means the Medicare program, the Medicaid program, the Maternal and Child Health Services Block Grant program, the Block Grants for State for Social Services program, any state Children's Health Insurance program, or any similar program. Facility agrees to indemnify and hold Company and the other members of the Saint Thomas System harmless from and against any loss, liability, judgment, penalty, fine, damages (including punitive and/or compounded damages), costs (including reasonable attorneys' fees and expenses) incurred as a result of Facility's exclusion from any Federal Healthcare Program.

9.21    Execution. To facilitate execution, this Agreement may be executed in one or more counterparts, each of which shall be considered an original, and which collectively shall constitute the Agreement.

**[SIGNATURE PAGE FOLLOWS]**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                STHe_JVMC000270

## FACILITY PARTICIPATION AGREEMENT
## SIGNATURE PAGE

In consideration of mutual covenants and promises stated herein and other good and valuable consideration, the undersigned agree to be bound by the Facility Participation Agreement as of the Effective Date.

A scanned, imaged, electronic, photocopy or stamp of the signatures hereunder shall have the same force and effect as an originally executed signature.

**FACILITY**                                                      **MISSIONPOINT HEALTH PARTNERS**

Saint Thomas Outpatient Neurosurgical         By: _____
Center, LLC
_____
(Facility Name)
_____             Title: _Chief Executive Officer_
(Signature)
_____
(Print Name of Person Signing)                   **Effective Date of Facility Participation**
                                                **Agreement (to be inserted by MissionPoint):**
_____
(Title of Person Signing)                        _____   January 1, 2012
                                                      (the "Effective Date")
_____
(Date Signed by Facility)

_4230 Harding Rd. # 901, Nash. TN 37205_
(Include Address of Facility)


_____
(Please Print Your Name)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                STHe_JVMC000271

EXHIBIT A

LIST OF FACILITY LOCATIONS

| Name of Facility Location: | Facility Address and Phone Number: | Facility Tax ID Number and Provider Number |
|---|---|---|
| Saint Thomas Outpatient Neurosurgical Center, LLC | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000272

EXHIBIT B

CLINICAL INTEGRATION STANDARDS

1. Facility must timely and satisfactorily submit data to disease registries in accordance with the Company's then current policy.

2. Facility shall maintain a high speed internet connection accessible by appropriate Facility personnel and shall maintain a valid e-mail address and sufficient hardware to access the internet.

3. Facility shall take such steps as are necessary in order to insure that appropriate Facility personnel are able to conveniently connect to the web portal maintained by the Company to facilitate clinical integration.

4. Facility shall submit claims data through the web portal maintained by the Company to facilitate clinical integration simultaneously with the submission to the applicable Plan Sponsor. Facility acknowledges that such claims data shall be used for quality improvement purposes, the development of evidence based medicine, and other clinical purposes and shall not be used for billing purposes. Facility acknowledges that billing shall be done directly to applicable Plan Sponsors in accordance with the Participation Agreement.

5. Facility shall query the web portal referenced above once per month and to review the quality and efficiency data available on such portal during such query.

6. Representatives of Facility shall participate in the operations of the Company without compensation by serving on a committee designated by the Governing Body of the Company as requested.

7. Appropriate Facility personnel shall attend the annual meeting of the Participating Providers of the Company.

8. Facility shall cooperate in the use of evidence based medicine protocols by Participating Physicians, as such protocols are developed or approved by the Governing Body of the Company and promulgated to the applicable practice.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000273

EXHIBIT C

### HIPAA Business Associate Addendum

**THIS HIPAA BUSINESS ASSOCIATE ADDENDUM** (the "Addendum") is effective as of the Effective Date of the Facility Participation Agreement to which it is attached (the "Effective Date"), by and between **MISSIONPOINT HEALTH PARTNERS**, a Tennessee nonprofit corporation ("Business Associate") and Saint Thomas Outpatient Neurosurgical Center, LLC, (the "Covered Entity") and adds to the Facility Participation Agreement to which it is attached between Business Associate and Covered Entity.

Pursuant to the Agreement, Business Associate may perform functions or activities on behalf of Covered Entity involving the use and/or disclosure of protected health information received from, or created or received by, Business Associate on behalf of Covered Entity ("PHI"). Therefore, if Business Associate is functioning as a business associate to Covered Entity, Business Associate agrees to the following terms and conditions set forth in this HIPAA Business Associate Addendum.

1. **Definitions.** For purposes of this Addendum, the terms used herein, unless otherwise defined, shall have the same meanings as used in the Health Insurance Portability and Accountability Act of 1996, and any amendments or implementing regulations ("HIPAA"), or the Health Information Technology for Economic and Clinical Health Act (Title XIII of the American Recovery and Reinvestment Act of 2009), and any amendments or implementing regulations ("HITECH").

2. **Compliance with Applicable Law.** The parties acknowledge and agree that, beginning with the relevant effective dates, Business Associate shall comply with its obligations under this Addendum and with all obligations of a business associate under HIPAA, HITECH and other related laws, as they exist at the time this Addendum is executed and as they are amended, for so long as this Addendum is in place.

3. **Permissible Use and Disclosure of Protected Health Information.** Business Associate may use and disclose PHI to carry out its duties to Covered Entity pursuant to the terms of the Agreement. Business Associate may also use and disclose PHI (i) for its own proper management and administration, and (ii) to carry out its legal responsibilities. If Business Associate discloses Protected Health Information to a third party for either above reason, prior to making any such disclosure, Business Associate must obtain: (i) reasonable assurances from the receiving party that such PHI will be held confidential and be disclosed only as required by law or for the purposes for which it was disclosed to such receiving party; and (ii) an agreement from such receiving party to immediately notify Business Associate of any known breaches of the confidentiality of the PHI.

4. **Limitations on Uses and Disclosures of PHI.** Business Associate shall not, and shall ensure that its directors, officers, employees, and agents do not, use or disclose PHI in any manner that is not permitted or required by the Agreement, this Addendum, or required by law. All uses and disclosures of, and requests by Business Associate, for PHI are subject to the minimum necessary rule of the Privacy Standards and shall be limited to the information contained in a limited data set, to the extent practical, unless additional information is needed to accomplish the intended purpose, or as otherwise permitted in accordance with Section 13405(b) of HITECH and any implementing regulations.

5. **Required Safeguards To Protect PHI.** Business Associate agrees that it will implement appropriate safeguards in accordance with the Privacy Standards to prevent the use or disclosure of PHI other than pursuant to the terms and conditions of this Addendum.

- 21 -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000274

6. **Reporting of Improper Use and Disclosures of PHI.** Business Associate shall immediately report to Covered Entity a use or disclosure of PHI not provided for in this Addendum by Business Associate, its officers, directors, employees, or agents, or by a third party to whom Business Associate disclosed PHI.

7. **Reporting of Breaches of Unsecured PHI.**   Business Associate shall immediately report to Covered Entity a breach of unsecured PHI, in accordance with 45 C.F.R. §§ 164.400-414. Business Associate shall cooperate with Covered Entity's breach notification and mitigation activities, and shall be responsible for all costs incurred by Covered Entity for those activities.

8. **Mitigation of Harmful Effects.**  Business Associate agrees to mitigate, to the extent practicable, any harmful effect of a use or disclosure of PHI by Business Associate in violation of the requirements of this Addendum, including, but not limited to, compliance with any state law or contractual data breach requirements.

9. **Agreements by Third Parties.**  Business Associate shall enter into an agreement with any agent or subcontractor of Business Associate that will have access to PHI.  Pursuant to such agreement, the agent or subcontractor shall agree to be bound by the same restrictions, terms, and conditions that apply to Business Associate under this Addendum with respect to such PHI.

10. **Access to Information.**  Within five (5) days of a request by Covered Entity for access to PHI about an individual contained in a Designated Record Set, Business Associate shall make available to Covered Entity such PHI for so long as such information is maintained by Business Associate in the Designated Record Set, as required by 45 C.F.R. § 164.524.  In the event any individual delivers directly to Business Associate a request for access to PHI, Business Associate shall within two (2) days forward such request to Covered Entity.

11. **Availability of PHI for Amendment.**  Within five (5) days of receipt of a request from Covered Entity for the amendment of an individual's PHI or a record regarding an individual contained in a Designated Record Set (for so long as the PHI is maintained in the Designated Record Set), Business Associate shall provide such information to Covered Entity for amendment and incorporate any such amendments in the PHI as required by 45 C.F.R. § 164.526. In the event any individual delivers directly to Business Associate a request for amendment to PHI, Business Associate shall within two (2) days forward such request to Covered Entity.

12. **Documentation of Disclosures.**  Business Associate agrees to document disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528.

13. **Accounting of Disclosures.** Within five (5) days of notice by Covered Entity to Business Associate that it has received a request for an accounting of disclosures of PHI regarding an individual during the six (6) years prior to the date on which the accounting was requested, Business Associate shall make available to Covered Entity information to permit Covered Entity to respond to the request for an accounting of disclosures of PHI, as required by 45 C.F.R. § 164.528. In the case of an electronic health record maintained or hosted by Business Associate on behalf of Covered Entity, the accounting period shall be three (3) years and the accounting shall include disclosures for treatment, payment and healthcare operations, in accordance with the applicable effective date of Section 13402(a) of HITECH.  In the event the request for an accounting is delivered directly to Business Associate, Business Associate shall within two (2) days forward such request to Covered Entity.

- 22 -

14. **Electronic PHI.** To the extent that Business Associate creates, receives, maintains or transmits electronic PHI on behalf of Covered Entity, Business Associate shall:

   (a) Comply with 45 C.F.R. §§164.308, 310, 312, and 316 in the same manner as such sections apply to Covered Entity, pursuant to Section 13401(a) of HITECH, and otherwise implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of electronic PHI;

   (b) Ensure that any agent to whom Business Associate provides electronic PHI agrees to implement reasonable and appropriate safeguards to protect it; and

   (c) Report to Covered Entity any security incident of which Business Associate becomes aware.

15. **Judicial and Administrative Proceedings.** In the event Business Associate receives a subpoena, court or administrative order or other discovery request or mandate for release of PHI, Covered Entity shall have the right to control Business Associate's response to such request. Business Associate shall notify Covered Entity of the request as soon as reasonably practicable, but in any event within two (2) days of receipt of such request.

16. **Availability of Books and Records.** Business Associate hereby agrees to make its internal practices, books, and records relating to the use and disclosure of PHI available to the Secretary of the Department of Health and Human Services for purposes of determining compliance with the Privacy Standards.

17. **Breach of Contract by Business Associate.** In addition to any other rights Covered Entity may have in the Agreement, this Addendum or by operation of law or in equity, Covered Entity may i) immediately terminate the Agreement if Covered Entity determines that Business Associate has violated a material term of this Addendum, or ii) at Covered Entity's option, permit Business Associate to cure or end any such violation within the time specified by Covered Entity. Covered Entity's option to have cured a breach of this Addendum shall not be construed as a waiver of any other rights Covered Entity has in the Agreement, this Addendum or by operation of law or in equity.

18. **Effect of Termination of Agreement.** Upon the termination of the Agreement or this Addendum for any reason, Business Associate shall return to Covered Entity or, at Covered Entity's direction, destroy all PHI received from Covered Entity that Business Associate maintains in any form, recorded on any medium, or stored in any storage system. This provision shall apply to PHI that is in the possession of Business Associates or agents of Business Associate. Business Associate shall retain no copies of the PHI. Business Associate shall remain bound by the provisions of this Addendum, even after termination of the Agreement or Addendum, until such time as all PHI has been returned or otherwise destroyed as provided in this Section.

19. **Injunctive Relief.** Business Associate stipulates that its unauthorized use or disclosure of PHI while performing services pursuant to this Addendum would cause irreparable harm to Covered Entity, and in such event, Covered Entity shall be entitled to institute proceedings in any court of competent jurisdiction to obtain damages and injunctive relief.

20. **Indemnification.** Business Associate shall indemnify and hold harmless Covered Entity and its officers, trustees, employees, and agents from any and all claims, penalties, fines, costs, liabilities or damages, including but not limited to reasonable attorney fees, incurred by Covered Entity arising from a violation by Business Associate of its obligations under this Addendum.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                STHe_JVMC000276

21. **Exclusion from Limitation of Liability.**   To the extent that Business Associate has limited its liability under the terms of the Agreement, whether with a maximum recovery for direct damages or a disclaimer against any consequential, indirect or punitive damages, or other such limitations, all limitations shall exclude any damages to Covered Entity arising from Business Associate's breach of its obligations relating to the use and disclosure of PHI.

22. **Owner of PHI.**   Under no circumstances shall Business Associate be deemed in any respect to be the owner of any PHI used or disclosed by or to Business Associate by Covered Entity.

23. **Third Party Rights.**   The terms of this Addendum do not grant any rights to any parties other than Business Associate and Covered Entity.

24. **Independent Contractor Status.**   For the purposed of this Addendum, Business Associate is an independent contractor of Covered Entity, and shall not be considered an agent of Covered Entity.

25. **Changes in the Law.**   The parties shall amend this Addendum to conform to any new or revised legislation, rules and regulations to which Covered Entity is subject now or in the future including, without limitation, HIPAA, HITECH, the Privacy Standards, Security Standards or Transactions Standards.

26. **Conflicts.**   If there is any direct conflict between the Agreement and this Addendum, the terms and conditions of this Addendum shall control.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000277

Affiliated ASC Attachment Last Revised 12/15/2011

MISSIONPOINT HEALTH PARTNERS FACILITY PARTICIPATION AGREEMENT

## PRODUCT ATTACHMENT

## SELF-INSURED EMPLOYERS

## AMBULATORY SURGERY CENTERS (AFFILIATED)

1. **Fee-For-Service Payments**.  Facility shall be paid fee-for-service reimbursement for Facility Services provided thereby to Members in an amount equal to the lesser of (a) Facility's actual billed charges and (b) the per case rates set forth on Exhibit A attached hereto (as updated from time to time), in each case, less any applicable Coinsurance, Copayments and Deductibles.

2. **Shared Savings Payment**.

   a.  Definitions

      i.  The term "ASC" means each Participating Provider that is licensed as an ambulatory surgical center, but not including any location operated under a hospital license or billed as a hospital-based location.

      ii.  The term "Total Shared Savings Amount" means, for each calendar year, the amount paid to Company with respect to such calendar year by the applicable Plan Sponsor as shared savings payments.

      iii.  The term "Outpatient Facility Shared Savings Amount" means, for each calendar year, twenty percent (20%) of the Total Shared Savings Amount for the applicable plan.

      iv.  The term "Total ASC Shared Savings Pool" means, for each calendar year and for the applicable Plan, thirty-five percent (35%) of the Outpatient Facility Shared Savings Amount.

      v.  The term "Facility Treated Members" means, for any calendar year, the total treated Members for the applicable Plan for Facility.

      vi.  The term "Total ASC Treated Members" means, for any calendar year, the total treated Members for the applicable Plan for all ASCs.

      vii.  The term "Facility Shared Savings Payment" means, for each calendar year and for the applicable Plan, an amount equal to (A) the Total ASC Shared Savings Pool, multiplied by (B) a fraction having as a numerator the Facility Treated Members and a denominator equal to the Total ASC Treated Members.

   b.  Payment of Shared Savings Payment.  In addition to the fee-for-service payments set forth in Section 1 above, within one hundred twenty (120) days following the payment of the Total Shared Savings Amount by the applicable Plan Sponsor to Company (such date, the "Shared Savings Payment Date"), Facility will be paid the amount (if any) of the Facility Shared Savings Payment for such period for the applicable Plan; provided,

however, that if a material default or substantial breach by Facility (including, without limitation, any failure by Facility to comply with the Clinical Integration Standards) has occurred under the Participation Agreement, which default or breach has not been cured or waived as of the Shared Savings Payment Date, then the Facility Shared Savings Payment for such calendar year shall be deemed forfeited by Facility and will not thereafter be paid to Facility.

3. **Capitalized Terms**.  Capitalized terms used herein shall have the meaning given to them in the Participation Agreement unless another meaning is given to them herein.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000279

Affiliated ASC Attachment Last Revised 12/15/2011

### Exhibit A to Self-Insured Employers Product Attachment

### Ambulatory Surgery Centers

The per case rates are set forth below and are based on the ambulatory surgery groups as recognized by the attached Exhibit B:

| Group | Per Case Rate |
|-------|---------------|
| 1 | $643.7 |
| 2 | REDACTED |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |

The per case rates include all Facility services related to the procedure, including: nursing, technician and related services; use of Facility operating room and recovery rooms; drugs, biological, surgical dressings, supplies, splints, casts and appliances and equipment directly related to the provision of the surgical procedure; diagnostic or therapeutic services or items directly related to the provision of the surgical procedures; materials for anesthesia; all laboratory testing (including pre-operative testing) related to the provision of the surgical procedure; and all radiological testing (including pre-operative testing) related to the provision of the surgical procedure.

Multiple surgical procedures will be reimbursed 100/50/50 for each additional code.

If codes are not assigned to a grouper, the entire claim will revert to a R ⅓% discount off charges.
E

Implants* - The following codes will be paid in addition to the per case rates above, subject to the terms set forth below:

| | | |
|---|---|---|
| Pacemaker | Revenue Code 275 | R ⅓% of Covered Charges |
| Prosthetic/Orthotic Devices | Revenue Code 274 | E ⅓% of Covered Charges |
| Other Implants | Revenue Code 278 | D ⅓% of Covered Charges |

*Charges billed for Implants must meet the criteria of a Surgical Implant or Surgical Appliance as noted below and be no greater than the charge billed to any other third party payor. In addition the

3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000280

payment made will in no instance be greater than the total cost of an individual implant. Periodic audits will be performed to ascertain adherence to this criteria and adjustments will be made accordingly.

Surgical Implant: A device that is medically necessary and medically appropriate which is surgically placed internally for therapeutic or reconstructive purposes and not considered a prosthetic or orthotic device.

Surgical Appliance: A surgical device that is medically necessary and medically appropriate which is externally paced as a part of a surgical procedure and is integral to the surgical procedure and not considered a prosthetic or orthotic device.

-4-

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000281

| General Information | |
|---|---|
| **Hospital Name:**<br>Saint Thomas Outpatient Neurosurgical Center, LLC | |
| **Federal Tax ID Number:**<br>62-1802891 | |
| **Hospital NPI:**<br>1538139811<br>* If Hospital has multiple NPIs, please include explanation and claim samples | **Practice Website:** |

| Service Address |
|---|
| * If Hospital has multiple addresses please attach a list with all addresses |
| **Service Address:**<br>4230 Harding Road, Suite 901 |
| **City:**<br>Nashville |
| **State:**<br>TN |
| **Zip:**<br>37205 |
| **Contact Person Name:**<br>Cindy Williams |
| **Email Address:**<br>cwilliam@stthomas.org |
| **Telephone Number:**<br>615-284-7839 |
| **Facsimile (FAX) Number:**<br>615-284-7403 |
| **County:**<br>Davidson |

| Remit Address |
|---|
| **Address:**<br>PO Box 305172 – Dept 16 |
| **City:**<br>Nashville |
| **State:**<br>TN |
| **Zip:**<br>37230-5172 |
| **Contact Person Name:**<br>Deborah Schamberg |
| **Email Address:** |
| **Telephone Number:**<br>615- 341-7170 |
| **Facsimile (FAX) Number:**<br>615- 341-3568 |

| For ChoiceCare Use Only | | |
|---|---|---|
| Nomination | ☐ Yes | ☐ No |

CHC Hosp 09-2007 TN A

15

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

STHe_JVMC000282