**EXHIBIT B**

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE ELKHART SUPERIOR COURT NO. 1 |
| | )SS: | |
| COUNTY OF ELKHART | ) | CAUSE NO: 20D01-1410-CT-216 |

JOE ALCOZAR, et al.  )
Plaintiffs,  )
  )
v.  )
  )
ORTHOPEDIC AND SPORTS MEDICINE  )
CENTER OF NORTHERN INDIANA, et al.  )
Defendants.  )

*FILED IN OPEN COURT NOV 1 2 2015 CLERK ELKHART SUPERIOR COURT NO. 1*

## ORDER ON PENDING MATTERS

This Order addresses the parties' motions for summary judgment on two central issues:  (1) the applicability of the Medical Malpractice Act to Plaintiffs'[1] claims and (2) whether Medical Protective Company has a duty to defend and indemnify, at least to some extent, Orthopedic and Sports Medicine Center of Northern Indiana ("OSMC").  In reaching the conclusions below, the Court considered the following filings:

1.   The Motion for Summary Judgment and attachments filed by certified mail on 5/15/2015 by Medical Protective Company and Medical Protective Services, Inc. (collectively, "Medical Protective").

---

[1]   The Court will refer generically to all plaintiffs to this declaratory judgment action and similarly situated intervenors as "Plaintiffs."  At this time and pending before this Court are the following cases:

| | |
|---|---|
| 20D01-1404-CT-72 | 20D01-1404-CT-79 |
| 20D01-1404-CT-80 | 20D01-1404-CT-81 |
| 20D01-1404-CT-82 | 20D01-1406-CT-113 |
| 20D01-1406-CT-122 | 20D01-1407-CT-133 |
| 20D01-1407-CT-134 | 20D01-1407-CT-144 |
| 20D01-1407-CT-145 | 20D01-1408-CT-156 |
| 20D01-1408-CT-161 | 20D01-1408-CT-166 |
| 20D01-1408-CT-167 | 20D01-1409-CT-176 |
| 20D01-1409-CT-201 | 20D01-1409-CT-171 |
| 20D01-1409-CT-194 | 20D01-1409-CT-178 |
| 20D01-1409-CT-203 | 20D01-1410-CT-210 |
| 20D01-1410-CT-223 | 20D01-1410-CT-220 |
| 20D01-1503-CT-39 | |

Medicine Center of Northern Indiana, Inc., ASC Surgical Ventures, LLC, OSMC, John Doe Company[2] filed by certified mail on 5/15/2015, along with the attachments.

3.    The Motion for Summary Judgment of Stephen W. Robertson as administrator of the Indiana Patient's Compensation Fund (hereinafter "PCF"), filed by certified mail on 5/15/2015, along with the attachments.

4.    Plaintiffs' Memorandum in Response to the Motions for Summary Judgment, along with attachments, filed 6/25/2015 by certified mail.

5.    OSMC's Response to PCF's and Medical Protective's Motion for Summary Judgment, filed 6/26/2015 by certified mail.

6.    OSMC's Reply to Plaintiffs' Response to the Motions for Summary Judgment, filed by certified mail on 7/8/2015.

7.    Medical Protective's Reply in Support of their Motion for Summary Judgment, filed 7/10/2015 by certified mail.

8.    PCF's Reply in Support of Motion for Summary Judgment, filed 7/10/2015 by certified mail.

The Court heard arguments on 8/7/2015. Plaintiffs appeared by counsel, Attorney Small, Attorney McKeever and Attorney Piatt. PCF appeared by counsel, Attorney Cowgur and Attorney Fulford. Medical Protective appeared by counsel, Attorney Peterson. OSMC appeared by counsel, Attorney Hardman. At the hearing, PCF requested that the Court enter findings of fact and conclusions of law under Ind. Trial Rule 52, and the Court granted that request. The Court provided the parties forty-five (45) days to tender proposed findings of fact and conclusions of law. The Court also considered the parties' proposed findings of fact and conclusions of law in reaching its own conclusions:

9.    Plaintiffs' proposed Findings of Fact and Conclusions of Law, filed by certified mail on 9/17/2015.

10.   PCF's Submission of Proposed Findings of Fact & Conclusions of Law, filed by certified mail on 9/21/2015.

---

[2]    The Court will refer to these defendants collectively as "OSMC." The Court will refer to the individual organizations by their full names.

11.   OSMC's proposed Findings of Fact and Conclusions of Law, filed by certified mail on 9/21/2015.

12.   Medical Protective's proposed Findings of Fact and Conclusions of Law, filed by certified mail on 9/21/2015.

Upon receiving all of the parties' proposed findings of fact and conclusions of law, the Court took the matter under advisement.

Having reviewed the filings and heard argument, the Court GRANTS OSMC's motion for summary judgment, DENIES PCF's motion for summary judgment, and GRANTS Medical Protective's motion for summary judgment.   Based upon the aforementioned filings and argument, the Court enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT[3]

1.   Plaintiffs are residents of Indiana and Michigan.

2.   OSMC operates medical clinics in Indiana.[4]

3.   Medical Protective provides medical malpractice insurance to OSMC.[5]

4.   Broadly, the medical malpractice insurance coverage policy requires Medical Protective to defend and indemnify OSMC "[i]n any claim based upon professional services," subject to four exclusions:

a.   Criminal acts and willful torts,

---

[3]      This Order addresses various motions for summary judgment.  Accordingly, these "Findings of Fact" are a statement of the undisputed material facts.

[4]      Compl. ¶ 1.  The Court acknowledges that generally allegations from a complaint are not an appropriate basis for factual findings.  However, the central question in this declaratory judgment action is whether Plaintiffs' complaint sounds in medical malpractice or general negligence.  For the sake of brevity and clarity, the Court will not repeat that findings citing to the complaint are merely allegations. Additionally, to avoid confusion, "Compl." or "Complaint" refers to the complaint filed in 20D01-1404-CT-72 and the complaint filed with the Department of Insurance as the "DOI Complaint" or "DOI Compl."

[5]      Medical Protective's Ex. A (OSMC Policy) and Ex. B (ASC Policy) are copies of the insurance policies.

      b.      Claims that fall under OSMC's general liability policy,

      c.      Punitive damages, or damages above and beyond compensatory damages, and

      d.      Any amounts that exceed policy limits.[6]

5.      The New England Compounding Center ("NECC") was a compounding pharmacy located in Massachusetts.[7]

6.      In 2005, OSMC began purchasing betamethasone and hyaluronidase from New England Compounding Center.[8]

7.      OSMC began purchasing drugs from NECC after Elkhart General Hospital, which is not a party to this case, began ordering compounded pharmaceuticals from NECC.[9]

8.      Before Elkhart General Hospital ordered pharmaceuticals from NECC, two pharmacists from the hospital traveled to NECC's facilities.[10]

9.      Dr. Gene W. Grove, Sr., M.D. works as the medical director of OSMC and as chairman of the pharmacy and therapeutics board at Elkhart General Hospital.[11]

10.      While acting as chairman of the pharmacy and therapeutics board, Dr. Grove became aware that the Elkhart General Hospital medical staff had authorized NECC as a supplier.[12]

11.      OSMC hires Elkhart General Hospital pharmacists to act as consultants.[13]

---

[6]      OSMC Policy, pp. 1-2 ; ASC Policy, pp. 1-2.

[7]      Compl. ¶¶ 8 & 13.

[8]      Dep. Kauffman-Kennel, p. 9:3-8.

[9]      Dep. Kauffman-Kennel 9:9-10:4; Dep. Grove 13:21-14:17.

[10]      Dep. Grove 13:7-11.

[11]      Dep. Grove 51:18-21.

[12]      Dep. Grove 14:11-17.

[13]      Dep. Grove 14:20-15:16.

12.     OSMC's trust in Elkhart General Hospital's vetting process for pharmaceutical suppliers played a role in OSMC's authorization of NECC as a supplier.[14]

13.     In 2006, OSMC decided to use preservative-free methylprednisolone acetate ("MPA").[15]

14.     Physicians at OSMC determined that preservative-free steroids are safer for patients because preservatives may cause arachnoiditis and damage the spinal cord.[16]

15.     Commercial drug manufacturers do not produce MPA in a preservative-free form.[17]

16.     OSMC decided to purchase preservative-free MPA from NECC because OSMC was already purchasing betamethasone and hyaluronidase from NECC.[18]

17.     OSMC did not seek other potential suppliers of preservative-free MPA.[19]

18.     The medical board at OSMC authorized the use of preservative-free MPA.[20]

19.     The medical board at OSMC authorized NECC as a supplier of medications.[21]

20.     Plaintiffs allege that compounding pharmacies may not mass produce pharmaceuticals, but rather must produce drugs for individual patients.[22]

21.     Mass producers of pharmaceuticals must receive special licenses and are

---

[14]     Dep. Grove 23:4-10.

[15]     Dep. Kauffman-Kennel 11:10-15, Dep. Grove 22:18-20.

[16]     Dep. Grove 22:2-12.

[17]     Dep. Kauffman-Kennel at 10:25, Dep. Grove at 16:22-25.

[18]     Dep. Kauffman-Kennel 11:18-12:1.

[19]     Dep. Grove 22:25-23:11.

[20]     Dep. Grove 20:18-21:4.

[21]     Dep. Grove 22:21-24.

[22]     Compl ¶¶ 36-37.

subject to greater FDA oversight.[23]

22.    Drugs acquired from a compounding pharmacy generally involve greater risk than drugs acquired from a mass producer.[24]

23.    In 2012, the Center for Disease Control ("CDC") began investigating an outbreak of fungal meningitis, lumbar fungal infections, and similar diseases.[25]

24.    The CDC traced the outbreak to three lots of preservative-free MPA that NECC produced.[26]

25.    Approximately 17,676 vials of preservative-free MPA originated from the contaminated lots.[27]

26.    A recall was issued, and only approximately 3,000 vials were returned, with approximately 14,000 doses having been previously administered.[28]

27.    A number of the returned vials contained visible particulate and other foreign matter.[29]

28.    Fifty (50) of the returned vials were tested for sterility, and all of them contained viable microbial growth.[30]

29.    OSMC's alleged negligence caused Plaintiffs' injuries.[31]

30.    Plaintiffs' Proposed Complaint, filed with the Department of Insurance ("DOI

---

[23]    Compl. ¶¶ 27-31.

[24]    Compl. ¶¶ 41-48.

[25]    Compl. ¶¶ 54-57.

[26]    Compl. ¶¶ 54-57.

[27]    Compl. ¶¶ 58-59.

[28]    Compl. ¶¶ 58-59.

[29]    Compl. ¶¶ 86-87.

[30]    Compl. ¶¶ 86-87.

[31]    Compl. ¶ 155.

Complaint") alleges that OSMC breached the standard of care with the following acts and omissions:[32]

a.      OSMC failed to exercise reasonable and prudent care to ensure that the drug they purchased were made by NECC in compliance with all applicable pharmaceutical laws;

b.      OSMC failed to exercise reasonable and prudent care to ensure that the drug they purchased were sold to them by NECC in compliance with all applicable pharmaceutical laws;

c.      OSMC failed to use the appropriate, necessary and reasonable due diligence and investigatory steps and measures necessary to vet, evaluate and determine the safety and quality of NECC's drugs, and in particular, determine if NECC could properly and legally compound, package and provide sterile preservative free drugs;

d.      OSMC failed to exercise reasonable and prudent care to ensure that the drugs they procured were produced in sanitary, sterile conditions;

e.      OSMC failed to exercise reasonable care to avoid procuring drugs that were adulterated, contaminated and unreasonably dangerous;

f.      OSMC failed to conduct adequate due diligence regarding whether NECC was a reputable and safe supplier of sterile injectable compounds;

g.      OSMC failed to visit NECC's facilities before procuring compounded drugs, and other medicines, from NECC;

h.      OSMC failed to investigate and exercise sufficient due diligence before purchasing from NECC, including failing to investigate or inquire concerning NECC's compounding practices, standard operating procedures, pharmacist training, and risk management protocols;

I.      OSMC failed to determine whether NECC had a history of recalling compounded medications before procuring medicines from that company;

j.      OSMC failed to investigate NECC's regulatory history with the FDA and/or the Massachusetts Board of Registration in Pharmacy before procuring drugs from NECC;

k.      OSMC failed to determine whether NECC had a history of product liability suits before procuring medicines from that company;

l.      OSMC failed to keep abreast of the dangers of sterile compounding;

---

[32]      DOI Compl. ¶ 12.

m.      OSMC purchased compounded drugs in bulk from NECC without using patient specific individual prescriptions;

n.      OSMC failed to adequately supervise and train the agents and employees who ordered drugs from NECC;

o.      OSMC failed to implement policies and procedures that would prevent the procurement of purportedly sterile drugs from an out-of-state compounding pharmacy with a deplorable facility and sterility procedures, a checkered regulatory past, product recall problems, and a history of product liability suits;

p.      OSMC failed to exercise reasonable care in such other manners as may be shown through discovery and trial.

## CONCLUSIONS OF LAW

### Jurisdiction and Standard of Review

1.      The Court has jurisdiction to hear this declaratory judgment action, which is on the applicability of the Medical Malpractice Act (hereinafter "MMA") to the claims asserted in Plaintiffs' underlying complaints.[33]

2.      The Court may only grant summary judgment if "the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[34]

3.      The Parties agree, and the Court concludes, that there is no genuine issue of material fact, and the question before the Court is a pure question of law.

4.      The decision of whether to grant summary judgment in this case "ultimately turns on whether [Plaintiffs] stated a claim in negligence or medical malpractice."[35]

### Medical Malpractice Claims

---

[33]    *Preferred Prof'l Ins. Co. v. West*, 23 N.E.3d 716, 724-26 (Ind. Ct. App. 2014), *trans. denied*.

[34]    *Anonymous Hosp., Inc. v. Doe*, 996 N.E.2d 329, 332 (Ind. Ct. App. 2013), *trans. denied*.

[35]    *Id.*

5.    Whether the MMA applies to a claim is question of law for the Court.[36]

6.    The MMA does not apply to all claims against medical providers, and a claim against a medical provider grounded in general negligence instead of medical malpractice falls outside the scope of the MMA.[37]

7.    Even if an injury occurs at a healthcare provider's facility and the injured person is a patient at that facility, those facts are not sufficient to determine whether the MMA is applicable.[38]

8.    The Court examines the substance of a claim to determine whether the MMA applies.[39]

9.    According to the Court of Appeals, "the test to determine whether a claim sounds in medical malpractice is whether the claim is based on the provider's behavior or practices while acting in his professional capacity as a provider of medical services."[40]

10.    Another panel of the Court of Appeals stated, "The MMA covers 'curative or salutary conduct of a health care provider acting within his or her professional capacity,' i.e., it must be undertaken in the interest of or for the benefit of the patient's health."[41]

11.    In *West*, the court quoted an earlier decision from a separate panel:

A case sounds in ordinary negligence [rather than medical negligence] where the factual issues are capable of resolution by a jury without application of the standard of care prevalent in the local medical community. By contrast, a claim falls under the Medical Malpractice Act where there is a causal connection between the conduct

---

[36]    *Id.*

[37]    *Peters v. Cummins Mental Health, Inc.*, 790 N.E.2d 572, 576 (Ind. Ct. App. 2003).

[38]    *Estate of O'Neal ex rel. Newkirk v. Bethlehem Woods Nursing & Rehab. Ctr.*, 878 N.E.2d 303, 311 (Ind. Ct. App. 2007).

[39]    *Doe by Roe v. Madison Ctr. Hosp.*, 652 N.E.2d 101, 104 (Ind. Ct. App. 1995), *trans. dismissed.*

[40]    *Doe*, 996 N.E.2d at 333 (internal citations and quotations omitted).

[41]    *West*, 23 N.E.3d at 727 (quoting *Collins v. Thakkar*, 552 N.E.2d 507, 510 (Ind. Ct. App. 1990)).

complained of and the nature of the patient-health care provider relationship.[42]

12.     The Indiana Supreme Court has held, "to fall outside the Malpractice Act a health care provider's actions must be demonstrably unrelated to the promotion of the plaintiff's health or an exercise of the provider's professional expertise, skill, or judgment."[43]

13.     The Parties disagree as to whether Plaintiffs' alleged acts of negligence are properly considered acts of "health care," which is statutorily defined:

> "Health care" means an act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement.[44]

## Identification of the Issue

14.     PCF asserts that Plaintiffs only allege that two events were negligent, and PCF argues that those two events do not fall within the scope of the MMA.  Those two events are (1) OSMC's decision to use preservative-free MPA, instead of MPA containing preservatives, and (2) the procurement of preservative-free drugs from NECC.

15.     Whereas, Plaintiffs and OSMC argue that the Court should consider these two events as part of a broader course of treatment for these patients' back pain.

## Review of Case Law

17.     The parties direct the Court to five (5) cases that distinguish medical malpractice from premises liability and products liability.

### *Premises Liability*

18.     The PCF focuses on three cases in which the Court of Appeals analyzed whether the plaintiffs' claims fell within the scope of the MMA or constituted common law premises liability claims.

---

[42]     *Id.* (citing *Terry v. Cmty. Health Network, Inc.,* 17 N.E.3d 389, 393 (Ind. Ct. App. 2014)).

[43]     *Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182, 186 (Ind. 2011).

[44]     Ind. Code § 34-18-2-3 (1998).

19.     In *Harts v. Caylor–Nickel Hospital, Inc.*, a patient alleged, by affidavit, that he suffered injuries because his bed rail collapsed as he attempted to roll over, causing him to fall out of bed.[45]  Harts further alleged, "[the hospital's] employees failed to properly restrain or secure the side guardrail, and their negligence caused my fall."[46]  The Court of Appeals held,

> The tenor of Harts' complaint taken as a whole clearly supports an allegation of ordinary negligence. We cannot say that these allegations were part and parcel of diagnosis and treatment which would subject his claim to coverage under the Act. He did not allege any breach of duty directly associated with medical negligence that was integral to the rendering of medical treatment that would subject his claim to the Medical Malpractice Act.

20.     In *Putnam Cnty. Hosp. v. Sells*, Sells alleged that the healthcare provider had negligently failed to raise her bed rails, which caused the anaesthetized patient to fall from the bed and sustain injuries to her face.[47]  The *Sells* court distinguished *Harts*, noting that unlike Harts, Sells did not allege "faulty premises or equipment," but "challenges the health care decisions of the Hospital made in regard to . . . Sells while she was under general anesthesia recovering from a surgical procedure."[48]  Moreover, failure to raise the bed rails constituted merely one aspect of a fact pattern that showed the allegedly negligent conduct was *medically*, and not simply generally, negligent.  The patient was under anesthesia at the time of the injury, and the allegedly negligent conduct included "failing to properly train and supervise . . . staff members with regard to proper procedure for monitoring patients in the recovery room following surgery" and "failing to properly monitor and observe Leann Sells in the recovery room, failing to insure that railings were in place on her recovery room bed and failing to take proper steps to insure that Leann Sells would not injure herself while under anesthesia."[49]  These allegations led the court to conclude that the "complaint [fell] squarely within the scope of the [MMA]."[50]

21.     In *Pluard v. Patients Compensation Fund*, an infant suffered injuries to his head when a surgical lamp detached from the wall and struck him as a nurses' assistant

---

[45]     553 N.E.2d 874, 879 (Ind. Ct. App. 1990).

[46]     *Id.*

[47]     619 N.E.2d 968, 969 (Ind. Ct. App. 1993).

[48]     *Id.* at 971.

[49]     *Id.*

[50]     *Id.*

adjusted the lamp's position.[51]  The Court of Appeals held,

> The nurses' assistant's manipulation of the light, while very close in time to the light's falling on Pluard, has not been alleged to have caused his injury. Pluard was injured because the light fell on him; the light fell on him because it was not properly attached to the wall. Put another way, the duty to secure the light, and even the nurses' assistant's duty to position it, did not involve a health care decision involving the exercise of professional skill or judgment. Instead, it involved the general duty to maintain safe premises and equipment. As such, it involves issues capable of resolution without application of the standard of care prevalent in the local medical community, and thus, is outside the purview of the Act, which requires convening a panel of medical experts for the purpose of judging a completely different kind of question. Even when we view the evidence in the light most favorable to Pluard, and accept the proposition that the light fixture's fall was sufficiently proximate in time as to make it part of the ongoing care of Pluard, the nurses' assistant being under the direction of the surgeon, it still was not an event that required the exercise of professional skill and judgment.

### Products Liability

22.    Plaintiffs and OSMC direct the Court to two cases in which the Court of Appeals analyzed whether the plaintiffs were required to bring certain products liability claims against health care providers in accordance with MMA procedure.

23.    In *St. Mary Med. Ctr., Inc. v. Casko*, the plaintiff brought a products liability claim against the hospital that installed an allegedly defective pacemaker.[52]  Casko appealed the trial court's decision to deny the hospital's motion to dismiss the claim due to expiration of the statute of limitations under the MMA.[53]  The court was required to determine whether the MMA applied to the plaintiff's claim and concluded that the MMA did, in fact, apply.[54]  In so concluding, the court found that "unlike [the premises liability cases that Casko cited], where the allegations of negligence were unrelated to a scheme of health care, the provision of a pacemaker is clearly a part of the overall medical services

---

[51]    705 N.E.2d 1035, 1037-38 (Ind. Ct. App. 1999), *trans. denied.*

[52]    639 N.E.2d 312, 313 (Ind. Ct. App. 1994).

[53]    *Id.*

[54]    *Id.* at 315.

provided by the hospital."[55]  **The court, in effect, agreed with the hospital's position that "the sale of various items necessary for a patient's treatment are merely incidental to the overall purpose of providing health care,"[56] a position derived from *Dove by Dove v. Ruff.*** (Emphasis mine).

24.     In *Dove,* the Court of Appeals held that a products liability claim against an allergist who had compounded an injectable drug for a patient, to be administered by someone outside his office, that allegedly caused anaphylaxis in the patient, fell within the scope of the MMA.[57]  The court held that "the sale [of the compounded medication] was incidental to the delivery of medical services."[58]  Importantly, the court did not focus upon the single transaction but rather characterized the transaction as one piece in a broader course of treatment.[59]  The court did not find that premises liability cases were helpful, in this products liability case, in deciding the ultimate question: whether the health care provider "was acting in his professional capacity."[60]

## Decision

25.     After review of the case law, the Court concludes that the decision in this action turns on whether the Court narrows its characterization of the allegedly negligent act to OSMC's procurement of MPA and ignores the role that the procurement process played in the broader context of the treatment of back pain.  The Court declines to take such a narrow view.

26.     As in *Dove* and *Casko,* the Court finds that the premises liability cases the PCF cites are easily distinguishable and not relevant to Plaintiffs' claims.  Bed rails and surgical lamps are goods that will benefit many patients and those goods must be maintained, as with any premises. Conversely, OSMC purchased, or should have

---

[55]     *Id.*

[56]     *Id.* at 313.

[57]     558 N.E.2d 836, 840 (Ind. Ct. App. 1990).

[58]     *Id.* at 839.

[59]     *Id.* at 838 ("By its nature, the practice of medicine is primarily a service, but there are times when goods are provided to patients incidental to the delivery of health care services.  The providing of such goods does not normally remove the health care professional from the protection of the Malpractice Act.")

[60]     *Id.* at 840.

purchased, preservative-free MPA for a specific patient during the course of that patient's treatment. The Court acknowledges that *Dove* and *Casko* were products liability cases, not negligence cases. Yet, the value of these two cases flows from their characterization of the allegedly negligent conduct as a piece of the overall provision of healthcare, not the correlation of claims that the patients in those cases brought.

27.    Even if the only act that Plaintiffs alleged to be negligent were the procurement of MPA,[61] the decision to procure MPA in bulk from a compounding pharmacy was only one step taken to treat the patients' medical needs.

28.    The Court concludes that as in *Dove* and *Casko*, OSMC's allegedly negligent procurement of MPA was merely incidental to the provision of medical services: injections of pain-relieving steroids directly into the spine.

29.    The decisions to use preservative-free MPA and to purchase that product from NECC were salutary conduct undertaken for the benefit of these patients' health.

30.    These actions are not demonstrably unrelated to the promotion of the Plaintiffs' health.  The actions were taken to treat the patients' back pain.

31.    Nor are these actions demonstrably unrelated to OSMC's professional expertise, skill, or judgment.  The decision to use preservative-free MPA was a medical decision made for the benefit of the patients, and OSMC's choice of NECC as supplier was a decision based on the medical board's professional expertise and judgment.

32.    The question of whether OSMC's procurement practices and decision to acquire preservative-free MPA from NECC fell below the standard of care is a question most suitable for a panel of medical doctors, not a jury composed of laypersons.

33.    Viewed in the larger context of treatment, OSMC's doctors and employees were acting in their professional capacity as a provider of healthcare when they purchased MPA from NECC, on behalf of OSMC patients.

34.    Accordingly, Plaintiffs' claims fall within the scope of the MMA.

35.    Furthermore, PCF's argument - that OSMC's decision to purchase preservative-free MPA from a compounding pharmacy, instead of MPA that contained preservatives from an FDA-approved manufacturer, did not cause Plaintiffs' injuries - is improper at this stage of the proceedings.  Causation is relevant to the merits of Plaintiffs'

---

[61]    Plaintiffs also bring a claims sounding in informed consent.

claims, not whether OSMC's doctors were acting in the professional capacity when they made the decision to use preservative-free MPA.

36.     OSMC's motion for summary judgment is GRANTED and PCF's motion for summary judgment is DENIED.

## Medical Protective

37.     The Court finds there is no genuine issue of material fact and Medical Protective is entitled to judgment on the contract interpretation issues presented to the Court.

38.     No party opposes Medical Protective's motion.

39.     Medical protective has acknowledged a duty to defend OSMC.  The Court agrees that Medical Protective has a duty to defend OSMC in this matter.

40.     Medical Protective has a duty to indemnify OSMC, except to the extent that the insurance policies limit Medical Protective's liability.

41.     Medical Protective's policies with OSMC do not cover, *inter alia*, criminal acts and willful torts, claims that fall under OSMC's general liability policy, punitive damages or damages above and beyond compensatory damages, and any amounts that exceed policy limits.

42.     The applicability and extent of those exclusions is **not** an issue before the Court and the Court merely finds that the insurance policy contains those limitations on coverage.

43.     Accordingly, as specifically noted herein, Medical Protective's motion for summary judgment is GRANTED.

**Conclusion**

Based upon the foregoing, PCF's motion for summary judgment is DENIED. OSMC's motion for summary judgment is GRANTED and Medical Protective's motion for summary judgment is GRANTED.

ORDER ENTERED this 12th day of November, 2015. Copy of Order and Notice to attorneys of record electronically. Counsel for OSMC directed to file a copy of this Order with the St. Joseph Superior Court.

_____
Evan S. Roberts
Judge, Elkhart Superior Court No. 1

FILED
IN OPEN COURT

NOV 1 2 2015

CLERK ELKHART SUPERIOR
COURT NO. 1