IN THE FIFTH CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE

WAYNE A. REED, individually and as        )
husband and next of kin of decedent,      )
DIANA E. REED,                            )
                                          )
            Plaintiff(s),                 )
                                          )
v.                                        )
                                          )         No. 13C417
SAINT THOMAS OUTPATIENT                   )         Jury Demand
NEUROSURGICAL CENTER, LLC,                )
HOWELL ALLEN CLINIC a Professional        )
Corporation, SAINT THOMAS                 )
NETWORK, SAINT THOMAS HEALTH,             )
and ST. THOMAS HOSPITAL,                  )
                                          )
            Defendants.                   )

## MOTION TO COMPEL

### Introduction

Plaintiff Wayne Reed respectfully moves this Court for an order compelling the Defendants Saint Thomas Outpatient Neurosurgical Center, LLC ("Saint Thomas Neurosurgical") and Howell Allen Clinic to provide full and complete responses to certain interrogatories and requests for production.

In their discovery responses, the Defendants assert numerous boilerplate objections, and they refuse to provide critical information. For example, the Defendants refuse to identify certain key witnesses, and they refuse to produce important photographs. Defendants repeatedly assert various statutory privileges even though those privileges are not intended to shield the type of information requested by Mr. Reed.

Defendants' discovery responses violate Tenn. R. Civ. P. 26.02(5) by failing to provide sufficient information that would enable the Plaintiff and/or this Court to evaluate whether Defendants' claim of privilege is valid. For example, Defendants repeatedly assert the Peer

Review Committee privilege as well as the Quality Improvement Committee privilege. However, Defendants fail to provide any information regarding those purported committees. Defendants do not identify the name of the subject committee, the identities of the members of the committee, the function of the committee, whether committee meetings actually occurred, or any other information that would permit Plaintiff's counsel to determine the validity of Defendants' purported privilege claim. Defendants bear the burden of establishing that their claim of privilege is valid, and they cannot meet that burden.

The Defendants' deficient discovery responses are attached as Exhibits A-D respectively, and specific responses that are the subject of this motion are listed below.[1] Plaintiffs respectfully request that the Court order the Defendants to supplement their responses to the interrogatories and requests discussed below.

### Background

In this litigation, Plaintiffs assert strict product liability claims and other claims arising from Defendants' sale and distribution of steroids contaminated with deadly fungus. Plaintiffs base those claims upon provisions of the Tennessee Products Liability Act of 1978. Tenn. Code Ann. § 29-28-101 *et seq.* That Act expressly authorizes claims for strict tort liability against sellers and distributors of defective or unreasonably dangerous products when the product maker cannot be served with process in Tennessee or has been judicially declared insolvent. See Nye v. Bayer Cropscience, Inc., 347 S.W.3d 686 (Tenn. 2011); and Tenn. Code Ann. 29-28-106(4)&(5).

In addition to claims for strict product liability, Plaintiffs also assert negligence claims. Plaintiffs assert that one or more of the Defendants acted carelessly and recklessly in deciding to

---

[1] Plaintiff's listing of certain deficient responses in this motion is not intended to imply that Defendants' other responses are complete. It may be necessary for the Plaintiff to request supplemental responses to other interrogatories and requests in the future. However, given present time constraints, the responses identified in this motion are those most critical for the upcoming depositions.

procure purportedly sterile injectable steroids from New England Compounding Pharmacy, Inc. ("NECC").  Plaintiffs assert that Defendants failed to investigate NECC adequately, if at all, before buying injectable medicines from that out-of-state pharmacy.  If Defendants had investigated NECC before buying medications from it, they would have discovered:  (1) that NECC had a terrible regulatory history; (2) that NECC had been sued previously because its unsterile products injured or killed other people; and (3) that NECC operated its purportedly sterile compounding pharmacy on a site shared with a garbage compacting operation.

Saint Thomas Neurosurgical injected steroids purchased from NECC without doing anything to investigate the legitimacy of that out-of-state "compounding pharmacy."  That conduct resulted in numerous deaths and illnesses.  In fact, according the U. S. Centers for Disease Control and Prevention ("CDC"), 15 people died in Tennessee and 152 people contracted fungal infections, as a result of the fungal meningitis outbreak.[2]

**Argument**

The public policy of this State is to encourage open and liberal discovery. "The rules favor discovery. Thus the party opposing discovery must demonstrate with more than conclusory statements and generalizations that the discovery limitations being sought are necessary to protect it from, among other things, oppression or undue burden or expense." State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Trust, 209 S.W.3d 602, 615 (Tenn. Ct. App. 2006).

A party claiming a privilege bears the burden of proving that the privilege applies to each element of information for which the privilege is asserted.  See D. Paine, S. Sheppard, N. Cohen, Tennessee Law of Evidence§ 501.3 (1995) and In re Southern Ind Banking Corp., 35 B.R. 643, 647 (Bkrtcy. 1983) ("the burden of proof to establish the existence of the privilege rests upon the

---

[2] See http://www.cdc.gov/hai/outbreaks/meningitis-map-large.html.

claimant") (citing <u>Weil v. Investment, Inc.</u>, 647 F.2d 18, 25 (9th Cir. 1981), and <u>In re Blier Cedar</u> <u>Co., Inc.</u>, 10 B.R. 993 (Bkrtcy. D. Me. 1981)). Statutory privileges are to be strictly construed in favor of discoverability/admissibility. <u>In re Southern Ind. Banking Corp.</u>, 35 B.R. at 647 (considering application of the attorney-client privilege and noting that, "Because it is an obstacle to the investigation of the truth, 'the privilege must be strictly confined within the narrowest possible limits consistent with the logic of its principle.'").

In <u>Lee Medical v. Beecher</u>, 312 S.W.3d 515 (Tenn. 2010), the Tennessee Supreme Court announced three guiding principles that should be applied when construing statutory privileges. The first principle is that <u>Tennessee favors broad discovery</u>. <u>Id.</u> at 525. That principle enables parties and courts "to seek the truth so that disputes will be decided by facts rather than by legal maneuvering." <u>Id.</u> "The second principle is that privileges present obstacles to the search for the truth." <u>Id.</u> (*citing* VIII John H. Wigmore, *Evidence* § 2196, at 111 (McNaughten Rev. 1961) (hereinafter "Wigmore"); *see also* 23 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5422, at 677 (1980). The third principle "is that rules of evidence generally disfavor privileges in civil proceedings." <u>Id.</u>

An application of those guiding principles reveals that the Defendants' boilerplate objections should be overruled. Specifically, the Defendants repeatedly object to Plaintiff's discovery requests based upon the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219 and the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272. Defendants attempt to use those statutory privileges in order to conceal the identity of a pharmacist that the Defendant Saint Thomas Neurosurgical consulted in connection with its purchase of injectable steroids from NECC and any communications between the pharmacist and the Defendants' representatives. However, nothing in those statutory

privileges provides for the concealment of the name of a potential witness.  Nothing in those statutes prevents litigants from discovering whether a particular person is, or is not, a member of a Peer Review Committee or Quality Improvement Committee.

Defendants are attempting to hamper the search for the truth without demonstrating that their claim of privilege is real or justified.  The law does not allow Defendants to withhold information under a claim of privilege while simultaneously failing to comply with Rule 26.02(5).  That rule expressly requires a party who withholds information based upon a claim of privilege to provide sufficient information that will allow the requesting party to assess the applicability of the privilege.  Specifically, the Rule 26.02(5) provides:

> **(5) Claims of Privilege or Protection of Trial Preparation Materials.** When a party withholds information otherwise discoverable under the rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege protection.

Defendants fail to provide any information suggesting that their reliance of the Peer Review Committee privilege and/or the Quality Improvement Committee privilege is justified. Defendants do not identify the name of the subject committee, the identities of the members of the committee, the function of the committee, whether committee meetings actually occurred, or any other information that would permit either the Plaintiff or this Honorable Court to determine the validity of Defendants' privilege claim.  Defendants bear the burden of establishing that their claim of privilege is valid, and they cannot meet that burden.

The Plaintiff Wayne Reed respectfully requests that this Court compel supplemental responses to the following requests:

- Saint Thomas Neurosurgical's responses to Interrogatories 2 & 17

- Saint Thomas Neurosurgical's responses to Requests for Production 25, 32-35, 56 & 66

- Howell Allen Clinic's responses to Interrogatories 2

- Howell Allen Clinic's responses to Requests for Production 13, 27, 31, 32-37, & 69

Defendants responses to those requests are included in <u>Exhibits A-D</u> respectively. Plaintiff's counsel will appear at the time scheduled for the hearing of this motion prepared to discuss each of those responses.

LEADER, BULSO & NOLAN, PLC

By: _____
George Nolan (BPR No. 14974)
William D. Leader, Jr. (BPR No. 9531)
414 Union Street, Suite 1740
Nashville, Tennessee 37219
(615) 780-4114

*Attorneys for Plaintiffs Wayne Reed, Fred and Loduska May, and Mae Parman*

### NOTICE OF HEARING

**THIS MOTION IS EXPECTED TO BE HEARD ON TUESDAY, MAY 14, 2013 AT 1:00 P.M.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished by Email and U.S. Mail, postage prepaid, to:

C.J. Gideon, Jr.
Chris J. Tardio
Gideon, Cooper & Essary, PLC
315 Deaderick Street, Suite 1100
Nashville, TN 37238

Mary M. Bers
Joseph Ahillen
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207

Mark P. Chalos
Lieff, Cabraser, Heimann & Bernstein, LLP
One Nashville Place
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219-2423

this 8th day of May, 2013.

Lela Hollabaugh
Amy D. Hampton
Bradley Arant Boult Cummings, LLP
1600 Division Street, Suite 700
Nashville, TN 37203

John O. Belcher
Lassiter, Tidwell & Davis PLLC
One Nashville Place
150 Fourth Avenue North, Suite 1850
Nashville, TN 37219

George Nolan

# EXHIBIT A

IN THE FIFTH CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE

| | | |
|---|---|---|
| WAYNE A. REED, individually and as husband and next of kin of decedent, DIANA E. REED, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 13C417 Jury Demand |
| ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC, HOWELL ALLEN CLINIC, a Professional Corporation, SAINT THOMAS NETWORK, SAINT THOMAS HEALTH, and SAINT THOMAS HOSPITAL | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Tennessee Rules of Civil Procedure, St. Thomas Outpatient Neurosurgical Center, LLC ("STOPNC"), by and through undersigned counsel, provides the following responses to Plaintiff Wayne Reed's First Set of Interrogatories.

2.      Identify each communication (including face-to-face, telephone, email, or other communications) between NECC (including its agents, employees or representatives) and Saint Thomas Neurosurgical (including its agents, employees or representatives).   For each communication identified, please provide the following information:

      a)    the names, job titles, and contact information for each person involved in the communication;

      b)    the date, time, length, mode and location of each communication or discussion;

      c)    whether any notes, memoranda, recordings, writings or other records were kept of any of those conversations or communications; and

      d)    state as specifically as possible what each party to the communication or conversation said and state what actions Saint Thomas Neurosurgical took, if any, as a result of each communication or conversation.

RESPONSE:

OBJECTION. Counsel for STOPNC objects to this Interrogatory on the grounds that it is overbroad. Furthermore, Counsel for STOPNC objects to this Interrogatory on the grounds that it seeks information privileged from discovery by the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219 and/or the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272. Specifically, STOPNC's discussions with its pharmacist consultant and any outside pharmacist regarding NECC are privileged from discovery and protected from use in this lawsuit as communications with a quality improvement committee. Subject to and without waiving said objections, the Defendant states that the following are believed to be the communications with NECC:

**2010 FASCA Conference in Franklin, TN**

Debra Schamberg spoke with John Notarianni as described in Response to Interrogatory #1. Ms. Schamberg remembers few specific details about the conversation, but she does recall specifically discussing Omnipaque with Mr. Notarianni. Ms. Schamberg can be contacted through counsel for STOPNC. STOPNC's last known contact information for Mr. Notarianni is below. Ms. Schamberg did not make any record of the conversation. Ms. Schamberg believes she gave a business card to Mr. Notarianni.

John L. Notarianni
Regional Sales Manager
Medical Sales Management
Representing: NECC
Cell Phone: (508)454-0779
jnotarianni@medicalsalesmgmt.com

**Periodic Calls from Notarianni**

Mr. Notarianni called every couple months to see whether NECC could offer anything to STOPNC. Ms. Schamberg did not make any records of these calls or take any actions based on them.

**Phone call on May 4, 2011**

Mr. Notarianni contacted Ms. Schamberg by telephone on May 4, 2011, as he typically would every couple months, to solicit STOPNC's business. The substance of the conversation is covered in Response to Interrogatory # 1.

**Emails in May & June 2011**

Ms. Schamberg and Mr. Notarianni exchanged emails through May and June 2011 negotiating on pricing. The emails have been produced in STOPNC's Responses to the Plaintiff's First Set of Requests for Production and speak for themselves regarding the content of the conversations. Ms. Schamberg did not create any additional records regarding the emails. *See* Response to Interrogatory # 1 for additional information.

**Second Phone Call**

It appears from the emails described above that a second phone conversation took place between Ms. Schamberg and Mr. Notarianni regarding pricing of the MPA. Ms. Schamberg made notes on the pricing guide initially provided by Mr. Notarianni. Those handwritten notes have been produced in STOPNC's Responses to Plaintiff's First Set of Requests for Production and speak for themselves. *See* Response to Interrogatory # 1 for additional information.

**June 10, 2011 Email**

On June 10, 2011, Debra emailed Mr. Notarianni to initiate the process of placing an order with NECC. The email has been produced in STOPNC's Responses to Plaintiff's First Set of Requests for Production, and it speaks for itself. *See* Response to Interrogatory # 1 for additional information.

**June 10, 2011 Phone Call**

On June 10, 2011, Mr. Notarianni called Ms. Schamberg to discuss the mechanics of placing an order. The credit application and order have been produced in STOPNC's Responses to Plaintiff's First Set of Requests for Production and speak for themselves. No additional records were created by Ms. Schamberg as a result of the call. *See* Response to Interrogatory # 1 for additional information.

**2011 FASCA Conference**

On September 15 or 16, 2011, Ms. Schamberg attended a FASCA conference in Gatlinburg, TN. Ms. Schamberg recalls briefly speaking with Mario Giamei, Mr. Notarianni's successor sales rep at NECC, but she does not recall anything specific about the conversation. Below is the most recent contact information STOPNC has for Mr. Giamei.

Mario G. Giamei Jr.
Regional Sales Manager
NECC (New England Compounding Center)
Toll Free: (800) 994-6322
Cell Phone: (508) 454-0219
mgiamei@medicalsalesmgmt.com

### Betamethasone Orders

On or about December 12, 2011, Ms. Littleton contacted Mr. Giamei for a price quote on a 2 mL vial of preservative-free betamethasone injectable steroid. Mr. Giamei stated that NECC could provide it for $18 per 2mL vial or that NECC could provide it for $16 per 2 mL vial for orders of at least 100 vials.

Ms. Littleton made some notes during or after the call, which have been produced in STOPNC's Responses to Plaintiff's First Set of Requests for Production. The notes speak for themselves.

Ms. Littleton placed an order for ten (10) 2 mL vials of betamethasone on December 12, 2011. STOPNC continued to order betamethasone from NECC up until the fungal meningitis outbreak.

Ms. Littleton can be contacted through counsel for STOPNC.

### Faxed Orders

Ms. Littleton faxed the orders to NECC. NECC called Ms. Schamberg and confirmed receipt of the orders. No records were made of those calls, and STOPNC took no actions as a result of the calls. Ms. Schamberg does not remember the name of the individual who called to confirm receipt of the orders. The order forms have been produced in STOPNC's Responses to Plaintiff's First Set of Requests for Production and speak for themselves.

### Phone Calls in February 2012

On February 9, 2012, Ms. Schamberg contacted Mr. Giamei, to determine whether NECC could put different colored tops on the 2 mL vials of MPA to help distinguish them from the 1 mL vials.

On February 10, 2012, Mr. Giamei called Ms. Schamberg and informed her that he was working on her request. Mr. Giamei stated that another facility had made a similar request.

On February 13, 2012, Mr. Giamei called Ms. Schamberg and informed her that it would cost $13.50 per 2 mL vial to change the color of the vial cap.

Ms. Schamberg made notes from all three calls which have been produced in STOPNC's Responses to Plaintiff's First Set of Requests for Production. The notes speak for themselves.

STOPNC did not place any orders for 2 mL MPA from NECC after February 15, 2012.

Conversation about needing 500 vials to keep pricing

On April 3, 2012, Ms. Littleton placed an order for 400 1mL vials of MPA. Mr. Giamei contacted Ms. Schamberg and informed her that in order to maintain pricing at $6.50 per vial, STOPNC needed to order at least 500 vials.

Ms. Schamberg made a handwritten note regarding the call which has been produced in STOPNC's Responses to Plaintiff's First Set of Requests for Production. The note speaks for itself.

On April 9, 2012, Ms. Littleton resubmitted the order for 500 vials, and STOPNC ordered 500 vials from that point on.

June 20, 2012 Phone Call and Email with Julia Kinkel re: Omnipaque

On June 20, 2012, Ms. Schamberg contacted NECC to inquire about NECC providing Omnipaque to STOPNC. Ms. Schamberg spoke with Julia Kinkel. Ms. Kinkel emailed advertising information regarding Omnipaque and Isovue to Ms. Schamberg. The email has been produced in STOPNC's Responses to Plaintiff's First Interrogatories and speaks for itself.

Patient Lists

Mr. Giamei stopped by STOPNC in early to mid-2012 and spoke with Ms. Schamberg. He informed Ms. Schamberg that NECC needed STOPNC to submit a list of patients with each order. Debra informed Mr. Giamei that STOPNC would not be able to predict which patients would actually receive the MPA, and Mr. Giamei said that that was fine because NECC just needed a list of patient names. Mr. Giamei stated that the requirement came from the Massachusetts Board of Pharmacy.

Ms. Schamberg consulted with Dr. Culclasure and a pharmacist prior to sending the list of names.

Ms. Schamberg spoke with receptionist Sherri DeZwaan to determine the best way for STOPNC to provide such a list. Ms. DeZwaan suggested printing off the daily patient schedule. For the next several orders, when STOPNC needed to order MPA, Ms. Littleton asked Ms. DeZwaan to print off a list of names, which she did. On at least one occasion, Ms. DeZwaan was not at STOPNC when Ms. Littleton placed an order. Ms. Littleton submitted the order to NECC without a list, and NECC filled the order. The lists have been produced in STOPNC's Responses to Plaintiff's First Set of Requests for Production with patient names and addresses redacted.

### September 20, 2012 Call to NECC regarding Lot Numbers and Sterility Testing

Cindy McClendon called Mr. Giamei on September 20, 2012 (along the suppliers of other medications used during epidural steroid injections) at Dr. Culclasure's request, to check and see whether there had been any other reports of patients with meningitis. Mr. Giamei emailed Ms. McClendon sterility testing results for all three recalled lots to Ms. McClendon. The email and testing results have been produced in STOPNC's Responses to Plaintiff's First Set of Requests for Production. Ms. McClendon can be contacted through counsel for STOPNC.

### Mr. Giamei's visit to STOPNC in September 2012

On September 24, 2012, Mr. Giamei was on his way to a FASCA conference in Memphis and stopped in at STOPNC. Ms. Schamberg and Dr. Culclasure spoke with Mr. Giamei about the fungal meningitis outbreak. Mr. Giamei was adamant that the problem could not have come from NECC. He assured Dr. Culclasure and Ms. Schamberg that "this could not possibly be coming from us." Mr. Giamei stated that NECC complied with applicable sterility procedures and had a state-of-the-art facility. He even invited Ms. Schamberg and Dr. Culclasure to Massachusetts for a tour.

17.    Please describe in detail (including names and dates) the extent to which anyone associated with Saint Thomas Neurosurgical consulted with any pharmacist or hospital pharmacy department regarding whether to purchase medications from NECC in particular or compounding pharmacies in general.

> RESPONSE:
>
> **OBJECTION. Counsel for STOPNC objects to this Interrogatory on the grounds that it seeks information privileged from discovery by the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219 and/or the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272. Specifically, STOPNC's discussions with its pharmacist consultant and any outside pharmacist regarding NECC are privileged from discovery and protected from use in this lawsuit as communications with a quality improvement committee.**

18.    List in detail each entity which had possession or control of any of the MPA administered to Diana Reed from the time of its production to the time of its injection.

> RESPONSE:
>
> **OBJECTION. Counsel for STOPNC objects to this Interrogatory on the grounds that it is unduly burdensome. Subject to and without waiving said objection, STOPNC placed orders with NECC and received shipments from NECC via Fed-Ex.**

## VERIFICATION

STATE OF TENNESSEE            )
                             )
COUNTY OF DAVIDSON           )

I, John W. Culclasure, M.D., Medical Director of Saint Thomas Outpatient Neurosurgical Center, LLC swear and affirm that:

1. I am the Medical Director of STOPNC.

2. I have read the said interrogatories, and the foregoing answers thereto are true according to the best of my knowledge, information, and belief.

SAINT THOMAS OUTPATIENT
NEUROSURGICAL CENTER, LLC

By: John W. Culclasure, M.D.

Its: Medical Director

Sworn to and subscribed before me this 30th day of April, 2013.

_____
**Notary Public**

My Commission Expires:

_Mardi 14, 2017_

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following via hand delivery and Email, on this 30th day of April, 2013:

William D. Leader
George H. Nolan
Leader, Bulso & Nolan
414 Union Street, Suite 1740
Nashville, TN  37219
*Attorneys for Plaintiff*

William H. Lassiter, Jr.
John Overton Belcher
Lassiter Tidwell & Davis
150 4th Avenue North, Ste. 1850
Nashville, TN  37219
*Attorneys for Plaintiff*

Lela M. Hollabaugh
Amy D. Hampton
Bradley Arant Boult Cummings, LLP
1600 Division Street, Suite 700
Nashville, TN  37203
*Attorneys for Defendant Saint Thomas Hospital*

Mary M. Bers
Joseph Ahillen
Office of the Attorney General
PO Box 20207
Nashville, TN  37202-0207
*Attorneys for State of Tennessee*

*Chris J. Tardio // by permission // MHC*

**Chris J. Tardio**

# EXHIBIT B

## IN THE FIFTH CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE

| | |
|---|---|
| WAYNE A. REED, individually and as husband and next of kin of decedent, DIANA E. REED,<br><br>    Plaintiff,<br><br>v.<br><br>ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC, HOWELL-ALLEN CLINIC, a Professional Corporation, SAINT THOMAS NETWORK, SAINT THOMAS HEALTH, and SAINT THOMAS HOSPITAL,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 13C417<br>)   Jury Demand<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

### ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC'S RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT

---

Pursuant to Rules 26 and 34 of the Tennessee Rules of Civil Procedure, St. Thomas Outpatient Neurosurgical Center, LLC ("STOPNC"), by and through undersigned counsel, provides the following responses to Plaintiff Wayne Reed's First Set of Requests for Production.

25.    Produce a copy of all of Saint Thomas Neurosurgical's written policies, procedures and guidelines.

RESPONSE:

**OBJECTION. Counsel for STOPNC objects to this Request for Production on the grounds that it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. The vast majority of STOPNC's policies and procedures have nothing to do with this lawsuit. Subject to and without waiving said objections, included with Exhibit D are the indices to the policies and procedures which are not being produced. If the Plaintiff wishes to identify which policies and procedures he feels are discoverable, the Defendant will consider such a request. The Defendant objects to production of all policies and procedures.**

26.    Produce a copy of any policies, procedures, guidelines, articles or other material addressing how medications are to be purchased, stored, prescribed and/or handled.

RESPONSE:

**OBJECTION. Counsel for STOPNC objects to this Request for Production on the grounds that it is overbroad and unduly burdensome. Subject to and without waiving said objections, included with Exhibit D are STOPNC's policies regarding medication purchases.**

27.    Produce a copy of any emails, communications, policies, procedures, guidelines or other material addressing how patients who may have received recalled pharmaceuticals are to be contacted and/or informed of that possibility.

RESPONSE:

**Objection. Counsel for STOPNC objects to this Request for Production on the grounds that it is overbroad and unduly burdensome. Subject to and without waiving said objection, included with Exhibit D is STOPNC's policy regarding notifying patients who may have received recalled medications.**

32.     Produce a copy of all external communications between Saint Thomas Neurosurgical and any other person or entity relating to NECC's recall of MPA and/or the recent fungal meningitis outbreak.

RESPONSE:

**OBJECTION. Counsel for STOPNC objections to this Request for Production on the grounds that it is overbroad, unduly burdensome, and seeks information that is protected from discovery by the work-product doctrine, attorney-client privilege, the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219, the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272, and/or HIPAA. Communications after the outbreak were, obviously, very frequent, and such a broad request is virtually impossible to respond to. There are hundreds, if not thousands, of documents responsive to this request. In addition, the information is protected by Rule 1200-14-1-.15(2). Lastly, it seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence as it seeks after-the-fact communications related to the recall, not documents related to the decisions at issue.**

33.     Produce all communications between Saint Thomas Neurosurgical and the Tennessee Department of Health, the FDA, the CDC, and/or any other governmental entity relating to NECC's recall of MPA and/or the recent fungal meningitis outbreak.

RESPONSE:

**OBJECTION. Counsel for STOPNC objects to this Request for Production on the grounds that it is overbroad, unduly burdensome, and seeks information that is protected from discovery by the work-product doctrine, attorney-client privilege, the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219, the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272, and/or HIPAA. Communications after the outbreak were, obviously, very frequent, and such a broad request is virtually impossible to respond to. There are hundreds, if not thousands, of documents responsive to this request. In addition, the information is protected by Rule 1200-14-1-.15(2). Lastly, it seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence as it seeks after-the-fact communications related to the recall, not documents related to the decisions at issue.**

34.    Produce all communications between Saint Thomas Neurosurgical and anyone associated with Saint Thomas Hospital, Saint Thomas Network and/or Saint Thomas Health relating to NECC, NECC's recall of MPA and/or the recent fungal meningitis outbreak.

RESPONSE:

**OBJECTION. Counsel for STOPNC objects to this Request for Production on the grounds that it is overbroad, unduly burdensome, and seeks information that is protected from discovery by the work-product doctrine, attorney-client privilege, the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219, the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272, and/or HIPAA. Communications after the outbreak were, obviously, very frequent, and such a broad request is virtually impossible to respond to. In addition, the information is protected by Rule 1200-14-1-.15(2). Lastly, it seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence as it seeks after-the-fact communications related to the recall, not documents related to the decisions at issue.**

35.    Produce all communications between Saint Thomas Neurosurgical and anyone associated with Howell Allen Clinic relating to NECC, NECC's recall of MPA and/or the recent fungal meningitis outbreak.

RESPONSE:

**OBJECTION. Counsel for STOPNC objects to this Request for Production on the grounds that it is overbroad, unduly burdensome, and seeks information that is protected from discovery by the work-product doctrine, attorney-client privilege, the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219, the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272, and/or HIPAA. Communications after the outbreak were, obviously, very frequent, and such a broad request is virtually impossible to respond to. In addition, the information is protected by Rule 1200-14-1-.15(2). Lastly, it seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence as it seeks after-the-fact communications related to the recall, not documents related to the decisions at issue.**

56.    Please produce all corporate records of Saint Thomas Neurosurgical including all minutes, by-laws, resolutions, consent to action documents, annual reports, articles of organization, records of board or manager action, and documents reflecting the governance of that entity.

RESPONSE:

**OBJECTION. Counsel for STOPNC objects to this Request for Production on the grounds that it seeks information privileged from discovery by the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219 and/or the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272. Counsel for STOPNC further objects to this Request for Production on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objections, attached as Exhibit I are redacted board minutes for STOPNC from 2011 and 2012. Redacted information is irrelevant, not reasonably calculated to lead to the discovery of admissible evidence, or protected quality improvement committee information.**

57.    Please produce every report, spreadsheet or memoranda presented to the any person associated with Howell-Allen Clinic (and its predecessor entities) pertaining in whole or part to Saint Thomas Neurosurgical.

RESPONSE:

**OBJECTION. Counsel for STOPNC objects to this Request for Production on the grounds that it seeks evidence that is irrelevant, seeks evidence that is not reasonably calculated to lead to the discovery of admissible evidence, and can only be meant to annoy or harass. Additionally, the request is overbroad and unduly burdensome.**

66.    Produce all photographs taken in connection with the NECC recall and/or the fungal meningitis outbreak, including but not limited to photographs of any NECC products or Saint Thomas Neurosurgical's facilities.

RESPONSE:

**OBJECTION. Counsel for STOPNC objects to this Request for Production on the grounds that it seeks information protected from discovery by the work-product doctrine and attorney-client privilege. Any photographs taken by counsel or at the instruction of counsel are privileged from discovery.**

67.    Produce for inspection any vials of NECC products in your possession or control.

RESPONSE:

**STOPNC does not possess any vials of NECC Products.**

## REQUEST FOR ENTRY UPON LAND

Pursuant to Tennessee Rule of Civil Procedure 34.01, Plaintiff requests to be permitted to enter upon the campus of St. Thomas Hospital for the purpose of inspecting the Saint Thomas Neurosurgical facility, as well as signs referring to that facility elsewhere on the St. Thomas Hospital campus.

RESPONSE:

**OBJECTION. Counsel for STOPNC objects to this Request for Entry Upon Land on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Additionally, it is cumulative and can only be intended to annoy or harass.**

Respectfully submitted,

**GIDEON, COOPER & ESSARY, PLC**

*Chris J. Tardio // by permission // MHC*

**C.J. Gideon, Jr., #6034**
**Chris J. Tardio, #23924**
**Matthew H. Cline, #31076**
Suite 1100
315 Deaderick Street
Nashville, TN 37238
(615) 254-0400
***Attorneys for Defendants***
***Howell Allen and STOPNC***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following via hand delivery and Email, on this 30th day of April, 2013:

William D. Leader
George H. Nolan
Leader, Bulso & Nolan
414 Union Street, Suite 1740
Nashville, TN 37219
*Attorneys for Plaintiff*

William H. Lassiter, Jr.
John Overton Belcher
Lassiter Tidwell & Davis
150 4th Avenue North, Ste. 1850
Nashville, TN 37219
*Attorneys for Plaintiff*

Lela M. Hollabaugh
Amy D. Hampton
Bradley Arant Boult Cummings, LLP
1600 Division Street, Suite 700
Nashville, TN 37203
*Attorneys for Defendant*
*Saint Thomas Hospital*

Mary M. Bers
Joseph Ahillen
Office of the Attorney General
PO Box 20207
Nashville, TN 37202-0207
*Attorneys for State of Tennessee*

*Chris J. Tardio // by permission // MHC*

**Chris J. Tardio**

33

# EXHIBIT C

IN THE FIFTH CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE

| | |
|---|---|
| WAYNE A. REED, individually and as husband and next of kin of decedent, DIANA E. REED, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC, HOWELL ALLEN CLINIC a Professional Corporation, SAINT THOMAS NETWORK, SAINT THOMAS HEALTH, and Saint THOMAS HOSPITAL | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No. 13C417
Jury Demand

---

**HOWELL ALLEN CLINIC, A PROFESSIONAL CORPORATION'S
RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

---

Pursuant to Rules 26 and 33 of the Tennessee Rules of Civil Procedure, Howell Allen Clinic, a Professional Corporation ("Howell Allen"), by and through undersigned counsel, provide the following responses to Plaintiff Wayne Reed's First Set of Interrogatories.

## INTERROGATORIES

1.    Was Howell Allen Clinic, (including its agents, employees or representatives) involved in the decision to purchase medications from New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center ("NECC") for use at Saint Thomas Outpatient Neurosurgical Center, LLC ("Saint Thomas Neurosurgical")?  If so, identify each and every individual involved in the decision, and describe each and every step in the decision making process.

RESPONSE:

*See* St. Thomas Outpatient Neurosurgical Center's ("STOPNC") Responses to Plaintiff's First Set of Interrogatories. Howell Allen employed the individuals staffing STOPNC pursuant to a services agreement.

2.    Has Howell Allen Clinic ever purchased medication from a compounding pharmacy?  If so, identify the name of the compounding pharmacy, the name of the medication(s) purchased, the reason for procuring the medication(s) from the compounding pharmacy, and the price per dose of each medication purchased.

RESPONSE:

OBJECTION. Counsel for Howell Allen objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Medications purchased by and for Howell Allen are irrelevant to the claims forming the basis of the Plaintiff's Complaint. The relevant purchases were made by STOPNC.

## VERIFICATION

STATE OF TENNESSEE       )
                                   )

COUNTY OF DAVIDSON       )

I, Scott Butler, Chief Administrative Officer, of the Howell Allen Clinic, a Professional Corporation swear and affirm that:

1. I am the Chief Administrative Officer of Howell Allen.

2. I have read the said interrogatories, and the foregoing answers thereto are true according to the best of my knowledge, information, and belief.

HOWELL ALLEN CLINIC,
A PROFESSIONAL CORPORATION

By: Scott Butler

Its: Chief Administrative Officer


Sworn to and subscribed before me this 30th day of April, 2013.


Notary Public

My Commission Expires:

11/05/2014

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following via hand delivery and Email, on this 30th day of April, 2013:

William D. Leader
George H. Nolan
Leader, Bulso & Nolan
414 Union Street, Suite 1740
Nashville, TN 37219
*Attorneys for Plaintiff*

William H. Lassiter, Jr.
John Overton Belcher
Lassiter Tidwell & Davis
150 4th Avenue North, Ste. 1850
Nashville, TN 37219
*Attorneys for Plaintiff*

Lela M. Hollabaugh
Amy D. Hampton
Bradley Arant Boult Cummings, LLP
1600 Division Street, Suite 700
Nashville, TN 37203
*Attorneys for Defendant Saint Thomas
Hospital*

Mary M. Bers
Joseph Ahillen
Office of the Attorney General
PO Box 20207
Nashville, TN 37202-0207
*Attorneys for State of Tennessee*

Chris. J. Tardio

31

# EXHIBIT D

IN THE FIFTH CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE

| | |
|---|---|
| WAYNE A. REED, individually and as husband and next of kin of decedent, DIANA E. REED,<br><br>    Plaintiff,<br><br>v.<br><br>ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC, HOWELL ALLEN CLINIC, a Professional Corporation, SAINT THOMAS NETWORK, SAINT THOMAS HEALTH, and SAINT THOMAS HOSPITAL,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 13C417<br>)    Jury Demand<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

**HOWELL ALLEN CLINIC, A PROFESSIONAL CORPORATION'S RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION**

---

Pursuant to Rules 26 and 34 of the Tennessee Rules of Civil Procedure, Howell Allen Clinic, a Professional Corporation ("Howell Allen"), by and through undersigned counsel, provides the following responses to Plaintiff Wayne Reed's First Set of Requests for Production.

13.    Produce a copy of all emails, protocols, procedures, memoranda, guidelines and/or correspondence related to notifying or contacting patients who received steroid injections obtained from the NECC.

RESPONSE:

OBJECTION. Counsel for Howell Allen objects to this Request for Production on the grounds that it seeks information protected from discovery by the work-product doctrine, attorney-client privilege, the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219, the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272, and HIPAA. Additionally, it is overbroad and unduly burdensome. There were numerous communications after-the-fact with patients potentially exposed to contaminated product. The request essentially seeks all such communications, an obviously overbroad and unduly burdensome request.

25.    Produce any impeachment evidence concerning Diana Reed, Wayne Reed and/or Wayne Reed's claims.

RESPONSE:

**OBJECTION. Counsel for Howell Allen objects to this Request for Production on the grounds it is overbroad. Subject to and without waiving said objection, *see* STOPNC's responses to discovery.**

26.    Produce any incident reports pertaining to NECC, the fungal meningitis outbreak, and/or the treatment or care of Diana Reed at Howell Allen Clinic and/or Saint Thomas Neurosurgical in July – October, 2012.

RESPONSE:

**Howell Allen does not possess any such incident reports.**

27.    Produce a copy of all of Howell Allen Clinic's written policies, procedures and guidelines.

RESPONSE:

**OBJECTION. Counsel for Howell Allen objects to this Request for Production on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. The conduct and treatment at issue took place at STOPNC, not at Howell Allen.**

30. Produce a copy of any policies, procedures, guidelines, memoranda, articles or other material addressing compounded medications, the evaluation of compounding pharmacies, and/or the purchase of pharmaceuticals or compounded medications.

RESPONSE:

**OBJECTION. Counsel for Howell Allen objects to this Request for Production on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. The conduct and treatment at issue took place at STOPNC, not at Howell Allen. Subject to and without waiving said objections, the Defendant states that Howell Allen does not have a written policy addressing the purchase of medications from compounding pharmacies.**

31. Produce a copy of any emails, reports, memoranda, policies, procedures, guidelines or other material that addresses the purchase, administration and/or use of MPA or other steroids at Howell Allen Clinic and/or Saint Thomas Neurosurgical.

RESPONSE:

**OBJECTION. Counsel for Howell Allen objects to this Request for Production on the grounds that it is not reasonably calculated to lead to the discovery admissible evidence. The treatment and conduct at issue took place at STOPNC, not at Howell Allen. Additionally, the request for documents regarding activities at STOPNC should be directed to STOPNC. For responsive documents, *see* STOPNC's Responses to Plaintiff's First Set of Requests for Production.**

32.    Produce a copy of any policies, procedures, guidelines or other printed material that addresses epidural steroid injections performed at Howell Allen Clinic and/or Saint Thomas Neurosurgical.

RESPONSE:

**OBJECTION. Counsel for Howell Allen objects to the portion of this Request for Production regarding activities performed at STOPNC. That request should be directed to STOPNC. For responsive documents, *see* STOPNC's Responses to Plaintiff's First Set of Requests for Production. Epidural steroid injections are not performed at the Howell Allen Clinic.**

33.    Produce a copy of all internal communications at Howell Allen Clinic relating to NECC's recall of MPA and/or the recent fungal meningitis outbreak.

RESPONSE:

**OBJECTION. Counsel for Howell Allen objects to this Request for Production on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. In addition, counsel for Howell Allen objects to this Request for Production on the grounds that it seeks information protected by the work-product doctrine, the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219, the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272, and HIPAA. Lastly, it is overbroad and unduly burdensome. It essentially asks for every internal communication related to the fungal meningitis outbreak.**

34.    Produce a copy of all external communications between Howell Allen Clinic and any other person or entity relating to NECC's recall of MPA and/or the recent fungal meningitis outbreak.

RESPONSE:

**OBJECTION. Counsel for Howell Allen objects to this Request for Production on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. In addition, counsel for Howell Allen objects to this Request for Production on the grounds that it seeks information protected by the work-product doctrine, the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219, the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272, and HIPAA. Lastly, it is overbroad and unduly burdensome. It essentially asks for every external communication related to the fungal meningitis outbreak.**

35.    Produce all communications between Howell Allen Clinic and the Tennessee Department of Health, the FDA, the CDC, and/or any other governmental entity relating to NECC's recall of MPA and/or the recent fungal meningitis outbreak.

RESPONSE:

**OBJECTION. Counsel for Howell Allen objects to this Request for Production because all reports or investigations by public health agencies, such as the Tennessee Department of Health and the CDC, regarding the fungal meningitis outbreak are protected from disclosure through the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219; the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272; Rule 1200-14-1-.15(2); work-product doctrine; attorney-client privilege; and HIPAA. Those that are not protected are freely available to the Plaintiff from the various governmental entities.**

36.    Produce all communications between Howell Allen Clinic and anyone associated with Saint Thomas Hospital, Saint Thomas Network and/or Saint Thomas Health relating to NECC, NECC's recall of MPA and/or the recent fungal meningitis outbreak.

RESPONSE:

OBJECTION. Counsel for Howell Allen objects to this Request for Production on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Additionally, counsel for Howell Allen objects to this Request for Production on the grounds that it seeks information protected by the work-product doctrine, the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219, the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272, and HIPAA. Lastly, it is overbroad and unduly burdensome in that it is not focused to this patient.

37.    Produce all communications between Howell Allen Clinic and anyone associated with Saint Thomas Neurosurgical relating to NECC, NECC's recall of MPA and/or the recent fungal meningitis outbreak.

RESPONSE:

OBJECTION. Counsel for Howell Allen objects to this Request for Production on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. In addition, counsel for Howell Allen objects to this Request for Production on the grounds that it seeks information protected by the work-product doctrine, the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219, the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272, and HIPAA. Lastly, it is overbroad and unduly burdensome in that it is not focused to this patient.

67.     Please produce a copy of every sign, brochure, advertisement, web page, website, telephone directory, or other listings indicating the location of Saint Thomas Neurosurgical and/or the goods and services provided by that entity.

RESPONSE:

**OBJECTION. Counsel for Howell Allen objects to this Request for Production on the grounds that it should be directed to STOPNC. For STOPNC's response, *see* STOPNC's Responses to Plaintiff's First Set of Requests for Production.**

68.     Produce all communications between or among anyone associated with a member of Saint Thomas Neurosurgical regarding the ownership or governance of that entity.

RESPONSE:

**OBJECTION. Counsel for Howell Allen objects to this Request for Production on the grounds that it is overbroad and should be directed to STOPNC. For STOPNC's response, *see* STOPNC's Responses to Plaintiff's First Set of Requests for Production.**

69.     Produce all photographs taken in connection with the NECC recall and/or the fungal meningitis outbreak, including but not limited to photographs of any NECC products or Saint Thomas Neurosurgical's facilities.

RESPONSE:

**OBJECTION. Counsel for Howell Allen objects to this Request for Production on the grounds that it seeks information protected from discovery by the work-product doctrine and attorney-client privilege. Any photographs taken by counsel or at the instruction of counsel are privileged from discovery.**

29

Respectfully submitted,

**GIDEON, COOPER & ESSARY, PLC**

_C.J. Gideon // by permission // MHC_
**C.J. Gideon, Jr., #6034**
**Chris J. Tardio, #23924**
**Matthew H. Cline, #31076**
Suite 1100
315 Deaderick Street
Nashville, TN 37238
(615) 254-0400
***Attorneys for Defendants***
***Howell Allen and STOPNC***


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following via hand delivery and Email, on this 30th day of April, 2013:

William D. Leader
George H. Nolan
Leader, Bulso & Nolan
414 Union Street, Suite 1740
Nashville, TN 37219
*Attorneys for Plaintiff*

William H. Lassiter, Jr.
John Overton Belcher
Lassiter Tidwell & Davis
150 4th Avenue North, Ste. 1850
Nashville, TN 37219
*Attorneys for Plaintiff*


Lela M. Hollabaugh
Amy D. Hampton
Bradley Arant Boult Cummings, LLP
1600 Division Street, Suite 700
Nashville, TN 37203
*Attorneys for Defendant*
*Saint Thomas Hospital*

Mary M. Bers
Joseph Ahillen
Office of the Attorney General
PO Box 20207
Nashville, TN 37202-0207
*Attorneys for State of Tennessee*


_Chris J. Tardio // by permission // MHC_
**Chris J. Tardio**

32

# IN THE FIFTH CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE

| | | |
|---|---|---|
| **WAYNE A. REED, individually and as husband and next of kin of decedent, DIANA E. REED,** | ) ) ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) ) | **Case No. 13C417** **Jury Demand** |
| **ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC, HOWELL ALLEN CLINIC, a Professional Corporation, SAINT THOMAS NETWORK, SAINT THOMAS HEALTH, and SAINT THOMAS HOSPITAL** | ) ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

---

## ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC AND HOWELL ALLEN CLINIC, A PROFESSIONAL CORPORATION'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL

---

Come now Defendants, St. Thomas Outpatient Neurosurgical Center ("STOPNC") and Howell Allen Clinic ("Howell Allen") (hereinafter "Defendants"), and file this Response to Plaintiff's Motion to Compel.

### INTRODUCTION

As an initial matter, Plaintiff takes issue with objections raised by Defendants in their discovery responses by characterizing the objections as "boilerplate." Plaintiff fails to explain which objections are "boilerplate" or what exactly is inappropriate regarding those objections. Defendants raised the objections expressly authorized by the Tennessee Rules of Civil Procedure and state and federal law.

1

However, the objections raised are valid and applicable to the responses to which they were raised. Without a more specific explanation from Plaintiff, Defendants cannot provide a more specific response to this general comment in Plaintiff's motion.

Plaintiff also generally asserts that Defendants (1) "refuse to provide critical information" and (2) "refuse to identify certain key witnesses." But, it is unclear what "critical information" and "key witnesses" Plaintiff is referring to. Plaintiff fails to identify the specific information and witnesses sought or which discovery responses he is referring to, beyond that discussed specifically below. Again, without a more specific explanation from Plaintiff, Defendants cannot respond further. If the "key witness" Plaintiff is referring to is STOPNC's pharmacist consultant, that contention is discussed below in detail.

Specific points raised in the motion to compel are discussed below.

## LAW AND ARGUMENT

### I. Pharmacist Consultant[1]

STOPNC contracted with an independent pharmacist to provide the services listed below, as set forth in the contract. A redacted version of the relevant contract excerpt is attached as Exhibit 1.[2] The attached redacted version sets out the functions of the consulting pharmacist.

---

[1] Interrogatory to STOPNC 2, 17.

[2] The contract with the pharmacist consultant attached as Exhibit 1 is an excerpt from the 2012 renewal of the previous contract. Prior to 2012, STOPNC has the same pharmacist consultant. The previous contract with the pharmacist consultant had similar terms. The previous contract included duties such as "[d]evelop and aid in maintaining policies and procedures pertaining to any medication bought by or administered by the Surgery Center;" "[a]ssist in making known to the staff recommended necessary changes of policies for better compliance with existing state and federal regulations . . .;" and " . . .perform a monthly unit-check of all areas where medications are administered." The duties set out in the earlier contract are similar. The version attached as Exhibit 1 is redacted to remove portions irrelevant to this response.

2

As set out in the contract, the pharmacist consultant's role is to evaluate STOPNC's use of medications and to keep it in compliance with state and federal regulations:

> The [pharmacist consultant ("Consultant")] in order to assist compliance with accreditation standards and policies established by the Governing Body, agrees to provide the following services for the Surgery Center . . .
>
> . . .
>
> C.    Consultant Pharmacist will visit the facility no less than every thirty five days to perform a routine inspection of all medication storage areas.
>
> D.    To represent the Surgery Center, if requested, in on-site inspections from the State, Regulatory Agency and/or Accreditation Association, Board of Pharmacy, or Drug Enforcement Agency (DEA) in all matters related to medications if [sic] possible.
>
> E.    Direct and serve as a resource person to the Surgery Center's employees and physicians regarding the actions, interactions, compatibility, dosage, indications, and possible adverse reactions of pharmaceutical products utilized by the Surgery Center. Provide appropriate in-service training as necessary.
>
> F.    To provide assistance to the Surgery Center in developing and evaluating, on an annual basis, appropriate policies and procedures for the safe and effective use of drugs within the facility. To also assure that policies and procedures also address State and Federal regulatory and compliance issues of drug procurement, selection, storage, distribution, use, destruction, documentation, monitoring, and record keeping as required.
>
> . . .
>
> I.    To reasonably respond to telephone requests for technical information and procedural questions, etc. requested by center management or clinical drug information for members of the nursing and medical staffs.
>
> J.    Assist in the development of [sic] Quality Improvement Process regarding medication management related procedures and attend [sic] and participate [sic] in the quarterly Quality Improvement Process meetings when applicable and available.
>
> K.    Assist in the establishment and maintenance of [sic] Surgery Center medication formulary in conjunction with the Medical Executive Committee and the facility's designated medication nurse.

3

L.   Assist center staff in monitoring for expired medications and proper storage of all medications.

M.   Oversee that proper procedure is carried out in the destruction or return of outdated or unused drugs following all DEA guidelines.

N.   Oversee the surgery center's medication distribution system.

O.   Oversee all required records and conducts audit checks of controlled substances perpetual inventory.

P.   Will assist in the renewal and obtaining of all state and federal registrations.

. . .

Additionally, as explained in the Affidavit of Debra Schamberg attached as Exhibit 2, the consultant was retained "to evaluate the safety, quality, processes, and appropriateness of healthcare services provided by STOPNC, specifically as it related to purchase, maintenance, and use of medications and other pharmaceutical products."[3]

Clearly, as set out in the specific terms of the contract and the affidavit of Ms. Schamberg, the pharmacist consultant performed a peer review role as contemplated by the Tennessee Patient Safety and Quality Improvement Act of 2011 ("TPSQIA").

## A.   Defendants Have Properly Asserted the Peer Review Privilege

Plaintiff claims in the motion to compel that Defendants:

failed to provide any information regarding those purported [peer review] committees. Defendants do not identify the name of the subject committee, the identities of the members of the committee, the function of the committee, whether committee meetings actually occurred, or any other information that would permit Plaintiff's counsel to determine the validity of Defendants' purported privilege claim.

Plaintiff first claims that, at a minimum, the Defendants must reveal the name of the pharmacist consultant. However, even the name is privileged from discovery.

---

[3] Exhibit 2, ¶4.

4

First, specific to the Plaintiff's assertion that formal meetings must be held to qualify for the privilege, the TPSQIA does not require that the Quality Improvement Committee ("QIC")[4] hold meetings.[5] Therefore, it is irrelevant whether "committee meetings actually occurred."

At the "meet and confer" on May 6, 2013, Defendants' counsel advised Plaintiff's counsel that the committee does not have a formal name beyond "pharmacist consultant" and those persons designated to communicate with the pharmacist consultant on his evaluations and recommendations.

The pharmacist consultant's name is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. TPSQIA explicitly provides,

> Any person who supplies information, testifies or makes statements as part of a QIC may not be required to provide information as to the information, testimony or statements provided to or made before such a committee or opinions formed by such person as a result of committee participation.[6]

Thus, pursuant to the unambiguous language of the statute, the pharmacist consultant cannot be compelled to provide information regarding his activities as a pharmacist consultant. Therefore, the pharmacist consultant's name is neither relevant (because any information he has is not discoverable or admissible by statute) and not reasonably calculated to lead to the discovery of admissible evidence (because he is barred by statute from revealing such information).

Thus, simply, even the pharmacist consultant's name is not discoverable.

---

[4] A QIC is TPSQIA's equivalent to a peer review committee.
[5] *See* Tenn. Code Ann. § 68-11-272.
[6] *Id.* at § 68-11-272.

5

### 1. The Pharmacist Consultant Functioned as a QIC

The pharmacist must meet the following three elements to be considered a QIC under the statute:

1. The pharmacist consultant must fit into one of three categories of QIC;

2. The pharmacist consultant must serve one of the five enumerated purposes; and,

3. The pharmacist consultant must be performing a function in furtherance of one of those five purposes. [7]

Each element is explained below in turn.

#### a. The Pharmacist Consultant Fits All Three Categories of QIC

First, the statute requires that the pharmacist consultant be either:

1. A committee formed or retained by the healthcare organization,

2. An activity of a healthcare organization, *or*

3. One or more individuals employed by a healthcare organization performing one of the enumerated functions. [8]

The pharmacist consultant fits all three categories of QIC.

The pharmacist consultant is a committee retained by the healthcare organization. [9] STOPNC retained the pharmacist consultant for the purpose of performing quality improvement activities. [10]

---

[7] Tenn. Code Ann. § 68-11-272(b)(4).
[8] *Id.*
[9] *Id.*
[10] Exhibit 2, ¶6.

The pharmacist is actually a "healthcare organization" as defined by the statute because the pharmacist is "an entity that contracts with a healthcare organization to perform any of the functions of a QIC.[11]" STOPNC contracted with the pharmacist consultant to evaluate the quality of healthcare services at STOPNC.[12] Therefore, the pharmacist's activities as a healthcare organization fit the second definition.[13]

Finally, the pharmacist is employed, albeit as an independent contractor, to perform one of the enumerated functions.

Thus, the pharmacist consultant fits all of the three definitions of QIC set out in the statute. Under the statute's definition, he is a "QIC."

> **b.    The Pharmacist Consultant Served Several of the Enumerated Purposes**

Second, TPSQIA requires that the pharmacist perform a function for one of the following five purposes: to evaluate the (1) safety, (2) quality, (3) processes, (4) costs, (4) appropriateness, or (5) necessity of healthcare services.[14]

As stated above, and supported by the contract's language and Ms. Schamberg's affidavit, the purpose of the pharmacist's contractual responsibilities fits many of these categories.

Safety

The pharmacist's monthly inspections and assistance in developing and evaluating policies and procedures to ensure the safe and effective use of drugs within the facility, is obviously to evaluate the "safety" of healthcare services provided.[15]

---

[11] *Id.* § 68-11-272(b)(1)(E).
[12] Exhibit 2, ¶6.
[13] *Id.* § 68-11-272(b)(4).
[14] *Id.*
[15] Tenn. Code Ann. § 68-11-272(b)(4); Exhibit 1, ¶2(F).

7

Quality

The pharmacist's assistance in developing Quality Improvement Processes for medication management is to evaluate the "quality" of healthcare services provided.[16]

Processes

The pharmacist performed monthly inspections to evaluate the "processes" at STOPNC.[17]

Appropriateness

The pharmacist's assistance in decisions regarding STOPNC's formulary serves the purpose of evaluating the "appropriateness" of healthcare services at STOPNC.[18]

Thus, the consultant pharmacist clearly served the purposes of a QIC set out in the statute.

    **c.   The Pharmacist Consultant Performed Several of the Specifically Enumerated Functions**

Finally, TPSQIA provides a non-exhaustive list of functions to illustrate the purposes and roles of QICs protected by the statute.[19] The pharmacist consultant fit most of the categories, specifically:

> (A) Evaluation and improvement of the quality of healthcare services rendered;
>
>            . . .
>
> (L) Evaluation, review or improvement of methods, procedures or treatments being utilized;
>
>            . . .
>
> (O) Activities to determine the healthcare organization's compliance with state or federal regulations.[20]

---

[16] Tenn. Code Ann. § 68-11-272(b)(4); Exhibit 1 ¶2(J).
[17] Tenn. Code Ann. § 68-11-272(b)(4); Exhibit 1 ¶2(C).
[18] Tenn. Code Ann. § 68-11-272(b)(4); Exhibit 1 ¶2(K).
[19] Tenn. Code Ann. § 68-11-272(b)(4)(A)-(P).
[20] Tenn. Code Ann. § 68-11-272(b)(4).

TPSQIA only requires that the pharmacist perform *one* of these functions. The pharmacist consultant clearly met these three, and likely met many of the other illustrative functions.

First and foremost, STOPNC retained the pharmacist consultant for the purpose of improving the quality of care provided by STOPNC.[21]

The pharmacist's responsibilities under the contract are to "evaluate and improve the quality of healthcare services rendered" at STOPNC.[22] For example, the pharmacist consultant assists "center staff in monitoring for expired medications and proper storage of all medications."[23] This activity evaluates the quality of medications provided to patients.

Second, to some degree, the pharmacist consultant supervises healthcare providers during the monthly inspections and by assisting in the monitoring for expired medications and proper storage of all medications.[24]

Third, the pharmacist is responsible for the "evaluation, review or improvement of methods, procedures or treatment being utilized."[25]

The pharmacist consultant's assistance in evaluating and developing appropriate policies and procedures serves this function.[26] The contract also required the pharmacist to evaluate STOPNC's policies and procedures to ensure compliance with state or federal law.[27]

---

[21] Exhibit 2, ¶6.
[22] Tenn. Code Ann. § 68-11-272(b)(4)(A).
[23] Exhibit 1, ¶2(L).
[24] Tenn. Code Ann. § 68-11-272(b)(4)(I); Exhibit 1, ¶2(L).
[25] Tenn. Code Ann. § 68-11-272(b)(4)(L); Exhibit 1, ¶2(C).
[26] Exhibit 1, ¶2(F).
[27] Tenn. Code Ann. § 68-11-272(b)(4); Exhibit 1, ¶2(F).

9

2.     **The Consulting Pharmacist Clearly Meets the Definitional Sections of the Statute**

As set out above in detail, STOPNC retained the pharmacist consultant to act as a peer reviewer for purposes of quality improvement. The specific language in his contract, the intent of the agreement, and his functions in the evaluation of medication usage and management at STOPNC all fit squarely within the TPSQIA's definitional section.

Put simply, the pharmacist meets all three elements to be considered a protected QIC under the statute.

B.     **The Pharmacist Consultant's Reports and Communications are Privileged by TPSQIA**

After establishing that the consulting pharmacist is a QIC, the second prong of the analysis is to determine whether the documents and communications at issue are privileged by TPSQIA.[28]

TPSQIA specifically protects the "records of a QIC and testimony or statements made by a healthcare organization's officers or directors, trustees, healthcare providers, administrative staff, employees, or other committee members or attendees relating to activities of a QIC."[29]

"Records" are defined as:

[R]ecords of interviews, and all reports, incident reports, statements, minutes, memoranda, charts, statistics, evaluations, critiques, test results, corrective actions, disciplinary actions, and any and all other documentation generated in connection with the activities of a QIC and any patient safety work product as defined at § 921 of the Patient Safety and Quality Improvement Act of 2005, P.L. 109-41, as amended.[30]

---

[28] Tenn. Code Ann. § 68-11-272(c).
[29] *Id.* § 68-11-272 (c)(1).
[30] *Id.* § 68-11-272(b)(5) (emphasis added).

STOPNC has asserted privilege over reports generated by the pharmacist consultant and STOPNC's communications with the pharmacist regarding the pharmacist's activities as a QIC. Specifically, STOPNC has asserted privilege over reports and communications with the pharmacist regarding NECC and the procurement of steroids.

The pharmacist's reports clearly fit within the definition of "records," which includes "all reports."

And, communications with the pharmacist regarding the activities of the pharmacist as a QIC also fit within the definition of "records" because "statements" are specifically included in the definition.[31]

Alternatively, the communications are privileged because they are "statements by a healthcare organization's . . . employees . . . relating to the activities of the QIC."

Therefore, TPSQIA plainly protects from direct or indirect discovery (and from use in judicial proceedings) the pharmacist consultant's reports and communications with STOPNC staff members.

## C.    Relevant Case Law

There is no Tennessee case on point interpreting § 68-11-272. At least one court from another jurisdiction has held that a consultant's reports and testimony were privileged under that state's peer review statute, and the case may provide some guidance.[32]

---

[31] *Id.*
[32] However, frankly and respectfully, the instant Court does not need to go beyond the language of § 68-11-272 to find that it plainly applies here.

11

In *Grande v. Lahey Clinic Hosp., Inc.*, 49 Mass. App. Ct. 77 (Mass. Ct. App. 2000), the Massachusetts Court of Appeals held that a consultant surgeon's reports and testimony before a peer review committee were privileged.[33]

In *Grande*, the hospital considered complaints about a surgeon's care of patients following surgery to treat skin cancer.[34] The hospital hired an outside surgeon as a consultant to review the cases and report to the peer review committee.[35] The consultant surgeon reviewed the cases, drafted reports, and testified before the committee.[36]

In a subsequent action, the defendant-surgeon sought to depose the consultant regarding her reports and testimony.[37] The Massachusetts Court of Appeals held that the reports and testimony were protected by Massachusetts's peer review privilege.[38]

*Grande* is analogous to the present case because STOPNC does not have a pharmacist on-staff, necessitating the hiring of an outside consultant to review and evaluate its processes regarding medication.

And, notably, TPSQIA is much broader than Massachusetts' peer review statute.[39] Massachusetts' statute does not explicitly recognize that healthcare organizations may contract with outside entities to perform quality improvement functions or include "statements" as a type of record that is protected from discovery.[40] The Massachusetts court still found the information related to the consultant's reports privileged.

---

[33] *Grande*, 49 Mass. App. Ct. at 78 (attached as Exhibit 3).
[34] *Id.*
[35] *Id.*
[36] *Id.* at 79.
[37] *Id.*
[38] *Id.* at 81.
[39] *See* Mass. Gen. Laws ch. 111 §§ 204, 205.
[40] *Id.*

For the reasons explained above, the reports created by STOPNC's pharmacist consultant and any communications related to the pharmacist's activities as a QIC are privileged by TPSQIA.

## II.   Photographs[41]

Plaintiff claims that Defendants "refuse to produce important photographs." STOPNC.

Defendants objected to production of the photographs on the grounds that they are protected from discovery by the work-product doctrine. Defendants explained in their responses that any photographs taken by counsel or at the instruction of counsel are privileged from discovery. Counsel for Defendants further advised Plaintiff's counsel that the only responsive photographs that exist were taken by counsel for Defendants in anticipation of litigation.

Rule 26.02(3) of the Tennessee Rules of Civil Procedure makes clear that photographs taken by counsel are protected by the work-product doctrine.

Rule 26.02(3) protects from discovery documents and tangible things prepared by an attorney in anticipation of litigation.[42]

*Plaintiff* has the burden of establishing that he is entitled to the photographs because Plaintiff is seeking to compel discovery.[43] Plaintiff failed to satisfy this burden. As a result, the burden of proving that the photographs are work product should not shift back to the Defendants.

Regardless of the placement of the burden, the photographs are privileged work product.

---

[41] Request for Production to STOPNC 66; Request for Production Howell Allen 69.
[42] Tenn. R. Civ. P. 26.02(3); *Boyd v. Comdata Network, Inc.* 88 SW 3d 203, 221 (Tenn. Ct. App. 2002).
[43] *Comdata*, 88 SW 3d at 220.

To establish the doctrine, the Defendants must establish

1. The materials being sought are documents or tangible things;

2. The materials were prepared by or for Defendants or Defendants' representatives; and

3. The materials were prepared in anticipation of litigation.[44]

First, the photographs are tangible things.

Second, the photographs were taken by Defendants' counsel, which is explicitly identified as a type of "representative" under Rule 26.02(3).[45]

Third, Defendant's counsel took the photographs in anticipation of litigation.

Clearly, the photographs meet the three elements of the work-product doctrine and are thus protected from discovery.

## III.  STOPNC Policies and Procedures[46]

Plaintiff requested all of STOPNC's more than 200 written policies and procedures, constituting probably close to a thousand pages. Defendants objected to this request on the grounds that the request was overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

STOPNC has policies and procedures for everything from fire drills to hand-washing. Clearly, all STOPNC's policies and procedures are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

STOPNC produced more than 60 pages of policies and procedures for (1) medication purchases, (2) informing patients that they may have received recalled medications, and (3) reporting of adverse events.

---

[44] *Id.* at 221.
[45] Tenn. R. Civ. P. 26.02(3).
[46] Request for Production to STOPNC 25.

14

STOPNC also produced the indices for all policies and procedures so that Plaintiff could narrow the scope of the request. In response, at the "meet and confer" on May 6, 2013, Plaintiff's counsel identified 77 additional policies and procedures and requested that Defendants produce them.

Defendants have reviewed all 77 additional policies and procedures and determined that the following ten policies and procedures are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence:

1. HR-07 – STAFF RIGHTS AND ETHICAL DILEMMAS IN PATIENT CARE
2. IC-14 – STANDARD PRECAUTIONS
3. IC-18 – UNIVERSAL PRECAUTIONS
4. IM-07 – COMMUNITY RESOURCES
5. PC-30 – ASSESSMENT PRIOR TO INDUCTION
6. PC-33 – ANESTHESIA SERVICES
7. PC-34 – ANESTHESIA RESPONSIBILITIES
8. RI-08 – SECURITY
9. RI-09 – COMMUNICATION
10. RI-11 – PASTORAL CARE.

STOPNC will produce the additional 67 policies and procedures requested while maintaining the objections stated, specifically to their relevance. The above ten, however, are simply irrelevant and not reasonably calculated to lead to the discovery of admissible information.

IV.     **STOPNC Board Minutes**[47]

Plaintiff has requested "all corporate records of STOPNC including all minutes, by-laws, resolutions, consent to action documents, annual reports, articles of organization, records of board or manager action, and documents reflecting governance of that entity" without limitation.

First and foremost, Plaintiff placed no time or subject-matter limitation on this request, making it overbroad and unduly burdensome. Much of the information in the board minutes is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Defendants placed a reasonable limitation on this request and produced board minutes for 2011 and 2012 with information redacted that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence and/or protected by peer review privilege.[48]

Without further explanation from the Plaintiff as to why he feels this response was inadequate, Defendants cannot respond further.

V.      **Emails Regarding the Fungal Meningitis Outbreak**[49]

Plaintiff has essentially requested all emails regarding the fungal meningitis outbreak from STOPNC and Howell Allen. This request, as stated, is overly broad and unduly burdensome.

---

[47] Requests for Production to STOPNC 56.
[48] For example, Ms. Schamberg, STOPNC's Facility Director, makes a report at each board meeting on the status of various Quality Improvement Goals. Such information is protected by peer review privilege, and it was redacted. Similarly, information regarding the financial status of STOPNC was also redacted because it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.
[49] Requests for Production to STOPNC 32-35; Requests for Production to Howell Allen 13, 33-37.

Defendants have attached as Exhibit 4 an affidavit from Howell Allen's IT Manager, attesting to the breadth of this request.

There are approximately *15,000* emails from STOPNC employees alone during the time frame in question (September 2012 to April 2013) that will need to be reviewed to identify responsive emails.[50] Obviously, many of these 15,000 emails will deal, in some way, with the fungal meningitis outbreak. The emails will have to be evaluated to determine whether the information contained therein is privileged and/or protected by HIPAA, and that information will have to be redacted where possible.

Conservatively estimating that it will take 45 seconds to review each email, it would take approximately *187.5* hours to review all 15,000 emails. This certainly constitutes overly burdensome and overly broad discovery, particularly in the compressed timeframe prior to the depositions in June.[51]

Put another way, the United States District Court for the District of Kansas has quantified one gigabyte of data as "a truck load of documents."[52] Defendants have preserved well over one gigabyte of emails, or, in simpler terms, "a truck load of documents."[53]

At the "meet and confer" on May 6, 2013, Plaintiff's and Defendants' counsel agreed that it would be necessary to work out appropriate parameters to limit this request, potentially through the use of search terms or sender/recipient limitations.

---

[50] Exhibit 4.
[51] *See, e.g., Rodriguez-Torres v. Gov. Dev. Bank of Puerto Rico*, 2010 WL 174156 at *3 (D. Puerto Rico Jan. 20, 2010) (holding that $35,000 to produce documents is unduly burdensome) (attached as Exhibit 5).
[52] *See Hock Foods v. William Blair & Company, LLC*, 2011 WL 884446 at *7 (D. Kan. March 11, 2011) (internal quotations and citation omitted) (attached as Exhibit 6).
[53] Exhibit 4.

Defendants respectfully request that the Court place reasonable limitations on this request. As drafted, these requests are overly broad and unduly burdensome.

## VI.    Unfettered Discovery from Howell Allen

Plaintiff has propounded a substantial number of discovery requests upon Howell Allen, even though the conduct at issue took place at STOPNC. The allegations against Howell Allen are based almost entirely on the allegedly negligent acts of STOPNC.[54]

Howell Allen is a member of STOPNC, and under Tenn. Code Ann. § 48-217-101(a), as a member, Howell Allen does not have personal obligations and is not liable personally for the acts, debts, liabilities, or obligations of STOPNC. Because Howell Allen cannot be held liable for the actions of STOPNC, most of the discovery requested by Plaintiff from Howell Allen is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Even if the Court believes the allegations in the Complaint amount to more than mere cursory allegations of direct negligence against Howell Allen, the allegations are wholly unrelated to the clinical activities at Howell Allen.

Therefore, the information and documents requested pertaining to Howell Allen's clinical activities are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Defendants respectfully request that the Court place reasonable limitations on Plaintiff's discovery from Howell Allen.

---

[54] Compl. ¶¶ 130-140.

18

### A.   Howell Allen Policies and Procedures[55]

Plaintiff has requested (1) all written policies and procedures from Howell Allen; (2) policies and procedures "that address the purchase, administration, and/or use of MPA or other steroids at Howell Allen;" and (3) policies and procedures "that address epidural steroid injections performed at Howell Allen."

These requests are clearly overbroad and unduly burdensome, but more importantly, they seek information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

As discussed above, Howell Allen cannot be held liable for the actions of STOPNC.

Additionally, the medication purchases at issue took place at STOPNC, not at Howell Allen. STOPNC has distinct policies and procedures from those used at Howell Allen, and STOPNC has produced or is producing those policies and procedures which are discoverable, as explained above in Section III.

Plaintiff fails to explain why he is entitled to any information or documents that are unrelated to Howell Allen's role as a member of STOPNC. Howell Allen's clinical activities across middle Tennessee and into Kentucky are irrelevant to the conduct at issue. Plaintiff's requests for *all* Howell Allen policies are overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

---

[55] Requests for Production to Howell Allen 27, 31, 32.

Again, Defendants respectfully request that the Court place reasonable limitations on Plaintiff's discovery from Howell Allen. As drafted, the requests are overly broad and unduly burdensome, and they seek information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

### B.   Howell Allen's Purchases from Compounding Pharmacies[56]

Plaintiff has requested information and documents related to any purchases by *Howell Allen* from compounding pharmacies. As explained above, the clinical activities of Howell Allen at other office locations is irrelevant to the conduct at STOPNC, which is at issue. Howell Allen cannot be held liable by statute as a member of STOPNC for STOPNC's actions.

Additionally, the lack of subject-matter or time limitation on the request makes it overbroad and unduly burdensome.

Lastly, Howell Allen has never purchased injectable steroids from any other compounders. The medications it purchased from compounders were for other uses, making the purchases clearly irrelevant to the present case.

---

[56] Interrogatory to Howell Allen 2.

Respectfully submitted,

**GIDEON, COOPER & ESSARY, PLC**

**C.J. Gideon, Jr., #6034**
**Chris J. Tardio, #23924**
**Matthew H. Cline, #31076**
Suite 1100
315 Deaderick Street
Nashville, TN 37238
(615) 254-0400
*Attorneys for Defendants*
*Howell Allen and STOPNC*

21

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on the following via email on this 13th day of May, 2013:

William D. Leader, #9531
George H. Nolan, # 14974
Leader, Bulso & Nolan
414 Union Street, Suite 1740
Nashville, TN  37219

*Attorneys for Plaintiff*

William H. Lassiter, Jr.
John Overton Belcher
Lassiter Tidwell & Davis
150 4th Avenue North, Ste. 1850
Nashville, TN  37219

*Attorneys for Plaintiff*

Lela M. Hollabaugh, # 14894
Amy D. Hampton, # 22826
Bradley Arant Boult Cummings, LLP
1600 Division Street, Suite 700
Nashville, TN  37203

*Attorneys for Defendant St. Thomas Hospital*

Mary M. Bers, #13159
Joseph Ahillen, #028378
Office of the Attorney General
PO Box 20207
Nashville, TN  37202-0207

*Attorneys for State of Tennessee*

_____
**Chris J. Tardio**

22

## CONSULTING PHARMACIST AGREEMENT

THIS CONSULTING PHARMACIST AGREEMENT (this "Agreement) is made this 1st day of September 2012 , by and between the St Thomas NeuroSurgery Center (the "ASC") and ███████████ ("Consultant").

REDACTED



REDACTED

2.   Responsibilities.
The Consultant in order to assist compliance with accreditation standards and policies established by the Governing Body, agrees to provide the following services for the Surgery Center: Consultant does not insure or otherwise guarantee the performance of the responsibilities set forth. The ASC shall defend, indemnify and hold harmless the consultant from any and all claims of liability associated with the responsibilities set forth.

A.   To serve as the Consultant Pharmacist of Record to ASC in compliance with Tennessee law.

B.   Maintain current Pharmacy Registration in the State of Tennessee.

C.   Consultant Pharmacist will visit the facility no less than every thirty five days to perform a routine inspection of all medication storage areas.

D.   To represent the Surgery Center, if requested, in on-site inspections from the State, Regulatory Agency /and or Accreditation Association, Board of Pharmacy, or Drug Enforcement Agency (DEA) in all matters related to medications is possible

E.   Direct and serve as a resource person to the Surgery Center's employees and physicians regarding the actions, interactions, compatibility, dosage, indications, and possible adverse reactions of pharmaceutical products utilized by the Surgery Center. Provide appropriate in-service training as necessary.

F.   To provide assistance to the Surgery Center in developing and evaluating, on an annual basis, appropriate policies and procedures for the safe and effective use of drugs within the facility. To also assure that policies and procedures also address State and Federal regulatory and compliance issues of drug procurement, selection, storage, distribution, use, destruction, documentation, monitoring, and record keeping as required.

G.   Work closely with the Surgery Center's designated medication nurse to establish sufficient par levels for each designated area.   Supervise inventory controls for narcotics and all other drugs (orders and charts within DEA guidelines).

H.   Assist Surgery Center staff in procurement of drugs unable to be supplied by usual wholesaler or in an emergency situation.

I.   To reasonably respond to telephone requests for technical information and procedural questions, etc. requested by center management or clinical drug information for members of the nursing and medical staffs.

J.   Assist in the development for Quality Improvement Process regarding medication management related procedures and attends and participates in the quarterly Quality Improvement Process meetings when applicable and available.

K.   Assist in the establishment and maintenance Surgery Center medication formulary in conjunction with the Medical Executive Committee and the facility's designated medication nurse.
L.   Assist center staff in monitoring for expired medications and proper storage of all medications.
M.   Oversee that proper procedure is carried out in the destruction or return of outdated or unused drugs following all DEA guidelines.
N.   Oversee the surgery center's medication distribution system.
O.   Oversee all required records and conducts audit checks of controlled substances perpetual inventory.
P.   Will assist in the renewal and obtaining of all state and federal registrations.
Q.   Oversee all IV admixture usage.

The Consultant agrees that any information received by the Consultant during any furtherance of the Consultant's obligations in accordance with this Agreement, which concerns the business, personal, financial, or other affairs of the ASC will be treated by the Consultant in full confidence and will not be revealed to any other person, firms or organization. The ASC shall be responsible to the consultant for providing the necessary information to assist in compliance with standards and policies. The ASC's failure to provide such information, including documentation and other necessary resources, shall relieve the consultant of any responsibility to assist in compliance with standards and policies.

REDACTED

IN THE FIFTH CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE

| | | |
|---|---|---|
| WAYNE A. REED, individually and as husband and next of kin of decedent, DIANA E. REED, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 13C417 Jury Demand |
| ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC, HOWELL ALLEN CLINIC, a Professional Corporation, SAINT THOMAS NETWORK, SAINT THOMAS HEALTH, and SAINT THOMAS HOSPITAL | ) ) ) ) ) ) | |
| Defendants. | ) | |

## AFFIDAVIT OF DEBRA SCHAMBERG, RN

STATE OF TENNESSEE
COUNTY OF DAVIDSON

Comes Debra Schamberg, after first being duly sworn, and states as follows:

1.    I am over 18 years of age, have personal knowledge of the facts contained herein, and am competent to testify to same.

2.    I am the Facility Director of St. Thomas Outpatient Neurosurgical Center. I am also a registered nurse.

3.    St. Thomas Outpatient Neurosurgical Center is a licensed ambulatory surgical treatment center.

4.    I entered into the contract with St. Thomas Outpatient Neurosurgical Center's pharmacist consultant. The consultant was retained to evaluate the safety, quality, processes, and appropriateness of healthcare services provided by STOPNC, specifically as it related to purchase, maintenance, and use of medications and other pharmaceutical products. The STOPNC staff and I interacted with the consultant in connection with his regular evaluation of the use and maintenance of medications at STOPNC.

1



DEFENDANT'S
EXHIBIT
2

5.      As part of the quality improvement activities of the pharmacist consultant, he created reports and communicated with STOPNC staff members, including myself. These reports were generated and communications were made in connection with his assisting us in evaluating the safety, quality, processes, and appropriateness of healthcare services provided at STOPNC.

6.      By having a pharmacist consultant, STOPNC sought to improve the quality of care rendered at STOPNC. His evaluation of our practices related to medication use and management was intended to improve the quality of care at STOPNC.

7.      The pharmacist consultant also specifically assisted us in complying with state and federal regulations and standards.


_Debra Schamberg_
(Signature of Affiant)


Sworn to and subscribed by me on this  11  day of  May  , 2013.


_Cascey Parker_
(Notary Public)


My Commission Expires: May 3, 2016

CASCEY T. PARKER
STATE OF
TENNESSEE
NOTARY
PUBLIC
DAVIDSON COUNTY


2

DEFENDANT'S
EXHIBIT
3

49 Mass. App. Ct. 77 (2000)

# DONALD J. GRANDE

v.

# LAHEY CLINIC HOSPITAL, INC., & others.[1]

No. 98-P-936.

### Court of Appeals of Massachusetts, Middlesex.

November 5, 1999.
April 4, 2000.

Present: ARMSTRONG, SMITH, & KASS, JJ.

*Kevin P. Light* for the defendants.

*H. Bissell Carey, III,* for the plaintiff.

*Carl Valvo,* for Professional Liability Foundation, amicus curiae, submitted a brief.

KASS, J.

78    In connection with an action for breach of contract, fraudulent misrepresentation, intentional interference with *78 advantageous business relations, defamation, and other wrongs,[2] the plaintiff, Donald J. Grande, M.D., sought to depose Mary Maloney, M.D. She had been retained by Lahey Clinic Hospital, Inc. (Lahey), one of the primary defendants, as an out-of-state consultant to a Lahey peer review committee that was appraising the professional work of Dr. Grande in a number of specifically identified cases. Lahey sought a protective order on the ground that G. L. c. 111, §§ 204(a) and 205, conferred a peer review privilege on all information that Dr. Maloney acquired or developed in connection with her inquiry into the work of Dr. Grande. A judge of the Superior Court ruled that although Dr. Maloney's written report to the Lahey peer review committee was privileged, her oral testimony was not. The judge based that distinction on the ground that Dr. Maloney was neither a member of the peer review committee nor in attendance at its meetings. A single justice of the Appeals Court, acting under G. L. c. 231, § 118, authorized an interlocutory appeal from the order in the Superior Court allowing Dr. Maloney to be deposed. We decide that the privilege created by G. L. c. 111, § 204(a), and further defined by § 205, bars a deposition of Dr. Maloney by the plaintiff.

1. *Facts.* After a course of negotiations through the spring and summer of 1994, Lahey employed Dr. Grande as chairman of the Department of Dermatology. The particular specialty that Dr. Grande brought to Lahey was in Mohs surgery, a method of treating skin cancer by surgically removing one microscopic layer of skin at a time. Dr. Grande came on board at Lahey in October, 1994. Six months later, in March, 1995, two physicians at Lahey, the defendants J. Lawrence Munson, M.D., and Brooke R. Seckel, M.D., each wrote a memorandum to the Lahey tissue committee criticizing the manner in which Dr. Grande cared for patients on whom he had operated. Following procedures laid out in Lahey's by-laws, the critique of the care given by Dr. Grande in nine specific cases was referred to the Lahey peer review committee. There were no other Mohs surgeons at Lahey, and the hospital, therefore, retained Dr. Maloney, a Mohs surgeon, to consult to the peer review committee in reviewing the cases in question. Dr. Maloney practices at the Hershey Medical Center in Pennsylvania.

79    *79 In connection with her consultation to Lahey, Dr. Maloney spoke with physicians at Lahey and reviewed the patient charts in the cases under review. She submitted a written report to the peer review committee, which thereafter issued its conclusion that Dr. Grande's care was up to the standards of his specialty. That was not the end of the matter. Dr. Grande was certain that the memoranda critical of him were salvos in an undeclared turf war launched by other skin cancer surgeons and plastic surgeons at Lahey. He resigned and brought this action. The deposition he desires to

take of Dr. Maloney presumably is designed to explore whether she learned during her investigation that professional rivalry and conspiracy were behind the memoranda that triggered the peer review.

2. *Discussion.* Lahey looks to G. L. c. 111, §§ 204(a) and 205, as the source of the privilege that it says adheres to the information Dr. Maloney acquired in the course of her consultation to the Lahey peer review committee. The purpose and legislative history of §§ 204(a) and 205 were the subject of extended comment not long ago in *Carr v. Howard,* 426 **Mass.** 514, 517-522 (1998).[3] That purpose is to promote uninhibited investigation and expression of opinion in peer review proceedings. *Id.* at 518. See *Beth Israel Hosp. Assn. v. Board of Registration in Med.,* 401 **Mass.** 172, 182 (1987), in which the court said that the design of § 204(a) was "to foster aggressive critiquing of medical care by the provider's peers." With that purpose in mind, we turn to the statutory texts.

Section 204(a), so far as pertinent, provides:

> "[T]he proceedings, reports and records of a medical peer review committee shall be confidential and shall not be subject to subpoena or discovery...."

Section 204 was enacted by St. 1986, c. 351, § 9. The scope of what constitutes proceedings, reports and records of a medical peer review committee was defined a year later, expansively rather than narrowly, in a new § 205, added by St. 1987, c. 579, § 3.[4] Section 205*(b)* provides that:

80

> "Information and records ... which are necessary to the *80 work product of medical peer review committees ... shall be deemed to be proceedings, reports or records of a medical peer review committee for purposes of [§ 204]...."

Obviously the report of Dr. Maloney to the Lahey peer review committee falls squarely within the privilege conferred by § 204(a), and that is not a subject of contention. The Superior Court judge, however, differentiated such oral testimony as Dr. Maloney might give because § 204(a) also provides:

> "[N]o person who was in attendance at a meeting of a medical peer review committee shall be permitted or required to testify in any such judicial or administrative proceeding...."

Dr. Maloney did not attend any meetings of the Lahey peer review committee and the judge reasoned that fact took her out of the class of people whose testimony could not be obtained. The purpose of the "no person ... in attendance" clause in § 204(a) is to ensure that the confidentiality of peer review proceedings will not be unveiled by summoning as witnesses those who are peer review committee members and those who appear before the committee to assist it in its inquiries.

As a consultant and reporter to the Lahey peer review committee, Dr. Maloney's activities fall into the category of privilege defined by § 205, namely, "[i]nformation and records ... which are necessary to the work product of medical peer review committees." Dr. Maloney's conversations, the information she gathered, and her study of records were all to the end of working up her report for the peer review committee. Under § 205, those conversations, information gathered, and study are "proceedings" of a medical peer review committee and, as such, are privileged under § 204(a).

All this is entirely consonant with the overarching statutory purpose of promoting vigorous self-examination by hospitals and like health care institutions. See *Beth Israel Hosp. Assn. v. Board of Registration in Med., supra; Carr v. Howard, supra; Fowles v. Lingos,* 30 **Mass. App. Ct.** 435, 441 & n.8 (1991); *Swatch v. Treat,* 41 **Mass. App. Ct.** 559, 562-563 (1996). Hospitals would be discouraged from bringing in outside medical experts to assist in peer review if access to

81   their testimony in connection with their consultative efforts stripped away the *81 confidentiality of their consultative work and thereby of the peer review proceedings. Of course, peer review committees could guarantee the confidentiality of the work of a consultant by having the consultant attend the meetings of the peer review committee when the case on which the consultant has assisted is discussed, even if that meant dragging her or him in from Seattle or, less dramatically, Hershey, Pennsylvania. That would surely be a procrustean means to what we think the statute makes a self-evident end: that the opinions, memoranda, and reports that are the work product of a peer review committee

remain confidential. There is little point to providing that a report to a peer review committee will be confidential if the investigative work of the author of the report is not. Confidentiality in that case would be only skin deep.

The order of the Superior Court judge dissolving her previous protective order against the deposition of Dr. Maloney is vacated and the protective order prohibiting the deposition of Dr. Maloney by the plaintiff is reinstated.

*So ordered.*

[1] Lahey Clinic Foundation, Inc., Brooke R. Seckel, and J. Lawrence Munson.

[2] Other wrongs alleged were intentional interference with contractual relations and intentional infliction of emotional distress. Certain counts were aimed at individual, rather than all, defendants.

[3] *Carr* v. *Howard* was published after the Superior Court judge made her ruling.

[4] An existing § 205 was renumbered § 206.


Save trees - read court opinions online on Google Scholar.

## IN THE FIFTH CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE

| | |
|---|---|
| WAYNE A. REED, individually and as husband and next of kin of decedent, DIANA E. REED, <br><br> Plaintiff, <br><br> v. <br><br> ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC, HOWELL ALLEN CLINIC, a Professional Corporation, SAINT THOMAS NETWORK, SAINT THOMAS HEALTH, and SAINT THOMAS HOSPITAL <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 13C417
Jury Demand

---

### AFFIDAVIT OF ANDY FOWLER

---

STATE OF TENNESSEE
COUNTY OF DAVIDSON

Comes Andy Fowler, after first being duly sworn, and states as follows:

1.      I am over 18 years of age, have personal knowledge of the facts contained herein, and am competent to testify to same.

2.      I am the Manager of Information Technology for Howell Allen Clinic and St. Thomas Outpatient Neurosurgical Center.

3.      St. Thomas Outpatient Neurosurgical Center has preserved approximately 15,000 emails from the time period of September 2012 to April 2013.

4.      In total, STOPNC has preserved well over a gigabyte of emails.



DEFENDANT'S EXHIBIT
4
tables

_Andy Fowler_
(Signature of Affiant)

Sworn to and subscribed by me on this 13th day of May , 2013.

_Marcene O'Allen_
(Notary Public)

My Commission Expires: _____

MARLESE T. ALLEN
STATE
OF
TENNESSEE
NOTARY
PUBLIC
DAVIDSON COUNTY
My Commission Expires November 5, 2014

2

Westlaw.

Copies of decisions posted on this site have been downloaded from Westlaw with permission from West, a Thomson business.

Page 1

2010 WL 174156
--- F.Supp.2d ----, 2010 WL 174156 (D.Puerto Rico)
**(Cite as: 2010 WL 174156 (D.Puerto Rico))**

Only the Westlaw citation is currently available.

United States District Court,
D. Puerto Rico.
Vicky RODRÍGUEZ-TORRES, et al., Plaintiffs
v.
GOVERNMENT DEVELOPMENT BANK OF
PUERTO RICO, et al., Defendants.
Civil No. 09-1151 (JP).

Jan. 20, 2010.
Miguel A. Cuadros-Pesquera, Esq., Cuadros & Cuadros, San Juan, PR, William E. Meléndez-Menéndez, Esq., New York, NY, for Plaintiffs.

Mariela Rexach-Rexach, Esq., Erika Berríos-Berríos, Esq., Schuster & Aguiló, LLP, San Juan, PR, Frances R. Colón-Rivera, Esq., Saldaña & Carvajal, P.S.C., San Juan, PR, for Defendants.

*ORDER*

JAIME PIERAS, JR., Senior District Judge.

*1 Before the Court are Plaintiffs' motions (Nos. 160 and 164) to compel discovery requests and for discovery sanctions, and Defendant Government Development Bank of Puerto Rico's ("GDB") oppositions thereto (Nos. 168 and 174). For the reasons stated herein, Plaintiffs' motions to compel and for sanctions are hereby DENIED.

By way of background, on September 16, 2009, Plaintiffs filed a motion to compel discovery requests (No. 160). On the next day, Plaintiffs filed a second motion for discovery sanctions and to compel discovery requests (No. 164). Defendant GDB opposed both motions. The Court, on October 5, 2009, entered an Order holding in abeyance both motions by Plaintiffs and ordering the parties to provide the Court with a joint informative motion with all the information necessary for the Court to resolve the motions. The parties complied with the Order and submitted the joint informative motion on November 2, 2009 (No. 198). The Court will now address the discovery disputes in the motions brought by Plaintiffs.

1. Interrogatories Number Eight, Nine, Seventeen, and Twenty-Four

Interrogatory eight states:
As of January 1, for each year 2007, 2008, 2009, state with reference to the persons employed by co-defendant GDB: a) total number of employees; b) number of female employees; c) number of employees over 40; d) number of female employees over 40.

Interrogatory nine states:
As of January 1, for each year 2007, 2008, 2009, state with reference to the persons employed by co-defendant GDB, in each job title or job category: a) the average salary; b) total number of employees; c) number of female employees; d) number of employees over 40; e) number of female employees over 40 (redrafted to include a sub-set of the elements requested in both Interrogatories 9 and 10, as they were originally drafted).

Interrogatory seventeen states:
For each year 2007, 2008, 2009, list for each GDB employee who has been promoted: a) name, gender, age, date of promotion; b) job promoted from, with its corresponding salary grade and department; c) job promoted into, with its corresponding job description and criteria, selection devices and procedures, salary grade and department; d) justifications and reasons for selection over others; e) date and position of initial hire, with its corresponding salary grade and department; f) other positions held with employer, with their corresponding salary grade and department; g) the supervisors and officials involved with promotion and the nature of their involvement; h) copy of personnel file and all documents related to promotion.

Interrogatory twenty-four states:
For each year 2007, 2008, 2009, identify each job vacancy which has occurred and state: a) the date the job became available; b) the work experience, educational accreditation, or other qualifications required of job applicants; c) the name, sex, and age of the person who filled the vacancy.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



DEFENDANT'S
EXHIBIT
5

*2 In the joint informative motion, Defendant GDB objects to all four requests on a number of different grounds. One of the grounds is the relevance of said requests. GDB argues that said requests are irrelevant because Plaintiffs pleaded facts supporting claims of disparate treatment and not disparate impact.

Plaintiffs admit that the complaint pleads facts related to a disparate treatment theory and not disparate impact. [FN1] However, Plaintiffs argue that the evidence sought in the interrogatories could form the basis for which discriminatory intent could be inferred. Also, Plaintiffs argue that if the evidence shows a clear and pervasive difference between protected and non-protected individuals, Plaintiffs would be able to recover under disparate impact and would be able to amend their complaint.

>        FN1. Plaintiffs first argue that they choose not to characterize their claims as either disparate impact or disparate treatment. Then they admit that the complaint only raises claims of intentional discrimination and that the claims do not involve Plaintiffs attacking a facially neutral GDB policy. From this second statement, it is clear, even though Plaintiffs attempt to avoid admitting it, that the claims here involve disparate treatment and not disparate impact. *See Smith v. City of Jackson,* 544 U.S. 228, 239 (2005) (explaining that disparate impact involves facially neutral employment practices).

After considering the arguments, the Court disagrees with Plaintiffs. Under Federal Rule of Civil Procedure ("FRCP") 15(a), Plaintiffs could only amend the complaint if they had leave from Court because more than twenty-one days have passed since the complaint was served on Defendants. The Court has already altered the schedule in this case because of all the motions filed by the parties. Adding a claim of disparate impact would force the Court to alter the schedule again. The Court will not allow this.

As such, the Court finds that interrogatories eight, nine, seventeen and twenty-four are requesting irrelevant information. The information requested goes to disparate impact claims and not to disparate treatment. Since the complaint only brings claims of disparate treatment, the information requested is irrelevant to the claims in the complaint. Accordingly, the

Court DENIES Plaintiffs' motion requesting that Defendants be compelled to answer interrogatories eight, nine, seventeen, and twenty-four.

2. Request for Production of Documents Number Twelve

Request for production of documents twelve states:
>    For each year 2007, 2008, 2009, produce in native electronic format with its original metadata all e-mail communications and calendar entries describing, relating or referring to plaintiff Vicky Rodríguez, both inbound and outbound from co-defendant GDB's messaging system servers. Particular attention to the following definition of extract key-words needs to be exercised: a) identification of Rodriguez by different variations of her name; b) designation of pejorative and derogatory terms typically used to demean persons according to their age and gender (including but not limited to phrases such as: vieja, nena, arrugas, años, edad, etc.); c) designation of phrases which could be referring to the current and past litigations, and which could suggest retaliatory animus or activities (including but not limited to phrases such as: demanda, caso, testigos, demandada, plaintiff, etc.); d) designation of record custodians to include all co-defendants, and other unnamed GDB employees known to tease, insult and taunt Rodríguez based on her physical appearance and age (a description of the process is further detailed in the ESI Specialist Report).

*3 GDB opposes said request for Electronically Stored Information ("ESI") as irrelevant, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. Specifically, GDB argues that the requests by Plaintiffs are likely to produced hundreds if not thousands of documents which will include irrelevant, confidential and potentially privileged information. Plaintiffs, on the other hand, argue that the ESI requested includes metadata and native format documents which, unlike hard copy print outs, provides additional information as to reliability, chain of custody and authenticity.

Under FRCP 26(b)(2)(B), the Court is given the ability to limit ESI discovery. The rule states:
>    A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of

2010 WL 174156
--- F.Supp.2d ----, 2010 WL 174156 (D.Puerto Rico)
(Cite as: 2010 WL 174156 (D.Puerto Rico))

Page 3

undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

After considering the arguments and documents before the Court, the Court determines that Plaintiffs' motion to compel as to the ESI is hereby DENIED. In its October 5, 2009 Order (No. 179), the Court ordered the parties to provide the Court with an informative motion and an ESI Report (the "Report"). Plaintiffs were ordered to include in the informative motion a section explaining what information they anticipated finding in the native format documents and the basis for their belief that they will find such information. In the Report, the parties were ordered to provide information on the cost and time it would take to produce the ESI requested by Plaintiffs. The parties complied with the Order.

The Report was provided by Gabriel Rodríguez from Finanxial IT Consulting Services ("Finanxial"). In the Report, Finanxial stated that production of the ESI would cost around $35,000.00. [FN2] In a separate attachment, the parties explained how the information would be retrieved. As part of the process, GDB's counsel will perform a privilege and confidentiality review of all the records retrieved by Finanxial.

> FN2. The costs are broken down as follows: (1) $5,000.00 for the configuration and creation of the Concordance Database; (2) $20,000.00 to import the twenty-four Microsoft Outlook mailboxes that were requested by Plaintiffs; and (3) $10,000.00 for the database search and retrieval, and the final ESI Report.

Based on this information, the Court determines that the ESI requested is not reasonably accessible because of the undue burden and cost. The Court finds that $35,000.00 is too high of a cost for the production of the requested ESI in this type of action. Moreover, the Court is very concerned over the increase in costs that will result from the privilege and confidentiality review that Defendant GDB will have to un-

dertake on what could turn out to be hundreds or thousands of documents. The volume of such information along with the form in which the information is stored makes privilege determinations more difficult and, correspondingly, more expensive and time-consuming. _Hopson v. Mayor and City Council of Baltimore,_ 232 F.R.D. 228, 238 (D.Md.2005). As such, the Court determines that the ESI requested is not reasonably accessible.

*4 However, under FRCP 26(b)(2)(B), the party requesting the information that is not reasonably accessible can still acquire the information if the requesting party shows good cause. In the instant case, the Court finds that Plaintiffs have failed to show good cause. In the section in the informative motion explaining what Plaintiffs expect to find from the requested ESI and the basis for their belief, Plaintiffs state that they expect to find more relevant information than that which they have found from the hard copies of the documents requested in the initial request for production of documents. In the currently requested ESI, Plaintiffs anticipate finding communications showing discriminatory animus such as derogatory and demeaning references, exclusion from meetings, communications and work activities, and general disregard for Plaintiff Rodríguez's abilities. The only basis for their belief that they will find such information is that there are three articles which suggest that e-mail encourages senders to write unguarded, unwise and often inappropriate comments. [FN3]

> FN3. The three articles are: (1) _Dewey Partner's E-Mail Causes Upset Over Racial Insensitivity,_ N.Y. L.J., 01/28/23004; (2) _Inappropriate Useof E-mail and the Internet in the Workplace: The Arbitration Picture,_ 59 Disp. Resol. J. 26 (2004); and (3) _The Lewinsky Story Is a Tale Spun Out of Cyberspace and Therein Lies a Drawback of E-Mail: It's Difficult to Ever Really Delete It,_ The Wall Street Journal, Sept. 22, 1998, at A1.

The Court disagrees with Plaintiffs' conclusion. Just because e-mails are more likely to lead to inappropriate comments is not a sufficient basis to believe that the ESI requested here will lead to the discovery of the information Plaintiffs claim they will discover. The Court asked Plaintiffs to provide it with the basis

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2010 WL 174156
--- F.Supp.2d ----, 2010 WL 174156 (D.Puerto Rico)
(Cite as: 2010 WL 174156 (D.Puerto Rico))

Page 4

of their belief specifically because the Court wanted
to prevent Plaintiffs from requesting the ESI for the
sole purpose of conducting a fishing expedition. Af-
ter considering Plaintiffs' argument, the Court deter-
mines that Plaintiffs' request is merely a fishing ex-
pedition to find out if there is any evidence that sup-
ports their claim. Discovery is not meant to serve as a
fishing expedition. As such, the Court concludes that
this is not good cause. Accordingly, the Court deter-
mines that Plaintiffs' motion to compel the request for
production of documents number twelve is hereby
DENIED.

3. Request for Production of Documents Number
Fifteen

Request for production of documents fifteen states:
  The personnel files of each employee who has been
  assigned permanently or administratively to work
  in any of the same departments as Plaintiff
  Rodríguez for each year 2007, 2008, 2009, and un-
  til the present date.

Defendant GDB objects to this request because
Plaintiff is basically requesting the personnel file of
third parties employed in the Private Financing and
Municipal Financing Department. Defendant also
argues that said request is completely irrelevant to the
claims in Plaintiffs' complaint. Plaintiffs respond by
relying on the arguments presented in the section on
interrogatories number eight, nine, seventeen, and
twenty-four.

The Court agrees with Defendants. Plaintiffs have
failed to articulate what information they anticipate
finding in the employees files. They have not even
articulated what specific part of the files they want to
examine. Since Plaintiffs have failed to show that the
third party employee files are relevant, the Court
DENIES Plaintiffs' motion to compel the request for
production of documents number fifteen.

*5 IT IS SO ORDERED.

--- F.Supp.2d ----, 2010 WL 174156 (D.Puerto Rico)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2011 WL 884446 (D.Kan.)
**(Cite as: 2011 WL 884446 (D.Kan.))**

C
Only the Westlaw citation is currently available.

United States District Court,
D. Kansas.
HOCK FOODS, INC. f/k/a Williams Foods, Inc.,
Plaintiff,
v.
WILLIAM BLAIR & COMPANY, L.L.C., Defendant.

No. 09–2588–KHV.
March 11, 2011.

James C. Adams, II, Brooks Pierce McLendon
Humphrey & Leonard, LLP, Greensboro, NC, Gordon D. Gee, Seigfried, Bingham, Levy, Selzer &
Gee, P.C., Kansas City, MO, for Plaintiff.

Amanda J. Metts, Kristen C. Klanow, Steven S.
Scholes, McDermott, Will & Emery, LLP, Chicago,
IL, Harvey L. Kaplan, John C. Vaglio, Shook,
Hardy & Bacon LLP, Kansas City, MO, for Defendant.

### *MEMORANDUM AND ORDER*
K. GARY SEBELIUS, United States Magistrate
Judge.
**\*1** This matter comes before the Court upon
Plaintiff's Motion to Compel Discovery (ECF No.
52). The motion is fully briefed, and the Court is
prepared to rule. For the reasons explained below,
Plaintiff's Motion to Compel Discovery is granted
in part and denied in part.

### I. Procedural Requirements to Confer
The Federal Rules of Civil Procedure and this
district's local rules require a moving party to confer with opposing counsel about the discovery dispute before filing a motion to compel. Fed.R.Civ.P.
37(a)(1) provides that a motion to compel "must include a certification that the movant has in good
faith conferred or attempted to confer with the person or party failing to make disclosure or discovery

in an effort to obtain it without court action." This
district's local rules expand on the movant's duty to
confer, stating that a " 'reasonable effort' to confer
means more than mailing or faxing a letter to the
opposing party."[FN1] It requires the parties in good
faith to "converse, confer, compare views, consult
and deliberate, or in good faith attempt to do so."[FN2] The local rule also requires the movant to
"describe with particularity the steps taken by all
attorneys to resolve the issues in dispute."[FN3]

FN1. D. Kan. R. 37.2.

FN2. *Id.*

FN3. *Id.*

In this case, the parties have exchanged detailed correspondence and had a telephone conference aimed at attempting to resolve the instant discovery dispute without judicial intervention. The
Court finds Plaintiff has satisfied the conference requirements embodied in Fed.R.Civ.P. 37(a)(1) and
D. Kan. R. 37.2.

### II. Background
Prior to 2008, Plaintiff was known as Williams
Foods, Inc. and had two primary lines of business:
the Williams Foods line, which included spice and
gravy mixes; and the Wolferman's brand, which
was a catalogue seller of gourmet breads, jams, and
jellies.[FN4] On April 27, 2007, Plaintiff and Defendant entered into a contract ("Engagement Letter") for Defendant to provide investment banking
services in connection with the possible sale of
Plaintiff's company or its business lines.[FN5] Pursuant to the Engagement Letter, Defendant was to
seek a buyer or buyers for Plaintiff's company or its
business lines.[FN6] In early 2008, after Defendant
successfully completed its sales efforts, Plaintiff
sold its business lines in two separate asset purchase transactions.[FN7]

FN4. Am. Compl. ¶ 4, ECF No. 14.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



DEFENDANT'S
EXHIBIT
6

Not Reported in F.Supp.2d, 2011 WL 884446 (D.Kan.)
**(Cite as: 2011 WL 884446 (D.Kan.))**

FN5. *Id.* ¶ 5 & Ex. A thereto (Engagement Letter), ECF No. 15.

FN6. *Id.* ¶ 6.

FN7. *Id.* ¶ 9.

In addition to being paid an upfront retainer for its services, Defendant was guaranteed a minimum "Success Fee," which depended on the number of transactions that closed.[FN8] The "Success Fee" was subject to being increased based on the "Transaction Consideration" obtained from the transaction or transactions.[FN9] The Engagement Letter defined "Transaction Consideration" as

FN8. *Id.* ¶ 6.

FN9. *Id.* ¶ 7.

the total amount of cash and fair market value of all securities or other property paid or payable directly or indirectly ... to the Company ... including, without limitation, (i) amounts paid (A) pursuant to covenants not to complete, employment contracts, employee benefit plans or other similar arrangements (B) to holders of any warrants or convertible securities of the Company and (C) to holders of any options or stock appreciation rights issued by the Company, whether or not vested; (ii) the total amount of indebtedness for borrowed money or similar non-trade liabilities or obligations (including pension liabilities, guarantees, capitalized or operating leases and the like) of the Company repaid, retired, extinguished or assumed in connection with the Possible Transaction, or which otherwise remains outstanding with the Company or any affiliate thereof; and (iii) in the case of a sale of substantially all the Company's assets, the total consideration paid for such assets plus the net value of any current assets not sold by the Company.[FN10]

FN10. Engagement Letter ¶ 2, ECF No. 15.

**\*2** In the instant lawsuit, Plaintiff contends Defendant erroneously calculated the success fee due

under the contract, which resulted in an overpayment to Defendant of $556,988.00.[FN11] More specifically, Plaintiff asserts Defendant used the wrong purchase price in calculating the "Transaction Consideration" because Defendant failed to deduct certain closing and post-closing adjustments.[FN12] Plaintiff also contends Defendant incorrectly considered the following to be "current assets:" (1) Sophia Loren and NASCAR licensed brands; (2) warehouses that were leased by Plaintiff; and (3) the cash value of a life insurance policy on Conrad Hock, Jr.[FN13] Even assuming these were Plaintiff's "current assets," Defendant purportedly overvalued the Sophia Loren and NASCAR licensed brands and leased warehouses.[FN14] Defendant has counterclaimed, alleging Plaintiff breached the parties' contract by failing to pay the total amount due Defendant.[FN15]

FN11. Am. Compl. ¶ 25, ECF No. 14.

FN12. *Id.* ¶¶ 15–16.

FN13. *Id.* ¶¶ 17–19, 21.

FN14. *Id.* ¶¶ 17, 20.

FN15. Answer at 12 ¶ 1, ECF No. 18.

On July 9, 2010, Plaintiff served its First Set of Interrogatories and First Set of Document Requests upon Defendant.[FN16] By apparent agreement of the parties, Defendant served its responses and objections on August 17, 2010.[FN17] Defendant objected to Interrogatory No. 7 and Request for Production Nos. 24 and 25 because these requests purportedly seek information that is irrelevant, unduly burdensome, and confidential and proprietary.

FN16. Certificate of Service, ECF No. 36.

FN17. Notice of Service, ECF No. 41; Metts Decl. ¶ 4, ECF No. 55–2.

Interrogatory No. 7 states:

Identify and describe in detail any disputes or

Not Reported in F.Supp.2d, 2011 WL 884446 (D.Kan.)
**(Cite as: 2011 WL 884446 (D.Kan.))**

disagreements—regardless of whether legal action was taken—that You have had with any of Your clients in the last ten (10) years regarding Your calculation of the transaction consideration or success fee related to Your rendering of investment banking services to those clients. For each such dispute, (a) identify the client, (b) describe the basis of the dispute, (c) explain how the dispute was resolved, (d) identify the contract or agreement between you and the client."[FN18]

> FN18. Def. and Countercl. Pl.'s Answer to First Set of Interrogs., ECF No. 53–1.

Request No. 24 seeks, "Any engagement letter or other comparable agreement between You and any client that You identified in response to Interrogatory No. 7 above."[FN19]

> FN19. Def. and Countercl. Pl.'s Answer to First Set of Doc. Reqs., ECF No. 53–2.

Request No. 25 seeks, "All documents in any way related to disputes between You and any client related in any way to the calculation of the Success Fee, Transaction Consideration, or any comparable term in any engagement with that client."[FN20]

> FN20. *Id.*

On September 2, 2010, Plaintiff's counsel sent a letter to Defendant's counsel responding to Defendant's objections and indicating he might file a motion to compel if Defendant did not reconsider its position.[FN21] On September 9, 2010, Defendant's counsel responded and reiterated Defendant's objections based upon relevance and undue burden.[FN22] Two weeks later, on September 24, 2010, Plaintiff's counsel wrote a letter to Defendant's counsel explaining the purported relevance of the information sought in the requests.[FN23] On October 5, 2010, Defendant's counsel responded that she was standing by her September 9, 2010 letter.[FN24] The parties then had a telephone conference on October 21, 2010 in an attempt to resolve the instant

discovery dispute. Plaintiff contends that Defendant's counsel during this telephone conference made it clear that Defendant would not relent in its objections.

> FN21. Letter from James C. Adams, II to Amanda J. Metts (Sept. 2, 2010), ECF No. 53–3.

> FN22. Letter from Amanda J. Metts to James C. Adams, II (Sept. 9, 2010), ECF No. 53–4.

> FN23. Letter from James C. Adams, II to Amanda J. Metts (Sept. 24, 2010), ECF No. 53–5.

> FN24. Letter from Amanda J. Metts to James C. Adams, II (Oct. 5, 2010), ECF No. 53–6.

**\*3** On December 9, 2010, Plaintiff filed the instant motion seeking an order compelling Defendant to provide the information and documents sought in Interrogatory No. 7 and Request for Production Nos. 24 and 25. Plaintiff also seeks an order requiring Defendant to modify its protocol for searching electronically stored information ("ESI") to capture documents that relate to the interpretation of the calculation of "Transaction Consideration" or the "Success Fee." In its opposition, Defendant objects that the requests seek irrelevant information and are unduly burdensome.[FN25] Defendant also argues Plaintiff's motion should be denied as untimely.

> FN25. In its responses served on August 17, 2010, Defendant objected that the requests sought information and documents that were confidential and proprietary. In its opposition to the instant motion, Defendant objects only on relevance and undue burden grounds. "Objections initially raised but not relied upon in response to the motion to compel will be deemed abandoned." *Cardenas v. Dorel Juvenile Grp.,*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 884446 (D.Kan.)
**(Cite as: 2011 WL 884446 (D.Kan.))**

*Inc.,* 232 F.R.D. 377, 380 n. 15 (D.Kan.2005). Accordingly, the Court will not consider any objection that the information sought is confidential or proprietary.

## III. Analysis

### A. *Timeliness*

D. Kan. R. 37.1(b) states that "[a]ny motion to compel discovery in compliance with D. Kan. Rules 7.1 and 37.2 must be filed and served within 30 days of the default or service of the response ... that is the subject of the motion." Here, Defendant served its objections on August 17, 2010. A motion to compel discovery would have been due thirty (30) days thereafter, or by September 17, 2010, unless the time to do so had been extended by the Court. Plaintiff filed the instant motion on December 9, 2010, nearly three months after the deadline had passed.

Plaintiff contends the deadline to file its motion to compel was November 22, 2010. Plaintiff appears to have calculated this deadline based upon the parties' October 21, 2010 telephone conference. However, D. Kan. R. 37.1(b) clearly reflects that the triggering event is the service of the response that is the subject of the motion.[FN26] This District has consistently construed and applied the thirty day time period under D. Kan. R. 37.1(b) as beginning when specific information *first* leading to a dispute is discovered.[FN27] The deadline is not thirty days from the date the parties conclude their efforts to meet and confer.[FN28] Furthermore, the deadline is not tolled while the parties are engaged in efforts to resolve the discovery dispute without judicial intervention.[FN29] Rather, the common practice is for a party to request, prior to its expiration, an extension of its deadline to file a motion compel with respect to any discovery dispute upon which the parties are still conferring.[FN30]

FN26. *Cont'l Cas. Co. v. Multiservice Corp.,* No. 06–2256–CM, 2008 WL 73345, at *4 (D.Kan. Jan. 7, 2008).

FN27. *Id.* (emphasis added).

FN28. *Layne Christensen Co. v. Purolite Co.,* No. 09–2381–JWL, 2011 WL 124538, at *3 (D.Kan. Jan. 14, 2011).

FN29. *Id.; see also Cont'l Cas. Co.,* 2008 WL 73345, at *4 (noting that any other construction of the rule would allow a virtually indefinite extension of the deadline so long as counsel purported to continue engaging in an effort to secure the information informally from the opposing party); *Jones v. Greyhound Lines, Inc.,* No. 08–1185–MLB, 2009 WL 3809810, at *8 n. 8 (D.Kan. Nov. 13, 2009) (holding that a motion to compel was due thirty days after responses to discovery requests were due despite that parties had been attempting to resolve the issue without court intervention for several months prior to the filing).

FN30. *Layne Christensen Co.,* 2011 WL 124538, at *3.

In some cases, this District has excused an untimely motion to compel because the movant relied upon opposing counsel's false assurances of compliance.[FN31] Plaintiff did not rely upon any representations from Defendant's counsel that Defendant would be providing a further response or producing responsive documents. Defendant has maintained its objections throughout the course of the parties' meet and confer process and has never represented it would provide a supplemental response. The Court appreciates that Plaintiff attempted to resolve the issue without judicial involvement, but this fact alone does not excuse an untimely filing or toll the thirty day period in which to file.

FN31. *See Hartford Fire Ins. Co. v. P & H Cattle Co.,* No. 05–2001–DJW, 2008 WL 5046345, at * 1 (D.Kan. Nov. 24, 2008) (citing *Allianz Ins. Co. v. Surface Specialties, Inc.,* No. 03–2470–CM, 2005 WL 44534, at * 1 (D.Kan. Jan. 7, 2005));

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 884446 (D.Kan.)
**(Cite as: 2011 WL 884446 (D.Kan.))**

*Shultz v. Blue Cross & Blue Shield of Kan., Inc.,* No. 09–1220–WEB, 2010 WL 5067629, at *1 (D.Kan. Dec. 7, 2010).

*4 Thus, the thirty day period in which to file a motion to compel was triggered when Defendant served its objections on August 17, 2010, and any motion to compel should have been filed by September 17, 2010. Even assuming the deadline was November 22, 2010, Plaintiff's motion is still untimely.

When a motion to compel is filed after expiration of the time allowed for its timely filing, the proper standard to determine if it should be allowed out of time is a showing of excusable neglect.[FN32] Courts consider four factors to determine excusable neglect: (1) whether the movant acted in good faith; (2) reason for the delay, including whether it was within the reasonable control of the movant; (3) danger of prejudice to the nonmoving party; and (4) length of the delay and its potential impact on judicial proceedings.[FN33]

FN32. *Layne Christensen Co.,* 2011 WL 124538, at *1.

FN33. *Walls v. Int'l Paper Co.,* 192 F.R.D. 294, 295 (D.Kan.2000).

Plaintiff's counsel's delay in filing the motion was due in part to his preparation for a multi-week trial, not for any improper purpose.[FN34] Additionally, Plaintiff has demonstrated it made a good faith effort to resolve the disputed discovery issues before filing its motion to compel. The Court has no reason to believe Plaintiff or its attorney has acted in bad faith. Accordingly, this factor weighs in favor of finding excusable neglect.

FN34. Adams Decl. ¶ 5, ECF No. 62.

Turning to the reason for the delay, the press of other legal matters generally does not constitute excusable neglect.[FN35] Further, it appears Plaintiff's counsel could have been more diligent in his efforts to resolve the instant discovery dispute. For ex-

ample, it is not clear why the October 21, 2010 telephone conference did not occur until over two weeks after Defense counsel's October 5, 2010 letter. The Court finds the reason for the delay was within Plaintiff's counsel's control. As a result, this factor weighs against finding excusable neglect.

FN35. *Welch v. Centex Home Equity Co., LLC,* No. 03–2132–JWL, 2004 WL 2348295, at *2 (D.Kan. Apr. 23, 2004) (finding that delay caused by an office move and press of business was in control of plaintiff's counsel).

As to the third and fourth factors, the Court's consideration of Plaintiff's motion to compel will not prejudice Defendant or significantly impact the judicial proceedings in this case. The same day Defendant filed its opposition to Plaintiff's motion, Defendant filed a renewed motion to compel. Because there is another discovery dispute pending before the Court, the Court's consideration of Plaintiff's motion to compel will not significantly delay the case. Further, upon joint motion by the parties, the deadline for completing discovery was extended to July 29, 2011.[FN36]

FN36. Order, ECF No. 63.

After careful consideration of the relevant factors, the Court finds Plaintiff has shown excusable neglect. Although the reason for the delay was within Plaintiff's counsel's control, the Court finds this factor alone to be an insufficient basis to deny the motion to compel as untimely.

**B. Relevance**
As discussed above, Defendant objects that the information and documents sought in Interrogatory No. 7 and Request for Production Nos. 24 and 25 are irrelevant. Fed.R.Civ.P. 26(b)(1) provides, "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense ...."[FN37] Relevant information need not be admissible at trial so long as it is reasonably calculated to lead to the discovery of ad-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2011 WL 884446 (D.Kan.)
**(Cite as: 2011 WL 884446 (D.Kan.))**

missible evidence.[FN38] Relevance is broadly con-
strued at the discovery stage of litigation, and a
"request for discovery should be considered relev-
ant if there is 'any possibility' that the information
sought may be relevant to the claim or defense of
any party."[FN39] Therefore, discovery should or-
dinarily be allowed " 'unless it is clear that the in-
formation sought can have no possible bearing' "
on a claim or defense of a party.[FN40]

> FN37. Fed.R.Civ.P. 26(b)(1).

> FN38. *Id.*

> FN39. *Sheldon v. Vermonty,* 204 F.R.D.
> 679, 689 (D.Kan.2001) (quoting *Scott v.
> Leavenworth Unified Sch. Dist. No. 453,*
> 190 F.R.D. 583, 585 (D.Kan.1999)).

> FN40. *Id.*

**\*5** There is no presumption in the Federal
Rules of Civil Procedure that a discovery request is
relevant.[FN41] The proponent of a discovery re-
quest must, in the first instance, show the relevance
of the requested information to the claims or de-
fenses in the case.[FN42] In many instances, relev-
ance is apparent on the face of the request because
relevance is liberally construed in discovery.[FN43]
When relevancy is not readily apparent, the pro-
ponent has the burden of showing the relevancy of
the discovery request.[FN44]

> FN41. *Thompson v. Jiffy Lube Int'l, Inc.,*
> No. 05–1203–WEB, 2007 WL 608343, at
> \*8 n. 20 (D.Kan. Feb. 22, 2007).

> FN42. *Id.*

> FN43. *Id.*

> FN44. *Id.; Pulsecard, Inc. v. Discover
> Card Servs.,* 168 F.R.D. 295, 309
> (D.Kan.1996).

If the requesting party meets its initial burden
of demonstrating relevance, the burden shifts to the
party resisting discovery to establish lack of relev-
ance by demonstrating that the requested discovery
either (1) does not come within the scope of relev-
ance as defined under Fed.R.Civ.P. 26(b)(1), or (2)
is of such marginal relevance that the potential
harm occasioned by discovery would outweigh the
ordinary presumption in favor of broad discovery.
[FN45]

> FN45. *Gen. Elec. Capital Corp. v. Lear
> Corp.,* 215 F.R.D. 637, 640 (D.Kan.2004).

In this case, the parties dispute what assets
should have been included in the calculation of
"Transaction Consideration" pursuant to the parties'
Engagement Letter and how those assets were val-
ued. The parties disagree on the meaning of the
terms "Transaction Consideration," "current as-
sets," and "Success Fee ."

Under Illinois law, when a dispute exists
between the parties as to the meaning of a contract
provision, the threshold question is whether the
contract is ambiguous.[FN46] Where the terms of the
contract are clear, their meaning must be determ-
ined solely from the language of the agreement it-
self.[FN47] The corollary of this rule is that where
the contract language is ambiguous, extrinsic evid-
ence is admissible to determine the parties' intent
and clarify the meaning of the ambiguous terms.
[FN48] Additionally, extrinsic evidence may be con-
sidered provisionally for the limited purpose of de-
termining whether an ambiguity exists.[FN49]

> FN46. *Installco Inc. v. Whiting Corp.,* 784
> N.E.2d 312, 319 (Ill.App.Ct.2002). The
> Engagement Letter states that it will be
> governed by the laws of the State of
> Illinois. Engagement Letter ¶ 6, ECF No.
> 15. Although Plaintiff initially cited Kan-
> sas law in its memorandum, Plaintiff does
> not appear to dispute that Illinois law gov-
> erns the issue of whether extrinsic evid-
> ence will be admissible to interpret the En-
> gagement Letter. Regardless, there does
> not appear to be a substantive difference

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 884446 (D.Kan.)
**(Cite as: 2011 WL 884446 (D.Kan.))**

between Kansas and Illinois law on this is-
sue.

FN47. *Reynolds v. Coleman,* 527 N.E.2d
897, 902–03 (Ill.App.Ct.1988).

FN48. *See Installco Inc.,* 784 N.E.2d at
319.

FN49. *Bright Horizons Children's Ctrs.,
LLC v. Riverway Midwest II, LLC,* 931
N.E.2d 780, 792 (Ill.App.Ct.2010).

In its opposition, Defendant does not argue the
Engagement Letter is unambiguous and appears to
concede that certain types of extrinsic evidence
may be admissible. Morever, the trial judge has not
yet been asked to determine whether or not the
parties' Engagement Letter is ambiguous. Thus, it is
possible extrinsic evidence *may* be admissible to
determine the parties' intent and understanding of
the Engagement Letter, and the Court will not nar-
row the scope of discovery by assuming extrinsic
evidence will not be admissible. FN50

FN50. *See Protective Ins. Co. v. Mont-
gomery Tank Lines, Inc.,* No. 89 C 2793,
1989 WL 165113, at *4 (N.D.Ill.Dec. 28,
1989).

In Interrogatory No. 7 and Request for Produc-
tion Nos. 24 and 25, Plaintiff seeks information and
documents relating to disputes or disagreements
Defendant had with clients other than Plaintiff re-
garding Defendant's calculation of "Transaction
Consideration." The Court agrees with Plaintiff that
the manner in which Defendant has interpreted the
terms "Transaction Consideration," "current as-
sets," and "Success Fee" in substantially similar
agreements with other clients could be probative of
Defendant's intended meaning and understanding of
those terms when entering into the contract with
Plaintiff. Of course, it is possible Defendant might
be able to distinguish the facts and circumstances
surrounding how it resolved other fee disputes from
the facts of this case. However, at this point, it is

not "clear that the information sought can have no
possible bearing' " on a claim or defense of a party.
As a result, the Court finds the requests to be fa-
cially relevant.

*6 Thus, the burden shifts to Defendant to
demonstrate the documents and information sought
in the disputed requests are irrelevant. Defendant
argues the Court may consider extrinsic evidence
relating only to the previous agreements *between*
the parties, pre-contractual negotiations *between* the
parties, and the circumstances surrounding those
negotiations *between* the parties, not Defendant's
contracts with third parties. In support of its posi-
tion, Defendant cites various Illinois cases in which
courts have considered extrinsic evidence of the
parties' prior dealings and negotiations with each
other. FN51 However, the courts in these cases did
not preclude other types of extrinsic evidence from
being considered or hold that only the types of ex-
trinsic evidence admitted in those cases could be
considered by courts in interpreting a contract.

FN51. *See, e.g., Rybicki v. Anesthesia &
Analgesia Assoc., Ltd.,* 615 N.E.2d 1236,
1243 (Ill.App.Ct.1993) (considering dis-
cussions between the parties); *First Ill.
Nat'l Bank v. Knapp,* 615 N.E.2d 75, 80
(Ill.App.Ct.1993) (considering parties' pre-
contract negotiations); *Wald v. Chicago
Shippers Ass'n,* 529 N.E.2d 1138, 1146–47
(Ill.App.Ct.1988) (considering prior course
of dealings between the parties); *Kurti v.
Fox Valley Radiologists, Ltd.,* 464 N.E.2d
1219, 1226 (Ill.App.Ct.1984) (taking into
account the conduct of the parties over the
course of the contract at issue).

Defendant has not cited any authority in which
a court has expressly precluded extrinsic evidence
relating to a party's contracts with third parties nor
has this Court found any such authority. On the
contrary, some courts have allowed discovery of a
party's contracts with third-parties as long as the
contracts are analogous. FN52 Further, courts in
Illinois permit extrinsic evidence of industry-wide

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2011 WL 884446 (D.Kan.)
**(Cite as: 2011 WL 884446 (D.Kan.))**

customs or trade usage, which necessarily involves third party contracts.[FN53] Accordingly, the Court overrules Defendant's relevance objection.

> FN52. *See Cook, Inc. v. Boston Scientific Corp.,* No. 01 C 9479, 2002 WL 406977, at *3 (N.D.Ill. Mar. 15, 2002); *Protective Ins. Co .,* 1989 WL 165113, at *3–*4 (overruling magistrate's order and permitting discovery relating to plaintiff's contracts and dealings with third parties).

> FN53. *Protective Ins. Co.,* 1989 WL 165113, at *4 ("Course of dealing and usage of trade undoubtedly refer to what parties did in other contracts ...").

### C. *Undue Burden*

Defendant also argues Interrogatory No. 7 and Request for Production Nos. 24 and 25 are unduly burdensome. As the party asserting the objection, Defendant has " 'the burden to show facts justifying [its] objection by demonstrating that the time or expense involved in responding to requested discovery is unduly burdensome.' "[FN54] Additionally, Defendant has the burden to show " 'not only undue burden or expense, but that the burden or expense is unreasonable in light of the benefits to be secured from the discovery.' "[FN55] This imposes an obligation on Defendant " 'to provide sufficient detail in terms of time, money and procedure required to produce the requested documents.' "[FN56] Any objections that discovery is unduly burdensome must contain a factual basis for the claim,[FN57] and the objecting party must usually provide an "affidavit or other evidentiary proof of the time or expense involved" in responding to the discovery request.[FN58]

> FN54. *G.D. v. Monarch Plastic Surgery,* No. 06–2184–CM, 2007 WL 201150, at *2 (D.Kan. Jan. 22, 2007) (quoting *Horizon Holdings, L.L. C. v. Genmar Holdings, Inc.,* 209 F.R.D. 208, 213 (D.Kan.2002)).

> FN55. *Heartland Surgical Specialty Hosp.*

*v. Midwest Div., Inc.,* No. 05–2164–MLB, 2007 WL 3171768, at *2 (D.Kan. Oct. 29, 2007) (quoting *Cardenas v. Dorel Juvenile Grp., Inc.,* 232 F.R.D. 377, 380 (D.Kan.2005)).

> FN56. *G.D.,* 2007 WL 201150, at *2 (quoting *Horizon Holdings, L .L. C.,* 209 F.R.D. at 213).

> FN57. *Barnes v. Akal Sec., Inc.,* No. 04–1350–WEB, 2005 WL 3359717, at *2 (D.Kan. Dec. 9, 2005).

> FN58. *Sonnino v. Univ. of Kan. Hosp. Auth.,* 220 F.R.D. 633, 653 (D.Kan.2004).

In support of its undue burden objection, Defendant has submitted the declarations of Arthur Simon, Defendant's General Counsel, and Shirela Patterson, a Litigation Technology Project Manager for defense counsel. Based upon their declarations, Defendant argues compiling the information and documents sought in the discovery requests would involve the following two options:

• [Defendant] first would have to identify every potentially relevant client. Even assuming that Plaintiff's failure to limit the time covered by Request No. 25 was inadvertent, and reading in the ten-year period that applies to the other two Disputed Requests, [Defendant] conservatively estimates that it has worked with between 1,000 and 1,500 investment banking clients over the past ten years. (Affidavit of Arthur Simon ("Simon Aff."), attached as Ex. B, ¶ 4.) In 2010 alone, [Defendant] consummated transactions for 150 investment banking clients and terminated an additional 104 investment banking client engagements. (Simon Aff., ¶ 4.) [Defendant] entered into engagements with at least 250 new investment banking clients during that period. (Simon Aff., ¶ 4.) Next, [Defendant] would have to interview key members of the team assigned to work with each of those 1,000 to 1,500 clients to determine whether any dispute, defined in the broadest pos-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 884446 (D.Kan.)
**(Cite as: 2011 WL 884446 (D.Kan.))**

sible sense, had ever arisen in connection with that client's engagement. (Simon Aff., ¶ 5.) Assuming the preceding steps were even possible given the huge range of time and the unlikelihood that the necessary employees are still at [Defendant], [Defendant] would then have to search all electronic and hard copy records for any and all documents that relate to that dispute. (Simon Aff., ¶ 6.) Conducting the interviews of key team members alone would take hundreds of hours, and the resulting searches could take hundreds more.

**\*7** • In the likely event that [Defendant] cannot identify through employee interviews any and all disputes with its investment banking clients over the past ten years, [Defendant] would have to search its entire universe of electronic and hard copy documents for each of its corporate finance offices (Chicago, Boston, London, New York, San Francisco, and Shanghai) for any and all documents relating to disputes, again defined in the broadest possible sense. (Simon Aff., ¶¶ 4, 6.) This universe comprises 12,786 boxes of hard copy documents and 12 terabytes—12,000 gigabytes—of electronic data on [Defendant's] file and exchange servers. (Simon Aff., ¶ 6; Affidavit of Shirela Patterson ("Patterson Aff."), attached as Ex. C, ¶ 4.) This District has conceptualized one gigabyte as the equivalent of a "truck load" of documents. *Apsley,* 2007 U.S. Dist. LEXIS 5144, at 836 n. 30 (refusing to compel defendant to respond to a document request calling for review of at least 22 gigabytes of electronic information). It is impossible to even begin to calculate the time and expense associated with searching 12,000 truck loads of electronic documents alone. The search Plaintiff demands would be the discovery equivalent of searching for a needle in a haystack—an irrelevant needle. FN59

FN59. William Blair & Co., L.L.C.'s Opp'n to Hock Foods' Mot. to Compel Disc., ECF No. 55.

Plaintiff states it has requested information and documents relating only to Defendant's disputes, during its past ten years, with its clients who (1) signed the same standard contract that is at issue in this case FN60 and (2) had a dispute with Defendant regarding the calculation of "Transaction Consideration." Plaintiff contends Defendant has purposely mischaracterized the burden in responding to the requests at issue by making it appear that Plaintiff has requested documents and information with respect to every client, every contract, and every single dispute that Defendant has had with any of its clients over the past ten years. As a result, Plaintiff argues the declarations do not provide the Court with any evidence as to the true and actual burden involved in complying with the requests.

> FN60. It is not clear to the Court whether Interrogatory No. 7 is limited to clients who signed the same standard contract at issue in this litigation. Interrogatory No. 7 asks Defendant to identify and describe in detail any disputes or disagreements regarding Defendant's calculation of the transaction consideration or success fee. In what has been provided to the Court, Plaintiff has not defined the terms "transaction consideration" or "success fee." Thus, Interrogatory No. 7 encompasses any contract containing the terms "transaction consideration" or "success fee" even if those terms differ substantially from how they appear in the Engagement Letter. It is possible Plaintiff defined those terms in its original discovery requests, but those were not attached to the instant motion.

Plaintiff apparently takes issue with Mr. Simon's statement that to identify the clients with whom Defendant had a dispute or disagreement related to compensation, Defendant would either need to (1) search through every record of its clients over the past ten years or (2) interview key members of the teams assigned to work with each one of its cli-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 884446 (D.Kan.)
**(Cite as: 2011 WL 884446 (D.Kan.))**

ents over the past ten years. Defendant does not appear to have mischaracterized its burden. Assuming Interrogatory No. 7 is limited to the same contract that is at issue in this litigation, it is possible Defendant used the same standard contract with each of its client over the past ten years such that it would need to search each of those files to find the clients with whom it had a dispute regarding compensation. Even assuming Defendant used different contracts during the past ten years, the process described by Mr. Simon might be the only way to identify the clients that entered into the same contract with Defendant. It would not be particularly surprising to the Court if there were no easier way to identify the clients that had the same contract with Defendant as Plaintiff. Although it would have been helpful if Mr. Simon had provided some additional details about how long and widespread the contract at issue has been used by Defendant, the Court cannot conclude Defendant has exaggerated its burden involved in locating the information and documents responsive to Interrogatory No. 7 and Requests for Production Nos. 24 and 25.[FN61]

> FN61. There is no temporal scope identified in Request for Production No. 25. As a result, it is facially over broad, and the Court will limit the request to the same ten year period identified in Interrogatory No. 7. *See Hammond v. Lowe's Home Ctrs., Inc.,* 216 F.R.D. 666, 672 (D.Kan.2003) (holding that plaintiffs' failure to limit the temporal scope of interrogatories made them overly broad on their face).

**\*8** Based upon the process described in the affidavits submitted by Defendant, the Court finds the requests to be unduly burdensome. More specifically, the benefits to be secured from the discovery do not outweigh the burden or expense in responding to the requests at issue. Here, the requests seek information regarding any disputes or disagreements regardless of whether legal action was taken. Plaintiff does not appear to have defined the phrases "dispute" or "disagreement." The requests

are broad enough to include situations in which Defendant made a mathematical error in calculating the "Transaction Consideration." As a result, although the requests seek relevant information, they would also sweep in information that would likely have little or no probative value to the issues in this litigation. Further, the probative value of the type of extrinsic evidence being sought is relatively low compared to other types of extrinsic evidence.[FN62]

> FN62. *See Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.,* 284 F.3d 693, 701 (7th Cir.2002) (ranking types of extrinsic evidence in order of importance).

However, a party must still respond to an interrogatory or request for production to the extent it is not objectionable.[FN63] Defendant has not indicated whether prior similar disputes with any of its other clients occurred. The Federal Rules require a party to conduct a reasonable search for responsive information.[FN64] The Court believes Defendant can provide responsive information and documents by conducting a less burdensome search than described by Mr. Simon. It is difficult for the Court to delineate the exact parameters of such a "reasonable" search, however, because it does not have enough information about Defendant's record keeping system. At a minimum, it seems reasonable for Defendant to inquire of certain key employees, such as Mr. Simon, whether they are aware of any such disputes. Further, if Defendant's in-house General Counsel maintains its own files that contain a subset of customers with whom Defendant has had a dispute, it would seem significantly less burdensome for Defendant to search those files. Accordingly, Defendant shall provide a supplemental response to Interrogatory No. 7 and Requests for Production Nos. 24 and 25 within 21 days of this Order. The Court encourages the parties to meet and confer in an effort to agree upon a more narrowed search.

> FN63. *Van Deelen v. Shawnee Mission Sch. Dist. # 512,* No. 03–2018–CM, 2003

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 884446 (D.Kan.)
**(Cite as: 2011 WL 884446 (D.Kan.))**

WL 22849185, at *2 (D.Kan. Nov. 24, 2003); *Mackey v. IBP, Inc.,* 167 F.R.D. 186, 199 (D.Kan.1996).

FN64. *See Jacobson v. Starbucks Coffee Co.,* No. 05–1338–JTM, 2006 WL 3146349, at *2 (D.Kan. Oct. 31, 2006) (requiring a party to conduct a reasonable search for documents responsive to requests for production); *Walker v. THI of N.M. at Hobbs Ctr.,* No. 09–0060 JB/RLP, 2010 WL 552661, at *12 (D.N.M. Feb. 8, 2010) (ordering party responding to discovery request to conduct a diligent search for responsive documents); *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,* 244 F.R.D. 614, 626 (D.Colo.2007) (indicating that Rule 34 imposes an affirmative duty to seek information reasonably available through a party's employees, agents, and others subject to its control); *A. Farber & Partners, Inc. v. Garber,* 234 F.R.D. 186, 189 (C.D.Cal.2006) (stating that a party has an obligation to conduct a reasonable inquiry in the course of responding to requests for production).

D. *Search Protocol for ESI*

Plaintiff has also requested Defendant modify its search protocol for ESI to encompass any documents that reflect Defendant's interpretation of the terms "Transaction Consideration" and "Success Fee" as those terms are used in Defendant's standard Engagement Letter.

Fed.R.Civ.P. 26(b)(2)(B) provides,

A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**\*9** Among other things, Rule 26(b)(2)(C) provides that the Court, on motion or on its own, must limit the extent of discovery if it determine that "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."

As reflected in Mr. Simon's declaration, there appear to be 12 terabytes of electronic data on Defendant's file and exchange servers that could contain responsive documents.[FN65] This translates to 12,000 gigabytes of information.[FN66] Defendant estimates it would cost between $100 to $300 per gigabyte to run search terms, resulting in a cost of between $1.2 million and $3.6 million dollars, without accounting for the cost to review the search results.[FN67] The Court concludes it would be unduly burdensome for Defendant to search all of its electronic documents for responsive information as originally requested.

FN65. Simon Decl. ¶ 6, ECF No. 55–3.

FN66. Patterson Decl. ¶ 4, ECF No. 55–4.

FN67. *Id.*

However, this type of search would only be required if Defendant could not identify "up-front" the clients with whom Defendant had disputes or disagreements about compensation. As discussed above, the Court will not require Defendant to undertake the search described in Mr. Simon's declaration, but rather conduct a reasonable search for responsive information and documents. Part of any such reasonable search might include a more limited search of Defendant's ESI. For example, it might be appropriate to search Mr. Simon's emails

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 884446 (D.Kan.)
**(Cite as: 2011 WL 884446 (D.Kan.))**

or other key executives who were likely to have been involved in any disputes or disagreements. Additionally, if Defendant's search of its hard copy documents reveals only a handful of clients with whom it had a disagreement, it might be reasonable to search the emails of the individuals who were involved in those disputes. At this point, however, the Court does not have enough information to provide further guidance to the parties on the scope of searching Defendant's ESI.

**IV. Attorney Fees and Expenses**

Under Federal Rule of Civil Procedure 37(a)(5)(C), if a motion to compel is granted in part and denied in part, as is the case here, then the Courts may "apportion the reasonable expenses for the motion." The Court has reviewed the relevant filings and concludes that it is appropriate in this case to require the parties to bear their own expenses incurred in connection with this motion. Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Compel Discovery (ECF No. 52) is hereby granted in part and denied in part.

**IT IS FURTHER ORDERED** that Defendant shall provide a supplemental response to Interrogatory No. 7 and Request for Production Nos. 24 and 25 within twenty-one (21) days of this Order.

**IT IS SO ORDERED.**

D.Kan.,2011.
Hock Foods, Inc. v. William Blair & Co., L.L.C.
Not Reported in F.Supp.2d, 2011 WL 884446 (D.Kan.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

## IN THE FIFTH CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE

WAYNE A. REED, individually and as )
husband and next of kin of decedent, )
DIANA E. REED, )
              )
       Plaintiff(s), )
              )
v. )
              )    No. 13C417
SAINT THOMAS OUTPATIENT )    Jury Demand
NEUROSURGICAL CENTER, LLC, )
HOWELL ALLEN CLINIC a Professional )
Corporation, SAINT THOMAS )
NETWORK, SAINT THOMAS HEALTH, )
and ST. THOMAS HOSPITAL, )
              )
       Defendants. )

## PLAINTIFF'S REPLY SUPPORTING MOTION TO COMPEL

Plaintiff Wayne Reed respectfully submits this reply to Defendants' response to his Motion to Compel.

### I.    The Quality Improvement Committee privilege statute does not authorize Defendants to withhold names.

In their response, Defendants Saint Thomas Outpatient Neurosurgical Center, LLC ("Saint Thomas Neurosurgical") and Howell Allen Clinic assert, incorrectly and without citation to any authority, that the Tennessee Quality Improvement Committee privilege found at Tenn. Code Ann. § 68-11-272 allows Defendants to withhold names of individuals purportedly comprising a Quality Improvement Committee. Specifically, Defendants assert that the name of a "consulting pharmacist" is shielded from discovery. Defendants make that bald assertion without citing any opinion from any court and without reference to any statutory language stating such.

Nothing in the Quality Improvement Committee privilege statute authorizes the withholding of names. In fact, it is impossible for the Plaintiff or this Court to examine the

Defendants' claim of privilege without knowing who the committee members are or whether any committee meetings ever occurred. Moreover, Tennessee's judicially mandated approach to the narrow construction of privilege statutes is contrary to Defendants' unilateral attempt to label a consultant as a one man committee and therefore withhold that person's name from discovery.

In <u>Lee Medical v. Beecher</u>, 312 S.W.3d 515 (Tenn. 2010), the Tennessee Supreme Court construed the Tennessee Peer Review Privilege found at Tenn. Code Ann. § 63-6-219, a statute also relied upon by the Defendants. In that opinion, the Court announced three guiding principles that apply when construing statutory privileges. The first principle is that <u>Tennessee favors broad discovery</u>. <u>Id</u>. at 525. That principle enables parties and courts "to seek the truth so that disputes will be decided by facts rather than by legal maneuvering." <u>Id</u>. "The second principle is that privileges present obstacles to the search for the truth." <u>Id</u>. (*citing* VIII John H. Wigmore, *Evidence* § 2196, at 111 (McNaughten Rev. 1961) (hereinafter "Wigmore"); *see also* 23 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5422, at 677 (1980). The third principle "is that rules of evidence generally disfavor privileges in civil proceedings." <u>Id</u>.

Given Tennessee's unequivocal approach of construing privileges narrowly, Defendants cannot justify their unilateral decision to withhold the name of their so-called "consultant pharmacist." Moreover, the out-of-state authority relied upon by the Defendants supports Plaintiff's position.

In their response brief, the Defendants cite <u>Grande v. Laney Clinic Hosp., Inc.</u> 49 Mass App. Ct. 77 (Mass. Ct. App. 2000). In that decision, a hospital hired an outside consulting doctor for the purpose of advising the hospital's peer review committee about the work of a particular dermatologist. Specifically, the hospital hired an outside physician to speak with other

physicians and review patient charts in connection with the dermatologist in question.   That outside consultant then provided a report as well as testimony to the hospital's peer review committee.   Id. at 78-79.

The Grande opinion supports Plaintiff's position for two reasons.   First, in Grande, the name of the consulting physician was disclosed and actually mentioned in the opinion.   Id. at 78. Second, the consulting physician submitted both a report and testimony to an organized peer review committee.   Id.   In the present case, however, the Defendants do not establish that their so-called "consulting pharmacist" was asked to assist or give information to any particular committee.   Therefore, the Defendants have not met their burden of establishing that the Quality Improvement Committee privilege applies.

## II.    The Defendants have not established that the "Consulting Pharmacist" is a Quality Improvement Committee.

The Defendants bear the burden of establishing that the subject privilege applies.   See D. Paine, S. Sheppard, N. Cohen, Tennessee Law of Evidence§ 501.3 (1995) and In re Southern Ind Banking Corp., 35 B.R. 643, 647 (Bkrtcy. 1983) ("the burden of proof to establish the existence of the privilege rests upon the claimant") (citing Weil v. Investment, Inc., 647 F.2d 18, 25 (9th Cir. 1981), and In re Blier Cedar Co., Inc., 10 B.R. 993 (Bkrtcy. D. Me. 1981)).   In order to meet that burden, the Defendants submit part of a heavily redacted contract.   Defendants do not even submit the signature page of that document.   Therefore, the record contains zero evidence that both parties signed the subject instrument.   In addition, the Defendants unilaterally redact large portions of the contract without explanation.   The Defendants' attempt to use an incomplete and heavily redacted contract as a complete discovery shield is unfair, and it is contrary to Tennessee law favoring open discovery.

In addition, the Defendants have not established that their "consulting pharmacist" fits the definition of a "Quality Improvement Committee." In order to meet that definition, the Defendants must establish that said pharmacist is:

1.   A committee formed or retained by the healthcare organization;

2.   An activity of a healthcare organization; or

3.   One or more individuals <u>employed by</u> at healthcare organization performing one of the enumerated functions.

Tenn. Code. Ann. § 68-11-272(b)(4)(emphasis added). None of those three categories applies to the subject contractor pharmacist. First, the pharmacist is not a "committee formed" by Saint Thomas Neurosurgical. He or she is a contract vendor. Second, a person is not an activity. Therefore, the Defendants' assertion that the pharmacist is "an activity" is nonsensical. Third, the pharmacist is admittedly not an employee of either Defendant. He or she is an independent contractor. That person does not meet the definition of a Quality Improvement Committee, particularly in light of Tennessee law requiring that such statutes be narrowly construed. <u>See</u> <u>Lee Medical</u>, 312 S.W.3d at 525.

### III.   Photographs are discoverable.

Defendants also withhold from production certain photographs as "work product." Defendants withhold those photographs without citation to any opinion stating that withholding photographs as work product is justified or appropriate.

The subject photographs are facts which the Plaintiff Wayne Reed cannot obtain through other means. It is imperative that he discover photographic evidence of how the subject steroids were stored, tracked and administered. Plaintiff's counsel cannot walk into Saint Thomas Neurosurgical and start taking pictures, and conditions at that facility have presumably changed since the subject pictures were taken. Accordingly, the Plaintiff Wayne Reed has demonstrated a

substantial need for the photographs. Because he cannot obtain the information contained in the photographs through other means, the photographs are discoverable. Boyd v. Comdata Network, Inc. 88 S.W.3d 203, 221 (Tenn. App. 2003).

**IV.    Plaintiff is entitled to complete discovery from Howell Allen Clinic.**

In his Complaint, Wayne Reed alleges that Saint Thomas Neurosurgical and Howell Allen Clinic are alter egos.  (Complaint at ¶¶ 138-140).  Since the outset of this litigation, Plaintiff has established the following facts through requests for admission and interrogatories:

- Saint Thomas Neurosurgical has no employees.  All persons who staff Saint Thomas Neurosurgical are employees of Howell Allen Clinic;

- Howell Allen Clinic listed Saint Thomas Neurosurgical as one of its office locations;

- Howell Allen Clinic and Saint Thomas Neurosurgical use the same phone number;

- Howell Allen Clinic and Saint Thomas Neurosurgical use the same email system;

- Dr. John Culclasure, Medical Director of Saint Thomas Neurosurgical, is an employee of Howell Allen Clinic;

- Debra Schamberg, Facilities Director of Saint Thomas Neurosurgical, is an employee of Howell Allen Clinic;

- The Registered Agent for both Saint Thomas Neurosurgical and Howell Allen Clinic is the same person, Dr. Gregory Lanford.

(See Saint Thomas Neurosurgical and Howell Allen Clinic's responses to Plaintiff's Second Requests for Admissions contemporaneously filed herewith).  In addition, the Defendants have produced certain policies and procedures which state: "St. Thomas Outpatient Neurosurgical

Center is an ambulatory care center that is part of Howell Allen Clinic . . ." Therefore, Howell

Allen Clinic and Saint Thomas Neurosurgical Center are one and the same.  (See Exhibit 1).  The

Plaintiff is entitled to complete discovery from both.

LEADER, BULSO & NOLAN, PLC

By: _____

George Nolan (BPR No. 14974)
William D. Leader, Jr. (BPR No. 9531)
414 Union Street, Suite 1740
Nashville, Tennessee 37219
(615) 780-4114

*Attorneys for Plaintiffs Wayne Reed, Fred and
Loduska May, and Mae Parman*

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished by Email and
U.S. Mail, postage prepaid, to:

| | |
|---|---|
| C.J. Gideon, Jr. | Lela Hollabaugh |
| Chris J. Tardio | Amy D. Hampton |
| Gideon, Cooper & Essary, PLC | Bradley Arant Boult Cummings, LLP |
| 315 Deaderick Street, Suite 1100 | 1600 Division Street, Suite 700 |
| Nashville, TN 37238 | Nashville, TN 37203 |
| | |
| Mary M. Bers | John O. Belcher |
| Joseph Ahillen | Lassiter, Tidwell & Davis PLLC |
| Office of the Attorney General and Reporter | One Nashville Place |
| P.O. Box 20207 | 150 Fourth Avenue North, Suite 1850 |
| Nashville, TN 37202-0207 | Nashville, TN 37219 |

Mark P. Chalos
Lieff, Cabraser, Heimann & Bernstein, LLP
One Nashville Place
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219-2423

this 13th day of May, 2013.

_____
George Nolan

- 6 -

# EXHIBIT 1

### ST THOMAS OUTPATIENT NEUROSURGICAL CENTER
### INFECTION PREVENTION AND CONTROL PLAN
### CY 2012

#### OVERVIEW

St Thomas Outpatient Neurosurgical Center is an ambulatory care center that is part of the Howell Allen Clinic, a specialty clinic treating disorders of the brain and spine. The center has 6 patient rooms and 3 procedure rooms and provides outpatient pain treatments to patients. Primary procedures include epidural steroid injections, nerve root blocks, and facet denervations. Procedures are performed by an anesthesiologist using aseptic technique/mask for all procedures.

The Medical Executive Committee (MEC) oversees and serves as an advisory board to the center. Members of the committee include:

Steven Abram, MD, president;
John Culclasure, MD, medical director;
Debra Schamberg, RN, CNOR, facility director;
Scott Butler, CFA.

The MEC and the Governing Board approve all Infection Prevention policies and procedures.

#### INFECTION PREVENTION AND CONTROL PLAN/EVALUATION

Infection prevention surveillance and daily management of infection prevention activities is the responsibility of the facility director.

The Infection Control plan is reviewed at a minimum annually and modified based on the trending of data from the previous year, new regulatory requirements, new procedures implemented, problems identified, or other opportunities noted. Data trends are reviewed on an ongoing basis and reported quarterly to MEC and the Governing body.

A) Pain procedures are monitored monthly for infection and /or other post procedure complications. Letters are sent monthly to physicians requesting any reportable infections. These findings are reviewed with the medical director and reported to the MEC and Governing Board quarterly.

B) Hand Hygiene audits are performed monthly and overall compliance reported to MEC. Education is provided to staff and physicians when non-compliance is observed or reported. (See attached hand hygiene monitoring audit tool).