IN THE FIFTH CIRCUIT COURT
FOR DAVIDSON COUNTY, TENNESSEE

WAYNE A. REED, individually and as  )
husband and next of kin of decedent,)
DIANA E. REED,                      )
                                    )
          Plaintiff(s),             )
                                    )
vs.                                 ) No. 13C417
                                    ) Jury Demand
                                    )
SAINT THOMAS OUTPATIENT             )
NEUROSURGICAL CENTER, LLC,          )
HOWELL ALLEN CLINIC a Professional  )
Corporation, SAINT THOMAS           )
NETWORK, SAINT THOMAS HEALTH,       )
and ST. THOMAS HOSPITAL,            )
                                    )
          Defendants.               )
_____)


TRANSCRIPT OF PROCEEDINGS

Before The Honorable Joe P. Binkley, Jr.

May 14, 2013

Commencing at 1:00 p.m.

Volume 1

_____

Reported by:  Deborah K. Watson, RPR, LCR
Tennessee LCR No. 446
Expires:  6/30/2014

```
 1    APPEARANCES:
 2
      For the Plaintiff(s):
 3
              GEORGE H. NOLAN
 4            WILLIAM D. LEADER, JR.
              Leader, Bulso & Nolan, PLC
 5            414 Union Street, Suite 1740
              Nashville, TN 37219
 6            (615) 780-4100
              gnolan@leaderbulso.com
 7            bleader@leaderbulso.com
 8    For the Defendants, Saint Thomas Outpatient
      Neurosurgical Center, LLC, and Howell Allen Clinic,
 9    a Professional Corporation:
10            CHRIS J. TARDIO
              MATT CLINE
11            JOHN-MARK ZINI
              Gideon, Cooper & Essary, PLC
12            315 Deaderick Street, Suite 1100
              Nashville, TN 37238
13            (615) 254-0400
              chris@gideoncooper.com
14            matt@gideoncooper.com
15    For the Defendants, Saint Thomas Network, Saint
      Thomas Health, and St. Thomas Hospital:
16
              LELA M. HOLLABAUGH
17            Bradley Arant Boult Cummings LLP
              Roundabout Plaza
18            1600 Division Street,
                Suite 700
19            PO Box 340025
              Nashville, TN 37203-0025
20            (615) 244-2582
              lhollabaugh@babc.com
21
22
23
24
25
```

```
 1                 P R O C E E D I N G S
 2            THE COURT:  Good afternoon, everyone.
 3  See if we can clear up a couple of things first
 4  before we start.
 5            In Saint Thomas Neurosurgical's
 6  objection to some of the -- or several of the
 7  discovery requests, there is one statement -- well,
 8  let me just read.
 9            It says:  Communications after the
10  outbreak were obviously very frequent, and such a
11  broad request is virtually impossible to respond to.
12  There are hundreds, if not thousands, of documents
13  responsive to this request.
14            Here's the question that I'm asking:
15  In addition, the information is protected by
16  Rule 1200-14-1-15(2).
17            There is no (2) that I can find.  I
18  didn't know -- had not a clue what Rule
19  1200-14-1-15(2) was.  Nobody told me what that was,
20  so we had to figure it out.  Had to ask you-all.
21  And it's the Rules of the Tennessee Department of
22  Health, Health Services Administration, Communicable
23  and Environmental Disease Services.  And
24  1200-14-01.15 is General Measures for the Effective
25  Control of Reportable Diseases.
```

1              So do we have a misprint?

2              MR. TARDIO:  We tried to pull it up,

3      and Mr. Zini, an associate in our office, has seen

4      it.  And you'll see probably in the version that

5      Your Honor pulled up, there's a (1); but (2) is no

6      longer, at least on the Website versions that we're

7      trying to pull up today.

8              So, frankly, Judge, I don't know what

9      happened to (2).  I can tell you, Mr. Zini, when he

10     read it online and drafted these responses about,

11     what, three or four weeks ago, --

12             MR. ZINI:  Yes, sir.

13             MR. TARDIO:  -- (2) existed.  And (1)

14     is in the -- is still there.

15             THE COURT:  Right.

16             MR. TARDIO:  (2) has gone away.  So no,

17     I don't think it's a typo.  And I don't know what

18     happened to it in the online version of the Rules.

19     So, frankly, Judge, I don't have an answer for you.

20             THE COURT:  Okay.

21             MR. TARDIO:  But I can tell you that

22     the provision, when we read the provision, made

23     confidential information provided to the Department

24     of Health during a communicable disease outbreak

25     investigation, which makes sense.  But . . .

```
 1                    THE COURT:  It made it confidential.
 2                    MR. TARDIO:  Exactly.  It didn't
 3   address discoverability, and I don't think that that
 4   provision is the overarching issue --
 5                    THE COURT:  Right.
 6                    MR. TARDIO:  -- with the request,
 7   but . . .
 8                    THE COURT:  No, I agree.  But I want to
 9   understand everything you-all file.
10                    MR. TARDIO:  Sure.  I understand.
11                    THE COURT:  I just didn't understand
12   that one.
13                    MR. TARDIO:  Well, we're still going to
14   try to find (2), which apparently has dissolved in
15   cyberspace somewhere.  But (1) still exists, and
16   obviously -- or I shouldn't say obviously when we
17   deal with some of these regs.  But --
18                    THE COURT:  Right.
19                    MR. TARDIO:  -- if there's a (1), you
20   would think there's going to be a (2).
21                    THE COURT:  There should be.  But
22   anyway, see what y'all can figure out.
23                    MR. TARDIO:  Okay.
24                    THE COURT:  And we'll -- that's not a
25   huge issue, but throughout the -- throughout the
```

1    reading, I just wanted to make sure I understood

2    what y'all were referring to.

3              All right.  Now, here's how I handle

4    discovery disputes, and it's probably not unusual to

5    handle it this way.  I don't know how everybody else

6    does it.  I do them one at a time.  And that's the

7    only way to do it.  That's the only way to do it

8    effectively.  And I'll let y'all argue as much as

9    you need to on each one.  When I've made up my mind,

10   I'll stop you and give you a ruling.  If I haven't

11   said anything, then just keep arguing, because I'm

12   trying to decide.

13             And I like oral argument.  Oral

14   argument's very effective.  It's very helpful to me.

15   And besides that, you didn't go to law school just

16   to file papers.  You went to law school to argue

17   cases and argue your positions.  And I like -- I

18   like oral argument.  That's what it's all about,

19   what advocacy is all about.  So I'm all for it.

20             Okay.  See if I can find . . .

21             Okay.  I guess we'll start with --

22   well, anyway, do y'all want to make an opening

23   statement of any kind?  I'll be happy to hear you,

24   if you'd like.

25             MR. NOLAN:  Sure, Your Honor.

1            THE COURT:  Absolutely.

2            MR. NOLAN:  Your Honor, George Nolan

3    for the Plaintiff, Wayne Reed.  And I guess the

4    first thing we wanted to say is that we appreciate

5    the Court making itself available today and working

6    us in in midweek, kind of outside the normal motion

7    docket schedule for this purpose.

8            THE COURT:  Glad to do it.

9            MR. NOLAN:  I'd like to make a few

10   preliminary remarks about our theory of the case so

11   that the Court will understand why some of the

12   information we're asking the Court to compel is so

13   vitally important, as far as we're concerned.

14            And, Your Honor, I'd like to start by

15   mentioning that we have two primary theories in this

16   case.  The first is a product liability theory.  We

17   allege that these particular Defendants are sellers

18   under the Tennessee Product Liability Act and,

19   therefore, can be held strictly liable.  I'd like to

20   show the Court something about that.

21            The last time we were here, Mr. Gideon

22   put a statute up on the screen which is part of the

23   Health Care Liability Act.

24            THE COURT:  Yes.

25            MR. NOLAN:  This is the -- what most

1    lawyers call the med mal statute, Your Honor.  I
2    think it's called the Health Care Liability Act
3    and . . .
4              THE COURT:  That's the new -- that's
5    the new phrase for --
6              MR. NOLAN:  That's right.  That's the
7    new -- the new locution.  And it defines what a
8    health care liability action is.  And as you can
9    see, Your Honor, key to that definition is that in
10   order for something to be a health care liability
11   claim, it must allege that a health care provider or
12   providers have caused an injury.  It's got to allege
13   the health care provider caused an injury.
14             Well, Your Honor, our product liability
15   claims don't do that.  Our claims are separately set
16   forth in the complaints, and they alleged that the
17   product caused the harm.  And that's the whole
18   theory behind strict liability in tort is that when
19   an unreasonably dangerous or defective product is
20   placed into the stream of commerce and it hurts
21   folks, first the manufacturer can be held strictly
22   liable; and if the manufacturer is bankrupt or can't
23   be sued in Tennessee, then the seller can be held
24   strictly liable.
25             And, Your Honor, if you look at page 16

1    of the Reed complaint, focusing on paragraph 93,

2    this is part of our product liability claim in which

3    we allege Saint Thomas Neurosurgical is strictly

4    liable for the injuries and losses caused by the

5    unreasonably dangerous and defective steroids

6    injected into Diana Reed's cervical spine.

7              So I wanted the Court to just be

8    familiar with that theory.

9              It's really, however, Your Honor, our

10   negligence theories that has prompted this discovery

11   that we are arguing about today.  And our primary

12   negligence theory is that these particular

13   Defendants were negligent, they were careless, when

14   they chose to buy these steroids in bulk from this

15   particular out-of-state compounding pharmacy.

16             And it's important for the Court to

17   understand that this concern about the safety of

18   compounding pharmacies is not a new thing.  It's

19   been going back for more than ten years.  There's

20   been hearings in Congress, dating going back to

21   2003, about the dangers of compounding pharmacies.

22             Your Honor, this is a publication put

23   out by the FDA dating back to 2007 in which the FDA

24   puts out this pamphlet about the risks, special

25   risks associated with compounding pharmacies.  And

1   here, we have a report from the Centers for Disease

2   Control, Your Honor, that goes back to 2002 talking

3   about a series of fungal infections that were the

4   result of compounded steroids.

5           And this report says -- it says:  This

6   report describes five cases of fungal infection

7   associated with contaminated drugs prepared at a

8   compounding pharmacy.  Clinicians should consider

9   the possibility of improperly compounded medications

10  as a source of infection in patients after epidural

11  or intra-articular injections.

12          THE COURT:  What's the date of this

13  publication?

14          MR. NOLAN:  2002.  2002.

15          So, Your Honor, this is just the tip of

16  the iceberg.  There's a lot of medical literature

17  out there about this particular problem in the

18  medical and pharmacy communities.  And so, as a

19  result of this concern, the American Society of

20  Compounding Pharmacists put out some written

21  guidelines about how compounding pharmacies should

22  be evaluated.  These guidelines, Your Honor, were

23  put out in 2010, so about two years before this

24  outbreak.

25          And we can see here, Your Honor, that

1    the -- this organization of pharmacists recommends

2    several things when vetting a compounding pharmacy.

3    And one of the things, Your Honor, that they

4    recommend is a site visit, a visit to the

5    compounding pharmacy, to check things out.  Because

6    these are businesses, Your Honor, which are not

7    subject to the same degree of FDA oversight as are

8    FDA-approved manufacturers like Pfizer, for example.

9    So it's really important to go check these

10   organizations out carefully.

11              Another recommendation, Your Honor, is

12   to check out the regulatory history of a compounding

13   pharmacy before you start buying compounded

14   medications from the pharmacy.  And they also

15   recommend checking and seeing whether the pharmacy

16   has been sued, whether it has a history of product

17   liability lawsuits.

18              So, Your Honor, if these pharmacy

19   recommendations had been followed, there would have

20   been a site visit.  And that raises the question,

21   well, what was there to see at NECC?

22              This is an aerial photograph of the

23   NECC facility in Framingham, Massachusetts.  Here's

24   the facility here (indicating).  And behind it, Your

25   Honor, sharing the same site is a garbage compacting

1    operation.  And I note here, Your Honor, we have a

2    white structure that is behind the NECC facility

3    that we can use as a frame of reference.

4              That's another photograph, Your Honor,

5    looking at the rear of the NECC facility.

6              So this is the place that these

7    particular Defendants chose -- or from which they

8    chose to purchase their injectable steroids that, as

9    it turns out, were infected with lethal mold.

10             And, Your Honor, that brings us to the

11   first discovery request that we have a disagreement

12   about, Your Honor.  In their discovery responses,

13   they have made -- the Defendants, Saint Thomas

14   Neurosurgical and Howell Allen Clinic, make

15   reference to a so-called independent consulting

16   pharmacist, but they will not give us that

17   particular person's name.

18             And in their objection, they interpose,

19   really, two privilege statutes.  One is the Peer

20   Review statute that's been on the books since 1967;

21   and the other is the Quality Improvement Committee

22   privilege statute which was passed in 2011.

23             THE COURT:  April 12th, 2011.

24             MR. NOLAN:  That's right.

25             And, Your Honor, I think it's

```
 1   important, as we --
 2                THE COURT:  I'm sorry.  That's the
 3   effective date.
 4                MR. NOLAN:  That's the effective date.
 5                THE COURT:  It was passed before that.
 6   So that's the effective date of it.
 7                MR. NOLAN:  Yes, that -- that is
 8   correct, Your Honor.
 9                And it's important, Your Honor, as we
10   consider the legitimacy of this interposed
11   objection, to just consider the law of privilege
12   generally.
13                Your Honor, in our brief, we made
14   reference to a principle of Black Letter Law in
15   Tennessee, which is:  The party asserting a
16   privilege bears the burden of establishing each and
17   every element of the privilege.  That's what Don
18   Paine says, and many other courts have said the same
19   thing.
20                We also refer the Court's attention to
21   the "Lee Medical vs. Beecher" case in which our
22   Supreme Court construed the Peer Review Privilege
23   statute, one of the statutes that the Defendant
24   relies on.  And in construing that statute, our
25   Court articulated some general principles of
```

1   construction that applied to any particular claim of

2   privilege.

3            The first principle is:  Tennessee

4   favors broad discovery.  It's about the search for

5   the truth.  That's why we're here.  Secondly, Your

6   Honor, privileges are obstacles to the search for

7   the truth, and for that reason, under our Rules of

8   Evidence, privileges are not favored in civil

9   proceedings.

10           So, Your Honor, that's -- that's the

11   law.  And our first problem with their assertion of

12   privilege over this pharmacist is they won't even

13   give us the pharmacist's name.  They say in their

14   brief that the name is privileged, but they don't

15   offer any authority for that proposition.  They

16   don't cite a single case from any court anywhere

17   that makes that holding, nor do they refer us to any

18   language in the statute that says the names of

19   committee members are privileged.

20           Now, they do cite, Judge, a

21   Massachusetts Court of Appeals decision that

22   actually helps our case.  And I say that, Your

23   Honor:  It's a decision in which the Court in

24   Massachusetts reviewed a circumstance in which a

25   hospital hired an outside consulting doctor to come

1    in retrospectively and look over some charts for a

2    particular dermatologist, and then to actually

3    render -- give a report to the Peer Review Committee

4    of the hospital.

5            Well, there's two reasons why that

6    opinion supports the Plaintiffs' position.  The

7    first is, in that Massachusetts case, the name of

8    the consulting expert was revealed.  It was

9    discussed.  It was mentioned in the -- in the

10   opinions.  So it was not withheld under a claim of

11   privilege.  And secondly, Your Honor, in that case,

12   the pharmacist gave both the report and testimony to

13   a hospital Peer Review Committee.

14           That's not what we have in this case.

15   These Defendants are not claiming that this

16   particular pharmacist gave anything to a committee

17   organized by any of the Defendants.  There is no

18   committee that has been identified by these

19   Defendants.

20           So what is it that they do rely on,

21   Judge, to shield us from this pharmacist?  Because

22   we think, Your Honor, not only are we entitled to

23   this person's name, but we're entitled to any

24   communications that went to or came from this

25   particular pharmacist.

1                    Well, Your Honor, they have filed a

2      contract with the Court in response -- in their

3      response, and I've put it on our screen.  And the

4      first thing we note, Judge, is that this contract is

5      heavily redacted.  And there's no explanation as to

6      why.  It's been unilaterally done.  We don't know

7      what it is that has been hidden.  It's just been

8      heavily redacted, even though the Defendants bear

9      the burden of establishing that the privilege, in

10     fact, applies.

11                    Secondly, Your Honor, the first time

12     that we saw this contract or even knew that it

13     existed was yesterday.  That's the first time we saw

14     it.  And this discovery has been outstanding for

15     almost three months.  We've been talking about this

16     for a long time.  Last week we had a

17     meet-and-converse session for several hours.  This

18     contract was never mentioned.  It was not provided

19     to us.  The first time that it was given to us was

20     yesterday.

21                    The second thing about this contract

22     that's interesting is that no signature page has

23     been filed.  So there's nothing in the record that

24     shows that this contract was actually signed by both

25     parties.

1              Now, I understand that they don't want

2    us to know the name of the -- of the pharmacist.

3    But there's no reason why they couldn't have filed

4    the signature page, blacked out the name of the

5    pharmacist, so we could actually see the date when

6    this particular instrument was purportedly signed.

7    It's not there.  It's not in the record, it has not

8    been provided to us, and we don't know why.

9              And then, Your Honor, if you look at

10   the contract itself, on this first page here on the

11   screen, it mentions parties that aren't involved in

12   this litigation.  It says that it's in agreement

13   with Saint Thomas Neurosurgery Center.  Well, that

14   entity's not a party to this proceeding.  The

15   Defendant in this proceeding is Saint Thomas

16   Outpatient Neurosurgery Center, LLC.

17             Secondly, Your Honor, this contract is

18   dated September the 1st, 2012.  Now, Your Honor,

19   according to the Defendants' discovery responses,

20   all of the steroids that were injected into

21   Mrs. Reed were purchased and shipped before that

22   date.  So this contract has nothing to do with the

23   time period that is relevant to this litigation.

24   They've just put this contract in the record that

25   does not include the correct date.

1                    Your Honor, just before we walked over

2       to the courtroom today, another contract popped up

3       in our in-box, and I'd like to give the Court, if I

4       could, a copy of that.  (Tendering document.)

5                    The Defendants did a notice of filing

6       late this morning placing this document into the

7       record, so the first time we've seen it is today.

8       And frankly, I'm bringing it to the Court's

9       attention now because we object to the Defendants

10      relying on it today.

11                   And here's why.  First of all, it

12      mentions yet another entity that doesn't have

13      anything to do with this case:  Saint Thomas

14      Neurosurgical Associates.  I don't know what that

15      entity is, and there's no proof in the record

16      regarding what that entity is.

17                   Secondly, Your Honor, it says it's for

18      the purpose of providing an available pharmacy

19      license for the Oral Surgery Institute.  I don't

20      know what the Oral Surgery Institute is.  But, Your

21      Honor, I do know that these meningitis cases have

22      absolutely nothing to do with oral surgery.

23                   And finally, Your Honor, it's signed by

24      someone named Sullivan, apparently.  We don't know

25      who that is.  And, Your Honor, there's no affidavit

1    that's been tendered with this document.  They just

2    filed the document, apparently intending to rely on

3    it.

4              So we don't know what it is.  It hasn't

5    been authenticated.  And from the face of it, it

6    appears to have absolutely nothing to do with this

7    lawsuit.  Therefore, we object to them relying on

8    it, first of all.  And it can't be used by them to

9    meet the burden of establishing that -- that their

10   relationship with this pharmacist is -- is protected

11   by the Quality Improvement Committee privilege.

12             And then finally, Your Honor, I'd like

13   to point out that -- that if you look at the

14   language from the statute, the Quality Improvement

15   Committee statute, the Defendants have not

16   established that this particular pharmacist fits the

17   definition as found in the statute.

18             One thing that both sides agree on,

19   Judge, is that in -- the threshold issue as to

20   whether the privilege applies is whether the

21   person -- or whether we're dealing with the Quality

22   Improvement Committee, you know.  Have -- have these

23   Defendants established the existence of that

24   committee?  Is this pharmacist a committee?  That's

25   what they say.

```
 1                    Well, the pharmacist would have to fit
 2      one of three definitions.  First, is he a committee
 3      formed or retained by the health care organization?
 4      Well, he's a man, Your Honor.  He's not a committee
 5      formed or retained by anyone.
 6                    Secondly, Your Honor, is he an activity
 7      of a health care organization?  Well, a person can't
 8      be an activity.  That makes no sense.  So --
 9                    THE COURT:  I'm sorry.
10                    MR. NOLAN:  Sure.
11                    THE COURT:  Let me make sure I'm
12      following.
13                    So B(4), is that what this refers to?
14                    MR. NOLAN:  Yes, Your Honor.
15                    THE COURT:  Okay.  Okay.  I'm -- I've
16      got it all highlighted and numbered, and I just
17      wanted to make sure I was following you.
18                    MR. NOLAN:  So it's our position that a
19      person can't be an -- an activity.  That's
20      nonsensical.  And this man is not a committee formed
21      or retained by anyone.
22                    So then we're down to No. 3:  Is he one
23      or more individuals employed by a health care
24      organization performing one of the enumerated
25      functions?
```

1            And I focus the Court's attention on
2    the word "employed by."  They've made a big deal in
3    their papers about the fact that he is an
4    independent consulting pharmacist, he was an
5    independent contractor, he's not an employee, and
6    was not employed by these particular Defendants.
7            So, Your Honor, to wrap up that issue,
8    and then I'll -- I'll yield the podium to
9    Mr. Tardio --
10            THE COURT:  Hold on a minute.
11            MR. NOLAN:  Okay.
12            THE COURT:  And to be employed by, is
13    it necessary for him to be an employee?  I mean, you
14    can be employed and an independent contractor as
15    well as having somebody on the payroll as an
16    employee, can you not?
17            MR. NOLAN:  Well, I'm not sure about
18    that, Your Honor.  I mean, it said "employed by."
19    It didn't say "contracted by" or "hired by."  It
20    says "employed by."  And "employee" is a word that
21    has particular legal significance.
22            THE COURT:  That's true.
23            MR. NOLAN:  But even -- even if it's
24    arguable that maybe this particular pharmacist could
25    fall in with some -- into one of these categories

1    under the statutes, the fact still remains, Your
2    Honor, they have not met their burden of
3    establishing that the privilege applies because they
4    haven't provided the Court with any contract that
5    has anything to do with this lawsuit, according to
6    the proof in the record.
7              So I'll -- would the Court like me to
8    now take the individual requests one at a time and
9    yield to Mr. Tardio on this pharmacist issue?
10             THE COURT:  Well, I -- we'll let
11   Mr. Tardio make his opening remarks.
12             MR. NOLAN:  Okay.
13             THE COURT:  And then we'll -- then
14   we'll start with each contested --
15             MR. NOLAN:  Thank you, Your Honor.
16             THE COURT:  -- discovery issue.
17             Yes, sir.
18             MR. TARDIO:  Thank you.
19             THE COURT:  Mr. Tardio?
20             MR. TARDIO:  Your Honor, I'm not going
21   to argue our case.  Mr. Nolan made a very good
22   opening statement, showed a lot of documents that
23   may or may not relate to the trial of this case.
24             But here we are four months after the
25   outbreak started -- five, six -- six months after

1    the outbreak started, and then the issue in front of

2    the Court is a discovery dispute.  That's where we

3    are.

4              THE COURT:  Okay.

5              MR. TARDIO:  And I -- I do want to

6    point out to the Court that -- one important point,

7    I think, illustrated by some of Mr. Nolan's

8    comments:  We're trying to determine what documents,

9    what information is relevant to this case without

10   knowing what law applies because we haven't briefed

11   it yet.  Our position, as this Court knows from

12   earlier argument, is that the Products Liability Act

13   doesn't apply here.  So we're taking some of these

14   disputes in the abstract.

15              I will address the -- the Quality

16   Improvement Committee statute because it absolutely,

17   100 percent, applies to the relationship between

18   this consulting pharmacist and the STOPNC,

19   Saint Thomas Outpatient Neurosurgical Center.  The

20   statute --

21              And, Mr. Wood, why don't you put up the

22   statute?

23              Because I do want to look at the actual

24   language of the statute.

25              The statute defines a Quality

```
1     Improvement Committee not by its name -- and Lee
2     Medical said that specifically when it was applying
3     the other statute.  We don't look at a -- the name
4     of the committee, the name of the people involved;
5     we look at their function.  And this statute --
6     which I think it's important to recognize was passed
7     in response to Lee Medical --
8                    THE COURT:  Are you referring to --
9                    MR. TARDIO:  68-11-272.
10                    THE COURT:  Well, the Lee Medical
11    opinion, are you referring to the fact that the
12    Court, the Supreme Court, our Supreme Court, said
13    the term Peer Review Committee and Medical Review
14    Committee are interchangeable as far as statutory
15    language?
16                    MR. TARDIO:  It says that.  But also in
17    that -- in that opinion, I think at page 16, it says
18    that we don't look specifically at the name; we look
19    at the function.
20                    And that's what this statute does.  It
21    defines Quality Improvement Committee by the
22    function of the process and the function of the
23    people involved.  And it enumerates various
24    functions that -- that constitute what our
25    Legislature has said is a Quality Improvement
```

 1   Committee.

 2              And we -- we have to look at this

 3   statute in the context of the Legislature's clear

 4   decision, in the first paragraph of the statute, to

 5   say that the ability of health care providers to

 6   evaluate their care, and care that goes on within

 7   their facility, is so important to this state and so

 8   important to the Legislature that it outweighs

 9   discovery of that information in lawsuits; not only

10   the discovery of that information, but also the use

11   of that information.

12              So it's -- it's not admissible.  And

13   you can't even get it.  And that's the policy behind

14   this statute.  It's clear, it's obvious, that --

15   that the Legislature intended it to be broad and

16   strong.

17              THE COURT:  There's no way to improve

18   patient safety, quality of patient care, costs,

19   processes, necessity of health care services, unless

20   you have a committee studying that, and finding

21   fault where fault needs to be found so improvement

22   can occur.  And that's the -- that's the policy of

23   our state, is to encourage that kind of in-depth

24   review at all times, constantly.

25              MR. TARDIO:  And I respectfully submit

1    to the Court that ordering Saint Thomas Outpatient

2    Neurosurgical Center to disclose its communications

3    with a person that it retained, as established by

4    the affidavit, to do exactly what the -- the statute

5    contemplates, evaluate the use of medications and

6    evaluate the care given within those four walls of

7    that facility, to order us to do that would

8    significantly chill this purpose.

9              And if I'm advising a -- an ambulatory

10   surgery center or a hospital, I'm certainly not

11   going to tell them to -- to engage a consulting

12   pharmacist if everything that they communicate with

13   that consulting pharmacist is discoverable.

14   That's -- that's going to be used against them in

15   every lawsuit where -- and that's the intent of this

16   statute: to protect that relationship.  So our --

17   the threat --

18              THE COURT:  And -- and if that

19   information is used against the health care provider

20   in every lawsuit, then the health care provider

21   stops the process of trying to get better.

22              MR. TARDIO:  It takes -- it not only

23   takes away the incentive to get better and to

24   internally evaluate your care, it creates a

25   disincentive to do it.

1                    And that's exactly what the -- let me
2     make -- let me another statement, just as a broad
3     brush here.
4                    I can't use any of this information,
5     me, if it helps.  And 99.9 percent of the time, this
6     information -- maybe not 99 -- 95 percent of the
7     time, it helps.  It helps.  95 percent of the time,
8     the committee looks at things and says, "Hey, this
9     is -- this is great."  And I'm talking, obviously,
10    in the abstract here.
11                   But I can't use it; the Plaintiff can't
12    use it.
13                   THE COURT:  Right, right.
14                   MR. TARDIO:  In the --
15                   THE COURT:  In the process of
16    evaluation, the evaluator can say, "You're doing a
17    good job."
18                   MR. TARDIO:  Or they can say, "You're
19    doing a terrible job."
20                   THE COURT:  Right.
21                   MR. TARDIO:  And either way, they need
22    to be free to give a reasoned, independent
23    evaluation of that care and that process in order to
24    meet that policy set out in Section (a), the very
25    first section of the statute.

```
 1                    So as a -- as a broad context for what
 2      we look -- we're looking at, we have to interpret
 3      the statute to -- with that policy -- with that
 4      policy in mind.
 5                    The -- we have submitted sufficient
 6      information into this record to establish that the
 7      privilege applies.  There is nothing -- nothing
 8      nefarious about this -- the contracts we've filed.
 9      We redacted the parts that are not relevant.  We
10      filed the previous contract, which was referenced in
11      our papers.  It's not a surprise.  We referenced in
12      our papers and said, "We filed the 2012 contract,
13      but that's the contract that came before that."
14                    They say essentially the same thing.
15                    THE COURT:  The -- the one I just got:
16      February 1, 2007?
17                    MR. TARDIO:  Yes, sir.  It went up
18      through that September of 2012 contract.
19                    And the reason we filed those was not
20      to illustrate everything that was involved in this
21      relationship; it was to -- to illustrate for the
22      Court the function and functions that this
23      consulting pharmacist had.  And that's why those
24      provisions in the contract are important.
25                    So -- now, Mr. Nolan concentrated
```

1    largely on whether the pharmacist is a Quality

2    Improvement Committee under the statute.  He is.  He

3    meets all those definitions we put up.

4                But the -- the statute covers both ends

5    of this.  It covers the person evaluating the care

6    or the process or what's going on at the facility.

7    It also covers the people who are receiving that

8    information.

9                So in this situation, it covers both

10   the consulting pharmacist who's looking at the

11   medications used, the processes in place, the

12   policies and procedures.  It covers his conclusions,

13   the evaluator.  It also covers the communications

14   received by the facility.  In other words, if I'm

15   the facility, I have to be able to hear what he has

16   to say, and talk about that amongst my colleagues to

17   put his suggestions into place.

18               So if we look at -- let me see --

19   walking through the statute, it's -- it's obvious

20   that it applies.

21               Keep scrolling down.  We looked at the

22   policy already.

23               First and foremost, we know -- and I

24   don't know that there's any dispute that STOPNC is a

25   health care organization.  It's an ambulatory

 1   surgery center regulated under Title 68.

 2              This statute also extends the

 3   definition of health care organization to any

 4   entity -- in (b)(1)(E) -- any entity that contracts

 5   with a health care organization to perform any of

 6   the functions of a Quality Improvement Committee.

 7              So that broadens the definition of

 8   health care organization under this particular

 9   statute to anyone who contracts with a health care

10   organization.

11              That, right there, gives hospitals and

12   ambulatory surgery centers the ability to contract

13   with outside people to evaluate the care and the

14   processes within their four walls.  So under that,

15   (E), the pharmacist consultant, is a health care

16   organization.

17              The statute went so far as to provide

18   us with these definitions so that we didn't -- I

19   mean, obviously, some of these sub-definitions of

20   health care organization aren't what we would

21   normally consider to be a health care organization.

22   So that's why the statute and the Legislature's

23   given us these definitions.

24              So if we continue walking down, it

25   tells us what is a Quality Improvement Committee

1    under the statute.

2              Keep going.

3              So we get to Section 4, where it

4    defines Quality Improvement Committee or QIC.  First

5    off, it's a committee formed or retained by a health

6    care organization.  So it could be somebody within

7    the organization doing this evaluation; or you can,

8    obviously, retain somebody from outside, which makes

9    sense because not every hospital has every single

10   specialty.

11             Like in the case that we cited, they

12   had to -- they had to consult with an outside skin

13   surgeon because they didn't have somebody on staff

14   to evaluate that -- that care.  In this case, we

15   don't have a pharmacist on staff, so we have to

16   retain somebody from outside to evaluate the

17   medication use.

18             It also defines Quality Improvement

19   Committee as an activity of a health care

20   organization, the purpose of which is to evaluate

21   safety quality processes, costs, and necessity of

22   health care services.  So it includes within the

23   definition of committee, of Quality Improvement

24   Committee, the activities.  And this goes back to

25   the overarching impetus behind the statute to define

1    Quality Improvement Committee by its function, by

2    its acts -- not its name, its acts.

3                 So any activity of a health care

4    organization to evaluate safety quality processes,

5    costs, et cetera, that is a Quality Improvement

6    Committee by definition in the statute.  And we have

7    to read the words of the statute as the Legislature

8    wrote it.

9                 THE COURT:  You have to give them their

10   plain and ordinary meaning.

11                MR. TARDIO:  Right.

12                And then if we go on to the last

13   definition of Quality Improvement Committee:  One or

14   more individuals employed by a health care

15   organization performing these functions.

16                So again, we can tell -- or we can

17   reasonably interpret the statute in that provision

18   to include within Quality Improvement Committee a

19   single person -- a single person evaluating care

20   within a facility, externally retained by, or

21   internally, can qualify as a Quality Improvement

22   Committee.

23                Then we get to the most important part

24   of the statute.

25                THE COURT:  You have committee one,

```
 1    basically?
 2                    MR. TARDIO:  Sure.  Absolutely.
 3                    What is a Quality Improvement
 4    Committee?  What are the functions that qualify a
 5    person or a group of people engaging in this
 6    process?  What are the functions that make them a
 7    Quality Improvement Committee?  And it lists them.
 8                    First it gives you the broad -- the
 9    broad definition:  Evaluating safety quality
10    processes, costs, appropriateness or necessity of
11    health care services.
12                    And then it gives you this
13    nonexhaustive list of specific functions that these
14    people can fulfill to qualify as a Quality
15    Improvement Committee.
16                    And clearly, based on the affidavit of
17    Ms. Schamberg and the two contracts that are in this
18    record, the function -- the function of the process
19    that the consulting pharmacist and Ms. Schamberg and
20    the STOPNC staff engaged in, the function and
21    functions that they -- that they fulfilled are --
22    clearly fit within the general definition:
23    Evaluation of the safety quality processes, costs,
24    appropriateness and necessity of health care.  And
25    they specifically fit within the subdivisions, this
```

 1   nonexhaustive list.

 2              So looking at the function of the

 3   people involved in this process as evidenced by the

 4   affidavit and the two contracts that have been

 5   filed, it's clear that both the intent of the

 6   arrangement between the pharmacist and the center --

 7   both the intent of their arrangement and the way

 8   that arrangement was carried out fits within the

 9   confines of Section 4, and more specifically 4(a)

10   and the other subdivisions.

11              So they're doing -- they're doing what

12   the statute tells them they can do and what the

13   statute protects.

14              So clearly, both the pharmacist

15   consultant and Ms. Schamberg and the staff engaged

16   in this; they're both Quality Improvement

17   Committees; and from both ends, they fit within the

18   statute's definitions.

19              So then we get to what is protected.

20   And frankly, Judge, under the language of the

21   statute, it's everything, everything related to

22   these functions.

23              THE COURT:  If it meets the definition

24   of the -- well, I lost the word.

25              MR. TARDIO:  Records?

```
 1                   THE COURT:  No, the -- well, what am I
 2      trying to think of?  The exception to the rule is --
 3      can't read my mind.
 4                   Well, anyway, I'll -- I'll think of it
 5      in a minute.  Go ahead.  My apologies.
 6                   MR. TARDIO:  That's fine, Judge.
 7                   The -- the point of this statute is to
 8      protect communications, records, and anything else
 9      arising from this relationship.  So first, we have
10      filed an affidavit in two contracts to establish the
11      relationship existed, the function of that
12      relationship was consistent with what the statute
13      says Quality Improvement Committees are supposed to
14      do.
15                   THE COURT:  What I'm trying to say:
16      Meets the definition of privilege.  Everything is
17      protected.
18                   MR. TARDIO:  Exactly.  Everything is
19      privileged from discovery and from admission of
20      evidence -- or admission in any judicial or
21      administrative proceedings.
22                   So anything that the pharmacist
23      created, any communications between the pharmacist
24      and the Center, and anything created on the other
25      end internally, interpreting or applying what he
```

```
 1    says.
 2              Another important part of the statute:
 3    It protects from both direct discovery and indirect
 4    discovery.  This is -- has to be the broadest
 5    privilege statute in our -- or at least one of the
 6    broadest privilege statutes that we deal with on
 7    a -- on a fairly regular basis.  It protects
 8    everything within that relationship.  And that's
 9    because the Legislature felt that was necessary to
10    meet the policies set out in the first section.
11              So clearly -- clearly, we have a
12    Quality Improvement Committee by function, as
13    established by the affidavit in the contracts;
14    clearly, we have documents and communications that
15    have been identified that arise from this
16    relationship; and clearly, under the plain language
17    of the statute, they're protected and privileged.
18              So I would respectfully submit, Your
19    Honor, that the documents created by the consulting
20    pharmacist and any communications arising from the
21    relationship are privileged.
22              Thank you, Judge.
23              THE COURT:  All right.  Thank you.
24              Rebuttal?
25              MR. NOLAN:  Thank you, Your Honor.
```

1          Your Honor, the Court mentioned the
2   "Lee Medical vs. Beecher" decision.
3          THE COURT:  Yes.
4          MR. NOLAN:  And one of the things
5   that -- that the Supreme Court said in that decision
6   is that there are certain presumptions that courts
7   can consider when construing statutes.  And they
8   said:  Courts may also presume that the general
9   assembly did not intend an absurdity.
10          Your Honor, the way that these
11  Defendants are construing this statute is so broad
12  that if someone at Saint Thomas Neurosurgical went
13  into the broom closet and talked to themselves, that
14  could be labeled a Peer Review -- a Quality
15  Improvement Committee meeting.  That just doesn't
16  make sense.
17          As the Court observed, Your Honor, the
18  purpose of the Quality Improvement Committee
19  privilege is so that health care providers can form
20  committees and actually study the quality of care,
21  particularly retrospectively, so that if something
22  bad happens, we don't want it to be repeated.
23          But this is not a circumstance in which
24  Saint Thomas Neurosurgical, after this outbreak
25  occurred, went out and hired this particular

 1   pharmacist to do a postmortem look-back and figure

 2   out what happened, why it happened, and how it could

 3   be prevented in the future.  Now, if that happened,

 4   maybe they would have an argument that it should be

 5   a Quality Improvement Committee circumstance.

 6             But that's not what we have here, Your

 7   Honor.  What we have here is a record that is

 8   completely absent of any reliable information

 9   indicating that this pharmacist was -- meets the

10   definition of a Quality Improvement Committee.

11             Mr. Tardio didn't talk about the burden

12   that we have here today, but it's his client's

13   burden to establish that this privilege applies.

14   And under the contracts that have been filed, Your

15   Honor, they simply can't meet the burden.

16             Another thing he did not talk about is

17   the fact that the statute does not say they're

18   entitled to keep the names of a purported committee

19   member secret.  So, Your Honor, you know, if they

20   came forward and said, "Here's the committee.

21   Here's its members.  They have regular meetings, and

22   we're not going to tell you what the meetings

23   were -- what was discussed, and we're not going to

24   give you the minutes.  But we'll tell you we have a

25   duly-constituted committee and -- and it met, and it

1    didn't look back about this fungal meningitis

2    outbreak," then we think it would be a closer

3    question.

4              But none of it, no information like

5    that is in the record, Your Honor.  We ask the Court

6    to find that they have not met their burden, and

7    that this information is plainly discoverable.

8              THE COURT:  So the Plaintiffs' position

9    is -- make sure I understand, and tell me if I'm

10   wrong -- is that if the committee of one in this

11   case, the pharmacist, was contracted after the fact

12   of the -- of the issues in question in this case,

13   that the Quality Improvement Committee of one

14   created after the fact is not what the Legislature

15   intended to be protected?

16             MR. NOLAN:  That's right, Your Honor.

17   If you look at the -- if you look at the Lee Medical

18   opinion and its discussion of Peer Review Committees

19   and how they should be entitled to do postmortems,

20   and look at a doctor's conduct and decide whether --

21   what should be done, there's no question that would

22   be privileged information.

23             But that's not what we have here.  I

24   mean, what they're saying is, when they put these

25   contracts in the record, Your Honor, with entities

```
 1    that aren't parties to the case that apparently have

 2    nothing to do with the case, and they say, "Oh,

 3    well, that means everything that happened with this

 4    particular pharmacist is privileged," and that

 5    doesn't -- that doesn't make sense.

 6              I mean, the only thing they rely on,

 7    Your Honor, is a statute that I would suggest is not

 8    a blue-ribbon example of draftsmanship.  It's --

 9    it's very confusing.  But they haven't put

10    information in the record to show that they fall

11    within the purview of the statute.

12              That's our position.

13              THE COURT:  Okay.  Thank you.

14              MR. TARDIO:  Very briefly, Judge.  I

15    just want to respond to that.

16              THE COURT:  Okay.

17              MR. TARDIO:  Two points, Your Honor,

18    specifically from Mr. Nolan's statements.  First,

19    we're again hung up on the word "committee."  The

20    statute clearly defines Quality Improvement

21    Committee by the function of what these people are

22    doing, and it clearly can involve just one person on

23    the evaluator's side and on the facility's side, and

24    it clearly contemplates engaging people outside the

25    facility to perform these evaluation functions.
```

1              THE COURT:  I -- I think I agree with
2   you on that.  But what about the formation for
3   the -- for the contracting of this individual -- in
4   this case, the pharmacist -- after the fact?
5              MR. TARDIO:  Well, he -- he was
6   contracted in 2007.  The second contract was signed
7   in 2012.
8              THE COURT:  Okay.
9              MR. TARDIO:  That's why we have the
10  two.  And in our -- in our brief, what we did is we
11  filed the newest contract; and then in our brief, we
12  said the previous contract set out the same
13  functions.  And then this morning, I thought, well,
14  we better get the old contract in the record, too,
15  so . . .
16             THE COURT:  Well, I think Plaintiffs'
17  position is on the old contract.  Of course, the new
18  contract doesn't tell us much.  The old contract
19  tells us a little more.
20             First of all, the old contract says it
21  was entered into as a pharmacy consulting contract,
22  number one, entered into, it looks like, February 1
23  of 2007.  Looks like it was signed 3-20-07; however,
24  the date on the pharmacist's signature was blacked
25  out.  It looks like there was -- there was an

```
 1    attempt to make a line through a 7.  But it could --

 2    could be -- could be a 12 -- I mean, a 2, '02.  But

 3    '07 looks like what it is.

 4                   But anyway, the point is, it's between

 5    Saint Thomas Neurosurgical Associates and a

 6    duly-licensed pharmacist for the purpose of

 7    providing an available pharmacy license for the Oral

 8    Surgical Institute, licensure by the Tennessee

 9    Department of Health.

10                   I'm not sure I understand what that

11    means either.

12                   MR. TARDIO:  Well, I think the "Oral

13    Surgery" part is a cut-and-paste from another

14    contract, not . . .

15                   THE COURT:  So it shouldn't have been

16    in there?

17                   MR. TARDIO:  Well, it should say

18    probably Ambulatory Surgery Center or Saint Thomas

19    Neurosurgical Center.

20                   THE COURT:  But it doesn't say that.

21                   MR. TARDIO:  I agree.  That's why we

22    filed the affidavit where she says, "This is the

23    relationship."  So even if we didn't have a contract

24    in place, --

25                   THE COURT:  Yeah.
```

1          MR. TARDIO:  -- the affidavit says,

2  "This is the relationship I had with this person."

3          THE COURT:  The point -- but the

4  affidavit doesn't say when the relationship began

5  between the pharmacist and your client.

6          MR. TARDIO:  You're right, Judge.  And

7  I'm certainly willing to supplement that with a time

8  period.  I will represent, as an officer of the

9  court, it began in 2007 with that first contract.

10          THE COURT:  Okay.  That's why I was

11  confused.

12          MR. TARDIO:  And I understand, Judge.

13  We talk about the draftsmanship of the statute.  The

14  draftsmanship of the contract's also not super.

15          But one thing the -- the contracts and

16  the affidavit are clear on is the function that the

17  pharmacist fulfilled.  And that's what's important

18  under the statute.  And this suggestion that only

19  after-the-fact evaluation of care is protected by

20  the statute is absolutely contrary to the language

21  of the statute which protects education of staff.

22  Clearly, the intent being that you prevent some of

23  these things from happening; not just you determine

24  that they shouldn't have happened.  It covers

25  education.  It covers improvement, because you're

1    trying to improve on the front end.

2            The goal of the statute is obviously to

3    provide better care; not to evaluate care after the

4    fact and say, "Well, we shouldn't" -- the goal is,

5    going forward, the policy is to -- to provide better

6    health care for the residents of this state.

7            THE COURT:  So the Defendants' position

8    is, it doesn't matter when the consultant was

9    contracted, if it was before the fact of what we're

10   here about, or after the fact.  They're performing

11   the same function.

12           MR. TARDIO:  Right.  He's been

13   performing that function since 2007.  And if the

14   Court is hung up on the language of the statute,

15   we'll supplement our affidavit to say that the

16   relationship began in '07.

17           And I understand that it's not entirely

18   clear --

19           THE COURT:  Well, I'm just trying to

20   clear it up.

21           If the -- if your position is, it

22   doesn't matter when the consultant was contracted,

23   then -- or contacted.  Doesn't have to be

24   contracted, just contacted.

25           MR. TARDIO:  Sure.

1                THE COURT:  You don't have to have a

2     contract.

3                MR. TARDIO:  Absolutely.

4                THE COURT:  If the contact or contract

5     was made after the fact, it's -- he or it, the

6     committee -- in this case, committee of one,

7     pharmacist -- is performing the function, that is

8     protected by the statute.

9                MR. TARDIO:  I don't think that's --

10               THE COURT:  Is that -- is that your

11    position?

12               MR. TARDIO:  Yes, sir.

13               And I don't think there's any question

14    he was performing that function by the terms of the

15    contract and the -- and the explicit testimony in

16    the affidavit, at this point unrebutted.

17               Of course, if he's contracted after the

18    fact, we have a relevance issue because he didn't --

19    but I'm telling -- I'm representing to the Court he

20    was contracted before this outbreak, and he was

21    performing these functions before this outbreak

22    occurred, and that his role was to evaluate the care

23    and the use of medications at Saint Thomas

24    Outpatient Neurosurgical Center as set out in the

25    contracts and, more specifically, in the affidavit.

1                    That was his role, that was his

2    function, that was what he did, and that's what the

3    statute protects.

4                    Thank you, Your Honor.

5                    THE COURT:  All right.  You'll get the

6    last word, Mr. Nolan.

7                    MR. NOLAN:  Your Honor, 15 people have

8    died, and more than 100 have gotten sick, meningitis

9    from injections that were given at Saint Thomas

10   Neurosurgical.  So this is a very serious matter.

11   And they're trying to shield us from the identity of

12   a very important player in this.  And the only thing

13   they've done is come forward with these contracts

14   that don't lend any support for their position;

15   contracts, Your Honor, that aren't with any of the

16   parties to this lawsuit.  Contracts that say -- or

17   one of them says that it's for the purpose of

18   licensure for an Oral Surgical Institute.

19                    And that is against a backdrop of:  Its

20   their burden, its their burden to convince the Court

21   that this information should be shielded from all

22   these victims.  And that's not right, it's not fair,

23   and it's contrary to the law.  And we ask for the

24   information.

25                    Thank you.

1                   THE COURT:  Okay.  Because of the

2    previous discussions about this case, meetings with

3    you-all in the courtroom about this case, I have

4    heard the reference to the fact that the name of the

5    entity or entities, Saint Thomas Outpatient

6    Neurosurgical Center, LLC and/or Howell Allen

7    Clinic, have changed from time to time.  And maybe

8    that is one of the issues with these -- with the

9    affidavit, with the contract.  I mean, I don't know.

10   And I think that's -- I think that's what the

11   Plaintiff is referencing, that a lot of these --

12   these names that have been -- except for the

13   affidavit.  The affidavit states what the present

14   names are.

15                   But I think the names, based on your

16   discussions about this case, that -- the names

17   weren't that important to me at the time, but I have

18   heard you-all say the names have changed.  These

19   entities' names have changed.  And maybe that's --

20   maybe an affidavit is needed to substantiate that

21   and/or maybe documents to substantiate that.

22                   You know, if they're -- if they're

23   corporate entities and they're -- you know, they've

24   done the necessary filings with the Secretary of

25   State to show and trace the origin and history of

```
 1    the different names that these entities have had

 2    over time, that may -- may add some authenticity to

 3    these pharmacy -- this pharmacy that's on the

 4    contract, the one that I was just handed today, that

 5    I think the Plaintiffs were just handed today, dated

 6    February 1, 2007.  And maybe that will answer some

 7    of the Plaintiffs' issues.

 8              But I don't know -- I don't really want

 9    to put this off either.  So I'm just putting that

10    out as a means, possibly, of resolving that issue.

11              MR. TARDIO:  Your Honor, we can have an

12    affidavit that says their relationship extended back

13    to 2007 in the record today.  I think that our

14    affidavit kind of broad-strokes what the

15    relationship was, but I'm more than willing to

16    supplement with an affidavit that sets out the time

17    frame.

18              THE COURT:  Okay.  Well, the names of

19    the entities, too.  Or maybe -- maybe that will take

20    care of it.  Maybe an -- a supplemental affidavit

21    from Debra Schamberg, registered nurse, who is

22    the -- she's the facility director of Saint Thomas

23    Outpatient Neurosurgical Center and is also a

24    registered nurse.  Have her affidavit that states

25    date pharmacist was consulted for the first
```

1   consulting.  And by this named facility that we

2   know -- by the name we know of today and maybe the

3   names of -- name or names of that facility were

4   different earlier on.  Something to that effect, I

5   think, would help.

6            It would help -- it would help the

7   record -- it would clear the record up, because the

8   Plaintiffs made an issue about it.  I mean, I think

9   it needs to be cleared up.  And the Plaintiffs have

10  got every right to make an issue of that.  It's --

11  they're being good advocates for their clients by

12  doing that.

13           And I know we're kind of on a pushed

14  schedule here to make sure these depositions go off

15  as requested and planned.  And that's probably the

16  reason for the need for a supplemental affidavit of

17  Debra Schamberg.

18           Am I making sense to the Plaintiffs?

19  Does that -- would that help any?  Of course, it

20  depends on what it says, I guess, as to whether it

21  helps or not.  But do you understand what I'm

22  getting to?

23           MR. NOLAN:  Yeah.  I mean, I -- I do

24  think it depends on what -- what it says.

25           THE COURT:  Says, yes.

```
 1                    MR. NOLAN:  Very respectfully, I mean,
 2   our, of course, position is that, I mean, they've
 3   had their chance to put whatever they wanted to in
 4   the record, --
 5                    THE COURT:  And today is --
 6                    MR. NOLAN:  -- and now the issue is
 7   before the Court.
 8                    THE COURT:  -- today is the -- and I've
 9   heard that, too.  I heard that argument, too.  If
10   they haven't done it today, they're too late to
11   establish the privilege.  That's another issue for
12   me to decide.
13                    But I'm glad we're -- we're talking
14   about this before we start with the -- with the
15   issues of whether or not information is to be
16   revealed, because a lot of it depends on whether the
17   privilege applies.  So it's a good way to start --
18   start the discussion.
19                    So what do you say, Mr. Tardio, to the
20   Plaintiffs' position that everybody knew what we
21   were supposed to do today?  And if it hadn't been
22   done to the satisfaction of -- of the Plaintiffs and
23   maybe to the satisfaction of the Court, is it too
24   late?  Are you too late to establish your privilege?
25   Or is the privilege a privilege no matter what
```

1    and -- and it -- and it can't be waived by the
2    lateness of the presentation of proof to show the
3    privilege?
4              MR. TARDIO:  I think, respectfully,
5    Your Honor, the record, as is, is sufficient.  I
6    respectfully submit that even if you don't -- don't
7    consider the contracts, we still have an affidavit
8    that says, "This is the relationship we had with
9    this consulting pharmacist."
10             So I respectfully submit the record, as
11   is, is sufficient.  But I also respectfully submit
12   that with an issue of this importance in the policy
13   that -- that the State of Tennessee Legislature has
14   set out, it is entirely within this Court's
15   discretion to allow a supplemental affidavit that
16   adds literally one sentence to this process.  The
17   relationship I describe in this affidavit extends
18   back to 2007; or the contracts that are -- that have
19   been filed in this record, although the names might
20   be stated differently in the contract, it -- we
21   followed it as Saint Thomas Outpatient Neurosurgical
22   Center and its previous iterations.
23             So if Your Honor believes that the
24   record is not sufficient to establish the time frame
25   of this relationship, then I respectfully submit

1    that a supplemental affidavit as to what's already

2    in the record is entirely proper in this situation,

3    especially considering we have been on a very

4    compressed time frame.

5              THE COURT:  I'm aware of that.

6              MR. TARDIO:  We've answered literally

7    hundreds of requests, when you combine the two --

8    the four sets, but times three lawsuits that we're

9    answering discovery in.  So if Your Honor wishes the

10   record to be clear, I'm more than willing to have an

11   affidavit go in the record by this afternoon.

12             THE COURT:  Well, I think it's to

13   everybody's benefit, always, for the record to be

14   clear --

15             MR. TARDIO:  Sure.

16             THE COURT:  -- as possible in any case.

17             Okay.  Well, let's do this:  Let's see

18   what we can do with the -- if anything.  I mean,

19   I've -- I've looked through them all.  I can't

20   remember how many of these objections referred to

21   the privilege.  I think a lot of them do.  But maybe

22   we can solve some of those that don't.

23             MR. TARDIO:  Mr. Nolan may correct me,

24   but I think that the privilege -- the pharmacist

25   privilege is certainly one of four or five issues

```
 1    that permeate the responses.  So if the Court wishes

 2    to move on, I think that we could take up some of

 3    the other ones and address them.

 4               THE COURT:  While -- while we're here,

 5    I want to do something, if we can do it.

 6               MR. NOLAN:  I think we're -- I think

 7    there's a lot we can do, Your Honor.

 8               THE COURT:  Okay.  Good.  Well, let's

 9    do that.

10               MR. NOLAN:  So I take it the Court is

11    going to -- is -- the Court's going to take the

12    pharmacist privilege issue under advisement at this

13    point?

14               THE COURT:  Yes.  And I -- I would --

15    how long will it take for you to get a supplemental

16    affidavit?

17               MR. TARDIO:  I think we'll be able to

18    do it this afternoon.  I'm told Ms. Schamberg is at

19    home sick.  But, you know, she signed this one over

20    the weekend.

21               We've -- we've been bothering her with

22    a lot of things on these discovery requests, so I

23    think we can get a supplemental affidavit.

24               THE COURT:  Okay.  And I don't know

25    that that totally solves the Plaintiffs' position,
```

```
 1    but it might help at least fill that gap that I
 2    believe is there in the record.
 3              And I know, Mr. Tardio, you made a
 4    statement as an officer of the Court, what you said,
 5    and I -- I -- you know, I respect that, and I have
 6    no reason to doubt anything you're saying.  I just
 7    think the record needs to be as clear as it can be
 8    so we can move forward, based on what we do have in
 9    the record versus a representation, which is
10    perfectly fine.  But I think, given the import of
11    all this, we need to --
12              MR. NOLAN:  Your Honor, here's the
13    problem.
14              THE COURT:  -- dot the I's and cross
15    the T's.
16              MR. NOLAN:  Ms. Schamberg did not sign
17    the first contract back in 2007, so I don't see --
18              THE COURT:  How -- how do we know that?
19              MR. NOLAN:  Well, it's not her name on
20    the document.  If we look at the first contract, the
21    one --
22              THE COURT:  Tina -- Tina Sullivan, yes.
23              MR. NOLAN:  Yeah.  That -- so
24    Ms. Schamberg's affidavit, very respectfully, can't
25    really tell us anything.  I mean, the only contract
```

 1   that she claims that she signed is the one dated

 2   September 1st, 2012.

 3              THE COURT:  Which is totally redacted.

 4   I can't make any sense of it.

 5              MR. NOLAN:  It's so totally redacted.

 6   They don't give us the signature blocks, you know,

 7   and it's after the fact.  And Mr. Tardio has told

 8   the Court that the record is sufficient.

 9              So with all due respect, we think the

10   Court should make a decision based on what's before

11   it, because there's no reason for us to believe that

12   Ms. Schamberg can testify to anything about the

13   first contract.  She didn't sign it.

14              THE COURT:  Is -- if Defendants know --

15   and I know -- is Tina Sullivan still with the group?

16              MR. TARDIO:  No.  Ms. Schamberg took

17   her place as facility director.

18              THE COURT:  Where is -- do you know

19   where Ms. Sullivan is?

20              MR. TARDIO:  I don't know.

21              THE COURT:  Okay.

22              All right.  Well, let's -- let's do

23   what we can without going into a privilege issue at

24   this moment.  And if we can get something cleared

25   up -- and, I mean, I really think something needs --

1    I mean, the affidavit needs to say more than just

2    the date.  It needs to explain who Tina Sullivan is,

3    who she was, what -- what I've just been told.

4              I mean, all those things need to be --

5    and what -- what Saint Thomas Neurosurgical

6    Associates was and how -- what relationship that

7    entity has to the present entities at Saint Thomas

8    Outpatient Neurosurgical Center, LLC.

9              I mean, I -- I think it can be done if

10   it -- if they are, in fact, the same entities

11   with -- but we just don't have all that detail right

12   now in front of -- front of us.

13             So see what y'all can do about that.

14             MR. TARDIO:  Yes, sir.

15             THE COURT:  Okay.  Thank you.

16             (At which time, Mr. Cline and Mr. Zini

17   departed the courtroom.)

18             THE COURT:  Let's see what we can do on

19   the other issues.

20             MR. NOLAN:  All right, Your Honor.

21             Your Honor, the next issue that I think

22   we can deal with is --

23             THE COURT:  Yeah, and -- well, let me

24   say this --

25             MR. NOLAN:  Yeah.

1                    THE COURT:  -- before we go any

2      further.  Tell me why, Mr. Tardio, we -- we can't

3      know the name of the pharmacist consultant.

4                    MR. TARDIO:  Well, I -- I don't

5      think -- I don't know necessarily that the name -- I

6      think the name is probably privileged, under the

7      broad reading of the statute.  I also think the name

8      is not reasonably calculated to lead to the

9      discovery of admissible evidence.

10                    What -- the only thing you can get from

11     him, in theory, is information that is, by

12     statute --

13                    THE COURT:  But --

14                    MR. TARDIO:  -- inadmissible --

15                    THE COURT:  Yeah.

16                    MR. TARDIO:  -- inadmissible at trial.

17                    So I understand that -- that the name

18     is not the grand issue here.  Because I think even

19     if the Plaintiff has the name, they can't get any

20     information from him that's admissible.  So --

21                    THE COURT:  Well, let -- okay.  Let's

22     reveal his name.  That would be the first order.

23     Just say who he is, or she.

24                    MR. TARDIO:  Is the Court ordering?

25                    THE COURT:  Yes.

```
1                    MR. TARDIO:  Michael O'Neal.
2                    THE COURT:  Okay.  And spell O'Neal --
3                    MR. TARDIO:  Yes.
4                    THE COURT:  -- for the Court.
5                    MR. TARDIO:  N-E-A-L.  O- --
6                    THE COURT:  Apostrophe?
7                    MR. TARDIO:  -- N-E-A-L.
8                    THE COURT:  And what -- do you have a
9    CV on him or anything?
10                   MR. TARDIO:  No.  It will be
11   provided -- provided.  He -- he works at Vanderbilt,
12   and on the side, he consults for area health care
13   providers.
14                   THE COURT:  Okay.  If you could provide
15   his CV, and that would be -- I think that would be
16   helpful.  I think -- I think all -- I think his name
17   is discoverable.  You know, discovery in our state
18   is very broad.  Just like -- just like
19   cross-examination in trial is very broad, discovery
20   is very broad.  And I adhere to -- I'm going to do
21   my very best to adhere to what the law is in the
22   state.  That's what I'm supposed to do, so that's
23   what I will do.
24                   And so I -- I think that information
25   should be provided.  And maybe that will lead to
```

```
 1    something that's discoverable, and maybe it won't,

 2    but we don't know until we have the information.  I

 3    mean, that would -- you -- y'all know what I'm

 4    talking about.

 5                All right.  Let's see.  I guess the --

 6    I'm looking at the first Saint Thomas Outpatient

 7    Neurosurgical Center response to Plaintiffs' First

 8    Set of Interrogatories.  That's the first one that's

 9    attached to the Plaintiffs' Motion to Compel.

10                So is that -- that okay that we start

11    that way?

12                MR. NOLAN:  Yeah, that's right.  And I

13    think we've really dealt with that set, Your Honor.

14    We just attached Interrogatory No. 2, and that's the

15    one that withheld information about the pharmacist.

16                THE COURT:  Yes.

17                MR. NOLAN:  And we've also attached

18    Interrogatory No. 17, which deals with the same

19    issue.  So I think we've covered -- I think we've

20    covered those two requests.

21                THE COURT:  Well, but No. 2 says for

22    each communication.  And the communication issue is

23    still a privilege issue.

24                MR. NOLAN:  That's right.

25                THE COURT:  Is that what you're saying?
```

```
 1     We've covered it?

 2               MR. NOLAN:  That's right.

 3               THE COURT:  Okay.

 4               MR. NOLAN:  We've -- we've discussed

 5     it, yes.

 6               THE COURT:  Discussed it.

 7               When you say "covered," I thought we've

 8     solved it.  We have not solved it yet.

 9               MR. NOLAN:  No.

10               THE COURT:  We've -- we've just

11     discussed it.

12               MR. NOLAN:  That's right.

13               THE COURT:  We put it on the burner for

14     a -- for a short time.

15               All right.  And so then that moves us

16     on to Saint Thomas Outpatient Neurosurgical Center's

17     responses to Plaintiffs' First Set of Requests for

18     Production of Documents.

19               And that first one that's contested is

20     No. 25.  There's a copy of all of Saint Thomas

21     Neurosurgical's written policies, procedures, and

22     guidelines.

23               MR. NOLAN:  That's right.  I'm happy to

24     address that, Your Honor.

25               THE COURT:  Sure.
```

1              MR. NOLAN:  You know, I've been doing

2    this for about 22 years, and generally the way it

3    works, when you have a med mal case and you ask for

4    the entity's policies and procedures, that's a

5    standard request.  And the -- the Defendant produces

6    a big binder of policies and procedures, you go over

7    it with your little yellow stickies, and you review

8    those and designate the ones you want.  And if, for

9    some reason, you designate one that the other side

10   wants to fuss about, then you can fuss about it.

11             But that's the way I've approached it

12   until -- until now.  What's happened is that they

13   wouldn't -- you know, they haven't shown us all the

14   policies and procedures.  What they have shown us is

15   the index for the policy and procedure book.  And --

16             THE COURT:  Does that help you at all?

17             MR. NOLAN:  It did help.  It helped.

18   We went through and we -- we designated -- you know,

19   they produced a few, and we designated 77 more that

20   we wanted.  And they now, in their response, have

21   indicated that they're willing to give us 67 of the

22   77.  And so we're now down to 10 that they haven't

23   produced.

24             And I just don't understand why we're

25   doing this, to tell you the truth.  I mean, why

1    don't they just go ahead and show us the other 10?

2    I don't -- I don't -- I don't get it, Judge.  I

3    mean, you know --

4              THE COURT:  Well -- well, let's see --

5    well, go ahead.

6              MR. NOLAN:  Well, if you look at -- at

7    page 15 of their brief, they give us a list of the

8    10 that they don't want to show us.

9              THE COURT:  Yes.

10             MR. NOLAN:  Okay.  Most, if not all, of

11   those, Your Honor, are discoverable.  I mean, they

12   could lead to the discovery of admissible evidence.

13             The first one is HRO7, "Staff Rights

14   and Ethical Dilemmas in Patient Care."  Maybe --

15   maybe there were some ethical dilemmas, Your Honor,

16   that were created by this firestorm fungal

17   meningitis outbreak.  I don't know what the

18   procedure says, but we'd sure like to see it.  The

19   rules of discovery are broad.

20             The second one is IC14, "Infection

21   Control 14, Standard Precautions."  A lot of people

22   got meningitis infections, Judge, so the standard

23   precautions in the infection control part of the --

24   of the manual may bear on this.

25             IC18, "Universal Precautions."  Same

1    deal, Judge.  I mean, that could lead to the

2    discovery of admissible evidence.

3              IMO7, "Community Resources."  I don't

4    know what that's about, Your Honor.  I don't know

5    what it's about because I haven't seen it.  I just

6    don't know why they're making us go through that.  I

7    mean, it would be so much more efficient and less

8    expensive if they just let us see these things,

9    reserving all objections as to admissibility at

10   trial.

11             The next one is "Assessment Prior to

12   Induction."  That -- that may not apply, Judge.

13             The next one is "Anesthesia Services."

14   Well, Judge, Dr. Culclasure, the medical director

15   for -- for Saint Thomas Neurosurgical, he's an

16   anesthesiologist, and he's the guy who was giving

17   these shots.  So this very well may have some useful

18   information.

19             Same with the next one, "Anesthesia

20   Responsibilities."

21             The next one about security, Your

22   Honor, I don't know -- I don't know what that says,

23   whether it has any bearing on this.

24             But certainly the next one,

25   "Communication," very well may have a bearing on

```
 1    this because, Your Honor, there's a big issue in

 2    this case about whether there was an unreasonable

 3    delay to notify these people that they had received

 4    contaminated shots.  And it's -- one of our theories

 5    is that if they had told Diana Reed, on

 6    September 20th when they shut Saint Thomas

 7    Neurosurgical down, that the shots that she received

 8    were being recalled so that she could get in and get

 9    antifungal treatment, she would be alive today.  But

10    instead, three critical days went by, and now she's

11    not with us anymore.

12              So communication, Judge, there was a

13    big failure of communication in this case.  We think

14    we're entitled to that policy and procedure.

15              "Pastoral Care," I don't know why we

16    highlighted that one, but I don't think that is

17    germane to this.

18              But, Your Honor, we think we're

19    entitled to all the ones I've mentioned.  And we

20    just -- you know, we don't understand why this is so

21    difficult and time-consuming.

22              THE COURT:  All right.  Mr. Tardio?

23              MR. TARDIO:  This suggestion that we

24    haven't been cooperative in producing policies and

25    procedures is entirely wrong.  We've produced
```

1   eighty- -- 82, I think -- 82 policies and

2   procedures.  77 were -- we produced 5 voluntarily,

3   said these clearly apply, if my numbers are correct.

4   They requested either 67 more or 77 more, which we

5   will copy and produce.  And we're down to these 10,

6   which I'm holding in my hand.  They just don't apply

7   here.  They're not relevant and they're not -- not

8   discoverable.

9              And I have a responsibility to my

10  client to not say, "I just turned it over.  I know

11  it doesn't have anything to do with this, I know

12  that it's not relevant, and I know -- I know that

13  it's not reasonably calculated to lead to the

14  discovery of admissible evidence, but I just turned

15  it over."

16             These don't apply.  They're not

17  relevant.  They're not discoverable.  That's the ten

18  that we're down to, and this is -- this is it.  I'm

19  willing to submit them for an in camera review.  If

20  Your Honor says they're discoverable, hand them

21  over.  But I don't -- I respectfully disagree that

22  the answer to this objection is just to let the

23  Plaintiff see them and decide whether they want

24  them.

25             MR. NOLAN:  I guess, from our

1    perspective, there's no reason for in camera review

2    because there's no assertion of a privilege as to

3    these policies and procedures.

4              THE COURT:  All right.  The Plaintiffs

5    are conceding you don't need "Pastoral Care"?

6              MR. NOLAN:  Yes.

7              THE COURT:  All right.  Defendant will

8    provide 1 through 9 of the additional policies and

9    procedures that Plaintiff has requested, and

10   request, in addition, No. 25.

11             Discovery is broad and you've got to

12   turn it over.

13             All right.  Let's see.  Next number

14   that is contested is No. 32:  "Request to produce

15   all external communications between Saint Thomas

16   Neurosurgical and any other person or entity

17   relating to Nashville" -- I'm sorry.  What -- oh,

18   I'm sorry -- "NECC's recall of MPA" -- which is

19   the -- which is the injection material, correct?

20             MR. NOLAN:  Yes.

21             THE COURT:  -- "and/or the recent

22   fungal meningitis outbreak."

23             And the objection is:  Overly broad.

24             Is this -- does this have to do with

25   e-mails that -- that we've talked about?

```
 1                    MR. NOLAN:  It does have to do with
 2   e-mails --
 3                    THE COURT:  All right.
 4                    MR. NOLAN:  -- and --
 5                    THE COURT:  And there are numerous
 6   e-mails, correct?
 7                    MR. NOLAN:  Here's -- here's kind of
 8   where we are on that issue.  Yesterday we got an
 9   affidavit that they filed from an IT person in
10   Saint Thomas Neurosurgical saying that 15,000
11   e-mails have been segregated.  We don't know how
12   they were segregated or, kind of, what's included in
13   those.
14                    But, Your Honor, for purposes of moving
15   forward with these depositions, we really think
16   there are four key players whose e-mails should be
17   scrutinized.  And those four players are
18   Dr. Culclasure, Nurse Schamberg, Scott Butler, and
19   also Nurse Littleton, who is mentioned in
20   Saint Thomas Neurosurgical's discovery responses.
21   So --
22                    THE COURT:  What -- I'm sorry.  What
23   was the last name again?
24                    MR. NOLAN:  Ms. Littleton, I believe it
25   is.
```

```
 1                    THE COURT:  Nurse?

 2                    MR. NOLAN:  Nurse.

 3                    And if you just take those folks'

 4      e-mails, you're going to reduce the number way below

 5      15,000.  And we think, under the circumstances,

 6      given that so many people have died and gotten sick,

 7      requiring the Defendant to go through the e-mails of

 8      those four people and produce to us what's

 9      discoverable is -- is reasonable, Your Honor.

10                    And that's -- that's the way we suggest

11      the Court should narrow this issue down so that we

12      can get on with discovery.

13                    THE COURT:  Okay.  Yes, Mr. Tardio?

14                    MR. TARDIO:  I'm not sure how many

15      e-mails we're talking if we narrow it down to four.

16      We preserved -- we preserved all the STOPNC

17      employees' e-mails from -- I can't remember the

18      starting date.  I think it's in the affidavit, or

19      maybe it's in the papers -- up through essentially

20      the present.  That's what we did.  And that's what

21      got 15,000 e-mails.

22                    Now, certainly, a lot of those are

23      going to deal with the fungal meningitis outbreak, a

24      lot of e-mails sent from September 2012 forward at

25      that center that deal with it.  So I don't know that
```

1    it's as easy as saying, "Well, let's just look

2    through these four people."

3                Is that better than 15,000?  Sure.  But

4    it may still be 2- or 3,000.

5                And -- and I'm not -- my argument, Your

6    Honor, is, I'm not representing to the Court that

7    there aren't discoverable communications in there.

8                THE COURT:  No, I understand.

9                MR. TARDIO:  But I am representing to

10   the Court that it is a substantial burden, costly,

11   and time-consuming --

12               THE COURT:  I understand.

13               MR. TARDIO:  -- to go through them.

14   And all I'm asking for is some protection, some

15   guidance on how to do that.  Because I want to

16   comply with my obligation, but I also don't want to

17   tell one of our younger lawyers or somebody at

18   STOPNC that they need to sit in a room for the next

19   month and go through e-mails eight hours a day,

20   because I don't think that's what the Rules

21   contemplate.

22               THE COURT:  When are depositions

23   scheduled, again?  June 4th?

24               MR. NOLAN:  June 4th.

25               MR. TARDIO:  5th, and 6th.

1              THE COURT:  I'm sorry?

2              MR. TARDIO:  4th, 5th, and 6th.

3              MR. NOLAN:  June 4th.

4              THE COURT:  4th, yeah.

5              MR. TARDIO:  And we have -- we have

6    produced some e-mails.  We've produced the ones that

7    are clearly -- clearly apply.  We've produced the

8    ones that mention Diana Reed, for instance.  We've

9    produced the communications with NECC.  We've

10   produced the communications related to the decision

11   to purchase from NECC.  So this is not obstinate.

12   It's not obstructive.  It's simply --

13             THE COURT:  No, it's -- it's a

14   time-consuming cost issue.  I understand that.

15             MR. TARDIO:  Yes, sir.  Uh-huh.

16             So I don't profess to have the

17   solution, but I can tell you that it is an issue,

18   and I think it's a valid objection that, as worded,

19   the -- the request is too broad and too burdensome.

20             THE COURT:  All right.  What about the

21   protection that we talked about at the beginning, of

22   Rule 1200-14-1-15(2)?

23             MR. TARDIO:  I think that's going to

24   make them confidential.  I don't know that -- I

25   don't think it makes them nondiscoverable.

1               THE COURT:  Nondiscoverable?  I see.

2               MR. TARDIO:  So I don't know that they

3    can make it onto the -- outside the confines of this

4    litigation.  We might have to enter into a

5    protective order, --

6               THE COURT:  Yes.

7               MR. TARDIO:  -- but that's an issue

8    that we need to deal with.

9               THE COURT:  See if -- see if you-all

10   can -- see if you can find where that (2) is or is

11   not, if it -- if it just -- well, I don't -- there's

12   no -- no way to tell what happened.  And you don't

13   have an explanation right now what happened?

14              MR. TARDIO:  No.  We've been looking

15   for (2).  It existed when we drafted the responses,

16   I can assure the Court.

17              THE COURT:  So if that's an issue -- if

18   you can find the (2), and that becomes an issue for

19   protection, you-all -- you-all talk about that and

20   see if you can agree on it.  And if (2) does exist

21   and it does say it's protected, then, I mean, if it

22   says that --

23              MR. TARDIO:  Sure.

24              THE COURT:  -- then it ought -- there

25   ought to be a protective order entered.

```
 1                    MR. TARDIO:  I agree.  And I think
 2     that's something we'll be able to agree on.
 3                    THE COURT:  Okay.
 4                    MR. TARDIO:  But I'm not prepared to
 5     simply agree to go through all of Debra Schamberg's
 6     e-mails, all of Sandy Littleton's e-mails, all of
 7     Dr. Culclasure's e-mails, and all of -- was it
 8     Dr. Lanford --
 9                    MR. NOLAN:  Butler.
10                    THE COURT:  No.
11                    MR. TARDIO:  Oh, Scott Butler's
12     e-mails.
13                    THE COURT:  Scott Butler.
14                    All right.  I understand.
15                    MR. TARDIO:  But I -- you know, if Your
16     Honor wants to, we can run search terms.  I'm not
17     sure what the best way to do it is, frankly.
18                    THE COURT:  And search terms for the
19     e-mails involving Dr. Culclasure, Nurse Schamberg,
20     Scott Butler, and Nurse Littleton.
21                    MR. TARDIO:  I think what we would do
22     is run search terms within these four -- what we did
23     is segregate the accounts.  So we went in and we
24     have all of Dr. Culclasure's e-mail accounts.
25                    THE COURT:  Yes.  Yes.  Good.
```

```
 1                    And maybe they -- the Plaintiffs can --
 2      can specify -- what I thought you meant by "search
 3      terms" is maybe -- maybe look for some words in
 4      those e-mails --
 5                    MR. TARDIO:  That's what I meant.
 6                    THE COURT:  -- that would even narrow
 7      the scope even further.
 8                    MR. TARDIO:  Yes, sir.
 9                    THE COURT:  Is that something the
10      Plaintiffs could do?  Or is it just, you just don't
11      know enough to be able to say that right now?
12                    And you may not know.  This -- this is
13      discovery --
14                    MR. NOLAN:  Your Honor, I don't want to
15      take that idea off the table.  But I guess the point
16      I would make is, this is the tip of the iceberg.  I
17      mean, these folks are about to be hit with an
18      avalanche of litigation.  And these e-mails are
19      going to have to be produced.  You know, this is
20      work that's going to have to be done.  And requiring
21      the Defendant to review the e-mails of those four
22      people is just not an unreasonable burden under
23      these circumstances.
24                    THE COURT:  I understand.
25                    MR. TARDIO:  It is before June 4th.
```

```
 1    And that's what we're -- that's one of the problems
 2    we're dealing with --
 3                THE COURT:  Yes.
 4                MR. TARDIO:  -- going through.  You
 5    know, several thousand e-mails over a several-month
 6    period is not nearly as daunting as -- I mean,
 7    obviously, there are tons of HIPAA issues in here
 8    where other patients are mentioned.  Obviously,
 9    there are a ton of attorney/client communications
10    that are going to need to be weeded out or redacted,
11    so . . .
12                MR. NOLAN:  What if we do this, if I
13    could make a suggestion.
14                THE COURT:  Sure.
15                MR. NOLAN:  I think it would make sense
16    for Mr. Tardio to first ascertain how many e-mails
17    are included in the universe of those four people.
18                THE COURT:  Yes.
19                MR. NOLAN:  Could be a smaller number
20    than we anticipate.
21                THE COURT:  Yes.
22                MR. NOLAN:  And -- and then, if the
23    number is still unmanageable, then we can talk about
24    search terms.  And maybe we can collaborate on a
25    list of search terms that would further restrict the
```

```
 1    universe of e-mails.  That's the way I would suggest
 2    that we approach it.
 3              THE COURT:  Well, I think that's a good
 4    suggestion.  And I -- the information is
 5    discoverable.  And as you -- as you rightly point
 6    out, Mr. Nolan, they're going to have to do it.
 7    You're just the first to ask.  They're going to have
 8    to do it for other lawsuits that are pending, a
 9    litigation that might be -- might come about.  So I
10    don't -- I don't think it's an unreasonable request.
11              I'd be glad to entertain a cost/time
12    issue later, maybe, on a lot of this.  And this is
13    not -- this is not the only one, I'm sure, that's
14    going to involve time and cost, so I'll be glad to
15    entertain that later.
16              But let's do our best to get it --
17    Defendants do their best to get that together as
18    quickly as they can for Dr. Culclasure, Nurse
19    Schamberg, Scott Butler, and Nurse Littleton.  And
20    then see if you-all can -- the Plaintiffs' and
21    Defendants' counsel get together and maybe do search
22    terms on those.  If the Plaintiffs want to do that.
23    I'm not requiring you to do that.  Because I -- I
24    just think -- I mean, you're shooting in the dark
25    because you don't know what's there, so you might be
```

1    better off just getting the information, sifting

2    through it, and then determining what you think is

3    important for your case.

4              I mean, after all, this is discovery.

5    A lot of things that are learned in discovery are

6    not admissible at trial.  We all know that, so --

7    but, you know, discovery, one more time, is -- it

8    means what the word connotes:  You can discover and

9    learn.  A lot of it may not be ultimately anything

10   that ever comes out at trial, but it gives you

11   information to help you form trial strategy, maybe

12   find other information that might be admissible at

13   trial.  I mean, there's just a lot of things that

14   discovery allows litigants and their attorneys to

15   do.  So that information will be provided by Defense

16   Counsel.

17             All right.  No. 33:  Produce all

18   communications between Saint Thomas Neurosurgical

19   and Tennessee Department of Health, FDA, CDC, and/or

20   any other governmental entity relating to NECC's

21   recall of MPA and/or the recent fungal meningitis

22   outbreak.

23             Same objection:  Broad, time-consuming,

24   thousands of documents and, again, the protection

25   issue.

1            So how many thousands of documents on
2    this -- on this one?
3            MR. TARDIO:  It's -- I mean, it's the
4    same issue.  We captured the universe of all e-mails
5    sent by any --
6            THE COURT:  It's 15,000, still?
7            MR. TARDIO:  That's the estimate.
8            THE COURT:  Estimate, yes.
9            MR. TARDIO:  Howell Allen -- and I'm
10   sure the Court's already picked up on this.
11           Howell Allen lent its employees to
12   STOPNC, so it was -- there's a finite number of
13   STOPN- -- people working at STOPNC.  Finite number.
14   I think, it's 12, 14, something like that.
15           We preserved all their e-mails, all of
16   them.  Whether it's, "Can you pick up Johnny from
17   softball," or all the way -- you know, anything that
18   they sent or received.
19           THE COURT:  Yeah.
20           MR. TARDIO:  And that's the 15,000
21   number, so . . .
22           THE COURT:  Well, if we do the same --
23   same rule, same guidelines, Dr. Culclasure and Nurse
24   Schamberg, Scott Butler, Nurse Littleton, is that --
25   would that be acceptable, Plaintiffs?

1           MR. TARDIO:  I'll ascertain how many

2     that is.

3           THE COURT:  Just see how many that is,

4     and then try to get them together and provide them

5     as quickly as you can.

6           Okay.  Let's see.  The next one that's

7     got an objection is No. 66, Request to Produce 66:

8     Produce all photographs taken in connection with

9     NECC's recall and/or the fungal meningitis outbreak,

10    including, but not limited to, photographs of any

11    NECC products or Saint Thomas Neurosurgical's

12    facilities.

13          Objection:  Protected from discovery by

14    the work product doctrine and attorney/client

15    privilege.  Any photographs taken by counsel or at

16    the instruction of counsel are privileged from

17    discovery.

18          What do the Plaintiffs say?

19          MR. NOLAN:  Your Honor, I've never

20    encountered a work product objection for photographs

21    before.  I mean, it's our respectful position that

22    photographs are facts, and they should be produced.

23    You know, to the extent that the -- that it could be

24    characterized as work product, if you look at the

25    "Boyd vs. Comdata" decision, it makes it very clear

1    that if work product falls within the category of

2    what they call fact or ordinary work product, it's a

3    very low threshold that a requesting party must meet

4    in order to get the information.  And that is to

5    show that there's a substantial need for the

6    information and they can't get it through other

7    means.

8              Judge, this is the only way we can get

9    these photographs.  I mean, we can't walk into

10   Saint Thomas Neurosurgical and start taking

11   pictures.

12             So, Your Honor, I've just never had

13   anybody withhold photographs based on the work

14   product doctrine.  They should just show us the

15   photographs, give us copies, and reserve any

16   objections as to admissibility.

17             THE COURT:  Well, "Boyd vs. Comdata

18   Network," 88 S.W.3d 203, it's the case law -- well,

19   it's Court of Appeals, Middle Section, 2002.  Judge

20   Koch, now Justice Koch, wrote that opinion.  It is

21   the case law on work product doctrine, waiver,

22   common defense privilege.  I mean, it's everything

23   wrapped into one, --

24             MR. NOLAN:  Yeah.

25             THE COURT:  -- as Judge Koch is very

1   good at doing.  And he does say:  "To obtain
2   ordinary or fact work product" -- we don't have any
3   mental impressions or photographs of the -- of the
4   attorneys, so it's work -- it's fact work product,
5   ordinary or fact work product -- "the requesting
6   party must establish (1) that it has substantial
7   need for the materials and (2) that it is unable to
8   obtain these materials or their substantial
9   equivalent by other means without undue hardship."
10              Okay.  Mr. Tardio?  And you can -- you
11  can just do it right there, if you want to.
12              MR. TARDIO:  Okay.  Thank you, Judge.
13              THE COURT:  Sure.
14              MR. TARDIO:  All "Boyd" said -- well,
15  first off, I respectfully disagree that photographs
16  cannot set out mental impressions of attorneys.
17  Certainly, what you choose to take photographs of
18  and how you choose to take the photographs
19  absolutely can signal what is important, what you
20  felt was important, what part of whatever you're
21  taking pictures of is important.
22              THE COURT:  I agree.  But -- but you
23  can't be asked why you think that's important.
24  That's the mental impression that you can't -- that
25  they cannot discover.  And --

1                    MR. TARDIO:  After this happened, we

2     sent one of our lawyers out to STOPNC to take

3     photographs:  "Take photographs of anything you

4     think is important that we need to preserve to

5     prepare for litigation."

6                    That's exactly what work product is

7     intended to protect: tangible documents or tangible

8     things created by or for the party, or the party's

9     representative in this case, in anticipation of

10    litigation.

11                   So it -- I think that the work product

12    privilege doctrine applies.  I do.

13                   Now, the flip of that is, can the

14    Plaintiff or the opposing party obtain the

15    substantial equivalent via other means of discovery?

16                   They're going to have the opportunity

17    to ask Ms. Schamberg, Dr. Culclasure, and Scott

18    Butler anything they want about STOPNC.  Anything

19    they want -- I mean, not anything they want:

20    anything that could be captured in these

21    photographs.

22                   So I don't think that they made the

23    showing before the depositions that they can't get

24    the substantial equivalent via testimony.

25                   THE COURT:  Well, generally, the

1    substantial equivalent issue involves written

2    statements by witnesses in anticipation of

3    litigation.  And I really have not seen this issue

4    raised before.  That doesn't mean it's not a proper

5    issue to raise, though, where photographs are deemed

6    to be -- or claimed to be work product.

7              So -- and I guess the other issue that

8    comes to my mind is, what if I say, okay, the

9    Plaintiffs can go out to the facility and take their

10   own photos.  Are the -- is the facility the same now

11   as it was then?  If it's not, then you can't obtain

12   a substantial equivalent.

13             MR. NOLAN:  I assume they don't use the

14   same medicines and vendors.  I mean, you know, I

15   don't think it would be the same, Your Honor.

16             THE COURT:  It's hard to know whether

17   it is or is not.  But that -- that would be the only

18   way to obtain the substantial equivalent on

19   photographs if, in fact, photographs are actually

20   work product.  And I'm not sure they are.  I'm just

21   saying, if they are, how do you obtain the

22   substantial equivalent?  The only other way is to go

23   out and take your own photographs.

24             And y'all will give permission for them

25   to do a walk-through?  Have you --

1          MR. TARDIO:  We haven't even addressed
2     it.  We haven't even talked about it.
3          THE COURT:  Okay.  Well, go ahead,
4     Mr. Nolan.  What's your -- really, I guess, the real
5     issue, first of all, is:  Is it work product?  Are
6     photographs work product?
7          MR. NOLAN:  Well, Your Honor, --
8          THE COURT:  Photographs --
9          MR. NOLAN:  -- under -- under --
10         THE COURT:  It's like photographs of a
11    vehicle in an automobile wreck case.  I mean, that's
12    the only thing I can akin it to at this moment.  But
13    everybody's interested in that, both sides.  Nobody
14    ever claims privilege, but most of the time, the
15    photograph is of some assistance.
16         But, anyway, go ahead.
17         MR. NOLAN:  We don't think photographs
18    are work product.  And certainly, they don't contain
19    mental impressions.  We have a substantial need, and
20    there's really no other way we can get the
21    information contained in those photographs, because
22    they were taken, apparently, shortly after the
23    outbreak.
24         THE COURT:  All right.  Well, here we
25    go.  Court's ruling:  After review of "Boyd vs.

1    Comdata," I find that the photos are not work
2    product.  But if they are, the only way to -- well,
3    it's hard to establish a substantial need or an
4    inability to obtain the materials.  It's really --
5    that's a difficult burden a lot of times, but I
6    think that it -- at this juncture, even if it is
7    work product, that the Plaintiff has established
8    they have a substantial need.  And it's twofold:
9    Substantial need for photos and unable to obtain the
10   materials on their own or the substantial equivalent
11   by other means without undue hardship.
12              And I don't know -- it seems to me
13   things change in a facility.  And there's probably
14   at least one -- I don't know how many photographs
15   we're talking about, but I bet -- I'll bet there's
16   at least one that -- or more that capture images
17   that are -- that were different then than they --
18   than they are now.  And there's no way to -- for the
19   Plaintiff to obtain substantial equivalent unless
20   they do a walk-through and do their own photographs
21   in the facility.
22              The photographs -- the images taken by
23   the -- depicted by the photographs could very easily
24   have changed.
25              So that's the Court ruling.

```
 1                    All right.  And the next -- I think
 2      then we -- then we move on to the Howell Allen
 3      Professional Corporation's responses to
 4      interrogatories and the objections to those.
 5                    And the first one, first objection by
 6      the Defense is to Interrogatory Question 2, which
 7      is:  Has Howell Allen Clinic ever purchased
 8      medication from a compounding pharmacy?  If so,
 9      identify the name of the compounding pharmacy, the
10      name of the medications purchased, reason for
11      procuring the medication from the compounding
12      pharmacy, and the price per dose of each medication
13      purchased.
14                    Defendants' response is:
15                    Objection, overly broad and unduly
16      burdensome.
17                    Let's see.
18                    Medications purchased by Howell Allen
19      that are irrelevant to the claims form the basis of
20      this complaint that the relevant purchases were made
21      by STOPNC -- which is the other entity that we've
22      just discussed.  And I guess this is alter ego
23      issues.
24                    MR. NOLAN:  That's right.
25                    And, Your Honor, I'd like to show the
```

1    Court something about that, if I could.  Your Honor,

2    as the Court observed, we've -- you know, we allege

3    that Howell Allen and Saint Thomas Neurosurgical are

4    alter egos.  And here's what we've established

5    through a request for admissions that we filed with

6    the Court yesterday.

7              Everyone who was working over there at

8    Saint Thomas Neurosurgical was a Howell Allen

9    employee, and that includes Dr. Culclasure, the

10   medical director, as well as Nurse Schamberg, the

11   facilities director.

12             And, Judge, they didn't maintain an

13   arm's-length relationship between these two

14   entities, Your Honor, and I say that because they --

15   they produced documents to us that state that

16   Saint Thomas Neurosurgical is, in fact, part of

17   Howell Allen.  And let me show you what I'm

18   referring to.

19             Your Honor, this is one of the policies

20   and procedures that Saint Thomas Neurosurgy did

21   produce.  This is an internal document.  We can see

22   what it says.  So it says very plainly, Your Honor,

23   Saint Thomas Neurosurgical is part of Howell Allen.

24   That's what they say internally.  And that is

25   consistent, Your Honor, with what Howell Allen tells

1    its patients.

2              This is a brochure that Howell Allen

3    gave to Diana Reed.  And you can see that it lists

4    its several various office locations, including

5    Saint Thomas Hospital.  And when you look at the

6    next page, Judge, it has a list of all these

7    different Howell Allen locations, and we can see

8    that Saint Thomas Outpatient Neurosurgery Center is

9    on the list.  That's what they hold themselves out

10   to the public.  They say, "This is part of us.  This

11   is part of the Howell Allen Clinic."

12             Your Honor, another interesting pair of

13   documents are these two (indicating).  Your Honor,

14   on our -- on the left, we have a -- one of the bills

15   that Saint Thomas Neurosurgical sent for Mrs. Reed's

16   care.  And you see it's got the address, and it's

17   also got the phone number.

18             Now, on the right, we have Howell

19   Allen's Website.  And when we look at what phone

20   number Howell Allen lists, we see it's the same

21   phone number.  So they have an integrated telephone

22   system.  We also know, from the e-mails that have

23   been produced, that people like Ms. Schamberg use a

24   Howell Allen e-mail address.

25             So, Your Honor, it's our very

```
1    respectful position that there's a lot of proof --
2    and we haven't even taken any depositions yet, but
3    we've already got a lot of proof to show that
4    Saint Thomas Neurosurgical and Howell Allen are --
5    they're one and the same.  And it's for that reason,
6    Your Honor, that we think we're entitled to full
7    discovery from Howell Allen.  They're represented by
8    the same law firm, for goodness' sake.
9              But, Your Honor, more specifically to
10   the question that's before the Court, this question
11   asks whether Howell Allen uses this particular
12   steroid, MPA, methylprednisolone acetate; and if so,
13   where do they get that stuff?
14             That's directly relevant to the
15   standard of care, Your Honor.  If Howell Allen was
16   buying its MPA from Pfizer, an FDA-approved and
17   regulated product manufacturer, that's very, very
18   important in this lawsuit.  Howell Allen owns part
19   of Saint Thomas Neurosurgical, along with
20   Saint Thomas Network.
21             So what those other entities do as far
22   as purchasing steroids from compounders or not
23   purchasing steroids from compounders is directly
24   relevant to the issue of the standard of care, and
25   we think we're entitled to that information.
```

1           THE COURT:  Mr. Tardio?

2           MR. TARDIO:  Your Honor, I'll just

3  direct you to 48 -- I think it's 48-217-101.  This

4  is what will govern Howell Allen's purported

5  liability in this case.

6           Howell Allen is a member of STOPNC, as

7  is Saint Thomas.  Section 48-217-101(2) specifically

8  says that a member is not going to be personally

9  liable for the actions of the -- that's what we have

10  the limited liability company statute for.  And I

11  respectfully submit that a common phone number on a

12  Website, a map handed to patients, and an internal

13  infection control policy doesn't trump the

14  long-standing limited liability rule.

15           So that's the overarching objection to

16  this unfettered discovery of Howell Allen.

17           THE COURT:  All right.  Well, let me --

18  let me ask you this.  And I -- I'll let you continue

19  to argue if I'm not on point on this.

20           But what if that same interrogatory

21  question were asked of Saint Thomas Outpatient

22  Neurosurgical Center, LLC?

23           MR. TARDIO:  They asked it, and we

24  answered it.

25           THE COURT:  If they ask, you would

1   answer?

2               MR. TARDIO:  They did ask, and we did

3   answer.

4               THE COURT:  All right.  Now, back to

5   the Plaintiff.

6               Did you get -- you didn't get the

7   information you needed from that response?

8               MR. NOLAN:  Well, Your Honor, we know a

9   lot more now about where Saint Thomas Neurosurgical

10  bought its steroids.  But what we're asking about is

11  where Howell Allen Clinic bought its steroids.

12  That's what this question is about.

13              And, you know, the standard of care in

14  this medical community is an issue, and what that

15  standard of care required.  And Howell Allen Clinic,

16  in addition to owning part of Saint Thomas

17  Neurosurgical and also supplying all the employees

18  for that entity, they're a member of the medical

19  community.  And what they do as far as buying

20  steroids is hugely relevant, even -- even if -- if

21  the Court ultimately decides that they are, in fact,

22  a separate entity.  You know, that's really an issue

23  for another day.

24              THE COURT:  I -- I think so, too.  I

25  looked at -- looked at your brief on that and

1  reviewed the case law on that, and I really -- I
2  really believe that alter ego issue is an issue for
3  another day.
4              Is that what you're talking about?
5              MR. NOLAN:  Yeah, it's an issue for
6  another day.
7              THE COURT:  That's what I thought, too.
8  It's really back to relevance.  And really,
9  relevance can't be determined until you have the
10 information.  So I'm going to order the information
11 be provided.
12             MR. TARDIO:  Your Honor, let me make
13 one statement.
14             THE COURT:  Go ahead.
15             MR. TARDIO:  I understand the ruling
16 that there is relevant information within
17 Interrogatory 2, and I understand that's the ruling
18 of the Court.
19             There's no time frame on this.  There's
20 no limit to methylprednisolone acetate or other
21 injectable steroids.  I mean, conceivably, if they
22 bought an antibiotic ointment in 2000 or 1998 in
23 its -- in the Kentucky office --
24             THE COURT:  Yeah, it has nothing to do
25 with anything.  I understand.

```
 1                 MR. TARDIO:  Well, it's also --
 2                 THE COURT:  Can -- can you-all narrow
 3      it a little bit?
 4                 MR. NOLAN:  I would -- I would suggest
 5      narrowing it going back five years and limiting it
 6      to steroids.
 7                 THE COURT:  How does that sound,
 8      Mr. Tardio?
 9                 MR. TARDIO:  Not -- without waiving any
10      objection I've stated to the Court or stated in the
11      papers.  I understand the ruling.
12                 THE COURT:  Okay.  Let's do it that
13      way.
14                 So, again, what's the time frame?  Five
15      years from what date?
16                 MR. NOLAN:  Five years from October
17      the 1st of 2012.  That's when the outbreak roughly
18      was -- became public knowledge.
19                 THE COURT:  All right.  And then -- and
20      what was the medication limitation, did you say?
21                 MR. NOLAN:  Steroids.
22                 THE COURT:  Just steroids?
23                 Okay.  That would be the Court's order,
24      with that qualification, because that does narrow
25      the scope for the Defendants.
```

1                    All right.  Now we're moving to the

2       Howell Allen responses to Plaintiffs' First Set of

3       Requests for Production.  Let's see.  First

4       objection is to Request No. 13.

5                    Request 13 is:  Produce a copy of all

6       e-mails, protocols, procedures, memoranda,

7       guidelines and/or correspondence related to

8       notifying or contacting patients who received

9       steroid injections obtained from NECC.

10                   Howell Allen objects on the grounds it

11      seeks information protected by the work product,

12      attorney/client, Tennessee Peer Review Law, all

13      privileges, Tennessee Code Annotated

14      Section 63-6-219, Tennessee Patient Safety and

15      Quality Improvement Act.  Additionally, it's

16      overbroad, unduly burdensome.  Numerous

17      communications after the fact with patients

18      potentially exposed to contaminated product.

19      Request essentially seeks all communications, an

20      obviously, overbroad and unduly burdensome request.

21                   Okay.  If we eliminate the -- well,

22      eliminate -- let me start over -- narrow the

23      question so that we're not requesting information

24      that's potentially privileged under the Tennessee

25      Peer Review Law of 1967 and the Tennessee Patient

```
 1    Safety and Quality Improvement Act of 2011, what
 2    other -- I mean, if you've got a work product
 3    doctrine and attorney/client privilege, you need to
 4    do a privilege log on all that.  Maybe hadn't had
 5    time to do that.  I don't know.
 6                MR. TARDIO:  This is the same -- same
 7    e-mails we're talking about, the same set of
 8    e-mails.
 9                THE COURT:  Okay.
10                MR. TARDIO:  So the privilege will be
11    within these e-mails.  And the burden and breadth of
12    going through these e-mails and redacting privileged
13    information, you know, this is -- we're not talking
14    about 20 e-mails here.
15                THE COURT:  What about -- let's go to
16    protocols, procedures, memoranda, guidelines.  Is
17    that -- that's less broad.
18                MR. TARDIO:  You're talking about -- we
19    still on 13?
20                THE COURT:  Yes, sir.
21                MR. TARDIO:  The second half of it?
22                THE COURT:  It's a copy of all e-mails,
23    common protocols, common --
24                MR. TARDIO:  Well, I assume this is
25    asking for policies and protocols related to
```

1    notifying patients?  Is that what it's asking for?

2                    MR. NOLAN:  (Nods head.)

3                    MR. TARDIO:  I think those, if they

4    have any, are discoverable.

5                    THE COURT:  All right.

6                    MR. TARDIO:  This interrogatory

7    request, I guess it is, is just so broad that it's

8    literally anything written by anybody at Howell

9    Allen, ever.

10                   THE COURT:  No, I understand.  But

11   limiting it to the question right now, to protocols,

12   procedures.

13                   And I don't know what memoranda maybe

14   you're talking about, Mr. Nolan.  What would you say

15   that would be or could be limited to?  Maybe you --

16   maybe you don't know.

17                   MR. NOLAN:  Well, basically, if

18   there -- if there was stuff that they were sending

19   by e-mail or letter about contacting people who

20   received injections from NECC, you know, that's the

21   real limitation.  So, you know, it wouldn't go far

22   back in time.  It would only go back to, I guess,

23   September 18th, at the very earliest, and . . .

24                   THE COURT:  Of what year?

25                   MR. NOLAN:  Of 2012.

1              Because at some point, a decision was

2    made, "We need to start telling patients about

3    this."  And we just want to pick up documents and

4    e-mails that -- that were part of that process.

5              MR. TARDIO:  Well --

6              THE COURT:  2012 -- September 18th,

7    2012, forward?

8              MR. NOLAN:  That's right.

9              MR. TARDIO:  Just for context here:

10   After the outbreak occurred, we worked closely with

11   the Department of Health from day one to identify,

12   first, what was the culprit.  And once it was

13   determined that NECC was the rogue actor here and

14   sent the contaminated product, that that's -- that's

15   what caused this.  In other words, it wasn't

16   something at the facility; it was the product, the

17   steroid.

18              Once that was determined, the next

19   process was to determine who received it, which

20   was -- I can't remember the number, but it was

21   1,000, at least.  Because, remember, they got 2500

22   doses, I think, or vials.

23              The next step was to, in conjunction

24   with the Department of Health, determine, "What do

25   we do?  Do we call these people on the phone?  Do we

```
 1    e-mail them?  Do we write them a letter?  Do we go
 2    track them down at their house?"
 3              And some combination of that was done,
 4    as has been documented in the media.
 5              So this essentially asks for copies of
 6    every letter.  And we sent letters to all these
 7    patients.  Now -- so that -- that's overbroad.  Now,
 8    one -- it was the same letter.  So one
 9    representative letter to all these patients, I
10    think -- or one representative letter, I think, is
11    discoverable.  But --
12              THE COURT:  Hold on a second.
13              How does that sound, Mr. Nolan?
14              MR. NOLAN:  If they represent it's the
15    same letter that went to everybody, I think that's
16    reasonable.
17              THE COURT:  Okay.  All right.  Well,
18    that part is solved, then.  Now, that doesn't --
19    that's not everything you're asking for.
20              MR. NOLAN:  No, no.  I mean, there's
21    surely been some internal communications as well as
22    communications with the Department of Health.  And I
23    guess one thing I'm unclear about is:  Are the
24    15,000 e-mails that have been quarantined, would
25    they include, for example, anything Dr. Lanford
```

1    sent, would they --

2                    MR. TARDIO:  We've quarantined his,

3    we've preserved -- everybody who worked at STOPNC,

4    we have their e-mails.  It's just a matter of what

5    we do with them now.

6                    THE COURT:  Right.

7                    MR. TARDIO:  And how long it's going to

8    take.

9                    THE COURT:  Right.

10                   MR. TARDIO:  So yes -- I can't

11   represent -- I don't think I can represent that --

12   because I don't know.  I can -- we have them.  Is

13   everything in there?  I don't know.  You're talking

14   15,000 e-mails.

15                   But it should capture anything that

16   those people from STOPNC sent or received with the

17   Department of Health or anywhere -- anybody else,

18   so --

19                   MR. NOLAN:  Okay.

20                   MR. TARDIO:  -- yes, to answer

21   Mr. Nolan's question.

22                   THE COURT:  Okay.  And then we're back

23   to that issue we previously discussed about time,

24   how long it's going to take, cost.  Time is money,

25   always.  Time and cost are probably hand in glove.

```
 1    And can it all be done between now and June 4, 5,
 2    and 6?  And if not, are the Plaintiffs willing to go
 3    forward and take the chance that this is their only
 4    shot at the interrogatory -- at the -- sorry --
 5    depositions?
 6              So, let's see.  We really haven't
 7    talked about the privilege issues, but I guess
 8    they're really -- I know the answer is a good --
 9    it's a good lawyer-like answer.  It states every
10    privilege possible.  But is the Tennessee Peer
11    Review Law of 1967 and the Tennessee Patient Safety
12    and Quality Improvement Act of 2011, is that
13    primarily the issue?
14              MR. TARDIO:  Not with the e-mails, no,
15    sir.  The primary privilege with the e-mails is
16    going to be going through -- the primary issue with
17    the e-mails is going to be going through however
18    many e-mails we get down to -- 1,000, 2,000, 5,000,
19    whatever it is -- redacting conversations with
20    lawyer --
21              THE COURT:  Yes.
22              MR. TARDIO:  -- where I sent an e-mail
23    and said, "I need this, this, and this," or, "You
24    need to do this, this, and this."  So that's got to
25    be redacted.  Any -- any conversation about another
```

```
 1  patient --
 2                THE COURT:  Yes.
 3                MR. TARDIO:  -- you know --
 4                THE COURT:  Yeah, I understand.
 5                MR. TARDIO:  -- we're talking one
 6  patient out of thousand.  HIPAA, you've got to
 7  redact that; any work product issue where they, for
 8  us, are preparing something.
 9                THE COURT:  "They" meaning?
10                MR. TARDIO:  Meaning the people
11  whose -- whose e-mails we had preserved, our
12  clients.
13                THE COURT:  Okay.
14                MR. TARDIO:  So that's -- that's the
15  issue with the privilege and e-mails.  I'm certain
16  that there are e-mails that have attorney/client
17  communications and work product objections and HIPAA
18  objections within them.
19                THE COURT:  Okay.  Well, here -- this
20  is the real rub that we've -- we talked about the
21  last time we were all here.  Ms. Hollabaugh brought
22  it up first.  There are just so many e-mails to have
23  to go through.  And, you know, it's -- it's going to
24  take a Herculean effort to get all that done, even
25  working nonstop between now and the scheduled
```

1    depositions of June 4, 5, and 6, 2013.

2              So what -- tell me what you suggest, if

3    anything, Mr. Nolan?  You want to just say -- tell

4    the Defendants to do the best they can --

5              MR. NOLAN:  I think we ought to --

6              THE COURT:  -- and then see where we

7    go?

8              MR. NOLAN:  I think we ought to do -- I

9    think we ought to, you know, have them first tell us

10   how many e-mails are included for those four players

11   that we've already discussed, you know.  It may

12   be --

13             THE COURT:  Say who they are again for

14   the record.

15             MR. NOLAN:  They are Culclasure,

16   Schamberg, Butler, and Nurse Littleton.

17             And then tell us how many e-mails we're

18   talking about there.  And that might make the whole

19   thing much easier.  And if we think that it's still

20   unmanageable, then we'll talk about search terms.

21             THE COURT:  Okay.

22             MR. NOLAN:  And that might further

23   reduce things.  That's my only suggestion.

24             THE COURT:  All right.  That -- that

25   sounds reasonable to me.

1                    MR. TARDIO:  It is reasonable.  And I

2      will determine, as best we can, how many e-mails are

3      in those four -- four people's accounts.  But if

4      there are 15,000 in this many, then I'd say in this

5      many, there are going to be at least 1,000, so I

6      don't know.

7                    THE COURT:  Just do the best you can.

8      That's all you can do.

9                    MR. TARDIO:  We will -- we will

10     certainly do the best we can.

11                   THE COURT:  All right.  And then --

12     now, let's see.  What -- now, have you -- just tell

13     me if I'm incorrect.  Have you agreed, for purposes

14     of discovery, that copies of protocols, procedures,

15     memoranda, guidelines, is that -- you agree you-all

16     need to produce that or that's discoverable?

17                   MR. TARDIO:  All their policies and

18     procedures?

19                   THE COURT:  Well --

20                   MR. TARDIO:  Or are you talking related

21     to contact of patients?

22                   THE COURT:  Contact -- related to

23     contact of patients is what you wanted; isn't that

24     right, Mr. Nolan?

25                   MR. NOLAN:  That's what we asked in

1    this request, that's correct.

2              THE COURT:  Yes.

3              MR. TARDIO:  Yes, sir.  And I'm

4    virtually certain there isn't one, but we will --

5    and we've turned over the -- the Table of Contents.

6    But I will double-check.  And if Howell Allen has a

7    policy and procedure that dictates how patients are

8    contacted with an issue or medication issue, then I

9    will --

10             THE COURT:  All right.

11             MR. TARDIO:  I -- I agree that it's

12   discoverable.

13             THE COURT:  All right.  Very good.

14             Do you need to confer with Mr. --

15             MR. NOLAN:  Not on that one, I don't

16   think.

17             THE COURT:  Oh, I thought he might want

18   to talk to you about something.  Okay.

19             All right.  So -- and that's from

20   September 18th, 2012, forward; --

21             MR. NOLAN:  That's right.

22             THE COURT:  -- is that right?

23             Okay.  So that -- that will be the

24   Court's order.

25             There's a lot of discussion there

1    within that order, but I think we all know what

2    we're talking about.  We'll have to look at the

3    transcript to be sure we know.  But . . .

4                All right.  The next one is No. 27,

5    which is:  Produce a copy of all of Howell Allen

6    Clinic's written policies, procedures, and

7    guidelines.

8                Objection of Howell Allen is that

9    the -- it's overbroad and unduly burdensome.  The

10   contact -- contact and treatment issue took place at

11   STOPNC, not at Howell Allen.

12               Okay.  What --

13               MR. NOLAN:  I don't think we have the

14   index for Howell Allen's policies and procedures.  I

15   don't think that's been produced, has it?

16               MR. TARDIO:  I thought it had.

17               MR. NOLAN:  Okay.

18               MR. TARDIO:  I thought it had.

19               MR. NOLAN:  I thought it hadn't.

20   And --

21               MR. TARDIO:  Well --

22               MR. NOLAN:  -- you know, if it has,

23   then we can look at it and identify some that we

24   would like to see.  But I thought it had not been

25   produced.  And we ought to at least have a chance to

1    see the index.

2                THE COURT:  Well, I agree with that --

3                MR. TARDIO:  Well, we will -- we

4    will -- if we have not already, we will produce the

5    index.  I thought we had.

6                THE COURT:  Okay.

7                MR. TARDIO:  I -- I do have an

8    objection, though, to, again, just producing all of

9    Howell Allen's --

10                THE COURT:  Well, I understand.  But

11    I -- I'm going -- I'm going to be consistent.  I

12    said earlier that I -- I think all -- you know,

13    discovery is broad.  And whatever Mr. Nolan and

14    Mr. Leader say they want from the index that you --

15    that you-all -- well, start over.

16                Whatever y'all agree on, great.  Y'all

17    agree, state what your agreement is.  What you

18    cannot agree on -- I mean, policies and procedures,

19    I mean, I think they're all discoverable.  So my

20    order is that if there's no agreement on certain

21    ones, unless there's something really stringently

22    objected to, if it's similar to the previous request

23    from STOPNC on policies and procedures, then I say

24    it's produced.  You got to produce it.  Plaintiffs

25    are entitled to it.

1          If there's some -- some very strong

2    objection, then present it to me, and I'll -- I'll

3    decide.

4          All right.  The next request is No. 31:

5    Produce a copy of any e-mails, reports, memoranda,

6    policies, procedures, guidelines, or other material

7    that addresses the purchase, administration, and/or

8    use of MPA or other steroids at Howell Allen Clinic

9    and/or Saint Thomas Neurosurgical.

10          Howell Allen objects.  The treatment

11    and contact at issue took place at STOPNC, not at

12    Howell Allen.  Additionally, the request for

13    documents regarding activities at STOPNC should be

14    directed to STOPNC.  For responsive documents, see

15    STOPNC's Responses to Plaintiffs' First Set of

16    Requests for Production.

17          First of all, Mr. Nolan, did that --

18    that information that was produced at -- by STOPNC's

19    Responses to Plaintiffs' First Set of Requests for

20    Production, did that help?

21          MR. NOLAN:  They gave us information

22    about where STOPNC purchased its steroids.  But

23    it's -- it's really the same issue that we discussed

24    earlier, that being --

25          THE COURT:  Okay.

1          MR. NOLAN:  -- you know, we wanted to

2   find out about Howell Allen's purchase of steroids.

3   And we really don't know -- you know, this could be

4   a very small universe of documents or a large

5   universe, depending on how much steroids they used

6   at Howell Allen and how many vendors they've used.

7          THE COURT:  What do you say,

8   Mr. Tardio?

9          MR. TARDIO:  They inject other joints.

10          THE COURT:  All the time?

11          MR. TARDIO:  I don't know.  I don't

12   know the answer to the question about frequency.

13   But I know they have purchased MPA and other

14   steroids for use in shoulder, knee.  Not the -- the

15   cervical or lumbar.  But -- so yeah, there are

16   responsive documents.

17          My objection is that they're not

18   relevant.  I mean, there are -- they're, in essence,

19   a parent company, a member of -- a member of STOPNC

20   under the statute we looked at.  And their purchases

21   of medications and their treatment of patients are

22   irrelevant and not reasonably calculated to lead to

23   the discovery of admissible evidence.  So I

24   respectfully submit to the Court that the objection

25   stands on its own.

```
1              THE COURT:  All right.
2              MR. NOLAN:  Your Honor, I would say --
3   you know, for example, if there was a memorandum
4   issued by Dr. Lanford and Howell Allen to all the
5   other Howell Allen doctors that says, "This is how
6   we should evaluate compounding pharmacies," or, "We
7   should only use Depo-Medrol when we're injecting
8   joints because that's made by Pfizer and that's a
9   good product."
10             You know, if -- I don't know what
11  exists; but if -- if stuff like that is there, it
12  would certainly be encompassed within this request.
13  And it would be relevant.
14             MR. TARDIO:  I don't disagree.  But
15  that's not what the interrogatory -- the request
16  asks for.  It doesn't say, "Is there a memoranda --
17  or memorandum within Howell Allen that directs
18  people to how to buy from compounding pharmacies?"
19  That's something specific that we can ask our
20  client.  And they can say, "Yeah, we have it," or,
21  "No, we don't."  But when you ask for all memoranda
22  related to drug purchases with no time limit, --
23             THE COURT:  Yeah.
24             MR. TARDIO:  -- that -- frankly, it's
25  almost impossible to answer without just saying,
```

1    "Give me every document you've ever created related

2    to drug purchases."

3                    THE COURT:  All right.  Want to do a

4    time frame like we did the last --

5                    MR. NOLAN:  Yeah.  I would say five

6    years and limited to steroids.

7                    THE COURT:  Steroids, five years from

8    10-1-2012, like we did before?  Is that

9    acceptable --

10                   MR. NOLAN:  (Nods head.)

11                   THE COURT:  -- as a narrowing?

12                   MR. NOLAN:  (Nods head.)

13                   THE COURT:  Is that a "yes"?

14                   Or if it's not acceptable, just say

15   it's not.  But that will be the order.

16                   MR. NOLAN:  That's -- that's -- that's

17   fine with us.

18                   THE COURT:  Okay.  All right.  So

19   steroids, five years -- five years back from

20   10-1-2012.  And my ruling on that previous one, I

21   think this is really the same, and tell me if I'm

22   incorrect.  It's Interrogatory No. 2 that was

23   objected to by the defense of Howell Allen Clinic

24   responses.

25                   So my -- my ruling will be the same.  I

1    believe it's a very, very similar question, so same

2    ruling.  And same time frame: five -- five years

3    back from 10-1-2012, and steroids.

4              All right.  Next one, Request to

5    Produce 32:  Produce a copy of any policies,

6    procedures, guidelines, or other printed material

7    that addresses epidural steroid injections performed

8    at the Howell Allen Clinic and/or Saint Thomas

9    Neurosurgical.

10             Howell Allen's response is:  Objection.

11   Objects to a portion of the request regarding

12   activities performed by STOPNC.  That request should

13   be directed to STOPNC.

14             And I'm assuming, Mr. Nolan, you did

15   make that request to STOPNC?

16             MR. NOLAN:  We did.

17             THE COURT:  And you got information,

18   but you still want the same information from Howell

19   Allen?

20             MR. NOLAN:  Yeah.

21             THE COURT:  All right.  And then the

22   further objections:  Epidural steroid injections are

23   not performed at the Howell Allen Clinic.

24             Okay.  Mr. Tardio?

25             MR. TARDIO:  That's the objection.  I

1   don't know what relevance the -- the members --

2   again, it's not -- we'll tell you what -- what they

3   do, where this treatment took place, but it's

4   irrelevant and not reasonably calculated to lead to

5   the discovery of admissible evidence when asking

6   these same questions about a member where the

7   treatment didn't take place.

8            THE COURT:  All right.  Well, I -- this

9   is a similar issue we've had before I've already

10  ruled.  And I'm going to rule that it's discoverable

11  and should be provided by Howell Allen.  Objection

12  overruled.

13           All right.  No. 33:  Produce a copy of

14  all internal communications of Howell Allen Clinic

15  related to NECC's recall of MPA and/or the recent

16  fungal meningitis outbreak.

17           Howell Allen's response is:  Objection.

18  Seeks information protected by work product,

19  Tennessee Peer Review, Tennessee Patient Safety and

20  Quality Improvement Act, overbroad, unduly

21  burdensome.  Essentially asks for every internal

22  communication related to the fungal meningitis

23  outbreak.

24           And -- and I agree with that last

25  statement.  So tell me what you think.  Any way we

```
 1    can narrow that, Mr. Nolan?
 2                 MR. NOLAN:  You know, it's already
 3    limited in time because it wouldn't go back any
 4    earlier than September the 18th, which was the
 5    first --
 6                 THE COURT:  All right.
 7                 MR. NOLAN:  -- indication of a problem.
 8    That's September the 18th of 2012.
 9                 THE COURT:  2012?  So anything after
10    that.  So that -- that is limited.  We -- there was
11    a limitation put on a similar request earlier, so
12    that -- that helps, to a degree.
13                 MR. TARDIO:  I need to be heard on this
14    because --
15                 THE COURT:  Sure.
16                 MR. TARDIO:  -- we're talking -- now
17    we've broadened the universe of e-mails beyond the
18    15,000.  The 15,000 e-mails only is the Howell Allen
19    employees who worked at STOPNC.  Howell Allen
20    certainly has more employees than that.  They have
21    facilities in Kentucky, here, and other communities.
22    So it's going to be much more than 15,000 e-mails
23    we're going to have to preserve, and --
24                 THE COURT:  "All internal
25    communications" is very broad.
```

 1            MR. TARDIO:  So that would conceivably

 2    grab, if the office manager in the Hopkinsville

 3    office of Howell Allen sent an e-mail to her son

 4    saying, "This fungal meningitis outbreak is awful."

 5    So we have to go through all 5,000 of her -- that

 6    office manager's e-mails and -- or 1,000 or 500 or

 7    however many, looking for anything that -- it's just

 8    too broad and too cumbersome and too burdensome

 9    as -- as drafted, even with the limitation -- the

10    time limitation.

11            THE COURT:  All right.  Can you

12    suggest, Mr. Nolan, further narrowing?  I mean, do

13    you want to redraft that?  You want to redraft it

14    right now so I can rule on it?

15            MR. NOLAN:  What if we -- what if we --

16    what if we limited it to internal communications

17    involving STOPNC's -- the people who worked at

18    STOPNC, or people who worked at Howell Allen's main

19    office?

20            MR. TARDIO:  I don't -- we didn't

21    preserve every Howell Allen employee.  We preserved

22    employees at Howell Allen who worked at STOPNC.  And

23    I thought that was reasonable and a good faith

24    response to expected litigation.  So I don't know if

25    we have every Howell Allen's -- every Howell Allen

1    employee's exhaustive e-mail account.  I don't know

2    if we have it.  I know we have the people who worked

3    at STOPNC who -- I think it's reasonable those are

4    the people who would be involved in this.

5              So it's going to have to be limited to

6    those people, or else I can't guarantee we've got

7    everything that Howell Allen sent or received.

8              MR. NOLAN:  Your Honor, I might make a

9    suggestion.  I wonder if we shouldn't defer this

10   particular request for -- for the present and -- you

11   know, for example, when we take these depositions,

12   we may find out that there's someone else that we're

13   going to need to depose in the course of the

14   lawsuit.  Like maybe Dr. Lanford was heavily

15   involved in this, and we're going to have to depose

16   him.  So we may need to approach Mr. Tardio and say,

17   "Okay.  Now we need to make sure we've got Mr. --

18   Dr. Lanford's e-mails."

19             I think maybe kind of a smaller-bite

20   approach might help.  So I'd be willing to yield on

21   this request for present and -- and --

22             THE COURT:  Just wait and see what the

23   depositions reveal?

24             MR. NOLAN:  Right.

25             THE COURT:  All right.  That's good.

```
 1                    So -- so withdrawn at this time?  Would
 2      that be the --
 3                    MR. NOLAN:  Sure.
 4                    THE COURT:  -- answer?
 5                    Okay.  That's No. 33.
 6                    All right.  And the next one is No. 34:
 7      Produce a copy of all external communications
 8      between Howell Allen Clinic and any other person or
 9      entity relating to NECC's recall of MPA and/or the
10      recent fungal meningitis outbreak.
11                    Objection by Howell Allen?
12                    MR. TARDIO:  It's the -- it's the same
13      issues, Judge.  The next several are the same.
14                    THE COURT:  All external communication.
15                    MR. NOLAN:  You know, I would suggest
16      the same approach.  I -- I think we ought to yield
17      this for now --
18                    THE COURT:  All right.
19                    MR. NOLAN:  -- with the understanding
20      that we may, after these depositions, be asking for
21      some additional documents.
22                    THE COURT:  So No. 34 is withdrawn at
23      this time.
24                    Okay.  No. 35:  Produce all
25      communications between Howell Allen Clinic and the
```

1    Tennessee Department of Health, the FDA, the CDC

2    and/or any other governmental entity relating to

3    NECC's recall of MPA and/or the recent fungal

4    meningitis outbreak.

5              Howell Allen objects.  Because our

6    reports of investigations by public health agencies

7    such as Tennessee Department of Health and the CDC

8    regarding fungal meningitis outbreak are protected

9    from disclosure due to Tennessee Peer Review of

10   1967, Tennessee Patient Safety and Quality

11   Improvement Act of 2011, work product,

12   attorney/client, HIPAA.  And those not protected are

13   freely available to the Plaintiff from various

14   governmental entities.

15             In other words, Plaintiff can get --

16   get information just as easy as you can provide it

17   to him; is that correct?

18             MR. TARDIO:  Some of it.  But, I mean,

19   this is going to require us -- these are -- I'd

20   submit, respectfully, that 33 through 37 are going

21   to kind of raise the same issues:  How do we go

22   through all of Howell Allen's e-mails and locate

23   communications with governmental entities regarding

24   the outbreak?

25             THE COURT:  What do you say, Mr. Nolan?

1              MR. NOLAN:  I don't think that would be

2     that hard.  I mean, I think what would -- what would

3     have to happen is, the lawyers would first have to

4     approach Howell Allen and say, "Okay.  Who was

5     communicating with the government about this?  Who

6     was communicating with the government?"  And then

7     find that person and ask what they have.

8              I think that's all that's required.

9              THE COURT:  And "the government"

10    meaning the Tennessee Department of Health, C- --

11    any governmental entity?

12             MR. NOLAN:  That's right.

13             MR. TARDIO:  Okay.  I think that that

14    information, who was -- who was communicating with

15    the government, is discoverable, and I think that

16    we've either given it or it will come out in the

17    depositions.

18             I -- I gather that Mr. Nolan's asking

19    me to then ask them to go through all their e-mails

20    and see if they have any communications with the

21    government?

22             THE COURT:  Is that right, Mr. Nolan?

23             MR. NOLAN:  Yes.

24             THE COURT:  Another big task?

25             MR. TARDIO:  Well, I don't know how

1   they're going to do it.  Do you just look at every

2   single e-mail you sent for the last eight months,

3   seven months, or do you search?

4              THE COURT:  Well, is there any way to

5   do it by . . .

6              MR. TARDIO:  I guess you could do

7   keywords.

8              THE COURT:  Yeah, right.  Like

9   "Tennessee Department of Health," "CDC," or other

10  public health agencies.  I don't know what others

11  there would be, but . . .

12             MR. NOLAN:  I mean -- yeah.

13             THE COURT:  I say do the best you can

14  on that, and -- and maybe try to use keywords and --

15             MR. TARDIO:  And --

16             THE COURT:  -- get as much information

17  as you can.  And then if you've got -- they've got

18  some things that are --

19             Well, tell me how any of that might be

20  privileged.  It might be protected.

21             MR. TARDIO:  Well, it could be HIPAA --

22  HIPAA-related, --

23             THE COURT:  That's right.  Sure.

24             MR. TARDIO:  -- if you're talking about

25  another patient.

```
 1                    THE COURT:  Sure.  Oh, absolutely.  But
 2   I'm talking about with regard to these Plaintiffs.
 3                    MR. TARDIO:  Oh, these Plaintiffs?
 4                    THE COURT:  Yes.
 5                    MR. TARDIO:  We've produced all e-mails
 6   that mentioned Diana Reed, of the players, the
 7   people involved in this.
 8                    THE COURT:  Okay.
 9                    MR. TARDIO:  We did the key- --
10   keyword -- I think we did it by keyword search.
11                    Right?
12                    MR. ZINI:  We went through
13   Schamberg's --
14                    MR. TARDIO:  We went through Debra
15   Schamberg's --
16                    MR. ZINI:  -- and did keyword
17   through --
18                    MR. TARDIO:  -- and keyword searched
19   the other accounts.  So --
20                    THE COURT:  For -- for governmental
21   agency communications?
22                    MR. TARDIO:  No.  For Diana Reed.
23   There are going to be a lot more governmental.
24                    THE COURT:  Well, that's all we're
25   talking about right now, is governmental.
```

```
 1                    MR. TARDIO:  Right.  What I -- I guess
 2   what I'm saying is, there are going to be a lot
 3   more, --
 4                    THE COURT:  I see what you're saying.
 5                    MR. TARDIO:  -- and it's going to
 6   broaden the scope, and you're going to be picking up
 7   a thousand patients.
 8                    THE COURT:  A lot of different
 9   patients, yes.
10                    MR. TARDIO:  So --
11                    MR. NOLAN:  I mean, I'm sure that
12   Howell Allen had a point person or two to
13   communicate with the government.  It just didn't let
14   all of its employees start sending stuff to the FDA.
15   So I don't see what would be more complicated than
16   just have these good lawyers find out, who were the
17   point people in communicating with the government,
18   and then someone needs to go through their stuff.
19                    And you'd start by asking these people,
20   "All right.  Gather up all your communications that
21   you had with the CDC or the FDA or the Tennessee
22   Department of Health."
23                    THE COURT:  And that's assuming they
24   had some key people doing that.  That's a fairly --
25   fairly valid assumption, I would think.
```

```
 1              MR. TARDIO:  Sure, that's true.

 2              I -- I think we can identify the people

 3      without any problem.  I just don't know how many

 4      e-mails we're talking about.  And what I'm afraid of

 5      is, if we're asked to produce everything, every

 6      communication with any governmental entity,

 7      that's -- that's a pretty tall burden.

 8              THE COURT:  It is.

 9              MR. TARDIO:  And then if a few of them,

10      for whatever reason, aren't caught by the keyword

11      search, or when I ask the lady at Howell Allen,

12      who's -- who may have e-mailed with the government

13      eight times, and she doesn't do a very thorough

14      search, and she says, "I don't have any," well, do I

15      then have a duty to go search every one of her

16      e-mails to check?

17              I'm trying to fulfill my duty to

18      produce discoverable information at -- in an

19      efficient way, but I'm also trying to protect my

20      client from being blamed in eight months for not

21      turning up e-mail 15,001.

22              So if Your Honor orders me to follow a

23      certain process, of course I will do it.  And if

24      that process is identify who these people were

25      communicating with the government, and then do
```

1    keyword searches and pull out e-mails that come back

2    with CDC or Department of Health, I'm certainly

3    willing to do that.  I think that's a reasonable way

4    to do it.  But as drafted, that asks for a lot more.

5              THE COURT:  I agree.  And I think that

6    the narrower approach you've suggested is a good way

7    to handle this.  And -- and then you do the best you

8    can with your key people.  I mean, they -- you can't

9    vouch for their memory or lack of memory.  I mean,

10   you do the best you can with that.  And then, you

11   know, as -- as time moves along, as we all know,

12   people's memories are jogged by whatever events or

13   conversations occurred.  They say, "Oh, I do

14   remember."  Just supplement.  I mean, that's the

15   best you can do.  We're dealing with human beings

16   who, you know, may or may not remember everything.

17   Just do the best you can.

18              All right.  With that explanation and

19   narrowing of the requests, the objection is

20   overruled to No. 35.

21              Now, we're at No. 36:  Produce all

22   communications between Howell Allen Clinic and

23   anyone associated with Saint Thomas Hospital,

24   Saint Thomas Network, and/or Saint Thomas Health

25   relating to NECC, NECC's recall of MPA, and/or the

```
 1   recent fungal meningitis outbreak.
 2               Howell Allen's objection is that --
 3   let's see -- it seeks information protected by work
 4   product, Tennessee Peer Review Law, Tennessee
 5   Patient Safety and Quality Improvement Act, and that
 6   it's overbroad and unduly burdensome, and is not
 7   focused on this patient.
 8               So let's see if we can narrow it.
 9               MR. NOLAN:  I'd suggest that we defer
10   that one until after the deposition.
11               THE COURT:  Defer?  Okay.  So -- so
12   withdrawn at this time, like -- as we did the
13   others?
14               MR. NOLAN:  Sure.
15               THE COURT:  All right.
16               Okay.  No. 37:  Produce all
17   communications between Howell Allen Clinic and
18   anyone associated with Saint Thomas Neurosurgical
19   relating to NECC, NECC's recall of MPA, and/or the
20   recent fungal meningitis outbreak.
21               Howell Allen objects.  Let's see.
22   Seeks information protected by work product,
23   Tennessee Peer Review, Tennessee Patient Safety and
24   Quality Improvement Act, overbroad and unduly
25   burdensome, and is not focused to this patient.
```

1                    MR. NOLAN:  Your Honor, I would suggest

2     that -- that we follow the process for the four key

3     players that we've already outlined.  I think that

4     same process should be applied to this -- this

5     question, because that would make sense.

6                    THE COURT:  And the four people again

7     are, for the record?

8                    MR. NOLAN:  They are Debra Schamberg,

9     Dr. Culclasure, Scott Butler, and Nurse Littleton.

10                    THE COURT:  Okay.  With that suggested

11    narrowing, what do you say, Mr. Tardio?

12                    MR. TARDIO:  For the record, I maintain

13    the objection we stated, --

14                    THE COURT:  Yes.

15                    MR. TARDIO:  -- but I understand the

16    order of the Court.

17                    THE COURT:  Okay.  To be consistent, I

18    stand by my previous order on that, on this type of

19    issue.  And the requests are limited to Nurse

20    Schamberg, Dr. Culclasure, Mr. Butler, and Nurse

21    Littleton.

22                    All right.  And I believe this is the

23    last.  No. 69:  Produce all photographs taken in

24    connection with NECC recall and/or the fungal

25    meningitis outbreak, including, but not limited to,

1    photographs of any NECC products or Saint Thomas

2    Neurosurgical's facilities.

3              Howell Allen objects on the basis of

4    privilege, work product, attorney/client privilege.

5    Photos were taken at instruction of counsel,

6    privilege discovery.

7              Is that not the same issue we've

8    already discussed and I already ruled --

9              MR. NOLAN:  Yes, we've already

10   discussed that.

11             THE COURT:  -- I've already ruled on?

12             MR. NOLAN:  Yes.

13             THE COURT:  Okay.  And I ruled, I

14   believe, that it's not work product and not

15   privileged.  But if it is, the two -- the -- if it

16   is work product, that Plaintiff has a substantial

17   need for the materials and is unable to obtain the

18   materials or their substantial equivalents by other

19   means without undue hardship, or maybe

20   impossibility, particularly if the scene has changed

21   from the time the photographs were taken by the

22   Defense till now.  And that would make it impossible

23   to replicate the images taken by photographs that

24   were taken much earlier by the Defense.

25             Is that all of the discovery issues?

1              MR. NOLAN:  I realized that we skipped
2    one, Your Honor.
3              THE COURT:  Oh, okay.  Sorry.
4              MR. NOLAN:  And that is STOPNC's
5    responses to Request for Production 56, which is the
6    request that asks for STOPNC's board minutes.
7              THE COURT:  Yes.  Sorry.
8              MR. NOLAN:  And they produced redacted
9    board minutes to us, which are useless.  I mean, we
10   think we ought to at least be able to review
11   STOPNC's board minutes, given the circumstances and
12   the fact that we have corporate veil piercing claims
13   and, you know, probing whether corporate formalities
14   are observed is important, and many other different
15   issues.
16              The approach we suggested is we should
17   have the opportunity to at least see those at
18   Mr. Tardio's office, and if we think there's
19   something in there that's relevant, we'll address it
20   with them directly.  And if we can't agree to it,
21   then we could give it to the Court for in camera
22   inspection.
23              THE COURT:  Okay.  And the objection --
24              MR. TARDIO:  The objection is not to
25   production of any of the board minutes.

```
 1              THE COURT:  Right.

 2              MR. TARDIO:  The objection is to parts

 3  of the board minutes that are attorney/client

 4  communications, --

 5              THE COURT:  Right.

 6              MR. TARDIO:  -- peer review actions,

 7  and things that have nothing to do with this

 8  lawsuit.  So I don't think filing a lawsuit entitles

 9  you to every corporate document produced within that

10  business.  And I don't think anybody here thinks

11  that it does, but that's what is being asked for.

12              I also don't think it entitles a party

13  to then inspect and choose what they want and what

14  they don't want.  That defeats the purpose of

15  objecting to any part of it.

16              So we produced what, as officers of the

17  court, we submitted was not privileged and

18  discoverable.  We redacted what we didn't feel was

19  discoverable, and we redacted anything that was

20  privileged.  So I -- and we went back two years

21  instead of going back -- I don't know if there was

22  even a time limitation on the --

23              If the question is whether these

24  meetings existed for purposes of the corporate veil

25  claim, they did.  And they can ask any of these
```

```
 1   witnesses whether these meetings existed and, "What
 2   did you discuss?"  And that's fine, as long as it's
 3   not asking for privileged information.
 4                 But unlimited access to board minutes,
 5   I think, is -- I don't think is -- is contemplated
 6   or allowed by the Rules.
 7                 THE COURT:  Okay.  Mr. Nolan?
 8                 MR. NOLAN:  Here's what I would
 9   respectfully suggest.  First of all, we didn't limit
10   this in time, and I think a temporal limitation is
11   reasonable.  I would suggest the five-year
12   limitation.  And I think we're entitled to see all
13   corporate records going back five years, given that
14   we have a corporate veil piercing claim.
15                 Now, if there's attorney/client
16   privilege included in the board minutes, we're not
17   entitled to see that, and that would be legitimately
18   redacted.  But if they're going to redact that, they
19   should give us a privilege log that says --
20                 THE COURT:  Why.
21                 MR. NOLAN:  -- why they're redacted.
22                 THE COURT:  Yes.  I agree with you.
23                 MR. NOLAN:  And, you know, as far as
24   the Quality Improvement Committee privilege is
25   concerned, I mean, the Court's taken that under
```

```
 1   advisement for present.  But I think that they
 2   should give us all the corporate records.  And if
 3   they redact something based on privilege, they ought
 4   to tell us specifically what they're withholding and
 5   why they're withholding it.
 6              But, you know, the annual reports and
 7   the bylaws and the charter and that stuff, we should
 8   receive that information.
 9              THE COURT:  Well, you get -- can't you
10   get the charter at the Secretary of State?
11              MR. NOLAN:  I think we could get that
12   from the Secretary of State, yeah.
13              THE COURT:  Bylaws, aren't they -- is
14   that part of what's filed with the Secretary of
15   State?  I'm not sure.  Maybe not.
16              MR. TARDIO:  I don't know.
17              MR. NOLAN:  I'm not sure of that
18   either.
19              THE COURT:  I don't either.
20              MR. NOLAN:  I mean, I assume on a shelf
21   somewhere there's a corporate minute book, record
22   book, that contains all of these corporate
23   documents, and I think they ought to at least show
24   that to us --
25              THE COURT:  All right.
```

1          MR. NOLAN:  -- absent any

2   attorney/client privilege stuff.

3          THE COURT:  Well, I think what

4   Mr. Tardio is saying is -- and I agree with

5   Mr. Nolan.  I mean, redact what you think needs to

6   be redacted.  A five-year limitation, I don't think

7   is too excessive.  And five-year limitation -- well,

8   month, year.  What year?

9          MR. NOLAN:  From October 1st of 2012,

10  backwards.

11         THE COURT:  10-1-2012 back five years?

12         MR. NOLAN:  Yeah.

13         THE COURT:  Okay.

14         And, Mr. Tardio, redact whatever you

15  think is privileged and give a privilege log on all

16  redactions, and then we'll see where we go from

17  there.  I think that's the best you can do.  I think

18  that's the best we can do on that right now.

19         MR. TARDIO:  Right.

20         What about the portions of the board

21  minutes that have zero to do with this lawsuit,

22  zero?

23         THE COURT:  Well --

24         MR. TARDIO:  "We're going to -- we're

25  going to institute eight fire drills this year

1    instead of six."  "We are going to lease our parking

2    spaces instead of buying them."

3                    THE COURT:  Well, what do you propose?

4    You propose to redact?

5                    MR. TARDIO:  Well, that's what we did.

6                    THE COURT:  Oh, okay.  You've already

7    done that?

8                    MR. TARDIO:  Uh-huh.

9                    THE COURT:  Well, I think you ought to

10   say --

11                   MR. TARDIO:  What's in there?

12                   THE COURT:  Well, I was getting ready

13   to say why you redacted it, but --

14                   MR. TARDIO:  I mean, the problem is --

15                   THE COURT:  -- it has to do with

16   parking space, I mean, you could -- you could -- on

17   a privilege log, you -- it's really not a privilege

18   log.  It's not privileged.  But, I mean, it's -- if

19   it's something that inane -- and I'm sure a lot of

20   it is -- I mean, there's really no harm, is there?

21                   MR. TARDIO:  No.  But some of it isn't.

22   I mean, it's still an invasion --

23                   THE COURT:  I understand.

24                   MR. TARDIO:  -- into these people's

25   business --

```
 1                THE COURT:  I understand.
 2                MR. TARDIO:  -- that doesn't have
 3   anything to do with this lawsuit.  And I understand
 4   that there are things in there that do have to do
 5   with this lawsuit.
 6                THE COURT:  Well --
 7                MR. TARDIO:  And I'm not saying those
 8   aren't discoverable.
 9                THE COURT:  Well, if it's not
10   privileged, it's discoverable.  They can see it.  If
11   it's clearly things like parking spaces and other
12   things like that, I mean, clearly not relevant, but
13   it's there.  And I understand it's an invasion, but,
14   you know, we got a lawsuit here, and discovery is
15   very broad in Tennessee.  If you don't have
16   privilege, or it's not, you know, so overly broad to
17   be too time-consuming and expensive to produce, then
18   I think you ought to produce it.
19                So -- I understand the -- your
20   argument.  You're making a good argument for your
21   client.  Both of y'all are.  Both sides are
22   representing their clients as they should,
23   zealously, and that's exactly what you're charged
24   with doing.  You're doing it and doing a great job.
25   That's why I'm here just to referee the disputes.
```

1   So that's -- that's what we've done today.

2              And so I think Mr. Nolan's narrowing of

3   the Request sixty- -- I'm sorry -- 56 for STOPNC is

4   accepted by the Court.  And to that extent, the --

5   with that narrowing, the objection is overruled.

6   No. 56.

7              All right.  Now we've got some requests

8   to limit the discovery to seven hours per witness;

9   is that right?

10             MR. TARDIO:  Yes, sir.  I filed that.

11  I frank- -- admittedly, Mr. Nolan has not had a

12  chance to respond.  So with that caveat -- it's a

13  simple motion.  If Your Honor wants to take it up

14  and Mr. Nolan doesn't mind, I'm fine arguing it.

15             MR. NOLAN:  I think we ought to go

16  ahead and talk about it, Your Honor, --

17             THE COURT:  Okay.

18             MR. NOLAN:  -- if the Court is inclined

19  to do that.

20             THE COURT:  Sure.

21             MR. NOLAN:  Your Honor, I don't

22  understand their -- why they're requesting this

23  limitation.  It's not contained in the Rules of

24  Civil Procedure, you know, particularly given the

25  enormous scope of the tragedy that occurred here.  I

1    mean, 15 people dead, more than 100 who contracted

2    meningitis.  I just don't understand why

3    Saint Thomas Neurosurgical would take the position

4    that under these circumstances, given that these

5    folks made the decision to buy this stuff from this

6    out-of-state compounder, they're entitled to special

7    treatment that's not provided for in the Rules.

8                    So that's -- that's our first position.

9                    And I don't know how the Court would --

10    would impose restrictions on parties who are not

11    before it, you know, people who aren't parties to

12    the lawsuit.  And I kind of felt like the motion was

13    designed to achieve that.

14                    But, you know, we think we need to be

15    able to take very thorough depositions of these

16    people.

17                    THE COURT:  Well, I had modified --

18    you-all had competing orders at our last meeting.

19    Have y'all -- y'all got a copy of the modified order

20    I sent you?

21                    MR. TARDIO:  Yes, sir.

22                    THE COURT:  Okay.  And I think that

23    sets out well what the nonparties are to do that

24    will give you-all, the questioning attorneys,

25    questions and let you ask them.  If you don't want

1    to ask those questions -- I mean, you might not want

2    to do that -- then I'm going to -- I'm going to

3    require those lawyers to identify themselves,

4    identify their potential client, and ask the

5    question.

6              But these nonparties and attorneys who

7    will be participating, I don't want them to take

8    over your deposition, the Plaintiffs' deposition or

9    the Defendants' deponents, and make this burdensome

10   for everybody.

11             So -- well, can I have the calendar,

12   William, please?

13             I feel like I'll be around and y'all

14   can contact me, is what I'm thinking, --

15             COURT OFFICER:  (Tendering calendar.)

16             THE COURT:  Thank you.

17             -- if you have a problem.

18             MR. TARDIO:  You might regret that.

19             THE COURT:  Well, I don't know.  Y'all

20   don't know.  Or you do know.  Surely, you know my

21   reputation, that I stay here long hours, and there

22   are not many days I miss.

23             I will be here 4, 5, and 6 -- or

24   actually, let's see.  A pretrial conference on the

25   3rd of June for a case set for trial on 6-17.

1    Motions in limine, basically.  And then I've got a

2    Motion for Summary Judgment in a securities fraud

3    case on the 5th at 1:00 p.m.  I've got a review for

4    that.  And nothing right now in court for the 6th.

5    But I've got -- I'll have a monster motion docket on

6    the 7th because I'm missing a couple of motion

7    dockets because of being out of town.

8              So I'll be around.  And I'll give y'all

9    my cell phone if I'm not here at the office or if

10   it's after hours.  And I might -- sometimes I'm here

11   a lot after hours reviewing, preparing for the next

12   day or next days, and sometimes I don't hear that --

13   hear the telephone in the office.  I'll give you my

14   cell number to call me if you need me.  And

15   that's -- everybody else has got it, so -- 289-3792.

16   And I'll try to help you-all if you run into some

17   problems.

18              I don't -- I just don't think putting

19   an artificial limit -- I mean, you may complete one

20   well before seven hours.  You may not.  You may need

21   to go on.  And I -- y'all are all really very good

22   at what you do.  You're all excellent lawyers, and

23   you're not going to be -- I mean, these discovery

24   depositions, sometimes they take longer than you

25   anticipate because -- because one question and then

```
 1    answer leads to others that you did not -- other
 2    questions you did not anticipate.  I mean, you're
 3    going to anticipate very many questions, but
 4    depending on what the answers are, you may end up
 5    with a lot more questions.
 6              So just, it's hard to know how long a
 7    deposition is going to take, so I'm not going to put
 8    an artificial limit on it.  But just use good --
 9    good reason and common sense.  I know that you-all
10    will do.
11              Now, the next is to limit all present
12    law firms to one questioning attorney.  What about
13    that?  I mean, that doesn't seem too unreasonable.
14              MR. NOLAN:  I agree, Your Honor, per
15    witness.  I mean, you know, for example, I might
16    want to take the lead on one witness, and Mr. Leader
17    might --
18              THE COURT:  Yes.
19              MR. NOLAN:  -- want to take the lead on
20    another witness.
21              THE COURT:  That's all right with you,
22    Mr. Tardio?
23              MR. TARDIO:  Yes, that's fine.  What
24    I'm trying to prevent is Mr. Nolan doing five hours
25    of questioning and then Mr. Leader saying, "I've got
```

```
 1    five hours" on the same witness; Mr. Kinnard saying,

 2    "I've got five hours"; Mr. Clayton saying, "I've got

 3    five hours."

 4              I think that it's fair --

 5              THE COURT:  Yes.

 6              MR. TARDIO:  -- to expect one lawyer

 7    from each firm.

 8              THE COURT:  Yes, I -- I agree.

 9              So that will be the Court's order.

10              All right.  Now, on the privilege

11    issue, what's the -- what's the word on getting an

12    updated -- well, not updated, but a supplemental

13    affidavit?  And then depending on what it says, you

14    know, we still may have -- well --

15              MR. TARDIO:  I can --

16              THE COURT:  -- I know we're going to

17    have issues, no matter what it says, I believe.

18              MR. TARDIO:  I can represent to the

19    Court it's being signed, and it will say that this

20    is the first draft.  I'm not sure what happened --

21    what the final draft looks like.  But it will say

22    that the 2012 contract, Debra Schamberg entered into

23    it.  It was with the same pharmacist that tracked

24    back to 2007.  The relationship and the duties and

25    the functions hasn't changed since 2007.  The
```

1    contracts are with Saint Thomas Outpatient

2    Neurosurgical Center.

3              Regardless of the name in there, we --

4    the -- the names do not -- aren't our names.

5    That -- Saint Thomas Outpatient Neurosurgical

6    Center, the entity, was the contracting party.

7              THE COURT:  Even if --

8              MR. TARDIO:  Even if it says

9    Saint Thomas Surgical Center, or whatever it says on

10   the contract.

11             THE COURT:  All right.  What -- go

12   ahead.

13             MR. TARDIO:  That Tina Sullivan was the

14   pre- -- was the facility director beforehand.  And

15   then from 2007 to present, the pharmacist consultant

16   has fulfilled the same duties as set out in both the

17   contracts and the affidavit.

18             THE COURT:  What about the reference to

19   the -- in the pharmacy consulting contract that is

20   entered -- it was handed to me today, the one that

21   says it was entered into February 1, 2007, that

22   talks about that the contract was entered into for

23   the purpose of providing an available pharmacy

24   license for the Oral Surgery Institute.

25             Is that -- what is that?  Is that a

1    mistake?

2              MR. TARDIO:  It's a cut-and-paste job.

3    I mean, it doesn't affect the terms of the contract.

4    The duties -- the affidavits now, two of them -- or

5    there will be two of them in the record -- say what

6    the duties between Saint Thomas Outpatient

7    Neurosurgical Center and the pharmacist consultant

8    were and what they were doing.

9              THE COURT:  Okay.

10             MR. TARDIO:  I mean, I don't --

11             THE COURT:  Well, I guess those will be

12   questions that will asked of Debra Schamberg --

13             MR. TARDIO:  Sure.

14             THE COURT:  -- at her deposition.

15             MR. TARDIO:  That's the other thing.

16   We're kind of doing this in the abstract, so it's

17   somewhat difficult to draft these affidavits on --

18   with a time budget and get everything in there you

19   want to get in there.

20             But now I think the record is clear

21   that from '07 to 2012, there was a pharmacist

22   consultant who contracted with this entity to

23   fulfill functions and purposes and duties that are

24   contemplated by the statute.

25             So I think we've answered that

1    question.

2                    THE COURT:  All right.  And you'll be

3    able to get that to the Plaintiffs' attorneys today,

4    you think?

5                    MR. TARDIO:  Yes, sir, or first thing

6    in the morning.

7                    THE COURT:  First thing in the morning?

8    Okay.

9                    MR. TARDIO:  Yes, sir.  I mean, I -- I

10   don't know if it's going to be back and be able to

11   file it before 4:30.  But, you know, I'll file it in

12   the morning.

13                   THE COURT:  Okay.  All right.  I've got

14   an expedited motion hearing in the morning at 9:00

15   in a case that's set for trial in August, jury

16   trial.  I've got to be at -- before the Metro

17   Council at 4:00 p.m. for a budget hearing.

18                   Y'all want to come back at 1:00 and see

19   if we can --

20                   MR. TARDIO:  Tomorrow?

21                   THE COURT:  Tomorrow.

22                   MR. TARDIO:  I'm scheduled to be out of

23   town at a meeting.

24                   THE COURT:  All right.

25                   MR. TARDIO:  Is Your Honor going to

1    want supplemental briefing on the issue?

2              THE COURT:  No, I don't think that's

3    necessary.  I don't believe.

4              MR. NOLAN:  I think we ought to just

5    come over and talk about it.

6              THE COURT:  Come over and argue --

7    finish arguing based on the -- based on the

8    supplemental affidavit --

9              MR. NOLAN:  Okay.

10             THE COURT:  -- and go on and get it

11   done.

12             MR. NOLAN:  I agree.

13             THE COURT:  And -- if y'all can do it.

14   And I'm sorry -- can somebody else come?  I mean, I

15   know you've been the lead on this.

16             MR. TARDIO:  Just tell me again what

17   the -- we're talking tomorrow afternoon?  Is that

18   the slot we've identified?

19             THE COURT:  Yes.  And that's all I've

20   got.

21             MR. TARDIO:  Okay.

22             THE COURT:  And I've told y'all, I've

23   got a preplanned vacation that -- you know, almost

24   nine or ten months ago, --

25             MR. TARDIO:  Understood.

```
 1                    THE COURT:  -- paid for.  And I'm
 2  going.
 3                    MR. TARDIO:  I understand that
 4  completely.
 5                    THE COURT:  And so I'm trying to get
 6  y'all in before I leave so you can get these
 7  depositions going.
 8                    MR. TARDIO:  And the earliest is 1:00
 9  tomorrow?
10                    THE COURT:  Yes.  Well, based on who
11  I've got at 9:00, I think 1:00 is probably right.
12                    MR. NOLAN:  May I ask --
13                    THE COURT:  Yes.
14                    And I've got to be at that budget
15  hearing, but it's just downstairs in Council
16  chambers at 4:00.
17                    MR. NOLAN:  At 4:00?
18                    THE COURT:  Yes.
19                    MR. NOLAN:  Would it be possible to do
20  2:00 rather than 1:00 tomorrow?  I can move
21  something I've already got at 1:00.
22                    THE COURT:  And Mr. Tardio, you're out
23  of town, aren't you?
24                    MR. TARDIO:  Uh-huh.  I start a trial
25  in a few weeks, and we're --
```

```
 1                    THE COURT:  Yes.
 2                    MR. TARDIO:  -- starting to get geared
 3     up for that.
 4                    THE COURT:  I understand.
 5                    So you've got to -- you've got to get
 6     somebody to come in your place.
 7                    MR. TARDIO:  (Nods head.)
 8                    THE COURT:  Let's see.  What about
 9     Thursday, the 16th?  I've got -- let's see.  I've
10     got to see my eye doctor, got some lab work I've got
11     to do early.  Start at 7:45 with the eye doctor.
12     8:30, lab work.  11:30, Weighted Caseload Committee
13     meeting.  Noon, all judges meeting.  And I've got a
14     couple of settlement approvals in the afternoon.
15     But I can -- I could maybe do this at 2:00 on the
16     16th.
17                    MR. NOLAN:  That would be fine.
18                    THE COURT:  How would that work?
19                    MR. TARDIO:  I have the 16th open.  I
20     know I have a phone hearing that's only going to
21     take about 15 minutes.  Let me just make sure it's
22     not at 2:00.
23                    THE COURT:  Or it can be at 2:30.
24                    MR. TARDIO:  Yeah.  Let me just see if
25     I . . .
```

```
 1                    The only thing I have on the 16th is at
 2      11:30, so 2:00 is fine.
 3                    THE COURT:  That sound okay to you,
 4      Mr. Nolan?
 5                    MR. NOLAN:  Sure.
 6                    THE COURT:  All right.  That will give
 7      y'all time to digest, and supplemental affidavit.
 8      That will probably work better for me, too.
 9                    Okay.  16th, May the 16th, Thursday,
10      2:00.  And we'll argue the privilege issue.
11                    Again, I mean, I know y'all have done a
12      great job of outlining that already in your
13      preliminary statements.  Thank you for that.
14                    MR. NOLAN:  Thank you for your help,
15      Judge.
16                    THE COURT:  Thank you all very much.
17                    MR. TARDIO:  Your Honor, let me just
18      make one statement before we all leave.
19                    THE COURT:  Yes.
20                    MR. TARDIO:  We have now answered --
21      and I had it written down -- 93 interrogatories, 139
22      requests, 60 requests for admissions, produced 75 or
23      80 policies, you know, a thousand pages.  Plus,
24      obviously, today's going to produce more work.
25                    I don't know, without going back
```

1    through my notes, the rulings today, how long it's

2    going to take to produce this stuff.  I don't know.

3                THE COURT:  Think about it between now

4    and Thursday.  Let's talk about that.  I know what

5    your next question is.

6                MR. TARDIO:  Well --

7                THE COURT:  If you can't produce it

8    all, can't get it all done by when the depositions

9    start, Plaintiffs are then in a position of having

10   to say, "Well, we'll go ahead without it," or we'll

11   postpone the depositions for a reasonable period of

12   time to get you to get it together.  I mean, I don't

13   know any other thing to do except just see what it

14   looks like.  I know it's a lot of information.  And

15   I know it may be not possible to produce it all

16   by -- in time for the Plaintiffs' counsel to review

17   it, digest it, and then break down questions that

18   will be asked of the deponents at the depositions.

19   So I understand.

20               And then the -- then the Plaintiffs

21   will have to make a decision about whether to go

22   forward with what you've got and be locked into not

23   taking those depositions again, or postpone for a

24   short period of time.

25               It's just practical issues that we all

1    have to face.

2                    MR. NOLAN:  Sure.

3                    THE COURT:  And I think the Defense,

4    you know, so far have shown good faith in getting

5    the information to you-all, to the Plaintiffs.

6                    MR. NOLAN:  And I believe they'll

7    continue to do that.  I think the Court has ruled on

8    these things.

9                    THE COURT:  I think so, too.

10                   MR. NOLAN:  So, you know, I believe

11   there's a lot of information that can be pulled

12   together.

13                   THE COURT:  Okay.  Well, we'll see.

14                   MR. TARDIO:  We'll do our best.

15                   THE COURT:  Yes.  That's all you can

16   do.

17                   All right.  Well done, gentlemen.

18   Thank you very much.

19                   MR. TARDIO:  Thank you, Your Honor.

20                   MR. NOLAN:  Thank you.

21                   (Proceedings were adjourned at

22   4:13 p.m. to be continued Thursday, May 16, 2013, at

23   2:00 p.m.)

24

25

1                    REPORTER'S CERTIFICATE

2

3              I, Deborah K. Watson, RPR, LCR, Notary

4     Public and Court Reporter, do hereby certify that I

5     recorded to the best of my skill and ability by

6     machine shorthand all the proceedings in the

7     foregoing transcript, and that said transcript is a

8     true, accurate, and complete transcript to the best

9     of my ability.

10             I further certify that I am not an

11    attorney or counsel of any of the parties, nor a

12    relative or employee of any attorney or counsel

13    connected with the action, nor financially

14    interested in the action.

15             SIGNED this 29th day of May, 2013.

16

17

18

19

20    _____

21             Deborah K. Watson, RPR, LCR

22    My Notary commission expires:  9/20/2016

23    Tennessee LCR No. 446
      Expires:  6/30/2014

24

25

IN THE FIFTH CIRCUIT COURT
FOR DAVIDSON COUNTY, TENNESSEE

WAYNE A. REED, individually and as      )
husband and next of kin of decedent,    )
DIANA E. REED,                          )
                                        )
        Plaintiff(s),                   )
                                        )
v.                                      ) Case No. 13C417
                                        ) Jury Demand
ST. THOMAS OUTPATIENT NEUROSURGICAL     )
CENTER, LLC, HOWELL ALLEN CLINIC, a     )
Professional Corporation, SAINT         )
THOMAS NETWORK, SAINT THOMAS HEALTH,    )
and SAINT THOMAS HOSPITAL,              )
                                        )
        Defendants.                     )
_____)

TRANSCRIPT OF PROCEEDINGS

Before The Honorable Joe P. Binkley, Jr.

May 16, 2013

Commencing at 2:37 p.m.

Volume 2

_____

Reported by:  Duke Firlus, RPR, LCR
Tennessee LCR No. 579
Expiration:  6/30/2014

```
 1    APPEARANCES:

 2    For the Plaintiff(s):

 3         GEORGE H. NOLAN
           Leader, Bulso & Nolan, PLC
 4         414 Union Street, Suite 1740
           Nashville, TN  37219
 5         (615) 780-4100
           gnolan@leaderbulso.com

 6
      For the Defendants Saint Thomas Outpatient
 7    Neurosurgical Center, LLC, and Howell Allen Clinic, a
      Professional Corporation:

 8
           CHRIS J. TARDIO
 9         MATT CLINE
           Gideon,  Cooper & Essary, PLC
10         315 Deaderick Street,  Suite 1100
           Nashville, TN  37238
11         (615) 254-0400
           Chris@gideoncooper.com
12         Matt@gideoncooper.com

13    For the Defendants Saint Thomas Network, Saint Thomas
      Health, and Saint Thomas Hospital:

14
           LELA M. HOLLABAUGH
15         Bradley Arant Boult Cummings, LLP
           Roundabout Plaza
16         1600 Division Street, Suite 700
           PO Box 340025
17         Nashville, TN  37203-0025
           (615) 255-2582
18         lhollabaugh@babc.com

19

20

21

22

23

24

25
```

1                   P R O C E E D I N G S

2               THE COURT:  Good afternoon, everyone.

3               MR. TARDIO:  Good afternoon, Judge.

4               MR. NOLAN:  Good afternoon.

5               THE COURT:  All right.  And I know you

6    all are all under a -- under the gun to provide

7    information.  I appreciate everybody working hard,

8    gathering information, getting it together, and

9    getting it to me for my review.  And I've been trying

10   to review a lot of the last-minute filings before we

11   started today.  That's why we got a little bit of a

12   late start, plus my meetings that I was involved in.

13   We had a caseload study and an all-judges meeting on

14   various issues that affect the 20th judicial district.

15   That's what I've been involved in most of the day.

16   Since I'm presiding judge for this district, I preside

17   over all these meetings.  I set the agendas.  I

18   prepare the agendas, talk to all the judges ahead of

19   time and make sure everybody has something on the

20   agenda they want to discuss, so a lot of -- a lot of

21   things involved in the administrative part of what I

22   do, but I still like it all.

23               All right.  So now I've got -- I've got

24   the information.  And I guess maybe hear from the

25   plaintiffs on this because I've got supplemental

```
 1   affidavits and additional information from the
 2   defense.
 3               MR. NOLAN:  Your Honor, I am taking the
 4   low tech approach today.
 5               THE COURT:  That's all right.
 6               MR. NOLAN:  I've got a notebook, if I
 7   can --
 8               THE COURT:  Okay.  Sure.
 9               MR. NOLAN:  -- tender this to the Court.
10               THE COURT:  Sure.
11               MR. NOLAN:  And basically what that has
12   in it, Judge, is everything that the defendants have
13   filed bearing on this particular issue --
14               THE COURT:  Yes.
15               MR. NOLAN:  -- as well as everything that
16   we've filed and it's indexed, and the very last tab is
17   a copy of the (inaudible).
18               THE COURT REPORTER:  I'm sorry?  Can you
19   repeat that?
20               MR. NOLAN:  The quality improvement
21   committee statute.
22               Your Honor --
23               THE COURT:  Which is TCA 68-11-272.
24               MR. NOLAN:  Your Honor, if we look at
25   Tab 2 --
```

```
 1              THE COURT:  Yes.
 2              MR. NOLAN:  -- this is the full copy of
 3   the 2012 contract that they filed yesterday, and,
 4   frankly, Your Honor, it was upsetting for us to see
 5   this document, and here's why:  If you look at the end
 6   of the document -- if you look at the end of the
 7   document, Your Honor --
 8              THE COURT:  You see the date of signature
 9   of Michael O'Neal?
10              MR. NOLAN:  That's right.
11              THE COURT:  4/4/13?
12              MR. NOLAN:  That's right.  And, Your
13   Honor, that was six months after Diana Reed died and
14   two months after we propounded our discovery, so we
15   just don't understand what's going on.  I mean, you
16   know, the sequence of events is that before the
17   hearing two days ago they filed a heavily redacted
18   contract that did not include this signature page and
19   no wonder why they didn't include this signature page.
20              So, Your Honor, we're in a circumstance
21   in which the defendant has the burden to establish
22   each and every element of this privilege.  Privileges
23   are construed narrowly because they interfere with the
24   search for the truth according to our supreme court,
25   but they're playing hide the ball and that's not fair.
```

1    That's not right, Your Honor.  It's not right for a

2    party who is trying to prevent families of such a

3    terrible tragedy from knowing information to approach

4    it in this sort of piecemeal fashion, so I guess our

5    first argument today, Your Honor, against this

6    assertion of privilege is that this approach shouldn't

7    be countenanced by this Court, frankly.  It should be

8    rejected because this is a document which should have

9    been placed in front of the Court in full off the bat

10   so we would know that it wasn't even signed, this

11   contract, until two months after we propounded our

12   discovery.  Now, the affidavits that are in the record

13   don't explain why that happened.  That's not mentioned

14   in either the pharmacist's affidavit or the affidavit

15   of nurse Schamberg.  So --

16            THE COURT:  I saw that.

17            MR. NOLAN:  -- secondly, Your Honor, as

18   the Court will recall two days ago, there was a

19   significant amount of argument about the fact that,

20   you know, this relationship with the pharmacist was

21   entered into for the purpose of improving the quality

22   of healthcare at STOPNC and that we need the

23   protection of this peer review statute in order to

24   give incentive for healthcare providers to enter into

25   relationships like this, and, therefore, it's just

1    critical that this privilege be enforced.  But, Your

2    Honor, we have also filed, which is under Tabs --

3    under Tab 11 in our book, a copy of the -- the

4    Medicare regulations.  It's 42 CFR Section 1448, and

5    that's a Medicare regulation, Your Honor, that governs

6    what the requirements are for an ambulatory surgery

7    center to be able to be paid for the pharmaceuticals

8    that it administers in its facilities.  And it says

9    that the ambulatory surgery center must provide drugs

10   and biologicals in a safe and effective manner in

11   accordance with accepted professional practice and

12   under the direction of an individual designated

13   responsible for pharmaceutical services.

14                Now, under the next tab, Your Honor, we

15   have the guidance document that is provided by the

16   Center for Medicare & Medicaid Services that

17   interprets what that particular regulation means.  And

18   that says as follows:  "The ambulatory surgery center

19   must designate a specific licensed healthcare

20   professional to provide direction to the ASC's

21   pharmaceutical services.  That individual must be

22   routinely present when the ASC is open for business,

23   but continuous presence is not required, particularly

24   when the ASC is open for long periods of time to

25   accommodate the recovery of patients for up

1   to 24 hours.  Ideally, the ASC should have available a

2   pharmacist who provides oversight or consultation to

3   the ASC's pharmaceutical services, but this is not

4   required by the regulation unless the ASC is

5   performing activities which under state law may only

6   be performed by licensed pharmacists."

7              So, Your Honor, to paraphrase that, in

8   order to get paid by Medicare, you need to be able to

9   convince Medicare that you are administering

10  pharmaceuticals under the watchful eye of a pharmacist

11  to some extent.  So with all due respect to the

12  arguments that have been advanced, it's just

13  disingenuous for them to say that this is all about

14  improving quality.  It's a -- it's a government

15  regulation that is in place before this particular

16  party can get paid when it performs -- or -- or it

17  gives pharmaceuticals to folks who are on Medicare,

18  and we just bring that to the Court's attention.

19             Now, Your Honor, if we turn to Tab 7, we

20  find the verified Interrogatory Response Number 2 from

21  Saint Thomas Neurosurgical, and, as the Court sees,

22  we've asked them to walk us through all their

23  communications with NECC.  And then they interpose an

24  objection based on the peer review statutes that we

25  made reference to.  And then this is what the response

 1    says, it says, "Specifically, STOPNC's discussions

 2    with its pharmacist consultant and any outside

 3    pharmacist regarding NECC are privileged..."

 4                    Is there another pharmacist involved

 5    whose -- whose name is not in the record, who is not

 6    discussed in any of these affidavits or contracts?

 7    We're very concerned about that, Your Honor, and we

 8    want to know whether there were -- were -- was any

 9    other pharmacist in addition to Michael O'Neal who was

10    involved in this.

11                    Now, Your Honor, if you turn to page 8 --

12                    THE COURT:  All right.  While you're

13    right there, let me just ask the defense.  That is --

14    that is specifically part of the defense's objection

15    to Interrogatory Question Number 2, which states that

16    the plaintiff is requesting the defense to "Identify

17    each communication (including face-to-face, telephone,

18    e-mail, or other communications) between NECC

19    (including its agents, employees or representatives)

20    and Saint Thomas Neurosurgical (including agents,

21    employees or representatives).  For each communication

22    identified, please provide the following information."

23                    And then part of the objection is that

24    state -- "Specifically, STOPNC's discussions" -- those

25    are initials, S-T-O-P-N-C-apostrophe-S; they stand for

```
 1    Saint Thomas Outpatient Neurosurgical Center.  When I
 2    say "STOPNC," that's what I'm referring to.  It says
 3    S-T-O-P-N-C.  Just an abbreviation.  Benefit of the
 4    court reporter is all I'm saying.
 5                "Specifically, STOPNC's discussions with
 6    its pharmacist consultant and any outside pharmacist
 7    regarding NECC are privileged..."
 8                Are there any other outside pharmacists
 9    other than Mr. O'Neal who has been identified?
10                MR. TARDIO:  There's no other outside
11    pharm -- there's no other pharmacy consultant.  If you
12    turn to page 9 --
13                THE COURT:  Okay.
14                MR. TARDIO:  -- or it's actually
15    discontin -- I think it's the same response.  It just
16    goes on for four or five different pages.
17                THE COURT:  Okay.
18                MR. TARDIO:  At the very top, that --
19                THE COURT:  Yes.
20                MR. TARDIO:  -- is what that is in
21    reference to.  Ms. Schamberg consulted with
22    Dr. Culclasure and a pharmacist prior to sending a
23    list of names.  Not Michael O'Neal.  She consulted
24    with a pharmacist colleague at another facility, not
25    during the purchase of these steroids, right there,
```

1    prior to sending the list of names.  And we -- it's

2    also identified in STOPNC's response to request for

3    production, one where it references specifically a --

4    "A handwritten note from a conversation with an

5    outside pharmacist has been redacted because it is

6    protected by the Tennessee peer review law,

7    Tennessee 68-11-272."

8              So, yes, that is different.  That's not

9    the Michael O'Neal conversation.  This is one

10   conversation.  We identified the conversation.  We

11   identified the document, the note that corresponds to

12   it, and we asserted the privilege.  So I --

13             THE COURT:  Okay.

14             MR. TARDIO:  It's not -- I went through

15   all the requests this morning to assure myself that

16   there was no question that asked, "Did you consult

17   with any pharmacist about sending the patient list?"

18   And there isn't one because I think it would be

19   responsive to that, but we identified it anyway within

20   this long response.

21             So to answer Mr. Nolan's question, yes,

22   there is another pharmacist not the same as O'Neal,

23   not a pharmacist consultant, not somebody we retained,

24   a -- what I would characterize as a colleague that she

25   called and said, you know, "They're asking us to send

1    patient lists.  What do you think?"  That's protected

2    by the peer review statute too, and we asserted that

3    in this response and in Number 2 in the request for

4    production.

5                    THE COURT:  Okay.  Thank you.

6                    MR. NOLAN:  Your Honor, we'd like -- we'd

7    like the name of that other pharmacist in the

8    facility.  We think we're entitled to that just like

9    we were entitled to Mr. O'Neal's name, and none of

10   that was clear to us until this moment.

11                   THE COURT:  Do you have any problem?

12                   MR. TARDIO:  Well, I stand by the

13   objection that that's not going to lead to

14   discoverable admiss -- or that's not going to lead to

15   admissible evidence.

16                   THE COURT:  It may not, but...

17                   MR. TARDIO:  If Your Honor orders me to

18   release the name, I'm glad to do it.  The

19   conversation's here, so I'm a little -- offended is

20   not the right word, but there's no hiding the ball.

21   The conversation is here in two different

22   interrogatories.  It's identified.  The document is

23   identified.  The privilege is asserted.  And if Your

24   Honor orders me to identify the name now -- they're

25   going to be taking Ms. Schamberg's deposition.  They

1    could ask her all these questions, and we can assert

2    the privilege then, but...

3                THE COURT:  Okay.  Well, I don't think it

4    hurts anything to give the name of the pharmacist.  I

5    mean, that -- that would be responsive to the

6    interrogatory question without revealing the

7    privilege.  I mean, the name is not privileged as we

8    said the other day.  I can't remember what day we were

9    here.  Two days ago.

10               MR. TARDIO:  Sure.  Your Honor, let me

11   just -- for the record --

12               THE COURT:  Yes.

13               MR. TARDIO:  -- I don't believe it's

14   responsive to this interrogatory.  This asks for

15   communications between NECC and STOPNC and that's not

16   one, but...

17               THE COURT:  Well, it may --

18               MR. TARDIO:  It may be -- the only

19   interrogatory it may be responsive to is this overall

20   interrogatory that asks for anybody with knowledge.

21               THE COURT:  Yes.

22               MR. TARDIO:  So by order of the Court

23   it's Pat Meacham (phonetic).  She's at --

24               MR. CLINE:  Beckham.

25               MR. TARDIO:  Beckham.  I'm sorry.

1   Beckham.

2                THE COURT:  Okay.  Pat Beckham.  All

3   right.  Spell the last name, if you know.

4                MR. TARDIO:  I believe it's

5   B-E-C-K-H-A-M.

6                THE COURT:  Okay.

7                MR. TARDIO:  And that, again, was not

8   related to the purchase of these steroids, which is

9   what the interrogatories are asking.  That's -- this

10  is in May of -- or April or May of 2012.

11               THE COURT:  And state one more time what

12  that -- what that consultation with pharmacist Pat

13  Beckham was about.

14               MR. TARDIO:  It was about when they asked

15  for lists of patients.

16               THE COURT:  When plaintiff asked for

17  lists of patients?

18               MR. TARDIO:  When NECC -- what happened,

19  Judge, is they -- we -- our relationship with NECC

20  started in June of 2011.  We bought from them all the

21  way up through the middle of 2012, and then sometime

22  in the middle of 2012 they came to us and said,

23  "Because of Massachusetts law, we need lists of

24  patient names before we can send you the -- the

25  steroids."  That's when Ms. Schamberg went to call up

1   Ms. Beckham, a colleague, and said essentially, "What

2   do you think?"  And that's the conversation.

3                  THE COURT:  Okay.

4                  MR. TARDIO:  And I submit that that's

5   also protected by the quality improvement privilege.

6                  THE COURT:  What they talked about?

7                  MR. TARDIO:  Sure.

8                  THE COURT:  Yeah, I understand.  All

9   right.

10                  MR. TARDIO:  It's a separate argument

11  than the O'Neal argument, but --

12                  THE COURT:  I understand.  I just wanted

13  to make sure I understood the context of the

14  conversation.  Thank you.

15                  MR. NOLAN:  Your Honor, I'd like to

16  address that very particular point.

17                  THE COURT:  Sure.

18                  MR. NOLAN:  You know, if we look at

19  page 8 of this particular interrogatory response,

20  STOPNC describes this sequence of events that occurred

21  in which it sent lists of patients' names to NECC, and

22  it says "Mr. Giamei stopped by STOPNC in early to

23  mid-2012 and spoke with Ms. Schamberg.  He informed

24  Ms. Schamberg that NECC needed STOPNC to submit a list

25  of patients with each order.  Debra informed

1    Mr. Giamei that STOPNC would not be able to predict

2    which patients would actually receive the MPA, and

3    Mr. Giamei said that that was fine because NECC just

4    needed a list of patient names.  Mr. Giamei stated

5    that the requirement came from the Massachusetts Board

6    of Pharmacy.

7              "Ms. Schamberg then consulted with

8    Dr. Culclasure and a pharmacist" -- we now know

9    Ms. Beckham -- "prior to sending the list...

10             "Ms. Schamberg spoke with the

11   receptionist, Sherri DeZwaan, to determine the best

12   way for STOPNC to provide such a list.  Ms. DeZwaan

13   suggested printing off the daily patient schedule.

14   For the next several orders, when STOPNC needed to

15   order MPA, Ms. Littleton asked Ms. DeZwaan to print

16   off a list of names, which she did.  On at least one

17   occasion, Ms. DeZwaan was not at STOPNC when

18   Ms. Littleton placed an order.  Ms. Littleton

19   submitted the order to NECC without the list, and NECC

20   filled the order.  The lists have been produced in

21   STOPNCC's [sic] responses to plaintiff's first request

22   for production with patient names and addresses

23   redacted."

24             So, Your Honor, let's look at the paper

25   trail associated with that.  If you look at Tab

1    Number 8, you find one of the documents that's been

2    produced, which is the NECC prescription order form

3    dated July the 24th of '12, and as you can see, Your

4    Honor, it includes two drugs, one of which is the

5    methylprednisolone, 500 units.  It's -- it's

6    purportedly signed by Dr. Culclasure, and the names

7    are left blank.  No patient names are identified.

8              Now, under Tab 9, Your Honor, we have one

9    of the patient lists that has been provided to us

10   as -- as being one of the lists that was faxed to

11   NECC.  All the names have been redacted except the

12   last name, Your Honor, which is Mickey Mouse.  So

13   here's the circumstance.  We have a situation in which

14   NECC asked STOPNCC for help papering over a patient

15   safety pharmacy rule in NECC's home state,

16   specifically the individual prescription requirement.

17   And at the moment -- at the moment that NEC -- that

18   STOPNCC decided to send patient lists, which have

19   nothing to do with whether these patients actually are

20   going to receive the medicine -- patient lists that

21   include Mickey Mouse -- to NECC so it can supposedly

22   paper over this government requirement, we moved out

23   of quality improvement and into a conspiracy to

24   violate the law.

25              Now, Your Honor, when that happened --

1   when that happened, they stepped outside the statute.

2   If you look at the statute, Your Honor, which is under

3   Tab 13, you can see what the policy is in Tennessee.

4   It says, "It's the policy of this state to encourage

5   the improvement of patient safety..."  That's the way

6   the statute begins.  And what they want to do --

7   without tendering any affidavits regarding

8   Ms. Beckham, they want to ask this Court to -- to

9   bless this sequence of events by labeling it quality

10  improvement.

11            Your Honor, the facts just don't bear

12  that out.  They have not met the burden of

13  establishing that their interaction with Ms. Beckham

14  is subject to the quality improvement committee

15  privilege, Your Honor, and the Court shouldn't view it

16  that way.  We have facts suggesting that -- I mean,

17  whatever happened to the -- the Health Insurance

18  Portability and Accountability Act of 1996, HIPAA?

19  You know, I mean, these patients have federally

20  protected HIPAA privacy rights.  Yet in order to get

21  around this individual prescription requirement up in

22  Massachusetts, they just send these names.  They send

23  these patient lists up to NECC.  So, Your Honor,

24  our -- our --

25            THE COURT:  Redacted, I assume?

1          MR. NOLAN:  No, no, no, no.

2          THE COURT:  Not redacted?

3          MR. NOLAN:  No, no, not redacted.  Not

4    redacted.  They just send the names.  They send --

5          THE COURT:  How do we know that?  I mean

6    how I do know that?

7          MR. NOLAN:  Well, I think -- and

8    Mr. Tardio can certainly confirm it, but what we've

9    gathered from the interrogatory responses is that the

10   names were redacted before the documents were produced

11   to us.  You know, in other words --

12         THE COURT:  But were not redacted when

13   they were sent to NECC?

14         MR. NOLAN:  No.  Because NECC wanted to

15   have something they could go to the government and

16   say, "Oh, oh, we know -- we've got individual names

17   that are associated with all these prescriptions."  I

18   mean that's what was going on.  There's a rule in

19   Massachusetts that says that pharmacies must file

20   reports attesting to the fact that when they're

21   compounding drugs they are doing so in response to a

22   patient-specific prescription.  So they just ask their

23   customers, "Hey, send us up some -- some patient

24   lists," and this customer complied.  Now, if that's

25   not a red flag that a compounding pharmacy is asking

1    you to just send up patient lists, regardless of

2    whether the folks are going to get shots, I mean, did

3    Mickey Mouse have a shot at -- at STOPNC?

4              I mean, we've been theorizing in our

5    office a lot about how Mickey Mouse's name got on this

6    list.  Maybe that's their procedure if a famous person

7    comes into their shop and they don't want to be in

8    their system.  I mean, I don't know, Your Honor, but

9    when you look at the interrogatory response, it

10   specifically says that when Mr. Giamei stopped by and

11   said "We need you to send us patient lists," they told

12   him that "Well, that doesn't mean these folks are

13   going to get the shots," and they went ahead and they

14   sent the lists anyway after consulting a pharmacist

15   and that -- Your Honor, they just -- there's just no

16   way.  There is no way with a straight face that they

17   can tell this Honorable Court that that was done for

18   quality improvement purposes.

19             And so, Your Honor, it's our very

20   respectful position that we're entitled to all of the

21   communications with -- with Ms. Beckham on that

22   particular issue.

23             Furthermore, Your Honor, just given the

24   entire sequence of events here, we think we're

25   entitled to all the communication with Mr. O'Neal as

1  well.  We just don't think, given the way this is

2  unfolding, the Court should find that they've met

3  their burden, and I appreciate the Court's indulgence.

4           THE COURT:  All right.  Thank you.

5  Mr. Tardio.

6           MR. TARDIO:  Yes.  We also appreciate the

7  Court's time, especially on a -- sounds like an

8  already busy day.  Let me address first Mickey Mouse

9  because it sounds -- it sounds sexy.  It's a --

10  something that sounds explosive, but it's incredibly

11  innocent.  They used Mickey Mouse as a placeholder in

12  their system for years when they wanted to hold open

13  an appointment so that Dr. Culclasure could go over to

14  Howell Allen and see a patient.  So Mickey Mouse was

15  used for years as essentially a dummy slot on the --

16  in the system because they couldn't just leave it

17  blank.  It had nothing to do with this.  It had been

18  used as a placeholder in the appointment system for

19  years.  So that's neither here nor there and really

20  has nothing to do with why we are here today.

21           All that argument from Mr. Nolan was

22  great argument, a very -- a very good closing

23  argument.  But the reason we're here in front of the

24  Court today is to determine whether or not reports

25  created by Michael O'Neal and communications between

1    Michael O'Neal and STOPNC, particularly Debra

2    Schamberg, are privileged from discovery

3    under 68-11-272.  And to suggest -- this conversation

4    with Ms. Beckham is not -- there's been no motion to

5    compel.  There's been no proof developed on that.  I'm

6    here to talk about the reports from Michael O'Neal and

7    the communications with Mr. O'Neal, and they're

8    clearly, clearly privileged under 68-11-272.

9              And I have very, very little to say, but

10    I did do four slides for the Court's benefit to take

11    the Court through what I think are the important

12    points.  At this -- at this point in the argument, I

13    think we've distilled it down to what we need to talk

14    about.  And, again, the first and foremost point for

15    the Court respectfully to consider is the policy

16    behind the act, and it's very clear.  It's in the

17    first section of the act.

18              The policy of this state and the

19    legislature's purpose in passing the statute is to

20    encourage healthcare providers -- healthcare

21    organizations like STOPNC -- to evaluate the quality,

22    cost, safety, and necessity of healthcare services

23    that they render, so that -- the legislature has said

24    we want healthcare organizations to do that.  And to

25    do that the legislature says we've got to protect that

1    process.  We've got to give them some incentive to do

2    this and some protection that allows these healthcare

3    organizations to do this without the fear of it being

4    used against them in litigation and the ability to

5    frankly discuss these issues within the four walls of

6    that facility.

7              Without this protection, if I'm a

8    healthcare provider, I'm not going to feel free to

9    discuss whether the care provided within our facility

10   is necessary, of high quality, cost effective, and

11   safe.  So that's why the legislature created the

12   statute in response to the decisions interpreting the

13   old peer review statute.  And the protection that the

14   legislature built was to protect and privilege all --

15   all, not some -- all written records and

16   communications related to this quality improvement

17   process, protect them and privilege them from

18   discovery, direct or indirect, and from use in any

19   judicial proceeding.

20             So now we have a detailed record created

21   on this issue as Mr. Nolan has passed the Court

22   thirteen -- twelve or thirteen different filings.

23   What we have put in the record:  Two affidavits from

24   Ms. Schamberg, the first that we filed a couple days

25   ago, the second we filed yesterday; an affidavit from

1    Michael O'Neal, and I know the Court's already read

2    all this.  We filed the full 2007 contract and the

3    full 2012 contract.

4              And let me briefly touch on the dates

5    that it was signed.  I don't know why Michael O'Neal

6    didn't sign the contract until April.  I can tell you

7    Debra Schamberg apparently signed it before all this

8    happened, so clearly there was no conspiracy afoot in

9    September of 2012 before we even knew that there was

10   any contaminated product out there.  So to suggest

11   that there was any conspiracy afoot with the

12   signatures on the contract doesn't fit when

13   Ms. Schamberg signed it.

14             And it doesn't matter anyway because,

15   first off, the 2007 -- even if we assume that this

16   contract wasn't signed until April of 2 -- or wasn't

17   consummated until April of 2007 -- or 2012, the 2007

18   contract was in place up until then, and it was

19   signed -- and even if we forget -- even if we assume

20   the contracts don't even exist.  Let's say, you guys,

21   there was no meeting of the minds, you didn't have the

22   correct entity's name, you didn't renew the contract

23   like you were supposed to, even if we throw all that

24   out and assume the contracts don't exist, the

25   relationship is still there, and the -- he's still

1   performing the same functions.  He's still performing

2   the same functions for the purposes set out in the

3   statute, and he's being paid for it.  So whether it's

4   by verbal agreement, whether it's by written

5   agreement, whether it's simply he's going to come

6   assist them in evaluating their medication use for

7   payment on an irregular or regular basis, it doesn't

8   matter.  All the contracts are filed to show is that

9   these are the functions that he fulfilled, and then

10  the affidavit testimony confirms that these are the

11  functions he fulfilled.  So we -- we filed both

12  contracts.  The fact that one was signed and the

13  second signature on one didn't come until April

14  of 2012 is completely irrelevant to the argument

15  before the Court today.

16                THE COURT:  But it's 2013.

17                MR. TARDIO:  I'm sorry.  2013.  Correct.

18  April 2013, with Ms. Schamberg signing in September

19  of 2012.  Regardless, it's completely irrelevant to

20  what we're here for today because before April of 2013

21  the same relationship was in place.

22                THE COURT:  Well -- and I -- I understand

23  what you're saying, but it seems that, you know, if

24  you're going to try to take advantage of the privilege

25  and that's why the privilege is there to be used, as

1    the legislature has intended it to be used, to

2    encourage the improvement of patient safety, quality

3    of patient care, evaluation of the quality, safety,

4    cost, processes and necessity of healthcare services

5    by hospitals, healthcare facilities, and healthcare

6    providers, it would seem the more paper you have to

7    establish that you're doing that the better, I mean,

8    because if you've got -- if you've got a privilege

9    that you're trying to assert, you've got to have some

10    basis for the privilege, and I understand what the

11    plaintiffs are saying.  I mean, they're saying we're

12    questioning whether there's really any basis to

13    establish a privilege.  I think that's what the

14    plaintiffs are saying.  Is that right, Mr. Nolan?

15              MR. NOLAN:  Yes, Your Honor.  In part,

16    yes, absolutely.

17              THE COURT:  I know that's not the whole

18    thing, but that's kind of what we're down to with

19    these contracts.  So I -- but you may be right too,

20    that it may not matter.  But if you're going to

21    establish the privilege, it seems to me that -- I

22    guess you could say, as you have -- as you have

23    argued, this is what we're doing.  It's all verbal.

24    This is what -- this is what we're doing, and we are

25    doing this in compliance with Tennessee Code Annotated

1    Section 68-11-272.

2                And I guess -- and then there's -- from

3    the plaintiff's standpoint, they're saying, well, how

4    do we know?  How do we know that just because you say

5    that?  I think that's what they're saying.

6                MR. TARDIO:  They can ask Debra Schamberg

7    why in the world did this contract not get signed by

8    the pharmacist consultant until April of 2013, and

9    they can take her answer and they can argue to the

10   jury that this indicates some conspiracy or some

11   impact on her credibility, and that's fine.  That's

12   what trials are for.  But the question before the

13   Court is whether the function that Mr. O'Neal filled

14   with STOPNC was within the confines of 68-11-272, and

15   in all the relevant times based on the affidavit

16   testimony that's in the record and the 2007

17   contract -- let's not forget that before this one was

18   signed, the 2007 contract sets out essentially the

19   same functions in a much less detailed fashion, so --

20               THE COURT:  And let me back up.

21   That 2007 contract, that is Mr. O'Neal's signature.

22   Right?

23               MR. TARDIO:  Yes, sir.

24               THE COURT:  Okay.  It's very scribbly for

25   a pharmacist.  3/20/0 -- what is that?  7?

```
1    Yeah, 3/20/07.  That's his signature on that
2    February 1, 2007 --
3                    MR. TARDIO:  Yes, sir.
4                    THE COURT:  -- pharmacy consultant
5    contract?
6                    MR. TARDIO:  Yes.
7                    THE COURT:  Okay.
8                    MR. TARDIO:  And that's -- and he attests
9    to that in his affidavit.  So even if we -- even if we
10   forget about the 2012 contract, the 2007 contract is
11   in place.  And Schamberg, twice, and Mr. O'Neal have
12   attested under oath by affidavit that he was
13   performing these functions from the 2007 contract on,
14   so it's unrefuted.  I mean, it -- you can argue about
15   what various dates mean, but it's unrefuted -- it's
16   unrefuted in the record that Mr. O'Neal's function
17   from 2007 forward was quality improvement as it
18   relates to STOPNC, that his role in this relationship
19   was for him to evaluate safety, quality, cost,
20   appropriateness and necessity of healthcare.  And
21   that's what the proof in this record as we stand here
22   in May of 2013 establishes.  It also establishes that
23   he reported and communicated to Ms. Schamberg, and
24   then Ms. Schamberg took these reports and
25   communications to the medical executive committee to
```

1    improve quality.

2              And the intent of the statute, the policy

3    behind the statute, is to protect those communications

4    so that when Ms. Schamberg goes to the medical

5    executive committee of which she's a part and talks

6    about what Mr. O'Neal says we're doing right or we're

7    doing wrong, she can frankly tell the medical

8    executive committee, "So that we can achieve the

9    purposes of the statute, improve healthcare."  So

10   that's -- that's where we are.  That's what the record

11   establishes.  That is unrefuted in the record, and the

12   only thing -- the only thing that -- the only response

13   is argument about the dates the second contract was

14   signed.

15             And, again, it's unrefuted that this --

16   the -- that he acted -- and the -- the statute talks

17   about the activities of the participants in the

18   process.  That's how it defines the privilege, what

19   are these people doing, not what's the name of their

20   committee, not what's the name of their physician,

21   what are they doing, what is their purpose, and what

22   is their function, and it's unrefuted as we stand here

23   today that Mr. O'Neal's actions, his activities, were

24   for quality improvement functions, and that, Your

25   Honor, is enough to establish the existence of the

1   privilege and to invoke the protections under the

2   statute.

3            Your Honor, respectfully, the record is

4   more than adequate to carry the burden to establish

5   the privilege applies to Mr. O'Neal's communications

6   and his reports, and we would respectfully ask the

7   Court to deny the motion to compel.  Thank you.

8            THE COURT:  Thank you.  Mr. Nolan.

9            MR. NOLAN:  Your Honor, you're correct

10  that because they have the burden of establishing this

11  privilege there needs to be a basis for it, and as the

12  Court will recall when they originally filed their

13  brief in response to our motion to compel, they made a

14  big, big deal out of the 2012 contract.  That's the

15  contract that they relied on.  And they filed part,

16  but not all, of the contract and they were prepared to

17  come in here and argue that, hey, we've met our

18  burden; this contract is important; it cloaks

19  everything with quality improvement privilege, and

20  this information should not be revealed to the

21  plaintiff.  And it's only after things didn't go well

22  two days ago that they decided to put in the full

23  contract and now we know, well, that contract didn't

24  even exist at the time Diana Reed died.  It hadn't

25  been signed even though their brief quoted huge

1    passages from it.

2              Your Honor, that's just not the way that

3    court business should be conducted.  It's just -- it's

4    just not appropriate.  And then to come -- come back

5    here again with all of these after-the-fact,

6    self-serving affidavits that rely on these contracts

7    that use -- you know, all the names are messed up.  I

8    mean, we've placed into the record the fact that Saint

9    Thomas Outpatient Neurosurgery Center, LLC, has gone

10   by that name and that name only since December the 9th

11   of 1999.  So, Your Honor, I just don't -- it's -- with

12   all due respect, you know, if they had come forward

13   with contracts that made sense, that actually used the

14   right party's name, that would be one thing, but they

15   have not done that in this particular circumstance.

16             And we've also put into the record, Your

17   Honor, some facts to rebut their contentions.  You

18   know, we've shown the Court that Medicare has rules of

19   what sort of consultants and pharmaceutical help has

20   to be used in order for outfits like this to be paid,

21   so there is an alternative explanation in the record

22   for the purposes of this particular arrangement.

23             Your Honor, if the Court finds in favor

24   of the plaintiff on this issue, it will not have a

25   chilling effect on anything.  There is always an

1     incentive by healthcare providers to do a good job.

2     There's always an incentive by healthcare providers to

3     improve the quality of their health -- healthcare

4     because that's good for the patients.  It's good for

5     the customers.  It's good risk management.  It's good

6     for everyone.  So there's just no reason to construe

7     this statute as broadly as they are suggesting.  Your

8     Honor, as I mentioned last time we were here, if -- if

9     you construe it as broadly as they're suggesting, it

10    could swallow virtually everything in the case, and

11    that's what we're worried about.  We don't want to get

12    into these depositions and every time the word

13    "pharmacist" crosses our lips, a witness is being

14    instructed not to answer, and we're very, very worried

15    about that eventuality.  So, Your Honor, if the Court

16    has no other questions, then that's all I have left to

17    say.

18                THE COURT:  All right.  Thank you.  Thank

19    you very much.  Let's see.  Mr. Tardio, can you tell

20    me -- and I may have missed it, because I did -- I did

21    read these affidavits, but I didn't put the study time

22    that I do a lot -- to a lot of these things to make

23    sure I'm understanding because sometimes it takes more

24    than one reading to really fully comprehend what I'm

25    looking at.  The name of the facility is what I'm

1    talking about, and we've got -- let's see.  The

2    defendant is Saint Thomas Outpatient Neurosurgical

3    Center, LLC, and the filing that Mr. Nolan was talking

4    about from the secretary of state's office does in

5    fact show that Saint Thomas Outpatient Neurosurgical

6    Center, LLC, has been incorporated under that same

7    name from December the 10th of 1999 -- well, let's

8    see.  Maybe I'm -- maybe I've got that -- sorry.

9    Let's see.  Here we go.  Yes.  From 12/10 of 1999

10   through -- and has filed the proper annual reports --

11   through March 26, 2012, to continue -- from the

12   secretary of state's standpoint -- for that entity to

13   continue being an operating corporate entity.  And

14   then the contracts, of course, are the

15   February 1, 2007, between -- pharmacist Michael O'Neal

16   is with the entity entitled "Saint Thomas

17   Neurosurgical Associates," a different name than the

18   Saint Thomas Outpatient Neurosurgical Center, LLC.

19   And then the 2012 contract, which cites began the

20   first day of September 2012, is between Michael

21   O'Neal, pharmacist, and Saint Thomas Neurosurgery

22   Center, not exactly the same as Saint Thomas

23   Outpatient Neurosurgical Center, LLC, and I think the

24   affidavits say they're the same entity.  Is that

25   correct?

1                    MR. TARDIO:  Yeah.  The affidavits say

2     essentially both Schamberg and O'Neal -- O'Neal

3     drafted these, the pharmacist, if you can't tell, so a

4     lawyer didn't draft these.  And his affidavit

5     testimony is that it's the wrong name; I put the wrong

6     name in there, but we still had a meeting of the

7     minds.  And, again, the statute doesn't require that

8     there be a contract in place --

9                    THE COURT:  No.

10                    MR. TARDIO:  -- for the peer review

11    privilege to apply, but I think what the Court is

12    asking is whether or not the affidavit testimony

13    clears that up, and I submit that it does.

14                    THE COURT:  Okay.

15                    MR. TARDIO:  That it's simply

16    Mr. O'Neal's poor draftsmanship.

17                    THE COURT:  Well, there's no question

18    that the -- let's see.  I don't -- where is that

19    previous peer view statute, the old one?  There it is.

20    Good.  Thank you.  The Tennessee peer review law

21    of 1967, which is codified at Tennessee Code Annotated

22    Section 63-6-219, and then the -- well, there the

23    legislature states in Section (b)(1), it says, "It is

24    the stated policy of Tennessee to encourage committees

25    made up of Tennessee licensed physicians to candidly,

1    conscientiously, and objectively evaluate and review

2    their peers'" -- that's S apostrophe -- "professional

3    conduct, competence, and ability to practice medicine.

4    Tennessee further recognizes that confidentiality is

5    essential both to effective functioning of these peer

6    review committees and to continued improvement in the

7    care and treatment of patients."

8              And then the -- effective April 12, 2011,

9    Tennessee Code Annotated Section 68-11-272, the

10   quality improvement committee statute, which states in

11   Section (a), "It is the policy of this state to

12   encourage the improvement of patient safety, the

13   quality of patient care and the evaluation of the

14   quality, safety, cost, processes and necessity of

15   healthcare services by hospitals, healthcare

16   facilities and healthcare providers.  Tennessee

17   further recognizes that certain protections must be

18   available to these entities to ensure that they are

19   able to effectively pursue these measures."

20              So it is very clear that the legislature

21   intends to protect quality improvement committees,

22   peer review committees, all those committees that seek

23   to continually monitor and make certain that

24   healthcare facilities are functioning in a safe manner

25   and provide safe care to their patients.  And in order

1   to do that, they have to be critical at times of

2   what's going on with the healthcare facilities, and

3   those critiques are what have to be protected.  And if

4   they're not protected, then the healthcare facilities

5   will never improve.  They cannot improve without

6   critique and finding better ways to do what they're

7   doing, safer ways to do what they're doing, to assist

8   in making certain that patients are properly protected

9   by the healthcare providers when the healthcare

10   providers provide those essential services to their

11   patients.

12           So it's really clear that's what the

13   legislature intended, and it intended to protect it,

14   and it's very important that that be followed, so I

15   find that the evidence that I've seen so far protects

16   the conversations that Mike -- that pharmacist Michael

17   O'Neal has in that regard with regard to patient care.

18   He's part of a quality improvement committee, a

19   committee of one.  The statute April 12, 2012 [sic],

20   clearly states that it can be the activity -- I'm

21   sorry.  Here it is.  TCA Section 68-11-272(b)(4) --

22   little B in parenthesis, Arabic 4 in parenthesis --

23   (as read) "'Quality improvement committee' or 'QIC'

24   means a committee formed or retained by a healthcare

25   organization, an activity of a healthcare

1    organization, or one or more individuals employed by a

2    healthcare organization performing the types of

3    functions listed in subdivisions (4)(A) through (P),

4    the purpose of which, or one of the purposes of which

5    is to evaluate the safety, quality, processes, costs,

6    appropriateness or necessity of healthcare services by

7    performing functions including, but not limited to the

8    following," and those functions listed are A

9    through P.  They are not all-encompassing functions,

10   nor are they -- are all of the -- all A through P

11   required to be functioning functions in order to meet

12   the definition of what a quality improvement committee

13   does.

14           So based on what I have in front of me,

15   that -- the protection is present.  I'm not so certain

16   about Pat Beckham, and I think your discovery may

17   reveal what her function was or is, and after we

18   determine what her function was or is, we'll determine

19   whether or not what she did is protected under the

20   statute.  It sounds like it may not be, based on what

21   I'm hearing so far, but I don't know all the facts

22   yet.

23           MR. TARDIO:  Would you like us to draw an

24   order?

25           THE COURT:  Yes, if you don't mind.  And,

1  now, let's do one other thing.  When we left two days

2  ago, the -- and I know, Mr. Tardio, you're going to do

3  your best to provide additional discovery as per our

4  discussions for 3 1/2 hours or so two days ago on the

5  additional information that was requested by

6  plaintiffs in which some of which was objected to and

7  some of which were worked out by agreement, others of

8  which I had to rule on.  You're going to do your best

9  to get that information to the plaintiffs so they can

10  be prepared to do the depositions starting June 4th.

11          Now, Mr. Nolan, I don't know when you're

12  going to get that information or if you are going to

13  get it all before June 4th when you start your

14  depositions, so I guess I need to know what your

15  position is, and maybe you -- maybe you don't know

16  that until you get the information whether you're

17  going to go forward with those depositions or whether

18  you want to postpone those depositions in order to get

19  all the information that has been ordered for you to

20  receive.  So am I right?  You just don't know the

21  answer to that yet?

22          MR. NOLAN:  Your Honor, we -- we plan to

23  go forward with the depositions.  I hadn't heard

24  any -- I haven't had any feedback from Mr. Tardio

25  about roughly when he thinks he can get the

```
 1    information that's been compelled to us.  That would

 2    be helpful to know, generally speaking.

 3                    THE COURT:  Do you have any idea,

 4    Mr. Tardio?

 5                    MR. TARDIO:  I think we're 36 hours from

 6    the order, so --

 7                    THE COURT:  I know.

 8                    MR. TARDIO:  -- some of it will be quick

 9    and some of it will be not so quick.  I can tell the

10    Court we answered the e-mail question.  The --

11    the 15,000 number that I cited to the Court is all

12    STOPNC -- or all Howell Allen employees went to STOPNC

13    from January 1, 2013 --

14                    MR. CLINE:  September.

15                    MR. TARDIO:  I'm sorry.  From

16    September 1, 2013, up through April --

17                    MR. CLINE:  '12.  September.

18                    MR. TARDIO:  I'm sorry.  Let me back up.

19    It's the -- it covers just the outbreak period.

20                    THE COURT:  Okay.

21                    MR. TARDIO:  So from September '12 up

22    through April 2013, when we preserved them, so --

23                    THE COURT:  It wasn't as many as you

24    thought.

25                    MR. TARDIO:  No, it's -- the 15,000 is --
```

```
 1    it's actually more -- there's more than I thought that

 2    are actually preserved.  That just covers the -- what

 3    I would consider --

 4                    THE COURT:  I see.

 5                    MR. TARDIO:  -- to be the relevant time

 6    period.

 7                    THE COURT:  I see.

 8                    MR. TARDIO:  Now, Your Honor instructed

 9    me or ordered me to figure out how many e-mails we

10    have preserved from Schamberg, Littleton, Butler, and

11    Culclasure.

12                    THE COURT:  Yes.

13                    MR. TARDIO:  The number for all time

14    periods -- so some of these date back to '01, '02,

15    whenever they started saving their e-mails -- is

16    19,000-something, close to 20,000, so those are the

17    numbers.  I submit to the Court we can't

18    review 19,000 e-mails between now and the 4th of June,

19    so I submit to the Court that a search term -- if --

20    if Mr. Nolan still seeks to go back before September

21    of 2012, then we're going to have to go the

22    search-term route.

23                    MR. NOLAN:  We'd be happy to collaborate

24    on some search terms.

25                    THE COURT:  All right.
```

1              MR. NOLAN:  That would be fine.

2              THE COURT:  All right.  And even with

3    search terms you may have an issue getting all that

4    between now and the 1st of June.

5              MR. TARDIO:  Probably.  Also I don't know

6    the cost.  I just don't know.  I mean, I don't know if

7    that's something we do in-house or send out.  My

8    suspicion is that it's something that we've got to

9    give an outside vendor to do, so anyway that is the

10   biggest project.

11             THE COURT:  Yes.  And what about the

12   other -- and, of course, I know that that's a big part

13   of the discovery that has been requested and ordered,

14   but what about the rest?

15             MR. TARDIO:  Board minutes are going to

16   take a while.  Five years of board minutes to go

17   through and redact.

18             THE COURT:  That's right.  You have to do

19   a redaction.

20             MR. TARDIO:  And Howell Allen going

21   through their storage to look for documents related to

22   purchase of -- I think the Court's order was steroids

23   in general.  If we limited it to injectable steroids,

24   that would help because I think steroids would cover

25   cortisone cream.

```
 1                    THE COURT:  Is that agreeable?
 2                    MR. NOLAN:  That's reasonable, yes.
 3                    THE COURT:  Injectable steroids.  That
 4      will be the order.
 5                    MR. TARDIO:  I figured that was the
 6      intent of Mr. Nolan, but I don't know that that was
 7      testified.  Regardless, they're going to have to go to
 8      storage and pull some documents, so it's -- it's a
 9      sizable ordeal, and I don't have a definite time
10      frame.
11                    THE COURT:  I understand.  All right.  So
12      that's what I suspected would be the answer.  So what
13      do you say now, Mr Nolan?  Do you just want to wait
14      and see what happens?  Because I don't want to subject
15      these folks to multiple depositions because we don't
16      have all of our documents, and I think from what I've
17      been seeing so far the defense is making a very good
18      effort to do what they need to do to produce those
19      documents, and their objections were valid.  I mean,
20      they had valid reasons for objecting, and that's why
21      we're all here, and that's why I'm here.  That's
22      what -- why everybody has a function to try to resolve
23      those kind of disputes.  And so -- but we're left with
24      a very short window of time for them to gather that
25      information to get it to you for you to study to -- I
```

1    mean, I know you're going to have to look at it before

2    you start asking questions, so -- and I don't want to

3    subject these folks to multiple depositions again

4    because we don't -- we don't have all of our discovery

5    documents.  And I think we've marched along, all of

6    us, as best we can to meet these deposition schedules

7    of June 4, 5, and 6.  So we probably don't have an

8    answer right now, but you all know how I'm thinking

9    about the multiple depositions, and I've said that

10   earlier.  We don't want to subject these folks to

11   multiple depositions where we can avoid it.  I mean,

12   they may not be avoidable sometime, but we know right

13   now that it's going to be a task, maybe a very

14   difficult task to gather all this information by the

15   defense to get to the plaintiffs in a timely manner in

16   order for the plaintiffs to be -- plaintiff's counsel

17   to be prepared to take these important depositions,

18   and I know how important they are to the case, so I

19   guess just have to see -- see how it goes.  And if you

20   all need me, I will -- I'll be available on the 3rd of

21   June to solve any of those problems that you might

22   need to address to the Court.  And we can do it by

23   telephone.  We can do it by -- you know, we can get

24   you in here.  Make sure I -- I don't think I have

25   anything scheduled right now, do I?

1          MR. FOWLER:  Something small each day, I

2   think.

3          THE COURT:  Yeah.  I was going to start a

4   two-week jury trial, but the lawyers respectfully

5   asked that they be allowed to continue that so they

6   could -- I could hear a motion for summary judgment in

7   that case before the jury trial which I'm hearing on

8   June 5th.  Oh, I do have a pretrial conference for a

9   jury trial that is scheduled for June 17th that starts

10  at 1:00 p.m. on Monday, June 3rd, so -- and we don't

11  have all those yet, do we?  We don't have those

12  motions in limine yet, do we?

13         MR. FOWLER:  I don't think so.

14         THE COURT:  So we don't know how many

15  there are.  I don't think it's going to be that many.

16  So I can be available in the afternoon or maybe the

17  morning for a telephone conference, or I'll -- you

18  know, I'll just work you all in because I know your --

19  your depositions start on the 4th.  Right?  Tuesday

20  the 4th?

21         MR. NOLAN:  That's correct.

22         THE COURT:  I'll work you in.  Just let

23  me know that you need me, if you do, and I'll work you

24  in.

25         MR. TARDIO:  Thank you, Your Honor.

1                THE COURT:  All right.  Anything else we

2    can do today?

3                MR. NOLAN:  No, Your Honor.

4                THE COURT:  All right.  Thank you all.

5                (Proceedings were adjourned at 3:41 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    REPORTER'S CERTIFICATE

2

3                    I, Duke Firlus, RPR, LCR, Notary Public

4        and Court Reporter, do hereby certify that I recorded

5        to the best of my skill and ability by machine

6        shorthand all the proceedings in the foregoing

7        transcript, and that said transcript is a true,

8        accurate, and complete transcript to the best of my

9        ability.

10                   I further certify that I am not an

11       attorney or counsel of any of the parties, nor a

12       relative or employee of any attorney or counsel

13       connected with the action, nor financially interested

14       in the action.

15                   SIGNED this 30th day of May, 2013.

16

17

18

19

20                   _____

21                   Duke Firlus, RPR, LCR

22

23       My commission expires:  September 8, 2013.
         Tennessee LCR No. 579

24       Expires 6/30/2014

25
```