# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | ) ) ) ) MDL No. 1:13-md-2419 ) |
| This Document Relates to: | ) Judge Rya Zobel ) |
| All Actions Involving Specialty Surgery Center and Dr. Kenneth Lister. | ) ) |

## PLAINTIFFS' STEERING COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL SSC AND DR. KENNETH LISTER TO PROVIDE DOCUMENTS AND TESTIMONY

The Plaintiffs' Steering Committee ("PSC") recently discovered that defendant Specialty Surgery Center, PLLC ("SSC") concealed or destroyed relevant records, and that witnesses represented by its counsel (Jean Atkinson  and defendant Dr. Kenneth Lister) gave false or misleading testimony at deposition concerning those records.  SSC and Lister's deception is material both to liability and damages, and it may provide a basis for sanctions.  Nevertheless, SSC, Dr. Lister, and their counsel refuse to permit necessary discovery into how and why this happened.[1]  The PSC therefore moves to compel SSC and Dr. Lister to: (1) permit the PSC to re-depose Atkinson and Lister; (2) to conduct a complete search for both hard copy and ESI records in response to the PSC's Second Set of Requests for Production ("2nd RFPs"), without date restrictions, arbitrary custodian limitations, or other unjustified restrictions; (3) to justify its redactions; and (4) to produce its litigation hold letter.[2]

---

[1] A Local Rule 37.1 Certification is appended to this brief.
[2] With respect to the 2nd RFPs, the PSC files this motion only as to certain over-arching and specific issues on which the parties have already reached an impasse, as detailed herein.  The PSC intends to meet and confer with SSC and Dr. Lister as to other issues specific to particular discovery requests, and the PSC reserves the right to move to compel SSC should the parties not be able to resolve the pending dispute regarding those particular issues.  The PSC also reserves the right to move for additional discovery, including a Rule 30(b)(6) deposition of SSC.

## BACKGROUND

**I.**    **SSC's Knowledge of Potential Litigation as of October 2, 2012 (at the Latest)**

Until approximately the Summer of 2013, defendant SSC operated a medical facility in

Cookeville, Tennessee, at which defendant Dr. Kenneth Lister routinely performed surgical

procedures.  In 2009, Calisher & Associates, Inc. ("Calishers") contracted with SSC to perform

certain management functions at SSC's Cookeville facility.[3]  That agreement remained in place

through approximately April 2013.  In July and August 2012, SSC purchased contaminated vials

of MPA from NECC.  Clinicians at SSC, including Dr. Lister, injected those vials into patients,

many of whom contracted fungal meningitis – and some of whom ultimately died as a result.

On September 26, 2012, SSC received notice from NECC that the MPA it had sold to

SSC may have been contaminated.[4]  On September 28, 2012, SSC received notice from the

Tennessee Department of Health that the MPA was linked to cases of meningitis, after which

time SSC began contacting patients to inform them of the issue.[5]

On October 2, 2012, Kim Bowlin, an administrator for SSC and Calishers, notified SSC's

malpractice carrier, State Volunteer Mutual Insurance Company ("SVMIC"), of the issue.[6]  On

that same date, after some type of discussion with SVMIC, Bowlin emailed the executive

committee of SSC to indicate that "all employees have been instructed not to do anything outside

---

[3] Declaration of Benjamin A. Gastel ("Gastel Decl."), Attachment Number ("Attach. No.") 1, Deposition Exhibit ("Depo. Ex.") 83.  Under MDL Order No. 10, the parties have numbered deposition exhibits sequentially.  Unless otherwise noted, the PSC will refer to the deposition exhibit designation for each document as "Depo. Ex. [X]" for clarity of the record.

[4] Gastel Decl., Attach. No. 2, Depo. Ex. 607, and Attach. No. 3, Depo. Ex. 637 ("Bowlin Timeline").

[5] Gastel. Decl., Attach. No. 3, Bowlin Timeline at CAL-00314 to -315; Gastel Decl., Attach. No. 4, Excerpts from Transcript of Deposition of Kim Bowlin ("Bowlin Dep."), at 83:8-84:22.

[6] Gastel. Decl., Attach. No. 4, Bowlin Dep. at 87:18-89:7. The PSC notes that Bowlin testified that she was paid by SSC (Bowlin Dep. at 19:11-14), but that her direct supervisors were Ron and Gina Calisher (Bowlin Dep. at 19:15-19).

the council [sic] of SVMIC."[7]  Bowlin testified that she contacted SVMIC because of the possibility that SSC would be sued in connection with the meningitis outbreak.[8]  In recent discovery responses, SSC represents that the "council of SVMIC" referenced by Bowlin was actually referring to "counsel hired by SVMIC" to defend SSC and related parties.[9]

On October 5, 2012, SVMIC informed Bowlin that SVMIC would be contacting State Farm (SSC's Medical Office and Commercial Liability Policy holder) to inform State Farm of the situation because SSC's "**entire process of purchasing might be questioned**."[10]  On that same day, representatives from the FDA arrived at SSC to retrieve vials of MPA and other material evidence.[11]  On October 12, 2012, Bowlin emailed multiple recipients at SSC and attorneys Matt Cline and CJ Gideon at the law firm of Gideon, Cooper & Essary PLC ("Gideon Cooper") (now MDL counsel for SSC and the other Tennessee Clinic Defendants) about procedures for continuing to contact patients.[12]  Furthermore, on or before October 12, 2012, SSC also began auditing its current vendors to ensure compliance with state licensing laws, DEA requirements, and accreditation information, which SSC represented to these vendors was done because of prompting from SSC's own lawyers.[13]  This began as early as October 12, 2012.  This shows that SSC's counsel was intimately involved with SSC's operations in the fall of 2012, and certainly had the opportunity to ensure that relevant documents were preserved beyond that date. Also, in response to recent document requests from the PSC, Gideon Cooper has represented that it sent a "litigation hold" communication to Dr. Lister, Jean Atkinson, and Kim Bowlin on

---

[7] Gastel Decl., Attach. No. 5, SSC-05026.
[8] Bowlin Dep. at 88:15-19.
[9] Gastel Decl., Attach No. 6, Responses to PSC's 2nd RFP, Resp. to RFP No. 13.
[10] Gastel Decl., Attach. No. 3, Bowlin Timeline at CAL-00318 (emphasis added); Gastel Decl., Attach. No. 4, Bowlin Dep. at 89:8-90:22.
[11] Bowlin Timeline at CAL-00318 to -319.
[12] Gastel Decl., Attach. No. 7, Depo. Ex. 638.
[13] Gastel Decl. Attach. No. 8, Depo. Ex. 117.

October 12, 2012, although Gideon Cooper and SSC refuse to provide a copy of that document and refuse to provide any records or testimony concerning that communication.[14]

## II.   Changes to the Formulary Before Sale of SSC to Cumberland

Prior to April 2013, SSC maintained an approved medications list that functioned as its drug formulary.[15]  In a previous discovery Order, this Court has already explained that a medical practice's drug formulary "may be evidence regarding what medications [the facility] believed to be safe," that it is discoverable, and that it must be produced.[16]

As explained in more detail herein, prior to April 2013, SSC's formulary **did not include** Depo-Medrol (the brand name version of MPA) as an approved medication.  Nevertheless, at some point in or about April 2013 – after being made aware of potential litigation associated with the MPA it purchased from NECC, and while represented by its current counsel with respect to the meningitis catastrophe – **SSC altered its drug formulary** to include "Depo Medrol" for the first time.[17]  At some point on or after May 3, 2013, Cumberland Medical Center purchased the assets of SSC.

## III.   SSC's Representations Concerning the Formulary

### A.  Document Production – Exhibit 91, the False Formulary

---

[14] Gastel Decl., Attach. No. 6, Resp. to 2nd RFP No. 4. Also, prior to April 2013, both Dr. Lister and SSC received notices from injured claimants under the Tennessee Health Care Liability Act ("THCLA").  Gastel Decl., Attach. No. 9, Response to Second Set of Requests for Admission and Corresponding Interrogatory ("Resp. to 2nd RFAs"), Resps. to RFA Nos. 6 and 7.

[15] Gastel Decl., Attach No. 10, Excerpts from Transcript of Deposition of Jean Atkinson ("Atkinson Dep"), at 35:5-13; Gastel Decl., Attach. No. 4, Bowlin Dep. 115:13-20.

[16] Docket No. 1712, February 26, 2015 Order of Magistrate Judge Boal on PSC's Motion to Compel Regarding Certain Document Requests, at p. 6 (emphasis added).

[17] Gastel Decl., Attach. No. 9, Resp. to 2nd RFA # 11 (admitting that SSC was represented by Gideon Cooper at the time that Depo-Medrol was added to the formulary).

4

On October 15, 2013, the PSC served its First Set of Requests for Production ("1st RFPs") to SSC and Lister, and served its First Set of Interrogatories to SSC (1st Interrogatories). Those requests were served just six months after SSC had altered its drug formulary.

On October 27, 2014, over a year later, SSC served its Responses to the 1st Interrogatories and 1st RFPs.[18]  In its interrogatory responses, SSC represented that, prior to the meningitis outbreak, Calishers had "instructed" SSC to execute a "Business Associate Agreement" with NECC to facilitate the purchase of MPA, that Dr. Lister had told Ms. Atkinson "not to do anything she felt uncomfortable doing and advised her to follow Calisher & Associates' advice," and that Calishers specifically authorized SSC to proceed with purchasing MPA from NECC utilizing patient names.[19]  In other words, SSC's responses created the impression that Calishers authorized the purchases and that SSC relied on Calishers' understanding of applicable standards and regulations.

Among other document requests, the PSC asked SSC and Dr. Lister to "[p]lease produce every Specialty Surgery employee handbook in force during 2012."  In Response to RFP No. 50, SSC represented that an exhibit to its production included "1) SSC's 'Pharmaceutical Services' policies" and "2) The table of contents to SSC's policies."[20]  The PSC will refer to the referenced exhibit as "Exhibit 91," as it was designated during the deposition of Dr. Lister.[21]

The first seven pages of Exhibit 91 contain documents that purport to constitute SSC's policies and procedures.  The first page of Exhibit 91 (SSC-00954) contains what purports to be

---

[18] Gastel Decl., Attach. No. 11, SSC Resps. to 1st Interrogatories (excerpts) and Attach. No. 12, SSC Resps. to 1st RFPs (excerpt of Resp. to RFP 50 with referenced exhibit 5 bearing Bates stamp SSC-00954 to SSC-00987).  Dr. Lister also served responses on the same day.  In relevant part, his responses incorporated SSC's responses by reference.

[19] Gastel Decl., Attach. No. 11, Resp. to Interrogatory No. 1.

[20] Gastel Decl., Attach. No. 12, Resp. to 1st RFP No. 50.

[21] Gastel Decl., Attach. No. 13, Exhibit 91.

SSC's drug formulary in place in 2012.  By its own terms, the formulary states that the "[t]his Center will have available to the practitioner the following medications that have been reviewed and approved by the practitioner and the Executive Committee," and that the "Objective" of the list is "[t]o provide safe and effective medications to the Center's patients."[22]  The first page contains a list of "Approved Medications," which includes "Depo Medrol" in the first column. At the top of the page, the "Effective Date" and "Revision Date" sections are both blank.  By contrast, the next six pages of the policy each contain an "Effective Date" of August 12, 2010. Dr. Lister was a member of the Executive Committee that was responsible for approving changes to the formulary.[23]  Based on SSC's production representations and operating under the assumption that SSC had honored its document preservation obligations, the PSC understood that SSC's drug formulary reflected that, in 2012, SSC's Executive Committee had included Depo-Medrol on its approved medical list as a "safe and effective medication."

### B.  Lister Deposition

On March 9, 2015, the PSC took the deposition of Dr. Lister.  Dr. Lister was shown Exhibit 91, which SSC and Lister had represented was the SSC pharmaceutical policy in place in 2012.  Dr. Lister acknowledged that the page contained what "appears to be an SSC approved medication list."[24]  When he was asked whether it was in effect in 2012, he responded: "I don't see a date on it."[25]  He initially disclaimed any knowledge as to whether it was in effect in 2012.[26]  Then the following exchange occurred:

**Q:**     **Was compounded MPA on Specialty Surgery Center's formulary in 2012?**

---

[22] Gastel Decl., Attach. No. 13, Depo. Ex. No. 91, at SSC-00954 (emphases added).
[23] Gastel Decl., Attach. No. 11, Resp. to 1st Interrogatory No. 10.
[24] Gastel Decl., Attach. No. 14, Excerpts of Tr. of Deposition of Kenneth Lister, at 161:18-19.
[25] Gastel Decl., Attach. No. 14, Lister Dep. at 161:20-22.
[26] Gastel Decl., Attach. No. 14, Lister Dep. at 161:23-162:1.

> **A:**    **Depo-Medrol was on the Specialty Surgery Center's formulary.**
>
> **Q:**    **I'm sorry?**
>
> **A:**    **Depo-Medrol was on Specialty Surgery Center's formulary.**[27]

Based on this answer, which Lister repeated twice, the PSC understood Lister to be testifying that Depo-Medrol in fact was on the SSC's formulary in 2012. Dr. Lister was on SSC's Executive Committee and knew or should have known of any changes to it.

### C.  Jean Atkinson Deposition

On March 10, 2015, the PSC deposed Jean Atkinson. Atkinson testified that the Calishers created SSC's formulary based on materials that SSC was utilizing at the time it hired Calishers (in 2009).[28] When asked whether SSC-00954 was "**the formulary** that Calisher created for Specialty Surgery" – *i.e.*, the one that Calishers had created after SSC hired it – Atkinson answered "yes".[29]

### D.  The Nature of Exhibit 91

Following the Lister and Calisher depositions, the PSC had no reason to question SSC, Lister's, and Gideon Cooper's representations that Exhibit 91 was a true and accurate copy of SSC's drug formulary in place during the time frame in which SSC (via Dr. Lister) injected contaminated MPA into patients. The PSC therefore had no reason to doubt that, at the time of the meningitis outbreak, the SSC formulary indicated that Depo-Medrol was approved for use by the Executive Committee at SSC as a "safe and effective" pharmaceutical.

### IV.    <u>August-September 2015 Calisher Productions and Depositions: The PSC's First Indication of Wrongdoing Concerning the Formulary.</u>

---

[27] Gastel Decl., Attach. No. 14, Lister Dep. Lister Dep. at 156:3-9.
[28] Gastel Decl., Attach. No. 10, Excerpts of Tr. of Deposition of Jean Atkinson, at 34:18-36:8.
[29] Gastel Decl., Attach. No. 10, Atkinson Dep. at 35:14-22 (emphasis added).

On April 21, 2015, the PSC served a subpoena for records and testimony on Calishers and its principals, Gina and Ron Calisher.  Beginning on August 10, 2015 (five months after the Lister and Atkinson depositions), Calishers produced records responsive to the PSC's discovery requests, including records related to SSC's drug formulary that were in Calishers' possession.  Among that production are multiple records that should have been – but were not – previously produced by SSC or Lister:

- Calishers produced an **alternate version** of SSC's drug formulary.[30] Unlike the page of Exhibit 91 produced by SSC, Calishers' version (now Deposition Exhibit 617) contained an "Effective Date" of August 12, 2010, and **did not list Depo Medrol** as an approved medication.

- Calishers produced an April 1, 2013 email from Ms. Calisher to Atkinson (cc'ing Bowlin) with an associated attachment.[31]  In the email, entitled "Approved Medication List," Ms. Calisher states to Atkinson: "Here it is. I put your additions in bold.  Please check the spelling as I couldn't read some of the print very well."[32]  The email attaches a draft approved medications list that contains bolded additions to the existing list, including the addition of "Depo Medrol."

On September 28, 2015, the PSC deposed Gina Calisher as the corporate representative of Calishers under Fed. R. Civ. P. 30(6).  At the deposition, the PSC questioned her about the documents that Calishers had produced concerning the drug formulary.  In contrast to SSC's portrayal of the Calishers as responsible for changes to the drug formulary, Ms. Calisher testified that she was essentially just a "typist" for SSC as it related to the drug formulary,[33] and she disclaimed any knowledge, expertise, or training in the formation of a drug formulary.[34]  She

---

[30] Gastel Decl, Attach. No. 15, CAL-00019, Depo Ex. 617.

[31] Gastel Decl., Attach. No. 16, Depo. Ex. 618.

[32] Gastel Decl., Attach. No. 16, Depo. Ex. 618 (emphasis added).

[33] Gastel Decl., Attach. No. 17, Excerpts from the deposition of Gina Calisher ("Calisher Dep.") at 35:18-24.  ("Q: Did Calishers produce a formulary of approved drugs for Specialty Surgery? A.  No. . . . I was the typist.")

[34] Gastel Decl., Attach. No. 17, G. Calisher Dep. at 38:23-39:11.

testified that SSC's Executive Committee was supposed to review the policy annually and make changes.[35]

The PSC asked Ms. Calisher whether the drug formulary in Exhibit 91 (SSC-00954) was in place at SSC in 2012. Calisher testified that SSC's version was likely the product of revisions that took place in the "spring of 2013," when the facility was under contract to be sold to Cumberland.[36]  She testified that the document actually in effect from 2010 to 2012 was different from the version produced by SSC in this litigation.[37]

PSC's counsel presented the formulary that Calishers had produced as CAL-00019 (designated as Exhibit 617).  Ms. Calisher testified that Exhibit 617 was the formulary in effect as of August 2010 –  **not SSC-00954 of Exhibit 91** – and she agreed that Exhibit 617 did not list Depo-Medrol.[38]  Ms. Calisher testified that, in fact, **she added Depo-Medrol** to the list (in bolded text) **in April 2013 at Atkinson's direction**, as reflected in her April 1, 2013 email to Ms. Atkinson.[39]  She testified that SSC would have had the 2010-2012 version in both hard copy and electronic form prior to the April 2013 revisions.[40]  She also testified that she emailed the bolded changes to the formulary to Ms. Atkinson in response to a handwritten or facsimile communication from Ms. Atkinson – although she (Ms. Calisher) did not produce or possess a copy of that communication.[41]

## V.        Summary of Relevant Facts

---

[35] Gastel Decl., Attach. No. 17, G. Calisher Dep. at 38:13-38:22; 61:9-18;
[36] Gastel Decl., Attach. No. 17, G. Calisher Dep. at 52:3-18.
[37] Gastel Decl., Attach. No. 17, G. Calisher Dep. at 52:19-23.
[38] Gastel Decl., Attach. No. 17, G. Calisher Dep. at 230:11-18.
[39] Gastel Decl., Attach. No. 17, G. Calisher Dep. at 230:25-232:16.
[40] Gastel Decl., Attach. No. 17, G. Calisher Dep. at 235:6-236:4.
[41] Gastel Decl., Attach. No. 17, G. Calisher Dep. at 233:24-234:12.

In sum, Depo-Medrol was not on SSC's formulary in 2012 as a "safe and effective medication" approved by its Executive Committee, SSC was subject to a litigation hold obligation as of October 2012, SSC directed Calishers to change the formulary both in hard copy and electronically in April 2013 to add Depo-Medrol, at some point SSC finalized that new version and left the "revision date" blank, SSC received a document request for the formulary in October 2013 (just six months later), SSC produced only the revised version in October 2014 without disclosing that it was not in effect in 2012, Atkinson knew about the changes but represented to the PSC at deposition that Exhibit 91 was the version in place in 2012, Lister gave misleading testimony about Exhibit 91, and the PSC had no way of discovering this issue until the September 28, 2015 deposition of Ms. Calisher.  Dr. Lister's testimony is particularly concerning, because Dr. Lister gave artfully evasive responses concerning Exhibit 91, likely reflecting his cognizance that it had been altered from the version in place in 2012 and a desire to conceal that fact from the PSC.

## VI.   PSC's Discovery Requests

After learning about SSC's deception, the PSC moved quickly to obtain additional information from SSC and Lister about the matter.  On October 1, 2015, the PSC emailed SSC's counsel, asking why CAL-00019 and CAL00299-300 were not part of SSC's production, and why there no documents reflecting authorization by SSC's Executive Committee to the list, communications between Gina Calisher and Atkinson concerning the modifications, and documents showing further edits to the draft sent by Ms. Calisher.[42]

In response, SSC contended that it did not produce 2013 records because the parties had agreed to a December 31, 2012 date cutoff for the scope of SSC's search for electronically stored

---

[42] Gastel Decl., Attach. No. 18, October 5, 2015 Email String.

information ("ESI").[43]   As to the 2012 formulary document that SSC never produced, counsel for SSC asserted that, after receiving the 1st RFPs, he had travelled to SSC to collect records, where he picked up a copy of the policies and procedures manual and produced it – without knowing that it was not actually in place in 2012.

In response, the PSC pointed out that SSC's response raised more questions than answers.  The PSC asked whether and when a litigation hold was sent, whether SSC and its insurance carriers collected and reviewed records during a factual investigation in late 2012 and early 2013, whether that review included the policies and procedures manual, whether that review included making a copy of the **pre-April 2013** manual, whether counsel had conducted any diligence to determine if Exhibit 91 was in effect in 2012 as it had represented in RFP 50, and whether the Executive Committee minutes in 2013 authorized modifications to the formulary.  The PSC requested that SSC conduct additional document searches and make certain SSC employees and Dr. Lister available to testify on this issue.  The PSC also indicated that it would serve additional document requests covering the time frame from October 1, 2012 through the sale of SSC, and the PSC requested that SSC reduce the time to provide answers.  SSC did not respond to the PSC's October 5, 2015 email.

On October 12, 2015, the PSC wrote to SSC again, indicating that the PSC would serve both deposition notices and written discovery, and that the PSC would petition the court for shorter deadlines.[44]   SSC finally responded, stating that it would not produce Atkinson and Lister voluntarily for re-deposition or agree to shorten the discovery response deadline.[45]

---

[43] Gastel Decl., Attach. No. 18, October 5, 2015 Email String.
[44] Gastel Decl. Attach. No. 19, October 12, 2015 Email String.
[45] Gastel Decl. Attach. No. 19, October 12, 2015 Email String.

On October 13, 2015, the plaintiffs served a Second Set of Requests for Admissions and Corresponding Interrogatory ("2nd RFA's"), as well as a Second Set of Requests for Production to Specialty Surgery Center, PLLC ("2nd RFP's").  On October 15, 2015, the PSC asked whether SSC and Lister would provide expedited responses to the 2nd RFAs and the 2nd RFPs, and whether SSC would agree to produce Dr. Lister and Ms. Atkinson for half-day depositions.[46] SSC agreed to expedite responses to the 2nd RFAs, but refused to produce Lister and Atkinson as requested and refused to expedite responses to the 2nd Interrogatories.  SSC served responses to the RFAs on October 28, 2015 and served response to the RFAs on November 20, 2015.[47]

## VII.   SSC's Inadequate Discovery Responses

SSC was asked to describe the due diligence it performed to determine that Exhibit 91 was a true and accurate copy of the drug formulary in place in 2012.  SSC's response states that "it was assumed" that Exhibit 91 was in effect in 2012 and that, when the PSC's 1st RFPs were received, an unidentified "former SSC employee from SSC's billing department" assisted in collecting documents and "would not have been aware that the written approved medication list was updated because she was not involved in the clinical side of SSC's operations."[48]  This response appears to blame a billing functionary for any discovery deficiencies, even though Atkinson was actively involved in making changes to the formulary and Dr. Lister was a member of SSC's Executive Committee and **a party at the time that SSC's counsel represents that Exhibit 91 was collected and produced**.  Both Dr. Lister and Atkinson therefore knew or should have known about the nature of Exhibit 91, the fact that the formulary was altered (and the previous version destroyed) despite a litigation hold, and that producing Exhibit 91 without

---

[46] Gastel Decl., Attach. No. 20, October 16, 2015 Email String.
[47] Gastel Decl., Attach. No. 9, Resp. to 2nd RFAs; Gastel Decl., Attach. No. 6, Resp. to 2nd RFPs..
[48] Gastel Decl., Attach. No. 9, Resp. to Interrogatory.

any evidence of the previous version would create the false impression that Depo-Medrol had been on SSC's approved medication list in 2012.

SSC's discovery responses are patently inadequate and track the same unjustifiable limitations that SSC articulated in the parties' earlier meet and confer process.  Although the PSC has identified numerous issues with SSC's discovery responses, the PSC focuses in this motion on three over-arching issues on which SSC refuses to budge: (1) SSC refuses to search for hard copy records after December 31, 2012, even though issues related to the drug formulary, SSC's litigation hold, and its failure to preserve and produce relevant records are at issue; (2) SSC refuses to gather a complete set of ESI records and to make a complete production of responsive ESI from those records; and (3) SSC refuses to produce its litigation hold communication or any related communications, based on blanket assertions of privilege.

## LEGAL STANDARDS

### I.   Discoverability

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party's claim or defense."[49] Relevance is broadly construed to encompass "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case."[50]  This Court has previously noted that "[t]he scope of discovery is very broad, and information is discoverable if there is any possibility it might be relevant to the subject matter of the action."[51]  "Relevant information

---

[49] Fed. R. Civ. P. 26(b)(1).

[50] *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 (1978); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 244 F.3d 189, 192 (1st Cir. 2001) ("The Supreme Court has long recognized that the Federal Rules of Civil Procedure are to be construed liberally in favor of discovery.")

[51] *Gulbankian v. MW Mfrs., Inc.*, Case No. 10-10392-RWZ, 2013 U.S. Dist. LEXIS 69773 (D. Mass. 2013) (internal quotations omitted); *see also In re Heparin Prods. Liab. Litig.* 273

includes any matter that is or may become an issue in the litigation."[52]  Because Rule 26(b) sets a "very low threshold for relevancy," courts should "err in favor of discovery rather than against it."[53]

## II.   Document Preservation Obligations

With respect to litigation hold obligations, parties have a legal duty to preserve relevant information when a person knows or should know that the document become material at some point in the future.[54]  Once on notice that evidence is relevant, the obligation to preserve evidence runs first to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation.[55]  The duty to preserve extends to potential evidence relevant to the issues in the case, including electronic information.[56]

As explained in *Zubulake*, once a litigation hold is in place, a party and its counsel must be certain that all sources of potentially relevant information are identified and placed on hold.[57]  This requires counsel to become fully familiar with the client's document retention policies, as well as the client's data retention architecture.[58]  It will also involve communicating with the "key players" in the litigation, in order to understand how they

---

F.R.D. 399, 406 (N.D. Ohio 2011) ("If there is any possibility that the information may be relevant to the general subject matter of the action.") citing *Oppenheimer*, 437 U.S. at 351.
[52] *Multi-Core, Inc. v. S. Water Treatment Co.*, 139 F.R.D. 262, 264 n.2 (D. Mass. 1991); s*ee also Chubb Integrated Sys. Ltd v. National Bank of Wash.*, 103 F.R.D. 52, 59 (D.D.C. 1984)("The concept of relevancy is broadly construed at the discovery stage of an action, and discovery rules are to be accorded liberal treatment.").
[53] *Kipperman v. Onex Corp.* 2008 U.S. Dist. LEXIS 34519, at *28 (N.D. Ga. Apr. 25, 2008).
[54] *Stevenson v. Union Pacific R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2003).
[55] *Telecom Int'l Am. Ltd. V. AT&T Corp.*, 189 F.R.D. 76, 81 (S.D.N.Y. 1999)
[56] *Zubulake v. UBS Warburg, LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004).
[57] *Id.*
[58] *Id.*

stored information.[59] Thus, it is **not sufficient** to notify all employees of a litigation hold and expect that the party then retain and produce all relevant information: counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched, and counsel and client must take some reasonable steps to see that sources of relevant information are located.[60]

### III.   <u>Spoliation</u>

As a general matter, spoliation of evidence can support sanctions.  Spoliation is the intentional, negligent, or malicious destruction of relevant evidence.  *Townsend v. Am. Insulated Panel Co., Inc.*, 174 F.R.D. 1, 4 (D. Mass. 1997).  Spoliation requires (1) an act of destruction, (2) discoverability of the evidence, (3) intent to destroy the evidence, and (4) occurrence of the act at a time when the party was on notice of that the evidence might be relevant to potential litigation.[61]  Even the mere negligent destruction of evidence can be sufficient to merit sanctions.[62]

### IV.   <u>Relevance of Document Destruction to Tennessee Law Claims</u>[63]

Under Tennessee law, a personal injury plaintiff generally can recover only (1) economic damages, and (2) non-economic damages up to $750,000.[64]  However, the statutory cap on non-economic damages does not apply if "[t]he defendant intentionally

---

[59] *Id.*

[60] *Id.*

[61] *Gordon v. DreamWorks Animation SKG, Inc.*, 935 F. Supp. 2d 306, 313 (D. Mass. 2013).

[62] *EEOC v. Chipotle Mexican Grill*, Civil Action No. 13-11503-FDS, 2015 U.S. Dist. LEXIS 42187 (D. Mass. Mar. 30, 2015).

[63] The parties dispute whether Massachusetts law or Tennessee law applies in cases involving the Tennessee Clinic Defendants (*see* D.E. 1938, 2004, 2097), an issue that the court has not resolved.  For purposes of the motion, the PSC assumes that Tennessee law may apply..

[64] Tenn. Code. Ann. § 29-39-102(e).  Section 102(e) increases the non-economic damages cap for certain enumerated "catastrophic" injuries.  The Plaintiffs reserve the right to challenge the constitutionality of the statutory damages cap.

falsified, destroyed or concealed records containing material evidence with the purpose of wrongfully evading liability in the case at issue."[65]  To the extent that there is a genuine dispute of fact about whether the statutory cap should be lifted, "the trier of fact, by special verdict, shall determine whether the exception[] . . . appl[ies] to the defendant and the cause of action."[66]  Thus, evidence concerning the applicability of the exemption may be determinative of whether a plaintiff may recover more than the default statutory cap.

## APPLICATION

### I.   Grounds for Further Discovery

It appears that SSC altered relevant records while facing prospective litigation, may have destroyed or concealed relevant documents, and failed to make a complete production in this litigation.  If SSC altered records, it could (1) support sanctions against SSC for its conduct, and (2) support an exception to the Tennessee cap on non-economic damages.  More broadly, the sequence of events indicates that SSC's production was deficient and indicates that, at a minimum, SSC failed to preserve relevant evidence.  The PSC is entitled to explore the scope of that deficiency, and depositions of Lister and Atkinson provide a starting point for that inquiry.[67]

### II.   The PSC's Requests

#### A.  Re-Deposition of Atkinson and Lister

---

[65] Tenn. Code Ann. § 29-39-102(h)(2).
[66] Tenn. Code Ann. § 29-39-102(i).
[67] The PSC is also entitled to know whether, when, how, and to whom litigation hold notices were sent, how SSC and its counsel ensured that relevant records were preserved, the nature of SSC's document retention policy, what steps counsel for SSC and/or SVMIC directed SSC to undertake, whether SSC in fact preserved all relevant records, and what other records may have been lost or altered.  In its discovery responses, SSC refuses to provide relevant information and records concerning these issues.  The PSC intends to address these particular issues through the meet and confer process and will bring any remaining disputes to the court's attention, including whether additional depositions are necessary.

Atkinson apparently gave false testimony at her deposition, representing that the 2013 formulary was in place in 2012, when in fact it was not.  Gina Calisher's testimony and records produced by the Calishers demonstrate that the changes to the formulary **were made at Atkinson's direction** less than a year before her deposition.  Atkinson surely knew this when she testified.  The PSC was not able to uncover Atkinson's deception until Gina Calisher's deposition in late September 2015, so it is unreasonable for SSC to take the position that the PSC already had a full and fair opportunity to depose Atkinson six months earlier, including (but not limited to) issues relating to document preservation, changes to the formulary, and her litigation hold obligations.  Moreover, Atkinson's deception casts doubt on the entirety of her testimony.  The PSC moves to compel Atkinson to appear for deposition without limitation.

As to Dr. Lister, Dr. Lister gave (at best) misleading testimony at his deposition.  In hindsight, it is apparent that Dr. Lister was parsing his words carefully to deceive the PSC, and that he knew that Exhibit 91 was **not** the 2012 formulary.  The manner in which he responded also suggests that he was prepared beforehand to answer direct questions concerning Exhibit 91 with artfully evasive responses, such as his testimony (which he stated identically twice) that "Depo Medrol was on the formulary".  As with Atkinson, Dr. Lister cannot in good faith maintain that the PSC had a full and fair opportunity to question him, particularly on issues related to SSC's drug formulary, document preservation, his litigation hold obligations, and his feigned ignorance concerning Exhibit 91.  Dr. Lister's deceptive testimony also casts doubts on the entirety of his testimony.  Thus, the PSC requests that Dr. Lister also appear for re-deposition without limitation.

## B.  Hard Copy and ESI Searches Without Date Restrictions and Without Artificial Custodian Restrictions

Because discovery has placed post-December 2012 conduct by SSC and Lister squarely at issue, SSC cannot refuse to produce post-December 31, 2012 hard copy records on the basis of relevance.  SSC made a limited production of post-2012 ESI relative to just three document custodians, but it has not conducted a hard copy search for post-2013 records (even as to those custodians).  Taken in context, SSC's reliance on the date limitation is unjustified.

Furthermore, SSC's responses artificially and inappropriately limit their unrestricted ESI search to Bowlin, Atkinson, and Diane Austin's files as to *one aspect*  of *one document request*:

> RFP No. 1:    Produce all documents and communications regarding your approved medication list, including but not limited to all previous versions of the approved medication list, all requests for changes related to the approved medication list, and all minutes of any board or committee meeting that mention the approved medication list or medications to be used at Specialty Surgery, and any emails that mention or relate to the approved medication list or medications to be used at Specialty Surgery.

> RESPONSE:

> Attached as Exhibit 1 is SSC's approved medication list now believed to have been in effect in 2012. SSC counsel affirmatively states that it was believed, up until Calisher and Associates' document production, that the approved medications list previously produced was in effect in 2012. **Counsel for SSC also conducted additional searches of the ESI returned by the PSC's original search terms (including the agreed date limitations) for documents related to the approved medication list.** Attached as Exhibit 2 is a spreadsheet containing lists of medications kept in each room at SSC.  The spreadsheet was created in May 2011 and last modified in October 2011.  A copy of each list was kept in the corresponding room at SSC.

> **Counsel for SSC also conducted searches, without date restrictions, of the email accounts of Kim Bowlin, Jean Atkinson, RN, and Diane Austin for responsive documents.** Attached as Exhibit 3 are nonprivileged responsive communications, with emails between SSC and counsel redacted from the email chains.
> Counsel for SSC also re-reviewed SSC's Board Minutes and Medical Executive Committee Minutes. Neither contains any reference to the approved medication list.

This discovery response raises numerous issues, only some of which the PSC will address here. First, counsel for SSC **did not conduct an undated search of hard copy documents** related to the approved medication list, a self-limitation that is inexplicable. Second, counsel for SSC did not conduct a complete undated ESI search; instead, **it self-restricted its undated ESI search to three particular individuals without explanation**. That is unjustifiable, particularly where testimony indicates that the Executive Committee of SSC (comprised of multiple committee members) was responsible for approving changes to the approved medications list and the list was apparently amended at least in August 2010 (and presumably at some point before that, given that the clinic had been operating for years at that point). Third, even as to the ESI that it allegedly searched for responsive documents, SSC's counsel claims to have "searched" the subset of records generated by the PSC's original search terms. SSC is not supposed to "search" a set of responsive documents – it has an obligation to **review them**.

The PSC therefore requests that SSC be ordered to produce responsive materials and information without regard to date limitation, to conduct a review for responsive hard copy materials, and to review and produce responsive ESI from the hard copy records from **all** relevant custodians (including but not limited to all members of the Executive Committee).

### C. Unspecified Redactions

Exhibit 3 to SSC's response to the 1st RFPs contains multiple redactions on the basis of privilege. SSC has not provided information by which the PSC can evaluate the claim of privilege, and the Court should order SSC to provide that information.

### D. Litigation Hold Communication

SSC refuses to produce a copy of its litigation hold communication, which the PSC requested in 2nd RFP No. 3:

RFP No. 3: Produce a copy of the litigation hold letter sent as a result of the anticipation of lawsuits being filed as a result of the fungal meningitis catastrophe.

RESPONSE: OBJECTION.  The litigation hold communication is a privileged attorney client communication and is also protected by the work-product doctrine. Without waiving these objections, in the interest of resolving this dispute, and in the interest of providing good faith responses to these requests, a litigation hold communication was sent to SSC on October 12, 2012, to ensure anything arguably related to the outbreak or dealings with NECC was preserved. The document is privileged from discovery.

When a plaintiff makes a preliminary showing of spoliation, courts routinely permit the opposing party to obtain discovery concerning the issue of spoliation, including a copy of the parties' litigation hold letter, even if the document would otherwise be privileged.[68]  Here, the PSC has shown that SSC destroyed relevant evidence, altered it, and covered up that alteration through discovery response and testimony.  Under the circumstances, the PSC made (at a minimum) a preliminary showing of spoliation that justifies discovery on that issue.  The PSC therefore requests that the Court order SSC to produce a copy of the litigation hold letter.[69]

## **CONCLUSION**

The PSC requests that the court order Atkinson and Dr. Lister to appear for deposition, that SSC produce complete responses to the PSC 2nd Set of RFPs without date limitations or arbitrary custodian limitations as to both hard copy records and ESI, that SSC justify its redactions, and that SSC produce a copy of the litigation hold letter.

---

[68] *Major Tours, Inc. v. Colorel*, 2009 U.S. Dist. LEXIS 68128 (D.N.J. Aug. 4, 2009) (collecting cases *and* granting motion to compel production of litigation hold notice, where plaintiff made a "preliminary showing of spoliation of evidence). *Magnetar Techs. Corp. v. Six Flags Theme Park, Inc.*, 886 F. Supp. 2d 466, 482 (D. Del. 2012) ("[T]here has been a growing trend among courts to find the attorney-client privilege is lost when spoliation has occurred . . . .  Although, in general, litigation hold letters are privileged, courts have adopted the view that the when spoliation occurs those letters become discoverable.")

[69] The PSC specifically reserves the right to conduct additional discovery related to spoliation and to pursue other lines of inquiry.

Date:  December 11, 2015         Respectfully submitted:

**/s/ Benjamin A. Gastel**
J. Gerard Stranch, IV
Benjamin A. Gastel
BRANSTETTER, STRANCH &
JENNINGS, PLLC
223 Rosa L. Parks Ave., Suite 200
Nashville, TN 37203
Telephone:  615/254-8801
Facsimile:  615/255-5419
gerards@branstetterlaw.com
beng@branstetterlaw.com
*Plaintiffs' Steering Committee and TN Chair*

Thomas M. Sobol
Kristen Johnson Parker
HAGENS BERMAN SOBOL SHAPIRO, LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone:  617/482-3700
Facsimile:  617/482-3003
tom@hbsslaw.com
kristenjp@hbsslaw.com

*Plaintiffs' Lead Counsel*

Annika K. Martin
Mark P. Chalos
LIEFF CABRASER, HEIMANN & BERNSTEIN, LLP
250 Hudson  Street, 8th Floor
New York, NY  10013
Telephone:  212/355-9500
Facsimile:  212/355-9592
akmartin@lchb.com
mchalos@lchb.com

*Federal/State Liaison*

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI 48075
Telephone:  248/557-1688
Facsimile:  248/557-6344
marc@liptonlaw.com

Kimberly A. Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue, Suite 365
Boston, MA 02116
Telephone: 617/933-1265
kdougherty@myadvocates.com

Mark Zamora
ZAMORA FIRM
6 Concourse Parkway, 22nd Floor
Atlanta, GA 30328
Telephone: 404/451-7781
Facsimile: 404/506-9223
mark@markzamora.com

Patrick T. Fennell (VSB 40393)
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, VA 24016
Telephone: 540/342-2000
Facsimile: 540/400-0616
pfennell@crandalllaw.com

*Plaintiffs' Steering Committee*

## LOCAL RULE 37.1 CERTIFICATION

On October 5, 2015, Gerard Stranch on behalf of the PSC sent a meet and confer letter to counsel to Specialty Surgery Center raising many of the issues that are the subject of this motion.  On October 15, 2015, the PSC served its second set of discovery on Specialty Surgery Center.  On or around October 16, 2015, Gerard Stranch and Benjamin A. Gastel and Matt Cline and Chris Tardio on behalf of the Specialty Surgery Center held a conference call to discuss these issues further.  On November 20, 2015, Benjamin A. Gastel on behalf of the PSC and Matt Cline and Kent Krause, both appearing for Specialty Surgery Center, held an additional conference call on the issues raised by this motion.  After these meet and confers and after Specialty Surgery responded to the PSC's second set of discovery requests, the PSC believes it in good faith attempted to narrow the issues presented by this motion, but reasonably believes the parties are at an impasse.  Accordingly, the PSC certifies that it has complied with Local Rule 37.1.

## <u>CERTIFICATE OF SERVICE</u>

I, Benjamin A. Gastel, hereby certify that I caused a copy of the foregoing *Plaintiffs'*
*Steering Committee's Memorandum in Support of Motion to Compel SSC and Dr. Kenneth Lister*
*to provide Documents and Testimony* to be filed electronically via the Court's electronic filing
system.  Those attorneys who are registered with the Court's electronic filing system may access
these filings through the Court's system, and notice of these filings will be sent to these parties
by operation of the Court's electronic filing system.

Date:   December 11, 2015

/s/ Benjamin A. Gastel
Benjamin A. Gastel