```
 1                    UNITED STATES DISTRICT COURT
 2                      DISTRICT OF MASSACHUSETTS
 3

 4
    IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
 5  PHARMACY CASES LITIGATION          )
                                       )
 6                                     )
                                       )
 7                                     )
                                       )
 8                                     )

 9          BEFORE:  THE HONORABLE RYA W. ZOBEL AND
                     THE HONORABLE JENNIFER C. BOAL
10

11

12
                         MOTION HEARING
13                             AND
                       STATUS CONFERENCE
14

15

16
             John Joseph Moakley United States Courthouse
17                        Courtroom No. 12
                          One Courthouse Way
18                        Boston, MA 02210

19
                         December 17, 2015
20                            2:00 p.m.

21
                Catherine A. Handel, RPR-CM, CRR
22                    Official Court Reporter
             John Joseph Moakley United States Courthouse
23               One Courthouse Way, Room 5205
                          Boston, MA 02210
24               E-mail: hhcatherine2@yahoo.com

25
```

```
 1     APPEARANCES:

 2
       For The Plaintiffs:

 3

 4         Hagens, Berman, Sobol, Shapiro LLP, by KRISTEN A. JOHNSON,
       ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts
 5     02142;

 6
           Janet, Jenner & Suggs, LLC, JESSICA MEEDER, ESQ., 75
 7     Arlington Street, Suite 500, Boston, Massachusetts 02116;

 8
           Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,
 9     IV, ESQ., 227 Second Avenue North, Nashville, Tennessee
       37201-1631;
10

11         Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
       Street, Suite 500, Boston, Massachusetts 02114;
12

13         Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K.
       MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, New York
14     10013-1413;

15
           Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
16     ESQ., 150 Fourth Avenue North, Suite 1650, Nashville, Tennessee
       37219;
17

18         Leader, Bulso & Nolan, PLC, by GEORGE H. NOLAN, ESQ., 414
       Union Street, Suite 1740, Nashville, Tennessee 37219;
19

20
        FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
21     NECP, INC.:

22
        Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
23     Street, Suite 2400, Boston, Massachusetts 02110-1724;

24

25      (Appearances continued on the next page.)
```

APPEARANCES (Cont'd):


FOR THE DEFENDANTS:


     Gideon, Cooper & Essary, PLC, by CHRIS J. TARDIO, ESQ., and
C.J. GIDEON, ESQ., 315 Deaderick Street, Suite 1100, Nashville,
Tennessee 37238;


     Todd & Weld LLP, by CORRINA L. HALE, ESQ., 28 State Street,
31st Floor, Boston, Massachusetts 02109;


     Fulbright & Jaworski, LLP, by MARCY H. GREER, ESQ., and
ADAM T. SCHRAMEK, ESQ., 98 San Jacinto Boulevard, Suite 1100,
Austin, Texas 78701;


     Pessin Katz Law, P.A., by GREGORY K. KIRBY, ESQ., 901
Dulaney Valley Road, Suite 400, Towson, Maryland 21204;


     Blumberg & Wolk LLC, by CHRISTOPHER M. WOLK, ESQ., 158
Delaware Street, P.O. Box 68, Woodbury, New Jersey 08096;


     Donoghue, Barrett & Singal, PC, by CALLEN G. STEIN, ESQ.,
One Beacon Street, Suite 1320, Boston, Massachusetts 02108-3113.

```
 1                      P R O C E E D I N G S

 2        (The following proceedings were held in open court before

 3   the Honorable Rya W. Zobel, United States District Court Judge,

 4   and the Honorable Jennifer C. Boal, Magistrate Judge, United

 5   States District Court, District of Massachusetts, at the John J.

 6   Moakley United States Courthouse, One Courthouse Way, Boston,

 7   Massachusetts, on December 17, 2015.)

 8             THE COURT:  Please be seated.

 9             COURTROOM DEPUTY CLERK URSO:  This is In Re: New

10   England Compounding, 13-MD-2419.

11             THE COURT:  Good afternoon.

12             I think we will skip the introduction of counsel.

13   Just tell me who you are before you begin to speak, and the

14   same, of course, is true of those people on the telephone who

15   wish to be heard.

16             Now, with respect to the agenda, the motion for oral

17   argument as to which -- the motions as to which you wish to

18   have a hearing today, there is first the motion for -- well,

19   discovery has been done.  So, I'll skip that altogether.

20             Then the other motions start with the plaintiffs'

21   motion for partial summary judgment.  Now, I note that the

22   reply to the opposition to that motion is the same document as

23   is the opposition to the defendant -- Tennessee defendants'

24   motion for partial summary judgment.  Now, does that mean that

25   both of them are now ready for hearing, Mr. Stranch?
```

1          MR. STRANCH:  Yes, your Honor, that's correct.  If

2  you recall, at the last hearing we were discussing the timing

3  so that we could have it heard at this conference because

4  that's the way we agreed to brief it so that it could be heard

5  today.

6          THE COURT:  I ask only because the Tennessee Clinic

7  Defendants' cross motion is listed, I thought, as still

8  briefing in progress.

9          MS. JOHNSON:  And that's my mistake, your Honor.

10 That should have been similarly listed at the top with the

11 partial motion for summary judgment.

12         THE COURT:  Well, you're all prepared.  So, I'll be

13 glad to hear it.  Now, who will argue?

14         MR. STRANCH:  Mr. Nolan will argue.

15         THE COURT:  Mr. Stranch for the plaintiffs?

16         MR. STRANCH:  No.  Mr. Nolan will argue.

17         THE COURT:  Mr. Nolan.

18         MR. GIDEON:  And, your Honor, C.J. Gideon on behalf

19 of the clinic defendants.

20         THE COURT:  Just a second.

21         (Pause.)

22         THE COURT:  There was an emergency motion tucked into

23 here for extension of time.  If there is still a request for

24 extension of time, which I think is long past, that motion is

25 allowed.

1          And, otherwise, I think we are to the merits.  Okay.

2          MR. NOLAN:  Your Honor, George Nolan from Nashville.

3          I would like to tender to the Court some documents

4    that I'm going to refer to during my argument.  I've given a

5    copy to my adversaries.  So, we can do that now, and it

6    consists of some of the statutes that the Court will be

7    construing as well as the exhibits that we relied on in our

8    brief.

9          THE COURT:  Is this designed to make sure that you

10   don't take much more than ten minutes on this?

11         MR. NOLAN:  I think it will make things go more

12   quickly, your Honor.

13         THE COURT:  That's good.  Do you have enough copies

14   for the law clerks, at least to share one?

15         MR. NOLAN:  Yes, your Honor.  We have one for your

16   Honor, Magistrate Boal, as well as the law clerks.

17         THE COURT:  So, Judge Boal and I will share one and

18   the law clerks, who are more numerous, will share one.

19         MR. NOLAN:  Thank you, your Honor.

20         Your Honor, through this motion, the Tennessee

21   clinics ask the Court for a partial summary judgment that

22   contains two rulings:  First, that the defendant Saint Thomas

23   Outpatient Neurosurgical Center was a seller or distributor of

24   the product that is the subject of this litigation.

25         THE COURT:  What was it?

1          MR. NOLAN:  The product was epidural steroid known

2     as --

3          THE COURT:  No.  I understand that.  So, your

4     position is that they were a seller?

5          MR. NOLAN:  Absolutely.

6          THE COURT:  And were a seller directly to the patient

7     or to the doctor who owned half of them and injected it?

8          MR. NOLAN:  It's our position, your Honor, that that

9     particular clinic sold the product to the patient.  The

10    product was paid for by the patient's insurance company or in

11    some cases the government through Medicare, and it is

12    undisputed, and both sides agree, that the money that this

13    particular clinic received for these epidural steroid

14    injections did include compensation for the drugs that were

15    provided to the patients.

16         THE COURT:  When I go to the hospital and they send

17    me home with a bunch of pills, are they sellers of the pills

18    to me?

19         MR. NOLAN:  Yes, your Honor, if --

20         THE COURT:  They are so treated by the law?

21         MR. NOLAN:  Under Tennessee law they would be,

22    because under Tennessee law, the definition of a seller under

23    our Products Liability Act is very broad, and if we look at

24    the documents that I tendered to the Court, specifically,

25    under the first tab, we find how our products liability

```
1    statute defines the term "seller," and it -- "seller includes
2    a retailer or wholesaler or distributor and means any
3    individual or entity engaged in the business of selling a
4    product, whether such sale is for resale or for use or
5    consumption."
6          So, your Honor, here's what the undisputed facts in
7    the record show on that particular issue:  There's no dispute
8    that the Saint Thomas Outpatient Neurosurgical Center is a
9    for-profit entity.  There's no dispute that that entity does a
10   high-volume epidural steroid injection practice.  That's 99
11   percent of what they do.
12         THE COURT:  Excuse me one moment.
13         You said that the insurance paid for it.  When the
14   patient got these injections --
15         MR. NOLAN:  Yes.
16         THE COURT:  -- which entity filed for the insurance
17   payment, either the Medicare or whatever supplementary
18   insurance?
19         MR. NOLAN:  Your Honor, two entities filed for
20   payment.  The first entity that filed for payment is the
21   Howell Allen Clinic, which is the neurosurgery group that owns
22   50 percent of the Saint Thomas Clinic, and the Howell Allen
23   Clinic sent a bill to Medicare or the insurance company for
24   the medical services of the doctor, Dr. Culclasure, who
25   actually administered the injections.
```

1          The second entity that sent a bill to a payor is the

2     clinic itself, the Saint Thomas Outpatient Neurosurgical

3     Center, and when that clinic sends a bill to Medicare, they

4     then receive money in exchange for the epidural steroid

5     injection that was provided to the patient and that money,

6     your Honor, does include payment for the drugs.  We know that --

7          THE COURT:  There was no bill from the defendant who

8     -- as to whom you seek partial summary judgment?

9          MR. NOLAN:  No.  There is a bill.  We're seeking

10    partial summary judgment against the Saint Thomas Outpatient

11    Neurosurgical Center and the Saint Thomas Outpatient

12    Neurosurgical Center sends bills that don't include the

13    service of the doctor that gave the shot.  That's billed

14    separately through a different organization.

15         The Saint Thomas Outpatient Neurosurgical Center

16    sends bills to Medicare.  Those bills are typically $1,034 for

17    an epidural steroid injection and that money does specifically

18    include payment for the drugs, and we know that's true and

19    undisputed because our adversaries admit that in their brief.

20         And, secondly, your Honor, if you look under Tab 8,

21    we find here a contract that is between this particular

22    clinic, Saint Thomas Outpatient Neurosurgical Center and Blue

23    Cross/Blue Shield of Tennessee, the largest health insurer in

24    Tennessee, and if you look under the purple tab, it indicates

25    what the global fee that that clinic charges encompasses, and

1   it specifically says the global fee also includes laser,

2   equipment, drugs, and facility charges.  So, there's no

3   question that money changed hands in exchange for these

4   patients receiving these particular drugs.

5          And it's interesting to note, your Honor, that the

6   doctor who gives these injections is not paid on salary.  He's

7   paid on commissions.  In other words, he receives 60 percent

8   of the collections that he gets from giving these shots.  So,

9   he's incentivized to spend less time with individual patients

10  and to give as many of these shots and to move as much of this

11  product as possible.  So, it's our respectful position, your

12  Honor, that under the undisputed facts, a sales occurred.

13  That's also supported by the testimony.

14         If you look under Tab 7, your Honor, we have here an

15  excerpt from the deposition of Ms. Debra Schamberg.  Now, who

16  is Debra Schamberg?  Well, she's a party defendant.  She is

17  the facility's director for the Saint Thomas Outpatient

18  Neurosurgical Center.

19         She was deposed and she was asked, quote:  "And Saint

20  Thomas Neurosurgical provides epidural steroids to patients in

21  exchange for money, correct?

22         Answer:  "That is correct.

23         Question:  "And it's a for-profit entity, Saint

24  Thomas Neurosurgical; is that correct?

25         Answer:  "That is correct."

```
1              Now, she could have said, but what she didn't say,

2      was:  No, no, no, no, we don't -- we don't give steroids in

3      exchange for money.  We provide a medical service.  That's

4      what we do.  We provide a service.  We provide treatment.  We

5      don't provide products, but that's not what she said.  She

6      said they provide epidural steroids in exchange for money, and

7      that was a truthful answer, your Honor, because while we all

8      agree that there is a large degree of medical services

9      associated with administering this drug to patients,

10     nevertheless, the patients aren't there for acupuncture.

11     They're not there for the process of having a needle placed in

12     their back.  They are there to receive medicine that is

13     designed to relieve pain and their insurance company pays for

14     it.

15              THE COURT:  Are you saying, then, that the

16     neurosurgical entity gets paid both for the product, but also

17     gets paid for the service or does the doctor get paid for the

18     service and the entity for the product?

19              MR. NOLAN:  What we're saying is that the doctor gets

20     paid separately for the medical service of administering the

21     shots.

22              THE COURT:  And that's 60 percent of the total cost?

23              MR. NOLAN:  And 60 percent of that money flow goes

24     into the doctor's pocket.  That's what his compensation is for

25     giving those shots.
```

1          Separate and apart from that, a bill goes from the

2    clinic to Medicare or health insurance company, which includes

3    compensation for the drugs.  It also includes, like, anything

4    else, overhead associated with providing that medicine to the

5    patient, but --

6          THE COURT:  Is the 60 percent based on an agreement

7    between the doctor and the clinic or is that the way the

8    reimbursement by the insurance companies works?

9          MR. NOLAN:  The 60 percent is the arrangement between

10   Dr. Culclasure and his employer, the Howell Allen Clinic.  So,

11   he works for the neurosurgeons.  The neurosurgeons refer

12   patients to this clinic that they own half of to get these

13   shots, and then the neurosurgery group, Howell Allen, sends

14   bills for Dr. Culclasure's services to Medicare and Dr.

15   Culclasure gets 60 percent of that revenue stream.  That's the

16   way his compensation works.  As far as the bill --

17         THE COURT:  It's not necessarily related to the way

18   in which the reimbursement occurs?

19         MR. NOLAN:  No.  No.  But we simply pointed out, your

20   Honor, that although my adversaries try to cast what they do

21   strictly as providing healthcare services and treatment for

22   the patient and they're not in the business of selling

23   products, according to them, their business arrangement

24   incentivizes the doctor to give less individual care to

25   patients and to give as many shots to as many patients in as

```
1    short a period as possible, but --

2             THE COURT:  But I don't need to make findings as to

3    that.

4             MR. NOLAN:  No, you don't.  You don't need to make

5    findings as to that.  The only thing that you need to

6    understand is that when this Saint Thomas Neurosurgical Clinic

7    sends a bill to Medicare and receives money for a particular

8    injection, that fee that they charge does include compensation

9    for the drugs.

10            So, that's our primary point, your Honor, and under

11   the undisputed facts, we suggest to the Court that the Court

12   should rule that this particular clinic is a seller.

13            Now, why is that so important?  Well, under our

14   product liability statute, your Honor, generally speaking, a

15   seller can't be subject to strict product liability in tort.

16   That's the manufacturer's responsibility, but there's an

17   exception to that in our statute.

18            When a manufacturer is judicially declared insolvent,

19   under Tennessee law, then the seller or distributor is

20   required to stand behind the product.  That's a very important

21   public policy decision made by our legislature.  When a

22   product maker is defunct, the burden of loss does not fall

23   upon the innocent victims that played absolutely no role in

24   importing that product in Tennessee.  The burden rests on the

25   sellers and distributors who participated in bringing that
```

1    product into the Tennessee market.

2        So, under our products liability statute, when a

3    product maker is defunct and a seller is required to stand

4    behind the product, then the doctrine of joint and several

5    liability applies.  In other words, the seller is legally

6    responsible as the product maker would have been if the

7    product maker hadn't gone bankrupt for all harm caused by the

8    product.  Now, that leads me --

9        THE COURT:  There's no comparative fault here?

10       MR. NOLAN:  There would be no comparative fault, and

11   that's under the Tennessee Supreme Court decision of *Owens vs.*

12   *Truckstops of America*, and what that decision held, your

13   Honor, is that when strict seller product liability applies,

14   the jury assigns fault attributable to the product in a single

15   unit and separate fault cannot be assigned to any of the other

16   players within the chain of distribution.  So, any of the

17   other players that participated in making the product or

18   testing the product or marketing the product or designing the

19   product, cannot be on the Verdict Form because the fault

20   associated with the product for all harm caused by the product

21   is assigned as a single unit.  Otherwise, you know, there

22   would be no benefit to having strict product liability.

23       THE COURT:  And the liability falls only on the last

24   to sell to the injured plaintiff?

25       MR. NOLAN:  That's right.  In other words, the jury

assigns fault for all harm caused by the product, and then the

sellers or distributors are legally responsible to pay for the

harm attributed to the product.  The claim is not focused at

all on the seller's decision making, whether the seller was

careful or careless.  It's only about was the product

defective and did it cause harm to the patient and was this

particular -- did this particular entity sell it.

THE COURT:  You mean to the --

MR. NOLAN:  To what?  Was this particular entity --

did it sell the product to the consumer, basically.

So, your Honor, that brings me to my adversaries'

cross motion for summary judgment.  The basic premise of their

argument is that plaintiffs can't pursue products liability

claims against healthcare providers, because under the

Tennessee Healthcare Liability Act, that's the only remedy

that the plaintiffs have and, therefore, plaintiffs simply are

not allowed to prosecute strict products liability claims, but

if we look at the language of that statute, we can see that it

does not apply to our products liability claims.

Your Honor, if you look in your packet under Tab No.

4, that's the definition that is found in the Healthcare

Liability Act for what "healthcare services" means.  There's a

lot of stuff in that definition, but one thing that's not

there is the word "product."  It doesn't say anything about

products being covered under the Healthcare Liability Act.

1          Then if you look at Tab 5, your Honor, we find the

2   definition of a healthcare liability action that's within the

3   Healthcare Liability Act.

4          THE COURT:  Well, under Tab 4 --

5          MR. NOLAN:  Yes.

6          THE COURT:  -- all that is -- the only liability --

7   or the only applicable conduct for liability is care, right?

8          MR. NOLAN:  Care, that's right.  Healthcare liability

9   claims are about --

10         THE COURT:  Does that include surgery, for example?

11         MR. NOLAN:  Surgery would be an example of care,

12   sure.

13         THE COURT:  Does it include the use of mechanical

14   devices to assist the patient, for instance?

15         MR. NOLAN:  If a claim asserts that the care was

16   negligent and that the mechanical device was inappropriately

17   inserted or used or selected by the surgeon, for example, that

18   would be governed by the Healthcare Liability Act, but under

19   the products liability --

20         THE COURT:  Even though the patient gets charged for

21   this device separately from its insertion?

22         MR. NOLAN:  Right.  In other words, there could be a

23   circumstance, your Honor, in which a patient receives a

24   defective product that was sold by the healthcare provider and

25   the healthcare provider would face seller liability under our

1    products liability statute, but if the patient wants to impugn

2    the healthcare provider's decision making or care that was

3    rendered to the patient, that falls under the purview of the

4    Healthcare Liability Act, but if a patient asserts a claim

5    that is the product is defective, the manufacturer is now

6    defunct, the patient played no role in selecting that

7    manufacturer or selecting the product, even, then under

8    Tennessee products liability law, that burden falls on the

9    party that actually profited from the transaction and brought

10   the product into Tennessee.

11          So, your Honor, some of our claims, unquestionably,

12   are governed by the Healthcare Liability Act.  Our claims that

13   criticize this clinic for choosing NECC as its steroid

14   provider of choice are governed by the Healthcare Liability

15   Act.  No question about it.  But our strict product liability

16   claim is not governed by the Healthcare Liability Act.

17          And, your Honor, if you look at -- if you look at --

18   under Tab 9 in your packet, this is two pages from the master

19   complaint, which are our products liability claim, and you'll

20   notice if you read that particular claim -- it's actually

21   three pages -- it doesn't talk about healthcare services.  It

22   doesn't talk about the care that was rendered.  It doesn't

23   even say the healthcare provider caused harm to a patient.  It

24   says that the product caused harm.

25          And so, our strict products liability claims, your

1    Honor, have nothing to do with the conduct or the services

2    provided by the healthcare provider or the care.  They are

3    only about the product.

4            So, what the defendants are asking this Court to do,

5    your Honor, is to construe the Healthcare Liability Act as

6    completely doing away with and preempting this important

7    provision of the Product Liability Act, but that's not the way

8    Tennessee law works as far as statutory construction is

9    concerned.

10           Your Honor, in our response brief, we point out two

11   fundamental tenets of statutory construction under Tennessee

12   law:  The first tenet is that statutes, if at all possible,

13   should be construed by courts harmoniously.  So, if there's a

14   way for a court to construe seemingly conflicting statutes in

15   harmony, that should be done.

16           Secondly, your Honor, our legislature codified a

17   principle of statutory construction, and it's cited in

18   Footnote 6 of our response brief, and in that codification, it

19   says that when there are two statutes that appear to

20   contravene each other, they should be construed so as the

21   matters following -- falling within the purview of each

22   statute are governed by that statute.  That's exactly what

23   we're proposing the Court to do here.

24           Because the Healthcare Liability Act doesn't talk

25   about products and is only focused on services and care, that

1   act governs many of the plaintiffs' claims, but because

2   plaintiffs' strict product liability claims don't focus on the

3   care and services provided by these defendants but only focus

4   on harm caused by a product, those claims, your Honor, are

5   governed by the Product Liability Act.

6           THE COURT:  I think you should conclude your

7   argument.

8           MR. NOLAN:  Thank you.

9           MR. GIDEON:  Your Honor, I'm C.J. Gideon on behalf of

10  STOPNC.

11          THE COURT:  C.J.?

12          MR. GIDEON:  C.J. Gideon, last name Gideon.

13          THE COURT:  Okay.

14          MR. GIDEON:  I represent Saint Thomas Outpatient

15  Neurosurgery Center, Howell Allen Clinic, also known as the

16  Tennessee Clinic Defendants.

17          If your Honor has any questions before I begin, I

18  would be pleased to answer them, but I've got about --

19          THE COURT:  I prefer to interrupt.

20          MR. GIDEON:  Well, that's fine, and I would ask you

21  to do so.

22          THE COURT:  Not seriously, except I don't have any

23  questions right now.

24          MR. GIDEON:  Okay.

25          I admire Mr. Nolan's ability to appear to be so

```
1    sincere and, yet, to be so wrong about the law in Tennessee.

2    As we pointed out in our brief, the recitation of the law, the

3    efforts to convince this Court to take this pathway to find

4    that the Tennessee Products Liability Act governs the

5    relationship between STOPNC and the plaintiffs is a pathway to

6    sure error.

7           The first point to be focused on is the Products

8    Liability Act does not apply even in the setting of an

9    insolvent manufacturer unless the other seller has another

10   feature.  And what's that other feature?  They have to be in

11   the business of selling products.

12          There is no showing that's been made to you at all.

13   There's been almost no reference to that point from Mr. Nolan,

14   and there is no evidence that STOPNC is in the business of

15   selling products.

16          Your Honor inquired based on past experience about

17   leaving a hospital and having them give you pills to take home

18   with you.  I don't know what knowledge the Court has of an

19   epidural steroid injection, but it involves a long needle.  It

20   involves a fluoroscope --

21          THE COURT:  I have intimate acknowledge.

22          MR. GIDEON:  Okay.  Well, then you know that there is

23   more to it than just a vial of methylprednisolone acetate.

24   There is a fluoroscope.  There is a radiologist.  There is

25   normal saline, and everybody has got on gloves.  There is a
```

1    fixed one-time fee for the entire service, including the

2    nurse, the recovery room, the gloves, the facility, the

3    license.  Something else he didn't mention --

4         THE COURT:  But does not the insurance company treat

5    it as separate pieces?

6         MR. GIDEON:  No, ma'am, not in this case, and it's

7    been submitted to you many, many times.  There is one global

8    bill on the Reed case and all the others that's one fixed fee

9    of $1,034, of which Blue Cross/Blue Shield pays $370.  There

10   is no bill for methylprednisolone acetate.

11        And how can I say that with such conviction?  Some of

12   these patients received two vials.  There wasn't an upgrade

13   charge.  There wasn't an additional charge.  You couldn't call

14   STOPNC and say, I'd like to come by and pick up a vial, pick

15   up gloves and administer it myself.

16        The first and most important point here is that

17   STOPNC is not in the business of selling methylprednisolone

18   acetate, number one.

19        Number two, Mr. Nolan's argument that the crafty

20   lawyer can decide what law applies based on what you put in

21   your complaint was rejected unequivocally by the Tennessee

22   Supreme Court on October 8th, 2015 in the case of *Ellithorpe*

23   *vs. Weismark*.  In that case there was a counselor handling a

24   very nasty -- well, handling the children of a very nasty

25   divorce.  She was accused of not communicating with the

1    parents and, therefore, she was sued, and the plaintiff lawyer

2    said this isn't a malpractice case.  This is not a psychiatric

3    or psychological malpractice case.  This is a case where we're

4    saying she didn't do what the Court told her to do.

5         Well, the Tennessee Supreme Court on October 8th,

6    2015 said no matter how you characterize it, it's still

7    covered by the Healthcare Liability Act of 2011, which covers

8    all issues.  It is the sum source and sum total of the law

9    that governs it, and that's the same point we're making here,

10   because this is clearly a transaction that is related to the

11   delivery of healthcare.

12        These patients as a group -- most of them had chronic

13   low-back pain.  They were referred by a neurosurgeon to

14   STOPNC, and John Culclasure, an anesthesiologist M.D. by

15   training, injected methylprednisolone acetate into the

16   epidural space using fluoroscopy for guidance, and then they

17   were followed by nursing staff thereafter.  It is

18   unequivocally related to the delivery of healthcare, and

19   that's when and where the Tennessee Healthcare Liability Act

20   applies, so says the Supreme Court on October 8th.

21        Third point, an area where Massachusetts and

22   Tennessee are similar, when you have a hybrid transaction, Mr.

23   Nolan says they can proceed on a products liability theory on

24   one hand and a malpractice theory on the other.

25        Tennessee and Massachusetts are the same, and the

1    answer to that is no.  What the Court must do is look at the

2    predominance, what predominates.  Is it services or is it

3    product?  And if services predominate, then product liability

4    law does not apply, and we've briefed that at length.

5         And given that -- I'm sure your Honor is very

6    familiar with Massachusetts law on this point, but in the case

7    where there is a predominance of services, even if there is a

8    sale, which there wasn't here, the strict products liability

9    -- the UCC liability in Massachusetts does not apply.

10        The next thing I need to address is what I

11   respectfully submit is a fundamental problem with the

12   plaintiffs' position in this case.  They say there is no

13   conflict in the law and that this Court need not make a choice

14   between the Tennessee Products Liability Act and the Tennessee

15   Healthcare Liability Act.  That's just not true.

16        If you look at the sections of the law that state

17   what they apply to, you will find in succinctly the following:

18   The Tennessee Products Liability Act applies to every injury

19   caused by a product, no matter what you call the theory.  The

20   Tennessee Healthcare Liability Act, on the other hand, says it

21   applies to every injury arising from healthcare services

22   provided by a healthcare provider which is related to

23   healthcare or healthcare that should have been provided.

24        There's a conflict in application of the two

25   statutes.  They do overlap.  And under Tennessee law, the more

1    recent statute governs, first of all; and, secondly, under the

2    predominance test, since this -- services clearly predominate

3    here, the Healthcare Liability Act must govern.

4            I respectfully disagree very much so with Mr. Nolan's

5    description of an opinion that even if all of you have

6    practiced law in Tennessee for many, many years, the *Owens vs.*

7    *Truckstop*s opinion is one that leads many people to scratch

8    their head and wander away, read it again and get a different

9    feeling, but I will invite the Court to take a look at Page

10   433 of the opinion, which absolutely makes clear that what he

11   told you is wrong.

12           And that is, in that case they held that if the

13   third-party defendants charged with strict liability in tort

14   are also charged with negligence, as in our case, their

15   liability on the negligence claim will be several only.

16           So, it is not at all clear that *Owens* has any

17   application.  Do you understand the circumstances?  An

18   individual goes into a truckstop and falls off a stool.  He

19   sues the truckstop.  He does nothing about his case for two

20   years.  The truckstop then files a third-party action against

21   the designer of the stool and the seller.  They do nothing

22   about the case for three years.  Then the law in Tennessee

23   changes in the *McIntyre* decision in 1992 when the Tennessee

24   Supreme Court wiped away contributory negligence and adopted

25   comparative fault.

1          At that stage the defendant asserts comparative fault

2    against the two entities that used to be in the third-party

3    action.  The plaintiff says I'd like to do the same thing,

4    too.  Barred by the statute of limitations.

5          So, the ultimate holding is that they're not going to

6    let the defendant assert comparative fault and they are going

7    to hold the defendant responsible for everything that may have

8    happened to a defective stool, but they're still going to let

9    him pursue a contribution action which had been eliminated by

10   the *McIntyre* decision.  It's a transitional opinion that's out

11   on an island all by itself.

12         It also says that if this case occurred after the

13   adoption of comparative fault, the results would be different.

14   Well, these cases all occurred after the adoption of

15   comparative fault.  *Owens* is of no use and of no help in

16   making the decision in this case.

17         Final point, *Owens* did not involve a healthcare

18   provider at all.

19         We ask you to decide the case in the following

20   fashion:  That the claims in this case arise from or are

21   related to the delivery of healthcare, that the Tennessee

22   Healthcare Liability Act governs all these claims, that the

23   Products Liability Act of 1978 does not, that this Court will

24   follow the holding in *Ellithorpe vs. Weismark,* and, last, that

25   this Court will join the majority of the jurisdictions around

1    the country which hold that when a physician or an ambulatory

2    service provider, like STOPNC, is providing services,

3    including products as well, that the doctrine of strict

4    products liability does not apply.  Who said that so far?

5    Restatement of Torts Third ALR, and 31 of the 33 states that

6    have considered this issue.

7            Now, do you have any questions, your Honor?

8            THE COURT:  I don't think so.

9            MR. GIDEON:  Thank you.

10           THE COURT:  Crystal clear.

11           MR. GIDEON:  Thank you.

12           THE COURT:  And I will take the papers.

13           You don't have anything else, do you?

14           MR. NOLAN:  A couple of brief points, if that's all

15   right.

16           THE COURT:  You have to respond to the *Owens* case,

17   right?

18           MR. NOLAN:  No.  I just wanted to mention the

19   *Ellithorpe* case and that's the only case, and I also encourage

20   the Court to read that opinion carefully, because what it said

21   was that the Healthcare Liability Act applies to all claims

22   alleging healthcare providers caused an injury.  We all agree

23   on that, but that's not what our product liability claims do.

24           THE COURT:  Thank you.

25           MS. GREER:  Your Honor, Marcy Greer for the Saint

1    Thomas Entities.

2           Just for the record, we have adopted and joined in

3    the argument of the Tennessee Clinic Defendants, all the

4    summary judgment materials, et cetera.

5           THE COURT:  So, that's it, right?

6           MR. GIDEON:  Judge Zobel, since we also filed a

7    motion, can I have 60 more seconds, please?

8           THE COURT:  Is everybody agreed you can have 60 more

9    seconds?

10          MR. GIDEON:  Or 75.

11          THE COURT:  60.

12          MR. NOLAN:  No objection.

13          MR. GIDEON:  60.

14          The other thing I wanted to mention that I really

15   thought was astonishing in the PSC's briefs, one of the

16   arguments they make was there was no other law in Tennessee

17   that said at any time that the delivery of healthcare products

18   in conjunction with healthcare was anything other than a

19   service.

20          Well, that's just not true.  I encourage the Court to

21   look at TCA 47-2-316, which has been on the books since 1967,

22   that says --

23          THE COURT:  It's probably outdated.

24          MR. GIDEON:  It's still good law.  Still good law.

25          -- that says that a whole series of things that

```
1    involve finite products are not anything other than the
2    delivery of medical services, and that was an important
3    omission in the PSC's brief.  I thank you.
4             THE COURT:  Thank you very much.
5             Now, I think that's all we need to hear today, right?
6    Oh, no.  There is the motion to strike the two cases that
7    disappeared.
8             MS. JOHNSON:  That's correct, your Honor.
9             THE COURT:  Are you arguing that?
10            MS. JOHNSON:  I am not.  That's actually Saint
11   Thomas' motion.  They made it.  I suggest they go first.
12            MS. GREER:  Your Honor, Marcy Greer for the Saint
13   Thomas Entities, and this motion is also joined in by the
14   Tennessee Clinic Defendants.
15            Basically, the Court has spent a number of hours,
16   many, many months, lots of briefing developing a Bellwether
17   procedure.  We've talked at length since we came in the case
18   three years ago about that process and making it fair and
19   balanced as well as representative.
20            THE COURT:  Is the question in this case what Rule
21   41(a) means?
22            MS. GREER:  Yes, sort of, but it's also what it means
23   in the context of a Bellwether setting where we have designed
24   this procedure, because what is effectively happening is that
25   if the PSC is allowed to dismiss these cases without
```

1   consequence, whether under a voluntary dismissal, a

2   stipulation or a -- well, stipulation would require our

3   consent, but -- or a motion from the Court, however it

4   happens, if they get a free range to do that, they're

5   effectively getting unlimited strikes, and right now we

6   started with 15 Bellwethers.  There was one that was cross

7   designated.  We have struck two of them.  They've now pulled

8   down two more.  If that's allowed to occur, we're down to

9   eleven plaintiffs and there's still six strikes to exercise.

10          And what's even more concerning to us is that the PSC

11   will get -- just continue to dismiss cases that they think

12   should not be in the Bellwether pool, and there are very

13   strong principles against that, because we don't have that

14   same ability.  You know, we've moved to dismiss, but we have

15   to get a Court order, and they can dismiss at will under their

16   theory.

17          THE COURT:  But that depends, does it not, on whether

18   or not there was an answer --

19          MS. GREER:  Well, it doesn't --

20          THE COURT:  -- or whether the answer that was filed

21   to the master complaint covers these cases?

22          MS. GREER:  It does, in part, yes, your Honor, it

23   does, because -- and we have filed a master answer.

24          Let me take you back to how we got to the procedure

25   that we have with the master answer.  We were the ones

1  advocating for a procedure that's used in most of these types

2  of cases, the MDLs, of one master complaint that applies to

3  the defendants and then short-form answer -- complaints that

4  can be answered with short-form answers in the individual

5  cases.

6         The PSC chose not to do that after the Court ordered

7  it.  The PSC instead put all of their allegations against the

8  Saint Thomas Entities in the short-form complaints and then

9  adopted in most cases their long complaints, the individual

10  complaints from before.  So, what we were faced with by virtue

11  of them following this unprecedented procedure --

12         THE COURT:  No.  I understand the history.  I

13  understand the history.  I'm just wondering what -- I'm trying

14  to understand the technical issue as to why these cases --

15  what should happen to these cases.

16         MS. GREER:  Well, the --

17         THE COURT:  You suggested either that I should order

18  they're dismissed with prejudice or -- I don't know exactly

19  what else you would like me to do.

20         MS. GREER:  Or to treat them as strikes.  The PSC

21  gets four strikes from the Bellwether pool, just like we do,

22  and if you were to require them to treat these as strikes as

23  opposed to just a pure voluntary dismissal without

24  consequence, that gets us closer to remedying the issue that

25  we're most concerned about.

```
 1              THE COURT:  Okay.  I know you're agreeing.  Mr.
 2    Stranch.
 3              MR. STRANCH:  Your Honor, I've never seen a defendant
 4    fight so hard to avoid a plaintiff giving up.
 5              THE COURT:  Yes, but are you giving up?  I mean, if
 6    it's not with prejudice, then the next thing that happens is
 7    the Bellwether trials take place and then there are settlement
 8    discussions and suddenly these plaintiffs want to be back in.
 9              MR. STRANCH:  Well, your Honor, let me give you a
10    little bit of history about these categories of cases.
11              Tennessee, as we know, has a one-year statute of
12    limitations.  So, people have to file their cases within a
13    year, and at the time that that year was running, we didn't
14    truly appreciate the latency of the fungal meningitis.  There
15    were still times in which people were developing fungal
16    meningitis and the fear was you may get a year and a half down
17    the road, develop fungal meningitis and then not be able to
18    bring your case.
19              THE COURT:  What is the incubation period, or
20    whatever it's called?  What is it called?
21              MR. STRANCH:  The fungal meningitis?
22              THE COURT:  Yes.
23              MR. STRANCH:  The incubation period was initially
24    thought to be 180 -- was thought to be 90 days or less, and
25    then people started developing it 120, 180 days having
```

1    relapses.  And so, they weren't really sure what it was and

2    that's --

3            THE COURT:  Even now?

4            MR. STRANCH:  I don't know that there's ever been

5    scientific consensus on exactly what it is, to be honest with

6    you, your Honor, but --

7            THE COURT:  So, what's the consequence to these

8    plaintiffs who have now dismissed their cases?

9            MR. STRANCH:  I mean -- your Honor, I'll be perfectly

10   frank with the Court.  We don't represent them.  They have

11   their own lawyers.  We can't control whether they dismiss or

12   not, but we have a statute of repose in Tennessee that's three

13   years and we're outside of that.  So, whether it's with

14   prejudice or without prejudice, it's going to be hard for them

15   to bring their case back, and I don't know what conversations

16   they had with their lawyers, but I would postulate to the

17   Court that what occurred was the lawyers sat down with them

18   and said, Here's your potential damages and here's what it's

19   going to cost to go to trial.  And those people decided, You

20   know what?  I'm not willing to do that, then.

21           And just so the Court knows, these aren't the only

22   two cases that have been voluntarily dismissed recently.

23   There's been additional cases, I believe seven or eight, that

24   are not Bellwethers that were also dismissed in the last month

25   or two, I presume for the same reasons, because there were

1    also people in that category six and seven that did not

2    develop fungal meningitis.

3         THE COURT:  What's the plaintiffs' position as to the

4    possibility or the probability of these cases coming -- trying

5    to come alive again?

6         MR. STRANCH:  I mean, I think -- I don't think

7    they're going to -- I mean, your Honor, I'm not going to say

8    never, but I don't see a way in which they could bring them

9    alive again, to be perfectly frank with the Court.

10         THE COURT:  Well, if that's so, why not dismiss with

11    prejudice?

12         MR. STRANCH:  Your Honor, I didn't file the notice of

13    voluntary dismissal.  That was decided between those

14    plaintiffs and their lawyers and that's the way they did it.

15    You know, I did speak with the lawyer for them and he said if

16    it needs to be with prejudice, he's okay with that and so are

17    the clients.  So, I really think it's much ado about nothing.

18         THE COURT:  Okay.

19         MR. STRANCH:  And --

20         THE COURT:  And assume for the moment it is with

21    prejudice.  Then does it also count as a strike?

22         MR. STRANCH:  I do not believe it should, your Honor,

23    because the PSC didn't dismiss these cases.  You know, this is

24    not something we did, you know.  We didn't say -- we didn't

25    dismiss these cases.  We don't have the authority to.  You

1    know, we're just getting our cases ready for trial.  This is

2    not like in the FEMA cases where all the discovery had already

3    been done and the case is going to be tried in a couple of

4    days and they try to voluntarily dismiss.  I mean, this is

5    before any discovery was done case specific of these people.

6              THE COURT:  Okay.

7              MS. GREER:  Your Honor, the idea that the PSC doesn't

8    speak for these plaintiffs rings really hollow.  We're talking

9    about an MDL where the PSC has been appointed for precisely

10   that purpose.  For them to come in and say, Oh, we had nothing

11   to do with this and it shouldn't count against us is simply

12   not fair.

13             The Bellwether procedure is designed to deal with all

14   of the plaintiffs in this pool, and that is what we have been

15   operating under.  That's what we've been trying to get to for

16   all this time and that's what the Court has ordered.  And for

17   them to say, Oh, well, these people voluntarily dismissed

18   these cases, but there's no consequence to us, we're going to

19   start seeing every case where they think that they don't have

20   the best advantage get voluntarily dismissed, and it's going

21   to be blamed on people who are not before the Court,

22   supposedly.  They brought their cases.  They wanted to be in

23   the MDL, and they need to play by the rules.  They should

24   be --

25             THE COURT:  If they are dismissed with prejudice, is

1    there any reason why you couldn't nominate another case of the

2    same character?

3           MS. GREER:  Well, we've only got 117 cases and we're

4    trying to get -- we got five different categories of injury.

5           THE COURT:  So, the --

6           MS. GREER:  The PSC wants to dismiss all of the fear

7    cases, the no-injury cases, and the ones where they're not

8    going to get big damages because they want to focus only on

9    the severe injury cases, which, you know, is certainly their

10   position, but the point is that's why we have the strikes, is

11   to avoid the outliers.  They're going to keep getting these

12   cases voluntarily dismissed, and the point of having a pool is

13   to have a fair shot by each side to eliminate the outliers.

14          THE COURT:  But I don't understand how you're harmed

15   if they are -- if these two cases are dismissed with prejudice

16   and you're entitled to nominate two more cases that are

17   exactly the same category.

18          MS. GREER:  As long as it -- I mean, it's going to

19   keep going on, your Honor, is my concern.

20          THE COURT:  Well, maybe.  Maybe not.

21          MS. GREER:  Well, perhaps, maybe that would be an

22   appropriate resolution here, would be to allow us to appoint

23   some additional cases.

24          THE COURT:  Okay.

25          MS. GREER:  But the Court would need to order that

1    any further dismissals from the Bellwether pool would count as

2    strikes, and that might be one way to remedy it, because,

3    otherwise, they're going to end up with unlimited numbers of

4    strikes to get all the cases they don't want tried out and get

5    to the number that they want.

6              THE COURT:  But they get rid of all the fear cases

7    without having to pay a dime.

8              MS. GREER:  That's 26 percent of the cases.

9              THE COURT:  But why do you care?  They're gone.

10             Anyhow, I will take the papers and think about it.

11   Thank you.

12             MR. STRANCH:  Thank you, your Honor.

13             THE COURT:  That takes care of all of the motions as

14   to which argument was sought.

15             There is one other motion that I think I allowed.

16   Premier Orthopedic and Sports Medicine motion to dismiss

17   product liability claims, and I believe I allowed that, and

18   the motion itself does not include the order that they want me

19   to sign.  I couldn't find it.  So, if an order is requested,

20   then could I, please, have the order and I will be happy to

21   sign it.

22             MR. WOLK:  Judge, I'll be happy to file that tomorrow

23   for your Honor.

24             THE COURT:  Any time.  Any time.

25             MR. WOLK:  Okay.  So, then we can consider that --

```
1            THE COURT:  I think it was allowed.

2            MR. WOLK:  Okay.  Yes, it was unopposed, your Honor,

3    and it had not been discussed at the previous conference.

4    That's why I requested it be put on the agenda.  So, I'll send

5    in the order so your Honor can sign it.

6            THE COURT:  Okay.  Thank you.

7            MR. WOLK:  Thank you, Judge.

8            THE COURT:  Finally, there is a plaintiffs' motion,

9    Docket No. 2303, for leave to file exhibit under seal.  I

10   don't know whether that's addressed to Judge Boal or to me,

11   but to the extent it's addressed to me, I only want to allow

12   it if the matters are really confidential and not just because

13   a lawyer says, Well, under our protective order, somebody

14   said, I don't want it public.  So, if it's truly confidential,

15   then counsel could tell me that and I will allow sealing, but

16   we really want to keep sealing to an absolute minimum.  That

17   is Docket No. 2303.  I'm sorry, the other one was 2387.

18           MS. JOHNSON:  Your Honor, I believe that 2303 was

19   part of the PSC's motion for partial summary judgment that you

20   just heard this morning.

21           THE COURT:  Well, in that case, I'm not allowing it

22   until I get some kind of suggestion, at least, by counsel that

23   the document is, indeed, to be confidential and not just

24   because a lawyer under protective order could do it.

25           MR. STRANCH:  Your Honor, we'll take a look at that.
```

```
 1   We'll get with whoever designated it confidential and work it
 2   out.
 3            THE COURT:  Thank you very much.
 4            I think that's all I had, and we now go to -- Judge
 5   Boal has dealt with Item A.  I think we have dealt now with
 6   Item B.  And we now come to C, the report to the Court.
 7            MS. JOHNSON:  Yes, your Honor.  Thank you.
 8            Item No. 4, status of the bankruptcy.  Mr. Gottfried
 9   will provide that report.
10            MR. GOTTFRIED:  Good afternoon, your Honor.
11            THE COURT:  Good afternoon.
12            MR. GOTTFRIED:  I have three things to report to the
13   Court.  The first --
14            THE COURT:  I hope they're good.
15            MR. GOTTFRIED:  Say again.
16            THE COURT:  I hope they're good.
17            MR. GOTTFRIED:  They are good.
18            THE COURT:  Terrific.
19            MR. GOTTFRIED:  The first is that all allowed
20   unsecured claims have been paid.
21            THE COURT:  Terrific.
22            MR. GOTTFRIED:  Second, Judge Boroff held a hearing
23   yesterday on the post confirmation officer's first omnibus
24   objection to claims and those claims have been resolved as
25   requested by the post confirmation officer.  There is an
```

```
 1    additional couple of claims that will be heard on January 6th,
 2    but the claim objections process is proceeding efficiently and
 3    moving forward in a quick fashion.
 4          And then, lastly, we are going to be announcing for
 5    probably early to mid January an option to sell off the
 6    equipment that's been left.  And so, we will be in the process
 7    of finalizing that as well.  So, good progress is being made,
 8    your Honor.
 9          THE COURT:  Thank you very much.
10          MS. JOHNSON:  Item No. 5, the status of the insurance
11    declaratory judgment actions in the Specialty Surgery Center
12    cases.  I understand that competing proposed certification
13    orders --
14          THE COURT:  Excuse me one minute.
15          On my docket this is Item No. C(8), insurance
16    declaratory judgment.
17          MS. JOHNSON:  If I could hand up to the Court -- we
18    filed --
19          THE COURT:  I have a corrected one.
20          MS. JOHNSON:  We have filed a corrected agenda.  I
21    have copies, if I could hand that up.
22          THE COURT:  Thank you.
23          (Attorney Johnson hands document to the Court.)
24          THE COURT:  Okay.  Sorry.
25          MS. JOHNSON:  So, as to the Specialty Surgery Center
```

1    declaratory judgment action, the parties have filed competing

2    certification orders and that continues to progress.

3           No. 6, the status of discovery.  Judge Boal has

4    issued a number of orders in the past month and we -- the

5    parties mentioned something this morning, but we are all very

6    appreciative of how much work and how quickly Judge Boal and

7    her staff has been able to turn things around here, and we

8    know that the schedule we've set would not be possible without

9    that.  So, we very much appreciate it.

10          I don't think any of those particular orders warrant

11   discussing, given the proceedings that we had this morning,

12   your Honor, unless you wish to talk about any specifically.

13   Thank you.

14          MR. STRANCH:  Judge Boal is going to do a victory lap.

15          MS. JOHNSON:   Item 7, the status of the litigation

16   track.  The 7(a), Mr. Sobol regrets that he was not able to

17   attend.  So, I will give the report in his stead.

18          The report is simple.  The Plaintiffs' Steering

19   Committee has solicited and collected time and expense records

20   from attorneys who wish to be considered for a common benefit

21   fee award.  We are in the process of reviewing time and

22   conducting interviews of firms that have made those

23   submissions.  We expect interviews will start and we hope

24   finish in January, and we would anticipate making a

25   recommendation or otherwise a report to the Court in the first

1    part of next year.

2         7(b), and this is really to simply alert the case to

3    an -- to alert the Court to an upcoming deadline.  There is

4    currently a stay of discovery in place as to clinics that

5    have -- I believe the number is four or fewer cases against

6    them in the MDL, and that stay expires sometime in December, I

7    believe it's the 31st.  The PSC intends to make a filing

8    asking the Court to extend that deadline.

9         I understand we're still speaking with some of the

10   counsel for particular clinics and we're hoping that we can do

11   something jointly or at least with some consensus behind it

12   and we anticipate making that, I would hope, this week and

13   maybe next.

14        THE COURT:  Okay.  It certainly would be nice if it

15   could be done by consensus.

16        MS. JOHNSON:  Yes, we are trying.

17        7(c) Mr. Stranch will address.

18        MR. STRANCH:  Thank you, your Honor.

19        MAGISTRATE JUDGE BOAL:  Actually, I had a question

20   about (i), the motion for extension of common fact discovery

21   deadline applicable to cases naming Box Hill defendants to

22   March 25th.  I know that was filed this week.  Does the PSC

23   anticipate objecting to that?

24        MS. JOHNSON:  My understanding, your Honor, is that

25   we do not anticipate objecting.  I believe that was filed as

1   an unopposed motion, but I would prefer to speak -- confirm

2   that with counsel for the particular Box Hill plaintiffs, but

3   I would suggest to you that we can do that and let the Court

4   know within a day or two.

5           MAGISTRATE JUDGE BOAL:  So, my next question is -- I

6   had, I think, earlier this month endorsed an order making the

7   Premier and Box Hill deadlines the same.  So, should this

8   motion also apply to the Premier defendants?

9           MR. WOLK:  That is one that we intended to at some

10  point join, your Honor, but because it was filed as a motion

11  to extend, then we had more time to do that --

12          MAGISTRATE JUDGE BOAL:  I think you need to sit down.

13          MR. WOLK:  I'm sorry.

14          That is a motion that we intended to join.  I don't

15  think that the deadline for joining that or filing a reply to

16  that has come yet.  So, we did intend to join that at some

17  point.

18          MAGISTRATE JUDGE BOAL:  None of the deadlines have

19  expired.  If I can rule on it next week or this week -- it

20  seemed to me that you were then going to ask to join it.  So,

21  I'm asking you now whether you would like to join it.

22          MR. WOLK:  And we would.  Yes, we would, your Honor.

23          MR. KIRBY:  And, your Honor, just to explain.  The

24  motion explained itself that it was with the assent of the --

25          THE COURT:  Can you please identify yourself.

1          MR. KIRBY:  I'm sorry.  Gregory Kirby on behalf of

2     the Box Hill defendants.

3          The motion itself that I filed was with the assent of

4     the plaintiffs in that case.  So, there was no --

5          MAGISTRATE JUDGE BOAL:  That's what was not clear to

6     me.  It looked like it was specific to certain plaintiffs

7     rather than it had been assented to by the PSC.

8          MS. JOHNSON:  To the extent there's any ambiguity,

9     the PSC assents to that extension.

10         MAGISTRATE JUDGE BOAL:  And then you would also ask

11    on behalf of the Premier defendants for the same extension?

12         MR. WOLK:  That's right.  If I have to confer with

13    the PSC, I'll do that, unless your Honor is inclined to grant

14    that.

15         MAGISTRATE JUDGE BOAL:  No, but I understood Ms.

16    Johnson to say you needed to check with counsel who is in

17    charge of the New Jersey cases.  Did I understand that --

18         MS. JOHNSON:  I think as a matter of diplomacy, I

19    should at least have a discussion.

20         MAGISTRATE JUDGE BOAL:  All right.  So, if I hear

21    nothing by next Monday, then I'll understand that I can grant it.

22         MS. JOHNSON:  Excellent, your Honor.

23         MAGISTRATE JUDGE BOAL:  And join in the Premier

24    defendants.

25         MR. WOLK:  As to both.  Okay.  Thank you, your Honor.

```
 1              MR. STRANCH:  That brings us to the motion to amend

 2     to add Calisher.  As we discussed at the last status

 3     conference, we filed that motion and Calisher was weighing

 4     what they wanted to do.  They've decided not to oppose that

 5     motion and have not filed a response.  So, it is ripe for

 6     granting.  And so, we would just ask that the Court go ahead

 7     and grant that motion.

 8              THE COURT:  No opposition at all?

 9              MR. STRANCH:  No.

10              THE COURT:  Okay.  It's allowed.  This is No. 2380,

11     is the motion, right?

12              MAGISTRATE JUDGE BOAL:  Can I just ask for a

13     clarification?  Which group does the Specialty Surgery Center

14     fall into?

15              MR. STRANCH:  The Specialty Surgery Center is one of

16     the Tennessee clinics.  It was the clinic on the Cumberland

17     Plateau in east Tennessee, and they are on a slightly

18     different time track.  In fact, we filed a motion to try to

19     establish new dates for that because we're adding Calisher in.

20     We've also got the motion to compel that we'll discuss in a

21     little bit when it comes up relating to modification of

22     documents and not turning them over.  We'll talk about that in

23     a minute.

24              MR. GIDEON:  Judge Boal, Specialty Surgery Center

25     includes the names Jean Atkinson who was the Debbie Schamberg
```

1    there, Kenneth Lister who was the John Culclasure, and that is

2    the facility that is the subject of the declaratory judgment

3    action pending before Magistrate Brown and Chief Judge Sharp

4    in Nashville, the declaratory judgment action filed by State

5    Farm.

6              MAGISTRATE JUDGE BOAL:  Thank you.

7              MR. STRANCH:  And to be clear, none of the

8    Bellwethers come from the Specialty Surgery Center pool of

9    cases.  They're all Saint Thomas cases.

10             THE COURT:  Now, part (d).

11             MS. JOHNSON:  That brings us to 7(d).

12             Since the last status conference, the PSC filed a

13   list of cases that had been self identified by plaintiffs'

14   counsel that name only settling defendants and for which it

15   would be appropriate for the Clerk to notate the dismissals.

16             We did have -- working with the Clerk, we submitted a

17   corrected version of that list.  We believe that list to be

18   fully correct now and it will be appropriate -- I don't mean

19   to be telling the Clerk what to do.  So, I don't mean in that

20   sense, but it would be appropriate that those cases be

21   dismissed at this point.

22             THE COURT:  They're to be dismissed based on the fact

23   that the only people they sued have now settled and the cases

24   are, therefore, completed?

25             MS. JOHNSON:  That is correct, your Honor.

```
 1                THE COURT:  So, it's, in essence -- is it a judgment

 2      that we're entering, or what?

 3                MS. JOHNSON:  It is a judgment that you are entering

 4      pursuant to the Court's earlier order implementing this

 5      process, indicating that judgment would be entered for those

 6      list of cases that were to be provided at a later date.

 7                MAGISTRATE JUDGE BOAL:  And if I could just ask -- I

 8      know they're not here, but there was a motion by some of the

 9      defendants in the criminal case to continue to participate in

10      discovery here based, in part, because they said the Court had

11      not entered judgment dismissing them from the MDL.

12                MS. JOHNSON:  Correct.

13                MAGISTRATE JUDGE BOAL:  So, does some order from the

14      Court in response to the list of cases that you've now filed

15      need to be entered before they are dismissed from the case?

16                MS. JOHNSON:  So, we tried to deal with this in a

17      little bit of a backwards way.  So, the Court entered the

18      order that the Court previously entered said -- asked the PSC

19      to provide a list of cases, and that earlier order said that

20      judgment would then be entered in that list of cases.  So, I

21      believe the Court has already entered an order entering

22      judgment, and all that needs to be done now is to have the

23      Clerk notate that judgment has been entered in each of the

24      cases that appear on that list.

25                THE COURT:  So, simply a judgment dismissing the
```

```
 1   case?

 2          MS. JOHNSON:  That's correct.  And it is a -- it is

 3   truly, your Honor, at this point in time, your Honors,

 4   procedural in that the Court has already dismissed all of the

 5   claims against these defendants.  So, now this is the

 6   important but somewhat ministerial work of correcting the

 7   dockets.

 8          THE COURT:  Do you know -- the list that you filed on

 9   the corrected list, do they have docket numbers?

10          MS. JOHNSON:  They do, your Honor, yes, individual

11   civil action numbers for each case.

12          THE COURT:  So, the 2450 is the list -- includes the

13   list?

14          MS. JOHNSON:  Yes, your Honor.

15          THE COURT:  Okay.

16          MS. JOHNSON:  The list may be 2450-1.  I can't

17   remember, but it's associated with that entry.

18          THE COURT:  Okay.  Thank you.

19          MS. JOHNSON:  No. 8 is inadvertently included from

20   last time.  We talked about the Michigan proceedings last

21   time.  So, there's no further update there.

22          No. 9.  Ms. Martin asked that I apologize to the

23   Court.  She had to leave in order to make another engagement,

24   but she wanted me to inform the Court that there was no

25   additional pro se activity this month.
```

```
 1              THE COURT:  Thank you.

 2              MS. JOHNSON:  On No. 10, in terms of scheduling.  We

 3    discussed with Judge Boal this morning that I believe the --

 4    January 14th Judge Boal will also hold a hearing after the

 5    status conference following the status conference, instead of

 6    separately on January 15th.

 7              THE COURT:  So, January 15th is out?

 8              MS. JOHNSON:  Correct.  I'm sorry, that's not really

 9    my place to say, your Honor, but I believe that's what you

10    said.

11              MAGISTRATE JUDGE BOAL:  You're accurately reporting

12    what took place this morning.

13              MS. JOHNSON:  Thank you.

14              And in terms of the February 11th, we also talked

15    about Judge Boal holding her hearing following the status

16    conference that day as well.

17              THE COURT:  Instead of at 11:30?

18              MAGISTRATE JUDGE BOAL:  Yes.

19              MS. JOHNSON:  And while this does not say it --

20              THE COURT:  Do we have a hearing at 2 o'clock on that

21    day?

22              COURTROOM DEPUTY CLERK URSO:  Yes.

23              THE COURT:  February 11th?

24              COURTROOM DEPUTY CLERK URSO:  Yes.

25              THE COURT:  Okay.
```

```
 1          MS. JOHNSON:  And could we request a March date?

 2          COURTROOM DEPUTY CLERK URSO:  Do we have a date in

 3    mind?

 4          MS. JOHNSON:  I would suggest March 10th.

 5          COURTROOM DEPUTY CLERK URSO:  Sure.  I'll rearrange

 6    the schedule.  I'll switch something over that we have on.

 7    So, March 10th, at 2:00.

 8          THE COURT:  Okay.  And, again, the same, Judge Boal

 9    in the morning and this in the afternoon or are we permanently

10    going to 2 o'clock to be followed?

11          MS. JOHNSON:  I would suggest that's -- the parties

12    can make it work to Judge Boal's discretion.

13          THE COURT:  It's up to you.

14          MAGISTRATE JUDGE BOAL:  I'm available as of now both

15    the morning and the afternoon.  So, I don't -- I think it

16    sometimes depends on the volume.  So, it's probably safer for

17    us to put -- I'm not encouraging volume, but if we put it at

18    11:30, it gives us enough time, I suppose, to deal with

19    everything.

20          MS. JOHNSON:  Thank you, your Honor.

21          That then brings us to fully-briefed motions, and

22    while I don't think we need to address all of these, I did

23    want to address No. 11 with the Court's permission.  I believe

24    this would be addressed to Judge Boal.

25          The PSC has not filed a formal response, but we did
```

1    want to share with the Court our perspective on this issue,

2    which is that, from our perspective, the protective order and

3    the deposition protocol do not permit non-parties to

4    participate in depositions where confidential or otherwise

5    protected information is used.

6              It's very clear to the PSC that the Insiders and NECC

7    and the affiliated defendants are no longer parties in this

8    litigation.  Certainly, not in any meaningful way.  There may

9    be a procedural quirk they're still on the docket as a party

10   because a particular civil action has not yet been dismissed,

11   but as all the claims against them have been dismissed,

12   they're not really parties and certainly not in the ordinary

13   sense.

14             From the PSC's perspective, it's a distraction to

15   have additional participants in these depositions, and I don't

16   say that in any way to malign their counsel or suggest they've

17   not been behaving appropriately.  It's simply additional

18   bodies and additional people participating and, particularly,

19   in terms of scheduling and things like that, it's just -- it's

20   a bit of a distraction.

21             THE COURT:  Are they participating or are they simply

22   sitting in?

23             MS. JOHNSON:  My understanding is that they are

24   participating largely by telephone.  They're listening.

25   They're not -- and anyone in this courtroom who knows

```
1    otherwise should speak up.
2            MR. STEIN:  I'm sorry, your Honor.  Cal Stein
3    representing Barry Cadden.  I'm colleagues with Michelle
4    Peirce who filed the motion.  If I may.
5            Yes, we are just --
6            MR. ELLIS:  Come to a microphone.
7            MR. STEIN:  I'm sorry.
8            THE COURT:  You can go in the witness box.  There's a
9    mic in the witness box.  All you got to do is turn it on.
10           COURTROOM DEPUTY CLERK URSO:  It's on, Judge.
11           MR. STEIN:  Can you hear me?
12           THE COURT:  You can even sit down.
13           (Discussion off the record.)
14           MR. STEIN:  This is a spot I've never sat in.
15           THE COURT:  Lucky you.
16           MR. ELLIS:  You're fortunate.
17           MR. STEIN:  Do we have it now?
18           THE COURT:  Yes.  Perfect.
19           MR. STEIN:  Yes, your Honor.  We are just looking to
20   be able to log in remotely and continue to watch and listen to
21   the depositions and get transcripts, as we have been all
22   along.  We are not looking to participate, show up at the
23   locations of the depositions or ask any questions.
24           MAGISTRATE JUDGE BOAL:  Thank you.
25           THE COURT:  Okay.  You're welcome to stay there if
```

```
1    you want.

2              MR. STEIN:  Then I will.  Thank you.

3              MR. SCHRAMEK:  Your Honor, Adam Schramek for the

4    Saint Thomas Entities.

5              I've been involved in this with respect to the issue

6    of the criminal defendants' attorneys reaching out to me

7    asking for call-in information and not knowing whether they're

8    a party, they're not a party, what should I do.

9              So, just from a practical point of view, we filed a

10   response saying we really don't care if they listen in or not

11   so long as -- and this is a very important qualification -- so

12   long as that is not going to be some basis for denying us

13   discovery in the future, because the government has taken the

14   position that they didn't want the criminal defendants

15   participating in the MDL.  So, they knew that the depositions

16   -- and, again, from our position, we don't care if they're

17   there or not, but that can't be used as a reason that we can't

18   get the evidence we need, which really includes two key

19   witnesses, Joe Connolly and John Notarianni, which are very

20   important for us to get, your Honor.

21             MAGISTRATE JUDGE BOAL:  Thank you.

22             MS. JOHNSON:  And I don't want to further complicate

23   this issue, your Honor.  So, I apologize sort of for bringing

24   this up, but there are documents in the repository and that

25   are, at least potentially, being used at these deposition that
```

1      were produced by non-parties, third parties or parties who are

2      not present before the Court today and they were produced

3      under the terms of a protective order and a deposition

4      protocol.  So, I'm loath to suggest that we need to solicit

5      input from people who really may have no fight in this game,

6      but just to make the Court aware of that.

7               MAGISTRATE JUDGE BOAL:  Thank you.

8               MS. JOHNSON:  I believe that brings us to No. 12,

9      which we have not requested argument for, but there is a

10     motion to certify for interlocutory appeal pending before the

11     Court.

12              THE COURT:  That's ready to decide?

13              MS. JOHNSON:  Yes, your Honor.

14              THE COURT:  Okay.

15              MS. JOHNSON:  No. 13, the Court has already indicated

16     it has been allowed, and Mr. Wolk says that he will provide a

17     proposed order.

18              And No. 14 is simply an enumeration of the choice of

19     law briefing previously filed.  There's nothing new there.

20              THE COURT:  Yes.

21              MS. JOHNSON:  On the briefing in progress...

22              (Discussion off the record.)

23              MR. STRANCH:  First, your Honor, for No. 15, the

24     emergency motion, I understand Judge Boal dealt with that this

25     morning.  So, that's taken care of.

1           As to No. 16, this is the motion that we mentioned

2     before where we discovered that the drug formulary had been

3     modified in April of 2013 to include on it the DepoMedrol that

4     was used in this case.  Previously it was not on the drug

5     formulary and, according to the terms of the formulary, if

6     it's not there, you're not supposed to be using it.

7           That document was not turned over to us in the

8     original document production.  We only got it through Calisher

9     as a third party because they had some emails where they made

10    the changes to the document.  So, that's a motion to compel

11    that we have pending and asking for the Tennessee defendant --

12    the Specialty Surgery defendant to (A) produce two witnesses

13    for a re-deposition who testified that that was in effect in

14    2012 when it wasn't.

15          MAGISTRATE JUDGE BOAL:  Well, I don't think -- they

16    haven't responded yet.  So, I'll put it on if it's fully

17    briefed for the next time.

18          MR. STRANCH:  Okay.  Thank you.

19          MS. JOHNSON:  That brings us, then, to a series of

20    motions where defendants are requesting access to the Rust/

21    Omni repository which houses qualified protected health

22    information or other health information protected by state

23    statute.

24          The PSC, as we discussed this morning, does not

25    substantively object to the request for access.  There are a

```
1    few details we need to work out in terms of who can access
2    what materials, but as we discussed with Judge Boal this
3    morning, we are going to -- all the parties that have filed
4    motions will sit down with the PSC and we'll try to submit a
5    jointly-proposed order.
6              And then as to the dispositive motions, I would only
7    note that 25 is the motion that your Honor referred to earlier
8    that really was part of what we heard this morning, as is 28.
9    Otherwise, that's it.
10             THE COURT:  Does anyone have anything else?
11             (No response.)
12             THE COURT:  Well, I wish you all a happy holiday and
13   -- oh, yes, Mr. Gideon.
14             MR. GIDEON:  Yes, ma'am.  I would like to ask the --
15             THE COURT:  Mr. Gideon's trumpet is coming up.
16             MR. GIDEON:  Pardon me?
17             THE COURT:  Mr. Gideon's trumpet.
18             MR. GIDEON:  Yes.  Yes.  In fact, my name is Clarence
19   Gideon.  When I was young I asked my dad, also Clarence
20   Gideon, when I heard on the news a story about Gideon versus
21   Wainwright, I said, Is that a relative of ours?  And my dad
22   said, No, no, no, no.
23             I don't know how to put this before the Court, but --
24   and I'm directing this to Judge Boal because it's a discovery
25   issue, but using the Massachusetts Board of Registration and
```

1    Pharmacy deposition as an example, counsel for the nonparty

2    criminal defendants, the Insiders, were seeking to be

3    included.  The Assistant U.S. Attorneys have been telling us

4    that one of the reasons they're opposing our efforts to take

5    depositions is because they can get access to information to

6    use at the trial.

7         We're going to need some guidance in terms of how to

8    handle this concretely.  The current order which we're

9    observing, everybody understands the deposition is

10   confidential for 30 days, but I'm, frankly, at a loss to know

11   whether we are permitted to vary from the notification process

12   to everyone who has ever been a party prospectively.  If an

13   order is entered dismissing all these claims against these

14   individuals, does that process then change?  Do we no longer

15   have to notify them, no longer have to give them access by

16   telephone to the depositions or not?  I don't think it's our

17   prerogative to just say, Well, we're not going to let you do

18   that because the AUSA doesn't want us to.  So, we need some

19   guidance so that we're not fighting this out with individuals

20   before each of these prospective depositions, which includes

21   depositions of experts coming up between now and February 19th.

22        THE COURT:  Is this matter before the Court -- before

23   either Judge Boal or before me in some formal way?

24        MR. GIDEON:  That's why I was asking, your Honor.

25   Should we submit a motion for clarification of the pending MDL

1    order?

2            THE COURT:  Well, whatever you title the motion, if

3    you want some relief from a problem, you got to tell us what

4    the problem is.

5            MR. GIDEON:  Okay.  All right.  We'll do it.

6            MR. STEIN:  Your Honor, excuse me.  I think this is

7    the same issue that's before the Court with respect to Barry

8    Cadden's motion to continue to attend the depositions in --

9            MAGISTRATE JUDGE BOAL:  I haven't read it today, but

10   my recollection is it's just a motion to attend the

11   depositions.  It doesn't necessarily deal with all the

12   collateral issues that Mr. Gideon has now raised about what's

13   to happen with deposition transcripts or things that might be

14   protected -- otherwise protected.

15           MR. GIDEON:  Correct.  And currently we're in this

16   no-man's zone where after 30 days, I don't know what the

17   status of that transcript is.  I know it's confidential for

18   30, but I don't know who has access to it prospectively, and I

19   don't want to be in a position where the AUSA tells us that by

20   virtue of failing to control access to the discovery, we have

21   affected a fair trial in this venue.

22           MAGISTRATE JUDGE BOAL:  Well, I agree absolutely with

23   Judge Zobel.  I'm not comfortable ruling on things on the fly.

24   I prefer to have documents that are filed that everybody can

25   comment on.  Obviously, if you all can agree on a proposed

1    amendment to whatever protocol we're talking about -- if you

2    think I need to stay the dissemination of depositions until we

3    work out a protocol, I'm obviously happy to entertain that

4    type of motion as well.  Certainly, I don't think you all

5    should be put in -- you're trying to litigate your own case,

6    right, and you don't want to get dragged into other people's

7    battles, but it is all very sensitive and it's very

8    complicated.  So, I would prefer to proceed on a written

9    motion.

10          MR. GIDEON:  Well, we will, at least from our

11   client's standpoint, respond to the Cadden motion

12   substantively and ask for guidance, and we join with Mr.

13   Schramek.  We don't care one way or the other, but we want

14   clear rules of the road as to what we're supposed to do.

15          THE COURT:  Well, include in your motion, please, a

16   proposed order.

17          MR. GIDEON:  We will.

18          MAGISTRATE JUDGE BOAL:  Yes.

19          MR. GIDEON:  Thank you.

20          THE COURT:  I have one question that was raised by

21   No. 28.  Is there actually a motion to stay decision on the

22   motions that I just heard this afternoon?

23          MR. GIDEON:  Yes.  And it's only to bring to your

24   attention that in the declaratory judgment case you were told

25   about a few minutes ago that's pending in Nashville, State

1    Farm versus Specialty Surgery --

2              THE COURT:  Pending a decision by the Supreme Court

3    of Tennessee?

4              MR. GIDEON:  Yes.  Judge Kevin Sharp, the Senior

5    Judge in Nashville, has ordered that the questions be

6    certified to the Tennessee Supreme Court.  Competing orders

7    were submitted on December 3rd, and we ask you in your

8    discretion to wait and see what they say, and that's the

9    motion.

10             THE COURT:  Now, is there opposition to that motion

11   to stay?

12             MR. STRANCH:  Yes, there is, your Honor.  We'll be

13   filing our opposition to it.

14             THE COURT:  Okay.  So, I wait for opposition.

15             Anything else?

16             MR. GIDEON:  No, your Honor.

17             THE COURT:  Well, thank you all again.  I'm sorry, I

18   just suddenly saw this.

19             MR. GIDEON:  Thank you.

20             MS. JOHNSON:  Thank you, your Honor.

21             MR. WOLK:  Thank you, your Honor.

22             MR. NOLAN:  Thank you.

23             THE COURT:  Court is in recess.

24             (Adjourned, 3:20 p.m.)

25

```
 1                    C E R T I F I C A T E

 2         I, Catherine A. Handel, Official Court Reporter of the

 3   United States District Court, do hereby certify that the

 4   foregoing transcript, from Page 1 to Page 59, constitutes to the

 5   best of my skill and ability a true and accurate transcription of

 6   my stenotype notes taken in the matter of Multidistrict

 7   Litigation No. 13-02419-RWZ, In Re: New England Compounding

 8   Pharmacy Cases Litigation.

 9


10

     December 27, 2015      /s/Catherine A. Handel
11   Date                   Catherine A. Handel, RPR-CM, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```