# EXHIBIT 5

## In the Matter Of:

### NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY

## VIDEOTAPED DEPOSITION OF KENNETH R. LISTER, M.D.

*March 09, 2015*



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF KENNETH R. LISTER, M.D. on 03/09/2015                Pages 158..161

Page 158

1   A.   I have no idea.
2   Q.   Did you ever use this script when you
3   talked with any of the patients you talked with?
4   A.   When I talked to patients I talked with, I
5   talked about medical problems, not financial problems.
6   Q.   Okay.  Did any of the patients whom you
7   spoke with ask you whether Specialty Surgery Center
8   would pay any of their medical bills?
9   A.   No.
10  Q.   You can put that to the side.  We're
11  finished with it.  I'm going to hand you what we're
12  going to mark as Exhibit 90 to your deposition,
13  SSC-02316.  Have you ever seen that document before,
14  sir?
15       (Exhibit 90 was marked for
16       identification.)
17       MS. HOLLABAUGH:  Mark, can you
18       identify that for us, please.
19       MR. CHALOS:  Sure.  Did you hear the
20       Bates number?
21       MS. HOLLABAUGH:  I did.
22       MR. CHALOS:  You did not?
23       MS. HOLLABAUGH:  I did, but I don't
24       have a copy of the document.
25       MR. CHALOS:  Okay.  Hang on one

Page 159

1   second.
2        MR. GIDEON:  It's the "End depo now"
3        document.
4        MS. HOLLABAUGH:  Okay.
5        MR. GIDEON:  You're welcome to come
6        down here and look at it if you want to.
7        MR. CHALOS:  We have extra copies.
8        We're just digging them out.
9        THE WITNESS:  I have seen this
10       document before.
11  Q.   (By Mr. Chalos)  You have?
12  A.   Yes.
13  Q.   Okay.  In what context have you seen it?
14  A.   I believe that I saw it actually several
15  years ago, and with the -- associated with the "End
16  Depo Now" campaign, which was online.
17  Q.   What was that campaign about?
18  A.   It was an attempt to place forward
19  information, correct or not, that Depo-Medrol caused
20  severe arachnoiditis in many patients.
21  Q.   Okay.  Do you know who was behind that
22  campaign?
23  A.   No.
24  Q.   Do you know where Specialty Surgery Center
25  got that document?

Page 160

1   A.   No, I do not.
2   Q.   Did anyone ever tell you that NECC gave
3   that to you at Specialty Surgery Center?
4   A.   No.
5   Q.   Do you believe that their statements are
6   true?
7   A.   I believe that I have to take this into
8   considerable consideration when I administer a
9   medication.  Whether it's true or not, I can't
10  specifically say.
11  Q.   Okay.  Well, you still give your patients
12  Depo-Medrol; right?
13  A.   Yes, I do.
14  Q.   So you've concluded that whatever risks
15  there are associated with it, they're outweigh the
16  benefits to your patients; right?
17  A.   My patients have concluded that.
18  Q.   And you don't disagree?
19  A.   I don't disagree.
20  Q.   You wouldn't do something for your patient
21  that -- where the risks outweigh the benefits, would
22  you?
23  A.   No, I would not.
24  Q.   Even if the patient asked for it?
25  A.   No, I would not.

Page 161

1        (Exhibit 91 was marked for
2        identification.)
3   Q.   (By Mr. Chalos)  I'm going to hand you what
4   we'll mark as Exhibit 91.  It's SSC-00953 through
5   SSC-00960, and it says "SSC pharmaceutical services
6   policies."  I'm going to ask you in particular about
7   the second page, which is the approved medications
8   section.
9        And I'm going to ask you, Doctor, just
10  about Page 00954.
11  A.   Okay.
12  Q.   You can --
13  A.   Then I've reviewed that.
14  Q.   Okay.  Yeah, I mean, you can look at the
15  whole document.  I'm just going to ask you about to
16  that one page for now.  Do you recognize what this
17  page is here?  This is Exhibit 91, Page SSC-00954?
18  A.   This appears to be an SSC approved
19  medication list.
20  Q.   Was this the medication list that was in
21  effect in 2012, to your knowledge?
22  A.   I don't see a date on it.
23  Q.   Do you know -- separate from whether
24  there's a date on the top of the document, do you know
25  whether this was --


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF KENNETH R. LISTER, M.D. on 03/09/2015          Pages 162..165

Page 162

```
 1    A.    No, I do not.
 2    Q.    How would we find that out?
 3          MR. GIDEON:  Let him finish; okay?
 4    Q.    (By Mr. Chalos)  You've been doing great
 5  all day long.
 6          MR. GIDEON:  You really have.
 7      Sometimes you think he's finished and he's
 8      not.  Just let him finish.
 9          THE WITNESS:  Okay.
10    Q.    (By Mr. Chalos)  I was finished that time.
11  I'll do it again.  How would we find out whether this
12  was the list of approved medications for Specialty
13  Surgery Center in 2012?
14    A.    I don't know.
15    Q.    Is that something Ms. Atkinson might know?
16    A.    She may.
17    Q.    Does Calisher & Associates have any role
18  with respect to the management of Cumberland Medical
19  Center?
20    A.    Not as far as I know.
21    Q.    Were the Calisher & Associates group -- was
22  the Calisher & Associates group managing Specialty
23  Surgery Center right up until the time Specialty
24  Surgery Center ceased operation?
25    A.    Yes, I believe they were.
```

Page 163

```
 1    Q.    How did you learn about this outbreak?
 2    A.    Jean Atkinson called me when the initial
 3  recall was obtained by her, and at that point in time,
 4  we canceled all my cases.
 5    Q.    What did you learn during that first phone
 6  call?
 7    A.    Only that there was potential particular
 8  contamination to the NECC product.
 9    Q.    When did you first learn that any of your
10  patients had been made sick by the NECC product that
11  you injected into them?
12    A.    I don't believe that I learned anything
13  about a sick patient until Monday or Tuesday of the
14  next week.
15    Q.    Okay.  On what day of the week did you
16  learn about the contaminated medication?
17    A.    We learned of the -- what do you mean by
18  contaminated medication?
19    Q.    On what day did you receive that first call
20  from Ms. Atkinson that there had been a recall of the
21  NECC product?
22    A.    On Thursday.
23    Q.    Okay.  And then Monday of the next week is
24  when you believe you learned that at least one of your
25  patients had been made sick by those injections?
```

Page 164

```
 1    A.    Correct.
 2    Q.    Did you do anything between Thursday and
 3  Monday with respect to the NECC situation?
 4    A.    All of the patients that had received the
 5  NECC product were called on Friday.
 6    Q.    Who called them?
 7    A.    The center personnel.
 8    Q.    Specialty Surgery Center personnel?
 9    A.    Specialty Surgery Center personnel.
10    Q.    Okay.  They called at that point all 164
11  patients?
12    A.    Correct.
13    Q.    What did they tell them?
14    A.    They told them a specific release from the
15  Department of Health.
16    Q.    Okay.  So they were given a script to
17  follow in those --
18    A.    They were given a script to follow.
19    Q.    Did you talk to any of your patients over
20  that first weekend?
21    A.    Not over the first weekend, no.
22    Q.    Okay.  And what happened then after you
23  learned that there had been a patient that was made
24  ill?
25    A.    Well, actually before I learned a patient
```

Page 165

```
 1  had been made ill, I learned on Sunday that there was
 2  a potential patient ill here in Nashville, that it was
 3  potential fungal contamination, and on Monday we began
 4  to call everyone with another script regarding the
 5  potential of meningitis.
 6    Q.    And that was another script from the
 7  Tennessee Department of Health?
 8    A.    Correct.
 9    Q.    And when did you first start yourself
10  calling patients?
11    A.    Monday morning, 7:00 a.m.
12    Q.    And approximately how many of the 164
13  patients that -- of your patients that were injected
14  with NECC's MPA, how many did you speak with?
15    A.    At least half.
16          (Exhibit 92 was marked for
17      identification.)
18    Q.    (By Mr. Chalos)  I'm going to hand you what
19  we've marked as Exhibit 92.  It's SSC-00306 through
20  SSC-00312.  If you could please take a look through
21  this document and tell us what we're looking at here.
22    A.    This is a handwritten call record where I
23  attempted to contact as many patients as I possibly
24  could with regard to this catastrophe.
25    Q.    And these are your handwritten notes?
```



Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2565-5   Filed 01/08/16   Page 5 of 7

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF KENNETH R. LISTER, M.D. on 03/09/2015       Pages 166..169

Page 166

1   A.   Correct.
2   Q.   Are there any other notes that you took
3 regarding your communications with patients other than
4 what's included here in Exhibit 92?
5   A.   I don't believe there's any other notes
6 that I took.
7   Q.   Are there any other notes that you took
8 either handwritten or electronically regarding NECC or
9 the contaminated medication from NECC other than what
10 we see here in Exhibit 92?
11   A.   I don't believe so.
12   Q.   When you searched your e-mails on your
13 Comcast.net account, did you find any e-mails that
14 were related to NECC's medication or the meningitis
15 outbreak?
16   A.   I didn't search my e-mails.
17   Q.   Right.  When the lawyers searched your
18 e-mails, do you know whether they found any e-mails in
19 your e-mail account related to NECC or the medications
20 or the outbreak?
21   A.   There may have been some communication from
22 Dr. Kainer or one of the other doctors in the
23 Department of Health.
24   Q.   Were there any communications between you
25 and Specialty Surgery Center in that batch that they

Page 167

1 found?
2   A.   I don't remember any.
3   Q.   Who from the Calisher & Associates group
4 was ever onsite at Specialty Surgery Center?
5   A.   Ever?
6   Q.   Yes, sir.
7   A.   Okay.  Mr. Calisher and his wife Gina.
8   Q.   Janet?
9   A.   Gina.
10   Q.   Gina.  Anybody else?
11   A.   That's all.
12   Q.   Were either Mr. Calisher or Gina Calisher
13 licensed medical professionals?
14   A.   I believe both are nurses.
15   Q.   RNs?
16   A.   I believe so.
17      MR. CHALOS:  All right.  Why don't we
18    take a break now, and we may be getting
19    near the end of my questioning.
20      VIDEOGRAPHER:  We're off the record.
21    This is the end of Tape No. 4.  The time is
22    2:38 p.m.
23      (A recess was taken.)
24      VIDEOGRAPHER:  Here begins Tape No. 5
25    in the deposition of Kenneth R. Lister,

Page 168

1   M.D.  We're back on the record and the time
2    is 2:58 p.m.
3   Q.   (By Mr. Chalos)  Doctor, if you could pull
4 out Exhibit 91.  It's the SSC pharmaceutical services
5 policies.  This -- I'm referring you in particular to
6 Page SSC-00954.  Do you see that?
7   A.   Yes, I do.
8   Q.   And is Depo-Medrol without preservative
9 listed on the Specialty Surgery Center formulary?
10   A.   Depo-Medrol is listed on the formulary.
11   Q.   Does that include Depo-Medrol with
12 preservative and Depo-Medrol without preservative?
13   A.   Yes, it would.
14   Q.   And why do you say that?
15   A.   Because it doesn't say specifically one way
16 or the other.
17   Q.   So in your view, if it doesn't say
18 specifically one way or the other, it includes all
19 formulations including those without preservatives?
20   A.   Correct.
21   Q.   In 2012, did Specialty Surgery Center have
22 a quality improvement committee?
23   A.   Yes, it did.
24   Q.   Who was on that?
25   A.   I believe all of the members of the medical

Page 169

1 board -- of the executive board were on the quality
2 improvement committee.
3   Q.   And did the quality improvement committee
4 at Specialty Surgery Center review the NECC-related
5 outbreak?
6   A.   Yes, it did.
7   Q.   When was that?
8   A.   I don't remember.
9   Q.   Were you -- did you participate in that
10 process?
11   A.   Yes, I would have.
12   Q.   Do you recall participating in the process?
13   A.   No.
14   Q.   Did you attend any meetings of the quality
15 improvement committee related to the fungal meningitis
16 outbreak?
17   A.   I don't recall any meetings specifically
18 related to the fungal meningitis outbreak.
19   Q.   Did it come up at other meetings?
20   A.   It may have.
21   Q.   And you're talking about the board
22 meetings?
23   A.   Correct.
24   Q.   And I think -- you think it came up in the
25 October 2012 board meeting?


Discovery Litigation Services
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2565-5   Filed 01/08/16   Page 6 of 7

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF KENNETH R. LISTER, M.D. on 03/09/2015   Pages 194..197

Page 194

1   approved.
2   Q.   So you believed it then and you believe it
3   now; correct?
4   A.   Correct.
5   Q.   What's the basis for that belief?
6   A.   Because the -- because all compounded
7   medications are under the direct supervision of the
8   FDA.
9   Q.   And I believe you testified in response to
10  previous questioning that you hadn't seen any of the
11  literature prior to 2012 about the risks of compounded
12  drugs; correct?
13  A.   I had not seen any specific literature
14  related to the risk of compounded medications.
15  Q.   Do you remember hearing about --
16  A.   No.
17  Q.   -- risks of compounded drugs?
18  A.   No.
19  Q.   What was your understanding prior to July
20  of 2012 as to what compounding pharmacies did?
21  A.   Compounding pharmacies produced medications
22  that are not generally available in the marketplace,
23  specialty medications that are needed, but
24  manufacturers do not make.
25  Q.   Did you understand prior to 2012 that a

Page 195

1   compounding pharmacy actually uses raw ingredients to
2   actually mix the compounding drug?
3   A.   I'm not a pharmacist.  I don't know how
4   they produce these medications.
5   Q.   Do you think they ordered them from
6   somebody?
7   A.   Like I said, I'm not a pharmacist.  I don't
8   know how they produce the medications.
9   Q.   Do you still have Exhibit 91 in front of
10  you, Dr. Lister?  Do you mind turning back to that.
11  A.   Correct.
12  Q.   This is the SSC-00954, the list of approved
13  medications.
14  A.   Correct.
15  Q.   And this is, in essence, the SEC formulary?
16  A.   That's what it appears to be, yes.
17  Q.   And then the name formulary isn't on it,
18  but it -- in essence, this was the formulary at SSC?
19  A.   In essence, it was.
20  Q.   What's the purpose of the -- of the
21  approved medications policy?
22  A.   The purpose is stated right here.  To
23  provide safe effective medications for the center's
24  patients.
25  Q.   What's the process for getting a medication

Page 196

1   on the list of approved medications?
2   A.   "On an annual basis, the executive
3   committee shall review the list of approved
4   medications for the center to use."
5   Q.   Right.  You just read what's under the
6   heading procedure.
7   A.   Correct.
8   Q.   How does a new medication -- is there a
9   process for getting a new medication onto the
10  formulary?
11  A.   I presume that the new medication would
12  have to be approved on an annual basis by the
13  executive committee.
14  Q.   But you don't have a -- have you ever been
15  through that process?  In other words, have you ever
16  sought executive committee approval for any
17  medication?
18  A.   No.  The typical pathway for getting a new
19  medication would be to ask Jean, who goes through the
20  Calishers, and then who approaches the executive
21  committee.
22  Q.   Have you been through that process before?
23  A.   No.
24  Q.   Did you ever discuss with Ms. Atkinson
25  whether or not you should seek executive committee

Page 197

1   approval to get preservative-free MPA on the
2   formulary?
3   A.   I don't believe that's a new medication.
4   Q.   Did you ever have any conversations with
5   Ms. Atkinson about that?
6   A.   I don't believe that's a new medication, so
7   no.
8   Q.   In your view, preservative-free MPA was
9   essentially the same thing as Depo-Medrol?
10  A.   Correct.
11  Q.   Even though it had different ingredients
12  and didn't have any preservatives in it?
13  A.   It didn't have different ingredients.  It
14  just didn't have a preservative in it.
15  Q.   So it was different in that sense anyway?
16  A.   It was different only in the sense that it
17  did not have the picolinium, but the active
18  ingredients were the same.
19  Q.   Now, you said a moment ago that you're not
20  a pharmacist; correct?
21  A.   Correct.
22  Q.   And does Ms. Atkinson have any pharmacy
23  expertise?
24  A.   No, she doesn't.
25  Q.   And who at Calisher has pharmacy expertise?


Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2565-5   Filed 01/08/16   Page 7 of 7

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF KENNETH R. LISTER, M.D. on 03/09/2015     Pages 198..201

Page 198

1   A.   I'm not sure.
2   Q.   But neither of you sought to consult with
3 anyone that you knew to be a pharmacy expert
4 purchasing medications from NECC, did you?
5   A.   No.
6   Q.   Does SSC have a pharmacist available for
7 oversight or consultation even if it's not an
8 employee?
9   A.   There's a pharmacist that occasionally
10 gives recommendations, but that's all I know.
11  Q.   He doesn't have any kind of a
12 contractual --
13  A.   No.
14  Q.   -- relationship with SSC?
15  A.   No.
16  Q.   Dr. Lister, would you mind just turning
17 back to Exhibits 93 and 94 for a moment.  Now, this is
18 a document that's title is "Prescription order form";
19 correct?  Both 93 and 94 have that title.
20  A.   Correct.
21  Q.   And do you recall seeing that title when
22 you signed these order forms?
23  A.   I recall it being an order form.  That's
24 all I recall.
25  Q.   I mean, NECC wasn't making any drugs

Page 199

1 pursuant to prescriptions, were they?
2   A.   I'm not sure of your question.
3   Q.   I mean, did NECC have any patient
4 prescriptions or did they make any patient
5 prescriptions?
6   A.   Again, I'm not sure of your question.
7   Q.   Well, were you and SSC ordering
8 prescriptions from NECC?
9   A.   We were told that because NECC was licensed
10 as a pharmacy that they needed prescription names for
11 this order.
12  Q.   They didn't need actual prescriptions.
13 They just needed names; correct?
14  A.   Correct.
15  Q.   Was that a red flag at all to you?
16  A.   No, it was not.
17  Q.   Why not?
18  A.   I've been in medicine 38 years.  A lot of
19 things have changed in 38 years.  In 38 years we've
20 seen many, many, many changes and I thought this was
21 just another change in medicine.
22  Q.   Are you aware of any other instance where
23 SSC had to give patient names to order medications?
24  A.   I'm not aware of any.
25  Q.   Did you personally review the Tennessee

Page 200

1 pharmacy board regulations?
2   A.   No, I did not.
3   Q.   Do you know if Ms. Atkinson talked to Gina
4 Calisher about those?
5   A.   Yes, I did.
6   Q.   And what did she tell you about that
7 conversation that she had with Gina Calisher?
8   A.   She told me that the Tennessee pharmacy
9 board regulations did not preclude us buying from
10 NECC.
11  Q.   As long as you gave them the patient names?
12  A.   The patient names I understood were a
13 requirement of Massachusetts, not Tennessee.
14  Q.   Are you aware that the NECC sales
15 representative actually sent Ms. Atkinson a copy of
16 some regulations?
17  A.   I'm not specifically aware of that.
18  Q.   But you are aware that she -- that
19 Ms. Atkinson discussed with the NECC representative
20 some kind of a regulatory requirement?
21  A.   Correct.
22  Q.   If you'd take a look back at Exhibit 93,
23 Dr. Lister, the last page is Bates stamped 27,
24 SSC-00027.  You see that?
25  A.   Correct.

Page 201

1   Q.   And this is an order for 100 vials of
2 preservative-free MPA?
3   A.   Correct.
4   Q.   Do you recall whether 100 vials was a
5 larger order than usual for SSC?
6   A.   I don't recall.
7   Q.   One way or the other, whether it was large
8 or small or average?
9   A.   Average.
10  Q.   How often does the executive committee
11 meet?
12  A.   I believe the executive committee meets
13 once a quarter -- met once a quarter.
14  Q.   Was that the same -- was that combined with
15 the board meeting or was it a separate meeting?
16  A.   It was separate meetings, but continuous.
17  Q.   I'm sorry, I may have missed this before.
18 But was it -- were the same people on the executive
19 committee as were on the board?
20  A.   Yes.
21       (Exhibit 97 was marked for
22    identification.)
23  Q.   (By Mr. Chalos)  I'm showing you
24 Exhibit 97, Dr. Lister.  Do you know what Exhibit 97
25 is, Dr. Lister?


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com