# EXHIBIT 7

## Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: NEW ENGLAND
COMPOUNDING PHARMACY,
INC. PRODUCTS LIABILITY    MDL No. 2419
LITIGATION
              Master Dkt:
              1:13-md-02419-RWZ
~~~~~~~~~~~~~~~~~~~~

THIS DOCUMENT RELATES
TO:

All Actions

~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF
JEAN ATKINSON

9:04 a.m.
March 10, 2015

Suite 1100
315 Deaderick Street
Nashville, Tennessee

Blanche J. Dugas, RPR, CCR No. B-2290

## Page 2

```
                    APPEARANCES OF COUNSEL

On Behalf of the Plaintiffs:
    J. GERARD STRANCH, IV, Esquire
    BENJAMIN A. GASTEL, Esquire
    Branstetter, Stranch & Jennings, PLLC
    227 Second Avenue North
    Nashville, Tennessee  37201
    (615) 254-8801
    (615) 250-3937 (facsimile)
    gerards@branstetterlaw.com

    MARK P. CHALOS, Esquire
    Lieff, Cabraser, Heimann & Bernstein, LLP
    Suite 1650, One Nashville Place
    150 Fourth Avenue
    Nashville, Tennessee  37219-2423
    (615) 313-9000
    (615) 313-9965 (facsimile)
    mchalos@lchb.com
    DANIEL L. CLAYTON, Esquire
    Kinnard, Clayton & Beveridge
    127 Woodmont Boulevard
    Nashville, Tennessee  37205
    (615) 686-2501
    (615) 297-1505 (facsimile)
    dclayton@kcbattys.com
On Behalf of Saint Thomas Outpatient Neurosurgical
Center, LLC; Howell Allen, a Professional Corporation;
John W. Culclasure, M.D.; Debra V. Schamberg, RN:
    CLARENCE J. "C.J." GIDEON, JR., Esquire
    MATTHEW CLINE, Esquire
    CHRISTOPHER TARDIO, Esquire
    Gideon, Cooper & Essary, PLC
    Suite 1100
    315 Deaderick Street
    Nashville, Tennessee 37238
    (615) 254-0400
    (615) 254-0459 (facsimile)
    cj@gideoncooper.com
    matt@gideoncooper.com
    chris@gideoncooper.com
```

## Page 3

```
             ~~ APPEARANCES CONTINUED ~~
On Behalf of St. Thomas Health; St. Thomas Network;
St. Thomas West Hospital f/k/a St. Thomas Hospital:
    LELA M. HOLLABAUGH, Esquire
    Bradley, Arant, Boult & Cummings, LLP
    Suite 700, Roundabout Plaza
    1600 Division Street
    Nashville, Tennessee  37203
    (615) 252-2348
    (615) 252-6379 (facsimile)
    lhollabaugh@babc.com

On Behalf of UniFirst Corporation:
    JIM REHNQUIST, Esquire
    NICHOLAS DREW, Esquire
    Goodwin Procter, LLP
    53 State Street, Exchange Place
    Boston, Massachusetts 02109
    (617) 570-1000
    (617) 523-1231 (facsimile)
    ndrew@goodwinprocter.com
    jrehnquist@goodwinprocter.com
On Behalf of Specialty Surgery Center - Crossville,
PLLC; Kenneth R. Lister, M.D.; Kenneth R. Lister,
M.D., PC:
    PARKS T. CHASTAIN, Esquire
    Brewer, Krause, Brooks, Chastain & Burrow, PLLC
    Suite 2600
    611 Commerce Street
    Nashville, Tennessee  37203
    (615)256-8787
    (615)256-8985 (facsimile)
    pchastain@bkblaw.com
```

## Page 4

```
         ~~ ATTORNEYS APPEARING VIA VIDEO STREAM ~~
On Behalf of Premier Orthopaedic & Sports Medicine
Associates of Southern New Jersey, LLC d/b/a Premier
Orthopaedic & Sports Associates, LLC; Premier
Orthopaedic Associates Surgical Center, LLC:
    JAY J. BLUMBERG, Esquire
    Blumberg & Wolk, LLC
    158 Delaware Street
    Woodbury, New Jersey 08096
    (856) 848-7472
    (856) 848-8012 (facsimile)
    jjblumberg@blumberglawoffices.com
On Behalf of Barry Cadden, Lisa Conigliaro Cadden,
Carla Conigliaro, Gregory Conigliaro, Douglas
Conigliaro and Glenn Chin:
    ROBERT H. GAYNOR, Esquire
    Sloane & Walsh, LLP
    Suite 850
    Three Center Plaza
    Boston, Massachusetts  02108
    (617) 523-6010
    (617) 227-0927 (facsimile)
    rgaynor@sloanewalsh.com
On Behalf of Medical Advanced Pain Specialists, PA and
David M. Schultz, M.D.:
    CLARE CARROLL, Esquire
    McCarthy, Bouley & Barry, PC
    47 Thorndike Street
    Cambridge, Massachusetts  02141
    (617) 225-2211
    (617) 225-7711 (facsimile)
    cfc@mbblaw.com
On Behalf of Ocean State Pain Management, Inc. and
Abdul Barakat, M.D.:
    KATHERINE DENNIS, Esquire
    Capplis, Connors & Carroll, PC
    Suite 220
    18 Tremont Street
    Boston, Massachusetts  02108
    (617) 227-0722
    (617) 227-0772 (facsimile)
    kdennis@capplisconnors.com
```

Page 33

1   Q.   Okay. Who handles the management for
2   Cumberland Medical Center?
3   A.   For my endoscopy department, it's Pam
4   Kendrix.
5   Q.   Do you work for Cumberland Medical Center
6   now?
7   A.   Yes.
8   Q.   You receive -- your paycheck says
9   Cumberland Medical Center on it?
10  A.   Yes.
11  Q.   Okay. Okay. I want to hand you a document
12  that's previously been marked as Exhibit 84 to the
13  Lister deposition. And if I mispronounce anyone's
14  names, just please correct me. It's not intentional.
15  It's through ignorance. So is it Calisher? Is that
16  how it's pronounced?
17  A.   Yes.
18  Q.   Have you seen this document before?
19  A.   No.
20  Q.   Have you flipped through to look at the
21  pages behind it, please. The question I'm going to
22  ask you once you finish looking through that is: Have
23  you seen this document before?
24  A.   No, I have never seen this document.
25  Q.   You've never seen it before?

Page 34

1   A.   No.
2   Q.   Okay. All right.
3   A.   Not to my recollection.
4   Q.   Okay. Let's talk about that time in
5   approximately 2009 when Calisher was hired. What was
6   your understanding of why Calisher was hired by
7   Specialty Surgery?
8   A.   My understanding at that time, Calishers
9   was coming in to rewrite our insurance contracts and
10  manage the operation of the center.
11  Q.   And by manage the operation of the center,
12  that would be payroll, that would be vendor payments,
13  that would be procurement, those sorts of things; is
14  that correct?
15  A.   My understanding was when they come in, any
16  decisions as far as staff, changes in policy, vendors,
17  everything had to go through the Calishers.
18  Q.   So let's talk specifically about
19  pharmaceutical products since that's kind of why we're
20  all here today. If you needed to order more of a
21  specific pharmaceutical product during your weekly
22  review of inventory, would you go to Calisher and say,
23  "We need to order X amount of this drug," or would you
24  just -- or how would that work? What would that
25  process be?

Page 35

1   A.   When the Calishers come in, they done
2   inventory of everything we had in the center, and if
3   it was already an established drug, we did not have to
4   go through the Calishers.
5   Q.   Okay. And how would it become an
6   established drug? Did they create a formulary that
7   listed what was already established that you could
8   order and what wasn't?
9   A.   Yes.
10  Q.   And was that formulary created by the
11  Calishers based upon what you were already using in
12  the facility?
13  A.   Yes.
14  Q.   Okay. I'm going to hand you what was
15  marked yesterday as Exhibit 91 and ask you to take a
16  look at SSC-00954. Is that the formulary -- and the
17  question I'm going to ask you as you look at that is:
18  Is that the formulary that Calisher created for
19  Specialty Surgery?
20      MR. GASTEL: Does anybody need a copy
21  of that?
22      THE WITNESS: Yes.
23  Q.   (By Mr. Stranch) And so when this says
24  Afrin, that means that you had already been ordering
25  and stocking Afrin specifically in the facility and

Page 36

1   you were able to continue doing that without having to
2   come back to the Calishers; correct?
3   A.   Yes.
4   Q.   By the same token, Depo-Medrol is on here.
5   And so as long as you continued to order specifically
6   Depo-Medrol, you didn't have to go back to the
7   Calishers; correct?
8   A.   Yes.
9   Q.   MPA is not listed on here, correct, or
10  methylprednisolone acetate not listed on here;
11  correct?
12  A.   Depo-Medrol and MPA is the same drug.
13  Q.   And so it's your belief that there is -- so
14  it was your belief that you could order the MPA
15  without having to go to the Calishers; is that
16  correct?
17  A.   Yes.
18  Q.   And where did that understanding come from?
19  Did the Calishers tell you that?
20  A.   I'm not sure where you're going from there.
21  Q.   Well, I'm asking you. I mean, you have no
22  pharmaceutical training --
23  A.   Yes.
24  Q.   -- so how do you know there's no difference
25  between Depo-Medrol the branded drug and MPA

Page 37

1  preservative-free?
2    A.   Say that again.
3    Q.   Okay.  Do you have any pharmaceutical
4  training?
5    A.   No.
6    Q.   Okay.  But you've stated here that there is
7  no difference between Depo-Medrol and
8  preservative-free MPA; isn't that correct?
9    A.   Yes.
10   Q.   Okay.  Where does your understanding come
11 that there's no difference between Depo-Medrol and MPA
12 preservative-free?
13   A.   I discussed it with Dr. Lister and when I
14 ordered Depo-Medrol, on the box below it, it says
15 methylprednisolone acetate.
16   Q.   And does Depo-Medrol have a preservative in
17 it?
18   A.   Yes, to my knowledge.
19   Q.   And the MPA that you later ordered from
20 NECC was preservative-free; correct?
21   A.   Yes.
22   Q.   Okay.  And would you agree with me that
23 there's a difference between a pharmaceutical product
24 that has a preservative in it and a pharmaceutical
25 product that doesn't have a preservative in it;

Page 38

1  correct?
2    A.   The only difference is it doesn't have a
3  preservative in it.
4    Q.   But that's a difference, isn't it?
5    A.   That's a difference.  It's still the same
6  drug.
7    Q.   So did you go to Calister [sic] before
8  ordering MPA from NECC?
9    A.   Yes.
10   Q.   And why did you go to Calisher before
11 ordering MPA?
12   A.   It was a new vendor and they had asked for
13 patient names.
14   Q.   So what was it that triggered your review
15 by Calister?  Was it because there was a new vendor or
16 was it -- was that solely the reason why?
17   A.   Like I said, it was a new vendor and NEC
18 had asked for patient names.
19   Q.   Okay.  And what about asking for patient
20 names triggered a warning in your head?
21   A.   I had never been asked for patient names by
22 another vendor.
23   Q.   Okay.  And if Calister had told you when
24 you contacted them about NECC being a new vendor and
25 the patient names, if they had said, no, don't order

Page 39

1  from them, would you have ordered from NECC?
2    A.   No, sir.
3    Q.   So even if NECC hadn't asked you for the
4  new names, if Calister had said, "We've done our due
5  diligence and we don't think you should order from
6  them," you would not have ordered from them; correct?
7    A.   No.
8    Q.   And Calisher must approve all new vendors;
9  correct?
10   A.   Correct.
11   Q.   Did you rely upon Calisher to do due
12 diligence into whether NECC was a reputable supplier?
13   A.   Say that --
14   Q.   Did you rely upon Calisher to do due
15 diligence to determine whether NECC was a reputable
16 supplier?
17   A.   I'm still not getting your question.  I'm
18 sorry.
19   Q.   Let me try by making a little bit of a
20 statement and maybe that'll help explain --
21   A.   Okay.
22   Q.   -- what I'm doing.
23        In doing procurement, no matter what,
24 there's some vendors that are reliable --
25   A.   Uh-huh (affirmative).

Page 40

1    Q.   -- that follow good policy and deliver
2  their product on time.
3         There are other vendors that are just
4  complete shams and never deliver anything or don't
5  deliver what you order, or there's defects in what
6  their product are that they offer.
7         And so when a new vendor comes in, do you
8  rely on Calisher to do the underlying review to
9  determine whether this is a reputable vendor that
10 Specialty Surgery should be doing business with, or do
11 you do that investigation yourself?
12   A.   It's a partnership.  When -- we help each
13 other out.
14   Q.   Okay.  So did you do any investigation of
15 NECC before deciding to place an order with them?
16   A.   Yes.
17   Q.   Okay.  What did you do?
18   A.   Reviewed the material that Mario give me.
19 I made sure they had a Tennessee license.  Reviewed
20 the Tennessee pharmacy board.  Contacted Dr. Lister.
21 I talked with the Calishers.  And on the pamphlet that
22 Mario give me, he says that they are USP 797
23 compliant.  So I got online to look what that was
24 because I had never heard of it before.
25        And then there was a -- there was another

10 (Pages 37 to 40)