1

2
                    UNITED STATES DISTRICT COURT
3
                     DISTRICT OF MASSACHUSETTS

4

5
    IN RE:  NEW ENGLAND COMPOUNDING     )  MDL NO. 13-02419-RWZ
6   PHARMACY CASES LITIGATION           )
                                        )
7                                       )
                                        )
8                                       )
                                        )
9                                       )

10

11          BEFORE:  THE HONORABLE JENNIFER C. BOAL

12

13

14                      **MOTIONS HEARING**
                            **AND**
15                    **STATUS CONFERENCE**

16

17

18          John Joseph Moakley United States Courthouse
                       Courtroom No. 12
19                     One Courthouse Way
                       Boston, MA 02210
20

21                     January 14, 2016
                         2:00 p.m.
22

23          Catherine A. Handel, RPR-CM, CRR
                    Official Court Reporter
24   John Joseph Moakley United States Courthouse
              One Courthouse Way, Room 5205
25                   Boston, MA 02210
            E-mail: hhcatherine2@yahoo.com

APPEARANCES:


For The Plaintiffs:


    Hagens, Berman, Sobol, Shapiro LLP, by KRISTEN A. JOHNSON, ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts 02142;


    Janet, Jenner & Suggs, LLC, by JESSICA H. MEEDER, ESQ., Commerce Centre East, 1777 Reisterstown Road, Suite 165, Baltimore, Maryland 21208;


    Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH, IV, ESQ., 227 Second Avenue North, Nashville, Tennessee 37201-1631;


    Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac Street, Suite 500, Boston, Massachusetts 02114;


    Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K. MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, New York 10013-1413;


    Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS, ESQ., 150 Fourth Avenue North, Suite 1650, Nashville, Tennessee 37219;


    Leader, Bulso & Nolan, PLC, by GEORGE H. NOLAN, ESQ., 414 Union Street, Suite 1740, Nashville, Tennessee 37219;


    Kinnard, Clayton & Beveridge, by RANDALL L. KINNARD, ESQ., The Woodlawn, 127 Woodmont Boulevard, Nashville, Tennessee 37205;


  (Appearances continued on the next page.)

```
 1     APPEARANCES (Cont'd):

 2


 3     FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
 4     NECP, INC.:

 5
           Duane Morris LLP by MICHAEL R. GOTTFRIED, ESQ., 100 High
 6     Street, Suite 2400, Boston, Massachusetts 02110-1724;

 7


 8


 9     FOR THE DEFENDANTS:
10

11         Gideon, Cooper & Essary, PLC, by CHRIS J. TARDIO, ESQ., and
       MATTHEW H. CLINE, ESQ., 315 Deaderick Street, Suite 1100,
12     Nashville, Tennessee 37238;

13
           Brewer, Krause, Brooks, Chastain & Burrow, PPLC, by KENT E.
14     KRAUSE, ESQ., 611 Commerce Street, Suite 2600, Nashville,
       Tennessee 37203;
15

16         Fulbright & Jaworski, LLP, by MARCY H. GREER, ESQ., and
       ADAM T. SCHRAMEK, ESQ., 98 San Jacinto Boulevard, Suite 1100,
17     Austin, Texas 78701;

18
           Pessin Katz Law, P.A., by GREGORY K. KIRBY, ESQ., 901
19     Dulaney Valley Road, Suite 400, Towson, Maryland 21204;

20
           Blumberg & Wolk LLC, by CHRISTOPHER M. WOLK, ESQ., 158
21     Delaware Street, P.O. Box 68, Woodbury, New Jersey 08096;

22

23

24

25
```

```
 1                   P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3    before the Honorable Jennifer C. Boal, Magistrate Judge,
 4    United States District Court, District of Massachusetts, at
 5    the John J. Moakley United States Courthouse, One Courthouse
 6    Way, Boston, Massachusetts, on January 14, 2016.)
 7              COURTROOM DEPUTY CLERK YORK:  The Honorable Jennifer
 8    C. Boal presiding.  You may be seated.
 9              Today is January 14th, 2016.  We're on the record in
10    the matter of NECC, Case No. 13-MD-2419.  Will counsel in the
11    courtroom please identify themselves for the record.
12              MS. JOHNSON:  Good afternoon, your Honor.  Kristen
13    Johnson for the Plaintiffs' Steering Committee.
14              MS. MARTIN:  Good afternoon, your Honor.  Annika
15    Martin for the Plaintiffs' Steering Committee.
16              MR. STRANCH:  Good afternoon, your Honor.  Gerard
17    Stranch for the Plaintiffs' Steering Committee.
18              MR. ELLIS:  Rick Ellis for various plaintiffs.
19              MR. TARDIO:  Chris Tardio and Matt Cline for the
20    Tennessee Clinic Defendants.
21              MR. KRAUSE:  Kent Krause for SSC and Dr. Lister.
22              MS. GREER:  Marcy Greer for the Saint Thomas
23    Entities.
24              MR. KIRBY:  Greg Kirby for the Box Hill defendants.
25              THE COURT:  Anyone else?
```

1          So, I don't know, Ms. Johnson, if you wanted to run

2     us through -- go back through the agenda, I guess, and pick up

3     what we did not discuss before Judge Zobel.

4          MS. JOHNSON:  Yes, your Honor.  I think we have two

5     motions for which oral argument has been arrested and unless

6     your Honor has a preference, I'll take them in the way they

7     happen to be listed, which is No. 1, the Saint Thomas

8     Entities' motion to amend the Bellwether schedule.

9          THE COURT:  So, I'll hear from Saint Thomas first.

10          MR. TARDIO:  Your Honor, Chris Tardio.  I will

11     address that.

12          It was a joint effort by Saint Thomas and STOPNC

13     defendants and, basically, we've come to the point, we

14     believe, and respectfully submit, we've run out of days to do

15     the discovery left to be done.  I've reviewed -- and we've

16     spoken in the last week or so with the PSC several times,

17     exchanged red lines and, I believe, made some progress.  I

18     think both sides -- I won't speak for them -- agree, I think,

19     that some extension is necessary and maybe the dispute at this

20     point is how much, but let me respectfully submit -- or

21     suggest a few points to the Court that the Court may want to

22     consider in building this schedule and adapting the schedule

23     as the litigation goes forward.

24          One, as I look at 2578-1, which is the plaintiffs'

25     submission filed just yesterday, I believe, or the day before,

1    it only allows us about 60 days to do common expert discovery

2    from 1/29 -- common expert depositions 1/29 to 3/28/16.  That

3    is probably going to be about 30 depositions when we combine

4    our experts, the plaintiffs' experts and Saint Thomas'

5    experts, and the Court may think, well, maybe you can do 30

6    depositions in 60 days if we just do them in 60 days, but --

7              THE COURT:  You're super human, right?

8              MR. TARDIO:  True.

9              But there are also -- these activities are running

10   concurrent with case-specific discovery, as the Court is

11   aware, extensive motion practice on legal issues, discovery

12   issues.  So, it's not as if we only have to take these common

13   expert depositions.

14             The second point, the same issues arises with the

15   deadline set out for case-specific experts.  Under the

16   plaintiffs' proposal, we get about 27, 28 days to do all case-

17   specific expert depositions.  That is just not enough time.

18             What we have proposed, both in meet-and-confers and

19   in our filings -- at least the STOPNC defendants have proposed

20   that case-specific expert discovery happen after the Court

21   selects the four cases that are going to be the four lead

22   trial cases.  I think that would significantly help everyone

23   because we wouldn't be doing case-specific expert discovery in

24   all eleven or twelve cases.  We would just be doing it in the

25   four trial cases.  That's one suggestion we had made.

1          We also think it may benefit the parties and the

2    Court should consider extending the common expert discovery --

3    common expert deposition deadline and run that the same as the

4    case-specific expert discovery deadline.  So that basically we

5    have both tracking at the same time and ending at the same

6    time.

7          One more point that I would like to highlight for the

8    Court deals with Bellwether selections.  The order that's in

9    place requires us, I believe by this Friday, to draft and

10   submit a brief that, as I understand it, advocates for the

11   cases that we think should be tried first.

12         I would respectfully suggest that it makes more sense

13   to execute our strikes on each side so that we're not arguing

14   about cases that are ultimately stricken.

15         So, what I would suggest is that something be -- the

16   schedule that comes out be modified such that we -- each side

17   executes their strikes and then a week or so later we argue

18   about which cases should be tried first.  I think at this

19   point we're supposed to argue about the cases at the same time

20   we're executing our strikes.

21         The last point I will -- well, two points quickly.

22   The deadlines submitted by the plaintiffs or proposed by the

23   plaintiffs, as I read them, have a deadline to submit *Daubert*

24   motions which comes before -- or at the exact same time as the

25   close of case-specific expert discovery.  I think that there

1    has to be some stagger there.  If we're going to challenge a

2    case-specific expert, I think we have to have time -- I mean,

3    if we take a -- for instance, if we take a deposition on April

4    17th, we want to challenge that expert, we're not going to be

5    able to file that motion on April 18th, and probably won't

6    even have the transcript back.  Won't have the transcript back.

7         Last point, I think that any mediation deadline in

8    the order that the Court fashions should be 30 or 45 or 60

9    days after the conclusion of discovery.  If we're going to put

10   a deadline on mediating it, I think it should be after

11   discovery ends if there's going to be a deadline in there.

12        THE COURT:  I had noticed that.  Is there some -- I

13   guess I hadn't heard about that before or maybe I missed it.

14   Are the parties interested in mediation or not?

15        MR. TARDIO:  We have at no time said that we are not

16   interested in mediating these cases.  We have -- I don't want

17   to call them terms, but we have some things that we think are

18   important in the mediation process, that all the cases be

19   mediated at one time for a common resolution as opposed to

20   just mediating one set of Tennessee cases or one subset.  We

21   have also advocated that that should come at or near the end

22   of common discovery.  So, when -- can I commit to mediating

23   the case now?  No, but we've never foreclosed that.

24        THE COURT:  I would -- obviously, it's going to be up

25   to Judge Zobel when she tries cases.  I wouldn't bank on the

1   fact that she would delay a trial date because of mediation

2   efforts, given how long the cases have been pending, and the

3   opportunities to mediate during the course of this.  So, I

4   think I would just -- obviously, she can do what she would

5   like, but I wouldn't -- if I was in your shoes, I wouldn't bet

6   on her putting off the trial date for mediation.  I could be

7   wrong.

8         MR. TARDIO:  Okay.  What I was suggesting -- and

9   maybe I was not clear -- is that we conclude at least the

10  common portion of the case discovery before we mediate these

11  cases.

12        THE COURT:  Because there doesn't seem to be a lot of

13  time left in terms of --

14        MR. TARDIO:  True.

15        THE COURT:  So, I guess I would encourage you -- and

16  it sounds as if -- would you be engaging private mediators?

17        MR. TARDIO:  Probably, but we haven't gotten that far

18  in the discussions.

19        THE COURT:  I would encourage you, if you do think

20  you would be interested in mediation -- obviously, it's a

21  voluntary process.  It's not worthwhile, particularly if the

22  defendants are not interested in doing it -- that you explore

23  that now rather than waiting until -- at least who you would

24  pick and they may not have time.  So, I think that would be

25  worthwhile, the parties exploring now rather than waiting

```
 1    until the summer to do so.
 2             MR. TARDIO:  Understood, your Honor.
 3             THE COURT:  In terms of the schedule -- and I have to
 4    say, I haven't looked at it recently.  When is it anticipated
 5    that it would be teed up for Judge Zobel to decide who the
 6    Bellwether -- or which plaintiffs would be going to trial or
 7    defendant -- when is it teed up for her to make that decision?
 8             MR. TARDIO:  I think under the current order, we are
 9    required to file a brief on that issue this Friday -- and
10    somebody can correct me if I'm wrong -- which at that point it
11    would be --
12             THE COURT:  Ready for decision.
13             MR. TARDIO:  I believe so.
14             Now, another problem with that is we haven't finished
15    all the plaintiffs' depositions.  Some of them have been
16    suspended along the way.  Some others have had to be moved.
17    So, that's another reason that it's difficult to argue about
18    these cases without having seen the people.
19             MS. GREER:  Your Honor, for the Saint Thomas
20    Entities, we are comfortable and agree with the proposal to
21    pick the four Bellwethers first and then do -- work up the
22    case-specific expert discovery, et cetera.  We think those are
23    good suggestions and staggering the strikes and having a
24    little bit of time after the strikes to file the briefs to
25    support that.  We can do that, you know, fairly quickly, but
```

1    we do need to have those depositions.

2              THE COURT:  Thank you.

3              MR. STRANCH:  Thank you, your Honor.  Gerard Stranch

4    for the Plaintiffs' Steering Committee.

5              Conceptually speaking, the big problem is we're

6    adding a bunch of little things, is what the Saint Thomas

7    Entities are doing, a bunch of little things here and there,

8    and then when you get to the end of the schedule, you realize

9    we're extending things all the way into the end of summer and

10   that's way too far.  These cases have been sitting on the

11   docket for a very long time.  We've been litigating them very

12   hard.  These defendants refuse to open case-specific discovery

13   when we thought it was open and wasted 90 days on that until

14   the courts finally said, yes, it is clearly open, go start --

15   go forth and discover.

16             So, we've done our part, you know, and these -- this

17   doesn't need to be delayed any further.  I mean, the simple

18   truth of the matter is the Plaintiffs' Steering Committee is

19   getting the cases ready.  We're moving the cases forward.  In

20   an effort to compromise to avoid having to tie up more

21   judicial time, we made this offer that would extend everything

22   approximately 45 days from the current schedule so that we

23   could get everything done in a timely fashion that will

24   provide some additional time to the defendants, which we think

25   is more than enough time.  We've gone through the hard part of

1    getting our experts together and we got them disclosed.
2    Defendants' experts, common experts are due tomorrow.  That
3    date does not need to be moved again.  It's been moved
4    multiple times already.  Most of the fact portion of the case-
5    specific depositions have already taken place, either through
6    the treater doctors, thanks to the Court's order from the last
7    session.  Most of those have now gone forward.  Most of the
8    plaintiffs have already sat for their depositions.  A couple
9    of them did have to be suspended after an 80-year-old man sat
10   for a six-hour deposition or defendants said they wanted to
11   come back to ask some additional questions.  These people are
12   not in the greatest of health, and we've been amenable to
13   that.  We've worked with them on all of these issues, but what
14   we don't need to do is just put more and more time into the
15   schedule that's going to keep us from the ultimate goal, which
16   is getting to a trial so that these people can have their day
17   in court.  They've waited years already.
18           We think our schedule is very easy to meet.  We think
19   we can meet the current schedule without these extensions, but
20   we're willing to do the extensions because the defendants
21   asked us if we would, but we just think 90 days is too far,
22   it's too long, and it puts off a long time before the people
23   actually get to a trial.
24           Conceptually speaking, your Honor, we do not have a
25   problem with doing the Bellwether strikes first and then

1    submitting our briefs to the Court as to who we want.  That's

2    not a problem, but what we don't need to do is bump the entire

3    schedule two weeks to do that.  We don't need to bump all the

4    other dates just for that.

5         And doing the case-specific experts after the Court

6    picks the cases, assuming the Court picks the cases shortly

7    after we disclose them under our schedule and file with the

8    Court, then, that's what will happen, but what we don't need

9    to do is put the entire case on hold while we wait for Judge

10   Zobel to make that ruling, because Judge Zobel may rule in a

11   week.  She may take 30 days, but we don't need to stop all the

12   presses while that goes on.  We should continue to work up the

13   cases and get stuff ready.

14        THE COURT:  So, right now when are those strikes due?

15        MR. STRANCH:  As it stands today, they're due

16   tomorrow.

17        THE COURT:  As well as -- so, right now it's the

18   strikes and the briefs are due tomorrow?

19        MR. STRANCH:  That's correct, your Honor.

20        THE COURT:  And from the defendants' perspective, it

21   sounds as if you would go forward tomorrow if you had to, but

22   I think it -- I'm going to extend the deadline.  So, you're

23   not going to be filing things tomorrow.  I don't know if I'll

24   get the ruling out tomorrow.  I just need to, obviously, pick,

25   you know, which version or a compromise version, one of the

```
 1    two.  All right.  So, that's what we'll do.  Anything else?
 2               MR. STRANCH:  Unless your Honor has a specific
 3    question about any of the dates.
 4               THE COURT:  No.  I thought the briefings were fairly
 5    clear on that.  So, thank you.  All right.  So, I will take
 6    that under advisement.
 7               MR. STRANCH:  Thank you.
 8               MS. GREER:  Your Honor, common issue summary judgment
 9    deadlines are also tomorrow, and we had asked that those be
10    extended.
11               THE COURT:  Yes.  So, any deadlines that are for my
12    consideration in these motions, if it's tomorrow -- I don't
13    know if I'll get the decision out tomorrow, but you don't need
14    to comply with them.  I will extend the deadlines.  I just
15    need to pick for how long.
16               MR. STRANCH:  Hold on, your Honor.
17               Does that mean that the defendants don't have to
18    disclose their common experts tomorrow?
19               THE COURT:  I don't think that's one of the deadlines
20    that was --
21               MR. STRANCH:  Okay.
22               MR. TARDIO:  We've never asked to extend that.
23               MR. STRANCH:  I just wanted to -- because the Court
24    said anything tomorrow.  I just wanted to make sure that there
25    wasn't --
```

1          THE COURT:  No.  No.  Anything that I've been asked

2     to change for tomorrow.

3          MR. STRANCH:  Okay.

4          THE COURT:  Anything that I've been asked to change

5     that's actually due tomorrow doesn't need to be due tomorrow,

6     but I didn't understand that the common experts was one of the

7     deadlines that I was asked to change.

8          MR. STRANCH:  It had not been requested, but I just

9     wanted to clarify.

10         THE COURT:  All right.  Did anyone else need any

11    clarification based on what I just said?  No?  All right.

12         MS. JOHNSON:  I think that brings us to the second

13    motion for which the parties requested oral judgment, which is

14    the PSC's motion to compel Specialty Surgery Center and Dr.

15    Lister to provide documents and testimony, and Mr. Stranch

16    will be addressing that as well.

17         MR. STRANCH:  Good afternoon again, your Honor.

18         To set the stage very quickly, there is -- there are

19    two main clinic groups in Tennessee.  There's the Saint Thomas

20    Entities and then there's the Specialty Surgery that are in

21    east Tennessee.  This motion relates to the Specialty Surgery

22    and Dr. Lister, which is the second set of clinics outside of

23    Nashville in east Tennessee and they're also on a separate

24    timeline than the Bellwethers.

25         This motion relates specifically to discovery that

1    was served surrounding the drug formulary.  This is the one

2    where we discovered through a deposition of the Calishers that

3    the drug formulary that had been given to us and represented

4    both by counsel and the clients as being the drug formulary in

5    effect was not actually in effect.  We now know that that drug

6    formulary was never approved by the medical executive

7    committee.

8         We know that counsel that turned it over had both

9    formularies and did not give us the one that did not include

10   DepoMedrol, which was the drug that was used here that was in

11   effect.  Instead, gave us a formulary that was never approved

12   and did include DepoMedrol.

13        What we've asked is that we get all the documentation

14   surrounding that change and we've asked for questions as to

15   what diligence was done around the representations that this

16   formulary was in effect and, your Honor, instead of trying to

17   go through everything in great detail, I'll try to explain the

18   conceptual differences that we're having.

19        One of the main ones is the changes to this formulary

20   were made in April of 2013.  Our ESI protocol has a cutoff

21   before then.  So, all the ESI was not gathered that included

22   2013.  Now, the email boxes did, but all the other ESI didn't,

23   and one of the big conceptual problems we've been having is I

24   said I want you to go get the rest of the electronic

25   information you have that includes 2013 and search that,

1    because this is a big deal.

2            THE COURT:  I had thought that -- maybe I

3    misremembered, but I thought that the defendants have

4    represented that they ran undated searches.

5            MR. STRANCH:  Through the documents that they had

6    already collected in which they excluded 2013 beforehand.

7            THE COURT:  You mean the 40,000?

8            MR. STRANCH:  No.  That 40,000 -- so, the way it

9    worked was the defendants went and grabbed electronic

10   information from Specialty Surgery.  It was not everything

11   that they had.  It was date limited, except for the email

12   boxes, is my understanding, because you can't cut those off.

13   They ran search terms on that and had produced documents of

14   which they reviewed and then produced to us.

15           The problem is that initial grouping of documents was

16   already date limited.  So, when they ran further searches on

17   it, because some ESI did get through that, some didn't, they

18   did not have all the 2013 materials there, and when I asked

19   them to go back and to gather the rest of that electronically-

20   stored information that would include all of 2013 instead of

21   just bits and pieces of 2013, I was told absolutely not.  It's

22   going to be too expensive.

23           And so, we're moving to compel them to do that and to

24   run those searches on that so that we get the full document

25   production that we're entitled to around this issue.  That's

1    one of the big issues that's a problem.

2         The other issue that we've got, your Honor, that

3    arises out of that is the re-depositions of Dr. Lister and Dr.

4    Atkinson -- and Jean Atkinson, the nurse.  They both

5    testified.  Dr. Lister testified multiple times when asked

6    that DepoMedrol was on the drug formulary.  He said that.  It

7    was not.  It was never approved and put on there.

8         THE COURT:  So, my understanding of the -- I mean,

9    obviously, the defendants can correct me when they speak, but

10   I had understood they did not oppose a re-deposition, but that

11   it should be limited and, also, that they felt it should be

12   not a separate common discovery, but that it should be taken

13   even if it could be construed as common during the case-

14   specific discovery because these individuals likely would be

15   deposed again.

16        MR. STRANCH:  So, first off, your Honor, the

17   limitations, it creates problems because every time we've

18   gotten a filing on this issue, we've learned new information

19   that we didn't think we would have to go into, and we already

20   have enough fights in depositions over common versus case

21   specific, and I can give you a specific example.

22        In a recent deposition of a doctor, the question the

23   doctor was asked was, "Doctor, when you referred the plaintiff

24   to STOPNC for a steroid injection, did you know at that time

25   that they were purchasing from NECC?"

```
1            Counsel objected and instructed him not to answer
2     because they said that's a common issue, not a case-specific
3     issue, and we're going to be filing a motion on that as well,
4     but we enough fights over what's allowed to ask and what's not
5     and people being instructed not to answer.  We don't need it
6     in this case, particularly because once people start telling
7     the truth, they may start saying new things that we didn't
8     know and we may need to inquire into those areas.
9            THE COURT:  Right, but in some ways that proposal
10    would seem to answer that concern because even though they're
11    being called for case specific, you could ask common issue
12    about this limited issue.  I took it more as limiting the
13    number of times a person had to appear rather than saying, Oh,
14    we're only going to take case specific at this time.
15           MR. STRANCH:  Your Honor, at this time there is no
16    schedule that would start any case-specific discovery as it
17    relates to Specialty Surgery.  So, in effect, we would not be
18    able to inquire into it at all, and that's the problem,
19    because we need to inquire into it because we don't know what
20    additional written discovery we may have to do on this or if
21    there's any additional witnesses that we may need to call to
22    take testimony from that previously we thought had no
23    relevance to any of this.
24           So, we need to go ahead and do those depositions so
25    that we will know what else needs to be done, because the last
```

1   thing we need to do is get in the middle of case-specific

2   discovery and then have to reopen common discovery because we

3   need three new witnesses because they all point to different

4   people, saying these were the people that told me to do it.

5           There's no reason to delay this.  There's no reason

6   to push this off.  In fact, we were initially told they would

7   under no circumstances agree to a re-deposition of them,

8   period.

9           THE COURT:  Well, here we go.

10          MR. STRANCH:  So, now we're being told we can, but

11  you have to take them at some indeterminant point in the

12  future that may or may not ever come, and we won't be able to

13  get to the bottom of this until we take their depositions.

14  So, that's the issue as it relates to their depositions, your

15  Honor, and we do need those.

16          Now, the last kind of area is we want a copy of the

17  retention -- of the document retention letter, the litigation

18  hold letter that was sent out.  The defendants have opposed

19  that and say you have not made a showing of spoliation.  Well,

20  we believe, if you review our reply brief, that we very

21  clearly have.

22          What we do know, your Honor, is that Jean Atkinson

23  faxed to Calishers a document that had handwriting on it with

24  additions to the drug formulary.  That document no one knows

25  where it is.  That document was sent after the litigation hold

1    was put into place.  That document has been spoliated.  It's

2    gone.  No one can find it.  Now, maybe it will show up when

3    they do the extra ESI searches.  Maybe it's been scanned in

4    and we didn't find it because it was scanned in in 2013, but

5    we won't know until they do those searches, which they've so

6    far refused to even gather that information to search it.

7            Now, we think we've met all the requirements to have

8    that turned over so that we can see who received the letter

9    and what the letter instructed them to do and whether they

10   violated that letter when they sent it -- or when they

11   destroyed that document or not.

12           We believe there also were additional documents that

13   may have been destroyed as well.  We won't know that for

14   certain until we get into the depositions, though.  We know

15   there's nothing in writing telling Jean Atkinson to do this.

16   We don't have the medical executive committee minutes.  It has

17   been represented to us by counsel that there's no mention of

18   this in the medical executive committee minutes.  So, maybe

19   there was no instruction to her, but I'm guessing that the --

20   that a nurse did not on her own decide to update the drug

21   formulary and add 30 drugs to it, including the one in this

22   litigation.  Someone instructed her to do that.

23           So, we want to inquire into Jean Atkinson about that

24   process in the deposition and we want to know what happened to

25   the documents surrounding that, because there are none, which

1    is just, you know, hard to fathom in this day and age that

2    there's nothing surrounding it.  So, those are the documents

3    that we want, your Honor.

4           The key thing on the search is we need that

5    additional grouping of information to be gathered so that the

6    searches will be effective.  Otherwise, we're searching stuff

7    that's already excluded that time period.  We want the

8    depositions without limitation because that would avoid us

9    having to come back a third time and saying now we need to

10   depose them on these three topics that we were told we

11   couldn't and we need them now, not at some indeterminate point

12   in the future so we can determine what additional discovery,

13   if any, needs to be done, and we need the litigation hold

14   letter, and we think -- and even the defendants admit that

15   it's discoverable if we make a showing of spoliation, which we

16   believe we've done.

17          THE COURT:  My understanding is from your reply brief

18   that your request with respect to the redactions to Exhibit 3

19   have been satisfied.

20          MR. STRANCH:  That has been resolved, your Honor.

21          THE COURT:  Mr. Tardio.

22          MR. TARDIO:  Thank you, your Honor.

23          Let me see if I can clarify a few points that may

24   help the Court.

25          We gathered the email accounts in April 2013, after

1    this formulary change happened.  So, any emails about --

2    assuming they predated the actual change and they're not post

3    -- talking about a post change would be captured in the

4    information that we have gathered, and in responding to this

5    second set of discovery, we searched those emails through

6    April 2013 of Kim Bowlin, Jean Atkinson, Dr. Lister and Diane

7    Austin, another potentially-involved person, and produced

8    those documents.

9          So, what I think I hear Mr. Stranch asking for now is

10   for us to attempt to preserve -- or capture, process, whatever

11   word we want to use, the remainder of the email accounts from

12   when we preserved them up through, I suppose, today and do

13   searches of those, and we think that that is unduly

14   burdensome, as we outlined in our response.

15         The second point --

16         THE COURT:  My understanding, then, is that -- I

17   guess to -- you did a search with -- it was an undated search

18   at the time because you ran it in April 2013.  So, you didn't

19   capture things since April 2013 because that wasn't -- you did

20   the search at that time.  So, of course, it couldn't create

21   things that were going to be generated in the future.

22         MR. TARDIO:  Right.

23         THE COURT:  I guess -- why doesn't your ongoing

24   obligation to provide discovery mean that you wouldn't have

25   checked the material after April 2013?

1          MR. TARDIO:  Well, one is our protocol in place --

2          THE COURT:  I see.

3          MR. TARDIO:  -- I don't think, obligated us to

4    capture or search anything beyond what we -- what we have.

5          Now, at this point I think the Court -- obviously,

6    it's in the Court's discretion to say, no, you need to go back

7    and get everything from April 2013 forward and search it, and

8    if the Court orders us to do that, we'll obviously do it, but

9    our position is that we've --

10          THE COURT:  It wasn't a relevance objection.  It was

11    that if this is what you did, you thought the protocol -- that

12    you've complied with the protocol on --

13          MR. TARDIO:  We feel we complied with the protocol,

14    past tense, and that we complied with our reasonable

15    obligation to search and produce documents in response to this

16    new set of discovery.

17          THE COURT:  Because I didn't quite follow -- I'm

18    looking now at Page 10 of your brief that says, "When the PSC

19    served its second set of request for production focused on the

20    formulary issues, counsel for SSC did not re-review each page

21    of the 40,000 case relevant electronic documents.  Instead,

22    counsel searched for terms relevant to the topics raised in

23    the PSC's second request for production."

24          So, I guess what I took from that -- I don't know if

25    it's still 40,000 because you've turned over 5,000, right?

1   So, you went back and re-reviewed the 35,000 remaining

2   documents, the documents that hadn't been produced, to see if

3   they satisfied anything requested in the second set?

4          MR. TARDIO:  No, we didn't go back and do a page-by-

5   page review of the 40,000 or the 35,000.

6          THE COURT:  So, what did it mean when you said you

7   searched for terms relevant to the topic?

8          MR. TARDIO:  We ran the search of terms specific to

9   the formulary, formulary approved medication -- there were a

10  couple of others -- through the custodians that we believed to

11  have any potential involvement in the formulary change,

12  Atkinson, Bowlin, Austin and Lister.

13         THE COURT:  Okay.  So, you ran it both in terms of

14  custodians that you had already searched before and then you

15  added some?

16         MR. TARDIO:  No, we didn't add them.  They were

17  included the first time.

18         Let me let Mr. Cline -- he can explain it better than

19  me because he's the one that actually did it.

20         MR. CLINE:  Good morning.

21         We did two separate searches.  So, we searched

22  undated Kim Bowlin, Jean Atkinson, Diane Austin, Dr. Lister,

23  undated.  Then we searched the 40,000 documents returned by

24  the pre --

25         THE COURT:  Just for clarification, this is on the

1    second time you're doing this?

2         MR. CLINE:  Yes, ma'am, in responding to the second

3    request for production.

4         THE COURT:  Okay.

5         MR. CLINE:  And then we ran those same search terms

6    through the 40,000 pages returned by the PSC's original search

7    terms.  So, there were two separate searches.  There was a

8    search that was date restricted --

9         THE COURT:  So, I guess -- I know this is a small

10   point.  Why are you researching the 5,000 that you already

11   turned over?

12        MR. CLINE:  They weren't produced.  We produced a

13   subset of those documents.

14        When the parties negotiated the ESI protocol, they

15   came to agreed search terms.  So, all the data we collected

16   was processed against the search terms.  There were 40,000

17   pages returned from that search.  We then reviewed those for

18   responsiveness in responding to the PSC's first request for

19   production and produced 5,000 pages.

20        So, when we get the second set of request for

21   production, we ran searches of those 40,000 pages rather than

22   re-reviewing all 40,000 pages.  Does that make sense?

23        THE COURT:  Sorry.  I'll have to go back and --

24        MR. TARDIO:  We, basically, when we got the second

25   set, went back and instead of reviewing page by page the

1    40,000, we did a targeted search.

2              THE COURT:  It doesn't sound like you did a page-by-

3    page on the first time around either.  You ran the search

4    terms.

5              MR. CLINE:  No.  We reviewed all 40,000 pages.

6              THE COURT:  All right.

7              MR. CLINE:  The 40,000 was a subset of the entire

8    collection.  The 40,000 pages hit the search terms the PSC

9    gave us the first time.

10             THE COURT:  And then you hand reviewed the 40,000?

11             MR. CLINE:  Yes, ma'am.

12             MR. TARDIO:  The first time around.

13             MR. CLINE:  So, we didn't re-review them the second

14   time around.  We searched them the second time around.

15             THE COURT:  All right.

16             MR. TARDIO:  The second point -- and this may be

17   another point of clarity.  Mr. Stranch is correct, our initial

18   position was we don't believe you're entitled to take a second

19   deposition of Dr. Lister and Jean Atkinson.

20             I realize that they have raised issues, and we have

21   never disputed that we produced the wrong document with the

22   impression that it was the right one that was in effect in

23   2012.  Never disputed that.  Have never said anything other

24   than that's what we did and we shouldn't have done it.  We

25   screwed up the first time around.

1          Our position is if the Court is going to order Dr.

2    Lister and Jean Atkinson to be deposed again, it should only

3    be limited to these issues, and it does make sense to do it in

4    the case-specific portion of these cases.  They're going to be

5    deposed again in the case-specific part of these cases, I'm

6    assuming.  I can't imagine they wouldn't be and can easily be

7    folded into that deposition.  What we want to avoid, as the

8    Court alluded to, is a third -- basically, a third deposition

9    of them.

10          THE COURT:  And what is the timing with the SSC?  Are

11    they in the same -- they are in the same timing group as

12    everybody else, right, or is it -- no?

13          MR. STRANCH:  Separate.

14          THE COURT:  They're separate?

15          MR. TARDIO:  Right.  They're behind the STOPNC cases.

16    They were going along together for a while and they --

17          THE COURT:  How many schedules do we have now?  A lot.

18          MR. TARDIO:  At least two from the standpoint --

19          THE COURT:  (Indicating) I have a folder like this

20    with the scheduling.

21          MR. TARDIO:  Right, but they are behind the STOPNC

22    cases and will be because the Calishers are potentially being

23    added to the cases, which will -- little bit further on.

24          THE COURT:  All right.  Anything else?

25          MR. TARDIO:  Yes.  Let me make a couple more points.

1          The plaintiffs' position when it comes to spoliation

2    or destruction of documents is that -- I think Mr. Stranch

3    said something like, We know Jean Atkinson faxed a handwritten

4    list of medications to prompt this change to the formulary.

5    That's not exactly what the testimony has been, because nobody

6    has come out and said, I remember this document existed.

7    There was a fax.  I saw it.  The testimony has been much more

8    equivocal.

9          Gina Calisher was asked about it.  She said she very

10   well could have.  It could have been sent to me.  It could

11   have been faxed to me.  Kim Bowlin, the other witness who

12   talked about it, said, I assume.  I really don't know.

13         So, there's not really any solid evidence in the

14   record that a document -- a communication from Jean Atkinson

15   to Gina Calisher to update the formulary in April or March of

16   2013 exists, and there's definitely not any solid evidence

17   that such a document has been destroyed.

18         And that leads to the next point that I would like to

19   make for the Court, which is, let's say that the Court orders

20   us to perform additional searches, which we submit would be

21   burdensome and costly.  I don't know that we can get around

22   that.  The Court, of course, has to make the balancing

23   determination whether it's appropriate or not, but if the

24   Court orders us to do these searches, we do the searches and

25   let's say we find a document where Jean Atkinson in March or

1    April of 2013 says to Gina Calisher, the management company,

2    Hey, we need to update this formulary.  DepoMedrol is not on

3    here.  We need to update this.  I don't believe that that is

4    this smoking gun that the plaintiffs paint it as.

5            It's six months after the outbreak.  It didn't --

6    clearly, the fact that DepoMedrol was not on the formulary in

7    2012, adding it or not having it on there, that didn't cause

8    any injury to the plaintiffs.  It's a paperwork issue.  Is it

9    sloppy?  Can they argue to the jury, Hey, this is sloppy?

10   They didn't update the formulary.  They didn't even have a

11   drug they were using on the formulary.  They can make that

12   argument, but they don't need a lot more searches and more

13   depositions to make that argument.

14           The other point is that they had been using brand

15   DepoMedrol for years at the clinic and there's never been any

16   argument -- and I don't think there is even today -- that

17   brand DepoMedrol is unsafe.  In fact, the argument is the

18   opposite, that we should have used brand DepoMedrol.

19           The only real relevance other than sloppiness that

20   this -- the fact that DepoMedrol wasn't on the 2012 formulary

21   has is if the argument is they were using brand DepoMedrol.

22   It was unsafe.  It wasn't on the formulary.  That's not the

23   argument.

24           I think at this point the plaintiffs are fishing a

25   little bit to really hit Jean Atkinson over the head with this

1    document.  She said at her deposition she didn't remember it.

2    We've stipulated to these points.  They have enough to impeach

3    her at trial if they wish to do so, and we feel that

4    additional searches, additional unlimited depositions will

5    only add to the hours and cost of these cases and at this

6    point are not necessary.  Thank you, your Honor.

7              THE COURT:  If I understand correctly as well, SSC

8    was purchased by Cumberland after May 3rd of 2013?

9              MR. TARDIO:  Hm-hmm.

10             THE COURT:  So, I guess when you're asking for

11   documents going forward, are we just talking about -- I don't

12   think we're just talking about a month, right?  You want --

13             MR. STRANCH:  I believe it actually didn't end up

14   closing until June; is that correct?

15             THE COURT:  So, are we talking about two months of --

16             MR. STRANCH:  Well, it's more than that, your Honor,

17   because -- here's what's going on.  You were told -- and they

18   were very artful in the way they described it to you.  We got

19   the email boxes as of this date, but there's hard drives with

20   documents on them.  There's other places where electronic

21   documents are stored outside of email, and those were the ones

22   that they refused to go back and have because they stopped

23   those at the end of 2012.  So, nothing on there has been

24   searched from 2013 on, and that's what I asked them to go back

25   and gather, and they refused to.  So, that's what we're

1    fighting over, in part.

2        Now, they cut off these emails in the middle of 2013.

3    We know there were more changes made to the formulary after

4    Gina Calisher's email back to Jean Atkinson and if those are

5    after that date, we want those emails, too.  So, they need to

6    go ahead and take the email boxes through when Specialty

7    Surgery shut down, which is only going to be a couple of

8    months, and search them to see if there's additional

9    information in there related to this issue.

10        And, your Honor, I want to address a couple of

11    misrepresentations that were made to the Court.  They're very

12    frustrating to me.  You heard them say, We now all agree this

13    is the formulary that was in effect in 2012.  Their discovery

14    responses don't say that.  Their discovery responses say, "The

15    document now believed to be."

16        And so, we have to get to the bottom.  Is it or is it

17    not?  They need to answer that question and we need to find

18    out how it happened.

19        Now, they say, We don't know that any documents were

20    destroyed.  They said that this is all a bunch of hoodoo and a

21    bunch of, you know, aspersions by the plaintiffs.  Let me tell

22    you, your Honor, Gina Calisher's own email back to Jean

23    Atkinson says, I had a hard time reading your handwriting.

24    The question was, did she scan it and email it to him or did

25    she fax it to him?  But there was handwriting on a document

1    that made these changes that Gina Calisher had a hard time

2    reading.

3           So, it's just a flat misrepresentation to the Court

4    to say that we don't know if that document exists or not,

5    because that's what the changes were made based on, and that

6    document has not been produced, and I think the jury is going

7    to find it very instructive that these defendants modified

8    their formulary and tried to pass it off on the Court and the

9    plaintiffs to show that they were allowed to be using

10   DepoMedrol, because the formulary says only these drugs, and

11   they were using a drug not on the formulary that was in effect

12   at the time.  That is very relevant to a jury.

13          THE COURT:  All right.  Thank you.  I will take it

14   under advisement.  What's the next thing on the schedule?

15          MS. JOHNSON:  Those were the only two motions that

16   the parties had sought oral argument on, your Honor.

17          There are -- by way of an update, rather than try and

18   re-traverse the entire agenda, I think there are a few update

19   items we can provide to the Court by way of what's going on

20   with a few issues.

21          In terms of Tennessee, the Court had issued an order

22   dealing with whether or not treating physicians at Howell

23   Allen would be deposed, and just to share with the Court, some

24   of those depositions have already occurred.  Most of the rest

25   are scheduled, and that is proceeding.

1          There is on the agenda a motion to amend the case

2   management order relating to Specialty Surgery Center.  That

3   is not yet fully briefed, but will be by the next time.  I

4   believe the only remaining piece of that is plaintiffs' reply.

5          The Court also issued an order requiring the PSC to

6   provide -- or, rather, sanctioning the written depositions,

7   and the PSC has worked out with the defendants that we will

8   provide our written questions by February 1st and we are

9   working pretty furiously on that.

10          In terms of the Premier schedule, the Court did

11   extend the deadline there, and just to report to the Court,

12   that there are depositions of doctors that are scheduled in

13   the next month or so and we're working with defense counsel

14   for Premier to schedule a couple of additional depositions.

15          As to Box Hill, there are some efforts being made by

16   the PSC to clean up some of Box Hill's discovery responses.

17   Those may result in a motion to compel.  We're not sure yet,

18   but that may be something that you see before the next status

19   conference.

20          Then in terms of the Rust-Omni access issue, we

21   addressed that this morning, but the PSC and the defendants

22   will work to get something filed with the Court, either an

23   agreed-upon proposed order or statements of disagreements

24   within the next two weeks.

25          THE COURT:  I understand the PSC hasn't filed its

1    reply yet, but I did have a couple questions on the motion to

2    amend with respect to Specialty Surgery and maybe we won't

3    need oral argument.  I can rule after the reply.

4           I was a little bit confused -- I think some of this

5    has to do with when the motion was filed, and then my

6    understanding is Judge Zobel granted the motion to amend to

7    add Calisher.

8           So, what's happened since then?  I mean -- and this

9    may be because I wasn't paying attention at the time.  Has the

10   complaint -- have the complaints been served on Calisher?

11   What's going on with that?

12          MR. STRANCH:  So, the way it stands right now is when

13   we filed our motions to amend, we attached those complaints to

14   it.  This is what we raised with Judge Zobel.

15          THE COURT:  Yes.

16          MR. STRANCH:  Because they've not been put on the

17   docket yet.  So, we asked her how she wanted to handle it

18   earlier, and she said file them in the individual cases.  So,

19   we will file them in the individual cases, and then we'll work

20   with Mr. Moran, who is the lawyer for Calishers, to work out a

21   briefing schedule, because it's my understanding he's --

22          THE COURT:  Is there a service issue or is that all

23   taken care of by prior orders?

24          MR. STRANCH:  I don't believe that there is a service

25   issue.

```
 1          THE COURT:  You just need to identify yourself for
 2   the court reporter.
 3          MR. MORAN:  Thank you, your Honor.  John Moran for
 4   Calisher & Associates, and Calisher & Associates has not been
 5   served with the complaints yet.  I'm happy to work out with
 6   Mr. Stranch an agreement to accept service.
 7          THE COURT:  I would just be interested in the timing
 8   because, obviously, some of the discovery is going to depend
 9   on when you're served.  I understand -- and then that will
10   trigger a time for a motion to dismiss.  I understand that may
11   be in the offering.
12          And then I hadn't understood that we had stayed any
13   other discovery in this case pending a resolution of a motion
14   to dismiss.  No?
15          MR. STRANCH:  No.
16          THE COURT:  Okay.  Because it looked as if there was
17   some suggestion that that should happen.
18          MR. MORAN:  And, your Honor, my understanding is that
19   the parties were in agreement that Calisher & Associates would
20   have some time -- if its motion to dismiss was denied, would
21   then have some time to take common-issue discovery.
22          THE COURT:  So, that's my -- I don't understand --
23   that hasn't been the practice, is my understanding, that
24   discovery took place even while motions to dismiss are
25   pending.  You were just saying you got a separate agreement
```

```
 1   from the PSC that might have been out of the norm or --
 2           MR. STRANCH:  No.
 3           MR. MORAN:  I think one of the twists, your Honor, is
 4   some of the discovery that we would like to take are
 5   depositions of Dr. Lister and Jean Atkinson, who had been
 6   deposed before.  Specialty Surgery -- or those defendants,
 7   understandably, would rather not have us take their
 8   depositions if we're going to get out of the case, anyway.
 9   So, that was why the proposed order was set up the way it was.
10           THE COURT:  All right.  Well, that's helpful.
11           MR. STRANCH:  Your Honor, we've got the motion to
12   compel pending on those two.  If that's ordered, Mr. Moran can
13   take that deposition at the same time, because we -- unless
14   there's some major revelations in the deposition and lots of
15   testimony that everyone is not expecting, then there's no way
16   it will take all day for us.
17           THE COURT:  All right.  So, that's helpful.  I'll
18   wait to have the reply.  I'm not sure it's something that
19   needs oral argument on.  I mean, if there's anything that you
20   would like to say now.
21           MR. MORAN:  I won't be filing the reply.  So --
22           THE COURT:  No.  I understand that, but you filed an
23   opposition, right?  Or are you in agreement?
24           MR. TARDIO:  No.  We filed an opposition -- Specialty
25   Surgery Center filed an opposition that was basically saying
```

1    that the plaintiffs -- if the Court grants the motion to

2    compel, that shouldn't open up common discovery for the

3    plaintiffs again.

4                THE COURT:  I see.

5                MR. TARDIO:  And that was basically our position.

6                THE COURT:  Okay.  And did you want to add anything

7    else, Mr. Tardio?

8                MR. TARDIO:  No, ma'am.

9                THE COURT:  Would the PSC like to add -- I know I'm

10   getting a reply brief.

11               MR. STRANCH:  We'll file a brief reply.  I'm sure it

12   will be eloquent and will cover everything.

13               THE COURT:  You're humble, too.

14               MR. STRANCH:  And, hopefully, very persuasive.

15               No.  Your Honor, basically, there's still common

16   discovery to be done here, particularly surrounding this

17   formulary issue, and we shouldn't have artificial cutoffs that

18   are basically going to require us to come back to the Court

19   and ask the Court to reopen issues again.  We should just

20   leave it all open.  Mr. Moran can do the discovery he needs to

21   do during that time.  We can do our follow-up on the formulary

22   and anywhere else that that may lead us that we need to go to,

23   and then we can move these cases into the Bellwether process

24   as well.

25               THE COURT:  All right.  Sounds good.  Anything else?

1          MS. MEEDER:  Your Honor, I just wanted to clarify one

2    thing.  Earlier Ms. Johnson testified that the date upon which

3    the PSC's cross questions for the Rule 31 depositions was --

4    that they were due February 1st.  I just wanted to clarify

5    that's true.  So, the Premier defendants' notices -- but the

6    Box Hill notices have a response date of January 25th.

7          MR. KIRBY:  Your Honor, Greg Kirby for the Box Hill

8    defendants.

9          To make it consistent, we'll agree to make it

10   February the 1st so that there's not two separate dates.

11         MS. MEEDER:  Thank you.

12         THE COURT:  Great.  All right.  Well, thank you

13   everyone.  I will see you in February.

14         MS. JOHNSON:  Thank you.

15         MR. TARDIO:  Thank you, your Honor.

16         COURTROOM DEPUTY CLERK YORK:  All rise.  The Court is

17   in recess.

18         (Adjourned, 3:22 p.m.)

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2            I, Catherine A. Handel, Official Court Reporter of the

3    United States District Court, do hereby certify that the

4    foregoing transcript, from Page 1 to Page 39, constitutes to the

5    best of my skill and ability a true and accurate transcription of

6    my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

7    Re: New England Compounding Pharmacy, Inc., Products Liability

8    Litigation.

9

10       January 21, 2016          /s/Catherine A. Handel
         Date                      Catherine A. Handel RPR-CM, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```