*****ROUGH DRAFT*****

1                 UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3    ————————————————————————————————————————————————

4    IN RE:  NEW ENGLAND COMPOUNDING   :
     PHARMACY, INC; PRODUCTS           : MDL No 2419
5    LIABILITY LITIGATION              :
                                       : Master Dkt.
     ————————————————————————————————— : 1:13-md-02419-FDS
6
     THIS DOCUMENT RELATES TO:         :
7                                      : Judge Rya Zobel
     All Cases Identified in           :
8    Docket No.  1472-1                :
                                       :
9    ————————————————————————————————————————————————

10

                      VIDEOTAPED DEPOSITION
11                      OF MICHAEL O'NEAL

12

13

                          9:07 a.m.
14                    January 11, 2016

15                 Gideon Cooper & Essary
                          Suite 1100
16                   315 Deaderick Street
                    Nashville, Tennessee
17

18

            Susan DeCarlo, RPR, CCR No.  B-2125
19

20

21

22

23

24

25

                              1

*****ROUGH DRAFT*****

1       A.          It was a nine-month -- it was back

2   in 2000 -- I can't even remember -- I think that

3   it was 2009 it was just a certification for

4   leadership.

5       Q.          Okay.   Thank you.   And I understand

6   you are now employed at Vanderbilt; is that

7   correct?

8       A.          That's correct.

9       Q.          Can you give me just a brief

10  thumbnail sketch of your employment history post

11  graduation from Auburn up to present day?

12      A.          Sure.   It's rather easy.   I worked

13  for about three months for Eckerd drug here in

14  Nashville and I have been at Vanderbilt ever

15  since.   I have been at Vanderbilt since November

16  of 1991.

17      Q.          That is an easy work history to

18  remember.

19      A.          Yeah.

20      Q.          And why did you leave Eckerd?

21      A.          I just wanted to be in a hospital

22  pharmacy.   I actually had an offer with

23  Vanderbilt.   I was just waiting for a position.

24      Q.          Okay.   And do you do any other work

25  on the side, consulting work or other work of

*****ROUGH DRAFT*****

1    that nature?

2         A.        I am a consultant for surgery

3    centers, several surgery centers here in

4    Nashville or in this region.

5         Q.        How many surgery centers do you

6    consult for?

7         A.        Currently I have 21 clients.

8         Q.        And STOPNC is one of those clients?

9         A.        Yes, it is.

10        Q.        Do you do any other work for Howell

11   Allen?

12        A.        No, I do not.

13        Q.        Do you do any work for any other

14   clinics that are jointly owned by Howell Allen

15   and other parties?

16        A.        No, I do not.

17        Q.        Describe your job responsibilities

18   at Vanderbilt, please.

19        A.        Currently I am a procurement merger

20   so I am a management level over procurement and

21   inventory management.

22        Q.        For the hospital pharmacy?

23        A.        Correct, for the hospital pharmacy.

24        Q.        So by procurement you are only

25   going out and finding the pharmaceutical products

*****ROUGH DRAFT*****

1    contract template, that I felt like provided an

2    infrastructure for the services that I would

3    render to them.

4         Q.      I am going to show you a document

5    that I am going to hopefully mark correctly as

6    Exhibit 865 and I am going to ask you to take a

7    look at this.  And the question that I am going

8    to ask you after you look at it and review it is

9    do you recognize this document.

10        A.      Yes, sir, I do.

11                (Exhibit Number 865, Pharmacy

12        Consulting Contract, was marked for

13        identification.)

14   BY MR. STRANCH:

15        Q.      What is this document?

16        A.      This is my consulting contract with

17   St. Thomas Outpatient Neurosurgical Center and

18   myself, so the dates I -- it must have been

19   earlier in the year because I see that this is

20   February of 2007.

21        Q.      All right.  And you signed it March

22   of '07, correct?

23        A.      That's correct.

24        Q.      And this is your form contract that

25   was in use in 2007?

21

*****ROUGH DRAFT*****

1       **Q.**          Okay.  So when was the first time
2    that you can recall actually being in STOPNC's
3    facilities?
4       **A.**          I can't tell you specifically, but
5    I would guess it was either February or March of
6    2007.
7       **Q.**          Okay.  And do you recall what the
8    purpose of your first visit to the facility was?
9       **A.**          I would say the purpose was not any
10   different than the purpose ever is; it's just to
11   go in and do a formal and thorough inspection and
12   then to provide any report back to the facility
13   about things that I had found based on my
14   expertise and knowledge in regards to how
15   medication management should occur in a surgery
16   center.
17      **Q.**          And this is a standard inspection
18   you do for all your clients?
19      **A.**          It is, yes, sir.
20      **Q.**          And can you describe what that
21   inspection consists of?
22      **A.**          Sure.  So I examine medication
23   management storage areas.  I review their
24   narcotic paperwork to determine if it's meeting
25   the DEA guidelines in regards to signatures and

24

*****ROUGH DRAFT*****

1    co-signatures.  I am a third party or I consider

2    myself a third party for reviewing any potential

3    diversion of controlled substances, so a lot of

4    time is spent with actual controlled substance

5    management.  In addition, I will review

6    expiration dates of products.  I will basically

7    do what I consider an environment of care survey

8    looking at temperatures of refrigeration, making

9    sure that medications are stored properly

10    according to the package insert by the FDA,

11    approved by the FDA.  So it's really just kind of

12    a monthly, as I call it, housekeeping.  And there

13    is multiple compliance and regulatory points that

14    I review and basically review that and then

15    report back about either compliance or

16    noncompliance.

17    **Q.**    Okay.  And is that predominantly

18    what service you provided to all of your clinic

19    clients?

20    **A.**    It would be the predominant

21    service, yes, that is correct.

22    **Q.**    And are you an employee of STOPNC?

23    **A.**    No, I am not.

24    **Q.**    Okay.  So you are a vendor of

25    STOPNC who provides them a service?

*****ROUGH DRAFT*****

1    BY MR. STRANCH:

2        Q.        Okay.  Do you also provide any

3    advice on medication procurement to your clients?

4        A.        If a client asks me about

5    procurement of certain drugs, then I would

6    provide that information.  It's certainly within

7    the scope of what I would consider my level of

8    expertise and would provide consultation in that

9    area.

10       Q.        But the burden is on the clinic to

11   come to you and say we have a question about

12   this, correct?

13       A.        In general.  In general.

14                 MR. STRANCH:  Why don't we go off

15           the record for a second while we fix that

16           and I will see if we can change these

17           blinds.

18                 THE VIDEOGRAPHER:  Off the record

19           at 9:29.

20                 (Recess.)

21                 THE VIDEOGRAPHER:  Back on the

22           record at 9:30.

23   BY MR. STRANCH:

24       Q.        And let's just go through this

25   document, your 2007 contract, because you have

28

*****ROUGH DRAFT*****

1    is that what that --

2         **A.**        That's correct, with a facility

3    staff.

4         **Q.**        Okay.

5         **A.**        And then sign off on that

6    statement.

7         **Q.**        To assure proper documentation and

8    recordkeeping between the pharmacy records and

9    the patient's medical records.  So explain what

10   that would entail.

11        **A.**        So this would entail, again, my

12   third-party view, if you will, for the actual

13   recordkeeping of -- if there is documentation of

14   a medication being administered and what is

15   actually documented in the chart.  This primarily

16   refers to controlled substance administration

17   where if a staff member or anyone stated they

18   gave a certain amount of the narcotic, then that

19   would be both on the center's documentation and

20   in the patient's medical record.  It's just a

21   reconciliation of the two to prevent diversion or

22   to detect diversion.

23        **Q.**        So it's not the sort of thing that

24   you would be doing to track which lots of a drug

25   were given to which patient?

42

*****ROUGH DRAFT*****

1    **A.**          That is correct.  It would not be

2    that.  Now, it could be if I was requested.

3    Again, that is beyond the scope of my service,

4    but a lot of times it was primarily just for

5    documentation of controlled substances.

6       **Q.**          Did STOPNC ever ask you to help

7    with lot tracking for drugs that were dispensed

8    to patients?

9       **A.**          Lot tracking, no.

10      **Q.**          Was there anything else that -- any

11   other services that you provided that we have not

12   discussed here that you believed you were

13   obligated to provide under this contract?

14      **A.**          No, sir, this embodied basically my

15   services to STOPNC.

16      **Q.**          Okay.  And let me ask you, so after

17   you would do one of these monthly visits, what --

18   you would take your 30, 35 minutes and do it and

19   then what would due to memorialize that?

20      **A.**          I would type up -- I have a form

21   report that I send STOPNC and then I would score

22   them as either compliant or noncompliant on each

23   line within that report and then for noncompliant

24   issues I would give them a written explanation

25   for why they are not compliant.

*****ROUGH DRAFT*****

1         Q.        Do you have a copy of one of those
2    forms that we can see?
3         A.        I do not.  My attorney has one.
4                   MR. PINCKNEY:  I do.  Do you want
5          to see it?
6                   MR. STRANCH:  I would love to see
7          one.
8                   MR. PINCKNEY:  (Tendered.)
9                   MR. STRANCH:  Why don't we take a
10         quick break, get some copies of this and I
11         just want to make it an exhibit so we have a
12         list of what there is that you are doing.
13                  THE VIDEOGRAPHER:  Off the record
14         at 9:46.
15                  (Recess.)
16                  THE VIDEOGRAPHER:  Back on the
17         record at 9:58.
18                  (Exhibit Number 866, Monthly
19         Inspection Template, was marked for
20         identification.)
21    BY MR. STRANCH:
22         Q.        Okay.  I am going to hand you a
23    document that I have marked as Exhibit 866 and
24    ask if you can identify that document after
25    reviewing it?  (Tendered.)

44

*****ROUGH DRAFT*****

1     **A.**          Yes, I can.

2     **Q.**          What is this?

3     **A.**          This is a template for my monthly

4     inspections that I provide to STOPNC.

5     **Q.**          So this is everything that you do

6     in your monthly inspection, correct?

7     **A.**          Yes.   In the actual physical direct

8     observation inspection, that's correct.

9     **Q.**          Okay.   And there is -- and this is

10    all about storage, documentation, sorts of

11    things; and it does not deal with procurement,

12    correct?

13    **A.**          That's correct.

14    **Q.**          Okay.   Let's go back to 865 real

15    quick which is your '07 contract.   I just want to

16    confirm is that your signature as a pharmacist

17    down at the bottom?

18    **A.**          Yes.

19    **Q.**          It's dated March 20, 2007, correct?

20    **A.**          That's correct.

21    **Q.**          Do you recall when you began

22    issuing monthly reports to STOPNC?

23    **A.**          Not specifically, no, I don't.

24    **Q.**          Did you ever report to a peer

25    review committee at STOPNC?

45

*****ROUGH DRAFT*****

1          **A.**          It depends on how you define

2     report.  It's my understanding that this report

3     does go back and is reported back through the

4     medical executive committee, so I don't know if

5     it's tabulated -- I don't know, but, yes, this

6     information goes back to the MEC.

7          **Q.**          Did you ever meet with the MEC?

8          **A.**          Not directly, no, sir.

9          **Q.**          Do you know who is on the MEC?

10         **A.**          I don't know specifically, no, I

11    don't.

12         **Q.**          And your contact with either Tina

13    Sullivan or Debbie Schamberg, correct?

14         **A.**          That's correct.

15         **Q.**          And so anything that you provided

16    would have been to them, correct?

17         **A.**          Not all the time.  There was a

18    nurse, again as I mentioned, the nurse manager

19    that was not the administer of the facility that

20    I would provide my reports to directly and then

21    there were times when I may or may not include

22    Debra or Tina.

23         **Q.**          But those two individuals would

24    have been the only people that you would have

25    communicated your reports to, correct?

*****ROUGH DRAFT*****

1      **A.**        Correct.

2      **Q.**        So you did not send your reports to

3    Dr. Culclasure?

4      **A.**        No.

5      **Q.**        And you were never called to meet

6    with any peer review committee to discuss any of

7    your findings?

8      **A.**        No, I was not.

9      **Q.**        And no member of the medical

10   executive committee or peer review committee ever

11   reached out to you with questions during that

12   time, correct?

13     **A.**        I can't -- I don't know if Debra

14   Schamberg or Tina at the time was a member, but

15   they had questions for me --

16     **Q.**        Okay.

17     **A.**        -- as I provided my reports.

18     **Q.**        But other than those two, no one

19   else reached out to you with any questions from

20   STOPNC?

21     **A.**        No, not to my recollection.

22     **Q.**        Do you understand the different

23   types of licensing for a pharmaceutical pharmacy

24   versus a branded pharmaceutical wholesaler or

25   distributor manufacturer?

47

*****ROUGH DRAFT*****

1    BY MR. STRANCH:

2        Q.        Okay.  So let's go back to kind of

3    the basics on this 2012 contract; this is your

4    template, correct?

5        A.        Yes, it is.

6        Q.        And did you draft this yourself or

7    did you have someone else draft it for you?

8        A.        No, I actually borrowed this from

9    another organization that -- or used it from

10   another organization that presented it to me so

11   it became a standard pharmacist contract.

12       Q.        And what is your understanding

13   about the difference between this contract and

14   the 2007 contract?  Do you have greater

15   obligations under one or the other?

16       A.        No, I would not say so, not in my

17   mind.  I think my intent was to spell out for my

18   client a little bit more of my specific

19   responsibilities as it relates to medication

20   management --

21       Q.        Okay.

22       A.        -- just to give them a little bit

23   more depth and also to give the contract a bit

24   more -- to add some legalese to is, some legal

25   language that addresses HIPAA.

*****ROUGH DRAFT*****

1        Q.        There has always got to be a little
2    lawyer Latin in there.
3        A.        Yeah.
4        Q.        Okay.  So from your intention,
5    though, is that this contract does not add new
6    obligations on you or on the client; it's a
7    continuation of what it was before, it's just
8    spelled out better?
9        A.        That's correct.
10       Q.        So all of the things that we
11   discussed earlier that you did would be the same
12   here, correct?
13       A.        Yes.
14       Q.        And is this contract still in
15   effect between you and STOPNC?
16       A.        Yes, it is.
17       Q.        So you have renewed it after it
18   expired in September 2015?
19       A.        And I think the terms -- that's
20   correct, it's section one that it auto -- or it's
21   a three-year term.  I mean it just automatically
22   renews --
23       Q.        Okay.
24       A.        -- unless either party, either
25   party addresses or requests termination.

*****ROUGH DRAFT*****

1      Q.        Okay.  So I am reading through the
2    responsibilities here and it -- yeah, and it
3    appears to be the same basically as what you had
4    in your other one; is that correct?
5      A.        That is correct.
6      Q.        And this is your standard contract
7    that you are now using with other clinics that
8    you also talk with; is that correct?
9      A.        I believe it's with most, yes, sir,
10   that is correct.
11     Q.        Okay.
12     A.        I may have made further changes,
13   small changes, but no content changes in regards
14   to my responsibilities.
15     Q.        And you operate it the same way
16   under this contract as the old contract?
17     A.        I did, yes.
18     Q.        So it's a seamless transition?
19     A.        Yes.
20     Q.        Who was the designated medication
21   nurse at STOPNC?
22     A.        At the time I believe that it was
23   Cindy McClendon, she is a nurse there at the
24   facility.
25     Q.        Is it still Cindy McClendon now?

*****ROUGH DRAFT*****

1      **A.**        Yes, I say that.  I can't remember

2      the termination date of the prior nurse

3      coordinator manager, not Tina, but the other

4      nurse that I mentioned.

5      **Q.**        Whose name no one can remember?

6      **A.**        Yes.

7      **Q.**        Okay.  Would it be fair to say that

8      you only have a couple of affirmative duties

9      which is basically surrounding the narcotics

10     control and documentation and the inspections and

11     all other duties you have you have to be

12     contacted first before you're triggered to do

13     something, correct?

14     **A.**        Unless I saw something through

15     direct observation that I felt like I wanted to

16     share with the facility.

17     **Q.**        Okay.  But that would be part of

18     your inspection obligation then, right?

19     **A.**        That's right.  It would come from

20     that, that is correct.  So, yes, as far as

21     participating in these A through Q, that is

22     correct.

23     **Q.**        Okay.  So there is a lot of

24     discussion about quality improvement process.  Do

25     you know who -- do you know if STOPNC has a

*****ROUGH DRAFT*****

1    quality improvement committee?

2         **A.**        From my understanding they have a

3    medical executive committee.  I can't speak to

4    whether -- I don't know if one is the other, but

5    I know that --

6         **Q.**        So you don't know who is on the

7    quality improvement committee then?

8         **A.**        Correct.

9         **Q.**        You don't even know if they

10   actually have one or not?

11        **A.**        No.  I mean, I can't testify that I

12   do know that they have one.

13        **Q.**        And if you could think back to this

14   time period when you provided this new contract,

15   was there any discussion between you and STOPNC

16   at that time about changing your job

17   responsibilities?

18        **A.**        No --

19        **Q.**        Okay.

20        **A.**        -- there was no change or

21   discussion.

22        **Q.**        And so the signature date

23   difference of April of 2013 versus September of

24   2012 was just -- just slipped through the cracks

25   and then that is when you signed it, correct?

*****ROUGH DRAFT*****

1         MR. PINCKNEY:  I am having problems

2    because I am reading this judge's order and

3    I can't see that these questions fall under

4    the judge's order.  Do you read it

5    differently?

6         MR. STRANCH:  Well, we all agreed

7    in front of the judge that if he -- we can

8    talk about things that are clearly outside

9    the privilege.

10         MR. PINCKNEY:  And I was part of

11    that conversation -- I was not part of the

12    conversation, I listened to the whole thing.

13    I was on the phone too.  And I want to tell

14    you that what happened at that conference to

15    me is different from what is in this order,

16    and the Court speaks to it best and that is

17    what it says.  If you tell me how I am

18    misinterpreting something, I am really open

19    to it.

20         MR. STRANCH:  Yeah, I think that

21    the way that the Court --

22         MR. PINCKNEY:  These questions

23    don't really bother me much, to be honest.

24         MR. STRANCH:  I think the way the

25    Court took it is that if all of us agreed on

*****ROUGH DRAFT*****

1      something there, she did not feel that it

2      was necessary to address in the order

3      because we agreed upon it.  So the things

4      that she addressed in the order were the

5      things where we did not have substantial

6      agreement.

7              MR. PINCKNEY:  And we had

8      agreement -- and you know what I told you

9      before the deposition started about

10     agreement.

11             MR. STRANCH:  Yes.

12             MR. PINCKNEY:  Tell me what we

13     agreed to then because I was not aware that

14     we had an agreement.  But if you tell me

15     what was, than I would be in better shape.

16             MR. STRANCH:  Yes.  For example,

17     one of the things that we all agreed upon is

18     that if he made no substantive

19     recommendations before medication was

20     ordered, then there is no way the privilege

21     applies and we can ask that.

22             MR. PINCKNEY:  I did agree to that.

23             MR. STRANCH:  Yes.

24             MR. PINCKNEY:  I agreed to that and

25     I put that in my motion.

84

*****ROUGH DRAFT*****

1             MR. STRANCH:  That's correct and

2        that is what we are working around to now.

3        That is what this question is related to.

4             MR. TARDIO:  Well, I think that

5        maybe -- I don't think that that is what the

6        question was.  I think that it was border

7        and that may have prompted the objection.

8             MR. PINCKNEY:  Do you mind just

9        asking the question again?

10            MR. STRANCH:  Yes.

11   BY MR. STRANCH:

12        Q.      The question was:  When you learned

13   about the fungal meningitis outbreak is that also

14   when you first learned that STOPNC had purchased

15   MPA from the New England Compounding Center?

16            MR. TARDIO:  I object to the form

17        of the question.  And I also object in that

18        if there was any substantive discussion

19        between him and STOPNC at any point about

20        purchasing from compounders, purchasing from

21        anybody frankly it would be covered from

22        68-11-272.  I can't instruct him not to

23        answer.  He is not my witness, but we would

24        invoke the privileged on this question.

25            MR. PINCKNEY:  Well, I mean, maybe

85

*****ROUGH DRAFT*****

1          you can clear it -- I am concerned about

2          this too.  Maybe you could clarify by

3          finding out where he first learned it if you

4          ask him that simple question.

5                    MR. STRANCH:  Okay.

6                    MR. PINCKNEY:  And if he tells you

7          that he got it from Debra, then I am going

8          to invoke -- if they got it from reading the

9          newspaper, that is something else or

10         watching 60 Minutes.

11    BY MR. STRANCH:

12         Q.        Okay.  Let's rephrase the question

13    then.  When did you first learn that STOPNC had

14    ordered MPA from the New England Compounding

15    Center?

16         A.        I can't speak to the exact dates,

17    but I know that I was aware prior to the

18    actual -- when this became public knowledge.  So

19    for as long as upon my medication reviews my

20    direct observation of the facility, once they

21    started stocking it, I was aware at that point,

22    yes.

23         Q.        So that was when you first became

24    aware?

25         A.        Correct, when I saw it actually in

86

*****ROUGH DRAFT*****

1      the facility upon observation.

2          Q.      So you were not consulted prior to

3      the first purchase, correct?

4          A.      That is my understanding, that's

5      correct, yes.

6                  MR. STRANCH:  Okay.  I will tell

7          you, what, then, let's take about a

8          three-minute break and see if we can't wrap

9          this up quickly then.

10                 THE VIDEOGRAPHER:  Off the record

11         at 11:12.

12                 (Recess.)

13                 THE VIDEOGRAPHER:  Back on the

14         record at 11:33.

15     BY MR. STRANCH:

16         Q.      Dr. O'Neal, I want to try and go

17     back over some of your testimony very briefly and

18     then I will have a couple of quick questions for

19     you after that just to make sure everything is

20     clear for the record.

21         A.      Okay.

22         Q.      You testified that you first became

23     aware that STOPNC had purchased MPA from New

24     England Compounding Center when you were doing

25     your monthly inventory; is that correct?

*****ROUGH DRAFT*****

1        **A.**        That's correct.

2        **Q.**        And you also testified that you

3    were not consulted by STOPNC prior to any of

4    their MPA purchases from the New England

5    Compounding Center, correct?

6        **A.**        Is this a question that I can

7    answer?

8               MR. PINCKNEY:  Yes, you can answer.

9        You can answer any question about whether

10       you consulted with STOPNC before they

11       purchased the medication because you never

12       did, so there is no privilege.

13               MR. STRANCH:  Right.

14               THE WITNESS:  Okay.  Yes, that is

15       correct.

16   BY MR. STRANCH:

17       **Q.**        That is correct.  Okay.  So you

18   were not consulted.

19               All right.  I am going to hand you

20   a document that we are going to mark as Exhibit

21   873 and I will ask that you take a look at that.

22               (Exhibit Number 873, Privilege Log,

23       was marked for identification.)

24   BY MR. STRANCH:

25       **Q.**        You may not have seen this before

88

*****ROUGH DRAFT*****

1              MR. PINCKNEY:  And that is all it
2     is?
3              MR. STRANCH:  That's correct.
4              MR. PINCKNEY:  The way that you
5     phrased the question is not correct.
6              MR. STRANCH:  Okay.  Let me try to
7     rephrase this a different way so that we can
8     make this less confusing and still be clear
9     on the record.
10    BY MR. STRANCH:
11       Q.      Other than this two page document
12    identified on the privilege log, do you have any
13    written documents that you provided to STOPNC
14    related to NECC or MPA?
15       A.      Not that I am familiar with.  Not
16    that I recollect.
17       Q.      And who did you provide these
18    medication management monthly reviews to?
19       A.      Cindy McClendon and/or Debra
20    Schamberg.
21       Q.      Okay.
22       A.      I mean, without seeing these
23    reviews, was this a roll-up of --
24              MR. PINCKNEY:  We actually typed
25    this up in my office and I thought that this

*****ROUGH DRAFT*****

1           was redacted out of something that he did.

2           But, no, we did -- the judge ordered us --

3           we got the order seven days after it was

4           issued and we were ordered within 14 days of

5           the order to come up with a privilege log.

6           And I determined as your attorney that only

7           two pages were subject to the privilege.

8                    THE WITNESS:  Okay.

9    BY MR. STRANCH:

10        Q.        All right.  And so just to make

11   sure we are clear on the record, other than

12   these -- this two-page document that you provided

13   to Debra Schamberg or Cindy McClendon, you are

14   aware of no other documents that you provided to

15   STOPNC related to New England Compounding Center

16   or MPA?

17        A.        That's correct.  I just -- I don't

18   know two pages, it must have been a summary of

19   because each --

20                   MR. PINCKNEY:  Don't say anything

21        else.

22                   THE WITNESS:  Okay.

23                   MR. PINCKNEY:  I will tell you

24        after it's over.

25                   THE WITNESS:  Okay.

91

*****ROUGH DRAFT*****

1        **A.**        I do not.

2        **Q.**        Have you had any conversations with

3   St. Thomas about your consulting relationship

4   with STOPNC?

5        **A.**        I have not.

6                      MS. HOLLABAUGH:  That is all I

7        have.  Thank you very much.

8                      EXAMINATION

9   BY MR. TARDIO:

10       **Q.**        Dr. O'Neal, my name is Chris

11  Tardio.  I represent STOPNC, Howell Allen, Debra

12  Schamberg and Dr. Culclasure.  Do you understand

13  who I am and who I represent?

14       **A.**        Yes, I do.

15       **Q.**        I have some questions for you

16  related to your functions at STOPNC, so I want to

17  talk in a broad sense.

18                     I think that you have already kind

19  of explained generally what you did and I want to

20  just ask you about some of those things.

21                     Well, first off, from 2007 when you

22  started your relationship with STOPNC up until

23  2012 when the meningitis outbreak happened, were

24  your functions the same?

25       **A.**        Yes, they were.

94

*****ROUGH DRAFT*****

1      Q.          Did they change at any point from
2      '07 to '12?
3      A.          No, they did not.
4      Q.          Did your role as a pharmacy
5      consultant for STOPNC change at any point from
6      '07 to '12?
7      A.          No, it did not.
8      Q.          So setting aside what the '07
9      contract says and the '12 contract says, from a
10     practical perspective did your role and functions
11     stay the same continuously from '07 up to
12     September of '12?
13     A.          Yes, they did.
14     Q.          As part of your role at STOPNC or
15     your functions at STOPNC, did you assist STOPNC
16     and Ms. Schamberg in evaluating the safety of
17     their medications practices?
18     A.          Yes, I did.
19     Q.          Did you assist STOPNC and Debra
20     Schamberg in evaluating the quality of their
21     medication practices?
22     A.          Chris, that depends on how you
23     define quality, but I am going to say that if we
24     defied it as a comparison of the services they
25     rendered as compared to common or similar

*****ROUGH DRAFT*****

```
 1                 THE WITNESS:  That is how I see my
 2         role for STOPNC or any of my clients is to
 3         bring my expertise and knowledge specific to
 4         pharmacy and medication management into that
 5         environment, so to answer the question, yes.
 6   BY MR. TARDIO:
 7         Q.        And as part of your functions at
 8   STOPNC or your functions attendant to your role
 9   with STOPNC, you provided both verbal and written
10   communications, right?
11         A.        That's correct.
12         Q.        So you provided both verbal and
13   written recommendations and evaluations, true?
14         A.        That is correct, yes.
15         Q.        And I think you told us earlier --
16   and tell me if I understood this incorrectly --
17   that your understanding from the time you started
18   with STOPNC up through the meningitis outbreak in
19   2012 was that your verbal and written
20   recommendations would go through Debra Schamberg
21   or Tina Sullivan or Cindy McClendon to be shared
22   potentially with the MEC, right?
23                 MR. STRANCH:  Objection.
24                 THE WITNESS:  It's my understanding
25         that my reports are rolled up into a
```

*****ROUGH DRAFT*****

```
 1          quarterly report to the MEC.  That is my

 2          understanding.

 3    BY MR. TARDIO:

 4          Q.          Was it your understanding in

 5    performing your consulting services that your

 6    evaluations and recommendations would end up in

 7    front of the medical executive committee in some

 8    form or fashion?

 9                      MR. STRANCH:  Objection.

10                      THE WITNESS:  That is my

11          understanding, yes, in that regard.

12    BY MR. TARDIO:

13          Q.          Was it your understanding that the

14    medical executive committee would consider those

15    evaluations and recommendations in making any

16    potential changes to their medication specific

17    practices?

18          A.          Yes, I saw my recommendations as

19    part of the process.

20                      MR. STRANCH:  Objection.

21    BY MR. TARDIO:

22          Q.          And I think you told us you don't

23    know whether Ms. Schamberg or Ms. Sullivan were

24    part -- were members of the medical executive

25    committee, correct?
```

*****ROUGH DRAFT*****

1          **A.**          That's correct.

2          **Q.**          You just know that ultimately or

3     you understood that ultimately your

4     recommendations and evaluations would end up in

5     front of the medical executive committee in some

6     form or fashion, correct?

7          **A.**          That's correct.

8          **Q.**          It was STOPNC who retained you to

9     provide these medication-specific recommendations

10    and evaluations, right?

11         **A.**          That's correct.  Can we go off the

12    record?  Is there a tissue or something in here?

13                    MR. STRANCH:  Yes.

14                    THE VIDEOGRAPHER:  Off the record

15         at 11:48.

16                    (Recess.)

17                    THE VIDEOGRAPHER:  Back on the

18         record at 11:48.

19    BY MR. TARDIO:

20         **Q.**          Dr. O'Neal, the reports that you

21    produced as part of your consult that we have

22    discussed here for several hours today, do those

23    reports -- or did you intend with those reports

24    to capture the results of your evaluations and

25    also your recommendations?

*****ROUGH DRAFT*****

1    were the ones that we discussed earlier which are

2    related to the monthly inspections, correct?

3         A.        Correct, which I would directly

4    observe, correct.

5         Q.        And the remainder, they have to

6    come to you before you were triggered to

7    undertake something, correct?

8         A.        Yes, it sounds -- yes.

9         Q.        And you testified earlier also that

10   your reports that you send from your monthly

11   inspections --

12        A.        Correct.

13        Q.        -- are somehow rolled up -- I

14   believe is the phrase that you used or summarized

15   and then you believe at some point after that

16   they are provided to the medical executive

17   committee, correct?

18        A.        That is my understanding, correct.

19        Q.        But it's the summary or rollup of

20   your records that is provided, correct?

21        A.        I probably use the term rollup in

22   regards to statistically in regards to what is --

23   what areas do they need to work on the most to

24   improve in safety and quality, but I don't know

25   if they present every note that I take over a

112

*****ROUGH DRAFT*****

1    period of quarter and then, you know, present

2    that to the med exec committee.  I don't know the

3    answer to that.

4              MR. STRANCH:  Okay.  Give us one

5         second off the record --

6              THE WITNESS:  Right, no problem.

7              MR. STRANCH:  -- and I think that

8         we can wrap this up.

9              THE WITNESS:  Okay, thank you.

10             THE VIDEOGRAPHER:  Off the record

11        at 12:02.

12             (Recess.)

13             THE VIDEOGRAPHER:  We are back on

14        the record at 12:06.

15   BY MR. STRANCH:

16        Q.      Okay.  Your affidavit that you were

17   looking at in answering questions off of

18   earlier --

19        A.      Yes.

20        Q.      -- did you draft that document?

21        A.      No, I did not.

22        Q.      Who drafted that document?

23        A.      I don't know specifically.

24        Q.      Who presented that document to you?

25        A.      Gideon and Cooper.

113