Exhibit "E"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE: NEW ENGLAND
COMPOUNDING PHARMACY,
INC. PRODUCTS LIABILITY       MDL No. 2419
LITIGATION

                              Master Dkt:
                              1:13-md-02419-RWZ

~~~~~~~~~~~~~~~~~~~~~~
THIS DOCUMENT RELATES
TO:


All Actions


~~~~~~~~~~~~~~~~~~~~~~~~~


30(b)(6) VIDEOTAPED DEPOSITION OF
MICHAEL SCHATZLEIN, M.D.


9:11 a.m.
July 21, 2015


Suite 700, Roundabout Plaza
1600 Division Street
Nashville, Tennessee


Blanche J. Dugas, RPR, CCR No. B-2290

```
 1                  APPEARANCES OF COUNSEL

 2
     On Behalf of the Plaintiffs:
 3       MARK P. CHALOS, Esquire
         Lieff, Cabraser, Heimann & Bernstein, LLP
 4       Suite 1650, One Nashville Place
         150 Fourth Avenue
 5       Nashville, Tennessee  37219-2423
         (615) 313-9000
 6       (615) 313-9965 (facsimile)
         mchalos@lchb.com
 7
     On Behalf of St. Thomas Health, St. Thomas Network,
 8   St. Thomas West Hospital f/k/a St. Thomas Hospital:
         ADAM T. SCHRAMEK, Esquire
 9       Norton, Rose, Fulbright
         Suite 1100
10       98 San Jacinto Boulevard
         Austin, Texas 78701
11       (512) 536-5232
         adam.schramek@nortonrosefulbright.com
12
         AMY D. HAMPTON, Esquire
13       Bradley, Arant, Boult & Cummings, LLP
         Suite 700, Roundabout Plaza
14       1600 Division Street
         Nashville, Tennessee  37203
15       (615) 252-2379
         (615) 252-6379 (facsimile)
16       ahampton@babc.com

17   On Behalf of Saint Thomas Outpatient Neurosurgical
     Center, LLC; Howell Allen, a Professional Corporation;
18   John W. Culclasure, M.D.; Debra V. Schamberg, RN:
         CHRISTOPHER TARDIO, Esquire
19       Gideon, Cooper & Essary, PLC
         Suite 1100
20       315 Deaderick Street
         Nashville, Tennessee 37238
21       (615) 254-0400
         (615) 254-0459 (facsimile)
22       chris@gideoncooper.com

23

24

25
```

```
 1    On Behalf of Specialty Surgery Center - Crossville,
      PLLC; Kenneth R. Lister, M.D.; Kenneth R. Lister,
 2    M.D., PC:
           ASHLEY E. GENO, Esquire
 3         Brewer, Krause, Brooks, Chastain & Burrow, PLLC
           Suite 2600
 4         611 Commerce Street
           Nashville, Tennessee  37203
 5         (615) 256-8787
           (615) 256-8985 (facsimile)
 6         ageno@bkblaw.com

 7          ~~ Attorneys Appearing Via Video Stream ~~

 8    On Behalf of Ocean State Pain Management, Inc. and
      Abdul Barakat, M.D.:
 9         THOMAS M. DOLAN, III, Esquire
           Capplis, Connors & Carroll, PC
10         Suite 220
           18 Tremont Street
11         Boston, Massachusetts  02108
           (617) 227-0722
12         (617) 227-0772 (facsimile)
           tdolan@capplisconnors.com
13
      On Behalf of Premier Orthopaedic & Sports Medicine
14    Associates of Southern New Jersey, LLC d/b/a Premier
      Orthopaedic & Sports Associates, LLC; Premier
15    Orthopaedic Associates Surgical Center, LLC:
           MELISSA BUTERBAUGH, Esquire
16         Blumberg & Wolk, LLC
           158 Delaware Street
17         Woodbury, New Jersey 08096
           (856) 848-7472
18         (856) 848-8012 (facsimile)
           mbuterbaugh@blumberglawoffices.com
19
      On Behalf of Dallas Back Pain Management/Momentum
20    Pain Management and Abbeselom Ghermay, M.D.:
           COURTNEY BOES, Esquire
21         Fraley & Fraley, LLP
           Suite 6300
22         901 Main Street
           Dallas, Texas 75202-3773
23         (214) 761-6468
           cboes@fraley-law.com

24

25
```

```
 1    On Behalf of Medical Advanced Pain Specialists, PA and
      David M. Schultz, M.D.:
 2         CLARE CARROLL, Esquire
           McCarthy, Bouley & Barry, PC
 3         47 Thorndike Street
           Cambridge, Massachusetts  02141
 4         (617) 225-2211
           (617) 225-7711 (facsimile)
 5         cfc@mbblaw.com

 6    On Behalf of Tim I. Chowdhury, M.D.:
           BARTHOLOMEW T. FREEZE, Esquire
 7         FREUND, FREEZE & ARNOLD
           Suite 800
 8         65 E. State Street
           Columbus, Ohio 43215-4247
 9         (614) 255-7567
           (614) 827-7303 (facsimile)
10         bfreeze@ffalaw.com

11    On Behalf of a Defendant Party:
           CALLAN STEIN, Esquire
12         Donoghue Barrett & Singal, PC
           Suite 1320
13         One Beacon Street
           Boston, Massachusetts  02108
14         (617) 720-5090
           (617) 720-5092 (facsimile)
15         cstein@dbslawfirm.com

16
      Also Present:
17    Michael Mitchell, videographer

18

19

20

21

22

23

24

25
```

Page 40

1      Q.      (By Mr. Chalos)  Okay.  Do you know -- are

2   you here to testify about each and every action St.

3   Thomas Health took to ensure that medication injected

4   into patients at STOPNC was safe and free from

5   contaminants?

6      A.      St. Thomas Health had no involvement in

7   that matter.  So we -- St. Thomas Health did not

8   operate, manage, oversee STOPNC.  It was the joint

9   venture with its own board of directors and -- who

10  were appointed by St. Thomas Network.  So I -- I don't

11  know what preparation I could do with regard to that.

12     Q.      Did you undertake to determine whether St.

13  Thomas Health took any action to ensure that

14  medication injected into patients at STOPNC was free

15  and safe from contaminates?

16     A.      That would be the same answer I just

17  rendered, sir.

18             MR. SCHRAMEK:  Object to form.

19             THE WITNESS:  I -- there was no call

20        for any action to be taken, and so it

21        wasn't relevant to the -- I don't know how

22        to answer a question like that.  I just

23        don't know how.

24     Q.      (By Mr. Chalos)  Did St. Thomas Health take

25  any actions to ensure that medication injected into

Page 49

1    Q.    Is that -- what agreement is referenced

2    there?  If you look at D, it references a services

3    agreement between Health and STOPNC.

4    A.    There was a single services agreement

5    between Health and STOPNC which had to do with -- with

6    managed care contracting, and it called for the

7    managed care department -- and actually, just to be

8    clear, initially that agreement was with St. Thomas

9    Hospital where the managed care department resided in

10   the early days of STOPNC.  And then when the managed

11   care department moved to the St. Thomas Health level

12   as Baptist and St. Thomas became more consolidated,

13   the agreement was changed.  And so that became then

14   the first and only agreement between St. Thomas Health

15   and any of its -- and/or any of its predecessors.

16         So that's the sole agreement between the

17   entity that now is known as St. Thomas Health and

18   STOPNC was an agreement most recently I looked it was

19   a matter of $3,500 per year for review of managed care

20   contracts and St. Thomas Health has, again, the

21   capability that St. Thomas Hospital did before.  It's

22   the kind of thing that's difficult for a smaller

23   entity to have the expertise.

24   Q.    And you're here today prepared to testify

25   about the services agreement between St. Thomas Health

Page 58

1     Q.     Exhibit 506.  It says -- the question is:

2  Has St. Thomas Health ever paid for or provided any

3  personnel, medications, equipment, medical supplies,

4  medical forms, billing services, telephone services,

5  contract -- on, there's a laundry list -- to St.

6  Thomas Neurosurgical.  If so, explain in detail, and

7  the answer here is, subject to and without waiving the

8  foregoing objection, see response to Interrogatory 13.

9         And Interrogatory 13 is the interrogatory

10  we just talked about where there are a number of

11  different responses to the different subparts, but my

12  question is:  Is that reference in Interrogatory No.

13  15 to the services agreement between St. Thomas Health

14  and STOPNC?

15     A.     I'm aware only of, as I previously said,

16  the only agreement between St. Thomas Health and

17  STOPNC is a services agreement for assistance with

18  managed care contracting.

19     Q.     Other than the services agreement, has St.

20  Thomas Health ever -- ever provided any other -- any

21  supplies or services to STOPNC?

22     A.     No, sir.

23     Q.     No. 16, Interrogatory No. 16 on Page 10 of

24  Exhibit 506 says, explain in detail all financial

25  transactions that occurred between St. Thomas Health

Page 69

1    agreement.

2         A.    Okay.

3         Q.    It's not the very front page, but it's the

4    front page of the text of the agreement.

5         A.    Yes, sir.

6         Q.    So the page we're looking for has at the

7    bottom DEREED-ST Network 00005 that's the page and it

8    says on the top St. Thomas Outpatient Neurosurgical

9    Center, LLC operating agreement.  Are you with me?

10        A.    Yes, sir.

11        Q.    And it says in that first paragraph that

12   the operating agreement is made and entered into as of

13   the first day of July, 2000 by and between St. Thomas

14   Health Services, a Tennessee nonprofit corporation,

15   and Neurosurge -- Neurological Surgeons, PC, a

16   Tennessee corporation.

17              Do you see that?

18        A.    Yes, sir.

19        Q.    The St. Thomas Health Services referenced

20   here, if I understood your testimony, later became St.

21   Thomas Network; is that right?

22        A.    Yes, sir.

23        Q.    And the name St. Thomas Health Services

24   then began to be used by an entity that later became

25   St. Thomas Health?

1      A.      That is correct.

2      Q.      And today, those entities are respectively

3  St. Thomas Network and St. Thomas Health; right?

4      A.      Yes, sir.

5      Q.      At any time, has St. Thomas -- current

6  entity, St. Thomas Health been a party to an operating

7  agreement with Neurological Surgeons or any successor

8  entity of Neurological Surgeons with respect to the

9  ambulatory surgery center now known as STOPNC?

10     A.      I'm trying to -- I'm trying to determine

11 whether I need to exclude that services agreement in

12 my answer.  Other than the single services agreement

13 between St. Thomas Health and STOPNC, the answer to

14 that question is no.

15     Q.      At the time this operating agreement was

16 entered into in July of 2000, St. Thomas Network --

17 I'm sorry -- St. Thomas Health Services was owned

18 solely by Ascension Health; is that right?

19     A.      You know, I don't know that to be a fact.

20 I believe that it was -- it was owned by the newly

21 formed merged entity between Baptist and St. Thomas.

22     Q.      Okay.  You see on that page we were just

23 talking about, 00005, St. Thomas Health Services is

24 abbreviated as STHS?

25     A.      Yes.

1    0007, Paragraph 1.1.11, it says the board or board of

2    governors shall refer to those individuals described

3    in Article 7 in whom the management of the LLC is

4    vested.  Do you see that?

5         A.    Yes, sir.

6         Q.    And in 2012, the board of governors

7    included four members total?

8         A.    Yes, sir.

9         Q.    And two of those members were Dawn Rudolph

10   and Craig Polkow?

11        A.    Yes, sir.

12        Q.    And two of those members were appointed by

13   St. Thomas Network; right?

14        A.    Yes, sir.

15        Q.    So in 2012, the board in whom the

16   management of the LLC was vested included two members

17   appointed by St. Thomas Network, two members appointed

18   by the Howell Allen Clinic?

19        A.    Yes, sir.

20        Q.    If you flip over to the next page, please,

21   0008, I'm looking at Paragraph 1.1.14, it says, center

22   means outpatient -- an outpatient center for the

23   performance of neurological procedures on the campus

24   of St. Thomas Hospital in Nashville, Tennessee.

25              Do you see that?

1      Q.     Okay.  When you came aboard in 2010, was

2   St. Thomas Network solely a holding company?

3      A.     I'm having trouble characterizing the --

4   the solely.  It has been a blend of operating and

5   holding evolving towards holding.  So I'd have to -- I

6   can't answer beyond that.

7      Q.     Today, is St. Thomas Network solely a

8   holding company?

9      A.     Yes, sir.

10     Q.     In, let's say, July of 2012, do you know

11  whether it was solely a holding company, Network, that

12  is?

13     A.     With respect to STOPNC, it functioned as a

14  holding company.

15     Q.     What do you mean by that?

16     A.     That means that it held our interests in --

17  it held the 50 percent interest in STOPNC and

18  appointed board members to oversee the work of STOPNC

19  and had no role in the operations of STOPNC.

20     Q.     Was -- is it your belief that St. Thomas

21  Network was always just a holding company with respect

22  to STOPNC?

23     A.     Yes, sir, it never had any operating

24  responsibility for STOPNC.

25     Q.     And so whatever its obligations were under

1   successfully.

2        Q.      The members in 2012 -- well, at all

3   times -- of STOPNC were St. Thomas Health Services and

4   its successor named organizations and Neurological

5   Surgeons, PC and its successor organizations; is that

6   right?

7        A.      Yes, which has generically been referred to

8   even here by you and me as Howell Allen Clinic.  So

9   yes.

10       Q.      If you'll flip over to the next page, 0010,

11   looking at Paragraph 1.1.28, it says, managers means

12   the president, secretary and any other managers who

13   may be designated from time to time by the board of

14   governors to manage the affairs of the LLC pursuant to

15   the provisions of Article 8 of the agreement.  Do you

16   see that?

17       A.      Yes, sir.

18       Q.      Did the board of governors of STOPNC

19   actually appoint managers, to your knowledge?

20       A.      Yes.

21       Q.      Do you know who the managers of the LLC

22   were in 2012?

23       A.      In 2012, president was Dr. Lanford.  And

24   there was also a -- a director or operations manager

25   of some title of which I'm not certain.  Those would

1   be the two principal operators.  And there was also a

2   services agreement with Howell Allen Clinic to provide

3   all the employees and the medical director.

4        Q.     Okay.  Do you know who that operations

5   manager was in 2012?

6        A.     Oh gosh, her name is escaping me.  It's --

7   it's been well produced.

8        Q.     Yeah, is it Debra Schamberg?

9        A.     Yes.

10       Q.     Did the board of governors of STOPNC

11  approve the services agreement with Howell Allen

12  Clinic by which the medical director was designated?

13       A.     The board of governors of STOPNC?  I wasn't

14  a member of the board of governors of STOPNC.  That

15  would be customary corporate practice that they would.

16       Q.     Did the board members of STOPNC who were

17  appointed by St. Thomas Network provide any kind of

18  periodic reporting to St. Thomas Network of the

19  operations of STOPNC?

20       A.     Assurances that regulatory requirements

21  were being met and financial information.

22       Q.     On what periodic basis would the board

23  members of STOPNC who were appointed by St. Thomas

24  Network report to the St. Thomas Network board?

25       A.     Typically quarterly.

1            MR. SCHRAMEK:  Object to the form.

2            THE WITNESS:   Sometimes Network

3        doesn't manage STOPNC.  So there --

4        there -- I don't recall, but there were no

5        employees.  So typically the general

6        nature, the generic nature of Network

7        during my tenure has been to hold entities

8        that we do not manage or control.

9        Q.    (By Mr. Chalos)  We being --

10       A.     Hold our interest in entities that St.

11  Thomas Health does not own or control.  So Network is

12  a subsidiary that sits there with the important

13  responsibility of appointing board members and

14  receiving reports about investments that we have in

15  entities that we do not own or control.  That's its

16  current purpose and that has always been its purpose

17  with regard to STOPNC.

18       Q.     During your tenure?

19       A.     Yes, sir.

20       Q.     In 2012, did St. Thomas Network manage any

21  entities, taking out the word other, entities?

22       A.     I do not believe so.

23       Q.     In 2012, did Network hold the interest of

24  St. Thomas Health in any entities other than STOPNC?

25            MR. SCHRAMEK:  Object to the form.

1          p.m.)

2               VIDEOGRAPHER:  We're back on the

3          record at 12:42.

4               (Exhibit 511 was marked for

5          identification.)

6     Q.     (By Mr. Chalos)  We've marked as

7     Exhibit 511 a document entitled "Services agreement,"

8     dated January 1st, 2004 between St. Thomas Outpatient

9     Neurosurgical Center, LLC and St. Thomas Health

10    Services.  It has the Bates number or Bates range of

11    DEREED-STHealth00001 through 3.  I'll hand you that,

12    Doctor.  That's Exhibit 511.

13              MR. SCHRAMEK:  Thank you.

14              MS. GENO:  Thank you.

15    Q.     (By Mr. Chalos)  What is this document,

16    sir?

17    A.     This is a services agreement by which

18    STOPNC engages St. Thomas Health as a non-exclusive

19    provider of assistance with managed care contracting.

20    Q.     Okay.  And this St. Thomas Health Services

21    entity is the entity that's now known as St. Thomas

22    Health?

23    A.     It is.

24    Q.     So by 2004, the entity now known as St.

25    Thomas Health was known as St. Thomas Health Services?

1       A.      Yes, sir.

2       Q.      And it is signed -- if you flip to the

3   third page -- signed on behalf of St. Thomas Health

4   Services by a CFO of St. Thomas Health Services; is

5   that right?

6       A.      That's what it appears to be, yes, sir.

7       Q.      Do you recognize the name on that

8   signature?

9       A.      No, sir.

10      Q.      Looks to be Kenneth something or other.

11      A.      Yep.

12      Q.      And this contract -- if you look on Page 2,

13  Paragraph 3A -- calls for the client, who is defined

14  here as STOPNC, to pay the contractor, which is

15  defined here as St. Thomas Health Services, $3,500 a

16  year paid in equal monthly installments for the

17  services that the contractor is providing, that's St.

18  Thomas Health Services; is that right?

19      A.      Yes, sir.

20      Q.      Did they -- they -- did St. Thomas -- did

21  STOPNC pay to St. Thomas Health Services for each year

22  that this contract was in effect $3,500?

23      A.      To the best of my knowledge, they did.

24      Q.      Do you know if they paid it monthly or in a

25  lump sum?

1    A.    I don't know.

2    Q.    Was this contract in effect through 2012?

3    A.    I believe it was.  I believe it's in effect

4  today.

5    Q.    Okay.  And is it pursuant to the same

6  contract that we're looking at here as Exhibit 511?

7    A.    There may have been an update.  I haven't

8  looked.  We sometimes review to make sure that the

9  rates are fair market value when we're selling

10  services to a physician or an entity.

11    Q.    Have you seen any kind of update or

12  addendum to -- or new services agreement that relates

13  to the arrangement of negotiating managed care

14  contracts?

15    A.    No.  No, sir, I have not.

16    Q.    So as far as we know here today, this is

17  the contract that governed in 2012?

18    A.    Yes, sir.

19    Q.    Was there a lease agreement between STOPNC

20  and the entity that owned the building where the

21  STOPNC clinic was?

22    A.    You know, I don't have direct personal

23  knowledge of that.  That office complex is owned by a

24  company called HRT.  And so all I can do is assume

25  that STOPNC leased that space from HRT.

1    range of DEREED-STH01062 through 70.  If you'd take a

2    look at that, my question to you is:  What is this

3    document?

4        A.    I'm not finding the exhibit.

5        Q.    Well, stand by.  We've now marked as

6    Exhibit 513.  I think it's a collective -- it's called

7    a collective exhibit.  A series of Exhibit A's.

8              (Exhibit 513 was marked for

9        identification.)

10             THE WITNESS:  Okay.  These appear to

11        go together.  So together, they constitute

12        an agreement whereby St. Thomas Hospital

13        provided certain services to STOPNC for

14        fees.

15             MR. CHALOS:  Okay.  And just for

16        completeness, let's mark this as the next

17        numbered exhibit.

18        Q.    (By Mr. Chalos)  Okay.  So we've now marked

19    as Exhibit 514 the first amendment to the services

20    agreement between St. Thomas Hospital and St. Thomas

21    Outpatient Neurosurgical Center.  The first amendment

22    is Bates range DEREED-STH01029 through 01061.  And it

23    looks like, as far as I can tell, the first amendment

24    relates to a federal exclusion from federal healthcare

25    programs and adding in some additional provisions

1    about corporate compliance and ethical and religious

2    directives.  Does that square with your understanding?

3              (Exhibit 514 was marked for

4         identification.)

5              THE WITNESS:  Yes, sir.

6         Q.    (By Mr. Chalos)  Okay.  So going back --

7    let's go back to Exhibit 512, which is the services

8    agreement dated September 18th of 2000.  Is this

9    services agreement with the exhibits and the first

10   amendment that we've marked as exhibits here -- is

11   this the contract that governed the services agreement

12   between St. Thomas Hospital and STOPNC through the

13   present day?

14        A.    Yes, sir.

15        Q.    Are you aware of any other amendments or

16   addenda to this agreement other than what we've marked

17   as Exhibits 512, 513 and 514?

18        A.    Not through 2012.  However, if I remember

19   correctly, some of the exhibits allow for annual

20   adjustment of the charges as they -- in the original

21   agreement, they were perpetual.  So they need to be

22   adjusted upward for fair market value.  So possibly

23   I'm recalling the wrong document, but this is all

24   broken up with --

25        Q.    Yeah.

1      A.      But if there were changes, they would have

2    been to negotiate the rates for various services.  For

3    example, if we look at 513, which is an accounting

4    services addendum, your numbers 01022, that's an

5    increase from the hourly number in the original

6    agreement.

7      Q.      Oh, I see.  Okay.  So if we look at 01073,

8    for example, that shows a rate -- that's the first

9    page of Exhibit 513.

10     A.      Yeah.

11     Q.      That shows a rate of $50 an hour for

12   accounting services, monthly review of the general

13   ledger, and the next page of Exhibit 513 is 01022,

14   which has the cost of $67.60.  Is that what you were

15   meaning?

16     A.      No.  Actually -- yes, that is what I mean.

17   I'm sorry.  I just didn't have the documents.  So

18   these are -- these are addenda to different

19   agreements.  But yeah.  And there's a previous one

20   where I believe it was 30.  So, I mean, I think

21   these -- these were negotiated upward over time.

22     Q.      Okay.  So from 2000 through the present

23   day, St. Thomas Hospital provided accounting services

24   to STOPNC continuously?

25             MR. SCHRAMEK:  Object to the form.

Page 105

1              THE WITNESS:  I don't think

2         accounting -- it just depends on the

3         definition of accounts services.  There

4         were certain defined services provided and

5         they're outlined in these agreements,

6         review of the general ledger.  And then at

7         one point there was a request that -- that

8         that the accounting information be

9         summarized for a board presentation and --

10        but we're not talking about onsite

11        accounting services here.

12        Q.    (By Mr. Chalos)  I see.  So if we look at

13   the first page of Exhibit 513, it's 01073 is the

14   number.

15        A.     Okay.

16        Q.     Bottom right.  It says, addendum to

17   services agreement, service to be purchased,

18   accounting services, then the description is monthly

19   review, general ledger?

20        A.     Yes, sir.

21        Q.     So did St. Thomas Hospital provide a

22   monthly review of the general ledger of STOPNC from

23   September of 2000 through the present?

24        A.     To the best of my knowledge, they did.

25        Q.     Okay.  And then if you flip to the next

1  page, this is 01022, addendum to the services

2  agreement, accounting services, including the monthly

3  review of the general ledger and now preparation of

4  board packet; right?

5      A.    Yes, sir.  And that was what I was

6  referring to as the summary of the financial

7  statements to be included with the board of governors

8  materials.

9      Q.    I see.  And this one is dated -- well,

10 there are two signatures, but it's either October or

11 November of 2006.

12     A.    Yes.

13     Q.    And do you think there was a subsequent

14 adjustment of the -- either the services provided or

15 the cost of the services relating to accounting

16 services?

17     A.    I have no knowledge.

18     Q.    Okay.  The next page, this is 01023, it's

19 addendum to services agreement, service to be

20 purchased, credentialing description is provide

21 primary verification for physicians requiring

22 privileges -- I think it should say in the ASC?

23     A.    Yes, sir.

24     Q.    That "is" is probably a typo?

25     A.    Yes, sir.

1      Q.     Is that a service that St. Thomas Hospital

2   provided from 2000 through the present?

3      A.     I have no reason to believe that it was

4   discontinued.  So yes.

5      Q.     Who is Marilyn Sechrest?

6      A.     Well, this is '06.  At the hospital, I

7   never had an operating role.  But the folks who do

8   this work are the folks in the medical staff office,

9   medical staff services office, and this was primary

10  source verification which means that people seeking

11  privileges at the hospital, you need to check the

12  National Practitioner Data Bank.  You need to make

13  sure they have a license.  You need to make sure --

14  and so this is not making judgments on their

15  qualifications to practice.  This is primary source

16  verification and large hospitals have enterprises

17  devoted to doing this.  And for the few doctors at

18  STOPNC, I'm just assuming they determined that they

19  would have their primary source verification done at

20  the hospital.

21     Q.     Did the primary source verification occur

22  on an ongoing basis?  In other words, once it was done

23  with respect to physicians, it's done periodically

24  with respect to that same physician?

25     A.     You know, I'm not an expert on the

1      A.      Well, the -- this says provide primary

2   verification for physicians requiring privileges.

3   Credentialing is a whole -- is the term for the

4   process by which a medical staff determines who it

5   will admit and grant privileges to and that's a --

6   that's a process that involves committees and meetings

7   and research and interviews and it varies from medical

8   staff to medical staff.

9           So the other term would be credentialing,

10  and primary source verification is just a preliminary

11  step prior to the credentialing process even starting.

12     Q.      I see.  Does primary source verification

13  include reviewing a physician's disciplinary record?

14     A.      I think it may include obtaining it.  It

15  does not include reviewing it.  It's a matter of

16  obtaining publicly available information on the

17  physician.

18     Q.      Does the primary source verification

19  process also include obtaining documents that are not

20  otherwise publicly available?

21     A.      I don't believe so.  Again, this is not my

22  area of -- of minute expertise.

23     Q.      And if you flip over, 01024, we're still in

24  Exhibit 513, it's service to be purchased.  This is,

25  again, another addendum to the services agreement,

1   food services that were -- that involved providing

2   floor stock on a weekly basis; is that right?

3        A.    Yes, sir.

4        Q.    In other words, the -- at least at this

5   time on this page, the St. Thomas Hospital was to

6   provide floor stock to STOPNC of food?

7        A.    Yes, sir.

8        Q.    And then the next couple of pages here I

9   think detail that a little bit.  That included at some

10  point provide meals to the staff of STOPNC if they so

11  desired; is that right?

12       A.    Yes.

13       Q.    And then if you continue on to Page 01076,

14  it's 513, addendum to services agreement for

15  instrument sterilization and packaging.

16       A.    Yes, sir.

17       Q.    What does that mean?

18       A.    Hospitals have departments called central

19  sterile supply where instruments that are used in

20  procedures are cleaned and sterilized and packaged

21  into sterile packages for surgical procedures, and

22  this agreement says that on a case-by-case basis, if

23  STOPNC wanted to utilize the services of the

24  hospital's sterile supply, they could do so.

25       Q.    Was this for reusable instruments only?

1      A.      Reusable are the only ones who get

2  sterilized.

3      Q.      Okay.  If you flip over again to Page

4  01026, it says it's another addendum to services

5  agreement, service to be purchased pastoral care

6  services.  Do you see that?

7      A.      Yes, sir.

8      Q.      The St. Thomas Hospital agreed to provide

9  in exchange for $75 an hour staff education on the

10  ethical and religious directives for Catholic

11  healthcare services and to consult with patients and

12  families upon request; is that right?

13      A.      Yes, sir.

14      Q.      And in 2006, that was an increase from $30

15  to $75 per hour for that service.  If you look at the

16  next page you'll see $30 an hour.

17      A.      Yeah, and that was 2000, so that's --

18  whether there were interim increases, I don't know,

19  but that was over six years.

20      Q.      Okay.  And then if you continue on, the

21  last page of Exhibit 513 is 01072, addendum to

22  services agreement for managed care contracting.  Do

23  you see that?

24      A.      Yes.

25      Q.      And this is the exhibit or addendum

1    pursuant to which St. Thomas Hospital at that time

2    provided payor/employer negotiations, contract

3    analysis, contract language review, contract

4    maintenance and in-service coordination in connection

5    with the managed care contracts?

6        A.      Yes, sir.

7        Q.      And at some point that function was -- I'm

8    sorry -- I said that was the last page.  That's not

9    the last page -- but that function was moved to St.

10   Thomas Health at some point?

11       A.      The only agreement ever between St. Thomas

12   Health and STOPNC was when the managed care department

13   moved from the Hospital to Health and this portion of

14   this agreement was replaced with an agreement for St.

15   Thomas Health.

16       Q.      Okay.  The next page of Exhibit 513 is

17   01027.  St. Thomas Hospital blood bank agreed to

18   provide or St. Thomas Hospital agreed to provide

19   emergency blood products for use at STOPNC upon

20   request; is that right?

21       A.      Yes, sir.

22       Q.      Do you know whether that ever actually

23   happened, that St. Thomas provided blood to patients

24   of STOPNC?

25       A.      No, I don't.  It's wise to have this

Page 114

1    A.    Well, you just asked me if there were any

2    services that they refused to provide, and I said the

3    requests would all be managed pursuant to the

4    agreements.

5    Q.    Right.  What I'm saying --

6    A.    You're asking for services outside of the

7    agreements and the answer is, no, I'm not aware of

8    any.

9    Q.    In other words, were there any services

10   that there is no agreement on that St. Thomas -- that

11   STOPNC asked St. Thomas Hospital to provide and St.

12   Thomas Hospital said, we're not going to do that?

13   A.    I'm not aware of any requests nor am I

14   aware of any denials.

15   Q.    Okay.  Is there any reason St. Thomas

16   Hospital couldn't provide pharmacy services to STOPNC

17   at any time?

18   A.    You're just asking -- I can only testify as

19   to an opinion and having run surgical centers, the

20   needs of the pharmacies are very, very, very

21   different.  And it's an outpatient enterprise as

22   opposed to a hospital.  Unit doses are different,

23   drugs used are different.  So it wouldn't have been a

24   convenient or wise, natural thing to do.  And my

25   understanding is that STOPNC had their own pharmacist

Page 115

1    under contract, so it never was discussed, wouldn't

2    have occurred to me.

3        Q.     Okay.  Is there any reason they couldn't

4    have provided that service if asked?

5               MR. SCHRAMEK:  Objection, form.

6        Q.     (By Mr. Chalos) Let me ask that again.  Is

7    there any reason St. Thomas Hospital couldn't have

8    provided pharmacy services to STOPNC if asked?

9        A.     We did not have outpatient specific

10   pharmacy expertise, ambulatory surgery outpatient

11   pharmacy expertise.  That would be a reason.

12       Q.     Did St. Thomas Hospital -- let's say in

13   2012 -- have any outpatient services that it

14   administered?

15       A.     Oh, yes.

16       Q.     And as part of that, would they sometimes

17   give drugs to the patients?

18       A.     Yes.

19       Q.     Who handled the drugs for St. Thomas

20   Hospital's outpatient procedures?

21       A.     The pharmacy.

22       Q.     The St. Thomas Hospital pharmacy?

23       A.     Yes, sir.

24       Q.     So why couldn't that same pharmacy provide

25   outpatient drugs for the STOPNC?

Page 123

1    and so I'm not sure the extent to which it was

2    implemented in all the different periods that are

3    referred to in all these different attachments, but --

4    but over time, we tried to work this provision into

5    every contract of any type.

6         Q.    Is the -- is some patient transfer contract

7    in effect today between STOPNC and St. Thomas

8    Hospital?

9         A.    I'm certain there is.

10        Q.    In your April 2015 deposition, you said at

11   that point you had never been to the STOPNC facility.

12   Is that still true?

13        A.    It is.

14        Q.    Have you been in St. Thomas West Hospital

15   since 2012?

16        A.    I have.

17        Q.    Have you been up to the 9th floor of that

18   building?

19             MR. SCHRAMEK:  Object to the form.

20             THE WITNESS:  I'm not sure.

21        Q.    (By Mr. Chalos)  Is there a reason you

22   haven't been to the STOPNC facility?

23        A.    I don't -- I don't know how to answer that.

24   We don't own or operate it and there are many, many

25   facilities that we own and operate that I haven't

1                              DISCLOSURE

2

3          Pursuant to Article 10.B of the Rules
    and Regulations of the Board of Court
    Reporting of the Judicial Council of
4   Georgia which states:  "Each court reporter
    shall tender a disclosure form at the time
5   of the taking of the deposition stating the
    arrangements made for the reporting
6   services of the certified court reporter,
    by the certified court reporter, the court
7   reporter's employer or the referral source
    for the deposition, with any party to the
8   litigation, counsel to the parties, or
    other entity.  Such form shall be attached
9   to the deposition transcript," I make the
    following disclosure:

10

11          I am a Georgia Certified Court
    Reporter.  I am here as a representative of
    Discovery Litigation Services, LLC.
12  Discovery Litigation Services, LLC was
    contacted to provide court reporting
13  services for the deposition.  Discovery
    Litigation Services, LLC will not be taking
14  this deposition under any contract that is
    prohibited by O.C.G.A. 9-11-28(c).

15

16          Discovery Litigation Services, LLC
    has no contract/agreement to provide
17  reporting services with any party to the
    case, any counsel in the case, or any
18  reporter or reporting agency from whom a
    referral might have been made to cover this
    deposition.

19

20          Discovery Litigation Services, LLC
    will charge its usual and customary rates
21  to all parties in the case, and a financial
    discount will not be given to any party to
    this litigation.

22

23

24                          Blanche J. Dugas
                            CCR No. B-2290

25

Page 126

1    STATE OF GEORGIA:

2    COUNTY OF FULTON:

3

4              I hereby certify that the foregoing

5         transcript was reported, as stated in the

6         caption, and the questions and answers

7         thereto were reduced to typewriting under

8         my direction; that the foregoing pages

9         represent a true, complete, and correct

10        transcript of the evidence given upon said

11        hearing, and I further certify that I am

12        not of kin or counsel to the parties in the

13        case; am not in the employ of counsel for

14        any of said parties; nor am I in any way

15        interested in the result of said case.

16

17

18

19

20             BLANCHE J. DUGAS, CCR-B-2290

21

22

23

24

25

Page 127

1                           CAPTION

2

3           The Deposition of MICHAEL SCHATZLEIN, M.D.,

4    taken in the matter, on the date, and at the time and

5    place set out on the title page hereof.

6           It was requested that the deposition be

7    taken by the reporter and that same be reduced to

8    typewritten form.

9           It was agreed by and between counsel and

10   the parties that the Deponent will read and sign the

11   transcript of said deposition.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:13-md-02419-RWZ   Document 2745-5   Filed 03/15/16   Page 35 of 36

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
30(B)(6) VIDEOTAPED DEPOSITION OF MICHAEL SCHATZLEIN, M.D. on 07/21/2015       Page 129

```
 1                      DEPOSITION ERRATA SHEET

 2

 3    DLS Assignment No.  23052

 4    Case Caption:  In Re:  New England Compounding

 5                       Pharmacy, Inc. Products Liability

 6                       Litigation

 7

 8    Witness:  MICHAEL SCHATZLEIN, M.D. - 07/21/2015

 9

10          DECLARATION UNDER PENALTY OF PERJURY

11    I declare under penalty of perjury that I have read

12    the entire transcript of my deposition taken in the

13    captioned matter or the same has been read to me, and

14    The same is true and accurate, save and except for

15    changes and/or corrections, if any, as indicated by me

16    on the DEPOSITION ERRATA SHEET hereof, with the

17    understanding that I offer these changes as if still

18    under oath.

19

20    Signed on the 3rd day of

21    September, 2015.

22

23    _____

24    MICHAEL SCHATZLEIN, M.D.

25
```

Digitally signed by Mike Schatzlein, M.D.
DN: cn=Mike Schatzlein, M.D., o=Ascension
Health, ou=Group Operating Executive for
Indiana, Jacksonville, and Tennessee,
email=mike.schatzlein@ascensionhealth.org,
c=US
Date: 2015.09.03 16:26:15 -05'00'



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

DEPOSITION ERRATA SHEET

| Page and line | Change to | Reason for change |
|---|---|---|
| 28/22-23 | "No.  It's a Saint Thomas Health board decision often with input from the senior leadership team." | Clarification |
| 48/9-10 | "It was 2002." | Clarification |
| 51/17 | "Until July 31, 2012 it was Dr. Batchelor and Alan Strauss." | Clarification |
| 51/21-23 | "Yes, sir.  Craig Polkow replaced Alan Strauss as of August 1, 2012." | Clarification |
| 52/8 | Replace "2012" with "2013" | Clarification |
| 53/25 to 54/5 | No. | Clarification |
| 55/12 | Replace "formally" with "formerly" | Transcription error |
| 61/15 | "Yes, certain defined accounting services outlined in an agreement." | Clarification per later testimony at 105/1-11 |
| 72/11 | "No.  Dawn Rudolph did not join the STOPNC board until 2013." | Clarification |
| 79/2-3 | "Saint Thomas Network doesn't manage STOPNC." | Transcription error |
| 86/17 | Replace "remade" with "changed" | Clarification |

SIGNATURE: _____  DATE: _____
9/3/2015

Digitally signed by Mike Schatzlein, M.D.
DN: cn=Mike Schatzlein, M.D., o=Ascension Health, ou=Group Operating Executive for Indiana, Jacksonville, and Tennessee, email=mike.schatzlein@ascensionheal th.org, c=US
Date: 2015.09.03 15:34:59 -05'00'