Exhibit "F"

*Ser of we have this. If so, just file this xtra copy. If not, set up*

# SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC

## OPERATING AGREEMENT

As of July 1, 2000



0610202.07
084000-403  07/19/2000

DEREED-STNetwork00001

# TABLE OF CONTENTS

ARTICLE I.
DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.1    Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.2    Additional Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE II.
ORGANIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    2.1    Formation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    2.2    Adoption of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    2.3    Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    2.4    Principal Place of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE III.
PURPOSE, POWERS AND PHILOSOPHY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    3.1    Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    3.2    Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    3.3    Philosophy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE IV.
CAPITAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.1    Capital Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.2    Additional Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.3    No Interest or Right to Withdraw . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.4    Membership Interests and Amendments to Exhibit A . . . . . . . . . . . . . . 11

ARTICLE V.
ALLOCATION OF INCOME AND LOSSES; CASH DISTRIBUTIONS . . . . . . . . . . . . . . . . . 11
    5.1    Capital Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    5.2    Profits and Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    5.3    Special Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    5.4    Curative Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    5.5    Other Allocation Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    5.6    Tax Allocations; Code Section 704(c) . . . . . . . . . . . . . . . . . . . . . . . . . 14
    5.7    Allocations of Profits, Losses and Distributions in Respect of Interest Transferred . 14
    5.8    Distributions of Available Cash Flow . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    5.9    Distributions From Liquidations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    5.10   Consequences of Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    5.11   Modification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE VI.
RIGHTS AND DUTIES OF MEMBERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    6.1    Rights and Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    6.2    Liability of Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    6.3    Annual Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    6.4    Special Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

0610202.07
084000-403  07/19/2000

6.5     Waiver of Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
6.6     Voting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
6.7     Quorum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
6.8     Action at Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
6.9     Informal Action by Members . . . . . . . . . . . . . . . . . . . . . . . . . . 16
6.10    Member Approval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE VII.
BOARD OF GOVERNORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
7.1     General Powers and Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
7.2     Number, Election and Term . . . . . . . . . . . . . . . . . . . . . . . . . . 17
7.3     Removal and Resignation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
7.4     Vacancy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
7.5     Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
7.6     Waiver of Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
7.7     Quorum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
7.8     Action at Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
7.9     Informal Action by Governors . . . . . . . . . . . . . . . . . . . . . . . . . 18
7.10    Board of Governors Committees . . . . . . . . . . . . . . . . . . . . . . . 18
7.11    Actions by Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
7.12    Restriction on Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE VIII.
MANAGERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8.1     Manager Designation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8.2     Manager Election . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8.3     Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8.4     Removal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8.5     Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8.6     Duties of President . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8.7     Duties of Vice President/Secretary . . . . . . . . . . . . . . . . . . . . . 21
8.8     Qualifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
8.9     Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARTICLE IX.
ACCOUNTING, BOOKS AND BANK ACCOUNTS . . . . . . . . . . . . . . . . . . . . 21
9.1     Accounting Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
9.2     Books . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
9.3     Bank Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
9.4     Reports and Financials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARTICLE X.
INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
10.1    Authority to Indemnify . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
10.2    Limitations on Authority to Indemnify . . . . . . . . . . . . . . . . . . . 22
10.3    Mandatory Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
10.4    Advances for Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
10.5    Court Ordered Indemnification . . . . . . . . . . . . . . . . . . . . . . . . 23

0610202.07
084000-403  07/19/2000

DEREED-STNetwork00003

10.6   Determination and Authorization of Indemnification . . . . . . . . . . . . . . . . . . . 23
10.7   Indemnification of Managers, Employees and Agents . . . . . . . . . . . . . . . . . . 23
10.8   Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
10.9   Nonexclusive Right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE XI.
TAX MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
11.1   Tax Matters Member . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
11.2   Tax Matters Handled by LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
11.3   Partnership for Tax Purposes Only . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE XII.
TRANSFER RESTRICTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
12.1   Transfer Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
12.2   Required Transfer of Member's Interest . . . . . . . . . . . . . . . . . . . . . . . . . 25
12.3   Government Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
12.4   Tax Exemption Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
12.5   Purchase Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
12.6   Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
12.7   Appraisal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

ARTICLE XIII.
DISSOLUTION AND WINDING UP OF THE LLC'S EXISTENCE . . . . . . . . . . . . . . 27
13.1   Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
13.2   Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
13.3   Distribution on Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
13.4   Deemed Contribution and Distribution . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ARTICLE XIV.
GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
14.1   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
14.2   Integration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
14.3   Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
14.4   Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
14.5   Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

0610202.07
084000-403  07/19/2000

DEREED-STNetwork00004

# SAINT THOMAS OUTPATIENT
# NEUROSURGICAL CENTER, L.L.C.

## OPERATING AGREEMENT

THIS OPERATING AGREEMENT is made and entered into as of the first (1st) day of July, 2000, by and between Saint Thomas Health Services, a Tennessee nonprofit corporation ("STHS") and Neurological Surgeons, P.C., a Tennessee professional corporation (the "P.C.") (STHS and the P.C., and such other Persons who may become members under the terms of this Agreement, the "Members" and each, a "Member").

## WITNESSETH:

WHEREAS, the Members desire to form a limited liability company under and pursuant to the Act (as defined below), to conduct certain business as a limited liability company, and to set forth their mutual rights and obligations in this Agreement; and

WHEREAS, the business to be conducted by the limited liability company shall promote health and provide services to individuals without regard to race, creed, national origin, gender, payor source or the ability to pay for the services.

NOW, THEREFORE, in consideration of the mutual promises, covenants and undertakings hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

1.1     Definitions.  As used herein the following terms shall have the indicated meanings. Terms not otherwise defined herein shall have the meaning set forth in Act.

1.1.1    "Act" means the Tennessee Limited Liability Company Act in effect on the date hereof and as may be hereafter amended.

1.1.2    "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)      Credit to such Capital Account any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)     Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

0610202.07
084000-403  07/19/2000

DEREED-STNetwork00005

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.1.3   "Affiliate" with respect to any individual or Entity, means any individual or other Entity directly or indirectly controlling, controlled by, or under control with such individual or Entity.

1.1.4   "Agreement" means this Operating Agreement, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto," and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

1.1.5   "Articles of Organization" means the Articles of Organization of the LLC filed with the Secretary of State of the State of Tennessee, as amended from time to time.

1.1.6   "Ascension" means Ascension Health, a Missouri non-profit corporation, which is the sole member of STHS.

1.1.7   "Assign" means to make an Assignment.

1.1.8   "Assignment" means any transfer, alienation, sale, conveyance, assignment or other disposition of all or any part of any existing Membership Interest in the LLC, including without limitation any gift, bequest, devise, hypothecation, mortgage, lien, pledge, encumbrance, granting of a security interest or any transfer by operation of law.

1.1.9   "Available Cash Flow" means all cash, revenues and funds received by the LLC, less the sum of the following to the extent paid or set aside by the LLC:

(i)     All principal and interest payments on indebtedness of the LLC and all other sums paid to lenders;

(ii)    All cash expenditures incurred incidental to the operation of the LLC's business; and

(iii)   Such financial reserves as the Board deems reasonably necessary to the proper operation of the LLC's business.

1.1.10   "Bankruptcy" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy." A "Voluntary Bankruptcy" means, with respect to any Person, the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; the filing of any petition or answer by such Person seeking to adjudicate it a bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency, or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian, or other similar official for such Person or for any substantial part of its property; or corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any

DEREED-STNetwork00006

Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or other similar relief under any present or future bankruptcy, insolvency, or similar statute, law, or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within sixty (60) days.

1.1.11  "Board" or "Board of Governors" shall refer to those individuals described in Article VII in whom the management of the LLC is vested.

1.1.12  "Capital Account" means, with respect to any Member, the Capital Account maintained in accordance with the following provisions:

(i)     To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Section 5.3 or Section 5.4 hereof, and the amount of any LLC liabilities assumed by such Member or which are secured by any Property distributed to such Member;

(ii)    To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section 5.3 or Section 5.4 hereof, and the amount of any liabilities of such Member assumed by the LLC or which are secured by any property contributed by such Member to the LLC.

(iii)   In the event all or a portion of an interest in the LLC is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv)    In determining the amount of any liability for purposes of Sections 1.1.11(i) and 1.1.11(ii) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Treasury Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the Board shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the LLC or the Members), are computed in order to comply with such Treasury Regulations, the Board may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Article XIII hereof upon the dissolution of the LLC. The Board also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of LLC capital reflected on the LLC's balance sheet, as computed for book purposes in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event

DEREED-STNetwork00007

unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

1.1.13 "Capital Contributions" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the LLC with respect to the Membership Interest held by such Member pursuant to the terms of this Agreement. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the LLC by the maker of the note or a Person related to the maker of the note within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(c) shall not be included in the Capital Contribution of any Member until the LLC makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(d)(2).

1.1.14 "Center" means an outpatient center for the performance of neurological procedures on the campus of St. Thomas Hospital in Nashville, Tennessee.

1.1.15 "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

1.1.16 "Default Interest Rate" means a rate per annum equal to the lesser of (1) three percent (3%) plus a varying rate per annum that is equal to the interest rate publicly quoted by Bank of America, N.A., from time to time as its prime commercial or similar reference interest rate, with adjustments in that varying rate to be made on the same date as any change in that rate; and (2) the maximum rate permitted by law.

1.1.17 "Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deductions for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

1.1.18 "Directives" has the meaning given to such term in Section 3.1.

1.1.19 "Entity" means any corporation, partnership, trust, foundation, limited liability company, or other entity.

1.1.20 "Fair Market Value" means the value set forth in an appraisal by an independent third-party appraiser selected by the mutual agreement of the parties utilizing methodology acceptable to the Internal Revenue Services for appraising an interest in a business to be bought or sold by a tax-exempt entity, assuming a willing buyer and a willing seller, neither under a compulsion to buy or sell, and taking into account the effect or anticipated effect of the termination of the Membership Interest of the selling Member.

DEREED-STNetwork00008

1.1.21 "Financial Rights" means the right to share in profits, losses and distributions of the LLC and to receive interim and liquidation distributions of the LLC.

1.1.22 "Fiscal Year" means (i) the period commencing on the effective date of this Agreement and ending on December 31, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in clause (ii) for which the LLC is required to allocate Profits, Losses, and other items of LLC income, gain, loss, or deduction pursuant to Article V hereof.

1.1.23 "Governance Rights" means all of each Member's rights as a Member in the LLC other than Financial Rights and the right to assign such Financial Rights.

1.1.24 "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the LLC shall be the gross fair market value of such asset, as determined by the Board;

(ii)    The Gross Asset Values of all LLC assets shall be adjusted to equal their respective gross fair market values as determined by the Board as of the following times:  (a) the acquisition of an additional interest in the LLC (other than the purchase of a Membership Interest pursuant to the terms of the initial Memorandum) by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the LLC to a Member of more than a de minimis amount of LLC Property as consideration for an interest in the LLC; and (c) the liquidation of the LLC within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that the adjustments pursuant to clauses (a) and (b) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interest of the Members in the LLC;.

(iii)   The Gross Asset Value of any LLC asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the Board; and

(iv)    The Gross Asset Values of LLC assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and subparagraph (vi) of the definition of Profits and Losses and Section 5.3(g) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section 1.1.23(iv) to the extent the Board determines that an adjustment pursuant to Section 1.1.23(ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.1.23(iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Section 1.1.23(i), Section 1.1.23(ii), or Section 1.1.23(iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

1.1.25 "Issuance Items" has the meaning set forth in Section 5.3(i).

DEREED-STNetwork00009

1.1.26 "LLC" means Saint Thomas Outpatient Neurosurgical Center, LLC, a Tennessee Limited Liability Company.

1.1.27 "LLC Minimum Gain" has the meaning ascribed to "partnership minimum gain" as set forth in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

1.1.28 "Managers" means the President, Secretary and any other managers who may be designated from time to time by the Board of Governors to manage the affairs of the LLC pursuant to the provisions of Article VIII of this Agreement.

1.1.29 "Medicaid" means the joint Federal/State program to provide reimbursement for health care services rendered to indigents and shall include without limitation the TennCare program and it successors.

1.1.30 "Member Nonrecourse Debt" has the meaning ascribed to "partner nonrecourse debt" as set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

1.1.31 "Member Nonrecourse Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the LLC Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

1.1.32 "Member Nonrecourse Deductions" has the meaning ascribed to "partner nonrecourse deductions" as set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

1.1.33 "Members" means those persons set forth on Exhibit A attached hereto as may be hereafter amended, together with any additional Members admitted pursuant to the provisions of this Agreement.

1.1.34 "Membership Interest" means each Member's interest in the LLC, consisting of (i) the Financial Rights, (ii) the Governance Rights, and (iii) rights to assign the Financial Rights and Governance Rights.

1.1.35 "Ministry Location" means an organization or a group of related organizations in a particular community or geographic area which is controlled by an entity of which Ascension is the sole member or sole shareholder.

1.1.36 "Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

1.1.37 "Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

1.1.38 "P.C." means Neurological Services, P.C., a Tennessee professional corporation.

DEREED-STNetwork00010

1.1.39 "Percentage Interest" means the percentage as set forth opposite such Member's name on Exhibit A hereto, as the same may be amended from time to time.

1.1.40 "Person" means any individual, partnership, corporation, trust, or other Entity.

1.1.41 "Profits" and "Losses" means, for each Fiscal Year, an amount equal to the LLC's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i) Any income of the LLC that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.1.42 shall be added to such taxable income or loss;

(ii) Any expenditures of the LLC described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(I), and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.1.42 shall be subtracted from such taxable income or loss;

(iii) In the event the Gross Asset Value of any LLC asset is adjusted pursuant to subparagraphs (ii) and (iii) of the definition of Gross Asset Value set forth herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv) Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(v) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of Depreciation set forth herein; and

(vi) To the extent an adjustment to the adjusted tax basis of any LLC asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the LLC, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii) Notwithstanding any other provision of this Section 1.1.42, any items which are specifically allocated pursuant to Sections 5.3 and 5.4 hereof shall not be taken into account in computing Profits or Losses.

0610202.07
084000-403  07/19/2000

7

DEREED-STNetwork00011

The amounts of the items of LLC income, gain, loss or deduction available to be specially allocated pursuant to Sections 5.3 and 5.4 hereof shall be determined by applying rules analogous to those set forth in Sections 1.1.42(i) through 1.1.42(vii) hereof.

1.1.42  "Property" means all real and personal property acquired by the LLC and any improvements thereto, and shall include both tangible and intangible property.

1.1.43  "Regulatory Allocations" has the meaning set forth in Section 5.4.

1.1.44  "Responsible Person" has the meaning given to such term in Section 48-243-101(a)(7) of the Act.

1.1.45  "Safe Harbors" shall mean those regulations promulgated to protect certain business arrangements from prosecution under the anti-kickback provisions of the Social Security Act, codified at 42 C.F.R. § 1001.952, and any successor regulations.

1.1.46  "Securities Act" means the Securities Act of 1933, as amended, or any similar law then in effect.

1.1.47  "Securities and Exchange Commission" includes any governmental body or agency succeeding to the functions thereof.

1.1.48  "Service Agreements" means one or more service agreements to be entered into between the LLC and one or more of its Members or their respective Affiliates pursuant to which such Member (or one of its Affiliates) will provide certain support services, personnel and supplies to the Center, such as pastoral care, quality assurance services, housekeeping services, billing and collection services, and the services of the employees who will staff the center, for a fee to the LLC.

1.1.49  "Sponsors" means the Northeast, Southeast, East Central and West Central provinces of the Daughters of Charity of St. Vincent De Paul and the Congregation of the Sisters of St. Joseph of Nazareth and such other entities added as "Sponsors" to the national system of health care organizations of which Ascension is the ultimate parent.

1.1.50  "STHS" means Saint Thomas Health Services, a Tennessee nonprofit corporation that is exempt from the payment of federal income taxes by virtue of the provisions of section 501(c)(3) of the Code.

1.1.51  "Successor" means a Member's executor, administrator, guardian, conservator, other legal representative, or successor.

1.1.52  "Surgical Procedure" means a procedure on the list of Medicare-covered procedures for ambulatory surgery centers as published by the U.S. Department of Health and Human Services.

1.1.53  "System Policy" means that policy established from time to time by Ascension.

DEREED-STNetwork00012

1.1.54  "Tax Matters Member" has the meaning given such term in Section 11.1 hereof.

1.1.55  "Transfer" means, as a noun, any voluntary or involuntary transfer, sale, assignment, exchange, lease, mortgage, charge, hypothecation, pledge or other conveyance or encumbrance, including any transfer by law or otherwise and, as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, lease, mortgage, charge, hypothecate, pledge or otherwise to convey or encumber.

1.1.56  "Treasury Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time, including corresponding provision of succeeding regulations.

1.2     Additional Terms.  The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  All references to Articles and Sections shall be deemed references to Articles and Sections of this Agreement, unless the context shall otherwise require.  All references herein to Exhibits shall be deemed to be references to the Exhibit(s) attached to this Agreement.  The terms "this Agreement," "hereof," "hereunder" and similar expressions refer to this Agreement as a whole and not to any particular Article or Section or other portion hereof and include any agreement supplemental hereto.  The conjunction "or" shall be understood in its inclusive sense (and/or).

## ARTICLE II.
## ORGANIZATION

2.1     Formation.  On _____, 2000, the LLC was formed by the filing of Articles of Organization by the Secretary of State of the State of Tennessee.

2.2     Adoption of Agreement.  The Members hereby adopt this Agreement as the operating agreement of the LLC as the term "Operating Agreement" is used in the Act, to set forth the rules, regulations and provisions regarding the management of the business of the LLC, the governance of the LLC, the conduct of its business and the rights and privileges of its members.

2.3     Name.  The name of the LLC shall be Saint Thomas Outpatient Neurosurgical Center, LLC.  The LLC may adopt and conduct its business under such assumed or trade names as the Board may from time to time determine.  The LLC shall file any assumed or fictitious name certificates as may be required to conduct business in any state.

2.4     Principal Place of Business.  The initial Registered Agent and Registered Office of the LLC shall be E. Berry Holt III, c/o Boult, Cummings, Conners & Berry PLC, 414 Union Street, Suite 1600, Nashville, Tennessee, 37219, County of Davidson.  The principal executive office of the LLC shall be located at 4230 Harding Road, Nashville, Tennessee, 37205, or such other place as the Board may, from time to time, determine.

## ARTICLE III.
## PURPOSE, POWERS AND PHILOSOPHY

DEREED-STNetwork00013

3.1     Purpose.  The purpose of the LLC shall be to develop, own and operate an outpatient surgery center specializing in neurological procedures, to provide health care services in a manner that furthers STHS's charitable purpose by promoting health for a broad cross section of the community, to promote health and provide services to individuals referred to the Center without regard to race, creed, national origin, gender, payor source or the ability to pay for the services, to further the charitable missions and tax-exempt purpose of STHS, and to engage in any and all lawful business for which limited liability companies may be organized under the Act.  In fulfilling its purpose, the LLC shall comply with, and shall operate its business in compliance with, the Ethical and Religious Directives for Catholic Health Care Services (the "Directives") to the extent the Directives are applicable.  Further, the purpose of the LLC shall be to support the institutions sponsored by Ascension, and to cooperate with other institutions sponsored by Ascension.

3.2     Powers.  The LLC may exercise all powers necessary or convenient to carry out its business and affairs and to effectuate the purposes set forth in Section 3.1 hereof, which may be legally exercised by limited liability companies under the Act.  Notwithstanding the foregoing, the LLC shall have no power to do anything inconsistent with the Directives, the charitable mission or the tax-exempt purpose of STHS.

3.3     Philosophy.  The philosophy of the LLC is that of the Sponsors as articulated and promoted through statements of Mission, Vision and Values of STHS in accordance with the official teachings of the Roman Catholic Church and the Directives.

## ARTICLE IV.
## CAPITAL

4.1     Capital Contributions.  The capital contributed by each Member is set forth on Exhibit A, as amended from time to time.

4.2     Additional Contributions.  No Member shall be required to make any additional Capital Contributions.  A Member may make such additional contributions as may be approved from time to time by the Board.

4.3     No Interest or Right to Withdraw.  No Member shall have the right to demand the return of, or otherwise withdraw, his contribution, or to receive any specific property of the LLC, except as specifically provided in this Agreement.  No Member shall have the right to demand and receive property other than cash in return for his contributions.  No interest shall be paid on Capital Contributions or on balances in the Capital Accounts.

4.4     Membership Interests and Amendments to Exhibit A.  Each Member shall be credited with the Percentage Interest and Capital Contributions set forth opposite such Member's name on Exhibit A, as amended from time to time.  The amounts shown on Exhibit A with respect to Capital Contributions and Percentage Interest shall be appropriately amended to reflect changes in such amounts as a result of admission of additional Members, any additional Capital Contributions by Members pursuant to Section 4.2 hereof, any withdrawals or reductions in Capital Contributions, any changes in the Membership of the LLC, or Assignments of Membership Interests.  Exhibit A also shall be amended from time to time to reflect any changes in the addresses of Members.

## ARTICLE V.

DEREED-STNetwork00014

## ALLOCATION OF INCOME AND LOSSES; CASH DISTRIBUTIONS

5.1 <u>Capital Accounts</u>. The LLC will maintain for each Member an account to be designated as such Member's "Capital Account" as defined in Section 1.1.11 hereof.

5.2 <u>Profits and Losses</u>. After giving effect to the Special Allocations set forth in sections 5.3 and 5.4 hereof, Profits and Losses for any Fiscal Year shall be allocated among the Members in proportion to each Member's Percentage Interest.

5.3 <u>Special Allocations</u>. The following special allocations shall be made in the following order:

(a) <u>Minimum Gain Chargeback</u>. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Article V, if there is a net decrease in LLC Minimum Gain during any LLC Fiscal Year, each Member shall be specially allocated items of LLC income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in LLC Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.3(a) is intended to comply with the minimum gain chargeback requirement in such Section of the Treasury Regulations and shall be interpreted consistently therewith.

(b) <u>Member Minimum Gain Chargeback</u>. Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Article V, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any LLC Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5), shall be specially allocated items of LLC income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.3(b) is intended to comply with the minimum gain chargeback requirement in such Section of the Treasury Regulations and shall be interpreted consistently therewith.

(c) <u>Qualified Income Offset</u>. Notwithstanding the above, any Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), shall be allocated items of income or gain (including gross income if necessary) in an amount and manner sufficient to eliminate any deficit created in such Member's capital account (to the extent it exceeds such Partner's obligation to restore such deficit) as quickly as possible. The provisions of

DEREED-STNetwork00015

this Section 5.3(c) are intended to comply with the provisions of Treas. Reg. Section 1.704-1(b), including any amendments or successive regulations thereto and shall be so interpreted.

      (d)    Gross Income Allocation.  In the event any Member has a deficit Capital Account at the end of any LLC Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore, if any, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of LLC income and gain in the amount of such excess as quickly as possible, provided that any allocations pursuant to this Section 5.3(d) shall be made if and only to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article V have been tentatively made as if this Section 5.3(d) and Section 5.3(c) hereof were not in the Agreement.

      (e)    Nonrecourse Deductions.  Nonrecourse Deductions for any Fiscal Year or other period shall be allocated among the Members in proportion to their Percentage Interest.

      (f)    Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

      (g)    Code Section 754 Adjustment.  To the extent an adjustment to the adjusted tax basis of any LLC asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts, as a result of a distribution to a Member in complete liquidations on interests the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if such adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specifically allocated to the Members in accordance with their interests in the LLC in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such distribution was made in the event that Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

      (h)    Loss Limitations.  The Losses allocated pursuant to Section 5.2 hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 5.2, the limitation set forth in this Section 5.3(h) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

      (i)    Allocations Relating to Taxable Issuance of Membership Interests.  Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of an

DEREED-STNetwork00016

interest in the LLC to a Member (the "Issuance Items") shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each such Member if the Issuance Items had not been realized.

(j)     Upon liquidation of the LLC, Profits and Losses, or items thereof, shall, to the extent possible, be allocated among the Members so that all Member's Capital Accounts are in proportion to their Percentage Interests.

5.4     Curative Allocations. The allocations set forth in Sections 5.3(a), 5.3(b), 5.3(c), 5.3(d), 5.3(e), 5.3(f), 5.3(g) and 5.3(h) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of LLC income, gain, loss or deduction pursuant to this Section 5.4. Therefore, notwithstanding any other provision of this Section 5.4 (other than the Regulatory Allocations), the Board shall make such offsetting special allocations of LLC income, gain, loss or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all LLC items were allocated pursuant to Sections 5.2, 5.3(i) and 5.5. In exercising their discretion under this Section 5.4, the Board shall take into account future Regulatory Allocations under Sections 5.3(a) and 5.3(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Section 5.3(e) and 5.3(f).

5.5     Other Allocation Rules.

(a)     The Members are aware of the income tax consequences of the allocations made by this Article V and hereby agree to be bound by the provisions of this Article V in reporting their shares of LLC income and loss for income tax purposes.

(b)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Board using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(c)     Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the LLC within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' interests in LLC Profits are in proportion to their Percentage Interest.

(d)     To the extent permitted by Section 1.704-2(h)(3) of the Treasury Regulations, the Members shall endeavor not to treat distributions of cash as having been made from the proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt.

5.6     Tax Allocations; Code Section 704(c). In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the LLC shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the LLC for federal income

DEREED-STNetwork00017

tax purposes and its initial Gross Asset Value (computed in accordance with the definition of Gross Asset Value contained herein.

In the event the Gross Asset Value of any LLC asset is adjusted pursuant to Section 1.1.23(ii) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the Members in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 5.6 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provisions of this Agreement.

5.7     Allocations of Profits, Losses and Distributions in Respect of Interest Transferred. Profits and Losses allocable to any Member whose Membership Interest has been Assigned, in whole or in part, during any fiscal year, shall be allocated among the Persons who were the holders of such interests during such year in proportion to their respective holding periods, according to the books and records of the LLC, without separate determination of the results of LLC operations during such periods. Profits or Losses attributable to a sale or other disposition of all or any portion of the assets of the LLC shall be allocated to those Members who were Members at the time of the occurrence of the disposition giving rise to such Profits or Losses. Distributions of LLC assets in respect of the interest shall be made only to persons who, according to the books and records of the LLC, are the owners of such Membership Interest on a date selected by the Board, in its sole discretion. The Board and the LLC shall incur no liability for making distributions in accordance with the provisions of the preceding sentence whether or not the Board of the LLC has knowledge or notice of any transfer of ownership of any Membership Interest.

5.8     Distributions of Available Cash Flow. The LLC may, but is not obligated to, make current distributions out of Available Cash Flow as the Board, in its sole discretion, may determine. Distribution shall be made to the Members in accordance with their respective Percentage Interest, except as otherwise provided in Section 5.9 hereof.

5.9     Distributions From Liquidations. Upon liquidation of the LLC, assets remaining after payment of all LLC debts and obligations in accordance with Section 48-245-1101 of the Act shall be distributed in proportion to the positive Capital Account balances of all Members, after allocation of Profits or Losses for the year of the liquidation in accordance with Sections 5.2, 5.3 and 5.4. The Members shall not be obligated to contribute cash or any other asset to the LLC to make up deficits in the Capital Account balances of Members either during the term of the LLC or upon liquidation.

5.10     Consequences of Distributions. Upon the determination to distribute, remit or pay funds in any manner expressly provided in this Article V, made in good faith, the Members shall incur no liability on account of such distribution, even though such distribution may have resulted in the LLC retaining insufficient funds for the operation of its business, which insufficiency resulted in loss to the LLC or necessitated the borrowing of funds by the LLC.

5.11     Modification. The Board of Governors, without the consent of the Members, may modify the provisions of this Article V or any other provisions of this Agreement if, after consultation with

0610202.07
084000-403 07/19/2000

14

counsel to the LLC, the Board determines that such modification is necessary to (a) cause the allocations contained in this Article V to have substantial economic effect or otherwise be respected for Federal Income Tax purposes under Section 704 of the Code; (b) cause the allocation of Profits and Losses to conform, in accordance with the requirements of Section 704 of the Code, to the distributions provided in Section 5.9; or (c) cause the provisions of the Agreement to comply with any applicable legislation, regulation or rule enacted or promulgated after the date of this Agreement, which change is necessary to enable the LLC to carry out its purposes in the manner contemplated by this Agreement. Any such amendment shall be so as to cause the least significant deviation from the provisions of this Agreement as originally set forth.

## ARTICLE VI.
## RIGHTS AND DUTIES OF MEMBERS

6.1     Rights and Duties. The Members shall have such rights and duties as are provided in this Agreement and the Act.

6.2     Liability of Members. Except as otherwise set forth in the Act, the Members shall not be liable under a judgment, decree or order of a court, or in any manner, for a debt, obligation or liability of the LLC.

6.3     Annual Meetings. The Members shall hold an annual meeting at the date, time and place within the State of Tennessee determined by the Board of Governors to elect the Board of Governors, to review the prior year's operations, to discuss operations for the coming year and to take up such other matters as may be properly raised at the meeting. Written notice of the meeting stating the place, day and hour of the meeting shall be delivered not less than ten (10) nor more than sixty (60) days before the meeting. The business transacted at a meeting shall not be limited to the purposes stated in the notice of the meeting. Failure to hold an annual meeting will not invalidate any actions taken by the Members, the Board of Governors or the Managers.

6.4     Special Meetings. Any Member or Members holding, in the aggregate, not less than a ten percent (10%) Percentage Interest or the Board of Governors may call a special meeting of the Members. The Person calling the meeting may designate any place within Davidson County, Tennessee for any special meeting. Written notice stating the place, day and hour of the special meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than sixty (60) days before the meeting.

6.5     Waiver of Notice. A Member may waive notice required by this Article VI or the Act either before or after a meeting by providing to the Secretary a written waiver which shall be placed in the LLC's records; provided, however, attendance by a Member at a meeting is a waiver of notice of that meeting, except where the Member objects at the beginning of the meeting to the transaction of business because the meeting is not lawfully called or convened, or objects before a vote on an item of business because the item may not lawfully be considered at that meeting and does not participate in the consideration of the item at that meeting.

6.6     Voting. Except as otherwise provided in this Agreement, each Member shall have voting rights equivalent to its Percentage Interests.

DEREED-STNetwork00019

6.7   Quorum. A quorum shall be present at a meeting of the Members if Members holding more than seventy-five percent (75%) of the Percentage Interests of all of the Members are represented at the meeting in Person or by proxy.

6.8   Action at Meetings. Unless otherwise provided by law or this Agreement, the affirmative vote of Members holding a majority of the Percentage Interest of the Members at a meeting at which a quorum is present shall constitute the act of the Members. At all meetings of the Members, a Member may vote by proxy executed in writing by the Member or by the Member's duly authorized attorney in fact. The proxy shall be filed with the Secretary before or at the time of the meeting. Any Member may demand that voting be by ballot. A Member may participate at any meeting by means of a communication device pursuant to which all Members participating may simultaneously hear each other.

6.9   Informal Action by Members. The Members may take any action without a meeting if a consent in writing, setting forth the action so taken and waiving the right to act at a meeting, is signed by the Members holding a majority of the voting power held by all Members.

6.10   Member Approval. Without the prior written consent or approval of Members holding more than fifty percent (50%) of the Percentage Interest of the Members, neither the Board of Governors, the Managers nor any agent of the LLC may cause the LLC to do any of the following:

(a)   amend this Agreement or the LLC's Articles of Organization except as set forth in Section 5.11 and Section 7.12;

(b)   adopt any new, or any changes to existing, long-term or master institutional or strategic plans for the LLC;

(c)   organize or acquire, or authorize the organization or acquisition of, any subsidiary or Affiliate of the LLC;

(d)   merge the LLC with or consolidate the LLC into any other entity;

(e)   sell, assign or otherwise transfer all or substantially all of the LLC's assets in one or more related transactions; or

(f)   cause the LLC to incur indebtedness in excess of $25,000.00.

The preceding to the contrary notwithstanding, in the event that STHS determines in good faith that the Members, the Board of Governors or the Managers have failed or may fail to cause the LLC to conduct its activities so that the charitable purposes of STHS take precedence over the profit-making motives of the LLC, STHS shall be empowered and authorized to unilaterally require the LLC, its Board of Governors and its Managers to take such actions, or refrain from such actions, that are necessary or appropriate to preserve and protect STHS' tax-exempt status.

## ARTICLE VII.
## BOARD OF GOVERNORS

7.1   General Powers and Duties. The LLC's business and affairs shall be managed by and be under the direction of its Board of Governors, subject to such limitations as are otherwise set forth

0610202.07
084000-403 07/19/2000

16

DEREED-STNetwork00020

in the Act or this Agreement. The Board of Governors may delegate such authority and responsibility as it deems to be in the best interests of the LLC to the Managers. A Governor need not be a resident of the State of Tennessee. The Governors as such shall not receive any compensation for their services, but by resolution the Board of Governors may provide for reimbursement to Governors for all reasonable and necessary expenses incurred in attending meetings of the Board of Governors. When such expense may be determined in advance, the President may advance such amounts to respective Governors for that purpose upon request. The Board of Governors may also provide for a reasonable per diem for attendance at the meetings and for compensation for any other proper service rendered the LLC.

7.2     Number, Election and Term. The Board of Governors shall initially consist of four (4) members. The Governors shall be divided into two (2) classes. Two (2) of the Governors shall be appointed by STHS and shall be STHS Governors. Two (2) of the Governors shall be appointed by the P.C. and shall be P.C. Governors. The Board of Governors may vote to increase the size of the Board from time to time, provided that any increase shall be in increments of two (2) Governors - one (1) to be appointed by STHS and one (1) to be appointed by the P.C. The term of each of the initial Governors initially elected by the Members shall be from the inception of the LLC until the first annual meeting of the Members, at which time their successors shall be elected and qualified. After the first annual meeting of the Members, all Governors shall serve for terms of one (1) year, or until their successor shall have been elected and qualified, or until the earlier of their death, removal, resignation or disqualification. At each annual meeting of the Members, the P.C. shall appoint the P.C. Governors and STHS shall appoint the STHS Governors.

7.3     Removal and Resignation. Only the Members which elected a Governor may remove a Governor, at a special meeting called for such purpose, with or without cause. A Governor may resign at any time by giving a written resignation to the President or the Secretary of the LLC. The resignation is effective without acceptance when such resignation is actually received by the President or Secretary unless a later effective time is specified in the resignation.

7.4     Vacancy. A vacancy created by removal, death, incapacity, resignation or an increase in the number of Governors or by any other reason may be filled only by election by the Member or Members which elected such Governor or, in the case of an increase in the number of Governors, which elects the class designated for the new Governor position. The individual elected to fill a vacancy shall serve until the next annual meeting of the Members.

7.5     Meetings. An annual meeting of the Board of Governors shall be held at the date, time and place determined by the Board of Governors. Special meetings of the Board of Governors may be called by the President, the Board of Governors or any two (2) Governors by giving two (2) days' notice to the Governors of the date, time, place and purpose of the special meeting. Participation at any meeting may be by any means of communication pursuant to which all Governors participating may simultaneously hear and speak to each other.

7.6     Waiver of Notice. A Governor may waive any notice required by this Article VII or the Act before or after the date and time stated in the notice. Except as set forth in the following sentence, the waiver must be in writing, signed by the Governor entitled to the notice and filed with the minutes or other records of the LLC. A Governor's attendance at or participation in a meeting waives any required notice to him of the meeting unless the Governor at the beginning of the meeting (or promptly upon his arrival) objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to any action taken at the meeting.

DEREED-STNetwork00021

7.7    Quorum.  The presence at a meeting of three (3) Governors shall constitute a quorum for such meeting.

7.8    Action at Meetings.  Unless otherwise provided by the Act or this Agreement, the affirmative vote of a majority of the Governors present at a meeting at which a quorum is present shall constitute the act of the Governors.

7.9    Informal Action by Governors.  Any action may be taken without a meeting if a consent in writing, setting forth the action so taken and waiving the right to act at a meeting, is signed by at least three (3) Governors, unless such action requires, pursuant to the Act or this Agreement, the approval of a greater number of votes in which case the written consent must be executed by at least that greater number of Governors.

7.10    Board of Governors Committees.  The Board of Governors, by written resolution, may establish committees having the authority of the Board of Governors in the management of the LLC's business.  The resolution shall state the express authority granted to each committee and the manner in which each committee shall act.  Each of the members of each committee must be a Governor.  All procedures and provisions set forth herein with respect to the Board of Governors shall, to the extent relevant, apply equally to committees of the Board of Governors.

7.11    Actions by Committee.  To the extent set forth in the resolution authorizing a committee, and except as otherwise provided in the Act or this Agreement, the committee may exercise the authority of the Board of Governors; provided, however, that no committee may:

(a)    authorize distributions, except according to a formula or method prescribed by the Board of Governors;

(b)    approve or propose to Members actions that the Act requires to be approved by Members;

(c)    fill vacancies on the Board of Governors or on any of its committees;

(d)    adopt a plan of merger not requiring Member approval;

(e)    authorize or approve the reacquisition of Membership Interests; or

(f)    authorize or approve the issuance or sale or contract for sale of Membership Interests.

7.12    Restriction on Actions.  The Board of Governors and the Managers shall:

(a)    not cause the LLC to engage in any activities or take any action which is inconsistent with the tax-exempt status of STHS;

(b)    cause the LLC to conduct all of its activities and transactions in accordance with the underlying philosophy and objectives of the corporate responsibility plan adopted by the LLC;

0610202.07
084000-403  07/19/2000

18

DEREED-STNetwork00022

(c)  cause the LLC to conduct its activities and transactions so that the charitable purposes in Section 3.1 take precedence over any profit-making motives;

(d)  not approve of or engage in those activities which require the prior approval of STHS and Entities which directly or indirectly control STHS, as set out in the charter or bylaws of STHS, until such approval is obtained, which include:

(i)  the approval, change or interpretation of any statement of, or requirements for, the mission, vision, role or purpose of the LLC;

(ii)  the approval of any changes to the Operating Agreement or Articles of Organization of the LLC which are inconsistent with System Policy;

(iii)  the approval in accordance with System Policy of the formation of any subsidiary entity of the LLC;

(iv)  the appointment or removal, with or without cause of the STHS Governors;

(v)  the approval of the evaluation policies and processes for the President of the LLC, and the evaluation of the performance of the President of the LLC;

(vi)  the approval of debt incurred by the LLC in excess of limits specified in System Policy;

(vii)  the approval of projects which involve the expenditures of funds or divestiture of assets of the LLC in excess of limits specified in System Policy;

(viii)  the approval of an alienation of assets for which Canonical approvals are required;

(ix)  the approval, in accordance with System Policy, of the divestiture, dissolution, closure, merger, consolidation, change in membership, or reorganization of the LLC; and

(x)  the taking of any action that is inconsistent with System Policy or the governing documents of Ascension.

All Members are aware of the limitation on the activities or actions of the LLC under this Section 7.12 and agree that the decision of the Board of Governors or the Managers to forego an action or activity which would be inconsistent with the tax-exempt status of STHS or STHS's corporate responsibility plan, or which would be inconsistent with the purpose, powers, or philosophy of the LLC or which fails to gain the requisite approval, or to take or forego an action or activity in a manner so that the charitable purposes in Section 3.1 take precedence over any profit-making motives, shall not be a breach of the duty of loyalty of the Board of Governors or the Managers to the LLC or its Members, notwithstanding that the decision to forego an action or activity for any such reason is not in the best business interest of the LLC.

0610202.07
084000-403  07/19/2000

DEREED-STNetwork00023

## ARTICLE VIII.
## MANAGERS

8.1     <u>Manager Designation</u>.  The LLC shall at all times have Managers acting as President, Vice President, and Secretary, and may have additional Managers as the Board of Governors may determine.  Any number of offices may be held by the same Person, except that the President may not serve as the Secretary.

8.2     <u>Manager Election</u>.  The Board of Governors shall elect the Managers at its initial meeting and at the annual meetings of the Board of Governors.

8.3     <u>Term</u>.  The Managers shall hold office for a term of one (1) year or until their successors have been duly elected and qualified.

8.4     <u>Removal</u>.  The Board of Governors may remove any Manager with or without cause and such removal shall be without prejudice to the contract rights, if any, of the Manager so removed.

8.5     <u>Vacancies</u>.  A vacancy in any Manager position because of death, resignation, removal or any other cause may be filled by the Board of Governors for the unexpired portion of the term.

8.6     <u>Duties of President</u>.  The President shall be the Chief Executive Officer of the LLC and shall have the responsibilities, duties, obligations, powers and authority prescribed by the Act for Chief Managers or expressly delegated to him by the Board of Governors.  He shall keep full and correct account of receipts and disbursements in the books belonging to the LLC, and shall deposit all moneys and other valuable effects in the name and to the credit of the LLC, in such banks as may be designated by the Board of Governors.  He shall dispose of funds of the LLC as may be ordered by the Board of Governors, taking proper vouchers for such disbursements, and shall render to the Board of Governors, whenever they may require it of him, an account of all his transactions and of the financial condition of the LLC.

8.7     <u>Duties of Vice President/Secretary</u>.  The Board of Directors may, in its discretion, elect one or more Vice Presidents, and such Vice Presidents shall have such duties as shall be assigned by the Board of Governors from time to time.  The Secretary shall have the responsibilities, duties, obligations, powers and authority prescribed by the Act for the Secretary.

8.8     <u>Qualifications</u>.  Managers need not be residents of the State of Tennessee, Governors or Members.

8.9     <u>Compensation</u>.  The Board of Governors may compensate Managers for their services as such, separate and apart from expenses and per diem as Governors, when the Board of Governors in its discretion deems a Manager's duties and responsibilities justify such action.

## ARTICLE IX.
## ACCOUNTING, BOOKS AND BANK ACCOUNTS

9.1     <u>Accounting Period</u>.  The annual accounting period of the LLC shall end on December 31.  The books of the LLC shall be kept on the accrual method of accounting in accordance with generally accepted accounting principles.

0610202.07
084000-403  07/19/2000

DEREED-STNetwork00024

9.2     Books.  Full and accurate records of all transactions of the LLC shall be kept by the Managers in proper books of account, computerized accounting systems or electronic data storage. Said records shall be kept at all times in the principal executive office of the LLC or such other place as agreed upon by the Board of Governors. Each Member and Governor shall at all times have access to and may inspect any and all said records.

9.3     Bank Accounts.  An account or accounts in the name of the LLC shall be maintained in such bank or banks as the Board of Governors may from time to time select. All monies and funds of the LLC, and all instruments for the payment of money to the LLC, shall, when received, be deposited in said bank account or accounts, or prudently invested in marketable securities or other negotiable instruments. All checks, drafts and orders upon said account or accounts shall be signed in the LLC's name by the President and/or the Vice President and such other Person or Persons as the Board of Governors may from time to time determine. A safety deposit box may be kept in the name of the LLC if the President shall so elect, and access to such safety deposit box shall be permitted upon the signature of the President and/or the Vice President and such other Person or Persons as the Board of Governors may from time to time authorize.

9.4     Reports and Financials.  The LLC shall prepare financial statements at least quarterly that include a balance sheet as of the end of the reporting period and an income statement for such period. The LLC shall deliver, on or before the first day of the fourth month following the end of its fiscal year, to the Secretary of State for filing an annual report that sets forth: (i) the LLC's name and the fact that it is organized in the State of Tennessee; (ii) the street address and zip code of its registered office and the name of its registered agent at that office; (iii) the street address, including the zip code, of its principal executive office; (iv) the names and business addresses, including zip codes, of its Governors; (v) the names and business addresses, including zip codes, of its Managers; (vi) the LLC's federal employer identification number; and (vii) the number of the LLC's Members as of the date of filing. Information in the annual report shall be current as of the date the annual report is executed on behalf of the LLC.

## ARTICLE X.
## INDEMNIFICATION

10.1     Authority to Indemnify.  Subject to the provisions of Section 10.6, the LLC shall indemnify an individual made a party to a proceeding, because such individual is or was a Responsible Person, against liability incurred in the proceeding if the Responsible Person satisfies the following standard of conduct: (a) the Responsible Person's conduct was in good faith and the Responsible Person reasonably believed (i) in the case of conduct in the Responsible Person's official capacity with the LLC, that his or her conduct was in the best interest of the LLC or was consistent with the limitations set forth in this Agreement, and (ii) in all other cases, that his or her conduct was at least not opposed to the LLC's best interest or was consistent with the limitations set forth in this Agreement; (b) in the case of any criminal proceeding, the Responsible Person had no reasonable cause to believe his or her conduct was unlawful; or (c) the Responsible Person's conduct with respect to an employee benefit plan for a purpose he or she reasonably believed to be in the interests of the participants in and beneficiaries of the plan is conduct that satisfies Section 10.1. The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the Responsible Person did not satisfy the foregoing standard of conduct.

10.2     Limitations on Authority to Indemnify.  Except as to court-ordered indemnification as provided in Section 10.5, the LLC may not indemnify a Responsible Person (i) in connection with a

DEREED-STNetwork00025

proceeding by or in the right of the LLC in which the Responsible Person was adjudged liable to the LLC, and (ii) in connection with any other proceeding charging improper personal benefit to such Responsible Person, whether or not involving action in the Responsible Person's official capacity, in which the Responsible Person was adjudged liable on the basis that personal benefit was improperly received by such Responsible Person.

10.3    Mandatory Indemnification. The LLC shall indemnify a Responsible Person who is or was wholly successful, on the merits or otherwise, in the defense of any proceeding to which such Responsible Person was a party because he or she is or was a Responsible Person of the LLC against reasonable expenses incurred in connection with the proceeding.

10.4    Advances for Expenses. The LLC may pay for or reimburse the reasonable expenses a Responsible Person who is a party to a proceeding in advance of final disposition of the proceeding if: (a) the Responsible Person furnishes to the LLC a written affirmation of his or her good faith belief that he or she has satisfied the standard of conduct set forth in Section 10.1; (b) the Responsible Person furnishes to the LLC a written undertaking (which shall be an unlimited general obligation of the Responsible Person but need not be secured and may be accepted by the LLC without reference to financial ability to repay), executed Personally on his or her behalf, to repay the advance if it is ultimately determined that he or she is not entitled to indemnification; and (c) a determination is made that the facts then known to those making the determination would not preclude indemnification under this Section 10.4.

10.5    Court Ordered Indemnification. A Responsible Person of the LLC who is a party to a proceeding may apply for indemnification to the court conducting the proceeding or to another court of competent jurisdiction. On receipt of an application for indemnification, the court, after giving any notice the court considers necessary, may order indemnification if it determines: (a) the Responsible Person is entitled to mandatory indemnification as set forth in Section 10.3, in which case the court shall also order the LLC to pay the Responsible Person's reasonable expenses incurred to obtain court ordered indemnification; or (b) the Responsible Person is fairly and reasonably entitled to indemnification in view of all relevant circumstances, whether or not the Responsible Person has satisfied the standard of conduct set forth in Section 10.1 or was adjudged liable as set forth in Section 10.2, but if adjudged so liable indemnification is limited to reasonable expenses incurred by the Responsible Person.

10.6    Determination and Authorization of Indemnification. Except as to court-ordered indemnification as provided in Section 10.5, the LLC may not indemnify a Responsible Person under Section 10.1 unless authorized in the specific case after a determination has been made that indemnification of the Responsible Person is permissible in the circumstances because the Responsible Person has satisfied the standard of conduct set forth in Section 10.1. The determination shall be made: (a) by the majority vote of a quorum of the Board of Governors consisting of Governors of the LLC who are not at the time parties to the proceeding; (b) if a quorum cannot be obtained under Section 10.6(a), by the majority vote of a committee duly designated by the Board of Governors (in which designation Governors at the time parties to the proceeding may participate), consisting solely of two (2) or more Governors not at the time parties to the proceeding; (c) by independent legal counsel (i) selected by the Board of Governors or by a committee in the manner set forth in Section 10.6(a) or (b), respectively; or (ii) if a quorum of the Board of Governors cannot be obtained under Section 10.6(a) and a committee cannot be designated under Section 10.6(b), selected by a majority vote of the full Board of Governors (in which selection Governors who are parties may participate); or (d) by the Members holding a majority of the Percentage Interest, provided that the Percentage Interest owned by or voted under the Control of Members who are at the time parties to the proceeding may not vote on the determination.

DEREED-STNetwork00026

Authorization of indemnification and evaluation as to reasonableness of expenses shall be made in the same manner as the determination that indemnification is permissible as provided in this Section 10.6, except that if the determination is made by special legal counsel, authorization of indemnification and evaluation as to reasonableness of expenses shall be made by those entitled under Section 10.6(c) to select special legal counsel.

10.7   Indemnification of Managers, Employees and Agents. A Manager of the LLC who is not a Responsible Person is entitled to mandatory indemnification as provided in Section 10.3, and is entitled to apply for court-ordered indemnification as provided in Section 10.5, in each case to the same extent as a Responsible Person. The LLC may indemnify and advance expenses to a Manager, employee, independent contractor or agent of the LLC who is not a Responsible Person to the same extent as a Responsible Person. The LLC may also indemnify and advance expenses to a Manager, employee, independent contractor or agent who is not a Responsible Person to the extent consistent with public policy, as determined by specific action of the Board of Governors or by contract.

10.8   Insurance. The LLC may purchase and maintain insurance on behalf of an individual who is or was a Responsible Person, Manager, employee, independent contractor or agent of the LLC or who, while a Responsible Person, Manager, employee, independent contractor or agent of the LLC, is or was serving at the request of the LLC as a responsible Person, manager, employee, independent contractor, agent, partner or trustee of another foreign or domestic limited liability LLC, corporation, partnership, joint venture, trust, employee benefit plan, or other enterprise, against liability asserted against or incurred by such individual in that capacity or arising from such individual's status as a Responsible Person, Manager, employee, independent contractor or agent of the LLC whether or not the LLC would have the power to indemnify such individual against the same liability as provided in Sections 10.1, 10.2 or 10.3 hereof.

10.9   Nonexclusive Right. The indemnification and advancement of expenses granted pursuant to, or provided by this Article X shall not be deemed exclusive of any other rights to which a Responsible Person seeking indemnification or advancement of expenses may be entitled, whether contained in this Article X, the Articles of Organization of the LLC, in the Act, in a resolution of the Members, or an agreement providing for such indemnification; provided, however, that no indemnification may be made to or on behalf of any Responsible Person if a judgment or other final adjudication adverse to the Responsible Person establishes his or her liability: (a) for any breach of duty of loyalty to the LLC or its Members; (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; or (c) for any liability for wrongful distributions incurred under the Act.

Nothing in this Section 10.9 shall affect any rights to indemnification to which the LLC's personnel, other than Responsible Persons, may be entitled by contract or otherwise under law. This Section 10.9 does not limit the LLC's power to pay or reimburse expenses incurred by a Responsible Person in connection with his or her appearance as a witness in a proceeding at a time when he or she has not been named defendant or respondent to the proceeding.

## ARTICLE XI.
## TAX MATTERS

11.1   Tax Matters Member. The Tax Matters Member of the LLC within the meaning of Section 6231(a)(7) of the Code shall be STHS; provided, however, that if such Person would not be treated as a party to the proceeding within the meaning of Section 6226(c) and (d) of the Code for any

0610202.07
084000-403  07/19/2000

DEREED-STNetwork00027

taxable year involved in a partnership proceeding, then the Tax Matters Member for such year shall be the Person designated by the Members who would be treated as a party to the proceeding for such year.

11.2    Tax Matters Handled by LLC. The LLC shall have full authority to negotiate with, to conclude agreements with or to refuse to agree with federal and state taxing authorities as to the taxable income of the LLC for any taxable period and any determination of such taxable income shall be binding upon the Members, each of which individually shall be liable to pay any additional tax, interest, and penalties or entitled to receive any refund and interest resulting from such determination. The LLC shall not be responsible for any loss or damage to either Member as a result of any such determination or failure to arrive at a determination. The LLC may also make such elections including, without limitation, an election under Section 754 of the Code, as the Board may determine.

11.3    Partnership for Tax Purposes Only. The Members have formed the LLC under the Act and expressly do not intend hereby to form a partnership (except insofar as the LLC may be treated as a partnership for tax purposes only). The Members do not intend to be partners to one another or partners as to any third party.

## ARTICLE XII.
## TRANSFER RESTRICTIONS

12.1    Transfer Restrictions. Except as provided in Section 12.2, no Member may Transfer, voluntarily or involuntarily, in whole or in part, its Membership Interest without the prior written consent of the Board of Governors, and any attempt to do so shall be void and of no force and effect, and shall constitute a breach of this Agreement.

12.2    Required Transfer of Member's Interest. Under certain circumstances, a Member may be required to transfer its Units.

12.2.1    If (1) a Member is granted relief under any title of the Bankruptcy Code, makes a general assignment for the benefit of creditors, takes the benefit of any insolvency act, (2) a permanent receiver or trustee in bankruptcy is appointed for a Member's property, or a temporary receiver is appointed for a Member and such appointment is not vacated or set aside within sixty (60) days from the date of such appointment, the LLC may, at the election of the Governors, require the offending Member to sell its Membership Interest to the LLC for an amount equal to three (3) times such Member's Percentage Interest in the LLC's earnings before interest expense and taxes for the preceding fiscal year or, if the LLC has not operated for an entire fiscal year, for its Fair Market Value.

12.2.2    The P.C. and each physician shareholder or employee of P.C. agrees not to be an employee, director, creditor, consultant or equity owner of another outpatient surgery center within Davidson County Tennessee or any county adjacent to Davidson County, Tennessee, during the time of such P.C.'s ownership interest in the Partnership and for a period of three (3) years thereafter. In the event of a breach of this agreement, the LLC may at the election of the STHS Governors, without requiring consent of the Members or the P.C. Governors, and without limiting any other rights of the LLC to enforce such noncompete, require the P.C. to sell its Membership Interest in the LLC to the LLC for an amount equal to $1.00. If a court determines that this restriction on competition is too broad in geographic scope or duration, the restriction shall be deemed to be revised to apply to such geographic area or period of time as the court determines to be permissible. The P.C. and each signatory physician shareholders of P.C. agrees that the repurchase of the P.C.'s Membership Interest upon breach of this noncompete agreement

DEREED-STNetwork00028

may not be an adequate remedy to the LLC and that the LLC shall have the right to injunctive relief to enforce such noncompete agreement in addition to the right to repurchase the P.C.'s Membership Interest in the LLC.

12.2.3  Upon a Transfer of a Member's Membership Interest in violation of this Agreement, or an attempted Transfer, which is not aborted upon receipt of notice from the LLC, the LLC may at the election of the Board require such Member, or Person or entity holding the Membership Interest, to sell such Membership Interest to the LLC for an amount equal to three (3) times such Member's Percentage Interest in the LLC's earnings before interest expense and taxes for the preceding fiscal year or, if the LLC has not operated for an entire fiscal year, for its Fair Market Value.

12.2.4  The P.C. shall conduct its affairs in such a manner that the activities of the LLC shall comply with the terms of the Safe Harbor applicable to hospital/physician ASC's, 42 C.F.R. § 1001.952(r)(4).  Specifically, the P.C. shall cause each of its Shareholders to comply with the requirements of 42 C.F.R. § 1001.952(r)(1), (2) or (3), as applicable, to the extent such compliance is required by 42 C.F.R. § 1001.952(r)(4).  If the STHS Governors determine in good faith that the P.C. has not so conducted its affairs, the STHS Governors may give written notice to the P.C. requiring the P.C. to, within thirty (30) days of the date of such notice, modify its business affairs in order to bring them into compliance.  If the P.C. has not, to the satisfaction of the STHS Governors, corrected the problems set forth in the notice, the LLC may, at the election of the STHS Governors, without requiring the consent of the Members or the P.C. Governors, require the P.C. to sell its Membership Interest to the LLC for an amount equal to fifty percent (50%) of the Fair Market Value of such interest.

12.3    Government Regulation.

In the event that, in the opinion of counsel to the LLC, the referral of or billing for Medicare or any other patients to the Center by the P.C. or its physician shareholders (other than due to a default or noncompliance with this Agreement by P.C. or its physician shareholders or employees) becomes illegal, or such counsel concludes that the receipt of cash distributions from the LLC by a P.C. will be found to be in violation of 42 U.S.C. Section 1320a-7b(b) (the illegal remuneration prohibition in the Social Security Act) or any other statute or if the LLC is required to repurchase any or all outstanding Membership Interests in connection with a settlement of an enforcement action under the Illegal Remuneration Prohibition in the Social Security Act, or if the ownership of a healthcare facility by a referring physician or physicians becomes illegal under applicable local, state or federal law, the LLC shall purchase the Membership Interest of the P.C. for a purchase price equal to the Fair Market Value of such Membership Interest.

12.4    Tax Exemption Matters.  In the event that, in the opinion of counsel to STHS, the continued ownership by the P.C. of a Membership Interest in the LLC creates a material risk that to the tax-exempt status of STHS or any of its Affiliates, then STHS shall provide written notice to the P.C. During the thirty (30) day period commencing on the date of such notice, the Members shall attempt to execute an amendment to this Agreement which will remove any risk to the tax-exempt status of STHS or any of its affiliates.  If no such Agreement is executed within such thirty (30) day period, then the LLC shall, at the request of STHS, purchase the Membership Interest of the P.C. for a purchase price equal to the Fair Market Value of such Membership Interest.

DEREED-STNetwork00029

12.5    Purchase Price.  If the LLC purchases the Membership Interest of a Member pursuant to this Article XII, the purchase price for the interest shall be determined as set forth above and payable in the manner hereinafter set forth:

12.5.1  To the extent not previously taken into account pursuant to this Article XII, the purchase price shall be adjusted to reflect:

(i)      the amount of any obligations, if any, of the Member to the LLC, and

(ii)     any debt due from the LLC to the Member

12.5.2  The purchase price for the Membership Interests shall be paid in cash.

12.5.3  The closing of the LLC's purchase of the Membership Interest shall be held at the principal office of the LLC within thirty (30) days following the delivery to the LLC of the appraised value of the Membership Interest by the appraiser.  At the closing, the LLC shall pay, upon the terms specified hereinabove, the purchase price of such Membership Interest to the P.C., after receiving appropriate releases and satisfactions.

12.6    Reporting.  The P.C. shall, from time to time at the request of STHS, provide sufficient data to STHS to allow STHS to determine (1) the extent to which the revenues of the medical practice of the P.C. and its shareholders and employees consist of revenues from the performance of Surgical Procedures, (2) the total number of Surgical Procedures performed by each physician shareholder or employee of the P.C. over such periods of time as may be specified by STHS, and (3) such other information as may be reasonably required by STHS to determine the extent to which the LLC and its Members are in compliance with the applicable Safe Harbors.

12.7    Appraisal.  Whenever an appraisal is called for under the terms of this Section 12.3, the cost of the appraisal shall be borne by the LLC.  The appraiser shall be directed to promptly complete the appraisal, to give notice as provided hereunder to both parties of the appraised value of the Membership Interest and to deliver a copy of the appraisal to both parties.  The decision of the appraiser shall be final and binding upon both parties.

### ARTICLE XIII.
### DISSOLUTION AND WINDING UP OF THE LLC'S EXISTENCE

13.1    Term.  The term of the LLC shall continue in perpetuity.

13.2    Dissolution.

(a)     The LLC shall be dissolved upon the first to occur of the following:

(i)      the action of STHS, with or without approval of the other Members of the LLC, if STHS and St. Thomas Hospital receives an unfavorable ruling from the Internal Revenue Service stating that the continued ownership interest of STHS in the LLC will adversely affect the tax-exempt status of STHS or St. Thomas Hospital;

DEREED-STNetwork00030

(ii)    the vote of Members holding no less than seventy-five (75) percent of the Percentage Interest at a meeting held for such purpose;

(iii)    by order of a court with jurisdiction over the LLC; or

(iv)    by action of the Secretary of State.

(b)    The death, withdrawal, expulsion, Transfer, insanity, Bankruptcy or dissolution of a Member or the occurrence of any other event which terminates the continued Membership of a Member in the LLC shall not constitute an event of dissolution.

13.3    <u>Distribution on Dissolution</u>.    Upon dissolution of the LLC, all LLC assets remaining after payment of LLC creditors shall be distributed to the Members in proportion to their positive Capital Account balances.

In the event the LLC is "liquidated" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), distributions shall be made in all cases, in accordance with the Member's positive Capital Account balances determined after all adjustments to the Member's Capital Accounts for the taxable year. Such distribution shall be made within the time periods required by Treasury Regulation Section 1.704-1(b).

In the discretion of the Board, a pro-rata portion of the distributions that would otherwise be made to the Members may be:

(a)    distributed to a trust established for the benefit of the Members for the purpose of liquidating LLC assets, collecting amounts owed to the LLC, and paying any contingent or unforseen liabilities in connection with the LLC arising out of or in connection with the LLC. The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Board, in the same proportions as the amount distributed to such trust by the LLC would otherwise have been distributed to the Members under Section 13.4 hereof.

(b)    withheld to provide a reasonable reserve for LLC liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the LLC, provided that such withheld amounts shall be distributed to the Members as soon as practicable.

13.4    <u>Deemed Contribution and Distribution</u>.    Notwithstanding any other provisions of this Article XIII, in the event the LLC is liquidated within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g) but the LLC is not required to be dissolved and wound up pursuant to Sections 13.2 and 13.3, the assets of the LLC shall not be liquidated, the LLC's liabilities shall not be discharged, and the LLC's affairs shall not me wound up. Instead, solely for federal income tax purposes, the LLC shall be deemed to have contributed the assets and the liabilities of the LLC in kind to a new limited liability company in exchange for an interest in the new limited liability company. Immediately thereafter, the LLC shall be deemed to have distributed interests in the new limited liability company to the Members in proportion to their respective interest in the LLC.

DEREED-STNetwork00031

## ARTICLE XIV.
## GENERAL PROVISIONS

14.1    Notices.  All notices, consents, waivers, directions, requests, votes or other instruments or communications provided for under this Agreement shall be in writing, signed by the party giving the same, and shall be deemed properly given three (3) business days after mailing if sent by United States mail, postage prepaid, addressed:

(a)    in the case of the LLC, to its principal office;

(b)    in the case of a Governor, to his business or residential address as on record with the LLC;

(c)    in the case of any Member, to the address set forth on Exhibit A; or to such address as any Member may specify in writing to the LLC.

14.2    Integration. This Agreement embodies the entire agreement and understanding among the Members and supersedes all prior agreements and understandings, if any, among and between the Members relating to the subject matter hereof.

14.3    Applicable Law. This Agreement and the rights of the Members shall be governed by and construed and enforced in accordance with the laws of the State of Tennessee.

14.4    Severability.  In case any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and any other application thereof shall not in any way be affected or impaired thereby.

14.5    Binding Effect.  Except as herein otherwise provided to the contrary, this Agreement shall be binding upon, and inure to the benefit of, the Members and their respective heirs, executors, administrators, successors, transferees and assigns.

DEREED-STNetwork00032

IN WITNESS WHEREOF, this Agreement is executed effective as of the date first set forth above.

SAINT THOMAS HEALTH SERVICES

By: _Thomas G. Berman_ _____
     President and Chief Executive Officer

NEUROLOGICAL SURGEONS, P.C.

By: _____

Title: _President_ _____

0610202.07
084000-403  07/19/2000

DEREED-STNetwork00033

## EXHIBIT A

| Names and Addresses | Capital Contribution | Percentage Interest |
|---|---|---|
| Saint Thomas Health Services<br>4220 Harding Road<br>Nashville, TN 37205 | _____ | 50% |
| Neurological Surgeons, P.C.<br>4320 Harding Road<br>Nashville, TN 37205 | _____ | 50% |

0610202.07
084000-403 07/19/2000

30

DEREED-STNetwork00034

# SERVICES AGREEMENT

THIS SERVICES AGREEMENT (the "Agreement") is made and entered into effective as of the 18th day of September, 2000 by and between NEUROLOGICAL SURGEONS, P.C., a Tennessee professional corporation (the "Group"), and SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC, a Tennessee limited liability company (the "Company").

## W I T N E S S E T H:

WHEREAS, the Group is a group of neurological surgeons duly licensed to practice medicine in the State of Tennessee; and

WHEREAS, the Company is a limited liability company formed under and existing by virtue of the laws of the State of Tennessee for the purpose of establishing and operating an outpatient neurosurgical center (the "Center"); and

WHEREAS, the Company may desire to appoint the Group to provide certain services to the Center and the Group is willing to accept such appointment, subject to the terms and conditions set forth below;

NOW, THEREFORE, in consideration of the foregoing and, in accordance with the terms and conditions set forth below, the parties hereto agree as follows:

## ARTICLE I.
## ENGAGEMENT, SERVICES, AND AUTHORITY

**Section I.1** **Engagement.** If the Company determines that it wishes to engage the Group to provide services upon the terms and conditions set forth herein, the Company shall provide executed, written notice to the Group in substantially the form attached hereto as Exhibit A setting forth those services the Company desires the Group to perform (the "Acceptance Notice"). If the Group desires to accept the engagement to provide such services under the terms and conditions set forth in this Agreement and the Acceptance Notice, the Group shall execute and return an executed copy of the Acceptance Notice to the Company. The executed Acceptance Notice shall be attached as an addendum to this Agreement.

0665117.01
084000-401 08/24/2000

DEREED-STNetwork00035

### Section I.2    Authority.

(a)    The Group represents and warrants that it has the right, power, legal capacity, and authority to enter into and perform its obligations under this Agreement, and further warrants that no approvals or consents of any person or entity other than the Group is necessary in connection with the execution of this Agreement by the Group.

(b)    The Company represents and warrants that the Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement, and further warrants that no approvals or consents of any person or entity other than the Company are necessary in connection with the execution of this Agreement.

### Section I.3    Authority and Responsibilities of the Group.

(a)    Reliance.  In furtherance of the objectives of this Agreement, the Group shall be entitled to rely upon instructions received from the Company, as to any and all acts to be performed by the Group.

(b)    Construction.  The grant of express authority to the Group with regard to specific matters by this Agreement is not intended by the Company to be narrowly construed for the purpose of restricting the authority of the Group.

### Section I.4    Control Retained by the Company.  The Company shall at all times exercise control over the assets and operation of the Center, and the Group shall perform those services as directed in the Acceptance Notice in accordance with policies, directives, budget and By-Laws adopted by the Company.  By entering into this Agreement and delivering an Acceptance Notice, the Company does not delegate to the Group any of the powers, duties, and responsibilities vested in the Company by law.  The Company may, consistent with the terms of this Agreement, direct the Group to implement policies and may adopt policy recommendations or proposals made by the Group.  The Group and the Company each expressly disclaim any intent to form a partnership, association, or any other entity, or to become joint venturers in the operation of the Center by virtue of the execution of this Agreement or the provision of services hereunder and agree that the Group's services under this Agreement are provided on an independent contractor basis.  The relationship created by this Agreement is one of principal (the Company) and agent (the Group).

### Section I.5    Medical and Professional Matters.  Under no circumstances shall the Group be responsible for any medical or professional matters.  The Group may, however, consult with the Company and make recommendations concerning such matters.

0665117.4‖
084000-4‖3  08/24/2000

DEREED-STNetwork00036

## ARTICLE II.
## INSURANCE

If the Company engages the Group to provide any services hereunder, the Group shall be named an additional insured under all insurance policies procured by the Company with respect to the Center. The right of the Group to invoke the protection of such policies shall be severable from and independent of the Company's rights, and these policies shall not be terminable or non-renewable except upon thirty (30) days' written notice to the Group. No later than thirty (30) days following the delivery of an Acceptance Notice and thirty (30) days following the end of each policy year, the Company shall give to the Group a copy of the endorsements naming the Group an additional insured. Such insurance policies shall contain endorsements which reflect the primary liability of the Company's insurance carrier for all covered losses provided for herein, notwithstanding any insurance which may be maintained by the Group or any affiliate of the Group. The Company hereby waives any right of contribution with respect to the loss covered under such policies (or with respect to deductibles thereunder) against the Group or any of the Group's insurance carriers.

## ARTICLE III.
## COMPENSATION

The Company shall reimburse the Group for services provided hereunder as set forth in the Acceptance Notice(s) attached as addendum(s) to this Agreement.

## ARTICLE IV.
## CONFIDENTIAL INFORMATION

For the purpose of this Agreement, the term confidential information (the "Confidential Information") shall include the following: (i) all documents and other materials, including but not limited to, all memoranda, clinical manuals, handbooks, production books, educational material and audio or visual recordings, which contain information relating to the operation of the Center or its programs (excluding written materials distributed to patients in the operation of the Center as promotion for the Center), (ii) all methods, techniques and procedures utilized in providing services to patients in the Center not readily available through sources in the public domain, and (iii) all trademarks, trade names, service marks, or protected software of the Group and their related data files.

The Company acknowledges and agrees that the Confidential Information is owned by the Group and has been disclosed to it in confidence and with the understanding that it constitutes valuable business information developed by the Group at great expenditure of time, effort and money. The Company agrees that it shall not, without the express prior written consent of the Group, use the Confidential Information

0665117.01
084000-403 08/24/2000

- 3 -

DEREED-STNetwork00037

for any purpose other than the performance of this Agreement. The Company further agrees to keep strictly confidential and hold in trust all Confidential Information and not disclose or reveal such information to any third party without the express prior consent of the Group.

Upon termination of this Agreement by either party for any reason whatsoever, the Company shall forthwith return to the Group all material constituting or containing Confidential Information and the Company shall not thereafter use, appropriate, or reproduce such information or disclose such information to any third party.

The provisions of this Article IV shall survive any termination or expiration of this Agreement.

The Group shall have the right to use any Confidential Information and any technical or business expertise obtained during the course of its engagement hereunder in connection with its management of any other facility.

## ARTICLE V.
## TERM AND TERMINATION

**Section V.1** Term. This Agreement shall commence on the date first written above and shall continue until terminated upon thirty (30) days written notice from one party to the other; provided, however, that in the event this Agreement is terminated prior to September 18, 2001, then the parties shall not enter into an agreement similar to this Agreement until on or after September 18, 2001. Any such notice may be given at the complete option of the giving party with or without cause.

**Section V.2** Services. Upon termination of this Agreement, the Group shall immediately discontinue providing any services which it had been providing to the Company pursuant to this Agreement.

**Section V.3** Remedies Upon Termination. Upon termination of this Agreement, the Group shall remove from the Center all property of the Group, and neither party shall have any further obligations under this Agreement except pursuant to Article III and Article IV of this Agreement. The Group shall be entitled to receive payment of all amounts unpaid but earned up to the date of termination, which payment shall be due on the date on which the Group vacates the Center's premises and relinquishes to the Company sole possession of any and all property of the Company, including financial records and other documents necessary for operation of the Center.

## ARTICLE VI.
## MISCELLANEOUS

DEREED-STNetwork00038

**Section VI.1   Assignment.**   This Agreement may not be assigned by either party without the prior written consent of the other party, which consent shall not be unreasonably withheld.   Any attempted assignment in violation of this section shall be null and void and of no force or effect.

**Section VI.2   Indemnification.**

(a)   **Company Indemnification.**   The Company agrees to indemnify and hold harmless the Group, its directors, officers, employees, agents, affiliates and shareholders, and their respective shareholders, directors, officers, employees and agents (collectively, a "Group Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees and expenses related to the defense of any claims) (a "Loss"), which may be asserted against any of the Group Indemnified Parties, including without limitation matters relating to:   (i) alleged or actual failure by the governing body, board of directors and/or similar body of the Company to perform any of its duties; (ii) any pending or threatened medical malpractice or other tort claims asserted against the Group relating to the Center; (iii) any action against the Group brought by any of the Group's current or former employees for any action or inaction during the period when such employee was performing services for the Center; (iv) any act or omission by any Group employee assigned to the Center; and (v) any violation of any requirement applicable to the Center under any federal, state or local environmental, hazardous waste or similar law or regulation; provided that such Loss has not been caused by the gross negligence or willful misconduct of the Group Indemnified Party seeking indemnification pursuant to this Agreement.

(b)   **Group Indemnification.**   The Group agrees to indemnify and hold harmless the Company and its members, partners, or shareholders (as appropriate), its directors or governors (as appropriate), and its officers, employees and agents (collectively, a "Company Indemnified Party") from and against all Loss which may be asserted against any Company Indemnified Party as a result of the gross negligence or willful misconduct of the Group in connection with the performance by the Group of its duties hereunder; provided that such Loss has not been caused by the gross negligence or willful misconduct of the Company Indemnified Party seeking indemnification pursuant to this Agreement.

**Section VI.3   Access to Books and Records.**

(a)   **This Agreement.**   If it shall be determined or asserted that this Agreement is a contract between a provider and a subcontractor within the meaning of Section 1861(v)(1)(I) of the Social Security Act or any rules, regulations, or judicial or administrative interpretations or decisions promulgated or made pursuant to that Section, then the Group and the Company hereby agree that:   (i) until the expiration of four (4) years after the furnishing of any service pursuant to this Agreement, each shall make available, upon written request of the Secretary of the Department of Health and Human Services (the "Secretary"), or upon written request of the Comptroller General, or any

DEREED-STNetwork00039

of their duly authorized representatives, this Agreement and any books, documents, and records that are necessary to certify the nature and extent of the costs incurred by the Company or the Group with respect to this Agreement and the services provided pursuant to it, and (ii) if either the Group or the Company carries out any of the duties of this Agreement through a subcontract with a value or cost of $10,000 or more over a twelve (12)-month period with a related organization, that subcontract shall contain a clause to the effect that until the expiration of four (4) years after the furnishing of any services pursuant to the subcontract, the related organization shall make available, upon written request of the Secretary, or upon request of the Comptroller General, or any of their duly authorized representatives, the subcontract, and any books, documents, and records of such organization as are necessary to verify the nature and extent of the costs incurred with respect to the subcontract and the services provided pursuant to it. This Agreement shall be automatically and retroactively amended, without the necessity of any action by the parties to it, to include the terms of any rules, regulations, or judicial or administrative interpretations or decisions promulgated or made under Section 1861(v)(1)(I) of the Social Security Act, to the extent that the terms of such rules, regulations, interpretations or decision differ from the provisions of this Section 8.4. Such automatic and retroactive amendment shall be deemed to have become effective on the effective date of the amendment.

(b) <u>Subcontracts</u>. If it shall be determined or asserted that any contract which the Group enters into for and on behalf of the Company pursuant to the Group's duties under this Agreement is a contract between a provider and a subcontractor within the meaning of Section 1861(v)(1)(I) of the Social Security Act or any rules, regulations, or judicial or administrative interpretations or decisions promulgated or made pursuant to that Section, then the Group shall cause to be included in each such contract provisions which require that: (i) until the expiration of four (4) years after the furnishing of any service pursuant to that contract, the contractor shall make available, upon written request of the Secretary of the Department of Health and Human Services (the "Secretary") or upon written request of the Comptroller General, or any of their duly authorized representatives, that contract and any books, documents, and records of the subcontractor that are necessary to certify the nature and extent of the costs incurred by the Company of the subcontractor with respect to that subcontract and the services provided under it, and (ii) if either the Company or the contractor duties of the contract through a subcontract shall contain a clause to the effect that until the expiration of four (4) years after the furnishing of any services pursuant to the subcontract, the related organization shall make available, upon written request of the Secretary or the Comptroller General, or any of their duly authorized representatives, the subcontract and any books, documents, and records of such organization that are necessary to verify the nature and extent of the costs incurred with respect to the subcontract and the services provided pursuant to it. The Group shall further require that such contract or subcontract be automatically and retroactively amended, without the necessity of any action by the parties thereto, to include the terms of any rules, regulations, or judicial or administrative interpretations or decision promulgated or made under Section

DEREED-STNetwork00040

1861(v)(1)(I) of the Social Security Act, to the extent that the terms of such rules, regulations, interpretations or decision differ from the terms of the contract or subcontract, and that such automatic and retroactive amendment shall be deemed to have become effective on the effective date of the amendment.

> **Section VI.4**  Notices. All notices permitted or required by this Agreement shall be deemed given when in writing and delivered personally via overnight courier or deposited in the United States mail, postage prepaid, return receipt requested, addressed to the other party at the address set forth below or such other address as the party may designate in writing:

|  |  |
|---|---|
| To the Company: | Saint Thomas Outpatient Neurosurgical Center, LLC<br>4230 Harding Road, Suite 901<br>Nashville, Tennessee  37205 |
| with a copy to: | J.B. Hardcastle, Jr., Esquire<br>Boult, Cummings, Conners & Berry, PLC<br>414 Union Street, Suite 1600<br>Nashville, Tennessee  37219 |
| To the Group: | Neurological Surgeons, P.C.<br>Attn: Mark Mason<br>2410 Patterson Street<br>Suite 500<br>Nashville, TN  37203 |

> **Section VI.5**  Entire Agreement; Modification and Change.   This Agreement contains the entire agreement between the Group and the Company and supersedes any and all prior agreements, arrangements, or understandings between the Group and the Company relating to the subject matter of this Agreement.   This Agreement, and any provision or time period specified in this Agreement, cannot be changed or modified except by another agreement in writing executed by both the Group and the Company.

> **Section VI.6**  Headings.  The headings contained in this Agreement are for convenience of reference only and are not intended to define, limit, or describe the scope or intent of any provision of this Agreement.

> **Section VI.7**  Severability.  If any provision of this Agreement or its application to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and application of its provisions to other persons or circumstances shall not be affected and shall be enforced to the greatest extent permitted by law.

0665117.01
084000-403 08/24/2000

- 7 -

DEREED-STNetwork00041

**Section VI.8   Governing Law.**  This Agreement shall be deemed to have been made under, and shall be construed and interpreted in accordance with, the laws of the State of Tennessee and with any and all federal laws, including laws relating to Medicare, Medicaid, Tenncare and other third party payers.  In the event there is a change in such laws, whether by statute, regulation, agency or judicial decision, that has any material effect on any term of this Agreement, or in the event that counsel to one party determines that any term of this Agreement poses a risk of  violating such laws, then the applicable term(s) of this Agreement shall be subject to renegotiation and either party may request renegotiation of the affected term or terms of this Agreement, upon written notice to the other party, to remedy such condition. In the interim, the parties shall perform their obligations hereunder in full compliance with applicable law.

**Section VI.9**   Rights Cumulative; No Waiver.  No right or remedy in this Agreement conferred upon or reserved to either the Group or the company is intended to be exclusive of any other right or remedy, and each right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement, or now or hereafter legally existing upon the occurrence of an event of default under this Agreement.  The failure of either the Group or the Company to insist at any time upon the strict observance or performance of any of the provisions of this Agreement or to exercise any right or remedy as provided in this Agreement shall not impair the right or remedy or be construed as a waiver or other relinquishment of it with respect to subsequent defaults.

**Section VI.10** Counterparts.    This   Agreement   may   be   executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section VI.11** Events Excusing Performance.  The Group shall not be liable to the Company for failure to perform any of the services required herein in the event of strikes, lock-outs, calamities, acts of God, unavailability of supplies or other events over which the Group has no control for so long as such events continue, and for a reasonable period of time thereafter.

**Section VI.12** Attorneys' Fees.  If legal action is commenced by either party to enforce or defend its rights under this Agreement, the prevailing party in such action shall be entitled to recover its costs and reasonable attorneys' fee in addition to any other relief granted.

**Section VI.13** Time is of the Essence.  Time is hereby expressly declared to be of the essence in this Agreement.

**Section VI.14** Language Construction.  The language in all parts of this Agreement shall be construed, in all cases, according to its fair meaning, and not for or against either party hereto.  The parties acknowledge that each party has reviewed and

DEREED-STNetwork00042

revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

DEREED-STNetwork00043

IN WITNESS WHEREOF, the Group and the Company have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

NEUROLOGICAL SURGEONS, P.C.

By: _____

Title:  Mark Mason, Administrator

SAINT      THOMAS      OUTPATIENT
NEUROSURGICAL CENTER, LLC

By: _____

Title: Tina Sullivan, RN   Director

0665117.01
084000-40) 08/24/2000

- 10 -

DEREED-STNetwork00044

**SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC**
**AND**
**NEUROLOGICAL SURGEONS, P.C.**

## ADDENDUM TO SERVICES AGREEMENT

**Service to be purchased: Medical Directorship**

**Description:** Provide direction and leadership for the Medical Staff
Monitor quality assurance and patient care

**TERMS:**

**Cost:** Fifty Thousand Dollars ($50,000.00) annually. Payable in equal monthly installments.

**Length of time:** Twelve (12) Months

**MANAGERS RESPONSIBLE FROM EACH INSTITUTION:**

Saint Thomas Outpatient Neurosurgical Center:  Tina Sullivan, RN

Neurological Surgeons:  Mark Mason

**EFFECTIVE DATE:**   September 18, 2000

**APPROVED BY:**

_Tina Sullivan_

8-25-00

**SAINT THOMAS OUTPATIENT**
**NEUROSURGICAL**
**CENTER, LLC**

Date

_[signature]_

8/25/2000

**NEUROLOGICAL SURGEONS, P.C.**

Date

0665117.01
084000-403 08/24/2000

11          **Exhibit A**

DEREED-STNetwork00045

SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC
AND
NEUROLOGICAL SURGEONS, P.C.

## ADDENDUM TO SERVICES AGREEMENT

Service to be purchased: **Personnel and Personnel Administration**

Description:   **Provide all staff.**
            **Provide payroll and benefits administration.**
**TERMS:**

Cost:  Actual cost of staff salaries and benefits plus a 5% administration fee based on total staff cost.  Payable monthly.

Length of time:   Twelve (12) Months

**MANAGERS RESPONSIBLE FROM EACH INSTITUTION:**

Saint Thomas Outpatient Neurosurgical Center:  Tina Sullivan, RN

Neurological Surgeons:  Mark Mason

**EFFECTIVE DATE:**   September 18, 2000

**APPROVED BY:**

_Tina Sullivan_                     8/25/00
SAINT THOMAS OUTPATIENT          Date
NEUROSURGICAL
CENTER, LLC

_[signature]_                       8/25/2000
NEUROLOGICAL SURGEONS, P.C.       Date

0665117.[]
084000-4[] 08/24/2000

12          Exhibit A

DEREED-STNetwork00046

**SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC**
**AND**
**NEUROLOGICAL SURGEONS, P.C.**

**ADDENDUM TO SERVICES AGREEMENT**

Service to be purchased: Billing And Collection Of Facility Charges

Description:    Bill and collect facility charges

TERMS:

     Cost:  5% of Net Revenues payable monthly.

     Length of time:   Twelve (12) Months

MANAGERS RESPONSIBLE FROM EACH INSTITUTION:

     Saint Thomas Outpatient Neurosurgical Center:  Tina Sullivan, RN

     Neurological Surgeons:  Mark Mason

EFFECTIVE DATE:   September 18, 2000

APPROVED BY:

_____          8·25·00
SAINT THOMAS OUTPATIENT                        ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   NEUROSURGICAL                              Date
   CENTER, LLC

_____          8/25/2000
NEUROLOGICAL SURGEONS, P.C.                  ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                             Date

0665117.01
084000-403 08/24/2000

           13          Exhibit A

DEREED-STNetwork00047

**SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC**
**AND**
**NEUROLOGICAL SURGEONS, P.C.**

**ADDENDUM TO SERVICES AGREEMENT**

**Service to be purchased:** Accounts Payable Service and General Ledger Data Entry

**Description:**   Pay all facility approved invoices.
Enter all data into the General Ledger
Prepare General Ledger for accounts review

**TERMS:**

Cost:  $25.00 per hour up to a maximum of 40 hours a month.  Payable monthly.

Length of time:  Twelve (12) Months

**MANAGERS RESPONSIBLE FROM EACH INSTITUTION:**

Saint Thomas Outpatient Neurosurgical Center:  Tina Sullivan, RN

Neurological Surgeons:  Mark Mason

**EFFECTIVE DATE:**  September 18, 2000

**APPROVED BY:**   _Tina Sullivan_                      _8·25·00_
SAINT THOMAS OUTPATIENT                  Date
NEUROSURGICAL
CENTER, LLC


_____                           _8/25/2000_
NEUROLOGICAL SURGEONS, P.C.        Date

0665117.01
084000-401 08/24/2000

14          Exhibit A

DEREED-STNetwork00048