Exhibit "L"

```
            UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS


IN RE: NEW ENGLAND
COMPOUNDING PHARMACY,
INC. PRODUCTS LIABILITY       MDL No. 2419
LITIGATION
                              Master Dkt:
                              1:13-md-02419-RWZ

~~~~~~~~~~~~~~~~~~~~~
THIS DOCUMENT RELATES
TO:


All Actions


~~~~~~~~~~~~~~~~~~~~~~~~~



              VIDEOTAPED DEPOSITION OF
              JOHN W. CULCLASURE, M.D.


                    9:05 a.m.
                  March 23, 2015



                    Suite 1100
                315 Deaderick Street
                Nashville, Tennessee



       Blanche J. Dugas, RPR, CCR No. B-2290
```

```
 1                APPEARANCES OF COUNSEL

 2   On Behalf of the Plaintiffs:
          RANDALL L. KINNARD, Esquire
 3        DANIEL L. CLAYTON, Esquire
          Kinnard, Clayton & Beveridge
 4        127 Woodmont Boulevard
          Nashville, Tennessee  37205
 5        (615) 686-2501
          (615) 297-1505 (facsimile)
 6        rkinnard@kcbattys.com
          dclayton@kcbattys.com
 7
          J. GERARD STRANCH, IV, Esquire
 8        BENJAMIN A. GASTEL, Esquire
          Branstetter, Stranch & Jennings, PLLC
 9        227 Second Avenue North, Fourth Floor
          Nashville, Tennessee  37201
10        (615) 254-8801
          (615) 250-3937 (facsimile)
11        gerards@bsjfirm.com

12        GEORGE NOLAN, Esquire
          WILLIAM LEADER, Esquire
13        Leader, Bulso & Nolan, PLC
          414 Union Street - Suite 1740
14        Nashville, Tennessee  37219-1734
          (615) 780-4114
15        (615) 780-4122 (facsimile)
          gnolan@leaderbulso.com
16        bleader@leaderbulso.com

17   On Behalf of St. Thomas Outpatient Neurosurgical
     Center, LLC; Howell Allen, a Professional Corporation;
18   John W. Culclasure, M.D.; Debra V. Schamberg, RN:
          CLARENCE J. "C.J." GIDEON, JR., Esquire
19        MATTHEW CLINE, Esquire
          CHRISTOPHER TARDIO, Esquire
20        Gideon, Cooper & Essary, PLC
          315 Deaderick Street - Suite 1100
21        Nashville, Tennessee 37238
          (615) 254-0400
22        (615) 254-0459 (facsimile)
          cj@gideoncooper.com
23        matt@gideoncooper.com
          chris@gideoncooper.com
24

25
```

```
 1                ~~ APPEARANCES CONTINUED ~~

 2   On Behalf of Saint Thomas Health, Saint Thomas
     Network, Saint Thomas West Hospital f/k/a St. Thomas
 3   Hospital:
          ADAM T. SCHRAMEK, Esquire
 4        Norton, Rose, Fulbright
          Suite 1100
 5        98 San Jacinto Boulevard, Suite 1100
          Austin, Texas 78701
 6        (512) 536-5232
          adam.schramek@nortonrosefulbright.com
 7
          LELA M. HOLLABAUGH, Esquire
 8        Bradley, Arant, Boult & Cummings, LLP
          Suite 700, Roundabout Plaza
 9        1600 Division Street, Suite 700
          Nashville, Tennessee  37203
10        (615) 252-2348
          (615) 252-6348 (facsimile)
11        lhollabaugh@babc.com

12   On Behalf of UniFirst Corporation:
          JIM REHNQUIST, Esquire
13        NICHOLAS DREW, Esquire
          Goodwin Procter, LLP
14        53 State Street, Exchange Place
          Boston, Massachusetts 02109
15        (617) 570-1000
          (617) 523-1231 (facsimile)
16        ndrew@goodwinprocter.com
          jrehnquist@goodwinprocter.com
17
     On Behalf of Specialty Surgery Center - Crossville,
18   PLLC; Kenneth R. Lister, M.D.; Kenneth R. Lister,
     M.D., PC:
19        MEGAN A. CARRICK, Esquire
          Brewer, Krause, Brooks, Chastain & Burrow, PLLC
20        Suite 2600
          611 Commerce Street, Suite 2600
21        Nashville, Tennessee  37203
          (615) 256-8787
22        (615) 256-8985 (facsimile)
          mcarrick@bkblaw.com
23

24

25
```

```
 1          ~~ ATTORNEYS APPEARING VIA VIDEO STREAM ~~

 2   On Behalf of the Plaintiffs:
          DANIEL MILLER, Esquire
 3        Janet, Jenner & Suggs, LLC
          Suite 165
 4        1777 Reisterstown Road
          Baltimore, Maryland  21208
 5        (410) 653-3200
          (410) 653-9030 (facsimile)
 6        dkm@myadvocates.com

 7   On Behalf of the Plaintiffs Jocelyn Norris and James
     and Michelle Palmer:
 8        CHRISTOPHER T. CAIN, Esquire
          Scott & Cain
 9        Suite 601
          550 West Main Street
10        Knoxville, Tennessee  37902
          (865) 525-2150
11        (865) 525-2120 (facsimile)
          cain@scottandcain.com
12
     On Behalf of St. Thomas Outpatient Neurosurgical
13   Center, LLC; Howell Allen, a Professional Corporation;
     John W. Culclasure, M.D.; Debra V. Schamberg, RN:
14        JEREMY CAIN, Esquire
          Gideon, Cooper & Essary, PLC
15        315 Deaderick Street - Suite 1100
          Nashville, Tennessee 37238
16        (615) 254-0400
          (615) 254-0459 (facsimile)
17        jeremy@gideoncooper.com

18   On Behalf of Dallas Back Pain Management/Momentum Pain
     Management and Abbeselom Ghermay, M.D.:
19        COURTNEY BOES, Esquire
          Fraley & Fraley, LLP
20        Suite 6300, Bank of America Plaza
          901 Main Street
21        Dallas, Texas  75202
          (214) 761-6460
22        (214) 761-6469 (facsimile)
          cboes@fraley-law.com
23

24

25
```

```
 1            ~~ VIDEO STREAM APPEARANCES CONTINUED ~~

 2   On Behalf of Premier Orthopaedic & Sports Medicine
     Associates of Southern New Jersey, LLC d/b/a Premier
 3   Orthopaedic & Sports Associates, LLC and Premier
     Orthopaedic Associates Surgical Center, LLC:
 4        JAY J. BLUMBERG, Esquire
          Blumberg & Wolk, LLC
 5        158 Delaware Street
          Woodbury, New Jersey 08096
 6        (856) 848-7472
          (856) 848-8012 (facsimile)
 7        jjblumberg@blumberglawoffices.com

 8   On Behalf of Barry Cadden, Lisa Conigliaro Cadden,
     Carla Conigliaro, Gregory Conigliaro, Douglas
 9   Conigliaro and Glenn Chin:
          ROBERT H. GAYNOR, Esquire
10        Sloane & Walsh, LLP
          Suite 850
11        Three Center Plaza
          Boston, Massachusetts  02108
12        (617) 523-6010
          (617) 227-0927 (facsimile)
13        rgaynor@sloanewalsh.com

14   On Behalf of Medical Advanced Pain Specialists, PA and
     David M. Schultz, M.D.:
15        CLARE CARROLL, Esquire
          McCarthy, Bouley & Barry, PC
16        47 Thorndike Street
          Cambridge, Massachusetts  02141
17        (617) 225-2211
          (617) 225-7711 (facsimile)
18        cfc@mbblaw.com

19   On Behalf of Ocean State Pain Management, Inc. and
     Abdul Barakat, M.D.:
20        THOMAS M. DOLAN, III, Esquire
          Capplis, Connors & Carroll, PC
21        Suite 220
          18 Tremont Street
22        Boston, Massachusetts  02108
          (617) 227-0722
23        (617) 227-0772 (facsimile)
          tdolan@ccclaw.org
24

25
```

```
 1          ~~ VIDEO STREAM APPEARANCES CONTINUED ~~

 2   On Behalf of Harris Methodist Hospital Southlake:
         ROBERT YOUNG, Esquire
 3       English, Lucas, Priest & Owsley, LLP
         1101 College Street
 4       Bowling Green, Kentucky  42102-0770
         (270) 782-6500
 5       (270) 782-7782 (facsimile)
         byoung@elpolaw.com
 6
     On Behalf of Medical Advanced Pain Specialists, PA and
 7   David M. Schultz, M.D.:
         TRACY CONTE, Esquire
 8       The Blair Law Firm
         Suite 207
 9       5214 Maryland Way
         Brentwood, Tennessee  37027
10       (615) 515-4492
         (615) 515-4491 (facsimile)
11       tconte@blair-law.com

12
     Also Present:
13   Daniel Makowski, Videographer
     Melissa Howard, paralegal
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   you've made a mistake, will you agree to try to fix it
 2   during the deposition?
 3       A.      Yes.
 4       Q.      We're going to take breaks.  I'm going to
 5   shoot for about every 50 minutes.  If you need one
 6   before that, you're welcome to take it.  Okay?
 7       A.      Yes.
 8       Q.      How many patients of St. Thomas Outpatient
 9   neurological --
10               MR. GIDEON:  Neurosurgical.
11       Q.      (By Mr. Kinnard)  -- Neurosurgical Center
12   died from meningitis?
13       A.      13, I believe.
14       Q.      How many were injured?
15       A.      I think 113 got sick.
16       Q.      Do you agree that this was a catastrophe?
17       A.      Yes.
18       Q.      You understand the importance of your
19   testimony today, don't you?
20       A.      Yes.
21       Q.      Were you the medical director of this
22   center?
23       A.      Yes.
24       Q.      Were you overall in charge of it?
25       A.      I'm -- I don't understand the question.
```

```
 1      Q.     Of the center.  Were you overall in charge
 2  of it?
 3      A.     Well, there's a manager, a nurse manager,
 4  and so she was in charge of the day-to-day operations,
 5  and I was -- I'm the medical director.
 6      Q.     Did she answer to you as the medical
 7  director?
 8      A.     For clinical issues, not for -- not for
 9  personnel matters or other things along those lines.
10      Q.     Okay.
11      A.     We would collaborate, I guess, if there was
12  an issue like that.
13      Q.     Let's go over your background, Doctor.
14  Where were you born?
15      A.     Orangeburg, South Carolina.
16      Q.     When?
17      A.     1957, January 23rd.
18      Q.     And where were you raised?
19      A.     About ten miles away in a smaller town.
20  St. Matthews.
21      Q.     Where did you go to high school?
22      A.     In Orangeburg.  Wade Hampton Academy.
23      Q.     What year did you graduate from high
24  school?
25      A.     1975.
```

1    A.    Yes, sir.

2    Q.    Did Howell Allen pay you for the ESIs done
3 at this center?

4    A.    Howell Allen collected the money from the
5 insurance companies and the patients for the work that
6 I did, they retained 40 percent of that to cover my
7 overhead and expenses, and then paid me the remaining
8 60 percent.

9    Q.    But they would collect money -- Howell
10 Allen would collect money for ESIs done at this
11 center; correct?

12    A.    For the ones that I did, yes.

13    Q.    All right.  Did this center pay you some
14 money as medical director?

15    A.    No.

16    Q.    Did the center pay you anything for
17 anything?

18    A.    No, sir.

19    Q.    So the way you got your money for your work
20 over there was through Howell Allen; true?

21    A.    Yes.

22    Q.    You didn't charge the patients personally?

23    A.    No.  They got a bill from Howell Allen
24 Clinic.

25    (Exhibit 122 was marked for

1    as you could have gotten MPA like you were getting it
2    from Pfizer, you would have kept using it?
3         A.    Yes.
4              MR. GIDEON:   Objection.
5         Q.    (By Mr. Kinnard)  I want to be certain
6    about some things in respect to what you did about
7    this switch to NECC.  Is it true you never called a
8    pharmacist about this potential switch?
9         A.    Yes, that's true.
10        Q.    Is it true you never consulted with any
11   doctors in your group?
12        A.    Yes, that's true.
13        Q.    Is it true, other than some brochures that
14   Ms. Schamberg showed you from NECC, that that's the
15   only documents you ever saw about this proposed
16   switch?
17        A.    Yes, that's true.
18        Q.    You never went to a computer and Googled
19   NECC, did you?
20        A.    I never Googled the name of any
21   manufacturer or supplier that we got supplies from.
22        Q.    The question is did you ever go to a
23   computer and Google anything about NECC?
24        A.    No, sir.
25        Q.    Other than these three ladies you told us

1    about, did you ever talk to anybody about NECC before

2    the catastrophe?

3         A.    No, sir.

4         Q.    How much trouble would it have been,

5    Doctor, to consult with a qualified pharmacist about

6    the question of whether what NECC does is safe?

7         A.    I don't know.

8         Q.    Is there anything in writing about the

9    decision that was made to switch to NECC?

10        A.    If there is something in writing, it would

11   be from Debra, since she was doing the ordering or

12   initiating the contact.  I would not have made any

13   notes that I'm aware of.

14        Q.    If it there were any questions about the

15   quality of steroids at NECC, did you expect Ms.

16   Schamberg to find that out?

17        A.    No, I expected the FDA and the Tennessee

18   department of pharmacy and the Massachusetts Board of

19   Pharmacy to be on top of that.

20        Q.    Did you know, when Ms. Schamberg talked to

21   you, that NECC was a compounding pharmacy?

22        A.    Yes, sir.

23        Q.    What did you know a compounding pharmacy

24   was?

25        A.    Compounding pharmacies take raw material

1    Q.    Have you seen any of the notes, any
2    handwritten notes or anything like that?
3    A.    I saw them while they were -- I mean, I saw
4    them at that time. I've not seen them in any of the
5    materials I've reviewed for the deposition.
6    Q.    Do you know if they were kept or destroyed?
7    A.    I don't know. I would be surprised if
8    Debra -- anything would be destroyed. She's pretty
9    careful about documents.
10         (Exhibit 136 was marked for
11     identification.)
12   Q.    (By Mr. Kinnard) I'm going to mark as
13   Exhibit 136 STOPNC_1597, which is a two-page document.
14   It also includes 1594. It's dated October 3rd, 2012.
15   You familiar with this letter?
16   A.    Yes, I believe so. I think I saw it.
17   Q.    Is this a competitor of STOPNC?
18   A.    He has another pain practice in town. I --
19   I don't usually think of it as a competitor. We're
20   closed. I mean, I'm not -- he's not -- so I don't
21   compete with him for patients. I mean, we're a closed
22   center. We don't take outside referrals.
23   Q.    Okay. There's a sentence in the first
24   paragraph where he says, "The medications utilized by
25   the physicians at Center for Spine, Joint and

1  A.  That's primarily it.  I mean, if they -- if
2  the patient got scheduled and they're with a
3  particular -- and their diagnoses didn't establish
4  medical necessity with their insurance company, then
5  we can do the procedure and not be reimbursed.  I
6  mean, if that's -- I generally ask the billing not to
7  balance bill patients if there are errors that
8  occurred because of something that we missed.  If I'm
9  aware of it, I don't want the patients billed.
10  Q.  Do you remember any ESI patients not being
11  reimbursed for medical necessity reasons?
12  A.  Not specifically.  I don't get a report
13  from the business office about how many are not being
14  reimbursed because of a problem.  That's just not the
15  data that I get.
16  Q.  So if there were medical necessity issues
17  that came up, you wouldn't have known about them?
18  A.  Probably.  I've asked the billing office if
19  there is a problem, you know, to let me know if they
20  need, you know, help with diagnosis codes or anything
21  like that or that I can help with, but I don't know of
22  any -- they don't -- I haven't gotten a call about any
23  specific patients that didn't -- you know, insurance
24  denied payment for.
25  Q.  What entity handles the billing for STOPNC?

1   A.      It's internal to the practice -- or Howell
2   Allen.  Excuse me.  The Howell Allen billing office, I
3   believe, handles them.
4   Q.      A patient who's considering getting an
5   epidural steroid injection presumably like most
6   procedures has other options; correct?
7   A.      Yes.
8   Q.      What are the other options that a patient
9   has in lieu of getting an ESI?
10  A.      Time, analgesics, physical therapy.  Those
11  would be the main ones.
12  Q.      Who do you mean by time?
13  A.      Just waiting, see if it gets better.
14  Q.      You described the sort of initial consult
15  you -- that you do with the new patients earlier
16  today.  And I believe you said, you know, you walk
17  into the room and the patient's got the blue wristband
18  and they're in street clothes and you go over things
19  with them for a few minutes, and then you might leave
20  that room to go and do a procedure, for example.
21          When you walk into the room the first time
22  to meet the new patient, what do you know about that
23  patient as you walk into their room?
24  A.      Well, I've already picked up the chart and
25  I look at the chart.  So I see some basic demographic

1    relaxed.
2         Q.     Did you feel the same way after your
3    preparation?
4         A.     Yes.
5         Q.     And did you talk to Debra Schamberg about
6    your deposition --
7         A.     No.
8         Q.     -- in the couple of weeks before it?
9         A.     No, other than just, you know, that it was
10   coming up because she's aware of the scheduling, I had
11   to be out today.
12        Q.     Did you read the transcript of her
13   deposition?
14        A.     No.
15        Q.     Do you know who the Saint Thomas Hospital
16   pharmacist is or was?
17        A.     No.
18        Q.     Does the name Martin Kelvas mean anything
19   to you?
20        A.     That does -- Marty, I think.  That does
21   sound familiar, Marty Kelvas, I believe.
22        Q.     Do you know who he is?
23        A.     I wouldn't know him if he walked in here.
24        Q.     Do you -- do you have a memory of how the
25   name come up or how you became familiar with the name?

1                    DISCLOSURE

2

3        Pursuant to Article 10.B of the Rules
    and Regulations of the Board of Court
    Reporting of the Judicial Council of
4   Georgia which states:  "Each court reporter
    shall tender a disclosure form at the time
5   of the taking of the deposition stating the
    arrangements made for the reporting
6   services of the certified court reporter,
    by the certified court reporter, the court
7   reporter's employer or the referral source
    for the deposition, with any party to the
8   litigation, counsel to the parties, or
    other entity.  Such form shall be attached
9   to the deposition transcript," I make the
    following disclosure:

10

        I am a Georgia Certified Court
11  Reporter.  I am here as a representative of
    Discovery Litigation Services, LLC.
12  Discovery Litigation Services, LLC was
    contacted to provide court reporting
13  services for the deposition.  Discovery
    Litigation Services, LLC will not be taking
14  this deposition under any contract that is
    prohibited by O.C.G.A. 9-11-28(c).

15

        Discovery Litigation Services, LLC
16  has no contract/agreement to provide
    reporting services with any party to the
17  case, any counsel in the case, or any
    reporter or reporting agency from whom a
18  referral might have been made to cover this
    deposition.

19

        Discovery Litigation Services, LLC
20  will charge its usual and customary rates
    to all parties in the case, and a financial
21  discount will not be given to any party to
    this litigation.

22

23

                        Blanche J. Dugas
24                      CCR No. B-2290

25

1   STATE OF GEORGIA:

2   COUNTY OF FULTON:

3

4        I hereby certify that the foregoing

5       transcript was reported, as stated in the

6       caption, and the questions and answers

7       thereto were reduced to typewriting under

8       my direction; that the foregoing pages

9       represent a true, complete, and correct

10      transcript of the evidence given upon said

11      hearing, and I further certify that I am

12      not of kin or counsel to the parties in the

13      case; am not in the employ of counsel for

14      any of said parties; nor am I in any way

15      interested in the result of said case.

16

17   March 31, 2015

18

19

20

21         BLANCHE J. DUGAS, CCR-B-2290

22

23

24

25

1                    CAPTION

2

3         The Deposition of JOHN W. CULCLASURE, M.D.,

4   taken in the matter, on the date, and at the time and

5   place set out on the title page hereof.

6         It was requested that the deposition be

7   taken by the reporter and that same be reduced to

8   typewritten form.

9         It was agreed by and between counsel and

10  the parties that the Deponent will read and sign the

11  transcript of said deposition.

12

13

14

15

16

17

18

19

20

21

22

23

24

25