Exhibit "M"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE: NEW ENGLAND
COMPOUNDING PHARMACY,
INC. PRODUCTS LIABILITY       MDL No. 2419
LITIGATION
                              Master Dkt:
                              1:13-md-02419-RWZ

~~~~~~~~~~~~~~~~~~~~~~
THIS DOCUMENT RELATES
TO:


All Actions


~~~~~~~~~~~~~~~~~~~~~~~~~



VIDEOTAPED DEPOSITION OF
DEBRA SCHAMBERG, R.N.


9:06 a.m.
February 4, 2015



Suite 1100
315 Deaderick Street
Nashville, Tennessee



Blanche J. Dugas, RPR, CCR No. B-2290

```
 1                  APPEARANCES OF COUNSEL

 2
     On Behalf of the Plaintiffs:
 3       GEORGE NOLAN, Esquire
         WILLIAM LEADER, Esquire
 4       Leader, Bulso & Nolan, PLC
         Suite 1740
 5       414 Union Street
         Nashville, Tennessee  37219-1734
 6       (615) 780-4114
         (615) 780-4122 (facsimile)
 7       gnolan@leaderbulso.com
         bleader@leaderbulso.com
 8
         J. GERARD STRANCH, IV, Esquire
 9       Branstetter, Stranch & Jennings, PLLC
         227 Second Avenue North
10       Nashville, Tennessee  37201
         (615)254-8801
11       gerards@branstetterlaw.com

12       MARK P. CHALOS, Esquire
         Lieff, Cabraser, Heimann & Bernstein, LLP
13       Suite 1650, One Nashville Place
         150 Fourth Avenue
14       Nashville, Tennessee  37219-2423
         (615) 313-9000
15       (615) 313-9965 (facsimile)
         mchalos@lchb.com
16
         DANIEL L. CLAYTON, Esquire
17       Kinnard, Clayton & Beveridge
         127 Woodmont Boulevard
18       Nashville, Tennessee  37205
         (615) 686-2501
19       (615) 297-1505 (facsimile)
         dclayton@kcbattys.com
20

21

22

23

24

25
```

```
 1            ~~ APPEARANCES CONTINUED ~~

 2   On Behalf of Saint Thomas Outpatient Neurosurgical
     Center, LLC; Howell Allen, a Professional Corporation;
 3   John W. Culclasure, M.D.; Debra V. Schamberg, RN:
          CLARENCE J. "C.J." GIDEON, JR., Esquire
 4        MATTHEW CLINE, Esquire
          CHRISTOPHER TARDIO, Esquire
 5        Gideon, Cooper & Essary, PLC
          Suite 1100
 6        315 Deaderick Street
          Nashville, Tennessee 37238
 7        (615) 254-0400
          cj@gideoncooper.com
 8        matt@gideoncooper.com
          chris@gideoncooper.com
 9
     On Behalf of St. Thomas Health; St. Thomas Network;
10   St. Thomas West Hospital f/k/a St. Thomas Hospital:
          ERIC J. HOFFMAN, Esquire
11        ADAM T. SCHRAMEK, Esquire
          Norton, Rose, Fulbright
12        Suite 1100
          98 San Jacinto Boulevard
13        Austin, Texas 78701
          (512) 536-5232
14        adam.schramek@nortonrosefulbright.com
          eric.hoffman@nortonrosefulbright.com
15
          AMY D. HAMPTON, Esquire
16        Bradley, Arant, Boult & Cummings, LLP
          Suite 700, Roundabout Plaza
17        1600 Division Street
          Nashville, Tennessee  37203
18        (615) 244-2582
          (615) 252-6379 (facsimile)
19        ahampton@babc.com

20   On Behalf of Premier Orthopaedic & Sports Medicine
     Associates of Southern New Jersey, LLC d/b/a Premier
21   Orthopaedic & Sports Associates, LLC; Premier
     Orthopaedic Associates Surgical Center, LLC:
22        JAY J. BLUMBERG, Esquire
          Blumberg & Wolk, LLC
23        158 Delaware Street
          Woodbury, New Jersey 08096
24        (856) 848-7472
          (856) 848-8012 (facsimile)
25        jjblumberg@blumberglawoffices.com
```

```
 1              ~~ APPEARANCES CONTINUED ~~

 2   On Behalf of UniFirst Corporation:
          JIM REHNQUIST, Esquire
 3        KATE E. MACLEMAN, Esquire
          Goodwin Procter, LLP
 4        53 State Street, Exchange Place
          Boston, Massachusetts 02109
 5        (617) 570-1000
          (617) 523-1231 (facsimile)
 6        jrehnquist@goodwinprocter.com
          kmacleman@goodwinprocter.com
 7

 8   On Behalf of Specialty Surgery Center - Crossville,
     PLLC; Kenneth R. Lister, M.D.; Kenneth R. Lister,
 9   M.D., PC:
          MEGAN A. CARRICK, Esquire
10        Brewer, Krause, Brooks, Chastain & Burrow, PLLC
          Suite 2600
11        611 Commerce Street
          Nashville, Tennessee  37203
12        (615)256-8787
          (615)256-8985 (facsimile)
13        mcarrick@bkblaw.com

14   *The following attorneys appeared via video stream*

15        CHRISTOPHER T. CAIN, Esquire
          Scott & Cain
16        Suite 601
          550 West Main Street
17        Knoxville, Tennessee  37902
          (865) 525-2150
18        (865) 525-2120 (facsimile)

19        CLARE CARROLL, Esquire
          McCarthy, Bouley & Barry, PC
20        47 Thorndike Street
          Cambridge, Massachusetts 02141
21        (617) 225-2211
          (617) 225-7711 (facsimile)
22        cfc@mbblaw.com

23

24

25
```

```
 1                ~~ APPEARANCES CONTINUED ~~

 2         TRACY CONTE, Esquire
           The Blair Law Firm
 3         Suite 207
           5214 Maryland Way
 4         Brentwood, Tennessee   37027
           (615) 515-4492
 5         tconte@blair-law.com

 6         DUSTIN CLINT DANIEL, Esquire
           Schulman, LeRoy & Bennett, PC
 7         7th Floor
           501 Union Street
 8         Nashville, Tennessee  37219-0676
           (615) 244-6670
 9         (615) 254-5407 (facsimile)
           ddaniel@slblawfirm.com
10
           KATHERINE DENNIS, Esquire
11         Capplis, Connors & Carroll, PC
           Suite 220
12         18 Tremont Street
           Boston, Massachusetts 02108
13         (617) 227-0722

14         ROBERT H. GAYNOR, Esquire
           Sloane & Walsh, LLP
15         Suite 850
           Three Center Plaza
16         Boston, Massachusetts 02108
           (617) 523-6010
17         (617) 227-0927 (facsimile)
           rgaynor@sloanewalsh.com
18
           BRANDON KULWICKI, Esquire
19         Stewart, Courington, Dugger & Dean
           Suite 200
20         1701 N. Market Street
           Dallas, Texas 75202
21         (214) 615-2025
           (214) 615-2001 (facsimile)
22         brandon@scddlaw.com

23


24


25
```

```
 1              ~~ APPEARANCES CONTINUED ~~

 2        JESSICA H. MEDDER, Esquire
          Janet, Jenner & Suggs, LLC
 3        Suite 165
          1777 Reisterstown Road
 4        Baltimore, Maryland  21208
          (410) 653-3200
 5        (410) 653-9030 (facsimile)
          jmedder@myadvocates.com
 6
          ROBERT YOUNG, Esquire
 7        English, Lucas, Priest & Owsley, LLP
          1101 College Street
 8        Bowling Green, Kentucky  42102-0770
          (270) 782-6500
 9        (270) 782-7782
          byoung@elpolaw.com
10
          LOUIS W. VOELKER, Esquire
11        Eichhorn & Eichhorn, LLP
          200 Russell Street
12        Hammond, Indiana 46320
          (219) 931-0560
13        lvoelker@eichhorn-law.com

14        ASHLEE A. WEBSTER, Esquire
          LeClairRyan
15        Drawer 1200
          1800 Wells Fargo Tower
16        Roanoke, Virginia 24006
          (540) 510-3000
17
          MARK ZAMORA, Esquire
18        The Orlando Firm, PC
          Suite 2600
19        5 Concourse Parkway
          Atlanta, Georgia 30328
20        (404) 373-1800
          mark@markzamora.com
21

22

23

24

25
```

```
 1            ~~ APPEARANCES CONTINUED ~~

 2       CHRISTOPHER WOLK, Esquire
         MELISSA BUTERBAUGH, Esquire
 3       Blumberg & Wolk, LLC
         158 Delaware Street
 4       Woodbury, New Jersey 08096
         (856) 848-7472
 5       (856) 848-8012 (facsimile)
         cwolk@blumberglawoffices.com
 6       mbuterbaugh@blumberglawoffices.com

 7       JEREMY CAIN, Esquire
         Gideon, Cooper & Essary, PLC
 8       Suite 1100
         315 Deaderick Street
 9       Nashville, Tennessee 37238
         (615) 254-0400
10       jeremy@gideoncooper.com

11       NICHOLAS DREW, Esquire
         Goodwin Procter, LLP
12       53 State Street, Exchange Place
         Boston, Massachusetts 02109
13       (617) 570-1000
         (617) 523-1231 (facsimile)
14       ndrew@goodwinprocter.com

15       BEN GASTEL, Esquire
         Branstetter, Stranch & Jennings, PLLC
16       227 Second Avenue North
         Nashville, Tennessee  37201
17       (615)254-8801
         beng@bsjfirm.com
18
     Also Present:
19   Daniel Makowski, Videographer
     Scott Butler
20

21

22

23

24

25
```

1     Q.      And so have you continued to serve as the

2   facility director for St. Thomas Neurosurgical since

3   2009?

4     A.      Yes, I have.

5     Q.      And describe your duties as the facility's

6   director.

7     A.      I oversee the day-to-day operations of the

8   facility.

9     Q.      And what does that include?

10    A.      I oversee the whole -- the staff and the

11  running of the facility, anything that's a part of the

12  clinical side.

13    Q.      Are you an employee of Howell Allen Clinic?

14    A.      Yes, I am.

15    Q.      And are all the people who work at St.

16  Thomas Neurosurgical employees of Howell Allen Clinic?

17    A.      Yes, they are.

18    Q.      And how many people do you supervise?

19    A.      Probably -- I do have some part time so --

20  and PRN.  On a basis, usually 13.

21    Q.      And those 13 people, what types of jobs do

22  they comprise?

23    A.      I have registered nurses, LPN, medical

24  assistants and secretaries and x-ray technician.

25    Q.      Okay.  So would it be fair for me to

1    St. Thomas Neurosurgical and Howell Allen Clinic did

2    not provide you with any special training other than

3    the on-the-job experience that you mentioned for you

4    to fulfill the role as facility director; is that

5    true?

6         A.    I -- it wasn't necessary.

7         Q.    All right.  And did you provide -- did

8    anyone provide you with any special training about how

9    to go about evaluating drug suppliers or pharmacies?

10        A.    In my 30 years of nursing, we're -- and

11   working in the OR, you're constantly doing that.

12        Q.    So I understand that your testimony is that

13   you have experience in that regard, but I guess my

14   question to you is:  Did Howell Allen Clinic or St.

15   Thomas Neurosurgical or St. Thomas Hospital or St.

16   Thomas Health ever provide you with any particular

17   training about how to evaluate a compounding pharmacy

18   or any other type of drug supplier?

19        A.    St. Thomas Hospital had nothing to do with

20   my job, first of all.  My training is ongoing.  I'm

21   not sure how to -- what you're looking for on this,

22   sir.

23        Q.    All right.  So am I correct in

24   understanding that Howell Allen Clinic and St. Thomas

25   Neurosurgical never provided you with any specialty

Page 78

1     Q.    So revenue was not a concern in the least

2   when you learned about this so-called shortage; is

3   that true?

4     A.    If we can't do procedures, then I have to

5   lay off staff.  We can't take care of our patients.

6     Q.    So does that mean, yes, you were concerned

7   about revenues?

8     A.    Well, then, yes, from that aspect of it.

9     Q.    Other than Dr. Culclasure, did you speak

10   with anyone else about whether it would be wise to

11   purchase materials from NECC?

12     A.    Not that I recall.

13     Q.    Did you have any conversations with anybody

14   at St. Thomas Hospital?

15     A.    No.

16     Q.    Did you have any conversations with anyone

17   on the board of St. Thomas Neurosurgical?

18     A.    Regarding?

19     Q.    Regarding switching to NECC.

20     A.    No.

21     Q.    Did you have any conversations with any of

22   the neurosurgeons at Howell Allen Clinic?

23     A.    No.

24     Q.    And at the time you and Dr. Culclasure made

25   the decision to start purchasing this material from

Page 174

1    to the Omnipaque.

2        Q.      Okay.  So did that statement by Dr.

3    Manchikanti raise any red flags in your mind about the

4    safety of purchasing from NECC?

5        A.      Not that I recall.

6        Q.      Did you discuss this e-mail with

7    Dr. Culclasure?

8        A.      I don't remember.

9                MR. NOLAN:  Why don't we take a short

10         break.

11               THE WITNESS:  Okay.

12               VIDEOGRAPHER:  We're off the record.

13         This is the end of Tape No. 3.  The time is

14         2:42 p.m.

15               (A recess was taken.)

16               VIDEOGRAPHER:  Here begins Tape No. 4

17         in the deposition of Debra Schamberg.

18         We're back on the record and the time is

19         2:57 p.m.

20       Q.      (By Mr. Nolan)  Ms. Schamberg, during the

21    shortage that you've mentioned, did you ever approach

22    the St. Thomas Plaza Pharmacy about whether they could

23    supply MPA to your facility?

24       A.      Not that I recall.

25       Q.      Is there any particular reason why you

1    didn't approach the St. Thomas Plaza Pharmacy?

2        A.      They're -- that's not something I would

3    order from.

4        Q.      Now, I want to get back to the two reasons

5    that you initially mentioned as to why you -- what you

6    call the primary reasons for going with NECC, the

7    shortage, and I think you said that having a truly

8    preservative-free MPA product was better for the

9    patients.  Have I characterized that fairly?

10       A.      Yes, those are the main reasons.

11       Q.      Okay.  So who told that you it was better

12   for the patients?

13       A.      I went on Dr. Culclasure's recommendation.

14       Q.      Okay.  Did you do any independent research

15   on that particular issue?

16       A.      No.

17       Q.      Did you ever inquire as to whether

18   CuraScript or Clint Pharmaceuticals could provide a

19   truly preservative-free steroid?

20       A.      They provided me what they said was a

21   preservative-free, but we know that it did have

22   alcohol in it, but they considered it

23   preservative-free.

24       Q.      Did -- so if I understand it, there are

25   some differences between Depo-Medrol -- brand name

Page 188

1    Dr. Culclasure's decision to begin purchasing from

2    NECC; is that true?

3        A.    We did not use this for NECC.

4        Q.    Do you know why changes to the formulary

5    require, I guess, three levels of review, the medical

6    director, the medical executive committee and

7    ultimately the board?

8        A.    It just goes through the chain of command

9    to make sure everyone knows.

10       Q.    And would you agree that adding drugs for

11   use in the clinic without appropriately amending the

12   formulary and going through that review could be

13   dangerous for patients?

14           MR. GIDEON:  Objection to the form.

15           THE WITNESS:  Not necessarily, I

16      don't.

17       Q.    (By Mr. Nolan)  Did you ever talk with a

18   pharmacist named Martin Kelvas at St. Thomas Hospital?

19       A.    Not that I recall.

20       Q.    What about Carmen Leffler?

21       A.    Not that I recall.

22       Q.    How did you first learn that there was a

23   problem in September -- I think you said on September

24   the 18th, 2012?  How did you first become aware that

25   there was a problem with a potential meningitis issue?

```
 1        identification.)

 2              MR. REHNQUIST:  Objection.

 3              THE WITNESS:  Yes.

 4      Q.    (By Mr. Schramek)  And these -- the one

 5   we're looking at here is called medication errors.

 6      A.       That is correct.

 7      Q.       And you're familiar with this policy?

 8      A.       Sort of at the moment.

 9      Q.       Yeah.  And it says at the top its purpose

10   is to prevent, detect and resolve drug-related

11   problems that can result in patient harm; correct?

12      A.       Correct.

13      Q.       And when we look at the definition of a

14   medication error, it talks about medication errors

15   being preventable.  Any preventable event that could

16   lead or cause to inappropriate patient use or

17   medication -- or patient harm; right?

18              MR. GIDEON:  I object to the form.

19        That's not an accurate rendition of the

20        sentence you just referred to.

21              MR. SCHRAMEK:  Sure.  Let me re-read

22        it.

23      Q.    (By Mr. Schramek)  The first sentence says,

24   "A medication error is any preventable event that may

25   cause or lead to any inappropriate medication use or
```

1    patient harm while the medication is in the control of

2    the healthcare professional, patient or consumer."

3        A.    That is what it says.

4        Q.    Did I read that correctly?

5              So that's what this policy is talking

6    about; right?

7        A.    Correct.

8              MR. REHNQUIST:  Objection.

9        Q.    (By Mr. Schramek)  And if we go to the last

10   page on reporting, it says that nursing and pharmacy

11   will report medication errors to the MEC for their

12   review; correct?

13       A.    Correct.

14       Q.    And the MEC we talked about earlier; right?

15   The MEC is the medical executive committee; right?

16       A.    That is correct.

17       Q.    The medical executive committee is -- who

18   are the four persons on it?

19       A.    Dr. Jason Hubbard, Scott Butler, Shreka

20   Rogers and Christy Ebert.

21       Q.    And no one on the medical executive

22   committee is employed by any of the St. Thomas

23   entities; correct?

24             MR. REHNQUIST:  Objection.

25             THE WITNESS:  That is correct.

1      Q.      (By Mr. Schramek)   And you as the

2  director -- facilities director, this is one of the

3  policies that you also are in charge of overseeing;

4  right?

5              MR. REHNQUIST:   Objection.

6              THE WITNESS:   Correct.

7      Q.      (By Mr. Schramek)   And, in fact, if we look

8  at the top of Page STOPNC_300, it says, "The medical

9  staff, in collaboration with the nursing and other

10 staff as appropriate, shall periodically assess its

11 definition of a significant medication error and the

12 mechanism's effectiveness to detect significant

13 medication errors."

14             Did I read that correctly?

15     A.      You did.

16     Q.      And with respect to this policy, this is a

17 policy through you and the MEC that is aimed at

18 resolving, addressing medication errors; fair?

19             MR. REHNQUIST:   Objection.

20             MR. STRANCH:   Objection to the form.

21             THE WITNESS:   Yes.

22     Q.      (By Mr. Schramek)   And is this a policy

23 that you followed during your work at STOPNC as the

24 facility's director?

25     A.      This is the policy we would follow.

1    you as facilities director in consultation with

2    Dr. Culclasure?

3         A.    That is correct.

4         Q.    And I think you've said this a few parts

5    throughout the day, but I want to be clear.  None of

6    the St. Thomas entities had anything to do with the

7    decision of STOPNC to begin acquiring product from

8    NECC?

9         A.    That is correct.

10              MR. STRANCH:  Objection to form.

11        Q.    (By Mr. Schramek)  If we could go to

12   Exhibit 39 real quickly.  It's that -- that kind of

13   big exhibit full of e-mails and invoices.  Do you have

14   it in front of you?

15        A.    Yes.

16              MR. REHNQUIST:  I'm sorry, can you

17     say that number again.

18              MR. SCHRAMEK:  Exhibit 39, Bates

19     STOPNC_2386 is the cover.

20        Q.    (By Mr. Schramek)  The top e-mail of that

21   packet was from a -- from you to Marlesa Allen --

22   Marlese Allen; correct?

23        A.    Marlese, yes, sir.

24        Q.    And I think later in the -- in the

25   deposition, we learned that she's the director of HR

1   Do you remember saying that?

2        A.      Yes.

3        Q.      And that's reflected by the fact that you

4   have a very small formulary; right?

5        A.      Correct.

6                MR. REHNQUIST:  Objection.

7        Q.      (By Mr. Schramek)  Is it fair to say

8   that -- can you tell me what is the relationship, if

9   any, between the STOPNC formulary on Exhibit 40 and,

10  for example, St. Thomas Hospital's formulary.

11               MR. STRANCH:  Objection, foundation.

12               THE WITNESS:  That I couldn't -- you

13       know, I don't think that would even be

14       close, but I can't -- I don't know what's

15       all on St. Thomas's formulary.

16       Q.      (By Mr. Schramek)  Have you ever seen the

17  formulary?

18       A.      No.

19       Q.      In connection with your work in STOPNC, did

20  you ever have any interaction with the formulary?

21       A.      For St. Thomas Hospital?

22               MR. STRANCH:  Objection.

23       Q.      (By Mr. Schramek)  Hospital.

24       A.      No.

25       Q.      Do you personally -- do you believe that

Page 242

1    the St. Thomas Hospital formulary has anything to do

2    with STOPNC?

3                MR. STRANCH:  Objection.

4                MR. NOLAN:  Objection to the form.

5                THE WITNESS:  No.

6    Q.    (By Mr. Schramek)  And it doesn't appear

7    that your formulary, in fact, changed since 2007; is

8    that right?

9    A.    At that time.

10    Q.    And just so the record's clear, at the

11    bottom of these policies, it says what the date

12    written was, the dates they were reviewed, and then

13    the dates they were revised; correct?

14    A.    Correct.

15    Q.    When you want to determine whether a policy

16    has changed, that's what you look at; right?

17    A.    Yes.

18    Q.    We had some talk about what's referred to

19    as the St. Thomas -- I believe the Medical Plaza.  Is

20    that the right term for it?

21    A.    Yes.

22    Q.    And that's the office building essentially

23    in which STOPNC rents space?

24    A.    Correct.

25                MR. NOLAN:  Objection to the form.

Page 290

1                         DISCLOSURE

2
            Pursuant to Article 10.B of the Rules
3     and Regulations of the Board of Court
      Reporting of the Judicial Council of
4     Georgia which states:  "Each court reporter
      shall tender a disclosure form at the time
5     of the taking of the deposition stating the
      arrangements made for the reporting
6     services of the certified court reporter,
      by the certified court reporter, the court
7     reporter's employer or the referral source
      for the deposition, with any party to the
8     litigation, counsel to the parties, or
      other entity.  Such form shall be attached
9     to the deposition transcript," I make the
      following disclosure:

10
            I am a Georgia Certified Court
11    Reporter.  I am here as a representative of
      Discovery Litigation Services, LLC.
12    Discovery Litigation Services, LLC was
      contacted to provide court reporting
13    services for the deposition.  Discovery
      Litigation Services, LLC will not be taking
14    this deposition under any contract that is
      prohibited by O.C.G.A. 9-11-28(c).

15
            Discovery Litigation Services, LLC
16    has no contract/agreement to provide
      reporting services with any party to the
17    case, any counsel in the case, or any
      reporter or reporting agency from whom a
18    referral might have been made to cover this
      deposition.

19
            Discovery Litigation Services, LLC
20    will charge its usual and customary rates
      to all parties in the case, and a financial
21    discount will not be given to any party to
      this litigation.

22

23
                          Blanche J. Dugas
24                        CCR No. B-2290

25

1   STATE OF GEORGIA:

2   COUNTY OF FULTON:

3

4           I hereby certify that the foregoing

5       transcript was reported, as stated in the

6       caption, and the questions and answers

7       thereto were reduced to typewriting under

8       my direction; that the foregoing pages

9       represent a true, complete, and correct

10      transcript of the evidence given upon said

11      hearing, and I further certify that I am

12      not of kin or counsel to the parties in the

13      case; am not in the employ of counsel for

14      any of said parties; nor am I in any way

15      interested in the result of said case.

16

17  February 10, 2015

18

19

20          BLANCHE J. DUGAS, CCR-B-2290

21

22

23

24

25

Page 292

1                          CAPTION

2

3              The Deposition of DEBRA SCHAMBERG, RN,

4    taken in the matter, on the date, and at the time and

5    place set out on the title page hereof.

6              It was requested that the deposition be

7    taken by the reporter and that same be reduced to

8    typewritten form.

9              It was agreed by and between counsel and

10   the parties that the Deponent will read and sign the

11   transcript of said deposition.

12

13

14

15

16

17

18

19

20

21

22

23

24

25