Exhibit "P"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE: NEW ENGLAND
COMPOUNDING PHARMACY,
INC. PRODUCTS LIABILITY     MDL No. 2419
LITIGATION

                            Master Dkt:
                            1:13-md-02419-RWZ
~~~~~~~~~~~~~~~~~~~~~
THIS DOCUMENT RELATES
TO:


All Actions


~~~~~~~~~~~~~~~~~~~~~~~~


30(b)(6) VIDEOTAPED DEPOSITION OF
MARTIN KELVAS


1:07 p.m.
August 26, 2015



Suite 2600
5 Concourse Parkway
Atlanta, Georgia



Blanche J. Dugas, RPR, CCR No. B-2290

```
 1                    APPEARANCES OF COUNSEL

 2
     On Behalf of the Plaintiffs:
 3        GEORGE NOLAN, Esquire
          Leader, Bulso & Nolan, PLC
 4        Suite 1740
          414 Union Street
 5        Nashville, Tennessee  37219
          (615) 780-4114
 6        (615) 780-4122 (facsimile)
          gnolan@leaderbulso.com
 7
          DANIEL L. CLAYTON
 8        Kinnard, Clayton & Beveridge
          127 Woodmont Boulevard
 9        Nashville, Tennessee  37205-2240
          (615) 297-1007
10        (615) 297-1505 (facsimile)
          dclayton@kcbattys.com
11
          J. GERARD STRANCH, IV, Esquire
12        BENJAMIN A. GASTEL, Esquire
          Branstetter, Stranch & Jennings, PLLC
13        223 Rosa L. Parks Avenue, Suite 200
          Nashville, Tennessee  37203
14        (615) 254-8801
          (615) 250-3937 (facsimile)
15        gerards@branstetterlaw.com

16   On Behalf of St. Thomas Health, St. Thomas Network,
     St. Thomas West Hospital f/k/a St. Thomas Hospital:
17        YVONNE K. PUIG, Esquire
          ERIC J. HOFFMAN, Esquire
18        Norton, Rose, Fulbright
          Suite 1100
19        98 San Jacinto Boulevard
          Austin, Texas 78701
20        (512) 536-2450
          (512) 536-4598 (facsimile)
21        yvonne.puig@nortonrosefulbright.com
          eric.hoffman@nortonrosefulbright.com
22

23

24

25
```

```
 1   On Behalf of Saint Thomas Outpatient Neurosurgical
     Center, LLC; Howell Allen, a Professional Corporation;
 2   John W. Culclasure, M.D.; Debra V. Schamberg, RN:
          CHRISTOPHER TARDIO, Esquire
 3        Gideon, Cooper & Essary, PLC
          Suite 1100
 4        315 Deaderick Street
          Nashville, Tennessee 37238
 5        (615) 254-0400
          (615) 254-0459 (facsimile)
 6        chris@gideoncooper.com

 7   On Behalf of Specialty Surgery Center - Crossville,
     PLLC; Kenneth R. Lister, M.D.; Kenneth R. Lister,
 8   M.D., PC:
          KENT E. KRAUSE, Esquire
 9        Brewer, Krause, Brooks, Chastain & Burrow, PLLC
          Suite 2600
10        611 Commerce Street
          Nashville, Tennessee  37203
11        (615) 630-7755
          (615) 256-8985 (facsimile)
12        kkrause@bkblaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              APPEARANCES VIA VIDEOSTREAM

 2
    On Behalf of Ocean State Pain Management, Inc. and
 3  Abdul Barakat, M.D.:
         THOMAS M. DOLAN, III, Esquire
 4       Capplis, Connors & Carroll, PC
         Suite 330
 5       18 Tremont Street
         Boston, Massachusetts  02108
 6       (617) 227-0722
         (617) 227-0772 (facsimile)
 7       tdolan@capplisconnors.com

 8  On Behalf of Dallas Back Pain Management/Momentum
    Pain Management and Abbeselom Ghermay, M.D.:
 9       HEATHER KANNY, Esquire
         Fraley & Fraley, LLP
10       Suite 6300
         901 Main Street
11       Dallas, Texas 75202-3773
         (214) 761-6468
12       hkanny@fraley-law.com

13  On Behalf of Tim I. Chowdhury, M.D.:
         BARTHOLOMEW T. FREEZE, Esquire
14       Freund, Freeze & Arnold
         Suite 800
15       65 E. State Street
         Columbus, Ohio 43215-4247
16       (614) 255-7567
         (614) 827-7303 (facsimile)
17       bfreeze@ffalaw.com

18  On Behalf of Advanced Pain & Anesthesia Consultants
    PC, BKC Pain Specialists, and Cincinnati Pain
19  Management Consultants, Inc.:
         CAROLINE M. KELLY, Esquire
20       Morrison Mahoney, LLP
         250 Summer Street
21       Boston, Massachusetts  02210
         (617) 737-8885
22       (617) 342-4802 (facsimile)
         ckelly@morrisonmahoney.com

23

24

25
```

```
 1    On Behalf of a Defendant Party:
           JOSEPH C. KLAUSING, Esquire
 2         O'Bryan, Brown & Toner, PLLC
           1500 Starks Building
 3         455 South 4th Street
           Louisville, Kentucky  40202
 4         (502) 585-4700
           klausingj@obtlaw.com
 5

 6    Also Present:
      Henry Stewart, videographer
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    because it was voluminous.  There was predominantly

2    the pharmacies within the hospitals and whatever they

3    were responsible for for drug distribution.

4         Q.    Okay.

5         A.    Yeah.

6         Q.    So -- but you are aware that Ascension owns

7    more than just hospitals; correct?  They own other

8    medical service facilities, ambulatory surgery

9    centers.  They own clinics and other things of that

10   nature; correct?

11        A.    I was aware that they had diverse

12   businesses that they owned.  I was not -- detailed

13   knowledge of them, nor knowledge of how they bought or

14   sold their drugs or how they administered them.  I was

15   only aware of our ministry in the Nashville area as to

16   what we did and how we purchased and distributed

17   medications.  I wasn't privy to all of -- all of the

18   ministries throughout the United States.  So I really

19   can't answer that question beyond that.

20        Q.    Okay.  So you don't know if the pharmacy

21   council applied to nonhospital entities owned by

22   Ascension or not?

23        A.    No.  Our contracts were basically for the

24   nonprofit side of the business.  As far as any

25   for-profit ventures, that's a whole different class of

Page 66

1   trade.  We had nothing to do with them.

2       Q.      So anything that was on the nonprofit side,

3   either because it was owned on the nonprofit side or

4   operated by the nonprofit side, would be covered by

5   the pharmaceutical council; correct?  Or the pharmacy

6   council; correct?

7               MS. PUIG:  Would be or would not be?

8               MR. STRANCH:  Would be covered by the

9       pharmacy council.

10              THE WITNESS:  The nonprofit side

11      only.

12      Q.      (By Mr. Stranch)  Yes.  That's correct.

13      A.      Yes.

14      Q.      And St. Thomas Hospital fell within the

15  nonprofit side; correct?

16      A.      Yes.

17      Q.      Okay.  Does that also apply to network and

18  health?  St. Thomas Network and St. Thomas Health also

19  fell within the nonprofit side?

20      A.      The network, yes.  I couldn't tell you -- I

21  didn't have a list.  I only knew what I was dealing

22  with at St. Thomas Hospital.  We had a limited number

23  of clinics that we were told were part of the network.

24  They were considered a cost center of the hospital.

25      Q.      Okay.

Page 68

1      Q.      So would STOPNC have then been on the

2  for-profit side of the Ascension entities?

3      A.      That's what I was led to believe.

4      Q.      Okay.  And were you led to believe that

5  during the time you worked at St. Thomas Hospital or

6  at some point since then?

7      A.      No, when I worked there.

8      Q.      Okay.

9      A.      Yeah.  It was made very clear that they

10 were not a cost center of the hospital.

11     Q.      Okay.

12             MS. PUIG:  Would this be a good time

13   for a break?

14             MR. STRANCH:  Sure.  If you're ready.

15   Ready for a break?

16             THE WITNESS:  Sure.

17             MS. PUIG:  So we're off the record.

18             VIDEOGRAPHER:  2:12 p.m., we're off

19   the record.

20             (A recess was taken.)

21             VIDEOGRAPHER:  This is Disc No. 2.

22   2:31 p.m., we're on the record.

23     Q.      (By Mr. Stranch)  Okay.  I understand

24 you've signed a protective order in the break; is that

25 correct?

1      Q.     Yeah.   So if someone from that for-profit

2    side that is in that different class had contacted

3    you, would you have at least encouraged them to

4    contact the Board of Pharmacy or Board of Health to

5    determine whether they could be doing this?

6      A.     I don't know.   Like I said, that didn't

7    happen.   I never spoke to them about it.   I didn't

8    even think of calling them because we -- you know, the

9    line is drawn in the sand.   They're over there in the

10   for-profit world.   We're in the nonprofit world.   Our

11   worlds did not -- we did not mesh.   We didn't talk to

12   each other, really.

13            So if they had called me, as an inference,

14   I would have told them what we're doing, and I would

15   have explained to them why.   But then again, I might

16   have said to them -- first of all, at that point in

17   time before 2012, we had no concern at that point so

18   much about the safety of the product.   It was more

19   about the regulatory issue, and being a different

20   class of trade, I couldn't speak to that for the

21   doctor's office.   They're outside of that triangle.

22     Q.     But if a clinic or a doctor's office was

23   trying to meet the same standards, the same high

24   standards that you meet and provide through your

25   pharmacy, you would have discouraged them from

1       A.      Yes, sir.

2       Q.      You did not give that instruction to anyone

3    at STOPNC; true?

4       A.      That's -- that's correct.

5       Q.      Okay.  You didn't call Dr. Culclasure and

6    say, do not buy from a compounding pharmacy; right?

7       A.      That's correct.

8       Q.      Didn't call Debra Schamberg and say, do not

9    buy from a compounding pharmacy; right?

10      A.      That's correct.

11      Q.      And this directive to your staff was not

12   put in writing; true?

13      A.      No.

14      Q.      That you remember.

15      A.      No.  Not that I recall, no.

16      Q.      And there is a process at St. Thomas for

17   adopting formal written policies; right?

18      A.      Yes.

19      Q.      And the policy -- or your directive to your

20   staff, it was never put through that process and

21   became a formal policy prior to 2012; true?

22      A.      That's correct.

23      Q.      In fact, I think you told us just a few

24   minutes ago that you have no recollection of ever

25   discussing anything about compounding pharmacies or

1    about NECC with anyone at STOPNC; true?

2        A.      That is correct.

3        Q.      Same with Howell Allen; true?

4        A.      That is correct.

5        Q.      And I think you told us a few minutes ago

6    that there would be no reason for you to give that

7    instruction to anyone at STOPNC; right?

8        A.      That's correct.

9        Q.      And one of the reasons that there would be

10   no reason for you to give that instruction is because

11   you weren't responsible for purchasing drugs for

12   STOPNC; true?

13       A.      That is correct.

14               MR. STRANCH:  Object to form.

15       Q.      (By Mr. Tardio)  You didn't have any

16   authority to tell STOPNC what to do or what not to do;

17   right?

18       A.      That's correct.

19               MR. STRANCH:  Objection to form.

20               MS. PUIG:  If you could wait just a

21        second to give everybody the opportunity to

22        object.

23               THE WITNESS:  I'm sorry.

24               MS. PUIG:  That's okay.  The pace has

25        quickened a bit, but let everybody say what

1                     DEPOSITION ERRATA SHEET

2

3    DLS Assignment No.   23352

4    Case Caption:  In Re.  New England Compounding Company

5                      Products Liability Litigation

6

7    Witness:  MARTIN KELVAS - 08/26/2015

8

9              DECLARATION UNDER PENALTY OF PERJURY

10   I declare under penalty of perjury that I have read

11   the entire transcript of my deposition taken in the

12   captioned matter or the same has been read to me, and

13   The same is true and accurate, save and except for

14   changes and/or corrections, if any, as indicated by me

15   on the DEPOSITION ERRATA SHEET hereof, with the

16   understanding that I offer these changes as if still

17   under oath.

18

19   Signed on the _19th_ day of

20   _October_ , 20_15_.

21

22   _____

23   MARTIN KELVAS

24

25

## DEPOSITION ERRATA SHEET

| Page and line | Change to | Reason for change |
|---|---|---|
| GLOBAL | "St. Thomas Health" should be "Saint Thomas Health" | Transcription error |
| GLOBAL | "St. Thomas Network" should be "Saint Thomas Network" | Transcription error |
| GLOBAL | "St. Thomas Entities" should be "Saint Thomas Entities" | Transcription error |
| GLOBAL | "Beckom" should be "Beckham" | Transcription error |
| 1 | Remove reference to "30(b)(6)" | Transcription error |
| 15/16 | Change "them" to "him" | Transcription error or misspoke |
| 23/7 | "stopped" should be "started" | Transcription error or misspoke |
| 25/24 | Change "Carmichael" to "Carmen" | Misspoke |
| 26/12 | Change "of it" to "the severance letter" | Clarification |
| 27/25 | Change "Ebel" to "Boal" | Transcription error |
| 32/11 | Change "direct report" to "supervisor" | Misspoke |
| 43/18 | Change "upstanding" to "standing" | Transcription error |
| 45/13 | Change "law" to "log" | Transcription error |
| 45/14 | Change "Ebel's" to "Boal's" | Transcription error |
| 52/10 | Change "Tagatzs" to "Tagatz" | Transcription error |
| 61/12 | Change "PT and T" to "P and T" | Transcription error or misspoke |
| 66/23 | Insert "non-profit" before "clinics" | Clarification |
| 67/5 | Insert "What" before "we" | Transcription error or misspoke |
| 68/3 | Change to "That's what I was led to believe, if by Ascension Entities you're referring to Saint Thomas Health" | Clarification |
| 71/21 | Change "antirooms" to "anterooms" | Transcription error |
| 82/23 | Change "Ebel's" to "Boal's" | Transcription error |
| 98/20 | Change "reviewing" to "review" | Transcription error or misspoke |
| 104/19 | Insert "a" after "had" | Transcription error or misspoke |
| 120/13 | Change "an inference" to "a reference" | Transcription error or misspoke |
| 160/16 | Change "now" to "not" | Transcription error |
| 166/9 | Change "Giomi" to "Giamei" | Transcription error |
| 167/19 | Insert "non-profit" before "clinics" | Clarification |
| 184/5 | Change "you're" to "your" | Transcription error |

SIGNATURE: _____  DATE: _10-19-15_