Exhibit "R"

# SERVICES AGREEMENT

THIS SERVICES AGREEMENT (the "Agreement") is made and entered into effective as of the 18th day of September, 2000 by and between **ST. THOMAS HOSPITAL**, a Tennessee not-for-profit corporation ("Hospital"), and **SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC**, a Tennessee limited liability company (the "Company").

## WITNESSETH:

WHEREAS, the Hospital is a nonprofit corporation formed under and existing by virtue of the laws of the State of Tennessee for the purpose of providing health care to middle Tennessee and southern Kentucky, with a special concern for the sick and poor, and which operates Saint Thomas Hospital in Nashville, Tennessee; and

WHEREAS, the Company is a limited liability company formed under and existing by virtue of the laws of the State of Tennessee for the purpose of establishing and operating an outpatient neurosurgical center (the "Center"); and

WHEREAS, the Company may desire to employ the Hospital to provide certain services to the Center and the Hospital is willing to accept such employment, subject to the terms and conditions set forth below;

NOW, THEREFORE, in consideration of the foregoing and, in accordance with the terms and conditions set forth below, the parties hereto agree as follows:

## ARTICLE I.
## ENGAGEMENT, SERVICES, AND AUTHORITY

Section 1.1   Engagement.   If the Company determines that it wishes to engage the Hospital to provide services upon the terms and conditions set forth herein, the Company shall provide executed, written notice to the Hospital in substantially the form attached hereto as Exhibit A setting forth those services the Company desires the Hospital to perform (the "Acceptance Notice"). If the Hospital desires to accept the engagement to provide such services under the terms and conditions set forth in this Agreement and the Acceptance Notice, the Hospital shall execute and return an executed copy of the Acceptance Notice to the Company. The executed Acceptance Notice shall be attached as an addendum to this Agreement.

0661334.02
084000-409 08/22/2000



**EXHIBIT**
tabbies
512
Shatzen 3/21/16

DEREED-STH01062

### Section 1.2   Authority.

(a)     The Hospital represents and warrants that it has the right, power, legal capacity, and authority to enter into and perform its obligations under this Agreement, and further warrants that no approvals or consents of any person or entity other than the Hospital is necessary in connection with the execution of this Agreement by the Hospital.

(b)     The Company represents and warrants that the Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement, and further warrants that no approvals or consents of any person or entity other than the Company are necessary in connection with the execution of this Agreement.

### Section 1.3   Authority and Responsibilities of the Hospital.

(a)     Reliance.  In furtherance of the objectives of this Agreement, the Hospital shall be entitled to rely upon instructions received from the Company, as to any and all acts to be performed by the Hospital.

(b)     Construction.  The grant of express authority to the Hospital with regard to specific matters by this Agreement is not intended by the Company to be narrowly construed for the purpose of restricting the authority of the Hospital.

### Section 1.4   Control Retained by the Company.  The Company shall at all times exercise control over the assets and operation of the Center, and the Hospital shall perform those services as directed in the Acceptance Notice in accordance with policies, directives, budget and By-Laws adopted by the Company.  By entering into this Agreement and delivering an Acceptance Notice, the Company does not delegate to the Hospital any of the powers, duties, and responsibilities vested in the Company by law.  The Company may, consistent with the terms of this Agreement, direct the Hospital to implement existing policies and may adopt policy recommendations or proposals made by the Hospital. The Hospital and the Company each expressly disclaim any intent to form a partnership, association, or any other entity, or to become joint venturers in the operation of the Center by virtue of the execution of this Agreement or the provision of services hereunder and agree that the Hospital's services under this Agreement are provided on an independent contractor basis. The relationship created by this Agreement is one of principal (the Company) and agent (the Hospital).

### Section 1.5   Medical and Professional Matters.  Under no circumstances shall the Hospital be responsible for any medical or professional matters. The Hospital may, however, consult with the Company and make recommendations concerning such matters.

0661334.02
084000-409 08/22/2000

DEREED-STH01063

## ARTICLE II.
## INSURANCE

If the Company engages the Hospital to provide any services hereunder, the Hospital shall be named an additional insured under all insurance policies procured by the Company with respect to the Center. The right of the Hospital to invoke the protection of such policies shall be severable from and independent of the Company's rights, and these policies shall not be terminable or non-renewable except upon thirty (30) days' written notice to the Hospital. No later than thirty (30) days following the delivery of an Acceptance Notice and thirty (30) days following the end of each policy year, the Company shall give to the Hospital a copy of the endorsements naming the Hospital an additional insured. Such insurance policies shall contain endorsements which reflect the primary liability of the Company's insurance carrier for all covered losses provided for herein, notwithstanding any insurance which may be maintained by the Hospital or any affiliate of the Hospital. The Company hereby waives any right of contribution with respect to the loss covered under such policies (or with respect to deductibles thereunder) against the Hospital or any of the Hospital's insurance carriers.

## ARTICLE III.
## COMPENSATION

The Company shall reimburse the Hospital for services provided hereunder as set forth in the Acceptance Notice(s) attached as addendum(s) to this Agreement.

## ARTICLE IV.
## CONFIDENTIAL INFORMATION

For the purpose of this Agreement, the term confidential information (the "Confidential Information") shall include the following: (i) all documents and other materials, including but not limited to, all memoranda, clinical manuals, handbooks, production books, educational material and audio or visual recordings, which contain information relating to the operation of the Center or its programs (excluding written materials distributed to patients in the operation of the Center as promotion for the Center), (ii) all methods, techniques and procedures utilized in providing services to patients in the Center not readily available through sources in the public domain, and (iii) all trademarks, trade names, service marks, or protected software of Hospital and their related data files.

The Company acknowledges and agrees that the Confidential Information is owned by the Hospital and has been disclosed to it in confidence and with the understanding that it constitutes valuable business information developed by the Hospital at great expenditure of time, effort and money. The Company agrees that it shall not, without the express prior written consent of the Hospital, use the Confidential Information for any purpose other than

0661334.02
084000-409 08/22/2000

- 3 -

DEREED-STH01064

the performance of this Agreement. The Company further agrees to keep strictly confidential and hold in trust all Confidential Information and not disclose or reveal such information to any third party without the express prior consent of the Hospital.

Upon termination of this Agreement by either party for any reason whatsoever, the Company shall forthwith return to the Hospital all material constituting or containing Confidential Information and the Company shall not thereafter use, appropriate, or reproduce such information or disclose such information to any third party.

The provisions of this Article IV shall survive any termination or expiration of this Agreement.

The Hospital shall have the right to use any Confidential Information and any technical or business expertise obtained during the course of its engagement hereunder in connection with its management of any other facility.

## ARTICLE V.
## TERM AND TERMINATION

Section 5.1    Term. This Agreement shall commence on the date first written above and shall continue until terminated upon thirty (30) days written notice from one party to the other. Any such notice may be given at the complete option of the giving party with or without cause.

Section 5.2    Services.    Upon termination of this Agreement, the Hospital shall immediately discontinue providing any services which it had been providing to the Company pursuant to this Agreement.

Section 5.3    Remedies Upon Termination.    Upon termination of this Agreement, the Hospital shall remove from the Center all property of the Hospital, and neither party shall have any further obligations under this Agreement except pursuant to Article III and Article IV of this Agreement. The Hospital shall be entitled to receive payment of all amounts unpaid but earned up to the date of termination, which payment shall be due on the date on which the Hospital vacates the Center's premises and relinquishes to the Company sole possession of any and all property of the Company, including financial records and other documents necessary for operation of the Center.

## ARTICLE VI.
## MISCELLANEOUS

Section 6.1    Assignment.    This Agreement may not be assigned by either party without the prior written consent of the other party, which consent shall not be unreasonably withheld.    Notwithstanding the foregoing, the Hospital may assign this

0661334.02
084000-409 08/22/2000

- 4 -

DEREED-STH01065

Agreement freely and without the written approval of the Company to a related or affiliated entity of the Hospital, including without limitation, any for-profit or not-for-profit corporation or a limited liability company that is now existing or that may hereafter be formed, of which the Hospital or a related or affiliated entity is a shareholder or a member. The term "related or affiliated entity" shall include without limitation Ascension Health; an entity whose sole member or owner is Ascension Health; or a subsidiary (whether direct or indirect) of Ascension Health. Any attempted assignment in violation of this section shall be null and void and of no force or effect.

### Section 6.2    Indemnification.

(a)    Company Indemnification.    The Company agrees to indemnify and hold harmless the Hospital, its directors, officers, employees, agents, affiliates and shareholders, and their respective shareholders, directors, officers, employees and agents (collectively, a "Hospital Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees and expenses related to the defense of any claims) (a "Loss"), which may be asserted against any of the Hospital Indemnified Parties, including without limitation matters relating to:  (i) alleged or actual failure by the governing body, board of directors and/or similar body of the Company to perform any of its duties; (ii) any pending or threatened medical malpractice or other tort claims asserted against the Hospital relating to the Center; (iii) any action against the Hospital brought by any of the Hospital's current or former employees for any action or inaction during the period when such employee was performing services for the Center; (iv) any act or omission by any Hospital employee assigned to the Center; and (v) any violation of any requirement applicable to the Center under any federal, state or local environmental, hazardous waste or similar law or regulation; provided that such Loss has not been caused by the gross negligence or willful misconduct of the Hospital Indemnified Party seeking indemnification pursuant to this Agreement.

(b)    Hospital Indemnification.    Hospital agrees to indemnify and hold harmless the Company and its members, partners, or shareholders (as appropriate), its directors or governors (as appropriate), and its officers, employees and agents (collectively, a "Company Indemnified Party") from and against all Loss which may be asserted against any Company Indemnified Party as a result of the gross negligence or willful misconduct of Hospital in connection with the performance by the Hospital of its duties hereunder; provided that such Loss has not been caused by the gross negligence or willful misconduct of the Company Indemnified Party seeking indemnification pursuant to this Agreement.

DEREED-STH01066

## Section 6.3    Access to Books and Records.

(a)    <u>This Agreement</u>.  If it shall be determined or asserted that this Agreement is a contract between a provider and a subcontractor within the meaning of Section 1861(v)(1)(I) of the Social Security Act or any rules, regulations, or judicial or administrative interpretations or decisions promulgated or made pursuant to that Section, then the Hospital and the Company hereby agree that:  (i) until the expiration of four (4) years after the furnishing of any service pursuant to this Agreement, each shall make available, upon written request of the Secretary of the Department of Health and Human Services (the "Secretary"), or upon written request of the Comptroller General, or any of their duly authorized representatives, this Agreement and any books, documents, and records that are necessary to certify the nature and extent of the costs incurred by the Company or the Hospital with respect to this Agreement and the services provided pursuant to it, and (ii) if either the Hospital or the Company carries out any of the duties of this Agreement through a subcontract with a value or cost of $10,000 or more over a twelve (12)-month period with a related organization, that subcontract shall contain a clause to the effect that until the expiration of four (4) years after the furnishing of any services pursuant to the subcontract, the related organization shall make available, upon written request of the Secretary, or upon request of the Comptroller General, or any of their duly authorized representatives, the subcontract, and any books, documents, and records of such organization as are necessary to verify the nature and extent of the costs incurred with respect to the subcontract and the services provided pursuant to it. This Agreement shall be automatically and retroactively amended, without the necessity of any action by the parties to it, to include the terms of any rules, regulations, or judicial or administrative interpretations or decisions promulgated or made under Section 1861(v)(1)(I) of the Social Security Act, to the extent that the terms of such rules, regulations, interpretations or decision differ from the provisions of this Section 8.4. Such automatic and retroactive amendment shall be deemed to have become effective on the effective date of the amendment.

(b)    <u>Subcontracts</u>.  If it shall be determined or asserted that any contract which the Hospital enters into for and on behalf of the Company pursuant to the Hospital's duties under this Agreement is a contract between a provider and a subcontractor within the meaning of Section 1861(v)(1)(I) of the Social Security Act or any rules, regulations, or judicial or administrative interpretations or decisions promulgated or made pursuant to that Section, then the Hospital shall cause to be included in each such contract provisions which require that:  (i) until the expiration of four (4) years after the furnishing of any service pursuant to that contract, the contractor shall make available, upon written request of the Secretary of the Department of Health and Human Services (the "Secretary") or upon written request of the Comptroller General, or any of their duly authorized representatives, that contract and any books, documents, and records of the subcontractor that are necessary to certify the nature and extent of the costs incurred by the Company of the subcontractor with respect to that subcontract and the services provided under it, and (ii) if either the Company or the contractor duties of the contract through a subcontract shall contain a clause to the

DEREED-STH01067

effect that until the expiration of four (4) years after the furnishing of any services pursuant to the subcontract, the related organization shall make available, upon written request of the Secretary or the Comptroller General, or any of their duly authorized representatives, the subcontract and any books, documents, and records of such organization that are necessary to verify the nature and extent of the costs incurred with respect to the subcontract and the services provided pursuant to it. The Hospital shall further require that such contract or subcontract be automatically and retroactively amended, without the necessity of any action by the parties thereto, to include the terms of any rules, regulations, or judicial or administrative interpretations or decision promulgated or made under Section 1861(v)(1)(I) of the Social Security Act, to the extent that the terms of such rules, regulations, interpretations or decision differ from the terms of the contract or subcontract, and that such automatic and retroactive amendment shall be deemed to have become effective on the effective date of the amendment.

Section 6.4    Notices. All notices permitted or required by this Agreement shall be deemed given when in writing and delivered personally via overnight courier or deposited in the United States mail, postage prepaid, return receipt requested, addressed to the other party at the address set forth below or such other address as the party may designate in writing:

<div style="margin-left:2em;">

To the Company:    Saint Thomas Outpatient Neurosurgical Center, LLC
    4230 Harding Road, Suite 901
    Nashville, Tennessee  37205

To The Hospital:    Saint Thomas Hospital
    Attn:  Chief Executive Officer
    Post Office Box 380
    4220 Harding Road
    Nashville, Tennessee 37202

with a copy to:    J.B. Hardcastle, Jr., Esquire
    Boult, Cummings, Conners & Berry, PLC
    414 Union Street, Suite 1600
    Nashville, Tennessee  37219

</div>

Section 6.5    Entire Agreement; Modification and Change. This Agreement contains the entire agreement between the Hospital and the Company and supersedes any and all prior agreements, arrangements, or understandings between the Hospital and the Company relating to the subject matter of this Agreement. This Agreement, and any provision or time period specified in this Agreement, cannot be changed or modified except by another agreement in writing executed by both the Hospital and the Company.

DEREED-STH01068

Section 6.6    **Headings**. The headings contained in this Agreement are for convenience of reference only and are not intended to define, limit, or describe the scope or intent of any provision of this Agreement.

Section 6.7    **Severability**.  If any provision of this Agreement or its application to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and application of its provisions to other persons or circumstances shall not be affected and shall be enforced to the greatest extent permitted by law.

Section 6.8    **Governing Law**. This Agreement shall be deemed to have been made under, and shall be construed and interpreted in accordance with, the laws of the State of Tennessee and with any and all federal laws, including laws relating to Medicare, Medicaid, Tenncare and other third party payers.  In the event there is a change in such laws, whether by statute, regulation, agency or judicial decision, that has any material effect on any term of this Agreement, or in the event that counsel to one party determines that any term of this Agreement poses a risk of  violating such laws, then the applicable term(s) of this Agreement shall be subject to renegotiation and either party may request renegotiation of the affected term or terms of this Agreement, upon written notice to the other party, to remedy such condition. In the interim, the parties shall perform their obligations hereunder in full compliance with applicable law.

Section 6.9    **Rights Cumulative; No Waiver**.  No right or remedy in this Agreement conferred upon or reserved to either the Hospital or the company is intended to be exclusive of any other right or remedy, and each right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement, or now or hereafter legally existing upon the occurrence of an event of default under this Agreement. The failure of either the Hospital or the Company to insist at any time upon the strict observance or performance of any of the provisions of this Agreement or to exercise any right or remedy as provided in this Agreement shall not impair the right or remedy or be construed as a waiver or other relinquishment of it with respect to subsequent defaults.

Section 6.10   **Counterparts**. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 6.11   **Events Excusing Performance**. The Hospital shall not be liable to the Company for failure to perform any of the services required herein in the event of strikes, lock-outs, calamities, acts of God, unavailability of supplies or other events over which the Hospital has no control for so long as such events continue, and for a reasonable period of time thereafter.

0661334.02
084000-409 08/22/2000

- 8 -

DEREED-STH01069

Section 6.12   **Attorneys' Fees.**  If legal action is commenced by either party to enforce or defend its rights under this Agreement, the prevailing party in such action shall be entitled to recover its costs and reasonable attorneys' fee in addition to any other relief granted.

Section 6.13   **Time is of the Essence.**  Time is hereby expressly declared to be of the essence in this Agreement.

Section 6.14   **Language Construction.**  The language in all parts of this Agreement shall be construed, in all cases, according to its fair meaning, and not for or against either party hereto.  The parties acknowledge that each party has reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

IN WITNESS WHEREOF, the Hospital and the Company have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

ST. THOMAS HOSPITAL

By: *Wilma S. Newton*

Title: _____

SAINT   THOMAS   OUTPATIENT NEUROSURGICAL CENTER, LLC

By: *Ira Sullivan R.N.*

Title: *Director*

0661334.02
084000-409 08/22/2000

- 9 -

DEREED-STH01070

**SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC**
**AND**
**ST. THOMAS HOSPITAL**

**ADDENDUM TO SERVICES AGREEMENT**

Service to be purchased: _Accounting Services_

Description: _Monthly review of General Ledger_

**TERMS:**

Cost: _$50/hour up to a maximum of 12 hrs/month_

Length of time: _Twelve (12) months_

**MANAGERS RESPONSIBLE FROM EACH INSTITUTION:**

Saint Thomas Outpatient Neurosurgical Center: _Tina Sullivan_

St. Thomas Hospital: _Catherine Doyle/Gary Hearn_

**EFFECTIVE DATE:** _September 18, 2000_

APPROVED BY:

_[signature]_                              _8·25·00_
SAINT THOMAS OUTPATIENT              Date
   NEUROSURGICAL
   CENTER, LLC

_[signature: Wilma Newton]_              _8·25·00_
ST. THOMAS HOSPITAL                  Date

EXHIBIT
513
Schaldein 7/21/15

0661334.01
084000-409  08/03/2000

DEREED-STH01073

**ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER**
**AND**
**ST. THOMAS HOSPITAL**

**ADDENDUM TO SERVICES AGREEMENT**

Service to be purchased:  Credentialing

Description:  Provide primary verification for physicians requiring privileges is the ASC.

TERMS:

    Cost:   $67.60/hour up to maximum of 12 hours/month

    Length of time:   12 Months

MANAGERS RESPONSIBLE FROM EACH INSTITUTION:

    Saint Thomas Outpatient Neurosurgical Center: Amanda Tidmore

    St. Thomas Hospital: Marilyn Sechrest

EFFECTIVE DATE: **Last date both parties signed this Addendum**
TERMINATION DATE: 09/18/2007

APPROVED BY:

_Amanda Tidmore_
SAINT THOMAS OUTPATIENT       Date _11-10-06_
NEUROSURGICAL CENTER, LLC

_James V. Vishean_
ST. THOMAS HOSPITAL       31OCT06
           Date

0661334.02
084000-409 10/23/2006       **Exhibit A**

DEREED-STH01023

ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER
AND
ST. THOMAS HOSPITAL

## ADDENDUM TO SERVICES AGREEMENT

Service to be purchased: Food Services

Description:  Provide floor stock on a weekly basis.

TERMS:

    Cost:   On the CareNet under Floor Stock Requisition

    Length of time:   12 Months

MANAGERS RESPONSIBLE FROM EACH INSTITUTION:

    Saint Thomas Outpatient Neurosurgical Center: Amanda Tidmore

    St. Thomas Hospital: Lester Poe

EFFECTIVE DATE: **Last date both parties signed this Addendum**
TERMINATION DATE: 09/18/2007

APPROVED BY:


SAINT THOMAS OUTPATIENT         Date  _11 70 -06_
NEUROSURGICAL CENTER,LLC


ST. THOMAS HOSPITAL         31OCT06
                                           Date

0661334.02
084000-409 10/23/2006          **Exhibit A**

SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC.
AND
ST. THOMAS HOSPITAL

### ADDENDUM TO SERVICES AGREEMENT

Service to be purchased: ___Food Services___

Descritpion: ① Provide floor stock on a weekly basis
② Provide full meals upon request of staff

TERMS:

Cost: See attached pricer, billed monthly

Length of time: Twelve (12) months

MANAGERS RESPONSIBLE FROM EACH INSTITUTION:

Saint Thomas Outpatient Neurosurgical Center: Tina Sullivan

St. Thomas Hospital: Calvin Neal

EFFECTIVE DATE: September 18, 2000

APPROVED BY:

___Tina Sullivan R.N.___          8·25·00
SAINT THOMAS OUTPATIENT          Date
    NEUROSURGICAL
    CENTER, LLC

___Wilma Newton___               8·25·00
ST. THOMAS HOSPITAL              Date

0661334.01
084000-409  08/03/2000          Exhibit A

DEREED-STH01074

FLOOR SUPPLIES
Department/Delivery Area:

**Saint Thomas Oupatient Neurosurgical Center , LLC**
**4230 Harding Road, Suite 901**

Week Ending

| Description | Unit | #### Sun | #### Mon | #### Tue | #### Wed | #### Thu | #### Fri | 1/0 Sat | Total Supplie | Unit Cost | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bagels, Plain, IW | EA | | | | | | | | | 0.26 | 0.00 |
| Bowl, Foam 12 oz 8/125 | SLV | | | | | | | | | 7.05 | 0.00 |
| Cereal, Ind. Cheerios | EA | | | | | | | | | 0.50 | 0.00 |
| Cereal, Ind. Cornflakes | EA | | | | | | | | | 0.48 | 0.00 |
| Cereal, Ind. Raisin Bran | EA | | | | | | | | | 0.48 | 0.00 |
| Cereal, Ind. Rice Krispies | EA | | | | | | | | | 0.47 | 0.00 |
| Cheese, Cream PC | EA | | | | | | | | | .0.21 | 0.00 |
| Coffee Filter, Small | SLV | | | | | | | | | 0.75 | 0.00 |
| Coffee, Decaf 160/2 oz | PKG | | | | | | | | | 0.57 | 0.00 |
| Coffee, Reg 160/2 oz | PKG | | | | | | | | | 0.48 | 0.00 |
| Crackers, Graham | PKG | | | | | | | | | 0.15 | 0.00 |
| Crackers, Saltine 2/ct | PKG | | | | | | | | | 0.05 | 0.00 |
| Crackers, Wheat | PKG | | | | | | | | | 0.08 | 0.00 |
| Creamer, Non-Dairy, Dry PC | BX | | | | | | | | | 2.03 | 0.00 |
| Fruit, Assorted  Whole | EA | | | | | | | | | 0.45 | 0.00 |
| Gelatin, Any Ind Portion | EA | | | | | | | | | 0.72 | 0.00 |
| Gelatin, Diet Ind Portion | EA | | | | | | | | | 0.65 | 0.00 |
| Juice, Apple 4 oz frzn | EA | | | | | | | | | 0.15 | 0.00 |
| Juice, Cranberry 4 oz frzn | EA | | | | | | | | | 0.15 | 0.00 |
| Juice, Grape 4 oz frzn | EA | | | | | | | | | 0.18 | 0.00 |
| Juice, Orange, Purity | EA | | | | | | | | | 0.18 | 0.00 |
| Meal Deal, Cold | EA | | | | | | | | | 5.00 | 0.00 |
| Meal Deal, Hot | EA | | | | | | | | | 7.25 | 0.00 |
| Milk, 1/2 % Plus 1/2 PT | EA | | | | | | | | | 0.25 | 0.00 |
| Muffin, Otis Spunk LF IW | EA | | | | | | | | | 0.45 | 0.00 |
| Mayonaise PC 200/CS | EA | | | | | | | | | 0.08 | 0.00 |
| Mustard, PC 500/CS | EA | | | | | | | | | 0.03 | 0.00 |
| Napkin Disp 13x17 Café | SLV | | | | | | | | | 6.09 | 0.00 |
| Peanut Butter, PC | EA | | | | | | | | | 0.21 | 0.00 |
| Pretzel Twist Mini Fat Fr | EA | | | | | | | | | 0.47 | 0.00 |
| Pudding, Choc or Van, Ind | EA | | | | | | | | | 0.50 | 0.00 |
| Salt PC | BAG | | | | | | | | | 2.30 | 0.00 |
| Sandwich, Asst Flr Supply | EA | | | | | | | | | 2.25 | 0.00 |
| Soda, Cans | EA | | | | | | | | | 0.35 | 0.00 |
| Stir Stix, Coffee, Plastic | BX | | | | | | | | | 2.43 | 0.00 |
| Sugar, PC | BX | | | | | | | | | 11.01 | 0.00 |
| Sugar, Substitute, PC | BG | | | | | | | | | 9.56 | 0.00 |
| Teaspoon/Knife/Fork Pkt | EA | | | | | | | | | 0.17 | 0.00 |

Total     $0.00

DEREED-STH01075

**SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC**
**AND**
**ST. THOMAS HOSPITAL**

## ADDENDUM TO SERVICES AGREEMENT

Service to be purchased: _Instrument Sterilization_

Description: _Provide instrument sterilization + packaging_

**TERMS:**

Cost: _Per Set, see attachment, billed monthly_

Length of time: _Twelve (12) months_

**MANAGERS RESPONSIBLE FROM EACH INSTITUTION:**

Saint Thomas Outpatient Neurosurgical Center: _Tina Sullivan_

St. Thomas Hospital: _Pat Stefanik_

EFFECTIVE DATE: _September 18, 2000_

APPROVED BY:

_[signature]_      _12-4-00_
SAINT THOMAS OUTPATIENT      Date
NEUROSURGICAL
CENTER, LLC

_[signature]_      _12-8-00_
ST. THOMAS HOSPITAL      Date

0661334.01
084000-409 08/03/2000

**Exhibit A**

DEREED-STH01076

## ESTIMATED COSTS OF PROCESSING Neuro Surgical Center INSTRUMENTS – October 2000
### Minimum /Moderate set & Individual items

**Processing costs** were determined by costing out the avg. salary of staff that handle sets, the supplies and resources needed to prepare each set for use. We are estimating 2-3 hours per month of administrative time that have been added to this calculation.

| Item | Each cost | Minimum | Moderate |
|---|---|---|---|
| Handling | Processing Assistant Time | $10.00 | $13.75 |
| Transport time | Processing Assistant Time | $1.26 | $1.26 |
| Administration time | Manager/Supervisors | $.69 | $.69 |
| Foam liner | $.25 | $.25 | $.25 |
| Filter | $.15 | $.15 | $.15 |
| Sterigage/indicator | $.15 | $.45 | $.45 |
| Container cards | $.05 | $.10 | $.10 |
| Arrows | $.16 | $.32 | $.32 |
| Tape | $.005 | $.005 | $.005 |
| ID labels | $.03 | $.06 | $.06 |
| Count sheet | $.006 | $.006 | $.006 |
| Decontam Log | $.001 | $.001 | $.001 |
| Surgical towels | $.10 | $.50 | $.50 |
| Protector tips | $.09 | $.90 | $.90 |
| Biol. Indicator | $.10 | $.10 | $.10 |
| Load stickers | $.005 | $.005 | $.005 |
| Recording records | $.006 | $.006 | $.006 |
| Electricity | $.50 | $.50 | $.50 |
| Water | $.50 | $.50 | $.50 |
| Cleaner for cart & container | $.25 | $1.00 | $1.00 |
| Detergent/lubric in Washer | $.50 | $.50 | $.50 |
| Repair  Maint Sterilizer | $.50 | $.50 | $.50 |
| Repair  Maint Washer | $.50 | $.50 | $.50 |
| Total known | | $18.30 | $22.05 |
| Round up total | | $18.50 | $22.50 |
| With mark up (x 3.125) | | $57.37 | $70.31 |

**Classifying sets** was determined by a combination of methods. Taking into account that the physical size of the sets is not an accurate  method to classify sets we classified sets into minimum, moderate, and maximum categories based on the following criteria:

1. Total number of individual instruments in the set
2. Number of commonly known instruments in the set
3. Number of complicated, uncommon instruments in the set
4. Difficult to clean instru & time for pre or hand wash
5. Necessity to protect delicate instruments
6. Need for matching specific instruments to specific sets
7. Time it takes to reassemble set for sterilization
8. Any special instructions for sterilization
9. Number & time to locate missing items
10. Special treatment of items (i.e. dry for STERRAD)

The sets proposed for the NSC are classified as a minimum or a moderate set.

**Individual Items:** There is also a charge for processing individual items ex. peel packed or small wrapped item ($2.00 cost with a $6.25 charge)

**Cost of Handling**

Cost of handling sets was determined by estimating the amount of time each staff member will be involved in the handling of a set including the extra time to record duplicate record separately from other sterilization records.  Transport time was determined by timing the route from CSP to NSC several times during the day and with several different staff members.  It averaged 30.3 minutes round trip. 30.3 minutes / 6 sets per cart = 5.05 minutes x $ .25/minute = $ 1.26 per set for transporting. The budgeted average salary was used for the job classification: Processing Assistant - $ 12.29/hr + 21% benefit time = $14.88 divided by 60 minutes = $ .25/minute

Administrative time is estimated to be 3 hours/month to oversee process, create reports, and communicate with NSC staff. We can use the hourly salary of $30.65 + benefit time = $37.08 x 3hours = $111.24 / 160 of cases per month 40 cases per week x 4 weeks/month. $111.24/160= $. 69/set

| Minimum /Moderate Set | Staff involved | Minutes Handled/Set | Cost per set |
|---|---|---|---|
| | Processing Staff | 40/55 | $ 10.00/$13.75 |
| | Transport Staff | 5 | $ 1.26 |
| | Admin  time | 1.125 | $.69 |

DEREED-STH01077

SterilTek, Inc.

# Fax

| To: | Cindy Wedel/St. Thomas Hospital | From: | Tom Bauer |
|-----|------|------|------|
| Fax: | 615.222.3707 | Pages: | 1 |
| Phone: | | Date: | 08/25/00 |
| Re: | Pricing Proposal | CC: | |

☐ Urgent     X For Review     ☐ Please Comment     ☐ Please Reply     ☐ Please Recycle

---

Dear Cindy:

We have reviewed the Tray information you sent, and are pleased to propose the following the following prices for our Close Proximity Offsite Sterilization Services. Prices are inclusive of all transportation, cleaning, decontamination, reassembly, resterilization and all sterilization packaging and consumables utilized in our process.

SMALL TRAYS                                            $13.00 each

- Carpal Tunnel Set
- Ulnar Nerve Set

LARGE TRAYS                                            $23.00 each

- Nuero Laminectomy (Lumbar) Set
- Anterior Cervical Laminectomy Set

REUSABLE BASIN SETS (if applicable)                    $ 5.00 each

SINGLE INSTRUMENTS ("peel packs")                      $ 1.50 each

Thank you again for the opportunity. Please call me at 508.791.3024 should you have any questions.

ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER
AND
ST. THOMAS HOSPITAL

ADDENDUM TO SERVICES AGREEMENT

Service to be purchased: Instrument Sterilization

Description: Provide Instrument sterilization and packaging.

TERMS:

Cost:  24.00/set, $2.85/individual item, $1.50 sterilization only

Length of time:  12 Months

MANAGERS RESPONSIBLE FROM EACH INSTITUTION:

Saint Thomas Outpatient Neurosurgical Center: Amanda Tidmore

St. Thomas Hospital: Pat Stefanik

EFFECTIVE DATE: **Last date both parties signed this Addendum**
TERMINATION DATE: 09/18/2007

APPROVED BY:

_Amanda Tidmore_ (signature)
SAINT THOMAS OUTPATIENT          Date  11-10-06
NEUROSURGICAL CENTER, LLC

_Glenn A. Virluss_ (signature)
ST. THOMAS HOSPITAL              31OCT06
                                 Date

**ST. THOMAS OUTPATIENT NEUROSURGICAL CENTER**
**AND**
**ST. THOMAS HOSPITAL**

## ADDENDUM TO SERVICES AGREEMENT

Service to be purchased:  Pastoral Care Services

Description:  1) Provide staff education on the Ethical and Religious Directives for Catholic Health Care Services.  2) Provide consultation with patients and families upon request.

TERMS:

    Cost:   $75.00/hour

    Length of time:   12 Months

MANAGERS RESPONSIBLE FROM EACH INSTITUTION:

    Saint Thomas Outpatient Neurosurgical Center: Amanda Tidmore

    St. Thomas Hospital: Mary Lou O'Gorman

EFFECTIVE DATE: **Last date both parties signed this Addendum**
TERMINATION DATE: 09/18/2007

APPROVED BY:

_Amanda Tidmore_
SAINT THOMAS OUTPATIENT      Date  11-10-06
NEUROSURGICAL CENTER, LLC

_Glenn A. Vosteen_
ST. THOMAS HOSPITAL      31 OCT06
      Date

0661334.02
084000-409 10/23/2006      **Exhibit A**

DEREED-STH01026

**SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC**
**AND**
**ST. THOMAS HOSPITAL**

**ADDENDUM TO SERVICES AGREEMENT**

Service to be purchased: Pastoral Care Services

Description: ① Provide staff orientation on the Ethical and Religious Directives for Catholic Health Care Services ② Provide consultations with patients and families as request by the neurosurgical center staff

TERMS:

Cost: $30⁰⁰ per hour, billed monthly

Length of time: Twelve (12) months

MANAGERS RESPONSIBLE FROM EACH INSTITUTION:

Saint Thomas Outpatient Neurosurgical Center: Tina Sullivan

St. Thomas Hospital: Julie O' Conner

EFFECTIVE DATE: September 18, 2000

APPROVED BY:

_Una Sullivan_
SAINT THOMAS OUTPATIENT
NEUROSURGICAL
CENTER, LLC

8·25·00
Date

_Wilma S. Newton_
ST. THOMAS HOSPITAL

8·24·00
Date

0661334.01
084000-409  08/03/2000

**Exhibit A**

DEREED-STH01071

**SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC**
**AND**
**ST. THOMAS HOSPITAL**

<u>**ADDENDUM TO SERVICES AGREEMENT**</u>

Service to be purchased: _Managed Care Contracting_

Description: _Provide payor/employer negotiations, contract analysis, contract language review, contract maintenance, inservice coordination_

TERMS:

Cost: _$50 hour, billed monthly_

Length of time: _Twelve (12) months_

MANAGERS RESPONSIBLE FROM EACH INSTITUTION:

Saint Thomas Outpatient Neurosurgical Center: _Tina Sullivan_

St. Thomas Hospital: _Bernie Sherry - Chief Managed Care Offr._

EFFECTIVE DATE: _September 18, 2000_

APPROVED BY:

_Tina Sullivan RN_                     _8·25·00_
SAINT THOMAS OUTPATIENT              Date
   NEUROSURGICAL
   CENTER, LLC

_Wilma Newton_                        _8·25·00_
ST. THOMAS HOSPITAL                   Date

0661334.01
084000-409  08/03/2000

**Exhibit A**

DEREED-STH01072

SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER
AND

SAINT THOMAS HOSPITAL

ADDENDUM TO SERVICE AGREEMENT

Service to be purchased:  Emergency Blood Products

Description:   Saint Thomas Hospital Blood Bank will provide emergency blood products
               for use in the Saint Thomas Outpatient Neurosurgical Center.
               Both parties agree to follow the attached protocol.

Terms:
Cost:   Customary Saint Thomas Hospital charge for cost of pretransfusion and
        crossmatch testing/unit of blood requested

Length of agreement:  Twelve (12) months

Responsible Personnel from each institution:

Saint Thomas Outpatient Neurosurgical Center:  Amanda Tidmore

Saint Thomas Hospital Blood Bank:  Julie Robe

Effective Date:  08-15-2006

Approved By:


_____         _____
Saint Thomas Outpatient                  8/25/06
Neurosurgical Center, LLC                Date


_____         _____
Saint Thomas Hospital                    9/7/06
Laboratory Director                      Date


DEREED-STH01027

*1456*

# SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER
## AND
## ST. THOMAS HOSPITAL

## ADDENDUM TO SERVICES AGREEMENT

Service to be purchased:  Biomedical Engineering Support Services

Description:   Maintenance and repair services to therapeutic and diagnostic medical equipment owned by Saint Thomas Outpatient Neurosurgical Center, LLC

TERMS:

Cost:  Two labor rates will be established at the beginning of each fiscal year (July 1st) for general biomedical equipment service and diagnostic medical imaging equipment service.  The two rates set will be based on actual St. Thomas labor costs plus benefit costs plus overhead items.  Billing occurs quarterly based on actual use of St. Thomas Biomedical Engineering staff labor usage for the past quarter.

Length of time:  Indefinitely, billing based on actual usage only

MANAGERS RESPONSIBLE FROM EACH INSTITUTION:

**Saint Thomas Outpatient Neurosurgical Center:**  Tina Sullivan

**St. Thomas Hospital:**  Joe Howe

EFFECTIVE DATE:  July 1, 2004

APPROVED BY:

_Tina Sullivan_                                  9/27/04
**SAINT THOMAS OUTPATIENT**                      Date
**NEUROSURGICAL CENTER**

_Cindy Wedel_                                    7-14-04
**ST. THOMAS HOSPITAL**                          Date

0661334.02
084000-409 07/14/2004                    **Exhibit A**

DEREED-STH01028

# FIRST AMENDMENT TO THE
## SERVICES AGREEMENT
## BETWEEN ST. THOMAS HOSPITAL
## AND SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC

**THIS ADDENDUM** to the Services Agreement (the "Agreement") is entered into by and between St. Thomas Hospital ("Hospital") and Saint Thomas Outpatient Neurosurgical Center, LLC ("Company").

### WITNESSETH:

**WHEREAS**, the parties have decided to execute an Addendum to the Agreement and subject the Agreement to the terms and conditions set forth in this Addendum;

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, the parties agree as follows:

I.      A new Section 6.15 shall be added and reads as follows:

### Exclusion from Federal Health Care Programs.

Company represents and warrants that it has not been nor is it about to be excluded from participation in any Federal Healthcare Program. Company agrees to notify Hospital within one (1) business day of Company's receipt of a notice of intent to exclude or actual notice of exclusion from any such program. The listing of Company or any Company-owned subsidiary on the Office of Inspector General's exclusion list (OIG website) or the General Services Administration's Lists of Parties Excluded from Federal Procurement and Nonprocurement Programs (GSA website) for excluded individuals and entities shall constitute "exclusion" for purposes of this paragraph. In the event that Company is excluded from any Federal Healthcare Program, this Agreement shall immediately terminate. For the purposes of this paragraph, the term "Federal Healthcare Program" means the Medicare program, the Medicaid program, the Maternal and Child Health Services Block Grant program, the Block Grants for State for Social Services program, any state Children's Health Insurance program, or any similar program.

Further, Company agrees to indemnify and hold Hospital harmless from and against any loss, liability, judgment, penalty, fine, damages (including punitive and/or compounded damages), costs (including reasonable attorneys' fees and expenses) incurred by Hospital as a result of Company's failure to notify the Hospital of its exclusion from any Federal Healthcare Program.

1



DEREED-STH01029

II.     A new Section 6.16 shall be added and reads as follows:

### Corporate Compliance.

Hospital has in place a Corporate Responsibility Program ("Program"), which has as its goal to ensure that Hospital complies with federal, state and local laws and regulations. The Program focuses on risk management, the promotion of good corporate citizenship, including the commitment to uphold a high standard of ethical and legal business practices, and the prevention of misconduct. Company acknowledges Hospital's commitment to Corporate Responsibility and agrees to conduct all business transactions, which occur pursuant to this Agreement in accordance with the Program, Hospital's Code of Conduct and Medicare billing requirements.

III.    A new Section 6.17 shall be added and reads as follows:

### Ethical and Religious Directives.

The parties acknowledge that Hospital is a member of Ascension Health and that the operation of Hospital in accordance with the Ethical and Religious Directives for Catholic Health Care Services, as promulgated by the United States Conference of Catholic Bishops, Washington, D.C. of the Roman Catholic Church or its successor ("Directives") and the principles and beliefs of the Roman Catholic Church is a matter of conscience to Hospital. It is the intent and agreement of the parties that neither this Agreement nor any part hereof shall be construed to require Hospital to violate said Directives in its operation and all parts of this Agreement must be interpreted in a manner that is consistent with said Directives. In performing services under this Agreement, Company shall conduct its activities in a manner consistent with said Directives. A copy of the Ethical and Religious Directives are attached hereto and incorporated herein as Exhibit A.

IV.     **Conflict of Terms.**   In the event terms in this Addendum conflict with terms in the Agreement, the terms in this Addendum shall control. This Addendum shall survive all future renewal periods unless an amendment to the Agreement requires an updated Addendum, or until such time as the Agreement is either terminated or not renewed for a subsequent term.

V.     **Effective Date.**   The effective date of this Addendum shall be the 1st day of July, 2004.

VI.     **Incorporation.**   This Addendum to the Agreement shall be incorporated into and made a part of the Agreement. All provisions in the Agreement that are not modified or amended by this Addendum shall remain in full force and effect.

*[Signatures on following page.]*

2

DEREED-STH01030

**IN WITNESS WHEREOF,** the duly authorized officer and representative of Hospital and the Company have executed this Addendum on the dates written below.

**"HOSPITAL"**

Saint Thomas Hospital

By: *Cindy Wedel*
Printed: Cindy Wedel
Title: COO
Date: 7-14-04

**"COMPANY"**

Saint Thomas Outpatient Neurosurgical Center, LLC.

By: *Tina Sullivan*
Printed: TINA SULLIVAN
Title: Director
Date: 7/27/04

K:\Legal Services\Addenda\STH\STOutpatientNeuroCenter.DOC

3

DEREED-STH01031

# EXHIBIT A

DEREED-STH01032

# Ethical and Religious Directives
# for Catholic Health Care Services,
# Fourth Edition

### *United States Conference of Catholic Bishops*

This fourth edition of the *Ethical and Religious Directives for Catholic Health Care Services* was developed by the Committee on Doctrine of the National Conference of Catholic Bishops and approved as the national code by the full body of bishops at its June 2001 General Meeting. This edition of the Directives, which replaces all previous editions, is recommended for implementation by the diocesan bishop and is authorized for publication by the undersigned.

Monsignor William P. Fay
General Secretary
USCCB

Excerpts from *The Documents of Vatican II*, ed. Walter M. Abbott, SJ, copyright © 1966 by America Press are used with permission. All rights reserved.

Scripture texts used in this work are taken from the *New American Bible*, copyright © 1991, 1986, and 1970 by the Confraternity of Christian Doctrine, Washington, D.C. 20017 and are used by permission of the copyright owner. All rights reserved.

Copyright © 2001, United States Conference of Catholic Bishops, Inc., Washington, D.C. All rights reserved. No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the copyright holder.

To order *Ethical and Religious Directives, Fourth Edition*, in its official published format, contact USCCB Publishing Services, 800-235-8722 (in the Washington metropolitan area or from outside the United States, 202-722-8716). Pocket-size format: No. 5-452; Three-hole punch format: No. 5-454. $2.95 per copy plus shipping and handling; quantity discounts are available.

DEREED-STH01033

## Contents

Preamble
General Introduction

PART ONE
The Social Responsibility of Catholic Health Care Services

PART TWO
The Pastoral and Spiritual Responsibility of Catholic Health Care

PART THREE
The Professional-Patient Relationship

PART FOUR
Issues in Care for the Beginning of Life

PART FIVE
Issues in Care for the Dying

PART SIX
Forming New Partnerships with Health Care Organizations and Providers

Conclusion

## Preamble

Health care in the United States is marked by extraordinary change. Not only is there continuing change in clinical practice due to technological advances, but the health care system in the United States is being challenged by both institutional and social factors as well. At the same time, there are a number of developments within the Catholic Church affecting the ecclesial mission of health care. Among these are significant changes in religious orders and congregations, the increased involvement of lay men and women, a heightened awareness of the Church's social role in the world, and developments in moral theology since the Second

DEREED-STH01034

Vatican Council. A contemporary understanding of the Catholic health care ministry must take into account the new challenges presented by transitions both in the Church and in American society.

Throughout the centuries, with the aid of other sciences, a body of moral principles has emerged that expresses the Church's teaching on medical and moral matters and has proven to be pertinent and applicable to the ever-changing circumstances of health care and its delivery. In response to today's challenges, these same moral principles of Catholic teaching provide the rationale and direction for this revision of the *Ethical and Religious Directives for Catholic Health Care Services*.

These Directives presuppose our statement *Health and Health Care* published in 1981.[1] There we presented the theological principles that guide the Church's vision of health care, called for all Catholics to share in the healing mission of the Church, expressed our full commitment to the health care ministry, and offered encouragement to all those who are involved in it. Now, with American health care facing even more dramatic changes, we reaffirm the Church's commitment to health care ministry and the distinctive Catholic identity of the Church's institutional health care services.[2] The purpose of these *Ethical and Religious Directives* then is twofold: first, to reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person; second, to provide authoritative guidance on certain moral issues that face Catholic health care today.

The *Ethical and Religious Directives* are concerned primarily with institutionally based Catholic health care services. They address the sponsors, trustees, administrators, chaplains, physicians, health care personnel, and patients or residents of these institutions and services. Since they express the Church's moral teaching, these Directives also will be helpful to Catholic professionals engaged in health care services in other settings. The moral teachings that we profess here flow principally from the natural law, understood in the light of the revelation Christ has entrusted to his Church. From this source the Church has derived its understanding of the nature of the human person, of human acts, and of the goals that shape human activity.

The Directives have been refined through an extensive process of consultation with bishops, theologians, sponsors, administrators, physicians, and other health care providers. While providing standards and guidance, the Directives do not cover in detail all of the complex issues that confront Catholic health care today. Moreover, the Directives will be reviewed periodically by the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops), in the light of authoritative church teaching, in order to address new insights

DEREED-STH01035

from theological and medical research or new requirements of public policy.

The Directives begin with a general introduction that presents a theological basis for the Catholic health care ministry. Each of the six parts that follow is divided into two sections. The first section is in expository form; it serves as an introduction and provides the context in which concrete issues can be discussed from the perspective of the Catholic faith. The second section is in prescriptive form; the directives promote and protect the truths of the Catholic faith as those truths are brought to bear on concrete issues in health care.

## General Introduction

The Church has always sought to embody our Savior's concern for the sick. The gospel accounts of Jesus' ministry draw special attention to his acts of healing: he cleansed a man with leprosy (Mt 8:1-4; Mk 1:40-42); he gave sight to two people who were blind (Mt 20:29-34; Mk 10:46-52); he enabled one who was mute to speak (Lk 11:14); he cured a woman who was hemorrhaging (Mt 9:20-22; Mk 5:25-34); and he brought a young girl back to life (Mt 9:18, 23-25; Mk 5:35-42). Indeed, the Gospels are replete with examples of how the Lord cured every kind of ailment and disease (Mt 9:35). In the account of Matthew, Jesus' mission fulfilled the prophecy of Isaiah: "He took away our infirmities and bore our diseases" (Mt 8:17; cf. Is 53:4).

Jesus' healing mission went further than caring only for physical affliction. He touched people at the deepest level of their existence; he sought their physical, mental, and spiritual healing (Jn 6:35, 11:25-27). He "came so that they might have life and have it more abundantly" (Jn 10:10).

The mystery of Christ casts light on every facet of Catholic health care: to see Christian love as the animating principle of health care; to see healing and compassion as a continuation of Christ's mission; to see suffering as a participation in the redemptive power of Christ's passion, death, and resurrection; and to see death, transformed by the resurrection, as an opportunity for a final act of communion with Christ.

For the Christian, our encounter with suffering and death can take on a positive and distinctive meaning through the redemptive power of Jesus' suffering and death. As St. Paul says, we are "always carrying about in the body the dying of Jesus, so that the life of Jesus may also be manifested in our body" (2 Cor 4:10). This truth does not lessen the pain and fear, but gives confidence and grace for bearing suffering rather than being overwhelmed by it. Catholic health care ministry bears witness to the truth

DEREED-STH01036

that, for those who are in Christ, suffering and death are the birth pangs of the new creation. "God himself will always be with them [as their God]. He will wipe every tear from their eyes, and there shall be no more death or mourning, wailing or pain, [for] the old order has passed away" (Rev 21:3-4).

In faithful imitation of Jesus Christ, the Church has served the sick, suffering, and dying in various ways throughout history. The zealous service of individuals and communities has provided shelter for the traveler; infirmaries for the sick; and homes for children, adults, and the elderly.[3] In the United States, the many religious communities as well as dioceses that sponsor and staff this country's Catholic health care institutions and services have established an effective Catholic presence in health care. Modeling their efforts on the gospel parable of the Good Samaritan, these communities of women and men have exemplified authentic neighborliness to those in need (Lk 10:25-37). The Church seeks to ensure that the service offered in the past will be continued into the future.

While many religious communities continue their commitment to the health care ministry, lay Catholics increasingly have stepped forward to collaborate in this ministry. Inspired by the example of Christ and mandated by the Second Vatican Council, lay faithful are invited to a broader and more intense field of ministries than in the past.[4] By virtue of their Baptism, lay faithful are called to participate actively in the Church's life and mission.[5] Their participation and leadership in the health care ministry, through new forms of sponsorship and governance of institutional Catholic health care, are essential for the Church to continue her ministry of healing and compassion. They are joined in the Church's health care mission by many men and women who are not Catholic.

Catholic health care expresses the healing ministry of Christ in a specific way within the local church. Here the diocesan bishop exercises responsibilities that are rooted in his office as pastor, teacher, and priest. As the center of unity in the diocese and coordinator of ministries in the local church, the diocesan bishop fosters the mission of Catholic health care in a way that promotes collaboration among health care leaders, providers, medical professionals, theologians, and other specialists. As pastor, the diocesan bishop is in a unique position to encourage the faithful to greater responsibility in the healing ministry of the Church. As teacher, the diocesan bishop ensures the moral and religious identity of the health care ministry in whatever setting it is carried out in the diocese. As priest, the diocesan bishop oversees the sacramental care of the sick. These responsibilities will require that Catholic health care providers and the diocesan bishop engage in ongoing communication on ethical and pastoral matters that require his attention.

DEREED-STH01037

In a time of new medical discoveries, rapid technological developments, and social change, what is new can either be an opportunity for genuine advancement in human culture, or it can lead to policies and actions that are contrary to the true dignity and vocation of the human person. In consultation with medical professionals, church leaders review these developments, judge them according to the principles of right reason and the ultimate standard of revealed truth, and offer authoritative teaching and guidance about the moral and pastoral responsibilities entailed by the Christian faith.[6] While the Church cannot furnish a ready answer to every moral dilemma, there are many questions about which she provides normative guidance and direction. In the absence of a determination by the magisterium, but never contrary to church teaching, the guidance of approved authors can offer appropriate guidance for ethical decision making.

Created in God's image and likeness, the human family shares in the dominion that Christ manifested in his healing ministry. This sharing involves a stewardship over all material creation (Gn 1:26) that should neither abuse nor squander nature's resources. Through science the human race comes to understand God's wonderful work; and through technology it must conserve, protect, and perfect nature in harmony with God's purposes. Health care professionals pursue a special vocation to share in carrying forth God's life-giving and healing work.

The dialogue between medical science and Christian faith has for its primary purpose the common good of all human persons. It presupposes that science and faith do not contradict each other. Both are grounded in respect for truth and freedom. As new knowledge and new technologies expand, each person must form a correct conscience based on the moral norms for proper health care.

## PART ONE
### The Social Responsibility of Catholic Health Care Services

### Introduction

Their embrace of Christ's healing mission has led institutionally based Catholic health care services in the United States to become an integral part of the nation's health care system. Today, this complex health care system confronts a range of economic, technological, social, and moral challenges. The response of Catholic health care institutions and services to these challenges is guided by normative principles that inform the Church's healing ministry.

DEREED-STH01038

First, Catholic health care ministry is rooted in a commitment to promote and defend human dignity; this is the foundation of its concern to respect the sacredness of every human life from the moment of conception until death. The first right of the human person, the right to life, entails a right to the means for the proper development of life, such as adequate health care.[7]

Second, the biblical mandate to care for the poor requires us to express this in concrete action at all levels of Catholic health care. This mandate prompts us to work to ensure that our country's health care delivery system provides adequate health care for the poor. In Catholic institutions, particular attention should be given to the health care needs of the poor, the uninsured, and the underinsured.[8]

Third, Catholic health care ministry seeks to contribute to the common good. The common good is realized when economic, political, and social conditions ensure protection for the fundamental rights of all individuals and enable all to fulfill their common purpose and reach their common goals.[9]

Fourth, Catholic health care ministry exercises responsible stewardship of available health care resources. A just health care system will be concerned both with promoting equity of care—to assure that the right of each person to basic health care is respected—and with promoting the good health of all in the community. The responsible stewardship of health care resources can be accomplished best in dialogue with people from all levels of society, in accordance with the principle of subsidiarity and with respect for the moral principles that guide institutions and persons.

Fifth, within a pluralistic society, Catholic health care services will encounter requests for medical procedures contrary to the moral teachings of the Church. Catholic health care does not offend the rights of individual conscience by refusing to provide or permit medical procedures that are judged morally wrong by the teaching authority of the Church.

**Directives**

1. A Catholic institutional health care service is a community that provides health care to those in need of it. This service must be animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church.

2. Catholic health care should be marked by a spirit of mutual respect among care-givers that disposes them to deal with those it serves and their families with the compassion of Christ, sensitive to their vulnerability at a time of special need.

DEREED-STH01039

3. In accord with its mission, Catholic health care should distinguish itself by service to and advocacy for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable to discrimination: the poor; the uninsured and the underinsured; children and the unborn; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees. In particular, the person with mental or physical disabilities, regardless of the cause or severity, must be treated as a unique person of incomparable worth, with the same right to life and to adequate health care as all other persons.

4. A Catholic health care institution, especially a teaching hospital, will promote medical research consistent with its mission of providing health care and with concern for the responsible stewardship of health care resources. Such medical research must adhere to Catholic moral principles.

5. Catholic health care services must adopt these Directives as policy, require adherence to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction regarding the Directives for administration, medical and nursing staff, and other personnel.

6. A Catholic health care organization should be a responsible steward of the health care resources available to it. Collaboration with other health care providers, in ways that do not compromise Catholic social and moral teaching, can be an effective means of such stewardship.[10]

7. A Catholic health care institution must treat its employees respectfully and justly. This responsibility includes: equal employment opportunities for anyone qualified for the task, irrespective of a person's race, sex, age, national origin, or disability; a workplace that promotes employee participation; a work environment that ensures employee safety and well-being; just compensation and benefits; and recognition of the rights of employees to organize and bargain collectively without prejudice to the common good.

8. Catholic health care institutions have a unique relationship to both the Church and the wider community they serve. Because of the ecclesial nature of this relationship, the relevant requirements of canon law will be observed with regard to the foundation of a new Catholic health care institution; the substantial revision of the mission of an institution; and the sale, sponsorship transfer, or closure of an existing institution.

DEREED-STH01040

9. Employees of a Catholic health care institution must respect and uphold the religious mission of the institution and adhere to these Directives. They should maintain professional standards and promote the institution's commitment to human dignity and the common good.

## PART TWO
### The Pastoral and Spiritual Responsibility of Catholic Health Care

### Introduction

The dignity of human life flows from creation in the image of God (Gn 1:26), from redemption by Jesus Christ (Eph 1:10; 1 Tm 2:4-6), and from our common destiny to share a life with God beyond all corruption (1 Cor 15:42-57). Catholic health care has the responsibility to treat those in need in a way that respects the human dignity and eternal destiny of all. The words of Christ have provided inspiration for Catholic health care: "I was ill and you cared for me" (Mt 25:36). The care provided assists those in need to experience their own dignity and value, especially when these are obscured by the burdens of illness or the anxiety of imminent death.

Since a Catholic health care institution is a community of healing and compassion, the care offered is not limited to the treatment of a disease or bodily ailment but embraces the physical, psychological, social, and spiritual dimensions of the human person. The medical expertise offered through Catholic health care is combined with other forms of care to promote health and relieve human suffering. For this reason, Catholic health care extends to the spiritual nature of the person. "Without health of the spirit, high technology focused strictly on the body offers limited hope for healing the whole person."[11] Directed to spiritual needs that are often appreciated more deeply during times of illness, pastoral care is an integral part of Catholic health care. Pastoral care encompasses the full range of spiritual services, including a listening presence; help in dealing with powerlessness, pain, and alienation; and assistance in recognizing and responding to God's will with greater joy and peace. It should be acknowledged, of course, that technological advances in medicine have reduced the length of hospital stays dramatically. It follows, therefore, that the pastoral care of patients, especially administration of the sacraments, will be provided more often than not at the parish level, both before and after one's hospitalization. For this reason, it is essential that there be very cordial and cooperative relationships between the personnel of pastoral care departments and the local clergy and ministers of care.

Priests, deacons, religious, and laity exercise diverse but complementary roles in this pastoral care. Since many areas of pastoral care call upon the

DEREED-STH01041

creative response of these pastoral care-givers to the particular needs of patients or residents, the following directives address only a limited number of specific pastoral activities.

**Directives**

10. A Catholic health care organization should provide pastoral care to minister to the religious and spiritual needs of all those it serves. Pastoral care personnel—clergy, religious, and lay alike—should have appropriate professional preparation, including an understanding of these Directives.

11. Pastoral care personnel should work in close collaboration with local parishes and community clergy. Appropriate pastoral services and/or referrals should be available to all in keeping with their religious beliefs or affiliation.

12. For Catholic patients or residents, provision for the sacraments is an especially important part of Catholic health care ministry. Every effort should be made to have priests assigned to hospitals and health care institutions to celebrate the Eucharist and provide the sacraments to patients and staff.

13. Particular care should be taken to provide and to publicize opportunities for patients or residents to receive the sacrament of Penance.

14. Properly prepared lay Catholics can be appointed to serve as extraordinary ministers of Holy Communion, in accordance with canon law and the policies of the local diocese. They should assist pastoral care personnel—clergy, religious, and laity—by providing supportive visits, advising patients regarding the availability of priests for the sacrament of Penance, and distributing Holy Communion to the faithful who request it.

15. Responsive to a patient's desires and condition, all involved in pastoral care should facilitate the availability of priests to provide the sacrament of Anointing of the Sick, recognizing that through this sacrament Christ provides grace and support to those who are seriously ill or weakened by advanced age. Normally, the sacrament is celebrated when the sick person is fully conscious. It may be conferred upon the sick who have lost consciousness or the use of reason, if there is reason to believe that they would have asked for the sacrament while in control of their faculties.

DEREED-STH01042

16. All Catholics who are capable of receiving Communion should receive Viaticum when they are in danger of death, while still in full possession of their faculties.[12]

17. Except in cases of emergency (i.e., danger of death), any request for Baptism made by adults or for infants should be referred to the chaplain of the institution. Newly born infants in danger of death, including those miscarried, should be baptized if this is possible.[13] In case of emergency, if a priest or a deacon is not available, anyone can validly baptize.[14] In the case of emergency Baptism, the chaplain or the director of pastoral care is to be notified.

18. When a Catholic who has been baptized but not yet confirmed is in danger of death, any priest may confirm the person.[15]

19. A record of the conferral of Baptism or Confirmation should be sent to the parish in which the institution is located and posted in its Baptism/Confirmation registers.

20. Catholic discipline generally reserves the reception of the sacraments to Catholics. In accord with canon 844, §3, Catholic ministers may administer the sacraments of Eucharist, Penance, and Anointing of the Sick to members of the oriental churches that do not have full communion with the Catholic Church, or of other churches that in the judgment of the Holy See are in the same condition as the oriental churches, if such persons ask for the sacraments on their own and are properly disposed.

   With regard to other Christians not in full communion with the Catholic Church, when the danger of death or other grave necessity is present, the four conditions of canon 844, §4, also must be present, namely, they cannot approach a minister of their own community; they ask for the sacraments on their own; they manifest Catholic faith in these sacraments; and they are properly disposed. The diocesan bishop has the responsibility to oversee this pastoral practice.

21. The appointment of priests and deacons to the pastoral care staff of a Catholic institution must have the explicit approval or confirmation of the local bishop in collaboration with the administration of the institution. The appointment of the director of the pastoral care staff should be made in consultation with the diocesan bishop.

22. For the sake of appropriate ecumenical and interfaith relations, a diocesan policy should be developed with regard to the appointment of non-Catholic members to the pastoral care staff of

DEREED-STH01043

a Catholic health care institution. The director of pastoral care at a Catholic institution should be a Catholic; any exception to this norm should be approved by the diocesan bishop.

## PART THREE
### The Professional-Patient Relationship

### Introduction

A person in need of health care and the professional health care provider who accepts that person as a patient enter into a relationship that requires, among other things, mutual respect, trust, honesty, and appropriate confidentiality. The resulting free exchange of information must avoid manipulation, intimidation, or condescension. Such a relationship enables the patient to disclose personal information needed for effective care and permits the health care provider to use his or her professional competence most effectively to maintain or restore the patient's health. Neither the health care professional nor the patient acts independently of the other; both participate in the healing process.

Today, a patient often receives health care from a team of providers, especially in the setting of the modern acute-care hospital. But the resulting multiplication of relationships does not alter the personal character of the interaction between health care providers and the patient. The relationship of the person seeking health care and the professionals providing that care is an important part of the foundation on which diagnosis and care are provided. Diagnosis and care, therefore, entail a series of decisions with ethical as well as medical dimensions. The health care professional has the knowledge and experience to pursue the goals of healing, the maintenance of health, and the compassionate care of the dying, taking into account the patient's convictions and spiritual needs, and the moral responsibilities of all concerned. The person in need of health care depends on the skill of the health care provider to assist in preserving life and promoting health of body, mind, and spirit. The patient, in turn, has a responsibility to use these physical and mental resources in the service of moral and spiritual goals to the best of his or her ability.

When the health care professional and the patient use institutional Catholic health care, they also accept its public commitment to the Church's understanding of and witness to the dignity of the human person. The Church's moral teaching on health care nurtures a truly interpersonal professional-patient relationship. This professional-patient relationship is never separated, then, from the Catholic identity of the health care institution. The faith that inspires Catholic health care guides medical

DEREED-STH01044

decisions in ways that fully respect the dignity of the person and the relationship with the health care professional.

**Directives**

23. The inherent dignity of the human person must be respected and protected regardless of the nature of the person's health problem or social status. The respect for human dignity extends to all persons who are served by Catholic health care.

24. In compliance with federal law, a Catholic health care institution will make available to patients information about their rights, under the laws of their state, to make an advance directive for their medical treatment. The institution, however, will not honor an advance directive that is contrary to Catholic teaching. If the advance directive conflicts with Catholic teaching, an explanation should be provided as to why the directive cannot be honored.

25. Each person may identify in advance a representative to make health care decisions as his or her surrogate in the event that the person loses the capacity to make health care decisions. Decisions by the designated surrogate should be faithful to Catholic moral principles and to the person's intentions and values, or if the person's intentions are unknown, to the person's best interests. In the event that an advance directive is not executed, those who are in a position to know best the patient's wishes—usually family members and loved ones—should participate in the treatment decisions for the person who has lost the capacity to make health care decisions.

26. The free and informed consent of the person or the person's surrogate is required for medical treatments and procedures, except in an emergency situation when consent cannot be obtained and there is no indication that the patient would refuse consent to the treatment.

27. Free and informed consent requires that the person or the person's surrogate receive all reasonable information about the essential nature of the proposed treatment and its benefits; its risks, side-effects, consequences, and cost; and any reasonable and morally legitimate alternatives, including no treatment at all.

28. Each person or the person's surrogate should have access to medical and moral information and counseling so as to be able to form his or her conscience. The free and informed health care decision of the person or the person's surrogate is to be followed so long as it does not contradict Catholic principles.

DEREED-STH01045

29. All persons served by Catholic health care have the right and duty to protect and preserve their bodily and functional integrity.[16] The functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available.[17]

30. The transplantation of organs from living donors is morally permissible when such a donation will not sacrifice or seriously impair any essential bodily function and the anticipated benefit to the recipient is proportionate to the harm done to the donor. Furthermore, the freedom of the prospective donor must be respected, and economic advantages should not accrue to the donor.

31. No one should be the subject of medical or genetic experimentation, even if it is therapeutic, unless the person or surrogate first has given free and informed consent. In instances of nontherapeutic experimentation, the surrogate can give this consent only if the experiment entails no significant risk to the person's well-being. Moreover, the greater the person's incompetency and vulnerability, the greater the reasons must be to perform any medical experimentation, especially nontherapeutic.

32. While every person is obliged to use ordinary means to preserve his or her health, no person should be obliged to submit to a health care procedure that the person has judged, with a free and informed conscience, not to provide a reasonable hope of benefit without imposing excessive risks and burdens on the patient or excessive expense to family or community.[18]

33. The well-being of the whole person must be taken into account in deciding about any therapeutic intervention or use of technology. Therapeutic procedures that are likely to cause harm or undesirable side-effects can be justified only by a proportionate benefit to the patient.

34. Health care providers are to respect each person's privacy and confidentiality regarding information related to the person's diagnosis, treatment, and care.

35. Health care professionals should be educated to recognize the symptoms of abuse and violence and are obliged to report cases of abuse to the proper authorities in accordance with local statutes.

36. Compassionate and understanding care should be given to a person who is the victim of sexual assault. Health care providers should cooperate with law enforcement officials and offer the person

DEREED-STH01046

psychological and spiritual support as well as accurate medical information. A female who has been raped should be able to defend herself against a potential conception from the sexual assault. If, after appropriate testing, there is no evidence that conception has occurred already, she may be treated with medications that would prevent ovulation, sperm capacitation, or fertilization. It is not permissible, however, to initiate or to recommend treatments that have as their purpose or direct effect the removal, destruction, or interference with the implantation of a fertilized ovum.[19]

37. An ethics committee or some alternate form of ethical consultation should be available to assist by advising on particular ethical situations, by offering educational opportunities, and by reviewing and recommending policies. To these ends, there should be appropriate standards for medical ethical consultation within a particular diocese that will respect the diocesan bishop's pastoral responsibility as well as assist members of ethics committees to be familiar with Catholic medical ethics and, in particular, these Directives.

## PART FOUR
### Issues in Care for the Beginning of Life

### Introduction

The Church's commitment to human dignity inspires an abiding concern for the sanctity of human life from its very beginning, and with the dignity of marriage and of the marriage act by which human life is transmitted. The Church cannot approve medical practices that undermine the biological, psychological, and moral bonds on which the strength of marriage and the family depends.

Catholic health care ministry witnesses to the sanctity of life "from the moment of conception until death."[20] The Church's defense of life encompasses the unborn and the care of women and their children during and after pregnancy. The Church's commitment to life is seen in its willingness to collaborate with others to alleviate the causes of the high infant mortality rate and to provide adequate health care to mothers and their children before and after birth.

The Church has the deepest respect for the family, for the marriage covenant, and for the love that binds a married couple together. This includes respect for the marriage act by which husband and wife express

DEREED-STH01047

their love and cooperate with God in the creation of a new human being. The Second Vatican Council affirms:

> This love is an eminently human one. . . . It involves the good of the whole person. . . . The actions within marriage by which the couple are united intimately and chastely are noble and worthy ones. Expressed in a manner which is truly human, these actions signify and promote that mutual self-giving by which spouses enrich each other with a joyful and a thankful will.[21]

> Marriage and conjugal love are by their nature ordained toward the begetting and educating of children. Children are really the supreme gift of marriage and contribute very substantially to the welfare of their parents. . . . Parents should regard as their proper mission the task of transmitting human life and educating those to whom it has been transmitted. . . . They are thereby cooperators with the love of God the Creator, and are, so to speak, the interpreters of that love.[22]

For legitimate reasons of responsible parenthood, married couples may limit the number of their children by natural means. The Church cannot approve contraceptive interventions that "either in anticipation of the marital act, or in its accomplishment or in the development of its natural consequences, have the purpose, whether as an end or a means, to render procreation impossible."[23] Such interventions violate "the inseparable connection, willed by God . . . between the two meanings of the conjugal act: the unitive and procreative meaning."[24]

With the advance of the biological and medical sciences, society has at its disposal new technologies for responding to the problem of infertility. While we rejoice in the potential for good inherent in many of these technologies, we cannot assume that what is technically possible is always morally right. Reproductive technologies that substitute for the marriage act are not consistent with human dignity. Just as the marriage act is joined naturally to procreation, so procreation is joined naturally to the marriage act. As Pope John XXIII observed:

> The transmission of human life is entrusted by nature to a personal and conscious act and as such is subject to all the holy laws of God: the immutable and inviolable laws which must be recognized and observed. For this reason, one cannot use means and follow methods which could be licit in the transmission of the life of plants and animals.[25]

DEREED-STH01048

Because the moral law is rooted in the whole of human nature, human persons, through intelligent reflection on their own spiritual destiny, can discover and cooperate in the plan of the Creator.[26]

## Directives

38. When the marital act of sexual intercourse is not able to attain its procreative purpose, assistance that does not separate the unitive and procreative ends of the act, and does not substitute for the marital act itself, may be used to help married couples conceive.[27]

39. Those techniques of assisted conception that respect the unitive and procreative meanings of sexual intercourse and do not involve the destruction of human embryos, or their deliberate generation in such numbers that it is clearly envisaged that all cannot implant and some are simply being used to maximize the chances of others implanting, may be used as therapies for infertility.

40. Heterologous fertilization (that is, any technique used to achieve conception by the use of gametes coming from at least one donor other than the spouses) is prohibited because it is contrary to the covenant of marriage, the unity of the spouses, and the dignity proper to parents and the child.[28]

41. Homologous artificial fertilization (that is, any technique used to achieve conception using the gametes of the two spouses joined in marriage) is prohibited when it separates procreation from the marital act in its unitive significance (e.g., any technique used to achieve extra-corporeal conception).[29]

42. Because of the dignity of the child and of marriage, and because of the uniqueness of the mother-child relationship, participation in contracts or arrangements for surrogate motherhood is not permitted. Moreover, the commercialization of such surrogacy denigrates the dignity of women, especially the poor.[30]

43. A Catholic health care institution that provides treatment for infertility should offer not only technical assistance to infertile couples but also should help couples pursue other solutions (e.g., counseling, adoption).

44. A Catholic health care institution should provide prenatal, obstetric, and postnatal services for mothers and their children in a manner consonant with its mission.

45. Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable

DEREED-STH01049

fetus) is never permitted. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion, which, in its moral context, includes the interval between conception and implantation of the embryo. Catholic health care institutions are not to provide abortion services, even based upon the principle of material cooperation. In this context, Catholic health care institutions need to be concerned about the danger of scandal in any association with abortion providers.

46. Catholic health care providers should be ready to offer compassionate physical, psychological, moral, and spiritual care to those persons who have suffered from the trauma of abortion.

47. Operations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child.

48. In case of extrauterine pregnancy, no intervention is morally licit which constitutes a direct abortion.[31]

49. For a proportionate reason, labor may be induced after the fetus is viable.

50. Prenatal diagnosis is permitted when the procedure does not threaten the life or physical integrity of the unborn child or the mother and does not subject them to disproportionate risks; when the diagnosis can provide information to guide preventative care for the mother or pre- or postnatal care for the child; and when the parents, or at least the mother, give free and informed consent. Prenatal diagnosis is not permitted when undertaken with the intention of aborting an unborn child with a serious defect.[32]

51. Nontherapeutic experiments on a living embryo or fetus are not permitted, even with the consent of the parents. Therapeutic experiments are permitted for a proportionate reason with the free and informed consent of the parents or, if the father cannot be contacted, at least of the mother. Medical research that will not harm the life or physical integrity of an unborn child is permitted with parental consent.[33]

52. Catholic health institutions may not promote or condone contraceptive practices but should provide, for married couples and the medical staff who counsel them, instruction both about the Church's teaching on responsible parenthood and in methods of natural family planning.

DEREED-STH01050

53. Direct sterilization of either men or women, whether permanent or temporary, is not permitted in a Catholic health care institution. Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available.[34]

54. Genetic counseling may be provided in order to promote responsible parenthood and to prepare for the proper treatment and care of children with genetic defects, in accordance with Catholic moral teaching and the intrinsic rights and obligations of married couples regarding the transmission of life.

## PART FIVE
## Issues in Care for the Dying

### Introduction

Christ's redemption and saving grace embrace the whole person, especially in his or her illness, suffering, and death.[35] The Catholic health care ministry faces the reality of death with the confidence of faith. In the face of death—for many, a time when hope seems lost—the Church witnesses to her belief that God has created each person for eternal life.[36]

Above all, as a witness to its faith, a Catholic health care institution will be a community of respect, love, and support to patients or residents and their families as they face the reality of death. What is hardest to face is the process of dying itself, especially the dependency, the helplessness, and the pain that so often accompany terminal illness. One of the primary purposes of medicine in caring for the dying is the relief of pain and the suffering caused by it. Effective management of pain in all its forms is critical in the appropriate care of the dying.

The truth that life is a precious gift from God has profound implications for the question of stewardship over human life. We are not the owners of our lives and, hence, do not have absolute power over life. We have a duty to preserve our life and to use it for the glory of God, but the duty to preserve life is not absolute, for we may reject life-prolonging procedures that are insufficiently beneficial or excessively burdensome. Suicide and euthanasia are never morally acceptable options.

The task of medicine is to care even when it cannot cure. Physicians and their patients must evaluate the use of the technology at their disposal. Reflection on the innate dignity of human life in all its dimensions and on the purpose of medical care is indispensable for formulating a true moral judgment about the use of technology to maintain life. The use of life-

DEREED-STH01051

sustaining technology is judged in light of the Christian meaning of life, suffering, and death. Only in this way are two extremes avoided: on the one hand, an insistence on useless or burdensome technology even when a patient may legitimately wish to forgo it and, on the other hand, the withdrawal of technology with the intention of causing death.[37]

Some state Catholic conferences, individual bishops, and the USCCB Committee on Pro-Life Activities (formerly an NCCB committee) have addressed the moral issues concerning medically assisted hydration and nutrition. The bishops are guided by the Church's teaching forbidding euthanasia, which is "an action or an omission which of itself or by intention causes death, in order that all suffering may in this way be eliminated."[38] These statements agree that hydration and nutrition are not morally obligatory either when they bring no comfort to a person who is imminently dying or when they cannot be assimilated by a person's body. The USCCB Committee on Pro-Life Activities' report, in addition, points out the necessary distinctions between questions already resolved by the magisterium and those requiring further reflection, as, for example, the morality of withdrawing medically assisted hydration and nutrition from a person who is in the condition that is recognized by physicians as the "persistent vegetative state" (PVS).[39]

**Directives**

55. Catholic health care institutions offering care to persons in danger of death from illness, accident, advanced age, or similar condition should provide them with appropriate opportunities to prepare for death. Persons in danger of death should be provided with whatever information is necessary to help them understand their condition and have the opportunity to discuss their condition with their family members and care providers. They should also be offered the appropriate medical information that would make it possible to address the morally legitimate choices available to them. They should be provided the spiritual support as well as the opportunity to receive the sacraments in order to prepare well for death.

56. A person has a moral obligation to use ordinary or proportionate means of preserving his or her life. Proportionate means are those that in the judgment of the patient offer a reasonable hope of benefit and do not entail an excessive burden or impose excessive expense on the family or the community.[40]

57. A person may forgo extraordinary or disproportionate means of preserving life. Disproportionate means are those that in the patient's judgment do not offer a reasonable hope of benefit or

DEREED-STH01052

entail an excessive burden, or impose excessive expense on the family or the community.[41]

58. There should be a presumption in favor of providing nutrition and hydration to all patients, including patients who require medically assisted nutrition and hydration, as long as this is of sufficient benefit to outweigh the burdens involved to the patient.

59. The free and informed judgment made by a competent adult patient concerning the use or withdrawal of life-sustaining procedures should always be respected and normally complied with, unless it is contrary to Catholic moral teaching.

60. Euthanasia is an action or omission that of itself or by intention causes death in order to alleviate suffering. Catholic health care institutions may never condone or participate in euthanasia or assisted suicide in any way. Dying patients who request euthanasia should receive loving care, psychological and spiritual support, and appropriate remedies for pain and other symptoms so that they can live with dignity until the time of natural death.[42]

61. Patients should be kept as free of pain as possible so that they may die comfortably and with dignity, and in the place where they wish to die. Since a person has the right to prepare for his or her death while fully conscious, he or she should not be deprived of consciousness without a compelling reason. Medicines capable of alleviating or suppressing pain may be given to a dying person, even if this therapy may indirectly shorten the person's life so long as the intent is not to hasten death. Patients experiencing suffering that cannot be alleviated should be helped to appreciate the Christian understanding of redemptive suffering.

62. The determination of death should be made by the physician or competent medical authority in accordance with responsible and commonly accepted scientific criteria.

63. Catholic health care institutions should encourage and provide the means whereby those who wish to do so may arrange for the donation of their organs and bodily tissue, for ethically legitimate purposes, so that they may be used for donation and research after death.

64. Such organs should not be removed until it has been medically determined that the patient has died. In order to prevent any conflict of interest, the physician who determines death should not be a member of the transplant team.

DEREED-STH01053

65. use of tissue or organs from an infant may be permitted after death has been determined and with the informed consent of the parents or guardians.

66. Catholic health care institutions should not make use of human tissue obtained by direct abortions even for research and therapeutic purposes.[43]

## PART SIX
### Forming New Partnerships with Health Care Organizations and Providers

### Introduction

Until recently, most health care providers enjoyed a degree of independence from one another. In ever-increasing ways, Catholic health care providers have become involved with other health care organizations and providers. For instance, many Catholic health care systems and institutions share in the joint purchase of technology and services with other local facilities or physicians' groups. Another phenomenon is the growing number of Catholic health care systems and institutions joining or co-sponsoring integrated delivery networks or managed care organizations in order to contract with insurers and other health care payers. In some instances, Catholic health care systems sponsor a health care plan or health maintenance organization. In many dioceses, new partnerships will result in a decrease in the number of health care providers, at times leaving the Catholic institution as the sole provider of health care services. At whatever level, new partnerships forge a variety of interwoven relationships: between the various institutional partners, between health care providers and the community, between physicians and health care services, and between health care services and payers.

On the one hand, new partnerships can be viewed as opportunities for Catholic health care institutions and services to witness to their religious and ethical commitments and so influence the healing profession. For example, new partnerships can help to implement the Church's social teaching. New partnerships can be opportunities to realign the local delivery system in order to provide a continuum of health care to the community; they can witness to a responsible stewardship of limited health care resources; and they can be opportunities to provide to poor and vulnerable persons a more equitable access to basic care.

On the other hand, new partnerships can pose serious challenges to the viability of the identity of Catholic health care institutions and services, and their ability to implement these Directives in a consistent way,

DEREED-STH01054

especially when partnerships are formed with those who do not share Catholic moral principles. The risk of scandal cannot be underestimated when partnerships are not built upon common values and moral principles. Partnership opportunities for some Catholic health care providers may even threaten the continued existence of other Catholic institutions and services, particularly when partnerships are driven by financial considerations alone. Because of the potential dangers involved in the new partnerships that are emerging, an increased collaboration among Catholic-sponsored health care institutions is essential and should be sought before other forms of partnerships.

The significant challenges that new partnerships may pose, however, do not necessarily preclude their possibility on moral grounds. The potential dangers require that new partnerships undergo systematic and objective moral analysis, which takes into account the various factors that often pressure institutions and services into new partnerships that can diminish the autonomy and ministry of the Catholic partner. The following directives are offered to assist institutionally based Catholic health care services in this process of analysis. To this end, the United States Conference of Catholic Bishops has established the Ad Hoc Committee on Health Care Issues and the Church as a resource for bishops and health care leaders.

This new edition of the *Ethical and Religious Directives* omits the appendix concerning cooperation, which was contained in the 1995 edition. Experience has shown that the brief articulation of the principles of cooperation that was presented there did not sufficiently forestall certain possible misinterpretations and in practice gave rise to problems in concrete applications of the principles. Reliable theological experts should be consulted in interpreting and applying the principles governing cooperation, with the proviso that, as a rule, Catholic partners should avoid entering into partnerships that would involve them in cooperation with the wrongdoing of other providers.

**Directives**

67. Decisions that may lead to serious consequences for the identity or reputation of Catholic health care services, or entail the high risk of scandal, should be made in consultation with the diocesan bishop or his health care liaison.

68. Any partnership that will affect the mission or religious and ethical identity of Catholic health care institutional services must respect church teaching and discipline. Diocesan bishops and other church authorities should be involved as such partnerships are developed, and the diocesan bishop should give the appropriate authorization before they are completed. The diocesan bishop's approval is

DEREED-STH01055

required for partnerships sponsored by institutions subject to his governing authority; for partnerships sponsored by religious institutes of pontifical right, his *nihil obstat* should be obtained.

69. If a Catholic health care organization is considering entering into an arrangement with another organization that may be involved in activities judged morally wrong by the Church, participation in such activities, must be limited to what is in accord with the moral principles governing cooperation.

70. Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization.[44]

71. The possibility of scandal must be considered when applying the principles governing cooperation.[45] Cooperation, which in all other respects is morally licit, may need to be refused because of the scandal that might be caused. Scandal can sometimes be avoided by an appropriate explanation of what is in fact being done at the health care facility under Catholic auspices. The diocesan bishop has final responsibility for assessing and addressing issues of scandal, considering not only the circumstances in his local diocese but also the regional and national implications of his decision.[46]

72. The Catholic partner in an arrangement has the responsibility periodically to assess whether the binding agreement is being observed and implemented in a way that is consistent with Catholic teaching.

## Conclusion

Sickness speaks to us of our limitations and human frailty. It can take the form of infirmity resulting from the simple passing of years or injury from the exuberance of youthful energy. It can be temporary or chronic, debilitating, and even terminal. Yet the follower of Jesus faces illness and the consequences of the human condition aware that our Lord always shows compassion toward the infirm.

Jesus not only taught his disciples to be compassionate, but he also told them who should be the special object of their compassion. The parable of the feast with its humble guests was preceded by the instruction: "When you hold a banquet, invite the poor, the crippled, the lame, the blind" (Lk 14:13). These were people whom Jesus healed and loved.

DEREED-STH01056

Catholic health care is a response to the challenge of Jesus to go and do likewise. Catholic health care services rejoice in the challenge to be Christ's healing compassion in the world and see their ministry not only as an effort to restore and preserve health but also as a spiritual service and a sign of that final healing that will one day bring about the new creation that is the ultimate fruit of Jesus' ministry and God's love for us.

## Notes

1. National Conference of Catholic Bishops, *Health and Health Care: A Pastoral Letter of the American Catholic Bishops* (Washington, D.C.: United States Catholic Conference, 1981).

2. Health care services under Catholic auspices are carried out in a variety of institutional settings (e.g., hospitals, clinics, out-patient facilities, urgent care centers, hospices, nursing homes, and parishes). Depending on the context, these Directives will employ the terms "institution" and/or "services" in order to encompass the variety of settings in which Catholic health care is provided.

3. *Health and Health Care*, p. 5.

4. Second Vatican Ecumenical Council, *Decree on the Apostolate of the Laity (Apostolicam Actuositatem)* (1965), no. 1.

5. Pope John Paul II, Post-Synodal Apostolic Exhortation, *On the Vocation and the Mission of the Lay Faithful in the Church and in the World (Christifideles Laici)* (Washington, D.C.: United States Catholic Conference, 1988), no. 29.

6. As examples, see Congregation for the Doctrine of the Faith, *Declaration on Procured Abortion* (1974); Congregation for the Doctrine of the Faith, *Declaration on Euthanasia* (1980); Congregation for the Doctrine of the Faith, *Instruction on Respect for Human Life in its Origin and on the Dignity of Procreation: Replies to Certain Questions of the Day (Donum Vitae)* (Washington, D.C.: United States Catholic Conference, 1987).

7. Pope John XXIII, Encyclical Letter, *Peace on Earth (Pacem in Terris)* (Washington, D.C.: United States Catholic Conference, 1963), no. 11; *Health and Health Care*, pp. 5, 17-18; *Catechism of the Catholic Church*, 2nd ed. (Washington, D.C.: United States Catholic Conference, 2000), no. 2211.

8. Pope John Paul II, *On Social Concern, Encyclical Letter on the Occasion of the Twentieth Anniversary of "Populorum Progressio"*

*(Sollicitudo Rei Socialis)* (Washington, D.C.: United States Catholic Conference, 1988), no. 43.

9. National Conference of Catholic Bishops, *Economic Justice for All: Pastoral Letter on Catholic Social Teaching and the U.S. Economy* (Washington, D.C.: United States Catholic Conference, 1986), no. 80.

10. The duty of responsible stewardship demands responsible collaboration. But in collaborative efforts, Catholic institutionally based health care services must be attentive to occasions when the policies and practices of other institutions are not compatible with the Church's authoritative moral teaching. At such times, Catholic health care institutions should determine whether or to what degree collaboration would be morally permissible. To make that judgment, the governing boards of Catholic institutions should adhere to the moral principles on cooperation. See Part Six.

11. *Health and Health Care*, p. 12.

12. Cf. *Code of Canon Law*, cc. 921-923.

13. Cf. ibid., c. 867, § 2, and c. 871.

14. To confer Baptism in an emergency, one must have the proper intention (to do what the Church intends by Baptism) and pour water on the head of the person to be baptized, meanwhile pronouncing the words: "I baptize you in the name of the Father, and of the Son, and of the Holy Spirit."

15. Cf. c. 883, 3 .

16. For example, while the donation of a kidney represents loss of biological integrity, such a donation does not compromise functional integrity since human beings are capable of functioning with only one kidney.

17. Cf. directive 53.

18. *Declaration on Euthanasia*, Part IV; cf. also directives 56-57.

19. It is recommended that a sexually assaulted woman be advised of the ethical restrictions that prevent Catholic hospitals from using abortifacient procedures; cf. Pennsylvania Catholic Conference, "Guidelines for Catholic Hospitals Treating Victims of Sexual Assault," *Origins* 22 (1993): 810.

DEREED-STH01058

20. Pope John Paul II, "Address of October 29, 1983, to the 35th General Assembly of the World Medical Association," *Acta Apostolicae Sedis* 76 (1984): 390.

21. Second Vatican Ecumenical Council, "Pastoral Constitution on the Church in the Modern World" (*Gaudium et Spes*) (1965), no. 49.

22. Ibid., no. 50.

23. Pope Paul VI, Encyclical Letter, *On the Regulation of Birth (Humanae Vitae)* (Washington, D.C.: United States Catholic Conference, 1968), no. 14.

24. Ibid., no. 12.

25. Pope John XXIII, Encyclical Letter, *Mater et Magistra* (1961), no. 193, quoted in Congregation for the Doctrine of the Faith, *Donum Vitae*, no. 4.

26. Pope John Paul II, Encyclical Letter, *The Splendor of Truth (Veritatis Splendor)* (Washington, D.C.: United States Catholic Conference, 1993), no. 50.

27. "Homologous artificial insemination within marriage cannot be admitted except for those cases in which the technical means is not a substitute for the conjugal act but serves to facilitate and to help so that the act attains its natural purpose" (*Donum Vitae*, Part II, B, no. 6; cf. also Part I, nos. 1, 6).

28. Ibid., Part II, A, no. 2.

29. "Artificial insemination as a substitute for the conjugal act is prohibited by reason of the voluntarily achieved dissociation of the two meanings of the conjugal act. Masturbation, through which the sperm is normally obtained, is another sign of this dissociation: even when it is done for the purpose of procreation, the act remains deprived of its unitive meaning: 'It lacks the sexual relationship called for by the moral order, namely, the relationship which realizes "the full sense of mutual self-giving and human procreation in the context of true love"'" (*Donum Vitae*, Part II, B, no. 6).

30. Ibid., Part II, A, no. 3.

31. Cf. directive 45.

32. *Donum Vitae*, Part I, no. 2.

DEREED-STH01059

33. Cf. ibid., no. 4.

34. Cf. Congregation for the Doctrine of the Faith, "Responses on Uterine Isolation and Related Matters," July 31, 1993, *Origins* 24 (1994): 211-212.

35. Pope John Paul II, Apostolic Letter, *On the Christian Meaning of Human Suffering (Salvifici Doloris)* (Washington, D.C.: United States Catholic Conference, 1984), nos. 25-27.

36. National Conference of Catholic Bishops, *Order of Christian Funerals* (Collegeville, Minn.: The Liturgical Press, 1989), no. 1.

37. *Declaration on Euthanasia.*

38. Ibid., Part II, p. 4.

39. Committee for Pro-Life Activities, National Conference of Catholic Bishops, *Nutrition and Hydration: Moral and Pastoral Reflections* (Washington, D.C.: United States Catholic Conference, 1992). On the importance of consulting authoritative teaching in the formation of conscience and in taking moral decisions, see *Veritatis Splendor*, nos. 63-64.

40. *Declaration on Euthanasia*, Part IV.

41. Ibid.

42. Cf. ibid.

43. *Donum Vitae*, Part I, no. 4.

44. While there are many acts of varying moral gravity that can be identified as intrinsically evil, in the context of contemporary health care the most pressing concerns are currently abortion, euthanasia, assisted suicide, and direct sterilization. See Pope John Paul II's *Ad Limina* Address to the bishops of Texas, Oklahoma, and Arkansas (Region X), in *Origins* 28 (1998): 283. See also "Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" (*Quaecumque Sterilizatio*), March 13, 1975, *Origins* 10 (1976): 33-35: "Any cooperation institutionally approved or tolerated in actions which are in themselves, that is, by their nature and condition, directed to a contraceptive end . . . is absolutely forbidden. For the official approbation of direct sterilization and, a *fortiori*, its management and execution in accord with hospital regulations, is a matter which, in the objective order, is by its very nature (or intrinsically) evil." This directive supersedes the "Commentary on the Reply of

DEREED-STH01060

the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" published by the National Conference of Catholic Bishops on September 15, 1977 in *Origins* 11 (1977): 399-400.

45. See *Catechism of the Catholic Church*: "Scandal is an attitude or behavior which leads another to do evil" (no. 2284); "Anyone who uses the power at his disposal in such a way that it leads others to do wrong becomes guilty of scandal and responsible for the evil that he has directly or indirectly encouraged" (no. 2287).

46. See "The Pastoral Role of the Diocesan Bishop in Catholic Health Care Ministry," *Origins* 26 (1997): 703.

August 29, 2003 Copyright © by United States Conference of Catholic Bishops

DEREED-STH01061