**In the Matter Of:**

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

---

**VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D.**

*March 04, 2016*

---



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 2 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 1

1              UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3                    ---oOo---

4

5    IN RE:  NEW ENGLAND
     COMPOUNDING PHARMACY, INC.
6    PRODUCTS LIABILITY LITIGATION,
                                      MDL No. 2419
7                                     Master Dkt:
                                      1:13-md-02419-RWZ
8    ------------------------------
     THIS DOCUMENT RELATES TO:
9

10   All Actions

11   ------------------------------

12

13

14            VIDEOTAPED DEPOSITION OF
                DAVID A. KESSLER, M.D.
15

16                   9:00 a.m.
17                 March 4, 2016

18

19
                     Suite 2900
20                 275 Battery Street
               San Francisco, California
21

22

23      GINA V. CARBONE, CSR #8249, RMR, CRR, CCRR

24

25



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              A P P E A R A N C E S

 2

 3   On Behalf of The Plaintiffs:

 4       LIEFF, CABRASER, HEIMANN & BERNSTEIN
         By:  MARK P. CHALOS
 5       and  DONALD C. ARBITBLIT
         and  ANNIKA K. MARTIN
 6       275 Battery Street, 29th Floor
         San Francisco, California 94111-3339
 7       (415) 212-355-9500
         mchalos@lchb.com
 8       darbitblit@lchb.com
         akmartin@lchb.com

 9

10

11   On Behalf of Saint Thomas Outpatient Neurosurgical
     Center, LLC; Howell Allen, a Professional Corporation;
12   John W. Culclasure, M.D.; Debra V. Schamberg, RN:

13       GIDEON, COOPER & ESSARY
         By:  CLARENCE J. "C.J." GIDEON, JR.
14       and  KAYCEE L. WEETER
         315 Deaderick Street, Suite 1100
15       Nashville, Tennessee 37238
         (615) 254-0400
16       cj@gideoncooper.com
         kaycee@gideoncooper.com

17

18

19   On Behalf of St. Thomas Health, St. Thomas Network,
     St. Thomas West Hospital f/k/a St. Thomas Hospital:

20
         NORTON, ROSE, FULBRIGHT
21       By:  STACEY A. MARTINEZ
         98 San Jacinto Boulevard, Suite 1100
22       Austin, Texas 78701
         (512) 474-5201
23       stacey.martinez@nortonrosefulbright.com

24

25   //
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   APPEARANCES (continued)

 2


 3   On Behalf of Specialty Surgery Center - Crossville,
     PLLC; Kenneth R. Lister, M.D.; Kenneth R. Lister, M.D.,
 4   PC:

 5       BREWER KRAUSE BROOKS & CHASTAIN PLLC
         By:  ASHLEY E. GENO
 6       611 Commerce Street, Suite 2600
         Nashville, Tennessee 37203
 7       (615) 630-7728
         ageno@bkblaw.com
 8


 9


10   ALSO PRESENT:  ALAN DIAS, videographer

11


12                    --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 5 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 4

```
 1                    INDEX OF EXAMINATION

 2

 3   DEPOSITION OF DAVID A. KESSLER, M.D.

 4   EXAMINATION BY:                                  PAGE

 5          MR. GIDEON                                   9

 6

 7                     --oOo--

 8

 9                    INDEX OF EXHIBITS

10   FOR IDENTIFICATION                               PAGE

11   EXHIBIT 1232 A letter dated March 3, 2016 from     10
                  U.S. Department of Justice
12
     EXHIBIT 1233 Notice of Deposition of David A.      17
13                Kessler, M.D.

14   EXHIBIT 1234 A series of emails Bates              49
                  FDA_E00428907 - FDA_E00428909
15
     EXHIBIT 1235 Chapter V - Drugs and Devices, 21     49
16                U.S.C. 351

17   EXHIBIT 1236 Addendum to Appendix - C Materials    49
                  Considered
18
     EXHIBIT 1237 Various congressional transcripts     49
19                excerpts Bates FDA_E00424471 -
                  FDA_E00424472 and FDA_E00424421 -
20                FDA_E00424427

21   EXHIBIT 1238 An ASHP document entitled             49
                  Methylprednisolone Acetate Injection
22                dated 26 July 2012

23   EXHIBIT 1239 A letter dated July 25, 2003 from     49
                  Davis Wright Tremaine LLP
24

25   //
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 6 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 5

INDEX OF EXHIBITS (continued)

FOR IDENTIFICATION                                                    PAGE

EXHIBIT 1240 A letter dated July 25, 2003 from          49
             Davis Wright Tremaine LLP

EXHIBIT 1241 A memo dated May 30, 1995, Subject:        66
             Public Issues Update May 22 - 26,
             1995 Bates 52260 7446 - 52260 7451

EXHIBIT 1242 United States of America v. Franck's       66
             Lab, Inc. Order

EXHIBIT 1243 U.S. Pharmacist publication The FDA        66
             Mandate: Never Give Up, Never

EXHIBIT 1244 U.S. Pharmacist publication FDA            66
             Tries to Compound the Compounding
             Rules

EXHIBIT 1245 David A. Kessler v. J. Michael             66
             Bishop, Robert Dynes, Mark Yudof,
             "Jane/John Doe" Complaint and Demand
             for Jury Trial December 12, 2008

EXHIBIT 1246 David A. Kessler v. J. Michael             68
             Bishop, et al. Order Granting
             Defendants' Motion for Summary
             Judgment: Requiring Plaintiff's
             Opposition Papers to be Filed

EXHIBIT 1247 An email dated September 27, 2010          81
             from Jason Salvucci to Debra
             Schamberg with attachments

EXHIBIT 1248 Appendix - B Prior Testimony              110

EXHIBIT 1249 21 U.S.C.A. § 396 Effective:   June       140
             22, 2009

EXHIBIT 1250 Exhibit F Expert Report David A.          159
             Kessler, M.D.

EXHIBIT 1251 Compliance Policy Guide Manual            162
             Section 460.200 Pharmacy Compounding

//



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 7 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 6

```
 1              INDEX OF EXHIBITS (continued)

 2    FOR IDENTIFICATION                                  PAGE

 3    EXHIBIT 1252 A letter to Susan Liner dated          175
                   February 18, 2003 Bates BORP0016762
 4                 - BORP0016764; A letter to Susan
                   Liner dated March 17, 2003 Bates
 5                 BORP0016816 - BORP0016817

 6    EXHIBIT 1253 A hard drive provided by Dr.           178
                   Kessler, the contents of which will
 7                 be transmitted electronically by
                   counsel and not attached to the
 8                 transcript

 9    EXHIBIT 1254 A series of emails with various        219
                   MEDICAL SALES MANAGEMENT Bates
10                 numbers

11    EXHIBIT 1255 21 U.S.C.A. § 360 Effective: July 9,   244
                   2012
12
      EXHIBIT 1256 Suggested Formula for                  252
13                 Methylprednisolone Acetate 80 mg/mL
                   Injection Suspension
14
      EXHIBIT 1257 FDA alerts health care professionals   272
15                 not to use sterile drug products
                   from Cape Apothecary, Inc., in
16                 Annapolis, MD

17    EXHIBIT 1258 Complaints FDA Received Associated     275
                   with NECC and Ameridose
18
      EXHIBIT 1259 A series of emails Bates               292
19                 FDA_E00426108 - FDA_E00426109

20    EXHIBIT 1260 A series of emails Bates               310
                   FDA_E00426077 - FDA_E00426078
21
      EXHIBIT 1261 A series of emails Bates               314
22                 FDA_E00427667

23    EXHIBIT 1262 A series of emails Bates               316
                   FDA-E00426106 - FDA_E00426107
24

25    //
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 8 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 7

1              INDEX OF EXHIBITS (continued)

2    FOR IDENTIFICATION                                      PAGE

3    EXHIBIT 1263 An email with attachments Bates            336
                  FDA_E00434732 - FDA_E00434736
4
     EXHIBIT 1264 A photocopy of Dr. Kessler's              345
5                  handwritten notes and various
                   printouts
6

7

8                         --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 9 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 8

```
 1        VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D.
                       MARCH 4, 2016
 2

 3             THE VIDEOGRAPHER:  Good morning.  We are on the

 4    video record at 9:00 a.m.  Today is March 4th, 2016.

 5    This is a matter pending before the United States

 6    District Court for the District of Massachusetts, case

 7    No. MDL 2419.

 8             We are located today at 275 Battery Street, the

 9    city of San Francisco, California.

10             My name is Alan Dias from Discovery Litigation

11    Services.

12             Counsel, would you please identify yourself for

13    the record.

14             MR. CHALOS:  Mark Chalos for the plaintiff

15    steering committee.

16             MR. ARBITBLIT:  Don Arbitblit for plaintiffs.

17             MS. MARTIN:  Annika Martin for the plaintiffs.

18             MS. GENO:  Ashley Geno for SSC and Dr. Lister.

19             MS. MARTINEZ:  Stacey Martinez on behalf of

20    St. Thomas Health, St. Thomas West Hospital, and

21    St. Thomas Network.

22             MR. GIDEON:  C.J. Gideon and Kaycee Weeter for

23    Howell Allen, Saint Thomas Outpatient Neurosurgical

24    Center, Debbie Schamberg, John Culclasure, SSC, Ken

25    Lister.
```



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 10 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 9

```
 1              THE VIDEOGRAPHER:  Will the court reporter
 2   please swear in the witness.
 3
 4                   DAVID A. KESSLER, M.D.,
 5                 having been sworn, was
 6              examined and testified as follows:
 7
 8                   EXAMINATION BY MR. GIDEON
 9              MR. GIDEON:  Is there something you wanted to
10   say on the record before we got started?
11              THE WITNESS:  I do think we should -- I'd ask
12   counsel to discuss the letter you received from the
13   Department of Justice, and I would like that to be on
14   the record and I'd like to address certain issues.
15              MR. GIDEON:  Okay.
16              MR. ARBITBLIT:  So, Counsel, we are getting
17   copies made of the DOJ letter.  We'd like it to be
18   marked as an exhibit.  And I wanted it to be on the
19   record that counsel for the DOJ had asked us to instruct
20   Dr. Kessler not to disclose any information that would
21   waive any privilege that the government might have.
22              We have not acknowledged that there is such a
23   privilege, or that he might waive it, but we wanted the
24   DOJ's position to be on the record.  And if you have no
25   objection, we'd have that letter marked as an exhibit.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 11 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 10

```
 1    And we have copies for counsel.
 2            MR. CHALOS:  What's the exhibit number?
 3            MS. WEETER:  1232.
 4            (Whereupon, Exhibit 1232 was marked for
 5            identification.)
 6            MR. GIDEON:  And, Don, you are referring to the
 7    letter we got yesterday from David Glass?
 8            MR. ARBITBLIT:  Yes.  Dated March 3rd, 2016
 9    from David Glass, senior trial counsel.
10            And what we would ask, subject to your
11    agreement, is that the deposition be shareable with
12    counsel and their experts, but subject to an
13    acknowledgment that we're going to give the DOJ a --
14    some reasonable period, like ten days, to let us know if
15    they have any problems or think that there's any issue
16    they want to raise with the court.
17            If they don't find, the deposition becomes just
18    a standard transcript.  If they do, then the transcript,
19    as previously mentioned, would be shareable with experts
20    so that they would know what other experts are saying,
21    but we would agree to keep it sealed until the court has
22    a chance to rule on anything the DOJ might say.
23            Does that seem reasonable?
24            MR. GIDEON:  I think it's already covered in
25    the order -- the protective order in this case.  My
```



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 12 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 11

1    understanding is all the depositions remain confidential

2    for 30 days.  Isn't that right, Mark?

3          MR. CHALOS:  Yeah, I think that's right.  But I

4    think the only nuance here is that this would be a

5    nonparty making an assertion of some kind of privilege,

6    and I'm not sure that was contemplated by the original

7    protective order.

8          MR. GIDEON:  I don't think it was, but I will

9    agree on behalf of my clients that we will treat this as

10   confidential with the exception of giving it to our

11   experts and clients for the next 30 days.  And then if

12   David Glass or somebody else has some criticisms or

13   complaints, they can take it up in that time frame.

14         MR. ARBITBLIT:  The other thing I wanted to

15   mention is that Dr. Kessler has only reviewed documents

16   that were available through the public record, either

17   through the FDA's website or the response of the FDA

18   through the Freedom of Information Act request.  So

19   there's nothing that he has from his tenure at FDA,

20   which ended in 1997 before NECC was formed, and he has

21   had no -- nothing in his FDA duties that had to do with

22   the facts of this case.

23         MR. GIDEON:  Okay.  Did you want to say

24   something?

25         THE WITNESS:  To clarify, I'm not comfortable



1   with what you've agreed to.  Let me just put a couple
2   things and explain.
3            First, I would ask that you -- both of you or
4   any lawyers in the room -- refrain from asking me
5   anything that could be violative of the Department of
6   Justice.  So I would ask that you -- I don't have my
7   counsel here.  No reason for me to have counsel here.
8   But I would ask you to put -- you know, you're the
9   lawyers, so you do me a favor and not ask any questions
10  that would cross the line with that letter.
11           Second, let me just put a couple things on the
12  record.  One, I was involved in no particular matter, I
13  don't think NECC even existed, what was it 1998,
14  something --
15           MR. GIDEON:  Formed in '98.
16           THE WITNESS:  '98.  So I left, and I was not
17  involved in any -- certainly not with regard to NECC.
18           MR. GIDEON:  That's what Don just said.
19           THE WITNESS:  And also nothing with regard to
20  Saint Thomas during my tenure.
21           No. 2, I limited my opening report to FDA
22  publicly available documents, best of my knowledge,
23  right?  Because there were things that were on the
24  website, FDA, either congressional or FDA.
25           In the response -- in defendants' response



1  exhibits, I did see certain FDA FOI documents.  And

2  while I'm a student, you know, I live the liberty of

3  process issues, I'm not a scholar in that way and I

4  certainly don't want to lawyer it.  I do think there are

5  issues if one -- as the DOJ letter stated -- if

6  deliberative process is the decisional process that FDA

7  made whether to do something or not do something.  And

8  to the extent that is protected, some of that FOI

9  documents went toward those questions.

10       And I did respond in my supplemental, I mean,

11  to the documents that defendants' experts raised.  So I

12  do think that they're -- I mean, if -- again, however

13  the law of deliberative process and FOI, obviously we're

14  dealing with exemption 5 here, I leave it to others.

15       I do ask, just to be respectful, that you

16  really limit this.  Because there's not counsel here

17  representing Department of Justice, I do ask that you --

18  I would like to limit this deposition to, you know,

19  officers of the court.  I mean, I only do that as a

20  suggestion.  It's up to you.  But that would be my

21  request until the DOJ -- because I certainly don't want

22  to lawyer what's deliberative process and what's not.

23       MR. GIDEON:  Well, what I'm willing to do on

24  behalf of all my clients is to follow what I said just a

25  few minutes ago.  And that is to take the terms of the



```
 1   existing protective order which makes the depositions
 2   confidential for 30 days and expand that to include the
 3   deposition of Dr. Kessler.  That's as far as I'm willing
 4   to go.
 5            The questions that I intend to ask today, in my
 6   judgment, do not intrude in any way on deliberative
 7   process of the FDA, and certainly not when Dr. Kessler
 8   was there, from 1990 to 1997.  And he left in -- let's
 9   see.  He left two years before the next one was
10   appointed in '99.
11            What was the date of your departure from the
12   FDA?
13            THE WITNESS:  February '97.
14            MR. GIDEON:  NECC was formed at the end of the
15   year in 1998, so I really don't think it's a legitimate
16   concern by David Glass.  But we can address it on a
17   one-to-one basis.  We'll do a very orderly, respectful
18   deposition today, and if something comes up, Don, I'll
19   expect you to raise a hand.  Okay?
20            MR. ARBITBLIT:  Or the witness may.
21            MR. GIDEON:  That's fine.
22            We also, I will tell you, Dr. Kessler, we have
23   a magistrate judge that's very involved in the details
24   of the case who can -- who will and can address these
25   things quite well if an issue comes up.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 16 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 15

```
 1              THE WITNESS:  Great.

 2              MR. GIDEON:  Good enough?

 3              MR. ARBITBLIT:  Good enough.

 4         I would just ask, when you say within the order

 5    that exists, I'm assuming that that means that you would

 6    like to share Dr. Kessler's deposition transcript with

 7    your experts.

 8              MR. GIDEON:  Yes.

 9              MR. ARBITBLIT:  And I respect that that's

10    reasonable.  I would ask whether you would consider

11    giving DOJ the weekend to let us know before you

12    circulate it.

13              MR. GIDEON:  I'm not going to have it, Don, to

14    circulate before the weekend is over anyway.

15              MR. ARBITBLIT:  Well, you never know.  I mean,

16    court reporters are very responsive.  When you ask them

17    to expedite, they get their fingers working at warp

18    speed and can get transcripts out quickly.  And/or we

19    could even get a rough for that purpose.

20              MR. GIDEON:  I will agree to defer this until

21    Monday morning if you want me to.

22              MR. ARBITBLIT:  We'll send the rough to David

23    Glass and tell him he's got the weekend.

24              MR. GIDEON:  Okay.

25              THE WITNESS:  Thank you very much, sir.  I
```



1  appreciate your consideration.

2         MR. GIDEON:  Sure.  Now my time starts at ten

3  after 9:00.  Good enough?

4         MR. ARBITBLIT:  All right.

5         THE WITNESS:  Thank you, sir.

6         MR. GIDEON:  Should we get started?

7         THE WITNESS:  I can't see you very well, would

8  you mind pulling the curtain behind you?  I'm squinting

9  at you.

10        MR. GIDEON:  What is it, the shining forehead?

11        THE WITNESS:  No.  It's the San Francisco haze.

12 Thank you.  Now I can see you, sir.

13        MR. GIDEON:  Shall we swear the witness -- he

14 already has been.

15    Q.  Dr. Kessler, I know you've given depositions

16 before, but let me give you three general rules that

17 apply to this deposition today.  If you will follow

18 them, it will permit us to have a more informed

19 discussion and will actually be much more efficient with

20 your time.

21        First, please listen to the question I ask you.

22 If at any time you do not understand what I'm asking,

23 tell me and I'll do a better job the next time.

24        The second thing is, please give me a direct

25 answer.  And then if you need to explain a direct



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 18 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 17

1    answer, I won't cut you off.

2              Third, if at any time you need to take a break

3    as a matter of personal comfort, to check on family,

4    somebody may be traveling, all I ask you to do is to

5    finish the pending question, and then we'll take a

6    break.  It's not designed to be an endurance run.

7              Good enough?

8         A.  Thank you, sir.

9         Q.  Sure.  One of the things that I sent to the

10   lawyers that engaged you is a Notice of Deposition.

11   Have they provided you with a copy of it?

12        A.  Yes, I saw it.  Yes.

13        Q.  All right.  Let's get copies for everybody of

14   Exhibit A.

15              Exhibit 1233.

16              (Whereupon, Exhibit 1233 was marked for

17              identification.)

18              MR. GIDEON:  And what I would like to do is

19   begin with Exhibit A that is attached to Exhibit 1233.

20   Flip the page one more.

21              You see that?

22        A.  Yes, sir.

23        Q.  Without me reading each of these individually,

24   would you please tell me the materials you brought with

25   you today.


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1       A.  Yes, sir.

2           So I have here on the table -- may I stand?

3       Q.  Absolutely.  Sure.  Bring them back into the

4   camera -- bring them back into the camera range.

5       A.  Let me tell you --

6       Q.  An oral inventory is okay.

7       A.  And then we can go through them if you want to

8   see that.

9       Q.  Sure.

10      A.  So I have binders on this table that represent,

11  one, both my report and my rebuttal report.  And the

12  documents that are cited in each paragraph -- if there's

13  a document cited in the paragraph or in a footnote, that

14  document is behind that tab.  So all the documents cited

15  in both the report and the rebuttal report are in those

16  binders.

17      Q.  And there are how many binders?

18      A.  Well, the ones that I'm referring to are the

19  first three, I believe, if I can see that.

20          I then have a treatise on drug regulation by

21  Don Beers.  It's a publicly available treatise, if we

22  want to refer to it, that I've looked at.

23          I have the defendants' experts reports.

24      Q.  Which ones?

25      A.  So I have Miller and Bradshaw.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        Q.   Do you have any of the others?

2        A.   So I have Mr. Penta's exhibits.  I've not --

3   the reason for that is that there were certain

4   Massachusetts Board of Pharmacy documents, what I asked

5   for, they were in that binder as referred to by

6   Dr. Miller.

7        Q.   Okay.  The Penta exhibits, but not the Penta

8   deposition?

9        A.   That's correct.  I mean, it was the exhibits

10  that I looked at.

11       Q.   Okay.

12       A.   Okay?  It was some of them.

13            In addition to that, there is, just a little

14  beyond your question, and I have some others.  There is

15  an errata sheet.  There are some typos, some numbers,

16  that I think I've asked counsel to bring.

17            There are a few --

18       Q.   Stop, please.  An errata sheet to what?

19       A.   I'm sorry.  An errata sheet to my supplemental.

20  There were a couple of typos in that.

21       Q.   It's an errata sheet or a change to some of the

22  content of your supplemental report?

23       A.   Yes.  So we brought that.  Yes.  Those are very

24  minor.

25       Q.   Are they just typos?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.  They're typos.

 2        Q.  Not substantive?

 3        A.  Nothing of substance.  You can look at that.

 4        Q.  I will.

 5        A.  In addition, I asked counsel, there were some

 6   documents that I have looked at since the time I signed

 7   my report.  So there's an additional list of things that

 8   I've looked at, and I asked counsel to do that.

 9            I asked counsel to bring a copy -- counsel has

10   a copy of my invoice to give you.

11            And then I have some documents in front of me

12   here, sir.

13        Q.  Give me an inventory of what's to your left.

14        A.  So I have here bound copies of my report, I

15   have my supplemental report, and I just have an index to

16   my report --

17        Q.  Okay.

18        A.  -- of the schedules.

19        Q.  And what about the two other bound volumes at

20   the bottom of that stack?

21        A.  So both of these are my report, sir.

22        Q.  Okay.

23        A.  Both of these are my report.  I have some DOJ

24   information on deliberative privilege from the DOJ

25   website and others.
```



1      Q.  Okay.

2      A.  So I have that.

3      Q.  All right.  Did you pull that last night after

4  you saw the Glass letter?

5      A.  Actually, I pulled it around 6:00 o'clock this

6  morning.

7      Q.  You have some kind of blotter in front of you

8  too with a lot of handwriting on it.  Is that yours or

9  is that something that's here for the witness?

10     A.  No, this is mine.

11     Q.  It is?

12     A.  Yes.

13     Q.  And tell me what the blotter represents that's

14  material to today's discussion.

15     A.  You asked me for notes.

16     Q.  Okay.

17     A.  So I was being responsive to your request.

18  There are a couple of documents, GEO reports, excerpts

19  from that, so these are notes you've asked me to bring.

20     Q.  You are the first witness I've ever met that

21  uses a blotter as a means of recording notations; is

22  this something you made as you went through the

23  materials?

24     A.  Yes, sir.

25     Q.  Is this your routine to use a desk blotter for



1   that purpose?

2        A.   I wouldn't want to say I use it all the time,

3   but I've used it on numerous occasions.  Yes.

4        Q.   How many pages of content are there on the

5   blotter?

6        A.   One, two, three, there's some typed -- three --

7   there's a little handwriting.  Maybe five, sir.

8        Q.   Okay.  It's probably unfair to ask you this

9   question, but is your handwriting -- is your handwriting

10  decipherable or are you the typical physician who writes

11  in his own little script?

12       A.   You asked me to answer directly?

13       Q.   I do.

14       A.   Yeah.  You can stand over my shoulder and help

15  me answer that question whether you -- I mean, I can --

16  well, I don't know if I can read it.

17       Q.   Well, I'm sure you can.  My God, I hope so.

18  But let me look at it.

19       A.   See if you can -- thank you, sir.

20       Q.   Actually, you're better than the norm.  But you

21  kind of fall at the 50th percentile.

22       A.   I'm sorry.

23       Q.   We're going to have to get this copied and

24  probably have you dictate it.

25            Is there an engineering firm nearby that can



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 23

1  copy those large pieces of paper, Don?

2          MR. ARBITBLIT:  I can find out.

3          MR. GIDEON:  Would you ask someone at a break

4  just to check and see if there's an architectural or

5  engineering firm around that can do that at my expense

6  today?

7          MR. ARBITBLIT:  I'll do it now.

8          MR. GIDEON:  Okay.

9      Q.  What I would like to do next --

10     A.  Can I just continue one thing so I'm complete?

11     Q.  Absolutely.  Go ahead.

12     A.  So I have some documents on the floor.

13     Q.  Inventory them for me, please.

14     A.  So these are documents that I have either --

15  you asked me to bring documents, I mean, that I have

16  looked at or collected.  I'm happy to go through them,

17  but you should know there are -- there are documents

18  here.

19     Q.  Dr. Kessler, have we now identified your entire

20  file in conjunction with your engagement in this case?

21     A.  Not exactly.

22     Q.  Okay.  What else do we have?

23     A.  So I have a hard drive.

24     Q.  Okay.  That's on your laptop?

25     A.  It's connected -- plugged in, but happy to give



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   you the hard drive if you would like.

2       Q.  Does the hard drive duplicate the materials

3   that we've just talked about or does it expand beyond

4   the materials you've identified?

5       A.  I believe it expands beyond the materials, sir.

6       Q.  Is there an index to the hard drive?

7       A.  There are -- there are file names.  If you

8   would take those as an index, I guess I can give you the

9   file names.

10      Q.  Okay.  All right.  We have the hard drive, we

11  have an additional list of materials that you have

12  reviewed that you've asked the lawyers to give me today.

13      A.  Yes, sir.

14      Q.  We have an errata sheet for some nonsubstantive

15  changes in your rebuttal report.  We have the five pages

16  of handwritten text on the blotter before you.  We have

17  some invoices you've asked the lawyers to produce for me

18  today.  And then we have the intangible data on the hard

19  drive where there isn't a formal index, but there are

20  separately noted file names.

21          And you can duplicate the hard drive for me?

22      A.  I can't, but somebody, I'm sure --

23      Q.  Someone else can?

24      A.  Certainly happy to give this to someone.

25      Q.  Now, I'll ask the same question again:  With



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    that description of materials, do we have a complete

2    identification of your file for this engagement?

3         A.  Yes, sir.

4         Q.  All right.  I asked also for an updated CV if

5    the CV that was attached to the original report is

6    incomplete.  Do you have an updated CV?

7         A.  I don't believe I've updated my CV, but I don't

8    want to represent that that -- I don't think there is an

9    updated CV.  But I also don't want to represent that

10   that CV is up to date.  I mean, at a certain point I

11   stop putting things on.

12        Q.  Okay.  I asked also for communication

13   specifically between the attorneys for the plaintiffs

14   and you that relate to compensation for your study or

15   testimony.  I know that you are charging a thousand

16   dollars an hour, but I don't know what that is

17   applicable to.  Is that applicable to our discussion

18   today?

19        A.  So --

20        Q.  Are you charging me a thousand an hour to talk

21   to me today?

22        A.  My rate is a thousand dollars an hour.

23        Q.  Well, the reason I ask, some witnesses will

24   charge $250 to review materials, somewhat more for a

25   deposition if there's no videotape, some ask for a



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   premium if there's a videotape, some ask for even more
 2   if they show up in court.  Is yours a lump-sum thousand
 3   dollars an hour?
 4        A.  Yes, sir.  It's been standard that way for a
 5   good five, six years.
 6        Q.  Okay.  Then I also wanted you to identify the
 7   facts or data that the attorneys provided to you to be
 8   considered in forming your opinions, and I want to draw
 9   a distinction between what they gave you and what you
10   selected.  So will you do that for us, please.
11            MR. ARBITBLIT:  I'll object to anything that
12   invades the work product privilege.  And -- let me
13   finish.
14            MR. GIDEON:  I'm not cutting you off.
15            MR. ARBITBLIT:  You just looked like you were
16   ready to speak, and so I just wanted to finish before
17   you do.
18            Doctor -- we have provided nothing to
19   Dr. Kessler other than documents in the litigation.  We
20   have not -- he has not relied on anything from counsel
21   in terms of documentation of facts.  And anything that
22   we've provided in terms of communications is protected
23   by the confidentiality under Rule 26.
24            MR. GIDEON:  Revised Rule 26.
25            MR. ARBITBLIT:  Revised Rule 26.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1            MR. GIDEON:  I'm fully familiar with the
 2    language.
 3            MR. ARBITBLIT:  I just want to make sure.  The
 4    witness isn't necessarily familiar with the distinction,
 5    Counsel, so I want to make sure that communications
 6    between counsel and the witness are confidential, and
 7    the only things that he's relied on are matters that are
 8    in the documentation or the transcripts.
 9            MR. GIDEON:  Okay.  Well, but there is -- there
10    is no privilege, Don, there's no protection for tangible
11    factual materials that have been given to a witness.
12            MR. ARBITBLIT:  And no such materials -- I'll
13    represent to you that no such materials have been
14    provided other than what's in the documentation that's
15    been produced in the litigation.
16            MR. GIDEON:  That's been identified in the
17    report?
18            MR. ARBITBLIT:  Correct.
19            MR. GIDEON:  Q.  Okay.  Now, then, with
20    that representation, what I want to know is what did
21    Dr. David Kessler pull on his own.
22        A.  We'd have to go through each document.
23        Q.  Just tell me which ones, by looking at them,
24    you selected on your own.
25        A.  You say -- you mean selected -- tell me -- I'm
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  not sure I understand your question.

2      Q.  You don't understand the word "selected on your

3  own" or the phrase "selected on your own"?

4      A.  No.  Because let me tell you why I don't

5  understand it, and maybe that will help you.

6      Q.  Sure.

7      A.  So as I understand it, there are documents

8  relating to -- they were part of discovery in this

9  matter.  Right?  I didn't do, for example, an FDA FOI

10  request, okay.  I don't know which party did.  So I --

11  did I select -- if I asked for documents, right, did

12  that mean I selected -- if they gave me -- I don't have

13  access to the database that you have, right?

14          So there are documents that I pulled off the

15  website.  There are documents I asked counsel for.  We'd

16  have to go through, you know, again, what you mean by

17  "selected."  Did I ask them for it?  Did they give it to

18  me?  Did I get it from a separate -- depends what you

19  mean by "selected."

20      Q.  Okay.  Well, this isn't designed to be as

21  complicated as your response makes it sound.

22      A.  I'm sorry.

23      Q.  I'm not interested in repeating the things that

24  were given to you by the lawyers that engaged you, which

25  Don just told us are reflected in your reports.  What I



1  am interested in are things that you decided you would

2  pull from a website or ask for on your own.

3      A.  There were many things that I asked for --

4  again, I apologize.  I just don't understand your

5  question.  I'm just being exact.

6          There are certainly things that went into my

7  report that I asked for.  Is that what you are asking

8  for?

9      Q.  Tell me what things you can recall asking those

10 that engaged you to send to you.

11     A.  Oh, okay.  Well, we'd have to just start with

12 the beginning of the report and go through the report.

13     Q.  I don't want to spend the time going through

14 the report.  You can't tell me the things you asked for

15 unless we go through the report paragraph by paragraph?

16     A.  There are -- there are thousands of pages, I

17 mean, that I now have available.  I certainly don't --

18 I'd have to go and refresh my memory.  If you show me a

19 document, I could tell you whether I asked for it.

20 Happy to do that.

21     Q.  Okay.  But what I would like to know is whether

22 you recall asking for any particular documents.  Or you

23 can answer that question without the time-consuming

24 process of going through the report page by page,

25 paragraph by paragraph.



```
1          A.   I asked for many documents.
2          Q.   Can you recall any of those that you asked for?
3          A.   Sure.  I asked for documents of my testimony
4     that I gave.
5          Q.   In other cases?
6          A.   No.  I mean, on compounding.
7          Q.   Uh-huh.  The May 1, 1996 testimony to Congress?
8          A.   I asked for that.  I asked for compliance
9     policy guides.
10         Q.   The 2002 compliance policy guide and its
11    predecessor?
12         A.   Yes.
13         Q.   Both of those?
14         A.   Yes.  I asked for documents -- publicly
15    available documents with regard to -- to NECC.  There
16    was publicly available documents that I asked for, and
17    then I saw FOI requests and then I asked for that.
18         Q.   Okay.
19         A.   I asked for depositions in this matter.
20         Q.   And which ones did you receive?
21         A.   So I received Schamberg.
22         Q.   Debbie Schamberg?
23         A.   Yeah.
24         Q.   Did you receive John Culclasure's deposition?
25         A.    I did.  And also I also asked for the
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1  exhibits.

 2       Q.  Any additional depositions?

 3       A.  Kelvas.

 4       Q.  Marty Kelvas, did you receive that?

 5       A.  And the exhibits.

 6       Q.  Did you ever receive a deposition taken of an

 7  individual whose name is Terry Grinder?

 8       A.  Yes, I did.  Tennessee Board.

 9       Q.  Board of Pharmacy?

10       A.  And the exhibits I asked for.  Yes.

11       Q.  Any additional depositions?

12       A.  Carmen Leffler.  And I think there was Regina

13  Calishers.

14       Q.  Okay.  In terms of your note keeping as you

15  review materials, aside from the blotter that's in front

16  of you now, do you prepare memos or notes on a computer,

17  iPad or smartphone device in addition?

18       A.  No.  I would tend to scribble.

19       Q.  All right.  What else do you recall asking for

20  as part of this engagement?

21       A.  So I asked for rules of STOPNC, medical staff

22  rules, formularies of STOPNC.  I asked for -- I asked

23  for or pulled shortage lists from the American Society

24  of Health System Pharmacists.  I pulled -- I pulled or

25  asked for articles on ESI.  I asked for specific
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    shortage information on MPA.

2         Q.   Also limited to ASHP data or other databases?

3         A.   I think there's FDA as well as ASHP.

4         Q.   And when you say MPA, you mean

5    methylprednisolone acetate?

6         A.   Exactly.  And Depo-Medrol, both.

7         Q.   Okay.

8         A.   Because some include both.

9         Q.   Did you ask for any data reflecting when Sandoz

10   and Teva quit producing generic methylprednisolone

11   acetate in the states?

12        A.   I have some reference to the generic on the

13   shortage list.  And some shortage lists, I believe, talk

14   about Teva --

15        Q.   And Sandoz?

16        A.   Yeah.

17        Q.   Did you get that data as part of this?

18        A.   I'm happy to show you what data.  We can pull

19   it out.

20        Q.   Where is that, the stuff we're talking about

21   now, the shortage list, the articles on ESI, data that

22   may come from the FDA on production of MPA in the

23   United States?  Is that in a stack here?

24        A.   You have it in my report.

25        Q.   All right.  It's reflected in the report



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 34 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 33

1    itself?

2        A.  So it's reflected in the report.  And what I

3    tried to do, if you have my report, you'll see there's

4    extensive schedules.  So that's -- these are an

5    example -- I mean, all of those schedules.  I mean,

6    everything in the report.  I mean, all those schedules

7    are materials that I've asked for.

8        Q.  Okay.

9        A.  And I wanted us to have it available today if

10   you want to ask me about it.  So all that material.

11       Q.  Okay.  Continue with anything else that you, as

12   the witness, asked the people that engaged you to send.

13       A.  I asked for the prescriptions.  Any

14   prescriptions, prescription order forms.  Those were

15   included as exhibits in both Culclasure and Schamberg's

16   deposition.  So when I asked for the depositions, I got

17   the exhibits.  But I certainly asked for that.

18       Q.  As part of the exhibits that were made

19   available to you from the Penta deposition, were you

20   given a copy of the October 2010 letter from NECC to the

21   Massachusetts Board of Pharmacy sending them the order

22   form that was used in these cases?

23       A.  So there was reference to that.  Yes.  I don't

24   remember -- there's reference to that in, I believe,

25   Dr. Miller's report.  There's a footnote to a document.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    And I did, at one point, look at that.

2             I can tell you -- I also have a disc of Mr. --

3    you'll see it on the hard drive -- of Mr. Bradshaw's

4    exhibits.  I can't tell you whether I saw that off of

5    Bradshaw's exhibits or Penta's exhibits.

6        Q.  Okay.  All right.  What else do you recall

7    asking for, Dr. Kessler, other than what we've already

8    talked about?

9        A.  If you let me go through my report and refresh

10   my memory.

11       Q.  I don't want to spend the time going through

12   this page by page.

13       A.  Basically, if you look at my report and you

14   look at the -- the supplemental report, and you look

15   at -- I asked, for example, what was cited by

16   Mr. Bradshaw and Dr. Miller.  So I looked -- I asked for

17   those documents.

18       Q.  Did you overlap with Mr. Bradshaw at the FDA?

19       A.  I believe he was 2005 to 2007, something like

20   that.

21       Q.  So the answer is no?

22       A.  Are those his dates?

23       Q.  Yes.

24       A.  If those are his dates, the answer is no.

25       Q.  And Dr. Miller you overlapped with, did you



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 36 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 35

1   not?

2       A.  I did.

3       Q.  For what period of time?  You were commissioner

4   from sometime in 1990 until sometime in 1997?

5       A.  I was confirmed around October --

6       Q.  Of '90?

7       A.  -- of '90.  Didn't really start in the position

8   until about December of 1990.

9       Q.  Okay.  December of '90?  And when did you --

10      A.  I mean, I was confirmed before then, but I

11  think my start date was when I really arrived in office.

12      Q.  When did you leave the FDA?

13      A.  February '97.

14      Q.  What date, though?

15      A.  I'd have -- we'd have to go look.

16      Q.  You don't know the precise date?

17      A.  I think -- I think it was the last day of

18  February, but don't hold me to it.

19      Q.  Okay.

20      A.  It was a White House event for me and it's a

21  matter of public record.

22      Q.  Did you sign an NDA as you left?

23      A.  I have no recollection, but I think I would

24  remember that.  I don't think that was practiced at the

25  time.  It was practiced at the agency.  There are laws



1   governing, right, I mean, post employee conduct.  I'm

2   aware of those.  But I'm not aware of any nondisclosure.

3        Q.  All right.  Okay.  And your overlap with

4   Dr. Miller who was head of one of the divisions of the

5   FDA for a number of years was how long?

6        A.  That's actually not correct.

7        Q.  It's not?

8        A.  It was an office of biotechnology, it was not a

9   division.  I don't mean to be quibbling.  But I believe

10  he was an office in the commissioner's office.

11       Q.  What was the overlap is the key.  How many

12  years together?

13       A.  I think he was -- I think he left -- you'd have

14  to ask Dr. Miller when he left.  I actually probably

15  have it on his CV.  Was it '94 or something?  He's

16  certainly out by '95, because I have documents here

17  concerning Dr. Miller in 1995 that I have in my pile

18  below me.

19       Q.  Did the person who filled the head of the

20  office of biotechnology serve at the pleasure of the

21  commissioner?

22       A.  The only one -- the only one who gets to use

23  that term, sir, is the president of the United States.

24       Q.  Well, I need to ask the question and get a

25  direct answer.  What's your understanding.  As the



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   commissioner of the FDA, who can you select and who can

2   you terminate --

3        A.   So --

4        Q.   -- without having to get somebody else's

5   permission, whether it's political or not?

6        A.   It's a complex answer to that question.

7        Q.   You can't fire the head of the office of

8   biotechnology --

9        A.   Um.

10       Q.   -- as the commissioner of the FDA?

11       A.   I didn't say that.  Usually, I mean, there's --

12  there's agency personnel offices, and it depends on

13  one's status.  Political appointees, my guess, probably

14  would be fired by the White House, right, probably after

15  consultation with the commissioner and the secretary, if

16  that were the case.

17            Career civil service would be handled by human

18  resources or the personnel office in consultation with

19  management, but personnel would take care of it.

20       Q.   All right.  Well, let me ask the question

21  again.  Based on your understanding of the authority of

22  the commissioner's office at the FDA, were you able to

23  select who you wanted to head the office of

24  biotechnology without having to get anybody else's

25  permission or approval?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     A.  No.  It never works that way in government.

2  Any appointment that I would make would be subject,

3  again, to the personnel office's civil service regs.

4  That processes, those individuals, and any political

5  appointment would be made at the White House level of

6  presidential personnel.

7     Q.  So was Dr. Miller appointed to head up the

8  office of biotechnology by a president of the

9  United States?

10    A.  The -- what was Dr. Miller's status?  Was he a

11  presidential appointee?

12    Q.  That's what I'm asking you.

13    A.  So Dr. Miller was not a presidential appointee,

14  because there is no other presidential appointee at FDA.

15  Was he a political appointee, I don't know.  Dr. Miller

16  was there before I got there.

17    Q.  Okay.

18    A.  And Frank Young hired him.

19    Q.  I missed the last name.  Frank who?

20    A.  Frank Young worked with personnel to bring --

21  but I have no idea how Dr. Miller was brought on board.

22    Q.  Did you bring any literature that you've relied

23  upon in performing the opinions expressed in your

24  report?  And by that I mean any peer reviewed published

25  literature, whether it's in a treatise or a quarterly or



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   monthly publication.  Do you have that with you today?

2        A.  Sure.  So I did mention, for example, I brought

3   the Beers treatise on drug regulation.

4        Q.  Correct.

5        A.  And I think that --

6        Q.  Is that it?

7        A.  I brought that.  I have other documents here

8   that we can go through if you would like.

9        Q.  Let me see those, please.

10       A.  May I just grab something to drink?

11       Q.  Absolutely.  Certainly.

12            MR. ARBITBLIT:  Counsel, Dr. Kessler gave me a

13   few items that he wanted copied yesterday to provide in

14   response to the notice that I was given this morning.

15   So they're not in his pile, but I want to make sure you

16   are aware of them.

17            MR. GIDEON:  Let me have them, please.

18            MR. ARBITBLIT:  I don't have as many copies.

19            THE WITNESS:  I may have a copy.

20            MR. ARBITBLIT:  Well, this is one of them.

21   Here's copies for the --

22            THE WITNESS:  I think I have those in my pile.

23            MR. ARBITBLIT:  It may be that you have those.

24            C.J., I have these two articles.  Why don't you

25   take a look at these and see if you already have them in



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016

Page 40

1    the stack.  If you do, you can give those back to me or

2    have them marked as exhibits, as you choose.

3            MR. GIDEON:  This one I do have in the stack.

4    I haven't seen the second one yet.

5            THE WITNESS:  It may be behind the first.

6            MR. GIDEON:  Yeah.  I've got this one.  Thank

7    you.

8        Q.  Okay.  Dr. Kessler, I appreciate you giving me

9    these materials, and I'm going to do a quick inventory

10   of these before I hand them back to you.  But what I'm

11   actually very specifically interested in right now is

12   published literature, whether it's a treatise, textbook,

13   New England Journal of Medicine article.

14           Now, in this group there is an article from the

15   Pharmacist that's dated November 16th, 2011 entitled,

16   "FDA Tries to Compound the Compounding Rules."

17           And likewise, in this stack of materials, is

18   another article from the Pharmacist entitled, "The FDA

19   Mandate:  Never Give Up, Never," publication November

20   22nd, 2006.

21           Other than that, I don't see any literature

22   like I was thinking of in this stack.

23       A.  Let me see it.  I think I understand your

24   question a little better.

25       Q.  Sure.



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 42 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 41

1     A.   If you turn to Appendix C of my report.

2     Q.   Okay.

3     A.   You will see long lists of, I think, the

4  materials you -- for example, textbooks, other

5  documents.  They are all cited in my report or in the

6  appendix, and they are footnoted.  And I do have copies

7  of them in my binders and I have copies of them here.

8  So, I mean, for all the opinions --

9     Q.   To save time --

10    A.   I'm sorry.

11    Q.   Let's make sure -- I've read your report over

12  and over and over again.  I've read the articles as

13  well.  What I'm interested in, is there anything else

14  that you have pulled, looked at, considered this morning

15  at 6:00 a.m., that's not listed in the bibliographies

16  that you consider to be reliable or authoritative

17  published material?  That's the essence of the question.

18    A.   I think we've discussed everything.  I mean,

19  it's the material that I have with me today --

20    Q.   All right.

21    A.   -- or on hard drive.  I mean, or in these

22  binders.  Everything -- I tried to -- all the bases for

23  my opinions, the treatises, statutes, regulations,

24  published literature, are cited in my report.

25    Q.   Okay.


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A.  Except for some things that I have looked at,
2   obviously, since -- since my report.
3        Q.  All right.  And that's really one of the things
4   that I'm most interested in is your initial report was
5   signed December 15th, 2015.  There is a supplemental
6   report after we disclosed the opinions of Dr. Miller.
7   What have you looked at since you executed the
8   supplemental report in terms of substantive material?
9   Whether it's a deposition, article on the Internet,
10  what, if anything, have you reviewed?
11       A.  So some of the material -- obviously some of
12  the material there I've reviewed subsequent; for
13  example, the U.S. Pharmacist's articles --
14       Q.  These two?
15       A.  I didn't see -- I think there's one court case.
16       Q.  United States of America versus Franck's Lab,
17  Inc.; did you review those materials too?
18       A.  Subsequent to the supplemental.
19       Q.  Were you involved in the Franck's Lab, Inc.
20  case?
21       A.  No, not to my knowledge.  No.
22       Q.  What is the relevance to you of the order in
23  the U.S. District Court for the Middle District of
24  Florida in the Franck's Lab case?
25       A.  Actually, it's a very good summary of the



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   history of the regulation of compounding.

2       Q.  Okay.  A summary that you agree with?

3       A.  No, I didn't say that.

4       Q.  No.  It's a very good summary?

5       A.  It's a -- it's a judge trying to -- let me not

6   make any editorial comments whatsoever.

7           The reason I pulled it was I wanted to be

8   familiar with judicial opinions on compounding, and that

9   was one that I had not seen prior to my supplement.

10      Q.  Okay.

11      A.  Let me not make any editorial comments.

12      Q.  All right.  There's a group of materials,

13  begins with a document that's to Tom Griscom from Tim

14  Hyde, May 30th, 1995, that deals with some litigation in

15  Florida and state issues.  Apparently the focus of this

16  is an op-ed by Dr. Miller.  Is that why this group of

17  materials is important?

18      A.  This is a -- Tom C.Griscom was the chief

19  lobbyist political operative for RJ Reynolds.  I believe

20  it's around the 1995 document, and Griscom is asking --

21  is stating that he's having Dr. Miller write an op-ed

22  criticizing FDA.

23      Q.  Okay.  And then there are two green binders

24  with letters from Davis Wright Tremaine to Henry Miller,

25  M.D., one dated July 25th, 2003, perhaps these are



1    duplicates, on your behalf to Dr. Miller.

2         A.   There's actually -- can I see -- they should be

3    duplicates, but I'm happy to tell you what these are.

4         Q.   Are these letters on your behalf from a law

5    firm to Dr. Miller telling him to stop doing something?

6         A.   Yeah.  So there are two sets of letters here,

7    and there's some attachments here.  There is a June

8    30th, 2003 letter from me to Dr. Miller saying that

9    he -- that attaches a document from the Deputy

10   Commissioner for Management and Systems that is a

11   review, an audit, of my -- it says:  Review and Audit of

12   Dr. Kessler's Travel Vouchers and Imprest Fund

13   Transactions During His Tenure.

14         Happy to read this letter into the record if

15   you'd like.

16         Q.   We'll just exhibit it.

17         A.   But it basically says the -- informs, based on

18   that document that I just cited, on that review, that

19   Dr. Miller made false statements.

20         And then there is a subsequent letter from

21   Davis Wright which cites false statements.

22         Q.   Are those two green plastic binders duplicates?

23         A.   Yes, sir.  I believe so.

24         Q.   All right.

25         A.   We have to double-check.  There's two --



1   basically two letters, each with an attachment, both to

2   Dr. Miller.

3        Q.   Would you put them back in the green plastic?

4        A.   I'd be happy to, sir.

5        Q.   Then we've got, in one of these documents, an

6   ASHP document dated 26 July 2012 that refers to MPA,

7   methylprednisolone acetate --

8        A.   As well as Depo-Medrol, if I'm correct, on the

9   bottom of that.

10       Q.   You're right.  And it refers to shortages where

11  Sandoz, Teva and Pfizer would not -- or could not

12  provide a reason for the respective shortages?

13       A.   That's what it states there.

14       Q.   Yes.

15       A.   You asked me a question about those companies,

16  and that includes one of the statements.  But which

17  drug?  Just so we're clear.

18       Q.   Methylprednisolone acetate injection.

19       A.   As opposed to Depo-Medrol, right?

20       Q.   Well, no.  They're all listed under the heading

21  Methylprednisolone Acetate Injection.

22       A.   Right.

23       Q.   Then there's methylprednisolone acetate

24  injection, Sandoz; methylprednisolone acetate injection,

25  Teva --



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 47 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                   Page 46

1      A.   Right.

2      Q.   -- and then Depo-Medrol injection, Pfizer, all

3  under the same heading of Methylprednisolone Acetate

4  Injection.

5      A.   And then just for the record, so you can -- so

6  we're complete, just read the whole document.   These

7  other headings.

8      Q.   Available Products, there's a listing of those

9  at the bottom of the page.   And it goes on to the second

10 page about Estimated Resupply Dates, Related Shortages,

11 updating, disclaimers, and the fact that it's a

12 publication by ASHP.

13          When we were talking previously, I think you

14 told me that you looked at some FDA data on shortages;

15 is that in this stack?   I haven't seen it.

16     A.   Which -- so I believe, if you just give me a

17 second.

18     Q.   If it's in your report I don't need you to find

19 that again.   But if there is something independent of

20 your report you looked at, that's what I want to

21 identify.

22     A.   Yes.   Let me just double-check so I can answer

23 that.

24          So there's several hundred pages relating to

25 shortage.



1    Q.   In the report?

2    A.   And if you look at Schedule 3B, which goes on

3    from page 254 to 324, that's all in the report.  That's

4    FDA's documents relating to shortages.

5    Q.   Okay.  And then the last two things in the

6    stack include a definition under 21 U.S.C. 351 of when a

7    drug or device is adulterated.  Page and a line.

8    A.   That's just 350 -- yeah, it's just the part of

9    the statute that deals with old drugs as opposed to new

10   drugs.

11   Q.   Right.

12        And then finally, in the material you just gave

13   me, we have two documents, FDA 428907, 428908, 428909,

14   that reflect email communications between Bruce Ota, and

15   Karen Archdeacon with respect to NECC.

16   A.   That are part of the FDA FOI request that I

17   received that was cited by Dr. Miller.

18   Q.   What I'm going to do, Dr. Kessler, is I'm going

19   to have my assistant here, Kaycee, put an exhibit number

20   on each of these respective stacks while you and I

21   continue to talk, and then we'll identify these as

22   separate exhibits in just a moment.

23   A.   Sure.  And if I could just -- if any of your

24   questions, I need those --

25   Q.   Absolutely.



1      A.   Thank you, sir.

2           MR. CHALOS:   Mr. Gideon, for completeness,

3   we've got an addendum to Appendix C here.  I don't know

4   if that's in the materials you've seen.

5           MR. GIDEON:   It's not.

6           MR. CHALOS:   I think it probably lists what

7   you've seen.  Let me hand you a copy of this.

8           MR. GIDEON:   We'll mark the papers themselves

9   so it's not separated from the folders.

10          This would have saved us a bunch of time.

11          MR. CHALOS:   I believe Dr. Kessler mentioned

12  this earlier today, but that's a copy of the index.  The

13  addendum to the index.

14          MR. GIDEON:   Q.  Does the witness have one

15  of these in front of him?

16     A.   Yes.

17     Q.   On Appendix C, Dr. Kessler, in the first

18  subcategory Document Type and Title, Articles and Texts,

19  did you select the listed articles?

20     A.   Again, we had a discussion on the word

21  "select."

22     Q.   Did you choose those or were they sent to you?

23     A.   No.  So you are asking about -- let's just take

24  the first four for example purposes.  So for example,

25  on -- my recollection is on Vivian -- on both Vivian



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    articles, I pulled those.  Right?  On the Beers, that's
2    my book.  The current shortages, it was a request of
3    mine from counsel.
4         Q.  Okay.
5         A.  That's mine.
6              MR. GIDEON:  All right.  We'll make this --
7    give me an exhibit sticker -- the very next one.
8              (Whereupon, Exhibits 1234 through 1240 were
9              marked for identification.)
10             MR. GIDEON:  I'm going to make Appendix C that
11   we were just given Exhibit 1236 to this deposition.  If
12   this doesn't follow sequentially, we'll place something
13   in its place.
14        Q.  Have you read all of the materials listed in
15   the bibliography to your report?
16        A.  No.  I wouldn't want -- well, I wouldn't want
17   to -- the materials available to me, I wouldn't want to
18   represent that I've read every single word of everything
19   on that list.
20        Q.  Well, let me just tell you, I'm a simple guy
21   and I ask simple questions.
22             Have you read all the materials listed in the
23   index?
24        A.  I have not read -- I -- again, my answer is my
25   answer.  I have not read every line --
```



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 51 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 50

1      Q.  Okay.

2      A.  -- of all the materials.

3      Q.  Your report reflects that you've looked at the

4  Tennessee Healthcare Liability Act.

5          Do you recall that?

6      A.  I believe I've referenced that in my report.

7      Q.  The question is, have you read the Tennessee

8  Healthcare Liability Act?

9      A.  I'd have to go back and check.  I don't

10 remember it as of this moment in time.

11     Q.  All right.  You are licensed to practice

12 medicine in the state of California?

13     A.  I am.

14     Q.  You have previously been licensed in other

15 states during your career, have you not?

16     A.  Yes.  And those are sort of nonactive when one

17 moves.

18     Q.  Right.  And I just want to confirm with you

19 specific time frames in specific states.

20         You've previously been licensed in Connecticut,

21 but it is now on inactive status, correct?

22     A.  I believe that's correct.

23     Q.  When were you licensed in Connecticut?  From

24 when until when?

25     A.  Again --



```
 1        Q.  If the answer is "I don't recall," that's fine.

 2        A.  Well, I can generally tell you when we moved to

 3   Connecticut in 1997 I applied for licensure.  And again,

 4   I don't quite know what inactive status means, whether

 5   that's -- whether I'm still licensed.  I've not asked

 6   for the license to be active, I think I just notify

 7   them.  But I'm not paying active -- I'm not paying

 8   active dues.  Only --

 9        Q.  You don't consider yourself to be licensed to

10   practice medicine in Connecticut?

11        A.  Again, I'm on -- we could talk to the board.  I

12   was licensed, I asked to be put on nonactive status.  I

13   don't -- you know, I'm not paying dues there at the

14   present time.

15        Q.  When were you licensed to practice medicine in

16   Maryland?

17        A.  When we moved to -- well, I think it was

18   probably two periods of time.  I did my residency at

19   Hopkins.

20        Q.  What was the time frame?

21        A.  So my residency, late '70s to early '80s.  And

22   then I'm sure I -- I have to refresh my recollection --

23   but I think when I moved to FDA, I probably moved my

24   license from -- not moved, but I probably applied for

25   Maryland licensure.
```



```
 1         Q.   You were licensed as a resident in pediatrics?

 2         A.   That's a little complicated, as you know.

 3    Residents are under a general statute.  I don't think --

 4    I'd have to go back and check to see whether I held a

 5    particular license or whether Hopkins held the license.

 6         Q.   Have you ever been licensed to practice

 7    medicine in New York?

 8         A.   Yes.

 9         Q.   From when to when?

10         A.   When I was medical director of Einstein

11    Hospital, so in the 1980's.

12         Q.   When to when?

13         A.   When I finished my residency, what, about '82,

14    probably.  Again, I'm on inactive status so I don't want

15    to give you an end date.  But I don't pay dues in

16    New York.

17         Q.   So from the time frame since when have you been

18    licensed to practice medicine in California and

19    California alone?

20         A.   So I don't know the term "California alone"

21    because we have these inactive statuses, and I'll let

22    others do that.

23              But I can probably pull my license if you want,

24    now, from my wallet.  I am sure -- I mean, I believe

25    I've been licensed from 2003 to the present.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q.   You have never been licensed to practice

2   medicine in the state of Tennessee?

3      A.   I have not.

4      Q.   And you've never been licensed to practice

5   medicine in any of the states that surround Tennessee,

6   correct?

7      A.   That's correct, sir.

8      Q.   Have you ever operated, yourself, an ambulatory

9   surgery center that was licensed in Tennessee or any of

10   the states that surround Tennessee?

11      A.   Not in Tennessee or the states surrounding

12   Tennessee, no.

13      Q.   Have you ever operated an ASC in any state?

14      A.   I'd have to go back and check licensure,

15   whatever, on -- I'd have to go back and think about that

16   question in the various capacities of whether I had

17   responsibility at Yale, New York, or here in the various

18   capacities.

19           There certainly were ambulatory surgical units

20   in all three.  I'm not sure -- I'd have to go back and

21   check who held the licensure, the institution, and what

22   my role was.

23      Q.   Have you ever been licensed as a pharmacist?

24      A.   No, I've not been licensed as a pharmacist.

25   I've chaired pharmacy and therapeutics committees as a



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    medical director, but I've never been licensed as a

2    pharmacist.

3        Q.   Okay.  Have you ever offered testimony claiming

4    to be an expert in the practice of medicine where the

5    defendant in the case was another physician?

6        A.   Where the defendant was a physician.  I would

7    have to go back and review.  Nothing -- I just have

8    to -- I don't know the answer to that question.  I'd

9    have to go review the cases that I've testified in.

10       Q.   Well, we're going to get to your listing that

11   was attached to the disclosure in this case of your

12   litigation-related involvements over the last several

13   years, but do you recall ever being somebody who was

14   offered by a lawyer as an expert on standards of care

15   for a pediatrician?  Use that as the first example.

16       A.   I'd have to go back and review -- review my

17   testimony.

18       Q.   In how many different cases?

19       A.   Well, for example, I mean, I just have to --

20   let me tell you what was going through my head and

21   just -- maybe you can -- so again, if you look, for

22   example, in a case Allergan and Botox, and I'd have to,

23   for example, look who the defendants were.

24            And I am sure that questions were asked of me

25   about the appropriate use of medicine by doctors in a



```
 1   certain -- I mean, for example, in that matter.  We'd
 2   have to go back and look exactly who the defendants are.
 3   Obviously there was a pharmaceutical company.  There was
 4   also a defendant, but I don't know if the individual
 5   doctors -- I think the individual doctor were probably
 6   also parties, but I don't want to represent that without
 7   checking.
 8       Q.  Well --
 9       A.  Then the question, for example, is it
10   appropriate to use a drug off label, and what that
11   standard of care is.  So I've testified with regard to
12   those types of issues, certainly.
13       Q.  Well, I want an answer to my question.  I'm not
14   asking you about what comments you may have made in a
15   case about certain issues.  I want you to tell me, do
16   you recall ever being disclosed as an expert where the
17   defendant was not Allergan or Bard or McNeil, but an
18   individual physician?
19       A.  So I've answered that question.
20       Q.  And the answer is what, you don't recall it?
21       A.  I've answered the question.  No, the answer is
22   we would have to go check to see all the defendants in
23   those cases.
24           I do remember, with regard to individual
25   conduct -- again, I have to check who the defendants
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   are -- opining what was appropriate for individual

2   doctors to do.

3        Q.   Uh-huh.

4        A.   So I have testified on that in a number of

5   instances.

6        Q.   Okay.  Now, you told me a few moments ago, as

7   you discussed your background, that you did your

8   residency at Hopkins; was it in the pediatrics program?

9        A.   Yes.

10        Q.   And you completed the three-year pediatrics

11   residency at Hopkins?

12        A.   I did.

13        Q.   Are you board certified in pediatrics?

14        A.   So I was for 30 years.  I took my initial

15   boards, I took my recertification boards several times,

16   and I'm a professor of pediatrics; I've just chosen not

17   to take the recertification boards.  I may at some

18   point.  So at the moment I'm not board certified in

19   pediatrics, but I have been for some 30 years, and I'm a

20   professor of pediatrics.

21        Q.   Your residency training in pediatrics was from

22   1979 to 1982 at Hopkins, correct?

23        A.   Yes, sir.

24        Q.   You are not board certified in the field in

25   which you obtained your residency training as you and I



1    speak today, are you?

2         A.   I'm not board certified, I'm board eligible.  I

3    was board certified and I just chose not to sit for the

4    recertification.

5         Q.   So your board certification in pediatrics

6    expired?

7         A.   Several years ago when I decided not to just

8    sit for recertification.

9         Q.   And when was that?

10        A.   I'd have to go -- it was a few years ago.

11        Q.   Did the American Board of Pediatrics have a

12   program called maintenance of certification?

13        A.   Yes.

14        Q.   Did you drop out of the maintenance of

15   certification process several years in advance of the

16   actual expiration date of your board certification?

17        A.   You know, I'd have to check exactly what that

18   was, but I basically dropped out.

19        Q.   Yeah.

20        A.   But we'd have to find that exact.  I don't

21   remember exactly the dates you are talking about.

22        Q.   As you're probably familiar, a number of

23   hospitals will condition the ability to obtain staff

24   privileges at an institution upon a number of factors,

25   and one of which is frequently the physician's board



1    certification by one of the authorized ABMS board
2    certifying entities; you are quite familiar with that?
3        A.  I've chaired medical staff committees.
4        Q.  Sure.
5        A.  So I know that exactly.
6        Q.  All right.  Do you have staff privileges to
7    admit a patient to any hospital in greater
8    San Francisco?
9        A.  I -- not at the moment.  For 30 -- for my
10   entire career, medical director at Yale, here, I did.
11   But again, I gave that up the last several years.  I'm
12   licensed to practice medicine.
13       Q.  We've covered that.
14       A.  I'm licensed to practice medicine, but I gave
15   that up.  I gave up my privileges voluntarily just
16   because I, you know, spend most of my time doing
17   research, et cetera.
18       Q.  How long has it been since you last had the
19   opportunity to admit a patient to any hospital where you
20   have had privileges in the past?
21       A.  Last several years.  I forget exactly when it
22   was.
23       Q.  What's your best estimate of what year it was
24   that you surrendered your status of having admitting
25   privileges?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.  I voluntarily didn't reapply.

 2        Q.  When would that have been?

 3        A.  I don't have the exact date.

 4        Q.  And where did you not reapply?

 5        A.  To the UCSF Medical Center, I had privileges

 6   here.  I was a hospitalist.  And then I just -- I

 7   decided to give that up.

 8        Q.  Okay.  Did -- as you well know, it's common

 9   with university teaching centers that frequently they

10   will have a flagship hospital, but they'll oftentimes

11   have relationships with hospitals in the community so

12   they can give their residents more of a varied

13   experience.  Do you know what I'm talking about?

14        A.  Yes.

15        Q.  All right.  Did you have staff privileges

16   anywhere other than UCSF?

17        A.  I'd have to double-check.  I'm pretty sure I

18   had staff privileges at San Francisco General, certainly

19   giving grand rounds there, et cetera.  But I believe all

20   my active hospitalist duties were at UCSF.

21        Q.  Okay.

22        A.  I've lectured at the other places, I've taught

23   at the other places, but I think I've only actually seen

24   patients at UCSF.

25        Q.  Can you tell me the last year you actually
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  recall admitting a patient to the hospital as the

2  attending physician?

3        A.  I'd have to go back and check.  It was during

4  my hospitalist -- when I was a hospitalist.  And even

5  then, I probably didn't admit -- the residents probably

6  admitted and admitted under my name.

7        Q.  Right.

8        A.  But, I mean, certainly in the 2000s --

9  somewhere -- I don't know the exact date.

10        Q.  When did your tour as a hospitalist come to an

11  end?

12        A.  I don't know.  I probably stopped being a

13  hospitalist 2007 or so.  2008.  But that's just an

14  approximation.

15        Q.  And as a hospitalist, were you paid a thousand

16  dollars an hour for your services?

17        A.  So I didn't -- I was paid by the State of

18  California.  We didn't bill by the hour.

19        Q.  Well, did your compensation for working as a

20  hospitalist come close to the thousand-dollar-an-hour

21  charge for the time talking to me today?

22        A.  My salary was a matter of public record.  We

23  can go back and look and you can calculate hours and

24  what that comes to.

25        Q.  Do you know what the comparison was?



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    A.  I probably -- I don't know.  My guess, it was

2  approximately -- probably about a half a million dollars

3  a year.  Don't hold me to what my salary -- maybe it was

4  600, 700.  I don't remember, sir.

5    Q.  And as a hospitalist, did you work 50, 60 hours

6  a week, 50 weeks a year?

7    A.  I work all the time.  I don't know -- when you

8  are a hospitalist, I think I was on call all the time,

9  every day, for -- but I -- but if you look -- I was only

10  a hospitalist for several weeks a year.  So maybe it was

11  two weeks.

12    Q.  Okay.

13    A.  So I mean, so I think you would probably say I

14  did that pro bono as a hospitalist.  There was no

15  obligation for me to do that, so I think I probably did

16  that pro bono.

17    Q.  So you stopped working as a pediatric, I

18  assume, hospitalist in 2007, correct?

19    A.  I said I wasn't sure about the date, I gave

20  that as an approximate date.

21    Q.  But your services were as a pediatric

22  hospitalist, correct?

23    A.  Yes, I was a pediatric and adolescent -- child

24  and adolescent.

25    Q.  Now, up to and including the time when you did



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   not reapply for staff privileges, had you ever performed

2   an epidural steroid injection on anyone?

3        A.   I don't believe so.

4        Q.   Have you ever performed any form of invasive

5   delivery of steroids into the spinal column during your

6   career?

7        A.   I don't believe -- I've certainly entered the

8   spinal column, but I never believe that I pushed

9   steroids.

10       Q.   Well, I would find it absolutely unbelievable

11  that a pediatrician somewhere along their career hasn't

12  done spinal taps --

13       A.   That's what I just said.

14       Q.   -- both emergency and afterwards.

15            But other than drawing off CSF for the purposes

16  of diagnosis or diminishing pressure, have you ever

17  delivered drugs into the epidural space anywhere in the

18  spinal column?

19       A.   So I've certainly administered methotrexate and

20  other things intrathecally.

21       Q.   Other than that?

22       A.   I'd have to go back and check.

23       Q.   The methotrexate delivery intrathecally in a

24  child would be for what?

25       A.   Chemotherapy.



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                     Page 63

 1        Q.  Did you have a fellowship program in pediatric
 2   oncology?
 3        A.  Was I trained?
 4        Q.  It's designed to be a simple question.
 5            Did you have a formal fellowship program in
 6   pediatric oncology?
 7        A.  So I certainly have those programs.  I mean, in
 8   my medical center those programs exist.  I didn't do
 9   those programs.  I pushed intrathecal methotrexate
10   certainly as a resident.
11        Q.  Okay.  All right.  Now --
12        A.  I was accepted into a fellowship program in
13   pediatric oncology but I decided not to go.
14        Q.  All right.
15        A.  I became medical director of the hospital.
16        Q.  At Einstein?
17        A.  I did.
18        Q.  Okay.  Now, other than pediatrics, have you
19   been board certified in any other field at any time?
20        A.  No.
21        Q.  Have you ever sought board certification in any
22   other field at any time?
23        A.  No, I did not.
24        Q.  Have you ever been board eligible in any other
25   field at any time?



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 65 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 64

1      A.  You know, I don't believe so.  Maybe preventive

2   medicine, other things -- I'm a professor of

3   epidemiology, biostatistics.  I don't know what that

4   grants me.  We'd have to look.

5      Q.  Up to and including, if your estimate is

6   correct, 2007, you came to -- you came to UCSF 2003,

7   didn't you?

8      A.  I did.

9      Q.  Okay.  From 2003 until 2007, did you actually

10  have staff privileges at an outpatient diagnostic

11  center?

12     A.  We'd have to check the bylaws.  As you know,

13  UCSF has many different clinics associated, and I just

14  don't want to use -- I'm pretty sure my privileges would

15  have attached using the specific word outpatient

16  diagnostic center.  Certainly there were outpatient

17  clinics and outpatient ambulatory units, and I'm sure my

18  privileges attached to those.

19     Q.  Well, when I use the term outpatient diagnostic

20  center I'm being more specific than that.  The term I --

21  the meaning I intend to convey with that is an ODC,

22  similar to what's licensed in Tennessee, that will have

23  the capacity to do a CT myelogram, MRI, will have the

24  capacity to infuse Omnipaque for the purposes of

25  diagnostic studies, in some cases they'll do



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 66 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 65

1  bronchoscopies.

2       A.  Sure.

3       Q.  Did you ever have staff privileges at an

4  outpatient diagnostic center as I have described?

5       A.  So I believe UCSF, my staff privileges

6  accounted -- encumbered all the UCSF clinics.  Have to

7  go back and look at the bylaws.

8       Q.  Okay.

9       A.  And certainly those clinics included those --

10 had those kind of services available.

11      Q.  When you came to UCSF, were you given tenure

12 from the beginning?

13      A.  Yes.

14      Q.  And tenure at UCSF means what?

15      A.  How long do you want it to mean?

16      Q.  Good response.

17           Does tenure mean that you get to hold the

18 faculty position for life if you are tenured?

19      A.  I let others judge what tenure is.

20      Q.  Okay.  Now, your CV represents to me that you

21 were the dean of the UCSF School of Medicine from 2003

22 to 2007, correct?

23      A.  That's correct.

24      Q.  You were fired on December 13th, 2007 as the

25 dean of the UCSF school of medicine?



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1          A.  As a dean, but not as the professor of
 2     pediatrics.
 3          Q.  And your termination as dean of the UCSF School
 4     of Medicine was upheld by a hearing committee at UCSF on
 5     January 11th, 2010, correct?
 6          A.  So, again, I was a whistleblower in a matter,
 7     and I will leave it to others to decide what is
 8     confidential.
 9          Q.  Was your termination of December 13th, 2007
10     upheld by a hearing committee on January 11th, 2010?
11          A.  I don't believe -- I believe that there are
12     certain things that are confidential.  I don't believe
13     that that was a matter of public record, but I don't
14     know.
15          Q.  Let's have exhibits -- items 2 and 3.
16              I'm handing you Exhibit 1245, Dr. Kessler.
17              MR. CHALOS:  What happened to the other
18     exhibits?
19              MR. GIDEON:  She's stacking them up.
20              MR. CHALOS:  I'm sorry, you marked the --
21              MS. WEETER:  I marked all those.
22              (Whereupon, Exhibits 1241 through 1245 were
23              marked for identification.)
24              MR. GIDEON:  And we'll cover those sometime in
25     the future.
```



1    Q.  Exhibit 1245 is a complaint you filed acting as

2  lawyer for yourself in the United States District Court

3  for the Northern District of California in the

4  San Francisco Division.

5        If you look at page 18 of the complaint, you'll

6  see your signature, correct?

7    A.  I see my signature there.  I believe the

8  Government Accountability Project represented this.

9    Q.  Well, I see only a David Kessler signing the

10 complaint pro se in the complaint filed December 12,

11 2008.

12       Do you see a signature by any other lawyer?

13   A.  No, but as I understand this, I mean, I was

14 represented by the Government Accountability Project.

15   Q.  Okay.  Well, subsequently a summary judgment

16 was granted in favor of the people you sued; isn't that

17 correct?

18   A.  This is with regard to retaliation complaints.

19   Q.  Well, with respect to the entire complaint.

20   A.  But if you read your question, your question

21 was whether my firing was upheld.  This is whether there

22 was retaliation.

23   Q.  Well --

24   A.  Under the civil rights law.

25



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              (Whereupon, Exhibit 1246 was marked for
 2              identification.)
 3              MR. GIDEON:  Q.  I'm handing you
 4    Exhibit 1246, which is the Order Granting
 5    Defendants' Motion for Summary Judgment:  Requiring
 6    Plaintiff's Opposition Papers to be Filed in an
 7    order entered October 5th, 2011 by Phyllis J.
 8    Hamilton, United States District Judge.
 9              This dismissed your complaint, did it not?
10         A.  There was a -- if you read the last opinion of
11    her -- the last paragraph, there was -- what she
12    dismissed, not on the merits, but she dismissed my
13    grievance, which was a retaliation grievance.
14         Q.  Okay.
15         A.  Under the whistleblower, again, the Civil
16    Rights Act.
17         Q.  If you'll look at page 8 of that summary
18    judgment order that's in front of you?
19         A.  Yes.
20         Q.  Focus right there on page 8, you will see the
21    finding by the United States district judge that on
22    January 11th, 2010 --
23         A.  Show me which sentence you are at.
24         Q.  It's the first full paragraph on page 8 of the
25    opinion.  Page 8 of 25.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     A.  Right.

2     Q.  It states, quote:  On January 11, 2010, the

3 Hearing Committee issued its finding of fact,

4 conclusions and recommendations.

5          And then there's a citation to certain

6 documents.

7     A.  Yes.

8     Q.  And then it says:  The Hearing Committee

9 unanimously concluded that Dr. Kessler's Grievance

10 should be denied in its entirety.

11    A.  The whistleblower -- the retaliation grievance.

12 I was labeled as a whistleblower.  That was agreed to,

13 and they denied retaliation.

14    Q.  Then it says:  The Hearing Committee found that

15 "the reason for Dr. Bishop's decision, in consultation

16 with his superiors, to terminate Dr. Kessler from his

17 Deanship was not retaliation for Dr. Kessler having made

18 protected disclosures.  Rather, Dr. Bishop's decision

19 reflected his view that Dr. Kessler could no longer

20 effectively lead the School of Medicine."

21          I've read that correctly, have I not?

22    A.  You have.

23    Q.  All right.  Wasn't this summary judgment order

24 the termination of the litigation between you and the

25 University of California at SF?



1       A.   This is exactly what this represents.

2       Q.   It is what it is, hah?

3       A.   It is what it is.

4       Q.   Okay.  Have you had any subsequent litigation

5  with UCSF over your relationship with that institution?

6       A.   Again, we'd have to check with the Government

7  Accountability Project, but I don't believe so.

8       Q.   Have you had any other personal litigation

9  against lawyers, doctors, or corporate entities?

10       A.   No.

11       Q.   Have you had any other personal litigation --

12       A.   Excuse me.  At what point in time?

13       Q.   Any time.

14            We found this on Pacer, which you know is the

15  federal court system.  Have you had any other litigation

16  against another medical school --

17       A.   No.

18       Q.   -- during your career?

19       A.   No.

20       Q.   Have you had any litigation against a company

21  or an individual over another dispute during your

22  career?

23       A.   During my career in my professional capacity?

24       Q.   Yes.

25       A.   No.



1    Q.  Have you had any litigation with any law firms

2    over your testimony or your fees?

3    A.  No.

4    Q.  Okay.  I mentioned earlier, when we first

5    started talking, that the FDA website reflects that you

6    were the commissioner of the Food, Drug and Cosmetics

7    Agency from November 8th, 19 --

8    A.  Food and Drug Administration.

9    Q.  Okay.  Food and Drug Administration.

10   A.  Please.

11   Q.  I'll get it.

12   A.  Thank you.

13   Q.  The website reflects your tour of duty was

14   November 8th, 1990 to February 28th, 1997.  Does that

15   sound correct?

16   A.  Again, that sounds correct.  That was

17   probably -- we have to check when I became -- officially

18   it was confirmed.  I probably didn't start until

19   December, I think I mentioned to you.

20   Q.  You did.

21       When did you actually become employed by Yale

22   University?

23   A.  Probably July 1st, 2000 -- I'm guessing July

24   1st, 1997.

25   Q.  When you left the FDA, did you already have, in



1  hand, an offer to join Yale?

2      A.  No, I did not.  I deliberately didn't -- I had

3  no contact with Yale prior to FDA.

4      Q.  Do you remember my request at the beginning

5  that I ask succinct questions and you give me a succinct

6  answer?  I'd like to ask it again.

7          When you left the FDA, did you have a job offer

8  in hand from Yale University?

9          MR. ARBITBLIT:  Objection.  Asked and answered,

10  Counsel.

11          THE WITNESS:  If my answer was -- is direct as

12  I could be, was no, I did not.

13          MR. GIDEON:  Good.

14          THE WITNESS:  I mean, it's on the record.

15          MR. GIDEON:  Q.  Okay.  How long did it

16  take you before you found employment after leaving

17  the FDA February 28th, 1997?

18      A.  I think in a matter of days.  I think that

19  weekend, if I'm right.  I don't remember exactly which

20  weekend it was, I recall coming home from the

21  dry-cleaner and my wife saying Rick Levin called and he

22  asked whether you want to be dean of Yale Medical

23  School.

24      Q.  Was Rick Levin the chairman or chancellor of

25  Yale University?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     A.  He was the president.  So I think it was a

2  matter of very soon thereafter.  That call from Rick was

3  unsolicited.

4     Q.  Okay.  You handed us, and we're going to

5  exhibit them in a few moments, two green binders that

6  reflected correspondence from a lawyer on your behalf to

7  Dr. Miller.

8     A.  And --

9     Q.  And --

10     A.  And a letter from me to Dr. Miller.

11     Q.  Fine.  I haven't had a chance to look at them.

12  I haven't had a chance to read the pages, so I don't

13  know the content.

14     A.  Uh-huh.

15     Q.  But you did mention, when you were describing

16  them, there was some kind of either formal or informal

17  audit document attached to one of the letters.

18        Do you recall that?

19     A.  Yes.

20     Q.  Okay.  Was there an evaluation audit or

21  examination of your billing the FDA for travel-related

22  expenses at the time you left on February 28th, 1997?

23     A.  Can I have those documents?

24     Q.  Sure.

25     A.  So as I -- as I remember --



1      Q.  Hold on just a second so I can hand you the

2  documents.

3      A.  Thanks.

4      Q.  I'm going to hand Dr. Kessler two documents

5  right now.  One is entitled Exhibit 1240 that begins

6  with a letter of July 25th, 2003 to Dr. Henry Miller.

7  That's the first page.

8          Then there is a second exhibit, 1239, that has

9  the same letter in this folder.

10          And here are those two back.

11     A.  Thank you, sir.

12     Q.  And the pending question, Dr. Kessler, is

13  whether when you left the FDA, was there an audit

14  underway to determine if you had appropriately accounted

15  for travel expenses?

16     A.  No, I don't think that -- I don't think -- as

17  you phrased the question, the answer would probably be

18  no.  But let's look at this letter because this probably

19  has the information.

20     Q.  In exhibit which number?

21     A.  Well, there is -- if you take Exhibit 1237

22  (verbatim), and if you look at this January 24th, 1997.

23          So let me give you a little more context for

24  your -- to the answer to that, best I can do this.

25          So there is -- there was first a -- we can make



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    this very simple.

2        Q.  Good.

3        A.  I was not involved with -- as this finding

4    shows, I was not involved at all with my travel

5    vouchers.  I didn't -- as this says, I did not

6    personally handle my travel vouchers or imprest fund

7    transactions.  I provided receipts or -- when it was

8    requested, but I wasn't involved in the details

9    reviewing and signing vouchers or transactions.

10           But I was -- but so -- but I did -- I

11   requested, in 1993, if you look, late 1993 or 1994, just

12   as a matter of prudence, the Office of Financial

13   Management reviewed his vouchers to assure compliance

14   with regulations, and a review found them to be in

15   order.

16           So the first time I just -- I voluntarily -- I

17   just said please, just review all my travel, and they

18   did.  And then I think what the history was -- and

19   again, you have to trace this.  But there was some -- I

20   think it's in my book.  There was some 650 FOI requests

21   on me.  And you can trace it through an outside

22   third-party group that requested just, again, hundreds

23   of requests for documents.

24           That, if you look, I think you can -- if you

25   connect the dots, that was -- we were involved in --



1    it's about investigation of the tobacco industry and

2    there were connections to that group with the tobacco

3    industry.

4            I don't know the full -- I've never been privy

5    to the full handoff of that group as a result of the

6    tobacco industry engaging with that group and monitoring

7    things and then handing it off.

8            But then it says in February of 1996, a

9    congressional inquiry into my travel eventually spurred

10   interest in the Associated Press.  The congressional

11   inquiry was limited.  I asked the scope be expanded to a

12   complete audit of his travel documents.  The

13   commissioner asked that the audit be conducted at a

14   level of detail beyond which was normally devoted, and

15   then steps were taken.

16           And then the audit of the six years travel

17   vouchers and imprest funds from 1991 to 1996 -- so this

18   was done before I left -- reveal 275 taxi claims with a

19   total reimbursement of $8,000.  And then it talks about

20   an over-reimbursement of 823.  But that was done at the

21   time.

22           Bottom line, though, is this demonstrates I was

23   not -- I had nothing to do with my travel expense forms

24   whatsoever.

25       Q.  I didn't ask you to admit complicity.  I just



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 78 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 77

1   wondered if there was an audit underway when you left.

2        A.  So the answer is no.  It looks like the audit

3   was complete.

4        Q.  Okay.

5        A.  And there was several audits done, some at my

6   request, as this lays out.

7        Q.  You graduated from law school in what year?

8   Not that long ago.  At least for me it's not that long

9   ago.

10       A.  So I probably -- I graduated, what, I did two

11  years at University of Chicago and a third year at

12  Harvard.  So Harvard was '78.

13       Q.  Okay.  Have you ever been licensed to practice

14  law in any state?

15       A.  Never sat for a bar.  Chose not to take a bar.

16       Q.  So the answer is what?

17       A.  Never took a bar.

18       Q.  So never licensed to practice law anywhere in

19  the United States?

20       A.  Because I never took a bar, yes.  I graduate --

21  have my law degree.

22       Q.  You've never taken a deposition, argued a

23  motion in court under the authority of another lawyer,

24  have you?

25       A.  No, but I've taught law school.



```
1          Q.   Without being licensed?

2          A.   I don't think -- I've taught law school at

3    Columbia Law School.  I've taught food and drug law.

4    You don't need to be licensed to be a professor, to have

5    an academic appointment.

6          Q.   True.

7          A.   Thank you.

8          Q.   You became familiar with the definition of

9    cause in fact in one or both of the law schools you went

10   to, didn't you?

11         A.   Cause in --

12         Q.   Did you have a torts class when you were in law

13   school?

14         A.   Richard Epstein taught me torts.

15         Q.   So the answer is yes?

16         A.   That answer is probably -- well, if we were

17   joking, I would probably say no, if you know Richard.

18         Q.   Did you have a torts class, irrespective of the

19   quality of the instructor, when you were in law school?

20         A.   Richard's interest was not really torts, as you

21   know that.  It was law and economics.  So yes, I did

22   take torts.

23         Q.   Did you become familiar with the not

24   complicated concept of cause in fact when you were in

25   law school?
```



1     MR. CHALOS:  Objection to the form.

2     THE WITNESS:  I probably saw it -- the issues

3  of causation is what I would do, is probably what I was,

4  you know, generally familiar with causation issues.

5     MR. GIDEON:  Q.  Were you introduced to the

6  uniform commercial code when you were in law school?

7     A.  I certainly took courses in --

8     Q.  UCC?

9     A.  -- yes, sir.

10     Q.  You --

11     A.  I leave it -- on that there are very few things

12  I would say -- you know, on that one, please talk to

13  others on the UCC.

14     Q.  You don't claim any expertise under the UCC, do

15  you?

16     A.  I took Andy Kaufman's UCC class, but I would

17  strongly urge you to consult somebody else.

18     Q.  I'll ask the question again.  Irrespective of

19  who your instructors were or were not, you don't claim

20  to be an expert in the application of the UCC?

21     A.  I thought a court determined that.  I probably

22  have a greater knowledge than the average citizen, but I

23  certainly don't want to get involved in UCC issues.

24     Q.  Okay.  Tell me when Saint Thomas Outpatient

25  Neurosurgical Center first began purchasing product from



```
 1   medical sales management and NECC.  Month and year.
 2        A.  I'd have to look it up.  I don't want to guess.
 3   I think it was probably around 2011, but I have --
 4   there's evidence in that documentation, I believe.
 5        Q.  Did you look at the exhibits to Debbie
 6   Schamberg's deposition as you formed your opinions in
 7   this case?
 8        A.  Yes.  I mean, I certainly --
 9        Q.  Let me have No. 4.
10        A.  As I read that deposition.
11            MR. ARBITBLIT:  Counsel, if you are switching
12   topics, we've been going for about an hour and 25
13   minutes.
14            MR. GIDEON:  Whenever you want to stop.
15            MR. ARBITBLIT:  Dr. Kessler, if you want to
16   take a break --
17            THE WITNESS:  If you are in the middle of a
18   series of questions, why don't we go through.  I'm
19   perfectly happy to.
20            MR. GIDEON:  It's at your pleasure.  I don't
21   care.  If you want to take a break -- Don, if you want
22   to take a break, it's fine.  I will continue all day
23   long without stopping, I will warn you about that.
24            MR. ARBITBLIT:  I know the feeling.
25            MR. GIDEON:  So may I have -- we can discuss
```



Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 82 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 81

1    this and then we'll take a break after that, how does

2    that sound?

3                MR. ARBITBLIT:  Fine.

4                (Whereupon, Exhibit 1247 was marked for

5                identification.)

6                MR. GIDEON:  Q.  I'm going to hand you what

7    was marked as Exhibit 31 to the Schamberg

8    deposition, but it's Exhibit 1247 to yours.

9                And we've arranged this, Dr. Kessler -- first

10   you can take a look at it and see if you don't have some

11   working recollection of seeing these materials.  I think

12   your answer will be yes, but tell me independently

13   whether that is your answer.

14      A.  I think I -- not only is it yes, but I believe

15   I cite this in my report or in my supplemental.

16      Q.  Which is why I asked you earlier about the

17   materials that you selected versus the ones that you

18   focused on, in part to determine your familiarity with

19   the materials.

20               But you do recall seeing the documents in the

21   exhibit that's in front of you, don't you?

22      A.  I take -- I mean, I take you at your

23   representation that this is the whole document.  I

24   haven't turned every page, but I certainly see certain

25   things that I've seen before.



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016

Page 82

1      Q.  And you can see, in the very first document in
2  this exhibit, it's an email from Jason Salvucci,
3  September 27th, 2010, to Debbie Schamberg?
4      A.  Yes.
5      Q.  Where he refers to meeting her in Franklin at
6  the show?
7      A.  Yes.
8      Q.  Now, what experience have you had with the
9  Federation of Ambulatory Surgery Centers?  FASCA?
10      A.  Probably none.
11      Q.  Have you ever attended a FASCA show?
12      A.  Probably not.  I have no recollection.
13      Q.  What limitations were placed by FASCA on who
14  could be an exhibitor at their shows?
15      A.  You'd have to ask FASCA.
16      Q.  It's okay to just say I don't know.
17      A.  You would have to ask FASCA.
18      Q.  You don't know, do you?  You don't know?
19      A.  I could find -- if there's a document, I'm
20  happy to look at the document.  But I don't know.
21      Q.  Did the Food and Drug Administration appear at
22  FASCA shows?
23      A.  We'd have to go and look at the record.  I
24  don't know the answer to that.
25      Q.  In order for someone from FDA to go to a show



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    as an exhibitor, would they have to get some advance

2    authorization?

3         A.   To show up as a -- to go to a technical --

4         Q.   Not to go -- to go as an exhibitor to a FASCA

5    show --

6         A.   If FDA wanted to exhibit?

7         Q.   Yes.

8         A.   If FDA wanted to exhibit, they would apply as

9    any other exhibitor is my guess.

10        Q.   But within FDA, let's say I was someone who

11   worked for FDA during the time you were there and I

12   wanted to attend, for whatever reason, a FASCA show as

13   an exhibitor, would I have to get permission to do so?

14        A.   Well, you probably have to fill out certain --

15   certainly attendant permissions.  You would probably

16   have to fill out a travel voucher if you wanted to go

17   to -- in anticipation if I'm going to fly there.

18             If I was going to drive there, and it was local

19   and it was in my jurisdiction, I -- I can make the

20   decision whether it was in my jurisdiction and I had a

21   reason to go for FDA business, I could probably make

22   that decision.

23        Q.   Do you know if FDA acted as an exhibitor at

24   ambulatory surgery center shows, FASCA shows, where FDA

25   had a booth and they were in the same sequence as the



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    booths for NECC and Ameridose?  Do you know whether

2    that's true or not?

3         A.  I'd have to check.  I don't know.

4         Q.  Okay.  You will see, it's item No. 3, in the

5    exhibit ahead of you, is methylprednisolone acetate.

6         A.  Yes.  You are on page 3, is that what you said?

7         Q.  Yes, sir.  The third page in the exhibit should

8    say methylprednisolone acetate.

9         A.  Yes.

10        Q.  As of the date that these materials were sent

11   to Debbie Schamberg, September 27, 2010, was there a

12   commercially available preservative-free

13   methylprednisolone acetate?

14        A.  I'm not aware of that, but depends -- I'm not

15   aware of one.

16        Q.  Okay.

17        A.  I'm aware of the -- Pfizer's product that -- of

18   Depo-Medrol.  I think Ms. Schamberg says that that was

19   preservative-free, but everything I know, that contains

20   benzyl alcohol.  So to me that would be a preservative.

21        Q.  Did the Depo-Medrol, the branded product from

22   Pfizer, also include an active ingredient called

23   picolinium?

24        A.  I think you would have to give me the label to

25   refresh --



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 85

1         Q.  We would just read the label together --

2         A.  Yes.

3         Q.  -- and see if picolinium is present or not?

4         A.  If picolinium is on the label, then it was in

5    the product.

6         Q.  Is picolinium a preservative?

7         A.  I'd want to check.

8         Q.  Okay.

9         A.  I thought -- I'd want to check.  When I looked

10   at the -- the Depo-Medrol, the one warning about

11   preservative was benzyl alcohol.  But we can -- why

12   don't you just give me the label and I can answer it.

13        Q.  Your report refers to Depo-Medrol being

14   approved in 1959 originally by the FDA.  And the formula

15   for Depo-Medrol has continued to include benzyl alcohol

16   for approval up to and including the present date,

17   doesn't it?

18        A.  I believe at .99 percent or something like

19   that.

20        Q.  Yes.

21        A.  If you can do me a favor and just hand me the

22   label for Depo-Medrol, I think you could -- I'd want to

23   testify based on the label.

24        Q.  We will get the label for you.

25        A.  Great.  I appreciate that.

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 87 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 86

1       Q.  We'll continue with these documents before we
2   take a break.
3           You see the representation on page 3 by NECC
4   that all CSP formulations are USP 797 compliant.  Do you
5   consider yourself to have working familiarity with
6   USP 797?
7       A.  I think I was.  USP and FDA -- I'm sorry,
8   working familiarity?
9       Q.  Yes.
10      A.  I'd have to -- I'm certainly working
11  familiarity with USP.  I was on the board as
12  commissioner of USP.  But I don't have working
13  familiarity with that statute on the basis of my --
14  sitting here today.
15          But if you give me the pharmacopeia standards,
16  I'm happy to discuss those.
17      Q.  Prompted by having a copy of USP 797 in front
18  of you, you feel comfortable discussing the language but
19  you don't have it memorized; is that what you are
20  telling me?
21      A.  I'd be happy to discuss it --
22          MR. CHALOS:  Hang on a second.  Object to the
23  form.
24          THE WITNESS:  Again, I think exactly -- if you
25  hand me the standards, I'll tell you.  Certain standards



1    I feel more comfortable than others --

2         MR. GIDEON:  Q.  Right.

3         A.  -- discussing.  Because -- so just hand me the

4    standards and I'd be happy to tell you which ones I'm

5    comfortable doing.

6         Q.  Okay.  Now, where is there any statement on

7    page 3 of the document that I handed to you, that

8    exhibit that has methylprednisolone acetate at the top,

9    where it says this can only be dispensed with a

10   patient-specific prescription?

11        A.  Well, so this says -- so the answer is this

12   does not say those exact words, as you've stated.  It

13   does say, if you look at three bullets from the bottom,

14   that it is compounded for your patients by pharmacists

15   extensively trained in aseptic compounding.

16        The definition of compounding, right,

17   certainly -- almost every definition of compounding

18   means that the drug is -- if it's compounded, it's

19   available for an individual patient by an individual

20   prescription subject to a physician/patient

21   relationship.  So that's the basis of compounding.

22        Q.  Okay.  Is there a difference between aseptic

23   compounding versus terminal sterilization?

24        A.  I'd want to review that.

25        Q.  Let me ask it differently.  Do you know of any



1  difference between aseptic compounding and terminal

2  sterilization?

3      A.  I'd want to look at the various standards

4  before I gave an opinion.

5      Q.  Do you have any information at all whether the

6  terms are synonymous or different, as you and I speak

7  now?  And the terms I'm talking about are aseptic

8  compounding on one hand versus terminal sterilization on

9  the other.

10     A.  Yeah.  So I, obviously, was involved in major

11 sterility issues.  And sterility is part of the Food,

12 Drug and Cosmetic Act.  I'd want to look at the code

13 before I give an opinion.

14     Q.  What is a class 10 microenvironment?

15     A.  I'd have to look that up.

16     Q.  How does a class 10 differ from an ISO 5 or an

17 ISO 7 microenvironment?

18     A.  Happy to look that up.

19     Q.  Don't know without looking?

20     A.  Again, I'd be happy -- those things are easy to

21 answer your question.  Again, happy to do that right now

22 if you would like me to.

23     Q.  What I'm interested in is whether you know

24 without being prompted by looking at something else.

25     A.  Sir, I'm here as an expert.  And again, if you



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   look at my report, I don't go into this.  You are asking

2   me questions that are beyond my report.  Happy to give

3   you the answers, but in order to do that as an expert,

4   I'd want to make sure.  I'm not going to do stuff off

5   the top of my head.

6        Q.  Well, let me ask you this, Dr. Kessler:  Can

7   you tell me, without doing some research in writing,

8   what the difference between an ISO 5 versus an ISO 7

9   microenvironment is?

10       A.  I'd have to look that up.  I don't carry that

11  in my head.

12       Q.  All right.  What and how is hyaluronidase used?

13  Perhaps you can pronounce it better than I can.

14       A.  Hyaluronidase.

15       Q.  Yes.  I like your pronunciation.  It's on

16  page 4.

17           How  is that used and what is it used for?

18       A.  So hyaluronidase -- I believe hyaluronidase is

19  usually found in collagen.  I believe it's a by-product,

20  and is an enzyme that would affect collagen.  Happy to

21  look up the biochemistry.

22       Q.  I'm not interested in this cellular action, but

23  in what circumstances would a physician use

24  preservative-free hyaluronidase?

25       A.  So I would want to look at the label for



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   hyaluronidase.  If you have it, give it to me.  And the

2   way we would determine that is look at the label for

3   hyaluronidase and see what it would be indicated for.

4   Again, I don't carry it in my head.

5       Q.  Don't know?

6       A.  I'd want to see what -- it's very easy to get

7   the answer.  We'd look at a label and see what the

8   indications for use would be.

9       Q.  Okay.  Now, looking at the advertisement by

10  NECC, page 4, the one we were just looking at, is there

11  any statement that these products are only available

12  with a patient-specific prescription?

13      A.  Again, as I stated on the prior page, certainly

14  any -- it says these are compounded.

15      Q.  Right.  But my question is specific.  Is there

16  a statement these products are only available with a

17  patient-specific prescription?  It's a yes or no.

18      A.  So --

19          MR. ARBITBLIT:  Objection.  Objection.  You

20  interrupted his answer.

21          MR. GIDEON:  Yeah.

22          MR. ARBITBLIT:  It's not necessarily yes or no.

23  So object to the question being misleading.

24          THE WITNESS:  So if the definition of

25  compounding includes patient-specific prescriptions as



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    it does, if drugs are available for compounding by

2    patient -- I mean, compounding is done for

3    patient-specific prescriptions.  So those things are --

4    certainly compounding includes patient-specific

5    prescriptions.

6            So I would certainly say that anybody looking

7    at this, if you know it's compounded and if you're -- if

8    you're a professional, you should know that it's a

9    patient-specific prescription.

10           MR. GIDEON:  Q.  I see.  Is the language

11   anywhere on this page where it says this product is

12   only available with a patient-specific prescription,

13   question mark?

14       A.  On this page, it says it's compounded.

15       Q.  Yeah.

16       A.  Doesn't say -- have that language.  I believe

17   that if you look several pages later, it's there.  But

18   it's not -- it says it's compounded, which means

19   patient-specific prescription.

20       Q.  Right.  Next page, page 5, starts off with

21   Trouble Finding Preservative-Free Kenalog.

22           Do you see that?

23       A.  Yeah, I do.  It's triamcinolone, right?

24       Q.  Right.  It also states here, as it did on each

25   one of the prior pages, USP 797 compliant, correct?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.  Yes.
 2        Q.  All right.  Now, if NECC had actually complied
 3   with USP 797, the fungal meningitis outbreak never would
 4   have occurred; isn't that correct?
 5             MR. CHALOS:  Objection.  Calls for speculation.
 6             THE WITNESS:  I wouldn't want to give an
 7   opinion on it.
 8             MR. GIDEON:  Q.  Do you have an opinion on
 9   that question?
10        A.  No.
11        Q.  Sir?
12        A.  No.
13             MR. GIDEON:  Don, you said you wanted to take a
14   break.  This is an appropriate time to do so.
15             MR. ARBITBLIT:  Before doing so, Counsel, I'd
16   ask, for completeness, that you read paragraph G on
17   page 10 of the document under the heading Dispensing.
18             MR. GIDEON:  You'll get a chance to do so
19   whenever you want to.
20             MR. ARBITBLIT:  We'll do it now, then.
21             MR. GIDEON:  Once we -- no, no.  You don't get
22   a chance in an expert's deposition to do an
23   interrogation.  You get the opportunity --
24             MR. ARBITBLIT:  I --
25             MR. GIDEON:  Wait a minute.  Let me finish.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1           MR. ARBITBLIT:  Sure.
 2           MR. GIDEON:  You get an opportunity after I am
 3   finished.
 4           MR. ARBITBLIT:  My understanding, sir, is that
 5   the rule of completeness applies at the time the
 6   question is asked about a document, and that you have
 7   not complied with it by omitting the text at page 10
 8   that is directly addressed to the series of questions
 9   you just asked the witness about pages 3 and 4.
10           I believe that I am entitled to read that into
11   the record now if you choose not to.
12           MR. GIDEON:  Okay.  Well, I can't stop you from
13   doing so today, but I don't think you have that
14   prerogative.  I don't recall asking him about page 10.
15   But if you -- if you want to bring up page 10, then I
16   guess I can't stop you from doing so.  But this doesn't
17   count against my time.
18           MR. ARBITBLIT:  This doesn't count against your
19   time, but I will read into the record from the same
20   document that counsel was using at page 10 under
21   Dispensing as part of -- at page 9.
22           MR. GIDEON:  Excuse me, though, Don.
23           MR. ARBITBLIT:  Yes.
24           MR. GIDEON:  You are starting on page 10, but
25   you are not even purporting to begin with the entire
```



```
 1   document which begins on page 9 with General --
 2              MR. ARBITBLIT:  I was just about to do that.
 3              MR. GIDEON:  -- General Overview of Policies &
 4   Procedures for Compounding Sterile Products at NECC.
 5              MR. ARBITBLIT:  Fair enough.  That's just what
 6   I was about to do, Counsel.
 7              Starting at page 9 of the document, General
 8   Overview of Policies & Procedures for Compounding
 9   Sterile Products includes paragraph G on the following
10   page.  Quote:  Product is dispensed by patient-specific
11   prescription only.  There must be a specific
12   practitioner-patient-pharmacist relationship to dispense
13   to an individual patient or facility, end of quote.
14              MR. GIDEON:  Okay.  Now are you going to read
15   the rest of pages 9 and 10?
16              MR. ARBITBLIT:  I've read what I wanted to
17   read.  If you want to read more, you are welcome to do
18   that.
19              MR. GIDEON:  Okay.  So the rule of completeness
20   is not requiring you to spend your time going on the
21   entire content of the document.
22              MR. ARBITBLIT:  The rule of completeness does
23   not mean that either of us has to read 33 pages into the
24   record, Counsel, and you know that quite well.
25              MR. GIDEON:  You got it.  I agree.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1             All right.  Let's take a short break and then
 2    we'll come back.
 3             While we are on break, to save some time, we're
 4    going to dictate the exhibit numbers on the documents
 5    that he gave us earlier.  Okay?
 6             MR. CHALOS:  Let's do that when we're all in
 7    the room together.
 8             MR. GIDEON:  Then let's just do it right now
 9    before we take a short break.
10             MR. CHALOS:  That's fine.  This counts against
11    your time, by the way.
12             MR. GIDEON:  The article that's entitled FDA
13    Tries to Compound the Compounding Rules is Exhibit 1244.
14             The article, the FDA Mandate:  Never Give Up,
15    Never is Exhibit 1243.
16             The -- you are covering the phone.
17             THE WITNESS:  I'm sorry.  Are there people on
18    the phone?
19             MR. GIDEON:  I don't know.
20             The file folder that has the Franck's Lab
21    documents is Exhibit 1242.
22             The file folder that has material from Griscom
23    to Hyde is Exhibit 1241.
24             The ASHP material on methylprednisolone acetate
25    injection is 1238.
```



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1           FDA documents that deal with the Colorado Board

2    of Pharmacy cease and desist order that was sent to the

3    FDA are Exhibit 1237.

4           The definition of adulteration is Exhibit 1235.

5           And the Ota email correspondence is

6    Exhibit 1234.

7           And then we have two additional documents that

8    are 1240 and 1237 (verbatim) that are the correspondence

9    from a lawyer Davis Wright and Tremaine to Dr. Miller.

10   Okay?

11          MR. ARBITBLIT:  Okay.

12          THE VIDEOGRAPHER:  This is the end of disc

13   No. 1, volume 1.

14          We are off the record at 10:54 a.m.

15          (Recess taken from 10:54 AM to 11:07 AM)

16          THE VIDEOGRAPHER:  This is the beginning of

17   disc No. 2, volume 1.

18          We are back on the record at 11:07 a.m.  You

19   may proceed.

20          MR. GIDEON:  Q.  You said that you wanted

21   to address something, Dr. Kessler?

22       A.  Yes.

23       Q.  What is it you want to address?

24       A.  Thanks.  Just -- so if you go to look at

25   page 82.



1      Q.  Of what?

2      A.  Of the transcript here.

3           THE REPORTER:  It's my transcript today.

4           MR. GIDEON:  Oh.

5           THE WITNESS:  If you go to page 82 of it, the

6    question is did Depo-Medrol the branded product from

7    Pfizer also included an active ingredient -- may I do

8    that -- called pick -- she -- I'll let you get that.

9           THE REPORTER:  It will be edited later.

10          THE WITNESS:  It will be edited -- but

11   basically pick.  That statement was made, and then she

12   puts a question mark.

13          My answer was you would have to give me the

14   label.

15          Let me just read for the record.  The label

16   that I have from Pfizer for Depo-Medrol shows that the

17   ingredients includes methylprednisolone acetate,

18   polyethylene glycol, polysorbate, monobasic sodium

19   phosphate, diabasic sodium phosphate, and that the only

20   preservative that's listed on the label that I have in

21   front of me is benzyl alcohol.  It says benzyl alcohol

22   added as a preservative.

23          MR. GIDEON:  Q.  Want to see if I can ask

24   you some questions that will elicit a direct answer.

25   Very succinct answers.



1           Were you consulted by the Massachusetts Board

2    of Registration and Pharmacy in connection with the

3    fungal meningitis outbreak?

4        A.   No.

5        Q.   Were you consulted by the FDA in connection

6    with the fungal meningitis outbreak?

7           MR. CHALOS:   Object to the form.

8           THE WITNESS:   Depending on how you interpret

9    your question, the answer would be perhaps.

10          MR. GIDEON:   Q.   By whom and when?

11       A.   So again, the only hesitation I have here is

12   I'm trying to think through the Department of Justice

13   request.   So if you could -- you are asking me a

14   question -- I mean, again, just -- I need lawyers to

15   make sure we don't misstep here.   Happy to answer it,

16   but I don't have in my own -- DOJ is not here, so I just

17   want to be careful here.

18          So, I mean, again, I'm not sure how to answer

19   that without the advice of good counsel, meaning wise

20   people, in light of DOJ's letter.

21       Q.   That's your answer?

22       A.   The Department of Justice, sir, has made a

23   request of you --

24       Q.   Look, I know that.   I don't want to spend my

25   time having you recap a letter that we --



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.   Hold on a second --

 2             MR. CHALOS:  Wait a second --

 3             THE WITNESS:  May I finish my answer --

 4             MR. GIDEON:  I just asked, is that your answer?

 5   It doesn't need -- you don't need to spend all my time

 6   talking about your thoughts.

 7             THE WITNESS:  Well, I mean, we --

 8             MR. CHALOS:  Hang on.  I object to the

 9   admonition.  It's not a question.

10             MR. GIDEON:  Guys, one of the two of you should

11   note the objections.  You know that's a fundamental

12   rule.  It's either you, Mark, or it's you, Don.

13             MR. CHALOS:  That's not true.  That's not the

14   way it works in MDL, C.J.  Sorry to tell you, but --

15             MR. GIDEON:  You're such an expert.  I'm really

16   appreciative of your commentary.  And really, really

17   thankful.

18             MR. CHALOS:  I object to --

19             MR. GIDEON:  What I'd like is a direct answer

20   to my question --

21             MR. CHALOS:  Hang on --

22             MR. GIDEON:  -- which applies in every

23   deposition in every setting.

24             MR. CHALOS:  Let me interpose an objection.

25   We're not interested in your admonitions.  If you have a
```



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 101 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 100

 1   question, you can ask it.  If you don't like his answer,

 2   there's nothing you can do about that, Mr. Gideon.

 3           MR. GIDEON:  Well, there is something I can do

 4   about it, and I'll ask it again.

 5           MR. CHALOS:  Fair enough.

 6           MR. GIDEON:  Q.  Were you consulted by the

 7   FDA in connection with the fungal meningitis

 8   outbreak?  Question mark.

 9           MR. CHALOS:  And I object to that question on

10   the grounds that we discussed earlier.  There's a

11   pending request from the Department of Justice that we

12   treat -- that we are mindful of their assertions of

13   privilege here.  Dr. Kessler has expressed his concern

14   that we may be getting very close if not over that line.

15           So object to the question.

16           MR. GIDEON:  And do what?

17           MR. CHALOS:  Period.

18           MR. GIDEON:  Well, I want an answer to the

19   question.

20           MR. CHALOS:  Well --

21           THE WITNESS:  So, just trying to get -- get to

22   the question.

23           MR. GIDEON:  Q.  You'll see a really

24   succinct question:  Were you consulted by the FDA in

25   connection with the fungal meningitis outbreak?



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 102 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 101

1    Question mark.

2            MR. CHALOS:  Same objection.

3            THE WITNESS:  So I -- again, being respectful

4    of the Department of Justice's admonitions to counsel

5    here, I'm not sure I fully understand the scope -- what

6    you mean by connection with the fungal meningitis

7    outbreak.  In connection with.

8            So if -- because that's a -- I have had -- let

9    me put on the record, I have had a conversation, right,

10   with a senior FDA official, right, at a point in time,

11   right -- again, I don't know whether it's within your --

12   your time frame in connection with the fungal meningitis

13   outbreak, right?  But I have had a conversation with a

14   senior FDA official, right?

15           I don't know what the word "consulted" means,

16   but we -- we had a conversation.  Depends what you mean

17   by "consulted" and "in connection with."  So I've had a

18   conversation with a senior FDA official.

19           MR. GIDEON:  Q.  Okay.  In connection with,

20   related to, because of, dealing with the fungal

21   meningitis outbreak or not?

22       A.  It's possible to interpret that conversation as

23   within the scope of that question.  Yes.

24       Q.  All right.

25       A.  But again --



```
 1          Q.  When was this conversation with the senior FDA
 2    official?
 3               MR. CHALOS:  Hang on.  Objection.
 4               Are you finished with your answer, sir?  You
 5    are entitled to finish it.
 6               THE WITNESS:  Yeah.  I can only date it by
 7    events.
 8               MR. GIDEON:  Q.  Fine.
 9          A.  I don't have a date.
10          Q.  Sure.  Date it by an event then.
11          A.  So there were certain congressional hearings.
12    There were multiple congressional hearings, and it was
13    around that time.
14          Q.  Was it in connection with, related to, or
15    dealing with the testimony of FDA representatives before
16    either the United States Senate or the United States
17    House of Representatives?
18               MR. CHALOS:  Same objections interposed before
19    regarding the Department of Justice's request that we
20    stay away from privileged materials.
21               THE WITNESS:  Again, I don't fully -- just for
22    the record, I don't fully understand the issue.  I'm not
23    asserting the privilege.  I'm just trying to be
24    respectful of DOJ's request.
25               The -- I'm not sure it was specifically about
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 104 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 103

1    testimony in your question.  I mean, again -- but maybe

2    you would interpret it as that conversation having to do

3    with testimony.  I remember a general conversation.

4              MR. GIDEON:  Q.  I'm just asking the

5    questions.

6              I don't know -- so far, I don't know if you

7    talked to anybody --

8         A.  Well, I just told you I did.

9         Q.  Okay.  Well, who was it you talked to?

10        A.  So I'm going to ask --

11             MR. CHALOS:  Same objection.

12             THE WITNESS:  Yeah.  I'm going to ask the DOJ

13   and counsel and your judge, respectfully, to decide

14   whether you want me -- whether the court wants me to do

15   that.  I'm happy to do that --

16             MR. GIDEON:  Q.  Well, then go ahead and do

17   it.

18        A.  Well, you're not the only -- there's others who

19   have interests here.

20        Q.  I see.

21        A.  And I think, respectfully -- again, I'm only

22   too happy to discuss this.  But I've got to -- there was

23   a letter that you received from the Department of

24   Justice, and I -- obviously you want to honor that, I

25   would assume, as well as you want to honor that.

DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    I'm happy to talk.  I'm just trying to be

2  thoughtful here on how we should deal with this.  I've

3  had a conversation with a senior FDA official that could

4  be interpreted as having to do with FDA and the fungal

5  meningitis outbreak.  I don't know whether the

6  United States government's interest, the court's

7  interest, whether you want me -- whether I should answer

8  that question or not.

9    Q.  Are you declining to answer the question

10  because of some uncertainty on your part about whether

11  you should?

12    A.  I -- again, I'm the last one to be --

13    Q.  Please answer my question.

14    A.  I am, sir.  Please let me answer my -- let me

15  fully answer.

16    Okay.  I am not an expert.  Okay?  I am a

17  student of, right, but I am not going to play lawyer

18  here on deliberative process privileges of the

19  United States government or on executive privilege, I

20  mean, or on attorney-client, right?

21    They have put you on notice to be careful of

22  conversations, right, that would relate to that.  I'm

23  pointing that out, right?  I'm happy -- whatever the

24  court would like me to answer, I'm only too happy to

25  answer.  But I think this needs to be discussed.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ  Document 2766-1  Filed 03/29/16  Page 106 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 105

1          I don't know who's on the phone, I don't know

2     who's watching this streaming video, right?  And I have

3     concern -- and I think we have to do this thoughtfully.

4     Again, happy to answer the question, I mean, if that's

5     the right thing to do.

6          If you want to represent that it's the right

7     thing to do in the Department of Justice's view, I'll

8     take your representation.

9          Q.  All right.  I asked you a simple question, you

10    have now told me three times about the reservations

11    expressed by the justice department yesterday.

12         You've told me three times you're happy to

13    answer but you are uncomfortable doing so.

14         All I want from you is a succinct answer.  Are

15    you declining to answer my question today until there is

16    a ruling from Judge Zobel or a ruling from Judge Boal

17    that clears away the uncertainty?

18         MR. CHALOS:  Objection.  Form and asked and

19    answered.

20         THE WITNESS:  I'm happy to answer the question

21    today if you will assure me in asking the question, as

22    an officer of the court, you, that there is no

23    Department of Justice interest that could be asserted

24    that I would be running up against.

25         If you give me that assertion, that it's fine



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 107 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 106

1  for me to answer that question in view of the Department

2  of Justice, I'm happy to answer that question.

3          MR. GIDEON:  Q.  Well, Dr. Kessler, you

4  know, by dint of experience, that I cannot speak for

5  the United States Department of Justice.  You know

6  that.  You knew it when you asked me the rhetorical

7  question.

8          MR. CHALOS:  Hang on a second.  Objection.

9  That's not even a question.  Object to the form.

10         THE WITNESS:  But you are on notice that you

11  should not go near deliberative process issues of the

12  FDA.  So you know what the rules are.  I mean, you're

13  the officer of the court.  If you're confident that your

14  question doesn't raise any issues -- I mean, again, I

15  went to law school, but you are the lawyer here.

16         MR. GIDEON:  Q.  Yeah.

17     A.  Okay.  And I'm just telling you, I had a

18  conversation, I recall a conversation, you are pushing

19  me to answer that question.  And I think it would be

20  wise to make sure, before you go further, to consult

21  with the Department of Justice.

22         I'm happy to have you do that today.  Pick up

23  the phone and call and do that.  But please work that

24  out, right, so we can all -- I'm happy to answer that

25  question.



1       Q.  We'll do two things.  We don't need to spend

2   any more time on this particular point.  We'll get ahold

3   of Glass, David Glass.  We'll get the court reporter to

4   give him a specific question at a break that he can tell

5   us whether or not he asserts an objection or not.  If he

6   does, we'll take this up with Judge Boal.  If he

7   doesn't, I'll expect an answer to the question.  Simple.

8   Simple solution.

9       A.  Fair.

10      Q.  Okay.

11      A.  Thank you.

12      Q.  Were you consulted by the United States House

13  of Representatives or the United States Senate with

14  respect to the legislation passed in 2013 designed to

15  reform control and management of compounders?

16      A.  I don't recall.

17      Q.  I suspect you are aware that the Senate health,

18  education, labor and pension committee is currently

19  looking at funding for the NIH budget for the FDA; are

20  you aware of that?

21      A.  I am aware generally, yes.

22      Q.  Okay.  And I assume you are also aware of the

23  fact that the Senate labor committee, the one I just

24  mentioned to you --

25      A.  That I used to work for.



1    Q.  -- chaired by, now, Lamar Alexander of

2    Tennessee, is looking at changing the rules regarding

3    FDA jurisdiction over lab testing equipment and the

4    extent of jurisdiction over medical software.  You are

5    familiar with that, aren't you?

6        A.  I'm aware that there are multiple bills pending

7    in the Senate.  If you have any of those draft bills,

8    please give them to me so we can be specific.  I know

9    there are a whole host.  There are many FDA issues that

10   are currently under consideration.

11       Q.  The question is, have you been consulted by the

12   Senate health, education, labor and pension committee on

13   any of the points I just brought up?

14       A.  On medical software or --

15       Q.  Lab testing equipment.

16       A.  I don't believe by the Senate health committee,

17   no.

18       Q.  When were you engaged to participate in this

19   specific litigation?  "When" is the operative question.

20       A.  The word that I'm having a hard time is

21   "engaged."  I can tell you when I was contacted.

22       Q.  All right.  That's what I mean.  When were you

23   asked to participate, hired on, asked to get involved?

24   When?

25           MR. CHALOS:  Objection.  Form.



1          THE WITNESS:  I think the first conversation I

2    had -- don't hold me to it -- may have been -- may have

3    been summer 2014, but don't hold me to that date.  I

4    don't have a great recollection.

5          MR. GIDEON:  Q.  Well, is there something

6    we should look at so you can refresh your

7    recollection and tell us when you were actually

8    asked to be involved?

9          A.  You'd probably have to look in my brain or look

10   at the person who talked to me.  I think it was a

11   conversation.  I don't think there was anything else.

12         Q.  Who is the person I should look at who talked

13   to you?  Should I look at Don?

14         A.  If that's permissible under the federal rules.

15         Q.  Is it Don that engaged you?

16         A.  I -- you are using the word "engaged."  I --

17   again, may I -- am I free under the federal rules to

18   tell you who I've communicated with?

19         Q.  Of course.

20         A.  So if that is fine, then, yes, I had a

21   conversation with Mr. Arbitblit, I believe, around 2014.

22         Q.  All right.  And Mr. Arbitblit is the gentleman

23   who is here today that I was referring to as Don?

24         A.  Yes.

25         Q.  Okay.  Was the telephone call from



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 111 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 110

1    Mr. Arbitblit to you in the summer of '14 the first time

2    you had worked with him?

3         A.  No, I don't believe so.

4         Q.  Let's take a look at Exhibit B to your

5    report --

6         A.  Sure.

7         Q.  -- which is a listing of litigation-related

8    involvements.

9         A.  If you want to just see, it is --

10        Q.  I'm going to hand you one.  Don't worry about

11   it.

12        A.  Thanks.

13        Q.  We're going to hand you one.

14            And for the purposes of efficiency, I'm going

15   to refer to the firm you are working with today as Lieff

16   Cabraser.  There may have been name changes over the

17   years, but that's the firm I'm referring to.

18            Mr. Arbitblit is a member of Lieff Cabraser,

19   correct?

20        A.  Yes.

21            (Whereupon, Exhibit 1248 was marked for

22            identification.)

23            MR. GIDEON:  Q.  Okay.  This is

24   Exhibit 1248, and it's Exhibit B to your testimony?

25        A.  Yes.



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 111

1        Q.   The first thing I want to do is for you to tell
2    us on the bullet points in which of those cases were you
3    employed, contacted to participate in the case, by
4    Mr. Arbitblit or one of his colleagues at Lieff
5    Cabraser?
6        A.   Give me a second to go through this list to
7    find that.
8        Q.   Sure.
9             MR. CHALOS:   Object to the form.
10            MR. GIDEON:   What's wrong with the question?
11            MR. CHALOS:   It's compound.   It says in which
12   of those cases were you employed, contacted to
13   participate in the case.   I think those are two
14   different concepts.
15            MR. GIDEON:   Well, we'll see if we can bridge
16   that gap.
17            MR. CHALOS:   That's a good idea.
18            MR. GIDEON:   Q.   Ready?
19       A.   Yeah.   Thank you.
20       Q.   In which of the cases were you contacted to
21   participate by Lieff Cabraser or one of the lawyers in
22   that office?
23       A.   My recollection is that I was contacted in the
24   Yaz case by Mr. Arbitblit.
25       Q.   Okay.   This is six bullet points down, the Yaz



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 113 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 112

1   and Yasmin Marketing Sales Practices & Products
2   Liability Litigation?
3         A.   Yes.  My recollection is I was contacted by
4   him.
5         Q.   Did you end up working with him in that
6   litigation or did you work principally with someone
7   else?
8         A.   There were multiple attorneys involved in that
9   case.
10        Q.   Okay.
11        A.   That case settled.
12        Q.   Any others?
13        A.   So the answer is -- I just want to be complete.
14   I'm going to go a little beyond your question, if I may,
15   okay, I mean, so you have the full -- so I don't
16   misspeak here, right?
17             I believe the -- there's two other cases that
18   come to mind where Mr. Arbitblit may have been involved
19   in, but I don't believe he contacted me.
20        Q.   Okay.
21        A.   But again, of one I'm sure he didn't contact me
22   because it was the attorney general of Louisiana where I
23   was retained on, but I believe Mr. Arbitblit worked on
24   that.  And there may have been -- and --
25        Q.   Which one was that on this list?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    A.  So there was -- it was State v. -- if you go

2    down, State v. Merck, that's the attorney general of

3    Louisiana.

4    Q.  And Mr. Arbitblit, according to your

5    recollection, worked on State versus Merck & Company?

6    A.  Yes, that's my recollection.

7    Q.  Okay.  And is there another one where you think

8    you worked with Mr. Arbitblit?

9    A.  Yeah.  Again, I don't remember who -- I mean,

10   that one I know Mr. Arbitblit did not contact me on.

11   Q.  Okay.

12   A.  I can recall.  But I believe Mr. Arbitblit was

13   involved in Actos, but I don't recall who contacted me.

14   Q.  Which bullet corresponds with that reference?

15   The one that's near -- two-thirds down?

16   A.  Yes, sir.

17   Q.  Okay.  In the Western District of Louisiana,

18   filed 12/29/11?

19   A.  Yes, sir.

20   Q.  Okay.  Now, I didn't mean to limit my question

21   to Mr. Arbitblit.  I intended to expand it to all the

22   members of his law office, Lieff Cabraser, irrespective

23   of which office it may be.  Are there any other cases

24   where Lieff Cabraser worked with you on this Appendix B?

25   A.  Let me look.  Those are the ones that I see



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 115 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 114

1    sitting here.

2         Q.  Okay.

3         A.  That's the ones -- that's what comes to mind.

4         Q.  Now, I just want to take them item by item so

5    we get a snapshot of what the case was about from your

6    view.

7              On the Zoloft Product Liability Litigation that

8    was filed April 17th, 2012, were you testifying on

9    behalf of the people suing the manufacturer of Zoloft?

10        A.  Yes.

11        Q.  And who was the manufacturer of Zoloft that you

12   were offering opinions about?

13        A.  I'd have to -- I believe it was Pfizer.

14        Q.  Okay.  And at the time that Pfizer developed

15   Zoloft, was Pfizer an FDA-registered manufacturer?

16        A.  Certainly.

17        Q.  Did you express the opinion that Pfizer, as an

18   FDA-registered manufacturer, had acted improperly?

19        A.  We'd have to pull that.  You would have to look

20   at that.

21        Q.  You don't recall what the critique was?

22        A.  I --

23        Q.  Sir?  You don't recall --

24        A.  I'm just double-checking that it's Pfizer.

25   Just to be -- just so that I have my head -- just give



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 116 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                      Page 115

1    me one second.

2            That case had to do with birth defects and what

3    the label said about -- and whether it was appropriately

4    categorized as a category D drug, whether there was

5    human evidence.  And there was human evidence, and I

6    said that.

7        Q.  And the essence of the critique was that the

8    manufacturer of Zoloft had not shared with the FDA the

9    data reflecting that the product could be harmful to the

10   unborn, correct?

11       A.  No.  I don't think that was what the critique

12   was.

13       Q.  Well, what was it, then?

14       A.  So I -- well, we'd have to pull the actual

15   opinions, and I don't have that with me.

16           I think that the critique was that the -- that

17   the human evidence of risk to the fetus was not

18   disclosed to patients and physicians in the label.  Not

19   to -- not as you said.

20       Q.  All right.  The second bullet point, In re

21   Risperdal -- Risperdal.  Excuse me.  Risperdal is

22   manufactured by Johnson & Johnson, isn't it?

23       A.  Janssen Pharmaceutica is owned by Johnson &

24   Johnson.

25       Q.  What was the critique of the division of



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 117 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 116

1    Johnson & Johnson in re Risperdal?

2        A.   This had to do with boys growing breasts and

3    the issue of both the -- as you know, there was a --

4    there was a criminal trial with off-label prosecution

5    for Janssen.  I believe an off-label promotion.

6             So it had to do with both the off-label

7    promotion, that illegal activity, as well as whether

8    Janssen failed to disclose data in the scientific -- I

9    mean, in its studies.

10       Q.   Uh-huh.  You offered opinions critical of the

11   division of Johnson & Johnson in that case, didn't you?

12       A.   I offered the opinions, the facts supported.

13       Q.   I am not -- I am not asking you whether you

14   felt your opinions were justified or somebody didn't.

15   I'm just trying to determine which side of the

16   litigation you were on, Dr. Kessler.

17            Were you testifying on behalf of a patient

18   suing Janssen or were you testifying on behalf of

19   Janssen?

20       A.   On behalf of the patient.

21       Q.   All right.  Let's go to the third bullet point,

22   Wells versus Allergan, Drake versus Allergan, two cases

23   listed together.  What was the essence?  What was the

24   issue in these cases?

25       A.   So the issue was children getting botulism from



1   Botox.

2       Q.  Were you testifying on behalf of a family suing

3   Allergan or were you testifying on behalf of Allergan?

4       A.  I was testifying on behalf of the families

5   where the children got botulism.

6       Q.  And at the time Allergan made the products in

7   question, Allergan was an FDA-registered manufacturer,

8   correct?

9       A.  Yes.

10      Q.  Let's go to the fourth item, fourth bullet

11  point, C.R. Bard, Inc., Pelvic Repair System Products

12  Liability Litigation.  Did this deal with the pelvic

13  sling?

14      A.  Pelvic mesh.

15      Q.  And in that case were you testifying on behalf

16  of patients suing C.R. Bard?

17      A.  Yes.

18      Q.  And at the time C.R. Bard made the pelvic mesh,

19  was C.R. Bard an FDA-registered manufacturer?

20      A.  I'm sure.

21      Q.  Okay.  Then the next bullet point is SB versus

22  Ortho-McNeil-Janssen Pharmaceuticals, Risperdal.  Ortho,

23  McNeil and Janssen are all wholly-owned subsidiaries of

24  J&J, aren't they?

25      A.  Yes.



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 119 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 118

1     Q.  Were you testifying on behalf of patients suing

2     Ortho, McNeil and Janssen?

3     A.  Yes.

4     Q.  Ortho, McNeil and Janssen were all

5     FDA-registered manufacturers, correct?

6     A.  Yes.

7     Q.  In re Yaz & Yasmin Marketing Sales Practice &

8     Products Liability Litigation.  Yaz and Yasmin were

9     contraceptives, weren't they?

10    A.  Drospirenone.  Yes, sir.

11    Q.  And who was the company that made those

12    products?

13    A.  I'm just double-checking so I can get -- my

14    recollection is it's Bayer.  Let me just double-check

15    that for the record.

16        Yes, it's Bayer HealthCare Pharmaceuticals.

17    Q.  Was Bayer HealthCare Pharmaceuticals an

18    FDA-registered manufacturer when Yaz and Yasmin were

19    made?

20    A.  Yes.

21    Q.  And what was your critique of Yaz and Yasmin?

22    A.  Again, I think it had to do with off-label

23    activity as well as disclosure of -- the failure to

24    disclose data that the company had.

25    Q.  Failure to disclose data the company had before



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 120 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 119

1    seeking approval?

2         A.  We'd have to pull the report.  I don't want to

3    misspeak here.

4         Q.  All right.  In re Flonase Antitrust Litigation,

5    who engaged you in that case?  Which side of the

6    litigation?

7         A.  There were corporate entities that engaged me.

8    These were payers who paid for drugs.  This was

9    antitrust litigation.

10        Q.  And your role was to support people who were

11   opposing a merger?

12        A.  No.  This was complicated citizens' petition

13   language, generic -- generic drugs, et cetera.  I was

14   testifying on a pretty narrow issue.

15        Q.  And what was the narrow issue?

16        A.  Again, about FDA citizens' petition, the

17   regulation of generic drugs.

18        Q.  I see.  Okay.

19             Well, did you offer substantive testimony

20   regarding the scope of FDA regulation of generic drugs

21   in that case?

22        A.  I think that would be probably fair.  We'd have

23   to go back and look at the testimony.

24        Q.  That was the Eastern District of Pennsylvania?

25        A.  Right.



1      Q.   Okay.  Is Pharmathene versus Siga Techs, Inc. a

2   commercial case?

3      A.   Yes.

4      Q.   Does that also deal with market share,

5   antitrust considerations?

6      A.   No.  I believe it had to do with patent.  I was

7   hired by Siga Technologies, the -- I was hired by the

8   drug manufacturer.

9      Q.   Commonwealth versus Merck & Company, Kentucky

10   Circuit Court, September 28, 2009 and Utah; what product

11   was at issue in that litigation?

12      A.   That was I was retained by the attorney general

13   of the state.  And that was Vioxx.

14      Q.   Vioxx.  Okay.

15           And you were testifying on behalf of

16   individuals suing Merck & Company?

17      A.   No.

18      Q.   No?

19      A.   I was testifying on behalf of the attorney

20   general.

21      Q.   And the testimony you offered at the request of

22   the attorney general was what?

23      A.   I mean, it had to do with the science

24   underlying Vioxx.

25      Q.   Did it have to do with the risk of myocardial



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   infarction in individuals taking Vioxx?

2        A.  Yes.

3        Q.  And did you offer the opinion that Merck &

4   Company had not acted appropriately with respect to the

5   risk of myocardial infarction?

6        A.  There was specific -- I'd want to look at that

7   report, but there were specific representations of the

8   company that were in question.

9        Q.  Your testimony was critical of Merck & Company?

10       A.  My testimony dealt with that science.  And

11  again, happy to come back and tell you what those

12  opinions were.  I believe that case settled, so I don't

13  know what's public record or not.

14       Q.  Merck & Company was an FDA-registered

15  manufacturer at the time that it's -- that it developed

16  and obtained permission to market Vioxx in the

17  United States, wasn't it?

18       A.  Yes.

19       Q.  Okay.  Next one is Commonwealth Care Alliance

20  versus AstraZeneca Pharm, L.P.  Is this a commercial

21  dispute over insurance payments or market share?

22       A.  I believe this is -- this is also -- I'd want

23  to go back.  I believe this was an antitrust case.

24       Q.  Smith & Nephew, Inc. versus N.H. Insurance

25  Company in the Western District of Tennessee.  What was



```
 1   the issue there?
 2        A.  I was retained by counsel for the defendants.
 3   Again, it had to do with legality of conduct.
 4        Q.  The legality of Smith & Nephew, Inc.'s conduct?
 5        A.  Yes.
 6        Q.  Was there a contention by N.H. Insurance
 7   Company that they shouldn't have to pay for something
 8   because Smith & Nephew had done something
 9   inappropriately?
10        A.  Again, I want to be a little careful.  I don't
11   know what is confidential there and what's not.  So we'd
12   want to check with counsel before I answer.
13        Q.  Who was the attorney that engaged you in the
14   Smith & Nephew case?
15        A.  Frost, Todd, Brown.
16        Q.  In Kentucky?
17        A.  Yes.
18        Q.  Who in particular at Frost Todd engaged you?
19        A.  Laurie Hammond.
20        Q.  Say it one more time.
21        A.  I believe Laurie Hammond.
22        Q.  And who was the attorney for Smith & Nephew,
23   Inc.?
24        A.  I don't recall.
25        Q.  Okay.  In re Neurontin Marketing, Sales
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 124 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 123

1   Practices & Products Liability Litigation, the District

2   Court of Massachusetts.

3        A.   Again, legality of conduct, off-label promotion

4   by Pfizer, certain corporate entities suing Pfizer for

5   that off-label conduct.

6        Q.   Right.  And Pfizer, again, was FDA registered

7   at the time they carried out the conduct in question,

8   weren't they?

9        A.   Yes.

10       Q.   Did you work with Lieff Cabraser in the

11  Neurontin Marketing Sales Practices & Products Liability

12  Litigation?

13       A.   That does not come to mind, no.

14       Q.   Brown versus American Brands, is that a tobacco

15  case?

16       A.   That is.

17       Q.   In re Actos, who was the manufacturer of Actos?

18       A.   I believe it was Takeda.

19       Q.   Takeda.  Japanese pharmaceutical firm?

20       A.   Yes.

21       Q.   And the contention is that Actos triggered an

22  unacceptable incidence of bladder cancer; isn't that

23  right?

24       A.   There was a statistically significant increase

25  in bladder cancer if you did the analysis beginning in



```
1    2002, and that was never reported by -- that was never

2    reported by the company.

3         Q.  Was Takeda an FDA-registered manufacturer when

4    they developed Actos and obtained permission to market

5    that product in the United States?

6         A.  Again, I would assume so.  That company was

7    acquired, I believe.  I just have to go back and look.

8    I believe that's correct.

9         Q.  All right.  The -- this is one of the cases

10   where you said that you worked with or were contacted by

11   Mr. Arbitblit.

12        A.  Arbitblit.

13        MR. GIDEON:  I'm sorry, it's hard for me to

14   pronounce and I don't know why.  Arbitblit.  I've got it

15   down now.

16        MR. ARBITBLIT:  You are not the first.

17        MR. GIDEON:  Q.  Did you testify on behalf

18   of patients who were suing Takeda in that case?

19        A.  Yes.  There was a $7 billion verdict.

20        Q.  Mr. Arbitblit did very well in that case,

21   didn't they?  Did he share any of those proceeds with

22   you after you delivered a $7 billion verdict?

23        MR. CHALOS:  Object to form.

24        THE WITNESS:  It was a $6 billion verdict, and

25   no.
```



1            MR. GIDEON:  Q.  Next, Brown versus

2    RJ Reynolds Tobacco.  Tobacco case?

3            A.  Yeah, I believe -- yes, it's a tobacco case.

4            Q.  I'm going to go down to Cabana versus Stryker.

5    Were you testifying on behalf of someone suing the

6    device manufacturing company Stryker?

7            A.  Yes.

8            Q.  And what was your critique of Stryker?

9            A.  Again, I don't know whether that is public or

10   not.  You'd -- I would want to -- I'd want you to

11   contact the counsel.  I believe that case settled, so I

12   don't know what is public, sir.

13           Q.  You represent -- you articulated the interest

14   of the plaintiff or the defendant in that case?

15           A.  I represented the interests of me, in that I

16   told what the science was.

17           Q.  Who engaged you, plaintiff or defendant?

18           A.  Plaintiffs.  Thank you.

19           Q.  Who paid you, plaintiff or defendant?

20           A.  It was a plaintiff in that case.

21           Q.  Who was the lawyer, then, that engaged you so I

22   can check with him and see if it's okay to talk to you

23   about what you did in that case?

24           A.  I'll get you the name.  It's --

25           Q.  Just make yourself a note, and when it comes to



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  you --

2       A.  Yeah, it's -- it's Estephan -- it's -- first

3  name is Estephan.  Cynthia Garber was also, I think,

4  involved.  But it was Estephan.  I'd be happy to get you

5  the name.

6       Q.  Sure.  That's fine.  Then the next one down is

7  re Fosamax litigation.

8       A.  That was a narrow issue about preemption.

9  And -- in Fosamax.  But it was whether, in fact, certain

10  actions were preempted under a statute.

11      Q.  Were you offering testimony on behalf of a

12  patient suing the manufacturer of Fosamax claiming that

13  the state law claims were not preempted by federal law?

14      A.  Yes.  It was under preemption.  And, again, the

15  nature of those claims.

16      Q.  And you were engaged by the plaintiff in that

17  case?

18      A.  Yes.

19      Q.  In any -- has there been any personal injury

20  case in the last six years where you testified on behalf

21  of a defendant?

22      A.  Personal injury, no.  But other cases I've

23  testified on behalf of defendants.

24      Q.  Well, now let's look at the affidavits here.

25  The DePuy --



1        A.   That's actually not true.

2        Q.   Which one of these, where there's a claim of

3   personal injury, death, physical suffering, where you

4   testified on behalf of a defendant?

5        A.   The second one.

6        Q.   The Risperdal?

7        A.   I'm sorry.  I apologize.  I'm looking at the

8   bottom three, sir.

9        Q.   Well, the bottom three are just affidavits or

10  sworn expert statements.

11       A.   They're sworn statements, but that was on

12  behalf of the defendant, in that -- where the defendant

13  was being sued.

14       Q.   Which case?

15       A.   The Cordero v. Endoscopy.  I was testifying on

16  behalf of the endoscopy center.

17       Q.   What testimony were you offering?  What was the

18  subject matter of your opinion testimony in that case?

19       A.   Adverse events.  Adverse event reporting.

20       Q.   Okay.  Under the MedWatch system?

21       A.   Exactly.

22       Q.   Were you offering any testimony regarding how

23  to perform an endoscopic procedure?  On the techniques

24  of endoscopy?

25       A.   Not that I recall.



1        Q.  On the first affidavit, the ASR Hip System

2    Cases, were you offering opinions critical of that

3    subsidiary of Johnson & Johnson?

4        A.  There was an issue there, I believe, about

5    public disclosure of whether certain documents in the

6    public interest should be disclosed or not.  I think

7    that was the matter.

8        Q.  Did this --

9        A.  I don't recall that.

10       Q.  Did this particular hip system case deal with

11   petrochemical -- a failure to clean off petrochemical

12   substances on the acetabular cup?

13       A.  No, I don't believe so.

14       Q.  And what was the issue in Jenkins versus

15   Medtronic?

16       A.  I apologize.  I don't remember.

17       Q.  It's also in the Western District of Tennessee?

18       A.  Yes.

19       Q.  Were you engaged by Frost Todd in that case

20   too?

21       A.  I don't believe that was the case.  And I

22   apologize, I don't remember that.

23       Q.  Are there any other cases that constitute

24   affidavits or sworn statements or testimony at trial or

25   by deposition other than what we've just covered in this



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 130 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 129

1   exhibit?

2       A.  This is what comes to mind.  Actually, hold on

3   one second.  Let me just think of something.

4           So there may be a case subsequent to this

5   report that I may have testified in.

6       Q.  This report was sent to us in December of 2015.

7   Have you testified in the last 90 days?

8       A.  I believe I may have one case, I believe.

9       Q.  Where?

10      A.  In deposition.

11      Q.  In San Francisco, but where was the case

12  pending?

13      A.  I believe it's St. Louis.

14      Q.  What was the style of the case?  The who sued

15  whom?

16      A.  It's a plaintiff -- it's a joint -- it's a

17  bellwether case on Depakote.

18      Q.  And who is the manufacturer of Depakote?

19      A.  Give me a second so I can get it.

20      Q.  Are you referring to Google again?

21      A.  Well, yeah.  I just want to make sure I get it

22  exactly right.  Just give me a second.  I have it in my

23  head, but I just -- let me -- I'll be happy to do that

24  at the next break and give it to you.

25      Q.  All right.  Did you testify on behalf of the



```
1   manufacturer of Depakote or on behalf of people suing
2   Depakote?
3         A.  It was on behalf of the plaintiffs.
4         Q.  And who engaged you?
5         A.  There is a -- I mean, there's -- I believe
6   there's an MDL that Janet Arbitblit and Williams Keker
7   (phonetic).
8             MR. ARBITBLIT:  Sorry --
9             MR. GIDEON:  Q.  Is that -- Janet
10  Arbitblit, is that Don Arbitblit's wife?
11        A.  No, no, no.
12            MR. ARBITBLIT:  Janet Abaray --
13            THE WITNESS:  Janet Abaray.  I'm sorry.  Now
14  you have me confused.
15            MR. ARBITBLIT:  My wife would not be happy to
16  hear that there's a Janet Arbitblit.
17            THE WITNESS:  Yes, I'm sorry.  I apologize.
18  Now you have me --
19            MR. GIDEON:  Q.  Putting aside the humor
20  now, who was it that asked you to be involved in
21  that case?
22        A.  I think it's Janet Abaray.
23        Q.  Could you spell the last name for us.
24            MR. ARBITBLIT:  A-B-A-R-A-Y.
25            MR. GIDEON:  Q.  And where does she
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   practice?
 2        A.   I believe somewhere in Ohio, if I'm right.
 3        Q.   And is there, as you said, an MDL on damages
 4   associated with the use of Depakote?
 5        A.   There is -- this -- again, this is birth
 6   defects.  This is a well-known teratogen.
 7        Q.   And you offered opinions in that deposition
 8   that were critical of the manufacturer of Depakote?
 9        A.   I offered an opinion of -- based on the
10   scientific evidence that the congenital risks -- total
11   congenital malformations was known as of a certain date.
12        Q.   And that the --
13        A.   And that there was also illegal -- again, there
14   was illegal conduct.  There was a consent decree against
15   the pharmaceutical company for off-label marketing.
16        Q.   And was this -- was this manufacturing company
17   an FDA-registered manufacturer that carried out this
18   illegal activity?
19        A.   Yes.
20        Q.   FDA registration, then, does not assure that
21   the public will receive safe, uncontaminated products,
22   does it?
23        A.   No.  There is no guarantee here.  Right?  It's
24   a system of regulation.  But as we all know, it is
25   the -- there are no guarantees.  My predecessor, Don
```



Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 133 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 132

1    Kennedy, taught me that -- who was president of Stanford

2    subsequently, as Don said, all FDA really can do is

3    create incentive for companies and individuals to act

4    appropriately.

5         Q.  Okay.  But among the incentives, I think I

6    recall from your report that during your tenure as

7    commissioner of FDA, you created an office, division or

8    section, I don't want to get hung up on the term, of

9    criminal investigations, correct?

10        A.  OCI.  Office of criminal investigations.  Yes.

11        Q.  So what I said is correct?

12        A.  It's an office -- yes, I created that office.

13        Q.  In what year?  Well, you were there '90 to '97,

14   so when was it during your tenure?

15        A.  I don't know exactly.  It was pretty early on.

16        Q.  Okay.

17        A.  And your word creation is -- leaves some, you

18   know, exactly when I, you know, to implement.

19            But I came up with the idea and I put the idea

20   into implement -- and it was probably '92 or about that

21   time.

22        Q.  Okay.  During the years that you were

23   commissioner of the Food and Drug Administration, you

24   had the authority to call upon manufacturers to enter

25   into a moratorium on sale of products in the



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 134 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 133

1   United States, didn't you?

2           MR. CHALOS:  Object to the form.

3           THE WITNESS:  I would not -- I did that in one

4   instance, based on -- let me tell you what the authority

5   was.  This was a device that was on the market as a

6   preamendments class 3 device.  And the manufacturer was

7   allowed to market the device, knowing that it would have

8   to supply safety and efficacy data when the FDA called

9   for it.  That's the way Congress created the statute.

10          When we called for the data, there was no data.

11  The manufacturers didn't have -- they had never studied

12  the device, and yet the market -- the device had been on

13  the market for several decades and people were using the

14  device.

15          What I did was I could have -- based on the

16  fact that the device then became a -- I mean, shipped in

17  interstate commerce without an approved indication, I

18  thought that the best way, in light of certain

19  controversy, was just to basically say time out.  Let's

20  see if we can figure out what that data is -- are.  So I

21  called for a moratorium.

22          MR. GIDEON:  Q.  Okay.

23      A.  Based on that authority.  Because it was a

24  preamendments class 3 device for which they did not

25  submit any data.



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 135 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 134

1       Q.   And you called for a moratorium with respect to

2   a product widely referred to as a silicone breast

3   implant?

4       A.   Yes.

5       Q.   In addition to the authority to call for a

6   moratorium on a product, the FDA had the authority, if

7   someone was, in the view of the FDA, violating the law,

8   to seek an injunction to enjoin them from improper

9   activity, correct?

10          MR. CHALOS:   Object to the form.

11          THE WITNESS:   There are a number of remedies

12   under the Federal Food, Drug and Cosmetic Act.

13          MR. GIDEON:   Q.   Injunction is one of them?

14      A.   Injunction is one of them for violations.

15          But understand how that works.   FDA can't just

16   enjoin.   FDA has to go into a court and ask a court to

17   enjoin.

18      Q.   And FDA has to go into a court and convince the

19   court to enter an injunction, correct?

20      A.   Yes.

21      Q.   All right.   FDA also had the authority to issue

22   alerts to consumers and to healthcare providers,

23   correct?

24          MR. CHALOS:   Object to the form.

25          THE WITNESS:   Concerning what?



```
 1            MR. GIDEON:  Q.  Well, let's say, for

 2    example, do you recall a concern at FDA when you

 3    were commissioner about the use of transdermal

 4    fentanyl patches?

 5         A.  My -- the concern that I remember with regard

 6    to fentanyl was the fentanyl lollypop.  That was the one

 7    that I remember.  I'm not saying you are wrong.  I'd

 8    have to refresh my recollection.  But the -- there was a

 9    fentanyl product that was being manufactured as a

10    lollypop --

11         Q.  For children?

12         A.  -- anesthesia.  Sorry?

13         Q.  For children?

14         A.  For children.  And that's the one that I was

15    intimately involved in.

16         Q.  And what did the Food and Drug Administration

17    do about the fentanyl lollypop while you were the

18    commissioner?

19         A.  So I think we put significant restrictions on

20    how and when it can be used was my recollection.

21         Q.  And required a black box warning?

22         A.  I'm sure, again, this was -- this was as part

23    of the new drug process.

24            I mean, just so -- for the record, you're

25    asking me about questions about, for example, in
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 137 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 136

```
 1   fentanyl, you are dealing with a new drug, right?  I
 2   mean, just for the record, you have the ability to do
 3   certain things for new drugs and then there are old
 4   drugs.  And one of the questions, obviously, in this
 5   matter is whether compounding makes a drug a new drug,
 6   whether it's a new drug or whether it's an old drug.
 7        Q.  Okay.  We're talking about remedies available
 8   to the Food and Drug Administration.
 9        A.  But it's remedies -- please understand it
10   depends --
11        Q.  I didn't finish my question.
12        A.  Okay.  Sure.  I'm sorry.  I apologize, sir.
13        Q.  We were talking about remedies available to the
14   Food and Drug Administration in addition to insisting
15   upon a moratorium, under the circumstances you
16   described, seeking an injunction, issuing warnings or
17   notices to the public.  What other remedies were
18   available?
19        A.  Let's put a footnote there.  Those remedies
20   depend on the regulatory class -- regulatory status of
21   the product.  So I wouldn't want to answer your question
22   that you can do a moratorium in any instance.  I
23   wouldn't want to say you can put a black box on any
24   instance.
25             I mean, those labeling requirements, for
```



1  example, I mean, apply to new drugs.  So let's just be

2  careful which remedies apply to which category of

3  products.

4       Q.  Okay.  Now, isn't it true, and hasn't it been

5  true, throughout the time you began at FDA in 1990, and

6  up to the current date, that FDA does not approve a

7  chemical compound, FDA approves a drug for an intended

8  use?

9       A.  I --

10          MR. CHALOS:  Object to the form.

11          THE WITNESS:  I've stated that.

12          MR. GIDEON:  Q.  Is it true or not?

13       A.  So it is true with regard to new drugs, sir,

14  under section 505, right?

15          Then we can deal with old drugs.  That would

16  not be applicable to old drugs.

17       Q.  Okay.  Was Depo-Medrol approved by the FDA for

18  epidural injection in the time frame 2010 to 2012?

19       A.  I don't believe Depo-Medrol ever was approved

20  for steroid injection.  I believe the use is an

21  off-label use.

22       Q.  Was Kenalog, a branded product, made by

23  Bristol-Myers, approved for epidural steroid injection

24  2010 to 2012?

25       A.  So I believe the answer is no.  But again, to



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 138

```
 1   be thorough here, if you want to ask me what those
 2   things are approved for, if you can just hand me the
 3   label.  We should be precise here, but I believe on my
 4   recollection of the label, the answer is no.
 5        Q.  There is a difference, isn't there, between
 6   off-label and against label use?
 7              MR. CHALOS:  Object to the form.
 8              MR. GIDEON:  Q.  The question is just is
 9   there a difference.  And if there isn't, you can say
10   no.  If there is, say yeah and then we'll talk about
11   it some more.
12              MR. CHALOS:  Objection to form.
13              THE WITNESS:  I don't know what you mean
14   exactly by "against label."
15              MR. GIDEON:  Q.  Well, for example, the
16   Kenalog label specifically prohibits using that
17   product for epidural steroid injections, doesn't it?
18        A.  I need to see the label, please.
19        Q.  Why don't you pull it up on your computer.
20   It's right in front of you.  Kenalog, Bristol-Myers.
21        A.  Happy to do that, sir.
22              Kenalog 10, let's see if I have it.
23        Q.  I'm not sure anybody can hear you speaking with
24   your hand up, Dr. Kessler.
25        A.  Let me see if I can get the official
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Bristol-Myers answer.

2         I don't have the official -- I'm getting a

3    generic cite.  If you can just hand me the label so I

4    can have the prescribing information, or if anyone has a

5    copy of the PDR.

6         Q.  We'll get it for you.  We'll get it for you.

7         A.  I appreciate it.

8         Q.  Is there a difference between off-label versus

9    against-label use?

10        MR. CHALOS:  Objection to form.

11        THE WITNESS:  So I'm -- if I'm interpreting

12   your question right, I don't know specifically -- if

13   what you mean is are there indications that are not

14   cited on the label, that are just -- there's no

15   reference to it, versus are there times when it says do

16   not use, or this product is contraindicated, right,

17   that's -- there's obviously that would be -- there would

18   be a difference.  Obviously those labels are different.

19        So if that's what you mean by "against label."

20        MR. GIDEON:  Q.  It's what I mean by

21   "against label."  Have you not heard that term being

22   used to describe that scenario previously?

23        A.  I'm not sure "against label" I've ever -- I'm

24   not sure I've ever heard -- again, I think I know what

25   that means, but I would probably say where the label



Case 1:13-md-02419-RWZ  Document 2766-1  Filed 03/29/16  Page 141 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 140

 1  prohibited it or was contraindicated or something like

 2  that.

 3       Q.  Physicians are free to use medications beyond

 4  the labeled authorized uses, correct?

 5       A.  So FDA's position, okay, is as you state.

 6  Okay.  There are other constraints on physicians to use

 7  drugs off-label beyond FDA regulations.

 8       Q.  There's an explicit provision, 21 U.S.C 396.

 9  Give me that.

10           (Whereupon, Exhibit 1249 was marked for

11           identification.)

12           MR. GIDEON:  Q.  This is Exhibit No. 1249.

13  You are familiar with that --

14       A.  Let me just.

15       Q.  -- provision of the United States Code, are you

16  not?

17       A.  Let me just take a look at it.

18       Q.  Sure.

19       A.  What's your question?

20       Q.  Doesn't this recite the fact that nothing about

21  the law pertinent to the Food and Drug Administration

22  has any impact on the prerogative, the discretion, of a

23  healthcare practitioner to prescribe or use a drug or

24  device?

25       A.  No, that's not --



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 142 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 141

1          MR. CHALOS:  Object to the form.

2          THE WITNESS:  That's not what that states.

3          MR. GIDEON:  Q.  What does this state then,

4    Dr. Kessler?

5       A.  So this applies, as I read this, only to

6    devices.

7       Q.  Okay.  Have you ever researched that issue?

8       A.  I've written extensively on the issue of

9    off-label promotion, and I implemented the law when I

10   was FDA commissioner.

11          But this has nothing -- you see the word drug

12   here?  You handed me that saying that was drugs.

13      Q.  Right.

14      A.  Do you see anything about drugs there?

15      Q.  I've gotten your interpretation.

16      A.  No, no, no.  That's not my question.  There's

17   no interpretation.  My question is, doesn't say the word

18   drug there, it says device.

19      Q.  I see.  Is the FDA's position that a physician

20   may use a device for an off-label purpose --

21          MR. CHALOS:  Object to the form.

22          MR. GIDEON:  Q.  -- as well as a drug?

23      A.  That's a complicated question.

24      Q.  So there's not a straight answer to it?

25      A.  No.  I mean, I've written about this.  Let me



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 143 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 142

```
 1   see if I can give you, in general, the answer.
 2          In general, as far as FDA statute is concerned,
 3   I'm not talking about state statutes, I'm not opining on
 4   standard of care or anything else like that.  Just
 5   dealing under FDA law.  The FDA has generally stated,
 6   and I have stated, that a physician, in his or her
 7   judgment, right, in the best interest of a patient, may
 8   use a drug, right, beyond the intended conditions of
 9   use.  That's in the term "drug."
10          A physician may not promote the use, right?
11   There are limits to what a physician -- if you go back
12   to U.S. v. Evers, you'll see there are limitations on
13   what physicians -- and what's off-label promotion, I
14   mean, by physicians.
15          So in general, again, for an individual
16   patient, individual physician judgment, subject to, you
17   know, following -- writing a prescription, following the
18   rules, best interest of the patients, physician should
19   use his or her judgment.
20      Q.   Okay.  Now, you've referred several times to
21   the fact that a drug manufacturer cannot promote a
22   purpose that is not within the label, correct?
23      A.   So let's do it this way --
24      Q.   No, let's just answer the question.
25      A.   I am answering your question.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 144 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 143

1      Q.  How so?

2      A.  Can I --

3           MR. CHALOS:  Object to the form.

4           THE WITNESS:  So if you look at the statute,

5      the statute says the intended use.  There's two real

6      requirements.  The intend -- you can't promote -- you

7      cannot have an intended use beyond your application,

8      okay?

9           No. 2, you have to provide adequate directions

10     for use that's on the label.  So those are the actual

11     specific requirements.

12          With regard to promotion, you can't have an

13     intended use --

14          (Reporter clarification.)

15          THE WITNESS:  You can't have an intended use.

16          MR. GIDEON:  Q.  Can or cannot?

17     A.  You cannot have an intended use where you go

18     market this drug, promote this drug, for use beyond the

19     label.

20     Q.  The approved labeling?

21     A.  Label.

22          The -- there is -- as you know, there are, in

23     certain courts, the issue, there's certain First

24     Amendment cases that relate to the word "promotion."

25          But I think everybody agrees that when it comes



1  to intended use, you can't have an intended use that is

2  beyond -- again, we're dealing with new drugs here, not

3  old drugs.

4       Q.  All right.  Now, is methylprednisolone acetate

5  a new drug or an old drug?

6       A.  So tell me who's -- tell me who's selling it.

7       Q.  So the determination of whether something is a

8  new or old drug depends on who is selling the product?

9       A.  Well, so the new drug provisions, right, I

10  mean, it has to do with who's introducing it into

11  interstate commerce.  That's 505, which is the new drug.

12       So, yes, the introduction into interstate

13  commerce will trigger the new drug provisions of the

14  act.

15       Q.  Okay.

16       A.  So let me answer your question.

17       In the case of Pfizer, right -- you asked me

18  methylprednisolone acetate, right?

19       Q.  Make sure you understand the question --

20       A.  I understand this question.

21       Q.  Is methylprednisolone acetate a new drug or an

22  old drug --

23       MR. ARBITBLIT:  He's in the middle of his

24  answer.  He's in the middle of his answer.  You can't

25  interrupt him in the middle of an answer.  Wait until he



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   finishes.
 2           MR. GIDEON:  Well, soon some day --
 3           MR. ARBITBLIT:  Be polite --
 4           MR. GIDEON:  Soon some day he will answer my
 5   question.
 6           MR. ARBITBLIT:  He will answer your question.
 7   It's not as easy as you think.
 8           THE WITNESS:  So let me answer your question.
 9           MR. GIDEON:  Q.  Please.
10       A.  With regard to Depo-Medrol --
11       Q.  No, methylprednisolone acetate is the question.
12   Not changing the question.
13           MR. ARBITBLIT:  You are interrupting.  He is
14   answering your question.  If you'll give him a minute,
15   you'll get your answer.
16           MR. GIDEON:  Is that a promise?
17           MR. ARBITBLIT:  It is.
18           MR. GIDEON:  Okay.
19           THE WITNESS:  I -- Depo-Medrol, who's --
20           MR. GIDEON:  Q.  I didn't ask about
21   Depo-Medrol.
22       A.  Well, could you -- as I asked --
23           MR. ARBITBLIT:  If you can't stop yourself from
24   interrupting, we can just take the lunch break until you
25   calm down.
```



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 147 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 146

1    MR. GIDEON:  No, I'm not going to need any

2    time.  I just want an answer to the question that's

3    pending.

4    MR. ARBITBLIT:  Depo-Medrol and

5    methylprednisolone acetate may be the same thing.  If

6    you let him answer the question, instead of interrupting

7    him every time he starts to speak, we'll make progress

8    toward completion.  If you can't do that then we'll take

9    a lunch break now.

10    MR. GIDEON:  Q.  I'm going to make sure, so

11   that it's clear, that the question does not deal

12   with Fosamax, Depo-Medrol or Bactrim.  It deals with

13   methylprednisolone acetate and only that product.

14   Now, go ahead.

15   A.  So I'm looking at the label for -- I'm going to

16   answer your question.  Let me -- please let me finish.

17   Q.  Sure.

18   A.  I'm looking at the label for Depo-Medrol, and

19   the first item in that as the active ingredient is

20   methylprednisolone acetate.  So I'm not sure why you

21   don't understand that, if I'm talking about Depo-Medrol,

22   and why you didn't clarify your question, right,

23   appropriately, right?

24    So Depo-Medrol is a new drug.  There is an NDA

25   that is in a -- that I assume is in effect that Pfizer



```
1   holds for Depo-Medrol whose active ingredient is
2   methylprednisolone acetate.  That would be a new drug.
3   They submitted an application.  We'd have to go back and
4   look at the 1959 record.
5           With regard to methylprednisolone acetate --
6       Q.  Which is what I asked you about.
7       A.  -- which is also the scientific name of
8   Depo-Medrol.  With regard to that, if it is a product
9   made by a compounder, okay, as in this case, by NECC,
10  that methylprednisolone, right, depends on what year and
11  what court you are asking me about.
12          And up until --
13      Q.  What year and what what?  Court?
14      A.  What year and what court.
15          Up until 1997, I would answer your question
16  that methylprednisolone acetate made by a compounder was
17  a new drug subject to the new drug provisions of the
18  act.
19          The issue then becomes is there enforcement
20  discretion for methylprednisolone acetate.  When
21  Congress enacted FDAMA in 1997, Congress exempted
22  compounded drugs for as -- from the new drug provisions,
23  right?
24          So it then became, in essence, the new drug
25  provisions were not applicable.  505 was not applicable.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 149 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 148

1    So what would remain applicable was 501(a), right?  So

2    you have, then, if FDAMA is in effect, it's, in essence,

3    exempt from the new drug provisions.

4           Then you have periods of time where the law is

5    unclear of whether FDAMA is in effect.  So you could

6    take the position, right, FDA took the position when

7    western states made FDAMA invalid, right, that the prior

8    law attached, and that would be a new drug.

9           When Gonzales' opinion came and upheld the

10   validity of FDAMA, right, then it's exempt from the new

11   drug.  So it depends on what year you're talking about

12   and what court and what interpretation you put on, which

13   court opinions govern.

14        Q.  Okay.  Now Western States reached the Supreme

15   Court of the United States, didn't it?

16        A.  It did.

17        Q.  And when Western States reached the Supreme

18   Court of the United States, the Supreme Court affirmed

19   the decision striking down the amendments based on first

20   amendment issues, correct?

21        A.  You want to hand me Western States?

22        Q.  I'm just asking you, do you know?  You gave me

23   a lecture about the law.

24           Do you remember this reaching the Supreme Court

25   of the United States?



```
 1            MR. CHALOS:  Hang on.  Objection.
 2   Argumentative.
 3            THE WITNESS:  So what Western States did --
 4            MR. GIDEON:  Q.  I didn't ask you what it
 5   did.  I asked you do you recall that Western States
 6   reached the Supreme Court of the United States?
 7       A.  You asked me -- that was not your question.
 8       Q.  It is now.
 9       A.  Okay.
10       Q.  Did Western States reach the Supreme Court of
11   the United States?
12            MR. ARBITBLIT:  Objection.  Asked and answered.
13            THE WITNESS:  Yes.
14            MR. GIDEON:  Q.  And the Supreme Court of
15   the United States is the one and only Supreme Court
16   in the federal system, correct?
17       A.  Yes.
18       Q.  All right.  Now, after the Supreme Court of the
19   United States affirmed the lower court decision, were
20   all methylprednisolone acetates made by compounders
21   going across state lines now once again new drugs?
22       A.  The circuits would split on that question.
23       Q.  Massachusetts was not in the Fifth Circuit, was
24   it?
25       A.  No.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.  The Fifth Circuit was the only circuit where a

2    compounded methylprednisolone acetate was not a new

3    drug; isn't that correct?

4        A.  Go look at -- is it folks -- Franck's?  I don't

5    believe that's in the Fifth Circuit.  Maybe I'm wrong.

6    I'd have to look at a map.

7            I mean, there were multiple court opinions on

8    Gonzalez and the Fifth Circuit and Ukese.

9            And I think that certainly certain provisions

10   of Gonzalez Medical Center were looked at by Franck's,

11   but we can pull that opinion.

12       Q.  All right.  As of the time frame 2010 to 2012,

13   was methylprednisolone acetate made by NECC a new drug?

14       A.  It was unclear.

15       Q.  And is it unclear to you today whether it was

16   at that time?

17            MR. CHALOS:  Object to the form.

18            THE WITNESS:  I'm sorry, was it unclear to

19   me --

20            MR. GIDEON:  Q.  Is it unclear to you today

21   whether methylprednisolone acetate made by NECC was,

22   in fact, a new drug between 2010 and 2012?

23       A.  It's not -- it's not -- I'm sorry.  If I

24   understand your question, it's -- I'm not sure I

25   understand the difference from the last two questions.



1       It was unclear.  I think any reading of the

2   history of this would show that with the circuits split,

3   right, and with the Supreme Court not answering the

4   question whether, in fact, the advertising provisions

5   were severable, with that not being answered, and

6   without having the 2016 -- I mean, what is it, the new

7   Drug Quality Act in effect, I think that anyone looking

8   at this would have to say that it was unclear what law

9   governed at the time.

10       FDA did try, for a period of time after

11  Western States -- I would say, you know, the period

12  about 2006 to 2008, FDA, you can see, took a position

13  where it tried, again pretty aggressively, to regulate

14  these as new drugs, but then you have the split in the

15  circuits.  And then I think there was -- I think it's

16  fair to say there was confusion.

17       Q.  Is it true that physicians are rarely in the

18  position to determine whether a drug is safe and

19  effective?  That is the responsibility of the

20  manufacturer?

21           MR. CHALOS:  Objection to form.

22           THE WITNESS:  So do you want to hand me the

23  context in which I said that --

24           MR. GIDEON:  Q.  Sure.

25       A.  -- I would appreciate it.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 153 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 152

1      Q.  I'm going to hand you your report in the

2    Risperdal litigation.  You'll take a look at

3    paragraph 16.

4            This is a report that covers 91 pages, and then

5    the signature page is on the 92nd.  You'll see your name

6    and a signature date of September 17th, 2012.

7      A.  Yes.

8      Q.  Okay.  Take a look at paragraph 16.

9      A.  Yes.

10     Q.  And is this not your testimony in 16, quote:

11   In my opinion, physicians are rarely in the position to

12   determine whether a drug is safe and effective.  That is

13   the responsibility of a manufacturer, period, end quote?

14     A.  Yes, that is my testimony, and let me explain

15   that.

16           When new drugs are sold, they are extensively

17   tested and there's volumes and volumes, again, for new

18   drugs, of data, right?  Most physicians -- I don't see

19   any physicians that I know of -- I mean, physicians

20   rarely go through and read all that data about safety

21   and effectiveness to make that judgment.

22           Physicians have other responsibilities, right?

23   But the reading of the NDA, right, and the judgment of

24   whether that data supports the risk/benefit equation --

25   again, we're dealing for new drugs -- whether there's a



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 154 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 153

1    risk/benefit, if the drug's risks are acceptable in

2    light of the benefits and whether the drug works, that's

3    all the data in the NDA, right?  And very few physicians

4    will read an entire NDA.  In fact, I've never met anyone

5    who has read an entire NDA.

6          But that applies to new drugs here, as

7    Risperdal was here.  That's not what you are dealing

8    with in this case.

9          Q.  Is there anything in paragraph 16 that limits

10   this expression of opinion to new drugs and physicians

11   not reading the entire NDA?

12         A.  The term safe and effective is a term of art,

13   as you know well, and that's contained in the 505 --

14   section 505 that applies to new drugs.

15         Q.  Uh-huh.  Okay.

16         A.  That was not an applicable section here.

17         Q.  You agree with me that pharmaceutical companies

18   are prohibited from using third parties to engage in

19   promotion for which the company itself may not engage?

20         A.  That's correct.

21         Q.  And that is true of any pharmaceutical company,

22   isn't it?

23         MR. CHALOS:  Object to the form.

24         THE WITNESS:  Again, those -- that intended --

25   those intended use provisions which deal with promotion



1   that underlies those are all derived from section 505.

2   And if a drug is exempted from 505, I mean, it's a whole

3   different regulatory analysis.

4           MR. GIDEON:  Q.  Is it your -- do you

5   intend to offer the testimony in this case that the

6   methylprednisolone acetate manufactured by NECC was

7   exempted from section 505 of the Food, Drug and

8   Cosmetic Act?

9           What's the answer to that?

10      A.  So it was certainly -- it was certainly, from

11  the period -- the answer is yes.  And certainly we know

12  that there's no dispute that from the period of 1997 to

13  2002, until Western States, Congress enacted FDAMA.  I'm

14  on record having opposed it.

15          But there's no question during that period

16  that --

17      Q.  The period '97 to '02?

18      A.  Well, before Western States, right?  In that

19  period when FDAMA was in effect, I mean, compounding was

20  exempt from the -- from 505.

21      Q.  Okay.

22      A.  Then you have a period, right, after the court

23  struck down the advertising and promotion issues, you

24  have this period, maybe 2006 to 2007, 2008, where FDA

25  tries to reassert authority as a new drug.  You see



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    evidence of that.

2            Then beginning in 2000 -- when was -- Gonzalez

3    was 2006, but Ukese was 2008.  When you have the split

4    in the circuits, right, then there was just utter

5    confusion.

6        Q.  Well, the time frame I'm interested in is 2010

7    to 2012.  During that time frame, was methylprednisolone

8    acetate manufactured by NECC and sold in interstate

9    commerce exempted from section 505 of the Food, Drug and

10   Cosmetic Act in your opinion?

11       A.  I think the answer is it is unclear.  I think

12   that if FDAMA was in effect, as many argued, the answer

13   would be -- it would not be a new drug.  And that was a

14   position that certainly some people took.

15       Q.  And if FDAMA wasn't in effect, a compounded

16   product was a new drug?

17       A.  If FDAMA was not in effect and FDA had

18   authority, you would -- under the existing act, you

19   could make an argument that it was a new drug.  That was

20   opposed -- that argument was opposed by -- you know,

21   there were a lot of difference of opinions.  Depending

22   on where you sat, different groups had different

23   opinions on -- that's why Congress ultimately

24   established, you know, a new law.

25       Q.  It's true, isn't it, that drug promotion



1  strongly influences prescribing behavior, and that

2  physicians underestimate the influence of drug promotion

3  activities?

4           MR. CHALOS:  Object to the form.

5           THE WITNESS:  Sure.  You are quoting me.  You

6  are doing a good job.

7           Let me just put a footnote there.  Again,

8  because the relevance to this case.  I mean, there's

9  still responsibilities on the part of physicians.

10          MR. GIDEON:  Q.  Is it true, Doctor, that

11 promotion includes literature?

12          MR. CHALOS:  Object to the form.

13          MR. GIDEON:  Q.  Promotion includes

14 published literature?

15          MR. CHALOS:  Object to the form.

16          THE WITNESS:  It -- you know, of course one

17 could promote a drug -- I mean, companies do promote

18 drugs by handing out literature.

19          MR. GIDEON:  Q.  Is it true that promotion

20 includes conferences?

21          MR. CHALOS:  Object to the form.

22          THE WITNESS:  Certainly that could -- well, you

23 are really going to the question of what's labeling,

24 right?

25          MR. GIDEON:  Q.  No, I'm just asking



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    questions and hoping I can get, once or twice today,

2    a direct answer.

3            MR. CHALOS:  Object to the form.

4    Argumentative.

5            THE WITNESS:  Sir --

6            MR. CHALOS:  There's no question.

7            MR. GIDEON:  Q.  I'm just reminding you of

8    something I said a while ago, and that was I really

9    had a hope that if I asked a succinct question I'd

10   get a direct answer.  I must tell you I'm feeling

11   disappointed at this stage that it hasn't occurred.

12           MR. CHALOS:  Hang on a second.  Objection --

13           MR. GIDEON:  So I'm reminding you to please

14   answer my questions directly.

15           MR. CHALOS:  I object to the admonition.  I'm

16   sorry you are disappointed, but that's not a proper

17   question.

18           There's nothing to answer.

19           THE WITNESS:  Let me put on the record --

20           MR. GIDEON:  No, he's telling you not to speak

21   anymore.

22           THE WITNESS:  He's not --

23           Are you instructing me not to speak?

24           MR. ARBITBLIT:  Wait for a question.

25           MR. CHALOS:  I'm suggesting wait for a



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   question.
 2           THE WITNESS:  I'll wait for a question.
 3           MR. GIDEON:  Q.  Isn't it true, also, that
 4   any time a pharmaceutical company has reason to know
 5   that the risks of a drug may result in adverse
 6   events, that pharmaceutical company has a
 7   responsibility to inform physicians and healthcare
 8   providers?
 9       A.  Certainly under 505.
10           MR. ARBITBLIT:  Let's take a lunch break.
11           THE WITNESS:  Certainly under new drug
12   provisions.
13           MR. GIDEON:  Q.  Take a look at
14   paragraph 326 of your --
15           MR. ARBITBLIT:  Counsel, are you reneging on
16   your offer to take a break whenever we wanted?
17           MR. GIDEON:  No, I'm not.  But he said under
18   505, and there's no such qualification on his prior
19   testimony.
20       Q.  Isn't it correct --
21           And then we'll take a break.
22           MR. ARBITBLIT:  Okay.
23           MR. GIDEON:  Q.  -- that paragraph 326 of
24   your affidavit says precisely what I suggested with
25   no such qualifications?
```



```
 1              (Whereupon, Exhibit 1250 was marked for

 2              identification.)

 3              MR. CHALOS:  What exhibit are we looking at

 4    here?

 5              MR. GIDEON:  He's got it in front of him.

 6              MR. CHALOS:  What's the number on that?

 7              MS. WEETER:  1250.

 8              MR. CHALOS:  1250?

 9              MS. WEETER:  Uh-huh.

10              MR. ARBITBLIT:  And what paragraph?

11              MR. GIDEON:  326.

12              THE WITNESS:  So what you are missing,

13    Counselor --

14              MR. GIDEON:  Q.  I didn't ask you what I'm

15    missing.

16         A.  I'm answering your question.

17         Q.  Is there any such qualification in

18    paragraph 326 of the affidavit --

19         A.  I'm answering your question.

20         Q.  -- is the question.

21              MR. CHALOS:  Object to the form.

22    Argumentative.

23              THE WITNESS:  The -- this has to do with

24    adverse events on the drug's labeling.  Those

25    requirements are set out, right, by 505, which applies
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   to new drugs.
 2            MR. GIDEON:  Q.  Uh-huh.  Is there any
 3   reference to section 505 of the Food, Drug and
 4   Cosmetic Act in paragraph 326 --
 5        A.  No, but I'm --
 6        Q.  -- of that lengthy statement?
 7        A.  No, but I'm sure the whole report is predicated
 8   on a 505 drug -- and section 505 is, I'm sure, cited in
 9   this report.
10            MR. ARBITBLIT:  And for completeness, the
11   paragraph just before what you read, Counsel, refers
12   specifically to the Food, Drug and Cosmetic Act.
13            (Reporter clarification.)
14            MR. ARBITBLIT:  Paragraph 325 of the document
15   from which counsel read refers to the Food, Drug and
16   Cosmetic Act in its entirety.  And so to read 326 in
17   isolation is incomplete.  Pursuant to Rule 106, rule of
18   completeness, that's appropriate to add.
19            Let's take a lunch break.
20            MR. GIDEON:  We're going to take a lunch break.
21   It's -- it is 12:35 locally.
22            MR. ARBITBLIT:  2:35 Nashville time.
23            MR. GIDEON:  12:35 locally.  And we'll take,
24   what, one hour?
25            MR. ARBITBLIT:  If you need it.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              MR. GIDEON:  I don't need that long if you've

 2       got food coming here.

 3              MR. ARBITBLIT:  The food is already out there

 4       on the counter.  We can agree that --

 5              MR. GIDEON:  Whatever you want to do.

 6              MR. ARBITBLIT:  We're off the record, right?

 7              THE REPORTER:  No.

 8              MR. GIDEON:  Let's go off the record.

 9              THE VIDEOGRAPHER:  This is the end of disc

10       No. 2, volume 1.

11              We are off the record at 12:33 p.m.

12              (Recess taken from 12:33 PM to 1:09 PM)

13              MR. GIDEON:  Q.  Dr. Kessler, your blotter

14       with those notes on it, it's been sent off to an

15       accounting or architectural firm for copying, and

16       you have said you don't intend to answer questions

17       until those notes are back, correct?

18          A.  Yes.  I would like to have my notes in front of

19       me as an expert.  So I just -- I brought notes.  I don't

20       know the areas that you are going to cover, and

21       certainly I would like to have the privilege of having

22       my notes in front of me.

23          Q.  Well --

24          A.  They were taken away and I just would like them

25       back.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.  You said a moment ago that if you could find
2  out what the subject matter is you might change your
3  mind.  And I'll tell you what the subject matter is.
4  And it's the FDA's 2002 compliance policy guide.
5         Are you comfortable answering questions about
6  the compliance policy guide without your notes?
7    A.  I think so, sir.
8    Q.  Good.
9         We need an exhibit number.
10         MR. ARBITBLIT:  Do you want to go back on the
11  video record now?
12         MR. GIDEON:  Yes.
13         THE VIDEOGRAPHER:  One moment please.
14         This is the beginning of disc No. 3, volume 1.
15         We are back on the record at 1:11 p.m.  You may
16  proceed.
17         (Whereupon, Exhibit 1251 was marked for
18         identification.)
19         MR. GIDEON:  Q.  Dr. Kessler, I just handed
20  you a copy of the Compliance Policy Guides Manual
21  Section 460.200, which is referred to in a lot of
22  the papers in this case as the 2002 compliance
23  policy guide from the FDA.
24         If you look at page 3 of that document there is
25  a statement that reads as follows:  An increasing number



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    of establishments with retail pharmacy --

2          A.  Do me a favor.  Show me where, so I'm exactly

3    reading with you.

4          Q.  It is the very first sentence on page 3.

5          A.  I see "FDA believes."  That's what you --

6    that's where you're starting.  "FDA believes."  Thank

7    you.

8          Q.  -- that an increasing number of establishments

9    with retail pharmacy licenses are engaged in

10   manufacturing and distributing unapproved new drugs for

11   human use in a manner clearly outside the traditional

12   bounds of pharmacy practice and that violates the Act.

13          Do you see that?

14         A.  Yes.

15         Q.  Okay.  What act is this referring to?

16         A.  This would be the Federal Food, Drug and

17   Cosmetic Act enacted in 1938 and amended multiple times

18   since then.

19         Q.  All right.  And who were the establishments

20   with retail pharmacy licenses that were engaged in

21   manufacturing and distributing unapproved new drugs that

22   were referred to at page 3 of the CPG?

23          MR. CHALOS:  Object to the form.

24          THE WITNESS:  You -- I couldn't give you what

25   was in FDA's mind, exactly, at the time.  I don't know



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 165 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                  Page 164

1  exactly what establishments they were talking about in

2  this.  But in general, I think we're talking about

3  compounding establishments.

4           MR. GIDEON:  Q.  Was NECC one of those

5  establishments with a retail pharmacy license

6  engaged in manufacturing and distributing unapproved

7  new drugs for human use as of the time of

8  publication of the compliance policy guide?

9       A.  So you didn't read the full sentence.

10      Q.  I asked just a question.  Was NECC one of those

11 entities?

12      A.  Right.  So I don't know specifically.  One

13 would think so.  But what you didn't read, right, is the

14 beginning of the sentence where it says "FDA believes."

15      Q.  Uh-huh.

16      A.  Right?  Whether, in fact, they were engaged in

17 manufacturing and distributing, I don't know whether FDA

18 concluded it was NECC.

19          You see at this time, to your question, if my

20 memory serves me right, that around a similar time in

21 2002, and I would want my notes for this, that you see

22 that FDA concluded with the Massachusetts Board of

23 Pharmacy that NECC was a compounding pharmacy and not

24 manufacturing.  That was specifically discussed around

25 2002.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        And again, I need my notes to look at which

2   document that is.

3        So at around this time, right, I mean,

4   specifically with regard to NECC, and I'll give you the

5   citation as soon as my document -- my notes are back --

6   I believe FDA concluded, with Massachusetts Board of

7   Pharmacy, that it was a compounder.  So that would not

8   be consistent with this.  So that's the first thing with

9   regard to NECC.

10        With regard to whether compounders are

11   manufacturers, again, this says FDA believes.  And as I

12   testified earlier, I think after Western States in 2002,

13   and this is written thereafter, FDA is trying to

14   reassert jurisdiction, right?

15        Now, not everybody -- certainly courts did not

16   agree.  The industry did not agree that it was

17   manufacturing, and FDA, when put to the test to comment

18   about whether NECC, around this time, concluded that it

19   was a compounder.

20        So this says what it says, but other documents

21   would say it was a compound -- NECC was a compounder and

22   not a manufacturer.

23   Q.  Now, did anybody ever provide you with any of

24   the documents from 2002 and 2003 -- in fact, they're

25   Penta exhibits -- where FDA describes NECC repeatedly as



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1  a manufacturer?
 2      A.  So --
 3      Q.  Did they provide you with those documents?
 4          MR. CHALOS:  Object to form.
 5          THE WITNESS:  Yes.  I've seen 483s.
 6          MR. GIDEON:  Q.  Not a 483.  An actual
 7  description by the FDA -- the documents are among
 8  the Penta exhibits -- where the FDA calls NECC a
 9  manufacturer.  Have you seen those?
10          MR. ARBITBLIT:  Now, Counsel, you are
11  representing something that's in a document that may or
12  may not be accurate.  If you have something you want to
13  show him, do so.  Otherwise, let him finish his answer.
14  He was giving you an answer about 483s that he has seen.
15  You are interrupting him, like, repeatedly, and it's
16  inappropriate.
17          MR. GIDEON:  Oh, my gosh.  This is just
18  ridiculous.  You guys would have to recognize -- I think
19  anybody would -- that his answers have been consistently
20  nonresponsive, almost from the beginning --
21          MR. ARBITBLIT:  I absolutely disagree.
22          MR. GIDEON:  Let me finish.
23          -- almost from the beginning.  If you ask him
24  if today is Friday, he gives us a description of the
25  entire calendar.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 168 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                 Page 167

1        It has been nonresponsive all day long.  And I

2    asked him a simple question if anybody had ever given

3    him the Penta exhibits where the FDA describes NECC as a

4    manufacturer, and he just starts talking, and then you

5    defend him.  It's ridiculous.

6        MR. ARBITBLIT:  That is so far from a simple

7    question, Counsel, because it's includes reference to a

8    document that you haven't shown the witness that may or

9    may not be consistent with what you are representing.

10       You don't have the right to represent a

11   document out of thousands of pages reviewed and pretend

12   that you are all knowledgeable as to what's in it, or

13   that he has no right to see it to answer a question.

14       And he certainly was answering your questions

15   all day long.

16       MR. GIDEON:  Well, Dr. Kessler has talked a lot

17   today, but hasn't answered many of my questions.  That's

18   the truth.

19       MR. ARBITBLIT:  Well, that's your vision of the

20   truth.

21       MR. GIDEON:  I think it will be verified when

22   an objective party looks as it.

23       MR. CHALOS:  Okay.  Is there a question

24   pending?  I've lost track.

25       MR. GIDEON:  He was still talking.  I have lost



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 169 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 168

1    track of what my question was that I asked 22 minutes

2    ago.

3            MR. ARBITBLIT:  Does he have to know whether

4    the form 483s were part of Penta's exhibits?  Is that

5    what you really want this deposition to be about?

6            He's telling you a responsive answer about a

7    document that referred to NECC as a manufacturer, and

8    you want him to tell you whether that was one of Penta's

9    hundred exhibits?  Is that really your idea of a fair

10   question?

11           MR. GIDEON:  Well, let me give you my idea of a

12   very fair question.

13           Did this witness that you engaged ever see a

14   Penta exhibit where the FDA described NECC as a

15   manufacturer?  Nobody finds that question difficult to

16   answer.  It's a yes or no.

17           MR. ARBITBLIT:  No it's not, because --

18           MR. CHALOS:  Object to the form.

19           MR. ARBITBLIT:  -- you are asking the witness

20   to identify which are Penta exhibits out of all the

21   documents that he's reviewed.

22           And I would advise the witness, if you remember

23   a document that was a Penta exhibit, you may answer it.

24   If you remember another document you are not sure if

25   it's a Penta exhibit, you can advise counsel in your



1   response.

2          MR. GIDEON:   Q.   Now the question:   Did

3   FDA, in the documents that were made available to

4   you, specifically describe NECC repeatedly as a

5   manufacturer?

6          A.   So I believe the documents that I -- to answer

7   that question -- that I would want to look at, that were

8   made available, the exact documents, are on my notes and

9   I would like to see that.

10         Q.   You know what brought this up is you said that

11  as you looked at the compliance policy guide, you were

12  looking at this and you said but -- but the FDA

13  described NECC as a compounder.   What document were you

14  referring to when you said that?

15         A.   So, again, the specific citation is in my

16  notes, and I'd --

17         Q.   The blotter?

18         A.   Yeah.   I can give you the specific citation.

19  But from memory, okay, what I remember, which is a

20  direct answer to your question, okay, is FDA did use the

21  term -- did use the word manufacturing as it was

22  inspecting in 2002, right?

23         But in the specific meeting minutes with the

24  Massachusetts Board of Pharmacy, when asked in this time

25  period in 2002 whether NECC was a manufacturer or



1    compounder, the agreement was -- the result of FDA's

2    review, was that NECC was a compounder.  I'd be happy to

3    give you that exhibit as soon as my notes are back.

4         Q.  Well, the way we got the opportunity to

5    continue today's scheduled deposition was I told you I

6    wanted to ask you about the compliance policy guide --

7    let me finish -- and you said okay, we can talk about

8    that before the notes come back.  Remember?

9         A.  But we're not talking about --

10             MR. CHALOS:  Object to the form.

11   Argumentative.

12             THE WITNESS:  So -- so, again, I'd be happy to

13   talk about this in the abstract.  If you are talking

14   about specific documents as they applied to NECC, right,

15   which you did, I need my notes.

16             MR. GIDEON:  Q.  I didn't bring it up.  I

17   asked you was NECC one of those establishments with

18   retail pharmacy licenses that was engaged in

19   manufacturing and distributing that is referred to

20   in the first three lines of the compliance policy

21   guide at page 3.  It's a simple question.

22             MR. CHALOS:  Object --

23             MR. GIDEON:  Q.  Was it NECC or not?

24             MR. CHALOS:  Objection.  Argumentative.

25             THE WITNESS:  So I --



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1           MR. CHALOS:  Hang on a second.

2           Objection.  Argumentative.  Compound.

3   Objection to form.

4           THE WITNESS:  There's no way that I could know

5   when the person who wrote this, what was in their mind.

6           MR. GIDEON:  Q.  Right.

7           Now, let's talk about the criteria under the

8   policy itself that's in front of you.

9       A.  Sure.

10      Q.  Now, this was published after the decision in

11  Western States, wasn't it?

12      A.  Yes.  And before other decisions.  Yes.

13      Q.  Well, doesn't it refer to, on page 1 in the

14  introduction, to the fact that the U.S. Supreme Court

15  had already acted in Thompson versus Western States?

16      A.  Exactly, sir.  But before other court opinions

17  were at issue.

18      Q.  Right.  And getting back to page 3 where it

19  refers to the policy, was this the published policy of

20  the Food and Drug Administration?

21      A.  This is a compliance policy guide.  That's what

22  this was.

23      Q.  Yeah.  Was it a published policy of the FDA?

24      A.  This was a compliance policy guide, and I'd be

25  happy to tell you what that means.



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 173 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                     Page 172

1      Q.  Sure.  Go ahead.

2      A.  Okay.

3      Q.  I expected that you would.  Was it a published

4  policy of the FDA or is this something that is simply

5  collected in a document by some other legal publishing

6  house?

7      A.  So the best way to -- so to establish what this

8  is, is if you look at the first page, sir, right, in

9  that black box, right, it tells you what this is.

10     Q.  Yes.

11     A.  So this reflects FDA's thinking on the topic.

12 It doesn't confirm any rights or person.  It does not

13 operate to bind FDA to the public, and it doesn't have

14 the force of law, right?  It's not a regulation pursuant

15 to the APA, right?  So it's not a statute or a

16 regulation.  This just -- this gives you what FDA's

17 thinking is at the time.

18     Q.  Okay.  Now, if we go to page 3 and we start to

19 try and make some -- give some meaning to the language

20 the FDA used, in the second sentence under Policy it

21 says:  However, when the scope and nature of a

22 pharmacy's activities raise the kinds of concerns --

23     A.  I'm sorry, I'm reading -- the second sentence

24 under Policy is "FDA anticipates."  Where are you --

25     Q.  Page 3.



1        A.   I'm there.

2        Q.   Page 3.

3        A.   Yes.

4        Q.   Second full paragraph --

5        A.   Second full paragraph.  I'm sorry.

6        Q.   -- under Policy --

7             MR. CHALOS:  Here are your notes.

8             THE WITNESS:  Thank you very much.

9             MR. GIDEON:  Q.  -- which says:  However --

10       A.   Yes, sir I got it.

11       Q.   -- when the scope and nature of a pharmacy's

12  activities raise the kinds of concerns normally

13  associated with a drug manufacturer --

14       A.   Yes.

15       Q.   -- and result in significant violations of the

16  new drug, adulteration, or misbranding provisions of the

17  Act, FDA is determined that it should seriously consider

18  enforcement action.

19            Have I read that correctly?

20       A.   Exactly.

21       Q.   Now, what are the scope and nature of a

22  pharmacy's activities that would raise the kinds of

23  concerns normally associated with a drug manufacturer?

24       A.   FDA lists those.

25       Q.   Where are those in this document?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 175 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 174

1       A.  One through nine.

2       Q.  Oh, I see.  So these items that follow below

3   that are the kinds of things that would inform the FDA's

4   decision, correct?

5       A.  As well as the context for those.

6       Q.  Okay.  Now, let's look at No. 1.

7           Was NECC compounding drugs in anticipation of

8   receiving prescriptions?

9       A.  I believe the record shows that they were.

10      Q.  Okay.  Item No. 1 also refers to quantities.

11  Except in very limited quantities?

12      A.  Yes.

13      Q.  There is a section here that refers to

14  inordinate volume; isn't that correct?

15      A.  Yes.

16      Q.  Which one is it?

17      A.  If you know which one it is, we can save time.

18  I was reading.  There's 1 -- the limited quantities in

19  1, right?  Except in very limited quantities.  But

20  that's in relation to the amount of prescriptions that

21  they get in afterwards.  So that's what the determining

22  factor is there.

23          So obviously limited quantities, again,

24  compared to the number of prescriptions they had.

25      Q.  Did FDA define the term "inordinate volume"?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    A.   Show me where inordinate volume is.  If you can

2    save me time, I'd be happy --

3    Q.   I just asked you if it's defined.  Because it's

4    not defined in this document.

5         MR. CHALOS:   Objection to the form.

6         THE WITNESS:   So if you look at the '92 policy

7    that I was involved in, I believe they give examples of

8    volume in that compliance policy guide.

9         MR. GIDEON:   Okay.  Let's get No. 19 together.

10        (Whereupon, Exhibit 1252 was marked for

11        identification.)

12        MR. GIDEON:   Q.   I'll hand you two letters.

13   One is Exhibit 1252, it's two letters.  It's dated

14   February 18th, 2003 and March 17th, 2003.

15   A.   Sure.

16   Q.   These are letters to Susan Liner Recall

17   Coordinator at the Food and Drug Administration.  They,

18   together, are Exhibit 1252.

19   A.   Right.  And if I could just agree that when I

20   got my notes -- get back, if someone could pull S0486 in

21   response to a previous question.

22   Q.   I want you to look at these two documents.

23   First thing I want you to do after you look at them is,

24   have you seen them before?

25   A.   Right.



1        Q.   What are you looking at?

2        A.   I'm looking to be able to answer your question.

3    I want to check my memory.

4        Q.   You need to identify for us what's on your

5    computer screen.

6        A.   These are just -- this is my expert report, and

7    the documents cited in that report, and I just want to

8    double-check something.

9        Q.   Just tell us the paragraph that you are looking

10   at.

11       A.   The paragraph of my -- that I am looking at --

12       Q.   Whatever is on the screen, tell us what you are

13   looking at.

14       A.   So I'm looking at -- right now I'm looking at

15   the responses of NECC to Liner.  I'm just looking to see

16   whether I have this document.  Whether I've looked at

17   this document.

18       Q.   Are you looking at a list of documents or are

19   you looking at any of the content of your reports?

20       A.   I'm looking at the content of my reports.

21       Q.   Okay.  So what are the paragraph numbers?

22       A.   Right now, I'm into the schedules.

23       Q.   Schedules or paragraphs?

24       A.   Schedules don't have paragraphs, sir.

25       Q.   Okay.  Well, I asked you a paragraph number and



1   you said yes, I'll answer that.  Are you looking at a

2   paragraph of your report or a schedule?

3           MR. ARBITBLIT:  Object to form.

4           THE WITNESS:  Am I looking -- I'm not looking

5   at a paragraph.  Right now I'm looking at an actual

6   document.

7           MR. GIDEON:  Q.  We know that, Doctor, but

8   what part of your report are you looking at for the

9   last time?

10      A.  I'm looking at -- so I have, in front of me, an

11  OCR of all the documents, both in my schedules and my

12  appendices and my report.  So I have an OCR of some

13  2,000 pages.  And -- that I have looked at.

14          That I want to just finish one other thing if I

15  may.

16      Q.  We'll make that OCR --

17      A.  It's on the hard drive, sir.

18      Q.  Well, we'll have to print out the hard drive

19  that you offered to me earlier.

20      A.  That's 2,000 pages.

21      Q.  Correct.  But with respect to the OCR that

22  you're referring to, we will make that Exhibit 1253.

23          MR. CHALOS:  We'll provide that electronically.

24  It's 2600 pages.

25



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 179 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 178

1              (Whereupon, Exhibit 1253 was marked for

2              identification.)

3              THE WITNESS:  Hold on one second.  I have to

4    get another thumb drive which is the FOI documents.

5              I have the FOI documents on another thumb

6    drive, but I have to find it here.  For some reason my

7    folder is empty here, but I have to check.

8              I don't see this document in my schedules or

9    appendices, but I have to check one other file.  I don't

10   recall off the top of my head certainly with regard to

11   the first one.  Let me just see the second one.

12             MR. GIDEON:  Q.  The two letters are from

13   the same lawyer to the same person at FDA involving

14   the same manufacturer, NECC.

15       A.  Right.

16             MR. ARBITBLIT:  Object to the preamble.

17             MR. GIDEON:  Just trying to facilitate his

18   review of the document.

19             MR. ARBITBLIT:  You're including a term of

20   art --

21             MR. GIDEON:  Trying to be helpful.

22             MR. ARBITBLIT:  -- in your facilitating.

23             THE WITNESS:  So I am aware of the recall and

24   some of the communication.  I'd want to check and make

25   sure that I've seen this letter.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 179

```
1          MR. GIDEON:  Q.  Well, that was the
2    question.  I handed them to you and wanted to know
3    if you had seen those before.  Do you have a memory
4    of seeing those letters before?
5          A.  I have a memory of the back and forth on the
6    recall, but I don't recall exactly this letter.
7          Q.  Okay.  Well, you can see here, these are from
8    the Board of Registration and Pharmacy, documents 16762
9    to 16764, and 16816 to 16817.  This reflects volume of
10   product being recalled at the behest of the FDA and the
11   Board of Registration and Pharmacy, doesn't it?
12         A.  Yes.
13             MR. ARBITBLIT:  Object to form.
14             MR. GIDEON:  Q.  And the volume shown on
15   the two letters is a volume that is inordinate for a
16   retail pharmacy, is it not?
17             MR. CHALOS:  Object to the form.
18             THE WITNESS:  So the statute -- what the
19   statute says -- let me finish, sir.
20             What the compliance policy guide says, okay, to
21   the provision that we've talked about on limited use,
22   the issue is it would be -- the limited use, okay,
23   depends on the number of prescriptions that the company
24   had.  So what the compliance policy guide is very clear
25   about, compounding drugs in anticipation, except in very
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 181 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 180

```
1    limited instances --
2           MR. GIDEON:  Q.  No, it says quantities.
3       A.  Very limited quantities in relation to the
4    amount of drugs compounded after receiving valid
5    prescriptions.
6       Q.  Okay.
7       A.  So the concept here is it is -- if you have --
8    this all determines, this all hangs on the central
9    premise of whether there were prescriptions here.
10      Q.  And did you see, in any of the documents you
11   looked at, whether FDA and the Board of Registration and
12   Pharmacy even checked to see if there were prescriptions
13   for any of those products that were recalled?
14      A.  So, again, in general, I did not see that.
15   Okay?  I didn't see, in 2002 -- let me correct that.
16           Can I just get S0486, please?  Could someone
17   help pull that?  That's a Massachusetts Board of
18   Pharmacy document.
19           I did not see, again -- again, generally that
20   would be the state medical board that would be looking
21   at prescriptions.  I didn't see that.
22           Thanks for the help, Don.
23      Q.  You didn't see whether the FDA or the
24   Massachusetts Board of Registration and Pharmacy even
25   checked to see if those recalled drugs were covered by a
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   prescription, correct?

2         A.   Exactly.  I did not see that.

3              Let me add, you -- just so it's on the record.

4   You asked me -- and I apologize, but you asked me

5   earlier about whether NECC was viewed as a manufacturer,

6   and I told you that it was viewed by a compounder.

7              And on page S0486, right, an FDA document

8   between Kristina Joyce and the central file, it says a

9   discussion was held to decide if NECC should be

10  considered a manufacturer or compounder.  It says it was

11  decided that the current findings supported a

12  compounding role.  And this is February 2003.

13             So that was the way FDA viewed, certainly at

14  that point in time, based on that document.

15        Q.   Okay.  Well, we have two letters before us,

16  though, don't we?  We've got one dated February 18th,

17  2003, and one dated March 17th, 2003, correct?

18        A.   Yes.

19        Q.   Let's take them in chronological order.

20        A.   Yes.

21        Q.   If you will look at the second page of the

22  February 18th, 2003 letter to Susan Liner --

23        A.   Right.

24        Q.   -- it has a table that was prepared by the

25  lawyer for NECC reflecting the volume compounded and the



1   volume distributed, correct?

2       A.  Yes.

3       Q.  All right.  And I suspect that there will be

4   disagreements about the numbers, but if we estimate,

5   based on the numbers shown on that page, we certainly

6   can reach the conclusion that thousands of vials were

7   distributed of methylprednisolone, 80-milligram per

8   milliliter, Preservative-free suspension, as shown on

9   page 2 of that exhibit, correct?

10      A.  Certainly if you look at the volume distributed

11  and you add up the third column, you would get to

12  several thousand.

13      Q.  All right.

14      A.  You would get into the thousands.

15      Q.  Let's go back.  Let's go back and take a look

16  at page 3 of the compliance policy guide.

17      A.  Yes.

18      Q.  At the top of the page, FDA offers this

19  example.  Quote:  For example, some firms receive and

20  use large quantities of --

21      A.  Just show me exactly where you are reading it.

22  I'm on page 3 looking at the first sentence.

23      Q.  I'll count the lines for you.

24      A.  Thank you very much.

25      Q.  Line 10.  "For example."  After "retail



1   pharmacies" there's a period.

2        A.  I see a sentence that says "Moreover."

3        Q.  Then there is, "For example."

4        A.  I see "Moreover," then, "Pharmacies engaged" is

5   the next sentence.  Am I misreading -- you are in the

6   first existing paragraph on page 3?

7        Q.  Yes.  Ten lines down.

8        A.  It's the sentence before "Moreover."  I see it.

9   "For example, some firms receive."

10        Q.  Here.  I'll read it to you:  For example, some

11   firms receive and use large quantities of bulk drug

12   substances to manufacture large quantities of unapproved

13   drug products in advance of receiving a valid

14   prescription for them.  Moreover, some firms sell to

15   physicians and patients with whom they have only a

16   remote professional relationship.  Pharmacies engaged in

17   activities analogous to manufacturing and distributing

18   drugs for human use may be held to the same provisions

19   of the Act as manufacturers, end quote.

20            I've read that correctly, haven't I?

21        A.  Exactly, sir.

22        Q.  Isn't what's shown on page 2 of the February

23   18th letter a large quantity of methylprednisolone

24   acetate?

25        A.  It -- volume is what it is.



1    Q.  Right.  Is it a large quantity, is the

2    question.

3              MR. CHALOS:  Object to form.

4              THE WITNESS:  Can I -- let me find -- let me

5    answer that question precisely with some standard.  Hold

6    on a second.

7              So if you look and can do this --

8              MR. GIDEON:  Q.  Show us what you are

9    looking at.

10    A.  If you want -- again, if you want the judgment

11    of what's large and what's not large, because it's not

12    defined here.  But if you look at, in my report, S0337.

13              So I mean, in the earlier compliance policy

14    guide when FDA was talking about large, it used an

15    example of 300,000 doses, units of albuterol for 6,000

16    patients.  Those were the numbers that I've seen to just

17    have a standard.  So we know that that is -- that would

18    be large.

19    Q.  300,000 units for 6,000 patients?

20    A.  Yeah.  They used an example, has issued warning

21    letters that they're clearly manufacturing.  So we know

22    that that's an example, right, that I can point to

23    something concrete.

24    Q.  Is that the only example offered in the earlier

25    compliance policy guide?



1      A.  Only one I've seen, sir.  I mean, it's the

2  only -- when you look for what's large, what's not

3  large, right?  But that's absolute numbers, you

4  understand?

5          The real issue, when you want to know -- it's

6  not just whether it's large, it's -- is it large

7  compared to the number of prescriptions it had.  That's

8  the key determiner.

9      Q.  Okay.  Well, would 10,412 vials, in your

10  opinion, have been a large quantity of compounded

11  product which would be more analogous to manufacturing?

12      A.  If they had 10,000 prescriptions, then that's

13  not an issue.

14      Q.  Correct.  But if they don't have 10,412

15  scripts, would 10,412 vials of methylprednisolone,

16  80-milligram per milliliter single-use vials be a large

17  quantity?

18          MR. CHALOS:  Hang on a second.  Objection.

19  Form.  Incomplete hypothetical.

20          THE WITNESS:  So if you have -- if you don't

21  have prescriptions, if you are not doing this with

22  regard to -- you don't have prescriptions and you are

23  not going to get those prescriptions, right, there's

24  something that's wrong.

25          MR. GIDEON:  Q.  Is it -- is 10,412 vials a

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 187 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 186

1    large quantity analogous to manufacturing?

2              MR. CHALOS:  Object to the form.

3              THE WITNESS:  I can tell you that 10,000 is

4    large.  With regard to whether it's a manufacturer, it

5    doesn't meet the 300,000 test here that we've -- not

6    that it's a test, but that example.  So we know it

7    doesn't meet that.

8              But the issue, for me, as a -- whether it's

9    manufacturing or compounding, the real central premise

10   is is this patient-specific prescriptions.  That's

11   what's key here.  That's what's missing in this whole

12   thing.  That's what your client and NECC were engaged in

13   this scheme to do this without.

14        Q.   Okay.  Tell me this:  As you look through these

15   other factors in the compliance policy guide it says, on

16   item No. 3:  Compounding finished drugs from bulk active

17   ingredients that are not components of FDA-approved

18   drugs without an FDA sanctioned investigational new drug

19   application in accordance with 21 U.S.C. 355 and 21 CFR

20   312.

21             Do you see that?

22        A.   I do, sir.

23        Q.   Did NECC compound drugs from bulk active

24   ingredients that were not components of FDA-approved

25   drugs without an FDA sanctioned investigational new drug



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 188 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 187

1   application?

2        A.  So I did not see any IND, so it didn't have

3   that.  Okay.  I have not been privy to where the bulk

4   drug came from, right?  I've not seen the drug master

5   file that would -- to know where that bulk drug came

6   from.

7        Q.  Okay.  Can you answer the question?

8        A.  Unless I knew -- I would need to see the drug

9   master file of where that drug came from to know whether

10  that was an approved drug.  I just don't -- I've not

11  seen that.  No one has provided me with that -- I've not

12  seen where the bulk drug comes from and the status of

13  that bulk drug.

14       Q.  Okay.  Item No. 6 refers to:  Using commercial

15  scale manufacturing or testing equipment for compounding

16  drug products.

17           Was NECC using commercial scale manufacturing

18  or testing equipment?

19       A.  So I believe FDA, at one point, asked that

20  question specifically as part of the 483.  It was one of

21  the questions that was asked.  And I'd have to pull up

22  that document to see whether, in fact, what -- NECC's

23  response.  I don't see any determination when I -- from

24  just sitting here, that FDA concluded that it was,

25  right?



1        So I mean, again, I would want to see the 483s.

2   I think there's a direct question on that matter.

3        Q.  In the space of two months, can a retail

4   pharmacy make 10,412 vials of methylprednisolone acetate

5   without commercial scale manufacturing equipment?

6             MR. CHALOS:  Object to the form.

7             THE WITNESS:  Again, let me let somebody

8   else -- we'd have to look and see what that definition

9   is.  I'm not aware that there was -- I'm not aware what

10  FDA or -- what the equipment was, nor what FDA -- what

11  the equipment was, nor what FDA concluded.

12        So you have to show me the equipment that was

13  in use.  Is it possible in two months to make 10,000

14  vials --

15            MR. GIDEON:  Q.  Of MPA.

16        A.  -- of MPA.  From my experience and sitting in

17  pharmacies, I'm just trying to think going back to my

18  days of doing products.  So I would guess I could

19  probably do a thousand unit doses of compounded product,

20  I mean, when I sat there in the pharmacy.

21        Q.  When was this?

22        A.  This was when I was -- I had the

23  responsibility, you know --

24        Q.  When?

25        A.  This was back in the 1980s when I was running



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    the hospital.  And when we would have strikes, when

2    there was strikes in New York, I would actually go down

3    and work in the pharmacy.

4         Q.  Did you have a pharmacy license in New York?

5         A.  I was medical -- I was licensed as a physician.

6         Q.  No.  My question was, did you have a pharmacy

7    license in New York?

8         A.  I had a license as a physician.  And under

9    New York law, I was able to be able to work in the

10   hospital pharmacy during a strike in an emergency to

11   save the lives of patients.

12        Q.  Okay.  And you were compounding thousands of

13   vials of methylprednisolone acetate?

14        A.  No, I didn't say that.  I'm just trying to

15   anticipate.  I was sitting there unit dosing certain

16   things under the supervision of pharmacists, okay?  As a

17   physician, and I was just trying to understand, you

18   know, trying to prepare unit dose medicines, which is,

19   in essence, a form of compounding and how many I could

20   have done that day.

21             Again, let others testify exactly what is

22   feasible and not.  I did not see the equipment, nor did

23   I see FDA making a determination on that equipment.

24        Q.  Okay.

25        A.  Again, if someone could help me, I can search



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 191 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 190

1    in a minute, but I don't want to take your time of what

2    the -- what's in the 483 on the answer to that question.

3         Q.   Which 483 are you referring to, the one from

4    2002 to 2003 or the one that's post-outbreak?

5         A.   No.  I'm talking about earlier on, there were,

6    I believe there were questions that were asked that went

7    to these kinds of -- and it may be in the EIR or in

8    other FDA documents.  I did see some reference to these

9    things early on.

10        Q.   In this time frame that we are talking about,

11   which is 2002, 2003, the time frame set by the letters

12   in front of you --

13        A.   Yes.

14        Q.   -- was NECC compounding drug products that were

15   commercially available in the marketplace, or were

16   essentially copies of commercially available

17   FDA-approved drug products?

18            This is item No. 8 on page 4 of the compliance

19   policy guide.

20        A.   It would depend on your interpretation.  I

21   think there's different interpretations one could give

22   to that.

23        Q.   What's your answer?  What's your

24   interpretation?  The witness' interpretation?

25            Was NECC compounding drug products commercially



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 192 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 191

1    available in the marketplace or that are essentially

2    copies of commercially available FDA-approved drug

3    products, period?

4        A.  It would depend on your interpretation whether

5    preservative free is essentially the same or not.

6        Q.  What do you think?

7        A.  Well, you know, I've -- the FDA does give a

8    definition of essentially the same.  I'd have to pull

9    that definition.  I think there's an -- I mean, there

10   are arguments both ways, would be my opinion.

11       Q.  Arguments both ways.  Okay.

12       A.  If you take the view that the preservative free

13   wasn't necessary, and that there was approved drug as,

14   you know, Culclasure and others were using don't care,

15   then it's the same as a copy.  If you're taking the

16   position that preservative free is something different,

17   then it's not a copy.

18       Q.  Well, was -- was Depo-Medrol preservative free

19   or not?

20           MR. CHALOS:  Object to form.

21           THE WITNESS:  We already went through that.

22           MR. GIDEON:  Q.  It wasn't?

23       A.  It had benzyl alcohol.

24       Q.  So methylprednisolone acetate is indisputably

25   not a copy of Depo-Medrol, is it?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 193 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 192

```
 1            MR. CHALOS:  Object to the form.
 2            THE WITNESS:  The active agent -- I mean,
 3   again, this is complicated law and I've been in these
 4   situations, okay?  The active agent, okay, I mean --
 5            MR. GIDEON:  Q.  The methylprednisolone
 6   acetate?
 7       A.  Which is in Depo-Medrol -- that's what your
 8   active agent -- you have inactive agents and you have
 9   preservative.
10            But, you know, I think one could argue that it
11   is a copy of something that is on the market.  And I
12   think if you want to emphasize that it was preservative
13   free, then you would conclude that it is not.  So that's
14   why I think there could be differences of
15   interpretation.
16       Q.  Okay.  Well, if, in fact, methylprednisolone
17   acetate without benzyl alcohol, which is not a duplicate
18   of Depo-Medrol, was being made by NECC, their
19   methylprednisolone acetate is unequivocally a new drug,
20   then, isn't it?
21            MR. ARBITBLIT:  Object to form.
22            THE WITNESS:  Sorry, let me understand your
23   question.  Is if -- not if FDAMA is in effect.
24            MR. GIDEON:  Q.  FDAMA struck down --
25   struck down by the Supreme Court of the
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 194 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 193

1    United States.

2         A.  No, sir.  That's incorrect.  Okay?  So what we

3    know is the advertising provisions are struck down,

4    right?  The Supreme Court did not decide, and you can

5    read the opinion, you know, that it did not strike down

6    FDAMA.  It didn't decide that.  That's what led to the

7    confusion and the circuits split whether the compounding

8    FDAMA was valid or not valid.

9         Q.  Okay.  Well, then let's try and focus on the

10   FDA's announced compliance policy guide --

11        A.  Sure.

12        Q.  -- and see if we can make some sense of this

13   with respect to NECC.

14             With me?

15        A.  Sure.

16        Q.  All right.  When you look at 10,412 vials being

17   recalled as shown on page 2 of the February 18th letter

18   to Susan Liner at the FDA, okay?  Are you still with me?

19        A.  Yeah, I'm with you but I'm just trying to --

20        Q.  And then you look at pages 1 and 2 of the March

21   17th letter --

22        A.  Yes, sir.

23        Q.  -- have you looked at that?

24        A.  Yeah.

25        Q.  And the last sentence on the final full



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 195 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 194

1    paragraph on page 1 of the March 17th letter begins as

2    follows:  The states into which those lots of

3    betamethasone were shipped include, and then there is a

4    list of -- it's either 27 or 28 states.

5          A.  Yes.

6          Q.  It runs from Arizona to Wisconsin.

7          A.  Yes.

8          Q.  Now, when you put these two together, doesn't

9    this show to you that NECC, at the time, was making a

10   large quantity of preservative-free drug products

11   analogous to manufacturing?

12              MR. CHALOS:  Object to the form.

13              THE WITNESS:  If you're preservative free and

14   you are emphasizing preservative free, that's not a

15   compound -- that's not a drug that's commercially

16   available, right?

17              If it's not a drug that's commercially

18   available, okay, you have to meet -- you're either a

19   compounder or a manufacturer.  We know -- there's no

20   doubt that on February 24th, 2003, right, Massachusetts

21   Board of Pharmacy and FDA concluded, right, that it was

22   decided the current findings supported a compounding

23   role for NECC.  That was FDA.  That's what we know in

24   this time period.

25              So on the basis of what everything FDA had,



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 196 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 195

```
 1   which was the compliance policy guide, it had all the

 2   facts, these letters, right, certainly by -- within

 3   that -- you know, a 12-month period, the FDA concluded,

 4   through this whole episode, that it was a compounder.

 5          MR. GIDEON:  Q.  If you're distributing

 6   something that is not commercially available, you

 7   are either a compounder or you are a manufacturer,

 8   correct?

 9          MR. CHALOS:  Object to the form.  Object to the

10   premise of the questions.  Misstating the testimony.

11          THE WITNESS:  Are you distributing it with

12   regard to prescriptions?  Do you have patient-specific

13   prescriptions or any anticipation of patient --

14          MR. GIDEON:  Q.  No.  You have no patient

15   prescriptions.  You are distributing bulk volumes.

16   It is not commercially available.  Are you a

17   compounder or a manufacturer?

18          MR. ARBITBLIT:  Object to form.  Incomplete

19   hypothetical.

20          THE WITNESS:  Okay.  My view would be is if you

21   are -- you can't be a compounder.

22          MR. GIDEON:  Q.  Cannot?

23      A.  You cannot be a compounder, okay?  If you are

24   distributing drugs and you get no prescriptions in,

25   right, and it's not in anticipation of prescriptions,
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 197 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 196

```
 1    then you should not be a compounder.
 2            The essential definition of compounding has to
 3    have -- I mean, I assume it's on the first page of the
 4    compliance policy guide.  The first beginning.  It's all
 5    about patient-specific prescriptions.
 6        Q.  Okay.  Well, what's the definition of a
 7    manufacturer?
 8            MR. CHALOS:  Object to the form.
 9            THE WITNESS:  Under what purposes?  For what
10    purposes?
11            MR. GIDEON:  Q.  What is the definition of
12    a manufacturer to making large volumes of drugs?
13            MR. CHALOS:  Object to the form.
14            MR. GIDEON:  Q.  What are the criteria that
15    would allow any reasonable person to say they are
16    manufacturing?
17            MR. CHALOS:  Object to the form.
18            THE WITNESS:  So, I mean, our entire -- our
19    entire legitimate drug supply, I mean, in this country
20    is, you know, Pfizer and Abbott.  Those are
21    manufacturers.  They don't need physician --
22    patient-specific practices.  They are introducing a drug
23    in interstate commerce, right, for sale, and they are
24    subject to 505, right?  They are clearly manufacturers.
25            MR. GIDEON:  Q.  Okay.  I know that Pfizer
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   is a manufacturer and I know Abbott is a

2   manufacturer.  What I want you to do, though, is

3   tell us what is the definition of a manufacturer.

4   Don't just tell me a company name.  That's not

5   helpful.  Tell me what the definition is.

6            MR. CHALOS:  Object to the form.

7            THE WITNESS:  So a -- under which law?

8            MR. GIDEON:  Q.  The --

9       A.  Under FDAMA or not under FDAMA?

10      Q.  The Food, Drug and Cosmetic Act of 1938, as

11  amended, up to and including but not including the 1997

12  FDAMA.

13      A.  Not including --

14      Q.  Not including FDAMA.

15           MR. CHALOS:  Object to the form.

16           THE WITNESS:  So if you wanted to do that,

17  that's what I wrote specifically in the -- that's what

18  we wrote specifically in the 1992, 1994 compliance

19  policy guide.

20           MR. GIDEON:  Q.  What is it?

21      A.  Okay.  And it gave certain -- that gave certain

22  criteria, okay, that if you were engaged in -- they were

23  not -- they were, I don't know, seven, eight, nine

24  criteria that were part of that policy guide whereby

25  even if you were a retail pharmacy, the agency would not



```
 1   grant enforcement discretion.
 2        Q.  Okay.  I'm going to ask again.  What is the
 3   definition of a manufacturer?  Please give me some
 4   substance to your answer instead of just telling me
 5   about things I might find somewhere else at another
 6   time.
 7             MR. CHALOS:  Object to the form.  Object to the
 8   commentary.
 9             MR. GIDEON:  Q.  And if you honestly can't
10   answer --
11        A.  No, I --
12        Q.  If you can't answer the question, just say so.
13        A.  I can answer this very -- I mean -- and I think
14   I just did, right?
15        Q.  No, you didn't.
16        A.  Yes, I did.  Well, I think I did.
17             If you turn to page S0338 in my report, just
18   turn there.
19        Q.  Okay.  Why don't you read it to us.
20        A.  Okay.
21        Q.  What is the definition of a manufacturer?
22        A.  So FDA -- this is where FDA -- FDA may, in the
23   exercise of its enforcement discretion, initiate federal
24   enforcement actions against entities, okay, and
25   responsible persons when the scope and nature of a
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   pharmacy's activity raises the kinds of concerns

2   normally associated with a manufacturer, and that

3   results in significant violations of the new drug

4   adulteration or disbanding provision of the Act.  In

5   determining whether to initiate such actions, the agency

6   will consider whether the pharmacy engages in any of the

7   following acts, and then lists nine things.  And then

8   says the foregoing list of factors is not intended to be

9   exhaustive, and any other factors may be appropriate for

10  consideration in a particular case.

11        What is -- I mean, anyone who introduces,

12  right, a drug in the -- in interstate commerce, right,

13  is subject, I mean, for the purposes of selling that

14  drug is a manufacturer, unless FDA either gave it an

15  exception, as traditional compounding, right, or FDAMA,

16  right, basically gave it an exemption from the new drug

17  acts and they were allowed to introduce stuff in

18  interstate commerce.

19        Q.  Did FDA offer a definition of manufacturer in

20  any source other than what you just read to us, which is

21  largely duplicated in the compliance policy guide, isn't

22  it?

23        A.  Well, it was in earlier compliance policy

24  guide.

25        Q.  But the nine factors that you pointed to in the



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 201 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 200

1    document in front of you are essentially the same nine

2    factors in the 2002 compliance policy guide; isn't that

3    correct?

4            MR. CHALOS:  Object to the form.

5            THE WITNESS:  Right.  Yes.  We can search

6    through the regs, and happy to do that, and see where

7    the word manufacturer -- I use the word manufacturer

8    as -- generally as a drug sponsor, a drug manufacturer,

9    the holder of an NDA is a drug manufacturer.  I've used

10   those terms.  Those are all people who introduce things

11   in interstate commerce subject to 505.

12           Compound, we're dealing with this gray area of

13   retail pharmacy and when is retail pharmacy allowed to

14   introduce things in interstate commerce and when do they

15   cross the line.  That's the issue.

16           MR. GIDEON:  Q.  Well, of course.  Now,

17   look at the second letter.

18       A.  This is the May 17th?

19       Q.  March --

20       A.  March.  Sorry.

21       Q.  March 17th.

22           The lawyer for NECC is admitting to the FDA

23   that NECC has recalled product from 26 or 27 states,

24   correct?

25       A.  That was -- is part of the FDA inspection, I



```
1    believe.  Yes.
2        Q.  And it is crystal clear, then, not subject to
3    dispute or argument, that NECC is selling product in
4    interstate commerce in at least half the states in the
5    country, correct?
6        A.  That's correct.
7        Q.  Okay.  Likewise, it's clear from the earlier
8    letter that at least 10,000-plus vials were recalled,
9    right?
10       A.  Right.
11       Q.  So you have volume, you have clear-cut evidence
12   of interstate commerce by NECC.  Is there any reflection
13   in any of the materials you have made available to you
14   that FDA asked for, or NECC represented, that they had a
15   new drug application approval for the product they were
16   selling?
17            MR. CHALOS:  Objection to form.
18            THE WITNESS:  There is no --
19            MR. CHALOS:  Hang on a second.
20            Objection to form.  Misstates the substance of
21   these letters.
22            THE WITNESS:  The question is independent of
23   the letters, correct?
24            MR. GIDEON:  Q.  It is.  Has nothing to do
25   with the letters.
```



1            Is there any indication that FDA asked, or NECC

2    represented, that they were compounding from bulk active

3    ingredients that are, in fact, components of

4    FDA-approved drugs?

5        A.  You just changed your question.  You first

6    asked me is there any evidence, if I'm correct, whether

7    NECC had a new drug application in effect, right?

8            I am not aware, and I'm sure FDA was fully

9    aware, that there was no new drug application because

10   NECC was saying it was a compounder.  NECC is saying

11   we're doing all this subject to patient-specific

12   prescriptions.  That's its representations at the time.

13       Q.  Oh, that's what NECC represented to the FDA

14   that they were doing all this subject to

15   patient-specific prescriptions.  Where is that in the

16   documents that have been made available to you?

17       A.  So if you go to BOP00934, I believe there's

18   that statement back in around the 2002 area.

19       Q.  Okay.

20       A.  And also if you look at, I believe, S0496.  But

21   again --

22       Q.  S0496?

23       A.  I have it written down as S496, but it must

24   be -- I think it's S0496, but I'd have to double-check.

25       Q.  Was FDA entitled to rely upon the



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    representations by NECC?

2              MR. ARBITBLIT:  Object to form.

3              THE WITNESS:  I see no statutory prohibition

4    against that.

5              MR. GIDEON:  Q.  I asked you a question.

6    In terms of enforcement, was FDA entitled to rely

7    upon the representation by NECC that all of these

8    drugs, you say, were covered by patient-specific

9    prescriptions?

10        A.  I didn't say these --

11             MR. ARBITBLIT:  Object to form.  Argumentative.

12             THE WITNESS:  -- these drugs were covered by

13   patient prescriptions.  Please understand, there was a

14   scheme here, right?

15             MR. GIDEON:  Q.  In 2002 is the time frame

16   we're talking about.

17        A.  Well --

18        Q.  That's what we're talking about.

19        A.  So I don't see the data from 2002.  The data

20   that I -- sorry.  Let me be very clear.

21             There is a statement, okay, in direct

22   questions, I mean, that NECC represents in 2002 that

23   they dispense approved product in bulk for

24   administration to individual patients pursuant to

25   receipt of a valid prescription from a prescriber.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        Q.  And that's why I asked you, and we've spent ten

2    minutes on this, was FDA entitled to rely upon that

3    representation by NECC?  It's a simple question.

4        A.  It's not.

5             MR. CHALOS:  Hang on.

6             Objection.

7             THE WITNESS:  It's naive, sir.

8             MR. CHALOS:  Objection.  Argumentative.

9             THE WITNESS:  With all due respect, it can't be

10   simple.  What do you mean "entitled" -- you are a

11   sophisticated lawyer.  What do you mean "entitled" by?

12             MR. GIDEON:  Q.  You tell me.  You used to

13   be commissioner of the FDA.  Were the folks on the

14   ground talking to NECC there as employees of the

15   United States of America, were they entitled to

16   accept the representation of a compounder that these

17   products are being dispensed based on individual

18   patient-specific prescriptions?  Were they

19   entitled --

20        A.  Entitled under what?

21        Q.  I don't know.  Was it --

22        A.  You are asking the question, so let's just not

23   make this in the abstract --

24        Q.  You tell me from an FDA standpoint, were the

25   employees entitled to rely upon the representations by



1   the compounder?

2        A.  Entitled?

3        Q.  Yeah --

4            MR. CHALOS:  Objection.

5            THE WITNESS:  Entitled is a matter of law.

6            MR. GIDEON:  Q.  Well, let's start there.

7        A.  Entitled is a matter of law.  I see nothing in

8   the statute that says you can't rely on a statement.

9        Q.  You can or cannot?

10       A.  You cannot.  I see nothing that says, in the

11  statute, if you make a statement to me, I mean, in

12  writing, which is subject to -- what is it --

13  18 U.S.C. 1001, that's a statement to a federal

14  official.

15       Q.  Right.

16       A.  Federal officials are allowed to rely on

17  statements made to them.  Of course you are.

18       Q.  Okay.

19       A.  Let me finish the answer.

20           At the same time as you see in the documents,

21  right, there was a -- there was a decision, right, that

22  at that time, that they -- that NECC was engaged in a

23  compounding role.  And therefore, the decision was made

24  to let the state of Massachusetts take the lead.

25           In fact, you know, most of the time, I have



1    never, as FDA commissioner, gone into the issue of the

2    appropriateness of prescriptions.  That's usually a

3    state matter.

4         Q.  You have or have not?

5         A.  I have not.  Right?  Most of the time the issue

6    of prescribing and whether something is a valid

7    prescription, right, I mean, that's usually a state

8    matter.

9         Q.  And it does differ from state to state.

10             MR. CHALOS:  Objection.

11             THE WITNESS:  Whether a valid -- yeah, I

12    mean --

13             MR. GIDEON:  Q.  Listen to me.  State law

14    differs with respect to what is and isn't a valid

15    prescription from state to state around the country,

16    does it not?

17         A.  Yes.

18             MR. CHALOS:  Objection to form.

19             THE WITNESS:  Yes.  But very important, what

20    FDA has said, and this is what FDA's role says, is you

21    can only engage in this kind of activity, you know, if

22    you have valid prescriptions.

23             FDA -- what constitutes a valid prescription, I

24    will agree with you, I mean, one could look to state

25    law.  But there has to be a valid prescription.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1              MR. GIDEON:  Q.  Okay.  Now, with respect

2   to all of the material that you have looked at from

3   2002, did any of the FDA employees take the step to

4   see if any of these products were covered by a valid

5   state prescription?

6         A.  I don't -- I don't see that.  What FDA did was

7   what you would expect FDA to do, which was, I mean, at

8   the time there was a concern about the safety of certain

9   products.  FDA focused on the issue, and I think acted

10  very appropriately, made sure that product was recalled.

11  Right?

12              Because understand at this moment in time --

13        Q.  What question are you answering?

14        A.  I'm -- you are asking me about whether -- what

15  FDA's role was.

16        Q.  No, I didn't.

17        A.  Yes, you did.

18        Q.  I didn't ask that question at all.  I said did

19  they check to see whether or not there were valid

20  prescriptions.  You answered that and said there's no

21  evidence that they did, and then you just started

22  talking.

23        A.  No, I didn't start talking.

24              MR. CHALOS:  Object to the form.  There's not a

25  question.



```
 1              Excuse me.  Object to the form.
 2              MR. GIDEON:  That's true.  There is no
 3    question, but he is just extolling something, sharing
 4    with us at a thousand bucks an hour.  And I really must
 5    insist on you answering my questions.
 6              MR. CHALOS:  Don't answer.  Object to the form.
 7    That's not a question.  Object to the admonition.
 8              Hang on.  Let him ask a question, please.
 9              MR. GIDEON:  Q.  Yeah.  Now that we know
10    they didn't check, why didn't they, if that's so
11    important?
12              MR. ARBITBLIT:  Object to form.
13              MR. CHALOS:  Object to the form.
14              MR. GIDEON:  Q.  Why didn't they take the
15    time to check and see if this volume of product was
16    covered by patient-specific prescriptions?
17              MR. ARBITBLIT:  Object to form.
18              THE WITNESS:  Exactly the answer I gave you
19    before when you cut me off.  I gave you an answer.
20              MR. GIDEON:  Q.  I --
21        A.  Yes, you did.
22        Q.  Okay.  What is the answer, then?
23        A.  Read back what my answer was.  What I said was
24    the reason -- what FDA was doing at this time, right,
25    was what FDA should have been focused on, which was
```



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 210 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 209

1    to -- and what its clear authority was, certainly with

2    FDAMA -- if the product was contaminated, FDA had a

3    responsibility to get that product off the market and

4    get that product recalled.  That's what FDA did.  Okay?

5          The state Board of Pharmacy -- I mean, yes, you

6    are right, I very much wish, okay, that this whole

7    scheme that your client and the -- and NECC were engaged

8    in were -- was discovered and exposed.  That would have

9    been very nice.

10         That -- being able to show that there was this

11   scheme of providing prescriptions or prescription order

12   forms or lists when that was the key safeguard, and NECC

13   was doing this without, your client was facilitating, do

14   I wish that that would have been uncovered?  Absolutely.

15   It was not.

16         MS. MARTINEZ:  Objection.  Nonresponsive.

17         MR. GIDEON:  Q.  Was my client doing

18   business with NECC in 2002?

19    A.  No, but your client was --

20    Q.  Were they doing business in 2003 --

21    A.  No.

22    Q.  -- when the FDA was still there?

23    A.  No.

24    Q.  So why don't you answer my question.  Why

25   didn't the FDA check to see if there were



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    patient-specific prescriptions on hand for all this huge

2    volume of product in 2002 and 2003 once the contaminated

3    product that had made some folks in California deathly

4    ill was off the market?  Why didn't they check?

5              MR. CHALOS:  Object --

6              THE WITNESS:  For the exact --

7              MR. CHALOS:  Hang on one second.

8              Object to the form.  Misstates the evidence in

9    the case and compound.

10             MR. ARBITBLIT:  And asked and answered.

11             THE WITNESS:  Because FDA focused on what FDA

12   should focus on, and the authority it had.  The

13   authority -- I mean, at this time, right, I mean,

14   depending on whether FDAMA is in effect or not, the one

15   clear authority it had, right, was to make sure that any

16   filthy, putrid or decomposed product that may be

17   injurious was off the market.  That's what FDA focused

18   on.

19             It concluded that NECC was a compounder and

20   turned over that regulation to the Massachusetts Board

21   of Pharmacy.

22             MR. GIDEON:  Okay.

23             MR. ARBITBLIT:  Before you move on, if you are

24   moving on, I have something to read for completeness.

25   And it's a reference to something that the witness spoke
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  about.  It's at schedule 5 of his report, sub (e), FDA

2  Investigation Report, October 24, 2002 to February 10,

3  2003, at page 14, which is also marked as S0476.

4         Question No. 2 of the FDA investigation:  Does

5  the NECC continue to fill patient-specific prescriptions

6  for each compounded product dispensed?

7         Answer:  NECC dispenses and prepares products

8  in bulk for administration to individualized patients

9  pursuant to a receipt of a valid prescription from a

10 prescriber, end quote.

11        MR. GIDEON:  Q.  Do you know if that

12 representation by NECC was intentionally false or

13 not?

14    A.  I don't believe I've seen the prescription

15 databases and the prescriptions that NECC had at the

16 time, so I don't know that.  I know it was false later

17 on.  It would have been false later on.

18    Q.  And when did it first become false?  When did

19 the representations by NECC about getting

20 patient-specific prescriptions first, to your knowledge,

21 become just an utter lie.

22        MR. CHALOS:  Object to the form.

23        THE WITNESS:  So on -- based on the --

24        MR. GIDEON:  Q.  The question is when.

25    A.  I understand exactly.



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        MR. CHALOS:  Object to the form.

2        THE WITNESS:  So based on the record that I

3   have seen, okay?

4        MR. GIDEON:  Q.  I'm directing it to you as

5   the witness, not a record somebody else has seen.

6   So that's implicit.

7        MR. CHALOS:  Object to the commentary.  There's

8   not a question pending at this point.

9        MR. GIDEON:  Q.  When?  When did their

10  representations about receiving patient-specific

11  prescriptions become an utter lie?

12        MR. CHALOS:  Object to the form.  Misstates the

13  record.

14        THE WITNESS:  So the record that I have seen --

15        MR. GIDEON:  Q.  Okay.  The record you've

16  seen.  We've got that.

17     A.  But -- but --

18        MR. CHALOS:  Object to the commentary.  There's

19  not a question pending, sir.

20        THE WITNESS:  Hold on.  I -- what I'm trying to

21  help you get -- I mean, because the record --

22        MR. GIDEON:  Q.  Doctor, you are not

23  helping anybody because you are --

24     A.  I'm trying to answer your question.

25     Q.  -- you are not answering anything.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1            MR. CHALOS:  Objection.  Argumentative.
 2            MR. GIDEON:  Q.  Every response --
 3            MR. ARBITBLIT:  Let's take a break.
 4            MR. GIDEON:  Q.  -- you provide, there's a
 5   long windup, and then a lot of words, and very
 6   seldom an answer.
 7            MR. CHALOS:  Objection to the form.
 8            C.J., quit whining.  Let's take a break.
 9            MS. MARTINEZ:  There's a question pending.
10   Hold on.
11            MR. CHALOS:  There is no question pending --
12            MR. ARBITBLIT:  He stopped his question with a
13   diatribe.
14            MR. CHALOS:  There's no question pending.
15   Let's take a break.
16            MR. GIDEON:  We're going to get an answer to
17   the question.  The witness says he wants to answer the
18   question --
19            THE WITNESS:  I would like to answer the
20   question.
21            MR. GIDEON:  -- so let's get an answer.
22            MR. ARBITBLIT:  Well, then reask the question
23   and don't interrupt him when he's giving you --
24            MR. GIDEON:  You are interrupting --
25            MR. ARBITBLIT:  There's no question pending,
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Doctor.

2            Ask the question.

3            MR. GIDEON:  You are interrupting a gentleman

4    that wants to talk some more.

5            Go ahead.

6            MR. ARBITBLIT:  Dr. Kessler, wait for a

7    question.

8            MR. GIDEON:  Q.  No, no, no.  Go ahead and

9    speak.  Share with them what you wanted to say.

10           MR. ARBITBLIT:  There's a question.  Go ahead.

11           THE WITNESS:  You asked me when.  When I have

12   evidence of the fraud.

13           MR. GIDEON:  Q.  That's not what I asked.

14   I asked you when did it become apparent to you from

15   the record you've seen, not the record somebody else

16   has seen, that the representations of having a

17   patient-specific prescription made by NECC were just

18   an utter lie?  When?

19           MR. ARBITBLIT:  Object to form.

20           MR. CHALOS:  Object to the form.

21           THE WITNESS:  The documents that I have show,

22   right, that false and no prescriptions were certainly

23   done in the 2011 -- I mean, in the NECC, the

24   prescription order forms, 2012, sorry, period of time.

25   Those are -- that's the evidence in the record that I



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 216 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 215

1   have.  Okay?

2          I do not have, in the record, evidence of

3   prescription logs, et cetera, other than the

4   prescription logs from STOPNC.  Those prescription

5   documents, call them -- I'll just testify whether

6   they're prescriptions or fake prescriptions or meant to

7   be prescriptions, others can testify -- that, clearly

8   evidences STOPNC, Saint Thomas Outpatient and NEC were

9   engaged in a fraud.  I don't know -- engaged in

10  wrongdoing.  Those were not prescriptions.  We know

11  that.

12         That's what I have in this record.  I do not

13  want to represent, okay, because I have not seen other

14  cases, other instances earlier on, right, where there

15  was orders without valid prescriptions.

16         MR. GIDEON:  Q.  Did these folks not give

17  you a copy of the investigation of NECC by the Board

18  of Registration and Pharmacy of the products they

19  sold to the Massachusetts Eye and Ear Clinic?

20         MR. CHALOS:  Object to the form.

21         THE WITNESS:  I believe I saw something about

22  potency and Mass Eye and Ear.  Yes, I believe I did see

23  something.

24         MR. GIDEON:  Q.  Good.  Did you tell me

25  earlier that you actually read the transcript of the



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 217 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 216

1    Penta deposition or did you only see the exhibits?

2         A.  I only -- let me be exactly clear.  I used the

3    Penta exhibits to be able to find citations that are

4    cited in Dr. Miller's report.  Because I didn't have

5    Dr. Miller's CV, so I had the footnotes.  But I

6    didn't -- so I looked at the documents in Dr. Miller's,

7    and I used the Penta documents to be able to find what

8    Dr. Miller was citing.

9         Q.  Well, did you see, among the Penta exhibits,

10   the emails between Cadden and Conigliaro confirming that

11   for all of the monthly product sold to the Massachusetts

12   Eye and Ear Clinic, there were no patient-specific

13   prescriptions?

14        A.  I'd have to review.  I just don't know.

15        Q.  Does that ring a bell?

16        A.  I mean, Mass Eye and Ear, but that specific

17   statement does not ring a bell.

18        Q.  Do you recall those exhibits where once Mass

19   Eye and Ear complained about the problems with

20   subpotency --

21        A.  Yes.

22        Q.  -- of these ophthalmic syringes that they were

23   shipping over every month, and they anticipated an

24   investigation by the Board of Registration and Pharmacy,

25   Cadden emails Conigliaro and says we're going to have to



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  figure out a way to get patient names.  And Cadden says

2  to Conigliaro, unless she's a complete fool she'll know

3  what we're up to.

4           Do you remember those emails?

5      A.  What's --

6           MR. CHALOS:  Hold on a second.

7           Object to the form.  Object to the

8  paraphrasing.  If you have a document, I'd suggest you

9  show it to him if you want to ask a specific question.

10          THE WITNESS:  I remember similar kinds of

11 emails, perhaps that one.  I did read the DOJ criminal

12 information.

13          MR. GIDEON:  Q.  The indictment?

14     A.  The indictment.  And I believe there are

15 certain emails that are referenced to that dealing with

16 this scheme or this fraud.

17     Q.  Was the Massachusetts Eye and Ear Clinic

18 involved in a scheme and a fraud with NECC?

19          MR. CHALOS:  Object to the form.

20          THE WITNESS:  I don't have the evidence of what

21 they submitted.  I do not know what they submitted to

22 NECC.  I only know what STOPNC submitted to NECC.  If

23 you want to give me the record of those prescriptions,

24 I'd be happy to look at them.

25          MR. GIDEON:  Q.  There are no



```
 1   prescriptions.
 2          MR. CHALOS:  Hang on.  Object to the form.
 3          THE WITNESS:  Did they submit false
 4   prescriptions?
 5          MR. GIDEON:  Q.  There are no
 6   prescriptions.  They just ordered.
 7       A.  Did they submit false prescriptions?
 8       Q.  They just ordered product.  One hundred vials a
 9   month.
10          MR. CHALOS:  Hang on.  Object to the form.
11          THE WITNESS:  Then that would be different.
12   That would be a different set of facts.  Because what
13   STOPNC did here was to facilitate this scheme of this
14   wrongdoing by signing these things called prescription
15   order forms and giving names when they weren't
16   prescriptions and there wasn't a physician-pharmacist
17   relationship.  That allowed NECC to enter these names in
18   a database and together perpetuate this wrongdoing.
19          MR. GIDEON:  Q.  Okay.  Well let's take a
20   look at the --
21          THE WITNESS:  Could we take a break?
22          MR. ARBITBLIT:  We can.
23          MR. GIDEON:  Sure.  And when we come back,
24   we'll talk about this precise subject you've just
25   brought up with your answer.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 220 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 219

```
 1              THE WITNESS:  Thank you.
 2              THE VIDEOGRAPHER:  This is the end of disc
 3    No. 3, volume 1.
 4              We are off the record at 2:26 p.m.
 5              (Recess taken from 2:26 PM to 2:38 PM)
 6              (Whereupon, Exhibit 1254 was marked for
 7              identification.)
 8              THE VIDEOGRAPHER:  This is the beginning of
 9    disc No. 4, volume 1.
10              We are back on the record at 2:38 p.m.  You may
11    proceed.
12              MR. GIDEON:  Q.  The documents in front of
13    you are exhibits to the deposition of Mario Giamei.
14    Were you previously provided with those exhibits?
15         A.  They may be in the Penta documents.  I don't
16    recall specifically.  I don't recall.
17         Q.  Okay.  Take a look at them.
18         A.  What, specifically, would you like me to read?
19         Q.  Just want you to read these documents.
20         A.  Okay.
21         Q.  And then I'll ask you questions once you've
22    taken a look at each of these emails.
23         A.  Okay.
24         Q.  Take a look at --
25         A.  I'm not done.  I apologize.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 220

```
 1        Q.   Will you lift your head up when you've finished
 2   looking at these emails?
 3        A.   I'd be happy to.
 4             My head is up.
 5        Q.   Okay.  Did you know before I handed you this
 6   group of documents that Saint Thomas Outpatient
 7   Neurosurgery Center refused the NECC request for patient
 8   names?
 9             MR. CHALOS:  Object to the form.
10             THE WITNESS:  I know -- I don't know it in the
11   way that was phrased.  No, I didn't know that.  I --
12   this does -- some of this jives with what I've read in
13   the Debra Schamberg testimony.
14             MR. GIDEON:  Q.  You can see on MEDICAL
15   SALES MANAGEMENT 82, which is the second page, that
16   in that Debbie Schamberg refused the Medical Sales
17   Management request for patient names.
18             MR. CHALOS:  Which date of the email are you
19   looking at?
20             MR. GIDEON:  Second page.
21             MR. CHALOS:  This is the June 13th, 2011 email?
22             MR. GIDEON:  Yes.  MEDICAL SALES MANAGEMENT 82
23   at the bottom of the page.
24             MR. CHALOS:  I see.
25             THE WITNESS:  Do you have a complete document?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          MR. GIDEON:  Q.  What do you mean complete

2    document?

3          A.  Because these aren't consecutive Bates numbers.

4    So could you do me the favor and give me a complete

5    document?

6          Q.  I have a document in front of you that is an

7    email of June 13th, 2011, from Bob Ronzio, who headed

8    Medical Sales Management to Barry Cadden.

9          You know who Barry Cadden is, don't you?

10         A.  I do, sir.

11         Q.  Okay.  Before today, before I handed you this

12   Medical Sales Management page 82, did you know that

13   Debbie Schamberg, on behalf of STOPNC, refused to

14   provide the patient names?

15         MR. CHALOS:  Object to the form.  Misstates the

16   testimony and the document.

17         THE WITNESS:  I was aware of testimony, and I'd

18   have to refresh it, from Debbie Schamberg about

19   discussions about giving patient lists.  That's what I

20   am aware of.  I don't -- I don't recall, I have to look

21   in that deposition to her testimony.  I don't recall

22   where she says that she refused to do it.

23         And I don't see -- correct me where I am -- she

24   said she spoke to her administrator and they have a

25   strict policy on providing patient information out of



1    the office.  That's, you know, obviously -- I mean, I

2    think there was some discussion about HIPAA also in the

3    deposition.

4           I told them we are completely HIPAA compliant,

5    and we maintain a very strict privacy system under our

6    HIPAA policy.  They're not willing to move forward.

7           The record I show is that, in fact, she didn't

8    refuse.  That, in fact, the list did go in.  That's what

9    I see in the record.

10          Certainly at certain points in time lists did

11   go in.  So it's un -- it's certainly not the case that

12   she refused to give -- or let me not state exactly

13   who -- you made a statement that Schamberg refused.  I

14   can't tell you who at STOPNC did this.  But clearly

15   lists went in, so the bottom line is they didn't refuse.

16       Q.  So your careful analysis of the facts are that

17   STOPNC provided lists of patient names during calendar

18   year 2011?

19       A.  No, I --

20          MR. CHALOS:  Object to the form.

21          THE WITNESS:  No, I think I -- let me pull

22   those lists very specifically, if I may.  If someone

23   could help me get those patient lists and those

24   prescription order forms.  Let me just pull them.

25          MR. GIDEON:  Q.  Do you have any --



```
 1        A.   Let -- let -- let -- let --

 2        Q.   Do you have any lists --

 3        A.   I'm still answering the question, please.

 4        Q.   Do you have any lists of patient names being

 5   provided throughout the entire year, calendar year 2011?

 6        A.   Now, so let me just finish answering this.  And

 7   let me just pull --

 8        Q.   Here's the question.  Any patient names being

 9   provided during calendar year 2011?

10        A.   So I think there are lists.  Let me just get

11   the footnote, then I'll pull the actual.  Just give me

12   one second.

13             Thank you, sir.

14             So the answer to your question is, from what I

15   can determine here, that it was done in 2012.

16        Q.   That's not the question.

17             The question was, do you have any evidence at

18   all that any patient names were provided by STOPNC to

19   NECC during the entire calendar year 2011?

20        A.   Hang on one second, please.

21             If someone could kindly just pull for me STOPNC

22   0060-64.  And actually, let's start from 0056.  Mine are

23   just out of order here.  And I apologize.  These are

24   not -- I can get that.  That will give you the dates.

25             THE REPORTER:  Would you repeat the first
```

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 224

1    number again, please.

2              THE WITNESS:  Sure.  I've asked for

3    STOPNC_0060-64, and beginning 0056 to 59, 65 to 67.  If

4    I can just pull the documents in footnote 14 of my

5    report, I can be exact in that answer.  If someone could

6    help me just pull -- see if they have documents.

7    Because mine just happen to be out of order.  I must

8    have pulled them.

9              So the answer to your question is no -- no, I

10   don't see it in 2011, I see it in 2012.

11        Q.  As you look at the document that's in front of

12   you, the email traffic we were just talking about --

13        A.  Yes, sir.

14        Q.  -- recite the exhibit number again, please.

15   The cover number.

16        A.  In this case, 1254.

17        Q.  Okay.

18        A.  Previously 683.

19        Q.  Okay.  If you will look at MEDICAL SALES

20   MANAGEMENT 252, it's the next to last page.  It's only

21   three lines.  Shouldn't take too long.

22        A.  Yes.  I've seen it.  I read it initially.

23        Q.  Right.  In referring to Saint Thomas Outpatient

24   Neurosurgical Center it says:  This facility has an

25   order in for No. 500 Methly 80 of 1 milliliters and



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 226 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                 Page 225

```
 1    No. 10 Beta Repo pf 2 milliliters.  Quote:  They have

 2    been waived from providing patient names as of

 3    6/13/2011, period, end quote.  Please advise how I

 4    should proceed with this order.  Thank you, Steven

 5    Sanda.

 6          And this goes to Bob Ronzio, correct?

 7    A.   That's what it says.

 8    Q.   Did Barry Cadden or Bob Ronzio have the

 9    authority to waive the requirement for patient-specific

10    prescriptions?

11    A.   Patient prescription --

12          MR. CHALOS:  Object to the form.

13          THE WITNESS:  Patient-specific prescriptions

14    were essential if you were going to order -- deliver

15    prescription compounded drugs.

16          MR. GIDEON:  Q.  My question again:  Did

17    Barry Cadden, Robert Ronzio, or anybody at NECC have

18    the authority to waive the requirement for

19    patient-specific prescriptions?

20          MR. ARBITBLIT:  Object to form.

21          THE WITNESS:  I think my answer is the exact

22    same answer that I gave you before, and I'm trying to

23    pull it up.  Give me a second.

24          MR. GIDEON:  Q.  What is it?

25          MR. ARBITBLIT:  Asked and answered.
```



```
 1              THE WITNESS:  Let me give you -- pull up my --
 2              Can you help me get to the bottom?  I guess --
 3     is there -- thank you.
 4              Wait.  My -- my answer --
 5              MR. GIDEON:  Q.  The screen in front of you
 6     is a copy of the transcription by the court reporter
 7     to your left, isn't it?
 8         A.  Yes.  And I just want to read.  My answer was
 9     patient-specific prescriptions were essential if you
10     were going to order or deliver prescription compounded
11     drugs.
12         Q.  Okay.
13         A.  So they were essential.
14         Q.  Okay.  I know they're essential according to
15     you, but my question --
16         A.  It's not just according to me.  It's according
17     to -- should be according to any definition of
18     compounding that you could read or exists.
19         Q.  The question is, did Barry Cadden, Robert
20     Ronzio, Doug Conigliaro, or anybody at NECC have the
21     authority to waive patient-specific prescriptions?
22         A.  Pursuant to what?
23         Q.  Any authority.  Did they have the authority --
24         A.  Pursuant to federal law?
25         Q.  State law.  Federal law.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.   There was a --
 2             MR. CHALOS:  Object to the form.
 3             THE WITNESS:  There was a requirement -- excuse
 4   me.
 5             MR. GIDEON:  Q.  Could you start that
 6   again, because it wasn't clear.
 7        A.   There is a requirement, right, as I said, that
 8   if you are going to order or you're going to deliver
 9   compounded drugs, you have to have a patient-specific
10   prescription.
11        Q.   Okay.  So did Barry Cadden have the authority
12   to waive that requirement?
13        A.   Barry --
14             MR. CHALOS:  Object to the form.
15             THE WITNESS:  -- Cadden did not have the
16   authority to waive that requirement, nor did STOPNC have
17   the authority to submit false names.
18             MR. GIDEON:  Q.  Okay.  Just had to get
19   that in there, didn't you?
20             MR. CHALOS:  Object to the form.
21   Argumentative.
22             MR. GIDEON:  Q.  Do you consider yourself
23   an advocate or an expert?
24        A.   I am very much an expert.
25        Q.   In what?
```



```
 1        A.  I think I probably know more about the federal

 2   regulation of drugs than probably many people in this

 3   country.  I'm probably as, you know, as expert on that

 4   question.

 5            Your questions are -- I mean, what your -- what

 6   you're doing, and you are certainly entitled to do that,

 7   you are asking me for a very narrow question, right,

 8   that gives you an answer.

 9        Q.  I'm asking you for a very narrow question?

10        A.  You are asking a narrow question, and what I am

11   doing is putting it in context.  Right?

12        Q.  What you are doing is not answering the very

13   narrow question.

14            MR. CHALOS:  Objection.  Argumentative.

15            THE WITNESS:  I --

16            MR. CHALOS:  Wait for a --

17            MR. GIDEON:  Q.  I want you to continue

18   telling us the areas where you see yourself as a

19   real expert.

20            MR. CHALOS:  Object to form.

21            MR. GIDEON:  Q.  You've told us about

22   federal regulation of drugs.  Are there any other

23   areas where you see yourself really as an expert?

24            MR. ARBITBLIT:  Object to form.

25            THE WITNESS:  Yes.
```



```
 1              MR. GIDEON:  Q.  What are they?

 2         A.  Multiple areas.

 3         Q.  What are they?

 4         A.  I know I was intimately involved in

 5    compounding, in the requirements for compounding.

 6         Q.  Okay.

 7         A.  I've run a hospital.  I've been in charge of

 8    pharmacy and therapeutic committees.  I've done drug

 9    formularies.  I've -- I understand safeguards of patient

10    needs.  I know safeguards the patient needs to protect

11    them.  I know the importance of an integrity of a

12    prescription drug system.

13         Q.  Okay.  Well, the order forms that you were

14    showing us earlier that -- when I asked you was there

15    one in 2011, and ultimately you said no, and you said

16    there are some in 2012, were those order forms approved

17    by the Massachusetts Board of Pharmacy?

18         A.  I have not seen any document one way or the

19    other that, quote, approves these forms.

20         Q.  Who gave Debbie Schamberg the order forms that

21    you have looked at?

22         A.  I'd have to check her deposition.  I'm not

23    sure -- I'd have to check and see exactly what she

24    testified to.  I don't remember exactly.

25         Q.  Do those order forms that you've been looking
```



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 231 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 230

1    at a few moments today, do they constitute an adequate

2    prescription order under Tennessee law?

3        A.  I would let you have other experts who are

4    experts on Tennessee.

5        Q.  Are you an expert on Tennessee law?

6        A.  I would not want to opine on Tennessee pharmacy

7    law.  I can tell you that.

8        Q.  That answers my question.  Are you an expert in

9    Tennessee law, and your answer is no?

10       A.  What I specifically answered was that I am

11   not -- I will certainly yield, let others answer who

12   enforce the Tennessee law.  They can testify whether

13   this was a valid prescription.

14       Q.  There may be lots of people who have opinions,

15   but that isn't even close to what I asked you.

16           I asked you whether or not you considered

17   yourself to be an expert on Tennessee law, and it's

18   subject to an incredibly simple answer; either yes, you

19   do or no, you don't.

20           MR. CHALOS:  Object to the form.

21   Argumentative.

22           THE WITNESS:  Yeah.  I am -- for Tennessee law,

23   I will leave that to other experts in this case.

24           MR. GIDEON:  Q.  Well, do you know of a

25   person who claims to be an expert on Tennessee law



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 232 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 231

1    in this case?

2            MR. CHALOS:  Object to the form.

3            THE WITNESS:  I know that there's other

4    testimony that I've read, whether this is a valid

5    prescription form.  I mean, in depositions there are

6    people who have opined whether this is a valid

7    prescription form or not who are familiar with Tennessee

8    Board of Pharmacy practice laws.  I will leave that to

9    them, to the question of whether this was a valid or

10   not.

11           Certainly I can tell you, right -- it's

12   certainly within my competence that Mickey Mouse is

13   not -- could not be -- when it's clearly not a patient,

14   that can't be a valid prescription.  That, I can tell

15   you with certainty.

16       Q.  And that would be openly apparent to anybody,

17   wouldn't it?

18           MR. CHALOS:  Object to the form.  Calls for

19   speculation.

20           THE WITNESS:  I had to go check and make sure.

21   I mean, you only know from deposition testimony, right,

22   there's no patient.

23           MR. GIDEON:  Q.  The name Mickey Mouse is

24   apparent to everybody in this room as something that

25   doesn't describe a living, breathing patient.



1    That's obvious, isn't it?

2            MR. CHALOS:  Object to the form.  Calls for

3    speculation.

4            THE WITNESS:  We can go look -- we can go look

5    up and see if there's anybody in this United States and

6    look at the phone book and see whether -- I've

7    actually -- I actually --

8            MR. GIDEON:  Q.  You've done that?

9        A.  Well, I actually looked here --

10       Q.  Did you charge these folks for doing that?

11           MR. ARBITBLIT:  Object to the form.

12           THE WITNESS:  You're -- if you would like to

13   stop now, I'll stop charging.  There won't be any other

14   payment.  You are asking me all these questions, so I'm

15   sitting here --

16           MR. GIDEON:  Q.  Did you search the name

17   Mickey Mouse and charge these folks for it?

18       A.  I wanted to know specifically.  I read the

19   deposition of Debra Schamberg where she stated that

20   Mickey Mouse was not a real name.

21       Q.  So why did you need to verify that by a name

22   search in the state of California?

23       A.  Because I don't -- I'm sorry, I didn't do a

24   name search in the state of California.  I read that

25   in -- you're asking me whether there's anyone in the



1    United States, right, who is named Mickey Mouse.  I

2    don't know that.

3         Q.  I didn't ask that.

4         A.  You said wasn't it apparent that this was a

5    false name.

6         Q.  Sure.

7         A.  Right?  It certainly appeared that way.  But

8    you can't sit here and tell me that you know there's no

9    one named Michael Mouse that goes by Mickey.

10        Q.  So let me make sure I understand on video, did

11   you actually search to see if there are people by the

12   name of Mickey Mouse?

13        A.  No.  I read Ms. Schamberg's testimony.

14        Q.  Uh-huh.

15        A.  She said that Mickey Mouse was not a real

16   person.  That that was not meant to be a real person.

17   That testimony, I read.

18        Q.  And did you recall, as you read Debbie

19   Schamberg's testimony, that the term was used to cover

20   the time frame when John Culclasure was not available at

21   STOPNC but was at another location?

22        A.  On the floor, I think she referred to.

23        Q.  Do you recall that testimony too?

24        A.  Exactly.  I think she said when he was

25   scheduled for another floor.



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 235 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 234

1        Q.   Correct.

2        A.   But why would you then submit that name as a

3    prescription?

4        Q.   Well, the question is through 2011, time frame

5    we're talking about, we have established that there were

6    no submissions of any names or any prescriptions; is

7    that not correct?

8             MR. CHALOS:  Objection.

9             THE WITNESS:  So what I --

10            MR. GIDEON:  Q.  Is that not correct?

11       A.   So I did not -- I said the list appears to be

12   2012.

13       Q.   Sure.

14       A.   The prescription order form, I've -- I have

15   multiple prescription order forms that do not have

16   names.

17       Q.   Not a one?

18            Now --

19            MR. CHALOS:  Hold on a sec.

20            Objection to the misrepresentation.

21            MR. GIDEON:  Q.  Throughout 2011, since

22   there were no names on any of the order forms,

23   should NECC have dispensed product to Saint Thomas

24   Outpatient Neurosurgery Center?

25            MR. CHALOS:  Object to the mischaracterization.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      MR. GIDEON:  Why don't you throw in

2  argumentative too.  That will help.

3      MR. CHALOS:  Object to that.  That's

4  argumentative.

5      MR. GIDEON:  Go ahead.

6      MR. CHALOS:  C.J., you are not going to get

7  anywhere -- excuse me.  You're not going to get anywhere

8  acting that way.  You are frustrated, I get it, but it's

9  because of your questions.

10     MR. GIDEON:  No.  You know what is going on

11 here, Mark?  You like to talk, you say things that mean

12 nothing.  But the bottom line is your witness will not

13 answer a question directly, and we're just going to have

14 to continue plugging along.  But your commentary is so

15 far off the mark, it's not even half serious.

16     MR. CHALOS:  Right.  Well, I object to the

17 colloquy here.

18     MR. GIDEON:  Q.  So here's the question

19 again.

20   A.  Thanks.

21   Q.  There are no names on any order sheet through

22 calendar year 2011.

23     MR. CHALOS:  Objection.  Asked and answered.

24     MR. GIDEON:  Q.  I have taken the time to

25 show you, with specific documents that perhaps the



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 237 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 236

1    people that engaged you didn't share with you, maybe

2    they did and you don't remember them, that STOPNC

3    refused to provide any patient names, and then the

4    folks at NECC just decided to waive the requirement

5    for any names.

6              MR. CHALOS:  Objection to the form.

7              MR. GIDEON:  Q.  Now, given that -- given

8    that -- here comes the question.

9              MR. CHALOS:  Okay.  Object to everything before

10   the question then.

11             MR. GIDEON:  Q.  Should NECC have shipped

12   methylprednisolone acetate to Saint Thomas

13   Outpatient Neurosurgery Center in Nashville,

14   Tennessee?

15             MR. CHALOS:  Object to the form.

16             THE WITNESS:  The answer is NEC should not have

17   shipped, nor should STOPNC filled out prescription order

18   forms to order the form (verbatim).  None of that

19   conduct should have taken place.  NEC should not have

20   shipped.  STOPNC should not have ordered and filled out

21   those forms.

22             MR. GIDEON:  Q.  Do you have -- do you have

23   information that's been provided to you that

24   reflected that any of the purchasers from NECC, in

25   calendar year 2011 or 2012, actually obtained



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 237

1   product with patient-specific prescriptions?

2           MR. CHALOS:  Object to the form.

3           THE WITNESS:  All I know is that in 2011, I do

4   have a form that's a prescription order form where a

5   name of the patient is blank, and those were filled.

6           MR. GIDEON:  Q.  Go ahead and read him the

7   question back.  Maybe you can get his attention to

8   answer the question.

9           MR. CHALOS:  Objection to the form.

10  Argumentative.

11          MR. GIDEON:  Right.  Misleading.

12          Go ahead.  Read him back the question.

13          MR. CHALOS:  Actually, that time you didn't try

14  to mislead.

15          MR. GIDEON:  Go ahead and answer the question

16  this time.  Maybe when she reads it back to you, you

17  will answer it.

18          MR. CHALOS:  Object to the form.

19          (Record read as follows: Do you have

20          information that's been provided to you that

21          reflected that any of the purchasers from NECC,

22          in calendar year 2011 or 2012, actually

23          provided product with patient-specific

24          prescriptions?)

25          THE WITNESS:  The answer is, what I have



```
 1   available is prescription order forms without the names
 2   of patients.
 3            MR. GIDEON:  Okay.  I'll ask her to read it
 4   back to you again.
 5            (Record read as follows: Do you have
 6            information that's been provided to you that
 7            reflected that any of the purchasers from NECC,
 8            in calendar year 2011 or 2012, actually
 9            provided product with patient-specific
10            prescriptions?)
11            THE WITNESS:  The evidence I have are patient
12   prescription order forms which say name of the patient
13   that's left blank, that has a name of a doctor by
14   STOPNC.  So there's no patient-specific names on these
15   forms.
16            MR. GIDEON:  Q.  Okay.
17       A.  But there is a form that is a prescription
18   order form where that is left blank.
19       Q.  And that's not in compliance with the
20   requirement for a patient-specific prescription, is it?
21       A.  Certainly doesn't appear to be in compliance.
22   If I asked for patient specific, it doesn't give any
23   evidence of a pharmacist-physician interaction where
24   care was given in deciding whether this
25   preservative-free medicine should have been used.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.  Now, if -- are you familiar enough with the
2  fungal meningitis outbreak to know that there were three
3  bad batches?

4    A.  Yes.

5    Q.  There was one bad batch made May 21st, there
6  was another bad batch made June 29th, and a third bad
7  batch made August 10th, correct?

8    A.  I didn't have the dates in my head.  I knew
9  there were three batches.

10   Q.  I can tell you those are the three dates listed
11 on the log formula worksheets.

12   A.  And I don't dispute that.

13   Q.  If a physician in Tennessee or New Jersey or
14 Texas had written a patient-specific prescription for
15 David Kessler for an epidural steroid injection, and
16 NECC responded to that patient-specific prescription
17 with a vial from one of these bad lots, you still would
18 have been exposed to contamination, wouldn't you?

19       MR. CHALOS:  Incomplete hypothetical.
20 Objection.

21       THE WITNESS:  So that individual patient would
22 have been exposed.  But that decision, right, would have
23 been the result -- that prescription was written, you
24 know, with that name, and a specific decision was made
25 to do Preservative-free, right, then you are willing to



1  take that risk.

2         MR. GIDEON:  Q.  Yeah.

3      A.  Right?  But the fact is, so you are right.

4  Maybe one patient would have been exposed where a

5  physician says, you know, you have an allergy to benzyl

6  alcohol.  There's a specific reason I don't want to use

7  benzyl alcohol.  So you would make that decision, and

8  you would make that risk benefit.  One patient would

9  have gotten harmed, not these dozens or hundreds of

10 patients.

11         Because that decision making that goes into

12 that prescription, right, would have had -- have a

13 physician think through the question of do I want a

14 preservative, do I not want preservative, which is

15 better for my patient, right?

16         That was the whole goal of compounding.  It was

17 individual.  One person may have been harmed if you --

18 if somebody had to think through that, two people or

19 three people, not 700 patients nationwide.

20     Q.  Is there a limit on the number of

21 prescriptions, patient-specific prescriptions that a

22 physician can write?

23         MR. CHALOS:  Object to the form.  Incomplete

24 hypothetical.

25         THE WITNESS:  Sure.  I would assume there's



```
 1   a -- I mean, there has to be a basis to write a
 2   prescription.
 3           MR. GIDEON:  Q.  My question is, is there a
 4   limit on the number of patient-specific
 5   prescriptions that a physician can write under state
 6   practice laws?
 7           MR. CHALOS:  Objection.  Incomplete
 8   hypothetical.
 9           THE WITNESS:  I don't believe so.  But again,
10   I'm not going to opine on state law.  I can -- what is
11   clear, there is a limit, obvious -- obviously, to the
12   number -- to the thinking process.  If I have to go
13   think, do I want this patient to have preservative free
14   or not, that's a decision process that would have to be
15   consciously made.
16           So, I mean, I would make that decision -- a
17   physician would make that decision each and every time.
18   I mean, if there was evidence that these patients had
19   allergies and the risks, benefits -- there's a calculus
20   that would have to go into that prescription that would
21   be based on the needs of that patient.
22           So, in fact, I mean, the reality is here, that
23   Culclasure did not, right, go through that thinking
24   process at all with regard to whether preservative-free
25   should be given to whether the risks and benefits --
```



1    risks -- the benefits outweighed the risks.

2            MR. GIDEON:   Q.   Have you ever had a

3    residency in anesthesia?

4        A.   No.   I was not an anesthesiologist.

5        Q.   And I think we've covered much earlier that

6    with the exception of being board certified in

7    pediatrics at one point in time, you have not been

8    boarded in any other occupations?

9        A.   That's correct.

10       Q.   You have never provided anesthetic or pain

11   management services to a patient in the United States,

12   have you?

13       A.   Certainly as a pediatrician.   I was involved

14   in -- we did pain management before there was pain

15   management, I mean, back -- certainly during my

16   training.

17       Q.   Let's take the relevant time frame.   2010 to

18   2012, were you providing pain management services to

19   adults anywhere in the United States?

20       A.   I don't think -- I may have been consulted.   I

21   mean, on -- I'm an addiction expert and other things,

22   and I may have been consulted.   But the answer would be

23   no, I think.

24       Q.   What was the cost associated with registration

25   with the FDA in 2010 and 2011?



1          A.   The establishment fee under PDUFA?

2          Q.   The cost associated if NECC had decided to step

3    up and register as a manufacturer, what would it have

4    cost them?

5               MR. CHALOS:   Object to the form.   Vague.

6               THE WITNESS:   I'd have to look if there were

7    specific requirements under PDUFA.   It's easily

8    available.

9               MR. GIDEON:   Q.   What were the fees?

10         A.   I don't know the fees offhand.   I was involved

11   in the -- the enactment of PDUFA, but I've not looked at

12   the fees specifically again.   They're easily available.

13         Q.   Since you stepped down as commissioner in 1997,

14   have you registered any company as an FDA-registered

15   manufacturer?

16         A.   I certainly have been on the board of

17   pharmaceutical companies that have registered.

18         Q.   I didn't ask about boards or consulting.   I

19   asked whether you have ever taken the steps to register

20   a company as an FDA-registered manufacturer.

21         A.   I don't think I've filled out those forms, no.

22   But I've been on boards that have done that.

23         Q.   Before the outbreak in 2012, was any other

24   policy guide issued other than 460.200, the one we

25   talked about earlier?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016

Page 244

```
 1        A.  Well, there were two policy -- two compliance
 2    policies.
 3        Q.  There was one during your tenure, and then
 4    there is this last is 460.200, correct?
 5        A.  Right.
 6        Q.  Were any others issued before September of
 7    2012?
 8        A.  I'm not aware of any others.
 9            (Whereupon, Exhibit 1255 was marked for
10            identification.)
11            MR. GIDEON:  21 U.S.C. 360(g)1.
12        Q.  Exhibit 1255 should be right in your
13    wheelhouse, Doctor.  It's 21 U.S.C.A. § 360.
14        A.  Inspection?
15        Q.  No.  Exemption from registration.
16        A.  Right.
17        Q.  I want you to look at 360(g)1.
18        A.  Yes.
19        Q.  Which addresses the exemption from the duty to
20    register.
21        A.  Yes.  Yes.
22        Q.  Whose duty is it to register in the first
23    place?
24            MR. ARBITBLIT:  Object to form.
25            MR. GIDEON:  Q.  It's not the purchaser's
```



1  duty to register a manufacturer, is it?

2       A.  No.

3       Q.  It's not the patient's duty to register a

4  manufacturer?

5       A.  No.

6       Q.  The manufacturer has the duty to register if

7  they are a manufacturer, correct?

8       A.  If there is a requirement to register.

9       Q.  Okay.  And before someone may introduce drugs

10 in interstate commerce, under what circumstances must

11 they register?

12      A.  So we -- I have to check.

13          I want to go back.  Certainly with regard to

14 the introduction of new drugs.

15      Q.  Okay.  Can't put a new drug in interstate

16 commerce without registration?

17      A.  That's clear.

18      Q.  Okay.  Now secondly, even if you register, you

19 may not introduce an adulterated drug in interstate

20 commerce, correct, whether registered or not?

21      A.  You are correct.  That 501(a) that applies to

22 old drugs does not allow you to introduce anything that

23 would be contaminative or may be in injurious to health.

24      Q.  Correct.

25      A.  That applies independent of the new drug



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 247 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 246

1    provisions.

2         Q.   Okay.   Now, an exemption for registration is

3    addressed at 21 U.S.C. 360(g)1, correct?

4         A.   Right.

5         Q.   Let's take it step by step in light of what you

6    told me about your expertise in this area.

7              First of all, if you are a pharmacy and you

8    want to avoid registration, you have to be operating in

9    accordance with state law, don't you?

10        A.   That's certainly the first sentence.

11        Q.   First step?

12        A.   Yes, sir.

13        Q.   Now, if state law requires patient-specific

14   prescriptions, and you're dispensing without them, then

15   you're not operating in accordance with state law, are

16   you?

17        A.   Of course not.

18        Q.   Okay.   Second, if state law requires compliance

19   with USP 797, and you are not complying with it, then

20   you are not complying with state law, correct?

21        A.   That's correct.

22        Q.   Next it says, as part of this exemption from

23   the duty to register, that you must dispense drugs upon

24   prescription of practitioners licensed to administer

25   drugs, end quote; isn't that correct?



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 248 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 247

1    A.   Let me see where you are reading.  So these are

2  if you are licensed to administer such drugs to patients

3  under the care of such practitioners, right, you can be

4  exempt, right?  Is that what you are saying?

5    Q.   You have to get a prescription from a

6  practitioner who is licensed to administer drugs; isn't

7  that right?

8    A.   Yes.

9    Q.   Well, if you're getting no prescription from

10  somebody who is authorized to administer drugs, then

11  that is another reason you cannot claim an exemption

12  from registration; isn't that correct?

13    A.   I'm sorry, a couple of double negatives in

14  there.

15    Q.   There's only one.  But I'll run it by you

16  again.

17    A.   Just -- thanks.

18    Q.   I'll do it again.

19      If a pharmacy is not obtaining prescriptions

20  from somebody who's authorized to write them and

21  administer drugs --

22    A.   Right.

23    Q.   -- then that pharmacy cannot claim exemption

24  from a duty to register under 21 U.S.C. 360(g)1?

25    A.   Right.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     Q.  It is clear, is it not, from the time we have

2  spent covering this, that NECC should have registered

3  with the FDA in calendar year 2011, isn't it?

4     A.  I would want to just go back and understand the

5  interaction of this section with FDAMA.  I just would

6  want to review that.  I've not issued an opinion on

7  that, and I just want to check the statute on FDAMA and

8  see what does the exemption -- I'm just trying to think.

9  I think in my head.

10          There's an exemption under new drugs.  There's

11  an exemption from the adulteration -- some of the

12  adulteration, some of the exemption from the

13  misbranding.  I'd have to check.  If you have the FDAMA

14  statute, it will tell you specifically what the

15  exemptions are.  I just want to be careful that I don't

16  misspeak.

17     Q.  What do you mean?  What do you want?  Do you

18  want us to pull up the old statute so you can --

19     A.  Why don't you pull FDAMA.

20     Q.  Give us a citation, we'll pull it up.

21     A.  Just FDAMA.  If you -- you give me FDAMA, I can

22  tell you specifically.

23     Q.  Is it in your materials?

24     A.  Yeah, I can find it if you would like.

25     Q.  Why don't you go ahead and do it if it's that



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016

Page 249

```
 1   important to you answering that question.
 2        A.   I just want to make sure the interaction of
 3   this -- this section with the other sections before I
 4   speak.   Happy to look at it.   Let me just get it.
 5             (Discussion off the record.)
 6             MR. GIDEON:  Would you lift the blotter up,
 7   too, just to see if it might not have gotten under
 8   there.
 9             Thank you.   Those have not been copied yet,
10   have they.
11             MR. ARBITBLIT:  They have not.
12             MR. GIDEON:  Okay.  Nice try.
13             MR. ARBITBLIT:  We're off the record for a
14   second.   You can put this on the video.
15             It's the Pepsi syndrome.
16             MR. GIDEON:  He is trying to wipe the record
17   clean.
18             MR. ARBITBLIT:  You got that.  I'm trying to
19   preserve the record, Counsel.
20             MR. GIDEON:  He's spoliating right now.
21             MR. ARBITBLIT:  Let the record reflect it was
22   diet Snapple.
23             That's about as much as I can do, I think it's
24   all still legible.
25             MR. GIDEON:  Q.  Can you give me the
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  citation you are looking at?

2      A.  Sure.  So what I'm particularly interested in

3  is, because as you -- what --

4      Q.  I asked for the citations.

5      A.  So I'm at S0343.  I'm at section 503(a).

6      Q.  You've been to law school, you know the

7  citations for CFR and uniform -- United States Code.

8      A.  This is --

9      Q.  Begins with a number first --

10     A.  This is 21 U.S.C. 353(a).

11     Q.  Okay.

12     A.  What I want to -- the reason I'm --

13     Q.  I don't need you to tell us why.  I just want

14 you to finish your review so you can answer the

15 question.

16     A.  Yeah, I don't -- I know there are issues, both

17 with -- as part of this section, both with inspections.

18 Certainly with inspections on FDA's authority with

19 regard to compounding.  I'd have to look to be more

20 specific to see if there's any interaction.

21         I don't see, based on this review, but I would

22 want to be able to check because as we -- I know that

23 compounders did resist and invoke certain sections of

24 the act, both with regard to -- certainly with regard to

25 inspections, and I think with regard to establishment.



1  But I need to look at the legal basis for that before

2  I'd opine.

3       Q.  The FDA is responsible for protecting the

4  public health by assuring the safety, efficacy and

5  security of human and veterinary drugs, biological

6  products, medical devices, the food supply, cosmetics,

7  and products that emit radiation; isn't that correct?

8            MR. ARBITBLIT:  Object to form.

9            THE WITNESS:  Certainly that was true -- that

10 was a true statement up until 1997.

11           MR. GIDEON:  Q.  And then what happened in

12 1997?

13      A.  Congress enacted FDAMA.  So that would be a

14 true statement, right, with regard to new drugs.

15      Q.  Okay.

16      A.  Because the safety and efficacy applies to new

17 drugs.  But Congress exempted, as we've been talking

18 about, compounding from those new drugs.  So that was

19 why I objected to FDAMA when I was commissioner.

20 Publicly.

21      Q.  Okay.  Now, did federal law stipulate

22 acceptable formularies for ambulatory surgery centers

23 licensed by the individual states?

24      A.  No, they did not.

25      Q.  Did Tennessee state law define what was an



1  acceptable formulary under an ambulatory surgery center?

2       A.  Usually -- no, usually medical staffs do that.

3       Q.  Did Tennessee law permit substitution for

4  prescriptions in calendar years 2010 through 2012?

5            MR. CHALOS:  Object to the form.

6            THE WITNESS:  I would assume so, but I would

7  want to pull the statute.

8            MR. GIDEON:  Give me No. 13.

9            THE WITNESS:  Thank you, Don.

10           MR. GIDEON:  This is Exhibit 1256.

11           (Whereupon, Exhibit 1256 was marked for

12           identification.)

13           MR. GIDEON:  And this comes from PCCA075 to

14  078.  Documents produced by Pharmacy Compounding Centers

15  of America, PCCA, produced to the PSC before we got

16  involved in the litigation.

17      Q.  I want you to take a moment and look at it, but

18  I want to tell you what my specific question is.

19      A.  Sure.

20      Q.  And that is if NECC had complied with this

21  policy to crimp and seal individual vials and then

22  autoclave those individual vials for 20 minutes at

23  121 degrees centigrade, 15 pounds per square inch, would

24  that have prevented the fungal outbreak?

25      A.  I'm not going to opine on that.  An infectious



Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 254 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                      Page 253

1  disease expert can do that.

2      Q.  Do you know whether complying with this

3  procedure would have killed the fungi in the vials in

4  question?

5      A.  I have not studied that question, sir.

6      Q.  So you do not know?

7      A.  I have no opinion on that.

8      Q.  You told me earlier that you knew the

9  difference between terminal sterilization and aseptic

10  processing.

11          MR. ARBITBLIT:  Object to form.

12  Mischaracterizes.

13          MR. GIDEON:  Q.  How does that

14  mischaracterize what you said?

15      A.  I said I can look that up pretty quickly.  I

16  didn't have it in my head.

17      Q.  Okay.  Well, the document that's in front of

18  you right now, you have enough experience to know that

19  what it advocates doing is terminal sterilization,

20  correct?

21      A.  I mean, the final stage of the product, that's

22  what terminal means, yes.

23      Q.  Correct.  So if your ultimate production are

24  individual vials, and those individual vials are subject

25  to being autoclaved, that is terminal sterilization,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  isn't it?

2       A.  Again, I have no reason to dispute that

3  definition.

4       Q.  Okay.  Now, at any time when you were at the

5  FDA, as a means of dealing with compounders, did the FDA

6  ever suggest that compounders should be required to

7  report the volume of product they ship in interstate

8  commerce as a way to figure out where the risk was

9  greatest?

10          Do you want to hear the question again?

11      A.  No, I think I got the question.  I'm just

12  trying to think.

13      Q.  1990 to 1997.  And let me tell you one of the

14  reasons why I asked you the question.  You and I talked

15  earlier about your testimony to Congress --

16      A.  Yes.

17      Q.  -- May 1st, 1996.

18      A.  Yes, sir.

19      Q.  And one of the things you said during that, and

20  I'm going to give you a direct quote --

21      A.  Sure.

22      Q.  -- that I think you will recall.

23          Where is that case?

24          Yeah, here it is.  May 1st, 1996.  Your

25  testimony was that you were concerned that compounding



Case 1:13-md-02419-RWZ Document 2766-1 Filed 03/29/16 Page 256 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 255

1  pharmacists would, quote, cheat and produce or compound

2  drugs to replace manufactured drugs that were out there.

3       A.  Can I see my testimony?  I'll get it.  I'll

4  pull it up.

5       Q.  Okay.

6       A.  I'll get it.  I remember there's two paragraphs

7  in my testimony, if my recollection is --

8       Q.  I believe I've quoted it directly.

9       A.  Let me just pull it up.

10      Q.  Okay.

11      A.  Just give me a second, sir.

12      Q.  Have the date correct, don't I?

13      A.  That sounds right, but just give me one second.

14           If anyone has documents for paragraphs 41 -- I

15  have 41 and 43.  Here's my testimony.  My memory is two

16  paragraphs in a row.  Let's see if I can get to it.

17           MR. ARBITBLIT:  Do you have it?

18           THE WITNESS:  You didn't read that correctly.

19           MR. GIDEON:  Q.  Did you say that you were

20  concerned that compounding pharmacists would, quote,

21  cheat?  Did you use those -- did you use that term?

22      A.  No.  When you said it, it doesn't sound like

23  me.  That's why I --

24      Q.  Were you asked the question, are you concerned

25  whether compounding pharmacists will cheat and produce



Case 1:13-md-02419-RWZ Document 2766-1 Filed 03/29/16 Page 257 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 256

```
 1   or compound drugs to replace manufactured drugs that
 2   were out there, and you responded yes?
 3        A.  You would have to pull up -- show me -- I can
 4   show you exactly -- the testimony I have, I'm not
 5   disputing if there was a Q and A -- but let me give you
 6   the phrase.  It's more likely --
 7        Q.  Are you looking at the testimony or prepared
 8   comments?
 9        A.  I'm looking at my prepared comments.
10        Q.  Okay.  But I'm talking about the Q and A with
11   the members of the representative committee in question.
12   And I actually think it was now senator, then
13   congressman, Richard Burr from North Carolina.  Does
14   that ring a bell?
15        A.  I certainly remember Congressman Burr well.  So
16   what I used was:  It is likely to encourage large scale
17   manufacturing under the guise of pharmacy compounding.
18        Q.  Okay.
19        A.  I don't know whether -- did I use the word
20   cheat or did he use the word cheat?  I don't remember.
21   But I'm not going to dispute.  If you have a record
22   there, just show it to me.  The Q and A.
23             MR. GIDEON:  Do we have the Q and A?
24             MS. WEETER:  We can play the video.  I have it
25   right here in front of me.  We can play your testimony.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          THE WITNESS:  I'd be happy to have it.

2          MR. GIDEON:  Q.  Do you need that in order

3     to answer my question?

4          A.  Again, I don't -- the words that I have in

5     front of me are what I said.  I'm not -- if you have a

6     record, right, I trust you to represent that record

7     correctly.

8          Q.  Okay.  Well, Mark doesn't.

9          A.  Well, I have no doubt if you have the

10    transcript and you have the video, what I said is what I

11    said.

12          Q.  Well, let me -- let me tell you that I wouldn't

13    have asked you the question unless I'd looked at the

14    transcription of the Q and A.  And what I've written

15    down is that you responded "yes" when a congressman, and

16    I believe it is then-Congressman Burr, asked you:  Are

17    you concerned that compounding pharmacists will cheat

18    and produce or compound drugs to replace manufactured

19    drugs that were out there.  And my memory is you said

20    yes.

21          The premise for this is as a result of that,

22    while you were still commissioner, did FDA ever take

23    steps to determine volume of product being shipped out

24    of state by compounding pharmacies?

25          A.  I don't know -- I don't recall whether we ever



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 259 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 258

1    did that specifically.

2        Q.  Okay.  Subsequent to your departure from the

3    FDA sometime in --

4        A.  Wait.  Wait.  No, of course we did.  Because I

5    cite in the compliance policy guide those numbers that I

6    gave you earlier.  So obviously we determined the

7    volumes earlier.  That was certainly under my watch.

8        Q.  But that prior compliance policy guide that

9    preceded 460.200 was 1990-what?

10       A.  '2 --

11       Q.  1992 or 1993?

12       A.  Or something like that.  But we did that in

13   anticipation while I was there, so we did do volume at

14   that point.

15       Q.  But after your response to the question from

16   then-Congressman Burr, May 1st, 1996, did FDA take any

17   action to try and determine who the big compounders were

18   in terms of volume?

19       A.  Understand that after that testimony, Congress

20   changed the law and it was not based on volume, right.

21       Q.  The compliance policy guide that we have spent

22   a good deal of time on today refers to volume as one of

23   the factors looked at in deciding whether someone is

24   functioning like a manufacturer or as a compounder.

25       A.  Correct me if I'm wrong, but you and I decided



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 260 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 259

1   that if you look, that the word had to do with limited

2   prescriptions and based on the number of prescriptions

3   you've had.  That it did not specifically -- I mean,

4   that was the paragraph you and I looked at, unlimited

5   quantities.  I asked you if there was another thing that

6   said inordinate volume, you never gave me a citation.

7       Q.  I'll give you a citation.  You told me earlier

8   you were an expert in all things involving regulation of

9   manufacturers.

10      A.  No, no, no --

11      Q.  It is this language here --

12          MR. CHALOS:  Object.

13          MR. GIDEON:  Q.  -- that says part of --

14  part of what you would look to to determine if this

15  company needed the careful scrutiny of the FDA --

16      A.  Can I -- can I --

17      Q.  -- I'm getting to it.

18      A.  Can I have the document in front of me?

19          MR. CHALOS:  I object to the form of the

20  question.

21          THE WITNESS:  Could I just have the document?

22          MR. GIDEON:  Q.  You've got the document.

23  Compliance policy guide.

24      A.  I may have it, but I have a lot of documents in

25  front of me.  Give me the page.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        Q.   Same page, 3.

2        A.   Yes.

3        Q.   For example, it's the same thing that -- where

4    I had to count the lines for you.

5        A.   This is line 10 that we talked about earlier.

6        Q.   Yeah.  Quote:  For example, some firms receive

7    and use large quantities of bulk drug substances to --

8    here's the keywords -- manufacture large quantities of

9    unapproved drug products to advance -- in advance of

10   receiving a valid prescription for them, end quote.

11            Question --

12       A.   That was --

13       Q.   Question:  From and after 2002, did the FDA

14   take any steps to see which compounders were actually

15   making large quantities of compounded products that they

16   were shipping into interstate commerce?

17            MR. CHALOS:  Object to the form.  Time frame.

18            THE WITNESS:  So you're -- you've misstated the

19   record.

20            MR. GIDEON:  Q.  It's not a statement of

21   the record, Dr. Kessler -- wait a minute -- it is a

22   question that deserves an answer.

23       A.   Right.  So FDA cited in this policy, as you and

24   I went through, right, that the agency will consider

25   whether a pharmacy engages in any of the following acts.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 262 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 261

1   And it lists 1 through 9.

2            You read me a statement that was a factual

3   question, right, under discussion.  You implied, in that

4   question, or I understood, that one of the criteria was

5   an inordinate amount of 1 through 9.

6            What I stated on number 1 was where I saw

7   limited quantities had to do with limited quantities in

8   relation to the amounts of drugs compounded after

9   receiving valid prescriptions.

10           So again, the essential issue here is, I mean,

11  are there prescriptions, right?  And the amounts that

12  you're compounding with regard to the amount of

13  prescriptions you have, that's the issue here.

14       Q.  Well, apparently the FDA disagrees, in 2002,

15  because the FDA took the time to say that one of the

16  factors that the FDA is going to look at is whether or

17  not an entity is receiving and using large quantities of

18  bulk drug substances to manufacture large quantities of

19  unapproved drug products in advance of receiving a valid

20  prescription for them?

21       A.  Where are you reading from?  You're reading

22  from a sentence under Discussion.

23           In fact, if you -- to be correct, let's look

24  under the Policy where it says:  The agency will

25  consider -- in determining whether to initiate such



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  action, the agency will consider nine factors.  You and

2  I talked about that.

3          And I don't see what you're reading as one of

4  the factors that FDA said it would consider.  Am I

5  wrong?

6      Q.  So from the standpoint of this self-proclaimed

7  expert in drug regulation, volume by a compounder was

8  irrelevant to the FDA?

9          MR. CHALOS:  Object to the form.

10         MR. ARBITBLIT:  Object to the form.

11 Argumentative.

12         THE WITNESS:  So, again, I was confirmed by the

13 United States Senate, appointed by one president,

14 reconfirmed -- I mean, kept on by a second president,

15 right?  And I ran the agency for seven years.

16         So, again --

17         MR. GIDEON:  Q.  Is volume relevant or

18 irrelevant?

19     A.  I'm taking issue.  You felt it necessary to

20 talk about self-proclaimed.

21     Q.  Yeah.

22     A.  Right?  You didn't need to do that.  Okay?

23         Now let's talk about volume.

24     Q.  Is volume relevant or not relevant?

25     A.  I believe that volume is relevant.  If you read



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 264 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 263

1    No. 1, okay?  If you -- if you want to be precise and

2    understand how this works, right, volume is relevant,

3    right, as it relates to prescriptions, right?  So you

4    can only -- I mean, you can only compound, right, a

5    very -- a very limited quantity without prescriptions.

6            What is not answered in these is if you had

7    prescriptions, can you compound, right, more than a

8    limited quantity.  If you -- certainly that's under this

9    policy.

10           Under the law, right, I didn't see, again,

11   except as it related to the anticipation of

12   prescriptions, any limitations on how much you can do

13   under FDAMA.  I saw there was a limitation of how much

14   you could have on hand, right, in anticipation of

15   prescriptions.  That's where volume is key.

16       Q.  All right.  So volume is relevant, but there

17   are two factors:  How much volume is generated based on

18   patient-specific prescriptions, and how much volume is

19   generated without patient-specific prescriptions?

20       A.  Well said.

21       Q.  Thank you.  We agree on that.

22       A.  Thank you.

23       Q.  Let's turn to page 4, see if we can continue

24   this process of agreement.

25           Page 4, down at the bottom, under Regulatory



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 265 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 264

1    Action Guidance.

2         A.  Yes, sir.

3         Q.  We shouldn't have to read it but it does say:

4    District offices are encouraged to consult with state

5    regulatory authorities to assure coherent application of

6    this guidance to establishments that are operating

7    outside of the traditional practice of pharmacy.

8              I've read that correctly, haven't I?

9         A.  Yes, sir.

10        Q.  And then the next paragraph tells us some of

11   the remedies that are available if the FDA decides to

12   take some action, correct?

13        A.  Yes, sir.

14        Q.  Warning letter was one available in 2002?

15        A.  Yes.

16        Q.  Seizure of product, correct?

17        A.  Yes.

18        Q.  When you were commissioner, wasn't there a

19   seizure of orange juice that was being represented to be

20   fresh but, in fact, was made from concentrate?

21        A.  Yes.  The United States marshals --

22        Q.  Yes.

23        A.  -- for economic adulteration pursuant to the

24   act.

25        Q.  Injunction, something we talked about earlier,



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 266 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                     Page 265

1  correct?  A civil injunction to make somebody stop doing

2  something?

3      A.  Right.

4      Q.  And prosecution.  These last two require entry

5  into the judicial system, correct?

6      A.  Yes.

7      Q.  All right.

8      A.  But as -- I'm sorry.

9      Q.  Now --

10     A.  But some of those are not applicable, I mean,

11 if you're a compounder.  You and I can agree on that,

12 right?

13     Q.  Well, we'll see.

14         Now, were you shared -- did these folks tell

15 you that in the summer -- excuse me -- in May of 2011,

16 NECC had a cease and desist order issued against it by

17 the state Board of Pharmacy in Colorado?

18     A.  I think you saw the document.  You read the

19 document earlier into the record that I had pertaining

20 to that.

21     Q.  So you know that in May of 2011, the Colorado

22 state Board of Pharmacy issued a cease and desist order

23 against NECC?

24     A.  That's correct.

25     Q.  You also know that that cease and desist order



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 267 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 266

1   was sent to the New England District Office of the FDA?

2        A.  I do know it was in receipt -- yes.

3        Q.  You also know that the New England District

4   Office of the FDA did not send that cease and desist

5   order to the Massachusetts Board of Registration and

6   Pharmacy, don't you?

7        A.  I've read Dr. Hamburg's testimony on that.  In

8   fact, I have the exact language.  Let me tell you what I

9   know.  Dr. Hamburg testified she wished there was better

10  communication.  The Massachusetts Board of Pharmacy said

11  they became aware of it in the -- in 2012.

12       Q.  '12?

13       A.  Right.  I think Dr. Smith testified to that, if

14  my recollection is right.

15       Q.  The interim commissioner, Lauren Smith, of the

16  Massachusetts Board of Pharmacy?

17       A.  She said the executive -- there was something I

18  didn't quite understand.  I have the testimony, let me

19  just get it.

20       Q.  You are free to do it if you wish, but I can

21  tell you that the Penta deposition establishes as well

22  that the Massachusetts Board of Registration and

23  Pharmacy did not get the May 2011 cease and desist order

24  until June or July of 2012.

25       A.  I believe Dr. Hamburg -- and I want to check



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   this -- FDA asked Colorado to share with Massachusetts

2   Board of Pharmacy, but let's just get the actual

3   testimony.

4        Q.  So that you understand, though, my question is,

5   do you know that when the New England District Office of

6   the FDA got the cease and desist order in May of 2011,

7   they did not send it on to the Massachusetts Board of

8   Registration and Pharmacy?

9             MR. CHALOS:  Object to the form.

10            THE WITNESS:  Let me check so we're actually

11  clear, and we can put this on the record, if you like.

12  The answer is in Exhibit 1237 that you marked.  Let me

13  just see.

14            Let me just read you exactly what we -- what I

15  know, and it's only based on what Dr. Hamburg and what

16  Dr. Smith testified.  You know, in retrospect -- this is

17  Dr. Hamburg -- clearly I would have hoped that there

18  would have been greater communication that speaks to the

19  issue that was raised about ensuring the appropriate

20  level --

21            (Reporter clarification.)

22            THE WITNESS:  Sorry.

23            -- that speaks to the issue that was raised

24  about ensuring the appropriate level of back-and-forth

25  communication and coordination with our state partners.



Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 269 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 268

1    When this email was received, it was in the context of a

2    violation of state pharmacy registration and licensure.

3    And while there was an indication they had sent the

4    product in the absence of patient-specific

5    prescriptions, there was no indication of a safety or

6    quality concern that was being raised.

7            So, you know, we really felt that it was, as I

8    understand it, those kinds of issues are often handled

9    state Board of Pharmacy to state Board of Pharmacy.  We

10    should have made sure that Massachusetts was aware.

11            But there's also other testimony --

12            MR. GIDEON:  Q.  You just read that to me.

13    How does that answer the question I asked you?

14        A.  Well, because I wasn't at FDA at the time.

15        Q.  We know that.

16        A.  Well --

17        Q.  How does that answer the question I asked you,

18    which was as an expert in this case, do you know whether

19    FDA passed on to the New England -- excuse me,

20    Massachusetts Board of Registration and Pharmacy the

21    FDA's unquestioned receipt of a cease and desist order

22    from Colorado against NECC issued in May of 2011?

23        A.  And the answer, as I just told you that

24    Dr. Hamburg testified, that she had wished there was

25    better communication.  There was not a product quality



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 270 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 269

1    or safety issue.

2              And what I'm trying to determine, and there's

3    other pages of testimony, whether -- that I thought I

4    read where FDA said to the -- said to Colorado, share

5    this with Massachusetts.  That's -- again, this

6    testimony is the extent of my knowledge.

7         Q.  So how does it answer the question then?

8         A.  It --

9         Q.  It doesn't.

10        A.  It tells -- well, she was asked about those

11   questions.  This is the record that I have.

12        Q.  Well, let's look at it -- I assume it's the

13   best you can do in answering my question of whether they

14   did or didn't share the information?  They, being the

15   FDA with the --

16        A.  Well --

17        Q.  Excuse me.

18              -- the Massachusetts Board of Registration and

19   Pharmacy?

20              MR. CHALOS:  Object to the form.

21              THE WITNESS:  Actually, there's more here.

22   This is Dr. Smith:  Just to be clear, while the

23   executive director of the Board of Pharmacy did receive

24   notification from the Colorado Board of Pharmacy

25   regarding the cease and desist, that was done in



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016

Page 270

1    April -- done in April of 2011.  We have not found any
2    record that there was any communication from the
3    Colorado Board at that time back in 2011.
4             That's the testimony.  That's what I can --
5    that's what I have.
6         Q.  Well, let's apply the compliance policy guide
7    at page 4.  If the New England District Office of FDA
8    gets an email from the Colorado Board of Pharmacy that
9    says we have issued a summary suspension, a cease and
10   desist order of NECC for improper conduct here in our
11   state, under the compliance policy guide, the district
12   office there in Boston should have shared that report
13   with the Board of Registration and Pharmacy in the state
14   of Massachusetts, correct?
15            MR. CHALOS:  Object to the form.
16            THE WITNESS:  Or tell Colorado to send it.
17            I mean, the -- I'm certain -- let me just get
18   the exact language.  Certainly if this --
19            MR. GIDEON:  Q.  I am referring to
20   regulatory action guidance.
21        A.  This says they are encouraged to consult with
22   state regulatory authorities to assure coherent
23   application.
24            I mean, again, we have to look at the record
25   whether Colorado was asked to send this to



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  Massachusetts.  This was, again, at this time what is --
2  what I think is the most important.  If there was a
3  product safety or significant -- if the product was
4  contaminated, right, that clearly should have been the
5  number one issue for FDA.  And if there was evidence of
6  that, even as an old drug, the agency should have done
7  something.
8       Q.  Right.  And in addition to that, though, if the
9  report from Colorado makes it clear that NECC is selling
10  product in the state of Colorado without
11  patient-specific prescriptions, raises the issue of
12  whether NECC should be registered as a manufacturer with
13  the FDA, doesn't it?
14       A.  It certainly raises that question.  Law was --
15  the law was very confused at this time.  And what you
16  see, whether we like it or not, that confusion,
17  certainly post Gonzalez and Ukese, led to this sort of
18  very gray area.
19            MR. GIDEON:  Give me number 20.
20            THE WITNESS:  Can I ask how much time we have
21  left?
22            THE VIDEOGRAPHER:  Five hours and 53 minutes on
23  the record.
24            THE WITNESS:  Five hours and 53 minutes.
25            MR. GIDEON:  We've got 5 hours and 53 minutes



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    left, in response to your question.

 2              THE WITNESS:  Thank you.  I look forward to

 3    this.

 4              MR. GIDEON:  1257.

 5              (Whereupon, Exhibit 1257 was marked for

 6              identification.)

 7              MR. ARBITBLIT:  In other words, an hour and

 8    seven minutes left.

 9              THE WITNESS:  Where would you like to go for

10    dinner in San Francisco?

11              MR. GIDEON:  What's the name of that old

12    seafood place?

13              MS. WEETER:  Tadich.

14              MR. GIDEON:  Tadich.  Great food.

15              THE WITNESS:  Let's talk before you go to

16    dinner.

17              MR. GIDEON:  Okay.

18        Q.  All right.  I've handed you an FDA alert to

19    healthcare professionals.

20        A.  Yes.

21        Q.  This deals with Cape Apothecary, Inc. in

22    Anapolis, Maryland, issued November 15th, 2015.

23        A.  Yes.

24        Q.  One of the things that's mentioned at the -- in

25    subsection -- well, the subsection entitled regulatory
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 273

1    action guidance that we talked about a few moments ago,

2    was FDA --

3          A.   Regulatory action guidance.  In this

4    document --

5          Q.   No, no, no.  Compliance policy guide.

6          A.   Yes, sir.

7          Q.   We talked about it a moment ago.  FDA initiated

8    regulatory action may include issuing a warning letter.

9               Is the document in front of you right now an

10   example of a warning letter?

11         A.   No.

12         Q.   Tell me how the document in front of you right

13   now is different than a warning letter?

14         A.   A warning letter, as that term is used, is a --

15   there will be an addressee company, and it will be

16   labeled -- warning label usually in bold and underlined.

17         Q.   Okay.

18         A.   It will be identified as such.

19         Q.   So what was -- what was this type of document

20   that's in front of you called in the FDA lexicon?

21   Public alert?  Informational?  What was the term?

22         A.   These are probably drug safety -- this was some

23   drug alert and statement.

24         Q.   Well, this alert tells the public don't use

25   products from this company, right?



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1       A.   Dated when?

2       Q.   I just told you.  11/15/2015.

3       A.   After we've had probably the worst national

4   crisis since Sulfanilamide, right?

5       Q.   Now, was this -- was this capacity to alert the

6   public something that only began November -- September

7   26, 2012, or was this capacity something FDA had

8   beforehand?

9            MR. ARBITBLIT:  Object to the form.

10           THE WITNESS:  The capacity?

11           MR. GIDEON:  Q.  The power, the authority,

12   to issue this kind of document, did that exist only

13   after September 26th, 2012, or was it something that

14   the FDA could have done in 2010, 2011, 2012?

15           MR. ARBITBLIT:  Object to form.

16           THE WITNESS:  So certainly FDA could have,

17   under all -- all interpretations of law, had FDA found

18   samples that were contaminated, right, if you had a drug

19   sample, as they did back in 2002, I believe, if you have

20   a drug sample that's contaminated, FDA -- and/or that

21   that sample may being injurious to health, FDA can act.

22           You have to have a sample, right, and -- of

23   drug product, right?  Some type of contamination,

24   filthy, putrid, under the old drug provisions.  If they

25   had that, they could have -- they could have clearly



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 276 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 275

1    acted under any interpretation of the law and should

2    have.

3         Q.  Okay.  Now, you are not suggesting that the

4    Western States case took away the authority of the FDA

5    to act with respect to contaminated, adulterated, putrid

6    product made by any manufacturer?

7         A.  That's correct.  That's correct, but you would

8    have to have a drug sample -- I mean, you would have to

9    have that in the drug sample, you would have to have

10   laboratory confirmation, right?  You'd have to show that

11   that could be injurious to health, then you can go into

12   a court and you can act.

13        Q.  Okay.

14            Give me 21.

15            (Whereupon, Exhibit 1258 was marked for

16            identification.)

17            MR. GIDEON:  The exhibit number is on the back

18   of the first page.  1258.

19            MR. ARBITBLIT:  Counsel, just for the record,

20   if you altered the original of this by putting certain

21   items in bold --

22            MS. WEETER:  Here's the original.

23            MR. ARBITBLIT:  Well, let's have that marked as

24   well as the accompanying exhibit.

25            MR. GIDEON:  I don't follow the objection.



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 277 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 276

```
 1          MR. ARBITBLIT:  Well, this -- you've altered an
 2   original document by highlighting the matters that you
 3   feel are important, and I think it would be appropriate
 4   for the record to reflect the original of this document
 5   in addition to the version that you would like to
 6   question the witness upon.
 7          MR. GIDEON:  Well, actually, I don't think
 8   you're right.  I don't think you're right.  I'll tell
 9   you what the methodology is.
10          The normal nonbolded print you will find at
11   FDA E00424316, 317 and 318.  Okay?  What we have done is
12   interspersed into this document, based on the subsequent
13   production by the Food and Drug Administration, other
14   documents with separate FDA numbers.  And they are
15   bolded only to reflect that they are not part of the
16   original.
17          MR. ARBITBLIT:  Thank you.
18          MR. GIDEON:  So that's the methodology.
19          MR. ARBITBLIT:  Thank you for clarifying that.
20          MR. GIDEON:  And if you want to, we can mark
21   FDA 424316, 317 and 318.  I have no objections to that.
22   But it's actually not me emphasizing or changing
23   something for the purposes of emphasizing it.
24          MR. ARBITBLIT:  Fair enough.  I appreciate the
25   clarification.
```



1          MR. GIDEON:  Okay.

2          MS. WEETER:  I'll also add that we have the

3   supporting documents for the subsequently produced ones

4   that are highlighted in bold.

5          MR. GIDEON:  So you don't have to object under

6   Rule 106 about completeness.  We have all of the

7   underlying documents as well here, and he is free to

8   look at them.

9      Q.  What I'm going to suggest is that you take a

10  look at this document for a few moments.  You will find

11  that it is chronological.  The regular print was

12  produced by your former employer, the FDA, in its

13  Production of Documents, as I mentioned to you, with the

14  FDA numbers.

15     A.  Okay.

16     Q.  Three numbers.  And then the additions have

17  separate FDA production numbers because they have made

18  productions to us on what they referred to as a rolling

19  basis.  Okay?

20     A.  I'm -- I was confused.  Was this originally --

21  you are saying this was done by FDA.

22          MS. WEETER:  It was originally produced by FDA.

23          THE WITNESS:  Produced.  That's not my

24  question.  What is the typed by the house committee or

25  what is the typed by FDA?



1          MR. GIDEON:  Q.  Prepared by FDA.  Produced

2  by FDA.  We can't go any further than that.  I don't

3  know.

4          A.  So I --

5          Q.  Never had an opportunity to ask a single

6  question of anybody with FDA to ask them.

7          A.  I think this -- if you go online, this is house

8  committee work.  But again, let's --

9          Q.  Well, you may be ahead of the ball and you are

10  more familiar with it.

11          A.  That's fine.

12          Q.  But I don't want to start asking you questions

13  on it until you've had at least an opportunity to

14  acquaint yourself with some of these sections.

15          I'm going to take five minutes and go to the

16  bathroom while you're taking a look at it, since we got

17  5 hours and 57 minutes left to go.

18          THE WITNESS:  Look forward to it.  All five

19  hours.

20          MR. ARBITBLIT:  Off the record.

21          THE VIDEOGRAPHER:  This is the end of disc

22  No. 4, volume 1.

23          THE WITNESS:  Going off the record?

24          THE VIDEOGRAPHER:  We're going off the record

25  at 4:02 p.m.



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              (Recess taken from 4:02 PM to 4:15 PM)
 2              THE VIDEOGRAPHER:  This is the beginning of
 3    disc No. 5, volume 1.
 4              We are back on the record at 4:15 p.m.  You may
 5    proceed.
 6              MR. ARBITBLIT:  I have a brief objection to
 7    Exhibit 1258 which includes excerpts taken by counsel
 8    for the defendants interspersed and interlineated with
 9    previous documents.
10              And it's burdensome, during the deposition, to
11    have to review the original documents to see what
12    defense counsel has chosen to highlight as opposed to
13    what may be necessary to complete the record.  That's my
14    objection.
15              MR. GIDEON:  Ready?
16              THE WITNESS:  I am.  And if I can also add
17    something, if I may.  You asked me to look at this.
18              MR. ARBITBLIT:  You may not.  You may wait for
19    a question.
20              THE WITNESS:  No, I'm going to put something on
21    the record, Don.  I apologize.  Because I think this is
22    important.
23              You asked me to read this.  And again,
24    pertaining to the earlier conversation, if you look
25    at -- there's an entry on --
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 281 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 280

```
1              MR. GIDEON:  Q.  The lawyer over here just
2     told you you couldn't make this addition.  Are you
3     not going to follow his advice?
4          A.  I am not going to follow his advice.
5              MR. ARBITBLIT:  There's a question that counsel
6     has asked you you can now answer.
7              THE WITNESS:  I'm now going to answer.
8              MR. GIDEON:  Q.  You are not going to
9     follow the lawyer's advice?
10         A.  No, I'm not.
11         Q.  Is that the question?
12             MR. ARBITBLIT:  Yes, that was your question.
13             MR. GIDEON:  And I got an answer to that.  Now
14    I'm going to ask my next question.
15             THE WITNESS:  This is important, sir, I'm not
16    being flip at all.  May I do this, please?
17             MR. GIDEON:  I haven't --
18             MR. ARBITBLIT:  You may.
19             MR. GIDEON:  I haven't asked you a question --
20             THE WITNESS:  You --
21             MR. GIDEON:  -- and this doesn't count against
22    my time.
23             If you wish to make a statement, I guess
24    there's no way I can stop you right now.
25             THE WITNESS:  I think this document is in
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 281

```
 1    violation of the agreement that you have with the
 2    Department of Justice and I would ask you to check with
 3    them before you ask any questions.
 4              MR. GIDEON:  Q.  Well, I don't.  And I'm
 5    not going to be objecting to my own questions on
 6    behalf of the Department of Justice.  I am going to
 7    ask you questions about the facts that are shown in
 8    the exhibit.  The facts come from documents produced
 9    by the Food and Drug Administration and specific
10    documents in a rolling production.  So --
11         A.  This --
12         Q.  -- I will begin by asking --
13         A.  This document --
14         Q.  I --
15         A.  Let me finish, sir, please.
16         Q.  No, no.  I was in the middle of a sentence,
17    Dr. Kessler, and you --
18         A.  You didn't let me finish --
19         Q.  -- do not have the prerogative to interrupt
20    someone else who is speaking.
21         A.  I respect that --
22         Q.  That is not your prerogative.
23         A.  But, please, there's a serious issue here.
24              (Reporter requests one speaker at a time.)
25              THE WITNESS:  You are not letting me put that
```



1    on the record.

2            MR. GIDEON:  She asked you to be quiet and you

3    didn't.

4            MR. ARBITBLIT:  Counsel, she asked you both

5    equally.

6            MR. GIDEON:  She's looking right at Dr. Kessler

7    who just keeps talking no matter what anybody says.

8            MR. ARBITBLIT:  That's uncalled for.

9            MR. GIDEON:  Q.  Now, one thing, in the

10   limited amount of time you and I have together

11   today, but I do think there will be another

12   opportunity, is for you and I to please speak one at

13   a time so that we can both be kind to the court

14   reporter.  Will you agree to do that?

15       A.  I'd be happy to do that.

16       Q.  All right.  Now, I can't stop you from making a

17   speech about the documents, so will you please do it and

18   get it over with so I can ask a question.

19       A.  You have added to this document on the last

20   page information about the office of the chief counsel

21   at FDA whose -- again, I don't want to characterize it

22   as legal advice, but you've been advised not to go near

23   attorney-client privilege.

24           I think when you are talking about the office

25   of the chief counsel is not doing something, I'll leave

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  others to decide whether that's attorney-client.  That's

2  not my job.  But I do think you are very close to the

3  line, and I would certainly request that you not put me

4  in a position, right, not to be respectful to the letter

5  you received.

6          So I think your -- that's being cited here.

7  And again, I just think it's important -- I think you

8  should be careful.

9          Q.  Well, Doctor, do you remember when you were in

10  law school addressing attorney-client privilege?  And do

11  you recall being told that if you produce information

12  that reflects the communications, it can be waived?  Do

13  you recall that?

14          A.  And please have that discussion with the

15  Department of Justice, sir.

16          Q.  I'm not going to have this discussion with you

17  any longer.  Are you referring to the entry of July

18  17th, 2012 from a document the FDA produced to us which

19  said:  Bruce Ota emailed Karen Archdeacon, quote, OCC at

20  the moment is not doing anything with compounding

21  pharmacies because of the recent losses in the

22  southwest, end quote?

23          Is that the one you are referring to?

24          A.  Yes.  To me --

25          Q.  Do you know where we got the document?



1    A.  I'm sure you got it from FDA.  But clearly,

2  that document -- statement that if that is not

3  deliberative process, I don't know what is deliberative

4  process.

5    Q.  Okay.  Well, let's talk about June 2007, the

6  first page.

7    A.  Okay.

8    Q.  When did the MedWatch system take effect?  What

9  year?

10   A.  I did MedWatch probably 1994, '5, something

11  like that.

12   Q.  You see in June of 2007 in the original

13  produced by FDA, FDA receives a MedWatch report about a

14  patient receiving an NECC-repackaged Avastin injection

15  for macular degeneration, April 2007, developing a

16  severe eye infection and needing emergency surgery.

17       Now, is that representative of the kind of

18  information that FDA would need before they act to

19  protect the public?

20       MR. CHALOS:  Objection.  Form.

21       THE WITNESS:  You need a lot of information to

22  protect the public.  As I understand that case -- and

23  again, I can give you the records -- certainly on some

24  of the Avastin cases that I looked into the adverse

25  events, there was a diagnosis of sterile



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 286 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 285

1   endo-ophthalmalitis (sic).

2          MR. GIDEON:   Q.   Endophthalmitis?

3          A.   Yes.   Endo-ophthalmitis (sic).   And as I

4   understand it, you look at those records, I did not see,

5   again, I mean FDA is questioning whether it's a

6   compounder or a manufacturer, we know.   But those came

7   in, but I don't see any samples that were positive that

8   I'm aware of with regard to that.

9          Q.   Is it because FDA didn't take the time to ask

10  for samples from the Avastin injection for macular

11  degeneration that NECC made?   Is that why there are no

12  samples?

13         A.   I don't know, but I'm not aware of any samples.

14  I don't know, but the record does not show any positive

15  samples there.   And I guess there were, from that -- I

16  think it was Genentech, they're talking -- there were

17  documents about 40 to 50 patients who got that lot, and

18  that there were no issues.   I just don't see any samples

19  that were positive.   I don't know why there was not --

20  whether there was or was not samples.   I just am not

21  privy to that.

22         Q.   Well, accepted regulatory oversight would have

23  required FDA, when they received a report on MedWatch

24  that a patient had developed a severe eye infection

25  requiring emergency surgery, to at least attempt to



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 287 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 286

1  obtain samples from that Avastin packaging, wouldn't it?

2           MR. CHALOS:  Object to the form.

3           THE WITNESS:  No.

4           MR. GIDEON:  Q.  No?

5      A.  But again, FDA -- FDA gets thousands and

6  thousands of adverse events.  And again, I don't see a

7  full record of what FDA did here.  So I'm just not privy

8  to that.  I just can't opine.

9      Q.  Do you know if FDA did anything at all?

10     A.  Dr. Miller says it prompted an inspection.  But

11 the documents that I see don't support that these

12 adverse events prompted the inspection.  But, again, I

13 can't quite connect the dots.

14     Q.  Well, you'll be able to connect the dots when

15 you look at this.  There wasn't another inspection of

16 NECC by FDA from 2003 until 2012, was there?

17          MR. ARBITBLIT:  Object to form.

18          THE WITNESS:  So there was follow-up.  There

19 was -- there were no issues, as I understand it, between

20 that recall and about 2007, as far as adverse reactions.

21          Beginning in 2007, I see a number of incidents,

22 right, beginning in 2007.  You have these MedWatch

23 reports.  There was an issue of a liposuction.  There

24 was an issue of klebsiella.  There was an issue of

25 phosphatidylcholine.  And what I see is FDA going to



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 288 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 287

1    inspect and try to determine, certainly on the

2    liposuction, on the phosphatidylcholine, on the

3    klebsiella, and none of that, to my knowledge, showed

4    any positive samples or gave -- as I see the record.

5    And basically FDA, in a number of these cases subsequent

6    to 2007 where FDA's doing stuff, FDA is going to look at

7    the issue.

8          I don't have the record on Avastin, but in

9    other cases, FDA is looking at the record and trying to

10   determine the basis.

11         MR. GIDEON:   Q.   What question are you

12   answering?  Because you've been talking for so long,

13   I've forgotten if I even asked you a question.

14      A.   You asked me what FDA did.

15         MR. CHALOS:   Object to the commentary.

16         MR. GIDEON:   Q.   No, I asked you whether or

17   not they had done an inspection between 2003 and

18   2012, an inspection of NECC, and then you started

19   talking.   You have not yet answered whether FDA put

20   a boot in the door at NECC between 2003 and 2012,

21   and that's what I want to know.

22      A.   FDA did not step foot in NECC.   FDA did put a

23   boot in a number of complaints that were allegedly

24   related to NECC.

25      Q.   In 2003?



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 289 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 288

1      A.   No.  FDA investigated things in 2008, April,

2   October, as you see on -- I mean, there were certain --

3      Q.   They did an inspection?

4      A.   No.  What they did was they went after there

5   was a report, for example, about phosphatidylcholine.

6   The --

7      Q.   We'll get to that.

8      A.   -- LA district office.  You can go through

9   that.  So FDA went through and tried to determine the

10  cause, right?

11     Q.   But let's take it step by step.

12     A.   Please.

13     Q.   From 2003, and you will recall we talked about

14  a recall of methylprednisolone acetate preservative

15  free, and betamethasone, the two that led to the

16  significant recalls in the 26 states.

17     A.   Yes.

18     Q.   After that occurred, that was the last time any

19  person employed by the Food and Drug Administration set

20  foot at any NECC until after the fungal meningitis

21  catastrophe; isn't that right?

22     A.   I think that's correct.

23     Q.   Okay.

24     A.   But that's because -- just so you -- between

25  2002 and 2007, there weren't any adverse event reports



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 290 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 289

1  that I saw.

2      Q.  That's why we're doing this.  Now we've just

3  talked about --

4          MR. ARBITBLIT:  Object to that.

5          MR. GIDEON:  Q.  -- June of 2007 with the

6  man who had emergency surgery and had a severe eye

7  infection.  Look at the next entry --

8      A.  Just give me what patient that was, because I

9  have three.  Just give me -- you can give me the

10  MedWatch report.

11     Q.  The patient's name?

12     A.  Just give me the FDA documents.  I have three

13  reports of Avastin.  If we're going to talk about them,

14  just give me the MedWatch reports.

15     Q.  We're looking at your blotter.  You have three

16  reports of patient sickness or injury connected with

17  Avastin repackaging?

18     A.  I have three MedWatch reports concerning

19  Avastin, but I don't have --

20     Q.  What's the date on those three reports that you

21  recorded?

22     A.  I have somewhere around 2007.

23     Q.  2007.  Did you write down the FDA document

24  numbers as you prepared that blotter?

25     A.  Yes, I do.



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 290

1       Q.   Okay.  Well, then we know the FDA document

2   numbers.

3       A.   But if you want to discuss the case --

4       Q.   I want to discuss the exhibit that's in front

5   of you.

6       A.   No, no.  But I can't discuss a case without

7   giving me -- you're giving me a house report that is a

8   one-page -- one sentence about a case.  If you want to

9   show me about a case, please show me the record.

10      Q.   Well, I'm going to ask you questions.  I will

11  expect you to answer them.  December of 2007, FDA

12  receives a call from a physician who had administered

13  epidural injections of betamethasone to numerous

14  patients who then experienced severe flu-like symptoms?

15      A.   Uh-huh.

16      Q.   They find several vials made between August and

17  October of '07 that are discolored and contained

18  particles.  What did FDA do in December of 2007 to

19  protect the public from NECC?

20      A.   You need to give me the -- that inspection

21  report and that file.

22      Q.   You don't know?

23      A.   Well, again, you are asking me specifically in

24  December 2007.  Dr. Miller -- I mean, unless this is --

25  didn't -- no one has raised this case that I've seen in



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 292 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 291

1    Dr. Miller's report, or Mr. Bradshaw's report, with this

2    date.  So if you want to give me more information, just

3    give me the file on this case.

4             MR. ARBITBLIT:  So for completeness, Counsel,

5    I'd like to read from one of the documents that your

6    associate provided pertaining to this very episode of

7    betamethasone.  I'm reading from FDA E00426108, and also

8    marked as NECC_FDA 02598, lab class 1, no bacterial

9    endotoxins detected in 1 through 5 subcomposites

10   pertaining to the betamethasone episode that you are

11   referring to.

12            MR. GIDEON:  Q.  Now, I want you to read

13   the whole thing to make sure it's complete, but I

14   don't want to waste time doing it.  Is there any

15   reflection here that FDA -- and I assume you are

16   referring to the Bruce Ota compliance officer

17   document.  Is there any indication here that there

18   was any effort to find whether there were

19   patient-specific prescriptions?

20            You've obviously spent some time reading it; is

21   there any reference to that in the document?

22            MR. ARBITBLIT:  Counsel, you are entitled to

23   read anything else you feel is necessary from the

24   document.

25            MR. GIDEON:  Well, then we need to exhibit --



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 293 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 292

```
 1            MR. ARBITBLIT:  You are not entitled to ask me
 2      questions.
 3            MR. GIDEON:  We need to make that an exhibit,
 4      then, right now.
 5            MR. ARBITBLIT:  That's fine.
 6            MR. GIDEON:  The next exhibit will be
 7      FDA 426108 to 426109.  And you will see that there is
 8      nothing in here about even asking if there are
 9      patient-specific prescriptions.
10            MR. CHALOS:  Objection to the commentary.
11      That's not a question.
12            MR. GIDEON:  Right.  Trying to save time.
13            MR. CHALOS:  I'm not sure why you are taking
14      time making speeches, frankly.
15            MR. GIDEON:  Got to do it.  Got to do it.
16            (Whereupon, Exhibit 1259 was marked for
17            identification.)
18            MR. GIDEON:  Q.  Now, the same document
19      that the gentleman just a moment ago brought up at
20      FDA 426109, I'm going to hand this to you, Doctor.
21      Bruce Ota, compliance officer to the New England
22      district, comments in his email to Samia Nasr,
23      quote:  This appears to be a new drug --
24      Dr. Kessler -- this appears to be a new drug this
25      company is compounding.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          Now, as of December of 2007, were compounders

2   permitted to make new drugs and skip registration with

3   the FDA?

4          MR. ARBITBLIT:  Object to form.

5          THE WITNESS:  I don't understand your question.

6          MR. GIDEON:  Q.  Could a compounder make

7   new drugs whenever they wished and in whatever

8   volumes they wished?

9      A.  The new drug is a -- is a provision of the act.

10  I'm not sure, again --

11     Q.  Could a compounder make a new drug and sell it

12  in interstate commerce without seeking approval from the

13  FDA in advance?

14     A.  This is -- let's define new drug, as this is --

15  in this case, this is a -- this is a -- a copy of an

16  approved drug.  This is a different drug.

17         If this is a different drug, not a copy,

18  essentially not a copy, right, you -- I mean, your

19  question -- I mean, is it --

20     Q.  It's not my question, it's the comment by Bruce

21  Ota.  If Bruce Ota with the FDA is right, did NECC have

22  the prerogative to make new drugs and sell them in

23  interstate commerce if they wished to do so?

24     A.  Either you are a compounder, right?  And a

25  compounder -- if you are under FDAMA, if that was the



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  law, or you are exempt from new drugs.  So you can't be

2  a compounder and be subject to the new drug provisions,

3  right?

4        Now let me look and see what the actual product

5  is that's being sold here, and maybe that will shed

6  light on what Mr. Ota is saying, right?

7        So this is New Orleans.  This is actually --

8  hold on a second.  Okay.  So this doesn't -- I

9  apologize.  You gave me this case in December of 2007.

10 This is April 2008.

11     Q.  Well, I didn't bring this up.  Another lawyer

12 in this room brought it up, so I thought I'd ask you

13 about it.

14     A.  But this document doesn't -- this is dated

15 wrong.  Because the issue, I mean, again, that I'm aware

16 of --

17     Q.  Could you please answer the question, just once

18 today?

19     A.  Sir --

20        MR. CHALOS:  Objection.

21        MR. GIDEON:  Q.  One time, please.

22        MR. CHALOS:  Objection to the commentary.

23        MR. GIDEON:  Q.  Just one time, can you

24 answer the question directly.

25     A.  I don't know what case this is referring to.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 296 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 295

```
 1   You represented this case --
 2        Q.  I didn't represent anything.
 3        A.  This is represented as being December 2007.  I
 4   said I did not know what it is.  I'm looking at this,
 5   and this is April of 2000 -- May of 2008 -- April, May
 6   of 2008.  I certainly know what this case is about.
 7        Q.  Okay.  Well, then, without all the windup,
 8   you've got the email in front of you, just tell us,
 9   since one of the FDA employees says it appears that NECC
10   is making a new drug, were they permitted to do so
11   without approval from the FDA?  It's a really simple
12   question.
13        A.  So if someone could pull for me
14   NEC_FDA 05989-992.
15        Q.  Do you have it?
16        A.  I may.  I have to find it.  But if someone
17   could -- so I don't have to -- it's late.  If someone
18   could help me find that document -- that document,
19   please.
20        Q.  How is that document going to help you answer
21   my question about new drug?
22        A.  Because my notes here says FDA says compounding
23   with regard to the April 2008 case.  You want to know
24   whether this is new drug and not compounding.  I need to
25   see the FDA documents.  Please give them to me that
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 297 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 296

```
1   relate to this case.
2        Q.  And you don't have them?
3        A.  I'd be happy to get them.
4        Q.  Pull them up.
5        A.  Okay.
6        Q.  You got to have them to answer a point blank
7   question, pull them up.
8        A.  Okay.  I will be happy to -- if someone
9   could -- I just need the FDA FOI, because my folder
10  is -- or I have to go find my thumbnail drive.  I don't
11  have -- I just need help on FDA 05989-992.  And
12  NEC_FDA 06094-95.  If someone could help me pull those
13  documents up, happy to discuss this case.
14       Q.  Go ahead.  You've had them at some point.
15       A.  I have a thumb drive.
16       Q.  You are the best person to find them.
17       A.  Well, I'd be happy.  I have to find my thumb
18  drive because it's not on the hard drive, as I told you
19  earlier.
20       Q.  Can you, slower, this time, dictate the FDA and
21  NECC document numbers, please.
22       A.  Sure.  Happy to do that.
23       Q.  While you're --
24       A.  I'll look.  So the documents I have -- if this
25  relates -- if this relates --
```



1      Q.   Just give us the numbers.

2      A.   Assuming this relates to the New Orleans case,

3    right, I would appreciate seeing NECC_FDA 06094-5 and

4    NECC_FDA 05989-992.  Okay?

5      Q.   Okay.

6      A.   If someone could help me find those documents,

7    I would appreciate it.

8      Q.   We'll see who gets to it most quickly.  If you

9    can pull your thumb drive and we can see if we can pull

10   them off our database.

11     A.   Thank you very much.  Here's my thumb drive.

12          MR. GIDEON:  Let's see who is quickest.  Feel

13   some pressure, Kaycee?

14          (Inaudible discussion off the record.)

15          MS. WEETER:  Got it.

16          MR. ARBITBLIT:  All right, Kaycee.

17          MR. GIDEON:  Is there any way we can put the

18   document up on a screen in here, Don?  Do we have the

19   ability to transfer the document to a screen or can

20   you --

21          MR. ARBITBLIT:  You are asking the wrong guy.

22   I'm such a -- I suggest that --

23          MR. CHALOS:  I've asked for somebody to bring

24   up some copies of those documents.  So if you guys want

25   to talk about something else in the meantime, we can



```
 1    come back to that when we get the documents.
 2            MR. GIDEON:  He says he can't answer the
 3    question without looking at the document.
 4            MR. CHALOS:  Maybe we can ask a different
 5    question.
 6            THE WITNESS:  I have the document, so I can
 7    pull it up here.  Give me a second.  I'm not as quick.
 8            MR. GIDEON:  Q.  The first document is
 9    another email from Bruce Ota to Samia.  It says:
10    Below is the original email I sent to you.  The
11    consumer complaint number was made on 12/7/07 to the
12    New Orleans district office.  The collection report
13    states the expiration date for sample X number is
14    2/23/08.  The manufacturer -- the manufacturer is
15    New England Compounding Center, which they received
16    a compounding WL, warning letter, that the center
17    drafted and we sent.  Do we want to do anything.
18            That's -- what's the document number on that?
19            MS. WEETER:  This is NECC_FDA 06094.
20            MR. GIDEON:  Okay.
21            THE WITNESS:  Then it's 95, right?
22            MS. WEETER:  There's two.
23            MR. GIDEON:  Why don't you read him the next
24    one so he can hear that.
25            THE WITNESS:  Thanks.
```



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 300 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 299

```
 1            MS. WEETER:  The next email says --
 2            MR. GIDEON:  What's the date?
 3            MS. WEETER:  April 1st, 2008 from Bruce Ota to
 4   Samia Nasr.
 5            Samia, I just received the attached worksheet
 6   for sample 426119.  It appears the New Orleans office
 7   received a complaint from a Dr. blank -- it's
 8   redacted -- a pain specialist that treats fibromyalgia
 9   patients.
10            I believe this is the same information that's
11   on this previously discussed document that you have in
12   front of you that we just introduced.
13            THE WITNESS:  That's Bates number ending in 95?
14            MS. WEETER:  Yes, sir.  It's the same.  Oh,
15   that was 94, excuse me.
16            THE WITNESS:  And then 95?
17            MS. WEETER:  Here's 95.  95 is the same
18   information that you see on -- what was that last
19   exhibit that was marked, 1259?
20            MR. GIDEON:  You've got it.
21            THE WITNESS:  Ask then one more.
22            MS. WEETER:  It's the same email from Bruce Ota
23   that references it was a new drug being compounded.
24            THE WITNESS:  Could you pull up --
25            MS. WEETER:  And then below that is an email
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ  Document 2766-1  Filed 03/29/16  Page 301 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 300

```
 1   from Mutahar Shamsi on April 1st, 2008, to Bruce Ota
 2   that says:  Could you look at this please, it is from
 3   New England Compounding.  It was classified as an LC2.
 4              And that was his forwarding of the complaint
 5   from the New Orleans district office.
 6              MR. GIDEON:  Okay.
 7              THE WITNESS:  Could you do me a favor and pull
 8   up 05 --
 9              (Reporter clarification.)
10              THE WITNESS:  05989.
11              MS. WEETER:  05989.
12              THE WITNESS:  That's what I have.  To 992.
13              MR. GIDEON:  These are FDA documents?
14              THE WITNESS:  Yes.
15              MR. ARBITBLIT:  It's the NECC_FDA.
16              MR. GIDEON:  Okay.  If it's too long we can
17   spin it around and look at it.
18              MS. WEETER:  Almost there.
19              THE WITNESS:  I have this in a 74-page thing.
20   Do you know what page it is?  Part of a 74-page PDF.
21              MS. WEETER:  It's page 52 of 74.
22              THE WITNESS:  Let me pull it up.  At least I
23   know what page it was.  Fifty what?
24              MS. WEETER:  Fifty-two of 74.
25              MR. GIDEON:  With lots of redactions.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          MS. WEETER:  There are lots of redactions.

2          THE WITNESS:  So page 52.  Change -- looks like

3    I zoomed around.  Sorry.  So I can read it.

4          Yeah, so --

5          MR. GIDEON:  Q.  Are we there yet?

6       A.  There's a considerable amount of material about

7    this doctor that FDA is asking about.  I think FDA --

8    the doc apparently is still using this despite the

9    discoloration.  He's writing articles about this drug to

10   use it, I guess.

11      Q.  Now, remember what I wanted to know about was

12   if, as the FDA said, this appeared to be a new drug, did

13   the FDA have the responsibility to take some action?

14          MR. ARBITBLIT:  Object to the form.

15          THE WITNESS:  Hold on a second.

16          You can see that there's considerable

17   investigation here of this doctor.

18          MR. GIDEON:  Q.  That's not responsive.

19      A.  I understand.

20      Q.  And I object to it.  It's not responsive.

21      A.  Okay.

22      Q.  There's a pending question.  Did FDA have an

23   obligation to take some action if they thought, as Bruce

24   Ota communicated, that NECC was making a new drug and

25   selling it in interstate commerce?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 302

```
 1           MR. ARBITBLIT:  Object to form.

 2           MR. GIDEON:  Q.  Simple question.

 3           MR. ARBITBLIT:  Object to form.

 4           THE WITNESS:  Depends what a general counsel of

 5    the agency thought the law was.  And as you've seen,

 6    there is questions about that.

 7           MR. GIDEON:  Q.  Have you seen a single

 8    document where this issue on a product made in

 9    Massachusetts causing injury in New Orleans was ever

10    presented to the general counsel's office for

11    action?

12      A.  And that's what -- that's what I raised my

13    concern about.  You see that certainly --

14      Q.  Talking about April of 2008.

15      A.  Right.  But you see Ota in 2009, in February --

16    and again I'm not privy to exactly what the -- I mean,

17    all the FDA documents, right?  I'm sorry.  Let me just

18    get --

19      Q.  I don't see anything about general counsel in

20    2009.

21      A.  You certainly see general counsel's position in

22    2012.  That's what we have.

23      Q.  That's four years later, Doctor.

24      A.  I understand.  But as you -- I mean, as I've

25    testified before, you know after Ukese, after 2008, I
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ Document 2766-1 Filed 03/29/16 Page 304 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 303

1    mean, the agency was -- there was probably difference in

2    opinion within the agency.

3         Q.  Okay.  What's your view, as the expert on

4    regulation of drugs if, in fact, NECC was making a new

5    drug that they made in Massachusetts caused injury in

6    New Orleans, did the FDA have the responsibility to the

7    public to take some action?

8              MR. ARBITBLIT:  Object to form.  Assumes facts

9    not in evidence.

10             THE WITNESS:  If it was viewed as a compounding

11   pharmacy, FDA would only be allowed to do that by -- if

12   it found samples that were contaminated.  Then it would

13   be allowed to do that, right?

14             MR. GIDEON:  Q.  Did FDA find samples that

15   were contaminated?

16        A.  I don't -- certainly there was no

17   contamination.  In this particular instance, there was

18   decolorized vials.  But there was no evidence of

19   contamination that I have seen.  That's why -- if you

20   look at the record.

21        Q.  There was a report that there was particulate

22   matter in the vials; isn't that correct?

23        A.  Yes.

24        Q.  Okay.

25        A.  I -- but that's not contamination, necessarily.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.  The requirement not to sell adulterated product

2   in interstate commerce isn't just limited to something

3   that is contaminated with the biological origin, is it?

4    A.  It was basically decomposed, filthy, putrid,

5   because this was the old drug act.

6    Q.  Sure.

7    A.  And it may result in injury.  Just because

8   something is decolorized or particularized doesn't

9   mean -- it depends whether there was something that

10  could harm somebody in there.  Bottom line is there

11  something in there, is there growth.  That's what you

12  would specifically want, or other forms of

13  contamination.

14   Q.  So given the fact that that's that important,

15  if FDA received a report that there's been patient

16  injury from a product made by a compounder, first thing

17  they should do is secure the product and test it to see

18  if there is biological contamination within the vials?

19       MR. ARBITBLIT:  Objection.  I've already read

20  the record.  That's exactly what they did, Counsel.  So

21  it's misleading to keep questioning him about something

22  they did.

23       MR. GIDEON:  We need to establish some

24  standards.  We need to establish some standards from the

25  expert on what needs to be done under given



Case 1:13-md-02419-RWZ  Document 2766-1  Filed 03/29/16  Page 306 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 305

1    circumstances, not just rereading documents to us.

2    That's why I asked.

3            THE WITNESS:  If a doctor is making certain

4    complaints, you would go into that doctor's office and

5    you would look at the samples.  You would -- and you'd

6    interview the -- the -- you'd interview the doctor.

7            There was a sample collected, it was 426119,

8    and it was analyzed for endotoxin ID and potency.  And

9    the lab class 1, there was no -- I mean, I'm reading

10   this.  There was no bacterial endotoxins detected, as I

11   read this, in one to five subcomposites, and it meets

12   FDA requirement for assay -- assay and ID.

13           So you have FDA testing here for endotoxin.

14   And please note this product is 6 milligrams per mL of

15   betamethasone.  What -- and then they're talking about

16   what they're measuring.  And they're measuring.

17       Q.  Can you tell me what question you are

18   answering?

19       A.  You asked me what the standard is, and I said

20   it should be tested and, in fact, they tested the

21   sample.

22       Q.  I see.  Okay.

23           Well, isn't there also a requirement that you

24   get in and test soon enough so that the product doesn't

25   get beyond its beyond use date before you test it?



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 307 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 306

1    Surely you would agree with that?

2        A.  I'm not sure I understand your question.

3        Q.  Well, if you are going to test a product and

4    determine if it's contaminated, one of the things you

5    wish to do is test it before it reaches its product

6    expiration date; isn't that correct?

7            MR. ARBITBLIT:  Object to the form.

8            THE WITNESS:  What you would do -- let's see

9    where the sample was collected.

10           So it looks like this sample was -- I mean, if

11   I read this, and it's not exact, this sample is probably

12   one of the samples where the doctor was complaining

13   about, although this record is not clear, right?

14           So you -- what you would want to do is to focus

15   on the samples that were implicated by this doctor.  If

16   I say -- if this doctor is saying these samples are

17   causing harm, you would want to test the implicated

18   samples.  I'm not sure I understand your question.

19       Q.  But you want to test them promptly before they

20   expire, correct?

21       A.  Well, actually, you would probably -- you would

22   have greater growth if you let it sit for a while if

23   there was a problem.

24       Q.  Yeah.

25       A.  Right.  So you would even see more of a



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 308 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 307

1   problem.  So obviously, if someone is making a complaint

2   that patients were injured, you would want to go in and

3   test the sample.  And that's what it seems to have done.

4           Q.  Wouldn't you want to test the sample for fungi?

5           A.  Well, the --

6           Q.  Wouldn't you want to test the sample for fungi?

7           A.  I'd be happy to let the -- depends on what the

8   complaint was.

9           Q.  We know that.  We know what the complaint was.

10  Under the circumstance, given the complaint, wouldn't

11  you want to test for fungi?

12          A.  I'll let the infectious disease experts testify

13  exactly what they think it should be testified -- what

14  it should be tested for.

15          Q.  I'm talking about regulatory oversight.

16  Wouldn't adequate regulatory oversight require testing

17  not just for a bacterial contamination, but also fungi

18  and viral contamination?

19          A.  You certainly don't test for fungi all the

20  time.  It depends on what samples you have from the

21  patient.  So if you have positive cultures out of the

22  patient that are fungi, then you would look for fungi,

23  right?  But infectious disease people can go through

24  that, I think.

25          Q.  But not you?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 309 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 308

1        A.  I'd be happy to discuss it if you want.

2        Q.  Do you claim expertise in determining what

3    kinds of tests must be run on product that has been

4    seized for the purposes of determining if it's

5    contaminated?

6        A.  Yeah, I'd be happy to testify if you'd like.

7    It depends on the context of the complaint.  So if you

8    see certain symptoms and you have certain cultures from

9    patients, you want to be able to direct it, I mean,

10   toward what the clinical symptoms.  If the clinical

11   symptoms are consistent with the fungal disorder, or if

12   you have cultures, then you would certainly want to test

13   for fungal.

14       Q.  Okay.  Now, look at the next entry, May of

15   2008.

16       A.  Will you give me the underlying documents on

17   this one too, please.

18       Q.  I'm going to ask the question.

19       A.  Okay.  But if you are --

20       Q.  I'm going to ask you the questions.

21       A.  Okay.

22       Q.  The Ohio Board of Pharmacy reaches out to FDA

23   again, this time regarding lidocaine injections stating,

24   quote:  Before the board issues a cease and desist to

25   the Ameridose telling them to stop shipping manufactured



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 310 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 309

1    products into Ohio under the guise of compounding.  I

2    wonder if you would verify for me whether or not this is

3    a legitimately manufactured product that is made by an

4    FDA-approved manufacturer, end quote.

5           In the event that an -- that a state Board of

6    Pharmacy inquired of the FDA whether a company was FDA

7    registered or not, didn't the compliance policy guide

8    require an answer to that question?

9       A.   The --

10          MR. CHALOS:  Object to form.

11          THE WITNESS:  I believe the compliance policy

12   guide talked about encouraging cooperation.  And --

13          MR. GIDEON:  Q.  Wasn't an answer required?

14      A.   Required?

15          MR. CHALOS:  Object to the form.

16          THE WITNESS:  That's not what the policy -- it

17   said encourages -- I mean, obviously if you asked me a

18   question, I mean, if you are a state, you would expect,

19   out of decent courtesy, to get an answer from that.

20          I don't have -- do you have the record of this,

21   please?  Do you have the underlying documents on this?

22          MR. GIDEON:  Q.  Whether we do or we don't,

23   we're not going spend the time on it.  I want to

24   know whether or not the FDA had a responsibility to

25   answer that question from the Ohio Board of



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 311 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 310

```
 1    Pharmacy.  Should be a simple answer.
 2              MR. CHALOS:  Object to form.
 3              THE WITNESS:  I'm not aware of a legal
 4    responsibility.  As a matter of common courtesy, I would
 5    obviously expect that somebody should get back to them.
 6    Again, depending on the issue, right?
 7              I mean, if there is a product quality or safety
 8    issue, that takes priority.  I don't know what happened
 9    here.  I don't have the record.
10              MR. GIDEON:  Q.  Well, we'll give you the
11    next document which is FDA 426077 and 78, which
12    pertains to June 27th, 2008.
13              (Whereupon, Exhibit 1260 was marked for
14              identification.)
15              MR. GIDEON:  You can read the exhibit number
16    into the record.
17              THE REPORTER:  What's the exhibit number?
18              MR. GIDEON:  Q.  The exhibit number,
19    Dr. Kessler, on the front?
20         A.  1260.
21         Q.  1260?
22         A.  Yes.  I'm just going to put on the record, this
23    is clearly deliberative process.  And it talks about
24    OCC, so it's clearly deliberative process when I was not
25    there, so I would ask you to be cautious.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.  Don't worry about me.  I'll take the risks

2  associated with asking the question based on a document

3  that's been turned over to us by the FDA itself.

4    A.  I respect that, sir, but you understand this is

5  clearly deliberative process.

6    Q.  No, I don't.  I don't.  I don't agree with you,

7  and I'm going to ask you the question.  Tell me --

8    A.  Let me read the document -- let me read the

9  whole thing.

10       Yes, sir.

11   Q.  Okay.  You'll see that the Ota email is dated

12  June 27th, 2008.

13   A.  I do.

14   Q.  And you will also see that the text of the Ota

15  email establishes that there was a warning letter to

16  NECC on December 4, 2006, and that NECC responded

17  January 5th, 2007, correct?

18   A.  Yes.

19   Q.  Now, was it acceptable at the FDA not to

20  respond to a reply to a warning letter for over a year

21  and a half?  Was that acceptable?

22       MR. ARBITBLIT:  Object to form.

23       MR. CHALOS:  Object to form.

24       THE WITNESS:  Depends the basis for not

25  replying.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ  Document 2766-1  Filed 03/29/16  Page 313 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 312

1              MR. GIDEON:  Q.  What was the basis for not

2      responding to the NECC reply of January 5th until at

3      least a year and a half later, sometime after June

4      27th of 2008?

5              A.  I can speculate if you would like.

6              Q.  Do you know?

7              A.  No.

8              Q.  Okay.  Now, was it the policy of the FDA that

9      when a company received a warning letter and replied,

10     that FDA would not inspect that company again until the

11     FDA had provided a written response to the reply?

12             A.  I'm not sure I'm aware of a formal policy like

13     that.

14             Q.  Was it a -- was it a regulation that provided

15     that a company that had received a warning letter could

16     simply eliminate prospective inspections by filing a

17     reply, and if FDA didn't respond to the reply, they were

18     free of any inspections from that point forward?

19             A.  No.  I don't think that would be accurate at

20     all.

21             Q.  That's what happened here, though, isn't it?

22             MR. ARBITBLIT:  Object to form.

23             THE WITNESS:  No, I don't think that's what the

24     record shows.  I think what you see is that there's a

25     legal tussle that is going on on the jurisdiction of



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 314 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 313

 1    FDA.

 2            In fact, if you look at much of the warning

 3    letter, it really is a -- FDA's letter talks about their

 4    legal authority.  Talks about -- I mean, it's really not

 5    relevant to this case.  It was about Trypan Blue, there

 6    was some Avastin issues, right?

 7            But so FDA is setting out its legal position.

 8    NECC has its lawyers come back and say FDA, you're

 9    wrong.  It cites Gonzalez in there and says you don't

10    have jurisdiction.  We're a compounder.  So what is -- I

11    mean, anybody who looks at this, you actually have --

12    again, I can't be exactly sure -- her response was in

13    office of chief counsel.

14            So if you want to know what was going on,

15    right, you are going to have to get into the

16    deliberative process of the FDA, and that's why I'm

17    asking you to be cautious here.

18        Q.  I've heard that.  You heard my response to that

19    as well.

20            Do you recall any time, during your tenure at

21    the FDA, where a company was able to forestall

22    prospective inspections simply because FDA had never

23    responded to the company's reply to a warning letter?

24        A.  I'm just trying to think.

25            I don't know of an analogous situation.



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 315 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 314

```
 1       Q.  All right.
 2       A.  And I'm not sure I agree with you on your
 3   premise of your question, right, of the company was able
 4   to forestall.  That was your conclusion of the facts and
 5   your interpretation.  I'm not agreeing with it.
 6       Q.  Well, let's see if it's me versus the FDA.
 7   Pull out FDA 427667, please.
 8            THE WITNESS:  How much time is left?
 9            MR. GIDEON:  Five hours and 47 minutes.
10            THE WITNESS:  Thank you.
11            MR. ARBITBLIT:  Thirteen minutes left.
12            MS. WEETER:  Which one did you say, C.J.?
13            MR. GIDEON:  FDA --
14            MS. WEETER:  427667?
15            MR. GIDEON:  -- 427667.  It's October 2, 2008.
16   Make that the next exhibit.
17            (Whereupon, Exhibit 1261 was marked for
18            identification.)
19            MR. CHALOS:  Is this three pages or three
20   copies?
21            MS. WEETER:  Three copies.
22            MR. GIDEON:  Q.  You'll see an email
23   from -- do you know, is it Mutahar Shamsi, am I
24   pronouncing that correctly?  Do you know the
25   individual in question?
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 316 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 315

1      A.  I don't believe so.

2      Q.  Well, I'm doing the best I can as far as the

3  pronunciation.  I think it is Mutahar Shamsi, to Bruce

4  Ota.  At the top, it's dated October 2nd, 2008.

5      A.  Yes.

6      Q.  And in the second sentence it says:  Regina and

7  I were insistent that some sort of letter has to go out

8  before we reinspect.

9          Do you know of any basis for that in an

10 operating standard, informal policy and procedure,

11 statute or regulation that says you can't go back and

12 look again unless you've responded to a reply to a

13 warning letter?

14     A.  This was not the typical -- so the answer is

15 no.  But this was not the typical warning letter and

16 response.  This was a legal dispute, I mean,

17 regrettably, between FDA and lawyers for NECC and saying

18 you don't have jurisdiction, FDA.

19          If I were in the field, I could certainly say

20 to headquarters, only be logical, please resolve this.

21 I'm not walking in there to be told that they don't have

22 jurisdiction again.  Do we have jurisdiction or do we

23 not have jurisdiction.

24          So obviously, I mean, I could be sympathetic --

25 again, I don't know exactly who's who here.  But I



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  wouldn't want to walk into a firm where there's a legal

2  dispute if I were an FDA investigator.  That's not fair

3  to the FDA investigator until they knew whether the

4  office of the chief counsel was going to support them.

5          And again, I think we are very close to

6  deliberative process here.

7      Q.  Now, in October of the same year, pulling

8  FDA 426106 to 107, the same month as this statement that

9  they're not going to go back until there is a reply to

10  the response?

11      A.  That's not what this says.  You

12  mischaracterized that.  It says:  CDER is going to try

13  to set up a conference call with Kevin Fanin and others

14  at the office of the chief counsel next week to try and

15  resolve this.

16          Somebody wants -- I mean, Regina and I were

17  insistent that some sort of letter has to go out before

18  we reinspect.  They're trying to resolve this with their

19  colleagues.

20          (Whereupon, Exhibit 1262 was marked for

21          identification.)

22          MR. GIDEON:  Q.  The same month we have the

23  underlying documents that reflect an outbreak of

24  klebsiella pneumonia on multiple patients in this

25  email that is FDA 426106 to 107 in the city of



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 318 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 317

```
 1   New York.  Correct?
 2            At least 5 and up to 17 individuals exposed to
 3   klebsiella pneumonia.  Three hospitalized, two with
 4   positive blood cultures, nine have been interviewed
 5   without symptoms.  Symptoms -- or the exposure occurred
 6   between October 13th and 14th.  The patients received an
 7   intravenous version of the drug triamcinolone, brand
 8   name Kenalog, made by NECC.
 9        A.  Could you kindly pull NECC_FDA 08550, and then
10   zero -- 03476 on October 28th?  What's the date of
11   these?
12            If you can give me the October 28th documents.
13   Go ask your question, but let's pull those documents.
14   Ask your question.
15            MS. WEETER:  What was the first number you
16   said?
17            THE WITNESS:  NECC_FDA 08550.  Then I think it
18   is 03476, but I could be wrong.  But you should have it.
19   One is an October 30th document, and one is an October
20   28th document.
21            But go ahead, ask your question.
22            MR. GIDEON:  Q.  Well, doesn't this
23   document establish that there was a product made by
24   NECC that was used on multiple patients?  Question.
25        A.  That's correct.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 319 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 318

1     Q.  Yeah.

2     A.  But that's not -- I mean, but please do the

3   full record here.  I believe FDA went to the pain clinic

4   and decided the pain clinic -- let's find the documents,

5   but let me have them in front of me.

6         I believe FDA went and inspected the pain

7   clinic and found the pain clinic did not have proper

8   infectious control practices and the problem was at the

9   pain clinic.  But please pull those documents so we can

10  have those on the record.

11    Q.  Isn't this correct, though, you had a number of

12  people sick, FDA knew that there was product being made

13  and sold by NECC without patient-specific prescriptions,

14  as confirmed by the documents that are right in front of

15  you.

16    A.  So, again --

17    Q.  Simple question.  Is that true or not?

18    A.  So let's just -- so just give me the line.  I

19  haven't read this.  Tell me where it says that.  I'm

20  sure you are right, but just give me the line where it

21  says that.

22    Q.  Well, bullet point one:  At least five and

23  possibly up to 17 individuals exposed to klebsiella

24  pneumonia.

25    A.  Yes.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q.   Bullet point four, it was made by NECC.

2  Triamcinolone, also known as Kenalog.

3      A.   Right.

4      Q.   Correct?

5      A.   Again, I think there's some question about the

6  NECC product in the subsequent documents, but I'm not

7  going to -- you know, I need those documents in front of

8  me before testifying.

9      Q.   Doesn't establish that there were not

10 patient-specific prescriptions --

11     A.   Show me where --

12     Q.   -- covering --

13     A.   -- says that --

14     Q.   -- the product used on multiple patients?

15         MR. CHALOS:  Object to form.

16         THE WITNESS:  I'm sorry.  Show me where it says

17 that, please.

18         MR. GIDEON:  Q.  The bottom of the first

19 page.

20     A.   The triamcinolone was provided in a 10

21 multi-vial -- right?  The envelope had on it a

22 prescription --

23     Q.   No, no, no.  Don't skip it.  Read it very

24 carefully.  The envelope reportedly had on it --

25     A.   Reportedly had on it --



```
 1              (Reporter requests one speaker at a time.)
 2              MR. GIDEON:  I'll read it.  Quote:  The
 3      envelope reportedly had on it a "prescription" for a
 4      single patient being seen at the clinic.
 5              The clinic drew multiple doses from this
 6      single-patient-specific-vial and used this for several
 7      patients.
 8              Doesn't that establish there were not
 9      patient-specific prescriptions for each administration
10      of the NECC product?
11          A.  This certainly seems to be exactly what it
12      says.  It seems to be -- there was a vial with a
13      prescription, okay, I mean, on it, for one patient.  And
14      it looks like somebody reused this for multiple
15      patients.
16              And to be honest with you, I think you have
17      your answer on the klebsiella.  Because why is somebody
18      using a single unit for multiple patients.  So somebody
19      at the pain clinic obviously doesn't know basic
20      infection control, but let's take a look those
21      documents.
22          Q.  Well, the vial doesn't have a prescription on
23      it.  The vial doesn't say anything about being for a
24      specific patient.
25          A.  The envelope did.
```



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 321

```
 1        Q.  The envelope reportedly had on it a
 2   prescription.
 3        A.  It says exactly what it says.
 4        Q.  Correct.  Which is why I asked the question.
 5   Doesn't this make it clear, didn't FDA know that NECC
 6   was selling product that was not being used for specific
 7   patients?
 8             MR. CHALOS:  Object to the --
 9             MR. GIDEON:  Q.  And not being subject to
10   patient-specific prescriptions?
11             MR. CHALOS:  Object to the form.  Misstates the
12   document.
13             MR. GIDEON:  Argumentative.
14             Go ahead.
15             THE WITNESS:  This --
16             MR. CHALOS:  Object to the commentary.
17             THE WITNESS:  And can I see my documents that I
18   requested, please, if you can help me?
19             MS. WEETER:  They're on my computer.  I can
20   read them.  Do we need to read those or do we want to
21   move on?
22             MR. GIDEON:  Q.  I'm going to give
23   Dr. Kessler the opportunity to explain why you need
24   the documents.  And if you can tell us why we should
25   spend time on it we'll do it for you.  But just to
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    request the documents to talk about them isn't

2    really pertinent.

3         A.   So you don't -- you're not asking -- you didn't

4    ask what -- whether FDA acted appropriately on this?

5         Q.   No.  I've already asked you some questions --

6         A.   And I --

7         Q.   I'm certain you're going to say that FDA acted

8    in the highest standards of regulatory oversight.  I

9    expect that.

10             MR. CHALOS:  Objection.  Argumentative.

11             MR. ARBITBLIT:  For completeness, I'll read

12   from the document that the witness referred to, which is

13   an October 30, 2000 email from Robert Durkin to Samia

14   Nasr saying:  It seems it was lack of aseptic technique

15   at the clinic level with subsequent contamination of the

16   Visipaque --

17             (Reporter clarification.)

18             MR. ARBITBLIT:  -- Visipaque -- capital

19   V-I-S-I-P-A-Q-U-E -- manufactured by GE Healthcare, end

20   of quote.

21             And the page number of that -- and that's

22   responding to a question from Nasr to Durkin on the same

23   date.  And the question is, quote:  It looks like they

24   ruled out that the problem was from NECC, triple

25   question mark, end of quote.



```
 1              So your attempts are --
 2              MR. GIDEON:  Q.  We'll make that the next
 3   exhibit.  Does that reflect --
 4              MR. ARBITBLIT:  Hold on.
 5              MR. GIDEON:  -- the presence --
 6              MR. ARBITBLIT:  I'll read the number so you can
 7   find it.  It's NECC_FDA 08550, which is part of an
 8   11-page document.
 9              MR. GIDEON:  Q.  Does that reflect the
10   presence of testing on the vial?
11      A.  I have to see the -- you have to give me the
12   document.
13      Q.  Does it reflect testing on the vial?
14      A.  Sounds like it's not an NECC product.
15              MS. WEETER:  It is an NECC --
16              THE WITNESS:  What?
17              MS. WEETER:  They received an NECC product.
18              THE WITNESS:  I'm sorry?
19              MR. GIDEON:  Q.  Does it reflect testing on
20   the vial?
21              THE WITNESS:  Could someone print that?
22              MR. ARBITBLIT:  Object to form.  What vial?
23              MR. GIDEON:  The vial that we've spent five
24   minutes talking about.  The multi-use vial with
25   triamcinolone in it made by NECC.
```



```
 1              I'm just asking --
 2              THE WITNESS:  Can I see that document?
 3              MR. CHALOS:  It's on the screen.
 4              MR. GIDEON:  I'm just asking, Kaycee, does it
 5    reflect testing on the vial?
 6              MS. WEETER:  It looks like they requested
 7    samples or reports from the New York NYC DHMH, and
 8    there's no evidence in here that they had results from
 9    those --
10              MR. GIDEON:  Hmm.
11              MS. WEETER:  -- samples that were --
12              THE WITNESS:  It does say these have been sent
13    to the department's labs.
14              MR. GIDEON:  Q.  Is there anything in there
15    reflecting that what you told me earlier should
16    occur, which is, you go ahead and you look at this
17    material, you get the laboratory data and determine
18    what's in the product to see if it relates to the
19    illness of the patient?  Do you find any reflection
20    of testing of the vial?
21         A.  Yes.  You see it says here, these have been
22    sent to the department's labs.
23         Q.  What's the result?
24         A.  I'm sorry, you have to give me the record if
25    you want me --
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 326 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                 Page 325

1      Q.  Well, I suspected, since you asked for the

2  documents earlier, you would have looked yourself to see

3  if the vial was tested.

4      A.  Hold on one second.

5      Q.  And that's the pending question:  Was the vial

6  tested to see if it was contaminated?

7      A.  Let me just read this.

8          MR. ARBITBLIT:  Counsel, I think we're at the

9  end of seven hours.  In the spirit of cooperation, if

10  the witness is willing, we'd like you to have an

11  additional 15 minutes.  You probably aren't going to

12  think that's sufficient, I'm guessing, because we never

13  seem to agree on that.  But that's what we're offering.

14  If you would like to continue with the questioning for

15  an additional 15 minutes, we're willing to stay for

16  that.

17          MR. GIDEON:  Well, I'm happy to take the

18  additional 15 minutes, but it won't be sufficient to

19  complete what I intend to do today.  So if -- I'll take

20  the 15, but not with the agreement that that's it.

21          MR. ARBITBLIT:  I wasn't asking for your

22  agreement.  I wasn't expecting it.

23          MR. GIDEON:  What I want to understand is can I

24  go ahead and take the extra 15, then seek permission

25  from the magistrate to complete this deposition, or is



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 327 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 326

1   the 15 a "if you take this you have agreed that that's
2   it"?
3           MR. ARBITBLIT:  No, I was not suggesting 15
4   minutes and you are forever barred.  You can seek what
5   you want and we'll oppose it, and we think we're being
6   reasonable.
7           MR. GIDEON:  I appreciate the 15 minutes.  Very
8   gracious.
9           MR. CHALOS:  Would 30 minutes obviate your
10  concern?
11          MR. GIDEON:  No.  I think Dr. Kessler's lack of
12  response to literally every question today has made it
13  such that I've really had just a couple hours to
14  actually ask him questions.  It has been a long time
15  since I've seen a witness this unresponsive, so I will
16  be seeking additional time.  And we'll use examples from
17  today's deposition to attempt to convince the judge to
18  let us have that time.
19          MR. ARBITBLIT:  I expect that you will.  And
20  we'll probably use examples of your improper questioning
21  in response.
22          MR. GIDEON:  Sure.  Well, I don't know what
23  we're doing right now.  He's looking at something, I
24  don't know why, I don't know what he intends to do.
25          THE WITNESS:  You have a question pending, sir.


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1            MR. GIDEON:  Q.  Well, I asked you did they

2     ever test the vials, which you told us was the gold

3     standard for a response by the regulator.

4            MR. CHALOS:  Object to the form.

5            MR. ARBITBLIT:  Object to form.

6            MR. GIDEON:  Q.  What is the answer to that

7     question?

8        A.  Yes, this was tested.  I'm just trying -- this

9     was tested and I'm just trying to understand.

10       Q.  What were the results, then?

11       A.  I don't have the results in this document, but

12    this was sent for testing.

13       Q.  I know --

14       A.  And it was concluded that there were improper

15    infection control practices at the clinic.

16       Q.  Okay.

17            MR. ARBITBLIT:  May I have the computer back

18    now?

19            THE WITNESS:  Thank you.

20            MR. GIDEON:  Q.  Now, take a look at the

21    exhibit that reflects the materials produced by FDA.

22    The larger document that has the time line, the

23    chronology that's typed.

24       A.  Yes, sir.

25       Q.  Can you give me the exhibit number on that



```
1   again, please

2        A.   424316.

3        Q.   No, no, no.  The exhibit number.  Remember,

4   it's on the back of the first page.

5        A.   Sure.  1258.  1258.

6        Q.   Okay.  If you will look at the next page,

7   September of 2009, your former employer receives

8   complaints about NECC mass producing and distributing

9   sodium tetradecyl sulfate and erythromycin ointment

10  without patient-specific prescriptions.

11            There is no record that FDA did a thing about

12  that in response?

13       A.   Could you show me those complaints.

14            MS. WEETER:  This is based on the document that

15  was produced by the FDA.  I'm not --

16            MR. GIDEON:  Q.  They didn't identify what

17  the basis for this was.

18       A.   I'm not sure this document was produced by FDA.

19       Q.   It was produced --

20            MS. WEETER:  It's Bates stamped by the FDA.

21            THE WITNESS:  It was produced by FDA, but I'm

22  not sure it was prepared by the FDA.

23            I have no record of what this is.  And if you

24  want to give me what this is, happy to look at it.

25            MR. GIDEON:  Q.  I'm going to ask you
```



```
 1   questions about what should have happened, given

 2   your expertise in regulation.

 3              With this background with NECC, if FDA received

 4   complaints about NECC mass producing and distributing

 5   sodium tetradecyl sulfate and erythromycin ointment

 6   without patient-specific prescriptions, what should FDA

 7   have done?

 8              MR. CHALOS:  Object to the form.  Incomplete

 9   hypothetical.

10              THE WITNESS:  You are asking my personal

11   opinion?

12              MR. GIDEON:  Q.  No, no.  I'm asking you as

13   the expert that you say you are in regulation of

14   pharmaceuticals and as a person who has worked as a

15   regulator.  I don't want just an off-the-cuff

16   personal opinion, I want the opinion you think you

17   are qualified to offer as an expert.

18              MR. CHALOS:  Let me interpose an objection.

19   I'm not sure it relates to his opinions he's given in

20   this case.  Is there something specific in his report

21   that you are tying this to?  Otherwise this is just

22   asking him on the fly to create a new opinion based on a

23   sentence that has no backup with any document.  So I

24   object to the questioning here.

25              MR. GIDEON:  Q.  Go ahead.
```



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 331 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 330

```
 1        A.  So --

 2        Q.  No, no.  Here's the question.

 3        A.  Okay.

 4        Q.  With that data, FDA, with this background,

 5   receives complaints that NECC is mass producing and

 6   distributing sodium tetradecyl sulfate and erythromycin

 7   ointment without patient-specific prescriptions.  As an

 8   expert in regulatory oversight, what should FDA have

 9   done?

10            MR. CHALOS:  Same objection and incomplete

11   hypothetical.

12            THE WITNESS:  I can tell you what I wish FDA

13   had done.

14            MR. GIDEON:  Q.  I want to know what they

15   had a responsibility to do.

16            MR. CHALOS:  Same objections.

17            THE WITNESS:  In 2009, it's not clear that FDA

18   had any responsibilities except other than when you're

19   dealing with contaminated substances.  The law was

20   unclear.  FDA acted each and every time when there was

21   evidence of contamination.

22            The regulatory and legal status of NECC was

23   being fought back and forth by lawyers.  Some in the

24   pharmacy industry saw, as you saw in those articles,

25   that FDA was very aggressive and too aggressive in light
```



1    of what they viewed the law was, right?

2           So I mean, if there was harm, if there was

3    samples that were positive, FDA should have acted.  I

4    would have -- I certainly would have wished that FDA had

5    gone in and exposed this scheme about false

6    prescriptions.  That's what I wish.  But you can't -- I

7    don't think anybody could say credibly, with the varying

8    law and the confusion at that time, right, with the --

9    in the absence of public health evidence, regrettably,

10   that was the standard of the filthy, putrid -- that was

11   what FDA really had available to it.  And that's what

12   FDA should use.

13          Public health, should act.  Just on patient

14   prescriptions, there's a fight.  There's a fight on what

15   the interpretation of the law is.  I wished FDA had

16   closed down this whole scheme that was going on, NECC,

17   later on STOPNC, anyone else.

18       Q.  Who were they scheming with in 2009?  "They,"

19   being NECC.

20       A.  You have to give me the documents for 2009.

21   I've asked for them, right?  So there was scheming going

22   on.  There was this scam going on, and it certainly went

23   on with your client too, right?  And I wish FDA and the

24   state boards had closed that down.

25       Q.  Was FDA scheming, too, to look the other way



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 333 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 332

1    when told product was being shipped without patient

2    specific -- let me finish.  Was FDA scheming with NECC,

3    looking the other way when told that there were no

4    patient-specific prescriptions, but they looked the

5    other way as part of a scheme?

6              MR. CHALOS:  Object to the form.

7              THE WITNESS:  No.  No.  FDA -- Congress took

8    away FDA's authority in 1997 of the new drug provisions.

9    The industry sued FDA, I mean, at least three times, if

10   not more.  Every time FDA acted, right, it was met with

11   a barrage.

12             To criticize FDA, right, I mean, if you -- you

13   know, it's -- only in this country can you take away

14   FDA's authority and then go where was FDA when somebody

15   gets hurt.  That doesn't make sense, sir.  Right?

16             I mean, there were responsibilities, right, to

17   have prescriptions.  Your client had their

18   responsibility, NECC had that responsibility, right, and

19   had that happened, we wouldn't be -- been people

20   following that, we wouldn't be sitting here.  There was

21   a scam.  FDA's authority was taken away in 1997.

22        Q.  So from and after 1997, the FDA was impotent by

23   virtue of law to take any action to protect the public

24   from compounders?

25        A.  That's not what I said.



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 334 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                  Page 333

1      MR. ARBITBLIT:  Misleading.  Mischaracterizes.

2  Argumentative.

3      THE WITNESS:  I was very clear that if there

4  were contaminated samples that FDA had, right, under

5  501, right, FDA could act.  That was clear.  And FDA did

6  that each and every time.  The issue of shipment and

7  interstate commerce of compounded drugs, right, that,

8  there were great legal battles going on, right?

9      MR. GIDEON:  Q.  So from 1997 forward,

10 instead of the FDA, if the state Board of Pharmacy

11 or state Department of Health did not enforce the

12 patient-specific prescription requirement, then it

13 was up to the purchasers to do so, but not the FDA?

14     A.  You --

15     MR. CHALOS:  Object to the form.

16     THE WITNESS:  You certainly have -- I mean, in

17 the record I think I have it somewhere I could pull it.

18 I know time is short.  You have certain clinics

19 complaining to their state boards about this, where they

20 would not engage in this kind of conduct.  So you do see

21 the reporting by clinics in the same position as STOPNC

22 and saying we shouldn't do this and complain to their --

23 to their boards.

24     MR. GIDEON:  Q.  Do you recall being

25 provided with a copy of a complaint that came out of



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 335 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 334

1  Nashville by Clint Ebel (phonetic) against NECC?

2       A.  I have to double-check, sir.

3       Q.  Does that ring a bell?  Were you provided with

4  a copy of the Ebel deposition?  Look and see if that's

5  something you got.

6       A.  Let me see if I got it -- I looked at it.

7            Yes, I do have the Ebel deposition.  I'm not

8  sure how much time I spent with it.  Give me the

9  exhibit.

10       Q.  I'm going to give it to you in just a second.

11       A.  Thanks.

12            MR. ARBITBLIT:  Counsel, I think this will be

13  the last document we have time for pursuant to the

14  agreement.

15            MR. GIDEON:  Exhibit No. 25.

16            THE WITNESS:  I have different exhibit numbers.

17            MR. GIDEON:  No, no.  It's our internal list so

18  we can pull these materials.

19            THE WITNESS:  I'm sorry.

20            MR. ARBITBLIT:  While she's pulling that, just

21  to save time I want to -- one more completeness item

22  which is from NECC_FDA 02655 and 2656, which is a

23  correspondence between FDA's Robert Kang and Samia Nasr

24  referring to the klebsiella infections issue which

25  states, quote:  The evidence points to problems with



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 336 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 335

1    infection control procedures at the clinic.  The

2    New York lab is growing klebsiella from an open vial of

3    contrast that they got from the facility.  And attaches

4    at the second page of the document a reference from

5    Marcell Layton (phonetic), M.D., Assistant Commissioner

6    Bureau of Communicable Disease for the New York City

7    Department of Health stating Argen (phonetic), our lab

8    just notified us that the bottle of iodixanol,

9    I-O-D-I-X-A-N-O-L, (was an open bottle used on about 15

10   patients) is growing a klebsiella, K-L-E-B-S-I-E-L-L-A.

11   We wanted to notify you, and through you, appropriate

12   folks at FDA, end of quote.

13          MR. GIDEON:  Q.  Before we handed you this

14   document, were you aware of the fact that in June of

15   2008, Clint Pharmaceuticals based in Old Hickory,

16   Tennessee, which is part of the Middle Tennessee,

17   complained directly to the FDA about product being

18   made by NECC and being sold in that market?

19          A.  I don't believe I -- I have no recollection of

20   this.  But obviously I have it.  I mean, but I did not

21   spend a lot of time with the Ebel deposition.

22          Q.  Okay.  What did accepted standards require of

23   the FDA when you have a company like Clint

24   Pharmaceuticals complaining about NECC marketing product

25   without patient-specific prescriptions and not in



```
 1   limited volume?

 2              (Whereupon, Exhibit 1263 was marked for

 3              identification.)

 4              MR. ARBITBLIT:  Object to form.

 5              MR. CHALOS:  Object to the form.

 6              MR. ARBITBLIT:  And we'll call that the last

 7   question for today.

 8              THE WITNESS:  Show me where you are referring

 9   to, sir.

10              MR. GIDEON:  Q.  No, just answer the

11   question since it is the last one.

12        A.  Let me read the documents.

13        Q.  What did the standards require of the FDA when

14   you have a member of the public, informed member,

15   complaining about NECC's conduct in their business

16   market --

17              MR. CHALOS:  Object to the form -- I'm sorry.

18              MR. GIDEON:  Q.  -- June 17th, 2008, what

19   was expected of the FDA under these circumstances?

20   Reasonably expected of the FDA under those

21   circumstances?

22              MR. CHALOS:  Object to the form.  Misstates the

23   document.  Misstates the facts.

24              THE WITNESS:  Let me take a look at it.  Could

25   you point to me -- I'm looking at this document.  Just
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    show me the NECC part.

2            MR. GIDEON:  Q.  Down at the bottom.

3        A.  Which one?

4        Q.  It's on the memorandum.  See the memorandum

5    section?

6        A.  The second page?  Yeah?

7        Q.  It's actually the third.

8        A.  Third page.  So -- because he's complaining

9    about a number of different compounds.

10       Q.  Yes.

11       A.  Is that correct?

12       Q.  Yeah.  But he's complaining about the -- he is

13   complaining about NECC, as you can see at the bottom.

14       A.  Let me just see.  So this is on the June 18th?

15   Is that the paragraph that I should be reading?

16       Q.  June 17th, 2008.  At the bottom it says three

17   additional vials.

18       A.  I'm on the same page.  Give me the Bates

19   number.

20           MR. CHALOS:  That's the right page.

21           MR. GIDEON:  Q.  434734.

22       A.  On June 18th.

23       Q.  Yeah.

24       A.  On June 18th I contacted --

25       Q.  It says at the bottom, to answer your



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 338

```
 1   question --
 2        A.  Thank you.
 3        Q.  -- three additional vials were received from
 4   the gentleman, which were three sizes of betamethasone
 5   manufactured by New England Compounding Company.
 6            MR. CHALOS:  I think what he's saying is the
 7   first part of that paragraph says on June 18th.
 8            MR. GIDEON:  Q.  Yes.  Yeah, that's right.
 9        A.  Okay.  I'm sorry.
10            If I'm reading this correctly, correct me if
11   I'm wrong, he's defining the compounding is going on,
12   right, of betamethasone, correct?  That's the way I read
13   this, sir.  He's saying here's three examples of
14   compounding.  You asked me what the standard was?
15        Q.  What response was reasonably to be expected
16   from the FDA with this complaint from Clint
17   Pharmaceuticals?
18        A.  Well, again --
19            MR. CHALOS:  Object to the form.
20            THE WITNESS:  -- you have multiple -- multiple
21   complaints about multiple compounders.  And again, what
22   is responsible is if there was a public health hazard
23   for contaminated product after -- you know, the law
24   allowed these guys to compound, right?  There was great
25   debate on what that -- how that would be defined.
```



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 340 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 339

1          FDA, at this point, had its authority stripped,

2    and the circuits added confusion.  And FDA has a

3    responsibility if there was -- somebody was being

4    harmed -- for example, like the klebsiella example, that

5    ended up not being an NECC product, I mean, apparently,

6    that was infected, according to the document that was

7    just read.  So if there's a New England Compounding

8    product that's contaminated -- that contamination is

9    causing injury, FDA certainly should have been in there.

10          Regrettably, okay, when that evidence of

11   contamination occurred, because that was the authority

12   that was left by Congress, when that authority -- when

13   that was found, a lot of people were already hurt.

14          MR. ARBITBLIT:  And with that, we are going to

15   close for the day.  I would just like --

16          THE WITNESS:  I have two -- I have one or two

17   things just to -- I'd like to just put on the record.

18          MR. ARBITBLIT:  Go ahead.

19          THE WITNESS:  So I just want to clarify one

20   issue.  You asked me about my list that I've testified,

21   remember the cases I've testified and Lieff Cabraser,

22   their involvement, and we did all the cases that I

23   testified.

24          But then when you got to the bottom, I think I

25   identified those appropriately, there may be one of


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  those cases in DePuy, that declaration, I'd have to

2  check my memory that Lieff Cabraser was involved in.

3  And just -- so I just wanted to add that for the record.

4           And I also just want to add for the record,

5  just so it's clear, that nothing that -- in my

6  conversation with that senior FDA official that I did

7  not name, I did not in any way rely on that person for

8  any of my opinions.

9           MR. ARBITBLIT:  Thank you, Doctor.

10           We would request the rough draft as soon as

11  possible.  I don't know what the procedure has been for

12  expediting or not expediting.  Not expediting.  Okay.

13           MR. GIDEON:  Well, she said she can get it done

14  by --

15           MS. MARTINEZ:  We wanted it expedited.

16           MR. GIDEON:  Didn't you say you could get it

17  done by Tuesday?  That should be satisfactory.

18           MR. CHALOS:  Well, we need a rough to send to

19  the government.

20           MR. ARBITBLIT:  If you're willing to wait for

21  the final to go to David Glass for his one-day 24-hour

22  review, then we'll wait for the final on Tuesday.

23           MR. GIDEON:  Are you still running the video?

24           THE VIDEOGRAPHER:  Uh-huh.

25           MR. GIDEON:  We can go off the video and do



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 342 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 341

1    this on the transcript.  Is that all right with you?

2                MR. ARBITBLIT:  That's fine

3                THE WITNESS:  May I be excused?

4                MR. GIDEON:  Of course you can.  Make sure you

5    take your mic off.

6                THE WITNESS:  I'm not taking any documents, I'm

7    just going to the men's room.  Thank you, sir.

8                THE VIDEOGRAPHER:  This is the end of today's

9    deposition.  We are off the record at 5:41 p.m.

10           The master disc will be held by Discovery

11   Litigation Services.

12               MR. GIDEON:  Don, dictate what you propose to

13   do about the --

14               THE REPORTER:  Still on the record, though?

15               MR. GIDEON:  Still on the record with you.

16               MR. ARBITBLIT:  My proposal is, since the court

17   reporter has graciously agreed to provide a final

18   transcript on Tuesday, if I'm correct -- correct me if I

19   say anything that is wrong, I'm sure someone around the

20   table will -- that --

21               MR. GIDEON:  Objection.  Misleading.

22               MR. ARBITBLIT:  Argumentative.

23               MR. GIDEON:  Argumentative.

24               Go ahead.

25               MR. ARBITBLIT:  Are you sure your name isn't



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 343 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 342

1  J.C.?

2          MR. GIDEON:  It's actually Clarence.  Clarence

3  James.

4          MR. ARBITBLIT:  Clarence James.  Thank you.  I

5  was wondering.

6          So my proposal is that since we could get the

7  final by Tuesday, that we give David Glass a break.

8  Because I was looking at some of the very clever

9  transcription shorthand, like the word, three syllables,

10 one of which was "yum."  I don't remember what the word

11 was, but it struck me that that was not -- moratorium --

12 that's what it was -- mor-tor-yum -- that we give David

13 Glass an extra two days.  One -- instead of Monday, it

14 would be Tuesday for him to get the transcript,

15 Wednesday for him to tell us whether he has any problems

16 with it.

17         And then during that time, we would refrain

18 from sharing the transcript with other experts.  Because

19 I think that would be consistent with David Glass'

20 request that we keep it sealed until he has a chance to

21 look at it.

22         MR. GIDEON:  I can't agree to that with respect

23 to other experts.  I can agree as to dissemination

24 beyond our experts and the lawyers.  I can agree not to

25 disseminate it to our clients, but I can't -- cannot



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 344 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 343

1    agree with respect to other experts.

2            MR. ARBITBLIT:  And you -- will you agree to

3    instruct your other experts that the document, meaning

4    the transcript, is going to be reviewed by counsel for

5    the USA and that they should not disclose what's in it

6    to anybody except you and your staff --

7            MR. GIDEON:  Yes.

8            MR. ARBITBLIT:  -- until David Glass has a

9    chance to respond?

10           MR. GIDEON:  I will agree to that.

11           MR. ARBITBLIT:  Okay.  And we'll wait, then.

12   Do you know -- what's your best estimate as to when on

13   Tuesday we might receive it?

14           THE REPORTER:  I'm planning to turn it into the

15   reporting office in the morning, the beginning of the

16   business day.  So it depends on how long it takes them

17   to turn it around.  I can tell them to --

18           MR. ARBITBLIT:  The beginning of the day on

19   Tuesday?

20           THE REPORTER:  On Tuesday.

21           MR. ARBITBLIT:  Are there any spellings we can

22   help you with?

23           MR. CHALOS:  Klebsiella?

24           THE REPORTER:  You actually spelled that.

25           But there are other things, for instance,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    there's a hard drive with a sticker on it, and I need to
 2    know what the agreement is on that.
 3            MR. GIDEON:  The agreement on that was to
 4    transfer it digitally.
 5            MR. ARBITBLIT:  That's fine.
 6            THE REPORTER:  So I need to know if that's
 7    going to be retained by counsel.  That's fine.
 8    Otherwise they don't like to release the transcript
 9    without the complete exhibits.
10            MR. CHALOS:  We can make a photocopy of this
11    right now so you can have something to put in there.
12            THE REPORTER:  Yeah, that's fine.  As long as I
13    am not supposed to have the contents of the hard drive
14    attached.
15            MR. CHALOS:  I can make a photocopy of this and
16    you can say "retained by counsel."
17            THE REPORTER:  That's fine.  And then what
18    about the blotter?
19            MR. GIDEON:  I'd like to make the blotter as
20    the next sequential exhibit, but we'll agree to keep a
21    copy as the exhibit and you can have your original
22    blotter back.
23            THE REPORTER:  So will that be retained by
24    counsel or sent to the reporting office?  Because that
25    will need to be delivered by Tuesday morning.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 346 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 345

```
 1           MR. GIDEON:  I don't want to bollix up getting
 2   access to the transcript based on trying to get this
 3   copied.  So why don't we provide that the blotter will
 4   be retained by counsel.
 5           Don, can you provide us with the copy of his
 6   blotter at my expense and we'll make the copy the next
 7   exhibit?
 8           MR. ARBITBLIT:  Yes.
 9           MS. WEETER:  And that will be No. 1264.
10           THE REPORTER:  And that's the last exhibit for
11   the day?
12           MR. GIDEON:  Yes.
13           THE REPORTER:  And 1264 will be retained by
14   counsel, then, unless we receive it by Tuesday.
15           (Whereupon, Exhibit 1264 was marked for
16           identification.)
17           MR. ARBITBLIT:  Are we off the record?
18           THE REPORTER:  Anything else for the record?
19           MR. GIDEON:  No, not that I can think of.
20       (The deposition adjourned at 5:48 PM)
21
22               ---o0o---
23
24
25
```



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 347 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 346

1          I, Gina V. Carbone, Certified Shorthand

2   Reporter licensed in the State of California, License

3   No. 8249, hereby certify that the deponent was by me

4   first duly sworn and the foregoing testimony was

5   reported by me and was thereafter transcribed with

6   computer-aided transcription; that the foregoing is a

7   full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9   attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12          The dismantling, unsealing, or unbinding of the

13   original transcript will render the reporter's

14   certificates null and void.

15          In witness whereof, I have hereunto set my hand

16   this day:  March, 8th 2016.

17          _____ Reading and Signing was requested.

18          _____ Reading and Signing was waived.

19          ___X___ Reading and signing was not requested.

20

21

22          *Gina V. Carbone*

23          GINA  V. CARBONE

24          CSR 8249, RMR, CRR, CCRR

25



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016      Index: $250..1992

**$**

**$250** 25:24

**$6** 124:24

**$7** 124:19,22

**$8,000** 76:19

**(**

**(e)** 211:1

**0**

**0056** 223:22 224:3

**0060-64** 223:22

**02** 154:17

**02598** 291:8

**02655** 334:22

**03476** 317:10, 18

**05** 300:8

**05989** 300:10, 11

**05989-992** 295:14 296:11 297:4

**06094** 298:19

**06094-5** 297:3

**06094-95** 296:12

**07** 290:17

**078** 252:14

**08550** 317:9,17 323:7

**1**

**1** 30:7 96:13,17 161:10 162:14 171:13 174:6, 10,18,19 193:20 194:1 219:3,9 224:25 261:1,5,6 263:1 278:22 279:3 291:8, 305:9

**10** 88:14,16 92:17 93:7,14, 15,20,24 94:15 138:22 182:25 211:2 225:1 260:5 319:20

**10,000** 185:12 186:3 188:13

**10,000-plus** 201:8

**10,412** 185:9, 14,15,25 188:4 193:16

**1001** 205:13

**106** 160:17 277:6

**107** 316:8,25

**10:54** 96:14,15

**10th** 239:7

**11** 69:2

**11-page** 323:8

**11/15/2015** 274:2

**11:07** 96:15,18

**11th** 66:5,10 68:22

**12** 67:10 266:12

**12-month** 195:3

**12/29/11** 113:18

**12/7/07** 298:11

**121** 252:23

**1232** 10:3,4

**1233** 17:15,16, 19

**1234** 49:8 96:6

**1235** 96:4

**1236** 49:11

**1237** 74:21 96:3,8 267:12

**1238** 95:25

**1239** 74:8

**1240** 49:8 74:5 96:8

**1241** 66:22 95:23

**1242** 95:21

**1243** 95:15

**1244** 95:13

**1245** 66:16,22 67:1

**1246** 68:1,4

**1247** 81:4,8

**1248** 110:21,24

**1249** 140:10,12

**1250** 159:1,7,8

**1251** 162:17

**1252** 175:10, 13,18

**1253** 177:22 178:1

**1254** 219:6 224:16

**1255** 244:9,12

**1256** 252:10,11

**1257** 272:4,5

**1258** 275:15,18 279:7 328:5

**1259** 292:16 299:19

**1260** 310:13, 20,21

**1261** 314:17

**1262** 316:20

**1263** 336:2

**12:33** 161:11, 12

**12:35** 160:21, 23

**13** 252:8

**13th** 65:24 66:9 220:21 221:7 317:6

**14** 110:1 211:3 224:4

**14th** 317:6

**15** 252:23 325:11,15,18, 20,24 326:1,3, 7 335:9

**15th** 42:5 272:22

**16** 152:3,8,10 153:9

**16762** 179:8

**16764** 179:9

**16816** 179:9

**16817** 179:9

**16th** 40:15

**17** 317:2 318:23

**17th** 114:8 152:6 175:14 181:17 193:21 194:1 200:18, 21 336:18 337:16

**18** 67:5 205:13

**18th** 175:14 181:16,22 183:23 193:17 337:14,22,24 338:7

**19** 71:7 175:9

**1938** 163:17 197:10

**1959** 85:14 147:4

**1979** 56:22

**1980's** 52:11

**1980s** 188:25

**1982** 56:22

**1990** 14:8 35:4, 8 71:14 137:5 254:13

**1990-what** 258:9

**1991** 76:17

**1992** 197:18 258:11



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: 1993..30th

**1993** 258:11

**1994** 75:11
197:18 284:10

**1995** 36:17
43:14,20

**1996** 30:7 76:8,
254:17,24
258:16

**1997** 11:20
14:8 35:4 51:3
71:14,24 72:17
74:22 147:15,
21 154:12
197:11 243:13
251:10,12
254:13 332:8,
21,22 333:9

**1998** 12:13
14:15

**1:09** 161:12

**1:11** 162:15

**1st** 71:23,24
254:17,24
258:16 299:3
300:1

―――――――

**2**

**2** 12:21 66:15
96:17 143:9
161:10 182:9
183:22 193:17,
20 211:4 225:1
258:10 314:15

**2,000** 177:13,
20

**2/23/08** 298:14

**20** 252:22
271:19

**2000** 71:23
155:2 295:5
322:13

**2000s** 60:8

**2002** 30:10
124:1 154:13
162:4,22
164:21,25
165:12,24
169:22,25
180:15 190:4,
11 200:2
202:18 203:15,
19,22 207:3
209:18 211:2
260:13 264:14
274:19 288:25

**2003** 43:25
44:8 52:25
64:6,9 65:21
74:6 165:24
175:14 181:12,
17,22 190:4,11
209:20 210:2
211:3 286:16
287:17,20,25
288:13

**2005** 34:19

**2006** 40:20
151:12 154:24
155:3 311:16

**2007** 34:19
60:13 61:18
64:6,9 65:22,
24 66:9 154:24
284:5,12,15
286:20,21,22
287:6 288:25
289:5,22,23
290:11,18,24
293:1 294:9
295:3 311:17

**2008** 60:13
67:11 151:12
154:24 155:3
288:1 294:10
295:5,6,23
299:3 300:1
302:14,25
308:15 311:12
312:4 314:15
315:4 335:15
336:18 337:16

**2009** 120:10
302:15,20
328:7 330:17
331:18,20

**2010** 33:20
66:5,10 68:22
69:2 82:3
84:11 137:18,
24 150:12,22
155:6 242:17,
25 252:4
274:14

**2011** 40:15
68:7 80:3
214:23 220:21
221:7 222:18
223:5,9,19
224:10 229:15
234:4,21
235:22 236:25
237:3,22 238:8
242:25 248:3
265:15,21
266:23 267:6
268:22 270:1,3
274:14

**2012** 45:6
114:8 137:18,
24 150:12,22
152:6 155:7
214:24 223:15
224:10 229:16

234:12 236:25
237:22 238:8
242:18 243:23
244:7 252:4
266:11,24
274:7,13,14
283:18 286:16
287:18,20
302:22

**2013** 107:14

**2014** 109:3,21

**2015** 42:5
129:6 272:22

**2016** 8:1,4 10:8
151:6

**21** 47:6 140:8
186:19 244:11,
13 246:3
247:24 250:10
275:14

**21st** 239:5

**22** 168:1

**22nd** 40:20

**24** 211:2

**24-hour** 340:21

**2419** 8:7

**24th** 74:22
194:20

**25** 68:25 80:12
334:15

**252** 224:20

**254** 47:3

**25th** 43:25 74:6

**26** 26:23,24,25
45:6 200:23
274:7 288:16

**2600** 177:24

**2656** 334:22

**26th** 274:13

**27** 84:11 194:4
200:23

**275** 8:8 76:18

**27th** 82:3
311:12 312:4

**28** 120:10
194:4

**28th** 71:14
72:17 73:22
317:10,12,20

**29th** 239:6

**2:26** 219:4,5

**2:35** 160:22

**2:38** 219:5,10

**2nd** 315:4

―――――――

**3**

**3** 66:15 84:4,6
86:3 87:7 93:9
133:6,24
162:14,24
163:4,22
170:21 172:18,
25 173:2
182:16,22
183:6 186:16
219:3 260:1

**30** 11:2,11 14:2
56:14,19 58:9
322:13 326:9

**300,000** 184:15,
19 186:5

**30th** 43:14 44:8
317:19



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: 31..about

**31** 81:7

**312** 186:20

**317** 276:11,21

**318** 276:11,21

**324** 47:3

**325** 160:14

**326** 158:14,23 159:11,18 160:4,16

**33** 94:23

**350** 47:8

**351** 47:6

**353(a)** 250:10

**355** 186:19

**360** 244:13

**360(g)1** 244:11, 17 246:3 247:24

**396** 140:8

**3B** 47:2

**3rd** 10:8

---

**4**

**4** 8:1 80:9 89:16 90:10 93:9 190:18 219:9 263:23, 25 270:7 278:22 311:16

**40** 285:17

**41** 255:14,15

**424316** 276:21 328:2

**426077** 310:11

**426106** 316:8, 25

**426108** 292:7

**426109** 292:7, 20

**426119** 299:6 305:7

**427667** 314:7, 14,15

**428907** 47:13

**428908** 47:13

**428909** 47:13

**43** 255:15

**434734** 337:21

**460.200** 162:21 243:24 244:4 258:9

**47** 314:9

**483** 166:6 187:20 190:2,3

**483s** 166:5,14 168:4 188:1

**4:02** 278:25 279:1

**4:15** 279:1,4

**4th** 8:4

---

**5**

**5** 13:14 88:16 89:8 91:20 211:1 271:25 278:17 279:3 284:10 291:9 317:2

**50** 61:5,6 285:17

**500** 224:25

**501** 333:5

**501(a)** 148:1 245:21

**503(a)** 250:5

**505** 137:14 144:11 147:25 153:13,14 154:1,2,7,20 158:9,18 159:25 160:3,8 196:24 200:11

**50th** 22:21

**52** 300:21 301:2

**53** 271:22,24, 25

**57** 278:17

**59** 224:3

**5:41** 341:9

**5th** 68:7 311:17 312:2

---

**6**

**6** 305:14

**6,000** 184:15, 19

**6/13/2011** 225:3

**60** 61:5

**600** 61:4

**65** 224:3

**650** 75:20

**67** 224:3

**683** 224:18

**6:00** 21:5 41:15

---

**7**

**7** 88:17 89:8

**700** 61:4 240:19

**70s** 51:21

**74** 300:21,24

**74-page** 300:19,20

**78** 77:12 310:11

**797** 86:4,6,17 91:25 92:3 246:19

---

**8**

**8** 68:17,20,24, 25 190:18

**80** 224:25

**80-milligram** 182:7 185:16

**80s** 51:21

**82** 52:13 96:25 97:5 220:15,22 221:12

**823** 76:20

**8th** 71:7,14

---

**9**

**9** 93:21 94:1,7, 15 261:1,5

**90** 35:6,7,9 129:7 132:13

**91** 152:4

**92** 132:20 175:6

**92nd** 152:5

**94** 299:15

**95** 36:16 298:21 299:13, 16,17

**97** 132:13 154:17

**98** 12:15,16

**99** 14:10 85:18

**992** 300:12

**9:00** 8:4 16:3

---

**A**

**A-b-a-r-a-y** 130:24

**a.m.** 8:4 41:15 96:14,18

**Abaray** 130:12, 13,22

**Abbott** 196:20 197:1

**ability** 57:23 136:2 297:19

**able** 37:22 176:2 189:9 209:10 216:3,7 250:22 286:14 308:9 313:21 314:3

**ABMS** 58:1

**about** 20:19 24:3 32:14,20 33:10 35:8 45:15 46:10 48:23 52:13



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 351 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016   Index: absence..addendum

53:15 54:25 55:14,15 57:21 59:13 61:2,19 76:1,19 80:12, 23 81:16 85:10 88:7 93:6,9,14 94:2, 99:6 100:2,4 102:25 110:10 114:5, 12 115:3 119:16 125:23 126:8 128:4 132:20 135:3, 17,25 136:7,13 138:10 140:20 141:14,25 142:3 145:20 146:21 147:6, 148:11,23 151:12 152:20 162:5 164:1,2 165:18 166:14 168:5, 170:6,7, 9,13,14 171:7 179:21,25 181:5 182:4 184:14 190:5, 10 198:5 203:16,18 207:8,14 211:1,19 212:10 215:21 216:19 218:24 221:18,19 222:2 224:12 228:1,21 234:5 243:18,25 246:6 249:23 251:18 254:15 256:10 260:5 262:2,20,23 264:25 267:19, 24 269:10 273:1,7 277:6 281:7 282:17,

20,24 284:5,13 285:17 286:20 288:5,13 289:3,13 290:8,9 292:8 294:13 295:6, 21 297:25 301:6,7,9,11 302:6,13,14,19 304:21 305:15 306:13 307:15 309:12 310:23 311:1 313:3,4, 319:5 320:23 322:1 323:24 328:8,11 329:1,4 331:5 333:19 335:9, 17,24 336:15 337:9,12,13 338:21 339:20 341:13

**absence** 268:4 331:9

**absolute** 185:3

**absolutely** 18:3 39:11 47:25 62:10 166:21 209:14

**abstract** 170:13 204:23

**academic** 78:5

**accept** 204:16

**acceptable** 153:1 251:22 252:1 311:19, 21

**accepted** 63:12 335:22

**access** 28:13

**accompanying** 275:24

**accordance** 186:19 246:9, 15

**according** 113:4 226:14, 16,17 339:6

**Accountability** 67:8,14 70:7

**accounted** 65:6 74:14

**accounting** 161:15

**accurate** 166:12 312:19

**acetabular** 128:12

**acetate** 32:5,11 45:7,18,21,23, 24 46:3 84:5,8, 13 87:8 95:24 97:17 144:4, 18,21 145:11 146:5,13,20 147:2,5,16,20 150:2,13,21 154:6 155:8 183:24 188:4 189:13 191:24 192:6,17,19 236:12 288:14

**acetates** 149:20

**acknowledged** 9:22

**acknowledgment** 10:13

**acquaint**

278:14

**acquired** 124:7

**across** 149:21

**act** 11:18 50:4, 8 68:16 88:12 132:3 134:12 144:14 147:18 151:7 154:8 155:10,18 160:4,12,16 163:12,15, 173:17 183:19 197:10 199:4 264:24 274:21 275:5,12 284:18 293:9 304:5 331:13 333:5

**acted** 83:23 114:18 121:4 171:15 207:9 275:1 322:4,7 330:20 331:3 332:10

**acting** 67:1 235:8

**action** 89:22 173:18 258:17 264:1,12 270:20 273:1, 3,8 301:13,23 302:11 303:7 332:23

**actions** 126:10 198:24 199:5

**active** 51:6,7,8 59:20 84:22 97:7 146:19 147:1 186:16, 23 192:2,4,8 202:2

**activities** 156:3 172:22 173:12, 22 183:17

**activity** 116:7 118:23 131:18 134:9 199:1 206:21

**Actos** 113:13 123:17,21 124:4

**acts** 199:7,17 260:25

**actual** 57:16 115:14 143:10 166:6 177:5 223:11 267:2 294:4

**actually** 16:19 21:5 22:20 36:6,14 40:11 42:25 44:2 59:23,25 64:9 71:21 92:2 109:7 127:1 189:2 215:25 223:22 232:7,9 233:11 236:25 237:13,22 238:8 256:12 260:14 267:10 269:21 276:7, 22 294:7 306:21 313:11 326:14 337:7

**add** 160:18 181:3 182:11 277:2 279:16 340:3,4

**added** 97:22 282:19 339:2

**addendum**



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 352 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016    Index: addiction..agree

48:3,13

**addiction**
242:21

**addition** 19:13
20:5 31:17
134:5 136:14
271:8 276:5
280:2

**additional** 20:7
24:11 31:2,11
96:7 325:11,
15,18 326:16
337:17 338:3

**additions**
277:16

**address** 9:14
14:16,24
96:21,23

**addressed** 93:8
246:3

**addressee**
273:15

**addresses**
244:19

**addressing**
283:10

**adequate** 143:9
230:1 307:16

**administer**
246:24 247:2,
6,10,21

**administered**
62:19 290:12

**administration**
71:8,9 82:21
132:23 135:16
136:8,14
140:21 171:20
175:17 203:24

211:8 276:13
281:9 288:19
320:9

**administrator**
221:24

**admit** 58:7,19
60:5 76:25

**admitted** 60:6

**admitting** 58:24
60:1 200:22

**admonition**
99:9 157:15
208:7

**admonitions**
99:25 101:4

**adolescent**
61:23,24

**adulterated**
47:7 245:19
275:5 304:1

**adulteration**
96:4 173:16
199:4 248:11,
12 264:23

**adults** 242:19

**advance** 57:15
83:1 183:13
260:9 261:19
293:13

**adverse** 127:19
158:5 284:24
286:6,12,20
288:25

**advertisement**
90:9

**advertising**
151:4 154:23
193:3

**advice** 98:19
280:3,4,9
282:22

**advise** 168:22,
25 225:3

**advised** 282:22

**advocate**
227:23

**advocates**
253:19

**affect** 89:20

**affidavit** 128:1
158:24 159:18

**affidavits**
126:24 127:9
128:24

**affirmed** 148:18
149:19

**after** 21:3
37:14 42:6
72:16 81:1
93:2 124:22
149:18 151:10
154:22 165:12
171:10 175:23
180:4 182:25
258:15,19
260:13 261:8
274:3,13
288:4,18,20
302:25 312:3
332:22 338:23

**afterwards**
62:14 174:21

**again** 13:12
24:25 28:16
29:4 37:21
38:3 41:12
46:19 48:20
49:24 50:25

51:3,11 52:14
54:21 55:25
58:11 66:6
68:15 70:6
71:16 72:6
75:19,22 79:18
86:24 88:20,
21,25 90:4,13
98:11,14,18
100:4 101:3,
11,25 102:21
103:1,21
104:12 105:4
106:14 109:17
112:21 113:9
118:22 119:16
121:11 122:3,
10 123:3,
124:6 125:9
126:14 129:20
131:5,13
135:22 137:25
139:24 142:15
144:2 149:21
151:13 152:17,
25 153:24
156:7 165:1,11
169:15 170:12
174:23 180:14,
19 184:10
188:1,7
189:21,25
192:3 198:2
202:21 224:1,
14 225:16
227:6 235:19
238:4 241:9
243:12 247:16,
18 254:2,10
257:4 261:10
262:12,16
263:10 269:5
270:24 271:1
278:8 279:23
282:21 283:7

284:23 286:5,
6,12 290:23
293:10 294:15
302:16 308:23
310:6 312:10
315:12,22,25
316:5 318:16
319:5 328:1
338:18,21

**against** 70:9,
16,20 93:17,18
95:10 105:24
131:14 138:6,
14 139:19,21,
23 198:24
203:4 265:16,
23 268:22
280:21 334:1

**against-label**
139:9

**agency** 35:25
37:12 71:7
197:25 199:5
261:24 262:1,
15 271:6 302:5
303:1,2

**agent** 192:2,4,8

**agents** 192:8

**aggressive**
330:25

**aggressively**
151:13

**ago** 13:25 56:6
57:7,10 77:8,9
157:8 162:1
168:2 273:1,7
292:19

**agree** 10:21
11:9 15:20
43:2 94:25
153:17 161:4



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 353 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016    Index: agreed..announced

165:16 175:19 206:24 263:21 265:11 282:14 306:1 311:6 314:2 325:13

**agreed** 12:1 69:12 326:1 341:17

**agreeing** 314:5

**agreement** 10:11 170:1 263:24 281:1 325:20,22 334:14

**agrees** 143:25

**ahead** 23:11 84:5 103:16 146:14 172:1 214:5,8,10 235:5 237:6, 12,15 248:25 278:9 296:14 317:21 321:14 324:16 325:24 329:25 339:18 341:24

**ahold** 107:2

**Alan** 8:10

**albuterol** 184:15

**alcohol** 84:20 85:11,15 97:21 191:23 192:17 240:6,7

**alert** 272:18 273:21,23,24 274:5

**alerts** 134:22

**Alexander**

108:1

**all** 11:1 13:24 17:4,13 18:14 21:3 22:2 24:10 25:4 31:19 32:25 33:5,6,10 34:6 36:3 37:20 41:5,8,20,22 42:3 43:12 44:24 45:20 46:2 47:3 49:6, 14,22 50:2,11 53:20 55:22 58:6 59:15,19 61:7,8 63:11, 14 65:6 66:21 69:23 75:4,17 80:22 86:4 88:5 89:12 92:2 95:1,6 99:5 101:24 105:9,14 106:24 109:22 113:21 115:20 116:21 117:23 119:4 124:9 129:25 131:24 132:2 134:21 144:4 149:18, 20 150:12 152:20 153:3 154:1 163:19 167:1,12,15 168:20 177:11 180:8 182:3,13 193:16 195:1 196:4 200:10 202:11,14 203:7 204:9 207:2,18 210:1 216:11 223:18 232:14 237:3 241:24 246:7

249:24 259:8 263:16 265:7 272:18 274:17 277:6 278:18 282:16 286:9 295:7 297:16 302:17 307:19 312:20 314:1 339:22 341:1

**allegedly** 287:23

**Allen** 8:23

**Allergan** 54:22 55:17 116:22 117:3,6,7

**allergies** 241:19

**allergy** 240:5

**Alliance** 121:19

**allow** 196:15 245:22

**allowed** 133:7 199:17 200:13 205:16 218:17 303:11,13 338:24

**almost** 87:17 166:20,23 300:18

**alone** 52:19,20

**along** 62:11 235:14

**already** 10:24 16:14 34:7 71:25 161:3 171:15 191:21 304:19 322:5 339:13

**also** 12:19

14:22 25:4,9, 12 26:6 30:25 34:2 55:4,6 84:22 91:24 97:7 107:22 120:4 121:22 126:3 128:17 131:13 134:21 147:7 158:3 174:10 202:20 211:3 222:2 265:25 266:3 268:11 277:2 279:16 291:7 305:23 307:17 311:14 319:2 340:4

**altered** 275:20 276:1

**although** 306:13

**am** 29:1 50:21 54:24 93:2,10 96:15 104:14, 16,17 107:21 109:17 116:13 142:25 176:11 177:4 178:23 183:5 202:8 221:20,23 227:24 230:10, 22 262:4 270:19 279:16 280:4 281:6 285:20 314:23

**ambulatory** 53:8,19 64:17 82:9 83:24 251:22 252:1

**amended** 163:17 197:11

**amendment**

143:24 148:20

**amendments** 148:19

**America** 42:16 252:15

**American** 31:23 57:11 123:14

**Ameridose** 84:1 308:25

**among** 132:5 166:7 216:9

**amount** 174:20 180:4 261:5,12 282:10 301:6

**amounts** 261:8, 11

**analogous** 183:17 185:11 186:1 194:11 313:25

**analysis** 123:25 154:3 222:16

**analyzed** 305:8

**Anapolis** 272:22

**and/or** 15:18 274:20

**Andy** 79:16

**anesthesia** 135:12 242:3

**anesthesiologist** 242:4

**anesthetic** 242:10

**Annika** 8:17

**announced** 193:10



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 354 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016   Index: another..appropriately

**another** 40:18
54:5 70:16,21
77:23 113:7
168:24 178:4,
198:5 233:21,
25 239:6
247:11 259:5
282:11 286:15
294:11 298:9

**answer** 16:25
17:1 22:12,15
29:23 34:21,24
36:25 37:6
46:22 49:24,25
51:1 54:8
55:13,20,21
72:6,11 74:17,
24 77:2,16
78:15,16
81:12,13 82:24
85:12 87:11
88:21 90:7,20
97:13,24 98:9,
15,18,21 99:3,
4,19 100:1,18
102:4 104:7,9,
13,14,15,24,25
105:4,13,14,
15,20 106:1,2,
19,24 107:7
112:13 122:12
136:21 137:25
138:4 139:1
141:24 142:1,
24 144:16,24,
25 145:4,6,8,
15 146:2,6,16
147:15 154:9,
155:11,12
157:2,10,14,18
161:16 166:13,
14 167:13
168:6,16,23
169:6,20 176:2

177:1 184:5
187:7 190:2,23
198:4,10,12,13
205:19 208:6,
18,19,22,23
209:24 211:7
212:24 213:6,
16,17,19,21
218:25 223:14
224:5,9
225:21,22
226:4, 228:8
230:9,11,18
235:13 236:16
237:8,15,17,25
242:22 250:14
257:3 260:22
267:12 268:13,
17,23 269:7
280:6,7,13
290:11 294:17,
24 295:20
296:6 298:2
309:8,13,19,25
310:1 315:14
320:17 327:6
336:10 337:25

**answered**
55:19,21 72:9
105:19 149:12
151:5 167:17
207:20 210:10
225:25 230:10
235:23 263:6
287:19

**answering**
142:25 145:14
151:3 159:16,
19 162:5
167:14 207:13
208:5 212:25
223:3,6 228:12
249:1 269:13
287:12 305:18

**answers** 89:3
97:25 166:19
230:8

**anticipate**
189:15

**anticipated**
216:23

**anticipates**
172:24

**anticipation**
83:17 174:7
179:25 195:13,
25 258:13
263:11,14

**antitrust** 119:4,
9 120:5 121:23

**anybody** 37:24
91:6 103:7
165:23 166:19
167:2 212:23
225:17 226:20
231:16 232:5
278:6 282:7
313:11 331:7

**anymore**
157:21

**anyone** 62:2
139:4 151:7
153:4 199:11
232:25 255:14
331:17

**anything** 10:22
12:5 26:11,20,
21 33:11 41:13
42:10 109:11
141:14 142:4
153:9 212:25
245:22 283:20
286:9 291:23
295:2 298:17
302:19 320:23

324:14 341:19

**anyway** 15:14

**anywhere**
59:16 62:17
77:18 91:11
235:7 242:19

**APA** 172:15

**apologize** 29:4
127:7 128:16,
22 130:17
136:12 181:4
219:25 223:23
279:21 294:9

**Apothecary**
272:21

**apparent**
214:14 231:16,
24 233:4

**apparently**
43:15 261:14
301:8 339:5

**appear** 238:21

**appeared** 233:7
301:12

**appears** 234:11
292:23,24
295:9 299:6

**appendices**
177:12 178:9

**appendix** 41:1,
6 48:3,17
49:10 113:24

**applicable**
25:17 137:16
147:25 148:1
153:16 265:10

**application**
79:20 143:7

147:3 186:19
187:1 201:15
202:7,9 264:5
270:23

**applied** 51:3,24
170:14

**applies** 93:5
99:22 141:5
153:6,14
159:25 245:21,
25 251:16

**apply** 16:17
83:8 137:1,2
270:6

**appointed**
14:10 38:7
262:13

**appointee**
38:11,13,14,15

**appointees**
37:13

**appointment**
38:2, 78:5

**appreciate** 16:1
40:8 85:25
139:7 151:25
276:24 297:3,
326:7

**appreciative**
99:16

**appropriate**
54:25 55:10
56:1 92:14
160:18 199:9
267:19,24
276:3 335:11

**appropriately**
74:14 115:3
132:4 146:23
207:10 322:4



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
*Nationwide Coverage*

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 355 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016Index: appropriateness..asked

339:25

**appropriateness**
206:2

**approval** 37:25
85:16 119:1
201:15 293:12
295:11

**approve** 137:6

**approved** 85:14
137:17,19,23
138:2 143:20
187:10 191:13
203:23 293:16

**approves** 137:7
229:19

**approximate**
61:20

**approximately**
61:2

**approximation**
60:14

**April** 114:8
270:1 284:15
288:1 294:10
295:5,23 299:3
300:1 302:14

**Arbitblit** 9:16
10:8 11:14
14:20 15:3,9,
15,22 16:4
23:2,7 26:11,
15,25 27:3,12,
18 39:12,18,
20,23 72:9
80:11,15,24
81:3 90:19,22
92:15,20,24
93:1,4,18,23
94:2,5,16,22
96:11 109:21,

22 110:1,18
111:4,24
112:18,23
113:4,8,10,12,
21 124:11,12,
14,16,20
130:6,8,10,12,
15,16,24
144:23 145:3,
6,13,17,23
146:4 149:12
157:24 158:10,
15,22 160:10,
14,22,25
161:3,6
166:10,21
167:6,19
168:3,17,19
177:3 178:16,
19,22 179:13
192:21 195:18
203:2,11
208:12,17
210:10,23
213:3,12,22,25
214:6,10,19
218:22 225:20,
25 228:24
232:11 244:24
249:11,13,18,
21 251:8
253:11 255:17
262:10 272:7
274:9,15
275:19,23
276:1,17,19,24
278:20 279:6,
18 280:5,12,18
282:4,8 286:17
291:4,22
292:1,5 293:4
297:16,21
300:15 301:14
302:1,3 303:8
304:19 306:7

312:22 322:11,
18 323:4,6,22
325:8,21
326:3,19
327:5,17 333:1
334:12,20
336:4,6
339:14,18
340:9,20
341:2,16,22,25

**Arbitblit's**
130:10

**Archdeacon**
47:15 283:19

**architectural**
23:4 161:15

**area** 200:12
202:18 246:6
271:18

**areas** 161:20
228:18,23
229:2

**aren't** 108:5
117:24 221:3
325:11

**Argen** 335:7

**argue** 192:10

**argued** 77:22
155:12

**argument**
155:19,20
201:3

**argumentative**
149:2 157:4
159:22 170:11,
24 171:2
203:11 204:8
213:1 227:21
228:14 230:21
235:2,4 237:10

262:11 321:13
322:10 333:2
341:22,23

**arguments**
191:10,11

**Arizona** 194:6

**around** 35:5
43:20 80:3
102:13 109:21
164:20,24
165:3, 202:18
206:15 289:22
300:17 301:3
341:19

**arranged** 81:9

**arrived** 35:11

**art** 153:12
178:20

**article** 40:13,
14,18 42:9
95:12,14

**articles** 31:25
32:21 39:24
41:12 42:13
48:18,19 49:1
301:9 330:24

**articulated**
125:13

**ASC** 53:13

**aseptic** 87:15,
22 88:1,7
253:9 322:14

**Ashley** 8:18

**ASHP** 32:2,3
45:6 46:12
95:24

**aside** 31:15
130:19

**ask** 9:11 10:10
12:3,6,8,9
13:15,17 14:5
15:4,10,16
16:21 17:4
22:8 23:3
24:25 25:23,25
26:1 28:17
29:2 32:9
33:10 36:14,24
37:20 49:21
72:5,6 76:25
79:18 82:15,17
87:25 89:6
92:16 97:23
100:1,4
103:10,12
134:16 138:1
145:20 149:4
159:14 166:23
170:6 198:2
207:18 208:8
214:2 217:9
219:21 238:3
243:18 271:20
278:5,6 280:14
281:2,3,7
282:18 285:9
290:10 292:1
294:12 298:4
299:21 308:18,
20 310:25
311:7 317:13,
14,21 322:4
326:14 328:25

**asked** 9:19
19:4,16 20:5,8,
9 21:15,19
22:12 23:15
24:12,17 25:4,
12 28:11,15
29:3,7,14,19
30:1,2,3,8,14,
16,17,19,25



Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 356 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016        Index: asking..back

31:10,21,22,25
33:7,12,13,16,
17 34:15,16
45:15 51:5,12
54:24 72:9,22
76:11,13 81:16
93:6,9 99:4
105:9,18 106:6
108:23 109:8
130:20 144:17
145:22 147:6
149:5,7,12
157:9 164:10
167:2 168:1
169:24 170:17
175:3 176:25
181:4 187:19,
21 190:6
201:14 202:1,6
203:5 204:1
210:10 214:11,
13,14 224:2
225:25 229:14
230:15,16
235:23 238:22
243:19 250:4
254:14 255:24
257:13,16
259:5 267:1
268:13,17
269:10 270:25
279:17,23
280:6,19
282:2,4
287:13,14,16
297:23 305:2,
19 309:17
321:4 322:5
327:1 331:21
338:14 339:20

**asking** 12:4
16:22 29:7,9,
22 31:19 34:7
38:12 43:20

48:23 55:14
89:1 93:14
98:13 103:4
105:21 116:13
135:25 147:11
148:22 156:25
168:19 204:22
207:14 228:7,
9,10 232:14,25
281:12 290:23
292:8 297:21
301:7 311:2
313:17 322:3
324:1,4 325:21
329:10,12,22

**ASR** 128:1

**assay** 305:12

**asserted**
105:23

**asserting**
102:23

**assertion** 11:5
105:25

**assertions**
100:12

**asserts** 107:5

**assistant** 47:19
335:5

**associate** 291:6

**associated**
64:13 76:10
131:4 173:13,
23 199:2
242:24 311:2

**assume** 61:18
103:25 107:22
124:6 146:25
196:3 240:25
252:6 269:12
291:15

**Assumes** 303:8

**assuming** 15:5
297:2

**assure** 75:13
105:21 131:20
264:5 270:22

**assuring** 251:4

**Astrazeneca**
121:20

**attached** 17:19
25:5 54:11
64:15,18 73:17
148:8 299:5

**attaches** 44:9
335:3

**attachment**
45:1

**attachments**
44:7

**attempt** 285:25
326:17

**attempts** 323:1

**attend** 83:12

**attendant** 83:15

**attended** 82:11

**attending** 60:2

**attention** 237:7

**attorney** 112:22
113:2 120:12,
19,22 122:13,
22

**attorney-client**
104:20 282:23
283:1,10

**attorneys** 25:13
26:7 112:8

**audit** 44:11
73:17,20 74:13
76:12,13,16
77:1,2

**audits** 77:5

**August** 239:7
290:16

**authoritative**
41:16

**authorities**
264:5 270:22

**authority** 37:21
77:23 132:24
133:4,23
134:5,6,21
154:25 155:18
209:1 210:12,
13,15 225:9,18
226:21,23
227:11,16,17
250:18 274:11
313:4 332:8,
14,21 339:1,
11,12

**authorization**
83:2

**authorized** 58:1
140:4 247:10,
20

**autoclave**
252:22

**autoclaved**
253:25

**available** 11:16
12:22 18:21
29:17 30:15,16
33:9,19 46:8
49:17 65:10
84:12 87:19
90:11,16 91:1,

12 136:7,13,18
169:3,8
190:15,16
191:1,2
194:16,18
195:6,16
201:13 202:16
233:20 238:1
243:8,12
264:11,14
331:11

**Avastin** 284:14,
24 285:10
286:1 287:8
289:13,17,19
313:6

**average** 79:22

**avoid** 246:8

**aware** 36:2
39:16 84:14,
15, 107:17,20,
21,22 108:6
178:23 188:9
202:8,9
221:17,20
244:8 266:11
268:10 285:8,
13 294:15
310:3 312:12
335:14

**away** 102:20
105:17 161:24
275:4 332:8,
13,21

---

**B**

**back** 18:3,4
40:1,10 45:3
50:9 52:4
53:14,15,20
54:7,16 55:2



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 357 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016   Index: back-and-forth..being

60:3,23 62:22
65:7 74:10
95:2 96:18
119:23 121:11,
23 124:7
142:11 147:3
161:17,25
162:10,15
165:5 170:3,8
171:18 175:20
179:5 182:15
188:17,25
202:18 218:23
219:10 237:7,
12,16 238:4
242:15 245:13
248:4 270:3
274:19 275:17
279:4 298:1
310:5 313:8
315:11 316:9
327:17 328:4
330:23

**back-and-forth**
267:24

**background**
56:7 329:3
330:4

**backup** 329:23

**bacterial** 291:8
305:10 307:17

**Bactrim** 146:12

**bad** 239:3,5,6,
17

**ball** 278:9

**bar** 77:15,17,
20

**Bard** 55:17
117:11,16,18,
19

**barrage** 332:11

**barred** 326:4

**Barry** 221:8,9
225:8,17
226:19 227:11,
13

**based** 37:21
44:17 85:23
131:9 133:4,
15,23 148:19
181:14 182:5
204:17 211:23
212:2 250:21
258:20 259:2
263:17 267:15
276:12 311:2
328:14 329:22
335:15

**bases** 41:22

**basic** 320:19

**basically** 34:13
44:17 45:1
57:18 97:11
133:19 199:16
287:5 304:4

**basis** 14:17
86:13 87:21
194:25 251:1
277:19 287:10
311:24 312:1
315:9 328:17

**batch** 239:5,6,7

**batches** 239:3,
9

**Bates** 221:3
299:13 328:20
337:18

**bathroom**
278:16

**Battery** 8:8

**battles** 333:8

**Bayer** 118:14,
16,17

**became** 63:15
71:17 78:8
133:16 147:24
266:11

**because** 12:23
13:16,21 28:4
32:8 36:16
38:14 52:21
58:16 74:18
77:20 87:3
101:8,20
104:10 112:22
122:8 133:23
156:8 167:7
168:17 175:3
184:11 202:9
207:12 210:11
212:21,23
215:13 216:4
218:12 221:3
224:7 227:6
232:23 235:9
240:11 250:3,
22 251:16
258:4 261:15
268:14 277:17
283:21 285:9
287:12 288:24
289:8 294:15
295:22 296:9,
18 304:5,7
313:22 320:17
325:12 337:8
339:11

**become** 71:21
78:23 211:18,
21 212:11
214:14

**becomes** 10:17
147:19

**Beers** 18:21
39:3 49:1

**before** 8:5 9:10
11:20 14:9
15:11,14 26:16
35:10 38:16
40:10 72:16
76:18 81:25
86:1 88:4,13
92:15 95:9
102:15,18
106:20 118:25
122:12 154:18
160:11 170:8
171:12,16
175:24 179:3,4
181:15 183:8
208:19 210:23
220:5 221:11
225:22 236:9
242:14 243:23
244:6 245:9
249:3 251:1
272:15 281:3
284:18 305:25
306:5,19
308:24 315:8
316:17 319:8
335:13

**beforehand**
274:8

**began** 79:25
137:5 274:6

**begin** 17:19
93:25 281:12

**beginning**
65:12 72:4
96:16 123:25
155:2 164:14
166:20,23

196:4 219:8
224:3 279:2
286:21,22

**begins** 43:13
74:5 194:1
250:9

**behalf** 8:19
11:9 13:24
44:1,4 73:6
114:9 116:17,
18,20 117:2,3,
4,15 118:1
120:15,19
124:17 125:5
126:11,20,23
127:4,12,16
129:25 130:1,3
221:13 281:6

**behavior** 156:1

**behest** 179:10

**behind** 16:8
18:14 40:5

**being** 21:17
29:5 54:13
55:16 60:12
64:20 78:1
85:13 88:24
90:23 101:3
127:13 135:9
139:21 151:5
179:10 192:18
193:16 204:17
209:10 223:4,8
242:6 253:25
257:23 264:19
268:6 269:14
274:21 280:16
283:6,11 294:5
295:3 299:23
318:12 320:4,
23 321:6,9
326:5 330:23



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 358 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016        Index: believe..bottom

331:19 332:1
333:24 335:17,
18 339:3,5

**believe** 18:19
24:5 25:7
32:13 33:24
34:19 36:9
43:19 44:23
46:16 48:11
50:6,22 52:24
59:19 62:3,7,8
64:1 65:5
66:11,12 70:7
80:4 81:14
89:18,19 91:16
93:10 108:16
109:21 110:3
112:17,19,23
113:12 114:13
116:5 120:6
121:12,22,23
122:21 123:18
124:7,8 125:3,
11 128:4,13,21
129:8,13 130:5
131:2 137:19,
20,25 138:3
150:5 169:6
174:9 175:7
187:19 190:6
201:1 202:17,
20 211:14
215:21,22
217:14 241:9
255:8 257:16
266:25 274:19
299:10 309:11
315:1 318:3,6
335:19

**believes** 163:5,
6 164:14
165:11

**bell** 216:15,17

256:14 334:3

**bellwether**
129:17

**below** 36:18
174:2 298:10
299:25

**benefit** 240:8

**benefits** 153:2
241:19,25
242:1

**benzyl** 84:20
85:11,15 97:21
191:23 192:17
240:5,7

**best** 12:22
58:23 74:24
133:18 142:7,
18 172:7
269:13 296:16
315:2

**Beta** 225:1

**betamethasone**
194:3 288:15
290:13 291:7,
10 305:15
338:4,12

**better** 16:23
22:20 40:24
89:13 240:15
266:9 268:25

**between** 25:13
26:9 27:6
47:14 69:24
87:22 88:1
89:8 138:5
139:8 150:22
181:8 216:10
253:9 286:19
287:17,20
288:24 290:16

315:17 317:6
334:23

**beyond** 19:14
24:3,5 76:14
89:2 112:14
140:3,7 142:8
143:7,18 144:2
305:25

**bibliographies**
41:15

**bibliography**
49:15

**big** 258:17

**bill** 60:18

**billing** 73:21

**billion** 124:19,
22,24

**bills** 108:6,7

**bind** 172:13

**binder** 19:5

**binders** 18:10,
16,17 41:7,22
43:23 44:22
73:5

**biochemistry**
89:21

**biological**
251:5 304:3,18

**biostatistics**
64:3

**biotechnology**
36:8,20 37:8,
24 38:8

**birth** 115:2
131:5

**Bishop's** 69:15,
18

**black** 135:21
136:23 172:9

**bladder** 123:22,
25

**blank** 237:5
238:13,18
296:6 299:7

**blood** 317:4

**blotter** 21:7,13,
21,25 22:5
24:16 31:15
161:13 169:17
249:6 289:15,
24

**Blue** 313:5

**Boal** 105:16
107:6

**board** 19:4
31:8,9 38:21
51:11 56:13,
18,24 57:2,3,5,
11,16,25 58:1
63:19,21,24
86:11 98:1
164:22 165:6
169:24 179:8,
180:11,17,20,
24 194:21
209:5 210:20
215:17 216:24
229:17 231:8
242:6 243:16
265:17,22
266:5,10,16,22
267:2,7 268:9,
20 269:18,23,
24 270:3,8,13
308:22,24
309:5,25
333:10

**boarded** 242:8

**black** 135:21
136:23 172:9

**boards** 56:15,
17 243:18,22
331:24 333:19,
23

**Bob** 221:7
225:6,8

**bold** 273:16
275:21 277:4

**bolded** 276:15

**bono** 61:14,16

**book** 49:2
75:20 232:6

**boot** 287:20,23

**booth** 83:25

**booths** 84:1

**BOP00934**
202:17

**Boston** 270:12

**both** 12:3
18:11,15
20:21,23 30:13
32:6,8 33:15
45:1 48:25
62:14 78:9
116:3,6 177:11
191:10,11
250:16,17,24
282:4,13

**Botox** 54:22
117:1

**bottle** 335:8,9

**bottom** 20:20
46:9 76:22
87:13 127:8,9
220:23 222:15
226:2 235:12
263:25 304:10
319:18 337:2,



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 359 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: botulism..carry

13,16,25
339:24

botulism
116:25 117:5

bound 20:14,
19

bounds 163:12

box 135:21
136:23 172:9

boys 116:2

Bradshaw
18:25 34:16,18

Bradshaw's
34:3,5 291:1

brain 109:9

brand 317:7

branded 84:21
97:6 137:22

Brands 123:14

break 17:2,6
23:3 80:16,21,
22 81:1 86:2
92:14 95:1,3,9
107:4 145:24
146:9 158:10,
16,21 160:19,
20 213:3,8,15
218:21

breast 134:2

breasts 116:2

breathing
231:25

bridge 111:15

brief 279:6

bring 18:3,4
19:16 20:9
21:19 23:15

38:20,22 93:15
170:16 294:11
297:23

Bristol-myers
137:23 138:20
139:1

bronchoscopies
65:1

brought 17:24
19:23 38:21
39:2,7 108:13
161:19 169:10
218:25 292:19
294:12

Brown 122:15
123:14 125:1

Bruce 47:14
283:19 291:16
292:21 293:20,
21 298:9
299:3,22 300:1
301:23 315:3

bucks 208:4

budget 107:19

bulk 183:11
186:16,23
187:3,5,12,13
195:15 202:2
203:23 211:8
260:7 261:18

bullet 111:2,25
113:14 115:20
116:21 117:10,
21 318:22
319:1

bullets 87:13

bunch 48:10

burdensome
279:10

Bureau 335:6

Burr 256:13,15
258:16

business 83:21
209:18,20
336:15

by-product
89:19

bylaws 64:12
65:7

———————
C
———————

C.griscom
43:18

C.J. 8:22 39:24
99:14 213:8
235:6 314:12

C.R. 117:11,16,
18,19

Cabana 125:4

Cabraser
110:16,18
111:5,21
113:22,24
123:10 339:21
340:2

Cadden
216:10,25
217:1 221:8,9
225:8,17
226:19 227:11,
15

calculate 60:23

calculus
241:19

calendar
166:25 222:17
223:5,9,19

235:22 236:25
237:22 238:8
248:3 252:4

California 8:9
50:12 52:18,
19,20 60:18
67:3 69:25
210:3 232:22,
24

Calishers 31:13

call 61:8 73:2
106:23 109:25
132:24 215:5
290:12 316:13
336:6

called 57:12
72:21 84:22
133:8,10,21
134:1 218:14
273:20

calls 92:5
166:8 231:18
232:2

calm 145:25

came 64:6
65:11 132:19
148:9 187:4,5,
9 285:6 333:25

camera 18:4

can't 16:7
24:22 29:14
34:4 37:7
93:12,16
134:15 143:6,
12,15 144:1,24
145:23 146:8
195:21 198:9,
12 204:9 205:8
231:14 233:8
245:15 278:2
282:16 286:8,

13 290:6 294:1
298:2 313:12
315:11 331:6

cancer 123:22,
25

cannot 106:4
142:21 143:7,
16,17 195:22,
23 205:9,10
247:11,23

capacities
53:16,18

capacity 64:23,
24 70:23
274:5,7,10

Cape 272:21

capital 322:18

care 37:19
54:14 55:11
80:21 121:19
142:4 191:14
238:24 247:3

career 37:17
50:15 58:10
62:6,11 70:18,
22,23

careful 98:17
104:21 122:10
137:2 222:16
259:15 283:8

carefully
319:24

Carmen 31:12

Carolina
256:13

carried 123:7
131:17

carry 89:10



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 360 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: case..Chalos

90:4

**case** 8:6 10:25
11:22 14:24
23:20 37:16
42:15,20,24
54:5,11,22
55:15 80:7
111:3,13,24
112:9,11 114:5
115:2 116:11
117:15 119:5,
21 120:2
121:12,23
122:14 123:15
124:18,20
125:2,3,11,14,
20,23 126:17,
20 127:14,18
128:10,19,21
129:4,8,11,14,
17 130:21
144:17 147:9
153:8 154:5
156:8 162:22
199:10 210:9
222:11 224:16
230:23 231:1
254:23 268:18
275:4 284:22
290:3,6,8,9,25
291:3 293:15
294:9,25
295:1,6,23
296:1,13 297:2
313:5 329:20

**cases** 30:5
33:22 54:9,18
55:23 64:25
111:2,12,20
112:17 113:23
116:22,24
124:9 126:22
128:2,23
143:24 215:14

284:24 287:5,9
339:21,22
340:1

**catastrophe**
288:21

**categorized**
115:4

**category** 115:4
137:2

**causation** 79:3,
4

**cause** 78:9,11,
24 288:10

**caused** 303:5

**causing** 302:9
306:17 339:9

**cautious**
310:25 313:17

**CDER** 316:12

**cease** 96:2
265:16,22,25
266:4,23 267:6
268:21 269:25
270:9 308:24

**cellular** 89:22

**center** 8:24
53:9 59:5 63:8
64:11,16,20
65:4 79:25
83:24 127:16
150:10 220:7
234:24 236:13
252:1 298:15,
16

**centers** 82:9
251:22 252:14

**centigrade**
252:23

**central** 181:8
186:9

**certain** 9:14
13:1 19:3
25:10 55:1,15
66:12 69:5
81:24 83:14
86:25 102:11
123:4 126:9
128:5 131:11
133:18 136:3
143:23 150:9
189:15 197:21
207:8 217:15
222:10 250:23
270:17 275:20
288:2 305:3
308:8 322:7
333:18

**certainly** 12:17
13:4,21 14:7
24:24 29:6,
33:17 36:16
39:11 53:19
55:12 59:18
60:8 62:7,19
63:7,10 64:16
65:9 79:7,23
80:8 81:24
83:15 86:10
87:17 90:13
91:4,6 114:16
150:9 154:10,
11 155:14
156:22 158:9,
11 161:21
165:15 167:14
178:10 181:13
182:5,10 195:2
209:1 214:22
222:10,11
228:6 231:11,
12 233:7
238:21 242:13,

15 243:16
245:13 246:10
250:18,24
251:9 256:15
258:7 263:8
270:18 271:14,
17 274:16
283:3 284:23
287:1 295:6
302:13,21
303:16 307:19
308:12 315:19
320:11 331:4,
22 333:16
339:9

**certainty**
231:15

**certification**
57:5,12,15,16
58:1 63:21

**certified** 56:13,
18,24 57:2,3
63:19 242:6

**certifying** 58:2

**cetera** 58:17
59:19 119:13
215:3

**CFR** 186:19
250:7

**chaired** 53:25
58:3 108:1

**chairman** 72:24

**Chalos** 8:14
10:2 11:3 48:2,
6,11 66:17,20
79:1 86:22
92:5 95:6,10
98:7 99:2,8,13,
18,21,24
100:5,9,17,20
101:2 102:3,18

103:11 105:18
106:8 108:25
111:9,11,17
124:23 133:2
134:10,24
137:10 138:7,
12 139:10
141:1,21 143:3
149:1 150:17
151:21 153:23
156:4,12,15,21
157:3,6,12,15,
25 159:3,6,8,
21 163:23
166:4 167:23
168:18 170:10,
22,24 171:1
173:7 175:5
177:23 179:17
184:3 185:18
186:2 188:6
191:20 192:1
194:12 195:9
196:8,13,17
197:6,15 198:7
200:4 201:17,
19 204:5,8
205:4 206:10,
18 207:24
208:6,13
210:5,7 211:22
212:1,7,12,18
213:1,7,11,14
215:20 217:6,
19 218:2,10
220:9,18,21,24
221:15 222:20
225:12 227:2,
14,20 228:14,
16, 230:20
231:2,18 232:2
234:8,19,25
235:3,6,16,23
236:6,9,15
237:2,9,13,18



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 361 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016      Index: chance..closed

239:19 240:23
241:7 252:5
259:12,19
260:17 267:9
269:20 270:15
284:20 286:2
287:15 292:10,
13 294:20,22
297:23 298:4
309:10,15
310:2 311:23
314:19 319:15
321:8,11,16
322:10 324:3
326:9 327:4
329:8,18
330:10,16
332:6 333:15
336:5,17,22
337:20 338:6,
19 340:18

chance 10:22
73:11,12
92:18,22

chancellor
72:24

change 19:21
301:2

changed 202:5
258:20

changes 24:15
110:16

changing 108:2
145:12 276:22

characterize
282:21

charge 25:24
60:21 229:7
232:10,17

charging 25:15,
20 232:13

cheat 255:1,21,
25 256:20
257:17

check 17:3
23:4 50:9 52:4
53:14,21
55:22,25 57:17
60:3 62:22
64:12 70:6
71:17 84:3
85:7,9 122:12
125:22 176:3
178:7,9,24
207:19 208:10,
15 209:25
210:4 229:22,
23 231:20
245:12 248:7,
13 250:22
266:25 267:10
340:2

checked
180:12,25

checking 55:7

chemical 137:7

Chemotherapy
62:25

Chicago 77:11

chief 43:18
282:20,25
313:13 316:4,
14

child 61:23
62:24

children 116:25
117:5 135:11,
13,14

choose 40:2
48:22 93:11

chose 57:3
77:15

chosen 56:16
279:12

chronological
181:19 277:11

chronology
327:23

circuit 120:10
149:23 150:1,
5,8

circuits 149:22
151:2,15 155:4
193:7 339:2

circulate 15:12,
14

circumstance
307:10

circumstances
89:23 136:15
245:10 305:1
336:19,21

citation 165:5
169:15,18
248:20 250:1
259:6,7

citations 216:3
250:4,7

cite 81:15
139:3 258:5

cited 18:12,13,
14 34:15 41:5,
24 44:18 47:17
139:14 160:8
176:7 216:4
260:23 283:6

cites 44:21
313:9

citing 216:8

citizen 79:22

citizens'
119:12,16

city 8:9 316:25
335:6

civil 37:17 38:3
67:24 68:15
265:1

claim 79:14,19
127:2 247:11,
23 308:2

claiming 54:3
126:12

claims 76:18
126:13,15
230:25

clarification
143:14 160:13
267:21 276:25
300:9 322:17

clarify 11:25
146:22 339:19

clarifying
276:19

class 78:12,18
79:16 88:14,16
133:6,24
136:20 291:8
305:9

classified 300:3

clean 128:11
249:17

clear 45:17
146:11 179:24
201:2,7 203:20
209:1 210:15
216:2 227:6

241:11 245:17
248:1 267:11
269:22 271:9
306:13 321:5
330:17 333:3,
340:5

clear-cut
201:11

clearly 163:11
184:21 196:24
215:7 222:14
231:13 267:17
271:4 274:25
284:1 310:23,
24 311:5

clears 105:17

client 186:12
209:7,13,17,19
331:23 332:17

clients 11:9,11
13:24

clinic 215:19
216:12 217:17
318:3,4,7,9
320:4,5,19
327:15 335:1

clinical 308:10

clinics 64:13,
17 65:6,9
333:18,21

Clint 334:1
335:15,23
338:16

close 60:20
100:14 230:15
283:2 316:5
339:15

closed 331:16,
24



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 362 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016      Index: code..compliance

**code** 79:6
88:12 140:15
250:7

**coherent** 264:5
270:22

**collagen** 89:19,
20

**colleagues**
111:4 316:19

**collected** 23:16
172:5 305:7
306:9

**collection**
298:12

**colloquy**
235:17

**Colorado** 96:1
265:17,21
267:1 268:22
269:4,24
270:3,8,16,25
271:9,10

**Columbia** 78:3

**column** 62:5,8,
18 182:11

**come** 32:22
60:10,20 95:2
112:18 121:11
123:13 170:8
218:23 281:8
298:1 313:8

**comes** 14:18,
25 60:24 114:3
125:25 129:2
143:25 187:12
236:8 252:13

**comfort** 17:3

**comfortable**
11:25 86:18

87:1, 162:5

**coming** 72:20
161:2

**comment**
165:17 293:20

**commentary**
99:16 198:8
212:7,18
235:14 287:15
292:10 294:22
321:16

**comments**
43:6,11 55:14
256:8,9 292:22

**commerce**
133:17 144:11,
13 155:9
196:23 199:12,
18 200:11,14
201:4,12
245:10,16,20
254:8 260:16
293:12,23
301:25 304:2
333:7

**commercial**
79:6 120:2
121:20 187:14,
17 188:5

**commercially**
84:12 190:15,
16,25 191:2
194:15,17
195:6,16

**commissioner**
35:3 36:21
37:1,10,15
44:10 71:6
76:13 86:12
132:7,23
135:3,18

141:10 204:13
206:1 243:13
251:19 257:22
264:18 266:15
335:5

**commissioner's**
36:10 37:22

**committee** 8:15
66:4,10 69:3,8,
14 107:18,23
108:12,16
256:11 277:24
278:8

**committees**
53:25 58:3
229:8

**common** 59:8
310:4

**Commonwealth**
120:9 121:19

**Communicable**
335:6

**communicated**
109:18 301:24

**communication**
25:12 178:24
266:10 267:18,
268:25 270:2

**communication
s** 26:22 27:5
47:14 283:12

**community**
59:11

**companies**
45:15 132:3
243:17

**company** 55:3
70:20 113:5
118:11,24,25

120:9,16
121:4,8,9,14,
25 122:7
124:2, 125:6
131:15,16
153:19,21
158:4,6 179:23
197:4 243:14,
20 273:15,
292:25 309:6
312:9,10,15
313:21 314:3
335:23 338:5

**company's**
313:23

**compared**
174:24 185:7

**comparison**
60:25

**compensation**
25:14 60:19

**competence**
231:12

**complain**
333:22

**complained**
216:19 335:17

**complaining**
306:12 333:19
335:24 336:15
337:8,12,13

**complaint** 67:1,
5,10,19 68:9
298:11 299:7
300:4 307:1,8,
9,10 308:7
333:25 338:16

**complaints**
11:13 67:18
287:23 305:4

328:8,13 329:4
330:5 338:21

**complete** 23:10
25:1 46:6
76:12 77:3
112:13 217:2
220:25 221:1,4
291:13 325:19,
25

**completed**
56:10

**completely**
222:4

**completeness**
48:2 92:16
93:5 94:19,22
160:10,18
210:24 277:6
291:4 322:11
334:21

**completion**
146:8

**complex** 37:6

**compliance**
30:8,10 75:13
162:4,6,20,22
164:8 169:11
170:6,20
171:21,24
175:8 179:20,
24 182:16
184:13,25
186:15 190:18
193:10 195:1
196:4 197:18
199:21,23
200:2 238:19,
21 244:1
246:18 258:5,
8,21 259:23
270:6,11 273:5
291:16 292:21



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016     Index: compliant..consider

309:7,11

**compliant** 86:4
91:25 222:4

**complicated**
28:21 52:2
78:24 119:12
141:23 192:3

**complicity**
76:25

**complied** 92:2
93:7 252:20

**complying**
246:19,20
253:2

**components**
186:17,24
202:3

**compound**
40:16 95:13
111:11 137:7
165:21 171:2
186:23 194:15
200:12 210:9
256:1 257:18
263:4,7 338:24

**compounded**
87:14,18 90:14
91:7,14,18
147:22 150:2
155:15 180:4
181:25 185:10
188:19 211:6
225:15 226:10
227:9 260:15
261:8 299:23
333:7

**compounder**
147:9,16
165:7,19,21
169:13 170:1,2
181:6,10

194:19 195:4,
7,17,21,23
196:1 202:10
204:16 205:1
210:19 258:24
262:7 265:11
293:6,11,24,25
294:2 304:16
313:10

**compounders**
107:15 149:20
165:10 250:23
254:5,6 258:17
260:14 293:1
332:24 338:21

**compounding**
30:6 40:16
43:1,8 87:15,
16,17,21,23
88:1,8 90:25
91:1,2, 94:4,8
95:13 136:5
154:19 164:3,
23 174:7
179:25 181:12
186:9,16
187:15 189:12,
19 190:14,25
193:7 194:22
196:2 199:15
202:2 205:23
226:18 229:5
240:16 250:19
251:18 252:14
254:25 255:20,
25 257:17,24
261:12 283:20
292:25 295:22,
24 298:15,16
300:3 303:10
309:1 338:5,
11,14 339:7

**compounds**

337:9

**computer** 31:16
138:19 176:5
321:19 327:17

**concentrate**
264:20

**concept** 78:24
180:7

**concepts**
111:14

**concern** 14:16
100:13 105:3
135:2,5 207:8
268:6 302:13
326:10

**concerned**
142:2 254:25
255:20,24
257:17

**concerning**
36:17 134:25
289:18

**concerns**
172:22 173:12,
23 199:1

**conclude**
192:13

**concluded** 69:9
164:18,22
165:6,18
187:24 188:11
194:21 195:3
210:19 327:14

**conclusion**
182:6 314:4

**conclusions**
69:4

**concrete**
184:23

**condition** 57:23

**conditions**
142:8

**conduct** 36:1
55:25 122:3,4
123:3,5,7
131:14 236:19
270:10 333:20
336:15

**conducted**
76:13

**conference**
316:13

**conferences**
156:20

**confident**
106:13

**confidential**
11:1,10 14:2
27:6 66:8,12
122:11

**confidentiality**
26:23

**confirm** 50:18
172:12

**confirmation**
275:10

**confirmed** 35:5,
10 71:18
262:12 318:14

**confirming**
216:10

**confused**
130:14 271:15
277:20

**confusion**
151:16 155:5
193:7 271:16

**condition** 57:23

**congenital**
131:10,11

**Congress** 30:7
133:9 147:21
154:13 155:23
251:13,17
254:15 258:19
332:7 339:12

**congressional**
12:24 76:9,10
102:11,12

**congressman**
256:13, 257:15

**Conigliaro**
216:10,25
217:2 226:20

**conjunction**
23:20

**connect** 75:25
286:13,14

**connected**
23:25 289:16

**Connecticut**
50:20,23 51:3,
10

**connection**
98:2,5 100:7,
25 101:6,7,12,
17,19 102:14

**connections**
76:2

**consciously**
241:15

**consecutive**
221:3

**consent** 131:14

**consider** 15:10

**331:8 339:2**



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 364 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016       Index: considerable..cost

41:16 51:9
86:5 173:17
199:6 227:22
260:24 261:25
262:1,4

**considerable**
301:6,16

**consideration**
16:1 199:10

**considerations**
120:5

**considered**
26:8 41:14
181:10 230:16

**consistent**
165:8 167:9
308:11

**consistently**
166:19

**constitute**
128:23 230:1

**constitutes**
206:23

**constraints**
140:6

**consult**  79:17
106:20 264:4
270:21

**consultation**
37:15,18 69:15

**consulted**  98:1,
5 100:6,24
101:15,17
107:12 108:11
242:20,22

**consulting**
243:18

**consumer**

298:11

**consumers**
134:22

**contact**  72:3
112:21 113:10
125:11

**contacted**
108:21 111:3,
12,20,23
112:3,19
113:13 124:10
337:24

**contained**
153:13 290:17

**contains**  84:19

**contaminated**
210:2 271:4
274:18,20
275:5 303:12,
15 304:3 306:4
308:5 325:6
330:19 333:4
338:23 339:8

**contamination**
239:18 274:23
303:17,19,25
304:13,18
307:17,18
322:15 330:21
339:8,11

**contaminative**
245:23

**contemplated**
11:6

**content**  19:22
22:4 73:13
94:21 176:19,
20

**contention**
122:6 123:21

**context**  151:23
174:5 228:11
268:1 308:7

**continue**  23:10
33:11 47:21
80:22 86:1
211:5 228:17
235:14 263:23
325:14

**continued**
85:15

**contraceptives**
118:9

**contraindicated**
139:16 140:1

**contrast**  335:3

**control**  107:15
318:8 320:20
327:15 335:1

**controversy**
133:19

**conversation**
101:9,13,16,
18,22 102:1
103:2, 104:3
106:18 109:1,
11,21 279:24
340:6

**conversations**
104:22

**convey**  64:21

**convince**
134:18 326:17

**cooperation**
309:12 325:9

**coordination**
267:25

**Coordinator**

175:17

**copied**  22:23
39:13 249:9

**copies**  9:17
10:1 17:13
20:14 39:18,21
41:6,7 190:16
191:2 297:24
314:20,21

**copy**  17:11
20:9,10 23:1
33:20 39:19
48:7,12 86:17
139:5 162:20
191:15,17,25
192:11 215:17
226:6 293:15,
17,18 333:25
334:4

**copying**  161:15

**Cordero**  127:15

**corporate**  70:9
119:7 123:4

**correct**  19:9
27:18 36:6
39:4 45:8
50:21,22 53:6,
7 56:22 61:18,
22 64:6 65:22,
23 66:5 67:6,
17 71:15,16
91:25 92:4
110:19 115:10
117:8 118:5
124:8 132:9,11
134:9,19,23
140:4 142:22
148:20 149:16
150:3 158:20
161:17 174:4,
14 177:21
180:15 181:1,

17 182:1,9
185:14 195:8
200:3,24
201:5,6,23
202:6 221:23
225:6 234:1,7,
10 239:7 242:9
244:4 245:7,
20,21,24
246:3,20,21,25
247:12 251:7
253:20,23
255:12 258:25
261:23 264:12,
16 265:1,5,24
270:14 275:7
303:22 306:6,
20 311:17
317:1,25
318:11 321:4
337:11 338:10,
12 341:18

**correctly**  69:21
173:19 183:20
255:18 257:7
264:8 314:24
338:10

**correspondence**
73:6 96:5,8
334:23

**corresponds**
113:14

**Cosmetic**
134:12 154:8
155:10 160:4,
12,16 163:17
197:10

**cosmetics**
251:6

**cost**  242:24
243:2,4



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 365 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: could..dated

**could** 12:5
29:19 45:11
47:23 51:11
69:19 72:12
82:14,19 83:21
85:22 98:13
104:3 105:23
115:9 130:23
133:15 145:22
148:5 155:19
156:17,22
162:1 171:4
175:19,20
180:16 188:18
189:19,25
190:21 192:10,
14 206:24
218:21 221:4
222:23 223:21
224:5 226:18
227:5 231:13
259:21 274:14,
16,25 275:11
293:6,11
294:17 295:13,
17,18 296:9,12
297:6 299:24
300:2,7 304:10
312:15 315:19,
24 317:9,18
323:21 328:13
331:7 333:5,17
336:24 340:16

**couldn't** 163:24
280:2

**counsel** 9:12,
16,19 10:1,9,
12 12:7 19:16
20:5,8,9 26:20
27:5,6 28:15
39:12 49:3
72:10 80:11
92:15 93:20
94:6,24 98:19

101:4 103:13
122:2,12
125:11 158:15
160:11,15
166:10 167:7
168:25 275:19
279:7,12 280:5
282:4,20,25
291:4,22
302:4,19
304:20 313:13
316:4,14 325:8
334:12

**counsel's**
302:10,21

**Counselor**
159:13

**count** 93:17,18
182:23 260:4
280:21

**counter** 161:4

**country** 196:19
201:5 206:15
228:3 332:13

**counts** 95:10

**couple** 12:1,11
19:20 21:18
326:13

**course** 109:19
200:16 246:17
341:4

**courses** 79:7

**court** 8:6 9:1
10:16,21 13:19
15:16 26:2
42:15,23 67:2
70:15 77:23
79:21 103:14
104:24 105:22
106:13 107:3

120:10 123:2
134:16,18,19
147:11,13,14
148:12,13,15,
18,24 149:6,
10,14,15,18,19
150:7 151:3
154:22 171:14,
16 192:25
193:4 226:6
275:12 282:13
341:16

**court's** 104:6

**courtesy**
309:19 310:4

**courts** 143:23
165:15

**cover** 66:24
161:20 224:15
233:19

**covered** 10:24
58:13 180:25
203:8,12 207:4
208:16 242:5

**covering** 95:16
248:2 319:12

**covers** 152:4

**CPG** 163:22

**create** 132:3
329:22

**created** 132:7,
12 133:9

**creation** 132:17

**credibly** 331:7

**criminal** 116:4
132:9,10
217:11

**crimp** 252:21

**crisis** 274:4

**criteria** 171:7
196:14 197:22,
24 261:4

**critical** 116:10
121:9 128:2
131:8

**criticisms**
11:12

**criticize** 332:12

**criticizing**
43:22

**critique** 114:21
115:7,11,16,25
118:21 125:8

**cross** 12:10
200:15

**crystal** 201:2

**CSF** 62:15

**CSP** 86:4

**CT** 64:23

**Culclasure** 8:24
33:15 191:14
233:20 241:23

**Culclasure's**
30:24

**cultures** 307:21
308:8,12 317:4

**cup** 128:12

**current** 49:2
137:6 181:11
194:22

**currently**
107:18 108:10

**curtain** 16:8

**cut** 17:1 208:19

**cutting** 26:14

**CV** 25:4,5,6,7,
9,10 36:15
65:20 216:5

**Cynthia** 126:3

―――――――――

**D**

**damages** 131:3

**data** 24:18 26:7
32:2,9,17,18,
21 46:14 115:9
116:8 118:24,
25 133:8,10,
20,25 152:18,
20,24 153:3
203:19 324:17
330:4

**database** 28:13
218:18 297:10

**databases** 32:2
211:15

**date** 14:11
25:10 35:11,
14,16 52:15
57:16 59:3
60:9 61:19,20
84:10 85:16
102:6,9,10
109:3 131:11
152:6 220:18
255:12 289:20
291:2 298:13
299:2 305:25
306:6 317:10
322:23

**dated** 10:8
40:15 43:25
45:6 175:13
181:16,17
274:1 294:14



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016     Index: dates..deposition

311:11 315:4

dates 34:22,24
46:10 57:21
223:24 239:8,
10

David 8:1 9:4
10:7,9 11:12
14:16 15:22
27:21 67:9
107:3 239:15
340:21

Davis 43:24
44:21 96:9

day 35:17 61:9
80:22 145:2,4
167:1,15
189:20 339:15

days 10:14
11:2,11 14:2
72:18 129:7
188:18

deal 96:1 104:2
117:12 120:4
128:10 137:15
146:11 153:25
258:22

dealing 13:14
101:20 102:15
136:1 142:5
144:2 152:25
153:7 200:12
217:15 254:5
330:19

deals 43:14
47:9 146:12
272:21

dealt 121:10

dean 65:21,25
66:1,3 72:22

Deanship 69:17

death 127:3

deathly 210:3

debate 338:25

Debbie 8:24
30:22 80:5
82:3 84:11
220:16 221:13,
18 229:20
233:18

Debra 220:13
232:19

decades
133:13

December 35:8,
9 42:5 65:24
66:9 67:10
71:19 129:6
290:11,18,24
293:1 294:9
295:3 311:16

decent 309:19

decide 66:7
103:13 181:9
193:4,6 283:1

decided 29:1
59:7 63:13
181:11 194:22
236:4 243:2
258:25 318:4

decides 264:11

deciding
238:24 258:23

decipherable
22:10

decision 69:15,
18 83:20,22
149:19 171:10

174:4 205:21,
23 239:22,24
240:7,11
241:14,16,17

decisional 13:6

decisions
171:12

declaration
340:1

declining 104:9
105:15

decolorized
303:18 304:8

decomposed
210:16 304:4

decree 131:14

defects 115:2
131:6

defend 167:5

defendant 54:5,
6 55:4,17
125:14,17,19
126:21 127:4,
12

defendants
54:23 55:2,22,
25 122:2
126:23 279:8

defendants'
12:25 13:11
18:23 68:5

defense 279:12

defer 15:20

define 251:25
293:14

defined 175:3,4
184:12 338:25

defining 338:11

definition 47:6
78:8 87:16,17
90:24 96:4
191:8,9 196:2,
6,11 197:3,5
198:3,21
199:19 226:17
254:3

degeneration
284:15 285:11

degree 77:21

degrees 252:23

deliberately
72:2

deliberative
13:6,13,22
14:6 20:24
104:18 106:11
284:3 310:23,
24 311:5
313:16 316:6

deliver 225:14
226:10 227:8

delivered 62:17
124:22

delivery 62:5,
23

demonstrates
76:22

denied 69:10,
13

Depakote
129:17,18
130:1,2 131:4,
8

department
9:13 12:5
13:17 98:12,22

100:11 101:4
102:19 103:23
105:7,11,23
106:1,5,21
281:2,6 283:15
333:11 335:7

department's
324:13,22

departure
14:11 258:2

depend 190:20
191:4

depending 98:8
155:21 210:14
310:6

depends 28:18
37:12 84:14
101:16 136:10
144:8 147:10
148:11 179:23
302:4 304:9
307:7,20 308:7
311:24

Depo-medrol
32:6 45:8,19
46:2 84:18,21
85:10,13,15,22
97:6,16
137:17,19
145:10,19,21
146:4,12,18,
21,24 147:1,8
191:18,25
192:7,18

deposition 8:1
10:11,17 13:18
14:3,18 15:6
16:17 17:10
19:8 25:25
30:24 31:6
33:16,19 42:9
49:11 77:22



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 367 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016    Index: depositions..disclose

80:6,10 81:8
92:22 99:23
128:25 129:10
131:7 170:5
216:1 219:13
221:21 222:3
229:22 231:21
232:19 266:21
279:10 325:25
326:17 334:4,7
335:21 341:9

**depositions**
14:1 16:15
30:19 31:2,11
33:16 231:5

**Deputy** 44:9

**Depuy** 126:25
340:1

**derived** 154:1

**describe**
139:22 169:4
231:25

**described** 65:4
136:16 168:14
169:13

**describes**
165:25 167:3

**describing**
73:15

**description**
25:1 166:7,24

**deserves**
260:22

**designed** 17:6
28:20 63:4
107:14

**desist** 96:2
265:16,22,25
266:4,23 267:6

268:21 269:25
270:10 308:24

**desk** 21:25

**despite** 301:8

**detail** 76:14

**details** 14:23
75:8

**detected** 291:9
305:10

**determination**
144:7 189:23

**determine**
74:14 81:18
90:2 116:15
151:18 152:12
223:15 257:23
258:17 259:14
269:2 287:1,10
288:9 306:4
324:17

**determined**
79:21 173:17
258:6

**determiner**
185:8

**determines**
180:8

**determining**
174:21 199:5
261:25 308:2,4

**developed**
114:14 121:15
124:4 285:24

**developing**
284:15

**device** 31:17
47:7 125:6
133:5,6,7,12,

14,16, 140:24
141:18,20

**devices** 251:6

**devoted** 76:14

**DHMH** 324:7

**diabasic** 97:19

**diagnosis**
62:16 284:25

**diagnostic**
64:10,16,19,25
65:4

**Dias** 8:10

**diatribe** 213:13

**dictate** 22:24
95:4 296:20
341:12

**didn't** 28:9 35:7
37:11 42:15
43:3 59:1 60:5,
17,18 63:8
64:7 71:18
72:2 75:5
76:25 78:10
112:21 113:20
116:11,14
124:21 133:1,
136:11 145:20
146:22 148:15
149:4 159:14
164:9,13
170:16 180:15,
21,23 187:2
189:14 193:6
198:15 203:10
207:16,18,23
208:10,14
209:25 216:4,6
220:11 222:7,
15 227:19
232:23 233:3

236:1 237:13
239:8 243:18
253:16 255:18
262:22 263:10
266:18 269:14
281:18 282:3
285:9 290:25
294:11 295:2
309:7 312:17
321:5 322:3
340:16

**diet** 249:22

**differ** 88:16
206:9

**difference**
87:22 88:1
89:8 138:5,9
139:8,18
150:25 155:21
253:9 303:1

**differences**
192:14

**different** 54:18
64:13 88:6
111:14 139:18
154:3 155:22
190:21 191:16
218:11,12
273:13 293:16,
17 298:4
334:16 337:9

**differently**
87:25

**differs** 206:14

**difficult** 168:15

**diminishing**
62:16

**dinner** 272:10,
16

**dint** 106:4

**direct** 16:24,
36:25 72:11
97:24 99:19
157:2,10
169:20 188:2
203:21 254:20
308:9

**directing** 212:4

**directions**
143:9

**directly** 22:12
93:8 157:14
235:13 255:8
294:24 335:17

**director** 52:10
54:1 58:10
63:15 269:23

**disagree**
166:21

**disagreements**
182:4

**disagrees**
261:14

**disappointed**
157:11,16

**disbanding**
199:4

**disc** 34:2
96:12,17 161:9
162:14 219:2,9
278:21 279:3
341:10

**disclaimers**
46:11

**disclose** 9:20
116:8 118:24,
25



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: disclosed..does

disclosed 42:6
55:16 115:18
128:6

disclosure
54:11 118:23
128:5

disclosures
69:18

discoloration
301:9

discolored
290:17

discovered
209:8

discovery 8:10
28:8 341:10

discretion
140:22 147:20
198:1,23

discuss 9:12
80:25 86:16,21
103:22 290:3,
4,6 296:13
308:1

discussed
41:18 56:7
100:10 104:25
164:24 299:11

discussing
86:18 87:3

discussion
16:19 21:14
25:17 48:20
181:9 222:2
249:5 261:3,22
283:14,16
297:14

discussions
221:19

disease 253:1
307:12,23
335:6

dismissed
68:9,12

disorder
308:11

dispense 94:12
246:23

dispensed 87:9
94:10 204:17
211:6 234:23

dispenses
211:7

dispensing
92:17 93:21
246:14

dispute 121:21
154:12 201:3
239:12 254:2
256:21 315:16
316:2

disputing 256:5

distinction 26:9
27:4

distributed
182:1,7,10

distributing
163:10,21
164:6,17
170:19 183:17
195:5,11,15,24
328:8 329:4
330:6

district 8:6
42:23 67:2,3
68:8,21 113:17
119:24 121:25
123:1 128:17

264:4 266:1,3
267:5 270:7,11
288:8 292:22
298:12 300:5

division 36:9
67:4 115:25
116:11 132:7

divisions 36:4

doc 301:8

doctor 26:18
55:5 156:10
177:7 212:22
214:1 244:13
283:9 292:20
301:7,17
302:23 305:3,6
306:12,15,16
340:9

doctor's 305:4

doctors 54:25
55:5 56:2 70:9

document
18:13,14 27:22
29:19 33:25
43:13,20 44:9,
18 46:6 48:18
73:17 81:23
82:1,19,20
87:7 92:17
93:6,20 94:1,7,
21 160:14
162:24 165:2,5
166:11 167:8,
11 168:7,23,24
169:13 172:5
173:25 175:4
176:16,17
177:6 178:8,
180:18 181:7,
14 187:22
200:1 217:8
220:25 221:2,

5,6,16 224:11
229:18 253:17
259:18,21,22
265:18,19
273:4,9,12,19
274:12 276:2,
4,12 277:10
280:25 281:13
282:19 283:18,
25 284:2
289:23 290:1
291:17,21,24
292:18 294:14
295:18,20
296:21 297:18,
19 298:3,6,8,
18 299:11
302:8 310:11
311:2,8
317:19,20,23
322:12 323:8,
12 324:2
327:11,22
328:14,18
329:23 334:13
335:4,14
336:23,25
339:6

documentation
26:21 27:8,14
80:4

documents
11:15 12:22
13:1,9,11
18:12,14 19:4
20:6,11 21:18
23:12,14,15,17
26:19 28:7,11,
14,15 29:22
30:1,3,14,15,
16 34:17 36:16
39:7 45:5 47:4,
13 69:6 73:23
74:2,4 75:23

76:12 81:20
86:1 95:4,21
96:1,7 128:5
165:20,24
166:3,7 168:21
169:3,6,8
170:14 175:22
176:7,18
177:11 178:4,5
179:8 180:10
190:8 202:16
205:20 214:21
215:5 216:6,7
219:12,15,19
220:6 224:4,6
235:25 255:14
259:24 276:14
277:3,7,13
279:9,11
281:8,10
285:17 286:11
289:12 291:5
295:25 296:13,
24 297:6,24
298:1 300:13
302:17 305:1
308:16 309:21
316:23 317:12,
13 318:4,9,14
319:6,7 320:21
321:17,24
322:1 325:2
331:20 336:12
341:6

does 10:23
24:2,3 48:14
65:17 71:14
81:1 87:12,13
88:16 91:1
94:22 107:6
120:4 123:13
130:25 131:20,
22 137:6 141:3
146:11 168:3



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 369 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: doesn't..drug

172:12 191:7
206:9,16 211:4
216:15,17
220:12 245:22
248:8 256:13
264:3 268:13,
17 269:7
285:14 323:3,
9,13,19 324:4,
12 334:3

**doesn't** 49:12
85:17 93:16,18
99:5 106:14
107:7 138:17
140:20 141:17
171:13 172:12,
13 179:11
186:5,7 194:8
231:25 238:21,
255:22 257:8
269:9 271:13
280:21 294:8,
14 304:8
305:24 317:22
319:9 320:8,
19,22,23 321:5
332:15

**doing** 44:5
58:16 87:5
89:7 92:15
93:13,16
105:13 156:6
185:21 188:18
202:11,14
208:24 209:13,
17,20 228:6,
11,12 232:10
253:19 265:1
282:25 283:20
287:6 289:2
291:14 315:2
326:23

**DOJ** 9:17,19

10:13,22 13:5,
21 15:11
20:23,24 98:16
103:12 217:11

**DOJ'S** 9:24
98:20 102:24

**dollars** 25:16,
22 26:3 60:16
61:2

**Don** 8:16 10:6
14:18 15:13
18:21 23:1
27:10 28:25
80:21 92:13
93:22 99:12
109:13,15,23
130:10 131:25
132:2 180:22
252:9 279:21
297:18 341:12

**done** 62:12
76:18,20 77:5
91:2 122:8
189:20 214:23
219:25 223:15
232:8 243:22
269:25 270:1
271:6 274:14
276:11 277:21
287:17 304:25
307:3 329:7
330:9, 340:13,
17

**door** 287:20

**dose** 189:18

**doses** 184:15
188:19 320:5

**dosing** 189:15

**dots** 75:25
286:13,14

**double** 247:13

**double-check**
44:25 46:22
59:17 118:14
176:8 202:24
334:2

**double-
checking**
114:24 118:13

**doubt** 194:20
257:9

**Doug** 226:20

**down** 111:25
113:2, 124:15
125:4 126:6
145:25 148:19
154:23 183:7
189:2 192:24,
25 193:3,5
202:23 243:13
257:15 263:25
289:23 331:16,
24 337:2

**dozens** 240:9

**Dr** 8:18 9:20
11:15 14:3,7,
22 15:6 16:15
19:6 26:19
27:21 33:25
34:7,16,25
36:4,14,17
38:7,10,13,15,
21 39:12 40:8
42:6 43:16,21
44:1,5,8,12,19
45:2 47:17,18
48:11,17 66:16
69:9,15,16,17,
18,19 73:7,10
74:4,6,12
80:15 81:9
89:6 96:9,21

100:13 106:3
116:16 138:24
141:4 161:13
162:19 167:16
214:6 216:4,5,
6,8 260:21
266:7,9,13,25
267:15,16,17
268:24 269:22
281:17 282:6
286:10 290:24
291:1 292:24
299:7 310:19
321:23 326:11

**draft** 108:7
340:10

**drafted** 298:17

**Drake** 116:22

**draw** 26:8

**drawing** 62:15

**drew** 320:5

**drink** 39:10

**drive** 23:23
24:1,2,6,10,19,
21 34:3 41:21
83:18 177:17,
18 178:4,6
296:10,15,18
297:9,11

**drop** 57:14

**dropped** 57:18

**Drospirenone**
118:10

**drug** 18:20
39:3 45:17
47:7 55:10
71:6,8,9 78:3
82:21 87:18
88:12 115:4

120:8 132:23
134:12 135:16,
23 136:1,5,6,8,
14 137:7
140:21,23
141:11,18,22
142:8,9,21
143:18 144:5,
8,9,11,13,21,
22 146:24
147:2,17,22,24
148:3,8,11
150:3,13,22
151:7,18
152:12 154:2,
7,25 155:9,13,
16,19,25
156:2,17
158:5,11
160:3,8,12,15
163:16 171:20
173:13,16,23
175:17 183:11,
13 186:18,25
187:4,5,8,9,10,
12,13,16
190:14,17,25
191:2,13
192:19 194:10,
15,17 196:19,
22 197:10
199:3,12,14,16
200:8,9 201:15
202:7,9 229:8,
12 245:15,19,
25 260:7,9
261:18,19
262:7 271:6
273:22,23
274:18,20,23,
24 275:8,9
276:13 281:9
288:19 292:23,
24 293:9,11,
14,16,17 294:2



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016    Index: drug's..employment

295:10,21,24
299:23 301:9,
12,24 304:5
317:7 332:8

**drug's** 153:1
159:24

**drugs** 47:9,10
62:17 91:1
119:8,13,17,20
136:3,4 137:1,
13,15,16 140:7
141:12,14
144:2,3 147:22
149:21 151:14
152:16,18,25
153:6,10,14
156:18 160:1
163:10,21
174:7 179:25
180:4,25
183:18 186:16,
18,23,25
195:24 196:12
202:4 203:8,12
225:15 226:11
227:9 228:2,22
245:9,14,22
246:23,25
247:2,6,10,21
248:10 251:5,
14,17,18 255:2
256:1 257:18,
19 261:8
293:2,7,22
294:1 303:4
333:7

**dry-cleaner**
72:21

**due** 204:9

**dues** 51:8,13
52:15

**duplicate** 24:2,

21 192:17

**duplicated**
199:21

**duplicates**
44:1,3,22

**during** 12:20
44:13 50:15
60:3 62:5
70:18,21,23
83:11 132:6,
14,22 154:15
155:7 189:10
222:17 223:9,
19 242:15
244:3 254:19
279:10 313:20

**Durkin** 322:13,
22

**duties** 11:21
59:20

**duty** 71:13
244:19,22
245:1,3,6
246:23 247:24

———————

**E**

———————

**E00424316**
276:11

**E00426108**
291:7

**each** 17:23
18:12 27:22
45:1 47:20
91:24 211:6
219:22 241:17
320:9 330:20
333:6

**Ear** 215:19,22
216:12,16,19
217:17

**earlier** 48:12
71:4 81:16
95:5 100:10
165:12 177:19
181:5 184:13,
24 190:5
199:23 201:7
215:14,25
229:14 242:5
243:25 253:8
254:15 258:6,
259:7 260:5
264:25 265:19
279:24 296:19
324:15 325:2

**early** 51:21
132:15 190:9

**easily** 243:7,12

**Eastern** 119:24

**easy** 88:20
90:6 145:7

**Ebel** 334:1,4,7
335:21

**economic**
264:23

**economics**
78:21

**edited** 97:9,10

**editorial** 43:6,
11

**education**
107:18 108:12

**effect** 146:25
148:2,5 151:7
154:19 155:12,
15,17 192:23
202:7 210:14
284:8

**effective**

151:19 153:12

**effectively**
69:20

**effectiveness**
152:21

**efficacy** 133:8
251:4,16

**efficiency**
110:14

**efficient** 16:19

**effort** 291:18

**eight** 197:23

**Einstein** 52:10
63:16

**EIR** 190:7

**either** 11:16
12:24 23:14
73:16 94:23
99:12 102:16
194:4,18 195:7
199:14 230:18
293:24

**electronically**
177:23

**elicit** 97:24

**eligible** 57:2
63:24

**eliminate**
312:16

**else** 11:12
23:22 24:23
31:19 33:11
34:6 41:13
79:17 88:24
109:11 112:7
142:4 188:8
212:5 214:15
281:20 291:23

297:25 331:17

**else's** 37:4,24

**email** 47:14
82:2 96:5
220:18,21
221:7 224:12
268:1 270:8
292:22 295:8
298:9,10
299:1,22,25
311:11,15
314:22 316:25
322:13

**emailed** 283:19

**emails** 216:10,
25 217:4,11,15
219:22 220:2

**emergency**
62:14 189:10
284:16 285:25
289:6

**emit** 251:7

**emphasize**
192:12

**emphasizing**
194:14 276:22,
23

**employed**
71:21 111:3,12
288:19

**employee** 36:1

**employees**
204:14,25
207:3 295:9

**employer**
277:12 328:7

**employment**
72:16



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
*Nationwide Coverage*

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 371 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016        Index: empty..event

empty 178:7

enacted 147:21 154:13 163:17 251:13

enactment 243:11

encourage 256:16

encouraged 264:4 270:21

encourages 309:17

encouraging 309:12

encumbered 65:6

end 14:14 52:15 60:11 94:13 96:12 112:5 152:13 161:9 183:19 211:10 219:2 225:3 246:25 260:10 278:21 283:22 309:4 322:19,25 325:9 335:12 341:8

ended 11:20 339:5

ending 299:13

endo-ophthalmitis 285:1,3

Endophthalmitis 285:2

endoscopic 127:23

endoscopy 127:15,16,24

endotoxin 305:8,13

endotoxins 291:9 305:10

endurance 17:6

enforce 230:12 333:11

enforcement 147:19 173:18 198:1,23,24 203:6

engage 153:18, 19 206:21 333:20

engaged 17:10 28:24 29:10 33:12 108:18, 21 109:15,16 119:5,7 122:13,18 125:17,21 126:16 128:19 130:4 163:9,20 164:6,16 168:13 170:18 183:4,16 186:12 205:22 209:7 215:9 236:1

engagement 23:20 25:2 31:20

engages 199:6 260:25

engaging 76:6

engineering 22:25 23:5

England 40:13 266:1,3 267:5 268:19 270:7 292:21 298:15 300:3 338:5 339:7

enjoin 134:8, 16,17

enough 15:2, 16:3 17:7 100:5 239:1 253:18 305:24

ensuring 267:19,24

enter 132:24 134:19 218:17

entered 68:7

entire 23:19 58:10 67:19 93:25 94:21 153:4,5,11 166:25 196:18, 19 223:5,19

entirety 69:10 160:16

entities 58:2 70:9 119:7 123:4 164:11 198:24

entitled 40:15, 18 74:5 93:10 95:12 102:5 202:25 203:6 204:2,10,11, 15,19,20,25 205:2,5,7 228:6 272:25 291:22 292:1

entity 261:17

entry 265:4 279:25 283:17 289:7 308:14

envelope 319:21,24 320:3,25 321:1

enzyme 89:20

epidemiology 64:3

epidural 62:2, 17 137:18,23 138:17 239:15 290:13

episode 195:4 291:6,10

Epstein 78:14

equally 282:5

equation 152:24

equipment 108:3, 187:15, 18 188:5,10, 11,12 189:22, 23

errata 19:15, 18,19,21 24:14

erythromycin 328:9 329:5 330:6

ESI 31:25 32:21

essence 41:17 115:7 116:23 147:24 148:2 189:19

essential 196:2 225:14 226:9, 13,14 261:10

essentially 190:16 191:1, 5,8 200:1 293:18

establish 172:7 304:23,24 317:23 319:9 320:8

established 155:24 234:5

establishes 266:21 311:15

establishment 243:1 250:25

establishments 163:1,8,19 164:1,3,5 170:17 264:6

Estephan 126:2,3,4

estimate 58:23 64:5 182:4

Estimated 46:10

et 58:17 59:19 119:13 215:3

evaluation 73:20

even 12:13 15:19 26:1 60:4 93:25 106:9 180:12, 24 197:25 235:15 245:18 271:6 287:13 292:8 306:25

event 35:20 102:10 127:19 288:25 309:5



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 372 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016    Index: events..expense

**events** 102:7
127:19 158:6
159:24 284:25
286:6,12

**eventually** 76:9

**ever** 21:20 52:6
53:8,13,23
54:3,13 55:16
62:1,4,16
63:21,24 65:3
77:13 82:11
137:19 139:23,
24 141:7
165:23 167:2
168:13 242:2
243:19 254:6
257:22,25
302:9 327:2

**Evers** 142:12

**every** 49:18,25
61:9 81:24
87:17 99:22,23
146:7 213:2
216:23 241:17
326:12 330:20
332:10 333:6

**everybody**
17:13 143:25
165:15 231:24

**everything** 33:6
41:18,22 49:18
84:19 194:25
236:9

**evidence** 80:4
115:5,17
131:10 155:1
201:11 202:6
207:21 210:8
214:12,25
215:2 217:20
223:17 238:11,
23 241:18

271:5 303:9,18
324:8 330:21
331:9 334:25
339:10

**evidences**
215:8

**exact** 29:5
57:20 59:3
60:9 87:12
169:8 210:6
224:5 225:21
266:8 270:18
306:11

**exactly** 23:21
32:6 55:2
57:17,21 58:5,
21 70:1 72:19
86:24 127:21
129:22 132:15,
18 138:14
163:2,25 164:1
171:16 173:20
179:6 181:2
189:21 208:18
211:25 216:2
222:12 229:23,
233:24 256:4
267:14 302:16
304:20 307:13
313:12 315:25
320:11 321:3

**examination**
9:8 73:21

**examined** 9:6

**example** 28:9
33:5 34:15
39:2 41:4
42:13 48:24
54:15,19,22,23
55:1,9 135:2,
25 137:1
138:15 182:19,

25 183:3,9,10
184:15,20,22,
24 186:6
260:3,6 273:10
288:5 339:4

**examples** 175:7
326:16,20
338:13

**except** 42:1
174:11,19
179:25 263:11
330:18

**exception**
11:10 199:15
242:6

**excerpts** 21:18
279:7

**excuse** 70:12
93:22 115:21
208:1 227:3
235:7 265:15
268:19 269:17
299:15

**excused** 341:3

**executed** 42:7

**executive**
104:19 266:17
269:23

**exempt** 148:3,
10 154:20
247:4 294:1

**exempted**
147:21 154:2,7
155:9 251:17

**exemption**
13:14 199:16
244:15,19
246:2,22
247:11,23
248:8,10,11,12

**exemptions**
248:15

**exercise**
198:23

**exhaustive**
199:9

**exhibit** 9:18,25
10:2,4 17:14,
15,16,19 44:16
47:19 49:7,11
66:16 68:1,4
74:5,8,20,21
81:4,7,8,21
82:2 83:6,8
84:5,7 87:8
95:4,13,15,21,
23 96:3,4,6
110:4,21,24
129:1 140:10,
12 159:1,3
162:9,17
168:14,23,25
170:3 175:10,
13,18 177:22
178:1 182:9
219:6 224:14
244:9,12
252:10,11
267:12 272:5
275:15,17,24
279:7 281:8
290:4 291:25
292:3,6,16
299:19 310:13,
15,17,18
314:16,17
316:20 323:3
327:21,25
328:3 334:9,
15,16 336:2

**exhibitor** 82:14
83:1,4,9,13,23

**exhibits** 13:1
19:2,7,9 31:1,
5,10 33:15,17,
18 34:4,5 40:2
47:22 49:8
66:15,18,22
166:8 167:3
168:4,9,20
216:1,3,9,18
219:13,14

**exist** 63:8
274:12

**existed** 12:13

**existing** 14:1
155:18 183:6

**exists** 15:5
226:18

**expand** 14:2
24:3 113:21

**expanded**
76:11

**expands** 24:5

**expect** 14:19
207:7 290:11
309:18 310:5
322:9 326:19

**expected** 172:3
336:19,20
338:15

**expecting**
325:22

**expedite** 15:17

**expedited**
340:15

**expediting**
340:12

**expense** 23:5



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 373 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016       Index: expenses..FDA

76:23

**expenses** 73:22
74:15

**experience**
59:13 82:8
106:4 188:16
253:18

**experienced**
290:14

**expert** 54:4,14
55:16 79:20
88:25 89:3
99:15 104:16
127:10 161:19
176:6 227:23,
24 228:3,19,23
230:5,8,17,25
242:21 253:1
259:8 262:7
268:18 303:3
304:25 329:13,
17 330:8

**expert's** 92:22

**expertise** 79:14
246:6 329:2

**experts** 10:12,
19,20 13:11
15:7 18:23
230:3,4,23
307:12

**expiration**
57:16 298:13
306:6

**expire** 306:20

**expired** 57:6

**explain** 12:2
16:25 152:14
321:23

**explicit** 140:8

**exposed** 209:8
239:18,22
240:4 317:2
318:23 331:5

**exposure** 317:5

**express** 114:17

**expressed**
38:23 100:13
105:11

**expression**
153:10

**extensive** 33:4

**extensively**
87:15 141:8
152:16

**extent** 13:8
108:4 269:6

**extolling** 208:3

**extra** 325:24

**eye** 215:19,22
216:12,16,19
217:17 284:16
285:24 289:6

---

**F**

**facilitate**
178:17 218:13

**facilitating**
178:22 209:13

**facility** 94:13
224:24 335:3

**fact** 46:11 69:3
78:9,24 107:23
126:9 133:16
140:20 142:21
150:22 153:4
164:16 165:24
171:14 187:22

192:16 202:3
205:25 222:7,8
240:3 241:22
261:23 264:20
266:8 303:4
304:14 305:20
313:2 335:14

**factor** 174:22

**factors** 57:24
186:15 199:8,
9,25 200:2
258:23 261:16
262:1,4 263:17

**facts** 11:22
26:7,21 116:12
195:2 218:12
222:16 281:7,
303:8 314:4
336:23

**factual** 27:11
261:2

**faculty** 65:18

**failed** 116:8

**failure** 118:23,
25 128:11

**fair** 100:5
107:9 119:22
151:16 168:9,
12 276:24
316:2

**fake** 215:6

**fall** 22:21

**false** 44:19,21
211:12,16,17,
18 214:22
218:3,7 227:17
331:5

**familiar** 27:1,4
43:8 57:22

58:2 78:8,23
79:4 108:5
140:13 231:7
239:1 278:10

**familiarity**
81:18 86:5,8,
11,13

**families** 117:4

**family** 17:3
117:2

**Fanin** 316:13

**far** 14:3 103:6
142:2 167:6
235:15 286:20
315:2

**FASCA** 82:9,
11,13,15,17,22
83:4,12,24

**favor** 12:9
67:16 85:21
163:2 221:4
300:7

**FDA** 11:17,19,
12:21,24 13:1,
6 14:7,12 28:9
32:3,22 34:18
35:12 36:5
37:1,10,22
38:14 40:16,18
43:22 46:14
47:13,16 51:23
71:5,25 72:3,7,
17 73:21 74:13
82:25 83:6,8,
10,11,21,23,24
85:14 86:7
95:12,14 96:1,
3 98:5 100:7,
24 101:10,14,
18 102:1,15
104:3,4 106:12

107:19 108:3,9
115:8 119:16,
20 123:6
131:20 132:2,7
133:8 134:6,7,
15,16,18,21
135:2 137:5,6,
7,17 140:7
141:10 142:2,5
148:6 151:10,
12 154:24
155:17 162:23
163:5,6
164:14,17,22
165:6,11,13,
17,25 166:7,8
167:3 168:14
169:3,12,20
171:23 172:4,
13,20,24
173:17,24
174:25 178:13
179:10 180:11,
23 181:7,13
182:18 184:14
186:18,25
187:19,24
188:10,11
189:23 190:8
191:7 193:18
194:21,23,25
195:3 198:22
199:14,19
200:22,25
201:14 202:1,
8,13,25 203:6
204:2,13,24
206:1,20,23
207:3,6,7,9
208:24,25
209:2,4,22,25
210:11,17
211:1,4 242:25
251:3 254:5
257:22 258:3,



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 374 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016     Index: FDA'S..finishes

16 259:15
260:13,23
261:14,15,16
262:4,8 264:11
266:1,4 267:1,
6 268:14,19
269:4,15 270:7
271:5,13
272:18 273:2,
7,20 274:7,14,
16,17,20,21
275:4 276:11,
14,21 277:12,
14,17,21,22,25
278:1,2,6
282:21 283:18
284:1,13,18
285:5,9,23
286:5,7,9,16,
25 287:5,6,9,
14,19,22
288:1,9
289:12,23
290:1,11,18
291:7,15
292:7,20
293:3,13,21
295:9,11,22,25
296:9,11,20
300:13 301:7,
12,13,22
302:17 303:6,
11,14 304:15
305:12,13
308:22 309:6,
24 310:11
311:3,19
312:8,10,11,17
313:1,7,8,16,
21,22 314:6,7,
13 315:17,18
316:2,3,8,25
318:3,6,12
321:5 322:4,7
327:21 328:11,

15,18,20,21,22
329:3,6 330:4,
8,12,17,20,25
331:3,4,11,12,
15,23,25
332:2,7,9,10,
12,14,22
333:4,5,10,13
335:12,17,23
336:13,19,20
338:16 339:1,
2,9 340:6

**FDA'S** 11:17
47:4 140:5
141:19 162:4
163:25 170:1
172:11,16
174:3 193:10
206:20 207:15
250:18 268:21
287:6 313:3
332:8,14,21
334:23

**FDA-
APPROVED**
186:17,24
190:17 191:2
309:4

**FDA-
REGISTERED**
114:15,18
117:7,19
118:5,18
121:14 124:3
131:17 243:14,
20

**FDAMA** 147:21
148:2,5,7,10
154:13,19
155:12,15,17
192:23,24
193:6,8 197:9,
12,14 199:15

209:2 210:14
248:5,7,13,19,
21 251:13,19
263:13 293:25

**feasible** 189:22

**February**
35:13,18 71:14
72:17 73:22
76:8 175:14
181:12,16,
183:22 193:17
194:20 211:2
302:15

**federal** 70:15
109:14,17
126:13 134:12
163:16 198:23
205:13,16
226:24,25
228:1,22
251:21

**Federation** 82:9

**fee** 243:1

**feel** 86:18 87:1
276:3 291:23
297:12

**feeling** 80:24
157:10

**fees** 71:2
243:9,10,12

**fellowship**
63:1,5,12

**felt** 116:14
262:19 268:7

**fentanyl** 135:4,
6,9,17 136:1

**fetus** 115:17

**few** 13:25
19:17 39:13

56:6 57:10
73:5 79:11
153:3 273:1
277:10

**fibromyalgia**
299:8

**field** 56:24
63:19,22,25
315:19

**Fifth** 149:23
150:1,5,8

**Fifty** 300:23

**Fifty-two**
300:24

**fight** 331:14

**figure** 133:20
217:1 254:8

**file** 23:20 24:7,
9,20 25:2
95:20,22 178:9
181:8 187:5,9
290:21 291:3

**filed** 67:1,10
68:6 113:18
114:8

**filing** 312:16

**fill** 83:14,16
211:5

**filled** 36:19
236:17,20
237:5 243:21

**filthy** 210:16
274:24 304:4
331:10

**final** 193:25
340:21,22
341:17

**finally** 47:12

**Financial** 75:12

**find** 10:17 23:2
46:18 57:20
62:10 82:19
111:7 162:1
178:6 184:4
198:5 216:3,7
248:24 277:10
290:16 291:18
295:16,18
296:10,16,17
297:6 303:14
318:4 323:7
324:19

**finding** 68:21
75:3 91:21

**findings** 181:11
194:22

**finds** 168:15

**fine** 14:21 51:1
73:11 80:22
81:3 95:10
102:8 105:25
109:20 126:6
278:11 292:5
341:2

**fingers** 15:17

**finish** 17:5
26:13,16 92:25
99:3 102:5
136:11 146:16
166:13,22
170:7 177:14
205:19 223:6
250:14 281:15,
18 332:2

**finished** 52:13
93:3 102:4
186:16 220:1

**finishes** 145:1



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016       Index: fire..formulations

**fire** 37:7

**fired** 37:14
65:24

**firing** 67:21

**firm** 22:25 44:5
110:15,17
123:19 161:15
316:1

**firms** 71:1
182:19 183:9,
11,14 260:6

**first** 12:3 16:21
18:19 21:20
40:5 48:17,24
54:15 68:24
71:4 74:7,25
75:16 79:25
81:9 111:1
124:16 126:2
128:1 143:23
148:19 163:4
165:8 170:20
172:8 175:23
178:11 182:22
183:6 196:3,4
202:5 211:18,
20 223:25
244:22 246:7,
10,11 250:9
275:18 284:6
298:8 304:16
317:15 319:18
328:4 338:7

**five** 22:7 24:15
26:5 271:22,24
278:15,18
305:11 314:9
318:22 323:23

**flagship** 59:10

**flip** 17:20
280:16

**Flonase** 119:4

**floor** 23:12
233:22,25

**Florida** 42:24
43:15

**flu-like** 290:14

**fly** 83:17
329:22

**focus** 43:15
68:20 193:9
210:12 306:14

**focused** 81:18
207:9 208:25
210:11,17

**FOI** 13:1,8,13
28:9 30:17
47:16 75:20
178:4,5 296:9

**folder** 74:9
95:20,22 178:7
296:9

**folders** 48:9

**folks** 150:4
204:13 210:3
215:16 232:10,
17 236:4
265:14 335:12

**follow** 13:24
16:17 49:12
174:2 275:25
280:3,4,9

**follow-up**
286:18

**following** 94:9
142:17 199:7
260:25 332:20

**follows** 9:6
162:25 194:2

237:19 238:5

**food** 71:6,8,9
78:3 82:21
88:11 132:23
134:12 135:16
136:8,14
140:21 154:7
155:9 160:3,
12,15 161:2,3
163:16 171:20
175:17 197:10
251:6 272:14
276:13 281:9
288:19

**fool** 217:2

**foot** 287:22
288:20

**footnote** 18:13
33:25 136:19
156:7 223:11
224:4

**footnoted** 41:6

**footnotes** 216:5

**force** 172:14

**foregoing**
199:8

**forehead** 16:10

**forestall** 313:21
314:4

**forever** 326:4

**forget** 58:21

**forgotten**
287:13

**form** 33:22
62:4 79:1
86:23 98:7
105:18 106:9
108:25 111:9

124:23 133:2
134:10,24
137:10 138:7,
12 139:10
141:1,21 143:3
150:17 151:21
153:23 156:4,
12,15,21 157:3
159:21 163:23
168:4,18
170:10 171:3
175:5 177:3
179:13,17
184:3 185:19
186:2 188:6
189:19 191:20
192:1,21
194:12 195:9,
18 196:8,13,17
197:6,15 198:7
200:4 201:17,
20 203:2,11
206:18 207:24
208:1,6,12,13,
17 210:8
211:22 212:1,
12 213:7
214:19, 215:20
217:7,19
218:2,10 220:9
221:15 222:20
225:12,20
227:2,14,
228:20,24
230:20 231:2,
5,7,18 232:2,
11 234:14
236:6,15,18
237:2,4,9,18
238:17,18
240:23 243:5
244:24 251:8
252:5 253:11
259:19 260:17
262:9,10 267:9

269:20 270:15
274:9,15
284:20 286:2,
17 293:4
301:14 302:1,3
303:8 306:7
309:10,15
310:2 311:22,
23 312:22
319:15 321:11
323:22 327:4,5
329:8 332:6
333:15 336:4,
5,17,22 338:19

**formal** 24:19
63:5 73:16
312:12

**formed** 11:20
12:15 14:14
80:6

**former** 277:12
328:7

**forming** 26:8

**forms** 33:14
76:23 209:12
214:24 218:15
222:24 229:13,
16,19,20,25
234:15,22
236:18,21
238:1,12,15
243:21 304:12

**formula** 85:14
239:11

**formularies**
31:22 229:9
251:22

**formulary**
252:1

**formulations**
86:4



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: forth..Gideon

**forth** 179:5
330:23

**forward** 222:6
272:2 312:18
333:9

**forwarding**
300:4

**Fosamax**
126:7,9,
146:12

**fought** 330:23

**found** 70:14
72:16 75:14
89:19 270:1
274:17 303:12
318:7 339:13

**four** 48:24
302:23 319:1

**fourth** 117:10

**frame** 11:13
51:20 52:17
101:12 137:18
150:12 155:6,7
190:10,11
203:15 233:20
234:4 260:17

**frames** 50:19

**Francisco** 8:9
16:11 58:8
59:18 67:4
129:11 272:10

**Franck's** 42:16,
19,24 95:20
150:4,10

**Frank** 38:18,19,
20

**Franklin** 82:5

**frankly** 292:14

**fraud** 214:12
215:9 217:16,
18

**free** 109:17
140:3 191:5,
12,16,18
194:13,14
241:13 266:20
277:7 288:15
312:18

**Freedom** 11:18

**frequently**
57:25 59:9

**fresh** 264:20

**Friday** 166:24

**front** 20:11
21:7 48:15
68:18 81:21
86:17 97:21
138:20 159:5
161:18,22
171:8 177:10
190:12 200:1
219:12 221:6
224:11 226:5
253:17 256:25
257:5 259:18,
25 273:9,12,20
290:4 295:8
299:12 310:19
318:5,14 319:7

**Frost** 122:15,
18 128:19

**frustrated**
235:8

**full** 68:24 76:4,
5 112:15 164:9
173:4,5 193:25
286:7 318:3

**fully** 27:1 101:5

102:21,22
104:15 202:8

**functioning**
258:24

**fund** 44:12
75:6

**fundamental**
99:11

**funding** 107:19

**funds** 76:17

**fungal** 98:3,6
100:7,25
101:6,12,20
104:4 239:2
252:24 288:20
308:11,13

**fungi** 253:3
307:4,6,11,17,
19,22

**further** 106:20
278:2

**future** 66:25

———————

**G**

**gap** 111:16

**Garber** 126:3

**gave** 26:9
28:12 30:4
47:12 58:11,
14,15 61:19
88:4 95:5
148:22 197:21
199:14,16
208:18,19
225:22 229:20
259:6 287:4
294:9

**GE** 322:19

**Genentech**
285:16

**general** 16:16
52:3 59:18
94:1,3,7 103:3
112:22 113:2
120:12,20,22
142:1,2,15
164:2 180:14
302:4,10,19,21

**generally** 51:2
79:4 107:21
142:5 180:19
200:8

**generated**
263:17,19

**generic** 32:10,
12 119:13,17,
20 139:3

**Geno** 8:18

**gentleman**
109:22 214:3
292:19 338:4

**GEO** 21:18

**gets** 36:22
270:8 286:5
297:8 332:15

**getting** 9:16
100:14 116:25
139:2 171:18
211:19 247:9
259:17

**Giamei** 219:13

**Gideon** 8:22
9:8,9,15 10:6,
24 11:8,23
12:15,18 13:23
14:14,21 15:2,
8,13,20,24
16:2,6,10,13

17:18 23:3,8
26:14,24 27:1,
9,16,19 39:17
40:3,6 48:2,5,
8,14 49:6,10
66:19,24 68:3
72:13,15 79:5
80:14,20,25
81:6 87:2
90:21 91:10
92:8,13,18,21,
25 93:2,12,22,
24 94:3,14,19,
25 95:8,12,19
96:20 97:4,23
98:10 99:4,10,
15,19,22
100:2,3,6,16,
18,23 101:19
102:8 103:4,16
106:3,16 109:5
110:23 111:10,
15,18 124:13,
17 125:1
130:9,19,25
133:22 134:13
135:1 137:12
138:8,15
139:20 140:12
141:3,22
143:16 145:2,
4,9,16,18,20
146:1,10
149:4,14
150:20 151:24
154:4 156:10,
13,19,25
157:7,13,20
158:3,13,17,23
159:5,11,14
160:2,20,23
161:1,5,8,13
162:12,19
164:4 166:6,
17,22 167:16,



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
**Nationwide Coverage**

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016      Index: give..got

21,25 168:11 169:2 170:16, 23 171:6 175:9,12 177:7 178:12,17,21 179:1,14 180:2 184:8 185:25 188:15 191:22 192:5,24 195:5,14,22 196:11,14,25 197:8,20 198:9 200:16 201:24 203:5,15 204:12 205:6 206:13 207:1 208:2,9,14,20 209:17 210:22 211:11,24 212:4,9,15,22 213:2,4,16,21, 24 214:3,8,13 215:16,24 217:13,25 218:5,19,23 219:12 220:14, 20,22 221:1 222:25 225:16, 24 227:5,18,22 228:17,21 229:1 230:24 231:23 232:8, 16 234:10,21 235:1,5,10,18, 24 236:7,11,22 237:6,11,15 238:3,16 240:2 241:3 242:2 243:9 244:11, 25 249:6,12, 16,20,25 251:11 252:8, 10, 253:13 255:19 256:23 257:2 259:13,

22 260:20 262:17 268:12 271:19,25 272:4,11,14,17 274:11 275:17, 25 276:7,18,20 277:1,5 278:1 279:15 280:1, 8,13,17,19,21 281:4 282:2,6, 9 285:2 286:4 287:11,16 289:5 291:12, 25 292:3,6,12, 15,18 293:6 294:21,23 297:12,17 298:2,8,20,23 299:2,20 300:6,13,16,25 301:5,18 302:2,7 303:14 304:23 309:13, 22 310:10,15, 18 312:1 314:9,13,15, 317:22 319:18 320:2 321:9, 13,22 323:2,5, 9,19,23 324:4, 10,14 325:17, 23 326:7,11,22 327:1,6,20 328:16,25 329:12,25 330:14 333:9, 24 334:15,17 335:13 336:10, 18 337:2,21 338:8 340:13, 16,23,25 341:4,12,15, 21,23

**give** 10:13

16:16,24 20:10,13 23:25 24:8,12,24 28:17 40:1,19 46:16 49:7 52:15 59:7,12 72:5 74:23 84:24 85:12 86:15 88:13 89:2 90:1 92:6 95:14 97:13 105:25 107:4 108:8 111:6 114:25 129:19, 22,24 140:9 142:1 145:14 163:24 165:4 168:11 169:18 170:3 172:19 175:7 190:21 191:7 198:3 215:16 217:23 221:4 222:12 223:11,24 225:23 226:1 238:22 248:20, 21 249:25 252:8 254:20 255:11,13 256:5 259:7,25 271:19 275:14 284:23 289:8, 9,12,14 290:20 291:2,3 295:25 297:1 298:7 308:16 310:10 317:12 318:18, 20 321:22 323:11 324:24 327:25 328:24 331:20 334:8, 10 337:18

**given** 16:15 27:11 28:24

33:20 39:14 65:11 167:2 236:7 238:24 241:25 304:14, 25 307:10 329:1,19

**gives** 166:24 172:16 228:8

**giving** 11:10 15:11 40:8 59:19 166:14 213:23 218:15 221:19 290:7

**Glass** 10:7,9 11:12 14:16 15:23 21:4 107:3 340:21

**glycol** 97:18

**goal** 240:16

**God** 22:17

**goes** 46:9 47:2 225:6 233:9 240:11

**going** 15:13 22:23 29:13,24 34:11 40:9 47:18 54:10,20 74:4 80:12 81:6 83:17,18 89:4 94:14,20 95:4 103:10,12 104:17 110:10, 13, 112:14 125:4 146:1, 10,15 149:21 152:1 156:23 161:20 185:23 188:17 198:2 213:16 216:25 225:14 226:10 227:8 235:6,7,

10,13 241:10 252:25 254:20 256:21 261:16 277:9 278:15, 23,24 279:20 280:3,4,7,8,14 281:5,6 283:16 286:25 287:6 289:13 290:10 295:20 306:3 308:18,20 309:23 310:22 311:7 312:25 313:14,15 316:4,9,12 319:7 321:22 322:7 325:11 328:25 331:16, 21,22 333:8 334:10 338:11 339:14 341:7

**gold** 327:2

**gone** 206:1 331:5

**Gonzales'** 148:9

**Gonzalez** 150:8,10 155:2 271:17 313:9

**good** 8:3 15:2, 16:3 17:7 26:5 42:25 43:4 65:16 72:13 75:2 98:19 111:17 156:6 162:8 215:24 258:22

**Google** 129:20

**gosh** 166:17

**got** 9:10 10:7 15:23 38:16



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 378 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016    Index: gotten..harmed

40:6 45:5 48:3
94:25 103:22
117:5 124:14
159:5 161:2
170:4 173:10
175:20 212:16
249:18 252:15
254:11 259:22
267:6 271:25
278:16 280:13
283:25 284:1
285:17 292:15
295:8 296:6
297:15 299:20
334:5,6 335:3
339:24

**gotten** 141:15
240:9 249:7

**govern** 148:13

**governed** 151:9

**governing** 36:1

**government**
9:21 38:1 67:8,
14 70:6 340:19

**government's**
104:6

**grab** 39:10

**gracious** 326:8

**graciously**
341:17

**graduate** 77:20

**graduated** 77:7,
10

**grand** 59:19

**grant** 198:1

**granted** 67:16

**Granting** 68:4

**grants** 64:4

**gray** 200:12
271:18

**great** 15:1
85:25 109:4
272:14 333:8
338:24

**greater** 58:7
79:22 267:18
306:22

**greatest** 254:9

**green** 43:23
44:22 45:3
73:5

**grievance**
68:13 69:9,11

**Grinder** 31:7

**Griscom** 43:13,
20 95:22

**ground** 204:14

**grounds**
100:10

**group** 40:14
43:12,16 75:22
76:2,5, 220:6

**groups** 155:22

**growing** 335:2,
10

**growth** 304:11
306:22

**guarantee**
131:23

**guarantees**
131:25

**guess** 24:8
37:13 61:1
80:2 83:9

93:16 188:18
226:2 280:23
285:15 301:10

**guessing** 71:23
325:12

**guidance**
264:1,6 270:20
273:1,3

**guide** 30:10
162:4,6,23
164:8 169:11
170:6, 171:21,
24 175:8
179:20,24
182:16 184:14,
25 186:15
190:19 193:10
195:1 196:4
197:19,24
199:21,24
200:2 243:24
258:5,8,21
259:23 270:6,
11 273:5
309:7,12

**guides** 30:9
162:20

**guise** 256:17
309:1

**guy** 49:20
297:21

**guys** 99:10
166:18 338:24

---
**H**
---

**hah** 70:2

**half** 61:2 201:4
235:15 311:21
312:3

**Hamburg**
266:9,25
267:15,17
268:24

**Hamburg's**
266:7

**Hamilton** 68:8

**Hammond**
122:19,21

**hand** 14:19
40:10 48:7
72:1,8 74:1,4
81:6 85:21
86:25 87:3
88:8 110:10,13
138:2,24 139:3
148:21 151:22
152:1 175:12
210:1 263:14
292:20

**handed** 73:4
87:7 141:12
162:19 179:2
220:5 221:11
272:18 335:13

**handing** 66:16
68:3 76:7
156:18

**handle** 75:6

**handled** 37:17
268:8

**handoff** 76:5

**handwriting**
21:8 22:7,9

**handwritten**
24:16

**Hang** 86:22
99:8,21 102:3
106:8 149:1

157:12 171:1
185:18 201:19
204:5 208:8
210:7 218:2,10
223:20

**hangs** 180:8

**happen** 224:7

**happened**
66:17 251:11
310:8 312:21
329:1 332:19

**happy** 23:16,25
24:24 29:20
32:18 44:3,14
45:4 80:19
82:20 86:16,21
87:4 88:18,20,
21 89:2,20
103:15,22
104:1,23,24
105:4,12,20
106:2,22,24
121:11 126:4
129:23 130:15
138:21 170:2,
12 171:25
175:2 200:6
217:24 220:3
249:4 257:1
282:15 296:3,
8,13,17,22
307:7 308:1,6
325:17 328:24

**hard** 23:23
24:1,2,6,10,18,
21 34:3 41:21
108:20 124:13
177:17, 296:18

**harm** 304:10
306:17 331:2

**harmed** 240:9,
17 339:4



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016    Index: harmful..house

**harmful** 115:9

**Harvard** 77:12

**hasn't** 62:11
137:4 157:11
167:17

**haven't** 40:4
46:15 73:11,12
81:24 167:8
183:20 264:8
280:17, 318:19

**having** 9:5
37:4,24 43:21
58:24 86:17
98:25 103:2
104:4 108:20
151:6 154:14
161:21 214:16

**hazard** 338:22

**haze** 16:11

**he's** 15:23 27:7
36:15 43:21
144:23,24
157:20,22
159:5 168:6,21
213:23 249:20
301:9 326:23
329:19 337:8,
12 338:6,11,13

**head** 36:4,19
37:7,23 38:7
54:20 89:5,11
90:4 114:25
129:23 178:10
220:1,4 239:8
248:9 253:16

**headed** 221:7

**heading** 45:20
46:3 92:17

**headings** 46:7

**headquarters**
315:20

**health** 8:20
31:24 107:17
108:12,16
245:23 251:4
274:21 275:11
331:9,13
333:11 335:7
338:22

**healthcare**
50:4,8 118:16,
17 134:22
140:23 158:7
322:19

**hear** 130:16
138:23 254:10
298:24

**heard** 139:21,
24 313:18

**hearing** 66:4,10
69:3,8,14

**hearings**
102:11,12

**held** 52:4,5
53:21 181:9
183:18 341:10

**help** 22:14 28:5
180:17,22
189:25 212:21
222:23 224:6
235:2 295:18,
20 296:11,12
297:6 321:18

**helpful** 178:21
197:5

**helping** 212:23

**Henry** 43:24
74:6

**here** 11:4 12:7
13:14,16 18:2
20:12,14 21:9
23:18 32:23
36:16 41:7
44:6,7 47:19
48:3 53:17
58:10 59:6
74:10 86:14
88:25 91:24
97:2 98:11,15,
16,17 100:13
101:5 103:19
104:2,18
106:15 109:23
112:16 114:1
119:3 126:24
131:23 138:1,3
141:12 144:2
153:6,7,16
159:4 161:2
173:7 174:13
178:6, 180:7,9
183:10 184:12
186:5,11
187:24 203:14
218:13 223:15,
23 232:9,15
233:8 235:11,
17 236:8
241:22 254:24
256:25 259:11
261:10,13
269:21 270:10
277:7 280:1
281:23 283:6
286:7 291:15,
17 292:8 294:5
295:22 297:18
298:7 301:17
305:13 310:9
312:21 313:17
315:25 316:6
318:3 324:8,21
329:24 332:20

**here's** 39:21
223:8 235:18
255:15 260:8
275:22 297:11
299:17 330:2
338:13

**hesitation**
98:11

**Hickory** 335:15

**highest** 322:8

**highlight**
279:12

**highlighted**
277:4

**highlighting**
276:2

**hip** 128:1,10

**HIPAA** 222:2,4,
6

**hired** 38:18
108:23 120:7

**history** 43:1
75:18 151:2

**Hmm** 324:10

**hold** 35:18 61:3
65:17 99:1
109:2,3 129:2
178:3 184:5
212:20 213:10
217:6 234:19
294:8 301:15
325:4

**holder** 200:9

**holds** 147:1

**home** 72:20

**honest** 320:16

**honestly** 198:9

**honor** 103:24,
25

**hope** 22:17
157:9

**hoped** 267:17

**hoping** 157:1

**Hopkins** 51:19
52:5 56:8,11,
22

**hospital** 8:20
52:11 58:7,19
59:10 60:1
63:15 189:1,10
229:7

**hospitalist**
59:6,20 60:4,
10,13,15,20
61:5,8,10,14,
18,22

**hospitalized**
317:3

**hospitals** 57:23
59:11

**host** 108:9

**hour** 25:16,20,
22 26:3 60:16,
18 80:12
160:24 208:4
272:7

**hours** 60:23
61:5 271:22,
24,25 278:17,
19 325:9
326:13

**house** 35:20
37:14 38:5
102:17 107:12
172:6 277:24
290:7



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 380 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: how..I've

**how** 18:17 22:4
36:5,11 38:21
58:18 72:15
81:1 88:16
89:12,17 98:8,
18 104:2
127:22 134:15
135:20 143:1
189:19 225:3
253:13 263:2,
12,13,17,18
268:13,17
269:7 271:20
273:12 295:20
334:8 338:25

**Howell** 8:23

**however** 13:12
172:21 173:9

**huge** 210:1

**human** 37:17
115:5,17
163:11 164:7
183:18 251:5

**humor** 130:19

**hundred** 46:24
168:9 218:8

**hundreds** 75:22
240:9

**hung** 132:8

**hurt** 332:15
339:13

**hyaluronidase**
89:12,14,18,24
90:1,3

**Hyde** 43:14
95:23

**hypothetical**
239:19 240:24
241:8 329:9

330:11

———————

**I**

**I'd** 9:11,14
29:18 35:15
45:4 50:9 52:4
53:14,15,20
54:8,16,22
57:10, 59:17
60:3 62:22
72:6 80:2 84:3
85:7,9,22
86:10,21 87:4,
24 88:3,12,15,
20 89:4,10
90:6 92:15
99:19 114:13
121:6,22
125:10 126:4
135:7 150:6
157:9 169:16
170:2,12
171:24 175:2
178:24 187:21
191:8 202:24
216:14 217:8,
24 220:3
221:17 229:22,
23 243:6
248:13 250:19
251:2 257:1,13
282:15 291:5
294:12 296:3,
17 307:7
308:1,6 339:17
340:1

**I'll** 14:18 16:23
23:7 24:25
26:11 27:12
52:21 71:11
79:18 86:25
97:8 100:4
107:7 125:24

129:23 158:2
162:3 165:4
175:12 177:1
182:23 183:10
215:5 219:21
223:11 232:13
238:3 247:15,
18 255:3,6
259:7 276:8
277:2 282:25
296:24 307:12
311:1 320:2
322:11 323:6
325:19

**I'm** 11:6,25
13:2,3,23 14:3
15:5,13 16:8,
22 18:18 19:19
22:17,22
23:10,16 24:22
26:14 27:1,25
28:22,23 29:5
32:18 36:1,2
38:12 40:9,
41:10,13 42:4
44:3 45:8
47:18 49:10,20
51:5,7,11,13,
22 52:14 53:20
55:13 56:16,
18,19 57:2
58:11,14
59:13,17 64:2,
14,17,20
66:16,20 68:3
71:23 72:19
74:4 80:18
81:6 82:19
83:17 84:14,17
86:7,10,16
87:4 88:7,23,
25 89:4,22
95:17 98:12,18
99:15 101:5

102:22,23,25
103:4,10,12,
15,21 104:1,
12,22,23,24
105:20 106:2,
17,22,24
108:6,20
110:10,14,17
112:14,21
114:24 116:15
117:20 124:13
125:4 127:7
130:13,17
131:2 135:7,22
136:12 138:23
139:2,11,23
142:3 146:1,
10,15,18,20,21
148:22 150:5,
18,23,24 152:1
154:13 155:6
156:25 157:7,
10,13,15,25
158:17 159:14,
16,19 160:5,7,
8 163:2 172:23
173:1,5 176:2,
14,15,20,22
177:4,5,10
182:22 188:9,
17 189:14
190:5 193:19
198:2 202:6,8
207:14 212:4,
20,24 219:25
223:3 225:22
228:3,9 229:22
232:14,23
241:10 242:21
244:8 247:13
248:8 249:18
250:2,5,12
252:25 254:11,
20 256:4,9,10,
21 257:5

258:25 259:17
262:19 265:8
269:2 270:17
277:9,20
278:15 279:20
280:7,10,14,15
281:4 283:16
284:1 285:8,13
286:7 290:10
291:7 292:13,
20 293:10
294:15 295:4
297:22 298:7
302:16,17
305:9 306:2,18
307:15 308:18,
20 310:3,22
311:7 312:12
313:16,24
314:2,5 315:2,
21 318:19
319:6,16
321:22 322:7
323:18 324:1,
4,24 325:12,17
327:8,9
328:15,18,21,
25 329:12,19
334:7,10,19
336:17,25
337:18 338:9,
10,11 341:6,
18,19

**I've** 18:22 19:2,
16 20:8 21:20
22:3 33:7 40:6
41:11, 42:12
49:18 50:6
51:5 52:25
53:24,25 54:1,
9 55:11,19,21
56:16 58:3
59:22,23 62:7,
19 69:21 76:4



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ Document 2766-1 Filed 03/29/16 Page 381 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2015 Index: I-o-d-i-x-a-n-o-l..informal

77:25 78:2,3 81:25 94:16 101:17 103:22 104:2 109:18 124:14 126:22 137:11 139:23, 24 141:8,15,25 153:4 166:5 167:24 176:16 178:25 183:20 184:16 185:1 187:4,10,11 191:7 192:3 200:9 211:14 220:12 224:2, 22 229:7,8,9 231:4 232:6 234:14 243:11, 21,22 248:6 255:8 257:14 264:8 266:7 272:18 287:13 290:25 297:23 302:24 304:19 313:18 322:5 326:13,15 331:21 339:20, 21

**I-o-d-i-x-a-n-o-l** 335:9

**ID** 305:8,12

**idea** 38:21 111:17 132:19 168:9,11

**identification** 10:5 17:17 25:2 49:9 66:23 68:2 81:5 110:22 140:11 159:2 162:18 175:11 178:2 219:7 244:10 252:12

272:6 275:16 292:17 310:14 314:18 316:21 336:3

**identified** 23:19 24:4 27:16 273:18 339:25

**identify** 8:12 26:6 47:21 168:20 176:4 328:16

**ill** 210:4

**illegal** 116:7 131:13,14,18

**illness** 324:19

**impact** 140:22

**implant** 134:3

**implement** 132:18,20

**implemented** 141:9

**implicated** 306:15,17

**implicit** 212:6

**implied** 261:3

**importance** 229:11

**important** 43:17 206:19 208:11 249:1 271:2 276:3 279:22 280:15 283:7 304:14

**impotent** 332:22

**imprest** 44:12 75:6 76:17

**improper** 134:8 270:10 326:20 327:14

**improperly** 114:18

**inactive** 50:21 51:4 52:14,21 192:8

**inappropriate** 166:16

**inappropriately** 122:9

**inaudible** 297:14

**Inc** 42:17,19 117:11 120:1 121:24 122:23 272:21

**Inc.'s** 122:4

**incentive** 132:3

**incentives** 132:5

**inch** 252:23

**incidence** 123:22

**incidents** 286:21

**include** 14:2 32:8 47:6 84:22 85:15 194:3 273:8

**included** 33:15 65:9 97:7

**includes** 45:16 90:25 91:4 94:9 97:17 156:11,13,20 279:7

**including** 61:25 64:5 85:16 178:19 197:11, 13,14

**incomplete** 25:6 160:17 185:19 195:18 239:19 240:23 241:7 329:8 330:10

**incorrect** 193:2

**increase** 123:24

**increasing** 162:25 163:8

**incredibly** 230:18

**IND** 187:2

**independent** 46:19 201:22 245:25

**independently** 81:12

**index** 20:15 24:6,8,19 48:12,13 49:23

**indicated** 90:3

**indication** 133:17 202:1 268:3,5 291:17

**indications** 90:8 139:13

**indictment** 217:13,14

**indisputably** 191:24

**individual** 31:7 55:4,5,18,24

56:1 70:21 87:19 94:13 142:15,16 203:24 204:17 239:21 240:17 251:23 252:21, 22 253:24 314:25

**individualized** 211:8

**individually** 17:23

**individuals** 38:4 120:16 121:1 132:3 317:2 318:23

**industry** 76:1,3, 6 165:16 330:24 332:9

**infarction** 121:1,5

**infected** 339:6

**infection** 284:16 285:24 289:7 320:20 327:15 335:1

**infections** 334:24

**infectious** 252:25 307:12, 23 318:8

**influence** 156:2

**influences** 156:1

**inform** 158:7 174:3

**informal** 73:16 315:10



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 382 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016        Index: information..into

information
9:20 11:18
20:24 32:1
74:19 88:5
139:4 217:12
221:25 236:23
237:20 238:6
269:14 282:20
283:11 284:18,
21 291:2
299:10,18

Informational
273:21

informed 16:18
336:14

informs 44:17

infuse 64:24

ingredient
84:22 97:7
146:19 147:1

ingredients
186:17,24
202:3

initial 42:4
56:14

initially 224:22

initiate 198:23
199:5 261:25

initiated 273:7

injection 45:18,
21,24 46:2,4
62:2 95:25
137:18,20,23
239:15 284:14
285:10

injections
138:17 290:13
308:23

injunction

134:8,13,14,19
136:16 264:25
265:1

injured 307:2

injurious
210:17 245:23
274:21 275:11

injury 126:19,
22 127:3
289:16 302:9
303:5 304:7,16
339:9

inordinate
174:14,25
175:1 179:15
259:6 261:5

inquired 309:6

inquiry 76:9,11

insist 208:5

insistent 315:7
316:17

insisting
136:14

inspect 287:1
312:10

inspected
318:6

inspecting
169:22

inspection
200:25 244:14
286:10,12,15
287:17,18
288:3 290:20

inspections
250:17,18,25
312:16,18
313:22

instance 133:4
136:22,24
303:17

instances 56:5
180:1 215:14

instead 146:6
198:4 333:10

institution
53:21 57:24
70:5

instruct 9:19

instructing
157:23

instructor
78:19

instructors
79:19

insurance
121:21,24
122:6

intangible
24:18

integrity 229:11

intend 14:5
64:21 143:6
154:5 161:16
325:19

intended
113:21 137:7
142:8 143:5,7,
13,15,17 144:1
153:24,25
199:8

intends 326:24

intentionally
211:12

interaction
238:23 248:5

249:2 250:20

interest 76:10
78:20 104:6,7
105:23 125:13
128:6 142:7,18

interested
28:23 29:1
40:11 41:13
42:4 88:23
89:22 99:25
155:6 250:2

interests
103:19 125:15

interim 266:15

interlineated
279:8

internal 334:17

Internet 42:9

interpose 99:24
329:18

interposed
102:18

interpret 98:8
101:22 103:2

interpretation
141:15,17
148:12 190:20,
24 191:4
192:15 275:1
314:5 331:15

interpretations
190:21 274:17

interpreted
104:4

interpreting
139:11

interrogation
92:23

interrupt
144:25 213:23
281:19

interrupted
90:20

interrupting
145:13,24
146:6 166:15
213:24 214:3

interspersed
276:12 279:8

interstate
133:17 144:11,
12 155:8
196:23 199:12,
18 200:11,14
201:4,12
245:10,15,19
254:7 260:16
293:12,23
301:25 304:2
333:7

interview 305:6

interviewed
317:4

intimately
135:15 229:4

into 18:3,4
29:6 44:14
62:5,17 63:12
76:9 89:1
93:10,19 94:23
132:20,25
134:16,18
144:10,12
176:22 182:14
194:2 206:1
240:11 241:20
260:16 265:5,
19 275:11
276:12 284:24



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 383 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016        Index: intrathecal..items

305:4 309:1
310:16 313:15
316:1

intrathecal 63:9

intrathecally
62:20,23

intravenous
317:7

introduce
199:17 200:10,
14 245:9,19,22

introduced 79:5
299:12

introduces
199:11

introducing
144:10 196:22

introduction
144:12 245:14

intrude 14:6

invades 26:12

invalid 148:7

invasive 62:4

inventory 18:6
23:13 40:9

investigated
288:1

investigation
76:1 211:2,4
215:17 216:24
301:17

investigational
186:18,25

investigations
132:9,10

investigator
316:2,3

invoice 20:10

invoices 24:17

invoke 250:23

involved 12:12,
17 14:23 42:19
75:3,4,8,25
79:23 88:10
108:23 112:8,
18 113:13
126:4 130:20
135:15 175:7
217:18 229:4
242:13 243:10
252:16 340:2

involvement
339:22

involvements
54:12 110:8

involving
178:13 259:8

iodixanol 335:8

ipad 31:17

irrelevant
262:8,18

irrespective
79:18 113:22

isn't 11:2 24:19
27:4 28:20
67:16 92:4
123:22 137:4
138:5,9 150:3
153:22 155:25
158:3,20
174:14 183:22
192:20 199:21
200:2 206:14
226:7 230:15
232:1 246:25
247:6,12 248:3
251:7 254:1

288:21 303:22
304:2 305:23
306:6 312:21
318:11 322:1
341:25

ISO 88:16,17
89:8

isolation
160:17

issue 10:15
14:25 102:22
116:3,24,25
119:14,15
120:11 122:1
126:8 128:4,14
134:21 141:7,8
143:23 147:19
171:17 179:22
185:5,13 186:8
200:15 206:1,5
207:9 261:10,
13 267:19,23
269:1 271:5,11
274:12 286:23,
24 287:7
294:15 302:8
310:6,8 333:6
334:24 339:20

issued 69:3
184:20 243:24
248:6 265:16,
268:22 270:9
272:22

issues 9:14
13:3,5 43:15
55:12,15 79:2,
4,23 106:11,14
108:9 148:20
154:23 250:16
268:8 285:18
286:19 308:24
313:6

issuing 136:16
273:8

it's 10:24 13:20
14:15 16:11
17:6 19:21
22:8 23:25
26:4 32:25
33:2 35:20
36:7 37:5,6
38:25 40:12
41:19 42:9,25
43:4,5,20
46:11,18 47:8
48:5,9 59:8
63:4 68:24
72:14 75:20
76:1 77:8
80:20,22 81:8
82:2,16 84:4
87:18 89:15,19
90:6,17,22
91:7,8,14,17,
18,23 97:3
99:9,12
101:11,22
105:6,25
110:24 111:11
114:24 118:14,
16 121:15
124:13 125:3,
22,24 126:2
128:17 129:13,
16 130:22
131:23 132:12
136:6,9 139:20
145:7 146:11
148:2,10
150:23,24
151:15 154:2
155:25 160:21
161:14 162:4
166:15 167:5,7
168:16,17,25
170:21 172:14,

15 175:3,13
177:17,24
181:3 183:8
184:11 185:1,
5,6 186:4,6,8
191:15,17
194:4,17
195:25 196:3,4
201:7 202:24
204:3,4,7
210:25 211:1
222:11 224:20
226:16 230:17
231:11,13
235:8,15 243:7
244:13,25
245:3 248:25
249:15,23
256:6 260:3,20
267:15 269:12
276:22 279:10
283:7 285:5
291:13 293:20
295:11,17
296:18 298:21
299:7,14,22
300:15,16,21
301:20 304:21
306:4,11 308:4
310:24 313:4
314:6,15 315:4
323:7,14 324:3
328:4,20
330:17 332:13
334:17 337:4,7
340:5

item 114:4
117:10 146:19
174:10 186:16
187:14 190:18
334:21

items 39:13
66:15 174:2
275:21


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 384 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: its..Kennedy

**its** 30:10 49:13
69:3,10 116:9
160:16 198:23
202:12 209:1
277:12 305:25
306:5 313:7,8
339:1

**itself** 33:1
153:19 171:8
311:3

---

**J**

**J&j** 117:24

**Janet** 130:6,9,
12,13,16,22

**Janssen**
115:23 116:5,
8,18,19 117:23
118:2,4

**January** 66:5,
10 68:22 69:2
74:22 311:17
312:2

**Japanese**
123:19

**Jason** 82:2

**Jenkins** 128:14

**Jersey** 239:13

**jives** 220:12

**job** 16:23 72:7
156:6 283:2

**John** 30:24
233:20

**Johnson**
115:22,23,24
116:1,11 128:3

**join** 72:1

**joint** 129:16

**joking** 78:17

**Journal** 40:13

**Joyce** 181:8

**judge** 14:23
43:5 65:19
68:8,21 103:13
105:16 107:6
326:17

**judgment** 14:6
67:15 68:5,18
69:23 142:7,
16,19 152:21,
23 184:10

**judicial** 43:8
265:5

**juice** 264:19

**July** 43:25 45:6
71:23 74:6
266:24 283:17

**June** 44:7
220:21 221:7
239:6 266:24
284:5,12 289:5
311:12 312:3
335:14 336:18
337:14,16,22,
24 338:7

**jurisdiction**
83:19,20
108:3,4 165:14
312:25 313:10
315:18,22,23

**just** 10:17 12:1,
11,18 13:15,24
15:4 19:13,25
20:15 23:4,10
24:3 26:15,16
27:3,23 28:25
29:4,5,11

39:10 44:16,18
45:17 46:5,6,
16,22 47:8,12,
22, 48:23
49:11,20 50:18
51:6 54:7,19,
21 56:16 57:3,
7 58:15 59:6
64:13 74:1
75:11,16,17,22
76:25 82:16
85:1,12,21
87:3 90:10
93:9 94:2,5
95:8 96:24
97:15 98:14,16
99:4 102:21,23
103:4,8 104:1
106:17 107:23
108:13 110:9
112:13 114:4,
24,25 116:15
118:13,14
124:7 125:25
127:9 128:25
129:3,21,22,23
133:19 134:15
135:24 136:2
137:1 138:2,8
139:3, 140:14,
17 142:4,
145:24 146:2
148:22 155:4
156:7,25 157:7
160:11 161:19,
24 162:19
164:10 166:17
167:4 172:16
175:3,19
176:6,7,9,15
177:14 178:11,
17 180:16
181:3 182:21
184:16 185:6
187:10,24

188:17 189:14,
17 193:19
198:4,12,14,17
199:20 202:5
204:22 207:21
208:3 211:21
214:17 215:5
216:14 218:6,
8,24 219:19
222:24 223:6,
7,10,11,21,23
224:4,6,7,12
226:8,16
227:18 235:13
236:4 247:17
248:4,5,7,8,15,
21 249:2,4,7
250:13 254:11
255:9,11,13
256:22 259:21
266:19 267:2,
13,14 268:12,
23 269:22
270:17 274:2
275:19 280:1
283:7 285:18,
20 286:7,8
288:24 289:2,
8,9,12,14
291:2 292:19
294:17,23
295:8 296:9,11
297:1 299:5,12
302:17 304:2,7
305:1 307:17
310:22 313:24
318:18,20
321:25 324:1,4
325:7 326:13
327:8,9
329:15,21
331:13 334:10,
20 335:8
336:10,25
337:14 339:7,

15,17,19
340:3,4,5
341:7

**justice** 9:13
12:6 13:17
98:12,22
100:11 103:24
105:11,23
106:2,5,21
281:2,6 283:15

**Justice's** 101:4
102:19 105:7

**justified** 116:14

---

**K**

**K-l-e-b-s-i-e-l-l-a**
335:10

**Kang** 334:23

**Karen** 47:15
283:19

**Kaufman's**
79:16

**Kaycee** 8:22
47:19 297:13,
16 324:4

**keep** 304:21

**keeping** 31:14

**keeps** 282:7

**Keker** 130:6

**Kelvas** 31:3,4

**Ken** 8:24

**Kenalog** 91:21
137:22 138:16,
20,22 317:8
319:2

**Kennedy** 132:1



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: Kentucky..last

**Kentucky** 120:9
122:16

**kept** 262:14

**Kessler** 8:1 9:4,
20 11:15 14:3,
7,22 16:15
26:19 27:21
34:7 39:12
40:8 47:18
48:11,17 66:16
67:9 69:16,17,
19 74:4,12
80:15 81:9
89:6 96:21
100:13 106:3
116:16 138:24
141:4 161:13
162:19 167:16
214:6 239:15
260:21 281:17
282:6 292:24
310:19 321:23

**Kessler's** 15:6
44:12 69:9
326:11

**Kevin** 316:13

**key** 36:11
185:8 186:11
209:12 263:15

**keywords**
260:8

**killed** 253:3

**kind** 11:5 21:7
22:21 65:10
73:16 206:21
274:12 282:13
284:17 333:20

**kindly** 223:21
317:9

**kinds** 172:22

173:12,22
174:3 190:7
199:1 217:10
268:8 308:3

**klebsiella**
286:24 287:3
316:24 317:3
318:23 320:17
334:24 335:2,
10 339:4

**knew** 106:6
253:8 316:3
318:12

**know** 10:14,20
12:8 13:2,18
15:11, 16:15
22:16 23:17
25:15,16 27:20
28:10,16 29:21
35:16 38:15
48:3 51:4,13
52:2,20 54:8
55:4 57:17
58:5,16 59:8,
13 60:9,12,25
61:1,7 64:1,3,
12 70:14 73:13
76:4 78:17,21
79:4,12 80:24
82:16,18,20,24
83:23 84:1,3,
19 87:25
88:19,23 90:5
91:7,8 94:24
95:19 98:24
101:11,15
103:6 104:5
105:1 106:4,5,
12 108:8
113:10 116:3
121:13 122:11
124:14 125:9,
12 131:24

132:15,18
138:13 139:12,
24 142:17
148:22 151:11
152:19 153:13
154:11 155:20,
24 156:16
158:4 161:20
163:25 164:12,
17 168:3
169:10 171:4
174:17 177:7
179:2 184:17,
21 185:5 186:6
187:5,9 188:23
189:18 191:7,
14 192:10
193:3,5
194:19,23
195:3 196:20,
25 197:1,23
204:21 205:25
206:21 208:9
211:11,16
215:9,10
216:14 217:2,
21,22 220:5,
10,11 221:9,12
222:1 226:14
228:1,3 229:4,
10,11 230:24
231:3,21
232:18 233:2,8
235:10 237:3
239:2,24 240:5
243:10 250:6,
16,22 253:2,6,
18 256:19
257:25 265:21,
25 266:2,3,9
267:5,15,16
268:7,15,18
278:3 283:25
284:3 285:6,
13,14,19 286:9

287:21 290:1,
22 294:25
295:4,6,23
300:20,23
301:11 302:25
307:9 309:24
310:8 312:6
313:14,25
314:23,24
315:9,25 319:7
320:19 321:5
326:22,24
327:13 330:14
332:13 333:18
338:23 340:11

**knowing** 133:7

**knowledge**
12:22 42:21
79:22 211:20
269:6 287:3

**knowledgeable**
167:12

**known** 131:11
319:2

**Kristina** 181:8

___

**L**

**L.P.** 121:20

**LA** 288:8

**lab** 42:16,19,24
95:20 108:3,15
291:8 305:9
335:2,7

**label** 55:10
84:24 85:1,4,
12,22,23,24
89:25 90:2,7
97:14,15,20
115:3,18
138:3,4,6,14,

16,18 139:3,
14,19,21,23,25
142:22 143:10,
19,21 146:15,
18 273:16

**labeled** 69:12
140:4 273:16

**labeling** 136:25
143:20 156:23
159:24

**labels** 139:18

**labor** 107:18,
23 108:12

**laboratory**
275:10 324:17

**labs** 324:13,22

**lack** 322:14
326:11

**Lamar** 108:1

**language** 27:2
86:18 91:10,16
119:13 172:19
259:11 266:8
270:18

**laptop** 23:24

**large** 23:1
182:20 183:11,
12,23 184:1,
11,14,18
185:2,3,6,10,
16 186:1,4
194:10 196:12
256:16 260:7,
8,15 261:17,18

**largely** 199:21

**larger** 327:22

**last** 21:3 35:17
38:19 47:5



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 386 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: late..letters

54:12 58:11,
18,21 59:25
68:10,11
104:12 126:20
129:7 130:23
150:25 177:9
193:25 224:20
265:4 282:19
299:18 334:13
336:6,11

**late** 51:21
75:11 295:17

**later** 91:17 97:9
211:16,17
302:23 312:3
331:17

**Lauren** 266:15

**Laurie** 122:19,
21

**law** 13:13 44:4
67:24 71:1
77:7,14,18,21,
25 78:2,3,9,12,
19,21,25 79:6
106:15 113:22
126:13 134:7
140:21 141:9
142:5 148:4,8,
23 151:8
155:24 172:14
189:9 192:3
197:7 205:5,7
206:13,25
226:24,25
230:2,5,7,9,12,
17,22,25
241:10 246:9,
13,15,18,20
250:6 251:21,
25 252:3
258:20 263:10
271:14,15

274:17 275:1
283:10 294:1
302:5 330:19
331:1,8,15
338:23

**laws** 35:25
231:8 241:6

**lawyer** 13:4,22
54:14 67:2,12
73:6 77:23
96:9 104:17
106:15 125:21
178:13 181:25
200:22 204:11
280:1 294:11

**lawyer's** 280:9

**lawyers** 12:4,9
17:10 24:12,17
28:24 70:9
98:14 111:21
313:8 315:17
330:23

**lays** 77:6

**Layton** 335:5

**LC2** 300:3

**lead** 69:20
205:24

**least** 77:8
201:4,8 278:13
285:25 300:22
312:3 317:2
318:22 332:9

**leave** 13:14
35:12 66:7
79:11 230:23
231:8 282:25

**leaves** 132:17

**leaving** 72:16

**lecture** 148:23

**lectured** 59:22

**led** 193:6
271:17 288:15

**Leffler** 31:12

**left** 12:16 14:8,
9 20:13 35:22
36:13,14 71:25
72:7 73:22
74:13 76:18
77:1 226:7
238:13,18
271:21 272:1,8
278:17 314:8,
11 339:12

**legal** 172:5
251:1 282:22
310:3 312:25
313:4,7 315:16
316:1 330:22
333:8

**legality** 122:3,4
123:3

**legible** 249:24

**legislation**
107:14

**legitimate**
14:15 196:19

**legitimately**
309:3

**lengthy** 160:6

**let** 10:14 12:1,
15:11 16:16
18:5 22:18
26:12 28:4
34:9 37:20
39:9,17 40:23
43:5,11 46:22
48:7 49:20
52:21 54:20
65:19 74:23

80:9 87:25
89:6 92:25
97:8,15 99:24
101:8 104:14
113:25 118:14
129:3,23 133:4
138:25 140:14,
17 141:25
144:16 145:8
146:6,16
152:14 156:7
157:19 166:13,
22 168:11
170:7 178:11
179:19 180:15
181:3 184:4
188:7 189:21
192:22 203:20
205:19,24
208:8 216:2
222:12,21,24
223:1,6,7,10
226:1 230:3,11
233:10 247:1
249:4,21
254:13 255:9
256:5 257:12
266:8,18
267:10,12,14
270:17 281:15,
18 294:4
300:22 302:17
306:22 307:7,
12 311:8 318:5
325:7 329:18
332:2 334:6
336:12,24
337:14

**let's** 14:8 17:13
41:11 48:23
66:15 74:18
83:10 95:1,6,8
110:4 116:21
117:10 126:24

133:19 135:1
136:19 137:1
138:22 142:23,
24 158:10
160:19 161:8
171:7 174:6
175:9 181:19
182:15 193:9
204:22 205:6
213:3,8,15,21
218:19 223:22
242:17 246:5
255:16 263:23
267:2 269:12
270:6 272:15
275:23 278:8
284:5 288:11
293:14 297:12
306:8 314:6
317:13 318:4,
18 320:20

**letter** 9:12,17,
25 10:7 12:10
13:5 21:4
33:20 44:8,14,
20 73:10 74:6,
9,18 98:20,25
103:23 178:25
179:6 181:22
183:23 193:17,
21 194:1
200:17 201:8
264:14 273:8,
10,13,14 283:4
298:16 311:15,
20 312:9,15
313:3,23
315:7,13,15
316:17

**letters** 43:24
44:4,6 45:1
73:17 175:12,
13,16 178:12
179:4, 181:15



**DISCOVERY
LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: letting..look

184:21 190:11
195:2 201:21,
23,25

**letting** 281:25

**level** 38:5
76:14 267:20,
24 322:15

**Levin** 72:21,24

**lexicon** 273:20

**Liability** 50:4,8
112:2 114:7
117:12 118:8
123:1,11

**liberty** 13:2

**license** 51:6,24
52:5,23 164:5
189:4,7,8

**licensed** 50:11,
14,20,23 51:5,
9,12,15 52:1,6,
18,25 53:1,4,9,
23,24 54:1
58:12,14 64:22
77:13,18 78:1,
4 189:5 246:24
247:2,6 251:23

**licenses** 163:9,
20 170:18

**licensure** 51:3,
25 53:14,21
268:2

**lidocaine**
308:23

**lie** 211:21
212:11 214:18

**Lieff** 110:15,18
111:4,21
113:22,24
123:10 339:21

340:2

**life** 65:18

**lift** 220:1 249:6

**light** 98:20
133:18 153:2
246:5 294:6
330:25

**like** 9:13,14,17
10:14 13:18
15:6 17:18
23:9 24:1
26:15 29:21
34:19 39:8
40:22 44:15
72:6 77:2
85:18 88:22
89:15 99:19
100:1 104:24
140:1 142:4
161:18,21,24
166:15 169:9
213:19 219:18
232:12 235:11
248:24 255:22
258:12,24
267:11 271:16
272:9 276:5
284:11 291:5
301:2 306:10
308:6 312:5,12
320:14 322:23
323:14 324:6
325:10,14
335:23 339:4,
15,17

**likely** 256:6,16

**likewise** 40:17
201:7

**limit** 13:16,18
240:20 241:4,
11

**limitation**
263:13

**limitations**
82:13 263:12

**limited** 12:21
32:2 174:11,
18,19,23
179:21,22
180:1,3 259:1
261:7 263:5,8
282:10 304:2
336:1

**limits** 142:11
153:9

**line** 12:10 47:7
49:25 76:22
100:14 182:25
222:15 235:12
260:5 283:3
304:10 318:18,
20 327:22

**Liner** 175:16
176:15 181:22
193:18

**lines** 149:21
170:20 182:23
183:7 224:21
260:4

**liposuction**
286:23 287:2

**list** 20:7 24:11
32:13,21 49:19
111:6 112:25
176:18 194:4
222:8 234:11
334:17 339:20

**listed** 41:15
45:20 48:19
49:14,22 97:20
116:23 239:10

**listen** 16:21
206:13

**Lister** 8:18,25

**listing** 46:8
54:10 110:7

**lists** 31:23
32:13 41:3
48:6 173:24
199:7 209:12
221:19 222:10,
15,17,22,23
223:2,4,10
261:1

**literally** 326:12

**literature**
38:22,25
40:12,21 41:24
156:11,14,18

**litigation** 8:10
26:19 27:15
43:14 69:24
70:4,8,11,15,
20 71:1 108:19
112:2,6 114:7
116:16 117:12
118:8 119:4,6,
9 120:11
123:1,12 126:7
152:2 252:16
341:11

**litigation-related**
54:12 110:7

**little** 19:13
22:7,11 40:24
52:2 74:23
112:14 122:10

**live** 13:2

**lives** 189:11

**living** 231:25

**lobbyist** 43:19

**local** 83:18

**locally** 160:21,
23

**located** 8:8

**location** 233:21

**log** 239:11

**logical** 315:20

**logs** 215:3,4

**lollypop** 135:6,
10,17

**long** 36:5 41:3
58:18 72:15
77:8 80:23
167:1,15 213:5
224:21 287:12
300:16 326:14

**longer** 69:19
283:17

**look** 20:3 22:18
34:1,13,14
35:15 39:25
47:2 54:21,23
55:2 60:23
61:9 64:4 65:7
67:5 68:17
73:11 74:18,22
75:11,24 80:2,
5 81:10 82:20,
23 87:13 88:3,
12,15,18 89:1,
10,21,25 90:2,
7 91:17 98:24
109:6,9,12,13
110:4 113:25
114:19 119:23
121:6 124:7
126:24 140:17
150:4,6 152:2,
8 158:13



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 388 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016   Index: looked..manufacturer

162:24 165:1
169:7 172:8
175:6,22,23
181:21 182:10,
15 184:7,12
185:2 186:14
188:8 193:16,
20 200:17
202:20 217:24
218:20 219:17,
22,24 221:20
224:11,19
232:4, 243:6
244:17 249:4
250:19 251:1
252:17 253:15
259:1,14
261:16,23
269:12 270:24
272:2 277:8,10
278:16,18
279:17,24
285:4 286:15
287:6 289:7
294:4 296:24
300:2,17
303:20 305:5
307:22 308:14
313:2 315:12
320:20 324:16
327:20 328:6,
24 331:25
334:4 336:24

**looked** 18:22
19:10 20:6,8
23:16 26:15
34:16 41:14
42:1,7 46:14,
20 50:3 85:9
150:10 169:11
176:16 177:13
180:11 193:23
207:2 216:6
229:21 232:9

243:11 257:13
258:23 259:4
284:24 325:2
332:4 334:6

**looking** 27:23
88:19,24 90:9,
10 91:6 107:19
108:2 127:7
146:15,18
151:7 159:3
169:12 176:1,
2,9,11,13,14,
15,18,19,20
177:1,4,5,8,10
180:20 182:22
184:9 220:2,19
229:25 250:1
256:7,9 282:6
287:9 289:15
295:4 298:3
326:23 332:3
336:25

**looks** 77:2
167:22 301:2
306:10 313:11
320:14 322:23
324:6

**losses** 283:21

**lost** 167:24,25

**lot** 21:8 162:21
167:16 213:5
259:24 284:21
285:17 335:21
339:13

**lots** 194:2
230:14 239:17
300:25 301:1

**Louis** 129:13

**Louisiana**
112:22 113:3,
17

**lower** 149:19

**lump-sum** 26:2

**lunch** 145:24
146:9 158:10
160:19,20

---

**M**

**M.D.** 8:1 9:4
43:25 335:5

**macular** 284:15
285:10

**made** 9:17 13:7
21:22 33:18
38:5 44:19
55:14 69:17
97:11 98:22
117:6,18
118:11,19
137:22 147:9,
16 148:7
149:20 150:13,
21 169:3,8
192:18 201:13
202:16 205:17,
23 207:10
210:3 214:17
222:13 239:5,
6,7,24 241:15
264:20 268:10
275:6 277:17
285:11 290:16
298:11 302:8
303:5 304:16
309:3 317:8,23
318:12 319:1
323:25 326:12
335:18

**magistrate**
14:23 325:25

**maintain** 222:5

**maintenance**
57:12,14

**major** 88:10

**make** 27:3,5
38:2 39:15
41:11 43:6,11
49:6,10 74:25
83:19,21 89:4
98:15 106:20
125:25 129:21
144:19 146:7,
10 152:21
172:19 177:16,
22 178:24
188:4,13
193:12 204:23
205:11 210:15
231:20 233:10
240:7,8
241:16,17
249:2 265:1
280:2,23
291:13 292:3
293:2,6,11,22
314:16 321:5
323:2 332:15
341:4

**makes** 14:1
28:21 136:5
271:9

**making** 11:5
189:23 194:9
196:12 240:11
260:15 282:16
292:14 295:10
301:24 303:4
305:3 307:1

**malformations**
131:11

**man** 289:6

**management**
37:19 44:10

75:13 80:1
220:15,17,22
221:8,12
224:20 242:11,
14,15,18

**Mandate** 40:19
95:14

**manner** 163:11

**Manual** 162:20

**manufacture**
183:12 260:8
261:18

**manufactured**
115:22 135:9
154:6 155:8
255:2 256:1
257:18 308:25
309:3 322:19
338:5

**manufacturer**
114:9,11,15,18
115:8 117:7,19
118:18 120:8
121:15 123:17
124:3 126:12
129:18 130:1
131:8,17 133:6
142:21 151:20
152:13 165:22
166:1,9 167:4
168:7,15
169:5,25
173:13,23
178:14 181:5,
10 186:4
194:19 195:7,
17 196:7,12
197:1,2, 198:3,
21 199:2,14,19
200:7,8,9
243:3,15,20
245:1,4,6,7



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 389 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016   Index: manufacturers..mean

258:24 271:12
285:6 298:14
309:4

**manufacturers**
118:5 132:24
165:11 183:19
196:21,24
259:9

**manufacturing**
125:6 131:16
163:10,21
164:6,17,24
165:17 169:21
170:19 183:17
184:21 185:11
186:1,9
187:15,17
188:5 194:11
196:16 256:17

**many** 18:17
22:4 29:3 30:1
36:11 54:18
64:13 108:9
155:12 167:17
189:19 228:2

**map** 150:6

**Marcell** 335:5

**March** 8:1,4
10:8 175:14
181:17 193:20
194:1 200:19,
20,21

**Mario** 219:13

**mark** 8:14 11:2
48:8 91:13
99:12 100:8
101:1 235:11,
15 257:8
276:20 322:25

**marked** 9:18,25
10:4 17:16

40:2 49:9
66:20,21,23
68:1 81:4,7
110:21 140:10
159:1 162:17
175:10 178:1
211:3 219:6
244:9 252:11
267:12 272:5
275:15,23
291:8 292:16
299:19 310:13
314:17 316:20
336:2

**market** 120:4
121:16,21
124:4 133:5,7,
12,13 143:18
192:11 209:3
210:4,17
335:18 336:16

**marketing**
112:1 118:7
122:25 123:11
131:15 335:24

**marketplace**
190:15 191:1

**marshals**
264:21

**Martin** 8:17

**Martinez** 8:19
209:16 213:9
340:15

**Marty** 31:4

**Maryland**
51:16,25
272:22

**mass** 215:22
216:16,18
328:8 329:4
330:5

**Massachusetts**
8:6 19:4 33:21
98:1 123:2
149:23 164:22
165:6 169:24
180:17,24
194:20 205:24
210:20 215:19
216:11 229:17
266:5,10,16,22
267:1,7
268:10,20
269:5,18
270:14 271:1
302:9 303:5

**master** 187:4,9
341:10

**material** 21:14
33:10 41:17,19
42:8,11, 47:12
95:22,24 207:2
301:6 324:17

**materials** 17:24
21:23 24:2,4,5,
11 25:1,24
27:11,12,13
31:15 33:7
40:9,17 41:4
42:17 43:12,17
48:4 49:14,17,
22 50:2 81:11,
17,19 84:10
102:20 201:13
248:23 327:21
334:18

**matter** 8:5
12:12 17:3
28:9 30:19
35:21 55:1
60:22 66:6,13
72:18 73:2
75:12 127:18
128:7 136:5

162:2,3 188:2
205:5,7 206:3,
8 282:7 303:22
310:4

**matters** 27:7
276:2

**may** 14:20 17:4
18:2 30:7
32:22 39:10,
19,23 40:5
55:14 56:17
80:25 96:19
97:7 99:3
100:14 109:2,
17 110:16
112:14,18,24
113:23 129:4,
5,8 141:20
142:7,10 146:5
153:19 158:5
162:15 166:11,
12 167:8,9
168:23 177:15
183:18 190:7
198:22 199:9
200:18 210:16
219:10,15
222:22 230:14
239:5 240:17
242:20,22
245:9,19,23
254:17,24
258:16 259:24
265:15,21
266:23 267:6
268:22 273:8
274:21 278:9
279:4,13,17,18
280:16,18
295:5,16 304:7
308:14 327:17
339:25 341:3

**maybe** 22:7

28:5 54:21
61:3,10 103:1
150:5 154:24
236:1 237:7,16
240:4 294:5
298:4

**Mcneil** 55:17
117:23 118:2,4

**MDL** 8:7 99:14
130:6 131:3

**mean** 13:10,12,
19 15:15 19:9
23:15 25:10
27:25 28:12,
16,19 29:17
30:6 32:4 33:5,
6 35:10 36:1,9
37:11 38:24
41:8,18,21
52:24 54:19
55:1 60:8
61:13 63:7
65:15,17 67:13
72:14 80:8
81:22 91:2
94:23 98:14,18
99:7 101:6,16
103:1 104:20
105:4 106:12,
14 108:22
112:15 113:9,
20 116:9
120:23 130:5
133:16 135:24
136:2,25 137:1
139:13,19,20
141:25 142:14
144:10 150:7
151:6 152:19
154:2,19
156:8,17 165:3
184:13 188:1,
20 191:9



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 390 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016   Index: meaning..mischaracterize

192:2,4 196:3, 18,19 198:13 199:11,13 203:22 204:10, 205:11 206:7, 12,24 207:7 209:5 210:13 212:21 214:23 216:16 222:1 231:5,21 235:11 241:1, 16,18,22 242:15,21 248:17 253:21 259:3 261:10 262:14 263:4 265:10 270:17, 24 275:8 285:5 288:2 290:24 293:18,19 294:15 302:16, 24 303:1 305:9 306:10 308:9 309:17,18 310:7 313:4,11 315:16,24 316:16 318:2 320:13 331:2 332:9,12, 333:16 335:20 339:5

**meaning** 64:21 172:19

**means** 15:5 21:21 51:4 65:14 91:18 101:15 171:25 253:22 254:5

**meant** 215:6 233:16

**meantime** 297:25

**measuring** 305:16

**medical** 31:21 52:10 54:1 58:3,10 59:5 63:8,15 70:16 72:22 80:1 108:4,14 150:10 180:20 189:5 220:14, 16,22 221:8,12 224:19 251:6 252:2

**medications** 140:3

**medicine** 40:13 50:12 51:10,15 52:7,18 53:2,5 54:4,25 58:12, 14 64:2 65:21, 25 66:4 69:20 238:25

**medicines** 189:18

**Medtronic** 128:15

**Medwatch** 127:20 284:8, 10,13 285:23 286:22 289:10, 14,18

**meet** 186:5,7 194:18

**meeting** 82:5 169:23

**meets** 305:11

**member** 110:18 336:14

**members** 113:22 256:11

**memorandum** 337:4

**memorized** 86:19

**memory** 29:18 34:10 164:20 169:19 179:3,5 255:15 257:19 340:2

**memos** 31:16

**men's** 341:7

**meningitis** 98:3,6 100:7, 25 101:6,12,21 104:5 239:2 288:20

**mention** 11:15 39:2 73:15

**mentioned** 10:19 48:11 71:4,19 272:24 277:13

**Merck** 113:2,5 120:9,16 121:3,9,14

**merger** 119:11

**merits** 68:12

**mesh** 117:14, 18

**met** 21:20 153:4 332:10

**Methly** 224:25

**methodology** 276:9,18

**methotrexate** 62:19,23 63:9

**methylprednisol one** 32:5,10 45:7,18,21,23, 24 46:3 84:5,8, 13 87:8 95:24 97:17 144:4, 18,21 145:11 146:5,13,20 147:2,5,10,16, 149:20 150:2, 13,21 154:6 182:7 183:23 185:15 188:4 189:13 191:24 192:5,16,19 236:12 288:14

**mic** 341:5

**Michael** 233:9

**Mickey** 231:12, 23 232:17,20 233:1,9,12,15

**microenvironme nt** 88:14,17 89:9

**middle** 42:23 80:17 144:23, 24,25 335:16

**might** 9:21,23 10:22 162:2 198:5 249:7

**Miller** 18:25 19:6 34:16,25 36:4,14,17 38:7,13,15,21 42:6 43:16,21, 24 44:1,5,8,19 45:2 47:17 73:7,10 74:6 96:9 216:8 286:10 290:24

**Miller's** 33:25

38:10 216:4,5, 6 291:1

**milligrams** 305:14

**milliliter** 182:8 185:16

**milliliters** 224:25 225:1

**million** 61:2

**mind** 16:8 112:18 114:3 123:13 129:2 162:3 163:25 171:5

**mindful** 100:12

**mine** 21:10 49:3,5 223:22 224:7

**minor** 19:24

**minute** 92:25 145:14 190:1 260:21

**minutes** 13:25 80:13 168:1 169:23 204:2 271:22,24,25 272:8 278:15, 17 314:9,11 323:24 325:11, 15,18 326:4,7, 9

**misbranding** 173:16 248:13

**mischaracterizat ion** 234:25

**mischaracterize** 253:14



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016   Index: mischaracterized..Mr

mischaracterized 316:12

Mischaracterizes 253:12 333:1

mislead 237:14

misleading 90:23 237:11 304:21 333:1 341:21

misreading 183:5

misrepresentation 234:20

missed 38:19

missing 159:12,15 186:11

misspeak 112:16 119:3 248:16

misstated 260:18

Misstates 201:20 210:8 212:12 221:15 321:11 336:22, 23

Misstating 195:10

misstep 98:15

ml 305:14

moment 47:22 50:10 56:18 58:9 162:1,13 207:12 252:17 273:7 283:20 292:19

moments 56:6

73:5 273:1 277:10

Monday 15:21

monitoring 76:6

monobasic 97:18

month 80:1 216:23 218:9 316:8,22

monthly 39:1 216:11

months 188:3, 13

moratorium 132:25 133:21 134:1,6 136:15,22

more 16:18,19 17:20 25:24 26:1 59:12 64:20 74:23 87:1 94:17 107:2 122:20 185:11 214:4 228:1 250:19 256:6 263:7 269:21 278:10 291:2 299:21 306:25 332:10 334:21

Moreover 183:2,4,8,14

morning 8:3 15:21 21:6 41:14

most 42:4 58:16 152:18 205:25 206:5 271:2 297:8

motion 68:5 77:23

Mouse 231:12, 23 232:17,20 233:1,9,12,15

move 210:23 222:6 321:21

moved 51:2,17, 23,24

moves 50:17

moving 210:24

MPA 32:1,4,22 45:6 188:15,16

Mr 8:14,16,22 9:8,9,15,16 10:2,6,8,24 11:3,8,14,23 12:15,18 13:23 14:14,20,21 15:2,3,8,9,13, 15,20,22,24 16:2,4,6,10,13 17:18 23:2,3,7, 8 26:11,14,15, 24,25 27:1,3,9, 12,16,18,19 34:2,3,16,18 39:12,17,18, 20,23 40:3,6 48:2,5,6,8,11, 14 49:6,10 66:17,19,20,24 68:3 72:9,13, 15 79:1,5 80:11,14,15, 20,24,25 81:3, 6 86:22 87:2 90:19,21,22 91:10 92:5,8, 13,15,18,20, 21,24,25 93:1, 2,4,12,18,22,

23,24 94:2,3,5, 14,16,19,22,25 95:6,8,10,12, 19 96:11,20 97:4,23 98:7, 10 99:2,4,8,10, 13,15,18,19, 21,22,24 100:2,3,5,6,9, 16,17,18,20,23 101:2,19 102:3,8,18 103:4,11,16 105:18 106:3, 8,16 108:25 109:5,21,22 110:1,18,23 111:4,9,10,11, 15,17,18,24 112:18,23 113:4,8,10,12, 21 124:11,13, 16,17,20,23 125:1 130:8,9, 12,15,19,24,25 133:2,22 134:10,13,24 135:1 137:10, 12 138:7,8,12, 15 139:10,20 140:12 141:1, 3,21,22 143:3, 16 144:23 145:2,3,4,6,9, 13,16,17,18, 20,23 146:1,4, 10 149:1,4,12, 14 150:17,20 151:21,24 153:23 156:4, 10,12,13,15, 19,21,25 157:3,6,7,12, 13,15,20,24,25 158:3,10,13,

15,17,22,23 159:3,5,6,8,10, 11,14,21 160:2,10,14, 20,22,23,25 161:1,3,5,6,8, 13 162:10,12, 19 163:23 166:4,6,10,17, 21,22 167:6, 16,19,21,23,25 168:3,11,17, 18,19 169:2 170:10,16,22, 23,24 171:1,6 173:7,9 175:5, 9,12 177:3,7, 23 178:12,16, 17,19,21,22 179:1,13,14,17 180:2 184:3,8 185:18,25 186:2 188:6,15 191:20,22 192:1,5,21,24 194:12 195:5, 9,14,18,22 196:8,11,13, 14,17,25 197:6,8,15,20 198:7,9 200:4, 16 201:17,19, 24 203:2,5,11, 15 204:5,8,12 205:4,6 206:10,13,18 207:1,24 208:2,6,9,12, 13,14,17,20 209:17 210:5, 7,10,22,23 211:11,22,24 212:1,4,7,9,12, 15,18,22 213:1,2,3,4,7,



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 392 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: MRI..NECC

11,12,14,16,
21,22,24,25
214:3,6,8,10,
13,19,20
215:16,20,24
217:6,13,19,25
218:2,5,10,19,
22,23 219:12
220:9,14,18,
20,21,22,24
221:1,15
222:20,25
225:12,16,20,
24,25 226:5
227:2,5,14,18,
20,22 228:14,
16,17,20,21,24
229:1 230:20,
24 231:2,18,23
232:2,8,11,16
234:8,10,19,
21,25 235:1,3,
5,6,10,16,18,
23,24 236:6,7,
9,11,15,22
237:2,6,9,11,
13,15,18
238:3,16
239:19 240:2,
23 241:3,7
242:2 243:5,9
244:11,24,25
249:6,11,12,
13,16,18,20,
21,25 251:8,11
252:5,8,10,13
253:11,13
255:17,19
256:23 257:2
259:12,13,19,
22 260:17,20
262:9,10,17
267:9 268:12
269:20 270:15,
271:19,25

272:4,7,11,14,
17 274:9,11,15
275:17,19,23,
25 276:1,7,17,
18,19,20,24
277:1,5 278:1,
20 279:6,15,18
280:1,5,8,12,
13,17,18,19,21
281:4 282:2,4,
6,8,9 284:20
286:2,4,17
287:11,15,16
289:4,5 291:1,
4,12,22,25
292:1,3,5,6,10,
12,13,15,18
293:4, 294:6,
20,21,22,23
297:12,16,17,
21,23 298:2,4,
8,20,23 299:2,
20 300:6,13,
15,16,25
301:5,14,18
302:1,2,3,7
303:8,14
304:19,23
306:7 309:10,
13,15,22
310:2,10,15,18
311:22,23
312:1,22
314:9,11,13,
15,19, 317:22
319:15,18
320:2 321:8,9,
11,13,16,22
322:10,11,18
323:2,4,5,6,9,
19,22,23
324:3,4,10,14
325:8,17,21,23
326:3,7,9,11,
19,22 327:1,4,

5,6,17,20
328:16,25
329:8,12,18,25
330:10,14,16
332:6 333:1,9,
15,24 334:12,
15,17,20
335:13 336:4,
5,6,10,17,18,
22 337:2,20,21
338:6,8,19
339:14,18
340:9,13,16,
18,20,23,25
341:2,4,12,15,
16,21,22,23,25

**MRI** 64:23

**Ms** 8:17,18,19
10:3 66:21
84:18 159:7,9
209:16 213:9
233:13 256:24
272:13 275:22
277:2,22
297:15 298:19,
22 299:1,3,14,
17,22,25
300:11,18,21,
24 301:1
314:12,14,21
317:15 321:19
323:15,17
324:6,11
328:14,20
340:15

**much** 15:25
16:19 173:8
182:24 209:6
227:24 242:5
249:23 263:12,
13,17,18
271:20 297:11
313:2 334:8

**multi-use**
323:24

**multi-vial**
319:21

**multiple** 102:12
108:6 112:8
150:7 163:17
229:2 234:15
317:24 319:14
320:5,14,18
338:20,21

**must** 94:11
157:10 202:23
208:4 224:7
245:10 246:23
308:3

**Mutahar** 300:1
314:23 315:3

**myelogram**
64:23

**myocardial**
120:25 121:5

_____

**N**

_____

**N.H.** 121:24
122:6

**naive** 204:7

**name** 8:10 31:7
38:19 60:6
110:16 125:24
126:3,5 130:23
147:7 152:5
197:4 231:23
232:16,20,21,
24 233:5,12
234:2 237:5
238:12,13
239:24 289:11
317:8 340:7
341:25

**named** 233:1,9

**names** 24:7,9,
20 217:1
218:15,17
220:8,17
221:14 222:17
223:4,8,18
225:2 227:17
234:6,16,22
235:21 236:3,5
238:1,14

**narrow** 119:14,
15 126:8
228:7,9,10,13

**Nashville**
160:22 236:13
334:1

**Nasr** 292:22
299:4 322:14,
22 334:23

**national** 274:3

**nationwide**
240:19

**nature** 126:15
172:21 173:11,
21 198:25

**NDA** 35:22
146:24 152:23
153:3,4,5,11
200:9

**near** 106:11
113:15 282:22

**nearby** 22:25

**NEC** 215:8
236:16,19

**NEC_FDA**
295:14 296:12

**NECC** 11:20
12:13,17 14:14



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 393 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016   Index: NECC'S..notations

30:15 33:20
47:15 84:1
86:3 90:10
92:2 94:4
147:9 150:13,
21 154:6 155:8
164:4,10,18,23
165:4,9,18,21,
25 166:8 167:3
168:7,14
169:4,13,25
170:2,14,17,23
174:7 176:15
178:14 181:5,
9,25 186:12,23
187:17 190:14,
25 192:18
193:13 194:9,
23 200:22,23
201:3,12,14
202:1,7,10,13
203:1,7,22
204:3,14
205:22 209:7,
12,18 210:19
211:5,7,12,15,
19 214:17,23
215:17 217:18,
22 218:17
220:7 223:19
225:17 226:20
234:23 236:4,
11,24 237:21
238:7 239:16
248:2 252:20
265:16,23
268:22 270:10
271:9,12
285:11 286:16
287:18,20,22,
24 288:20
290:19 293:21
295:9 296:21
301:24 303:4
311:16 312:2

313:8 315:17
317:8,24
318:13 319:1,6
320:10 321:5
322:24 323:14,
15,17,25 328:8
329:3,4 330:5,
22 331:16,19
332:2,18 334:1
335:18,24
337:1,13 339:5

**NECC'S** 187:22
336:15

**NECC-
REPACKAGED**
284:14

**NECC_FDA**
291:8 297:3,4
298:19 300:15
317:9,17 323:7
334:22

**necessarily**
27:4 90:22
303:25

**necessary**
191:13 262:19
279:13 291:23

**need** 16:25
17:2 36:24
46:18 47:24
78:4 98:14
99:5 107:1
138:18 146:1
160:25 161:1
162:9 165:1
170:15 176:4
187:8 232:21
250:13 251:1
257:2 262:22
284:18,21
290:20 291:25
292:3 295:24

296:9,11
304:23,24
319:7 321:20,
23 340:18

**needed** 259:15

**needing** 284:16

**needs** 104:25
229:10 241:21
304:25

**negatives**
247:13

**Nephew** 121:24
122:4,8,14,22

**Network** 8:21

**Neurontin**
122:25 123:11

**Neurosurgery**
220:7 234:24
236:13

**Neurosurgical**
8:23 79:25
224:24

**never** 15:15
38:1 40:19
53:1,4 54:1
62:8 76:4
77:15,17,18,
20,22 92:3
95:14,15 124:1
133:11 153:4
206:1 242:10
259:6 278:5
313:22 325:12

**new** 40:13 47:9
52:7,16 53:17
135:23 136:1,
3,5,6 137:1,13
144:2,5,8,9,11,
13,21 146:24
147:2,17,22,24

148:3,8,10
149:21 150:2,
13,22 151:6,14
152:16,17,25
153:6,10,14
154:25 155:13,
16,19,24
158:11 160:1
163:10,21
164:7 173:16
186:18,25
189:2,4,7,9
192:19 199:3,
16 201:15
202:7,9 239:13
245:14,15,25
248:10 251:14,
16,18 266:1,3
267:5 268:19
270:7 292:21,
23,24 293:2,7,
9,11,14,22
294:1,2,7
295:10,21,24
297:2 298:12,
15 299:6,23
300:3,5
301:12,24
302:9 303:4,6
317:1 324:7
329:22 332:8
335:2,6 338:5
339:7

**next** 11:11 14:9
16:23 23:9
49:7 91:20
117:21 121:19
125:1 126:6
129:24 183:5
224:20 246:22
264:10 280:14
289:7 292:6
298:23 299:1
308:14 310:11

314:16 316:14
323:2 328:6

**nice** 209:9
249:12

**night** 21:3

**NIH** 107:19

**nine** 174:1
197:23 199:7,
25 262:1 317:4

**Nobody** 168:15

**nonactive**
50:16 51:12

**nonbolded**
276:10

**nondisclosure**
36:2

**none** 82:10
236:18 287:3

**nonparty** 11:5

**nonresponsive**
166:20 167:1
209:16

**nonsubstantive**
24:14

**nor** 188:10,11
189:22 227:16
236:17

**norm** 22:20

**normal** 276:10

**normally** 76:14
173:12,23
199:2

**North** 256:13

**Northern** 67:3

**notations** 21:21



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: note..obtain

**note** 31:14
99:11 125:25
305:14

**noted** 24:20

**notes** 21:15,19
31:16 161:14,
17,18,19,22
162:6 164:21
165:1,5 169:8,
16 170:3,8,15
173:7 175:20
295:22

**nothing** 11:19,
21 12:19 20:3
26:18 54:7
76:23 100:2
140:20 141:11
157:18 201:24
205:7,10
235:12 292:8
340:5

**notice** 17:10
39:14 104:21
106:10

**notices** 136:17

**notification**
269:24

**notified** 335:8

**notify** 51:6
335:11

**November**
40:15,19 71:7,
14 272:22
274:6

**now** 16:2,12
23:7,19 24:25
27:19 29:17
31:16 32:21
40:11,14 50:21
52:24 56:6

61:25 63:11,18
65:20 74:5
82:8 87:6 88:7,
21 90:9 92:2,
20 93:11 94:14
95:8 105:10
108:1 113:20
114:4 124:15
126:24 130:13,
18,20 137:4
142:20 144:4
146:9, 148:14
149:8,18,21
162:11 165:15,
23 166:10
169:2 171:7,10
172:18 173:21
174:6 176:14,
22 177:5 194:8
200:16 207:1
208:9 223:6
232:13 234:18
236:7 239:1
245:18 246:2,
13 249:20
251:21 253:18
254:4 256:12
262:23 265:9,
14 273:9,13
274:5 275:3
280:6,7,13,24
282:9,16
284:17 289:2
291:12 292:4,
18 293:1 294:4
301:11 308:14
311:19 312:8
316:7 326:23
327:18,20

**nuance** 11:4

**number** 10:2
36:5 47:19
56:4 57:22,24
74:20 134:11

159:6 162:9,25
163:8 174:24
176:25 179:23
185:7 224:1,
14,15 240:20
241:4,12 250:9
259:2 261:6
271:5,19
275:17 286:21
287:5,23
298:11,13,18
299:13 310:15,
17,18 317:15
318:11 322:21
323:6 327:25
328:3 337:9,19

**numbers** 19:15
95:4 176:21
182:4,5 184:16
221:3 258:5
277:14,16,17
289:24 290:2
296:21 297:1
334:16

**numerous** 22:3
290:13

**NYC** 324:7

――――――――――

**O**

**o'clock** 21:5

**object** 26:11
86:22 90:23
98:7 99:8,18
100:9,15 111:9
124:23 133:2
134:10,24
137:10 138:7
141:1,21 143:3
150:17 153:23
156:4,12,15,21
157:3,15
159:21 163:23

166:4 168:18
170:10,22
177:3 178:16
179:13,17
184:3 186:2
188:6 191:20
192:1,21
194:12 195:9,
18 196:8,13,17
197:6,15 198:7
200:4 203:2,11
207:24 208:1,
6,7,12,13,17
210:5,8 211:22
212:1,7,12,18
214:19, 215:20
217:7,19
218:2,10 220:9
221:15 222:20
225:12,20
227:2,14,
228:20,24
230:20 231:2,
18 232:2,11
234:25 235:3,
16 236:9,15
237:2,18
240:23 243:5
244:24 251:8
252:5 253:11
259:12,19
260:17 262:9,
10 267:9
269:20 270:15
274:9,15 277:5
286:2,17
287:15 293:4
301:14,20
302:1,3 303:8
306:7 309:10,
15 310:2
311:22,23
312:22 319:15
321:8,11,16
323:22 327:4,5

329:8,24 332:6
333:15 336:4,
5,17,22 338:19

**objected**
251:19

**objecting** 281:5

**objection** 9:25
72:9 79:1
90:19 92:5
99:24 101:2
102:3 103:11
105:18 106:8
107:5 108:25
138:12 139:10
149:1,12
151:21 157:12
170:24 171:2,3
175:5 185:18
201:17,20
204:6,8 205:4
206:10,18
209:16 213:1,7
228:14 234:8,
20 235:23
236:6 237:9
239:20 241:7
275:25 279:6,
14 284:20
292:10 294:20,
22 304:19
322:10 329:18
330:10 341:21

**objections**
99:11 102:18
276:21 330:16

**objective**
167:22

**obligation**
61:15 301:23

**obtain** 57:23
286:1



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: obtained..okay

**obtained** 56:25
121:16 124:4
236:25

**obtaining**
247:19

**obviate** 326:9

**obvious** 232:1
241:11

**obviously**
13:13 42:2,11
55:3 88:10
103:24 136:4
139:17,18
174:23 222:1
241:11 258:6
291:20 307:1
309:17 310:5
315:24 320:19
335:20

**OCC** 283:19
310:24

**occasions** 22:3

**occupations**
242:8

**occur** 324:16

**occurred** 92:4
157:11 288:18
317:5 339:11

**OCI** 132:10

**OCR** 177:11,
12,16,21

**October** 33:20
35:5 68:7
288:2 290:17
314:15 315:4
316:7 317:6,
10,12,19
322:13

**ODC** 64:21

**off** 17:1 28:14
34:4 55:10
62:15 76:7
89:4 91:20
96:14 128:11
161:6,8,11,14
178:10 208:19
209:3 210:4,17
219:4 235:15
249:5,13
278:20,23,24
297:10,14
340:25 341:5,9

**off-label** 116:4,
5,6 118:22
123:3,5 131:15
137:21 138:6
139:8 140:7
141:9,20
142:13

**off-the-cuff**
329:15

**offer** 72:1,7
119:19 121:3
154:5 158:16
199:19 329:17

**offered** 54:3,14
116:10,12
120:21 131:7,9
177:19 184:24

**offering** 114:12
126:11 127:17,
22 128:2
325:13

**offers** 182:18

**offhand** 243:10

**office** 35:11
36:8,10,20
37:7,18,22,23
38:8 75:12
113:22,23

**132**:7,10,12
266:1,4 267:5
270:7,12
282:20,24
288:8 298:12
299:6 300:5
302:10 305:4
313:13 316:4,
14

**office's** 38:3

**officer** 105:22
106:13 291:16
292:21

**officers** 13:19

**offices** 37:12
264:4

**official** 101:10,
14,18 102:2
104:3 138:25
139:2 205:14
340:6

**officially** 71:17

**officials** 205:16

**often** 268:8

**oftentimes**
59:10

**Oh** 29:11 97:4
166:17 174:2
202:13 299:14

**Ohio** 131:2
308:22 309:1,
25

**ointment** 328:9
329:5 330:7

**okay** 9:15
11:23 14:19
15:24 18:6
19:7,11,12
20:17,22 21:1,

16 23:8,22,24
24:10 25:12
26:6 27:9,19
28:10,20
29:11,21 30:18
31:14 32:7
33:8,11 34:6
35:9,19 36:3
38:17 40:8
41:2,25 43:2,
10,23 47:5
49:4 50:1 54:3
56:6 59:8,21
61:12 63:11,18
64:9 65:8,20
67:15 68:14
71:4,9 72:15
73:4,20 77:4,
13 79:24 82:16
84:4,16 85:8
87:6,22 90:9
93:12 94:14,19
95:5 96:10,11
101:19 103:9
104:16 106:17
107:10,22
109:25 110:23
111:25 112:10,
15,20 113:7,
11,17,20
114:2,14
117:21 119:18
120:1,14
121:19 122:25
125:22 127:20
132:5,16,
133:22 136:7,
12 137:4,17
140:5,6 141:7
142:20 143:8
144:15 145:18
147:9 148:14
149:9 152:8
153:15 154:21
158:22 163:15

**167**:23 169:19,
20 170:7
172:2,18
174:6,10 175:9
176:21,25
179:7,20,22
180:6, 181:15
185:9 186:14
187:3,7,14
189:12,16,24
191:11 192:4,
16 193:2,9,
194:18 195:20,
23 196:6,25
197:21,22
198:2,19,20,24
201:7 202:19
203:21 205:18
207:1 208:22
209:4,6 210:22
212:3,15
215:1,13
218:19 219:17,
20,23 220:5
221:11 224:17,
19 226:12,14
227:11,18
229:6,13 236:9
238:3,16
245:9,15,18
246:2,18
249:12 250:11
251:15,21
253:17 254:4
255:5, 256:10,
18 257:8 258:2
262:22 263:1
273:17 275:3,
13 276:11
277:1,15,19
284:5,7 288:23
290:1 294:8
295:7 296:5,8
297:4,5 298:20
300:6,16



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
*Nationwide Coverage*

*100 Mayfair Royal*
*181 Fourteenth Street*
*Atlanta, GA 30309*
*404.847.0999*
*www.DiscoveryLit.com*

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016        Index: old..originally

301:21 303:3,
24 305:22
308:14,19,21
311:11 312:8
320:13 327:16
328:6 330:3
335:22 338:9
339:10 340:12

old 47:9 136:3,
6 137:15,16
144:3,5,8,
245:22 248:18
271:6 272:11
274:24 304:5
335:15

omitting 93:7

Omnipaque
64:24

once 149:21
157:1 210:2
216:18 219:21
294:17

oncology 63:2,
6,13

one 12:12 13:5
17:9,20 18:11
22:6 23:10
34:1 36:4,22
39:20 40:3,4,6
42:3,15 43:9,
25 45:5,16
48:14 49:7
50:16 57:25
58:1 73:17
74:5 78:9
79:12 84:15
85:10 88:8
90:10 91:25
99:10 104:12
107:23 110:10,
13 111:4,
112:21,25

113:7,10,15
115:1 121:19
122:20 124:9
126:6 127:2,5
129:3,8 133:3
134:13,14
135:6,14 136:4
149:15 156:16
160:24 162:13
164:4,10,12
168:8 170:17
174:1,16,17
175:13 177:14
178:3,9,11
181:16,17
185:1 187:11,
19,20 190:3,4,
21 192:10
206:24 210:7,
14 217:11
218:8 223:12,
20 229:15,18
233:9 234:17
239:5,17
240:4,8,17
242:7 243:24
244:3 247:15
254:13,19
255:13 258:22
261:4,15
262:3,13
264:14 271:5
281:24 282:9,
12 283:23
290:8,25 291:5
294:21,23
295:9 298:24
299:21 305:11
306:4,12
308:17 314:12
317:19 318:22
320:1,13 325:4
334:21 336:11
337:3 339:16,
19,25

one's 37:13

one-day 340:21

one-page 290:8

one-to-one
14:17

ones 18:18,24
27:23 30:20
81:17 87:4
113:25 277:3

online 278:7

only 11:4,15
13:19 27:7
36:22 51:8
59:23 67:9
81:14 87:9
90:11,16 91:12
94:11 97:19
98:11 102:6
103:18,21
104:24 141:5
146:13 149:15
150:1 183:15
184:24 185:1,2
206:21 216:1,2
217:22 224:20
231:21 247:15
263:4 267:15
274:6,12
276:15 303:11
315:20 332:13

op-ed 43:16,21

open 335:2,9

opening 12:21

openly 231:16

operate 172:13

operated 53:8,
13

operating
246:8,15 264:6

315:10

operative
108:19

ophthalmic
216:22

opine 230:6
241:10 251:2
252:25 286:8

opined 231:6

opining 56:1
142:3

opinion 68:10,
25 88:4,13
92:7,8 114:17
121:3 127:18
148:9 152:11
191:10 193:5
248:6 253:7
303:2 329:11,
16,22

opinions 26:8
38:23 41:8,23
42:6 43:8 80:6
114:12 115:15
116:10,12,14
121:12 128:2
131:7 148:13
150:7 155:21,
23 171:16
230:14 329:19
340:8

opportunity
58:19 92:23
93:2 170:4
278:5,13
282:12 321:23

oppose 326:5

opposed 45:19
47:9 154:14
155:20 279:12

opposing
119:11

Opposition
68:6

oral 18:6

orange 264:19

order 10:25
11:7 14:1 15:4
33:14,21 42:22
68:4,7,18
69:23 75:15
82:25 89:3
96:2 181:19
209:11 214:24
218:15 222:24
223:23 224:7,
25 225:4,14
226:10 227:8
229:13,16,20,
25 230:2
234:14,15,22
235:21 236:17,
18 237:4
238:1,12,18
257:2 265:16,
22,25 266:5,23
267:6 268:21
270:10

ordered 218:6,
8 236:20

orderly 14:17

orders 215:15

origin 304:3

original 11:6
25:5 275:20,22
276:2,4,16
279:11 284:12
298:10

originally 85:14
277:20,22



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 397 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: Orleans..part

**Orleans** 294:7 297:2 298:12 299:6 300:5 302:9 303:6

**Ortho** 117:22 118:2,4

**Ortho-mcneil-janssen** 117:22

**Ota** 47:14 96:5 283:19 291:16 293:21 294:6 298:9 299:3,22 300:1 301:24 302:15 311:11,14 315:4

**other** 10:20 11:14 26:19 27:14 30:5 32:2 34:7 38:14 39:7 40:21 41:4 46:7 50:14 59:16,22,23 62:15,20,21 63:18,19,22,24 64:2 66:17 67:12 70:8,11,15 88:9 112:17 113:23 126:22 128:23,25 136:17 140:6 152:22 165:20 171:12,16 172:5 177:14 178:9 186:15 190:8 199:9,20 215:3,13,14 228:22 229:19 230:3,23 231:3 232:13 242:8,21 243:23,24 249:3 268:11 269:3 272:7 276:13 287:9 304:12 330:18 331:25 332:3,5

**others** 13:14 19:1,14 20:25 52:22 65:19 66:7 79:13 87:1 103:18 112:12 189:21 191:14 215:7 230:11 244:6,8 283:1 316:13

**Otherwise** 166:13 329:21

**our** 11:10 25:17 196:18 222:5 267:25 297:10 334:17 335:7

**out** 15:18 23:2 32:19 36:16 57:14,18 77:6 83:14,16 104:23 106:24 123:7 131:17 133:19,20 156:18 159:25 161:3 162:2 167:11 168:20 177:18 217:1 221:25 223:23 224:7 236:17,20 243:21 254:8 256:2 257:19,23 307:21 308:22 309:19 315:7 316:17 322:24 333:25

**outbreak** 98:3,6 100:8,25 101:7,13,21

104:5 239:2 243:23 252:24 316:23

**outpatient** 8:23 64:10,15,16,17,19 65:4 79:24 215:8 220:6 224:23 234:24 236:13

**outside** 75:21 163:11 264:7

**outweighed** 242:1

**over** 22:14 41:11, 54:12 70:5,21 71:2 100:14 108:3,4 110:16 121:21 210:20 216:23 280:1 282:18 311:3,20

**over-reimbursement** 76:20

**overlap** 34:18 36:3,11

**overlapped** 34:25

**oversight** 285:22 307:15,16 330:8

**Overview** 94:3,8

**own** 22:11 27:21,24 28:3 29:2 98:16 281:5

**owned** 115:23

## P

**p.m.** 161:11 162:15 219:4,10 278:25 279:4 341:9

**Pacer** 70:14

**packaging** 286:1

**page** 17:20 29:24 34:12 46:9,10 47:3,7 67:5 68:17,20,24,25 74:7 81:24 84:6,7 86:3 87:7 89:16 90:10,13 91:11,14,20 92:17 93:7,14,15,20,21,24 94:1,7,10 96:25 152:5 162:24 163:4,22 170:21 171:13,18 172:8,18,25 173:2 181:7,21 182:5,9,16,18,22 183:6,22 190:18 193:17 194:1 196:3 198:17 211:3 220:15,20,23 221:12 224:20 259:25 260:1 263:23,25 270:7 275:18 282:20 284:6 300:20,21,23 301:2 319:19 322:21 328:4,6 335:4 337:6,8,18,20

**pages** 22:4 24:15 29:16 46:24 73:12 91:17,25 93:9 94:15,23 152:4 167:11 177:13,20,24 193:20 269:3 314:19

**paid** 60:15,17 119:8 125:19

**pain** 242:10,14,18 299:8 318:3,4,6,7,9 320:19

**paper** 23:1

**papers** 48:8 68:6 162:22

**paragraph** 18:12,13 29:15,25 68:11,24 92:16 94:9 152:3,8 153:9 158:14,23 159:10,18 160:4,11,14 173:4,5 176:9,11,21,25 177:2,5 183:6 194:1 259:4 264:10 337:15 338:7

**paragraphs** 176:23,24 255:6,14,16

**paraphrasing** 217:8

**part** 28:8 31:20 32:17 33:18 47:8,16 81:18 88:11 93:21 104:10 135:22



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 398 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016   Index: participate..permitted

156:9 168:4
177:8 187:20
197:24 200:25
246:22 250:17
259:13,14
276:15 300:20
323:7 332:5
335:16 337:1
338:7

**participate**
108:18,23
111:3,13,21

**particles**
290:18

**particular** 12:12
29:22 52:5
107:2 122:18
199:10 303:17

**particularized**
304:8

**particularly**
250:2

**particulate**
303:21

**parties** 55:6
153:18

**partners**
267:25

**party** 28:10
167:22

**passed** 107:14
268:19

**past** 58:20

**patches** 135:4

**patent** 120:6

**patient** 58:7,19
60:1 87:19
91:2 94:13

116:17,20
126:12 142:7,
16 195:13,14
203:13 217:1
220:7,17
221:14,19,25
222:17,23
223:4,8,18
225:2,11
229:9,10
231:13,22,25
236:3 237:5
238:11,12,22
239:21 240:4,
8,15 241:13,21
242:11 284:14
285:24 289:8,
16 304:15
307:21,22
320:4,13,24
324:19 331:13
332:1

**patient's** 245:3
289:11

**patient-specific**
87:10 90:12,
17,25 91:3,4,9,
12,19 186:10
195:12 196:5,
22 202:11,15
203:8 204:18
208:16 210:1
211:5,20
212:10 214:17
216:12 225:9,
13,19 226:9,21
227:9 237:1,23
238:9,14,20
239:14,16
240:21 241:4
246:13 263:18,
19 268:4
271:11 291:19
292:9 318:13

319:10 320:9
328:10 329:6
330:7 332:4
333:12 335:25

**patients** 59:24
87:14 115:18
117:16 118:1
142:18 183:15
184:16,19
189:11 203:24
211:8 238:2
240:10,19
241:18 247:2
285:17 290:14
299:9 307:2
308:9 316:24
317:6,24
319:14 320:7,
15,18 321:7
335:10

**pay** 52:15
122:7

**payers** 119:8

**paying** 51:7,13

**payment**
232:14

**payments**
121:21

**PCCA** 252:15

**PCCA075**
252:13

**PDF** 300:20

**PDR** 139:5

**PDUFA** 243:1,
7,11

**pediatric** 61:17,
21,23 63:1,6,
13

**pediatrician**

54:15 62:11
242:13

**pediatrics** 52:1
56:8,10,13,16,
19,20,21 57:5,
11 63:18 66:2
242:7

**peer** 38:24

**pelvic** 117:11,
12,14,18

**pending** 17:5
74:12 100:11
108:6 129:12
146:3 167:24
212:8,19
213:9,11,14,25
301:22 325:5
326:25

**Pennsylvania**
119:24

**pension** 107:18
108:12

**Penta** 19:7
33:19 165:25
166:8 167:3
168:14,20,23,
25 216:1,3,7,9
219:15 266:21

**Penta's** 19:2
34:5 168:4,8

**people** 33:12
67:16 95:17
98:20 114:9
119:10 130:1
133:13 155:14
200:10 228:2
230:14 231:6
233:11 236:1
240:18,19
307:23 318:12
332:19 339:13

**Pepsi** 249:15

**per** 182:7
185:16 252:23
305:14

**percent** 85:18

**percentile**
22:21

**perfectly** 80:19

**perform** 127:23

**performed**
62:1,4

**performing**
38:23

**perhaps** 43:25
89:13 98:9
217:11 235:25

**period** 10:14
35:3 100:17
151:10,11
152:13 154:11,
12,15,17,19,
22,24 169:25
183:1 191:3
194:24 195:3
214:24 225:3

**periods** 51:18
148:4

**permissible**
109:14

**permission**
37:5,25 83:13
121:16 124:4
325:24

**permissions**
83:15

**permit** 16:18
252:3

**permitted** 293:2



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 399 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016      Index: perpetuate..PM

295:10

perpetuate
218:18

person 36:19
109:10,12
171:5 172:12
178:13 196:15
230:25 233:16
240:17 288:19
296:16 329:14
340:7

personal 17:3
70:8,11
126:19,22
127:3 329:10,
16

personally 75:6

personnel
37:12,18,19
38:3,6,20

persons 198:25

pertaining
265:19 279:24
291:6,10

pertains 310:12

pertinent
140:21 322:2

petition 119:12,
16

petrochemical
128:11

pf 225:1

Pfizer 45:11
46:2 84:22
97:7,16
114:13,14,15,
17,24 123:4,6
144:17 146:25
196:20,25

Pfizer's 84:17

Pharm 121:20

Pharmaceutica
115:23

pharmaceutical
55:3 123:19
131:15 153:17,
21 158:4,6
243:17

pharmaceuticals
117:22 118:16,
17 329:14
335:15,24
338:17

pharmacies
183:1,4,16
188:17 257:24
283:21

pharmacist
40:15,18
53:23,24 54:2

Pharmacist's
42:13

pharmacist-
physician
238:23

pharmacists
31:24 87:14
189:16 255:1,
20,25 257:17

pharmacopeia
86:15

pharmacy 19:4
31:9 33:21
53:25 98:2
163:1,9,12,20
164:5,23 165:7
169:24 170:18
179:8,11,16
180:12,18,24

188:4,20
189:3,4,6,10
194:21 197:25
199:6 200:13
209:5 210:21
215:18 216:24
229:8,17 230:6
231:8 246:7
247:19,23
252:14 256:17
260:25 264:7
265:17,22
266:6,10,16,23
267:2,8 268:2,
9,20 269:19,
23,24 270:8,13
303:11 308:22
309:6 310:1
330:24 333:10

pharmacy's
172:22 173:11,
22 199:1

Pharmathene
120:1

phone 95:16,18
105:1 106:23
232:6

phonetic 130:7
334:1 335:5,7

phosphate
97:19

phosphatidylch
oline 286:25
287:2 288:5

phrase 28:3
256:6

phrased 74:17
220:11

Phyllis 68:7

physical 127:3

physician
22:10 54:5,6
55:18 60:2
89:23 141:19
142:6,10,11,
16,18 189:5,8,
17 196:21
239:13 240:5,
13,22 241:5,17
290:12

physician's
57:25

physician-
pharmacist
218:16

physician/
patient 87:20

physicians
115:18 140:3,6
142:13,14
151:17 152:11,
18,19,22
153:3,10
156:2,9 158:7
183:15

pick 97:8,11
106:22

picolinium
84:23 85:3,4,6

pieces 23:1

pile 36:17
39:15,22

place 49:12,13
236:19 244:23
272:12

placed 82:13

places 59:22,
23

plaintiff 125:14,

17,19,20
129:16

Plaintiff's 68:6

plaintiffs 8:16,
17 25:13
125:18 130:3

plastic 44:22
45:3

play 104:17
256:24,25

please 8:12 9:2
16:21, 17:24
19:18 23:13
26:10 39:9,17
71:10 75:17
79:12 104:13,
14 106:23
108:8 136:9
138:18 145:9
146:16 162:13
180:16 198:3
203:13 208:8
223:3,20
224:1,14 225:3
280:16 281:15,
23 282:12,17
283:14 288:12
290:9 294:17,
21 295:19,25
296:21 300:2
305:14 308:17
309:21 314:7
315:20 318:2,9
319:17 321:18
328:1

pleasure 80:20

plugged 23:25

plugging
235:14

PM 161:12
219:5 279:1



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 400 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016   Index: pneumonia..presence

**pneumonia**
316:24 317:3
318:24

**point** 25:10
34:1 56:18
70:12 101:10
107:2 115:20
116:21 117:11,
21 181:14
184:22 187:19
212:8 242:7
258:14 296:6,
14 312:18
318:22 319:1
336:25 339:1

**pointed** 199:25

**pointing** 104:23

**points** 108:13
111:2,25
222:10 334:25

**policies** 94:3,8
244:2

**policy** 30:9,10
162:4,6,20,23
164:8 169:11
170:6,20
171:8,19,21,
23,24 172:4,
20,24 175:6,8
179:20,24
182:16 184:13,
25 186:15
190:19 193:10
195:1 196:4
197:19,24
199:21,23
200:2 221:25
222:6 243:24
244:1 252:21
258:5,8,21
260:23 261:24
263:9 270:6,11

273:5 309:7,
11,16 312:8,12
315:10

**polite** 145:3

**political** 37:5,
13 38:4,15
43:19

**polyethylene**
97:18

**polysorbate**
97:18

**position** 9:24
35:7 65:18
140:5 141:19
148:6 151:12,
18 152:11
155:14 191:16
283:4 302:21
313:7 333:21

**positive** 285:7,
14,19 287:4
307:21 317:4
331:3

**possible**
101:22 188:13
340:11

**possibly**
318:23

**post** 36:1
271:17

**post-outbreak**
190:4

**potency** 215:22
305:8

**pounds** 252:23

**power** 274:11

**practice** 50:11
51:10,15 52:6,

18 53:1, 54:4
58:12,14
77:13,18 118:7
131:1 163:12
231:8 241:6
264:7

**practiced**
35:24,25

**practices**
123:1,11
196:22 318:8
327:15

**practitioner**
140:23 247:6

**practitioner-
patient-
pharmacist**
94:12

**practitioners**
246:24 247:3

**preamble**
178:16

**preamendments**
133:6,24

**preceded** 258:9

**precise** 35:16
138:3 218:24
263:1

**precisely**
158:24 184:5

**predecessor**
30:11 131:25

**predicated**
160:7

**preempted**
126:10,13

**preemption**
126:8,14

**premise** 186:9
195:10 257:21
314:3

**premium** 26:1

**prepare** 31:16
189:18

**prepared**
181:24 256:7,9
278:1 289:24
328:22

**prepares** 211:7

**prerogative**
93:14 140:22
281:19, 293:22

**prescribe**
140:23

**prescriber**
203:25 211:10

**prescribing**
139:4 156:1
206:6

**prescription**
33:14 87:10,20
90:12,17 91:9,
12,19 94:11
142:17 181:1
183:14 203:25
206:7,15,23,25
207:5 209:11
211:9,14
214:17,24
215:3,4 218:14
222:24 225:11,
15 227:10
229:12 230:2,
13 231:5,7,14
234:3,14,15
236:17 237:4
238:1,12,17,20
239:14,16,23
240:12 241:2,

20 246:24
247:5,9 260:10
261:20 319:22
320:3,13,22
321:2 333:12

**prescriptions**
33:13,14 90:25
91:3,5 174:8,
20,24 179:23
180:5,9,12,21
185:7,12,21,
22,23 186:10
195:12,13,15,
24,25 196:5
202:12,15
203:9,13
204:18 206:2,
22 207:20
208:16 209:11
210:1 211:5,
15,20 212:11
214:22 215:6,
7,10,15 216:13
217:23 218:1,
4,6,7,16
225:10,13,19
226:9,21 234:6
237:1,24
238:10 240:21
241:5 246:14
247:19 252:4
259:2 261:9,
11,13 263:3,5,
7,12,15,18,19
268:5 271:11
291:19 292:9
318:13 319:10
320:9 328:10
329:6 330:7
331:6,14
332:4,17
335:25

**presence**
323:5,10



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 401 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016    Index: present..programs

**present** 51:14
52:25 85:3,16

**presented**
302:10

**preservative**
84:20 85:6,11
97:20,22
191:5,12,16,18
192:9,12
194:13, 240:14
241:13 288:14

**preservative-
free** 84:12,19
89:24 91:21
182:8 194:10
239:25 241:24

**preserve**
249:19

**president** 36:23
38:8 132:1
262:13,14

**presidential**
38:6,11,13,14

**Press** 76:10

**pressure** 62:16
297:13

**pretend** 167:11

**pretty** 59:17
119:14 132:15
151:13 253:15

**prevented**
252:24

**preventive** 64:1

**previous**
175:21 279:9

**previously**
10:19 46:13
50:14,20

139:22 219:14
224:18 299:11

**principally**
112:6

**print** 177:18
276:10 277:11
323:21

**prior** 43:9 72:3
90:13 91:25
148:7 158:18
258:8

**priority** 310:8

**privacy** 222:5

**privilege** 9:21,
23 11:5 20:24
26:12 27:10
100:13 102:23
104:19 161:21
282:23 283:10

**privileged**
102:20

**privileges**
57:24 58:6,15,
20,25 59:5,15,
18 62:1 64:10,
14,18 65:3,5
104:18

**privy** 76:4
187:3 285:21
286:7 302:16

**pro** 61:14,16
67:10

**probably** 22:8,
24 36:14
37:13,14 48:6
51:18,23,24
52:14,23 55:5
57:22 60:5,12
61:1,2,13,15
71:17,18,23

74:17,18 77:10
78:16,17 79:2,
3,21 80:3
82:10,12
83:14,15,21
109:9 119:22
132:20 139:25
188:19 228:1,
2,3 273:22
274:3 284:10
303:1 306:11,
21 325:11
326:20

**problem** 306:23
307:1 318:8
322:24

**problems** 10:15
216:19 334:25

**procedure**
127:23 253:3
315:10 340:11

**procedures**
94:4,8 335:1

**proceed** 96:19
162:16 219:11
225:4 279:5

**proceeds**
124:21

**process** 13:3,6,
13,22 14:7
29:24 57:15
104:18 106:11
135:23 241:12,
14, 263:24
284:3,4
310:23,24
311:5 313:16
316:6

**processes** 38:4

**processing**
253:10

**produce** 24:17
255:1,25
257:18 283:11

**produced** 27:15
252:14,15
277:3,12,22,23
278:1 281:8
283:18 284:13
327:21 328:15,
18,19,21

**producing**
32:10 328:8
329:4 330:5

**product** 26:12
79:25 84:17,21
85:5 91:11
94:10 97:6
114:7 115:9
120:10 124:5
134:2,6 135:9
136:21 137:22
138:17 139:16
144:8 146:13
147:8 155:16
179:10 185:11
188:19 200:23
201:3,15
203:23 207:10
208:15 209:2,
3,4 210:2,3,16
211:6 216:11
218:8 234:23
237:1,23 238:9
253:21 254:7
257:23 264:16
268:4,25
271:3,10
274:23 275:6
294:4 302:8
304:1,16,17
305:14,24
306:3,5 309:3
310:7 317:23

318:12 319:6,
14 320:10
321:6 323:14,
17 324:18
332:1 335:17,
24 338:23
339:5,8

**production**
32:22 253:23
277:13,17
281:10

**productions**
277:18

**products** 46:8
90:11,16 94:4,
9 112:1 117:6,
11 118:8,12
123:1,11
131:21 132:25
137:3 183:13
187:16 188:18
190:14,17,25
191:3 194:10
204:17 207:4,9
211:7 215:18
251:6,7 260:9,
15 261:19
273:25 309:1

**professional**
70:23 91:8
183:16

**professionals**
272:19

**professor**
56:16,20 64:2
66:1 78:4

**program** 56:8
57:12 63:1,5,
12

**programs** 63:7,
8,9



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 402 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016   Index: progress..quantities

progress 146:7

prohibited
140:1 153:18

prohibition
203:3

prohibits
138:16

Project 67:8,14
70:7

promise 145:16

promote
142:10,21
143:6,18
156:17

promotion
116:5,7 123:3
141:9 142:13
143:12,24
153:19,25
154:23 155:25
156:2,11,13,19

prompted
86:17 88:24
286:10,12

promptly
306:19

pronounce
89:13 124:14

pronouncing
314:24

pronunciation
89:15 315:3

proper 157:16
318:7

proposal
341:16

propose 341:12

prosecution
265:4

prospective
312:16 313:22

protect 229:10
284:19,22
290:19 332:23

protected 13:8
26:22 69:18

protecting
251:3

protection
27:10

protective
10:25 11:7
14:1

provide 39:13
45:12 143:9
165:23 166:3
177:23 213:4
221:14 236:3
341:17

provided 17:11
26:7,18,22
27:14 75:7
187:11 219:14
222:17 223:5,
9,18 236:23
237:20,23
238:6,9 242:10
291:6 312:11,
14 319:20
333:25 334:3

providers
134:22 158:8

providing
209:11 221:25
225:2 242:18

provision
140:8,15

179:21 199:4
293:9

provisions
144:9,13
147:17,22,25
148:3 150:9
151:4 153:25
158:12 173:16
183:18 193:3
246:1 274:24
294:2 332:8

prudence 75:12

PSC 252:15

public 11:16
35:21 60:22
121:13 125:9,
12 128:5,6
131:21 136:17
172:13 251:4
273:21,24
274:6 284:19,
22 290:19
303:7 331:9,13
332:23 336:14
338:22

publication
39:1 40:19
46:12 164:8

publicly 12:22
18:21 30:14,16
251:20

published
38:24 40:12
41:17,24
156:14 171:10,
19,23 172:3

publishing
172:5

pull 21:3 27:21
29:2 32:18
52:23 114:19

115:14 119:2
138:19 150:11
175:20 180:17
187:21 191:8
222:21,24
223:7,11,21
224:4,6 225:23
226:1 248:18,
19,20 252:7
255:4,9 256:3
295:13 296:4,
7,12 297:9
298:7 299:24
300:7,22 314:7
317:9,13 318:9
333:17 334:18

pulled 21:5
28:14 31:23,24
41:14 43:7
49:1 224:8

pulling 16:8
316:7 334:20

purchaser's
244:25

purchasers
236:24 237:21
238:7 333:13

purchasing
79:25

purporting
93:25

purpose 15:19
22:1 141:20
142:22

purposes 48:24
62:15 64:24
110:14 196:9,
10 199:13
276:23 308:4

pursuant
160:17 172:14

203:24 211:9
226:22,24
264:23 334:13

pushed 62:8
63:9

pushing 106:18

put 12:1,8,11
45:3 47:19
51:12 101:9
104:21 136:19,
23 148:12
156:7 157:19
165:17 194:8
245:15 249:14
267:11 279:20
281:25 283:3
287:19,22
297:17 310:22
339:17

putrid 210:16
274:24 275:5
304:4 331:10

puts 97:12

putting 25:11
130:19 228:11
275:20

_____

Q

_____

qualification
158:18 159:17

qualifications
158:25

qualified
329:17

quality 78:19
151:7 268:6,25
310:7

quantities
174:10,11,18,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

19,23 180:2,3
182:20 183:11,
12 259:5
260:7,8,15
261:7,17,18

**quantity** 183:23
184:1 185:10,
17 186:1
194:10 263:5,8

**quarterly** 38:25

**question** 16:21
17:5 19:14
22:9,15 24:25
28:1 29:5,23
36:24 37:6,20
40:24 41:17
45:15 50:7
53:16 54:8
55:9,13,19,21
63:4 67:20
74:12,17 79:18
88:21 90:15,23
91:13 92:9
97:6,12 98:9,
14 99:9,20
100:1,8,9,15,
19,22,24
101:1,23 103:1
104:8,9,13
105:4,9,15,20,
21 106:1,2,7,9,
14,19,25
107:4,7
108:11,19
111:10 112:14
113:20 117:7
121:8 123:7
136:11,21
138:8 139:12
140:19 141:16,
17,23 142:24,
25 144:16,19,
20 145:5,6,8,

11,12,14
146:2,6,11,16,
22 147:15
149:7,22
150:24 151:4
154:15 156:23
157:6,9,17,24
158:1,2
159:16,19,20
164:10,19
167:2,7,13,23
168:1,10,12,15
169:2,7,20
175:21 184:2,5
187:7,20 188:2
189:6 190:2
192:23 198:12
201:22 203:5
204:3,22
207:13,18,25
208:3,7,8
209:24 211:4,
24 212:8,19,24
213:9,11,12,
14,17,18,20,
22,25 214:2,7,
10 217:9
223:3,8,14,16,
17 224:9
225:16 226:15,
19 228:4,7,9,
10,13 230:8
231:9 234:4
235:13,18
236:8,10
237:7,8,12,15
240:13 241:3
249:1 250:15
252:18 253:4,5
254:10,11,14
255:24 256:11
257:3,13
258:15 259:20
260:11,13,22
261:3, 267:4

268:13,17
269:7,13
271:14 272:1
276:6 277:24
278:6 279:19
280:5,11,12,
14,19 282:18
287:11,13
292:11 293:5,
19,20 294:17,
24 295:12,21
296:7 298:3,5
301:22 302:2
305:17 306:2,
308:18 309:8,
18,25 311:2,7
314:3,25
317:13,14,21,
24 318:17
319:5 321:4
322:22,23,25
325:5 326:12,
25 327:7 330:2
336:7,11 338:1

**questioning**
285:5 304:21
325:14 326:20
329:24

**questions** 13:9
14:5 47:24
49:21 54:24
72:5 80:18
89:2 93:8
97:24 103:5
135:25 136:4
150:25 157:1,
14 161:16
162:5 167:14,
17 187:21
190:6 195:10
203:22 208:5
219:21 228:5
232:14 235:9
269:11 278:12

281:3,5,7
290:10 292:2
302:6 308:20
322:5 326:14
329:1

**quibbling** 36:9

**quick** 40:9
298:7

**quickest**
297:12

**quickly** 15:18
253:15 297:8

**quiet** 282:2

**quit** 32:10
213:8

**quite** 14:25
51:4 58:2
94:24 266:18
286:13

**quote** 69:2
94:10,13
152:10,13
183:19 211:10
225:1,3 229:19
246:25 254:20
255:1,20
260:6,10
283:19,22
292:23 308:24
309:4 320:2
322:20,23,
334:25 335:12

**quoted** 255:8

**quoting** 156:5

_____
          **R**
_____

**radiation** 251:7

**raise** 10:16
14:19 106:14

172:22 173:12,
22

**raised** 13:11
267:19,23
268:6 290:25
302:12

**raises** 199:1
271:11,14

**ran** 262:15

**range** 18:4

**rarely** 151:17
152:11,20

**rate** 25:22

**Rather** 69:18

**re** 115:20
116:1 118:7
119:4 122:25
123:17 126:7

**reach** 149:10
182:6

**reached**
148:14,17
149:6

**reaches** 306:5
308:22

**reaching**
148:24

**reactions**
286:20

**read** 22:16
41:11,12 44:14
46:6 49:14,18,
22,24,25 50:7
67:20 68:10
69:21 73:12
80:10 85:1
92:16 93:10,19
94:14,16,17,23



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 404 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016      Index: reading..refer

97:15 141:5
152:20 153:4,5
160:11,15,16
164:9,13
173:19 183:10,
20 193:5
198:19 199:20
208:23 210:24
215:25 217:11
219:18,19
220:12 224:22
226:8,18 231:4
232:18,24
233:13,17,18
237:6,12,19
238:3,5 255:18
261:2 262:25
264:3,8 265:18
266:7 267:14
268:12 269:4
279:23 291:5,
12, 298:23
301:3 304:19
306:11 310:15
311:8 318:19
319:23 320:2
321:20 322:11
323:6 325:7
338:12 339:7

reading  17:23
151:1 152:23
153:11 163:3
172:23 174:18
182:21 247:1
261:21 262:3
291:7,20 305:9
337:15 338:10

reads  162:25
237:16

ready  26:16
111:18 279:15

real  185:5
186:9 228:19

232:20 233:15,
16

reality  241:22

really  13:16
14:15 35:7,11
42:3 78:20
99:15,16
100:23 132:2
156:23 157:8
168:5,9 208:4
228:23 268:7
295:11 313:3,4
322:2 326:13
331:11

reapply  59:1,4
62:1

reask  213:22

reason  12:7
19:3 25:23
43:7 45:12
69:15 83:12,21
158:4 178:6
208:24 240:6
247:11 250:12
254:2

reasonable
10:14,23 15:10
196:15 326:6

reasonably
336:20 338:15

reasons  254:14

reassert  154:25
165:14

rebuttal  18:11,
24:15

recall  29:9,22
30:2 31:19
34:6 50:5 51:1
54:13 55:16,20
60:1 72:20

73:18 81:20
93:14 106:18
107:16 113:12,
13 114:21,23
122:24 127:25
128:9 132:6
135:2 149:5
175:16 178:10,
23 179:6
216:18 219:16
221:20,21
233:18,23
254:22 257:25
283:11,13
286:20 288:13,
14 313:20
333:24

recalled  179:10
180:13,25
193:17 200:23
201:8 207:10
209:4

recalls  288:16

recap  98:25

receipt  203:25
211:9 266:2
268:21

receipts  75:7

receive  30:20,
24 31:4,6
131:21 182:19
183:9,11 260:6
269:23

received  9:12
30:21 47:17
103:23 268:1
283:5 285:23
298:15 299:5,7
304:15 312:9,
15 317:6
323:17 338:3

receives
284:13 290:12
328:7 330:5

receiving  174:8
180:4 183:13
260:10 261:9,
17,19 284:14

recent  283:21

recertification
56:15,17 57:4,
8

recess  96:15
161:12 219:5
279:1

recite  140:20
224:14

recognize
166:18

recollection
35:23 48:25
51:22 81:11
82:12 109:4,7
111:23 112:3
113:5,6 118:14
135:8,20 138:4
255:7 266:14
335:19

recommendatio
ns  69:4

reconfirmed
262:14

record  8:4,13
9:10,14,19,24
11:16 12:12
35:21 44:14
46:5 60:22
66:13 72:14
82:23 93:11,19
94:24 96:14,18
97:15 101:9

102:22 118:15
121:13 135:24
136:2 147:4
154:14 157:19
161:6,8,
162:11,15
174:9 181:3
212:2,5,13,14,
15,21 214:15,
25 215:2,12
217:23 219:4,
10 222:7,9
237:19 249:5,
13,16,19,
256:21 257:6
260:19,21
265:19 269:11
270:2,24
271:23 275:19
276:4 278:20,
23,24 279:4,
13,21 282:1
285:14 286:7
287:4,8, 290:9
297:14 304:20
306:13 309:20
310:9,16,22
312:24 318:3,
10 324:24
328:11,23
339:17 340:3,4
341:9,14,15

recorded
289:21

recording
21:21

records  284:23
285:4

redacted  299:8

redactions
300:25 301:1

refer  18:22



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 405 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: reference..replied

110:15 171:13

**reference** 32:12 33:23,24 113:14 139:15 160:3 167:7 190:8 210:25 291:21 335:4

**referenced** 50:6 217:15

**references** 299:23

**referred** 19:5 134:2 142:20 162:21 163:22 168:7 170:19 233:22 277:18 322:12

**referring** 10:6 18:18 109:23 110:17 129:20 163:15 169:14 177:22 190:3 224:23 270:19 283:17,23 291:11,16 294:25 334:24 336:8

**refers** 45:6,10 82:5 85:13 160:11,15 171:19 174:10, 13 187:14 258:22

**reflect** 47:14 249:21 276:4, 15 316:23 323:3,9,13,19 324:5

**reflected** 32:25 33:2 69:19 73:6 236:24

237:21 238:7

**reflecting** 115:9 181:25 324:15

**reflection** 201:12 291:15 324:19

**reflects** 50:3 71:5,13 172:11 179:9 283:12 327:21

**reform** 107:15

**refrain** 12:4

**refresh** 29:18 34:9 51:22 84:25 109:6 135:8 221:18

**refuse** 222:8,15

**refused** 220:7, 16 221:13,22 222:12,13 236:3

**regard** 12:17, 19 30:15 55:11,24 67:18 135:5 137:13 143:12 145:10 147:5,8 165:4, 9, 178:10 185:22 186:4 195:12 241:24 245:13 250:19, 24,25 251:14 261:12 285:8 295:23

**regarding** 102:19 108:2 119:20 127:22 269:25 308:23

**Regina** 31:12 315:6 316:16

**register** 243:3, 19 244:20,22 245:1,3,6,8,11, 18 246:23 247:24

**registered** 123:6 243:14, 17 245:20 248:2 271:12 309:7

**registration** 98:2 131:20 179:8, 180:11, 24 215:18 242:24 244:15 245:16 246:2,8 247:12 266:5, 22 267:8 268:2,20 269:18 270:13 293:2

**regrettably** 315:17 331:9 339:10

**regs** 38:3 200:6

**regular** 277:11

**regulate** 151:13

**regulation** 18:20 39:3 43:1 119:17,20 131:24 172:14, 16 210:20 228:2,22 259:8 262:7 303:4 312:14 315:11 329:2,13

**regulations** 41:23 75:14 140:7

**regulator** 327:3 329:15

**regulatory** 136:20 154:3 263:25 264:5 270:20,22 272:25 273:3,8 285:22 307:15, 16 330:8,22

**reimbursement** 76:19

**reinspect** 315:8 316:18

**relate** 25:14 104:22 143:24 296:1

**related** 46:10 101:20 102:14 263:11 287:24

**relates** 263:3 296:25 297:2 324:18 329:19

**relating** 28:8 46:24 47:4

**relation** 174:20 180:3 261:8

**relationship** 70:5 87:21 94:12 183:16 218:17

**relationships** 59:11

**relevance** 42:22 156:8

**relevant** 262:17,24,25 263:2,16 313:5

**reliable** 41:16

**relied** 26:20 27:7 38:22

**rely** 202:25 203:6 204:2,25 205:8,16 340:7

**remain** 148:1

**remedies** 134:11 136:7, 9,13,17,19 137:2 264:11

**remember** 35:24 50:10 55:24 57:21 72:4,19 73:25 103:3 113:9 128:16,22 135:5,7 148:24 168:22,24 169:19 170:8 217:4,10 229:24 236:2 255:6 256:15, 20 283:9 301:11 328:3 339:21

**reminding** 157:7,13

**remote** 183:16

**reneging** 158:15

**repackaging** 289:17

**Repair** 117:11

**repeat** 223:25

**repeatedly** 165:25 166:15 169:4

**repeating** 28:23

**replace** 255:2 256:1 257:18

**replied** 312:9



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: reply..rest

**reply** 311:20
312:2,11,17
313:23 315:12
316:9

**replying** 311:25

**Repo** 225:1

**report** 12:21
18:11,15 19:22
20:7,14,15,16,
21,23 24:15
25:5 27:17
29:7,12,14,15,
32:24,25 33:2,
3,6,25 34:9,13,
14 38:24 41:1,
5,11,24 42:2,4,
6,8 46:18,20
47:1,3 49:15
50:3,6 81:15
85:13 89:1,2
110:5 119:2
121:7 129:5,
132:6 152:1,4
160:7,9 176:6,
7 177:2,8,
184:12 198:17
211:1,2 216:4
224:5 254:7
270:12 271:9
284:13 285:23
288:5 289:10
290:7,21 291:1
298:12 303:21
304:15 329:20

**reported** 124:1,
2

**reportedly**
319:24,25
320:3 321:1

**reporter** 9:1
97:3,9 107:3
143:14 160:13

161:7 223:25
226:6 267:21
281:24 282:14
300:9 310:17
320:1 322:17
341:14,17

**reporters** 15:16

**reporting**
127:19 333:21

**reports** 18:23
21:18 28:25
176:19,20
286:23 288:25
289:13,14,16,
18,20 324:7

**represent** 18:10
25:8,9 27:13
49:18 105:6
125:13 167:10
215:13 257:6
295:2

**representation**
27:20 81:23
86:3 105:8
203:7 204:3,16
211:12

**representations**
121:7 202:12
203:1 204:25
211:19 212:10
214:16

**representative**
256:11 284:17

**representatives**
102:15,17
107:13

**represented**
67:8,14 125:15
201:14 202:2,
13 264:19
295:1,3

**representing**
13:17 166:11
167:9

**represents**
21:13 65:20
70:1 203:22

**request** 11:18
13:21 21:17
28:10 47:16
49:2 72:4 77:6
98:13,23
100:11 102:19,
24 120:21
220:7,17 283:3
322:1 340:10

**requested** 75:8,
11,22 321:18
324:6

**requests** 30:17
75:20,23
281:24 320:1

**require** 265:4
307:16 309:8
335:22 336:13

**required**
135:21 254:6
285:23 309:13,
14

**requirement**
225:9,18
227:3,7,12,16
236:4 238:20
245:8 304:1
305:12,23
333:12

**requirements**
136:25 143:6,
11 159:25
229:5 243:7

**requires**
246:13,18

**requiring** 68:5
94:20 285:25

**rereading** 305:1

**research** 58:17
89:7

**researched**
141:7

**reservations**
105:10

**residency**
51:18,21 52:13
56:8,11,21,25
242:3

**resident** 52:1
63:10

**residents** 52:3
59:12 60:5

**resist** 250:23

**resolve** 315:20
316:15,18

**resources**
37:18

**respect** 15:9
47:15 67:19
107:14 121:4
134:1 177:21
193:13 204:9
206:14 207:1
275:5 281:21
311:4

**respectful**
13:15 14:17
101:3 102:24
283:4

**respectfully**
103:13,21

**respective**
45:12 47:20

**respond** 13:10
311:20 312:17

**responded**
239:16 256:2
257:15 311:16
313:23 315:12

**responding**
312:2 322:22

**response** 11:17
12:25 28:21
39:14 65:16
169:1 175:21
187:23 213:2
258:15 272:1
312:11 313:12,
18 315:16
316:10 326:12,
21 327:3
328:12 338:15

**responses**
176:15

**responsibilities**
152:22 156:9
330:18 332:16

**responsibility**
53:17 151:19
152:13 158:7
188:23 209:3
301:13 303:6
309:24 310:4
330:15 332:18
339:3

**responsible**
198:25 251:3
338:22

**responsive**
15:16 21:17
168:6 301:18,
20

**rest** 94:15



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 407 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016    Index: restrictions..rule

restrictions
135:19

result 158:5
170:1 173:15
239:23 257:21
304:7 324:23

results 199:3
324:8 327:10,
11

Resupply 46:10

retail 163:1,9,
20 164:5
170:18 179:16
182:25 188:3
197:25 200:13

retained 112:23
120:12 122:2

retaliation
67:18,22 68:13
69:11,13,17

retrospect
267:16

reused 320:14

reveal 76:18

review 25:24
31:15 42:17
44:11,18 54:7,
9,16 75:14,17
87:24 170:2
178:18 216:14
248:6 250:14,
21 279:11
340:22

reviewed 11:15
24:12 38:24
42:10,12 75:13
167:11 168:21

reviewing 75:9

Revised 26:24,

25

Reynolds 43:19
125:2

rhetorical 106:6

Richard 78:14,
17 256:13

Richard's 78:20

Rick 72:21,24
73:2

ridiculous
166:18 167:5

right 11:2,3
12:23 16:4
17:13 21:3
24:10 25:4
28:9,11,13
31:19 32:25
34:6 36:1,3
37:14,20 40:11
41:20 42:3
43:12 44:24
45:10,19,22
46:1 47:11
49:1,6 50:11,
18 58:6 59:15
60:7 63:11,14
68:20 69:1,23
72:19 74:5
87:2,16 88:21
89:12 90:15
91:20,23,24
92:2 95:1,8
101:9,10,11,
13,14,24
104:17,20,22,
23 105:2,5,6,9
106:24 109:22
112:16 115:20
116:21 119:4,
25 123:6,23
124:9 129:22,
25 131:2,23

134:21 136:1
137:14 138:20
139:12,16
141:13 142:7,
8,10 144:4,9,
17,18 146:22,
23 147:10,23
148:1,6,7,10
149:18 150:12
151:3 152:18,
22,23 153:3
154:18,22
155:4 156:24
159:25 161:6
163:19 164:12,
13,16,20
165:3,14
167:10,13
169:22 170:14
171:6,18
172:8,9,14,15
175:19,25
176:14,22
177:5 178:15
181:7,23
182:3,13
184:1,22
185:3,23
187:4,25
193:4, 194:16,
20,21 195:2,25
196:23,24
198:14 199:12,
15,16 200:5
201:9,10 202:7
203:14 205:15,
21 206:5,7
207:11 208:24
209:6 210:13,
15 214:22
215:14 224:23
228:7, 231:11,
21 233:1,7
235:16 237:11
239:22,25

240:3,12,15
241:23 244:5,
12,16 246:4
247:3,4,7,22,
25 249:20
251:14 253:18
255:13 256:25
257:6 258:20
260:23,24
261:3,11
262:15,22
263:2,3,4,7,10,
14,16 265:3,7,
12 266:13,14
271:4,8 272:18
273:9,12,25
274:4,18,22,23
275:10 276:8
280:24 282:6,
16 283:4
286:22 288:10,
21 292:4,12
293:18,21,24
294:3,6 297:3,
16 298:21
302:15,17
306:13,25
307:23 313:6,
15 314:1,3
318:14,20
319:3,21
326:23 331:1,
8,21,23
332:10,12,15,
16,18 333:4,5,
7,8 337:20
338:8,12,24
341:1

rights 67:24
68:16 172:12

ring 216:15,17
256:14 334:3

risk 115:17

240:3,12,15
241:23 244:5,
12,16 246:4

120:25 121:5
240:1, 254:8

risk/benefit
152:24 153:1

risks 131:10
153:1 158:5
241:19,25
311:1

Risperdal
115:21 116:1
117:22 127:6
152:2 153:7

RJ 43:19 125:2

Robert 225:17
226:19 322:13
334:23

role 53:22
119:10 181:12
205:23 206:20
207:15

rolling 277:18
281:10

Ronzio 221:7
225:6,8,17
226:20

room 12:4 95:7
231:24 294:12
341:7

rough 15:19,22
340:10,18

rounds 59:19

routine 21:25

row 255:16

rule 10:22
26:23,24,25
93:5 94:19,22
99:12 160:17
277:6



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 408 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: ruled..scheme

ruled 322:24

rules 16:16
31:21,22 40:16
95:13 106:12
108:2 109:14,
17 142:18

ruling 105:16

run 17:6 229:7
247:15 308:3

running 105:24
188:25 340:23

runs 194:6

**S**

S0337 184:12

S0338 198:17

S0343 250:5

S0476 211:3

S0486 175:20
180:16 181:7

S0496 202:20,
22,24

S496 202:23

safe 131:21
151:18 153:12

safeguard
209:12

safeguards
229:9,10

safety 133:8
152:20 207:8
251:4,16 268:5
269:1 271:3
273:22 310:7

said 12:18
13:24 61:19

62:13 75:17
84:6 92:13
96:20 115:3,6,
19 124:10
131:3 132:2,11
151:23 157:8
158:17 161:16
162:1 169:10,
12,14 170:7
177:1 206:20
207:18,20
208:23 221:24
227:7 229:15
233:4,15,24
234:11 253:14,
15 254:19
255:22 257:5,
10,11,19 259:6
262:4 263:20
266:10,17
269:4 283:19
295:4 301:12
305:19 309:17
317:16 332:25
340:13

Saint 8:23
12:20 79:24
215:8 220:6
234:23 236:12

salary 60:22
61:3

sale 132:25
196:23

sales 112:1
118:7 122:25
123:11 220:15,
16,22 221:8,12
224:19

Salvucci 82:2

same 24:25
46:3 74:9
83:25 93:19

101:2 102:18
103:11 146:5
178:13,14
183:18 191:5,
8,15 200:1
205:20 225:22
260:1,3 292:18
299:10,14,17,
22 316:7,8,
322:22 330:10,
16 333:21
337:18

Samia 292:22
298:9 299:4,5
322:13 334:23

sample 274:19,
20,21,22
275:8,9 298:13
299:6 305:7,21
306:9,10,11
307:3,4,6

samples
274:18 285:7,
10,12,13,15,
18,20 286:1
287:4 303:12,
14 305:5
306:12,15,16,
18 307:20
324:7,11 331:3
333:4

San 8:9 16:11
58:8 59:18
67:4 129:11
272:10

sanctioned
186:18,25

Sanda 225:5

Sandoz 32:9,15
45:11,24

sat 77:15

155:22 188:20

satisfactory
340:17

save 41:9 95:3
174:17 175:2
189:11 292:12
334:21

saved 48:10

saw 17:12 21:4
30:17 34:4
79:2 215:21
261:6 263:13
265:18 289:1
330:24

saying 10:20
44:8 72:21
135:7 141:12
202:10 247:4
277:21 294:6
306:16 315:17
322:14 333:22
338:6,13

says 44:11,17
69:8,14 75:5
76:8 84:18
87:9,11 90:14
91:11,14,18
97:21 111:11
139:15 141:18
143:5 158:24
164:14 165:11,
20 172:21
173:9 179:19,
20 180:2
181:8,10 183:2
186:15 205:8,
10 206:20
213:17 216:25
217:1 221:22
224:24 225:7
240:5 246:22
259:13 261:24

270:9,21 282:7
286:10 295:9,
22 298:2,9
299:1 300:2
313:9 315:6,
316:11,12
318:19,21
319:13,16
320:12 321:3
324:21 337:16,
25 338:7

SB 117:21

scale 187:15,
17 188:5
256:16

scam 331:22
332:21

scenario
139:22

Schamberg
8:24 30:21,22
81:7 82:3
84:11,18
220:13,16
221:13,18
222:13 229:20
232:19

Schamberg's
33:15 80:6
233:13,19

schedule 177:2
211:1

scheduled
170:5 233:25

schedules
20:18 33:4,5,6
176:22,23,24
177:11 178:8

scheme 186:13
203:14 209:7,



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 409 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016      Index: scheming..senior

11 217:16,18
218:13 331:5,
16 332:5

**scheming**
331:18,21,25
332:2

**scholar** 13:3

**school** 65:21,
25 66:3 69:20
70:16 72:23
77:7,25 78:2,3,
13,19,25 79:6
106:15 250:6
283:10

**schools** 78:9

**science** 120:23
121:10 125:16

**scientific** 116:8
131:10 147:7

**scope** 76:11
101:5,23
119:20 172:21
173:11,21
198:25

**screen** 176:5,
12 226:5
297:18,19
324:3

**scribble** 31:18

**script** 22:11

**scripts** 185:15

**scrutiny** 259:15

**se** 67:10

**seafood** 272:12

**seal** 252:21

**sealed** 10:21

**search** 189:25

200:5 232:16,
22,24 233:11

**sec** 234:19

**second** 12:11
16:24 40:4
46:9,17 74:1,8
86:22 99:1,2
106:8 111:6
115:1,20 127:5
129:3,19,22
157:12 171:1
172:20,23
173:4,5 178:3,
11 181:21
184:6 185:18
200:17 201:19
210:7 217:6
220:15,20
223:12,20
225:23 246:18
249:14 255:11,
13 262:14
294:8 298:7
301:15 315:6
325:4 334:10
335:4 337:6

**secondly**
245:18

**secretary** 37:15

**section** 132:8
153:14,16
154:1,7 155:9
160:3,8 162:21
174:13 248:5
249:3 250:5,17
337:5

**sections** 249:3
250:23 278:14

**secure** 304:17

**security** 251:5

**see** 13:1 14:9
16:7,12 17:21
18:8, 22:19
23:4 34:3 39:9,
25 40:21,23
41:3 42:15
44:2 52:4
55:22 67:6,7,9,
12 68:20
81:10,24 82:1
84:4 90:3,6,7
91:10,22
100:23 103:20
110:9 111:15
113:25 119:18
125:22 133:20
138:18,22,25
141:11,14,19
142:1, 151:12
152:5,18
154:25 163:5,
13 164:19,21
168:13 169:9
174:2 176:15
178:8,11 179:7
180:10,12,14,
15,19,21,23,25
183:2,4,8
186:21 187:2,
8,22,23 188:1,
8 189:22,23
190:8 193:12
200:6 203:3,19
205:7,10,20
207:4,6,19
208:15 209:25
215:22 216:1,9
220:14,24
221:23 222:9
224:6,10
228:18, 229:23
232:5,6 233:11
247:1 248:8
249:7 250:20,
21 255:3,16

260:14 262:3
263:10,23
267:13 271:16
279:11 284:12
285:4,7,18
286:6,11,21,25
287:4 288:2
292:7 294:4
295:25 297:8,
9,12 299:18
301:16 302:13,
15,19,21
304:17 305:22
306:8,25 308:8
311:11,14
312:24 314:6,
22 321:17
323:11 324:2,
18,21 325:2,6
333:20 334:4,6
337:4,13,14

**seeing** 81:11,
20 179:4 297:3

**seek** 134:8
325:24 326:4

**seeking** 119:1
136:16 293:12
326:16

**seem** 10:23
325:13

**seems** 307:3
320:11,12
322:14

**seen** 40:4 43:9
46:15 48:4,7
59:23 81:25
166:5,9,14
175:24 178:25
179:3 184:16
185:1 187:4,
11,12 211:14
212:3,5,14,16

214:15,16
215:13 224:22
229:18 290:25
302:5,7 303:19
320:4 326:15

**seized** 308:4

**seizure** 264:16,
19

**seldom** 213:6

**select** 28:11
37:1,23 48:19,
21

**selected** 26:10
27:24,25 28:2,
3,12,17,19
81:17

**self-proclaimed**
262:6,20

**sell** 183:14
293:11,22
304:1

**selling** 144:6,8
199:13 201:3,
16 271:9
301:25 321:6

**Senate** 102:16
107:13,17,23
108:7,12,16
262:13

**senator** 256:12

**send** 15:22
29:10 33:12
266:4 267:7
270:16,25
340:18

**sending** 33:21

**senior** 10:9
101:10,14,18
102:1 104:3



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: sense..simply

340:6

**sense** 193:12
332:15

**sent** 17:9 48:22
84:10 96:2
129:6 161:14
266:1 268:3
298:10,17
324:12,22
327:12

**sentence** 68:23
163:4 164:9,14
172:20,23
182:22 183:2,
5,8 193:25
246:10 261:22
281:16 290:8
315:6 329:23

**separate** 28:18
47:22 276:14
277:17

**separated** 48:9

**separately**
24:20

**September** 82:3
84:11 120:10
274:6,13 328:7

**sequence**
83:25

**sequentially**
49:12

**series** 80:18
93:8

**serious** 235:15
281:23

**seriously**
173:17

**serve** 36:20

**serves** 164:20

**service** 37:17
38:3

**services** 8:11
60:16 61:21
65:10 242:11,
18 341:11

**set** 159:25
190:11 218:12
288:19 316:13

**sets** 44:6

**setting** 99:23
313:7

**settled** 112:11
121:12 125:11

**seven** 197:23
262:15 272:8
325:9

**severable**
151:5

**several** 46:24
54:12 56:15
57:7,15 58:11,
21 61:10 77:5
91:17 133:13
142:20 182:12
290:16 320:6

**severe** 284:16
285:24 289:6
290:14

**SF** 69:25

**Shall** 16:13

**Shamsi** 300:1
314:23 315:3

**share** 15:6
120:4 124:21
214:9 267:1
269:4,14

**shareable**
10:11,19

**shared** 115:8
265:14 270:12

**sharing** 208:3

**she'll** 217:2

**she's** 66:19
217:2 282:6
334:20

**shed** 294:5

**sheet** 19:15,18,
19,21 24:14
235:21

**shining** 16:10

**ship** 254:7

**shipment** 333:6

**shipped** 133:16
194:3 236:11,
17,20 257:23
332:1

**shipping**
216:23 260:16
308:25

**short** 95:1,9
333:18

**shortage** 31:23
32:1,13,21
46:25

**shortages**
45:10,12
46:10,14 47:4
49:2

**should** 9:11
16:6 23:17
44:2 69:10
84:7 91:8
99:10 104:2,7,
106:11 109:6,

12,13 128:6
138:3 142:18
173:17 181:9
196:1 208:25
210:12 225:4
226:17 234:23
236:11,16,17,
19,20 241:25
244:12 248:2
254:6 268:10
270:12 271:4,
6,12 275:1
283:8 304:17
305:20 307:13,
14 310:1,5
317:18 321:24
324:15 329:1,6
330:8 331:3,
12,13 337:15
339:9 340:17

**shoulder** 22:14

**shouldn't** 122:7
224:21 264:3
333:22

**show** 26:2
32:18 68:23
82:6,11,25
83:3,5,12
163:2 166:13
175:1 182:21
184:8 188:12
194:9 209:10
214:21 217:9
222:7 235:25
256:3,4,22
275:10 285:14
290:9 319:11,
16 328:13
336:8 337:1

**showed** 287:3

**showing**
229:14

**shown** 167:8
179:14 182:5,8
183:22 193:17
281:7

**shows** 75:4
82:14,22 83:24
97:16 174:9
312:24

**sic** 285:1,3

**sick** 318:12

**sickness**
289:16

**side** 116:15
119:5

**Siga** 120:1,7

**sign** 35:22

**signature** 67:6,
7,12 152:5,6

**signed** 20:6
42:5

**significant**
123:24 135:19
173:15 271:3
288:16

**signing** 75:9
218:14

**silicone** 134:2

**similar** 64:22
164:20 217:10

**simple** 49:20,
21 63:4 75:1
105:9 107:7,8
167:2,6 170:21
204:3,10
230:18 295:11
302:2 310:1
318:17

**simply** 172:4



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: since..sort

312:16 313:22

**since** 20:6
42:2,7 52:17
163:18 234:21
243:13 274:4
278:16 295:9
325:1 326:15
336:11 341:16

**single** 49:18
278:5 302:7
320:4,18

**single-patient-
specific-vial**
320:6

**single-use**
185:16

**sir** 15:25 16:5,
12 17:8,22
18:1 20:12,21
21:24 22:7,19
24:5,13 25:3
26:4 44:23
45:4 48:1 53:7
56:23 61:4
74:11 79:9
84:7 88:25
92:11 93:4
98:22 102:4
104:14 113:16,
19 114:23
118:10 125:12
127:8 136:12
137:13 138:21
157:5 162:7
171:16 172:8
173:10 176:24
177:17 179:19
183:21 185:1
186:22 193:2,
22 204:7
212:19 221:10
224:13 246:12

253:5 254:18
255:11 264:2,
9,13 273:6
283:15 294:19
299:14 311:4,
10 326:25
327:24 332:15
334:2 336:9
338:13 341:7

**sit** 57:3, 233:8
306:22

**sitting** 86:14
114:1 187:24
188:16 232:15
332:20

**situation**
313:25

**situations**
192:4

**six** 26:5 76:16
111:25 126:20

**sizes** 338:4

**skip** 293:2
319:23

**sling** 117:13

**slower** 296:20

**smartphone**
31:17

**Smith** 121:24
122:4,8,14,22
266:13,15
267:16 269:22

**Snapple** 249:22

**snapshot** 114:5

**Society** 31:23

**sodium** 97:18,
19 328:9 329:5
330:6

**software** 108:4,
14

**sold** 152:16
155:8 215:19
216:11 294:5
318:13 335:18

**solution** 107:8

**some** 10:14
11:5,12 13:8
19:12,14,15,21
20:5,11,23
21:7 22:6
23:12 24:14,17
25:23,25 26:1
32:8,12,13
42:1,11 43:14
44:7 46:14
56:17,19 64:25
73:16 75:19,20
77:5 81:10
83:1 89:7 95:3
97:24 104:10
132:17 138:11
145:2,4 155:14
172:5,19
177:12 178:6,
24 182:19
183:9,10,14
184:5 190:8
193:12 210:3
214:4 220:12
222:2 229:16
248:11,12
260:6 264:10,
12 265:10
273:22 274:23
278:14 284:23
291:20 296:14
297:13,24
301:13,23
303:7 304:23,
24 313:6 315:7
316:17 322:5

330:23

**somebody**
11:12 17:4
24:22 37:4
54:13 79:17
116:14 188:7
212:5 214:15
240:18 247:10,
20 265:1
297:23 304:10
310:5 316:16
320:14,17,18
332:14 339:3

**someone** 23:3
24:23,24 82:25
83:10 112:6
125:5 134:7
175:20 180:16
189:25 222:22
223:21 224:5
245:9 258:23
281:20 295:13,
16,17 296:8,12
297:6 307:1
323:21 341:19

**something** 9:9
11:24 12:14
13:7 14:18
21:9,22 34:19
36:15 39:10
44:5 46:19
49:12 85:18
88:24 96:21
100:3 109:5
122:7,8 129:3
140:1 144:7
157:8 166:11,
12 172:4 176:8
184:23 185:24
191:16 192:11
206:6 208:3
210:24,25
215:21,23

231:24 258:12
264:25 265:2
266:17 271:7
274:6,7,13
276:23 279:17,
20 282:25
284:10 297:25
304:2,8,9,11,
21 326:23
329:20 334:5

**sometime** 35:4
66:24 312:3

**somewhat**
25:24

**somewhere**
60:9 62:11
131:2 198:5
289:22 333:17

**soon** 145:2,4
165:5 170:3
305:24 340:10

**sophisticated**
204:11

**sorry** 19:19
28:22 41:10
66:20 86:7
95:17 99:14
124:13 127:7
130:8,13,17
136:12 150:18,
23 157:16
172:23 173:5
192:22 203:20
214:24 232:23
247:13 265:8
267:22 301:3
302:17 319:16
323:18 324:24
334:19 336:17
338:9

**sort** 50:16
271:17 315:7



**DISCOVERY
LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 412 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: sought..states

316:17

**sought** 63:21

**sound** 28:21
71:15 81:2
255:22

**sounds** 71:16
255:13 323:14

**source** 199:20

**southwest**
283:22

**space** 62:17
188:3

**speak** 26:16
57:1 88:6
106:4 146:7
157:20,23
214:9 249:4
282:12

**speaker** 281:24
320:1

**speaking**
138:23 281:20

**speaks** 267:18,
23

**specialist** 299:8

**specific** 31:25
50:19 64:15,20
90:15 94:11
107:4 108:8,19
121:6,7 143:11
169:15,18,23
170:14 216:16
217:9 235:25
238:22 239:24
240:6 243:7
250:20 252:18
281:9 320:24
321:6 329:20
332:2

**specifically**
25:13 40:11
102:25 138:16
164:12,24
169:4 187:20
197:17,18
219:16,18
222:22 230:10
232:18 243:12
248:14,22
258:1 259:3
290:23 304:12

**speculate**
312:5

**speculation**
92:5 231:19
232:3

**speech** 282:17

**speeches**
292:14

**speed** 15:18

**spell** 130:23

**spend** 29:13
34:11 58:16
94:20 98:24
99:5 107:1
309:23 321:25
335:21

**spent** 204:1
248:2 258:21
291:20 323:23
334:8

**spin** 300:17

**spinal** 62:5,8,
12,18

**spirit** 325:9

**split** 149:22
151:2,14 155:3
193:7

**spoke** 210:25
221:24

**spoliating**
249:20

**sponsor** 200:8

**spurred** 76:9

**square** 252:23

**squinting** 16:8

**SSC** 8:18,24

**St** 8:20,21
129:13

**Stacey** 8:19

**stack** 20:20
32:23 40:1,3,
17,22 46:15
47:6

**stacking** 66:19

**stacks** 47:20

**staff** 31:21
57:23 58:3,6
59:15,18 62:1
64:10 65:3,5

**staffs** 252:2

**stage** 157:11
253:21

**stamped**
328:20

**stand** 18:2
22:14

**standard** 10:18
26:4 55:11
142:4 184:5,17
305:19 315:10
327:3 331:10
338:14

**standards**
54:14 86:15,25

87:4 88:3
304:24 322:8
335:22 336:13

**standpoint**
204:24 262:6

**Stanford** 132:1

**start** 29:11
35:7,11 172:18
205:6 207:23
223:22 227:5
278:12

**started** 9:10
16:6 71:5
207:21 287:18

**starting** 93:24
94:7 163:6

**starts** 16:2
91:20 146:7
167:4

**state** 43:15
50:12 53:2,13
60:17 77:14
113:1,2,5
126:13 140:5
142:3 149:21
180:20 205:24
206:3,7,9,13,
15,24 209:5
222:12 226:25
232:22,24
241:5,10
246:9,13,15,
18,20 251:25
257:24 264:4
265:17,22
267:25 268:2,9
270:11,13,22
271:10 309:5,
18 331:24
333:10,11,19

**stated** 13:5

87:12 90:13
137:11 142:5,6
232:19 261:6

**statement** 87:6
90:11,16 97:11
160:6 162:25
202:18 203:21
205:8,11,13
216:17 222:13
251:10,14
260:20 261:2
280:23 284:2
316:8

**statements**
44:19,21 45:16
127:10,11
128:24 205:17

**states** 8:5
32:11, 36:23
38:9 42:16
45:13 50:15,19
53:5,10,11
67:2 68:8,21
69:2 77:19
91:24 102:16
104:6,19 106:5
107:12,13
121:17 124:5
133:1 140:15
141:2 148:7,
14,15,17,18,
21,25 149:3,5,
6,10,11,15,19
151:11 154:13,
18 165:12
171:11,15
193:1 194:2,4
200:23 201:4
204:15 232:5
233:1 242:11,
19 250:7
251:23 262:13
264:21 275:4



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016        Index: stating..summary

288:16 298:13 334:25

**stating** 43:21 308:23 335:7

**statistically** 123:24

**status** 37:13 38:10 50:21 51:4,12 52:14 58:24 136:20 187:12 330:22

**statuses** 52:21

**statute** 47:9 52:3 86:13 126:10 133:9 142:2 143:4,5 172:15 179:18, 19 205:8,11 248:7,14,18 252:7 315:11

**statutes** 41:23 142:3

**statutory** 203:3

**stay** 102:20 325:15

**steering** 8:15

**step** 207:3 243:2 246:5,11 287:22 288:11

**stepped** 243:13

**steps** 76:15 243:19 257:23 260:14

**sterile** 94:4,9 284:25

**sterility** 88:11

**sterilization** 87:23 88:2,8

253:9,19,25

**steroid** 62:2 137:20,23 138:17 239:15

**steroids** 62:5,9

**Steven** 225:4

**sticker** 49:7

**still** 51:5 156:9 167:25 193:18 209:22 223:3 239:17 249:24 257:22 301:8 340:23 341:14, 15

**stipulate** 251:21

**stop** 19:18 25:11 44:5 80:14 93:12,16 145:23 232:13 265:1 280:24 282:16 308:25

**STOPNC** 31:21, 22 215:4,8 217:22 221:13 222:14,17 223:18,21 227:16 233:21 236:2,17,20 238:14 331:17 333:21

**STOPNC_0060-64** 224:3

**stopped** 60:12 61:17 213:12

**stopping** 80:23

**straight** 141:24

**streaming** 105:2

**Street** 8:8

**strict** 221:25 222:5

**strike** 189:10 193:5

**strikes** 189:1,2

**striking** 148:19

**stripped** 339:1

**strongly** 79:17 156:1

**struck** 154:23 192:24,25 193:3

**Stryker** 125:4, 6,8

**student** 13:2 104:17

**studied** 133:11 253:5

**studies** 64:25 116:9

**study** 25:14

**stuff** 32:20 89:4 199:17 287:6

**style** 129:14

**sub** 211:1

**subcategory** 48:18

**subcomposites** 291:9 305:11

**subject** 10:10, 12 38:2 87:20 127:18 142:16 147:17 162:2,3 196:24 199:13 200:11 201:2

202:11,14 205:12 218:24 230:18 253:24 294:2 321:9

**submissions** 234:6

**submit** 133:25 218:3,7 227:17 234:2

**submitted** 147:3 217:21, 22

**subpotency** 216:20

**subsection** 272:25

**subsequent** 42:12,18 44:20 129:4 258:2 276:12 287:5 319:6 322:15

**subsequently** 67:15 132:2 277:3

**subsidiaries** 117:23

**subsidiary** 128:3

**substance** 20:3 198:4 201:20

**substances** 183:12 260:7 261:18 330:19

**substantive** 20:2 42:8 119:19

**substitution** 252:3

**succinct** 72:5 97:25 100:24 105:14 157:9

**such** 9:22 27:12,13 99:15 158:18,25 159:17 199:5 247:2,3 261:25 273:18 297:22 326:13

**sued** 67:16 127:13 129:14 332:9

**suffering** 127:3

**sufficient** 325:12,18

**suggest** 217:8 254:6 277:9 297:22

**suggested** 158:24

**suggesting** 157:25 326:3

**suggestion** 13:20

**suing** 114:9 116:18 117:2, 16 118:1 120:16 123:4 124:18 125:5 126:12 130:1

**Sulfanilamide** 274:4

**sulfate** 328:9 329:5 330:6

**summary** 42:25 43:2,4 67:15 68:5,17 69:23 270:9



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ    Document 2766-1    Filed 03/29/16    Page 414 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016    Index: summer..talking

**summer** 109:3
110:1 265:15

**superiors** 69:16

**supervision**
189:16

**supplement**
43:9

**supplemental**
13:10 19:19,22
20:15 34:14
42:5,8,18
81:15

**supply** 133:8
196:19 251:6

**support** 119:10
286:11 316:4

**supported**
116:12 181:11
194:22

**supporting**
277:3

**supports**
152:24

**Supreme**
148:14,17,18,
24 149:6,10,
14,15,18 151:3
171:14 192:25
193:4

**sure** 11:6 16:2
17:9 18:3,9
22:17 24:22
27:3,5 28:1,6
30:3 39:2,15
40:25 41:11
47:23 51:22
52:24 53:20
54:24 58:4
59:17 61:19
64:14,17 65:2

73:24 89:4
93:1 98:15,18
101:5 102:10,
25 106:20
110:6 111:8
112:21 117:20
126:6 129:21
135:22 136:12
139:23,24
140:18 144:19
146:10,17,20
151:24 156:5
160:7,8 168:24
171:9 172:1
175:15 178:25
193:11,15
202:8 207:10
210:15 218:23
224:2 229:23
231:20 233:6,
10 234:13
240:25 250:2
252:19 254:21
268:10 284:1
292:13 293:10
296:22 304:6
306:2,18
313:12 314:2
318:20 326:22
328:5,18,22
329:19 334:8
341:4,19,25

**Surely** 306:1

**surgery** 82:9
83:24 251:22
252:1 284:16
285:25 289:6

**surgical** 53:19

**surrendered**
58:24

**surround** 53:5,
10

**surrounding**
53:11

**Susan** 175:16
181:22 193:18

**suspect** 107:17
182:3

**suspected**
325:1

**suspension**
182:8 270:9

**swear** 9:2
16:13

**switching**
80:11

**sworn** 9:5
127:10,11
128:24

**sympathetic**
315:24

**symptoms**
290:14 308:8,
10,11 317:5

**syndrome**
249:15

**synonymous**
88:6

**syringes**
216:22

**system** 31:24
70:15 117:11
127:20 128:1,
10 131:24
149:16 222:5
229:12 265:5
284:8

**Systems** 44:10

---
**T**
---

**tab** 18:14

**table** 18:2,10
181:24 341:20

**Tadich** 272:13,
14

**take** 11:13
13:25 17:2,5
24:8 37:19
39:25 48:23
56:17 72:16
74:21 77:15
78:22 80:16,
21,22 81:1,1,
22 86:2 92:13
95:1,9 105:8
107:6 114:4
140:17 145:24
146:8 148:6
152:2,8
158:10,13,16,
21 160:19,20,
23 181:19
182:15 190:1
191:12 205:24
207:3 208:14
213:3,8,15
218:19,21
219:17,24
224:21 240:1
242:17 246:5
252:17 257:22
258:16 260:14
264:12 277:9
278:15 284:8
285:9 288:11
301:13,23
303:7 311:1
320:20 325:17,
19,24 326:1
327:20 332:13,
23 336:24

341:5

**Takeda** 123:18,
19 124:3,18

**taken** 31:6
76:15 77:22
96:15 161:12,
24 219:5,22
235:24 243:19
279:1,7 332:21

**takes** 310:8

**taking** 121:1
191:15 262:19
278:16 292:13
341:6

**talk** 25:20
32:13 47:21
51:11 79:12
104:1 125:22
138:10 170:7,
13 171:7 214:4
218:24 235:11
262:20,23
272:15 284:5
289:13 297:25
322:1

**talked** 24:3
34:8 103:7,9
109:10,12
167:16 179:21
243:25 254:14
260:5 262:2
264:25 273:1,7
288:13 289:3
309:12

**talking** 32:20
46:13 57:21
59:13 60:21
71:5 88:7 99:6
136:7,13 142:3
146:21 148:11
164:1,2 167:4,
25 170:9,13



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 415 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: talks..thank

184:14 190:5,
10 203:16,18
204:14 207:22,
23 224:12
234:5 251:17
256:10 282:7,
24 285:16
287:12,19
302:14 307:15
323:24

**talks** 76:19
310:23 313:3,4

**tangible** 27:10

**taps** 62:12

**taught** 59:22
77:25 78:2,3,
14 132:1

**taxi** 76:18

**teaching** 59:9

**technical** 83:3

**technique**
322:14

**techniques**
127:23

**Technologies**
120:7

**Techs** 120:1

**telephone**
109:25

**tell** 14:22 16:23
17:24 18:5
21:13 27:23,25
28:4 29:9,14,
19 34:2,4 44:3
49:20 51:2
54:20 55:15
59:25 79:24
81:12 86:25
87:4 89:7

99:14 107:4
108:21 109:7,
18 111:1
121:11 133:4
144:6 157:10
162:3 168:8
171:25 176:9,
12 186:3,14
197:3,4,5
204:12, 215:24
222:14 230:7
231:11,14
233:8 239:10
248:14,22
250:13 252:18
254:13 257:12
265:14 266:8,
21 270:16
273:12 295:8
305:17 311:7
318:19 321:24
330:12

**telling** 44:5
86:20 106:17
157:20 168:6
198:4 228:18
308:25

**tells** 172:9
269:10 273:24

**ten** 10:14 16:2
183:7 204:1

**tend** 31:18

**Tennessee** 31:8
50:4,7 53:2,5,
9,10,11,12
64:22 108:2
121:25 128:17
230:2,4,5,6,9,
12,17,22,25
231:7 236:14
239:13 251:25
252:3 335:16

**tenure** 11:19
12:20 44:13
65:11,14,17,19
132:6,14 244:3
313:20

**tenured** 65:18

**teratogen** 131:6

**term** 36:23
52:20 64:19,20
132:8 139:21
142:9 153:12
169:21 174:25
233:19 255:21
273:14,21

**terminal** 87:23
88:1,8 253:9,
19,22,25

**terminate** 37:2
69:16

**termination**
66:3,9 69:24

**terms** 13:25
26:21,22 31:14
42:8 88:6,7
200:10 203:6
258:18

**Terry** 31:7

**test** 165:17
186:5,6 304:17
305:24,25
306:3,5,17,19
307:3,4,6,11,
19 308:12
327:2

**tested** 152:17
305:20 307:14
325:3,6 327:8,
9

**testified** 9:6
54:9 55:11

56:4 126:20,23
127:4 129:5,7
165:12 229:24
266:9,13
267:16 268:24
302:25 307:13
339:20,21,23

**testify** 85:23
124:17 129:25
189:21 215:5,7
307:12 308:6

**testifying** 114:8
116:17,18
117:2,3,4,15
118:1 119:14
120:15,19
125:5 127:15
319:8

**testimony**
25:15 30:3,7
54:3,17 71:2
102:15 103:1,3
110:24 119:19,
23 120:21
121:9,10
126:11 127:17,
18,22 128:24
152:10,14
154:5 158:19
195:10 220:13
221:16,17,21
231:4,21
233:13,17,19,
23 254:15,25
255:3,7,15
256:4,7,25
258:19 266:7,
18 267:3
268:11 269:3,6
270:4

**testing** 108:3,
187:15,18
305:13 307:16

323:10,13,19
324:5,20
327:12

**tests** 308:3

**tetradecyl**
328:9 329:5
330:6

**Teva** 32:10,14
45:11,25

**Texas** 239:14

**text** 24:16 93:7
311:14

**textbook** 40:12

**textbooks** 41:4

**Texts** 48:18

**than** 22:20
26:19 27:14
34:7 40:21
59:16 62:15,21
63:18 64:20
79:22 87:1
89:13 128:25
199:20 215:3
228:2 243:24
263:7 273:13
278:2 330:18

**thank** 15:25
16:5,12 17:8
22:19 40:6
48:1 71:12
74:11 78:7
107:11 111:19
125:18 163:6
173:8 182:24
219:1 223:13
225:4 226:3
252:9 263:21,
22 272:2
276:17,19
297:11 314:10



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 416 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016        Index: thankful..thing

327:19 338:2
340:9 341:7

**thankful** 99:17

**thanks** 74:3
96:24 110:12
180:22 235:20
247:17 298:25
334:11

**that's** 11:3
12:18 14:3,21,
23 21:9,13
23:24 27:14,16
31:15 33:4
36:6 38:12
41:15,17 42:3
45:13 46:20
47:3,8 48:4,12
49:1,5 50:22
51:1,5 52:2
53:7 62:13
65:23 68:18
74:7 81:21
84:2 87:21
94:5 95:10,12
97:20 98:21
99:11,13 101:8
105:4 106:9
108:22 109:14
111:17 113:2,
6,15 114:3
124:8 126:6
127:1 133:9
135:14 139:17,
19 140:25
141:2,16,23
142:9 143:10
144:11 146:2
150:5 153:2,7,
13,20 155:23
157:16 160:18
163:5,6 165:8
166:11 167:17,
19 171:8,21

174:20,21
177:20 180:17
184:22 185:3,
7,12,24
186:10,11,12
190:4 192:7,13
193:2,6
194:14,15,17,
23 197:4,17
200:15 201:6
202:12,13
203:18 204:1
205:13 206:2,7
208:2,7,10
209:4 210:17
212:6 214:13,
25 215:12
221:19 222:1,8
223:16 224:11
225:7 232:1
235:3 236:23
237:4,20
238:6,13,19
241:14 242:9
245:17 246:10,
21 249:23
253:17,21
255:23 261:13
263:8,15
265:24 269:5
270:4,5 272:24
274:20 275:7
276:18 277:23
278:11 279:13
282:8 283:1,6
287:21 288:22,
24 289:2 290:4
292:5,11 294:5
298:18 299:10,
13 300:12
301:18 302:12,
22,23 303:19,
25 304:11,14,
20 305:2 307:3
309:16 311:3

312:21,23
313:16 316:2,
11 317:25
318:2 322:21
325:5,12,13,20
326:1 327:23
331:6,11
332:25 334:4
337:20 338:8,
12 339:8 341:2

**their** 10:12
15:17 59:12
62:11 82:14
100:12 171:5
192:18 212:9
313:3 316:18
332:17 333:19,
22,23 336:15
339:22

**themselves**
48:8

**then-
congressman**
258:16

**therapeutic**
229:8

**therapeutics**
53:25

**there's** 10:15
11:19 13:16
18:12 20:7
22:6,7 23:4
25:25 26:1
27:10 33:3,24,
25 37:11,12
42:15 43:12
44:2,7,25
45:23 46:8,24
69:5 80:4
82:19 100:2,10
103:18 112:17
127:2 130:5,6,

16 139:14,17
140:8 141:16,
24 143:5,23
152:17,25
154:12,15
156:8 157:6,
158:18 171:4
174:18 183:1
185:23 188:2
190:21 191:9
194:19 202:17
207:20,24
212:7,18
213:4,9,14,25
214:10 231:3,
22 232:5,25
233:8 238:14
240:6,25
241:19 247:15
248:10 250:20
255:6 268:11
269:2,21
279:25 280:5,
24 281:23
298:22 301:6,
16,22 304:15
312:24 316:1
319:5 324:8
331:14 339:7

**thereafter** 73:2
165:13

**therefore**
205:23

**these** 14:24
17:23 20:21,23
21:19 23:14
33:4,22 39:24,
25 40:9,10
41:21 42:14
43:25 44:3,4
45:5 46:6
47:20,21 48:15
52:21 81:11

84:10 86:1
90:11,14,16
116:24 119:8
127:2 151:14
174:2 175:16,
22 176:6 179:7
186:14 190:7,8
192:3 194:8
195:2 201:21
203:7,10,12
204:16 207:4
215:16 216:22
218:14,17
219:19,22
220:2 221:3
223:23 229:19
232:10,14,17
238:14 239:17
240:9 241:18
247:1 263:6
265:4,14
273:22 278:14
286:11,22
287:5 300:13
306:16 317:11
324:12,21
334:18 336:19
338:24

**they'll** 59:10
64:25

**they're** 13:12
20:1 39:15
45:20 127:11
165:24 184:21
222:6 226:14
243:12 285:16
305:15,16
316:9,18
321:19

**thing** 11:14
16:24 23:10
105:5,7 111:1
146:5 165:8



Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 417 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: things..through

175:23 177:14
186:12 259:5
260:3 282:9
291:13 300:19
304:16 311:9
328:11

**things** 12:2,11,
23 14:25 17:9
20:7 25:11
27:7 28:23
29:1,3,6,9,14
42:1,3 47:5
62:20 64:2
66:12 76:7
79:11 81:25
88:20 91:3
107:1 136:3
138:2 174:3
189:16 190:9
198:5 199:7
200:10, 218:14
235:11 242:21
254:19 259:8
272:24 288:1
306:4 339:17

**think** 9:11
10:15,24 11:3,
4,8 12:13 13:4,
12 14:15 19:16
25:8 31:12
32:3 35:11,17,
23,24 36:13
39:5,22 40:23
41:3,18 42:15
46:13 51:6,17,
23 52:3 53:15
55:5 59:23
61:8,13,15
71:19 72:18
73:1 74:16
75:18,20,24
78:2 80:3
81:11,14
84:18,24 85:22

86:7,24 93:13
98:12 103:21
104:25 105:3
106:19 109:1,
10,11 111:13
113:7 115:11,
16 119:22
126:3 128:6
129:3 130:22
132:5 135:19
139:24 143:25
145:7 150:9
151:1,7,15
155:11 162:7
164:2,13
165:12 166:18
167:21 188:2,
17 190:21
191:6,9
192:10,12,14
198:13,16
202:24 207:9
222:2,21
223:10 225:21
228:1 233:22,
24 240:13,18
241:13 242:5,
20,23 243:21
248:8,9 249:23
250:25 254:11,
12,22 256:12
265:18 266:13
271:2 276:3,7,
8 278:7 279:21
280:25 282:11,
24 283:2,6,7
285:16 288:22
301:7 307:13,
24 312:19,23,
313:24 315:3
316:5 317:17
319:5 320:16
325:8,12
326:5,11
329:16 331:7

333:17 334:12
338:6 339:24

**thinking** 40:22
172:11,17
241:12,23

**third** 17:2
77:11 84:7
116:21 153:18
182:11 239:6
337:7,8

**third-party**
75:22

**Thirteen** 314:11

**Thomas** 8:20,
21,23 12:20
79:24 215:8
220:6 234:23
236:12

**Thompson**
171:15

**thorough** 138:1

**those** 13:9
18:15 19:23
23:1 24:8 29:9
30:2,13 33:5,6,
14 34:17,22,24
36:2 38:4 39:9,
22,23 40:1
42:17 44:22
45:15 46:8
47:24 48:22
49:1 50:16
55:12,23 63:7,
8,9 64:18 65:9,
10 66:21,24
73:23 74:10
86:16 87:12
88:20 91:3
108:7 111:2,
12,13 113:25
121:11 124:21

126:15 136:19,
25 138:1
139:18 143:10
153:24,25
154:1 159:24
161:14,17
164:4,10
166:3,9 170:17
173:24,25
174:5 179:3,4
180:13,25
184:16 185:23
194:2 196:20
200:10 214:25
215:4,10
216:18 217:4,
23 219:14
222:22,23
229:16,25
236:21 237:5
239:10 243:21
249:9 251:18
252:22 253:24
255:21 258:5
265:10 268:8
269:10 285:4,6
289:20 296:12
297:6,24
317:13 318:9,
10 319:7
321:20 324:9
328:13 330:24
336:20 339:25
340:1

**though** 35:14
93:22 181:16
197:2 267:4
271:8 312:21
318:11 341:14

**thought** 79:21
85:9 133:18
269:3 294:12
301:23 302:5

**thoughtful**
104:2

**thoughtfully**
105:3

**thoughts** 99:6

**thousand**
25:15,20,22
26:2 60:15
182:12 188:19
208:4

**thousand-dollar-
an-hour** 60:20

**thousands**
29:16 167:11
182:6,14
189:12 286:5,6

**three** 16:16
18:19 22:6
53:20 87:13
105:10,12
127:8,9 170:20
224:21 239:2,
9,10 240:19
277:16 289:9,
12,15,18,20
314:19,21
317:3 332:9
337:16 338:3,
4,13

**three-year**
56:10

**through** 11:16,
17,18 18:7
21:22 23:16
27:22 28:16
29:12,13,15,24
34:9,11 49:8
54:20 66:22
75:21 80:18
98:12 111:6
152:20 174:1



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016  Index: throughout..triamcinolone

186:14 191:21
195:4 200:6
234:4 235:21
240:13,18
241:23 252:4
260:24 261:1,5
288:8, 291:9
307:23 335:11

throughout
223:5 234:21

throw  235:1

thumb  178:4,5
296:15,17
297:9,11

thumbnail
296:10

Tim  43:13

time  11:13
16:2,20,22,23
17:2 20:6 22:2
29:13 34:11
35:3,25 41:9
50:10,19
51:14,18,20
52:17 58:16
60:21 61:7,8,
25 63:19,22,25
70:12,13 73:22
75:16 76:21
83:11 92:14
93:5,17,19
94:20 95:3,11
98:25 99:5
101:10,12
102:13 107:2
108:20 110:1
114:14 117:6,
18 121:15
122:20 123:7
132:21 133:19
137:5,18
146:2,7 148:4

150:12,16
151:9,10
155:6,7 158:4
160:22 163:25
164:7,19,20
165:3,18
169:24 174:17
175:2 177:9
181:14 190:1,
10,11 194:9,24
198:6 202:12
203:15 205:20,
22,25 206:5
207:8,12
208:15,24
210:13 211:16
214:24 222:10
233:20 234:4
235:24 237:13,
16 241:17
242:7,17 248:1
254:4 258:22
260:17 261:15
268:14 270:3
271:1,15,20
280:22 281:24
282:10,13
285:9 288:18
291:14,20
292:12,14
294:21,23
307:20 309:23
313:20 314:8
320:1 321:25
326:14,16,18
327:22 330:20
331:8 332:10
333:6,18
334:8,13,
335:21

time-consuming
29:23

times  56:15
105:10,12

139:15 142:20
163:17 332:9

Title  48:18

tobacco  76:1,2,
6 123:14
125:2,3

today  8:4,8
14:5,18 16:17
17:25 23:6
24:12, 25:18,
21 33:9 39:1
41:19 48:12
57:1 60:21
86:14 93:13
97:3 105:15,21
106:22 109:23
150:15,20
157:1 166:24
167:17 221:11
230:1 258:22
282:11 294:18
325:19 326:12
336:7

today's  21:14
170:5 326:17
341:8

Todd  122:15,
18 128:19

together  36:12
85:1 95:7
116:23 175:9,
18 194:8
218:18 282:10

told  28:25
46:14 56:6
103:8 105:10,
12 125:16
170:5 181:6
222:4 228:21
246:6 253:8
259:7 268:23
280:2 283:11

296:18 315:21
324:15 327:2
332:1,3

Tom  43:13,18

too  21:8 42:17
103:22 104:24
128:20 224:21
233:23 235:2
249:7 300:16
308:17 330:25
331:23,25

took  56:14,15
77:17,20 79:7,
16 148:6
151:12 155:14
261:15 275:4
332:7

top  87:8 89:5
178:10 182:18
315:4

topic  172:11

topics  80:12

torts  78:12,14,
18,20,22

total  76:19
131:10

tour  60:10
71:13

toward  13:9
146:8 308:10

trace  75:19,21

track  167:24
168:1

traditional
163:11 199:15
264:7

traffic  224:12

trained  63:3

87:15

training  56:21,
25 242:16

transactions
44:13 75:7,9

transcript
10:18 15:6
97:2,3 215:25
257:10 341:1,
18

transcription
226:6 257:14

transcripts
15:18 27:8

transdermal
135:3

transfer  297:19

travel  44:12
74:15 75:4,6,
17 76:9,12,16,
23 83:16

travel-related
73:21

traveling  17:4

treat  11:9
100:12

treatise  18:20,
21 38:25 39:3
40:12

treatises  41:23

treats  299:8

Tremaine  43:24
96:9

trial  10:9 116:4
128:24

triamcinolone
91:23 317:7



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 419 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016    Index: tried..understanding

319:2,20 323:25

**tried** 33:3 41:22 151:13 288:9

**tries** 40:16 95:13 154:25

**trigger** 144:13

**triggered** 123:21

**triple** 322:24

**Trouble** 91:21

**true** 78:6 84:2 99:13 127:1 137:4,5,12,13 151:17 153:21 155:25 156:10, 19 158:3 208:2 251:9,10,14 318:17

**trust** 257:6

**truth** 167:18,20

**try** 151:10 172:19 193:9 237:13 249:12 258:17 287:1 316:12,14

**trying** 43:5 98:12 100:21 102:23 104:1 116:15 165:13 178:17,21 188:17 189:14, 17,18 193:19 212:20,24 225:22 248:8 249:16,18 254:12 269:2 287:9 292:12 313:24 316:18

**Trypan** 313:5

**Tuesday** 340:17,22 341:18

**turn** 41:1 198:17,18 263:23

**turned** 81:24 210:20 311:3

**tussle** 312:25

**twice** 157:1

**two** 14:9 20:19 22:6 39:24 42:14 43:23 44:6,22,25 45:1 47:5,13 51:18 61:11 73:5 74:4, 77:10 96:7 99:10 107:1 111:13 112:17 116:22 143:5 150:25 175:12, 13,22 178:12 181:15 188:3, 13 194:8 240:18 244:1 255:6,15 263:17 265:4 288:15 298:22 317:3 339:16

**two-thirds** 113:15

**tying** 329:21

**type** 48:18 273:19 274:23

**typed** 22:6 277:24,25 327:23

**types** 55:12

**typical** 22:10 315:14,15

**typos** 19:15,20, 25 20:1

———————

**U**

**U.S.** 42:13,23 142:12 171:14

**U.s.c** 140:8

**U.S.C.** 47:6 186:19 205:13 244:11 246:3 247:24 250:10

**U.S.C.A.** 244:13

**UCC** 79:8,13, 14,16,20,23

**UCSF** 59:5,16, 20,24 64:6,13 65:5,6,11,14, 21,25 66:3,4 70:5

**Uh-huh** 30:7 56:3 73:14 116:10 153:15 159:9 160:2 164:15 233:14 290:15 340:24

**Ukese** 150:8 155:3 271:17 302:25

**ultimate** 253:23

**ultimately** 155:23 229:15

**Um** 37:9

**un** 222:11

**unacceptable**

123:22

**unanimously** 69:9

**unapproved** 163:10,21 164:6 183:12 260:9 261:19

**unbelievable** 62:10

**unborn** 115:10

**uncalled** 282:8

**uncertainty** 104:10 105:17

**unclear** 148:5 150:14,15,18, 20 151:1,8 155:11 330:20

**uncomfortable** 105:13

**uncontaminated** 131:21

**uncovered** 209:14

**under** 26:23 45:20 46:3 47:6 52:3 60:6 67:24 68:15 77:23 79:14 92:17 93:20 108:10 109:14, 17 126:10,14 127:20 134:12 136:15 137:14 142:5 155:18 158:9,11,17 171:7 172:20, 24 173:6 189:8,16 196:9 197:7,9 204:20 222:5 230:2

241:5 243:1,7 245:10 247:3, 24 248:10 249:7 252:1 256:17 258:7 261:3,22,24 263:8,10,13,25 270:11 274:17, 24 275:1 277:5 304:25 307:10 309:1 333:4 336:19,20

**underestimate** 156:2

**underlies** 154:1

**underlined** 273:16

**underlying** 120:24 277:7 308:16 309:21 316:23

**understand** 16:22 28:1,2,5, 7 29:4 40:23 67:13 101:5 102:22 134:15 136:9 144:19, 20 146:21 150:24,25 185:4 189:17 192:22 203:13 207:12 211:25 229:9 233:10 248:4 258:19 263:2 266:18 267:4 268:8 284:22 285:4 286:19 293:5 301:19 302:24 306:2,18 311:4 325:23 327:9

**understanding**



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 420 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016    Index: understood..versus

11:1 36:25
37:21 93:4

**understood**
261:4

**underway**
74:14 77:1

**unequivocally**
192:19

**unfair** 22:8

**uniform** 79:6
250:7

**unit** 188:19
189:15, 320:18

**United** 8:5
36:23 38:9
42:16 67:2
68:8,21 77:19
102:16 104:6,
19 106:5
107:12,13
121:17 124:5
133:1 148:15,
18,25 149:6,
11,15,19 193:1
204:15 232:5
233:1 242:11,
19 250:7
262:13 264:21

**units** 53:19
64:17 184:15,
19

**university** 59:9
69:25 71:22
72:8,25 77:11

**unless** 29:15
187:8 199:14
217:2 257:13
290:24 315:12

**unlimited** 259:4

**unquestioned**
268:21

**unresponsive**
326:15

**unsolicited**
73:3

**until** 13:21
15:20 35:4,8
50:24 64:9
71:18 105:15
144:25 145:24
147:12,15
154:13 161:17
251:10 266:24
278:13 286:16
288:20 312:2,
10 316:3,9

**up** 11:13 13:20
14:18,25 25:10
26:2 38:7
40:19 58:11,15
59:7 61:25
64:5 66:19
80:2 83:3
85:16 88:15,18
89:10,21 93:15
95:14 105:24
106:22 107:6
108:13 112:5
132:8,19 137:6
138:19,24
147:12,15
169:10 170:16
182:11 187:21
197:11 217:3
218:25 220:1,4
225:23 226:1
232:5 243:3
248:18,20
249:6 251:10
253:15 255:4,9
256:3 292:19
294:11,12

296:4,7,13
297:18,24
298:7 299:24
300:8,22
316:13 317:2
318:23 333:13
339:5

**updated** 25:4,6,
7,9

**updating** 46:11

**upheld** 66:4,10
67:21 148:9

**upon** 38:23
132:24 136:15
202:25 203:7
204:2,25
246:23 276:6

**urge** 79:17

**us** 9:19 10:14
15:11 16:18
26:10 28:25
33:9 48:10
73:4 94:23
107:5 109:7
111:2 129:6
130:23 166:24
176:4,9,12
181:15 184:8
197:3 198:19
199:20 208:4
228:18,21
229:14 248:18,
20 250:13
264:10 283:18
295:8 305:1
311:3 321:24
326:18 327:2
335:8

**use** 21:25 22:2
36:22 54:15,25
55:10 64:14,19
89:23 90:8

131:4 135:3
137:8,20,21
138:6 139:9,16
140:3,6,23
141:20 142:8,
9,10,19 143:5,
7,10,13,15,17,
18 144:1
153:25 163:11
164:7 169:20,
179:21,22
182:20 183:11,
18 188:13
200:7 240:6
255:21 256:19,
20 260:7
273:24 301:10
305:25 326:16,
20 331:12

**used** 22:3
33:22 89:12,17
107:25 135:20
139:22 172:20
184:14,20
200:9 204:12
216:2,7 233:19
238:25 256:16
273:14 317:24
319:14 321:6
335:9

**uses** 21:21
140:4

**using** 64:15
93:20 109:16
133:13 138:16
153:18 187:14,
17 191:14
261:17 301:8
320:18

**USP** 86:4,6,7,
11,12,17 91:25
92:3 246:19

**usually** 37:11
89:19 206:2,7
252:2 273:16

**Utah** 120:10

**utter** 155:4
211:21 212:11
214:18

---

**V**

**V-i-s-i-p-a-q-u-e**
322:19

**Vague** 243:5

**valid** 180:4
183:13 193:8
203:25 206:6,
11,14,22,23,25
207:4,19 211:9
215:15 230:13
231:4,6,9,14
260:10 261:9,
19

**validity** 148:10

**varied** 59:12

**various** 53:16,
17 88:3

**varying** 331:7

**verbatim** 74:22
96:8 236:18

**verdict** 124:19,
22,24

**verified** 167:21

**verify** 232:21
309:2

**version** 276:5
317:7

**versus** 42:16
81:17 87:23



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: very..wanted

89:8 113:5
116:22 117:21
120:1,9
121:20,24
123:14 125:1,4
128:14 139:8,
171:15 314:6

**very** 14:17,23
15:16,25 16:7
19:23 40:11
42:25 43:4
49:7 73:2 75:1
79:11 82:1
90:6 97:25
100:14 124:20
153:3 163:4
168:12 173:8
174:11,19
179:24,25
180:3 182:24
198:13 203:20
206:19 207:10
209:6,9 222:5,
22 227:24
228:7,9,12
263:5 271:15,
18 283:2 291:6
297:11 316:5
319:23 326:7
330:25 333:3

**veterinary**
251:5

**vial** 239:17
320:12,22,23
323:10,13,20,
22,23,24
324:5,20
325:3,5 335:2

**vials** 182:6
185:9,15,16,25
188:4,14
189:13 193:16
218:8 252:21,

22 253:3,24
290:16 303:18,
22 304:18
327:2 337:17
338:3

**video** 8:4 105:2
162:11 233:10
249:14 256:24
257:10 340:23,
25

**VIDEOGRAPHE
R** 8:3 9:1
96:12,16 161:9
162:13 219:2,8
271:22 278:21,
24 279:2
340:24 341:8

**videotape**
25:25 26:1

**VIDEOTAPED**
8:1

**view** 69:19
105:7 106:1
114:6 134:7
191:12 195:20
303:3

**viewed** 181:5,6,
13 303:10
331:1

**violates** 163:12

**violating** 134:7

**violation** 268:2
281:1

**violations**
134:14 173:15
199:3

**violative** 12:5

**Vioxx** 120:13,
14,24 121:1,16

**viral** 307:18

**virtue** 332:23

**vision** 167:19

**Visipaque**
322:16,18

**Vivian** 48:25

**volume** 96:13,
17 161:10
174:14,25
175:1,8 179:9,
14,15 181:25
182:1,10
183:25 201:11
208:15 210:2
219:3,9 254:7
257:23 258:13,
18,20,22 259:6
262:7,17,23,
24,25 263:2,
15,16,17,18
278:22 279:3
336:1

**volumes** 20:19
152:17 195:15
196:12 258:7
293:8

**voluntarily**
58:15 59:1
75:16

**voucher** 83:16

**vouchers** 44:12
75:5,6,9,13
76:17

---

**W**

**wait** 92:25 99:2
144:25 157:24,
25 158:2 214:6
226:4 228:16
258:4 260:21

279:18 340:20,
22

**waive** 9:21,23
225:9,18
226:21 227:12,
16 236:4

**waived** 225:2
283:12

**walk** 316:1

**walking** 315:21

**wallet** 52:24

**want** 10:16
11:23 13:4,
15:21 18:7,22
22:2 25:8,9
26:8 27:3,5,20
29:13 33:10
34:11 39:15
46:20 49:16,17
50:18 52:14,23
55:6,13,15
64:14 65:15
72:22 79:23
80:2,14,15,21
85:7,9,22
87:24 88:3,12
89:4,25 92:6,
19 93:15 94:17
97:23 98:17,24
100:18 103:14,
24,25 104:7
105:6,14 110:9
111:1 112:13
114:4 119:2
121:6,22
122:10,12
125:10 129:21
132:8 136:21,
23 138:1 146:2
148:21 151:22
161:5 162:10
164:21 166:12

168:5,8 169:7
175:22,23
176:3,7 177:14
178:24 184:10
185:5 190:1
192:12 197:2
215:13 217:9,
23 219:19
226:8 228:17
240:6,13,14
241:13 244:17
245:13 246:8
248:4,6,7,15,
17,18 249:2
250:12,13,22
252:7,17,18
254:10 263:1
266:25 276:20
278:12 287:21
290:3,4,8
291:2,12,14
295:23 297:24
298:17 304:12
306:14,17,19
307:2,4,6,11
308:1,9,12
309:23 313:14
316:1 321:20
324:25 325:23
326:5 328:24
329:15,16
330:14 334:21
339:19 340:4

**wanted** 9:9,18,
23 11:14 26:6,
16 33:9 37:23
39:13 43:7
83:6,8,12,16
92:13 94:16
96:20 158:16
170:6 179:2
197:16 214:9
232:18 335:11
340:3,15



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 422 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016      Index: wants..western

**wants** 103:14 213:17 214:4 316:16

**warn** 80:23

**warning** 85:10 135:21 184:20 264:14 273:8, 10,13,14, 298:16 311:15, 20 312:9,15 313:2,23 315:13,15

**warnings** 136:16

**warp** 15:17

**wasn't** 61:19 69:23 75:8 121:17 155:15 171:11 191:13, 22 218:16 227:6 233:4 264:18 268:14 286:15 309:13 325:21,22

**waste** 291:14

**watch** 258:7

**watching** 105:2

**way** 13:3 14:6 26:4 38:1 90:2 95:11 99:14 133:9,18 142:23 171:4 172:7 181:13 217:1 220:11 229:18 233:7 254:8 280:24 297:17 331:25 332:3,5 338:12 340:7

**ways** 191:10, 11

**we'd** 9:17,25 27:22 28:15 29:11 35:15 55:1 57:20 64:4,12 70:6 82:23 90:7 114:19 115:14 119:2,22 122:11 147:3 188:8 325:10

**we'll** 14:17 15:22 17:5 44:16 47:21 48:8 49:6,12 66:24 86:1 92:20 95:2 107:1,2,3,6 111:15 138:10 139:6 146:7,8 158:21 160:23 177:16,18,23 218:24 248:20 265:13 288:7 297:8 310:10 321:25 323:2 326:5,16,20 336:6 340:22

**we're** 13:13 22:23 32:20 45:17 46:6 54:10 73:4 95:3,6 99:25 110:13 136:7 144:2 152:25 160:20 161:6 164:2 170:9 200:12 202:11 203:16,18 213:16 216:25 217:3 234:5 249:13 267:10 278:24 289:2,

11

13,15 309:23 313:10 325:8, 13,15 326:5,23

**we've** 24:3 26:22 34:7 41:18 45:5 48:3 58:13 80:12 81:9 128:25 179:21 181:16 186:5 204:1 212:16 242:5 251:17 271:25 274:3 289:2 323:23

**website** 11:17 12:24 20:25 28:15 29:2 71:5,13

**week** 61:6 316:14

**weekend** 15:11, 14,23 72:19,20

**weeks** 61:6,10, 11

**Weeter** 8:22 10:3 66:21 159:7,9 256:24 272:13 275:22 277:2,22 297:15 298:19, 22 299:1,3,14, 17,22,25 300:11,18,21, 24 301:1 314:12,14,21 317:15 321:19 323:15,17 324:6,11 328:14,20

**welcome** 94:17

**well** 13:23

14:25 15:15 16:7 18:18 22:16,17 25:23 27:9 28:20 29:11 32:3 36:24 39:20 41:13 45:8,20 49:16,20 51:2, 17 54:10,19 55:8,13 59:8 60:19 62:10 64:19 67:9,15, 19,23 74:21 78:16 83:14 87:11 89:6 93:12 94:24 99:7 100:3,18, 20 103:8,9,16, 18,25 106:3 109:5 111:15 115:13,14 116:7 118:23 119:19 124:20 126:24 127:9 129:21 132:13 135:1 138:15 141:22 144:9 145:2,22 153:13 154:18 155:6 156:22 161:23 167:16, 19 168:11 170:4 171:13 174:5 176:25 177:18 179:1,7 181:15 185:9 191:7,18 192:16 193:9 196:6 198:16 199:23 200:16 203:17 205:6 213:22 216:9 218:19 229:13 230:24 232:9 234:4 235:16

244:1 247:9 253:17 256:15 257:8,9,12 261:14 263:20 265:13 266:21 268:14,16 269:10,12,16 270:6 272:25 273:24 275:23, 24 276:1, 277:7 278:9 281:4 283:9 284:5 285:22 286:14 290:1, 10,23 291:25 294:11 295:7 296:17 305:23 306:3,21 307:5 310:10 313:19 314:6 315:2 320:22 325:1, 17 326:22 327:1 338:18 340:13,18

**well-known** 131:6

**Wells** 116:22

**went** 13:9 21:22 29:6 78:9 106:15 190:6 191:21 222:15 260:24 288:4,9 318:3, 6 331:22

**weren't** 118:9 123:8 218:15 288:25

**West** 8:20

**western** 113:17 121:25 128:17 148:7,14,17,21 149:3,5,10


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: what's..who

151:11 154:13,
18 165:12
171:11,15
275:4

what's  10:2
13:22 20:13
27:14 36:25
58:23 64:22
111:10 121:13
122:11 140:19
142:13 154:9
156:23 159:6
167:12 176:4
183:22 184:11
185:2 186:11
190:2,23 196:6
217:5 272:11
289:20 298:18
299:2 303:3
310:17 317:10
324:18,23

whatever  53:15
83:12 104:23
161:5 176:12
293:7

whatsoever
43:6 76:24

wheelhouse
244:13

whenever
80:14 92:19
158:16 293:7

where  24:19
32:20 45:10
54:4,6 55:16
58:19 59:4
82:5 83:24
87:6,9 91:11
112:18,22
113:7,24 117:5
124:10 126:20
127:2,3,12

129:9,11
139:25 143:17
148:4 150:1
151:13 154:24
155:22 163:2,6
164:14 165:25
166:8 167:3
168:14 171:18
172:24 173:25
175:1 182:21
187:3,5,9,12
198:22 200:6
202:15 215:14
216:18 221:22,
23 228:18,23
232:19 237:4
238:18,23
240:4 247:1
254:8,23 260:3
261:6,21,24
263:15 269:4
272:9 283:25
287:6 302:8
306:9,12
313:21 316:1
318:19,20
319:11,16
332:14 333:19
336:8

whereby
197:24

whereupon
10:4 17:16
49:8 66:22
68:1 81:4
110:21 140:10
159:1 162:17
175:10 178:1
219:6 244:9
252:11 272:5
275:15 292:16
310:13 314:17
316:20 336:2

whether  13:7
15:10 22:15
29:19,21 34:4
37:5 38:25
40:12 42:9
51:4,5 52:4,5
53:16 67:21
72:22 81:13
83:20 84:1
88:5,23 101:11
103:14 104:5,
7,10 107:5
115:3,4 116:7,
13 126:9
136:5,6 144:7
148:5 150:15,
21 151:4,18
152:12,24,25
153:2 164:16,
17 165:10,18
168:3,8 169:25
176:16 180:9,
11,23 181:5
185:6 186:4,8
187:9,22 191:4
193:7 199:5,
206:6,11
207:14,19
210:14 215:5
230:12,16
231:4,6,9
232:6,25
241:24,25
243:19 245:20
253:2 255:25
256:19 257:25
258:23 260:25
261:16,25
268:18 269:3,
13 270:25
271:12,16
283:1 285:5,20
287:16,19
291:18 295:24
304:9 309:2,6,

22,24 316:3
322:4

which  11:20
14:1 18:24
27:23 28:10,24
30:20 44:21
46:16 47:2
57:25 68:4,13,
23 70:14 72:19
74:20 76:14
81:16 87:4
91:18 94:1
99:22 110:7
111:2,11,20
112:25 113:14,
23 116:15
119:5 127:2,14
133:24 137:2
144:11 147:6,7
148:12 151:23
153:19, 159:25
160:15 162:21
165:1 168:20
169:19 170:15
173:9 174:16,
17 178:4
185:11 189:18
190:3,11
192:7,17 194:2
195:1 197:7
199:20 205:12
207:7 208:25
211:3 220:15,
18 238:12
240:14 244:19
260:14 268:18
279:7 283:18
298:15 310:11
314:12 321:4
322:12 323:7
324:16 327:2
334:22,24
335:16 337:3
338:4

while  13:2
47:20 95:3
135:17 157:8
257:22 258:13
268:3 269:22
278:16 296:23
306:22 334:20

whining  213:8

whistleblower
66:6 68:15
69:11,12

White  35:20
37:14 38:5

who  14:24
22:10 36:4,19,
22 37:1,23
38:19 53:21
54:13,23 55:2,
25 79:19 82:13
83:10 103:9,18
109:10,12,18,
23 113:9,13
118:11 119:5,
8,10 122:13,
18,22 123:17
124:18 125:17,
19,21 129:14,
18 130:4,20
132:1 144:8
153:5 163:19
171:5 199:11
200:10 221:7,9
222:13,14
229:20 230:3,
11,14,25
231:6,7 233:1
247:6,10
258:17 281:20
282:7 285:17
289:6 290:12,
14 297:8,12
313:11 315:25
329:14 331:18



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2766-1   Filed 03/29/16   Page 424 of 426

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016        Index: who's..witness

**who's** 105:1,2
144:6,10
145:19 247:20
315:25

**whole** 46:6
81:23 108:9
154:2 160:7
186:11 195:4
209:6 240:16
291:13 311:9
331:16

**wholly-owned**
117:23

**whom** 98:10
183:15

**whose** 31:7
147:1 244:22
282:21

**why** 28:4 39:24
43:16 80:18
81:16 85:11
124:14 138:19
146:20,22
155:23 192:14
198:19 204:1
208:10,14
209:24 210:4
232:21 234:2
235:1 248:19,
25 250:13
251:19 254:14
255:23 285:11,
19 289:2
292:13 298:23
303:19 305:2
313:16 320:17
321:4,23,
326:24

**widely** 134:2

**wife** 72:21
130:10,15

**will** 9:1 11:8,9
14:22,24 15:20
16:17,18,19
20:4 25:23
26:10 28:5
41:3 57:23
59:10 64:22,23
66:7 68:20
80:22,23 81:12
84:4 85:24
93:19 97:9,10,
24 131:21
144:13 145:4,6
153:4 167:21
177:22 181:21
182:3 199:6
206:24 220:1
223:24 224:19
230:11,23
231:8 235:2,12
237:17 248:14
254:22 255:25
257:17 261:24
262:1 273:15,
18 277:10
281:12 282:11,
14,17 288:13
290:10 292:6,7
294:5 296:8
308:16 311:14
326:15,19
328:6 334:12
341:10,20

**Williams** 130:6

**willing** 13:23
14:3 222:6
239:25 325:10,
15 340:20

**windup** 213:5
295:7

**wipe** 249:16

**Wisconsin**

194:6

**wise** 98:19
106:20

**wish** 209:6,14
266:20 280:23
306:5 330:12
331:6,23

**wished** 266:9
268:24 293:7,
8,23 331:4,15

**within** 15:4
83:10 101:11,
23 142:22
195:2 231:12
303:2 304:18

**without** 29:23
37:4,24 55:6
78:1 80:23
88:19,24 89:7
98:19 133:17
162:6 186:13,
18,25 188:5
192:17 209:13
215:15 238:1
245:16 246:14
263:5,19
271:10 290:6
293:12 295:7,
11 298:3 317:5
318:13 328:10
329:6 330:7
332:1 335:25

**witness** 9:2,11
11:25 12:16,19
14:13,20 15:1,
25 16:5,7,11,
13 21:9,20
27:4,6,11
33:12 39:19,22
40:5 48:14
72:11,14 79:2
80:17 90:24

92:6 93:9
95:17 97:5,10
98:8 99:3,7
100:21 101:3
102:6,21
103:12 105:20
106:10 109:1
124:24 130:13,
17 133:3
134:11,25
137:11 138:13
139:11 141:2
143:4,15
145:8,19
149:3,13
150:18 151:22
153:24 156:5,
16,22 157:5,
19,22 158:2,11
159:12,23
163:24 166:5
167:8 168:13,
19,22 170:12,
25 171:4 173:8
175:6 177:4
178:3,23
179:18 184:4
185:20 186:3
188:7 191:21
192:2,22
194:13 195:11,
20 196:9,18
197:7,16 200:5
201:18,22
203:3,12
204:7,9 205:5
206:11,19
208:18 210:6,
11,25 211:23
212:2,5,14,20
213:17,19
214:11, 215:21
217:10,20
218:3,11,21
219:1 220:10,

25 221:17
222:21 224:2
225:13,21
226:1 227:3,
228:15,25
230:22 231:3,
20 232:4,12
234:9 235:12
236:16 237:3,
25 238:11
239:21 240:25
241:9 243:6
251:9 252:6,9
255:18 257:1
259:21 260:18
262:12 267:10,
22 269:21
270:16 271:20,
24 272:2,9,15
274:10,16
276:6 277:23
278:18,23
279:16,20
280:7,15,20,
281:25 284:21
286:3,18 293:5
298:6,21,25
299:13,16,21,
24 300:7,10,
12,14,19,22
301:2,15 302:4
303:10 305:3
306:8 309:11,
16 310:3
311:24 312:23
314:8,10
317:17 319:16
321:15,17
322:12 323:16,
18,21 324:2,12
325:10 326:15,
25 327:19
328:21 329:10
330:12,17
332:7 333:3,



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Index: witness'..year

334:16,19
336:8,24
338:20 339:16,
19 341:3,6

**witness'** 190:24

**witnesses**
25:23

**WL** 298:16

**won't** 17:1
232:13 325:18

**wonder** 309:2

**wondered** 77:1

**word** 28:2
48:20 49:18
101:15 108:20
109:16 132:17
141:11,17
143:24 169:21
200:7 256:19,
20 259:1

**words** 87:12
213:5 257:4
272:7

**work** 26:12
61:5,7 106:23
107:25 112:6
123:10 189:3,9
278:8

**worked** 38:20
83:11 110:2
112:23 113:5,
8,24 124:10
329:14

**working** 15:17
60:19 61:17
81:11 86:5,8,
10,12 110:15
112:5

**works** 38:1

99:14 134:15
263:2

**worksheet**
299:5

**worksheets**
239:11

**worry** 110:10
311:1

**worst** 274:3

**would** 8:12
9:13,20 10:10,
19,20,21 11:4
12:3,6,8,10
13:18,20 15:4,
5,10 16:7
17:18,24 23:3,
9 24:1,8 29:1,
21 31:18 35:23
37:14,17,19
38:2,5 39:8
45:3,11 48:10
54:6 55:22
59:2 61:13
62:10,24 64:14
78:17 79:3,12,
16 82:17 83:1,
8,13,15 84:20,
24 85:1 88:22
89:20,23,25
90:2,3,8 91:6
92:3 97:13
98:9 103:2,25
104:22, 105:24
114:19 119:22
124:6 125:10
130:15 133:3,7
137:15 139:17,
25 147:2,15
148:1,8 149:22
151:2,8,11,25
155:13,
161:18,21,24

163:16 164:13,
21 165:7,21
166:18,19
168:22 169:7,9
172:3 173:22
174:3 179:22
180:20 182:11,
14 184:17
185:9,11,15
187:5,8 188:1,
18 189:1,2
190:20 191:4,
10 192:13
195:20 196:15
197:25 207:7
209:8,14
211:17 213:19
218:11,12
219:18 223:25
230:3,6 231:16
232:12 234:2
239:17,21,22
240:4,7,8,12,
25 241:14,16,
17,20 242:22
243:3 245:23
248:4,5,24
249:6 250:21
251:13 252:6,
23 253:3
255:1,20 256:3
259:14 262:4
267:17,18
272:9 275:7,8,
9 276:3,5
281:2 283:3
284:18 285:22
297:3,7
303:11, 304:12
305:4,5 306:1,
8,14,17,21,25
307:2,22
308:12 309:2,
18 310:4,25
312:5,10,19

325:2,14 326:9
331:4 333:20
338:25 339:15
340:10

**wouldn't** 22:2
49:16,17 92:6
136:21,23
231:17 239:18
257:12 286:1
307:4,6,10,16
316:1 332:19,
20

**Wright** 43:24
44:21 96:9

**write** 43:21
240:22 241:1,5
247:20 289:23

**writes** 22:10

**writing** 89:7
142:17 205:12
301:9

**written** 141:8,
25 165:13
202:23 239:14,
23 257:14
312:11

**wrong** 111:10
135:7 150:5
185:24 258:25
262:5 294:15
297:21 313:9
317:18 338:11
341:19

**wrongdoing**
215:10 218:14,
18

**wrote** 171:5
197:17,18

---
## Y

**Yale** 53:17
58:10 71:21
72:1,3,8,22,25

**Yasmin** 112:1
118:7,8,18,21

**Yaz** 111:24,25
118:7,8,18,21

**yeah** 11:3
22:14 30:23
32:16 44:6
47:8 57:19
88:10 90:21
91:15,23 102:6
103:12 106:16
111:19 113:9
125:3 126:2
129:21 138:10
169:18 171:23
184:20 193:19,
24 205:3
206:11 208:9
230:22 240:2
248:24 250:16
254:24 260:6
262:21 301:4
306:24 308:6
318:1 337:6,
12,23 338:8

**year** 14:15
58:23 59:25
61:3,6,10 77:7,
11 80:1 132:13
147:10,13,14
148:11 222:18
223:5,9,19
235:22 236:25
237:22 238:8
248:3 284:9
311:20 312:3
316:7



**DISCOVERY
LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

**years** 14:9
36:5,12 54:13
56:14,19 57:7,
10,15 58:11,21
76:16 77:11
110:17 126:20
132:22 252:4
262:15 302:23

**yesterday** 10:7
39:13 105:11

**yet** 40:4 133:12
249:9 287:19
301:5

**yield** 230:11

**York** 52:7,16
53:17 189:2,4,
7,9 317:1
324:7 335:2,6

**you'd** 36:13
82:15 109:9
275:10 305:5,
308:6

**you'll** 34:3 67:5
68:17 92:18
100:23 142:12
145:14,15
152:2,5 286:14
311:11 314:22

**you're** 12:8
22:20 45:10
57:22 91:7,8
99:15 103:18
106:12,13
135:24 148:11
163:6 177:22
178:19 191:15
194:13,18
195:5 227:8
228:6 232:12,
25 235:7
246:14,15
247:9 260:18

261:12,21
262:3 265:11
276:8 278:16
290:7 296:23
313:8 322:3,7
330:18 340:20

**you've** 12:1
16:15 21:19
24:4,12,17
38:22 48:4,7
50:3,20 53:4
77:22 105:12
142:20 161:1
214:15 218:24
219:21 220:1
228:21 229:25
232:8 250:6
259:3,22
260:18 276:1
278:13 282:22
287:12 291:20
295:8 296:14
299:20 302:5
315:12

**Young** 38:18,
20

**yours** 21:8 26:2
81:8

**yourself** 8:12
51:9 53:8 67:2
86:5 125:25
145:23 227:22
228:18,23
230:17 278:14
325:2

---

**Z**

**zero** 317:10

**Zobel** 105:16

**Zoloft** 114:7,9,
11,15 115:8

**zoomed** 301:3



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com