REPORT OF OPINIONS OF LAWRENCE J. WINIKUR, M.D.

QUALIFICATIONS

I, Lawrence J. Winikur, M.D., an anesthesiologist and owner of Piedmont Pain Medicine, PC, state as follows:

I obtained my medical degree from the Medical College of Virginia and performed my internship at Roanoke Memorial Hospital. I completed my residency in Anesthesiology and fellowship training in Pain Medicine at the Mayo Clinic in Rochester, Minnesota. I am board certified in Anesthesiology and Pain Medicine.

I am currently the Medical Director of Piedmont Pain Medicine in Danville, Virginia.

I have been continuously licensed to practice medicine in the State of Virginia from 1999 until the present. During the 12 months preceding September 2012 until the present, I have practiced in the specialty of Anesthesiology and Pain Medicine.

Additional details regarding my education and training, as well as a list of my publications during the last ten years, are contained in my *Curriculum Vitae*, copy attached.

I manage Piedmont Pain Medicine, P.C. in Danville, Virginia and have operated that pain management clinic throughout (and preceding) the period 2011 to the present. I am familiar with the standard of care in the field of anesthesiology and pain medicine including the treatment of patients with epidural steroid injections and the management of pain centers in Danville, Virginia and Greensboro, North Carolina. Additionally, I am familiar with Greensboro, North Carolina and its medical community based on: patient referrals to and from physicians in Greensboro; review of patients' charts who received treatment from Greensboro physicians; discussions with Greensboro physicians concerning patient care, both with regard to pain management patients and patients receiving general medical and surgical care and discussions with physicians in Greensboro, North Carolina concerning the management of pain centers. I am generally familiar with the Greensboro community.

Based on information provided to me relating to Nashville, Tennessee including but not limited to the number of hospitals, community size, availability of medical specialties and medical services, demographic information including population, median age, median income, gender and educational background it is my opinion that Greensboro, North Carolina and Nashville are similar communities.

Furthermore, the medical and physiological considerations involved in the administration of epidural steroid injections for pain treatment are not influenced by any geographic differences between Danville, Greensboro, and Nashville. Physicians in these communities have access to the same information, equipment and medication. Treatment of patients with epidural steroid injections does not change from Danville to Greensboro, to Nashville. Nor does the management of pain management centers change from communities such as Danville to Greensboro to

Nashville.

Regarding the issues in this matter, the standard of care is the same for patients presenting to Saint Thomas Outpatient Neurosurgical Center in 2012 as they are in Danville, Greensboro, Nashville or other similar communities.

Based on my education, training and experience, I am familiar with the recognized standard of acceptable professional practice in the specialty of anesthesiology and in the management of pain centers in Danville, Virginia, Greensboro, North Carolina and similar communities during 2011- 2012.

## INFORMATION REVIEWED

My statements are based on my background, training and experience as well as the following information, which I reviewed:

- Medical records of 5 patients who received epidural steroid injections at Saint Thomas Outpatient Neurosurgical Center during 2012;

- Documents regarding the regulatory history of New England Compounding Pharmacy, Inc., d/b/a/ New England Compounding Center ("NECC");

- Information from the United States Centers for Disease Control and Prevention ("CDC"), including the *Morbidity and Mortality Weekly Report* dated December 13, 2002 regarding certain cases of fungal meningitis caused by contaminated epidural steroids made by a compounding pharmacy;

- Information from an October 23, 2003 hearing before the United States Senate's Committee on Health, Education, Labor, and Pensions regarding pharmacy compounding;

- Information published by the United States Food and Drug Administration ("FDA") regarding compounded drug products, compounding pharmacies, and the risks associated with compounded drugs;

- Information published by The American Society of Health System Pharmacists warning the pharmacy and medical community of the risks of using compounded drugs;

- Certain Federal, Tennessee and Massachusetts pharmacy laws governing pharmacy compounding; and

- The depositions of Debra Schamberg, R.N., John Culclasure, M.D., Jeff Ebel, Carmen Leffler, D.Ph., Martin Kelvas, D.Ph., and Terry Grinder,

D.Ph., as well as portions of the depositions of Michael Schatzlein, M.D. and Scott Butler.

## SUMMARY OF FACTS

The substance of the facts and opinions to which I expect to testify are developed through review of pertinent documents and deposition testimony taken in this case. In addition, I rely upon my education, training and experience in my specialty including where applicable the pertinent and relevant literature.

### NECC History

NECC operated a compounding pharmacy in Framingham, Massachusetts. Before the catastrophe that became widely known during the fall of 2012, NECC had a history of adverse events relating to its operations. NECC operated its purportedly sterile compounding pharmacy on a site shared with a garbage compacting and mattress recycling business.

NECC was the subject of multiple complaints to and investigations by the FDA and the Massachusetts Board of Registration in Pharmacy ("MBP"). Those complaints and investigations often focused on unsterile conditions at NECC's facilities. For example, the FDA issued a Warning Letter to NECC in 2006. The FDA letter details numerous problems at NECC including the sale of compounded drugs without patient-specific prescriptions. In addition, the FDA's Warning Letter stated that NECC was compounding copies of commercially available drugs, selling misbranded compounded drugs, and experiencing problems with storage and sterility. That warning letter was available on the FDA's website before the events described.

### Compounded Drugs Require Individual Prescriptions

The preparation, sale and distribution of compounded drugs, in bulk and without individual prescriptions, is unlawful in Tennessee and Massachusetts. In order for drugs to be procured from a compounding pharmacy, patient-specific prescriptions involving the prescriber-patient-pharmacist relationship must be used. *See T.C.A. § 63-10-204(4); Mass. Gen. Law c. 94C, § 17(c); and 21 U.S.C. § 353a.* See, also deposition of Terry Grinder, D.Ph.

### Saint Thomas Outpatient Neurosurgical Center

Saint Thomas Outpatient Neurosurgical Center ("Saint Thomas Neurosurgical") is a facility located in Nashville, Tennessee. Although it is licensed as an ambulatory surgery center, no neurosurgeons actually work there and no surgeries are performed there. Saint Thomas Neurosurgical specializes in providing epidural steroid injections to patients of a neurosurgery group known as the Howell Allen Clinic.

According to Michael Schatzlein, M.D., President and CEO of Saint Thomas Health, Saint Thomas Neurosurgical is a for-profit joint venture which is part of the Saint Thomas Health system.

Saint Thomas Neurosurgical is located on the 9th floor of the Medical Plaza East on the Saint Thomas Hospital campus. Saint Thomas Neurosurgical's receptionist, Sheri DeZwaan,

wore a name tag bearing the name "Saint Thomas Hospital" at the top. In addition, Dr. Schatzlein testified as follows:

> Q. Do you -- would it surprise you to learn that patients who went to the St. Thomas Outpatient Neurosurgical Center believed that they were receiving care from an entity that was part of the St. Thomas Health system?
>
> A. I guess I'd have to say, no, it wouldn't surprise me.

Saint Thomas Neurosurgical is owned jointly by Saint Thomas Network and Howell Allen Clinic. Saint Thomas Network and Howell Allen Clinic share the profits generated by Saint Thomas Neurosurgical equally. Saint Thomas Network is wholly owned by Saint Thomas Health. Dr. Schatzlein described Saint Thomas Network as a pass through entity with zero employees.

In 2011 and 2012, Saint Thomas Neurosurgical performed an average of 450 to 500 epidural steroid injections each month. It performed roughly 5,000 epidural steroid injections each year.

The Medical Director of Saint Thomas Neurosurgical, John Culclasure, M.D., does not receive a salary. He is paid a percentage of collections for the epidural injections that he gives. Specifically, Dr. Culclasure is paid an amount equal to sixty percent (60%) of the collections for each ESI that he gives.

Saint Thomas Hospital Declines to Purchase from NECC

Martin Kelvas D.Ph., former Director of Pharmacy Services for Saint Thomas Hospital, specifically instructed all pharmacy staff on the non-profit side of the Saint Thomas Health system not to purchase drugs from compounding pharmacies. Dr. Kelvas testified that, in early 2011, a sales representative from NECC approached Dr. Kelvas in order to solicit St. Thomas Hospital's business. NECC proposed selling compounded medications in bulk to the hospital. Based upon Dr. Kelvas' general knowledge of pharmacy laws, he did not feel that the proposed arrangement was lawful. Accordingly, he declined NECC's solicitation, and he called the Tennessee Board of Pharmacy.

Dr. Kelvas then talked with Terry Grinder, D.Ph. of the Tennessee Board of Pharmacy. Dr. Grinder confirmed what Dr. Kelvas already knew. Drugs could not be legally purchased from a compounding pharmacy in bulk, without prescriptions. Any drugs purchased from a compounding pharmacy must be procured pursuant to an individual prescription based upon the prescriber-patient-pharmacist relationship. Dr. Grinder explained that, in order to procure medications without individual prescriptions, the drugs must be procured from an entity with a manufacturer's license.

After confirming that NECC's solicitation was not legal, Dr. Kelvas instructed all pharmacy personnel on the non-profit side of the Saint Thomas Health system not to purchase from compounding pharmacies. However, Saint Thomas Health did not instruct anyone on the for-profit side of its organization not to buy in bulk from compounding pharmacies.

Dr. Grinder of the Tennessee Board of Pharmacy testified that procuring medications, in bulk and without individual prescriptions, from compounding pharmacies was not lawful. Whenever healthcare providers called his office with questions about compounding pharmacies, Dr. Grinder explained that medications could only be procured from compounding pharmacies by using individual prescriptions based upon the prescriber-patient-pharmacist relationship. Bulk purchases without prescriptions could not be made from compounding pharmacies. Bulk purchases could only be made from entities with a wholesaler, manufacturer or distributor's license. NECC did not have such a license.

Saint Thomas Neurosurgical Purchases Injectable Steroids in Bulk From NECC

John Culclasure, M.D. is Saint Thomas Neurosurgical's Medical Director. Debra Schamberg, R.N. is the clinic's Facilities Director. Ms. Schamberg has no pharmacy training. Dr. Culclasure and Ms. Schamberg made the decision for Saint Thomas Neurosurgical to purchase methylprednisolone acetate ("MPA") from NECC.

In late 2010, Saint Thomas Neurosurgical began purchasing MPA from a supplier in Nashville, Tennessee known as Clint Pharmaceuticals. The MPA that Saint Thomas Neurosurgical bought from Clint Pharmaceuticals did not come from a compounding pharmacy. Clint Pharmaceuticals only supplied steroids manufactured by FDA regulated pharmaceutical companies. All of the MPA purchased by Saint Thomas Neurosurgical from Clint Pharmaceuticals was FDA approved.

In June of 2011, Saint Thomas Neurosurgical chose to stop buying FDA approved steroids through Clint Pharmaceuticals and began buying compounded MPA from NECC. Saint Thomas Neurosurgical made that change when Clint Pharmaceuticals increased its price for FDA approved generic MPA from $6.49 per vial to $8.95 per vial. Emails sent and received by Ms. Schamberg establish that Saint Thomas Neurosurgical switched from purchasing FDA approved steroids to purchasing compounded steroids from NECC and thereby saved $2.46 per vial.

Dr. Culclasure testified that, if Saint Thomas Neurosurgical had run short in its supply of MPA, he would have used an alternative steroid such as triamcinolone (Kenacort - Bristol-Myers Squibb) or betamethasone (Celestone Soluspan - Merck).

According to invoices produced by Saint Thomas Neurosurgical, the clinic purchased two thousand five hundred (2,500) vials of MPA from NECC during a period of three months during the summer of 2012. That volume made Saint Thomas Neurosurgical NECC's largest customer by volume for the purchase of MPA during the critical three month period when NECC distributed tainted pharmaceuticals throughout the country.

Saint Thomas Neurosurgical decided to purchase compounded MPA from NECC without doing anything to learn about compounded medications in general or NECC in particular. Dr. Culclasure and Ms. Schamberg testified that their decision to purchase compounded steroids from NECC included the following analysis and due diligence:

- zero research regarding the safety and risks of compounded medications;

- no review of FDA publications and warnings regarding the dangers of compounded drugs;

- zero review of medical literature regarding the risks of pharmacy compounding;

- no inquiries regarding previously reported deaths caused by compounded medications;

- no request to NECC for references;

- no effort to investigate NECC's regulatory history;

- no request to review NECC's sterility testing results;

- no attempt to identify or contact any NECC customers;

- zero effort to verify information contained in NECC's promotional literature; and

- no consultation with a pharmacist for advice about purchasing non-FDA approved compounded drugs.

In fact, Dr. Culclasure and Ms. Schamberg never even Googled NECC before they selected NECC to be Saint Thomas Neurosurgical's preferred supplier of injectable MPA.

Dr. Culclasure and Ms. Schamberg claim that they reviewed NECC's promotional literature before approving the purchase of MPA from NECC. That literature contains the following statement:

### G. Dispensing

> Product is dispensed by patient-specific prescription only. There must be a specific practitioner-patient-pharmacist relationship to dispense to an individual patient or facility.

In spite of that statement, Saint Thomas Neurosurgical proceeded with bulk purchases of MPA from NECC (frequently in 500 vial batches) without using patient-specific prescriptions.

Saint Thomas Neurosurgical sends patient lists to NECC

In early to mid-2012, an NECC representative informed Saint Thomas Neurosurgical that NECC needed to receive lists of patients with each order for MPA. NECC made that request more than six months after Saint Thomas Neurosurgical started making bulk purchases from NECC. The NECC representative explained that NECC needed patient lists in order to comply with Massachusetts Board of Pharmacy requirements.

Ms. Schamberg then told the NECC representative that she could not predict which patients would receive MPA. Therefore, Saint Thomas Neurosurgical could not provide lists that would actually correspond with patients who receive MPA. In response, the NECC representative indicated that any list of patient names would suffice.

After receiving that request, Saint Thomas Neurosurgical occasionally sent patient lists to NECC, although it did not send a list with each order. Saint Thomas Neurosurgical sent those lists even though the lists did not correspond with patients who actually received MPA compounded by NECC. Saint Thomas Neurosurgical sent those lists without regard to patient privacy provisions contained in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

Patients Contract Fungal Meningitis and Die

According to Dr. Culclasure, more than one hundred (100) patients contracted fungal meningitis after receiving contaminated epidural steroid injections at Saint Thomas Neurosurgical. Thirteen (13) patients died.

## OPINIONS

Following is a summary of testimony and opinions that I expect to provide at the trial of this case, including the basis and reasons for such testimony. All of my testimony and opinions will be offered to a reasonable degree of medical certainty within the field of Anesthesiology and Pain Medicine.

I reserve the right to amend this disclosure in the event I am provided with any additional pertinent information or, if necessary, to rebut any opinions offered by Defendants' experts.

## ANATOMY OF THE HUMAN SPINE

I will offer testimony regarding the anatomy in the region of the human spine, including the brain stem, spinal cord, cerebrospinal fluid, nerve roots, vertebrae, inter-vertebral discs, associated arteries, and the size and relationship of these structures and associated spaces such as arachnoid, dura, subdura, subarachnoid, and epidural.

## EPIDURAL STEROID INJECTIONS

I will offer testimony regarding the use of ESIs in pain management practice, including relieving nerve root compromise and dural irritation and how ESIs can provide non-surgical therapeutic benefits when pain is arising from structures adjacent to the epidural space.

I will testify concerning the process by which ESIs are provided to patients, including the imaging process, placement of the needle, use of contrast, and confirmation of needle placement, etc.

I will offer testimony concerning the risks involved in ESI procedures and that when ESIs are performed by a skilled, experienced doctor in an appropriate setting, with carefully screened patients and appropriate medications, the chance of significant complications from an

ESI is very low. For the most part, complications occurring after epidural steroid injections are rare and most commonly the result of technical error.

## CORTICOSTEROIDS

I will offer testimony concerning the nature, application and physiological effects of steroids such as methylprednisolone acetate, when used in a parenteral application such as a steroid injection into the epidural space.

Steroids suppress the human immune system. That is why, for example, the product literature provided by FDA approved manufacturers warns that persons who are on corticosteroids are more susceptible to infections than are healthy individuals and there may be decreased resistance and inability to fight localize infection when corticosteroids are used. Corticosteroids exacerbate fungal infections.

## STEROIDS AVAILABLE FOR USE IN ESIs

I will explain the most common steroids used in interventional pain management procedures and the attributes and availability of each. The use of Depo-Medrol (Pfizer) in ESI applications is very common. Other steroids that are used in ESIs include Kenalog (Bristol-Myers Squibb) and Celestone Soluspan (Merck). Depo-Medrol, Kenalog and Celestone Soluspan are manufactured by FDA approved pharmaceutical companies.

Generic versions of Depo-Medrol, Celestone Soluspan, and Kenalog are also commercially available from laboratories regulated by the FDA. These include manufacturers such as Teva and Sandoz.

## SELECTION AND SOURCE OF STEROIDS FOR USE IN ESI'S

There has been substantial attention in the field of pain management relating to the source of steroids for parenteral use, including ESIs.

I will testify that selection of corticosteroids used in epidural steroid injections is especially critical for numerous reasons, including:

   a)   The steroid is injected into the spinal canal in extremely close proximity to the central nervous system. The dura separating the spinal cord from the epidural space is very thin. If pathogens are present in the medication, they may cause a migration through the dura into the central nervous system through the spinal cord. An invasive fungal infection could easily migrate through the thin protective dura layer separating the epidural space from the spinal cord;

   b)   The central nervous system is a relatively closed system, making treatment of infection more difficult if it were to occur;

   c)   The sizing of the steroid particulates (in suspension) is important and should be relatively consistent;

  d)  As previously discussed, the steroid is an immune system suppressant. Accordingly, the medication itself will suppress the body's natural ability to fight off invading pathogens; and the steroid exacerbates fungal infection.

I will testify that only steroids manufactured by FDA approved pharmaceutical companies are appropriate for use in ESIs.

## DANGERS ASSOCIATED WITH COMPOUNDING PHARMACIES

I will testify that, a number of years ago, compounding pharmacies began emerging as a lightly regulated market for drugs like the steroids used in ESI procedures. These compounding pharmacies offered lower prices and, in some instances, they touted that their versions of the steroids were preservative free, unlike the FDA approved versions of the drugs. However, these compounded drugs were not produced under strict FDA requirements and the precise formulations for these drugs were unknown (unlike the FDA regulated drug manufacturers).

Negative health events with disastrous outcomes occurred and were reported after patients were administered drugs manufactured by compounding pharmacies. The serious risks of pharmacy compounding have been the subject of considerable public discussion in the pharmacy community and the medical community. Compounding pharmacies are not subject to the same FDA regulations as are drug manufacturers and compounded drugs are not FDA approved.

Trade groups and public health officials have been warning of the special risks posed by compounded drugs for years. For example, in 2002, the CDC published a report regarding at least two cases of fungal meningitis arising from contaminated medication used in epidural injections. The report concluded that "purchasers of pharmaceuticals should determine if supplies are provided from a compounding pharmacy that…follows appropriate measures to ensure that injectable products are free of contamination."

In October 2003, the United States Senate held a hearing regarding regulatory issues in the compounding industry. Experts testified at length regarding the dangers of compounded drugs during that hearing.

On March 24, 2005, *USA Today* published a front page article with the following headline: **"Safety concerns grow over pharmacy-mixed drugs"**. That article discussed growing concern over the fact that drugs produced in bulk by compounding pharmacies are not FDA approved and are not subject to the same oversight as drugs produced by pharmaceutical companies.

In 2006 the FDA conducted a survey of compounded drug products. They collected 36 samples from compounding pharmacies across the US during unannounced visits. Twelve (12) of the thirty-six (36) samples (33%) failed analytical testing. The FDA survey concluded "poor quality compounded drugs are a serious public health concern, as improperly compounded products have been linked to grave adverse events, including deaths."

In May 2007, the FDA published an article titled "The Special Risks of Pharmacy Compounding." That article highlighted numerous adverse events involving compounded products. It also warned of the emergence of large scale compounding operations that were clearly operating outside of the bounds of traditional compounding practice.

In 2010, the FDA posted an educational video on YouTube regarding concerns over the quality of compounded drugs.

The American Society of Health System Pharmacists has also played an active role in warning the pharmacy and medical community of the risks of using compounded drugs. In 2010 they published the "ASHP Guidelines on Outsourcing Sterile Compounding Services." They also developed a "Contractor Assessment Tool" for healthcare organizations to use in conjunction with their guidelines. That document was developed to be used by health systems when deciding whether and from where they should purchase compounded medications.

The foregoing is not an exhaustive list of publicly available information regarding the risks associated with compounded drugs; rather it is a representative sample of the types of information available.

The FDA and other professional organizations have repeatedly warned the medical community against using compounded drugs unless medically necessary for a specific patient's needs.

## STANDARD OF CARE AND VIOLATIONS

The decision by Saint Thomas Neurosurgical, Dr. Culclasure and Ms. Schamberg to purchase corticosteroids from NECC for use in ESIs constitutes a deviation below the applicable standard of care for anesthesiologists and clinics administering ESI's in Danville, Virginia, Greensboro, North Carolina and similar communities, including Nashville, Tennessee.

The decision by Saint Thomas Neurosurgical, Dr. Culclasure and Ms. Schamberg to administer corticosteroids from NECC to patients of Saint Thomas Neurosurgical constitutes a deviation below the standard of care for anesthesiologists and clinics administering ESI's in Danville, Virginia, Greensboro, North Carolina and similar communities, including Nashville, Tennessee.

Dr. Culclasure and Ms. Schamberg either failed to understand and appreciate or else chose to ignore the risks inherent in administering ESIs using corticosteroids purchased from a compounding pharmacy.

It was a breach below the applicable standard of care for Saint Thomas Neurosurgical to purchase steroids in bulk from a compounding pharmacy.

Unless a special medical need existed to administer compounded steroids to a particular patient (which it did not), it was a breach below the applicable standard of care to purchase steroids from a compounding pharmacy without patient specific prescriptions.

Any purported desire for a preservative free steroid (which is not the case according to Dr. Culclasure) is an insufficient justification to purchase steroids from a compounding pharmacy. On adult patients, any neurotoxin danger associated with a small amount of preservative is practically non-existent and the comparable risks of purchasing from a compounding pharmacy are great and potentially lethal, as demonstrated in case histories from around the country.

During all relevant times, there were commercially available steroids for use in ESIs. Any purported shortage of steroids for use in ESIs is not factually accurate and in any event would be an insufficient reason to purchase steroids for ESIs from a compounding pharmacy.

The owners of Saint Thomas Neurosurgical were negligent and their actions fell below the applicable standard of care by failing to appropriately and properly supervise, train and manage Dr. Culclasure and Ms. Schamberg with respect to their procurement of appropriate and safe steroids for use in ESIs.

It is my opinion that Saint Thomas Neurosurgical, Dr. Culclasure, Ms. Schamberg and the owners of Saint Thomas Neurosurgical failed to protect the safety of patients by failing to insure that steroids for use in ESIs were purchased from safe, appropriate sources and that such conduct was negligent and fell below the applicable standard of care for providers in Danville, Virginia and similar communities, including Nashville, Tennessee. Further, I am of the opinion that the above acts of negligence that constitute deviations below the applicable standard of care resulted in and caused injuries that otherwise would not have occurred.

## COMPENSATION

I have been compensated in the amount of $9,250 for the study and review. My hourly rate for review is $250.00, my hourly rate for deposition testimony is $1,500.00 and my hourly rate for video deposition testimony is $2,500.00.

## PRIOR TESTIMONY

Attached is a list of other cases in which I have testified as an expert witness during the past four years.

_____
Lawrence J. Winikur, M.D.

**12-10-15**
_____
Date

# Lawrence Jay Winikur, M.D.

10384 Martinsville Highway
Danville, Virginia 24541
(434) 685-7855

# Curriculum Vitae

### Education
| | |
|---|---|
| 1977-1982 | B.A. Biology, California State University of Northridge. |
| 1982-1984 | Masters level work in Astrophysics, N.A.S.A. |

### Training
| | |
|---|---|
| 1984-1988 | Medical Degree, Medical College of Virginia, Richmond, VA. |
| 1988-1989 | Transitional Internship, Roanoke Memorial Hospital, Roanoke VA. |
| 1989-1992 | Anesthesiology Residency, Mayo Clinic, Rochester Minnesota |
| 1991-1992 | Advanced Training in Pain Management and Regional Anesthesia, Mayo Clinic. |

### Professional History
| | |
|---|---|
| 1992-1999 | Staff Anesthesiologist, Wayne Memorial Hospital, Goldsboro, N.C. |
| | Pain Clinic Medical Director, Wayne Memorial Hospital, Goldsboro, N.C. |
| 1999-2002 | Medical Director of Memorial Hospital Pain Clinic, Martinsville, VA |
| 2002-current | President of Piedmont Pain Medicine, PC |
| | National Speaker for Jansen Pharmaceuticals |
| | National Speaker for Endo Pharmaceuticals( GOLD LEVEL) |
| | National Speaker for Pfizer Pharmaceuticals |

### Board Certification and Licensure
| | |
|---|---|
| 1994-Present | American Board of Anesthesiology |
| 1989-Present | National Board of Medical Examiners, I, II, III |
| 1992-Present | North Carolina Medical Board. License Number #35233 |
| 1999-Present | Commonwealth of Virginia, License Number #0101059090 |
| 2000-Present | Diplomat of American Academy of Pain Management |
| 2006-Present | Diplomat American Board of Pain Medicine |

### Professional Organizations
American Medical Association
North Carolina Medical Society
North Carolina Society of Anesthesiologists
American Pain Society
American Society of Pain Specialists
American Society of Regional Anesthesia and Pain Medicine
International Association for the Study of Pain
American Academy of Pain Management
American Academy of Pain Medicine
Society for Pain Practice Management
American Academy of Interventional Pain Specialists
International Intradiscal Therapy Society

North American Spine Society
International Anesthesia Research Society
American Academy of Addiction Medicine
Henry County Sheriff's Deputy
Specialization in Drug Diversion

## List of testimony – Larry Winikur, M.D.

**Wayne Bradley Muncher v. Melvin Thomas Roberts**
**Overby, Hawkins, and Wright**
Provided Expert Testimony for the Plaintiff

**Rocky Bare v. Ready Mix Concrete Company**
**Altizer and Altizer Lawfirm**
Provided Expert Testimony for the Plaintiff

**Maxine Travis v. GPM Investments**
**Gentry Locke Rakes and Moore, LLC**
Worker's Compensation Case
Provided Expert Testimony for the Plaintiff

**Faye Martin v. Stanley Furniture Company, Inc.**
**Gentry Locke Rakes and Moore, LLC**
Worker's Compensation Case
Provided Expert Testimony for Defendant

**Paul D'Amico, M.D. v. Commonwealth of Virginia**
**Gentry Locke Rakes & Moore, LLP**
Criminal Felony Case or Murder for Hire
Provided Expert Testimony, Forensic Evidence Testimony, and Court Appearance

**Jacqueline Hundley, Plaintiff v. Family Dollar, Inc**
**Sanzone and Baker**
Worker's Compensation Case
Provided Expert Testimony for Plaintiff

**Claude Brandon v. Mabe Trucking**
**Teague Campbell Dennis and Gorham**
Provided Expert Testimony for Plaintiff

**Sharon Ferguson, Plaintiff**
**Young, Haskins, Mann, Gregory, McGarry and Wall**
Provided Expert Testimony for Plaintiff

**Geraldine Prophet v. American Retirement Homes, Inc**
**Lucas and Kite**
Provided Expert Testimony for Plaintiff

**Margaret Leona Wilkins v. Home Health Agency**
**Fred Smith Law Firm**
Provided Expert Testimony for Plaintiff

**Barry Hurd v. Mario Yopihua-Jimenez**
**Carter and Craig**
Provided Expert Testimony for Plaintiff

**Raymond E. Sayers v. Henry K. Hostetler and J.W. Manning, Inc**
**Gentry Locke Rakes and Moore, PLC**
Provided Expert Testimony for Plaintiff

**Patricia Palmer v. Barker and Gee**
**Young, Haskins, Mann, Gregory, McGarry and Wall**
Provided Expert Testimony for Plaintiff

**Rebecca Fontaine, Plaintiff**
**Gardner Barrow and Sharpe, P.C.**
Provided Expert Testimony at Trial

**Tina Shupe v. John T. Turski, III, M.D. and Carillion**
**Gentry Locke Rakes and Moore, LLP**
Provided Expert Testimony in Medical Malpractice Case

**Conrad Fischer v. MTD Products**
**Gentry Locke Rakes and Moore, LLC**
Performed Independent Medical Examination.
Review of all Forensic Materials.

**Leona Wilkins v. Home Health Agency**
Expert designation for the plaintiff. Compensation for testifying