UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) |
| | ) MDL No. 2419 ) Docket No. 1:13-md-2419 (RWZ) |
| THIS DOCUMENT  RELATES TO: | ) ) |
| ALL CASES | ) ) ) |

**NON-PARTY THE EMORY CLINIC'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO QUASH SUBPOENA
FOR DEPOSITION BY WRITTEN QUESTIONS**

Non-Party The Emory Clinic, Inc. ("TEC") submits this Memorandum of Law in Support of its Motion to Quash Subpoena for Deposition by Written Questions (the "Subpoena") issued to the "Emory Clinic Ambulatory Surgery Center" by Defendants Premier Orthopaedic and Sports Medicine Associates of Southern New Jersey, LLC, trading as Premier Orthopaedic Associates, Premier Orthopaedic Associates Surgical Center, LLC, Kimberly Yvette Smith, M.D., a/k/a Kimberly Yvette Smith- Martin, M.D., Thomas Dwyer, M.D., Rhaul Shah, M.D., John Catalano, M.D., Richard C. DiVerniero, M.D., and Richard Strauss, M.D. (collectively, the "Premier Defendants").

**SUMMARY OF THE ARGUMENT**

The Subpoena calls for TEC's Ambulatory Surgical Department to answer myriad written questions about the "due diligence" it performed before purchasing medication from New England Compounding Pharmacy, Inc. ("NECC").  TEC moves to quash the Subpoena because the information sought is irrelevant to any claims or defenses in the MDL.  TEC's Ambulatory Surgical Department never purchased methyl prednisolone acetate ("MPA"), the core product at

issue in this MDL, from NECC.   Accordingly, the Premier Defendants' entire theory of relevance, upon which the Court predicated its order permitting the discovery to proceed, is nullified.   Moreover, the discovery sought would not aid the jury in ascertaining the standard of care applicable to the negligence claims against the Premier Defendants where: (a) the standard of care cannot be established without expert testimony; (b) such expert testimony must be sufficient for a jury to find that the consensus of the profession involved recognizes the standard defined by the expert; and (c) the conduct of TEC, even when considered with that of the relatively small number of other non-party entities on whom virtually identical subpoenas were served, says nothing about the consensus of the profession involved and thus cannot reliably bolster or refute any expert testimony.

As a further reason for quashing the Subpoena, the person within TEC's Ambulatory Surgical Department responsible for purchasing medications from NECC died in 2012.   TEC, therefore, is incapable of producing a witness with first-hand knowledge of most of the information sought.

Alternatively, even if there were any relevance, which there is not, the discovery sought is disproportionate to the needs of the MDL, considering the importance of the discovery in resolving the issues and the burden imposed on TEC weighed against the likely benefit to the Premier Defendants.

Accordingly, as discussed more fully below, the Subpoena should be quashed.

## BACKGROUND

### A.      The MDL and the Subpoena

This MDL involves wrongful death and personal injury claims arising out of the administration of MPA manufactured by NECC. *See In re New England Compounding*

*Pharmacy, Inc. Products Liab. Litig.,* No. MDL 13–2419, 2013 WL 6058483, at *1 (D. Mass. Nov. 13, 2013) (ECF No. 572).   In October 2015, the Premier Defendants issued subpoenas to ten non-party entities, including the "Emory Clinic Ambulatory Surgery Center," calling for depositions by written questions.[1]   *See* Notice of Filing of Notices of Dep. by Written Questions October 15, 2015, ECF No. 2333.   Also in October 2015, another group of defendants in the MDL, Box Hill Surgery Center, LLC, Ritu T. Bhambhani, M.D., and Ritu T. Bhambhani, M.D., LLC (collectively, the "Box Hill Defendants") issued subpoenas to ten other non-party entities. *See* Notice of Filing of Notices of Dep. by Written Questions October 12, 2015, ECF No. 2319. The subpoenas served by the Premier Defendants and Box Hill Defendants were substantively identical and directed to a variety of orthopedic practices, surgical centers, medical centers, and other health care providers.

After the Plaintiffs' Steering Committee ("PSC") filed motions for protective orders seeking to require the depositions to be conducted orally rather than by written questions, the Premier Defendants filed a brief in which they explained why they had served these subpoenas: they were seeking "information about the due diligence conducted by these entities which formed the informational basis for their decision to purchase MPA from NECC." Premier Orthopaedic and Sports Medicine Associates of Southern New Jersey, LLC, et al's Opp'n to the Pl. Steering Committee's Mot. for Protective Order Regarding Premier's Notices of Dep. by Written Question, at 1, Nov. 6, 2015, ECF No. 2385 (emphasis added).   They argued that their

---

[1] The "Emory Clinic Ambulatory Surgery Center" is neither a legal entity nor does TEC use that name to refer to any division or unit that it operates. *See* Affidavit of Frank N. Gaeta ("Gaeta Aff."), filed herewith, ¶ 2; Affidavit of Evangeline Dennis ("Dennis Aff."), filed herewith, ¶ 2.  The "Ambulatory Surgical Department" is one of many departments within TEC. *See* Dennis Aff., ¶ 2.  Notwithstanding the misnaming of the witness, TEC construes the Subpoena as having been issued to TEC and requesting information from TEC's Ambulatory Surgical Department.

"goal" was to "gather targeted information as to the due diligence conducted by other NECC customers who purchased MPA," and that the "questions submitted to these entities are worded to focus narrowly on this issue and no other, and gather as much information as possible." *Id.* at 6 (emphasis added).  In their opposition to the PSC's motion for a protective order, the Box Hill Defendants expressly adopted all of the arguments made by the Premier Defendants.  *See* The Box Hill Defs.' Opp'n to the Pl. Steering Committee's Mot. for Protective Order Regarding Box Hill's Notices of Dep. by Written Question, at 3, Nov. 20, 2015, ECF No. 2425.  Like the Premier Defendants, the Box Hill Defendants represented to the Court that the entities on which they had served subpoenas had purchased MPA from NECC.  *Id.* ("The Premier Defendants also filed notices of Depositions by Written Questions in mid-October, 2015, and served the same and subpoenas on ten different non-party entities, which had also previously purchased MPA from NECC before the meningitis outbreak.") (emphasis added).

The Court denied the PSC's motions because the subpoenas "appear to be targeted to the narrow topic of what due diligence was conducted by various NECC customers prior to purchasing MPA from NECC."  Order on PSC's Mot. for Protective Order Regarding Notices of Dep. by Written Questions, at 2, Dec. 18, 2015, ECF No. 2528 (the "2015 Order") (emphasis added).

In February 2016, the Premier Defendants and Box Hill Defendants re-issued the subpoenas to many but not all of the non-party entities on whom they had served subpoenas in October 2015.  Notice of Filing of Notices of Dep. by Written Questions, Feb. 17, 2016, ECF No. 2665 and exhibits thereto; Notice of Filing of Amended Notices of Dep. by Written Questions, Feb. 19, 2016, ECF No. 2669 and exhibits thereto.  The Premier Defendants later withdrew their subpoena to one of those entities, Summit Surgery Center ("Summit"), in the face

of Summit's motion to quash. *See* Notice of Withdrawal of Subpoena, Mar. 15, 2016, ECF No. 2746. Altogether, the Premier Defendants and Box Hill Defendants have issued and maintained subpoenas directed to 15 entities, including TEC (collectively, the "Non-Party Entities").

The Subpoena to TEC, like the subpoenas served on the other Non-Party Entities, instructs it to designate one or more corporate representatives of its Ambulatory Surgery Department to answer 21 questions relating to what it purchased from NECC; what actions the Ambulatory Surgery Department took prior to making purchases from NECC; whether the Ambulatory Surgery Department received any representations from Medical Sales Management and/or NECC prior to making purchases from NECC and whether the Ambulatory Surgery Department did anything in response to those representations; and whether any patients were injured by products sold by NECC. *See* Notice of Filing of Notices of Dep. by Written Questions, Feb. 17, 2016, ECF No. 2665, and Exhibit 7 thereto, ECF No. 2665-5. The Subpoena is also accompanied by an additional 85 cross-examination questions submitted by the PSC. *Id.* The majority of these questions relate to whether anyone associated with the Ambulatory Surgical Department between January 1, 2010 and September 25, 2012, had knowledge about a variety of instances of contaminated products sold by compounding pharmacies. *Id.*

**B.**    **TEC**

Non-party TEC is an affiliate of Emory University. *See* Gaeta Aff., ¶ 2. TEC is a multi-specialty faculty practice plan with more than 1,280 employed physicians. *See* Dennis Aff., ¶ 2. The Ambulatory Surgical Department is one of many departments within TEC. *Id.* As of September 2012, the Ambulatory Surgical Department consisted of five different business units at two locations, with approximately 101 full-time and 14 part-time employees. *Id.* Today the Ambulatory Surgical Department has eight different business units. *Id.* TEC has no affiliation

with the Premier Defendants. *See* Dennis Aff., ¶ 6.

TEC's Ambulatory Surgical Department never purchased MPA from NECC.  *Id.,* ¶ 3.; *see also* NECC Customer List Since 5/21/2012, Sorted by Customer - With Product Information (Oct. 23, 2012) (http://www.fda.gov/downloads/Drugs/DrugSafety/FungalMeningitis /UCM325466.pdf).  The medications that the Ambulatory Surgical Department purchased from NECC included eye drops, anesthetic agents, steroid agents, and other products that assist in the administration of medication. *See* Dennis Aff., ¶ 4.

Kate Shandley was the materials manager for TEC's Ambulatory Surgical Department at the time of its purchases from NECC.  *Id.*, ¶ 5.  Ms. Shandley was the person in the Ambulatory Surgical Department responsible for purchasing medications from NECC.  *Id.*  Ms. Shandley died in the Fall of 2012.  *Id.*

### C.   Customers of NECC and Other Compounding Pharmacies

NECC has identified approximately 3,000 customers for the period between May 21, 2012 and October 23, 2012. *See* NECC Customer List Since 5/21/2012, Sorted by State (Oct. 23, 2012) (listing approximately 3,000 customers) http://www.fda.gov/downloads /Drugs/DrugSafety/FungalMeningitis/UCM325466.pdf.   NECC was only one of thousands of compounding pharmacies in the United States at that time.  *See* Sarah Turk, "Compounding Pharmacies in the U.S., IBISWorld Industry Report (January 2015) at 30, attached to the Gaeta Aff. as Ex. A.

### ARGUMENT

### A.   Legal Standard

The Subpoena seeks discovery from TEC's Ambulatory Surgical Department under Fed. R. Civ. P. 30(b)(6) and 31, and was served on TEC pursuant to Rule 45.  See Fed. R. Civ. P.

30(a)(1) and 31(a)(1).  A Rule 45 subpoena is enforceable only if the information sought falls within the scope of proper discovery under Fed. R. Civ. P. 26(b)(1).  *See In re New England Compounding Pharmacy,* No. MDL 13–2419, 2013 WL 6058483, at *4.  Rule 26(b)(l), as recently amended, provides that the information sought must be not only "relevant to any party's claim or defense" but also "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  *See* Fed. R. Civ. P. 26(b)(l ).

The amended Rule 26 is "intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse."  *See Henry v. Morgan's Hotel Grp., Inc.,* 2016 WL 303114, at *3 (S.D.N.Y. Jan. 25, 2016), (citing Fed.R.Civ.P. 26(b)(1) Advisory Committee's notes to 2015 amendments).  "The party issuing the subpoena has the burden of establishing that the requested information is relevant to its claims or defenses."  *Enargy Power (Shenzhen) Co. v. Xiaolong Wang,* 2014 WL 2048416, at *2 (D. Mass. May 16, 2014).

Non-parties such as TEC are afforded more protection from discovery than parties participating in the litigation.  *See, e.g., Cusumano v. Microsoft Corp.,* 162 F.3d 708, 717 (1st Cir. 1998) ("Although discovery is by definition invasive, parties to a law suit must accept its travails as a natural concomitant of modern civil litigation.  Non-parties have a different set of expectations."); *In re Centrix Fin., LLC,* 2012 WL 6625920, at *16 (D.N.J. Dec. 18, 2012) ("Everest is a non-party and therefore is afforded greater protection from discovery than a normal party.").  A subpoena seeking irrelevant information from a non-party will be quashed pursuant to Rule 45(d)(3). *See In re New England Compounding Pharmacy,* No. MDL 13–2419,

2013 WL 6058483, at *10.

     **B.**    **The Subpoena Must Be Quashed Because The Information Sought is Irrelevant.**

The information sought through the Subpoena is irrelevant because TEC's Ambulatory Surgical Department did not purchase MPA, and because TEC's conduct, even when considered with that of the other Non-Party Entities, cannot reliably support or refute the expert testimony necessary to establish the applicable standard of care.

     **1.**    **The Premier Defendants' Entire Theory of Relevance, Upon Which the 2015 Order is Based, is Negated Because TEC's Ambulatory Surgical Department Never Purchased MPA.**

The Subpoena must be quashed because TEC's Ambulatory Surgical Department did not purchase MPA and therefore, as effectively conceded by the Premier Defendants, cannot provide any relevant information. The Premier Defendants opposed the PSC's request for a protective order and sought to justify the subpoenas they issued on the basis that the subpoenas had been served on "non-party entities which had <u>purchased MPA</u> from NECC prior to the outbreak" and that they were seeking "targeted information as to the due diligence conducted by other NECC customers who <u>purchased MPA</u>."  Premier Orthopaedic and Sports Medicine Associates of Southern New Jersey, LLC, et al's Opp'n to the Pl. Steering Committee's Mot. for Protective Order Regarding Premier's Notices of Dep. by Written Question, at 1, 6, Nov. 6, 2015, ECF No. 2385 (emphasis added).  Because TEC's Ambulatory Surgical Department did not purchase MPA from NECC, the Premier Defendants cannot now credibly claim that TEC possesses relevant information.  The Subpoena should be quashed as a result.

Moreover, the Court's Orders have highlighted the centrality of MPA to the MDL in general and the subpoenas issued by the Premier Defendants in particular.  In a 2013 order on motions to quash, the Court stated:  "This litigation involves claims for wrongful death and

personal injury arising out of the administration of an injectable steroid, [MPA], manufactured by defendant [NECC]." *See In re New England Compounding Pharmacy,* No. MDL 13–2419, 2013 WL 6058483, at *1. The Court further highlighted the significance of MPA in the 2015 Order. The Court denied the PSC's motions precisely because the subpoenas were targeted to the "narrow topic of what due diligence was conducted by various NECC customers <u>prior to purchasing MPA from NECC</u>." *See* 2015 Order, at 2 (emphasis added). Because the only relevant area of inquiry recognized by the Court in the 2015 Order does not apply to TEC, an entity that <u>never purchased MPA</u>, the Subpoena should be quashed.

### 2.    The Conduct of TEC's Ambulatory Surgical Department is Irrelevant to Determining the Standard of Care.

The apparent purpose of the Premier Defendants and Box Hill Defendants for seeking this discovery is to establish the standard of care applicable to the negligence claims against them. *See generally* The Box Hill Defs.' Opp'n to the Pl. Steering Committee's Mot. for Protective Order Regarding Box Hill's Notices of Dep. by Written Question, at 2, Nov. 20, 2015, ECF No. 2425. ("[T]he PSC contends that the Box Hill Defendants failed to engage in sufficient 'due diligence' allegedly required by the standard of care, and that that failure caused the Box Hill Defendants to purchase contaminated MPA from NECC, which then allegedly caused injury to the Plaintiffs in the instant cases."). Even if the Premier Defendants were permitted to reverse course, despite their prior representations to this Court, and argue that the due diligence conducted by buyers of <u>any</u> NECC products is sufficiently relevant to the standard of care to justify the Subpoena, their argument would fall short.

The testimony of TEC and the other Non-Party Entities is irrelevant because the standard of care cannot be established without expert testimony, whether or not the negligence claims against the Premier Defendants qualify as medical malpractice claims. *See Davis v. Brickman*

*Landscaping, Ltd.*, 98 A.3d 1173, 1179-80 (N.J. 2014).[2]   In *Davis*, the court noted that, "when deciding whether expert testimony is necessary, a court properly considers whether the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment as to whether the conduct of the [defendant] was reasonable." *Id.* at 1179 (internal quotation marks omitted).   As examples of cases requiring the plaintiff to advance expert testimony establishing an accepted standard of care, the *Davis* decision lists "the ordinary dental or medical malpractice case," … "the responsibilities and functions of real-estate brokers with respect to open-house tours," … "precautions necessary to ensure the safe conduct of a funeral procession," … "the appropriate conduct for those teaching karate," [and] "the proper repair and inspection of an automobile." *Id.* at 1179 (internal quotation marks omitted).   The court concluded, based on this precedent, that the plaintiffs were required to present expert testimony to establish the standard of care applicable to the inspection of fire sprinklers by qualified contractors.   *See Id.* at 1180.   A review of the myriad questions put to TEC's Ambulatory Surgical Department by the Premier Defendants and the PSC demonstrates that matter at hand is sufficiently esoteric as to require expert testimony.

Also, such expert testimony must be sufficient for a jury to find that the consensus of the profession or industry involved recognizes the standard defined by the expert.   *See Taylor v. DeLosso*, 725 A.2d 51, 53-54 (N.J. Super. Ct. App. Div. 1999) ("[O]pinion testimony must relate to generally accepted … standards, not merely to standards personal to the witness.   In other words, plaintiff must produce expert testimony upon which the jury could find that the consensus

---

[2] The Premier Defendants are located in New Jersey and have been sued by a number of residents of New Jersey alleging to have been injured in New Jersey.  *See generally* Conditional Transfer Order, February 22, 2013, ECF No. 129 and complaints in New Jersey lawsuits listed therein.  Accordingly, New Jersey law must apply to the negligence claims against the Premier Defendants.

of the particular profession involved recognized the existence of the standard defined by the expert.") (citations and internal quotation marks omitted).

For medical malpractice cases, New Jersey law appears to treat proof of the consensus of medical opinion, through expert testimony, as dispositive of the issue of the standard of care. *See Fernandez v. Baruch*, 244 A.2d 109, 112 (N.J. 1968). In *Fernandez*, a wrongful death action against psychiatrists, the "basic question [was] whether the defendant doctors, in the application of accepted medical practice, knew or should have known that [the plaintiff] presented a suicide risk requiring special precautions." *Id*. at 111. The "plaintiff failed to produce evidence upon which the jury could find that the consensus of medical opinion required that the defendant doctors envision a suicide potential …." *Id*. at 112. Accordingly, the court ruled that the defendants could not be liable for malpractice because "there was no proof that generally accepted medical standards required the defendant doctors to conclude that [the plaintiff] was likely to attempt suicide…." *Id*. For other negligence claims where the standard of care must be established through expert testimony, "[e]vidence of the custom or practice of a particular industry does not conclusively dispose of the issue of the proper standard of conduct." *Estate of Elkerson v. N. Jersey Blood Ctr.*, 776 A.2d 244, 250 (N.J. Super. App. Div. 2001). It is "at most evidential of this standard." *Davis,* 98 A.3d at 1182 (citation omitted). In any event, the conduct of a relatively small number of members of the profession or industry involved is no substitute for expert testimony.

The testimony sought from TEC, even when considered with that sought from the other Non-Party Entities, would not even be of value to supplement any expert testimony offered by the Premier Defendants. That is because the conduct of TEC and the other Non-Party Entities in their decisions to purchase from NECC says nothing about the consensus of the profession or

industry involved, which must be proved to establish the standard of care. TEC and the other Non-Party Entities consist of 15 buyers of medications from NECC. NECC, however, has listed approximately 3,000 customers for 2012, the year in which it sold the tainted MPA. Also, NECC was only one of thousands of compounding pharmacies in the United States at that time. TEC and the other Non-Party Entities simply do not provide a sufficient sample size upon which any reliable inferences or conclusions could be drawn.

### C. The Subpoena Must Be Quashed Because TEC is Incapable of Producing Anyone With First-Hand Knowledge.

As a further reason for quashing the Subpoena, Kate Shandley, the person within TEC's Ambulatory Surgical Department responsible for purchasing medications from NECC, died in 2012. TEC, therefore, is incapable of producing a witness with first-hand knowledge of most of the information sought.

### D. Alternatively, The Subpoena Must Be Quashed Because The Discovery Sought is Disproportionate To the Needs of the MDL.

Even if there were some relevance to the discovery sought pursuant to the Subpoena, it would be disproportionate to the needs of the MDL, considering the importance of the discovery in resolving the issues and the burden imposed on TEC weighed against the likely benefit to the Premier Defendants. The Subpoena constitutes exactly the type of "discovery overuse" that the recent revisions to Rule 26(b)(l) are designed to prevent. The Subpoena would impose a considerable and unnecessary burden on TEC. In order to answer the 106 questions posed pursuant to the Subpoena (21 by the Premier Defendants and 85 by the PSC), TEC would have to undertake significant efforts to research and answer these questions. *See* Dennis Aff., ¶ 8. Indeed, to answer many questions regarding the state of "The Emory Clinic Ambulatory Surgical Center's" knowledge, TEC would have to undertake surveys or interviews to determine what

numerous employees did or did not know.  *Id*.  Moreover, the questions all relate to facts that took place more than four years ago. Answering these questions therefore requires overcoming the challenges presented by the passage of time, the most significant of which is Ms. Shandley's death, and also including documents being more difficult to locate, recollections fading, and personnel turnover.  TEC would also have to expend resources to prepare one or more witnesses to testify.

By contrast, TEC's Ambulatory Surgical Department did not purchase MPA from NECC; the establishment of the standard of care requires expert testimony on the consensus of the profession involved, of which TEC and the other Non-Party Defendants represent only a handful of the thousands of members; and in light of Ms. Shandley's death, TEC is incapable of producing any witness with first-hand knowledge of most of the information sought.  The burden imposed on TEC to comply with the Subpoena would thus be significantly outweighed by any infinitesimally small benefit that could come from information provided by TEC. *See* Fed. R. Civ. P. 26(b)(l).

## **CONCLUSION**

For the foregoing reasons, TEC respectfully requests this Court to quash the subpoena issued to it by the Premier Defendants.

Respectfully submitted,

THE EMORY CLINIC, INC.

By its attorneys,

/s/ Frank N. Gaeta
Frank N. Gaeta (BBO #561388)
RICH MAY, P.C.
176 Federal Street
Boston, MA  02110
(617) 556-3800
fgaeta@richmaylaw.com

Dated: April 1, 2016

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper or electronic copies will be delivered to those indicated as non-registered participants on April 1, 2016.

/s/ Frank N. Gaeta
Frank N. Gaeta