UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | MDL No. 2419 |
| THIS DOCUMENT RELATES TO: | Dkt. No. 1:13-md-2419 (RWZ) |
| All Suits Naming St. Thomas Hospital, Saint Thomas Network, Saint Thomas Health and Saint Thomas Outpatient Neurosurgical Center, LLC | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' STEERING COMMITTEE'S OPPOSITION TO SAINT THOMAS ENTITIES' GLOBAL MOTION FOR PARTIAL SUMMARY JUDGMENT ON CLAIMS FOR ACTUAL AGENCY AND DIRECT LIABILITY**

Summary judgment should never be granted as a matter of course, and certainly not under circumstances in which the record is replete with numerous hotly disputed material facts. In the present litigation, the record contains numerous disputes regarding the nature and implications of the intertwined relationships among the Saint Thomas Entities[1] and the Saint Thomas Clinic.[2] Sworn facts establish that the Saint Thomas Entities held themselves out to the public as one unified organization. The record contains documents and testimony indicating that the Saint Thomas Entities could and did exercise control over the Saint Thomas Clinic. In addition, the Saint Thomas Entities knowingly breached their duty of reasonable care to Plaintiffs by operating the Saint Thomas Clinic in a manner that was below the required standard

---

[1] Saint Thomas West Hospital, formerly known as St. Thomas Hospital ("St. Thomas Hospital"), Saint Thomas Network, and Saint Thomas Health (all three collectively, the "Saint Thomas Entities").

[2] Saint Thomas Outpatient Neurosurgical Center, LLC ("Saint Thomas Clinic" or "the Clinic").

of care.[3] Those factual disputes should be resolved by a jury.[4]  For the reasons discussed below,

the Saint Thomas Entities' Global Motion for Partial Summary Judgment on Claims for Actual

Agency and Direct Liability [Dkt. 2743] should be denied.[5]

## I.     "OUR NAME IS ON THE DOOR."

Testimony and emails authored by Saint Thomas Health's highest ranking corporate

officials establish that the Saint Thomas Clinic was the actual and apparent agent of the Saint

Thomas Entities. In fact, once the burgeoning fungal meningitis catastrophe became public news,

Michael Schatzlein, M.D., President and CEO of Saint Thomas Health, sent an email to Dr.

Gregory Lanford, President of Howell Allen Clinic, as follows:

> "You may be assured that no one from Saint Thomas has referred to STOPNC as
> an 'unaffiliated clinic.' **Our name is on the door**."[6]

With that phrase, Saint Thomas Health's CEO summed up what is readily apparent in the

Nashville community:  Saint Thomas Clinic is part of the Saint Thomas Health system, an

integrated system of healthcare entities marketed to the public under the unitary Saint Thomas

brand. In name, words, and actions, the Saint Thomas Entities and Saint Thomas Clinic

purposefully and consistently hold themselves out to the public as a singular organization,

blurring any distinctions between or among them. Using common "Saint Thomas" branding and

large-scale marketing campaigns, those entities intentionally foster the public perception that

they are one united organization.[7]

---

[3] Along with this brief, the PSC has also filed a Response to the Saint Thomas Entities' statement
of "undisputed" material facts, many of which the PSC dispute.
[4] The proposed verdict form previously filed with this Court [Dkt. 2796-1] indicates an example
of how the agency question can be posed to the jury.
[5] All evidence cited in this brief is referenced by lettered Exhibits and attached to the Declaration
of Benjamin A. Gastel, which is filed contemporaneously with this brief.
[6] Ex. A, Schatzlein Ex. 160.
[7] Ex. A, Schatzlein 4/6/15 Dep. 50:23 – 51:14 ("…I firmly believed and its generally best
practice, in fact, the only practice, that integrated systems of care have a unifying name."),

Advertisements highlighting the tag line "Saint Thomas Health: One Name, One Healing Community" are prominently placed throughout the Nashville area, including on billboards at the Nashville International Airport and plastered across the sides of Nashville city buses.[8] The "Saint Thomas" name is used across facilities to suggest – and indeed promise – commonality of ownership, standards, values, and service.[9]

---

31:12-31:21 (Saint Thomas does not allow other businesses in the Nashville community to use the Saint Thomas name without its permission because not doing so preserves the impression that Saint Thomas has "a coordinated integrated system of care.").

[8] Ex. Q, Rudolph Ex. 216.

[9] Ex. C, Climer Dep. 20:2-20:8 (The Saint Thomas brand was intended to convey to the community "the values of the organization,  that we are a not-for-profit organization that is mission driven and […] the representation of the Catholic church from a healthcare perspective in our communities."), 23:5-8 (The Saint Thomas name "is the Catholic name that is present in the community. It also has a strong recognition across a several county area."); Ex. A, Schatzlein Dep. 27:10-14 (He agrees that "the name Saint Thomas is intended to convey the idea that patients who go to Saint Thomas will receive safe, high quality care."); 28:6-14 (He agrees that "when someone goes to a Saint Thomas facility, a facility with Saint Thomas arm of their work, it's located on a Saint Thomas campus, that the name was intended to convey to the patients that they were receiving safe, high quality care at that particular facility."); Ex. L, Kelvas Dep. 172:12-173:3 (Asked "If a patient is going to ... the for-profit side, one of those clinics, or is coming to a clinic on the nonprofit side … would they expect the same level of patient safety and care?" Kelvas, Director of Pharmacy Services for Saint Thomas Hospital, responded "That's a patient perception and when you have a branded product such as Saint Thomas, and the patient -- and this is my opinion – the patient of Saint Thomas so they associate because it has the Saint Thomas name on it. So you, you know, it's part of the same, quote/unquote, organization and patient perception would -- yeah, they expect that this is part of the same organization.); 173:4 - 173:8 (Kelvas agreed that " they would expect the same level of care at STOPNC that they would receive at Saint Thomas Hospital or any of the other Saint Thomas entities."); Ex. A, Schatzlein 4/6/15 Dep. 25:5-25:8 ("it's [de rigeur] within the health system to – to seek to have a common culture and a common brand across facilities"), 28:24-29:4 ("Q: …If someone sees the Saint Thomas name posted on the door of a facility at the Saint Thomas Hospital campus, is that name intended to convey to the community that that facility will place patient safety first? A: Yes."); Ex. D, Lanford 9/18/15 Dep. 16:10-17:8 ("I think 'Saint Thomas' was always going to be a part of [the Clinic name]. … It was in a medical building on their campus, and they were our 50/50 partner in the venture. … Saint Thomas had a very good reputation, as it still does today. … I think that's a reasonable assumption to think that using the hospital's name would be a positive thing, yes."); Ex. Q, Rudolph 4/21/15 Dep. 42:5-20 ("I do know that as part of our "One Healing Community," we focused on our values that the sisters brought forward. So if I think of attributes, I think of those values. Q. And what are those values? A. Oh, you really put me on notice here. Creativity, wisdom, integrity, reverence and education. Q. Are those written down

## I.   THE SAINT THOMAS ENTITIES EXERCISE CONTROL OVER THE SAINT THOMAS CLINIC.

In addition to presenting a united face to the public, the Saint Thomas Entities owned, managed, controlled, and operated the Saint Thomas Clinic as part of an indistinguishable tangle of related entities. On paper, the Saint Thomas Clinic is co-owned by Saint Thomas Network and Howell Allen.[10] According to Dr. Schatzlein (CEO of Saint Thomas Health), Saint Thomas Network is a "pass-through entity" with zero employees.[11] That "pass-through entity" is wholly owned by Saint Thomas Health, the same company that owns St. Thomas Hospital.[12]  In practice, the employees and leadership of the Saint Thomas Entities, Howell Allen, and the Saint Thomas Clinic consistently considered the Saint Thomas Clinic to be a "partnership" between the Saint Thomas Entities and Howell Allen – a partnership with equal rights of control and equal sharing of profits.

As Dr. Gregory Lanford, President of Howell Allen and Chairman of Saint Thomas Clinic's governing board, put it in an email to the CEOs of Saint Thomas Hospital (Dawn Rudolph) and Saint Thomas Health (Michael Schatzlein, M.D.):

---

somewhere?  A. Yeah, as part of the "One Healing Community," we did an associate commitment to care that talked about the values and talked about, you know, the daughters' legacy and kind of how they can model those values in their day-to-day work. So we did some work on that post-rebranding."); *see also* Ex. O, Joachimsthaler Report ¶ 19 ("A service brand is thus a promise about the future experience with an organization…"), ¶ 25 ("For example, 'Saint Thomas' can create a promise of quality or assurance for the customer experience of healthcare services provided in the Saint Thomas-branded medical units … it can evoke trust in quality of medical treatment").

[10] Ex. A, Schatzlein Dep. Ex. 174 (Operating Agreement of Saint Thomas Outpatient Neurosurgical Center, LLC lists Saint Thomas Heath Services (predecessor of Saint Thomas Health) and Neurological Surgeons, P.C. (predecessor of Howell Allen) as members).

[11] Ex. A, Schatzlein Dep., pp. 32 -33, 89; Ex. E, Butler Ex. 71  (STE_MDL_003622 at 25).

[12] Ex. A, Schatzlein Dep., p. 36.

> Our group has never considered this Joint Venture to be anything other than a partnership between Saint Thomas Hospital and Howell Allen Clinic. That's how it began and that's how it has functioned over the last 13 years.[13]

Dr. Lanford went on to describe the control shared by the partners in operating the Clinic: "The management of the facility has shared responsibilities between our group and your hospital."[14] Dr. Lanford's statements indicating shared control are further corroborated by the testimony of Saint Thomas Clinic board member Scott Butler. Mr. Butler testified that Saint Thomas maintained an equal right, along with Howell Allen, to control Saint Thomas Clinic's conduct.[15] Moreover, it was the official policy of the Saint Thomas Clinic that "overall management of the center shall be directed by the facility administrator through the medical executive committee *in conjunction with* the board of directors."[16]

The makeup of Saint Thomas Clinic's board of directors likewise demonstrates a system of shared control. Dale Batchelor, MD, a Saint Thomas Clinic board member and Saint Thomas Hospital's Chief Medical Officer, testified that he and the other board members "had ultimate responsibility for the operation of" Saint Thomas Clinic.[17]

Although the defendants now claim that operational authority over the Saint Thomas Clinic was delegated to and vested solely in Howell Allen, the paper trail and governing corporate documents show the opposite. The Articles of Organization of the Clinic explicitly

---

[13] Ex. A, Schatzlein Dep. Ex. 160; Ex. E, Butler Exhibit 60 (Saint Thomas Health's Vice President of Corporate Responsibility Program, Cynthia Figaro, likewise understood Saint Thomas Clinic to be a partnership. Ms. Figaro sent a letter to Saint Thomas Clinic's Coding & Compliance Manager stating as follows: "Saint Thomas Health is a partner with your company in the Saint Thomas Outpatient Neurosurgical Center, LLC joint venture.").
[14] Ex. A, Schatzlein Dep. Ex. 160.
[15] Ex. E, Butler 2/5/15 Dep. 31:8-24.
[16] Ex. F, Butler 9/17/15 Dep. 44:14-25; Butler Ex. 597.
[17] Ex. G, Batchelor Dep. 25:8-12.

state: "The Company [i.e. the Clinic] will be Board managed."[18]  In addition, the Services

Agreement between Howell Allen's predecessor and the Saint Thomas Clinic explicitly states:

"the Company [i.e. the Saint Thomas Clinic LLC] shall at all times exercise <u>control</u> over the

assets and operation of the Center [i.e. Saint Thomas Clinic]" and that "[b]y entering into this

Agreement … the Company does not delegate to the Group [Howell Allen] any of the powers,

duties, and responsibilities vested in the Company by law."[19]

    Defendants have not (and cannot) point to any documentary evidence that operational

authority over the Saint Thomas Clinic was ever delegated to and solely vested in Howell Allen.

In fact, Defendants' expert on corporate structure, Robert Parrino, who examined all the

organizational documents and agreements, admitted that he could find no written expression of

the purported delegation of operational authority over the Clinic to Howell Allen.[20]

    The reason for a corporate structure using a common name, multiple entities, and a

system of shared control becomes clear once one considers the financial motives of the parties.

In short, the Saint Thomas Clinic was formed for the purpose of generating revenue for the Saint

Thomas Entities, all of which purport to be tax-exempt non-profit organizations. The structure of

Saint Thomas Clinic (a for-profit, high-volume ESI clinic) was dictated by the need to protect the

Saint Thomas Entities' tax-exempt status as not-for-profit entities. The solution to that quandary

– how to set up a clinic intended to generate profits for the Saint Thomas Entities while

preserving their tax-exempt status – was to put "buffers" between the for-profit clinic and the

---

[18] Ex. P, Parrino Ex. 1192, Article IV, Articles of Organization of Saint Thomas Outpatient Neurosurgical Center, LLC.

[19] Ex. F, Butler Ex. 594, Section 1.4 (Control Retained by the Company), Services Agreement (Sep. 18, 2000) (emphasis added).

[20] Ex. P, Parrino Dep. 53:5-53:19 (admitting he did not see the delegation of operating authority from the Clinic to Howell Allen in any of the documentation, and that his "expert" opinion that such delegation had taken place was based on one statement from Dr. Batchelor's deposition testimony).

not-for-profit entities. In this case, Saint Thomas Health put Saint Thomas Network (a pass-through buffer) between it and Saint Thomas Clinic; Saint Thomas Network serves no purpose other than to pass profits from Saint Thomas Clinic through to Saint Thomas Health. Nothing about that arrangement is intended to serve any purpose other than maximizing revenue and minimizing taxes while simultaneously allowing the Saint Thomas Entities to exercise joint control over their namesake, Saint Thomas Clinic.[21]

The foundational documents of Saint Thomas Clinic make that purpose clear:  the explicit purpose of the clinic is to support the Saint Thomas Entities,[22] and paramount above all things, the tax-exempt status of Saint Thomas must be preserved. For that reason, the Operating Agreement gives Saint Thomas the unilateral power to require the Clinic, its Board, or its managers to take actions or refrain from actions as necessary to preserve Saint Thomas Health's tax-exempt status.[23]

In fact, it was never intended for the Clinic to have any measure of independence from Saint Thomas Entities' control. The Saint Thomas Clinic was required to follow the ethical and religious directives of Saint Thomas.[24] As the Operating Agreement makes clear, Saint Thomas

---

[21] Ex. A, Schatzlein 4/6/15 Dep. 133:21-25 (Saint Thomas relies upon its joint ventures to generate money for Saint Thomas to use on whatever it chooses to spend money on.).
[22] Ex. A, Schatzlein Ex. 174, Operating Agreement, Paragraph 3.1 ("[t]he purpose of the LLC shall be to support the institutions sponsored by Ascension, and to cooperate with other institutions sponsored by Ascension."); Schatzlein 4/6/15 Dep. 108:23-109:1 (The "institutions sponsored by Ascension" are the ministries, which include Saint Thomas Hospital and Saint Thomas Health.).
[23] Ex. A, Schatzlein Ex. 174, Operating Agreement, Section 6.10; Schatzlein 4/6/15 Dep. 109:17-21 (One purpose of the Operating Agreement is to preserve the tax exempt status of Saint Thomas Hospital and Saint Thomas Health.).
[24] Ex. Q, Rudolph 4/21/15 Dep. 50:20-24; Ex. A, Schatzlein 4/6/15 Dep. 117:9-19; Schatzlein Ex. 174, Operating Agreement ("The philosophy if the LLC is that of the sponsors as articulated and promoted through the statement of mission, vision and values of Saint Thomas Health Services in accordance with the official teachings of the Roman Catholic Church and the directives.").

Clinic "shall have no power to do anything inconsistent with the Directives, the charitable mission or the tax-exempt purpose of [the Saint Thomas Entities]."[25] No Clinic policies could be promulgated without approval of the Clinic Board, half of which is comprised of Saint Thomas appointees.[26]

If one of the Saint Thomas Entities' representatives on the Clinic's board gave Dr. Culclasure or Nurse Schamberg a directive, they would be expected to follow it.[27] Moreover, when they wanted to, the Saint Thomas Entities could – and did – "essentially over[i]de the board structure of the clinic" in order to call the shots.[28]

Taken together, numerous facts support Plaintiffs' vicarious liability claims. At the very least, genuine disputes of material fact regarding issues of agency and control preclude summary judgment.

## II.   <u>LEGAL STANDARD</u>

On summary judgment, the moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top–Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citations omitted). A genuine issue of fact exists where a fact finder could find in favor of the non-moving party, "while material facts are those whose existence or nonexistence has the potential to change the outcome of the suit." *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (internal quotations marks and citation omitted). In determining whether summary judgment is proper, evidence is considered "in the light most favorable to the non-

---

[25] Ex. A, Schatzlein Ex. 174 (Operating Agreement).
[26] Ex. G, Batchelor Dep. 29:13-17.
[27] Ex. E, Butler 2/5/15 Dep. 27:16-20.
[28] Ex. A, Schatzlein 4/6/15 Dep. 63:1-19.

moving party" and "all reasonable inferences" are drawn in his favor. *Ahmed v. Johnson*, 752

F.3d 490, 495 (1st Cir. 2014).

### III.   AMPLE EVIDENCE SUPPORTS PLAINTIFFS' VICARIOUS LIABILITY CLAIMS.[29]

The concept of agency "includes every relation in which one person acts for or represents

another." *White v. Revco Disc. Drug Ctrs., Inc.*, 33 S.W.3d 713, 723 (Tenn. 2000). An agency

relationship does not require an explicit agreement or understanding between the parties; when

"the facts establish the existence of an agency relationship, it will be found to exist whether the

parties intended to create one or not." *Id*. (citations omitted). As stated by the Tennessee

Supreme Court in *White*:

> Whether an agency exists "is a question of fact under the circumstances of the particular case; and whether an agency has been created is to be determined by the relation of the parties as they in fact exist under their agreement or acts."  (citation omitted).
>
> . . .
>
> The law did not strictly require that "the principal or master should expressly direct or have knowledge of the act done; it is enough that the servant or agent was acting in the business of his superior.  (citation omitted)
>
> . . .
>
> "A person may be the servant of two masters, not joint employers, at one time as to one act, if the service does not involve abandonment of the service to the other."  In so doing, the person serving two masters "may cause both employers to be responsible for an act . . . if the act is within the scope of the employment for both. (citation omitted).

*Id.* at 723-724. As stated by the Tennessee Supreme Court in *Johnson v. LeBonheur Children's*

*Medical Center*, 74 S.W.3d 338, 343 (2002):

---

[29] Defendants have not moved for summary judgment on Plaintiffs' apparent agency claims. Def's Mem. 2 n.4 [Dkt. 2744]. Regardless of the outcome of this motion, the Saint Thomas Entities are still facing trial on Plaintiffs' apparent agency claims.

> The principal's right to control the acts of the agent is a relevant factor when determining the existence of an agency relationship. The amount of actual control exercised by the principal over the agent also may be determinative of whether an agency relationship exists.

A principal may still be bound by its agent's acts which are beyond the scope of her actual or apparent authority through ratification; however, ratification is usually a question of the principal's intent, which is generally regarded as a question of fact inappropriate for resolution at summary judgment. *Racing Head Serv., LLC v. Mallory Alexander Int'l Logistics, LLC*, No. 09-2604-STA-TMP, 2012 WL 174862, at *16 (W.D. Tenn. Jan. 20, 2012) (denying summary judgment on agency claims where questions of fact about the relationship between the parties remained vigorously disputed).

In the present litigation, as described above, the Saint Thomas Entities and Howell Allen considered the Saint Thomas Clinic a partnership, and operated it as such. The fact that Saint Thomas Clinic purports to be an LLC on paper is irrelevant; the actions and words of the leadership and employees are what matter here. The key individuals involved referred to the Clinic as a partnership and acknowledged it had always been intended to be and operated as a partnership.[30]  In fact, the equal control arrangement became a source of frustration during the catastrophe response, prompting Dr. Schatzlein to suggest the LLC Operating Agreement be amended so that Howell Allen would have more operational control.[31]  That point alone indicates that Howell Allen did not have sole operational authority in 2012, as Defendants falsely assert.

---

[30] Ex. A, Schatzlein Ex. 160; Ex. Q, Rudolph 4/21/15 Dep. 265:8-265:15; Ex. A, Schatzlein Dep. 45:3-8 (Schatzlein agreed that both members of the joint venture used "partnership" language in their communications to describe the center.); Ex. C, Climer Ex. 184 (Saint Thomas Health listed the Saint Thomas Clinic under a list of Saint Thomas Health Joint Ventures/Partnerships in a Nashville Ministry Overview (STE_MDL_023291 at 302)).

[31] Ex. A, Schatzlein Ex. 160, 10/30/2012 email from Schatzlein to Lanford, cc Rudolph, Climer ("It also appeared during the crises that the ancient LLC structure at STOPNC made crisis management awkward because everything had to be done by a four-member board rather than, say, Scott [Butler] as the administrator. … I do believe we should revise the LLC operating agreement to give the administrator clearer operating authority.").

As Dr. Lanford clearly wrote, Howell Allen and the Saint Thomas Entities shared management of the Clinic and together exercised control over its operations – "That's how it began and that's how it has functioned over the last 13 years."[32]

The employees and leadership of the Saint Thomas Entities, Howell Allen, and Saint Thomas Clinic are inextricably intertwined. The Board of the Saint Thomas Clinic consists of two Saint Thomas appointees and two Howell Allen appointees. Given that Saint Thomas Network is a pass-through entity with zero employees, the Saint Thomas Network appointees to the Clinic's Board were necessarily always employees of Saint Thomas Hospital or Saint Thomas Health.[33]  In addition, the Saint Thomas Entities themselves have overlapping board members. For example, in 2011 to 2012, Michael Schatzlein, Alan Strauss, and Wes Littrell served as board members (and officers) for both Saint Thomas Network and Saint Thomas Health.[34] Michael Schatzlein was CEO of Saint Thomas Health in 2012.[35] Wes Littrell was chief strategy officer, president, and CEO of Saint Thomas Health affiliates (i.e. the joint ventures and other business entities) for all of 2012.[36] Littrell reported to Schatzlein.[37] The Saint Thomas Network board members chose the Saint Thomas Clinic board members.[38] Alan Strauss (CFO of Saint Thomas Health) and Dale Batchelor (CMO of Saint Thomas Hospital) were board members of the Saint Thomas Clinic in 2011 to 2012.[39]

---

[32] Ex. A, Schatzlein Ex. 160.
[33] Ex. E, Butler 2/5/15 Dep. 31:16-22; Ex. R, Rudolph 7/2/15 Dep. 75:19-23 (Saint Thomas Health and Saint Thomas Network have common board members).
[34] Ex. B, Schatzlein 7/21/15 Dep. 28:10-28:14 and Ex. R, Rudolph Ex. 447 (STE_MDL_21272).
[35] Ex. A, Schatzlein 4/6/15 Dep. 17:11-17:16.
[36] Ex. Q, Rudolph 4/21/15 Dep. 127:5-127:14.
[37] Ex. A, Schatzlein 4/6/15 Dep. 144:9-144:16.
[38] Ex. B, Schatzlein 7/21/15 Dep. 29:19-29:23.
[39] Ex. B, Schatzlein 7/21/15 Dep. 28:10-28:14 and Ex. R, Rudolph Ex. 447 (STE_MDL_21274).

Adding to the confusion, Saint Thomas Clinic and Saint Thomas Hospital likewise had common Board members; the four members of the Saint Thomas Clinic board in the fall of 2012 were Dale Batchelor (CMO of Saint Thomas Hospital), Greg Lanford, Scott Butler, and Craig Polkow (CFO of Saint Thomas Health).[40] None of the Saint Thomas appointees who served on the Clinic's Board were paid for their work on the board; in fact, they considered their roles as Clinic Board members to be part of their jobs as employees of the Saint Thomas Entities.[41]

Beyond those serving as Board members, other Saint Thomas Health and Hospital personnel also were responsible for integral functions at Saint Thomas Clinic. In fact, Howell Allen's ability to draw on the Saint Thomas Entities' resources in order to handle certain day-to-day operational functions of the Clinic was one of the benefits of its partnership with the Saint Thomas Entities.[42] For example, Saint Thomas Hospital's medical affairs office provided credentialing for Saint Thomas Clinic physicians.[43] Cindy Williams, Saint Thomas Health's Director of Managed Care Joint Venture Contracting facilitated the managed care contracts for Saint Thomas Clinic.[44] Part of Ms. Williams' job responsibilities included helping Saint Thomas Clinic get paid for goods and services provided to patients.[45] Williams does not provide managed care contract services to any entity that is not affiliated with Saint Thomas Health.[46]

---

[40] Ex. E, Butler 2/5/15 Dep. 79:6-79:10 and Butler Ex. 71 (STE_MDL_003622).
[41] Ex. G, Batchelor Dep. 25:1-3; Ex. Q, Rudolph 4/21/15 Dep. 32:2-32:21.
[42] Ex. D, Lanford 9/18/15 Dep. 45:18-46:8 (discussing resources Saint Thomas brought to the partnership that the Clinic could draw from, including Saint Thomas handling managed care contracts, credentialing, equipment sterilization and mechanical services for the Clinic).
[43] Ex. G, Batchelor Dep. 35:25-36:3.
[44] Ex. H, Williams Dep. 12:9-12:12.
[45] Ex. H, Williams Dep. at 15:15-15:20.
[46] Ex. H, Williams Dep. 33:10-33:13.

After the fungal meningitis catastrophe, Williams notified managed care payors of the catastrophe on Saint Thomas Clinic's behalf.[47]

Saint Thomas Hospital's infection control nurse, Candace Smith, helped Saint Thomas Clinic with infection control measures.[48] Nurse Schamberg (of Saint Thomas Clinic) would occasionally call Nurse Smith (of Saint Thomas Hospital) when she had questions regarding infection control.[49] The Saint Thomas Entities did not bill the Clinic or Howell Allen for those infection control services provided, as they would have billed an independent third party.[50] Jennifer Hendricks, Financial Coordinator for Saint Thomas Health, put together the financials for the Saint Thomas Clinic's board reports.[51]  Those Clinic board reports were printed on Saint Thomas Health letterhead.[52]

The Saint Thomas Entities also controlled the public image and marketing of the Saint Thomas Clinic. For example, the Saint Thomas Clinic does not have its own website or web presence, but instead is mentioned on the websites of both the Saint Thomas Entities and Howell Allen.[53] In 2008, Saint Thomas Health Chief Marketing Officer Rebecca Climer assisted with public relations at Saint Thomas Clinic by suggesting to Saint Thomas Entities' public relations firm Jarrard, Inc. that "We may want to feature the docs at STOPNC for pain management" in certain healthcare trade publications.[54]  In 2011, the Saint Thomas Entities considered sponsoring a seminar about pain management featuring the Saint Thomas Clinic that would "emphasize each

---

[47] MDL Ex. 232 at STE_MDL_019140.
[48] Ex. I, Schamberg Dep. 188:22-189:11.
[49] Ex. I, Schamberg Dep. 191:10-13.
[50] Ex. I, Schamberg Dep. Dep. 191:10-191:19.
[51] Ex. E, Butler Ex. 67 at STOPNC-0002425.
[52] *Id.*
[53] Ex. C, Climer Dep. 143:24-144:6.
[54] Ex. C, Climer 4/8/15 Dep. 32:1-32:22 and Climer Ex. 182 at STE_MDL_005887.

aspect of the continuum of care and our services within that area" and "messaging can be in the form of cross-selling, onsite seminars, outreach seminars, etc."[55]

The fact that Saint Thomas Clinic was an integral part of the Saint Thomas Health system is further supported by facts following the catastrophe. As soon as Saint Thomas Health learned about the burgeoning fungal meningitis catastrophe, Saint Thomas Health, through its marketing department, assumed control of Saint Thomas Clinic's communications with patients.[56] Executives from Saint Thomas Health and Saint Thomas Hospital – including some who were not Clinic board members – acted as the decision-makers regarding Saint Thomas Clinic's actions and communications during the catastrophe.[57] Scott Butler (of Howell Allen) testified that he did not have any control over Saint Thomas Clinic's public relations related to the catastrophe.[58] The Saint Thomas Entities' executives, communications chief, and lawyers took control of all public relations and communications for the Clinic after the catastrophe.[59]

According to Dr. Schatzlein (CEO of Saint Thomas Health), he "essentially overrode the board structure of the clinic" in order to give Rebecca Climer (Chief Marketing Officer for Saint Thomas Health) authority to direct the Clinic's communications with patients. Executives and lawyers for Saint Thomas Health then created a written script used by the Clinic when it called

---

[55] Ex. C, Climer 4/8/15 Dep. 36:7-36:12 and Climer Ex. 183 at STE_MDL_023197. Ex. C, Climer 4/8/15 Dep. 35:25-36:2 (Climer agrees that "sponsoring seminars about pain management is a form of marketing.").

[56] Ex. D, Lanford 9/18/15 Dep. 114:7-114:16 ("Saint Thomas is a partner in STOPNC, and that [handling marketing and PR for the Clinic] was a role they were playing, yes.").

[57] Despite not being on the Clinic board at the time, Saint Thomas Hospital CEO Dawn Rudolph attended Clinic Board meetings and issued directives to Scott Butler in the wake of the catastrophe. Ex. Q, Rudolph 4/21/15 Dep. 262:10-262:20, 24:20-25:2, 22:4-22:8; Ex. E, Butler 2/5/15 Dep. 86:12-87:1; Ex. Q, Rudolph Ex. 230; Rudolph Ex. 233.

[58] Ex. E, Butler 2/5/15 Dep. 35:5-35:13 and Butler Ex. 60.

[59] Ex. C, Climer Ex. 204.

patients to inquire about meningitis symptoms.[60] For example, Berry Holt, attorney for Saint Thomas Hospital and Saint Thomas Health, reviewed and edited the written script.[61]

In addition to controlling the Clinic's communications with patients, the Saint Thomas Entities likewise controlled its post-catastrophe public relations. At one point, there was even a suggestion that Saint Thomas hold a "Day of Prayer" for the patients and families affected by the catastrophe, because it would be a "good PR move."[62] Language for a post-outbreak press release by the Clinic was created by Saint Thomas Health's Chief Marketing Officer, and reviewed and approved by the Clinic board, the CEO of Saint Thomas Hospital, and the Saint Thomas Entities' lawyers.[63] At no point did Howell Allen or the Saint Thomas Clinic pay any money to Saint Thomas Health or Saint Thomas Hospital for their handling of those public relations efforts.[64]

These facts establish that the Saint Thomas Entities exercised control over the Saint Thomas Clinic, such that the Clinic was the agent of the Saint Thomas Entities.[65] Those facts likewise demonstrate that several genuine issues of disputed material fact make summary judgment here inappropriate.[66]

---

[60] Ex. A, Schatzlein 4/6/15 Dep. 63:1-63:19; Ex. C, Climer 4/8/15 Dep. at 25:7-25:24.

[61] Ex. E, Butler 2/5/15 Dep. 110:3-110:24; Ex. A, Schatzlein 4/6/15 Dep. 63:23-64:11; Schatzlein Ex. 166 at STOPNC-0003501.

[62] Ex. E, Butler Ex. 61.

[63] Ex. Q, Rudolph 4/21/15 Dep. 223:21-224:16.

[64] Ex. D. Lanford 9/18/15 Dep. 114:7-114:16.

[65] *See e.g.*, *Franklin Distributing Co. v. Crush International (U.S.A.), Inc.*, 726 S.W.2d 926, 930 (Tenn. Ct. App. 1986) (finding an actual agency relationship between principal and agent because, notwithstanding that an agreement characterized the relationship as a non-agency agreement because "[Principal] reaped the benefits of [agent's] manufacturing, bottling and selling of [Agent's Product]. More importantly, [Principal] had the requisite control because it could terminate the franchise if [Agent] performed in contravention of the agreement."

[66] Defendants' ancillary argument that the Saint Thomas Entities cannot be vicariously liable for claims against Dr. Culclasure is unfounded. Contrary to Defendants' contention, whether the principal has the legal right to control the agent is irrelevant; the determinative factor is whether

## IV.   THE SAINT THOMAS ENTITIES BREACHED THEIR DUTY OF REASONABLE CARE.

Plaintiffs' direct liability claims center on the failure by the Saint Thomas Health system (including Saint Thomas Health, Saint Thomas Network, Saint Thomas Hospital, and Saint Thomas Clinic) to follow uniform standards for the procurement of medications throughout the organization. In other words, before the fungal meningitis catastrophe, Saint Thomas Hospital learned that NECC was attempting to sell compounded drugs illegally, without patient-specific prescriptions. Upon learning of NECC's illegal conduct, Saint Thomas Hospital determined not to buy medications from NECC, and it instructed all hospital personnel not to do so. In addition, the hospital's head pharmacist then contacted sister hospitals within the Saint Thomas Health system and likewise told them not to purchase from NECC. Unfortunately, however, no one within the Saint Thomas Health organization notified entities on the for-profit side of the system, including the Saint Thomas Clinic, that purchasing from NECC without prescriptions was unlawful. By failing to communicate that important patient information across its organizational structure, Saint Thomas Health and Saint Thomas Hospital beached their duty of reasonable care.

---

the principal actually exercised control over the agent. *See Edmonds v. Chamberlain Memorial Hosp.*, 629 S.W.2d 28, 30-31 (Tenn. App. 1981) (rejecting defendant's argument that a hospital must have the legal right to control the physician before the physician can be considered the hospital's agent); *see also Givens v. Mullikin*, 75 S.W.3d 383, 395 (Tenn. 2002) (holding that although a principal may lack the legal right to control its agent, "we simply cannot ignore the practical reality that the [principal] may seek to exercise actual control over its [agent]"), Restatement (Third) of Agency § 1.01, cmt. c (2006) ("A person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment."). Defendants' authorities to the contrary are unavailing: *Medical Education Assistance Corp. v. State ex rel. E. Tenn. State Univ. Quillen Coll. Of Med.*, 19 S.W. 3d 803 (Tenn. Ct. App. 1999) does not concern vicarious liability claims, and *Thomas ex rel. Thomas v. Oldfield*, No. M2007-01693-COA-R3-CV, 2008 WL 2278512 (Tenn. Ct. App. Feb. 8, 2008) concerns actual agency claims against a hospital, and thus does not threaten Plaintiffs' claims regarding Dr. Culclasure against Saint Thomas Health or Saint Thomas Network, nor Plaintiffs' apparent agency claims against Saint Thomas Hospital. Thus legally Defendants' argument fails as to Dr. Culclasure, and cannot support Defendants' argument for summary judgment here.

In Tennessee, a cause of action for negligence requires proof of the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct falling below that applicable standard of care amounting to breach of that duty, (3) an injury or loss, (4) causation in fact, and (5) proximate  or legal cause.[67]  "[L]egal duty" is defined as that which the law requires to be done or forborne to a determinate person, or to the public at-large, and as a correlative to a right vested in such determinate person or the public at-large."[68]  Duty is the legal obligation a defendant owes to a plaintiff to conform to a reasonable person standard of care in order to protect against unreasonable risks of harm.[69]  A duty rests on everyone to use due care under the attendant circumstances, and negligence is doing what a reasonable and prudent person would not do under the given circumstances.[70]  "Professionals are judged according to the standard of care required by their  profession."[71]

As revealed by the evidence discussed below, all patients of the Saint Thomas Health system, including those of Saint Thomas Clinic, deserved the same degree of care and safety in medication sourcing and procurement. Documents and testimony gleaned in discovery show that the Saint Thomas Entities' leadership and employees knew that they had a duty to ensure that all facilities within the Saint Thomas Health system met the applicable standard of care and safety for their patients, and yet they failed to meet that duty.

---

[67] *Roe v. Catholic Diocese of Memphis, Inc.*, 950 S.W.2d 27, 31 (Tenn. Ct. App. 1996).
[68] *AFG Indus., Inc. v. Holston Elec. Coop.*, 556 F. Supp. 33 (E.D. Tenn. 1982); *see also Dooley v. Everett*, 805 S.W.2d 380 (Tenn. Ct. App. 1990).
[69] *Staples v. Cbl & Assocs.*, 15 S.W.3d 83 (Tenn. 2000); *Burroughs v. Magee*, 118 S.W.3d 323 (Tenn. 2003).
[70] *Dooley*, 805 S.W.2d at 384-85.
[71] *Id.*

A.   **Saint Thomas Hospital Declines to Purchase from NECC and Fails to Inform Saint Thomas Clinic.**

Before Saint Thomas Clinic began purchasing medications from NECC, Saint Thomas Hospital declined to do so. According to Martin Kelvas D.Ph., former Director of Pharmacy Services for Saint Thomas Hospital, he specifically instructed all pharmacy staff on the non-profit side of the Saint Thomas Health System not to purchase drugs from compounding pharmacies.[72] Dr. Kelvas testified that, in early 2011, a sales representative from NECC approached Dr. Kelvas in order to solicit Saint Thomas Hospital's business. NECC proposed selling compounded medications in bulk to the hospital. Based upon Dr. Kelvas' general knowledge of pharmacy laws, he did not feel that the proposed arrangement was lawful.[73] Accordingly, he declined NECC's solicitation, and he called the Tennessee Board of Pharmacy.[74]

Dr. Kelvas then talked with Terry Grinder, D.Ph. of the Tennessee Board of Pharmacy. Dr. Grinder affirmed Dr. Kelvas' interpretation of Tennessee law. Compounded drugs could not be legally purchased from a compounding pharmacy in bulk. Compounded drugs may only be dispensed by a compounding pharmacy, licensed by a board of pharmacy, to fulfill a patient-specific prescription written by a physician (i.e. within the prescriber-patient-pharmacist relationship).[75] Dr. Grinder further explained that, in order to procure medications without individual prescriptions, the drugs must be procured from an entity with a manufacturer's license.[76]

---

[72] Ex. L, Kelvas Dep. 163:14-164:14.
[73] Ex. L, Kelvas Dep. 104:8-105:6.
[74] Ex. L, Kelvas Dep. 105:7-21.
[75] Ex. L, Kelvas Dep. 96:23-97:5.
[76] Ex. L, Kelvas Dep. 97:13-22.

Dr. Grinder of the Tennessee Board of Pharmacy testified that in Tennessee procuring medications, in bulk and without individual prescriptions, from compounding pharmacies was not lawful.[77]  Whenever healthcare providers called his office with questions about compounding pharmacies, Dr. Grinder explained that medications could only be procured from compounding pharmacies by using individual prescriptions based upon the prescriber-patient-pharmacist relationship.[78] Bulk purchases without prescriptions could not be made from compounding pharmacies. Bulk purchases could only be made from entities with a wholesaler or manufacturer license. NECC did not have such a license.[79]

After confirming that NECC's solicitation was not legal, Dr. Kelvas instructed all pharmacy personnel on the non-profit side of the Saint Thomas Health system (e.g., Saint Thomas West Hospital in Nashville, Saint Thomas Midtown Hospital in Nashville, Saint Thomas Hospital for Specialty Surgery in Nashville and Saint Thomas Rutherford Hospital in Murfreesboro) not to purchase from compounding pharmacies.[80]  However, Saint Thomas Health leadership failed to instruct anyone on the for-profit side of its organization (including Saint Thomas Clinic) not to buy in bulk from compounding pharmacies.[81]

**B.**     **Saint Thomas Clinic Purchases Injectable Steroids in Bulk from NECC.**

John Culclasure, M.D. is Saint Thomas Clinic's Medical Director. Debra Schamberg, R.N. is the clinic's Facilities Director. Ms. Schamberg has no pharmacy training. Dr. Culclasure and Ms. Schamberg jointly made the decision for Saint Thomas Clinic to make bulk purchases of methylprednisolone acetate ("MPA") from NECC without individual patient prescriptions.[82]

---

[77] Ex. M, Grinder Dep. 23:18-19, 28:18-22, 29:3-8.
[78] Ex. M, Grinder Dep. 31:13-23.
[79] Ex. M, Grinder Dep. 28:18-29:4.
[80] Ex. L, Kelvas Dep. 109:24-111:12.
[81] Ex. L, Kelvas Dep. 120:1-12.
[82] Ex. N, Culclasure Dep. 116:2-5; 177:24-178:4; Ex. I, Schamberg Dep. 56:3-4.

Despite Dr. Culclasure and Ms. Schamberg's testimony that they carefully reviewed

NECC's promotional literature before approving the purchase of MPA from NECC, they ignored

the following statement:

### G. Dispensing

Product is dispensed by patient-specific prescription only. There must be a specific practitioner-patient-pharmacist relationship to dispense to an individual patient or facility.[83]

In spite of that statement, Saint Thomas Clinic proceeded with bulk purchases of MPA from

NECC (frequently in 500 vial batches) without using patient-specific prescriptions. According to

Dr. Culclasure, more than one hundred (100) patients got sick after receiving contaminated

epidural steroid injections at Saint Thomas Clinic. Thirteen (13) patients died.[84]

### C. Plaintiffs' Direct Negligence Claims Are Supported by Highly Competent Expert Testimony.

James Gray, III, PharmD., MBA is the Executive Director of Pharmacy at Barnes-Jewish

Hospital in St. Louis, Missouri. He has served in that institution's pharmacy leadership position

since 1983. He was a member of the Missouri Board of Pharmacy from 1997 through 2002 and

served as its President from 2001 until 2002.

Dr. Gray has offered the following opinions regarding the conduct of Saint Thomas

Health, Saint Thomas Hospital, and Saint Thomas Network:

Products from compounding pharmacies are inherently less safe and more risky than

FDA approved drugs made by FDA licensed pharmaceutical manufacturers. A June 3, 2013,

report prepared for Congress by the Congressional Research Service stated that 33% of

compounded drugs sampled by the FDA in 2006 failed analytical testing, much higher than

commercially prepared and FDA regulated drugs where only 2% failed testing. FDA regulated

---

[83] Ex. I, Schamberg Ex. 31, p. 10.
[84] Ex. N, Culclasure Dep 14:8-15.

pharmaceutical manufacturers are required to follow strict manufacturing and quality control standards known as current Good Manufacturing Practices (cGMP – 21 CFR Parts 210 and 211). Those standards are much more stringent, and produce products that are much less likely to contain harmful contaminants or variations in content, than products made by compounding pharmacies.[85]

Compounding pharmacies are regulated by state boards of pharmacy and do not operate under the same degree of safety focused scrutiny. Defects in compounded drugs are primarily detected after the products are sold and administered to patients. The stringent pre-release testing required of FDA regulated manufacturers under cGMP insures production errors are less likely to occur. Further, when defects do occur, commercially manufactured drug defects are usually detected prior to distribution.[86]  The comparable risks of purchasing from a compounding pharmacy, on the other hand, are significant as well as potentially lethal, as demonstrated in case histories from around the country.[87]

NECC is a compounding pharmacy and could not lawfully sell compounded drugs in Tennessee except in response to an individual patient prescription based upon a specific prescriber-patient-pharmacist relationship. NECC could not lawfully sell compounded drugs in bulk in Tennessee.[88]

The Saint Thomas Health system (including Saint Thomas Health, Saint Thomas Hospital, Saint Thomas Network, and Saint Thomas Clinic) failed to protect the safety of its patients by making sure that no entity, either not-for-profit or for-profit, in the Saint Thomas

---

[85] Ex. S, Declaration of James Gray, III, Pharm.D., MBA, ¶ 39.
[86] *Id*.
[87] *Id*. ¶ 40.
[88] *Id*. ¶41; Ex. M, Grinder Dep. 28:18-22, 29:3-8, 31:13-20.

Health system purchased illegally sold compounded drugs in violation of Tennessee drug laws and in violation of federal drug laws.[89]

Dr. Schatzlein, President and CEO of Saint Thomas Health, testified that Saint Thomas Clinic is a for-profit joint venture which is part of the Saint Thomas Health system.[90] This meant the Clinic was required to adhere to the policies and philosophies of the Saint Thomas Entities.[91] Schatzlein himself recognized the Saint Thomas Entities' "moral obligation" to patients of the Clinic.[92] In fact, Schatzlein testified that one of the reasons to use the common "Saint Thomas" name across facilities was to "signal to our associates that we're all working together for the same cause … to motivate them around patient service, patient experience, that reaches a standard level."[93] Dawn Rudolph, CEO of Saint Thomas Hospital, testified that Saint Thomas expects all the health care practitioners within the system to meet the standard of care.[94] Certainly patients would expect both the for-profit and the non-profit Saint Thomas facilities to provide the same level of patient safety and care.[95]

Saint Thomas Health CEO Michael Schatzlein confirmed that, if Saint Thomas recognized that there was a patient safety problem at its joint venture that bears the Saint Thomas

---

[89] Ex. S, Gray Declaration ¶ 43.

[90] Ex. A, Schatzlein 4/6/15 Dep. 21:18-22:6, 142:20-25.

[91] Ex. E, Butler Ex. 60 at STOPNC-011563 (Cynthia Figaro wrote to STOPNC and said "The STHe Corporate Responsibility Program requires that we ensure that any business associates who generate billings must have evidence of an effective compliance plan. I am requesting that you complete the enclosed questionnaire.").

[92] Ex. Q, Rudolph Ex. 233.

[93] Ex. A, Schatzlein 4/6/15 Dep. 51:7-51:11.

[94] Ex. Q, Rudolf 4/21/15 Dep. 50:21-52:7 ("Q: Does St. Thomas expect that all of the healthcare practitioners within its ministry and joint ventures will meet the applicable standard of care? … A: …I would expect that we have the ability to review for standard of care and that there would be processes in place to review and sanction should standard of care not be met.").

[95] Ex. L, Kelvas Dep. 172:12-173:8 (agreeing that "they would expect the same level of care at STOPNC that they would receive at Saint Thomas Hospital or any of the other Saint Thomas entities").

name, they would have acted.[96] Schatzlein would expect the Saint Thomas board members that were on the Clinic's board to address any patient safety problems that came to their attention as far as the Clinic was concerned.[97]

As mentioned above, the pharmacy director of Saint Thomas Hospital confirmed with the Tennessee Board of Pharmacy that NECC could not sell compounded drugs in Tennessee without both a patient-specific prescription and a genuine prescriber-patient-pharmacist relationship. He then communicated that information across the non-profit side of the Saint Thomas Health system in early 2011. Despite those communications, Saint Thomas Health and Saint Thomas Hospital failed to notify personnel on the for-profit side of the system - Saint Thomas Clinic - that purchasing compounded medications, in bulk and without individual prescriptions, was not lawful in Tennessee.[98] In addition, Saint Thomas Health, Saint Thomas Network, Saint Thomas Hospital, and Saint Thomas Clinic, all as part of the Saint Thomas Health system, failed to take appropriate measures to insure that well trained drug procurement personnel were in place at, or available to, Saint Thomas Clinic in order to protect the safety of patients when procuring steroids for use in ESIs.[99]

All patients of the Saint Thomas Health system, including those of Saint Thomas Clinic, deserve the same degree of care and safety in medication procurement. The failure by the Saint Thomas Health system (including Saint Thomas Health, Saint Thomas Network, Saint Thomas Hospital, and Saint Thomas Clinic) to make sure that medications were not purchased from

---

[96] Ex. A, Schatzlein 4/6/15 Dep. 98:5-98:21.
[97] Ex. A, Schatzlein 4/6/15 Dep. 98:25-99:4.
[98] Ex. S, Gray Declaration ¶ 44.
[99] *Id.*

compounding pharmacies, in bulk and without individual prescriptions, fell below the standard of care for a health system and was negligent and reckless.[100]

## V.    CONCLUSION

As is evident from the facts recited above, and the PSC's response to Defendants' statement of "undisputed" facts, the material facts underlying Plaintiffs' vicarious and direct liability claims against the Saint Thomas Entities are very much in dispute. Those factual disputes should be resolved by the jury at trial. The Saint Thomas' Entities' request for summary judgment should be denied.

Dated:  April 20, 2016                          Respectfully submitted,

_____

Mark P. Chalos
Annika K. Martin
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219-2417
Telephone:  (615) 313.9000
Facsimile:  (615) 313.9965
mchalos@lchb.com
akmartin@lchb.com

*Federal/State Liaison and* Pro Se *Liaison*

---

[100] *Id.* ¶ 45

Thomas M. Sobol
Kristen Johnson
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Telephone:  (617) 482-3700
Facsimile:  (617) 482-3003
tom@hbsslaw.com
kristenj@hbsslaw.com

*Plaintiffs' Lead Counsel*

J. Gerard Stranch, IV
Benjamin A. Gastel
Anthony A. Orlandi
BRANSETTER, STRANCH & JENNINGS PLLC
227 Second Avenue North
Nashville, TN  37201
Telephone:  (615) 254-8801
Facsimile:  (615) 255-5419
gerards@branstetterlaw.com
beng@branstetterlaw.com
aorlandi@bsjfirm.com

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI  48075
Telephone:  (248) 557-1688
Facsimile:  (248) 557-6344
marc@liptonlawcenter.com

Kim Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue, Suite 365
Boston, MA  02116
Telephone:  (617) 933-1265
kdougherty@myadvocates.com

Mark Zamora
ZAMORA FIRM
6 Concourse Way, 22nd Floor
Atlanta, GA  30328
Telephone:  (404) 451-7781
Facsimile:  (404) 506-9223
marc@markzamora.com

Patrick T. Fennell
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, VA  24016
Telephone:  (540) 342-2000
pfennel@crandalllaw.com

*Plaintiffs' Steering Committee*

## <u>CERTIFICATE OF SERVICE</u>

I, Annika K. Martin, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated:  April 20, 2016

_____
Annika K. Martin

1301446.2                          -27-