# EXHIBIT D

## In the Matter Of:

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

## VIDEOTAPED DEPOSITION OF GREGORY B. LANFORD, M.D.

*September 18, 2015*



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

Page 13

1  Center?
2  A.  Yes, I do.
3  Q.  Okay. What was your role with respect to
4  starting STOPNC?
5  A.  In the late '90s, all of us -- when I say "all
6  of us," all the neurosurgeons in our practice; there
7  were five or six of us at that point -- were doing the
8  majority of our work at Saint Thomas Hospital, but also
9  some work at what was then Parkview Hospital, as well as
10  Memorial Hospital.
11      And we realized that at least 60 percent of
12  what we did, we could do as an outpatient in regards to
13  the surgery -- surgical procedures we were performing:
14  anterior cervical fusions, lumbar laminectomies, those
15  sorts of things.
16      And we approached, basically, HCA -- at that
17  point, Baptist was still in existence -- and
18  Saint Thomas with a business plan to start an outpatient
19  neurological surgery center.
20  Q.  What time frame are we talking?
21  A.  1999. And I think at that point, we were doing
22  most of our work at Saint Thomas, and Saint Thomas was
23  strongly wanting to be our partner in that regard.
24      As you know, Tennessee is a certificate of need
25  state, and so to start an entity like that, we were

Page 14

1  going to need a hospital partner, and Saint Thomas was a
2  logical partner in that, and they were actually excited
3  to -- to start the venture.
4      So in 1999, we got a certificate of need and
5  actually opened the center at the end of '99 or the
6  first of 2000. And we were doing outpatient spinal
7  surgery there, in addition to epidural steroid
8  injections.
9  Q.  Was there anything -- was there any reason
10  connected with the certificate of need that required you
11  to use the Saint Thomas name and the center's name?
12  A.  I don't think the name as such. I felt like at
13  least an environment of getting a certificate of need at
14  that point, a hospital partner was necessary. I'm not
15  sure there was a naming issue that was necessary, but it
16  was on their campus, and they were our 50/50 partner.
17  And, therefore, we did use their name.
18  Q.  Was the notion always after you pro- -- well,
19  let me back up.
20      Did Neurological Surgeons approach Saint Thomas
21  with this idea?
22  A.  Yes.
23  Q.  Were you involved in that approach?
24  A.  Yes.
25  Q.  Who did you speak with?

Page 15

1  A.  Tom Beeman was the administrator of Saint
2  Thomas at that point, the CEO, and he was involved in
3  the conversations at that point, as well as Berry Holt,
4  who was their attorney at that point.
5      I think John Voigt was our attorney at that
6  time, and it was basically myself and a fellow named
7  Mark Mason, who was our administrator at that time, as
8  well as Everette Howell and myself.
9  Q.  Did you at that time have a position within
10  Neurological Surgeons?
11  A.  I was president of the group then.
12  Q.  Okay. When did you become president of that
13  group?
14  A.  1997.
15  Q.  Okay. And you've been president of either
16  Neurological Surgeons or Howell Allen from 1997 through
17  today?
18  A.  That's correct.
19  Q.  When was the first discussion of what the
20  clinic's name would be? Was it in that first meeting or
21  sometime after that?
22  A.  I don't recall.
23  Q.  Were you involved in the discussions about
24  naming?
25  A.  I was.

Page 16

1  Q.  Was there ever consideration of using a
2  different name?
3  A.  There might have been some variations on the
4  theme of "Saint" -- "Saint Thomas" and "Neurosurgical"
5  and "Center," but I'm not sure. I think that was --
6  something around that name was going to be what it was
7  going to be called. There was never -- it was never
8  going to be called "Neurological Surgeons Outpatient
9  Center" or -- I think "Saint Thomas" was always going to
10  be part of that.
11  Q.  Okay. Why is that?
12  A.  It was on their campus. It was in a medical
13  office building that was on their campus, and they were
14  our 50/50 partner in the venture.
15  Q.  At that time, going back to when the center was
16  first opened, did the Saint Thomas name have a meaning
17  in the community?
18  A.  I felt, yes, Saint Thomas had a very good
19  reputation, as it still does today.
20  Q.  And part of the thinking about the name was to
21  capitalize on the Saint Thomas's good reputation in the
22  community?
23  A.  I can't --
24      MR. SCHRAMEK: Object to the form.
25      THE WITNESS: I can't tell you that that's

Page 45

1  practice of neurosurgery were growing up in the time of
2  managed care and the -- and the lurking changes that
3  supposedly were coming in the early 2000s with how
4  healthcare was going to be administered, and we needed
5  to find efficiencies of care.
6      We felt it was much more efficient in regards
7  to helping patients in an outpatient setting. The
8  advantages of having a procedure performed in an
9  outpatient center versus doing outpatient surgery in a
10 hospital is tremendous. You have to -- you basically
11 have two environments to deal with instead of 12 for the
12 same procedure.
13     So not only was it more efficient for the
14 patient, safer for the patient, better outcomes; it
15 just -- in my mind, that's what I'd grown up with, and
16 it made sense to me. And I think that was why I was one
17 of the major drivers to have that done.
18 Q.   And, ultimately, there was arrangement whereby
19 Saint Thomas would handle the managed care contracts for
20 STOPNC; is that right?
21 A.   They did and still do, yes.
22 Q.   Saint Thomas brought to the venture with Howell
23 Allen Clinic a number of resources, right, that the
24 clinic could pull from?
25 A.   Yes.

Page 46

1  Q.   And those resources included the patient
2  transfer agreement whereby patients can be taken, if
3  they needed to be, from the STOPNC into -- directly into
4  the Saint Thomas Hospital?
5  A.   Correct.
6  Q.   And another one of those resources that Saint
7  Thomas brought to the arrangement was the ability to
8  manage the managed care contracts, right?
9  A.   Yes.
10 Q.   And there were some other agreements with the
11 Saint Thomas Hospital group that -- whereby they
12 provided some services to STOPNC?
13 A.   Credentialing and services such as that, yes.
14 Q.   And they sterilized some of the equipment as
15 well, right?
16 A.   When you say "sterilized some of the
17 equipment," I'm not sure what you mean.
18 Q.   Yeah. They -- there was an agreement by which
19 Saint Thomas Hospital provided some of the sterilization
20 services for some of the medical equipment that were to
21 be used?
22 A.   I don't recall specifically that agreement, but
23 it's possible that that existed, yes.
24 Q.   And there was also an agreement whereby
25 Saint Thomas Hospital and their affiliates would provide

Page 47

1  some mechanical services for some of the equipment
2  within the STOPNC? Do you remember that?
3  A.   Yes.
4  Q.   Was one of the considerations in partnering
5  with Saint Thomas the notion that Saint Thomas
6  physicians and administration had certain expertise that
7  could serve as a resource for the STOPNC if needed?
8  A.   I'm not sure I understand the question.
9  Q.   Yeah. The Saint Thomas Hospital was a
10 well-established facility at this point, right?
11 A.   Yes.
12 Q.   I'm talking about 1999. And they knew how to
13 run a hospital for sure, right?
14 A.   Yes.
15 Q.   And did they also have at that time outpatient
16 centers that the Saint Thomas group were in?
17 A.   I don't know the answer to that.
18      MR. SCHRAMEK: Object to the form.
19 BY MR. CHALOS:
20 Q.   Did Saint Thomas have ambulatory surgery
21 centers that it was either a part owner or a full owner
22 of at that time?
23 A.   There was a -- there's an outpatient surgery
24 center at Saint Thomas that I'm not sure was there in
25 1999 or 2000. And I'm not -- I don't recall what their

Page 48

1  outpatient setup was for surgery at that point, if they
2  had a separate outpatient center or if it was just done
3  in the main operating room and then treated as an
4  outpatient. I don't recall.
5  Q.   When you first approached Saint Thomas about
6  creating the STOPNC, was there a discussion about what
7  type of procedures would be done in that facility?
8  A.   Yes.
9  Q.   And at that time, there was a notion that spine
10 surgeries would be done there?
11 A.   Yes.
12 Q.   And they were done for some period of time?
13 A.   Yes.
14 Q.   And then at some point, the spine surgeries
15 were no longer being done at STOPNC?
16 A.   They were moved to a different location, that's
17 correct.
18 Q.   Okay. When was that?
19 A.   2005.
20 Q.   Why did that happen?
21 A.   Saint Thomas -- the converse happened at that
22 point. Saint Thomas approached us about an opportunity
23 at the Baptist North Tower. They had a hospital there
24 that was a women's hospital, and the physicians in the
25 women's hospital didn't -- it was being underutilized,

Page 113

1   medication, no.
2   Q.   Has STOPNC changed the way it's ordered
3   medication as a result of this outbreak?
4   A.   I don't know if they've changed the way they
5   order it, no.
6   Q.   Has STOPNC changed the way it evaluates vendors
7   before it purchases medication as a result of this
8   outbreak?
9   A.   I don't know.
10  Q.   As part of your search for answers, have you
11  undertaken to determine who's at fault for causing the
12  outbreak?
13  A.   I've made no independent research, no.
14  Q.   Has anyone other than lawyers undertaken that
15  research at Howell Allen?
16  A.   Not to the best of my knowledge, no.
17  Q.   Has anybody at STOPNC, other than lawyers,
18  tried to figure out who's as fault for the outbreak?
19  A.   Not to the best of my knowledge.
20  Q.   Let's please go back to Exhibit 73, the exhibit
21  we were just talking about.
22       Why was it important to you in late September
23  2012 that Howell Allen still remain anonymous with
24  respect to this press conference?
25  A.   Because we didn't have all the answers of what

Page 114

1   was going on in this outbreak, and we didn't have -- we
2   were trying to have one message via Saint Thomas
3   communications, because we didn't have the same
4   infrastructure to deal with that.
5   Q.   And so Howell Allen was relying on Saint Thomas
6   to handle the media relations and the public relations?
7   A.   It wasn't Howell Allen so much; STOPNC.  Saint
8   Thomas is a partner in STOPNC, and that was a role they
9   were assuming, yes.
10  Q.   Did Howell Allen or STOPNC pay any money to
11  the -- whoever Rebecca Climer worked for, for her to
12  handle the PR?
13  A.   I have no idea.
14  Q.   Did Howell Allen pay any money, to your
15  knowledge?
16  A.   Not to my knowledge, no.
17  Q.   The next email on Exhibit 73 is from Rebecca
18  Climer to you and others, September 28th at 6:20 a.m.
19  She said, "If we can move the state off a press
20  conference in our 7:00 a.m. call, that will be
21  significant.  We do need to be realistic in
22  understanding that whether it is a press conference or a
23  press release, anonymity is going to be short-lived
24  given the calls that we have made, the multiple
25  facilities involved, et cetera."

Page 115

1       Do you see that?
2   A.   Yes.
3   Q.   Do you have any idea what she was talking about
4   when she said, "Anonymity is going to be short-lived
5   given the calls we have made and the multiple facilities
6   involved"?
7   A.   Because we'd been calling patients about the
8   issues we were having.
9   Q.   And then she asks, "What does SVMIC advise the
10  STOPNC board in this regard?"
11       Do you see that?
12  A.   Yes.
13  Q.   And what is SVMIC?
14  A.   State Volunteer Mutual Insurance.  They do our
15  liability insurance for the physicians.
16  Q.   For Howell Allen as well?
17  A.   Howell Allen facility, yes.
18  Q.   Howell Allen and STOPNC?
19  A.   Yes.
20  Q.   Okay.  And then your response to that -- I'm
21  sorry; Mr. Butler's response that email said, "We have
22  spoken with our attorneys who feel that we have used the
23  medication/supplies properly and handled it
24  appropriately.  SVMIC has advised us to make no
25  comment."

Page 116

1       Do you see that?
2   A.   Yes.
3       MR. GIDEON:  That's not all it says, Mark.
4   You've left out the last sentence.
5       MR. CHALOS:  Yeah.
6   BY MR. CHALOS:
7   Q.   "SVMIC has advised us to make no comment."
8       Is that true?
9   A.   Yes.
10  Q.   And then Mr. Butler went on to say, "Too many
11  questions unanswered"?
12  A.   Correct.
13  Q.   What questions were unanswered at that point?
14  A.   There were a myriad of questions that were
15  unanswered.  No one had all the answers about what was
16  going on and what was causing the outbreak.
17  Q.   Were you involved in the discussions with
18  SVMIC?
19  A.   I don't recall.
20  Q.   Who notified the insurance company about this
21  outbreak?  Do you know?
22  A.   I assume Mr. Butler, but I'm not sure of that.
23  Q.   Was there a concern by STOPNC that there might
24  be -- they might be held civilly liable for this
25  outbreak?