# EXHIBIT E

## In the Matter Of:

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION

## VIDEOTAPED DEPOSITION OF SCOTT BUTLER

*February 05, 2015*



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

Page 21

1  That's how it began and that's how it has functioned
2  over the last 13 years."
3     Have I read those sentences correctly?
4  A.  Yes.
5  Q.  Is the material and the words that you
6  wrote for Dr. Lanford, are those words true?
7  A.  I'm not sure what you mean by are they
8  true.
9  Q.  Are you unfamiliar with that term?
10 A.  I'm just not sure what -- are you -- if
11 you're saying that the document is -- how you read it
12 is how I typed it, then, yes. I'm not sure what
13 you're asking me --
14 Q.  Well --
15 A.  -- is true or not.
16 Q.  When you were writing this at Dr. Lanford's
17 request, did you endeavor to make sure that the
18 verbiage you selected was truthful?
19 A.  I guess I would say I'm not -- I'm not sure
20 that I would say truthful. I would say that this is
21 my opinion on the situation.
22 Q.  All right. That was your honest opinion at
23 the time; correct?
24 A.  Correct.
25 Q.  All right. Now, the sentence that begins,

Page 22

1  "Our group," which we've already read. "Our group had
2  never considered this joint venture to be anything
3  other than a partnership between St. Thomas Hospital
4  and Howell Allen Clinic," who is "our group"?
5  A.  Howell Allen Clinic.
6  Q.  All right. And then when you say, "That's
7  how it began." Are you referring to -- is "it" St.
8  Thomas Neurosurgical?
9  A.  Yes.
10 Q.  Okay. And it says, "That's how it began
11 and that's how it has functioned over the last
12 13 years." "It" is still St. Thomas Neurosurgical;
13 correct?
14 A.  Yes.
15 Q.  All right. And then continuing on, it
16 says, "The management of the facility has shared
17 responsibilities between our group and your hospital.
18 Until your arrival, the administrator at St. Thomas
19 Hospital has always been on the board at STOPNC."
20    Did I read that correctly?
21 A.  Yes.
22 Q.  All right. And then it says, "The Howell
23 Allen Clinic has had a long -- a very long and
24 successful partnership with St. Thomas Hospital."
25    Did I read that correctly?

Page 23

1  A.  Yes.
2  Q.  What partnership are you referring to?
3  A.  I think if I was -- going back and looking
4  at it, I think I would say that that partnership to me
5  could probably be replaced with relationship, really
6  referring to our relationship with St. Thomas
7  Hospital. That our physicians had been at St. Thomas
8  Hospital for roughly 40 years in some form or fashion.
9  Q.  Did Dr. Lanford eventually send this e-mail
10 to Dawn Rudolph?
11 A.  I believe so, but I'm not sure.
12 Q.  Can you tell me how the name St. Thomas
13 Neurosurgical was selected.
14 A.  I don't know.
15 Q.  Do you know who chose that name?
16 A.  I don't know.
17 Q.  Do you know why that entity has continued
18 to use that name since you've been there?
19 A.  I think that was the name that it was
20 started with and there's just never been any
21 initiative to change it.
22 Q.  Do you think that St. Thomas Surgical, by
23 using the St. Thomas name, has benefited from that?
24 A.  No, I don't think so.
25 Q.  All right. And if we look at the e-mail,

Page 24

1  at the bottom is Dr. Lanford's e-mail to you asking
2  you to draft an e-mail for Dawn. Dawn Rudolph;
3  correct?
4  A.  Correct.
5  Q.  And he suggested that you send a copy -- or
6  he intended to send a copy of the e-mail apparently to
7  MS. Does that stand for Mike Schatzlein?
8  A.  I would think so.
9  Q.  And Mike Schatzlein at that point in time
10 was the president and CEO of St. Thomas Health?
11 A.  I think so.
12 Q.  All right. But is Mr. Schatzlein a
13 physician?
14 A.  Yes.
15 Q.  Okay. So Dr. Schatzlein was not on the
16 board of St. Thomas Neurosurgical; is that correct?
17 A.  Correct.
18 Q.  Was Ms. Rudolph on the board?
19 A.  I believe at that time she was on the
20 board.
21 Q.  And for what purpose did Howell Allen and
22 St. Thomas come together and form St. Thomas
23 Neurosurgical?
24 A.  I'm not sure. I wasn't -- I wasn't there
25 at the time.

Page 25

1  Q. Well, what is your understanding of the
2  purpose that St. Thomas and Howell Allen Clinic had
3  operated St. Thomas Surgical since you were involved
4  beginning in 2007?
5  A. Since I've been involved, it's been
6  operating as a surgery center that does epidural
7  steroid injections, blocks.
8  Q. Okay. And as I understand it, the
9  ownership of that entity is shared equally between St.
10 Thomas and Howell Allen Clinic; is that correct?
11 A. Yes.
12 Q. But the profits from that entity are
13 distributed equally; is that correct?
14 A. Yes.
15 Q. And it is a for-profit entity?
16 A. Yes.
17 Q. And the profits are calculated after
18 expenses are paid; is that correct?
19 A. Yes.
20 Q. So that expenses are likewise shared
21 between the venturers; is that true?
22 A. Yes.
23 Q. And at the time of the meningitis outbreak,
24 who were the St. Thomas Neurosurgical board members?
25 A. Myself, Greg Lanford, Dale Batchelor and

Page 26

1  Dawn Rudolph.
2  Q. All right.
3  A. I'm not sure if Dawn or Alan Strauss was
4  the -- we didn't -- we don't have any control over the
5  St. Thomas board side, and their side changed -- has
6  changed over the last seven and a half years since
7  I've been there. So I'm not sure who --
8  Q. All right.
9  A. -- the -- it was two of those three I'm --
10 I'm pretty sure of that.
11 Q. Okay. All right. And so you -- Howell
12 Allen didn't have any control over who St. Thomas
13 selected to be its representatives on the board;
14 correct?
15 A. Correct.
16 Q. All right. And so we know who you are. We
17 know who Dr. Lanford is. Dale Batchelor was the chief
18 medical officer for St. Thomas Hospital; is that
19 correct?
20 A. Yes.
21 Q. And Dawn Rudolph was the CEO of St. Thomas
22 Hospital; correct?
23 A. Yes.
24 Q. And what position did Alan Strauss hold?
25 A. I believe he was the CFO of -- he was the

Page 27

1  CFO.
2  Q. Do you know whether that was a -- either
3  St. Thomas Hospital or St. Thomas Health?
4  A. I'm not sure if that was -- I'm not sure.
5  Q. And you were here during Ms. Schamberg's
6  deposition yesterday?
7  A. Yes.
8  Q. And you heard her indicate that she reports
9  to the board; correct?
10 A. Correct.
11 Q. Okay. And would I be correct in
12 understanding that if you as a board member gave a
13 directive to Ms. Schamberg, you would expect her to
14 follow that directive?
15 A. Yes.
16 Q. Would I be correct in understanding that if
17 Dr. Bachelor gave Ms. Schamberg a directive as a board
18 member of St. Thomas Neurosurgical, you would expect
19 her to follow that directive?
20 A. Yes.
21 Q. And would the same be true for Dr.
22 Culclasure?
23 A. If he gave her a directive, would she be
24 responsible for following it?
25 Q. Yes.

Page 28

1  A. I think depending on what -- what it is,
2  yes.
3  Q. And what was the purpose for having
4  representatives of St. Thomas on the St. Thomas
5  Neurosurgical board?
6  A. Because they own 50 percent of the -- of
7  the surgery center.
8  Q. Okay. Would I be correct in understanding
9  that both Howell Allen Clinic and St. Thomas -- and
10 St. Thomas had an equal right to control St. Thomas
11 Neurosurgical because their representation on the
12 board was equal?
13    MR. HOFFMAN: Objection to form.
14    THE WITNESS: I'm not sure what
15 you're asking.
16 Q. (By Mr. Nolan) Sure. The board
17 representation for Howell Allen and St. Thomas was
18 equal, each side had two members on the board for a
19 total of four; is that correct?
20 A. Yes.
21 Q. All right. So both members of the joint
22 venture had equal control as far as the venture itself
23 was concerned. You'll agree with that?
24 A. Yes.
25 Q. Let's look back at the e-mail, which is

```
                                                Page 29
 1   Exhibit 58. And in the last paragraph of your e-mail,
 2   you see the sentence that begins, "We hope that your
 3   decision to remain, quote, unaffiliated during this
 4   crisis is not a sign of the decline of our
 5   partnership."
 6          Do you see that?
 7      A.  Yes.
 8      Q.  And then it says, "At the Howell Allen
 9   Clinic, we remain fiercely loyal to St. Thomas
10   Hospital and our affiliation and dependence on you is
11   reflected in our excellence in patient care that
12   hasn't changed over -- in over 30 years."
13          Did I read that correctly?
14      A.  Yes.
15      Q.  And what does "affiliation and dependence
16   on you" mean?
17      A.  On the affiliation side, obviously our
18   ownership of a surgery center and then our physicians
19   that covered all the neurosurgery for St. Thomas
20   Hospital would be what I would be referring to.
21      Q.  All right. So that's the affiliation side.
22   What about dependence? What does that mean?
23      A.  I think the dependence would be that we
24   depend on St. Thomas Hospital. That's where we take
25   care of patients for our group and in their hospital.
```

```
                                                Page 30
 1          (Exhibit 59 was marked for
 2          identification.)
 3      Q.  (By Mr. Nolan) Let me hand you a document
 4   that we're going to make Exhibit No. 59. And it is
 5   a -- it's a newspaper article that you were quoted in
 6   from the Tennessean. And I want to ask you if you
 7   read this article when it was published.
 8      A.  I'm sure I did read it when it was
 9   published.
10      Q.  Okay. Do you recall giving an interview to
11   the Tennessean, a writer named Josh Brown?
12      A.  Yes.
13      Q.  And at the bottom of the first page, you
14   talk about the center. Is that St. Thomas
15   Neurosurgical?
16      A.  Yes.
17      Q.  All right. And you say, "The center
18   started 12 years ago as a joint venture between St.
19   Thomas network, the parent corporation of St. Thomas
20   Hospital, and Howell Allen Clinic, a local group of
21   neurosurgeons."
22          Did you tell Mr. Brown that?
23      A.  Yes.
24      Q.  Okay. Now, is it your understanding that
25   ownership of half of the clinic is re -- resides in
```

```
                                                Page 31
 1   St. Thomas network?
 2      A.  I think that goes back to the question you
 3   asked earlier. I'm not sure who the official owner
 4   is.
 5      Q.  Okay. Let me ask you to assume that the
 6   operating agreement for St. Thomas Neurosurgical is,
 7   in fact, set up that way, it shows St. Thomas network
 8   is owning half of the company. But I'd also like you
 9   to assume that that -- that entity, St. Thomas
10   network, has zero employees. Do you know why it is
11   that it was set up such that at least on paper, half
12   of the ownership of St. Thomas Neurosurgical would
13   reside in an entity with zero employees?
14          MR. HOFFMAN: Objection to form.
15          THE WITNESS: No.
16      Q.  (By Mr. Nolan) Okay. And I take it, then,
17   that the people who actually served on the board of
18   St. Thomas -- St. Thomas Neurosurgical since you've
19   been there have been either employees of St. Thomas
20   Hospital or employees of St. Thomas Health; is that
21   correct?
22      A.  Yes.
23      Q.  All right. And then the next paragraph of
24   our article says, "Originally the center handling both
25   spinal surgery and epidural steroid injections" --
```

```
                                                Page 32
 1   excuse me. I messed that up. Let me start over.
 2          "Originally, the center handled both spinal
 3   surgery and epidural steroid injections. Since 2005,
 4   it has focused exclusively on pain management and
 5   gives roughly 500 -- 5,000 epidural steroid injections
 6   a year, Butler said."
 7          Did you -- did you represent that to
 8   Mr. Brown?
 9      A.  Yes.
10      Q.  And did you give your interview to
11   Mr. Brown in your capacity as a board member of St.
12   Thomas Neurosurgical?
13      A.  I'm not sure if I -- I'm not sure if I did
14   it as a board member or as a -- as the administrator
15   of Howell Allen Clinic. I mean, I guess it's one and
16   the same, but --
17      Q.  Okay. Fair enough. And what is the date
18   of -- that this article was published?
19      A.  October 17th, 2012.
20      Q.  Okay. Let me hand you a document that was
21   produced to us that we're going to make Exhibit
22   No. 60, and it is STOPNC_11563. Now, this is a letter
23   on St. Thomas Health letterhead dated the same date as
24   the -- as the article that was published in the
25   Tennessean?
```

Page 33

1    (Exhibit 60 was marked for
2    identification.)
3    MR. GIDEON: That must be the wrong
4    document, 11563, 011563.
5    Q.   (By Mr. Nolan) So this appears to be a
6    letter on St. Thomas Health letterhead that was
7    actually apparently sent the same day as the
8    Tennessean article; correct?
9    A.   Yes.
10   Q.   Okay. And it's a letter from someone named
11   Cynthia Figaro, who identifies herself as vice
12   president of corporate responsibility program. Do you
13   see that?
14   A.   Yes.
15   Q.   And it's to a woman named Shreka Rogers.
16   Do you know Ms. Rogers?
17   A.   Yes.
18   Q.   And who does she work for?
19   A.   She's the billing manager for Howell Allen.
20   Q.   Okay. And the letter indicates that she's
21   the coding and compliance manager for St. Thomas
22   Neurosurgical. Do you see that?
23   A.   Yes.
24   Q.   Does she also serve that function?
25   A.   No. She's the -- she's our billing manager

Page 34

1    and since we manage the facility, she manages the
2    billing.
3    Q.   Okay.
4    A.   I don't -- I've never seen her referred to
5    as the coding and compliance manager.
6    Q.   Okay. And this is what she says in the
7    first sentence. "St. Thomas Health is a partner with
8    your company in the St. Thomas Outpatient Neurological
9    Center, LLC joint venture."
10   Did I read that correctly?
11   A.   Yes.
12   Q.   Is that referring to what you call STOPNC
13   and I call St. Thomas Neurosurgical?
14   A.   Yes.
15   Q.   Okay. Were you aware that St. Thomas
16   Health was referring to itself as a partner with your
17   company?
18   A.   No. I've never seen this letter.
19   Q.   Do you know -- I mean, how do you interpret
20   the phrase "your company"? Who is "your company"?
21   A.   I would assume Howell Allen.
22   Q.   Is it true that because Howell Allen and
23   St. Thomas were so bound together in this joint
24   venture that functioned as a partnership that you took
25   it upon yourself after the outbreak to influence the

Page 35

1    hospital's PR moves?
2    MR. HOFFMAN: Objection to form.
3    MR. GIDEON: Objection to the form.
4    THE WITNESS: No.
5    Q.   (By Mr. Nolan) Did you take it upon
6    yourself to influence the hospital's PR moves?
7    A.   No.
8    Q.   Why not?
9    A.   Why did I not try to influence their PR
10   moves?
11   Q.   Yeah. Why not?
12   A.   I think because I feel like I don't have
13   any control over their PR department.
14   (Exhibit 61 was marked for
15   identification.)
16   Q.   (By Mr. Nolan) Let me hand you an e-mail
17   that we'll make Exhibit No. 61. And this is at St.
18   Thomas entities 014181. And let me ask you if you've
19   seen this before?
20   MR. GIDEON: Let me see the document
21   number -- the Bates number again.
22   Q.   (By Mr. Nolan) You've seen this before.
23   This is an e-mail from you to Dawn Rudolph; is that
24   correct?
25   A.   Yes.

Page 36

1    Q.   And it's an e-mail that you sent on October
2    the 9th, 2012; is that right?
3    A.   Yes.
4    Q.   And the subject is "Two things"; is that
5    correct?
6    A.   Yes.
7    Q.   Could you read into the record the two
8    things that you e-mailed to Ms. Rudolph.
9    A.   "No. 1, our group would like to buy lunch
10   for the ER staff tomorrow. Who can I talk to about
11   coordinating this effort? No. 2, Standard has a great
12   idea. He would like for St. Thomas to have a day of
13   prayer for the patients and families affected by the
14   meningitis outbreak. Good PR move."
15   Q.   Now, Standard refers to Dr. Standard; is
16   that correct?
17   A.   Yes.
18   Q.   And is he one of the owners of Howell Allen
19   Clinic?
20   A.   Yes.
21   Q.   And when did you decide that having St.
22   Thomas organize a day of prayer for the patients and
23   families affected by the meningitis outbreak would be
24   a good PR move?
25   A.   I assume when I sent the e-mail.

Page 77

1    Anything that the Howell Allen Clinic staff has to do
2    for STOPNC.
3        Q.   Okay.
4        A.   That aren't STOPNC employees.
5        Q.   All right. What is your understanding of
6    what professional fees includes?
7        A.   I'm not sure. That's what I was saying,
8    I'm not sure if professional fees is the management
9    fee or purchased services.
10       Q.   I gotcha. Okay. Let me hand you a
11   collection of documents we'll make Exhibit No. 70. It
12   begins at STOPNC_0712, and can you tell us what these
13   documents are.
14           (Exhibit 70 was marked for
15       identification.)
16           THE WITNESS: A service agreement.
17       Q.   (By Mr. Nolan) Okay. So this document is
18   the various services that Howell Allen Clinic provides
19   for St. Thomas Neurosurgical; is that right?
20       A.   Yes.
21           (Exhibit 71 was marked for
22       identification.)
23       Q.   (By Mr. Nolan) All right. Let me hand you
24   a set of documents we're marking Exhibit 71. It
25   starts at St. Thomas entities 003622, and ask you to

Page 78

1    tell us what this is.
2        A.   Looks like it's part of a recredentialing
3    application for Amerigroup on disclosure of ownership.
4        Q.   Okay. And so it's from Cindy Williams to
5    you, the e-mail is. Who is Cindy Williams?
6        A.   She works for St. Thomas.
7        Q.   All right. She's listed as being the
8    director of joint venture contract and managed care.
9    Do you see that?
10       A.   Uh-huh (affirmative).
11       Q.   Is that a yes?
12       A.   Yes.
13       Q.   Okay. And the next page gives information
14   about the ownership of St. Thomas Neurosurgical;
15   correct?
16       A.   Yes.
17       Q.   And it seems to have information about how
18   the various St. Thomas entities are interrelated. Do
19   you see that?
20       A.   Yes.
21       Q.   Okay. And then it lists the -- the
22   officers of St. Thomas Neurosurgical. Do you see
23   that?
24       A.   Yes.
25       Q.   Is that synonymous with the board?

Page 79

1        A.   Yes, that's the same thing as the board.
2        Q.   Same thing as the board. Okay. And so
3    does this refresh your memory as to who the board
4    members were at the time of the outbreak?
5        A.   Yes.
6        Q.   All right. So these four people listed as
7    official officers, those were the four board members
8    of St. Thomas Neurosurgical at the time of the
9    outbreak?
10       A.   Yes.
11           (Exhibit 72 was marked for
12       identification.)
13       Q.   (By Mr. Nolan) Let me hand you an e-mail
14   which we'll make Exhibit No. 72, STOPNC_0002431, and
15   let me ask you if you recognize that?
16       A.   Okay.
17       Q.   So you sent this e-mail to Ms. Schamberg in
18   May of 2012; is that correct?
19       A.   Yes.
20       Q.   All right. And what prompted you to send
21   this e-mail?
22       A.   Based on my memory, I had a meeting with
23   the secretaries who do the scheduling, and these were
24   the issues that they asked -- I asked them to e-mail
25   me the issues they were having and I e-mailed those to

Page 80

1    Debra.
2        Q.   Okay. And the fourth point that you list
3    is medication differences between the competition and
4    STOPNC. Do you see that?
5        A.   Yes.
6        Q.   What is that about?
7        A.   I think that was about how other surgery
8    centers around town would not make patients wait after
9    being off a medication. You know, a lot of times
10   they'll make a patient wait. They'll quit taking a
11   blood pressure medicine or something and have a
12   procedure within X number of days. And that was where
13   I believe we were making the patient wait longer than
14   the competition was after being off certain types of
15   medication. Other facilities were doing it quicker
16   than we were.
17       Q.   How did you first learn that there was a
18   problem associated with St. Thomas Neurosurgical in
19   September of 2012?
20       A.   John Culclasure called me on Wednesday
21   night, September the 19th, about a patient, I believe,
22   that was at Vanderbilt. And at the time, the patient
23   was a recent -- had received an injection at STOPNC, I
24   believe July 28th, 26th, 28th, something like that.
25       Q.   And did Dr. Culclasure indicate that it

Page 85

1  common person in all four of the rooms.
2  Q. So he was the common link in those four
3  patients that you were aware of at that time?
4  A. Correct.
5  Q. All right. And so what happened next?
6  A. The state came by that Friday, and then
7  starting the next week was when we were meeting with
8  the state, phone calls with the state, still didn't
9  have any idea what was going on, and it just kind of
10  progressed from there to calling the patients,
11  checking on them, you know, asking if they were okay,
12  if they had a problem. If so, send them to an ER and
13  then to sending letters.
14  Q. All right. Now, you said that there were
15  meetings with the state. Who was included in those
16  meetings?
17  A. I think those were more phone calls with
18  the state.
19  Q. Okay.
20  A. Conference calls. Culclasure was on -- I
21  believe he was on all of them. I believe Dr. Latham
22  was on -- from St. Thomas was on some of the calls. I
23  may have called in to one or two of them, but
24  clinically, I didn't know what they were talking about
25  so I don't think I continued to call in to those phone

Page 86

1  calls.
2  Q. Okay.
3  A. I would wait on Culclasure to tell me, hey,
4  this is what is going on, this is what we need to do.
5  Q. And in addition to meetings with the state,
6  were there any meetings with people at St. Thomas?
7  A. The STOPNC board, we met, I believe that
8  first week. I believe we had a conference call and a
9  meeting that week. I think the scary thing for us was
10  that more patients continued to get sick. So that was
11  the scary thing for us.
12  Q. And so was Dawn Rudolph included in any of
13  these meetings?
14  A. I believe so, yes.
15  Q. And what about Dr. Schatzlein?
16  A. I don't think so.
17  Q. Okay.
18  A. He might have been invited, but I don't
19  know if he was -- I don't remember him being on any
20  phone calls or any -- in any meeting.
21  Q. All right. And so we now know that at that
22  time Ms. Rudolph was not on the board of St. Thomas
23  Neurosurgical. The board representatives for St.
24  Thomas consisted of Dale Batchelor and Craig Polkow;
25  correct?

Page 87

1  A. Correct.
2  Q. And so why was Dawn Rudolph being included
3  in these post-outbreak meetings?
4  A. I think because the patients were going --
5  were -- there were patients at St. Thomas at the time
6  that were sick. I'm not sure if we were directing
7  patients to St. Thomas yet, but I know there were
8  patients at St. Thomas.
9  Q. All right. And how many meetings do you
10  recall being involved in in which Ms. Rudolph
11  attended?
12  A. Phone calls or face-to-face, sit down
13  meetings?
14  Q. Let's break it down. Let's talk about
15  face-to-face meetings first.
16  A. I believe just one.
17  Q. All right. And was that the meeting that
18  you referred to in the e-mail that you drafted for
19  Dr. Lanford that we talked about earlier?
20  A. I'm not sure.
21  Q. Okay. Was there a meeting where Ms.
22  Rudolph indicated that she wanted to be the buffalo?
23  A. Right. Yes.
24  Q. Okay. And what -- what did you take that
25  to mean, she wanted to be the buffalo?

Page 88

1  A. That I think the idea was that we wanted to
2  stand up and take care of the patients and not act
3  like we didn't know what was going on.
4  Q. So stand together and weather the storm, so
5  to speak?
6  A. Yes.
7  Q. All right. In addition to Ms. Rudolph as
8  well as Dr. Batchelor and Mr. Polkow, were there any
9  other St. Thomas representatives who participated in
10  any face-to-face meetings?
11  A. The only person I would think would have
12  been there would have been Dr. Latham.
13  Q. Okay.
14  A. I don't remember anybody else being there.
15  Q. Okay. And so what was the topic of these
16  meetings?
17  A. I think the first meeting was we didn't
18  know what it was -- what was going on at the time,
19  what do we do. Then I think later it was how are we
20  doing, how are we handling these phone calls, how are
21  we handling mailing these letters. You know, after
22  discussions with the state, you know, to determine
23  what we needed to do next and just to keep everybody
24  informed as to what we were doing.
25  Q. Okay. All right. Any other meetings that

Page 109

1  the chief communications and marketing officer of St.
2  Thomas Health would be determining what St. Thomas
3  Neurosurgical says to patients --
4       MR. TARDIO: Object to the form.
5  Q.  (By Mr. Nolan) -- when calls are made?
6  A.  I asked for her help.
7  Q.  Okay. And so why did you ask for the help
8  of the chief communications and marketing officer of
9  St. Thomas Health in determining what should be said
10 to patients by the neurosurgical center when calls
11 were made?
12 A.  I think because nobody in our -- in our
13 practice, in our management team had any experience
14 with an adverse situation and didn't really know how
15 to react to it.
16 Q.  And does Ms. Climer have any medical
17 training, to your knowledge?
18 A.  I don't know.
19 Q.  Okay. And then after Ms. Climer sends this
20 first e-mail to you, did you give her any feedback on
21 the proposed script?
22 A.  I don't think so.
23 Q.  And did St. Thomas Neurosurgical ever pay
24 Ms. Climer for the work that she did in connection
25 with this e-mail and other PR efforts after the

Page 110

1  outbreak?
2  A.  No.
3  Q.  And then the next e-mail further up,
4  Ms. Climer says to you and Dr. Batchelor, "Have Berry
5  review the script. He would like to add a statement
6  in case they ask, 'Why are you calling me,' say --
7  okay to say, 'There have been some reactions to the
8  procedure and we're calling to check and see if you
9  have had any reaction.'"
10      Did I read that correctly?
11 A.  Yes.
12 Q.  All right. And who is "they" in case they
13 ask? Who is "they"?
14 A.  The patients.
15 Q.  Okay. Now, is Berry a physician?
16 A.  No.
17 Q.  Okay. Is he a public health official?
18 A.  No.
19 Q.  Who is Berry?
20 A.  Berry Holt, an attorney for St. Thomas.
21 Q.  All right. So he's a lawyer who represents
22 St. Thomas Hospital and St. Thomas Health; is that
23 right?
24 A.  To my knowledge, yes.
25 Q.  Did it strike you as strange that a chief

Page 111

1  communications officer for St. Thomas Health and a
2  lawyer for St. Thomas Health would be scripting what
3  this particular ambulatory surgery center would say to
4  patients who might be suffering from a
5  life-threatening infection?
6       MR. HOFFMAN: Objection to form.
7       MR. TARDIO: Objection to form.
8       THE WITNESS: At the time, that was
9   the least of my worries, who was involved
10  with the script.
11 Q.  (By Mr. Nolan) Okay. Is it true that St.
12 Thomas was taking control of what St. Thomas
13 Neurosurgical would say because St. Thomas recognized
14 that St. Thomas Neurosurgical shared their name and
15 was their agent?
16      MR. HOFFMAN: Objection to form.
17      MR. TARDIO: Object to form.
18 Q.  (By Mr. Nolan) You can go ahead and
19 answer.
20 A.  I think we got a script from St. Thomas
21 because the state asked us to call the patients back
22 and neither me or Debra had any idea what we needed to
23 say. So we asked for their help because we really
24 didn't have any experience at all with any kind of
25 event like this.

Page 112

1  Q.  So in terms of what St. Thomas
2  Neurosurgical said to patients when it initially began
3  calling patients, it said -- it followed the script
4  that Ms. Climer provided through this e-mail; correct?
5  A.  To my knowledge, yes. I didn't hear every
6  call, but this was what script they were supposed to
7  follow.
8  Q.  Did the state ever tell anyone to your
9  knowledge to say anything to patients that was false?
10 A.  Can you ask the question again?
11 Q.  Did the state ever tell anyone to your
12 knowledge to make false statements to the
13 neurosurgical center's patients?
14 A.  No, I don't know that I would characterize
15 them as false statements. Maybe they would just be --
16 wouldn't contain the entire facts of the case. But at
17 this point, you have to remember we didn't know it was
18 the tainted steroid. We had no idea what it was. We
19 just had sick people in the hospital and were trying
20 to figure out how to take care of them.
21 Q.  Do you think that it is important for St.
22 Thomas Neurosurgical to be truthful anytime a patient
23 poses a question to it?
24 A.  Yes.
25 Q.  And do you think it's important for St.



Saint Thomas Health

October 17, 2012

Shreka Rogers
Coding & Compliance Manager
Saint Thomas Outpatient Neurological Center, LLC
4230 Harding Road, Suite 901
Nashville, TN 37205

Dear Shreka:

Saint Thomas Health is a partner with your company in the Saint Thomas Outpatient Neurological Center, LLC joint venture. The STHe Corporate Responsibility Program requires that we ensure that any business associates who generate billings must have evidence of an effective compliance plan. I am requesting that you complete the enclosed questionnaire and return to my attention by Thursday, November 1, 2012.

Haven't seen you in a while, hope everything is going well for you.

Sincerely,

Cynthia Figaro
Vice President of Corporate Responsibility Program

Enclosure

Corporate Responsibility Program
P.O. Box 380 • Nashville, TN 37202 • Phone: 615.222.6628 • Fax: 615.222.2880
www.saintthomas.org    Member Ascension Health

CONFIDENTIAL DISCOVERY MATERIAL                                          STOPNC-011563

| | |
|---|---|
| From: | Scott Butler(sbutler@howellallen.com) |
| To: | Dawn Rudolph |
| CC: | |
| BCC: | |
| Subject: | 2 things |
| Sent: | 10/09/2012 10:30:17 AM -0500 (CDT) |
| Attachments: | |

1. Our group would like to buy lunch for the ER staff tomorrow. Who can I talk to about coordinating this effort?

2. Standard has a great idea. He would like for St Thomas to have a "Day of Prayer" for the patients and families affected by the meningitis outbreak. Good PR move.



STE_MDL_014181