# EXHIBIT F

# In the Matter Of:

## NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

## VIDEOTAPED DEPOSITION OF SCOTT BUTLER

*September 17, 2015*



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

Page 37

1  negotiated?
2  A.   I don't know.
3  Q.   Was Howell Allen Clinic -- or, I'm sorry. Was
4  Howell Allen Clinic or its predecessor, Neurosurgical
5  Surgeons, PC, a part owner of this center when this was
6  executed?
7  A.   Yes.
8  Q.   Has any other entity other than Saint Thomas
9  Network ever owned the other half of the Saint Thomas
10 Center?
11 A.   I don't think so.
12 Q.   So the center has always been co-owned by an
13 organization that's affiliated with Saint Thomas Health?
14 A.   Yes.
15 Q.   And when did the center begin operations?
16 A.   2000.
17 Q.   Right about the time this services agreement
18 was executed, I assume?
19 A.   I believe so, yes.
20 Q.   Do you know if the services agreement had to be
21 approved by the Saint Thomas Center's board?
22 A.   I don't know.
23 Q.   The -- the monies that are received by Howell
24 Allen Clinic pursuant to this services agreement, are
25 those considered operating costs of the Saint Thomas

Page 38

1  Center?
2  A.   I don't know.
3  Q.   Who would know?
4  A.   Our accountant, Nina Bogle.
5  Q.   Is she in-house at Howell Allen Clinic?
6  A.   Yes.
7  Q.   Do you know if the revenue that Howell Allen
8  Clinic receives pursuant to this service agreement is
9  somehow offset by any distributions it receives from the
10 profits from Saint Thomas Center?
11 A.   No.
12 Q.   No, you don't know, or no, it's not offset?
13 A.   No, it's not offset.
14 Q.   So, in other words, Howell Allen Clinic gets
15 the revenue from the services agreement, plus its
16 proportional share of the profits from Saint Thomas
17 Center.
18 A.   Yes.
19 Q.   And I think you've more or less answered this
20 question, but you do not know how much total revenue in
21 2012 Howell Allen received pursuant to this services
22 agreement?
23 A.   No.
24 Q.   Do you know it for any year?
25 A.   No.

Page 39

1  Q.   Can you possibly approximate it?
2  A.   No.
3       MR. GASTEL:  We've been going about an
4  hour. Let's take maybe a ten-minute break. I'm sorry;
5  I had a little bit too much coffee this morning.
6       MR. TARDIO:  Okay.
7       THE VIDEOGRAPHER:  Everybody watch your
8  microphones, please. We're off the record at 10:06.
9       (Brief recess from 10:06 a.m. to
10      10:19 a.m.)
11      THE VIDEOGRAPHER:  We're back on the
12 record at 10:19.
13 BY MR. GASTEL:
14 Q.   Mr. Butler, do you sit on the center's board?
15 A.   Yes.
16 Q.   How long have you sat on the center's board?
17 A.   Since 2007.
18 Q.   Howell Allen is permitted to appoint two
19 members to the center's board, correct?
20 A.   Yes.
21 Q.   And so it's a four-person board?
22 A.   Yes.
23 Q.   And Saint Thomas Network has the authority to
24 appoint the other two persons who sit on the board?
25 A.   Yes.

Page 40

1  Q.   Who is the other Howell Allen representative on
2  the center's board?
3  A.   Greg Lanford.
4  Q.   How long have you and Mr. Lan- -- is it
5  Dr. Lanford?
6  A.   Dr. Lanford.
7  Q.   How long have you and Dr. Lanford sat on the
8  center's board?
9  A.   We've been on there together since 2007. I'm
10 not sure how long he's been on the board.
11 Q.   So you and Dr. Lanford have been the
12 center's -- or Howell Allen's representatives on the
13 center's board since 2007.
14 A.   Yes.
15 Q.   And you were there in 2012 during the
16 meningitis catastrophe?
17 A.   Yes.
18 Q.   What role does Howell Allen have in appointing
19 the other two members of the center's board?
20 A.   The Saint Thomas Network positions?
21 Q.   Correct.
22 A.   No role at all.
23 Q.   How are you informed when new people from the
24 Saint Thomas Network side of the board are going to be
25 appointed?

Page 41

1   A.   They tell us at the board meeting.
2   Q.   Fair to say that somebody else just shows up
3   and it's suddenly like they're on the center's board?
4   A.   Yes, sir.
5        MR. SCHRAMEK: Object to the form.
6        (Clarification by the reporter.)
7        MR. GASTEL: It's Adam Schramek's.
8   BY MR. GASTEL:
9   Q.   In 2012 who were the two Saint Thomas Network
10  representatives on the center's board?
11       MR. SCHRAMEK: Object to the form.
12       THE WITNESS: I don't know.
13  BY MR. GASTEL:
14  Q.   Was Dawn Rudolph on the board?
15  A.   I don't know.
16  Q.   Well, who was on the board of the center in
17  2012?
18  A.   Greg Lanford and myself from Howell Allen, and
19  I believe Dale Batchelor was on there for Saint Thomas,
20  but I don't know any -- I don't remember who the second
21  person was for Saint Thomas.
22  Q.   Well, who was attending board meetings in 2012?
23  A.   I don't remember.
24  Q.   Who sits on the board now?
25  A.   Bernie Sherry and Lisa Davis.

Page 42

1   Q.   How often does the board meet?
2   A.   Quarterly.
3   Q.   Generally, do all four board members show up at
4   the board meetings?
5   A.   Yes.
6   Q.   Who else attends board meetings?
7   A.   Debra Schamberg, John Culclasure, and Jennifer
8   Hendricks.
9   Q.   Who is Ms. Hendricks?
10  A.   She's the accounting representative from Saint
11  Thomas Health, Saint Thomas Network.
12  Q.   Was she attending board meetings in 2012?
13  A.   Yes.
14  Q.   To the best of your recollection, has she
15  attended all board meetings from 2011 to present?
16  A.   I don't know.
17  Q.   Do the board meeting minutes show who attends
18  the board meetings?
19  A.   Yes.
20  Q.   Who is responsible -- in 2012 who was
21  responsible for keeping board minutes?
22  A.   Debra Schamberg.
23  Q.   Is that true today?
24  A.   Yes.
25  Q.   I believe that you had previously identified

Page 43

1   Nina Bogle as Howell Allen's accountant.
2   A.   Yes.
3   Q.   Was she there in 2012?
4   A.   Yes.
5   Q.   How long has she been the inside accountant for
6   Howell Allen Clinic?
7   A.   At least 15 years. I'm not sure exactly.
8   Q.   I'm going to hand you a document that we'll
9   mark as Exhibit 597.
10       (Exhibit No. 597 was marked.)
11  BY MR. GASTEL:
12  Q.   Are you familiar with this document, sir?
13  A.   No.
14  Q.   Do you see there at the top of the document, it
15  says "Policy Title Management"?
16  A.   Yes.
17  Q.   And do you see at the bottom that there are --
18  date written is September 9th, 2000?
19  A.   Yes.
20  Q.   And then it looks like it's been revised twice,
21  in September of 2002 -- or I'm sorry; reviewed twice, in
22  September of 2002 and September of 2012.
23  A.   Yes.
24  Q.   Do you see that?
25  A.   Yes.

Page 44

1   Q.   Who reviews this policy, sir?
2   A.   The board of directors.
3   Q.   But you don't have any specific recollection of
4   reviewing it in February of 2012?
5   A.   No.
6   Q.   Do you see -- will you just read for the
7   record, please, sir, the purpose of the policy.
8   A.   "To identify the chain of command for
9   management of the center and their specific
10  responsibility."
11  Q.   And -- and "Physician Management," do you see
12  that, sir?
13  A.   Yes.
14  Q.   Will you read the first sentence of that
15  policy, please, sir.
16  A.   "The overall management of the center shall be
17  directed by the facility administrator through the
18  medical executive committee in conjunction with the
19  board of directors."
20  Q.   And this is an official policy of the Saint
21  Thomas Center?
22  A.   Yes.
23  Q.   Is it official policy that, according to its
24  policy title, governs the management of the center?
25  A.   Yes.

**Exhibit 71-Deposition of Butler**

**File under seal**

**Exhibit 73**

**File Under Seal.**


Δ π EXHIBIT 594
Deponent Butler
Date 9/17/15 Rptr. PW
WWW.DEPOBOOK.COM

## SERVICES AGREEMENT

THIS SERVICES AGREEMENT (the "Agreement") is made and entered into effective as of the 18th day of September, 2000 by and between NEUROLOGICAL SURGEONS, P.C., a Tennessee professional corporation (the "Group"), and SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC, a Tennessee limited liability company (the "Company").

### WITNESSETH:

WHEREAS, the Group is a group of neurological surgeons duly licensed to practice medicine in the State of Tennessee; and

WHEREAS, the Company is a limited liability company formed under and existing by virtue of the laws of the State of Tennessee for the purpose of establishing and operating an outpatient neurosurgical center (the "Center"); and

WHEREAS, the Company may desire to appoint the Group to provide certain services to the Center and the Group is willing to accept such appointment, subject to the terms and conditions set forth below;

NOW, THEREFORE, in consideration of the foregoing and, in accordance with the terms and conditions set forth below, the parties hereto agree as follows:

### ARTICLE I.
### ENGAGEMENT, SERVICES, AND AUTHORITY

Section I.1    Engagement. If the Company determines that it wishes to engage the Group to provide services upon the terms and conditions set forth herein, the Company shall provide executed, written notice to the Group in substantially the form attached hereto as Exhibit A setting forth those services the Company desires the Group to perform (the "Acceptance Notice"). If the Group desires to accept the engagement to provide such services under the terms and conditions set forth in this Agreement and the Acceptance Notice, the Group shall execute and return an executed copy of the Acceptance Notice to the Company. The executed Acceptance Notice shall be attached as an addendum to this Agreement.

Section I.2    Authority.

(a)    The Group represents and warrants that it has the right, power, legal capacity, and authority to enter into and perform its obligations under this Agreement, and further warrants that no approvals or consents of any person or entity other than the Group is necessary in connection with the execution of this Agreement by the Group.

(b)    The Company represents and warrants that the Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement, and further warrants that no approvals or consents of any person or entity other than the Company are necessary in connection with the execution of this Agreement.

Section I.3    Authority and Responsibilities of the Group.

(a)    Reliance. In furtherance of the objectives of this Agreement, the Group shall be entitled to rely upon instructions received from the Company, as to any and all acts to be performed by the Group.

(b)    Construction. The grant of express authority to the Group with regard to specific matters by this Agreement is not intended by the Company to be narrowly construed for the purpose of restricting the authority of the Group.

Section I.4    Control Retained by the Company. The Company shall at all times exercise control over the assets and operation of the Center, and the Group shall perform those services as directed in the Acceptance Notice in accordance with policies, directives, budget and By-Laws adopted by the Company. By entering into this Agreement and delivering an Acceptance Notice, the Company does not delegate to the Group any of the powers, duties, and responsibilities vested in the Company by law. The Company may, consistent with the terms of this Agreement, direct the Group to implement policies and may adopt policy recommendations or proposals made by the Group. The Group and the Company each expressly disclaim any intent to form a partnership, association, or any other entity, or to become joint venturers in the operation of the Center by virtue of the execution of this Agreement or the provision of services hereunder and agree that the Group's services under this Agreement are provided on an independent contractor basis. The relationship created by this Agreement is one of principal (the Company) and agent (the Group).

Section I.5    Medical and Professional Matters. Under no circumstances shall the Group be responsible for any medical or professional matters. The Group may, however, consult with the Company and make recommendations concerning such matters.

## ARTICLE II.
## INSURANCE

If the Company engages the Group to provide any services hereunder, the Group shall be named an additional insured under all insurance policies procured by the Company with respect to the Center. The right of the Group to invoke the protection of such policies shall be severable from and independent of the Company's rights, and these policies shall not be terminable or non-renewable except upon thirty (30) days' written notice to the Group. No later than thirty (30) days following the delivery of an Acceptance Notice and thirty (30) days following the end of each policy year, the Company shall give to the Group a copy of the endorsements naming the Group an additional insured. Such insurance policies shall contain endorsements which reflect the primary liability of the Company's insurance carrier for all covered losses provided for herein, notwithstanding any insurance which may be maintained by the Group or any affiliate of the Group. The Company hereby waives any right of contribution with respect to the loss covered under such policies (or with respect to deductibles thereunder) against the Group or any of the Group's insurance carriers.

## ARTICLE III.
## COMPENSATION

The Company shall reimburse the Group for services provided hereunder as set forth in the Acceptance Notice(s) attached as addendum(s) to this Agreement.

## ARTICLE IV.
## CONFIDENTIAL INFORMATION

For the purpose of this Agreement, the term confidential information (the "Confidential Information") shall include the following: (i) all documents and other materials, including but not limited to, all memoranda, clinical manuals, handbooks, production books, educational material and audio or visual recordings, which contain information relating to the operation of the Center or its programs (excluding written materials distributed to patients in the operation of the Center as promotion for the Center), (ii) all methods, techniques and procedures utilized in providing services to patients in the Center not readily available through sources in the public domain, and (iii) all trademarks, trade names, service marks, or protected software of the Group and their related data files.

The Company acknowledges and agrees that the Confidential Information is owned by the Group and has been disclosed to it in confidence and with the understanding that it constitutes valuable business information developed by the Group at great expenditure of time, effort and money. The Company agrees that it shall not, without the express prior written consent of the Group, use the Confidential Information

for any purpose other than the performance of this Agreement. The Company further agrees to keep strictly confidential and hold in trust all Confidential Information and not disclose or reveal such information to any third party without the express prior consent of the Group.

Upon termination of this Agreement by either party for any reason whatsoever, the Company shall forthwith return to the Group all material constituting or containing Confidential Information and the Company shall not thereafter use, appropriate, or reproduce such information or disclose such information to any third party.

The provisions of this Article IV shall survive any termination or expiration of this Agreement.

The Group shall have the right to use any Confidential Information and any technical or business expertise obtained during the course of its engagement hereunder in connection with its management of any other facility.

## ARTICLE V.
## TERM AND TERMINATION

Section V.1   Term.   This Agreement shall commence on the date first written above and shall continue until terminated upon thirty (30) days written notice from one party to the other; provided, however, that in the event this Agreement is terminated prior to September 18, 2001, then the parties shall not enter into an agreement similar to this Agreement until on or after September 18, 2001. Any such notice may be given at the complete option of the giving party with or without cause.

Section V.2   Services.   Upon termination of this Agreement, the Group shall immediately discontinue providing any services which it had been providing to the Company pursuant to this Agreement.

Section V.3   Remedies Upon Termination.   Upon termination of this Agreement, the Group shall remove from the Center all property of the Group, and neither party shall have any further obligations under this Agreement except pursuant to Article III and Article IV of this Agreement. The Group shall be entitled to receive payment of all amounts unpaid but earned up to the date of termination, which payment shall be due on the date on which the Group vacates the Center's premises and relinquishes to the Company sole possession of any and all property of the Company, including financial records and other documents necessary for operation of the Center.

## ARTICLE VI.
## MISCELLANEOUS

Section VI.1 Assignment. This Agreement may not be assigned by either party without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any attempted assignment in violation of this section shall be null and void and of no force or effect.

Section VI.2 Indemnification.

(a) Company Indemnification. The Company agrees to indemnify and hold harmless the Group, its directors, officers, employees, agents, affiliates and shareholders, and their respective shareholders, directors, officers, employees and agents (collectively, a "Group Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees and expenses related to the defense of any claims) (a "Loss"), which may be asserted against any of the Group Indemnified Parties, including without limitation matters relating to: (i) alleged or actual failure by the governing body, board of directors and/or similar body of the Company to perform any of its duties; (ii) any pending or threatened medical malpractice or other tort claims asserted against the Group relating to the Center; (iii) any action against the Group brought by any of the Group's current or former employees for any action or inaction during the period when such employee was performing services for the Center; (iv) any act or omission by any Group employee assigned to the Center; and (v) any violation of any requirement applicable to the Center under any federal, state or local environmental, hazardous waste or similar law or regulation; provided that such Loss has not been caused by the gross negligence or willful misconduct of the Group Indemnified Party seeking indemnification pursuant to this Agreement.

(b) Group Indemnification. The Group agrees to indemnify and hold harmless the Company and its members, partners, or shareholders (as appropriate), its directors or governors (as appropriate), and its officers, employees and agents (collectively, a "Company Indemnified Party") from and against all Loss which may be asserted against any Company Indemnified Party as a result of the gross negligence or willful misconduct of the Group in connection with the performance by the Group of its duties hereunder; provided that such Loss has not been caused by the gross negligence or willful misconduct of the Company Indemnified Party seeking indemnification pursuant to this Agreement.

Section VI.3 Access to Books and Records.

(a) This Agreement. If it shall be determined or asserted that this Agreement is a contract between a provider and a subcontractor within the meaning of Section 1861(v)(1)(I) of the Social Security Act or any rules, regulations, or judicial or administrative interpretations or decisions promulgated or made pursuant to that Section, then the Group and the Company hereby agree that: (i) until the expiration of four (4) years after the furnishing of any service pursuant to this Agreement, each shall make available, upon written request of the Secretary of the Department of Health and Human Services (the "Secretary"), or upon written request of the Comptroller General, or any

of their duly authorized representatives, this Agreement and any books, documents, and records that are necessary to certify the nature and extent of the costs incurred by the Company or the Group with respect to this Agreement and the services provided pursuant to it, and (ii) if either the Group or the Company carries out any of the duties of this Agreement through a subcontract with a value or cost of $10,000 or more over a twelve (12)-month period with a related organization, that subcontract shall contain a clause to the effect that until the expiration of four (4) years after the furnishing of any services pursuant to the subcontract, the related organization shall make available, upon written request of the Secretary, or upon request of the Comptroller General, or any of their duly authorized representatives, the subcontract, and any books, documents, and records of such organization as are necessary to verify the nature and extent of the costs incurred with respect to the subcontract and the services provided pursuant to it. This Agreement shall be automatically and retroactively amended, without the necessity of any action by the parties to it, to include the terms of any rules, regulations, or judicial or administrative interpretations or decisions promulgated or made under Section 1861(v)(1)(I) of the Social Security Act, to the extent that the terms of such rules, regulations, interpretations or decision differ from the provisions of this Section 8.4. Such automatic and retroactive amendment shall be deemed to have become effective on the effective date of the amendment.

(b) <u>Subcontracts</u>. If it shall be determined or asserted that any contract which the Group enters into for and on behalf of the Company pursuant to the Group's duties under this Agreement is a contract between a provider and a subcontractor within the meaning of Section 1861(v)(1)(I) of the Social Security Act or any rules, regulations, or judicial or administrative interpretations or decisions promulgated or made pursuant to that Section, then the Group shall cause to be included in each such contract provisions which require that: (i) until the expiration of four (4) years after the furnishing of any service pursuant to that contract, the contractor shall make available, upon written request of the Secretary of the Department of Health and Human Services (the "Secretary") or upon written request of the Comptroller General, or any of their duly authorized representatives, that contract and any books, documents, and records of the subcontractor that are necessary to certify the nature and extent of the costs incurred by the Company of the subcontractor with respect to that subcontract and the services provided under it, and (ii) if either the Company or the contractor duties of the contract through a subcontract shall contain a clause to the effect that until the expiration of four (4) years after the furnishing of any services pursuant to the subcontract, the related organization shall make available, upon written request of the Secretary or the Comptroller General, or any of their duly authorized representatives, the subcontract and any books, documents, and records of such organization that are necessary to verify the nature and extent of the costs incurred with respect to the subcontract and the services provided pursuant to it. The Group shall further require that such contract or subcontract be automatically and retroactively amended, without the necessity of any action by the parties thereto, to include the terms of any rules, regulations, or judicial or administrative interpretations or decision promulgated or made under Section

1861(v)(1)(I) of the Social Security Act, to the extent that the terms of such rules, regulations, interpretations or decision differ from the terms of the contract or subcontract, and that such automatic and retroactive amendment shall be deemed to have become effective on the effective date of the amendment.

Section VI.4  Notices. All notices permitted or required by this Agreement shall be deemed given when in writing and delivered personally via overnight courier or deposited in the United States mail, postage prepaid, return receipt requested, addressed to the other party at the address set forth below or such other address as the party may designate in writing:

|  |  |
|---|---|
| To the Company: | Saint Thomas Outpatient Neurosurgical Center, LLC<br>4230 Harding Road, Suite 901<br>Nashville, Tennessee 37205 |
| with a copy to: | J.B. Hardcastle, Jr., Esquire<br>Boult, Cummings, Conners & Berry, PLC<br>414 Union Street, Suite 1600<br>Nashville, Tennessee 37219 |
| To the Group: | Neurological Surgeons, P.C.<br>Attn: Mark Mason<br>2410 Patterson Street<br>Suite 500<br>Nashville, TN 37203 |

Section VI.5  Entire Agreement; Modification and Change.  This Agreement contains the entire agreement between the Group and the Company and supersedes any and all prior agreements, arrangements, or understandings between the Group and the Company relating to the subject matter of this Agreement.  This Agreement, and any provision or time period specified in this Agreement, cannot be changed or modified except by another agreement in writing executed by both the Group and the Company.

Section VI.6  Headings.  The headings contained in this Agreement are for convenience of reference only and are not intended to define, limit, or describe the scope or intent of any provision of this Agreement.

Section VI.7  Severability.  If any provision of this Agreement or its application to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and application of its provisions to other persons or circumstances shall not be affected and shall be enforced to the greatest extent permitted by law.

Section VI.8  Governing Law.  This Agreement shall be deemed to have been made under, and shall be construed and interpreted in accordance with, the laws of the State of Tennessee and with any and all federal laws, including laws relating to Medicare, Medicaid, Tenncare and other third party payers.  In the event there is a change in such laws, whether by statute, regulation, agency or judicial decision, that has any material effect on any term of this Agreement, or in the event that counsel to one party determines that any term of this Agreement poses a risk of violating such laws, then the applicable term(s) of this Agreement shall be subject to renegotiation and either party may request renegotiation of the affected term or terms of this Agreement, upon written notice to the other party, to remedy such condition.  In the interim, the parties shall perform their obligations hereunder in full compliance with applicable law.

Section VI.9  Rights Cumulative; No Waiver.  No right or remedy in this Agreement conferred upon or reserved to either the Group or the company is intended to be exclusive of any other right or remedy, and each right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement, or now or hereafter legally existing upon the occurrence of an event of default under this Agreement.  The failure of either the Group or the Company to insist at any time upon the strict observance or performance of any of the provisions of this Agreement or to exercise any right or remedy as provided in this Agreement shall not impair the right or remedy or be construed as a waiver or other relinquishment of it with respect to subsequent defaults.

Section VI.10 Counterparts.    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section VI.11 Events Excusing Performance.  The Group shall not be liable to the Company for failure to perform any of the services required herein in the event of strikes, lock-outs, calamities, acts of God, unavailability of supplies or other events over which the Group has no control for so long as such events continue, and for a reasonable period of time thereafter.

Section VI.12 Attorneys' Fees.  If legal action is commenced by either party to enforce or defend its rights under this Agreement, the prevailing party in such action shall be entitled to recover its costs and reasonable attorneys' fee in addition to any other relief granted.

Section VI.13 Time is of the Essence.  Time is hereby expressly declared to be of the essence in this Agreement.

Section VI.14 Language Construction.  The language in all parts of this Agreement shall be construed, in all cases, according to its fair meaning, and not for or against either party hereto.  The parties acknowledge that each party has reviewed and

revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

DEREED-STNetwork00043

IN WITNESS WHEREOF, the Group and the Company have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

NEUROLOGICAL SURGEONS, P.C.

By: _____

Title: Mark Mason, Administrator


SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC

By: _____

Title: Tina Sullivan, RN   Director

0665117.01
034000-403 08/24/2000

- 10 -

# ARTICLES OF ORGANIZATION
# OF
# SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC

Pursuant to the provisions of §48-205-101 of the Tennessee Limited Liability Company Act, T.C.A. §48-201-101 et seq., the undersigned Organizer hereby adopts the following Articles of Organization of a limited liability company:

### Article I.

The name of the limited liability company is Saint Thomas Outpatient Neurosurgical Center, LLC (the "Company").

### Article II.

The address of the initial registered office of the Company shall be: Sherrard & Roe, PLC, 424 Church Street, Suite 2000, Nashville, Davidson County, Tennessee 37219. The initial registered agent at that office shall be John R. Voigt.

### Article III.

The name and address of the organizer of the Company are John R. Voigt, c/o Sherrard & Roe, PLC, 424 Church Street, Suite 2000, Nashville, Tennessee 37219.

### Article IV.

The Company will be Board managed.

### Article V.

The number of members at the date of the filing of the Articles is: two (2).

### Article VI.

The address of the principal executive office of the Company is: 4220 Harding Road, Ninth Floor, Nashville, Tennessee 37205.

### Article VII.

The Company shall not have the power to expel a member.

Exhibit 1192
RJC 2/23/2016

## Article VIII.

The Company shall dissolve only upon the occurrence of the events specified in the Operating Agreement of the Company (the "Dissolution Events"). The Dissolution Events may include less than all of the events listed in T.C.A. Section 48-245-101(a)(5)(A)-(K) or its successor provision.

## Article IX.

The Members shall not have the authority to bind the Company without specific authorization by vote of the members or Board of Governors pursuant to the terms of the Operating Agreement.

IN WITNESS WHEREOF, the undersigned has executed these Articles of Organization on this 9th day of December, 1999.

_____
John R. Voigt, Organizer