# EXHIBIT G

## In the Matter Of:

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

## VIDEOTAPED DEPOSITION OF DALE BATCHELOR, M.D.

*September 02, 2015*



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

```
 1                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2

 3

 4
     IN RE: NEW ENGLAND
 5   COMPOUNDING PHARMACY,
     INC. PRODUCTS LIABILITY      MDL No. 2419
 6   LITIGATION
                                  Master Dkt:
 7                                1:13-md-02419-RWZ
     ~~~~~~~~~~~~~~~~~~~~~~
 8   THIS DOCUMENT RELATES
     TO:
 9

10   All Actions

11
     ~~~~~~~~~~~~~~~~~~~~~~~
12

13
                  VIDEOTAPED DEPOSITION OF
14                  DALE BATCHELOR, M.D.

15
                        9:06 a.m.
16                   September 2, 2015

17

18            Suite 700, Roundabout Plaza
                 1600 Division Street
19                Nashville, Tennessee

20

21       Blanche J. Dugas, RPR, CCR No. B-2290

22

23

24

25
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Nationwide Coverage

Page 25

1   Q.  It was -- did you consider that to be part
2   of your job with St. Thomas Hospital?
3   A.  Yes.
4   Q.  Did you regularly attend St. Thomas
5   Outpatient Neurosurgical Center board meetings during
6   the time you served on the board?
7   A.  Yes.
8   Q.  Did you understand that as a -- did you
9   understand as a board member that the management of
10  STOPNC was vested in the board?
11  A.  The board had ultimate responsibility for
12  the operation of that entity.
13  Q.  Have you ever seen the operating agreement
14  for STOPNC?
15  A.  Yes.
16  Q.  Let me hand you what we've marked this as
17  Exhibit 174.
18      MR. CHALOS:  Does anybody need a
19  copy?
20      MS. PUIG:  Sure.  I'll take a copy.
21  Thank you.
22      MR. CHALOS:  Sorry, I don't have
23  another one.
24      MS. HAMPTON:  That's okay.
25  Q.  (By Mr. Chalos)  You've seen this document

Page 26

1   before, sir?
2   A.  Uh-huh (affirmative).  Yes.
3   Q.  I'll refer you, if I may, to Page 10,
4   Paragraph 3.1.  Tell me when you've had a chance to
5   read that.
6   A.  Yes.
7   Q.  Okay.  Does this paragraph accurately state
8   your understanding of the purpose of STOPNC?
9   A.  Yes.
10  Q.  If you look at the last sentence of that
11  paragraph, it says, "Further, the purpose of the
12  LLC" -- meaning STOPNC -- "shall be to support the
13  institutions sponsored by Ascension and to cooperate
14  with other institutions sponsored by Ascension."
15      Do you see that?
16  A.  Yes.
17  Q.  What does that mean?
18  A.  When I read it, my interpretation, I'm not
19  a lawyer, so I -- if it has a legal nuance, that's
20  beyond me.  So it's -- it says to support the
21  institution, that means that it -- I take it not to be
22  in opposition to the general philosophical stance of
23  Ascension or Ascension institutions.
24  Q.  What about "to cooperate with other
25  institutions sponsored by Ascension"?  What does that

Page 27

1   mean?
2   A.  Again, not to be at odds with your members
3   of the same entity, meaning Ascension, to be
4   cooperative.
5   Q.  If you would flip over to Page 16, I'd like
6   to direct your attention to Paragraph 7.1 which then
7   spills over to Page 17.  7.1, if you wouldn't mind
8   taking a look at that.
9   A.  Okay.
10      Okay.
11  Q.  This provides -- and I'm reading from the
12  second sentence on Page 17 -- that "The board of
13  governors of STOPNC may delegate such authority and
14  responsibility as it deems to be in the best interest
15  of the LLC to the managers."
16      Do you see that?
17  A.  Right.
18  Q.  Okay.  Did that, in fact, happen?  Did the
19  STOPNC board delegate the authority for managing the
20  business and affairs of STOPNC to managers?
21  A.  The board delegated the responsibility too
22  for the operations outside the board, yes.
23  Q.  To whom did they delegate those
24  responsibilities?
25  A.  To the management team of the

Page 28

1   neurosurgeons.
2   Q.  And that was the Howell Allen Group?
3   A.  They were Neurological Surgery at that
4   time, I think.
5   Q.  They ultimately became the Howell Allen
6   Group?
7   A.  Yes.
8   Q.  And they -- that group also appointed a
9   medical director for the clinic; is that right?
10  A.  I think that's correct.
11  Q.  Do you know who that was?
12  A.  Again, if memory serves me correctly, Dr.
13  Everett Howell.
14  Q.  Was he ultimately replaced by somebody
15  else?
16  A.  I don't know.
17  Q.  Do you know who the medical director of
18  STOPNC was in 2012?
19  A.  I cannot answer that for sure.
20  Q.  Other than attending board meetings for
21  STOPNC, what other actions did you take for STOPNC
22  while you served on the board, if any?
23  A.  Probably none.
24  Q.  Did you attend all of the STOPNC board
25  meetings while you were on the board for the

Page 29

1  organization?
2  A.  Not all of them.
3  Q.  They would -- the board would typically
4  meet four times a year; is that right?
5  A.  They would vary in frequencies, but that
6  sounds about right.
7  Q.  And if we assume there were about four
8  meetings a year, how many would you typically attend
9  in a given year?
10  A.  Typically most of them, three out of four
11  at least, if not four out of four, but not the
12  absolute all.
13  Q.  Did you have any role in approving any
14  policies for STOPNC while you were on the board?
15  A.  Policies would be presented by the MEC or
16  whomever to the -- and those would be approved by the
17  board.
18  Q.  Do you recall approving any policies
19  regarding pharmaceutical drugs purchased by the clinic
20  for sale and administration to patients?
21  A.  No.
22  Q.  Did you ever approve such policies?
23  A.  No.
24  Q.  Did you have any role in connection with
25  approving a formulary for STOPNC?

Page 30

1  A.  Not that I recall.
2  Q.  Have you ever seen a formulary for STOPNC?
3  A.  Again, not that I recall.
4  Q.  Do you know whether STOPNC had a policy
5  regarding whether it could purchase drugs from
6  compounders?
7  A.  No.
8  Q.  That wasn't a very good question.
9      Did STOPNC, to your knowledge, have a
10  policy regarding whether it could purchase drugs from
11  compounders?
12  A.  Not to my knowledge.
13  Q.  Prior to the meningitis outbreak in 2012,
14  do you recall any discussions about purchasing --
15  about STOPNC purchasing drugs from compounders?
16  A.  No.
17  Q.  Did STOPNC have an equivalent of the PTAC
18  committee that existed at St. Thomas Hospital?
19  A.  I don't know.
20  Q.  Did you ever serve on a committee like a
21  PTAC committee for STOPNC?
22  A.  No.
23  Q.  Did you ever serve as a medical director of
24  STOPNC?
25  A.  No.

Page 31

1  Q.  Did you ever serve as the chief medical
2  officer of STOPNC?
3  A.  No.
4  Q.  Did anyone from STOPNC ever seek your
5  medical judgment on any issue?
6  A.  Not to my knowledge.
7  Q.  If someone from STOPNC had asked for your
8  medical judgment on an issue, would you have given it?
9  A.  Probably.
10  Q.  Why do you say probably? Is there a chance
11  you might not have?
12  A.  Well, no, it's very simple. My
13  relationship with STOPNC was a board member, not as a
14  medical advisor. But if somebody came to me in the
15  hallway and asked me a question about eyeballs and how
16  they related to neurologic procedures, I probably
17  would opine at that point trying to help him out as a
18  doctor but not as a CMO and not as a board member of
19  STOPNC.
20  Q.  Do you know. Well, strike that.
21      Did anyone, to your knowledge, from STOPNC
22  ever seek Marty Kelvas's pharmaceutical advice on any
23  issue?
24  A.  Not that I know of.
25  Q.  Would Mr. Kelvas have provided his opinion

Page 32

1  if asked by someone from STOPNC?
2      MR. GIDEON: I object to the outright
3  speculation.
4      MS. PUIG: Object to form. You can
5  go ahead and answer if you know.
6      THE WITNESS: I have no clue what
7  Marty would do.
8  Q.  (By Mr. Chalos) Have you ever talked with
9  Marty Kelvas about the meningitis outbreak in 2012?
10  A.  I talked to him probably in September of
11  2012 when all this was swirling about.
12  Q.  What did you talk to him about?
13  A.  I was getting his opinion on compounding,
14  and this is when the facts were slowly but surely
15  rising to the surface.
16  Q.  Okay. What did he say to you?
17  A.  Best of my recollection, he said that he
18  did not use compounding labs and he didn't like the
19  concept.
20  Q.  Didn't like what concept?
21  A.  The use of compounding labs outside the
22  facility.
23  Q.  Did he say why?
24  A.  I'm sure he did, but I can't remember.
25  Q.  Did you say anything else to Mr. Kelvas

Page 33

1    that you recall?
2    A.   No. It was a very short conversation.
3    Q.   Did he say anything about the safety of
4    compounded drugs from outside laboratories?
5         MS. PUIG: Before or after the
6    outbreak, Counsel?
7         MR. CHALOS: During the conversation
8    he's talking about.
9         THE WITNESS: The outbreak was
10   ongoing as we had this very brief
11   discussion. I think he did voice some
12   concern about the safety, but...
13   Q.   (By Mr. Chalos) What did he say, as best
14   you can recall?
15   A.   I honestly cannot recall.
16   Q.   Okay. Where did that conversation -- where
17   did that conversation happen?
18   A.   Somewhere within the environments of the
19   hospital.
20   Q.   Was anybody else present?
21   A.   I really have no recollection.
22   Q.   Did you just happen to run into him in the
23   hospital?
24   A.   Yeah. At this point we had a lot of
25   activity going on.

Page 34

1    Q.   Prior to the outbreak, did you have any
2    conversations with Mr. Kelvas about the safety of
3    compounders?
4    A.   No.
5    Q.   Prior to the outbreak, did you have
6    conversations with anyone about the safety of
7    compounded drugs?
8    A.   No.
9         VIDEOGRAPHER: Excuse me, would you
10   mind if we take a break again? I'm so
11   sorry.
12        MR. CHALOS: Sure.
13        VIDEOGRAPHER: We're off the record
14   at 9:51.
15        (A recess was taken.)
16        VIDEOGRAPHER: Okay. We're back on
17   the record at 10:08.
18   Q.   (By Mr. Chalos) Did you view, Dr.
19   Batchelor, part of your role as a board member of
20   STOPNC to be looking out for the safety of STOPNC
21   patients?
22   A.   As a member of any organization that's
23   healthcare related, you always have to have patient
24   safety in mind. That's the role of whatever you're
25   doing.

Page 35

1    Q.   Why is that?
2    A.   Well, patient safety is ultimately one
3    thing that you're charged to protect as best as
4    possible.
5    Q.   And would you agree that an organization
6    should never put money profits over patient safety?
7         MR. GIDEON: Objection to the form.
8         MS. PUIG: Object to form.
9    Q.   (By Mr. Chalos) You may answer.
10   A.   Profits should not trump safety.
11   Q.   That was true for STOPNC as well?
12   A.   Yes.
13        MR. GIDEON: Objection to form.
14        THE WITNESS: Yes.
15   Q.   (By Mr. Chalos) Did you in your capacity
16   as either a board member of STOPNC or chief medical
17   officer of St. Thomas Hospital provide any
18   credentialing services to STOPNC?
19   A.   Did I?
20   Q.   Yes, sir.
21   A.   I personally didn't provide credentialing
22   services. The STOPNC -- the STOPNC used the services
23   of medical affairs to credential their doctors,
24   medical affairs at the hospital.
25   Q.   Okay. So STOPNC used St. Thomas Hospital's

Page 36

1    medical affairs office to do credentialing for the
2    STOPNC physicians?
3    A.   Right.
4    Q.   Do you know what type of credentialing was
5    done by St. Thomas Hospital for STOPNC physicians?
6    A.   It was general medical staff credentialing.
7    You did verification of licensure, federal check,
8    compliance and those kind of issues.
9    Q.   Are you familiar with the credentialing
10   process?
11   A.   Yes.
12   Q.   Okay. What would the credentialing process
13   at St. Thomas Hospital -- let's say in 2012, what
14   would that involve?
15   A.   Well, you have physicians that would apply
16   for membership to the medical staff. They would
17   complete an application for it, outline their
18   qualifications, their training, their certifications,
19   their references, and all that has to be source
20   verified.
21        So there was a staff that their job was to
22   collect that data, document it, document their
23   licensure with the state and present a file and then
24   the file was voted on, approved or disapproved by the
25   medical executive committee. And once it was