# EXHIBIT H

# In the Matter Of:

## NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

## VIDEOTAPED DEPOSITION OF CINDY WILLIAMS

*July 29, 2015*



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2

 3

    IN RE:  NEW ENGLAND             )
 4  COMPOUNDING PHARMACY,           )
    INC. PRODUCT LIABILITY          )
 5  LITIGATION.                     )
                                    )MDL NO. 2419
 6                                  )Master Dkt:
    THIS DOCUMENT RELATES TO:       )1:13-md-02419-RWZ
 7                                  )
    All Actions                     )
 8  _____  )

 9

10

11

12
              VIDEOTAPED DEPOSITION OF:
13
              CINDY WILLIAMS
14
              Taken on behalf of the Plaintiffs
15
              July 29, 2015
16

17

18

19
    _____
20
              CARISSA L. BOONE, LCR, RPR
21

22

23

24

25
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2820-8   Filed 04/20/16   Page 4 of 6

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF CINDY WILLIAMS on 07/29/2015          Pages 10..13

Page 10

1  A.   Yes, I've moved some.
2  Q.   And before going to work for St. Thomas,
3  did you have any other jobs in the healthcare
4  industry?
5  A.   I did.  I worked for -- I started out
6  with what was West Side Hospital, which is an
7  HCA facility, and then it moved into being
8  Centennial Medical Center.
9  Q.   Okay.  And how long did you work for
10 West Side/Centennial?
11 A.   Five years.
12 Q.   Before that, did you have any other
13 healthcare experience?
14 A.   No.  I was a student.
15 Q.   What -- and generally, what is your
16 educational background?
17 A.   I have a Bachelor's degree from the
18 University of Alabama.
19 Q.   What is currently your job title?
20 A.   Director of Managed Care Joint Venture
21 Contracting.
22 Q.   Okay.  And how long has that been your
23 title?
24 A.   I'm not sure I could put an actual time
25 frame on it.  I've had multiple titles through

Page 11

1  my 22 years, but I would say at least five, ten
2  years.
3  Q.   Okay.  And who do you report to?
4  A.   Nancy Armour Barker.
5  Q.   And what is her title?
6  A.   Vice President Managed Care.
7  Q.   Do you know who she reports to?
8  A.   Craig Polkow.
9  Q.   And what is his title?
10 A.   Chief Financial Officer for the System.
11 Q.   And do you supervise other employees?
12 A.   No.  We're a very small department.
13 Q.   All right.  So there's -- is there anyone
14 who reports to you?
15 A.   No.
16 Q.   And are your job duties today basically
17 the same as they have been for, say, the past
18 five years?
19 A.   All in all, yes.
20 Q.   Explain what your job duties are.
21 A.   I provide managed care services to our
22 employed physicians and to our joint venture
23 entities.
24 Q.   What does that mean, "joint venture
25 entities"?

Page 12

1  A.   Joint ventures, in my terminology, is
2  when we, St. Thomas Health, have an ownership
3  with another company for a facility.
4  Q.   So the entity known as St. Thomas
5  Outpatient Neurosurgical Center is one of the
6  joint venture entities that you're referring to;
7  is that correct?
8  A.   Yes, sir.
9  Q.   And so part of your job responsibilities
10 includes negotiating managed care contracts for
11 that particular joint venture; is that true?
12 A.   I facilitate those contracts, correct.
13 Q.   All right.  What does that mean, to
14 "facilitate those contracts"?
15 A.   Because -- what it means is that I act in
16 a messenger model role, that I represent the
17 venture to the payors.
18 Q.   Okay.
19 A.   So anything that is done is on the
20 direction of the facility.
21 Q.   So you take direction from the St. Thomas
22 Outpatient Neurosurgical Center when you are
23 facilitating a managed care contract for them?
24 A.   Correct.
25 Q.   Does that mean that you help them

Page 13

1  negotiate the contract with the payor?
2  A.   I'm not sure exactly the defi- --
3  definition of -- you're saying negotiate.  I
4  mean, yes, I -- I take a rate to them.  I kind
5  of let them know where they sit in the
6  marketplace.  They make the decision based upon
7  their financials, if it's something they want to
8  accept.  I turn around, I work with the managed
9  care companies, letting them know what the payor
10 -- I mean what the facility is wanting.  So if
11 that's what you call "negotiating," yes.
12 Q.   Okay.  So -- so you're kind of at the
13 intersection between the St. Thomas Outpatient
14 Neurosurgical Center and the -- the companies or
15 Government entities that pay that -- that
16 facility; is that true?
17 A.   You could say that.  I'm their contact,
18 yes.
19 Q.   Okay.  And -- and who's -- what -- what
20 entity specifically is your employer?
21 A.   St. Thomas Health.
22 Q.   Okay.  And so when you do -- do work for
23 the St. Thomas Outpatient Neurosurgical
24 Center --
25 A.   Uh-huh.


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF CINDY WILLIAMS on 07/29/2015          Pages 14..17

Page 14

1  Q.     -- can you give us some examples of the
2  types of payors that you interact with?
3  A.     Our major payors in the Middle Tennessee
4  market are Blue Cross, Aetna, Cigna, United,
5  HealthSpring.  So when contracts are up for
6  renewal, when contract terms are finalized that
7  at this point in time we need to reach back out,
8  I will reach back out and negotiate.  As I've
9  mentioned, what we were talking about
10 negotiating with that particular insurance
11 company.
12        I also provide credentialing services.
13 If they continue to have billing issues with the
14 payor -- because that is a frequent thing;
15 payors don't always pay correctly -- they --
16 they, the center, will reach back out to me to
17 see if contractually if the -- the payor is
18 paying based upon our contract.  And so I will
19 review the contract and work with them in that
20 capacity.
21 Q.     Okay.  So I take it, then, that you --
22 now, if I refer to St. Thomas Outpatient
23 Neurosurgical Center, that's kind of a mouthful.
24 Sometimes I might refer to it as St. Thomas
25 Neurosurgical.  If I do that, will you

Page 15

1  understand that I'm referring to the St. Thomas
2  Outpatient Neurosurgical Center?
3  A.     Yes, sir.  There's several acronyms that
4  you can use for them.
5         MS. PUIG:  Like STOPNC?
6  BY MR. NOLAN:
7  Q.     Sure.  And so -- so if I understand your
8  testimony, on the front end of St. Thomas
9  Neurosurgical's relationship with the payor, you
10 help that facility negotiate or facilitate how
11 much it's going to get paid for the -- for what
12 it provides to patients, correct?
13 A.     As much as the translation back and
14 forth, yes.
15 Q.     All right.  And then if there are
16 problems with St. Thomas Neurosurgical actually
17 being paid for what it provides to patients, you
18 might become involved in that issue as well; is
19 that true?
20 A.     Yes, sir.
21 Q.     And you also mentioned that you provide
22 credentialing services?
23 A.     Yes, sir.
24 Q.     And what does that mean?
25 A.     An insurance company must credential a

Page 16

1  facility, a provider or anyone providing
2  services.  And they have applications that are
3  standard applications that are -- request
4  information on the facility.  So those go out on
5  a regular basis.  So because of the various
6  insurance companies, you have them coming to you
7  at different times throughout the year.  So some
8  facilities credential every year, some every
9  three years.  And so those applications come to
10 me or to the facility and are passed over to me,
11 and I gather the data and the information to
12 submit those back to the insurance company.
13 Q.     So you actually fill out the applications
14 on behalf of the -- St. Thomas Neurosurgical?
15 A.     At times I have, yes.
16 Q.     Is that the normal course?
17 A.     Yes, it is.
18 Q.     All right.  So why does St. Thomas
19 Neurosurgical not fill out its own applications
20 for -- to be credentialed by these payors?
21 A.     As a joint venture, they have contracted
22 with us for managed care services.  And that is
23 one of the services that fall into managed care
24 contracting.
25 Q.     Why does St. Thomas Neurosurgical not

Page 17

1  negotiate its own payment contracts with these
2  payors?
3  A.     I'm not sure.  It was a decision made
4  when the center was formed --
5  Q.     Okay.
6  A.     -- to purchase service.
7  Q.     What do you know about the formation of
8  St. Thomas Neurosurgical?
9  A.     I know it is a joint venture partnership
10 between St. Thomas Network and a physician group
11 named Howell Allen.
12 Q.     And how did you learn that?
13 A.     Those are pieces of information that have
14 to be provided to me in order for me to complete
15 credentialing information.
16 Q.     I see.  And do you recall who provided
17 that information to you?
18 A.     No, sir.  Too long ago.
19 Q.     All right.  Let me -- let me hand you a
20 document that I'm going to make Exhibit No. 517.
21        (Exhibit 517 was marked.)
22 BY MR. NOLAN:
23 Q.     And I want to get you just to tell us
24 what this -- what this is (tendering).
25 A.     Are you ready?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF CINDY WILLIAMS on 07/29/2015      Pages 30..33

Page 30

1  A.    I'm not license [sic] person that can
2  tell you exactly what that defines itself as.
3  But, typically, there are a set of procedures
4  that fall under a licensed facility that they
5  are able to perform surgical and certain
6  procedures.  I'm not Clinical.
7  Q.    And so am I correct that how a particular
8  entity is licensed can affect the rates that it
9  receives for various things that it provides to
10 patients from the payors?
11 A.    I'm not sure that licensing -- well,
12 okay.  You have to be licensed in order for a
13 facility to even pay you because that does not
14 -- if you are not licensed, then you do not meet
15 their criteria in order for them to legally be
16 able to pay you.
17 Q.    Okay.
18 A.    Is there a rate compared to a diff- -- a
19 specific license?  I can tell you that a payor
20 has different rates -- different ways of paying
21 based upon what type of facility they are.
22 Q.    I see.
23 A.    Ambulatory surgery centers are paid on
24 what's called a fee schedule for outpatient
25 surgeries.  Hospitals are paid a different way.

Page 31

1  A physician's practice is paid a different way.
2  So I guess to answer your question, yes, based
3  upon how you are licensed puts you in a category
4  of how you are paid.
5  Q.    What about pain clinics, are they paid on
6  a different scale, so to speak, as opposed --
7  A.    No --
8  Q.    -- to an ambulatory surgery center?
9  A.    My -- again, I'm -- I'm sorry.  I wasn't
10 supposed to --
11 Q.    That's all right.  Let's -- let's --
12 let's start over.
13       MS. PUIG:  Let him finish the
14 question.
15       THE WITNESS:  Okay.  Yeah, sorry.
16 BY MR. NOLAN:
17 Q.    The question is:  What about pain clinics
18 that aren't licensed as surgery centers, they're
19 licensed as clinics?  Are they paid on a
20 different scale, so to speak, as ambulatory
21 surgery centers?
22 A.    I do not provide services for a pain
23 clinic, so I cannot tell you how they're paid.
24 Q.    Other than ambulatory surgery centers and
25 hospitals, what other types of entities do you

Page 32

1  provide services for?
2  A.    Free-standing imaging centers.
3  Q.    Okay.
4  A.    A sleep center and hospitals.  And,
5  again, physicians.
6  Q.    You -- what about physician groups?
7  A.    Just the one that I had referenced
8  earlier that St. Thomas Health owns.  We have a
9  very large multispecialty group.
10 Q.    Other than the St. Thomas Center, do you
11 provide any services for any other entity that
12 provides epidural steroid injections to
13 patients?
14 A.    There is one other surgery center that is
15 affiliated with our imaging center that I
16 believe provides epidural injections, but I
17 cannot confirm.  I -- it's a relatively new
18 center that I've just started working with.
19 Q.    And what's the name of that facility?
20 A.    Rads of America.
21 Q.    Rads of America?
22 A.    Uh-huh.
23 Q.    Who owns that entity?
24 A.    That's a very complicated question.  We,
25 through St. Thomas, have a [sic] ownership in it

Page 33

1  with our partners Middle Tennessee Imaging.  It
2  was the formation of it.  Premier Radiology --
3  to be truthfully honest, I can't tell you
4  exactly the ownership.  I can give you names of
5  people that have affiliation with it, Advanced
6  Diagnostic Imaging, which is the physicians.
7  But, again, it's -- it's a very -- that's a
8  legal thing that I'm not sure how they have
9  structured the ownership.
10 Q.    Okay.  Do you provide managed care
11 contract services to any entity that is not
12 affiliated with St. Thomas Health?
13 A.    No, sir.
14 Q.    When you provide services to St. Thomas
15 Neurosurgical, do you record your time in any
16 way?
17 A.    No, sir.
18 Q.    Do you know whether St. Thomas Health
19 sends any sort of an invoice to St. Thomas
20 Neurosurgical for the specific work that you do?
21 A.    They do.
22 Q.    Let me hand you a document we're going to
23 make Exhibit No. 520.
24       (Exhibit 520 was marked.)
25 BY MR. NOLAN:


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com